```
 1          IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -   -   -
 5
          IN RE:  NATIONAL      :   HON. DAN A.
 6        PRESCRIPTION OPIATE    :   POLSTER
          LITIGATION             :
 7                               :
          APPLIES TO ALL CASES   :   NO.
 8                               :   1:17-MD-2804
                                 :
 9
             - HIGHLY CONFIDENTIAL -
10
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       -   -   -
12
                   July 19, 2018
13
                       -   -   -
14
15          Videotaped deposition of
       MICHAEL ORIENTE, taken pursuant to
16     notice, was held at the law offices of
       Weitz & Luxenberg, 700 Broadway, New York
17     New York, beginning at 9:01 a.m., on the
       above date, before Michelle L. Gray, a
18     Registered Professional Reporter,
       Certified Shorthand Reporter, Certified
19     Realtime Reporter, and Notary Public.
20                     -   -   -
21
            GOLKOW LITIGATION SERVICES
22     877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY PROCTOR, P.A.
BY: MIKE PAPANTONIO, ESQUIRE
    ARCHIE C. LAMB, JR., ESQUIRE
316 South Baylen Street
Pensacola, Florida 32502
(850) 435-7000
mpapantonio@levinlaw.com
alamb@levinlaw.com

   - and -

WEISMAN KENNEDY & BERRIS CO LPA
BY: ERIC KENNEDY, ESQUIRE
    BRIAN ASQUITH, ESQUIRE
1600 Midland Building
101 W. Prospect Avenue
Cleveland, Ohio 44115
(216) 781-1111
ekennedy@weismanlaw.com
basquith@weismanlaw.com

   - and -

NAPOLI SHKOLNIK, PLLC
BY: SHAYNA E. SACKS, ESQUIRE
360 Lexington Avenue, 11th Floor
New York, New York 10017
(212) 397-1000
Ssacks@napolilaw.com
   - and -
GRAY & WHITE LAW
BY: MARK K. GRAY, ESQUIRE
713 East Market Street
Louisville, Kentucky 40202
(502) 805-1800
Mgray@grayandwhitelaw.com
Representing the Plaintiffs

Page 3

APPEARANCES: (Cont'd.)

COVINGTON & BURLING, LLP
BY: EMILY JOHNSON HENN, ESQUIRE
333 Twin Dolphin Drive, Suite 766
Redwood Shores, California 94065
(650) 632-4715
Ehenn@cov.com
   - and -
COVINGTON & BURLING, LLP
BY: EMILY KVESELIS, ESQUIRE
850 Tenth Street, NW
Suite 586N
Washington, D.C. 20001
Ekveselis&cov.com
(202) 662-5110
Representing the Defendant, McKesson
Corporation

MARCUS & SHAPIRA, LLP
BY: JAMES F. ROSENBERG, ESQUIRE
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
(412) 338-4683
Rosenberg@marcus-shapira.com
Representing the Defendant, HBC
Service Company

REED SMITH, LLP
BY: NEIL A. HLAWATSCH, ESQUIRE
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8245
nhlawatsch@reedsmith.com
Representing the Defendant,
Amerisource Bergen Drug Corporation

Page 4

APPEARANCES: (Cont'd.)

JONES DAY
BY: LAURA JANE DURFEE, ESQUIRE
2727 North Harwood Street
Dallas, Texas 75201
(214) 220-3939
Ldurfee@jonesday.com
Representing the Defendant, Walmart

MORGAN LEWIS & BOCKIUS, LLP
BY: CAROLYN A. SILANE, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6734
Csilane@morganlewis.com
Representing the Defendant, Rite Aid
of Maryland

PELINI CAMPBELL & WILLIAMS, LLC
BY: ERIC J. WILLIAMS, ESQ.
8040 Cleveland Avenue NW
Suite 400
North Canton, Ohio 44720
(330) 305-6400
ejwilliams@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

DECHERT, LLP
BY: DEBRA D. O'GORMAN, ESQUIRE
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500
Debra.ogorman@dechert.com
Representing the Defendant, Purdue
Pharmaceuticals

Page 5

APPEARANCES: (Cont'd.)

ZUCKERMAN SPAEDER LLP
BY: CONOR B. O'CROININ, ESQUIRE
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
(410) 949-1160
Cocroinin@zuckerman.com
Representing the Defendant, CVS

ARNOLD & PORTER KAYE SCHOLER, LLP
BY: ANGELA R. VICARI, ESQUIRE
250 West 55th Street
New York, New York 10019
(212) 836-8214
Angela.vicari@apks.com
Representing the Defendants, Endo
Health Solutions; Endo
Pharmaceuticals, Inc.; Barr
Pharmaceutical, Inc.; and Barr
Pharmaceutical Company, Inc.

TELEPHONIC APPEARANCES:

SEEGER WEISS, LLP
BY: DAVID R. BUCHANAN, ESQUIRE
77 Water Street
New York, New York 10005
(212) 584-0700
Dbuchanan@seegerweiss.com
- and -
SPANGENBERG SHIBLEY & LIBER, LLP
BY: DUSTIN B. HERMAN, ESQUIRE
1001 Lakeside Avenue East
Suite 1700
Cleveland, Ohio 44114
(216) 696-3232
Dherman@spanglaw.com
- and -
WEISMAN KENNEDY & BERRIS CO LPA
BY: DANIEL P. GOETZ, ESQUIRE
1600 Midland Building
101 W. Prospect Avenue
Cleveland, Ohio 44115
(216) 781-1111
Dgoetz@weismanlaw.com
- and -
NAPOLI SHKOLNIK, PLLC
BY: JOSEPH L. CIACCIO, ESQUIRE
360 Lexington Avenue, 11th Floor
New York, New York 10017
(212) 397-1000
jciaccio@napolilaw.com

- and -

TAFT STETTINIUS & HOLLISTER, LLP
BY: CHOU-IL LEE, ESQUIRE
One Indiana Square
Indianapolis, Indiana 46204
(317) 713-3519
Clee@taftlaw.com

TELEPHONIC APPEARANCES: (Cont'd.)

- and -

GREENE KETCHUM, LLP
PAUL T. FARRELL, JR., ESQUIRE
419 11th Street
Huntington, West Virginia 25701
(304) 521-4778
Paul@greeneketchum.com
- and -
GARSON JOHNSON, LLC
BY: JAMES A. DEROCHE, ESQUIRE
101 West Prospect Avenue, Suite 1600
Midland Building
Cleveland, Ohio 44115
(216) 696-7009

- and -

LAW OFFICE OF LUKE D. MAHONEY
BY: LUKE DANIEL MAHONEY, ESQUIRE
1200 Ontario St
Cleveland, Ohio 44113
(216) 443-7800
Representing the Plaintiffs

APPEARANCES: (Cont'd.)

ROPES & GRAY, LLP
BY: JOSH GOLDSTEIN, ESQUIRE
800 Boylston Street
Boston, Massachusetts 02199
(617) 951-7234
Josh.goldstein@ropesgray.com
Representing the Defendant,
Mallinckrodt

WILLIAMS & CONNOLLY, LLP
BY: MATTHEW C. MONAHAN, ESQUIRE
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
Mmonahan@wc.com
Representing the Defendant, Cardinal
Health

KIRKLAND & ELLIS, LLP
BY: KAITLYN COVERSTONE, ESQUIRE
300 North LaSalle Street
Chicago, Illinois 60654
(312) 862-7184
Kaitlyn.coverstone@kirkland.com
Representing the Defendant, Allergan

MORGAN LEWIS BOCKIUS LLP
BY: ZACHARY R. LAZAR, ESQUIRE
77 West Wacker Drive
Chicago, Illinois 60601
(312) 324-1492
Zachary.lazar@morganlewis.com
Representing the Defendants, Teva
Pharmaceuticals, Inc. Cephalon Inc,
Watson Laboratories, Actavis LLC,
Actavis Pharma, Inc.

APPEARANCES: (Cont'd.)

JACKSON KELLY, PLLC
BY: DOUGLAS J. CROUSE, ESQUIRE
500 Lee Street East, Suite 1600
Charleston, West Virginia 25301
(304) 340-1347
Dcrouse@jacksonkelly.com
Representing the Defendant,
Miami-Luken

ALSO PRESENT:

VIDEOTAPE TECHNICIAN:

Henry Marte

LITIGATION TECHNICIAN:
Evan Wolfe

ALSO PRESENT:

Carol Moore
Sarah Merced
Sara Papantonio
Olivia Bergert
(Levin Papantonio)

Donna Rozman
(Weisman Kennedy)

- - -

Highly Confidential - Subject to Further Confidentiality Review

- - -
I N D E X
- - -

Testimony of:          MICHAEL ORIENTE

By Mr. Papantonio      25, 583
By Mr. Kennedy         321, 603
By Ms. Henn                575
By Mr. O'Croinin           598

- - -
E X H I B I T S
- - -

NO.            DESCRIPTION        PAGE
MCK-Oriente-515  GAO State        332
        Monitoring Programs
        Provide Useful
        Tool to Reduce
        Diversion
        P1.1076

MCK-Oriente-518  Memo for ASA     338
        Hutchinson
        Subject, Review
        Of the DEA
        Report No. I-2002-010
        P1.1086

- - -
E X H I B I T S (Cont'd.)
- - -

NO.             DESCRIPTION       PAGE
MCK-Oriente-529  Threshold        437
        Change Form
        12/30/09
        P1.1243
        MCKMDL00385989-95

MCK-Oriente 535  CVS to Pay       550
        Penalty in
        Methamphetamine
        Case
        P1.5005.1

MCK-Oriente-062  McKesson         314
        Operations Manual
        P1.345
        MCKMDL000002509-539
MCK-Oriente-020  E-mail Thread    306
        8/18/11
        Subject, McKesson
        Marketing Opportunities
        Actavis Oxymorphone ER
        P1.113
        ACTAVIS0623837-40
MCK-Oriente-322  DOJ,             292
        Biopharmaceutical
        Company, Cephalon to
        Pay 425 Million
        P1.1381

- - -
E X H I B I T S (Cont'd.)
- - -

NO.             DESCRIPTION       PAGE
MCK-Oriente-519  Follow-Up Review 343
        Of the DEA Efforts
        To Control the
        Diversion of
        Controlled
        Pharmaceuticals
        July 2006
        P1.1088

MCK-Oriente-525  Threshold        436
        Change Form
        12/30/09
        P1.1228
        MCKMDL00368716-22

MCK-Oriente-526  Threshold        437
        Change Form
        12/30/09
        P1.1236
        MCKMDL00381960-66

MCK-Oriente-527  Threshold        437
        Change Form
        12/30/09
        P1.1239
        MCKMDL00382971-77

MCK-Oriente-528  Threshold        437
        Change Form
        12/30/09
        P1.1240
        MCKMDL00383396-02

- - -
E X H I B I T S (Cont'd.)
- - -

NO.             DESCRIPTION       PAGE
MCK-Oriente-279  McKesson         283
        Manufacturer
        Marketing Contract
        P1.1317
        MCKMDL00353368-69
MCK-Oriente-144  McKesson         278
        Manufacturer
        Marketing Product
        Promotional Agreement
        P1.1154
        MCKMDL00353305-06

MCK-Oriente-060  Death Map        584
        P1.324
MCK-Oriente-383  In the Matter    30
        Of McKesson
        Corporation
        P1.1428
        MCKMDL00409050-112
MCK-Oriente-503  US DOJ           569
        CVS Pharmacy Inc.
        Pays 5 Million to
        Settle
        P1.296
MCK-Oriente-504  US DOJ           568
        US Reaches 8 Million
        Settlement
        P1.297

MCK-Oriente-506  US DOJ           568
        CVS to Pay 3.5
        Million
        P1.300

Highly Confidential - Subject to Further Confidentiality Review

Page 14

```
1              - - -
2      E X H I B I T S  (Cont'd.)
3              - - -
4
5  NO.          DESCRIPTION      PAGE
6  MCK-Oriente-507  US DOJ        566
              Drug Diversion
7             Claims Against
              CVS
8             P1.301
9  MCK-Oriente-511  US DOJ        560
              CVS to Pay
10            11 Million
              P1 .305
11
   MCK-Oriente-534  5 Things      554
12            News Letter
              DEA Moves Against
13            Two Florida
              Pharmacies
14            P1.5004.1
15 MCK-Oriente-537  CVS DEA       570
              Settlements
16            Total Paid
              130.6 Million
17            P1.5007
18 MCK-Oriente-544  Giant Eagle   410
              Threshold Change
19            Form
              P1.5014.1
20            MCKMDL00364141-44
21 MCK-Oriente-545  PowerPoint    327
              Lifestyle Drugs &
22            Internet Pharmacies
              P1.5015.1
23            MCKMDL00403340-48
24
```

Page 15

```
1              - - -
2      E X H I B I T S  (Cont'd.)
3              - - -
4
5  NO.          DESCRIPTION      PAGE
6  MCK-Oriente-546  Threshold Change 401
              Form
7             11/28/08
              P1.5016
8             MCKMDL00000524
9  MCK-Oriente-539  Establishing  509
              Opioid Threshold
10            P1.5009
11 MCK-Oriente-541  CSMP          378
              P1.5011.1
12            MCKMDL00144473-86
13 MCK-Oriente-542  ISMC CSMP     389
              Outbound Calls
14            SF Pilot Program
              P1.5012.1
15            MCKMDL00317004-10
16 MCK-Oriente-543  RNA Threshold 467
              Change/Level 1
17            Form
              P1.5013.1
18            MCKMDL00000497-512
19 MCK-Oriente-547  E-mail Thread 445
              12/16/08
20            Subject, Could you
              Do Me a Favor
21            P1.5017.1
              MCKMDL00000515-18
22
23
24
```

Page 16

```
1              - - -
2      E X H I B I T S  (Cont'd.)
3              - - -
4
5  NO.          DESCRIPTION      PAGE
6  MCK-Oriente-548  Threshold Change 459
              Forms
7             11/26/08
              P1.5018.1
8             MCKMDL00000527-30
9  MCK-Oriente-559  CSMP          510
              Observation
10            Level 1
              Documentation Forms
11            P1.5030.1
12 MCK-Oriente-562  Memo, 4/1/10  518
              Subject, FY11
13            Compensation Plan
              P1.5035.1
14            MCKMDL00346787
15 MCK-Oriente-563  Settlement &  506
              Release Agreement
16            P1.5036.1
              MCKMDL00409289-99
17
   MCK-Oriente-567  E-mail Thread 536
18            9/26/12
              Subject, Good Day
19            #1
              P1.5040.1
20            MCKMDL00409355-57
21
22
23
24
```

Page 17

```
1              - - -
2      E X H I B I T S  (Cont'd.)
3              - - -
4
5  NO.          DESCRIPTION      PAGE
6  MCK-Oriente-564  E-mail Thread 490
              5/31/11
7             Subject, High
              Percentage
8             To Threshold
              Customers
9             P1.5037
              MCKMDL00409322
10
   MCK-Oriente-566  E-mail,       530
11            2/28/12
              Subject, CSMP
12            Omit v Report
              P1.5039
13            MCKMDL00409326
14 MCK-Oriente-569  E-mail Thread 532
              8/19/10
15            Subject, Sales
              Ride Along
16            P1.5042.1
              MCKMDL00409351-53
17
   MCK-Oriente-570  US DOJ Letter 498
18            8/13/14
              P1.5043.1
19            MCKMDL00409224-246
20 MCK-Oriente-571  CSMP          526
              Observation
21            Level 1
              Documentation
22            Forms
              P1.5044.1
23
24
```

Page 18

```
      - - -
E X H I B I T S (Cont'd.)
      - - -
NO.        DESCRIPTION      PAGE
MCK-Oriente-572  Handwritten     365
                 Demonstrative
                 When Made Increase
                 In Threshold

MCK-Oriente-573  Handwritten     341
                 Demonstrative
                 McKesson Took Our
                 Responsibilities
                 Very Seriously

MCK-Oriente-574  Handwritten     548
                 Demonstrative
                 CVS Performs
                 Its Own
                 Due Diligence

MCK-Oriente-V-1  Video 1         266

MCK-Oriente-V-7  Video 7         182

MCK-Oriente-V-8  Video 8         456

      - - -
```

Page 19

```
      - - -
DEPOSITION SUPPORT INDEX
      - - -

Direction to Witness Not to Answer
PAGE  LINE
None.

Request for Production of Documents
PAGE  LINE
None.

Stipulations
PAGE  LINE
None.

Questions Marked
PAGE  LINE
None.
```

Page 20

THE VIDEOGRAPHER: We are now on the record. My name is Henry Marte. I am a videographer for Golkow Litigation Services.

Today's date is July 19, 2018. And the time is 9:01 a.m.

This videotaped deposition is being held at 700 Broadway, New York, New York in the matter of In Re: National Prescription Opiate Litigation.

The deponent today is Mr. Michael Oriente.

All appearances please introduce themselves for the record.

MR. PAPANTONIO: Mike Papantonio for the plaintiff.

You know what, let's just get everybody in the room so there's no --

MS. MOORE: Okay. Carol Moore for the plaintiff.

MS. MERCED: Sarah Merced

Page 21

for the plaintiff.

MR. WOLFE: Evan Wolfe for plaintiff.

MR. KENNEDY: Eric Kennedy, plaintiffs.

MS. ROZMAN: Donna Rozman for plaintiff.

MR. ASQUITH: Brian Asquith for plaintiff.

MR. GRAY: Mark Gray, plaintiffs.

MR. LAMB: Archie Lamb for the plaintiff.

MR. O'CROININ: Conor O'Croinin for defendant, CVS.

MR. HLAWATSCH: Neil Hlawtsch, defendant Amerisource Bergen Corporation -- Amerisource Bergen Drug Corporation and Amerisource Bergen Corporation.

MR. WILLIAMS: Eric Williams for defendant Prescription Supply, Inc.

MR. ROSENBERG: James

Page 22

1  Rosenberg, HBC Services Company.
2      MS. DURFEE:  Laura Jane
3  Durfee, Walmart.
4      MS. KVESELIS:  Emily
5  Kveselis, McKesson.
6      MS. HENN:  Emily Henn on
7  behalf of McKesson and the
8  witness.
9      MR. ORIENTE:  Michael
10  Oriente, McKesson.
11      MR. PAPANTONIO:  We get
12  everybody?
13      Go ahead.
14      MS. VICARI:  Angela Vicari
15  of Arnold and Porter, here for
16  Endo Health Solutions; Endo
17  Pharmaceuticals, Inc.; Barr
18  Pharmaceutical, Inc.; and Barr
19  Pharmaceutical Company, Inc.
20      MR. SALTZ:  Adam Saltz for
21  the plaintiff.
22      MR. GOLDSTEIN:  Josh
23  Goldstein, Ropes & Gray for
24  Mallinckrodt.

Page 23

1      MR. PAPANTONIO:  We have
2  people on the telephone.  If
3  you're on the phone, would you
4  identify yourself, please?
5      MS. SACKS:  Shayna Sacks --
6      MR. PAPANTONIO:  Oh, I'm
7  sorry.  Hang on.
8      MS. SACKS:  -- for the
9  plaintiff.  Sorry.
10      MR. PAPANTONIO:  Shayna?
11  Okay.  My apologies.
12      MS. SILANE:  Caroline Silane
13  for defendant, Rite Aid of
14  Maryland, Inc.
15      MR. MONAHAN:  Matthew
16  Monahan on behalf of defendant
17  Cardinal Health, Inc.
18      MS. PAPANTONIO:  Sara
19  Papantonio, plaintiff.
20      MS. BERGERT:  Olivia
21  Bergert, plaintiff.
22      MR. PAPANTONIO:  We've got
23  people coming in.
24      MS. O'GORMAN:  I represent

Page 24

1  Purdue.
2      MR. PAPANTONIO:  Purdue.
3  And what is your name?
4      MS. O'GORMAN:  Debra
5  O'Gorman.
6      MR. PAPANTONIO:  Debra.  All
7  right.  So we got everybody in
8  here right now.
9      Okay.  On the telephone, who
10  do we have on the phone?
11      Nobody?  Okay.
12      MR. CROUSE:  Doug Crouse for
13  Miami-Luken.
14      MR. PAPANTONIO:  Okay.  Who
15  else?
16      MR. LAZAR:  Good morning.
17  This is Zach Lazar from Morgan
18  Lewis, on behalf of the Teva
19  defendants.
20      MR. PAPANTONIO:  Okay.
21  Anybody else?
22      MS. COVERSTONE:  Kaitlyn
23  Coverstone from Kirkland & Ellis,
24  on behalf of Allergan.

Page 25

1      MR. PAPANTONIO:  All right.
2  Anybody else?
3      MR. FARRELL:  Paul Farrell
4  on behalf of plaintiffs.
5      MR. PAPANTONIO:  All right.
6  Anybody else?
7      All right.  With that, it
8  sounds we are about ready.  Just
9  swear the witness and we'll get
10  started.
11          - - -
12      ... MICHAEL ORIENTE, having
13  been first duly sworn, was
14  examined and testified as follows:
15          - - -
16      EXAMINATION
17          - - -
18  BY MR. PAPANTONIO:
19      Q.  Sir, state your name,
20  please?
21      A.  My name is Michael Oriente.
22      Q.  Mr. Oriente, you were one of
23  the directors of regulatory affairs for
24  McKesson; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1   A.   Yes.
2   Q.   How many years did you do
3 that?
4   A.   I have been doing it since
5 late 2007 and continue to still do it
6 today.
7   Q.   And with that, sir, you were
8 expected to understand all of the
9 regulatory -- all of the regulatory
10 requirements that McKesson was supposed
11 to follow in the sale of opioids; is that
12 correct?
13   A.   I would monitor the
14 purchases for the sales of controlled
15 substances to our customers.
16   Q.   Let me ask the question
17 again.  You were expected to understand
18 all of the regulatory requirements that
19 McKesson was supposed to follow as it
20 sold narcotic drugs, opioids?
21       MS. HENN:  Objection to
22   form.
23       THE WITNESS:  Yes.
24 BY MR. PAPANTONIO:

Page 27

1   Q.   Is that a correct statement?
2   A.   Yes.
3   Q.   Okay.  Mr. Oriente, I
4 understand that you sometimes have a
5 problem hearing.  If you can't hear what
6 I'm saying, please interrupt me.  Say, "I
7 just didn't hear you.  Repeat the
8 question."  Okay?  And we'll do that as
9 we proceed here today.
10   A.   Okay.
11   Q.   All right.  So if management
12 at McKesson hid information from you
13 about how they were going about
14 distributing their drugs, that would
15 affect your ability as a regulator to do
16 your job, wouldn't it?
17       MS. HENN:  Objection to
18   form.
19       THE WITNESS:  I did -- I did
20   not know of any hidden
21   information.
22 BY MR. PAPANTONIO:
23   Q.   I didn't say that.  Listen
24 very carefully to the questions,

Page 28

1 Mr. Oriente.
2       I asked you if McKesson
3 management hid information about how they
4 were going about distributing narcotic
5 drugs, that would affect your ability to
6 do your job as a regulator.  Is that yes
7 or no?
8       MS. HENN:  Objection to
9   form.
10       THE WITNESS:  It could if I
11   didn't have all the information,
12   yes.
13 BY MR. PAPANTONIO:
14   Q.   It could if you didn't have
15 all the information.  Why would it affect
16 you if you didn't have all the
17 information?
18       MS. HENN:  Objection to
19   form.
20       THE WITNESS:  I would -- I
21   would need to understand the full
22   amount that a customer was
23   purchasing.
24 BY MR. PAPANTONIO:

Page 29

1   Q.   Okay.  Fair enough.  So the
2 more information you had about how
3 McKesson was going about distributing
4 narcotic drugs, the better you can
5 determine how to adjust your job in
6 regulatory; is that a correct statement?
7       MS. HENN:  Objection to
8   form.
9       THE WITNESS:  Could you
10   repeat the question?
11 BY MR. PAPANTONIO:
12   Q.   Yeah.  The more information
13 you had about how McKesson was
14 distributing their drugs, their narcotic
15 drugs, the better you could do as a
16 regulator in performing your job?
17       MS. HENN:  Objection to
18   form.
19       THE WITNESS:  Yes.  The more
20   information I had, the better
21   decision I could make.
22 BY MR. PAPANTONIO:
23   Q.   And, Mr. Oriente, if the
24 information about distribution of those

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 narcotics is hidden from you as a
2 regulator, you're not able to adjust to
3 what you need to do as a regulator. If
4 they're hiding information, you can't do
5 your job as a regulator. Would you agree
6 with that?
7        MS. HENN: Objection to
8    form.
9        THE WITNESS: I would say
10    that I had all the information
11    that I needed to perform my job.
12    I was unaware of any information
13    not being shared with myself.
14 BY MR. PAPANTONIO:
15    Q.   All right. Let's talk about
16 some of that information right now.
17        MR. PAPANTONIO: Please put
18    up Document 1428, Evan. Mr. --
19    huh?
20        MS. MOORE: That's McKesson
21    Oriente 383.
22 BY MR. PAPANTONIO:
23    Q.   Okay. As we're proceeding
24 here, Emily, what's going to happen is

Page 31

1 she's going to read a number for
2 identification of the document into the
3 record because we're marking each one of
4 these as we go.
5        MR. PAPANTONIO: Okay. So,
6    Carol, if you would do that as you
7    proceed.
8        Did you hear what that
9    number was? Okay.
10        MS. HENN: So, Counsel, is
11    the document premarked? Is that
12    what you're saying?
13        MR. PAPANTONIO: Yes, it's
14    premarked, because that way we
15    can -- we're doing it by Oriente
16    exhibit as a deposition. We're
17    going to be doing that as we go
18    forward. I'm sure you are going
19    to be covering a lot of these
20    depos.
21        The idea is we're going to
22    be marking a document with an
23    exhibit for that deposition.
24        MS. HENN: Is there any

Page 32

1 reason not to start with McKesson
2 Oriente-1?
3        MR. PAPANTONIO: Yeah, there
4    is. There is. And we'll explain
5    that as we go. But this is easily
6    identified when you go back and
7    look at the record. That's all
8    I'm saying.
9        MS. HENN: Just for the
10    record, our preference would be to
11    do it in order to make it simpler.
12    You handed me two copies. Which
13    one is for the witness?
14        MR. PAPANTONIO: One is for
15    the witness, and one for you, and
16    one is for Emily next to you if
17    you'd like.
18        MS. HENN: Do you have one
19    for -- additional copies?
20        MR. PAPANTONIO: I don't
21    think we have that many. You may
22    have to -- you may have to share.
23        MS. HENN: I think the
24    protocol requires four copies --

Page 33

1        MR. PAPANTONIO: I'm sure we
2    do have four copies.
3        MS. HENN: -- so defendants
4    can have copies.
5        (Document marked for
6    identification as Exhibit
7    MCK-Oriente-383.)
8 BY MR. PAPANTONIO:
9    Q.   All right. Let -- sir,
10 Mr. Oriente, as we're proceeding today
11 what I'm going to be doing is I'm going
12 to be putting documents up on the screen.
13 The screen will both be in front of you,
14 you'll be able to see the big screen up
15 here.
16        Either -- feel free to use
17 either one.
18    A.   All right. Thank you.
19    Q.   Now, this document is titled
20 "In the Matter of McKesson Corporation."
21 Take a look at that. Let's go -- let's
22 take a look at this document.
23        Have you seen this document?
24    A.   I have not.

Page 34

1    Q.   Okay.  When did you first
2  get information -- when were you first
3  told by your company that you were going
4  to be appearing here in a deposition?
5    A.   I don't recall the exact
6  date.  It would have been a few weeks
7  back.
8    Q.   Would you say three weeks,
9  four weeks?  What would you say?
10       MS. HENN:  Objection to
11       form.
12       THE WITNESS:  I would take
13       an estimate of about four weeks.
14  BY MR. PAPANTONIO:
15    Q.   Okay.  In that time that you
16  knew that you were going to be coming
17  here for a deposition, did you have the
18  opportunity to review any documents?
19    A.   No.  I did not go back and
20  look at anything.
21    Q.   All right.  But this
22  document that we're looking at right now
23  called, "In the Matter of McKesson
24  Corporation," it says at the bottom, "DEA

Page 35

1  Diversion Group, Washington Division."
2       You've never seen this
3  document; is that a correct statement?
4    A.   That is correct.
5    Q.   All right.  Would you turn
6  to the next page of that document.  I
7  want to review this document with you.
8  And I want to ask you questions about
9  this document as far as your
10  understanding of your regulatory
11  responsibilities for this company.  Okay?
12       MS. HENN:  Counsel, just one
13       statement I'd like to make on the
14       record.
15       First of all, did we get the
16       Bates number of the document into
17       the record?
18       MR. PAPANTONIO:  No.  We're
19       going to -- here's what we're
20       going to do.  We're not going to
21       take the time to read Bates
22       numbers here, because we only have
23       so much time.  At the end of it we
24       will sit there and read the Bates

Page 36

1  numbers as we go.  Okay.
2       MS. HENN:  Okay.  I would
3       just like to note that this
4       document is marked confidential,
5       and that pursuant to the protocol
6       entered by the court, the court
7       reporter shall clearly mark this
8       transcript prior to the expiration
9       of the 30-day period as highly
10       confidential subject to further
11       confidentiality review.  Thank
12       you.
13  BY MR. PAPANTONIO:
14    Q.   Well, Mr. Oriente, this was
15  so confidential that they didn't tell you
16  about it, did they?
17       MS. HENN:  Objection to
18       form.
19  BY MR. PAPANTONIO:
20    Q.   I mean, this is -- you heard
21  this is a confidential document.  And you
22  had been with the company -- how many --
23  how many years you've been with the
24  company?

Page 37

1    A.   With McKesson total,
2  14 years.
3    Q.   And this is so confidential
4  that they didn't tell you about it and
5  you're one of the directors of regulatory
6  for McKesson; is that a correct
7  statement?
8       MS. HENN:  Objection to
9       form.
10       THE WITNESS:  I am one of
11       the directors of regulatory, yes.
12  BY MR. PAPANTONIO:
13    Q.   And do you see where it
14  says -- the very first line, "This is an
15  investigation of the actions and
16  practices of McKesson Corporation."
17       Did you know that this
18  investigation was going on by the DEA?
19    A.   I knew that Landover was
20  being involved in an investigation.  But
21  I have not seen the document.
22    Q.   Well, sir, you -- Landover
23  was an area that you regulated, isn't it?
24       MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  form.
2      THE WITNESS:  I was
3  responsible for the Landover
4  distribution center, yes.
5  BY MR. PAPANTONIO:
6      Q.  Tell the jury what the
7  Landover distribution center is.
8      A.  Landover distribution center
9  was located in Landover, Maryland, and it
10 distributed controlled substances, Rx
11 product and OTC to McKesson customers in
12 that geographic area.
13     Q.  Tell me what the
14 geographic -- how many states did that
15 geographic area cover?
16     A.  The Landover distribution
17 center had customers in, of course,
18 Maryland, West Virginia, Delaware,
19 Washington D.C.  I believe that was the
20 general area that they serviced.
21     Q.  How many years were you the
22 director of regulatory there at Landover?
23     MS. HENN:  Objection to
24 form.

Page 39

1      THE WITNESS:  I'm not
2  exactly sure when the Landover
3  distribution center stopped
4  operating.  But I was there from
5  late 2007 when it closed.
6  BY MR. PAPANTONIO:
7      Q.  And it closed in 2012,
8  didn't it?
9      A.  I am unaware of the exact
10 date that it closed.
11     Q.  All right.  We'll get to
12 that.
13         It says, "This is an
14 investigation of the actions and
15 practices of McKesson Corporation."
16 That's what the first line reads, right?
17         And you knew about the
18 investigation going on, correct?
19     A.  Yes.
20     Q.  And then it says, from
21 May 2008 through May -- through
22 March 2012.  That was the area of time
23 that the investigation was taking place
24 on Landover, correct?

Page 40

1      A.  That's what the document
2  says, yes.
3      Q.  And during that entire time,
4  you were there at Landover, weren't you?
5      MS. HENN:  Objection to
6  form.
7      THE WITNESS:  Yes.
8  BY MR. PAPANTONIO:
9      Q.  During the time 2008 through
10 2012, you were there and you were the
11 director -- you were the director of
12 regulatory; is that a correct statement?
13     A.  Yes.
14     Q.  And then it actually -- it
15 mentions right down underneath the next
16 line, it says, "Landover" -- do you see
17 where it says "Landover distribution
18 center"?  It gives DEA, and then it gives
19 a number.  That number, what is that
20 number, sir?
21     A.  I do not know what that
22 number stands for.
23     Q.  Okay.  And then it says,
24 "Landover is no longer in operation."

Page 41

1      Do you see that?
2      A.  Yes.
3      Q.  Go to the next page please.
4      MS. HENN:  And I'll just
5      remind the witness he can take
6      whatever time he'd like to review
7      the document.
8  BY MR. PAPANTONIO:
9      Q.  Do you see the next page
10 there?  It says, "Civil liability."
11     Do you see that?
12     A.  Yes.  It's at the top of the
13 page.
14     Q.  In this confidential
15 document that you've never seen prior to
16 me putting it in front of you today, the
17 first thing it says is it talks about
18 what McKesson liability is.
19     Do you see, "McKesson
20 liability emanates from 21 U.S.C.
21 842(a)5."
22     Do you see that?
23     A.  Yes, I see it here.
24     Q.  You know what that is, don't

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 you, Mr. Oriente?
2          MS. HENN:  Objection to
3    form.
4 BY MR. PAPANTONIO:
5    Q.   You've seen that number
6 before, haven't you?
7    A.   I have not seen that number
8 before, no.
9    Q.   Before you went to -- before
10 you went to regulatory, nobody told you
11 about 21 U.S.C. 842.  Is that your
12 testimony here today?
13          MS. HENN:  Objection to
14    form.
15          THE WITNESS:  I am not
16    familiar with that specific
17    listing.
18 BY MR. PAPANTONIO:
19    Q.   Well, let's do -- let's look
20 at the next listing, 21 U.S.C. 823.  Had
21 anybody shown you that prior to the time
22 that you took over regulatory -- director
23 of regulatory at Landover?  Had anybody
24 showed you that?

Page 43

1    A.   No one showed me that.  But
2 I am familiar that, you know, we had a
3 system in place to watch for diversion as
4 far as sales for size, frequency, and
5 pattern of orders.
6    Q.   Right.  And if you didn't do
7 that, you would be breaking the law,
8 wouldn't you?
9          MS. HENN:  Objection to
10    form.
11          THE WITNESS:  I can't say
12    that we'd be breaking the law.
13    That is the requirement to meet
14    that requirement.
15 BY MR. PAPANTONIO:
16    Q.   Well, if you didn't do that,
17 sir, the DEA would fine you, wouldn't
18 they?
19          MS. HENN:  Objection to
20    form.
21 BY MR. PAPANTONIO:
22    Q.   If you didn't do what 21
23 U.S.C. 823 told you to do, the DEA would
24 fine you, yes or no?

Page 44

1          MS. HENN:  Objection to
2    form.
3          THE WITNESS:  I believe they
4    would have the ability to.  It's
5    not necessarily that they would.
6 BY MR. PAPANTONIO:
7    Q.   Well, not to comply with 21
8 U.S.C. 823 would be unlawful.  Can we
9 agree on that?
10    A.   We need to follow the
11 regulation.  That is correct.
12    Q.   And not to do it would be
13 considered unlawful, yes or no?
14          MS. HENN:  Objection to
15    form.
16          THE WITNESS:  We would need
17    to follow that, and I believe that
18    we would be out of compliance if
19    we did not.
20 BY MR. PAPANTONIO:
21    Q.   Well, you see it says,
22 "Failure to provide effective controls
23 against theft, diversion of controlled
24 substance in violation of 21 C.F.R.," and

Page 45

1 then it gives you a section, right?
2          Are you familiar with 21
3 C.F.R. 1301?
4    A.   I don't know the exact
5 listing of 21 C.F.R. and that section.
6 But I do understand that we needed to
7 have a controlled substance in place, and
8 that is, you know, how we monitored the
9 sales of the controlled substances.
10    Q.   Well, you know one thing 21
11 U.S.C. 823 told you to do is that you
12 were supposed to provide suspicious order
13 reports to the DEA, weren't you?
14          MS. HENN:  Objection to
15    form.
16          THE WITNESS:  Yes, we would
17    report suspicious orders when we
18    deemed them suspicious.
19 BY MR. PAPANTONIO:
20    Q.   And if you deemed them
21 suspicious and you failed to report them,
22 that would be unlawful, wouldn't it?
23          MS. HENN:  Objection to
24    form.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    THE WITNESS: We would
2  report those that were deemed
3  suspicious, yes.
4  BY MR. PAPANTONIO:
5    Q.   And if you failed to do
6  that, that would be unlawful, correct?
7  Yes or no sir?
8    MS. HENN: Objection.
9  Objection to form.
10    THE WITNESS: If we did not
11  report a suspicious order that we
12  deemed suspicious, yes.
13  BY MR. PAPANTONIO:
14    Q.   All right. And then it says
15  right -- the next one is C.F.R. 1301.
16  You've seen that before, haven't you? In
17  your role as regulatory for Landover, you
18  were familiar with 21 C.F.R. 1301,
19  correct?
20    MS. HENN: Objection to
21  form.
22    THE WITNESS: I, again, do
23  not know the specific regulation
24  from -- from memory. I know that

Page 47

1  we followed the 21 C.F.R. But I
2  don't -- I cannot tell you what 21
3  C.F.R. Section 1301.71
4  specifically states.
5  BY MR. PAPANTONIO:
6    Q.   You did -- how many years
7  were you regulatory?
8    MS. HENN: Objection to
9  form.
10    THE WITNESS: Since late
11  2007 through today.
12  BY MR. PAPANTONIO:
13    Q.   You're still in regulatory
14  today, correct?
15    A.   That is correct.
16    Q.   And you understand, being in
17  regulatory, that you had a responsibility
18  to design and operate a system that would
19  disclose suspicious orders to the DEA
20  when you found them to be suspicious; is
21  that correct?
22    MS. HENN: Objection to
23  form.
24    THE WITNESS: That is

Page 48

1  correct.
2  BY MR. PAPANTONIO:
3    Q.   And not to do that would be
4  breaking the law, wouldn't it?
5    MS. HENN: Same objection.
6  BY MR. PAPANTONIO:
7    Q.   Correct? It would be
8  breaking the law, wouldn't it,
9  Mr. Oriente?
10    A.   Not to report the suspicious
11  orders would not be following the
12  regulation.
13    Q.   Isn't -- but let's be clear.
14  Because we're going to be talking. It
15  would be breaking the law that you're
16  supposed to follow under 21 U.S.C., yes
17  or no?
18    MS. HENN: Objection to
19  form.
20    THE WITNESS: We have a
21  requirement to follow that
22  requirement, and so we need to
23  follow the law.
24  BY MR. PAPANTONIO:

Page 49

1    Q.   And if you don't, that's
2  called breaking the law, isn't it? Can
3  we agree on that?
4    MS. HENN: Objection to
5  form.
6  BY MR. PAPANTONIO:
7    Q.   Because if there's something
8  in between, Mr. Oriente, this is your
9  time to tell everybody in this room, if
10  there's something that's different from
11  what I'm saying, break the law. Is there
12  another term that you want to use as we
13  proceed here today?
14    MS. HENN: Objection to
15  form.
16    THE WITNESS: I would not
17  say that -- a different term. It
18  would -- it would not be following
19  the law.
20  BY MR. PAPANTONIO:
21    Q.   Okay. Okay. I'm good with
22  that, Mr. Oriente. We'll move on.
23    Let's go to the next page.
24    MS. HENN: I'd also like to

Highly Confidential – Subject to Further Confidentiality Review

Page 50

1  ask the approximately three people
2  that joined the phone call since
3  we began to please identify
4  themselves for the record.
5      Anybody on the phone who's
6  not yet identified yourself, could
7  you please just identify yourself
8  for the record?
9      MR. GOETZ:  Dan Goetz from
10  Weisman Kennedy.
11      MS. COOK:  Renee Cook.
12      MR. HERMAN:  Dustin Herman
13  from Spangenberg, for the
14  plaintiffs.
15      MS. HENN:  Anybody else?
16      MR. DeROCHE:  James DeRoche
17  from Weisman Kennedy.
18      MS. HENN:  Anybody else?
19  Thank you.
20      MR. PAPANTONIO:  Thank you,
21  Emily, for catching that.  I
22  didn't hear the little beeps.
23  BY MR. PAPANTONIO:
24      Q.  All right.  Mr. Oriente,

Page 51

1  let's go ahead to the next page.  Now, as
2  your lawyer told you, I don't want to
3  jump into this page without you taking a
4  look at it.  Take a minute and look at
5  it, the first time this is the first time you've
6  seen this confidential document.  I think
7  it was characterized as highly
8  confidential, right?
9      MS. HENN:  Objection to
10  form.
11  BY MR. PAPANTONIO:
12      Q.  It says, "McKesson is
13  subject" -- let's just look at Paragraph
14  2.  21 U.S.C. 842.
15      Do you see that?
16      Have you ever seen 21 U.S.C.
17  842?
18      A.  I have not.
19      Q.  Sir, let me preface
20  something.  Did you not attend -- did you
21  not attend seminars that the DEA actually
22  put on for directors of regulatory for
23  McKesson?  Do you ever remember attending
24  a seminar that talked to you about these

Page 52

1  very things that you're supposed to be
2  doing as a regulator?
3      MS. HENN:  Objection to
4  form.
5      THE WITNESS:  I personally
6  did not attend the seminar.
7  BY MR. PAPANTONIO:
8      Q.  But you were a director.  Is
9  there any -- at Landover, correct?  You
10  were a director of regulatory?
11      MS. HENN:  Objection to
12  form.
13      THE WITNESS:  Landover was
14  one of my distribution centers
15  that I oversaw, yes.
16  BY MR. PAPANTONIO:
17      Q.  We're going to talk about
18  other distribution centers.  But right
19  now, we can establish that you were the
20  director at Landover; is that a correct
21  statement?
22      MS. HENN:  Objection to
23  form.
24      THE WITNESS:  For

Page 53

1  regulatory, yes.
2  BY MR. PAPANTONIO:
3      Q.  All right.  And you never
4  attended any of the DEA seminars that
5  they put on for directors of regulatory
6  telling them what the laws were and what
7  your responsibilities were; is that a
8  correct statement?
9      A.  I did not attend.
10      Q.  All right.  So let's --
11  let's read this.  It says, "21 U.S.C.
12  provides that it's unlawful" -- they're
13  using that word too, unlawful --
14  "unlawful to refuse or negligently fail
15  to make, keep, furnish any record,
16  report, notification, declaration, order,
17  order form, statement, invoice,
18  information required under this section."
19      Do you see that?
20      MS. HENN:  Objection to
21  form.
22      THE WITNESS:  I see that
23  listed here.
24  BY MR. PAPANTONIO:

Page 54

1    Q.   And the truth is, where it
2  says -- where it says it's unlawful to
3  refuse to fail to make this information
4  available to the DEA, that's exactly what
5  McKesson did, is they refused to give
6  information to the DEA about their
7  narcotic drugs that they were selling to
8  pharmacies, even when McKesson understood
9  that suspicious orders were taking place?
10       MS. HENN:  Objection to
11       form.
12       THE WITNESS:  I'm not --
13       not -- I am not aware of any
14       refusal to give information to DEA
15       when they requested it.
16  BY MR. PAPANTONIO:
17       Q.   Sir, is there anybody else
18  that was -- was it just you directing --
19  was it just you who was the director at
20  Landover of regulatory?
21       A.   I was the director of
22  regulatory at Landover.  Any type of
23  information that the DEA requested would
24  go through our legal department.

Page 55

1        I was not responsible to
2  send that information to DEA.
3        Q.   Okay.  So lawyers -- what
4  you're telling us is lawyers had the last
5  decision on what was supposed to be sent
6  to the DEA.  Is that your testimony?
7        MS. HENN:  Objection to
8        form.
9        THE WITNESS:  I don't know
10       if it was lawyers.  It was our
11       legal department that we would
12       submit all requests to.
13  BY MR. PAPANTONIO:
14       Q.   And they certainly -- it's
15  important that you know what they're
16  submitting to the DEA and what they're
17  not submitting to the DEA.  As a
18  regulator, that's important to you, isn't
19  it, Mr. Oriente?
20       MS. HENN:  Objection to
21       form.
22       THE WITNESS:  Once we would
23       send in the request that we would
24       receive either through a subpoena

Page 56

1  or other action through our legal
2  department in San Francisco, they
3  would then furnish the information
4  to DEA.
5  BY MR. PAPANTONIO:
6        Q.   So the lawyers decided what
7  was supposed to go on to the DEA.  Is
8  that your testimony?
9        A.   My testimony is the legal
10  department would send it in.  I don't
11  know exactly who in the legal department
12  would furnish the information that DEA
13  was requesting.
14       Q.   But nobody -- we know this
15  much.  The legal department never gave
16  you this document, this highly
17  confidential document that we're looking
18  at right now.  Nobody in legal gave you
19  that, did they?
20       MS. HENN:  Counsel, you're
21       referring to the DEA document,
22       Exhibit --
23       (Brief interruption.)
24  BY MR. PAPANTONIO:

Page 57

1        Q.   Okay.  Listen to the
2  question again.  All right?  You never
3  received this document that is -- that
4  we've decided is a confidential document.
5  Legal never gave you that when you were
6  trying to do your job as a regulator; is
7  that correct statement?
8        A.   It's a correct statement
9  that I've not seen this document, yes.
10       Q.   Okay.  Legal never gave
11  it to you as far as you can remember; is
12  that correct statement?
13       A.   I thought I just answered
14  that, but.
15       Q.   Well, if you did, are you --
16       A.   Yeah.
17       Q.   -- satisfied with your
18  answer?
19       A.   I have not seen this
20  document before today.
21       Q.   Mr. Oriente, I'm not trying
22  to accuse you of anything you haven't
23  done here or -- there's no accusation
24  here.  I'm simply trying to find out what

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 information was shared with you so you
2 could do your job as a regulator at
3 Landover. Do you understand that?
4     A.   Yes.
5     Q.   Okay. So let's go -- let's
6 go to the next page. The next page is
7 Page 3; is that right? No. Excuse me,
8 page -- next page over, 5. It says
9 statute and regs --
10        MS. HENN: Counsel, is there
11    a page number you're referring to?
12        MR. PAPANTONIO: Yeah, if
13    you look at -- on the Bates stamp,
14    that five down there would be your
15    page number.
16        THE WITNESS: The next one.
17        MR. PAPANTONIO: The very
18    next page.
19 BY MR. PAPANTONIO:
20    Q.   At the top of it, it says,
21 "Statute and regs."
22        Do you see that?
23    A.   Yes.
24    Q.   It says, "The registrant

Page 59

1 shall design and operate a system to
2 disclose the registrant's suspicious
3 orders of controlled substances."
4        Do you see the term
5 "suspicious orders"?
6    A.   Yes.
7    Q.   Do you ever -- do you see
8 any mention about there being a
9 responsibility to report suspicious
10 customers?
11        MS. HENN: Objection to
12    form.
13 BY MR. PAPANTONIO:
14    Q.   Is there anything -- is
15 there anything in that statute right
16 there that says you have the right not to
17 report suspicious orders, but to report
18 suspicious customers?
19        MS. HENN: Counsel, you're
20    referring to the quote from the
21    regulation there on Page 5?
22        MR. PAPANTONIO: Right.
23 BY MR. PAPANTONIO:
24    Q.   Do you see anything in there

Page 60

1 that says, "Oh, we don't -- McKesson
2 doesn't have to report suspicious orders.
3 We have the right to report suspicious
4 customers"?
5        Do you see anything in that
6 wording there?
7        MS. HENN: Objection to
8    form.
9        THE WITNESS: The statement
10    here says suspicious orders.
11 BY MR. PAPANTONIO:
12    Q.   Correct. It doesn't say
13 suspicious customers, does it?
14    A.   Suspicious customers is not
15 listed here, no.
16    Q.   And that would -- so let's
17 go to the next page.
18        Statute and regulations. It
19 says, "The registrant" -- that would be
20 McKesson, right? You'd be a registrant
21 with the DEA?
22    A.   Yes.
23    Q.   All right. Landover would
24 be a registrant with the DEA; is that

Page 61

1 correct?
2    A.   Yes.
3    Q.   "The registrant shall inform
4 the field division of the DEA in this
5 area of suspicious orders when discovered
6 by the registrant."
7        Do you see that?
8        MS. HENN: Objection to
9    form.
10 BY MR. PAPANTONIO:
11    Q.   The registrant shall inform
12 the field division office of the DEA in
13 this area of suspicious orders when
14 discovered by the registrant."
15        Do you see that?
16    A.   Yes. I see that.
17    Q.   Now, this says "when
18 discovered." Do you see those two words,
19 "when discovered"?
20    A.   Yes.
21    Q.   This doesn't say you can do
22 it three months after you find it. It
23 doesn't say you can -- you can report the
24 suspicious order four months after you

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 find it.  This says when it's discovered,
2 you have responsibility to tell the DEA
3 about the fact that you're finding a
4 suspicious order; is that correct?
5        MS. HENN:  Objection to
6    form.
7        THE WITNESS:  It's
8    underlined in this document, "when
9    discovered."
10 BY MR. PAPANTONIO:
11    Q.   All right.  And it goes on
12 to even tell you -- it even tells you
13 what a suspicious order is supposed to
14 look like.  It says -- it says,
15 "Suspicious orders include orders of
16 unusual size."
17        Do you see that?  Unusual
18 size.  You would agree with that.  That'd
19 be suspicious if it's an unusual size,
20 right?
21        MS. HENN:  Objection to
22    form.
23        THE WITNESS:  Yes.
24 BY MR. PAPANTONIO:

Page 63

1    Q.   And you'd agree it would be
2 suspicious if it's -- if it's not a -- if
3 it's not a normal pattern.  You'd agree
4 with that, right?
5        MS. HENN:  Objection to
6    form.
7        THE WITNESS:  It says
8    "deviating substantially from a
9    normal pattern."
10 BY MR. PAPANTONIO:
11    Q.   Right.  You would agree that
12 would be suspicious, correct?
13    A.   Deviating substantially,
14 yes.
15    Q.   And you would agree that
16 unusual frequency of an order would be
17 suspicious, correct?
18        MS. HENN:  Objection to
19    form.
20        THE WITNESS:  Yes.  Orders
21    of unusual frequency, size and
22    pattern.  Those are the three.
23 BY MR. PAPANTONIO:
24    Q.   Let's go to the next page.

Page 64

1 Civil liability at the top of it.
2        Do you see that?
3        It says, "Civil liability."
4 It says, "A registrant who violates 842
5 is" -- "842(a)5 is subject to a civil
6 penalty of $10,000 per occurrence."
7        Did you know that every time
8 you violated one of these statutes that
9 were you subject to a civic penalty of up
10 to $10,000 every time you did it?
11        MS. HENN:  Objection to
12    form.
13        THE WITNESS:  I was aware
14    that there was a penalty for each
15    occurrence, yes.
16 BY MR. PAPANTONIO:
17    Q.   Did you know it was $10,000?
18    A.   I wasn't exactly sure of the
19 monetary fine.
20    Q.   It says, "In other words,
21 McKesson is subject to a civil penalty up
22 to $10,000 for each suspicious order or
23 activity that went unreported."
24        Do you follow that?  Each

Page 65

1 activity that went unreported, or was not
2 reported when discovered.
3        Do you see that?
4    A.   Yes, I see that.
5    Q.   And when -- do you see this,
6 sir, the word, sir, "when discovered"?
7 Do you see those words in that statement,
8 "when discovered"?  Do you see anything
9 in there that tells you that you're able
10 to report a suspicious order four months
11 after you get the suspicious order?  Is
12 there anything in that statute that says
13 that?
14    A.   The statute says "when
15 discovered."
16    Q.   So you'd agree that if you
17 break this law, this is not -- this is a
18 serious violation, isn't it?  $10,000
19 fine is a pretty serious violation, isn't
20 it?
21        MS. HENN:  Objection to
22    form.
23        THE WITNESS:  I really can't
24    say if that's a serious --

Page 66

BY MR. PAPANTONIO:

Q. Well, I mean, for most people on the jury watching this, $10,000, if they have to pay $10,000, that's pretty serious, isn't it?

MS. HENN: Objection to form.

THE WITNESS: It's a high dollar amount, absolutely.

BY MR. PAPANTONIO:

Q. Well, yeah. Is it an -- is it an amount of money that got your attention, as far as not being willing to violate this statute? Does $10,000 per violation get your attention?

MS. HENN: Objection to form.

THE WITNESS: That would not make my determination on, you know, getting my attention.

Any fine would get my attention.

BY MR. PAPANTONIO:

Q. Okay. Certainly a $10,000

Page 67

fine would get your attention, wouldn't it?

A. It would.

Q. And we've also -- and we've also established that, again, in defense of you, you haven't seen this document prior to today, correct?

A. That is correct.

Q. All right. The next page, it says, "2008 settlement terms."

Do you see that?

A. Yes.

Q. Now, it says, "In 2008 McKesson entered into a settlement agreement resolving claims under 21 U.S.C. 842(a)5 and C."

Now, did you -- did you know prior to coming here today to testify that before this document -- well, did you know that in 2008 the DEA and the DOJ caught you engaged in break -- caught McKesson engaged in breaking the law?

MS. HENN: Objection to form.

Page 68

BY MR. PAPANTONIO:

Q. Did you know that prior to coming here today?

MS. HENN: Objection to form.

THE WITNESS: I knew in 2008 that McKesson paid a settlement fine, yes.

BY MR. PAPANTONIO:

Q. And did you know that they agreed that they had broken the law?

MS. HENN: Objection to form.

BY MR. PAPANTONIO:

Q. That your company admitted that they knowingly broke the law dealing with narcotic drugs?

MS. HENN: Objection.

BY MR. PAPANTONIO:

Q. Did you know that prior to coming here today?

MS. HENN: Objection to form.

THE WITNESS: I did not know

Page 69

that. I know they paid the fine. But I didn't know about the agreement that they broke the law.

BY MR. PAPANTONIO:

Q. Well, you were with them in 2008, weren't you?

A. Yes.

Q. And so nobody gave you the details of them admitting that they broke the law --

MS. HENN: Objection.

BY MR. PAPANTONIO:

Q. -- in dealing with narcotics?

MS. HENN: Objection to form.

THE WITNESS: I understood that a fine was paid. And that was my understanding.

BY MR. PAPANTONIO:

Q. All right. Did anybody talk to you about the things they had done wrong prior to 2008? Did anybody tell you, we did this wrong, we did that

Highly Confidential – Subject to Further Confidentiality Review

Page 70

1 wrong?  Did anybody give you a list of
2 all the things that McKesson had done to
3 break the law and be fined in this 2008
4 settlement?
5        MS. HENN:  Objection to
6     form.
7        THE WITNESS:  I understood
8     that it was for not reporting what
9     was deemed suspicious orders by
10    DEA.
11 BY MR. PAPANTONIO:
12    Q.   Well, did you take the time
13 to take a look at what they had done to
14 where the DEA said, "You broke the law,
15 McKesson," and then McKesson admits,
16 "Yeah, we broke the law"?  Did you take a
17 look to see what they did to break the
18 law?
19        MS. HENN:  Objection to
20     form.
21        THE WITNESS:  Again, I was
22     not aware that we had broken the
23     law.  I know that there was an
24     agreement to settle and that the

Page 71

1     fine was paid.
2 BY MR. PAPANTONIO:
3    Q.   Well, you paid a $13 million
4 fine for that one thing in 2008, didn't
5 you?
6        MS. HENN:  Objection to
7     form.
8 BY MR. PAPANTONIO:
9    Q.   Did you know that?
10        MS. HENN:  Objection to
11     form.
12 BY MR. PAPANTONIO:
13    Q.   $13 million.
14        MS. HENN:  Same objection.
15        THE WITNESS:  I knew that
16     the fine was paid.  And I knew
17     there was settlement and an
18     agreement.  But I did not know
19     that there was, you know, the
20     amount -- the amount that was
21     paid, it was a settlement.  I did
22     not know that there was wrongdoing
23     admitted.
24 BY MR. PAPANTONIO:

Page 72

1    Q.   Okay.  Nobody told you that
2 McKesson admitted that they broke the
3 law?  Prior to you coming here today,
4 that's the first time you've heard that;
5 is that correct?
6        MS. HENN:  Objection to
7     form.
8        THE WITNESS:  I understood
9     that we paid a settlement.  That
10     is -- and I thought there was an
11     agreement that the settlement --
12 BY MR. PAPANTONIO:
13    Q.   Well, you just --
14        MS. HENN:  Counsel, could
15     you please --
16 BY MR. PAPANTONIO:
17    Q.   Go ahead go ahead.
18        MS. HENN:  -- let him finish
19     his answers.  Thank you.
20 BY MR. PAPANTONIO:
21    Q.   Go ahead.
22    A.   The settlement would be paid
23 and that McKesson would make changes but
24 not that there was, you know, guilt and

Page 73

1 admittance of not reporting the errors --
2    Q.   So --
3    A.   -- the way I understood it.
4    Q.   So you understood that
5 McKesson, just out of -- just paid
6 $13 million?  For what, you don't know
7 what it is, correct?
8        MS. HENN:  Objection to
9     form.
10        THE WITNESS:  No.
11 BY MR. PAPANTONIO:
12    Q.   Is that right?
13    A.   No, that is not correct.
14     What I understood was that
15 McKesson paid a settlement fine for not
16 reporting what the DEA deemed as
17 suspicious orders.
18    Q.   Well, it was more than that,
19 wasn't it, sir?  You know that it
20 involved more than just suspicious
21 orders, don't you?
22    A.   I do not know that.
23    Q.   Is that the first time
24 you've heard it?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    MS. HENN:  Objection to
2    form.
3    THE WITNESS:  You're saying
4    that it involved more?
5    BY MR. PAPANTONIO:
6    Q.   Yes.
7    A.   I don't know what more
8    you're referring to.
9    Q.   Because you never took the
10   time to look at the settlement, did you?
11   MS. HENN:  Objection to
12   form.
13   THE WITNESS:  It was not my
14   responsibility to look at the
15   settlement.
16   BY MR. PAPANTONIO:
17   Q.   Sir, it was your
18   responsibility to be a regulator for
19   McKesson that was selling narcotics to
20   the American public.  That was your job,
21   wasn't it?
22   MS. HENN:  Objection to
23   form.
24   THE WITNESS:  My job was to

Page 75

1    review purchases that were made by
2    customers on a daily basis and to
3    look at what customers are
4    purchasing, the amount they are
5    purchasing, the quantity that they
6    are purchasing.  That was my
7    responsibility as the regulatory
8    director over Landover
9    distribution center.
10   BY MR. PAPANTONIO:
11   Q.   And in that responsibility,
12   we've already, within the last half hour,
13   established that nobody has even shown
14   you this document that we're looking at
15   called "In the Matter of McKesson
16   Corporation," nobody showed that to you,
17   right?
18   A.   I have not seen this
19   document.
20   Q.   And nobody showed you the
21   2008 settlement that McKesson had with
22   the DEA and the Department of Justice to
23   instruct you about what you should or
24   should not be doing as a regulator?

Page 76

1    MS. HENN:  Objection to
2    form.
3    THE WITNESS:  What we should
4    be doing is reviewing purchases,
5    as it was stated in the
6    requirement, for size, pattern and
7    frequency, and then making a
8    determination if we deemed any of
9    those suspicious.
10   BY MR. PAPANTONIO:
11   Q.   And if you don't do that, it
12   is unlawful, correct?
13   MS. HENN:  Objection to
14   form.
15   BY MR. PAPANTONIO:
16   Q.   It's breaking the law.  If
17   you don't do what you just described, you
18   are breaking the law of the United
19   States, correct?
20   MS. HENN:  Objection to
21   form.
22   THE WITNESS:  In order to
23   meet the requirement, you need to
24   do that.

Page 77

1    BY MR. PAPANTONIO:
2    Q.   All right.  And then so you
3    said -- I think you just mentioned that
4    in 2008 it's your understanding that
5    McKesson settled with the Department of
6    Justice and agreed to do what?  Do you
7    know what they agreed to do?
8    A.   From the way I understood
9    it, McKesson would report suspicious
10   orders on a more ongoing basis to
11   determine if customers were purchasing in
12   the correct amount for their size
13   business.
14   Q.   Sir, you see the second
15   paragraph, okay.  Look, you can read
16   this.  It says, "McKesson agreed to
17   implement a program designed to detect
18   and prevent diversion of controlled
19   substances."
20   Do you see where it says
21   that?
22   MS. HENN:  Objection to
23   form.
24   And, Counsel, I'd appreciate

Page 78

1  it if you would treat the witness
2  a little more respectfully.
3  BY MR. PAPANTONIO:
4      Q.   Do you see that, sir?
5      A.   Yes, the second bullet says
6  that.
7          MR. PAPANTONIO:  I'm trying
8      to speak up.
9  BY MR. PAPANTONIO:
10     Q.   All right.  And can you hear
11 me okay, Mr. Oriente?
12     A.   Yes, I can.  Thanks.
13     Q.   So McKesson agreed to
14 implement a program designed to detect
15 and prevent diversion of controlled
16 substances.
17         Now, if I got it right, you
18 were supposed to already be doing that
19 prior to 2008, weren't you?  Weren't
20 you --
21         MS. HENN:  Objection to
22     form.
23         MR. PAPANTONIO:  Emily,
24     would you let me finish?

Page 79

1          MS. HENN:  I refer to you as
2  counsel --
3          MR. PAPANTONIO:  Oh,
4  counsel.
5          MS. HENN:  -- and I would
6  prefer that you refer to me --
7          MR. PAPANTONIO:  Okay.
8  However you want me to --
9          MS. HENN:  -- with respect,
10 not by my first name.
11         MR. PAPANTONIO:  I'm sorry.
12 Tell me your last name.
13         MS. HENN:  My last name is
14 Henn.  But counsel will be --
15         MR. PAPANTONIO:  Henn.  So
16 I'll call you Ms. Henn.  Is that
17 okay?
18         MS. HENN:  Yes.
19         MR. PAPANTONIO:  All right,
20 Ms. Henn.
21 BY MR. PAPANTONIO:
22     Q.   So let me be clear about
23 something.  You know that you were
24 supposed to implement a program designed

Page 80

1  to detect and prevent diversion of
2  controlled substances long before 2008,
3  right?  You know that?
4      A.   We had a program prior to
5  2008.
6      Q.   This says, "McKesson agreed
7  to implement a program designed to detect
8  and prevent diversion of controlled
9  substance."
10         That's what you agreed to in
11 2008, correct?
12         MS. HENN:  Objection to
13     form.
14         THE WITNESS:  It is in this
15     document.  When you say "you
16     agreed to," it is not me, because
17     prior to this we had a manual
18     system, and we would look at
19     purchases, so we were always
20     looking at purchases.  It was a
21     manual system.  And I'm just
22     telling you.
23         And so it would be people
24     looking at reports to determine

Page 81

1      amounts that customers were
2      buying.
3          Since 2008 there was an
4      automated system put in place that
5      would assist in that process.  But
6      there was always a system in place
7      to detect and look at what was
8      being purchased.  It wasn't like
9      it started in 2008.
10 BY MR. PAPANTONIO:
11     Q.   Okay.  So you're saying in
12 2008 you had a new and improved program
13 that was going to keep track of
14 suspicious orders.  Is that your
15 testimony?  It was new improved?
16         MS. HENN:  Objection to
17     form.
18         THE WITNESS:  I would say
19     it's not new.  It was enhanced to
20     be a system-generated, allowed
21     things to be more efficiently
22     identified, allow us to review
23     more quickly.
24 BY MR. PAPANTONIO:

Page 82

1     Q.   And your prior system was so
2 bad that the DEA and the Department of
3 Justice actually fined you $13 million
4 because you were not reporting suspicious
5 orders, correct?
6     MS. HENN: Objection to
7 form.
8     THE WITNESS: I would not
9   say that it was a bad system. We
10   were fined for not reporting what
11   DEA deemed as suspicious orders.
12 BY MR. PAPANTONIO:
13     Q.   Well, I mean, you weren't
14 doing your job?
15     MS. HENN: Counsel.
16 BY MR. PAPANTONIO:
17     Q.   You were breaking the law,
18 correct?
19     MS. HENN: Mr. Oriente, did
20   you finish your last answer?
21     THE WITNESS: I was going to
22   add more, that the determination
23   of a suspicious order is when the
24   wholesaler has an order, they look

Page 83

1 at pattern of ordering, size,
2 frequency, quantity. And then a
3 determination, is that order
4 suspicious or not.
5 BY MR. PAPANTONIO:
6     Q.   Okay.
7     A.   If we don't report that
8 order as suspicious because we felt that
9 that particular customer has followed
10 that pattern of ordering previously, then
11 that may be why that order was not
12 reported.
13     Q.   Well, we know this much.
14 Prior to 2008, that system that you just
15 described, it wasn't working, was it?
16 Because the DEA and the DOJ hit you for a
17 $13 million fine for not reporting
18 suspicious orders. We know that much,
19 correct?
20     MS. HENN: Objection to
21   form.
22     THE WITNESS: That did occur
23   in 2008.
24 BY MR. PAPANTONIO:

Page 84

1     Q.   Right. Let's go to the next
2 page. You see the next page, Page 8. It
3 says, "Failure to report timeline."
4     Now, do you see -- turn that
5 next page, Mr. Oriente.
6     MS. HENN: Are you referring
7   to Page 9, Counsel?
8     MR. PAPANTONIO: Page 9. It
9   says Page 9, yeah.
10 BY MR. PAPANTONIO:
11     Q.   Okay. It says, "Failure to
12 report timeline."
13     Do you see that?
14     A.   Yes.
15     Q.   Now, had anybody prior to
16 you coming here today told you that the
17 DEA did an investigation on Landover, and
18 they made records and they made
19 presentations right in this document that
20 show how many times McKesson violated the
21 agreement of 2008 by not reporting
22 suspicious orders? Had anybody shared
23 any time talking to you about that?
24     MS. HENN: Objection to

Page 85

1   form.
2     THE WITNESS: Could you
3   repeat the question?
4 BY MR. PAPANTONIO:
5     Q.   Yeah, I'll be glad to.
6 Prior to coming here today -- you had --
7 three weeks ago, you knew you were coming
8 here today, right?
9     A.   Yes.
10     Q.   Did anybody from McKesson --
11 I'm not interested in what you said to
12 your lawyers. I'm interested in what
13 McKesson -- did anyone at McKesson sit
14 down with you and go over the list of
15 things that they did to violate the 2008
16 agreement where you were found -- your
17 company was found to have engaged in
18 unlawful contact -- conduct and fined
19 $13 million?
20     MS. HENN: Objection to
21   form.
22     THE WITNESS: Since the
23   three weeks back or ever?
24 BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 Q. How about -- let's go with
2 ever, Mr. Oriente. Let's go with ever.
3 Did McKesson -- anybody from
4 McKesson sit down with you and say,
5 "Listen, we have an agreement. We paid
6 our $13 million, and as of 2008 we now
7 have an agreement. And the agreement
8 says that we're supposed to do A, B, and
9 C."
10 Has anybody shared that
11 agreement with you?
12 MS. HENN: Objection to
13 form.
14 THE WITNESS: The -- what
15 was shared with me, was that we
16 would be sharing suspicious orders
17 on a more frequent basis.
18 BY MR. PAPANTONIO:
19 Q. All right. So in other
20 words, okay, if you didn't do that, if
21 you didn't follow that agreement, where
22 you were fined $13 million, you would be
23 engaged in unlawful conduct, yes or no?
24 MS. HENN: Objection to

Page 87

1 form.
2 THE WITNESS: Since the 2008
3 agreement, McKesson agreed to
4 report suspicious orders on a more
5 regular basis.
6 BY MR. PAPANTONIO:
7 Q. And if you didn't do that,
8 you would be engaged in unlawful conduct,
9 correct?
10 MS. HENN: Objection to
11 form.
12 THE WITNESS: That would be
13 correct.
14 BY MR. PAPANTONIO:
15 Q. You would be breaking the
16 law, just breaking the law; is that
17 correct?
18 MS. HENN: Objection to
19 form.
20 BY MR. PAPANTONIO:
21 Q. Yes?
22 A. We would be out of
23 compliance.
24 Q. You would be breaking the

Page 88

1 law, Mr. Oriente, yes or no?
2 MS. HENN: Objection to
3 form.
4 THE WITNESS: As the way
5 it's written, yes.
6 BY MR. PAPANTONIO:
7 Q. Okay. Let's go to the next
8 page. It's Page 10. It says, "Failure
9 to report timeline."
10 Do you see that?
11 And then the first thing it
12 has there, it says, "May 2nd, 2008,
13 settlement."
14 Do you see that? That's
15 what we've been talking about,
16 Mr. Oriente. Do you see that?
17 A. Yes, yes.
18 Q. And then it says, "On
19 July 15, 2011, the DEA requested a list
20 of McKesson's top 20 purchase" --
21 "purchasers of oxycodone, oxymorphone,
22 hydrocodone, and alprazolam."
23 Do you see that?
24 A. Yes, that's here.

Page 89

1 Q. And then it says, "CSMP
2 files" -- they requested files for
3 Accokeek Drug Healthcare and Family Meds.
4 Do you see that?
5 A. Yes.
6 Q. And it says, "Purchase
7 history for Accokeek," right?
8 A. Yes.
9 Q. And tell me which one of
10 those -- those pharmacies you're familiar
11 with?
12 A. Both Accokeek and Family
13 Meds.
14 Q. How are you familiar with
15 them personally?
16 A. I made site visits to
17 Accokeek pharmacy and met with the
18 pharmacists. Part of our program for
19 controlled substance monitoring was to
20 make pharmacy visits, and so I had been
21 to Accokeek pharmacy.
22 Q. So you had -- you had direct
23 contract -- contact with Accokeek, right?
24 A. I did.

Page 90

1   Q.   And who else did you have
2  direct contact with?
3     A.   Family Meds, I believe, is
4  the same owner as Accokeek, if I recall.
5     Q.   Okay.  All right.  And it
6  says that the -- it says as of July 15,
7  2011, they requested a list of the top 20
8  purchases.
9         And, sir, you would agree
10  that the reason that you report this kind
11  of information to the DEA of suspicious
12  orders is because they have -- you have
13  to be part of the policing in the -- in
14  the sale of narcotics.  That's what a
15  distributor is.  You have to be part of
16  the policing to keep narcotics running --
17  you know, running in a way they are
18  supposed to run, correct?
19         MS. HENN:  Objection to
20     form.
21         THE WITNESS:  We are
22     responsible as a distributor to
23     have a program in place that would
24     monitor controlled substance

Page 91

1  sales.
2  BY MR. PAPANTONIO:
3     Q.   In fact, you were actually
4  part of the policing of the drug sales,
5  correct?  Your organization, McKesson, or
6  any distributor is part of that policing
7  process, aren't you?
8         MS. HENN:  Objection to
9     form.
10         THE WITNESS:  Part of our
11     requirement as a distributor and
12     registrant is to have a monitoring
13     program in place, yes.
14  BY MR. PAPANTONIO:
15     Q.   And certainly, on July 15th,
16  2011, you were aware that there was also
17  a drug crisis that was taking place, an
18  opioid drug crisis taking place in
19  America.  You knew that, didn't you?
20     A.   I knew that there was high
21  opioid problem, yes.
22     Q.   And you were supposed to
23  report this information because you
24  wanted to make sure there was no criminal

Page 92

1  use of drugs, correct?
2         MS. HENN:  Objection to
3     form.
4         THE WITNESS:  In what case
5     are you referring to?  In the case
6     of Accokeek?
7  BY MR. PAPANTONIO:
8     Q.   No, no particular case.  As
9  a broad statement, the reasons that you
10  were supposed to report suspicious orders
11  is because one thing you wanted to try to
12  prevent was the criminal use of drugs,
13  correct?
14     A.   If -- if we deemed an order
15  suspicious and -- and we would report it
16  to prevent diversion.
17     Q.   And that is criminal use of
18  drugs, correct?  That's one diversion is
19  criminal use of drugs?
20     A.   For nonmedical purpose, yes.
21     Q.   And you clearly knew in 2011
22  that there was already, as you said, you
23  already understood there was an opioid
24  drug crisis in America, correct?

Page 93

1         MS. HENN:  Objection to
2     form.
3  BY MR. PAPANTONIO:
4     Q.   You knew that?
5     A.   Yes.
6     Q.   And you knew that there was
7  actually -- that there was occurrences
8  that were even characterized as the oxy
9  express.  Have you ever heard of the oxy
10  express?
11         MS. HENN:  Objection to
12     form.
13         THE WITNESS:  I have heard
14     of the oxy express.  I believe
15     that was a problem in Florida
16     coming up the east coast.
17  BY MR. PAPANTONIO:
18     Q.   Well, as a matter of fact,
19  it came up right into the area that you
20  were part of a distributor, right in your
21  part of the country.  The oxy express
22  came right up to where you were a
23  distributor.  So where -- excuse me,
24  where you were a regulator for the

Page 94

1 distribution of McKesson narcotics. You
2 knew that, right?
3        MS. HENN: Objection to
4 form.
5 BY MR. PAPANTONIO:
6    Q.   I'm going to -- let me
7 repeat the question, because I want to be
8 clear about this.
9        You knew in 2011 that the
10 oxy express ran right through the very
11 territory where you were working as a
12 regulator for the sale in regard to the
13 sale of narcotic drugs for McKesson. You
14 knew that, didn't you?
15        MS. HENN: Objection to
16 form.
17        THE WITNESS: I didn't know
18        that it was specifically at any
19        one pharmacy. I knew that it was
20        along the east coast.
21 BY MR. PAPANTONIO:
22    Q.   You didn't know where it
23 ended?
24        MS. HENN: Objection to

Page 95

1        form.
2        THE WITNESS: From my
3        understanding it went all the way
4        up to Boston.
5 BY MR. PAPANTONIO:
6    Q.   And you -- so it covered the
7 very territory -- some of the very
8 territory you worked, the oxy express?
9        MS. HENN: Objection to
10        form.
11 BY MR. PAPANTONIO:
12    Q.   Right?
13    A.   The oxycodone problem was
14 along the entire east coast.
15    Q.   And the only way the oxy
16 express could work is there was a glut of
17 opioids out there -- for the oxy express
18 to work, there had to be extra drugs out
19 on the market, correct?
20        MS. HENN: Objection to
21        form.
22 BY MR. PAPANTONIO:
23    Q.   Have you ever heard that,
24 that the oxy express could not operate

Page 96

1 unless there was a glut of opioids out in
2 the market?
3    A.   I have not heard that
4 before, no.
5    Q.   All right. Let's go to the
6 next page here. It says, "Failure to
7 report timeline. Between May 2008 and
8 July 15, 2011, McKesson did not submit a
9 single suspicious order."
10        Do you see that?
11        MR. PAPANTONIO: Could you
12        underline this for me, Evan? If
13        you don't mind, I want you to
14        underline between May 2008 and
15        July 15, 2011, McKesson did not
16        submit a single suspicious order.
17 BY MR. PAPANTONIO:
18    Q.   Do you see that?
19    A.   I see that.
20    Q.   And you, sir, were working
21 as a regulator between 2008 and
22 July 2011. That was your job as a
23 regulator, right?
24        MS. HENN: Objection to

Page 97

1        form.
2        THE WITNESS: Yes, that was
3        part of my job.
4 BY MR. PAPANTONIO:
5    Q.   And you, sir -- so if we
6 read this right, you never were involved
7 in submitting one single suspicious order
8 to the DEA even after you had already
9 been fined -- McKesson had already been
10 fined $13 million the first time, right?
11    A.   In this time period from
12 2008 to 2011 --
13    Q.   We're talking almost four
14 years.
15        MS. HENN: Counsel.
16 BY MR. PAPANTONIO:
17    Q.   I'm sorry. Go ahead.
18    A.   In this time period between
19 2008 and 2011, I know that I had
20 customers that we stopped doing business
21 with. As far as the suspicious order
22 reporting, I don't recall the exact
23 number. Here it's saying that it did not
24 submit a single one.

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  Q.   The exact number --
2       MS. HENN:  Counsel.
3  BY MR. PAPANTONIO:
4  Q.   I'm sorry.  Go ahead.
5  A.   But I do not recall the
6  exact number that that would have been.
7  I know that we had customers that we
8  would stop doing business with.  But as
9  far as a single suspicious order, I'm not
10 familiar with that.
11 Q.   Well, the number here, sir,
12 there are no numbers.
13 A.   Right.
14 Q.   They're saying zero.
15 A.   Mm-hmm.
16 Q.   Your company was fined
17 $13 million for breaking the law in 2008,
18 right?  And then your company, McKesson,
19 agreed to say, oh, we're going to do
20 better.  Isn't that what you told me a
21 few minutes ago?  We're going to do
22 better?
23      MS. HENN:  Objection to
24 form.

Page 99

1       THE WITNESS:  What I -- what
2  I said was we had enhanced the
3  program to identify suspicious
4  orders, yes.
5  BY MR. PAPANTONIO:
6  Q.   So let me get this right.
7  This is your enhanced program.  Between
8  2008 and 2011, your enhanced program
9  reported zero suspicious orders.  That's
10 the enhanced program that you're talking
11 about?
12 A.   The -- I can't say exactly
13 what would have been suspicious between
14 that time period because I don't -- I
15 don't have that information.  What --
16 Q.   This -- go ahead.
17 A.   But what I was going to say
18 is that, according to this document,
19 yeah, zero orders were reported.
20 Q.   Okay.  And if zero orders
21 are reported, A, you were breaking the
22 law, correct?
23      MS. HENN:  Objection.
24 BY MR. PAPANTONIO:

Page 100

1  Q.   McKesson, not you, but
2  McKesson is breaking the law?
3  A.   If there were --
4       MS. HENN:  Objection to form
5  go ahead.
6       THE WITNESS:  If there were
7  suspicious orders during that
8  period and we did not report them,
9  then yes.
10 BY MR. PAPANTONIO:
11 Q.   You're breaking the law.
12      And the second thing is, if
13 there were no suspicious orders at that
14 time, you are absolutely violating your
15 2008 agreement with the Department of
16 Justice where you said you were going to
17 build an enhanced program, right?
18      MS. HENN:  Objection to
19 form.
20      THE WITNESS:  We did build
21 that enhanced program.
22 BY MR. PAPANTONIO:
23 Q.   I'm looking at the enhanced
24 program.  The enhanced program says that

Page 101

1  between 2008 and 2011, the enhanced
2  program didn't report one suspicious
3  order.  Do you understand what I'm saying
4  here, Mr. Oriente?
5       MS. HENN:  Objection to
6  form.
7       THE WITNESS:  No orders were
8  reported during that time period.
9  BY MR. PAPANTONIO:
10 Q.   Gotcha.
11 A.   We were still monitoring and
12 watching what purchases were being made.
13 Q.   Okay.  Where is it -- you
14 tell me anywhere, in everything that
15 we've just reviewed so far, that it says
16 that you can monitor and not report a
17 suspicious order?
18      MS. HENN:  Objection.
19 BY MR. PAPANTONIO:
20 Q.   You tell me where I'm
21 supposed to find that law.  I'll go to it
22 right now.  We'll talk about it.  Where
23 is the law that says all you have to do
24 is monitor and not report suspicious

Page 102

1 orders?
2    MS. HENN: Objection to
3 form.
4    THE WITNESS: We have to --
5 we have to report suspicious
6 orders if identified as
7 suspicious.
8 BY MR. PAPANTONIO:
9    Q.   Right. Right. And you
10 identified no suspicious orders between
11 2008 and 2011 under your new, improved,
12 enhanced program, correct? That's what
13 this says, isn't it?
14    MS. HENN: Objection to
15 form.
16    THE WITNESS: That's what
17 this says.
18 BY MR. PAPANTONIO:
19    Q.   Okay. And it says -- as a
20 matter of fact, it says, in fact,
21 McKesson did not submit a suspicious
22 order until November of 2011.
23    Do you see that?
24    A.   Yes, I see that.

Page 103

1    Q.   And then underneath it says,
2 "Four months after DEA requested the top
3 customer list and CSMP files for Accokeek
4 and Family Meds."
5    Do you see that? Take a
6 minute and read -- take a minute and read
7 that. I want you to get that in your
8 head before I ask you questions about it.
9 "Four months after DEA requested the top
10 20 customer list and the CSMP files for
11 Accokeek and Family Meds is the first
12 time that McKesson submitted a suspicious
13 order."
14    Do you see that?
15    A.   Yes, I see that.
16    Q.   All right. So if I'm
17 reading this right, four years -- I mean,
18 between 2008 and 2011, there's no
19 suspicious orders reported by McKesson,
20 if we take that first paragraph, right?
21    And then -- sir, did you
22 want to say something?
23    MS. HENN: That was the
24 phone.

Page 104

1    THE WITNESS: No, it wasn't
2 me. There was a phone beeping.
3 BY MR. PAPANTONIO:
4    Q.   And then the next paragraph
5 is -- is -- it says, "McKesson did not
6 submit a suspicious order until November
7 of 2011, but that was four months after
8 the DEA requested the information,
9 customer lists, and the files for
10 Accokeek and Family Meds Incorporated,"
11 right?
12    MS. HENN: Objection to
13 form.
14 BY MR. PAPANTONIO:
15    Q.   That's what it says, right?
16    A.   That's what -- yeah, that's
17 what --
18    Q.   All right.
19    A.   -- this bullet is saying,
20 that they requested the 20 top customers
21 and files for Accokeek and Family Meds.
22    Q.   All right, sir. As we go
23 forward, I want to be very clear about
24 something. It was not your -- what you

Page 105

1 told me at the beginning of this
2 deposition, that it was the lawyers for
3 McKesson who was supposed to be reporting
4 the suspicious orders. Is that what you
5 told me?
6    MS. HENN: Objection to
7 form.
8    THE WITNESS: No. What I
9 said was when requests came in for
10 customer files like for Accokeek
11 and Family Meds, that request
12 would go from me to our legal
13 department for them to pull the
14 reports to send to Accokeek and
15 Family Meds.
16 BY MR. PAPANTONIO:
17    Q.   So did you personally do any
18 reporting of suspicious orders between
19 2008 and 2011? Did you?
20    A.   I don't recall the exact
21 amount that I would have done. I
22 don't -- I don't remember how many
23 customers I would have sent in to DEA,
24 nor if I reported any orders. It's seven

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  to 10 years ago.
2     Q.   Well, I understand that.
3  But, so we have to go -- the only
4  document we have is the DEA investigation
5  that says that between May 2008 and
6  July 2011, McKesson did zero reports,
7  correct?
8        MS. HENN:  Objection to
9     form.
10 BY MR. PAPANTONIO:
11    Q.   That's all we have to go by.
12       MS. HENN:  Objection to
13    form.
14       THE WITNESS:  That's what is
15    listed here, yes.
16 BY MR. PAPANTONIO:
17    Q.   Yeah.  And let's go to
18 the -- let me ask you something.  If this
19 is true, if it's true that between 2008
20 and 2011 that there were suspicious
21 orders that were reported to McKesson,
22 but McKesson did not report them to the
23 DEA, that would be breaking the law,
24 correct?

Page 107

1        MS. HENN:  Objection to
2     form.
3        THE WITNESS:  They would not
4     have been reported to McKesson.
5     McKesson would have identified
6     them as suspicious.
7  BY MR. PAPANTONIO:
8     Q.   Okay.  Fine.  If McKesson
9  identified -- identified suspicious
10 orders --
11    A.   Right.
12    Q.   -- and failed to report them
13 to the DEA, that would be breaking the
14 law, wouldn't it?
15    A.   If McKesson identified a
16 suspicious order, McKesson would have
17 reported a suspicious order.
18    Q.   You believe they would have
19 reported.  But this says they did not.
20       MS. HENN:  Objection to
21    form.
22       THE WITNESS:  This says they
23    didn't report any.  So what I'm
24    saying is, if we identified a

Page 108

1  suspicious order, we report a
2  suspicious order.
3  BY MR. PAPANTONIO:
4     Q.   So according --
5     A.   If you don't identify a
6  suspicious order, you don't report it.
7     Q.   Okay.  Right.  So according
8  to Mr. Oriente, there were no suspicious
9  orders that were identified between May
10 2008 and July of 2011.  According to
11 Mr. Oriente, there were no suspicious
12 orders identified by McKesson during that
13 period of time; is that right?
14       MS. HENN:  Objection to
15    form.
16       THE WITNESS:  What -- what I
17    said was if we identified a
18    suspicious order, we would report
19    it.  I can't say that one was
20    identified and not reported
21    because I do not know that.
22 BY MR. PAPANTONIO:
23    Q.   Well, if we go by this
24 document, which is an investigation that

Page 109

1  was done by the U.S. government,
2  Department -- the DEA and the Department
3  of Justice, if we go by this document, it
4  says that under this enhanced program,
5  that McKesson had in place, there were
6  zero suspicious orders reported during
7  that time between 2008 and 2011, right?
8        MS. HENN:  Objection to
9     form.
10 BY MR. PAPANTONIO:
11    Q.   If we go by this document.
12    A.   That's what -- yes.
13    Q.   Do you have any reason to
14 believe --
15       MS. HENN:  Can you let the
16    witness finish his answers?
17       MR. PAPANTONIO:  Yeah.  I'm
18    sorry.
19       THE WITNESS:  I was going to
20    say, that's what the document has
21    listed here, that there were none
22    reported between May of 2008 and
23    July 15th of 2011.
24 BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Q.   Do you have any independent
2  knowledge, sir, about the DEA taking it
3  on themselves to phony -- phony up
4  information and lie about what we're
5  reporting right here?
6          MS. HENN:  Objection to
7      form.
8          THE WITNESS:  No, I would
9      not believe that.
10 BY MR. PAPANTONIO:
11   Q.   I wouldn't believe -- no,
12 that's what I'm -- I want to make sure
13 you're not taking the position that what
14 the DEA is representing here, that there
15 were zero suspicious orders between 2008
16 and 2011.  You're not taking the position
17 that the DEA in any way lied about that,
18 right?
19   A.   No, absolutely not.
20   Q.   All right.  That's good.
21         MS. HENN:  Counsel, there
22     have been additional beeps.
23     You've heard them.  Can we ask
24     anyone on the phone who's not yet

Page 111

1  noted their appearance and is
2  listening in to please do so now.
3          Is there anyone on the phone
4      who has not yet noted their
5      appearance?
6          MR. PAPANTONIO:  All right.
7          THE WITNESS:  Must not be.
8          MR. PAPANTONIO:  I guess
9      not.
10 BY MR. PAPANTONIO:
11   Q.   Let's go to the next page,
12 Page 12.  Just turn one page over there
13 if you would, Mr. Oriente.
14         It continues.  The headline
15 on this DEA report, Department of Justice
16 report, is, "Failure to Report Timeline."
17 And we're talking about McKesson; is that
18 correct?  Right.  The cover on this is --
19 is "In the Matter of McKesson
20 Corporation," right?
21   A.   Yes.
22   Q.   And this says, "Failure to
23 report timeline."  And the first -- the
24 very first thing we see there is on

Page 112

1  October 25th, 2011, the DEA requested the
2  CSMP files for ten additional McKesson
3  customers, including Drug City, Judy's
4  Drug Store, and Herndon Pharmacy.
5          Now, first of all, tell the
6  jury what is -- at this point, they've
7  probably heard this already, but tell
8  them what a CSMP is?
9    A.   CSMP is an acronym for
10 controlled substance monitoring program.
11   Q.   And that was your
12 responsibility to run a controlled
13 substance monitoring program at McKesson,
14 right?
15   A.   I used the controlled
16 substance monitoring program, yes.  It
17 was a corporatewide program that was used
18 by myself to review customers of their
19 controlled purchases.
20   Q.   Is that the same controlled
21 substance program that failed to report a
22 single suspicious order between 2008 and
23 2011?  Is that the same suspicious -- is
24 that the same CSMP we're talking about

Page 113

1  here?
2          MS. HENN:  Objection to
3      form.
4          THE WITNESS:  There was one
5      CSMP.  There was one program.
6  BY MR. PAPANTONIO:
7    Q.   All right.  So the CSMP is
8  the same one that we're talking about
9  that failed to report even one suspicious
10 order for three and a half years, right?
11         MS. HENN:  Objection to
12     form.
13         THE WITNESS:  That would be
14     the same program.
15 BY MR. PAPANTONIO:
16   Q.   Then it goes on to say --
17 now, I want to ask you.  Which one of
18 these -- Drug City, Judy's Drug, and
19 Herndon Pharmacy, which one of those did
20 you have personal involvement with?
21   A.   I was responsible for all
22 three customers.  I made site visits to
23 Drug City.  And I also made site visits
24 to Herndon Pharmacy.  Herndon Pharmacy

Highly Confidential - Subject to Further Confidentiality Review

Page 114

¹ was actually one of the customers that I
² turned off and reported to DEA.
³      Q.   Right.  We're going to talk
⁴ about that in just a minute.  So you
⁵ actually -- you actually were hands-on
⁶ with these drug stores, right, these
⁷ pharmacies?
⁸      A.   The Drug City and Herndon I
⁹ made actual physical site visits to.  I
¹⁰ don't recall visiting Judy's, no.
¹¹      Q.   Okay.  And the next line
¹² is -- it says, "On November 8, 2011,
¹³ McKesson ceased shipping controlled
¹⁴ substances to Herndon Pharmacy."
¹⁵      Do you see that?
¹⁶      A.   Yes, sir.
¹⁷      Q.   Now, that's 2011.  And
¹⁸ that's less than one month after the DEA
¹⁹ requested the CSMP file.  Do you
²⁰ remember?  They requested the file.  And
²¹ then right after they requested the file,
²² you say that you cut-off Herndon after --
²³ after that request; is that right?
²⁴      MS. HENN:  Objection to

Page 115

¹      form.
²      THE WITNESS:  I turned off
³      Herndon Pharmacy as I was doing my
⁴      due diligence and research on that
⁵      particular customer.
⁶ BY MR. PAPANTONIO:
⁷      Q.   And so is it just a
⁸ coincidence that one month after the DEA
⁹ requested the CSMP files on Herndon
¹⁰ Drugs, you made the determination, less
¹¹ than one month after that, that you were
¹² going to terminate them?  Is that
¹³ coincidence?
¹⁴      MS. HENN:  Objection to
¹⁵      form.
¹⁶      THE WITNESS:  My decision
¹⁷      had nothing to do with the DEA
¹⁸      request for top customers.  What I
¹⁹      would have been looking at is how
²⁰      much Herndon Pharmacy had
²¹      purchased, their percentage of
²²      controls to RX, what type of
²³      controls were they purchasing,
²⁴      what doctors the pharmacy was

Page 116

¹ filling prescriptions for.
²      I remember this one very
³ intimately because the doctor was
⁴ Dr. Salerian in Washington D.C.,
⁵ And he was a psychiatrist, and he
⁶ was writing prescriptions for
⁷ oxycodone.
⁸      And when I visited Herndon
⁹ Pharmacy, Herndon Pharmacy
¹⁰ would -- we would get pharmacy
¹¹ information from the pharmacy to
¹² see how many doctors they were
¹³ filling for and a percent of a
¹⁴ certain doctor.  And that one
¹⁵ doctor was greater than 80 percent
¹⁶ of his oxycodone business.
¹⁷      And the distance from the
¹⁸ doctor's office all the way out to
¹⁹ Herndon Pharmacy in Herndon,
²⁰ Virginia was, I think, greater
²¹ than 25 miles.  And between the
²² distance and the fact that one
²³ doctor was greater than 80 percent
²⁴ of the oxycodone, I made a

Page 117

¹ decision that -- to cease selling
² controlled substances to Herndon.
³ BY MR. PAPANTONIO:
⁴      Q.   Right.
⁵      A.   Herndon Pharmacy then
⁶ brought a lawsuit against McKesson
⁷ because I did terminate selling controls
⁸ to him.
⁹      Q.   And you terminated them one
¹⁰ month --
¹¹      A.   That --
¹²      Q.   Wait a second.
¹³      You terminated them less
¹⁴ than one month after the DEA in 2011
¹⁵ said, "We want the records on Herndon."
¹⁶ That's a correct statement, isn't it?
¹⁷      A.   I would not have known that
¹⁸ Herndon was one that was sent in to DEA.
¹⁹      Q.   Well, so it's purely
²⁰ coincidental?  Is that what we're saying
²¹ here?
²²      A.   Herndon was one of my top
²³ customers that I was looking at.  The
²⁴ fact that they were also on the list to

Page 118

1 DEA was not my -- you know, did not make
2 my decision based off of what I found in
3 doing my due diligence of the doctor, the
4 distance, the type of controls that he
5 was purchasing for me to make the
6 decision to recommend turning him off.
7     Q.   Okay.  But between 2008 and
8 2011, that's the first time that you ever
9 did that, isn't it?
10        MS. HENN:  Objection to
11     form.
12 BY MR. PAPANTONIO:
13     Q.   It's the first time that you
14 closed a pharmacy down between 2008 and
15 2011, right?
16        MS. HENN:  Objection to
17     form.
18        THE WITNESS:  It may have
19     been in Landover.
20 BY MR. PAPANTONIO:
21     Q.   Yeah.
22     A.   But I'm not aware.  I would
23 have to go and see what other customers I
24 had between '8 and '11 at other

Page 119

1 distribution centers that may have been
2 turned off.
3     Q.   So between 2008 and 2011,
4 Mr. Oriente, that's you, reports no
5 suspicious orders, closes no pharmacies
6 down.  And then, after the DEA in
7 October 2011 says, "Hey, we want the
8 files on Herndon drugs," that's when you
9 close them down, one month later?
10        MS. HENN:  Objection to
11     form.
12 BY MR. PAPANTONIO:
13     Q.   Is that -- is that right?
14        MS. HENN:  Objection to
15     form.
16        THE WITNESS:  It would have
17     been more than one month that I
18     was looking at Herndon Pharmacy.
19     So I would have been looking at
20     Herndon Pharmacy prior to the DEA
21     requesting their top -- or
22     McKesson's top customers.  So...
23 BY MR. PAPANTONIO:
24     Q.   So you had -- so in other

Page 120

1 words, you -- there were things that
2 Herndon was doing that was suspicious to
3 you; is that correct?  Long before they
4 were closed down; is that your testimony?
5        MS. HENN:  Objection to
6     form.
7        THE WITNESS:  We look at all
8     customers.  And I would have been
9     looking at Herndon as one of my
10     customers.  And then once I made
11     the determination that it was
12     suspicious, we turned them off.
13 BY MR. PAPANTONIO:
14     Q.   How many years were you
15 doing business with Herndon before you
16 simply turn them off after the DEA asked
17 for their files?  How many years have you
18 been doing business?
19     A.   I do not know when Herndon
20 Pharmacy exactly started with McKesson.
21 I don't know --
22     Q.   Were they -- go ahead.
23     A.   It could have been a newer
24 pharmacy.  It may have been a year.  I do

Page 121

1 not know that, when Herndon started with
2 McKesson.
3     Q.   You don't -- you don't know
4 that Herndon Pharmacy was there with
5 Landover the entire time that Landover
6 was in operation.  That's what your
7 testimony is?
8        MS. HENN:  Objection to
9     form.
10        THE WITNESS:  I don't know
11     when Herndon Pharmacy opened with
12     McKesson as a customer.  Yeah, I
13     don't have that date in my head.
14 BY MR. PAPANTONIO:
15     Q.   All right.  So just to be
16 clear, prior to the time that the DEA
17 says, "Give us the files on Herndon
18 Pharmacy," you had, first of all, never
19 reported a suspicious order on Herndon;
20 B, you determined that you would close
21 them down one month after the DEA
22 requested their files; is that correct?
23        MS. HENN:  Objection to
24     form.

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 THE WITNESS: As I said, my
2 investigation of Herndon Pharmacy
3 would not have been done in four
4 weeks. It would have been ongoing
5 before the DEA asked for the list
6 of top 20 customers.
7 So during my research of
8 Herndon which included site
9 visits, going past where the
10 doctor was located, seeing the
11 distance from the doctor to the
12 pharmacy, looking at their percent
13 of controlled substances that they
14 were purchasing -- excuse me --
15 purchasing, that would have taken
16 time.
17 And then when I received the
18 information that I had, made my
19 report, I requested and submitted
20 saying that we should terminate
21 Herndon Pharmacy as a customer.
22 Now the fact that they were
23 happening simultaneously, that
24 again did not weigh in on my

Page 123

1 decision to review Herndon.
2 I looked at our top
3 customers. So if our top
4 customers and DEA asked for that
5 top customer list, basically
6 equated to the same list of
7 customers, that makes sense
8 because we're looking at the same
9 top purchasing customers. Once it
10 was determined that Herndon was a
11 risk, I terminated them.
12 BY MR. PAPANTONIO:
13 Q. Well, the truth is, you were
14 suspicious of Herndon -- what you're
15 telling me is that you were suspicious of
16 Herndon prior to the time that the DEA
17 sent you a letter saying send us the
18 files? You were suspicious of them
19 already, right?
20 MS. HENN: Objection to
21 form.
22 THE WITNESS: I wouldn't say
23 that I was suspicious. They were
24 one that was identified as a

Page 124

1 customer of interest because of
2 their volume. They were a
3 customer of interest because of
4 their volume. So they were one of
5 the customers that I was
6 researching.
7 We have thousands of
8 customers. And so I was
9 researching Herndon, doing my due
10 diligence to determine if they
11 were a suspicious customer. And
12 as my research determined, I felt
13 they were, and, therefore, we
14 terminated business.
15 BY MR. PAPANTONIO:
16 Q. So you had been doing
17 business with them for, you don't know
18 how many years before you terminated
19 them?
20 A. That is correct. I know
21 they were a newer pharmacy and had opened
22 recently, I don't know the exact time
23 that they did business with McKesson.
24 Q. And you were -- you're

Page 125

1 saying that you were running some kind of
2 private investigation? I mean you were
3 investigating them on your own?
4 A. Yeah. I wouldn't say it was
5 a private investigation.
6 I mean, part of the
7 controlled substance monitoring program
8 that McKesson had was to know our
9 customer and do a site visit, talk with
10 the pharmacy, understand their business,
11 look for any signs such as, you know,
12 lines that may be outside the pharmacy,
13 look for any activity at a pharmacy that
14 doesn't look quite right.
15 Also go by a doctor's
16 office, see if there's a line of people
17 standing outside the doctor's office.
18 Are the license plate of cars driving up,
19 are they from within the state, or are
20 they from out of state. Those are the
21 type of things we looked for.
22 Q. Right. As a matter of fact,
23 sir, you actually had salespeople on the
24 ground working in different areas of the

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 country that lived right in the very city
2 where there were pill mills, right?  You
3 had McKesson employees -- if a city had a
4 pill mill, they lived right in that city,
5 didn't they?
6         MS. HENN:  Objection to
7     form.
8         THE WITNESS:  I'm unaware of
9     where McKesson employees live.
10    I -- you know, we have people that
11    live all over the country.
12 BY MR. PAPANTONIO:
13    Q.   Right.
14    A.   So specifically to where
15 they live, I do not know.
16    Q.   So but if you had an
17 employee that lived next to a pill mill
18 and they saw people lined up around the
19 pill mill at 8 o'clock in the morning,
20 that's something that you would want to
21 know as a regulatory guy, right?
22    A.   Yes, I would -- I would want
23 to know that information.  And
24 salespeople would call me from time to

Page 127

1 time and tell me that, you know, they
2 were either at a -- at a pharmacy.  So
3 there was some correspondence between
4 salespeople and myself if they saw
5 something and wanted to alert me to.
6    Q.   And how many -- tell me how
7 many pharmacies you closed down besides
8 Herndon?
9         MS. HENN:  Objection to
10    form.
11        THE WITNESS:  I don't know
12    off the top of my head.  I would
13    have to go back to records.
14 BY MR. PAPANTONIO:
15    Q.   More than three?
16    A.   Oh, yes.
17    Q.   Okay.  You have records that
18 show that, right?
19    A.   Yes.
20        MS. HENN:  Counsel, we've
21    been going over an hour.  I've
22    been waiting for a break.  But I
23    haven't really come to a natural
24    one.  I'd like to take a

Page 128

1 ten-minute break.
2         MR. PAPANTONIO:  Sure.
3         MS. HENN:  Thank you.
4         THE VIDEOGRAPHER:  Off the
5     record, right?  All right.  Stand
6     by, please.  The time is
7     10:20 a.m.  Going off the record.
8         (Short break.)
9         THE VIDEOGRAPHER:  We are
10    back on the record.  The time is
11    10:32 a.m.
12 BY MR. PAPANTONIO:
13    Q.   All right.  Sir, to continue
14 where we are, go to the page that's
15 marked -- go to the page that's marked
16 13.  I want to ask you, as you're looking
17 at that.  Now, I -- so one thing I'm not
18 clear about that you said prior to this
19 break was that you did an investigation
20 and you shut down Herndon; is that right?
21    A.   Yeah.
22    Q.   You did that, right?
23    A.   Yeah.  It was my
24 recommendation.

Page 129

1    Q.   When you did that, did you
2 report suspicious orders to the DEA?
3    A.   We reported the closing of
4 Herndon Pharmacy to DEA.
5    Q.   Did you report suspicious
6 orders to the DEA when you shut Herndon
7 down, yes or no?
8    A.   We -- I would say that that
9 was the same thing.  We reported
10 suspicious activity and that we closed
11 Herndon Pharmacy.
12    Q.   No, sir.  It's not the same
13 thing.
14        You -- for the record, I
15 want to be very clear.  When you decided
16 to shut down Herndon, you did not even
17 report suspicious orders to the DEA when
18 you did that, did you?
19        MS. HENN:  Objection to
20    form.
21 BY MR. PAPANTONIO:
22    Q.   Right?
23    A.   I'm not familiar with
24 reporting suspicious orders versus we're

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 closing a customer because of activity
2 that we don't feel --
3     Q.   Sir, you understand --
4         MS. HENN:  Sir, please let
5     him finish his answer.
6 BY MR. PAPANTONIO:
7     Q.   Were you finished?
8     A.   I wasn't.
9     Q.   Go ahead.  Finish your
10 answer.
11         MS. HENN:  Thank you, sir.
12         THE WITNESS:  We closed the
13     pharmacy because -- I don't
14     remember the exact letter that was
15     sent to DEA.  I know there was a
16     letter sent to DEA -- in the local
17     DEA, that oversaw the Landover DC,
18     saying that we were closing
19     Herndon Pharmacy.
20 BY MR. PAPANTONIO:
21     Q.   Okay.  So you closed them
22 down.  You saw clearly there were
23 suspicious orders before you closed them
24 down, correct?  Right?

Page 131

1     A.   Suspicious activity with the
2 doctors and the distance.
3     Q.   And you did not report that
4 to the DEA, yes or no, Mr. Oriente?  Very
5 simple?  When you saw suspicious
6 orders -- you want to call it suspicious
7 activity -- you did not report that to
8 the DEA?
9     A.   We --
10         MS. HENN:  Objection.
11 BY MR. PAPANTONIO:
12     Q.   You just said we shut them
13 down?
14         MS. HENN:  Objection to
15     form.
16         THE WITNESS:  We reported
17     when we closed them.
18 BY MR. PAPANTONIO:
19     Q.   Oh.  You -- after you closed
20 them is when you reported them to the
21 DEA?  Is that what you're telling us?
22     A.   At the same time.  We closed
23 them and sent the letter.  We called the
24 DEA and said, "We're a closing Herndon

Page 132

1 Pharmacy," and sent a follow-up letter to
2 DEA saying we're closing them.
3     Q.   Did you report the
4 suspicious orders in the letter that you
5 sent, yes or no?
6     A.   The specific orders?
7     Q.   Yes.  Suspicious orders, did
8 you report them when you closed down
9 Herndon?
10     A.   We reported the customer.
11 We reported the customer as being
12 suspicious.
13     Q.   Where is it that you get the
14 right to report a customer?  Where does
15 that come from?  There's nothing in the
16 statute that says all you have to do is
17 report a customer.  If it's there, please
18 show it to me.
19         MS. HENN:  Objection to
20     form.
21 BY MR. PAPANTONIO:
22     Q.   Please show me in the U.S.
23 21 statute anywhere where it says, "Hey,
24 all you have to do is report a suspicious

Page 133

1 customer.  You don't have to report
2 suspicious orders."  How about showing
3 that to me, so we can proceed with that.
4         MS. HENN:  Objection to
5     form.
6         THE WITNESS:  I don't see it
7     in the document anywhere.
8 BY MR. PAPANTONIO:
9     Q.   It's not there?
10     A.   So it's not there.
11     Q.   Yeah, it's not there.  You
12 just made that up just now, didn't you?
13     A.   No, I didn't make it up.  We
14 reported a suspicious customer to DEA.
15     Q.   But you did not report
16 suspicious orders to the DEA; is that
17 correct?
18         MS. HENN:  Objection to
19     form.
20 BY MR. PAPANTONIO:
21     Q.   Right?  You did not?
22     A.   Not specific orders.
23     Q.   And you understand that the
24 DEA was not -- the DEA was investigating

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 you, McKesson, not, Herndon. You
2 understand that, right? This thing that
3 we're covering right now is where the DEA
4 was trying to determine whether or not
5 your company engaged in unlawful conduct
6 by selling narcotics in the United
7 States. Yes or no, do you know that?
8        MS. HENN: Objection to
9    form.
10       THE WITNESS: When the DEA
11    asked for the list of top 20
12    customers and asked for specific
13    records on certain pharmacies, I
14    was not aware that we were being
15    investigated, no.
16 BY MR. PAPANTONIO:
17    Q.   Okay. So, but you
18 understand, sir, that if your company --
19 let's take Herndon out of it. This is
20 not about the Herndon Pharmacy, sir.
21 This investigation is about your company,
22 your CEO, you, Michael Oriente. This is
23 about you. It's not about Herndon,
24 right?

Page 135

1        MS. HENN: Objection to
2    form.
3 BY MR. PAPANTONIO:
4    Q.   Correct?
5        MS. HENN: Objection to
6    form.
7        THE WITNESS: Yes.
8 BY MR. PAPANTONIO:
9    Q.   And the information that you
10 didn't give to the -- to the DEA, we know
11 that you didn't give them suspicious
12 orders for sales that you had been
13 performing with Herndon for how many
14 years?
15       MS. HENN: Objection to
16    form.
17       THE WITNESS: Again, I said
18    I don't know how long Herndon was
19    a customer of McKesson. But if
20    the orders going into Herndon were
21    not deemed suspicious, but the
22    activity of the distance of the
23    doctor, the type of practice the
24    doctor was, the percentage of

Page 136

1 controlled substances that that
2 one doctor was writing at that
3 pharmacy, my interview with the
4 pharmacist, then owner, that
5 activity was suspicious.
6        Any one order may not have
7 been deemed suspicious, but the
8 total activity at the pharmacy,
9 when taking all those variables
10 into account, that's what made it
11 a suspicious activity pharmacy.
12 BY MR. PAPANTONIO:
13    Q.   Let's explore that a little
14 further.
15       Where's my -- where's my
16 video here?
17       Let's go to the next page.
18 13 -- it's Page 13. And we'll -- I want
19 to explore what you just said.
20       Because you just said that
21 all you had a responsibility to do was to
22 report suspicious activity, didn't you?
23       MS. HENN: Objection to
24    form.

Page 137

1        THE WITNESS: No, I didn't
2 say that. I didn't say that.
3 What I said was the variable
4 elements that made up my due
5 diligence of distance from the
6 pharmacy to the -- doctor to the
7 pharmacy, the amount that that one
8 doctor was writing, the fact that
9 when I talked to the PIC owner,
10 PIC being pharmacist in charge and
11 owner, that when he requested an
12 increase, a threshold increase, he
13 did not mention Dr. Salerian at
14 all, which was the top prescribing
15 doctor that he was filling for.
16 So he mentioned two or three other
17 doctors in the area that were not,
18 you know, high amount of
19 prescriptions.
20       The leading doctor that he
21 was filling for, he never
22 mentioned to me. So his activity
23 is what made me deem him
24 suspicious, not necessarily one

Page 138

1    order that he placed.
2    BY MR. PAPANTONIO:
3        Q.   But you'd agree that he did
4    place suspicious orders?
5        A.   No, I wouldn't agree with
6    that.
7        Q.   All right.  Well, let's go
8    to -- let's see.  There's more in this
9    document that tells us about Herndon.
10       A.   Yeah.  Yeah.
11       Q.   Let's take a look at it.
12       A.   All right.
13       Q.   Okay.  Go to the next page.
14       A.   Is that 13?
15       Q.   Yep.  Do you see where it
16   says, "Failure to report timeline"?
17       A.   Yes.
18       Q.   And the failure to report is
19   McKesson company, isn't it?  We're
20   talking about McKesson failure to report?
21       A.   Yes, yes.
22       Q.   We're not talking about
23   Herndon's failure to report, right?
24       A.   No.

Page 139

1        Q.   This is about a criminal --
2    this is -- excuse me.  This is about a
3    DOJ investigation into McKesson, right?
4        A.   That is what this document
5    would appear, yes.
6        Q.   And it says, "On January 13,
7    2012, McKesson discontinued Accokeek."
8    All right.  Do you see that?
9        A.   Yeah, Accokeek.
10       Q.   Accokeek.  "On that same
11   date, McKesson discontinued Family Meds."
12       Do you see that?
13       A.   Right.  As I stated, I
14   believe they were the same owner.
15       Q.   And then it says, "On
16   January 19, 2012, McKesson submitted SORs
17   for these two pharmacies a week before
18   scheduling a meeting at DEA."
19       Do you see that?
20       MS. HENN:  Objection to
21   form.
22       THE WITNESS:  Mm-hmm.
23   BY MR. PAPANTONIO:
24       Q.   All right.  So all of the

Page 140

1    sudden, between 2008 and 2011 there is
2    absolutely zero reporting about
3    suspicious orders or suspicious customers
4    or suspicious anything, right?
5        MS. HENN:  Objection to
6    form.
7    BY MR. PAPANTONIO:
8        Q.   Right?
9        A.   That is what this document
10   has.  And what I was thinking, where you
11   had here that we did not submit a single
12   suspicious order from '8 to '11.
13       Q.   Right.
14       A.   Was that to DEA headquarters
15   or to the field offices?
16       Q.   Well, you have to tell me,
17   sir.  You're the one in charge of
18   regulatory.  This is an -- this is an
19   investigation done by the DEA, and they
20   said between those years, there's no
21   record that you -- that you reported any
22   suspicious orders.
23       A.   Because when we were out in
24   the -- in the field, we had

Page 141

1    correspondence with DEA offices that are
2    out overseeing our distribution centers.
3        So I'm trying to understand,
4    in that statement where nothing was sent
5    into DEA, does that include the field
6    offices and the headquarters or just
7    headquarters?
8        Q.   Sir, this document speaks
9    for itself.  This document says that your
10   company failed to do any suspicious order
11   reporting for four years.  That speaks
12   for itself.  Okay.
13       MS. HENN:  Objection to
14   form.
15   BY MR. PAPANTONIO:
16       Q.   Let's go to the next page.
17       The next page is -- it is --
18   we are on 13.  It says on January 13th --
19   on January 13 --
20       MS. HENN:  Counsel can we
21   pause for a second until the
22   disruption is over.
23       (Brief interruption.)
24   BY MR. PAPANTONIO:

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Q.   "On January 13, 2012,
2 McKesson discontinued sales to Accokeek."
3         Do you see that?
4    A.   Yes.
5    Q.   And it before then had --
6 had done no reporting about suspicious
7 orders to the DEA, right?
8         MS. HENN:  Objection to
9    form.
10 BY MR. PAPANTONIO:
11   Q.   Right?
12        MS. HENN:  Objection to
13   form.
14        THE WITNESS:  I would say
15   that based off of the document,
16   that is correct.
17 BY MR. PAPANTONIO:
18   Q.   And then it says on the same
19 date, McKesson discontinued sales to the
20 Family Meds, right?
21   A.   That is what it states, yes.
22   Q.   And up to that point, there
23 was no reporting by McKesson about any
24 suspicious orders before you discontinued

Page 143

1 selling to these two pharmacies, correct?
2        MS. HENN:  Objection to
3    form.
4 BY MR. PAPANTONIO:
5    Q.   Yes?
6    A.   Since this listed the
7 July 15, 2011, and we closed them on
8 January 13, 2012, I don't know what
9 occurred between July 15, 2011, and
10 January 13, 2012.
11   Q.   But after you got the letter
12 from the DEA saying that we want the
13 records on ten pharmacies, that is when
14 you discontinued selling to Accokeek.
15 That is when you discontinued selling to
16 Family Meds, correct?  After you got the
17 letter --
18   A.   I can't --
19        MS. HENN:  Objection.
20 BY MR. PAPANTONIO:
21   Q.   After you got the letter
22 from the -- let me ask the question
23 again.  After you got the letter --
24   A.   Go ahead.

Page 144

1    Q.   After you got the letter
2 from the DEA requesting files, that they
3 wanted to investigate for ten additional
4 McKesson customers including Drug City,
5 including Judy's Drug, including Herndon
6 and Accokeek, until you got that letter,
7 you were doing business with these folks,
8 weren't you?
9        MS. HENN:  Objection to
10   form.
11        THE WITNESS:  As I stated,
12   simultaneously, my review of these
13   customers would have been ongoing.
14   So the fact that I'm reviewing the
15   same customers that the DEA has
16   asked who our top ten are, shows
17   that I was reviewing our top
18   customers.
19 BY MR. PAPANTONIO:
20   Q.   And it's just a coincidence
21 that you dropped them after the DEA
22 started their investigation?  Is that
23 coincidence?
24        MS. HENN:  Objection to

Page 145

1    form.
2        THE WITNESS:  I was not
3    aware that they had started the
4    investigation.
5 BY MR. PAPANTONIO:
6    Q.   Your legal department -- you
7 say you sent this information, all --
8 your legal department made decisions
9 about contact between McKesson and the
10 DEA in regard to suspicious orders?
11        MS. HENN:  Objection to
12   form.
13        THE WITNESS:  The legal
14   department would have sent in to
15   DEA any request for information on
16   customers.
17 BY MR. PAPANTONIO:
18   Q.   Okay.  So we have this
19 timewise, the investigation starts by the
20 DEA.  You say you did not know about an
21 investigation.  And immediately, within
22 one month after the investigation starts,
23 you start discontinuing business to
24 customers, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1      MS. HENN:  Objection to
2  form.
3      THE WITNESS:  These
4  customers, Accokeek, Family Meds,
5  Herndon, would have been customers
6  that I would have been reviewing
7  for weeks and months.
8  BY MR. PAPANTONIO:
9      Q.   Okay.  And tell me how
10 many -- while you were reviewing them for
11 weeks and months, tell me how many times
12 you reported to the DEA that there were
13 suspicious orders taking place.  Since
14 you have such a great memory of this, you
15 tell me how many times you reported
16 suspicious orders between -- with
17 these -- with these particular -- with
18 these particular pharmacies?
19     A.   I never said --
20     MS. HENN:  Objection to
21 form.
22     THE WITNESS:  I never said
23 that I had a great memory.  So
24 what I'm going to tell you is I

Page 147

1  don't recall how many orders,
2  suspicious orders, were reported.
3      And I don't recall exactly
4  how many customers were turned
5  off.  I know I ceased business
6  with several customers because of
7  suspicious activity that we deemed
8  this customer was doing.  And so
9  we did not want to continue
10 selling controls to.
11 BY MR. PAPANTONIO:
12     Q.   All right.  So at this
13 point, it's either that you just happened
14 to be investigating them at the same time
15 the DEA was, and that's just a
16 coincidence.  Is that -- is that your --
17 is that your testimony here today?
18 That's a coincidence?
19     MS. HENN:  Objection to
20 form.
21     THE WITNESS:  My -- my
22 statement is that we are looking
23 at the same customers.  We're
24 looking at the top purchases.

Page 148

1  BY MR. PAPANTONIO:
2      Q.   Right.
3      A.   So, yeah, we would have been
4  reviewing the same customers.
5      Q.   Yeah.  And you start
6  dropping them, and you start closing down
7  your business with them after you get a
8  letter from the DEA saying, "Let me see
9  their files."  That's when that starts
10 happening, right?
11     MS. HENN:  Objection to
12 form.
13     THE WITNESS:  DEA would have
14 had the ARCOS records to see all
15 along --
16 BY MR. PAPANTONIO:
17     Q.   Right.
18     A.   -- that they were high
19 purchasers.
20     Q.   And you did too?
21     A.   Right.  And that's why I was
22 reviewing them.
23     Q.   Right.  And when they asked
24 for your files to find out whether you

Page 149

1  had actually done any reporting of
2  suspicious orders, they found that you
3  did no reporting, right?
4      MS. HENN:  Objection to
5  form.
6      THE WITNESS:  I wouldn't
7  know what they found.
8  BY MR. PAPANTONIO:
9      Q.   Yeah.  Well, let's talk
10 about what they found.  Let's go to the
11 next page.
12     MS. HENN:  Counsel, just one
13 thing.
14     For those on the phone,
15 we're getting a fair amount of
16 noise.  And we would appreciate it
17 if you could all make sure that
18 you're on mute.  Thank you.
19 BY MR. PAPANTONIO:
20     Q.   "On February 24, 2012,
21 McKesson produced" --
22     A.   Wait, wait.  What page?
23     Q.   I'm on Page 14.  Actually,
24 it's 15.  If you look down in the bottom

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  corner, 15.
2      A.  Right, right.  That's why I
3  asked.
4      Q.  "On February 24th, McKesson
5  produced a summary of the SOR that were
6  ostensibly submitted to the DEA.  Five of
7  the pharmacies included in the summary
8  were customers of McKesson Landover."
9          Do you see that?
10     A.  Yes.
11     Q.  And that's where you did
12 business.  That's the plan that you ran.
13         MS. HENN:  Objection to
14 form.
15 BY MR. PAPANTONIO:
16     Q.  Right?
17     A.  I didn't -- I didn't --
18     Q.  Not ran, but --
19     A.  Right.  I oversaw their --
20     Q.  Regulatory.
21     A.  -- controlled substance.
22         MS. HENN:  And I'm just
23     going to note, there's a lot of
24     talking over each other, which

Page 151

1      makes the court reporter's job
2      really difficult.
3          So I'm going to ask that you
4      allow counsel to finish his
5      answer, he allows you to finish
6      your answer, and just try not to
7      talk over each other.
8          THE WITNESS:  Okay.
9          MS. HENN:  Thank you.
10 BY MR. PAPANTONIO:
11     Q.  It says, "Of these five
12 pharmacies the DEA could only find SORs
13 for three of them; that is, Accokeek,
14 Family Meds and Herndon."
15         Do you see that?
16     A.  Yes, I see that.
17     Q.  And then it goes on, "But
18 none were timely.  They weren't reported
19 when they were discovered."
20         Do you see -- that's the DEA
21 saying that you reported these, they
22 weren't timely, and they were reported,
23 they were not -- were reported when they
24 were discovered.  That's the DEA saying

Page 152

1  that.
2          Do you see that?
3          MS. HENN:  Objection to
4      form.
5          THE WITNESS:  That is what's
6      here in the report.  I don't know
7      when they were discovered versus
8      when they were reported.  It
9      doesn't have dates.
10 BY MR. PAPANTONIO:
11     Q.  Well, it says they weren't
12 reported when they were discovered.  Do
13 you have any reason to believe that the
14 DEA is lying about that --
15         MS. HENN:  Objection.
16 BY MR. PAPANTONIO:
17     Q.  -- as you look at this -- as
18 you look at this thing?
19         MS. HENN:  Objection to
20     form.
21         THE WITNESS:  I cannot tell
22     from what's written here.  But no,
23     I don't believe they're lying.
24     But it doesn't say that they were

Page 153

1      reported on what date and they
2      were discovered on what date.
3  BY MR. PAPANTONIO:
4      Q.  It just says, we looked at
5  the record.  It says they weren't
6  reported when they were discovered.  Do I
7  need to be any clearer than that?  That's
8  what it says.
9          MS. HENN:  Objection to
10     form.
11 BY MR. PAPANTONIO:
12     Q.  They weren't -- wait, let me
13 break it down.
14         "The suspicious orders were
15 not reported when they were discovered."
16 Yes, that's what it says, correct?
17         MS. HENN:  Objection to
18     form.
19         THE WITNESS:  That is what
20     it says.
21 BY MR. PAPANTONIO:
22     Q.  And that break -- that is
23 breaking the law when a suspicious order
24 is not reported when they're discovered,

Page 154

1  that break -- that's unlawful, correct?
2      MS. HENN:  Objection to
3  form.
4      THE WITNESS:  The
5  requirement is you report it when
6  discovered.
7  BY MR. PAPANTONIO:
8      Q.   Not three months later?  Not
9  four months later, correct?
10     A.   Not later, yes.
11     Q.   And when the DEA took a look
12 at the records that you gave them, and
13 reviewed them, for the very place,
14 Landover, where you were the number one
15 guy in regulatory, they said, "You know
16 what?  They weren't reported when they
17 were supposed to be reported."
18         That's what that says,
19 doesn't it?
20     A.   It's saying that they
21 weren't reported when they were
22 discovered.  It doesn't give dates
23 exactly when.
24     Q.   And that's a violation that

Page 155

1  is -- that is -- actually is a violation
2  that's unlawful where it comes to selling
3  the kind of narcotics that you were
4  distributing here in the United States,
5  correct?
6      MS. HENN:  Objection to
7  form.
8  BY MR. PAPANTONIO:
9      Q.   It's unlawful?
10     A.   Yes.
11     Q.   And you know it's unlawful
12 as we sit here today, correct?
13         MS. HENN:  Objection to
14 form.
15         THE WITNESS:  Yes.
16 BY MR. PAPANTONIO:
17     Q.   And you knew it was unlawful
18 when you were working as director of
19 regulatory.  You knew it was unlawful not
20 to report when a suspicious order is
21 discovered, you knew it was unlawful not
22 to report it, right?
23     A.   When it's discovered as
24 suspicious, yes.

Page 156

1      Q.   And you knew that if the DEA
2  found out that you had a pharmacy that
3  was engaged in suspicious orders, that
4  the DEA could close them down.  You
5  actually had that happen to you, didn't
6  you, the DEA closing down pharmacies that
7  you were in charge of?
8      A.   I believe that has happened.
9  I can't recall exactly which ones they
10 closed before we stopped shipment.
11     Q.   Well, sir, you -- let me do
12 this -- let me get this right.
13     A.   Yeah.
14     Q.   You're telling us right now
15 you don't have any memory of the DEA
16 closing pharmacies that you, Mr. Oriente,
17 was involved with.  Is that your
18 testimony here today?
19         MS. HENN:  Objection to
20 form.
21         THE WITNESS:  No.  That is
22 not what I'm saying.  What I'm
23 saying is I don't recall in
24 Landover.  I know of ones out of

Page 157

1  Pennsylvania where pharmacy was
2  closed.  But that was one where I
3  actually reported to DEA activity,
4  and then they did their
5  investigation and closed the
6  pharmacy.
7  BY MR. PAPANTONIO:
8      Q.   Sir, you're aware of -- if
9  you take a customer off of line, a
10 customer that's selling McKesson product,
11 and you close that pharmacy, McKesson
12 loses business, right?
13         MS. HENN:  Objection to
14 form.
15         THE WITNESS:  Yeah.
16 McKesson would stop doing business
17 with that customer.
18 BY MR. PAPANTONIO:
19     Q.   And if you lose business,
20 you lose money, don't you?
21     A.   That was never my
22 determining factor.
23     Q.   That's not my question.
24         If you close a pharmacy,

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  McKesson loses money, don't they?
2      A.   McKesson would lose money,
3  yes.
4      Q.   Yeah.  And as a matter of
5  fact, one reason that the DEA would close
6  a pharmacy down is because of suspicious
7  orders, right?
8      A.   That would be right.
9      Q.   And so between 2008 and 2011
10 when you reported zero suspicious orders,
11 the DEA had no reason to close down a
12 pharmacy, did they?
13         MS. HENN:  Objection to
14     form.
15         THE WITNESS:  I wouldn't
16     know what -- why DEA would or
17     wouldn't act on a pharmacy.
18 BY MR. PAPANTONIO:
19     Q.   Well, you know why -- you
20 know that one of the major reasons the
21 DEA will close down a pharmacy is because
22 of suspicious orders, right?
23         MS. HENN:  Objection to
24     form.

Page 159

1         THE WITNESS:  If they deemed
2     there was diversion going on, they
3     would, yes.
4  BY MR. PAPANTONIO:
5      Q.   And if you don't report
6  suspicious orders, the DEA doesn't know
7  about it, and they don't know to close
8  down the pharmacy, right?
9         MS. HENN:  Objection to
10     form.
11         THE WITNESS:  Well --
12 BY MR. PAPANTONIO:
13     Q.   True?
14     A.   If we don't report a
15 suspicious order, because we haven't
16 identified it as a suspicious order.
17     Q.   Right.  And if you don't
18 report a suspicious order, DEA has no
19 reason to go close down a pharmacy,
20 right?
21         MS. HENN:  Objection to
22     form.
23         THE WITNESS:  No, I can't
24     speak for DEA.

Page 160

1  BY MR. PAPANTONIO:
2      Q.   Well, for four years we know
3  that you didn't do that, and you know
4  that during your four years your company
5  was selling narcotics -- McKesson selling
6  narcotics to pharmacies all over the
7  country, right?
8      A.   Yes --
9         MS. HENN:  Objection to
10     form.
11         THE WITNESS:  -- we had
12     customers throughout all 50
13     states.
14 BY MR. PAPANTONIO:
15     Q.   And if you reported
16 suspicious orders, that would put the DEA
17 on notice that there might be a problem
18 with one of your customers, right?
19     A.   That is a correct statement.
20     Q.   Okay.  Let's go to this
21 page -- next page is 16.  It says,
22 "Failure to report timeline.
23         "Specifically DEA found just
24 three suspicious orders for the Herndon

Page 161

1  Pharmacy."
2         Do you see that?
3      A.   Yes.
4      Q.   And that's the one you said
5  closed down?  They found three suspicious
6  orders that were reported after they
7  started their investigation, right?
8      A.   In November, yes.
9      Q.   Let me be very clear about
10 what we're talking about here.  Okay.
11         In November, 2011, is the
12 first time that these suspicious orders
13 were submitted by you to the DEA; is that
14 right?
15         MS. HENN:  Objection to
16     form.
17         THE WITNESS:  That's what it
18     says here, that they were
19     submitted on November 15th.
20 BY MR. PAPANTONIO:
21     Q.   Mm-hmm.  And tell me when --
22 and if I remember, the first time that
23 they started asking about an
24 investigation of Herndon, was in January,

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 correct? Excuse me, January 12th --
2 January 2012.
3     A.   It's October 25, 2011, DEA
4 requested the files.
5     Q.   Right.  And then let's look
6 at the next line.  It says, "And 226" --
7 "226 suspicious orders for Accokeek and
8 Family Meds were not reported until
9 January 2012."  Right?  That's what that
10 says, doesn't it?
11     A.   Yes.  That's what the
12 document says.
13     Q.   So for each one of the 226
14 suspicious orders that weren't reported,
15 there is a fine of, what, $10,000 per
16 suspicious order?  Is that how that
17 works?
18     A.   That's what the requirement
19 said, yes.
20     Q.   And then it goes on, let's
21 go to the next page.  By the way, before
22 we get there, let's go back to that page.
23 It says -- you understand that the -- the
24 226 suspicious orders for Accokeek, they

Page 163

1 were reported a week before the DEA
2 demanded a meeting with your company.
3 Did you know that?
4         MS. HENN:  Objection to
5     form.
6         THE WITNESS:  I did not know
7     that.
8 BY MR. PAPANTONIO:
9     Q.   Nobody had told you that
10 before, that these 226 -- 226 suspicious
11 orders that just happened to be reported
12 about Accokeek and Family Meds were
13 reported a week before the DEA had
14 demanded a meeting with McKesson.  Nobody
15 told you that prior to today, correct?
16         MS. HENN:  Objection to
17     form.
18         THE WITNESS:  I was unaware
19     that that took place.  Once --
20     once the DEA got involved, our
21     corporate offices handled those.
22     They would -- they would have the
23     interaction.  It would have been
24     my boss, Don Walker, who would

Page 164

1     have handled that.
2 BY MR. PAPANTONIO:
3     Q.   They didn't tell you what
4 happened, did they?
5     A.   They did not make --
6         MS. HENN:  Objection to
7     form.
8         THE WITNESS:  They did not
9     make me aware, no.
10 BY MR. PAPANTONIO:
11     Q.   They didn't even tell you
12 what happened at the end of this
13 investigation, did they?
14         MS. HENN:  Objection to
15     form.
16         THE WITNESS:  They did not.
17 BY MR. PAPANTONIO:
18     Q.   They didn't tell you the
19 fines.  They didn't tell you what the DEA
20 found.  They didn't tell you anything,
21 did they?
22     A.   I knew of the fine, but I --
23 and I knew of the findings, but I did not
24 know of the, you know, the guilty verdict

Page 165

1 that you mentioned earlier.
2     Q.   Okay.  The -- let's go to
3 Page 17.  It says, "On February 28, 2012,
4 McKesson discontinued sales to Family
5 Pharmacy."
6         Do you see that?
7     A.   Yes.
8     Q.   And then right underneath
9 it, it says, "22" -- "22 suspicious
10 orders were submitted in March after
11 McKesson discontinued sales.  That's what
12 that says, doesn't it?
13     A.   It's what the document is
14 showing.
15     Q.   Do you have --
16     A.   I am not familiar as to why
17 the SORs would have been submitted after
18 we closed them.
19     Q.   Well, if you did that,
20 that's absolutely a violation of the law,
21 22 times, right?
22         MS. HENN:  Objection to
23     form.
24         THE WITNESS:  Again, having

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1 not seen this document prior to
2 today, I see it's written here.
3 I'm not sure who would have sent
4 in the 22 suspicious orders.
5 Again, I did not. So I'm
6 not familiar with who or when this
7 was submitted.
8 BY MR. PAPANTONIO:
9 Q. Mr. Oriente --
10 A. I would have written -- I
11 would have written a letter and sent to
12 DEA saying that we were closing family --
13 it would have been a form letter, and I
14 fill in the information, the DEA number,
15 the customer, and I would have e-mailed
16 that to DEA saying that we were closing
17 Family Pharmacy and Accokeek.
18 But I'm not, you know,
19 familiar as to then what suspicious
20 orders would have been sent in after the
21 fact that we closed them.
22 Q. But you can agree that if
23 you held suspicious orders and did not
24 report the suspicious orders as they were

Page 167

1 discovered, that is a violation -- a
2 violation of the law, 22 times here,
3 right?
4 MS. HENN: Objection to
5 form.
6 THE WITNESS: In seeing
7 this, I'm wondering who determined
8 that they were suspicious.
9 BY MR. PAPANTONIO:
10 Q. You answer my questions.
11 Don't ask me questions. I'm asking
12 you --
13 A. No, that wasn't -- I didn't
14 ask a question. I said -- I said --
15 Q. Well --
16 MS. HENN: Counsel --
17 THE WITNESS: I said I'm
18 wondering who. It's not a
19 question. It's a statement. I
20 wonder who deemed them suspicious.
21 BY MR. PAPANTONIO:
22 Q. Well, do you think there's
23 somebody working for McKesson who maybe
24 doesn't know what a suspicious order is,

Page 168

1 that told the DEA that you had 22
2 suspicious orders after you had already
3 discontinued doing business with this
4 pharmacy?
5 MS. HENN: Objection to
6 form.
7 BY MR. PAPANTONIO:
8 Q. Is there somebody who you
9 could give me a name about, that did
10 that, that maybe misled the DEA?
11 MS. HENN: Objection to
12 form.
13 THE WITNESS: No. I don't
14 have anyone. I'm just trying to
15 determine, you know, what -- what
16 determination was made in March of
17 2012 that those 22 were deemed
18 suspicious. That's all I'm
19 asking.
20 BY MR. PAPANTONIO:
21 Q. And the next thing that
22 maybe you're asking is -- because I'm
23 asking it -- is, do you believe that the
24 DEA is lying about what they're saying in

Page 169

1 this investigation report?
2 A. No, I do not believe that
3 the DEA is lying.
4 Q. Okay. All right. The next
5 thing it says, did -- "McKesson
6 discontinued sales to Drug City Pharmacy
7 on March 19, 2012."
8 Do you see that?
9 A. Yes.
10 Q. And then 65 suspicious
11 orders were submitted on March 21, 2012,
12 right?
13 A. Yeah. Two days afterwards.
14 Q. Yeah, so McKesson
15 discontinues sales to Drug City, and then
16 after they discontinue the sales, they
17 send in 65 suspicious orders to the DEA,
18 correct?
19 A. That's what this is saying,
20 yes.
21 Q. All right. And then let's
22 go to the next page. That's Page 18.
23 Sir, when you have questions about who
24 did what and why they did it, you're

Page 170

1 going to have to ask your lawyer, because
2 right now this is DEA report. This is
3 their investigation.
4      A.   Understood.
5      Q.   This is not my
6 investigation.
7           MS. HENN:  And, Counsel, I
8      would ask you not to instruct my
9      witness how to respond to your
10     questions.
11          MR. PAPANTONIO:  Well, he
12     obviously --
13          MS. HENN:  He will
14     respond --
15          MR. PAPANTONIO:  He needs to
16     ask questions --
17          MS. HENN:  -- as best he
18     can.
19          MR. PAPANTONIO:  -- to
20     somebody other than me.
21 BY MR. PAPANTONIO:
22     Q.   Okay.  So let's go to this
23 one.  This is Page 18.  And it says
24 failure -- again, "Failure to report."

Page 171

1 And this is about McKesson's failure to
2 report.
3           Do you see that?
4      A.   That's what it's titled.
5      Q.   It even gives us a summary
6 of the things that McKesson failed to
7 report, right?  That's what it does, it
8 gives a summary?
9      A.   Yes.
10     Q.   And it says on November 15,
11 2011, McKesson failed to report --
12 McKesson reported three suspicious order
13 transactions at Herndon Pharmacy in
14 medical -- medical D -- medical supply.
15          Do you see that?
16     A.   Yes.
17     Q.   It goes on.  And this is
18 saying "Failure to report," at the top of
19 this, right?
20          MS. HENN:  Objection.
21 BY MR. PAPANTONIO:
22     Q.   Do you see where it says
23 failure to report in big bold letters?
24          MS. HENN:  Objection to

Page 172

1      form.
2           THE WITNESS:  Yes.
3 BY MR. PAPANTONIO:
4      Q.   The next one is
5 January 19th.  It's Accokeek, 226
6 suspicious orders.
7           Do you see that?
8      A.   Yes.
9      Q.   The next one is Family Meds.
10 Do you see that?  McKesson, two
11 suspicious orders, right?
12     A.   What I'm -- what I'm seeing
13 here, it says that we reported them.  And
14 then at the top it says, "Failure to
15 report."  So --
16     Q.   Yeah, well, we're -- you're
17 going to see why they said that in just a
18 minute.
19     A.   Okay.
20     Q.   So the next one says 65
21 suspicious orders on March 12th --
22 March 2012, failed to report.  Right?
23     A.   Mm-hmm.
24     Q.   Go to the next page.  Page

Page 173

1 19.  It says failure to report.  That's
2 not my words.  That is the DEA saying
3 failure to report.
4           It says, "Even after
5 entering into the settlement
6 agreement" -- we're talking about the
7 2008 settlement agreement, right?
8      A.   Right.
9      Q.   Do you know of any other
10 settlement agreement that they entered
11 into besides 2008?
12     A.   I believe there was one in
13 2013.
14     Q.   Okay.  So they entered into
15 a settlement agreement in 2013.  They
16 entered into a settlement agreement in
17 2008.  And they entered into settlement
18 agreements because they were breaking the
19 law, correct?
20          MS. HENN:  Objection to
21     form.
22          THE WITNESS:  I don't know
23     exactly why they settled.  That
24     was -- I was not involved with the

Page 174

1  settlement.
2  BY MR. PAPANTONIO:
3      Q.   But you know they were
4  breaking the law, don't you?
5          MS. HENN:  Objection to
6      form.
7          THE WITNESS:  You mentioned
8      that earlier today in the 2008
9      case.
10  BY MR. PAPANTONIO:
11     Q.   Yeah.
12     A.   As I stated earlier, I
13  thought they had a settlement and simply
14  paid a civil fine.
15     Q.   Okay.  So we had -- so far
16  we have 2008, 2013, where they enter into
17  a settlement with the DEA.  And what they
18  say in the settlement, we're going to get
19  it right this time, right?  We're going
20  to do right.  That's what they say,
21  right?
22          MS. HENN:  Objection to
23      form.
24          THE WITNESS:  We're going to

Page 175

1      make changes, yes.
2  BY MR. PAPANTONIO:
3      Q.   Okay.  How many narcotics do
4  you think McKesson sold between 2008 and
5  2013?  Do you have a swag number of how
6  many millions of narcotic pills that
7  McKesson put on the street in America
8  between 2008 and 2013?
9          MS. HENN:  Objection to
10     form.
11         THE WITNESS:  I don't have
12     that total number, no.
13  BY MR. PAPANTONIO:
14     Q.   Do you have any idea how
15  many narcotic pills McKesson was selling
16  every year?
17     A.   I do not have that total
18  number, no.
19     Q.   We're going to look at it in
20  a minute.  I just want to know -- it's
21  right here in this report.  I want to
22  know if you have any memory.
23     A.   No, I never seen that
24  number.

Page 176

1      Q.   Okay.  Because nobody ever
2  showed this to you.  And you were the
3  director of regulatory at Landover, one
4  of the biggest distribution sites
5  McKesson owned, right?
6      A.   I don't know how Landover
7  compared to the other 20 something
8  distribution centers that we have.
9      Q.   So let's see what the DEA
10  says on this page.  And again, this is
11  your opportunity to tell me that you
12  believe the DEA was lying.  If you want
13  to say that on the record, I'll be glad
14  to take it.  But let's look at what it
15  says.
16     A.   I've said more than twice
17  that I don't believe the DEA is lying.
18     Q.   All right.  If they're not
19  lying, here is what it says.  "Even after
20  entering into the settlement agreement,
21  McKesson by its own admissions failed to
22  report at least 318 suspicious orders at
23  the time that they were or should have
24  been discovered."

Page 177

1          Do you see that?
2      A.   Yes.  That's the first
3  bullet.
4      Q.   You understand that's not my
5  words.  That's the Department of Justice,
6  the DEA, the U.S. government.
7      A.   Mm-hmm.
8      Q.   And they gave you the right
9  to sell these -- the U.S. government
10  gives the distributor, McKesson, the
11  right to do this if they follow the law,
12  correct?
13     A.   That is correct.  That's
14  stipulation of being a registrant.
15     Q.   And right now, in America,
16  McKesson, Amerisource, and Cardinal are
17  the three biggest narcotic distributors
18  in the country, correct?
19     A.   Yes, that is correct.
20     Q.   And so those three people
21  were given a special right to sell
22  narcotics to the American public, and all
23  the government asked you to do was report
24  when you see suspicious orders, right?

Page 178

1 Correct?
2    A.  That's part of the
3 stipulation, yes.
4    Q.  And the DEA determined that
5 there were -- at least right here, that
6 there were 318 suspicious orders that, by
7 McKesson's own admission, they failed to
8 report and should have been reported,
9 right?
10    A.  That's what it says here,
11 yes, that McKesson by its own admission.
12 Again, this is the first time I'm seeing
13 this. So I was unaware of that.
14    Q.  Do you feel -- sir, would
15 you like to have seen this before you
16 came in here to testify about what you
17 know about diversion and the sale of
18 narcotic drugs by McKesson throughout the
19 United States? Is this something that
20 would have helped up testify here today?
21      MS. HENN: Objection to
22     form.
23      THE WITNESS: I don't
24     believe it would have helped me

Page 179

1    testify here today, no.
2 BY MR. PAPANTONIO:
3    Q.  Okay. Because you knew all
4 this before you came here, didn't you?
5    A.  No, sir. That's not a true
6 statement.
7    Q.  So you knew before you even
8 walked in this room that McKesson had
9 failed to report 318 suspicious orders
10 when they should have reported it. You
11 knew that prior to coming here today,
12 didn't you?
13      MS. HENN: Objection to
14     form.
15      THE WITNESS: No, I did not
16     know that.
17 BY MR. PAPANTONIO:
18    Q.  Nobody with McKesson shared
19 that with you, did they?
20    A.  They did not.
21    Q.  And this is the first time
22 you've heard it?
23    A.  The first time I'm seeing it
24 and hearing it, yes.

Page 180

1    Q.  Well, answer this. Do you
2 see where it says, "This is only the tip
3 of the iceberg"?
4    A.  That is the next bullet down
5 on this report, yes.
6    Q.  That is the DEA saying that
7 McKesson failed to report 318 suspicious
8 orders at the time that they should have
9 been reported and that, you know what,
10 that's only the tip of the iceberg,
11 that's the first time you saw those
12 words, "tip of the iceberg," right?
13    A.  That is correct.
14    Q.  Do you know what the rest of
15 the iceberg looks like underneath the
16 tip? How much more failure to report
17 took place at McKesson?
18      MS. HENN: Objection to
19     form.
20 BY MR. PAPANTONIO:
21    Q.  Do you know of any other
22 reporting -- let me scratch that. Let me
23 totally scratch that and ask you:
24      This is telling me 318

Page 181

1 suspicious orders that McKesson failed to
2 report on narcotic drugs that they were
3 selling to people in this country. 318.
4      Now, are there more that I
5 need to know about that you know about as
6 we sit here and talk today?
7      MS. HENN: Objection to
8     form.
9      THE WITNESS: I am unaware
10     of any others that were not
11     reported.
12 BY MR. PAPANTONIO:
13    Q.  You weren't even aware that
14 these weren't reported, right?
15    A.  That's what I said, yeah. I
16 am unaware. I've never seen this report.
17 I did not have these numbers. And you
18 know, this report was handled between DEA
19 and McKesson corporate offices.
20    Q.  Well, who is corporate -- is
21 Mr. -- what's -- Hammergren, is he
22 corporate office?
23    A.  My boss would have been Don
24 Walker.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    Q.   Well, is Mr. Hammergren, is
2  he -- do you consider him corporate?
3         MR. PAPANTONIO:  Give me the
4  video.  Are you ready for a video
5  on this something?  Give me
6  Video 7.
7         (Document marked for
8  identification as Exhibit
9  MCK-Oriente-Video-7.)
10 BY MR. PAPANTONIO:
11   Q.   Do you know Mr. Hammergren
12 is?
13   A.   Yes.
14   Q.   Have you ever walked up and
15 shaken his hand?
16   A.   I met him one time.
17   Q.   Did you watch him when he
18 swore before the -- when he raised his
19 right hand and swore to the congressional
20 hearing and testified?  Did you watch him
21 testify?
22   A.   I saw it on television.
23        MR. PAPANTONIO:  Okay.
24 Could you -- are you able to show

Page 183

1  that video.  Let me give a copy
2  of -- give me -- the hard copies
3  to counsel.
4  BY MR. PAPANTONIO:
5    Q.   Let's watch this video.  And
6  I want to ask you whether you saw this.
7        MS. HENN:  You mentioned
8  hard copies.
9        MR. PAPANTONIO:  Yeah, we
10 got -- we got hard copies of
11 transcripts.
12        MR. PAPANTONIO:  So go ahead
13 and play this.
14        MS. HENN:  Do you want the
15 witness to have a hard copy?
16        MR. PAPANTONIO:  No, I
17 don't.  I want him to watch this
18 video as a guy running his company
19 who testified in front of Congress
20 under the threat of perjury.
21 That's what I want.  Show this
22 video, please.
23        (Video playback.)
24        MR. HAMMERGREN:  We have a

Page 184

1  role to play, Congressman,
2  certainly.  And in your example
3  one of the most important roles we
4  play is to make sure we find
5  suspicious customers and
6  suspicious orders and cut off the
7  supply to those customers.
8         (End of video playback.)
9  BY MR. PAPANTONIO:
10   Q.   Did you hear that testimony?
11   A.   I did hear it, yes.
12   Q.   Okay.  Will you tell
13 everybody -- tell the jury where it is
14 that Mr. Hammergren, the CEO of your
15 company, ever was told that it was okay
16 to report suspicious customers instead of
17 suspicious orders.
18        Please tell me, if you
19 can -- in your experience in regulatory,
20 would you please tell me any place that
21 you can identify that Mr. Hammergren
22 would be led to believe that it was okay
23 to report suspicious orders?
24        MS. HENN:  Objection to

Page 185

1  form.
2         THE WITNESS:  You just said
3  two different things you said
4  suspicious customers --
5  BY MR. PAPANTONIO:
6    Q.   Suspicious customers.
7    A.   -- and suspicious orders.
8  Okay.  So you want to --
9         MS. HENN:  Objection to
10 form.
11        MR. PAPANTONIO:  Yeah, let's
12 play it again.  I want to make
13 sure we get this.  Play it again,
14 please.
15        (Video playback.)
16        MR. HAMMERGREN:  We have a
17 role to play, Congressman,
18 certainly.  And in your example
19 one of the most important roles we
20 play is to make sure we find
21 suspicious customers and
22 suspicious orders and cut off the
23 supply to those customers.
24        (End of video playback.)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

BY MR. PAPANTONIO:

Q. So he says that one of the most important roles you play is to report suspicious orders.

That's what he just said, right?

A. Well, he said suspicious customers and suspicious orders.

Q. And you know there's nothing in the -- there is -- at no time did the DEA tell you that it was okay to report suspicious customers?

MS. HENN: Objection.

BY MR. PAPANTONIO:

Q. You know that that's something that you made up?

MS. HENN: Objection to form.

BY MR. PAPANTONIO:

Q. Suspicious customers?

A. Suspicious customers is not in the regulation.

Q. Right. And you know that Mr. Hammergren raised his right hand and

Page 187

testified in front of Congress, telling Congress that it was okay just to report suspicious customers rather than suspicious orders. That's what he just said?

MS. HENN: Objection to form.

THE WITNESS: I believe he said -- and I believe in his statement he said suspicious customers and suspicious orders.

BY MR. PAPANTONIO:

Q. Okay. So let's --

A. Not or.

Q. Let's talk about the suspicious orders. We just saw a document that 318 suspicious orders were never reported to the DEA, right?

A. That's what the document states. Yes.

Q. And you just had the president, the CEO of McKesson, the highest guy in the entire food chain, saying, "You know what? We think that's

Page 188

our highest responsibility, to report suspicious orders." That's what he just said, right?

MS. HENN: Objection to form.

THE WITNESS: He said that -- was it this year 2018? And this is referring to what 20-something.

BY MR. PAPANTONIO:

Q. Is something different?

A. No. What I'm saying is, in his statement -- can we play it again?

Q. Yes, sir. Before we play it, let me ask if you know this. Do you know that he raised his right hand --

A. Okay.

Q. -- and swore before Congress about what he was going to testify to? Did you know that?

A. Yeah, I watched it on television at home.

Q. You watched the whole thing?

A. Right. Yeah.

Page 189

Q. Okay. Let's watch it again here.

(Video playback.)

MR. HAMMERGREN: We have a role to play, Congressman, certainly. And in your example one of the most important roles we play is to make sure we find suspicious customers and suspicious orders and cut off the supply to those customers.

(End of video playback.)

BY MR. PAPANTONIO:

Q. So the most important thing is suspicious orders?

A. And suspicious customers and cut off the supply.

Q. And you're not able to tell me anywhere in the regulatory anywhere where it says, you know what, all we have to do is report suspicious customers or suspicious orders?

MS. HENN: Objection.

BY MR. PAPANTONIO:

Page 190

1  Q.  You're not aware of that
2  anywhere, right?
3      MS. HENN:  Objection to
4      form.
5      THE WITNESS:  It says we
6      need to report suspicious orders.
7  BY MR. PAPANTONIO:
8  Q.  Orders.  Not suspicious
9  customers, right?
10  A.  That is correct.
11  Q.  So he's making that up right
12  there, isn't he?
13      MS. HENN:  Objection to
14      form.
15      THE WITNESS:  I can't speak
16      for him.
17  BY MR. PAPANTONIO:
18  Q.  Well, he's misleading
19  Congress, and he swore under oath to tell
20  the truth, right?
21      MS. HENN:  Objection to
22      form.
23  BY MR. PAPANTONIO:
24  Q.  Yes?

Page 191

1  A.  He was before Congress, yes.
2  But I can't speak for Mr. Hammergren.
3      MR. PAPANTONIO:  Let's go
4      back to this document.  We have
5      more videos we'll listen to.
6  BY MR. PAPANTONIO:
7  Q.  In fact, in this -- this
8  document we're talking about, it says,
9  "In fact, McKesson did not report any of
10  these suspicious orders until it was
11  known" --
12      MR. PAPANTONIO:  Would you
13      please underline this.
14  BY MR. PAPANTONIO:
15  Q.  "McKesson did not report any
16  of these suspicious orders until it was
17  known that the DEA was inquiring about
18  the ordering patterns of McKesson's top
19  Landover DF customers."
20      Do you see that?  Isn't that
21  what we've been talking about,
22  Mr. Oriente, that none of these
23  suspicious orders were actually reported
24  until the DEA started this investigation.

Page 192

1  That's what that says right there, right?
2      MS. HENN:  Objection to
3      form.
4  BY MR. PAPANTONIO:
5  Q.  Am I right?
6  A.  That's what it says here.
7  Q.  Okay.
8  A.  As I said, my review of
9  customers was continual.  And again, if
10  I'm looking at the same customers that
11  the DEA was looking at, that would -- was
12  done because of the volume of these top
13  customers.
14  Q.  Okay.  And again, you have
15  no --
16      MS. HENN:  Counsel, please
17      let him finish his answer.
18  BY MR. PAPANTONIO:
19  Q.  Are you finished?
20  A.  What is DF customers?
21  Q.  Sir, I'm not going to --
22  this is me asking questions of you.
23  Okay?  This isn't you asking questions of
24  me.

Page 193

1  A.  Well, then I don't
2  understand what this says.
3  Q.  Okay.  Fine.
4  A.  It says McKesson's top
5  Landover DF customers.
6  Q.  So you don't -- let's go
7  with you don't understand what this says.
8  A.  The DF piece.  Let's be
9  specific.
10  Q.  Okay.  You don't
11  understand -- you don't understand what
12  DF means.  Nobody had ever told you that
13  318 suspicious orders were never
14  reported, right?
15  A.  That is correct.
16  Q.  Let's go to -- and by the
17  way, you were the number one guy in
18  Landover for regulatory, right?
19  A.  I was responsible to monitor
20  what was being purchased.  The suspicious
21  order reporting was done from McKesson's
22  corporate office.
23  Q.  And the corporate office,
24  was that a bunch -- were those lawyers

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  sitting around determining what ought to
2  go to the DEA or not go to the DEA?  Were
3  those lawyers who made that
4  determination?
5      A.   I don't know that.  I don't
6  know who made the determination.
7      Q.   Because I thought earlier in
8  this -- in this discussion you told me
9  that it was sent to the lawyers.
10     A.   When a request for DEA
11 information from a subpoena or top
12 customers, when a request came in for
13 information, that went to our law
14 department.
15          If it was the suspicious
16 orders, I'm not sure if that was Don
17 Walker sending that in or -- or someone
18 in our law department.
19     Q.   So nobody -- at least we
20 know this much.  Nobody in the law
21 department called you up and said, "Hey,
22 Mr. Oriente, you might want to know
23 before you go testify today that we
24 didn't report 318 suspicious orders."

Page 195

1          MS. HENN:  Objection.  I
2      think you're asking him what a
3      lawyer told him.
4          MR. PAPANTONIO:  Let me --
5      I'm --
6          MS. HENN:  I'm going to
7      instruct -- can I finish?
8          MR. PAPANTONIO:  Yeah, go
9      ahead.  Instruct him.
10         MS. HENN:  I'm going to
11     instruct the witness not to answer
12     questions about what lawyers did
13     or didn't say to him.  That's not
14     a proper question.
15 BY MR. PAPANTONIO:
16     Q.   You told us that suspicious
17 information was sent to the lawyers in
18 San Francisco.  Didn't you tell me that?
19         MS. HENN:  Objection to
20     form.
21         THE WITNESS:  I did not say
22     that.
23 BY MR. PAPANTONIO:
24     Q.   It was sent to the law

Page 196

1  department, right?
2          MS. HENN:  Objection to
3      form.
4          THE WITNESS:  I said a DEA
5      request for information was sent
6      to our law department.  All our
7      correspondence with DEA, we do not
8      decide what we submit.  It goes to
9      our law department.  They review
10     it.  They pull the documents.
11     They would send the top ten
12     customers that the DEA requested.
13     I did not say suspicious orders
14     would go through the law
15     department.
16 BY MR. PAPANTONIO:
17     Q.   So let's go on.  Okay.
18 Let's go to the next page.
19         "Multiple analysis."  Do you
20 see where it says multiple analysis?
21     A.   Yes.
22     Q.   Next page, please.
23 "Multiple analysis.  The DEA analyzed
24 data submitted by McKesson."

Page 197

1          Do you see that?
2      A.   Yes.
3      Q.   In other words, the DEA
4  asked you, "Would you please give us all
5  the information about these ten
6  pharmacies?"
7          Do you remember that?
8      A.   Yes.
9      Q.   Let's look -- let's look at
10 the pharmacies.  So they analyze the
11 pharmacies, right?  Right?
12     A.   That's what it says here,
13 yes.
14     Q.   And then they do this
15 report, correct?
16     A.   That's -- it says they
17 analyzed the data that McKesson submitted
18 to them.
19     Q.   And they say they analyzed
20 it monthly.  Do you see where it says
21 monthly?
22     A.   Mm-hmm.
23     Q.   Let's see -- let's see what
24 they found.  Okay.  Go to the next page.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1   The DEA then determined the
2   average monthly orders of controlled
3   substances. Do you see where it says
4   that?
5       A.   Yes.
6       Q.   The DEA then determined the
7   average monthly orders of controlled
8   substances.
9           Tell the jury why it's so
10  important to analyze the monthly orders
11  of controlled substances narcotics?
12          MS. HENN: Objection to
13          form.
14  BY MR. PAPANTONIO:
15      Q.   Tell the jury why that's so
16  important?
17          MS. HENN: Same objection.
18          THE WITNESS: We looked at
19          customers on a monthly threshold
20          basis. And by that, I mean that
21          they are allocated a quantity that
22          they can order per month. And
23          then orders are automatically
24          blocked if they try to exceed that

Page 199

1   monthly allocation.
2   BY MR. PAPANTONIO:
3       Q.   And so, that -- isn't there
4   something called a red flag? Have you
5   ever heard the term "red flag"?
6       A.   I have.
7       Q.   Tell the jury what a red
8   flag is.
9       A.   There are different red
10  flags. Red flags could be a customer is
11  omitting, and by that I mean that the
12  order is being blocked. They're trying
13  to order more than what they're
14  authorized to order.
15          Another red flag that we
16  looked at were amount of cash sales that
17  a pharmacy might be doing.
18          Another red flag would be if
19  one particular doctor was writing an
20  exorbitant of prescriptions at a
21  pharmacy.
22          Another red flag is their
23  control percentage of total Rx within
24  pharmacy.

Page 200

1           Another red flag would be
2   distance of patients to the pharmacy. So
3   there are several red flags to look at.
4       Q.   Let's talk about this red
5   flag. One red flag is when the average
6   monthly orders of controlled substances
7   look like they're higher than they should
8   be, right? That's a red flag, isn't it?
9       A.   Higher than they should be?
10      Q.   The average is. The average
11  is higher than the typical average.
12  That's a red flag, right?
13      A.   If a -- that could be one
14  red flag. Volume does not, you know,
15  constitute -- volume alone, depending on
16  the size of the pharmacy, does not
17  constitute a diversion. It would be one
18  red flag of many that would require
19  additional due diligence to research.
20      Q.   In other words, if a
21  pharmacy all of the sudden orders 40
22  times the average that they should be --
23  of their monthly average, that's
24  certainly a red flag, isn't it?

Page 201

1       A.   In that example it would be.
2       Q.   Yeah. How about 30 times?
3       A.   That example I would say it
4   would be.
5       Q.   Yeah. And so you're now
6   aware that the DEA has looked at all the
7   information that they gleaned from those
8   ten pharmacies, and they've done their
9   own analysis, according to this, right?
10  According to this?
11      A.   According to this, yeah.
12      Q.   It says, "Finally, the DEA
13  identified the number of transactions
14  that represented multiples of the average
15  monthly orders of McKesson Landover."
16          Sir, that's where you were
17  in charge. You were in charge of
18  regulatory at Landowner -- Landover,
19  right?
20      A.   Yes, I was responsible for
21  Landover.
22      Q.   That's your responsibility,
23  correct?
24      A.   Mm-hmm.

Highly Confidential – Subject to Further Confidentiality Review

Page 202

1   Q.   Is there anybody there -- is
2   there anybody there in regulatory that
3   had a higher responsibility there at
4   Landover than you?
5       A.   No.
6       Q.   Okay.  So we are talking to
7   the right guy where it becomes
8   responsibility about regulatory, aren't
9   we?
10      A.   For Landover, yes.
11      Q.   Yeah.  Okay.  So let's look
12  at what it says.  Go to the next page.
13  "McKesson Landover, distributor
14  oxycodone, dosage units, sales to
15  pharmacies May 2008, month-to-date
16  totals."
17          Do you see that?
18      A.   Yes.
19      Q.   "Month-to-date totals
20  compared with the monthly pharmacy
21  averages."
22          Do you see that?
23      A.   Yes, I see that.
24      Q.   Now, you see the first --

Page 203

1   you see the first column, it says the,
2   "Multiple of the monthly pharmacy
3   average."
4          Go down to where -- you see
5   the -- you see the two.  Do you see that
6   two?
7       A.   Mm-hmm.
8       Q.   It says that as far as times
9   that there were a month -- as far as
10  times that there were orders of two times
11  the monthly average, they say that
12  happened 122,288 times while they're at
13  Landover.  That's what that says.  Do you
14  see it?
15      A.   I see it.  Can I have a
16  minute just to read this?
17      Q.   Yes, sir.  You take all the
18  time you want.  We're going to go through
19  the numbers because this is where you
20  were in charge.
21      A.   Okay.
22      Q.   All right.  Now, you see
23  where it says one hundred -- forgive
24  me -- 122,280 times that there was

Page 204

1   oxycodone dosages that exceeded the
2   monthly average by two.
3          Do you see that?
4       A.   I see that.  I'm trying to
5   understand what it is that they're --
6       Q.   We'll see if this helps you.
7   Let's go down to --
8          MS. HENN:  Counsel, he's
9      still talking.
10         THE WITNESS:  I'm trying to
11     see what it is -- the heading
12     says, "Number of sales
13     transactions" --
14  BY MR. PAPANTONIO:
15      Q.   Right.
16      A.   -- "with a month-to-date
17  total dosage units at least this multiple
18  of monthly pharmacy average."
19      Q.   Right.
20      A.   So they're saying that there
21  were certain pharmacies that are above
22  the average.
23      Q.   No, sir.  They are talking
24  about Landover.  They're saying --

Page 205

1   McKesson Landover as a distributor sold
2   oxycodone in dosage unit sales to
3   pharmacies between May 20 -- between May
4   2008 and 2012.
5          Do you see that?  Did I read
6   that right?
7       A.   Mm-hmm.
8       Q.   And then it shows you
9   exactly what the multiples are of how
10  many times the average McKesson sold.  Do
11  you see where it says down here -- it
12  says, for example, three.  Do you see the
13  three underneath the two?
14      A.   In the first column, yes.
15      Q.   Okay.  So three -- we're
16  talking about three times the monthly
17  average.  71 thousand times that was sold
18  from Landover.
19      A.   Over four years.
20      Q.   Yes.  Well, that's what it
21  says.
22      A.   Okay.
23      Q.   Okay.  Now, they thought
24  that was important to the point -- if you

Page 206

1 go to the right. They were going to
2 propose a fine -- if you go to the right.
3 They were going to propose a fine of
4 $1,222,880,000. You see that? That's
5 the proposed fine for the violation of
6 selling 122,288 times a dosage of two as
7 a multiple?
8         MS. HENN: Objection to
9     form.
10 BY MR. PAPANTONIO:
11     Q.   Do you see that?
12     A.   I see what it's saying. I'm
13 not really understanding what this is
14 showing me.
15     Q.   Because nobody showed it to
16 you, right, before coming in here today.
17 Nobody showed this to you, did they?
18     A.   No, I never seen this
19 document.
20     Q.   You had -- you had no idea,
21 that as a matter of fact 10,000 times --
22 if you go down to -- see where it says
23 ten right there? Do you see the ten?
24         MS. HENN: Counsel, which

Page 207

1     ten are you talking about?
2 BY MR. PAPANTONIO:
3     Q.   The ten right on that page.
4 It's about four from the bottom.
5         MS. HENN: On the first
6     column?
7         MR. PAPANTONIO: First
8     column.
9         MS. HENN: Thank you.
10         MR. PAPANTONIO: See where
11     that big ten is? Would you
12     highlight the ten, so everybody
13     can see the ten.
14 BY MR. PAPANTONIO:
15     Q.   See right there on that ten,
16 it says ten times -- excuse me. No, no.
17 It says 10,000 times. 10,609 times
18 McKesson Landover distributor allowed ten
19 times the averages -- monthly average to
20 be sold. That's what that says, right?
21         MS. HENN: Objection to
22     form.
23 BY MR. PAPANTONIO:
24     Q.   I mean, that's not my words.

Page 208

1 That's coming from the DEA. You
2 understand that, right?
3         MS. HENN: Objection to
4     form. Let's let the witness
5     answer your question.
6         THE WITNESS: The document
7     says that multiple of monthly
8     pharmacy average was ten times,
9     and that the number of sales
10     transactions month-to-date total
11     dosage units at least this
12     multiple of monthly pharmacy
13     average occurred 10,000 times over
14     a four-year period.
15         MS. HENN: Now, are you --
16     Mr. Oriente --
17         THE WITNESS: Yeah, so we
18     had pharmacies that were above the
19     average.
20         Now, since you're dealing
21     with an average, wouldn't you
22     expect to have pharmacies above
23     the average and others below the
24     average if you're looking at an

Page 209

1     average?
2 BY MR. PAPANTONIO:
3     Q.   Sir, you are the guy in
4 charge of the -- you're in charge of --
5     A.   Well, I'm telling you that.
6 If you take an average, you're going to
7 have --
8     Q.   Let's --
9         MS. HENN: Let's --
10         THE WITNESS: Let me finish,
11     please.
12 BY MR. PAPANTONIO:
13     Q.   Finish your -- finish
14 your -- because I'm -- because what I'm
15 trying to figure out --
16         MS. HENN: Counsel --
17         MR. PAPANTONIO: Hang on.
18         MS. HENN: You've not
19     letting him finish.
20 BY MR. PAPANTONIO:
21     Q.   Okay. I want you to finish,
22 but here's what I want you to finish:
23 Why did they want to fine you
24 $1,222,880,000 for that one entry?

Page 210

1 MS. HENN: Counsel, he never
2 finished your prior question.
3 It's really not proper for you to
4 interrupt his answer and ask a
5 different question.
6 BY MR. PAPANTONIO:
7 Q. Go ahead and answer the best
8 you can.
9 MS. HENN: So he was in the
10 middle of answering and if you
11 could just let him respond --
12 BY MR. PAPANTONIO:
13 Q. All right. I'll -- go ahead
14 and answer why --
15 MS. HENN: -- it would be
16 helpful.
17 BY MR. PAPANTONIO:
18 Q. -- answer how you allow ten
19 times --
20 MS. HENN: You're doing it
21 again. You're asking a different
22 question.
23 MR. PAPANTONIO: Yeah, well,
24 let me ask --

Page 211

1 MS. HENN: If you can just
2 stop talking, so he can finish the
3 question --
4 MR. PAPANTONIO: Well, would
5 you read the question I asked
6 where he started talking about
7 some -- Madam Court Reporter.
8 THE COURT REPORTER: Sure.
9 MR. PAPANTONIO: What is the
10 last question I asked before he
11 went off on what he wanted to talk
12 about? What was it?
13 (The requested portion of
14 the testimony was read back by the
15 court reporter.)
16 MS. HENN: And that's not
17 the question that he had been
18 responding to. The question that
19 he had been responding to was
20 about, "Right there on that ten,
21 it says ten times -- excuse me,
22 no, no. It says 10,000 times.
23 10,609 times McKesson Landover
24 distributor allowed ten times the

Page 212

1 averages -- monthly average to be
2 sold. That's what it says,
3 right?"
4 MR. PAPANTONIO: Okay. He
5 answered it.
6 MS. HENN: And you went on
7 and said, "That's not my words.
8 That's coming from the DEA. You
9 understand that?"
10 The witness was responding
11 to that when he was interrupted.
12 MR. PAPANTONIO: Let him
13 respond to that question.
14 MS. HENN: Thank you. Thank
15 you.
16 THE WITNESS: So the 10,000
17 times over the four years would
18 equate to 2,500 times a year
19 divided by the 12 months in a
20 year. You are looking at 200 in
21 a -- in a month. And that's about
22 50 times in a week.
23 And so that's ten orders a
24 day, where you have customers that

Page 213

1 are above the average.
2 BY MR. PAPANTONIO:
3 Q. Yeah.
4 A. So again, if you're dealing
5 with an average, you're going to have
6 certain customers that are above average,
7 and certain that are below.
8 Q. Sir --
9 MS. HENN: Counsel.
10 THE WITNESS: You'll
11 always -- let me finish, please.
12 BY MR. PAPANTONIO:
13 Q. Go ahead.
14 MS. HENN: Thank you.
15 THE WITNESS: You'll always
16 have customers that are above an
17 average in any business.
18 BY MR. PAPANTONIO:
19 Q. All right. Well, sir,
20 whatever it was, the DEA looked at it,
21 and they decided that along with you
22 filing to report 318 suspicious orders,
23 now they're taking a look at -- let's
24 take a look at averages of how much

Page 214

1  McKesson -- how many narcotic drugs
2  McKesson was sending around this country
3  where a pharmacy was exceeding a monthly
4  average, right? That's what this is
5  doing, right?
6       MS. HENN: Objection to
7  form.
8       THE WITNESS: Right.
9  BY MR. PAPANTONIO:
10      Q. That's the second part.
11      Now, you know what, I said
12  one million a minute ago. They wanted to
13  fine you one billion. $1,222,880,000 for
14  this thing that you just described as --
15  shouldn't be a problem, right?
16      A. No, I didn't say that.
17      Q. Oh, it is a problem?
18      A. No, I didn't say that
19  either. I didn't say it was a problem.
20  I didn't say it wasn't a problem.
21      Q. Well, you --
22      A. What I said was I broke it
23  out to what it equated to per day in the
24  amount of orders.

Page 215

1       Q. And after the DEA finally
2  got this information that you had been
3  not -- where information that you had not
4  been disclosing to them about ten
5  pharmacies, they do an analysis, right?
6       A. Mm-hmm.
7       Q. They do an analysis and they
8  find that 318 times you violated the law
9  by not reporting suspicious orders.
10  That's the first thing they find.
11      Do you remember that?
12      A. Mm-hmm.
13      Q. The second thing they find,
14  is they want to -- they want to propose a
15  fine of $1,222,880,000 for your conduct.
16  Do you see that?
17      MS. HENN: Objection to
18  form.
19  BY MR. PAPANTONIO:
20      Q. Did I get that right?
21      A. That is the number on Line
22  2, yes.
23      Q. Okay. Let's go to the next
24  page. Now, this is oxycodone here?

Page 216

1       Do you see that?
2       MS. HENN: Page 24?
3       MR. PAPANTONIO: I'm on Page
4  24.
5       MS. HENN: Are you on
6  hydrocodone?
7       THE WITNESS: Hydrocodone.
8  BY MR. PAPANTONIO:
9       Q. I'm sorry. Hydrocodone. So
10  we start off with oxycodone was the
11  analysis. For example -- hey, I meant to
12  ask you, is oxycodone addictive?
13      A. I'm not a doctor. But from
14  what I've read, it is addictive.
15      Q. Yeah. And you know that the
16  people that you're buying from are
17  Purdue, right, Purdue Pharmacy?
18      A. Purdue is one of the
19  manufacturers that we sold, yes.
20      Q. And you know that while you
21  were selling this product, you were aware
22  that Purdue had been fined multi-million
23  dollars for lying about the addictive
24  nature of oxycodone. You know that,

Page 217

1  right?
2       MS. O'GORMAN: Object to
3  form.
4  BY MR. PAPANTONIO:
5       Q. Did you not know that?
6       A. I knew that Purdue had
7  lawsuits against it regarding its
8  marketing practices.
9       Q. Right.
10      A. I don't follow that
11  particularly closely to see, you know,
12  whether they were found guilty and paid
13  fines. I'm busy with my McKesson
14  responsibilities.
15      Q. Sir, you're buying narcotic
16  drugs from Purdue, correct? We can agree
17  to that, as you just said. You know
18  that --
19      A. McKesson does, yes.
20      Q. And yours --
21      A. We deal with multiple
22  wholesale manufacturers.
23      Q. And second of all, you're
24  aware as you are buying those narcotic

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 drugs, that Purdue had been sued for --
2 for lying about the addictive nature of
3 the drugs that you're distributing for
4 them, right.
5        MS. O'GORMAN: Object to
6    form.
7 BY MR. PAPANTONIO:
8    Q.   You know that?
9    A.   As I said, I was aware that
10 they were being sued, yes.
11    Q.   And you know that it had to
12 do with the fact that they were lying to
13 the American public about the addictive
14 nature of their drugs that they were
15 selling to you.
16        MS. O'GORMAN: Objection.
17 BY MR. PAPANTONIO:
18    Q.   Right?
19    A.   Again, I know there was
20 legal matters against Purdue. I didn't
21 really follow them to know whether or
22 not, you know, they were paid fines in
23 that case.
24    Q.   Sir, you knew when you were

Page 219

1 distributing their drugs as their
2 distributor, you clearly understood that
3 they had been fined for lying about the
4 addictive nature of their drugs,
5 OxyContin and oxycodone. You knew that
6 didn't you?
7        MS. O'GORMAN: Objection to
8    form.
9        THE WITNESS: I would say
10    that I learned of it.
11 BY MR. PAPANTONIO:
12    Q.   All right. And is it --
13 sir, as somebody that's involved with
14 actually regulatory matters, that's
15 pretty important to know that the people
16 that you're buying -- the people you're
17 buying narcotics from are out there
18 telling the American public, that, "Hey,
19 this stuff just ain't that addictive."
20 That's pretty information, isn't it?
21    A.   That's important, yes.
22    Q.   Yeah, and you knew that the
23 full time that you were a distributor
24 with this company, didn't you?

Page 220

1        MS. HENN: Objection to
2    form.
3        THE WITNESS: Not the
4    full-time, no. I said I learned
5    of it.
6        MS. HENN: Counsel, we've
7    been going another hour. So I
8    would suggest another ten-minute
9    break.
10        MR. PAPANTONIO: That's
11    fine. If you'd like to, Ms. Henn,
12    we'll take a ten-minute break.
13        THE VIDEOGRAPHER: The time
14    is 11:35 a.m. Going off the
15    record.
16        (Short break.)
17        THE VIDEOGRAPHER: We are
18    back on the record. The time is
19    11:46 a.m.
20 BY MR. PAPANTONIO:
21    Q.   You ready? Okay. Sir,
22 let's go -- let's go back to what we're
23 talking about here. I want to focus a
24 little bit on this $1,222,880,000

Page 221

1 proposed fine for what McKesson had done.
2        The was this -- was this
3 built into the business plan as far as
4 you know? In other words, did McKesson
5 understand we can pay this kind of money
6 and still make a profit, we can pay these
7 fines and still make a profit?
8        MS. HENN: Objection to
9    form.
10 BY MR. PAPANTONIO:
11    Q.   Was that -- as far as you
12 know, was there any discussion about
13 well, you know, we can pay one billion,
14 we can pay $700 million, all this list of
15 fines here? Was there a discussion that,
16 yeah, we're making so much money, we can
17 pay that kind of money and still make a
18 profit?
19        MS. HENN: Objection to
20    form.
21        THE WITNESS: In my area of
22    responsibility in regulatory, I
23    did not get involved with profit
24    and loss.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

BY MR. PAPANTONIO:

1    Q.   Okay.  But this -- these are
2 the proposed findings.  You see them,
3 right?
4    A.   Yes, I see them.
5    Q.   Okay.  Would you please
6 go -- let's go to Page 26.  That's
7 Accokeek.  You're familiar with Accokeek.
8 Am I saying --
9    A.   Accokeek.
10    Q.   Accokeek.
11    A.   Accokeek.
12    Q.   Okay.  That's Page 26.  And
13 go to the next page right after that,
14 Page 27.
15    A.   Okay.
16    Q.   It says up at the top,
17 "Failure to report," and we're talking
18 about suspicious orders, right?
19    A.   Mm-hmm.
20    Q.   It says November 29th they
21 failed to report 40 suspicious orders.
22 November they were -- failure to report.
23 This is just on Accokeek, by -- Accokeek

Page 223

1 by the way.
2         40 times there was a failure
3 to report suspicious orders on Accokeek.
4         Do you see that?
5         MS. HENN:  Objection to
6 form.
7 BY MR. PAPANTONIO:
8    Q.   Do you see that?
9    A.   I see the 40.  I'm wondering
10 what they're determining -- like 40
11 orders on one day?
12    Q.   Sir, it just says the
13 date --
14    A.   Yeah, it says 40.  But I
15 don't know what the 40 references.
16    Q.   Well, it says failure to
17 report 40 times.  And you understand 40
18 times, if they failed to report 40 times,
19 each time is -- they're actually
20 violating the law?
21         MS. HENN:  Objection to
22 form.
23 BY MR. PAPANTONIO:
24    Q.   You understand that, right?

Page 224

1         MS. HENN:  Objection to
2 form.
3         THE WITNESS:  Yes.  They're
4 saying 40 times.  Again, I don't
5 know what the reference 40 refers
6 to, whether that's an item, a line
7 item on an order, or 40 orders in
8 a day.  That -- I'm not sure what
9 the 40 references.
10 BY MR. PAPANTONIO:
11    Q.   Okay.  We'll clear that up
12 as this goes on.
13         But it says, it says then
14 December failed to report 12.
15 December 6th, failed to report 27
16 suspicious orders.  December 7th.
17         This is just Accokeek.
18         Do you see that?
19    A.   Yes.
20    Q.   Accokeek.  And this Number
21 7, failure to report 33.  December 8th
22 failed to report 38.
23         And each time they failed to
24 report that, you understand sir that that

Page 225

1 is actually a violation of the law.  It's
2 actually breaking the law.
3         MS. HENN:  Objection to
4 form.
5 BY MR. PAPANTONIO:
6    Q.   Correct?
7         MS. HENN:  Objection to
8 form.
9         THE WITNESS:  That's what
10 this report is showing.  Yes.
11 BY MR. PAPANTONIO:
12    Q.   And one reason that that law
13 is so stringent is because we're selling
14 narcotics to the American public,
15 correct?
16    A.   We're selling them to
17 Accokeek, yes.
18    Q.   Yeah, and Accokeek is
19 selling them to the American public?
20    A.   Yes.
21    Q.   And you understand one
22 reason you were given that McKesson was
23 given the right to actually sell this
24 drug is that you were supposed to police

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 these type of problems, McKesson was?
2        MS. HENN:  Objection to
3    form.
4 BY MR. PAPANTONIO:
5    Q.   Right?
6    A.   We are responsible to have a
7 controlled substance monitoring program
8 in place, yes.
9    Q.   Would you go to page 29,
10 please.  And here's some more about
11 Accokeek.  Accokeek.  And this was your
12 account, true?
13    A.   Yes.
14    Q.   It says -- now, when did you
15 start with them?  When did you start
16 there at Landover?
17    A.   It would have been late
18 2007.
19    Q.   Okay.  So in 2007 when you
20 started, they were only selling 389,700
21 oxycodone.
22        Do you see that?
23    A.   Yes.
24    Q.   And then by 2011 when this

Page 227

1 investigation by the DEA started, they've
2 increased that from -- they're increased
3 that 71 percent in sales of just
4 oxycodone alone, correct?
5        MR. PAPANTONIO:  Can you
6    underline oxycodone for me, Evan.
7 BY MR. PAPANTONIO:
8    Q.   That's just oxycodone we're
9 talking about?
10    A.   Yes, they increased over the
11 five years.
12    Q.   And 71 percent increase.
13        Now, are you familiar -- was
14 there some -- was there some huge
15 catastrophe that took place around where
16 this Accokeek Drug Healthcare is?  I
17 mean, do you know where the town is?
18    A.   It's located in Maryland.
19    Q.   Was there some big
20 catastrophe where people were injured or
21 anything like that that happened between
22 2007 and 2011?
23    A.   I don't believe there was.
24    Q.   Was there -- was there

Page 228

1 71 percent increase in population there
2 in Maryland?
3    A.   I don't know what the
4 population change was.
5    Q.   Was there something that
6 where -- so you're not able to tell me
7 anything that really happened in that
8 area where Accokeek sold drugs that
9 really should have caused it to go
10 from -- to make a 71 percent increase in
11 sales, right?
12        MS. HENN:  Objection to
13    form.
14        THE WITNESS:  The pharmacy
15    would have had a business growth
16    in their -- in their number of
17    scripts and in their pharmacy
18    sales.  So they -- they had a
19    business growth.
20        It would have went through
21    a -- what we call a threshold
22    change request and a review to see
23    whether or not the pharmacy should
24    be granted an increase over what

Page 229

1    their current threshold was
2    established at.  So there would
3    have been a review by myself and a
4    determination made whether or not
5    their oxycodone should have been
6    increased.
7 BY MR. PAPANTONIO:
8    Q.   Increased 71 percent.  If
9 you look at hydrocodone, that was
10 increased 185 percent between 2007 and
11 2011.  That's what that document says,
12 right?
13    A.   Yeah.  The 71 percent was
14 over four years.
15    Q.   And this is 185 percent over
16 four years, correct?
17    A.   Yes.  In the hydrocodone, it
18 went from 11 to 41 over four years.
19    Q.   And which of those two
20 drugs, oxycodone or hydrocodone, have the
21 biggest impact?  Which one is the
22 stronger narcotic?
23    A.   Oxycodone.
24    Q.   Oxycodone.  Okay.  And

Highly Confidential – Subject to Further Confidentiality Review

Page 230

1 you've got -- you've got oxymorphone that
2 had 132 percent increase, right?
3    A.   Right.
4    Q.   And this is while you were
5 there.  They went from selling 400 --
6 they went from selling 400 oxymorphone to
7 selling 24,400 oxymorphone, correct?
8    A.   That is correct.  They would
9 have been getting more scripts from
10 doctors prescribing it.
11    Q.   Mm-hmm.  Let's go to the
12 next page.  That is Page 31.  Oh, no is
13 it 30?
14    A.   30.
15    Q.   So this says, "Accokeek Drug
16 Healthcare number of oxycodone sales
17 transactions with dosage units exceeding
18 the monthly average."
19    Do you see that?
20    So while they were growing
21 their business, as you described, they --
22 you had 2,271 times that the transactions
23 they were involved with, exceeded three
24 times the monthly average, right?

Page 231

1    MS. HENN:  Objection to
2 form.
3 BY MR. PAPANTONIO:
4    Q.   That's what that says,
5 right?
6    MS. HENN:  Objection to
7 form.
8 BY MR. PAPANTONIO:
9    Q.   That's what that says,
10 right?
11    MS. HENN:  Objection to
12 form.
13    THE WITNESS:  That's what
14 the document shows, yes.
15 BY MR. PAPANTONIO:
16    Q.   And that as they were
17 growing their business, as you described
18 there at Accokeek, four -- 1,797 times
19 they had transactions that exceeded their
20 monthly average by four times.
21    MS. HENN:  Objection to
22 form.
23 BY MR. PAPANTONIO:
24    Q.   Correct?

Page 232

1    A.   It would not have been their
2 monthly average.  It would have been the
3 average pharmacy.
4    Q.   Yeah.  That's what I'm
5 saying.  Okay.  The average pharmacy.
6    A.   Yeah.
7    Q.   In other words, a pharmacy
8 doing a regular business, day to day,
9 this -- the number of drugs, narcotic
10 drugs that they're selling is three times
11 that average, and that's 2,271 times they
12 exceeded three times.  And then four
13 times they are selling their narcotics --
14 these are your narcotics, right?
15    MS. HENN:  Objection to
16 form.
17 BY MR. PAPANTONIO:
18    Q.   These are McKesson
19 narcotics, right?
20    A.   It's oxycodone sales.
21    Q.   Yeah.  1,797 right,
22 transactions, where they exceeded the
23 average pharmacy by four times.  That's
24 what it says, correct?

Page 233

1    A.   Yes.  They were -- they were
2 a high volume larger pharmacy.  Above the
3 average.
4    Q.   All right.  And so
5 ultimately they were closed down, right?
6    A.   Ultimately McKesson -- a
7 decision was made by me that ceased
8 selling controls to them, yes.
9    Q.   And how many years did it
10 take you to make that decision?
11    A.   I don't know when they first
12 started.  But whenever the date that I
13 closed them, I don't have that, I'm sure
14 it's in here when Accokeek was closed.
15 They would have been reviewed, since I
16 took the position in 2007, so it would
17 have been a couple years' review.
18    Q.   And we all -- as we saw,
19 they increased their business -- we saw
20 clearly, oxy -- I mean, hydrocodone
21 alone, they increased their business
22 185 percent during the time that you were
23 there, correct?
24    MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    form.
2         THE WITNESS:  Yeah, they
3    would have been receiving
4    prescriptions from doctors,
5    writing for hydrocodone.  That
6    increased from seven -- 2007 to
7    2011.
8    BY MR. PAPANTONIO:
9         Q.   During while they were doing
10   all of that, if you were comparing what
11   they were doing with the average pharmacy
12   here in America, they committed 2,271
13   transactions that exceeded the typical
14   average pharmacy by three times, right?
15        A.   That's what the document is
16   showing, yes.  They were a large
17   pharmacy, large volume pharmacy.
18        Q.   Okay.  And they were a large
19   pharmacy when you decided to stop doing
20   business with them, right?
21        A.   They were, yes.
22        Q.   And oxycodone was a Purdue
23   product; is that right?
24        A.   I don't believe so.

Page 235

1    Oxycodone is the generic.  Purdue product
2    is OxyContin.
3         Q.   OxyContin, right.  And
4    that's -- OxyContin is the one that
5    Purdue lied about as far as -- as far as
6    its addictive nature, correct?
7         MS. HENN:  Objection to
8    form.
9         MS. O'GORMAN:  Same
10   objection.
11        THE WITNESS:  I'm not --
12   not -- I can't speak for what
13   Purdue said or did.
14   BY MR. PAPANTONIO:
15        Q.   Sir, you don't think you
16   have a responsibility selling narcotics
17   during a period of time where there is an
18   opioid crisis going on in the United
19   States, and you're buying from a company
20   that has been hit for -- has been fined
21   for lying about the qualities of their
22   product.  That's not important to you as
23   a regulator?
24        MS. O'GORMAN:  Objection.

Page 236

1         THE WITNESS:  No, I didn't
2    say that.  I take my job very
3    seriously.  I take my
4    responsibility very seriously.
5         I said that I could not
6    speak for what Purdue did or
7    didn't do or said or didn't say.
8         Obviously if any controlled
9    substance has an addictive policy,
10   DEA schedules them two through
11   five, the lower the number the
12   more addictive.
13        So whether it's a Schedule
14   II drug through a Schedule V drug,
15   they all have benefits when used
16   appropriately, and they all have,
17   you know, problems where they can
18   be abused.
19        So I knew that a Schedule II
20   drug obviously has a potential for
21   more abuse than a Schedule V drug.
22        So yes, I was aware of the
23   potential, if not taken, you know,
24   for medical purposes, that they

Page 237

1    could be abused.
2    BY MR. PAPANTONIO:
3         Q.   In other words, you wouldn't
4    go out and buy narcotics from Pablo
5    Escobar without understanding Pablo
6    Escobar and the cartel is selling you,
7    right?  You want to know what they are
8    selling you, true?
9         MS. HENN:  Objection to
10   form.
11        THE WITNESS:  Sir, I
12   won't -- I won't speculate on
13   that.
14   BY MR. PAPANTONIO:
15        Q.   Yeah.  Well, if you've got a
16   company that's manufacturing a product
17   and they're lying about how addictive the
18   product is, that's a problem you want to
19   know about, right?
20        MS. HENN:  Objection to
21   form.
22   BY MR. PAPANTONIO:
23        Q.   Because you're selling a lot
24   of drugs.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    MS. O'GORMAN: Same
2  objection.
3    THE WITNESS: I was
4  responsible for monitoring what
5  stores are purchasing. And that I
6  did.
7    As far as if the customer --
8  the manufacturer and the
9  truthfulness of what they're
10  portraying, I did not get involved
11  with that, because the -- the
12  product has a medical purpose if
13  used correctly for medical
14  reasons.
15  BY MR. PAPANTONIO:
16    Q.   All right. Let's go to the
17  next -- let's go to the next slide. This
18  is the next page. This is 31. This is
19  Accokeek Drug Healthcare.
20    Do you see that?
21    A.   Yes.
22    Q.   You see that? That line
23  goes straight up in the air.
24    Do you see that? Or angle.

Page 239

1    MS. HENN: Objection to
2  form.
3  BY MR. PAPANTONIO:
4    Q.   Do you see the angle on
5  that. That is -- that is dosage units
6  that are being sold out of one pharmacy
7  that you were selling drugs to, correct?
8  That's just for oxycodone?
9    A.   Yes. And this appears that
10  the dosage units cover a year's time; is
11  that correct?
12    Q.   Right. And as you're
13  selling that -- as you're selling that
14  product, your sales are going up, right?
15  As they are selling more drugs, your
16  sales are going up, correct?
17    A.   Sales would have increased.
18  But as I said, I don't get involved with
19  the dollars and cents. I'm looking at
20  their overall Rx business and then the
21  amount of controls to non-controls that
22  they are doing. I did not look at
23  dollars. I looked at dosages.
24    Q.   Okay. But you're on

Page 240

1  incentive -- you had an incentive program
2  that salespeople were actually making
3  more money if they sell more drugs,
4  right?
5    MS. HENN: Objection to
6    form.
7    THE WITNESS: When you said
8    "you," I am not on an incentive
9    program.
10    The salespeople are
11    compensated on total sales of a
12    pharmacy, not just the controlled
13    substances.
14  BY MR. PAPANTONIO:
15    Q.   If they say more product,
16  they make more money, yes or no,
17  salespeople?
18    A.   Salespeople are on
19  commission, yes.
20    Q.   And if you were CEO, the
21  fellow we saw raise his right hand and
22  testify in front of Congress, if he has
23  the company selling more drugs, he's
24  making more money, right?

Page 241

1    A.   It would -- it would appear
2  that total -- total sales of the company
3  would be, you know, included.
4    Again the controlled
5  substances are a very small part of our
6  total sales.
7    Q.   And if you take -- if you
8  take one of your customers offline, you
9  take a pharmacy like Accokeek offline,
10  you're actually losing sales, aren't you?
11    A.   We would be losing sales.
12  But as you saw, we did take them offline.
13    Q.   Yeah, after how many years?
14    A.   It looks like -- well, for
15  me, from '7 through, I guess, '11.
16    Q.   So from 2007 to 2011 during
17  a time where they had a 185 percent
18  increase in one of their sales of their
19  narcotic drugs, between that time you let
20  them continue selling drugs, right?
21    A.   I allowed them to continue
22  to purchase from McKesson, yes.
23    Q.   And then in 2011, when the
24  DEA comes and says, "Let me see the

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 records," that's when you took them
2 offline, correct?
3        MS. HENN:  Objection to
4    form.
5        THE WITNESS:  As I stated
6    earlier, my review of Accokeek was
7    not predicated upon the DEA's
8    request for information.
9        My job at Landover was to
10   review customers continuously, and
11   I did it on a daily basis.
12       Accokeek was one of several
13   of our top purchasers that I would
14   have been reviewing, going out to
15   make a site visit, looking at the
16   analysis of data of what they're
17   purchasing.
18       And then as I stated, in
19   2011, made a determination to
20   close the pharmacy.
21 BY MR. PAPANTONIO:
22   Q.   Well, let's look on the Drug
23 Pharmacy.  That's Page 34.  That's
24 another one of your customers, right?

Page 243

1 Drug Pharmacy.
2    A.   Drug City, yes.
3    Q.   Drug City.  Yeah.  You were
4 hands-on with them.  You knew who was
5 running it.  You showed up, shook their
6 hand, right?
7        MS. HENN:  Objection to
8    form.
9        THE WITNESS:  I visited the
10   pharmacy, yes.
11 BY MR. PAPANTONIO:
12   Q.   Mm-hmm.  Let's look at this
13 one.  This is -- this is -- now we're
14 going to move from Accokeek and we're
15 going to move to another one.  It's
16 called Drug City, Drug City Pharmacy.
17       And so it says on Drug City,
18 they begin by saying, "Let's look at the
19 failure to report" -- report suspicious
20 orders, right?  Drug City Pharmacy.
21       And then it goes -- it tells
22 you the number of times that the Drug
23 City failed to report.  It gives you a
24 whole list.  18 times, 13 times, 10

Page 244

1 times.
2        Do you see that?
3        MS. HENN:  Objection to
4    form.
5        THE WITNESS:  I do.  As I
6    stated earlier, I'm not sure if
7    that's orders or lines or what
8    that number references.  It
9    doesn't say.
10 BY MR. PAPANTONIO:
11   Q.   It was important enough,
12 though, that the DEA was ready to fine
13 you, fine McKesson for your conduct with
14 Drug City Pharmacy, right?
15       MS. HENN:  Objection to
16    form.
17       THE WITNESS:  Yes.  I'm just
18    stating that it doesn't say orders
19    on here for me to agree or
20    disagree.
21 BY MR. PAPANTONIO:
22   Q.   And so let look at this.
23 Let's see if we can find a pattern here.
24 They got -- go to Slide Number 37.

Page 245

1        Now, here we have oxy --
2 this is Drug City Pharmacy.  One of
3 your -- one of the people that you dealt
4 with directly.  Talking about oxycodone
5 and oxymorphone, right?  In 2007
6 oxycodone, and you say that's -- excuse
7 me 2007, they were selling 1,281,700
8 doses there, right?
9    A.   Yes.
10   Q.   And then by 2011 they'd
11 increased 33 percent to 3,083,600.
12       Do you see that?
13   A.   Yes.  This is --
14   Q.   That --
15   A.   -- one of my larger accounts
16 that I monitored.
17   Q.   Yeah.  And let's talk
18 about -- let's go to the next page, after
19 looking at that increase.  Let's see the
20 number of times that the sales
21 transaction with the dosage exceeded the
22 monthly pharmacy average.  In other
23 words, let's compare them to other
24 pharmacies?

Page 246

1    A.   This customer, Drug City,
2 was the largest customer in that
3 distribution center.
4    Q.   Mm-hmm.  I know.  But let's
5 still talk about --
6    A.   It certainly would have been
7 above the average.
8    Q.   Let's talk about it.
9    A.   Okay.
10    Q.   Because you were -- McKesson
11 was making a lot of money on Drug City
12 Pharmacy, right?
13        MS. HENN:  Objection to
14    form.
15        THE WITNESS:  I -- again, I
16    don't look at the dollars at a
17    pharmacy.  I'm not in sales.
18 BY MR. PAPANTONIO:
19    Q.   Yeah, and --
20    A.   So I have no idea how much
21 they're spending with us.  I just know
22 volumewise, dosages, they were the
23 largest customer I had out of Landover.
24    Q.   Okay.  And as a matter of

Page 247

1 fact they were so bad -- so big, if you
2 look at this document, Number 38, 30
3 times -- now, it's saying there were 914
4 transactions where the pharmacy was
5 exceeding the average pharmacy by 30
6 times the number of drugs -- number of
7 narcotics they were selling, right?
8    A.   That's what this is showing.
9    Q.   30 times, right?  Let's look
10 at the next page.
11    A.   And is that 30 times over
12 the four-year period?
13    Q.   Sir, I think the way it's
14 looking, it might be.  Yeah, but how
15 about the top.  You want to talk about a
16 four-year period.
17        Thanks for interrupting me
18 there.
19        Look at the times that they
20 exceeded four times the average --
21 national average for pharmacies was 9,014
22 transactions where they exceeded the
23 averages by four times.
24        Do you see that?

Page 248

1    A.   Yeah, it's here.
2    Q.   And Drug City was closed
3 down also, wasn't it, after the DEA asked
4 you to provide information about their
5 files, give the DEA the information, they
6 were closed down after that too, weren't
7 they?
8        MS. HENN:  Objection to
9    form.
10        THE WITNESS:  Drug City
11    was -- had their threshold reduced
12    initially.  And then eventually
13    they were closed from a McKesson
14    customer.
15        It was not right after the
16    DEA inquiry.
17        Again, I looked at the top
18    customers that I had.
19        Every customer here that
20    we're talking about was one of my
21    top volume customers.  So I would
22    have been looking at them even
23    without the DEA included.
24 BY MR. PAPANTONIO:

Page 249

1    Q.   Let's go to Page 40 there on
2 Drug City.  Let's talk about how -- this
3 is their sales.  Do you see those dosage
4 units, how it goes straight up.  2007,
5 2011, straight up, right?
6        And as that straight up,
7 sales for McKesson went straight up too,
8 of selling narcotics there at that drug
9 store, right?
10    A.   Again, I don't deal with
11 sales.  But yes, if you're selling more
12 and requesting, again, this means that
13 they would have been receiving more
14 prescriptions written by doctors for that
15 medication.
16    Q.   Now, I saved this last one.
17 Go to Page 40.  I saved this last one for
18 right now because you wanted to talk
19 about Herndon and what you had done with
20 Herndon Pharmacy, how you were performing
21 your investigation.  Do you remember we
22 were talking about that a while ago?
23    A.   Yeah.  Herndon was one that
24 we spoke, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.   Yeah.  Right.  And that's
2  one that closed down, that you stopped
3  doing business with them, after the DEA
4  asked for information --
5         MS. HENN:  Objection to
6    form.
7  BY MR. PAPANTONIO:
8    Q.   -- about their sales, true?
9         MS. HENN:  Objection to
10    form.
11        THE WITNESS:  They --
12    Herndon Pharmacy is a pharmacy
13    that I closed based off of their
14    purchasing, yes.
15  BY MR. PAPANTONIO:
16    Q.   All right.  And then if you
17  will go to Page 43 there.  Let's see what
18  the DEA said -- had to say when they
19  looked at these files.
20        Do you see where it says,
21  "Failure to report, Herndon Pharmacy"?
22  Do you see that?
23    A.   Yes.
24    Q.   It says, "Clearly, McKesson

Page 251

1  identified suspicious orders on or before
2  August 19th" -- excuse me -- "August 19,
3  2011."
4         Did I read that right?
5    A.   That's what it says there.
6  Yes.
7    Q.   All right.  And it says, "No
8  suspicious orders were submitted to the
9  DEA until November" -- "until
10  November 15, 1911 (sic)."  So -- is that
11  right?
12        MS. HENN:  Objection to
13    form.
14        THE WITNESS:  That's what
15    it's saying here.  I don't know
16    what they're basing the
17    identification of the suspicious
18    orders on or before August 19th
19    on.
20  BY MR. PAPANTONIO:
21    Q.   Well, let's see.  Let's see,
22  because now, by now, they have the
23  records.  They finally can review the
24  records of these -- of Herndon Pharmacy.

Page 252

1  Do you understand?  Now they have all the
2  records.  They've asked for them, and
3  they've been given over by McKesson.
4  Let's see what they find.
5    A.   They would have had the
6  records prior to that even in their ARCOS
7  reporting.
8    Q.   Well, they must not have had
9  all of them, because they asked you for
10  your files to see if what your company
11  was doing was consistent with what they
12  were reporting, right?
13        MS. HENN:  Objection to
14    form.
15  BY MR. PAPANTONIO:
16    Q.   In other words, your company
17  could be make -- phonying up records.
18  They don't know that.
19        MS. HENN:  Objection to
20    form.
21  BY MR. PAPANTONIO:
22    Q.   Your company could be
23  phonying up records left and right.
24  That's what they're trying to find out

Page 253

1  here, right?
2         MS. HENN:  Objection to
3    form.
4         THE WITNESS:  I don't know
5    what they are trying to find out.
6    But I know monthly it's a
7    requirement that we send into DEA
8    ARCOS reporting, so they would
9    have had Herndon Pharmacy's
10    purchases every month.
11  BY MR. PAPANTONIO:
12    Q.   Unless McKesson is phonying
13  up the records and not telling them the
14  truth, right?
15        MS. HENN:  Objection to
16    form.
17        THE WITNESS:  I can't speak
18    on that, sir.
19  BY MR. PAPANTONIO:
20    Q.   All right.  And it says,
21  "McKesson found Herndon's" -- "Herndon's
22  orders suspicious well before
23  August 19th."
24        Do you see that?

Page 254

1    A.  Yeah, it's the third bullet.
2    Q.  Yeah, it says as a matter of
3 fact, they found them suspicious -- it
4 says July 27, 2011, right?
5    MS. HENN:  Objection to
6    form.
7 BY MR. PAPANTONIO:
8    Q.  I want you to look at this
9 very carefully before we go to the next
10 page.  You correct anything that you want
11 to correct on this page right now.  Okay.
12 You understand that the DEA is saying
13 that you had clear information that there
14 were suspicious orders taking place
15 before August 19th, right?  Didn't you
16 tell me that you did this investigation
17 yourself?
18    A.  Yeah, I visited the
19 pharmacy.
20    Q.  Okay.  And apparently you
21 did not report the August 19th -- you did
22 not report suspicious orders till
23 July 27, 2011, right?  That's what this
24 is saying.

Page 255

1    A.  That's what it's saying.  I
2 don't know if I had a suspicious order
3 prior to that.
4    MS. HENN:  Objection to
5    form.
6 BY MR. PAPANTONIO:
7    Q.  Well, okay.  We either
8 believe the DEA or we don't.  Do you
9 believe them, that you failed to report
10 suspicious orders?
11    A.  That is what they are
12 stating, yes.
13    Q.  Okay.  That's all we can
14 accomplish.  They -- as a matter of fact,
15 if you go to Page 45, it says Herndon
16 Pharmacy, number of oxycodone sales
17 transactions exceeding the monthly
18 pharmacy averages.  It even gives us
19 that.  Look what it says.
20    Do you see those numbers?
21 We are talking about transactions, 124
22 transactions that exceeded the averages
23 by three times the national average.  Do
24 you see that?  Did you find that in your

Page 256

1 investigation?
2    MS. HENN:  Objection to
3    form.
4    THE WITNESS:  I did not make
5    that comparison to the national
6    average.
7 BY MR. PAPANTONIO:
8    Q.  Do you remember telling us
9 about Dr. Salerian?
10    A.  Yes.
11    Q.  Didn't you mention
12 Dr. Salerian?
13    A.  I did.
14    Q.  And as a matter of fact, you
15 knew that a search warrant had been
16 issued to Dr. Salerian before you ever
17 started your investigation, didn't you?
18    A.  I am not certain of that.
19    Q.  Well, let's look.  Let's go
20 to Page 46.  You talked about how you
21 did -- you looked at what Dr. Salerian
22 was doing.  You looked at what other
23 pharmacies were doing around him.  Do you
24 remember that big explanation you gave me

Page 257

1 about how your investigation was taking
2 place?
3    MS. HENN:  Objection to
4    form.
5    THE WITNESS:  Yeah, I gave
6    you the details of what I did in
7    my due diligence.
8 BY MR. PAPANTONIO:
9    Q.  Well, you know, sir, don't
10 you, that a search warrant had already
11 been issued to Dr. Salerian before you
12 did the first thing?  You know that.
13    MS. HENN:  Objection to
14    form.
15    THE WITNESS:  How do I know
16    that, sir?
17 BY MR. PAPANTONIO:
18    Q.  Well, you get a report of
19 any search warrants that go out.
20    A.  From who?
21    Q.  From the DEA.  If they're
22 doing a search warrant, you have a right
23 to get a report, correct?
24    MS. HENN:  Objection to

Page 258

1   form.
2       THE WITNESS:  I have not
3   seen that information prior to
4   what I'd reviewed.
5   BY MR. PAPANTONIO:
6       Q.   All right.  So why don't you
7   take a look at Page 46 and tell me what
8   you found about Dr. Salerian and when you
9   reported any of this material that we are
10  talking about here about Dr. Salerian.
11  He ran a pill mill, didn't he?
12      MS. HENN:  Objection to
13  form.
14      THE WITNESS:  I don't know
15  if he ran a pill mill.
16      My suspicion was based off
17  the fact that he was a
18  psychiatrist writing for
19  oxycodone, and the distance from
20  his pharmacy -- excuse me, from
21  his practice to the pharmacy.
22  BY MR. PAPANTONIO:
23      Q.   And he had people driving in
24  from West Virginia that were going, a

Page 259

1   part the oxy express, to buy narcotics
2   that your company, McKesson, was selling
3   to Dr. Salerian.  Had people driving in
4   from West Virginia to do that, right?
5       MS. HENN:  Objection to
6   form.
7       THE WITNESS:  We weren't
8   selling to Dr. Salerian.
9   BY MR. PAPANTONIO:
10      Q.   Who were you selling to?
11      A.   Herndon Pharmacy.
12      Q.   Okay.  And how does Dr.
13  Salerian fit into that?
14      A.   Dr. Salerian was the doctor
15  writing the prescriptions that were
16  getting filled at Herndon Pharmacy.  But
17  we were not selling to Dr. Salerian.
18      Q.   Okay.  Got it.  So you're
19  saying I didn't sell to Dr. Salerian
20  directly, but you know that Dr. Salerian
21  was buying all of these -- all of these
22  drugs that you were selling to Herndon.
23  You knew that?
24      MS. HENN:  Objection to

Page 260

1   form.
2       THE WITNESS:  Dr. Salerian
3   wasn't buying any drugs.  He was
4   writing prescriptions.
5   BY MR. PAPANTONIO:
6       Q.   Writing prescriptions.
7       Okay.  Well, let's --
8   however you want -- let's say writing
9   prescriptions.
10      Tell us what red flags you
11  saw about Dr. Salerian and when you saw
12  them?
13      A.   Okay.  The exact time that I
14  saw them, I don't recall, but what I saw
15  was the distance from the doctor's office
16  to the pharmacy.  He was in D.C.  The
17  pharmacy is in Herndon, Virginia.  It was
18  a distance.
19      His practice, he was a
20  psychiatrist writing for oxycodone.  The
21  amount of prescriptions that he -- both
22  in quantity and the number of scripts
23  percentage that he made up at Herndon
24  Pharmacy, he was the top prescribing

Page 261

1   doctor for the scripts that were getting
2   filled at Herndon Pharmacy.
3       Q.   And how many years was he
4   getting away with that?  While this was
5   your watch, how many years was
6   Dr. Salerian getting away with what you
7   just described?
8       MS. HENN:  Objection to
9   form.
10      THE WITNESS:  I don't know
11  the exact time that Herndon opened
12  and I closed him.  So I can't say.
13  I don't have that information in
14  front of me.
15  BY MR. PAPANTONIO:
16      Q.   We've already established
17  that you closed them after the DEA asked
18  for the records.  That's when you closed
19  them, right?
20      A.   I closed them when I
21  concluded my review.  I don't have the
22  dates when I started and when I ended.
23  My review may have been prior to the DEA
24  asking for that list of top customers.  I

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 don't have that information, nor do I
2 recollect the exact dates.
3      Q.   We looked at the dates, and
4 we found that you actually stopped doing
5 business with Herndon after the DEA asked
6 you for the Herndon records.  We saw
7 that.  Do you remember that?  Or do you
8 want to go back to it?
9      A.   No.  That would have been
10 when I resolved and saw that -- made a
11 determination, because I did visit this
12 pharmacy both with the sales team and
13 also our VP GM.  I was there with -- I
14 was at Herndon several visits.  I went
15 with upper management, who was
16 responsible for the distribution area,
17 the VP GM, vice president general
18 manager.  And our determination was that
19 we would stop doing business with Herndon
20 Pharmacy.
21      Q.   And you knew that
22 Dr. Salerian had specialized in cash
23 customers.  You knew that he was -- he
24 was a cash doctor.  You knew that, right?

Page 263

1      A.   No, I did not.  How -- no, I
2 would not have known that -- how patients
3 were paying Dr. Salerian.
4      Q.   And you knew that most of
5 his customers were from West Virginia.
6 Did you know that?
7      A.   I'm unaware.  I'm not
8 certain of that to my recollection back
9 then.
10      Q.   And -- but you had
11 responsibility under your responsibility
12 to protect the American public from a
13 drug crisis, you had a responsibility to
14 have in place a system that would
15 determine whether this type of thing was
16 going on, cash customers, people driving
17 in from out of town, you had a
18 responsibility to make sure you had a
19 system that prevented that, correct?
20      MS. HENN:  Objection to
21 form.
22      THE WITNESS:  We had
23 responsibility to have a system to
24 detect diversion based off of

Page 264

1 frequency, size and patterns.
2      And, you know, the fact that I did
3 turn this customer off shows that
4 I was doing my due diligence.
5 BY MR. PAPANTONIO:
6      Q.   Yeah, you did your due
7 diligence after you sold him all of those
8 drugs for seven years, right?
9      MS. HENN:  Objection to
10 form.
11      THE WITNESS:  I don't know
12 the extent of Herndon, how long
13 they were open.  I do not believe
14 that he was open seven years.
15 BY MR. PAPANTONIO:
16      Q.   All right.  How many years
17 they were open, you were make -- McKesson
18 was making a lot of money while
19 Dr. Salerian was dealing with Herndon
20 selling money -- selling dope for cash,
21 right?  A lot of years that went on,
22 right?
23      A.   Again, I said I don't know
24 if patients are paying cash at the

Page 265

1 doctor's office.  It's protected.
2      Q.   You had a marketing program.
3 McKesson had a marketing program, didn't
4 they, where they actually -- they
5 actually had marketing programs to
6 increase the sales of these drugs, all
7 over the country, correct?
8      MS. HENN:  Objection to
9 form.
10      THE WITNESS:  I am not
11 familiar with our marketing side
12 of the business.  I don't get
13 involved with marketing.  I was in
14 regulatory.  So I'm not familiar
15 with what sales programs there
16 were out there.
17 BY MR. PAPANTONIO:
18      Q.   So nobody ever told you, as
19 you were trying to do your job in
20 regulatory and control the flow of drugs,
21 nobody told you that, hey, we're out
22 there actually marketing drugs.  We're
23 helping sell -- we're helping -- we're
24 helping push more pills.  Nobody ever

Page 266

1  told you that, did they?
2        MS. HENN:  Objection to
3  form.
4        THE WITNESS:  McKesson would
5  be in the sales department they
6  would be selling all products.
7  Controlled substances, Rx, OTC.
8        But as I said, I'm not aware
9  of specific sales programs to
10  increase sales of controlled
11  substances.
12  BY MR. PAPANTONIO:
13      Q.   Give me --
14        MR. PAPANTONIO:  What number
15  is that?  Video 1.  Let's take a
16  look at.  No, wait I want -- yeah,
17  Video Number 1.  Video Number 1.
18  Yeah, Video Number 1 if you could
19  tee it up.
20        (Document marked for
21  identification as Exhibit
22  MCK-Oriente-Video-1.)
23  BY MR. PAPANTONIO:
24      Q.   You say you watched the

Page 267

1  entire -- did you watch the entire
2  congressional hearing with your boss
3  testifying in front of the congressional
4  hearing after he'd sworn to tell the
5  truth?
6      A.   I was not at the TV the
7  entire time, no.
8      Q.   All right.  Let's see if you
9  were at the TV during this time.  Let's
10  play this.
11        MR. PAPANTONIO:  You've got
12  to turn it up.  Start again and
13  turn it up.
14        (Video playback.)
15        MR. HAMMERGREN:  As a
16  distributor, we don't manufacture
17  prescription drugs.  We don't
18  market them to doctors or
19  patients, nor do we market any
20  particular category of drugs such
21  as opioids to pharmacists.
22        Distributors respond to
23  pharmacy orders which are based on
24  doctors' prescriptions.

Page 268

1        (End of video playback.)
2  BY MR. PAPANTONIO:
3      Q.   Wow, one of y'all are lying
4  here.  He just said that they don't
5  market drugs.  Isn't that what he just
6  said?  And you just said they do, which
7  is it?
8        MS. HENN:  Objection to
9  form, Counsel.
10  BY MR. PAPANTONIO:
11      Q.   I'm just curious.  Is he
12  lying about -- when he's testifying in
13  front of Congress, swore to tell the
14  truth, is he telling the truth when he
15  tells the entire congressional meeting
16  there that McKesson doesn't market drugs?
17        Let's play it again I want
18  to make sure we get this right.
19        MR. PAPANTONIO:  Play it
20  again, please.
21        (Video playback.)
22        MR. HAMMERGREN:  As a
23  distributor, we don't manufacture
24  prescription drugs.  We don't

Page 269

1  market them to doctors or
2  patients, nor do we market any
3  particular category of drugs, such
4  as opioids, to pharmacists.
5        Distributors respond to
6  pharmacy orders which are based on
7  doctors' prescriptions.
8        (End of video playback.)
9  BY MR. PAPANTONIO:
10      Q.   Did you know that he said
11  that in front in front of Congress?
12      A.   No, I did not.
13      Q.   Okay.  If he said that, he's
14  not telling the truth.  He's committing
15  perjury, isn't he?
16        MS. HENN:  Objection to
17  form.
18        THE WITNESS:  I'm not going
19  to say if he is or isn't.
20  BY MR. PAPANTONIO:
21      Q.   Okay.  If he's raising his
22  right-hand and swearing to Congress that
23  he's telling the truth, and he's lying,
24  he's committing perjury, isn't he?

Page 270

1   A.   What he --
2        MS. HENN:  Objection to
3   form.
4        THE WITNESS:  What I believe
5   he's saying there is that we sell
6   what pharmacies order.
7   BY MR. PAPANTONIO:
8    Q.   No, sir.  No, sir.  He
9   says --
10       MR. PAPANTONIO:  Play it
11  again.  Play it again.
12       (Video playback.)
13       MR. HAMMERGREN:  As a
14  distributor, we don't manufacture
15  prescription drugs.  We don't
16  market them to doctors or
17  patients, nor do we market any
18  particular category of drugs such
19  as opioids to pharmacists.
20       Distributors respond to
21  pharmacy orders, which are based
22  on doctors' prescriptions.
23       (End of video playback.)
24  BY MR. PAPANTONIO:

Page 271

1    Q.   Wow.  That's just not true,
2   is it?  What he just -- what he just said
3   in front of Congress, the very highest
4   man, very highest person in McKesson
5   drugs just lied to Congress, didn't he?
6        MS. HENN:  Objection to
7   form.
8        THE WITNESS:  I can't say
9   that he did.  If you want me to --
10  and know what he's saying, then
11  he's saying that a doctor writes a
12  prescription.  A pharmacy orders
13  product to fill that prescription.
14  And then we fill -- we send an
15  order to a pharmacy after they
16  order it.
17       MR. PAPANTONIO:  All right.
18  We'll -- we're going to explore
19  this a little bit more after
20  lunch.  Okay.  We'll take a lunch
21  break, and we'll come back and
22  pick up with this.  Okay.
23       THE VIDEOGRAPHER:  All
24  right.  Stand by, please.  The

Page 272

1   time is 12:24 p.m.  Off the
2   record.
3            - - -
4        (Lunch break.)
5            - - -
6        THE VIDEOGRAPHER:  We are
7   back on the record.  The time is
8   1:09 p.m.
9            - - -
10       EXAMINATION (Cont'd.)
11           - - -
12  BY MR. PAPANTONIO:
13   Q.   Sir, when we took a lunch
14  break, we were talking about the
15  marketing that McKesson does.  And in
16  fact, marketing, by marketing, you
17  increase sales, correct?  Isn't that the
18  idea of marketing?
19       MS. HENN:  Objection to
20  form.
21       THE WITNESS:  Well, I --
22  marketing is not necessarily a
23  correlation to increasing sales.
24  I see it more of advertising.

Page 273

1   BY MR. PAPANTONIO:
2    Q.   Okay.  So you were
3   advertising narcotics?
4        MS. HENN:  Objection to
5   form.
6        THE WITNESS:  Not myself.
7   BY MR. PAPANTONIO:
8    Q.   But McKesson?
9    A.   I don't --
10       MS. HENN:  Objection to
11  form.
12       THE WITNESS:  I don't know
13  that they were.  I know they do
14  sales so by saying marketing and
15  sales as one, I'm not aware of
16  them marketing controls and
17  pushing controls.
18       If a pharmacy isn't going to
19  be able to fill a prescription,
20  they are not going to buy
21  something simply to buy it and put
22  it on their shelf.
23  BY MR. PAPANTONIO:
24   Q.   Sir, let me cut right to it,

Highly Confidential – Subject to Further Confidentiality Review

Page 274

1 okay.
2       You as a regulator, as you
3 sit here today, had no idea that your
4 company was out marketing narcotics.  Is
5 that a yes or a no?
6       MS. HENN:  Objection to
7    form.
8       THE WITNESS:  As I stated,
9    McKesson is selling products that
10   a pharmacy needs to fill
11   prescriptions.
12 BY MR. PAPANTONIO:
13   Q.   Narcotics is one of them?
14   A.   Yes.
15   Q.   Correct?
16       Okay.  You did know that
17 they were marketing narcotics then,
18 correct?
19       MS. HENN:  Objection to
20   form.
21 BY MR. PAPANTONIO:
22   Q.   I want to be clear on this,
23 because I'm getting ready to go through
24 some documents here.  And I want to be

Page 275

1 clear, you knew that McKesson was
2 marketing narcotics, yes or no?
3       MS. HENN:  Objection to
4    form.
5       THE WITNESS:  Yes, McKesson
6    is selling narcotics.
7 BY MR. PAPANTONIO:
8    Q.   Okay.  And for example --
9        MR. PAPANTONIO:  1154, would
10   you put up 1154.
11 BY MR. PAPANTONIO:
12   Q.   You knew, sir, didn't you,
13 that McKesson -- let me -- before I ask
14 this question.
15       If you see upticks in
16 sales -- for example, we went through a
17 few of the pharmacies that you were in
18 charge with, right?  And there is a lot
19 of factors that affect upticks in sales.
20 You would agree with that?
21   A.   Yes.
22   Q.   I think you explained a few.
23   A.   Yes, there are some.
24   Q.   And -- and if you don't know

Page 276

1 that your company is marketing, you have
2 no way to keep up with why there are so
3 many sales at a particular pharmacy, you
4 kind of have to know a correlation, don't
5 you?
6       MS. HENN:  Objection to
7    form.
8       THE WITNESS:  In the
9    regulatory area, we would request
10   information from the pharmacy that
11   would explain why their increase
12   in business.
13 BY MR. PAPANTONIO:
14   Q.   All right.  And you knew
15 that -- or maybe you didn't know.  But do
16 you have any opinion as far as your
17 experience as a regulator, that marketing
18 increases sales?
19       MS. HENN:  Objection to
20   form.
21       THE WITNESS:  I would say
22   not in the case for controlled
23   substances, because a prescription
24   has to be written by a doctor in

Page 277

1       order for that increase in sales
2       to take place.
3 BY MR. PAPANTONIO:
4    Q.   When -- after your
5 president, Mr. Hammergren, CEO, testified
6 that your company didn't do any
7 marketing, do you remember any e-mails
8 flying around -- flying around at
9 McKesson saying he just -- he just
10 committed perjury?
11       MS. HENN:  Objection to
12   form.
13 BY MR. PAPANTONIO:
14   Q.   Was there any kind of
15 e-mails like that that were flying around
16 the McKesson headquarters?
17       MS. HENN:  Objection to
18   form.
19       THE WITNESS:  I did not see
20   any e-mails pertaining to that,
21   no.
22 BY MR. PAPANTONIO:
23   Q.   But it wasn't true.  What he
24 said was not true.  You agreed to that

Page 278

1 already, I think?
2           MS. HENN: Objection to
3     form.
4           THE WITNESS: I don't know
5     what his definition of
6     marketing -- what he was referring
7     to on that.
8 BY MR. PAPANTONIO:
9     Q.   Yeah. Well, as a matter of
10 fact, sir, you were marketing with
11 Purdue. You had --
12           MR. PAPANTONIO: 1154.
13     Could you put up 1154.
14           MS. MOORE: It's MCK Oriente
15     144.
16           MS. HENN: Do you want 1154,
17     or would you like him to see 144?
18           MR. PAPANTONIO: 1154. The
19     number she is giving is just for
20     identification.
21           (Document marked for
22     identification as Exhibit
23     MCK-Oriente-144.)
24 BY MR. PAPANTONIO:

Page 279

1     Q.   You've seen -- have you ever
2 seen this document --
3           MS. HENN: Wait, wait.
4           Counsel, I just want to make
5     sure we're clear. The witness has
6     been handed a document that's
7     labeled and marked McKesson
8     Oriente 144. So we need to make
9     sure that the record's clear about
10     that. I don't know what number
11     you're using, but that's what he
12     has.
13           MS. O'GORMAN: Can I have a
14     copy of that document.
15           MS. HENN: And we're --
16           MR. PAPANTONIO: So --
17           MS. HENN: And we need
18     another copy of the document.
19           MR. PAPANTONIO: Yeah.
20 BY MR. PAPANTONIO:
21     Q.   So McKesson had a marketing
22 arrangement with Purdue. Did you know
23 that?
24           MS. HENN: Objection to

Page 280

1     form.
2           THE WITNESS: I was not
3     aware, nor have I ever seen this.
4 BY MR. PAPANTONIO:
5     Q.   Is this the first time that
6 you've seen this marketing arrangement
7 between McKesson and Purdue where they
8 were marketing narcotics?
9     A.   Yes. As I --
10           MS. HENN: Objection to
11     form.
12           THE WITNESS: Yes. As I
13     stated earlier, I did not get
14     involved with the sales side of
15     the business. I have never seen
16     this document.
17 BY MR. PAPANTONIO:
18     Q.   Do you know what loyal --
19 what the term "loyalty script" is? Have
20 you ever heard that?
21     A.   No, I have not.
22     Q.   Okay. Did you know that
23 Purdue and McKesson actually, as early as
24 2010, had a marketing program, an

Page 281

1 agreement with something called Butrans.
2 Do you know what Butrans is?
3     A.   No, I've never heard of --
4     Q.   B-U-T-R-A-N-S?
5     A.   No, sir, never heard of it.
6     Q.   You don't know if it's a
7 narcotic or not?
8     A.   Butrans? I've never heard
9 that word before.
10     Q.   Yeah, okay. And so nobody
11 told you as you were out trying to figure
12 out regulatory aspects of what was going
13 on with your pharmacies, when were they
14 selling more, when were they selling
15 less, nobody told you that while all that
16 was going on, Purdue and McKesson had a
17 marketing program put together?
18           MS. HENN: Objection.
19 BY MR. PAPANTONIO:
20     Q.   Nobody told you that, right?
21           MS. HENN: Objection to
22     form.
23 BY MR. PAPANTONIO:
24     Q.   Correct?

Page 282

1    A.   You mentioned that, and I
2 was unaware that there was any program
3 between the two.
4    Q.   And apparently your CEO, the
5 highest man in this company, must have
6 been unaware of it too, because he told
7 Congress there was no such thing as
8 marketing between -- for McKesson
9 marketing?
10    MS. HENN:  Objection to
11 form.
12 BY MR. PAPANTONIO:
13    Q.   That's what we -- that's
14 what we listened to on the video, didn't
15 we?
16    MS. HENN:  Objection to
17 form.
18 BY MR. PAPANTONIO:
19    Q.   Right?
20    A.   I don't know what he was
21 exactly referring to, sir.
22    Q.   Well, you knew that you were
23 marketing -- do you know what Teva is?
24 Have you ever heard the company Teva?

Page 283

1    A.   Teva Pharmaceutical, they're
2 another manufacturer.
3    Q.   Okay.  And you had -- nobody
4 told you that --
5    MR. PAPANTONIO:  Would you
6 put up 1317, please.
7    MS. HENN:  Could we get a
8 copy for the witness, please?
9    MR. PAPANTONIO:  We're
10 getting a copy right now.  1317.
11 Carol give the identification on
12 this.
13    MS. MOORE:  MCK Oriente 279.
14    (Document marked for
15 identification as Exhibit
16 MCK-Oriente-279.)
17 BY MR. PAPANTONIO:
18    Q.   Tell the jury what Fentanyl
19 is.
20    MS. HENN:  Counsel, can you
21 wait until the witness has the
22 document, please?  Thank you.
23    MR. PAPANTONIO:  Well, he
24 doesn't have to have the document

Page 284

1 in order to answer this question.
2 BY MR. PAPANTONIO:
3    Q.   Tell the jury what fentanyl
4 is.
5    MS. HENN:  Do you want him
6 to look at it?
7    MR. PAPANTONIO:  I do want
8 him to look at it.  I'm not asking
9 about the document.
10    MS. HENN:  I just want to
11 make sure he's doing one thing at
12 a time.  If you have a question or
13 you'd like --
14 BY MR. PAPANTONIO:
15    Q.   This is a clear question.
16 Tell the jury what fentanyl is.
17    A.   Fentanyl is a controlled
18 substance used to control pain.
19    Q.   And tell us about the
20 potency of fentanyl, as you understand
21 it?
22    A.   It's highly potent and
23 usually is administered in a patch.
24    Q.   Is it -- would you agree

Page 285

1 that it is the most potent narcotic on
2 the market?
3    A.   I'm not a pharmacist, but I
4 know it's one of the higher potency --
5 excuse me -- potency controlled
6 substances, yes.
7    Q.   Again, we heard that your
8 CEO say that you don't market, McKesson
9 doesn't market.  What is -- the title on
10 this is "McKesson Manufacturer Marketing
11 Contract."  And then it goes on and it
12 talks about Actiq and Fentora.  Would you
13 tell the jury what Actiq and Fentora is.
14    MS. HENN:  Objection to
15 form.
16    THE WITNESS:  I know Actiq.
17 Fentora I'm not 100 percent clear
18 or familiar with that specific
19 brand.
20    The Actiq, I believe, is
21 like a lollypop dispenser type for
22 fentanyl.
23 BY MR. PAPANTONIO:
24    Q.   So you've got a fentanyl

Page 286

1 lollipop that you would agree is the most
2 potent narcotic ever sold in America.
3 You would agree with that, wouldn't you?
4     A.   Not necessarily, sir.  I'm
5 not a pharmacist.  I can't say that it's
6 more or less potent than another drug.
7     Q.   Have you ever seen the
8 comparison between how potent fentanyl is
9 compared to other narcotics?
10       MS. HENN:  Objection to
11    form.
12       THE WITNESS:  No.  No.
13 BY MR. PAPANTONIO:
14    Q.   I'll put this up in a
15 minute.  Have you ever seen that?
16       MS. HENN:  Are you going to
17    hand him --
18       MR. PAPANTONIO:  I'm going
19    to in just a second.
20 BY MR. PAPANTONIO:
21    Q.   Have you ever seen that?
22       MS. HENN:  What are you
23    referring to, Counsel?
24 BY MR. PAPANTONIO:

Page 287

1    Q.   I'm looking at a picture
2 that makes a comparison between heroin
3 and fentanyl.
4       Have you ever seen any kind
5 of comparisons between fentanyl and
6 heroin?  Ever seen any comparisons
7 between fentanyl and heroin?
8     A.   Not that specific one.  But
9 yes, that fentanyl is one of the
10 stronger, you know, drugs.
11    Q.   Okay.  And so when your CEO
12 was testifying before Congress and said
13 we don't market, he didn't mention
14 anything that, oh, by the way, we are
15 marketing the most potent narcotic sold
16 in America, which is fentanyl, along with
17 Teva.  You never heard that out of that
18 discussion that we saw on the screen, did
19 you?
20       MS. HENN:  Objection to
21    form.
22       THE WITNESS:  I did not hear
23    that on -- on video, no.
24 BY MR. PAPANTONIO:

Page 288

1    Q.   When you -- what was your
2 involvement with Fentora and Actiq, the
3 fentanyl products?
4       MS. HENN:  Objection to
5    form.
6       THE WITNESS:  Fentanyl is
7    one of the base codes under --
8    there are 82 different base codes
9    that we monitor.
10       They were under the fentanyl
11    base code.  They would have had a
12    monthly threshold amount.  So it
13    was one of 82 products that we --
14    or, excuse me -- 82 base codes
15    that we looked at on a daily
16    basis.
17 BY MR. PAPANTONIO:
18    Q.   Okay.  We already heard that
19 you were aware of the Department of
20 Justice going after Purdue and making
21 them pay a fine for the way they sold
22 their product, correct?
23       MS. HENN:  Objection to
24    form.

Page 289

1 BY MR. PAPANTONIO:
2    Q.   We already heard that
3 earlier, right?
4       MS. HENN:  Objection to
5    form.
6       MS. O'GORMAN:  Same
7    objection.
8 BY MR. PAPANTONIO:
9    Q.   Earlier in the deposition,
10 we talked about that.
11       Do you remember that?
12    A.   Yes, I do.
13    Q.   Okay.  And you were aware of
14 it, correct?
15       MS. HENN:  Objection to
16    form.
17       MS. O'GORMAN:  Same
18    objection.
19       THE WITNESS:  I was aware
20    that there was a lawsuit against
21    Purdue for their advertising
22    practices.
23 BY MR. PAPANTONIO:
24    Q.   So you decide, even though

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 there was a lawsuit against Purdue for
2 advertising in a way that misled the
3 public about the addictive nature of
4 their products, you were aware that
5 McKesson chose to do business with them
6 anyway, true?
7        MS. HENN:  Objection to
8    form.
9        MS. O'GORMAN:  Objection to
10   form.
11       THE WITNESS:  McKesson did
12   business with Purdue to sell a
13   product that, you know, when used
14   in the correct or medical
15   purposes, is beneficial to
16   fighting pain.  That, I knew.
17 BY MR. PAPANTONIO:
18   Q.   And you know enough to know
19 that if you don't tell the truth about
20 the qualities of your product, if you lie
21 about the qualities of your product when
22 consumers are buying that product, that
23 can cause real harm.  You're aware of
24 that, aren't you, as -- in your business

Page 291

1 for this many years?
2        MS. HENN:  Objection to
3    form.
4        THE WITNESS:  If -- if the
5    person taking the product does not
6    have all the truthful information,
7    it could be detrimental.
8 BY MR. PAPANTONIO:
9    Q.   And you know that the
10 people, the very people that you were
11 buying products from, which was Purdue,
12 was not giving truthful information to
13 doctors and to patients.  You know that
14 now, correct?
15       MS. O'GORMAN:  Objection.
16       MS. HENN:  Objection to
17   form.
18       THE WITNESS:  I know that
19   now.  When I learned of it, it was
20   still ongoing.
21 BY MR. PAPANTONIO:
22   Q.   When did you learn about it,
23 sir?
24   A.   I don't remember the exact

Page 292

1 date, sir.
2    Q.   And so now we're talking
3 about another company, not Purdue.  We're
4 now talking about a company Teva, and
5 McKesson is marketing a fentanyl product
6 for them, two fentanyl products.  And you
7 are aware, sir, aren't you that the
8 Department of Justice actually brought
9 criminal charges against them for also
10 not telling the truth about information
11 of their product.  Did you know that?
12       MS. HENN:  Objection to
13   form.
14       THE WITNESS:  No, I did not.
15   I did not know Teva had --
16 BY MR. PAPANTONIO:
17   Q.   Okay.  Had you ever -- let
18 me just -- let me see if this ever -- you
19 ever remember this knocking around the
20 office.  13 -- excuse me, 1381.
21       MS. MOORE:  MCK Oriente 322.
22       (Document marked for
23   identification as Exhibit
24   MCK-Oriente-322.)

Page 293

1 BY MR. PAPANTONIO:
2    Q.   Do you see where it says up
3 in the left-hand corner there, sir -- I
4 know this is not your document.  Here's
5 what I'm interested in.  You had a system
6 at McKesson where information was sent
7 around about issues involving narcotics
8 that involved other companies besides
9 your own, correct?
10       MS. HENN:  Objection to
11   form.
12       THE WITNESS:  I'm not
13   familiar with this.  You said
14   there's a system.
15 BY MR. PAPANTONIO:
16   Q.   Yeah.  I mean, you had an --
17 you had an entire system that kept you
18 informed about what was happening in
19 the -- in the drug business, right?
20       MS. HENN:  Objection to
21   form.
22       THE WITNESS:  No, not to my
23   knowledge.
24 BY MR. PAPANTONIO:

Page 294

1   Q.   Had you ever heard of Rx
2   News?
3   A.   That's not a McKesson
4   system, is it?
5   Q.   It's a system that you were
6   a member of, McKesson -- Rx News.  Do you
7   know you were a member that?
8        MS. HENN:  Objection to
9        form.
10       THE WITNESS:  Was I on that
11       e-mail distribution?
12  BY MR. PAPANTONIO:
13       Q.   Yeah.  Did you know that?  I
14  don't want to speak for you.  Do you have
15  any memory of getting news from Rx News?
16       MS. HENN:  Objection to
17       form.
18       THE WITNESS:  I don't have a
19       recollection of getting news from
20       Rx News.
21  BY MR. PAPANTONIO:
22       Q.   And so is it your testimony
23  that when something would happen with
24  another company, when they've involved

Page 295

1   themselves in criminal conduct, when
2   they've been -- they've been hit by the
3   DOJ for doing something illegal, that you
4   had no way of knowing that?  Is that your
5   testimony?
6        MS. HENN:  Objection to
7        form.
8        THE WITNESS:  I don't recall
9        getting updates via Rx News.
10  BY MR. PAPANTONIO:
11       Q.   Isn't that important
12  information for you to know as a
13  regulator?  I mean, you're in -- you're
14  in regulatory.  You're selling narcotics
15  all over the country.  And you're buying
16  those products from people that you don't
17  know anything about?
18       MS. HENN:  Objection to
19       form.
20  BY MR. PAPANTONIO:
21       Q.   Is that what you're telling
22  me?
23       MS. HENN:  Objection to
24       form.

Page 296

1        THE WITNESS:  The decision
2   to do business at that level would
3   not have been my responsibility.
4   My responsibility was to monitor
5   what the customers purchased, not
6   to determine if McKesson would use
7   a wholesaler -- excuse me, a
8   manufacturer or not.
9   BY MR. PAPANTONIO:
10       Q.   Well, you don't want to do
11  business with a manufacturer that is
12  guilty of criminal conduct, do you?
13       MS. HENN:  Objection to
14       form.
15  BY MR. PAPANTONIO:
16       Q.   Or is that okay with you?
17       A.   That decision was not left
18  up to me, sir.
19       I -- again, I would monitor
20  what our customers purchased.  But
21  whether or not McKesson did business with
22  a manufacturer was above my level.
23       Q.   Wouldn't you want to know as
24  a regulator, sir, that's working every

Page 297

1   day to try to regulate the amount of
2   narcotics that are being spread out all
3   over this country, wouldn't you know --
4   wouldn't you want to know if you're doing
5   business with a criminal?
6        MS. HENN:  Objection to
7        form.
8   BY MR. PAPANTONIO:
9        Q.   Buying products from a
10  criminal, is that important to you?
11       MS. HENN:  Same objection.
12       THE WITNESS:  It's important
13       to me.  It was handled at a higher
14       level than myself.
15  BY MR. PAPANTONIO:
16       Q.   Okay.  Let me ask you.
17  You've been in regulatory how many years?
18       A.   11 years, sir.
19       Q.   11 years.  And after
20  11 years of experience, you would have to
21  agree with me, sir, wouldn't you, that it
22  is pretty important to know that the
23  people that you're doing business with
24  have been hit for criminal conduct.

Page 298

1 That's pretty important information to
2 you, isn't it?
3         MS. HENN:  Objection to
4     form.
5         THE WITNESS:  The
6     information would be good to know.
7     The decision on whether or not to
8     do business with that company
9     would not be under my
10    responsibility to continue or to
11    cease.
12 BY MR. PAPANTONIO:
13    Q.   Yeah, you -- but -- and
14 you --
15        This is the first time that
16 you've seen this document.  The left-hand
17 corner it says Department of Justice, and
18 it talks about Teva has to pay
19 $425 million for what they call criminal
20 information plea.  Did you know that?
21        MS. HENN:  Counsel, is this
22    about Teva?  I don't see anything
23    about Teva.
24 BY MR. PAPANTONIO:

Page 299

1    Q.   Sir, you know what Cephalon
2 is.  Counsel may not be.  You know who
3 Cephalon.  Cephalon is Teva, isn't it?
4    A.   I do not know that for sure,
5 sir.
6    Q.   Sir, how much information
7 were you given day to day about all the
8 people that you were buying drugs from
9 and then distributing in the company,
10 like Purdue or Teva or Cephalon?  How
11 much information were you given by people
12 in management that said we have a
13 relationship with somebody who has been
14 hit and fined for criminal conduct?
15        MS. HENN:  Objection to
16    form.
17 BY MR. PAPANTONIO:
18    Q.   Who is it that would tell
19 you that?
20        MS. O'GORMAN:  Objection.
21        THE WITNESS:  We -- in the
22    regulatory that I was responsible
23    for was for what our customers
24    were purchasing, not for the

Page 300

1     actions of our -- of our
2     manufacturers that we were buying
3     from.
4 BY MR. PAPANTONIO:
5    Q.   Sir, so you felt like --
6 your testimony here today is you felt
7 like you had no responsibility to
8 understand where all these narcotics were
9 coming from that was being distributed
10 through your distribution operation in
11 Landover.  Is that what you're telling
12 me?
13        MS. HENN:  Objection to
14    form.
15        THE WITNESS:  No, sir.
16    That's not what I'm telling you.
17        What I'm saying is my
18    responsibility was in what was
19    being sold by McKesson to these
20    licensed pharmacies and to watch
21    what products they were
22    purchasing.
23        It was not my responsibility
24    to follow what lawsuits or actions

Page 301

1 were going against manufacturers.
2 BY MR. PAPANTONIO:
3    Q.   The jury is going to hear,
4 sir, about how potent fentanyl is, right.
5 How would you describe the potency of
6 fentanyl?
7    A.   Again, sir, I'm not a
8 pharmacist.  So a potency of fentanyl
9 versus other products, I don't have that
10 scientific knowledge.
11    Q.   You know by the time -- by
12 the time that 2011 rolled around, you
13 knew that on the street people were
14 taking all three of your drugs that
15 McKesson distributed, and they were
16 mixing it in cocktails.  You'd heard
17 about that, correct?
18        MS. HENN:  Objection to
19    form.
20        THE WITNESS:  That, I was
21    aware.
22 BY MR. PAPANTONIO:
23    Q.   You were aware of that.
24 When did you become aware of that?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    A.   The exact time frame, I
2  don't know.
3    Q.   When did you become aware of
4  the number of people who were dying every
5  day from overdoses from narcotics, opioid
6  narcotics?
7      MS. HENN:  Objection to
8    form.
9      THE WITNESS:  That would
10   have been early on, say 2008.
11 BY MR. PAPANTONIO:
12   Q.   You knew in 2000 though --
13 no.  You weren't there in 2000?
14   A.   No, sir.
15   Q.   Yeah, okay.  2008 is the
16 first time that you heard that A, there's
17 a crisis, an opioid crisis.  You agree?
18   A.   About that, yes, sir.
19   Q.   2008 is the first time that
20 you heard that more than 100 people were
21 dying every day from opioid overdoses,
22 correct?
23     MS. HENN:  Objection to
24   form.

Page 303

1      THE WITNESS:  About that
2    time, yes.
3  BY MR. PAPANTONIO:
4    Q.   And as you were hearing that
5  information, you were watching the sales
6  tick up higher and higher for every
7  pharmacy that was under your control at
8  Landover.  Is that a correct statement?
9    A.   No, sir, it's not.
10     MS. HENN:  Objection to
11   form.
12     THE WITNESS:  It wasn't
13   every pharmacy.
14 BY MR. PAPANTONIO:
15   Q.   Well, how many pharmacies
16 was it?
17   A.   I don't have that exact
18 amount.  There were hundreds of
19 customers, sir, so I wouldn't know
20 exactly how many increased versus did not
21 increase.
22   Q.   Well, during the time that
23 you had learned that people, more than --
24 I think it's 116 people.  Tell me if you

Page 304

1  have a different number.  That 116 people
2  were dying.  I think that number rises
3  around 2007, as you said.
4      Once you learned that 116
5  people were dying every day from opioids,
6  did your company make any adjustment in
7  the way that they were selling opioids?
8      MS. HENN:  Objection to
9    form.
10     THE WITNESS:  We were
11   continuously adjusting and looking
12   at purchases.  As I said, we
13   looked at it on a daily basis as
14   to what customers were purchasing
15   and what quantities, and in what
16   percentage of controls to Rx, how
17   much the business was growing,
18   wasn't growing, again, working
19   with the pharmacies to find out
20   which doctors they were filling
21   these prescriptions for, to try
22   and understand if it was for a
23   legitimate medical purpose.
24 BY MR. PAPANTONIO:

Page 305

1    Q.   So let me take you back to
2  marketing again, because marketing is,
3  whether you agree or not -- I'm not --
4  it's still not clear to me whether you
5  agree that if you market a product,
6  you're going to sell more product.  At
7  this point you have no opinion on that,
8  right?
9      MS. HENN:  Objection to
10   form.
11     THE WITNESS:  Again, you
12   cannot sell something to a
13   pharmacy if they're not going to
14   use it to fill a prescription.
15 BY MR. PAPANTONIO:
16   Q.   Tell us what Actavis is.
17   A.   I believe it's pronounced
18 Actavis.
19   Q.   Tell us what Actavis is.
20   A.   I'm not sure if it's another
21 company, I believe.
22   Q.   Well, let's take a look at
23 it.
24     MR. PAPANTONIO:  Would you

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    give us Document 113, please.
2  BY MR. PAPANTONIO:
3    Q.   Because I'm still on this
4  topic dealing your CEO testifying in
5  front of Congress saying that your
6  company did not market, okay.  I'm still
7  on this topic.  Stay with me here.
8    A.   I'm with you.
9    Q.   All right.  Do you see this
10  document right here?
11    MS. HENN:  So the document.
12    MR. PAPANTONIO:  Carol, give
13    them the number.
14    MS. MOORE:  MCK Oriente 20.
15    MS. HENN:  Thank you.
16    (Document marked for
17    identification as Exhibit
18    MCK-Oriente-020.)
19  BY MR. PAPANTONIO:
20    Q.   So this document, if you
21  will look, first of all, tell me, who is
22  John Hansen?  Do you know?
23    A.   I do not know who John
24  Hansen is.

Page 307

1    Q.   You see the -- you see Page
2  2 of this document right here.
3    MS. HENN:  Just to remind
4    the witness, you can take your
5    time to read the document.
6  BY MR. PAPANTONIO:
7    Q.   Well, I want you to read it,
8  because nobody is showing it to you
9  before you came in here today, did you?
10    A.   No, I've never seen this.
11    Q.   Yeah, this is -- this is a
12  McKesson document, right?
13    A.   I don't know.  Is it?
14    Q.   Well, let's take a look at
15  the top of it.  It says, at the top of
16  this page on Page 2 --
17    MR. PAPANTONIO:  How about
18    blowing that up for me.
19  BY MR. PAPANTONIO:
20    Q.   It says, "Subject: McKesson
21  marketing opportunities.  Actavis."  And
22  we are talking about oxymorphone and that
23  is a narcotic that McKesson sold,
24  correct?

Page 308

1    A.   Yes, McKesson carried that
2  product.
3    Q.   All right.  And here they
4  are talking about marketing that product
5  that McKesson sold with Actavis.
6    Do you see that?
7    MS. HENN:  Let's give the
8  witness a chance to read it,
9  please.
10    MR. PAPANTONIO:  Sir, are
11  you a little --
12    MS. HENN:  Just let --
13    MR. PAPANTONIO:  No, no.
14  I'm going to ask questions.
15  He's -- you're welcome to read
16  anything you want.  I'm amazed
17  that these documents haven't been
18  shown to this witness.  So don't
19  waste my time here.  Now,
20  here's --
21    MS. HENN:  Counsel, I'd just
22  like to again reiterate --
23    MR. PAPANTONIO:  That's
24  fine.

Page 309

1    MS. HENN:  -- as you agreed,
2  that if the witness needs to read
3  the document to answer your
4  questions, you need to give him
5  time to do that.
6    MR. PAPANTONIO:  I'm fine
7  with that.  And I am appalled that
8  you never -- or anybody with
9  McKesson never showed him this
10  document before you put him in
11  that chair to be cross-examined.
12  I'm appalled.
13    MS. HENN:  Noted.
14  BY MR. PAPANTONIO:
15    Q.   So with that, read the
16  document.  Do you see it?
17    The top of the page says,
18  "Subject: McKesson marketing
19  opportunities."  And you didn't even know
20  prior to coming in here, and obviously
21  either your CEO did know and lied to
22  Congress or he didn't know, but it says
23  right here, "McKesson marketing
24  opportunities.  Actavis, oxymorphone,"

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  right there, correct? And that's a
2  product -- that's a product that you
3  distributed?
4      A.  Yes.
5      Q.  All right. And it says,
6  "Hi, Ara. I'm the marketing director for
7  the McKesson one-stop generics program.
8  In collection" -- "in collaboration with
9  Amber Kehoe's product management team
10  I've put together a marketing plan" --
11      MR. PAPANTONIO: Please
12      underline "marketing plan."
13  BY MR. PAPANTONIO:
14      Q.  -- "put together a marketing
15  plan to promote awareness of your
16  recently launched oxymorphone ER
17  tablets."
18      And, sir, is there anything
19  equivocal about what I just read? Do you
20  understand what this is talking about in
21  regard to marketing oxymorphone that your
22  company distributed all over this
23  country?
24      MS. HENN: Objection to

Page 311

1      form.
2      THE WITNESS: This document,
3      from what I'm reading, says that
4      McKesson is looking at promoting
5      awareness for this new product.
6      What I was involved in is
7      the threshold amount that a
8      customer could order. So with a
9      threshold amount remaining the
10      same, the customer could not get
11      any more product unless I made a
12      threshold adjustment.
13      So, you know, they would
14      have had to have business increase
15      to justify that.
16      The amount that a pharmacy
17      could purchase was not just
18      increased based on any marketing
19      that was done. We looked at
20      different factors than -- than the
21      marketing.
22  BY MR. PAPANTONIO:
23      Q.  So why would the CEO of
24  McKesson get up and lie to Congress about

Page 312

1  marketing if it's not important? Why
2  would he do that? Do you know?
3      MS. HENN: Objection to
4      form.
5      THE WITNESS: I'm not aware
6      of what Mr. Hammergren's testimony
7      was based on.
8  BY MR. PAPANTONIO:
9      Q.  It was based on a lie,
10  wasn't it?
11      MS. HENN: Objection to
12      form.
13      THE WITNESS: I don't agree
14      with that.
15  BY MR. PAPANTONIO:
16      Q.  Let's read the next
17  paragraph. It says, "I understand that
18  you're looking to target this to
19  approximately 500 accounts with
20  significant brand purchase history and
21  have accounted for in the proposal.
22      "Please note, however, that
23  many of our communication vehicles can
24  reach a larger population at no

Page 313

1  additional charge."
2      Did I just read that right,
3  or is there anything that you want to add
4  to it before we move on?
5      A.  You read that right. As I
6  stated earlier, being in regulatory and
7  looking at different factors that go into
8  threshold setting, I'm not familiar with
9  what they would be referring to
10  regarding, you know, marketing and sales
11  and things of that nature here.
12      So, again, the threshold
13  that I was responsible for and what I
14  would look at would not be affected by if
15  they were doing this -- these promotions.
16      Q.  In other words, promotions
17  don't make any difference to sales of
18  McKesson. Is that what you're telling
19  me?
20      MS. HENN: Objection to
21      form.
22      THE WITNESS: No, what I
23      said was promotion -- these
24      promotions would not have an

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    effect on a customer being able to
2    order more product.
3        MR. PAPANTONIO:  Look, I'm
4    going to close and I'm going to
5    let my partner take over from
6    here, Mr. Kennedy.
7    BY MR. PAPANTONIO:
8        Q.   But I want to ask you
9    something.  If you're -- if you are in
10   the position of having to tell the DEA
11   about suspicious orders, that's something
12   that you take very seriously, right?
13       A.   Yes, sir, I do.
14       Q.   And the term "suspicious
15   orders" is pretty clear.  If an order is
16   suspicious, you -- you need to report it,
17   correct?  We've established that.
18       MS. HENN:  Objection to
19   form.
20       THE WITNESS:  That is
21   correct.
22       MR. PAPANTONIO:  Okay.
23   Would you please show him
24   Document 345, please.

Page 315

1        MS. MOORE:  MCK Oriente 62.
2        (Document marked for
3    identification as Exhibit
4    MCK-Oriente-062.)
5    BY MR. PAPANTONIO:
6        Q.   Sir, take a minute and look
7    at this.  Do you see where it says
8    McKesson operations manual.  Have you
9    ever seen this before?
10       A.   Yes, sir.
11       Q.   When have you seen it?
12       A.   I wouldn't remember the
13   exact date.  It would have been when it
14   was established and -- and sent out to
15   us.
16       Q.   So you are familiar with the
17   document, right?
18       A.   Yes.
19       Q.   You're familiar -- you were
20   familiar with the document before you
21   came in here to testify today, correct?
22       A.   I've seen this document
23   prior.  It's a few years old.
24       Q.   How about -- how about

Page 316

1    turning over to .23, Page 23.  It's at
2    the top right-hand corner.  Oh, excuse
3    me.  No. 20 -- yeah, Page 23.  It's at
4    the top right-hand corner.
5        A.   Okay.
6        Q.   Are you there?
7        A.   Yes, sir.
8        MR. PAPANTONIO:  Would you
9    please blow up that paragraph that
10   says "customer communications" for
11   me, Evan.
12   BY MR. PAPANTONIO:
13       Q.   This is out of -- this is
14   right out of your manual, true?
15       A.   Yes.  That's -- that's
16   written here in the document.
17       Q.   All right.  Do you see where
18   it says under -- let's see, one, two,
19   three, four, five, six -- under 5, do you
20   see that fifth dot?
21       A.   Yes, sir.
22       Q.   It says, "Refrain from using
23   the word 'suspicious' in communication.
24   Once McKesson deems an order or customer

Page 317

1    suspicious, McKesson is required to act."
2        MR. PAPANTONIO:  Now I want
3    you to underline that, because
4    we're going to talk about that in
5    just a minute.
6    BY MR. PAPANTONIO:
7        Q.   This is telling you, this is
8    telling everybody who reads this document
9    to refrain from using the word
10   "suspicious" in communication because
11   once McKesson deems an order suspicious,
12   McKesson is required to act.
13       Isn't it a good thing that
14   McKesson should act when they find out an
15   order is suspicious, do you have any
16   problems with that?
17       A.   Sir, when we find an order
18   to be suspicious and a customer to be
19   suspicious, we would act.  But when we
20   first see a customer and we might call
21   them a customer of interest, as we
22   conduct our review and due diligence, so
23   for instance, while I'm doing my research
24   of a customer and I'm doing my research

Page 318

1 of his purchase patterns, okay, I don't
2 call them suspicious until I deem that
3 there is actual suspicious activity. And
4 at that point I would say there is
5 suspicious customer intake action.
6 But prior to that, they were
7 a customer of -- of interest that I would
8 be reviewing.
9 Q. Now, sir, let me ask you. I
10 want to -- I want to -- read this with me
11 one time. Would you read that out loud
12 where it says refrain. Please read that
13 to me.
14 A. "Refrain from using the word
15 'suspicious' in communications."
16 Q. Go ahead.
17 A. Oh.
18 "Once McKesson deems an
19 order and/or customer suspicious,
20 McKesson is required to act. This means
21 all controlled substance sales to that
22 customer must cease and the DEA must be
23 notified."
24 Which is what we did.

Page 319

1 Q. Well, here you're saying
2 don't use the word "suspicious," because
3 once you do that, it kicks into play the
4 fact that you have a responsibility, is
5 that correct?
6 Once the word "suspicious"
7 is used, McKesson has responsibility to
8 get control of the problem, is that a yes
9 or a no?
10 A. Once we deem them suspicious
11 we took action on them.
12 Q. And we saw earlier, 318
13 times, where -- where there was no --
14 there was no suspicious order that was --
15 that was given to the DEA, right, 318
16 times?
17 MS. HENN: Objection to
18 form.
19 BY MR. PAPANTONIO:
20 Q. We saw that, right?
21 A. It was in the document.
22 Q. And here, this document
23 we're looking at, says don't use the word
24 "suspicious," because if you do, that's

Page 320

1 going to require McKesson to do
2 something. Right? McKesson is required
3 to act?
4 MR. PAPANTONIO: Would you
5 underline "required to act"?
6 BY MR. PAPANTONIO:
7 Q. Required to act. Right?
8 A. Right. The date on this
9 document is 2013.
10 Q. So what? Who cares? Is
11 that important?
12 MS. HENN: Counsel.
13 BY MR. PAPANTONIO:
14 Q. I'm interested to know, why
15 is that important?
16 A. Only that if this was given
17 to in us 2013 and you are referring to
18 actions that took place in 2011.
19 Q. You knew you were supposed
20 to report suspicious orders all the way
21 back to the first time you sold your
22 first pill, didn't you?
23 A. That is correct. And we
24 always did and -- and do. And that's why

Page 321

1 we had a manual system when I came into
2 regulatory in '07, and it has since been
3 automated for us to be able to review
4 more customers more quickly.
5 Q. Sir, we're going to have my
6 partner Eric Kennedy talk to you about
7 what you did and didn't do. Give us a
8 minute. We're going to change positions;
9 okay?
10 A. All right.
11 MR. PAPANTONIO: Take a
12 break for five minutes.
13 THE VIDEOGRAPHER: All
14 right. Take off your microphone.
15 MR. PAPANTONIO: Yep.
16 THE VIDEOGRAPHER: The time
17 is 1:43 p.m. Going off the
18 record.
19 (Short break.)
20 THE VIDEOGRAPHER: We are
21 back on the record. The time is
22 1:49 p.m.
23 - - -
24 EXAMINATION

Highly Confidential – Subject to Further Confidentiality Review

Page 322

1           - - -
2    BY MR. KENNEDY:
3        Q.   Mr. Oriente, my name is Eric
4    Kennedy, I also represent the plaintiffs
5    in this case.  All right?
6        A.   Mm-hmm.
7        Q.   And I'm going to ask you a
8    few questions.  I'm going to try not to
9    be repetitious of -- of what you've
10   already answered.
11       All right?
12       A.   Okay.  Thank you.
13       Q.   Let me start by asking
14   this -- this relatively simple question.
15       From -- from everything that
16   you've heard this morning, from
17   everything that you have answered this
18   morning, can we agree that McKesson
19   played some role in causing the opioid
20   crisis that we have in this country?
21       MS. HENN:  Objection to
22   form.
23       THE WITNESS:  I would say
24   that we did our due diligence to

Page 323

1    the best of our ability with the
2    information we had and made sure
3    that what we were distributing to
4    pharmacies was going towards
5    medical purposes and that they
6    were going towards filling
7    prescriptions that were written by
8    doctors.
9        And in -- if and when we
10   determined they weren't, we took
11   action to not ship additional
12   product, as demonstrated by the
13   pharmacies that -- that I closed.
14   BY MR. KENNEDY:
15       Q.   So is the answer to my
16   question "yes"?
17       MS. HENN:  Objection to
18   form.
19   BY MR. KENNEDY:
20       Q.   Is the answer to my question
21   "yes"?
22       A.   I would say no, it isn't a
23   yes.
24       Q.   So it's your position, just

Page 324

1    when we start off, I want to understand
2    your position from everything that we
3    have heard, McKesson played zero role in
4    causing the opioid crisis that we have in
5    America today?
6        MS. HENN:  Objection to
7    form.
8    BY MR. KENNEDY:
9        Q.   Is that correct?  And that's
10   a clear yes or no.
11       A.   I don't believe we caused
12   it.
13       Q.   I didn't say that.  Did you
14   play a role --
15       MS. HENN:  Counsel.
16   BY MR. KENNEDY:
17       Q.   My question is very simple.
18   Would you agree that McKesson played a
19   role, they didn't cause it all, but
20   played a role in the crisis that we have
21   in America today as it relates to
22   prescription opioids?
23       MS. HENN:  And, Counsel, I
24   would just ask that you let the

Page 325

1    witness finish his answers.
2        MR. KENNEDY:  I'm sorry.
3        THE WITNESS:  We did play a
4    role as a distributor, yes.
5        MR. KENNEDY:  That's all I'm
6    asking.
7        MS. HENN:  Are you done with
8    your answer?
9        THE WITNESS:  Yes, I am.
10   Thank you.
11   BY MR. KENNEDY:
12       Q.   Now, let me ask you -- I
13   want to -- there may be some things that
14   we can very easily agree upon.  All
15   right?  Because I want to ask you about
16   what McKesson knew or should have known
17   what was going on in America as we
18   continue to discuss what they did and
19   didn't do.  All right?
20       A.   All right.
21       Q.   Late '90s, early 2000s, we
22   have an opioid crisis in the United
23   States of America.  True?
24       A.   I'm not familiar that far

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 back, because I wasn't in regulatory in
2 the late '90s.
3     Q.   Well, let me ask you this,
4 sir.  You've been in the pharmacy
5 industry since 1999, have you not?
6     A.   I worked for Eckerd Drug at
7 that time, yes.
8     Q.   And they are in the pharmacy
9 industry, are they not?
10     A.   Yes.
11     Q.   And then you came to
12 McKesson in '04, correct?
13     A.   That is correct.
14     Q.   And into regulatory in '07,
15 correct?
16     A.   That is correct.
17     Q.   You read newspapers in the
18 2000s, did you not?
19     A.   I was not aware that there
20 was the epidemic that existed when I
21 moved into regulatory in '07.
22     Q.   You knew that by 2001,
23 4.8 million Americans had reported in the
24 media and to the CDC, 4.8 million

Page 327

1 admitted to abusing prescription opioids
2 by 2001?
3         MS. HENN:  Objection to
4     form.
5 BY MR. KENNEDY:
6     Q.   You didn't understand that?
7     A.   It wasn't that I didn't
8 understand that.  I wasn't aware that
9 that was the number at 2001, sir.
10     Q.   By 2007, when you went into
11 regulatory, McKesson was already
12 admitting internally, were they not, they
13 were already admitting internally that
14 opioids, prescription opioids that you
15 were selling, were killing more Americans
16 than cocaine and heroin combined, true?
17         MS. HENN:  Objection to
18     form.
19         THE WITNESS:  I don't know
20     that McKesson was admitting that.
21     I have -- I heard it in the
22     newspapers and such and on the
23     news.  But I did not hear it
24     internally with McKesson

Page 328

1 correspondence.
2         MR. KENNEDY:  Would you give
3     me 5015, please.
4         Exhibit -- McKesson exhibit,
5     I'm sorry, 545.
6         MS. ROZMAN:  No, it's MCK
7     Oriente 545.  I'm sorry.
8         MS. HENN:  And just for the
9     record, I'd note that these
10     documents have highlighting, is
11     that --
12         MR. KENNEDY:  Yes,
13     highlighting is all by me and
14     there will be writing and it's all
15     by me.
16         MS. HENN:  Thank you.
17         (Document marked for
18     identification as Exhibit
19     MCK-Oriente-545.)
20 BY MR. KENNEDY:
21     Q.   McKesson document, sir, is
22 McKesson up in the right-hand corner?
23     A.   Yes.
24     Q.   It looks like it's a

Page 329

1 national operations conference from 2007,
2 true?  A national conference?
3     A.   Yes, sir.
4     Q.   And who is Don Walker?
5     A.   Don Walker was the senior
6 vice president in distribution
7 operations.
8     Q.   Did you work in operations?
9     A.   I did from '04 through late
10 '07.
11     Q.   Go to Page .3, if you would.
12 This is a McKesson document.
13         Are they telling all folks,
14 at this national conference, "Opioid
15 painkillers kill more than cocaine and
16 heroin combined," on .3?
17     A.   Yes, that's highlighted
18 here.
19     Q.   So McKesson knows it, and
20 they are telling their folks internally
21 by 2007, true?
22     A.   Yes.  That's noted here.
23     Q.   And certainly, sir, given
24 the fact that you work in the pharmacy

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 industry since 1999, you knew and
2 understood that the opioid crisis in
3 America was addicting and killing more
4 Americans every single year, '01, '02,
5 '04, '05, right up to the time that you
6 moved into regulatory, sir, correct?
7     MS. HENN:  Objection to
8     form.
9     THE WITNESS:  I see it here.
10     I didn't recall it previously that
11     that statement was made.
12 BY MR. KENNEDY:
13     Q.   As someone in the industry,
14 sir, since 1999, McKesson since '04, you
15 did not understand that the crisis was
16 getting worse every year?
17     MS. HENN:  Objection to
18     form.
19     THE WITNESS:  I did know
20     that the crisis was increasing.  I
21     just don't recall having seen it
22     in a document that you're
23     presenting here.
24 BY MR. KENNEDY:

Page 331

1     Q.   Let's talk about diversion.
2 Tell us what diversion is.
3     A.   Diversion would be the
4 misuse of controlled substances for
5 nonmedical purposes.
6     Q.   A lot of diversion occurs at
7 the pharmacy level, true?
8     A.   There -- I can't say what
9 percent occurs at the pharmacy level.
10 There is internal diversion and theft as
11 well as, you know, external diversion
12 where scripts are filled for nonmedical
13 reasons.
14     Q.   And McKesson certainly knew,
15 understood, as you did, as early as 2002
16 that diversion, the movement of opioids,
17 of narcotics into illegal markets was
18 occurring in the United States, they
19 understood that, did they not?
20     MS. HENN:  Objection to
21     form.
22     THE WITNESS:  I can't speak
23     for all of McKesson.  But I would
24     say that in that time frame, yes,

Page 332

1 we were aware that there --
2 certainly there was some diversion
3 going on.
4 BY MR. KENNEDY:
5     Q.   It was a significant problem
6 in America.  It wasn't some going on.  It
7 was a big problem in America that was
8 contributing to the crisis, was it not?
9     MS. HENN:  Objection to
10     form.
11     THE WITNESS:  There was
12     diversion going on, sir.  I didn't
13     measure the amount of total
14     diversion going on.
15     MR. KENNEDY:  Give me 1076
16     please.
17     MS. ROZMAN:  This is MCK
18     Oriente 515.
19     (Document marked for
20     identification as Exhibit
21     MCK-Oriente-515.)
22 BY MR. KENNEDY:
23     Q.   Sir, you've -- you've heard
24 of the -- the General Accounting Office

Page 333

1 of the United States government, have you
2 not?
3     A.   Yes, I've heard of the GAO.
4     Q.   This is a May 2002 report,
5 titled "Prescription Drugs:  State
6 Monitoring Programs Provide Useful Tool
7 to Reduce Diversion."  Do you see that?
8     A.   Are you referring to the
9 highlighted paragraph on Page 2?
10     Q.   I'm referring to the title
11 of it, sir.
12     A.   Okay.
13     Q.   That's what it's titled,
14 "Prescription Drugs"?
15     A.   Yes.
16     Q.   If you look at the next page
17 which is .6, do you see the highlighted
18 portion?  And this is 2002.  "The
19 diversion and abuse of prescription drugs
20 are associated with incalculable costs to
21 society in terms of addiction, overdose,
22 death, and related criminal activities."
23 Did I read that right?  Sir?
24     A.   Yes.

Page 334

1    Q.   And it continues, "DEA has
2  stated that the diversion and abuse of
3  legitimately produced controlled
4  pharmaceuticals constitutes a
5  multibillion-dollar illicit market
6  nationwide." Do you see that?
7    A.   Yes.
8    Q.   And if your company McKesson
9  is the largest distributor of these
10  narcotics in the country, they certainly
11  should know about what's going on with
12  diversion of the drugs that they are
13  selling to pharmacies, can we agree with
14  that?
15       MS. HENN:  Objection to
16  form.
17 BY MR. KENNEDY:
18    Q.   Can we agree with that, sir?
19       MS. HENN:  Objection to
20  form.
21       THE WITNESS:  Yes, they...
22 BY MR. KENNEDY:
23    Q.   They should know that?
24    A.   They should know about the

Page 335

1  diversion.  This document was from I
2  believe '02.
3    Q.   Yes, sir.
4    A.   I was not at McKesson at the
5  time.
6    Q.   But you're part of the
7  industry.
8    A.   When --
9    Q.   Are you denying the fact
10  that McKesson is the largest distributor
11  of opioids in this country, are you
12  denying the fact that they ought to know
13  about the extent of diversion, sir?
14       MS. HENN:  Objection to
15  form.
16       THE WITNESS:  No, I did not
17  say that they should not know
18  about it.  I'm just stating that
19  in '02 when this document came out
20  I did not work for McKesson.
21 BY MR. KENNEDY:
22    Q.   Can you agree with me, sir,
23  as part of this industry, and someone who
24  has dealt with the DEA his entire career,

Page 336

1  can you agree that by the -- by the early
2  2000s, it had become evident that the DEA
3  by itself could not monitor and prevent
4  diversion of narcotics into our
5  communities.  They couldn't do it by
6  themselves.  Correct?
7       MS. HENN:  Objection to
8  form.
9       THE WITNESS:  I don't know
10  what they can and couldn't do.
11       I know that the requirement
12  was for a distributor to have a
13  program in place to monitor --
14  monitor and detect suspicious
15  ordering.
16       MR. KENNEDY:  Give me 1086.
17 BY MR. KENNEDY:
18    Q.   I'm asking about the DEA and
19  their abilities and -- and what McKesson
20  knew and understand about the DEA's
21  ability to handle the problem by
22  themselves.  All right?  And it was known
23  by the early 2000s that the DEA by
24  themselves could not prevent the

Page 337

1  diversion of narcotics into our
2  communities.  It was known, was it not?
3       MS. HENN:  Objection to
4  form.
5       THE WITNESS:  Sir, I -- I
6  could not say whether the -- what
7  resources the DEA has for them to
8  do their ability.
9       So I really can't comment
10  whether they could do it alone or
11  not, sir.  I know our requirement
12  is to have a system in place to
13  report --
14 BY MR. KENNEDY:
15    Q.   We'll talk about that.  I
16  just want to ask about --
17       MS. HENN:  Counsel, let's
18  let him answer the question
19  please.
20       MR. KENNEDY:  Go ahead.
21       MS. ROZMAN:  This is Exhibit
22  MCK Oriente 518.
23       MS. HENN:  Did you have any
24  more you wanted to add?

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1  THE WITNESS:  No.
2  MS. HENN:  All right.  So
3  I'm handing the witness MCK
4  Oriente 518.
5  (Document marked for
6  identification as Exhibit
7  MCK-Oriente-518.)
8  BY MR. KENNEDY:
9  Q.  See this -- this stated
10  memorandum for ASA Hutchinson,
11  administrator, Drug Enforcement
12  Administration.  Do you see that?
13  A.  Yes.
14  Q.  And it's from the Inspector
15  General.  Have you ever heard of the
16  Inspector General of the United States of
17  America?
18  A.  Yes, I have.
19  Q.  "Subject, review of Drug
20  Enforcement Administration's
21  investigations of the diversion of
22  controlled pharmaceuticals.  Report
23  number I-2002-010."  Do you see that,
24  sir?

Page 339

1  A.  Yes, that's in the subject
2  line.
3  Q.  Does the first title state,
4  "Attached is the final report covering
5  our review of the Drug Enforcement
6  Administration's, DEA, efforts to
7  investigate cases of controlled
8  pharmaceutical diversion"?  Does it state
9  that, sir?
10  A.  It does.
11  Q.  If you'll go to --
12  MS. HENN:  Counsel, does
13  this document have a date?
14  MR. KENNEDY:  This is from
15  2002.
16  MS. HENN:  Thank you.
17  BY MR. KENNEDY:
18  Q.  And if you'll go, sir, to
19  .4.
20  A.  10 percent is all they are
21  diverting.
22  Q.  Are you on .4?  It's up on
23  the screen.
24  A.  Yeah, I'm looking at the

Page 340

1  document here.  Where is that on this
2  document?
3  Q.  It's on .4, Page .4 up in
4  the right corner, right upper corner,
5  sir.
6  A.  Okay.
7  MS. HENN:  And you can take
8  your time to review it.
9  BY MR. KENNEDY:
10  Q.  Does the Inspector General
11  state here in 2002, "Our review found
12  that DEA's enforcement efforts have not
13  adequately addressed the problem of
14  controlled pharmaceutical diversion"?
15  Does it state that, sir?
16  A.  It does.
17  Q.  "Despite the widespread
18  problem of pharmaceutical abuse, the DEA
19  has dedicated only 10 percent of its
20  field investigator positions to diversion
21  investigations," sir.  Do you see that?
22  A.  Yes.  It says only
23  10 percent.
24  Q.  McKesson is the largest

Page 341

1  distributor of pharmaceuticals,
2  controlled substances in the country.
3  Shouldn't they understand the abilities,
4  inabilities of the DEA in fighting this
5  problem of diversion?  Shouldn't they
6  understand that?
7  MS. HENN:  Objection to
8  form.
9  THE WITNESS:  Sir, I'm --
10  I'm not, you know, in a position
11  to determine what abilities the
12  DEA has.
13  As far as McKesson, we took
14  our responsibilities, you know,
15  seriously as a distributor and we
16  had our programs in place.
17  And to -- here I'm reading
18  that the DEA only used 10 percent
19  of its field investigators to look
20  at the problem, and that the
21  overall investigators decreased
22  3 percent during this problem.
23  BY MR. KENNEDY:
24  Q.  Do you have --

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    A.   So for me to say what the
2  DEA should be doing is not in -- is
3  really not my place, sir.
4    Q.   I'm just -- I'm just asking
5  you what the largest distributor in the
6  world should understand about the
7  limitations of the DEA.  All right?
8    A.   Mm-hmm.
9    Q.   But you said something, and
10  I'm going to write it down.
11      I started to write it down.
12  Because we're going to talk about this in
13  a minute.
14      You just said that McKesson
15  took our -- quote, "took our
16  responsibilities very seriously."
17      Is that what you just told
18  me?
19      MS. HENN:  Objection to
20  form.
21  BY MR. KENNEDY:
22    Q.   "McKesson took our
23  responsibilities very seriously."  Is
24  that what you just told me?

Page 343

1    A.   I believe that's what I
2  said, yes.
3    Q.   We'll come back to that, all
4  right.
5      The United States of America
6  was so concerned about this crisis and
7  about the DEA's ability, they did another
8  follow-up study in 2006.
9      Can we agree that if the
10  federal government is reporting a study
11  with respect to the DEA's ability to
12  fight diversion, McKesson as the largest
13  distributor of these narcotics should
14  know and understand that, sir?
15      MS. HENN:  Objection to
16  form.
17      THE WITNESS:  Sir, it --
18  BY MR. KENNEDY:
19    Q.   I'm just -- can you agree
20  they should know that?
21      MS. HENN:  Objection to
22  form.
23      THE WITNESS:  I believe
24  McKesson should know what is going

Page 344

1  on in the -- in the industry
2  that -- that we're regulated in.
3  BY MR. KENNEDY:
4    Q.   And they are being regulated
5  by the DEA, right?
6    A.   That is correct.
7      MR. KENNEDY:  Give me 1088,
8  please.
9      MS. HENN:  I'm sorry, did
10  you --
11      THE WITNESS:  I said one of
12  the agencies that regulates us.
13  We also have FDA.
14      MS. ROZMAN:  This is MCK
15  Oriente Exhibit 519.
16      THE WITNESS:  Thank you.
17      (Document marked for
18  identification as Exhibit
19  MCK-Oriente-519.)
20  BY MR. KENNEDY:
21    Q.   Does it say up here on the
22  left of the cover page, "U.S. Department
23  of Justice, Office of the Inspector
24  General, Evaluation and Inspections

Page 345

1  Division."  Is that what it states?
2    A.   It does say that.
3    Q.   Is the title of this report,
4  "Follow-up of the Drug Enforcement
5  Administration's efforts to control the
6  diversion of controlled pharmaceuticals"?
7  Does it state that, sir, is that the
8  title of this program?
9    A.   Yes, it is.
10    Q.   And this is July of 2006.
11  Would that be correct?
12    A.   That's what's stated here,
13  yes.
14    Q.   And if you go to Page .5 in
15  the upper right-hand corner.  Now, this
16  is the follow-up of the DEA by the
17  federal government.
18      And this follow-up in '06,
19  they state, "Despite these positive
20  actions, we identified several continuing
21  concerns.  We found that although the
22  need for special agent assistance in
23  diversion investigations had increased
24  significantly since our previous review,

Page 346

1 the time spent by special agents
2 assisting diversion investigations still
3 constitutes a small share of their total
4 investigative effort."
5          Do they state that, sir?
6      A.   Yes, that's written here.
7      Q.   They continue to state:  "In
8 addition, we've found that the DEA still
9 had not resolved the complicated issue of
10 providing law enforcement authority for
11 diversion investigators, although it is
12 actively pursuing this matter.  Further,
13 we found that few DEA special agents had
14 received diversion control training
15 beyond the two-hour module provided
16 during basic agent training."
17          And finally:  "In addition,
18 the support provided by intelligence
19 analysts to diversion groups in the field
20 has continued to be limited, and
21 intelligence analysts still received
22 minimal diversion control training."
23          Tell me, '06, you're working
24 at McKesson.  Who read this report at

Page 347

1 McKesson to understand the limitations of
2 the DEA in assisting and controlling the
3 flow of narcotics to pharmacies?
4          MS. HENN:  Objection to
5      form.
6 BY MR. KENNEDY:
7      Q.   Who?
8          MS. HENN:  Same objection.
9          THE WITNESS:  I cannot tell
10     you who read this report.  I know
11     that I did not.
12 BY MR. KENNEDY:
13     Q.   And at this point in time,
14 you understand, you've been in the
15 industry since '99.  What do we have,
16 40-, 50-, 60,000 pharmacies in the United
17 States at this time, correct, in '06?
18         MS. HENN:  Objection to
19     form.
20         THE WITNESS:  I don't know
21     the exact amount of pharmacies in
22     the United States in '06, sir.
23 BY MR. KENNEDY:
24     Q.   Certainly McKesson knew and

Page 348

1 understand that the DEA alone could not
2 monitor 40-, 50-, 60,000 pharmacies,
3 true?
4          MS. HENN:  Objection to
5      form.
6          THE WITNESS:  I'm sorry.  I
7      can't comment on what the DEA's
8      abilities are.
9 BY MR. KENNEDY:
10     Q.   You talked a lot with
11 Mr. Papantonio.  You talked a lot about
12 suspicious orders.  Do you remember all
13 that discussion?
14     A.   Yes.
15     Q.   And I think you agreed with
16 him that -- that legally, the law
17 requires that McKesson, number one,
18 identify suspicious orders from
19 pharmacies, correct?
20     A.   Yes.
21     Q.   And number two, I think you
22 agreed that the law requires that
23 McKesson, when it identifies a suspicious
24 order, that they report that to the DEA,

Page 349

1 correct?
2      A.   Yes, sir.
3      Q.   And when this new program,
4 this enhanced program came in in 2008,
5 can we agree that McKesson knew and
6 understood not only did they have to
7 recognize suspicious orders, not only is
8 it their lawful duty to report those to
9 the DEA, but they knew and understood
10 that the DEA expected them to not ship
11 suspicious orders?
12     A.   Yes.  Once an order was
13 identified as suspicious, it should not
14 be shipped.
15     Q.   Sir, I'm going to ask you
16 some questions now about -- that maybe
17 will explain some -- some things.
18         We talked about a lot of
19 suspicious orders that you didn't report
20 to the DEA this morning, correct?
21         MS. HENN:  Objection to
22     form.
23 BY MR. KENNEDY:
24     Q.   Correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    A.   They -- they were noted in
2  the report.  I'm -- I'm not familiar with
3  which ones the DEA is saying suspicious
4  that I did not report.
5    Q.   I understand.  But you --
6  you weren't questioning the accuracy of
7  those DEA reports this morning, they
8  weren't making that stuff up, right?
9    A.   I don't believe they were,
10  no.
11    Q.   And I want to take a look,
12  maybe with a little bit of detail, as to
13  why that happened.  All right?
14    A.   Yes.
15    Q.   As I ask you questions
16  though, and as we talk about what
17  McKesson did and didn't do, as we talk
18  about the decisions that McKesson has
19  made along the way, can we agree that
20  it's important to evaluate McKesson's
21  decisions within the framework of what
22  was going on in America at the time, can
23  we agree to that?
24    MS. HENN:  Objection to

Page 351

1    form.
2    THE WITNESS:  You're saying
3    looking back at it now?
4  BY MR. KENNEDY:
5    Q.   That's what we're going to
6  do.  We're going to -- we're going to
7  look back at that new program in '08, and
8  when we look at the decisions that
9  McKesson made along the way, it's
10  important to look at those decisions
11  within the context of what was going on
12  in America; number one, a crisis, number
13  two, diversion, and number three, a DEA
14  that needed help.  All right?
15    MS. HENN:  Objection to
16    form.
17  BY MR. KENNEDY:
18    Q.   Can we do that?
19    MS. HENN:  Same objection.
20    THE WITNESS:  Okay.
21  BY MR. KENNEDY:
22    Q.   And let's look at the
23  controlled substances monitoring program
24  that came into effect at McKesson in

Page 352

1  2008.  All right.  That's where I want to
2  focus maybe the rest of the afternoon.
3  All right?
4    A.   Mm-hmm.
5    Q.   You were a director of
6  regulatory affairs when this new program
7  came into place, true?
8    A.   Yes.
9    Q.   A national program, true?
10    A.   Yes.
11    Q.   Managed and implemented in
12  the same fashion nationally, correct?
13    MS. HENN:  Objection to
14    form.
15    THE WITNESS:  It was rolled
16    out on a national level.
17    Depending on the region where we
18    administered it, different regions
19    in the country had different
20    controlled substance problems.
21    Some being hydrocodone, others
22    being oxycodone.
23    So there would be some
24    differences within a regional area

Page 353

1    of what base codes were being
2    identified as problematic.
3  BY MR. KENNEDY:
4    Q.   That might have been
5  different, sir.  But the program, the
6  printed program that -- that we have
7  looked at, that you have in front of you,
8  Exhibit 62, this program was a national
9  program, correct?
10    A.   Yes.  One program.
11    Q.   There wasn't a different
12  detailed and documented McKesson
13  operation manual -- manual for controlled
14  substances.  There wasn't a different one
15  in the West, and the East and Midwest,
16  true?
17    A.   That's correct.
18    Q.   It was the same program and
19  the intention and actuality was, this was
20  implemented and managed uniformly across
21  this country, sir --
22    MS. HENN:  Objection to
23    form.
24    THE WITNESS:  Yes.

Page 354

BY MR. KENNEDY:

Q. Now, this monitoring program of 2008, it was structured around the creation of thresholds, true?

A. Yes.

Q. Thresholds or -- or limitations, we're going to call them. Threshold limitations, all right?

A. Yes.

Q. And a threshold was a limitation that was put on each specific opioid that you sold, true?

A. It was a monthly threshold set on all base codes, not just opioids.

Q. All right. But we're going to talk about opioids.

A. Okay.

Q. We're going to talk about narcotics. All right?

A. Okay.

Q. We're going to talk about painkilling neurotics -- narcotics and opiates. So you understand what I am talking about, right?

Page 355

A. Mm-hmm. Yes.

Q. And the threshold for the system that McKesson set up as part of its 2008 program whereby you would set a threshold or a limitation on each specific narcotic, true?

A. It would be on a base code level. So for instance, all your oxycodone-based products that the DEA deemed the base ingredient being oxycodone would be under one base code, and that's base code 9143 oxycodone, and all strengths within oxycodone were in that base code.

So whether you were 10-milligram, 15-milligram, 30-milligram, it all got added up, and they had one base code for oxycodone.

Q. Okay. Base code for oxycodone.

A. And one threshold.

Q. So you've got a threshold for oxycodone, correct?

A. Mm-hmm. Yes, sir.

Page 356

Q. And each one of your customers, each different pharmacy would have a different threshold for oxycodone?

A. It -- some may have the same threshold. It wasn't different --

Q. And that would -- that would be just coincidence, correct?

A. Well, they could have -- with -- with hundreds and hundreds of customers, customers could have the same threshold, sir.

Q. Absolutely. But every customer -- well, we'll take a look and go through this.

Oxycodones, each customer would have a threshold for oxycodones?

A. Their threshold would be based off of their previous purchasing.

Q. I'm not asking what -- would you just listen to my questions?

A. I'm --

Q. Every -- I'm going to ask you. When I want an explanation I'll ask for one.

Page 357

Every customer, every customer would have a threshold for oxycodone, correct?

A. Yes.

Q. And every customer would have a threshold for hydrocodone, correct?

A. Correct.

Q. And each grouping of different narcotic would have a threshold for each customer, correct?

A. Correct.

Q. All right. It was the monthly limitation, correct?

A. Yes.

Q. It was done on a monthly basis, correct?

A. Yes. It would reset after each month.

Q. All righty. If we can look at 62. I believe you -- you have 62, Exhibit 62, which is 345.

MS. HENN: That's the McKesson operations manual. The

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    sticker with 62 on it.
2    BY MR. KENNEDY:
3       Q.   Yes, this is the -- sir,
4    we're going to use this a lot.  This is
5    the McKesson operations manual, correct?
6       A.   Yes, sorry, I have it in
7    front of me.
8       Q.   Came into place in 2008,
9    correct?
10      A.   I believe that was the time
11   frame.  This one is dated 2013.  But it
12   may have just been an update, I'm not
13   sure.
14      Q.   Well, if you -- if you look
15   at .27, you'll see that this comes into
16   play in February of 2008, correct, Page
17   27 up in the right.
18      A.   Page 27, did you say?
19      Q.   .27, upper right.
20      A.   Okay.  Sorry about that.
21         Revision 1, February 2008.
22   Yes, sir.
23      Q.   And if you go to page .2, if
24   you would, of your manual.

Page 359

1       A.   Yes.
2          MR. KENNEDY:  Do we have .2?
3    BY MR. KENNEDY:
4       Q.   Your manual states, "All
5    McKesson customers are evaluated and
6    classified into like business segments
7    based upon type of business and monthly
8    dollar prescription sales."  And this is
9    all under threshold limits, correct?
10      A.   Yes, it is.
11      Q.   "Additionally, Six Sigma
12   analysis helped to identify appropriate
13   threshold amounts for every controlled
14   substance for all and every family type."
15   Correct?
16      A.   Yes, sir.
17      Q.   "Out of that information, a
18   matrix of family codes and threshold
19   amounts were developed."  Correct?
20      A.   Yes, sir.
21      Q.   So it was an entire process
22   that you would go through to establish
23   thresholds, true?
24      A.   Yes.  By business type and

Page 360

1    pharmacy volume.
2       Q.   And --
3          MR. KENNEDY:  If you'll give
4    me 509 please -- 5009.
5          MS. ROZMAN:  Which is MCK
6    Oriente 539.
7          (Document marked for
8    identification as Exhibit
9    MCK-Oriente-539.)
10   BY MR. KENNEDY:
11      Q.   This is something we
12   created, sir, because I want to be very
13   clear about these thresholds.
14         Number one, thresholds with
15   respect to this 2008 monitoring program,
16   they were a critical component of that
17   program, were they not?
18         MS. HENN:  Counsel, what's
19   that quoting?  It's not clear from
20   the document.
21         MR. KENNEDY:  We'll go to
22   each document if you want to look
23   at the quote.  All right?
24         MS. HENN:  I'm -- I'm

Page 361

1    just --
2    BY MR. KENNEDY:
3       Q.   Can you agree with that
4    statement, sir, that thresholds with
5    respect to your program that McKesson
6    implemented, that you managed, thresholds
7    were a critical part of the program,
8    true?
9       A.   Thresholds -- excuse me.
10   Thresholds were a critical aspect of --
11   part of the program, yes.
12      Q.   And from what we just looked
13   at, McKesson took great care in setting
14   those thresholds for each of its
15   customers for each of the controlled
16   substances, correct?
17      A.   We took great care in
18   setting thresholds based off of the
19   customer's past historical volume and
20   also by base code, yes.
21      Q.   And with respect to each
22   customer, you considered, in creating
23   those thresholds, you considered each
24   customer to be unique so their threshold

Page 362

1 was specific to each customer's business
2 needs, correct?
3         MS. HENN:  Objection to
4     form.
5         THE WITNESS:  They were
6     unique and we also had what is
7     known as default thresholds, which
8     is a minimum amount that a
9     customer would be assigned, if
10    they were -- they were a new
11    customer or hadn't purchased a
12    significant amount and a default
13    number was used.
14 BY MR. KENNEDY:
15    Q.   And McKesson would make
16 informed decisions based upon the
17 established threshold information, true?
18    A.   We used their past 12-month
19 history.
20    Q.   Is that true, sir?  Is that
21 statement true?
22    A.   Yes, we used their 12-month
23 history.
24    Q.   And you used the threshold

Page 363

1 to make informed decisions, correct, sir?
2     A.   It was one of the --
3         MS. HENN:  Objection to
4     form.  Go ahead.
5         THE WITNESS:  It was one of
6     the decision points, yes.
7 BY MR. KENNEDY:
8     Q.   And in 2008, after paying
9 $13 million -- a $13 million fine with
10 respect to your settlement with the DOJ
11 and the DEA, at that point in time you
12 agreed, you agreed with the DEA that you
13 would establish a system with thresholds
14 to monitor the flow of opioids, did you
15 not, sir?
16        MS. HENN:  Objection to
17    form.
18        THE WITNESS:  I believe that
19    was the -- a statement made.  Yes,
20    I did not deal directly with DEA,
21    so I can't say exactly what was
22    committed to with them.  But I
23    know that we set thresholds for
24    monitoring.

Page 364

1 BY MR. KENNEDY:
2     Q.   Let me ask you.  You were in
3 charge of this program.  Nobody told you
4 that one of the agreements with the DEA
5 is that you would create a system of
6 thresholds going forward?
7     A.   We -- we --
8     Q.   I'm only asking.  Did
9 anybody tell you that that was part of
10 the agreement with the DEA in 2008, that
11 you would establish thresholds?
12    A.   Yes.  That's how we created
13 the thresholds to start.
14    Q.   And when you first put this
15 program in place in 2008, sir, would I be
16 correct that you represented to the DEA
17 that if McKesson were to change a
18 threshold, increase a threshold, you
19 represented to the DEA that McKesson
20 would require documentation to support
21 the increase?
22        MS. HENN:  Objection to
23    form.
24        THE WITNESS:  I am

Page 365

1     unfamiliar with what was said to
2     DEA regarding threshold increases.
3     I know when we made threshold
4     increases we did reviews --
5 BY MR. KENNEDY:
6     Q.   Sir, I'm just asking was
7 that represented --
8         MS. HENN:  Counsel, please.
9         MR. KENNEDY:  He's not
10    answering my question.
11 BY MR. KENNEDY:
12    Q.   Was that represented to the
13 DEA, that if you were to increase a
14 threshold, documentation would be
15 required, was that what you told them?
16        MS. HENN:  Objection to
17    form.  And I just really would
18    appreciate if he were permitted to
19    finish his answers, Counsel.
20 BY MR. KENNEDY:
21    Q.   Is that what was
22 represented, sir?
23    A.   I -- I did not speak to DEA
24 so I don't know what was conveyed to

Highly Confidential – Subject to Further Confidentiality Review

Page 366

1  them.  I know that when we did a
2  threshold review, part of our
3  documentation was to have a report
4  outlining the details that we used to
5  review the threshold and what the
6  threshold was, what it was going to, and
7  why we made that threshold change.
8        But I don't know what was
9  conveyed to the DEA, because I did not
10  communicate with them.
11     Q.   Sir, I just -- I just
12  listened to your answer.  Let me write
13  something down if I could have the Elmo
14  again.
15        You just told us that when
16  you made an increase in the threshold you
17  would have a report as to the reason; is
18  that correct?
19     A.   There would be a reason --
20        MS. HENN:  Objection to
21  form.  Go ahead.
22        THE WITNESS:  There would be
23  a reason asking why -- what --
24  what type of business change

Page 367

1        required the -- the pharmacy to
2        request additional product.
3  BY MR. KENNEDY:
4     Q.   So business change, right?
5  What else, report as to the reason.
6  You're looking for a business change.
7  Like for example, like one of our main
8  customers are -- one of our main
9  competitors down the street closed,
10  correct?
11     A.   Correct, that would be an
12  example.
13     Q.   Or a new hospital moved into
14  the community so we need more opioids,
15  right?
16     A.   Correct.
17     Q.   That's the kind of thing you
18  were looking for?
19     A.   Yes, sir.
20     Q.   What else for a change, an
21  increase in that threshold?
22     A.   If there was an acquisition
23  made where the pharmacy bought another
24  pharmacy.

Page 368

1     Q.   Basically, sir, you're --
2  you're required to document why you are
3  making the change, true?
4     A.   We would have a reason as to
5  why, yes, sir.
6     Q.   All right.  Thanks.  We're
7  going to come back to that.
8        Now, sir, and I'm going to
9  ask you this a variety of times.  Sir,
10  this whole threshold system that you set
11  up, that you told the DEA that you would
12  do, that the DEA required you to do, and
13  that you did put in place.  The reason
14  that's important is because under your
15  monitoring program that came in in '08,
16  the enhanced program, basically the way
17  it was structured is if a customer would
18  place an order in any given month over
19  their threshold, that would trigger a
20  Level 1 review or investigation, correct?
21     A.   Yes, sir.
22     Q.   And if after Level 1 the
23  person that did the review wasn't really
24  satisfied, it could move to Level 2 and

Page 369

1  it could even move to Level 3, correct?
2     A.   That is correct.
3     Q.   So you start with Level 1,
4  you start with Level 2, and at Level 2
5  and 3, that's where -- that's where an
6  order might get identified as suspicious
7  and then reported, correct?
8     A.   It had the potential to be
9  identified as such, yes.  It not always
10  was.
11     Q.   But if a customer didn't
12  order over their threshold, there would
13  not be an automatic triggering of the
14  Level 1 investigation, correct?
15     A.   That is correct.  Because
16  the Level 1 would get triggered when the
17  customer had what we called an omit,
18  which is a stopping of an order from
19  going through.
20     Q.   That's an order over the
21  threshold?
22     A.   Correct.
23     Q.   So that's what the
24  importance of this system is.  The

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 thresholds are the beginning step for you
2 folks to identify suspicious orders,
3 correct?
4     A.   It would block a customer
5 from ordering above their threshold.
6     Q.   It was -- listen to my
7 question.  I didn't ask you anything
8 about a block.  Would you listen to my
9 questions.
10         The threshold was the
11 beginning step in the identification of
12 the suspicious orders, correct?
13     A.   No.  I would say no, sir,
14 because a customer hitting their
15 threshold on the last day of the month
16 for one bottle of 100 pills would not
17 necessarily be deemed suspicious
18 because --
19     Q.   I'm not talk -- I'm talking
20 about -- I'm talking about triggering.
21 I'm talking about the beginning.
22         The threshold is what
23 triggers the Level 1, which then moves to
24 Level 2 and Level 3, correct?  So the

Page 371

1 first step is the customer orders over
2 the threshold.  If they do, that triggers
3 a Level 1 investigation.
4     A.   That is true.
5     Q.   All righty.
6         MR. KENNEDY:  Now, can I
7 have the Elmo for a second,
8 please.
9 BY MR. KENNEDY:
10     Q.   I want to go back to your
11 statement here, sir.
12         "McKesson took our
13 responsibilities very seriously."  That's
14 your statement, sir?
15     A.   Right, sir.
16     Q.   And do you know that the
17 president/CEO of McKesson, you talked
18 about earlier, he testified on May 18th
19 of this year in front of Congress.
20 You've seen some clips of that?
21     A.   Yes, I did.
22     Q.   And do you know -- and you
23 watched it.  Do you remember him saying,
24 just like you just said, he said that

Page 372

1 McKesson took its responsibilities with
2 respect to monitoring controlled
3 substances, they took that responsibility
4 back in '08 very seriously.  Do you
5 remember that?
6     A.   I remember hearing that,
7 yes.
8     Q.   And that is what you've told
9 us here today?
10     A.   I did say that, yes.
11     Q.   All right.  Now, when
12 somebody, when a customer would want
13 to -- let's talk a little bit about how
14 serious y'all took this.
15         Customers weren't told what
16 their threshold was in any particular
17 drug, right?
18     A.   That is correct.  They were
19 blind to it.
20     Q.   Why is that important?
21     A.   Because if a customer knew
22 what their threshold was, they would have
23 the ability to order up to and stay just
24 below the threshold and never sort of

Page 373

1 trip on one of the red flags which was an
2 omit.
3     Q.   So they don't order above,
4 you are not going to trigger a Level 1
5 investigation, right?
6     A.   That is correct, because
7 they --
8     Q.   So you didn't -- you didn't
9 tell them their thresholds?
10     A.   That is correct.  Because
11 they were authorized on the size of their
12 pharmacy to have a monthly threshold set.
13 For instance, a customer may be
14 authorized to order 5,000 doses a month.
15 So if they are ordering 4,800 doses, they
16 are authorized to order 5,000 --
17     Q.   Sir, sir, I asked you a very
18 simple question.  I asked you a simple
19 question.
20         MS. HENN:  Counsel --
21 BY MR. KENNEDY:
22     Q.   If they don't order above,
23 you don't trigger the Level 1
24 investigation; is that right?

Page 374

1　　A.　That's correct.

2　　Q.　Thank you.

3　　　　MS. HENN:  And I'll just

4　remind the witness that he is

5　entitled to give his answer to the

6　question.

7　　　　MR. KENNEDY:  He's entitled

8　to answer my question.

9　　　　MS. HENN:  Right.

10　　　　MR. KENNEDY:  Not the

11　question he wants to answer.

12　　　　MS. HENN:  Well, we can --

13　　　　MR. KENNEDY:  That's what

14　he's entitled to.  And nothing

15　more.

16　　　　MS. HENN:  And we can

17　disagree about whether you are

18　allowing him to do that.

19　BY MR. KENNEDY:

20　　Q.　You didn't tell the customer

21　what their threshold was, but you

22　certainly warned them when they got close

23　to their threshold in any given month

24　for, say, OxyContin, correct?

Page 375

1　　A.　There was --

2　　Q.　Is that correct?

3　　A.　There was a percentage

4　warning report -- or not warning report.

5　But on the invoice --

6　　Q.　Sir, listen to my question.

7　　A.　Yes.

8　　Q.　The answer is yes, correct?

9　　A.　Yes.

10　　Q.　And the first warning that

11　you would give to the customer each month

12　would be right on their invoice, correct?

13　　A.　Yes.

14　　Q.　Letting them know they are

15　getting close to their threshold, right?

16　　A.　Yes.

17　　Q.　But that's not the only

18　warning you gave customers, is it?

19　　A.　I'm not familiar with other

20　warnings, sir.

21　　Q.　Let me ask you this.  The

22　customer sees on their -- on their

23　statement, on their -- on their billing

24　that they are getting close to their

Page 376

1　threshold.  If they call up on the

2　telephone, somebody answers the phone,

3　usually a sales rep, they are told that

4　they are getting close to their threshold

5　if they make that call, correct, they

6　already know, they've seen it on their

7　bill, right?

8　　A.　It is --

9　　　　MS. HENN:  Objection to

10　form.  Go ahead.

11　　　　THE WITNESS:  If it was on

12　the invoice, they would have that.

13　Sales did not have visibility to

14　thresholds.

15　BY MR. KENNEDY:

16　　Q.　Let me ask you this.  When

17　they would call McKesson after seeing

18　they were close to their threshold, they

19　would be asked whether they wanted to

20　increase their threshold, right?

21　　　　MS. HENN:  Objection to

22　form.

23　　　　THE WITNESS:  That I'm not

24　aware, sir.  Usually if a customer

Page 377

1　called in, the customer would

2　request the review.

3　BY MR. KENNEDY:

4　　Q.　Sir, if they don't ask, they

5　are told that they can increase their

6　threshold, were they not?

7　　　　MS. HENN:  Objection to

8　form.

9　　　　THE WITNESS:  I'm not aware

10　of sales saying that they can

11　increase it, no, sir.

12　BY MR. KENNEDY:

13　　Q.　Sir, when -- if a customer

14　were to call on the telephone who was

15　getting close to their threshold and if

16　they were to request a threshold

17　increase, right over the telephone, in

18　five minutes, that McKesson employee

19　could ask him a few questions and fill

20　out, in five minutes, a one-page

21　threshold change request, correct?

22　　A.　They --

23　　Q.　They could do it in five

24　minutes?

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    A.   They could -- it may take
2 five minutes, yes, sir.
3    Q.   And, sir, in fact, these
4 thresholds, which are the foundation of
5 your entire program to control the flow,
6 if somebody asked for a threshold
7 increase, it was such a sure thing that
8 the customer would -- would be told, the
9 customer would be told, if you don't hear
10 back from us, consider the threshold
11 increase approved, right, right over the
12 phone they would be told that?
13       MS. HENN:  Objection to
14   form.
15       THE WITNESS:  I'm not aware
16   of that statement, sir.
17       MR. KENNEDY:  If you can
18   give us 5011 please.
19 BY MR. KENNEDY:
20    Q.   Are you surprised at that
21 statement?
22       MS. HENN:  Objection to
23   form.
24       THE WITNESS:  I am.

Page 379

1       MS. ROZMAN:  Which is MCK
2   Oriente 541.
3       (Document marked for
4   identification as Exhibit
5   MCK-Oriente-541.)
6 BY MR. KENNEDY:
7    Q.   Sir, this is titled
8 "Controlled Substances Substance
9 Monitoring Program," CSMP, correct?
10    A.   Yes.
11    Q.   Second paragraph, it states,
12 "McKesson's technology monitors their
13 purchases and alerts customers when they
14 near their threshold."  Do you see that,
15 sir?
16    A.   Yes.
17    Q.   They are getting alerted,
18 right?
19    A.   Yes.  There's a warning
20 printed on the invoice.
21    Q.   Now, you told us these
22 thresholds are critical, right?  They are
23 critical, correct?
24    A.   Yes.

Page 380

1    Q.   Sir, this -- look to the
2 next page.  This is the audience who
3 this -- this is directed towards.  Do you
4 see the audience says, "First service
5 representatives, including specialty and
6 support."
7       Can you tell us who first
8 service -- or ServiceFirst
9 representatives, who are those folks at
10 McKesson?
11    A.   ServiceFirst representatives
12 are customer service down in the Texas
13 office.
14    Q.   And these folks, they are
15 sales assistants, right?
16    A.   They are customer serve
17 reps, I don't know if they are sales
18 assistants.  They handled customer
19 inquiries when they were called in.
20    Q.   They handled threshold
21 increases, did they not?
22    A.   They would -- they didn't --
23 well, when you say handle them, they
24 would take the information, send it to

Page 381

1 the -- in each distribution center there
2 is a sales administrator who would then
3 submit the TCR to the McKesson regulatory
4 person for review.
5    Q.   Right.  They filled out the
6 threshold change request over the
7 telephone in five minutes, a customer
8 assistance rep, right?
9       MS. HENN:  Objection to
10   form.
11 BY MR. KENNEDY:
12    Q.   Is that right, sir?
13    A.   I'm not familiar with the
14 customer ServiceFirst representative
15 filling them out.  The ones that -- that
16 I would review would come through the
17 sales administrator at the distribution
18 center and fill out what we called a TCR
19 form, or a threshold request form.
20    Q.   Well, we're going to talk
21 about -- a threshold change request,
22 right?
23    A.   Yes.
24    Q.   And they filled that out

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 over the phone, correct?
2      MS. HENN: Objection to
3   form.
4      THE WITNESS: When you say
5   they filled that out over the
6   phone, they would get the
7   information from the customer
8   and --
9 BY MR. KENNEDY:
10   Q.   And fill out the form over
11 the telephone?
12   A.   -- fill it out -- yes. And
13 then would submit it to regulatory for
14 review.
15   Q.   Excellent. Now look at .3.
16 This is what is being told to the people
17 who are answering the phone and receiving
18 requests from pharmacies.
19      This is the script they are
20 given. Look at .3. Do you see this,
21 sir, on .3?
22   A.   I'm looking for .3.
23   Q.   Up in the right-hand corner.
24   A.   Oh, okay, third page.

Page 383

1   Q.   This is what they're --
2 they're instructed to tell a pharmacy who
3 wants to increase this all-important
4 threshold.
5      "Tell caller that you will
6 forward the request and that someone from
7 McKesson distributor center will call if
8 the request is denied. Otherwise, the
9 caller can consider the request
10 approved."
11      That's what they are
12 instructed to tell pharmacies. You are
13 surprised by that, aren't you?
14   A.   Well, since this is a --
15   Q.   My question is real simple.
16 Surprised by that?
17      MS. HENN: And the witness
18   should answer the question as he
19   deems fit.
20      THE WITNESS: Since this is
21   a customer care document and not a
22   regulatory document that I would
23   have seen, I am surprised at that.
24 BY MR. KENNEDY:

Page 384

1   Q.   Sir, you say you wouldn't
2 see this?
3   A.   Yeah.
4   Q.   You are the one in charge of
5 attempting to regulate the flow of
6 narcotics to pharmacies. And the way
7 you're doing it is putting into place a
8 threshold system, correct? That's how
9 you were doing it.
10   A.   Correct. And I would watch
11 that threshold process. But as far as
12 the communication of a customer hearing
13 back that it was approved or not? I did
14 not get involved.
15      MR. KENNEDY: Can you give
16   me the Elmo again please, sir.
17 BY MR. KENNEDY:
18   Q.   You told us earlier, and so
19 did the president of your company, that
20 "McKesson took our responsibility very
21 seriously." And this threshold system
22 was taken so seriously that if somebody
23 wanted to increase their threshold, they
24 were told just to assume. It's so easy,

Page 385

1 just assume that it's been approved.
2 Correct? Is that what they were told?
3   A.   Not -- not to assume, no.
4 Consider the request approved if you
5 don't hear that it's denied.
6   Q.   Thank you. But that wasn't
7 all, sir, that wasn't all you were doing
8 with respect to these thresholds. You
9 were actually proactive about it. If the
10 customer got near their threshold and
11 they didn't call McKesson, if they didn't
12 call McKesson to say increase my
13 threshold, you folks actually put into
14 place a system where you would call the
15 customer and say, "Do you want to
16 increase your threshold?" Are you aware
17 of that program, sir?
18      MS. HENN: Objection to
19   form.
20      THE WITNESS: I am -- I am
21   not.
22 BY MR. KENNEDY:
23   Q.   You were the head of
24 regulatory, weren't you?

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    A.   Yes, sir.
2         MR. KENNEDY:  Give me 5012
3    please.
4  BY MR. KENNEDY:
5    Q.   This -- this document is
6  titled "ISMC Controlled Substance
7  Monitoring Program, CSMP Outbound Calls."
8  Those are calls McKesson is making,
9  outbound, correct?  Is that what outbound
10 means?
11   A.   Yes.
12   Q.   First sentence, first
13 service assists -- and I suggested to you
14 before that first service sales.  Does
15 this say first service -- "ServiceFirst
16 assists RSMs."  Is that what it says?
17   A.   That is what it says.
18   Q.   And what does RSM stand for?
19   A.   Retail sales manager.
20   Q.   "ServiceFirst assists retail
21 sales managers housed out of the
22 following distribution centers by
23 generating outbound calls."
24        So they are making the calls

Page 387

1  to independent customers nearing their
2  CSMP thresholds.  So these folks are
3  being told, these assistants to the sales
4  folks are being told, you call pharmacies
5  if they get close to their thresholds.
6  Is that what it's saying, sir?
7    A.   So these distribution
8  centers, these six of them, were not in
9  my region, so I had no responsibilities
10 for these six DCs.
11   Q.   That's fine.  I'm talking
12 about a national program, sir.  All
13 right.  I'm talking about a national
14 program.
15   A.   Mm-hmm.
16   Q.   Let me ask you this.
17        Let's go down here.
18        "Audience.  This monitoring
19 program, the audience is designated ISMC
20 ServiceFirst representatives."
21        What is ISMC?  That is
22 independent/small/medium-size customers,
23 right?
24   A.   Yes.

Page 388

1    Q.   And they are assisting the
2  sales folks, correct?
3    A.   Yes.  That's -- again, this
4  document I would not have seen because
5  the audience was the customer care
6  section.  It was not regulatory.  And
7  with these six DCs not being my DCs, I
8  was unaware that that's how these six DCs
9  were handling this.
10   Q.   Let me ask you, sir.
11 McKesson, McKesson is sitting here in the
12 United States of America at this point in
13 time, and there's an opioid crisis, there
14 is diversion that is feeding this crisis.
15 And are you telling me that -- that with
16 respect to your monitoring obligations,
17 you've got this regulatory department
18 going on and at the same time you have
19 sales in the middle of it and you don't
20 even know about it, you don't even know
21 about this program?
22        MS. HENN:  Objection to
23   form.
24        THE WITNESS:  My

Page 389

1  responsibility was six DCs in the
2  Northeast, sir.  And I knew my
3  program.  This was in the North
4  Central region handled by another
5  regulatory director.
6         So if they were making these
7    outbound calls, sir, I was not
8    aware.
9  BY MR. KENNEDY:
10   Q.   So you are trying to control
11 the flow of opioids into this country,
12 and sales is trying to increase the
13 opioids going in.  And you have no idea
14 that they are involved in your program?
15        MS. HENN:  Objection to
16   form.
17        THE WITNESS:  The request
18   from sales to review a threshold
19   does not automatically mean that
20   the threshold would have been
21   increased.
22 BY MR. KENNEDY:
23   Q.   Sir, I'm just talking about
24 now your sales folks making phone calls

Page 390

1 to customers who are near their
2 thresholds to ask them if they want to
3 increase their threshold. And you don't
4 know about it, right?
5       MS. HENN: Objection to
6    form.
7 BY MR. KENNEDY:
8    Q.  Do you know about that going
9 on?
10       MS. HENN: Same objection.
11       THE WITNESS: I don't -- I
12    did not know that in the North
13    Central, these six distribution
14    center customers were getting
15    calls.
16 BY MR. KENNEDY:
17    Q.  Sir, look at this. You told
18 us before that the sales folks never --
19 they would never see the daily reports on
20 thresholds. Look at Page 2, .2.
21       Yeah, this is Exhibit 542.
22       Look at that second page
23 of -- of this protocol. Does it state --
24 and this is under policy. Does it state,

Page 391

1 "Designated ISMC," so that's
2 independent/small/medium pharmacies,
3 "SFRs," ServiceFirst reps who are -- who
4 are assisting sales, "they will review
5 Department of Regulatory Affairs, DRA,
6 daily reports."
7       You just said the sales
8 folks didn't see the regulatory reports.
9 This is saying something different,
10 correct?
11    A.  I said the customers don't
12 see their reports.
13    Q.  "And proactively," next
14 sentence. "And proactively contact." So
15 we want you folks to be proactive. We
16 want you to call the customer who reached
17 90 percent of their threshold. "ISMC SFR
18 assistant sales will document the
19 customer's response and e-mail requests
20 for increases of thresholds." Do you see
21 that?
22       Do you see that, sir?
23    A.  Yes.
24    Q.  Go down to Number 6. When

Page 392

1 they look at this report, when they look
2 at this report, first thing they are
3 supposed to do is verify if the customer
4 has already been contacted this month
5 regarding their threshold. So look at
6 that first. They are saying to these --
7 these sales assistant. First look and
8 see if they've already been contacted.
9 Correct?
10    A.  Correct.
11    Q.  It says here that if the
12 customer has reached 96 percent of their
13 threshold, if yes, call the customer
14 again. Right? Is that right?
15    A.  That's what it states here,
16 yes.
17    Q.  So a customer might get two
18 phone calls in one month from your sales
19 assistant, right?
20    A.  In this region, yes. Not in
21 mine.
22    Q.  Number 8, "Call the
23 customer, referring the point of contact
24 provided on the contact spreadsheet," see

Page 393

1 that?
2    A.  Yes.
3    Q.  Number 9. This is the ninth
4 step of the instruction to these sales
5 assistants.
6       "Advise pharmacy that they
7 are nearing their CSMP threshold."
8 Right? And -- right?
9    A.  Yes, that's what Number 9
10 says.
11    Q.  It says tell them what
12 percentage they are at, correct?
13       Does it say that, provide
14 percentage?
15    A.  It does.
16    Q.  So if I'm a customer and I
17 know I've -- I've purchased 9,000
18 oxycodones and the sales assistant says,
19 you know, Mr. Kennedy, Mr. Pharmacist,
20 you're at 90 percent of your threshold,
21 it's pretty easy for me now to know my
22 threshold, right? Is that right, sir?
23    A.  The customer may be able to
24 back into that number, yes.

Page 394

1    Q.   Pretty easy math, isn't it?
2    A.   They -- they could do the
3  math to determine it.  They --
4    Q.   Didn't you tell us earlier
5  that you never told the customer their
6  threshold because you don't want to do
7  that, because then they are going to be
8  able to play underneath their threshold
9  and they are going to be able to divert
10  opioids and narcotics into the community.
11  Isn't that what you told us earlier, sir?
12        MS. HENN:  Objection to
13    form.
14        THE WITNESS:  That's --
15  BY MR. KENNEDY:
16    Q.   Didn't you tell us that?
17    A.   That's what I said for the
18  area that I was responsible for which is
19  not any of these six DCs receiving these
20  phone calls, sir.
21    Q.   The national program that --
22  that McKesson was implementing, right?
23    A.   I -- I said it was regional
24  in my area of the Northeast.  My six DCs

Page 395

1  did not do this and that's why I said it
2  was regional.
3    Q.   Let's go down to Number 12.
4  Number 12, this is the 12th step for the
5  sales assistant.  After they've made one
6  or two calls does it say there, if the
7  customer doesn't want to increase their
8  threshold, does it say, "Advise the
9  customer to contact ServiceFirst if
10  threshold needs change.  Provide your
11  direct phone number."  Is that what it
12  says?
13    A.   That is what it says.
14    Q.   Sir, what we've got here,
15  we've got a system.  Again, you told us
16  you were taking this very seriously.
17  You've got a system whereby, number one,
18  let's say a pharmacy is getting low on
19  OxyContin, oxycodone, dangerous drug,
20  right?
21    A.   Strong painkiller.
22    Q.   In the middle of the
23  epidemic, right?
24    A.   That is correct.

Page 396

1    Q.   So this program of
2  thresholds that you folks are taking so
3  serious on any given month, if -- if
4  Mr. Pharmacist is getting close to that
5  threshold that's going to trigger an
6  investigation, if he gets close, number
7  one, you are going to notify him on his
8  bill, correct?
9    A.   That is correct.
10    Q.   And by these programs,
11  number two, sir, if he calls he's going
12  to be told he can increase his threshold.
13  And number three, if he doesn't call, you
14  are going to call him once or twice,
15  correct?
16        MS. HENN:  Objection.
17  BY MR. KENNEDY:
18    Q.   Correct, under this program,
19  correct?
20        MS. HENN:  Objection to
21    form.
22        THE WITNESS:  This program
23    would start the review, yes.  It
24    doesn't mean that the review would

Page 397

1  actually get approved.
2  BY MR. KENNEDY:
3    Q.   And you're -- and you're
4  going to then ask him, do we -- do I want
5  to increase -- do you want to increase
6  your thresholds in one of these two
7  calls, and then if he says no, you're
8  going to say hey, here is a direct dial
9  number.  If you want to increase your
10  threshold, call us back.
11        Isn't that what this program
12  says, that is what was going on?
13    A.   This -- this program says
14  that the service rep would get the call
15  back, yes.
16    Q.   And, sir, and if the
17  customer says to you, you know what, I do
18  want to increase my threshold.  He's told
19  you know what, consider your threshold
20  raised unless we get back to you.
21        And this was you folks at
22  McKesson, according to you, and the CEO
23  in his testimony to Congress, this was
24  you folks taking your responsibilities

Page 398

1  very seriously since 2008, right?
2       MS. HENN:  Objection to
3  form.
4  BY MR. KENNEDY:
5       Q.   Is that right?
6       A.   As I stated, this was not a
7  practice in my area of responsibility.
8       Q.   You know what, these
9  thresholds that we are talking about
10 here, if we can go back a second, to 5009
11 I think.
12      MS. HENN:  And, Counsel, the
13 deposition protocol requires
14 demonstratives to be entered as
15 exhibits, just to make sure we
16 take back --
17      MR. KENNEDY:  5009 is
18 Exhibit 539.
19      MS. ROZMAN:  This is that
20 one.
21      MS. HENN:  I'm talking about
22 the Elmo demonstratives.
23      MS. ROZMAN:  Oh, I'm sorry.
24      MS. HENN:  Those need to be

Page 399

1       labeled as exhibits at some point.
2  BY MR. KENNEDY:
3       Q.   I want to go back a second
4  here, because we -- we just need to be
5  reminded of this as we go forward.
6       This -- this threshold
7  system we are going to continue to talk
8  about.  It was a critical compart -- part
9  of your program to monitor the flow of
10 narcotics into the community, correct,
11 critical, correct?
12      A.   I would say yes, it was.
13      Q.   And you took great care in
14 setting it, right?
15      A.   I did, yes.
16      Q.   And it had to be unique for
17 your customers, each one of them was
18 going to get a specific threshold because
19 the customers were different, correct?
20      A.   It was based off of their
21 historical data unless the full
22 thresholds were used when setting up new
23 customers.
24      Q.   And McKesson was going to

Page 400

1  use it to make informed decisions based
2  upon established threshold information,
3  that's what you were going to use it for?
4       A.   Correct.
5       Q.   And if you were going to
6  change them, if you were going to change
7  it, it was required that you document it,
8  right?
9       A.   We did a -- what was called
10 a threshold change review by regulatory
11 to see if the threshold should be
12 increased.
13      Q.   Let's take a look at some
14 change.  Let's look at that process that
15 you were talking about.  If we'll --
16 we'll mark that exhibit.
17      MR. KENNEDY:  Keep the Elmo
18 up for a second.  If we can go back.
19 BY MR. KENNEDY:
20      Q.   I wrote this down, because
21 this is what you told me earlier.
22      If you were going to
23 increase a threshold you needed to report
24 the reason, correct?

Page 401

1       A.   Right, sir.
2       Q.   And you are looking for a
3  business change, some kind of business
4  change at the pharmacy to document and
5  explain and justify the increase, right?
6       A.   Yes.
7       Q.   And we talked about you've
8  got a competitor that's closed down,
9  you've got a new group of doctors, right?
10      A.   Mm-hmm.  Right.
11      Q.   All right.  Threshold change
12 request, that was the standard form
13 utilized by McKesson to initiate a
14 change, true?
15      A.   Yes.
16      Q.   Standard form used across
17 the country, right?
18      A.   I believe it was standard.
19 Yes.
20      Q.   And we're trying to get an
21 understanding of why no suspicious orders
22 were reported earlier, right?  Some --
23 understand that's why we're doing this.
24 So let's look at a threshold change

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1  request.
2       MR. KENNEDY:  If you can
3  give me 5016, please.
4       MS. ROZMAN:  MCK Oriente
5  546.
6       (Document marked for
7  identification as Exhibit
8  MCK-Oriente-546.)
9  BY MR. KENNEDY:
10      Q.   This is a standard form
11 threshold change request at McKesson.
12 True?
13      A.   This is the form that was
14 used in 2008, yes.
15      Q.   Across the country?
16      A.   In 2008, yes.
17      Q.   Up in that left hand it
18 gives us the date that this was filled
19 out, right, 11/28/08?
20      A.   Mm-hmm.
21      Q.   Customer name.  That's going
22 to be the name of the customer that wants
23 the change, true?
24      A.   Yes.

Page 403

1       Q.   Various RNA customers it
2  says.  This -- this threshold is being
3  requested, the change, by various RNA
4  customers, see attachment.  And I suppose
5  there's an attachment and there's a list
6  of all the customers that this would
7  apply to, correct?
8       A.   According to this it says
9  that there is an attachment, yes.  That
10 attachment isn't here.
11      Q.   And RNA would be retail
12 national accounts, true?
13      A.   That is correct.
14      Q.   That's the big accounts,
15 those are the big national chains, right?
16      A.   Those are the chain stores,
17 yes.
18      Q.   That's the CVS, that's the
19 Walmart, that's the Walgreens, correct?
20      A.   Yes.
21      Q.   And down here then with
22 respect to what narcotic or what
23 controlled substances you're asking the
24 increase for, it says, "Various."  True?

Page 404

1       A.   On here it says various,
2  yes.
3       Q.   It says, "Increase amount
4  30 percent."  True?
5       A.   Yes.
6       Q.   So you're asking for a
7  30 percent increase on various different
8  controlled substances for various
9  different customers.  True?
10      MS. HENN:  Objection to
11 form.
12 BY MR. KENNEDY:
13      Q.   Is that true?  Is that what
14 it says?
15      A.   This document says that,
16 yes.
17      Q.   "Reason for change,
18 parentheses, attach supporting
19 documentation."  Do you see that, sir?
20      A.   Yes.
21      Q.   What's the stated reason by
22 McKesson for this change?
23      A.   The -- this says, "Increase
24 due to the Thanksgiving holiday."

Page 405

1       Q.   Thanksgiving?
2       A.   That's what it says here,
3  because of the DCs being closed.
4       Q.   That's -- is that what it
5  says, Thanksgiving?
6       A.   Says Thanksgiving holiday.
7       Q.   30 percent increase.  Is
8  that what it says?
9       A.   That's what this document
10 says, yes.  This was not one of mine.
11      Q.   Want to go back to that --
12 if we can go back to the Elmo for a
13 second here.  I just want to put this all
14 in context, about what you've been
15 telling us here today.
16      A.   Mm-hmm.
17      Q.   When we make an increase in
18 the threshold, we report the reason, and
19 we're looking for a business change.  Is
20 that what you told me?
21      Is that what you told me?
22      A.   A change -- a change in
23 business would be one of the reasons that
24 we would look for.  So in this case, with

Page 406

1 the increase due to the Thanksgiving
2 holiday, that either distribution centers
3 are closed today so customers can't get
4 their -- their product, they may need to
5 order earlier in the month, things of
6 that nature.
7        This was not one of my
8 requests, so I cannot say exactly what
9 was reviewed and such. It was done by
10 another director.
11    Q.   Sir, whoa, one second here.
12 Doesn't this say, that -- that
13 justification, thanks. Doesn't this say
14 permanent or temporary threshold change?
15 Is that what it says?
16    A.   This one says perm
17 underlying, yes.
18    Q.   You -- you're talking about
19 a permanent 30 percent change for
20 Thanksgiving. Is that what it says?
21    A.   This document does say that.
22 I cannot say why it was written up. I --
23 I don't know because this is not one of
24 mine.

Page 407

1    Q.   That was approved the same
2 day the request was -- was being made,
3 right?
4        MS. HENN:  Objection to
5 form.
6 BY MR. KENNEDY:
7    Q.   Right?
8    A.   This -- this looks like it
9 was approved by another regulatory
10 director. I don't know what decisions
11 were made to approve this.
12    Q.   Well, that's Dave Gustin,
13 that DG, right?
14    A.   I believe it is, yes.
15    Q.   You know him, right?
16    A.   I worked with Dave, yes.
17    Q.   He is a good guy?
18    A.   That's a commentary, sir. I
19 mean Dave was --
20    Q.   Well, do you like him, a
21 competent guy, he did a good job for
22 McKesson?
23        MS. HENN:  Objection to
24 form.

Page 408

1        THE WITNESS:  I believe he
2 did, sir.
3 BY MR. KENNEDY:
4    Q.   And he's -- he's going to
5 follow the rules in the approach that
6 McKesson is taking with respect to these
7 things, isn't he?
8    A.   He would in his
9 interpretation of the program, sir.
10    Q.   Let me ask you this.
11 When -- when this program got put into
12 place in the beginning, when you folks
13 made the commitment to the DEA and the
14 department of justice in the settlement
15 agreement after paying $13 million and
16 you said we're going to put a program in
17 place, and we're going to foundation this
18 program on thresholds, did you tell them
19 that you would be making 30 percent
20 increases for various different
21 pharmacies because of Thanksgiving and
22 that they would be permanent? Did you
23 represent that to the DEA, the DOJ, when
24 you agreed to put in a threshold system?

Page 409

1        MS. HENN:  Objection to
2 form.
3 BY MR. KENNEDY:
4    Q.   Did you tell them that?
5    A.   Sir, you are asking me what
6 was said to the DEA and I was not there,
7 so I cannot comment on what was said to
8 the DEA.
9    Q.   And, sir, I said before,
10 when I asked you about your system, I
11 thought it was really important that we
12 look at all of the decisions that being
13 made by McKesson, I thought it was
14 important that we look at these decisions
15 within the framework of what is going on
16 in America. And while you folks are
17 making the decision to increase the sales
18 of controlled substances to various
19 pharmacies on a permanent basis for
20 Thanksgiving, at this point in time,
21 controlled substances are killing more
22 people in this country, sir, at that
23 point in time than coke and heroin
24 combined. Isn't that the fact?

Page 410

1     MS. HENN:  Objection to
2  form.
3  BY MR. KENNEDY:
4     Q.   True?  This is '08.
5     MS. HENN:  Same objection.
6  BY MR. KENNEDY:
7     Q.   Isn't that true, sir?
8     A.   That's what the other
9  document had in it, yes, sir.
10    Q.   Let's continue on.  Let's
11  how serious we are all taking this,
12  what's going on.
13    MS. HENN:  Counsel, it's
14  been about an hour since you got
15  started.  So I'd ask if it's an
16  okay time to take a ten-minute
17  break?
18    MR. KENNEDY:  Sure.
19    THE VIDEOGRAPHER:  Stand by
20  please.  The time is 2:57 p.m. Off
21  the record.
22    (Short break.)
23    THE VIDEOGRAPHER:  We are
24  back on the record.  The time is

Page 411

1  3:12 p.m.
2     MR. KENNEDY:  We all set?
3     THE VIDEOGRAPHER:  All set.
4  BY MR. KENNEDY:
5     Q.   All right, Mr. Oriente, I
6  want to continue to talk about threshold
7  change requests.
8     Let me show you 5014.
9     MS. ROZMAN:  Which is MCK
10  Oriente 544.
11    (Document marked for
12  identification as Exhibit
13  MCK-Oriente-544.)
14  BY MR. KENNEDY:
15    Q.   This is another threshold
16  change request, threshold change form,
17  correct?
18    A.   Yes.
19    Q.   All right.  And you can see
20  that attached to this threshold change
21  request are two pages of e-mails.  True?
22    MS. HENN:  And, Counsel, I
23  just want to point out there is
24  red handwriting with the words

Page 412

1  "not truthful" pointing to words.
2     MR. KENNEDY:  Yeah.
3  Correct.  And there's a numbering
4  system.
5  BY MR. KENNEDY:
6     Q.   All the red handwriting is
7  mine, all right?
8     And if -- if this --
9  attached to this threshold change
10  request, I'm going to start by talking
11  about the e-mails leading up to that
12  threshold change request.  All right.
13    And I put numbers on these,
14  one, two, three, four, five.  And that's
15  so we can follow it through
16  chronologically.  All right.
17    So if you'll go to Page .4.
18    MS. HENN:  And you can take
19  your time reading the whole
20  document if you need to.
21    THE WITNESS:  Okay.
22  BY MR. KENNEDY:
23    Q.   We're going to read the
24  entire document, sir.  All right.  You

Page 413

1  all set?
2     A.   Almost.  Okay.  Thank you.
3     Q.   All right.  E-mail Number 1.
4  Let's start with the first e-mail that's
5  written.  Number 1.  Do you see that on
6  Page .4?
7     A.   Yes, sir.
8     Q.   Now, down at the bottom, on
9  .4, we have an e-mail from Dave Gustin,
10  correct?
11    A.   Yes.  He's the --
12    Q.   And he is -- he is a
13  director of regulatory affairs just like
14  you, true?
15    A.   Yes.  He handled the
16  Northeast region.
17    Q.   And you are in the Northeast
18  region?
19    A.   I'm sorry, I misspoke.  He
20  was in the North Central.  Thank you.
21    Q.   All right.  North Central?
22    A.   Yeah.  Thank you.
23    Q.   He sends an e-mail on
24  May 28, '08.  Correct?

Page 414

1    A.   Yes.
2    Q.   And he sends it to you,
3 correct?
4    A.   Yes.  Michael, Blaine and
5 Rex and Joel.
6    Q.   He sends it to Snider,
7 correct?
8    A.   Yes.
9    Q.   Who is Snider?
10   A.   Blaine Snider is the DC
11 manager at the New Castle distribution
12 center.
13   Q.   And he says it to Catton,
14 correct?
15   A.   Rex Catton.
16   Q.   Catton.  And he's in sales,
17 true?
18   A.   Yes, he was vice president
19 of sales.
20   Q.   And the subject on this is
21 New Castle CSMP report.  New Castle is in
22 your region, true?
23   A.   Yes.
24   Q.   And New Castle is what

Page 415

1 services Cayahouga County, Cleveland,
2 Ohio, Summit County, Akron, Ohio, true?
3    A.   They handle all the -- this
4 one regarded Giant -- Giant Eagle.  So
5 they would handle all the Giant Eagle
6 stores.
7    Q.   In that area that I just
8 mentioned, that geographic area?
9    A.   I believe so, yes.
10   Q.   All right.  So the answer to
11 my question is yes, right?
12   A.   Yes.
13   Q.   And the subject then is New
14 Castle CSMP.  So that's controlled
15 substance monitoring report.  75 percent
16 plus with a date 5/28/08.  Is that the
17 subject?
18   A.   Yes.
19   Q.   And so --
20        MS. HENN:  Counsel, just a
21     note.  It looks like this is a
22     reply to a prior e-mail.  Do we
23     not have that e-mail?
24        MR. KENNEDY:  We do not

Page 416

1 have.  You folks didn't produce
2 it.
3        MS. HENN:  Okay.
4 BY MR. KENNEDY:
5    Q.   So the subject then is a
6 75 percent report as of 5/28/08.  And
7 that -- that would be a report that is
8 identifying all of your customers who
9 have purchased at least 75 percent of
10 their threshold as of that day in the
11 month.  True?
12   A.   Yes, sir.
13   Q.   And Dave Gustin is saying to
14 Rex who is in sales, "Rex, I await your
15 input."  So now we've got a -- we've got
16 a regulatory director asking Rex in sales
17 for his input, correct?  That's the first
18 sentence?
19   A.   Yeah.  Dave is asking Rex
20 for comment.
21   Q.   Is that the -- that's
22 correct, he's asking sales for some
23 input, true?
24   A.   He's asking Rex for input.

Page 417

1 Yes.
2    Q.   The second sentence is, "I
3 can bump it if you agree to a small
4 bump."
5        And he's asking, and he's
6 talking about bumping up the threshold.
7 True?
8    A.   That is what Dave is
9 referring to, yes.
10   Q.   So now we've got a director
11 of regulatory affairs is asking sales for
12 their input about an increase of a
13 threshold.  True?
14   A.   He's asking Rex for his
15 opinion on bumping the threshold, yes.
16   Q.   He says, "I know RNA,"
17 regional or retail national accounts,
18 "should make the contact initially, but
19 it looks like the customer called the
20 description center so let me know."
21 Right?  Is that the e-mail?
22   A.   Yes, sir.  That's what it
23 says.
24   Q.   Okay.  So we've got a

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1 regulatory affairs director asking sales
2 for their input on an increase in the
3 threshold. And then next, if we go up to
4 e-mail Number 2, about an hour later.
5 Rex Catton, Catton, he e-mails back to
6 Gustin, he e-mails you, and Snider, the
7 same folks, right, and we -- we've got
8 the same subject line, New Castle CSMP
9 report 75 percent, 5/28/08, correct?
10    A.   Yes.
11    Q.   And sales is saying, "Yes.
12 Please bump it up." So increase the
13 threshold. "There were other stores in
14 the list that was sent yesterday. We
15 spoke to Greg Carlson yesterday, and he
16 asked us to increase those above
17 80 percent."
18         First of all, who is -- who
19 is Greg Carlson?
20    A.   I don't know who Greg
21 Carlson is.
22    Q.   Anyway, Greg Carlson,
23 somebody at McKesson, he is asking that
24 you bump up everybody on this list,

Page 419

1 increase the threshold for everybody on
2 the list that has already purchased
3 80 percent or more of their threshold.
4 Isn't that what he's asking? Isn't that
5 what he's asking, sir?
6    A.   He's ask -- what I'm reading
7 here is he's asking for customers who are
8 at 80 percent to be given an increase so
9 they don't hit their threshold.
10    Q.   That's what he's asking,
11 right? Is that what he's asking?
12    A.   I just said I believe he is
13 asking for an increase so that the
14 customers won't get the omits and not be
15 able to order product.
16    Q.   Across the board, let's
17 increase everybody that's already got to
18 08 percent, that's what he's asking?
19    A.   Right. We don't know from
20 this e-mail how many they are talking
21 about. It could be a couple or more.
22    Q.   Well, we'll go to the next
23 e-mail. We're going to find out.
24         So Dave Gustin, the director

Page 420

1 of regulatory, an hour later.
2    A.   Mm-hmm.
3    Q.   He sends an e-mail back to
4 sales, and to you and to other folks, and
5 he says, "The list, by the way, is a long
6 one."
7         That's the lists of all the
8 folks, all the pharmacies, all the
9 customers he wants to get a bump in their
10 threshold. He says, "The list, by the
11 way, is a long one."
12         "I need a reason to go in
13 and bump all those stores thresholds."
14 Is that what he said?
15    A.   That's what's written here.
16    Q.   And let me ask you, sir.
17 Mr. Gustin, he is right, isn't he? When
18 he says, I need a reason to bump up the
19 thresholds of a long list of pharmacies,
20 he's right when he says that, isn't he?
21 Isn't he?
22    A.   Yes. Yes, he would need a
23 reason. What's the reason for the
24 increase.

Page 421

1    Q.   That's the way things are
2 supposed to be done at McKesson, right?
3    A.   That's part of the procedure
4 to understand why the thresholds are
5 being made.
6    Q.   That's the right way to do
7 it, isn't it, sir? Isn't that the right
8 way to do it, exactly what he's
9 suggesting there. That's the right way
10 to do it.
11    A.   It's -- it's part of the
12 process to review a threshold, the
13 reason.
14    Q.   He goes on and next he says,
15 "They," they meaning everybody on this
16 list, all these pharmacies, "They are all
17 purchasing at well past their historic
18 trends or they would not be on the
19 report."
20         He next says, "The question
21 is why, and until it is answered, the
22 response should not just be going in and
23 changing their thresholds to keeping them
24 off the report."

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1     And when he says, "The
2 question is why, and until we answer it,"
3 we can't just go in and bump up a whole
4 long list of thresholds. When he says
5 that, he was right, wasn't he?
6     A.   Yes. We wouldn't want to
7 just make changes for the sake of making
8 changes.
9     Q.   He's right, isn't he?
10     A.   Yes.
11     Q.   And you agreed with him at
12 that point?
13     A.   Well, I don't know if I
14 agreed with him at that point. I'm
15 agreeing with what I'm reading here.
16 This is a ten-year-old e-mail.
17     Q.   And, sir, I'll tell you
18 what. Mr. Gustin was right. And you
19 agree he was right. But guess what?
20 That entire long list of pharmacies all
21 got their bump, every single one of them,
22 despite no reason. They all got an
23 increase in their thresholds, sir. You
24 know that?

Page 423

1     MS. HENN:  Objection to
2     form.
3 BY MR. KENNEDY:
4     Q.   You were on this e-mail,
5 sir.
6     A.   Excuse me?
7     Q.   You were on this e-mail.
8     A.   Right, I was on the e-mail.
9 I don't know if I was in the office or on
10 vacation or what, on May 28th of 2008.
11 I'd have to see.
12     Yes, I got the e-mail.
13 Again, if this account -- I was on the
14 e-mail because I had the New Castle
15 distribution center.
16     Q.   Yep.
17     A.   Dave Gustin may have had the
18 customer we're referring to on here which
19 I believe was Giant Eagle. So Dave would
20 have made the increases based off of the
21 customer.
22     Q.   I tell you what. You
23 increased a long list of pharmacies with
24 no reason. That is absolutely contrary

Page 424

1 to what you represented to the DEA as to
2 what you were going to do pursuant to the
3 2008 settlement.
4     MS. HENN:  Objection to
5     form.
6 BY MR. KENNEDY:
7     Q.   Is that right?
8     MS. HENN:  Objection to
9     form.
10     THE WITNESS:  When you said
11     you made an increase, are you
12     saying me personally or you
13     McKesson?
14 BY MR. KENNEDY:
15     Q.   I'm saying you McKesson,
16 your company.
17     A.   Oh.
18     Q.   That's wrong, isn't it?
19     MS. HENN:  Objection to
20     form.
21     THE WITNESS:  Not
22     necessarily. You would need to
23     know what the reason was.
24 BY MR. KENNEDY:

Page 425

1     Q.   He's asking for the reason.
2     A.   Right. And until we know
3 what the reason, which we haven't gotten
4 to yet, we wouldn't know.
5     Q.   Well, let's go to the next
6 page. Turn that page. Let's go to
7 e-mail Number 4 then, sir.
8     Now we are on Page .3. I'm
9 sorry, .3 is e-mail Number 4. Now it's
10 four months later. It's four months
11 after, after Mr. Gustin, you agreed,
12 said, hey, unless you give us a reason we
13 can't increase these thresholds because
14 that's not right.
15     Four months later, Diane
16 Martin -- who is Diane Martin?
17     A.   She worked in the
18 distribution center. I'm not sure what
19 her position was.
20     Q.   She sends an e-mail now on
21 September 22, 2008, correct?
22     A.   Yes.
23     Q.   She sends it to Gustin. She
24 sends it to Catton in sales. She sends

Page 426

1 it to Snider. Same subject line: New
2 Castle CSMP report 75 percent, dated
3 5/28/08. Right? Correct?
4     A.   Yes.
5     Q.   And this is a part of the
6 same e-mail string, sir. And she writes
7 Dave -- she's talking about what occurred
8 four months earlier. And she says,
9 "Dave, since we" -- "since these were
10 bumped up without a threshold change
11 request in late May, what is the reason
12 for the increase in dosages? I'll have
13 to create some sort of threshold change
14 request for each of them and then we will
15 need some details for the action taken."
16        Is that what she wrote, sir?
17     A.   That is what's written here.
18     Q.   And she's talking about the
19 fact that those thresholds and that long
20 list were increased four months earlier
21 without any reason, isn't she?
22        MS. HENN:  Objection to
23     form.
24        THE WITNESS:  She's asking

Page 427

1     what is the reason. There was a
2     reason which is --
3 BY MR. KENNEDY:
4     Q.   Well, no. I'll ask about
5 that. She's asking, what is the reason
6 we increased that long list of thresholds
7 four months earlier. Isn't that what she
8 is asking, sir?
9     A.   Diane is asking for the
10 reason, yes.
11     Q.   And she said she's going to
12 have to create a threshold change request
13 four months after the thresholds were
14 changed, right?
15     A.   She wrote here that she
16 needs some sort of threshold change
17 request for each of them and will need
18 details.
19     Q.   Sir, I'm -- let me ask you
20 this. Was it the policy and procedure at
21 McKesson at this point in time, something
22 they were taking very seriously, was it
23 their policy and procedure to create the
24 request four months after the increase is

Page 428

1 given? Is that what they were doing?
2     A.   Absolutely not. I'm not
3 sure why Dave did not have a threshold
4 change request form at the time of the
5 increase. I can't say why he did not
6 make one out.
7     Q.   Well, let's -- let's look
8 further, sir. We have Diane Martin
9 asking him, asking Dave Gustin, what's
10 the reason we made all these increases
11 four months earlier.
12        If we look up above, you see
13 that he e-mails -- e-mails her back three
14 hours later. "Reason..... RNA
15 reasonable request for a small increase."
16 And then cites Rex Catton from sales,
17 right?
18     A.   Mm-hmm, right.
19     Q.   So we're increasing a whole
20 bunch of people four months earlier. And
21 the reason is because somebody from sales
22 just says it's reasonable.
23        Let me ask you. Sales says
24 reasonable request for a whole bunch of

Page 429

1 people. Is that what you considered to
2 be the required documentation for an
3 increase in a threshold?
4     A.   I don't know what reason.
5 It's not spelled out here. It could have
6 been a business increase that -- I
7 believe this was Giant Eagle was on here.
8 That Giant Eagle was seeing a business
9 growth in their pharmacies and needed
10 increases.
11     Q.   Do you know that? Do you
12 know that?
13     A.   I know -- no. What I'm
14 saying is there's no reason stated here.
15     Q.   Okay. Well, there's not
16 only no reason stated there. But let's
17 look at -- let's look at the page before
18 that's attached. .2.
19        This is the threshold change
20 request that got created four months
21 after the fact, right? She says, "I'm
22 going to have to put one together to
23 explain what we did four months earlier."
24 And now here it is. Do you see that?

Page 430

1 Giant Eagle?
2     A.   Right, I see Giant Eagle
3 and --
4     Q.   Do you see the date on
5 there?
6     A.   5/28.
7     Q.   5/28/08.  Sir, 5/28/08,
8 that's not the date that this threshold
9 change request was made, is it?
10     MS. HENN:  Objection to
11 form.
12 BY MR. KENNEDY:
13     Q.   That's not the date that
14 this request was made.
15     A.   No, it was made on the 28th,
16 the request.  The request was made on the
17 28th.
18     Q.   Oh, but the form wasn't made
19 on that date, correct?
20     A.   I don't know what date the
21 form was made.
22     Q.   Sir --
23     A.   It looks like -- right.
24 It's Diane saying that she didn't have

Page 431

1 one based in September.
2     Q.   On September 22 of '08, and
3 now attached to that, and now the form
4 gets made, and it's dated -- it's dated
5 now 5/28/08, correct?
6     A.   It is.
7     MS. HENN:  Objection to
8 form.
9 BY MR. KENNEDY:
10     Q.   Whoever put 5/28/08 on this
11 threshold change request knew that this
12 threshold change request form was not
13 filled out on 5/28/08.  They knew it.
14     MS. HENN:  Objection to
15 form.
16 BY MR. KENNEDY:
17     Q.   Is that right, sir?
18     A.   I -- I -- looking at what
19 this is saying with the September request
20 for a TCR form, it appears that way.
21     Q.   Then let's go down here.  We
22 were talking about Giant Eagle, correct.
23 And that's the customer name, correct?
24     A.   Yes.

Page 432

1     Q.   And they are talking about
2 changes for hydrocodone, correct?
3     A.   Correct.
4     Q.   And hydrocodone is at the
5 center of the opioid crisis that's going
6 on in '08, correct?
7     A.   That is correct.
8     Q.   And look at the change.
9 Look at the reason for the change.
10 Reasonable request for a small increase
11 per Rex Catton from sales.
12     A.   Right.  Most of the requests
13 for increases would come from sales
14 because they are interacting with the
15 customer.
16     Q.   Exactly.
17     A.   So sales would send them
18 into regulatory.  Regulatory would do the
19 review and either approve or deny based
20 off of their review.  So the fact that
21 this request came from sales is not
22 atypical.
23     Q.   Oh, I'm not talking -- sir,
24 I'm not talking about sales filling out a

Page 433

1 request form.  I'm talking about sales
2 giving you the reason for the change.
3 That's what we are talking about right
4 here.
5     A.   Well, sales would provide
6 the reason for the change.  They would --
7 they would tell us that the customer had
8 a -- a business increase or their
9 competitor closed or something like that.
10 And then we would take that information,
11 do our review and either make -- approve
12 or deny the request.
13     Q.   All right.  I'm going to
14 write that one down too.  Because we're
15 going to come back to it.  You're telling
16 us sales is providing you with the reason
17 for increasing your thresholds.
18     A.   The reason, not the
19 justification.
20     Q.   Oh, okay.  So they are
21 giving you the reason, but not the
22 justification.
23     A.   We decide, regulatory
24 decides if the reason given is justified.

Page 434

1    Q.  Coming from sales?
2    A.  Coming from sales.  And we
3 deny some when the reason is not
4 substantial.  Or we'll go back to the
5 customer and ask for additional
6 information to support the business
7 change.
8    Q.  Let's look down here.  This
9 says approved.  And there's a signature
10 by Blaine Snider.  He dates his signature
11 5/28/08.  Do you see that?
12    A.  Yes.
13    Q.  That ain't true, is it?  He
14 didn't sign this on 5/28/08, did he, sir?
15    MS. HENN:  Objection to
16 form.
17    THE WITNESS:  From the
18 e-mail chain I can say that it
19 looks like it may have been
20 created in September.
21 BY MR. KENNEDY:
22    Q.  And, sir, was it the -- was
23 it the practice at McKesson to backdate
24 documents so that if the DEA came in, it

Page 435

1 would look like you were fulfilling your
2 legal responsibilities, sir, was that the
3 practice at McKesson?
4    A.  No, sir.  That was not the
5 practice.
6    How -- how do I know this
7 one from Giant Eagle is on the list that
8 Rex approved?  Is there something that
9 shows that?
10    Q.  Sir --
11    A.  I'm just asking.
12    Q.  -- it's part of the same
13 e-mail chain, and they were all produced
14 together by your lawyer.
15    A.  Okay.  Because again, this
16 was done by -- not by myself.  So for me
17 to speculate what took place, you're not
18 asking me of actions that I did.  You're
19 asking me actions that others did.
20    Q.  It was in your region,
21 wasn't it?
22    A.  The distribution center was?
23    Q.  Yeah.
24    A.  Yes.

Page 436

1    Q.  In your region, right?
2    A.  Yes.
3    Q.  And you were part of an
4 e-mail chain, weren't you?
5    A.  Yes.
6    Q.  And did you stand up when --
7 when Dave Gustin said we can't send this,
8 and we can't increase this entire list
9 unless we have a reason.  I don't see an
10 e-mail back from you, saying you're
11 absolutely right, don't let this go
12 forward, this is my region.
13    Where is that e-mail?
14    MS. HENN:  Objection to
15 form.
16 BY MR. KENNEDY:
17    Q.  I don't see it on the e-mail
18 chain.
19    A.  Again, the request came from
20 sales to Dave.  And Dave had this chain.
21 And he is the one that increased it.
22    Q.  Now, let's -- I'm going to
23 show you some more -- more threshold
24 change requests.  This is a series of

Page 437

1 different exhibits.
2    And we're not going to use
3 the screen on this one.
4    MR. KENNEDY:  This is a
5 package of different exhibits.
6    MS. ROZMAN:  Collectively we
7 have MCK Oriente 525, 526, 527,
8 528, and 529.
9    (Document marked for
10 identification as Exhibit
11 MCK-Oriente-525.)
12    (Document marked for
13 identification as Exhibit
14 MCK-Oriente-526.)
15    (Document marked for
16 identification as Exhibit
17 MCK-Oriente-527.)
18    (Document marked for
19 identification as Exhibit
20 MCK-Oriente-528.)
21    (Document marked for
22 identification as Exhibit
23 MCK-Oriente-529.)
24 BY MR. KENNEDY:

Highly Confidential – Subject to Further Confidentiality Review

Page 438

1  Q.  Take a look at these if you
2  would, sir.  These are five different
3  threshold change requests for 2009.
4      The attachments I believe
5  are the same for each one.  Take a
6  look -- more threshold requests.  Five
7  different threshold change requests.
8  Correct?
9  A.  Yes.
10  Q.  All dated 12/30/09.
11  A.  Mm-hmm.
12  Q.  Correct?
13  A.  Yes.  End of month.
14  Q.  Five different pharmacies,
15  correct?
16  A.  Yes.
17  Q.  All five threshold change
18  requests have a 3,000-unit increase of a
19  controlled substance, correct?
20  A.  Yes.
21  Q.  And the reason for the
22  requested change, be specific it says,
23  include documentation, four words:
24  "End-of-the-year buffers."  Is that what

Page 439

1  it says for all five, all five different
2  pharmacies?
3  A.  End of month and end of --
4  end of year.
5  Q.  Same documents attached to
6  every single one of these requests,
7  correct?
8  A.  As they were hitting their
9  monthly threshold.
10  Q.  So what we have on the same
11  date, five different pharmacies are
12  getting the same increase for the same
13  four-year reason, true?
14  A.  It -- it was the end of the
15  month.  So customers were obviously more
16  apt to hit their threshold near the end
17  of the month.
18  Q.  So the answer is true.  Five
19  different pharmacies for the same
20  four-year -- four-word reason, on the
21  same date, are getting the same 3,000
22  increase, correct?
23  A.  Yes.
24  Q.  And if you follow the e-mail

Page 440

1  chain, this all happened in less than
2  three hours.  Five requests, five
3  different pharmacies, same amount
4  requested, same amount granted, same
5  four-word reason.  Right?
6  A.  Mm-hmm.
7  Q.  Do you know who Mr. Boggs
8  is?
9  A.  Yes.
10  Q.  Dave Boggs?  Is he above you
11  in the chain, he's a senior regulatory
12  affairs?
13  A.  Not -- not Dave Boggs.
14  Q.  Dave Boggs, what is it?
15  A.  Gary Boggs.
16  Q.  I'm sorry.  Gary Boggs.  He
17  is up above you --
18  A.  Yes.
19  Q.  In fact, he is a senior
20  regulatory --
21  A.  Yes, he is a senior director
22  over the eastern half of the country.
23  Q.  Do you know that he gave
24  testimony on behalf of McKesson on

Page 441

1  May 23, 2018, so a month ago about?
2  A.  I knew that he did.  Yes.
3  Q.  And with respect to these
4  thresholds, he testified, and I'm going
5  to quote, on behalf of the company, he
6  testified, "I think it's important to
7  understand that we have a very large,
8  diverse customer base and that the
9  customer base is very nuanced in terms of
10  individual sizes, individual needs, based
11  upon their business models, and,
12  therefore, there's no size one" -- or
13  "one size that fits all of that."  Did
14  you know about that testimony?
15  A.  I didn't know --
16  MS. HENN:  Objection to
17  form.  Go ahead.
18  THE WITNESS:  I didn't know
19  specifically what he said.  But
20  what he's talking about took place
21  in 2018.  And this document is
22  talking about increases that were
23  done in 2009.
24  BY MR. KENNEDY:

Page 442

1   Q.   So you don't think that
2   applies?
3       A.   No, sir, that's not what I
4   said.  I said that the increase in 2009
5   is not what Gary Boggs is referring to.
6       Q.   Well, he was referring back
7   to your programs over the years.  And yet
8   if they are all different, and you folks
9   are taking great care to set these
10  specific thresholds, we've got a
11  situation here that in one day in a
12  three-hour period, five different
13  pharmacies for the same four-word --
14  four-word reason are getting the same
15  3,000 increase.  Right?
16      MS. HENN:  Objection to
17      form.
18      THE WITNESS:  These
19      pharmacies received 3,000 doses
20      each in order for them to get
21      additional product that they
22      needed within that month, yes.
23  BY MR. KENNEDY:
24      Q.   Well, let's go back then.

Page 443

1   Look at that -- look at that Number 3 on
2   this form.  That Number 3 in that form?
3       A.   Where -- where are you, sir?
4       Q.   Number 3.  It says, "For
5   reasons requested, end-of-year buffer,"
6   and then 3 says, "Permanent or temporary
7   threshold increase."
8       And what is written there,
9   sir, as to whether or not this end of the
10  year is permanent or temporary?
11      A.   It says permanent.
12      Q.   Do you see any documented
13  reason as you required, any documented
14  reason as you represented to the DEA you
15  would do for a permanent increase in
16  these threshold change requests?
17  Permanent.  You told us this was end of
18  the year, but they are giving these folks
19  a 3,000 increase permanent.  Is that
20  true?
21      A.   The increase was made
22  permanent --
23      Q.   Is that true?
24      A.   -- for them to make -- the

Page 444

1   increase was made permanent for them to
2   get additional product because they were
3   bumping up against their threshold.
4       Q.   Permanent increase for the
5   end-of-the-year buffer.  Is that what
6   happened here, sir?
7       A.   Well, it says end of the
8   year.  It would -- in my opinion it would
9   be an end of month because they need more
10  in the month.  It's not an end-of-year
11  buffer.  We don't have an end of --
12  end-of-year threshold.
13      Q.   Does it say end of year?
14      A.   It says end-of-year buffers.
15      Q.   Right.  And if you look at
16  the e-mail that it's attached to it says,
17  "Customers are calling about end of
18  year," does it not, on the e-mails?  And
19  then on the reason it says end of year,
20  but you're giving them a 3,000 permanent
21  increase.
22      A.   Mm-hmm.
23      Q.   Let me show you another
24  exhibit, another threshold change

Page 445

1   request.  All right.
2       MR. KENNEDY:  5017.  This
3   one we'll bring up please.
4       MS. ROZMAN:  This is MCK
5       Oriente 547.
6       (Document marked for
7       identification as Exhibit
8       MCK-Oriente-547.)
9   BY MR. KENNEDY:
10      Q.   And I put numbers on this so
11  we could -- we can follow through in the
12  right order, in the right order of these
13  e-mails.
14      First e-mail chronologically
15  is on the first page.  Now, Dave Gustin,
16  we know Dave Gustin, he is a director of
17  regulatory affairs like you, correct?
18      A.   Yes.
19      Q.   And he is in charge of the
20  entire region?
21      A.   He was in charge of the
22  North Central.  He I believe has since
23  retired.
24      Q.   And you wouldn't expect him

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1 to be doing things that weren't
2 consistent with the policies of this
3 company, would you? You wouldn't expect
4 Dave to be doing that, he is a good guy,
5 a good employee. He is going to -- he is
6 going to follow what McKesson does, won't
7 he?
8     A.   He should -- he should
9 follow the proper procedure, yes.
10     Q.   So Dave Gustin, on
11 December 16, 2008, he sends an e-mail to
12 Michael Bishop. Do you see that?
13     A.   Yes.
14     Q.   Do you know who Michael
15 Bishop is?
16     A.   Michael Bishop was a
17 regulatory affairs manager. But at this
18 time he was in the -- in 2008 when this
19 was written, he was in the retail
20 national accounts team.
21     Q.   And what's that? Does that
22 make him sales?
23     A.   He would have been involved
24 with customer support and sales.

Page 447

1     Q.   So now we got a -- again, we
2 got a regulatory guy writing an e-mail to
3 sales. And the subject is could you do
4 me a favor. Do you see that?
5     A.   Yes.
6     Q.   And he e-mails to Bishop,
7 and he says, "Are you in" -- "are you in
8 today?" Correct?
9     A.   Yes.
10     Q.   Now, we turn the page. And
11 it's the same day. We look at the next
12 e-mail, it's at the top of the page. And
13 Gustin sends a second e-mail to Bishop on
14 the same day, same subject, could you do
15 me a favor. Right?
16     A.   Yeah. Same subject on the
17 e-mail.
18     Q.   Dave Gustin, again you would
19 expect him to follow the policies. He
20 says, "I just need a threshold change
21 request from you signed and dated the
22 30th." Do you see where he says that?
23     A.   Yes.
24     Q.   And it's December 16th when

Page 448

1 he's writing that. So he's probably
2 talking about November 30th, two weeks or
3 so ago. Is that what he says?
4     A.   It -- it doesn't say
5 November 30th. But since he has the
6 30th, it would seem to be November 30th.
7     Q.   And Gustin says, "I will use
8 it for the 30 percent increases I made
9 for the regional national accounts" --
10 those are the big chains, right?
11     A.   Correct.
12     Q.   He says, "I'm going to use
13 this threshold change request, I will use
14 it for the 30 percent increases I made
15 for the RNAs that day after you e-mailed
16 me all those reports. Thanks." Do you
17 see that?
18     A.   Yeah -- yes. It doesn't say
19 how many were on those reports, but yes.
20     Q.   It doesn't really matter,
21 does it, how many is on the reports. You
22 shouldn't be making out threshold change
23 requests more than two weeks after you
24 make the changes, should you, sir?

Page 449

1     A.   He should have had the
2 documentation when he made the changes.
3     Q.   He's asking him to approve a
4 30 percent increase that was made two
5 weeks earlier. Right?
6     A.   He's asking for the
7 follow-up paperwork. Yeah. Dave made
8 the -- the increase. He's asking Michael
9 to make out the TCR form. It appears
10 Dave made the increase without having the
11 paperwork.
12     Q.   Look down to the next -- we
13 look down to the next e-mail. It's
14 Bishop's -- he e-mails back and says,
15 "I'm in a meeting for the next 30." Do
16 you see that? It says I'm in a meeting
17 for the next 30, right?
18     A.   Yes.
19     Q.   Turn to the next page, and
20 it's -- it's a day later, correct?
21     A.   Yeah. The 17th.
22     Q.   And Bishop e-mails back
23 to Gustin. He says, "This is the
24 Thanksgiving increases." So now we're

Page 450

1  back to increases for Thanksgiving,
2  right?
3      A.   Right.  This references
4  that -- that other e-mail that was -- or
5  that TCR form that was done on
6  Thanksgiving.
7      Q.   Gustin e-mails him back and
8  says, "Yep.  11/28, right?  So now we are
9  talking about more increases for
10  Thanksgiving," correct?
11     A.   I believe this references
12  the same increase that the Thanksgiving
13  TCR referenced from Rex.
14     Q.   And now we go to the next
15  page.  And we see Bishop, it looks like
16  he sends and encloses a threshold change
17  form.  Now it looks like he filled it out
18  and signed it, right?  Is that correct?
19     A.   Well --
20     Q.   Threshold change form, see
21  that?
22     A.   Yeah.  Right.  It just shows
23  a Word attachment.  It doesn't show
24  the -- what was actually sent.

Page 451

1      Q.   Well, you ask him to send
2  him back one signed.  So do you think he
3  probably was sending one back signed?
4          MS. HENN:  Objection to
5      form.
6          THE WITNESS:  I can't tell
7      from what I'm looking at, though.
8  BY MR. KENNEDY:
9      Q.   Sir, don't you find it
10  unusual that -- that Michael Bishop,
11  instead of e-mailing Gustin back and
12  saying look it, I -- I can't sign and
13  date a threshold two and a half weeks
14  late, that's -- that's not honest.  But
15  he just -- do you find it unusual, he
16  just sends it back, without objecting?
17         MS. HENN:  Objection to
18     form.
19         THE WITNESS:  Well, in -- in
20     number --
21  BY MR. KENNEDY:
22     Q.   Sir, I'm just asking, did
23  you find it unusual that you have -- you
24  have Gustin saying put something together

Page 452

1  and sign it for me and send it back.  And
2  he's not saying I'm not doing that.  It's
3  two and a half weeks late.  I'm not doing
4  that.  Do you find that unusual?
5          MS. HENN:  Objection to
6      form.
7  BY MR. KENNEDY:
8      Q.   Is that unusual, sir?  Very
9  simple question.
10         MS. HENN:  Same objection.
11  BY MR. KENNEDY:
12     Q.   Was that the culture here at
13  your company?
14     A.   No.  No, that's not the
15  culture.  Our typical process is to have
16  the paperwork when we're making the
17  increase.  Dave realized he didn't have
18  the form.  He asked Michael to make one
19  out so that we had a copy to support the
20  increase that was done on Thanksgiving.
21     Q.   Not typical?  Go up to the
22  next e-mail, please.  Go up to the next
23  e-mail.
24     A.   Number 7?

Page 453

1      Q.   Number 7.  We've got Gustin
2  now sending another e-mail.  And it's --
3  it's to a different group of people.  And
4  he's sending it to you also, is he not?
5      A.   Yes.  I'm on -- I'm on
6  the --
7      Q.   December 17th?
8      A.   I'm cc'd.
9      Q.   Okay.  And again, could you
10  do me a favor.  This one isn't -- this is
11  different.  This is not to Bishop.  Now,
12  this is to a different group of people
13  saying, can you do me a favor, right?
14         MS. HENN:  Objection to
15     form.
16  BY MR. KENNEDY:
17     Q.   Right?
18     A.   Well, I'm -- I'm reading it,
19  sir.
20     Q.   I'll -- we'll -- you want
21  to -- we'll go through it.  I'm going to
22  go through it.
23     A.   Yeah, but you asked me a
24  question that I can't answer until I read

Page 454

1 it.
2     Q.   I'm saying, was this to a
3 different group of people?
4         MS. HENN:  Counsel, if you
5     give him a moment he'll answer
6     your question.
7 BY MR. KENNEDY:
8     Q.   Was this to a different
9 group of people?
10     A.   It -- this one is sent to
11 the pharmacy group DC managers.  DCM.
12     Q.   And it's sent to you?
13     A.   I'm cc'd along with the
14 other directors, Tracy and Bill.
15     Q.   And he is attaching
16 threshold change form, is he not?
17     A.   It says, "The attached TCR
18 form covers all RNA increases made on
19 that date" --
20     Q.   Stop.  The attachment.  Do
21 you see the line,
22 thresholdchangeform.doc, is that the
23 attachment?
24     A.   Yes.

Page 455

1     Q.   And does he state that
2 you're included, "On November 28th, I
3 sent request" -- "I was sent requests by
4 Michael for over 200 thresholds to get
5 30 percent increases for various national
6 accounts.  The attached TCR form covers
7 all RNA increases made that date.  Please
8 sign and file.  This is not routine, but
9 I was the only DRA on and so my time was
10 spent making the changes.  And I may have
11 missed some e-mails to DCs."
12         Sir, he's talking about 200
13 threshold changes at 30 percent, is he
14 not, in this e-mail?  Is he not talking
15 about --
16     A.   He is, but I'm not the
17 Michael he's referring to.
18     Q.   Oh, but you are copied on
19 the e-mail, aren't you, sir?
20     A.   Yes, but he's -- but I did
21 not send the request to him.  By Michael,
22 he's meaning Michael Bishop.
23     Q.   Real simple.  He's talking
24 about 200 threshold change requests of

Page 456

1 30 percent on one day.  True?  Is that
2 what he's talking about?
3     A.   That's what he wrote here,
4 yes.
5     Q.   And he's talking about doing
6 it without any threshold change request
7 forms.  Correct?  Is that true, sir?
8     A.   He -- yes.
9     Q.   And now, even further, he's
10 asking these folks to sign them two weeks
11 after the date.
12         And I'm going to ask you
13 again.  Is that the way things were done?
14 Is that the culture at your company with
15 respect to threshold changes?
16     A.   No, sir.  It's not.  And
17 when it says please sign and file, they
18 could have signed them, filed them.  They
19 did not need to date them for November or
20 they could have put per -- for December
21 change and dated it December.
22     Q.   Well, they could have done a
23 lot of things, sir, but they put the
24 wrong date on it, sir.  They put the

Page 457

1 dishonest date on every single one of
2 them, for 200 changes in one day, right?
3         MS. HENN:  Objection to
4     form.
5         THE WITNESS:  They put the
6     date that the increase took place
7     on.
8 BY MR. KENNEDY:
9     Q.   You know what, you told us
10 how serious you took this program
11 considering we had a crisis going on in
12 this country.  And so did the president
13 and CEO of your company when he testified
14 in front of Congress.  Let's take a look
15 at that, sir, because I might want to ask
16 you.
17         MR. KENNEDY:  If you can
18     give us 8, please.
19         (Document marked for
20     identification as Exhibit
21     MCK-Oriente-Video-8.)
22         (Video playback.)
23         REP. CASTOR:
24     Mr. Hammergren, your company

Page 458

1  McKesson distributed over
2  1.8 million opioid pills each year
3  in 20 -- 2006 and 2007 to Family
4  Discount Pharmacy. That's an
5  average of about 5,000 pills per
6  day in this rural small town.
7      Based upon figures cited by
8  DEA, McKesson shipped Family
9  Discount approximately six times
10 the amount of hydrocodone that an
11 average pharmacy in west -- in
12 rural West virginia would have
13 received during those years.
14     So similar question to you,
15 McKesson delivered millions of
16 pills to the single pharmacy.
17 Clearly that's not reasonable and
18 you should have -- you should have
19 flagged that and stopped that
20 right away. Why didn't you?
21     MR. HAMMERGREN: We did
22 terminate the relationship with
23 that pharmacy, and like
24 Mr. Barrett, I -- I would have

Page 459

1  liked to have made a decision
2  faster.
3      REP. CASTOR: Don't you take
4  responsibility for what was
5  happening back then? Was it that
6  the -- the profit motive was --
7  simply overcame the -- you saw
8  that paying the penalties on your
9  settlement agreements was a cost
10 worth paying because you were
11 making so much money?
12     MR. HAMMERGREN:
13 Congresswoman, we take all these
14 matters very seriously. Any
15 settlement with a regulator we
16 take very seriously. Our systems
17 have evolved and we continue to
18 invest heavily to make sure that
19 situations like that don't happen
20 again.
21     REP. CASTOR: I think this
22 was the opposite of due diligence
23 that was required under the law
24 and we're going to be looking for

Page 460

1  greater accountability. Thank
2  you, and I go back.
3      (Video playback ended.)
4  BY MR. KENNEDY:
5      Q.   You heard him talk about
6  taking the settlement very seriously,
7  didn't you?
8      A.   Yes.
9      Q.   Let's look at another
10 threshold change request if we could.
11 This is 5018.
12     MS. ROZMAN: MCK Oriente
13     548.
14     (Document marked for
15     identification as Exhibit
16     MCK-Oriente-548.)
17 BY MR. KENNEDY:
18     Q.   Is this another threshold
19 change request, sir?
20     A.   Yes, it is.
21     Q.   And this one, this one is
22 dated 11/26/08, is it not?
23     A.   Yes, it is.
24     Q.   And it was approved the same

Page 461

1  day, do you see that? Same day?
2      A.   Yes.
3      Q.   And the customer on here is
4  a CVS pharmacy. True?
5      A.   Yes, it is.
6      Q.   And they are asking for a
7  30 percent increase. Correct?
8      A.   They are.
9      Q.   And as you told the DEA, if
10 we are going to increase the -- a
11 threshold, if we're going to increase a
12 threshold, we will require documentation,
13 does it not? Is that what it says?
14     A.   Yes.
15     Q.   What you agreed to with the
16 FDA (sic), we will require documentation
17 if we're going to increase a threshold.
18 True?
19     A.   Right. Threshold change
20 form.
21     Q.   The reason for change. And
22 it says, "Attach supporting
23 documentation."
24     The reason for change is,

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1 "Per the agreement between CVS and
2 McKesson, approved by Don Walker on
3 September 25th to temporarily withhold
4 threshold monitoring until CVS analyzed
5 the requested data."
6         And based on that statement,
7 this increase by 30 percent was approved.
8 Do you see that, sir?
9     A.    Again, it was approved by
10 another regulatory director.  Not myself.
11     Q.    It states here that you made
12 an agreement, somebody made an agreement
13 with CVS to stop the monitoring of their
14 thresholds.  Do you see that?
15     A.    To temporarily withhold it,
16 yes.
17     Q.    And so during this -- how
18 long this temporary -- how long --
19     A.    It doesn't say on this
20 document how long temporary was.
21     Q.    Is that appropriate for any
22 period, whether it's a day or two or 10
23 or a hundred, to not monitor the
24 thresholds of CVS?  Is it proper?

Page 463

1     A.    I can't speak on the
2 agreement that was made, because this is
3 the first time I'm seeing that, this
4 agreement between Don Walker and CVS to
5 temporary withhold this while CVS
6 analyzed requested data.
7     Q.    I'm going to ask you, sir,
8 when you said to the DEA -- let's start
9 from the beginning.  When Congress passed
10 the Controlled Substances Act of 1970,
11 when the DEA issued its regulations in
12 '71, when you signed the agreement with
13 the DEA in '08, did you agree with them
14 and tell them that you were just going to
15 monitor some of the pharmacies some of
16 the time?
17         MS. HENN:  Objection to
18 form.
19 BY MR. KENNEDY:
20     Q.    Is that what you said?
21     A.    No, sir.
22     Q.    And the law says you've got
23 to monitor all of the pharmacies all the
24 time.  Doesn't it?  Isn't that the law?

Page 464

1         MS. HENN:  Objection to
2 form.
3         THE WITNESS:  We may have
4 still been monitoring them.  We
5 were not looking at their
6 thresholds on what they were
7 ordering for this temporary
8 period.  And again, I don't know
9 if this was a week or ten days or
10 how much.
11         And again, this was done in
12 the West region, which is not my
13 area of responsibility.
14 BY MR. KENNEDY:
15     Q.    Sir, let me ask -- let me
16 ask you this.
17     A.    Yes.
18     Q.    At this point in time,
19 you're doing business with hundreds of
20 CVSs, right, hundreds of CVSs?
21     A.    Yes.
22     Q.    Who is Don Walker?
23     A.    Don Walker was a senior vice
24 president distribution operations who we

Page 465

1 reported into.
2     Q.    He was a -- he is a national
3 guy, right?
4     A.    Yes, sir.
5     Q.    He makes agreements with
6 CVS, he's making national agreements,
7 right?
8     A.    Yes, sir.
9     Q.    Let me ask you.  This
10 special arrangement that you seem to have
11 with CVS, did it have anything to do with
12 the fact that by 2008, when you had this
13 agreement not to monitor their
14 thresholds, did it have anything to do
15 with the fact that by 2008, CVS was a
16 12-billion, not million, a $12-billion
17 customer of McKesson?
18         MS. HENN:  Objection to
19 form.
20         THE WITNESS:  Sir, I -- as I
21 said earlier, I don't get involved
22 with sales.  So I would not even
23 know how much business McKesson
24 did with CVS on the dollar value.

Page 466

1    So I can't say what the
2    decisionmaking was.
3  BY MR. KENNEDY:
4       Q.   This is all very serious
5  because there was an opioid crisis going
6  on, correct?
7       A.   Yes, sir.
8       Q.   Is that right?
9       A.   Yes, sir.
10      Q.   And diversion from
11  pharmacies like CVS was going on, was it
12  not?
13      A.   During this period, I don't
14  know when the CVS had their issues in
15  Florida at two stores.  But yes, there
16  was -- there was an opioid crisis in '08.
17      Q.   Let's look at -- let's
18  continue with CVS.  Let's look at another
19  threshold change request.
20          This is 5013.
21          MS. ROZMAN:  MCK Oriente
22      543.
23          (Document marked for
24      identification as Exhibit

Page 467

1    MCK-Oriente-543.)
2  BY MR. KENNEDY:
3       Q.   Another threshold change
4  request, sir?
5       A.   Yes, sir.
6       Q.   This is from 4/28/10, the
7  top one we're looking at.  Do you see
8  that?
9       A.   Yes, sir.  April 28 of 2010.
10      Q.   Customer name, it says, "See
11  list."  Do you see that?
12      A.   Yes.
13      Q.   And they are looking for a
14  15 percent increase in a list of
15  different controlled substances.  True?
16      A.   Yes.
17      Q.   Reason for requested change,
18  the required documentation.  And it says
19  be specific.  Do you see that, capital
20  letters, "be specific."  Include
21  supporting documentation.
22          Right?  That's what the form
23  states?
24      A.   Yes.

Page 468

1       Q.   And the reason the
2  documented, be-specific reason, is quote,
3  "per the process agreed to with McKesson
4  and the CVS loss prevention team 2/6/09,
5  Michael Oriente," that's you," will
6  provide CVS a list of any location
7  requiring CVS validation prior to further
8  threshold change requests.  For now,
9  these threshold increases are considered
10  reasonable."
11          Do you see that statement,
12  sir?
13      A.   Yes, I do.
14      Q.   Why is this statement in
15  quotes?
16      A.   I don't know.  I didn't
17  write this document.
18      Q.   What it says, "for now,
19  these threshold increases are considered
20  reasonable."  These, what these?  What
21  threshold requests, anything by CVS?
22          What's that mean when it
23  says, "These threshold changes will be
24  considered reasonable for now"?  What

Page 469

1  does that mean?
2       A.   Again, I did not write this
3  document so I can't speak on what it's
4  pertaining to.  As you said under the
5  controlled substance requested, it says,
6  "See list."
7          So I don't know, since I
8  didn't create this document.  It was
9  created by either Jake or -- and approved
10  by Tom McDonald, our West regional
11  director, again not myself.
12      Q.   Sir, it looks like -- it
13  looks like CVS is getting preapproval,
14  right?
15          MS. HENN:  Objection.
16  BY MR. KENNEDY:
17      Q.   "For now, these threshold
18  increases are considered reasonable," in
19  quotes.
20          They are getting preapproval
21  of threshold increase requests.
22      A.   What -- what --
23          MS. HENN:  Objection to
24      form.

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1 BY MR. KENNEDY:
2     Q.   Isn't that what was going
3 on?
4          MS. HENN:  Objection to
5 form.
6          THE WITNESS:  No, sir.  What
7     it says here is that I will
8     provide CVS a list of any location
9     requiring CVS to validate prior to
10    further TCRs.  So it's --
11 BY MR. KENNEDY:
12    Q.   What' the -- read the next
13 sentence, sir.  There's another sentence.
14    A.   And then the next sentence
15 says, "For now, these threshold increases
16 are considered reasonable."
17        But again, I did not write
18 this so I cannot speak on what that
19 second sentence says.
20    Q.   You don't think this is a
21 CVS getting threshold increased requests
22 preapproved?
23    A.   No, sir.  Not preapproved.
24 Because it says, "For now, these

Page 471

1 threshold increases are considered
2 reasonable."  So a 15 percent increase,
3 judging off of the list that was
4 submitted, Jake would have submitted it
5 and approved it and Tom McDonald in
6 regulatory would have reviewed it and
7 approved it.
8     Q.   Let's take a look -- let's
9 see what's going on.  Let's see what's
10 going on, sir.  Let's look at the next
11 page.
12        The next page is .2.  Do you
13 see that next page?  We got the
14 attachment here.  Do you see that?  It's
15 one CVS store, right?
16    A.   Yes, sir.
17    Q.   And they are looking for an
18 increase in oxycodone, correct?
19    A.   Yes.  They are currently set
20 at 11,000.  They've reached 10,934 doses.
21    Q.   So the answer is yes,
22 correct?
23    A.   Yes.
24    Q.   This page is kind of the

Page 472

1 daily report that tells you where you are
2 with respect to the threshold increases,
3 true?
4     A.   This report is -- I'm trying
5 to determine what -- what report this is.
6     Q.   Do you see down the end,
7 threshold percentage, do you see that,
8 threshold percentage?
9     A.   Where are you?
10    Q.   Threshold percentage, on
11 that report, page .2.
12    A.   Threshold percentage.  Yes,
13 I -- right.  It shows them what their
14 monthly threshold is, how much they
15 bought, the threshold that they are at
16 and then a new threshold.
17    Q.   So that increase, that's
18 getting approved on the same day that it
19 is made with the statement, "For now,
20 these threshold increases are considered
21 reasonable."
22    A.   2,000-dose increase on an
23 11,000 threshold.
24    Q.   And that CVS store was at

Page 473

1 99.4 percent of their threshold, right?
2     A.   Correct.
3     Q.   Now look at the next page.
4 We've got another threshold change
5 request, right?
6     A.   This one is January 20th.
7     Q.   Right.  Another one,
8 January 20 of '10.  And you've got the
9 same statement.  Another 15 percent
10 increase and that statement:  "For
11 now, these threshold increases are
12 considered reasonable."  Same statement,
13 correct?
14    A.   Yes.
15    Q.   Now, this is 1/20/10.
16 Right?
17    A.   Yes.
18    Q.   Now, if you look at what's
19 attached to that.  They said see list.
20 If we look at this list, on this one, you
21 can have 12 different threshold change
22 requests.  True?
23    A.   Yes.  There's 12.
24    Q.   And if you look down the

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1  list, every single one on the threshold
2  percentage down there at the end?
3      A.   Mm-hmm.
4      Q.   Every one of them is above
5  80 percent.
6      A.   Right.  This report would
7  only show those customers above
8  80 percent.
9      Q.   Right.  Exactly.  Exactly.
10  That's what they are getting.  They are
11  getting a report that says everybody is
12  above 80 percent.  And now we've got --
13  one second.  Now we've got 12 different
14  CVS requests.  Correct?  Correct?
15      A.   This -- this report is
16  showing 12 thresholds that they want
17  reviewed and the customers are on the
18  report because they are above 80 percent,
19  which is where the report would frame.
20      Q.   Absolutely, they are all
21  attached to one form that says hey, for
22  now these threshold increases are
23  considered reasonable.
24      And, sir, let me ask you

Page 475

1  this.  Look at the top one listed.  CVS
2  8944A.  Do you see that top one there?
3      MS. HENN:  What page are you
4  on, sir?
5      THE WITNESS:  He's on this
6  one.
7      MR. KENNEDY:  We're on .4.
8      MS. HENN:  .4?  Thank you.
9  BY MR. KENNEDY:
10      Q.   Do you see that?
11      A.   Yes.
12      Q.   Did they have a new group of
13  doctors move into the building of the
14  pharmacy?  Did they?
15      A.   I cannot tell from this
16  document.
17      Q.   Did they have a competitor
18  go out of business down the street?
19      A.   Again, I can't tell from
20  this document.
21      Q.   Only thing you can see, sir,
22  with respect to all 12 is the single
23  statement, "For now, these are considered
24  reasonable," that's all you can tell.

Page 476

1  True?  Is that true, sir?
2      A.   The fact that they were at
3  an 8,000 monthly threshold, which is our
4  base number, these stores were not
5  elevated to begin with.
6      Q.   Sir, am I -- is it true that
7  the only statement that you see in your
8  explanation here that would even justify
9  this, is "for now these are all
10  reasonable," isn't that what a statement
11  under explanation or reason for the
12  increase of all 12 stores, right?
13      MS. HENN:  Objection to
14  form.
15  BY MR. KENNEDY:
16      Q.   All 12.
17      MS. HENN:  Objection to
18  form.
19      THE WITNESS:  This is saying
20  that these threshold increases are
21  considered reasonable, looking at
22  each of them to go up the amount
23  that they did.
24  BY MR. KENNEDY:

Page 477

1      Q.   Look -- go down to the
2  fourth one.  Did they have a competitor
3  go out of business?
4      A.   The request for codeine with
5  oxide?
6      Q.   Yeah, codeine, that's a
7  serious drug.  Did they have a competitor
8  go out of business that's justifying this
9  increase?
10      A.   I cannot tell from the
11  paperwork that this is showing, no.
12      Q.   What we do know is that all
13  12 of these are above 80 percent of their
14  threshold, right, all 12?
15      A.   Correct.
16      Q.   Is that a coincidence?  Is
17  that a coincidence?
18      A.   No, because --
19      Q.   First group they are all
20  above --
21      MS. HENN:  Counsel, counsel.
22      THE WITNESS:  You're asking
23  me -- you're asking me a question.
24  I'd like to answer.

Page 478

1  BY MR. KENNEDY:
2      Q.   Very good.
3          Is that a coincidence, sir?
4      A.   No, it's not a coincidence,
5  but the report will only show customers
6  that are above 80 percent.  It's an
7  80 percent threshold warning report.
8      Q.   Exactly.  Somebody is asking
9  for it, right?  Somebody is asking for
10  the 80 percent report, right?
11         MS. HENN:  Objection to
12     form.
13  BY MR. KENNEDY:
14     Q.   And they are attaching it to
15  threshold change requests.  That's what's
16  going on, right?
17         MS. HENN:  Objection to
18     form.
19         THE WITNESS:  I don't know
20     if they are asking for it or this
21     report is what they used to
22     generate the request.
23         Again, this was, what, eight
24     years ago.  Our program was

Page 479

1      changed dramatically.
2  BY MR. KENNEDY:
3      Q.   I'm talking about what's
4  going on there now.  That's all I want to
5  know about, what's going on --
6      A.   Now?
7      Q.   -- then.
8      A.   Oh, okay.
9      Q.   That's what we're asking
10  about.
11         Go to the next one.  .5. .5,
12  4/16/09.  It says, "See list again."  Do
13  you see that?
14     A.   Yes.
15     Q.   It says down here again,
16  reason, "For now, these threshold
17  increases are considered reasonable."  Do
18  you see that?
19     A.   Mm-hmm.
20     Q.   And if we look at the form
21  attached.  Lo and behold, all, all of
22  these CVS stores are over 80 percent,
23  right?  86, 99, 88.  All of them are
24  over, right?  Is -- is that correct?

Page 480

1  They are all over 80 percent?
2      A.   Yes, but this -- this report
3  from 4/16 which is Item 5 is -- is not
4  even filled out.  It's --
5      Q.   It's supposed --
6      A.   There's no DCMs.  There's
7  no -- there's no sales.  There's no
8  regulatory persons --
9      Q.   It's supposed to be filled
10  out, isn't it?
11     A.   Well, I'm -- I'm not sure
12  why it wasn't.  I can only say what I'm
13  seeing and it's blank.
14     Q.   Let's go to the next page.
15     A.   Do these -- do these three
16  relate to this one?
17     Q.   Let's go to the next page.
18  .8.
19     A.   Same thing.  It's --
20     Q.   Sir, if they are all related
21  to the first one, then what you've got
22  going on here is someone is backdating
23  again, right?
24         MS. HENN:  Counsel,

Page 481

1      objection to form.
2          THE WITNESS:  I can't tell
3      from this document, sir.
4  BY MR. KENNEDY:
5      Q.   Go to the next page.
6      A.   I'm just saying that it's
7  not filled out with who approved it.  And
8  there's no regulatory name or date.
9      Q.   Let's go to the next page,
10  sir, .8.  Do you see the next page?
11     A.   Yeah.
12     Q.   Dated 4/17/09?
13     A.   Yes, sir.  That's the one
14  that I'm referring to.  It is -- there's
15  no --
16     Q.   It says, "See list," again,
17  right?
18     A.   Yes.
19     Q.   It says, "For now, these
20  thresholds considered reasonable,"
21  correct?
22     A.   Yes.
23     Q.   And attached to that, sir,
24  now you've got seven different CVS

Highly Confidential - Subject to Further Confidentiality Review

Page 482

1 pharmacies, correct? Is that correct?
2     A.   Yes.  Yes.
3     Q.   And every one of them is
4 over 80 percent in their threshold so far
5 that month, correct?
6     A.   Yes.  I can't even tell
7 who -- who approved this, because there's
8 no name on the regulatory side of who
9 approved it.  So I don't know if it was
10 Tom, Dave.
11     Q.   Sir, just -- please just
12 answer my questions.  All right?
13     A.   Well, the --
14     Q.   Just answer my questions --
15     A.   The document is so vague I
16 can't comment on it.
17     Q.   And it's your document,
18 isn't it --
19     A.   It's not mine personally.
20 Yes, it is McKesson's.
21     Q.   Is this the way things were
22 done at McKesson?  That you were
23 increasing thresholds without the
24 documents even being completed?

Page 483

1     A.   I was not aware of that --
2        MS. HENN:  Objection to
3     form.
4        THE WITNESS:  -- nor have I
5     done that.
6 BY MR. KENNEDY:
7     Q.   All right.  Let go to the
8 next one.  Page 11.
9     A.   Mm-hmm.
10     Q.   Do you see the next one?
11 4/14/09, do you see that?
12     A.   Yes.
13     Q.   4/14/09 says, "See list."
14 Right?
15     A.   Yes.
16     Q.   "For now, these thresholds
17 increases are considered reasonable,"
18 correct?
19     A.   Right.  This one has Tom
20 McDonald as the regulatory person on the
21 next page.
22     Q.   And now the attachment has
23 got three CVS pharmacies, true?
24     A.   Yes.

Page 484

1     Q.   And all of them, all of them
2 are over 80 percent of their thresholds,
3 correct?
4     A.   Yes, or they wouldn't be on
5 the report.
6     Q.   And go to the next one,
7 Page 14, sir.
8     A.   Yes.
9     Q.   Another threshold change
10 request dated 3/27/09, true?
11     A.   Yes.  And again, filled out
12 by Tom McDonald.
13     Q.   And it states -- right.  And
14 again states, "For now, these thresholds
15 increases are considered reasonable."  It
16 says that again, right?
17     A.   It does.
18     Q.   And now you've got them
19 attached to 31 different threshold change
20 requests, right, 31 different ones, true,
21 31?
22     A.   Without counting them it
23 looks about 31, yes.
24     Q.   All of them are above

Page 485

1 80 percent, right?
2     A.   Yes.  Again, there are on an
3 80 percent and above report.
4     Q.   And I can look down here and
5 I can -- I can pick the fourth one down.
6 CVS 884647.
7        Sir, tell me, what was their
8 new business that --
9     A.   Which fourth one down are
10 you at?
11     Q.   Go with -- just you pick
12 one.  Go ahead, pick one of the CVS
13 numbers.
14     A.   Well, the fourth one down is
15 7293.
16     Q.   Tell me, any new business
17 documenting a threshold change request
18 and increase to them, sir?
19     A.   I cannot tell from this
20 report because I didn't make this
21 adjustment.
22     Q.   Every single one on this
23 form, like every single one attached, was
24 a CVS store that was over 80 percent of

Page 486

1 their threshold for the month. True?
2    A.   Yes. They were over
3 80 percent.
4    Q.   And the same reason is
5 stated for every single one of them.
6 "For now, consider these reasonable."
7 Correct?
8    A.   That was the reason given on
9 the document. Yes.
10    Q.   Sir, what you had going on
11 here was a system whereby you preapproved
12 every single CVS pharmacy that got to
13 within 80 percent of their threshold
14 automatically without them even asking,
15 that's what the agreement with CVS was,
16 true?
17       MS. HENN: Objection to
18    form.
19       THE WITNESS: I'm not aware
20    of that agreement, that if they
21    reached 80 percent they would be
22    increased. I'm not aware of
23    that -- that...
24 BY MR. KENNEDY:

Page 487

1    Q.   So we just went through
2 probably 60 CVSs.
3    A.   Mm-hmm.
4    Q.   All of them appear in the
5 80 percent list.
6    A.   Mm-hmm.
7    Q.   All of them are getting a
8 15 percent increase for the same reason,
9 "For now, consider these reasonable."
10       And you're telling me there
11 was no special agreement with CVS to
12 automatically increase any single one of
13 their stores that hit the 80 percent
14 list?
15    A.   I'm not aware of any
16 agreement, no.
17    Q.   That would be inappropriate.
18 That would be contrary to everything you
19 agreed to do with respect to monitoring
20 the flow of opioids in our community,
21 would it not?
22       MS. HENN: Objection to
23    form.
24 BY MR. KENNEDY:

Page 488

1    Q.   Wouldn't that be contrary to
2 everything you folks agreed to, a
3 pre-agreement with CVS?
4       MS. HENN: Objection to
5    form.
6       THE WITNESS: The business
7    reason for these increases is what
8    would need to be known. Whether
9    or not the store had an increase
10    in business overall and,
11    therefore, they needed certain
12    base codes increased.
13 BY MR. KENNEDY:
14    Q.   What is the business reason?
15    A.   There's no reason --
16       MS. HENN: Counsel.
17       THE WITNESS: There is no
18    reason here.
19 BY MR. KENNEDY:
20    Q.   There is no reason, is
21 there?
22    A.   There's no business reason
23 explained in this document, so.
24    Q.   And every one of those

Page 489

1 increases happened the same day the
2 request was made, true, every one we
3 looked at?
4    A.   Our program --
5       MS. HENN: Objection to
6    form.
7 BY MR. KENNEDY:
8    Q.   Every one we looked at?
9    A.   Our program, when a request
10 would come in, we would look at the
11 customers, go in through the McKesson
12 system, and review their purchases. It
13 doesn't take long to review the
14 customers' purchases. Their history of
15 what it is they are buying, looking at
16 any omits. And so to make a threshold
17 change within the same day is not out of
18 the ordinary during our review.
19       MR. KENNEDY: What -- give
20    me 5037, please.
21       MS. ROZMAN: MCK Oriente
22    564.
23       (Document marked for
24    identification as Exhibit

Page 490

1    MCK-Oriente-564.)
2  BY MR. KENNEDY:
3    Q.   Sir, this exhibit is -- this
4  is an e-mail from Tom McDonald dated May
5  31, 2011.  Do you see that?
6    A.   Yes.
7    Q.   And it's to a whole group of
8  McKesson people.  Do you recognize any of
9  those people?
10    A.   Let me -- just give me a
11  minute to read this.  I recognize some as
12  DC, distribution center managers or
13  directors --
14    Q.   Does it state there --
15    A.   -- of operations.
16    Q.   I'm sorry.  The subject is
17  state high percentage threshold
18  customers?
19    A.   Yeah, high percentage to
20  threshold customers.  So at the end of
21  the month, these -- these people are
22  approaching their threshold.
23    Q.   And does he --
24    A.   Can I have a minute to read

Page 491

1  this?
2    MS. HENN:  Yes, you may.
3  BY MR. KENNEDY:
4    Q.   Well, I'm going to read it
5  through with you.  We're going to read
6  every single word.  We can do that
7  together or you can read it and then
8  we'll read it together.  But I'm going to
9  read every word of it.  All right.
10    A.   Sure, go ahead.
11    Q.   Does it state West -- so
12  he's probably talking to his whole
13  region.  "I generally do not run the
14  threshold warning report on the last day
15  of the month.  However, I believe there
16  is a use for this practice.  Attached is
17  the report at 90 percent and greater ran
18  this morning.  I suggest you review this
19  document.  We originally set up
20  thresholds in 2008 based upon an existing
21  customer's 12-month usage number on a
22  particular base code.  We then took the
23  highest month of that year and added
24  10 percent to establish a threshold base.

Page 492

1  This 10 percent buffer allowed for
2  unusual (sic) fluctuations from month to
3  month.  That being said, we will need to
4  make periodic adjustments to accounts as
5  they grow their business.  Customers at
6  or near 100 percent on the last day of
7  that month should be reviewed and a
8  determination should be made to adjust up
9  10 percent if required."
10    Do you see that?
11    A.   Yes.
12    Q.   Now, you're supposed to
13  be --
14    MS. HENN:  Counsel, there is
15    one correction.  I think there was
16    a -- you said "unusual" when the
17    word was "usual."
18    MR. KENNEDY:  All right.
19    MS. HENN:  It says,
20    "10 percent buffer used for usual
21    corrections from month to month."
22    Slight correction.
23  BY MR. KENNEDY:
24    Q.   Is he talking about making

Page 493

1  10 percent adjustment up on any customer
2  that gets to 90 percent of their
3  threshold, sir?
4    A.   Okay.  You're asking me
5  to --
6    Q.   Let's read that last
7  statement.  "Customers at" --
8    A.   -- determine what -- you
9  asked me a question, sir.
10    Q.   Let me read it back to you
11  and then I'll ask you again, sir.
12    "Customers at or near
13  100 percent of the last day of the month
14  should be reviewed and a determination
15  should be made to adjust up by 10 percent
16  if required?"
17    My question to you is, sir:
18  Does this sound like an approach, does
19  this sound like an atmosphere or a
20  culture where you folks at regulatory are
21  monitoring a program to limit the amount
22  of opioids going into our communities or
23  you are trying to sell more opioids.
24  What does that sound like to you?

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1    MS. HENN:  Objection to
2  form.
3    THE WITNESS:  What you're
4  asking me to -- my opinion here on
5  Tom's comments is review these
6  customers, determine if their
7  business is growing.  If so,
8  submit those for regulatory
9  review.  It doesn't mean they are
10  going to get it.
11    It's not -- it's not a
12  rubber stamp that they would be
13  approved.  It's, they can review
14  these customers and determine,
15  because thresholds are stagnant,
16  or they were stagnant.  They were
17  locked in.  And if a business is
18  increasing, they are going to hit
19  that threshold or be, as Tom puts
20  here, near 100 percent.  And so
21  being proactive to do a review is
22  what Tom is saying.
23  BY MR. KENNEDY:
24    Q.  He's talking about making

Page 495

1  threshold requests without the customers
2  even asking.  He's saying look at -- look
3  at the reports.  If they are within
4  90 percent, maybe we don't even call
5  them.
6    A.  No, you're assuming that.
7    Q.  Let's -- I want to put this
8  in context, why we keep talking about
9  these thresholds.
10    If you keep raising
11  thresholds you're going to sell more
12  opioids, right?  That's -- that's real
13  clear.  You keep raising thresholds,
14  you're selling more opioids, true?
15    A.  A higher threshold would
16  permit more opioids to be sold, yes.
17    Q.  And if you keep raising
18  thresholds, pharmacies aren't going to
19  exceed their thresholds, correct?
20    A.  Not necessarily.  They could
21  still try to exceed them if they are
22  growing at a faster pace than what our
23  increase was.
24    Q.  But you're going to make

Page 496

1  that probability really small.  You keep
2  increasing those thresholds.  Then
3  pharmacies don't exceed their thresholds.
4  And then pharmacies don't have a Level 1
5  review and investigation triggered,
6  correct?
7    MS. HENN:  Objection to
8  form.
9  BY MR. KENNEDY:
10    Q.  Because they only trigger an
11  investigation if they exceed their
12  thresholds, true?
13    MS. HENN:  Objection to
14  form.
15  BY MR. KENNEDY:
16    Q.  Is that true, sir?
17    A.  In -- back in that time
18  frame, they would need to have an omit in
19  order to go to a Level 1 review.
20    Q.  Which probably explains why
21  everything we talked about this morning,
22  you folks not reporting suspicious
23  orders.  Because if you keep raising
24  thresholds, then people don't exceed

Page 497

1  their thresholds.  And if they don't
2  exceed their thresholds, they don't get
3  investigated.  If they don't get
4  investigated, there is no suspicious
5  orders, and if there's no suspicious
6  orders, then you're not reporting
7  anything to the FDA, sir.  And then
8  opioids are pouring into our community,
9  sir.  That's right, isn't it?  What I
10  just said is right?
11    MS. HENN:  Objection to
12  form.
13    THE WITNESS:  No.  You said
14  FDA, sir.
15  BY MR. KENNEDY:
16    Q.  Excuse me.
17    A.  DEA.
18    Q.  Other than FDA or DEA, what
19  I just said is right.
20    MS. HENN:  Objection to
21  form.
22    THE WITNESS:  The process
23  that you explained, if -- if it
24  took place in that manner would be

Page 498

1  correct.
2  BY MR. KENNEDY:
3      Q.   And, sir --
4      A.   As all the documents that
5  you've shown me here, and that process, I
6  would just like to say that those were
7  not in the responsibility of the area
8  that I worked.  These are in the West,
9  and in the North Central.  So, you know,
10  you're -- you're asking me just on
11  processes that I did not do in my region.
12      Q.   With these threshold
13  requests, sir, McKesson did everything
14  they could possibly do with sales right
15  in the middle of it to increase the
16  thresholds so there would be no
17  investigations, so there would be no
18  suspicious orders, so there's nothing
19  getting reported to the DEA and opioids,
20  narcotics are pouring into our community,
21  sir, correct?
22          MS. HENN:  Objection to
23      form.
24          THE WITNESS:  No, I would

Page 499

1  find that not to be correct, sir.
2          MR. KENNEDY:  Give me 5043
3      please.
4          MS. ROZMAN:  Which is MCK
5      Oriente 570.
6          (Document marked for
7      identification as Exhibit
8      MCK-Oriente-570.)
9  BY MR. KENNEDY:
10      Q.   Sir, this is a -- this is a
11  letter from the United States Department
12  of -- Department of Justice dated
13  August 13, 2014.  Correct?
14      A.   Yes.
15      Q.   And it is sent to attorneys
16  representing McKesson.  Is that what it
17  indicates?  Covington & Burling LLP in
18  Washington D.C.  Do you see that?
19      A.   Yes.
20      Q.   And this relation -- in all
21  fairness, it relates to the Aurora
22  distribution center.  Do you see that?
23      A.   Where does it say Aurora?
24      Q.   First paragraph.

Page 500

1      A.   Oh yes.  Yes.
2      Q.   Have you ever seen this
3  before?
4      A.   I don't recall seeing this
5  exact document.  I do know that the
6  Aurora DC I believe had to show cause.
7      Q.   All right.  Go to page 12,
8  if you would.  Do you see that top
9  paragraph.  You see the top paragraph on
10  Page 12?
11      A.   Yes, sir.
12      Q.   This is the Department of
13  Justice, writing, writing to McKesson's
14  lawyers, all right?
15      A.   Yes, sir.
16      Q.   They say, "Second, McKesson
17  Aurora routinely manipulated thresholds.
18  It would often preemptively increase
19  thresholds of its customers on particular
20  drugs before the customers even submitted
21  a threshold change request seeking a
22  threshold increase."  Do you see that?
23      A.   I see that written here,
24  yes.

Page 501

1      Q.   That's what we've been
2  talking about, right?  In all parts of
3  the country, that's what we've just been
4  talking about for the last two hours,
5  right?
6      A.   When -- when you said all
7  different parts of the country, sir.  Not
8  in my part of the country.
9      Q.   Let's go down, sir.  "Time
10  and time again, McKesson Aurora increased
11  a customer's threshold in a particular
12  month so that customer did not exceed
13  that threshold and thus trigger McKesson
14  Aurora's obligation to conduct a Level 2
15  or 3 review."  Do you see that?
16      A.   I do see that written here,
17  yes.
18      Q.   And that's exactly what
19  we've been talking about the last couple
20  hours, right?
21          MS. HENN:  Objection to
22      form.
23          THE WITNESS:  That is what
24      you've pointed out.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 502

BY MR. KENNEDY:

Q.   And the third it says, "McKesson Aurora was often willing to increase a pharmacy's threshold for the flimsiest of reasons and without adequate investigation." Do you see that, sir?

A.   Yes.

Q.   Things like Thanksgiving, right, things like end-of-the-year increase, right, sir, things like because we consider this reasonable or things like Mr. Catton from sales says this is reasonable. Flimsy, flimsy reasons.

MS. HENN:  Objection to form. And I'd just like to note to the people on the phone, there's somebody without their mute button on, and if everyone could just make sure you are on mute, we would appreciate it.

BY MR. KENNEDY:

Q.   You see, sir, that's what we've been talking about, right? That's what we've been talking about.

Page 503

A.   Yes. Some -- some of the reasons that you pointed out were not as strong as they could have been.

Q.   Well, their reasoning -- I'm sorry --

MS. HENN:  Counsel. I just want to make sure he has a chance to finish.

MR. KENNEDY:  Go ahead. I'm so sorry.

BY MR. KENNEDY:

Q.   Go ahead, sir.

A.   That the reasons were not as strong as they could have been. Again, the request could come from sales who has spoken with the customer and they are conveying the message. It didn't come from the customer to regulatory. It went through sales. That was the -- that was the program.

Q.   So let me ask you. Let's talk about these Level 1 reviews real quick. Level 1 reviews. That is the first step in identifying, recognizing a

Page 504

suspicious order. The Level 1 review. True?

A.   The Level 1 was initiated when a customer would have an omit. It doesn't mean it's necessarily suspicious.

Q.   Now we're going to -- we're going to -- I'm -- I'm -- we're going to go back because we need to -- we need to kind of follow the protocol rules.

A.   Mm-hmm.

Q.   You listen very careful to my question. My question is real simple.

Level 1 reviews. That was the first step in the investigation as to whether or not an order was suspicious. Correct?

MS. HENN:  Objection to form. You can answer.

BY MR. KENNEDY:

Q.   That's the first step. It gets triggered --

A.   Yes, when an omit occurs -- yes.

Q.   -- when a customer orders

Page 505

over the threshold, right?

A.   Yes.

Q.   But if you keep raising thresholds, nobody ever orders over the threshold. We've been through that, correct?

A.   Correct.

MS. HENN:  Objection to form.

BY MR. KENNEDY:

Q.   But Level 1 is the first level investigation to determine whether or not the order is suspicious, true?

A.   Yes.

MR. KENNEDY:  Now, give me 5036.

BY MR. KENNEDY:

Q.   I'm going to look at what McKesson agreed to in the DEA 2008 settlement agreement with respect to reviewing customers that ordered over their threshold. All right?

MS. ROZMAN:  That's MCK Oriente 563.

Highly Confidential – Subject to Further Confidentiality Review

Page 506

1    (Document marked for
2    identification as Exhibit
3    MCK-Oriente-563.)
4        MS. HENN:  And we will need
5    a break relatively soon if there
6    is a good spot to stop.
7  BY MR. KENNEDY:
8        Q.   Do you see that, Page 1?
9        A.   Mm-hmm.
10       Q.   This is the settlement
11  agreement between the Department of
12  Justice and the DEA and McKesson.  True?
13       A.   Yes.  Yes.
14       Q.   All right.  And this says,
15  "This agreement is applicable to all of
16  McKesson's distribution centers," right,
17  when it says, "DEA registered
18  facilities."  True?
19       A.   Yes.
20       Q.   If you go to Page .3.  See
21  where it says terms and conditions?
22       A.   Yes, sir.
23       Q.   And it says obligations of
24  McKesson?

Page 507

1        A.   Yes.
2        Q.   And this is what McKesson
3  agreed to with the United States
4  government, right?
5        A.   Yes.
6        Q.   And this is after the
7  payment of a $13 million fine, true?
8        A.   Yes.
9        Q.   And it states under McKesson
10  obligations, "A, McKesson agrees to
11  maintain a compliance program designed to
12  detect and prevent diversion of
13  controlled substances as required under
14  the CSA and applicable DEA regulations.
15       "This program shall include
16  procedures to review orders for
17  controlled substances."
18       This is the important part:
19  "Orders that exceed established
20  thresholds and criteria will be reviewed
21  by a McKesson employee trained to detect
22  suspicious orders for the purposes of
23  determining whether, I, such orders
24  should not be filled and reported to the

Page 508

1  DEA, or II, based upon a detailed review,
2  the order is for a legitimate purpose and
3  the controlled substances are not likely
4  to be diverted into other than legitimate
5  medical, scientific or industrial
6  channels."
7        Do you see that?
8        A.   Yes.
9        Q.   So you're agreeing that if a
10  customer orders over their threshold that
11  we've been talking about, McKesson is
12  going to have somebody in place, it was
13  your Level 1, that's the start, you're
14  going to have somebody in place that's
15  been trained, that has been trained to
16  detect suspicious orders for the purposes
17  of determining whether such orders are
18  legitimate, whether they are being
19  diverted into -- or not being diverted
20  and only being used for legitimate
21  scientific, medical, and industrial
22  channels.  That's what you agreed to.
23       MS. HENN:  Objection to
24  form.

Page 509

1  BY MR. KENNEDY:
2        Q.   Correct?
3        A.   That -- that is what
4  McKesson agreed to, yes.
5        Q.   Now, sir, McKesson, the
6  program that you set up, would I be
7  correct that you got a customer, let's
8  say OxyContin, let's say OxyContin,
9  they've reached their threshold.  And
10  that's a dangerous drug, right?
11  OxyContin is a dangerous drug.  It's in
12  the middle of this crisis, correct?
13       A.   If it's not used in it -- as
14  prescribed, yes, it's a dangerous drug.
15       Q.   So I've got a customer and
16  they order over their threshold for
17  OxyContin.  That triggers a Level 1
18  review.
19       McKesson had salespeople.
20  You had salespeople doing your Level 1
21  reviews.  Salespeople, sir.
22       A.   I'm not aware of salespeople
23  doing Level 1 reviews.
24       MS. HENN:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1  form.
2  BY MR. KENNEDY:
3      Q.   Sir --
4      A.   Customer service -- again,
5  sir, I can only speak for my region and I
6  know in my distribution centers --
7          MR. KENNEDY:  5030 please.
8          MS. HENN:  Are you done with
9      your answer?
10         THE WITNESS:  No.
11         In my region, sir, customer
12     service people at the distribution
13     center would make calls to the
14     customer and go through that list,
15     one, Level 1 excuse me, Level 1
16     review.
17         MS. ROZMAN:  This is MCK
18     Oriente 559.
19         (Document marked for
20     identification as Exhibit
21     MCK-Oriente-559.)
22 BY MR. KENNEDY:
23     Q.   Sir, what we're showing you
24 here is Exhibit 559, that's a Level 1

Page 511

1  documentation form.  Is it not?
2      A.   Observation Level 1
3  documentation form.  Yes.  Out of the
4  Denver distribution center.  Again, not
5  in my area for me to know about.
6      Q.   This form is used across the
7  country -- this form is used across the
8  country, is it not?  This is a standard
9  form used across the country?
10     A.   Yes, sir.
11     Q.   We see here on a Level 1
12 investigation dated 5/25/08.  Do you see
13 that?
14     A.   Mm-hmm, yes, sir.
15     Q.   For Carl's Pharmacy, which
16 means they breached their threshold
17 because we are at a Level 1.  And Dave
18 Grushey, an account manager, did the
19 investigation?
20     A.   In this case, yes, he did do
21 it.  Again, sir, this is not in my area.
22     Q.   He is a part of sales,
23 right?
24     A.   He's an account manager,

Page 512

1  yes.
2      Q.   Sales.  Let's look at the
3  second page.
4      A.   I can only comment on what I
5  know and in my area that I know.  Sales
6  do not do Level 1s.
7      Q.   Let's look at the second
8  page.  We'll go quick.  Second page.
9  8/20/08.  Got another sales manager doing
10 a Level 1 investigation, correct, another
11 sales manager doing another
12 investigation.  Correct?
13     A.   Yes.  This was at the Denver
14 DC.  Again, it looks like they were using
15 account managers to assist with Level 1s.
16     Q.   Let's go to the next page.
17 11/25/09.  Kealey Pharmacy.  Matt Lange,
18 regional sales manager.  He is doing the
19 investigation, right?
20     A.   Yeah, 8144.  I'm not sure of
21 which distribution center that is, but
22 it's not one of mine again, sir.
23     Q.   Next page.
24     A.   Next one.  Retail sales

Page 513

1  manager Washington Courthouse.  That
2  would be a Dave Gustin.
3      Q.   And that's February 24th,
4  right?  That's in the Midwest, right?
5      A.   North Central, sir.
6      Q.   North Central.
7          Next page.  .5.  2/19/10.
8  We've got another regional sales manager
9  doing a Level 1 investigation to look for
10 suspicious order, right?  Is that right?
11     A.   Doing the -- doing the
12 Level 1 to find out from the customer why
13 they omitted.
14     Q.   All right.  Now we've got
15 a --
16     A.   And that was, again, Dave
17 Gustin's North Central Chicago DC.
18     Q.   Go to the next page, .6.
19 We've got another sales manager on 12/29,
20 correct?
21     A.   Yes.  Again, the North
22 Central DC.
23     Q.   Now we go to the next page.
24 We've got another sales manager, right,

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1  on 6/30/09, right?
2      A.  Yes.  On this one the DC is
3  listed as 1844, but I believe they mean
4  8144.
5      Q.  Where is that?
6      A.  8144 is North Central.  Dave
7  Gustin's area again.
8      Q.  Next one we got 1/14/10.
9  Another regional sales manager doing a
10  Level 1 investigation.  Is that right,
11  sir?
12          MS. HENN:  Objection to
13      form.
14          THE WITNESS:  It is correct.
15      Again, not in my area of
16      responsibility of the Northeast,
17      sir.
18  BY MR. KENNEDY:
19      Q.  Sir, sir, can we agree here
20  and have an understanding that sales
21  folks, sales folks at McKesson, they have
22  a financial interest in the outcome of a
23  Level 1 investigation, true?
24      A.  They are obtaining the

Page 515

1  information here on a Level 1.  It would
2  go to a Level 2 and 3 that the regulatory
3  director would be responsible for.
4      Q.  Can you answer my question?
5      A.  Yeah.
6      Q.  My question is real simple.
7      A.  Okay.
8      Q.  A salesperson at McKesson
9  has a financial interest in the outcome
10  of a Level 1 investigation of one of your
11  customers.  Is that true, sir?
12      A.  They could because of the
13  compensation package which again I'm not
14  totally familiar with because I'm not in
15  sales.
16      Q.  Well, let me -- just -- it's
17  more than that.  Number one, your
18  salespeople got a bonus for retention of
19  customers, correct?  If they could retain
20  all the customers in their region for a
21  one-year period, they got a
22  thousand-dollar bonus, did they not, sir?
23          MS. HENN:  Objection to
24      form.

Page 516

1          THE WITNESS:  I'm not -- I'm
2      not familiar with the sales
3      retention policies.  I'm not in
4      sales, sir.  I don't get involved
5      with that.
6  BY MR. KENNEDY:
7      Q.  Sales is all through your
8  program.  Sales is at every single aspect
9  of this controlled substances monitoring
10  program.  They are calling the customers
11  to ask them if they want to increase
12  their thresholds.  They are doing Level 1
13  reviews, sir.  They are providing the
14  information for the onboarding, the
15  beginning of the process, as to whether
16  or not you are going to sell these folks
17  opioids, and you don't know their
18  compensation package?
19          MS. HENN:  Objection to
20      form.
21          THE WITNESS:  No, sir, I
22      don't know their compensation
23      package.
24  BY MR. KENNEDY:

Page 517

1      Q.  Are you disagreeing with me
2  when I tell you that they got paid a
3  bonus if they could retain all of the
4  customers each year?
5          MS. HENN:  Objection to
6      form.
7          THE WITNESS:  I'm not
8      disagreeing with you.  I'm saying
9      I am not aware of it.  It has
10      no --
11          MR. KENNEDY:  5035, please.
12          THE WITNESS:  It has no
13      determination on my decision when
14      I made them working on my
15      customers in the Northeast in
16      regulatory.
17          MS. HENN:  Counsel, is this
18      a good time for a break?  We've
19      been going about an hour and
20      20 minutes.
21          I'm going to just ask for a
22      break.  Thank you.
23          MR. KENNEDY:  Yeah, that's
24      fine.

Page 518

1 THE VIDEOGRAPHER: Stand by
2 please. Remove your microphones.
3 The time is 5:40 p.m. Off the
4 record.
5 (Short break.)
6 THE VIDEOGRAPHER: We are
7 back on the record. The time is
8 4:56 p.m.
9 BY MR. KENNEDY:
10 Q. All right, Mr. Oriente. We
11 just asked to take a look at 5035 if we
12 could.
13 MS. ROZMAN: Which is MCK
14 Oriente 562.
15 (Document marked for
16 identification as Exhibit
17 MCK-Oriente-562.)
18 MS. HENN: 562 you said?
19 MS. ROZMAN: Yeah. Here --
20 MS. HENN: Oh, this is new?
21 MS. ROZMAN: Yeah.
22 THE WITNESS: Thank you.
23 BY MR. KENNEDY:
24 Q. And you had indicated that

Page 519

1 you didn't really know and understand how
2 the salespeople were compensated at
3 McKesson, is that right?
4 A. That is correct. I didn't
5 get involved with compensation plans for
6 sales.
7 Q. Here is a memo to U.S.
8 pharmaceutical retail sales team. Do you
9 see that?
10 A. Yes.
11 Q. Dated April 1, 2010?
12 A. Yes.
13 Q. Talking about the
14 compensation plan. Do you see that?
15 A. Yes.
16 Q. And does it state, it's
17 highlighted, "Win new business. We
18 continue to emphasize on new accounts and
19 have raised the commission factor to
20 enrich the payouts."
21 A. Yes, on new accounts.
22 Q. Next bullet. "Prove our
23 value everyday and maintain 100 percent
24 customer retention." Do you see that?

Page 520

1 A. Yes.
2 Q. "The more customers you have
3 enrolled in the programs and maintained
4 participation within your territory, the
5 more commission dollars you earn." Do
6 you see that?
7 A. Yes.
8 Q. Finally it says, "We ask the
9 retail compensation council to guide the
10 development of a compensation plan that
11 rewards you for sales results, and I'm
12 pleased to announce that we've increased
13 the total annualized target payout." Do
14 you see that?
15 A. Yes.
16 Q. And can we agree, sir, that
17 if you tell a customer that one of their
18 orders is suspicious and you refused to
19 ship them controlled substances, and you
20 report them to the DEA, that you're not
21 going to maintain a good sales
22 relationship with that customer?
23 MS. HENN: Objection to
24 form.

Page 521

1 BY MR. KENNEDY:
2 Q. Would that be true?
3 A. That is correct. And I
4 truly did not, in my region, have a good
5 relationship with our salespeople because
6 we had basically conflicting goals. They
7 were interested in sales and I was
8 interested in regulatory. So, you know,
9 there were salespeople that didn't like
10 my decisions, but they had to live with
11 them because I had the final say.
12 MR. KENNEDY: Can you read
13 back the question.
14 BY MR. KENNEDY:
15 Q. I want you to listen to the
16 question and I want you to try to answer
17 my question as opposed to giving speeches
18 about what you want to talk about. Is
19 that agreeable?
20 MS. HENN: Counsel.
21 BY MR. KENNEDY:
22 Q. So I'm going to read back
23 the question and you try to answer it
24 again.

Page 522

1    MR. KENNEDY:  Go ahead,
2  please.
3        (Whereupon, the court
4     reporter read back the requested
5     portion of testimony.)
6  BY MR. KENNEDY:
7     Q.   Do you agree with that
8  statement, sir?
9     A.   Yes.
10    Q.   Go back for a second.  I
11 want to still talk about these Level 1
12 reviews if we could.
13       MR. KENNEDY:  Go back to
14 5036.  I want to --
15       MS. HENN:  5036?
16       MR. KENNEDY:  Yes, 5036
17    which is Exhibit 563.
18 BY MR. KENNEDY:
19    Q.   This is the agreement that
20 you made with the FDA.  Again, I think
21 it's Page 12.
22       MS. HENN:  DEA, counsel.
23 BY MR. KENNEDY:
24    Q.   Yeah.  This is the agreement

Page 523

1  with the DEA in 2008.  And we're back to
2  the obligations.
3        It's right up on the board
4  if...
5        MS. HENN:  Do you have the
6     document?
7        THE WITNESS:  Yeah, but
8     it's page -- 563 --
9        MR. KENNEDY:  I'm sorry,
10    Page 3.
11       THE WITNESS:  -- only has 11
12    pages, so it can't be on Page 12.
13       MS. HENN:  Page 3.
14       THE WITNESS:  Okay.  Thank
15    you.
16 BY MR. KENNEDY:
17    Q.   Page 3.
18    A.   Okay.
19    Q.   This is the agreement again.
20 This is your -- McKesson's agreement with
21 the DEA in 2008 after paying the
22 $13 million fine.  This is what they
23 agreed with respect to reviewing folks
24 that went over the thresholds.

Page 524

1        The red line, orders that
2  exceed thresholds, it says, "Establish
3  thresholds and criteria, will be reviewed
4  by a McKesson trained to detect
5  suspicious orders for the purposes of
6  determining whether, I, such orders
7  should be not filled and reported to the
8  DEA, or II, based upon a detailed review
9  the order is for a legitimate purpose and
10 the controlled substances are not likely
11 to be diverted into other than legitimate
12 scientific or industrial channels."
13       Now, from what you've told
14 me, and from what the CEO from your
15 company told Congress, you took this
16 seriously, right, this is important.
17 You're reviewing folks that have gotten
18 above their threshold or ordered above
19 their threshold, correct?
20    A.   They ordered above, but did
21 not receive above their threshold, yes.
22    Q.   And Level 1 reviews,
23 according to your protocol, sir, they
24 were being done by warehouse managers,

Page 525

1  were they not?
2        MS. HENN:  Objection to
3     form.
4  BY MR. KENNEDY:
5     Q.   Inventory managers, were
6  they not?
7     A.   Not in my region.  They were
8  done by customer service people in the
9  office.
10       MR. KENNEDY:  Need 5044
11    please.
12 BY MR. KENNEDY:
13    Q.   Customer service folks?
14    A.   Yeah.
15    Q.   Those are salespeople you
16 told us?
17    A.   Not necessarily.  In the
18 distribution center they have nothing to
19 do with sales.  They are customer
20 service.  They handle delivery issues.
21 They handle customer concerns.  But they
22 are not in the sales department.
23    Q.   Let's look at Exhibit 571.
24       MS. ROZMAN:  It's identified

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    as MCK Oriente 571.
2        (Document marked for
3    identification as Exhibit
4    MCK-Oriente-571.)
5  BY MR. KENNEDY:
6        Q.   So I want to ask you, we
7  want to look at how serious you were
8  taking these Level 1 reviews.  The first
9  step in identifying suspicious orders.
10  Do you see this, this is Exhibit 571.
11  CSMP, controlled substances monitoring
12  program observation Level 1 documentation
13  form.  Do you see that?
14        A.   Yes, sir.
15        Q.   And this Level 1 review on
16  3/20/09 was done by the inventory
17  manager, is that right?
18        A.   Yes, this one was done by a
19  DC inventory manager out of the West
20  region.
21        Q.   And it was for oxycodone.
22  That drug is in the middle of this
23  crisis, is it not, sir?
24        A.   Oxycodone is one of the

Page 527

1  drugs in this crisis, yes.
2        Q.   Not just one of them, sir.
3  It's in the middle of the crisis.  Right?
4        A.   Well, I mean it -- I can't
5  say that oxycodone was any worse than
6  hydrocodone.  They were -- You know, it
7  depends on the area of the country.
8        Q.   Let's look at .2.  Second
9  page.
10        We got another Level 1
11  investigation of a customer that has
12  exceeded their threshold on 3/31/10.  Now
13  you've got a warehouse manager doing the
14  investigation for oxycodone.  Is that
15  true, sir?
16        A.   According to this document
17  it is, sir.
18        Q.   Let's --
19        A.   Again, you are asking me
20  about a document I've never seen and
21  about a region I'm not responsible for.
22        Q.   It was the culture at this
23  company, sir, it was the culture at this
24  company that you did not take monitoring

Page 528

1  seriously.
2        MS. HENN:  Objection to
3  form.
4        THE WITNESS:  I would
5  disagree with that.  Because in
6  the area that I was responsible
7  for, in the Northeast region, sir,
8  these actions did not take place
9  by warehouse managers.
10        So again, this is all in the
11  West that I had no responsibility
12  for, sir.
13  BY MR. KENNEDY:
14        Q.   We're not going to go
15  through them all, sir.  But time and time
16  again, we've got warehouse managers doing
17  Level 1 investigations of your customers,
18  sir.
19        And who did you say was
20  doing it in your place?
21        A.   Customer service reps.
22        Q.   Customer service reps.  So
23  we got inventory managers doing Level 1
24  investigations, warehouse managers, and

Page 529

1  in your area you've got customer service
2  folks, is that right?
3        A.   Yes, sir.  Now.
4        Q.   And --
5        A.   Go ahead.
6        Q.   That's who is doing it where
7  you are?
8        A.   Yes, but what I wanted to
9  say was warehouse managers and DC
10  inventory managers are not in sales, sir.
11        Q.   Oh, I know, sir.  That I
12  know.  So we've got salespeople doing it,
13  inventory guys doing it, warehouse folks
14  doing it, and your folks were called
15  what?
16        A.   Customer service.
17        Q.   Customer service.  Are those
18  folks even full-time employees?
19        A.   Yes, sir.
20        Q.   Let's change -- let me --
21  let me ask you how serious these
22  investigations were at McKesson.
23        MR. KENNEDY:  Give me 5039.
24        MS. ROZMAN:  Identified as

Page 530

1  MCK Oriente 566.
2       (Document marked for
3  identification as Exhibit
4  MCK-Oriente-566.)
5  BY MR. KENNEDY:
6    Q.   This is an e-mail from Jake
7  Kramer. Who is Jake Kramer?
8    A.   Jake Kramer was the
9  distribution manager in Denver
10 distribution center.
11   Q.   He's sending an e-mail on
12 February 28, 2012 to Robert Perrich,
13 true?
14   A.   Yes. I don't know what
15 position Robert Perrich held or holds.
16   Q.   And its subject is, it says
17 omit report. That would mean this --
18 this customer ordered over their
19 threshold, right?
20   A.   The CSMP omit V report, yes,
21 would be for customers that ordered above
22 their threshold.
23   Q.   Now, we are over the
24 threshold with a customer. We've

Page 531

1  triggered a Level 1 review, correct?
2    A.   It should have, yes.
3    Q.   And what does he say here?
4  So now you've got somebody over their
5  threshold. We need to investigate. This
6  could be a suspicious order. And he says
7  here, "Can you call prescription shop and
8  see if they need an adjustment?"
9       That's an increase in the
10 threshold, right? Is that what that is?
11   A.   He's calling them to see if
12 they need an adjustment and what is --
13 what is the reason, if it's a Level 1,
14 what is the reason for the omit.
15   Q.   And when he says, he says,
16 he's not talking about investigation.
17 His response to an order over the
18 threshold is to have somebody else call
19 the pharmacy and say hey, do you need us
20 to raise your threshold. It sounds like
21 a sales call, not a program that's been
22 put into place to monitor and control the
23 opioids going into our communities,
24 right? Isn't that what it sounds like to

Page 532

1  you?
2       MS. HENN: Objection to
3  form.
4       THE WITNESS: No, it doesn't
5  because you're not following
6  through on the rest of the review.
7  So a Level 1 is to gather the
8  reason why the customer omitted.
9  And in this case they are asking
10 him if he needs an adjustment.
11 The customer may say he needs an
12 adjustment. Regulatory would then
13 review that and not necessarily
14 make the increase based off of the
15 review.
16       MR. KENNEDY: Let's go to
17 5042.
18       MS. ROZMAN: MCK Oriente
19 569.
20       (Document marked for
21 identification as Exhibit
22 MCK-Oriente-569.)
23 BY MR. KENNEDY:
24   Q.   Sir, this is an e-mail from

Page 533

1  Jake Kramer. And Jake Kramer again is
2  who?
3    A.   Jake Kramer was the
4  distribution center manager in the Denver
5  distribution center.
6    Q.   This is August 19, 2010. Do
7  you see that?
8    A.   Yes.
9    Q.   To John Schultz, right? Do
10 you know who John Schultz is?
11   A.   I don't.
12   Q.   What about cc'd to
13 Saltzgaber?
14   A.   I don't know Kirk either.
15   Q.   And it says subject sales
16 ride-along Southern Colorado. Right?
17   A.   Yes.
18   Q.   And he says, "John, below is
19 a list of must-see accounts." So those
20 would probably be pharmacies, correct?
21   A.   Yes.
22   Q.   "Their monthly thresholds
23 are at a level. I would like to visit
24 them again and see the business for

Page 534

1 myself. They have, quote, 'absolutely
2 nothing to worry about.' But part of the
3 CSMP, our monitoring program, requires
4 that I visit accounts over a certain
5 threshold."
6      So these folks are at a
7 Level 1 and he's assuring everybody, he's
8 going to visit them, but they've got
9 absolutely nothing to worry about. I
10 just need to do it because that's what
11 our monitoring program says. Is that
12 what's going on here?
13      A.   It doesn't --
14      MS. HENN:  Objection to
15 form.
16      THE WITNESS:  It doesn't say
17 Level 1. It says their monthly
18 thresholds are at a level, I would
19 like to visit them. There is no
20 mention here of Level 1.
21 BY MR. KENNEDY:
22      Q.   Do you think this is an
23 appropriate response and message and
24 culture, sir, that they've got absolutely

Page 535

1 nothing to worry about, that's what
2 you're telling your folks. Because I
3 just do it because --
4      A.   I can't speak for what --
5      Q.   -- that's what our program
6 says.
7      MS. HENN:  Objection to
8 form.
9      THE WITNESS:  Yeah, I can't
10 speak for what Jake was saying
11 here.
12      You know, he may have just
13 seen that they were approaching
14 their threshold and wanted to
15 visit them, because I know we made
16 a requirement that customers at a
17 certain level be visited and
18 that's what he's referring to.
19      His wording that they have
20 absolutely nothing to worry about,
21 I don't know what he's basing that
22 off of.
23      MR. KENNEDY:  Give me 5040
24 please.

Page 536

1      MS. ROZMAN:  Identified as
2 MCK Oriente 567.
3      (Document marked for
4 identification as Exhibit
5 MCK-Oriente-567.)
6 BY MR. KENNEDY:
7      Q.   This e-mail string --
8      MS. HENN:  Hang on. Sorry,
9 I haven't gotten it to him yet,
10 Counsel.
11      THE WITNESS:  Thank you.
12 BY MR. KENNEDY:
13      Q.   Do you see the e-mail, it
14 starts at the bottom. The first e-mail
15 is from Tom McDonald to Jake Kramer. Who
16 is Tom McDonald?
17      A.   Tom McDonald is the director
18 of regulatory affairs, was the director
19 of regulatory affairs in the West region.
20 He now has responsibility for the SoCal
21 distribution center and Sacramento
22 distribution center. Two DCs only in the
23 West now.
24      Q.   Tom McDonald writes to Jake

Page 537

1 Kramer on September 26, 2012. He says,
2 "This is another one with a high
3 oxycodone ratio." What does that mean?
4 What does that high oxycodone ratio
5 means?
6      A.   That means that his
7 oxycodone purchases to his overall RX
8 purchases are at an elevated percentage.
9      Q.   And Jake Kramer, he
10 responds, "Everybody is high. Everybody
11 is high, Tom. Are we supposed to cut
12 everybody off?"
13      A.   My answer to that would be
14 yes.
15      Q.   That ain't what they did, is
16 it?
17      A.   I don't know what they did.
18      MS. HENN:  Objection to
19 form.
20 BY MR. KENNEDY:
21      Q.   Are you even suggesting to
22 me that they cut anybody off?
23      MS. HENN:  Objection to
24 form.

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| Page 538 | Page 540 |

Page 538

1 THE WITNESS: This was in
2 2012. I know that in 2013 myself
3 and my counterparts turned off
4 several customers that had a high
5 percentage of oxycodone.
6 BY MR. KENNEDY:
7 Q. So yeah, let's go back, now
8 that you bring up this 2013.
9 2008, McKesson gets fined
10 $13 million for not reporting suspicious
11 orders, correct?
12 A. Yes.
13 Q. Now, they say we're going to
14 change things around here. We're
15 changing it, we're putting in a new
16 program.
17 And five years later, in
18 2013, now you're shutting programs down,
19 correct, now you're shutting folks down
20 and you're getting shut down in 2013.
21 MS. HENN: Objection to
22 form.
23 THE WITNESS: I'm not aware
24 where we were shut down as far --

Page 539

1 I mean in my distribution centers
2 in the Northeast I believe we had
3 certain DCs that could not ship
4 controls, yes.
5 BY MR. KENNEDY:
6 Q. And were you sanctioned
7 again in 2013?
8 A. Yes.
9 Q. So 2008, we're going to turn
10 over a new leaf and put in a new program.
11 And so you were sanctioned, you got a
12 problem again in 2013. And then in 2017,
13 sir, you pay a $150 million fine for once
14 again not reporting suspicious orders.
15 Is that true?
16 MS. HENN: Objection to
17 form.
18 THE WITNESS: I don't know
19 the exact year that it was paid.
20 But yes, I know we paid a fine of
21 about $150 million.
22 BY MR. KENNEDY:
23 Q. So '08 we're going to do it
24 right. Then in 2013 you are still not

Page 540

1 doing it right. And then in 2017,
2 $150 million fine because you're still
3 not doing it right. And now we are in
4 2018. Is that the sequence of your
5 interactions with the DEA with respect to
6 their actions and their sanctions and
7 your fines, sir?
8 MS. HENN: Objection to
9 form.
10 THE WITNESS: I believe
11 there were two fines paid by
12 McKesson. So what you're
13 referring to I believe was in '08,
14 and then the second one was paid
15 in 2017 that -- that I'm
16 referencing. I don't know of
17 three. You mentioned '8, '13 and
18 '17.
19 BY MR. KENNEDY:
20 Q. I want to talk a little bit
21 about these regional national accounts.
22 Those are the big customers, right?
23 A. Yes. Yes.
24 Q. Those are the ones where

Page 541

1 McKesson makes its most money?
2 A. Again, sir, I'm not in sales
3 so I don't know where we're making more
4 profit, whether it's an independent or
5 retail national accounts. I don't look
6 at the dollars and cents.
7 Q. The majority of your
8 customers, if we look at individual
9 pharmacies, are the majority of them part
10 and parcel of regional national accounts,
11 the big chains?
12 MS. HENN: Objection to
13 form.
14 BY MR. KENNEDY:
15 Q. Would that -- would that be
16 true?
17 A. Could you repeat the
18 question?
19 Q. Are the majority of your
20 pharmacies part of regional national
21 accounts, the big chain pharmacies?
22 MS. HENN: Objection to
23 form.
24 THE WITNESS: I don't know

Page 542

1   the amount of the small
2   independent customers.  I know in
3   the retail national accounts we
4   have close to 20,000 registrants.
5  BY MR. KENNEDY:
6       Q.   20,000.  When you entered
7   into this settlement in 2008 with the DEA
8   and the Department of Justice, and you
9   instituted this new program, in addition
10  to identifying suspicious orders, you
11  told the DEA that you would institute a
12  program of knowing your customer.  True?
13      A.   Yes.
14      Q.   In fact, if we look at the
15  program that was put together, you
16  emphasize, we're going to -- we're
17  looking at suspicious orders with
18  thresholds.  But in order to prevent
19  diversion, to control the flow of opioids
20  into the country, we're going to know our
21  customer, right?
22      A.   That was part of it, yes,
23  sir.
24          MR. KENNEDY:  We want to

Page 543

1   look at 512.  Is that one of --
2          MS. ROZMAN:  Well, it's
3   Exhibit 62 now.
4          MR. KENNEDY:  62.  Look at
5   62, and it's 345.
6          MS. HENN:  I'm sorry, which?
7          THE WITNESS:  62, this one.
8          MS. ROZMAN:  It's
9   Exhibit 62.
10          MS. HENN:  562?
11          MR. KENNEDY:  Yeah, and it's
12  our P-345.  This is the first --
13          THE WITNESS:  Is this the
14  one?
15          MS. ROZMAN:  No, no.  It's
16  Exhibit 62.
17          MR. KENNEDY:  You can just
18  look up if you want.
19          THE WITNESS:  Oh, oh.  It's
20  that one.
21  BY MR. KENNEDY:
22      Q.   We're just going to read the
23  first page.  It's up on the screen.
24          MS. HENN:  Just a second,

Page 544

1   we'll get it.
2          THE WITNESS:  Yeah, 62.
3  BY MR. KENNEDY:
4       Q.   Okay.  This is your
5   monitoring the manual in 2008, correct?
6       A.   Yes.  This is our operating
7   manual.
8       Q.   This is what you put in
9   place with respect to your agreement with
10  the DEA after paying 13 million, correct?
11      A.   Yes.
12      Q.   I want to go to page --
13          MR. KENNEDY:  Do you want to
14  give me a little bit more of that
15  page, please.
16  BY MR. KENNEDY:
17      Q.   Do you see where it states
18  "DEA expects," the third highlight down,
19  "DEA expects McKesson to know their
20  customer"?
21      A.   Yes.
22      Q.   "This means understanding
23  the customer's business, why they
24  purchase, as well as how much they

Page 545

1   purchase."  Do you see that?
2       A.   Yes, sir.
3       Q.   If you go to Page 22 of
4   this, of this document.
5          THE VIDEOGRAPHER:  Watch
6   your microphone.
7  BY MR. KENNEDY:
8       Q.   Do you see under due
9   diligence there on 22, if you look at the
10  screen it might be easier.
11      A.   I got it.
12      Q.   Does it state, 22, due
13  diligence.  So this is the investigations
14  y'all have to do.  "McKesson's
15  responsibility is to know its customer."
16  Do you see that?
17      A.   Yes.
18      Q.   And when it said that, when
19  you made that agreement, it didn't mean
20  some of your customers, did it?
21          MS. HENN:  Objection to
22  form.
23          THE WITNESS:  No.  It said
24  know our customer.

Page 546

1 BY MR. KENNEDY:
2     Q.   That means all your
3 customers?
4     A.   I would say that's what it
5 meant.
6     Q.   And you folks would divide
7 your customers into two groups, the big
8 chains are one group, and then the
9 independent/small/medium size, that was a
10 different group, correct?
11     A.   We divided them into two
12 segments because their businesses are
13 different, sir.
14     Q.   All right.  But you've got
15 to know all your customers.
16     A.   Yes.
17     Q.   The big chains and the
18 independents and the small ones, right?
19     A.   Yes.
20     Q.   When somebody that's an
21 independent or a small/medium, when they
22 would breach your threshold, that Level 1
23 investigation would involve placing a
24 call to the particular pharmacy that

Page 547

1 placed the order above their threshold,
2 true?
3     A.   Yes.
4     Q.   And so if pharmacy X,
5 Miller's Pharmacy on Main Street in
6 Cleveland, Ohio, breached their
7 threshold, you're getting ahold of
8 Miller's Pharmacy on Main Street in
9 Cleveland, Ohio, that ordered over their
10 threshold.  Right?
11     A.   Yes.
12     Q.   But if a big chain like CVS
13 breaches their threshold, the call went
14 to their corporate headquarters, their
15 regulatory department, their oversight
16 department.  Correct?
17     A.   Yes, I believe that's how it
18 worked.
19     Q.   So if a CVS store in Idaho
20 places an order above their threshold,
21 you are calling Providence, Rhode Island.
22 You are calling the corporate office with
23 respect to that Level 1 --
24     MS. HENN:  Objection to

Page 548

1     form.
2 BY MR. KENNEDY:
3     Q.   -- to find out what's going
4 on in Idaho, correct?
5     MS. HENN:  Objection to
6     form.
7     THE WITNESS:  Right.
8     Because they had -- they perform
9     their own due diligence internal
10     regulatory review.
11 BY MR. KENNEDY:
12     Q.   Okay.  I'm going to write
13 that down.  I got a paper.
14     MS. ROZMAN:  We're going to
15     mark as MCK Oriente 574.
16     MR. KENNEDY:  I'm going to
17     put that up please.
18     (Document marked for
19     identification as Exhibit
20     MCK-Oriente-574.)
21 BY MR. KENNEDY:
22     Q.   So these national chains,
23 the big customers, the CVS, they do their
24 own due diligence, they've got their own

Page 549

1 regulatory department, correct?
2     A.   Yes.
3     Q.   And CVS, now that's a
4 customer that you're doing over
5 $10 billion worth of business with,
6 right?
7     MS. HENN:  Objection to
8     form.
9     THE WITNESS:  Again, sir, I
10     don't know the exact dollar amount
11     that McKesson does with each
12     chain.
13 BY MR. KENNEDY:
14     Q.   Let me ask you, sir, real
15 simple question.
16     If you're going to rely upon
17 somebody like CVS to do the due
18 diligence, you want to make sure they are
19 doing a good job, don't you?
20     A.   We want to make sure they
21 are following the requirements
22 established for them, yes.
23     Q.   I mean that's -- you've got
24 to make sure.

Page 550

1    A.   Yeah, we -- yes.
2    Q.   Sir, in 2010, do you
3 understand CVS paid a $77 million penalty
4 in California, do you know that?
5    A.   In California, I was not
6 aware.  I knew they did in Florida have
7 some stores.  But I wasn't aware of
8 California.
9         MR. KENNEDY:  505, please.
10    5005.
11        MS. ROZMAN:  Identified as
12    MCK --
13        MR. KENNEDY:  5 -- yeah,
14    5005.
15        MS. ROZMAN:  MCK Oriente
16    535.
17        (Document marked for
18    identification as Exhibit
19    MCK-Oriente-535.)
20 BY MR. KENNEDY:
21    Q.   Here's -- this is from the
22 New York Times.  "CVS to pay penalty in
23 methamphetamine case," 2010, New York
24 Times.

Page 551

1        Folks at McKesson get the
2 New York Times, right?
3    A.   Sir, I don't know what
4 newspapers they do get.  I know I have
5 not seen this before.
6    Q.   Well, "CVS Caremark has
7 agreed to pay $77.6 million to settle an
8 investigation that its drug stores
9 allowed widespread sales of cough
10 medicines used to manufacture the
11 stimulant methamphetamine."  That's a
12 street drug, right, highly addictive,
13 kills people.  Is that right?  You know
14 what methamphetamine is.
15    A.   Yes.
16        MS. HENN:  Objection to
17    form.
18        THE WITNESS:  Yes, it's made
19    from cough medicines.
20 BY MR. KENNEDY:
21    Q.   So CVS Pharmacy, a
22 subsidiary, acknowledged that it had sold
23 pseudoephedrine to criminals who used it
24 to make meth.  Do you see that?

Page 552

1    A.   Yeah, that's highlighted
2 here in Paragraph 2.
3    Q.   Let me ask you this.  In
4 2010, in 2010, you're saying, you know,
5 if a CVS pharmacy goes above their
6 threshold, we're going to call corporate
7 and let them do the due diligence at CVS.
8        Did you ever sit down and
9 say, you know what, maybe they are not
10 doing such a good job with their due
11 diligence.  Maybe we ought to do it
12 ourselves.  Did you say that in 2010 when
13 you saw this?
14        MS. HENN:  Objection to
15    form.
16        THE WITNESS:  Sir, I did not
17    see this in 2010.  And when I
18    would call or have contact with a
19    chain corporate office, we did not
20    rely solely on their information
21    to make the determination.  We
22    gathered the information from
23    them.  We did not call the
24    individual store.

Page 553

1 BY MR. KENNEDY:
2    Q.   Exactly.  You didn't call
3 the individual store.  You told us
4 before, they do their due diligence
5 and --
6    A.   We gather the information
7 from their corporate office.
8    Q.   Exactly.
9    A.   And then we do our review.
10    Q.   The same people that were
11 overseeing CVS for the conduct that cost
12 them 77.6 million bucks, that's who you
13 are relying on, right?
14        MS. HENN:  Objection to
15    form.
16 BY MR. KENNEDY:
17    Q.   Correct, sir?
18        MS. HENN:  Objection to
19    form.
20        THE WITNESS:  I'm not sure
21    who would have overseen this for
22    them.  Again, I was not aware, as
23    I stated, that in California they
24    paid this fine.  I knew of the two

Page 554

1  instances in Florida.
2  BY MR. KENNEDY:
3      Q.   But look at -- you have the
4  duty to know your customer.  And if your
5  customer pays a $77.6 million fine,
6  McKesson ought to know about that, they
7  have the duty to know their customer.
8  And this is their biggest customer,
9  right?
10      MS. HENN:  Objection to
11  form.
12  BY MR. KENNEDY:
13      Q.   Yes?
14      A.   This may -- this may have
15  been known by McKesson, sir.  It was not
16  known by me, being responsible for the
17  Northeast region that in California they
18  paid this fine.
19      MR. KENNEDY:  Give me 5004,
20  please.
21      MS. ROZMAN:  Identified as
22  MCK Oriente 534.
23      (Document marked for
24  identification as Exhibit

Page 555

1  MCK-Oriente-534.)
2  BY MR. KENNEDY:
3      Q.   All right.  Sir, now it's
4  2012.  It's 2012.  If somebody goes over
5  their threshold in a CVS store in Idaho,
6  you are calling their regulatory
7  oversight department in Rhode Island.
8  But at the same time you're following
9  that kind of procedure, now in 2012, the
10  DEA makes a move on two Florida
11  pharmacies, distributor, over pill sales.
12  And those two pharmacies are CVS stores.
13  Is that right?
14      A.   They are CVS stores.  I
15  believe --
16      Q.   Sir, are they CVS stores?
17      A.   Excuse me?
18      Q.   Are they CVS stores?
19      MS. HENN:  Objection to
20  form.
21      THE WITNESS:  The -- the two
22  stores in this article?
23  BY MR. KENNEDY:
24      Q.   Yes.

Page 556

1      A.   Yes, they are.
2      Q.   Thank you.  Now, does it
3  state here, "Story highlights.  The DEA
4  says two pharmacies ordered more than
5  3 million oxycodone units in a year.  A
6  typical pharmacy orders 69,000 units a
7  year."  And they ordered 3 million.  Do
8  you see that?  Did I read that right?
9      A.   Yes.
10      Q.   And then it states, "Agents
11  from the Drug Enforcement Administration
12  raided two CVS pharmacies in Central
13  Florida over the weekend, removing
14  controlled substances and suspending the
15  stores' ability to handle or distribute
16  drugs such as painkillers, oxycodone and
17  hydrocodone."
18      Did I read that right?
19      A.   Yes.
20      Q.   And sir, can we agree that
21  if McKesson has the duty to know its
22  customers, they certainly should have
23  known about this, right?
24      A.   We did know about -- we

Page 557

1  heard about this.  Are these two
2  customers with McKesson in Florida?
3      Q.   Did you know about this with
4  respect to McKesson, sir?  Did you know
5  about this --
6      A.   I heard --
7      Q.   Did you hear about this?
8      A.   I heard about this, yes.
9      Q.   All right.  And let me ask
10  you this, sir.
11      A.   And again --
12      MS. HENN:  Counsel.
13  Counsel --
14      THE WITNESS:  Can I finish,
15  please?
16  BY MR. KENNEDY:
17      Q.   I just asked you if you
18  heard about it and the answer was yes.
19      MS. HENN:  Counsel, he had
20  something else to say.
21      MR. KENNEDY:  But he can't
22  give speeches.  You have to answer
23  my questions.
24      MS. HENN:  He's not giving

Page 558

1    speeches.  He's trying to answer.
2  BY MR. KENNEDY:
3    Q.   My -- my question is very
4  simple.  Did you hear about this?
5        MS. HENN:  Asked and
6    answered.
7        THE WITNESS:  I heard about
8    the two stores in Florida, yes.
9  BY MR. KENNEDY:
10    Q.   And my question to you now
11  is, at this point in time, in 2012, after
12  finding out this, did you folks sit down
13  and say maybe we shouldn't be letting CVS
14  monitor themselves out of their corporate
15  headquarters in Rhode Island, maybe we
16  should monitor them when they exceed
17  their threshold?
18        MS. HENN:  Objection.
19  BY MR. KENNEDY:
20    Q.   Did anybody sit down and
21  have that kind of meeting in 2012?
22        MS. HENN:  Objection to
23    form.
24  BY MR. KENNEDY:

Page 559

1    Q.   Did you go to such a
2  meeting?
3    A.   That -- I did not go to such
4  a meeting.  That type of meeting would
5  have been handled by our senior vice
6  president Don Walker.
7    Q.   Did anybody come to you and
8  say this meeting occurred, even if you
9  didn't go to it?
10    A.   I don't recall if one did
11  occur.
12    Q.   And if you can give me --
13  this resulted in a $22 million fine.  Do
14  you understand that, to CVS, a
15  $22 million fine?
16    A.   Yes, I am aware.
17    Q.   So at this point CVS has
18  paid $150 million in 2010, and now
19  another $22 million in 2012.  Right?  And
20  they are your biggest customer, they are
21  the biggest customer of McKesson, are
22  they not?
23        MS. HENN:  Objection to
24    form.

Page 560

1        THE WITNESS:  I do not know
2    who our largest customer is, sir.
3  BY MR. KENNEDY:
4    Q.   By 2012, you're doing
5  $19 billion worth of business with CVS.
6  You didn't know that?
7        MS. HENN:  Objection to
8    form.
9        THE WITNESS:  No, sir.  I
10    don't look at dollars with
11    customers.  I am not in sales.
12  BY MR. KENNEDY:
13    Q.   Let's go to -- let's go to
14  2013.
15        MR. KENNEDY:  If you can
16    give me 305, please.
17        MS. ROZMAN:  Identified MCK
18    Oriente 511.
19        (Document marked for
20    identification as Exhibit
21    MCK-Oriente-511.)
22  BY MR. KENNEDY:
23    Q.   Now, this is -- this is a
24  publication by the United States

Page 561

1  Attorney's Office.  Do you see that?
2    A.   Yes.
3    Q.   And the date is April 3,
4  2013.  Correct?
5    A.   Yes.
6    Q.   You see -- the headline is
7  "CVS to pay 11 million to settle civil
8  penalty claims involving violations of
9  the Controlled Substances Act."
10        And then it states, "The
11  United States has alleged that from
12  October 6, 2005, to October 5th of 2011,
13  CVS pharmacy stores in Oklahoma and
14  elsewhere violated the Controlled
15  Substances Act and the recordkeeping
16  regulations by creating, entering, and
17  maintaining invalid dummy DEA
18  registration numbers or numbers other
19  than the valid DEA registration number of
20  the prescribing practitioner on
21  dispensing records, which were at times
22  provided to state prescription drug
23  monitoring programs."
24        Did I read that right?

Page 562

1    A.    That is what is written
2  here.
3    Q.    And these CVS stores in
4  several states, Oklahoma and elsewhere
5  were filling prescriptions for certain
6  prescribers whose DEA registration
7  numbers were not current or valid.  Did
8  you see that?
9    A.    Yes.
10   Q.    And in knowing your customer
11  as was your obligation, McKesson should
12  have known about this $11 million fine,
13  right?
14       MS. HENN:  Objection to
15     form.
16  BY MR. KENNEDY:
17   Q.    Is that right?  They should
18  have known about it.  They had the duty
19  to know their customers.  And this is an
20  $11 million fine.  They should have known
21  about this.  True?
22       MS. HENN:  Objection to
23     form.
24       THE WITNESS:  They --

Page 563

1     McKesson may have known about
2     this.  I can't say.
3  BY MR. KENNEDY:
4    Q.    Well, I'm not talking about
5  whether they did or they didn't.
6       MS. HENN:  Counsel, please.
7  BY MR. KENNEDY:
8    Q.    My question is real simple:
9  Should they?
10       MS. HENN:  Let him finish
11     his sentences.
12       MR. KENNEDY:  But I want him
13     to answer my question.
14  BY MR. KENNEDY:
15   Q.    Go ahead.
16       MS. HENN:  I know it's late
17     in the day, but it's basic --
18  BY MR. KENNEDY:
19   Q.    Here's my question.  I'm --
20  we'll start all over.
21       Would you agree that
22  pursuant to McKesson's obligation to know
23  their customer, they should have known
24  about this $11 million fine in Oklahoma?

Page 564

1       MS. HENN:  Objection to
2     form.
3       THE WITNESS:  I -- I can't
4     say that McKesson didn't know
5     about this.  At a -- at a higher
6     level than me they may have been
7     aware of this.
8  BY MR. KENNEDY:
9    Q.    And they should have been,
10  correct?
11       MS. HENN:  Objection to
12     form.
13       THE WITNESS:  They --
14  BY MR. KENNEDY:
15   Q.    They should have been.
16   A.    They should have and could
17  have.  I do not know if, you know, the --
18  the vice president that I reported into
19  knew about this.  I'm sure that he may
20  have.  But for me to be in the Northeast
21  region and to know about Oklahoma, I'm
22  not -- I'm not going to be aware of that.
23   Q.    I'm going to ask you.  It's
24  2013.  Now, did -- did anybody above you

Page 565

1  say look it, you are a director of
2  regulatory affairs for one of our
3  regions.  How many folks had your job,
4  your similar job in the country?
5    A.    Four.
6    Q.    Did the folks above you call
7  you four in and say you know what,
8  they've been find 150 million, then 77,
9  and now another 11.  Maybe we shouldn't
10  let these folks monitor themselves.
11  Maybe we should monitor them instead of
12  calling corporate headquarters.  Because
13  corporate headquarters was the one
14  monitoring them when they got fined all
15  these monies.
16   A.    We don't let them monitor
17  themselves.  We do monitor them.  We go
18  to corporate headquarters for information
19  on the pharmacy.
20   Q.    And the same folks you're
21  getting information from were the same
22  people watching these stores when they
23  got all these fines, right?  Right?  Same
24  folks?

Highly Confidential - Subject to Further Confidentiality Review

Page 566

1  A.  Yes.
2      MR. KENNEDY:  Give me 301,
3  please.  Now it's 2015.
4      MS. ROZMAN:  MCK Oriente
5  507.
6      (Document marked for
7  identification as Exhibit
8  MCK-Oriente-507.)
9  BY MR. KENNEDY:
10  Q.  Now, it's 2015, sir.  2015.
11  Now we've got a -- we've got a
12  publication here again by the United
13  States Attorney's Office, do we not?
14  A.  Yes.
15  Q.  And this, this headline, and
16  this is from August 10, 2015, correct?
17  A.  Yes.
18  Q.  And the quote is, or excuse
19  me, the headline is "Drug diversion
20  claims against CVS Health Corp. resolved
21  with $450,000 civil settlement."  Do you
22  see that?
23  A.  Yes.
24  Q.  And then it says, the first

Page 567

1  paragraph, "Pharmacy chain CVS Health
2  Corp. has agreed to pay $450,000 to
3  resolve the United States' allegations
4  that several of its Rhode Island stores
5  violated the federal Controlled
6  Substances Act by filling invalid
7  prescriptions and maintaining deficient
8  records."  Do you see that?
9  A.  Yes.
10  Q.  Let me ask you, who in the
11  regulatory department was in charge of
12  CVS?
13  A.  In August of 2015 I believe
14  it may have been Tom McDonald.
15  Q.  And who was in charge in
16  2012?
17  A.  I'm not certain if it was me
18  or Tom.
19  Q.  And who was in charge in
20  2010?
21  A.  I'm not certain if it was me
22  or Tom.  We switched accounts sometime
23  during that time frame.
24      MR. KENNEDY:  Give me 297

Page 568

1  please.
2      MS. ROZMAN:  Identified as
3  MCK Oriente 504.
4      (Document marked for
5  identification as Exhibit
6  MCK-Oriente-504.)
7  BY MR. KENNEDY:
8  Q.  Another publication by the
9  United States Attorney's Office.  Do you
10  see here McKesson, excuse me, CVS is
11  paying an $8 million fine to settle
12  allegations for unlawful distribution of
13  controlled substances.  Do you see that?
14  A.  Yes.
15      MR. KENNEDY:  Give me 300,
16  please.
17      MS. ROZMAN:  MCK Oriente
18  506.
19      (Document marked for
20  identification as Exhibit
21  MCK-Oriente-506.)
22  BY MR. KENNEDY:
23  Q.  Now, it's 2016.  Publication
24  by the United States Attorney's Office,

Page 569

1  District of Massachusetts.  Headline,
2  "CVS to pay $3.5 million to resolve
3  allegations that pharmacists filled fake
4  prescriptions."  Do you see that, sir?
5  A.  Yes.
6  Q.  And you're in charge of CVS
7  by this time, aren't you?
8  A.  2016, yes.
9  Q.  So you knew about this,
10  right, because you've got a duty to know
11  your customer.  You knew about this,
12  right?
13  A.  I don't recall if I saw this
14  precise document.
15      MR. KENNEDY:  Give me 296,
16  please.
17      MS. ROZMAN:  McKesson -- MCK
18  Oriente 503.
19      (Document marked for
20  identification as Exhibit
21  MCK-Oriente-503.)
22  BY MR. KENNEDY:
23  Q.  Now, it's 2017.  We have
24  another publication by the United States

Page 570

1  Attorney's Office, Eastern District of
2  California.  Correct?  Do you see that?
3      A.   Yes.
4      Q.   And the headline reads, "CVS
5  Pharmacy pays $5 million to settle
6  alleged allegations of the Controlled
7  Substances Act."  Do you see that, sir?
8      A.   Yes.
9          MR. KENNEDY:  Give me 5007
10  please.
11          MS. ROZMAN:  MCK Oriente
12  537.
13          (Document marked for
14  identification as Exhibit
15  MCK-Oriente-537.)
16          MS. HENN:  And Counsel, just
17  to note, I believe we have about
18  five minutes left.
19  BY MR. KENNEDY:
20      Q.   Mr. Oriente, this is a chart
21  that we created of CVS, DEA, Department
22  of Justice settlements between 2010 and
23  2016 that we've been talking about.
24          In a six-year period, CVS

Page 571

1  paid $130.6 million worth of fines for
2  violating the Controlled Substances Act
3  at the pharmacy level.  Do you see this,
4  sir?
5      A.   Yes, I see that.
6      Q.   And let me ask you, at any
7  single point in time, did anybody, did
8  anybody above you, around you, say we
9  need to have a meeting because maybe,
10  maybe we shouldn't be letting CVS
11  corporate monitor themselves?
12          MS. HENN:  Objection to
13  form.
14  BY MR. KENNEDY:
15      Q.   Did anybody ever hold that
16  meeting, sir?
17          MS. HENN:  Objection to
18  form.
19          THE WITNESS:  We -- we don't
20  allow CVS corporate to monitor
21  themselves, we monitor them.  We
22  use their corporate as a
23  communication line to get
24  information on the individual

Page 572

1  pharmacy.
2  BY MR. KENNEDY:
3      Q.   Exactly, sir.  So you've got
4  a CVS pharmacy in Idaho, or Cleveland, or
5  Alabama or Colorado, and if they exceed
6  the threshold, you don't call the
7  pharmacy, you call CVS corporate, the
8  same folks that are monitoring CVS to the
9  tune of $130 million worth of fine.  That
10  was your program, sir, right?
11          MS. HENN:  Objection to
12  form.
13  BY MR. KENNEDY:
14      Q.   That was the program.  Call
15  corporate.  Correct?
16          MS. HENN:  Objection to
17  form.
18          THE WITNESS:  We --
19  BY MR. KENNEDY:
20      Q.   Is that correct, sir?
21          MS. HENN:  Objection to
22  form.
23  BY MR. KENNEDY:
24      Q.   That's who you called?

Page 573

1      A.   We would call corporate to
2  get information on their stores.
3      Q.   Exactly.
4      A.   As opposed to dealing with
5  the individual pharmacies.
6      Q.   You called corporate because
7  you don't want to make CVS corporate mad
8  because you were doing, by this point,
9  $16 billion worth of business every year,
10  your biggest customer?
11          MS. HENN:  Objection.
12  BY MR. KENNEDY:
13      Q.   That's why you called
14  corporate and you didn't investigate a
15  single one of their pharmacies.
16          MS. HENN:  Objection to
17  form.
18  BY MR. KENNEDY:
19      Q.   Correct, sir?
20          MS. HENN:  Objection to
21  form.
22          THE WITNESS:  No, that's not
23  correct, because we didn't -- it
24  wasn't to get them mad.  We called

Page 574

1 them because they would have the
2 most information on that
3 particular pharmacy.
4 BY MR. KENNEDY:
5 Q. But everybody else, you
6 called the pharmacy, is that right?
7 MS. HENN: Objection to
8 form.
9 THE WITNESS: No, that is
10 not right. On chains we called
11 the corporate office.
12 BY MR. KENNEDY:
13 Q. Exactly.
14 A. On chains we called the
15 corporate office.
16 Q. But on everybody but --
17 A. On the individual stores,
18 which is an individual pharmacy, there is
19 no corporate office to call so you call
20 that individual pharmacy.
21 Q. For the independents you
22 investigated, but for the big customers
23 you called corporate?
24 A. We investigated also, in a

Page 575

1 different route.
2 MR. KENNEDY: Thank you. I
3 got nothing further.
4 MS. HENN: I'm going to have
5 some questions so I suggest we go
6 off the record.
7 THE VIDEOGRAPHER: Stand by
8 please. The time is 5:42 p.m.
9 Going off the record.
10 (Short break.)
11 THE VIDEOGRAPHER: We are
12 back on the record. The time is
13 5:54 p.m.
14 - - -
15 EXAMINATION
16 - - -
17 BY MS. HENN:
18 Q. Mr. Oriente, you testified
19 earlier today that you joined McKesson in
20 2004, is that correct?
21 A. Yes. 2004.
22 Q. And before joining McKesson
23 you worked as the director of operations
24 and distribution at Eckerd?

Page 576

1 A. Yes.
2 Q. When you joined McKesson you
3 were the director of operations for the
4 Delran, New Jersey, distribution center,
5 is that correct?
6 A. That is correct.
7 Q. And in 2007 you became
8 director of regulatory affairs overseeing
9 a number of distribution centers?
10 A. Yes. The Northeast region.
11 Q. Why did you move into
12 regulatory affairs?
13 A. Part of the responsibility
14 of the director of operations is to be
15 required to monitor and oversee the
16 maintaining of records in the controlled
17 substance. So besides having total
18 responsibility for the distribution
19 center, the DEA requirements are also
20 part of that.
21 We were given the lifestyle
22 drug monitoring program to oversee as
23 part of our overall responsibilities.
24 And I found it very interesting to

Page 577

1 monitor and look at what customers were
2 purchasing and the analytics that went
3 into it.
4 So when the newly created
5 positions were rolled out, I was
6 interested in moving into the regulatory
7 department. It was a little more
8 analytical than -- than running the
9 distribution center.
10 Q. And you said you found it
11 interesting to see how pharmacies were
12 purchasing. Why did you find that
13 interesting?
14 A. I found that interesting to
15 do the research and to look at how they
16 were ordering controls versus
17 non-controls, the type of business that
18 they had. More interactions with
19 customers. And also just -- it was such
20 an important topic at that time, I felt
21 it was definitely something I wanted to
22 get involved with.
23 Q. You testified earlier about
24 the evolution of McKesson's controlled

Page 578

1 substances monitoring program. How would
2 you describe that evolution?
3     A.   The program today is much
4 more system generated. It would be like
5 comparing a -- when we first started it
6 was a manual process. We always had
7 controlled -- we always looked at
8 controlled sales. It was a manual
9 process. There were paper reports.
10 People would sit there, look at the
11 report, look at the type of pattern that
12 the customer was ordering. It was very
13 manual, kind of like an old biplane.
14 Today we have a streamlined jet.
15          Reports are generated for
16 us. A lot of the analytics are generated
17 by our system. We're able to look at
18 customer purchases at a much higher rate
19 of speed to make determinations. We have
20 a lot more warning reports. And it's
21 been evolving continuously.
22          And so what we have today is
23 much more robust than what we were doing.
24 We were still doing it. So it was

Page 579

1 still -- met the requirement, but it took
2 a lot more manual process to get to the
3 same determination.
4     Q.   Could you describe the
5 relationship you've had with the DEA over
6 the course of your career in McKesson
7 regulatory affairs?
8     A.   Yes. I felt that my
9 relationship with DEA was very good.
10 When I started in '07 in regulatory, our
11 Delran distribution center was always one
12 where the DEA paid compliments to when
13 they came in to do their cyclical audits.
14 Our recordkeeping was always good. Our
15 inventory was good. So the local DEA
16 office over my distribution center was
17 always satisfied with what we were doing.
18          When I went into regulatory
19 I dealt with the Washington D.C. office
20 that oversaw Landover. I dealt with the
21 New York office, as well as the New
22 Jersey office and the Pittsburgh office
23 of DEA, and the Rocky Hill office. And
24 would have conversations with different

Page 580

1 DEA agents when we were either calling to
2 report a customer or sending them a
3 letter notifying them that we cut
4 customers off.
5     Q.   And what happened when you
6 communicated to DEA in those instances
7 about a pharmacy?
8     A.   DEA would basically say
9 thank you for the information. And then
10 that was really the end of it. It was
11 not a two-way communication. We would
12 give them the information of a
13 particular -- either a pharmacy or maybe
14 a doctor that we saw a lot of activity
15 on.
16          They would again thank us
17 for the information. That was pretty
18 much the end of what we heard unless we
19 heard about it in the news later on if
20 there was additional action taken. But
21 we were never, you know, communicated
22 back on, on anything that we submitted.
23     Q.   Tell me your mission and
24 responsibilities in McKesson's regulatory

Page 581

1 affairs group. How do they compare with
2 the mission and responsibilities of
3 McKesson's sales group?
4     A.   My responsibilities are to
5 monitor what a customer is purchasing and
6 to look at their percentage of controls,
7 their total controls that they are
8 buying, making sure that the mix of
9 products is typical of what a pharmacy
10 would be purchasing.
11          I don't look at dollars of a
12 customer. It's just either going to be
13 independent or retail national account.
14 And even with a retail national account
15 I'll look at volume, total doses, but I
16 don't look at dollars. So I'm never
17 making a determination based off of a
18 dollar value.
19          Sales, of course, would
20 be -- I can just surmise they are looking
21 to increase sales for their customer.
22 But what I liked is that we had final
23 say. So if I didn't feel that a customer
24 warranted an increase, I would not make

Highly Confidential – Subject to Further Confidentiality Review

Page 582

1 that increase.
2    Q.   How would you describe
3 McKesson's culture in the area of
4 compliance and regulatory affairs?
5    A.   I would say that McKesson
6 has a corporate culture, they call it
7 ICARE, I-C-A-R-E.  It's integrity,
8 customer focused, and then
9 accountability, respect and excellence.
10 I find that McKesson is a very -- they
11 look at accountability and respect and
12 excellence of the job that we do.
13       As I mentioned earlier, I
14 take -- took my job, take my job very
15 seriously.  I know that I play an
16 important role in the monitoring of sales
17 of controlled substances.  I take that
18 responsibility very personally.
19       I think that McKesson has a
20 very high ethics group when it comes to
21 integrity in what we do.
22       MS. HENN:  I have no further
23    questions.
24       MR. PAPANTONIO:  Sir, I've

Page 583

1    got a few questions.
2       Would you please put up
3    Document Number 324.
4          - - -
5       EXAMINATION
6          - - -
7 BY MR. PAPANTONIO:
8    Q.   I want to ask you about,
9 sir, while you were evolving to where you
10 say you've been evolving.  Is that what
11 you said?
12       MS. HENN:  Objection to
13    form.
14       THE WITNESS:  I -- I believe
15    I said that our program is
16    continuously improving.
17 BY MR. PAPANTONIO:
18    Q.   Okay.  Let's look at --
19 let's look at how many people have been
20 dying across the United States while
21 you've been evolving.  Let's take a look
22 at that.
23       MR. PAPANTONIO:  324 please.
24       (Document marked for

Page 584

1    identification as Exhibit
2    MCK-Oriente-060.)
3 BY MR. PAPANTONIO:
4    Q.   Now, sir, I'm wondering, you
5 have surely seen the -- what I call the
6 death map.  Have you seen the death map?
7    A.   Not that exact document, no.
8    Q.   You've not seen -- you've
9 not seen this?
10    A.   Not the death map, no.
11    Q.   Is that right?  Why don't
12 you take a look at what I call the death
13 map.  Okay.
14       MS. HENN:  Counsel, do you
15    have copies?
16       MR. PAPANTONIO:  Give --
17    give a copy to the lawyers,
18    please.
19 BY MR. PAPANTONIO:
20    Q.   Now, let's look at this
21 death map.  Take a look at it.  And tell
22 me, is this the first time you've seen
23 this.
24       MS. MOORE:  That's McKesson

Page 585

1    Oriente 60.
2       THE WITNESS:  No, I have
3    not --
4 BY MR. PAPANTONIO:
5    Q.   Have you ever seen the death
6 map?
7    A.   No, I've not seen the death
8 map.
9    Q.   Before you came in here to
10 testify, nobody showed you the death map,
11 did they?
12    A.   No.
13    Q.   Well, let's do this realtime
14 on the death map.  Do you see, do you see
15 down on the death map, if you take a
16 look at the first -- the first very part
17 of the death map, do you see where it
18 has, do you see this area, this grey all
19 the way to, it looks like a light brown.
20 Do you see that right there?
21    A.   What -- what number are you
22 referring to, 10?
23    Q.   I'm referring to 1999.  Do
24 you see up in the corner, sir?  You may

Highly Confidential - Subject to Further Confidentiality Review

Page 586

1 want to look up here --
2     A.   You said grey, but I --
3 there's a couple of shades here and I
4 want to make sure I'm looking at the same
5 one you are.
6     Q.   Okay.
7     A.   So there's a number to the
8 right of it.  Is that the 10?
9     Q.   Yeah.
10    A.   Okay.
11    Q.   Yeah, that's it.
12    A.   Thank you.
13    Q.   So, so this is the number of
14 deaths that started as you were evolving
15 as a company and trying to figure out how
16 to evolve.  Let's talk about the
17 evolution of death.
18        1999.  Turn to the next
19 page.  Do you see that area around West
20 Virginia?  Can -- do you know where West
21 Virginia is on a map?
22    A.   Yes, sir, right in this
23 area.
24    Q.   Do you know where Ohio is on

Page 587

1 a map?
2     A.   Up here.
3     Q.   And what -- tell me what
4 color that is.
5     A.   Color for which state?
6     Q.   Either one.  West Virginia
7 or --
8     A.   Ohio is in the blue shades.
9 West Virginia is in the tan shades.
10    Q.   Okay.  Let's talk about the
11 tan shades then, since we've got a lot to
12 talk about on the evolution of the death
13 map.
14        This is 1999 is where the
15 death map starts, correct?
16    A.   Yes.
17    Q.   And then the death map goes
18 to 20, goes to 2000, correct?
19    A.   Yes.
20    Q.   Does that -- does that tan
21 shade get better, that area you're
22 supposed to be in charge of, does that
23 get bigger?
24        MS. HENN:  Objection to

Page 588

1     form.
2 BY MR. PAPANTONIO:
3     Q.   Take a look at it.  If it
4 doesn't, tell me it doesn't.  We'll let
5 the jury decide.
6        Does it get bigger in 2000,
7 the death map?
8        MS. HENN:  Objection to
9     form.
10 BY MR. PAPANTONIO:
11    Q.   Does it get bigger, sir?
12    A.   It looks to stay almost the
13 same.
14    Q.   Okay.  Well, let's move on.
15 Let's look at -- okay.  Let's focus just
16 on tan.  How about we do that.
17        Now, how about let's go to
18 2001.  Does 2001 on the death map, is
19 that area bigger or smaller than 19 --
20 the 1999, on the death map?
21    A.   It's increased somewhat.
22    Q.   Increased.  Okay.  Let's
23 look at 2002.  This is the area that you
24 were in charge of, correct?

Page 589

1        MS. HENN:  Objection to
2     form.
3        THE WITNESS:  Not the full
4     area of West Virginia, no.
5 BY MR. PAPANTONIO:
6     Q.   Well, do you see the West
7 Virginia area, 2002, take a look at it.
8     A.   I see the West Virginia area
9 in 2002.  I did not have the entire state
10 of West Virginia.
11    Q.   Well, we can look at that
12 and tell West Virginia has now moved from
13 just tan, they've gone all the way down
14 to, they've got all the way to brown.
15 Tell me what the deaths are for brown,
16 what does that represent, 30 deaths?
17        MS. HENN:  Objection to
18    form.
19 BY MR. PAPANTONIO:
20    Q.   30 deaths per 100,000
21 people?
22    A.   To this rig chart.  30 plus.
23    Q.   Yeah, so 30 plus people in
24 2001 in that, in West Virginia.  Correct?

Page 590

1 Let's go to 2002 --
2         A.   Per 100, per 100,000.
3         Q.   Per 100,000 people.
4             Now let's go to 2003 on the
5 death map.  Do you see that big brown
6 spot, that big blotch there?  That's West
7 Virginia, isn't it?
8             Can you see it better now if
9 you look up on the screen?
10        A.   No, I can see it from here.
11        Q.   All right.  Now, what do we
12 see there, we see brown, we see red, we
13 see orange?
14        A.   Mm-hmm.
15        Q.   So colors are changing as
16 you're trying to evolve and try to figure
17 out how to do better after being fined
18 $13 million.  How to do better after
19 you've been fined $150 million.  How to
20 do better after you have been -- after
21 the DOJ and the DEA has investigated you.
22 Right?  As you are evolving, that's part
23 of the evolution, correct?
24        MS. HENN:  Objection to

Page 591

1    form.
2        THE WITNESS:  Part of our
3    evolution was to have enhanced
4    reports that are system generated
5    and have systems assist us in the
6    reviews instead of a manual
7    process.  That's part of the
8    evolution.
9 BY MR. PAPANTONIO:
10        Q.   Let's see how that works.
11        MS. HENN:  And, Counsel,
12    just -- just to let you know, you
13    have two more minutes.
14 BY MR. PAPANTONIO:
15        Q.   Okay.  Then let's do this.
16 Let's go -- since I've been told I have
17 two minutes, let's go to Number 18.  Just
18 pull over to Page 18.  We'll just
19 compare.
20        MR. PAPANTONIO:  Would you
21    please put up -- would you put up
22    1999 compared to 2013 since I've
23    been told I only have how many
24    more minutes?  Two minutes.  How

Page 592

1 about putting them side by side.
2 BY MR. PAPANTONIO:
3        Q.   Look up here on the screen,
4 sir.
5        A.   I am.
6        MR. PAPANTONIO:  Would you
7    put the next one up on the screen
8    for me, please.
9 BY MR. PAPANTONIO:
10        Q.   Wow.  A lot of brown there,
11 huh?  What does the -- what does the dark
12 brown mean?  It means more than 30 deaths
13 per 100,000, correct?
14        A.   Yes.
15        Q.   And the tan, what does that
16 mean?
17        A.   16 to 17.  Or 14 or 15.
18        Q.   So do you realize what we're
19 doing here, we're comparing what started
20 in 1999 when you were selling pills to
21 pharmacies, when McKesson was selling
22 narcotics to pharmacies, the first map we
23 see as far as people dying is the one on
24 the left.  Do you understand that?

Page 593

1        A.   Yes.
2        Q.   And the one on the right is
3 what happened as late as, what's the year
4 on that, 2013?
5        MS. MOORE:  2016.
6 BY MR. PAPANTONIO:
7        Q.   2016.
8             That map is bright red with
9 dead people, isn't it, sir?
10        MS. HENN:  Objection to
11    form.
12 BY MR. PAPANTONIO:
13        Q.   It is bright red with dead
14 people?
15        MS. HENN:  Objection to
16    form.
17 BY MR. PAPANTONIO:
18        Q.   Wouldn't you agree with
19 that?
20             Sir, do you understand that
21 is children, mothers, fathers, uncles,
22 sisters and brothers.  That's a
23 statistic.  But what that statistic
24 means, and those are family members dying

Highly Confidential – Subject to Further Confidentiality Review

Page 594

1 because your company participated with
2 CVS and Purdue and Teva and all these --
3 Cardinal, and participated in expanding
4 the death map from what we see on the
5 left to what we see on the right. Are
6 you proud of that, sir?
7          MS. HENN: Objection to
8      form.
9 BY MR. PAPANTONIO:
10     Q. Are you proud of that?
11         MS. HENN: Objection to
12     form.
13         THE WITNESS: The epidemic
14     is not something that I am proud
15     occurred. I do my job to try to
16     limit that.
17 BY MR. PAPANTONIO:
18     Q. Yeah. Well, didn't you tell
19 me McKesson has an ICARE culture. Isn't
20 that what you said? It's ICARE culture.
21 And I think you said it's integrity,
22 accountability, excellence --
23         MS. HENN: Counsel, we've
24     reached the end so I'd just ask

Page 595

1     you to ask your last question.
2         MR. PAPANTONIO: I'm going
3     to ask the last question.
4 BY MR. PAPANTONIO:
5     Q. Isn't that what you told me,
6 on direct, isn't that what you said, the
7 ICARE program?
8     A. That is what I said.
9     Q. If we make a -- if we
10 look at --
11         MS. HENN: All right.
12     Counsel, we're done.
13 BY MR. PAPANTONIO:
14     Q. -- if you look at that map,
15 the ICARE policy is a disaster, isn't it?
16         MS. HENN: I'd like to go
17     off the record now, sir.
18 BY MR. PAPANTONIO:
19     Q. If we look at that map, the
20 ICARE policy is a disaster. Yes or no?
21         MS. HENN: Counsel, before
22     we went on the record again, you
23     agreed as the court ordered that
24     we would abide by the protocol --

Page 596

1         MR. PAPANTONIO: I'm going
2     to ask this question. You can
3     bring it up to the judge. I want
4     to ask this question since you
5     have this man here.
6         MS. HENN: Counsel.
7 BY MR. PAPANTONIO:
8     Q. You said you had an ICARE
9 program. Yes or no?
10         MS. HENN: And I'm going to
11     tell you that this needs to be the
12     last question.
13         MR. PAPANTONIO: Do you want
14     to instruct him -- okay --
15         MS. HENN: I'm not
16     instructing him not to answer.
17         MR. PAPANTONIO: Okay. This
18     is my last question.
19         MS. HENN: Thank you, sir.
20 BY MR. PAPANTONIO:
21     Q. You said you had an ICARE
22 program, right, that involved integrity,
23 it involved accountability, it involved
24 high ethics, it involved excellence.

Page 597

1         Look at these two maps and
2 you tell me whether all that ICARE
3 program was working between 1999 and
4 2016?
5     A. The ICARE principle that we
6 follow at McKesson, it covers all of
7 McKesson. The fact that West Virginia
8 deaths increased over these years, we did
9 our monitoring, and it isn't just in West
10 Virginia, the epidemic was widespread.
11     Q. Okay.
12     A. And we did what we could to
13 monitor and deter that from occurring.
14     Q. Because like your --
15         MS. HENN: Counsel.
16 BY MR. PAPANTONIO:
17     Q. Because like your CEO said,
18 you took it seriously.
19         MS. HENN: Counsel.
20         MR. PAPANTONIO: I don't
21     have any further questions.
22         MS. HENN: Thank you, sir.
23         THE VIDEOGRAPHER: Stand by
24     please. The time is 6:10 p.m.

Highly Confidential - Subject to Further Confidentiality Review

Page 598

1 This marks the end of today's
2 deposition. Off the record.
3 MR. O'CROININ: I do
4 actually have a couple questions
5 though.
6 (Brief pause.)
7 THE VIDEOGRAPHER: It's not
8 the end of today's deposition, but
9 we are going off the record. The
10 time is 6:10 p.m.
11 (Brief pause.)
12 THE VIDEOGRAPHER: The time
13 is 6:11 p.m. Back on the record.
14 - - -
15 EXAMINATION
16 - - -
17 BY MR. O'CROININ:
18 Q. I'm Conor O'Croinin, I
19 represent the CVS entities in this case.
20 A. Okay.
21 Q. And we have never met, have
22 we?
23 A. No, we have not.
24 Q. I know it's been a long day.

Page 599

1 I'll try to be very quick. Mr. Kennedy
2 asked you some questions, if you recall,
3 about what you referred to as an
4 agreement between CVS and McKesson?
5 A. Yes, sir.
6 Q. Concerning threshold
7 increase requests?
8 A. Yes, sir.
9 Q. Just to be clear, do you
10 have any firsthand knowledge of such an
11 agreement?
12 A. I do not.
13 Q. Mr. Kennedy also asked you
14 some questions about the approval of
15 certain threshold increase requests made
16 by CVS. Do you recall that line of
17 questioning?
18 A. I do.
19 Q. All right. And do you know
20 the reasons for those approvals of those
21 requests?
22 A. They would vary. I mean
23 each threshold change request typically
24 would, you know, vary by the stores to

Page 600

1 why they were increasing. Why they
2 needed an increase.
3 I don't know, you know, the
4 specific examples of specific reasons
5 that they submitted.
6 Q. So if you don't know the
7 specific reasons why they were submitted
8 or why they were approved, you couldn't
9 say one way or the other whether they
10 should have been approved?
11 MR. PAPANTONIO: Objection,
12 leading the witness. Ask a
13 question that's not leading.
14 Counsel, you have him on direct
15 right now.
16 MS. HENN: Counsel, there
17 are no speaking objections.
18 MR. PAPANTONIO: Objection
19 to form. Okay. We'll do it --
20 we'll -- your question needs
21 improving.
22 BY MR. O'CROININ:
23 Q. What is that -- can you say
24 one way or the other whether they --

Page 601

1 those requests ought to have been
2 approved?
3 A. Not seeing the reasons
4 listed for them, no.
5 Q. You were also asked
6 questions about McKesson'S policy of
7 reaching out to CVS's corporate offices
8 as opposed to going to an individual
9 pharmacy. Do you remember those
10 questions?
11 A. Yes.
12 Q. Is that -- is that a policy
13 that McKesson has that is specific to
14 CVS, is it a special CVS policy?
15 A. No, it is not a CVS policy.
16 All the retail national accounts are
17 handled on a corporate level.
18 Q. Are you aware of how many
19 stores CVS has in the U.S.?
20 A. I would be guessing. I know
21 it's in the thousands. I'm also not sure
22 exactly how many McKesson has versus some
23 of the other wholesalers.
24 Q. Does 10,000 sound right to

Highly Confidential - Subject to Further Confidentiality Review

Page 602

1 you?
2     A.  I'm not -- not sure if it's
3 that many. Yeah.
4     Q.  But you think it's in the
5 thousands?
6     A.  Oh yes.
7     Q.  And Mr. Kennedy went through
8 a number of press releases and articles
9 concerning fines that CVS paid in
10 connection with specific CVS stores. Do
11 you remember that line of questioning?
12     A.  Yes.
13     Q.  Do you know whether the vast
14 majority of CVS's stores have never been
15 implicated in any kind of investigation
16 or paid a fine?
17     MR. PAPANTONIO: Objection.
18 Form.
19     THE WITNESS: I would say
20 that with the number of total
21 stores that CVS has, the number
22 that was listed is a very small
23 percentage.
24     MR. O'CROININ: All right.

Page 603

1 That's all I have.
2     MR. KENNEDY: Yeah, let
3 me -- I'm going to ask you -- let
4 me ask you a few questions in
5 follow-up to the CVS questioning.
6     If you can pull up 5007
7 please.
8     MS. HENN: Do you by chance
9 have a copy for me?
10     MR. KENNEDY: Of?
11     MS. HENN: The exhibit.
12 I'll just look here.
13     - - -
14     EXAMINATION
15     - - -
16 BY MR. KENNEDY:
17     Q.  Mr. Oriente, did you just
18 tell us that you thought CVS was doing a
19 very good job?
20     A.  No, I did not say that,
21 that -- that I recollect.
22     I said that the amount of
23 stores that were fined here in comparison
24 to the total number of stores would be a

Page 604

1 small amount, small percentage.
2     Q.  Okay. So you didn't mean to
3 say that getting fined $77 million in
4 2010, and then 11 in '13, another
5 $350,000 in '13, and a $1.9 million fine
6 in '14, and $22 million in '15, and
7 $450,000 in '15, and 8 million and 3.5
8 million, another 5.
9     You're not saying a total of
10 $130.6 million of fines over six
11 years is a good job, are you?
12     MS. HENN: Objection to
13 form.
14 BY MR. KENNEDY:
15     Q.  You don't mean to tell us
16 that, do you?
17     MS. HENN: Objection to
18 form.
19     THE WITNESS: I don't
20 believe that's what I said. I
21 said the number of stores --
22 BY MR. KENNEDY:
23     Q.  My question is simple.
24     MS. HENN: Counsel, please

Page 605

1 let him finish his answer.
2 BY MR. KENNEDY:
3     Q.  You don't mean to say that,
4 do you? That they're doing a good job
5 here with $130 million worth of fines?
6     MS. HENN: Objection to
7 form.
8     THE WITNESS: I don't
9 believe I commented on whether
10 they were doing a good job. I
11 believe my comment was a small
12 percentage of the stores had
13 problems.
14 BY MR. KENNEDY:
15     Q.  Let me ask you right now.
16 Do you think CVS was doing a good job
17 with $130 million worth of fines over six
18 years? Do you think that's a good job in
19 monitoring the flow of narcotics into our
20 communities. Do you think that is a good
21 job?
22     MS. HENN: Objection to
23 form.
24     THE WITNESS: I think based

Highly Confidential - Subject to Further Confidentiality Review

Page 606

1  off of the fines they could have
2  done a better job, yes.
3      MR. KENNEDY:  I've got
4  nothing further.
5      MS. HENN:  Thank you.  But I
6  want to reserve signature.  I
7  think I mentioned earlier the
8  whole transcript should be marked
9  highly confidential pending
10  review.
11      THE VIDEOGRAPHER:  This
12  marks the end of today's
13  deposition.  The time is 6:18 p.m.
14      (Excused.)
15      (Deposition concluded at
16  approximately 6:18 p.m.)
17
18
19
20
21
22
23
24

Page 608

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 607

1
2      CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
   witness was duly sworn by me and that the
6  deposition is a true record of the
   testimony given by the witness.
7
       It was requested before
8  completion of the deposition that the
   witness, MICHAEL ORIENTE, have the
9  opportunity to read and sign the
   deposition transcript.
10
11
12
       _____
13  MICHELLE L. GRAY,
   A Registered Professional
   Reporter, Certified Shorthand
14  Reporter, Certified Realtime
   Reporter and Notary Public
15  Dated:  July 24, 2018
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 609

1      - - - - - -
       E R R A T A
2      - - - - - -
3
4  PAGE LINE CHANGE
5  ____ ____ _____
6      REASON: _____
7  ____ ____ _____
8      REASON: _____
9  ____ ____ _____
10     REASON: _____
11 ____ ____ _____
12     REASON: _____
13 ____ ____ _____
14     REASON: _____
15 ____ ____ _____
16     REASON: _____
17 ____ ____ _____
18     REASON: _____
19 ____ ____ _____
20     REASON: _____
21 ____ ____ _____
22     REASON: _____
23 ____ ____ _____
24     REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 610

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I,_____, do
5   hereby certify that I have read the
6   foregoing pages, 1 - 611, and that the
7   same is a correct transcription of the
8   answers given by me to the questions
9   therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  MICHAEL ORIENTE                DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20_____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 611

1       LAWYER'S NOTES
2   PAGE  LINE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____