```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL     :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION           :
     ----------------------------------------
 7                        :  CASE NO.
     THIS DOCUMENT        :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                          :  Hon. Dan A.
 9                        :  Polster
10                    -  -  -
             Thursday February 7, 2019
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -  -  -
14
             Videotaped deposition of AL
15   PAONESSA, taken pursuant to notice, was
     held at Buffalo Marriott Harbor Center,
16   95 Main Street, Buffalo, New York 14203,
     beginning at 10:05 a.m., on the above date,
17   before Amanda Dee Maslynsky-Miller, a
     Certified Realtime Reporter.
18
                      -  -  -
19
20
21
22        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23            deps@golkow.com
24
```

```
 1    APPEARANCES:

 2

 3         WEITZ & LUXENBERG, P.C.
           BY: PAUL J. PENNOCK, ESQUIRE
 4         BURTON KING, PARALEGAL
           BEN TRUAX, PARALEGAL
 5         CONOR KENNEDY, PARALEGAL
           700 Broadway
 6         New York, New York 10003
           (212) 558-5500
 7         Ppennock@weitzlux.com
           Representing the Plaintiffs

 8

 9

10         FOLEY LARDNER LLP
           BY:  KATY E. KOSKI, ESQUIRE
11         BY:  GRAHAM D. WELCH, ESQUIRE
           111 Huntington Avenue
12         Suite 2500
           Boston, Massachusetts 02199
13         Kkoski@foley.com
           Gwelch@foley.com
14         Representing the Defendant,
           Anda Pharmaceuticals, Inc.

15

16

      VIA TELEPHONE/LIVESTREAM:

17

18         ARNOLD & PORTER KAYE SCHOLER LLP
           BY:  DAVID KOUBA, ESQUIRE
19         601 Massachusetts Ave, NW
           Washington, DC 20001
20         (202) 942-5000
           david.kouba@arnoldporter.com
21         Representing the Defendant,
           Endo Pharmaceuticals

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES: (Continued)
 2
      VIA TELEPHONE/LIVESTREAM:
 3
 4         WEITZ & LUXENBERG, P.C.
           BY:  TERESA CURTIN, ESQUIRE
 5         700 Broadway
           New York, New York 10003
 6         (212) 558-5500
           Tcurtin@weitzlux.com
 7         Representing the Plaintiffs
 8
 9
10         JONES DAY
           BY: MEREDITH C. KINCAID, ESQUIRE
11         1420 Peachtree Street, N.E.
           Suite 800
12         Atlanta, Georgia 30309
           (404) 521-3939
13         Mkincaid@jonesday.com
           Representing the Defendant,
14         Walmart
15
16
17         COVINGTON & BURLING LLP
           BY:  CLAYTON BAILEY, ESQUIRE
18         850 Tenth Street, NW
           Suite 856N
19         Washington, DC 20001
           (202) 662-5000
20         cbailey@cov.com
           Representing the Defendant,
21         McKesson Corporation
22
23
24
```

```
 1   APPEARANCE: (Continued)
 2   VIA TELEPHONE/LIVESTREAM:
 3
 4        JACKSON KELLY PLLC
          BY:  SANDRA K. ZERRUSEN, ESQUIRE
 5        50 South Main Street
          Suite 201
 6        Akron, Ohio 44308
          (330) 252-9060
 7        Skzerrusen@jacksonkelly.com
          Representing the Defendant,
 8        AmerisourceBergen Corporation
 9
10
11        CLARK MICHIE LLP
          BY:  CHRISTOPHER J. MICHIE, ESQUIRE
12        220 Alexander Street
          Princeton, New Jersey 08540
13        (609) 423-2143
          Chris.michie@clarkmichie.com
14        Representing the Defendant,
          Pernix Therapeutics Holdings, Inc.
15
16
17   ALSO PRESENT:
     Dan Lawlor, Videographer
18
19
20
21
22
23
24
```

```
 1                    -   -   -
 2                  I N D E X
 3                    -   -   -
 4
    Testimony of: AL PAONESSA
 5
          By Mr. Pennock              13, 218
 6        By Ms. Koski                210
 7
 8
                      -   -   -
 9
                  E X H I B I T S
10
                      -   -   -
11
    NO.             DESCRIPTION              PAGE
12
    Anda-Paonessa
13  Exhibit-1     Resume, Albert R.
                  Paonessa, III             15
14
    Anda-Paonessa
15  Exhibit-2     Anda_Opioids_MDL_
                  0000618121-123            25
16
    Anda-Paonessa
17  Exhibit-3     Anda_Opioids_MDL_
                  0000078211-212            35
18
    Anda-Paonessa
19  Exhibit-4     Anda_Opioids_MDL_
                  0000276293-299            49
20
    Anda-Paonessa
21  Exhibit-5     Anda_Opioids_MDL_
                  0000282942                54
22
    Anda-Paonessa
23  Exhibit-6     Anda_Opioids_MDL_
                  0000273585-586            58
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2                E X H I B I T S
 3                    -  -  -
 4   NO.          DESCRIPTION              PAGE
 5   Anda-Paonessa
     Exhibit-7    Anda_Opioids_MDL_
 6                0000258573               66
 7   Anda-Paonessa
     Exhibit-8    Anda_Opioids_MDL_
 8                0000258572               71
 9
     Anda-Paonessa
10   Exhibit-9    Anda_Opioids_MDL_
                  0000091168-176           77
11
     Anda-Paonessa
12   Exhibit-10   PBS.org; Understanding the
                  Opioid Epidemic, Michael?s
13                Story                    86
14   Anda-Paonessa
     Exhibit-11   Allergan_MDL_
15                01030377-3738            87
16   Anda-Paonessa
     Exhibit-12   Anda_Opioids_MDL_
17                0000611326-327           90
18   Anda-Paonessa
     Exhibit-13   Anda_Opioids_MDL_
19                0000108236-243           95
20   Anda-Paonessa
     Exhibit-14   Anda_Opioids_MDL_
21                0000109074-073           105
22   Anda-Paonessa
     Exhibit-15   Anda; Back in Stock and
23                Last Chance Flyer        108
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                     -  -  -
2                 E X H I B I T S
3                     -  -  -
4   NO.           DESCRIPTION                    PAGE
5   Anda-Paonessa
    Exhibit-16    Sales Flyer; Are you
6                 Promoting all of these         112
7   Anda-Paonessa
    Exhibit-17    Anda; Oxycodone 5% Off         115
8
    Anda-Paonessa
9   Exhibit-18    Anda_Opioids_MDL_
                  0000610161                     118
10
    Anda-Paonessa
11  Exhibit-19    Anda_Opioids_MDL_
                  0000610178-184                 121
12
    Anda-Paonessa
13  Exhibit-20    Anda_Opioids_MDL_
                  0000612614                     128
14
    Anda-Paonessa
15  Exhibit-21    Anda_Opioids_MDL_
                  0000278594-615                 135
16
    Anda-Paonessa
17  Exhibit-22    US Department of Justice;
                  11/3/16; United States
18                Reaches $900,000 Settlement
                  With Drug City Pharmacy and
19                Its Former Owner for
                  Unlawful Distribution of
20                Controlled Substances          146
21  Anda-Paonessa
    Exhibit-23    Anda_Opioids_MDL_
22                0000078404-405                 150
23  Anda-Paonessa
    Exhibit-24    Anda_Opioids_MDL_
24                0000078400-401                 151
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2                E X H I B I T S
 3                    -  -  -
 4    NO.           DESCRIPTION                  PAGE
 5    Anda-Paonessa
      Exhibit-25   Anda_Opioids_MDL_
 6                 0000282932                     157
 7    Anda-Paonessa
      Exhibit-26   Anda_Opioids_MDL_
 8                 0000274716-717;
                   With Attachment               164
 9
      Anda-Paonessa
10    Exhibit-27   Anda_Opioids_MDL_
                   0000274587-589                166
11
      Anda-Paonessa
12    Exhibit-28   Anda_Opioids_MDL_
                   0000272213-215                169
13
      Anda-Paonessa
14    Exhibit-29   Anda_Opioids_MDL_
                   00002722520-521               172
15
      Anda-Paonessa
16    Exhibit-30   Anda_Opioids_MDL_
                   0000272517-519                176
17
      Anda-Paonessa
18    Exhibit-31   Anda_Opioids_MDL_
                   0000090857-858                178
19
      Anda-Paonessa
20    Exhibit-32   Anda_Opioids_MDL_
                   0000090808                    178
21
      Anda-Paonessa
22    Exhibit-33   Anda_Opioids_MDL_
                   0000090805-807                179
23
24
```

```
 1                    -  -  -
 2              E X H I B I T S
 3                    -  -  -
 4  NO.            DESCRIPTION              PAGE
 5  Anda-Paonessa
    Exhibit-34   United States District
 6               Court; Search and Seizure
                 Warrant                    186
 7
    Anda-Paonessa
 8  Exhibit-35   Anda_Opioids_MDL_
                 0000275048                 192
 9
    Anda-Paonessa
10  Exhibit-36   Anda_Opioids_MDL_
                 0000284363-364             193
11
    Anda-Paonessa
12  Exhibit-37   Skipped
13  Anda-Paonessa
    Exhibit-38   Anda_Opioids_MDL_
14               0000273292-293             193
15  Anda-Paonessa
    Exhibit-39   Anda_Opioids_MDL_
16               0000273518                 194
17  Anda-Paonessa
    Exhibit-40   Anda_Opioids_MDL_
18               0000287964                 194
19  Anda-Paonessa
    Exhibit-41   Anda_Opioids_MDL_
20               0000273617                 195
21  Anda-Paonessa
    Exhibit-42   Anda_Opioids_MDL_
22               0000273762                 195
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -   -   -

 2             E X H I B I T S

 3                    -   -   -

 4    NO.            DESCRIPTION              PAGE

 5    Anda-Paonessa

      Exhibit-43    Anda_Opioids_MDL_

 6                  0000283018-019           195

 7    Anda-Paonessa

      Exhibit-44    Anda_Opioids_MDL_

 8                  0000274800               196

 9    Anda-Paonessa

      Exhibit-45    Anda_Opioids_MDL_

10                  0000272207-208           214

11    Anda-Paonessa

      Exhibit-46    Anda_Opioid_MDL_Tx-data_

12                  CUY-SUM-OH_00001;

                    With Attachment          218s

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -   -   -

 2             DEPOSITION SUPPORT INDEX

 3                      -   -   -

 4

 5   Direction to Witness Not to Answer

 6   Page    Line   Page Line      Page Line

 7   190     12

 8

 9

10   Request for Production of Documents

11   Page Line      Page Line      Page Line

12   None

13

14

15   Stipulations

16   Page Line      Page Line      Page Line

17   12      1

18

19

20   Question Marked

21   Page Line      Page Line      Page Line

22   None

23

24
```

1                    -   -   -

2              (It is hereby stipulated and

3         agreed by and among counsel that

4         sealing, filing and certification

5         are waived; and that all

6         objections, except as to the form

7         of the question, will be reserved

8         until the time of trial.)

9                    -   -   -

10             VIDEO TECHNICIAN:  We are

11        now on the record.  My name is Dan

12        Lawlor, I'm a videographer with

13        Golkow Litigation Services.

14        Today's date is February 7th,

15        2019, and the time is 10:05 a.m.

16             This video deposition is

17        being held in Buffalo, New York,

18        in the matter of National

19        Prescription Opiate Litigation,

20        MDL Number 2804.

21             The deponent is Al

22        Paonessa.  Counsel will be noted

23        on the stenographic record.  The

24        court reporter is Amanda Miller

1          and will now swear in the witness.

2                    -  -  -

3               AL PAONESSA, after having

4          been duly sworn, was examined and

5          testified as follows:

6                    -  -  -

7               EXAMINATION

8                    -  -  -

9    BY MR. PENNOCK:

10          Q.    Mr. Paonessa, my name is

11   Paul Pennock.  I'm going to have quite a

12   few questions for you today.

13               Can we have an agreement

14   that if at any time you don't understand

15   my questions, you'll let me know?

16          A.    Yes.

17          Q.    Otherwise, I'm going to

18   assume that you understood them, okay?

19          A.    Okay.

20          Q.    You do understand we're

21   relying upon the truth of your answers

22   here today?

23          A.    Yes.

24          Q.    As I understand it, you were

Highly Confidential - Subject to Further Confidentiality Review

1    president of a company known as Anda from

2    2005 to 2015; is that right?

3         A.    Correct.

4         Q.    And you worked at Anda, as

5    well as a predecessor company, for some

6    years before that; is that correct?

7         A.    Yes.

8         Q.    So before you became

9    president, you worked in sales for about

10   four years?

11        A.    Two years in sales.

12        Q.    Two years in sales.

13              And before that, you worked

14   in IT?

15        A.    Yes.  Two years.

16        Q.    And the work that you did

17   throughout that entire time period

18   involved the distribution of

19   pharmaceuticals; is that right?

20        A.    Yes.

21        Q.    During that time period, and

22   I'm going to focus right now from 2005 to

23   2015, during that time period, some of

24   the pharmaceuticals that your company was

Highly Confidential - Subject to Further Confidentiality Review

1    responsible for distributing were

2    opioids; is that correct?

3         A.    Correct.

4                   - - -

5              (Whereupon, Anda-Paonessa

6         Exhibit-1, Resume, Albert R.

7         Paonessa, III, was marked for

8         identification.)

9                   - - -

10   BY MR. PENNOCK:

11        Q.    I marked as Exhibit-1 to

12   your deposition what I understand to be

13   your resume.

14             MR. PENNOCK:  Do you need a

15        copy of that?

16             Do you need a copy?

17             MS. KOSKI:  Yes.

18   BY MR. PENNOCK:

19        Q.    Now, you currently work for

20   a company known as KeySource?

21        A.    Yes.

22        Q.    And they also distribute

23   pharmaceuticals?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Did they distribute opioids?

2    A.    No.

3          MS. KOSKI:  Object to form.

4  BY MR. PENNOCK:

5    Q.    Did they, at one time,

6  distribute opioids?

7    A.    Yes.

8    Q.    Back when you were at Anda,

9  were they sometimes a customer of yours?

10   A.    Not that I know of.

11   Q.    I want to turn to the last

12 page of your resume, because I had a

13 question about something on it.

14         So, first of all, you

15 indicate here that your strongest belief

16 is that you always do what is right.

17         Do you see that statement?

18   A.    Yes.

19   Q.    Is that something you wrote?

20   A.    Yes.

21   Q.    Is that a belief that you've

22 held for a long time, or just when you

23 prepared this resume?

24   A.    Always.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    A long time?

2    A.    Yes.

3    Q.    You also have something

4    called a link to a Myers-Briggs

5    Interpretive Report.

6          Do you see that?

7    A.    Yes.

8    Q.    Myers-Briggs, this is some

9    kind of personality analysis; is that

10   correct?

11         MS. KOSKI:  Object to form.

12         THE WITNESS:  I believe.

13   I'm not sure.  I believe so.

14   BY MR. PENNOCK:

15   Q.    Did somebody else put this

16   on your resume, or did you put this on?

17   A.    It was suggested by the

18   person that created the resume for me.

19   Q.    That you took this

20   personality test, right?

21   A.    No.

22         MS. KOSKI:  Object to form.

23         You can answer.

24         THE WITNESS:  This was

Highly Confidential - Subject to Further Confidentiality Review

1    given -- this test was done while

2    we were owned by Actavis, which

3    was the parent company of Anda.

4         They gave the test to the

5    executives, and I took it and I

6    got the report from it.  And this

7    gentleman who did my profile asked

8    me if I had any of these, I said

9    yes.  And he thought it was good

10   to put it into the resume, or at

11   least the link to the document.

12 BY MR. PENNOCK:

13   Q.   Did you object to putting

14 this on?

15   A.   No.

16   Q.   So it indicates that your

17 personality, as determined by this

18 Myers-Briggs test, includes -- the

19 summary includes extraversion, right?

20         That's what it found?

21   A.   Yes.

22   Q.   I mean, you sent this resume

23 to people, haven't you?

24   A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     So when you sent it to them,

2   this was on there, right?

3        A.     Correct.

4        Q.     And it also indicates that

5   you have intuition, right?

6        A.     Yes.

7        Q.     And that your thinking and

8   perceiving, that's your personality type,

9   ENTP, right?

10       A.     Yes.

11       Q.     And you also wrote that

12  ENTPs tend to be innovative, strategic

13  thinkers, versatile, analytical and

14  entrepreneurial.

15              Do you see that?

16       A.     It's written there.  I did

17  not write that.  That was -- comes from

18  the Myers-Briggs description of what an

19  ENTP is.

20       Q.     Again, but this is your

21  resume, you put that on there to declare

22  yourself to have been found to be these

23  things by the Myers-Briggs test, right?

24       A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Let me back up a little bit.

 2          You --

 3          MS. KOSKI:  I'm sorry, just

 4     for one second.  You didn't mark

 5     the exhibit, or if you did, you

 6     might have the one with the label.

 7          MR. PENNOCK:  I have it

 8     right here.

 9          MS. KOSKI:  The one he has

10     doesn't have a label.  Did you

11     want him to be looking at the

12     labeled one, or do you want to

13     keep those?

14          MR. PENNOCK:  Whatever you

15     prefer.  It doesn't matter to me.

16     I just realized I was writing on

17     the marked one.

18          MS. KOSKI:  I saw you

19     underlining it too.  But you might

20     want to be using the marked one.

21     I'm just trying to figure it out.

22 BY MR. PENNOCK:

23          Q.    When you were at Anda, you

24     would sell -- well, let me back up.
```

1          What is oxy?

2          MS. KOSKI:  Object to form.

3          THE WITNESS:  A

4     pharmaceutical drug.

5  BY MR. PENNOCK:

6          Q.    You've used that term

7  before, right, oxy?

8          A.    Oxy?  Sure.  Yes.

9          Q.    What does it refer to?

10         A.    OxyContin.

11         Q.    Is that it?  Does it refer

12  to anything other than OxyContin?

13         A.    Not that I know of.

14         Q.    So when you were at Anda --

15  by the way, you were often referred to as

16  AL3; is that right?

17         A.    Yes.

18         Q.    Because you're Albert

19  Paonessa, III, correct?

20         A.    Right.

21         Q.    So when you were at Anda, at

22  one point in time, at least during 2008,

23  you were selling about $7.5 million a

24  quarter in oxy; isn't that right?

1    A.    I'm not sure.

2    Q.    So if you were selling $7.5

3  million a quarter, that would be about

4  $30 million in oxy a year, right?

5              MS. KOSKI:  Object to form.

6              THE WITNESS:  Math-wise,

7         yes.

8  BY MR. PENNOCK:

9    Q.    And, by the way, for the ten

10  years that you were president at Anda,

11  how much did you earn, in total?

12             MS. KOSKI:  Object to form.

13             THE WITNESS:  I don't know.

14  BY MR. PENNOCK:

15    Q.    Do you have an estimate for

16  how much you earned?

17    A.    For the ten years?

18             MS. KOSKI:  Are you asking

19         him personally or the company?

20             MR. PENNOCK:  I'm asking him

21         how much he earned for the ten

22         years he was at Anda.

23             MS. KOSKI:  Personally?

24             THE WITNESS:  I can try to

1    go year by year and add it up in

2    my head, but I don't really know

3    how much it was.  A lot of it was

4    in stock, too.  So that changed in

5    value over time.

6          My salary was around

7    $400,000.  And then I got bonuses

8    of up to 50 to 75 percent of that.

9    So on a yearly basis, I would get

10   somewhere around $650,000.

11         And then I got stock that

12   vested over four years.  And I

13   don't know what the value of that

14   is.  But the company itself grew

15   quickly and the stock appreciated,

16   too.  So it was Actavis stock, it

17   wasn't Anda stock.

18   BY MR. PENNOCK:

19        Q.   So taking your income,

20   including bonuses, we can rough it out

21   that as -- ten years as president, you

22   made somewhere in the neighborhood of

23   $6.5 million?

24        A.   Possibly.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And in addition to that, you

2  received stock?

3    A.    Yes.

4    Q.    What were your bonuses based

5  on?

6    A.    Bonuses were based -- 40

7  percent was based on the contribution or

8  what Anda did for the company, and then

9  60 percent was based on what Actavis did

10  as a company.

11    Q.    Did you meet with lawyers

12  regarding your deposition here today to

13  prepare?

14    A.    Yes.

15    Q.    How long did you meet?

16    A.    Yesterday, probably three,

17  four hours.

18    Q.    Did you meet with any --

19  anybody other than a lawyer to prepare

20  you for presentation at this deposition?

21    A.    No.

22         MR. PENNOCK:  I'll mark this

23         as Exhibit-2.

24              -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1          (Whereupon, Anda-Paonessa

2      Exhibit-2,

3      Anda_Opioids_MDL_0000618121-123,

4      was marked for identification.)

5                  -  -  -

6          THE WITNESS:  Okay.

7   BY MR. PENNOCK:

8      Q.    Sir, you've had an

9   opportunity to read Exhibit-2; is that

10   right?

11      A.    Yes.

12      Q.    I'm going to look at the

13   first -- this is a series of e-mails,

14   true?

15      A.    Yes.

16      Q.    The first e-mail in this

17   Exhibit-2 is an e-mail from you to a

18   gentleman by the name of Paul Bisaro,

19   right?

20      A.    Yes.

21      Q.    Who is he?

22      A.    He was a CEO of, at that

23   time named Watson, before we became

24   Actavis.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    CEO, Watson.

2          And Mr. Bisaro, he was your

3    boss, right?

4    A.    Yes.

5    Q.    Now, you indicate to him

6    that -- you're talking about some kind of

7    opportunity to buy Oxy, aren't you?

8    A.    Yes.

9    Q.    And you start out the e-mail

10   by saying that Mallinckrodt worked a deal

11   with Purdue to market a generic OxyContin

12   for an undisclosed number of months.

13         Do you see that?

14   A.    Yes.

15   Q.    Mallinckrodt was one of your

16   competitors?

17   A.    No.

18   Q.    Who is Mallinckrodt?

19   A.    They are a manufacturer of

20   generic pharmaceuticals.

21   Q.    And you didn't consider them

22   to be one of your competitors at that

23   time?

24   A.    No.

1    Q.    They didn't distribute in

2  any way?

3    A.    I'm not sure what they

4  distributed.  They sold to other

5  distributors and wholesalers like myself.

6    Q.    So who -- who were you

7  talking about buying the Oxy from in this

8  e-mail?

9    A.    It looks like Kinray, which

10  was a full-line wholesaler in the New

11  York City market.

12    Q.    So Kinray was a distributor?

13    A.    Wholesaler/distributor, yes.

14  They were a full-line wholesaler.

15    Q.    What does that mean?

16    A.    They sold brand drugs,

17  generic drugs, OTCs, Kleenex, things like

18  that.  So they did the front end and the

19  back end of a pharmacy.

20    Q.    What does it mean that the

21  Kinray product comes with a pedigree?

22    A.    It means that the -- that

23  Dava sold the drug directly to Kinray.

24  And that when I would purchase the drug,

Highly Confidential - Subject to Further Confidentiality Review

1    that I knew it came from Kinray and it

2    wasn't -- I knew where it was at all

3    times.  It came with a pedigree.

4              Florida passed a law that

5    you had to do past pedigrees, I believe

6    it was in July of '07.  We were the only

7    state with it, and we couldn't purchase a

8    product or sell a product if we didn't

9    trace it back to the origin.

10         Q.    So in any event, you

11   indicate here that Anda does about 7.5

12   million per quarter of Oxy.

13             Do you see that?

14         A.    Yes.

15         Q.    And that you can buy another

16   batch of Dava from Kinray at a 7 percent

17   better price than the price Mallinckrodt

18   offered us.

19             Do you see that statement?

20         A.    Yes.

21         Q.    And then you recommend to

22   your boss that you wanted to buy $8.35

23   million, on Monday, of Oxy?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And that would give you

2    about a four-month supply --

3    A.    Yes.

4    Q.    -- right?

5    Now, were there other Oxy --

6    were there other products that contained

7    opioids that you sold, other than Oxy?

8    MS. KOSKI:  Object to form.

9    THE WITNESS:  Yes.

10   BY MR. PENNOCK:

11   Q.    How many?

12   A.    I don't know.

13   Q.    So whatever the 7.5 million

14   per quarter of Oxy, that did not

15   represent your total sales, at that time,

16   of opioid products, correct?

17   A.    Correct.

18   Q.    Now, at some point -- by the

19   way, this was in -- this was in September

20   of 2008, right?

21   A.    Yes.

22   Q.    At some point in the summer

23   of 2007, you formed an agreement with the

24   DEA that you would not sell more than

1    5,000 units of a particular drug to

2    customers of yours; is that correct?

3                MS. KOSKI:  Object to form.

4                THE WITNESS:  No.

5    BY MR. PENNOCK:

6        Q.    You had an agreement that

7    you would not sell more than 5,000 units

8    of a drug to customers, more than that in

9    one month, right?

10               MS. KOSKI:  Object to form.

11               THE WITNESS:  No.

12   BY MR. PENNOCK:

13       Q.    So what agreement did you

14   form, in your mind, in 2007?

15               MS. KOSKI:  Object to form.

16               Go ahead.

17               THE WITNESS:  There was

18           never an agreement.  We met with

19           the DEA, and the DEA gave us a

20           guideline that nobody should

21           really have more than 5,000

22           tablets at any time.

23               They didn't define -- at

24           that point in time, they didn't

1          define if it was an opioid or the

2          type of chemical it was.  They

3          just basically said no pharmacy

4          should have more than 5,000,

5          unless there's reasons for it, and

6          we would have to understand why we

7          would give them more than 5,000.

8              But as a rule of thumb, that

9          they felt that we should not -- a

10         common -- based on the industry, a

11         pharmacy should not, probably,

12         sell more than 5,000 tablets at

13         any time, unless there was a

14         reason for it, that we would have

15         to investigate.

16    BY MR. PENNOCK:

17         Q.    Well, after having this

18    discussion with the DEA -- by the way,

19    you were personally part of that

20    discussion, weren't you?

21         A.    Which discussion was it?  We

22    spoke with them a lot.

23         Q.    Whatever discussion you had

24    where they provided you with this

1    guideline that you should probably not

2    sell more than 5,000 tablets at any time,

3    unless there was a reason for it.

4           A.    I don't recall the exact

5    time that that conversation happened, but

6    you're in the right time frame.  It was

7    somewhere in there.

8                 We spoke with them a lot.

9    The DEA -- the local DEA was literally

10   across the street from the Anda office.

11   We communicated all the time, a lot.

12                But I don't remember that

13   exact conversation.  But at that point,

14   it was 5,000 is what they discussed it

15   would be, a rule of thumb for us to look

16   at.

17          Q.    And you took that rule of

18   thumb very seriously, didn't you?

19          A.    Yes.

20          Q.    And you applied that to your

21   practice, in terms of sales; isn't that

22   right?

23          A.    Yes.

24          Q.    And the reason that you

1    applied it to your practice, in terms of

2    sales, was because you understood that

3    there was -- there appeared to be a

4    problem regarding the diversion of

5    opioids, right?

6         A.    Yes.

7         Q.    And at that time, was that a

8    concern of yours, to take steps to avoid

9    the diversion of opioids?

10        A.    Yes.

11        Q.    Now, you mentioned that if

12   some customer wanted more than 5,000,

13   that, then, you would investigate, true?

14        A.    Yes.

15        Q.    And what was the nature of

16   that investigation?

17        A.    If we are talking about the

18   2006, '07 time frame, then they would

19   have a questionnaire.  We understand who

20   they sold to.  We would look at exactly

21   what we sold to them, too, ourselves, and

22   look at what their mix was.

23             Then we would try to also

24   get a dispensing record from them of what

Highly Confidential - Subject to Further Confidentiality Review

1    they're dispensing so we could find out

2    where else they're buying opioids from.

3    Because the DEA would not share that

4    information with us.

5         Q.    When you -- if you received

6    an order for, let's say, 10,000 units,

7    would you report that to the DEA if you

8    didn't agree to fulfill that order?

9              MS. KOSKI:  Object to form.

10             THE WITNESS:  We did -- our

11             goal was to do the due diligence

12             on the front end to not even allow

13             a person to place an order for

14             that.

15             So they knew what their --

16             their limits that they could

17             possibly have.  If they tried to

18             place an order, which they didn't,

19             if they tried to place an order,

20             we would have identified the DEA

21             that they wanted more than the

22             5,000 limit.

23             But if they -- but we would

24             try to proactively not allow --

Highly Confidential - Subject to Further Confidentiality Review

1          proactively tell our customers

2          that this is all you're going to

3          get.  And if there's a reason that

4          your facility needs more than

5          5,000, then you're going to have

6          to, you know, give us more due

7          diligence in order for us to

8          approve that.

9                          -  -  -

10              (Whereupon, Anda-Paonessa

11          Exhibit-3,

12          Anda_Opioids_MDL_0000078211-212,

13          was marked for identification.)

14                          -  -  -

15      BY MR. PENNOCK:

16          Q.    I'm going to show you what's

17      been marked as Exhibit-3 to your

18      deposition.

19              MR. PENNOCK:  For the

20          record, I did not identify it,

21          Exhibit-2 was Anda_Opioids_MDL,

22          Bates number 0000618121.

23              Exhibit-3 is same prefix,

24          0000078211.

1                    THE WITNESS:  Okay.

2    BY MR. PENNOCK:

3         Q.    So this Exhibit-3 is a

4    letter that -- I'm sorry, an e-mail that

5    you were cc'd on, right?

6         A.    Yes.

7         Q.    And Michael Cochrane, he was

8    somebody that worked for you, right?

9         A.    Yes.

10        Q.    And he was involved in -- or

11   he was responsible for compliance; is

12   that right?

13        A.    Yes.

14        Q.    And Patrick Cochrane also

15   worked for you, right?

16        A.    Yes.

17        Q.    And he also -- you consulted

18   him with respect to compliance as well on

19   occasion, right?

20        A.    Yes.

21        Q.    And in this e-mail, do you

22   agree with me, it appears that a

23   customer, KeySource -- by the way, is

24   Steve Cochrane related to Michael and

Highly Confidential - Subject to Further Confidentiality Review

1    Patrick Cochrane?

2         A.    No, no.

3         Q.    So KeySource was looking to

4    purchase OxyContin from you, right?

5         A.    Correct.

6         Q.    And KeySource, according to

7    Michael Cochrane, who is e-mailing you,

8    he says, I raised the 30,000 for the

9    order they sent.

10              What does that mean?

11        A.    He raised their limit to

12   30,000.

13        Q.    He says, Ron is under the

14   impression that we are going to raise

15   again.

16              Do you see that?

17        A.    Correct.

18        Q.    He says, George, your e-mail

19   yesterday was that it was a small amount,

20   no worries.  I can say we all agreed.

21              Have I read that correctly?

22        A.    Yes.

23        Q.    But now raising them to more

24   than triple what we originally did is a

Highly Confidential - Subject to Further Confidentiality Review

1    different story.

2              Right?

3         A.    Correct.

4         Q.    As far as I know, they have

5    no intentions on buying anything else

6    from us.

7              Do you see that?

8         A.    Yes.

9         Q.    What he means is that

10   they're only buying -- they're only going

11   to be buying the OxyContin from you?

12        A.    Correct.

13        Q.    And that -- that statement

14   relates to the mix of their purchases

15   that I think you alluded to earlier,

16   right?

17        A.    I alluded to that as though

18   they were independent pharmacies.  This

19   was a distributor.

20        Q.    So you didn't concern

21   yourself with whether they were

22   purchasing anything other than Oxy from

23   you if they were a distributor?

24              MS. KOSKI:  Object to form.

1           THE WITNESS:  I don't

2      remember this e-mail at all, so I

3      don't know.

4  BY MR. PENNOCK:

5      Q.    Well, what was your

6  protocol?

7           MS. KOSKI:  Object to form.

8           THE WITNESS:  In 2007 on

9      this, I don't recall.

10  BY MR. PENNOCK:

11      Q.    Well, Michael Cochrane, who

12  you just indicated was in charge of

13  compliance, he made the statement to you,

14  As far as I know, they have no intentions

15  of buying anything else from us.

16           Do you see that?

17      A.    Yes.

18           My statement is that -- what

19  I'm trying to say is that I don't

20  remember what the exact protocol was for

21  a wholesaler or distributor.  I know for

22  an independent it was different.

23           I don't recall what we had

24  as that -- at that time in 2007, I do not

1    recall what we had, you know, for a

2    situation of selling to another

3    distributor.

4           Q.    He says, They are

5    overnighting a form to us for an

▮    ██████████████████████████

7           Do you see that?

8           A.    Correct.

9           Q.    That's the -- is that the

10   222 form they had to fill out?

11          A.    Correct.

12          Q.    That was required for any

13   purchase of a controlled substance Level

14   II, right?

15          A.    Yes.

16          Q.    We only shipped half of

17   their first order, due to some credit

18   issues.

19          And then he says, Should we

20   only ship the remainder of what they have

▮    ██████████████████████████

22          Do you see that statement?

23          A.    Correct.

24          Q.    And then he asks, Do we want

1  ███████████████████████████████

2  █ ████████████  ██████████

3              Do you see that?

4       A.    Correct.

5       Q.    He's directing that to you?

6       A.    Yes.

7       Q.    And the reason he's

8  directing it to you is that you were the

9  person that would make the final decision

10  on all increases over the limit; isn't

11  that right?

12      A.    Yes.

13      Q.    And you did that on a

14  regular basis for many years at Anda,

15  right?

16      A.    Yes, yes.

17      Q.    And, typically, it would be

18  Mr. Cochrane that would e-mail you and

19  indicate what the situation was and

20  request whether you approved an increase,

21  right?

22      A.    Yes.

23      Q.    Now, you wrote back to him,

24  Stay where you are.

Highly Confidential - Subject to Further Confidentiality Review

1          MS. KOSKI:  Object to form.

2     BY MR. PENNOCK:

3          Q.    Do you see that statement?

4          A.    Yes.  I can only assume, he

5     was across the hall from me, so I

6     probably walked across and talked to him.

7          MS. KOSKI:  My objection is

8          the e-mail back to him is not from

9          Mr. Paonessa, it's from Mr.

10         Fields.

11         MR. PENNOCK:  Oh, I didn't

12         pick up on that.  I apologize.

13         Let me -- let me check that.

14    BY MR. PENNOCK:

15         Q.    Who is George Fields?

16         A.    George Fields, in 2007,

17    would have been director of sales.

18         Q.    Why is he chiming in here?

19         A.    Well, it was common for a

20    rep to plead their case to someone above

21    them for their customer, why we wouldn't

22    allow people to have certain limits.

23    Very common that it would happen.

24              But my feelings were we

1    should always listen but not say -- you

2    know, we didn't have a blanket, just do

3    it; we would listen and then we would

4    start our due diligence on it.

5         Q.    So do you know if this sale

6    was approved or not?

7         A.    No idea.

8         Q.    No recollection of that?

9         A.    No.

10        Q.    How would we find that out?

11        A.    You'd have to get the

12   records from Anda.

13        Q.    If this sale were not

14   approved, would it have been your

15   protocol, at that time, to have reported

16   KeySource to the DEA for a suspicious

17   order?

18        A.    I don't know.  On a

19   distributor, I do not know -- I don't

20   remember what our protocol was on

21   distributors at that time.

22             If that was an independent

23   pharmacy, I would have said yes.

24        Q.    If it was an independent,

1    you would have?

2         A.    Yes.

3         Q.    Okay.

4         A.    Well, let me add to that.

5              I would have, had the due

6    diligence came back on an independent

7    that did not warrant them to have an

8    increase.  Which we did numerous times

9    that we sent to the DEA, once due

10   diligence, that this is -- we would turn

11   the customer off and we would not give

12   them more Oxy or hydrocodone.

13        Q.    So if a customer placed an

14   order -- withdrawn.

15             If a customer requested to

16   place an order with you that was

17   increasing their limits and you declined

18   it, then you would report it to the DEA,

19   right?

20             MS. KOSKI:  Object to form.

21             THE WITNESS:  Well, it would

22        not be an order.  They would

23        request for a limit increase.

24             If they wanted a limit

1       increase, we would do the due

2       diligence on the customer.  So

3       this was always a contention with

4       the DEA, that we said, we won't

5       allow people to order, we've put

6       systems in, they can't order more

7       than they're allowed to have.

8             And we trained them, if you

9       want more, you need to give us

10      information.  And the

11      information -- you're talking in

12      2007 and '08.  It changed again in

13      2010, '12.  It changed again,

14      probably, before I left Anda.

15            So it was constantly us

16      trying to figure out exactly --

17      you know, part of my opinion of

18      the DEA was they wanted us to work

19      extra hard on this, and I agree

20      with that opinion of theirs, but

21      they never gave us really solid

22      guidelines of what to go on and

23      what to do.

24            So we would do everything we

Highly Confidential - Subject to Further Confidentiality Review

1        can to try to figure out, you

2        know, what this -- if this

3        customer was a good customer or a

4        bad customer when it came to

5        opioids.

6             So, most likely, an order

7        never came through for -- from an

8        independent pharmacy, because we

9        didn't allow them to order and we

10       either turned them over to the DEA

11       or we gave them the increase.

12   BY MR. PENNOCK:

13       Q.    Why is it that you only were

14   concerned about selling too much opioid

15   to independent pharmacies and not

16   distributors?

17             MS. KOSKI:  Object to form.

18             THE WITNESS:  I don't have

19       an answer for that.

20             I am very surprised,

21       actually, that we sold to

22       KeySource.  I'm the CEO of

23       KeySource, and I had no idea that

24       we had sold to them back in 2007.

1    BY MR. PENNOCK:

2         Q.    Okay.  Let me see if I can

3    understand this, though.

4              You mentioned several times

5    the -- looking at and not agreeing to

6    fulfill an order from an independent

7    pharmacy.

8              But I -- is it correct that

9    you had a different standard for

10   distributors?

11             MS. KOSKI:  Object to form.

12             THE WITNESS:  Possibly.  I

13        don't recall.

14   BY MR. PENNOCK:

15        Q.    You would agree with me that

16   an order -- withdrawn.

17             You would agree, wouldn't

18   you, that selling 75,000 units of an

19   opioid to a pharmacy per month was a very

20   high order?

21             MS. KOSKI:  Object to form.

22             THE WITNESS:  It would be

23        unique.

24   BY MR. PENNOCK:

1      Q.      Have you seen documents

2  relating to Lake Erie Medical?

3      A.      Yes.

4      Q.      Do you know who Lake Erie

5  Medical is?

6      A.      Yes.

7      Q.      Who is Lake Erie Medical?

8      A.      They are a repackaging

9  company out of Erie, Pennsylvania.

10      Q.      What does that mean, a

11  repackaging company?

12      A.      This particular company

13  would take different pharmaceuticals in

14  bottles and they would break them down

15  into tablets -- into unit of use type of

16  tablets for nursing homes, hospitals,

17  blister packs, a unit of use may be 28

18  pills or 10 pills, and then put it into

19  their own NDC number.  And then it would

20  be sold -- resold to whoever the

21  pharmacies were that they had accounts

22  with.

23      Q.      You said that -- you were

24  referring to Lake Erie Medical in Erie,

Highly Confidential - Subject to Further Confidentiality Review

1    Pennsylvania?

2         A.    I believe that's where

3    they're from.

4         Q.    Do you know of a Lake Erie

5    Medical in Toledo, Ohio?

6         A.    No, I don't recognize that.

7    I don't remember that.  I thought they

8    were in Erie, Pennsylvania.

9              They came and visited us --

10   I don't remember.  And we visited them,

11   too.  But I didn't go on the trip to

12   visit them.

13                   -   -   -

14              (Whereupon, Anda-Paonessa

15        Exhibit-4,

16        Anda_Opioids_MDL_0000276293-299,

17        was marked for identification.)

18                   -   -   -

19   BY MR. PENNOCK:

20        Q.    Let me show you what's been

21   marked as Exhibit-4 now to your

22   deposition, bearing Bates number

23   0000276293.

24        A.    Okay.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall someone by the

2   name of Mike Holmes?

3    A.    No.

4    Q.    If you look at -- you see

5   that this exhibit begins -- the top page

6   is an e-mail, but it attaches some

7   letters, right?

8    A.    Yes.

9    Q.    And the first letter in

10   order, chronological order, is a letter

11   to Lake Erie Medical Supply -- I'm sorry,

12   to Lake Erie Medical and Surgical Supply.

13        Do you see that?

14    A.    Yes.

15    Q.    And that's from the DEA

16   Detroit field division, right?

17    A.    Yes.

18    Q.    And after that, there's a

19   letter that is part of the attachment

20   that appears to be a letter sent to the

21   DEA by Mike Holmes, president of Lake

22   Erie Medical Supply, right?

23    A.    Correct.

24    Q.    And then both of these

1    letters make their way, through an

2    e-mail, to Mike Cochrane, who worked for

3    you?

4         A.    Yes.

5         Q.    He was in charge, we

6    mentioned earlier, of compliance, right?

7         A.    Correct.

8         Q.    Meaning compliance with

9    these regulations and laws concerning the

10   distribution and the sale of opioids --

11              MS. KOSKI:  Objection.

12   BY MR. PENNOCK:

13        Q.    -- as well as other

14   compliance, right?

15              MS. KOSKI:  Object to form.

16              THE WITNESS:  Yes.

17   BY MR. PENNOCK:

18        Q.    Now, this someone -- Jeannie

19   Sieren, do you know who she is?

20        A.    No.

21        Q.    Well, she sent it to Mike

22   Cochrane.  And she says, Hi Michael, Mike

23   Holmes asked me to send this to you.

24              Do you see that statement?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    This is a copy of our letter

3   from the DEA and our response to the DEA.

4   We will also forward you our written plan

5   of action.

6              Do you see that?

7        A.    Yes.

8        Q.    So does it appear to you

9   that there -- withdrawn.

10             Do you -- based on the

11  protocols that you had back in June of

12  2008, can you shed some light on why this

13  would have been sent to you?

14             MS. KOSKI:  Object to form.

15             THE WITNESS:  No.  I have no

16        idea why they got this -- why we

17        got it.

18             And I have no idea why it

19        was sent or what was going on at

20        that time.

21  BY MR. PENNOCK:

22        Q.    Well, Lake Erie -- this Lake

23  Erie Medical from Toledo, Ohio, it

24  appears, was a customer of yours?  Is

Highly Confidential - Subject to Further Confidentiality Review

1   that what it looks like to you?

2        A.    Yes.

3        Q.    And do you have any

4   recollection of selling opioids to Lake

5   Erie in Toledo, Ohio?

6             MS. KOSKI:  Object to form.

7             THE WITNESS:  I don't

8        remember doing that.

9   BY MR. PENNOCK:

10       Q.    Having seen that this is

11  Lake Erie Medical Supply from Toledo,

12  Ohio, does that refresh your recollection

13  that the Lake Erie Medical was in Toledo,

14  Ohio and not Erie, Pennsylvania?

15       A.    It -- I'm sure that this

16  Lake Erie Medical is the one that we're

17  both talking about.  I just thought it

18  was in Lake -- I thought it was in Erie,

19  Pennsylvania.

20       Q.    Had you seen these documents

21  before?

22       A.    No.

23                 -   -   -

24             (Whereupon, Anda-Paonessa

Highly Confidential - Subject to Further Confidentiality Review

1          Exhibit-5,

2          Anda_Opioids_MDL_0000282942, was

3          marked for identification.)

4                    -  -  -

5     BY MR. PENNOCK:

6          Q.    Let me show you Exhibit-5 to

7     your deposition.  This is an e-mail

8     bearing Bates number 0000282942.

9          A.    Okay.

10         Q.    Now, the first e-mail on

11    Exhibit-5 is an e-mail to you from Mike

12    Cochrane, right?

13         A.    Correct.

14         Q.    And it's October 25th, 2007.

15              It says, Al, I need your

16    approval to change the monthly dosage

17    limit percentage on the account listed

██    ████████████████████████████████████████

██    ███████████████████████████████████████

20    month.

21              Have I read that correctly?

22         A.    Correct.

23         Q.    The reason, he says, it's

██    ████████████████████████████████████████

Highly Confidential - Subject to Further Confidentiality Review

█    ███████████████████████████████████████

2   right?

3           A.    Possibly.  I'd have to --

4   I'd have to do a calculator, but that's

5   probably correct.

6           Q.    And you replied, Approved.

7           A.    Correct.

8           Q.    So what was your basis for

9   approving a 1,400 percent increase to

10  this customer?

11          A.    There's not enough here for

12  me to say why I approved it.  Most cases,

13  we spoke about it.

14          Q.    So you think you spoke about

15  it?

16          A.    Yes.  We always spoke about

17  it.  I never approved anything without

18  having backup on it, or maybe not in the

19  e-mail.  But there was a discussion about

20  the account, of why they would do it.

21                And then they would say,

22  okay, I'll send you for approval.  And I

23  would approve it.  In --

24          Q.    So you think that you spoke

1    about it --

2           A.    I'm sure I spoke about it.

3           Q.    -- before this e-mail was

4    sent to you?

5           A.    Yes.

6           Q.    And then about four hours

7    later you approved it?

8                 You're saying you approved

9    it before it was ever sent to you?

10          A.    Absolutely.

11          Q.    Was that your protocol?

12          A.    Always.

13          Q.    And what type of information

14   did you require to approve such an

15   enormous increase?

16                MS. KOSKI:  Object to form.

17   BY MR. PENNOCK:

18          Q.    You agree with me that's an

19   enormous increase, don't you?

20                MS. KOSKI:  Object to form.

21                THE WITNESS:  I agree it's

22          not a normal one that you would

23          have seen Anda do.

24   BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

█    █    ████████████████

2    dosage units a month, right?

3                    MS. KOSKI:  Object to form.

4                    THE WITNESS:  There's so

5              much behind that, that I'm not

6              looking at right now, that I can't

7              answer that question.

8    BY MR. PENNOCK:

9          Q.    Do you know where any of

10   that documentation is?

11         A.    It would be in the Anda

12   compliance department.

13         Q.    It should be in the Anda

14   compliance files, right?

15         A.    I would assume so, yes.

16         Q.    Right.  You never directed

17   anyone to destroy any documents --

18         A.    Never.

19         Q.    -- did you?

20         A.    Never.

21         Q.    You never directed anyone to

22   destroy any e-mails?

23         A.    Never.

24         Q.    You have -- did you ever

Highly Confidential - Subject to Further Confidentiality Review

1  learn that there was any destruction of

2  documents concerning opioids at Anda?

3        A.    Never.

4        Q.    Since -- even since you

5  left, have you heard any rumor of that?

6        A.    Never.

7        Q.    Sir, I'm showing you what's

8  been marked as Exhibit-6 to your

9  deposition.  And it's 0000273685.

10                   -  -  -

11              (Whereupon, Anda-Paonessa

12         Exhibit-6,

13         Anda_Opioids_MDL_0000273585-586,

14         was marked for identification.)

15                   -  -  -

16              MS. KOSKI:  The exhibit that

17         you gave the witness seems to be

18         more pages than the one that you

19         gave me.

20              Oh, you just gave him more

21         than one copy.

22              MR. PENNOCK:  Sorry.

23  BY MR. PENNOCK:

24        Q.    Have you had a chance to

Highly Confidential - Subject to Further Confidentiality Review

1    look at that e-mail chain?

2         A.    Yes.

3         Q.    Exhibit-6, this starts out

4    with an e-mail to you at 9:00 in the

5    morning on June 17th, and it says, Al, I

6    need your approval to change the monthly

7    dosage limit percentage on the account

██    ██████████████████████████████████████

██    ██████████████████████████████████████

██    ██████████████████████████████████████

11   Medical.

12             Do you see that?

13        A.    Yes.

14        Q.    It's the same customer we

15   were talking about a moment ago --

16        A.    Correct.

17        Q.    -- right?

18        A.    Do you know what product it

19   is?

20        Q.    We'll get to that.

21             And you said, You have

22   backup for this?

23             Do you see that statement?

24        A.    Yes.

1   Q.   Feel comfortable?

2   A.   Yes.

3   Q.   And he wrote back, Yes.

4        Right?

5   A.   Correct.

6   Q.   And you approved it?

7   A.   Correct.

8   Q.   So is it your testimony that

9   you had a conversation with him about the

10  basis for his feeling comfortable for

11  this increase?

12       A.   I don't recall this specific

13  situation.

14       Q.   Well, what would have been

15  your basis to approve an increase of --

16  from 1,400 percent to 2,400 percent back

17  in June of 2008?

18       A.   I believe that our due

19  diligence that Michael had backup for was

20  going to be adequate.  Whether I saw it

21  or not, I do not recall.

22       Q.   So it's possible that you

23  may have approved it without seeing it?

24       A.   Not before asking, do you

Highly Confidential - Subject to Further Confidentiality Review

1   have backup to justify it?  That's what

2   the, Do you have backup for.

3          Q.    And if Cochrane said, Mike

4   Cochrane said, yes, I have backup, then

5   you would sign-off on it?

6          A.    It looks like I did in this

7   instance.  I don't know exactly what I

8   thought he would have or not have at that

9   time.

10              I knew he had reviewed Lake

11  Erie Medical numerous times.  So I

12  probably assumed that he had the backup

13  that I was expecting.

14         Q.    You understood at that time

15  that there appeared to be a problem with

16  opioids in the United States, didn't you?

17              MS. KOSKI:  Object to form.

18              THE WITNESS:  Not -- at this

19         period of time in 2006 and '07,

20         not to the extent that we saw in

21         later years, no.

22  BY MR. PENNOCK:

23         Q.    You knew people were dying

24  from opioids at that time, didn't you?

1           MS. KOSKI:  Object to form.

2           THE WITNESS:  I would assume

3       they did.  But I don't -- you

4       know, I don't believe that, at

5       that period of time, it was like

6       what we currently see today.

7   BY MR. PENNOCK:

8       Q.    Well, if we go back to

9   Exhibit-4, the letter from -- the letters

10  that Lake Erie sent to Mike Cochrane from

11  the DEA -- go back to Exhibit-4, please.

12      A.    Okay.

13      Q.    And so you approved this

14  increase on June 17th, 2008.  And the

15  letters regarding the DEA -- or, I'm

16  sorry, the letter from the DEA to Lake

17  Erie and Lake Erie's response was about

18  two weeks earlier, June 4th, 2008.

19          Do you see that?  That's

20  when they were sent to Cochrane.

21          MS. KOSKI:  Object to form.

22          THE WITNESS:  Okay.

23  BY MR. PENNOCK:

24      Q.    So the letters that we

1  looked at a few minutes ago in Exhibit-4

2  were e-mailed to Michael Cochrane, who

3  worked for you, on June 4th, 2008, right?

4      A.    Correct.

5      Q.    And then what we just looked

6  at in Exhibit-6 was June 17th, 2008,

7  right?

8      A.    Correct.

9      Q.    Now, Mr. Cochrane, at least,

10  had available to him a letter, and I want

11  to -- that letter.  And let's look at

12  some of the things the DEA said to Lake

13  Erie, if you want to take a minute.

14      A.    Okay.

15      Q.    All right.  Thank you.

16          Let's look at the -- so the

17  DEA letter to Lake Erie indicates that,

18  tell me if I'm reading this correctly,

19  please, Inventories performed did not

20  contain complete and accurate records of

21  all controlled substances.

22          Do you see that statement?

23      A.    Yes.

24      Q.    Retention samples resulting

Highly Confidential - Subject to Further Confidentiality Review

1    from the manufacturing process were not

2    included in the inventories.

3              Do you see that?

4         A.    Yes.

5         Q.    What are retention samples?

6         A.    When they would break down a

7    bottle and put it into, say, blister

8    packs, for example, there would not --

9    they would have to save certain tablets

10   and put them -- keep them on file,

11   basically, of something that went out as

12   it was broken down into different

13   packaging.

14             So they had to keep

15   something in the building.  So those

16   tablets needed to be accounted for.

17        Q.    But they hadn't done that,

18   right?

19        A.    Per this, yes.

20        Q.    It appears they hadn't done

21   that?

22        A.    It appears they hadn't done

23   that.

24        Q.    There was some missing

1   product, right?

2          A.    Yes.

3          Q.    And then they say, Damaged

4   controlled substances stock retained by

5   the firm -- meaning Lake Erie Medical,

6   right?

7          A.    Yes.

8          Q.    -- was not included in the

9   inventories.

10              Do you see that statement?

11         A.    Yes.

12         Q.    So that means that if they

13  claimed that some product was somehow

14  damaged, they didn't keep track of that?

15         A.    It appears so.

16         Q.    That's not good, is it?

17              MS. KOSKI:  Object to form.

18              THE WITNESS:  No.

19  BY MR. PENNOCK:

20         Q.    Mr. Cochrane did not bring

21  this to your attention when he asked you

22  to increase from 1,400 percent to 2,400

23  percent two weeks later, did he?

24              MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  I don't

2       recall.

3  BY MR. PENNOCK:

4       Q.    It doesn't appear that he

5  did?

6              MS. KOSKI:  Object to form.

7              THE WITNESS:  Agree.

8  BY MR. PENNOCK:

9       Q.    I mean, if he had brought

10  that to your attention, you -- under your

11  protocol, you wouldn't have approved

12  this, would you?

13             MS. KOSKI:  Object to form.

14             THE WITNESS:  There would

15       have been more information that I

16       would have needed to see.  But

17       this would have been alarming.

18  BY MR. PENNOCK:

19       Q.    Okay.

20                  -   -   -

21             (Whereupon, Anda-Paonessa

22       Exhibit-7,

23       Anda_Opioids_MDL_0000258573, was

24       marked for identification.)

```
 1                    -  -  -
 2   BY MR. PENNOCK:
 3         Q.    Let me show you what's
 4   marked as Exhibit-7 to your deposition.
 5   It's an e-mail bearing 0000258673.
 6               MS. KOSKI:  You gave me a
 7         different document.
 8   BY MR. PENNOCK:
 9         Q.    So this is five months later
10   and Cochrane, Michael Cochrane, e-mails
11   you and Patrick Cochrane.
12               Is that his brother?
13         A.    Yes.
14         Q.    And he says, What do you
15   want to increase Harvard to?
16               Do you see that?
17         A.    Yes.
18         Q.    He's talking about another
19   drug distributor, right?
20               MS. KOSKI:  Object to form.
21               THE WITNESS:  He was a
22         wholesaler, but yes.
23   BY MR. PENNOCK:
24         Q.    Okay.  Wholesaler.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Do you draw -- is there some

2   distinction between a distributor and a

3   wholesaler?

4           A.    Yeah, the full-line

5   wholesaler versus a distributor.  A

6   distributor is more of a secondary or

7   tertiary to pharmacies around the

8   country, where a full-line wholesaler, he

9   would be selling everything to most of

10  his accounts; but he also operated

11  slightly as a distributor, too, with some

12  telesales, which wasn't really common in

13  our industry.

14          Q.    So he asked you, What do you

15  want to increase Harvard to?

16          And Harvard was a wholesaler

17  of --

18          A.    Yes.

19          Q.    -- products, including

20  pharmaceuticals, right?

21          A.    Yes.

22          Q.    And this has nothing to do

23  with Harvard College?

24          A.    No.

1       Q.    Or Harvard University?

2       A.    No.

3       Q.    This was a wholesaler

4   located in -- around Detroit, Michigan?

5       A.    Yes.

6       Q.    And he says, Jay is working

7   on getting an Oxy order.

8             Who is Jay?

9       A.    He was the head of

10  procurement.  He was the one that had to

11  do the order forms if we were selling or

12  we were buying.

13      Q.    So Jay was in charge of

14  buying Oxy for you that you would then

15  sell to someone else?

16            MS. KOSKI:  Object to form.

17  BY MR. PENNOCK:

18      Q.    In part?

19      A.    No.  Jay -- Jay Barrett was

20  the head of purchasing -- or procurement,

21  part of purchasing, but procurement,

22  where you order the product versus where

23  you're negotiating with vendors on price

24  and stuff like that.

1            So it appears that there was

2    an order coming from Harvard, because

3    they didn't have sales reps and stuff for

4    Harvard, they would have dealt directly

5    with our procurement department.  And

6    that's what I believe that is.

7            There's so much behind this

8    that I don't see here.  But I -- you

9    know, there had to have been a

10   discussion.  I truly would not have just

11   written 200,000 and sent an e-mail.

12   There was a conversation about this in

13   person.

14       Q.    Because he says, Jay is

15   working on getting an Oxy order for 288

16   pieces of each strength, approximately

17   115,000 doses.

18       A.    The math doesn't even seem

19   to work for that, if it's 288 pieces of

20   each strength.  There's only four

21   strengths.  So I don't know totally what

22   that means.

23       Q.    Well, at least we can --

24   your interpretation is that Harvard

1   wanted to buy 115,000 doses?

2       A.    Correct.

3       Q.    And you wrote back, 200,000,

4   right?

5       A.    Correct.  I don't recall why

6   I wrote 200,000, though.

7       Q.    You knew -- you knew and

8   were friends with someone at Harvard,

9   weren't you?

10      A.    Yes.

11      Q.    Terry Hass, was he one of

12  the guys?  Or who were you friends with

13  there?

14      A.    Actually, ironically, his

15  name is Jay; it's Jay Levine, though.

16            And back in 2007, Terry Hass

17  wasn't there yet.  So it would still be

18  Jay Levine.

19                  -  -  -

20            (Whereupon, Anda-Paonessa

21      Exhibit-8,

22      Anda_Opioids_MDL_0000258572, was

23      marked for identification.)

24                  -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. PENNOCK:

2         Q.    Let me show you Exhibit-8.

3    It's a little confusing.

4              MR. PENNOCK:  Exhibit-7, by

5         the way, if I didn't read it, was

6         0000258573.

7              Exhibit-8 is 0000258572.

8    BY MR. PENNOCK:

9         Q.    So we have -- this is

10   another e-mail thread, right?  It's

11   different than the one I just showed you

12   in Exhibit-7, isn't it?

13        A.    Correct.

14        Q.    But it's on the same date,

15   November 9th.

16             Do you see that?

17        A.    Yes.

18        Q.    So the one we just looked

19   at, Cochrane e-mailed you at 9:18 a.m.,

20   What do you want to increase Harvard to?

21             And you wrote back at 2:23

22   p.m., 200,000.

23             Right?

24        A.    Correct.

1      Q.    Now we look at Exhibit-8

2    from the same day, and Cochrane e-mails

3    you at 10:00 a.m.  This time he includes

4    Kim Bloom.

5                She was in sales, right?

6      A.    Yes.

7      Q.    And he includes Jay Barrett,

8    who you referred to earlier.  He wasn't

9    on the other e-mail we looked at.

10               Do you see that?

11     A.    Yes.

12     Q.    It says, Subject:  Approval.

13   Al, I need your approval to change the

14   monthly dosage limit percentage on the

■    ████████████████████████████████

■    ████████████████████████████████

■    █████████████████████████

18               Do you see that?

19     A.    Yes.

20     Q.    And at 3:05 p.m. you wrote,

21   Approved.

22               Right?

23     A.    Yes.

24     Q.    This is the second time.  I

1    mean, you approved -- you approved it --

2    you approved it at 2:23 p.m., you said

3    200,000 -- well, you said 200,000, right?

4         A.    Correct.

5         Q.    And then -- but he had

6    previously written to you 200,000 earlier

7    that day?

8              MS. KOSKI:  Object to form.

9    BY MR. PENNOCK:

10        Q.    Do you see that?

11        A.    Okay.  Yes.

12        Q.    So can you explain to me

13   what transpired here?  I mean, you're --

14        A.    What I believe transpired

15   here is that we had the discussion about

16   it, I agreed to it.  I had -- I had

17   responded to this e-mail before I

18   responded to the second e-mail.

19            So in the earlier e-mail,

20   because we were verbally talking to each

21   other, I had said, you know, that we

22   would do 200,000.  And I responded to

23   that later in the afternoon.

24            He had already -- because he

1    knew I was already going to agree to

2    200,000, he had sent this, at 10:00 a.m.,

3    to me, because this was really the

4    official one that we used for approvals.

5                 So that's when he sent it to

6    me.  But I didn't approve -- I must have

7    responded to that one and he probably

8    came and told me.  Because, again, we're

9    across the hall, you got to respond to

10   the other one, which is the one that we

11   use in our files.

12                So I did end up responding

13   to his second e-mail that came, you know,

14   40 minutes later.

17   month?

18          A.    Yes.

19          Q.    And that's a massive amount,

20   isn't it?

21                MS. KOSKI:  Object to form.

22                THE WITNESS:  I don't

23          believe it's a massive amount for

24          a wholesaler his size, no.

```
 1    BY MR. PENNOCK:

 2         Q.    Really?

 3              MS. KOSKI:  I didn't hear

 4         you say something, but then

 5         there's an indication on the

 6         transcript that you said "really."

 7              Did you ask that question?

 8         Or was that just -- is there

 9         something pending?

10              MR. PENNOCK:  I may have

11         said that.  This entire case blows

12         my mind.

13              MS. KOSKI:  Move to strike

14         the colloquy.

15              MR. PENNOCK:  Well, we'll

16         get to another aspect of that.

17    BY MR. PENNOCK:

18         Q.    Whether it's a massive

19    amount for a wholesaler that size or not,

20    you agree with me that 200,000 units is

21    not something to joke about --

22              MS. KOSKI:  Object to form.

23    BY MR. PENNOCK:

24         Q.    -- right?
```

```
 1              A.    I agree.

 2                      -   -   -

 3              (Whereupon, Anda-Paonessa

 4         Exhibit-9,

 5         Anda_Opioids_MDL_0000091168-176,

 6         was marked for identification.)

 7                      -   -   -

 8    BY MR. PENNOCK:

 9              Q.    Let me show you what's been

10    marked as Exhibit-9 to your deposition.

11              MS. KOSKI:  Thank you.

12              He wants to know if you want

13         him to read the entire article?

14              THE WITNESS:  I know what --

15         I know what --

16              MR. PENNOCK:  I'm happy to

17         direct you to portions, and then

18         you can read whatever you'd like

19         after I do that.

20              MS. KOSKI:  If you have

21         questions like that, if you direct

22         that to him, it's better than

23         directing it to me.

24              THE WITNESS:  Okay.
```

1    BY MR. PENNOCK:

2         Q.    I've marked as Exhibit-9 to

3    your deposition.  The Bates number --

4    it's an e-mail with an attachment.  It's

5    Bates number 0000091168.

6              So what we have here is,

7    it's an e-mail that -- it's a little

8    tough to follow this thread, but

9    someone -- there we go.

10             David Liming, do you know

11   who that is?

12        A.    No.

13        Q.    David Liming sent an

14   e-mail -- well, it's very hard to follow

15   in the manner it was produced.

16             But it says to David Liming,

17   Oxy and Harvard.  Thanks, Dave.  It is a

18   great pleasure to be mentioned in the

19   same article as two convicted felons.  Be

20   well, TH.

21             TH is Terry Hass, right?

22             Right?

23        A.    Yes.

24        Q.    And you know who he is?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.    Yes.

2            Q.    You didn't know Liming, but

3    you knew him, right?

4            A.    Yes.

5            Q.    And this e-mail thread is in

6    June of 2012, right?

7            A.    Yes.

8            Q.    And then Terry Hass --

9    sorry, David Liming responds back to

10   Terry Hass -- both of them worked at the

11   Harvard Drug Group, right?

12           A.    Yes.

13           Q.    And he responds back, Now,

14   that is funny.  You made my day.

15                 Do you see that?

16           A.    Yes.

17           Q.    And then Terry forwarded the

18   thread and the attachment to you?

19           A.    Yes.

20           Q.    And the attachment that

21   Terry sent to you is a Business Week

22   article entitled, American Pain, the

23   Largest U.S. Pill Mill's Rise and Fall.

24                 Do you see that?
```

1       A.      Yes.

2       Q.      And this article, I won't

3  get into too much detail, but it talks

4  about -- it specifically mentions, it

5  says, George says --

6              MS. KOSKI:  Where are you?

7         I'm just trying to follow along

8         where you are.

9              MR. PENNOCK:  Sorry, Page 5.

10  BY MR. PENNOCK:

11      Q.      It said, quote, in the

12  article it says, George says that as his

13  business in Florida expanded, he

14  struggled to buy enough opioids to keep

15  up with the demand.  His stable of almost

16  a dozen wholesalers ranged from tiny

17  local operations, such as Medical Arts

18  Pharmacy in St. Petersburg, to a couple

19  of national distributors, including

20  Harvard Drug Group based in Livonia,

21  Michigan, one of the ten largest

22  wholesalers of generic drugs in the

23  country.

24              Do you see that statement?

1       A.   Yes.

2       Q.   And that's the very company

■ ████████████████████████████████

4  sale to about four years earlier, right?

5       A.   Yes.

6       Q.   And about -- and, sir, about

7  two and-a-half years after you approved

■ ████████████████████████████████

9  suspended their license to distribute

10  controlled substances, didn't they, in

11  June of 2010?

12       A.   Yes.

13       MS. KOSKI:  Object to form.

14  BY MR. PENNOCK:

15       Q.   And, now, having received

16  this article -- withdrawn.

17       Did you know, before you

18  received this article, that Harvard was a

19  major supplier of one of America's

20  largest pill mills?

21       MS. KOSKI:  Object to form.

22       THE WITNESS:  No.

23  BY MR. PENNOCK:

24       Q.   Well, when you saw that back

1    in 2012, knowing that you had been

2    selling to Harvard a lot of opioids, did

3    it disturb you that you had been

4    providing opioids that may have been

5    diverted to America's largest pill mill?

6                    MS. KOSKI:  Object to form.

7             Assumes facts not in evidence.

8                    THE WITNESS:  Yes.

9    BY MR. PENNOCK:

10           Q.    Did it disturb you that

11   these guys were joking around about this?

12                   MS. KOSKI:  Object to form.

13                   THE WITNESS:  I don't -- I

14            don't recall this e-mail at all.

15   BY MR. PENNOCK:

16           Q.    Were you paying attention to

17   anything that was going on?

18                   MS. KOSKI:  Object to form.

19   BY MR. PENNOCK:

20           Q.    With respect to opioids and

21   their distribution and diversion at that

22   time?

23                   MS. KOSKI:  Object to form.

24            You don't need to answer that.

1          That's inappropriate.

2                  You can ask a question and

3          answer.

4                  MR. PENNOCK:  I'm asking

5          him.

6    BY MR. PENNOCK:

7          Q.    What do you feel that you

8    were paying the most attention to with

9    regard to the distribution and potential

10   diversion of opioids at that time?

11                 MS. KOSKI:  Object to form.

12                 What time?

13                 MR. PENNOCK:  June of 2012.

14                 THE WITNESS:  I don't

15          remember exactly when I stopped

16          selling Harvard, but it was well

17          before that.  Harvard would have

18          probably been stopped in 2009 or

19          '10.  So, I mean, I'm not sure of

20          the exact dates, but they lost

21          their license in '10, correct?

22                 So -- and I -- so it's a

23          great article about what happened.

24          I explained to my guys, this is

1          why we got out of the selling --

2          we stopped, ourselves, well before

3          Harvard lost their license of

4          selling to physicians.

5          Proactively, on our own, we did

6          that.

7     BY MR. PENNOCK:

8          Q.    I see they were very upset

9     with you about that, since they're

10    sending you this article two years later.

11              MS. KOSKI:  Object to form.

12              THE WITNESS:  They were

13         making fun of the previous owners,

14         is what they were doing.

15    BY MR. PENNOCK:

16         Q.    You agree with me that it's

17    likely that some of the opioids that you

18    sold to Harvard did end up in diversion

19    through at least this -- this group that

20    was the subject of this article, right?

21              MS. KOSKI:  Object to form.

22         Calls for speculation.

23              You can answer that if you

24         can possibly know it.

```
 1                    THE WITNESS:  It's possible.
 2     BY MR. PENNOCK:
 3          Q.    It's likely?
 4                    MS. KOSKI:  Object to form.
 5                    THE WITNESS:  It's possible.
 6                    MR. PENNOCK:  Why don't we
 7          take a quick break?
 8                    VIDEO TECHNICIAN:  Going off
 9          record.  The time is 11:21.
10                      -   -   -
11                    (Whereupon, a brief recess
12          was taken.)
13                      -   -   -
14                    VIDEO TECHNICIAN:  We are
15          going back on record.  Beginning
16          of Media File Number 2.  The time
17          is 11:35.
18     BY MR. PENNOCK:
```

███     ████████████████

███          ███      █████████████████████

3        Q.    Is that where you grew up?

4        A.    Yes.

5        Q.    Did you see this news report

6    on -- take a look at this, marked as

7    Exhibit-10 to your deposition.

8                  -  -  -

9            (Whereupon, Anda-Paonessa

10           Exhibit-10, PBS.org; Understanding

11           the Opioid Epidemic, Michael?s

12           Story, was marked for

13           identification.)

14                  -  -  -

15           MS. KOSKI:  You might have

16           given me your -- there's a

17           handwritten note on this.  I don't

18           know if there's more.

19               MR. PENNOCK:  It's just my

20           10.

21    BY MR. PENNOCK:

22        Q.    I'm just wondering, is

23    that -- because you're from this area,

24    did you ever see this news report?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.    No.

2          Q.    Have you seen news reports

3    regarding opioid deaths in the United

4    States --

5          A.    Yes.

6          Q.    -- individuals and so forth?

7              MS. KOSKI:  Let him finish

8         his question.

9              THE WITNESS:  Yes.

10   BY MR. PENNOCK:

11         Q.    At one point, in April of

12   2009, you were sent something -- well,

13   you probably don't recall.  I'll show it

14   to you.

15                   -  -  -

16              (Whereupon, Anda-Paonessa

17         Exhibit-11,

18         Allergan_MDL_01030377-3738, was

19         marked for identification.)

20                   -  -  -

21   BY MR. PENNOCK:

22         Q.    This is Exhibit-11 to your

23   deposition is an e-mail that was sent to

24   you, Michael Cochrane, Patrick Cochrane,
```

1    from Tracey Hernandez at Watson.  It

2    bears Bates number Allergan_MDL_01033 --

3    I'll start again --

4    Allergan_MDL_01030377.  That's

5    Exhibit-11.

6           A.    Okay.

7           Q.    So Watson was essentially

8    the company that owned you, right?

9           A.    Yes.

10          Q.    Meaning owned Anda.

11                And this e-mail was sent in

12   April 2009 to a number of people,

13   including you, right?

14          A.    Yes.

15          Q.    And she's reporting to you

16   about a rule, a new rule that had been

17   published concerning marketing, right?

18                MS. KOSKI:  Object to form.

19                THE WITNESS:  That's what it

20          says there, yes.

21   BY MR. PENNOCK:

22          Q.    And she's also referencing

23   a -- she's referencing a new law

24   regarding what's called The Ryan Haight

Highly Confidential - Subject to Further Confidentiality Review

1    Act.

2                  Do you see that?

3          A.    Yes, it's there.  Yes.

4          Q.    And it's -- the new law is

5    trying to -- or making an effort to help

6    prevent use of the Internet to advertise

7    the sale of or offer to sell, distribute

8    or dispense a controlled substance,

9    right?

10                 MS. KOSKI:  You're asking

11             him if that's what the document

12             says?

13   BY MR. PENNOCK:

14         Q.    Do you see where --

15                 MR. PENNOCK:  Yes.

16   BY MR. PENNOCK:

17         Q.    Is that what the document

18   says?

19         A.    That's what I'm reading,

20   yes.

21         Q.    All right.  And did she --

22   was she above you, Tracey Hernandez?

23                 MS. KOSKI:  Object to form.

24   BY MR. PENNOCK:

1    Q.    In other words, was she sort

2  of one of your people that were higher up

3  than you, because she's at Watson?

4          No?

5    A.    No, I don't believe so.

6    Q.    In any event, she makes a

7  statement in here that there should be a

8  review of your marketing efforts.

9          Do you see that?

10   A.    Yes.

11   Q.    Now, Anda did promote

12 opioids, didn't they?

13   A.    Yes.

14   Q.    I'd like to go through some

15 of that with you.

16              -  -  -

17          (Whereupon, Anda-Paonessa

18     Exhibit-12,

19     Anda_Opioids_MDL_0000611326-327,

20     was marked for identification.)

21              -  -  -

22          MS. KOSKI:  Thank you.

23 BY MR. PENNOCK:

24   Q.    Exhibit-12 to your

Highly Confidential - Subject to Further Confidentiality Review

1    deposition is

2    Anda_Opioids_MDL_0000611326.

3          A.    Okay.

4          Q.    This is an e-mail where it

5    is being proposed for approval -- well,

6    first, let me start.

7                This is in -- this is in

8    April of 2007, right?

9          A.    Yes.

10         Q.    True?

11         A.    Yes.

12         Q.    And it's the spring promo

13   2007?

14         A.    Yes.

15         Q.    And it's to you and Brian

16   Witte, who was in sales, Witte?

17         A.    In 2007, he would have

18   been -- I believe he was in operation --

19   sales operations, yes.

20         Q.    It says, Al, per our

21   discussion, please approve/offer feedback

22   on the spring promo format.

23                Do you see that statement?

24         A.    Yes.

1          Q.    You should know that Jay and

2    his team are getting buy-in or sales-out

3    promos as best they can, too, in

4    conjunction with this.

5               Do you see that statement?

6          A.    Yes.

7          Q.    We added a 1.25 times tier

8    for 5 percent and a 1.5 times tier for 6

9    percent.

10              Right?  Do you see that?

11         A.    Yes, that's what it says.

12         Q.    Brian, confirm dating,

13   please.

14              Do you see that statement?

15         A.    Yes.

16         Q.    That refers to giving

17   buyers, like, lines of credit, right?

18         A.    No.

19              MS. KOSKI:  Object to form.

20   BY MR. PENNOCK:

21         Q.    Doesn't that -- that doesn't

22   refer to giving them, like, time to pay

23   you, like, 30 days or 60 days?

24              A.    I believe that this is the

1   buy side from us from manufacturers

2   they're talking about, not the sale to

3   the customer.

4        Q.    Okay.  In any event, the

5   actual promo is on the next page.

6        A.    Correct.

7        Q.    And it says that -- it goes

8   on to indicate the different discounts

9   that you're going to offer for your

10  products, right?

11       A.    Yes.

12       Q.    And that includes C-II

13  items, true?

14       A.    Yes.

15       Q.    And C-II items included

16  opioids, right?

17       A.    Yes.

18       Q.    And you were going to give 5

19  percent off minimum order of 1.25 times

20  the average C-II purchases on generic

21  items.

22            Do you see that?

23       A.    Yes.

24       Q.    So that means that if their

1    average had been -- whatever their

2    average was, if they ordered 25 percent

3    more than their average, you would give 5

4    point -- you would give 5 percent off?

5         A.    Yes.

6         Q.    And, again, what is the 60

7    days dating?  What does that mean?

8         A.    So there was extended dating

9    of when the customer had to pay, yes.

10        Q.    So you were giving -- so you

11   were giving them time to pay; order now,

12   pay later?

13        A.    Yes.

14        Q.    Right?

15        A.    Yes.

16        Q.    90 days -- if they went up

17   to 50 percent more than their average

18   C-II purchases, generic items only, you

19   would give them 6 percent off and 90 days

20   to pay?

21        A.    That's what it says, yes.

22        Q.    What kind of discussion did

23   you have about doing promotionals like

24   this for controlled substances?

```
 1              MS. KOSKI:  Object to form.

 2              THE WITNESS:  You're going

 3         back to early, you know, 2000 --

 4         late 2006, these discussions would

 5         have happened.  And at that point,

 6         you know, we weren't -- it wasn't

 7         the same environment that it is

 8         today, or even 2009, '10, '11.

 9              So we weren't afraid at that

10         point to, you know, do an overall

11         spring promotion that included

12         C-IIs.  It wasn't a spring

13         promotion for C-IIs, it just

14         happened to be that C-IIs were

15         part of it.

16                   -  -  -

17              (Whereupon, Anda-Paonessa

18         Exhibit-13,

19         Anda_Opioids_MDL_0000108236-243,

20         was marked for identification.)

21                   -  -  -

22    BY MR. PENNOCK:

23         Q.   I'm going to show you Bates

24    number Anda_Opioids_MDL_0000108236, is
```

Highly Confidential - Subject to Further Confidentiality Review

1    the initial Bates number.  It ends in

2    243.  The Bates got cut off in the

3    photocopy.  Just take a moment and look

4    at that.

5         A.    Okay.

6         Q.    So this is a -- this

7    document, Exhibit --

8              MR. PENNOCK:  What Exhibit

9         number is this?

10             MS. KOSKI:  13.

11             MR. PENNOCK:  13.

12        Exhibit-13.

13   BY MR. PENNOCK:

14        Q.    So let's take a look at

15   Exhibit-13.

16             This is Anda C-II product

17   listing, right?

18        A.    Yes.

19        Q.    Your source for Class II

20   generic and branded controlled substance

21   products.

22             Right?

23        A.    Yes.

24        Q.    This is something that you

1   would send out to potential customers,

2   right?

3           A.    Yes.

4           Q.    And the first page --

5           A.    No, I take -- I recall that

6   statement.

7                 This was what we would have

8   sent to current customers.

9           Q.    To current customers?

10          A.    Current customers.

11          Q.    Okay.  And -- meaning people

12  that were currently buying something from

13  you, whatever it was?

14          A.    Whatever; controls, not

15  controls.

16          Q.    So I just -- I'd like to go

17  over this.

18                First of all -- well, I'll

19  come back to that.

20                Ordering C-IIs from Anda is

21  easier than ever.

22                Right?  Do you see that?

23          A.    Yes.

24          Q.    Did you approve this?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      Two quick and convenient

3    steps to schedule a paper 222 form

4    pickup.

5              So this is talking about,

6    we'll get you the form so that you can

7    buy C-IIs, and then we'll even pick it up

8    and bring it back to us so we can process

9    the order, right?

10       A.      Yes.

11       Q.      And it goes on to describe

12   the two easy steps.

13             Fill out your paper 222

14   form.  And then Number 2, Schedule a

15   pickup online or call for sales

16   representative.

17       A.      Correct.

18       Q.      It gives you a little how to

19   do it and so forth, right?

20             And reminds you, you can

21   always call Fed Ex directly to schedule a

22   pick up if you have the pre-addressed Fed

23   Ex envelope from Anda/VIP.

24             Do you see that statement?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Yes.
 2          Q.    And, I mean, it's got these
 3   other things here.  Goodbye paper, as
 4   always, you can eliminate paper 222 forms
 5   and get live on CSOS, controlled
 6   substances ordering system, right?
 7          A.    Yes.
 8          Q.    That was the Anda system
 9   that your customers could use?
10          A.    It was an -- all
11   distributors had that system.
12          Q.    You had it?
13          A.    Yes.  We worked closely with
14   the DEA to develop some of it ourselves.
15          Q.    Now offering a full line of
16   brand and generic C-II products.
17                Do you see that statement?
18          A.    Yes.
19          Q.    So this would go out to
20   existing customers, and then you would
21   actually give them the list of what you
22   had stocked?
23          A.    Yes.
24          Q.    And I -- this highlighting
```

Highly Confidential - Subject to Further Confidentiality Review

1    is mine, of course, it's not on yours.

2              But first we have -- so I've

3    highlighted all the C-IIs that are

4    involved in this case.

5              You'll see fentanyl, right?

6         A.    Yes.

7         Q.    And then oxycodone with

8    ibuprofen.  You've got hydromorphone down

9    here.  There's the oxycodone/ibuprofen.

10             All these that are all on

11   this list.  This is morphine -- you've

12   got fentanyl, morphine, oxycodone with

13   acetaminophen, the Tylenol, right, APAP?

14        A.    Yes.

15        Q.    It goes on.

16             So you would agree with me

17   that we look at these listings, start

18   with the generics, that -- I did a

19   calculation.  I'll tell you that 78.33

20   percent of the drugs listed are either

21   fentanyl or an opioid.

22             Does that seem about right

23   to you?

24             MS. KOSKI:  Object to form.

1          THE WITNESS:  Yes.

2     BY MR. PENNOCK:

3          Q.    So what was the purpose of

4     this?

5          A.    We were a full-line

6     distributor at that point, carrying all

7     C-IIs.  Most C-IIs were opioids, but we

8     carried all C-IIs, Adderall, demerol,

9     Dilaudid, Dolophine.  They were all

10    carried.  We carried every one.

11          We were a secondary to

12    pharmacies around the country.  And we

13    carried every item, every generic item.

14    And then we started to carry the brand

15    items also, because we became a secondary

16    for chains, too, around the country.

17          Q.    What was the -- okay.  But

18    what was the purpose of sending this out

19    with these --

20          A.    We were an alternative --

21          Q.    -- instructions?

22          A.    We were an alternative

23    source.  And one of the -- we did want to

24    make -- it was more difficult for a

1    pharmacy to, you know, go to Fed Ex on

2    their own, pick up their own slip, pay

3    for it on their own.

4              So we made it simpler for

5    them than to hand it to our competitor,

6    which would have been the big three

7    wholesalers.

8              And then --

9         Q.    Why did you want to make it

10   simpler for them to order these -- in

11   particular, these opioids and fentanyl?

12        A.    I gave them an opportunity

13   to buy it from somebody else, which was

14   me.

15        Q.    I'm sorry?  You did what?  I

16   didn't understand your answer.

17        A.    I was one of the many

18   competitors that sold C-IIs, and I just

19   made it easier for my customers,

20   business-wise on their side.

21        Q.    This is -- the date that I

22   found on here says, Updated January 2010.

23        A.    Okay.

24        Q.    Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    Yes.

2       Q.    Earlier, a few minutes ago,

3   you mentioned that the environment in

4   2006 was -- you weren't as afraid as you

5   were, because the environment changed in

6   2009, 2010, 2011.

7           Do you remember saying that?

8       A.    Yes, I do.

9       Q.    So by January 2010, whatever

10  you perceived the environment to be in

11  2007, it certainly had changed in terms

12  of the opioid issue in America, hadn't

13  it?

14          MS. KOSKI:  Object to form.

15          THE WITNESS:  Yes.

16  BY MR. PENNOCK:

17      Q.    And did anyone, including

18  you, sit back and say, maybe we shouldn't

19  make it easier for people to buy these

20  opioids; maybe we should make it harder

21  for them to do so?

22      A.    We did make it harder.  They

23  couldn't just buy it because I had it.

24  We made it harder for them to order it

1    based on our due diligence that we did.

2              Using us as a supplier and

3    making it easier for them to buy from us,

4    yes, we did that.  We converted to CSOS

5    also, which was very important to the

6    DEA, because they gave them better

7    visibility into it.  So we did that.

8              But nothing changed of how

9    we looked at people in 2010 -- I mean, it

10   changed of how we looked at it.  It was

11   much more stringent and harder than it

12   was in 2006 and '07 to buy from us.

13             Just because I had the

14   products and gave them an easier way to

15   mail me a form did not make it easier for

16   them to acquire the product from me.

17        Q.    You just said that you were

18   doing this to make it easier for them;

19   you just said that.

20        A.    To mail in their form,

21   that's what I said.

22        Q.    Make it easier to get the

23   product?

24        A.    It didn't make it easier to

1    get 5,000 tablets or more, no.  That's

2    not what I said.

3              I said it was easier for

4    them to order, not to get more product.

5         Q.    Right.  So did you ever sit

6    back and say, maybe we shouldn't make it

7    so easy for them to order?

8              MS. KOSKI:  Object to form.

9              THE WITNESS:  I didn't -- I

10        don't think about it in the

11        context that you're conveying now,

12        no.

13                   -   -   -

14             (Whereupon, Anda-Paonessa

15        Exhibit-14,

16        Anda_Opioids_MDL_0000109074-073,

17        was marked for identification.)

18                   -   -   -

19             (Whereupon, a discussion off

20        the record occurred.)

21                   -   -   -

22    BY MR. PENNOCK:

23        Q.    Allow me to show you,

24    please, Exhibit-14 to your deposition.

1    Anda_Opioids_MDL_00000109074.  I'd like

2    to show you 073 followed by 074.

3           A.    Okay.

4           Q.    So this is another promotion

5    that you sent out, right?

6           A.    Yes.

7           Q.    This, apparently, is -- this

8    is a promotion to have your customers

9    participate in the controlled substances

10   ordering system online?

11          A.    Yes.

12          Q.    And if they did so, they

13   would get 10 percent off generic C-II

14   items on their first CSOS order.

15          A.    Correct.

16          Q.    And the second page lists

17   the top C-II products available through

18   Anda.

19                Do you see that?

20          A.    Yes.

21          Q.    And there's Concerta and

22   then it has OxyContin, generic Actiq --

23   that's a fentanyl product, right?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Generic codeine sulfate.

2  Generic Dolophine.  Generic Roxicodone.

3  Generic Percocet.  Generic MSIR.  Generic

4  MS-Contin.  Generic Duragesic.

5           Do you see each of those

6  listed on this?

7    A.    Yes.

8    Q.    Are you ready for CSOS?

9           Do you see that?

10   A.    CSOS, they call it.

11   Q.    CSOS.

12           Of all the controlled

13  substances you were talking about a few

14  minutes ago that you sold -- let's see,

15  one, two, three, four, five, six, seven,

16  eight, nine, ten, eleven, twelve -- ten

17  of the -- I'm sorry, nine of the twelve

18  that you put on were either fentanyl or

19  an OxyContin on this sheet.

20           MS. KOSKI:  Object to form.

21           THE WITNESS:  I don't

22        remember what our entire list of

23        C-IIs by brand names were, so --

24        on what you're showing me, yes,

Highly Confidential - Subject to Further Confidentiality Review

1          it's nine out of twelve.

2                    -   -   -

3               (Whereupon, Anda-Paonessa

4          Exhibit-15, Anda; Back in Stock

5          and Last Chance Flyer, was marked

6          for identification.)

7                    -   -   -

8     BY MR. PENNOCK:

9          Q.    I'm going to show you

10    Anda_Opioids_MDL_0000111235.

11         A.    Okay.

12         Q.    It's another document --

13    another promotion that you sent out to

14    customers, right?

15         A.    Yes.

16               When is it from?

17         Q.    Hmm?

18         A.    When is it from?

19         Q.    Do you know when --

20         A.    What time period?

21         Q.    -- it's from?

22         A.    No.

23         Q.    What does -- do you have an

24    idea of when this might be from?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    No.  I would think it would

2     be -- well, they have CSOS too, so it

3     would be early, it would still be early

4     on trying to get people to use CSOS.

5          Q.    "Early on" such as when?

6     Like, what do you mean by "early on"?

7          A.    '07, '08.  2007, 2008.

8               MS. KOSKI:  This is probably

9          attached to an e-mail, no, that

10         has a date on it?

11              MR. PENNOCK:  No.

12              Do you have a date on this

13         document?

14              MR. KENNEDY:  February 23,

15         2011.

16              MR. PENNOCK:  Where are you

17         getting this from?

18              MR. KENNEDY:  From

19         Relativity.  From the metadata.

20              MR. PENNOCK:  The

21         metadata -- I'll represent to you,

22         sir, that the metadata says

23         February 23, 2011.

24              THE WITNESS:  Okay.

1    BY MR. PENNOCK:

2         Q.    Does that seem like a

3    reasonable date to you for this?

4              MS. KOSKI:  Can we go off

5         for a second?

6              MR. PENNOCK:  Sure.

7              VIDEO TECHNICIAN:  Going off

8         record.  The time is 12:04.

9                   -  -  -

10             (Whereupon, a brief recess

11        was taken.)

12                  -  -  -

13             VIDEO TECHNICIAN:  Going

14        back on the record.  Beginning of

15        Media File Number 3.  The time is

16        12:05.

17   BY MR. PENNOCK:

18        Q.    Mr. Paonessa, you indicated

19   this was probably earlier, like 2009,

20   based on this number here, S/D 10/09,

21   right?

22        A.    Yes.

23        Q.    And I think you are saying

24   that's an expiration date?

Highly Confidential - Subject to Further Confidentiality Review

 1              A.    Yes.  And we wouldn't sell

 2     an item that was six months prior to

 3     that.  So the lowest one there is '10, so

 4     this would have gone out in early '09 or

 5     late '08.

 6              Q.    So at that time -- I mean,

 7     this is what I wanted to draw your

 8     attention to, Last chance.

 9                    Do you see that?

10              A.    That's what's written there.

11              Q.    That's -- do you -- as you

12     sit here today looking at that, is it

13     your view that that was an appropriate

14     way to market these medications?

15                    MS. KOSKI:  Object to form.

16                    THE WITNESS:  I have no

17              opinion.  I'm selling to a

18              pharmacist, not the public.  So

19              this was --

20     BY MR. PENNOCK:

21              Q.    It certainly looks like --

22              A.    -- this was stuff I had left

23     in stock.  So, I mean, last chance -- I

24     don't have an issue with that, that word,

```
 1    in the context of how we used it.  So --

 2         Q.    Well, you're trying to get a

 3    pharmacist to buy product from you,

 4    right?

 5         A.    Yes.

 6         Q.    And if you don't -- if they

 7    don't buy that product before the

 8    expiration date, I think you said that

 9    would mean you'd have to dispose of the

10    product?

11              MS. KOSKI:  Object to form.

12              THE WITNESS:  Yes.

13                   -  -  -

14              (Whereupon, Anda-Paonessa

15         Exhibit-16, Sales Flyer; Are you

16         Promoting All of These, was marked

17         for identification.)

18                   -  -  -

19    BY MR. PENNOCK:

20         Q.    Let me show you Exhibit-16.

21    This is Anda_Opioids_MDL_0000611426.

22         A.    Okay.

23         Q.    This is something you

24    sent -- it looks like you sent it out
```

1    internally to your own salespeople, is

2    that --

3          A.    Yes.

4          Q.    -- what this is?

5                Are you promoting all of

6    these, it says.

7                Do you see that?  Right?

8          A.    Yes, yes.

9          Q.    When was the last time you

10   sent flyers to your customers using

11   Remedy marketing materials?

12               MS. KOSKI:  Object to form.

13   BY MR. PENNOCK:

14         Q.    Do you see that statement?

15         A.    No.

16               Oh, at --

17         Q.    It's right here.

18         A.    -- the top.  Okay.

19         Q.    When was the last time you

20   sent flyers to your customers using

21   Remedy marketing materials?

22         A.    Okay.  Yes.

23         Q.    And so this went to your

24   salespeople to sort of inspire them to

1    move product; is that right?

2            A.    To mention to our customers

3    that we have products, yes.

4            Q.    And it says, Watson

5    products.

6                  Do you see what it says

7    here?

8            A.    Yes.

9            Q.    Watson products brand,

10   OxyContin OR 10 milligrams, 20

11   milligrams, 40 milligrams, 80 milligrams,

12   right?

13           A.    Yes.

14           Q.    So you're telling your

15   salespeople, don't forget about trying to

16   sell these products, right?

17           A.    All of these products on the

18   page, yes.

19           Q.    All the products on the

20   page?

21           A.    All of them, yes.

22                 This is 2007.

23                 MS. KOSKI:  Wait for a

24           question.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    -   -   -
2                 (Whereupon, Anda-Paonessa
3           Exhibit-17, Anda; Oxycodone 5%
4           Off, was marked for
5           identification.)
6                    -   -   -
7    BY MR. PENNOCK:
8           Q.    Exhibit-17 bears Bates
9    number Anda_Opioids_MDL_0000611413.
10          A.    Yes.
11          Q.    What is this document?
12          A.    It is -- I would assume it
13   was something on the Internet, our own
14   Anda net or VIP Pharm, or it could have
15   possibly been something that they could
16   put into a box if a customer requested
17   information on this item.
18                 Again, it's early --
19          Q.    February -- it expires the
20   end of February 2007.
21          A.    Right.  So this would have
22   been done in January or February of 2007.
23          Q.    Was it the belief, inside of
24   Anda, that these types of promotional
```

Highly Confidential - Subject to Further Confidentiality Review

1  efforts would help to increase your sales

2  of opioids?

3          A.    We had no -- we had no

4  program or goal whatsoever to sell

5  opioids as a goal.  We sold all products;

6  C-II, non-C-II, OTC, vitamins.

7          Q.    You didn't have any

8  program -- you didn't have any goal to

9  sell opioids of any kind?

10          A.    No.  Absolutely no goal to

11  sell opioids as a goal within our

12  organization.

13          Q.    Well, it was a goal to sell

14  all your products?

15          A.    All our products.

16          Q.    So if one of those products

17  was Adderall, you had a goal to sell

18  Adderall, right?

19          A.    We -- well, I would --

20  there's no -- I truly believe that

21  there's no program that we had internally

22  that I could find that I awarded people

23  for selling an opioid within our

24  organization.  You know, I would be upset

1    with myself if I saw that now.

2         Q.    But you certainly were

3    making efforts to increase your sales of

4    opioids throughout these years.

5              We've seen some evidence of

6    that already, haven't we?

7         A.    There was hundreds of these

8    type of things for all products that we

9    had that went out all the time, not just

10   opioids.

11        Q.    But in addition to that, I

12   mean, do you remember we looked early on

13   in the day at a request you made to your

14   boss that you wanted to buy about $8

15   million in Oxy?

16        A.    Yes.

17        Q.    Your goal was to get that

18   Oxy and then to sell it, right?

19        A.    Yes.  I sent the same type

20   of request when I requested almost $130

21   million of Protonics.

22        Q.    But Protonics hasn't killed

23   a quarter million people in the United

24   States, has it?

Highly Confidential - Subject to Further Confidentiality Review

1           MS. KOSKI:  Object to form.

2       Lacks foundation.

3                   -   -   -

4               (Whereupon, Anda-Paonessa

5       Exhibit-18,

6       Anda_Opioids_MDL_0000610161, was

7       marked for identification.)

8                   -   -   -

9    BY MR. PENNOCK:

10          Q.    I've marked as Exhibit-18 to

11   your deposition a document bearing Bates

12   number 0000610161.

13          A.    Okay.

14          Q.    Brian Witte wrote an e-mail

15   and you were cc'd, and it says, If it

16   moves Dava, approved.

17               Right?

18          A.    Correct.

19          Q.    And you wrote back, Agree?

20          A.    Yes.

21          Q.    And Dava was a form of

22   OxyContin, right?  A licensed form of

23   generic Oxy, right?

24          A.    Yes.

1          Q.    Al/Brian, please

2     considering -- please consider allowing

3     us to offer 60 days dating to customers

4     who order C-IIs for the first time, which

5     we track, as well as those who order

6     Dava/Oxy.

7               This was the vice president

8     of marketing, Mark Falkin?

9          A.    Yes.

10         Q.    So he's asking you and

11    Brian, let us give customers 60 days to

12    pay if they order C-IIs for the first

13    time, as well as those that ordered Oxy,

14    right?

15         A.    Yes.

16         Q.    Do you see that?

17              And you don't -- you don't

18    say -- you and Brian don't say anything

19    about, if it moves all the other C-IIs,

20    great.  Or that's fine.  You say, If it

21    moves Dava, approved.

22         A.    Yes.

23         Q.    Yes.

24              Because you and Anda were

1    interested, at every turn, on selling Oxy

2    and as much Oxy as you could; isn't that

3    right?

4                    MS. KOSKI:  Object to form.

5                    THE WITNESS:  No.  Disagree.

6                    MR. PENNOCK:  I'm going to

7            take a break.  Lunch is coming.

8                    MS. KOSKI:  12:30?

9                    MR. PENNOCK:  Oh, 12:30.

10                   MS. KOSKI:  Do you want to

11           power through to 12:30?

12                   MR. PENNOCK:  We'll take a

13           break right now.

14                   VIDEO TECHNICIAN:  Going off

15           record.  The time is 12:19.

16                      -  -  -

17                   (Whereupon, a luncheon

18           recess was taken.)

19                      -  -  -

20                   VIDEO TECHNICIAN:  We are

21           back on record.  This is the

22           beginning of Media File Number 4.

23           The time is 1:11.

24    BY MR. PENNOCK:

1          Q.    Mr. Paonessa, let me show

2    you, please, what's been marked now as

3    Exhibit-19 to your deposition.

4                      -   -   -

5                 (Whereupon, Anda-Paonessa

6            Exhibit-19,

7            Anda_Opioids_MDL_0000610178-184,

8            was marked for identification.)

9                      -   -   -

10   BY MR. PENNOCK:

11         Q.    This is a document, an

12   e-mail chain, bearing Bates number

13   0000610178.

14         A.    Okay.

15         Q.    Sir, this e-mail thread is

16   back in -- starts in February 2007,

17   right?

18         A.    Yes.

19         Q.    And so there's an e-mail

20   from Tracy Paonessa -- is that somebody

21   related to you?

22         A.    Yes.  My sister.

23         Q.    Your sister.

24                 And she indicates that

1    there's a customer looking for an order

2    90 days dating on $30,000 controlled

3    substances ordering system order.  Can

4    this be approved?  This is for 90, not

5    60.

6              Do you see that?

7         A.    Yes.

8         Q.    So she's -- some customer

9    has contacted her and wants, basically,

10   90 days to pay on ordering some product,

11   right?

12        A.    Yes.

13        Q.    And that product -- I'm

14   sorry.

15              So they have to check

16   whether they're going to give them the 90

17   days, right?  You saw that in the

18   e-mails?

19        A.    Yes.

20        Q.    A credit manager said the

21   customer has sufficient credit and is in

22   good standing, so they're going to give

23   them the 90 days, right?

24        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And then there is a further
2     communication by Ms. Paonessa, where she
3     indicates the order never -- this is a
4     couple of weeks later.
5               The order never went through
6     for the $30,000.  Now they would like to
7     place an order for $75,000, also asking
8     for the 90 days dating, right?
9               Do you see that?  This is
10    Bates number 182.
11         A.    Okay, yes.
12         Q.    It is 200 bottles of Item
13    Number 700654.
14               What does that number relate
15    to?
16         A.    Item number.
17         Q.    So, like, a particular --
18         A.    Sku.
19         Q.    Sku.
20               So, like, a particular set
21    of bottles?
22         A.    No one -- one individual
23    type of bottle, yes.  Just one.
24         Q.    One individual what?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Bottle.

2     Q.    It says 200 bottles of Item

3  Number 700654.

4     A.    Right.

5     Q.    So I'm just trying to

6  understand what that means.

7     A.    It's one bottle.  It's like

8  ibuprofen 200 count or whatever, 40

9  pieces, whatever.  It's one item number,

10  one individual unique sku.

11     Q.    So how do you get -- how do

12  you get 200 bottles of one individual

13  unique sku?

14     A.    I don't know what the sku

15  is.  I don't know if it's a 30 count, I

16  don't know if it's 100 count.  I have no

17  idea.

18     Q.    I'm sorry --

19     A.    I don't know who the

20  customer is either.  I don't -- I have no

21  idea who this is.

22     Q.    Okay.  But -- oh, I see.  So

23  that's -- that number relates, actually,

24  to 100-count bottles.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2    Q.    Is that -- you don't recall?

3  You don't know?

4    A.    Well, I wouldn't know.  I

5  mean, we can -- somebody could look it up

6  and let me know.  I wouldn't deny the

7  item itself, no.

8    Q.    Okay.  So the e-mails

9  continue, and the customer is faxing the

10  credit application now.

11         And it's now up to $78,000,

12  right?

13    A.    Yes.

14    Q.    And so it gets to the end,

15  and there's an e-mail here from Randy

16  Saal to Ms. Paonessa and others,

17  including Brian Witte.

18         And it says, Okay, we were

19  able to get his bank account number with

20  SunTrust Bank.  Today is the last day he

21  can purchase the Oxys by Watson, too.

22  Let me know if you want me to call it

23  down to you.

24         Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    And the date of that e-mail

3  is February 28th, 2007, right?

4    A.    Yes.

5    Q.    So somebody writes back --

6  let's see here.  Russel Durrett, credit

7  manager, Go ahead and put the order

8  through as this is approved along with

9  the dating.

10    Right?

11    A.    Yes.

12    Q.    Okay.  But for that to be

13  approved, you would have had to have

14  approved that, right?

15    MS. KOSKI:  Object to form.

16    THE WITNESS:  Your -- this

17    is a credit approval request, it

18    has nothing to do with the actual

19    order itself.  The order would

20    have already been created or

21    approved ahead of time, following

22    the normal procedure of having the

23    customer allowed to have that much

24    of that product.

Highly Confidential - Subject to Further Confidentiality Review

 1   BY MR. PENNOCK:

 2        Q.    Okay.  And the order -- Ms.

 3   Paonessa indicates the order went through

 4   on 2/28/07 --

 5        A.    Okay.

 6        Q.    -- right?

 7        A.    Yes.

 8        Q.    Okay.

 9             MR. PENNOCK:  I'm sorry,

10        sir.  I need to mark that as

11        Exhibit-20.

12             Exhibit-20 of your

13        deposition is a --

14             MS. KOSKI:  Now you're

15        testing my eyes.

16             MR. PENNOCK:  -- Bates

17        number 0000612614.

18                  -  -  -

19             (Whereupon, Anda-Paonessa

20        Exhibit-20,

21        Anda_Opioids_MDL_0000612614, was

22        marked for identification.)

23                  -  -  -

24   BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I'm looking at the first

2    e-mail on this document, and it's from

3    senior director of sales and marketing,

4    Watson is currently allocating oxycodone

5    HCL ER in 10, 20, 40 and 80 milligram to

6    its customers, including Anda.  We want

7    to ensure smooth customer supply, so

8    we've established the 5 percent promotion

9    to encourage customers to purchase an

10   increased supply of product than their

11   normal orders so that they would not

12   experience inventory supply issues.

13           Do you see that?

14   A.    Yes.

15   Q.    And the e-mail ultimately

16   reaches you.  And you reply, We need to

17   move as much product out of our building

18   as possible.  February 28th, what we have

19   left we need to throw out if Walgreens

20   won't take it.

21           Do you see that statement?

22   A.    Yes.

23   Q.    This is on February 22nd.

24           So you're talking about

Highly Confidential - Subject to Further Confidentiality Review

1   trying to sell as much Oxy as you can by

2   a particular date.

3            Do you see that?

4       A.    Yes.

5       Q.    And the reason you're

6   talking about that is because the product

7   was going to expire on that date and you

8   couldn't sell it anymore, right?

9       A.    That is not -- that probably

10  is not the case.

11           I don't know this exact

12  situation, but I would believe that

13  Watson probably had no longer the ability

14  to sell that sku for some reason, or that

15  product contractually.  So they said if

16  you don't sell it in this period of time,

17  then, you know, whatever happens,

18  happens.  We have to throw it out.

19           But nothing changes, that we

20  still would have had rules of who could

21  take how much of that product.  So it

22  could still only go to who had the right

23  to get, in whatever quantity it was.

24       Q.    When I showed you Exhibit-17

1    earlier, you told -- I said, Question:

2    Was it the belief inside Anda that these

3    types of promotional efforts would help

4    to increase your sales of opioids?

5              Answer:  We had no -- we had

6    no program or goal whatsoever to sell

7    opioids as a goal.  We sold all products;

8    C-II, non-C-II, OTC, vitamins.

9              Do you remember that

10   question and answer?

11        A.    Yes.

12        Q.    But what we see here is that

13   you were, in fact, specifically trying to

14   sell particular opioid product and sell

15   it by a certain date and willing to

16   extend 90 days dating credit for that

17   product; isn't that right?

18              MS. KOSKI:  Object to form.

19         Compound.

20              THE WITNESS:  Yes.  And it

21         still would have followed under

22         the due diligence that we had to

23         do on each account of how much

24         they could have.

1           This being Anda, owned by

2       Watson, we were still considered

3       part of Watson.  So this was

4       truly, in a sense, Watson's

5       product as a manufacturer.  I was

6       partially a manufacturer.  So I

7       needed -- this was in our

8       building, and I needed to get this

9       to Walgreens or whoever.

10          And I do not know their --

11      there will be a reason of why

12      Watson could not sell that product

13      after 2/28.  I don't know what the

14      reason is or was, but there would

15      have been some contractual reason

16      with another manufacturer, a deal

17      that the manufacturer made.  Their

18      own -- that product and Watson

19      label might have been made by

20      somebody else, or it was made by

21      Watson and they switched.  I'm not

22      sure.

23          But this would have been

24      something that Watson knew that if

Highly Confidential - Subject to Further Confidentiality Review

1    I didn't sell that, being part of

2    Watson, that they would have to

3    destroy the product; me too.  We

4    would have to destroy it.

5         I don't know what -- the

6    contractual relationship they had

7    on that item.

8    BY MR. PENNOCK:

9         Q.   But you told us a little

10   while ago, Question -- do you remember

11   this question and answer?

12        Question:  You did not have

13   any program, you didn't have any goal to

14   sell opioids of any kind?

15        Answer:  No.  Absolutely no

16   goal to sell opioids as a goal within our

17   organization.

18        Do you remember that

19   question and answer?

20        A.   I do.  And it's out of

21   context, because that was -- you were

22   describing what I understood as a goal, a

23   promotional period, something that I

24   could sell more of something.

1          This was to try to move

2   product for Watson, still in the normal

3   channels that we have, being able to be

4   able to sell it.  And, you know, still

5   following the same rules and procedures

6   we had of how much somebody could have of

7   it.

8          Q.    We'll let the jury decide if

9   it's out of context.  It was just a few

10  minutes ago, or a short while ago.

11          But this was the context,

12  this Exhibit-17, where I asked you about

13  this particular exhibit.  And you -- we

14  look at this, and we see that the offer,

15  5 percent off, expires at the end of

16  February, right?

17          A.    Correct, yes.

18          Q.    We went over that.

19          And the item number for

20  oxycodone -- I'm sorry, yeah, oxycodone,

21  which is OxyContin 80 milligrams, is

22  700654.

23          That's the same number for

24  this product that your sister sold, isn't

1    it?

2           A.    My sister did not sell.

3                 MS. KOSKI:  Object to form.

4                 THE WITNESS:  She does not

5          sell.  She was credit.  She was

6          part of credit.

7    BY MR. PENNOCK:

8           Q.    Okay.  Well, this is the

9    same -- it's the same product that your

10   sister had sought the credit extension of

11   $75,000 for, right?

12          A.    Yes.

13          Q.    That's the same one?

14          A.    Yes.

15          Q.    So the fact of the matter

16   is, then, that you did, at least in this

17   instance, you clearly had a goal to sell

18   particular OxyContin, didn't you?

19          A.    Yes.

20          Q.    I mean, I asked you at the

21   beginning of the dep, you understand I'm

22   relying, and we're all relying, on the

23   truth of your answers here today, don't

24   you?

1          MS. KOSKI:  Objection.  Move

2     to strike your colloquy.  You're

3     mischaracterizing his testimony.

4          MR. PENNOCK:  It's not

5     colloquy.

6          THE WITNESS:  Yes.

7              -   -   -

8          (Whereupon, Anda-Paonessa

9     Exhibit-21,

10     Anda_Opioids_MDL_0000278594-615,

11     was marked for identification.)

12             -   -   -

13 BY MR. PENNOCK:

14     Q.    I'm marking Exhibit-21 to

15 your deposition, sir.  It's 0000278594,

16 and it ends at 615.

17          MS. KOSKI:  Is that

18     handwriting on the original?

19          MR. PENNOCK:  Yes.

20          MS. KOSKI:  Was this

21     produced as a single document?

22          MR. PENNOCK:  I'm sorry?

23          MS. KOSKI:  Was this

24     produced as a single document?  It

1           has other e-mails in the back.

2               MR. TRUAX:  It was part of a

3           file.

4               MS. KOSKI:  Got it.  Thank

5           you.

6               THE WITNESS:  Okay.

7  BY MR. PENNOCK:

8           Q.   Sir, do you recognize the

9  handwriting on the first page of this

10  document?

11           A.   No.

12           Q.   If we -- sir, if we look at

13  the first e-mail in chronological order

14  in this document, it's an e-mail from Jim

15  Gatto to you on August 15th, 2007.

16             It says, Al, I need your

17  approval to change the monthly dosage

18  limit percentage on the account listed

19  below to 100 percent, allowing them to

        █████████████████████████████████

21  month.

22             Do you see that?

23           A.   Yes.

24           Q.   And it's marked, Urgent

1    approval, in his subject line, right?

2        A.    Yes.

3        Q.    And he sent that to you and

4    you approved it, right?

5        A.    Yes.

6        Q.    And he doesn't work across

7    the hall from you, does he?

8        A.    No.  We spoke before this.

9    But, yes, this was part of the process.

10   I had to have this document before he was

11   allowed to do it or change any of it.

12            So we spoke before this.  It

13   wouldn't have come through and I looked

14   down at this and said yes two minutes

15   later.

16       Q.    Right.  It was two minutes

17   later --

18       A.    There was a conversation --

19       Q.    -- 5:25?

20       A.    It was two minutes later.

21   But a conversation pursued before that.

22   And I am at my own computer, while not in

23   the same building, was looking at the

24   same documentation that you have

```
 1    attached.

 2         Q.    And why is it that you did

 3    not document any of these conversations

 4    that you had approving above the 5,000

 5    dosage units a month?

 6              MS. KOSKI:  Object to form.

 7              THE WITNESS:  I don't know.

 8         I didn't -- I didn't -- I never

 9         did that.

10    BY MR. PENNOCK:

11         Q.    And this goes on and the --

12    he writes, four days later, he's having

13    some e-mails with Lisa Serafini.

14              Who is she?

15         A.    She was the sales rep for

16    the account.

17         Q.    And it says, He orders a lot

18    of oxys monthly.  He gets 48 of all four

19    strengths each month.

20              Do you see that?

21         A.    Yes.

22              MS. KOSKI:  Bates ending

23         612.

24              THE WITNESS:  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. PENNOCK:
 2        Q.   So a day later, Gatto writes
 3   to you again, and he says, Al, I wanted
 4   to get your take on this one before I
 5   sent for a limit increase.  I already
 6   raised him to -- I already raised him on
 7   8/15 to 100 percent over limit.  I've
 8   also attached the E/pop from the sales
 9   rep explaining the account situation.
10   Looking at his numbers, I would have no
11   problem asking for another increase to
```

████  ███████████████████████████████████

████  ████████████████████████████████████

████  ███████  ████████████████████████████

████  █████████████████████████████████████

████  ████████████████  ███████████████████

```
17             Do you see that?
18        A.   Yes.
19        Q.   So, first of all, this is
20   five -- this is -- let's see.  Sorry,
21   this is 13 days after you raised him to
```

████  ████████████████████████████████████

████  █████████████████

```
24        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you wrote back a couple

2    of minutes later again, Approved.

3            True?

4    A.    Yes.

5    Q.    And we see here from this

6    e-mail, it doesn't sound like you had an

7    in-person -- I'm sorry, from this e-mail

8    it doesn't sound like you had some kind

9    of conversation with him before this

10   e-mail, does it?

11   A.    No.

12   Q.    And then he -- Gatto,

13   next -- at least in this set of

14   documents, he writes to you in -- I'm

15   sorry, it's like over two years 'later.

16           And you had been -- you had

17   been selling this place -- it's called

18   Drug City Pharmacy, right?

19   A.    Yes.

20   Q.    You had been selling them

██   ███████████████████████████████████

22   since around August -- end of August

23   2007, right?

24   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So now he writes again, it

2    says, Al, I need your approval to change

3    the monthly dosage limit percentage on

██    ████████████████████████████████████████

██    ██████████████████████████████████████

██    ██████████████████████████████

7    A.    There's --

8    Q.    Do you see that statement?

9    A.    Yeah.  I'm looking at this

10   now.  There's -- the two minutes apart

11   means that I had had a conversation

12   before this e-mail was written.

13   Q.    Okay.  Really?

14   A.    Yes, positively.  There's no

15   way, I just wouldn't do it.  So I'll

16   stand behind that forever.  I would not

17   have just, yes, sure, go ahead.  No

18   chance.  Absolutely no chance.

19          There was conversations that

20   happened well before this, most likely

21   down in the Anda building, about this

22   account with Michael and Patrick

23   Cochrane.  That's why they're on these

24   e-mails.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.     Only none of these e-mails,

2    whether from Michael Cochrane or Mr.

3    Gatto, not one of them says, Al, per our

4    conversation earlier today, do they?

5               We haven't seen one that

6    says that yet, have we?

7        A.     No.

8        Q.     Not one of them says, Al, as

9    we discussed, do they?

10              MS. KOSKI:  Object to form.

11   BY MR. PENNOCK:

12       Q.     They don't say that, do

13   they?

14       A.     No, they do not.

15       Q.     No.

16              What this e-mail does is

17   give you an explanation and facts.  He

18   tells you, account has sent me a dispense

19   report showing that he dispenses more

20   than that amount of oxycodone.

21              Do you see that statement?

22   Do you see that statement?

23       A.     Yes.

24       Q.     Then he gives you another

Highly Confidential - Subject to Further Confidentiality Review

```
 1    fact.  They are a CSOS account.
 2               Do you see that statement?
 3         A.    Yes.
 4         Q.    Their percentages are up and
 5    down as far as controls to non-controls,
 6    but for the most part decent numbers.
 7               Do you see that fact --
 8         A.    Yes.
 9         Q.    -- he's telling you?
16         Q.    And then he says, I have
17    told the sales rep to request a
18    questionnaire on Remedy.
19               Do you see that statement?
20         A.    Yes.
21         Q.    Okay.  So we know that you
22    don't even have a questionnaire yet on
23    this?
24         A.    That's not true.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    No?

2    A.    The questionnaires were --

3 the questionnaires, they change and they

4 were -- they evolve.  So this was a new

5 questionnaire that most likely was sent

6 to him to get more limits.  Because he

7 would have had a questionnaire before

8 that.

█     █          ████████████████████

█     ██████████████████████████████████

█     ██████████████████████████

█     █        ██████     ████████

13    Q.    And as you noted, two

14 minutes later again you approved it,

15 right?

16    A.    Yes.

17    Q.    Now, fast forward.  We're

18 now in January.  That last e-mail was

19 December 22, 2009, now we're on January

20 18th, 2010, like three weeks later,

21 right?

22    A.    Yes.

23    Q.    And he again writes to you.

24 Al, I need your approval to change the

Highly Confidential - Subject to Further Confidentiality Review

1    monthly dosage limit percentage on the

▮    ████████████████████████████████████

▮    ████████████████████████████████████

4    dosage units per month.

5         Do you see that statement?

6         A.    Yes.

7         Q.    And he goes on to give this

8    other information to you, right?

9         A.    Yes.

10        Q.    And, again, this time a

11   couple of hours later, you approved it.

▮    ██████████        █████████████████████

13   to get 75,000 dosage units per month,

▮    ███████

15        A.    Yes.

16        Q.    So do you know what happened

17   to Drug City?

18        A.    No.

19                    -   -   -

20            (Whereupon, Anda-Paonessa

21        Exhibit-22, US Department of

22        Justice; 11/3/16; United States

23        Reaches $900,000 Settlement with

24        Drug City Pharmacy and its Former

1          Owner for Unlawful Distribution of

2          Controlled Substances, was marked

3          for identification.)

4                    -   -   -

5    BY MR. PENNOCK:

6          Q.    I'll show you what's being

7    marked as Exhibit-22 to your deposition,

8    sir.

9          A.    Okay.

10         Q.    The title of this, this is

11   an article -- I'm sorry, this is a press

12   release from the United States Attorney's

13   Office, District of Maryland, United

14   States Reaches Settlement with Drug City

15   Pharmacy and Its Former Owner for

16   Unlawful Distribution of Controlled

17   Substances.

18         Do you see that?

19         A.    Yes.

20         Q.    And they say here, According

21   to the settlement agreement, Drug City

22   and Lichtman admitted that from January

23   2010 to April 4, 2012, they dispensed

24   controlled substances in a manner not

1    fully consistent with their compliance

2    obligations under the Controlled

3    Substances Act and related regulations.

4              Right?

5         A.    Yes.

6         Q.    Do you see that?

7         A.    Yes.

8         Q.    And we saw that in December

9    2009, on December 22nd, 2009, you

10   personally approved their increase

11   from -- what was it?

12             That was the one where you

█    ████████████████████████████████████

█    ████████████████████████████

█         ██      ████

█         ██      ██████████████████

█    ████████████████████████████████████

█    ██████

19             A.    Yes.

20             Q.    So you would agree with me

21   that it's likely that your -- the opioids

22   that you were selling to that place from

23   that period were being diverted and

24   illegally sold, wouldn't you?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  Object to form.

2              THE WITNESS:  I do not know

3         what he was doing.  I look at this

4         e-mail, I see that we did a site

5         visit, I see that we saw -- we had

6         a person actually go to the

7         facility and see it.

8              I see that he does 850

9         scripts a year -- a day, which is

10        huge.

11             I don't know, you know, what

12        his checks and balances were,

13        besides what he showed us.  And

14        the customer base that we saw, you

15        know, everything that I see on

16        here, you know, we did everything

17        that we could do, including the

18        site visit, talking to the owner,

19        understanding what's going on, to

20        feel that this was still okay.
```



10          What do you need to go to

11  anyone else for?

12          A.    He's doing --

13          MS. KOSKI:  Object to form.

14          THE WITNESS:  He's doing

15      close to 30,000 prescriptions a

16      month, maybe more.

17  BY MR. PENNOCK:

18          Q.    So any Oxy that he diverted

19  was your Oxy --

20          MS. KOSKI:  Object to form.

21  BY MR. PENNOCK:

22          Q.    -- right?

23          A.    Yes.

24                  -   -   -

Highly Confidential - Subject to Further Confidentiality Review

1    (Whereupon, Anda-Paonessa

2    Exhibit-23,

3    Anda_Opioids_MDL_0000078404-405,

4    was marked for identification.)

5    - - -

6  BY MR. PENNOCK:

7    Q.    Take a look at this, please.

8  Exhibit-23, it's an e-mail, 000078404.

9    A.    Okay.

10    Q.    So in February 2012, you get

11  an e-mail from Gayle Lane, right?  She

12  was in the Miami western diversion group

13  with the -- with who?  DEA?

14    A.    DEA.  Yes, with the DEA.

15    Q.    She e-mailed you and --

16  well, she e-mailed Mike Cochrane, who

17  sent it to you.  And you sent it to --

18  back to Cochrane.

19    There's a lot of talk up

20  here due to the Cardinal issue.  Can you

21  let me know what our due diligence is on

22  Drug City ASAP?  I know we have it,

23  because you would not have sold to him.

24  Also, send me his usage, too.

```
 1                   Do you see that?

 2         A.    Yes.

 3         Q.    So when this was sent to

 4  you, you did not have any knowledge, as

 5  you got this e-mail, as to what your due

 6  diligence had been for Drug City all that

 7  time?

 8               MS. KOSKI:  Object to form.

 9  BY MR. PENNOCK:

10         Q.    Did you?

11         A.    I didn't know what exactly

12  it was.  I knew that we had it, and we

13  did have it, because he sent it to Gayle.

14                     -   -   -

15               (Whereupon, Anda-Paonessa

16         Exhibit-24,

17         Anda_Opioids_MDL_0000078400-401

18         was marked for identification.)

19                     -   -   -

20  BY MR. PENNOCK:

21         Q.    Exhibit-24 to your

22  deposition is Bates number 0000078400.

23         A.    Okay.

24         Q.    You just told the jury that
```

```
1    you -- you said, I didn't -- with respect

2    to the due diligence on Drug City, you

3    said, I didn't know exactly what it was.

4    I knew we had it.  And we did have it.

5              Do you remember just saying

6    that a second ago?

7         A.   Yes.

8         Q.   Well, then, let's look at

9    this e-mail, Exhibit-24.

10             You got the -- forwarded the

11   request from the DEA.  And you write,

12   Wonderful.  Didn't we discuss this with

13   her before?  Are we shutting him down

14   today?

15             Do you see that statement?

16        A.   Yes.

17        Q.   And then Cochrane writes

18   back to you, Michael Cochrane, I think

19   this was the one you brought up last year

20   to her when we met with her.  I think

21   McKesson was giving them 240,000 a month.

22             Do you see that?

23        A.   Yes.

24        Q.   You say, Accokeek --
```

1    Cochrane says Accokeek was discussed in

2    more detail, and she confirmed in

3    December it was a pill mill.

4              Do you see that?

5         A.   Yes.

6         Q.   That's some other pill mill,

7    right?

8         A.   That we gave to them to let

9    them know that this was a pill mill in

10   our due diligence.

11        Q.   Right.  So at this point,

12   you're not even sure which pill mill

13   she's writing about?

14        A.   That's not true.

15             MS. KOSKI:  Object to form.

16             THE WITNESS:  That's not

17        true.

18   BY MR. PENNOCK:

19        Q.   You just -- you asked them,

20   didn't we discuss this with her before?

21        A.   I didn't --

22        Q.   And he tells you -- Cochrane

23   tells you, no, that was Accokeek?

24        A.   No.  Because we discussed --

1   we discussed -- she came in because of

2   Accokeek, because we found Accokeek, in

3   our due diligence, that there was a big

4   problem with that place and we wouldn't

5   sell them.

6            And she came in with a big

7   green bar paper worth and showed me, look

8   how horrible these guys are.  And at that

9   point, we discussed and showed her our

10  due diligence again on -- back then, not

11  in this time, not during 2012, but we

12  talked to her about this drug thing.

13           And no, we did not --

14      Q.    Which drug?

15      A.    Drug City.

16           We talked to her about Drug

17  City, and tried to get her -- do we know

18  anything about Drug City?  Do you see

19  something that's a problem with Drug

20  City?  Showed her the data on them too.

21  And she left that there wasn't a problem

22  with them.

23           And even so, we still

24  cancelled them from getting Oxy from us

Highly Confidential - Subject to Further Confidentiality Review

1   almost a year ahead of time -- or, no,

2   seven months.

3          Q.    So you told her, Gayle Lane,

4   that there was a problem with Drug City?

5          A.    No, I did not say there was

6   a problem with Drug City.  We showed our

7   due diligence on Drug City and asked her

8   opinion on it, because we went to the DEA

9   many times to ask their opinion of how we

10  were doing our due diligence.

11          And she did not have a

12  problem with Drug City with what we

13  showed her that day.

14          Q.    And so you didn't shut them

15  down?

16          A.    Not when the DEA told me, I

17  don't see an issue here.

18          Q.    Do you have any

19  documentation regarding this conversation

20  you're alleging with Gayle Lane?

21          MS. KOSKI:  Object to form.

22          THE WITNESS:  I personally

23      do not.

24  BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you know if it exists?

2    A.    Possibly.

3    Q.    What would be the form of

4    that documentation of this conversation

5    with the DEA?

6    A.    Someone -- it would have had

7    to be either Mike, Patrick or Jay

8    Spellman, because the three of us sat

9    with her that day that she would -- if

10   one of them documented it.

11        It could even be in the due

12   diligence of them that we talked to

13   Gayle.

14   Q.    Why is it that you brought

15   up Drug City to her in 2011 and not, for

16   example, in 2010, 2009?

17   A.    Because the due diligence we

18   were doing fell within the parameters

19   that we felt were okay for that -- for

20   that places and the size that they were.

21   Q.    This is back to Exhibit-21.

22        This is the photograph that

23   Gatto sent to you when he was asking for

24   an approval.  And there's your Drug City

Highly Confidential - Subject to Further Confidentiality Review

1    Pharmacy.

2              Do you see that?

3        A.    Yes.

4        Q.    That's what he sent to you

5    when he got approval from you to give

▮    ████████████████████████████████

7        A.    Yes.

8        Q.    From Google Maps, right?

9        A.    Yes.

10       Q.    All right.

11              -   -   -

12             (Whereupon, Anda-Paonessa

13        Exhibit-25,

14        Anda_Opioids_MDL_0000282932, was

15        marked for identification.)

16              -   -   -

17    BY MR. PENNOCK:

18       Q.    I'll hand you Exhibit-25,

19    please.  This is an e-mail bearing Bates

20    number 0000282932.

21       A.    Okay.

22       Q.    You just told us that you

23    had done your due diligence on Drug City

24    and had indicated, for the time that you

1   were selling them until the end, that

2   they were okay to sell to.  I think you

3   said something about because of their

4   size.

5              Do you remember that?  I can

6   get you the exact quote, if you want it.

7         A.    Yes.

8         Q.    So you told her, Gayle Lane,

9   that there was a problem with Drug City?

10             No, I did not say there was

11  a problem with Drug City.  We showed her

12  our due diligence on Drug City and asked

13  her her opinion on it.  Because we went

14  to the DEA many times to ask their

15  opinion about how we were doing our due

16  diligence.  And she said she did not have

17  a problem with Drug City, what we showed

18  her.

19             And you said -- do you

20  remember that?

21        A.    Yes.

22        Q.    So I'm showing you an e-mail

23  from -- it's an e-mail from February 3rd,

24  2010.

1         This is about a month after

2    you raised them, Drug City, 900 percent,

3    right?

4         A.    Yes.

5         Q.    And here is your e-mail,

6    5:30 in the morning, to Mike Cochrane.

7              SOPs, that stands for

8    standard operating procedure?

9         A.    Yes.

10        Q.    Mike, do we have anything in

11   writing on our policies for control

12   limits and how we handle each customer?

13             Do you see that statement?

14        A.    Yes.

15        Q.    Please let me know ASAP.   I

16   need to respond to a corporate person on

17   how we do it.  Or do you have anything?

18             Do you see that?

19        A.    Yes.

20        Q.    So at that time, one month

█    █████████████████████████████████████000

22   units a month, you, the president of the

23   company, didn't even know if you had

24   anything in writing --

1    A.    That's -- that's --

2    Q.    -- for your policies on

3  control limits and how you handle each

4  customer?

5         MS. KOSKI:  Object to form.

6         THE WITNESS:  That's 100

7         percent untrue.  I was asking him

8         if he had anything that he could

9         send me that I could forward.

10         We had those.  And I didn't

11         have anything at home at 5:30 in

12         the morning to send somebody.

13  BY MR. PENNOCK:

14    Q.    But you said, Do we have

15  anything in writing on our policies for

16  control limits?

17    A.    Well, I was asking for, does

18  he have a Word document on his laptop?

19  You know, do you have something you can

20  send me?  I need to send it to our

21  corporate office.

22    Q.    I see.

23         And he wrote back, We have a

24  brief SOP that addresses the increase

1  process above 5,000 per month that is our

2  standard.  I'm in PR at DCI.  I didn't

3  bring my laptop because I don't have an

4  air card.  I'm sure I have something

5  more, just need to look.  I think we -- I

6  think I have the letter we sent in the

7  beginning, the questionnaire, the SOP

8  regarding increases.

9           Do you see that statement?

10  A.     Yes.

11  Q.     Not exactly the height of

12  organization for written policies on

13  something as crucial as the sale and

14  distribution of opioids, is it?

15           MS. KOSKI:  Object to form.

16           THE WITNESS:  Disagree.

17  BY MR. PENNOCK:

18  Q.     You disagree.

19           You're the president of the

20  company, and you can't even put your

21  hands -- withdrawn.

22           This e-mail shows us that

23  the president of the company, who had

24  been distributing and approving opioids

1    for massive sale around the United States

2    for years, can't even put his hands on a

3    written policy regarding control limits

4    for each customer?

5              Doesn't that show that?

6              MS. KOSKI:  Object to form.

7              THE WITNESS:  Yes, it does

8         show that, that I did not have

9         that at 5:30 in the morning at my

10        house.

11   BY MR. PENNOCK:

12        Q.    You would think if you had

13   anything at 5:30 in the morning at your

14   house, it would be that?

15             MS. KOSKI:  Object to form.

16        Move to strike.

17   BY MR. PENNOCK:

18        Q.    Do you know how many people

19   died from opioids in 2010?

20             MS. KOSKI:  You don't need

21        to answer that question.

22   BY MR. PENNOCK:

23        Q.    Do you know that?

24             MS. KOSKI:  Object to form.

```
 1          Move to strike.
 2   BY MR. PENNOCK:
 3          Q.    Do you know an estimate of
 4   how many died that year?
 5               MS. KOSKI:  Object to form.
 6          Lacks foundation.
 7               MR. PENNOCK:  Let's take a
 8          quick break, please.
 9               VIDEO TECHNICIAN:  Going off
10          record.  The time is 2:04.
11                    -  -  -
12          (Whereupon, a brief recess
13          was taken.)
14                    -  -  -
15               VIDEO TECHNICIAN:  Going
16          back on record.  Beginning of
17          Media File 5.  The time is 2:16.
18   BY MR. PENNOCK:
19          Q.    Mr. Paonessa, I'm going to
20   show you what's being marked as
21   Exhibit-26 to your deposition,
22   0000274716.
23                    -  -  -
24               (Whereupon, Anda-Paonessa
```

1              Exhibit-26,

2              Anda_Opioids_MDL_0000274716-717;

3              With Attachment, was marked for

4              identification.)

5                      -  -  -

6    BY MR. PENNOCK:

7         Q.    Please take a look at that.

8         A.    Okay.

9         Q.    Okay.  So Exhibit-26 is an

10   e-mail with an attachment.  It's dated

11   September 24th, 2007.  It's sent to,

12   among others, Michael Cochrane.

13             Do you see that?

14        A.    Yes.

15        Q.    And it's regarding a

16   customer New Choice Pharmacy, located at

17   1900 23rd Street, Cuyahoga Falls, Ohio,

18   right?

19             Do you see that, purchasing

20   date from --

21        A.    Yes, but it's -- it's

22   confusing that the second part of the

23   body of it says that the bulk of the

24   patients serviced at New Choice come from

1  this other location.

2          Q.    Right.

3          A.    So it's from the pharmacy --

4  I understand now.

5          Q.    Maybe most of the

6  prescriptions are being filled from --

7  are being prescribed at Falls Pain?

8          A.    Correct.

9          Q.    And if you look at the

10 purchasing data, you see that the top 18

11 products dispensed by New Choice

12 Pharmacy, the top 18 products are

13 opioids.

14               You can determine that by

15 looking at the name of the product all

16 the way on the left-hand column.

17         A.    Yes, I see.

18         Q.    And by looking at the units

19 over there.

20         A.    Yes.

21         Q.    So the top 18 products are

22 opioids, or fentanyl.

23               Here is an example.  Here

24 are the fentanyls.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2          MS. KOSKI:  You're saying

3    you did the math to get the top

4    18?  This is alphabetical.

5          MR. PENNOCK:  Yes.  Yes.

6          THE WITNESS:  It will be

7    accurate.

8          MR. PENNOCK:  I'll show you

9    this e-mail.

10                 -   -   -

11          (Whereupon, Anda-Paonessa

12    Exhibit-27,

13    Anda_Opioids_MDL_0000274587-589,

14    was marked for identification.)

15                 -   -   -

16  BY MR. PENNOCK:

17          Q.    I'm just showing you -- I

18  just marked as Exhibit-27 to your

19  deposition an e-mail thread bearing Bates

20  number 0000274587.

21          A.    Okay.

22          Q.    So there's some e-mails that

23  begin -- the first e-mail is to Mike

24  Cochrane from Constantine Moshos.

 1                    And there's an indication

 2    that, We have to put a cap on controls

 3    for this account -- referring to New

 4    Choice Pharmacy, right?

 5                    MS. KOSKI:  Object to form.

 6                    THE WITNESS:  Yes.

 7                    Well, I don't know why

 8            Constantine would have wrote that,

 9            but that looks like what he wrote,

10            yes.

11    BY MR. PENNOCK:

12        Q.    It's come to my attention

13    that this pharmacy acts as an out

14    pharmacy for both the hospital and the

15    pain management center which is

16    associated with the hospital.

17                    Do you see that?

18        A.    Yes.

19        Q.    And there's another e-mail

20    here from Mike Cochrane.

21                    It says, Take a look at this

22    usage report on their purchases from

23    Cardinal.  They do buy some non-controls

24    from them, but nothing from us.

Highly Confidential - Subject to Further Confidentiality Review

1        Right?

2        A.     Okay.

3        Q.     And that's an issue, right,

4    if somebody is only buying controls from

5    you?

6        A.     Yes.  In 2007, pain clinics

7    were not considered what they are in

8    2010, '12, '15 and today.  They barely

9    exist anymore.

10            But in 2007, we were trying

11   to validate the doctor and the location.

12   And that looks like what we were trying

13   to do.

14            When I use the word

15   "legitimatize," that's what I'm meaning.

16   They are part of the Cleveland Health

17   Network, too, and Premiere Hospital

18   group, which is huge.  So I still was

19   concerned with this pain management

20   clinic and who they were, so that's what

21   I was trying to find out.

22            I don't know what the answer

23   came back, but that's what we needed to

24   vet out.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Well, you anticipated my

2    question, that you wrote, See if we can

3    legitimize it in some way.

4    A.    Poor choice of words.

5                  -  -  -

6              (Whereupon, Anda-Paonessa

7         Exhibit-28,

8         Anda_Opioids_MDL_0000272213-215,

9         was marked for identification.)

10                 -  -  -

11   BY MR. PENNOCK:

12   Q.    Take a look at Exhibit-28.

13   This is 0000272213.

14   A.    Okay.

15   Q.    So a few months later, in

16   December of 2007, there's a communique

17   that comes out from the DEA, right?

18   A.    Yes.

19   Q.    And it's from the

20   pharmaceutical investigations section,

21   Drug Enforcement Administration.  And it

22   indicates that a distributor, by their

23   own initiative, recently notified the DEA

24   that they have discontinued or restricted

1    business with the below-listed customers.

2    You are once again reminded of your

3    responsibilities to exercise due

4    diligence in accordance with 21 CSA

5    Section 823A1 for the maintenance of

6    effective controls against the diversion

7    of controlled substances into other than

8    legitimate medical, scientific or

9    industrial channels and to review your

10   customer's account, especially new

11   accounts, to ensure that all purchases

12   are only for these reasons.

13            So the DEA is letting you

14   know that anyone on this list you got to

15   take a close look at, right?

16        A.    Yes.

17        Q.    And the pharmacy we were

18   just looking at is on this list, right?

19        A.    Yes.

20        Q.    So who is Emily Schultz?

21        A.    She was one of the

22   compliance clerks that gathered and

23   analyzed the data from the -- that we

24   received from pharmacies.

1      Q.    Mike Cochrane writes to her,

2   Get all the customer information from

3   this below in Excel.  I don't want to cut

4   all of them off, some are good customers.

5          Do you see that?

6      A.    Yes.

7      Q.    I mean, that -- does that

8   raise some concerns for you, that he was

9   sort of prejudging whether he wants to

10  cut -- not cut customers off, without

11  looking into this?

12          MS. KOSKI:  Object to form.

13          THE WITNESS:  He probably

14          was following what Kyle said at

15          the bottom, such as, Your company

16          has a right to continue sales, if

17          deemed appropriate, with this

18          notification.  It does not infer

19          administrative or criminal

20          proceedings will be initiated on

21          this notification alone.

22              So he's asking for data on

23          each one of these pharmacies,

24          instead of just a straight cutoff

Highly Confidential - Subject to Further Confidentiality Review

1          from everyone.  We don't know how

2          other people did their due

3          diligence and what they saw.

4               But if we had nothing on

5          these people, they were cut off.

6          If New Choice was -- continued to

7          be sold, there was probably --

8          there was most likely data on

9          them, if that's what happened in

10         this instance.

11                   -  -  -

12              (Whereupon, Anda-Paonessa

13         Exhibit-29,

14         Anda_Opioids_MDL_00002722520-521,

15         was marked for identification.)

16                   -  -  -

17    BY MR. PENNOCK:

18         Q.    This is marked Exhibit-29 to

19    your deposition.  Bates number 272520.

20         A.    Okay.

21         Q.    Okay.  So this is an e-mail

22    thread talking about a pharmacy in Los

23    Angeles, right?

24         A.    Yes.

1    Q.    And somebody, Barry Koran,

2  e-mailed you and Jane Howard and wanted

3  to know if there was any update on

4  raising United.

5         That's the name of the

6  pharmacy, right?

7    A.    Yes.

8    Q.    And there's some e-mail

9  exchanges.  And, let's see.

10         Mike Cochrane writes to you,

11 They have heavy control use overall.

12 Their percentages with us are terrible.

13         What does that mean?

14    A.    Their percentage of

15 controlled versus non-controls were one

16 of the things that we look at.  And we

17 didn't -- you know, it was something that

18 would ask us to ask them for more

19 information, because we would need to

20 know, why are your control sales higher,

▮  ████████████████████████████████████

▮  ██████████████████████████████

23 Something like that.

24         This is 2008, still back in

Highly Confidential - Subject to Further Confidentiality Review

1  that period of time when the pain clinics

2  were still out there.

3           So it didn't fit, so we were

4  looking for more information.

5       Q.   Well, now we know that pain

6  clinics were a major part of the problem,

7  right?

8       A.   Yes.

17           Right?

18       A.   Yes.

19       Q.   So he's saying, we're not

20  doing this?

21       A.   Yes.

22       Q.   And you write back, Wouldn't

23  a hospice use more controls normally?

24  Putting aside the location for a minute.

1          So you're sort of saying

2     back to him, well, maybe there's a reason

3     why they are using all these controls?

4          A.    I did ask that, yes.

5          Q.    And when you said "putting

6     aside the location for a minute," what

7     were you talking about with that comment?

8          A.    I believe that Mike might

9     have stumbled upon the fact that fentanyl

10    might becoming something.  Fentanyl

11    wasn't a big -- wasn't a -- it was

12    obviously an opioid, but the Oxy was what

13    we looked at mostly.

14          And fentanyl was not

15    something that -- you know, we knew it

16    was an opioid, but it wasn't something

17    that it is now, and today.  And I didn't

18    know what he had seen in Los Angeles or

19    maybe we had talked.

20          But I did realize that this

21    was a hospice center -- or a pharmacy

22    that took care of people in hospice.  And

23    that was my question to Mike, is why --

24    wouldn't there be more controls for a

1    hospice place?

2        Q.    Right.  But what do you mean

3    by "putting aside the location for a

4    minute"?  Talking about Los Angeles?

5        A.    It's either Los Angeles --

6    I'm not sure.  It's either Los Angeles or

7    the location -- or that place, that

8    individual hospice.  It's one of the two.

9    I don't know which one.

10       Q.    Okay.  I'll show you that

11   you --

12                  -   -   -

13              (Whereupon, Anda-Paonessa

14       Exhibit-30,

15       Anda_Opioids_MDL_00002722520-521,

16       was marked for identification.)

17                  -   -   -

18   BY MR. PENNOCK:

19       Q.    Marked as Exhibit-30 is

20   another e-mail.  Bates number 272517.

21       A.    Okay.

22       Q.    So you concluded a few days

23   later that they would use -- or that you

1    month?

2           A.    Yes.  I suggested that.  I

3    didn't tell him to do it, unless you have

4    another e-mail that says I did.  So --

5                 MR. PENNOCK:  Give me a

6           five-minute break, please.

7                 VIDEO TECHNICIAN:  Going off

8           record.  The time is 2:36.

9                      -   -   -

10                (Whereupon, a brief recess

11          was taken.)

12                     -   -   -

13                VIDEO TECHNICIAN:  Going

14          back on record.  Beginning of

15          Media File 6.  The time is 2:45.

16   BY MR. PENNOCK:

17          Q.    Sir, I'm going to show you

18   Exhibit-31, please.

19                     -   -   -

20                (Whereupon, Anda-Paonessa

21          Exhibit-31,

22          Anda_Opioids_MDL_0000090857-858,

23          was marked for identification.)

24                     -   -   -

```
 1    BY MR. PENNOCK:

 2         Q.    This is 90857.

 3              MR. PENNOCK:  Where's the

 4         attachment?  Oh, it came

 5         separately.

 6                    -  -  -

 7              (Whereupon, Anda-Paonessa

 8         Exhibit-32,

 9         Anda_Opioids_MDL_0000090808, was

10         marked for identification.)

11                    -  -  -

12    BY MR. PENNOCK:

13         Q.    Here is the attachment that

14    was produced separately, Exhibit-32.

15              MS. KOSKI:  Oh, this one is

16         yours.

17    BY MR. PENNOCK:

18         Q.    The attachment is 90808.

19              MS. KOSKI:  Was this

20         attached to something else?

21              THE WITNESS:  This was

22         attached to this.

23              I'm assuming this was

24         attached to the e-mail, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1    When it says attachment --

2         MR. KING:  It says -- the

3    e-mail refers to an attachment.

4         THE WITNESS:  Right.  Which

5    is this.

6         MS. KOSKI:  So it's --

7         THE WITNESS:  Right here.

8         MS. KOSKI:  Got it.  The

9    Bates numbers aren't sequential.

10   But it's okay.

11        THE WITNESS:  Okay.

12             -  -  -

13        (Whereupon, Anda-Paonessa

14   Exhibit-33,

15   Anda_Opioids_MDL_0000090805-807,

16   was marked for identification.)

17             -  -  -

18 BY MR. PENNOCK:

19        Q.   Here is -- I'm marking

20 Exhibit-33.  This is 90805.

21        A.   Okay.

22        Q.   Okay.  So these e-mails

23 relate to the same United Pharmacy that

24 was the subject of some e-mails in early

1    2008, right?

2            A.    Yes.

3            Q.    And in July of 2012, there

4    is discussion between Mr. Cochrane and

5    Mr. Brown on an e-mail where Mr. Brown

6    notes that fentanyl has been anywhere

7    between 4,500 and 5,500 per month since

8    the end of last year.  The last three

9    months are closer to 5,000.

10           Do you see that?

11           A.    Yes.

12           Q.    Barry Koran, senior account

13   manager -- he would be in sales; is that

14   right?

15           A.    Yes.

16           Q.    He submitted a letter

17   apparently addressing some concerns about

18   United Pharmacy, right?

19           I had given you that letter,

20   right?

21           A.    Yes.

22           MS. KOSKI:  Object to form.

23   BY MR. PENNOCK:

24           Q.    And so the letter, the

1  letter is from Ernestina Saxton, true?

2  Correct?

3          A.    Yes.

4          Q.    And it's to whom it may

5  concern.  And it talks about somebody who

6  has been Dr. Saxton's patient since 2008

7  and Dr. Saxton has intractable migraine

8  with aura and chronic musculoskeletal

9  pain secondary to many athletic injuries,

10  decathlon, golf, ski, water, snow, jet,

11  basketball, bowling and running.

12              Do you see that?

13          A.    Yes.

14          Q.    And other trauma.

15              Now, there's nothing in here

16  indicating that this patient had cancer,

17  however, right?

18              MS. KOSKI:  Object to form.

19              THE WITNESS:  Yes.

20  BY MR. PENNOCK:

21          Q.    Cancer would have been the

22  indication for that particular medication

23  that they were asking for, right?

24          A.    No.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  Object to form.
2    BY MR. PENNOCK:
3         Q.    Fentanyl?
4         A.    No.
5         Q.    It could be prescribed for
6    these problems as well?
7              MS. KOSKI:  Object to form.
8         Foundation.
9              THE WITNESS:  I'm not -- I
10        wouldn't know.  Doctor-wise, I
11        wouldn't know.
12             And these are Actiq, too.
13        Based on the other e-mails, Actiq
14        is the fentanyl lollipop for
15        people -- it's not a patch.
16   BY MR. PENNOCK:
17        Q.    So this is a fentanyl
18   lollipop.
19             This is like a lozenge?
20        A.    It's actually --
21        Q.    It's actually a lollipop?
22        A.    It's actually a sucker, yes.
23             And the calls to Kyle Wright
24   were -- we didn't -- we wanted to know
```

Highly Confidential - Subject to Further Confidentiality Review

1     from Kyle Wright, how do we distinguish

2     patch -- should we distinguish patches

3     versus the lollipops, because the

4     indication of the lollipop, we didn't

5     know how often they would use the

6     lollipop, what the normal amount would

7     be.  So we were struggling if we should

8     take that and make it separate.

9          And I have a feeling, in the

10    later years, maybe in '12, we did

11    separate Actiq from Oxy -- I mean,

12    fentanyl.  I don't think that they were

13    in the same category.

14       Q.    With respect to this letter,

15    you -- and I think you have as

16    Exhibit-34 --

17         MS. KOSKI:  32?

18    BY MR. PENNOCK:

19       Q.    Sorry, 33.





Highly Confidential - Subject to Further Confidentiality Review



5        Q.    Or are we now questioning a

6   doctor that seems to have written a

7   sincere letter with this reasoning?

8        A.    Yes.

9        Q.    You say, Most bad doctors

10   would not have written the letter when

11   they know the pharmacy is going to get

12   the Oxy anyway.  Make sense?

Highly Confidential - Subject to Further Confidentiality Review



15    Q.    Well, you say, Or are we now

16  questioning a doctor that seems to have

17  written a sincere letter with the

18  reasoning?

19    A.    I still look at that as a

20  question, not an urging.

21    Q.    What about, Most bad doctors

22  would not have written the letter when

23  they know the pharmacy is going to get

24  the Oxy anyway?

1     A.    That was a statement, not

2   urging, once again.

3     Q.    Well, did this doctor end up

4   getting indicted?

5     A.    I don't know.

6                 -   -   -

7           (Whereupon, Anda-Paonessa

8           Exhibit-34, United States District

9           Court; Search and Seizure Warrant,

10          was marked for identification.)

11                -   -   -

12  BY MR. PENNOCK:

13    Q.    I'll show you what I'm

14  marking as Exhibit-34.  I'd like to

15  quickly go through this with you and

16  direct you to certain pages, sir.

17          MS. KOSKI:  Can you

18          represent for the record what this

19          is?  It's not from our files.

20          MR. PENNOCK:  Sure.  Marked

21          as Exhibit-34, a seizure and

22          search warrant that, as indicated,

23          was issued by the United States

24          District Court for the Central

Highly Confidential - Subject to Further Confidentiality Review

1    District of California in November

2    of 2017.

3  BY MR. PENNOCK:

4    Q.    If you turn to Page 3, you

5  will see that it was directed at -- you

6  see the document reflects it was directed

7  at United Pharmacy, Inc., Los Angeles,

8  California?

9    Page 3.

10    MS. KOSKI:  I'm struggling,

11    too.

12    But I'm not sure the witness

13    is familiar with the form of the

14    document.

15    Can you put it on the

16    screen, maybe, so we can see it?

17    MR. PENNOCK:  Yep.

18    MS. KOSKI:  So page numbered

19    3, not the Roman.

20    Just look on the screen.

21    THE WITNESS:  Sorry, I

22    didn't see that.  Okay.

23    Okay, I have it.  Yes.

24  BY MR. PENNOCK:

1    Q.    Okay.  So you see that it's

2  directed at United Pharmacy, Inc.?

3    A.    Yes.

4    Q.    And -- hold on.  And I just

5  want to direct your attention to the

6  doctor that is mentioned on here.  Page

7  21.

8    A.    Okay.

9    Q.    In February of 2015, the DEA

10  initiated the investigation in this case

11  after receiving information from the DEA

12  Fresno resident office that Dr. Ernestina

13  Saxton was writing large quantities of

14  controlled substance prescriptions for

15  patients located in Los Angeles.

16          Do you see that?

17    A.    Yes.

18    Q.    And that is the -- at least

19  appears to be the same doctor that wrote

20  this letter that you have been referring

21  to as a sincere doctor in your e-mail?

22    A.    Yes.

23    Q.    Did this ever come to your

24  attention?

1          A.    No.

2                MS. KOSKI:  I'm going to

3          object.  The document is dated

4          2017.  Mr. Paonessa didn't work at

5          Anda in 2017.

6                MR. PENNOCK:  Okay.

7                MS. KOSKI:  In fact had been

8          gone for two years --

9                MR. PENNOCK:  Hmm?

10               MS. KOSKI:  You had been

11         gone for two years by then, right?

12               THE WITNESS:  Three by then.

13         Because it says Anda '17.

14    BY MR. PENNOCK:

15         Q.    Take a look at Page 25.

16         A.    Okay.

17         Q.    It says, United dispensed

18    over 1 million dosage units of oxycodone

19    over the same period, with over 400,000

20    dosage units of 30-milligram oxycodone.

21               Do you see that?

22         A.    Yes.

23               MS. KOSKI:  I don't know

24         where you are.  What paragraph?

```
 1                  THE WITNESS:  25, right
 2        here.
 3                  MS. KOSKI:  I'm with you.
 4        Sorry.
 5   BY MR. PENNOCK:
 6        Q.    So whatever your protocol
 7   was for due diligence back in 2012, you
 8   would agree with me, if the allegations
 9   contained in this document are correct,
10   that the due diligence with respect to
11   this facility failed pretty badly?
12                  MS. KOSKI:  I'm going to
13        object to form.  And I'll instruct
14        you not to answer.
15                  He's not a lawyer.  This
16        is -- if the allegations in this
17        document, which is a search and
18        seizure warrant are correct.  How
19        can he answer that question?
20                  MR. PENNOCK:  I don't think
21        it's too hard.  I'm just -- so I'm
22        going to reiterate my question.
23   BY MR. PENNOCK:
24        Q.    I'm asking you, you've seen
```

Highly Confidential - Subject to Further Confidentiality Review

1    this document?

2         A.    Yes.

3         Q.    Assuming this to be

4    authentic, which I'm representing it is,

5    assuming these allegations against this

6    doctor to be correct, Dr. Ernestina

7    Saxton, you would agree with me that

8    whatever due diligence you and your

9    colleagues did in 2012 were insufficient

10   to make an appropriate determination as

11   to the prescriptions and use of

12   medications by Ernestina Saxton?

13              MS. KOSKI:  Object to form.

14        Lacks foundation.  Calls for a

15        legal conclusion.

16              You can answer if you want

17        to speculate for Mr. Pennock.

18              THE WITNESS:  I don't know

19        what they were buying in 2012.

20        This is 2017.  I have no idea what

21        they had in their due diligence

22        that we had on file for them at

23        that period of time.

24   BY MR. PENNOCK:

1        Q.    Sir, I have a series of

2    documents I'd like you to look at.  I'm

3    going to mark them all and hand them to

4    you one by one.  Before I question, I'll

5    get them all marked.

6              MR. PENNOCK:  I'm going to

7         need a number of other tabs.

8                   -  -  -

9              (Whereupon, Anda-Paonessa

10        Exhibit-35,

11        Anda_Opioids_MDL_0000275048, was

12        marked for identification.)

13                   -  -  -

14   BY MR. PENNOCK:

15        Q.    Here is Exhibit-36, which is

16   275048.

17              MS. KOSKI:  Is that 35?

18              MR. PENNOCK:  Wait a second.

19        Was that 35?

20              MS. KOSKI:  35.

21              MR. PENNOCK:  Sorry, I

22        marked 35 was --

23              MS. KOSKI:  You gave him 35,

24        you just said 36.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  So 35 was

 2         275048.

 3                   -  -  -

 4              (Whereupon, Anda-Paonessa

 5         Exhibit-36,

 6         Anda_Opioids_MDL_0000284363-364,

 7         was marked for identification.)

 8                   -  -  -

 9              MR. PENNOCK:  36 is 284363.

10                   -  -  -

11              (Whereupon, Anda-Paonessa

12         Exhibit-38,

13         Anda_Opioids_MDL_0000284363-364,

14         was marked for identification.)

15                   -  -  -

16              MR. PENNOCK:  38 is 273292.

17              I have 37 over here, I'm

18         looking for another copy.

19              MS. KOSKI:  You gave me --

20         okay, 38.

21              This is an extra copy of 38.

22         This is an extra of 38.

23                   -  -  -

24              (Whereupon, Anda-Paonessa
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Exhibit-39,

2              Anda_Opioids_MDL_0000273518, was

3              marked for identification.)

4                       -   -   -

5              MR. PENNOCK:  39 is 273518.

6              THE WITNESS:  I don't have

7       37.

8              MS. KOSKI:  I know.  I think

9       he's working on it.

10                      -   -   -

11             (Whereupon, Anda-Paonessa

12      Exhibit-40,

13      Anda_Opioids_MDL_0000287964, was

14      marked for identification.)

15                      -   -   -

16             MR. PENNOCK:  40 is 287964.

17                      -   -   -

18             (Whereupon, Anda-Paonessa

19      Exhibit-41,

20      Anda_Opioids_MDL_0000273617, was

21      marked for identification.)

22                      -   -   -

23             MR. PENNOCK:  41 is 273617.

24                      -   -   -
```

Highly Confidential - Subject to Further Confidentiality Review

1          (Whereupon, Anda-Paonessa

2     Exhibit-42,

3     Anda_Opioids_MDL_0000273762, was

4     marked for identification.)

5              -  -  -

6          MR. PENNOCK:  42 is 273762.

7              -  -  -

8          (Whereupon, Anda-Paonessa

9     Exhibit-43,

10     Anda_Opioids_MDL_0000283018-019,

11     was marked for identification.)

12              -  -  -

13          MR. PENNOCK:  43 is 283018.

14              -  -  -

15          (Whereupon, Anda-Paonessa

16     Exhibit-44,

17     Anda_Opioids_MDL_0000274800, was

18     marked for identification.)

19              -  -  -

20          MR. PENNOCK:  44 is 274800.

21          MS. KOSKI:  The only one he

22     did not get was 37.

23          MR. PENNOCK:  I don't have a

24     copy of it.  I'll just keep it

```
 1              right here for a moment so I don't

 2         lose track.

 3              MS. KOSKI:  Okay.

 4              MR. PENNOCK:  We don't have

 5         a copy, right?

 6              We started with 35?

 7              MS. KOSKI:  He's given you

 8         ten exhibits.  Listen to the

 9         questions, so you know which ones

10         he's referring to.

11    BY MR. PENNOCK:

12         Q.    So, Mr. Paonessa, I'd like

13    to look at Exhibit Number 35, please.

14         A.    Okay.

15         Q.    This is an e-mail in August

16    2007.  Al, I need your -- this is an

17    e-mail to you, right?

18         A.    Yes.

19         Q.    I need your approval to

20    change the monthly dosage limit

21    percentage on the account listed below to

22    99,999 percent, allowing them to purchase

23    up to unlimited dosage units a month.

24              That would be for C-IIs,
```

1    right?

2              MS. KOSKI:  Object to form.

3    BY MR. PENNOCK:

4         Q.    Do you see that statement?

5         A.    I see unlimited.  I don't

6    know what the drug was.

7         Q.    You don't know what the drug

8    was.

9              But the only -- the only

10   caps you had were on C-IIs, weren't they?

11        A.    No.

12        Q.    You had -- what else did you

13   have caps on?

14        A.    Soma -- what year was this?

15        Q.    2007.

16        A.    Hydrocodone, Soma, Adderall.

17        Q.    Those are all C-IIs?

18        A.    Hydrocodone wasn't.  Soma

19   wasn't.

20        Q.    You had caps on those?

21        A.    Alprazolam, lorazepam.

22              Yes, we had it on every

23   chemical that was a control, II through

24   IVs.

1          Q.    Would that have included

2    opioids?

3          A.    Yes, it would.

4          Q.    So if they were buying

5    opioids, they had unlimited?

6          A.    Yes.

7          MS. KOSKI:  Object to form.

8    BY MR. PENNOCK:

9          Q.    Right?

10         A.    Yes.

11         Q.    Okay.  Exhibit-36, February

12   of 2009.  And it starts out with an

13   e-mail from Kim Bloom, and she writes to

14   Dan Shannon -- sorry, Dan Shannon had

15   written to Kim Bloom, Usage is 128,495

16   tabs a month.

17         A.    Yes.

18         Q.    It says, Partners is already

19   at their limits for the month on

20   oxycodone combo and he needs products.

21         Do you see that?

22         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

███ ████████████  ██████████████████████

███ ████████████  ████████████████████

3          Do you see that statement?

4      A.    Yes.

5      Q.    And this gets forwarded up.

6  You see, Is there any way to make

7  Partners unlimited like we do BJK?

8          BJK was some other customer

9  of yours, right?

10      A.    Yes.

11      Q.    It makes sense.  We know who

12  they are and we know what they do.  We

13  really should treat them the same way as

14  we do BJK.

15          Right?

16      A.    Yes.

17      Q.    And Cochrane wrote to you, I

18  need your approval to make this location

19  unlimited.

20      A.    Yes.

21      Q.    Partners Pharmacy?

22      A.    It's not a pharmacy.  But

23  it's a long-term care, fourth largest in

24  the United States, still today.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    And you approved?

2      A.    Yes, I did.

3      Q.    It looks like -- I'm sorry,

4   39 is a duplicate.

5            Sorry, 37 is a duplicate of

6   36.

7            MS. KOSKI:  That's why you

8        didn't have any copies.

9            MR. PENNOCK:  What?

10           MS. KOSKI:  That's why you

11       didn't have any copies.  That's

12       the one we didn't get.

13  BY MR. PENNOCK:

14       Q.    So this would be 38.

15           MS. KOSKI:  We'll just skip

16       37, and the record will show

17       there's no 37.

18           MR. PENNOCK:  That's right.

19  BY MR. PENNOCK:

20       Q.    Exhibit-38, September 9th,

21   2008.  It's an e-mail.

22           Hi George, I'm making sure

23   this account is ready for this order that

24   should be arriving today.  I noticed that

Highly Confidential - Subject to Further Confidentiality Review

1    these items are coming up customer

2    ineligible.  Here are the items.  Can you

3    please have these corrected so the order

4    can be processed.

5            Do you see that statement?

6        A.    Yes.

7        Q.    It says, Oxy order for

8    Supervalu Advantage Logistics.

9            Do you know them?

10        A.    Yes, they are a very large

11    West Coast chain.  They're still in

12    business today.

13        Q.    And you made them unlimited,

14    too?

15        A.    Yes.  This was their -- this

16    was their warehouse that supplied each

17    one of their individual stores.  They had

18    their own vault.

19        Q.    They had their own what?

20        A.    They had their own vault.

21        Q.    And so you didn't -- when

22    that happened, like with this, you didn't

23    go do any due diligence on their

24    individual stores?

1    A.    I believe that we did due

2  diligence -- no, not on any individual

3  stores.

4          We would have done it with

5  their corporate office and gone through

6  their SOPs and what they had in place.

7  We had numerous chains that we sold

8  controls to.

9    Q.    Exhibit-39 is another, Need

10  your approval, monthly dosage limit on

■  ██████████████████████████████

■  ████████████████████████████████

■  ████████████████████████  ██████.

14    A.    Yes.  This is -- this was,

15  at the time, the largest wholesaler on

16  Puerto Rico.  And they are now owned by

17  Cardinal.  At that time in '08, I was

18  still selling distributors and

19  wholesalers, which I later stopped.

20    Q.    And, anyway, you approved

21  them as well?

22    A.    Yes.

23    Q.    And June 12th, 2009,

24  Cochrane writes to you, Al, I need your

1    approval to change the monthly dosage

2    percentage on the account listed below

▮    ████████████████████████████

▮    ██████████████████████

▮    ██████████

6         A.    Which one is that?

7         Q.    -- dosage units per month.

8               MS. KOSKI:  40.

9               THE WITNESS:  I don't see

10        40.

11              MS. KOSKI:  You had it.

12              MR. PENNOCK:  This is

13        Exhibit-40.

14              THE WITNESS:  No, I don't

15        have 40.

16              I have a blank one.  Oh,

17        it's at the bottom.  I'm sorry.  I

18        didn't see it.

19              Dispensing Solutions.  I do

20        not remember Dispensing Solutions

21        back in '09.  I don't know which

22        account that is.

23    BY MR. PENNOCK:

24        Q.    Well, in any event, you

1 ███████████████████████████

2    month?

3          A.    They were -- I remember now,

4    I don't remember -- they were a

5    repackager, as I explained in earlier

6    questions.

7                They were one of the

8    repackagers that dealt with nursing homes

9    and other places and put them in blister

10   packs, things like that.  That's who

11   Dispensing Solutions was.  I think they

12   were out of Tampa, I'm not sure, or

13   California.  I don't remember.

14               I met with this owner, too.

15   He came to our building and brought his

16   SOPs with him, I remember, when he came

17   in, of how he did this.  And we visited

18   his location.

19         Q.    Who visited?

20         A.    Michael Cochrane.

21         Q.    Here is June 2008,

22   increasing the monthly dosage limit to

23   2,400 percent.

24               A.    This is, again, a whole --

1    it's a wholesaler, but a wholesaler for a

2    grocery store chain in the Midwest.  I

3    don't remember what their brand name was

4    that was out there.  They had multiple

5    ones.

6              And they had their own

7    vault, so they did their own

8    distribution.  So we sold to them and

9    then they sold it to their own chain.

10             But it's like Food Lion or

11   something.  I forget which one it is.

12   But HJ Harkins, that's who they were.

13        Q.    A lot of pills heading -- a

14   lot of pills going out the door, huh?

15        A.    Relative to --

16        Q.    What a fiasco.

17             MS. KOSKI:  Move to strike.

18   BY MR. PENNOCK:

█      █    █    █

20   for Sandhills Packaging.

21             Do you know who they are?

22        A.    I believe they are the ones

23   that did the -- I'm not -- I shouldn't

24   speak, but I believe that was the ones

1    that dealt with Kroger's.  They did the

2    special packaging for Kroger's specialty.

3    But I'm not sure of that.  I think that's

4    who they were.

5           Q.    43, Kim Bloom, one of our

6    favorites.

7                 She wants -- let's see, also

8    need approval, 500 percent on Preferred

9    Pharmaceuticals wholesaler, great mix.

10                Each of these increases that

11   are reflected on Exhibit-43, and you

12   approved each of those?

13          A.    Yes.

14          Q.    And what -- is it your

15   position or are you telling us, with

16   respect to these, you had conversations

17   regarding each and every one of these

18   before you signed off on these?

19          A.    Thinking middle of 2010, I

20   don't remember whether I had -- it's

21   interesting that Kim is on these e-mails

22   now and she wasn't on these e-mails in

23   '09, '08 and '07.

24                So I believe, unless her

1  title is on here, sales operations, I

2  believe she was the one that worked with

3  Michael.  And if it came from her, then I

4  knew the due diligence was done with

5  Michael, and Robert wasn't there yet.

6            Once Robert came, he took

7  over this for her.  But I felt

8  comfortable that these were looked at by

9  Michael and his team before I would get

10  this, yes.

11       Q.   So you probably did not have

12  a specific conversation with either of

13  them, but were relying upon what you

14  understood to be their due diligence, in

15  terms of prior to these requests?

16       A.   By 2010, I did that.  And I

17  even, you know, will call out, there's a

18  doctor on here, and we stopped selling

19  doctors.

20            So this was right in the

21  time that, you know, we were changing,

22  you know, and getting even more stringent

23  after this.

24            But I would say I did not

Highly Confidential - Subject to Further Confidentiality Review

1  talk to these people -- I did not talk

2  about each one of these individually.  I

3  wouldn't say that I didn't talk about

4  some of them, such as A&P Pharmacy, which

5  was a chain.  So I can't say I did or did

6  not talk to them.

7          But I doubt that I talked to

8  them about each one of them.

9      Q.    What was the point of you

10  signing off?  Just because you were

11  president?

12     A.    I wanted to know that they

13  still followed the procedures that they

14  were supposed to do.  And I believe that

15  they did.

16          I did not want a change to

17  be made into the system of an amount

18  without me seeing it.

19     Q.    And last, Exhibit-44 --

20          MS. KOSKI:  Is that a

21     repeat?

22  BY MR. PENNOCK:

23     Q.    -- Dispensing Solutions.

24          Do you know who they are?

1          A.    Yes, we talked about them

2    already.  They were the ones out of Tampa

3    or Los Angeles, where the owner came out

4    and talked to us.

5              MR. PENNOCK:  Okay.  I don't

6         think I have -- I have no further

7         questions.  Thank you.

8              MS. KOSKI:  I will have a

9         couple, but can I take a quick

10        break first to make it shorter?

11             MR. PENNOCK:  Yes.

12             VIDEO TECHNICIAN:  Going off

13        the record.  The time is 3:19.

14                  -  -  -

15             (Whereupon, a brief recess

16        was taken.)

17                  -  -  -

18             VIDEO TECHNICIAN:  Going

19        back on record.  Beginning of

20        Media File Number 7.  The time is

21        3:29.

22                  -  -  -

23                  EXAMINATION

24                  -  -  -

Highly Confidential - Subject to Further Confidentiality Review

1    BY MS. KOSKI:

2         Q.    Mr. Paonessa, I just have a

3    few questions about some of the exhibits

4    that you went through with Mr. Pennock.

5              Do you have the exhibits in

6    front of you?

7         A.    Yes.

8         Q.    If you'd turn to Exhibit-6.

9         A.    Okay.

10        Q.    And this was an e-mail from

11   June of 2008, right?

12        A.    Yes.

13        Q.    And can you tell us what

14   product is at issue in this document?

15        A.    No.

16        Q.    Is there anything on the

17   face of the document that would tell us

18   what product is being -- there's an

19   increase request about?  Strike that.

20             Is there anything on the

21   face of the document that tells you what

22   product Mike is talking about here?

23        A.    No.

24        Q.    Okay.  Would you have known

Highly Confidential - Subject to Further Confidentiality Review

1    what product he was talking about in June

2    of 2008?

3           A.    Yes.  We would have talked

4    about it.

5           Q.    But we're here in 2019,

6    right?

7           A.    Yes.

8           Q.    If you look at Exhibit-5 --

9    I'm sorry, I skipped one.

10          A.    Okay.

11          Q.    Same question, this is an

12   e-mail from 2007, can you tell from the

13   face of the document what product this

14   relates to?

15          A.    No.

16          Q.    Exhibit-8.

17          A.    Okay.

18          Q.    E-mail from 2007.

19                Can you tell from the face

20   of this document what product is being

21   discussed here?

22          A.    No.

23          Q.    If you could turn to

24   Exhibit-13.

1    A.    Okay.

2    Q.    Do you recall discussing

3  this product listing with Mr. Pennock?

4    A.    Yes.

5    Q.    And if you turn to the

6  second page, Mr. Pennock asked you to

7  focus on, Ordering C-IIs from Anda is

8  easier than ever.

9          Do you recall that?

10   A.    Yes.

11   Q.    And can you read for the

12 jury the line that appears in relatively

13 small print underneath?

14   A.    The purchase of controlled

15 substances are subject to our monthly

16 pill count policies.

17   Q.    Can you explain to the jury

18 what that means?

19   A.    That we have policies in

20 place, per chemical, of how much they are

21 allowed to buy from us.  And we do due

22 diligence to allow them to have the

23 drugs, as well as if they would need more

24 for some reason, we do additional due

1    diligence as to, you know, how many pills

2    that they could have per chemical.

3         Q.    And just so it's clear, the

4    "they" in your answer, is that customers?

5         A.    Pharmacies, yeah.

6         Q.    Just to refresh you back to

7    Exhibit-28 that you talked about.

8              Do you remember talking with

9    Mr. Pennock about New Choice Pharmacy?

10        A.    Oh, okay.  Yes.

11        Q.    And do you recall this

12   Exhibit-28?

13        A.    Yes.

14        Q.    And on the second page,

15   there's a list of pharmacies that Mr.

16   Wright, from the DOJ, is talking -- from

17   the DEA, excuse me, is talking about.

18             Do you see that?

19        A.    Yes.

20        Q.    And the third up from the

21   bottom is New Choice Pharmacy --

22        A.    Yes.

23        Q.    -- is that right?

24             Okay.  I'm going to hand you

Highly Confidential - Subject to Further Confidentiality Review

1    what I've marked as Exhibit-45.

2                        -   -   -

3                   (Whereupon, Anda-Paonessa

4           Exhibit-45,

5           Anda_Opioids_MDL_0000272207-208,

6           was marked for identification.)

7                        -   -   -

8    BY MS. KOSKI:

9           Q.    And for the record --

10          A.    Okay.

11          Q.    -- Exhibit-45 is

12   Anda_Opioids_MDL_0000272207 to 208.

13                And you see there, there's

14   an e-mail from Emily Schultz, on December

15   11th of 2007, to customer maintenance.

16                Do you see that?

17          A.    Yes.

18          Q.    And you're copied on that

19   e-mail in the "cc" line?

20          A.    Yes, yes.

21          Q.    And what does Ms. Schultz

22   say in the middle of the e-mail there,

23   starting with, Please?  If you could read

24   that.

1          A.     Please change customer type

2     to 2002, expired DEA, with today's date

3     and remove schedules for the following

4     accounts.

5          Q.     And if you turn the page,

6     you'll see the eighth pharmacy listed

7     from the top --

8          A.     Yes.

9          Q.     -- do you see that, New

10    Choice Pharmacy?

11         A.     Yes.

12         Q.     So what does this e-mail

13    tell you about New Choice Pharmacy?

14         A.     They were cut off from

15    receiving controls, and this list was

16    sent to the DEA.

17         Q.     And what was the date that

18    they were cut off, according to this

19    exhibit?

20         A.     12/11/2007.

21         Q.     And is that the same date

22    that you received notification from Mr.

23    Wright at DEA about this particular

24    pharmacy, Exhibit-28?

1      A.    Yes, 12/11.  Same date.

2      Q.    If you could turn to

3  Exhibit-35.

4      A.    Yes.

5      Q.    Okay.  And you recall

6  talking about this exhibit with Mr.

7  Pennock as well?

8      A.    Yes.

9      Q.    And can you tell from the

10  face of this document what product is

11  being discussed here?

12      A.    No.

13      Q.    And in August of 2007, would

14  you have understood what product or

15  products were being discussed?

16      A.    I would have -- I would have

17  known, especially for MedCo, it's a very,

18  very large nationwide company.  This was

19  one of their many, many facilities.

20          But I would have known what

21  product it was at the time.

22      Q.    But on the face of this

23  document, you can't tell?

24      A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.

2            MS. KOSKI:  That's all I

3      have.

4            Do you have follow-up?

5            MR. PENNOCK:  Yes, I do have

6      a couple.  Just a couple.

7                    -  -  -

8            (Whereupon, a discussion off

9      the record occurred.)

10                   -  -  -

11           MR. PENNOCK:  Give us two

12     minutes.  We're just looking for

13     something.

14                   -  -  -

15                EXAMINATION

16                   -  -  -

17  BY MR. PENNOCK:

18           Q.    Sir, just a couple of

19  questions about Exhibit-45.

20           You mentioned that there was

21  an e-mail saying that New Choice Pharmacy

22  should be cut off from sales on December

23  11, 2007, right?

24           A.    Yes.

1    Q.    Counsel just asked you about

2    that.

3                    -   -   -

4              (Whereupon, Anda-Paonessa

5         Exhibit-46,

6         Anda_Opioid_MDL_Tx-data_CUY-SUM-OH

7         _00001; With Attachment, was

8         marked for identification.)

9                    -   -   -

10   BY MR. PENNOCK:

11   Q.    Let me show you Exhibit-46,

12   which is marked -- well, it's a native, a

13   document produced in native format.  And

14   it's from -- transactional data from

15   Anda.

16              MR. PENNOCK:  Is this the

17         number you're supposed to read,

18         this thing here?

19              Anda_Opioid_MDL_TX-data_CUY-

20         SUM-OH_00001.

21   BY MR. PENNOCK:

22   Q.    I'm going to direct you to a

23   couple of columns in that, and then we'll

24   be done?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Okay.

2    Q.    Okay.  So if you turn to the

3   last page of what I gave you, do you see

4   that, according to this document, not

5   only did you send oxycodone on the day

6   before, on December 10th, along with

7   fentanyl and hydrocodone and methadone --

8   do you see that?

9    A.    Yes.

10    Q.    But on December 11th, the

11   following were shipped:  Codeine,

12   fentanyl, morphine, morphine, morphine,

13   morphine, morphine, oxycodone.

14           Do you see that --

15    A.    Yes.

16    Q.    -- from this document here?

17           Do you see that?

18    A.    Yes.

19    Q.    So that would suggest to

20   you, would it not, that despite being --

21   despite Ms. Schultz saying that New

22   Choice should be shut off, at least as of

23   that day, they weren't shut off and stuff

24   was actually shipped out to them?

1           A.    I don't know the time of

2    this -- there's no time stamp on the

3    actual -- I got the date correct.

4                 I don't know what time the

5    order was done and processed.  And we

6    open at 9 o'clock in the morning.  So

7    it's possible it was before they took

8    them out of the system.

9           Q.    Right.  It went out before

10   this --

11          A.    Before we got --

12          Q.    -- it went out on the very

13   same day, though?

14          A.    It went out on the very same

15   day, yes.

16                MR. PENNOCK:  Thank you.

17                MS. KOSKI:  I have nothing

18          further.

19                VIDEO TECHNICIAN:  This

20          concludes today's deposition.

21          Going off the record.  The time is

22          3:41.

23                      -  -  -

24                (Whereupon, the deposition

Highly Confidential - Subject to Further Confidentiality Review

1          concluded at 3:41 p.m.)

2                    -    -    -

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1                    CERTIFICATE

2

3

4           I HEREBY CERTIFY that the

5    witness was duly sworn by me and that the

6    deposition is a true record of the

7    testimony given by the witness.

8

9

10           *Amanda Miller*

     Amanda Maslynsky-Miller

11   Certified Realtime Reporter

     Dated:  February 11, 2019

12

13

14

15

16

17           (The foregoing certification

18   of this transcript does not apply to any

19   reproduction of the same by any means,

20   unless under the direct control and/or

21   supervision of the certifying reporter.)

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1               INSTRUCTIONS TO WITNESS

2

3            Please read your deposition

4   over carefully and make any necessary

5   corrections.  You should state the reason

6   in the appropriate space on the errata

7   sheet for any corrections that are made.

8            After doing so, please sign

9   the errata sheet and date it.

10           You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14           It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
1                        - - - - - -

                        E R R A T A

2                        - - - - - -

3     PAGE    LINE    CHANGE/REASON

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____
```

Highly Confidential - Subject to Further Confidentiality Review

1              ACKNOWLEDGMENT OF DEPONENT

2

            I,_____, do

3    hereby certify that I have read the
     foregoing pages,  1 - 221, and that the

4    same is a correct transcription of the
     answers given by me to the questions

5    therein propounded, except for the
     corrections or changes in form or

6    substance, if any, noted in the attached
     Errata Sheet.

7

8    _____

      AL PAONESSA                 DATE

9

10

     Subscribed and sworn

11   to before me this
     _____ day of _____, 20_____.

12

     My commission expires:_____

13

14   _____

     Notary Public

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____  _____

 4    _____  _____  _____

 5    _____  _____  _____

 6    _____  _____  _____

 7    _____  _____  _____

 8    _____  _____  _____

 9    _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____
```