Highly Confidential - Subject to Further Confidentiality Review

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF OHIO

3              EASTERN DIVISION

4                 -   -   -

5    IN RE: NATIONAL PRESCRIPTION

6    OPIATE LITIGATION            Case No.

7                                 1:17-MD-2804

8    APPLIES TO ALL CASES         Hon. Dan A.

9                                 Polster

10   Case No. 1:17-MD-2804

11                -   -   -

12            January 30, 2019

13      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14            CONFIDENTIALITY REVIEW

15            Videotaped deposition of JEFFREY

16   S. PEACOCK, held at 200 Vesey Street, New York,

17   New York, commencing at 9:16 a.m., on the

18   above date, before Marie Foley, a Registered

19   Merit Reporter, Certified Realtime

20   Reporter and Notary Public.

21                -   -   -

22        GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

24            Deps@golkow.com

1 A P P E A R A N C E S:
2
3 MOTLEY RICE, LLC
4 BY: DONALD A. MIGLIORI, ESQUIRE
5   28 Bridgeside Boulevard
6   Mount Pleasant, South Carolina  29464
7   843.216.9000
8   dmigliori@motleyrice.com
9   Representing the Plaintiff
10
11
12 LOCKE LORD LLP
13 BY: JOHN P. McDONALD, ESQUIRE
14   C. SCOTT JONES, ESQUIRE
15   2200 Ross Avenue
16   Suite 2800
17   Dallas, Texas  75201
18   214.740.8758
19   jpmcdonald@lockelord.com
20   Representing Henry Schein, Inc. and
21   the Witness
22
23
24

1 A P P E A R A N C E S:
2
3 FARRELL FRITZ, LLP
4 BY: KEVIN P. MULRY, ESQUIRE
5   400 RXR Plaza
6   Uniondale, New York  11556
7   516.227.0620
8   Kmulry@farrellfritz.com
9   Representing Cardinal Health
10
11
12 GIBBONS P.C.
13 BY: PAUL E. ASFENDIS, ESQUIRE
14   One Pennsylvania Plaza
15   37th Floor
16   New York, New York  10119-3701
17   212.613.2067
18   pasfendis@gibbonslaw.com
19   Representing AmerisourceBergen
20
21
22
23
24

1 APPEARANCES VIA TELEPHONE AND STREAMING:
2
3 ARNOLD & PORTER KAYE SCHOLER, LLP
4 BY: TIFFANY M. IKEDA, ESQUIRE
5   777 Figueroa Street
6   44th Floor
7   Los Angeles, California  90017
8   213.243.4000
9   Representing Par and Endo
10
11
12 COVINGTON & BURLING, LLP
13 BY: LAUREN DORRIS, ESQUIRE
14   PAUL DOWNS, ESQUIRE
15   One CityCenter
16   850 Tenth Street NW
17   Washington, DC  20001
18   202.662.6000
19   Representing McKesson
20
21
22
23
24

1 APPEARANCES VIA TELEPHONE AND STREAMING:
2
3 JONES DAY
4 BY: CASTEEL BORSAY, ESQUIRE
5   325 John H. McConnell Boulevard, Suite 600
6   Columbus, Ohio  43215
7   614.469.3939
8   Representing Walmart
9
10
11 MARCUS & SHAPIRA LLP
12 BY: PAUL M. MANNIX, ESQUIRE
13   One Oxford Centre
14   35th Floor
15   Pittsburgh, Pennsylvania  15219
16   412.471.3490
17   Representing HBC Service Co.
18
19 ALSO PRESENT:
20   Marjorie Han, Henry Schein
21   Janine Downing, Henry Schein
22   Henry Marte, videographer
23
24

Page 6

1              - - -
2         TRANSCRIPT INDEX
3                    PAGE
4  APPEARANCES...................... 2 - 5
5  INDEX OF EXHIBITS................ 7 - 11
6  EXAMINATION OF JEFF PEACOCK:
7  BY: MR. MIGLIORI................. 14
8  AFTERNOON SESSION................ 189
9  SIGNATURE PAGE................... 328
10 ERRATA........................... 329
11 REPORTER'S CERTIFICATE........... 330
12
13
14
15              - - -
16
17
18
19
20
21
22
23
24

Page 7

1              - - -
2          E X H I B I T S
3              - - -

4  Henry Schein, Inc.-Peacock Exhibits    PAGE
5  Peacock      Plaintiffs' Notice of Oral     17
6  Exhibit 1   Videotaped Deposition of
7              Jeff Peacock As Fact
8              Witness For Defendant
9              Henry Schein
10
11 Peacock      LinkedIn profile of Jeff      24
12 Exhibit 2   Peacock
13
14 Peacock      Conflict of Interest          31
15 Exhibit 3   Statement, Offer Letter,
16             Bates No. HSI-MDL-00632419
17             to 00632520
18
19 Peacock      Power Point presentation      37
20 Exhibit 4   Global Quality Assurance,
21             Regulatory Affairs and
22             Trade Compliance December
23             9th, 2016 Jeff Peacock
24

Page 8

1  Peacock      Title 21 United States       94
2  Exhibit 5   Code Annotated Section 801
3
4  Peacock      Title 21 Code of Federal     100
5  Exhibit 6   Regulations Section 1301.74
6
7  Peacock      Letter dated December 21,    109
8  Exhibit 7   2018 from Locke Lord, with
9              attachment
10
11 Peacock      Healthcare Distribution      114
12 Exhibit 8   Management Association
13             (HDMA) Industry Compliance
14             Guidelines: Reporting
15             Suspicious Orders and
16             Preventing Diversion of
17             Controlled Substances,
18             Bates No. HSI-MDL-00063613
19             to 00063627
20
21 Peacock      Interoffice memorandum       154
22 Exhibit 9   dated December 23, 2013,
23             Bates No. HSI-MDL-00622244
24             to 00422250

Page 9

1  Peacock      Interoffice memorandum       189
2  Exhibit 10  dated December 19, 2012,
3              Bates No. HSI-MDL-00622252
4              to 00622258
5
6  Peacock      Interoffice memorandum       195
7  Exhibit 11  dated December 30, 2013,
8              Bates No. HSI-MDL-00621989
9              to 00621996
10
11 Peacock      Interoffice memorandum       198
12 Exhibit 12  dated February 14, 2014,
13             Bates No. HSI-MDL-00622219
14             to 00622224
15
16 Peacock      Interoffice memorandum       207
17 Exhibit 13  dated February 17, 2014,
18             Bates No. HSI-MDL-00499366
19             to 00499371
20
21 Peacock      DEA Compliance Update        208
22 Exhibit 14  October 2, 2014, Bates No.
23             HSI-MDL-00575077 to
24             00375079

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1  Peacock       Email chain ending May 7,      220
2  Exhibit 15    2018, with attachment,
3              Bates No. HSI-MDL-00572919
4              to 00572922
5
6  Peacock       Email dated July 19, 2018,    244
7  Exhibit 16    with attachment, Bates No.
8              HSI-MDL-00433692
9
10 Peacock       Email chain ending July      254
11 Exhibit 17    18, 2018, with attachment,
12             Bates No. HSI-MDL-00209427
13             to 00209428
14
15 Peacock       Email chain ending January    259
16 Exhibit 18    26, 2016, Bates No.
17             HSI-MDL-00156897 to 00156899
18
19 Peacock       Letter dated November 9,      277
20 Exhibit 19    2012, Bates No.
21             HSI-MDL-00397293 to 00397294
22
23 Peacock       Letter dated May 8, 2013,     285
24 Exhibit 20    with attachment

Page 11

1  Peacock       Memorandum in Support of      288
2  Exhibit 21    Motion For Summary Judgment
3              in the United States of
4              America versus Brian D. Heim
5
6  Peacock       Customer Service Imaging      295
7  Exhibit 22    printout, Bates No.
8              HSI-MDL-00001198 to 00001210
9
10 Peacock       Cegedim Dendrite Draft        309
11 Exhibit 23    Schein SOM Procedural
12             Review, Bates No.
13             HSI-MDL-00404369 to 00404383
14
15 Peacock       Email chain ending            321
16 Exhibit 24    February 27, 2015, Bates
17             No. HSE-MDL-0039634
18
19
20
21
22
23
24

Page 12

1  DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page  Line
5   - -none- -
6
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page  Line
10  - -none- -
11
12
13 STIPULATIONS
14  Page  Line
15  - -none- -
16
17
18 QUESTIONS MARKED
19  Page  Line
20  - -none- -
21
22
23
24

Page 13

1                - - -
2             9:16 a.m.
3          New York, New York
4                - - -
5          THE VIDEOGRAPHER:  We are now on
6  the record.
7          My name is Henry Marte.  I'm a
8  videographer with Golkow Litigation
9  Services.
10         Today's date is January 30th,
11 2019, and the time is 9:16 a.m.
12         This videotaped deposition is
13 being held at 200 Vesey Street, New
14 York, New York in the matter of
15 National Prescription Opiate
16 Litigation.
17         The deponent today is Jeffrey
18 Peacock.
19         All appearances are noted on the
20 stenographic record.
21         Will the court reporter please
22 administer the oath to the witness.
23                - - -
24

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1 JEFFREY S. PEACOCK, the Witness herein, having
2   been first duly sworn by a Notary
3   Public in and of the State of New
4   York, was examined and testified as
5   follows:
6 EXAMINATION BY
7 MR. MIGLIORI:
8   Q.  Good morning, sir.
9   A.  Hi.
10   Q.  My name is Don Migliori. I'm
11 from a law firm called Motley Rice, and
12 they represent various plaintiffs in this
13 litigation.
14     It's good to meet you.
15     Have you ever had your
16 deposition taken before?
17   A.  No, never.
18   Q.  Okay. Let me give you some
19 basics, and then we'll get started.
20     I'm going to ask you questions
21 throughout the day. The court reporter is
22 going to take down my questions. If
23 they're clear and understandable, I'd ask
24 that you respond to them. If you don't

Page 15

1 understand the question, I'd ask you to
2 let me know.
3     I would ask you to give me some
4 time between my question and your answer
5 such that, one, the court reporter can
6 take it down, and, two, your counsel, if
7 he chooses, would have an opportunity to
8 put an objection down on the record.
9     Okay?
10   A.  Mm-hm.
11   Q.  Second rule is you have to
12 actually say "yes" or "no."
13   A.  Yes.
14   Q.  And it's a lot easier for the
15 court reporter to type that --
16   A.  Yes.
17   Q.  -- than nods or gestures or
18 grunts.
19     If you answer a question, I'll
20 assume that you've understood it.
21     Is that a fair ground rule for
22 the day?
23   A.  Sure.
24   Q.  Okay.

Page 16

1   A.  Yes.
2   Q.  And if you need to take a break,
3 I'm happy to do that. This isn't,
4 hopefully not -- I don't think this will
5 take a full day. But to the extent we
6 need a break, I just ask that we finish
7 the question that we're on before we go
8 into a break. And I'm happy to
9 accommodate anything that you need.
10     Before we get started, do you
11 have questions of me or what we're about
12 to do?
13   A.  No. I'm clear. Thank you.
14   MR. McDONALD: Are you ready to
15 start?
16   MR. MIGLIORI: Yeah.
17   MR. McDONALD: Let me just --
18 we're not getting realtime.
19   Are you?
20   MR. MIGLIORI: I am.
21   (Pause.)
22 BY MR. MIGLIORI:
23   Q.  Okay. Sir, could you give the
24 jury your full name and your address,

Page 17

1 please?
2   A.  My name is Jeffrey Scott
3 Peacock. I live at 2911 Chester Street,
4 Oceanside, New York 11572.
5   Q.  Okay. And, what is your job
6 title?
7   A.  I'm the vice-president of Global
8 Quality Assurance and Regulatory Affairs.
9   Q.  And the name of your employer
10 is?
11   A.  Henry Schein.
12   Q.  How long have you worked there?
13   A.  Five years six months,
14 six-and-a-half months.
15   Q.  Okay. We'll go through some of
16 the specifics of your background and
17 training.
18     I want to start with Exhibit
19 Number 1.
20   (Peacock Exhibit 1, Plaintiffs'
21 Notice of Oral Videotaped Deposition
22 of Jeff Peacock As Fact Witness For
23 Defendant Henry Schein, was marked for
24 identification, as of this date.)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  BY MR. MIGLIORI:
2    Q.  I'm going to pass these across
3  the table.  There are two copies.  The one
4  with the sticker is for you.  The one
5  that's not is for your counsel.
6         In front of you is what's been
7  marked as Exhibit 1.  It's a notice of
8  today's deposition.
9         Were you provided this before
10 today?
11   A.  I left my glasses in my coat.
12        MR. McDONALD:  They're in your
13 jacket?
14        THE WITNESS:  They're in my
15 jacket pocket.  Sorry.
16        MR. MIGLIORI:  Not a problem.
17 We will need those today.
18        THE VIDEOGRAPHER:  Should we go
19 off the record?
20        MR. MIGLIORI:  It doesn't
21 matter.
22        (Pause.)
23        THE VIDEOGRAPHER:  Actually, can
24 we go off the record for just one

Page 19

1  second?  I think that phone might have
2  disconnected on us.
3        MR. MIGLIORI:  Okay.
4        THE VIDEOGRAPHER:  The time is
5  9:21 a.m.
6        Going off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:  We are back
9  on the record.
10        The time is 9:23 a.m.
11 BY MR. MIGLIORI:
12   Q.  Okay.  Had you seen, now that
13 we're situated, had you seen this, the
14 notice, before?
15   A.  Yes, sir.
16   Q.  When were you first advised of
17 this deposition?
18   A.  I don't remember the exact date.
19 I was notified by our corporate attorney
20 that I was called.
21   Q.  Was it within the past few
22 months?
23   A.  Yes, weeks.
24   Q.  And, did you meet with anybody

Page 20

1  in preparation for this deposition?
2    A.  Yes.
3    Q.  And, when did you first meet?
4    A.  Yesterday.
5    Q.  That was the first time you met?
6    A.  Yes.
7    Q.  Prior to that meeting, were you
8  provided any materials to review in
9  anticipation of the meeting?
10   A.  No, sir.
11   Q.  Have you reviewed documents in
12 preparation for today?
13   A.  Only yesterday.
14   Q.  How long was your meeting
15 yesterday?
16   A.  Six hours.
17   Q.  And, who was present?
18   A.  Mr. McDonald, the next
19 gentleman, and Margie.
20   Q.  Okay.
21   A.  I'm sorry.
22   Q.  Scott?
23   A.  Scott.
24   Q.  That's okay.  He is a gentleman.

Page 21

1         And the three of you met and
2  they provided documents, or did you also
3  bring with you documents?
4    A.  I brought in a couple documents.
5    Q.  Okay.  And, were these documents
6  you reviewed documents that were kept in
7  the ordinary course of business at Henry
8  Schein?
9    A.  Yes, sir.
10   Q.  Were you asked to produce
11 documents from your own files months ago
12 in response to discovery requests in this
13 case?
14   A.  Absolutely.
15   Q.  And, were the documents you
16 brought with you provided at that time?
17   A.  Yes.
18   Q.  So, there was nothing new that
19 you brought to the table yesterday?
20   A.  No, sir.
21   Q.  Okay.  Thank you.
22         And, in reviewing the documents,
23 was there anything that you reviewed that
24 was new to you that you hadn't seen

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  before, don't believe was in your custody
2  and control?
3     A.   There was some documents prior
4  to my joining Henry Schein in 2013.
5     Q.   And, did you review any
6  testimony in this case?
7     A.   No.
8     Q.   Do you know Shaun Abreu?
9     A.   I do.
10    Q.   And you know that Shaun Abreu
11 testified in this case?
12    A.   I do.
13    Q.   Did you talk to Shaun about his
14 testimony?
15    A.   I talked to him, but he didn't
16 disclose anything about the testimony.  He
17 said it was a long day.
18    Q.   Okay.  And, did you ever see or
19 review any of the written transcript of
20 his testimony?
21    A.   No, sir.
22    Q.   Did anyone tell you the
23 substance of his testimony?
24    A.   No, sir.

Page 23

1     Q.   Other than the documents that
2  counsel showed you and the documents you
3  brought to the meeting yesterday, is there
4  anything else that you reviewed in
5  anticipation or preparation for --
6     A.   No, sir.
7        MR. McDONALD:  Just be sure to
8  let him finish his question.
9        THE WITNESS:  I'm sorry.
10       MR. McDONALD:  That's okay.
11 BY MR. MIGLIORI:
12    Q.   Okay.  Let me go over your
13 background a little bit first, and then
14 we'll get into Henry Schein.
15       I don't -- do you have a current
16 curriculum vitae?
17    A.   I do.
18    Q.   Is that something you provided
19 to counsel?
20    A.   I don't recall.
21       MR. MIGLIORI:  Okay.  I don't
22 have a copy.
23       And, counsel, if you do and have
24 produced it, I don't -- I don't have

Page 24

1  it.
2        MR. McDONALD:  He didn't.
3        MR. MIGLIORI:  Okay.  Well,
4  we'll go from here and see what
5  happens.
6        (Peacock Exhibit 2, LinkedIn
7  profile of Jeff Peacock, was marked
8  for identification, as of this date.)
9  BY MR. MIGLIORI:
10    Q.   Best I can do is what you put
11 online on LinkedIn.
12       I show you Exhibit Number 2.
13 It's obviously very superficial, but let's
14 go over it.
15       Could you go over your
16 educational background?
17    A.   Sure.
18    Q.   So, you went to Cornell
19 University undergraduate?
20    A.   Correct.
21    Q.   And graduated in 1979?
22    A.   Yes.
23    Q.   With a bachelor of science
24 degree in animal physiology?

Page 25

1     A.   Correct.
2     Q.   And then it looks like you had a
3  four-year master's program in medical
4  biology and immunology?
5     A.   It was at night, so it took four
6  years to get, but I was working at the
7  time.
8     Q.   And, what is LIU Post?
9     A.   Long Island University.
10    Q.   Okay.
11    A.   C.W. Post campus.
12    Q.   Got you.
13       When you graduated in 1990, you
14 were -- you said you were working at the
15 time?
16    A.   Yes, sir.
17    Q.   And, I'm looking at this.  It
18 seems that you worked at Memorial
19 Sloan-Kettering Cancer Center from 1985 to
20 1986?
21    A.   That's correct.
22    Q.   And, what were you doing there?
23    A.   I was the manager of the
24 epidermal growth factor receptor

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  laboratory that was run by Dr. John
2  Mendelsohn, and we were doing research on
3  monoclonal antibodies for cancer
4  therapies, and a product that we worked on
5  actually became a drug called Erbitux.
6      Q.    Okay.
7      A.    Which is sold by Bristol-Meyers.
8      Q.    Do you think the Israelis have
9  found a cure?
10     A.    I hope so.
11     Q.    Sounds like they're optimistic.
12         That's the kind of work you were
13 doing though?
14     A.    Yes.
15     Q.    Research on medications?
16     A.    Yeah.
17         I was -- prior to that, I had
18 two other jobs.  I was working in research
19 doing, you know, monoclonal antibody
20 development, looking at, you know,
21 different bacterial infections, means to
22 detect them with monoclonal antibodies,
23 and that was the --
24     Q.    Were you doing any work at this

Page 27

1  time on controlled substances?
2      A.    No.
3      Q.    After that, there's a reference
4  to EZEM.
5         What is that?
6      A.    It was a pharmaceutical medical
7  device company.
8      Q.    And, what did you do for them?
9      A.    I did a lot for them.  So, I had
10 multiple -- multiple jobs.  I came as a
11 kind of an immunochemist when I was
12 working in their research laboratory.  We
13 started the department there called
14 Enteric Products where we commercialized
15 the protein from the Baylor College of
16 Medicine, and it was for detection of a
17 bacteria called Helicobacter pylori.  So
18 we had kind of spun off part of the
19 business, and we ran an incubator out at
20 Stony Brook University.  Relatively small
21 staff which we over the years built up
22 when but we started to commercialize this
23 product, put it through the FDA, and, you
24 know, sold it to major laboratories like

Page 28

1  Quest Laboratories, Quest Diagnostics.
2      Q.    So, is it fair to say you were
3  heavily involved in the research and
4  development and regulatory process for new
5  drugs?
6      A.    This was a diagnostic, so it
7  wasn't a drug.
8      Q.    Okay.  It was a --
9      A.    Yeah, it was a diagnostic.
10         After that, so, I was there
11 from, you know, '86 to about 2000.  There
12 was a new president brought on, and I was
13 brought in to the corporate fold where I
14 did -- ran clinical trials, quality
15 control, quality assurance.
16     Q.    That started in 2000?
17     A.    That started in 2000.
18     Q.    Same company though?
19     A.    Same company.
20     Q.    And that company is based in
21 Lake Success, New York?
22     A.    It's closed now.  We were
23 purchased in 2008.
24     Q.    By?

Page 29

1      A.    By Bracco Diagnostics.  It's the
2  next company on the list.
3         And I was --
4      Q.    Before we leave EZEM though.
5         At any time during your 21 years
6  there, did you work in any way with
7  controlled substances or opioids?
8      A.    No.
9      Q.    The company was bought out in
10 2008.
11         What did your responsibilities
12 become?
13         What was the name of the
14 company?
15     A.    The company was Bracco
16 Diagnostics.
17     Q.    Okay.  And, what, if any,
18 additional responsibilities did you have?
19     A.    So, in that role, I took on the
20 VP of operations, and in that role I was
21 overseeing the manufacturing of some of
22 the contract manufactured pharmaceuticals,
23 as well as some of the -- we -- EZEM made
24 barium products, barium sulphate for

Page 30

1 swallows, enemas, things like that. And
2 then in that role, I took over the
3 manufacturing responsibilities, 'cause of
4 my prior experience, of the facility that
5 we had in Montreal, as well as several
6 contract manufacturers throughout the U.S.
7     Q.   Okay.  And --
8     A.   Both in devices and drugs.
9         I'm sorry.
10    Q.   That was going to be my next
11 question.
12         On the drug side, did you have
13 any direct involvement with agencies, FDA,
14 DEA?
15    A.   Yes.
16    Q.   What kind of involvement did you
17 have?
18    A.   Well, we were audited fairly
19 regularly.  There was a -- you know, with
20 the device and the drug business, it was
21 almost every year we were being audited.
22    Q.   Okay.  Any controlled
23 substances?
24    A.   No, sir.

Page 31

1     Q.   You stayed there for how long?
2     A.   Five years.
3     Q.   And then what happened?
4     A.   Then I was recruited to come to
5 Schein.  The prince -- the Bracco
6 Diagnostics was based out of Princeton.  I
7 was commuting from Long Island to
8 Princeton and did that for five years, and
9 then I was recruited and I came to Henry
10 Schein.
11    Q.   Who recruited you?
12    A.   I don't know the name of the
13 recruiting firm.  It's a Long Island
14 company.  APR, something like that.
15         I'm sorry I don't know the name.
16    Q.   And, into what position did they
17 recruit you?
18    A.   I was the VP of Quality
19 Assurance and Regulatory Affairs.
20         MR. MIGLIORI:  I'm going to show
21 you what I'm just going to mark as
22 Exhibit 3.
23         (Peacock Exhibit 3, Conflict of
24 Interest Statement, Offer Letter,

Page 32

1 Bates No. HSI-MDL-00632419 to
2 00632520, was marked for
3 identification, as of this date.)
4 BY MR. MIGLIORI:
5     Q.   This is the personnel file that
6 we received for you.  I'm not going to go
7 through the whole thing.  We may return to
8 it later.  I just want to direct your
9 attention on Exhibit Number 3, if you look
10 at the bottom right corner there are
11 numbers and the first number is -- the
12 first letters are HSI.  That's referring
13 to Henry Schein Incorporated.  And then it
14 says MDL.
15         If you turn to the page that has
16 the last three numbers '425.  This appears
17 to be the signature page of a letter offer
18 to you and acceptance of the position.
19         Is that your signature?
20    A.   Yes, sir.
21    Q.   Okay.  So you accepted the
22 position on May 20th, 2013 to start on
23 July 1st of 2013, and the job title was
24 vice-president Regulatory Affairs based in

Page 33

1 Melville, New York reporting to Len David,
2 the senior vice-president and chief
3 compliance officer.
4         Is that the job that you
5 accepted?
6     A.   That's correct.
7     Q.   And, what did you understand the
8 job to be?
9     A.   The job was responsible for the
10 Quality Assurance and Regulatory Affairs
11 for the company for North America.
12    Q.   Okay.  And, is this the first
13 time that you would have been involved in
14 any way with responsibilities relative to
15 controlled substances?
16    A.   That's correct.
17    Q.   Had you had any training, prior
18 to accepting this position in 2013, in
19 regulatory compliance or obligations for
20 controlled substances?
21    A.   No, sir.
22    Q.   How did you get educated, or how
23 did you educate yourself to understand
24 your responsibilities in your new position

Page 34

1 relative to controlled substances at Henry
2 Schein?
3    A.  So, there was initially training
4 with the team.  So we -- we would meet and
5 go over what the processes were.
6 Generally it was on-the-job training.
7    Q.  Okay.  And, who were the folks,
8 when you got there, that had the knowledge
9 about the Controlled Substances Act and
10 the obligations of Henry Schein relative
11 to controlled substances that you learned
12 from on the job?
13    A.  Yeah.  So, primarily would be
14 Sergio Tejeda, who had been with the
15 company for a long time prior to my coming
16 on.
17    Q.  Okay.  And, we'll go through,
18 but he now reports to you, right?
19    A.  Correct.
20    Q.  Okay.  Who else?
21    A.  And his team.  So there were
22 people that had been, you know, reviewers,
23 verifiers, et cetera, for a number of
24 years.

Page 35

1    Q.  And, as I understand the
2 structure of Henry Schein, there is the
3 Regulatory Department and then there is a
4 Verifications Department.  Those are two
5 separate departments, but they have some
6 overlap in some of their responsibilities.
7       Is that a fair statement?
8    A.  Yeah.  It's a shared process,
9 right, so.
10    Q.  But Verifications, for example,
11 didn't report to Regulatory?
12    A.  No.
13    Q.  That is they are their own
14 department, and to the extent that there
15 was overlap, there was collaboration
16 between those two departments?
17    A.  Yes.
18    Q.  And, at no point in this process
19 did you have oversight obligations or
20 responsibilities towards Shaun Abreu or
21 those that worked for him in
22 Verifications, correct?
23    A.  That is correct.
24    Q.  Are you aware that Shaun Abreu

Page 36

1 was presented by your company as the
2 person with most knowledge about the
3 suspicious order monitoring programs and
4 the obligations of Henry Schein for
5 controlled substances?
6    A.  I was not aware, no.
7    Q.  Is it, in your view, in your
8 experience, in your on-the-job training,
9 your perception that compliance with the
10 Controlled Substances Act is more of a
11 responsibility of the Verifications
12 Department or of the Regulatory Affairs
13 Department?
14    A.  Could you repeat the question?
15    Q.  Sure.
16       Compliance and reporting to the
17 DEA, is that a function within Henry
18 Schein of the Regulatory Affairs
19 Department or the Verifications
20 Department?
21       MR. McDONALD:  Object to the
22    form.
23    A.  My opinion is it's a shared
24 responsibility.  So, there's functions

Page 37

1 that they do.  There is , you know,
2 processes within the team in the
3 electronic reporting, the ARCOS data, et
4 cetera, but then, you know, other
5 additional advising and oversight is with
6 my group.
7    Q.  Okay.  Is it fair to say then
8 that the primary responsibility to assure
9 compliance with DEA regulations is with
10 the Regulatory Department, but
11 Verification plays a role in that process?
12       MR. McDONALD:  Object to the
13    form.
14    A.  Yeah, I -- I -- I would agree.
15       MR. MIGLIORI:  Okay.  Let me
16    show you Exhibit Number 4.
17       (Peacock Exhibit 4, Power Point
18    presentation Global Quality Assurance,
19    Regulatory Affairs and Trade
20    Compliance December 9th, 2016 Jeff
21    Peacock, was marked for
22    identification, as of this date.)
23 BY MR. MIGLIORI:
24    Q.  This just helps me understand a

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 little bit more about the structure.
2      From time to time, we'll see a
3 document that doesn't have a date on it,
4 but I can tell you what the date is based
5 on information that's in the metadata.
6      So, I'll represent to you that
7 this is from December 9th of 2016.  It's a
8 Power Point presentation.  The Bates
9 number ends on the first page in '509.
10      And, if you look at the second
11 page, it's the cover of the Power Point is
12 "Global Quality Assurance, Regulatory
13 Affairs and Trade Compliance, December
14 9th, 2016, Jeff Peacock."
15      That's you, correct?
16   A.   That is correct.
17   Q.   Do you remember giving this
18 presentation?
19   A.   Yes, sir.
20   Q.   And, who had you given it to?
21   A.   My immediate boss.
22   Q.   Which was who at the time?
23   A.   Walter Siegel.
24   Q.   And, what was his title?

Page 39

1   A.   He's the chief counsel, senior
2 vice-president, chief counsel.
3   Q.   Okay.  And, what was the purpose
4 of the presentation?
5   A.   I was just taking on, I don't
6 know exactly the dates, but I had been
7 expanded and promoted for global
8 responsibility.  So this was one of the
9 kind of overviews that I did.
10   Q.   Okay.  So, at some point, you
11 went from regular -- the vice-president of
12 Regulatory Affairs to the vice-president
13 of Global Quality Assurance and Regulatory
14 Affairs?
15   A.   Yes.
16   Q.   And this would have been some
17 time approximately right after that
18 transition in 2016?
19   A.   I would assume.  I --
20   Q.   Okay.
21   A.   -- can't be sure, but --
22      MR. McDONALD:  And, to be clear,
23 Don, looking at your question, he
24 previously -- so we have a clear

Page 40

1 record, because Tejeda was
2 vice-president of Quality Assurance
3 and Regulatory Affairs and then it
4 changed to Global, still Quality
5 Assurance and Regulatory Affairs.
6      MR. MIGLIORI:  Did I --
7      MR. McDONALD:  You skipped
8 Quality Assurance in his initial
9 title.
10      MR. MIGLIORI:  In his initial,
11 fair enough.
12   A.   Actually, he's correct because
13 when I was hired, it was Regulatory
14 Affairs, and I split the department into
15 Quality Assurance and Regulatory Affairs.
16 That was one of the functions that I did.
17   Q.   Wait.  Can you repeat that
18 again, he's correct?  No, just the "he's
19 correct" part.
20   A.   Yeah, you're correct.
21      No, but the offer letter was
22 basically for Regulatory Affairs.
23   Q.   Right.
24   A.   And then over the course of, you

Page 41

1 know, a year or so, I broke the department
2 into Quality Assurance and Regulatory
3 Affairs.
4   Q.   I think that's why I pulled that
5 out of my head because we just pulled that
6 out of the letter.
7      So, you went from the
8 vice-president of Regulatory Affairs and
9 then it became the vice-president of
10 global -- I'm sorry, of Quality Assurance
11 and Regulatory Affairs.
12      Does trade compliance --
13   A.   That was rolled in, yeah.
14   Q.   Rolled into it as well?
15   A.   Yeah.
16   Q.   And then at some point, you --
17 they expanded that to not just domestic
18 U.S. responsibilities, but worldwide
19 responsibilities?
20   A.   Global, correct.
21   Q.   And this would have been a
22 presentation now of what's going on both
23 domestically and worldwide?
24   A.   Yes.

Page 42

1    Q.   And you were making this
2  presentation to your immediate report,
3  your supervision, correct?
4    A.   Mm-hm.
5    Q.   And, when you say compliance --
6  you said, sounded like a lawyer.  I forget
7  the counsel or something.
8        Who did you give this to, this
9  presentation?
10   A.   It was chief counsel.
11   Q.   Chief counsel.
12       So, is that within the Legal
13 Department?
14   A.   Yep.
15   Q.   All right.  On the third page of
16 this, it talks about the -- the division
17 and the mission statement.
18       And, is that something that
19 pre-existed, or did you come up with the
20 mission statement?
21   A.   It's changed, but I came up with
22 a new one, but this is what was there, I
23 believe.
24   Q.   Okay.  And part of the mission

Page 43

1  statement is to support the continuous
2  success of Henry Schein businesses and
3  operations worldwide while insuring
4  ongoing compliance with all applicable
5  regulatory, quality and trade compliance
6  requirements.
7        That component involves the
8  compliance with DEA and Controlled
9  Substances Act, correct?
10   A.   Yes, sir.
11   Q.   It also, to the extent relevant,
12 would apply to the FDA?
13   A.   Yes, sir.
14   Q.   And all of those functions and
15 that quality assurance and that
16 compliance, that fell under your direct
17 responsibility, correct?
18   A.   Yes, sir.
19   Q.   If you turn to the next page,
20 there's a flowchart that lists you on top
21 as vice-president, and then on the U.S.
22 side, which is all we're going to talk
23 about, it has four different columns
24 there.

Page 44

1        Are they broken up by
2  responsibilities?
3    A.   Yes, sir.
4    Q.   What are they?
5        Let's start with Sergio Tejeda.
6    A.   So, he's Regulatory Affairs,
7  director RA there.
8    Q.   Okay.  And under him there is
9  Gary, at least at the time, Tiam?
10   A.   Tiamsic.
11   Q.   Tiamsic.
12   A.   Andi Tiller.
13   Q.   And then there was an open
14 manager position?
15   A.   Correct.
16   Q.   And this would have been the
17 Regulatory Affairs Department in Melville
18 or both in Melville and I believe Denver?
19       Where is the other facility, or
20 the other --
21   A.   We have several facilities.  So,
22 there's one in Denver, Pennsylvania, in
23 Jacksonville, Florida, Bastian, Virginia,
24 Indianapolis and Reno, Nevada.

Page 45

1    Q.   Okay.  And they all have
2  regulatory responsibilities, all of those
3  that you just listed?
4    A.   Could you be more specific?
5    Q.   Are there regulatory affairs
6  folks in each of those locations?
7        I'm trying to work off this
8  flowchart and just understand the
9  structure of the department.
10   A.   No, there's not.
11   Q.   Okay.  So, are there any folks
12 within Regulatory Affairs, other than
13 those listed in this chart?
14   A.   So, I'm a little confused.  I
15 apologize.
16       So, if you go back to are there
17 any?  There's some of the DEA auditors
18 were in Indy, Jacksonville and Denver.  So
19 we had three of them there.
20   Q.   Okay.  You had -- so, you had
21 internal DEA auditors?
22   A.   Yeah, our internal DEA team.
23   Q.   Right.
24   A.   Would perform, you know, your

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  customer end audits, site audits.
2    Q.   And, is there a person -- is
3  there a managing person of that team, of
4  the internal --
5    A.   So, Sergio's the ultimate
6  director of that team.  There was a
7  manager who was left -- who had left, and
8  then there was a new manager who was
9  brought in.
10    Q.   Okay.  Who is the manager that
11  left?
12    A.   Her name was Tina Steffanie-Oak.
13    Q.   Okay.  And, who's the one that
14  replaced Tina Steffanie-Oak?
15    A.   His name is Frank O'Regan.
16    Q.   Okay.  And, what is the
17  responsibility of the internal DEA team,
18  audit team?
19    A.   So, they work with Verifications
20  when there is any Know Your Customer Due
21  Diligence that needs to be done.  They
22  review the files.  They review the
23  doctors.  They review the questionnaires.
24  They speak to them on occasion, and they

Page 47

1  may visit the site on occasion.
2    Q.   Okay.  What roles do they have
3  relative to audits?  Is it their own
4  auditing?
5       When you say DEA audits, are
6  they also responsible for external audits?
7    A.   Yes, of customers.
8    Q.   Okay.  Just of customers.
9    A.   They support the managing
10  director of the facilities, the
11  distribution centers.
12    Q.   Right.
13    A.   So, the operations people, they
14  would support the DEA audits when they
15  come to audit us.
16    Q.   Got you.
17    A.   These people would be support
18  for questions, et cetera.
19    Q.   And, so, this department,
20  this -- this department is under Sergio
21  Tejeda within Regulatory Affairs, correct?
22    A.   Correct.
23    Q.   And, from time to time, if
24  Verifications couldn't clear a pended or

Page 48

1  suspicious order, they would seek review
2  from this department?
3    A.   Correct.
4    Q.   And there were times throughout
5  the course, at least of your experience,
6  that those pended orders were cleared and
7  released within the Verifications
8  Department, correct?
9    A.   That is correct.
10    Q.   That is it didn't involve
11  Regulatory Affairs at all?
12    A.   Yes.
13    Q.   Is that still true today?  Is
14  that still part of the process?
15    A.   Yes.
16       MR. MIGLIORI:  Is that our
17    phone?
18       MR. McDONALD:  No.  It's next
19    door.  They just fixed it.
20       MR. MIGLIORI:  Okay.
21  BY MR. MIGLIORI:
22    Q.   And, can you remember, in the
23  time that you've been there from 2013 to
24  the present, any other people on this team

Page 49

1  just by name, on the -- the internal --
2    A.   You want the name of the people?
3    Q.   Yeah.  Just other folks that
4  worked with Tina or Frank.
5    A.   Beverly Butcher, Liam Schemer.
6    Q.   Anyone else that you can think
7  of?
8    A.   There was Pete Schmidt, Nick
9  DeLucia, Glenn Lonnquist.  And I believe
10  that's it.
11    Q.   Okay.  Did this group meet
12  regularly?
13    A.   Yes.
14    Q.   And, you said they were spread
15  out all over the country, or were they all
16  in Melville?
17    A.   All over -- well, most of them
18  were on -- on their -- different sites.
19    Q.   Okay.  And, so, how often would
20  they meet?  Was there a regular meeting
21  for them?
22    A.   There was a regularly
23  once-a-month meeting and, you know, there
24  was a lot of interface within the team.

Page 50

1    Q.    And, were there minutes of those
2  meetings?
3    A.    Yes.
4    Q.    And, were those minutes --
5    A.    Not all.  I can't say all, but
6  certainly some for sure.
7    Q.    And those minutes would be
8  shared with Sergio, or would Sergio be at
9  these meetings as well?
10   A.    Sergio was likely at those
11 meetings.
12   Q.    Okay.  And then would you get a
13 monthly report of those meetings?
14   A.    Sometimes I was present at those
15 meetings.
16   Q.    Okay.  Were they webinars?  Did
17 you link in visually?  Was it a phone
18 conference?
19   A.    Phone conference.
20   Q.    Okay.  And, was somebody's
21 responsibility to document any of the
22 decisions or concerns or events of the
23 month?
24   A.    I can't say specifically.  I

Page 51

1  mean, I -- you know, the minutes I think
2  drove what --
3    Q.    Okay.
4    A.    -- occurred.
5    Q.    And, if you were to ask to see
6  the minutes, where would you go?  On what
7  database, what system?
8          Or would you just call Lydia?
9    A.    I probably would have received
10 them.
11   Q.    Okay.  And, so, you would have
12 somewhere in your files a file of the
13 monthly meetings of the DEA Audit Team,
14 correct?
15   A.    Mm-hm.
16   Q.    Yes?
17   A.    Yes.
18   Q.    All right.  And that's something
19 that's kept in the ordinary course of your
20 business?
21   A.    Yes.
22   Q.    All right.  Any other teams
23 underneath Regulatory Affairs besides this
24 DEA Audit Team?

Page 52

1    A.    So, the teams that are listed
2  here, the Andi Tiller's team, she runs the
3  facility in Bastian, Virginia.  Gary
4  Tiamsic's team runs what we call the Major
5  Projects.
6    Q.    Okay.
7    A.    So, in 2013, there were two
8  legislations, the Drug Quality Security
9  Act for the FDA for serialization of
10 pharmaceutical products, as well as unique
11 device identification for barcoding and
12 identification of medical devices for
13 counterfeiting, et cetera.  So, those are
14 two large initiatives, as you might
15 imagine, and he's the project manager
16 running those projects.
17   Q.    When you say "running the
18 project," is it implementation?  Is it
19 lobbying?  How -- what role did Gary have?
20   A.    Well, it's a multifunctional.
21 So, you know, we have disciplines and
22 operations.  We have IT, et cetera.
23         So, during the meetings with the
24 vendors sourcing out the solutions that we

Page 53

1  have put in place, discussing negotiated
2  with those vendors for pricing, ultimately
3  managing a budget with myself.  You know,
4  I had sign-off authority on it.  Writing
5  minutes to the meetings.  Making sure that
6  we were on timelines.  Being able to
7  report how the progress of the, you know,
8  projects are going 'cause there are
9  certain timelines based on a class of
10 medical devices or who's, you know, the
11 manufacturer or distributors for
12 pharmaceuticals, there were different
13 dates that need to occur.  So we wanted to
14 make sure that we had, you know, process
15 in place to meet those deadlines.
16   Q.    Did Major Projects track
17 state-specific obligations in regulations;
18 for example reporting requirements to
19 Boards of Pharmacy and the like?
20   A.    That would be within the
21 Regulatory under Sergio's DEA team.
22         These were company-wide big
23 projects.
24   Q.    Sure.  Okay.

Page 54

1    So, none of them were truly just
2  specific to controlled substances or to a
3  particular drug?  It was more universal
4  projects?
5    A.  Yeah.  So, I mean, he does other
6  things as well.  So, you know, it's part
7  of just running projects, but not the
8  controlled substance part.
9    Q.  Okay.  The person for controlled
10 substances is Sergio Tejeda?
11   A.  Correct.
12   Q.  All right.  Did this group,
13 Major Projects, have regular meetings and
14 minutes similar to the DEA team?
15   A.  Yes.
16   Q.  All right.  And those would be
17 kept in the same --
18   A.  Yes.
19   Q.  -- course as the other minutes
20 that you have?
21   A.  Yes.
22   Q.  Okay.  And then, I'm sorry I
23 missed it, but what did Andi Tiller run?
24   A.  She runs the facility in

Page 55

1  Bastian, Virginia.  And, you know, it's
2  one of our distribution centers, but it's
3  also a pharmaceutical repackaging.  So
4  it's kind of a misnomer, repackaging, but
5  we take packs of ten, we don't open the
6  content, et cetera.  We just individualize
7  them for, you know, doctors that only want
8  one out of a package of ten.
9    Q.  So that has its own set of
10 controls and --
11   A.  It's an FDA-regulated process.
12   Q.  And, does Andi have any
13 responsibilities relative to controlled
14 substances or opiates?
15   A.  There are controlled substances
16 in our facility.
17   Q.  Okay.  So, that process of
18 repackaging could actually be for opioids
19 as well?
20   A.  No, I don't believe that it's
21 true.
22   Q.  All right.  But it's just for
23 other classes?
24   A.  Yes.

Page 56

1    Q.  All right.  They met regularly,
2  had their own minutes, reported to you as
3  well?
4    There's a "did" in there that I
5  didn't say.
6    Is that a group that had a
7  regular meeting, or the repackaging was
8  just simply a function that was managed
9  out of that?
10   A.  So, they reported on a monthly
11 basis on what the progress was and what
12 they had done, any issues like that.  They
13 have management review meetings, which,
14 you know, one's happening today.
15   Q.  More operational report?
16   A.  Yeah.
17   Q.  And then the open manager
18 position DEA, what role is that?  And who
19 filled it?
20   A.  The person who filled it was
21 Frank O'Regan, as I mentioned before.  He
22 had retired from the DEA, and he had
23 joined us to lead the team that does the
24 Know Your Customer surveillance.

Page 57

1    Q.  Do you know when he joined to
2  fill that position?
3    And again, just for orientation,
4  this presentation was created in December
5  9th of 2016.
6    A.  I don't have the date.
7    I'm sorry.
8    Q.  But it would be after that --
9    A.  Yes.
10   Q.  -- if my date is correct?
11   A.  Correct.
12   Q.  All right.  And, the Know Your
13 Customer components, at that point, you
14 had become aware that, prior to your
15 hiring into Henry Schein, there was a
16 project to get current with the Know Your
17 Customer Due Diligence files at the
18 company, correct?
19   MR. McDONALD:  Object to the
20 form.
21   A.  Yeah, I'm not quite clear.
22   Prior to my --
23   Q.  There was an observation made,
24 earlier before your arrival at Henry

Page 58

1 Schein, that 60 percent of the files had
2 no Know Your Customer Due Diligence
3 letters in them.
4     You were made aware of that when
5 you got them, correct?
6     A.   Maybe not immediately, but at
7 some point, yes.
8     Q.   And there was a concerted
9 effort, in fact you report on it, to catch
10 up and catch up quick, correct?
11     A.   Yes.
12     Q.   And you've been involved in that
13 process and you show in some of your
14 reporting the efficacy of actually
15 completing that process and doing deeper
16 dives into certain prescribers, correct?
17     MR. McDONALD:  Object to the
18 form.
19     A.   Two parts to your question.  I'm
20 not sure.
21     I apologize.
22     Q.   Sure.
23     You do report on the progress
24 and expediency or urgency of the project

Page 59

1 to get current to your supervisors,
2 correct?
3     A.   That is correct.
4     Q.   And, in that reporting, you also
5 talk about the importance of that process
6 and the ability it had given you to do
7 more on-site visits and inspections,
8 correct?
9     MR. McDONALD:  Object to the
10 form.
11 BY MR. MIGLIORI:
12     Q.   I believe you called it a
13 risk-driven process.  That is you
14 prioritized the catch-up project on the
15 Know Your Customer files by what seemed to
16 be the greatest risks first down to the
17 lesser risks.
18     A.   That is correct.
19     Q.   All right.
20     A.   We always take a risk-based
21 approach, as we need to.
22     Q.   And you also reported on doing
23 more on-site inspections in the period of
24 time that you were catching up, correct?

Page 60

1     A.   I'd have to see the document.  I
2 don't recall.
3     I'm sorry.
4     Q.   All right.  We'll show it to
5 you.  It's at the end of this.  But let me
6 finish this before I leave the document.
7     So, in terms of the regulatory
8 affairs and quality assurance, this team
9 here is the team, this open position was
10 ultimately taken by Frank O'Regan.
11     Does he still hold that
12 position?
13     A.   No, he does not.
14     Q.   Did somebody replace him?
15     A.   Somebody is starting on Monday.
16     Q.   Okay.  And, when did Frank no
17 longer have this position?
18     A.   December 20th.
19     Q.   Of this -- of 2018?
20     A.   Yes, sir.
21     Q.   And, why did he -- did he leave?
22     A.   He did leave.
23     Q.   And, why did he leave?
24     A.   So, he had applied through the

Page 61

1 state for a -- he took a test about four
2 years ago for a new position, 'cause he
3 had been in the DEA, and four years after
4 it, he had worked for us probably
5 year-and-a-half or two years, I don't
6 remember exactly the time frame, they
7 called him and said you got the job.  And
8 he basically wrestled with it and took it.
9     Q.   Okay.  And that's with the State
10 of New York?
11     A.   Yes.  Nassau County DA,
12 actually.
13     Q.   And, so, is he continuing to
14 work with compliance --
15     A.   Yes.
16     Q.   -- and controlled substances?
17     A.   That's correct.
18     Q.   Is Andi Tiller still in this
19 position?
20     A.   Yes.
21     Q.   How about Gary Tiamsic?
22     A.   Yes.
23     Q.   And Sergio still is as well?
24     A.   Yes.

Page 62

1    Q.   All right.  Anyone else on the
2  chart in the U.S.A. side that has
3  regulatory affairs responsibilities?  I
4  know that we're broken down by quality
5  assurance and the like, but is there any
6  overlap in these other -- these three
7  other?
8    A.   So, it depends on the definition
9  of regulatory affairs.
10    Q.   I'm primarily focused on DEA and
11  controlled substances.
12    A.   Right.  Just want to be clear.
13    Q.   No, I appreciate that.
14    A.   No.
15    Q.   Okay.  So, in my world that
16  we're dealing with in this case, the
17  opioid litigation, the -- the suspicious
18  order monitoring programs, the compliance
19  with DEA regulations relative to the
20  distribution and sale of opioids, that
21  would be covered by these four managers
22  and director and the folks that report to
23  them?
24    A.   Correct.

Page 63

1    Q.   All right.  On page 5, that's
2  your international crew?
3    A.   Yes.
4    Q.   All right.  Page 6 Regulatory
5  Affairs and Quality Assurance.  Again this
6  has up on top with Lydia.
7        Is it fair to say that Lydia's
8  probably equal in the importance --
9    A.   In importance to me?
10        More so, actually.
11    Q.   Okay.
12    A.   Make sure she gets a copy.
13    Q.   I know how that works.  That
14  works the same way in my office.
15        Tell me about the breakdown
16  here.
17        Who is Liz Ernst?
18    A.   Liz Ernst is the director at the
19  time, now VP of Regulatory and Quality at
20  Animal Health.
21    Q.   Okay.  And, so, is this for
22  research and development?  Is this for
23  regulatory compliance?  What roles would
24  that column have relative to the things

Page 64

1  that I'm -- that I'm asking you about, DEA
2  and opioids, if any?
3    A.   Well, they're a distributor.  So
4  they do have controlled substances.
5    Q.   Okay.  So, where are they?
6        When you say they're a
7  distributor.  Are they a distributor of
8  controlled substances to the animal health
9  business?
10    A.   The veterinary business, yes.
11    Q.   Okay.  And, so, do they have
12  their own set of rules or their own
13  compliance people?
14    A.   Yes.
15    Q.   And, who is the compliance
16  person within the animal health division?
17    A.   Liz Ernst is the lead.
18    Q.   Okay.  And, do they report to
19  you?
20    A.   No.
21    Q.   Do they have separate reporting
22  requirements?  I mean, do they -- do any
23  of their --
24        MR. MIGLIORI:  Strike that.

Page 65

1    Q.   The chart says they report to
2  you.
3        Is it just to report that
4  they're being compliant with their own
5  regulatory scheme?  Do you have any
6  involvement at all in their practice?
7    A.   I'm going to clarify that.  It's
8  a dotted line to me.
9    Q.   Okay.
10    A.   It's not a direct line.
11    Q.   Okay.  That's helpful.
12    A.   So, we are like advisors,
13  consultants, and we, you know --
14    Q.   Got you.
15    A.   -- surveil and try to help them
16  as necessary.
17    Q.   Same would be true for the Ortho
18  Organizers?
19    A.   Yes.  For all.
20    Q.   And the BioHorizons?
21    A.   Mm-hm.
22    Q.   And, what is Smart Pack?
23    A.   It's an animal feed company.
24  They have horse feed.

Page 66

1    Q.   You have a solid line to Kathy
2  Strange at Ace Surgical.
3        Do you have DEA regulatory
4  responsibilities over that division?
5    A.   Yes, sir.
6    Q.   And, what are they?
7    A.   So, they were a distributor of
8  controlled substances.  And my team would
9  help Sergio, and his team would help audit
10 them and advise them, et cetera.
11   Q.   Do they have their own sales
12 force at Ace Surgical?
13   A.   They do.
14   Q.   And, so, the sales force at Ace
15 Surgical would, of course, be accountable
16 to you for complying with regulatory
17 obligations for the sale and distribution
18 of controlled substances, correct?
19       MR. McDONALD:  Object to the
20   form.
21 BY MR. MIGLIORI:
22   Q.   That is some of the functions
23 of -- of the Regulatory Affairs is --
24 involves the sales and marketing of

Page 67

1  opioids as well, correct?
2        MR. McDONALD:  Object to the
3    form.
4    A.   In terms of process, yes.
5    Q.   Okay.  There's a specific
6  reference to, a little later in the deck,
7  but whatever functions they have at Ace
8  Surgical relative to opioids, the sale of
9  opioids, distribution of opioids, and
10 their compliance with regulations, that is
11 ultimately the responsibility of your
12 department, correct?
13   A.   Primarily it's the
14 responsibility of Kathy Strange, who is --
15 was the senior manager.  She was
16 ultimately promoted to vice-president and
17 ran this, but she had the direct line to
18 me for reporting, yes.
19   Q.   Okay.
20   A.   They managed their system
21 themselves, so they didn't -- you know,
22 Sergio and his team would provide
23 guidance.  And, so, again, it's audits,
24 things like that.

Page 68

1    Q.   And, how were their customers
2  different from Schein's customers, if they
3  are?
4    A.   I couldn't speak on that.
5    Q.   Okay.  Page 8 you've got
6  licensure database.
7        I just want to ask you briefly
8  where -- what do you call this database?
9    A.   Facility licensure database.
10   Q.   It's actually called that?
11   A.   So, our Henry Schein facilities
12 and the licensure that each facility has.
13   Q.   Okay.
14   A.   Globally.
15   Q.   All right.  So, these are your
16 own licenses, and this would include DEA
17 licensing?
18   A.   All the facilities that have
19 them, yes.
20   Q.   And they would include
21 state-based licensing, to the extent those
22 were required?
23   A.   Correct.
24   Q.   For controlled substances?

Page 69

1    A.   Correct.
2    Q.   The customer licensure
3  verification, we talked a little bit about
4  this.
5        But, is this Shaun Abreu's
6  department?
7    A.   Yes.
8    Q.   Okay.  The databases that they
9  use, at least in 2016, are MedPro and NTIS
10 systems.
11       Is that right?
12   A.   Yes, from back then, yes.
13   Q.   Okay.  Is it different today?
14   A.   I'm not aware.  I don't believe
15 so.  I think it's the same.
16   Q.   And the JDE is what?
17   A.   It's an Oracle EIP system.
18   Q.   Okay.  And is that the mother --
19 the mother board of everything?
20   A.   Enterprise resource system that
21 runs a company.
22   Q.   Okay.  If you could turn to page
23 13, the slide that you have in your
24 presentation called DEA Suspicious Order

Page 70

1 Monitoring: Suspicious order monitoring
2 is managed through a system algorithm that
3 was built by a leading DEA consultant firm
4 that confirms practice standards to insure
5 that only controlled substance drugs
6 applicable to the practice are sold and
7 that the amounts of controlled substances
8 are in line within acceptable tolerance
9 ranges.
10 The DEA consulting firm you're
11 referring to there is the Buzzeo firm, or
12 do you know?
13 A. I believe so, but I can't -- I'm
14 not a hundred percent positive at this
15 time.
16 Q. All right. If you go to the
17 fourth bullet point: The team has gone
18 back to gain Know Your Customer forms from
19 customers over the last few years on a
20 risk-based approach.
21 We were talking about that a
22 little earlier. In an effort to catch up
23 on the 60 percent of the customers that
24 had no due diligence Know Your Customer

Page 71

1 files, as of this point, it says: We have
2 approximately 600 left out of the total of
3 18,000 customers purchasing controlled
4 substances.
5 Was this a reporting to your
6 direct supervisor of what was left in the
7 project to catch up on the Know Your
8 Customer documentation?
9 A. Yes, that's fair. Yes.
10 Q. It says: Lastly, we perform
11 approximately 800 due diligence reviews
12 and 133 physician site audits of
13 suspicious customers each year, which has
14 been growing yearly. We also perform DEA
15 audits of JVs.
16 What are JVs?
17 A. Joint ventures.
18 Q. Involved in controlled
19 substances, including ACE, HSAH, Health
20 First, Banyan and Darby.
21 The DEA audits that you refer to
22 here, who ran those?
23 A. It would be Sergio or Frank
24 O'Regan and the team.

Page 72

1 Q. Okay. And, where are those
2 audits kept, that is the reports of those
3 audits?
4 A. We have a share drive online.
5 Q. Okay. And, how often were those
6 audits performed in the time that you were
7 responsible from when you started to -- to
8 present? What was the regularity of
9 frequency of those audits?
10 A. I'd say yearly, but I can't be
11 sure for every one. We target try to do
12 it yearly.
13 Q. And they would have been reduced
14 to a writing, correct?
15 A. Mm-hm.
16 Q. Yes?
17 A. Yes.
18 Q. And those writings would have
19 been shared with you and you would have
20 kept them in the ordinary course of
21 business, correct?
22 A. Yes.
23 Q. And, to the extent those audits
24 produced any recommendations or concerns,

Page 73

1 those would have been elevated to the
2 correct people for -- to be addressed,
3 correct?
4 A. At each facility, that's
5 correct.
6 Q. And, that is separate and apart
7 from any outside auditing, that is any
8 vendors that came in like Buzzeo or
9 Dendrite, to come in and do the same
10 function, right?
11 A. That is correct, yes.
12 Q. And those outside audits were
13 also produced to you in a report form,
14 correct?
15 A. I'm not aware. I mean, I don't
16 recall.
17 Q. Okay. I'll have some to show
18 you and maybe we can talk about it.
19 But, to the extent that
20 Dendrite, Buzzeo, any of those entities
21 performed an audit and issued a report or
22 finding, you would certainly be one of the
23 people to have received it, correct?
24 A. If it was of a Henry Schein

Page 74

1  facility, absolutely.
2       If it was for a joint venture,
3  I'm not sure.
4     Q.   Fair enough.  And I'm mostly
5  concerned about Henry Schein.
6     A.   Yeah.  Then I would say yes
7  then.
8     Q.   Okay.  And, do you know how
9  often outside vendors performed audits on
10 DEA compliance?
11    A.   I think fairly regularly, but I
12 don't know the time frame.  So, 12, 18
13 months, maybe once every two years,
14 somewhere in that area.
15    Q.   Okay.  And, was there
16 somebody -- was there another auditing
17 company besides Dendrite that you can
18 think of that would have performed that
19 kind of function?
20    A.   Hyman Phelps.
21    Q.   Okay.  Do you know when they
22 would have performed their audit?
23    A.   That was this past fall.
24    Q.   Fall of 2018?

Page 75

1     A.   Yes, sir.
2     Q.   And, was a report -- do you
3  recall reading a report of their audit?
4     A.   Yes.
5     Q.   And, is that something you would
6  maintain in the ordinary course of your
7  business?
8     A.   Yes, sir.
9     Q.   Do you recall any of the
10 conclusions of that audit?
11    A.   Not -- no, sir.  I --
12    Q.   You'd have to rely on the
13 document?
14    A.   I'd have to look at it.
15    Q.   Fair enough.
16       Any other third-party vendor
17 audits that you can think of?
18    A.   I can't recall.  Sorry.
19    Q.   Fair enough.
20       If you turn to page 15.  It
21 says:  Quality Assurance and Regulatory
22 Affairs communications plans have been
23 established for training and best
24 practices review for all facilities and

Page 76

1  JVs impacted by controlled substance DEA
2  issues, Quality Assurance and Regulatory
3  Affairs issues and Trade Compliance
4  issues.
5       The meetings are held with
6  relevant facilities regarding DQSA
7  prescription serialization and UID FDA
8  compliance.  Monthly reports are provided
9  for all territories and quality metrics
10 have been established for overview of
11 critical processes.
12       These monthly reports, who
13 produces them?  And where are they?
14    A.   My staff produces them.  Each
15 individual has a contributing part.  I
16 would put an executive summary on it, and
17 then I would provide it to my boss.
18    Q.   Okay.  And that's on a monthly
19 basis?
20    A.   Correct.
21    Q.   And that began when, to your
22 knowledge?
23    A.   I think my stamp on it came
24 probably in the fall of '13.

Page 77

1     Q.   Okay.
2     A.   So I don't know December or
3  November, somewhere in there.
4     Q.   So some time in the end of 2013
5  through to today, these monthly meetings
6  or reports have been a normal process of
7  the department?
8     A.   Correct.
9     Q.   Okay.  On page 16 it says:
10 Quality Assurance and Regulatory Affairs
11 developments are tracked globally by many
12 individuals around the globe through
13 seminars, general industry news
14 publication, email notifications from
15 regulatory agencies, trade journals and
16 keyword searches in Westlaw and Nexus.
17       Is there a place where those
18 tracked data or informations are kept?
19    A.   At this time, no.
20       Currently we have adapted one of
21 our positions to we call it Government
22 Affairs position and that person is a
23 lawyer.  They got their degree while
24 working with us.  They -- they had gone to

Page 78

1 school, but they finally passed the bar,
2 and they're now the repository.
3 Q. Okay. And, who is that person
4 today?
5 A. Nick DeLucia.
6 Q. Okay. And, any such -- the next
7 thing: Relevant findings are shared
8 throughout the Henry Schein network.
9 Are they shared electronically?
10 A. Yes. Or one of the controlled
11 meetings. So if we have a monthly meeting
12 with staff and we're talking about a -- a
13 new regulation or something like that,
14 we'll start kicking it off.
15 So, there's a major regulation
16 coming in Europe called the Medical Device
17 Regulation. It's kind of more mimicking
18 the A20 for medical devices. So, you
19 know, it's coming into effect in 2020, so
20 it's a lot of -- a lot of activity.
21 Everyone's getting involved in meetings,
22 now the kickoff meeting, looking at GAAP
23 analyses, et cetera.
24 Q. And, so, that would be housed,

Page 79

1 the hub for that would be Nick DeLucia?
2 A. The information about that, yes.
3 Q. Okay.
4 A. And others.
5 Q. Let me show you page 21, and
6 once we're finished with this we'll take
7 our first break.
8 Page 21 has -- it's entitled the
9 "Role of Regulatory Affairs." It says:
10 Regulatory Affairs are responsible for the
11 compliance of all Henry Schein operations
12 with applicable regulatory requirements
13 including - you list a bunch, but it says:
14 DEA, the National Board of Pharmacy, state
15 boards of pharmacy, and others both at the
16 federal and state level.
17 That -- that's -- that is
18 responsibility of your department,
19 correct?
20 A. Correct.
21 Q. It says: The manufacture,
22 purchase, storage, sale and shipment of
23 prescription drugs, including controlled
24 substances, prescription medical devices,

Page 80

1 hazardous materials and pesticides are
2 highly regulated activities by numerous
3 government agencies worldwide.
4 So, are you responsible here, in
5 any way, and I'm trying to focus in on the
6 sale of controlled substances.
7 Do you have, are you reporting
8 that you have within Regulatory Affairs a
9 responsibility as to the sale and sales
10 practices of controlled substances?
11 MR. McDONALD: Object to the
12 form.
13 A. Semantics, I believe.
14 Processes are in place. There's
15 customer verifications placed to make sure
16 that the doctors are appropriate licensed.
17 So, in that context, I think sale could be
18 considered.
19 Q. What about the messaging of the
20 sales force at Henry Schein to new
21 customers or existing customers?
22 A. I believe we do play a role. I
23 think there's a -- a -- I'm trying to
24 recall, but I believe there's a package

Page 81

1 that we've kind of, you know, educational
2 package that we put out.
3 Q. Okay. Do you know what that
4 package is called?
5 A. I don't.
6 Q. Do you know how big the sales
7 force is at Henry Schein?
8 MR. McDONALD: Object to the
9 form.
10 A. Roughly, it's about three to
11 four thousand.
12 Q. And, are all three to four
13 thousand sales reps qualified, authorized
14 to sell, among other things, controlled
15 substances?
16 MR. McDONALD: Object to the
17 form.
18 A. I couldn't speak to that, sir.
19 Q. Okay. That's what I'm trying to
20 understand, what -- what it is that you
21 oversee with respect to sales.
22 What if those sales forces were
23 presenting brochures of manufacturers
24 about controlled substances, is that

Page 82

1 something that would get reviewed through
2 your department?
3       MR. McDONALD:  Object to the
4   form; assumes facts not in evidence.
5   A.  No, sir.
6   Q.  Okay.  Do you know whether the
7 sales force at Henry Schein delivered any
8 promotional materials of any of the
9 controlled substance manufacturers in
10 their sales?
11   A.  I do not have any such
12 knowledge, no.
13   Q.  Okay.  One way or the other, you
14 don't know?
15   A.  I don't know.
16   Q.  All right.  And you don't
17 recall, since 2013, ever being asked to
18 review a situation where some
19 representations were made of the sales
20 force to doctors or consumers of -- of
21 opioids from Henry Schein's distribution?
22   A.  Representation of?
23   Q.  Of any kind about the efficacy,
24 the safety, the -- the use of, the proper

Page 83

1 use of, the indications for controlled
2 substances?
3   A.  No, I have not.
4   Q.  All right.  It says:  Regulatory
5 Affair customers - in quotes - includes
6 almost every Team Schein Member, TSM.  We
7 aid our fellow TSMs and joint venture
8 partners across the globe working in
9 business units in marketing, in private
10 brand, operations, verifications, customer
11 service and business development.
12       What roles do you play in
13 marketing as part of the Team Schein
14 Members that are involved in marketing?
15   A.  Well, I think in marketing we
16 play a role in onboarding new -- new
17 cus -- new products.  So, in terms of what
18 they're looking to bring on, 'cause we --
19 that's the business that we're in is
20 bringing on new products.  So
21 understanding what's there.  We look at
22 their regulatory requirements, making sure
23 that the products are properly registered
24 and they have, you know, all of the proper

Page 84

1 requirements that the company is in good
2 standing with the FDA, no recalls, no
3 warning letters, things of that nature.
4 So that we facilitate them bringing new
5 products into the Henry Schein fold.
6   Q.  And, is it also true on the
7 other side, on the distribution side, that
8 you're involved with the Know Your
9 Customer compliance obligations and all of
10 the out-the-door compliance requirements
11 relative to marketing and sales?
12       MR. McDONALD:  Object to the
13   form.
14   A.  Two parts to the question again.
15       So, the customer verifications,
16 again, yes, that's correct.
17       If you're talking about
18 marketing materials or anything else,
19 promotional materials regarding any
20 particular products, no.
21   Q.  Okay.  What's your definition of
22 the verification process?  What comes out
23 of Verification for regulatory affairs
24 purposes?

Page 85

1   A.  What would come out of
2 Verifications from the customer service
3 function would be an order that's pended
4 that they were not able to make a
5 determination on, that they need
6 additional eyes or decision-making
7 processes to make a final determination of
8 restriction or allowing sales.
9   Q.  Is the -- the process of pending
10 an order or performing due diligence of an
11 order primarily, or on the front lines,
12 the responsibility of the Verifications
13 Team?
14   A.  Define front lines.
15   Q.  The first indication of a
16 potential suspicious order or any red
17 flag.
18   A.  Then the answer's yes.
19   Q.  So, it's the Verifications Team
20 that would be the first to learn of and
21 know of a potential red flag?
22   A.  That's correct.
23   Q.  And it would be through the
24 Verifications Team that a decision would

Page 86

1 be made to halt shipment or clear shipment
2 or seek review from your department,
3 correct?
4    A.   I'd have to look at the
5 procedure, but yes.
6    Q.   All right.
7    A.   It makes sense.
8    Q.   In preparation for today, did
9 you educate yourself on the history of the
10 suspicious order monitoring programs and
11 SOPs, or do -- do you know it just from
12 your on-the-job training?
13    A.   I did not educate myself in
14 preparation for this.
15        You know, this is one of many
16 functions that I am responsible for.  So I
17 do have, you know, some knowledge.  It's
18 certainly not intimate knowledge about the
19 specifics of each procedure.
20    Q.   Okay.  So, to the extent we were
21 to get into the -- the history of when the
22 first suspicious order monitoring program
23 was put in place and what it entailed and
24 how it evolved and what set the thresholds

Page 87

1 prior to your employment at Henry Schein,
2 you would defer to somebody else on that
3 information?
4    A.   Yeah.  I would not have that
5 information.
6    Q.   All right.  If you go to page
7 22.  Again there's a reference to
8 Regulatory Affairs and DEA compliance.
9        It says:  The sale of controlled
10 substances is a high risk area with heavy
11 fines.
12        You agree with that, correct?
13    A.   Absolutely.
14    Q.   And you know that by definition,
15 a controlled substance or a Class II
16 controlled substance is a substance that
17 has a high risk of abuse and misuse,
18 correct?
19    A.   Yes, sir.
20    Q.   All right.  Regulatory Affairs
21 implemented and maintains a rigorous
22 Suspicious Order Monitoring and Know Your
23 Customer systems, as well as providing
24 sales reporting to insure compliance with

Page 88

1 DEA requirements and best practices.
2        Is the sales reporting there a
3 reference to ARCOS reporting?
4    A.   Yes, sir.
5    Q.   And, is the ARCOS reporting,
6 does it emanate from your department or
7 from Verifications?
8    A.   So, it's out of the JD Edwards
9 system.  It's an automated process.
10    Q.   Okay.  Who -- who monitors it,
11 supervises it, quality controls it?
12 Who's -- who's looking at it?
13    A.   The Verifications Team.
14    Q.   All right.  On page 22 it says:
15 Facility audits.  Regulatory Affairs
16 conducts domestic facility audits for
17 Henry Schein Inc. and subdivision partners
18 primarily for DEA and OSHA audits.  The
19 audit teams identify where a violation
20 could potentially arise and partner with
21 facility representatives to proactively
22 resolve these concerns.
23        Are these the audits that we
24 were talking about earlier that you think

Page 89

1 happened maybe once a year?
2    A.   For our DCs, absolutely.  And
3 for the JVs, likely.
4    Q.   Okay.  And them.
5        And, to the extent there are
6 reports of those, again, you would have
7 received those for the domestic DCs?
8    A.   Correct.
9        MR. MIGLIORI:  You have to
10 forgive me.  Somehow over the past two
11 days, I developed a cold.  So if my
12 voice dropped or you can't understand
13 me, let me know.  I feel like I'm
14 shouting right now.
15        THE WITNESS:  Not at all.
16 BY MR. MIGLIORI:
17    Q.   And in the last page, and then
18 we'll take a break, it says:  Metrics of
19 regulatory activities.
20        This is you just compiling,
21 basically from the time you got there
22 through the report in 2016, so essentially
23 from July of '13 or throughout all of '13
24 through all of '16, the -- the -- certain

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  activities --
2      A.   Activities.
3      Q.   So complaints, adverse events,
4  recalls and the like, right?
5      A.   That is correct.
6      Q.   When it says "DEA due diligence"
7  in the middle of the page, what is that?
8          Is that the Know Your Customer
9  follow-up?
10     A.   That is correct.
11     Q.   And, so, in 2013, 529 new Know
12 Your Customer reports were added to the
13 system.
14         Is that how I'm reading this?
15     A.   That's correct.
16     Q.   And then in 2016, in that
17 calendar year, there were an additional
18 930 added?
19     A.   Yes.
20     Q.   Do you know as of --
21     A.   Now, excuse me.  I don't know if
22 they're new customers or they were a
23 customer that had been, whether it was a
24 new drug or a new something else that

Page 91

1  would trigger a due diligence file to be
2  reviewed.  So, just to clarify that.
3      Q.   So this number 930 could be new
4  onboarded clients along with those that
5  never had a Know Your Customer letter in
6  the file that you were retroactively
7  catching up on?
8      A.   Correct.
9      Q.   All right.  But the 930 is for
10 the calendar year 2016, correct?
11     A.   Correct.
12     Q.   And the DEA customer audits,
13 that would be your department or
14 Verifications going out to see your
15 customers?
16     A.   My department.
17     Q.   And, who would perform those
18 audits?  Is that the team, the --
19     A.   Under Frank O'Regan.
20     Q.   -- Tina or Fred?
21     A.   Yeah.
22     Q.   Is it Fred or Frank?
23     A.   Frank.
24     Q.   They would go out and they would

Page 92

1  go out based on would it be the high risk
2  prioritized that is -- do they go out
3  randomly, or do they go out to specific
4  facilities based on risk?
5      A.   Based on risk.
6      Q.   Okay.  And, so, in 2013, if I'm
7  reading this right, 103 such audits were
8  performed of customers throughout the
9  U.S.?
10     A.   Mm-hm.
11     Q.   Yes?
12     A.   Yes.
13     Q.   And in 2016, 120 DEA audits
14 performed by Henry Schein within your
15 department were performed throughout the
16 United States?
17     A.   Yes.
18     Q.   And, obviously, that would
19 include the State of Ohio, where we are in
20 this litigation?
21     A.   It would include.  Whether it's
22 true or not for Ohio, I can't say.
23     Q.   To find out which are from Ohio
24 and which are from others, there is a way

Page 93

1  to search that information, correct?
2      A.   Yes.
3      Q.   And, is that in the JDE?
4      A.   It would be in the share --
5  share drive.
6      Q.   Share drive?
7      A.   Yeah.
8      Q.   Okay.
9      A.   All the reports would be in
10 there.
11     Q.   Do you know how far that --
12 those reports go back?
13     A.   I do not.
14     Q.   Did you do anything to educate
15 yourself at all, before we take a break,
16 about Ohio-specific actions taken,
17 investigations, audits in preparation for
18 today?
19     A.   I did not.
20         MR. MIGLIORI:  Okay.  Let's take
21 a break and see if I can get my voice
22 back.
23         THE VIDEOGRAPHER:  All right.
24 The time is 10:29 a.m.

Page 94

1 Going off the record.
2 (Recess taken.)
3 THE VIDEOGRAPHER: We are back
4 on the record.
5 The time is 10:48 a.m.
6 MR. MIGLIORI: I appreciate the
7 education you gave me on the systems
8 of the company. I want to take a step
9 back and talk about opioids
10 specifically and your obligations on
11 opioids.
12 Let me show you Exhibit
13 Number 5.
14 (Peacock Exhibit 5, Title 21
15 United States Code Annotated Section
16 801, was marked for identification, as
17 of this date.)
18 BY MR. MIGLIORI:
19 Q. As the vice-president of, among
20 other things, Regulatory Affairs, you
21 agree with me that it's within your
22 department ultimately that you are
23 responsible for compliance with the
24 Controlled Substance Act, correct?

Page 95

1 A. Yes, sir.
2 Q. And Congress made certain
3 findings about controlled substances, like
4 opioids.
5 Have you ever seen these before?
6 MR. McDONALD: In this form?
7 MR. MIGLIORI: And I'm referring
8 to Exhibit 5 is the -- is the direct
9 Congress findings in the Controlled
10 Substance Act relative to controlled
11 substances.
12 A. I have not.
13 Q. Let's see if you understand that
14 this is part of your charge and
15 responsibility within Regulatory Affairs
16 at Henry Schein.
17 It says Congress --
18 MS. BORSAY: I'm sorry to
19 interrupt. This is Casteel Borsy with
20 Jones Day on the phone.
21 I'm having a really difficult
22 time hearing the questions now. I
23 could hear them before the break. So
24 I don't know if you moved or don't

Page 96

1 have a microphone.
2 MR. MIGLIORI: As I was saying
3 at the break, I developed a cold and
4 my voice is starting to fade.
5 So, I will try to talk louder,
6 but it -- I feel like I'm screaming.
7 But I'll keep -- there's no way to
8 move the phone. The microphones are
9 built into the table.
10 MS. BORSAY: Okay. Thank you.
11 MR. MIGLIORI: But I'll do my
12 best.
13 BY MR. MIGLIORI:
14 Q. It says: Congress makes the
15 following findings. Many of the drugs
16 included within the subchapter have a
17 useful and legitimate medical purpose and
18 are necessary to maintain the health and
19 general welfare of the American people.
20 You understand that to be true
21 for controlled substances?
22 A. Yes, sir.
23 Q. The illegal importation,
24 manufacture, distribution or possession of

Page 97

1 improper use of controlled substances have
2 a substantial and detrimental effect on
3 the health and general welfare of the
4 American people.
5 Do you agree with that
6 statement?
7 A. I do.
8 Q. Do you believe today that we are
9 in an epidemic with respect to the abuse
10 and misuse of opioids?
11 A. I --
12 MR. McDONALD: Object to the
13 form.
14 Go ahead.
15 A. I do.
16 Q. We talked about this a little
17 earlier, but controlled substances have a
18 schedule. Schedule II opioids are, A, the
19 drug or other substance -- are classified
20 as this: The drug or substance has
21 a high potential for abuse.
22 You understand that to be true
23 for opioids, correct?
24 A. That's correct.

Page 98

1    Q.   The drug or other substance has
2  a currently accepted medical use in
3  treatment in the United States or
4  currently accepted medical use with severe
5  restrictions.
6        Do you appreciate that?  Do you
7  agree with that?
8    A.   Accepted medical use, yes.
9    Q.   And that there are severe
10 restrictions on that use, correct?
11       MR. McDONALD:  Object to the
12 form.
13       If you know, tell him.
14   A.   In terms of -- not -- I don't --
15 I'm not following what it says.
16   Q.   That there are severe
17 restrictions placed on the use of --
18   A.   In the ability to acquire them?
19   Q.   And distribute them.
20   A.   Yep.  Yes.
21   Q.   Okay.  The abuse of the drug or
22 other substance may lead to severe
23 psychological or physical dependence.
24       Do you understand that to be

Page 99

1  part of the classification of a Schedule
2  II drug?
3    A.   Yes, sir.
4    Q.   Is there somebody at Henry
5  Schein that is specifically tasked with
6  overseeing the compliance with Schedule II
7  controlled substances, or is that a
8  general obligation within your department,
9  of all people that work for you?
10   A.   In the Regulatory Department,
11 it's general.
12   Q.   And you understand that you have
13 a registration that is given by the
14 attorney general of the United States to
15 distribute Schedule II controlled
16 substances which requires you to be in
17 compliance with the Controlled Substances
18 Act, correct?
19   A.   That is correct.
20   Q.   And that failure to comply with
21 the Controlled Substances Act could cause,
22 among other things, the suspension or
23 revocation of that DEA registration,
24 correct?

Page 100

1    A.   Correct.
2    Q.   And part of that obligation of
3  Henry Schein is to maintain an effective
4  control against diversion of particular
5  controlled substances into other than
6  legitimate medical, scientific and
7  industrial channels.
8        Do you understand that to be
9  Henry Schein's obligation as a DEA
10 registrant?
11   A.   Yes, sir.
12   Q.   In carrying out that obligation,
13 do you understand that there's a specific
14 provision of the Controlled Substance Act,
15 this is Exhibit Number 6, that requires
16 Henry Schein, as a DEA registrant, to
17 design and operate a system to disclose to
18 the registrant suspicious orders of
19 controlled substances?
20       Do you understand that is the
21 obligation of Henry Schein to design and
22 operate that system?
23   A.   Yes, sir.
24       (Peacock Exhibit 6, Title 21

Page 101

1        Code of Federal Regulations Section
2        1301.74, was marked for
3        identification, as of this date.)
4  BY MR. MIGLIORI:
5    Q.   (Reading)  The registrant shall
6  inform the field office -- field division
7  office of the administration in his area
8  of suspicious orders when discovered by
9  the registrant.
10       Do you understand that
11 suspicious orders are to be, and have been
12 since 1971, reported to the DEA field
13 office when they are discovered?
14       MR. McDONALD:  Object to the
15 form.
16   A.   Yes, sir.
17   Q.   (Reading)  Suspicious orders
18 include orders of unusual size, orders
19 deviating substantially from a normal
20 pattern, and orders of unusual frequency.
21       Do you understand that to be, in
22 part, the definition of a suspicious
23 order?
24       MR. McDONALD:  Object to the

Page 102

1  form.
2  A.  I do.
3  Q.  So, an order that deviates from
4  a prior order in size, in pattern, or in
5  frequency, by this definition, is presumed
6  suspicious until determined otherwise,
7  correct?
8      MR. McDONALD:  Object to the
9      form.
10  A.  Yes.  Yes.
11  Q.  In your review of the historical
12  suspicious ordering monitoring programs of
13  Henry Schein, did you ever learn that the
14  suspicious order monitoring program
15  through 2009, at least, did not measure
16  deviations in frequency or pattern?  Did
17  you ever learn that fact?
18  A.  I did not.
19  Q.  Okay.
20  A.  I had no understanding, no.
21  Q.  And, to the extent that that is
22  true or not, that is something you leave
23  to those that were there at the time,
24  correct?

Page 103

1  A.  I would have to investigate.
2  Can't really make a determination, sir.
3  Q.  I guess my question is more
4  simple then.  You're not the person to
5  either refute that or affirm that
6  statement, correct?
7  A.  That's correct.
8  Q.  Are you aware that in Ohio, in
9  searching for suspicious orders in this
10  case, Henry Schein represented and
11  represents that it found no suspicious
12  orders reported to the DEA from 2009 to
13  the present, that is during the period of
14  time that it had transactional
15  information?
16      MR. McDONALD:  Object to the
17      form; mischaracterizes and misstates
18      the assertions of Henry Schein in this
19      case.
20  BY MR. MIGLIORI:
21  Q.  Were you aware of that?
22      MR. McDONALD:  Object.  Same
23      objection.
24

Page 104

1  BY MR. MIGLIORI:
2  Q.  You can answer.
3  A.  Could you reclarify or restate,
4  please?
5      I'm sorry.
6  Q.  Were you asked to help prepare
7  answers to interrogatories in this case,
8  or provide information so that the company
9  could respond to written questions in this
10  case?
11  A.  No, I was not.
12  Q.  Did you review yesterday any of
13  the written responses of the company in
14  this case?
15  A.  No, I did not.
16  Q.  Did they show you that Henry
17  Schein has not produced any suspicious
18  orders for Ohio in this case?
19  A.  No, they had not.
20  Q.  Does it surprise you that there
21  are no suspicious orders reported to the
22  DEA by Henry Schein in this case?
23      MR. McDONALD:  Object to the
24      form.

Page 105

1  A.  I would have to see what the
2  ordering patterns are, how much the
3  volumes were.  There's no way I could make
4  a determination just without any
5  information, sir.
6  Q.  You would agree with me that if
7  there were no suspicious orders for Ohio
8  from 2009 to present, it would mean that
9  there were no orders that deviated in
10  size, frequency, or pattern, by
11  definition, correct?
12      MR. McDONALD:  Object to the
13      form.
14  A.  So, I think, you know, I'd have
15  to understand what the -- what the scope
16  of this, you know, question is.
17      So, if we looked at sales
18  volumes, numbers, et cetera, what's the
19  practices are there, what's the percentage
20  of our total sales, et cetera, I'd be
21  better apt to answer that question.
22  Q.  Fair enough.  But I'm not asking
23  you about reporting.
24      I'm just simply saying that if

Page 106

1  there were an order that deviated in size,
2  frequency, or pattern --
3      A.  Yes. Then yes.
4      Q.  -- then it would be a suspicious
5  order, correct?
6      A.  Yes.
7      Q.  And, at the time of discovering
8  that deviation in size, frequency, or
9  pattern, under the obligations that we
10  just read, it would have had to have been
11  reported at the time of discovery,
12  correct?
13          MR. McDONALD:  Object to the
14      form.
15  BY MR. MIGLIORI:
16      Q.  That's the law, correct?
17          MR. McDONALD:  Object to the
18      form.
19          He's not a lawyer.
20          MR. MIGLIORI:  He's a Regulatory
21      Affairs vice-president.
22          MR. McDONALD:  And you --
23  BY MR. MIGLIORI:
24      Q.  What is your understanding of

Page 107

1  your obligation to comply with the DEA as
2  the person in the company worldwide
3  responsible for DEA compliance?
4          MR. McDONALD:  Objection.
5  BY MR. MIGLIORI:
6      Q.  Who's not a lawyer.
7      A.  I am not a lawyer.
8          MR. McDONALD:  Hang on. Hang
9      on.
10      Q.  I understand.
11          MR. McDONALD:  Object to the
12      form; vague as to time.
13          You can give your understanding.
14  BY MR. MIGLIORI:
15      Q.  Do you understand my question?
16      A.  Yes, I do.
17      Q.  All right.
18          Do you have an answer?
19      A.  I would say yes.
20      Q.  Okay. So, to make sure we
21  understand it, after all of that
22  interchange between me and your counsel.
23          MR. McDONALD:  There wasn't that
24      much.

Page 108

1          MR. MIGLIORI:  Well, I almost
2      forget my own question.
3  BY MR. MIGLIORI:
4      Q.  The -- the existence of a
5  deviation in size, frequency, or pattern,
6  once discovered, at the time of discovery,
7  is required to be reported to the field
8  office of the DEA under the regulations,
9  correct?
10          MR. McDONALD:  Object to the
11      form.
12      A.  Yes, that's my understanding.
13      Q.  Those regulations, to your
14  understanding, go back to 1971, even
15  before OxyContin was on the market,
16  correct?
17          MR. McDONALD:  Object to the
18      form.
19      A.  Yeah, I -- I was not involved in
20  anything regarded to controlled substance
21  prior to 2013. So I never researched when
22  it officially went into effect.
23          So I can't answer specifically,
24  but --

Page 109

1      Q.  Okay.
2          (Peacock Exhibit 7, letter dated
3      December 21, 2018 from Locke Lord,
4      with attachment, was marked for
5      identification, as of this date.)
6  BY MR. MIGLIORI:
7      Q.  I'm going to show you Exhibit
8  Number 7. Your counsel had a concern that
9  I was misrepresenting what Henry Schein
10  said. So I just -- I don't want to put
11  words in your mouth or the company's
12  mouth.
13          This is Exhibit Number 7. This
14  is a December 21st letter of Locke Lord in
15  this case to the Court, and I'm just going
16  to direct your attention to the bottom
17  where it says "Suspicious Order Reports."
18          It says:  As previously noted,
19  the Schein defendants have searched for
20  and located no suspicious order reports
21  with respect to any of its customers with
22  whom they have transacted business in
23  Summit County, Ohio, for the time period
24  for which they have transactional data.

Page 110

1　　　　Do you see that?

2　　A.　I do.

3　　　　MR. McDONALD:  And, to be clear,

4　you previously said the State of Ohio.

5　And this clearly says Summit County.

6　　　　MR. MIGLIORI:  That's why I'm

7　doing this.  I'm not being -- I'm

8　trying to clarify the objection.

9　　　　MR. McDONALD:  Awesome.

10　　　　MR. MIGLIORI:  I'm not a hostile

11　person.

12　　　　MR. McDONALD:  I know you're

13　not.  You just have a cold.

14　　　　MR. MIGLIORI:  I do have a cold.

15　　　　MR. McDONALD:  I'm trying to

16　help you out.

17　BY MR. MIGLIORI:

18　　Q.　So, in searching all of Summit

19　County, Ohio for the time period that

20　Schein maintains transactional data, Henry

21　Schein has found no suspicious orders

22　which would mean, under the law, that

23　Henry Schein found no deviations in size,

24　frequency, or pattern in any of its

Page 111

1　controlled substance orders for the time

2　period that they had data, correct?

3　　　　MR. McDONALD:  Object to the

4　form.

5　　A.　That's what it says.  That's

6　correct.

7　　Q.　Okay.  And, if a deviation in

8　size, frequency or pattern did -- did

9　arise, the obligation would have been at

10　the time of identifying it for Summit

11　County that Schein report that deviation

12　of size, frequency, or pattern of ordering

13　opioids to the field office for Ohio,

14　correct?

15　　　　MR. McDONALD:  Object to the

16　form.

17　　A.　Yeah.  Again, so back to my

18　comment if it failed to meet the

19　requirements, then yes, it would need to

20　be reported.  But, you know, depends on

21　what the volumes were and all the other

22　issues, so.

23　　Q.　Sure.

24　　A.　There's no data to look at, so.

Page 112

1　　Q.　This is much more definitional

2　than anything specific.  It just simply

3　said if there were a deviation in size,

4　frequency or pattern in any drug, in any

5　opioid distributed by Henry Schein in

6　Summit County, that deviation in size,

7　frequency or pattern, under the Controlled

8　Substance Act, would have had to have been

9　reported at the time it was discovered to

10　the field office of the Drug Enforcement

11　Agency, correct?

12　　　　MR. McDONALD:  Object to the

13　form.

14　　A.　Correct.

15　　Q.　And, based at least on the

16　exhibit in front of you, Exhibit 7, no

17　such reports to the DEA have been located

18　at Schein for that time period in Summit

19　County, correct?

20　　A.　According to this document.

21　　　　But I have no knowledge of who,

22　what, when, where, why this was done.

23　　Q.　Fair enough.  Thank you.

24　　　　Are you familiar with the -- the

Page 113

1　Healthcare Distribution Management

2　Association or its successor, the

3　Healthcare Distribution Association?

4　　A.　Yes, sir.

5　　Q.　Are you a member of it?

6　　A.　Our company is.  I've attended a

7　meeting.  I get, you know, monthly

8　updates, blog, newsletters, things like

9　that.

10　　Q.　Are you provided with minutes or

11　accounts of HDA meetings attended by

12　various Henry Schein employees?

13　　A.　May or may not have been.

14　Depends.  We go every year.  So,

15　generally, somebody in the organization,

16　whether it's in regulatory or others,

17　we've had, you know, many -- many

18　different people may have attended.

19　　Q.　Is there somebody at Henry

20　Schein who serves on the board, to your

21　knowledge?

22　　A.　Vaguely familiar, but I couldn't

23　name the person, sir.

24　　Q.　Okay.  But you understand

Page 114

1  that -- that that is the trade association
2  for distributors of -- of pharmaceuticals,
3  including controlled substances, correct?
4      A.   That's correct.
5      Q.   And Henry Schein is one such
6  distributor, correct?
7      A.   That is correct.
8      Q.   Other members include
9  manufacturers of controlled substances,
10 correct?  Do you know that?
11     A.   I don't know for sure.
12     Q.   All right.  And, relative to the
13 issue of suspicious order monitoring and
14 obligations to comply with Controlled
15 Substances Act, are you familiar with the
16 HDMA's guidance that it published with the
17 input of all of its members back in 2008?
18     A.   Don't recall.  Haven't recall
19 seeing it, sir.
20     Q.   Okay.  Let me show it to you.
21         (Peacock Exhibit 8, Healthcare
22     Distribution Management Association
23     (HDMA) Industry Compliance Guidelines:
24     Reporting Suspicious Orders and

Page 115

1      Preventing Diversion of Controlled
2      Substances, Bates No. HSI-MDL-00063613
3      to 00063627, was marked for
4      identification, as of this date.)
5      A.   Based on the time frame, I would
6  say no.  But I prefer to look at it before
7  I make a determination.
8      Q.   Absolutely.
9          MR. McDONALD:  It will make your
10         deposition shorter if you say no.
11         MR. MIGLIORI:  Maybe not.
12 BY MR. MIGLIORI:
13     Q.   Let me show you what's been
14 marked as Exhibit 8.  This is the industry
15 compliance guidelines of the Healthcare
16 Distribution Management Association
17 (HDMA).  The Industry Compliance
18 Guidelines: Reporting Suspicious Orders
19 and Preventing Diversion of Controlled
20 Substances.
21         Does that look familiar to you
22 at all?
23     A.   No, I have not seen this before,
24 sir.

Page 116

1      Q.   And part of your on-the-job
2  training for compliance with DEA
3  regulations when you got to Henry Schein
4  in 2013, this wasn't, to your
5  recollection, part of any introduction?
6      A.   Not in this format.  Might have
7  been summarized or parts of it pulled out,
8  but I don't recognize this format, sir.
9      Q.   In the introduction it refers to
10 its membership.  It says:  Manufacturers,
11 distributors, pharmacies and healthcare
12 practitioners share a mission and a
13 responsibility to continuously monitor,
14 protect and enhance the safety and
15 security of this system, to combat
16 increasingly sophisticated criminals who
17 attempt to breach the security of a
18 legitimate supply chain.
19         Do you understand that one of
20 the reasons why your department is charged
21 with compliance with DEA is to protect
22 against diversion of drugs?
23     A.   Yes, sir.
24     Q.   And it says:  These industry

Page 117

1  compliance guidelines are consistent with
2  and further extend the distributor's track
3  record of supporting and implementing
4  initiatives designed to improve the
5  safety, security and integrity of the
6  medical supply.  They have been prepared
7  in recognition of a growing problem of
8  misuse and diversion of controlled
9  substances and the critical role of each
10 member in the supply chain in helping to
11 enhance security.
12         Do you understand that the role
13 or the obligation of all members of the
14 supply chain for controlled substances is,
15 the critical role of each member, is to
16 help prevent and protect against misuse
17 and diversion of controlled substances,
18 including opioids?
19         MR. McDONALD:  Object to the
20         form.
21     A.   I think it's a community.
22 Everybody should be responsible, you know.
23         We wish physicians would be more
24 responsible, sure.

Page 118

1  Q. But, on that point, your trade
2 association says: At the center of a
3 sophisticated supply chain, distributors
4 are uniquely situated to perform the
5 diligence in order to help support the
6 security of the controlled substances they
7 deliver to their customers.
8  Do you see your role as being a
9 unique position to understand the supply
10 issues relative to potential diversion,
11 abuse, and misuse of controlled
12 substances?
13  A. I mean, we're -- we're one of
14 the key. Everybody's in the key. So,
15 manufacturers have their role. They don't
16 necessarily all distribute, right. So
17 they go through large distributors.
18 We're, you know, dealing with physician
19 and practices, very small. Whereas
20 everybody's responsible, in my opinion.
21  Q. Do you think that, as a
22 distributor, you're in a unique position
23 to understand the supply issues of each of
24 your customers?

Page 119

1  MR. McDONALD: Object to the
2 form.
3  A. The supply issues of how they
4 get it? It's difficult if they get it
5 from more than one distributor.
6  Q. You understand you have the
7 ability to, and in fact at times do, ask
8 for dispensing information from your
9 customers for all controlled substances?
10  MR. McDONALD: Object to the
11 form.
12  A. Yes, we ask, but depends what
13 they tell us.
14  Q. Sure.
15  A. Fundamentally, this is something
16 that, you know, if somebody's going to be
17 diverting drugs necessarily going to be
18 telling us the truth.
19  Q. Right. To the extent your trade
20 association says that the distributors,
21 because of their role in connecting
22 manufacturers with its customers, whether
23 they be doctors or hospitals or
24 pharmacies, that because it's your role to

Page 120

1 supply it, that you are in, as your trade
2 association says, distributors are
3 uniquely situated to perform the due
4 diligence in order to support the security
5 of the controlled substances they deliver
6 to their customers.
7  Do you believe that to be true?
8  A. The definition of unique. I
9 mean, it's -- yes, we have a central role.
10  Q. Okay.
11  It says: Further, due diligence
12 can provide a greater level of assurance
13 that those who purchase controlled
14 substances from distributors intend to
15 dispense them for legally accepted
16 purposes.
17  That is one of the goals of due
18 diligence, correct?
19  A. Yeah.
20  Q. You agree with that, yes?
21  A. I do, yes.
22  Q. And that due diligence can
23 reduce the possibility that controlled
24 substances within the supply chain will

Page 121

1 reach locations they are not intended to
2 reach.
3  Do you agree with that? That's
4 another benefit or function of proper due
5 diligence?
6  A. With the caveat that if we get
7 told the truth, we can do our jobs, yes.
8  Q. Is it enough to just ask a
9 question and get an answer for due
10 diligence?
11  MR. McDONALD: Object to the
12 form.
13  A. You need to do many things. So,
14 you could do a site audit. You could, you
15 know, do a Google search. You could look
16 at Google Earth and see what their
17 facility looks like. There's a lot of
18 things you could do to try to assess what
19 the conditions are.
20  Q. Okay. Let's see what some of
21 the suggestions are of the HDA.
22  Let's turn to the page that
23 starts with '616, on the bottom it says
24 '616.

Page 122

1    In 2008, your trade association
2 recommended to its members different
3 things to do before opening a new customer
4 account.
5    The distributor should obtain
6 background information on the customer and
7 the customer business.
8    You agree that's a -- a good
9 thing to do, correct?
10    A.  Yes.
11    Q.  They should review the
12 information carefully and, where
13 appropriate, verify it.
14    That's what your Verifications
15 Department would do, correct?
16    A.  Yes.
17    Q.  Independently investigate the
18 potential customer.
19    That's an important part of due
20 diligence, correct?
21    A.  Yes.
22    Q.  And the -- when we refer to Know
23 Your Customer Due Diligence, that is a
24 component part of your obligation to

Page 123

1 comply with DEA regulations, correct?
2    MR. McDONALD:  Objection.
3 BY MR. MIGLIORI:
4    Q.  That is the Know Your Customer
5 obligation exists beyond identifying
6 changes or deviations in size, frequency,
7 and pattern, correct?
8    MR. McDONALD:  Object to the
9 form.
10 BY MR. MIGLIORI:
11    Q.  Do you understand my question?
12    A.  Yeah.  I'm trying to relate it
13 to what the, you know-
14    Q.  I could break it down.
15    A.  Yeah, please.
16    I'm sorry.  I'm getting stuck on
17 semantics here.
18    Q.  Know Your Customer is an
19 obligation that you have to be compliant
20 with DEA even before you supply the first
21 opioid or controlled substance to that
22 customer, correct?
23    MR. McDONALD:  Object.
24    A.  Yes.

Page 124

1    MR. McDONALD:  Object to the
2 form.
3 BY MR. MIGLIORI:
4    Q.  In other words, it's not driven
5 or triggered only by a deviation in size
6 or frequency or pattern order.  It's
7 triggered by your obligation as a DEA
8 registrant who will supply or intends to
9 supply controlled substances to that
10 customer, correct?
11    MR. McDONALD:  Object to the
12 form.
13    A.  Yeah.  I'm not a lawyer.  I
14 mean, at the end of the day, I believe
15 you're correct.
16    Q.  Right.  And I'm asking these
17 questions in your role as a reg -- as the
18 vice-president of Regulatory Affairs, not
19 as a lawyer.
20    So, to the extent you can answer
21 it as a vice-president of Regulatory
22 Affairs and compliance with DEA, from that
23 perspective, that's all I'm asking.
24    A.  Okay.

Page 125

1    Q.  So, the Know Your Customer
2 requirement starts as you onboard a new
3 client, right?
4    MR. McDONALD:  Object to the
5 form.
6    A.  Yes.  Verifications of
7 licensing, et cetera is part of the
8 process.
9    Q.  And sometimes it's a site visit
10 to see what kind of -- what kind of
11 customers might be in the waiting rooms of
12 the -- either the dispensary or the
13 doctor's office, correct?
14    A.  I mean, there's many forms.  I
15 don't do those audits, so I really can't
16 speak to what the specifics of the actions
17 are.
18    Q.  Well, you gave a couple examples
19 recently.
20    You're familiar with certain red
21 flag items are for --
22    A.  Yeah.
23    Q.  -- Know Your Customer Due
24 Diligence, correct?

Page 126

1    A.   Yes, sir.
2    Q.   Some of them involve is the
3  patient paying with cash or insurance.
4       That's one red flag issue,
5  correct?
6    A.   Yes.
7    Q.   Cars in parking lots with
8  out-of-state license plates is another red
9  flag issue, right?
10   A.   It would appear to be, sure.
11   Q.   And a doctor that orders a
12 disproportionate amount of controlled
13 substances to non-controlled substances
14 raises a red flag concern that should be
15 investigated, correct?
16   A.   You know, would depend on the
17 circumstance.  A pain clinic, maybe not.
18      So, it depends on what the
19 circumstance of what the practice is.
20 That would also be considered.
21      With the license plate issue, it
22 depends on if they're on the border of
23 someplace.  That might have some --
24   Q.   Henry Schein has --

Page 127

1    A.   It's a variable.
2    Q.   I'm sorry.
3       Henry Schein has a due diligence
4  form that it sends to all of its
5  customers, correct?
6    A.   That is correct.
7    Q.   And when it discovered that 60
8  percent of them didn't have this form,
9  this process that you've been reporting on
10 is to get that form out to the customers
11 and get that feedback from the customers
12 about various things, including where
13 their office is, what kind of practice
14 they have, what types of controlled
15 substances they -- what percentage of
16 controlled substances they use, et cetera,
17 correct?  Those are different elements of
18 your --
19   A.   Of the questionnaire, yes.  Some
20 of that information would have already
21 been captured on the customer setup form
22 in the JDEwards that would allow us to,
23 you know, ship the product.
24   Q.   And, so, that -- those are the

Page 128

1  different types of information that are
2  part of your ongoing consistent obligation
3  to know your customer, not just those that
4  are triggered by a deviation in size,
5  frequency and pattern of -- of order,
6  correct?
7       MR. McDONALD:  Object to the
8    form.
9  BY MR. MIGLIORI:
10   Q.   That's an ongoing obligation?
11      MR. McDONALD:  Object to the
12   form.
13   A.   Yes.  It's part of what we do.
14 Yes.
15   Q.   Okay.  This HDMA guidance
16 actually gives a bunch of questionnaire
17 suggestions.
18      Do you see it here on the bottom
19 of page '616?
20   A.   Yes.
21   Q.   It talks about the business
22 background and the customer base and the
23 average number of prescriptions filled
24 each day.

Page 129

1       You don't ever recall getting
2  this kind of guidance in -- at Henry
3  Schein when you started in this position?
4    A.   So, the process of some of these
5  were in place at the time.
6    Q.   Okay.
7    A.   So, it was a review of what the
8  practices were.  That's what I was
9  basically my job -- on-the-job training
10 was about.
11   Q.   Okay.  And, when you got there,
12 you were aware that Henry Schein in 2013
13 was somewhat behind on the Know Your
14 Customer Due Diligence side of compliance,
15 and it was part of your job to get caught
16 up, correct?
17      MR. McDONALD:  Object to the
18   form.
19   A.   I'm not exactly sure when I
20 learned of the -- the backlog, but
21 ultimately, yes.
22   Q.   And that was one of the -- one
23 of the measures, even for your own
24 performance within the company, was your

Page 130

1  ability to sort of rectify this problem
2  that pre-existed you at the company,
3  correct?
4      A.   Correct.
5      Q.   All right.  And today, as of
6  today, has that now been caught up, to
7  your knowledge?
8      A.   To my knowledge, yes.
9      Q.   Okay.  And is that process of
10 catching up on all that backlog due
11 diligence, was that something that was
12 primarily the responsibility of the
13 Verifications Department and Shaun Abreu's
14 side of things?
15     A.   Primarily.
16     Q.   But in order to be compliant, in
17 order for your department to report
18 compliance with DEA, that's something that
19 you would have had a sort of joint
20 responsibility for --
21     A.   That's correct.
22     Q.   -- at least accountability for,
23 correct?
24     A.   That's correct.

Page 131

1      Q.   All right.  Turn to page '618.
2  The HDMA recommended to its members that
3  the distributor should independently
4  invent -- investigate the potential
5  customers by checking with the local DEA
6  office for information regarding a
7  potential customer.
8          Is that something that would be
9  a good practice for onboarding a new
10 customer?
11     A.   I'm sorry.  What bullet are you
12 on?
13     Q.   The very first one on top.  I'm
14 sorry.  Paragraph D.
15         When you onboard a new client --
16 a new customer at Henry Schein, do you
17 check with local DEA?
18     A.   Not to my knowledge.
19     Q.   Another recommendation is that
20 you check with the state oversight
21 authorities, like the Board of Pharmacy
22 and the Board of Medicine.
23         To your knowledge, does Henry
24 Schein check with those boards prior to

Page 132

1  onboarding a new client?
2      A.   In relate to both of them would
3  be their licenses.  If there's any issues
4  with licenses, we would certainly do that.
5  I'm not aware that we check specifically
6  and call and say is Dr. Jones okay.
7      Q.   Okay.  And I think Mr. Abreu
8  talked about this, but the verification
9  process would be to make sure that the
10 license is in good standing?
11     A.   Right.
12     Q.   And that at Henry Schein is
13 performed online as an online source?
14     A.   An automatic source, yes.
15     Q.   Do you check with any
16 disciplinary counsel or medical licensure
17 board of doctors, to your knowledge?
18         MR. McDONALD:  Object to the
19 form.
20     A.   I'm not aware.  Not that close
21 to that process.
22     Q.   What about criminal background,
23 do you do any criminal background check on
24 doctors that you're supplying to?

Page 133

1      A.   Not to my knowledge.
2      Q.   And, as you understand it today,
3  if an order gets pended in the system and
4  it's reviewed, one of the things that the
5  verification department does is send out a
6  new letter by regular mail with the
7  various questions about the prescribing
8  habits of that physician and wait for a
9  response from a doctor in writing,
10 correct?
11         MR. McDONALD:  Object to the
12 form.
13     A.   I can't say.  I'm not familiar
14 with the process specifically at that
15 level.
16     Q.   That level is handled by
17 Verifications or from the -- the Sergio
18 Tejeda level?
19     A.   The letter that goes out,
20 Sergio's team.
21     Q.   Okay.  That's -- that's within
22 your department, but Sergio would have the
23 information about what actually happens --
24     A.   Yeah.

Page 134

1    Q.    -- at that point, correct?
2    A.    Yep.
3    Q.    Do you know whether when you
4  bring on a new customer, whether, as it
5  says here in the HDMA guidance, you
6  conduct an Internet search to determine
7  whether any potential Internet business
8  can be identified relating to a potential
9  customer?
10         MR. McDONALD:  Object to the
11  form.
12   A.    I'm not aware.
13   Q.    Relative to the question that
14  goes out to the new potential customer,
15  the HDMA has various recommendations.  It
16  says that the individuals selected to
17  develop questionnaires for parts A and to
18  conduct reviews and investigations under
19  parts B and C should receive appropriate
20  training.
21         Do you see that?
22   A.    Yes.
23   Q.    Do you agree that the folks that
24  are doing the review of the due diligence

Page 135

1  in the questionnaires as they come back
2  should be appropriately trained to
3  investigate the -- whether or not an order
4  would be considered suspicious?
5    A.    Yes, they should be
6  appropriately trained.
7    Q.    Do you agree with me that they
8  should be folks that are -- are currently
9  trained and kept up to date on misuse,
10  abuse, and potential red flags for
11  diversion?
12         MR. McDONALD:  Object to the
13  form.
14   A.    Yes.
15   Q.    The next recommendation is that
16  the distributor should update the
17  questionnaires periodically, particularly
18  if a concern arises during an
19  investigation.
20         Do you agree that the form
21  should change over time?
22   A.    Continuous improvement is always
23  what everyone should live by in quality
24  regulatory.

Page 136

1    Q.    And, do you agree that the
2  performance and results of all steps in a
3  customer review process should be fully
4  documented as to each potential customer
5  and such documentation should be obtained
6  in the appropriate file?
7    A.    The records are important.
8  Absolutely.
9    Q.    In fact, there's an adage that
10  if it's not written down and recorded, it
11  doesn't exist.
12         Correct?
13   A.    Yeah.
14   Q.    And that is true in regulatory
15  compliance, correct?
16   A.    That is correct.
17   Q.    The distributor may include
18  provisions for notification of state and
19  federal authorities of an unlawful
20  activity identified under the Know Your
21  Customer Due Diligence as required by
22  local, state, or federal law.
23         You would agree with me that
24  that's an important component part.  It's

Page 137

1  not just enough to identify such potential
2  activity, but to share it with local law
3  enforcement and DEA, correct?
4    A.    I agree --
5         MR. McDONALD:  Hang on.
6         I object to the form.
7         You need to pause, okay.
8         THE WITNESS:  I'm sorry.
9         MR. McDONALD:  That's okay.
10  BY MR. MIGLIORI:
11   Q.    Are you involved at all in the
12  establishment, development of any of the
13  thresholds or algorithms used to identify
14  changes or deviations in size, pattern, or
15  frequency of orders by your customers?
16   A.    I was not involved, no.
17   Q.    To the extent that the
18  automization or the re-tuning of the
19  system happened or occurred, in terms of
20  the specifics of that change, that's not
21  something you would be directly involved
22  in, correct?
23   A.    I was not, no.
24   Q.    It's fair to say that that's

Page 138

1 something ultimately your department's
2 responsible for, but you relied on Sergio
3 Tejeda for the entire time that you've
4 held this position at Henry Schein, to
5 make sure that the algorithms and the
6 assumptions of the algorithms were
7 appropriate and consistent with DEA
8 regulations, correct?
9    A.   It wasn't Sergio.  It was the
10 outside consultants that we hired.  So
11 there was outside, you know, groups that
12 came in and did the re-tuning of the
13 algorithms.
14    Q.   I have some of those here, and
15 I'll show them to you.
16       But, the outside consultants
17 that came in, they -- they proposed the
18 changes, but they would have to be
19 approved at Henry Schein first, correct?
20    A.   Mm-hm.
21    Q.   Yes?
22    A.   Yes.
23    Q.   How -- how does that work at
24 Henry Schein?  Who would receive the

Page 139

1 certain Dendrite, Buzzeo, what was the
2 other one, Hyman Phelps, who would receive
3 those recommendations at Henry Schein and
4 make a decision to-go and no-go on a
5 particular recommendation?
6    A.   So, depending on the
7 circumstance, could be either the Customer
8 Verifications and Sergio would come
9 together, see what was, you know, needed,
10 put together a statement of work, reach
11 out to the consultant, have the consultant
12 come in and then they would agree, and I
13 probably would sign off on the final
14 purchase order for the -- for the service.
15    Q.   But, do you know how the
16 algorithms work?  Have you ever --
17    A.   I have not dealt into how the
18 algorithms work.
19    Q.   So you will rely on Sergio and
20 Shaun, those are the -- that's Regulatory
21 Affairs and Verifications, you would rely
22 on them for their input on how a threshold
23 was established, correct?
24    A.   That is correct.

Page 140

1    Q.   Even though you have a science
2 background and research and development
3 background, at Henry Schein you don't --
4 you have not gotten into the specifics of
5 suspicious order monitoring design
6 implementation and refinement, correct?
7 That's not -- you sign off on it, but you
8 don't know at any given moment what the
9 actual algorithm is or how it works,
10 correct?
11    A.   That is correct.
12    Q.   And, if I were to go talk to the
13 person that knew the most about it, not
14 outside the company, but within the
15 company, who would that be?
16    A.   I'd say a combination of Sergio
17 and Shaun.
18    Q.   Okay.  That may have saved you a
19 lot of time today.
20    A.   Fact.
21    Q.   And I appreciate it.  That's all
22 I'm trying to get to is facts.
23       So, to the extent the HDMA
24 provided guidances on what is a proper way

Page 141

1 to set a threshold or how far back in time
2 to look at a dispensing history, those
3 aren't parameters, those aren't data
4 points that you have any particularized
5 knowledge about or -- or command of,
6 correct?
7    A.   Yes, that's correct.
8    Q.   And, what about the -- when, in
9 fact, an order is in your system pended or
10 identified or flagged, do you have any --
11 do you play any role in establishing what
12 causes that event to -- to get
13 investigated?  Do you --
14    A.   Me personally, no.
15    Q.   Okay.
16    A.   I do not.
17    Q.   So, that's all sort of the
18 functional operational part of your
19 department that ultimately you have to
20 rely upon Sergio and Shaun Abreu to -- to
21 advise you of, make recommendations for
22 your sign-off?
23    A.   Yeah.  And Frank O'Regan when he
24 was with us also.  I mean, he's, you know,

Page 142

1  previously a DEA investigator. So he was
2  adding a lot of value in terms of training
3  and bringing the staff up to speed and
4  making determinations. He was making
5  those determinations.
6     Q.   Okay. So, are those the three
7  sort of top people that you rely on for
8  establishment of thresholds: Frank, Shaun
9  and Sergio?
10    A.   The threshold for?
11    Q.   For identification of suspicious
12 orders by size, frequency or pattern.
13       MR. McDONALD: And you're
14    referring to internally, right?
15       MR. MIGLIORI: Yeah.
16    A.   Yeah, so, the algorithm is based
17 on the ERP system would initially set
18 that. How that was set would be -- I
19 don't think Frank was involved, maybe
20 later, but mostly Shaun and Sergio.
21    Q.   You understand that some -- so,
22 some companies may set a threshold based
23 on three months of prescribing history,
24 while others may use 24 months. You

Page 143

1  understand that -- that there are
2  different decisions that need to be made
3  in terms of establishing a threshold?
4     A.   Sure.
5     Q.   And, in terms of what decisions
6  are made relative to those parameters, is
7  that something that Frank and Sergio and
8  Shaun would do, or is that something you
9  would be a part of deciding?
10    A.   I was not part of deciding, but
11 I believe it would come from the
12 consultants and what they felt and were
13 informing us were, like, industry
14 standards.
15    Q.   Okay. So, so it's fair to say
16 when it comes to the specifics of
17 algorithms and automated suspicious order
18 monitoring, you relied upon the outside
19 consultants and internally you relied upon
20 the input from Frank O'Regan, Sergio
21 Tejeda, and Shaun Abreu?
22    A.   Correct.
23    Q.   And based on that input from
24 those four difference sources, and from

Page 144

1  time to time others, Tina, you ultimately
2  would be the person that signed off on it,
3  correct?
4     A.   That's correct.
5     Q.   But you would not, at that
6  point, educate yourself to the level of
7  understanding the inner workings of it.
8  You were relying on this advice, correct?
9     A.   That is correct.
10    Q.   If you turn to page '625.
11       The HDMA recommends of
12 distributors relative to employees working
13 with controlled substances the following.
14 It says: Individuals working in
15 controlled substance areas should be
16 screened and selected for their attention
17 to detail, ability to recognize importance
18 of accuracy, length of tenure with the
19 company, and work ethic.
20       You agree with that, correct?
21    A.   Yes. Any position.
22    Q.   But controlled substance, you
23 agree with me, has a heightened
24 sensitivity within the company. That

Page 145

1  is --
2     A.   Right.
3     Q.   -- it is a highly restricted
4  area of distribution and the potential for
5  abuse and misuse is, by definition,
6  extremely high, correct?
7        MR. McDONALD: Object to the
8     form.
9  BY MR. MIGLIORI:
10    Q.   As a Schedule II drug, correct?
11       MR. McDONALD: Object to the
12    form.
13    A.   A Schedule II, yes.
14    Q.   It is recommended that employee
15 training include a review of DEA rules and
16 regulations.
17       Do you have today an employee
18 training for those that work within
19 Regulatory Affairs and within
20 Verifications of the DEA rules and
21 regulations?
22       And by training, I'm talking
23 about formal training.
24    A.   Could you define formal

Page 146

1 training?
2    Q.   Classroom, didactic.
3    A.   We've had classroom training.
4    Q.   What -- where and who gave that
5 training?
6    A.   Ken Romeo, one of our premier --
7 prior employees, and we had a session with
8 the HDA and some others a little over a
9 year ago.  I believe it was in October of
10 '17.
11    Q.   All right.  When did Ken Romeo
12 give a presentation?
13    A.   Probably in -- I don't know for
14 sure.  I'm sorry.
15    Q.   Were you at the company at the
16 time?
17    A.   I was, yes.
18    Q.   So it's some time after July of
19 2013?
20    A.   Yes.
21    Q.   Were you there?
22    A.   I was.  For part -- part of it.
23 Not -- it was a two-day training.  So part
24 of the sessions I was there.  Maybe two or

Page 147

1 three hours of it.
2    Q.   And, was it required?
3    A.   Customer Verifications and the
4 staff, yes.
5    Q.   Was it required of anybody in
6 Regulatory Affairs?
7    A.   The staff in Regulatory Affairs.
8    Q.   Okay.
9    A.   That team, yes.
10    Q.   And, when you say Verifications,
11 that's Shaun and the folks that work for
12 him, correct?
13    A.   Correct.
14    Q.   Okay.  Was there a Power Point
15 presentation of some sort, or --
16    A.   Yeah, there were some Power
17 Point presentations, I believe, yes.
18    Q.   Did you present at all?
19    A.   I introduced it.  That's all.
20    Q.   Other than that one
21 presentation, do you recall any other --
22 set aside the HDA for a second.
23         Do you recall any other internal
24 or recurrent Henry Schein training on DEA

Page 148

1 rules and regulations?
2    A.   So, we have a monthly, you know,
3 call, and there are discussions about the
4 rules and regulations.
5    Q.   Okay.
6    A.   We referred to that earlier
7 today.
8    Q.   So, that's the -- those -- those
9 generally have minutes and those minutes
10 are kept on the share file?
11    A.   Correct.
12    Q.   And that's attended by
13 Verifications and by Regulatory Affairs?
14    A.   Not Verifications.
15    Q.   Just Regulatory Affairs?
16    A.   Yes.
17    Q.   So, those monthly calls, to the
18 extent they have DEA rules and regulations
19 trainings, would only be for Regulatory
20 Affairs folks, not for Shaun Abreu and the
21 Verifications folks?
22    A.   That's correct.
23    Q.   Anything else that you can
24 recall?

Page 149

1    A.   I cannot.
2    Q.   Who were some of the people that
3 you know on the front line of
4 Verifications that would be making the
5 decisions today about whether an order
6 should be further investigated, somehow it
7 got pended automatically and requires
8 further due diligence?  Do you know any of
9 those folks?
10    A.   I know Shaun obviously for a
11 long time and Lisa Matalon, who's his
12 supervisor.  I've met a few of the
13 individuals, but I don't know them
14 specifically by name or, you know.
15    Q.   And Regulatory Affairs does not
16 have any regular systematic training of
17 those frontline staff members or
18 Verification Team members in terms of
19 their obligations under the Controlled
20 Substance Act, correct?
21    A.   I'm not aware.
22    Q.   Okay.  And then tell me about
23 this October of 2017 HDA presentation.
24    A.   So, again, we had a two-day

Page 150

1  meeting.  Several individuals from the HDA
2  came to visit.  We had several, you know,
3  guest speakers during the -- the process.
4  And again, we addressed some of the
5  ongoing regulations, some of the issues
6  that they brought to our attention or they
7  were, you know, giving us information on.
8  And the staff from around the country flew
9  in to be there.
10     Q.   Is this in the aftermath of the
11  Masters Pharmaceutical decision?
12     A.   The Masters was discussed at
13  that meeting, yes.
14     Q.   And, was this sort of a industry
15  advisory about the implications of what
16  Masters means for day-to-day operation
17  within the distributors?
18     A.   Could you repeat the question?
19     Q.   Sure.
20        Did HDA request to hold this
21  presentation?
22     A.   No.  It was our -- it was our
23  training and we invited them to speak on,
24  you know, current topics, et cetera.

Page 151

1     Q.   And the current topic of the end
2  of 2017 was a recent decision in the
3  Masters Pharmaceutical case, correct?
4     A.   That is correct.
5     Q.   And the implications of that
6  decision in terms of obligations and
7  compliance with the Controlled Substances
8  Act as a distributor, correct?
9     A.   Yes, sir.
10     Q.   And one of the key issues in
11  that decision was when to halt an order
12  from shipment and when to ship, correct?
13        MR. McDONALD:  Object to the
14     form.
15     A.   Yes.  That's my understanding.
16     Q.   Do you remember any of the --
17  the representations made of the HDA at
18  that meeting in terms of the Masters
19  decision, its implications, et cetera?
20     A.   I think it was evolving at the
21  time.  So I don't know the specifics of
22  what they presented.  I'd have to see the
23  presentations again, et cetera.  But, you
24  know, obviously this was something that

Page 152

1  they felt was becoming a big topic for
2  discussion and potentially implementation.
3     Q.   Okay.  Did -- and when you say
4  folks from all over the country came to
5  attend --
6     A.   Our team.
7     Q.   Okay.
8     A.   So our team in the different
9  DCs.
10     Q.   And that would be Regulatory
11  Affairs?
12     A.   Yes.
13     Q.   Do you know if Verifications
14  attended?
15     A.   Management.  Shaun was there,
16  I'm sure.
17     Q.   Okay.  But the -- the frontline
18  people that are actually getting the
19  pended orders and doing -- sending out the
20  letters, to your recollection, they didn't
21  attend that training, correct?
22        MR. McDONALD:  Object to the
23     form.
24     A.   Can't recall.

Page 153

1     Q.   Okay.  And, as a result of the
2  Masters decision and/or this HDA
3  presentation in the fall of 2017, did
4  Henry Schein change any of its standard
5  operating procedures or suspicious mon --
6  order monitoring systems?
7     A.   We were evolving too, yes.
8     Q.   So, what came of that?  That is,
9  what, if anything, do you attribute to a
10  change in the Henry Schein compliance with
11  the Controlled Substances Act as a result
12  of the Masters decision, if any?
13     A.   The decision of Masters was
14  evaluated for a period of time.  HDA was
15  solidifying the discussions, and then we
16  began to implement the process through the
17  IT teams, et cetera.  So, the implication
18  was that orders that had pended, all of
19  those were orders would be immediately
20  reported to the DEA.
21     Q.   Because they were, at the time
22  they were discovered, deviations in size,
23  frequency and pattern, correct?
24     A.   Yes.

Page 154

1    MR. MIGLIORI:  Exhibit Number 9.
2    (Peacock Exhibit 9, interoffice
3    memorandum dated December 23, 2013,
4    Bates No. HSI-MDL-00622244 to
5    00422250, was marked for
6    identification, as of this date.)
7  BY MR. MIGLIORI:
8    Q.   Exhibit Number 9 is a
9  interoffice memorandum marked privileged
10  and confidential to you and Jim Mullins
11  from Ken Romeo.
12       You said Ken Romeo was the guy
13  that gave a presentation of some sort, or
14  a training of some sort to Regulatory
15  Affairs, correct?
16    A.   That is correct.  He was on the
17  team at the time.
18    Q.   So, what was Ken Romeo's job
19  title at this point in 2013?
20    A.   I don't know exactly.  He was a
21  Regulatory Affairs specialist or senior
22  specialist, something of that nature.
23    Q.   Okay.  But he worked underneath
24  Sergio Tejeda?

Page 155

1    A.   Tina and then Sergio at that
2  time, yes.
3    Q.   So he was part of the DEA Audit
4  Team?
5    A.   Correct.
6    Q.   And, in December of 2013, who's
7  Jim Mullins?
8    A.   Jim Mullins, he's in charge of
9  operations, and he was over Shaun Abreu.
10    Q.   The subject line of this,
11  December 23rd, 2013, "Regulatory Internal
12  Assessment of Our DEA Suspicious Order
13  Monitoring/Know Your Customer Systems and
14  Procedures."
15       You agree with me that this is
16  at the beginning of your tenure at Henry
17  Schein, correct?
18    A.   Correct.
19    Q.   And this is certainly before the
20  Masters Pharmaceutical decision came out
21  in 2017, correct?
22    A.   Correct.
23    Q.   All right.  Did you review this
24  in preparation for today?

Page 156

1    A.   I read it yesterday, yes.
2    Q.   All right.  And, do you recall,
3  having read this yesterday, do you recall
4  the meeting surrounding this?
5    A.   Vaguely.
6    Q.   And, the team that we're talking
7  about, it says on December 2nd and 3rd of
8  2013, Ken Romeo, Tina Steffanie-Oak and
9  Sergio Tejeda were on a -- were on site at
10  Melville to complete a DEA compliance
11  assessment of the Henry Schein Suspicious
12  Order Monitoring/Know Your Customer
13  systems and procedures.
14       Was this a routine audit or a
15  regularly scheduled audit, to your
16  knowledge?
17    A.   I don't recall, but generally we
18  do that occasionally.
19    Q.   Okay.  It says: A desk audit
20  assessment was also performed with full
21  cooperation of the Verifications Team for
22  the Melville, New York and Reno call
23  center locations over a three-week period.
24       What is a desk audit assessment?

Page 157

1    A.   It's paper.  So you're not
2  asking individuals.  You're asking for
3  SOPs or procedures to review or --
4    Q.   Okay.  And this assessment was
5  limited to January 1st of '13 through
6  October 1st of 2013, correct?
7    A.   Yes.  That's what it says.
8    Q.   That was the period of study?
9    A.   Yeah, that's what it says.
10    Q.   All right.  So, at this point,
11  the suspicious order monitoring program at
12  Henry Schein is automated, correct?
13    A.   To my knowledge, yes.
14    Q.   All right.  As far as your
15  tenure at -- at Henry Schein, the
16  system -- the SOM was always a computer --
17  computerized program, correct?
18    A.   That's correct.
19    Q.   I may have asked you this, and
20  forgive me.
21       But, did you ever study the
22  evolution that led up to the exist -- the
23  program that existed at the time you got
24  there?

Page 158

1    A.   I did not.
2    Q.   All right.  It says:  The goals
3  of the audit were for the Verification and
4  Regulatory Teams to better understand,
5  anticipate and proactively respond to the
6  challenges in the ever-changing regulatory
7  environment by gaining an accurate
8  understanding of past and current business
9  practices and drawing informed conclusions
10  about the future.
11       Is that your general
12  recollection of the goal of the audit?
13    A.   Mm-hm.
14    Q.   Yes?
15    A.   Yes, sir.
16    Q.   The real value of this approach
17  is to take us beyond traditional
18  retrospective analysis and help us
19  anticipate and react accordingly with
20  future business needs and opportunity,
21  such as impending roll-out of the national
22  healthcare and potential emergence of
23  concierge physicians.
24       The roll-out of the national

Page 159

1  healthcare, what is that?  Is that
2  Obamacare?
3    A.   Yes.
4    Q.   Did that change your suspicious
5  order monitoring program in any way?
6    A.   No.
7    Q.   The second goal was to optimize
8  potential investment in key regulatory
9  business systems can improve the customer
10  service, sales process and regulatory
11  compliance without requiring large-scale
12  changes.  And third is a real world
13  assessment of our business from a
14  regulatory and verifications perspective.
15       What -- what do you understand
16  real world assessments to be?
17    A.   Very clear.  Something that's
18  taking an objective look across the whole
19  process.
20    Q.   You'd agree with me that real
21  world is more of a realistic,
22  on-the-ground, deeper-dive type
23  understanding of the impact of, or the
24  success of your program?

Page 160

1       MR. McDONALD:  Object to the
2  form.
3    A.   Semantics again.
4       You know, I could see where, you
5  know, it's an objective review, right.  On
6  the ground, you know, that's an objective
7  review.
8    Q.   All right.  As a result of that
9  audit by your DEA team, certain findings
10  were made, correct?
11    A.   Correct.
12    Q.   One of the findings, which was
13  ranked as a high risk, or high level risk,
14  was that the current computerized
15  suspicious order monitoring system is
16  dated.
17       What did you understand that to
18  mean?
19    A.   That it needed to be refreshed.
20    Q.   Why?  What did they tell you?
21    A.   So, the opportunity is that it
22  had not been checked against the neutral
23  nationally recognized medical database to
24  cross-check its validity as truthful and

Page 161

1  accurate.
2    Q.   So, it wasn't comparing it -- it
3  was comparing itself to itself, right?  It
4  wasn't comparing itself to what was going
5  on in the country?
6    A.   Yes.  That's what it says.
7    Q.   And, why is that a high risk?
8  Why is that a high risk for noncompliance
9  with the Controlled Substances Act?
10       MR. McDONALD:  Object to the
11  form; mischaracterizes the document.
12       MR. MIGLIORI:  Let me -- let me
13  walk through that for a second, just
14  so we have clarity.
15  BY MR. MIGLIORI:
16    Q.   This is your DEA internal
17  auditing team, correct?
18    A.   That is correct.
19    Q.   Their function is to perform
20  internal audits to make sure you're in
21  compliance with DEA regulations for
22  controlled substances in this context,
23  correct?
24    A.   That is correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 Q. Why is this observation that the
2 current computerized suspicious order
3 monitoring system as of December of 2013
4 was out of date? Why is that a high risk?
5 What risk does that pose?
6 A. So, I'm not familiar with the
7 specifics of the findings, sir.
8 At the end of the day, you know,
9 Henry Schein is -- tries to be
10 continuously improving itself. If there
11 hadn't been a refresh in the system in a
12 number of years, I don't know what the
13 history was 'cause I wasn't in the company
14 at the time, but depending on the number
15 of years, obviously there's opportunities
16 for improvement, and I think that's what
17 this is calling to -- to light is that we
18 needed to improve.
19 Q. Okay. You agree with me that
20 your own internal team considered the risk
21 of not improving and updating the
22 suspicious order monitoring system posed a
23 high risk to the company?
24 MR. McDONALD: Object to the

Page 163

1 form.
2 A. Yeah, that's the conclusion
3 of -- of the auditors.
4 And it's memo from Ken Romeo.
5 So that was his opinion. Yes, sir.
6 Q. Okay. It was actually the
7 opinion of his team, right? Ken Romeo,
8 Tina Steffanie-Oak and Sergio Tejeda
9 performed this audit, right?
10 A. Right.
11 Q. And they report to you, correct?
12 A. That's correct.
13 Q. And if they report to you and
14 tell you that there's a high risk to the
15 company because our computerized system is
16 outdated, you took that seriously, right?
17 A. Yes, sir.
18 Q. And, that's something Henry
19 Schein would do? That is, if it was not
20 accurately or efficiently or in the real
21 world operating to prevent, in this
22 context, the risk of diversion of
23 controlled substances, Henry Schein needed
24 to, and would, immediately address it,

Page 164

1 correct?
2 A. It doesn't say that we were out
3 of compliance. It says that we were --
4 could be better. So that's how I am
5 interpreting this. And, so, the risk of
6 our noncompliance or our -- our areas for
7 improvement, this was one that we're
8 taking seriously.
9 Q. So, in terms of the risk here,
10 the risk here is to noncompliance, right?
11 MR. McDONALD: Object to the
12 form.
13 BY MR. MIGLIORI:
14 Q. When your -- when your employees
15 say that the risk of not updating the
16 computer system is a high risk, they're
17 telling you it's a high risk to the
18 company because of noncompliance and
19 liability to the company, correct?
20 A. It doesn't say that here, sir.
21 Q. What does high risk mean?
22 This is your company.
23 A. It means that there's
24 opportunities for improvement. There's

Page 165

1 risk that's, you know, inherent here and
2 we're going to look at trying to improve
3 it.
4 Q. So, your interpretation of risk
5 is that it just means you can do better?
6 A. That's one that we should focus
7 on. The highest focus should be on these
8 observations.
9 Q. All right. Let's go back to the
10 first page, since I think we need a
11 definition.
12 Under "Scope" it says: The
13 ongoing assessment process is required by
14 the Code of Federal Regulations and the
15 Drug Enforcement Administration.
16 So, you understand that the DEA
17 requires you to do these internal audits?
18 A. Yes, sir.
19 Q. (Reading) We are also requested
20 by Henry Schein internal audit to conduct
21 an annual assessment of our systems and
22 processes.
23 So it's an internal policy, as
24 well as a federal regulation, correct?

Page 166

1   A.   Yes.
2   Q.   (Reading) The assessment is a
3   result of a cooperative effort of both the
4   Regulatory and Verification Teams and took
5   into account, 1, the identification of
6   controlled substance and/or specific
7   combinations of controlled substances that
8   might potentially place Schein in a high
9   risk category as a distributor of
10  controlled substances for DEA regulatory
11  actions.
12       Do you understand that to be the
13  Auditing Team's definition of what the
14  risk is?
15  A.   Yes.
16  Q.   That doesn't say there's room
17  for improvement under high risk, correct?
18  A.   No, I disagree, sir.
19  Q.   That says this is just room for
20  improvement?
21  A.   It says might potentially, sir.
22  Q.   Might potentially place Schein
23  in a high risk of being out of compliance
24  with the DEA.  That's the definition of

Page 167

1   high risk.
2        MR. McDONALD:  Object to the
3   form.
4   BY MR. MIGLIORI:
5   Q.   Correct?
6        MR. McDONALD:  Object to the
7   form.
8   BY MR. MIGLIORI:
9   Q.   At least in the document?
10       MR. McDONALD:  Well, you misread
11  the document.
12       MR. MIGLIORI:  I read it twice.
13       MR. McDONALD:  Well, and you
14  added some words too that are not in
15  the document.
16  BY MR. MIGLIORI:
17  Q.   Go ahead.  You can answer.
18       Is the definition of high risk
19  by the team that reported to you:
20  Potential -- potentially place Schein in a
21  high risk category as a distributor of
22  controlled substances for DEA regulatory
23  action.
24       Would you agree with me that the

Page 168

1   risk they're referring to is DEA action
2   against Schein?
3   A.   Potential DEA action, yes.
4   Q.   All right.  And the risk -- the
5   material -- the second is the materiality
6   of controlled substance transactions in
7   dollar thresholds and active product
8   ingredient thresholds, computer system
9   errors inherent or not presently accounted
10  for, unintentional misstatements or
11  omissions, risk control statistics as
12  related to a level of training, potential
13  errors, and known DEA hot buttons, such as
14  the current street trends.
15       Those are all of the foci,
16  focuses, foci of this audit, correct?
17  A.   Yes, sir.
18  Q.   All right.  Now let's get back
19  to the ways that Schein could improve
20  itself.
21       The second one.  Your Internal
22  Audit Team reported to you directly in
23  December of 2013, as you took on this new
24  role, and said:  Individual account

Page 169

1   thresholds for controlled substance
2   purchase may be adjusted by Verifications
3   without regulatory and/or appropriate
4   medical guidance which could result in an
5   inappropriate product release.  Risk level
6   high.
7        First of all, did I read that
8   correctly?
9   A.   Yes.
10  Q.   What did you understand that to
11  mean when your team reported that to you?
12  A.   So, that there were some
13  opportunities for improvement in the
14  system that, you know, we needed to
15  tighten the activities and the abilities
16  to edit or modify.
17  Q.   And if you didn't do that, there
18  was a, as the document says, a potential
19  risk for --
20  A.   Yes.
21  Q.   -- DEA action, correct?
22  A.   Yes.
23  Q.   And that risk, according to
24  them, has been ranked as high, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1     A.   Yes.

2     Q.   All right. It says:

3 Decisionmakers in the Verifications

4 Department lack the medical training and

5 qualifications to release controlled

6 substances without regulatory/medical

7 guidance in some instances.

8       Did you appreciate, when you

9 took this responsibility in 2013, that a

10 lot of -- some of the decisions being made

11 at the verifications level to let a pended

12 order go out were being made by folks

13 that, at least in your department's

14 assessment, weren't properly or

15 sufficiently trained in medicine or

16 regulatory compliance?

17       MR. McDONALD: Object to --

18 BY MR. MIGLIORI:

19     Q.   That was one of their

20 observations?

21       MR. McDONALD: Object to the

22 form.

23     A.   When I took the position, no.

24     Q.   In December 2013, was that the

Page 171

1 observation of your Internal DEA Audit

2 Team, that some of the Verification Team

3 members who had the ability and were

4 releasing pended orders to physicians were

5 not sufficiently trained in regulatory and

6 medical guidances? Is that what they told

7 you?

8     A.   That's what it says. Yes, sir.

9     Q.   All right. That's one of the

10 things, as you took this position, that

11 you had to fix, correct?

12     A.   Yes, sir.

13     Q.   And that's something you've

14 tried to do ever since, correct?

15     A.   Yes, sir.

16     Q.   And that's what a good company

17 would do, correct?

18     A.   Absolutely.

19     Q.   It says: The Verifications Team

20 is operating in a potential closed-loop

21 system. All closed-loop systems would be

22 considered potentially dangerous from a

23 regulatory standpoint.

24       Then they give an example.

Page 172

1       A product release decision could

2 be made solely within Verification Team

3 without a secondary check. Justification

4 letters submitted to Schein by physicians

5 or accounts requesting controlled

6 substance are not reviewed currently by

7 medically trained personnel.

8       So, at least at this time, your

9 auditing team was telling you that

10 somebody solely within Verifications,

11 without input from Regulatory, could take

12 a questionnaire sent out to a doctor, take

13 the information provided in that

14 questionnaire, and make a decision on his

15 or her own at that verifications level and

16 release the order without ever involving

17 anybody outside of Verifications.

18       Correct?

19     A.   Yes, sir.

20     Q.   And, according to at least these

21 auditors, that posed a high risk,

22 potential high risk for DEA enforcement

23 action, correct?

24     A.   Yes, sir.

Page 173

1     Q.   They say: In fairness,

2 Verification Team is doing the best they

3 can with the limited training that they

4 have received and many of our

5 Verifications colleagues are new to the

6 position of decisionmaker.

7       So, your auditing team in

8 Regulatory Affairs was trying to say well,

9 it's not that they were -- they had any

10 bad intentions. These were good people

11 trying to do the best they could, but just

12 simply weren't trained enough.

13       Is that what you understood them

14 to tell you?

15     A.   Yes, sir.

16     Q.   And then the same team said

17 that: Internal documentation such as

18 account notations performed by the

19 suspicious order HS teams is not revealed

20 to Regulatory on a regular basis.

21       And I -- I don't know what HS

22 stands for.

23       Is it their Henry Schein

24 suspicious order team?

Page 174

1   A.   Yes.
2   Q.   As opposed to the joint
3  venture's?
4   A.   Yeah.
5   Q.   Is that why it's there?
6   A.   I would imagine.
7   Q.   So, and there's documentation of
8  suspicious orders and notations to
9  customer files within Verifications that,
10  at this time, was not getting reported to
11  or shared with your department, Regulatory
12  Compliance, correct?
13   A.   That's what it says, yes.
14   Q.   And the recommendations made at
15  the end of 2013 was to provide
16  Verifications personnel with additional
17  medical and dental training geared toward
18  the recognition of common drug utilization
19  and prescribing habits of clinical
20  physicians, dentists and institutional
21  accounts.
22       So, one of the recommendations
23  of your internal team was to better train
24  the -- Shaun Abreu's Verifications Team on

Page 175

1  mental and dental prescribing habits,
2  correct?
3   A.   Correct.
4   Q.   Now, other than the, as I
5  understand it, the monthly calls don't
6  involve the Verifications staff, correct?
7   A.   That's correct.
8   Q.   And the HDA presentation was
9  only to management of Verification.  It
10  was only Shaun Abreu's.  It wasn't the
11  staff, to your knowledge.
12       Correct?
13   A.   It may have been Lisa Matalon,
14  but yes.
15   Q.   And the Ken Romeo presentation,
16  is that this presentation that you talked
17  about?
18   A.   Yes.
19   Q.   All right.  So, when you said
20  there was a training --
21   A.   This is the training.  That's
22  correct.
23   Q.   -- you're referring to this
24  document.

Page 176

1       So, this --
2   A.   No, not this document.  The
3  training that Ken did to the Verifications
4  Team on the medical applications of the
5  controlled substances.
6   Q.   Got you.
7       So, as a result of this audit --
8   A.   Correct.
9   Q.   -- in this report, in this
10  recommendation that I just read, Ken Romeo
11  did a training for the Regulatory Affairs
12  team, correct?
13   A.   Yes.
14   Q.   And did he do it also for the --
15  the Verifications Team?
16   A.   Yes.
17   Q.   All right.  And that happened
18  one time, to your knowledge?
19   A.   One time, to my knowledge.
20   Q.   All right.  And you think it
21  happened right after this December --
22   A.   I can't say the time frame.
23  Sorry.  Can't recall.
24   Q.   All right.  But you only recall

Page 177

1  it happening once?
2   A.   That's correct.
3   Q.   It says as a second opportunity:
4  Better define the limits under which an
5  atypical account is processed into the
6  regulatory system.  The current gut
7  feeling approach - in quotes - while
8  laudable, leaves Schein exposed.
9  Operating within a closed-loop is usually
10  dangerous - exclamation point.  During the
11  assessment process, accounts were
12  identified which needed further regulatory
13  scrutiny, but were trapped within the
14  closed-loop.
15       Do you recall after this audit
16  any changes that were implemented and
17  documented in SOPs to break through this
18  closed-loop gut-feeling approach to when
19  to involve Regulatory in these decisions?
20       MR. McDONALD:  Object to the
21  form.
22   A.   I wasn't aware.
23       MR. McDONALD:  Hang on.
24       Object to the form.

Page 178

BY MR. MIGLIORI:

Q. Go ahead.

A. I wasn't aware.

Q. All right. So, at least as to this second recommendation or opportunity, you're not aware, from 2013 to today, of any change in standard operating procedure to increase the amount of communication and interaction between the Verifications Team and the Regulatory Affairs Department?

A. No. I'd like to take that question -- my answer back.

We have implemented a database system so that the documentation is shared. So when Customer Verifications enters any comments or notations, et cetera, that file is an active file. It's recorded and then it's transferred to the Regulatory Team and then they see everything and there's much more transparency.

Q. Excellent.

What's that data -- what's that

Page 179

system called?

A. FileMaker Pro.

Q. And, when was that implemented?

A. Last year, maybe a little bit earlier, but completed last year.

Q. 2018?

A. Yeah.

Q. So, this recommendation in December of 2013, to the best of your knowledge, was implemented in 2018?

A. That's correct.

Q. That's, by my math, five years later, correct?

A. Your math is correct.

Q. All right. Last recommendation: Provide training to Verifications personnel on how to search Google and other databases so more accurate decision can be made.

Do you recall whether or not there were any changes in standard operating procedures to train Verification personnel on Internet-based searches?

A. I'm not aware that it was done.

Page 180

Q. Okay.

I show you on page 247: The current Schein SOPs allow for a three-time courtesy release of controlled substances before an account is required to produce full documentation of medical need on many controlled substances.

Did you understand that that was a standard operating procedure in 2013, that full medical need documentation was not required and that there was a three-time courtesy release permitted?

A. This is when I learned of it, sir.

Q. Did you have a concern when you learned of it?

A. Yes, sir.

Q. And, what was your concern?

A. Well, obviously, you know, the -- the opportunity is to improve to make sure that we have these without this courtesy release.

Q. What was the risk of continuing to have this three-time courtesy rule?

Page 181

And by risk I mean --

A. Our Know Your Customer data, sir, would not be complete.

Q. Okay. It says under that: If a diversion of controlled substances is taking place at the administration or nursing level of a Schein customer, the corresponding entity might hold Schein responsible for a lack of due diligence in our internal controls by releasing controlled substance through their individual DEA license.

So, it's a concern both of knowing your customer and of proper documentation, correct?

A. What do you mean by the documentation?

Q. Well, part of the DEA compliance. It's not just doing the job correctly, but also documenting it appropriately.

Correct?

A. That's correct.

Q. And that was -- those were both

Page 182

1  raised in this observation, correct?
2      A.  Yes, sir.
3      Q.  Number 5 it says:  The current
4  suspicious order monitoring system fails
5  to account for two potential deviant order
6  patterns.
7          It says:  The current computer
8  analysis system fails to detect a static
9  order patterns of controlled substances
10  and, B, a singular purchase order pattern.
11  Both of these order patterns may be
12  indicative of potential criminal activity
13  and liability to Schein for a controlled
14  substance product release without
15  appropriate due diligence under a strict
16  interpretation of the code.
17          Was that explained to you at the
18  time, how those two types of potential
19  suspicious orders were not being captured
20  by the system?
21      A.  I'm sure we discussed that.  I
22  don't recall, sir.
23      Q.  Okay.  The risk of that for
24  potential DEA enforcement action was

Page 183

1  considered to be moderate.
2          Do you see that?
3      A.  Yes, sir.
4      Q.  And then recommendations were
5  made to reprogram the current suspicious
6  order monitoring system to detect static
7  order patterns of a period of ten months
8  or more of a singular controlled or
9  combination of controlled substances
10  utilizing the active product ingredient.
11  Needs to be discussed with Verifications.
12          Do you know if that was ever
13  done?
14      A.  I believe it was, sir.
15      Q.  Okay.  And, who would have
16  implemented that?  That is, technically,
17  who would have verified that?  Who would
18  have implemented it and then quality
19  controlled it that it was working at the
20  company?
21      A.  I think a combination of the IT
22  teams and potentially Regulatory and
23  Customer Verifications, but all of the
24  activities would be driven by the IT team

Page 184

1  in terms of, you know, managing the
2  systems for that.
3      Q.  And who, at this time in 2013,
4  when this was being reported to you, who
5  would have been the IT person that, if you
6  recall?
7      A.  Liaison currently for Regulatory
8  is Gavin D'Souza, and I would venture that
9  he was probably it back then.
10      Q.  Okay.  And, who would then --
11  who would he have interacted with within
12  your department?
13      A.  Sergio.
14      Q.  Sergio, okay.
15          On the last page it says:
16  Overall recommendations.  Short-term.
17  Enhance communication with Verifications
18  Department.
19          That's something you said
20  FileMaker Pro addressed in 2018, correct?
21  The interactive?
22      A.  That was the ultimate goal.  I
23  think that there was other enhancements
24  prior to this.

Page 185

1      Q.  You can't recall any of the
2  specifics?
3      A.  No.
4      Q.  All right.  Do you have any
5  other additional medical training other
6  than what Ken Romeo did right after this
7  report, medical training of the
8  verification decisionmakers?
9      A.  I do not.
10      Q.  And as you sit here today,
11  you're not familiar with any verification
12  decisionmakers recurrent training program
13  at Henry Schein?
14      A.  Yeah, they don't report to me.
15  So I'm not sure.
16      Q.  (Reading)  Provide any
17  additional training relative to account
18  due diligence techniques.
19          Do you know if any additional
20  training had been implemented at Henry
21  Schein for due diligence techniques as a
22  result of this audit in 2013?
23      A.  I believe Ken Romeo's training,
24  from both a medical and due diligence

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 techniques, covered -- covered both
2 topics.
3 Q. Okay. And so, to your
4 knowledge, and to your recollection,
5 anyway, the only -- the only training was
6 whatever Ken did in that one- or two-day
7 presentation after this report?
8 A. Correct.
9 Q. All right. It says in the
10 long-term, there's a need to enhance the
11 computer system and validate it.
12 Correct?
13 A. Yes.
14 Q. When was that ultimately done?
15 A. I'd have to go back and look. I
16 don't know specifically off the top of my
17 head, sir.
18 Q. So, at the end of 2013, if the
19 SOM computer system was outdated, do you
20 have any recollection in your tenure as
21 vice-president of, among other things,
22 Regulatory Affairs of when the system was
23 switched?
24 MR. McDONALD: Object to the

Page 187

1 form.
2 BY MR. MIGLIORI:
3 Q. It would have happened during
4 your time --
5 A. Yeah, there's been two re-tunes,
6 I believe.
7 Q. Okay.
8 A. But I don't know the dates, sir.
9 Q. Okay. Enhance regulatory
10 training on medical aspects of a field
11 audit.
12 Other than what you've already
13 described, are you aware of any other
14 enhanced regulatory training on medical
15 aspects?
16 A. Yeah, that would be the monthly
17 reports where the auditors themselves
18 discuss what they find and what challenges
19 they've come across, et cetera.
20 Q. But that would only be within
21 the Regulatory Affairs Department. It
22 would not involve Verifications.
23 Correct?
24 A. Correct.

Page 188

1 Q. And then the last: A more
2 proactive involvement by Regulatory in API
3 and SOM systems on a continual basis.
4 Did you understand that ultimate
5 long-term recommendation of your Internal
6 DEA Audit Team was that Regulatory needed
7 to get more proactive in the actual
8 implementation of suspicious order
9 monitoring systems and Know Your Customer
10 obligations? Did you under -- appreciate
11 that as the recommendation?
12 A. Yes, sir.
13 Q. And, since your role as
14 vice-president in this area in 2013, is
15 that what you've tried to do over the past
16 five years, be more proactive in getting
17 the Regulatory Affairs Department involved
18 with the verification system?
19 A. In my opinion, yes.
20 Q. Okay. But as we sit here today,
21 it is still possible for a pended order,
22 or an order that is kicked out of the
23 automated system as being potentially
24 suspicious or suspicious and it is -- it

Page 189

1 is possible that that today, that order
2 can be determined or deemed by a
3 Verifications person to be okay to ship
4 without Regulatory involvement, correct?
5 A. That's my understanding.
6 Q. Okay.
7 MR. MIGLIORI: Why don't we take
8 a lunch break?
9 MR. McDONALD: Sure.
10 THE VIDEOGRAPHER: All right.
11 Stand by.
12 The time is 12:18 p.m.
13 Going off the record.
14 (Luncheon recess taken.)
15 - - -
16 A F T E R N O O N   S E S S I O N
17 - - -
18 THE VIDEOGRAPHER: We are back
19 on the record.
20 The time is 1:03 p.m.
21 - - -
22 (Peacock Exhibit 10, interoffice
23 memorandum dated December 19, 2012,
24 Bates No. HSI-MDL-00622252 to

Page 190

1    00622258, was marked for
2    identification, as of this date.)
3    BY MR. MIGLIORI:
4       Q.   Okay.  We were talking about the
5    Internal DEA Audit Team and their report
6    to you in December of 2013.
7          The company produced to me
8    several letters relating to that.  So I'm
9    just going to mark them and show them to
10   you.  I have a couple questions on each,
11   but it's mostly to just authenticate
12   these.
13          This is Exhibit Number 10.  It's
14   a similar letter to Exhibit Number 9.
15          That's Henry Schein interoffice
16   memorandum privileged and confidential.
17   This time it's just to you from Ken Romeo.
18   It's dated December 19th.  It says 2012,
19   but I think that's a typo.
20          Right?  You weren't there in
21   2012, were you?
22      A.   I was not, no.
23      Q.   Okay.  So I assume this is
24   December 19th of 2013.  It talks about the

Page 191

1    same scope of the assessment.
2          This looks like it's more of the
3    report of the verification side of things.
4    And, I can't tell what the differences
5    are.
6          Did you review this as well as
7    the one you -- we previously looked at,
8    number 9?  And feel free to go back and
9    compare them.
10         Is this part of what you
11   reviewed yesterday?
12      A.   Yes, sir.
13      Q.   Okay.  Did you identify, in
14   reviewing them, differences or why there
15   were two memos that were pretty similar,
16   but written to different people?
17      A.   Well, this was the internal memo
18   to the department.  So this was to me.
19   And then this other one was the one that
20   was to a broader audience, including the
21   Verifications Team.
22      Q.   Okay.  So, you wouldn't -- this
23   is dated earlier.  This would have been
24   December 19th of 2013.  So this was

Page 192

1    probably the -- in looking at Exhibit 10,
2    this is probably the first written report
3    anyway of the assessment, correct?
4       A.   Yeah.
5       Q.   That you received?
6       A.   The prequel.
7       Q.   Okay.  And, so, from this
8    Exhibit Number 19 was written and
9    distributed to not just Regulatory, but to
10   Regulatory and to Verifications, correct?
11      A.   Correct.
12      Q.   Essentially the substance of it
13   appears to be the same?  It has the same
14   reports of risk, the system being
15   outdated.  We talked about that already.
16   And the parameters of the market segment,
17   practice type and practice specialty do
18   not cross-reference normal clinical drug
19   utilization patterns.
20         So this was the observation that
21   it didn't reflect what was going on
22   nationally in the -- in the perimeters of
23   your system, correct?  That's consistent
24   with the prior document, correct?

Page 193

1       A.   Mm-hm.
2       Q.   Yes?
3          MR. McDONALD:  Well, I don't
4    think he's on the same page you're on,
5    Don.  Show him.
6       A.   You're on 10.  Where are you
7    reading from?
8       Q.   So, I'm reading under the first
9    findings.  I just want to establish that
10   these findings are generally the same
11   findings, they're just to a smaller
12   audience on the first document, correct?
13      A.   That is correct.
14      Q.   So, there's one observation
15   about the computerized system being
16   outdated and there's the observation here
17   about the parameters set in the suspicious
18   order monitoring program not reflecting
19   national real world utilization patterns,
20   correct?  That's B.
21         MR. McDONALD:  It says normal
22   clinical.
23         Where are you reading?
24         MR. MIGLIORI:  I'm actually just

Page 194

1 summarizing this part B.
2 MR. McDONALD: Okay.
3 A. Yeah, I would agree that the
4 documents are the same.
5 Q. Okay. We talked already about
6 there being a need for more medical
7 training.
8 There's one we didn't talk
9 about, and I didn't go back to compare if
10 it was in the earlier document. Number 3
11 it says: Accounting data reported to
12 Regulatory and Verification underwriters
13 as total sales may be materially
14 misstated.
15 What do you understand that to
16 be?
17 A. So, as defined in the
18 description under A, there's material,
19 like capital equipment, that could be
20 added or put into the value of that
21 account. So the total sales may be
22 misstated because it's not just controlled
23 substances. It could potentially be other
24 medical devices or capital equipment.

Page 195

1 Q. So, as it relates to DEA
2 compliance, which was the focus of this
3 audit, does that mean that it -- it was
4 possible that some of the sales data being
5 reported through ARCOS was misstated
6 because it included not just controlled
7 substances, but capital purchases?
8 MR. McDONALD: Object to the
9 form.
10 If you know, tell him. But
11 don't guess.
12 A. I don't know.
13 Q. Okay. You agree with me this is
14 a finding related to DEA compliance. I
15 mean, that's --
16 A. That's in the report, yes.
17 Q. Do you have any sense of why
18 that would be in this report?
19 A. I don't recall, sir. I'm sorry.
20 Q. Okay. That's fair enough.
21 MR. MIGLIORI: All right. You
22 can set that aside.
23 (Peacock Exhibit 11, interoffice
24 memorandum dated December 30, 2013,

Page 196

1 Bates No. HSI-MDL-00621989 to
2 00621996, was marked for
3 identification, as of this date.)
4 BY MR. MIGLIORI:
5 Q. So, I think this version of the
6 report, which is dated December 30th of
7 2013, is again addressed to you and to Jim
8 Mullins and the Verification Team. It
9 seems to report on the same issues.
10 First of all, did you review
11 this yesterday in preparation for today?
12 A. No, I did not.
13 Q. Do you know what the difference
14 is in this document from the other
15 documents?
16 One apparent difference is the
17 word "draft."
18 A. That's on the 23rd document
19 also.
20 Q. Yeah, okay.
21 It seems to be written to the
22 same people on Exhibit Number 9, the
23 December 23rd letter. And I'm just trying
24 to see whether you can help me understand

Page 197

1 if there's anything in here that is
2 different.
3 A. Honestly, I don't know. I mean,
4 I would have to go word-by-word through
5 the whole document. We could try to do
6 that, if you'd like.
7 Q. No, I mean, if you didn't review
8 it.
9 There are some things that, if
10 you go to page 6 of the document, or the
11 Bates number '996. In this particular
12 document, there seem to be more margin
13 notations of edits. You see the black
14 line on the bottom of page 6?
15 A. Yep.
16 Q. And then I don't recall this
17 component. It says: Background for
18 assessment conclusion. What is Schein's
19 statistical risks as determined from the
20 success of current SOM system?
21 First of all, do you know
22 what -- who would have inserted that
23 comment or question?
24 A. It's on the other document too.

Page 198

1  Q.  Is it?
2  A.  Yeah.
3     MR. McDONALD:  It's bullet 10.
4     MR. MIGLIORI:  I'm sorry?
5     MR. McDONALD:  It's bullet 10 on
6  Exhibit 9.
7  BY MR. MIGLIORI:
8  Q.  So, but it's presented a little
9  differently.  It doesn't have a 10 here.
10    I'm just trying to figure out is
11 there anything -- is that --
12 A.  Does it mean anything?  I don't
13 think so.
14 Q.  I mean, were you trying to edit
15 this document for yet a different
16 audience, to your knowledge?
17 A.  To my knowledge, no.
18 Q.  Okay.
19 A.  Not aware.
20    (Peacock Exhibit 12, interoffice
21 memorandum dated February 14, 2014,
22 Bates No. HSI-MDL-00622219 to
23 00622224, was marked for
24 identification, as of this date.)

Page 199

1  BY MR. MIGLIORI:
2  Q.  This is Exhibit 12.  This is a
3  February 14th, 2014 memorandum.  It's got
4  meeting minutes from a February 11th, 2014
5  review of the suspicious order monitoring
6  audit findings that we've been talking
7  about.
8     Tell me the context, if you can,
9  of this meeting.  Why was it held?  Was it
10 a regular meeting?  Was it specific to
11 this -- these findings, if you can recall?
12 A.  Well, it's obviously the
13 individuals that were -- the original
14 audit was addressed to.  So this was, I
15 guess, to discuss and more collectively
16 understand and ask questions.
17 Q.  Okay.  So, it was a meeting
18 dedicated to this issue, as best you can
19 tell?
20 A.  Yes, sir.
21 Q.  All of the folks that are listed
22 as attendees are either from Regulatory or
23 from Verifications?
24 A.  Yes, sir.

Page 200

1  Q.  Question mark.
2  A.  Yes.
3  Q.  Okay.  So, now after the first
4  finding about the current computerized
5  system being outdated, there is a proposed
6  preliminary action listed in italics.
7     Did you review this document
8  yesterday?
9  A.  No, sir.
10 Q.  Okay.  Look over the proposed
11 preliminary action, if you will, on page
12 2.
13 A.  (Perusing document.)
14    Okay.
15 Q.  Did Buzzeo address this issue?
16 Was it Buzzeo ultimately that you chose to
17 address this issue?
18 A.  I'm not a hundred percent sure,
19 but I believe so.  That's correct.
20 Q.  Do you recall any other third
21 party databases being tested,
22 investigated, vetted as referred in this
23 section?
24 A.  I don't have specific knowledge,

Page 201

1  sir.
2  Q.  You mentioned earlier the
3  company, was it Hyman Phelps?
4  A.  Yes.  It's a law firm, sir.
5  Q.  Okay.  So, you can't recall any
6  other input that you would have received
7  to address this first finding other than
8  what's represented here, that Ken and Tina
9  go talk to Buzzeo?
10 A.  Yeah, Buzzeo and possibly
11 others, but I don't recall who all they
12 spoke with.
13 Q.  On the second discussion point
14 about the need for training, medical and
15 regulatory training for decisionmakers,
16 the proposed preliminary action that Ken
17 will develop a training program in 2014
18 that will be given to Verification and
19 Regulatory.  Will also provide training to
20 HSAH and GIV as well.  Will need to
21 partner with the dental and animal
22 profession to cover these specialties.
23    So, that's the 2014.
24    Does that sound -- does that

Page 202

1   give you a better sense of time when that
2   training that Ken offered to those teams?
3       A.   Yes, it follows logically.
4       Q.   Okay.  In discussing in this
5   proposed preliminary action getting
6   training to other joint venture groups,
7   HSAH and GIV and dental and animal health,
8   is it fair to say that these observations,
9   these regulatory observations that the
10  internal DEA group came up with related to
11  not just the Henry Schein companies, but
12  to also these joint venture groups?
13          MR. McDONALD:  Object.
14  BY MR. MIGLIORI:
15      Q.   Was the audit included HSAH, GIV
16  and dental and animal health?
17      A.   The audit did not --
18          MR. McDONALD:  Object to the
19  form.
20      A.   The audit did not include those.
21  It was just the corporate office that was
22  done.
23      Q.   Okay.
24          MR. McDONALD:  And so that we

Page 203

1   have a clear record and not some
2   confusion at a later date, dental is
3   included with Henry Schein.  It's
4   Henry Schein Dental.
5           MR. MIGLIORI:  Correct.
6           MR. McDONALD:  That's not a
7   separate JV.
8   BY MR. MIGLIORI:
9       Q.   GIV is, right?
10      A.   Yeah.  Well, it's Henry Schein
11  company.
12      Q.   And HSAH, is that a Henry Schein
13  company?
14      A.   The animal health, yes.
15      Q.   Okay.  So, all of those were
16  involved in this DEA audit, correct?
17      A.   No, they were not.
18      Q.   Okay.  Why not?
19      A.   This was a focus on the
20  corporate system.  They have their own
21  systems.
22      Q.   Okay.  But the reaction to
23  training, is there -- do you recall why a
24  response to the recommendation included

Page 204

1   those, if they had separate systems?
2       A.   I do not.
3       Q.   Okay.  Accounting data reported
4   to Regulatory Affairs as total sales.  We
5   just talked about that.  We don't really
6   know what that means, as we sit here
7   today.
8           The proposal for the three-time
9   pend rule as listed here, Regulatory
10  requested the Verifications use the 16
11  high risk controlled substances instead of
12  the list of four controlled substances.
13  It also suggested that they reduce the
14  three-time pend to two times going
15  forward.
16          Is that essentially what was
17  recommended at this time?
18      A.   Yes, sir.
19      Q.   And, is that what happened?  Did
20  you change the three-time rule to a
21  two-time rule?
22      A.   I can't comment, sir.  Not for
23  sure.
24      Q.   Okay.  And, do you know whether

Page 205

1   or not they expanded the list of
2   controlled substances in Verifications
3   from the four that had been used through
4   2013 to the 16 high risk?
5       A.   I don't know specifically, sir.
6       Q.   Do you know even today what
7   number of controlled substances --
8       A.   I do not.
9       Q.   Okay.  On the finding related to
10  the two types of deviate order patterns
11  that were being -- that were -- were not
12  being accounted for in the existing
13  system, the proposed preliminary action
14  says:  In the short-term the correction
15  can be addressed by using data warehouse
16  reports to review customer order patterns.
17          What are data warehouse reports?
18  And where are they kept?
19      A.   It's in the JD Edwards system,
20  sir, so it's the ERP system.  It's a
21  module that basically tracks inventory to
22  customers.
23      Q.   All right.  So it's a inventory,
24  not a sales --

Page 206

1    A.   No, it would be tied to sales.
2  It would show what was shipped to which
3  customer.
4    Q.   Okay.  There's a question about
5  how far back some of this data goes.
6         Do you -- do you know how far
7  back the warehouse reports go?
8    A.   I do not.
9    Q.   But they exist in the JDE
10 system, right?
11   A.   Correct.
12   Q.   So, if we were --
13   A.   And we have off-site storage
14 also.
15   Q.   Okay.  And what -- the off-site
16 storage, is that hard copy storage?
17   A.   No.
18   Q.   Or redundant storage?
19   A.   Redundant, yeah.
20   Q.   Okay.  It says:  The long-term
21 correction will be to add a new pend logic
22 to the SOM system.
23        That is to change the algorithm,
24 right?

Page 207

1    A.   Mm-hm.
2    Q.   And that Ken and Tina will
3  use -- will discuss this issue with Buzzeo
4  and the other consultants.
5         Do you know --
6    MR. MIGLIORI:  Well, strike
7  that.
8         I think we have another document
9  that says when that happened.
10   Q.   Do you have any further
11 information about whether the Buzzeo
12 system incorporated new pend logic?  And
13 if so, when that happened?
14   A.   I don't know the dates, sir.
15        (Peacock Exhibit 13, interoffice
16 memorandum dated February 17, 2014,
17 Bates No. HSI-MDL-00499366 to
18 00499371, was marked for
19 identification, as of this date.)
20 BY MR. MIGLIORI:
21   Q.   This is Exhibit 13.
22        This is just another dated copy
23 of the same meeting minutes from appears
24 to be the same meeting on February 14th,

Page 208

1  but the memo is dated later than
2  Exhibit 12.
3         Did you review this in
4  preparation for today?
5    A.   I did not.
6    Q.   Is there a -- is there anything
7  that jumps out at you as being different,
8  in terms of who's getting this, why it's
9  being produced, that you can educate me
10 about?
11   A.   The first one has "draft" on it.
12 The same as before.  So that's all I --
13   Q.   So this one may be the final
14 because it doesn't have the watermark?
15   A.   Yeah.
16   Q.   Okay.  Fair enough.
17   MR. MIGLIORI:  So, that's
18 Exhibit Number 13.  We're cruising
19 now.
20        (Peacock Exhibit 14, DEA
21 Compliance Update October 2, 2014,
22 Bates No. HSI-MDL-00575077 to
23 00375079, was marked for
24 identification, as of this date.)

Page 209

1  BY MR. MIGLIORI:
2    Q.   Exhibit 14, this is an October
3  2nd, 2014 DEA compliance update.
4         Look at this and tell me if
5  you've seen this before, or if you
6  reviewed it in preparation for today.
7    A.   (Perusing document.)
8         I can't recall this specific
9  document, sir.
10        I don't believe I saw this
11 yesterday.  I certainly have received it
12 in the past.
13   Q.   Okay.  You're listed as an
14 attendee to this meeting.
15   A.   Correct.
16   Q.   Is this a regular meeting, based
17 on the way this document looks?
18   A.   Yes.
19   Q.   And would this be a monthly
20 meeting?
21   A.   That's correct.
22   Q.   Is this the monthly meetings
23 we've been talking about?
24   A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    Q.   So, if I were to look for and
2  ask for the minutes of the monthly
3  meetings that the Regulatory Affairs
4  Department itself held, these were by
5  phone, they would look something like
6  this, to the extent they exist?
7    A.   Correct.
8    Q.   All right.  2014 hydrocodone
9  gets rescheduled as a class -- a Schedule
10  II controlled substance, right?
11       Do you recall that?
12    A.   I do recall, yes.
13    Q.   And, so, there were some
14  logistical issues discussed in this
15  particular meeting about keeping those
16  records separate for the -- those that
17  were sent out as Class III and those that
18  were sent out as Class II, correct?
19    A.   Mm-hm.
20    Q.   Yes?
21    A.   Yes.
22    Q.   On the next page, there was a
23  minute entry saying:  Open Indy position
24  senior regulatory specialist.  Offer is

Page 211

1  made to candidate Beverly Butcher.
2  Beverly joined the team October 15th to
3  shadow Ken on several site visits prior to
4  solo trips.
5       Who is Beverly Butcher?  And
6  what was she hired to do?
7    A.   She's on the DEA Audit Team.  So
8  she's a senior specialist on that team.
9    Q.   Okay.
10    A.   Conduct audits.
11    Q.   She was a certified pharmacy
12  technician.
13    A.   Yes, sir.
14    Q.   Were any other members of the
15  DEA Audit Team, at that time, trained in
16  either pharmacy or medicine or --
17    A.   Liam was with the Florida Board
18  of Pharmacy.  He was an inspector there.
19    Q.   Okay.
20    A.   For a number of years prior to
21  joining us.
22    Q.   And, do you know when he was
23  hired?
24    A.   I don't have the date, sir.

Page 212

1    Q.   He's not -- he's not part of the
2  team as of the date of this memo, correct?
3    A.   Right.
4    Q.   As of October of 2014, he wasn't
5  yet hired?
6    A.   No.
7    Q.   Okay.  So, is this the first
8  person, to your knowledge, as you sit here
9  today, is Beverly the first person on the
10  DEA Audit Team that had this kind of
11  specialized training in pharmacy?
12    A.   Well, Ken's an MD.
13    Q.   Okay.
14    A.   I don't know specifically what
15  Glenn's background training is.
16       But of the others, that's
17  correct.
18    Q.   Ken Romeo is a medical doctor.
19       And, what was he trained in?
20    A.   I don't recall.
21    Q.   Did he ever practice medicine?
22    A.   I don't recall.
23    Q.   Okay.  And his title at this
24  time, was he a member of this team, or was

Page 213

1  he a supervising person on this team?
2    A.   He was a member of the team.
3    Q.   Okay.  And he's the one that
4  designed, at the recommendation of the
5  audit, the medical training program for
6  the others, correct?
7    A.   That's correct.
8    Q.   And it's because of his training
9  as a medical doctor that he was the one to
10  do that?
11    A.   Correct.
12    Q.   Beverly was hired as a certified
13  pharmacy tech to follow Ken around on site
14  visits and then ultimately, as it seems to
15  purport here, to do site visits for due
16  diligence on her own eventually?
17    A.   Which she's continuing to do
18  today.
19    Q.   Okay.  Is Ken still there today?
20    A.   No, he's not.
21    Q.   When did he leave?
22    A.   I don't remember the specific
23  time.
24    Q.   Okay.  Site visits in 2014.

Page 214

1 Most site visits to be conducted by our
2 team versus Pharma.
3 What does that mean? What is
4 the reference to Pharma?
5 A. It's not clear to me. I'm not
6 sure, sir.
7 Q. Who was doing site visits prior
8 to this?
9 A. I don't know anybody but our
10 team during my time.
11 Q. Did Verifications do site
12 visits?
13 A. Not that I'm aware. I don't
14 know.
15 Q. Well, this doesn't -- it's a
16 capital PH too. So it doesn't -- is that
17 a proper name? Do you have any inkling of
18 what that could possibly mean?
19 A. Light bulbs are going off.
20 I believe there was a consultant
21 that we used at some time.
22 Q. Okay.
23 A. But I'm not familiar with what
24 the name was, et cetera, but I believe

Page 215

1 that was a Pharma Science or something,
2 like that was a consultant the company had
3 used prior.
4 Q. So, until this point, at least
5 some of the site visits being conducted
6 through 2014 were being conducted by an
7 outsourced vendor?
8 A. That's my understanding.
9 Q. Okay. And, the meeting held
10 here in October of 2014 discussed the
11 concept of regulatory actually doing more
12 of it directly instead of outsourcing it?
13 A. Which was why Beverly was hired.
14 Q. Okay.
15 A. Yes.
16 Q. Great.
17 And it said, after that, that
18 the due diligence reviews were increasing,
19 that the summer had slowed down, but the
20 fall now ramping up. 45 new accounts were
21 reviewed and about 15 percent require site
22 visits at some point in time.
23 So, this process of catching up
24 on due diligence, of being more proactive,

Page 216

1 is ramping up in this October 2014 time
2 frame, correct?
3 A. Yeah. The activity's higher,
4 for sure.
5 Q. Okay. So, help me understand
6 it.
7 What is HSAH?
8 A. Henry Schein Animal Health.
9 Q. And you're saying that they do
10 or they don't have a separate system?
11 A. They do have a separate system.
12 Q. But Regulatory is discussing it
13 in its regular monthly meetings and
14 reporting on it in their minutes?
15 A. In this case, yes.
16 Q. Okay. And, so, there is some
17 responsibility, at least of the Regulatory
18 Affairs personnel that meet on this
19 monthly basis, to make sure that HSAH is
20 compliant with respect to controlled
21 substances, correct?
22 A. I said before --
23 MR. McDONALD: Object to the
24 form.

Page 217

1 Go ahead.
2 A. As I said earlier, we provide
3 consulting and auditing for them. So we
4 would give them guidance, you know, do an
5 audit of them, have some findings or
6 whatever and make recommendations to them.
7 Q. In fact, the first one says:
8 Still need help. Four weeks so far. What
9 else can we do for them?
10 So, it's you're serving as a
11 resource to them?
12 A. Guidance, yes.
13 Q. Okay. And it says: They are
14 going to sign a letter that they are
15 compliant, but they are not yet.
16 Do you know what that's
17 referring to?
18 A. I do not. Don't recall.
19 Q. It says: Arthur is still having
20 issues.
21 I -- do you recall what that's
22 about?
23 A. No, sir.
24 Q. It says: Do we continue to

Page 218

1 support or send a report of issues of what
2 needs to be done and then will return to
3 do another audit? Procedures have major
4 gaps and further training is required.
5     Do you recall what action you
6 all took at regulatory at Henry Schein in
7 terms of whether to just report out that
8 the findings of their compliance, or lack
9 of, or to actually do more? Do you recall
10 what decision was made after this meeting?
11     A. I do not, with the specific
12 decision, I don't remember.
13     Q. There's a reference: DEA could
14 come back for another visit at any time.
15     Do you know what that is
16 referring to?
17     A. I do not. I mean, the DEA comes
18 to all of our -- of all of our DCs
19 generally every year, and they -- it
20 appears that they may have been there and
21 they may come back. I don't know.
22     Q. All right. At the end of the
23 meeting, there was a 2015 assignment for
24 this DEA auditing group. It says:

Page 219

1 Evaluation reformatting our controlled
2 substances processes. Think about
3 restructure to take control of all DEA
4 SOM, including customer service
5 verifications for subsidiaries, joint
6 ventures, set up hotline, do verifications
7 here. What would it take? A subsidiaries
8 need a valid suspicious order monitoring
9 system. System compatibility may be an
10 issue. And then charge back cost to the
11 subsidiaries.
12     At any point after this October
13 2014 meeting, did you take on the
14 responsibility of the subsidiaries and
15 joint venture entities?
16     A. No, I did not.
17     Q. Do you know whether you
18 performed any further audits for them as a
19 resource or guidance?
20     A. Yes, we --
21     Q. After this.
22     A. Absolutely.
23     Q. And, did they change their
24 systems and update them and re-tune them?

Page 220

1     A. Continually improving. There's
2 been process changes, et cetera, staffing
3 changes, et cetera.
4     (Peacock Exhibit 15, email chain
5     ending May 7, 2018, with attachment,
6     Bates No. HSI-MDL-00572919 to
7     00572922, was marked for
8     identification, as of this date.)
9 BY MR. MIGLIORI:
10     Q. Exhibit 15. It's an email
11 exchange of May of last year between you
12 and Sergio Tejeda on the Henry Schein
13 suspicious order monitoring system memo.
14     Did you review this document
15 yes --
16     A. I did.
17     Q. I'm sorry. You did?
18     A. I did.
19     Q. Okay. You recall -- do you
20 recall, actually, this interaction --
21     A. I do.
22     Q. -- when it happened?
23     A. Mm-hm.
24     Q. Okay. In reading e-mails, you

Page 221

1 start from the back going forward. So, if
2 you look at the bottom of page 1 Sergio
3 wrote to you, he said: We came to see you
4 and talk to you about the SOM memo.
5 Wanted to share draft. See if this is
6 what you're looking for.
7     Do you recall why you asked him
8 to put together a memorandum in May of
9 2018 relating to the suspicious order
10 monitoring system at Henry Schein? What
11 was the context of this email exchange?
12     A. It was probably part of the
13 budget request maybe. I don't recall.
14     Q. There's a reference to a summary
15 for Stan.
16     Who's Stan?
17     A. Stan Bergman, the chairman and
18 CEO of the company.
19     Q. Okay. And, so, you were
20 reporting to Stan on the current system,
21 as well as some of the history of the
22 current system?
23     A. Yeah, giving him background,
24 yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1   Q.   Okay.  The revised memorandum
2   talks about how Henry Schein has a robust
3   suspicious order monitoring system which
4   we believe to be unique in the industry,
5   it being two-pronged, it was designed to
6   fully address the needs of our complex
7   business model.
8        It says:  The first prong of the
9   SOM gauges orders according to active
10  ingredient.  The second prong monitors
11  orders based on normalized active
12  ingredient being ordered in the internal
13  peer classification.
14       As you sit here today, do you
15  have an understanding what that means?
16  A.   Somewhat, yes.
17  Q.   Is this input that probably came
18  from Buzzeo that you're relating?
19  A.   Yes.
20  Q.   All right.  It says:  Our
21  current SOM was designed in conjunction
22  with BuzzeoPDMA in 2018 and implementing
23  was completed in 2009.  At that point,
24  there were no service providers that could

Page 223

1   offer an established solution.  Companies
2   were forced to develop their own.
3        Is that history as being related
4   by you to Stan supposed or intended to be
5   a history that you got from Sergio?
6   A.   Yes.
7   Q.   'Cause you obviously weren't
8   there at the time?
9   A.   From Buzzeo.
10       Right.
11  Q.   Okay.  It says:  Of the three
12  major drug wholesalers, only Amerisource
13  uses the Buzzeo system.  Similar to Henry
14  Schein, they implemented a traditional
15  model and are now looking to migrate to
16  the SOM cloud solution.  Cardinal and
17  McKesson developed their own SOM systems
18  in-house.  What we've learned at the same
19  level that Buzzeo does support all three
20  with customer site visits.
21       Did you have much interaction,
22  as head of Regulatory Affairs, with the
23  other what they call the big 3
24  distributors?

Page 224

1   A.   No.  No, sir.
2   Q.   Did you ever have any
3   interactions with them relative to the
4   effectiveness of suspicious order
5   monitoring programs or thresholds?
6   A.   Personally, no.
7   Q.   Did somebody in Henry Schein
8   have a regular interaction with any of the
9   big 3 suppliers?
10       MR. ASFENDIS:  Just note my
11  objection to form.
12  A.   Not that I'm aware of other than
13  at a meeting like the HDA where there
14  might be presentations of, you know,
15  ongoing activities or regulations or et
16  cetera or they may be present in speaking.
17  Q.   So, to the extent -- with
18  respect to the accuracy of the statement
19  that I just read, or paraphrased, that --
20  that's information you got from Sergio?
21  A.   Correct.
22  Q.   That's not information you
23  learned yourself?
24  A.   That's correct.

Page 225

1   Q.   All right.  In order to insure
2   compliance, your processes were audited in
3   2012.  So there was a 2012 audit of the
4   new system that was started in 2009 and
5   implemented through 2010 and '11, correct?
6   A.   Mm-hm.
7   Q.   Did you ever see the reports of
8   that audit in 2012?
9   A.   No.
10       MR. McDONALD:  Object to the
11  form.
12  BY MR. MIGLIORI:
13  Q.   That audit was a collaboration
14  of Verifications, Legal, Internal Audits
15  and Regulatory.
16       Was Legal involved in the 2013
17  audit, to your knowledge?
18  A.   Well, I report to Legal, right.
19  So I report to -- to the Legal Department.
20  So, by inference, I guess I give it to my
21  boss.
22  Q.   Okay.
23  A.   I don't know the specifics about
24  this.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  Q.  To the extent, in terms of the
2  audit that when you were there in 2013, to
3  the extent Legal was involved, it was
4  involved as it related to regulatory
5  compliance and day-to-day operations,
6  correct?
7       MR. McDONALD:  Object to the
8  form.
9  A.  Could you repeat?
10  Q.  Sure.
11       The legal involvement, when you
12  say you report to Legal, the legal
13  involvement on audits like the one we
14  talked about earlier in 2013, the legal
15  involvement, to your knowledge, was
16  relevant -- was related to regulatory
17  compliance issues, correct?
18       MR. McDONALD:  Object to the
19  form.
20  BY MR. MIGLIORI:
21  Q.  As opposed to ongoing litigation
22  or things like that?
23       MR. McDONALD:  Object to the
24  form.

Page 227

1  A.  Can't answer that.  I don't
2  really, you know, understand.  Or, you
3  know, assume yes, but I don't know.
4  Q.  All right.  You weren't aware in
5  2013 of any legal action that -- that the
6  Legal Department was consulting with you
7  on?
8  A.  No, sir.  Not at all.
9  Q.  The memo that -- that was
10  prepared for you to share with the CEO of
11  the company then goes on to say that one
12  of the main findings, in the 2012 audit:
13  One of the main findings was that the
14  suspicious order monitoring system should
15  be returned periodically -- re-tuned
16  periodically so that algorithms and
17  coefficients can be adjusted, if
18  necessary, to insure optimal sensitivity.
19  This was also highlighted during the
20  internal assessment conducted by
21  Regulatory in December of 2013.
22       Is that reference to the 2013
23  assessment the one that we've been talking
24  about, that is the one conducted by --

Page 228

1  A.  It's the only one that I'm aware
2  of, sir.
3  Q.  Okay.
4  A.  Yep.
5  Q.  (Reading)  Partnering with
6  industry recognized consultants, Henry
7  Schein suspicious order monitoring was
8  re-tuned in phases.  The first one was
9  completed on May 1st, 2015.
10       Does that refresh your
11  recollection as to when the first SOM
12  automated re-tuning was completed?
13  A.  Yes, it makes sense.
14  Q.  All right.
15  A.  Yeah.
16  Q.  So, all of the recommendations
17  that we saw about the system being out --
18  outdated, the first re-tune would be
19  referring to this May 1st, 2015 re-tune?
20       MR. McDONALD:  Object to the
21  form.
22       MR. MIGLIORI:  Let me state that
23  differently.
24

Page 229

1  BY MR. MIGLIORI:
2  Q.  One of the findings of the 2013
3  audit, the first finding, had to do with
4  the computerized system being outdated.
5       Do you recall that?
6  A.  Yes, sir.
7  Q.  This reference in your memo to
8  the CEO of the company said that in
9  addressing that issue, the first re-tune
10  with input from Buzzeo was completed in
11  May of 2015, correct?
12  A.  That's what it says, yes.
13  Q.  All right.  And the final phase
14  went live on November 1st of 2017.
15       Is that correct?
16  A.  Yes, sir.
17  Q.  Do you know what the final phase
18  was?
19  A.  The difference, I don't, sir.
20  Q.  All right.  So, with respect to
21  findings in 2012, then again in 2013,
22  according to this memorandum, as it
23  related to re-tuning and fixing the -- the
24  SOM, updating the SOM computerized system,

Page 230

1 the first re-tune first phase was
2 completed in May of 2015 and the final
3 phase was completed November 1st of 2017,
4 correct?
5     A.   That's what it says.  Yes, sir.
6     Q.   (Reading)  In order to insure
7 compliance with the current requirements
8 and regulator's expectations, we have
9 contacted three of our DEA consultants to
10 conduct another audit on our SOM and KYC
11 program.  One of them is Buzzeo, who has
12 an established SOM program compliance
13 audit.  We're also discussing audits with
14 Quarles and Brady and Cadwalader
15 Wickersham and Taft and are waiting for
16 their proposals.
17         Do you recall the outcome of
18 reaching out to the other two outside
19 vendors?
20     A.   We just decided to go with Hyman
21 Phelps.
22     Q.   Okay.  Which is a fourth one?
23     A.   Yes.
24     Q.   Okay.  And, tell me what you've

Page 231

1 retained Hyman Phelps to do.
2     A.   They came in to overview a lot
3 of the due diligence questionnaire,
4 communications with the customers, kind of
5 overview the SOM process as well.
6     Q.   Okay.  When did you hire them?
7     A.   It was the fall.  I'm not sure
8 exactly the month.
9     Q.   The fall of 2018?
10     A.   '18, yes, sir.
11     Q.   And, have they completed their
12 assessment?
13     A.   Yes, they have.
14     Q.   And, is there a report of that
15 assessment?
16     A.   Yes, there is.
17     Q.   And, have you seen that report?
18     A.   I have.
19     Q.   And, did you review it
20 yesterday?
21     A.   I did not.
22         MR. McDONALD:  You did not.
23     A.   I did not.  Sorry.
24     Q.   It's not one of the documents

Page 232

1 you brought with you to the meeting?
2     A.   No.
3     Q.   I can represent to you it's not
4 one of the documents that's been given to
5 me today.  So I'll have to ask you from
6 your memory.
7         What were the outcome or
8 findings of that report?
9         MR. McDONALD:  Well, hang on.
10 So, I need to -- before he
11 discloses that, I need to visit with
12 my co-counsel to see if we're claiming
13 privilege on that since that was --
14 that report is done by a law firm.
15         MR. MIGLIORI:  Well, can I ask a
16 couple foundational questions on it,
17 to his knowledge?  In other words, to
18 your knowledge --
19         MR. McDONALD:  Quarles and Brady
20 is a law firm, as you know.
21         MR. MIGLIORI:  So are two of
22 these others.
23         MR. McDONALD:  Correct.
24         MR. MIGLIORI:  And, so, let me

Page 233

1 ask a few questions, and then I will
2 respect that request.  I won't ask
3 about the substance of it.
4 BY MR. MIGLIORI:
5     Q.   As you report to the CEO of the
6 company in this email, you're saying that
7 in order to insure compliance with the
8 current requirements and regulator's
9 expectations, we have contacted three of
10 our DEA consultants to conduct another
11 audit on our SOM and Know Your Customer
12 program.
13         That was the purpose of reaching
14 out to outside consultants, correct?
15         MR. McDONALD:  Object to the
16 form.
17 BY MR. MIGLIORI:
18     Q.   That's what you report to the
19 head of the company, correct?
20     A.   Yeah.  So, we were looking to
21 continuously evaluate and improve our
22 systems.
23         Yes, I'm reporting to him about
24 that.

Page 234

1  Q.  So, the retention of the outside
2  consulting firm at issue in this
3  memorandum is for the purpose of making
4  sure that you were in compliance with
5  regulatory requirements for controlled
6  substances, correct?
7       MR. McDONALD:  Well, object to
8  the form.
9  A.  No, I don't think it's -- I -- I
10 beg to differ.
11      It's semantics again, so.
12 Q.  Correct me.
13 A.  I think it's really about the
14 fact that we have systems we feel we are
15 compliant and we're looking to button up
16 any loose ends that we might find.
17      So, that we were not in
18 compliance, I disagree with that comment.
19 Q.  And, if I suggested you weren't
20 in compliance, I actually agree with your
21 disagreement.  I didn't mean to.
22 A.  Woo-hoo.
23 Q.  More simply stated, this
24 memorandum to the CEO of the company says

Page 235

1  that it is your intent to talk to Buzzeo
2  and two other companies.
3       And these two other companies
4  are law firms; aren't they?  Is Quarles
5  and Brady a law firm?
6  A.  Yes.
7  Q.  And Cadwalader Wickersham and
8  Taft, that's a law firm?
9  A.  Yes.
10 Q.  So, your effort to, quote,
11 insure compliance with the current
12 requirements and regulator's expectations,
13 was addressed by reaching out to these
14 outside vendors, correct?
15      MR. McDONALD:  Object to the
16 form.
17 A.  We're be looking --
18      MR. McDONALD:  Object to the
19 form.
20 A.  We're looking for confirmation
21 of what we have in place is meeting the
22 requirements and if there's areas of
23 improvement, we would be engaged in the
24 process to fix them.

Page 236

1  Q.  And specifically, when you talk
2  about meeting your requirements, you were
3  talking about going to these DEA
4  consultants to conduct another audit on
5  our suspicious order monitoring and Know
6  Your Customer programs.  That's the
7  requirements that you're referring to,
8  correct?
9  A.  That's the heart of our systems,
10 yes.
11 Q.  All right.  And, so, you reached
12 out to Buzzeo and two law firms, as you
13 were representing here, at least in May of
14 2018, and you ended up going with yet a
15 fourth option, another law firm called
16 Hyman and --
17 A.  Phelps.
18 Q.  Phelps.
19      MR. McDONALD:  Object to the
20 form.
21      There's no representation in
22 here about anything to the CEO.  This
23 is a draft email from Sergio to him of
24 what he might send to the CEO.

Page 237

1       MR. MIGLIORI:  Right.  I --
2       MR. McDONALD:  No.
3       MR. MIGLIORI:  I'm perfectly
4  comfortable with your --
5       MR. McDONALD:  Okay.
6  BY MR. MIGLIORI:
7  Q.  You don't know if this ever got
8  cents, or do you know if this ever got
9  sent?
10 A.  Sitting here today, I'm not
11 sure.  I believe it did, but I --
12 Q.  Okay.
13 A.  I wouldn't swear on a stack of
14 bibles right now.
15 Q.  Okay.  Certainly the intent was
16 to prepare this memorandum for you to
17 share with the CEO of Henry Schein,
18 correct?
19 A.  Yes.
20 Q.  All right.  And it was your
21 intent in sharing this information with
22 the CEO of Henry Schein to inform him
23 that, as a result of the 2012 and 2013
24 audits, and as a result of the re-tuning

Page 238

1 that was done in 2015 and 2017, it was
2 your belief that it was necessary to vet
3 outside vendors to make sure that you're
4 all in compliance with the current
5 requirements and regulator's expectations
6 as it related to suspicious order
7 monitoring programs and Know Your Customer
8 programs, correct?
9     MR. McDONALD:  Object to the
10 form.
11     Go ahead.
12     A.   So, the statement that it was
13 necessary, I'll object to that.
14     I think it's best practices.  At
15 the end of the day, it's best practices to
16 evaluate your systems, to look to improve
17 them, and, you know, make sure that
18 they're the best they can be.
19     Q.   Okay.  It wasn't necessary, but
20 you were recommending it?
21     A.   Of course, yes.
22     Q.   All right.  And, whether you
23 sent this memorandum to the CEO of the
24 company, you, in fact, did interview three

Page 239

1 companies and a fourth company for this
2 purpose of finding a consultant to insure
3 compliance with current requirements and
4 regulator expectations as to suspicious
5 order monitoring and Know Your Customer
6 programs, correct?
7     A.   We did.
8     Q.   All right.  And, ultimately, as
9 a result of that process, you went with
10 Hyman and Phelps, correct?
11     A.   Yes.
12     Q.   And you were personally involved
13 in the retention of Hyman and Phelps?
14     A.   I believe I signed the contract,
15 yes.
16     Q.   And you believe you signed that
17 contract in the summer of 2018?
18     A.   Early fall.
19     Q.   And, so, a contract of retention
20 exists for this particular assignment?
21     A.   Statement of work for the
22 activity that we requested and a price.
23     Q.   And a statement of work was
24 consistent with what I just read?

Page 240

1     MR. McDONALD:  Object to the
2 form.
3     If you know, tell him, but don't
4 guess.
5     A.   Can't guess.  I'm not sure a
6 hundred percent.
7     Q.   Okay.  And, did they -- they
8 performed an audit as a result of your
9 retention, correct?
10     A.   Yes, they did.
11     Q.   And that audit was an on-site
12 audit?
13     A.   Yes, sir.
14     Q.   Did it also -- was there a
15 term -- was it also a desk audit?
16     A.   I'm not sure.
17     Q.   Did they go out to the
18 distribution centers?
19     A.   No, sir.
20     Q.   Was it just in Melville, New
21 York?
22     A.   Yes, sir.
23     Q.   Did they go to any Verifications
24 Team in Reno?

Page 241

1     A.   No, sir.
2     Q.   Did they have anybody from the
3 various national offices come in to
4 Melville for the audit, to your knowledge?
5     A.   I'm not sure, sir.
6     Q.   Did they review due diligence
7 files?
8     A.   That, I'm sure they did.
9     Q.   Did they review the pended order
10 database?
11     A.   Can't say for sure.
12     Q.   Did they review the suspicious
13 order monitoring reporting?
14     A.   Can't say for sure.
15     Q.   Do you know whether they
16 reviewed the ARCOS data reports?
17     A.   Can't say for sure.
18     Q.   In the end, they issued a report
19 which they sent to you?
20     A.   I believe they sent it to Sergio
21 and to Frank O'Regan and I was copied,
22 sure.
23     Q.   And they sent it to Sergio and
24 Franco as --

Page 242

1    MR. MIGLIORI: Strike that.
2    Q.   Did Sergio and Franco --
3    MR. McDONALD: It's Frank. Not
4  Franco.
5    MR. MIGLIORI: Frank. Sergio
6  and Frank.
7  BY MR. MIGLIORI:
8    Q.   Did Frank and Sergio serve as
9  the facilitators cooperating with their --
10   A.   Absolutely, yes.
11   Q.   And, so, the report was sent to
12 them.
13       And, was action taken as a
14 result of their report in terms of, as we
15 saw in the last few documents, proposed
16 changes?
17       MR. McDONALD: You can say yes
18 or no, but don't reveal any content
19 until we get --
20       MR. MIGLIORI: It's a yes-or-no
21 question right now.
22   A.   I believe so.
23   Q.   Okay. And, were you part of the
24 process of coming up with those

Page 243

1  recommendations?
2    A.   No, sir.
3    Q.   Were you part of the process of
4  deciding whether or not to implement those
5  recommendations?
6    A.   No, sir.
7    Q.   All right. If I pursue the
8  findings, are you going to want to wait
9  until you can talk to your client?
10       MR. McDONALD: I do. I want
11 to --
12       MR. MIGLIORI: All right. Then
13 we can put that on the record and
14 we'll deal with it after you've let me
15 know after talking to your client. I
16 want to pursue it.
17       MR. McDONALD: We can take a
18 break right now.
19       MR. MIGLIORI: We can do it
20 after the break. We can plow through
21 some more stuff.
22       MR. McDONALD: That's fine.
23       MR. MIGLIORI: But I do
24 represent, so you know, that I don't

Page 244

1  have it. I have a document from you
2  saying that you've substantially
3  complied with discovery, and so I
4  just -- obviously it's something I
5  want to further explore. And we could
6  do that whenever.
7        MR. McDONALD: Sure.
8        MR. MIGLIORI: Okay.
9        (Peacock Exhibit 16, email dated
10 July 19, 2018, with attachment, Bates
11 No. HSI-MDL-00433692, was marked for
12 identification, as of this date.)
13 BY MR. MIGLIORI:
14   Q.   Exhibit 16. This is a July
15 19th, 2018 email from you to Sergio Tejeda
16 regarding DEA slides for July 2018 Henry
17 Schein Incorporated board of directors
18 advisory committee meeting.
19       Did you review this in
20 preparation for today?
21   A.   Yes, sir.
22   Q.   And, do you recall what the
23 context was of this meeting?
24   A.   So, I am part of a subcommittee

Page 245

1  of the -- including the legal
2  representation, my boss, and four board
3  members. We call it the Board of
4  Directors Regulatory Compliance Committee.
5  The compliance officer is also part of
6  that, when I talk about other compliance
7  issues, and I kind of give them the state
8  of affairs of other DEA compliance
9  process.
10   Q.   Okay. Can you repeat for me the
11 name of the committee?
12   A.   The Board of Director -- BOD
13 Regulatory Compliance Committee.
14 Subcommittee, because it's not a full
15 board.
16   Q.   Okay. It's a subcommittee to
17 the board of directors of the company?
18   A.   That's correct.
19   Q.   All right. And, is there a
20 chairperson of that committee?
21   A.   My boss, Walter Siegel, and Joe
22 Herring of the board.
23   Q.   H-E-R-R-I-N-G?
24   A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    Q.   Okay.  And, who are the members
2  of the committee?
3    A.   Michael Ettinger, Nancy Lanis,
4  Kurt Kuhn, who's a board member.  I don't
5  know her name.  Carol Raphael?  Carol
6  Raphael.
7    Q.   Okay.
8    A.   And I'm struggling with the last
9  one.
10   Q.   And you?
11   A.   And me.
12   Q.   Anyone else from Regulatory --
13   A.   No.
14   Q.   -- or Verifications?
15       Okay.  So, there are some board
16  members and there are some, are the others
17  mostly senior-level management?
18   A.   Yes.
19   Q.   Okay.  And this subcommittee
20  deals with all types of regulatory
21  compliance, not just controlled
22  substances?
23   A.   Yes, everything.  All compliance
24  issues and regulatory issues.

Page 247

1    Q.   Certainly within that, it
2  includes the DEA and -- and controlled
3  substances, correct?
4    A.   That's correct.
5    Q.   And, so, Sergio, did he prepare
6  these slides for you for purposes of this
7  presentation?
8    A.   Yes, he did.
9    Q.   Does this subcommittee meet
10  regularly?
11   A.   Quarterly.
12   Q.   And, do you present quarterly of
13  your -- your events of the quarter?
14   A.   Not always.  So it kind of
15  depends on flow of the meeting, the agenda
16  topics, et cetera.
17   Q.   Okay.  Do you know why you were
18  reporting in July of this year to the
19  board?  Was there a particular impetus for
20  this report?
21   A.   I don't recall, no.  I mean,
22  it's one of the -- one of the topics,
23  right, key topic, quality issues,
24  regulations like I mentioned in the

Page 248

1  beginning of the morning about the medical
2  device regulation in Europe, that would be
3  something that I reported to them on.
4    Q.   Is it possible in that the
5  memorandum that we were just talking about
6  that you and Sergio were working on back
7  in May to be presented to the CEO about
8  hiring an outside vendor, is it possible
9  that that was one of the issues at this
10  quarterly meeting?
11       MR. McDONALD:  Object to the
12   form.
13  BY MR. MIGLIORI:
14   Q.   Hiring Hyman Phelps?
15       MR. McDONALD:  Object to the
16   form.
17   A.   Hiring for the -- I'm -- the
18  board, no.
19   Q.   Yeah.
20       Would this meeting have involved
21  any of the issues in the prior exhibit of
22  going to an outside vendor in order to get
23  another auditor assessment?
24   A.   I believe this was just about

Page 249

1  communications about what the rules were,
2  where the -- where the -- where we stand,
3  et cetera.  There was no ask or specific
4  action item that we were taking.
5    Q.   Okay.  This flowchart on page 1
6  that's up on the screen now:  DEA
7  Compliance Processes:  Follow the order.
8       Do you recall who put this
9  together?
10   A.   Sergio.
11   Q.   Did he do it for this meeting?
12   A.   I can't say for sure.  He may
13  have had it for other purposes, but --
14   Q.   Okay.  And, was this part of
15  the -- the, let's see what word you've
16  used.  The improvement or the re-tuning of
17  the system.  Is this the system as it
18  existed in July of 2018?
19   A.   Yes, I'm -- that's my
20  understanding.  Yes.  This is current.
21   Q.   And then this history on page 2
22  that's provided, is this a history that
23  Sergio put together?
24   A.   Yes, sir.

Page 250

1    Q.   So, he talks about setting up
2  the suspicious order monitoring system in
3  2018, its implementation being completed
4  in 2009.
5        Is that consistent with your
6  understanding of how things evolved?
7    A.   From the documents that I've
8  seen.
9    Q.   Okay.  That the 2012 Buzzeo
10 audit resulted in some recommendations.
11       There's no reference here to
12 2013 internal audit, is there?  Or am I
13 missing it?
14       Is that -- is this develop
15 multiyear plan for implementation?
16   A.   I think it could be understood
17 there.
18   Q.   Okay.  The 2015 first phase
19 re-tuning was completed by Richmond
20 Analytics?
21   A.   Yes.
22   Q.   Does that sound right?
23   A.   Yes.
24   Q.   And Buzzeo?

Page 251

1    A.   Yes.
2    Q.   So, that May phase 1
3  implementation was both Richmond Analytics
4  and Buzzeo?
5    A.   That's correct.
6    Q.   The November 2017 final phase
7  implementation of the re-tuning of the
8  suspicious order monitoring program at
9  Henry Schein was the Profit -- was done by
10 ProfitOptics?  Is that the second phase?
11   A.   Yes.
12   Q.   And then 2018 it says:  Schedule
13 by year-end to receive a consultant
14 assessment of our DEA compliant process.
15 Assessment will be focused on our Know
16 Your Customer Due Diligence and Suspicious
17 Order Reporting processes.
18       Is that the Hyman Phelps --
19   A.   It is, sir.
20   Q.   -- audit?
21   A.   Yes, sir.
22   Q.   Is it fair to say the Hyman
23 Phelps audit focuses on those two issues,
24 the Know Your Customer and suspicious

Page 252

1  order monitoring processes?
2    A.   Is it fair?  Yes, sir.
3    Q.   That's way too involved.
4        Let's go to the next one, page
5  4.
6        Are these -- there's a list of
7  some penalties paid by Henry Schein.  All
8  but one predates your involvement.  And
9  the one after which you're hired seems to
10 be outside of your system.
11       Is that fair to say?
12   A.   That is correct.
13   Q.   So, I assume you have no
14 knowledge or information about Henry
15 Schein's warning letter in 1998 from the
16 State of Ohio, correct?
17   A.   That would be a correct
18 assumption.
19   Q.   All right.  But you did keep
20 track of and report to the company the
21 much more substantial fines and penalties
22 paid by the other distributors of
23 controlled substances, correct?
24   A.   Yes.

Page 253

1    Q.   And I assumed -- well, I don't
2  want to assume.
3        Why -- why would you report that
4  information to the -- the board, or the
5  subcommittee?
6        MR. McDONALD:  Object to the
7  form.
8  BY MR. MIGLIORI:
9    Q.   What was the purpose of
10 including that in this report, if you
11 recall?
12   A.   Awareness to what's possible.
13   Q.   The risk?
14   A.   Yes.
15   Q.   All right.  Do you recall
16 actually giving this presentation?
17   A.   Yes.
18   Q.   Did anything come of that
19 presentation in terms of changes or
20 outcomes or new programs?
21   A.   Not specifically that I recall,
22 no.
23       MR. MIGLIORI:  Let's do this one
24 quickly.  This is number 17.

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    (Peacock Exhibit 17, email chain
2  ending July 18, 2018, with attachment,
3  Bates No. HSI-MDL-00209427 to
4  00209428, was marked for
5  identification, as of this date.)
6  BY MR. MIGLIORI:
7    Q.   This appears to be the same
8  document.  I probably should have just
9  used this one.
10     So, this is a email exchange
11  with Nick DeLucia and Francis O'Regan with
12  the presentation that we just walked
13  through.
14     Do you recall why they were
15  involved or how they were involved with
16  preparing this presentation?
17    A.   Well, they work for Sergio.  So
18  it's very likely that they actually did
19  the assembly of some of the content.
20    Q.   Okay.
21    A.   Or maybe all of the content.
22    Q.   Sure.
23     It says July 18th.  It says:
24  Frank - Nick's writing to Frank - This was

Page 255

1  the final version that I sent to Jeff.
2  There was one clarification I sent him in
3  an email regarding the attributes to
4  create a customer peer group in the SOMs.
5  It's now practice size rather than
6  practice type.
7     What's a customer peer group, if
8  you know?
9    A.   I don't know specifically.  I
10  would assume it's the type of practice,
11  but I can't assume.
12    Q.   All right.  If you can, just
13  jump ahead to page 2.
14     This one has a chart in it that
15  the other one didn't have, and it appears
16  to be a Know Your Customer Due Diligence
17  graphic.
18     Do you see it?
19    A.   I think it was on here, but it
20  got cut off.
21    Q.   Yeah, that's what I'm trying to
22  figure out.  Is it -- that's how it was
23  produced to us.  Let's use the one that we
24  can actually see.

Page 256

1    A.   Yeah.
2    Q.   Just briefly.
3    A.   Okay.
4    Q.   So, in this history of Schein's
5  SOMs and Know Your Customer Due Diligence
6  development, is it fair to say that you've
7  separated out, at least for this
8  presentation, the two components, that is
9  the computerized system and threshold
10  model to kick out potentially suspicious
11  orders, correct?
12    A.   Correct.
13    Q.   And then the Know Your Customer
14  Due Diligence requirements to be compliant
15  with DEA regulations, correct?
16    A.   Yes.
17    Q.   And the Know Your Customer Due
18  Diligence has different -- it's not just
19  triggered by the statistical computerized
20  model, correct?
21    A.   Could you repeat the question?
22    Q.   Yeah.
23     The Know Your Customer
24  obligations are ongoing.  They're not

Page 257

1  triggered by the -- only by the
2  statistical computerized suspicious order
3  monitoring system, correct?
4    A.   That's correct.
5    Q.   In fact, according to this
6  presentation, that there is Know Your
7  Customer obligations at the onboarding of
8  a new customer, bringing on a new
9  customer, correct?
10    A.   Yes.
11    Q.   There's Know Your Customer Due
12  Diligence in verifying all of the licenses
13  of the customers, correct?
14    A.   Yes.
15    Q.   The due diligence reviews are
16  due diligence reviews that are not only
17  triggered by events or orders, but there
18  is a -- there is a recommendation by
19  your -- your internal team that audits
20  happen on an ongoing basis, even of
21  existing customers, not just new
22  customers.
23     Correct?
24    A.   Could you restate that?  I got

Page 258

1 confused.
2    Q.  Sure.
3      The due diligence review is not
4 just for onboarding or for a triggered
5 suspicious event, correct?
6      MR. McDONALD: Object to the
7   form.
8    A.  Not just for onboarding or
9 triggered?
10    Q.  Right.
11      There is an obligation to be
12 compliant, to have a continual knowledge
13 and a present knowledge of your customers
14 dispensing history?
15    A.  That's correct, yes.
16    Q.  Okay. And that includes things
17 like site visits, as this graphic --
18    A.  May include site visits.
19    Q.  Okay. I wasn't sure why that
20 was in one and not the other. But I
21 should have asked you that.
22    A.  Yeah. I actually think it was
23 on this one and just got blown off however
24 it was reproduced or whatever.

Page 259

1      MR. MIGLIORI: Let me do a
2   couple more documents. Then we'll
3   take a break, and then we'll finish
4   up.
5      (Peacock Exhibit 18, email chain
6   ending January 26, 2016, Bates No.
7   HSI-MDL-00156897 to 00156899, was
8   marked for identification, as of this
9   date.)
10      MR. MIGLIORI: This is
11   Exhibit 18.
12      (Pause.)
13 BY MR. MIGLIORI:
14    Q.  I want to show you Exhibit 18.
15 This is an email exchange between Tina
16 Steffanie-Oak and Beverly Butcher
17 regarding Richard Mason.
18      Did you review this document in
19 preparation for today? It also includes
20 an email from DEA, a diversion
21 investigator.
22    A.  I don't recall yesterday.
23   I'm sorry.
24    Q.  All right. If you start from

Page 260

1 the back, do you know Donna Tomaselli?
2    A.  Not personally.
3    Q.  Okay. Do you understand, at
4 least from her signature line, that she's
5 a compliance analyst --
6    A.  Yes.
7    Q.  -- Americas?
8    A.  Yes.
9    Q.  Is that sort of a frontline
10 person on due diligence?
11    A.  Yes.
12    Q.  She wrote to William Crawford,
13 that you'll see is a DEA diversion
14 investigator, right?
15      Do you actually know William
16 Crawford?
17    A.  I do not.
18    Q.  Okay. She writes: Enclosed is
19 the requested information for Richard
20 Mason. Please confirm your receipt.
21      And he wrote back and, that is
22 the DEA agent, investigator: I have some
23 information concerning Dr. Richard Mason
24 that needs to be brought to the attention

Page 261

1 of Henry Schein compliance. Should I send
2 it to you? If not, please let me know who
3 to send it to.
4      And then she responds: Yes,
5 send it to me and Shaun as well.
6      Does this refresh any of your
7 recollection whether or not you may have
8 seen this before?
9    A.  I don't recall, no.
10    Q.  All right. The DEA investigator
11 writes to Donna and now to Shaun Abreu,
12 both from Verifications: Here in Ohio
13 doctors that dispense are required to
14 report to the Ohio prescription drug
15 monitoring program, OARRS. OARRS reports
16 that Dr. Mason has never reported any
17 dispensing.
18      Within your system, you agree
19 with me that Henry Schein is required in
20 knowing its customer to do verifications
21 both at the federal and state levels of --
22 of their customers, correct?
23      MR. McDONALD: Object to the
24   form.

Page 262

1   A.   Yes.
2   Q.   Okay.  And that would include
3  the OARRS system in Ohio, correct?
4       MR. McDONALD:  Object to the
5  form.
6   A.   This predates me.  I'm not
7  familiar with the OARRS system.
8   Q.   Well, this is 2016.  So it
9  doesn't predate you.
10      You may not be familiar.  I
11 accept that.  But this doesn't predate
12 you, correct?
13  A.   No.  I was reading the 2012
14 order.
15      Yes.
16  Q.   Okay.  So, the DEA writes:  I
17 ran across -- I ran ARCOS and found that
18 Mason ordered 10,000 hydrocodone since
19 2012.  I went to his practice to inspect
20 his records, which he could not produce.
21 I gave him time to find the records and
22 arranged a time to return for inspection a
23 few days later.  The state pharmacy board
24 went to inspect his records.  At which

Page 263

1  time, Dr. Mason admitted to them that he
2  lied to me and he had no dispensing
3  records because he was addicted to
4  hydrocodone and had been ordering
5  hydrocodone from your company for his
6  personal use.  If you need any additional
7  information, please let me know.
8       Now, I assume you don't recall
9  this yourself, correct?
10  A.   I never saw this.
11  Q.   Is this something, if presented
12 to Verifications, would get escalated to
13 Regulatory?
14      MR. McDONALD:  Object to the
15 form.
16  A.   May or may not.  Not sure.
17  Q.   At this stage, could -- it says
18 in the subsequent email, Donna writes
19 back, or writes to Tina in your
20 department:  We will restrict the account
21 today.  I have attached what was sent to
22 Investigator Crawford on December 10th.
23      So, is this something that
24 typically in your system your department

Page 264

1  would be informed of?
2   A.   Yes.
3   Q.   All right.  When that happens,
4  what happens next within Regulatory?  If
5  you were to receive this in Regulatory in
6  2016, what are the next steps, if any, in
7  the Know Your Customer obligations at
8  Schein?
9       MR. McDONALD:  Object to the
10 form.
11  A.   I don't know specifically.
12 My -- my intent would there be an
13 investigation, understand what the -- Dr.
14 Mason's forms looked like, what he did and
15 what he said and what he lied to us about.
16  Q.   Okay.
17  A.   And to see also whether or not,
18 you know, those 10,000 hydrocodones,
19 whether they came from us alone or whether
20 there were multiple distributors that he
21 was shopping at to meet his needs and to
22 stay under the radar.
23  Q.   And you see that the DEA
24 investigator actually looked to the state

Page 265

1  reporting system and to the ARCOS
2  transactional data and followed that up
3  with an on-site visit.  That's how this
4  issue came to his attention.
5   A.   Correct.
6   Q.   And that's consistent with the
7  Know Your Customer process at Henry
8  Schein, that -- that verifying or turning
9  to those transactional databases and doing
10 on-site visits is part of a Know Your
11 Customer Due Diligence good practice,
12 correct?
13      MR. McDONALD:  Object to the
14 form.
15  A.   Yeah, all areas of Know Your
16 Customer is good business.
17  Q.   Okay.  And, we know, at least
18 from this email, that one response was
19 Verifications restricted Dr. Mason's
20 account.
21      Do you know what the term
22 "restricted" means?
23  A.   He'll no longer be able to buy
24 controlled substances from us.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.   Is it just controlled
2   substances?
3    A.   I believe it's all
4   pharmaceuticals, but he's still able to
5   buy medical devices.
6    Q.   Okay.
7    A.   Dental or medical devices.
8    Q.   Do you know what happened with
9   respect to Dr. Mason's account after this
10  time?
11   A.   I do not.
12   Q.   If you wanted to find that out,
13  where would you go?  Where would you go?
14   A.   First I would go to Shaun Abreu
15  to see whether or not there was any
16  follow-up and whether the restriction's
17  still in place, which I would assume it
18  is.
19   Q.   Okay.  Is there another level of
20  action which is a suspension, a
21  termination, a disconnect?
22   A.   Restriction's the highest.
23  You're not buying pharmaceuticals from us.
24   Q.   Okay.  The first person you

Page 267

1   would go to in that scheme, in the scheme
2   of Henry Schein, would be Shaun Abreu?
3    A.   Yeah.
4    Q.   In Verifications?
5    A.   That's correct.
6    Q.   Would Sergio Tejeda have any
7   information on this?
8    A.   Yeah, he probably would have it
9   also on the FileMaker Pro database that we
10  have.
11   Q.   At this stage, once something's
12  restricted, is there an obligation in
13  either Verifications or Regulatory to do
14  anything further, other than restrict?
15   A.   We always notify the DEA when we
16  restrict any customer.
17   Q.   Okay.  And, in this case, when
18  you were told of it from the DEA,
19  presumably that wasn't a necessary step?
20   A.   Can't say for sure.
21   Q.   Okay.
22   A.   But I would assume that, yes.
23   Q.   Is there a report that's
24  generated weekly, monthly, quarterly, of

Page 268

1   all accounts that have been restricted?
2    A.   Yes, sir.
3    Q.   And, where is that housed?
4    A.   It's in the SharePoint data.
5    Q.   And, what's that file called?
6    A.   Restricted accounts.
7    Q.   So, there is a database of
8   restricted accounts that are -- I assume
9   it's a searchable database?
10      MR. McDONALD:  Object to the
11  form.
12      If you know, tell him.
13   A.   Can't say.  I don't know.
14   Q.   If you asked Sergio or Shaun to
15  go get me every doctor who has a
16  restricted account in Summit County, Ohio,
17  or in the State of Ohio, do you think that
18  they would be able to generate such a
19  report?
20      MR. McDONALD:  Object to the
21  form.
22   A.   I don't know how long it takes,
23  but I'm pretty sure they could generate
24  that report.

Page 269

1    Q.   The data would be there?
2    A.   Yeah, the data's there.
3    Q.   And it lives electronically --
4    A.   Correct.
5    Q.   -- somewhere?
6    A.   Yes.
7    Q.   And it's called the restricted
8   accounts --
9    A.   Yes.
10   Q.   -- database?
11      MR. McDONALD:  We've been going
12  a while.  So why don't we take a break
13  whenever you get to a good spot.
14      MR. MIGLIORI:  Yes.  I'm
15  thinking maybe let me do this one
16  document, 'cause I just --
17      MR. McDONALD:  You're so excited
18  about it.
19      MR. MIGLIORI:  No, I'd rather
20  just move on to the next topic at the
21  end of the break instead of being in
22  the middle of one.
23      But, if you don't mind, just
24  give me one second.

Page 270

1    And I'm going to claim sickness
2  as my basis for my request.
3    THE WITNESS:  I'm not feeling
4  well either.
5    MR. MIGLIORI:  Excellent
6  response.
7    Yeah, let's take a break here
8  this way I can fine tune.
9    THE VIDEOGRAPHER:  Okay.  Remove
10  the microphones.
11    The time is 2:19 p.m.
12    Off the record.
13    (Recess taken.)
14    THE VIDEOGRAPHER:  Okay.  We are
15  back on the record.
16    The time is 2:33 p.m.
17    MR. McDONALD:  So, as requested,
18  we have visited about your questions
19  regarding the Hyman Phelps report.  As
20  we discussed off the record, there is
21  not a final report yet.  It is
22  under -- currently under legal review
23  for finalization with Hyman Phelps.
24    I don't agree at this time that

Page 271

1  that report is actually discoverable
2  in this case.  It was done after the
3  initiation of litigation against my
4  client.  But I will let the witness
5  answer questions regarding his
6  knowledge of his review of the draft
7  of the report.
8    MR. MIGLIORI:  I appreciate
9  that.
10    We'll reserve, subject to what
11  he testifies to and any other thoughts
12  on that, we'll reserve any further
13  argument or objection to it.  But I
14  appreciate the courtesy, and hopefully
15  this gets us to where we need.
16    MR. McDONALD:  And you agree
17  that this is not, to the extent it is,
18  we ultimately claim privilege, this is
19  not a blanket waiver of any privilege.
20    MR. MIGLIORI:  Understood.  We
21  can proceed with that understanding.
22  BY MR. MIGLIORI:
23    Q.  So, Mr. Peacock, the question
24  then is you did retain Hyman Phelps in

Page 272

1  2018 and they did conduct a audit and
2  assessment of some type, and a report, as
3  we understand now, a draft report did
4  result from that.
5    Did you, in fact, review a draft
6  of that report?
7    A.  I did.
8    Q.  To the best of your
9  understanding, what did that report
10  conclude or find?
11    A.  I think in terms of a general
12  conclusion is that the systems were, you
13  know, pretty robust.  There were certain
14  Know Your Customer questions that should
15  be modified, both for better detail from
16  the physician's office and -- let me see
17  what else.
18    That was the -- that was the
19  main juxt of it, is that the Know Your
20  Customer questions needed to be, you know,
21  tuned a little bit better.  And that's
22  about it.
23    Q.  Okay.  Did the assessment go
24  into both systems, both the computerized

Page 273

1  system and the Know Your Customer
2  components?
3    A.  There was issues with the -- in
4  the audit with the suspicious order
5  monitoring system.
6    Q.  Okay.
7    A.  And the reporting of that and
8  how the state reporting and the ARCOS
9  reporting was done.
10    Q.  Okay.  And, do you recall what
11  the issues were?  Was it overreporting,
12  underreporting?
13    A.  No, I didn't say it was either
14  of those.
15    I said the audit was actually
16  conducting of that.  There was -- I can't
17  recall any specific findings that we were
18  under or overreporting.
19    Q.  Okay.
20    A.  Yep.
21    Q.  So, there were some findings.
22  You just don't recall, as you sit here,
23  what they are with respect to the
24  suspicious order monitoring system?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    A.   Correct.  There may have been
2  findings.  I don't remember.
3  Recommendations maybe, but it was, yeah.
4    Q.   Okay.  On the Know Your Customer
5  side, it's your understanding that there
6  were some recommendations that the due
7  diligence letters have -- request greater
8  information or more detail?
9    A.   Clarity, yes.
10   Q.   Did the outcome of that audit
11  support the continued use of a written due
12  diligence letter as a Know Your Customer
13  process?
14       Do you know what I mean?
15   A.   There was no recommendation to
16  abandon a letter.
17   Q.   Okay.  So, we have -- we know
18  that letters generally are sent from
19  Verifications to doctors if there are
20  questions about pended or suspicious
21  orders.  That -- that's one of the first
22  things that the Henry Schein Know Your
23  Customer system does when something gets
24  flagged.

Page 275

1       Correct?
2    A.   Correct.
3    Q.   A form letter with blanks in it
4  gets sent to the doctor for the doctor to
5  complete and return by mail to Henry
6  Schein for review, correct?
7    A.   For a pended order, correct.
8    Q.   And a pended order in your
9  system is an order that's been triggered
10  by an algorithm to be a deviation from
11  size, frequency and pattern, correct?
12   A.   Yes.
13   Q.   So, we've already discussed
14  that.
15       But, the -- the concept being if
16  it can't be resolved on its face, one of
17  the first things that the Verifications
18  Team does is send out this form letter to
19  the doctor for answers and clarity on the
20  prescribing need.
21       Correct?
22   A.   So, that's correct, but we're
23  talking about the Hyman Phelps issues and
24  that was the Know Your Customer kind of

Page 276

1  diligence questionnaire, not necessarily
2  the letter.  So you've drifted to the
3  letter.
4    Q.   Well, and I appreciate it.
5  That's exactly what I was trying to get
6  to, but I was getting there slowly.
7       So, there is the letter that
8  goes out when there is a due diligence
9  requirement through the suspicious order
10  monitoring program and then there's the
11  onboarding due diligence that is the
12  original letter?
13   A.   Correct.
14   Q.   That's part of it.
15       Was the Hyman Phelps
16  recommendations, to your recollection,
17  regarding both or regarding the initial
18  onboarding due diligence form?
19   A.   My recollection is primarily on
20  the initial onboarding.
21   Q.   Okay.  Any other information or
22  findings that you can recall from this
23  relative to either due diligence or SOMs?
24   A.   No, sir.

Page 277

1    Q.   Okay.  And, I don't know if this
2  is a question for you or for your counsel.
3       But, in terms of it being under
4  review right now, it's under review at
5  Hyman Phelps, or it's under review
6  internally, if you know?
7       MR. McDONALD:  I believe it's
8  under review internally with Henry
9  Schein.
10       MR. MIGLIORI:  Okay.  I
11  appreciate that.
12       We'll deal with any issues that
13  come out of that, but that's helpful
14  to me and I appreciate it.
15       (Peacock Exhibit 19, letter
16  dated November 9, 2012, Bates No.
17  HSI-MDL-00397293 to 00397294, was
18  marked for identification, as of this
19  date.)
20  BY MR. MIGLIORI:
21   Q.   Let me show you Exhibit 19.
22       We'll start wrapping this up.
23       In November of 2012, you weren't
24  yet at the company, but this is a letter

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 from Sergio Tejeda, who had a title then
2 of director of regulatory operations and
3 compliance.
4     Did that title stay with him
5 after you became vice-president?
6     A.   Director of regulatory is what
7 he is now, so.
8     Q.   Okay.
9     A.   I think he shortened it up for
10 his business card.
11     Q.   Did somebody have your position
12 before you?
13     A.   Yes.
14     Q.   Who?
15     A.   Not as vice-president.
16     Gentleman by the name of Michael
17 DiBello.
18     Q.   Okay.  And Michael DiBello, his
19 title was what?
20     A.   Director.  Or senior director.
21 I'm not sure exactly.
22     Q.   He would have been above Sergio?
23     A.   Correct.
24     Q.   And he was just regulatory, not

Page 279

1 quality assurance or -- or do you know?
2     A.   Prior to my coming, they were
3 all mixed together.
4     Q.   Okay.
5     A.   So, Regulatory covered quality,
6 regulatory and trade compliance.
7     Q.   Got you.
8     And, did he leave the company
9 when -- just before you got there, or --
10     A.   Some time before, yeah.
11     Q.   And, were you hired specifically
12 to fill that spot?  Was that your
13 understanding, that it was his leaving the
14 company that --
15     A.   Yes.
16     Q.   -- created this vacancy?
17     A.   That's correct.
18     Q.   So, just before your arrival at
19 Henry Schein, Sergio Tejeda wrote this
20 letter to the Ohio State Board of
21 Pharmacy, and it references operations in
22 the State of Ohio.
23     Have you seen this before?
24     A.   I have not, sir.

Page 280

1     Q.   It simply says that:  Henry
2 Schein is a wholesale distributor of
3 prescription drugs licensed to distribute
4 pharmaceuticals in Ohio.  Presently Henry
5 Schein operates six distribution centers
6 licensed to sell prescription drugs in
7 Ohio.
8     Do you know which six
9 distribution centers that would be?
10     A.   Reno, Jacksonville, Denver,
11 Pennsylvania, Indianapolis, and Bastian.
12 And Bastian there's GIV and Insource, so
13 there's two there.
14     Q.   Okay.  He represents to the
15 Board of Pharmacy in Ohio:  The primary
16 customers for our distribution services
17 are office-based dental and medical
18 practitioners.
19     That's true in Ohio, correct?
20     A.   Correct.
21     Q.   And that's true nationally,
22 correct?
23     A.   Nationally, yes.
24     Q.   It says:  The purpose of this

Page 281

1 letter is to notify the Ohio Board of
2 Pharmacy of an issue that was recently
3 discovered while conducting a routine
4 internal review of operations.
5     What are the routine internal
6 reviews of operations at Schein?  Is that
7 the auditing process we discussed earlier?
8 Was it the 2012 audit?  Or do you know?
9     A.   I do not know what this is
10 stating.
11     Q.   It says:  During the course of
12 our internal review, we realize that Henry
13 Schein has been underreporting sales of
14 controlled substances to the Ohio Board of
15 Pharmacy as required by state's
16 prescription monitoring program, PMP.  The
17 reports included sales of products that
18 contain tramadol and carisoprodol, but did
19 not include the sale of other controlled
20 substances.  We believe the underreporting
21 error was due to misinterpretation and/or
22 miscommunication of the state requirement
23 that happened during the implementation of
24 the computer automated reporting system.

Highly Confidential – Subject to Further Confidentiality Review

Page 282

1    Were you aware that the
2 implementation of the new SOM program, a
3 computerized program that became effective
4 in, I guess, 2010, 2011, was
5 underreporting to the State of Ohio?
6    A.    I was not aware, no.
7    Q.    You understand that to be the
8 Buzzeo -- as it's described here, would it
9 be correct to interpret that to be the
10 Buzzeo system that was put in place as a
11 result of the -- the revamping that was
12 described in the history you gave to, or
13 intended to give to the CEO of the
14 company?
15    A.    I can't say for sure, but it
16 would appear to be.
17    Q.    Okay.  It says:  To date, Henry
18 Schein has consistently filed the reports
19 on a timely basis as required by the PMP,
20 and prior to the discovery of this issue,
21 Henry Schein was not aware the reports
22 were incomplete.  Please be reassured that
23 there was never any intent to avoid or
24 circumvent the company's obligation under

Page 283

1 Ohio state law, and as a act of good
2 faith, Henry Schein is providing all
3 controlled substance sales information,
4 which was mistakenly omitted for the
5 previous two years.  See enclosures.
6    So, did you ever become aware
7 that there were two years of data
8 underreported to the Ohio Board of
9 Pharmacy under the state law requirements
10 of reporting for controlled substances?
11    MR. McDONALD:  Object to the
12    form.
13    A.    As I stated previously, this was
14 before my time at the company.  I did not
15 become aware.
16    Q.    And, based at least on the
17 content of this letter, what was happening
18 was the computerized system was only
19 reporting two controlled substances,
20 tramadol and carisoprodol, but it wasn't
21 reporting other Schedule II drugs up until
22 this time, November 2, 2012.
23    Correct?
24    A.    Yes.  That's what it says here.

Page 284

1    Q.    So, for purposes of the Ohio
2 Board of Pharmacy, they would not have any
3 information, assuming this to be correct,
4 they would not have any information of
5 Henry Schein's sales and distribution of
6 hydrocodone, oxycodone, or any other
7 Schedule II or III controlled substances,
8 correct?
9    MR. McDONALD:  Object to the
10    form.
11    A.    Yeah, you're making the
12 assumption what we were selling at the
13 time, sir.
14    I really don't have knowledge of
15 what we were selling, but it's likely.
16    Q.    Assuming that you were selling
17 hydrocodone and oxycodone prior to
18 November of 2012, if this letter to the
19 Ohio Board of Pharmacy is accurate, Ohio
20 would not know of those sales through the
21 required PMP program, correct?
22    MR. McDONALD:  Object to the
23    form.
24    A.    Yeah, I don't know enough.  It

Page 285

1 would appear that, you know, there should
2 have been reporting and there were -- the
3 data was provided at the time of this
4 letter.
5    MR. MIGLIORI:  Okay.  Let me
6    show you Exhibit Number 20.
7    (Peacock Exhibit 20, letter
8    dated May 8, 2013, with attachment,
9    was marked for identification, as of
10    this date.)
11 BY MR. MIGLIORI:
12    Q.    Now, you signed on to -- you
13 signed on to Henry Schein in May of 2013,
14 correct, and you started in July, correct?
15    A.    I started in July, correct.
16    Q.    All right.
17    A.    I accepted the position in May.
18    Q.    All right.  In May, Exhibit 20,
19 the cover page is a letter from the State
20 Medical Board of Ohio to a Dr. Brian Heim
21 in Akron, Ohio, and it says:  Dr. Heim,
22 Please find enclosed certified copy of the
23 findings, order and journal entry approved
24 and confirmed by the State Medical Board

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  meeting in regular session on May 8th,
2  2013.
3      One of the verifications or due
4  diligence resources for Henry Schein would
5  be the state medical licensure boards,
6  correct?
7      A.   Please repeat.
8      Q.   Sure.
9      The Know Your Customer program
10  at Henry Schein includes looking to, among
11  other things, state medical licensure
12  boards for information, correct?
13      A.   Yes, sir.
14      Q.   It would also include boards of
15  pharmacy in states, correct?
16      A.   That's correct.
17      MR. McDONALD:  Object to the
18  form.
19  BY MR. MIGLIORI:
20      Q.   All right.  On May -- if you
21  turn to, I don't know how to identify it
22  for you other than there's one page that's
23  got an Exhibit 1 sticker on it that's
24  about halfway through the stack.  They're

Page 287

1  not Bates numbered, and I apologize.
2      A.   Is this it up here?
3      Q.   Yeah.  So, it looks like this
4  (indicating).
5      It says Daniel Horrigan May 8th,
6  2012, 3:10 p.m. in the Court of Common
7  Pleas, County of Summit, Ohio.  Indictment
8  type.
9      A.   Yep.
10      Q.   You see that on -- this is filed
11  on May 18th of 2012, an indictment for
12  aggregated -- aggravated -- I'm sorry.
13  Aggravated trafficking in drugs,
14  aggravated trafficking in drugs tampering
15  with evidence.  And it relates to Brian D.
16  Heim of Akron, Ohio.
17      Do you see that?
18      A.   Yes.
19      Q.   All right.  When you're -- when
20  Henry Schein does due diligence, does it
21  turn to criminal records, or does it rely
22  on representations of its doctors about
23  criminal activity?
24      MR. McDONALD:  Object to the

Page 288

1  form.
2      If you know, tell him.
3  BY MR. MIGLIORI:
4      Q.   If you understand my question.
5      A.   I do not know whether or not we
6  look at criminal records like this.
7      Q.   I'm going to have you just set
8  that aside for a moment and show you the
9  next document.
10      (Peacock Exhibit 21, Memorandum
11      in Support of Motion For Summary
12      Judgment in the United States of
13      America versus Brian D. Heim, was
14      marked for identification, as of this
15      date.)
16  BY MR. MIGLIORI:
17      Q.   The next document is Exhibit 21.
18      This document is a pleading in
19  an action where the United States
20  Government seeks forfeiture of assets of
21  Dr. Heim because of his activity
22  relevant -- related to controlled
23  substances.  I'm going to have you turn to
24  the third page.  Page number 3 it gives a

Page 289

1  brief history of Dr. Heim.  It says:
2  Defendant was licensed under the laws of
3  Ohio to practice medicine.  Was also
4  registered under - this is a federal
5  statute - by the DEA to dispense
6  controlled substances to the extent
7  permitted by federal law.  Defendant has a
8  history of drug violations.  In 1998,
9  defendant entered a guilty plea to 24
10  felony counts of theft of drugs and 21
11  felony counts of illegal processing of
12  drug documents.  His medical licensure was
13  revoked and he was given treatment in lieu
14  of conviction.  Defendant's medical
15  license was later reinstated with
16  restrictions and he was put on probation
17  until January of 2005.
18      My first question is are you
19  aware of Dr. Heim or what Dr. Heim was
20  doing?
21      A.   Never heard of the gentleman
22  before today.
23      Q.   All right.  Would you agree with
24  me that in knowing your customer, assuming

Page 290

1  this is a customer of Henry Schein, that
2  in knowing your customer, those facts that
3  I just read to you from this pleading
4  would be relevant facts?
5      A.   Would they be relevant?  Yes.
6           What I find very disturbing
7  about this is that the DEA would reissue
8  his license.  To me that's the most
9  disturbing because that's the first thing
10 that a company will look at, right.  So if
11 the DEA hasn't done its due diligence, I
12 have, you know, a hard time understanding
13 how they're reinstating the doctor who's
14 got counts against him and then, you know,
15 we have to go and double check the DEA.
16          That's what this is -- that's
17 what you're implying, sir.
18     Q.   No, I'm not implying.  I'm just
19 reading the facts.  And the fact are here.
20 It says the defendant's medical license
21 was reinstated.  It doesn't say DEA
22 registration.
23     A.   Okay.
24     Q.   All right.  I just want to make

Page 291

1  sure we're on the same page.
2          I understand your concern about
3  DEA, but there's no reference to DEA --
4      A.   Okay.
5      Q.   -- registration, other than the
6  initial granting of it.
7          Do you see that?  I don't want
8  to imply anything.
9      A.   No, I got it.  I see it.
10     Q.   All right.
11     A.   So it was never restricted?
12     Q.   I don't know.
13          I'm just asking whether those
14 facts, a criminal history and a loss of
15 medical licensure --
16     A.   Yes.
17     Q.   -- are facts that are relevant
18 to a --
19     A.   Sure.  That would be reported.
20     Q.   Okay.  I want you to then go and
21 look at the bottom of page 4.  The bottom
22 of page 4 says:  The inspection and
23 subsequent investigation revealed that
24 defendant purchased 11,500 tablets of

Page 292

1  hydrocodone on 14 separate dates between
2  August 17th, 2011 and June 5th, 2013 from
3  Henry Schein Inc., a distributor of
4  pharmaceutical drugs.
5          So, at least for purposes of
6  this question, will you at least accept
7  the purported representation that Henry
8  Schein was a supplier of certain
9  controlled substances to Dr. Heim?
10         MR. McDONALD:  Object to the
11 form.
12 BY MR. MIGLIORI:
13     Q.   Do you see that in the pleading?
14     A.   I do see that in the pleading.
15     Q.   All right.
16          Henry Schein provided a summary
17 of these purchases to DEA on July 11th,
18 2012.
19          Do you see that?
20     A.   Mm-hm.
21     Q.   Exhibit B Summary of Purchase
22 Records.
23          And then it actually gives a
24 table of the 11,500 pills - these are

Page 293

1  based on pills - of hydrocodone in this
2  record, okay.  That is the, by invoice,
3  order date, size, total drug strength,
4  that is Henry Schein's information it
5  provided to the DEA, again, on July 11th,
6  2012.
7          Do you see that?
8      A.   Yep.
9      Q.   Okay.  I'm going to show you
10 Exhibit 22.
11          MR. McDONALD:  Well, and I'll
12 just tell you, state for the record
13 that I don't have any idea if any of
14 this is true or not because your
15 statement that you read earlier said
16 that the sales were between August
17 17th, 2011 and July 5 of 2013, and
18 that the report was made to DEA on
19 July 11th, 2012.  I'll represent to
20 you that's probably impossible to do.
21 That is to provide a report in July of
22 2012 about sales that were made
23 through June 5th, 2013.
24         MR. MIGLIORI:  Well, we can --

Page 294

1    MR. McDONALD: Something's wrong
2  with the dates.
3    MR. MIGLIORI: Yeah. The
4  indictment -- you could reconcile the
5  dates. The date that's wrong is not
6  the one that you think it is, but I
7  appreciate your spoken objection.
8    MR. McDONALD: There's something
9  wrong with the dates, and I don't know
10  what it is 'cause I've never seen this
11  before either.
12    MR. MIGLIORI: That's okay.
13    MR. McDONALD: And I have no
14  idea why it's remotely relevant to
15  this witness.
16    MR. MIGLIORI: You're a nice
17  person. I'm not going to make a big
18  deal about it, but that's more of an
19  objection than you're supposed to be.
20    MR. McDONALD: Well, you and I
21  both know otherwise, but that's okay.
22    MR. MIGLIORI: I'm okay with it.
23    MR. McDONALD: Thank you.
24    MR. MIGLIORI: I'll remember to

Page 295

1  do it when you do it to my client.
2    MR. McDONALD: Fair enough.
3    (Peacock Exhibit 22, Customer
4  Service Imaging printout, Bates No.
5  HSI-MDL-00001198 to 00001210, was
6  marked for identification, as of this
7  date.)
8  BY MR. MIGLIORI:
9    Q.  This is Exhibit Number 22. This
10  is the last document on Dr. Heim, but this
11  is your entire due diligence file for Dr.
12  Heim, as represented to us, okay.
13    Take your time to go through it.
14    A.  (Perusing document.)
15    Q.  Let me know when you're ready.
16    A.  (Perusing document.)
17    Okay.
18    Q.  Okay. Now, your counsel raised
19  a question about dates. So I'm going to
20  direct you back to 21 briefly on that page
21  5. And it's on the screen.
22    The U.S. Government in a
23  publicly filed pleading said that your
24  company provided a summary of these

Page 296

1  purchases to DEA on July 11th, 2012.
2  Summary of purchase records. The order
3  dates all predate, if you look underneath
4  that in the table, all predate July of
5  2012 in the table.
6    So, the 11,500 pills supplied by
7  Henry Schein to Dr. Heim were all sent
8  between August of 2011 and June of 2012
9  from Henry Schein to Dr. Heim, and that
10  information was shared by Henry Schein to
11  the DEA on July 11th, 2012. Okay. Just
12  for factual orientation --
13    A.  Clarification, yes.
14    Q.  Okay. If you look at the due
15  diligence file, in particular if you look
16  at the page that ends in '1204. It says
17  on 8/24/12. This is now a month later,
18  after Henry Schein has already provided
19  the DEA with this transactional
20  information of Dr. Heim, it says:  On
21  12 -- 8/24/2012 received completed
22  questionnaire. Placed in bin to be
23  approved FDU.  8/25 gave to Shaun.
24    Do you see that?

Page 297

1    A.  I do.
2    Q.  If you go to the front page,
3  which is sort of like a overall docket.
4  On August 30th of 2012, more than a month
5  after providing this information to the
6  DEA and now five months after this doctor
7  has been indicted, going back to Exhibit
8  Number 19, it's notated that Henry
9  Schein's due diligence letter is on file.
10  And Shaun Abreu testified already that the
11  pended orders were released and shipped in
12  full.
13    Is that effective due diligence?
14    MR. McDONALD: Object to the
15  form.
16    A.  I would have to investigate more
17  to understand what exactly happened here.
18    It seems like, you know, process
19  is 12. He's looking at testosterone and
20  will continue to notify DEA of orders.
21  That's what the comment is on that date.
22    Q.  If the DEA is -- is telling the
23  truth in its pleading in Exhibit
24  Number 21, Henry Schein, in cooperation

Page 298

1 with the federal government on an
2 indictment of this doctor, provided the
3 DEA on July 11th of 2012 the transactional
4 information for this doctor for use in
5 their forfeiture proceeding.
6      Who from Henry Schein would have
7 provided that transactional data to the
8 DEA to prosecute this doctor?
9      MR. McDONALD: Object to the
10 form.
11 A.   I don't know.
12 Q.   Is that a regulatory affairs?
13      MR. McDONALD: Object to the
14 form.
15 A.   Potentially a review of customer
16 verifications would likely pull it.
17 Q.   And, so, that information goes
18 to the DEA without Regulatory Affairs
19 being notified or any notation to --
20 A.   No, I didn't say that. I
21 said --
22 Q.   My question.
23 A.   No.
24 Q.   Would -- if that transactional

Page 299

1 data were requested and provided by DEA
2 to -- requested of Henry Schein to DEA,
3 who would -- who would get notified in
4 Regulatory?
5 A.   Regulatory and --
6      MR. McDONALD: Hang on.
7      Object to the form.
8      If you know, tell him.
9 BY MR. MIGLIORI:
10 Q.   Who in particular and how?
11 A.   At the time, I don't know. I
12 wasn't involved in the company at the
13 time.
14 Q.   Okay. Today who would get
15 notified if the DEA asked?
16 A.   Regulatory and Legal would be
17 informed.
18 Q.   Who -- who in Regulatory would
19 be informed?
20 A.   Either Sergio or the manager
21 position, Frank O'Regan or the new one
22 that's coming.
23 Q.   Okay. So, somebody at Schein
24 shares this information with the DEA to

Page 300

1 support an indictment in a forfeiture
2 claim on July 11th, 2012.
3      That, as we saw in Exhibit 19,
4 on May 18th of this year, this doctor has
5 been indicted by the federal government
6 for drug trafficking.
7      And if you turn to the page ends
8 in '1205 on Exhibit 22, Henry Schein's
9 License Verification Department August
10 23rd, 2012 is sending him a due diligence
11 verification letter.
12      Do you see that?
13 A.   I do.
14 Q.   And you'll see if you go through
15 this due diligence letter, there's not
16 even a question about criminal activity;
17 is there?
18 A.   On this form, no.
19 Q.   There's no documentation of a
20 phone call to the doctor, correct, in this
21 entire file?
22 A.   That's correct.
23 Q.   There's no documentation of a
24 phone call to the Ohio Board of Medical

Page 301

1 Licensure, correct?
2 A.   There's nothing noted.
3 Q.   There's no phone call to the
4 Ohio Board of Pharmacy in this due
5 diligence file, correct?
6 A.   Yes, there's nothing noted.
7 Q.   There is a request for further
8 information which is singularly a letter
9 that's generated to the doctor on August
10 23rd, 2012. Again, a month after
11 providing the DEA with all of this
12 doctor's controlled substance
13 transactions.
14      Correct?
15      MR. McDONALD: Object to the
16 form.
17 A.   Timing's correct.
18 Q.   And, it's possible that this
19 doctor actually answered every one of the
20 due diligence questions honestly and
21 accurately, correct?
22 A.   I have no knowledge whether they
23 did or they didn't.
24 Q.   None of these questions would in

Page 302

1  any way prompt this doctor to have to
2  admit that his license is being revoked,
3  he's under indictment, he's being
4  investigated for drug-trafficking and
5  evidence tampering, correct?  There's
6  nothing in this form that even elicits
7  that information, correct?
8      A.  I'd have to study the document.
9  I mean, if his license was revoked, then
10 he represented that he is a licensed
11 practitioner.
12     Q.  Well, according to the exhibit,
13 the license being revoked, according to
14 the first exhibit I showed you, doesn't
15 happen until May of '18, after going
16 through the whole process.
17     A.  May of '18, okay.
18     Q.  I'm sorry.  February of '13.
19 There's a findings on February 13 of 2013.
20         So, at this point, it's not
21 revoked.
22     A.  Correct.
23     Q.  But he knows he's under
24 indictment, right?

Page 303

1      A.  Yes, he knows he's under
2  indictment.
3      Q.  And, so --
4      A.  Is there a presumption of
5  innocence?
6          I don't know.  I don't know.
7      Q.  Well, let me ask you that.
8      A.  I don't know.
9      Q.  Is that what Henry Schein --
10     A.  No.
11     Q.  -- has built into its system,
12 that you're going to presume a person
13 who's been indicted for a second time on
14 drug charges --
15     A.  No, I misspoke.
16         I'm sorry.
17     Q.  Okay.  So, the reality is
18 that sending out this letter and returning
19 it and just verifying that it got put in
20 the file is not a robust due diligence
21 system, at least in this case, correct?
22     A.  In this case --
23         MR. McDONALD:  Object to the
24 form.

Page 304

1          Go ahead.
2      A.  In this case, no.
3      Q.  This is not compliant with the
4  DEA regulations on knowing your customer;
5  is it?
6          MR. McDONALD:  Object to the
7  form.
8      A.  We could have certainly done
9  better.
10     Q.  It's not compliant; is it, sir?
11         MR. McDONALD:  Object to the
12 form.  It's legal -- calls for a legal
13 conclusion.
14 BY MR. MIGLIORI:
15     Q.  You can answer.
16     A.  I wish we did better.
17     Q.  Understood.
18         But if this were in front of you
19 today, and I'm not trying to be smug, if
20 this were in front of you today, this
21 would not be an acceptable practice in
22 your department of Regulatory Affairs,
23 correct?
24     A.  No, wish that we hadn't had this

Page 305

1  happen.
2          MR. MIGLIORI:  Why don't we take
3  a break and let me just make sure I've
4  covered everything I wanted to.
5          THE VIDEOGRAPHER:  The time is
6  3:10 p.m.
7          Going off the record.
8          (Recess taken.)
9          THE VIDEOGRAPHER:  The time is
10 3:13 p.m.
11         Back on the record.
12 BY MR. MIGLIORI:
13     Q.  So, before we leave Exhibit 22,
14 which is the due diligence file for Dr.
15 Heim.  I'll direct you to the front page
16 of it, but you can look anywhere you want
17 within it.  But, as I understand the front
18 page from prior testimony, this is sort of
19 the inventory of what's in the file.
20         Does that -- is that consistent
21 with how you've seen these files?
22     A.  I'm not usually seeing these
23 files.
24     Q.  Okay.  Well, first of all, the

Page 306

1  names here, the users, are you familiar --
2  you certainly are -- you're familiar with
3  Shaun Abreu, who's listed on the last
4  entry of August 30th, 2012, correct?
5      A.   Correct.
6      Q.   And he's simply documenting that
7  the -- the letter is on file.
8          Do you know who P. Hall is?
9      A.   I do not.
10     Q.   Nobody within Regulatory
11 Affairs, correct?
12     A.   No.
13         None of these are from
14 Regulatory Affairs.
15     Q.   These are all within
16 Verifications, is going to be my question.
17     A.   Correct.
18     Q.   Okay.  Nowhere in this entire
19 file produced to us do I see an indication
20 that, even after cooperating with the DEA
21 in providing that information to the DEA,
22 that this account has been restricted.
23         Would that normally appear on
24 the due diligence file?

Page 307

1      A.   I couldn't say, sir.
2      Q.   Where would that be?  That would
3  be in the restricted file that we talked
4  about earlier?
5      A.   It would be in the JD Edwards
6  system.
7      Q.   And, is it -- nobody that's
8  touched this due diligence files, at least
9  from what we can tell on this form, is
10 from Regulatory Affairs, correct?
11     A.   Correct.
12     Q.   But the folks on -- in
13 Verifications could have restricted it --
14 restricted the account on their own
15 without informing Regulatory?
16     A.   At this time, I don't know, sir.
17     Q.   Okay.  We saw in the last
18 example that Tina was informed --
19     A.   Yes.
20     Q.   -- at least of the restriction.
21     A.   That's the process now.
22     Q.   And Tina's in your department,
23 Regulatory?
24     A.   Correct.

Page 308

1      Q.   Is there another file in
2  Regulatory that exists for Regulatory's
3  due diligence of this particular doctor,
4  or any doctor?  Is there a separate file?
5      A.   Would be in our FileMaker Pro
6  database.  But again, I don't know how far
7  back it went.  This is before my time.
8      Q.   Can you tell from looking at
9  this if this is FileMaker Pro?
10     A.   I could tell it's not.
11     Q.   It's not.
12         So, in FileMaker Pro, there may
13 be a different repository of the due
14 diligence for this doctor?
15     A.   There may be.  I don't know
16 exactly how far back they loaded all the
17 data in, so.
18     Q.   All right.  But at least on the
19 face of this document, with all that we've
20 seen in terms of the doctor, the
21 conviction, the indictment, nothing in
22 this due diligence file, as it's been
23 given to me from Henry Schein, reflects
24 that this account has been even

Page 309

1  restricted, correct?
2      A.   I don't see that on here, yes.
3      Q.   And you would agree with me that
4  if any account would be restricted, this
5  would be one?
6          MR. McDONALD:  Object to the
7      form.
8      A.   Looks like justification for
9  restriction, yes.
10     Q.   We talked about Dendrite and
11 their review.  This is a historic
12 document, but it relates to this document
13 we've just been talking about.
14         (Peacock Exhibit 23, Cegedim
15     Dendrite Draft Schein SOM Procedural
16     Review, Bates No. HSI-MDL-00404369 to
17     00404383, was marked for
18     identification, as of this date.)
19 BY MR. MIGLIORI:
20     Q.   I'll tell you from the metadata
21 this is from November 2nd of 2009.  So
22 this is in that process of revamping the
23 SOM procedures.
24         I'm going to bring you to the

Page 310

1  conclusions and recommendations on page 4.
2       In particular, in 2009,
3  Dendrite, the outside auditing consultant,
4  reported on Henry Schein's system.  It
5  says:  New accounts are opened without
6  sufficient due diligence, investigations,
7  inquiries.
8       Would you agree with me that not
9  having any notation on the due diligence
10 file for Dr. Heim about his earlier
11 medical license suspension is a
12 insufficient due diligence?
13      MR. McDONALD:  Object to the
14 form.
15  A.  What was the time frame that he
16 had his license suspended?  It was like
17 ten years before?
18  Q.  1998.
19  A.  'Til '12.  Yeah.
20      Yes, it's a problem.
21  Q.  It's a problem.
22      For the most part, new accounts
23 are opened based upon a verification of
24 the customer's DEA number, which is not

Page 311

1  considered adequate by the DEA.
2       So, you mentioned that the DEA,
3  I think you said you were upset the DEA
4  reissued his license or registration, or
5  something to that effect.
6       Were you aware that your
7  consultants provided to Henry Schein
8  information that it's not sufficient to
9  rely on whether or not the company, or the
10 doctor, the customer, has a valid DEA
11 registration for due diligence?
12  A.  I was not aware of this.
13  Q.  So, the mere fact that Dr. Heim
14 had a DEA registration in 2012 while under
15 indictment isn't in and of itself enough,
16 according to your consultant, to rely upon
17 for your obligations to know your
18 customer, correct?
19      MR. McDONALD:  Object to the
20 form.
21  A.  Just the license itself, it
22 would appear no.
23  Q.  Okay.  It goes on to say:
24 Correspondence regarding the prospective

Page 312

1  customer's previous history of using
2  controlled substances, office practice
3  rules, and general practice expectations
4  should be completed prior to opening a new
5  account.  A compliance agreement form
6  should be developed and included in the
7  new account opening process.
8       In fact, your outside consultant
9  back in 2009 told you, told your company,
10 that the previous history of using
11 controlled substances needs to be further
12 investigated before opening the account,
13 correct?
14      MR. McDONALD:  Object to the
15 form.
16  A.  Yes.  This is the
17 recommendation.
18  Q.  It says:  The MedPro inquiry
19 should be expanded for all controlled
20 substance accounts and not just for the
21 limited number of states that require
22 background checks.
23      Do you see that?
24  A.  I can read this.

Page 313

1  Q.  MedPro is an inquiry online for
2  just this reason, right?  That is to look
3  into background checks of doctors before
4  they become customers of Henry Schein,
5  correct?
6       MR. McDONALD:  Object to the
7  form.
8  A.  Just background checks?
9  Q.  Would MedPro --
10      MR. MIGLIORI:  Strike that.
11  Q.  Was Henry Schein using MedPro
12 for purposes of background checks on
13 doctors where it was required in certain
14 states?
15      MR. McDONALD:  Object to the
16 form.
17  A.  I wasn't with the company.  I
18 can't say, sir.
19  Q.  Do you know what MedPro is?
20  A.  I do.
21  Q.  What is it?
22  A.  It's a online database that has
23 information on all physicians' licenses.
24  Q.  Okay.  Is it just whether or not

Page 314

1 they have a license, or is it on the
2 history and background of that physician?
3    A.   There's more than just the
4 license.
5    Q.   And it would include any kind of
6 license revocations historically, correct?
7        MR. McDONALD:  Object to the
8 form.
9    A.   Can't answer it, sir.  I don't
10 know the details of all that it will
11 provide.
12    Q.   But it -- you know it's more
13 than just a license verification process?
14    A.   Yes.
15    Q.   And, as of this time, Dendrite
16 is telling Henry Schein that you need to
17 use it in all states, not just where it's
18 mandatory.  That's what their
19 recommendation is here, correct?
20    A.   That is correct.
21    Q.   It says:  Henry Schein has
22 conducted some on-site investigations for
23 prospective customers.  However, the
24 criteria for the level of due diligence

Page 315

1 has not been documented in any standard
2 operating procedure or memorandum.
3        Now, I think we said this
4 before, but if it's not written, it
5 doesn't exist in Regulatory Affairs,
6 correct?
7    A.   That's a premise, yes.  They're
8 talking about the criteria for what the
9 due diligence is.  So, you know, yes,
10 there's no specific checklist.
11    Q.   So, if a Verifications employee
12 wants to go find out what the criteria is,
13 there is no written place to go find it,
14 as of this time, according to your --
15    A.   I have no knowledge whether
16 there was or there wasn't and what was
17 represented or not.  I really -- it says
18 that they didn't have it.
19    Q.   Okay.  So, according at least to
20 your -- your paid consultant advising
21 Henry Schein about its systems, you would
22 agree with the company, with -- with
23 den -- with Dendrite that if there's going
24 to be a level of due diligence criteria,

Page 316

1 it is important that that criteria be
2 documented somewhere?
3    A.   And --
4        MR. McDONALD:  Hang on.
5 BY MR. MIGLIORI:
6    Q.   Correct?
7        MR. McDONALD:  Object to the
8 form.  Object to the form.
9 BY MR. MIGLIORI:
10    Q.   Correct?
11        Go ahead.
12    A.   There have been improvements
13 made to insure that there is this type of
14 checklist.
15    Q.   I understand that.  And I
16 appreciate that over time Henry Schein has
17 tried to make improvements.
18        My question simply is this
19 particular recommendation, if it's true
20 that Henry Schein had no written standard
21 operating procedure or memorandum defining
22 the criteria, that is a -- a
23 recommendation that you would support?
24 That is, in order to have an effective

Page 317

1 program in place, it has to be documented
2 and understood, correct?
3    A.   100 percent.
4    Q.   The last point here on the same
5 page:  Lower level staff is actively
6 involved in clearing pended orders.
7 Pended orders should be cleared by a
8 management official.
9        Again, assuming this was true in
10 2009 when your paid consultant advised
11 Schein of this, that's an accurate
12 statement, correct?
13        MR. McDONALD:  Object to the
14 form.
15    A.   I don't know whether it was
16 accurate or not.  I wasn't with the
17 company at the time.
18    Q.   Well, as a vice-president of
19 Regulatory Affairs now, you would agree
20 with the statement that cleared orders,
21 releasing controlled substances to
22 doctors, is something that should have a
23 clearance by a management official,
24 correct?

Page 318

1    MR. McDONALD:  Object to the
2  form.
3    A.   Depends on training and what the
4  management official is, right.  So, yes.
5  Technically.
6    Q.   Certainly that person should be
7  well-trained in issues surrounding
8  controlled substances, correct?  No matter
9  the status of that person?
10    A.   Yes.  Training should be
11  involved in this.
12    Q.   And here, at least according to
13  this document, the outside consultant,
14  Cegedim Dendrite, is saying that the
15  system in place at the time doesn't always
16  have a management official clearing pended
17  orders, correct?
18    MR. McDONALD:  Object to the
19  form; the document speaks for itself.
20    A.   It's hard to interpret whether
21  or not any -- when, how often a management
22  official may be involved.
23    Q.   2009 the consultant told Henry
24  Schein that Henry Schein has clearly

Page 319

1  invested a great deal of time and energy
2  in developing an adequate SOM system.
3  However, the responsibilities of the
4  customer service department, the
5  Verifications Department, and the
6  Regulatory Department appear to be poorly
7  defined and reliant, to some extent, upon
8  the judgment of individual employees
9  regarding what types of situations should
10  be referred to management for approval or
11  forwarded to Regulatory for investigation.
12    Did you find that to be true
13  when you got there in 2013?
14    A.   That we've been investing a
15  great deal of time and energy in
16  developing an adequate system?
17    Q.   We'll start with that one.
18    Did you feel that?
19    A.   I felt, yes, we were making --
20    MR. McDONALD:  Object to the
21  form.
22  BY MR. MIGLIORI:
23    Q.   Go ahead.  How about the rest of
24  it?

Page 320

1    MR. MIGLIORI:  You objected to
2  his question?  He changed the
3  question.
4    MR. McDONALD:  You ask the
5  questions.  He answers the questions.
6    MR. MIGLIORI:  All right.  Fair
7  enough.
8    MR. McDONALD:  How about we do
9  that?
10    MR. MIGLIORI:  How about the
11  rest of us do it?
12  BY MR. MIGLIORI:
13    Q.   The relationship between those
14  departments, even as we speak through
15  today, seems poorly defined?
16    A.   I think it's much clearer than
17  when I joined the company.  So I think
18  there's much more interactions.
19    I think the FileMaker Pro's
20  database has allowed for much more clarity
21  in terms of the -- the types of reviews
22  and the extent of the reviews and the
23  ability to communicate online with those
24  things.

Page 321

1    Q.   And to be clear, that was
2  effectuated in 2017?
3    A.   Correct.
4    Q.   All right.
5    MR. MIGLIORI:  Last sticker.
6    (Peacock Exhibit 24, email chain
7    ending February 27, 2015, Bates No.
8    HSE-MDL-0039634, was marked for
9    identification, as of this date.)
10  BY MR. MIGLIORI:
11    Q.   Now, we talked about Beverly
12  Butcher.  She was the woman hired who had
13  training as a pharmacy technician.
14    Is that correct?
15    A.   Yes.
16    Q.   And she and Tina Steffanie-Oak
17  have an email exchange which in early
18  iterations includes Sergio and a Kathleen
19  Reid.
20    Who's Kathleen Reid?
21    A.   She's also on the team.  She was
22  the administrative person, schedules,
23  meetings, things like that.
24    Q.   Okay.  And by "the team," you

Page 322

1  mean the DEA Audit Team?
2      A.  Correct.
3      Q.  All right.  So, in this email
4  exchange, starting from the bottom,
5  Beverly Butcher on your DEA Internal
6  Compliance Team writes to Tina
7  Steffanie-Oak, also on that team, on
8  February 27th, 2015.
9          At this point, you're the
10  vice-president of Regulatory Affairs,
11  among other things, correct?
12      A.  That's correct.
13      Q.  Beverly writes:  Site visit on
14  Dr. Spendal has been completed.  Dr.
15  Spendal is restricted from the purchase of
16  controlled substances.  The report has
17  been placed on the M: drive.  Thank you.
18          So, it would appear for Dr.
19  Spendal that Beverly Butcher is
20  documenting the restriction, or the
21  prohibition of further controlled
22  substance sales, to Dr. Spendal as of this
23  date, February 27th, 2015.
24          Correct?

Page 323

1      A.  She's communicating it to the
2  Customer Service Team and some of the
3  Regulatory Team, correct.
4      Q.  And it says "the report."
5          What kind of report are we -- is
6  this a due diligence report?  What kind of
7  report are we talking about?
8      A.  It would be the actual site
9  visit report.
10      Q.  Site visit.
11          And the M: drive, is that the
12  shared -- or, what is the M: drive?
13      A.  Yeah, it's the share drive.
14      Q.  And that's on the -- I get all
15  the acronyms mixed up.
16      A.  It's just on the general --
17      Q.  The JDE?
18      A.  It's not on the JDE.  It just
19  resides on our Internet.
20      Q.  So all site reports exist on
21  that M: drive --
22      A.  Correct.
23      Q.  -- today even?
24      A.  Correct.

Page 324

1      Q.  And, so, any site reports for
2  any doctor in Summit County, Ohio would
3  exist there too, correct?
4      A.  Should, yes.
5      Q.  Steffanie wrote back to Kathleen
6  Reid, who you said was the administrative
7  person on that committee?
8      A.  Correct.
9      Q.  (Reading)  I just found out from
10  Shaun - Abreu I assume - that
11  Verifications accidentally released his
12  hydrocodone order on February 23rd.
13  Please do not send a suspicious order
14  letter to the DEA.  Thanks.
15          Were you made aware of this?
16      A.  I was not.
17      Q.  Is that inconsistent with the
18  procedures for Henry Schein in its
19  reporting obligations to the DEA?
20          MR. McDONALD:  Object to the
21  form.
22      A.  Yeah, I'm -- I'd have to do more
23  investigation because, you know, they said
24  it was released on 2/23.  Beverly sends

Page 325

1  her email on -- on February 27th.
2      Q.  So, while pended, it was
3  released, before -- before being -- before
4  the site visit?
5      A.  Before the site visit it was
6  released, right.
7      Q.  So, while under investigation,
8  Verifications accidentally, to use their
9  terms, accidentally released the order?
10      A.  Correct.
11      Q.  Without awaiting the outcome of
12  the -- of the site visit?
13      A.  Correct.
14      Q.  And the site visit apparently
15  produced enough information to completely
16  restrict that doctor from purchasing from
17  Henry Schein controlled substances,
18  correct?
19      A.  Yes.
20      Q.  And, so, as you told me earlier
21  today when we were talking about the other
22  restricted account, you told me that the
23  next step was if you restricted an
24  account, you notified the DEA.

Page 326

1 Do you recall telling me that?
2 A. I did.
3 Q. All right. In this instance, a
4 restricted account with an order that was
5 released prematurely and accidentally, was
6 being told -- Tina Steffanie-Oak was
7 instructing the administrative person on
8 the DEA Compliance Team to not send a
9 suspicious order letter to the DEA.
10 That is not consistent with
11 Henry Schein's policies and procedures for
12 restricted accounts, correct?
13 A. Yes. I can't -- I can't defend
14 why this had happened. It does not follow
15 our --
16 Q. This should not have happened?
17 A. -- policy.
18 MR. McDONALD: Well, object to
19 the form.
20 BY MR. MIGLIORI:
21 Q. This should not have happened,
22 correct?
23 MR. McDONALD: Object to the
24 form.

Page 327

1 A. Doesn't follow our policies.
2 MR. MIGLIORI: All right. I
3 really appreciate your time.
4 I appreciate you tolerating my
5 weak voice.
6 THE WITNESS: No worries.
7 MR. MIGLIORI: But I do
8 appreciate you being here. I don't
9 have anything else.
10 MR. McDONALD: You pass the
11 witness?
12 I'll reserve my questions.
13 MR. MIGLIORI: Okay.
14 MR. ASFENDIS: I'm here and
15 counsel for Cardinal tells me he has
16 nothing either.
17 THE VIDEOGRAPHER: All right.
18 Stand by, please.
19 This marks the end of today's
20 deposition.
21 The time is 3:34 p.m.
22 Off the record.
23 (Deposition adjourned at
24 approximately 3:34 p.m.)

Page 328

1 ACKNOWLEDGMENT
2
3 STATE OF          )
4                   :ss
5 COUNTY OF        )
6
7 I, JEFFREY S. PEACOCK, hereby certify
8 that I have read the transcript of my
9 testimony taken under oath in my
10 deposition of January 30, 2019; that the
11 transcript is a true and complete record
12 of my testimony, and that the answers on
13 the record as given by me are true and
14 correct.
15
16
17 _____
      JEFFREY S. PEACOCK
18
19 Signed and subscribed to before me this
20 _____ day of _____, 2019.
21
22 _____
23 Notary Public, State of
24

Page 329

1 ERRATA
2 PAGE / LINE / CHANGE  /  REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    C E R T I F I C A T E
2  STATE OF NEW YORK
3  COUNTY OF NEW YORK
4
5       I, Marie Foley, RMR, CRR, a
6  Certified Realtime Reporter and Notary
7  Public within and for the State of New
8  York, do hereby certify:
9       THAT JEFFREY S. PEACOCK, the witness
10 whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the
13 testimony given by the witness.
14      I further certify that I am not
15 related to any of the parties to this
16 action by blood or marriage, and that I am
17 in no way interested in the outcome of
18 this matter.
19      IN WITNESS WHEREOF, I have
20 hereunto set my hand this 2nd day of
21 February, 2019.
22
23      _____
        MARIE FOLEY, RMR, CRR
24

Page 331

1       LAWYER'S NOTES
2  PAGE / LINE
3  ____ ____ _____
4  ____ ____ _____
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____