```
1              IN THE UNITED STATES DISTRICT COURT

                FOR THE NORTHERN DISTRICT OF OHIO

2                      EASTERN DIVISION

3

    IN RE NATIONAL PRESCRIPTION  | MDL No. 2804

4                               |

    OPIATE LITIGATION           | Case No. 17-MD-2804

5                               |

    APPLIES TO ALL CASES        | Hon. Dan A. Polster

6

7                       -  -  -

8              Tuesday, April 23, 2019

9                       -  -  -

10       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12                      -  -  -

13

14

15        VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,

    BS Pharm, Ph.D., RPh, held at Jones Day,

16  1420 Peachtree Street, N.E., Suite 800, Atlanta,

    Georgia, commencing at 9:28 a.m., on the above date,

17  before Susan D. Wasilewski, Registered Professional

    Reporter, Certified Realtime Reporter and Certified

18  Realtime Captioner.

19

20

21                      -  -  -

22           GOLKOW LITIGATION SERVICES

23       877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com

25
```

Page 2

```
1   APPEARANCES:
2   Counsel for Plaintiffs:
3     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
      BY:  MARK P. CHALOS, ESQUIRE
4        mchalos@lchb.com
      222 2nd Avenue South, Suite 1640
5     Nashville, Tennessee 37201-2379
      Phone: (615) 313-9000
6
7     CRUEGER DICKINSON LLC
      BY:  KRISTA K. BAISCH, ESQUIRE
8        kkb@cruegerdickinson.com
      4532 North Oakland Avenue
9     Whitefish Bay, Wisconsin 53211
      Phone: (414) 210-4367
10
11
      Counsel for Endo Health Solutions Inc.,
12  Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc., f/k/a Par
13  Pharmaceutical Holdings, Inc.
14    ARNOLD & PORTER KAYE SCHOLER LLP
      BY:  SEAN HENNESSY, ESQUIRE
15       sean.hennessy@arnoldporter.com
      601 Massachusetts Avenue, NW
16    Washington, D.C. 20001-3754
      Phone: (202) 942-5000
17
18
      Counsel for Walgreens Defendants:
19
      BARTLIT BECK LLP
20    BY:  LESTER C. HOUTZ, ESQUIRE
         lester.houtz@bartlit-beck.com
21    1801 Wewatta Street, Suite 1200
      Denver, Colorado 80202
22    Phone: (303) 592-3100
23
24
25
```

Page 3

```
1   APPEARANCES:
2   Counsel for McKesson Corporation:
3     COVINGTON & BURLING LLP
      BY:  MEGAN L. RODGERS, ESQUIRE
4        mrodgers@cov.com
      3000 El Camino Real
5     5 Palo Alto Square, 10th Floor
      Palo Alto, California 94306-2112
6     Phone: (650) 632-4700
7
8   Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
      and The Purdue Frederick Company:
9
      LYNN PINKER COX HURST
10    BY:  JOHN VOLNEY, ESQUIRE
         jvolney@lynnllp.com
11    2100 Ross Avenue, Suite 2700
      Dallas, Texas 75201
12    Phone: (214) 981-3800
13
14  Counsel for Walmart Inc., f/k/a Wal-Mart Stores,
      Inc.:
15
      JONES DAY
16    BY:  EDWARD M. CARTER, ESQUIRE
         emcarter@jonesday.com
17    325 John H. McConnell Boulevard, Suite 600
      Columbus, Ohio 43215
18    Phone: (614) 649-3939
19
20  Counsel for Allergan Finance, LLC:
21    KIRKLAND & ELLIS LLP
      BY:  ERICA B. ZOLNER, ESQUIRE
22       erica.zolner@kirkland.com
      ZACHARY A. CIULLO, ESQUIRE
23       zac.ciullo@kirkland.com
      300 North LaSalle Street
24    Chicago, Illinois 60654
      Phone: (312) 862-3247
25
```

Page 4

```
1   APPEARANCES:
2   Counsel for Teva Pharmaceuticals USA, Inc.,
      Cephalon, Inc., Watson Laboratories, Inc., and
3   Actavis LLC.:
4     MORGAN LEWIS & BOCKIUS, LLP
      BY:  MELISSA M. COATES, ESQUIRE
5        melissa.coates@morganlewis.com
      200 South Biscayne Boulevard, Suite 5300
6     Miami, Florida 33131
      Phone:  (305) 415-3000
7
8
9   Counsel for Rite Aid:
10    MORGAN LEWIS & BOCKIUS, LLP
      BY:  MATTHEW R. LADD, ESQUIRE
11       matthew.ladd@morganlewis.com
      101 Park Avenue
12    New York, New York 10178-0060
      Phone: (212) 309-6000
13
14  Counsel for AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation:
15
      REED SMITH LLP
16    BY:  JOSEPH MAHADY, ESQUIRE
         jmahady@reedsmith.com
17    1717 Arch Street, Suite 3100
      Philadelphia, Pennsylvania 19103
18    Phone: (215) 851-8100
19
20  Counsel for Johnson & Johnson and the Janssen
      Pharmaceuticals Defendants:
21
      O'MELVENY & MYERS LLP
22    BY:  ROSS B. GALIN, ESQUIRE
         rgalin@omm.com
23    7 Times Square
      New York, New York 10036-6537
24    Phone:  (212) 326-2000
25
```

Page 5

```
1   APPEARANCES:
2   Counsel for Cardinal Health, Inc.:
3     WILLIAMS & CONNOLLY LLP
      BY:  JOSHUA D. TULLY, ESQUIRE
4        jtully@wc.com
      725 Twelfth Street, N.W.
5     Washington, D.C. 20005
      (202) 434-5000
6
7
8   Counsel for Mallinckrodt LLC:
9     ROPES & GRAY LLP
      BY:  ELIZABETH BIERUT, ESQUIRE
         elizabeth.bierut@ropesgray.com
10    1211 Avenue of the Americas
      New York, New York 10036-8704
11    Phone: (212) 596-9000
12
13  APPEARANCES VIA TELEPHONE AND STREAM:
14  Counsel for the Henry Schein Defendants:
15    LOCKE LORD LLP
      BY:  BRANDAN MONTMINY, ESQUIRE
16       brandan.montminy@lockelord.com
      2200 Ross Avenue, Suite 2800
17    Dallas, Texas 75201
      Phone: (214) 740-8445
18
19  Counsel for H.D. Smith LLC:
20    BARNES & THORNBURG LLP
      BY:  MONIQUE HANNAM, ESQUIRE
21       hannam@btlaw.com
      11 South Meridian Street
22    Indianapolis, Indiana 46204
23  ALSO PRESENT:
24    JOSHUA COLEMAN, Videographer
25    JONATHAN JAFFE, jjaffe@its-your-internet.com
```

Page 6

1           ---
2          I N D E X
3           ---
4   Testimony of:  MATTHEW PERRI III, BS Pharm, Ph.D., RPh
5                  PAGE
6     DIRECT EXAMINATION BY MR. VOLNEY............  9
7     CROSS-EXAMINATION BY MS. RODGERS............  204
8     CROSS-EXAMINATION BY MR. LADD...............  309
9     CROSS-EXAMINATION BY MR. CARTER.............  337
10
11         E X H I B I T S
12      (Attached to transcript)
13   MATTHEW PERRI DEPOSITION EXHIBITS        PAGE
14   Perri Exhibit 1   Expert Report of Matthew Perri    11
                      III, BS Pharm, PhD, RPh
15                    March 25, 2019
16   Perri Exhibit 2   Curriculum Vitae           11
                      Matthew Perri III
17
     Perri Exhibit 3   Schedule 2: Perri Prior       11
18                    Testimony and Depositions
19   Perri Exhibit 4   Chapter 5 - Place: The        207
                      Pharmaceutical Industry Supply
20                    Chain
21   Perri Exhibit 5   Schedule 10: Marketing Messages  247
22
23
24
25

Page 7

1          E X H I B I T S
2        (Attached to transcript)
3   MATTHEW PERRI DEPOSITION EXHIBITS        PAGE
4
     Perri Exhibit 6   A Practical Introduction to the   247
5                    Use of Opioids for Chronic Pain
                      By Jennifer P. Schneider, MD
6                    MCKMDL00578003 through 578009
7   Perri Exhibit 7   PBI Prescribing Course Module    247
                      1:  Principles of Pain
8                    Management & Ethical Treatment
                      11-15-14
9                    Jennifer P. Schneider
                      MCKMDL00577963 through 577991
10
     Perri Exhibit 8   E-mail - Subject: Campaign      253
11                   3578-AMI-Mallinckrdt
                      Hydrocodone has been Released!
12                   MCKMDL00546914 through 546916
13  Perri Exhibit 9   E-mail - Subject: Pain Care     266
                      Forum
14                   PPLP004086826 and 4086827
15  Perri Exhibit 10  Expert Report of Matthew Perri  286
                      III, BS.Pharm, Ph.D., R.Ph.
16                   JM Smith Corporation v Cherokee
                      Pharmacy, et al.
17
18
19
20
21
22
23
24
25

Page 8

```
1           ---
2      THE VIDEOGRAPHER:  We are on the record.  My
3   name is Josh Coleman.  I'm the videographer for
4   Golkow Litigation Services.  Today's date is
5   April 23rd, 2019.  The time is approximately
6   9:28 a.m.
7      This deposition is being held in Atlanta,
8   Georgia, in the matter of In Re:  National
9   Prescription Opiate Litigation for the United
10  States District Court, Northern District of Ohio,
11  Eastern Division.
12     The deponent is Matthew Perri.  Counsel will
13  be noted on the stenographic record.
14     The court reporter is Susan Wasilewski, who
15  will now swear in the witness.
16     THE COURT REPORTER:  Would you raise your
17  right hand?
18     Sir, do you solemnly swear or affirm the
19  testimony you're about to give will be the truth,
20  the whole truth, and nothing but the truth?
21     THE WITNESS:  Yes, I do.
22     THE COURT REPORTER:  Thank you.
23     MATTHEW PERRI, III, BS Pharma, Ph.D., RPh,
24  called as a witness by the Track One Defendants,
25  having been duly sworn, testified as follows:
```

Page 9

```
1        DIRECT EXAMINATION
2   BY MR. VOLNEY:
3      Q.  Dr. Perri, my name is John Volney.  I
4   represent Purdue Pharma in this case.  I'm here to
5   take your deposition as an expert for the plaintiffs
6   in the matter.  You understand that?
7      A.  I do.
8      Q.  Have you given a deposition before?
9      A.  Yes, I have.
10     Q.  How many times?
11     A.  In matters like this, three, I believe,
12  three times.
13     Q.  So --
14     A.  Possibly four.
15     Q.  So you understand how the process works?
16     A.  Yes, I do.
17     Q.  So it's going to be important today that you
18  let me finish my question before you begin your
19  answer.  Understand?
20     A.  I do.
21     Q.  And I'll do the same.  I will try to provide
22  you the courtesy of letting you finish your question
23  before I ask my next question.  Is that fair?
24     A.  It's fair, and I appreciate that.
25     Q.  And you understand that it's your obligation
```

Page 10

1 today to tell the truth?

2 A. Yes.

3 Q. Is there any reason why you can't testify

4 fully and truthfully today? For example, are you

5 taking any medications?

6 A. I'm not taking anything that would interfere

7 with my ability to testify or to tell the truth,

8 yes.

9 Q. Okay. So I think it's going to be a bit of

10 a slog. It might last for two days, so if you need

11 a break, please let me know.

12 A. I definitely will do that.

13 Q. And I just ask that if there is a pending

14 question, you answer that question before we take

15 the break. Understand?

16 A. Agreed.

17 Q. Now, last point, it's important that you

18 answer verbally, meaning it's hard for Susan to take

19 down nods of the head or shakes of the head. So you

20 understand you're to give a verbal answer?

21 A. I do.

22 Q. All right. Now, you've been identified as

23 an expert by the plaintiffs in this case. What is

24 the subject matter of your expertise?

25 A. The subject matter of my expertise is

Page 11

1 pharmaceutical marketing.

2 Q. Now, I've premarked a few exhibits there in

3 front of you.

4 (Perri Exhibit 1 was marked for

5 identification.)

6 BY MR. VOLNEY:

7 Q. Could you confirm for me that the report

8 that you've issued in the case, without the

9 schedules, I've marked as Exhibit 1?

10 MR. CHALOS: Do you have another copy of

11 that?

12 MR. VOLNEY: Sure.

13 A. Yes. Exhibit 1 is the -- entitled Expert

14 Report of Matthew Perri, III.

15 (Perri Exhibit 2 was marked for

16 identification.)

17 BY MR. VOLNEY:

18 Q. And then Exhibit 2 is a copy of your CV?

19 A. Yes, it is.

20 (Perri Exhibit 3 was marked for

21 identification.)

22 BY MR. VOLNEY:

23 Q. And then Exhibit 3 is a copy of your prior

24 testimony in the last four years, fair?

25 A. Yes, it is.

Page 12

1 MR. VOLNEY: Counsel had asked for copies.

2 I might shoot some across the table here.

3 (Discussion off the record.)

4 BY MR. VOLNEY:

5 Q. Now, let's look at your -- your -- you've

6 identified yourself as a -- an expert in

7 pharmaceutical marketing. What academic degrees do

8 you hold?

9 A. So I have a BS in pharmacy from Temple

10 University, Philadelphia, Pennsylvania, and a Ph.D.

11 in pharmacy and marketing from the University of

12 South Carolina.

13 Q. When did you get your BS in pharmacy?

14 A. I received my BS from Temple University,

15 Philadelphia, 1981.

16 Q. And then when did you get your Ph.D.?

17 A. And the Ph.D. from the University of South

18 Carolina was in 1985.

19 Q. In connection with your education as a -- at

20 Temple University, did you take any courses related

21 to Schedule II or narcotic drugs?

22 A. I don't remember specific courses; however,

23 I know that the Schedule II or narcotic, or just

24 controlled substances, would have been covered in

25 pharmacology. They would have been covered in

Page 13

1 dispensing labs where we learned the dispensing

2 process and procedures for controlled substances

3 versus others.

4 So I feel certain that there were lectures

5 and exercises at Temple. However, I don't believe

6 we had an entire course that was devoted to

7 controlled substances.

8 Q. Did you have any course work -- have you had

9 any course work in your educational career related

10 to controlled substances, other than what you just

11 explained to me?

12 A. Just for clarification, I would -- I want to

13 distinguish, you know, that in my overall career,

14 there may have been a continuing education program

15 or something like that, and I would have to look

16 back and see.

17 So I feel certain that at some point in

18 time, I've either been required to take a controlled

19 substances CE, either by South Carolina or Georgia.

20 However, I don't think it's been any formal course

21 work, which is what I think the gist of your

22 question was.

23 Q. Correct. Let's look at -- let's look at

24 your CV. I think there's a -- I think you've

25 indicated in your CV and also in your report that

Page 14

1 you are a member of the Georgia Drug Utilization
2 Review Board?
3     A.  Yes.
4     Q.  Are you currently a member?
5     A.  Yes.
6     Q.  Tell me, what is -- is that sometimes
7 referred to as the DURB?
8     A.  DURB.
9     Q.  DURB.  What does the DURB do?
10     A.  The Drug Utilization Review Board, or DURB,
11 is the advisory committee to the state of Georgia's
12 Medicaid that recommends changes to their preferred
13 drug list to ensure the health of the citizens in
14 the state of Georgia.
15         And in that capacity, we review clinical
16 information.  We evaluate drugs by class and make
17 decisions regarding their status on the formulary,
18 which we recommend to the department.  It's up to
19 the department to make final decisions.
20     Q.  How long have you been on the DURB?
21     A.  I started working on the Drug Utilization
22 Review Board in about 2001, and I served on the
23 board for a few years before I was appointed
24 chairman of that board.  Traditionally, chairmen
25 serve a one- or two-year term, and I think I served

Page 15

1 about five or six or seven years as chairman
2 eventually and then retired from the board in 2012,
3 and then in 2018 I was asked to come back, so I did.
4     Q.  So you've been on the DURB for
5 approximately -- I guess your first go-round was 11
6 years, and now you're back on as of 2018?
7     A.  Yes.
8     Q.  Do you know whether any of the Schedule II
9 opioid painkillers that are at issue in this lawsuit
10 are on the approved list for the DURB?
11     A.  I believe some of them are, yes.
12     Q.  In your role as a board member and then
13 chair, did you consider any materials that you would
14 be -- that you would consider to be marketing
15 materials for those opioid pain killers?
16     A.  I'm trying to -- to think about what the
17 right answer to that question is.  I know over the
18 years I've been exposed to marketing materials
19 related to opioids.  I don't recall any specific
20 documents.  I actually recall a salesman or two, but
21 I don't -- I don't recall any specific documents or
22 marketing materials.
23         I do recall -- as part of the DURB board
24 process, we receive, before each meeting, a clinical
25 binder, which is a clinical review of each drug or

Page 16

1 each drug class that's being considered on that
2 meeting.  And so as part of that review, we would be
3 reviewing studies.
4         However, there wouldn't be any marketing
5 material, but there is also what they called the
6 manufacturers' forum, where manufacturers are
7 allowed to come and present their views on their
8 drugs, which gets incorporated into that meeting.
9 The manufacturers forum does.
10         So yes and no.  I guess I saw some marketing
11 materials over the years.  I don't recall any
12 specific documents, but the board itself, in making
13 decisions, would have reviewed primarily clinical
14 information, but at the same time, as practitioners,
15 we would have also been exposed to marketing efforts
16 that may have been present.
17     Q.  Do you -- do you recall any specific
18 marketing materials that you reviewed in connection
19 with your service on the DURB?  And obviously I'm
20 talking about marketing materials for opioid
21 painkillers.
22     A.  I don't remember a specific document, but as
23 I said, I know that I was exposed to documents
24 during that time period by -- in particular, one
25 salesman that -- sales representative that -- that

Page 17

1 did call on me in his capacity as a sales rep, both
2 as -- through my position as UGA, where I was
3 director of clinical practice, and the service on
4 the DURB board.
5     Q.  Do you recall the particular manufacturer
6 that that sales represented -- representative
7 represented?
8     A.  I do.
9     Q.  Which one was it?
10     A.  It was Purdue.
11     Q.  What do you recall about your meeting with
12 that sales rep?
13     A.  He was very friendly.  He was very dedicated
14 to his job.  He was pretty persistent in getting --
15 trying to set up meetings to come and talk to the
16 clinical practice group at the College of Pharmacy.
17 And I honestly don't recall whether he was ever
18 successful.  I think we tried to set up meetings.
19 I'm not sure that a meeting ever occurred.
20     Q.  Do you know what time frame these
21 interactions occurred, or do you recall?
22     A.  It had to be between 2001 and 2005,
23 somewhere in that time period.
24     Q.  Who puts together the clinical binder that
25 the DURB considers?

Page 18

1    A.   Over time, it's been different people, but
2   in my -- to the best of my recollection, the only
3   one I'm familiar with in recent 10 years is
4   Northstar Healthcare Consulting.  They're located in
5   Alpharetta, Georgia.
6    Q.   Does -- I take it that the DR -- DURB
7   decides both what drugs to add to the preferred drug
8   list, correct?
9    A.   They -- they decide what drugs they will
10  recommend to be added to the drug list.
11   Q.   Fair.  Recommend.  Does -- is there a --
12  does the DURB have a role to consider what drugs it
13  might recommend to be removed from the list?
14   A.   So just to clarify, a preferred drug list,
15  you can't really not cover something.  As long as
16  the manufacturer participates in the rebate program,
17  their drugs get in the formulary, but we have other
18  tools at our disposal, primarily preferred or
19  nonpreferred status and prior authorization or step
20  therapy.
21        So we don't really remove a drug, which is
22  what I think your question was asking me, but we can
23  make it more difficult to get to a drug.
24   Q.   And what are the ways you make it more
25  difficult to get to a drug?

Page 19

1    A.   Initially, it would be preferred versus
2   nonpreferred status, which you might be familiar
3   with in terms of tiers, a first, second, or fourth
4   tier in a formulary.  Preferred drug status has a
5   lower copay and is -- generally, there is no barrier
6   to prescribing that drug.
7        A nonpreferred drug has some barrier, but
8   really, it's insignificant.
9        But prior authorization is the most potent
10  tool that we possess, and prior authorization can
11  dramatically change the utilization of a drug.
12   Q.   How does prior authorization work?
13   A.   Prior authorization works through the
14  process where the prescriber has to basically make a
15  case for why the patient needs that particular drug,
16  rather than one that is not required for prior
17  authorization or does not require prior
18  authorization, and hopefully is, you know, either
19  preferred status or nonpreferred without prior
20  authorization.
21        Prescribers generally have to, either
22  through a phone call or a letter or a fax, justify
23  the need in that particular patient.
24        And the prior authorization criteria can be
25  anything.  We have, from time to time, recommended

Page 20

1   prior authorization criteria for Northstar, that is
2   the agent that actually solidifies those criteria.
3        But generally it's just a recommendation.
4   We don't set the criteria.  We don't evaluate the
5   criteria.  We just examine the formulary and make
6   recommendations.
7    Q.   And the formulary that we're talking about
8   is a formulary of drugs would be made available to
9   Georgia Medicaid --
10   A.   Yes.
11   Q.   -- patients?
12   A.   And, sorry, forgive me for calling it a
13  formulary.  I try to always refer to it as the
14  preferred drug list, or PDL, but, essentially, it's
15  a formulary.  It's just a more open version of that
16  because of the Medicaid rebates.
17   Q.   Is the PDL published?
18   A.   Yes, it is.
19   Q.   And something I could find online?
20   A.   Yes, you can.  I know that if you go to the
21  Department of Community Health website, you can go
22  right now and look and see what the status of every
23  drug is, whether it's preferred, nonpreferred, prior
24  authorization.
25   Q.   How often does the DURB meet?

Page 21

1    A.   Over the years, we've met as often as
2   monthly, but traditionally we meet quarterly.
3    Q.   What -- is there a record of the meetings
4   that occur, like the minutes of the meeting?
5    A.   As far as I know, Georgia Open Records
6   requires those meetings, except for the executive
7   sessions, to have their minutes maintained in an
8   archive and available to the public.
9    Q.   Are the clinical binders that the DURB
10  considers maintained?
11   A.   That's a good question.  I don't know.  I do
12  know that when I receive those binders, that they
13  are -- as the materials in this case, they're always
14  marked confidential and not for distribution.  So I
15  don't know what the rules are about that.
16   Q.   Earlier, when I was asking you questions
17  about your meetings with sales representatives for
18  drug manufacturers, you indicated that you had met
19  at least one representative for Purdue.  I take it
20  that that was not in connection with your service on
21  the DURB?  That was some other reason you met with
22  them?
23   A.   Actually, I was introduced to him through
24  the Drug Utilization Review Board, and he then, I
25  guess, also learned that I was director of clinical

Page 22

1  pharmacy practice at the university, and that I had
2  a team of about 10 faculty who were working in
3  community practice that he felt would be a good
4  group for him or someone from his company to meet
5  with.
6      Q.  And sitting here today, you don't recall
7  whether that meeting between him and the clinical
8  practice ever took place?
9      A.  I feel like we set up a meeting, but if it
10  took place, I don't think I was there.  We used to
11  have a -- Friday mornings were kind of a regroup for
12  the group.  We would come together, you know, review
13  the week's activities, plan the next week's
14  activities.
15      And we also, from time to time, had
16  continuing education or in-services by either one of
17  our group or somebody from the outside.  And as I
18  said, I just don't ever recall that occurring with
19  regard to -- it might have.  I just don't recall.
20      Q.  Does the -- in connection with its review of
21  drugs to determine whether to recommend to put them
22  on the PDL, does the DURB consider marketing
23  materials?
24      A.  I think to the extent that as practitioners,
25  most of them are exposed to marketing efforts, that

Page 23

1  that's going to factor into their decision-making in
2  some way.  I think literature would certainly
3  support that the external stimuli of -- of
4  marketing, it's hard to filter out.
5      I do think that -- that we try to rely
6  primarily on the scientific evidence when possible,
7  practice experience when possible, and other
8  information as it is -- as it's presented or as
9  we're exposed to it.
10      Q.  When you talk about the DURB members relying
11  on scientific evidence, what kinds of scientific
12  evidence are you talking about?
13      A.  Well, the -- for example, the clinical
14  binders that are produced by Northstar Healthcare
15  Consulting, they usually are a summary of the most
16  relevant and most recent research related to any
17  particular drug or drug class.
18      So there may be a clinical trial, a review
19  paper, a review of physiology or pathophysiology,
20  and so it -- those are generally not promotional.
21  They are intended to be more pure science.
22      Q.  Does the DURB look at or consider the
23  package insert created for particular drugs?
24      A.  I know that we've never, to my knowledge,
25  reviewed a package insert at a DURB board meeting.

Page 24

1  However, the -- to say that we didn't consider that
2  would probably not be true because any of us who
3  were exposed to any marketing materials would
4  probably have been exposed to a package insert at
5  some point as well.
6      I don't think we would rely on that very
7  heavily, but it probably would have been present in
8  the mix of things we looked at.
9      Q.  So obviously when a DURB board member shows
10  up for the board meeting, he or she can't erase from
11  his mind his or her practice experience and what
12  they were exposed to outside of the DURB; fair?
13      A.  Yeah.  I certainly think it's fair to say
14  that -- that the experience that you bring to
15  that -- through your clinical experience is valuable
16  to the board, and it would be very hard to filter it
17  out, number one.  And number two, I don't think we
18  would want them to filter that out.
19      Q.  How many members are on the DURB?
20      A.  The board has fluctuated in size over time.
21  I think there are currently about 12 or 14 members.
22  Back when I was serving as chairman, there were as
23  many as 20 to 22 members for a period of time.  The
24  board, as I said, has fluctuated in size.
25      The difference has been when managed

Page 25

1  Medicaid versus fee for service Medicaid first
2  started, we had representatives from all the
3  different managed care organizations.
4      That has changed.  Now we've gone back to
5  just a standard board with the appropriate
6  representation from different types of physicians,
7  pharmacists, nurses, consumers, and so forth.  So
8  the numbers have -- have changed, as well as the
9  composition.
10      Q.  How many physicians are -- is there a set
11  number of physicians who need to be on the DURB?
12      A.  I think they have rules, and I haven't
13  reviewed those lately.  I know back when I was
14  chairman back in the mid-2000s, I was -- I was aware
15  of what those ratios needed to be, but I really
16  don't know what they are now.
17      Q.  But there's physicians?  There's nurses?
18      A.  We have had nurses.  I know -- I know we
19  attempt to have a good representation of physicians,
20  pharmacists, and some type of nurse or consumer
21  advocate or somebody that's not necessarily directly
22  tied into the medical profession as a -- as a
23  representative on the board.
24      And I could look, if -- if you'd like, to
25  see what the board's composition is now, because I

Page 26

1 think I know what everybody does, but it would be
2 hard to remember without looking.
3     Q. In connection with putting together your
4 expert opinions in this case, did you interview or
5 talk to any DURB board members?
6     A. I think the answer to that is yes, but
7 not -- it wasn't a formal interview. The coauthor
8 of the Pharmaceutical Market textbook is Brent
9 Rollins, and Brent is a former student of mine. He
10 earned his Ph.D. back around 2008 or '09, I think.
11     And Brent, when I retired from the board, he
12 was admitted to the board. And I do recall asking
13 him about this -- not this case, but I remember
14 asking him if the sales rep that I used to know back
15 when I was on the board was still around. And so
16 it's not really an interview, but I did ask him that
17 question.
18     Q. What did you learn?
19     A. He said that he indeed was up until very
20 recently.
21     Q. Did you make any effort to contact that
22 sales rep?
23     A. No, I did not.
24     Q. Why were you asking Mr. Rollins about
25 whether that sales rep was still around?

Page 27

1     A. I asked Dr. Rollins that question --
2     Q. Sorry, Dr. Rollins.
3     A. Yes.
4     Q. Apologies?
5     A. It's okay. I asked him that question just
6 to -- just out of curiosity. I remember -- it was
7 actually -- I remember his name was Michael Packer.
8 And I asked him, just because I was curious if he
9 was -- you know, given the fact that the opioids
10 were in the news lately, if Michael was still around
11 and/or, you know, anybody in terms of the sales of
12 the opioids.
13     Q. So other than your conversation with
14 Dr. Rollins, do you recall any other conversations
15 with any DURB board member in connection with
16 putting together your expert opinions in this case?
17     A. Actually, the conversation with Dr. Rollins
18 wasn't in connection with this. It was just
19 curiosity, but just in the interest of full
20 disclosure, I wanted to know -- I wanted you to know
21 that I did ask him that question.
22     Q. Got it.
23     A. No. I have not discussed, for purposes of
24 this report, any -- I haven't asked or interviewed
25 anyone regarding my preparation of this report.

Page 28

1     Q. Is that -- the way I asked my question
2 before was whether you talked to any DURB board
3 member. I take it if I'd asked you, have you talked
4 to any practitioner in connection with putting
5 together your expert opinions in this case, the
6 answer would be "no." Is that right?
7     A. No, that would not be correct.
8     Q. Okay. What practitioners have you talked
9 to?
10     A. I did make an inquiry of two pharmacist
11 colleagues about the ordering of CIIs. I used to
12 work for Walmart and --
13     Q. Sorry. Hold that thought. There is a phone
14 issue. They can't hear. So let's --
15     THE VIDEOGRAPHER: We are now going off the
16 video record. The time is currently 9:52 a.m.
17     (Recess from 9:52 a.m. until 9:55?a.m.)
18     THE VIDEOGRAPHER: We are now back on the
19 video record. The time is currently 9:55 a.m.
20 BY MR. VOLNEY:
21     Q. So, Dr. Perri, before we had this
22 interruption, I'd asked you a question about what
23 practitioners you talked to in connection with
24 arriving at your opinions in this case. And you
25 indicated that you had talked to two pharmacists?

Page 29

1     A. Two pharmacist colleagues, that's right.
2     Q. Okay. Who did you talk to and why?
3     A. First it was Nancy Shepherd and Andy Hassel.
4 And Nancy is a former Walmart employee, and Andy is
5 a former CVS employee.
6     And I wanted to verify with Nancy that my
7 recollection of Walmart's ordering of CIIs and CIIIs
8 through V was consistent with her recollection. And
9 with Andy, because I've never worked with CVS, I
10 wanted to verify how they did order CIIs at CVS.
11     The reason behind that was because I was
12 able to locate information for, for example,
13 Walgreens on how they did their ordering and so
14 forth, but I was not able to nail that down for
15 Walmart or CVS. So I wanted to make sure that I had
16 the right information in terms of what their
17 ordering practices were.
18     So those were related to the manufacturers
19 as much as it did to just CVS and Walmart.
20     Q. So what we talk about CIIs or CIIIs or CIVs
21 or CVs, what are we talking about?
22     A. Controlled substances that usually have
23 special handling and ordering possibly. And is
24 your -- is your question intended to how they
25 were -- how they were ordered for those -- what I

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  found, or something different?
2  Q. Well, it's, like, what are they and then why
3  did it matter to you?
4  A. The -- it mattered because the -- the issue
5  of -- the marketing issue of distribution is
6  important, and if the chain pharmacies were
7  distributing and ordering from their own wholesale
8  distribution centers, that would have -- that would
9  have bearing -- possibly have bearing on my
10 opinions.
11     So if a -- one of the chains did or didn't
12 distribute CIIs, which it turns out that they all
13 did at some point, but that could have had bearing
14 on my opinions in terms of the marketing of the
15 opioids in this case.
16 Q. Did you talk to any other practitioners
17 other than the -- the two pharmacists you just
18 identified for me?
19 A. Practitioners? No.
20 Q. Did you interview any prescribers?
21 A. With respect to the issues in this case, no,
22 I did not interview any particular prescribers, but
23 I've worked with physicians and work with physicians
24 still on a continuous basis.
25 Q. Well, what work do you do with physicians?

Page 31

1  A. If -- we could go through the CV and I could
2  point a few things for you, but --
3  Q. Sure. Let's do it.
4  A. Okay.
5  Q. Exhibit 2?
6  A. Yeah.
7  Q. Try out the ELMO here.
8  A. Yeah.
9  Q. Tell me where you're looking.
10 A. Just looking at Page 1 of Exhibit 2.
11 Q. Yeah.
12 A. If you -- if you look down the list of
13 positions that I've held, there are a couple of them
14 that stand out.
15     1981 through 2007, pharmacist in community
16 practice. As a pharmacist, we communicated with
17 doctors routinely for a variety of reasons.
18     The position -- I'm looking here to see --
19 2001 through 2006, clinical pharmacist at Athens
20 Primary Care Pharmacy Care Clinic, that was a clinic
21 that was devoted to disease management and health
22 and wellness.
23     And we basically saw patients that were
24 receiving care from their primary care doctor, and
25 we did follow-up assessments, patient education,

Page 32

1  diet and exercise recommendations. We followed and
2  maintained their refills, for example, for blood
3  pressure, cholesterol medicine, and did wellness
4  assessments, followed diabetes, followed
5  anticoagulation, those activities.
6     So we worked in the doctor's office very
7  closely with physicians during that period of time.
8  And I say "we." That was the community practice
9  group that I was the director of, so that would have
10 been the time period that I did have overlap with
11 the Purdue rep.
12     And also through -- I don't know if I see it
13 on here or not, but I volun -- the only -- the only
14 pharmacy practice I do right now is as a volunteer
15 at the Mercy Health Clinic, and the Mercy Health
16 Clinic is a clinic for indigent care patients, just
17 basically people who have no insurance and no real
18 way to pay. So they have a full-time pharma -- not
19 full-time, she's part-time, but they have a
20 pharmacist that's there a couple of days a week
21 during the day, but a lot of these folks can't get
22 there during the day, so they have volunteer
23 pharmacists come in at night, along with volunteer
24 physicians. So we work side by side with the docs
25 at the Mercy Clinic to basically just take good care

Page 33

1  of patients.
2  Q. In connection with your pharmacy work and
3  community practice, is that volunteer work?
4  A. The work as a pharmacist in community
5  practice between 1981 and 2007 was usually for a
6  chain drugstore, and it was for -- it was
7  moonlighting.
8     When I was the director of pharmacy practice
9  group, that was -- that was part of my duties at the
10 University of Georgia, so I was also getting paid
11 through that.
12     The Mercy Clinic that we started in or about
13 2001 or 2002 with a group of pharmacists and
14 physicians, there was about four or five of us that
15 got that going, that was all volunteer work and has
16 been to this day.
17 Q. Do any of those pharmacy or pharmacist
18 positions that you've held involve dispensing
19 Schedule II narcotics?
20 A. The work in community practice would have
21 involved that as a community pharmacist, but we did
22 not dispense anything at the -- we -- we recommended
23 prescriptions, but did not dispense at the primary
24 care office. And we do not do anything with
25 controlled substances at the Mercy Clinic.

Page 34

1    Q.  Okay.  So where was the community practice
2    located?
3    A.  So the community pharmacy practice would
4    have been for a variety of chains.  Initially, it
5    was a company called Pathmark, which any of you from
6    up north might recognize, Drug Emporium, the A & P
7    food stores.  I think I've worked some with Kroger.
8    Yeah, I've worked with Kroger.  I've worked with
9    Walmart.
10   Q.  So, okay.  That makes sense.  You said
11   moonlighting, so --
12   A.  Right.
13   Q.  -- while you were teaching, you were also
14   moonlighting as a pharmacist?
15   A.  Right.
16   Q.  And then in connection with your
17   moonlighting from '81 to 2007, you would have
18   dispensed any drugs pursuant to the prescriptions
19   that you received as a pharmacist; fair?
20   A.  That is correct.
21   Q.  And did you receive any particular training
22   related to opioid painkillers as a community
23   pharmacist?
24   A.  Other than what I received in pharmacy
25   school and through my internship training, I don't

Page 35

1    think there would have been anything in addition to
2    that.
3    Q.  For example, you didn't receive any
4    additional training about how to identify potential
5    cases of abuse or misuse of Schedule II narcotics?
6    A.  To the best of my recollection, that was not
7    something that I was trained in at that time.
8    However, since that point in time, I have received
9    training in those areas, and I now teach pharmacy
10   students those skills.
11   Q.  And when did you receive that training?
12   A.  That started for me in about 2014 perhaps,
13   '15, somewhere in that -- about that time.  We
14   received a sizable grant from SAMHSA, Substance
15   Abuse and Mental Health Services Administration, to
16   implement SBIRT, Screening, Brief Intervention,
17   Referral to Treatment in the pharmacy curriculum.
18   The grant was also designed to introduce it
19   in psychology and social work, as well at a couple
20   of institutions, including the University of Georgia
21   and Georgia Tech.  So we have now integrated that
22   into the pharmacy curriculum.
23   Q.  And so if we look at your report, which is
24   Exhibit 1, Page 2, Footnote 1, is that what that is
25   referring to, the SAMHSA grant?

Page 36

1    A.  Yes.  UGA SBIRT Interprofessional Training
2    Program, that's it.
3    Q.  Who else is working with you on that grant?
4    A.  The principal investigator is Amanda
5    Abraham, and she's in the School of Public and
6    International Affairs and has a strong focus in
7    addiction and addiction research.
8    The rest of the team is -- I -- I can't
9    pronounce her name, but it's June, and she's in
10   social work.  Let's see.  Who else is on there?
11   Justin is in psychology, and Brian -- Brian McBride,
12   is in -- at Georgia Tech in either psychology or
13   social work, and I'm, of course, the pharmacy
14   connection.
15   Q.  Is there a -- well, let me see if I can ask
16   you in an open-ended way.
17   In pharmacy practice, are pharmacists
18   trained to identify common signs of possible abuse
19   or misuse of narcotics, prescribed narcotics?
20   MR. CHALOS:  Object to the form.
21   A.  Well, I can't speak to all pharmacy schools,
22   but I know what we do at Georgia, and at present we
23   do introduce the concept of the SBIRT program.  The
24   SBIRT starts out with a couple lectures on why it's
25   important, and in that, we -- the idea of being able

Page 37

1    to screen your patients to identify those who have
2    potentially problems with substance abuse in
3    general.  It could be opioids, it could be alcohol,
4    it could be anything.
5    Q.  Could be benzodiazepines, any drugs you
6    could possibly abuse, I take it?
7    A.  Yes.  And we focus primarily on alcohol,
8    opioids, and things like marijuana that -- that we
9    can screen -- we take a public health perspective to
10   it, because we're -- we're looking at it from the
11   angle, does this drug use have a potential to impact
12   the patient's health and their existing care?
13   So what we do at Georgia is we introduce the
14   topics.  We teach the students how to use screening
15   tools to identify patients who might be at risk.  We
16   can't give them a test and say, you're at risk or
17   you're not at risk.  We can say, you know, based on
18   information you've provided, you may be at risk, and
19   here's how that might be impacting your health.
20   So with that information, then a pharmacist
21   who is dispensing, who had that information, could
22   also then know if the patient was at higher risk for
23   addiction or something along those lines.
24   Q.  Is there a prescription monitoring program
25   in Georgia?

Page 38

1    A.  I believe so, yes.  I don't currently
2  practice, so I -- I know I've signed up for it, but
3  I've never accessed it because I'm not currently
4  practicing.
5    Q.  Okay.  Fair.  So as a -- as a doctor of
6  pharmacy, you're not a prescriber of drugs, I take
7  it?
8    A.  Clarification.  I am not a doctor of
9  pharmacy.  I'm --
10   Q.  Sorry.
11   A.  I have a BS in pharmacy.  My doctorate is in
12 pharmacy and marketing, but it's not clinical
13 pharmacy, so it's not a clinical doctorate.  They
14 changed the degree in about 2000, turned it into a
15 PharmD, rather than a BS.  They just added one more
16 year to the curriculum.  So I have a BS in pharmacy
17 and a Ph.D., rather than a PharmD.
18   Q.  Okay.  And the Ph.D. is the Ph.D. that's
19 focused on pharmaceutical marketing?
20   A.  Right.
21   Q.  As a separate subject?
22   A.  Yes.
23   Q.  Is that a marketing degree, or is that a
24 pharmacy degree?
25   A.  That's a good question.  The -- the

Page 39

1  situation was -- at the University of South
2  Carolina, when I was recruited to go there back in
3  1981, the College of Pharmacy had just applied for a
4  graduate program, and it was going to be a graduate
5  degree in pharmacy or what they, at that time,
6  called pharmacy care administration.
7       Because that program wasn't approved, they
8  said, well, we're going to have this approved any
9  day now, and so -- but we don't, so currently you're
10 going to have to be enrolled in the marketing
11 program over at the business school.
12      So I took my courses and did the business
13 school program, and about two or three months before
14 I graduated, the pharmacy program finally got
15 approved.  So I had taken all the pharmacy classes
16 that I needed to take, taken all the business
17 classes that I needed to take.  So they basically
18 gave me a dual -- a dual major.
19      The interesting thing about that is you
20 don't get a degree from the University of South
21 Carolina in pharmacy or marketing.  You get a
22 doctorate from the University of South Carolina, and
23 you have an area of focus.  So my focus was
24 marketing and pharmacy.
25   Q.  How long did it take you to get that?

Page 40

1    A.  Four years.
2    Q.  And give me a sense of what percentage of
3  time you spent taking marketing classes in the
4  business school versus pharmacy classes in the
5  pharmacy school.
6    A.  Wow.
7    Q.  I know it's a long time ago.
8    A.  Probably 75 percent, 80 percent at the
9  business school.  They -- some of the courses
10 weren't in the business school either.  You know,
11 the graduate school has all kinds of requirements.
12 You have to have statistics.  You had to have
13 psychology.  You had to have a foreign language.
14      So probably 20 percent was those outside
15 courses, and then three-quarters of the rest was the
16 business school.  And it was basically marketing,
17 marketing management, marketing theory classes.
18   Q.  So back to my original question:  As a
19 pharmacist, you're not a prescriber of any drugs; is
20 that fair?
21   A.  Yes, for the most part; however, some
22 pharmacists do an -- they -- they do recommend or,
23 under protocol, do some prescribing.  Generally that
24 does not apply to controlled substances.
25   Q.  In order to get access to one of the

Page 41

1  controlled substances that's involved in this
2  lawsuit, you would have to get a prescription from a
3  medical doctor or a doctor of osteopathy; fair?
4       MR. CHALOS:  Object to the form.
5    A.  Or someone who's legitimately able to
6  prescribe it, yes.
7    Q.  Okay.  But you, yourself, are not, in your
8  words, legitimately able to prescribe a Schedule II
9  narcotic; fair?
10   A.  Not by law, that's fair.
11   Q.  Are you -- do you consider yourself
12 qualified to testify about how doctors make the
13 decision to prescribe opioid painkillers?
14      MR. CHALOS:  Object to the form.
15   A.  From a perspective of marketing, absolutely.
16 From a patient care perspective, the decision
17 process is well-known to me.  So I think I do -- I
18 do have skills and expertise in that area, but I
19 didn't -- I didn't do any analysis in this case
20 about how doctors treated their patients or made
21 decisions about opioids.
22   Q.  Do you consider yourself qualified to
23 evaluate whether a particular prescription was
24 medically necessary?
25      MR. CHALOS:  Object to the form.

Page 42

1    A.  So that -- again, that was not part of what
2  I did in this matter.  As a pharmaceutical marketing
3  expert, that would not be part of an analysis that I
4  would undertake.
5        As a pharmacist, if I were to review a case,
6  and you provided me with the clinical picture, I
7  think pharmacists -- any pharmacist would be able to
8  tell you, given a clinical presentation of a
9  patient, what might or might not be clinically
10  indicated.
11        That's just part of what we do as
12  pharmacists.  We're the -- sort of the final
13  gatekeeper, and so that would be something that we
14  could do, but, again, I did not do that in this
15  matter.
16    Q.  Okay.  Just -- I'm trying to understand the
17  scope of your opinions and your expertise.
18        So my understanding of your responses to my
19  question is that you have pharmacy training that
20  would allow you to evaluate in certain circumstances
21  whether you thought a prescription was warranted or
22  not, but that's not what you're doing in this case?
23    MR. CHALOS:  Object to the form.
24    Q.  Fair?
25    A.  Right.  The analysis in this case was

Page 43

1  limited to -- to pharmaceutical marketing and not
2  the clinical aspects of patients.
3    Q.  Are you -- do you have any training in pain
4  management?
5    A.  No additional training outside of what I did
6  in pharmacy school at -- at the time.
7    Q.  Do you have any training in palliative care?
8    A.  So training versus experience, I mean, I've
9  had patients that were under palliative care in the
10  day, but I've -- I've never undertaken any
11  additional training in that area.
12    Q.  Are you -- do you have any particular
13  familiarity with the FDA's advertising regulations?
14    A.  Well, to the extent that FDA rules,
15  guidelines, regulations, impact pharmaceutical
16  marketing, I would be familiar with that.  I don't
17  consider myself an expert on the FDA, though.
18    Q.  Don't consider yourself an expert on
19  FDA's -- sorry.  Strike that.
20        Do you consider yourself an expert on the
21  FDA's marketing regulations?
22    MR. CHALOS:  Object to the form.
23    A.  So I think I'm -- I'm knowledgeable about
24  the aspects of marketing that are controlled by the
25  FDA, again, as far as that goes.  Inner workings of

Page 44

1  the FDA, I -- that's not something I could provide
2  opinions about.
3    Q.  Have you ever participated in a submission
4  of a new drug application to the FDA?
5    A.  No, I don't -- I have not.
6    Q.  Have you ever drafted marketing materials
7  for FDA approval?
8    A.  So when you say "drafted," for me as a
9  marketer, it has a perfect specific meaning.  And
10  that's somebody sitting at a desk with a graphic
11  design, coming up with, you know, a magazine style
12  slick or something like that, or it could be
13  crafting of a clinical trial.
14        So in the first case, I -- I've never
15  drafted materials for the FDA.  I have drafted
16  materials for use in studies, but I haven't drafted
17  materials that would be submitted to the FDA.
18        I have participated in -- in analysis and so
19  forth that were part of trials or part of research
20  that may have been submitted to the FDA at some
21  point in time, but I would have to look at just a
22  few articles that I coauthored with folks in the
23  clinical side to really evaluate that.
24        So I think the answer to your question is
25  no.

Page 45

1    Q.  I -- in connection with rendering your
2  opinions in this case, do you intend to render an
3  opinion that any particular defendant in this case
4  violated FDA regulations?
5    MR. CHALOS:  Object to the form.
6    A.  So I don't -- I don't think -- I don't think
7  that opinion is one that I've expressed in my
8  report, but there are opinions that come kind of
9  close to that, and I'm sure we'll get to that at
10  some point.
11    Q.  Have you had any professional experience
12  dealing with FDA warning letters or notices of
13  violation?
14    A.  I have been exposed to FDA warning letters
15  through my work on a couple of cases like this one.
16  I've also been made aware of warning letters through
17  the process of the Drug Utilization Review Board.
18  As I recall, there had been times when warning
19  letters had been discussed at that board.
20        So -- so through the media as well, where
21  I -- where there have been companies that -- that
22  received warning letters or other types of actions
23  by the FDA that's been publicized, I would be
24  exposed to it through that as well.
25    Q.  But in terms of interfacing directly with

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  the FDA with respect to a particular warning letter,
2  I take it the answer is, you -- you have not done
3  that?
4      A.  I've never received a warning letter from
5  the FDA, no.
6      Q.  But you've never -- I mean, I get it, but
7  you've never represented or worked for a
8  manufacturer and helped that manufacturer respond to
9  a warning letter; fair?
10     A.  That's fair.  I -- I get your question now.
11  No, I have not done that.
12     Q.  Do you have any professional experience
13  marketing Schedule II or Schedule III drugs?
14     A.  Only as a receiver of the information, not
15  as a marketer of the information.
16     Q.  Do you know how treatment with opioid
17  analgesics has changed since the mid-1990s?
18     A.  I do.
19        MR. CHALOS:  Object to the form.
20     Q.  You do?
21     A.  I do.
22     Q.  And how do you know that?
23     A.  Well, I've seen a shift in the paradigms
24  about pain management, and that has gone from a very
25  conservative approach to the use of pain medicines

Page 47

1  to a much more liberal approach to the use of pain
2  medicines.
3      Q.  Has the pendulum started to swing back
4  towards conservatism?
5        MR. CHALOS:  Object to the form.
6      Q.  To your knowledge?
7        MR. CHALOS:  Object to the form.
8      A.  So the -- the pendulum -- it's an
9  interesting analogy, I think.  The -- the problem
10  with looking at the pendulum is that there is a
11  large body of patients that have been exposed to
12  opioids that have developed problems associated with
13  their use.
14        And that group doesn't really get smaller
15  unless somebody dies or gets either put on some kind
16  of maintenance treatment or medication-assisted
17  therapy, or some sort of cognitive behavioral
18  therapy, and you know, is basically treated for
19  their addiction.  And in those cases, many times
20  it's still an addiction.  It's just being treated.
21        So to say the pendulum is swinging back is
22  not something I'm sure I can agree with, but I think
23  we have seen a plateau.  And the numbers -- while
24  the numbers remain high, I think that the recent
25  research that I've seen has showed a plateau, that

Page 48

1  the problem may not be continuing to expand.
2        However, there are many aspects to the
3  opioid addiction issue, many of which I'm not an
4  expert to discuss or to review.
5        But it is -- with specific regard to your
6  question on the pendulum swinging back, I don't
7  think it's swinging back.  I think we've -- we've
8  reached a point at which the pendulum is sort of
9  hanging out there, and we have yet to see what's
10  going to happen as a result.
11     Q.  Let's look back at your report.
12     A.  Excuse me?
13     Q.  Let's look at your report.  Let's look at --
14        MR. CHALOS:  This --
15     Q.  -- Paragraph 8.
16        MR. CHALOS:  This light is red.
17        THE VIDEOGRAPHER:  Looks like --
18        MR. VOLNEY:  Sorry.  Can you hear me?
19        MR. CHALOS:  Sorry if I misspoke.
20        MR. VOLNEY:  It's my fault.  Too much going
21  on in front of me.
22  BY MR. VOLNEY:
23     Q.  Let's look at Paragraph 8.  Just trying to
24  identify in your report what qualifications you have
25  that are specifically related to the area of

Page 49

1  opioids, and we've talked about the SBIRT that's
2  identified in Exhibit 1 on Page 2.  Is there
3  anything else in here in your qualifications or on
4  your CV related to the area of opioids?
5      A.  Yes.
6      Q.  What else is there?
7      A.  Well, at Footnote 1 is actually two grants.
8  The first one is a policy analysis at Georgia
9  Medicaid, which I started in about the same time
10  period that we started the SAMHSA grant.  And that
11  study is designed to evaluate the impact of Medicaid
12  safety measures that they put in place in about
13  2008, 2009 to limit patient exposure to opioids.
14        And that study funded by the National
15  Institute of Health, the National Institute on Drug
16  Abuse, just recently -- we just recently completed
17  it.  We're still finishing all the analysis.
18        But associated with that, we also published,
19  I think, three or four papers, certainly three, and
20  then there's one or two that are still in the
21  developmental stages, assessing Medicaid policies
22  with regard to changes they made to the Medicaid
23  program back in that time period, again, designed as
24  safety measures to limit exposure to opioids where
25  possible.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    So in addition to that, the training that I
2  have as a pharmacist certainly, I think, qualifies
3  me in terms of knowing about opioids and their
4  impact on patients.
5    Also, the technical aspects of opioids and
6  their distribution, the -- from the marketing angle
7  specifically, opioids are part of the prescription
8  drug marketing arena, and they have some special
9  rules that I identify in my report based on the
10 nature of opioids.
11   Q.  Does that cover the -- your work in the area
12 of opioids?
13   A.  So I think the only thing I'd like to add to
14 that is that -- that generally, a lot of the things
15 that I've done over time have related to issues that
16 would be the same whether we're talking about
17 opioids or other prescription medications, and I
18 think those are all tangentially related.  I don't
19 think that there's any that are directly related.
20   Q.  All right.  Let's -- let's look at
21 Exhibit 3.
22   A.  In addition to that, we --
23   Q.  Sure.
24   A.  -- made a couple of presentations at
25 regional, national, international meetings regarding

Page 51

1  opioids.  These are identified in the CV, but these
2  were just -- these -- these would be presentations
3  that were related to the papers that we published as
4  well.
5    Q.  What page are you looking at?
6    A.  This would be on Page 13 of the CV, and I
7  think they there are actually one or two that might
8  be missing here, but I could check, the ones that
9  begin with the name Jawordhana, those two
10 presentations both.
11   Q.  Did you participate in giving those
12 presentations?
13   A.  They -- they were -- as I recall, I
14 participated in the development of the
15 presentations.  I did not present them.  The
16 first -- the first author listed would have been the
17 presenting author.  I would have been the senior
18 author on both of those papers.
19   And that was -- that was the team on the
20 opioid grant.  It's a slightly different team than
21 the SAMHSA grant, but that would include Jayani
22 Jawordhana, Amanda Abraham, who was consistent on
23 both projects, Henry Young, and myself.
24   Q.  Is there -- was there more than one article
25 that was the result of the -- this collaboration?

Page 52

1    A.  Yes.
2    Q.  So one of them is Opioid Analgesics and
3  Georgia Medicaid Trends and Potential Inappropriate
4  Prescribing Practices by Demographic
5  Characteristics, 2004 to 2019?
6    A.  So the article wouldn't be that.  The
7  article would be listed on Page 4 of the CV.
8    Q.  All right.
9    A.  Articles Number -- Number 4, 5, and 6 are
10 the three that were published.
11   Q.  4, 5, and 6?
12   A.  Right.  And we have one that's in
13 preparation right now.  That's listed as Number 1,
14 but the 4, 5, and 6 are the three that are -- that
15 have actually -- I think Number 4 is actually --
16 it's no longer in press.  I think it's been
17 published, but I'd have to check.  Number 5 is
18 definitely in print, and Number 6 is definitely in
19 print.
20   Q.  When you talk about potential inappropriate
21 prescribing practices, what does that mean?
22   A.  So as part of the opioid grant, the policy
23 analysis, one of the variables that we looked at in
24 our regression modeling was whether the prescribing
25 by the physician met certain clinical criteria.

Page 53

1    And some folks out in Utah developed those
2  criteria very specifically.  They've been used in a
3  lot of research nationwide.  It's just referred to
4  generally as appropriate or inappropriate --
5  potentially inappropriate prescribing.
6    As an aside, this is why I mentioned that
7  some of the work I've done elsewhere actually
8  applies here because I've looked at inappropriate
9  prescribing in other categories; for example, in the
10 elderly, not specifically related to opioids, but
11 potentially inappropriate prescribing where some set
12 of clinical criteria that have been developed by
13 experts in the field are applied to a claims
14 database to determine if the prescribing was indeed
15 appropriate or not by that assessment.
16   It does not take into account the clinical
17 picture of the patient, only these objective
18 indicators that can be assessed from a claims
19 database.
20   So potentially inappropriate prescribing
21 would have been situations, for an example where a
22 benzodiazepine was prescribed at the same time as an
23 opioid analgesic, or where there was an overlap of
24 less than seven days between one opioid prescription
25 and another, or when the dose exceeded a certain

1 number of morphine milligram equivalents within a
2 particular time period.
3 So those are some examples of the ways we
4 assess objectively appropriateness of prescribing.
5 I think another one is Suboxone along with an
6 opioid. There might be one or two others. I -- we
7 can look at that article and see.
8 But again, potentially inappropriate
9 prescribing was assessed objectively through those
10 criteria, and then we simply used that as a variable
11 in our analysis. So one of the variables on the
12 right-hand side of the equation, the independent
13 variables would have been related to that
14 inappropriate prescribing.
15 Q. I take it you queried the Georgia Medicaid
16 database and the records that are available via that
17 database and then just identified particular cases
18 where there were these potential inappropriate
19 prescribing practices?
20 A. That -- generally, that's what we did.
21 We -- we received the database from Medicaid, and
22 then we proceeded to get it into a suitable format
23 for analysis. The -- the analysis itself, once we
24 identified patients who had taken any opioid during
25 the entire study period, we then looked at -- for

1 the -- we looked for those specific potentially
2 inappropriate criteria.
3 Q. But you're not making a judgment whether, in
4 a particular case or any subset of potential cases,
5 that there was an actual inappropriate prescribing
6 practice. It was just the potential for that.
7 Fair?
8 A. I think -- I think that's -- I think that's
9 a fair way to say that what -- what we looked at was
10 not an assessment of whether the prescribing was
11 actually appropriate or inappropriate. It was just
12 these objective criteria that have been shown over
13 time, by lots of experts, to be pretty good
14 indicators of whether that was the case or not.
15 Q. Did you find that the most prevalent
16 potential inappropriate prescribing practice by
17 doctors was overlapping opioid and benzodiazepine
18 prescriptions?
19 A. I don't have the article here in front of
20 me, but I think, as I recall, that was what we
21 found.
22 Q. What are benzodiazepines?
23 A. Benzodiazepines are, for example, lorazepam,
24 diazepam, clonazepam. They're -- they're a category
25 of drugs that are centrally acting and anxiolytic

1 and a muscle relaxant.
2 So there are some reasons why, over time,
3 physicians may have prescribed those along with an
4 opioid for pain, but I think research has borne out
5 over time that it's not a good idea to use those two
6 together.
7 Q. Do you consider -- well, there's a lot of
8 marketing discussion in your report. Drugs are
9 marketed -- well, here, the prescription drugs we're
10 talking about here, a particular patient wouldn't
11 get a prescription drug unless a doctor made the
12 medical judgment that it was necessary to write that
13 prescription for that patient; is that fair?
14 MR. CHALOS: Object to the form.
15 A. Well, a little bit earlier you asked me if I
16 was going to have opinions about the prescribing
17 process for individual patients, and I told you no.
18 So I probably should stick to my -- my answer on
19 that and say, you know, that's not something I
20 evaluated.
21 Q. So in terms -- in terms of doing your case
22 study in this -- in this lawsuit, you didn't look at
23 prescribing practices by doctors; fair?
24 A. I did not look at individual patient level
25 decisions by doctors. I did look at the decision

1 process that doctors use in making that decision for
2 a patient globally and from a theoretical
3 perspective as -- as relates to the marketing and
4 why marketing impacts that decision.
5 Q. So you are aware that potential
6 inappropriate prescribing practices can create
7 dangers to patients who are prescribed opioid
8 painkillers; fair?
9 MR. CHALOS: Object to the form.
10 A. So in looking at potentially inappropriate
11 prescribing, there's -- there's two parts to that.
12 There's the objectivity of it. It's been -- it's a
13 criteria that's been developed by experts that if
14 these occur, then we're more likely to see
15 inappropriate prescribing, and bad things happen.
16 At the same time, just because someone used a
17 benzodiazepine and an opioid together, it doesn't
18 mean a bad thing happened.
19 So the analysis is slightly different
20 between those two, and I'm not sure how to answer
21 your question because I didn't evaluate whether
22 those bad things happened.
23 The -- that's actually the focus of the last
24 paper that's not finished yet, where we're looking
25 at patient outcomes and patient outcomes in relation

Page 58

1  to these -- these potentially inappropriate
2  prescribing.
3      So soon I should know the answer to the
4  question whether or not benzodiazepines and opioids
5  caused a statistically significant increase in
6  negative outcomes for patients, but as we sit here
7  today, I can't tell you that I know the answer to
8  that.
9      Q.  Do you know what a learned intermediary is?
10     MR. CHALOS:  Object --
11     A.  Yes.
12     MR. CHALOS:  -- to the form.
13     A.  Yes, I do.
14     Q.  What is a learned intermediary?
15     A.  A prescriber is a learned intermediary, for
16  example.
17     Q.  So a healthcare provider who is licensed to
18  prescribe a particular drug is a learned
19  intermediary?
20     MR. CHALOS:  Object to the form; calls for a
21  legal conclusion.
22     A.  Could you read that again?
23     Q.  I'm reading from your book --
24     A.  Yeah.
25     Q.  -- Pharmaceutical Marketing --

Page 59

1      A.  Right.
2      Q.  -- Page 158 --
3      A.  Right.
4      Q.  -- in a chapter written by Mr. or
5  Dr. Brideau and Dr. Fanning.
6      A.  Yes.
7      Q.  Are they colleague of yours?
8      A.  They're acquaintances, yes.  They work --
9  they used to work at Philadelphia College of
10  Osteopathic Medicine College of Pharmacy.
11     Q.  And they state under the subheading Brief
12  History of Governmental Prescription Drug
13  Regulations, that:  Prescription medications are not
14  considered consumer goods because their use requires
15  a learned intermediary, quote, a healthcare provider
16  licensed to prescribe, to diagnose the condition
17  treated by the drug, recommend the drug and then
18  monitor the use of the drug, including its
19  effectiveness and adverse events.
20     Do you agree with that statement?
21     MR. CHALOS:  Object to form.
22     A.  Yes.  I have no reason to disagree with
23  that.
24     Q.  Okay.  I mean, you understand from your many
25  years of pharma -- pharmacy practice that there are

Page 60

1  gatekeepers in between potential patients and the --
2  the Schedule II, Schedule III narcotics; fair?
3      A.  By gatekeepers, you mean healthcare
4  professionals that are making decisions on their
5  behalf, yes.
6      Q.  Right.  And that includes a doctor?
7      A.  It would include a doctor or any prescriber.
8      Q.  Also include a government organization like
9  the FDA --
10     MR. CHALOS:  Object to the form.
11     Q.  -- who would have to approve the drug?
12     MR. CHALOS:  Object to the form.
13     A.  I guess at some level, the FDA's new drug
14  approval process or abbreviated new drug
15  applications process would have some impact on what
16  was actually available to practitioners, so
17  you couldn't say they were not involved.
18     Q.  And I think you would agree that
19  pharmacists, licensed --
20     A.  Can -- I'm sorry.
21     Q.  Sorry.  I interrupted you.
22     A.  I have a bad habit of thinking before I
23  speak, and I get -- I get stepped on sometimes, but
24  the -- the thing about that is, is that the FDA is
25  making a decision at a global, societal level about

Page 61

1  what's available, whereas the individual
2  practitioner is making a decision for that patient.
3  I think that's an important distinction.
4      Q.  Got it.  You would also consider the -- a
5  pharmacist to be potentially a gatekeeper?
6      A.  At a --
7      MR. CHALOS:  Object to the form.
8      A.  The pharmacist as a gatekeeper is at a
9  different -- I think level in the distribution and
10  supply chain, and so, yes, I would consider them a
11  gatekeeper as well.
12     Q.  Okay.  So I'm about to change subject
13  matters.  Do you want to take a break?
14     A.  I absolutely do.  Thank you.
15     Q.  Okay.
16     THE VIDEOGRAPHER:  We are now going off the
17  video record.  The time is currently 10:35 a.m.
18  This is the end of Media Number 1.
19     (Recess from 10:35 a.m. until 10:49 a.m.)
20     THE VIDEOGRAPHER:  We are now back on the
21  video record with the beginning of Media
22  Number 2.  The time is currently 10:49 a.m.
23  BY MR. VOLNEY:
24     Q.  So I failed to cover sort of one
25  qualification-related matter before we move to the

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  case study methodology and then the specific
2  opinions you have in this case.
3      You've identified for us at Schedule 2 of
4  your report, what I've marked as Exhibit 3, which is
5  your prior testimony for the last four years.
6      Do you see that?
7  A.  Yes, I do.
8  Q.  Is this accurate?
9  A.  Yes.
10  Q.  Can you tell me which of these matters
11  involves a use by you of the case study methodology?
12  A.  The -- if -- if -- I assume you're referring
13  to a marketing case study analysis versus a clinical
14  case study analysis?
15  Q.  Correct.  My understanding of your report in
16  this case is that it's a marketing case study
17  analysis.
18  A.  Right.
19  Q.  Fair?
20  A.  The reason I bring that up is because
21  several of these other cases were a patient case
22  study, so it's an individual patient that was being
23  studied.  So it's a similar analysis, different
24  subject matter completely, but similar methodology
25  for formulating opinions.

Page 63

1      But with respect to your question, the 2018
2  BCBS, et al., v. GSK used -- it sort of -- it was
3  sort of an abbreviated case, but it was a similar
4  methodology to the --
5  Q.  What did that case involve?
6  A.  Am I at liberty to discuss it?  Because I
7  did sign a protective order and --
8  Q.  Well, just generally, is it a products
9  liability case?  Is it a pharmacy marketing case?
10  A.  It was a marketing case with specific
11  relationship to manufacturing and manufacturing
12  issues as they relate to marketing.
13  Q.  So is that -- of the -- of these half dozen
14  on Exhibit 3, the one that involves a marketing case
15  study analysis is the BCBS versus GSK?
16  A.  Yes, but as I said, that -- it was a very
17  different kind of case.  It was -- number one, it
18  was just one company, and many of the opinions were
19  related to just how things worked in terms of the
20  pharmaceutical marketplace.
21  Q.  All right.  How long have you been a
22  testifying expert career-wise?
23  A.  In -- in matters such as these, I started in
24  about 2007 and --
25  Q.  And what percentage of your income do you

Page 64

1  derive from being a testifying expert or a
2  consulting expert in litigation matters?
3  A.  Over -- over the years, it works out to be
4  anywhere from 10 to 20 percent on an annualized
5  basis on average.
6  Q.  Have you ever had any of your -- well,
7  sitting here today, do you recall any marketing case
8  study expert opinions that you've given prior to
9  this one where you've used the same methodology as
10  you're using in this case?
11  A.  Yes.
12  Q.  Okay.  What -- what cases do you recall?
13  A.  So we have to go off this grid to do that,
14  or is that not something we can do?
15  Q.  No.  I think I'm entitled to ask.  We can go
16  off the grid.
17  A.  Okay.  So the first cases that I was
18  involved in was another MDL that was related to
19  average wholesale pricing and what was referred to
20  as spread pricing, and I used a case methodology in
21  that.
22      I also used a case methodology in -- and
23  there were -- one, two -- there were three AWP cases
24  that I used that same methodology for.
25      I used a similar methodology in an off-label

Page 65

1  marketing case in about 2009 or '10.
2      Also, a little after that, I was retained by
3  the Department of Justice to examine hospice
4  marketing, and I used the methodology there,
5  although those opinions were not admitted.  The --
6  my understanding is the judge said that while she
7  felt that I was a marketing expert, that because I
8  had not worked in hospice before, that she didn't
9  think I should be providing opinions on hospice.
10      Then the next time I used that -- that same
11  methodology would have probably been -- the exact
12  same methodology would have probably been the Blue
13  Cross Blue Shield case.
14  Q.  So the case where your opinion was excluded,
15  do you -- is that the matter of United States of
16  America vs. Aseracare, Inc.?
17  A.  Yes.
18  Q.  And that was pending in the Northern
19  District of Alabama, Southern Division?
20  A.  Yes.  I think it still is pending, actually.
21  Q.  Still is pending.  And in that case, you
22  were an expert hired by the plaintiff, the United
23  States of America or the Department of Justice?
24  A.  Yes.
25  Q.  And -- all right.  Your opinion was excluded

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 in that case, right?
2   A.   That is my understanding.
3   Q.   Now, let's see.  How much are you getting
4 paid in this case?
5   A.   My hourly rate is $350 per hour.
6   Q.   And do you know how much you've billed so
7 far?
8   A.   I've billed about 700 and -- about 700
9 hours.
10   Q.   So do the math for me.  That's a lot.  I'm a
11 lawyer, not a mathematician.
12   A.   It's about 210.  If I'm paid everything that
13 I've billed, then it's about $210,000 or a little
14 more than that.
15   Q.   Okay.  That's an issue between you and him.
16       Let's see.  How long -- when were you first
17 hired?
18   A.   First hired versus first contacted?
19   Q.   Well, first contacted.
20   A.   Okay.  First contacted in about 2012, 2013,
21 somewhere in that time range.
22   Q.   And who contacted you?
23   A.   Ms. Linda Singer.
24   Q.   Okay.  What happened next with respect to
25 your contact and getting hired?

Page 67

1   A.   Did a little bit of preliminary work at that
2 time, but my assessment was the document production
3 needed to be more for me to look at.  I needed to
4 see specific kinds of marketing documents, so I just
5 went idle with the case.
6       And then I was recontacted in July of 2018.
7   Q.   And who were you contacted by?
8   A.   Ms. Baisch, Krista.
9   A.   Krista, the woman sitting two to your
10 left -- to your right?
11   A.   Yes, to my right.
12   Q.   Okay.  And is she your primary contact
13 person for this matter?
14   A.   She has been.
15   Q.   And since you were hired in 2018, you've
16 spent about 700 hours, all told, on this matter?
17   A.   Approximately, yes.
18   Q.   Is anyone assisting you?
19   A.   I have an assistant, a pharmacist,
20 Dr. O'Dowd, who has helped me on a few tasks.
21   Q.   Who is he or she?
22   A.   She is a pharmacist who, while she was in
23 pharmacy school, was -- took my marketing classes
24 and had an interest in this area.
25   Q.   What has she done?

Page 68

1   A.   She has organized documents and worked at my
2 direction to just basically categorize, file, and
3 provide a listing of specific documents.  For
4 example, Table II in my report, I had her
5 primarily -- once the marketing message documents
6 were identified, I had her sort through them and
7 divide them into the categories that we see in that
8 table.
9   Q.   So in terms of Table II, that is, I guess,
10 her work product, but reviewed and approved by you
11 and put into your report?
12   A.   Well, I mean, actually, we worked on it
13 together, and she did -- once -- once the format was
14 laid out and the learning curve about what documents
15 go where was decided, then she did build out the --
16 the actual listings, and then I did go through and
17 review and edit everything.  She did that at my
18 direction, so --
19   Q.   In terms of identifying the documents that
20 you considered to be relevant to your report, how
21 did you go about doing that?
22   A.   So I had access to the Relativity database,
23 where I conducted some of my own searches.  The first
24 thing I did when I was contacted by the plaintiffs
25 was to send them a list of search terms.

Page 69

1       As you're probably aware, in July there was
2 a very rapidly approaching deadline that was still
3 on the books.  And I indicated that, you know, for
4 me to conduct all the searches and go through that
5 many documents that quickly would be impossible.
6       So I gave them search terms and said, these
7 are the kinds of documents I need to see.  Can you
8 conduct some searches and provide me with documents?
9       So with that, basically, as I understand it,
10 being done based on my search terms, which I believe
11 I've provided as well --
12   Q.   Uh-huh.
13   A.   -- the individual searches that I did, as
14 well as some searches that Dr. O'Dowd did at my
15 direction, so that would be where the documents came
16 from.
17       So when those documents were identified, I
18 then, you know, requested them to be provided to me
19 in PDF format.  Some of them were and some of them I
20 had to search for myself on the Relativity system.
21   Q.   Is it your testimony that all the defendant
22 documents that are identified in your report, you --
23 you and your assistant were able to identify through
24 the use of your search terms?
25   A.   I don't think that's what I said.  I

Page 70

1  think the -- the documents that are identified, for
2  example, the schedule that lists all the materials
3  considered, contains documents that we identified,
4  that I identified, some that she identified on her
5  own and reviewed with me, as well as some that were
6  identified by searches that were done by the
7  magicians at Relativity or attorneys or staff.  I
8  don't know who did those searches, but they were
9  conducted.  And so then they provided me with either
10 lists of Bates numbers or links to Relativity
11 documents, which I then reviewed.
12    Q.  Got it.  Tell me, what is the case study
13 methodology?
14    A.  Okay.  The case study methodology is a -- I
15 think a widely accepted method of doing analyses in
16 marketing and in medicine.
17        I realize that's an open-ended question, but
18 I -- but I'm hesitant to go too far with that.
19    Q.  Okay.  So let me split it up.
20    A.  Okay.
21    Q.  Case study methodology in terms of the
22 marketing context, what do businesses or people use
23 the case study methodology for, and how do they do
24 it in the marketing context?
25    A.  So case study methodology from a marketing

Page 71

1  perspective is extremely useful because it allows us
2  to look at complex systems of decisions in a real
3  world context and to evaluate, you know, the -- the
4  how and the why things were done and what happened.
5    Q.  Okay.  When you talk about the real world
6  context in the marketing arena, are you just focused
7  on the -- what's in the marketing materials, or are
8  you also trying to figure out how the audience
9  received and acted on those marketing materials?
10    A.  It's all of the above, because, actually,
11 from a marketing perspective, the -- one of the key
12 components, and actually a principle of marketing,
13 is awareness of the operating environment that
14 you -- that you have to live in.
15        So from a marketer's perspective, a
16 marketing plan or a marketing strategy would be
17 incomplete without assessment of what's going on out
18 there in the marketplace.  So it's both of those
19 issues that you bring up.
20    Q.  And part of assessing what's going on in the
21 marketplace is trying to figure out how consumers
22 are reacting to the marketing?
23    A.  So distinguishing consumers from -- from
24 who -- in a marketing perspective as applied here,
25 you know, we have customers.  And as you've probably

Page 72

1  noted, I distinguish customers with a "c" versus a
2  capital C, but consumers I look at as a little more
3  broad term.
4        So, yes, to look at consumers including both
5  patients as well as other customers, doctors, other
6  prescribers, third-party payers, insurance
7  companies, wholesalers, independent community
8  pharmacies, so a whole long list of potential other
9  customers.
10        But we would definitely be interested in
11 their behavior, how the marketing impacted them, but
12 not only that, also in the roles that they play and
13 how the information impacts them, the decisions that
14 they make, the way they make those decisions, what
15 they value in terms of information, and so on.
16    Q.  How did you make that -- or did you make
17 that judgment in this case, or evaluate in this case
18 how the marketing impacted particular prescribers,
19 third-party payers, insurance companies,
20 wholesalers, et cetera?
21    A.  So a large part of that assessment was done
22 based on the literature and research that's been
23 done in this area to identify how information
24 impacts, let's say, for example, prescribers.
25 Sections in my report are pretty extensive notated

Page 73

1  about that literature.
2        But in addition to that, the marketing plans
3  and marketing metrics are very detailed in this case
4  about how customers responded to defendants'
5  marketing.  So that was a big part of the assessment
6  as well.
7    Q.  Did you do any new research; for example,
8  take a survey?
9    A.  So -- so in -- in the case study
10 methodology, one of the things that a case
11 researcher might do is interview people making the
12 decision, making judgments, people designing the
13 marketing plans.
14        Unfortunately, in this instance, and it's --
15 happens in most case studies that are done in this
16 type of fashion, you can't do that.
17        But the interviews that you did through your
18 deposition process certainly provided a very similar
19 body of information to the kinds of questions that
20 might be asked of interviews if I were to do those
21 myself.
22    Q.  Now, why can't you do interviews in this
23 case?
24    A.  To my knowledge, I have no mechanism for
25 interviewing people in -- that are involved in -- or

Page 74

1 defendants that are involved in the case.
2     Q.   Well, what about prescribers, the folks in
3 Ohio who prescribed these medicines?
4     A.   So -- so, you know, I did not look at the --
5 as part of my marketing analysis, I did not look at
6 prescribers, per se.
7         From a marketing perspective, though, I did
8 look at, as I mentioned earlier, how the information
9 would impact their decisions and how it might
10 influence them.
11    Q.   And I'm trying to understand sort of how you
12 determine how a particular marketing message
13 impacted a particular prescriber, and let me -- let
14 me see if I can fairly recap what you've told me.
15        One thing you've said you've done is you've
16 relied upon the literature that exists in the sort
17 of marketing case study universe, which is cited in
18 your report; fair?
19    A.   I don't --
20        MR. CHALOS:  Object to the form.
21    A.   Yeah.  I don't think I said the marketing
22 case study literature, but I said the literature --
23 there's a body of literature associated with
24 prescribing behavior.  That's the literature I'm
25 referring to.

Page 75

1     Q.   Okay.  So you're relying on that body of
2 prescribing behavior literature.
3         And then second, I think you've identified
4 for me that you're looking at defendants' own
5 evaluation of the success or not of their marketing
6 plans; fair?
7     A.   Yes.
8     Q.   Anything else?
9     A.   Yes.  The -- the marketing literature in
10 general, not necessarily just related to physician
11 prescribing, also structures decision-making
12 processes, and it identifies a number of influences
13 on decision-making that must be considered in
14 analysis like this.  That's also in my report.  I
15 believe it's Figure 1 on Page -- Page 15.
16        So that also sort of structures the
17 theoretical underpinnings.  And then all the
18 research that's been done that we've alluded to just
19 a moment ago impacts this basic decision model.
20    Q.   I just want to make sure I understand, and I
21 apologize for repeating myself, but -- if I am.
22        I take it that you've not really engaged in
23 a quantitative analysis with respect to any
24 particular prescribing decision in the state of Ohio
25 or anywhere -- anywhere else in the United States in

Page 76

1 this case?
2         MR. CHALOS:  Object to the form.
3     A.   So I think I need to break your question
4 down a little bit.
5     Q.   Sure.
6     A.   The -- the -- I'm not sure I understand what
7 you mean by a quantitative prescribing decision.
8 That doesn't really --
9     Q.   Well, I guess what I'm talking about is
10 causation.  You're not going to say Dr. -- you can't
11 say Dr. X prescribed Drug Y because he saw Marketing
12 Material ABC; fair?
13        MR. CHALOS:  Object to the form.
14    A.   No, but I think if -- if I understand my
15 opinions correctly, I do believe that doctors,
16 prescribers, were influenced by marketing that
17 changed the way they prescribe medications, as a
18 general statement.
19    Q.   Okay.  General qualitative statement, I
20 understand that, and I read your report a number of
21 times, and I get that.
22        But in terms of percentage of prescription
23 decisions that were influenced by marketing versus
24 percentage that were not?
25    A.   That would -- that would be a different

Page 77

1 analysis, and I'm not even sure I know how to do
2 that analysis, so I'd have to give that some
3 thought.
4     Q.   But that's not an analysis that you've done
5 in this case, sort of to break it down?
6     A.   Yeah.  In this matter, I have not looked at
7 the individual prescribing by an individual doctor
8 or tried to make an assessment as to why they
9 prescribed based on different inputs into this model
10 that we've talked about on Page 15.
11    Q.   In terms of the universe of documents that
12 you reviewed, did you limit that in any way?  For
13 example, was it just the documents that were
14 produced by the defendants?
15    A.   No.  As I said earlier, I think the -- I was
16 not limited at all in what I had access to.  I know
17 that there were -- I think close to 30 million or
18 more documents in the document database that I had
19 reviewed and searched.  So I had no limitations on
20 that.
21        I did provide the search terms, as I said,
22 and I was provided documents by plaintiffs'
23 attorneys, based on my request for documents within
24 subject areas; for example, marketing plans.  That
25 was the -- the first thing on my list, the first

Page 78

1 priority on my list was to see marketing plans and
2 marketing planning documents.
3     When you -- when you do a search for that on
4 the Relativity database with 29 million documents,
5 you get a lot of returns, and it's a lot of
6 documents to look through.
7   Q.  When you talk about -- I'm on Page 4.
8   A.  Gotcha.
9   Q.  I just have some terminology questions.
10 First of all, the -- Exhibit 1, the report itself,
11 has this been subjected to peer review?
12   A.  Well, certainly the case study methodology
13 has been subjected to peer review over the years.
14 It's not a new technique.  It's -- it's been subject
15 to peer review in many publications regarding case
16 study methodology.
17     The theoretical underpinnings of the
18 research on prescribing behavior and pharmaceutical
19 marketing, those have all been subject to peer
20 review, but as far as I know, I was not at liberty
21 to have anybody review this, this document, prior to
22 it being, you know, used in this matter.
23   Q.  Okay.  So I think the answer to my question
24 is no?
25     MR. CHALOS:  Object to the form.

Page 79

1   A.  Not exactly.  The -- the --
2   Q.  And I was asking this particular document,
3 this -- the conclusions that you reached in your
4 expert report, it's not -- those particular
5 conclusions have not themselves been subject to peer
6 review, correct?
7   A.  Well, the way you worded it, though,
8 concerns me, because there are opinions that I
9 express that are completely consistent with
10 literature that has been peer reviewed.  So, I mean,
11 I think it's just hard to categorize it that way.
12     If you're asking this particular document,
13 no, it has been not -- not been peer reviewed
14 because it's subject to a protective order, but if
15 you're asking, have some of the opinions and -- are
16 they validated elsewhere?  Yeah, absolutely.
17   Q.  When you say in Paragraph 16 that you're
18 examining marketing in a real world context, what
19 does that mean?
20   A.  Well, you know, I think with regard to
21 opioids in particular, to look at the marketing and
22 not consider what was happening at a societal level
23 at any point during the marketing of the opioids
24 would be taking it out of its real world context;
25 for example, omitting that there were, at various

Page 80

1 places along the way, growing awareness of potential
2 problems with opioids, the rapid expansion of the
3 marketplace, so any number of issues that would come
4 up, the numbers of competitors in the marketplace,
5 the numbers of competing alternative goods or drugs
6 that might be used.
7     So there are a number of factors that create
8 the real world context.  For example, the size of a
9 particular sales force is a real world context.
10   Q.  Would you consider changes in thinking,
11 changes in medical judgment about the risks and
12 benefits of opioid painkillers over time to be part
13 of the real world context that you should consider?
14   A.  Yes.  I would -- I would consider -- I would
15 think that the real world context would necessarily
16 include changing paradigms about treatment of pain.
17   Q.  Is part of the real world context that you
18 considered the package inserts for these particular
19 drugs and how they might have changed over time?
20   A.  That -- we're -- we're bordering on outside
21 of real world context, and now we're bordering on
22 actual context of marketing decision-making.  So I
23 have to be careful how I answer that, but to a
24 degree, the -- a change in the package insert
25 could be reflective of a change in thinking at a

Page 81

1 regulatory agency, that's real world context.
2     Decisions within a company, though, about
3 changing the package insert would not be.  They
4 would be marketing context.  So it's a fine line
5 there, I realize, but it has an important
6 distinction to me.
7   Q.  I'm not following.
8   A.  I'm sorry.  I can try that again.
9   Q.  Try it again.
10   A.  Okay.  So let's take the package insert as
11 an example.  So if Purdue decides that they're
12 changing their package insert for whatever reasons,
13 based on new research or based on a marketing
14 decision that's made, that is not necessarily real
15 world context.  That's Purdue's marketing behavior.
16 It has significance from a marketing perspective.
17     If, however, the FDA comes to Purdue and
18 says, we don't like that package insert, we need you
19 to change it, that's real world context, because
20 it's the outside influencing Purdue, rather than
21 Purdue making a marketing decision and taking that
22 to the marketplace.
23   Q.  Do you know whether that occurred, that
24 particular event occurred in this case?
25   A.  Oh, yes, I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  Q.  And you know that the package insert for
2  OxyContin was changed along the way?
3  A.  Yes.
4  Q.  Did that -- did the changes in the package
5  insert -- are they reflected anywhere in your
6  analysis?
7  A.  I believe so, yes.
8  Q.  And tell me how.
9  A.  Again, I -- I am a little -- I'm the only
10  person in the room -- well, there's one other person
11  that doesn't have a computer, so -- but --
12  Q.  I don't have one.
13  A.  That's true, but to go -- I know that the
14  changing -- it seems in my report there is a section
15  that refers to changes in marketing of opioids over
16  time, and I am pretty sure that it's either
17  referenced or discussed in that section about
18  changes to the Purdue packaging.  So the
19  significance to that is -- is multi, though.
20  There's a lot of different marketing significance.
21  Q.  I'm trying to understand sort of -- I mean,
22  I understand sort of the marketingspeak about it has
23  significance in the marketing perspective, but
24  I'm -- and perhaps we can get beyond this -- my
25  mental block here.

Page 83

1  You're not prepared to and you're not going
2  to testify that any particular prescribing physician
3  was influenced by marketing; fair?
4  MR. CHALOS:  Object to the form.
5  Q.  Any -- like a quantitative analysis of 20
6  percent of prescribing decisions were influenced by
7  marketing, anything like that?
8  A.  Yeah.
9  MR. CHALOS:  Object to the form.
10  A.  I have -- I have not undertaken any
11  quantitative analysis of individual prescribing
12  decisions.  My opinions are related to overall
13  prescribing by physicians in general.
14  Q.  Okay.  And so I kind of view your -- I don't
15  want to quarrel with you about this, but your report
16  is more of a qualitative report?  This -- these are
17  the qualities of the marketing.
18  MR. CHALOS:  Object to the form.
19  A.  So case -- case method research is, by
20  definition, a qualitative research method, so, yes.
21  Q.  Okay.  Good.  What's next?  Let's see.  What
22  is -- were you asked to make any assumptions in
23  connection with your case study in this matter?
24  A.  I'm not sure about assumptions.  I guess it
25  is an assumption.  In the latter part of the report,

Page 84

1  I refer to the marketing messages as being false and
2  misleading.  So the assumption that I guess I was
3  asked to make is that these -- a group of other
4  experts will be providing testimony to that effect.
5  I already had indication of that through the warning
6  letters from the FDA.
7  Q.  What other plaintiffs' experts are you
8  referring to?
9  A.  I guess, as I recall, Kessler, Shoemaker,
10  Lemke, Valentine, Perrin.  I'm not sure I got them
11  all, but I think there were five.  Did I give you
12  five?
13  Q.  I think so.  So in connection with the case
14  study in this lawsuit, you were asked to make
15  assumptions about -- that the defendants' marketing
16  messages were false, misleading, inaccurate, or
17  designed to misstate the risks and benefits of
18  defendants' drugs; fair?  And I'm looking at --
19  A.  So --
20  Q.  -- Paragraph 154 of your --
21  A.  I'm sorry.  I can't help it.  I have to
22  think about it.
23  Q.  Yeah.
24  A.  The -- I think it's -- I think that's true,
25  but also, as I said, the -- the case study revealed

Page 85

1  information of its own merit based -- that had basis
2  to that.
3  Q.  Is it typical in the case study methodology
4  that you would be asked to make an assumption that
5  all of the defendants' marketing messages were
6  false, misleading, inaccurate, or designed to
7  misstate the risks and benefits of defendants'
8  drugs?
9  A.  It depends.
10  MR. CHALOS:  Object to the form.
11  A.  It depends.
12  Q.  Have -- have you done that before in
13  connection with any, I mean, expert opinion you've
14  given in a lawsuit?
15  A.  I'm hesitating because the answer to that is
16  "yes," but it -- I'm not sure I can discuss it.  I
17  don't know what -- I would need to ask you or these
18  other lawyers here what I'm allowed to say about the
19  GSK matter.
20  Q.  I mean, I've -- I have reviewed the case
21  study research that's identified in your report, and
22  I have not seen a particular piece of literature in
23  the -- that talks about the case study methodology
24  where it says it's appropriate for the person
25  forming the case study to make broad assumptions

Page 86

1 about the truth or falsity of particular materials
2 that they're looking at. And I am wondering, what
3 is the -- what's the academic basis, the expert
4 basis, for you to do that in this case?
5 　　MR. CHALOS: Object to the form.
6 　A. So with the case study method, there are
7 always assumptions that have to be made, always.
8 There's never going to be a time where there aren't
9 assumptions that are made, and the assumptions just
10 depend on the nature of the case.
11 　Q. I mean, those are pretty big assumptions in
12 this case, don't you think?
13 　　MR. CHALOS: Object to the form.
14 　A. Well, I think they would be big assumptions
15 if there wasn't a lot of evidence in the case itself
16 that I've mentioned that -- that led a reviewer to
17 see that it was true.
18 　Q. And what evidence are you talking about
19 again?
20 　A. The FDA warning letters in specific.
21 　Q. Is that the sole basis for you to reach that
22 conclusion?
23 　A. I'm not sure how to answer that because I
24 think the basis for it is enough, based on the FDA
25 citing that advertising was false or misleading.

Page 87

1 　Q. Do you consider yourself to be -- to have
2 expertise to be able to evaluate whether a
3 particular drug manufacturer's representations about
4 the risks and benefits of its drugs are false or
5 misleading?
6 　　MR. CHALOS: Object to the form. Object to
7 　the extent it calls for a legal conclusion.
8 　A. So are you asking if I have the knowledge or
9 skill to look at an ad and say, hey, this just
10 doesn't sound right to me or --
11 　Q. Well, I'm really -- sorry. I'm not -- I'm
12 not being clear about what I -- what I -- what I'm
13 trying to understand.
14 　　I take it that in this case, you're not
15 intending to offer an opinion that particular
16 advertisements are false or misleading; fair?
17 That's somebody else's role, that's Kessler's role,
18 the other guys you -- folks mentioned; fair?
19 　A. Yes, that's true.
20 　Q. So in connection with your case study, you
21 tell us at Paragraph 154 you've just assumed that
22 the marketing messages were false and misleading,
23 right?
24 　A. I'm pretty sure that I also said the part
25 about the FDA.

Page 88

1 　Q. And you said it's at least consistent with
2 the FDA documents that you've reviewed as well, the
3 warning letters?
4 　A. Right.
5 　Q. Right. Okay. Let's look at, sorry, Page 7,
6 and this is a list -- I guess it's just -- here are
7 the opinions, 1 through 7?
8 　A. Yes. One of the -- one of the things about
9 the case study method, you know, there are different
10 ways of writing it up. The -- one of the more
11 important things is to -- to communicate your
12 opinions in a literary way almost.
13 　　And this was something that was developed
14 by -- or a strategy, I think, that was developed by
15 Dr. Robert Yin, who's really sort of a leader on
16 thought processes on case study methods and case
17 study research.
18 　　But he says one of the things you can do is
19 put your -- you put your conclusions right out there
20 up front. And it's -- he calls it a suspense
21 method, where you then -- the reader has to read the
22 rest of the document to see where those opinions
23 came from.
24 　　So it's part of a strategy that's -- that's
25 accepted in case study reports and certainly one

Page 89

1 that I applied in this case.
2 　Q. And are these -- I know this is a synopsis
3 of the seven opinions you intend to offer, but does
4 this cover the waterfront in terms of the opinions,
5 at least the high level waterfront?
6 　A. Yes, it does.
7 　Q. So if I want to know Dr. Perri's opinions in
8 this case, I would just have to look at this report,
9 and the entire -- all of his opinions are included
10 somewhere in this report?
11 　A. All of them are included in this report, and
12 they are summarized on Page 7, 8, and 9.
13 　Q. And are there any other opinions that you
14 intend to offer that aren't in this report?
15 　　MR. CHALOS: Object to the form.
16 　A. Not that I'm aware of.
17 　Q. Okay. I mean, obviously, your report is
18 really long. So it's chock-full of stuff, but
19 let's -- in terms of your discussion of marketing,
20 did you pull that from any particular resource? Is
21 that pulled from your Pharmaceutical Marketing
22 textbook?
23 　A. It's pulled from 30 years of experience, and
24 most of it was just drafted, supplemented with
25 citations, and tweaked, so I honestly can't tell you

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  that -- I know I didn't take anything from the
2  marketing textbook, but I'm sure that -- because
3  I've written over the years, that -- that my writing
4  is going to begin to sound just alike or it's going
5  to be pretty close to the same thing.
6    Q.  Let's look at Paragraph 29.
7    A.  Paragraph 29?
8    Q.  Yeah.  We're on Page 13.  When you -- when
9  you talk about pharmaceutical marketing having a
10 heightened standard -- do you see that -- is that
11 heightened standard published anywhere?
12   A.  So I think this is a generally accepted
13 principle, that prescription pharmaceutical products
14 are, by nature, more dangerous and require a more
15 careful approach to their marketing than other
16 products, like bubble gum or baseball cards.
17      I don't know that -- that it's published in
18 a formal way, but I know that certainly, if you read
19 the introductory paragraphs to just about any of the
20 research that's cited here, they'll talk about the
21 importance of the prescription marketplace, and
22 that -- that drugs carry risks and benefits for
23 patients.
24   Q.  Right, but if I'm a pharmaceutical company
25 and want to write some marketing for my new patent

Page 91

1  medicine, is there anyplace I can look to determine,
2  like, what the -- what the rules are?  Like, is
3  there an FDA regulation, a publication?
4    A.  I think all of the above.  I think certainly
5  the FDA has rules and guidelines and regulations.  I
6  think that you could look to pharmaceutical
7  marketing literature that is -- has got plenty of
8  information regarding, sort of the -- the dos and
9  don'ts.
10      If you look at the Pharmaceutical Research
11 and Manufacturers Association, they have guidelines
12 that they've promulgated, as have other similar
13 organizations around the world.
14   Q.  Do you know what the FDA regulations are
15 related to prescription drug advertisements?
16   A.  I mean, in general, yes.
17   Q.  I mean, specifically.  I mean, you know that
18 the FDA regulates prescription drug advertising.
19 I'm asking, what do you know about that
20 specifically?
21      MR. CHALOS:  Object to the form.
22   A.  Well, if you're talking about -- that's --
23 that's really a broad question.  I mean, it's hard
24 to answer.  I could start at the top and work my way
25 down with that.

Page 92

1    Q.  Well, are you familiar with the FDA
2  regulations' fair balance requirements?
3    A.  Yes, I am.
4    Q.  What do you know about the fair balance
5  requirements?
6    A.  That when it comes to the communication of
7  information in an advertisement, there has to be a
8  balance of the information, and that balance must be
9  based on an assessment of the benefits and the
10 risks.
11      And the FDA has specific criteria that they
12 use to make that assessment.  Some of the FDA
13 warning letters cited in this report discuss that
14 very issue.
15   Q.  Tell me, when a manufacturer of drugs
16 creates a marketing piece, are they required to
17 submit that to the FDA?
18   A.  They are required to submit to the FDA their
19 ad copy transmittal form -- I think it's a 2253 --
20 prior to that ad being used for the very first time.
21 My understanding is, is that if the FDA does not
22 respond -- sometimes manufacturers will request a
23 specific response, but if they -- if the FDA doesn't
24 respond, the manufacturer is free to move forward
25 with that ad.

Page 93

1    Q.  Does the -- what's the name of the
2  organization within the FDA that takes care of or
3  regulates pharmaceutical advertising?
4    A.  DDMAC.
5    Q.  DDMAC?
6    A.  Division of Drug Marketing and
7  Communications.
8    Q.  Yes.  Does it have a new name now?
9    A.  It does.
10   Q.  What's it called now?
11   A.  I'm old school.  I have not -- it's -- let
12 me think about it.  I'll get it for you.  Yeah.
13   Q.  OPDP?
14   A.  Office of Prescription Drug Promotion,
15 right.  That's it.
16   Q.  Okay.
17   A.  Thank you.
18   Q.  And do those particular organizations
19 maintain or provide consumers, prescribers, the
20 ability to complain about particular advertisements?
21   A.  There is a mechanism, a -- where you can --
22 I think it's called the Bad Ad Program, where you
23 can report a --
24   Q.  Oh, yeah, sorry.  Bad Ad Program, how long
25 has that been in existence?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    A.  I think the Bad Ad Program is -- is
2  relatively new, maybe 2010, 2012 era, but I'm not
3  positive on that.  I -- let's put it this way.  I
4  believe there's always been a mechanism for someone
5  to report a bad ad.  I think it's a formal program
6  now that's been in existence about the last seven or
7  eight years.
8    Q.  Let's look at Paragraph 32.  I'm not -- I
9  don't understand your reference here to distortion.
10  What do you mean by that?
11    A.  This is an interesting paragraph, I think --
12    Q.  Yeah.
13    A.  -- because it -- you know, what is the right
14  word to describe a product that its mere consumption
15  requires increased consumption of that product?
16    So I decided to examine it from a marketing
17  perspective, and what happens in terms of marketing
18  is about creating value for customers based on their
19  needs, wants, and demands, but how does it impact
20  needs, wants, and demand.
21    So the opioid distortion is created by the
22  additional need created by use of a product that,
23  over time, requires increased use or increases the
24  desire to use that product, and that's the
25  distortion of the marketplace.  It's a distortion

Page 95

1  from a marketing perspective.
2    You take an antibiotic, and you get -- you
3  get better, or you take a blood pressure medication,
4  and you continue taking it over time, but with
5  regard to opioid use, there is a different factor
6  that comes up that I think has distorted the demand
7  for those drugs.
8    Q.  Well, you know that many people receive
9  prescriptions for -- for opioid pain medications
10  that they use pursuant to doctor's instructions and
11  then stop taking it; fair?
12    A.  I haven't analyzed that.
13    MR. CHALOS:  Object to the form.
14    A.  So I haven't analyzed that, but I -- I'm
15  aware, as a pharmacist outside the scope of this
16  analysis, that patients go to a dentist and get an
17  opioid.  And when their pain is gone, they stop
18  taking it.
19    Q.  So how do you -- have you made any effort to
20  measure this distortion that you talked about?
21    A.  I did not measure the distortion, but the
22  distortion was -- from a marketing perspective, the
23  distortion was evident in the marketing metrics that
24  were collected by the defendants and the successes
25  that they had in their product sales.

Page 96

1    Q.  In what way are they reflected in the
2  metrics?  Just that sales went up?
3    A.  Well, you know, we have a level of need in
4  the population for pain, pain management, and that's
5  epidemiologically set at a certain level.  We have a
6  certain number of people with low back pain, a
7  certain number with cancer pain.  And that doesn't
8  quadruple from one year to the next.
9    And so that's where the distortion was
10  noted, when we saw huge increases in the utilization
11  of specific products in very short periods of time,
12  which one plausible explanation was that it's
13  because they are opioids, and they've created this
14  distortion.
15    Q.  Okay.  What evidence do you have to support
16  that plausible explanation you've just given me?
17    A.  The marketing metrics that the defendants
18  collected and reported in their documents.
19    Q.  Are defendants' reporting marketing metrics
20  related to people that they think have become
21  addicted to the drugs?
22    A.  No.
23    Q.  Or is it just that sales increased?
24    A.  So it's --
25    MR. CHALOS:  Object; form.  Object to the

Page 97

1  form.
2    THE WITNESS:  Sorry.  I've got to slow down
3  here.
4    A.  So it is -- it is based on the fact that
5  sales increased, primarily, but part of the case
6  study methodology is to infer, from the facts that
7  are determined, what led to that.  So it's
8  completely consistent with the methodology to
9  evaluate competing alternatives.
10    So one alternative in this case is that we
11  had a huge increase in the number of patients with a
12  particular disease or condition or all diseases and
13  conditions, in reality, or that it was due to a
14  distortion in demand created by the marketing of
15  opioids.
16    Q.  What other alternatives did you consider?
17    A.  The one that I mentioned and the marketing
18  of -- the epidemiological -- in other words, making
19  it an access issue, that the certain number of
20  patients are established that need opioids, and then
21  we see that number growing exponentially over a
22  number of years, which doesn't make sense from an
23  epidemiological perspective, but the marketing
24  continues and the sales continue.  Therefore, the
25  most logical explanation, which is the most simple,

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1  is that opioids create their own demand.
2      Q.  Are you an epidemiologist?
3      A.  I -- I'm not an epidemiologist by trade, but
4  epidemiology is a pretty broad subject area, and I
5  have people that I work with that are
6  epidemiologists and they study epidemiology.  I have
7  studied disease and the incidence of disease.
8  The -- epidemiologists take a specific way of
9  looking at things, and they have their own
10  methodology.
11      So I didn't look at it from an
12  epidemiological perspective, but I certainly applied
13  that knowledge that I have to evaluating the
14  competing alternatives, which is completely, again,
15  consistent with case study methodology.
16      There are -- there are explanations.  Some
17  are more plausible than others.  You go with what
18  makes the most sense and what is most supported by
19  the data.
20      Q.  Well, I guess I'm a little flummoxed by your
21  answer to me, because I don't understand what is the
22  standard of plausibility that you're -- what
23  evidence is there to support your plausibility
24  determination?  And did you consider any other
25  plausible reasons why opioid prescriptions might

Page 99

1  have gone up?
2      A.  So let me break it down for you.
3      MR. CHALOS:  Object to the form.  That's
4  okay.
5      A.  Let me try to break it down.  So we're in
6  1995, and opioids are growing at 10 percent a year.
7  And we go from '95 to '96, and they grow at four
8  times that rate.  And the only difference -- we've
9  had no change in disease.  We've had no change in
10  the population other than normal year-over-year
11  growth, but the sales of opioids quadrupled.
12      That provides a pretty sound basis for that
13  explanation, that it was marketing and not patient
14  need that was creating and driving that demand.
15      Q.  Other than the number of prescriptions going
16  up from -- in your example, I think, '94 to '95, is
17  there any other evidence to back up your conclusion?
18      A.  Certainly, because over time, that same
19  scenario was repeated.  Between 1995 and about 2010,
20  there was a 1500 percent increase in that market.
21  So it's not just one data point that I looked at.
22  It was multiple data points with data flowing in
23  from multiple manufacturers' marketing metrics that
24  showed increases -- for the most part, increases in
25  sales, but always the market for opioids was

Page 100

1  growing, and, again, patient demand would not be
2  expected to grow at that rapid of a rate from year
3  to year.
4      Q.  And what is that conclusion based on, you
5  wouldn't expect demand to grow --
6      A.  Well --
7      Q.  -- from year to year at that rate?
8      A.  Well, we saw -- in -- in the marketing
9  documents, we saw that -- that marketing -- that
10  growth in the opioid marketplace was growing at
11  about 10 to 12 percent a year prior to the
12  introduction of OxyContin.
13      After the introduction of OxyContin, when
14  the marketing became much more aggressive, then we
15  saw rapid growth in that product category.  So from
16  a marketing perspective, that just makes sense, too.
17      Q.  Well, just because from the market
18  perspective, it makes sense doesn't mean it's a
19  scientific opinion.  I mean, to me, I'm not sure if
20  we're dealing with science here or just sort of from
21  the marketing perspective, it makes sense.  I don't
22  know if that's science.
23      So I'm trying to get to the science behind
24  your conclusion.  I think what you've told me --
25  and I'm -- is that there was a rapid increase in the

Page 101

1  market for opioids beginning in 1995.
2      And one explanation for that that you're
3  giving is that, at least potentially, some of that
4  increase in the prescribing could have been due to
5  people becoming addicted to the drug; fair?
6      MR. CHALOS:  Object to the form.
7      A.  So the -- that doesn't completely explain
8  the basis, but it's part of the basis.  And the rest
9  of the basis is that wasn't just '95 and '96.
10  It was beyond that.  It was every year between 1995
11  and 2010 or so, and the -- the rapid and sustained
12  increase in opioid utilization was key to that.
13      And it's all from a marketing perspective.
14  It's not from a, you know, patient care level
15  perspective.  It's all about the marketing.  What
16  were the variables that changed?  What were the
17  variables that remained constant?
18      Population does grow.  People can get
19  sicker, but to see those dramatic of changes would
20  not be expected, and history taught us that they
21  weren't seen prior to the marketing of OxyContin.
22  And then after that marketing began, we did see
23  those changes.
24      So from a marketing perspective, I'm very
25  comfortable with the science behind the conclusion

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  that -- that it was the opioid marketing that began
2  in and around that time period that created that
3  sustained increase in utilization of opioids.
4      Q.  Let's move on to -- let's see.  We've talked
5  a little bit about Paragraph 29 and the heightened
6  standards that you've identified in your -- the
7  heightened standards for pharmaceutical marketing in
8  Paragraph 29, but then in Paragraph 35, you talk
9  about basic standards.
10     Do you see that?
11     A.  Let me get there.  So just a small
12 distinction there.  The heightened standards apply
13 for prescription drugs over other consumer goods,
14 and then these are additional standards that apply
15 to pharmaceutical marketing above and beyond.
16     Q.  I notice that in Footnote 35, which is the
17 backup for the basic standards comment, you've
18 identified a number of articles.
19     A.  Yes.
20     Q.  And it looks like most of those articles
21 come from medical journals or publications from
22 places outside of the United States; is that right?
23     A.  I specifically wanted to -- opioids are a
24 drug that are used worldwide.  And they -- there are
25 agencies, associations, and so forth worldwide

Page 103

1  that -- that have published opinions and so forth,
2  and recommendations, guidelines, if you will.  So I
3  wanted to be sure to be as complete as possible
4  there, but there are also those cited from the
5  United States as well.
6      Q.  Which are which ones?
7      A.  That would be the PhRMA citation.
8      Q.  Oh, the Pharmaceutical Research and
9  Manufacturing Association's Code on Interaction With
10 Healthcare Professionals?
11     A.  Yes.
12     Q.  Are there any others that come from the US?
13     A.  So to the extent that US manufacturers are
14 also involved in some of these other countries, for
15 example, just in general, the World Health
16 Organization, you know, being involved in -- at the
17 global level, there may be some overlap there, but
18 I'm pretty sure that's the only one that is specific
19 to the US.  I mean, yeah, that's --
20     Q.  Is that right?
21     A.  It is.  If -- I just was -- you know, I was
22 looking at it.  It just struck me that, you know,
23 several defendants are, you know, multinational
24 firms, and some of these citations actually come
25 from their home countries, so --

Page 104

1      Q.  Was that your intent to --
2      A.  I just wanted to be as complete as possible.
3      Q.  So why don't we take a break, have lunch,
4  come back at 12:30.  Is that cool?
5      A.  That's fine.  Thank you.
6          THE VIDEOGRAPHER:  We are now going off the
7  video record.  The time is currently 11:45 a.m.
8  This is the end of Media Unit Number 1 -- Number
9  2.
10     (Recess from 11:45 a.m. until 12:59?p.m.)
11         THE VIDEOGRAPHER:  We are now back on the
12 video record with the beginning of Media Number
13 3.  The time is currently 12:59 p.m.
14 BY MR. VOLNEY:
15     Q.  Okay.  Let's -- let's get back to it.  I
16 have some questions -- I want to return to Figure 2
17 in your report, which is Exhibit 1, so maybe you
18 could turn to that.  Frankly, I'm hoping that you
19 can help me understand what this Figure 2 is
20 intended to show.
21     So what is Figure 2 intended to show?
22     A.  Sorry.  Figure 2 is a graphic representation
23 of the decision process that physicians use --
24 actually, any -- anyone would use in deciding
25 whether or not to purchase a product or to utilize a

Page 105

1  product.  That's the -- I'm looking over to my left
2  to see.  It's the blue -- the blue boxes.
3      Q.  The blue boxes show what?
4      A.  So that is sort of the -- it's the -- the
5  short version of the information processing model.
6  It's where the actual decision or product choice
7  gets made.  And that is the -- begins with a
8  patient's need.
9      It's adapted in this case.  This is a model
10 that has been utilized in marketing for literally
11 decades.  It's adapted in this case to apply
12 specifically to the physician prescribing decision.
13     But it begins with patient's need or a
14 recognized -- problem recognition or need
15 identification, and then that's followed by product
16 information search, an evaluation of alternatives by
17 the prescriber, and then choice of a prescription
18 medication, the patient's eventual use of that
19 medication, and then some outcome from that.
20     The patient either was satisfied with the
21 result or not.  In this case, they either found that
22 it relieved their pain or it doesn't.  They found
23 that it made them nauseous or it didn't.  And that
24 information then feeds back into the repeat process
25 for when a repeat use is necessary.  So that's the

Page 106

1  bottom -- that's the mainstay of the decision
2  process.
3      What's important about this model is it
4  shows you how the information that's available in
5  the marketplace relates to the -- the blue boxes
6  where the decision is made. So if you look to the
7  right, we have a lot of external influences, things
8  that are innate to the prescriber, perhaps, such as
9  culture or other issues, other -- other
10  characteristics like that.
11      The -- the box below that, individual
12  differences, includes several things that -- that
13  are slightly different, for example, including
14  attitudes and personality.
15      So these -- these factors do play into the
16  decision model because your beliefs, values, your
17  attitudes and perceptions have a big part -- a big
18  part to play in your decision-making.
19      Just -- so, for example, if you held the
20  belief that -- that drug companies were stellar in
21  their -- their research and that the clinical trials
22  that they -- they publish and so forth were just,
23  you know, really the gold standard, then that would
24  positively impact your decisions in this model.
25      If, on the other hand, you thought that

Page 107

1  there was always the potential for commercial bias
2  when a drug company sponsors research, that might
3  flavor you in a negative way. So these kinds of
4  influences are important.
5      And if you swing over to the -- to the
6  external stimuli completely opposite that on the
7  left side of the model, we see that there are active
8  stimuli in the marketplace that go beyond a patient
9  showing up with a need or your own individual
10  characteristics or the environment surrounding all
11  of it, and that includes marketer-dominated and
12  marketer -- and nonmarketer-dominated influences in
13  the marketplace.
14      These become important when a physician
15  doesn't have all the information that they need and
16  they are searching for more information so they can
17  provide the best care to their patient.
18      So marketer-dominated and
19  nonmarketer-dominated stimuli that are the result
20  of either company marketing efforts or an article
21  that is read or interaction with colleagues, that
22  all then begins to be processed by the physician or
23  prescriber through the green boxes, which model the
24  steps that you go through in incorporating
25  information that's gleaned from the external stimuli

Page 108

1  into your thought processes and cognition.
2      So sort of the right-hand side of the model
3  is more on the affective side, the green boxes are
4  more on the cognitive side, and something ends up in
5  your memory, something ends up as a knowledge that
6  you've gained that when you have a patient that
7  shows up with a need, back to the blue boxes now,
8  you then reach back into your memory and pull that
9  information out and use it.
10      So it is a fairly complete structuring of
11  how different influences impact that ultra-important
12  decision to prescribe a medication for a patient.
13      Q.  Okay. Looking at this model, where does the
14  physician's training factor in?
15      A.  That could come in a couple of different
16  places. For example, it could come from memory.
17  They've been taught in school, so they've attended
18  information. They've understood it or accepted or
19  rejected it, built it into their memory banks. So
20  it could come under memory.
21      It could also come in terms of their
22  individual differences. They could have had a
23  professor in medical school that said, hey, never
24  believe anything a drug company tells you, and
25  that's going to impact the way they look at things

Page 109

1  from then on. So it could affect their perceptions,
2  their attitudes, their beliefs, but it would come
3  into play through one of these avenues in the model.
4      Q.  Okay. Now, what about a particular
5  practitioner's clinical experience?
6      A.  So if you look at the blue boxes again,
7  where we have a patient outcome, that is -- in
8  marketing we have -- we have two possible outcomes,
9  either satisfied or not satisfied. There can be
10  ranges of that, but ultimately you either decide to
11  use the product again or not.
12      So that information, if you're a prescriber
13  and your patient is not happy or their pain was not
14  relieved, that means I've got to go back to the
15  drawing board and search for the next best
16  alternative or search for the right answer; for
17  example, increase the dose, change the medication,
18  try some other form of therapy, whether it be drug
19  or nondrug therapy, surgery, whatever it might be.
20      If the patient is satisfied, then that also
21  factors back into the model, if you follow the arrow
22  back up, so that the doctor would then or the
23  prescriber would then know that the patient was
24  happy with that alternative, they got a good
25  outcome, and they continue to prescribe.

Page 110

1    Q.   What about the clinical experience that
2  would have been gleaned by a prescriber who
3  regularly prescribed a certain type of medication to
4  a group of patients?
5    A.   Well, that -- that's -- this is a -- this
6  model is intended to represent a collection of data
7  points, not just an individual patient, although
8  it -- the decision process could apply to an
9  individual patient.
10    So if a doctor has lots and lots of
11  experience with a particular outcome in his patients
12  or her patients, then that information feeds back
13  into their memory as -- and will flavor their future
14  prescribing decisions.
15    Q.   So then conversely, if a doctor had a
16  negative experience with a patient with a particular
17  drug, the doctor might decide -- or might be more
18  reluctant to prescribe that to a new patient or a
19  different patient; fair?
20    MR. CHALOS:   Object to the form.
21    A.   So, again, the -- I can only look at this
22  from the marketing perspective.  So if we talk in
23  terms of satisfaction and dissatisfaction, I'd agree
24  with that.  If the outcome is one that the patient
25  had a good outcome and the doctor deemed that to be

Page 111

1  a positive, then it would bode well for future use.
2    So within the scope of an individual
3  patient, I can't really comment on that, but within
4  the scope of the marketing outcome, satisfaction and
5  dissatisfaction, I agree with that.
6    Q.   I take it what -- or one of the things I
7  gleaned from this particular diagram is that there
8  is a range of information that's in the mix when a
9  person in a clinical setting, a doctor in a clinical
10  setting, decides whether to prescribe a certain
11  medication; fair?
12    A.   There is a lot of information that has to be
13  processed.  That's absolutely true.
14    Q.   And one of the subsets of information that a
15  doctor would have to process would be marketing
16  information?
17    A.   Yes, that's true.  They would be -- they
18  would need to process that information because --
19  and I -- I'm pretty sure I -- I addressed this to
20  some degree in the report.  They've got to stay
21  current on -- with their drug knowledge and their
22  disease knowledge, and one of the ways they do that
23  is the information provided by marketing.
24    Q.   And I think you would agree with me that in
25  your experience -- I think you've referenced it here

Page 112

1  today or just now -- that some doctors look down
2  their nose at pharmacy company advertising; fair?
3    MR. CHALOS:   Object to the form.
4    A.   Yeah.  I think that's -- that's something
5  that if you -- if you look at the citations of --
6  that are included in the report, you would see that
7  there are a number of cites, and also agreeing with
8  that proposition that -- that doctors are skeptical
9  about the information they see if it's advertising
10  information.
11    Q.   Okay.  Let's -- let's continue on our waltz
12  through the report here.  Let's go to Paragraph 39.
13    A.   Okay.  I'm with you.
14    Q.   So in terms of the decision-making process
15  before an actual patient gets a drug or medicine,
16  there are a number of different potential -- well, I
17  guess earlier we talked about gatekeepers before a
18  drug makes it from a concept to patient, and those
19  gatekeepers include these gatekeepers that you list
20  here, prescribers, payers, sites of care, and
21  influencers; fair?
22    A.   So you refer to them as gatekeepers.  I
23  think -- I think the discussion we had this morning
24  was more -- and I'm not -- not necessarily
25  disagreeing with you, but I think the discussion we

Page 113

1  had this morning was more focused on, you know, a
2  checks and balances of a gatekeeper.  These are --
3  these -- these customers are -- in this context are
4  facilitators.
5    Q.   Facilitators, what do you mean by that?
6    A.   So in order to sell a product, the
7  pharmaceutical marketer has to appeal to the
8  interest and the needs of these customers to satisfy
9  the needs that they have, and so they're -- they're
10  really not looking at this as a gatekeeper.  It's
11  more of a how do we meet customer needs, and what --
12  who are those customers?  And that's what I've
13  identified in this paragraph.
14    Q.   Okay.  I think you're answering my question
15  from the perspective of the pharmaceutical company;
16  fair?
17    A.   Yes.
18    Q.   But from the perspective of the customer or
19  the -- ultimately the patient, these will be
20  gatekeepers before the drug makes it from the
21  pharmacy to their medicine cabinet; fair?
22    A.   So I think they --
23    MR. CHALOS:   Object to the form.
24    A.   These would be people that would have an
25  influence over what drug ends up in the patient's

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  hands. I agree with that, yes.
2      Q. And then some of these influences that are
3  reflected here or influences that these people
4  exercise would also go into -- for this physician
5  prescribing information processing model; fair?
6      A. They would have an entrance to that model,
7  yes.
8      Q. Okay. So they're in the mix, in other
9  words?
10     A. Each of these -- each of these customers
11 could have, in any instance, an impact on the
12 choices available to a -- to a prescriber which
13 would affect their decision process.
14     Q. Okay. Do you know, was there any
15 direct-to-consumer marketing by the defendant
16 manufacturers in this case?
17     A. Direct-to-consumer marketing, yes.
18     Q. Okay. What kind of direct-to-consumer
19 marketing are you aware of?
20     A. So there were numerous patient brochures and
21 patient-oriented materials that were distributed.
22 In addition to -- my assessment, in addition to
23 that, there was the work through advocacy groups
24 that were supported by defendants. And those are
25 both forms of direct-to-consumer marketing, which I

Page 115

1  distinguish in my report from direct-to-consumer
2  advertising.
3      Q. Okay. What's the difference between
4  direct-to-consumer marketing and direct-to-consumer
5  advertising?
6      A. So marketing is the broad umbrella, and
7  advertising would be a very specific -- it's what
8  you and I see when we wake up in the morning to
9  Ozempic commercials or something else where we're
10 seeing advertisements that are aimed at product
11 sales directly in the media aimed at consumers.
12     Q. Do you consider the activities of advocacy
13 groups to be direct consumer marketing by the drug
14 manufacturers?
15     A. At the end of the day, yes, I do.
16     Q. And why is that?
17     A. Their activities were part of their
18 marketing plans and designed to advance the messages
19 and marketing -- and using marketing strategies that
20 the defendants sought to advance in the marketplace,
21 so it becomes a part of their marketing.
22     Q. Okay. Let's see. Have you made an effort,
23 in considering the marketing pieces that you've
24 included in your report and in your chart, to show
25 how -- or take into account how the marketing

Page 116

1  changed over time?
2      A. Yes, I think I have.
3      Q. Are you aware that marketing has changed
4  over time?
5      A. I think it did -- it did -- there's two
6  answers to that. The specific tactics remained
7  about the same through the entire period of this
8  case, the strategies and so forth. The messages
9  changed over time. The products changed somewhat
10 over time.
11     Q. You mentioned before our lunch break that
12 part of the reason you feel comfortable making the
13 assumption that defendants' marketing messages at
14 large were misleading is because of the existence of
15 the FDA warning letters. Is that fair?
16     A. Yes.
17     Q. Do you know whether any defendant took
18 corrective action as a result of any warning letter?
19     A. Yes, I think they did.
20     Q. Are -- do you know whether that corrective
21 action was successful?
22     A. I guess it depends on how you define
23 successful.
24     Q. Well, have you made any effort in your
25 analysis to evaluate whether that corrective action

Page 117

1  was successful in any particular case?
2      A. So, I mean, if we take the package insert
3  change for OxyContin, and you -- you look at, you
4  know, what -- what -- the circumstances surrounding
5  that change, the circumstances on -- that
6  surround -- which are completely marketing
7  behaviors, of getting the information that ended up
8  in the original OxyContin package insert into that
9  package insert and the negotiations that went on
10 with the FDA, where the FDA got their information,
11 and how the FDA used that information and how it
12 ended up being the way it was, and then you look at
13 the change that was made.
14         The next step is to say, okay, that's good.
15 They made the change to the PI, but what changed in
16 the marketing? The PI might have changed, but the
17 marketing didn't change.
18         So I fail to see how that would -- would
19 impact the analysis because what I was looking at
20 was the actual messages being used and how those
21 messages were being communicated and the strategies
22 of how those messages were brought to market.
23     Q. Is the PI part of the mix of information
24 that a prescriber might consider before prescribing
25 a drug to a particular patient?

Page 118

1  A. If they reviewed the PI, it would become
2  part of the mix.
3  Q. Is it also fair to say that marketing is
4  only part of the mix to the extent that a particular
5  prescriber saw the marketing, remembered the
6  marketing, and sort of put it in his or her brain;
7  fair?
8  A. That is consistent with the information
9  processioning model and how information is
10 processed, yes.
11 Q. All right. So looking at this model, that's
12 what that is sort of intended to show? If a doctor
13 sees the marketing, is exposed to it, pays attention
14 to it, comprehends it, accept it -- accepts it, and
15 retains it, puts it in his memory, if a particular
16 patient shows up, that particular drug might come to
17 mind as a drug that is appropriate for that patient.
18 Fair?
19    MR. CHALOS: Object to the form.
20 A. Yes, I think that's -- that's accurate.
21 The -- I don't want to leave the model completely
22 open, though. The -- when it says acceptance, there
23 is also the possibility of rejection. They can
24 reject messages as well. So acceptance is a -- is a
25 term, it doesn't mean that you will accept every bit

Page 119

1  of information that you are provided, and the model
2  does account for that.
3  Q. I think that's a fair point, and I
4  understand that. I appreciate your clarification of
5  that point. I think that's a -- that's good to
6  hear.
7     The -- this physician prescribing
8  information processing model is not -- what you're
9  testifying about in this case is the marketing
10 piece, if we look at the stimuli on the left.
11 You're -- you're here to testify about sort of the
12 pharmaceutical marketing input into that prescribing
13 model; is that fair?
14    MR. CHALOS: Object to form.
15 A. So my analysis focused on the marketing
16 efforts, the branded and nonbranded marketing, and
17 -- that were designed to influence that memory and
18 cognition, yielding an acceptance, yes.
19 Q. And so the way you've done that is to
20 identify, through the Relativity database, the
21 various pieces of marketing materials that were
22 produced by the defendants in the case, as well as
23 reading some deposition testimony that was provided
24 to you from the various representatives of the
25 defendant companies; is that fair?

Page 120

1  A. And relying on the literature that provides
2  a theoretical underpinning for why those techniques
3  are effective or not effective.
4  Q. Okay. Got it. Did you see any marketing
5  from any defendant in this matter that you
6  considered to be fair and balanced?
7     MR. CHALOS: Object to the form.
8  A. I think the -- the pieces of marketing that
9  had more balance to them than less balance would be
10 pieces that were related to the package insert, for
11 example, which is obviously an approved -- an
12 approved document.
13    But when I look at the marketing plans --
14 and there's -- there's a reason why this is true,
15 that when I look the marketing plans, the
16 information in those marketing plans tends to be
17 heavily skewed towards the side of what can we do to
18 sell more product, not what can we do to withhold
19 product or to keep it from selling too fast.
20 Q. Isn't that the point of a marketing plan, to
21 market?
22 A. It -- it is the point of a marketing plan,
23 yes.
24 Q. And you would agree with me that in the
25 great United States of America, drug manufacturers

Page 121

1  are allowed to market their products?
2     MR. CHALOS: Object to the form.
3  A. So as I've -- as I've scoped out in my
4  report, I think that that is true as long as they
5  adhere to the standards that have been established
6  and that exist that relate to the marketing of
7  pharmaceuticals.
8  Q. So the -- the marketing plans themselves are
9  not documents that are intended to be shared with
10 the prescribers, TPPs, et cetera, fair?
11    MR. CHALOS: Object to the form.
12 A. So marketing -- marketing plans are intended
13 for, you know, the internal use of the company, but
14 they -- the value that they bring to the table is
15 that the marketing plans integrate the entire scope
16 of marketing, which is why I always get a little bit
17 nervous when we pick out one thing, like the PI, and
18 try to talk about it.
19    Marketing is a integrative process, and
20 that's another figure in my report, but the idea we
21 can look at any one piece of information and know
22 what's going on with marketing is just not valid.
23 It's the entire scope of activities that are
24 combined to create the product image, the perception
25 in a customer's mind, the -- whether or not doctors

Page 122

1  agree or disagree with it and encode it into memory
2  and then use it in choices for their patients.
3     Q.  I think -- I mean, I think what you're
4  pointing out is that it's a fairly complicated
5  decision-making process involving a number of
6  different moving parts; fair?
7     A.  It is -- the decision process has a number
8  of factors that influence it.  The parts aren't --
9  aren't really moving, per se, but the -- as
10  information in the marketplace changes, the
11  information would be a moving target, yes.
12     Q.  A doctor's experience with a particular drug
13  might change and then thereafter influence his or
14  her prescribing practice; fair?
15     A.  As the model would indicate, if they've had
16  a positive outcome, that would influence it in a
17  favorable way, and if they've had a negative patient
18  outcome, it might do the opposite.
19     Q.  I think I asked you a question earlier.  I
20  don't know if I got an answer to it.  Have you seen
21  any marketing piece -- and I mean a customer-facing
22  marketing piece -- from a defendant in this case
23  that you would consider to be fair and balanced?  I
24  think you answered my question that you -- at least
25  maybe the product insert in some cases?

Page 123

1     A.  Well, the product insert wouldn't -- I don't
2  think you --
3        MR. CHALOS:  Hang on.
4        Object to the form.
5     A.  I don't think you qualified it that way
6  before, because I don't think you said a
7  consumer-facing product or information piece.  I was
8  looking at all of the marketing pieces for -- if
9  you -- specifically talking about information that
10  was targeting consumers, is that what your question
11  is asking?
12     Q.  Right.  That's my question.  I'm sorry if
13  I --
14     A.  I may have --
15     Q.  -- misremembered what I asked.
16     A.  I may have misunderstood.  Sorry.
17        You know, I looked at a number of brochures
18  that were designed to educate patients about pain,
19  pain management, and the use of opioids in general.
20  They had a variety of information in them.
21        From a marketing perspective, there were
22  other important pieces to those documents, but to
23  answer your question in this specific instance, the
24  information was obviously intended to promote the
25  products, but to do it in such a way as there was a

Page 124

1  balance of information.
2     Q.  So at least with respect to the
3  consumer-facing documents that you reviewed, you, in
4  your analysis, identified some of those
5  consumer-facing marketing pieces that you believed
6  to have a fair and balanced set of information
7  provided?
8     A.  Well, I didn't really do that assessment,
9  but when I reviewed the documents, of course, I
10  would have formed some sense of whether the
11  information was fairly balanced or not.
12        But the -- the problem that I had with those
13  consumer-facing documents, as you refer to them as,
14  is whether or not they, in every instance, revealed
15  the source of the information in those documents and
16  whether it was promotional material or whether it
17  was sponsored by a company or whether it was
18  completely, you know, without -- without a
19  commercial influence.
20     Q.  So you created a 20-something-page chart
21  with your assistant of what you believed to be
22  misleading marketing messages.  Have you similarly
23  created a 20-page chart of the marketing messages
24  that defendants promulgated that were fair and
25  balanced?

Page 125

1     A.  So I --
2        MR. CHALOS:  Object to the form.
3     A.  I have to -- I have to -- to pull you back
4  on that.  That Table II in my report is not a table
5  of false and misleading marketing messages.  It is
6  simply a table of the themes that the marketing
7  focused on.
8        They in -- nowhere in my awareness of this
9  report do other than what is concluded by either the
10  FDA letters or by the assumption that those messages
11  were indeed false.
12        My job, my task, my analysis here was to
13  identify those messages that were employed by
14  defendants in their marketing, not to make that
15  assessment of whether they were false or misleading.
16        So that table, to answer your question, yes,
17  this table contains the messages that were and were
18  not false and misleading.
19     Q.  Okay.  Let's go to -- let's go to Table II,
20  which I think is on 86.
21     A.  Okay.  I'm with you.
22     Q.  Okay.  So I think you testified and
23  explained to me -- well, let's -- let's do it all
24  again so I make sure I'm clear about this.
25        Who identified the marketing messages A

Page 126

1 through -- I think it's X?
2 A. So they were -- it was an iterative process
3 of coming up with, here's a marketing piece. Well,
4 what category does this one fit into? What message
5 is this one focused on? And so over -- over
6 iteration after iteration of that, these different
7 messages were identified.
8      There may indeed be more or some of those
9 may overlap. I think I mentioned in my report that
10 these are not mutually exclusive, all of these
11 categories, because there is some overlap, but this
12 would have been developed as a result of that
13 iterative process of just looking at piece after
14 piece of marketing material that identified specific
15 messages in those materials.
16 Q. Okay. So this includes both customer-facing
17 marketing materials and internal company documents;
18 fair?
19 A. Yes, it does.
20 Q. And so --
21 A. Can I -- I need to clarify. When you say
22 customer-facing, are you talking customers with a
23 capital C, or are you talking about patients?
24 Q. I'm talking about the decision-makers to
25 decide whether to prescribe the drugs or not.

Page 127

1 A. I'm sorry, because for me, as from a
2 marketing perspective, when we use the word, you
3 know, "consumer-facing," then I get -- I get the
4 impression that we're talking about --
5 Q. Consumer means patient because they're the
6 ones who are --
7 A. Right.
8 Q. -- taking the drugs?
9 A. Right.
10 Q. Got it.
11 A. Okay.
12 Q. I'm talking about the decision-makers who
13 prescribe the drugs.
14 A. Okay.
15 Q. My understanding of your analysis is that
16 you're trying to analyze qualitatively the marketing
17 messages that the manufacturing defendants, and I
18 guess as well as others, promoted to the
19 prescribers, who ultimately made the decision
20 whether to prescribe or not, at least sort of the
21 main thrust of my -- of what I see your report as.
22      But I am going back to A through X. Are
23 those bullet points that -- the bullet points that
24 you came up with or --
25 A. As I said, it was -- it was an iterative

Page 128

1 process, and the -- the bullet points reflect the
2 content of the messages, not so much something that
3 I came up with. It was reflecting what the message
4 was really focused on.
5 Q. Okay. In other words, A through X, here are
6 the common messages that you, Dr. Perri, saw in the
7 marketing materials that you reviewed; fair?
8 A. Yes.
9 Q. And you're not making a judgment about
10 whether those marketing messages, those bullet
11 points, were true or false; fair?
12 A. I did not personally make that assessment,
13 no.
14 Q. So, for example, when you say: Extended --
15 A on page 86: Extended release drugs and/or Q12
16 dosing had fewer peaks and valleys and less chance
17 of addiction and abuse.
18      You're not making a value judgment about
19 whether that particular marketing message was true
20 or false?
21 A. That's correct, I did not make that
22 judgment.
23 Q. And if a particular manufacturing defendant
24 included that marketing message in a customer-facing
25 piece of marketing materials or internal marketing

Page 129

1 documents, are you able to say whether that
2 particular manufacturer knew whether that statement
3 was true or false at the time it was made?
4      MR. CHALOS: Object to the form.
5 A. I think it would depend.
6 Q. You haven't done that analysis, that when
7 Purdue put XYZ representation in a marketing piece,
8 Purdue knew that representation to be false?
9 A. Yeah. I -- I don't know how to answer that.
10 I -- you know, as far as -- as that goes, the -- for
11 example, the less -- as I said, these are not
12 mutually exclusive. This one, A, is Q12 dosing, and
13 that means fewer peaks and valleys and less chance
14 of addiction and abuse.
15      I mean, the less chance of addiction and
16 abuse is -- became the subject of the label change.
17 So did they know that it was false? Well, at some
18 point they did, but, you know, these documents
19 aren't dated and timed in this regard here.
20      So it could be that they knew or maybe they
21 didn't know. I don't know the answer to that
22 question. I didn't conduct -- that wasn't part of
23 my analysis.
24      This analysis was designed to enumerate the
25 marketing messages that were employed for these

Page 130

1  products over the period of this case.
2  Q.  Okay.  Just to understand how you put the
3  chart together, if there is a -- for example, your
4  Subsection D on Page 92 identifies a number of
5  documents where the message was to minimize concern
6  about addictive nature of opioids.
7     Do you see that?
8  A.  Yes.
9  Q.  If there was information in the marketing
10  piece that was intended to tell the prescriber that
11  there was a risk of addiction with a particular
12  drug, did you include that in the contents here?
13  A.  So this -- this particular section would not
14  include that because this is intended to demonstrate
15  that -- the message of minimizing the concerns over
16  addiction.
17  Q.  Have you -- I take it you haven't created a
18  Table II-B, where you identify instances in the
19  marketing where a particular manufacturer included a
20  robust warning about addiction, for example?
21  A.  Well, I don't think I actually needed to do
22  that, because any time that the -- the document
23  would be referring to opioids, and once there was a
24  black box warning, there would be that robust
25  warning.  It would be right there on -- on the

Page 131

1  advertising.  I mean, a black box warning isn't a
2  don't ever prescribe warning.  It's a be careful
3  warning.  So that was there.
4  Q.  Looking at the various categories of
5  representations in Table II, can you tell the jury
6  which ones you consider to be false or misleading?
7  A.  That was not part of my analysis, but I
8  think that I could refer them to other experts that
9  would be -- that have gone through and -- message by
10  message and either discounted or not discounted each
11  of these messages.
12  Q.  So that's not something that you're going to
13  testify about?
14  A.  No.
15  Q.  Sitting here today, have you done anything
16  to measure the efficacy of any particular -- the
17  effectiveness of any particular message in Table II?
18  A.  So the marketing is -- as I described
19  earlier, it's completely interrelated, and any one
20  message by itself has -- has really very little
21  meaning to me.  It's the overall scope of the
22  messages, all of them taken together, literally by
23  all of the defendants together, that has the most
24  meaning.
25  Q.  So I think the answer to my question is no,

Page 132

1  you haven't done an effective analysis of any
2  particular message?
3     MR. CHALOS:  Object to the form.
4  A.  I'm pausing because I'm trying to recall
5  within the report if there was any message that I
6  singled out as being particularly effective or not
7  effective.  And I -- it would -- it would seem to be
8  inconsistent with my proposition that the marketing
9  is intertwined and interrelated, so I think the
10  answer is "no."
11  Q.  I take it similarly, you haven't done any
12  effectiveness analysis with respect to any
13  particular warning given by any manufacturer in this
14  case?
15  A.  The only -- the only analysis that I did
16  with regard to that was some assessment in later
17  parts of the report where I looked at the balance of
18  benefits versus harms that were conveyed in the
19  marketing messages, and from the documents that I've
20  reviewed -- and I reviewed a lot of documents --
21  there was -- there was a substantial skew towards
22  the benefits side, which, again, from a marketing
23  perspective, that's what you would expect to see,
24  because marketing is designed to sell products, and
25  it does.

Page 133

1     So the question is -- then is that an
2  appropriate use of marketing?
3  Q.  I mean, we live in the United States.  We
4  all watch football games.  We are bombarded by -- I
5  guess those are direct-to-consumer advertisements
6  for particular prescription drugs.  Fair?
7     MR. CHALOS:  Object to the form.
8  A.  If we watched TV in the United States, we've
9  seen an advertised prescription medicine, yeah.
10  Q.  And those advertisements are intended to
11  tout the benefits of the particular prescription
12  medicine; fair?
13  A.  That's where fair balance comes in.  They
14  are supposed to have a fair balance, but as you and
15  I and everyone around this table would know, if you
16  watch one of those commercials, it is very
17  persuasive.  And you don't walk away from that
18  necessarily thinking about the risk of cancer that
19  you're going to get from taking this drug, but the
20  way it could possibly help you if you have this
21  disease or condition.
22  Q.  Can you say whether any particular doctor in
23  Cuyahoga County saw, heard, read, comprehended,
24  accepted, and retained any of the particular
25  messages in Table II?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 　　MR. CHALOS: Object to the form.
2 　　A. Well, I can get you right up to the point
3 whether or not they processed and used the
4 information, but my guess is they did use it.
5 The -- I reviewed call logs from Cuyahoga County,
6 and I saw the subject matter of the conversations
7 that the PSRs, the pharmaceutical sales
8 representatives, had with the docs and the materials
9 that they left with them and the things that they
10 discussed.
11 　　But whether or not any one doctor took that
12 information and used it in making a decision,
13 obviously I can't do that. I didn't do that
14 analysis.
15 　　Q. Yeah, because it could be that certain
16 doctors reject all pharmaceutical company marketing;
17 they're just in it for the free pizza, for example?
18 　　A. Right, but at the end of the day, what we
19 look at from a marketing perspective is were there
20 sales of the product in that area, and, of course,
21 there were.
22 　　Q. Okay. But just because there were sales of
23 a particular product doesn't mean that it was the
24 marketing drove the sales for a prescription or a
25 particular product; fair?

Page 135

1 　　MR. CHALOS: Object to the form.
2 　　A. Well, we're talking marketing in general
3 now, we're not talking about the -- you gave me a
4 very specific list before --
5 　　Q. Uh-huh.
6 　　A. -- of things that doctors saw or didn't see
7 and processed or didn't process, but if you're
8 talking the capital M marketing now, then I have to
9 bring up other issues that relate to -- and would
10 relate in Cuyahoga County.
11 　　The -- one of the primary influences on a
12 physician's process of prescribing is their comfort
13 level with a prescription product. One of the
14 primary ways they develop that comfort is by what
15 their peers are doing.
16 　　So if we look at the influence of peers in
17 peer-to-peer marketing, which we know occurred in
18 Cuyahoga County, then, yes, the marketing did have
19 an impact on these doctors, and I would say all of
20 them.
21 　　Q. I don't understand what you mean by
22 peer-to-peer marketing. Is that -- that's not
23 marketing that's done by a drug manufacturer, is --
24 　　A. It is -- it is -- if we look at the
25 marketing plans, and we can -- we can pull up just

Page 136

1 about any marketing plan that I've seen in this
2 entire matter.
3 　　One of the key areas of emphasis for the
4 defendants was the use of peer-to-peer marketing,
5 where they developed key opinion leaders, advocates
6 for their products. And these advocates worked both
7 as speakers for the companies and writing articles
8 and conducting research and also through advocacy
9 organizations to promote the themes, the messages,
10 the strategies that the defendants wanted to see
11 furthered in the marketplace.
12 　　Q. But whether any particular prescriber -- you
13 don't know whether any particular prescriber saw
14 peer-to-peer marketing in Cuyahoga County or some
15 other county for that matter; fair?
16 　　A. I mean, I would need to get out the call
17 logs and search the call logs and see if there is
18 any mention. I feel certain that there is. I'm
19 almost positive that there is, that there were
20 discussions between sales reps and customers
21 regarding, for example, a CME on pain management
22 that we're going to have, and it's going to be
23 presented by Dr. So-and-so, and you need to come
24 listen to it; or you should come -- we should be
25 able to come and present this to you and your staff

Page 137

1 over here at this hospital or that hospital.
2 　　So, I mean, I know that those kind of things
3 occurred. I -- without getting the materials that I
4 brought and literally looking through that call log,
5 I can't give you a specific as we sit here right
6 now.
7 　　Q. But at the micro level, whether
8 Dr. So-and-so got a message from his PSR to come see
9 other doctors speak about the great benefits of
10 opioid painkillers, you don't know, at the micro
11 level, whether that particular doctor went to that
12 presentation, processed the information, and then as
13 a result of that, began prescribing that particular
14 drug; fair?
15 　　MR. CHALOS: Object to the form.
16 　　Q. You haven't done it at a micro level?
17 　　MR. CHALOS: Object to the form.
18 　　A. Yeah. So, you know, I think in that -- in
19 that very narrowly defined instance for a particular
20 doctor at a particular time, but, again, I'd still
21 have to go back to the sales numbers and the sales
22 figures that, you know, clearly show that the
23 defendants were successful in increasing sales in
24 these -- in these territories that we're discussing.
25 So something impacted them.

Page 138

1   And when you look at marketing from a
2  theoretical perspective, what marketing is supposed
3  to do, and all the different types of marketing that
4  were employed, the result was attained that was set
5  out in the marketing plans.
6   Q. I don't know why you're having such a
7  struggle admitting to me that you don't know
8  particular doctors' prescribing practices and what
9  they relied upon when they made prescription
10 decisions. I mean, why are we having such a
11 struggle with this particular point?
12   Because I think it's pretty clear from your
13 report that you are not setting out to prove
14 reliance in any particular case, nor intending to
15 prove causation in any particular case, meaning any
16 prescribing decision that ended up in a bad outcome
17 for a patient.
18   MR. CHALOS: Object --
19   Q. Is that fair?
20   MR. CHALOS: Object to the form.
21   A. So I was with you up until you said "is that
22 fair." The -- what -- I think it's a very important
23 point that you're bringing up. And I will agree
24 with you. I will tell you that, no, I can't point
25 to Dr. Smith and say he was influenced in this way.

Page 139

1   But I see all the Dr. Smiths and all the
2  Dr. Joneses and everybody else, all the other
3  doctors that were there, and I see what was
4  presented to them. I see the organized, efficient
5  planning that went into it, the delivery of it, the
6  assessment of it, and the results of it.
7   Doctors prescribed opioids in Cuyahoga
8  County, and there is no question about that. And
9  the marketing theory that's behind all of this
10 suggests that if they use these techniques, they
11 will work to do exactly what was achieved.
12   Q. Does the -- in the prescribing context, does
13 the -- does the patient have any, I guess, role or
14 responsibility in the prescribing decision?
15   A. Yes.
16   Q. And you would agree with me that in
17 connection with your work on this -- on this case,
18 you know -- and probably your work as a pharmacist,
19 you know that patients engage in drug-seeking
20 behaviors; fair?
21   MR. CHALOS: Object to the form.
22   A. Some patients do engage in doctor shopping.
23 They do engage in drug-seeking behaviors. That's
24 true.
25   Q. They also engage in activities like

Page 140

1  diversion of drugs?
2   MR. CHALOS: Object to the form.
3   A. I can only -- I mean, I can't answer that
4  based on my analysis here, but I -- if you're asking
5  me, as a pharmacist, am I aware of that, yes, I am.
6   Q. I mean, as part of the work on SBIRT stuff,
7  you know that there's all sorts of things that
8  people do to get their hands on drugs illegally;
9  fair?
10   A. People find a way to get what they need.
11 Whether it's through a prescribing process through a
12 legitimate doctor or whether it's, you know, a pill
13 mill or whether they're buying it on the street
14 corner, they do have access in different ways.
15   What is also important about that is the
16 drugs have to be there in the first place for them
17 to have access to. And certainly from a marketing
18 perspective, increasing the supply of drugs in such
19 a dramatic way as we talked about this morning
20 certainly contributed to that.
21   Q. When you say increasing the supply of drugs,
22 what do you mean?
23   A. Well, there's several components to that.
24 On the one hand, the aggressive marketing -- and by
25 the way, I define that and justify the basis for

Page 141

1  calling it aggressive marketing in the report.
2   The aggressive marketing certainly grew the
3  market very rapidly, which increased access in the
4  marketplace. The availability of more and more
5  generics increased access in the marketplace. The
6  ability to have the quotas increased and to seek
7  increases in quotes for controlled substances
8  increased access in the marketplace.
9   So it becomes an issue of access, as well
10 as -- you know, combined with the marketing, if
11 we're talking about the -- specific to the drug
12 diversion we're talking about.
13   Q. Okay. Let's look at Page 23.
14   A. Okay.
15   Q. The first sentence of Paragraph 42 is:
16 Marketers frequently target prescribers who are most
17 likely to prescribe their drug.
18   Do you see that?
19   A. I do.
20   Q. Is that a common practice in the
21 pharmaceutical -- in pharmaceutical marketing?
22   A. Yes. High frequency prescribers are your
23 best bet in term of generating future sales.
24   Q. For example, a doctor who is known to
25 prescribe -- you know, I'm not a doctor, but in this

Page 142

1   case, like a pain management doctor is much more
2   likely to prescribe an opioid painkiller than a --
3   you know, maybe a general practitioner or somebody
4   who is a dermatologist or, you know, other field
5   that doesn't normally prescribe opioids?
6       MR. CHALOS: Object to the form.
7   A.   So you put a lot of people in there.
8   Q.   Yeah, I did. Sorry. That's a bad question.
9   A.   Yeah.
10  Q.   Let's -- let's skip that one.
11      Is there anything wrong with a manufacturer
12  targeting a prescriber who is most likely to
13  prescribe its drugs?
14  A.   It depends.
15      MR. CHALOS: Hang on.
16      Object to the form.
17      THE WITNESS: Sorry.
18      MR. CHALOS: My objection is before his
19  answer.
20  A.   I'll repeat my answer. It depends.
21      THE WITNESS: And I promise I'm going to try
22  to give you a moment.
23  Q.   That's all right. Would it be possible for
24  you to link the -- do you have the information
25  available to you to link information contained in

Page 143

1   the call notes to particular prescribers'
2   prescribing -- prescribing practices generally?
3   A.   The call notes do characterize the
4   prescribers from time to time. It will say things
5   like, Dr. Smith uses a lot of Oxy-IR, you know,
6   immediate release, or they'll characterize
7   prescribers as being high, medium, or low
8   prescribers for opioids.
9       But to link it to specific practices beyond
10  that, I don't know if I could or not. In other
11  words, I'd have to take -- I would have to undertake
12  a more quantitative analysis and go in and look at
13  every mention of this doctor prescribing or not
14  prescribing and try to correlate that with sales in
15  the -- in the territory, which, by the way, the
16  manufacturers do that, but I didn't have that
17  ability.
18  Q.   Have you identified any prescribers in
19  Cuyahoga or Summit County that you believe to be bad
20  prescribers --
21  A.   I didn't --
22  Q.   -- meaning pill mills.
23  A.   No, I did not undertake any kind of analysis
24  related to that.
25  Q.   Do you know if anybody has undertaken that

Page 144

1   analysis?
2   A.   Honestly, I don't know.
3   Q.   I want to look at Paragraph 54. I want to
4   look at -- let's look at 53.
5   A.   Paragraph, not page?
6   Q.   Sorry. Paragraph -- so Page 29. When we
7   talk about -- or when you talk about this hyphenated
8   term "good-science," tell me what that is.
9   A.   Good science is science that is --
10  Q.   That's good, right?
11  A.   It's -- actually -- actually --
12  Q.   It's better?
13  A.   I know you don't have drafts of the reports.
14  I'm pretty sure at some point I tried to explain
15  good science, but I can give you an explanation now.
16      Good science is science that is perceived as
17  being free of experimental bias, commercial bias,
18  and accurately measures what it says it's trying to
19  measure, measures it accurately on repeated
20  measurements, is responsive to gaps in our
21  knowledge. It's science that is helpful when the
22  results can be applied to various situations.
23  Q.   So I think what you're stating here in
24  Paragraph 53 is -- I mean, just sort of an axiomatic
25  or a truism is that doctors want to see good

Page 145

1   science, but you're not making a judgment about what
2   particular science in this case was good science
3   versus bad science; fair?
4   A.   Similar to the marketing messages, I didn't
5   make that assessment, but that has to be qualified,
6   because from -- some of the materials that I discuss
7   in my report relate to research that was conducted
8   where I believe there may be commercial bias present
9   by virtue of either who supported the research or
10  who funded the researchers who were conducting it,
11  or if those researchers were actually key opinion
12  leaders who were being paid by a company and so
13  forth. So with that qualification, yes.
14  Q.   Well, is it -- is it your opinion that any
15  research that is funded by a pharmaceutical company
16  would not qualify as, quote, good science?
17  A.   It could.
18  Q.   It could?
19  A.   It could under certain circumstances, yes.
20  Q.   And is it -- have you attempted to go back
21  and look at the journal articles, et cetera, to make
22  a determination whether any particular article
23  contains good science or not?
24  A.   So I didn't take it quite that far to
25  determine the nature of the science, because I

Page 146

1 didn't -- I didn't assess any methodologies, per se,
2 but I did -- I did undertake to look at specific
3 articles, who authored them, were the property
4 disclosures made in terms of their relationships
5 with drug companies. And in some cases they were,
6 and in some cases were not.
7     So up to the point of evaluating the
8 internal reliability and validity of the study, the
9 research design and all that, I did not undertake to
10 do that.
11     I did make some notations about sample sizes
12 in particular, or patient samples, but not the
13 actual structure of the research projects.
14     Q.  So when you were talking about sample sizes
15 of a particular study, is that information that you
16 would have gleaned from the other five plaintiffs'
17 experts who are testifying about --
18     A.  No.  For example, one of the articles by
19 Dr. Portnoy, he had an N of 38 in a study that he
20 did, and I noted that.
21     I think I -- the other article that I cite
22 in my paper, and was cited by defendants on numerous
23 occasions in their marketing materials, was, of
24 course, the Porter and Jick letter in the editor in
25 the New England Journal.  While it had a fairly

Page 147

1 substantial sample size, its sample was very limited
2 in terms of who it could be generalized to.
3     Q.  The N of 38 in the Portnoy article --
4     A.  Yeah.
5     Q.  -- is that disclosed on the face of the
6 article?
7     A.  It's disclosed in the body of the article,
8 but, again, this is -- this is -- this was not
9 something that I undertook to evaluate.  I'm just
10 making -- you asked the question.  I was giving you
11 the answer that there were some opinions that I held
12 based on some of those kinds of factors about the
13 quality of the research itself.
14     It doesn't mean it was a bad study because
15 it had an N of 38.  It just means the study could
16 have been limited.  And I would need to undertake --
17 I actually teach a course on literature evaluation,
18 or have taught at the university.  And you can't
19 just look at a study and say the sample size is N.
20 Therefore, it's no good.  You have to really get
21 into it and take it apart and see how decisions were
22 made, what patients were included, what the
23 exclusion criteria were, all of those kinds of
24 factors.  I did not undertake that.
25     Q.  Are those sorts of lessons -- like, you

Page 148

1 teaching a course, are those lessons also given to
2 doctors when they're in medical school, typically?
3     A.  Typically?  I have not found that to be the
4 case.
5     Q.  Now, in Paragraph 54, you cite an article by
6 Avorn, Chen, and Hartley?
7     A.  What -- I'm sorry, which --
8     Q.  Paragraph 54 on Page 30.
9     A.  Yes.
10     Q.  That article is from 1982?
11     A.  Yes.
12     Q.  Do you have any more up-to-date research to
13 support statements you're making in Paragraph 54?
14     A.  You know, I'm sure there are other articles
15 that are cited in the report that either touch on
16 that or would also support that that are more
17 current.  The Avorn article just -- Jerry Avorn is
18 a -- sort of a very well-respected and very highly
19 revered researcher in this area, and his -- this is
20 a seminal work that was done back then.  I've not
21 seen anything that provides evidence to the contrary
22 since that time.
23     Q.  In Footnote on Page 30, you talk about -- or
24 consider physician denial of the influence of
25 industry communication, samples, and gifts.

Page 149

1     Do you see that?
2     A.  Yes.
3     Q.  And then you say that that physician denial
4 may be understood in the context of extensive
5 findings from behavioral psychology regarding
6 unintentional and subconscious biases.
7     A.  Yes.
8     Q.  Have you attempted to quantify the
9 unintentional and subconscious bias that comes from
10 things like industry communication, samples, and
11 gifts?
12     A.  So this is a pretty complex area because
13 what happens is -- it's really a concept of
14 obligation.  And when someone provides something,
15 our feeling is they expect something in return, and
16 this is -- this is why I -- in the report I
17 addressed this earlier on when I talk about
18 marketing process and the peer-to-peer influences
19 and so forth.
20     The idea that you're given a gift creates
21 obligation, and this is a subconscious process, and
22 you want to try to please the gift-giver.  And so it
23 becomes -- it becomes a psychological issue, not so
24 much a marketing issue.  It plays very well into the
25 marketing concept.

Page 150

1  So quantitative analysis of it?  I don't
2  know that it's possible to even do that without
3  endeavoring to undertake a social psychology study
4  and do some kind of experiment, but the literature
5  on relationship marketing is extensive, and it
6  addresses this issue pretty well, I think.
7  Q.  Okay.  Let's look at the next page,
8  Paragraph 57.
9  A.  57?
10  Q.  57, right.
11  A.  Okay.
12  Q.  I'm really interested in understanding what
13  you mean by your conclusion there.  The second
14  sentence, you say:  This body of literature suggests
15  that regardless of what prescribers may think about
16  their decision-making and the inputs to the
17  decision-making process, the role of the
18  pharmaceutical marketer significantly impacts their
19  prescribing.
20  And I'm -- what do you mean by
21  "significantly impacts"?  Are we able to quantify
22  that, or is that --
23  A.  Well --
24  Q.  -- similar to your answer to my last
25  question?

Page 151

1  A.  No.  I think that -- I think that all of the
2  citations in this section of the report point to a
3  couple of key -- of key prepositions, if you will.
4  And that is, is that marketing works.
5  And when marketers provide information,
6  provide payments, provide gifts, provide free CE,
7  provide a research study, for any of the other
8  activities that they engage in, samples, meals, this
9  impacts prescribing.  And I think the body of
10  literature that's cited in this report -- and we
11  could look at each one in particular and figure out
12  where it relates to this, but it all supports the
13  contention that these efforts impact prescribing.
14  Q.  I got that point.  I mean, I understand
15  marketing works.  I'm the subject of marketing every
16  single day.  I get it, but I'm really struggling
17  with understanding what you mean when you use the
18  adverb "significantly."  How does -- how much -- do
19  you have any idea how much it moves the needle?
20  MR. CHALOS:  Object to the form.
21  A.  Some of these studies actually quantify
22  that.  For example, the Hadland study, I think, does
23  with respect to payments.
24  The last sentence in Paragraph 56 --
25  Q.  Right.

Page 152

1  A.  -- each additional meal was associated with
2  an increase of 0.7 percent in opioid claims.
3  So there are -- there are quantifications,
4  and that actually turns out to be a significant
5  increase that's reported in that article.
6  I guess I could have just as easily said a
7  pharmaceutical marketer impacts prescribing, but I
8  think that the adjective "significantly" or -- yeah,
9  adjective.
10  Q.  Adverb.
11  A.  Adverb?  Thank you.
12  Q.  It's all right.
13  A.  It's appropriate there, because I think the
14  impact -- one of the things we see is that doctors
15  underestimate the influence that marketers have on
16  them.  And because of that, sometimes they're
17  reluctant to even be aware of how much they're
18  impacted.
19  Q.  Do you know if the federal law has changed
20  with respect to what in-person marketing a
21  particular pharmaceutical manufacturer can do?  I've
22  read about the Sunshine Act.  Do you know about the
23  Sunshine Act?
24  A.  I mean, I'm aware of it, yes, but --
25  Q.  Do you know what that act requires with

Page 153

1  respect to marketing activities and reporting?
2  A.  Just that the activities have to be
3  reported.  For example, the Open Records has the
4  database where they keep track of all the meals and
5  anything else that companies paid for, the -- any
6  engagement.
7  I know that if somebody meets with me, as a
8  member of the DUR board, they've got to report that
9  under the Sunshine -- I guess it's the Sunshine Act
10  that requires that.
11  Q.  Okay.  Let's -- let's continue on.  Let me
12  see where we are now.  Let's move to Page 58.  What
13  is a clinical practice guideline?
14  A.  Clinical practice guideline, also known as a
15  clinical protocol, an evidence-based medicine
16  guidelines, lots of different terms for it, but
17  basically these are structured decision models that,
18  using evidence-based medicine and scientific
19  studies, patient experience, and the combined
20  knowledge of many years of experts, they come up
21  with a plan for treating patients that they think
22  will result in the best care possible.
23  Q.  Do you know whether certain states have
24  implemented prescribing guidelines related to opioid
25  painkillers?

Page 154

1    A. I know that the CDC has promulgated
2 guidelines. I assume that states followed suit, but
3 I'm not aware specifically of states.
4    Q. Have you evaluated any particular state's --
5 I take it for that reason, you have not evaluated
6 any particular state's prescribing guideline; fair?
7    A. I have -- I have not undertaken to evaluate
8 any guidelines that were outside the scope of the
9 guidelines that were advanced through the marketing
10 messages of the defendants.
11    Q. Do you have any opinion as to whether the
12 guidelines that were advanced through advocacy
13 groups or key opinion leaders, whether those
14 guidelines were appropriate?
15    A. So I did not undertake that analysis, but I
16 believe other experts have undertaken that.
17    How long have we been going?
18    Q. About an hour. Do you want to have a break?
19    A. If --
20    Q. Let's do it.
21    A. -- if anybody else needs to, I could use a
22 quick break.
23    Q. Yeah. Let's do it.
24    THE VIDEOGRAPHER: We are now going off the
25 video record. The time is currently 2:03 p.m.

Page 155

1 This is the end of Media Number 3.
2    (Recess from 2:03 p.m. until 2:15?p.m.)
3    THE VIDEOGRAPHER: We are now back on the
4 video record with the beginning of Media
5 Number 4. The time is currently 2:15 p.m.
6 BY MR. VOLNEY:
7    Q. So let's -- let's move to Page 53, Paragraph
8 89, which is your discussion of marketing messages
9 are different from the package insert.
10    A. Right.
11    Q. I think you earlier testified that in
12 connection with a new drug application, one of the
13 things that the FDA looks at and ultimately approves
14 is the package insert for a particular drug.
15    A. Yes.
16    Q. Are you just generally familiar with that?
17    A. Generally, yes.
18    Q. You yourself haven't had any particular
19 direct involvement in getting a package insert
20 approved; fair?
21    A. I have not.
22    Q. And you would agree with me that a package
23 insert is part of a company's marketing?
24    A. A package insert is part of a company's
25 marketing.

Page 156

1    Q. And I think you testified that on the DURB,
2 that's not something that's put in the sort of
3 clinical information and clinical binder you
4 receive?
5    A. That's correct. We don't -- we don't see
6 package inserts as part of what we review.
7    Q. Who are the package inserts provided to?
8    A. Generally, a package insert has to be
9 provided any time a drug name and its indication are
10 mentioned at the same time. So if a sales rep is,
11 you know, back in the olden days, giving you a cup
12 that says OxyContin on it, and he mentions the
13 indication, he's got to give you a package insert
14 attached to that cup.
15    And so in today's world, I think anytime
16 that the two are together, the indication in the
17 product name, the package insert is still required.
18    Q. So is that just for in-person meetings, or
19 is it also for, like, mail pieces?
20    A. Yeah. I'm pretty sure it applies to any
21 time, Internet, mail, in-person. Even if a -- if an
22 article is being distributed by a drug rep and that
23 article mentions the indication and the name of the
24 medication, I'm pretty sure they'd have to include a
25 package insert at that time, too.

Page 157

1    Q. So when we're looking at the physician
2 prescriber model, which I conveniently took off this
3 ELMO, it -- one of the things that will be in the
4 total mix of information would be the package
5 insert, at least it will be available to the
6 prescriber?
7    A. Yes. Thank you for that, because it's
8 available. It doesn't mean -- and as you -- as my
9 opinion states, it's not often relied upon.
10    Q. And is that based on anecdotal information,
11 or what?
12    A. Well, it's -- I don't think it's anecdotal.
13 I think it's the way marketing is conducted. The
14 package insert is -- I know I don't get to ask the
15 questions, but I'm sure we've all seen a package
16 insert. It's folded up in a little -- you know,
17 stuck to the prescription bottle or taped to the
18 bottom of the coffee mug or whatever, or it can be a
19 bigger piece, you know, 8?-by-11. So they come in
20 all different shapes and sizes. Some are more
21 useful than others.
22    But when the package insert is delivered,
23 it's not necessarily delivered as, oh, here is your
24 package insert, this contains all the prescribing
25 information, but rather, it's delivered as part of

Page 158

1  the obligation to deliver the package insert.
2      And what -- for example, we're talking about
3  the personal selling effort. It would be the sales
4  rep's job to then figure out what in that package
5  insert or what in their sales call today is most
6  important to convey to that prescriber and to
7  communicate that information.
8      And in marketing, we know that what works
9  best is to communicate product benefits and turn
10 those -- product features and turn those product
11 features into product benefits. So, you know, to
12 the extent that a package insert supports that, it
13 would be relied on by the sales rep. To the extent
14 that it doesn't, it may not be.
15     Now, just an example of that is, early on in
16 the OxyContin marketing, the reps frequently
17 referred to -- when doctors had concerns about
18 addiction, the reps frequently referred to the less
19 risk of addiction in the package insert that we now
20 know was changed later on.
21     So the package insert is variable. It's not
22 necessarily something that is relied on. It's
23 certainly not something that's focused on, but it is
24 provided.
25     Q. Do you know whether the original OxyContin

Page 159

1  package insert had a warning on each page that the
2  drug may be habit-forming?
3      A. I don't know if it had that on it or not.
4  I've read the original package insert, but I don't
5  recall that.
6      Q. If a -- if a doctor wanted to get the
7  pharmaceutical manufacturer's disclosures related to
8  a -- the particular risks of a drug, would the
9  doctor -- could the doctor look at the package
10 insert? Let me ask a different question, because
11 that's a bad question.
12     Is the package insert intended to provide
13 information about the risks of a particular drug?
14     A. I think it's fair to say that the package
15 insert is intended to provide a balanced picture of
16 the drug, including the benefits and the risks, and
17 all the information a doctor would need to know,
18 whether or not they would want to consider
19 prescribing it.
20     Q. And do you know whether doctors consider the
21 package insert to be useful for that purpose?
22     MR. CHALOS: Object to the form.
23     A. So my opinion about package inserts is that
24 they are not heavily relied upon. There are a lot
25 better sources of information that doctor would use

Page 160

1  that are much more concise and available, especially
2  in today's technology information world.
3      You probably recall the PDR, which was a
4  Physician's Desk Reference, which contained
5  basically all the package inserts for all the drugs
6  that were available. And so doctors might look up a
7  drug and get package insert information from that,
8  but as time and technology changed, the reliance on
9  the package insert has as well.
10     Q. What other sources of information out
11 there -- are there out there that are more concise
12 and available?
13     A. In today's drug information world, there is
14 a number of drug information services, from
15 Epocrates and Micromedex and UpToDate and several
16 other sources that are -- that information is culled
17 from a lot of different sources and summarized for
18 prescribers, pharmacists, nurses, formulary
19 managers, et cetera.
20     Q. So that more -- that more available and
21 concise information that you're talking about is
22 also information that would go into the total mix of
23 things a prescriber would consider or could
24 consider?
25     MR. CHALOS: Object to the form.

Page 161

1      A. It would be something that, when we're
2  looking at the prescriber information processing
3  model, when the need for information arises and
4  search is engaged, that they might turn to that
5  information to incorporate that or not incorporate
6  it, as the case may be, into their decision model,
7  yes.
8      Q. Okay. Let's move to Page 65. So in this
9  part of your report, you give a sort of background
10 information about the competitive market for
11 opioids.
12     Do you see that?
13     A. I do.
14     Q. And you start your story in the 1930s?
15     A. Yes.
16     Q. In fact, opioid painkillers have been used
17 since B.C. times; fair?
18     A. Yes. They've been used for a very long
19 time. And --
20     Q. And the --
21     A. -- it's my understanding that there's a
22 historian that is -- has been engaged in this case
23 as well that's telling the full story on the
24 history, which is the reason why I didn't go into
25 much of it here.

Page 162

1   Q.  It has been common knowledge in the medical
2   profession throughout the 1900s and 2000s that
3   opioid painkillers bear a risk of addiction; fair?
4       MR. CHALOS:  Object to the form.
5   A.  I think the medical thinking has been for a
6   very long time that opioids are addictive and
7   dangerous drugs to use.
8   Q.  Your recounting of the sort of history of
9   opioid painkillers, you know, beginning in the '70s
10  through the '80s to the '90s, where does that come
11  from?  Is that based on your personal knowledge?
12  A.  I started working in community pharmacy in
13  1977, so some of it is, but the order of what was
14  discussed here was really related more to building a
15  background for the -- what happened prior to and
16  then what happened right around the time of the
17  changes in the marketing practices to a more
18  aggressive nature in about the mid-1990s.  So it was
19  really just to provide a -- just a brief backdrop
20  about what drugs were on the market.
21      Sort of -- you would -- something you would
22  expect to see in a case analysis is a sort of
23  overview of what's going on.  So to just look at
24  opioids cold, without understanding what was in the
25  marketplace and what wasn't, what other competition

Page 163

1   was out there, it would be leaving some questions
2   unanswered.
3   Q.  But in terms of your description here of
4   what motivated Purdue to develop OxyContin and what
5   Purdue's intent was with respect to development of
6   OxyContin, that's information that you've gleaned
7   from the documents you've looked at in this case;
8   fair?
9   A.  That, in particular, came from the OxyContin
10  launch plan in 1993 or '94, I believe.
11  Q.  So this is a -- is this, in essence, a
12  paraphrase of that?
13  A.  A paraphrase or just a summary of it, yes,
14  summary of what I learned from it.
15  Q.  And you also talk in here, in this section
16  of your report, about your -- about Endo's launch of
17  the varying strengths of Percocet.
18      Do you see that?  I'm looking at Page 108.
19  A.  Paragraph 108?
20  Q.  67, 108, yes.
21  A.  Yeah.
22  Q.  How long has Percocet been on the market?
23  A.  Percocet, I am pretty sure, was on the
24  market when I started working in '77 or '78.  So
25  that would be the earliest I know.  Well, that was

Page 164

1   Percodan.  I'm not sure when Percocet exactly -- it
2   might have been a little after that.  I'd have to
3   check.
4   Q.  So do you know how long the drug oxycodone
5   has been around?
6   A.  Oxycodone has been around for a while, but
7   the Contin version of oxycodone has not been around
8   since -- but since about 1995.
9   Q.  So the OxyContin version of oxycodone is
10  what's called a long acting or extended release
11  oxycodone product; fair?
12  A.  Yes.
13  Q.  So that is -- that would -- that's what
14  would distinguish OxyContin from just a regular old
15  oxycodone pill; fair.
16  A.  The immediate release version, yes.
17  Q.  There is a discussion on Pages 69 and 70 of
18  your report about Purdue's decision-making with
19  respect to developing a -- a what?  An extended
20  release version of oxycodone?
21  A.  I think.
22  Q.  Tamper-resistant.
23  A.  I think these refer to Dr. Haddox's work
24  related to tamper-resistant formulations.
25  Q.  Has a tamper-resistant formulation of

Page 165

1   OxyContin been released?
2   A.  Eventually, yes.
3   Q.  Do you know what year it was released?
4   A.  I think it was relatively recently.  I'd
5   have to look back at my notes or the report, but I
6   want to say around 2012 or something like that --
7   Q.  So --
8   A.  -- was when it was finally approved.  They
9   sought approval for it much earlier than that, but
10  it was finally approved in that period.
11  Q.  So ultimately, the FDA made the decision to
12  approve a tamper-resistant version of OxyContin?
13  A.  Yes.
14  Q.  Do you know what decision process or
15  decision-making process the FDA must go through
16  before deciding whether to approve a particular
17  drug?
18  A.  They balance the safety and efficacy and
19  patient needs.
20  Q.  Do you have any criticism of the FDA's
21  decision to approve that particular drug?
22  A.  I certainly wasn't part of the discussion or
23  the analysis, so I really have no opinion about
24  that.
25  Q.  In Paragraph 115 on Page 70 of your report,

Page 166

1  you make some statements about what Dr. Haddox
2  believed and the company's decision-making with
3  respect to focusing on a tamper-resistant drug.
4      Do you see that?
5  A.  Yes.
6  Q.  What's the basis for these conclusions?
7  A.  So the -- the first sentence, in my opinion,
8  Dr. Haddox believed that opioid sales were
9  declining, that's the only thing I stated
10  that was a belief and that at this time that he had
11  already -- in the paragraph before, I -- he makes
12  the point in his testimony, I believe, that opioid
13  use had begun to decline.  So I was associating that
14  with that statement in the paragraph preceding.
15      But basically, I think one of the reasons --
16  and this is my opinion now.  This is the part where
17  I'm inferring from the data points.  I think that
18  probably what's happened here is that he is -- he is
19  seeing the decline in OxyContin sales and inferring
20  from that that the opioid market is declining as
21  well.
22      I think if you were to look at overall sales
23  of opioids, I think during this time period they
24  were still growing.
25  Q.  Okay.  Then so how does that fit into the

Page 167

1  bigger picture in here?  What is the -- what's the
2  conclusion you draw from that?
3  A.  Well, from a marketing perspective, if the
4  folks that are engaging in product promotion see
5  their markets as declining, they're looking at their
6  products as being in a product maturity or product
7  decline phase, even to the point of obsolescence.
8  And so they've got to begin to evergreen the
9  products, figure out a way to extend its life,
10  continue to generate sales.  This is -- this is what
11  marketers do.  It's their job.
12      So from Dr. Haddox's perspective, research
13  designed to identify ways to continue the success of
14  a product that has begun to decline would be very
15  important.
16  Q.  And isn't it common for all drug
17  manufacturers to engage in that sort of thinking and
18  decision-making when their drugs are about to come
19  off patent, for example?
20  A.  Yeah.  So it's typical for a product
21  manufacturer to tweak a formulation or develop a new
22  indication that can be patented, to develop a new
23  dosing schedule.  Lots of ways manufacturers do
24  that, and it's certainly consistent with marketing
25  principles and what we have seen in all product

Page 168

1  categories, you know, across the board over many
2  years.
3  Q.  Okay.  Let's get to the -- let's go to Page
4  73.  Okay.  This is sort of I, I guess, the beginning
5  of the meat of your discussion about the marketing
6  strategy for opioids for defendants.
7      When you say at the end of Paragraph 120
8  that the marketing documents you reviewed were
9  developed for use nationally and in Ohio?
10  Do you see that?
11  A.  Yes, I do.
12  Q.  Does that mean that necessarily, the
13  marketing documents that you reference here in your
14  report were used in Ohio?
15  A.  Yeah.  I don't think there's any question
16  that the marketing documents that were developed
17  were used in Ohio.  The testimony that I read, which
18  was -- there were a number of deponents that focused
19  on that issue, as well as, you know, just the fact
20  that the marketing plans were developed at the
21  national level to be implemented nationwide.
22      I think there's some -- there's some
23  latitude around that, which would be only reasonable
24  for marketers to adapt, you know, marketing plans
25  for different geographic areas.

Page 169

1      But in the case of Ohio, for example, you
2  know, with Janssen and the -- you know, Ohio was one
3  of their biggest markets for Nucynta.  So there was
4  a big -- you know, a big -- a big market share for
5  Nucynta in Ohio.
6      And so there could be increased dollars
7  spent in a particular area versus we're going to cut
8  back in this area.  We've got more high decile
9  prescribers in this area than we do there, in
10  another area, so it's going to impact our personnel
11  needs and so forth.
12      So within the implementation zone being
13  slightly different, the strategies and tactics are
14  approximately the same.
15  Q.  Do you know how many PSRs any particular
16  manufacturing defendant had assigned to Ohio?
17  A.  You know, I do know about the numbers that
18  they had nationally, but I don't know specifically
19  for Ohio.
20  Q.  Do you know whether Purdue currently has any
21  PSRs?
22  A.  My understanding is Purdue does not.
23  Q.  Do you know when Purdue stopped using PSRs?
24  A.  Not from my work in this case, but I -- my
25  understanding is around 2017 or 2018, they ended the

Page 170

1  sales force.
2      Q.  Do you know how big their sales force was
3  when they ended it?
4      A.  It was -- I think it's noted in the report
5  somewhere, but I'm going to say it was about 500 to
6  600, perhaps.
7      Q.  Now, in Paragraph 121 of your report you
8  state:  Defendants worked to create aggressive
9  marketing strategies for opioids, which served to
10  distort needs, wants, and demand for opioids.
11      A.  Which paragraph are we in?
12      Q.  121.
13      A.  Gotcha.  Yes.
14      Q.  So is the word "aggressive" a term of art?
15      A.  It can be a term of art.  I note the -- the
16  word "aggressive," I -- I would say I was hesitant
17  to use it myself in my report.  One of the -- one of
18  the rules of case studies is try not to be
19  sensational, and the -- you know, certainly there
20  are examples you can build into a case study that
21  are just that, and they raise eyebrows but they
22  don't make your point necessarily in the scone of
23  the ways.
24      And so I was worried about using the word
25  "aggressive," but from a marketing perspective,

Page 171

1  aggressive marketing can be easily defined as
2  marketing that is highly detailed, that's
3  strategically planned, with very specific and --
4  goals that are enumerated that set high attainment
5  levels for products.
6      So as a marketer, we have -- the word
7  "aggressive" doesn't carry the same negative
8  connotation as when I read aggressive marketing in a
9  report about a lawsuit or a settlement.  So there is
10  a big difference there.
11      The way I'm using the word "aggressive
12  marketing" is from a marketing perspective, it was
13  marketing that was, as I described here, very
14  detailed, well-planned out, well-integrated within
15  the organization, marketing that had very clear-cut
16  objectives, had good metrics to assess those
17  objectives, and reached out to customers in the most
18  effective ways.  So that's what I mean by
19  aggressive.
20      Q.  Is it common for pharmaceutical
21  manufacturers to using aggressive marketing, using
22  your term?
23      A.  So that's -- that question is one that --
24  you know, and I haven't -- I haven't analyzed a lot
25  of product categories the way I have the opioid

Page 172

1  category.
2      The -- aggressive in the marketing sense,
3  though, I think it would be fair to say that other
4  manufacturers for other product categories have used
5  aggressive marketing.
6      For example, the Ozempic that I referred to
7  a couple of times today, it's a new drug that's been
8  on the TV a lot lately.  And to me, I'm sure others
9  would agree, that that is a aggressive campaign.
10  You see a lot of it.  It's repeated frequently.
11  It's on all the channels.  You can't watch golf
12  without seeing it.  You can't watch baseball without
13  seeing it.  So I think that's true.
14      But the issue that comes up, if we relate it
15  back to the standards and the heightened standards,
16  in particular, for opioids and prescription drugs,
17  the use of those kinds of techniques surrounding
18  opioids to generate the dramatic increases in sales
19  seems to be inappropriate.
20      Q.  Okay.  Seems to be, what do you mean by
21  that?
22      A.  It -- it is -- it is using marketing to
23  expand demand for a dangerous drug beyond that which
24  is the -- let's just say the medically needed amount
25  in our society.  And the expansion of the demand

Page 173

1  creates more access in the marketplace.  That has
2  led to the problems that we have in our society
3  related to the use of opioids.
4      Q.  I mean, other than knowing that the number
5  of prescriptions for opioids started going up in
6  1995 and continued to rise for a period of time,
7  what have you done to assess the level of
8  appropriate demand for opioids?
9      A.  So the -- as I described this morning, we
10  had growth in opioids before 1995.  The growth was
11  just at a much, much lower rate.  After 1995, we had
12  growth that was at a much higher rate, and that
13  growth was sustained for many years.
14      The explanation, the -- there were a couple
15  of possible explanations for that.  And as I said
16  this morning, one of those is that, you know,
17  opioids expanded access and expanded the market
18  through the marketing.
19      The other is that more patients were sicker,
20  and that grew rapidly, and there was utilization.
21  The epidemiology of pain doesn't support that just
22  from a pharmacy perspective.  We would -- we see
23  growth.  It should be a fairly constant rate of
24  growth.  So something about the marketing must have
25  changed the utilization of those drugs.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    Q.  Could patients or people who were suffering
2  from pain conclude that there are now better avenues
3  for relief available to them, and that might account
4  for the expanded market?
5    A.  Yes.  And certainly that's something that I
6  considered.  The question is really, was pain
7  undertreated?  And so the answer -- I think if you
8  look at defendants' marketing documents, that is
9  something the defendants absolutely believed to be
10 true.  They -- that pain management was stigmatized,
11 that the use of pain medications was below levels
12 than it should be at.
13       The problem that I encounter with that in
14 the marketing analysis, though, is -- and by the
15 way, those were the themes that they focused on.  If
16 you look at Themes 1, 2 and 3, this is what
17 manufacturers focused on.  Their use of ads
18 supported those premises.  So that's all consistent
19 and expected from a marketer's viewpoint.
20       But the problem is, is should those
21 messages, once -- once we see the results of this
22 rapid increase in the marketplace, and the negative
23 outcomes from those rapid increases, shouldn't that
24 marketing be identified as inappropriate?
25       So at some point along the way somebody

Page 175

1  should have said, hey, wait, this isn't -- this
2  is -- we're getting -- too many patients are
3  becoming addicted.  We're having too many deaths as
4  a result of opioids.
5       When opioid use increases, the level of
6  analgesic increases and the level of pain, the level
7  of addiction and the level of death will increase as
8  well, so the more use we have of opioids, the more
9  we're going to have all of these benefits and harms.
10       So that's where the dilemma comes in, but,
11 you know, there is no question that the use of the
12 drugs in terms of the time periods that we're
13 talking about, from 1995 and '96 to 2000, to 2005 up
14 to 2010, dramatically increased.
15       And I think that that is at least temporally
16 associated with the marketing and defendants' own
17 internal marketing documents that were assessing the
18 marketing that are -- you know, the reimbursement of
19 their sales forces to promote the increased sales.
20       So we have all these different data points.
21 So then as a case analysis would charge you to do,
22 we had to then step -- take a step back from that
23 and say, okay, what's going on here?  What's the
24 most likely explanation?
25       And is it that we had a 1500-fold increase

Page 176

1  in the level of pain in our society, or is it
2  because the marketing was so effective, that a drug
3  that creates a distortion in demand was not only
4  effective at generating sales, but it began to
5  perpetuate its own sales.
6    Q.  Do you -- have you made any effort to
7  consider what amount of the increase in sales of
8  opioid painkillers was due to people who, before
9  then, had untreated pain?
10   A.  I did not undertake that analysis.
11   Q.  Probably pretty difficult to do; fair?
12   A.  For a marketer to do, I think it would be,
13 yes.
14   Q.  I take it from your testimony that there is
15 not a -- at least necessarily, a negative
16 connotation to use of the word "aggressive" to
17 describe a particular defendant's marketing?
18   A.  For -- depending on the context, because I
19 think definitely when you read the commentary about
20 opioid marketing in the lay literature, it's a very
21 negative context.
22       When you read a Department of Justice news
23 brief about a company's marketing, and they use the
24 word "aggressive," that's definitely a negative
25 connotation.

Page 177

1       So depending on the section of my report, I
2  think it could have a positive or a negative
3  connotation.  As I said before, my assessment from a
4  marketing -- pure marketing perspective is that
5  aggressive marketing is just a form of marketing.
6  It's marketing that is designed in certain ways.
7       However, when it comes to opioids, I think
8  after you read my report, you would understand that
9  I have the opinion that aggressive marketing, from
10 anyone's definition, is inappropriate with this
11 class of drugs.
12   Q.  Let's move to Page 75.  Well, I may have a
13 follow-up question.  I take it that aggressive
14 marketing by a pharmaceutical manufacturer is not a
15 violation of any particular FDA regulation?
16   A.  No.  As I -- as I said, the nature of
17 aggressive is -- is a -- it's a -- a marketing, as
18 you referred to earlier, term of art, but at the
19 same time, the violation is of standards, not of the
20 FDA regulation, and those standards are the ones
21 that I enumerated earlier.
22   Q.  Right, but just engaging in aggressive
23 marketing by a pharmaceutical company is not a
24 violation of any law that you know of; fair?
25   A.  Yeah.  I can't make any legal conclusions.

Page 178

1  Sorry.
2      Q.  Looking at Paragraph 123, which is on Page
3  75.
4      A.  Yes.
5      Q.  You throw us a bone in there.  You say:  It
6  should be noted the defendants' marketing documents
7  sometimes referenced the need to disclose safety
8  information for drugs consistent with FDA approved
9  indications and prescribing information contained in
10  the PI, package insert.
11      Do you see that?
12      A.  Yes.
13      Q.  Have you -- is there a schedule, or have you
14  sort of put all that stuff together in a particular
15  pile that we could look at, what you're referring
16  to, or is it just whatever is referenced in -- I
17  guess there is one document in Footnote 245?
18      A.  No, I don't have a schedule, but the
19  footnotes here and the discussion provide several
20  examples, and this is something we alluded to this
21  morning when we were talking about the package
22  insert, where there -- even though the PI is
23  mentioned or cautionary statements are mentioned,
24  the balance of information that is presented is
25  heavily skewed towards the benefits.

Page 179

1      Again, that makes sense from a marketing
2  perspective.  The question is, is it appropriate,
3  but it's balanced -- it's balanced heavily towards
4  the product features and benefits, not the product's
5  potential harms.
6      Q.  What does it mean when a drug is listed on
7  Schedule II?
8      A.  It means that it's a controlled substance
9  that has special purchasing and recordkeeping
10  requirements that is considered to be -- its use
11  needs to be much more carefully considered.
12      Q.  Has Schedule II had that meaning since the
13  mid-1990s?
14      A.  I'm not a historian of the Schedule II
15  books, but my understanding as a pharmacist would be
16  that Schedule II hasn't changed -- other drugs have
17  entered the category, but I don't know that the
18  definition of Schedule II has changed.
19      Q.  And do doctors have to have particular types
20  of licensure to be able to prescribe a Schedule II
21  drug?
22      A.  It is -- it is my understanding that a
23  doctor has to have a DEA license in order to do
24  that, as would a pharmacist have to have a DEA --
25  pharmacists have to sign special order forms that

Page 180

1  enable them to purchase, so --
2      Q.  Is there any particular type of education
3  that goes along with a pharmacist getting a DEA
4  license?
5      A.  Not that I'm aware of.
6      Q.  Are -- in a -- in the retail pharmacies that
7  you've worked in, are there special procedures in
8  place to deal with Schedule II narcotics?
9      A.  There are a couple of different ways that's
10  addressed in terms of inventory in the store and
11  purchasing.
12      On the one hand, some pharmacies have a safe
13  with a lock and, you know, it's guarded closely.
14  Other pharmacies just mix them in with their regular
15  inventory to make them harder to find, less subject
16  to potential pilferage.
17      So different pharmacies have different ways
18  of handling the issue.  Some pharmacies have a --
19  you know, what I call a rabbit garden.  They have a
20  few bottles here that are out in plain sight for
21  everybody to see and then all the good stuff is held
22  back somewhere else under lock and key.  So there's
23  many different ways that it's dealt with.
24      Q.  Do you know whether prescribing doctors have
25  to undergo any particular training to get a DEA

Page 181

1  license to prescribe Schedule II narcotics?
2      A.  I don't know.
3      Q.  You say here in Paragraph 123 that:  The
4  preponderance of defendants' messages focused on
5  translating drug features into drug benefits and
6  downplayed information that would serve to
7  discourage prescribing, including potential harms.
8      Do you see that?
9      A.  Yes.
10      Q.  So when you use the word "preponderance,"
11  what do you mean?
12      A.  The vast majority.
13      Q.  The vast majority?
14      A.  Yeah.
15      Q.  I mean, do you create two piles?
16      A.  Well, you know --
17      Q.  That indicates -- sorry.  To me that
18  indicates -- I mean, that's a term of art in legal
19  practice.  It indicates you've -- you've engaged in
20  some weighing, and preponderance means 51 percent
21  versus 49.
22      A.  51 or more --
23      Q.  Right.
24      A.  -- in my mind, so -- and I definitely think
25  it was -- I think I meant it that way.  I apologize

Page 182

1  for using a lawyer word. I try never to do that if
2  possible. They always have more meaning for you
3  than they did to me.
4      But the preponderance, the way you've
5  defined it as a lawyer term, I would agree with, and
6  I meant to use it that way in this case.
7      The examples that I give on subsequent
8  paragraphs, I think, explain that a little bit with
9  specific documents. Unfortunately, in today's
10 world, we don't have stacks of documents any more.
11 We have electronic files. So it's a little harder
12 to do that with, but when I look at the -- I was
13 going to say plethora, but I've decided not to.
14     When I look at the large number of documents
15 that I've reviewed in this matter, and I look at the
16 themes that were communicated and the way they were
17 communicated -- take the marketing plans out of it
18 for a minute.
19     But you look at the sales training
20 documents, for example, where sales reps are trained
21 on how to respond to doctors' concerns about
22 addiction, or doctors are trained to -- how to
23 respond to concerns over dependence or tolerance or
24 withdrawal, any of those issues.
25     The documents that I saw were focused on one

Page 183

1  of two things, primarily, and this is almost
2  exclusively. They were focused on ways to minimize
3  the doctors' concerns and take them the next step
4  into changing their perception about that concern or
5  to just downplay that concern to begin with.
6      So that's where -- that's the basis for
7  this. So there are multiple, multiple documents in
8  the sales training arena, multiple documents called
9  objection handlers. I think -- I saw lots of
10 different types of objection handlers, the training
11 documents about, you know, dealing with objections
12 and some specific sales techniques that were
13 employed. So that's the basis for that.
14     The preponderance was, you know, the vast
15 majority, almost all the documents weren't focused
16 on, you know, accept this, that opioids are
17 addictive, and let's discuss that. No, that's not
18 what they did. It's downplay that it's addictive
19 and shift them to this new way of thinking that --
20 that they can still be prescribed if we monitor the
21 patient closely, for example. So that's where that
22 basis comes from.
23     Q. Do you have any opinion as to whether a
24 doctor could appropriately prescribe an opioid as
25 long as that doctor continued to closely monitor his

Page 184

1  or her patient?
2      A. Well, I don't have an opinion in that regard
3  for this case, but that's my opinion about doctors
4  and drugs in general. They should always be
5  monitoring their patients.
6      Q. Let's -- let's move to Paragraph 134, and in
7  Paragraph 134, you identify particular -- three
8  general themes?
9      A. Yes.
10     Q. Did you come up with these themes?
11     A. No. There were multiple iterations of these
12 themes, and -- but, yes, at the end of the day,
13 these are -- there were the themes, as I saw them,
14 as most appropriate.
15     Q. The -- I think we've talked about your --
16 what you -- I mean, in coming up with these themes,
17 you looked at the documents, the marketing
18 materials, the presentations, the sales training,
19 whatever documents that you identified through your
20 Relativity searches and whatever documents might
21 have been gathered for you by somebody else, and
22 you've attempted to group them.
23     But in doing that, what you've done is
24 you've basically read the document and, in your
25 head, come up with three themes; fair?

Page 185

1      A. I -- you know, I read many documents and
2  then tried to figure out what was the best way to
3  represent the -- a -- in a couple of bullet points,
4  the best way to represent the majority of all of
5  those documents.
6      Q. In coming to that sort of bullet point
7  analysis, does that require any particular
8  expertise, other than the expertise of being a smart
9  guy?
10     A. Well, I -- let me think about that for a
11 second.
12     Can I -- there's a noise coming out of
13 the --
14     Q. It's a crackle.
15     MR. GALIN: I think there's someone who is
16 not on mute is typing.
17     MR. VOLNEY: Hey, folks on the telephone,
18 could somebody mute?
19     A. So, I mean, I think to answer your question,
20 do you need a particular expertise, I think it takes
21 somebody who can deconstruct the messages from the
22 marketing pieces and then reassemble them into
23 consistent themes.
24     Now, the interesting part about your
25 question, the reason why I'm really thinking about

Page 186

1  it for a minute is because I really learned this
2  information from the marketing documents themselves.
3  This wasn't necessarily my way of categorizing these
4  messages, because these were the themes that -- when
5  you look at the marketing planning documents, these
6  were the big core messages that the defendants'
7  marketing documents really sought to communicate.
8      And as I said, there were multiple
9  iterations in, you know, the way these are worded
10  and so forth, but opioids should be used first, you
11  know, that was a -- that was an easy one. That's
12  one of the main themes, is that opioids need to be
13  used sooner in treating pain.
14     So with that, you know, I think it does
15  require an expertise, perhaps even a combination of
16  expertises. And beyond that, it requires some type
17  of methodology to keep it all straight and to create
18  a record of what you've done and to be able to
19  report it.
20     Q.  Is it a -- does it require pharmaceutical
21  marketing expertise to read a document and identify
22  what the bullet point pharmaceutical marketing
23  message is?
24     MR. CHALOS:  Object to the form.
25     Q.  I guess what I'm getting at, and I think you

Page 187

1  will anticipate this, is I think I can read these
2  documents and categorize them by themes just as well
3  as you can. I just don't know that you're actually
4  providing some added benefit as an expert to the
5  jury. I'm trying to understand, from your
6  perspective, what you think you're -- what you're
7  adding as a pharmaceutical expert.
8      MR. CHALOS:  Object to the form.
9      A.  So do you want me to answer that, or was
10  that just a --
11     Q.  Well, it's kind of a statement, but I also
12  want you to answer it.
13     What are you providing that any other person
14  in this room or on the jury couldn't come to their
15  own conclusion about?
16     MR. CHALOS:  Object to the form.
17     A.  So I think there's a number of things, and
18  I'm going to reserve the right to add to my list as
19  we go on.
20     Q.  Sounds good.
21     A.  But at the very highest level, you can look
22  at any advertisement -- and you mentioned you're a
23  consumer, and you get advertised to all the time.
24  You can look at any advertisement and find out what
25  the message or the theme is, and potentially any

Page 188

1  consumer can do that for any product.
2      The problem in this analysis would be how to
3  know whether or not that -- those themes are
4  consistent with the theory of marketing, which --
5  the theoretical basis of marketing that says
6  delivery of that message via this mechanism will
7  provide the biggest bang for our buck.
8      The use of that theme in combination with
9  another theme that is designed to complement it, so
10  integrating the marketing messages, and the
11  consumers, while they can maybe identify a message,
12  they may not be able to synthesize those messages
13  and understand they are part of a bigger picture of
14  marketing.
15     The integration of the various marketing
16  efforts, the use of peer-to-peer influence, I mean,
17  you've asked me many questions today about
18  peer-to-peer marketing, peer-to-peer influence. So
19  I may be one up on you on that one.
20     But the idea of, can the average person just
21  look at a brochure designed for patients and be able
22  to assess from that what the purpose of a
23  well-orchestrated, well-defined, and aggressive
24  marketing promise might have been, I don't think so.
25     I think it takes somebody that can -- that

Page 189

1  can deconstruct the marketing, break it down into
2  its component parts, and understand how each of
3  those component parts relates to the overall purpose
4  of that marketing and what impact that marketing
5  had.
6      And certainly a consumer who is able to
7  identify a marketing message has no way of knowing
8  whether that was successful or not in achieving its
9  goal. They may not even understand the concept
10  behind an every 12-hour dosing, and why that would
11  be an effective marketing message for a doctor.
12     So when you add the layer of a physician or
13  the other customers to it, when you add the
14  comprehensive nature of marketing practices to it,
15  when you add that there are very strong theoretical
16  underpinnings that describe why what we do is
17  effective, that's at least the beginnings of the
18  list of why I think you need a pharmaceutical
19  marketing expert. And I haven't even touched on the
20  issue of standards and regulation and so forth.
21     Q.  So you think it -- does it take a
22  pharmaceutical marketing expert to understand what's
23  included -- what the intent is behind these
24  particular marketing pieces?
25     A.  Let me give you one example.

Page 190

1    MR. CHALOS: Object to the form.
2    A.   Let me give you one example.  If you give a
3  patient a PI, it's useless.
4    Q.   If you give a doctor a PI, is it useless?
5    A.   It can be.  If they don't read it, it was
6  useless.
7    Q.   The same -- the same is true for any piece
8  of marketing information you give to a prescriber.
9  If they don't read it, it's useless.
10    A.   Which is exactly --
11    Q.   Fair?
12    A.   Which is exactly why you need a marketing
13  expert to help you understand how this marketplace
14  works.  Do doctors read it or not?  And there is
15  evidence to support the contention that they don't.
16  They don't rely on the package insert, not the way
17  they do on other pieces of information.  And this
18  is -- again, we'll keep adding to the list, but --
19    Q.   I'm -- I guess I'm confused.  Is there -- is
20  there research that -- or have you done any -- have
21  you done any research to identify what percentage of
22  doctors do or do not rely on the PI, what percentage
23  of doctors do or do not rely on advertising, and
24  what percentage of doctors do or do not -- are or
25  are not influenced by key opinion leaders, that sort

Page 191

1  of thing?
2    A.   I have --
3    MR. CHALOS: Object to the form.
4    A.   I have not undertaken analysis to assign
5  percentages to any of those characteristics.
6  However, there are -- in the report, there is
7  literature cited that reflects on the use -- the
8  usefulness of the package insert and reliance on the
9  package insert.
10    Also in the report is information on the
11  categories that the pharmaceutical companies spend
12  on the various forms of advertising that they do;
13  for example, detailing or personal selling being the
14  biggest category and the highest expenditure.
15    So if you are a student of marketing, you
16  understand that marketers spend their dollars where
17  they get the most return.  And so if we're spending
18  the most money on detailing, then we know the
19  detailing is providing the most return in most
20  cases.
21    Q.   When you say opioids should be first line
22  therapy for pain, what does -- what does that mean?
23    A.   Basically, they should -- you should use
24  opioids as soon as possible.  When a patient
25  presents with pain, you should use an opioid.

Page 192

1    Q.   Like, with a toothache or, I mean, just like
2  any -- any type of pain, minor pain?
3    A.   Well, that's not my opinion, but I'm saying
4  that that's what the -- that's what the theme that I
5  saw in the marketing documents certainly suggested.
6    Q.   Okay.  I -- let's go back and look at this
7  chart a little bit more.  I just wanted to clarify
8  something.
9    A.   Are we talking about Table II now?
10    Q.   Yeah, we're back to Table II, the chart.  In
11  terms of the marketing messages that you've
12  identified in this chart, which are A through X --
13    A.   Yes.
14    Q.   And I just want to clarify.  Was it your
15  testimony that it was you, Dr. Perri, who came up
16  with those particular marketing messages
17  categorization?
18    A.   It was the defendants' marketing documents
19  that came up with those categories.
20    Q.   Well, you -- who wrote it down in this
21  report?  Not defendants' marketing documents.
22  You're the one who had to look at everything and put
23  it together.
24    MR. CHALOS: Object to the form.
25    A.   Yes.

Page 193

1    Q.   Go ahead.
2    A.   So in terms of these specific categories, it
3  would have been my assistant that created this
4  table.  And when we discussed the various categories
5  and the various messages that -- the A, B, C, D, E
6  were just intended to summarize the general theme of
7  the message inside that section of the table.
8    Q.   Okay.  So it's --
9    A.   There were iterations of this as well.
10    Q.   Understood.  Understood.  I mean, it was you
11  and your assistant who looked at the documents and
12  pulled the themes out and then categorized them?
13    A.   Essentially, yes.
14    Q.   And the -- it's likely that particular
15  themes would occur in multiple documents?
16    A.   Yes.
17    Q.   Do you -- do you think that the FDA
18  regulations governing and requiring package inserts
19  are useless?
20    MR. CHALOS: Object to the form.
21    A.   No.  I think my opinion is just a little
22  different than that.  My opinion is, is that they
23  are not heavily relied upon.
24    Q.   And is that based on your understanding that
25  many doctors will look at -- will shortcut that by

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  looking at references, like the Physician's Desk
2  Reference or other types of references?
3     A.  It's more than that.  It's all the efforts
4  that a pharmaceutical manufacturer -- pharmaceutical
5  marketer undertake to reach a doctor, and the
6  package insert is just one of those.
7        And if you look at the package insert in
8  comparison to detailing, personal selling, journal
9  ads, articles, guidelines, CME, all the other things
10 that are going on, the package insert is just a very
11 small part.  And it's primarily something that's not
12 attractive and not appealing.
13       So compare that package insert to the
14 well-crafted, carefully crafted messages that are
15 built into a personal selling encounter or a CME
16 program.  There's -- it's got a lot of competition,
17 and it just doesn't measure up that well.
18    Q.  I think you testified earlier that you
19 haven't undertaken a study to assign any sort of
20 percentage to the number of doctors who rely on the
21 package insert; fair?
22    A.  I have not.  There is literature cited in
23 the report, though, that assesses that to some
24 extent.
25    Q.  Do you have an opinion on how widely a

Page 195

1  package insert is relied upon?
2     A.  My opinion is that it's not heavily relied
3  upon.
4     Q.  Okay.  I mean, heavily indicates to me a
5  judgment call in terms of percentage.  20 percent
6  rely on it?  50 percent rely on it?  70 percent rely
7  on it?
8     A.  I think -- I think --
9     Q.  Is there any number you can put on that?
10    A.  I think there's evidence that some doctors
11 don't ever look at it, and some doctors look at it
12 some of the time.  And that's -- that would be
13 reflected in the literature that I cited here.
14    Q.  So in terms of answering my question, that's
15 the best you've got?  Some doctors look at it some
16 of the time?
17    A.  And some never look at it.  Yes.
18    Q.  Is it true that some doctors never look at
19 marketing materials at all?
20    A.  It -- that depends, because as we've
21 mentioned already today a few times, that marketing
22 has lots and lots of ways of reaching a doctor.  And
23 the nonbranded marketing is very effective at
24 reaching doctors -- this is addressed in my
25 report -- very effective at reaching doctors that

Page 196

1  won't see sales reps, that won't go to the CME
2  meetings.
3        So when they read something from the
4  American Pain Society that they don't realize has
5  been sponsored by, developed by, edited by, written
6  by a drug company, they may be exposed to marketing
7  and not even know it.
8     Q.  But again, in terms of percentages, can't
9  say who relied on unbranded marketed -- marketing
10 rather than branded marketing?
11    A.  I'm a little confused with that because I
12 thought we were talking about something else, the
13 percentages of doctors that look at the PI?
14    Q.  Right.  Versus percentages of doctors who
15 look at, you know, American Pain Management
16 Society's publications.  I mean, I think I've
17 established that in terms of putting raw -- I mean,
18 not raw numbers -- numbers on -- percentages on X
19 amount of doctors saw this and were misled by it,
20 that's not something that you're doing here?
21    A.  No, that's not something that I enlisted.
22    Q.  All right.  Let's --
23    A.  About that time again?
24    Q.  Yeah.  Why -- I mean, don't we take a little
25 break, and I'll see if I can finish up my

Page 197

1  examination and pass you off to somebody else.
2        THE VIDEOGRAPHER:  We are now going off the
3  video record.  The time is currently 3:08 p.m.
4  This is the end of Media Number 4.
5        (Recess from 3:08 p.m. until 3:19 p.m.)
6        THE VIDEOGRAPHER:  We are now back on the
7  video record with the beginning of Media
8  Number 5.  The time is currently 3:19 p.m.
9  BY MR. VOLNEY:
10    Q.  Let's look at Page 137.
11    A.  Okay.
12    Q.  We covered this a little bit this morning,
13 but my understanding of your report is that you know
14 that defendants' marketing messages changed over
15 time, but that you didn't make any effort to sort of
16 track the change in those marketing messages from
17 1995 to the present day; fair?
18    A.  I didn't -- I didn't create a detailed
19 timeline of when they changed, but I certainly noted
20 that the messages changed over that period; for
21 example, in about 2006 with the OxyContin PI change
22 or the shift around 2010 towards tamper-resistant
23 formulations.
24       So that was recognized.  It just -- it was
25 part of the overall marketing.  It wasn't something

Page 198

1  that I thought I needed to distinguish.
2      Q.  And why is it that you didn't need to
3  distinguish how the marketing changed over time?
4      A.  Because the messages maintained consistent
5  themes with the addition of some new themes; for
6  example, with respect to tamper resistance, but even
7  with the tamper resistance, the -- still the message
8  theme was that addiction was -- or abuse was going
9  to be harder with those.  So the original message
10  of, you know, lower abuse potential was still being
11  perpetuated, just in a different way.
12      Q.  You state in Paragraph 153 that:  Marketing
13  principles teach us that the impact of the early
14  marketing that was so effective in shifting
15  prescribers' paradigms about opioids would be
16  durable and resistant to change.
17      A.  Yes.
18      Q.  Have you quantified the durability or
19  resistance in any way?
20      A.  The marketing theory, marketing literature
21  is replete with evidence that once beliefs,
22  attitudes, and intentions are formed, that they are
23  very durable.  They're very hard to change.
24      There is a popular book back -- again, I'm
25  old school, but a popular book called Marketing

Page 199

1  Warfare, and that's one of the first things noted in
2  that book, is that marketing is warfare because once
3  a position is formed, a perception is formed in a
4  customer's mind, it's very difficult to change it.
5      Q.  You state at the end of Paragraph 153 that:
6  "Marketing principles teach us that two decades of
7  Defendants' marketing aimed at a paradigm shift,
8  will take time and effort to correct."
9      A.  Yes.
10      Q.  And then you -- it looks like you cite your
11  book.
12      A.  Yes, shamelessly.
13      Q.  Shamelessly.  You cite yourself.  I like
14  that.  So it's your say-so.
15      What do you mean by it will take time and
16  effort to correct?
17      A.  The habits -- the prescribing habits that
18  were developed over the time period of aggressive
19  opioid marketing will become engrained, and it will
20  be -- it will take time for those habits to change.
21      Q.  So if -- I mean, isn't it -- isn't it
22  your -- well, I mean, is it your opinion that if a
23  particular prescriber had a bad outcome because of
24  prescribing opioid painkillers to his or her
25  patients, one patient or multiple patients, that

Page 200

1  they didn't -- then would not be informed by that
2  outcome and stop prescribing those opioids?
3      MR. CHALOS:  Object to the form.
4      A.  That's not exactly how it works.  The --
5  it's a cumulative process.  So if they have a bad
6  outcome 20 or 30 times in a row -- or just pick a
7  number.  They had --
8      Q.  How about one?
9      A.  They had repeated bad -- well, that might
10  inform them not to use it in that patient, but it
11  may not extend to other patients.  When they have
12  multiple patients that have a bad outcome, it might
13  get them to extend that thinking to other patients.
14      It depends on what information gets fed back
15  into the system, basically, the outcome of
16  satisfaction or dissatisfaction, whether or not new
17  information gets encoded in the memory, that:  Oh,
18  guess what, opioids are addictive, I've got to build
19  that into my thinking or my thought process.
20      Or:  You know, I've had a lot of patients
21  that have done okay, and they are not as addictive
22  as I once thought, and I need to incorporate that
23  into my thinking.
24      Or it could be that, you know, the message
25  is, is that oxycodone really is more potent than

Page 201

1  morphine, rather than less potent, which a lot of
2  doctors perceived.
3      So it's got to be -- it's got to be
4  considered together, integrated, and how the
5  information of satisfaction or dissatisfaction
6  builds back into that model is critical.
7      So patient experience, 1 -- N equals 1, I
8  don't know how that impacts other than for that
9  patient, but as doctors gain more and more
10  experience, then that should begin to formulate that
11  comfort zone that they like to have when it comes to
12  prescribing, or not, which would decrease
13  prescribing.
14      Q.  Let's look at Paragraph 164.  There, the
15  first sentence, you say:  Based on metrics I have
16  seen, there is support for the proposition the
17  defendants' positive marketing increased the size of
18  the opioid market, effectively expanding sales and
19  increased the use of these dangerous drugs.
20      A.  Yes, I read that.
21      Q.  What is the -- what are the metrics that
22  you're talking about?
23      A.  So in the -- in the marketing documents,
24  there are numerous -- numerous documents that focus
25  on results, and the results that -- and, again,

Page 202

1 qualifying that by saying not every product was a
2 blockbuster, which I address in this report.
3     But for a majority of the products, products
4 were meeting the sales goals that they -- that were
5 established. And so the sales -- the numbers of
6 opioids being sold in the marketplace was growing
7 through that time period of from 1995 through at
8 least, you know, 2010, 2012, '14, when perhaps there
9 was a beginning of decline.
10     Q. The two sentences further on, you say:
11 There is a clear association between opioid
12 utilization and patient outcomes, including
13 increased analgesia -- analgesia, side effects,
14 diversion, overdose, and death.
15     Do you see that?
16     A. Yes.
17     Q. Have you made any effort to study drug
18 overdoses and deaths related to the use of
19 prescription painkillers?
20     A. Other than what I cite here, I know that
21 other experts have investigated that question.
22     Q. Do you know whether most overdose deaths --
23 do you know whether most overdose deaths involve a
24 combination of drugs?
25     A. I don't know.

Page 203

1     Q. So, for example, in your study for the
2 Georgia Medicaid, you determined that there were a
3 number of patients who were being prescribed both
4 benzodiazepines and opioids?
5     A. Yes.
6     Q. Do you know whether the majority of overdose
7 deaths attributed to -- or where there is a finding
8 that an opioid was involved, also other drugs, like
9 benzodiazepines, methamphetamines, or even, like,
10 illegal narcotics?
11     A. Or alcohol.
12     Q. Or alcohol, yeah, marijuana?
13     A. So I don't -- I don't have any way to
14 quantify that.
15     Q. Okay. Those are all of the questions I have
16 for you. I appreciate your patience, and I'll give
17 you back your report.
18     MR. VOLNEY: So I'm going to pass the
19 witness, too.
20     THE VIDEOGRAPHER: We are now going -- we
21 are now going off the video record. The time is
22 currently 3:27 p.m.
23     (Recess from 3:27 p.m. until 3:30 p.m.)
24     THE VIDEOGRAPHER: We are now back on the
25 video record. The time is currently 3:30 p.m.

Page 204

1     CROSS-EXAMINATION
2 BY MS. RODGERS:
3     Q. Good afternoon, Dr. Perri. My name is Megan
4 Rodgers. We met before the deposition began this
5 morning. I'm with the law firm Covington & Burling,
6 and I'm representing McKesson.
7     A. Okay.
8     Q. You're aware that there are several
9 wholesale distributors in this case, right?
10     A. Yes, I am.
11     Q. Okay. And when I use the phrase "wholesale
12 distributors," you understand I'm referring to
13 McKesson, AmerisourceBergen, and Cardinal, right?
14     A. Are you limiting it to just those three?
15     Q. Can we agree that I'm -- yeah.
16     A. Okay.
17     Q. I'm referring to those three.
18     Were you asked to consider whether you had
19 any opinions with respect to McKesson?
20     A. With respect to McKesson by itself?
21     Q. Yes.
22     A. No.
23     Q. Okay. Were you asked to consider whether
24 you had any opinions with respect to Cardinal?
25     A. Not -- none of the defendants independently.

Page 205

1 They're all -- the opinions are all based on a
2 collective assessment.
3     Q. Okay. So you have no opinions in this case
4 regarding specifically McKesson?
5     A. None that are related to McKesson only.
6     Q. Okay. And you have no opinions related
7 specifically to Cardinal?
8     A. Same -- nothing is -- while the opinions
9 apply to each of the wholesaler defendants, none of
10 the opinions are specifically singling them out as a
11 particular defendant regarding that opinion.
12     Q. Okay. And the same is true for
13 AmerisourceBergen?
14     A. Yes.
15     Q. Okay. Were you asked to produce materials
16 produced by those wholesale distributors?
17     A. So, yes, there were -- there were wholesale
18 documents -- wholesaler documents that were provided
19 to me, as well as some that I searched for in the
20 Relativity database.
21     Q. Okay. And what was the volume of the
22 materials that --
23     A. The -- as I recall, the largest share of the
24 distributor documents were contracting documents
25 and, for example, documents specifying purchasing

1  arrangements and marketing arrangements for generics
2  and -- so the largest part of them were -- seemed to
3  be legal documents.
4      There were some documents with other types
5  of information, but the biggest part of them was --
6  the biggest part of those documents were
7  distributor -- I'd call them distributor agreements,
8  that kind of thing.
9      Q.  Okay.  And, again, what was the overall
10 volume of those materials, would you say?
11     A.  I mean, in -- in the -- so the thousands and
12 thousands of documents that were in the overall set.
13 It was hundreds and hundreds of documents in the
14 distributor set, as I recall.
15     Q.  Okay.  Are those materials all identified in
16 your list of materials considered that you attached
17 to your report?
18     A.  Yes, they are.
19     Q.  Okay.  And did you review materials that
20 were produced by the distributors?
21     A.  Yes, I did.
22     Q.  Okay.  About how long did it take you to
23 review those materials related to the distributors
24 only?
25     A.  I did not keep -- I did not break down the

1  time that I spent, but I think it would be
2  proportional, the number of documents to the -- the
3  total numbers of documents.  So if there were, you
4  know, maybe -- I don't -- I can't give you a number
5  because I haven't counted, but let's just say for
6  the sake of argument there were 8,000 overall
7  documents, and there may have been 800 or so.
8      Q.  Uh-huh.
9      A.  Not counting the depositions, because
10 obviously there were a number of depositions related
11 to distributors.
12     So anywhere from 10 to maybe 20 percent in
13 terms of the effort.
14     Q.  Okay.  We talked before about -- a little
15 bit about the book that you wrote on Pharmaceutical
16 Marketing.
17     A.  Yes.
18     Q.  Or co-wrote.
19     A.  Edited.
20     Q.  Yes.  I actually tried to buy if off Amazon,
21 but when I looked, it was sold out.  I see there's
22 another copy.
23     A.  That's wonderful.
24     MR. VOLNEY:  That was me.
25     (Perri Exhibit 4 was marked for

1  identification.)
2  BY MS. RODGERS:
3      Q.  Anyway, I put in front of you one chapter
4  from that book, and I've marked it as Exhibit 4.
5  It's Chapter 5.  It's titled "Place:  The
6  Pharmaceutical Industry Supply Chain."
7      A.  Yes.
8      Q.  And I just wanted to kind of start with
9  basic principles.  I'm sorry that this is so simple,
10 but if you'd turn to Page 112, you'll see that you
11 have this kind of nice diagram on there, and I
12 wanted to start there.
13     A.  So -- oh, I gotcha.
14     Q.  Okay.
15     A.  Yeah, I'm there.  Thank you.
16     Q.  All right.  Would you agree that it's the
17 manufacturer that develops the prescription
18 medication?
19     MR. CHALOS:  Object to the form.
20     A.  I think, yes, manufacturers invent and
21 get -- seek approval for medications, yes.
22     Q.  Okay.  And before the manufacturer can make
23 that medication available to doctors and patients,
24 the FDA has to approve that medication and the
25 labeling as well?

1      A.  Yes.
2      Q.  Okay.  And the manufacturer then sends the
3  prescription medication to the wholesaler, correct?
4      MR. CHALOS:  Object to the form.
5      A.  I mean, there are -- there are arrangements
6  made between the two to facilitate the distribution
7  and other services.
8      Q.  Right.  And the wholesalers sit in the
9  middle between the manufacturers and the pharmacies
10 in the supply chain, right?
11     MR. CHALOS:  Object to the form.
12     A.  Yes, they do.
13     Q.  Okay.  So wholesalers are receiving the
14 prescription drugs from the manufacturers and then
15 shipping them to the pharmacies, right?
16     MR. CHALOS:  Object to the form.
17     A.  Yes.
18     Q.  Okay.  And meanwhile, the patient might be
19 receiving a prescription from a doctor, correct?
20     MR. CHALOS:  Object to the form.
21     A.  Certainly that's what happens in the supply
22 chain.  Patients get a prescription, and setting
23 aside all the other influences, the third parties,
24 the insurers, the doctors, and everything else, the
25 flow of the physical product, which I've identified

Page 210

1  in the figure in my report we can look at, certainly
2  goes from the manufacturer to the wholesaler to the
3  pharmacy to the patient.
4      Q.  Right.  And the patient, just to -- just to
5  make the record clear, the patient gets the
6  prescription from the doctor or a licensed
7  practitioner?
8          MR. CHALOS:  Object to the form.
9      A.  The written prescription, which is then
10  filled at the pharmacy.
11     Q.  Yes.
12     A.  For a pharmacist, when you say "gets the
13  prescription," we think of the bottle of pills.
14     Q.  Okay.
15     A.  Right.  So -- but the prescription form is
16  filled out by the doctor or the prescriber, yes.
17     Q.  Okay.  So by the time the patient shows up
18  to a pharmacy to pick up that prescription, they
19  have that prescription -- what I refer to as a
20  prescription, they have that order in hand, right?
21     A.  Correct.  And you'd be correct.  That -- it
22  is also referred to as a prescription, so, yeah.
23     Q.  Okay.  And that's just how the supply chain
24  is set up to work, right?
25         MR. CHALOS:  Object to the form.

Page 211

1      A.  So that's the physical distribution of the
2  product.  That's how the supply chain works, yes.
3      Q.  And there is nothing wrong with being a part
4  of that supply chain, right?
5          MR. CHALOS:  Object to the form.
6      A.  I think in my report, I point out that the
7  full -- every -- every stakeholder in the supply
8  chain is critical to the delivery of pharmaceuticals
9  in our -- in our nation's supply chain.
10     Q.  Every -- every participant has --
11  participant has an important role to play?
12     A.  Yes, they do.
13     Q.  And there's nothing wrong with the roles
14  themselves?
15     A.  You know, the -- I didn't make any
16  assessment of right or wrong, simply, you know, what
17  is the -- what is the role of each in the supply
18  chain.  So is it -- is it right or wrong for a
19  wholesaler to -- you know, to sell opioids?  You
20  know, that wasn't -- it -- that wasn't part of the
21  analysis.  What was part of the analysis is, how did
22  opioids get from inception to the marketplace?
23     Q.  Uh-huh.
24     A.  And so the wholesalers have a role in that.
25     Q.  Right.  And I just -- I'm stepping away from

Page 212

1  opioids for a second.  I'm just trying to ask a very
2  kind of basic question.
3      A.  Okay.
4      Q.  There is nothing inherently wrong with being
5  a part of that supply chain, right?
6          MR. CHALOS:  Object to the form.
7      A.  Yeah.  Every -- every stakeholder is
8  essential to providing drugs in our nation, and
9  that's an essential service to provide.
10     Q.  Okay.  And if you look at Page 108 of your
11  book, I want to direct your attention to one
12  paragraph there.  And it's the first page, and it's
13  the very last sentence on this page.  Could you read
14  that out loud?  Actually, the last two sentences.
15     A.  I'm going to try.
16     Q.  I can read it to you if it's too small.
17     A.  It's pretty blurry on this.
18     Q.  Okay.  So you can tell me if it looks wrong
19  to you, but I read:  Without the wholesaler
20  providing its vital distribution function in the
21  pharmaceutical supply chain, many pharmacies across
22  the country would not be able to serve their
23  customers' patients.  In the worst case scenario,
24  those patients could possibly have to survive
25  without vital medications, such as insulin, pain,

Page 213

1  blood pressure, or thyroid medications, among
2  others.
3          Did I read that correctly?
4      A.  You did.
5      Q.  Okay.  So the wholesaler's role in the
6  supply chain is vital, right?
7      A.  I would agree with that.
8      Q.  And medications like prescription opioids,
9  pain medications, are vital?
10     A.  In appropriate patients, yes.
11     Q.  Okay.  And it's important for patients who
12  need pain medication to be able to go to the
13  pharmacy and fill those prescriptions, correct?
14     A.  That -- it is important for patients to be
15  able to have access to the medications they need,
16  yes.
17     Q.  Including pain medication?
18     A.  Including pain medication, yes.
19     Q.  And the wholesaler or distributor's job is
20  to make sure that the medicine is available so that
21  the pharmacies can serve those patients, correct?
22     A.  That's one of their functions, yes.
23     Q.  Okay.  And if you turn now to Page 151 of
24  your report, I'm going to direct your attention to
25  approximately Paragraph 184.  I think you're saying

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 essentially the same thing here.
2     You wrote: As the US drug distribution
3 system currently exists, pharmaceutical
4 manufacturers could not ensure the distribution of
5 their products without both wholesale distributors
6 and pharmacy providers. Therefore, wholesale
7 distributors and pharmacies are integral to the
8 defendants' marketing of opioids.
9     So it's your opinion that wholesale
10 distributors are integral because they distributed
11 the prescription opioids, right?
12     MR. CHALOS: Object to the form.
13     A. The distribution is one aspect, but, yes,
14 that's correct.
15     Q. That's the aspect that you're referring to
16 right here in Paragraph 184?
17     A. Well, Paragraph 184 also deals with revenue
18 flows and while I didn't include it here, would also
19 include information flow.
20     But just for example, the role of the
21 wholesaler is very important to the manufacturer in
22 terms of production. They -- they're able to
23 provide information on sales and how much product is
24 moving through the distribution system, which
25 provides information to manufacturers to gear up or

Page 215

1 to gear down production facilities.
2     So it's all tied together, but I think I
3 absolutely do agree that this is consistent with the
4 book in that I think they're integral to the
5 process.
6     Q. Okay. So you would agree that wholesale
7 distributors are integral because they distributed
8 prescription opioids, correct?
9     MR. CHALOS: Object to the form.
10     A. So that is one of the reasons why they're
11 integral, because of the distribution. The --
12     Q. And I -- and I'm going to ask you now. Tell
13 me the other reasons that you think that wholesale
14 distributors are integral.
15     A. Right. And so if -- can I refer you to the
16 graph or the chart?
17     Q. Sure.
18     A. Yeah. So that's on Page 63.
19     Q. Uh-huh.
20     A. And it's Figure 4. And so we've addressed,
21 in the question that you've asked so far, we've
22 addressed the physical supply, which I think we
23 agree on, and we've addressed the -- that they're
24 integral. We agree on that.
25     I just want to make clear that from a

Page 216

1 marketing perspective, there are a lot of functions
2 that happen in the distribution system that are --
3 that are very important to the marketing process,
4 and one of those is how things are paid for. So the
5 system of chargebacks and discounts and money flows
6 within the system become very important, and the
7 wholesalers play a key role in that, as well as the
8 information and data that wholesalers have about
9 products, where they're going, how they're selling,
10 when they're selling, how many are needed in the
11 future, how many have been used in the past. All of
12 those -- all those information points things become
13 very important.
14     So those are the other -- the other reasons
15 why I think that wholesalers are integral. They
16 play a vital role. Without the wholesaler, the
17 pharmaceutical manufacturer would have to do that
18 distribution function on their own, which would be
19 extremely expensive, extremely inefficient, and not
20 in the best interest of patients probably.
21     Q. Okay. And it sounds like, from what you're
22 saying, that distributors are integral because of
23 their position in the supply chain, because that's
24 how prescription drugs are distributed, right?
25     A. Yes.

Page 217

1     MR. CHALOS: Object to the form.
2     A. Yes, that's right.
3     Q. And that same position in the supply chain
4 makes them integral to the distribution of insulin
5 the same way that they're integral to the
6 distribution of opioids?
7     MR. CHALOS: Object to the form.
8     A. That's true, yes.
9     Q. Okay. And it's not your opinion, correct,
10 that the distributors are integral because of any
11 advertising that they did?
12     MR. CHALOS: Object to the form.
13     A. So the -- my assessment of the distributor
14 advertising that I refer to in the report is that,
15 as expected, the distributor advertising focused
16 primarily on price, quality, availability, special
17 deals, stocking, and incentive-type advertising.
18 And on -- only on rare occasion did it affect -- did
19 it -- did it require a package insert or any product
20 information to be distributed.
21     So the reason that I believe that
22 wholesalers are integral to that process is because
23 of that function and that they did communicate
24 messages that were important to know in the
25 marketplace; for example, which generic immediate

Page 218

1  release oxycodone product can be purchased at the
2  best price, so the pharmacy can function more
3  efficiently, those kind of messages.
4      I did not notice -- I did not see documents
5  that the wholesale distributors distributed
6  marketing messages beyond that, with few exceptions.
7  For example, in one instance -- and I'd have to look
8  in the report to get the specific details on this --
9  a book was distributed through -- I believe it was
10 Cardinal. And that book did carry with it unbranded
11 marketing messages.
12     So, again, the primary messages, the vast
13 majority of the messages were product, price,
14 availability, quality. And then there were some
15 instances where it extended slightly beyond that in
16 distribution of information.
17     Q. Okay. And so when we talk about the bulk of
18 the -- what you refer to as advertising or the
19 provision of information about, you know, price and
20 product availability, when you look at what you're
21 saying in Paragraph 184 here and you talk about
22 distributors being integral to the defendants'
23 marketing of opioids, that's not what you're talking
24 about? You're not talking about the provision of
25 information about price and availability, right?

Page 219

1      MR. CHALOS: Object to the form.
2      A. You know, I have to -- I have to largely
3  agree that the -- you know, the vast majority, the
4  preponderance of the documents focused on those
5  issues, but there were instances where it reached
6  beyond that, but they were in the minority of cases.
7      Q. And they weren't integral?
8      MR. CHALOS: Object to the form.
9      A. Well, you know, that's actually an
10 interesting question, because the opinions that I
11 formed, marketing behaviors are not broken down into
12 this behavior and the next and the next, but all the
13 behaviors are interrelated.
14     So I didn't separate the behaviors out. I
15 didn't say, well, this is a good message, and this
16 is a bad message. These are all the messages. This
17 is how they impacted the marketplace.
18     So the distribution of 162,000 copies of a
19 book on proper pain management certainly qualifies
20 as a market message that was distributed and is part
21 of the overall scheme of marketing. It's -- it
22 didn't undertake to single out any one activity or
23 any one event or any one means of delivery of
24 marketing messages to associate sort of -- or
25 attribute their -- its impact to the marketing

Page 220

1  program, but the overall marketing and all the
2  things they did collectively contributed to the
3  marketing success.
4      Q. Okay. So if you turn to Page 154, please,
5  can you look at Paragraph 187.
6      A. Okay.
7      Q. And it says -- it looks to me like you're
8  saying kind of more of the same here: The increased
9  sales of opioids resulting from defendants'
10 marketing could not have occurred without wholesale
11 distributors and pharmacies, which completed the
12 supply chain system and made opioids available to
13 patients.
14     In your opinion, wholesale distributors are
15 important -- excuse me -- because they ensure that
16 the prescription medication was available at the
17 pharmacy when the patient showed up, right?
18     A. Yes, absolutely.
19     Q. And if you look at Paragraph 99 of your
20 report --
21     A. Okay. I'm with you.
22     Q. I'm just trying to find it. In the second
23 sentence: Each -- excuse me again -- each
24 stakeholder has the common goal of selling
25 pharmaceuticals by working with and through others

Page 221

1  in the supply chain system.
2      Do you see that?
3      A. I do.
4      Q. And you would agree there's nothing wrong
5  with every stakeholder sharing the common goal of
6  selling pharmaceuticals, right? There's nothing
7  inherently wrong about that?
8      MR. CHALOS: Object to the form.
9      A. So, again, it's how it works. It's not a
10 judgment about is it right or wrong, good, bad,
11 fair, or unfair. It's just simply that's how the
12 system works.
13     Q. And there is nothing wrong with that?
14     MR. CHALOS: Object to the form.
15     A. Yeah. I didn't make that assessment. I
16 didn't -- I didn't make that -- I don't analyze that
17 in this analysis.
18     Q. You have no opinion on that?
19     A. Well, I think the opinion that is expressed
20 in the textbook and other -- elsewhere in the report
21 is that wholesalers are essential to -- integral to
22 the process of drug distribution, and that is, in
23 general, a good thing in our society.
24     Does that go beyond that with opioids? Then
25 we can talk about that, but is -- this is -- I think

Page 222

1 we're agreeing on all these things, basically, yeah.
2  Q.  There's nothing wrong with -- there's
3 nothing wrong with a common goal of selling
4 pharmaceuticals?
5  MR. CHALOS:  Object to the form.
6  A.  Again, with the caveat that if there is an
7 inappropriate use of marketing, that from a macro
8 perspective, the wholesalers were implicated in that
9 marketing because of their role -- their integral
10 role in the supply chain.
11  And I do draw the opinion in my report that
12 the marketing of opioids was inappropriate or
13 violated standards, so to that extent, they would --
14 the wholesalers, the wholesale distributors, would
15 be part of that process.
16  Q.  And, again, I'm not asking about opioids in
17 this -- in this circumstance.  I'm just saying, each
18 stakeholder has the common goal of selling
19 pharmaceuticals by working with and through others
20 in the supply chain.  That's the supply chain
21 functioning as it's intended to, right?
22  MR. CHALOS:  Object to the form.
23  A.  Yeah.  As long as the marketing is in
24 appropriate fashion, then I agree with that.
25  Q.  Okay.  And then if you look at Paragraph

Page 223

1 100:  Revenue -- revenue flows between various parts
2 of the supply chain system in a variety of forms,
3 including payments, rebates, and chargebacks --
4  MS. RODGERS:  Sorry.
5  Q.  -- that ensure members of the supply chain
6 system have data such as utilization, supply, and
7 distribution showing exactly where each bottle of
8 pills is going and at what price.
9  So again, just a basic question:  There is
10 nothing wrong with revenue flowing between various
11 parts of the supply chain, right?
12  A.  That's correct.
13  Q.  Okay.  And if you look at Paragraph 101:
14 Wholesalers offer attractive pricing in connection
15 with their negotiation of volume discounts with
16 manufacturers.
17  Do you see that?
18  A.  Yes.
19  Q.  Okay.  And there's nothing wrong with
20 wholesalers offering attractive pricing to
21 pharmacies in connection with their negotiation of
22 volume discounts with manufacturers, right?
23  MR. CHALOS:  Object to the form.
24  A.  Right.  I think that's -- for pharmacies, at
25 least, that's a vital function to be able to

Page 224

1 increase their efficiency and ability to survive in
2 the marketplace.
3  Q.  Okay.  And that same paragraph goes on to
4 say:  Wholesalers can give preferential treatment to
5 a specific manufacturer's products by stocking only
6 or preferentially selected manufacturer's products
7 for distribution and/or generic purchasing programs.
8  There is nothing wrong with that, either,
9 right?
10  MR. CHALOS:  Object to the form.
11  A.  So we're still -- we're not on opiates,
12 right?
13  Q.  Correct.
14  A.  Yes, I agree.
15  Q.  While a distributor can set different prices
16 for generics, they're not the ones actually writing
17 the prescription for those medicines, right?
18  MR. CHALOS:  Object to the form.
19  A.  The wholesalers do not generate patient
20 level demand, no.
21  Q.  Okay.  It's the doctor that usually makes
22 the decision about whether to prescribe an opioid?
23  A.  Doctor or the prescriber, yes.
24  Q.  And the prescriber decides which opiate --
25 opioid to prescribe?

Page 225

1  A.  In the case of branded pharmaceuticals, yes;
2 in the case of generics, not generally, no.
3  Q.  And the prescriber decides what dosage to
4 prescribe?
5  A.  Generally speaking, yes, they do.
6  Q.  And the prescriber prescribes how many bills
7 to prescribe, right?
8  A.  Subject -- subject to rules and limits that
9 insurance may impose, yes.
10  Q.  Okay.  There are some other entities that
11 aren't part of the direct supply chain that we saw
12 in your book, but that nevertheless influence what
13 type of pain medication are available, right?
14  MR. CHALOS:  Object to the form.
15  Q.  I can give you some examples.
16  A.  So if you're referring to third-party
17 payers, PBMs, formulary committees, those kinds of
18 entities and stakeholders, yes, they exist and play
19 a vital role in the marketplace as well.
20  Q.  Correct.  So the FDA also influences what
21 type of pain medications are available?
22  A.  The role of the FDA is a little bit more
23 difficult for me to assess because I'm not an expert
24 on the FDA.  I'm aware of the FDA from a marketing
25 angle.

Page 226

1   But the other part of it is, is the FDA is
2  provided information by manufacturers. It doesn't
3  come from independent third parties. The
4  information comes from the party with a commercial
5  bias built in. So I would view that a little bit
6  differently than the others that you mentioned in
7  your question.
8   Q. Okay. The FDA, nonetheless, can approve or
9  reject a medication, correct?
10  A. Yes, they can. Based on --
11  Q. Okay.
12  A. -- information provided to them from
13  manufacturers, yes.
14  Q. And I think you testified that insurers,
15  third-party payers, and pharmacy benefit managers
16  also influence the availability of pain medication,
17  right?
18   MR. CHALOS: Object to the form.
19  A. They don't impact the availability of
20  medications. They impact access to medications
21  through their formulary decisions and safety
22  measures that they implement in their various
23  insurance plans, programs, and options that they
24  make available to patients, which usually impacts
25  the system through the prescriber because

Page 227

1  prescribers become aware of their patients' ability
2  to obtain medication on their formulary, in
3  preferred tiers, with preferred copayments, or
4  without prior authorization.
5   So they do impact it, but they don't create
6  the availability. They're usually approving the use
7  of or limiting the use of medications.
8   Q. If I could direct your attention to Page 14
9  of your report, it's the fourth bullet point down.
10  You wrote: Insurers, third-party payers, and
11  pharmacy benefit managers influence the medication
12  choices available to prescribers through formularies
13  and preferred drug lists.
14   Correct?
15  A. Yes.
16  Q. And that was true when you wrote it?
17  A. Yes.
18  Q. And that's true now?
19  A. Yes.
20  Q. Okay. And you would agree that government
21  and private insurers and pharmacy benefit managers
22  can implement strategies that could reduce
23  inappropriate prescribing of opioids, right?
24   MR. CHALOS: Object to the form; incomplete
25  hypothetical.

Page 228

1  A. I definitely agree to part of that, that
2  third-party payers, PBMs, formulary managers,
3  Medicaid, whoever, can put in place measures that
4  are designed to help ensure appropriate utilization.
5   But as you've noted in many of your
6  questions, the choice of a drug ultimately is the
7  responsibility of the prescriber. And the things
8  that third-party payers and others can implement
9  have a limited ability to impact the marketplace.
10  Even though some of them are very potent, some of
11  them are not.
12   For example, you know, preferred versus
13  nonpreferred status on the Medicaid formulary or a
14  first versus second versus third tier, compare those
15  all to prior authorization or step therapy. So
16  there are variable amounts of impact that they can
17  have.
18   That's why -- because of that, that's why
19  it's important to look at the entire system, what's
20  going on. The inputs to the doctor are generating
21  prescribing demand, and then the third-party payers
22  and so forth are trying to be some type of governor
23  to that. The whole supply chain works together to
24  try to ensure that this whole system works.
25  Q. Okay. And I just want to make sure that I

Page 229

1  got an answer to my question. You would agree that
2  government and private insurers and pharmacy benefit
3  managers have an ability to impact -- those are your
4  words -- the prescribing of opioids, right?
5   MR. CHALOS: Object to the form; incomplete
6  hypothetical.
7  A. So I think in my answer when I was referring
8  to they have the ability to impact, you keep saying
9  prescribing. The actual fact is that it's not
10  really -- they don't really impact the prescribing
11  necessarily, because the doctor may still make a
12  choice, and then they're -- the doctor is confronted
13  with formulary restrictions or patient copayments.
14   So the insurer can make it easier or harder
15  to access the medicine, but that doesn't necessarily
16  impact prescribing. Granted, in some cases it does
17  because when a doctor becomes aware -- a prescriber
18  becomes aware that a medication is in a nonpreferred
19  status on the formulary, it may impact their choice.
20   If they are aware that a copay is very high,
21  and there's no copay card available, that may impact
22  their choice, but it doesn't necessarily impact
23  prescribing. It impacts utilization.
24  Q. Okay. And you would agree -- I think you're
25  working on projects related to this -- that

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 government and private insurers and PBMs can use
2 claims data to better target policies aimed at
3 reducing opioid use?
4 MR. CHALOS: Object to the form.
5 A. So I would agree that they can use claims
6 data to assess the effectiveness of their policies.
7 I don't -- I don't know that they can use the claims
8 data to actually target that. To the extent that
9 the claims data provides them with information that
10 may be useful, yes, but the claims data and the
11 projects that we have ongoing are really designed to
12 assess things that --
13 MR. CHALOS: Could you slow down a little
14 bit? I just want to make sure she can get it all
15 down.
16 THE COURT REPORTER: I need to hear him
17 better.
18 MR. CHALOS: Yeah. Slow down and speak up.
19 Sorry to interrupt.
20 A. Okay. So the claims data is most useful for
21 assessing policies that have already been created
22 and for providing information that might help shape
23 future policies.
24 Q. Okay. You would also agree that government
25 and private insurers and PBM can use claims data in

Page 231

1 their possession to flag potential inappropriate
2 prescriptions?
3 MR. CHALOS: Object to the form; incomplete
4 hypothetical.
5 A. So that -- I'm not sure I can agree with
6 that, because the DUR process, or drug utilization
7 review process, in the claims -- the realtime
8 adjudication of a claim can potentially flag an
9 inappropriate prescription using criteria that --
10 for example, similar to the ones in the paper that
11 we discussed this morning, potentially inappropriate
12 prescribing, such as the use of a benzodiazepine
13 along with an opioid.
14 But the -- those claims data can't just
15 be -- I don't know if the insurers, the third-party
16 payers, and others can use that in realtime to stop
17 a prescription at that moment. I don't know if they
18 have that capability or not. I know that a message
19 can be sent back to the pharmacy saying, you know,
20 check this or check that, verify this, verify that.
21 But I -- again, I don't have any firsthand
22 knowledge to -- nor did I assess in this matter, how
23 that data was being used with regard to -- at the
24 pharmacy counter when a patient presents a
25 prescription from a physician or other prescriber,

Page 232

1 how that might or might not be used to block that
2 prescription from being filled.
3 Q. But the claims data could provide insight
4 into whether, for example, a patient is using benzos
5 at the same time as prescription opioids, right?
6 A. Right. And my understanding is, is that the
7 claims adjudication process that's in place now --
8 again, I haven't worked in retail community pharmacy
9 since 2007.
10 Q. Uh-huh.
11 A. The claims adjudication process now would,
12 in fact, flag a potential problem such as that. It
13 would then be up to the pharmacist and the
14 prescriber to determine if that is okay or not or --
15 Q. It -- sorry. It would flag that problem for
16 the pharmacy?
17 A. Yes, at the point of the prescription being
18 filled.
19 Q. Okay. So at that point, the pharmacist
20 could determine whether or not to fill that
21 prescription knowing that the patient is using
22 benzos at the same time as prescription opioids,
23 right?
24 A. Yes. And again -- and these are issues that
25 I really didn't look at in this matter, but the --

Page 233

1 you know, based on my experience as a pharmacist, I
2 can -- I can provide an answer to that question.
3 Q. Okay. If you could turn to Page 148 of your
4 report and look at Paragraph 175. In this paragraph
5 you state that: Wholesale -- wholesaler
6 distributors were integral to selling the generic
7 Kadian since these entities can select the generic
8 manufacturer offering the best pricing and
9 availability to use in their generic source programs
10 and are pivotal in dictating price to pharmacies.
11 Do you see that?
12 A. I do.
13 Q. Okay. So in other words, distributors could
14 select a price for Kadian that made it more
15 attractive for pharmacies to use over other generic
16 versions of the same product?
17 MR. CHALOS: Object to the form.
18 A. To the extent that there is a -- another
19 generic available for Kadian, yes.
20 Q. And that pricing, that making Kadian cost
21 less than another generic of the same product, that
22 doesn't make doctors write more prescriptions than
23 they otherwise would have, right?
24 MR. CHALOS: Object to the form.
25 A. Now, the -- I'm giving pause for that

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  because it -- one of the inputs to the prescription
2  process on the part of physicians, over -- over time
3  they become more sensitive to the issue of price.
4  And the availability of generics definitely does
5  impact prescribing decisions because a physician or
6  other prescriber may indeed look at a patient in
7  need of a medication and say, oh, well, there is a
8  generic available, I'm going to go this way versus
9  that way.
10     So I think I largely agree with that
11  statement, but there will be cases, there will be
12  times when the availability of a generic does serve
13  to increase access to medications by virtue of a
14  lower priced alternative being available, which, in
15  turn, can stimulate doctors to utilize that
16  medication more.
17     Q.  And on what is your opinion -- you -- so you
18  say sometimes the unavailability of generic could
19  impact prescription writing.  On what is that based?
20     A.  The literature, that, you know, the doctors
21  have had a growing awareness of pricing in their
22  decision-making process.
23     Q.  Is that cited in your report?
24     A.  I'm not positive.  It may be.  I'd have to
25  check.

Page 235

1     Q.  Can you take a look, please.
2     A.  Not quickly, no.  I can -- like I said, I
3  don't have a computer here where I can do quick
4  searches, but I can tell you that there's a lot of
5  literature on prescription pricing actually
6  published about physicians' awareness of
7  prescription operations.
8     And over time it has grown to the point
9  where doctors have become -- they generally, in the
10  past, were not very sensitive to price issues, but
11  now they have become more so sensitive to price
12  because of the cost of healthcare and the
13  out-of-pocket costs that patients incur, even since
14  Medicare Part D, with patients incurring a lot more
15  drug costs out of their own pockets.
16     I could -- if you want to take the time, I
17  can look through and see.
18     Q.  No.  That's okay.  I -- does it -- is it
19  your opinion, though, that knowledge of the price of
20  generics overrides the doctor's medical judgment in
21  the exam room?
22     A.  No.  I said it's an input.  It doesn't
23  override a medical judgment.  If a patient needs a
24  medication, a doctor may look at five choices and
25  say, well, four of these are brand name products

Page 236

1  that are expensive, I bet my patient is not even
2  going to buy them, versus the generic that will be a
3  lot more reasonably priced, I'm going to choose that
4  one.
5     I think that's the process that they go
6  through.
7     Q.  Is it your opinion that pharmacists, when
8  they're filling those prescriptions, should be more
9  skeptical of a prescription for a generic drug?
10     MR. CHALOS:  Object to the form.
11     A.  I don't think I've expressed that opinion at
12  all, no.
13     Q.  You don't have that opinion?
14     A.  I wouldn't think that what -- the doctor's
15  choice of generic or brand name would have any
16  impact on the pharmacist's judgment of the veracity
17  or legitimacy of a prescription.
18     Q.  Did you do any assessment about whether
19  physicians' knowledge about the pricing of opioids
20  affected their prescription writing?
21     A.  As a part of this analysis, we looked at, of
22  course, the marketing messages and so forth.  One of
23  the key things that was identified, identified in
24  Table II as well, is the formulary considerations
25  and the use of copay cards and reductions in the

Page 237

1  amount of patient copays, so to that -- to the
2  extent that those relate to price, yes.
3     Q.  Okay.  Did you do any assessment of whether
4  distributors communicating the price of generic
5  opioids affected the prescription writing of
6  physicians?
7     A.  No, I did not do any analysis related to
8  that issue of generics availability related
9  prescription writing.
10     Q.  Okay.  If you look at Page 29 of your
11  report, there's a section titled "Common
12  Marketing" -- I'll wait for you to get there.
13     A.  Okay.
14     Q.  There's a section called "Common Marketing
15  Techniques Used to Influence Prescribing."
16     Do you see that?
17     A.  Yes, I do.
18     Q.  And I think if you could just flip through
19  that section, it goes from Page 29 to 53, Page 53 of
20  your report.  Can you confirm that for me?
21     A.  Yes, that's correct.
22     Q.  Okay.  And hopefully I can make this quick,
23  but in this section, Pages 29 to 53, you identify
24  various forms of marketing techniques that you
25  believe are used to influence prescribing, right?

Page 238

1    A.  Yes.
2    Q.  And these various forms of marketing you
3  identify are specific to the manufacturing
4  defendants as compared to the distributor
5  defendants, right?
6       MR. CHALOS:  Object to the form.
7    A.  So the answer is, for the most part, these
8  methods, strategies, tactics, focused on marketing
9  to physicians and so forth are limited to the
10  manufacturers.
11       However, there -- in some cases there is a
12  role for wholesale distributors to help deliver
13  these in the marketplace, such as, for example,
14  through continuing education programs that may be
15  coordinated or sponsored by the wholesale
16  distributors.
17       And as I mentioned earlier, there's a -- at
18  least a couple examples that are cited in the report
19  that relate to distributors advancing information in
20  the marketplace that focused on the themes that the
21  manufacturers were perpetuating related to the use
22  of opioids.
23    Q.  Okay.  So I'm going to have to ask you --
24  and I apologize.  This is tedious, but I want to
25  make sure we understand exactly what relates to

Page 239

1  which defendant.
2       Are you alleging or expressing an opinion --
3  we'll start with McKesson -- that McKesson used any
4  of the various forms of marketing techniques used to
5  influence prescribing identified in your report on
6  Pages 29 to 53?
7    A.  So my opinion is not formulated -- it will
8  be the answer -- the same answer for all defendants
9  you're going to ask me about.
10       I didn't formulate opinions about individual
11  defendants.  I formulated opinions that are about
12  all of the defendants.  And so to the extent that
13  any defendant engaged in one marketing activity,
14  they were all part of the marketing process,
15  integral to that supply chain.
16       And the opinions are formed in the
17  aggregate.  They are not formed based on each
18  defendant.  Even though I did look at the marketing
19  documents from each defendant, I do not have
20  opinions about any defendant with specific focus on
21  that defendant only.
22    Q.  I guess I'm just confused about what your
23  opinion is with respect to my client, McKesson.  And
24  if we're talking about, for example -- and we can
25  break one out -- personal selling in your report, do

Page 240

1  you have an opinion that my client, McKesson,
2  participated in any personal selling efforts, and --
3    A.  I am --
4    Q.  -- if so, what's the basis of that?
5    A.  Well, I'm --
6       MR. CHALOS:  Hold on a second.  Object to
7    the form of the question.
8    A.  I'm sure that McKesson engaged in personal
9  selling, because your question is not very specific.
10  They have national account managers.  They have
11  sales representatives that go out to pharmacies and
12  conduct a lot of activities on the part of McKesson.
13  Now, what are they selling?  They're selling
14  McKesson's services, but that's not what you asked
15  me, so --
16    Q.  Do you have an opinion as to whether
17  McKesson engaged in personal selling related to
18  opioids, as discussed in your report on Pages 32 to
19  35?
20    A.  So I don't know if McKesson specifically did
21  that.  I have not seen specific evidence regarding
22  McKesson, that they communicated personal selling
23  messages in the marketplace.
24    Q.  And do you have an opinion as to whether
25  McKesson released publications about the efficacy of

Page 241

1  prescription opioids?
2    A.  I would need to look at the document
3  database and search through that to know
4  specifically if they distributed anything.
5       As I -- as I mentioned earlier, there were
6  some instances where manufacturers did use
7  wholesalers to distribute research to physicians or
8  pharmacies.  I don't -- I don't recall, as I sit
9  here right now, whether McKesson did that or not.
10  I'd have to look to see if there is any
11  documentation.
12    Q.  And where -- would you look in your report?
13  I mean, that's what you were asked to --
14    A.  No.  I would look at the document database
15  that contains all of the documents that I
16  considered, because I looked at, as I said, hundreds
17  and hundreds of documents from distributors, and
18  every document is not cited here in the report,
19  so --
20    Q.  You're talking about you would look in your
21  list of materials considered that's attached to your
22  report?
23    A.  It would further -- it would take more
24  review than that.  It would require me to look into
25  the documents that I have categorized and placed in

Page 242

1 the report that relate to those specific subjects.
2      If there was a McKesson document that
3 related to personal selling, it would be -- it would
4 be filed there, and I would be able to go find that
5 document.
6    Q. And that's because it -- I guess I'm just
7 trying to understand what questions you were trying
8 to answer in this report.
9      So it sounds like you don't know the answer
10 to the -- to my question because you weren't asked
11 to consider whether, for example, McKesson released
12 publications about the efficacy of prescription
13 opioids?
14    MR. CHALOS: Object to the form of the
15    question.
16    A. So I don't think -- I don't think that I
17 don't know the answer because of that. I don't know
18 the answer because I didn't know this was a memory
19 test, and I was going to be required to memorize
20 every document that I've seen here.
21      I've cited in my report documents that will
22 demonstrate to you, for example, Footnote 150,
23 that -- I believe it's Cardinal document -- that
24 talks about a CDC proposal where some things are
25 going to be distributed to pharmacies, I believe, or

Page 243

1 someone else.
2      And, again, without going back to -- and
3 having a computer and going back and looking for
4 specific documents, I can't answer that question
5 because my analysis was not at that micro of a
6 level.
7    Q. Do you intend to offer an opinion, if you're
8 called to testify at trial, about whether McKesson
9 engaged in any of the marketing techniques described
10 between Pages 29 and 53?
11    MR. CHALOS: Object to the form.
12    A. I intend to offer the opinion that McKesson
13 was part of the -- was integral to the marketing
14 process, but I don't intend to offer specific
15 opinions about McKesson at all.
16    Q. Okay. If you could turn to Page 86 --
17 actually, sorry, just one second.
18      Is the same true for Cardinal? You don't
19 intend to offer any opinions specific to Cardinal?
20    MR. CHALOS: Object to the form.
21    A. Yes. As I -- as I've said, I think, a few
22 times today, I don't have opinions about specific
23 defendants. And my opinions are presented in the
24 aggregate, because the marketing is completely
25 intertwined, and it can't be separated out.

Page 244

1    Q. So you're not able to say what effect, if
2 any, one defendant's -- one party's marketing
3 efforts had on the prescribing of opioids?
4    MR. CHALOS: Object to the form.
5    A. It is my opinion that any one party impacted
6 the marketing and that that marketing increased
7 access to opioids and utilization of opioids in the
8 marketplace, because each of the defendants is part
9 of that opinion in the aggregate.
10    Q. If we could look at Page 86 briefly, and
11 it's -- I want to direct your attention to Table II,
12 which is "Marketing Messages."
13    A. Yes.
14    Q. What does this table show? I know we've
15 talked about it before, but I just want to go back
16 to it quickly.
17    A. Table II is a summary of and examples of --
18 and not an exhaustive list, but a summary and a --
19 representative examples of the marketing messages
20 focused on specific themes. And we talked about
21 this table earlier. The contents of each section of
22 the table dictate the subject of the letter that
23 entitled that table.
24    Q. Uh-huh. And the right-hand column is titled
25 "Defendant," right?

Page 245

1    A. Yes.
2    Q. No documents produced by McKesson appear in
3 Table II, right?
4    A. Well, I think I -- I don't need to
5 necessarily look through. I don't -- I don't think
6 there is anything, but I can't say that. At least
7 with respect to the documents cited in Reference
8 Number 150, the Fishman text that I believe was
9 distributed through a wholesaler, I guarantee that
10 that Fishman text is cited in Table II.
11      And with respect to that -- and it's the
12 same as with the distribution of a physical product.
13 The wholesalers were integral to the process of
14 getting these products to market. They were
15 involved in the marketing process. They had
16 different messages, largely, than the messages that
17 were sent directly to physicians, but they had the
18 capability certainly of communicating directly with
19 the physician as well.
20      And to the extent that each of the
21 defendants, McKesson, Cardinal, AmerisourceBergen,
22 was involved and integral to the supply chain, they
23 are part of the opinions that I hold, but just to
24 state it again clearly for you, I don't hold a
25 specific opinion about Cardinal, McKesson, or ABC,

Page 246

1  and --
2  Q.  Okay.  And I just want an answer to my
3  question.  There is no document cited by McKesson in
4  Table II, right?
5  A.  As I said, there are documents in Table II
6  that were distributed by wholesalers, but I don't
7  know specifically if there was one, McKesson.  I
8  can -- I can go through and look at each individual
9  entry.  That would probably take some time, and I'm
10 happy to do that if you'd like.
11 Q.  Okay.  I'm going to represent that there's
12 no documents produced by McKesson, Cardinal, or
13 AmerisourceBergen in Table II.  Do you have any
14 reason to disagree with me?
15 A.  Only that I haven't had an opportunity to go
16 through.
17 Q.  Okay.  Can we talk about Schedule 10?  I
18 don't think we talked about that this morning.  Do
19 you have the full schedule in front of you?
20 A.  Yes.  I don't have it here.
21 Q.  And I guess we should mark that as an
22 exhibit as well, because --
23 A.  This is my copy.
24 Q.  Okay.
25 A.  So --

Page 247

1  Q.  Okay.  I'll mark mine.
2  (Perri Exhibit 5 was marked for
3  identification.)
4  BY MS. RODGERS:
5  Q.  We'll mark it as Exhibit 5 for the report.
6  What is Schedule 10?
7  A.  So Schedule 10 is -- let me give you the
8  official title:  Marketing Messages.
9  Q.  And what is it?
10 A.  It is a listing of all the documents that
11 were considered to contain marketing messages from
12 which I searched and looked at various documents to
13 compile Table II that's included in my report.
14 Q.  Okay.  There are two documents that were
15 produced by McKesson that appear in this table.  I'm
16 just going to mark them as Exhibits 6 and 7.
17 (Perri Exhibit 6 was marked for
18 identification.)
19 (Perri Exhibit 7 was marked for
20 identification.)
21 BY MS. RODGERS:
22 Q.  So Exhibit 6 is MCKMDL00578003, and
23 Exhibit 7 is MCKMDL00577963.
24 You've seen these documents before, I take
25 it?

Page 248

1  A.  I think so.  I can't be 100 percent sure.  I
2  looked at a lot of documents.
3  Q.  If they're included in Schedule 10, it's
4  safe to assume you've reviewed these documents,
5  right?
6  A.  It's safe to assume that I've reviewed the
7  vast majority of those documents, but I can't
8  testify, as I sit here today, I've seen each and
9  every single document.
10 Q.  Okay.
11 A.  I have no way to verify that.
12 Q.  These documents weren't actually created by
13 McKesson, correct?
14 A.  That's my understanding with regard to this
15 document.
16 Q.  Okay.  It's true for both Exhibits 6 and 7,
17 right?
18 A.  This document I definitely recognize, and in
19 this form or something close to it.  Yep.
20 Q.  You would agree that neither Exhibit 6 nor
21 Exhibit 7 were created by McKesson?
22 A.  As far as I know, they were -- they were not
23 created by McKesson.
24 Q.  So the only two documents in Schedule 10
25 that were produced by McKesson were not created by

Page 249

1  McKesson, right?
2  A.  It appears to be so, yes.
3  Q.  Okay.
4  MS. RODGERS:  If we could take a quick
5  break.  We've been going about an hour.
6  THE VIDEOGRAPHER:  We are now going off the
7  video record.  The time is currently 4:26 p.m.
8  This is the end of Media Unit 5.
9  (Recess from 4:26 p.m. until 4:39 p.m.)
10 THE VIDEOGRAPHER:  We are now back on the
11 video record with the beginning of Media
12 Number 6.  The time is currently 4:39 p.m.
13 BY MS. RODGERS:
14 Q.  Because of where wholesale distributors sit
15 in that supply chain, their customers are typically
16 pharmacies, right?
17 A.  No, I don't think I agree with that
18 completely.  I think there are some other
19 circumstances that would -- that they have other
20 customers in the supply chain as well.
21 Q.  They also include hospitals?
22 A.  Hospitals, pharmaceutical manufacturers.
23 Q.  VA centers?
24 A.  Yes.  I -- yes.
25 Q.  Okay.  And when wholesale distributors are

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 providing information to other entities, it's to
2 their customers, right, to these pharmacies and
3 hospitals and VA centers and manufacturers?
4    A.   The information and data and the revenue
5 flows that are -- that they service, those would be
6 customer relationships to a degree, yes.
7    Q.   Okay.  And I think you testified earlier
8 that the information that wholesale distributors
9 passed along related to opioids was generally
10 limited to price, quality, drug availability, and
11 service, right?
12    A.   The majority of the documents that I saw
13 focused on those issues, of price, quality,
14 availability, yes.
15    Q.   And when you use the term "quality," what do
16 you mean by that?
17    A.   In -- in pharmacyspeak, the issue of quality
18 is related to -- you know, when you buy a generic,
19 you don't want to run into the situation where, when
20 you take the product off the shelf, you open it up,
21 and there is a bottle full of cracked tablets or
22 powder.
23        You want to make sure that the generic
24 products that you're ordering are of sufficient
25 quality.  And to a degree, you know, we rely on the

Page 251

1 wholesaler to select generics that are good quality
2 and to provide them as good prices.
3    Q.   Okay.  So you're not using quality here to
4 mean product efficacy?
5    A.   Not in this context.
6    Q.   Okay.  Would you agree that there was
7 nothing false or misleading about information that
8 the distributors passed on to pharmacies regarding
9 the price of opioids?
10        MR. CHALOS:  Object to the form.
11    A.   And as we discussed earlier today, you know,
12 I didn't make any assessments of the truthfulness or
13 lack of truthfulness of the information that was
14 communicated.  I -- yeah.
15    Q.   So it's not your opinion that there was
16 anything false or misleading about the wholesale
17 distributors passing along information about the
18 price of opioids?
19    A.   Yeah.  I don't have --
20        MR. CHALOS:  Hang on a second.
21        Object to the form.
22    A.   I don't have an opinion one way or the other
23 about that, the pricing.
24    Q.   Okay.  And the same is true about any
25 information that the wholesale distributors passed

Page 252

1 on regarding the quality of opioids?
2        MR. CHALOS:  Object to the form.
3    A.   Yeah.  I didn't -- I didn't do that
4 assessment or make that -- include that in the
5 analysis.
6    Q.   You have no opinion about whether there was
7 anything false or misleading about information
8 related to the availability of opioids that the
9 wholesale distributors passed on to the pharmacies?
10        MR. CHALOS:  Object to the form.
11    A.   In terms of availability, you know, there
12 were -- there were specific marketing messages that
13 focused on availability, especially new strengths
14 and so forth, but I didn't make any assessment of
15 whether there was any truthfulness to that.  I don't
16 have any reason to have an opinion, really, on that.
17    Q.   And you don't have an opinion about whether
18 the distributors' provision of information to
19 pharmacies regarding the service that they could
20 provide was false or misleading?
21    A.   Again, I didn't make that assessment, no.
22    Q.   Okay.  And all of this information that
23 we've been talking about, the price, quality, drug
24 availability, and service, that information was
25 directed from the wholesale distributors to its

Page 253

1 customers, the pharmacies, the VA centers, the
2 hospitals, right?
3        MR. CHALOS:  Object to the form.
4    A.   So the information that they communicated
5 was primarily directed to those customers, yes.
6    Q.   And it's the doctors and the prescribers
7 that are writing the prescriptions, right?
8        MR. CHALOS:  Object to the form.
9    A.   Yeah.  I think it's well-understood that
10 there are many influences on prescribing.  We've
11 talked about a lot of these here today, but the
12 prescriber is the person or entity responsible for
13 generating the patient's prescription.
14    Q.   The information that we've been talking
15 about, what the distributors share with pharmacies
16 regarding price, quality, availability, service, you
17 refer for all of that information as marketing by
18 the distributors, right, in your report?
19    A.   Yes, I do.  That is all marketing
20 information, yes.
21    Q.   If you look at Footnote 193 of your report.
22        MR. CHALOS:  Which page is that?
23        MS. RODGERS:  It's Page 61.
24    A.   Okay.
25        (Perri Exhibit 8 was marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  identification.)
2  BY MS. RODGERS:
3      Q.  You cite a document I want to go ahead and
4  mark as Exhibit 8. It's MCKMDL00546914.
5      A.  I'm going to need to get longer arms.
6      Q.  I know, sorry. This table is enormous.
7          MR. CHALOS: Exhibit 8, you said?
8          MS. RODGERS: Yes, I believe it's Exhibit 8.
9      Q.  And I want to direct your attention to the
10  e-mail thread that you're actually quoting from in
11  Footnote 193 of your report.
12      A.  Uh-huh.
13      Q.  And that first sentence of the longer
14  paragraph says: Inform ISMC customers with purchase
15  history of Watson hydrocodone of the savings of
16  Mallinckrodt hydrocodone.
17          Do you see that?
18      A.  Yes.
19      Q.  And that's an example of McKesson providing
20  information about the price of hydrocodone to its
21  pharmacy customers, right?
22      A.  Essentially, it is. It -- you know, there's
23  other -- that sentence has other things to it that
24  have marketing perspective, but I would agree it
25  does -- it doesn't mention price, but it does

Page 255

1  mention potential savings.
2      Q.  And you understand that to mean cost
3  savings?
4      A.  It could be cost savings and probably is,
5  but it just says savings. It --
6      Q.  In fact, in your footnote, you said "with a
7  primary focus on pricing" when you're referring to
8  this e-mail?
9      A.  Right. The --
10          MR. CHALOS: Hold on.
11          Object to the form. Is that a question?
12          MS. RODGERS: Yes.
13          MR. CHALOS: What's your question?
14      Q.  In your footnote, you refer to this e-mail
15  as having a primary focus on pricing, right?
16      A.  Yes. The --
17          MR. CHALOS: Hang on.
18          Object to the form of that question.
19          THE WITNESS: Okay.
20          MR. CHALOS: Sorry.
21      A.  Yes. The overall -- the overall history --
22  the overall theme of this, I believe, is focusing on
23  price, if you read the balance of the -- of the
24  e-mail exchange.
25      Q.  Uh-huh. So McKesson was informing

Page 256

1  pharmacies with a purchase history of one brand of
2  hydrocodone that they could save if they purchased
3  another brand of that drug, right?
4          MR. CHALOS: Object to the form. You're
5  asking him to interpret a document from your
6  client. I'm not sure that's an appropriate
7  question, so I object -- object to the form of
8  that and --
9          MS. RODGERS: I don't think speaking
10  objections are allowed. I think it's object --
11          MR. CHALOS: I understand. I'm trying to
12  help you by giving you the basis for my
13  objection.
14          MS. RODGERS: Sounds like you're coaching
15  you witness. I appreciate just --
16          MR. CHALOS: No.
17          MS. RODGERS: -- object to the form.
18          MR. CHALOS: I appreciate your thoughts on
19  that, but I'm entitled to make an objection, and
20  I think probably under the rules I've got an
21  obligation to give you the basis of the
22  objection, which is what I was doing, and giving
23  you an opportunity to fix your question so that
24  it may be allowed at trial.
25  BY MS. RODGERS:

Page 257

1      Q.  Can you answer my question?
2      A.  If you can repeat it, I'll do my very best
3  to answer it.
4      Q.  Sure.
5          MS. RODGERS: Can you read it back?
6          THE COURT REPORTER: I hope so: So McKesson
7  was informing pharmacies with a purchase --
8          MS. RODGERS: I can do it.
9          THE COURT REPORTER: Yes, please do.
10      Q.  So McKesson was informing pharmacies with a
11  purchase history of Watson hydrocodone that they
12  could save if they purchased another brand of
13  hydrocodone from Mallinckrodt, correct?
14          MR. CHALOS: Same objections as I lodged to
15  the previous iteration of the same question.
16      A.  This document does include that, but it does
17  have other information included in it. For example,
18  it says in this paragraph: Combine campaign message
19  with industry news regarding FDA recommendation on
20  high dosage acetaminophen combination drugs.
21          But it seems to me that the -- based on my
22  interpretation of this document, that the main issue
23  that would be of interest to a customer pharmacist
24  in this case would be -- would be the price
25  differential.

Page 258

1  And there are other marketing implications
2  in this document as well, because they're obviously
3  seeking to gain information from the customers and
4  obviously making it clear that they're promoting the
5  use of hydrocodone.
6  Q. Okay. And you said the main issue of
7  interest in this e-mail would be the price
8  differential. You mean the price differential
9  between Watson hydrocodone and Mallinckrodt
10  hydrocodone, right?
11  MR. CHALOS: Object to the form.
12  A. So the e-mail is not 100 percent clear on
13  that, but it says: There were supplier-initiated
14  price increases of 10 to 30 percent on the Watson
15  product on a -- on top of an already higher
16  priced -- so I assume that they are focusing on
17  price.
18  Q. Between two different brands of hydrocodone?
19  MR. CHALOS: Object to the form.
20  A. Let me check something.
21  Okay. Yes, I believe that's the answer,
22  primarily comparing Watson to Mallinckrodt.
23  Q. It's not McKesson trying to convert a drug
24  like a cholesterol medication to opioid, right?
25  MR. CHALOS: Objection to the form.

Page 259

1  And you're asking him to interpret a
2  document, so I think it's an improper question.
3  MS. RODGERS: Again, I think, under the CMO,
4  you're limited to objection to form.
5  A. Yeah, I don't -- I don't see anywhere in
6  this document that -- that they are trying to
7  convert somebody from a statin -- I think is what
8  you said?
9  Q. Cholesterol medication.
10  A. -- a cholesterol medication to an opioid,
11  but as I said, there are other -- there are other
12  marketing themes that are contained in this -- in
13  this document.
14  Q. I want to look at Footnote 198 of your
15  report. And in that footnote, you refer to
16  McKesson's OneStop Generics and SynerGx programs,
17  right?
18  A. Yes.
19  Q. And those programs are designed to allow
20  pharmacies to order generics from one distributor,
21  right?
22  A. Those programs, as I understand them, that's
23  what they are designed to do, yes --
24  Q. Okay.
25  A. -- or -- or primarily from one. I think, in

Page 260

1  my review of the documents, that the agreements
2  usually specify a percentage that they need to buy
3  from to be a -- participating in those kinds of
4  programs, and the pharmacies try to buy as much as
5  they can from those programs.
6  Q. Okay. It's also a way for McKesson to
7  provide information about price and product
8  availability to its customers or pharmacies, right?
9  MR. CHALOS: Object to the form.
10  A. So in addition to what -- what you said, it
11  also gives McKesson the ability to, you know, focus
12  market share on specific manufacturer's products,
13  yes.
14  Q. Okay. If you look at Paragraph 99 of your
15  report.
16  A. Okay.
17  Q. So right after the sentence about "primary
18  messages in relation to wholesale distributors are
19  expected to be focused on price, quality, drug
20  availability, and service," and we talked about
21  that -- you have another sentence that says:
22  "However, pharmacists that dispense prescriptions
23  may also receive promotional messages focused on
24  drug features and benefits, similar to prescribers."
25  Do you see that?

Page 261

1  A. Yes.
2  Q. If you look at Paragraph -- sorry,
3  Footnote 194, you cite a Purdue document in support
4  of that conclusion, right?
5  A. I do.
6  Q. Have you seen any evidence that wholesale
7  distributors provided pharmacists with "promotional
8  messages that focused on drug features and
9  benefits"?
10  A. So as I understand it, this document was
11  distributed to pharmacists through the wholesalers.
12  Q. And this document is a "Purdue sponsored
13  counseling guide for pharmacists," right?
14  A. Yes. Let me read this first before I -- I
15  take back the yes. I need to read this and make
16  sure --
17  MR. CHALOS: Do you have that document,
18  Counsel, to show him?
19  MS. RODGERS: I do not. It's his citation
20  here.
21  A. So, as I recall, this document was
22  distributed through wholesalers or with the
23  assistance of the wholesalers.
24  Q. This document was written by Purdue,
25  correct?

Page 262

1   A. This was a document that was a counseling
2 guide. And again, I don't have the document in
3 front of me, and I don't have a perfect memory. So
4 this document was written by a person that was
5 sponsored by Purdue, if I recall the document
6 correctly as I sit here.
7   Q. Okay. And do you have any other basis for
8 an opinion that wholesale distributors are
9 advertising drug features and benefits to
10 pharmacists?
11   A. I know there are other examples that I've
12 seen where mailings that went out to pharmacists
13 required the inclusion of a package insert, which
14 indicates that the name of the medication and its
15 indications would have been mentioned at the same
16 time, which would qualify into your question.
17   Q. Those are the package inserts that I think
18 you said doctors don't look at --
19   A. I -- I --
20   Q. -- and patients don't look at.
21   A. Yes.
22     MR. CHALOS: Object to the -- object to the
23 form of the question.
24   A. Yeah. So the package inserts would be the
25 same that I referred to prior to now in this

Page 263

1 testimony.
2   Q. Okay. And the package inserts are also
3 written by the manufacturers, correct?
4   A. Yes, they are.
5   Q. Okay. On Page 81 of your report, you
6 identify three marketing themes, correct?
7   A. Yes.
8   Q. And the first theme you identify is that
9 "Dependence, tolerance, addiction, and withdrawal
10 should not be a concern in prescribing opioids."
11     Would you agree that wholesale distributors
12 did not utilize that marketing message?
13     MR. CHALOS: Object to the form.
14   A. So I need to ask you to clarify your
15 question for me, if you can.
16     The question, as I understand it, is asking
17 me, did the wholesalers seek to promote opioids with
18 these marketing messages.
19     Is that what you're asking me?
20   Q. I'm asking: Did the wholesale distributors
21 make the first marketing message?
22   A. So you -- you -- I'm sorry. Again, I need
23 to clarify because you're asking, did they make it.
24     No, I think it's pretty obvious that the
25 manufacturers created the marketing messages.

Page 264

1 However, the wholesale distributors did have a role
2 in distributing some of these messages.
3   Q. Okay. Let's take that -- I want to take
4 this in two steps, then.
5     You agree, then, that the distributors
6 didn't create the marketing message that
7 "Dependence, tolerance, addiction, and withdrawal
8 should not be a concern in prescribing opioids"?
9   A. Yes, I agree with that.
10   Q. And the market -- the wholesale distributors
11 did not create the marketing message that "Opioids
12 are effective for, and approve functioning in,
13 patients taking them for long-term and chronic use"?
14   A. So these messages were initiated by the
15 manufacturers.
16   Q. Okay. And one more: The distributors did
17 not create the message that "Opioids should be the
18 first-line therapy for pain," correct?
19   A. Same answer, yeah.
20   Q. Okay. Now, you used the term "utilized" in
21 Paragraph 134 when you are introducing these
22 marketing messages, right?
23   A. Yes.
24   Q. What do you mean by utilized?
25   A. Defendants communicated specific marketing

Page 265

1 messages to customers to accomplish the goals of
2 increasing awareness.
3   Q. Okay. So is it your opinion that the
4 wholesale distributors communicated this first
5 marketing message to customers?
6     And I assume we're talking about customers
7 in the little "c" sense.
8     MR. CHALOS: Object to the form.
9   A. So I think, as I've said on a number of
10 answers to your questions here, that the majority of
11 the messages did focus on the pricing issues and
12 related details, but some of the messages did focus
13 on these three themes.
14     For example, when we were looking at the
15 last footnote -- I forget which number we were
16 looking at, but that was a Purdue document that was
17 created for pharmacists. It was distributed through
18 the wholesalers, and it contained many of these same
19 themes.
20     The Fishman book that was distributed
21 through the wholesalers contained many of these same
22 themes. So the wholesalers did participate in
23 distributing some of these messages, even if they
24 didn't create them. They facilitated it in the
25 marketplace the same way they facilitate the

Page 266

1  physical distribution of the drugs.
2     Q.  Let's look at a document I'm going to mark
3  as Exhibit 9.
4        (Perri Exhibit 9 was marked for
5  identification.)
6        MR. CHALOS:  Is there an Exhibit 5?
7        MS. RODGERS:  It's Schedule 10 --
8        MR. CHALOS:  Oh, I see it.
9        MS. RODGERS:  -- of his report.
10       MR. CHALOS:  Do you have another copy of
11  that?
12       MS. RODGERS:  I do not.  I thought we were
13  going to mark his whole report as one exhibit.
14  BY MS. RODGERS:
15     Q.  Exhibit 9 bears Bates PPLP004086826.
16       And you've seen this document before, right?
17     A.  Yep.  Yes, I have.
18     Q.  This is about the Fishman text that you have
19  referred to several times --
20     A.  Yes.
21     Q.  -- in the last hour?
22     A.  Yes.
23     Q.  And you actually cited this document on
24  Page 153 of your report in Footnote 371, Page 153.
25       If you look at the text of this e-mail, it

Page 267

1  reads:  "Kelly (whose email address I do not have)
2  from your organization mentioned on today's PCF call
3  that the FSMB is looking for support to help
4  publish/distribute the 'Responsible Opioid
5  Prescribing' book."
6       And that's the Fishman book that you've
7  referred to several times today, right?
8     A.  Yes.
9     Q.  "I mentioned that there may be some interest
10  among my membership to consider supporting.  We
11  represent pharmaceutical wholesale distributors such
12  as McKesson and Cardinal Health."
13       Did I read that correctly?
14     A.  Yes.
15     Q.  Now, this e-mail doesn't actually say that
16  McKesson distributed the Fishman text, right?
17     A.  This e-mail in particular does not.  It
18  expresses an interest in doing so.
19     Q.  It doesn't even say that McKesson expresses
20  an interest in distributing the Fish- -- Fishman
21  text, does it?
22     A.  I'm sorry, I --
23       MR. CHALOS:  Object to the form.
24     A.  Yeah, I may have misheard you.
25       Was your question specific to McKesson?

Page 268

1     Q.  Yes.
2     A.  Okay.
3     Q.  So the e-mail does not say that McKesson
4  distributed the Fishman text, right?
5     A.  It does not say specifically that McKesson
6  distributed the text.
7     Q.  And it doesn't say that Cardinal distributed
8  the Fishman text either, does it?
9     A.  It simply says that there is interest in
10  distribution of the text.
11     Q.  Okay.  And it doesn't even say that McKesson
12  is interested in distributing the text, does it?
13       MR. CHALOS:  Object to the form.
14     A.  It seems to me that the subject of the
15  e-mail is McKesson and Cardinal, but it doesn't say
16  specifically in those words that McKesson is
17  interested in distributing the text.
18     Q.  They are listed as examples of what the
19  membership includes, of who the members are, right?
20       MR. CHALOS:  Object to the form; calls for
21  speculation.
22     A.  It's unclear who the -- who the membership
23  is but it -- from the e-mail, it appears to be at
24  least focused on McKesson and Cardinal.
25     Q.  I just want to be clear -- I'm not sure what

Page 269

1  you mean by "focused on."
2       McKesson and Cardinal are identified as
3  members of an organization, right?
4       MR. CHALOS:  Objection; argumentative.
5       He's answered your question.
6     Q.  Let me ask you a different way.
7       You testified that this e-mail doesn't say
8  that McKesson distributed the Fishman text, right?
9       MR. CHALOS:  Object to the form.
10     A.  So this e-mail does not say that McKesson
11  distributed the Fishman text.
12     Q.  Did you do anything to inquire whether any
13  of the distributors in this case were actually
14  involved in the distribution of the Fishman text?
15     A.  Yes.  I did see other documents, and I'm at
16  a disadvantage here because I don't have the other
17  citations in -- that reference 371 to determine if
18  those are actually the documents that led to that
19  conclusion in combination with this e-mail.
20     Q.  And you've seen no evidence that McKesson
21  distributed the Fishman text, right?
22       MR. CHALOS:  Object to the form.
23     A.  So that's not what I said.  I said I'm at a
24  disadvantage because I don't have the other
25  references.  You've shown me only one of three

Page 270

1 documents that I cite in this footnote, and without
2 seeing all three documents, I can't have a
3 conclusion about that.
4     Q.  Aside from the three documents identified in
5 this footnote, did you look anywhere else to see if
6 any of the distributors might have been involved in
7 distribution of the Fishman text?
8     A.  The only thing I would have had to go on
9 would have been any other documents that were in the
10 database that were identified as being from the
11 distributors.
12     Q.  Uh-huh.
13     A.  So again, without -- without my document
14 database to look at, I can't tell you that I saw
15 other documents.
16         I know that I came to the conclusion that
17 this Fishman text was distributed through the
18 wholesalers, and I wouldn't have just invented that.
19 So my belief is, is that either one of these
20 documents, an e-mail or a cover page to one of these
21 other documents was responsible for providing that
22 belief.
23         And certainly, even the document that you've
24 pointed out on a couple of occasions doesn't say
25 McKesson distributed.  It certainly leads you to

Page 271

1 believe McKesson had an interest in it.
2     Q.  It doesn't say that, though?
3         MR. CHALOS:  Object to the form.
4     A.  I think I've answered that already.
5     Q.  You said it leads you to believe.  You're
6 inferring that from the document, right?
7         MR. CHALOS:  Object to the form;
8 argumentative.
9     A.  Yes, you're right.
10    Q.  Okay.  I want to turn back just for a minute
11 to those three marketing themes we talked about, and
12 I believe you testified that the wholesale
13 distributors didn't create those marketing themes
14 but they may have passed that information on from
15 time to time in rare circumstances, right?
16        MR. CHALOS:  Objection to form.
17    A.  Yes, I think I generally agree with that.
18    Q.  And based on that reasoning, television
19 stations also contributed to the marketing, right?
20        MR. CHALOS:  Object to the form.
21    A.  I'm not following your reasoning there.
22    Q.  Well, television stations pass on marketing
23 created by manufacturers, right?
24    A.  So you're saying in general --
25        MR. CHALOS:  Hang on one second.

Page 272

1         Object to the form.
2     A.  Are you saying that in marketing in general
3 that TV stations contribute to the communication of
4 messages in the marketplace for products in generic
5 form, for any kind of product?
6     Q.  I'm saying you've testified that wholesale
7 distributors contributed to the marketing message by
8 passing it on from time to time, right?
9         MR. CHALOS:  Object to the form;
10 mischaracterizes testimony.
11    A.  I thought the question was about TV
12 stations.
13    Q.  Yes.
14    A.  Okay.
15    Q.  We're -- we're getting -- we're taking the
16 steps there.
17    A.  Okay.
18    Q.  You testified to that, correct?
19        MR. CHALOS:  Object to the form; misstates
20 his testimony.
21    A.  So I -- to reiterate my opinion about
22 defendants, is that it is an aggregate opinion based
23 on the marketing being intertwined and basically
24 inseparable because the manufacturers would have had
25 a very -- very difficult time creating the

Page 273

1 distribution of the product in the marketplace
2 without the distributors.
3         So my opinion isn't just that -- as you
4 mentioned, my opinion is, is that working together,
5 the wholesale distributors, the pharmaceutical
6 manufacturers and marketers, communicated these
7 marketing messages, delivered the product to the
8 marketplace.  And you can't look at any one behavior
9 by itself, it's all integrated into the marketing
10 process.
11    Q.  Okay, but I -- now you're mixing two
12 concepts, and I want to take them independently.
13        I understand --
14        MR. CHALOS:  Object to the form.  Oh, I'm
15 sorry.
16    Q.  -- that the wholesale distributors delivered
17 product to their customers, the pharmacies.
18        What I'm talking now about are these three
19 marketing messages that you've identified in your
20 report.
21    A.  Okay.
22    Q.  In your opinion, did the wholesale
23 distributors utilize those marketing messages?
24        MR. CHALOS:  Object to the form.  Object to
25 the preamble.

Page 274

1   A.  So when you had me define "utilize" for you
2   earlier, I used the word "communicate."
3   Q.  Uh-huh.
4   A.  So the answer is yes.
5   Q.  And based on that reasoning, television
6   stations also communicated the marketing messages of
7   manufacturers here, right?
8       MR. CHALOS:  Object to the form.
9   A.  So are we talking about opioids, or are we
10  talking about -- what are we talking about
11  television stations?
12  Q.  First let's talk about it generally.
13      Television stations communicate marketing
14  messages of manufacturers, right?
15      MR. CHALOS:  Object to the form.
16  A.  To the extent that the manufacturer uses TV
17  advertising, they would be communicating a marketing
18  message, yes.
19  Q.  And the same is true of radio?
20      MR. CHALOS:  Object to the form.
21  A.  Radio communicates marketing messages as
22  well.
23  Q.  And magazines, advertisements?
24  A.  Yes.
25      MR. CHALOS:  Object to the form.

Page 275

1   A.  That would be true as well.
2   Q.  And the Internet also communicates messages
3   from manufacturers?
4       MR. CHALOS:  Object to the form.
5   A.  Yes.
6   Q.  So all of these different aspects --
7   television stations, radio, magazines, Internet --
8   they are all carrying and communicating manufacturer
9   messages, correct?
10      MR. CHALOS:  Object to the form; incomplete
11  hypothetical.
12  A.  So to the extent that -- you know, in
13  your -- in your example where we're talking about a
14  generic -- sorry.  I shouldn't use the word
15  "generic," because it has too much overlap here, but
16  we're talking about a random product that's being
17  marketed through lots of different mechanisms, and
18  so each -- each of the people -- each of the
19  entities or stakeholders involved in that are part
20  of the marketing process, and that's -- that's -- I
21  think that should be clear in the same way that the
22  wholesale distributors are part of the marketing
23  process for opioids.
24  Q.  Right.  It's true for, again, birth control
25  the same way it's true for prescription opioids?

Page 276

1       MR. CHALOS:  Objection; incomplete
2   hypothetical.
3   A.  And to the extent that a wholesaler would
4   distribute information about a drug regardless of
5   what category that drug is in, they would be
6   integral to that distribution process as part of the
7   marketing.
8   Q.  Okay.  You can't identify any specific
9   distribution of prescription opioids that was caused
10  by these three marketing messages you've laid out in
11  your report, right?
12  A.  I think my opinion on that, as we've talked
13  about earlier today before you began questioning, is
14  that the analysis was not done at the individual
15  prescription level but it was done at the -- at the
16  market level, which I think absolutely all of the
17  marketing related to these products contributed to
18  the utilization of opioids and expansion of the
19  marketplace, in addition to creation of market share
20  for specific companies.
21  Q.  Okay.  And I think -- I think you're talking
22  about prescribing, and I'm talking about -- my
23  question is a little bit different right now.
24      So my question is:  You can't identify any
25  specific distribution of prescription opioids caused

Page 277

1   by the three marketing themes you've identified in
2   your report?
3       MR. CHALOS:  Object to the form.
4   A.  So, no, I have to disagree with that, and
5   the primary reason is because the distribution is a
6   function of the marketing.  If there were no
7   marketing and there was no creation of demand, there
8   would be no need for distribution.  So any
9   distribution that occurred is a direct result of the
10  marketing.
11  Q.  So it's your testimony that every
12  distribution of prescription opioids was a result of
13  the three marketing themes that you are identifying
14  on Page 81 of your report?
15      MR. CHALOS:  Object to the form; misstates
16  his testimony.
17  A.  What page are you looking at?
18  Q.  Page 81.
19  A.  I just need to have them in front of me.  So
20  the -- these three marketing themes were intended to
21  summarize the core messages around the opioid
22  marketing.  They contain -- each of them contains
23  numerous specific messages, and it is my opinion
24  that these themes and the messages contained therein
25  were integral to pharmaceutical marketers' ability

Page 278

1 to expand demand for opioids in the marketplace.
2 Part of that, being able to expand demand,
3 depended on wholesale distributors' ability to get
4 the product to market and create the access that's
5 needed, which we talked about at length earlier.
6 Q. I think that's still not quite an answer to
7 my question. I'm asking whether you can identify
8 specific distribution -- so, say, a specific
9 shipment -- from McKesson or Cardinal or
10 AmerisourceBergen that was caused by these three
11 marketing messages?
12 MR. CHALOS: Object to the form.
13 A. So in my analysis, the -- you know, you've
14 heard me say a couple of times today that marketing
15 works, and I think that that's a generally accepted
16 concept. We certainly see that the manufacturers
17 have a primary role in the creation of these
18 marketing messages, the distributors had a role in
19 the distribution of the products.
20 Can I point to a bottle of pills that came
21 from a manufacturing facility that ended up in a
22 Cardinal or McKesson or AmeriSource distribution
23 center and then ended up in Ohio and say that that
24 bottle of pills was directly related to the
25 marketing? I mean, that -- that's an analogy or a

Page 279

1 connection that I've not really considered having to
2 make because the marketing, we saw, increased the
3 utilization of opioids dramatically from 1995 and
4 beyond.
5 So the question that I think you're asking
6 me is was the marketing completely ineffective and
7 none of the marketing messages that were
8 disseminated in the marketplace had anything to do
9 with anybody buying opioids, and I just can't make
10 that connection. It's just too clear that the
11 marketing had a significant impact on the
12 utilization of these products.
13 Q. So I think you answered, in that long
14 response to my question, which was: You didn't
15 analyze whether any specific shipment of opioids,
16 prescription opioids from Cardinal,
17 AmerisourceBergen, or McKesson was caused by these
18 three marketing messages?
19 MR. CHALOS: Object to the form.
20 A. Yeah, and I think I also said that the --
21 Q. First, can you answer that question?
22 You didn't analyze whether any specific
23 shipment of opioids from Cardinal,
24 AmerisourceBergen, or McKesson was caused by these
25 three marketing messages?

Page 280

1 MR. CHALOS: Object to the form; asked and
2 answered.
3 A. I said my complete answer had -- that I did
4 not track, I did not analyze, but there was more to
5 my answer than that, which I would be happy to
6 restate for you.
7 Q. I think you answered my question.
8 A. Okay.
9 Q. And similarly, you didn't analyze -- do a
10 quantitative analysis of what percentage of
11 distributions by McKesson, AmerisourceBergen, or
12 Cardinal were caused by these marketing messages?
13 A. Yeah, I think my opinion is, is that the
14 vast majority of the opioid utilization was caused
15 by the marketing messages.
16 Q. Okay. Can you quantify "vast majority"?
17 A. No, I can't.
18 Q. What does that --
19 A. I can't quantify that.
20 Q. -- what does that mean to you?
21 A. The vast majority.
22 Q. Explain it to me.
23 A. Your question is asking me to say something
24 that just doesn't make any sense to me from a
25 marketing perspective. Your implication is, is that

Page 281

1 they did all of this marketing, they spent all this
2 money, they did all these things to promote the use
3 of opioids; and not in one instance did any of those
4 activities result in the sales of a product in Ohio.
5 Q. I'm asking you to quantify the effect of
6 that.
7 A. The vast majority.
8 Q. And you don't intend to offer any opinion
9 about the quantity of distributions that were caused
10 by these three marketing themes?
11 A. I can't quantify it for you, no.
12 Q. Okay. It can't be quantified?
13 MR. CHALOS: I object to the form.
14 A. I don't know if it can be quantified or not.
15 You're asking me to draw a conclusion that I don't
16 have the information in front of me to make.
17 I know that if you look at the other expert
18 reports, the Rosenthal regression clearly draws
19 connections between the marketing expenditures and
20 sales of products. I'm sure that there's some way
21 to -- and I have -- I have documents in the
22 schedules with the overall sales. I'm sure there is
23 a way to break that down for the state of Ohio, so
24 we can make that connection if it has to be made.
25 But again, your whole -- your whole

Page 282

1 hypothetical just seems -- I'm sorry, I don't mean
2 to offend you, but it seems ridiculous to me to not
3 understand that the marketing is impacting the sales
4 of opioids.
5     Q.  Okay.  And you testified you can't quantify
6 that for me, and you have no opinion on the exact
7 percentage of distributions here that were caused by
8 these marketing themes, right?
9     A.  I said I didn't do --
10        MR. CHALOS:  Hold on.
11     A.  -- the analysis.
12        MR. CHALOS:  Objection.  His testimony is
13 what it is.  I don't know why you're summarizing
14 it and putting it in his mouth.
15        So it's an improper question.  I object to
16 the form; I object to the foundation; I object to
17 mischaracterizing his testimony.  His testimony
18 is what it is.
19        MS. RODGERS:  Can I have the next exhibit
20 sticker?
21        THE WITNESS:  Can we take a quick break?
22        MS. RODGERS:  Sure.
23        THE VIDEOGRAPHER:  We are now going off the
24 video record.  The time is currently 5:22 p.m.
25        (Recess from 5:22 p.m. until 5:37?p.m.)

Page 283

1        THE VIDEOGRAPHER:  We are now back on the
2 video record.  The time is currently 5:37 p.m.
3 BY MS. RODGERS:
4     Q.  Dr. Perri, you've spearheaded a training
5 initiative that prepares pharmacists to recognize
6 patients with opioid abuse problems, right?
7     A.  If you're referring to the SBIRT grant that
8 I was the coinvestigator on, yes.
9     Q.  Okay.  And SBIRT stands for Screening, Brief
10 Intervention, Referral, and Treatment, right?
11     A.  Yes, it does.
12     Q.  In those trainings, do you identify factors
13 that pharmacists should consider in deciding whether
14 to prescribe or dispense opioids to a given patient?
15        MR. CHALOS:  Object to the form.
16     A.  So I'm not sure I understand your question,
17 but the things that would influence a pharmacist
18 giving opioids to a patient would be the
19 prescription.
20     Q.  I didn't hear you.
21     A.  The factors that would be related to a
22 pharmacist giving opioids to a patient would be the
23 prescription itself.
24        Did you mean to ask if there was some factor
25 that SBIRT identifies as risk factors for that

Page 284

1 patient or -- I don't -- I guess --
2     Q.  What is the purpose of those trainings?
3     A.  So that pharmacists can identify patients
4 whose alcohol consumption or drug consumption could
5 present them with a risk when it comes to the
6 medications that they take for legitimate health
7 concerns.  So it might be a patient that has a
8 higher risk of addiction, higher risk of substance
9 abuse of some sort.
10     Q.  And is the point of that so that pharmacists
11 can determine whether to fill a prescription or not
12 for a particular patient?
13     A.  No, it's not the patient engaged in
14 behaviors on their own that would be constructive to
15 their healthcare.
16     Q.  Can you repeat that one more time?
17     A.  Yeah.  It's to identify patients who are at
18 risk --
19     Q.  Uh-huh.
20     A.  -- so that the pharmacist can encourage
21 those patients to engage in more healthy behaviors.
22     Q.  Okay.  Does that training affect whether or
23 not a pharmacist should fill a prescription for a
24 patient?
25        MR. CHALOS:  Object to the form.

Page 285

1     A.  The SBIRT method does not impact the filling
2 of a prescription, no.
3     Q.  Okay.  Now, at the outset of this, when I
4 asked you questions, we looked at a passage in your
5 book.  And I believe you testified that pain
6 medication is a vital medication, right?
7        MR. CHALOS:  Object to the form.
8     A.  I don't -- I don't remember exactly what I
9 said.  Do you have that --
10     Q.  Would you agree that pain medication is a
11 vital medication?
12     A.  In the --
13        MR. CHALOS:  Object to the form; incomplete
14 hypothetical.
15     A.  In appropriate patients, yes.
16     Q.  It's a needed medication for some patients?
17     A.  In appropriate patients, yes.
18     Q.  And at the end of the day, it's the
19 prescriber that determines whether that pain
20 medication is needed for a patient, right?
21        MR. CHALOS:  Object to the form.
22     A.  Yes.  Generally speaking, yes.
23     Q.  You served as an expert witness in a case
24 called JM Smith Corporation vs. Cherokee Pharmacy in
25 South Carolina, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 A. Yes, I did.
2    MS. RODGERS: I'm going to mark as
3 Exhibit 10 this document.
4    (Perri Exhibit 10 was marked for
5 identification.)
6    THE WITNESS: Thank you.
7    MS. RODGERS: Hm-hmm. Sorry.
8 BY MS. RODGERS:
9 Q. And this is a copy of the report that you
10 submitted in that case, right?
11 A. This appears to be a copy of that report,
12 yes.
13 Q. And this was in 2014 that you served as an
14 expert in this case, right?
15 A. Yes.
16 Q. And you were retained by the pharmacy,
17 Cherokee Pharmacy?
18 A. I was retained by the attorney representing
19 Cherokee Pharmacy, yes.
20 Q. Okay. If you could turn to Page 3 of this
21 report, would you read aloud your first opinion?
22    MR. CHALOS: You want him to read the whole
23 page?
24    MS. RODGERS: The first --
25 Q. Sorry, the kind of title of the first

Page 287

1 opinion there.
2 A. "Pharmaceutical wholesalers are not
3 empowered by the DEA, any other agency or by any
4 applicable rule, regulation or standard to limit
5 patient access to needed medications."
6 Q. You wrote that statement, right?
7 A. Yes.
8 Q. And it was true when you wrote it?
9 A. Yes.
10 Q. And you still agree with it today?
11 A. Yes.
12 Q. If you look at -- well, let's just do this.
13    Would you agree that oxycodone is a needed
14 medication?
15    MR. CHALOS: Object to the form; incomplete
16 hypothetical.
17 A. I think, as I have said over and over a
18 couple of times today, that, in appropriate
19 patients, oxycodone is a medication that might be
20 needed by a patient.
21 Q. Okay. And if you look at Paragraph 15, you
22 wrote -- or it reads: "All pharmaceutical
23 wholesalers are regulated by the National
24 Association of Boards of Pharmacy (NADP) under the
25 provisions of the Prescription Drug Marketing Act of

Page 288

1 1987 which outlines the necessary requirements for
2 obtaining licensure as a wholesale distributor.
3 These requirements --" and then in italics, "do not
4 require pharmaceutical wholesalers to exercise
5 control over the pharmacies that they serve in terms
6 of drug distribution."
7    That's an accurate statement still, right?
8    MR. CHALOS: Object to the form.
9 A. I'm not sure that this is 100 percent
10 correct in the present day.
11 Q. Is it your opinion that wholesale
12 distributors are not required to exercise control
13 over the pharmacies that they service in terms of
14 drug distribution?
15 A. I think there's --
16    MR. CHALOS: Object -- object to the form.
17 Sorry.
18 A. I think there is -- there is a role that the
19 wholesalers play with respect to drug distribution
20 and -- yeah, leave it at that.
21 Q. So when you wrote this report in 2014, was
22 it true that these requirements that you're citing
23 here do not require pharmaceutical wholesalers to
24 exercise control over the pharmacies that they serve
25 in terms of drug distribution?

Page 289

1    MR. CHALOS: Object to the form.
2 A. When I wrote this in 2014, I believed that
3 to be true.
4 Q. And is it true today?
5 A. I don't think so.
6 Q. So what changed?
7 A. I became aware of requirements that were
8 placed on the wholesalers to do more monitoring for
9 the orders that were going through their
10 distribution centers.
11 Q. What requirements are those?
12 A. Well, I did not analyze any of that in this
13 case, but as I understand it -- and I think some --
14 I haven't read this whole report in, you know, five
15 years, but the -- the gist of my concerns here were
16 the way that the wholesalers were applying the
17 control over the pharmacy.
18    And at the time, I was not aware that the
19 DEA had begun activities, which I learned about
20 through my analysis of this case, to require
21 wholesalers to do a better job, to do more
22 monitoring of the orders that go through their
23 distribution centers.
24 Q. So you're saying that there are new
25 requirements that were not present in 2014 today

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1   that require wholesalers to exercise control over
2   pharmacies?
3      A.  No, that's not what I'm saying.
4      Q.  So you're saying when you wrote this
5   statement, it was not true?
6         MR. CHALOS:  Object to the form.
7      A.  No.  I think what I said was pretty clear,
8   that when I wrote this, I believed it to be true at
9   that time, and I still that -- believe that -- that
10  you have to look at what this sentence actually
11  means in the context of this case.
12        This was a situation where a pharmacist that
13  had done a very prudent job of documenting what they
14  did at the retail level was basically cut off from
15  supply of prescription medications for controlled
16  substances and, subsequently, all medications.
17        And the -- so it applies to the amount of
18  control that the wholesaler was applying.  And that
19  was my issue in this case, was that the wholesaler,
20  without doing its due diligence, had unilaterally
21  made some decisions that affected this pharmacist's
22  business.  So that's what my opinions in this case
23  related to.
24     Q.  I'm just trying to understand what changed
25  between then and now that leads you to now disagree

Page 291

1   with this document?
2      A.  Well, I --
3         MR. CHALOS:  Object -- object to the form.
4   It's mischaracterizing his testimony.
5      A.  Yeah.  So as I said -- and I answered your
6   question earlier, and I said that -- you said
7   something about changing between then and now.
8         I became aware, through my involvement in
9   this case, that in around 2006, '07, or '08, that
10  the DEA had communicated with wholesalers
11  specifically with regard to the -- their oversight
12  of orders that are placed by pharmacies.  That was
13  something that wholesalers had claimed during this
14  2014 time period, but I had no evidence -- and there
15  certainly was no evidence provided in this case --
16  to inform me about that.
17        So what has changed is my awareness of what
18  was going on.
19     Q.  So in other words, you were wrong, in your
20  words, when you wrote this sentence?
21        MR. CHALOS:  Object to the form;
22  mischaracterizes testimony.
23     A.  Yeah, as I said, I don't -- being "wrong" is
24  your words.  I said that the -- being wrong would be
25  a subject of how you interpret this sentence, and

Page 292

1   the sentence reads:  "These requirements do not
2   require pharmaceutical wholesalers to exercise
3   control..."
4         And I think that's still true.  What they do
5   require is for wholesalers to monitor the pharmacies
6   and the drug distribution process.
7         So I think the sentence is still true, but I
8   think it would be a misrepresentation to just tell
9   you that, no, that sentence still stands because
10  I -- I think there's more to it than that.
11     Q.  Okay.
12     A.  Basically I'm -- I'm agreeing with a lot of
13  what you're saying, but I think you are
14  mischaracterizing my use in the sentence.
15     Q.  Okay.  I want to look at your third opinion
16  in this report.  I think it's the first sentence of
17  Paragraph 19.
18     A.  Yes.
19     Q.  It reads:  "The role of the pharmacist is to
20  deliver the medication the medical provider orders,
21  ensuring these orders are filled correctly and that
22  the therapy is appropriate in regard to dosing, drug
23  interactions, and possible adverse reactions."
24     A.  Were --
25     Q.  It's your opinion that --

Page 293

1      A.  Were you reading -- I'm sorry, were you
2   reading Opinion III?
3      Q.  The first sentence of Paragraph 19.
4      A.  Okay, gotcha.  Thank you.
5      Q.  It's your opinion that pharmacists have a
6   duty to ensure that each prescription has a
7   legitimate medical purpose before filling that
8   prescription, right?
9         MR. CHALOS:  Object to the form.
10        I'm sorry, are you reading that?  I lost you
11  somewhere.
12        MS. RODGERS:  I read the first sentence of
13  Paragraph 19.
14        MR. CHALOS:  Right.
15        MS. RODGERS:  And then I asked the witness:
16  "It's your opinion that pharmacists have a duty
17  to ensure that each prescription has a legitimate
18  medical purpose before filling that
19  prescription."
20        MR. CHALOS:  Oh, okay.  Well, I object to
21  the form.  It doesn't have anything to do with
22  that, so I object to the form of the specific
23  question, compound.
24     A.  So the summary opinion is that "It is the
25  responsibility of the retail community pharmacist to

Page 294

1 monitor and attempt to ensure the appropriate
2 medication use."
3     And basically the pharmacist has two duties
4 there:  One is to ensure that there is a legitimate
5 relationship between the prescriber and the patient;
6 and Number 2, it's to ensure that the drug won't --
7 won't do any harm to the patient, to the best of
8 their ability to review that prospectively.
9     Q.  And pharmacists, not pharmaceutical
10 wholesalers, are charged with the responsibility to
11 ensure the appropriateness of the prescription
12 process, right?
13         MR. CHALOS:  Object to the form.
14     A.  Yes, that's -- I agree with that.
15     Q.  Okay.  Now, in Paragraph 21, the second
16 sentence, you wrote:  "I am not aware of any laws or
17 regulations that direct wholesalers to evaluate, at
18 the patient level or otherwise, pharmacy dispensing
19 practices."
20     Do you see that?
21     A.  Yes.
22     Q.  And that was true when you wrote it?
23     A.  It was.
24     Q.  And it's true today?
25     A.  Well, as I said, I've become aware since

Page 295

1 this time that -- through my work in this case, that
2 in and around 2006, 2008, that the DEA directed
3 wholesalers to pay more attention to the orders that
4 were being placed by pharmacists.
5     Now, I don't think any laws have changed.  I
6 know there have been no changes to the Controlled
7 Substances Act or -- associated rules and
8 regulations, but I do know there is increased
9 scrutiny at the level of DEA on the orders that are
10 placed by pharmacists.  That was not part of the
11 analysis I did in this case, though.
12     Q.  And increased scrutiny isn't laws or
13 regulations, right?
14     A.  That's --
15         MR. CHALOS:  Object to the form.
16     A.  That's right.
17     Q.  Okay.  So you're "not aware of any laws or
18 regulations today that direct wholesalers to
19 evaluate, at the patient level or otherwise,
20 pharmacy dispensing practices"?
21         MR. CHALOS:  Object to the form; misstates
22     his testimony.
23     A.  And so the evaluation that we were just
24 talking about with respect to the pharmacist's duty
25 is different than I see the duty of the wholesaler.

Page 296

1     Q.  I'm just trying to get an answer to my
2 question:  "You're 'not aware of any laws or
3 regulations that direct wholesalers to evaluate, at
4 the patient level or otherwise, pharmacy dispensing
5 practices'"?
6         MR. CHALOS:  Object to the form.
7     A.  So if you are saying laws or regulations, I
8 think I already said that I'm not aware that the
9 Controlled Substances Act has changes -- has changed
10 or that the -- that any other laws have changed.  So
11 to the extent that the laws and regulations haven't
12 changed but given the caveat that there are
13 increased scrutiny on the part of the DEA, I think
14 that the environment has changed.  The marketing
15 environment that we're operating in with respect to
16 these issues has changed.
17     Q.  In the last sentence, you write:  "The
18 responsibility of the wholesaler is to make sure the
19 pharmacy is a legitimate pharmacy business..."
20     Do you see that?
21     A.  I do.
22     Q.  Okay.
23         MR. CHALOS:  I think there is more to that
24     sentence.
25         MS. RODGERS:  Sure.

Page 297

1     Q.  ... and to report the required data of the
2 units of -- on the units of controlled substances
3 shipped or sold, to the DEA.
4     Did I read that correctly?
5     A.  Yes, you did.
6     Q.  Okay.  Now, ensuring -- I want to talk about
7 what it means to ensure that "the pharmacy is a
8 legitimate pharmacy business."
9     That includes checking licenses and
10 registrations, right?
11     A.  Yes.
12     Q.  It could include verifying that a pharmacy
13 is a brick-and-mortar business rather than some
14 rogue Internet pharmacy?
15     A.  I -- I assume that would include that, yes.
16     Q.  Okay.  And it could include checking that
17 the pharmacy sells an array of products and not just
18 pain medication, right?
19     A.  I don't know the answer to that.  I do know
20 that there are pharmacies that specialize in pain
21 management and I would assume that they also sell
22 other drugs, but I can't say for sure one way or the
23 other.
24     Q.  Okay.  And there's nothing else, in your
25 opinion, that the wholesaler is required to do to

Page 298

1 ensure that a pharmacy is "a legitimate pharmacy
2 business"?
3       MR. CHALOS: Object to the form.
4   A.  Well, at the time that I wrote this, the
5 understanding that I had that related to my
6 understanding and my interpretation of "legitimate
7 pharmacy business" was the -- was also including
8 whether the pharmacist was doing their due diligence
9 in terms of evaluating and screening and filling
10 prescriptions for -- and particularly with regard to
11 this case, for controlled substances, so legitimate
12 business being more -- a little more broadly defined
13 than I need to define it, but certainly the things
14 that you mentioned, I would agree with.
15  Q.  Uh-huh.
16  A.  I would just add that my understanding was,
17 is that legitimacy of the pharmacy, the
18 relationships with their patients and so forth was
19 also a concern.
20  Q.  Okay.  So it would include evaluating the
21 pharmacy's policies with respect to filling
22 prescriptions.
23       Is that an accurate summary of what --
24  A.  That's -- that's close to what I said, I
25 think.

Page 299

1  Q.  Okay.  Anything else?
2  A.  I think that's it.
3  Q.  Okay.  Let's look at Opinion V.
4       Now, in the facts of this case where you
5 were testifying as an expert, the wholesale
6 distributor unilaterally stopped providing
7 controlled substances to a pharmacy, right?
8  A.  Yes.
9  Q.  And that was, in part, because of that
10 pharmacy's oxycodone orders?
11  A.  That was alleged, yes.
12  Q.  Okay.  And you disagreed with the
13 distributor's decision to stop selling to the
14 pharmacy, right?
15  A.  Based on the fact that the distributor's
16 decision was made using general guidelines rather
17 than guidelines that were specifically considered
18 for that pharmacy, yes.
19  Q.  Okay.  And you note in Paragraph 26 that the
20 distributor's decision to stop selling controlled
21 substances was based on "two primary
22 considerations."  The first you identified was --
23 and this is a quote -- "a superficial internal
24 analysis of the volume of purchases of controlled
25 substances by Cherokee Pharmacy," correct?

Page 300

1  A.  Yes.
2  Q.  And that's because a review of the volume of
3 purchases of controlled substances by a pharmacy
4 alone isn't particularly helpful, right?
5       MR. CHALOS: Object to the form.
6  A.  Well, it depends.  The volume of purchases
7 for a particular pharmacy can be helpful.  For
8 example, this pharmacy was located next to a
9 hospital with emergency room facilities, so the
10 pharmacy might be expected to have higher volumes of
11 narcotics being sold through the pharmacy.  This
12 pharmacy also happened to be located on a state
13 line, basically, where they had customers coming
14 from two different states.  They were also in a very
15 rural area, which meant their customers traveled
16 further distances.  They were also in an area where
17 there weren't very many employers and lots of folks
18 were farmers and self-employed, which meant a lot of
19 patients paid cash.
20       These are all the warning signs for a
21 wholesaler.  So looking at it superficially, the
22 wholesaler judged that, hey, this pharmacy has got
23 something suspicious going on.
24  Q.  Uh-huh, and I want to talk about all of
25 those --

Page 301

1       MR. CHALOS: Wait.  Let him finish.  Let him
2  finish.
3  A.  So the -- the problem that I have with that
4 is, you know, without really consulting with the
5 pharmacy to see if there were reasons for all of
6 this, they just made the decision to cut that
7 pharmacy out.
8  Q.  And they made that decision based purely on
9 numbers, right?
10       MR. CHALOS: Hold on.
11       Doctor, were you finished with your answer?
12       THE WITNESS: I think so, yeah.
13       MR. CHALOS: Okay.
14       THE WITNESS: Thank you.
15       MR. CHALOS: Okay.  Please, Counsel, let him
16  finish his answer.  I know you want to get on to
17  your next question.  I also -- I'll -- maybe we
18  can go another question or two on this, but these
19  opinions are far outside of the scope of his
20  opinions that are being offered in our case here.
21  So I object to further questioning on suspicious
22  order monitoring since that's not part of his
23  opinions here.
24       MS. RODGERS: I'm sorry.  We're entitled to
25  ask questions about his prior expert testimony to

Page 302

1  the extent --
2     MR. CHALOS: I don't think that's true.
3     MS. RODGERS: -- it has a bearing on this
4  case.
5     MR. CHALOS: Well, to the extent it has a
6  bearing on his opinions in this case.
7     MS. RODGERS: To the extent it has a bearing
8  on this case.
9     MR. CHALOS: No, I'm sorry, that's not
10  right.
11     MS. RODGERS: If we need to call the special
12  master, we can, but I'm going to keep asking
13  questions --
14     MR. CHALOS: Yes, why -- we should do that
15  then probably.
16    You're not entitled to get into suspicious
17  order monitoring when he has no opinions about
18  that in this case.
19     MS. RODGERS: Okay. Do you want to let me
20  go a couple more questions, or do you want to
21  call the special master?
22     MR. CHALOS: It's up to you. It's your --
23  your deposition, so you can say --
24     MS. RODGERS: Well, I'm going to keep asking
25  questions, so it's -- it's a question of if

Page 303

1  you --
2     MR. CHALOS: Okay. Well, yeah, so then why
3  don't we pause here. I don't think you should
4  ask any more questions about suspicious order
5  monitoring, his opinions, because he hasn't
6  offered any of those in this case.
7    I was trying to be cooperative and give you
8  a few more questions, but you obviously intend to
9  take advantage of that, so we're not going to do
10  any more questions on suspicious order --
11  suspicious order monitoring.
12    If you want to stop the deposition now and
13  call David Cohen, then we can do that.
14     MS. RODGERS: Okay. Let's do that.
15     MR. CHALOS: Okay.
16     THE VIDEOGRAPHER: We are now going off the
17  video record. The time is currently 5:59 p.m.
18    (Recess from 5:59 p.m. until 6:09?p.m.)
19     MR. CHALOS: I believe you're going to tell
20  me why you're entitled to get into opinions that
21  he's not giving in this case.
22     MS. RODGERS: Yeah. So Dr. Perri has
23  testified repeatedly about the distributors' role
24  in the supply chain and how their distribution of
25  opioids to pharmacies was integral to the

Page 304

1  marketing of the supply chain, of -- of opioids
2  in general. This issue of kind of what --
3  whether distributors should or should not
4  distribute is central and core to that opinion.
5    Moreover, you know, it's a prior expert
6  report that he actually authored himself, so he
7  has held himself out as an expert in this area.
8  You know, it goes -- we're entitled to ask
9  questions for purposes of impeachment, for
10  quality of work, for bias, to test his expertise.
11    You know, it's kind of -- it kind of goes to
12  the foundation of the testimony about roles in
13  the supply chain, and so we think we're entitled
14  to ask these questions.
15     MR. CHALOS: Okay. So our position is that
16  you're entitled to ask him questions about the
17  opinions that he's offered within the four
18  corners of his report, which is Exhibit 1 to his
19  deposition.
20    He has said over and over again that he's
21  not giving any opinions about suspicious order
22  monitoring in this case. We have experts who
23  will do that. You can ask them all about that,
24  and you can maybe even ask them about Dr. Perri's
25  prior opinions in a different case in a

Page 305

1  completely different context.
2    But your position that you're entitled to
3  ask him about any opinion he's given in any case
4  for any reason and at any time in the past, we
5  just don't agree with.
6    So suspicious order monitoring is not part
7  of his opinions in this case. We don't think you
8  are entitled to ask about them.
9    I was trying to be cooperative and let you
10  get to a point using this Exhibit 10, which is a
11  prior opinion in a different case involving
12  different issues, but you obviously intend to ask
13  him his suspicious order monitoring opinion --
14  opinions, which he does not have in this case,
15  and he's not holding himself out as an expert in
16  that area in this case that we're here about
17  today, so --
18     MS. RODGERS: And just to clarify, we're
19  intending to ask him questions about whether he
20  thinks distributors should be shipping
21  prescription opioids to certain pharmacies.
22  You're classifying it as "suspicious order
23  monitoring." I think it's a little bit broader
24  and different than that, and, you know, I think
25  we are entitled for a number of reasons to ask

Page 306

1 these questions.
2    MR. CHALOS: Okay. Well, we disagree and
3 you can, you know, call it what you will. It's
4 about -- it's about monitoring orders to
5 pharmacies, and that's not what his opinions are
6 about here. It's a marketing -- he's a marketing
7 guy. He's giving marketing opinions in this
8 case, so --
9    MS. RODGERS: Do you want me to continue
10 asking questions and you can object, or do you --
11 are you preventing your witness from --
12    MR. CHALOS: I think we shouldn't waste any
13 more time. Y'all are telling me you're going --
14    MS. RODGERS: Well, it's our time to decide
15 how we use it. So, I guess, are you cutting --
16 are you instructing your witness not to answer
17 these questions, or did you want to reserve your
18 rights to object and --
19    MR. CHALOS: Yeah. I'm telling you that
20 it's beyond the scope of his opinions and I don't
21 think it's proper to ask him any more questions
22 about opinions that he doesn't have in this case.
23    So that's right, we'll table this issue,
24 we'll get David Cohen on the phone to have an
25 adjudication of whether you can ask him about

Page 307

1 suspicious order monitoring or other supply
2 monitors -- monitoring, but I don't intend to let
3 him answer any questions about opinions that he's
4 not giving in this case.
5    MS. RODGERS: Okay. All right.
6    Can, actually, one of the cocounsel e-mail
7 Special Master Cohen while we go off the record?
8    MR. CHALOS: So why don't we go on to some
9 other questioning and leave this to the side so
10 we don't have to -- and then we can get a ruling
11 on it and then you can come back to it and ask
12 him.
13    MS. RODGERS: Okay.
14    (Discussion off the record.)
15    (Recess from 6:13?p.m. until 6:14?p.m.)
16    THE VIDEOGRAPHER: We are now back on the
17 video record with the beginning of Media
18 Number 7. The time is currently 6:14 p.m.
19 BY MS. RODGERS:
20    Q.  Okay. Mr. Perri, I just have a couple more
21 questions pending our conversation with Special
22 Master Cohen, and the first is whether you've
23 completed all the work that you intend to do on this
24 matter.
25    A.  Unless more information is provided. The

Page 308

1 only thing that I might -- is if new questions are
2 posed, but I don't anticipate doing any further work
3 on the case.
4    Q.  If new questions are posed to you by whom?
5    A.  By Counsel, yeah.
6    Q.  And are you otherwise prepared to testify
7 about the opinions that you've included in your
8 report?
9    MR. CHALOS: Object to the form. I think it
10 gets into attorney-client privilege stuff about
11 his preparation.
12    So I'm going to instruct you not to answer
13 that question.
14    Q.  Are you considering any additional opinions
15 that are not otherwise in your report?
16    A.  Not at this time, no.
17    Q.  Okay.
18    MS. RODGERS: I have no further questions
19 pending resolution of our dispute with Special
20 Master Cohen.
21    MR. CHALOS: Our dispute is not with Special
22 Master Cohen. He will be adjudicating our
23 dispute. We have no dispute with Special Master
24 Cohen.
25    THE VIDEOGRAPHER: We are now going off the

Page 309

1 video record. The time is currently 6:15 p.m.
2    (Recess from 6:15 p.m. until 6:19 p.m.)
3    THE VIDEOGRAPHER: We are now back on the
4 video record. The time is currently 6:19 p.m.
5    CROSS-EXAMINATION
6 BY MR. LADD:
7    Q.  Good afternoon, Dr. Perri. My name is
8 Matthew Ladd from the law firm Morgan, Lewis &
9 Bockius representing defendant Rite Aid. I'm going
10 to ask you a few questions this afternoon.
11    A.  Okay.
12    Q.  Have we met before, prior to today's
13 deposition?
14    A.  I don't think so.
15    Q.  And are you aware that there are several
16 retail pharmacy defendants in this case?
17    A.  Yes.
18    Q.  Do you know who they are?
19    A.  My understanding was they were Walgreens,
20 CVS, and Walmart and a couple of others. I guess
21 since you're here, that would include Rite Aid.
22    Q.  So you're aware that Rite Aid is also a
23 defendant in this case?
24    A.  Yes.
25    Q.  And do you understand that the retail

Page 310

1  pharmacy defendants have been sued in this case in
2  their capacity as distributors?
3      A.  That's my understanding, yes.
4      Q.  So you understand that retail pharmacy --
5  retail pharmacy defendants are not being sued in
6  this case as dispensing pharmacies?
7      A.  Yes, I do understand that.
8      Q.  And you understand that the retail pharmacy
9  defendants in this case are not being sued with
10  respect to dispensing at any of their retail
11  pharmacy stores?
12      A.  That is my understanding, yes.
13      Q.  Is it also your understanding that the
14  retail pharmacy defendants in this case distribute
15  controlled substances only to their own pharmacy
16  stores?
17      A.  So the answer to that is I'm not sure.  I
18  know that the documents that I reviewed in the
19  record, I -- did draw that conclusion for -- you
20  know, in looking at each defendant individually to
21  formulate a -- you know, an aggregate opinion.  I
22  was able -- I think this was brought up this
23  morning.  I was able to ascertain that Walgreens did
24  distribute Schedule II narcotics through their --
25  for at least a period of time through their central

Page 311

1  warehousing.  Walmart and CVS were a little bit
2  different.  I don't know for Rite Aid.
3      Q.  Do you have any reason to believe that Rite
4  Aid made distributions of controlled substances
5  other than to its own pharmacy stores?
6      A.  I don't have any reason to believe that
7  and -- no, I don't.
8      Q.  And I want to return to what you said
9  earlier this morning and ask you a few questions
10  about it.
11      If I remember correctly, you said something
12  to the effect, during Mr. Volney's questioning, that
13  it would have some bearing on your opinions if
14  retail chain pharmacies were ordering from their own
15  distribution centers as opposed to ordering from a
16  wholesale distributor; is that correct?
17      MR. CHALOS:  Object to the form.
18      A.  So I -- I'm not sure I remember the exact
19  testimony this morning, but I think I can answer
20  your question.
21      The -- if a chain pharmacy was engaged in
22  wholesale distribution, they would be engaged in
23  wholesale distribution to their own stores.
24  However, if they did not distribute CII drugs at any
25  point, then they would not be engaged in the

Page 312

1  wholesale distribution that would be part of this
2  case.
3      Q.  And is it your understanding that all the
4  retail pharmacy -- pharmacies in this case did
5  distribute CII drugs?
6      A.  As I said just a moment ago, Walgreens, my
7  analysis of the materials, the answer is yes.
8      For Walmart, they -- they did
9  because they -- well, Walmart -- as far as I
10  understand, Walmart did distribute CIIs through
11  their own central warehouse, and CVS ordered -- CVS
12  distributed controlled substances but not
13  Schedule II.  My understanding is they distributed
14  controlled substances through -- through their
15  warehouse but excluded the Schedule II narcotics in
16  that.
17      Q.  Are you aware also that Rite Aid never
18  distributed CII controlled drugs?
19      A.  As I said, I have not seen documents related
20  to Rite Aid.
21      Q.  Do you have any reason to believe that Rite
22  Aid did distribute Schedule II narcotics at any
23  time?
24      A.  I didn't see any documents or testimony that
25  indicated that they did distribute that or that they

Page 313

1  didn't, so --
2      Q.  Do you know whether any of the retail
3  pharmacy defendants in this case are currently
4  distributing Schedule II narcotics?
5      A.  I know that -- at least my understanding is,
6  from the record, is that Walgreens no longer does.
7  Walmart, I don't know.  CVS never -- never did, as
8  far as I know, or at least not in a relevant time
9  period.
10      Q.  Do you know when Walgreens stopped
11  distributing?
12      A.  I saw the documentation about this, and I
13  think it was around 2013 or '14.
14      Q.  Were you asked to review any materials that
15  were produced by the retail pharmacy defendants in
16  this case?
17      A.  I wasn't specifically asked.  I cannot say
18  one way or the other how many documents or -- other
19  than deposition testimony that were from the retail
20  pharmacy defendants, because it was a very small
21  subset of the documents that were produced.
22      Q.  Setting aside deposition testimony, do you
23  have any specific recollection of reviewing any
24  documents that were produced by any of the retail
25  pharmacy defendants?

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    A.   Just the Walgreens, some Walgreens
2  documents.
3    Q.   Any other?
4    A.   I'm thinking.
5        I could give you a very specific answer to
6  that question if I had my resources available to me,
7  but if we looked at my report as a representative
8  sample of what documents are cited from which
9  defendants, I don't believe there are.  I believe
10 there is a Walgreens document cited, but I don't
11 believe there is a Walmart document.
12       I'd have to look to see for sure, but there
13 were very few documents that I reviewed related to
14 the pharmacy defendants.
15   Q.   And I think you said a moment ago that you
16 did not recall reviewing any documents produced by
17 Rite Aid; is that correct?
18   A.   Yes, I don't recall Rite Aid specifically at
19 all.
20   Q.   Do you recall reviewing any documents
21 produced by CVS?
22   A.   I honestly can't recall, as I sit here right
23 now.
24   Q.   And do you recall what the Walgreens
25 document was that you reviewed?

Page 315

1    A.   I believe it was an e-mail exchange or a
2  letter that was discussing the issue of ceasing
3  distribution from the wholesale facility, the
4  company-run wholesale facility, and discussing that
5  they would use up existing supplies of CIIs but,
6  after that, the CIIs would be coming from the
7  wholesaler.
8    Q.   Did that document have anything to do with
9  the marketing of opioids?
10   A.   Only inasmuch as the distribution of the
11 opioids is, in my opinion, a marketing activity.
12   Q.   I understand.
13       So aside from your opinion that the
14 distribution of opioids is a marketing activity,
15 that document contained no other marketing-related
16 substance aside from a discussion about ceasing
17 distribution?
18   A.   I think -- I think you're asking me about
19 marketing messages, such as contained in Table II.
20       And no, it did not.
21   Q.   Aside from what we just talked about, to
22 your recollection, did you review any other
23 materials that were produced by the retail pharmacy
24 defendants?
25   A.   Other than deposition testimony?  No.

Page 316

1    Q.   Correct.
2    A.   No.
3    Q.   And if you had, those documents would have
4  been in Schedule 3 of your report, correct?
5    A.   Yes, it would have been contained in
6  Schedule 3 if -- if documents from each of those
7  defendants were actually in the documents that were
8  either identified and provided to me or documents
9  that I searched for and identified myself.
10   Q.   If you could turn to Exhibit 1, Dr. Perri,
11 I'd like to ask you a few questions about your
12 report, starting on Page 9, under the heading "Basis
13 and Reasons for Opinions," Section 1, "Marketing and
14 Pharmaceutical Marketing."
15   A.   Yes.
16   Q.   Does Section 1, titled "Marketing and
17 Pharmaceutical Marketing," specifically discuss
18 marketing connected by any of the retail pharmacy
19 defendants?
20   A.   Not specifically, no.
21   Q.   So none of the retail pharmacy defendants
22 are, for instance, mentioned by name in Section 1?
23   A.   That's correct.
24   Q.   And there is no specific discussion in
25 Section 1 of any particular marketing efforts

Page 317

1  conducted or developed specifically by the retail
2  pharmacy defendants; is that right?
3    A.   I'm sorry, I -- it's getting late in the
4  day, and I think I lost you on that one.
5    Q.   I understand.  I'll repeat the question.
6        In Section 1, there is no specific
7  discussion of any particular marketing efforts
8  conducted or developed specifically by the retail
9  pharmacy defendants?
10   A.   That's correct, yes.
11   Q.   Is that right?
12   A.   Yes.
13   Q.   If you could turn to Page 64 of your report,
14 please.  I know you've discussed this table before.
15       Do you see the table titled "Table 1:
16 Pharmaceutical Supply Chain System Stakeholders" at
17 the top of Page 64?
18   A.   Yes, I do.
19   Q.   And on the left-hand column, there is a
20 heading that says Entity; is that right?
21   A.   Yes.
22   Q.   And what's your understanding of which
23 entity listed in the left-hand column of this table
24 corresponds to the retail pharmacy defendants?
25       Where do the retail pharmacy defendants fall

Page 318

1 in this list?
2    A.   Under "Pharmacies" or under "Wholesale
3 Distributors." The analysis that I did would not
4 have included them under "Pharmacies" because I
5 didn't really look at pharmacy dispensing, but I did
6 look at wholesale distributors, so they would fall
7 under "Warehousing Pharmacy Chains."
8    Q.   So in the context of the opinions in your
9 report specific to retail pharmacy defendants, you
10 were looking at them as Warehousing Pharmacy Chains;
11 is that right?
12    A.   That's correct.
13    Q.   And in the right-hand column, there's a
14 heading that says Supply Chain System Roles; is that
15 right?
16    A.   Yes.
17    Q.   And there are four roles listed on the
18 right-hand side; is that correct?
19    A.   For wholesale distributors?
20    Q.   Correct.
21    A.   Yes.
22    Q.   And can you just read those out loud for the
23 record, please, each of those four?
24    A.   Manage distribution of products, Facilitate
25 customer discounts and chargebacks, Service

Page 319

1 pharmacies/generic source programs, Negotiate
2 pricing with pharmacies.
3    Q.   Thank you.
4        And is it your opinion that all of those
5 four supply chain system roles are equally
6 applicable to warehousing pharmacy chains as they
7 are to full-service -- full-service wholesalers?
8    A.   I think my opinion would be that
9 full-service wholesalers do more than a wholesaling
10 pharmacy chain would do because of their ability to
11 manage data, which the wholesale -- wholesaling
12 pharmacy chains may not do. They may engage in some
13 of that, but the wholesale distributors are much
14 more able to draw the data transmission that goes on
15 in the industry, to provide the kind of data that's
16 actually useful to a pharmaceutical company.
17        The warehousing pharmacy chains are
18 basically -- my understanding and my experience in
19 working in the industry for so many years was that
20 they were doing that as a cost-saving measure and a
21 way to increase their own internal efficiencies, but
22 not to participate in some of these other -- for
23 example, other activities such as are defined in the
24 flowchart on the page -- in Figure 4 on the page
25 before this.

Page 320

1    Q.   And can you explain to me a little bit more
2 what you mean by managing data and to what extent
3 warehousing pharmacy chains like the retail pharmacy
4 defendants in this case are managing data?
5    A.   Yeah. So I -- my -- my belief is, is that
6 they are not doing that. They would be -- in terms
7 of providing data to, for example, a manufacturer on
8 sales movement of products and where resources need
9 to be allocated for future production, I don't think
10 the warehousing chains engage in that.
11        Again, I haven't done any analysis of their
12 business activities, so what I'm speaking to here is
13 not part of what I did in this case but just my
14 understanding of what happens in the industry and
15 based on my experience from working -- my experience
16 in working for at least one of the chains that we're
17 talking about.
18    Q.   And to the extent that retail chain
19 pharmacies are captive distributors -- in other
20 words, to the extent that they are supplying and
21 distributing drugs only to their own stores, any
22 data that they are managing would be in the context
23 of distribution to those stores; is that correct?
24    A.   That's my experience with -- in working with
25 Walmart, yes.

Page 321

1    Q.   Okay. Because when talking about customers,
2 the stores are the retail pharmacies' only
3 customers; is that right?
4    A.   Yes. In terms of the distribution process,
5 yes.
6    Q.   Right. And among these four roles here on
7 the right-hand side of Table 1, does the word
8 "marketing" appear in any of these four roles?
9    A.   It does -- it does -- it does in the first
10 box under "Pharmaceutical Manufacturers."
11    Q.   And so let me rephrase my question.
12        You're looking at the first box on the
13 right-hand side across from the box that says
14 Pharmaceutical Manufacturers, Branded, Generic,
15 Specialty. Is that right?
16    A.   Yes.
17    Q.   Okay. Let me bring you down to those four
18 bullet points that we were just talking about, the
19 box on the right-hand side across from the box that
20 says Wholesale Distributors, Full Service
21 Wholesalers, Warehousing Pharmacy Chains, those four
22 bullet points that we just talked about a few
23 moments ago.
24        Does the word "marketing" appear in that
25 box?

Page 322

1   A.  It does not.
2   Q.  Could we go to Page 86 of your report,
3  please?
4        I know that when Ms. Rodgers was asking you
5  some questions, you answered some questions about
6  this particular table.  I'm going to ask you a
7  similar question concerning the retail chain
8  pharmacy defendants.
9        This is called -- this is titled Table II:
10  Marketing Messages; is that right?
11   A.  Yes, sir.
12   Q.  And it's a table with four columns, the
13  right-hand column of which reads Defendant; is that
14  right?
15   A.  Yes, it does.
16   Q.  Can you tell me generally what this -- what
17  information this table contains?
18   A.  Table II contains --
19        MR. CHALOS:  Object to the form; asked and
20  answered.
21   A.  Table II contains marketing messages that
22  were summarized by looking at a large volume of
23  marketing-oriented documents grouped together under
24  subheadings that reflected general themes of those
25  marketing messages.

Page 323

1   Q.  Thank you.  And to your knowledge, do the
2  names of any of the retail pharmacy defendants --
3  Rite Aid, CVS, Walmart, or Walgreens -- appear at
4  all in this table?
5   A.  They did not.
6   Q.  So it's your understanding that this table
7  contains no documents or refers to no documents that
8  were produced by the retail pharmacy defendants; is
9  that correct?
10   A.  That is my --
11        MR. CHALOS:  Object to the form; asked and
12  answered.
13   A.  That is my understanding, yes.
14   Q.  Could I direct you, Dr. Perri, to Page 151
15  of your report, please?
16   A.  Yes, sir.
17   Q.  And specifically looking at Section H,
18  "Wholesale Distributors and Defendants' Marketing,"
19  that section begins at Paragraph 183 and extends to
20  Paragraph 187 on Page 154; is that correct?
21   A.  That's correct.
22   Q.  And this section of the report does not cite
23  to any documents that were produced by the retail
24  pharmacy defendants; is that right?
25        And you're looking at a binder.  Can you let

Page 324

1  us know exactly what you're looking at?
2   A.  Yes.  In response to the question about the
3  references, I noticed that Schedule 16,
4  "Co-Promotional Marketing with Distributor
5  Defendants" -- I wanted to make sure that, if
6  possible -- and I don't know that it will be, that
7  this did not include any of the retail pharmacies.
8  I don't believe that it does, but I just wanted to
9  verify that and give you the best answer possible.
10        No, you're correct.  I'm sorry.  It does
11  not.
12   Q.  I'll read the question back one more time
13  just so we have a record.
14        This section of the report, Section 3H of
15  your expert report, does not cite to any documents
16  that -- that were produced by the retail pharmacy
17  defendants; is that right?
18   A.  That's correct.
19   Q.  And similarly, this section of your report
20  does not specifically mention any of the retail
21  pharmacy defendants; is that right?
22   A.  It -- it doesn't mention any of them by
23  name, no.
24   Q.  Thank you.
25        Looking at Paragraph 183 of your report, the

Page 325

1  second sentence of that paragraph, you write:  "In
2  the pharmaceutical industry, the distribution
3  function is provided by pharmaceutical wholesale
4  distributors, and pharmacy chains who provide all or
5  part of the wholesale distribution function through
6  their own vertically integrated wholesale
7  distribution divisions."
8        Did I read that correctly?
9   A.  Yes.
10   Q.  Is it fair to say that what you're saying
11  here concerning pharmacy chains is that retail
12  pharmacies are part of the supply chain?
13   A.  That would be fair to say, yes.
14   Q.  Are you saying anything else in this
15  paragraph concerning any purported marketing efforts
16  by retail chain pharmacies other than that they are
17  part of the supply chain?
18        MR. CHALOS:  Object to the form.
19   A.  My opinions about the pharmacy chains are
20  related specifically to their involvement, if any,
21  in the distribution function as part of the supply
22  chain and not as -- not as pharmacies dispensing
23  prescriptions to patients.
24   Q.  And when you say "through their own
25  vertically integrated wholesale distribution

Page 326

1  divisions," is that a reference to what we were
2  speaking about a few moments ago as -- as retail
3  pharmacies being captive distributors and
4  distributing to their own stores?
5     A.  Yes, it is.
6     Q.  Could you turn the page to Paragraph 187,
7  the final paragraph of this section?
8        And in Paragraph 187, you write:  "Given the
9  forms of generic marketing, including the essential
10 function of drug distribution in the supply chain
11 system, the increased sales of opioids resulting
12 from Defendants' marketing could not have occurred
13 without wholesale distributors and pharmacies which
14 completed the supply chain system and made opioids
15 available to patients."
16       Did I read that correctly?
17    A.  Yes, you did.
18    Q.  Again, this paragraph is simply reiterating
19 the role in the supply chain that the retail chain
20 pharmacies play and that we discussed a moment ago;
21 is that correct?
22    MR. CHALOS:  Object to the form.
23    A.  I -- and that's partially correct, but when
24 I read the sentence now, it -- it says "completed
25 the supply chain and made opioids available to

Page 327

1  patients," so it does -- it does certainly seem like
2  I'm including pharmacies in their dispensing role
3  here.  However, I can tell you that I do not have an
4  opinion about that, other than that they were part
5  of the supply chain.
6     Q.  And I guess what I'm trying to get at is
7  that, setting aside dispensing, are you alleging
8  that retail chain pharmacies engaged in any sort of
9  marketing efforts aside from their role in the
10 supply chain, as you discuss here?
11    A.  No, I'm not.
12    Q.  In other words, you're not contending in
13 this report that retail pharmacy defendants
14 advertised opioids to doctors; is that right?
15    A.  No, I'm not.
16    Q.  And you're not contending in this report
17 that the retail pharmacy defendants advertised
18 opioids directly to patients, correct?
19    A.  My analysis did not provide that
20 information.  I am not alleging that, no.
21    Q.  And similarly, you're not alleging in this
22 report that the retail pharmacy defendants
23 advertised opioids to the general public?
24    A.  So you made the -- the distinction with the
25 term "advertised."  I'm trying to recall -- and,

Page 328

1  again, I'm -- I'm at a slight disadvantage here
2  because I don't have access to my documents, but the
3  question that's on my mind and the one that I may
4  not be able to answer for you right this moment is
5  whether or not retail pharmacies in general
6  distributed any patient-level brochures that were
7  provided by drug companies in their marketing
8  efforts.
9        If -- if they did do that -- and I -- again,
10 as I sit here right now, I can't recall whether
11 that's true or false, but it is entirely plausible
12 that that did occur because it's something that does
13 occur in the industry.  It would -- it would engage
14 the retail pharmacies as more of a part of marketing
15 than just the distribution function.
16    Q.  And you're talking about brochures that a --
17 that a retail pharmacy store might provide to a
18 patient or somebody coming in to pick up a
19 prescription?
20    A.  Not the package insert, but more -- more
21 along the lines of -- of the brochures that were
22 created by the marketing defendants in the
23 manufacturing sector that focused on patient
24 education materials that would be distributed
25 through doctors' offices.

Page 329

1        And as I said, I can't recall, as we sit
2  here right now, whether they were distributed
3  through any pharmacies.  I don't think it's the
4  case, but I just want to leave open the possibility.
5  And I do need to check on that.
6     Q.  Okay.  So let me just break that down and --
7  because it was kind of a long answer, so I'm going
8  to ask a handful of follow-up questions.
9     A.  Sure.
10    Q.  Is there -- is there anything in your
11 report, in Exhibit 1, specifically concerning what
12 you're talking about?
13       You said brochures that -- that patients
14 going to pharmacies might have received.
15    A.  I don't think so.  Again, I don't believe
16 that to be the case.
17    Q.  Okay.  And then, second, any of these
18 patient education materials that would be
19 distributed through doctors' offices, are you trying
20 to say that retail chain pharmacies, as
21 distributors, would have had any role in
22 distributing those sorts of promotional materials?
23    A.  Not as -- not as distributors, per se, but
24 just through the distribution of patient-oriented
25 materials through either the pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 manufacturers or even through advocacy groups. It's
2 possible that some of those patient materials ended
3 up in retail pharmacies.
4 As I said, I have not seen those documents,
5 and I cannot recall, as we sit here today, whether
6 that occurred or not.
7 Q. You haven't seen anything in the documents
8 that you've -- that you have reviewed for this case
9 indicating that the retail chain pharmacies were
10 distributing patient-oriented materials?
11 A. Not that I recall.
12 Q. So returning to my question, when I asked
13 you're not contending in this report that the retail
14 pharmacy defendants advertised opioids to the
15 general public, setting aside this -- the small
16 piece that you can't recall, is there anything else?
17 MR. CHALOS: Object to the form.
18 A. I don't think so, no.
19 Q. Returning, if you would, to Page 64 of your
20 report, Dr. Perri, we discussed warehousing pharmacy
21 chains and this -- this Table 1 entitled
22 "Pharmaceutical Supply Chain System Stakeholders."
23 I'd like to ask you, you mentioned the role
24 of pharmacies in the supply chain system. And very
25 broadly, pharmacies dispense medication to patients

Page 331

1 with prescriptions; is that right?
2 A. Yes.
3 Q. And what kinds of dispensing analyses are
4 you aware of that distributors or other entities
5 might -- might undertake in order to evaluate the
6 propriety of a pharmacy's dispensing?
7 A. I'm not sure I understand your question.
8 Are you asking me what a manufacturer or
9 wholesaler might look at to determine if the
10 pharmacy was a legitimate business or --
11 Q. I'm asking you generally, what's your
12 understanding of the term "dispensing analysis"?
13 A. The -- and my understanding of the term
14 "dispensing analysis" would be a review of the
15 information that can be summarized regarding patient
16 pharmacy purchases in a given pharmacy.
17 For example, we were talking about, a few
18 moments ago, whether the -- the numbers of patients
19 that pay cash for their prescriptions, the numbers
20 of patients that receive controlled substances, the
21 numbers of patients who live a certain distance from
22 the pharmacy, and variables such as that that can be
23 determined just based on the raw data that's in the
24 pharmacy prescription computers.
25 Q. And in your opinion, is a dispensing

Page 332

1 analysis going to be accurate if it does not account
2 for those variables that you just mentioned?
3 MR. CHALOS: Object to the form.
4 A. The -- a dispensing analysis, even paying
5 attention to those variables, might not be accurate
6 because it must be considered in terms of the
7 actual -- the pharmacy that's in question.
8 A few moments ago we were discussing the
9 specific pharmacy that was being asked about in the
10 questions, and it was my assertion that some of the
11 numbers that were looked at in that dispensing
12 analysis were sort of unfair to the pharmacy because
13 of the pharmacy's location being in a rural area,
14 being in a -- a border between two states, being
15 next to a hospital, and so forth.
16 But again, these are -- these are issues
17 that I really didn't look at in this case and -- and
18 were not part of -- not part of my report or
19 something that I even discussed in my report.
20 MS. RODGERS: I just want to say for the
21 record he's now going into this report again. I
22 think we're squarely entitled to ask questions --
23 MR. CHALOS: No. He asked him questions and
24 I let him ask one question. Absolutely we're not
25 waiving anything. He shouldn't have asked the

Page 333

1 question. That doesn't mean he can open the door
2 for you. I mean, good try, but no.
3 MS. RODGERS: He's testifying about it.
4 MR. CHALOS: He asked him a question about
5 it.
6 BY MR. LADD:
7 Q. So I -- I did ask a question, and I want to
8 go back now, Dr. Perri, and ask you some additional
9 questions concerning Exhibit 10, which was your
10 prior report in the Cherokee Pharmacy case.
11 MR. CHALOS: Well, we're not going to --
12 we're not going to do that, subject to the same
13 issue.
14 MR. LADD: So if that's your -- are you
15 instructing Dr. Perri not to answer any questions
16 about --
17 MR. CHALOS: I mean, are you going to do the
18 same thing that she tried to do?
19 MR. LADD: I'm asking you if you're
20 instructing --
21 MR. CHALOS: I'm asking you what questions
22 you're going to ask him. If you're going to ask
23 him about suspicious order monitoring and what
24 duties a distributor has with respect to
25 monitoring the dispensing practices of a

Page 334

1  pharmacy, that's beyond the report that is given
2  in this case, and I'm not going to let him answer
3  those questions, subject to the same issue.
4      I mean, this is not honest -- this is not an
5  honest undertaking, you trying to do what we're
6  debating and are going to bring to Special Master
7  Cohen.
8      MR. LADD: I disagree, and for the record, I
9  would like to say that we intended to ask
10  Dr. Perri questions about this report. We
11  believe that there are opinions that we --
12      MR. CHALOS: Which report? The one from the
13  other case you're talking about?
14      MR. LADD: The one from the other case.
15      MR. CHALOS: Okay.
16      MR. LADD: -- that there are opinions in
17  Dr. Perri's prior report that go directly to the
18  heart of this case and that we are entitled to
19  put any document that we would like in front of
20  Dr. Perri, not just his current expert report,
21  so --
22      MR. CHALOS: You're arguing the same thing
23  she just argued. We're -- we're going to have
24  Special Master Cohen rule on that, so don't try
25  to do the same thing that we're going to have

Page 335

1  Special Master Cohen rule about.
2      If you have other questions, ask them.
3  Otherwise, we'll get a ruling and then you can
4  come back and ask questions and you can come back
5  and ask questions if he rules your way, but don't
6  be dishonest and try to do something sneaky like
7  that --
8      MR. LADD: I'm not being dishonest.
9      MR. CHALOS: -- which is what you just did.
10      MR. LADD: And for the record, I would just
11  like to make clear that your position is you're
12  instructing Dr. Perri not to answer any questions
13  about this report?
14      MR. CHALOS: Subject to --
15      MR. LADD: Subject to --
16      MR. CHALOS: -- an adjudication --
17      MR. LADD: Subject to Special Master
18  Cohen's --
19      MR. CHALOS: Listen, I'll -- I'll say my own
20  words. Okay?
21      Subject to Special Master Cohen considering
22  and ruling on this issue. And don't be sneaky
23  and try to do something that you know is going to
24  be adjudicated with Special Master Cohen, trying
25  to ask the same questions that we've already

Page 336

1  decided we're not going to ask him until we get a
2  ruling on that.
3      MR. LADD: So for the record, we, Rite Aid,
4  reserves all its rights to answer -- to ask any
5  questions about this prior report subject to
6  Special Master Cohen's ruling on this dispute.
7      MR. CHALOS: Okay. Don't be sneaky.
8      MR. LADD: I'm not sneaky.
9  BY MR. LADD:
10  Q. Dr. Perri, does your report contain all the
11  opinions you are providing in this case concerning
12  the retail pharmacy defendants?
13  A. Yes, it does.
14  Q. Are you considering any additional opinions
15  with respect to the retail pharmacy defendants that
16  are not currently reflected in your report?
17  A. No, sir.
18      MR. LADD: I have nothing else at this time.
19      THE WITNESS: Thank you.
20      MR. LADD: Thank you for your time.
21      THE VIDEOGRAPHER: We are now going off the
22  video record. The time is currently 6:52 p.m.
23      (Recess from 6:52 p.m. until 6:54 p.m.)
24      THE VIDEOGRAPHER: We are now back on the
25  video record. The time is currently 6:54 p.m.

Page 337

1      CROSS-EXAMINATION
2  BY MR. CARTER:
3  Q. Good afternoon, Dr. Perri. My name is Ed
4  Carter, and I represent Walmart. I have some
5  questions for you.
6  A. Okay. Have we met, Mr. Carter?
7  Q. Not to my knowledge.
8      Do you recall meeting me?
9  A. It seems so, but I could be mistaken.
10  Q. Okay. Are you familiar with Dr. Dean
11  Krugman in the marketing department at the
12  University of Georgia?
13  A. Yes, I am.
14  Q. Do you consider him an expert on marketing,
15  generally?
16  A. He's -- I think he's an -- what I would
17  refer to as an advertising expert. I don't know
18  about his expertise in the field of marketing in
19  general, but I know in advertising, he's top-notch.
20  Q. How do you define "marketing" versus
21  "advertising"? What's the distinction you draw?
22  A. So advertising is a subset of marketing, a
23  very specific subset that relates to communication
24  of messages, specifically. But the overall
25  marketing process is much more comprehensive than

Page 338

1  just advertising, so there's -- there's more to it
2  than just the communication of the messages.
3      So all these issues we've been talking about
4  here today regarding supply chain considerations
5  and -- and so forth would be part of the marketing
6  program but not necessarily just part of
7  advertising.
8      Q.  When we talk about marketing, marketing can
9  serve a number of different roles, correct?
10     A.  Yeah.  I mean, I generally agree with that,
11 yes.
12     Q.  Marketing can stimulate primary product
13 demand?
14     A.  Oh, I see what you're getting at.
15     Yes, absolutely.
16     Q.  Marketing can also affect allocation or
17 brand switching within a product line, correct?
18     A.  Right.  I refer to that as "market share."
19     Q.  Market share.
20     With respect to your analysis of the
21 aggregate marketing relative to opioids, have you
22 undertaken any quantitative assessment as to which
23 portion was geared towards generating primary demand
24 versus allocation of a brand market share?
25     A.  I know that I reviewed documents that

Page 339

1  discussed those -- those issues.  I know I reviewed
2  metrics that evaluated the capture of market share
3  and market expansion, but I did not quantitatively
4  assess that.
5      The information I was looking for in those
6  kinds of documents was what was the impact of the
7  marketing, and it certainly is clear from the
8  analysis that the metrics that manufacturers
9  recorded showed significant and substantial
10 increases in the size of the opioid market overall,
11 as well as their ability to capture market share
12 from competition.
13     Q.  But in terms of parsing that or categorizing
14 the different documents cited in your reliance
15 materials, you're not able to give a percentage or
16 any kind of quantitative value to the purpose of the
17 marketing materials?
18     A.  I suppose that could be done, but I didn't
19 undertake that analysis.
20     Q.  So you're not prepared to provide that
21 information to the jury in this case?
22     A.  I don't plan on offering any opinions about
23 that, no.
24     Q.  Okay.  Do you agree that marketing is
25 inherently a competitive undertaking?

Page 340

1      A.  Generally, I agree with that, yes.
2      Q.  So when -- when Coca-Cola is marketing,
3  they're not trying to increase sales of Pepsi?
4      A.  They might not be trying to, but
5  inadvertently their marketing efforts will result in
6  increased sales of Pepsi.  That would be my opinion
7  on that.  It is very difficult -- there is a lot of
8  literature about that kind of marketing activity
9  when -- for example, competitive, Eveready Energizer
10 Bunny versus Duracell that -- that one marketing
11 program impacts the other, and if you have
12 head-to-head comparisons of Duracell to Energizer,
13 it lends credibility to the competitor, the
14 underdog, so to speak.
15     So there's a lot of -- a lot of reasons to
16 consider why that would -- it would be true that
17 marketing raises -- sort of raises the level of the
18 pond in terms of the shared voice that a product
19 category might have in the overall marketplace; and
20 therefore, everybody benefits from marketing when
21 one manufacturer is doing it.
22     Q.  So is it your opinion to the jury in this
23 case that Energizer Bunny commercials sell Duracell
24 batteries?
25     A.  They can, yes.

Page 341

1      Q.  You indicated earlier that your
2  understanding of Walmart --
3      A.  I'm sorry.  I need to clarify.
4      Q.  Okay.
5      A.  When they do a head-to-head comparison
6  between the two, if Duracell is the underdog and
7  they compete with Eveready, it lends credibility to
8  the Duracell brand, yes.
9      Q.  Okay.  And when Eveready is developing
10 product testing and writing market plans for an
11 Energizer Bunny spot, do you have any reason to
12 believe that their goal is to sell more Duracell
13 batteries?
14     A.  No, I don't think so.
15     Q.  Okay.  That would be antithetical to their
16 purpose?
17     A.  It could be antithetical, but I think they
18 realize as marketers that when they do advertising,
19 it will -- it will promote the brand -- the brand
20 and the category.
21     Q.  Okay.  You indicated earlier that your
22 understanding of Walmart's role as a distributor was
23 a little bit different, and then you indicated that
24 you believe Walmart distributed CII opioids through
25 a warehouse, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    A.  My recollection was that we -- while I never
2  placed any CII orders when I worked for Walmart, was
3  that they were ordered on Sunday and -- one time a
4  week, and it came from a Walmart facility.  That's
5  the best I can give you on that.  I didn't see
6  documents in the record that would have informed me
7  one way or the other beyond that.
8    Q.  Okay.  So sitting here today, do you have an
9  opinion prepared to a reasonable degree of
10  scientific certainty describing Walmart's
11  distribution process of opioids?
12    A.  No, I don't.
13    Q.  Okay.  What was the time frame where you
14  worked at Walmart as a community pharmacist?
15    A.  It was between about 2001 and 2007.
16    Q.  Do you know -- can you narrow that down with
17  any greater specificity?
18    A.  Well, I mean, I worked through that entire
19  period as a relief pharmacist.  It wasn't -- I
20  wasn't employed full-time by Walmart.
21    Q.  Were you ever, at any point in time, a
22  full-time Walmart employee?
23    A.  For no longer than a period of about a week
24  or two, yes.
25    Q.  And why did you stop working part-time at

Page 343

1  Walmart?
2    A.  When the 4-dollar prescriptions came into
3  being, which was around 2007 or 2008, we were
4  instructed that we were going to have additional
5  staff added to the stores to help meet the increased
6  volume.  That never materialized, and I just
7  basically wasn't willing to put my license on the
8  line to be understaffed.
9    Q.  Now, in terms of your experience at Walmart,
10  did you ever -- were you ever involved in the
11  diversion of controlled substances?
12    A.  No.
13    Q.  Were you ever given instructions from the
14  company to engage in conduct that you thought was
15  unethical or that would result in the diversion of
16  controlled substances?
17    A.  Related to controlled substances?  No.
18    Q.  Okay.  You mentioned -- well, let me ask
19  this:  In your expert report, you do not identify
20  any interviews or Walmart-specific information
21  cited, correct?
22    A.  That's correct.
23    Q.  Okay.  You identified some documents that
24  have been discussed.  You mentioned some deposition
25  testimony.  Did you read the depositions cited in

Page 344

1  your expert report word for word?
2    A.  I used a search tool to identify key words
3  in the depositions and it would -- it would pull up
4  all depositions where those search words were found
5  and then I would read the relevant sections of the
6  depositions that were identified.
7    Q.  Okay.  So for any depositions cited in your
8  report, is there any deposition that you read word
9  for word?
10    A.  Yes, there are.
11    Q.  Are those noted anyway -- well, excuse me.
12        Strike that.
13        Are those noted in a way that we could
14  identify the ones that you did read cover to cover?
15    A.  I can probably tell you which ones I read
16  cover to cover if I had a list of depositions in
17  front of me.  I know I wanted to try to read a key
18  marketing representative for each of the marketing
19  defendants and also -- so that would be six or seven
20  depositions there.  And then I also wanted to read
21  the depositions of physicians that were related to
22  Ohio Medicaid.
23    Q.  Okay.  You've indicated a couple times that
24  you're lacking materials that would help you answer
25  questions.  Is there a reason you didn't bring your

Page 345

1  full set of reliance materials in a way that would
2  be accessible to you for the purpose of this
3  deposition?
4    A.  I just, out of -- not having the, you know,
5  technological resources or knowledge that I would be
6  allowed to have a computer here and to look for
7  things on it.
8    Q.  And in a --
9        MR. CHALOS:  We're coming up -- actually,
10  we're way past the time --
11        MR. LADD:  Okay.
12        MR. CHALOS:  -- so...
13        MR. LADD:  I'll do one more for today, and
14  then we'll -- we'll wrap up today.
15  BY MR. LADD:
16    Q.  In the notebook that you brought with you
17  today, does that include any highlighting,
18  handwritten notes, or margin area?
19    A.  No, it's simply a printed report of the
20  entire -- a printed copy of the entire report.
21    Q.  So other than having it punched and in a
22  binder, there is nothing different about what's
23  already been provided to the defendants in this
24  case?
25    A.  That's right.

Page 346

1    MR. CARTER:  Okay.  Those are the questions
2  for today.  I still have additional questioning,
3  but we'll wrap in light of the late hour.
4    THE WITNESS:  Okay.
5    THE VIDEOGRAPHER:  We are going off the
6  video record.  The time is currently 7:04 p.m.
7  This is the end of Media Number 7.
8    (The deposition recessed at 7:04 p.m.)

---

Page 348

INSTRUCTIONS TO WITNESS

4    Please read your deposition over carefully
5  and make any necessary corrections.  You should
6  state the reason in the appropriate space on the
7  errata sheet for any corrections that are made.

9    After doing so, please sign the errata sheet
10  and date it.  It will be attached to your
11  deposition.

13    It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.

---

Page 347

1       C E R T I F I C A T E
2    I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter
4  and Certified Realtime Captioner, do hereby certify
5  that, pursuant to notice, the deposition of MATTHEW
6  PERRI III, BS Pharm, Ph.D., RPh, was duly taken on
7  Tuesday, April 23, 2019, at 9:28 a.m. before me.
8    The said MATTHEW PERRI III, BS Pharm, Ph.D.,
9  RPh, was duly sworn by me according to law to tell
10  the truth, the whole truth and nothing but the truth
11  and thereupon did testify as set forth in the above
12  transcript of testimony.  The testimony was taken
13  down stenographically by me.  I do further certify
14  that the above deposition is full, complete, and a
15  true record of all the testimony given by the said
16  witness, and that a review of the transcript was
17  requested.
18
19  _____
20  Susan D. Wasilewski, RPR, CRR, CCP
21  (The foregoing certification of this transcript does
22  not apply to any reproduction of the same by any
23  means, unless under the direct control and/or
24  supervision of the certifying reporter.)
25

---

Page 349

1       - - - - - -
2       E R R A T A
3       - - - - - -
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6   REASON: _____
7  ____  ____  _____
8   REASON: _____
9  ____  ____  _____
10   REASON: _____
11  ____  ____  _____
12   REASON: _____
13  ____  ____  _____
14   REASON: _____
15  ____  ____  _____
16   REASON: _____
17  ____  ____  _____
18   REASON: _____
19  ____  ____  _____
20   REASON: _____
21  ____  ____  _____
22   REASON: _____
23  ____  ____  _____
24   REASON: _____
25

Page 350

1    ACKNOWLEDGMENT OF DEPONENT

2

3    I, _____, do hereby

4    acknowledge that I have read the foregoing pages, 1

5    through 349, and that the same is a correct

6    transcription of the answers given by me to the

7    questions therein propounded, except for the

8    corrections or changes in form or substance, if any,

9    noted in the attached Errata Sheet.

10

11

12   _____

13   MATTHEW PERRI III, BS Pharm, Ph.D., RPh      DATE

14

15

16

17

18   Subscribed and sworn to before me this

19   _____ day of _____, 20____.

20   My Commission expires: _____

21

22   _____
     Notary Public

23

24

25

Page 351

1    LAWYER'S NOTES

2    PAGE  LINE

3    _____ _____ _____

4    _____ _____ _____

5    _____ _____ _____

6    _____ _____ _____

7    _____ _____ _____

8    _____ _____ _____

9    _____ _____ _____

10   _____ _____ _____

11   _____ _____ _____

12   _____ _____ _____

13   _____ _____ _____

14   _____ _____ _____

15   _____ _____ _____

16   _____ _____ _____

17   _____ _____ _____

18   _____ _____ _____

19   _____ _____ _____

20   _____ _____ _____

21   _____ _____ _____

22   _____ _____ _____

23   _____ _____ _____

24   _____ _____ _____

25