Highly Confidential - Subject to Further Confidentiality Review

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION
3

    IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
4                                 |
    OPIATE LITIGATION             | Case No. 17-MD-2804
5                                 |
    APPLIES TO ALL CASES          | Hon. Dan A. Polster
6

7                        - - -
8                Wednesday, April 24, 2019
9                        - - -
10

              CONFIDENTIAL - SUBJECT TO FURTHER
11
                    CONFIDENTIALITY REVIEW
12
                           - - -
13
                        Volume 2
14

15

          VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,
16   BS Pharm, Ph.D., RPh, held at Jones Day,
    1420 Peachtree Street, N.E., Suite 800, Atlanta,
17   Georgia, commencing at 8:35 a.m., on the above date,
    before Susan D. Wasilewski, Registered Professional
18   Reporter, Certified Realtime Reporter and Certified
    Realtime Captioner.
19

20

21                        - - -
22              GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
24                  deps@golkow.com
25

| Page 353 | Page 355 |
|---|---|

**Page 353**

1  APPEARANCES:
2  Counsel for Plaintiffs:
3  LEIFF CABRASER HEIMANN & BERNSTEIN, LLP
   BY:  MARK P. CHALOS, ESQUIRE
4     mchalos@lchb.com
   222 2nd Avenue South, Suite 1640
5  Nashville, Tennessee 32701-2379
   Phone: (615) 313-9000
6
   CRUEGER DICKINSON LLC
7  BY:  KRISTA K. BAISCH, ESQUIRE
      kkk@cruegerdickinson.com
8  4532 North Oakland Avenue
   Whitefish Bay, Wisconsin 53211
9  Phone: (414) 210-4367
10
11 Counsel for Endo Health Solutions Inc.,
   Endo Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
12 Par Pharmaceutical Companies, Inc., f/k/a Par
   Pharmaceutical Holdings, Inc.
13
   ARNOLD & PORTER KAYE SCHOLER LLP
14 BY:  SEAN HENNESSY, ESQUIRE
      sean.hennessy@arnoldporter.com
15 601 Massachusetts Avenue, NW
   Washington, D.C. 20001-3754
16 Phone: (202) 942-5000
17
   Counsel for Walgreens Defendants:
18
   BARTLIT BECK LLP
19 BY:  LESTER C. HOUTZ, ESQUIRE
      lester.houtz@bartlit-beck.com
20 1801 Wewatta Street, Suite 1200
   Denver, Colorado 80202
21 Phone: (303) 592-3100
22
23
24
25

**Page 355**

1  APPEARANCES:
2  Counsel for Teva Pharmaceuticals USA, Inc.,
   Cephalon, Inc., Watson Laboratories, Inc., and
3  Actavis LLC:
   MORGAN LEWIS & BOCKIUS, LLP
4  BY:  MELISSA M. COATES, ESQUIRE
      melissa.coates@morganlewis.com
5  200 South Biscayne Boulevard, Suite 5300
   Miami, Florida 33131
6  Phone: (305) 415-3000
7
8  Counsel for Rite Aid:
9
   MORGAN LEWIS & BOCKIUS, LLP
10 BY:  MATTHEW R. LADD, ESQUIRE
      matthew.ladd@morganlewis.com
11 101 Park Avenue
   New York, New York 10178-0060
12 Phone: (212) 309-6000
13
14 Counsel for AmerisourceBergen Corporation and
   AmerisourceBergen Drug Corporation:
15
   REED SMITH LLP
16 BY:  JOSEPH MAHADY, ESQUIRE
      jmahady@reedsmith.com
17 1717 Arch Street, Suite 3100
   Philadelphia, Pennsylvania 19103
18 Phone: (215) 851-8100
19
20 Counsel for Johnson & Johnson and the Janssen
   Pharmaceuticals Defendants:
21
   O'MELVENY & MYERS LLP
22 BY:  ROSS B. GALIN, ESQUIRE
      rgalin@omm.com
23 7 Times Square
   New York, New York 10036-6537
24 Phone: (212) 326-2000
25

| Page 354 | Page 356 |
|---|---|

**Page 354**

1  APPEARANCES:
2  Counsel for McKesson Corporation:
3  COVINGTON & BURLING LLP
   BY:  MEGAN L. RODGERS, ESQUIRE
4     mrodgers@cov.com
   3000 El Camino Real
5  5 Palo Alto Square, 10th Floor
   Palo Alto, California 94306-2112
6  Phone: (650) 632-4700
7
   Counsel for Purdue Pharma L.P., Purdue Pharma Inc.,
8  and The Purdue Frederick Company:
9  LYNN PINKER COX HURST
   BY:  JOHN VOLNEY, ESQUIRE
10    jvolney@lynnllp.com
   2100 Ross Avenue, Suite 2700
11 Dallas, Texas 75201
   Phone: (214) 981-3800
12
13
   Counsel for Walmart Inc., f/k/a Wal-Mart Stores,
14 Inc.:
15 JONES DAY
   BY:  EDWARD M. CARTER, ESQUIRE
16    emcarter@jonesday.com
   325 John H. McConnell Boulevard, Suite 600
17 Columbus, Ohio 43215
   Phone: (614) 649-3939
18
19
   Counsel for Allergan Finance, LLC:
20
   KIRKLAND & ELLIS LLP
21 BY:  ERICA B. ZOLNER, ESQUIRE
      erica.zolner@kirkland.com
22    ZACHARY A. CIULLO, ESQUIRE
      zac.ciullo@kirkland.com
23 300 North LaSalle Street
   Chicago, Illinois 60654
24 Phone: (312) 862-3247
25

**Page 356**

1  APPEARANCES:
2  Counsel for Cardinal Health, Inc.:
3  WILLIAMS & CONNOLLY LLP
   BY:  JOSHUA D. TULLY, ESQUIRE
4     jtully@wc.com
   725 Twelfth Street, N.W.
5  Washington, D.C. 20005
   (202) 434-5000
6
7
   Counsel for Mallinckrodt LLC:
8
   ROPES & GRAY LLP
9  BY:  ELIZABETH BIERUT, ESQUIRE
      elizabeth.bierut@ropesgray.com
10 1211 Avenue of the Americas
   New York, New York 10036-8704
11 Phone: (212) 596-9000
12
13 APPEARANCES VIA TELEPHONE AND STREAM:
14 Counsel for the Henry Schein Defendants:
15 LOCKE LORD LLP
   BY:  BRANDAN MONTMINY, ESQUIRE
16    brandan.montminy@lockelord.com
   2200 Ross Avenue, Suite 2800
17 Dallas, Texas 75201
   Phone: (214) 740-8445
18
19
   Counsel for H.D. Smith LLC:
20
   BARNES & THORNBURG LLP
21 BY:  MONIQUE HANNAM, ESQUIRE
      Monique.Hannam@btlaw.com
22 11 South Meridian Street
   Indianapolis, Indiana 46204
23
24
25

Page 357

1　APPEARANCES VIA TELEPHONE AND STREAM:
2　Counsel for AmerisourceBergen Corporation and
　　AmerisourceBergen Drug Corporation:
3
　　REED SMITH LLP
4　BY: ANNE E. ROLLINS, ESQUIRE
　　　arollins@reedsmith.com
5　1717 Arch Street, Suite 3100
　　Philadelphia, Pennsylvania 19103
6　Phone: (215) 851-8100
7
　　ALSO PRESENT:
8
　　JOSHUA COLEMAN, Videographer
9　JONATHAN JAFFE, jjaffe@its-your-internet.com
　　ERICA KUBLY, Seeger Weiss
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 358

1　　　　　- - -
2　　　　I N D E X
3　　　　Volume 2
4　　　　- - -
5　Testimony of: MATTHEW PERRI, III, BS Pharm, Ph.D., RPh
6　　　　　　　　　　　　　PAGE
7　CROSS-EXAMINATION BY MR. CARTER............... 364
8　CROSS-EXAMINATION BY MR. TULLY................ 405
9　CROSS-EXAMINATION BY MR. GALIN................ 419
10　RECROSS-EXAMINATION BY MS. RODGERS............ 492
11　RECROSS-EXAMINATION BY MR. LADD............... 524
12　CROSS-EXAMINATION BY MS. COATES............... 544
13　CROSS-EXAMINATION BY MS. ZOLNER............... 567
14　CROSS-EXAMINATION BY MS. BIERUT............... 626
15　CROSS-EXAMINATION BY MR. HENNESSY............. 634
16
17　　　　E X H I B I T S
18　　　　(Attached to transcript)
19　　　MATTHEW PERRI DEPOSITION EXHIBITS　　　PAGE
20　Exhibit 11　E-mail - Subject: Ohio Prescriber　409
　　　　　Education Draft Proposal
21　　　　CAH_MDL2804_00846989 through 847005
22　Exhibit 12　E-mail - Subject Ohio Prescriber　409
　　　　　Education Draft Proposal
23　　　　CAH_MDL2804_00866121 and 866122
24　Exhibit 13　Duragesic Package Insert　　432
25

Page 359

1　　　　E X H I B I T S
2　　　　(Attached to transcript)
3　　　MATTHEW PERRI DEPOSITION EXHIBITS　　　PAGE
4　Exhibit 14　Duragesic Full Prescribing　435
　　　　　Information
5
　　Exhibit 15　Duragesic Prescribing Information　441
6
　　Exhibit 16　Nucynta Prescribing Information　449
7
　　Exhibit 17　Nucynta Prescribing Information　453
8
　　Exhibit 18　Nucynta ER Prescribing Information　456
9
　　Exhibit 19　Slide Presentation re Nucynta　472
10　　　　JAN00085130 through 85232
11　Exhibit 20　Consumer Updates - A Guide to Safe　482
　　　　　Use of Pain Medicine
12
　　Exhibit 21　Article: Pharmacists turn away　520
13　　　　legitimate pain patients as
　　　　　wholesalers limit shipments of
14　　　　controlled substances
15　Exhibit 22　Fentoar Frequently Asked Question　557
　　　　　(FAQ) and Responses
16　　　　TEVA_CHI_00000509 through 521
17　Exhibit 23　Actiq Prescribing Information　563
18　Exhibit 24　Kadian Documents　573
　　　　　ACTAVIS0006823 through 6830
19
　　Exhibit 25　Kadian 2005 Publication Plan　579
20　　　　ACTAVIS0006930 through 6978
21　Exhibit 26　Kadian Marketing Overview　582
　　　　　ACTAVIS 0264972 through 265018
22
　　Exhibit 27　FDA Letter re NDA 20-616　584
23　　　　ALLERGAN_MDL_00798619 through 798643
24　Exhibit 28　Kadian PI Workshop March 2013　589
25　　　　ACTAVIS0567695 through 567736

Page 360

1　　　　E X H I B I T S
2　　　　(Attached to transcript)
3　　　MATTHEW PERRI DEPOSITION EXHIBITS　　　PAGE
4　Exhibit 29　Kadian Prescribing Information　590
5　Exhibit 30　Objection Handling Workshop Training　593
　　　　　Class Presentation
6　　　　ALLERGAN_MDL_00405512 through 405529
7　Exhibit 31　Testimony of Douglas Boothe　604
8　Exhibit 32　Health Care Compliance Business　608
　　　　　Rules
9　　　　ALLERGAN_MDL_01104711 through
　　　　　1104722
10
　　Exhibit 33　E-mail - Subject: MSLs & NAMs　619
11　　　　ALLERGAN_MDL_00194340 and 194341
12　Exhibit 34　Opana ER With Intac Digital MVA　653
　　　　　Navigator
13　　　　ENDO-CHI_LIT-00550036 through 550090
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 361

1        - - -
2        THE VIDEOGRAPHER:  We are now back on the
3    video record with the continued deposition of
4    Matthew Perri.  Today's date is April 24th, 2019.
5    The time is approximately 8:35 a.m.
6        THE COURT REPORTER:  Let me remind you that
7    you are still under oath.
8        THE WITNESS:  Thank you.
9        MR. CHALOS:  And, Mr. Carter, before you
10   start with your questions, I would like to just
11   say a quick word about our call with Special
12   Master Cohen last night so we get that on the
13   record.
14       Correct me if I get any of this wrong.
15       So we had, last night, shortly before
16   8:00 p.m., a conference call with Special Master
17   Cohen regarding the dispute that arose here
18   yesterday in connection with Mr. Perri's prior
19   opinions in an unrelated case that I believe were
20   memorialized, at least in some part, in
21   Exhibit 10, I think.
22       And so the dispute was the extent to which
23   the defendants are entitled to question Mr. Perri
24   about those opinions and about any related
25   opinions he might have in connection with the

Page 362

1    litigation we're here about today.
2        It was the plaintiffs' position that he
3    should not be questioned about opinions as it
4    relates to this litigation except to the extent
5    he has opinions that are expressed in his report.
6        Special Master Cohen ruled that the
7    defendants would be entitled to ask Dr. Perri
8    about his --
9        And I'm sorry I called you Mr. Perri.
10       -- that the defendants would be entitled to
11   ask Dr. Perri about the opinions that he
12   expressed in that prior litigation and they're
13   entitled to ask whether he has opinions about
14   those areas in this case with, as I understood
15   it, the admonishment that if his answer is he
16   does not have opinions about certain areas in
17   this litigation, that the witness is not to be
18   badgered or harassed in any way about those
19   answers.
20       So I tried to accurately summarize his
21   rulings, and I'm sure defense counsel will
22   correct me if I have not done that.
23       MR. LADD:  I think the only thing the
24   defendants have to add is --
25       MR. CHALOS:  Can y'all -- can y'all hear

Page 363

1    him?
2        MR. LADD:  I think the only thing the
3    defendants have to add is that on the call,
4    Special Master Cohen did say that the questioning
5    defendants have asked so far in no way amounted
6    to badgering and the questions so far the
7    defendants have asked have been, quote, perfectly
8    legitimate.
9        MR. CHALOS:  Right, and that's, of course,
10   without the benefit of having read even a rough
11   transcript at that point.  He was relying on the
12   statements of Counsel in making those rulings.
13       MS. RODGERS:  And one further point:  I
14   think Mr. Chalos agreed, and Special Master Cohen
15   was on the line, that he would hold the
16   deposition open through last night.
17       MR. CHALOS:  Yes, that's true, and I
18   considered it open regardless of the pending
19   dispute, so we comported ourself accordingly and
20   consistent with the Ohio rules and other
21   applicable rules to these proceedings.
22       MATTHEW PERRI, III, BS Pharm, Ph.D., RPh,
23   called as a witness by the Track One Defendants,
24   having been previously duly sworn, continued to
25   testify as follows:

Page 364

1              CROSS-EXAMINATION
2    BY MR. CARTER:
3        Q.  Good morning, Dr. Perri.
4        A.  Good morning.
5        Q.  Have you heard the expression in
6    marketingspeak that half the money spent on
7    marketing is wasted, but the problem is they don't
8    know what half?
9        A.  I have.
10       Q.  Okay.  And that's a quote from earlier in
11   the Twentieth Century, correct?
12       A.  I can't attribute a time to when that
13   actually came from, but I do think it is a relic
14   from the past, because I think modern marketers are
15   a lot smarter, a lot more savvy and sophisticated,
16   and if they are wasting half their money, they are
17   figuring out why and solving that problem.
18       Q.  Now, also, in the course of your training in
19   marketing, tell me if these numbers sound
20   approximately correct to you, that according to
21   industry estimates, the average American is exposed
22   to between 300 and 1500 advertisements and
23   commercials a day.
24       What about that, is that consistent?
25       A.  It sounds about right.

Page 365

1    Q.   And then of those, only 80 are consciously
2  noted and only 12 result in some form of a response.
3       Does that generally track the order of
4  magnitude, in your experience?
5    A.   It -- I think that needs to be qualified,
6  though, because the -- the issue of involvement,
7  which is a -- kind of big deal in marketing, and
8  it relates to the personal level of connectedness
9  you have to an issue.  Involvement completely
10  changes those numbers.
11      So if you're talking about the average
12  customer walking down the street, yeah, I could
13  agree with those, but if we're talking about
14  somebody that is involved in a particular issue,
15  such as a disease, somebody who has high blood
16  pressure and we're advertising a high blood pressure
17  product, you're going to get -- those numbers are
18  going to jump way up.
19    Q.   Would you agree that the quality of a
20  product and the services behind it are also
21  important keys in the growth of a particular product
22  use?
23    A.   Certainly depending on the category, but
24  generally, I would agree with that, and I think
25  there's another saying that's from back in the old

Page 366

1  school days that you usually get what you pay for
2  and you always get what you don't.  So, yes, I would
3  agree with that.
4    Q.   And so even if advertising results in a
5  product trial, if people's experience with that is
6  not satisfactory or if the services are not up to
7  par, advertising is not going to continue -- is not
8  going to cause them to continue using something that
9  they don't have a good experience with, fair?
10    A.   When the consumer is in the driver's seat, I
11  think that's true, yes.
12    Q.   Okay.  And just because money is spent on
13  advertising -- there are plenty of examples of
14  expensive marketing campaigns that have been
15  failures, correct?
16      MR. CHALOS:  Object to the form.
17    A.   I mean, I could think of a few that have
18  come to mind in the last decade or two.
19    Q.   And so while the marketers may be able to
20  control some factors -- such as product, price,
21  distribution, and forms of production -- those
22  factors interact with environmental conditions and
23  consumers that the marketer does not have control
24  over, correct?
25    A.   There are -- there are influences in the

Page 367

1  marketplace which marketers do not control, that's
2  correct.
3    Q.   And those environmental conditions and the
4  internal decision-making process of the consumer,
5  those often dictate the success or failure of a
6  advertising and marketing campaign; true?
7    A.   Yes.  I'd like to just add, though, that
8  when you mention the environmental factors, I think,
9  since we're talking about whether someone is a savvy
10  marketer or not, being able to impact, let's say,
11  through lobbying -- Coca-Cola can lobby with, you
12  know, the State legislature to create a more
13  favorable environment.  So marketers do go beyond
14  the scope sometimes of their internal manipulation
15  of variables, but to the external market environment
16  as well, so just to make sure that we keep that
17  clear.
18    Q.   And so the external environment, in the
19  general sense, where they are not interacting with
20  it and, again, those -- those factors that they
21  don't control, the consumer's response, those are
22  key factors that often dictate the success or
23  failure of a campaign?
24    A.   Yes, and I think that the key there, when
25  you said dictate the consumer's response, that's why

Page 368

1  the marketer has to do a good job on the production
2  side, to make sure that whatever product they are
3  creating meets customer needs, because if it
4  doesn't, as you pointed out with your question,
5  customers won't be loyal to it.
6    Q.   Do you agree that, in psychological terms,
7  people enter the advertising and marketing
8  communication process with their perceptual defenses
9  up?
10    A.   In some cases, yes, I would agree with that.
11    Q.   Do you agree that consumers understand what
12  advertising is and they have a skepticism to
13  advertising, they know that they are trying to be
14  sold a product or a service?
15      MR. CHALOS:  Object to the form.
16    A.   Yeah, I think we have to be careful with
17  that one, because I think it -- it touches on an
18  issue that is very important in healthcare
19  advertising, and that is, the knowledge of the
20  consumer.
21      A lot of times we'll do -- you'll get a
22  phone call, a survey or something like that that
23  comes on.  You're asked a question about a product
24  or a service or an experience, and you have no basis
25  for making that; yet, people answer anyway.

Page 369

1    When we apply that to consumer purchases or
2  decision-making or the way they view the
3  advertising, which I think is what you're asking me
4  about, the -- excuse me, the problem is, is if the
5  consumer is not knowledgeable about that area, they
6  don't have a basis to formulate an opinion about
7  whether that should be something that's trustworthy
8  or not.
9    Now, given that, I think sometimes
10  consumers -- and there -- there are different
11  categories of consumers, certainly, but I think
12  sometimes consumers are a bit skeptical about
13  advertising or they're distrustful of it, and that
14  certainly applies to -- specifically to various
15  industries in specific.
16    So I think generally I agree with that, but
17  I think it has -- you have to be careful not to just
18  lump everybody into one basket.
19    Q.  Okay.  And so with that explanation, let's
20  take it step by step.
21    As a general, broad principle, you agree
22  that consumers typically enter the advertising and
23  marketing communication exchange with their
24  perceptual defenses up, they're -- they're
25  recognizing that the communicator is trying to sell

Page 370

1  them something, in the general sense?
2    MR. CHALOS:  Object to the form.
3    A.  Yeah, I -- I think generally that the
4  consumer is going to -- depending on their level of
5  involvement, depending on the level of the impact of
6  the product.
7    Just let me give you an example.  You --
8  you're buying hot dogs for the baseball team to eat
9  after the last game of the season.  A lot goes into
10  that decision, and you may see advertising for hot
11  dogs.  That's a different decision than when you are
12  buying hot dogs to feed your family on a Tuesday
13  evening.  You may see advertising and evaluate it in
14  a different way.
15    So depending on the circumstances, the
16  situation, the level of involvement -- maybe you're
17  not as involved in the baseball team's nutrition as
18  you are your family's nutrition.
19    All of those factors come into play.  So
20  while I tend to agree with the general premise of
21  what you're saying, you have to be careful not to
22  just lump everyone into one basket and make the
23  broad characterization that everybody has got their
24  radar on when it comes to advertising because it
25  depends on the product situation and the -- and the

Page 371

1  consumer themselves.
2    Some people just have a higher tendency to
3  be attentive and to be critical and to be evaluative
4  about advertising.  Others are just more accepting
5  and yielding to whatever they see or hear.
6    So generally, I think it's okay to say that,
7  but I think you have to be careful and look at the
8  specifics of the situation.
9    Q.  You're actually talking about something
10  slightly different, right?
11    In the course of purchasing a product or
12  service, there are different, like you said, levels
13  of engagement; there's -- there's certain purchasing
14  decisions that are of greater consequence than
15  others.  So there are some that people spend a lot
16  of time researching and considering, and there's
17  others, you know, that they may, kind of, on a whim
18  or more automatically, right?
19    MR. CHALOS:  Object to the form.
20    A.  So impulse purchases versus purchases
21  contemplated, yeah, there are differences between
22  those.  And again, it may sound like I'm talking
23  about something different, but we can't separate
24  them because involvement, as a marketing issue, is
25  an antecedent of all of these other behaviors that

Page 372

1  we're talking about.  So involvement does dictate
2  whether or not a consumer is going to be more
3  cautious in their interpretation of an ad.
4  Involvement does, as you pointed in your remarks,
5  impact the way we make our purchasing decision.
6    So I just want to be -- I'm not disagreeing
7  with you, but I just want to be very careful that we
8  don't just blanket say this applies to everybody all
9  the time.
10    Q.  Right.  And -- but the one blanket basic
11  point that we would make is -- and that I take it
12  you'd agree with this -- in general, people
13  understand when an -- when they receive an
14  advertising communication, that it's trying to sell
15  them something --
16    MR. CHALOS:  Object to the form.
17    Q.  -- just in the broadest sense?
18    MR. CHALOS:  Sorry.  Object to the form.
19    Didn't mean to interrupt.
20    A.  I hope so.
21    Q.  And in the context of healthcare, the
22  healthcare market, doctors are on the spectrum of
23  people -- you know, potential consumers, they are on
24  the savvier end, more sophisticated end of potential
25  consumers than the run-of-the-mill consumer,

Page 373

1 correct?
2     MR. CHALOS: Object to the form.
3     A. Yeah. No, I -- unfortunately, doctors are
4 people, too, and they suffer from the same problems
5 as we do and I think it just depends on the doctor.
6 I think some doctors are very sensitive to
7 advertising issues. In fact, I know some doctors
8 personally that will not see, you know, a sales rep
9 and other doctors that they're pretty much fine with
10 it.
11     So again, in general, I think -- I would
12 agree that doctors are more well-educated and they
13 should be tuned in to those factors. Can we blanket
14 say every doctor is going to be a better consumer
15 because of that? I don't think so.
16     Q. Okay. Doctors are highly-trained
17 professionals, correct?
18     A. Yes, they are.
19     Q. As a result of their license requirements,
20 they are well educated?
21     A. They are well educated.
22     Q. And you haven't seen any study or research
23 that suggests that interaction with advertising
24 makes doctors forget their medical training?
25     MR. CHALOS: Object to the form.

Page 374

1     A. I can't imagine a study that could measure
2 that, but no, I haven't seen anything, no.
3     Q. Okay. Are you aware of any research that
4 shows that prescription opioid advertising
5 manipulates people into acting against their will?
6     A. That's a very specific research question,
7 and no, I'm not familiar with research that asks
8 that specific question.
9     Q. Okay. And I think you said that
10 yesterday -- but just to be clear, you've not
11 interviewed any doctor who prescribed opioids in
12 Cuyahoga or Summit County, have you?
13     A. As I recall yesterday, I think the way I
14 responded to that was that, no, I had not, but I had
15 read the testimony of two physicians that worked for
16 Ohio Medicaid.
17     Q. And you have not interviewed any pharmacists
18 in Cuyahoga or Summit County, have you?
19     A. No, I have not.
20     Q. And you've not interviewed any patient who
21 filled a prescription for opioids in Cuyahoga or
22 Summit County, have you?
23     A. No, I have not.
24     Q. Yesterday you said that you would be able to
25 indicate depositions that you read cover to cover by

Page 375

1 looking at the list of depositions. Do you have a
2 list of the depositions you considered?
3     A. Yes. Let me get that.
4     Q. As you're getting that, my question will be:
5 Please identify for the record the depositions that
6 you read word for word.
7     MR. CARTER: The witness is reviewing his
8 list. We are still here.
9     MS. HANNAM: Okay. Great. Thanks.
10     A. Okay.
11     Q. All right. Tell me what you find.
12     A. So to the best of my recollection, these are
13 the ones that I read entirely. As I was looking
14 through, I saw so many that I have searched through
15 and done the specific word searches that I described
16 yesterday, but the ones that I've read in entirety
17 were Chick and Bingol, Vorsanger, Altier, Snider --
18     Q. You might want to go a little slower for the
19 court reporter.
20     THE WITNESS: I'm sorry. I forgot about
21 you. I'll start over.
22     A. Chick, Bingol, Vorsanger, Altier, Snyder,
23 Vordestrasse, which, as I recall, he doesn't
24 pronounce German, he pronounces it Americanly,
25 Deem-Eshleman. I can't be 100 percent sure that I

Page 376

1 finished Matt Day, but I think I did -- Matthew Day.
2 Gasdia. I'm not sure if it's said Seid, and the
3 two, Wharton and Applegate, from Ohio. I know I've
4 read substantially Boothe and Wickline, but I don't
5 think I've read entirely Wickline.
6     Q. All right. Thank you.
7     Switching gears, you testified yesterday
8 that your review of the marketing messages and
9 what's contained in your report, that it doesn't set
10 out or, you know, index marketing that you think is
11 adjudicated to be improper, false, or misleading
12 versus marketing that was appropriate and lawful,
13 it's all put together in the aggregate.
14     Did I understand that correctly?
15     A. Yes. Table II is a listing of all the
16 messages that were gleaned from the marketing
17 documents, and it is a representative sample of the
18 messages that I saw.
19     Q. Okay. Now I want to focus on marketing that
20 would be considered appropriate and lawful.
21     You don't have any opinion criticizing or
22 taking issue with expansion of the market
23 attributable to lawful or appropriate advertising,
24 do you?
25     MR. CHALOS: Object to the form.

Page 377

1    A.  I think this is the whole crux of the matter
2  with regard to marketing and opioids, is that
3  expansion of the market for the sake of selling more
4  products is not appropriate.  And so I think my
5  opinions do focus on even the use of appropriate
6  marketing to expand the opioid market, because I
7  think that's inconsistent with standards that exist
8  in the pharmaceutical industry.
9    Q.  If there is a doctor who has patients who
10  need a product and lawful, accurate marketing raises
11  his awareness of the availability of a solution for
12  his patients and he then redirects his patients to
13  that medication that he believes is appropriate,
14  exercising his medical judgment, and there was
15  nothing false or misleading about that advertising,
16  would you suggest that that's an improper expansion
17  of the market?
18    MR. CHALOS:  Object to the form; incomplete
19  hypothetical.
20    A.  So in that very specific scenario, where the
21  doctor has identified a patient need and marketing
22  has been a positive influence on that, that is
23  contributing to legitimate need for opioids, which
24  would not require expansion of the market.  It
25  would -- it would be normal for the market to

Page 378

1  experience that utilization.
2    And in addition to that, it's just not that
3  simple, because then that doctor has been exposed.
4  This information has been encoded into his memory or
5  her memory, and on the next occasion for need, that
6  can influence that next decision as well.
7    So marketing isn't just a one shot, one
8  message, one reaction, one outcome.  It's about the
9  collective nature of all of these messages that are
10  compounded and coded into memory, searched for, and
11  utilized by doctors in the decision-making process
12  and then used either appropriately or
13  inappropriately, as the circumstances would dictate.
14    And we could -- we could talk about many,
15  many specific instances where the utilization might
16  be appropriate and the utilization might not be
17  appropriate.
18    And even in the appropriate situations, some
19  of those patients are going to experience problems
20  and negative outcomes from the use of opioids.
21    Q.  What happens downstream when there is a
22  legitimate medical prescription?  That has nothing
23  to do with the propriety of the underlying marketing
24  materials, does it?
25    MR. CHALOS:  Object to the form.

Page 379

1    A.  When we try to correlate a specific
2  marketing message with an outcome, we can do that
3  with -- we can try to do that, and we do that
4  certainly in marketing to measure its effectiveness.
5    But the problem with that is that ignores
6  the richness of the information that we have in
7  marketing and all of the robust nature of all the
8  messages, all the strategies, all the tactics that
9  are used.  So to try to point our finger at one
10  message and say that it's directly related to a
11  downstream outcome, it's almost impossible to do
12  that without a very narrowly defined, very
13  intricately designed experiment that was designed to
14  measure that.
15    But what we do know about marketing is the
16  collective nature of marketing results in outcomes,
17  and I firmly believe and my opinion is that that
18  marketing is directly related to the downstream
19  outcomes because it's -- it's encouraging or
20  discouraging use, it's -- that use then carries with
21  it implications.  And if marketing caused the use,
22  then marketing caused the implications as well.
23    Q.  The problem I'm having understanding where
24  you're going with this is, when you have your
25  aggregate opinion and you say that marketing in the

Page 380

1  aggregate leads to various outcomes in the
2  aggregate, there is a disconnect between what
3  actually happens in the real world.  There is no
4  doctor exposed to the sum aggregate of that
5  marketing that then dictates those outcomes.
6    So the situation you're describing in your
7  opinions actually never happened on an individual
8  level, true?
9    MR. CHALOS:  Object to the form.
10    A.  I'd say I disagree with that.
11    Q.  So how could it?  So all -- so there's some
12  doctor in some county that saw all of the marketing
13  in Table II, and then that dictated their patient
14  medical decisions?
15    MR. CHALOS:  Object to the form.
16    A.  Yeah, I would probably agree with you that
17  there is not a single, solitary doctor that saw
18  every single thing.  But I would disagree that most
19  doctors weren't exposed to multiple forms of
20  communication and multiple outreach from the
21  marketing of opioids.
22    Q.  So if there is a doctor that was only --
23  that was exposed to multiple marketing messages for
24  opioids but the ones that that particular doctor was
25  exposed to were all lawful and appropriate

Page 381

1  advertising, how can this aggregate effect that you
2  describe, that wouldn't apply to that situation,
3  would it?
4      MR. CHALOS:  Object to the form.
5      A.  Well, as I think I said earlier, lawful or
6  unlawful, the problem is, is with aggressive
7  marketing, with the outreach to -- you know, to the
8  most highest prescribers, the marketing that I saw
9  in this case was designed to increase the size of
10  the opioid market.  And we see from the results
11  manufacturers received, that that's exactly what it
12  did.
13      So to try to single out a doctor that saw
14  only what you describe as the appropriate or
15  legitimate messages, I just don't see how that's
16  possible because the whole legitimacy of the
17  marketing is challenged by the aggressive nature of
18  it.  So I disagree with your premise that you start
19  out with, that there is appropriate marketing that's
20  occurring in this arena.
21      Q.  So you actually disagree with the FDA, you
22  think there should be no marketing for opioids?
23      MR. CHALOS:  Object to the form.
24      Q.  Even if it conforms to every regulation,
25  your opinion is there should never be marketing for

Page 382

1  opioids?
2      A.  I get to say --
3      MR. CHALOS:  Object to the form.
4      Sorry.
5      A.  I get to say what my opinions are.
6      Q.  You do.  So am I wrong?  Is it --
7      A.  Yes, you're wrong.
8      MR. CHALOS:  Hold on.  Hold on.  Object to
9  the form of the question.
10      Q.  And I'll -- I'll try to not talk over you,
11  so let me ask it this way.  Is it your opinion to
12  the jury in this case that there should not be any
13  marketing for opioids?
14      A.  That is not my opinion, no.
15      Q.  Okay.  So if you believe -- well, let me ask
16  the flip side:  Do you believe that there is an
17  appropriate and lawful place for marketing for
18  opioids that should exist?
19      A.  I think --
20      MR. CHALOS:  Object to the form.
21      Sorry.
22      A.  I think there can be appropriate marketing
23  for opioids, and it would not look like what I've
24  seen in this case.
25      Q.  Okay.  So you do believe there could be

Page 383

1  appropriate marketing for opioids and that the goal
2  of that marketing would be to increase product use
3  and market share, so how would you -- oh, you
4  disagree?  You're shaking your head.
5      MR. CHALOS:  Hold on.  Don't -- object to
6  the form of the question.
7      THE WITNESS:  I'm sorry.
8      MR. CHALOS:  Don't shake or nod or --
9  just --
10      THE WITNESS:  Okay.
11      MR. CHALOS:  Let him finish his question,
12  let me make an objection, if there is one, and
13  then please answer.
14      THE WITNESS:  Okay.  I'm sorry.
15  BY MR. CARTER:
16      Q.  So you were disagreeing with me, so --
17      A.  Yeah.
18      Q.  -- where is the disagreement?
19      A.  Well --
20      MR. CHALOS:  And object to the form of the
21  previous question.
22      Go ahead.
23      A.  I'm sorry.  I'm going to just take a deep
24  breath here.
25      I don't like it when people tell me what my

Page 384

1  opinions are, because I think I've done a pretty
2  good job of laying out exactly what they are and I
3  don't go beyond what my opinions are.  I'm not going
4  to go beyond them.  And I think that they are
5  completely sound and -- based on what I saw in this
6  matter.
7      But when you -- when you start saying that I
8  don't think there would be any appropriate marketing
9  or -- I just -- I can't agree with those things.
10      Q.  Okay.  So there is -- there is appropriate
11  marketing for opioids?
12      A.  And I said there can be appropriate
13  marketing, it just wouldn't look like the aggressive
14  marketing that we saw here.
15      Q.  Okay.  So is it your opinion that every
16  example of marketing you saw was inappropriate?
17      A.  And this takes us back to why I was shaking
18  my head.
19      Q.  Okay.
20      A.  The -- my opinion is the marketing must be
21  considered in the aggregate.  You can't single out
22  any single message, you can't single out any single
23  contact with a doctor or any single strategy or
24  method.  You must consider the full scope of the
25  marketing.

Highly Confidential - Subject to Further Confidentiality Review

Page 385

1   Marketing is a process. I have taken great
2 lengths to explain that in my report. Marketing is
3 something that has an impact that goes beyond the
4 incident encounter. It's the sum total of the
5 activities.
6   Q. Have you ever conducted an academic --
7 academic research or study of a category of
8 marketing other than opioids where you've -- you've
9 only considered the propriety of the marketing in
10 the aggregate as opposed to individual messages?
11   MR. CHALOS: Object to the form.
12   A. If -- I'm not sure I understand your
13 question but --
14   Q. Sure. Let me ask -- let me -- let me
15 withdraw it and ask a different one.
16   There can be individual one-off marketing
17 messages that are -- that are wrong in any industry,
18 correct?
19   A. Correct.
20   Q. Coca-Cola could release an inappropriate
21 commercial?
22   A. I mean, I guess as a -- as a hypothetical,
23 yeah, that could happen.
24   Q. Okay. And just -- if Coca-Cola, you know,
25 has an inappropriate, risqué commercial in the Super

Page 386

1 Bowl that gets criticized, that doesn't mean that
2 marketing in the aggregate for soft drinks -- that
3 wouldn't lead to an opinion on marketing in the
4 aggregate for soft drinks, would it?
5   MR. CHALOS: Object to the form; incomplete
6   hypothetical.
7   A. So with that specific example, what I can
8 say is, is that if -- you're probably right about
9 that, but I can guarantee you that that one
10 advertisement that they saw during the Super Bowl
11 will impact consumers of Coca-Cola broadly forever.
12 It will always be in the customer's mind, and it
13 will always be an impact on customers' perceptions
14 of Coca-Cola, because that's what marketers work to
15 create, is a perception.
16   And as I said yesterday and I think I've
17 said multiple times during this deposition,
18 perceptions are very hard to change and once they're
19 changed, they're very durable and stable.
20   Q. So just to make sure I understand your
21 opinions -- and I'm not, in any way, telling you
22 what they are --
23   A. Thank you. I apologize.
24   Q. -- I'm trying to understand those. So you
25 agree that there are and can be appropriate specific

Page 387

1 messages and marketing that can exist for opioids,
2 but in this case, you are not looking at that or
3 acknowledging that because you think even
4 appropriate marketing messages become subsumed
5 within an overall aggregate market?
6   Explain to me this disconnect between how --
7 how you can have appropriate marketing and you
8 acknowledge that but then you say that the marketing
9 in the aggregate was -- was a problem.
10   MR. CHALOS: Object to the form, and also
11   incomplete hypothetical.
12   A. So I wanted to shake my head again there,
13 because instead of telling me what my opinion was,
14 you told me what I did or didn't do in this matter,
15 and so I want to make it very clear what I did.
16   I did look at the marketing. I looked at
17 each defendant, and I looked at those defendants so
18 that I could form an aggregate opinion about the
19 marketing of opioids because that's what is
20 impacting our country, is the marketing of opioids
21 in the aggregate.
22   So the disconnect that -- that I think that
23 we're -- we're talking about right now is if there
24 were some -- and correct me if I'm wrong here, if
25 there were messages out there that were actually

Page 388

1 okay from a science or a research perspective, why
2 was the use of those messages inappropriate?
3   Is that what your question is?
4   Q. That will -- that's one question. I'll ask
5 that one.
6   So when you look in the aggregate, did you
7 see examples of executions in isolation that you
8 think were appropriate?
9   MR. CHALOS: Object to the form.
10   A. So just to remind everybody, I didn't -- I
11 didn't evaluate the messages one by one and say, are
12 they true or false. There are other experts that
13 undertook that task.
14   My task was to identify the messages and to
15 analyze the marketing. My analysis for the
16 marketing was very detailed, very specifically
17 planned. It was comprehensive, it was aggressive.
18 It utilized the exact techniques that marketers
19 would use to maximize the expansion of the market
20 and capture market share in instances where that was
21 the goal. And I formed my opinions based on that.
22   So the question of whether this message or
23 this ad was appropriate or not, it wasn't on my
24 radar, it wasn't something I was asked to do, and it
25 wasn't part of this analysis.

Page 389

1    But whether or not the marketing together
2 expanded the market was, and that's exactly what I
3 did.
4    Q. Okay. So because of your aggregate
5 analysis, you are not -- are you prepared to opine
6 whether the role and the -- withdrawn.
7    I'll rephrase the question.
8    Do you have an opinion whether any expansion
9 of the market was attributable to lawful
10 advertising?
11    MR. CHALOS: Object to the form.
12    A. You know, this was -- this analysis was not
13 designed to be nor was I asked to provide a
14 quantitative assessment of the impact of any
15 individual ad or collection of ads or messages or
16 strategies or tactics. It was to examine the
17 aggregate nature of that.
18    Q. To the extent the aggregate body of
19 advertising and marketing in this space included
20 lawful messages, would those lawful messages -- have
21 you evaluated the impact of the lawful messages
22 versus ones that other experts might consider were
23 improper?
24    Do you know how the impact compares between
25 lawful and improper messages?

Page 390

1    MR. CHALOS: Object to the form.
2    A. I think that's what I just answered. Is
3 that just a different way of asking me the same
4 question?
5    Q. I don't understand it to be that, so let me
6 ask you, do you -- do you have an expert opinion
7 regarding the impact, potential impact of a lawful
8 message versus an unlawful message?
9    A. So the analysis did not evaluate individual
10 ads based on their expected or measured impact in
11 the case.
12    Q. Okay. And as a principle, it's not an
13 opinion that you intend to offer to the jury, is it,
14 that misleading ads are more impactful?
15    A. Actually, no. I don't -- I don't -- I don't
16 believe -- I don't even believe that. I think that
17 the marketing can't be broken down; therefore, the
18 positive, constructive, appropriate messages
19 combined with whatever messages are determined to be
20 false as what impacted this market. And it doesn't
21 matter whether it was the good or the bad. They all
22 impacted the market, and they impacted the market in
23 a way that expanded the market in an inappropriate
24 way.
25    Q. Okay. So you think the aggregate marketing

Page 391

1 impacted the market in a negative way.
2    Am I understanding you correctly?
3    MR. CHALOS: Object to the form.
4    A. I mean, I want to be more specific if -- if
5 I'm going to phrase it that way, but the aggregate
6 advertising that was done by the opioid marketers
7 expanded the opioid market in a way that was not
8 consistent with the standards that have been
9 established in the pharmaceutical industry for
10 marketing products like that.
11    Q. Okay. And so as a -- due to the nature of
12 your aggregate opinion, you would fault the
13 defendants in this case for the aggregate
14 advertising, even including otherwise lawful and
15 appropriate messaging?
16    MR. CHALOS: Object to the form.
17    A. As I've said, I didn't evaluate lawful or
18 appropriate. I just identified the advertising.
19 And it's my opinion that you can't separate the
20 advertising and break it down and look at one piece
21 of it and say, was this okay or not and how much
22 impact it did have. I don't believe that analysis
23 can be done, given -- given what we have to look at
24 here.
25    Q. Okay. So you have not -- as you've

Page 392

1 explained, you have not undertaken any -- any
2 qualitative analysis of what's -- what comprises the
3 aggregate market to break it into appropriate or
4 inappropriate messages, and your opinion -- you just
5 take it all together and say that the aggregate
6 created the expansion?
7    MR. CHALOS: Object to the form.
8    A. And so the first part of that where you said
9 you haven't looked at the components of the
10 aggregate, or something like that --
11    Q. You haven't conducted a qualitative analysis
12 as to what percentage of appropriate or
13 inappropriate messages comprise that aggregate?
14    A. That, I can agree with, yes.
15    Q. Okay. All right.
16    And so to the extent your opinion is
17 critical of the impact of the aggregate marketing,
18 do you think that the FDA should ban marketing in
19 this space?
20    MR. CHALOS: Object to the form.
21    A. You know, I -- I don't think I'm the person
22 to ask what the FDA should do.
23    Q. Okay. Based on your review of the materials
24 in this case, any evidence that Walmart ever
25 generated primary demand for a prescription opioid?

Page 393

1    MR. CHALOS: Object to the form.
2    A. You know, with respect to the case, I think
3  the answer is no.
4    Q. Okay. I want to talk about your areas of
5  expertise. You're not an expert in epidemiology,
6  are you?
7    A. I use epidemiology in my work all the time,
8  but I don't hold myself out as a -- I'm a
9  pharmaceutical marketing expert.
10   Q. Do you hold yourself out as an expert in
11  addiction medicine?
12   A. I do not, no.
13   Q. Do you hold yourself out as an expert
14  historian?
15   A. No.
16   Q. Do you hold yourself out as an expert in
17  interpretation of pharmacy defendant documents?
18   A. Is there such a category of expert?
19   Q. Well, there was an objection yesterday about
20  interpreting documents. So let me ask, do you hold
21  yourself out as someone who has some specialized
22  training that allows you to describe the meaning and
23  intent of internal company documents?
24   A. I'm not sure I know how to answer.
25   MR. CHALOS: Object to the form. Sorry.

Page 394

1    A. I'm not sure I know how to answer that
2  question because I wasn't aware that there was an
3  area of expertise called "reviewing expert
4  documents," so -- so -- but to that point, I spent
5  the last 35 years of my career evaluating literature
6  and understanding how to take data and interpret
7  that data and then have that -- turn that into an
8  article of publication, a book, some other scholarly
9  work, and have that be reviewed by others.
10   And I've published, you know, literally
11  hundreds of times in -- in peer-reviewed space, so I
12  guess I have an expertise in that area, if there is
13  such an area, but I don't -- I don't really -- I
14  mean, I'm an expert in pharmaceutical marketing. In
15  order to be an expert in pharmaceutical marketing, I
16  have to be able to look at marketing documents,
17  understand and interpret, analyze, synthesize the
18  data from those documents. So, yeah, I think I'm
19  expert in doing that.
20   Q. But you don't hold yourself out as an expert
21  in divining the intent of an author of a document,
22  do you?
23   MR. CHALOS: Object to the form.
24   A. So as a rule, I can never know what someone
25  was thinking. What I can know is what the document

Page 395

1  means in relation to other documents. I can know
2  how that document was, perhaps, used or not used. I
3  can know what the implications of that document were
4  and if any follow-up was done.
5    And this is -- this is integral to the case
6  study analysis methodology, because in a case study
7  analysis, this is what provides the context around
8  the solution of the case.
9    Q. In 2012, when Ms. Singer first contacted you
10  to work on opioid litigation -- I want to focus on
11  the time prior to your first contact with
12  Ms. Singer. Prior to that, had you published
13  anything in peer-reviewed sources related to
14  pharmaceutical opioid marketing?
15   A. I don't think there were any -- any articles
16  that I published during that time period that
17  focused specifically on opioids. I know I had
18  published several studies on drug utilization in
19  general, including use in the elderly, and we
20  evaluated a lot of drugs, including opioids, in that
21  population.
22   I would be happy to tell you about that
23  study if you'd like to hear about it, but there was
24  a pain or analgesia component to that study. The
25  reason I remember that study is because it was

Page 396

1  prior -- just -- just prior to Darvocet being
2  removed from the market, and in that study we found
3  that you had a 254 percent greater chance of dying
4  if you were over the age of 65 and took Darvocet.
5    Q. Any other publications prior to Ms. Singer
6  contacting you that dealt with the marketing of
7  prescription opioid medications?
8    A. I think that's the -- yeah, I think that's
9  the only study that -- no. I think there was one
10  other, but it was, again, focused on the same
11  issues, the use of drugs in the nursing home
12  population and one component of that was opioids and
13  pain -- analgesia in general.
14   Q. Prior to Ms. Singer contacting you, had you
15  ever undertaken the study of the marketing plans or
16  practices of the defendants in this case?
17   A. Yes.
18   Q. Okay. When did you do that?
19   THE WITNESS: Mark, am I allowed to talk
20  about other cases that --
21   Q. Were you disclosed?
22   A. Yes.
23   Q. Okay.
24   THE WITNESS: Does that mean, yes, I talk
25  about it or --

Highly Confidential – Subject to Further Confidentiality Review

Page 397

1      MR. CHALOS:  Well, yeah.  That's -- that's a
2  little bit tricky.  I'm not sure exactly what
3  case you're talking about but --
4      MR. CARTER:  Let's table that, and you can
5  confer on a break --
6      MR. CHALOS:  Yeah, let's do that.
7      MR. CARTER:  -- and figure out how to
8  instruct.
9      MR. CHALOS:  I know there were some cases
10  where he was disclosed but under a protective
11  order, and I'm not sure I've even seen the
12  protective orders in some of those cases but --
13      MR. CARTER:  Okay.
14      MR. CHALOS:  -- we'll -- we'll try to work
15  this out.
16      MR. CARTER:  Okay.
17  BY MR. CARTER:
18      Q.  All right.  Switching gears, a couple of
19  odds and ends and then I'll hand off to someone
20  else.
21      You mentioned around the end of your tenure
22  at Walmart, the beginning of the $4 generic program.
23      A.  Yes, sir.
24      Q.  Now, the $4 program at Walmart did not
25  include controlled substances, CIIs were not in that

Page 398

1  program, true?
2      A.  I'm pretty sure that's true, yes.
3      Q.  You said yesterday that you did not believe
4  you reviewed any documents produced by Walmart in
5  this case.  You made a reference generally in terms
6  of being at a disadvantage because of your material.
7      So I just want to ask you:  Has that changed
8  since yesterday?  Have you recalled any
9  Walmart-produced documents that you reviewed?
10      MR. CHALOS:  Object to the form.
11      A.  I'm glad you said "recalled," because I can
12  tell you that when I got home last night, I didn't
13  even look at anything, I just went straight to bed,
14  but the -- my recollection today is the same as it
15  was yesterday.  I don't remember seeing a lot of, if
16  any, Walmart documents.
17      Q.  Okay.  You mentioned early yesterday morning
18  an individual named Nancy Shepherd?
19      A.  Yes.
20      Q.  Who is she?
21      A.  Nancy is the pharmacist in charge of the
22  store that I worked, it was Store 2811 in Athens.
23      Q.  Okay.  And where does she currently work?
24      A.  I think she may be retired now, but she left
25  Walmart maybe five or six years ago.

Page 399

1      Q.  Do you know the circumstances under which
2  she left Walmart?
3      A.  I do not.
4      Q.  Why did you reach out to her?
5      A.  She was the only Walmart -- I know many
6  Walmart pharmacists.  She was the only one that I
7  had in my phone, and so I called her.
8      Q.  Okay.  Now, did you -- when was it that you
9  called her?
10      A.  A month or two ago.
11      Q.  So by that point, you understood that
12  Walmart was a defendant in this case represented by
13  counsel, right?
14      A.  Yes.
15      Q.  Did you ask anyone for permission to reach
16  out to a former Walmart employee?
17      MR. CHALOS:  Hold on.  Object to the form to
18  the extent you're talking about communications
19  between him and us, which I think are protected.
20      But you can -- except for any communications
21  you had with lawyers on our side, you can answer.
22      A.  No, I did not ask for permission --
23      Q.  Okay.
24      A.  -- nor did I discuss anything about the
25  case.  I just asked the question:  How did Walmart

Page 400

1  order CIIs?  That was it.
2      Q.  Okay.  And was that where the source of your
3  information in terms of the Sunday orders?
4      A.  That was my recollection, but I really
5  couldn't recall if we did anything else.  And Nancy
6  was a long-time Walmart employee, so I figured she
7  would be the person to ask.
8      Q.  When you reached out to Nancy, did you tell
9  her why you were calling?  Did you say you were
10  working as an expert for plaintiffs in litigation
11  and wanted some information about Walmart's
12  practices?
13      A.  No.  As I just said, I just asked her about
14  how CIIs were ordered.  And then we talked about my
15  new grandbaby, and that was the end of the
16  conversation.
17      Q.  Okay.  So when you talked to Ms. Shepherd,
18  she -- well, strike that.
19      Does Ms. Shepherd know you're working as an
20  expert for the plaintiffs in this litigation?
21      A.  I don't think so, no.
22      Q.  Other than that question, is there anything
23  else you asked her about Walmart or this litigation?
24      A.  No.  I asked her how she was doing, that's
25  it.

Page 401

1    Q.   Because it was that single question, I take
2    it you didn't take any notes from that call?
3    A.   No.
4    Q.   Okay.  Did you list Ms. Shepherd or that
5    conversation in your expert report as a reliance
6    material?
7    A.   No.
8    Q.   And based on the limited information you
9    received from her, I take it you don't rely on that
10   for your opinions in this case; is that true?
11   A.   You know, it's my understanding, as an
12   expert, I can -- I can talk to other people about
13   what goes on in the industry, and that's all I was
14   doing.
15   Q.   And my question --
16   A.   Yeah.
17   Q.   -- with respect, is just:  Are you relying
18   on that conversation for purposes of your opinions?
19   A.   No.
20       MR. CHALOS:  Object to the form.
21   Q.   Okay.  Now, on your CV, you don't include
22   the part-time work that you did moonlighting at
23   Walmart, do you?
24   A.   Yes, I do.
25   Q.   Where in your CV was that?

Page 402

1    A.   It's on the first page.  It says community
2    pharmacy practice, and I worked for a number of
3    different employers, so I didn't list them all.
4    There just wasn't room.
5    Q.   Okay.  So --
6    A.   The CV is already 30 some pages long.  I'm
7    trying to keep it shorter.
8    Q.   Okay.  So Walmart would be listed -- would
9    be subsumed within the community pharmacy line of
10   your CV?
11   A.   Yes.
12   Q.   But Walmart was not identified by name?
13   A.   Walmart was not.  None of the -- none of the
14   employers that I've worked for over the years were
15   identified by name, and there are a large number of
16   them.
17   Q.   Okay.  Do you know that Walmart no longer
18   distributes controlled opioids?
19   A.   That's my understanding, yes.
20   Q.   Okay.  Now, when you worked as a community
21   pharmacist, were you aware that opioids posed a risk
22   of addiction?
23   A.   Yes.
24   Q.   Okay.  Were you aware of that back to your
25   training as a pharmacist?

Page 403

1    A.   Yes.
2    Q.   And during your time working the counter as
3    a community pharmacist at Walmart, did you ever
4    violate your corresponding responsibility?
5    A.   No.
6    Q.   Okay.
7        MR. CARTER:  Those are all the questions I
8    have for you.  Thank you.
9        THE WITNESS:  Thank you.
10       MR. CHALOS:  Do you want to stay there?  We
11   could talk about that issue and then come back
12   and --
13       MR. CARTER:  If you're going to -- if folks
14   want to break now; otherwise, do we want to keep
15   moving?
16       MR. CHALOS:  Well, we have to answer your
17   question.
18       MR. CARTER:  Someone -- someone else can
19   follow up on that, or however you want to do it.
20   I don't --
21       MR. CHALOS:  That's fine.  That's fine.  I
22   just don't want to have you come back to answer
23   those questions.
24       MR. CARTER:  Yeah.  Do folks want to take a
25   break or just switch questioners?

Page 404

1        MS. COATES:  Sure.
2        MR. CARTER:  Okay.  We'll take a break.
3        MS. COATES:  Yes, the court reporter wants
4    to take a break.
5        MR. CARTER:  All right.  We'll take a break.
6        THE VIDEOGRAPHER:  We are now going off the
7    video record.  The time is currently 9:34 a.m.
8    This is the end of Media Number 1.
9        (Recess from 9:34?a.m. until 9:51 a.m.)
10       THE VIDEOGRAPHER:  We are now back on the
11   video record with the beginning of Media
12   Number 2.  The time is currently 9:51 a.m.
13   BY MR. CARTER:
14   Q.   I wanted to follow up on the question I
15   asked regarding whether prior to 2012 you had
16   reviewed marketing from the defendants, and so
17   here's my follow-up question:  Prior to Ms. Singer
18   contacting you in 2012, had you ever reviewed
19   marketing materials from any of the defendants in
20   this case specifically related to opioid products?
21   A.   No, I have not.
22       MR. CARTER:  All right.  Thank you.
23   A.   You asked another question that I remembered
24   something to.
25   Q.   Okay.

Page 405

1    A.   You were asking about publications prior to
2  2012.
3    Q.   Yes.
4    A.   The textbook did come out in, I think, 2009,
5  or '10, '11, somewhere in there, and it certainly
6  doesn't deal with opioids specifically, but it deals
7  with all drugs.
8    Q.   Okay.  Does that textbook chapter express
9  the opinion that the aggregate effect of opioid
10  marketing wrongfully increased the demand?
11    A.   It doesn't deal with opioids specifically at
12  all, so that's not --
13    Q.   So that's not in there?
14    A.   It's not in there.
15        MR. CARTER:  All right.  Thank you.  No
16  further questions from me.
17            CROSS-EXAMINATION
18  BY MR. TULLY:
19    Q.   Good morning, Doctor.  My name is Josh Tully
20  on behalf of Cardinal Health.
21    A.   Good morning, Josh, Mr. Tully.
22    Q.   Good morning.  Do you know anything about
23  Cardinal Health's First Fax Program?
24    A.   I don't believe so, no.
25    Q.   Do you know what information was

Page 406

1  communicated through that program?
2    A.   No.
3    Q.   Do you know the intended audience for that
4  program?
5    A.   As I said, I'm not familiar with it, so, you
6  know, I can't help you with that.
7    Q.   Okay.  Do you know anything about Cardinal
8  Health's Order Express service?
9    A.   I can tell you I'm not familiar with any of
10  the specific proprietary methods that Cardinal is
11  using.  I've not -- I've worked in pharmacies that
12  ordered from Cardinal before but it's been so long,
13  I'm sure that systems have changed.  As I said
14  yesterday, my last work experience in community
15  practice where we would have ordered medications was
16  in 2007, so no.
17    Q.   So I would be correct in concluding that you
18  do not -- that you do not know what information was
19  communicated through that program, correct?
20    A.   The first one or the second one that you
21  mentioned?  The answer is the same for both, no.
22    Q.   Okay.  Do you know what information was
23  communicated through Cardinal Health's First Script
24  Program?
25    A.   I don't.  That program seems to ring a bell

Page 407

1  but I can't say that I know what it was.
2    Q.   Do you know the intended audience for that
3  program?
4    A.   No.
5    Q.   Do you know anything about that program?
6    A.   I don't.  As I recall, I thought that that
7  was a autostocking program, it could have been
8  called something else at the time, but I really, as
9  I said, I don't know anything about the proprietary
10  services that are offered by Cardinal.
11    Q.   Okay.  I'll just run through a couple more
12  here just to confirm that.
13        Do you know what information was
14  communicated through Cardinal's Rx Deals Program?
15    A.   Just generally the -- I'm not sure if it was
16  related specifically to the generic sourcing, but it
17  was just pharmacy supply, pharmacy purchasing
18  information.
19    Q.   Do you know anything else about that
20  program?
21    A.   No.
22    Q.   Do you know what information was
23  communicated through Cardinal Health's Service Flash
24  Program?
25    A.   No.

Page 408

1    Q.   Do you know the intended audience for that
2  program?
3    A.   I do not.
4    Q.   Do you know anything about that program?
5    A.   No.
6    Q.   Do you know what information was
7  communicated through the Pharmacy Health Network?
8    A.   Nothing specific, no.
9    Q.   Anything general?
10    A.   Just that there are programs out there that
11  are designed to, you know, provide services to
12  independent and smaller chain pharmacies and I think
13  that was related to those services, but I can't be
14  sure.
15    Q.   Do you know anything else about that
16  program?
17    A.   No.
18    Q.   Yesterday Ms. Rodgers asked you some
19  questions in connection with a text written by
20  Dr. Scott Fishman.  Do you remember that?
21    A.   Yes.
22    Q.   She introduced Exhibit 9 with Bates stamp
23  PPLP004086826, which is one of the documents you
24  cite in Footnote 371.  Do you remember that?
25    A.   I think we still have it here.  So I have

Page 409

1  here Exhibit 9 in front of me.
2  Q.  Okay.  In Footnote 371 you cite two other
3  documents which I will provide you copies of.  The
4  first one is Bates stamped CAH_MDL2804_00846989,
5  which I will mark as Exhibit 11.
6  (Perri Exhibit 11 was marked for
7  identification.)
8  BY MR. TULLY:
9  A.  Give it a good push.  Thank you.
10  Q.  The second document you cite in Footnote 371
11  bears Bates stamp CAH_MDL2804_00866121, which I will
12  mark as Exhibit 12.
13  (Perri Exhibit 12 was marked for
14  identification.)
15  BY MR. TULLY:
16  Q.  So now you have copies of all three
17  documents that you cite in Footnote 371, correct?
18  A.  Yes, I do.
19  Q.  You're welcome to review those documents
20  before I ask you some questions about them, just let
21  me know when you're ready.
22  A.  Okay.  Okay.
23  Q.  Do you see that the first e-mail in both
24  Exhibits 11 and 12 is from the Federation of State
25  Medical Boards?

Page 410

1  A.  Help me understand.  So the first e-mail on
2  12 seems to be from Michael Mone at Cardinal.
3  Q.  So that's the e-mail at the top.
4  A.  Yes.  Are you talking about -- so going
5  backwards?
6  Q.  Going backwards, yes.
7  A.  Gotcha.  Yeah.
8  Q.  Okay.  So the first e-mail in this -- in the
9  e-mail chains in both Exhibit 11, based on the time
10  stamp --
11  A.  Yes.
12  Q.  -- is from the Federation of State Medical
13  Boards, correct?
14  A.  Yes, that's correct.
15  Q.  Do you know what the Federation of State
16  Medical Boards is?
17  A.  I'm not a doctor and I'm not sure how they
18  exactly function, but it is a -- an association of
19  medical boards representing the actual state
20  associations across the country, is my
21  understanding.
22  Q.  Do you agree that the Federation of State
23  Medical Boards approached Cardinal Health regarding
24  a prescriber education proposal?
25  MR. CHALOS:  Object to the form.

Page 411

1  A.  That appears to be the focus of the Jagoda
2  e-mail.
3  Q.  Do you have any reason to doubt the accuracy
4  of my statement?
5  MR. CHALOS:  Object to the form.
6  A.  No, I don't think so.  I think it's
7  definitely a proposal for a CE program.
8  Q.  The subject of the e-mails is:  Ohio
9  Prescriber Education Draft Proposal.  Correct?
10  A.  Yes.
11  Q.  Do you know if Cardinal Health did in fact
12  distribute the Fishman text?
13  A.  I need to -- I would need to look at the
14  balance of the references in that section because
15  according to these documents, it doesn't nail that
16  down for sure, no.
17  Q.  By balance of the documents --
18  A.  So the sentence of this is cited from -- has
19  four -- 370 through 373 listed, and there are a
20  number of documents there, so I would need to look
21  at all of those to make sure, because either -- if I
22  don't have evidence that this was a plan, it was
23  simply included to demonstrate that this was
24  something that was on the radar, this was something
25  that was being considered, which certainly is

Page 412

1  important to a marketing analysis.
2  If you're representing that it never went
3  out, that's okay with me, I don't have a problem
4  with that.
5  Q.  I'm just trying to understand the basis for
6  your assertion yesterday in which you said you
7  thought that Cardinal Health did in fact distribute
8  the Fishman text?
9  A.  I --
10  MR. CHALOS:  Object to the form.
11  A.  If I said that yesterday, I probably should
12  have said that it was -- I may -- I need to verify
13  that.
14  Q.  Okay.
15  A.  Yeah.
16  Q.  Are you able to verify it based off of any
17  of the documents you cite in Footnote 371?
18  A.  So based on 371 alone, I don't think so.  I
19  don't think I can guarantee that Cardinal
20  participated in this program, but I think the answer
21  to that can be figured out, yes.
22  Q.  Okay.  As you sit here today, do you recall
23  any other documents that suggest to you that
24  Cardinal Health did in fact distribute the Fishman
25  text?

Page 413

1    A.  You know, I -- as far as specifically the
2  Fishman text, I just -- I can't recall.  I'd need to
3  look at my -- at the documents that I have and see
4  if I can track down an answer to that.
5    Q.  Which other documents would you look at?
6    A.  All of the documents related to Cardinal
7  Health to see if there is anything in those
8  documents that are -- that takes us a step further
9  from the proposal stage to actual implementation.
10  So I know I've looked at various plans from the
11  marketing defendants that were geared towards
12  distribution of that book.  I, for some reason, I
13  had it in my head that Cardinal did participate in
14  the distribution of that, I could be wrong about
15  that.  Either way, it's not critical to my opinions
16  in terms of the overall marketing because certainly,
17  if nothing else, this shows that the Fishman text,
18  which we can talk about, was being considered as a
19  -- potentially being distributed by Cardinal, and
20  from a marketing perspective, it reflects more so on
21  the marketers, the marketing defendants, than the
22  distributor, but I really don't know what else to
23  say about that.
24    Q.  When you mentioned that you would need to
25  look at all of the documents related to Cardinal

Page 414

1  Health, are you referring to all of the documents
2  that Cardinal Health has produced in this case?
3    A.  Specifically, I was referring to the
4  documents that I have either found through my own
5  searches or documents that have been provided to me
6  by the attorneys when I requested documents related
7  to Cardinal and the other distributors.
8    Q.  Would that include documents on the
9  Relativity database that you referenced yesterday?
10    A.  Yes.
11    Q.  Other than the Fishman text, have you cited
12  any other documents in your report that you maintain
13  were distributed by Cardinal Health, McKesson or
14  AmerisourceBergen that contain the three themes on
15  Pages -- on Page 81 of your report?
16    A.  I don't think you want me to take the time
17  here to go through each and every instance in the
18  report.  I can tell you that substantively, though,
19  the -- as I said yesterday, the messages that were
20  -- the most common messages were those focused on
21  the sales to pharmacies related to price, quality,
22  availability, the generic sourcing, all of that.
23        There were instances where information like
24  this was noted, but as in this case, I can't say for
25  sure that it was sent out.  I can, if you want me to

Page 415

1  take the time, I can look through the report and
2  verify that there are no other examples in my
3  report.  It seems to me that in this report there
4  are examples of continuing education that were
5  sponsored, but I can't state for sure without
6  looking, so --
7    Q.  All right.  Turning to Footnote 370 of your
8  report, you reference a document bearing Bates Stamp
9  PPLPC004000083256, which you describe as, quote:
10  "Cardinal Health OxyContin Communication Plan,
11  September 2006."
12        Do you see that?
13    A.  I have it as 83258 in my report.
14    Q.  Oh, so you do.  Correct, yeah, you've got
15  the correct number there.
16    A.  Okay.
17    Q.  That document was a proposed communication
18  plan for Purdue, correct?
19    A.  I would need to see it to remember for sure.
20  There have been a lot of documents that I've looked
21  at, so --
22    Q.  Would it have been a proposed communication
23  plan for anyone other than Purdue?
24        MR. CHALOS:  Object to the form.
25    A.  As I said, I need to look at it.  I don't --

Page 416

1  I don't recall the document by the Bates number,
2  so --
3    Q.  Do you recall the document by how you
4  described it?
5    A.  You know, when I write these, I try to make
6  it so that I can remember it.  That gets harder and
7  harder to do as the report gets longer and longer,
8  and there are, you know, over 400 -- 400 footnotes
9  citing multiple documents in each footnote, so there
10  is -- I mean, conservatively, there is probably 1500
11  documents cited in the report.  I can't just
12  remember all of them.  I'm sorry.
13    Q.  Do you know whether that proposed plan was
14  actually implemented?
15    A.  I can't answer any questions about that
16  document without seeing it.
17    Q.  Well, the document is just a proposal.
18        MR. CHALOS:  Object to the form.
19    Q.  So I want to know if you have any basis to
20  believe that the proposed plan was actually
21  implemented?
22        MR. CHALOS:  Object to the form.
23    A.  As I said, I can't answer any questions
24  about it.  I can -- if you tell me that it was a
25  proposal, I can tell you that in my way of analyzing

Page 417

1  a case, if it was a proposal, I would not draw any
2  conclusions from it other than those that would be
3  related to a project being a proposal. I wouldn't
4  take a quantum leap and assume that it was
5  implemented.
6         However, as I mentioned with regard to these
7  other documents, there is value in knowing that
8  things were being considered, things were being
9  planned. Some things get implemented and some
10 things don't. In fact, some things get planned,
11 they get developed and they never happen. So those
12 are all things that occur, and I take that into
13 consideration when I do an analysis like this.
14        So if you have some specific question about
15 that document, I'd love to see it so I can recall it
16 and understand what we're talking about here.
17    Q. The only question I have about it is sitting
18 here today, do you know whether that proposed plan
19 was implemented?
20    MR. CHALOS: Object to the form.
21    A. As I said, I can't answer that question
22 unless I see the document so I can make sure that it
23 was a proposal and that there is nothing in that
24 document that suggests that it was indeed
25 implemented, yeah.

Page 418

1         And also, one of the things I do look for
2  whenever I see something like that, I look for cover
3  e-mails and things so that I know -- there is the
4  proposal and then there is a cover says, great,
5  we're funded, let's go forward. Or it says, hey, we
6  can't afford to do this now. Or there is no cover
7  e-mail at all, in which case I have no information.
8         And I can tell you for many of these, the
9  cover e-mails were simply not present. So sometimes
10 I knew, sometimes I didn't. I keep the documents
11 into the categories of what information they can
12 provide. I take it no further than that. If it was
13 a proposal, it was a proposal, that's all.
14    Q. Okay. So other than the document that you
15 reference here, ending in Bates Number 58, you're
16 not aware of any other document that would suggest
17 that this plan was in fact implemented, correct?
18    A. As I sit here right now, based on the
19 conversation we've just had, I would agree with
20 that.
21    MR. TULLY: I have no further questions.
22    THE VIDEOGRAPHER: We are now going off the
23 video record. The time is currently 10:14 a.m.
24    (Recess from 10:14 a.m. until 10:20 a.m.)
25    THE VIDEOGRAPHER: We are now back on the

Page 419

1  video record. The time is currently 10:20 a.m.
2         CROSS-EXAMINATION
3  BY MR. GALIN:
4    Q. Dr. Perri, my name is Ross Galin. I'm from
5  O'Melveny & Myers and I represent Janssen and J&J in
6  this matter. I would say nice to meet you but we've
7  been sitting beside each other for many hours now.
8         Bear with me, if you would. I am going to
9  attempt to streamline my questions for you that will
10 most likely result in a fair amount of me fumbling
11 about trying to put jigsaw pieces together after
12 having crossed stuff out that my colleagues have
13 already asked you about, so I apologize if I'm
14 fumbling about, but I do want to preserve some of
15 their time and your time and don't want to retread
16 ground.
17        But with that said, there is a -- there are
18 a couple of pieces of retreading, ground to be
19 retread just briefly to set the parameters.
20        Am I correct, based on what I have heard in
21 your testimony so far, that you are not offering any
22 Janssen-specific opinions in your report or
23 testimony?
24    A. Yes, that's correct. The opinions are not
25 specific to any one defendant, and that includes all

Page 420

1  defendants. They are general aggregate opinions
2  about all of the defendants in this matter.
3    Q. Okay. And if called to testify at trial,
4  you will not be offering any Janssen-specific
5  opinions; is that correct?
6    A. Yes, that is correct.
7    MR. CHALOS: Object to the form.
8    A. That's correct.
9    Q. Another point that has come up repeatedly,
10 so I apologize but I'm doing my housekeeping: You
11 have no opinions that you are offering as to whether
12 any Janssen marketing claims are false or
13 misleading; is that correct?
14    A. That's correct. The assessment of the false
15 and misleading nature of the ads was done by other
16 experts.
17    Q. And consistent with that, my understanding,
18 based on your testimony in this matter so far, is
19 that to the degree that you are making
20 determinations about false or misleading, is
21 based on reliance on -- I believe you listed five
22 other experts retained by plaintiffs in this matter;
23 is that correct?
24    A. Yes. There was one additional. It was the
25 FDA warning letters as well, so -- but you're

Page 421

1 correct in the five other experts.
2  Q.  And is there a particular FDA warning letter
3 directed at Janssen on which you are relying?
4  A.  I don't want to take your time now to look
5 through here.  I don't recall -- somewhere in the
6 report there is a list of the specific warning
7 letters.  I can't recall if there was a Nucynta
8 letter or not.
9  Q.  Okay.
10  A.  I want to leave that open that I can correct
11 that when I figure that out.
12  Q.  Well, how about if we -- are you willing to
13 agree that if the warning letter is not listed in
14 the report, in this section, it is not something
15 you're relying on?
16  A.  Yes.
17  Q.  Okay.  Let me apologize up front again for
18 what will be something of a slog here, but I just
19 want to go through this.  Can I ask you to look at
20 Exhibit 1, which is your report, as you are
21 familiar.
22  A.  Yes.
23  Q.  And if I could ask you to turn to Table II
24 on Page 86.
25  A.  I'm there.

Page 422

1  Q.  Okay.  Now that I've done that, I'm actually
2 going to -- well, first, you've testified several
3 times that what the table reflects is messages that
4 you've seen, representative messages across the
5 various defendants in this case, put into various
6 categories that are listed A through X, correct?
7  A.  Correct.
8  Q.  Okay.  Can I ask you to skip to Page 92, if
9 you would, and we'll begin our little bit of a slog
10 here, which is to say you see D on Page 92 is:
11 "Minimize concerns about addictive nature of
12 opioids."
13    And 90 -- and D covers Pages 92 to 93 in
14 your report, correct?
15  A.  Yes.
16  Q.  Am I correct that you do not list any
17 Janssen documents in this section of the table?
18  A.  In Part D of Table II I do not see any
19 Janssen documents.
20  Q.  Okay.  Can I ask you to look below that in
21 Letter E?  It reads:  "Science now showing opioids
22 are not as addictive as once thought."
23    Is that correct?
24  A.  That's correct.
25  Q.  And there are three documents listed in

Page 423

1 Section E of the table, correct?
2  A.  Yes.
3  Q.  None is a Janssen document, correct?
4  A.  That's correct.
5  Q.  Okay.  If we turn to Page 100, H:  "Problems
6 only occur when opioids are abused or used
7 illegally - addicts are bad people who knowingly
8 abuse the drugs, not good people who were seeking
9 treatment for legitimate ailments."
10    Did I read that correctly?
11  A.  Yes.
12  Q.  And the documents listed under H span from
13 Page 100 of the report into Page 101; is that
14 correct?
15  A.  It is.
16  Q.  And no Janssen document is listed there,
17 correct, in that section, correct?
18  A.  That's correct.
19  Q.  Okay.  And if we go down to -- if we move
20 ahead to Page 111 -- you're probably picking up on
21 the theme here.
22  A.  Yes.
23  Q.  Letter N, that category is:  "Even patients
24 at high risk of addiction can be safely prescribed
25 opioids by using risk-mitigation strategies such as

Page 424

1 pain contracts."
2    Did I read that correctly?
3  A.  Yes.
4  Q.  And that letter, the documents under Letter
5 N span from Page 111 into Page 112, correct?
6  A.  Yes.
7  Q.  And again, am I correct that there are no
8 Janssen documents listed in this portion of the
9 table?
10  A.  You are correct.
11  Q.  Okay.  If we could move ahead to Page 114,
12 I'll direct your attention to Letter P:
13 "Undertreated pain should be treated with opioids."
14    Did I read that correctly?
15  A.  Yes.
16  Q.  Okay.  And P spans from 114 to the top of
17 Page 116; is that correct?
18  A.  Yes.
19  Q.  And am I correct that, again, no Janssen
20 documents are listed in this section of the report?
21  A.  You are correct.
22  Q.  Okay.  Page 116, Q:  "There is more risk of
23 leaving pain untreated than using opioids to treat
24 pain. "
25    Did I read that correctly?

Highly Confidential - Subject to Further Confidentiality Review

Page 425

1   A.   Yes.
2   Q.   And Q lasts all the way to Page 118?
3   A.   Yes.
4   Q.   Okay.  And am I correct that there are no
5   Janssen documents listed in that section of this
6   report as well?
7   A.   Yes, you are.
8   Q.   Okay.  And below on Page 118, R is:
9   "Opioids offer more effective pain control and are
10  safer than alternatives."
11       And I believe that is only on Page 118.  Am
12  I correct that under Letter R there are no Janssen
13  documents listed?
14  A.   Yes, you are.
15  Q.   Okay.  We could go ahead to Page 123, easier
16  said than done for me, apparently.  At the bottom of
17  123, Letter U is:  "Opioids can be prescribed for
18  any pain condition without risk."
19       Did I read that correctly?
20  A.   You did.
21  Q.   And Section U, so to speak, runs from 123 to
22  the top of 125; is that correct?
23  A.   Yes.
24  Q.   And again, no Janssen documents are listed
25  in that section of the table, correct?

Page 426

1   A.   Yes.
2   Q.   Okay.  Also on Page 125, there are two
3   documents listed under V, which is:  "Opioids can be
4   prescribed to any age group without risk."
5       Is that correct?
6   A.   Yes, sir.
7   Q.   And again am I correct that neither of the
8   documents are Janssen documents?
9   A.   You are.
10  Q.   All right.  And good news, I get to say
11  finally, on Page 125, W is:  "'Round the clock'
12  dosing should be used for chronic pain rather than
13  'as needed' dosing."
14       And W runs from 125 to Page 126; is that
15  correct?
16  A.   That is correct.
17  Q.   And am I correct that there are no Janssen
18  documents listed in that section?
19  A.   Yes, you are.
20  Q.   All right.  Thank you.  Dr. Perri, I just
21  want to ask you a couple of questions or a few
22  questions.
23       Do you agree that chronic pain is a serious
24  medical condition?
25       MR. CHALOS:  Object to the form.

Page 427

1   A.   So it's -- of course it's out -- that's
2   outside the scope of what I did here, but as a
3   pharmacist, I would agree that chronic pain is
4   serious, yes.
5   Q.   Okay.  And will you agree with me that
6   chronic pain affects millions of people in the
7   United States?
8       MR. CHALOS:  Object to the form.
9   A.   If you have a statistic, I'd be happy to
10  entertain it.  I don't -- I don't follow the
11  numbers, so I can't say that it affects millions or
12  tens of millions, I just don't know, but I agree
13  it's a serious problem and a lot of people are
14  affected.
15  Q.   Okay.  And will you agree with me that
16  chronic pain affects people in Summit County, Ohio
17  and Cuyahoga County, Ohio?
18       MR. CHALOS:  Object to the form.
19  A.   Certainly, yes.
20  Q.   Okay.  Will you agree with me that there are
21  risks associated with untreated chronic pain?
22       MR. CHALOS:  Object to the form.
23  A.   So I have to be real careful here because I
24  don't -- I don't want to, you know, go beyond my
25  ability to have a basis for knowing that, and I'm

Page 428

1   not a doctor and so I can't really evaluate what
2   patients face for not being treated for pain, and I
3   think there are other experts that are better suited
4   to answer that question.
5   Q.   So if I were to ask you questions, as I have
6   been to a degree, about the treatment of pain, is it
7   your position that your answers would be that you
8   are not an expert and able to answer those
9   questions?
10  A.   Yeah, I'm not an expert on pain management,
11  so I don't hold myself out as one and I -- I am a
12  pharmacist, so I've provided care to patients who
13  are in pain, but it's very different than diagnosing
14  and following and monitoring and caring for a
15  patient over a long period of time who has chronic
16  pain.
17  Q.   Okay.  Well, would you agree with me that
18  it's the role of the prescribing physician to weigh
19  the risks and benefits of any pain medications when
20  treating an individual with pain patient?
21  A.   Yes, I would, I would agree with that
22  statement.
23  Q.   Okay.  Would you agree with me that for some
24  patients opioids may be the only effective treatment
25  for chronic noncancer pain?

Page 429

1     MR. CHALOS:  Object to the form; also
2  outside the scope of his opinions.
3     A.  You know, again, the -- to talk about these
4  kinds of issues -- I realize it's important for you
5  to do that and I want to try to give you an answer,
6  but I have to qualify it and say that, you know,
7  this is not what I did in my analysis here.  I can
8  answer that question as a pharmacist, and -- you
9  know, so given that, my sentiment about that is, is
10  that that's a downstream conclusion.  When a patient
11  is first starting out, there are always alternatives
12  and it may end up that some of those patients end up
13  that an opioid is the only alternative, I agree with
14  that, but at the beginning of care -- and there's a
15  lot of -- a lot of the messages in these tables that
16  we just went through focused on using opioids sooner
17  in the disease process, using them preferentially.
18     So I think I want to be real careful and
19  just say that the end result, it's possible that
20  opioids might be the only alternative for a patient,
21  but getting to that point, it's -- that's definitely
22  not true.
23     Q.  Okay.  Thank you.  Dr. Perri, you've said in
24  some form throughout your testimony over the last
25  day, and now a quarter, so -- that there is a drug

Page 430

1  problem in this country.  And am I correct that
2  you've testified in this deposition that there is a
3  drug problem in this country?
4     MR. CHALOS:  Object to the form.
5     A.  I know we've talked about that.  I believe
6  that there is a drug problem in this country, yes.
7     Q.  Okay.  And I take it you believe there --
8  well, I'll just ask you.
9     Do you believe there is a drug problem in
10  Cuyahoga County?
11     A.  I think it exists everywhere in the United
12  States, and probably other places in the world too.
13     Q.  Okay.  And do you believe that drug problem
14  involves heroin?
15     MR. CHALOS:  Object to the form; beyond the
16  scope of his opinions here.
17     A.  So, you know, I mentioned earlier I'm not an
18  expert in pain management, and I'm also not an
19  expert on addiction.  I've done some work in the
20  area, so I'm familiar with -- I've published in the
21  area of opioids, so I've read a lot of literature
22  about it, but, you know, I didn't -- I didn't look
23  at anything in my review of this case that focused
24  on illicit drug utilization.  I was completely
25  focused on the prescription opioid market.

Page 431

1     Q.  I'll just ask this one last question:  Do
2  you believe that the drug problem in this country
3  that you've referred to predates the 1990s and the
4  growth that you've discussed of opioids?
5     MR. CHALOS:  Object to the form.
6     A.  So I didn't -- I didn't really do a
7  historical review, and I know -- I know another
8  expert did, so I think we can defer to that expert
9  to get an answer to that question.
10     I think the data that I did see, the data
11  points that were identified through my analysis of
12  the marketing of defendants certainly indicate that
13  there was a point in time in the mid '90s where the
14  opioid utilization began to increase rapidly and
15  sustainably for many years, and alongside that there
16  was a parallel track of a growing, you know,
17  national, literally, catastrophe about drug use.
18     And so with that background and caveat that
19  I'm not a historian, I think that's about as much as
20  I can stay about it.
21     Q.  Okay.  I'm going to try to get the payoff
22  now from all this premarking we did.
23     MR. CHALOS:  Wait, I thought that was just
24  your one last question.
25     MR. GALIN:  Only on that.  The judge I

Page 432

1  clerked for, by the way, always said never trust
2  a lawyer who tells you he only has one question.
3     MR. CHALOS:  That one question in 86 parts.
4     MR. GALIN:  Yeah.  That's the old Rodney
5  Dangerfield.
6     (Perri Exhibit 13 was marked for
7  identification.)
8  BY MR. GALIN:
9     Q.  I'm going to show you what has been
10  premarked as Exhibit 13.
11     MR. GALIN:  I'll throw those over.  I
12  suppose if I were more adept, I would use the
13  Elmo now, but I think that's probably only going
14  to make this --
15     MR. CHALOS:  Are they both the same?
16     MR. GALIN:  Yes.  Yeah.
17     MR. CHALOS:  Okay.
18     MR. GALIN:  That's only going to make things
19  last longer.
20  BY MR. GALIN:
21     Q.  Dr. Perri, do you recognize this document?
22     A.  Yes, I do.
23     Q.  What is this?
24     A.  Duragesic package insert.
25     Q.  This is the FDA-approved package insert for

Highly Confidential - Subject to Further Confidentiality Review

Page 433

1 Duragesic?
2   A. It appears to be, yes.
3   Q. Okay. And because I don't believe the date
4 is on here --
5   A. 1990.
6   Q. There you go. I'm glad you found it,
7 because I didn't. It is the 1990 insert?
8   A. Uh-huh.
9   Q. Could you read for me below the Duragesic,
10 the header, the first thing that is stated on the
11 label?
12   A. "Fentanyl transdermal system."
13   Q. Okay. And then, I'm sorry, right below
14 that?
15   A. "Warning: May be habit forming."
16   Q. Okay. Can I ask you to turn to -- I
17 apologize, the page numbers aren't numbered but to
18 -- if you go one, two -- three pages in. I
19 recognize that they are double-sided. I'm talking
20 about the actual page rather than the page number.
21 At the top of the page it says "Chronic Pulmonary
22 Disease."
23   A. Yes.
24   Q. Okay. We're on the same page. I'll give
25 your attorneys a chance to make sure that they are

Page 434

1 there.
2     MR. CHALOS: I lost you. Three pages in?
3     MR. GALIN: It's three full pages, not on
4 both. The top is "Chronic Pulmonary Disease."
5     MR. CHALOS: Oh, the back of the third page.
6     MR. GALIN: Yeah.
7     MR. CHALOS: Okay. Got it. I'm there.
8     MR. GALIN: Later, when we have section
9 numbers, it will get a lot easier.
10 MR. GALIN:
11   Q. If I were to direct your attention about
12 just halfway down, do you see in there that it's
13 Drug or Abuse [sic] Dependence, that section?
14   A. I do.
15   Q. All right. Would you mind reading the text
16 under that header for me?
17   A. "Use of Duragesic in combination with
18 alcoholic beverages and/or other CNS depressants can
19 result in increased risk to the patient. Duragesic
20 should be used with caution in individuals who have
21 a history of drug or alcohol abuse, especially if
22 they are outside a medically controlled
23 environment."
24   Q. Can we flip over a page now? Again I'm
25 using pages. It's about two pages of text beyond.

Page 435

1 You see at the top there is a section "Drug Abuse
2 and Dependence."
3   A. Yes.
4   Q. Okay. To be fair, I'll bear the brunt of
5 reading at this point. It says: "Fentanyl is a
6 Schedule II controlled substance and can produce
7 drug dependence similar to that produced by
8 morphine. Duragesic therefore has the potential for
9 abuse."
10     Did I read that correctly?
11   A. Yes, you did.
12   Q. Okay. I believe, but let me confirm, that
13 is all I'd like with this exhibit, so you can set
14 that one aside.
15     (Perri Exhibit 14 was marked for
16 identification.)
17 BY MR. CHALOS:
18   Q. I am now going to show you what has been
19 marked as Exhibit 14. I'll throw that and try not
20 to wound anyone. These get thicker by the moment.
21     MR. CHALOS: Wait. 14?
22     MR. GALIN: Yes.
23     MR. CHALOS: This one was --
24     MR. GALIN: That was 13.
25     MR. CHALOS: Oh, okay. Thank you.

Page 436

1 BY MR. GALIN:
2   Q. Dr. Perri, do you recognize this document?
3   A. This a later package insert, prescribing
4 information, for Duragesic as well.
5   Q. All right. And maybe you've identified the
6 date on your own, but if not, I will represent to
7 you that this is the 2005 Duragesic package insert.
8   A. Actually, is it 2005? I thought it was
9 earlier than that. Yeah, it's 2003.
10   Q. Yes, this is 2003. Excuse me. I apologize.
11 I think this is actually the one that was in effect
12 in '05 but was modified in '03.
13   A. Yes.
14   Q. So just so that we're clear, just so you're
15 aware, I'm showing you from what was in effect in
16 '05 but was approved in '03.
17   A. Yes.
18   Q. Do you recognize -- I'll just -- on the
19 front page of this you see that there is text that
20 is inside a black outlined box that continues on to
21 Page 2 of the label?
22   A. I see that.
23   Q. And am I correct this is what is typically
24 referred to as a black box warning?
25   A. You're correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 437

1    Q.   What is a black box warning, Dr. Perri?
2    A.   It is a -- in my mind, the way I consider a
3 black box warning is a flag that goes up that says,
4 hey, be careful with this drug because it has some
5 special considerations that people need to know
6 about before they prescribe it.  It doesn't mean
7 don't use it, it doesn't mean that using it is going
8 to have a negative outcome automatically.  It just
9 means be aware, prepare the patient for whatever
10 potential could befall them, make sure they are
11 ready to deal with anything that could come up, and
12 that the prescriber, the pharmacist, anyone involved
13 in their care is aware of the added danger that
14 exists along with the use of this medication.
15   Q.   Okay.  There are warnings and precautions in
16 every FDA-approved label; is that correct?
17   A.   Yes.  The black box warning does go a little
18 bit further than that.  It sets it apart and makes
19 sure that you see that first.
20   Q.   In fact, am I correct that the black box
21 warning is meant to signal the most pressing of
22 warnings and draw extra attention to the prescriber
23 about the concerns included within the black box; is
24 that correct?
25        MR. CHALOS:  Object to the form.

Page 438

1    A.   Yeah, I think that's consistent with what I
2 described.  I used different words but I think it's
3 consistent.
4    Q.   So let me ask it this way.  Not all products
5 have black box warnings, correct?
6    A.   Yes, that's true.
7    Q.   What -- what prompts a black box warning for
8 a product as opposed to one that doesn't have one?
9        MR. CHALOS:  Object to the form.
10   A.   Yeah, so I, you know, I've said many times
11 I'm not an FDA expert so I can't tell you the exact
12 criteria that they use, but my understanding as a
13 pharmacist about when a drug gets a black box
14 warning is when we have what are called
15 postmarketing surveillance data, or something we've
16 learned about the drug since it's been on the market
17 that needs to be included in the labeling that
18 warrants special attention.
19   Q.   Okay.  And will you agree with me that the
20 purpose of the black box warning is to convey to the
21 prescriber that there are particular heightened
22 risks associated with the product bearing the black
23 box warning?
24        MR. CHALOS:  Object to the form.
25   A.   I think we're saying the same thing, yes.

Page 439

1    Q.   Okay.  Just wanted to make sure.
2        Would you mind reading to me the first
3 paragraph within the black box warning?
4    A.   Yes, and I will read it slowly.
5    Q.   Sorry.
6    A.   "Duragesic contains a high concentration of
7 a potent Schedule II opioid agonist, fentanyl.
8 Schedule II opioid substances which include
9 fentanyl, hydromorphone, methadone, morphine,
10 oxycodone, and oxymorphone have the highest
11 potential for abuse and associated risk of fatal
12 overdose due to respiratory depression.  Fentanyl
13 can be abused and is subject to criminal diversion.
14 The high content of fentanyl in the patches
15 (Duragesic) may be a particular target for abuse and
16 diversion."
17   Q.   Thank you, Doctor.  If we flip over to
18 Page 2, we're still in the black box warning,
19 correct?
20   A.   Yes.
21   Q.   If you look down into the fourth paragraph,
22 am I correct that it reads:  "Duragesic can be
23 abused in a manner similar to other opioid agonists,
24 legal or illicit.  The risk should be considered
25 when administering, prescribing or dispensing

Page 440

1 Duragesic in situations where the health care
2 professional is concerned about increased risk of
3 misuse, abuse or diversion."
4        Did I read that correctly?
5    A.   Yes.
6    Q.   Okay.  And that is within the black box
7 warning of this 2003-2005 period label?
8    A.   Yes.
9    Q.   I'm going to attempt to help the court
10 reporter.  I don't know if that helps or not.
11       And then the next paragraph down, midway
12 into it, this is the paragraph that begins:
13 "Persons at increased risk for opioid abuse
14 include..."
15       And then the next sentence says:  "Patients
16 should be assessed for their clinical risks for
17 opioid abuse or addiction prior to being prescribed
18 opioids.  All patients receiving opioids should be
19 routinely monitored for signs of misuse, abuse and
20 addiction."
21       Is that correct?
22   A.   Yes.
23   Q.   Okay.  I'm now going to flip ahead in this
24 to Page 11.  Happily we now have page numbers so it
25 should be easier to find.  And in this section you

Page 441

1  will see there is a section towards the bottom of
2  the page, "Misuse, Abuse and Diversion of Opioids,"
3  correct?
4      A.  Yes.
5      Q.  And again, this section discusses that:
6  "Fentanyl is an opioid agonist of the morphine-type.
7  Such drugs are sought by drug abusers and people
8  with addiction disorders and are subject to criminal
9  diversion."
10     Did I read that correctly?
11     A.  You did.
12     Q.  And the next paragraph is:  "Fentanyl can be
13 abused in a manner similar to other opioids, legal
14 or illicit."
15     And is actually -- it goes on, it's a
16 similar -- the similar warning to what we just read
17 in the black box section, correct?
18     A.  It is, yes.
19     Q.  Okay.  And if we page ahead, I think we can
20 set this -- okay.  Let's set this one aside, as fun
21 as it is reading labels.
22     You can put that aside, Dr. Perri.
23     (Perri Exhibit 15 was marked for
24 identification.)
25 BY MR. GALIN:

Page 442

1      Q.  I will now show you what has been marked
2  Exhibit 15.
3      MR. GALIN:  Oops.  I'm trying to balance the
4  getting it to you without being aggressive.
5  BY MR. GALIN:
6      Q.  All right.  Do you recognize this document,
7  Dr. Perri?
8      A.  I believe so, yes.  I know what it is, yes.
9      Q.  Okay.  This is the current -- I will
10 represent to you this is the current Duragesic
11 package insert, and if you flip to the very last
12 page you will see it's dated 2009, so it's the label
13 that's been in effect since 2009.
14     A.  Right.
15     Q.  Do you agree with me that that's what this
16 is?
17     A.  I believe that to be the case, yes.
18     Q.  Okay.  Again, I'll have you look, if you
19 would, at the first page of this, and again am I
20 correct that there is a black box warning?
21     A.  There is.
22     Q.  And would you read for me the first portions
23 or the title of the black box warning?
24     A.  "Warning:  Addiction, abuse and misuse;"
25     Q.  I'll let you stop.  I won't make you read

Page 443

1  the whole thing, unless you feel it necessary.
2      A.  No.
3      Q.  But that's -- okay.  So the start of this
4  black box warning calls out addiction, abuse and
5  misuse risk; is that correct?
6      A.  It does.
7      Q.  Okay.  And then if we go down the first --
8  there are bullets under the header for this black
9  box warning, correct?
10     A.  There are.
11     Q.  And the first bullet, would you mind -- I
12 hate to keep having you read, but read in the first
13 bullet into the record for me, please.
14     A.  "Duragesic exposes users to risks of
15 addiction, abuse and misuse, which can lead to
16 overdose and death.  Assess patient's risk before
17 prescribing, and monitor regularly for these
18 behaviors or conditions."
19     Q.  Okay.  And can I trouble you to read to
20 second one for me?
21     A.  "To ensure that the benefits of opioid
22 analgesics outweigh the risks of addiction, abuse
23 and misuse, the Food and Drug Administration (FDA)
24 has required a Risk Evaluation and Mitigation
25 Strategy (REMS) for these products."

Page 444

1      Q.  Okay.  And then to give you a break, I'll
2  take over.  On the fifth bullet down, it reads:
3  "Prolonged use of Duragesic during pregnancy can
4  result in neonatal opioid withdrawal syndrome which
5  may be life-threatening if not recognized and
6  treated."
7      Did I read that correctly?
8      A.  Yes.
9      Q.  Okay.  Can I ask you to page ahead to
10 Page 13, which is Section 5 of the label?  Are we
11 there?
12     A.  Yes.
13     Q.  Great.  Would you mind reading the title of
14 Section 5.1 to me under the warnings and precautions
15 section?
16     A.  "Addiction, Abuse, and Misuse."
17     Q.  Okay.  And could I trouble you to read that
18 first paragraph?
19     A.  "Duragesic contains fentanyl, an opioid
20 agonist and a Schedule II controlled substance.  As
21 an opioid, Duragesic exposes users to the risks of
22 addiction, abuse, and misuse.  Because
23 modified-release products such as Duragesic deliver
24 the opioid over an extended period of time, there is
25 a greater risk for overdose and death due to the

Page 445

1  larger amount of fentanyl present."
2      Q.  Thank you.  And then the second paragraph
3  reads:  "Although the risk of addiction in any
4  individual is unknown, it can occur in patients
5  appropriately prescribed Duragesic.  Addiction can
6  occur at recommended doses and if the drug is
7  misused or abused."
8          Did I read that correctly?
9      A.  Yes.
10     Q.  And then the next paragraph reads:  "Assess
11  each patient's risk for opioid addiction, abuse, or
12  misuse prior to prescribing Duragesic, and monitor
13  all patients receiving Duragesic for the development
14  of these behaviors and conditions.  Risks are
15  increased in patients with a personal or family
16  history of substance abuse (including drug or
17  alcohol abuse or addiction) or mental illness (e.g.,
18  major depression)."
19         Did I read that correctly?
20     A.  I think so.
21     Q.  All right.  5.1 continues on the next page
22  and mentions that:  "Opioids are sought by drug
23  abusers and people with addiction disorders and are
24  subject to criminal diversion.  Consider these risks
25  when prescribing or dispensing Duragesic."

Page 446

1          Do you see that?
2      A.  Yes.
3      Q.  And Section 5.2 discusses opioid analgesic
4  Risk Evaluation and Mitigation Strategy, REMS.
5          Dr. Perri, what is a REMS?
6      A.  It's exactly what the name suggests.  It's a
7  way to -- it's a mandated program that's designed to
8  help enure that drug use will be appropriate by
9  implementing a few steps, for example, having people
10  who prescribe a drug with a REMS complete an
11  educational program related to that product or the
12  REMS program itself, it includes information to be
13  passed out.  It includes warnings and precautions
14  and other information that prescribers would need to
15  know, pharmacists would need to know in order to
16  make sure the patient was prescribed and monitored
17  properly.
18     Q.  Am I correct that the purpose of a REMS in
19  this situation is to ensure that patient -- or
20  excuse me, that physicians are well educated on the
21  risks associated with using this product?
22         MR. CHALOS:  Object to the form.  It's
23      outside the scope of his opinions here.
24     A.  The -- to the extent that the -- that most
25  of the REMS that I'm familiar with require some type

Page 447

1  of education program, I guess that would -- that
2  would mean that your statement is true.  I haven't
3  evaluated that or I'm not an expert on REMS programs
4  to tell you that they are effective or not
5  effective, but I think certainly the intent of the
6  REMS, as I understand it as a pharmacist, even
7  though it's not really related to what I did here,
8  was to make sure that the information that needed to
9  be out in the marketplace about a particular drug
10  would be there, and precautions were in place.
11     Q.  You've said, and your lawyer objected that
12  it's outside the scope of what you've done here, you
13  said you didn't review it, but you did in fact cite
14  to the REMS documents and training materials in your
15  report, did you not?
16     A.  Yes, I referenced the REMS programs and I'm
17  generally familiar with them, but I don't -- I did
18  not evaluate whether any of them were effective at
19  accomplishing their goals or not.
20     Q.  Okay.  Right.  But you reviewed the REMS as
21  part of your review and included it in your report?
22     A.  I did -- I did read the various documents
23  associated with some of the REMS programs.  I'm sure
24  I haven't seen all of them over every instance in
25  time, but I've seen many of them, yes.

Page 448

1      Q.  Fair enough.  Okay.  Could I ask you to page
2  ahead to page 33?
3      A.  Okay.
4      Q.  Do you see Section 9?
5      A.  Yes.
6      Q.  What is the title of Section 9?
7      A.  "Drug Abuse and Dependence."
8      Q.  Okay.  And Section 9.2 is titled "Abuse."
9  Am I correct?
10     A.  Yes.
11     Q.  Within Section 9.2, one of the -- the final
12  sentence is:  "Duragesic can be abused and is
13  subject to misuse, addiction, and criminal
14  diversion."
15         Citing back to the warning we read before in
16  Section 5.1; am I correct?
17     A.  Yes.
18     Q.  Okay.  The next paragraph says that:  "The
19  high drug content in long-acting formulations adds
20  to the risk of adverse outcomes from abuse and
21  misuse."
22         Is that correct?
23     A.  Yes.
24     Q.  And the next paragraph:  "All patients
25  treated with opioids require careful monitoring for

Page 449

1 signs of abuse and addiction, because use of opioid
2 analgesic products carries the risk of addiction
3 even under appropriate medical use."
4      Did I read that correctly?
5 A.  Yes.
6 Q.  Okay.  Set that aside for the moment.
7 Hopefully for good.
8      So the good news, Dr. Perri, is we've gone
9 through all the labels I want to show you for
10 Duragesic.  The bad news is we have a second product
11 in this case.  So now we're going to do a similar
12 exercise, if you will bear with me, for Nucynta.
13 Again, I'm going to show you what's been previously
14 marked Exhibit 16.
15      (Perri Exhibit 16 was marked for
16 identification.)
17 BY MR. GALIN:
18 Q.  Do you recognize this document, Doctor?
19 A.  Yes.
20 Q.  What do you recognize this document to be?
21 A.  It's to be -- appears to be the prescribing
22 information for Nucynta.
23 Q.  Indeed this is the 2008 Nucynta package
24 insert or product label, depending on the
25 terminology you want to use.

Page 450

1 A.  Yes, it is.
2 Q.  And if you look at the very -- there are two
3 columns on the front page.  If you look at the top
4 right, there is a bullet.  Could you read that
5 bullet for me?
6 A.  "Abuse potential may occur.  Monitor
7 patients closely for signs of abuse and addiction."
8 Q.  Okay.  And if we were to go to -- that
9 references parenthetically 5.4, which is Section 5.4
10 of the label.  So if we turn to Page 5, which has
11 Section 5.4 on it --
12 A.  Yes.
13      MR. CHALOS:  Let me just interpose an
14 objection.  My copy says "Tradename TM" on it.
15 Is that -- am I looking at the right document?
16      MR. GALIN:  Yes.
17      MR. CHALOS:  Okay.  How do we know this is
18 Nucynta?
19      MR. GALIN:  I will represent to you that
20 it's Nucynta and that is the -- it isn't -- the
21 words used on here is the clinical name rather
22 than the marketing name.
23      MR. CHALOS:  This is the final version of
24 the label?
25      MR. GALIN:  Of the 2008 version, yes.

Page 451

1      MR. CHALOS:  Okay.
2      MR. GALIN:  As you may guess, we'll get to
3 look at some subsequent in a moment.
4      MR. CHALOS:  So we'll accept your
5 representation.  I don't know if that's true or
6 not but just -- I -- let me interpose an
7 objection subject to your questions that, you
8 know, we trust you, we believe you are telling us
9 the truth, but I just want to note that it
10 doesn't say that on the document, so --
11      MR. GALIN:  Understood and appreciated and
12 noted.
13 BY MR. GALIN:
14 Q.  So 5.4, just to throw your counsel even
15 further off, uses the other clinical name,
16 tapentadol, which is the more commonly understood
17 name for Nucynta, says:  "Tapentadol is a mu-opioid
18 agonist.  Such drugs are sought by drug abusers and
19 people with addition disorders."
20      Is that correct, what I wrote --
21 A.  Do pronunciations count?
22 Q.  Yeah.  Mu.
23 A.  Yes.  Thank you.
24 Q.  Fair enough.  Yes, my apologies for that.
25      It goes on to say that:  "Tradename can be

Page 452

1 abused in a manner similar to other opioid agonists,
2 legal or illicit.  This should be considered when
3 prescribing or dispensing Tradename in situations
4 where the physician or pharmacist is concerned about
5 an increased risk of misuse and abuse."
6      Again, as your lawyer pointed out, Tradename
7 was the placeholder.  This is the final version with
8 Nucynta put it in and you saw Tapentadol.
9      Did I read that correctly?
10 A.  Yes.
11 Q.  Okay.  It goes on to say that:  "Tapentadol
12 may be abused by crushing, chewing, snorting or
13 injecting the product.  These practices pose a
14 significant risk to the abuser that could result in
15 overdose and death."
16      And it cites to Section 9.  Is that correct?
17 A.  Yes.
18 Q.  And if we were to head up to Section 9,
19 which is on Page 12, Drug Abuse and Dependence, 9.1,
20 Controlled Substance, discusses that:  "This product
21 has an abuse potential similar to hydromorphone, can
22 be abused and is subject to criminal diversion."
23      Do you see that at the very bottom of
24 Page 12?
25 A.  I do.

Page 453

1    Q.   Okay.  And I won't subject us all to all of
2  the reading of 9.2 on Page 13, but that's entitled
3  "Abuse," correct?
4    A.   Correct.
5    Q.   And discusses addiction as a primary chronic
6  neurobiological disease with genetic, psychosocial
7  and environmental factors influencing its
8  development and manifestations, correct?
9    A.   Yes.
10   Q.   Okay.  And if you turn the page, 9.3
11 discusses dependence, correct?
12   A.   Yes.
13   Q.   Okay.  Let's set this one aside.  I promise
14 you we are getting closer.  I'm going to show you
15 what has been premarked 17.
16      (Perri Exhibit 17 was marked for
17 identification.)
18 BY MR. GALIN:
19   Q.   Do you recognize this document?
20   A.   This appears to be the 2011 version of the
21 Nucynta extended release package insert or
22 prescribing information.
23   Q.   Okay.  And am I correct that if you look on
24 the top left of this, this is the 2011, it says
25 "Initial US Approval:  2011"?

Page 454

1    A.   Yes.
2    Q.   And if you look on the final page of this
3  document, it confirms this is the 2011 version?
4    A.   Yes.
5    Q.   And am I correct that just below that on the
6  front page is yet another black box warning?
7    A.   It is.
8    Q.   Okay.  And will you read the first line
9  underneath -- within the black box warning?
10   A.   "Potential for abuse, proper patient
11 selection and limitations of use."
12      The first word was "Warning."  I'm sorry.
13   Q.   Thank you.  And then if you could read the
14 bolded material just below "See full prescribing
15 information."
16   A.   "Nucynta ER contains that tapentadol, a
17 mu-opioid agonist and Schedule II controlled
18 substance, with risk of misuse, abuse, and
19 diversion, similar to other opioid analgesics."
20   Q.   Thank you.  Can we page ahead to Page 8,
21 Section 5.5.  I will say on Page 7 you will see
22 Section 5 is entitled "Warnings and Precautions,"
23 and on Page 8, Section 5.5 is entitled "Misuse and
24 Abuse."  Correct?
25   A.   Yes.

Page 455

1    Q.   Similar language to what we just read about
2  tapentadol being "a mu-opioid agonist and is a
3  Schedule II controlled substance.  Such drugs are
4  sought by drug abusers and people with addiction
5  disorders."  Correct?
6    A.   Yes.
7    Q.   And then if we go down two paragraphs, there
8  is a paragraph that says:  "Nucynta ER can be abused
9  in a manner similar to other opioid agonists, legal
10 or illicit.  This should be considered when
11 prescribing or dispensing Nucynta ER in situations
12 where the physician or pharmacist is concerned about
13 an increased risk of misuse and abuse."
14      Am I -- did I read that correctly?
15   A.   I think so, yes.
16   Q.   And if we flip to the next page, the top of
17 Page 9:  "Drug abusers may attempt to abuse Nucynta
18 ER by crushing, chewing, snorting or injecting the
19 product.  These practices may result in the
20 uncontrolled delivery of Nucynta ER and pose a
21 significant risk to the abuser that could result in
22 overdose and death."
23      Did I read that correctly?
24   A.   Yes.
25   Q.   Okay.  And if we were to page ahead to

Page 456

1  Page 18 here in Section 9 of the label or package
2  insert, and this is entitled "Drug Abuse and
3  Dependence," correct?
4    A.   Yes.
5    Q.   In the second paragraph, under 9.2, is --
6  the section entitled "Abuse," the second paragraph
7  reads:  "The risks of misuse and abuse should be
8  considered when prescribing or dispensing Nucynta
9  ER."
10      Correct?
11   A.   Yes.
12   Q.   Okay.  You can set this one aside.  Good
13 news, the final of these labels, which has been
14 premarked 18.
15      (Perri Exhibit 18 was marked for
16 identification.)
17 BY MR. GALIN:
18   Q.   Do you recognize this, Dr. Perri?
19   A.   This is also Nucynta ER from 2008.
20   Q.   Okay.  '18, I believe.  2018, Is that what
21 you said?
22   A.   No, this one is 2008, I believe.  Well, no,
23 that's the initial approval date, so let's see.
24   Q.   If you look in the bottom right-hand corner,
25 where it says "Revised" on the front page.

Page 457

1   A.  Yes, 2018.  Generally, the very last line --
2   yes, there it is, September 2018.
3   Q.  And again, this has a black box on the front
4   left?
5   A.  It does.
6   Q.  And it again starts with:  "Warning:
7   Addiction, abuse, and misuse."
8       Correct?
9   A.  Yes.
10  Q.  Okay.  And this contains a similar
11  discussion of the risks associated with addiction,
12  abuse, and misuse, and the use during pregnancy that
13  we've read in the previous labels.  Am I correct?
14  A.  Yes.
15  Q.  Okay.  We can happily read them, but I think
16  people will prefer we don't, so we'll skip ahead to
17  5.1.  Section 5.1 is "Warnings and Precautions,"
18  correct?
19  A.  Yes, Section 5 is "Warnings and
20  Precautions."
21  Q.  Yes.  And 5.1 is "Addiction, Abuse, and
22  Misuse"?
23  A.  Yes.
24  Q.  And I will just read.  The first paragraph
25  under 5.1 reads:  Nucynta ER contains tapentadol, a

Page 458

1   Section II controlled substance.  As an opioid,
2   Nucynta ER exposes users to the risks of addiction,
3   abuse, and misuse.  Because extended-release
4   products such as Nucynta ER deliver the opioid over
5   an extended period of time, there is a greater risk
6   for overdose and death due to the larger amount of
7   tapentadol present."
8       Did I read that correctly?
9   A.  I think you said Section II controlled
10  substances, instead of Schedule II.  I may have
11  misheard you, though.
12  Q.  I probably misspoke but if I did, I
13  appreciate you correcting it.  It's a Schedule II
14  controlled substance.
15      And then the next paragraph:  "Although the
16  risk of addiction in any individual is unknown and
17  can occur in patients appropriately prescribed
18  Nucynta ER, addiction can occur at recommended doses
19  and if the drug is misused or abused."
20      The next paragraph goes on to direct the
21  physician to:  "Assess each patient's risk for
22  opioid addiction, abuse, or misuse prior to
23  prescribing Nucynta ER, and monitor all patients
24  receiving Nucynta ER for the development of these
25  behaviors and conditions."

Page 459

1       Have I read all that correctly?
2   A.  Yes.
3   Q.  Okay.  And Section 9, again, is "Drug Abuse
4   and Dependence."  Do you see that?
5   A.  Yes.
6   Q.  And again, 9.2 is "Abuse" and contains
7   lengthy warnings and directions to the physician
8   regarding the potential for abuse of this product;
9   is that correct?
10  A.  Yes.
11  Q.  Okay.  You can set that aside.
12      Doctor and, frankly, everyone, I appreciate
13  your patience with me as we went through that
14  exercise, but I think it's an important one.
15      Did you review the -- these labels or
16  product inserts as part of your effort in this
17  matter?
18  A.  Yes.  I made -- to the best I could, I made
19  a specific effort to make sure I'd seen the PIs for
20  all of the drugs.
21  Q.  Do you agree with me that after that lengthy
22  exercise, there is significant and extensive
23  warnings regarding addiction, abuse, misuse, abuse,
24  and dependence issues in each version of the
25  Duragesic, Nucynta and Nucynta ER labels?

Page 460

1       MR. CHALOS:  Object to the form.
2   A.  So based on what we've seen, I would agree
3   with you that there is plenty of warning information
4   in the PI.  The only thing I would say about that is
5   I think I've expressed my opinions about the utility
6   of the PI in the overall mix of the marketing
7   materials, but yes, I agree that there are warnings
8   contained in all of the PIs that we just reviewed.
9   Q.  Okay.  And just so that -- because your
10  lawyer objected, I will go with am I correct that
11  there is -- that warning information is in each of
12  the Duragesic labels?
13      MR. CHALOS:  Same objection.
14  A.  Yes.  The ones we just reviewed, the
15  warnings, different -- over time the warnings
16  change, but the warnings were present in all of the
17  PIs that we looked at.
18  Q.  And that includes Nucynta as well?
19  A.  Yes.
20  Q.  And Nucynta ER?
21  A.  Yes.
22  Q.  Okay.  Doctor, you said that you believed
23  the product inserts have limited utility, correct?
24  A.  They are a piece of the puzzle, but they are
25  not the only piece, so their utility has to be

Page 461

1  considered with respect to that, and as we read
2  through them, they're fairly long and very detailed
3  in some cases, so their utility for physicians is
4  limited by that.
5      But I think the main thing that -- the main
6  opinion that I've expressed is that the PI is just
7  one piece of the marketing that was presented, and
8  certainly these are all good examples that they
9  provide warnings.
10  Q.  Okay.  And in fact -- we will come back to
11  that, but one of the things you mentioned is --
12  yesterday, I can't remember who was speaking with
13  you, it might have been Mr. Volney, that -- I think
14  you testified that any time the product name and
15  indication are mentioned, I think you've used be it
16  even on a mug, it has to be -- the product insert or
17  label, package insert, product label, must be
18  provided; is that correct?
19  A.  Yes, and it was in reference to my
20  understanding of when they had to provide a PI,
21  which was any time they did those two actions
22  together.  And the mug example was an old-school
23  reference, because, of course, we know they don't do
24  that -- no one does that any more, but I remember,
25  you know, years passed getting a coffee mug that

Page 462

1  would say Nucynta or whatever and there would be an
2  annoying package insert folded up very tightly stuck
3  to the side of it.  So...
4  Q.  Okay.  And am I correct that in your review
5  of -- well, let me --
6      In your review of the documents for Janssen,
7  for this exercise, did you gain an understanding of
8  whether Janssen's sales representatives were
9  required to provide the package insert when engaging
10  in what I believe you referred to as personal
11  selling?
12  A.  Depending on the nature of their visit, my
13  answer would be yes, but I think that -- I don't see
14  evidence that the package inserts were distributed
15  inappropriately at any point.
16  Q.  And when you say distributed
17  inappropriately, the only inappropriate would mean
18  if they weren't distributed, correct?
19  A.  Right.  I think that's something that
20  industry people pay a lot of attention to because
21  it's a well-understood requirement and I think
22  everyone wants to be as diligent as possible making
23  sure the package insert is presented when it needs
24  to be.
25  Q.  So as you sit here today you have no reason

Page 463

1  to believe that sales reps for Janssen did not
2  distribute the package insert whenever discussing
3  the product and its indications, correct?
4      MR. CHALOS:  Object to the form.
5  A.  That's -- I -- yes, I agree that I haven't
6  seen any evidence that they didn't do that.  I still
7  have to say, though, I question the utility of it
8  given the big picture of the marketing, but I
9  certainly agree with that statement.
10  Q.  So let me talk about the question about the
11  utility.  Why is it that you question the utility of
12  the package insert?
13  A.  Well, I think we've established through
14  these last two days that, you know, physicians are
15  busy folks and they need information.  They also
16  need information that is succinct and relevant to
17  the decision they are making at that moment in time.
18      The package insert, as we've just gone
19  through, these are extensive documents and they are
20  generally not in this nice of a fashion to read.
21  They are generally a big sheet with print so small
22  you can't even really read them.  But the main point
23  is, is that they are one piece of a much larger
24  program of marketing that is presented related to
25  all of these products, Nucynta and Duragesic

Page 464

1  included, that focuses on product features and
2  product benefits, the things that are most at the
3  front of physicians' minds when they are trying to
4  make a decision about what their patient needs, and
5  what might be the best choice for their patient.
6      And certainly those bigger -- the bigger
7  more fuller scope focuses on the well-crafted and
8  well-defined, well-thought-out, well-planned
9  strategies that defendants have figured out will be
10  the most effective at increasing sales of these
11  products.
12      So for that reason, given the busy nature of
13  the physician, given the presentation of the
14  material in the PI not being the most user friendly
15  in many cases, and the large volume of other
16  marketing materials, and that includes the CE
17  programs and the use of key opinion leaders and all
18  the different ways that manufacturers reach out to
19  physicians to educate them about their drugs, the
20  package insert plays a role but it's a smaller role
21  than most of the other types of marketing just in
22  terms of how much utility it has during that patient
23  encounter for a decision-making.
24  Q.  You've mentioned a couple of times the large
25  and dense nature, so to speak, of the package

Page 465

1 insert. Am I correct that one of the ways meant to
2 address the depth and breadth of it is to provide
3 the black box warning up front, that in a succinct
4 way, as you put it, directs the physicians to that
5 warning information?
6     MR. CHALOS: Object to the form.
7     A. Yeah, that's -- that's true.
8     Q. And in fact, as we looked at, with one
9 exception, which was the first Duragesic label,
10 every one of the labels we looked at had a black box
11 warning that covered addiction, abuse, and misuse;
12 is that correct?
13     A. That statement is correct, yes.
14     Q. Okay. And in fact, in that one Duragesic
15 label that we looked at, and you have it, it's
16 Exhibit 13 if you would like to go back, I think I
17 asked you to read the very first thing under the
18 name on the top of the label and I believe you read
19 a warning about abuse risk; is that correct?
20     A. As I recall, yes, that's correct.
21     Q. Okay. You -- do you know whether or not
22 physicians are trained or taught either in medical
23 school or otherwise the importance of reviewing and
24 understanding package inserts?
25     A. I don't know specifically what their

Page 466

1 training involves. My understanding about what
2 physicians get in medical school in terms of
3 pharmacology training is that it's very minimal and
4 that most of their drug knowledge comes from their
5 practice experience on medical school campuses,
6 where they first begin seeing patients and
7 prescribing medications.
8     And from a marketing perspective, we also
9 know that marketers tend to spend a lot of time in
10 those environments, to be there present during a
11 physician's early training years. So that's my --
12 that's about the extent of my knowledge about what
13 they get in terms of training. I don't know that
14 they're -- or that they are or are not trained on
15 how to interpret a package insert.
16     Q. Well, do you think that doctors understand
17 the importance of a package insert?
18     A. I think over time that perhaps has been --
19 there would be a different answer to that question,
20 because I know back in the 1990s we didn't have
21 handheld pharmaceutical reference capabilities. Now
22 certainly we do, and I don't know any doctor that
23 refers to the PDR ever anymore, but I do -- and in
24 fact, they stopped making the PDR at some point in
25 the mid 2000s.

Page 467

1     The PDR was a collection of package inserts,
2 and so at least during the time period that the PDR
3 was around there would have been more reliance on
4 that, but since that point in time, with the advent
5 of all the handheld and computer-based drug
6 information systems, I think the importance of the
7 package insert is greatly diminished.
8     Q. The FDA still considers the package insert
9 an important part of marketing and information -- a
10 source of information for physicians, correct?
11     MR. CHALOS: Object to the form.
12     A. So the FDA's characterization of it, I don't
13 know what they call it, but I can tell you from my
14 perspective what I look at the -- the PI is what
15 sets the boundaries around which a pharmaceutical
16 manufacturer who wants to market their product can
17 engage, and the package insert outlines that, I
18 think, in a lot of detail. The black box warning is
19 required, the indications, all of that are laid out.
20     So within the scope of the package insert as
21 your boundaries, so those are the things that can be
22 discussed, so it's an important part of the
23 marketing, I agree. I don't know what the FDA
24 thinks but to me it's an important part of
25 marketing.

Page 468

1     Q. Are you familiar with the term Important
2 Safety Information or ISI?
3     A. Yes.
4     Q. What is ISI?
5     A. The information that's usually contained in
6 the package or prescribing information relative to
7 safe use of the product.
8     Q. And am I correct that pharmaceutical
9 manufacturers are required to include the ISI within
10 their -- in a fair and balanced way on their
11 marketing pieces?
12     A. Yes, that's my understanding.
13     Q. Okay. And in your review of Janssen's
14 documents, have you seen any indication that it ever
15 failed to include the ISI in its marketing pieces?
16     A. I don't recall anything specific where they
17 did not include the important safety information --
18     Q. Okay.
19     A. -- in a marketing piece.
20     Q. To the extent that the product insert is
21 given to -- or the package insert is given to
22 physicians, as you've said it's your understanding
23 it is, is it the manufacturer's fault that it is not
24 read or it is not considered by the physician, if in
25 fact that's the case?

Page 469

1    A.  Gosh.  I mean, I hate to use the word fault,
2  but what comes to my mind about that is, is that,
3  you know, the manufacturer has a lot of options when
4  they decide what information to present, and I think
5  my opinion is, is that the package insert generally
6  is a boundary and I think most people respect that
7  boundary, most manufacturers do.
8        The problem arises in what information is
9  focused on.  It's one thing to bring lunch to a
10 doctor's office and leave a package insert.  It's
11 another thing to meet personally with that doctor
12 and to discuss the talking points that are designed,
13 mapped out weeks ahead of time, strategized a year
14 ahead of time by a marketing planner, and expect the
15 doctor to pay more attention to the package insert
16 than the personal communication.
17       So is it -- is it their fault?  I mean,
18 essentially, it's designed so that the information
19 that's remembered by the doctor is the information
20 that will promote the product, not restrict its use,
21 so in -- at the end of the day, the marketing pieces
22 that are designed to focus on product features and
23 the benefits that those bring to patients and
24 doctors who use them.
25       The reasons why this drug is better than the

Page 470

1  competition, the reasons why this drug works better
2  than other therapies, those are all the messages
3  that get recalled.
4        So at the end of the day, I guess I don't
5  like to use the word their fault, but I guess in a
6  marketing sense, it's because of their actions that
7  those are the things that are remembered and that
8  the PI is not relied on.
9    Q.  In a number of the documents you looked at,
10 am I correct that they said "cannot be left behind"?
11   A.  There were documents that did say "this is
12 not a leave behind," "do not share with customers."
13 I can't recall a specific one right now to point you
14 to, but the -- I know that on many of the documents
15 I saw in the data -- in the document production,
16 there would be designations about whether a document
17 is permissible to be left behind or not, or if it
18 was intended to be left behind, "this is approved
19 for distribution."
20   Q.  And yet, as you said, the package insert is
21 always left behind, correct?
22       MR. CHALOS:  Object to the form.
23   A.  The package insert is left behind when it
24 meets those criteria for why it needs to be left
25 behind.  So if the -- if you're talking about

Page 471

1  Nucynta and its indications, then you would need to
2  leave a package insert.
3    Q.  So we -- if something is going to stay
4  behind, it will be the package insert in those cases
5  with the black box warning on it, correct?
6        MR. CHALOS:  Object to the form.
7    A.  Yeah, depending on the circumstance.  If it
8  was a -- if they meet the criteria for needing to
9  leave a package insert, I'm sure they probably would
10 have.
11   Q.  Okay.  Are --
12       THE WITNESS:  How long have we been going?
13       MR. CHALOS:  Over an hour.
14       MR. GALIN:  Do you want to take a --
15       THE WITNESS:  I kind of need to take a short
16 break.
17       MR. GALIN:  Certainly.  Absolutely.
18       THE WITNESS:  Thank you.
19       THE VIDEOGRAPHER:  We are now going off the
20 video record.  The time is currently 11:28 a.m.
21 This is the end of the Media Number 2.
22    (Recess from 11:28 a.m. until 11:40?a.m.)
23       THE VIDEOGRAPHER:  We are now back on the
24 video record with the beginning of Media
25 Number 3.  The time is currently 11:40 a.m.

Page 472

1        MR. GALIN:  Thank you.
2  BY MR. GALIN:
3    Q.  Dr. Perri, before the break, one of the
4  things you were mentioning was that time is spent
5  preplanning the way pharmaceutical manufacturers
6  will discuss product features and attributes during
7  personal selling in advance of those sales calls,
8  correct?
9    A.  Yes.
10   Q.  Okay.  During the break I placed before you
11 what's been marked as Exhibit 19 and I've shared
12 with your counsel.
13       (Perri Exhibit 19 was marked for
14 identification.)
15 BY MR. GALIN:
16   Q.  You may recognize this.  I know you looked
17 at a lot of documents, but you may recognize this as
18 some -- a Janssen document Bates stamped JAN00085130
19 that is cited in your report at Page 75, Footnote
20 245.  I won't blame you if you don't actually
21 remember this specific document.
22   A.  Actually, I do.
23   Q.  Oh, great.  I really -- you don't -- you're
24 obviously entitled to look through all of it, but I
25 will tell you I really only want to ask you a

Page 473

1  question about what is the first substantive slide
2  on Page 2 of this printout deck.  Do you see that
3  slide?
4      A.  I do.
5      Q.  And the title is "Compliance is Essential,"
6  correct?
7      A.  It is.
8      Q.  Am I correct that the first bullet reads:
9  "As a sales representative, it is my responsibility
10 to" and then a colon?
11     A.  Yes.
12     Q.  Okay.  The first bullet under the colon,
13 could you read that for me?
14     A.  "Always promote the benefit and safety of
15 our products consistent with the FDA-approved
16 indications and prescribing information."
17     Q.  And the second.
18     A.  "Disclose safety information for all
19 company-promoted products."
20     Q.  Okay.  And if you look in the talking
21 points, so to speak, the speaker notes that are
22 underneath the print, there is one listed, "Slide
23 Objective."
24     A.  Yes.
25     Q.  And it says:  "Stress that compliance is

Page 474

1  essential in everything we do when we are selling to
2  our customers we must stay within the guidelines."
3      Did I read that correctly?
4      A.  Yes.
5      Q.  Okay.  So this document reflects, does it
6  not, Dr. Perri, that Janssen took being compliant
7  and sharing safety information seriously, correct?
8      A.  I think that's one of the things this
9  document definitely shows, yeah.
10     Q.  Okay.  You can set that aside.  This is
11 where I really get jumbled trying to sort of piece
12 stuff together, as I warned before, and to move this
13 along, so bear with me for a second, but where I
14 think I would like to go next is back to Table II of
15 your report and Page 89 in particular.
16     So if I could ask you to -- this is
17 actually -- well, let's start on Page 88 of the
18 report, which is Letter B of Table II.
19     A.  Okay.
20     Q.  Letter B on Page 88 is "Abuse deterrent
21 formulations deter abuse."
22     A.  Yes.
23     Q.  And if you flip to Page 89, there is a
24 Janssen entry that is the second entry on the page
25 and it reads, and I quote -- quote you quoting from

Page 475

1  a document JAN-MS-00259893, quote:  "only AP-48
2  combines the superior potency of fentanyl with
3  naltrexone in a proprietary formulation to safeguard
4  against unintended usage."
5      Did I read that correctly?  Do you see that?
6      A.  Yes.
7      Q.  Do you know what AP-48 is?
8      A.  Off the top of my head, I don't recall, no.
9      Q.  Okay.  Do you know -- I will represent to
10 you that AP-48 is, as is suggested by the quote that
11 you have in the table, a developmental version of
12 the fentanyl patch Duragesic meant to safeguard
13 against abuse.
14     A.  Okay.
15     Q.  Does that sound familiar?  I take it you
16 don't know.
17     A.  Yeah.  I'm trying to remember the specific
18 document but --
19     Q.  I could show it to you if you want --
20     A.  No, that's --
21     Q.  -- but my question --
22     A.  Tell me what your question is, yeah.
23     Q.  Well, my question is do you know if AP-48
24 ever made it to market?
25     A.  I am not familiar with any fentanyl and

Page 476

1  naltrexone combinations that made it to market.
2      Q.  In fact, I will represent that it did not.
3      A.  Right.
4      Q.  Okay.  So considering that it did not make
5  it to market, do you believe that this document from
6  which you quote was used in marketing?
7      MR. CHALOS:  Object to the form.
8      A.  So no, I don't believe this document was
9  used in the marketing; however, as I've mentioned in
10 prior questions like this, it shows the thought
11 process, what was going on internally within
12 defendants to look at abuse deterrent formulations
13 and to bring abuse deterrents to the marketplace.
14 That was important to the marketing.  There were a
15 number -- not a number, there were a few products
16 that were developed, some got very far along, some
17 did not, but yet the processes that were engaged for
18 those products were very similar to, if not
19 identical to in terms of the plans and strategies,
20 to products that didn't make it to market as the
21 ones who did.
22     So I did include -- and there are other
23 examples in this table of products that or messages
24 that never made it to market because there was
25 either a problem with the message or the product

Page 477

1  never made it to market.
2  Q.  I guess what I'm struggling to understand
3  then, Dr. Perri, is if Table II, as I understand it
4  from your testimony, is meant to reflect examples or
5  the aggregate message that, as you said, has
6  influenced prescribers and led to this increased
7  growth, as you've stated, in opioid prescriptions,
8  why messages that were never actually used and why
9  messages about a product that never actually made it
10  to the market would be included in your table?
11  A.  I guess the best answer I can give you for
12  that is, that I wanted to be complete in my
13  presentation of what the manufacturers planned and
14  executed, and just because something didn't make it
15  to market didn't mean they didn't think about it.
16      The abuse-deterrent concept was important.
17  It was important to more than just Janssen, and I
18  think it was -- including that was one way of
19  showing that there was an attempt made, there were
20  considerations given, to an abuse-deterrent
21  formulation.  It didn't work out, but yet it's
22  important to note that from a -- the product
23  development perspective, this was something that was
24  on the radar because at this time -- and I shouldn't
25  say at this time because I don't know when this

Page 478

1  document relates to specifically time-wise as I'm
2  sitting here right now, but over time manufacturers
3  became more interested in abuse-deterrent
4  formulations because of a growing awareness
5  societally that we had a drug abuse problem in this
6  country, and that was one of the things that was
7  leading people to look at these abuse-deterrent
8  formulations.
9  Q.  I guess what I'm struggling with again,
10  Dr. Perri, is there is nothing in your table, is
11  there, that distinguishes messages that made it to
12  the public and to physicians and messages that never
13  got outside the walls of the various defendants.
14  Correct?
15  A.  The table summarizes messages that were in
16  the marketing materials.  That's certain.  The
17  majority of the messages, as I recall, were from
18  items that are certainly items that were distributed
19  in the marketing materials.  A few of the items in
20  there, such as this one that you've pointed out
21  today, were -- and others, for example, MoxDuo, that
22  never made it to market.  Another example I can give
23  you from Endo that cites to the use -- or to
24  promoting the use for an incorrect indication, which
25  was caught eventually, but it had other things in

Page 479

1  that document that I was interested in making sure
2  made it to my table.
3      So there are a number of documents in there,
4  just a few, that never made it, but yet they reflect
5  thinking.  And I can give you specifically with the
6  Endo document, for example, it references what I
7  considered to be a vulnerable population:  Veterans.
8  And so regardless of whether it made it to market in
9  that form, it showed consideration of targeting
10  veterans in the opioid marketing.
11      So the requirements for ending up in this
12  table were just that it was something that was in
13  the marketing process within defendants' marketing.
14  It doesn't necessarily mean that they made it to
15  market, although I'll represent that they did mostly
16  make it to market, and we can know for any one of
17  these whether it made it to market or not.  That's
18  not -- I mean, it's a possibility that that could be
19  another column in the table, "Did it make it to
20  market or not."  I just didn't do that at this
21  point.
22  Q.  Okay.  I'll let my colleagues representing
23  Endo deal with the discussion about Endo for you.
24  A.  I'm sure they noticed that as well, so --
25  Q.  I suspect they probably did.

Page 480

1      I will skip ahead in the purpose of time, if
2  you would, to I believe it is Page 104 of your
3  report, and there are a number of -- actually,
4  excuse me.  It's 103 that I want to look at.  Oh,
5  actually, bear with me for one moment.  All right.
6      Yes, it's 104.  If you look under K, it
7  says:  "Patients can be easily tapered off opioids."
8      Is that correct?
9  A.  That's correct.
10  Q.  And under K, the second document is a
11  Janssen document that's referenced by its Bates
12  number JAN00222151, correct?
13  A.  Correct.
14  Q.  Would you read the -- for me the quote
15  there?
16  A.  "Physical dependence is not the same as
17  addiction.  It may be managed by gradually reducing
18  the dosage of the drug if the doctor decides it is
19  appropriate to discontinue therapy."
20  Q.  I don't see anything or didn't hear anything
21  in there about it being easy, and yet this appears
22  under something that says "patients can be easily
23  tapered off of opioids."
24      Why is that?
25  A.  We'd have to get the whole document to get a

Page 481

1 sense of, you know, how it was being presented, but
2 I think certainly the sentiment that patients can be
3 tapered, and I think easily tapered, was something
4 that shows up in many documents, and, you know,
5 maybe the words that I've used to describe K aren't
6 perfect, but I don't think there would be any
7 argument that this phrase that's listed here,
8 "physical dependence is not the same as addiction,"
9 is making a statement. It's clearly saying just
10 because your patient is dependent, it doesn't mean
11 they're addicted. Okay? So that sort of sets the
12 tone for it. And it may be managed by gradually
13 reducing the dose, so here's the solution.
14     This is indicative of just exactly how I saw
15 the marketing messages being used by defendants.
16 There's a problem, it's a barrier to opioid use.
17 I've identified these barriers in my report and
18 there are categories, I think five barriers that
19 I've pointed out. One of them is this exact thing,
20 that withdraw is a big concern.
21     And so the way that this is dealt with in
22 the marketing documents is to minimize the concern
23 and tell what the solution is. What does that do?
24 That promotes the use of opioids. That doesn't
25 necessarily promote the appropriate use or the

Page 482

1 inappropriate use, and I did not make that judgment,
2 but it promotes the use of opioids, which is why
3 when looking at all of these documents and all of
4 the messages and all of the other marketing that
5 went on, I was able to form the conclusion that the
6 marketing of the opioids, which focused on product
7 features and benefits, heavily focused on the
8 reasons why you should buy the product and not the
9 reasons why you shouldn't, led to the expansion of
10 the opioid market.
11     Q. Okay. I would, in a different time, go
12 through with you the discussion as to how -- the
13 overall cite, but since it is -- the document to
14 which you cite is the Nucynta website -- or excuse
15 me, the Duragesic website from 2006. It's hundreds
16 upon hundreds of pages and I'll spare all of us that
17 fun, but I do want to show you what I will mark
18 Exhibit 20, which is a printout from a different
19 website.
20     (Perri Exhibit 20 was marked for
21 identification.)
22 BY MR. GALIN:
23     Q. This, if you look at the first page, you
24 will see that Pagevault captures the key facts as to
25 where this website comes from. This is the -- the

Page 483

1 URL indicates that it's the FDA's website and the
2 section is for consumers and it's a consumer update
3 captured just this month on April 4th, 2019?
4     Do you see what I'm referring to?
5     A. I do.
6     Q. Okay. If you were to go to the second page
7 of the printed version of the website, you will see
8 just past halfway down is a section -- and I
9 apologize for the small type, one of the problems
10 with a screen grab -- is "Misuse and Abuse." Do you
11 see the section I'm looking at?
12     A. Yes.
13     Q. And its second paragraph reads under this --
14 well, for completeness or -- I'll read. The first
15 paragraph is: "Misuse and abuse of pain medication
16 can be extremely dangerous. This is especially so
17 in regard to opioids. These medications should be
18 stored in a place where they cannot be stolen."
19     The second paragraph reads: "According to
20 the National Institutes of Health, studies have
21 shown that properly managed medical use of opioid
22 analgesic compounds (taken exactly as prescribed) is
23 safe, can manage pain effectively, and rarely causes
24 addiction."
25     Did I read that correctly?

Page 484

1     A. You did.
2     Q. So will you agree with me that the FDA is
3 stating that when properly prescribed and man --
4 opioids can manage pain effectively and rarely cause
5 addiction?
6     MR. CHALOS: Object to the form.
7     A. That's what this says, yes.
8     Q. Okay. You can set that aside, Dr. Perri.
9     I'm mindful of the time and if my colleagues
10 want to go. Let me sort of wrap up by going back to
11 something.
12     When we started our discussion at least, one
13 of the things you mentioned was that you have not
14 made any determinations as to whether or not any of
15 the marketing claims that you've reviewed are false
16 or misleading, correct?
17     A. I did not, that's correct.
18     Q. And in fact, you were relying on five other
19 experts and the FDA warning letters, I believe you
20 said, correct?
21     A. Yes.
22     Q. One of the things you've also said -- and
23 just around that, you, when putting together your
24 report, were asked to assume, in fact, that the
25 marketing claims were false and misleading; is that

Page 485

1  correct?
2    A.  That's generally the way it was placed, yes.
3    Q.  Okay.  And one of the things you said
4  earlier today when my colleague Mr. Carter was
5  speaking with you, and I think you said at least
6  once, if not twice, yesterday is, in essence, that
7  -- the term used, "the crux of the matter" here, is
8  that the marketing of opioids has violated the
9  standards of marketing.  I certainly don't want to
10 tell you what you said, but do you recall something
11 along that effect?
12        MR. CHALOS:  Object to the form.
13    A.  Yeah, I'm not sure I used those exact words
14 but I think that's roughly a paraphrase of it.
15    Q.  Let me use words that are yours from
16 Paragraph 192 on Page 155 at the end of your -- the
17 final presignature paragraph of your report?
18    A.  Okay.
19    Q.  You write: "Defendants violated marketing
20 standards by creating and disseminating false or
21 misleading marketing messages that downplayed or
22 minimized the risks associated with opioids while
23 emphasizing the benefits of their drugs, and by
24 disguising their support of activities aimed at
25 increasing sales of their own products."

Page 486

1    A.  Yes.
2    Q.  If in fact it turns out that the assumptions
3  that you've been asked to make, that our marketing
4  was in some way false or misleading, turns out to be
5  an incorrect assumption, does that not vitiate the
6  conclusions that you reach in your report?
7        MR. CHALOS:  Object to the form; incomplete
8  hypothetical.
9    A.  Let me read my sentence again and see how
10 taking the word false or misleading out would impact
11 the meaning of that sentence, and just give me one
12 second.
13    Q.  Of course.
14    A.  So if I -- if I take out the words
15 "disseminating false and misleading," it would just
16 say "disseminating marketing messages that
17 downplayed or minimized the risks associated with
18 opioids while emphasizing the benefits of their
19 drugs, and by disguising their support of activities
20 aimed at increasing sales of their own products."
21    I think the sentence remains true.
22    Q.  So if I'm understanding correctly, and I
23 certainly don't want to put words in your mouth, but
24 let me ask, am I correct in understanding that what
25 you are telling me is that it's not necessary for

Page 487

1  our marketing, our being defendants' marketing,
2  and I use us as a whole because you're talking about in
3  the aggregate you haven't found anyone -- yes.
4    A.  I'm sorry.  The first part -- I focused on
5  the last part of the sentence.  I didn't look at the
6  "violated marketing standards."  That part of it I
7  have to think about.  I haven't -- I just think that
8  the -- I guess what I was trying to say is that
9  the -- and I know that folks around this table are
10 probably tired of hearing me say that marketing
11 works.
12    Q.  Then we'll stop asking.
13    A.  But the -- I think that the marketing,
14 even -- whether the messages are false or
15 misleading, that wasn't really relevant.  The
16 marketing, what did it do, how did it do it, those
17 opinions that I've expressed I think they remain
18 true.
19    I need to think about this part, about did
20 they violate marketing standards, that part I have
21 to think about, because I know for some of them
22 there would still be a violation of the marketing
23 standards.  For example, the use of key opinion
24 leaders where the relationship between the company
25 and the KOLs was not disclosed, so in cases like

Page 488

1  that.
2    So I would need to go through each and every
3  part of it and verify that each standard was or
4  wasn't violated.  Does that provide you with an
5  answer you --
6    Q.  It provides me with your answer, which is
7  all I can ask for.
8    A.  Okay.
9    Q.  But what I'm really also trying to
10 understand here is you had said before, to your
11 point, you've said a few times in this deposition
12 that marketing is important and it worked, or that
13 marketing works.  I think in response to Mr. Carter
14 earlier you said that marketing itself isn't
15 inappropriate.
16    If I understand correctly, what you believe
17 the defendants did inappropriately was violating the
18 standards of marketing, as you refer to in
19 Paragraph 192.  Am I correct about that?
20        MR. CHALOS:  Object to the form.
21    A.  The judgment about whether any particular
22 message being appropriate or inappropriate wasn't
23 critical.  The false and misleading, that does
24 relate to some of the standards.  So false and
25 misleading, as -- when you asked me the question

Page 489

1 earlier, it does affect some of my judgment about
2 the marketing, but taking that out, it would only
3 probably affect a few of the several standards that
4 are listed.
5 If we took out some of the other words in
6 the sentence, it might also -- so it wasn't just
7 from the false and misleading perspective.
8 And you're right, I didn't examine the
9 nature of the ads, I relied on others to provide
10 that information.
11 So I think we can break this down piece by
12 piece and get out each standard and look at just how
13 it impacts that opinion, but I think the overall
14 opinion is that some marketing standards were still
15 violated even if we take out the false and
16 misleading nature that I relied upon in the
17 assumption to verify.
18 Q. And which standards would those be?
19 MR. CHALOS: Object to the form; incomplete
20 hypothetical.
21 A. If you look at Page 19, this is in the
22 section on the standards that apply to
23 pharmaceutical marketing, Paragraphs 34 through 36.
24 The -- assuming that what we're talking about is
25 taking out the words "false and misleading" from

Page 490

1 that statement, it -- again, I need to give this a
2 lot more thought because I spent a lot of time
3 working on this report and a lot of time analyzing
4 documents, and just to jump into it here and give
5 you a quick opinion, that because you've
6 asked the question, but I do like to think about
7 things.
8 Q. Okay. That's fair.
9 A. But it says that: "Marketing must always be
10 truthful. Marketing must never make false or
11 misleading statements to the medical community."
12 So if we take those out the question would
13 be do the -- do the FDA documents still give me
14 pause and make me think that there is false and
15 misleading marketing?
16 If we take away the FDA documents and the
17 assumption of false and misleading, then I would
18 get -- I would probably formulate an even different
19 opinion. So depending on the specific nature of the
20 hypothetical that we're talking about, I would yield
21 to you that if the ads were -- none of them were
22 false or misleading, that I wouldn't say they
23 violated the standard of not being truthful. It
24 could still be, though, that the learning that would
25 take place from those ads would violate some other

Page 491

1 standard, for example, not promoting the rational
2 use of medication, promoting a use that goes beyond
3 what we would call rational or appropriate use of
4 medicines.
5 So I would have to analyze it very carefully
6 and look at all the details and all the facts.
7 Just looking further on down this list,
8 "Accurately disclosing information about the risks
9 of their drug in addition to the benefits being
10 marketed," that requires a sort of different
11 analysis, but it wouldn't be impacted by the false
12 and misleading.
13 It should not be disguised, that we've
14 addressed in terms of the information being
15 disclosed about what is being supported and so
16 forth.
17 Good science and transparency.
18 So false and misleading would affect at
19 least one of these standards.
20 Q. Okay. While I would enjoy discussing this
21 more, I want to be respectful of my colleagues and I
22 appreciate your patience with me and I will turn the
23 microphone over to someone else, but I suspect
24 everyone is ready for a lunch break probably.
25 MR. CHALOS: I hear the lunch carts rolling.

Page 492

1 THE VIDEOGRAPHER: We are now going off the
2 video record. The time is currently
3 12:07 a.m. -- excuse me, p.m.
4 (Recess from 12:07?p.m. until 12:44?p.m.)
5 THE VIDEOGRAPHER: We are now back on the
6 video record. The time is currently 12:44 p.m.
7 RECROSS-EXAMINATION
8 BY MS. RODGERS:
9 Q. Dr. Perri, my name is Megan Rodgers. Again,
10 I'm with Covington & Burling representing McKesson.
11 I want to pick off where we left off -- pick
12 up where we left off yesterday, and I believe
13 yesterday you had testified that it was not
14 appropriate for a distributor to conduct kind of a
15 numbers-only analysis of a pharmacy's purchasing
16 history because it failed to take into account other
17 relevant considerations, right?
18 MR. CHALOS: Object to the form.
19 A. I'm sorry. Are you reading from the
20 testimony that I provided yesterday or --
21 Q. I am summarizing your testimony yesterday.
22 MR. CHALOS: Object to the form.
23 A. There was a lot in there. I need to take
24 that, you know, piece by piece. I would like to
25 look at it, if you -- if you have it.

Page 493

1    Q.   I don't have your testimony in front of me.
2  Let's take it piece by piece, though.
3    A.   Okay.
4    Q.   You would agree that it's not appropriate
5  for a distributor to conduct a numbers-only analysis
6  of a pharmacy's purchasing history, right?
7        MR. CHALOS:  I object.  That's outside of
8  the scope of the opinions that he's given in his
9  report, which is Exhibit 1 to this deposition.
10       MS. RODGERS:  And if you want to just have a
11 standing objection to these --
12       MR. CHALOS:  No, I'd like to make them.  I
13 think we need to make them each time for purposes
14 of keeping the record clear.
15       MS. RODGERS:  Okay.
16       MR. CHALOS:  Standing -- standing -- I've
17 never found standing objections to be
18 particularly effective because then it is not
19 clear when I am making it, so I'd rather just
20 make them for each question.
21       MS. RODGERS:  Okay.
22    A.   So in the questions that you were asking me
23 yesterday, and one other attorney was asking me
24 yesterday, dealing with this issue of what is
25 appropriate for the wholesalers to do, I just -- I

Page 494

1  want to be clear on the record that I did not do any
2  of that analysis or make any of those decisions or
3  have any opinions about that in this report that
4  I've written.  I understand that you all have the
5  right to ask me questions about this, so I will try
6  to give me as good of answer as I can.  I think, as
7  we established yesterday, though, this report was
8  written five years ago and there has been learning
9  that has occurred since then.
10    Q.   There has been, I'm sorry, what?
11    A.   There has been learning that has occurred
12 since then and I'm more familiar with the matters at
13 hand.  However, I'm not an expert on suspicious
14 order monitoring or what wholesalers should or
15 shouldn't do.
16    Q.   And when you say there has been learning on
17 this matter, you mean that you've learned more
18 information in connection with your participation in
19 this lawsuit?
20    A.   The -- what I mean is that since this 2014
21 case, I have become aware, as I mentioned yesterday,
22 that the DEA has put wholesalers sort of on notice
23 that they need to do a better job of monitoring
24 these orders.  I don't know much about that.
25 only -- that's the extent of what I know about it.

Page 495

1    Q.   And you learned about that in connection
2  with your participation in this lawsuit?
3    A.   Yes.
4    Q.   Okay.  And I think you testified yesterday
5  that it's not your understanding that any laws or
6  regulations changed since you wrote this expert
7  report, correct?
8        MR. CHALOS:  Object to the form.
9    A.   That is a pretty broad statement.  I can
10 tell you that I think what I said yesterday was that
11 I'm not aware that there have been any changes to
12 the Controlled Substances Act since it was written.
13    Q.   Okay.  And so let's -- let me point you to
14 Page 6 of your -- of Exhibit 10, which is your prior
15 expert report.
16    A.   Okay.
17    Q.   And in Paragraph 26 you say:  Based on my
18 review of the documents --
19       (Speakerphone interruption.)
20       (Discussion off the record.)
21       THE VIDEOGRAPHER:  We are now going off the
22 video record.  The time is currently 12:47 p.m.
23       (Recess from 12:47 a.m. until 12:49 p.m.)
24       THE VIDEOGRAPHER:  We are now back on the
25 video record.  The time is currently 12:49 p.m.

Page 496

1  BY MS. RODGERS:
2    Q.   Sorry about that interruption.
3    A.   It's quite all right.
4    Q.   I think we were looking at Paragraph 26, and
5  in that paragraph you wrote:  "Based on my review of
6  the documents provided, the decision to reduce and
7  then suspend controlled substances deliveries to
8  Cherokee Pharmacy appears to have been based on two
9  primary considerations.  First, a superficial
10 internal analysis of the volume of purchases of
11 controlled substances by Cherokee Pharmacy."
12       Do you see that?
13    A.   I do.
14    Q.   And why did you believe that that internal
15 analysis was superficial?
16    A.   I don't recall.  This is five years ago, so
17 I don't -- I don't really recall the documents or
18 why I would have used that term.  Yeah.
19    Q.   Okay.  Let's look at Paragraph 27 then,
20 where you wrote:  "With respect to its own internal
21 monitoring, Smith tracked and allotted certain
22 levels of controlled drugs to the pharmacies it
23 serviced.  Part of this analysis was done by the
24 'Suspicious Order Monitoring System' that tracked
25 not only actual product purchases but also attempted

Page 497

1  orders that were not filled by Smith in response to
2  customer's orders. Smith's analysis was limited to
3  the numbers of units dispensed for specific time
4  periods."
5      Is that refreshing your recollection?
6  A.  A little bit it does, yes.
7  Q.  Okay. And the paragraph goes on: "This
8  numbers-only oriented analysis does not take into
9  account the utilization patterns and the communities
10 served by Cherokee Pharmacy, its new store location
11 which was poised for growth, the demographics and/or
12 changes in the prescribing community, the patient
13 mix, incidence of disease or other factors (e.g.,
14 insurance, formulary restrictions, or policies and
15 procedures put in place by Cherokee Pharmacy to
16 screen controlled substance prescriptions) impacting
17 controlled substances utilization."
18     Do you see that?
19 A.  I do.
20 Q.  And you agree that those are the limitations
21 of the numbers-only oriented analysis conducted by
22 the distributor, correct?
23     MR. CHALOS: Object to the form.
24 A.  That, I don't know, because we were talking
25 about something completely different. Where did the

Page 498

1  numbers-only -- where is that? Is that --
2  Q.  It's part of the sentence, sir. "This
3  numbers-only oriented analysis..."
4      MR. CHALOS: Object to the form. Object, I
5      think it's misleading.
6  A.  Okay. I see where you're at now. "The
7  numbers-only oriented analysis does not take into
8  account..."
9      Okay. And your question about that was?
10 Q.  My question was you agree that the
11 limitations you've identified here were the
12 limitations of that numbers-only oriented approach
13 taken by the distributor in this case?
14     MR. CHALOS: Hang on a second. Object to
15     the form. I think that's misstating what this
16     document says.
17 A.  So I -- this does refresh my memory
18 slightly, and the thing that jumps out at me here
19 is, as I recall in this case, Mr. Forshee, who was
20 the pharmacist who owned Cherokee Pharmacy, and the
21 documents that I reviewed, he had placed orders
22 orders for the exact same order that he had been
23 placing for his controlled substances. In other
24 words, he ordered, let's say, five bottles of
25 OxyContin on Saturday and it didn't come in on

Page 499

1  Monday, so he placed that order again on Tuesday and
2  it didn't come in on Wednesday, so he placed that
3  order again on Thursday.
4      And what jumps out -- the recollection that
5  jumps out at me is that the way HD Smith -- I think
6  it was -- it was either HD or JM Smith, I can't
7  remember which one it was. The way they -- they
8  counted all of those towards his quota, and I think
9  that also referred to the "numbers-only," and I'm
10 not sure why they did that. I don't know what
11 processes or procedures they had in place, I just
12 know that from the documents that I saw and the
13 testimony that came out, was that any order placed,
14 whether it was filled or not, counted against his
15 purchases of controlled sub -- which greatly
16 inflated his apparent utilization, which the
17 wholesaler did not take into account, and I think
18 that was the real crux of what was going on here.
19 Q.  Okay. I'm just going to ask this question
20 again because that was a long answer that wasn't
21 entirely responsive.
22     So let me ask it a different --
23     MR. CHALOS: Objection.
24 Q.  Let me ask it a different way and see if you
25 better understand my question.

Page 500

1      "A numbers-only oriented analysis does not
2  take into account the utilization patterns and the
3  communities served by Cherokee Pharmacy, its new
4  store location which was poised for growth, the
5  demographics and/or changes in the prescribing
6  community, the patient mix, incidence of disease or
7  other factors."
8      Do you agree that an analysis by a
9  distributor should take those into account?
10     MR. CHALOS: Object to the form of the
11     question, and the opinion its seeking is beyond
12     the scope of the opinions that he's offered in
13     this case.
14 A.  So when I did the analysis back in 2014, I
15 certainly agree that the wholesaler should have
16 taken into account these factors. This was a very
17 different case and very different issues than we
18 have here, and as I said, I haven't provided any
19 opinions about this in this matter.
20 Q.  Do you agree those are always factors that
21 should be considered by a distributor?
22     MR. CHALOS: Object to the form; also beyond
23     the scope of the opinions he's offered in this
24     case as reflected in Exhibit 1 to this
25     deposition, his report.

Page 501

1    Q.   And just to be clear, I'm not asking you to
2  opine on whether any distributors' decision on any
3  given pharmacy was correct or incorrect right now.
4  I'm just asking as a general matter, do you agree
5  with the statement written here, that a numbers-only
6  oriented analysis is flawed and that instead, you
7  should take into account these other factors?
8        MR. CHALOS:  I object to the form.  I also
9        object that it is beyond the scope of the
10       opinions that he's offered in this case as
11       reflected in his report, which is Exhibit
12       Number 1 to this deposition.
13   A.   So the danger in me saying that these are
14  the things that need to be reviewed will maybe lead
15  people to think that I know the exact nature of what
16  needs to be reviewed by a wholesaler, and I don't.
17       I can tell you that in this case, based on
18  the documents that I saw in this specific instance,
19  it appeared that the decision that had been made had
20  been made based on what I refer to in the paragraph
21  as a numbers-only analysis and it did not take into
22  consideration these factors.  In that case, back in
23  2014, I apparently felt that it should have.
24   Q.   And are there situations you can think of
25  where a distributor should not take those factors

Page 502

1  into account?
2        MR. CHALOS:  Hang on a second.  Object to
3        the form, but I also object that it's beyond the
4        scope of the opinions that he's given in this
5        case as included in Exhibit Number 1 to this
6        deposition.
7    A.   So I don't know.  I would need to think
8  about that.  I would need to figure out -- you know,
9  if I'm going to be asked questions about what I
10  think is -- you're referring to, and I know I
11  referred to it here, as suspicious order monitoring,
12  which at the time was a new term to me, the answer
13  would need to be analyzed.  So should they always do
14  this?  Should they never this?  Should they do this
15  sometimes?  I don't know.
16   Q.   So let me ask you about the suspicious order
17  monitoring.  Do you have expertise in suspicious
18  order monitoring?
19   A.   I'm pretty sure I have said before that I do
20  not.
21   Q.   Then why did you opine about it in this
22  case?
23   A.   Because this case wasn't about suspicious
24  order monitoring.  This case was about a pharmacist
25  whose supply of all drugs was curtailed by his

Page 503

1  wholesaler, including controlled substances, and it
2  was based on the wholesaler's lack of awareness of
3  the business operations at this pharmacy, which
4  placed the pharmacy in jeopardy, and in fact, as I
5  understand it, the pharmacy is no longer in
6  business, but the crux of this matter was the
7  wholesaler stopped providing drugs which made the
8  pharmacist not able to sell, generate revenue, and
9  then not able to pay their bills to the wholesaler.
10  So that was -- that was what was going on here.
11  This wasn't about suspicious order monitoring or
12  anything.  It was just about a decision that the
13  wholesaler made that, in my assessment, wasn't fair
14  to the pharmacy.
15   Q.   And the decision that you made, the decision
16  that -- sorry -- that you were assessing or
17  considering in this case, the -- in other words, the
18  distributor's decision to stop providing controlled
19  substances to this pharmacy, part of the analysis,
20  in your words, that went into that decision was done
21  by the suspicious order monitoring system of that
22  distributor, correct?
23        MR. CHALOS:  Object to the form.
24   A.   This is something that would have come from
25  one of the documents that I reviewed.  This was not

Page 504

1  something that was based on my own knowledge.  It
2  was something that I learned as a process of
3  reviewing the materials in this case.
4    Q.   So you put that into your report without
5  knowing or understanding what the suspicious order
6  monitoring system of the distributor was?
7        MR. CHALOS:  Object to the form.
8    A.   That's not fair at all.  That's not fair at
9  all to say that.  What I said was I learned about
10  this from the documents that I reviewed in this
11  case.  So I don't know why you would say that I put
12  it in there without learning about that system.  I
13  learned what I needed to know to formulate this
14  opinion.
15   Q.   So you learned about suspicious order
16  monitoring for this distributor?
17   A.   I learned about what was happening in this
18  case at this time.  I was unaware that at that point
19  in time there was a formal process known as
20  suspicious order monitoring.  This was something
21  that at the time I thought was unique to HD Smith or
22  JM Smith, whoever it was.
23   Q.   And then you rendered a decision about the
24  distributor's analysis under their suspicious order
25  monitoring system, right?

Page 505

1      MR. CHALOS:  Object to the form.
2    A.  No, no.
3      MR. CHALOS:  Misstates the document.
4    Q.  What was your ultimate conclusion about the
5  wholesale distributor's decision to terminate the
6  sale of controlled substances to this pharmacy?
7      I'm not trying to trick you but I think it's
8  in bold listed as Opinion V on Page 5.
9    A.  I'm going to read the entire document
10  because I want to know what I'm talking about here.
11  It's been five years since I've seen this and you're
12  asking me a lot of questions and I don't know where
13  they're coming from, so if you'll please bear with
14  me.
15      MS. RODGERS:  Can we go off the record while
16  he reviews this document?
17    A.  I'm sorry, there is a question pending and
18  I'm reviewing the document in response to your
19  question.
20      MS. RODGERS:  I think we need to go off the
21  record for this.
22      MR. CHALOS:  I don't agree to go off the
23  record.
24      SPEAKER:  We have done that in other cases,
25  like Doug Boothe, when --

Page 506

1      MR. CHALOS:  I don't know -- I don't know
2  anything about that, but I'm not -- I don't agree
3  to go off the record here.
4      MR. LADD:  We have done that in other
5  cases.  We've gone off the record when the
6  witness expresses the desire to review an entire
7  document.  We've gone off the record to give the
8  witness a chance to review the document and gone
9  back on the record once the witness has finished
10  reviewing the document and is ready to answer
11  questions about the document.
12      MR. CHALOS:  Well, I don't agree.
13      MR. CIULLO:  It's a courtesy we extended to
14  the plaintiffs.
15      MR. CHALOS:  I know.
16      MS. BAISCH:  You didn't in my deposition.
17      MR. CIULLO:  You were deposed?
18      MS. RODGERS:  Okay.  I'm going to preserve
19  the objection so we can revisit this time
20  allocation later.  I think we should go off the
21  record right now.
22      MR. CHALOS:  I don't agree.
23      MS. RODGERS:  I'm preserving the objection.
24      MS. ZOLNER:  At a minimum, can we keep track
25  of the amount of time the witness is using to

Page 507

1  review the document?  (The time is 1:03 p.m.)
2    A.  (The time is 1:05 p.m.)  Okay.  Thank you
3  for giving me that time.  If you could ask your
4  question again, I think I'm prepared to answer.
5    Q.  Sure.  What was your ultimate conclusion
6  with respect to the distributor's decision to
7  terminate controlled substances here?
8      MR. CHALOS:  Object to the form.
9    A.  In this case, after having reviewed the
10  document, which has refreshed my memory about what
11  all was going on here, was that Smith Wholesale
12  suspended the sales of controlled substances to
13  Cherokee Pharmacy with what I referred to as an
14  incomplete or flawed analysis.
15    Q.  And it was incomplete or flawed because it
16  didn't take into account -- and I'm looking again at
17  Paragraph 7 -- 27 rather:  "The utilization patterns
18  in the community, its new store location which was
19  poised for growth, the demographics and/or changes
20  in the prescribing community, the patient mix,
21  incidence of disease, or other factors."
22      Correct?
23      MR. CHALOS:  Object to the form.
24    A.  That is what's written in the report, yes.
25    Q.  And you agree that business growth is a

Page 508

1  legitimate reason for increasing a pharmacy's
2  permissible order limits?
3      MR. CHALOS:  Object to the form; also is
4  seeking opinions that are beyond the scope of the
5  opinions that he's offered in this opioids
6  litigation as reflected in Exhibit Number 1 to
7  his deposition.
8    A.  So at least in this matter I did -- I did
9  come to that conclusion based on the documents that
10  I reviewed, that there were a number of factors that
11  were not considered, one of which was the pharmacy
12  was relatively new and it was in a growth phase,
13  yes.
14    Q.  Okay.  And when you say in this paragraph
15  "changes in the prescribing communities," you meant
16  general increases in prescribing that were happening
17  around the country?
18    A.  No, I don't believe so.  I think this was
19  specifically to this case, which the changes in the
20  prescribing community in this instance had to do
21  with the -- if I remember correctly, and I think
22  this is the case, there was a pain clinic with a
23  nurse practitioner that had just opened near the
24  hospital that was also adjacent to Cherokee
25  Pharmacy.  I'm pretty sure that's what that relates

Page 509

1 to, and this is five years ago, so --
2 Q. Okay. Yeah. And that would be a legitimate
3 reason for increasing a pharmacy's permissible order
4 limits?
5 MR. CHALOS: Object to the form of the
6 question. I also object to the question on the
7 grounds that it is outside of the scope of the
8 opinions that Dr. Perri has given in the opioids
9 litigation that we're here about today as
10 reflected in Exhibit Number 1 to this deposition.
11 A. So with respect to this case, the volume of
12 documents that I looked at included a number of
13 factors why I felt as though the process that Smith
14 used to decide not -- to no longer sell
15 prescriptions to Cherokee Pharmacy, that was one of
16 the factors, but there were many.
17 Q. Okay. And demographics, patient mix, and
18 incidence of disease, those are also other factors
19 that could lead a distributor to increase a
20 pharmacy's permissible order limits, right?
21 MR. CHALOS: Object to the form. Hang on
22 one second. Object to the form. I also object
23 to the question on the ground that it is outside
24 the scope of the opinions that he's given in the
25 opioids litigation as reflected in Exhibit

Page 510

1 Number 1 to this deposition.
2 A. I hate to ask but you can you repeat that
3 question again?
4 Q. Demographics, patient mix, an incidence of
5 disease, those are also factors that could lead a
6 distributor to increase a pharmacy's permissible
7 order limits, correct?
8 MR. CHALOS: Same objections.
9 A. Okay. So that -- that actually -- I'm glad
10 I had you repeat that, because I thought I had
11 detected something in there that concerned me.
12 I did not evaluate increasing order limits
13 under -- at any point in this case. The only
14 question that I had in front of me was the complete
15 cut off of supply to that pharmacy of controlled
16 substances.
17 So the question of should his allotments be
18 increased was never on my radar in this case.
19 Q. Okay. That's -- let me withdraw and
20 rephrase.
21 A. Okay.
22 Q. Demographics, changes in the prescribing
23 community, and patient mix, incidence of disease,
24 those are all factors that a distributor should
25 consider in deciding whether to service a pharmacy

Page 511

1 with controlled substances?
2 MR. CHALOS: Object to the form of the
3 question. I also object on the ground that it is
4 seeking opinion testimony that's beyond the
5 opinions that he's offered in this litigation as
6 reflected in Exhibit Number 1 to this deposition.
7 A. So my answer to that is at least in this
8 case, I think those are things I should have
9 considered. I don't know beyond this.
10 Q. Okay. Let's look at the top of Page 7.
11 A. Okay.
12 Q. And I'm just going to read a statement and
13 ask if you agree with it. It is the second
14 paragraph on the -- on Page 7: "Pharmacies of
15 different sizes and geographic locations have vastly
16 different dispensing patterns due to their location,
17 the number and types of prescribers nearby, and the
18 demographics of the patients served. Each of these
19 variables can impact the volume and mix of
20 prescriptions dispensed."
21 Do you agree with that statement?
22 A. I do.
23 Q. Okay. In the second bullet point you note
24 that the Pro Compliance report had based its
25 assessment on spacial data, which was the distance

Page 512

1 of the prescriber or patient from the pharmacy.
2 Would you agree that that's not an adequate
3 justification to withhold sale of controlled
4 substances -- controlled substances to a pharmacy?
5 MR. CHALOS: Object to the form of the
6 question. I also object on the ground that it
7 seeks opinion testimony beyond and outside the
8 scope of the opinions that he is offering in this
9 litigation as reflected in Exhibit Number 1 to
10 this deposition.
11 A. So in this particular matter, there was a
12 unique concern that I had because of the location of
13 Cherokee Pharmacy. Cherokee Pharmacy was located on
14 the border between Georgia and Tennessee, and as
15 such, they had a lot of patients that came -- and in
16 addition to that, they were located near Chattanooga
17 or outside Chattanooga, so they both drew patients
18 from the Chattanooga area, as well as the rural
19 areas around. So they had many patients that
20 traveled 50 or 75 miles to get to their pharmacy.
21 They had patients that traveled from out of state.
22 And based on what I recall from this case
23 and the Pro Compliance report, that Pro Compliance,
24 the company that evaluated the pharmacy computer
25 data for JM Smith, assessment was that the pharmacy

Page 513

1  was suspicious, or whatever other word they were
2  using, I don't recall what it was, but the
3  suspicious word is in this report, so I guess it
4  could be that, because -- or the orders were suspect
5  because of the distance that patients were traveling
6  to get to that pharmacy.
7       Now, to then not take that a step further
8  and look at it and say, "Oh, well, this pharmacy is
9  unique because of its geographic location," seemed
10 inappropriate to me and that's one of the basis for
11 the opinions that I expressed here.
12     Q.  In other words, there is nothing inherently
13 wrong with patients having to travel some distance,
14 you have to look a little closer at what's going on?
15     MR. CHALOS:  Object to the form, and object
16 to the extent it's calling for an opinion that's
17 beyond the scope of the opinions that he's
18 offering in this litigation as reflected in
19 Exhibit Number 1 to this deposition.
20     A.  So to answer your question, the -- if this
21 was a pharmacy in Athens, Georgia, that has a number
22 of pharmacies around and a completely different
23 geographic makeup, if patients are traveling 75 or
24 100 miles or coming from South Carolina or Tennessee
25 or North Carolina to shop in Athens, that would be

Page 514

1  very suspicious to me.  Again, I'm not basing this
2  on any kind of expertise in the order -- in the area
3  of knowing what a suspicious order looks like.  I'm
4  basing it on the fact that I'm a pharmacist and I
5  have seen, at least in this case, the way rules --
6  whatever rules by whoever imposed them were being
7  applied, and I thought it was unfair in the case
8  against Cherokee Pharmacy.
9      Q.  Okay.  The third bullet point you wrote:
10 "The Pro Compliance report notes that Tennessee has
11 one of the highest accidental drug overdose rates.
12 This is not relevant to the filling of legitimate
13 prescriptions by licensed pharmacists acting on
14 medical providers' orders.  While a significant
15 problem, this must be addressed from a variety of
16 perspective, including through educating patients,
17 not by withholding needed medications."
18     Do you agree with that statement?
19     MR. CHALOS:  Object to the form.  I also
20 object to the extent it's calling for -- I object
21 on the ground that it is calling for opinion
22 testimony that's beyond the opinions that he's
23 offered in this opioids litigation as reflected
24 in Exhibit 1 to this deposition.
25     A.  There is actually another factor that came

Page 515

1  into play here in the fact that Mr. Forshee's
2  pharmacy actually drew from -- primarily from
3  Georgia and not Tennessee, and I'm not sure why
4  that's not noted here, but I do recall that from --
5  as I'm getting more into this, I'm remembering more
6  about this case.
7       But in general, I would agree that
8  pharmacies may have or they may not have procedures
9  in place that can safeguard patients and the filling
10 of prescriptions.  We've all heard the term "pill
11 mills" before, and so if a pharmacy is just
12 indiscriminantly filling prescriptions without
13 vetting patients, not doing anything to protect
14 patients in any way, and I know from reviewing this
15 document over the last few minutes, Mr. Forshee had
16 an extensive procedure when a patient comes into the
17 pharmacy, where they collect page after page after
18 page of information to get to know the patient, to
19 help the patient understand how they were going to
20 meet their needs in term of providing pain
21 medications and things like that.
22     So in this particular instance, I definitely
23 agree with this.  I don't know if I could agree with
24 this in another instance, but at least here for
25 Cherokee Pharmacy, I definitely agree with this.

Page 516

1      Q.  You agree with the statement that I read to
2  you earlier:  "This is not relevant to the filling
3  of legitimate prescriptions by licensed pharmacists
4  acting on medical providers' orders.  While a
5  significant problem --" again the accidental drug
6  overdose rates -- "this must be addressed from a
7  variety of perspectives, including through educating
8  patients, not by withholding needed medications."
9      MR. CHALOS:  Object to the form, and I also
10 object to the extent it's calling for opinion
11 testimony beyond the scope of the opinions that
12 he's offering in this case as reflected in
13 Exhibit Number 1 to this deposition.
14     A.  So to the extent that this -- these two
15 sentences relate to Cherokee Pharmacy, I definitely
16 agree with them.
17     Q.  Thank you.  If you look at the next bullet
18 point, you note that:  "The Pro Compliance report
19 does not mention that Tennessee is the 3rd highest
20 in the US in terms of utilization of all
21 prescription medications..."
22     And then I'm skipping down to the next
23 paragraph there.  Do you agree that that "highlights
24 that average numbers of prescriptions per capita in
25 Tennessee will be different than the rates reported

Page 517

1 in other states and national averages"?

2    MR. CHALOS:  Object to the form.  I also

3 object to the extent it's calling for -- I object

4 on the ground that it is calling for opinions

5 that are beyond to scope of the opinions he's

6 offered in this case.

7 A.  So is your question do I agree that

8 Tennessee is third, is that --

9 Q.  I'm saying first, do you agree that the fact

10 that Tennessee is third highest in the US in term of

11 utilization of all prescription medications means

12 that the average numbers of prescriptions per capita

13 in Tennessee will be different than the rates

14 reported in other states and national averages?

15    MR. CHALOS:  Object to the form.  I also

16 object on the ground that it is seeking expert

17 testimony and opinions beyond the scope of the

18 opinions he's offered in this case.

19 A.  So that was the -- the footnote to that is

20 referenced to the Kaiser Family Foundation, so I

21 will defer to them to assess whether that's accurate

22 or not.  I certainly think the Kaiser Family

23 Foundation is a well-respected repository of date

24 regarding this type of utilization.

25    With regard to the next statement, I think

Page 518

1 that flows from the citation from Kaiser.

2 Q.  Which next -- that "interestingly"?

3 A.  Yes.

4 Q.  Okay.  Let me ask this a different way.  Why

5 did you include this point, that Tennessee is the

6 third highest in the US in terms of utilization of

7 all prescription medications in your report?

8 A.  So I guess the reason that was included was

9 because the drug utilization in different parts of

10 the country, and we've seen in this case that Ohio

11 has a fairly high utilization of certain drugs,

12 other parts of the country have less utilization, so

13 I think sensitivity should be applied at least in

14 this case of Cherokee Pharmacy, that I think was

15 treated unfairly by the wholesaler, based on this

16 report and my recollection of what I did in this

17 case, that the -- that whatever system the

18 wholesaler had in place, whatever data they were

19 using should have been sensitive to the fact that

20 they are in a high drug utilization area, and that

21 mean -- that might mean that they are more sensitive

22 or it might mean that they are less sensitive, but

23 it should have at least been considered and it was

24 not apparently considered.

25 Q.  Okay.  It should be considered even in the

Page 519

1 context of hydrocodone, which is I believe what

2 prompted this report?

3    MR. CHALOS:  Object to the form and object

4 to the extent it's seeking an opinion that is

5 beyond the scope of the opinions he's offering in

6 the current litigation as reflected in Exhibit 1

7 to this deposition.

8 A.  So for clarification, is hydrocodone the

9 drug that was at issue in this case?

10 Q.  I believe it's actually oxycodone in

11 Paragraph 29.

12 A.  Okay.

13    MR. CHALOS:  Same objection.

14 A.  I'm sorry.  Is there a question now?

15 Q.  Sure.  My question is is your opinion that

16 distributors should have considered the fact that

17 Tennessee is the third highest in the US in terms of

18 utilization of all prescription medications when

19 making a decision about whether to terminate the

20 sale of controlled substances?

21    MR. CHALOS:  Object to the form.  Object to

22 that question on the ground that it's seeking

23 opinion testimony that is outside the scope of

24 the opinions he's offering in this litigation as

25 reflected in Exhibit Number 1 to this deposition.

Page 520

1 A.  So I think I just answered that.  So if I

2 didn't -- if you don't think I did, then I need to

3 make sure we're communicating properly here, because

4 I said I think with regard to this case that

5 something that --

6    MR. CHALOS:  This case being?

7 A.  I'm sorry.  Yes, the Cherokee Pharmacy case,

8 that is something that the wholesaler should have

9 considered, Pro Compliance should have considered,

10 but they did not apparently consider, and I said it

11 could be that they would be more sensitive to

12 utilization because it's a high-use area, or they

13 might be less sensitive because it's a high-use

14 area.  So that was, I think, what the gist of my

15 answer was before.  Or is that the response as you

16 recall it?

17 Q.  Yes, I believe that was to a different

18 section, but that -- I appreciate your response now.

19 Thank you.  I want to ask you just one other

20 question about a document that you cite at

21 Footnote 8, and I brought a copy of that and marked

22 it as Exhibit 21.

23    (Perri Exhibit 21 was marked for

24 identification.)

25 BY MS. RODGERS:

Page 521

1    Q.  This is an article in Pharmacist.com, which
2 is titled:  "Pharmacists turn away legitimate pain
3 patients as wholesalers limit shipments of
4 controlled substances."
5        You've seen this document before, I take it?
6    A.  Yes.
7    Q.  This article?
8    A.  Yes.
9    Q.  What is the National Community Pharmacists
10 Association?
11   A.  NCPA is a group of -- I believe NCPA is the
12 association that used to be the National Association
13 of Retail Druggists and they've changed their name
14 to National Community Pharmacists Association, and
15 they represent our nation's independent community
16 pharmacies and some small chains, I think.
17   Q.  Okay.  And are you or have you been -- have
18 you ever been a member of that association?
19   A.  I've never been a member of NCPA or NARD;
20 however, during the early part of my career I was
21 frequently asked to speak at their meetings on
22 issues related to helping community pharmacists run
23 their businesses more efficiently, especially
24 related to marketing topics.
25   Q.  And I just want to direct your attention to

Page 522

1 right after the header "NCPA:  The pendulum has
2 really swung too far."
3    A.  Okay.
4    Q.  Where it says:  An online survey released in
5 January by the National Community Pharmacists
6 Association found that three out of four (75%) of
7 the nearly 1,100 responding pharmacies had
8 experienced three or more delays or issues caused by
9 stopping shipments -- stopped shipments of their
10 controlled substances over the past 18 months.
11       I'm just going to stop there.
12   A.  Okay.
13   Q.  Would you -- is it your opinion that that's
14 a problem, would you agree that that's a problem?
15       MR. CHALOS:  Object to the form.  I also
16   object on the ground that it seeks opinion
17   testimony beyond the scope of the opinions that
18   he has offered in this case as reflected in
19   Exhibit 1 to his deposition.
20   A.  Yeah.  So to answer your question, I -- you
21 know, I've cited this document in this report to
22 show that this wasn't a problem just for Cherokee
23 Pharmacy, but that other pharmacies are reporting
24 the same kinds of problems.  I did no analysis or
25 evaluation of that, I didn't verify those numbers,

Page 523

1 so I really can't tell you what they're all about
2 other than it's a report from a fairly reputable
3 trade magazine that says, hey, this is a problem for
4 other pharmacies, and I think that's the real reason
5 why I cited it here.
6        As far as whether I agree with it or not, I
7 certainly think that there is a heightened
8 sensitivity on the part of community pharmacists in
9 the area of being able to meet their patients'
10 needs.  I know that some pharmacies feel as though
11 the behavior of certain stores, certain groups of
12 stores, has negatively impacted the marketplace and
13 that's why they feel like their orders are being
14 reduced or cut back.
15       So I think this is a real issue.  I don't
16 really have any opinions about it or any analysis
17 associated with it, but with respect to Cherokee
18 Pharmacy, this was something I felt as though
19 would -- to highlight for whoever was reading this
20 report at the time, the fact that this is not just
21 an isolated incidence, perhaps there are other
22 incidences that are occurring.
23       MS. RODGERS:  Okay.  I have no further
24   questions.  Thank you for your time.
25       THE WITNESS:  Thank you.

Page 524

1        THE VIDEOGRAPHER:  We are now going off the
2   video record.  The time is currently 1:23 p.m.
3       (Recess from 1:23 p.m. until 1:27?p.m.)
4       THE VIDEOGRAPHER:  We are now back on the
5   video record with the beginning of Media
6   Number 4.  The time is currently 1:27 p.m.
7        RECROSS-EXAMINATION
8 BY MR. LADD:
9    Q.  Good afternoon, Mr. Perri.  My name again is
10 Matthew Ladd, and we spoke yesterday, from Morgan
11 Lewis representing Rite Aid.  I have a handful of
12 questions for you as you correctly intuited
13 concerning your prior expert report in Cherokee
14 Pharmacy which has been marked Exhibit 10.
15       Do you still have that exhibit in front of
16 you?
17   A.  Yes, I do.
18   Q.  Could you turn, please, to Page 4 of that
19 exhibit, and specifically let me direct your
20 attention to Paragraph 19.
21   A.  Okay.
22   Q.  Do you see where I am?
23   A.  Yes.
24   Q.  If you would look down, the fourth sentence
25 beginning "If the pharmacist believes," do you see

Page 525

1  that sentence?
2    A.  Yes, I do.
3    Q.  And to save time, I'll just read it into the
4  record.  You wrote here:  "If a pharmacist believes
5  that a particular drug might not be the best therapy
6  for a patient, they may explain their findings to
7  the medical provider, but the final decision is that
8  of the medical provider and the order must be filled
9  exactly as written."
10       Did I read that sentence correctly?
11   A.  Yes.
12   Q.  And was this part of the opinion in your
13 expert report that you submitted in the Cherokee
14 Pharmacy case?
15   A.  Yes, it was.
16   Q.  And did you agree with this statement when
17 you wrote it?
18   A.  Of course.  I agree with it now.
19   Q.  Thank you.  If you look to the next
20 statement, I'll ask a series of similar questions:
21 "Pharmacists have a professional duty to provide the
22 medications selected by the prescriber when a
23 legitimate patient-prescriber relationship exists."
24       Did I read that sentence correctly?
25   A.  Yes, you did.

Page 526

1    Q.  And did you agree with that statement when
2  you wrote your prior report?
3    A.  Yeah.  And I would like to just add, though,
4  that this is, with respect to the bigger context of
5  the pharmacist's duty when they bring a patient into
6  the pharmacy, the -- this doesn't apply to any
7  particular drug or drug category.  This is for all
8  drugs.
9    Q.  I understand this is for all drugs.
10   A.  Right.
11   Q.  Including controlled substances?
12   A.  Yes.
13   Q.  Including opioids?
14   A.  Yes, that's right.
15   Q.  And you agreed with this statement when you
16 wrote it?
17   A.  I did.
18   Q.  And you agree with this statement now?
19   A.  It's part of the Pharmacy Practice Act, yes.
20   Q.  Thank you.  If you could turn to the next
21 page, at the top of Page 5, the last sentence in
22 Paragraph 20, you wrote:  "The role of the
23 pharmacist is not one of second guessing medical
24 providers, but rather to work to ensure appropriate
25 drug therapy, the integrity of the prescription

Page 527

1  process, and to guarantee the delivery of
2  medications to patients."
3        Did I read that sentence correctly?
4    A.  Yes.
5    Q.  And did you agree with that statement when
6  you wrote it?
7    A.  There's a lot in there but I did agree with
8  it then and I do agree with it now.
9    Q.  Thank you.  In other words, the point is
10 pharmacists should not interfere with the
11 physician-patient relationship; is that correct?
12       MR. CHALOS:  Object to the form.  It also is
13    asking for opinions outside of the opinions he's
14    offered in this litigation, the opioids
15    litigation, as reflected in Exhibit 1 to his
16    deposition.
17   Q.  And to rephrase, Dr. Perri, if I may, the --
18 I'll withdraw that question and ask another one.
19       Part of your opinion in this prior report
20 was that pharmacists should not interfere with the
21 physician-patient relationship; is that correct?
22       MR. CHALOS:  Object to the form.
23   A.  So, actually, no, that's not -- that's not
24 really what I'm trying to imply here.  When you say
25 it should not interfere, it's more like they should

Page 528

1  intervene in a positive and appropriate way when
2  there is a problem.
3        So if you go back to the paragraphs that we
4  looked at just before, the duty to ensure that there
5  is a legitimate prescriber-patient relationship, the
6  duty to do a prospective drug utilization review and
7  ensure that the medication that is being prescribed
8  is not going to do any harm to the patient, these --
9  if you intervene in that, you're not interfering
10 with the patient-physician relationship, you are
11 intervening to ensure appropriate care.  So I
12 disagree with your use of the word interfering.
13       But with that being said, I think that the
14 pharmacist has the role as I've described in my
15 answer, and also the general Pharmacy Practice Act
16 that we all work underneath the authority of,
17 certainly it would support these statements.
18   Q.  And to be clear, and just to give some
19 context to this statement that you just gave, your
20 opinion in this report was that -- part of your
21 opinion in this report was that when a legitimate
22 patient-prescriber relationship exists, pharmacists
23 have a professional duty to provide the medication
24 selected by the prescriber; is that correct?
25       MR. CHALOS:  Object to the form.

Page 529

1    A.  Yes, and -- but there is two parts to that,
2  and the second part of it is that the pharmacist's
3  duty extends beyond just the legitimacy of the
4  patient-prescriber relationship, even though that's
5  the first part and if it's not met, then everything
6  stop, but the second part is, is to ensure that the
7  drugs is not going to do any harm.  So though -- but
8  those things, they have to go together, in my mind.
9    Q.  I understand.  Thank you, Dr. Perri, for
10  clarifying.
11    A.  Thank you.
12    Q.  Can you go to Paragraph 25 of this expert
13  report, please?
14    A.  Okay.
15    Q.  And you discussed yesterday with
16  Ms. Rodgers, just to refresh your recollection, this
17  particular part of the report dealt with a
18  distributor, Smith Wholesale, that in this case
19  unilaterally ceased providing controlled substances
20  to Cherokee Pharmacy; is that correct?
21    A.  Yes.
22    Q.  And you write in your report, and I'm
23  looking now at the last sentence before the two
24  bullet points:  "This action had two significant and
25  immediate effects on the operation of the pharmacy

Page 530

1  and its patients."
2    Do you see that sentence?
3    A.  Yes.
4    Q.  And did I read that correctly?
5    A.  Yes.
6    Q.  Thank you.  And one of the significant and
7  immediate effects that you noted in your prior
8  report was that the pharmacy could not provide
9  needed medications to its patients; is that correct?
10    A.  Yes.
11    Q.  And the second significant and immediate
12  effect of the distributor unilaterally ceasing to
13  provide controlled substances to the pharmacy was
14  that legitimate patients with serious medical
15  conditions were unable to obtain their controlled
16  substances medication from the pharmacy; is that
17  right?
18    A.  Yes.
19    Q.  Thank you.
20    A.  So --
21    Q.  Can you go to the next paragraph, please?
22    MR. CHALOS:  Hold on.  Do you have
23  something --
24    THE WITNESS:  No, it's okay.  I can -- I'll
25  bring this up.

Page 531

1    Q.  If you looked at Paragraph 26 at the top of
2  Page 6, is it fair to say that this particular
3  paragraph, based on the review of your prior report
4  that you were conducting during Ms. Rodgers'
5  examination, deals with two separate analyses that
6  had been done, one by the distributor and one by a
7  third party, Pro Compliance; is that correct?
8    MR. CHALOS:  Object to the form.
9
10    A.  It seems to me that JM Smith did some kind
11  of a superficial analysis and that they got a Pro
12  Compliance report.  There were a couple of issues
13  that were going on here with regard to these -- the
14  timing of all of this.  Smith -- and there is one
15  other issue that I feel like I have to tell you as
16  well because it has bearing on this whole report and
17  why this incident came about.
18    But the initial analysis, whatever Smith
19  did, and I don't know exactly -- I don't recall and
20  I don't know if I ever knew exactly what they did,
21  but whatever it was, it prompted them to order this
22  Pro Compliance report, and Mr. Forshee didn't want
23  to do the Pro Compliance report for some reason, as
24  I recall, because he felt like it was a violation of
25  HIPAA in some way, because the wholesaler would then

Page 532

1  be looking at his actual patient data in his
2  computer:  Names, addresses, phone numbers, ZIP
3  codes, all that kind of stuff.
4    So there was this back-and-forth between
5  them, and Mr. Young, who was the Smith
6  representative -- what has -- what has occurred to
7  me in all of this is that nothing -- something that
8  hasn't come up at all was the real reason that came
9  out in this whole case about why Mr. Forshee's
10  supply was being cut was because Smith didn't want
11  to do business with him anymore because he got very
12  rude with him on the telephone, and these were all
13  things that were being acting as if they were a
14  smoke screen to cloud the issue of why they were
15  really cutting him off as a supplier.
16    So there were these other layers to what was
17  going on, and I don't think that's come out before,
18  and really, as I'm getting back into this, I'm just
19  remembering more and more about the case.  So --
20    Q.  I --
21    A.  I was going to say but to answer your
22  question, there were -- there were two things that
23  were related to the orders, there was the conflict
24  between Mr. Forshee, as far as the releasing his
25  patient data to a third party that he didn't have

Page 533

1 any real knowledge of, and then the issues
2 related -- also the issues related to Mr. Forshee's
3 belief that the wholesaler shouldn't be interfering
4 with his patient relationships.
5    So there were four things, I think. You
6 mentioned two.
7    Q. Thank you, Dr. Perri. So just to go back to
8 my question, there were two analyses referred to in
9 this particular paragraph; is that correct, one
10 superficial internal analysis done by the
11 distributor, and one partial analysis of dispensing
12 statistics provided by Pro Compliance?
13    A. So to that question, yes, there were two
14 analyses. I thought the prior question had asked me
15 what the factors were.
16    Q. And I apologize if I was unclear, but this
17 paragraph is just addressing these two analyses, one
18 by the distributor and one by Pro Compliance; is
19 that right?
20    A. That's right.
21    Q. Okay. And in your opinion in this report
22 and I'm just reading from your report here, in your
23 opinion both the distributor's internal analysis and
24 the Pro Compliance report had serious flaws that
25 rendered these analyses largely useless; is that

Page 534

1 correct?
2    MR. CHALOS: Where is that? Where are you
3 reading from?
4    Q. So this is from the fourth sentence of
5 Paragraph 26.
6    A. That's what I said at the time, yes.
7    Q. And they were largely useless in evaluating
8 the appropriateness of the dispensing of controlled
9 substances at the pharmacy; is that right?
10    A. Based on the documents I had seen in this
11 matter, that's -- that was the conclusion I came to.
12    Q. Thank you, Dr. Perri. And just because I'm
13 not positive we got this on the record yesterday, if
14 you will go to Paragraph 29.
15    A. Okay.
16    Q. In your expert report in this case, Cherokee
17 Pharmacy, you stated that the distributor lowered
18 the allotment for oxycodone by as much as 50
19 percent; is that correct?
20    A. You know, I don't recall that but I see that
21 it's in the report here in Paragraph 29.
22    Q. Okay. Thank you. And as a result of that,
23 Cherokee Pharmacy could not fill all prescription
24 requests for oxycodone; is that right?
25    MR. CHALOS: Object to the form. I think

Page 535

1 that misstates the -- what this is saying here.
2    Q. So let me try the question a different way.
3 I'll read directly from your report.
4    A. Okay.
5    Q. "The fact that the distributor lowered the
6 allotment for oxycodone to Cherokee Pharmacy by as
7 much as 50 percent meant that Cherokee Pharmacy
8 could not fill all prescription requests for this
9 product."
10    Is that correct?
11    MR. CHALOS: Object to the form; misstates
12 the document.
13    A. So the real issue here, as I'm looking at
14 this, was that not only they were -- they were
15 cutting the quota, but they were also not telling
16 Mr. Forshee what his new magic number was going to
17 be.
18    Q. I understand.
19    A. So he ran the risk of if he placed an order
20 and it exceeded his allotment, that he was going to
21 then be held accountable for that order that he
22 never received once again, as he was in prior
23 orders, which was going to add to the demerits
24 against him and his pharmacy in the overall system
25 that Smith was using.

Page 536

1    So that actually contributed to my questions
2 about how the Smith system could be effective in
3 actually doing what it was purporting to do.
4    Q. Thank you. That's helpful. And because of
5 that, you opined in your report: "Patients would
6 have to seek to have their medication filled
7 elsewhere or go without needed medication."
8    Is that correct?
9    MR. CHALOS: Object to the form.
10    A. In the event that these things actually
11 happened and he didn't receive an order, and he
12 didn't have inventory to fill it, yes, they would
13 have needed to go somewhere else.
14    Q. Thank you, Dr. Perri. Could you turn to the
15 next page?
16    A. Yes.
17    Q. Actually, go two more pages in, on Page 8,
18 and then we'll jump back because I have a few more
19 questions about the Pro Compliance report that you
20 discussed with Ms. Rodgers just a few moment ago.
21    A. Okay.
22    Q. My first question has to do with the
23 conclusion that you arrived at in Paragraph 32. You
24 stated here: "The actions taken by Smith Drug
25 Company to arbitrarily impose restrictions on

Page 537

1  dispensing of controlled substances by Cherokee
2  Pharmacy interfered with its patients' ability to
3  get needed medications."
4      Is that correct?
5      MR. CHALOS:  Object to the form.
6  A.  That's the conclusion that I drew here.
7  Q.  Thank you.  And just so we have it on the
8  record, did you alter or change this opinion in any
9  way after you submitted it, to your recollection?
10     MR. CHALOS:  Object to the form.
11 A.  I don't know that there would even be a
12 mechanism to do that.  You mean like filing a
13 supplemental report or something like that?
14 Q.  Correct.  You're not aware of having changed
15 or altered your opinions in this case in any way?
16 A.  No.
17 Q.  Thank you.  If you could look back on Page 7
18 to the discussion of the Pro Compliance report, and
19 specifically the second bullet point, you spoke a
20 few moments ago with Ms. Rodgers concerning the Pro
21 Compliance report basing its assessment on spacial
22 data; is that correct?
23     MR. CHALOS:  Object to the form; a vague,
24 unclear question.
25 Q.  You can answer.

Page 538

1  A.  I'm looking for the word "spacial" so I --
2  oh, there it is.  Gotcha.  The second bullet point.
3  Okay.
4      Yes.
5  Q.  You remember discussing that with
6  Ms. Rodgers just a few minutes ago?
7  A.  Yes.
8  Q.  And if you look to the paragraph directly
9  after that beginning with the sentence "This is
10 flawed," do you see that?
11 A.  Yes, I do.
12 Q.  You wrote:  "This is flawed because no
13 standards are presented nor assessment of the actual
14 distances reported.  This is likely due to the lack
15 of defensible benchmark for these statistics given
16 the vast differences that would be seen between
17 rural and metropolitan areas."
18     Do you see that?
19 A.  I see that.
20 Q.  My question for you is in this case, what
21 would have been a defensible benchmark, in your
22 opinion?
23     MR. CHALOS:  Object to the form.  Are you
24 talk -- when you say "in this case," that's my
25 beef with the question.  Are you talking about in

Page 539

1  this case we are here about today, or in Smith?
2      MR. LADD:  In the case in Smith, in Smith.
3      MR. CHALOS:  Okay.  Yeah, because --
4      MR. LADD:  In which he wrote the prior
5  report.  Understood.
6      MR. CHALOS:  Okay.
7  BY MR. LADD:
8  Q.  In Smith, what would a -- what would a
9  defensible benchmark have looked like, in your
10 opinion?
11 A.  You know, I wasn't asked to come up with the
12 right answer, I was just making a notation here that
13 they hadn't developed a benchmark, they just said
14 that the patients were traveling too far but they
15 didn't say how far that was or why.  So I don't know
16 what the right number would be.
17     I do know that it would be different than an
18 in-town center city pharmacy because of the rural
19 location, and distance between two much bigger
20 cities than where Cherokee Pharmacy is located.
21 Q.  Thank you.  And I believe you said a moment
22 ago when you were being asked questions by
23 Ms. Rodgers that this was an unusual situation
24 because there was was a rural community that was
25 located between two larger cities?

Page 540

1  A.  And on the border.
2  Q.  Is that correct?
3  A.  Right.  And on the border.
4  Q.  And on the border.  So is it your
5  understanding that this particular city, Cleveland,
6  Tennessee, was the only community in the United
7  States that was both on the border of a state and
8  located between two much larger cities?
9  A.  It's the only one in Cleveland, Tennessee
10 that has those characteristics.  I don't know about
11 the rest of the country.
12 Q.  I understand.  Is it your understanding that
13 there are other rural communities in the United
14 States that are located between two much larger
15 cities?
16 A.  I'm sure that we could identify some if we
17 pulled out a map.  I think the point isn't whether
18 there is other cities or not, the point is, is
19 whatever rules were in place, were they being
20 applied appropriately to Cleveland -- Cleveland,
21 Tennessee and to Cherokee Pharmacy, which was the
22 analysis that I was trying to do in the Cherokee
23 Pharmacy case.
24 Q.  I understand.  But in your view in this
25 prior expert report, part of the reason there was a

Page 541

1  lock of a defensible benchmark was that the
2  dispensing analysis that took place did not take
3  into account the particular geographical
4  characteristics of the pharmacy in question; is that
5  right?
6     A.  I think, basically, that is something I
7  would agree with.
8     Q.  Okay.  And so in this -- so your
9  understanding at the time was that for a dispensing
10 analysis of a pharmacy's dispensing practices to be
11 accurate or to be accurate as possible, it would
12 need to take into account whatever geographical
13 particularities or characteristics that pharmacy
14 had?
15     MR. CHALOS:  Object to the form, and object
16 to the extent it's seeking opinions here in our
17 case, the opioids case, that are beyond the scope
18 of his opinions as reflected in Exhibit 1.
19     A.  So the answer to your question is, you know,
20 I don't know what needs to be done for other stores.
21 I did a pretty thorough analysis here of Cherokee
22 Pharmacy back when this all happened and I had a lot
23 of data, I could look at a lot of things.  I looked
24 at prescription numbers, the volumes, the actual
25 numbers of controlled substances that Mr. Forshee

Page 542

1  was ordering.  So I had a lot of information on that
2  so I could actually make an informed decision about
3  whether what was happening to him seemed to be
4  appropriate or not.
5     Beyond the scope of his store, I can't make
6  any conclusions or have any opinions about what's
7  right or wrong for other stores or what should be
8  done at the wholesaler level or any other level.
9     Q.  Understood.  But could you say at this time,
10 when you wrote this report, to a reasonable degree
11 of certainty that a dispensing analysis of a
12 pharmacy would likely be more accurate if it took
13 into account geographical characteristics of a
14 particular pharmacy than if it did not?
15     MR. CHALOS:  Object to the form, and object
16 to the extent it's calling for opinion testimony
17 beyond the scope of the opinions he's offering in
18 the opioids litigation.
19     A.  So with respect to Cherokee, I definitely
20 agree with that.  I don't know beyond that because
21 there may be more -- there may be some
22 one-size-fits-all that's appropriate.  I haven't
23 undertaken to study that.  I'm not an expert in that
24 area and I haven't looked at it at Cherokee nor in
25 our case today, the opioid case.

Page 543

1     Q.  You're not aware of any one-size-fits-all
2  dispensing analysis that would be appropriate in
3  Cherokee or any other case?
4     MR. CHALOS:  Object to the form.  I also
5  object to the extent it's -- object on the ground
6  that it is seeking opinion testimony beyond the
7  scope of the opinions he's offering in this
8  litigation as reflected in Exhibit 1 to his
9  deposition.
10     A.  So I guess what I'm saying is I leave open
11 the possibility that there is some rule that could
12 be applied, and I think you referred to it as a
13 dispensing analysis.
14     Q.  Yeah.  Yeah.
15     A.  And I think that's the Pro Compliance
16 report, is a dispensing analysis.  Am I correct in
17 that assumption?
18     Q.  Yes, that's correct.
19     A.  So if -- I would leave open the possibility
20 that there is some one-size-fits-all rule that could
21 be developed that would be an initial or prescreen
22 for any potential problems in a dispensing analysis.
23 Again, I don't know what that rule might be, I
24 haven't undertaken to analyze that, and I'm not an
25 expert in that area, and I didn't provide any

Page 544

1  opinions in the opioid case about things like that.
2     Q.  And just be clear, you're not aware of any
3  such one-size-fits-all rule as you sit here today?
4     A.  Well, I think what Cherokee was being
5  subjected to was a one-size-fits-all rule, which was
6  if you are traveling more than 25 miles, and I think
7  that's what we assumed they were using at the time,
8  just as my recollection is, is that number came into
9  my head, that seems to be what they were using, but
10 it didn't apply to Cherokee.
11     So it would -- that would at least be
12 evidence in my mind that a one-size-fits-all doesn't
13 work for anybody.
14     MR. LADD:  Thank you, Dr. Perri.  Those are
15 all the questions I have for you today.
16     THE VIDEOGRAPHER:  We are now going off the
17 video record.  The time is currently 1:47 p.m.
18     (Recess from 1:47 p.m. until 1:49?p.m.)
19     THE VIDEOGRAPHER:  We are now back on the
20 video record.  The time is currently 1:49 p.m.
21     CROSS-EXAMINATION
22 BY MS. COATES:
23     Q.  Hello, Dr. Perri.  My name is Melissa Coates
24 and I represent the Teva defendants in this matter.
25 I am going to try my best not to retread any ground

Page 545

1  but stick to some questions specific to my client.
2      A.   Okay.
3      Q.   And I'm -- am I correct, based on what I
4  heard in your testimony so far, that you are not
5  offering a Teva-specific opinion in your report or
6  your testimony?
7      A.   Yes.
8      Q.   And similarly, you are not offering any
9  Cephalon-specific opinion in your report or your
10 testimony?
11     A.   Yes.
12     Q.   Okay.  If we could turn -- we can go back to
13 Exhibit 1 to your report, and if we could turn to
14 Paragraph 165.
15     A.   Okay.
16     Q.   All right.  This is under Subsection G,
17 Defendants' Generic Marketing; is that correct?
18     A.   Yes, it is.
19     Q.   And it looks to me like Subsection G goes
20 through Paragraph 182; is that correct?
21     A.   Yes.
22     Q.   And does this Section G, Paragraphs 165
23 through 182, represent the entirety of the opinions
24 you're giving on generic marketing, generics
25 marketing?

Page 546

1      MR. CHALOS:  Object to the form.
2      A.   I think so.  I think the only other place
3  there might be something related to marketing of
4  generics would be in the section on the distribution
5  channels, the supply chain earlier in the report,
6  but it wouldn't be anything different.  It just
7  might be supplemental.
8      Q.   Okay.  And what do you mean, just so that we
9  can be clear, when you refer to generic marketing?
10     A.   So the marketing for brand name
11 pharmaceuticals and marketing for generics, in my
12 experience, is slightly different.
13     Q.   Okay.
14     A.   So I felt as though I should distinguish
15 between the two in the report.  So to the extent
16 that different methods are used or different themes
17 are used, I wanted to have a section that
18 specifically related to the themes used with
19 generics.
20     Q.   Okay.  And this is specific to generic
21 prescription medicines, and in this case opioids,
22 it's not generic in the sense of nonspecific or
23 unbranded, it's generic prescription medicines and
24 opioids?
25     A.   Yes.

Page 547

1      Q.   All right.  If we could turn to Paragraph
2  173.
3      A.   Okay.
4      Q.   And the last sentence of that paragraph
5  reads:  The key marketing messages are focused on
6  competitive prices and the assurance of consistent
7  supply of quality generic medicines -- medications.
8          Did I read that correctly?
9      A.   Yes, you did.
10     Q.   Thank you.  And I think you reference that
11 just a minute ago, that those marketing messages are
12 different than what you've seen with the branded
13 marketing messages; is that correct?
14     A.   Yes.
15     Q.   Okay.  And generic manufacturers do not
16 promote the safety, efficacy, or benefits of their
17 generic medications; is that correct?
18         MR. CHALOS:  Object to the form.
19     A.   I would agree that they generally don't do
20 that, but if there is not -- I can't say that that's
21 never done with respect to generics.  And if we
22 qualify that just a little bit, for example,
23 sometimes with generics there are -- references are
24 made to other products or comparable products, the
25 branded product itself.  So when that occurs, the

Page 548

1  generic is sort of linking itself to the branded
2  rather than just standing alone on its own.  So with
3  those qualifications -- generally, I completely
4  agree with this, and this is what I see in the vast
5  majority of the marketing messages associated with
6  generics that I saw in the opioid matter, was that
7  they focused on consistency of supply, pricing and
8  quality of the products.
9      Q.   Okay.  Thank you.  And turning to
10 Paragraph 182 -- sorry, 181, but just above still on
11 page 151.
12     A.   Okay.
13     Q.   Although we can read the sentence from the
14 beginning, just go back to page 150.  The sentence
15 starting:  "From a marketing and business
16 perspective, for each generic manufacturer who
17 decided to enter the opioid market, the profit
18 potential outweighed any barriers or potential
19 negative aspects of market entry, including concerns
20 over the risks of selling opioids."
21         Did I read that correctly?
22     A.   You did.
23     Q.   And this calculus, that profits outweigh the
24 risks and costs of a particular product, that
25 calculus is not unique to a decision to enter a

Page 549

1 market for opioids; is that correct?
2    A.   Yes, that's true, the go/no go decision
3 described in this section on my report, it would be
4 true for any generic product being considered.
5    Q.   Okay.  And medications that are available by
6 prescription, as opposed to, say, over the counter,
7 that is because there is some degree of risks
8 associated with those medications, correct?
9    A.   I think by definition, prescription
10 medications are more dangerous or more -- have more
11 potential for harms than over-the-continuer
12 medicines, yes.
13    Q.   Okay.  So a pharmaceutical manufacturer is
14 going to undergo a similar calculus when deciding to
15 manufacture or enter the market for any drug,
16 correct?
17    A.   I think there would be a contemplative
18 decision that would be made and they would -- they'd
19 have criteria.  Certainly I think the criteria for a
20 branded product may be different and certainly have
21 higher implications in terms of the amount of
22 investment that you've got to put into the product,
23 the amount of time that it would take to develop and
24 bring to market, but the overall "should we do this
25 or not" is going to be pretty similar at the end of

Page 550

1 the day:  Is this a market where we can find enough
2 customers to satisfy a model that's going to
3 generate the revenues we need to make to maximize
4 shareholder wealth and stay in business?
5    Q.   Okay.  And you're not giving an opinion that
6 there is anything wrong with selling generic opioid
7 medications; is that correct?
8    A.   No, I'm not giving an opinion that there is
9 anything wrong with that.
10    Q.   You're not giving an opinion that any
11 generic manufacturers in this case engaged in some
12 wrongful act; is that correct?
13         MR. CHALOS:  Object to the form.
14    A.   To the extent that, you know, opioid --
15 generic opioid manufacturers are part of the opinion
16 that, you know, the marketing expanded the opioid
17 market, they would be implicated in that, I think,
18 but I'm not making the assessment of right or wrong,
19 only that the marketing resulted in this expansion.
20 So I think the answer to your question is no, I'm
21 not giving that opinion, but there are opinions that
22 are related to that in the report just about the
23 expansion of the market, and certainly generics did
24 have a role in the expansion of the market.
25    Q.   Okay.  And generic opioids are subject to

Page 551

1 DEA quotas; is that correct?
2    A.   Yes.
3    Q.   So --
4    A.   As far as I know, yes.
5    Q.   Okay.  So manufacturers cannot simply
6 manufacture as much product as they want, correct?
7    A.   That's my understanding how the opioid quota
8 system works, yes.
9    Q.   Okay.  And are you familiar with the duty of
10 sameness when it comes to generic prescription
11 medicines?
12    A.   I don't know if I've heard that exact
13 phrase, but the -- I'm familiar with the
14 requirements for a generic are.
15    Q.   Okay.  And can you explain those
16 requirements to me, in your understanding?
17    A.   Right.  So a generic can come to market
18 without doing the clinical testing that the brand
19 name product has to do, but the generic must be
20 bioequivalent and it must have the same
21 bioavailability.  In other words, there is a -- I
22 think it used to be 85/120 rule, that the drug must
23 be within certain parameters.  So as long as the
24 drug is within those parameters of bioavailability
25 and bioequivalence, that it's essentially the same

Page 552

1 as the branded product.
2    Q.   And it's required to have the same label as
3 the branded product?
4    A.   Yes, that's part of it as well.  I was
5 taking it from a little bit different angle, but --
6 so -- but the indications, the safety information,
7 would all be exactly the same.
8    Q.   Okay.  If we could turn to Paragraph 128.
9    A.   Okay.
10    Q.   And if -- if you look at that paragraph and
11 Footnote 253 cited in Paragraph 128, you're citing
12 to the Boyer Teva deposition; is that correct?
13    A.   Yes.
14    Q.   And I believe you testified earlier that
15 this was not one of the depositions that you read in
16 its entirety; is that correct?
17    A.   Yes, that's correct.
18    Q.   Okay.  And the first sentence reads:
19 "Mr. Boyer, former President and CEO of Teva,
20 testified that using sales representatives to
21 communicate with doctors about the proper use and
22 risks of opioids was cost prohibitive and not done
23 by Teva."
24         Did I read that correctly?
25    A.   Yes, you did.

Highly Confidential - Subject to Further Confidentiality Review

Page 553

1    Q.   This testimony relates to Teva's generic
2  business; is that correct?
3    A.   Yes, generally speaking, yes.
4    Q.   Do you recall from reviewing the deposition
5  transcript whether this was specific to Teva's
6  generic business?
7    A.   As I recall, it was, yes.
8    Q.   Okay.  And is it your opinion, then, that
9  generic manufacturers failed to warn about the risks
10  of their generic opioid medications by failing to
11  use sales representatives to communicate with
12  doctors?
13    A.   No, I don't think that's my opinion
14  exactly..  I think that this was -- this was just
15  to -- again, you know, a case study analysis, you
16  have to look at so many different data points and
17  one of the data points that I was concerned about
18  was the balance of information in terms of whether
19  or not the -- you know, we spent a lot of time going
20  through a lot of package inserts earlier today, and
21  certainly those package inserts have warnings in
22  them and that's important.  That has to be
23  considered.
24    But then if you -- if you have a product and
25  it was simply a way of assessing whether or not, for

Page 554

1  Teva's generic products, whether there was any
2  effort on the parts of sales, which there are a lot
3  of sales reps out there bringing share of voice way
4  up for opioids, were there any sales reps out there
5  promoting the -- or communicating with doctors about
6  the proper use of the generic opioids?  So it was
7  just -- it's just a data point.
8    It's not really -- I mean, I don't really
9  even consider this judgmental against Teva.  It's
10  just simply that when we look at the overall balance
11  for generics, we generally aren't going to see a lot
12  of personal selling and we're not going to see a lot
13  of personal selling related to the risks or possible
14  harms of opioids.  It's just an artifact of the
15  market.  Again, it's not judgmental, it's just this
16  is the state of where we are, this is what's
17  typically done in that marketing.
18    Q.   What do you understand the public policy
19  reasons for making generic medications available in
20  the market to be?
21    A.   I think I address, to a certain extent, I
22  address that in the last section that we -- around
23  Paragraph 180, where we just were.  Generics
24  provide -- and we can certainly flip to that, but
25  just in general, generics provide a lower cost

Page 555

1  alternative that enables, from a couple of
2  perspectives, access to medications to be increased.
3    On the one hand we have third-party payers
4  who have a preference towards generics because they
5  are cheaper and it makes it a better deal for their
6  insurers and for their pharmacy benefit managers and
7  eventually for the patients as well.
8    For cash payments, generics present a lower
9  cost alternative that they may be able to afford
10  when indeed they can't afford a brand name product.
11  So public policy-wise I see generics as a positive
12  thing.
13    Q.   And if generic manufacturers were using
14  sales representatives to put out that voice, that
15  would affect their ability to offer those low
16  prices; is that correct?
17    A.   I mean, I don't -- I don't know the inner
18  workings of the generic manufacturers and what it
19  would cost them to do that if they already have a
20  sales force or if they don't.  The ins and outs of
21  that, my guess is it would cost them more money but
22  I haven't undertaken that analysis and certainly
23  don't know specifically for Teva, or any of the
24  manufacturers, if they could or couldn't, would or
25  wouldn't, and what it would cost, so -- but with

Page 556

1  that as a -- as sort of a caveat, I think certainly
2  the conclusion could be drawn that if generics
3  started marketing exactly the way brand name
4  products did, they would cost more.
5    Q.   Okay.  Thank you.  Let's turn to Paragraph
6  137.  The first sentence there reads:  "Fears were
7  also minimized through marketing communications that
8  indicated problems like addiction occur only when
9  opioids are abused or used illegally."
10    And then there is a Footnote 275.  Is that
11  correct?
12    A.   Yes.
13    Q.   Okay.  And if we look at 275 Footnote, it
14  starts:  "See generally, e.g."
15    And e.g. there means "for example," correct?
16    A.   Uh-huh.
17    Q.   So what follows is going to be an example to
18  support that first clause of Paragraph 137; is that
19  correct?
20    A.   Yes.
21    Q.   Okay.  So if we read after the e.g. in
22  Footnote 275, it says:  "Proper assessment of
23  patients, proper prescribing practices, periodic
24  reevaluation of therapy, and proper dispensing and
25  storage are appropriate measures to help limit abuse

Page 557

1  of opioid drugs."
2      Did I read that correctly?
3    A.  Yes.
4    Q.  So the quoted passage is about means to
5  limit abuse, correct?
6      MR. CHALOS:  Object to the form.
7    A.  The quoted passage does, yes.
8    Q.  Okay.  And do you agree that the things
9  listed in the quoted passage can be done to limit
10  abuse?
11    A.  Yes.  I think we would need to look at this
12  whole document, though, to get the reason why that's
13  being cited at 275, yeah.
14    Q.  Okay.  And the quoted passage at least does
15  not specifically mention addiction, is that correct?
16    A.  Well, it doesn't mention addiction.  It
17  mentions abuse, so, yeah.  Yeah.
18    Q.  Okay.  And it does not mention illegal use,
19  correct?
20    A.  Right.
21    Q.  Okay.  So I'm going to mark the document as
22  Exhibit 22.
23      (Perri Exhibit 22 was marked for
24  identification.)
25  BY MS. COATES:

Page 558

1    Q.  I'll give you that copy.
2    A.  Good throw.
3    Q.  That one is not going to make it quite as
4  far.
5      All right.  And that quote references
6  Page 11, right?  And just for comparison, the Bates
7  Number is TEVA_CHI_00000509.  And that's the same
8  Bates Number on the document that I gave you,
9  correct?
10    A.  Yes.
11    Q.  Okay.  And so if we turn to Page 11, and if
12  you look at the second bullet point, it says:  "All
13  patients treated with opioids require careful
14  monitoring for signs of abuse and addiction, since
15  use of opioid analgesic products carry the risk of
16  addiction even under appropriate medical use."
17      Did I read that correct?
18    A.  Yes.
19    Q.  So this is acknowledging that addiction can
20  occur when appropriately prescribed, correct?
21    A.  Yes.
22    Q.  And it does not actually state anything
23  about addiction occurring only when abused or used
24  illegally, correct?
25      MR. CHALOS:  Object to the form.

Page 559

1    A.  I'm finding myself wanting to look at this
2  whole area so I can make sure.
3    Q.  Please.
4    A.  I'm still trying to figure out if the
5  citation, you know -- why this was cited in this
6  particular occasion.
7    Q.  Okay.  Go ahead.
8    A.  Thanks.  Okay.  Now, if you don't mind,
9  would you ask me your question?
10    Q.  Sure.  So I'm struggling to see anything on
11  Page 11 that's stating that addiction occurs only
12  when abused or used illegally, which is the
13  proposition that you cited this document as an
14  example of.  Is that correct or --
15      MR. CHALOS:  Object to the form.
16    A.  So this section of the report, and this
17  particular -- this Paragraph 137, one of my -- one
18  of my contentions is that the marketing messages
19  minimized concerns over addiction -- dependence,
20  tolerance, addiction, withdrawal.  So the -- in this
21  sales training, which the topic of this page is
22  "Abuse, Addiction & Diversion," so this is a
23  question-and-answer that is designed to -- if you
24  look at the very first page of this document, it's
25  teaching a way -- a selling technique to minimize

Page 560

1  concerns and focus on the product's benefits and
2  features, and the reasons why it's okay to use the
3  project -- product, basically.
4      So I agree with you, this is not a -- the
5  best example I probably could have cited here, but
6  it does meet the criteria of what I would say, that
7  it's a communication, that's training in the sales
8  force, designed to alleviate fears about abuse, and
9  the question-and-answer, it does a job of taking the
10  doctor's fear, taking the prescriber's fear, and
11  reducing or minimizing that concern so that there
12  will be less trepidation about using the product.
13    Q.  Okay.  Thank you.  Do you know what branded
14  products -- branded opioid products in particular
15  Teva or Cephalon manufactures?
16    A.  Yes.
17    Q.  What are those products?
18    A.  I believe Fentora and Actiq, and the new one
19  that's eluding me right now, the newer one.  I'm --
20  I'm drawing a blank on the name of the newer
21  product, so --
22    Q.  I'm not aware of any new product, so I can't
23  help you there.
24    A.  Well, Hang on just one second because I'm
25  thinking of something.  So Fentora and Actiq I know

Page 561

1  for sure, and it may have been a competitor's
2  product but I thought there was another transmucosal
3  or transbuccal immediate release fentanyl.  Give me
4  just a second.
5      It strikes me this is the first time in this
6  entire process that anybody has asked me about drug
7  names.  It takes me a minute to adjust.
8  Q.  Sure.
9  A.  Ah, okay.  It was -- it says here Subsys.
10  That's it.  I'm good.
11  Q.  That's correct.  Thank you.
12      Okay.  And you testified earlier that you're
13  relying on other experts to determine whether any
14  branded marketing by Teva or Cephalon was false or
15  misleading; is that correct?
16  A.  The assessment of the specific messages and
17  their false and misleading, incorrect, whatever,
18  yes, I'm relying on other experts for that.
19  Q.  And are you familiar with the TIRF REMS
20  Access program?
21  A.  I'm generally familiar with it as I am all
22  the different REMS -- well, there weren't a lot of
23  different REMS but there were a couple of different
24  REMS that were involved here, so I'm generally
25  familiar with the requirement of that REM, yes.

Page 562

1  Q.  And are you aware that since 2012, Actiq and
2  Fentora have been subject to the TIRF REMS Access
3  program?
4  A.  I don't know the exact date of when that
5  happened but I think that's about the right time
6  period as I have it in my mind.
7  Q.  Okay.  Do you know what the prescriber
8  requirements of the TIRF REMS Access program are?
9  A.  I -- as I recall, they are very similar to
10  the other opioid REMS and it's requiring prescriber
11  training and education and a few other features I
12  don't recall specifically.
13  Q.  Do you know if there is a reason that TIRF
14  products have their own specific REMS?
15  A.  Yes, because of the difference in
16  administration and the potential for problems to
17  occur if they are not used properly.
18  Q.  And so being subject to their own specific
19  TIRF REMS, presumably those TIRF REMS have different
20  requirements or additional requirements to the other
21  REMS?
22  A.  They're different, yes.  Again, I don't
23  recall exactly the details in the REMS, but I am
24  familiar that it's -- that exists and that it was --
25  as I recall, it was slightly different, but at the

Page 563

1  same time similar to the others.
2      (Perri Exhibit 23 was marked for
3  identification.)
4  BY MS. COATES:
5  Q.  Okay.  I'm going to hand you what I'm going
6  to mark as Exhibit 23.
7  A.  Thanks.  Good job.
8  Q.  That one slides.  This one is harder.
9      MR. CHALOS:  That was a good one.
10      MS. COATES:  Thank you.
11  Q.  Do you recognize this document?
12  A.  I recognize it as the Actiq package insert
13  from 2011 era.  It was complete prescribing
14  information, I should say.  Oh, there is a med guide
15  here as well.
16  Q.  And do you see the date on this package
17  insert anywhere?
18  A.  December 2011.
19  Q.  Okay.  And so as I think we discussed, this
20  would be just before the TIRF REMS program was
21  implemented, but if we turn to the fourth page in
22  Section 5.10 --
23  A.  Yes.
24  Q.  -- it discusses what the requirements of the
25  TIRF REMS Access program are going to be in

Page 564

1  Section 5.10 titled "Transmucosal Immediate Release
2  Fentanyl (TIRF) Risk Evaluation and Mitigation
3  Strategy (REMS) Access Program."
4      Did I read that correctly?
5  A.  You did.
6  Q.  And if you look underneath the first full
7  paragraph there, it goes through the required
8  components of the TIRF REMS Access program.
9  A.  Yes.
10  Q.  And so the first requirement is that:
11  "Healthcare professionals, who prescribe Actiq for
12  outpatient use, must review the prescriber
13  educational materials for the TIRF REMS Access
14  program, enroll in the program, and comply with the
15  REMS requirements."
16      Did I read that correct?
17  A.  You did.
18  Q.  And the second bullet:  "To receive Actiq,
19  outpatients must understand the risks and benefits
20  and sign a Patient-Prescriber Agreement."
21      Did I read that correct?
22  A.  You did.
23  Q.  And "Pharmacies that dispense Actiq must
24  enroll in the program, and agree to comply with the
25  REMS requirements."

Page 565

1    Did I read that correct?
2    A.   Yes.
3    Q.   And "Wholesalers and distributors that
4    distribute Actiq must enroll in the program, and
5    distribute only to authorized pharmacies."
6    Is that correct?
7    A.   Yes.
8    Q.   So these are requirements that are specific
9    to this class of medications; is that correct?
10   A.   Well, these requirements are -- yes, I
11   agree, they are specific to Actiq and this class of
12   drugs.  They are not unique in terms of REMS.  There
13   are other programs that pharmacists and doctors have
14   to enroll and so forth, but this is certainly unique
15   to the other opioids.
16   Q.   Okay.  Thank you.  And I'm not going to go
17   through multiple iterations of labels with you, but
18   I do just want to confirm that there is a boxed
19   warning or a black box warning, however you want to
20   refer to it --
21   A.   Yes.
22   Q.   -- applicable to these medications as well.
23   A.   There is.
24   Q.   Okay.  Can we turn to Table II of your
25   report?  I believe it starts on page 86.  And as

Page 566

1    we've discussed, Table II is sort of your
2    categorization of the marketing messages that you
3    reviewed; is that correct?
4    A.   Yes.
5    Q.   And as we discussed, these are not typically
6    the type of marketing messages that generic
7    manufacturers are going to be communicating, that
8    these marketing messages would be more related to
9    branded manufacturers; is that correct?
10   A.   Yes, essentially, that's correct.
11   Q.   Okay.  And Section A, your first marketing
12   message:  Extended release drugs or q12 dosing had
13   fewer peaks and valleys and less chance of addiction
14   and abuse.
15   Is that correct?
16   A.   Yes.
17   Q.   And I guess I should have asked you this
18   previously, but Actiq or Fentora are not extended
19   use drugs, is that correct, extended release drugs?
20   A.   They are not used in this fashion, no.
21   Q.   Okay.  And there are no Teva documents
22   listed in this section; is that correct?
23   A.   No, there are not.
24   MS. COATES:  Okay, Doctor.  I think that I
25   am done with my questions, I tried to be short

Page 567

1    and sweet, and I think we can now take a break.
2    THE VIDEOGRAPHER:  We are now going off the
3    record.  The time is currently 2:20 p.m.
4    (Recess from 2:20 p.m. until 2:36?p.m.)
5    THE VIDEOGRAPHER:  We are now back on the
6    video record with the beginning of Media
7    Number 5.  The time is currently 2:36 p.m.
8    CROSS-EXAMINATION
9    BY MS. ZOLNER:
10   Q.   Good afternoon, Dr. Perri.  My name is Erica
11   Zolner.  I've been sitting on this side of the room,
12   so I'm not sure we've seen each other much in the
13   last couple of days, but I represent Allergan
14   Finance and I'm going to be asking you some
15   questions specifically about my client.
16   A.   Okay.
17   Q.   And just to be clear, although I think there
18   have been many people asking you these questions,
19   you are not offering any Allergan-specific opinions,
20   correct?
21   MR. CHALOS:  Object to the form.
22   A.   Yes, that's correct.
23   Q.   And you're also not offering any
24   Actavis-specific opinions, right?
25   MR. CHALOS:  Object to the form.

Page 568

1    A.   Yes, that's correct.
2    Q.   Let's turn to your report.
3    A.   Okay.
4    Q.   And I think you already have a copy which
5    was previously marked Exhibit 1.
6    A.   Yes.
7    Q.   Could you look at Paragraph 174?
8    A.   Okay.
9    Q.   In that paragraph you state that Actavis
10   marketed an opioid medication called Kadian,
11   correct?
12   A.   Yes.
13   Q.   Are you aware that Actavis acquired Kadian
14   from a company called Alpharma?
15   A.   I believe that's correct, yes.
16   Q.   Do you know when Actavis acquired Kadian
17   from Alpharma?
18   A.   I don't have an exact date, no.
19   Q.   Okay.  And I'm not expecting it to be a
20   memory test.  I'll represent to you that it was in
21   December of 2008.  Do you have any reason to
22   disagree with that date?
23   A.   No, that seems about what I -- that seems
24   about right to me.
25   Q.   Does your report cite marketing statements

Page 569

1　by Alpharma?
2　　A.　With respect to the family of companies
3　related to Actavis, I'm pretty sure they are all
4　referenced as -- let me took at Table II just to be
5　sure.
6　　Q.　While you are looking at that, you're not
7　suggesting that Alpharma is part of the Actavis
8　or Allergan family of companies,
9　　A.　Say that again.
10　　Q.　Sure.　You're not suggesting that Alpharma
11　is part of the Allergan or Actavis family of
12　companies?
13　　A.　Okay.　So your question was specific to
14　Alpharma?
15　　Q.　That's right.
16　　A.　Yeah.　So I know that Alpharma is not cited
17　in Table II or anywhere, yes.
18　　Q.　Okay.
19　　A.　So yes.
20　　Q.　Could you look at Page 93 of your report?
21　　A.　Okay.
22　　Q.　At the bottom of that page you quote a
23　document stating:　"Over time, your body may become
24　tolerant of your current dose.　You may require a
25　dose adjustment to get the right amount of pain

Page 570

1　relief.　This is not addiction.　It is just your
2　body getting used to the drug."
3　　　Did I read that correctly?
4　　A.　Yes.
5　　Q.　You attribute that statement to Allergan,
6　right?
7　　A.　That's what I was going to say a little bit
8　earlier, is that all of -- anything that has to do
9　with this family of defendants is -- Actavis and
10　Allergan, would be listed as Allergan.
11　　Q.　I guess I'm confused by what you mean by
12　"family of defendants."
13　　A.　With all the mergers --
14　　MR. CHALOS:　Sorry.　Let her finish her
15　question, if you would.　Sorry.　You can answer.
16　　Q.　Thank you.　We talked earlier about the fact
17　that Actavis acquired Kadian, the branded drug, from
18　Alpharma in December 2008, right?
19　　A.　We did talk about that.
20　　Q.　And you understand that Actavis did not
21　acquire Alpharma, right?
22　　A.　Yes.
23　　Q.　Okay.　So maybe you can describe to me what
24　you mean when you keep saying that there is a family
25　of defendants?

Page 571

1　　MR. CHALOS:　Object to the form.
2　　A.　So in my report I have a tab for Schedule 6
3　that is the ARCOS Opioid Drugs and Defendant
4　Corporate Groupings, and among other things it lists
5　the name of a drug, the status of that drug, who the
6　defendant is, and then manufacturers of that, and
7　the -- so I was careful in this table to list only
8　companies that are listed as a defendant, whether
9　they were --
10　　　So, for example, with the product fentanyl,
11　I'm looking at Table 1 in this Exhibit 6.　For
12　fentanyl, the number includes Actavis, Endo,
13　Mallinckrodt and Teva, and under the Actavis tab,
14　Actavis and Watson are both listed.　So I -- that's
15　what I'm referring to as the corporate families or
16　groupings of defendants.
17　　Q.　Okay.　But let's try to break that down.　Do
18　you understand that Alpharma is not a defendant in
19　this litigation?
20　　A.　Yes, I have -- I can check on that, too.
21　Let me see.
22　　　Schedule 5 is the list of the defendants in
23　the case --
24　　Q.　Right.　And you've listed them in
25　alphabetical order, right?

Page 572

1　　A.　Right.
2　　Q.　And I do not see Alpharma listed there?
3　　A.　That's correct.
4　　Q.　Okay.　So Alpharma is not part of the family
5　of defendants in this litigation, correct?
6　　A.　Did I say that they were?
7　　Q.　I'm confused by your term "family of
8　defendants" because defendants have specific meaning
9　in the context of litigation.
10　　A.　Okay.
11　　Q.　So maybe let's just take one step back.
12　　A.　Okay.
13　　Q.　Isn't it correct that Alpharma is not part
14　of this lawsuit?
15　　A.　That's my understanding, yes.
16　　Q.　And it's also your understanding that
17　Alpharma is not part of the family of defendants
18　that's part of the Allergan umbrella, correct?
19　　MR. CHALOS:　Object to the form.
20　　A.　I assume so.　The comings and goings of the
21　different companies, the mergers, acquisitions,
22　licensing, purchasing of products, I looked at the
23　products themselves and their marketing.　I didn't
24　really focus extensively on the -- you know, who was
25　making it when.　It was when did a product come to

Page 573

1　market, what was the marketing planning, what was
2　the metrics that were used to evaluate it, what
3　tactics were used, what strategies were used.
4　　Q.　Got it.　But you were looking at the
5　question of when a product came to market?
6　　A.　Right.
7　　Q.　I think that's what you just testified to.
8　And you were also including dates in the documents
9　that you cited throughout your report, correct?
10　　A.　Wherever possible, yes.
11　　Q.　So let's take a look at a document that I'm
12　going to mark Exhibit 24.
13　　　(Perri Exhibit 24 was marked for
14　identification.)
15　　　MS. ZOLNER:　This table is so long.
16　　　MR. CHALOS:　Do you have another copy of
17　that?
18　　　MS. ZOLNER:　I'll try to shuffle it across.
19　　　(Discussion off the record.)
20　BY MS. ZOLNER:
21　　Q.　Dr. Perri, if you could just look at the
22　first page in the upper left-hand corner, do you see
23　there where it's marked "Kadian"?
24　　A.　I'm confused.　Upper left-hand corner?
25　　Q.　Upper right-hand corner.　My apologies.

Page 574

1　　A.　Thank you.　Yes.
2　　Q.　And then under that it says: "Learn more
3　about customized pain control with Kadian."
4　　A.　Yes.
5　　Q.　And then you quote from language in your
6　report on the fourth page of this PDF, correct?　And
7　just for clarification, that's the page that's
8　marked ACTAVIS0006826, and I believe in your report
9　on page 93, which was the portion of your report we
10　were looking at before I showed you Exhibit 24, we
11　were looking at that language that I quoted earlier.
12　　A.　Okay.
13　　Q.　The "over time, your body..." section.
14　　A.　Yes.
15　　Q.　Do you recall that?
16　　A.　Yes.
17　　Q.　Do you see that language quoted on Page 4 of
18　Exhibit 24?
19　　A.　Yes.
20　　Q.　If you turn to the last page of Exhibit 24,
21　do you see in the bottom right -- bottom left-hand
22　corner there is a copyright date, and it's copyright
23　2007, Alpharma Branded Products Division?
24　　A.　Okay.
25　　Q.　Do you see that?

Page 575

1　　A.　I do.
2　　Q.　And then do you see that the document is
3　also dated in the next line March 2007?
4　　A.　Okay.
5　　Q.　And you'll recall several questions ago I
6　represented to you that Actavis acquired Kadian in
7　December of 2008.　Do you remember that?
8　　A.　You did.
9　　Q.　So that was over a year before -- this
10　document was published over a year before Actavis
11　acquired Kadian, correct?
12　　A.　That's right.
13　　　MR. CHALOS:　Hold on.　Object to the form.
14　　Q.　Do you have any reason to believe that
15　Actavis ever used this document after it acquired
16　Kadian?
17　　A.　I don't have any reason to suspect that they
18　did or didn't.　I wouldn't know.
19　　Q.　What about Allergan, do you have any reason
20　to suspect Allergan ever used this document?
21　　A.　I wouldn't know based on this document.
22　　Q.　Did you do any research to determine when
23　Actavis acquired Kadian from Alpharma prior to your
24　deposition today?
25　　A.　You know, that's -- I appreciate the

Page 576

1　question and the answer, I think, is no but maybe.
2　I was concerned with the marketing of Kadian.　I
3　wasn't concerned with who made it, when they made
4　it, and I wanted to see the marketing for Kadian and
5　that's what I focused on.
6　　　That's why I don't have independent opinions
7　about each individual defendant or another.　The --
8　what I was focused on was the marketing of opioids.
9　So whether Kadian was owned by you or someone else,
10　I wanted to know what was happening with Kadian and
11　that's what I stayed with.
12　　Q.　Understood.　And you weren't paying
13　attention to ownership lines or who was responsible
14　for manufacturing the drug in your review of the
15　marketing materials?
16　　A.　I tried to pay attention to that, but it was
17　impossible to keep that straight at all points for
18　every drug at every point in time because there were
19　so many mergers, acquisitions, licensing and so
20　forth that -- I did the best that I could, I think,
21　in keeping track of where everybody was with respect
22　to ownership and all that.
23　　　And I know certainly from reading some of
24　the depositions, and particularly with regard to
25　Allergan Financial, that there was a lot of question

Page 577

1  about ownership and things like this, so I
2  appreciate your concern over this and I'm sure you
3  all will figure out an answer to that, but from my
4  perspective, this was about Kadian, not about who
5  owned it at that time.
6      Q.  Understood.  So just for points of
7  clarification, as you sit here today you can't
8  recall any specific research you did to determine
9  when Actavis acquired Kadian from Alpharma?
10     A.  Not other than what I would have read in the
11  deposition transcripts about the timing of when
12  things happened, yeah.
13     Q.  Could you turn to Page 96 of your report
14  now?
15     A.  Okay.
16     Q.  Do you see where you wrote -- and this is by
17  the Actavis document in your chart, 0006930, do you
18  see that?
19     A.  Yes.
20     Q.  "It is important for these audiences to
21  understand the difference between addiction and
22  pseudoaddiction, which involved medication-seeking
23  behavior solely for the sake of pain relief.  While
24  tolerance to opioids can occur, a dose increase of
25  switch to another agent will often yield the needed

Page 578

1  pain relief.  Tolerance can also work advantageously
2  for the patient, since it also applies to adverse
3  events."
4      Did I read that right?
5      A.  You did.
6      Q.  And you attribute that statement to
7  Allergan, right?
8      A.  Yes, for the reason I explained earlier,
9  yes.
10     Q.  And by "the reason I explained earlier," you
11  mean that you weren't focused on the dates of
12  ownership for any particular drug?
13     A.  Not just that, but that is part of it.
14  The -- it's just Allergan as a named defendant.  I
15  wanted the column, this last column, to be a named
16  defendant, so whatever defendant family might have
17  been there.  So while it may have been an Actavis
18  document, it's listed under Allergan as the
19  defendant.
20     Q.  Okay.  Even though Allergan didn't own the
21  drug at the time, it's still listed under Allergan?
22     A.  Again, if that's the case, then that's like
23  the last example.  I wasn't focused enough on the
24  dates.
25     Q.  Understood.  The statement did come from

Page 579

1  ACTAVIS0006930, that's the document you're quoting,
2  right?
3      A.  You know, I've looked at all of these
4  documents, so I know that it came from that
5  document, but I can't tell you the time frame of it,
6  so --
7      Q.  Understood.  Why don't -- why don't we mark
8  that document.
9      A.  Okay.
10     Q.  Let's mark it Exhibit 25.
11     (Perri Exhibit 25 was marked for
12  identification.)
13  BY MS. ZOLNER:
14     A.  Good job.
15     Q.  We should bring a carrier pigeon.
16     I think the good news here is we're just
17  going to look at the first page.
18     A.  Okay.
19     Q.  So do you see where it says in the middle of
20  the page, "Kadian 2005 Publication Plan"?
21     A.  Yes.
22     Q.  It also says this document was prepared by
23  Alpharma on January 20th, 2005.  Do you see that?
24     A.  I do.
25     Q.  Do you have any reason to disagree with

Page 580

1  what's written on the first page of Exhibit 25?
2      A.  No, I do not.
3      Q.  As you sit here today, do you know if
4  Actavis ever used this document?
5      A.  What I was undertaking here was to look at
6  the contents specifically to refresh my memory about
7  what may have been going on in this planning
8  document, and then my thought was to get ahold of an
9  Actavis document, Actavis marketing plan for Kadian
10  and then compare them and see, and then maybe draw
11  the conclusion that they are similar or they're not
12  very similar and I could possibly answer your
13  question, but since I don't have the second
14  document, I can't really do that.
15     Q.  My question was a simple one.  I just was
16  asking do you know if this document was ever used by
17  Actavis?
18     A.  As I sit right now, I don't know.
19     Q.  Okay.  What about Allergan, as you sit here
20  now do you know if this document was ever used by
21  Allergan?
22     A.  I do not know that.
23     Q.  And I'm speaking about Exhibit 25, just for
24  the record.
25     A.  Right.

Page 581

1    Q.  In the case of Actavis, are you aware of any
2  regulatory or administrative action by the FDA?
3        MR. CHALOS:  Object to the form.
4    A.  I don't recall as I sit here.
5    Q.  What about Allergan, are you aware of any
6  further regulatory or administrative action by the
7  FDA against Allergan?
8        MR. CHALOS:  Object to the form.
9    A.  Again, as I sit here, I don't recall.
10    Q.  Let's go back to your report and I'm looking
11  at Paragraph 137 now.  Let me know when you're
12  there.
13    A.  127?
14    Q.  137.
15    A.  Okay.
16    Q.  Paragraph 137.
17    A.  I'm there.  I'm there.
18    Q.  Okay.  You state here that:  "Fears were
19  also minimized through marketing communications that
20  indicated problems like addiction occur only when
21  opioids are abused or used illegally, and if opioids
22  are taken as prescribed, the risk of addiction is
23  rare, less than 1 percent."
24        Did I read that correctly?
25    A.  Yes.

Page 582

1    Q.  Looking at your support materials, I want to
2  start with Footnote 276, and there you're citing a
3  document which is ACTAVIS0264972.
4        Do you see that?
5    A.  Yes.
6    Q.  Okay.  And in that footnote, Footnote 276,
7  it says:  "See generally, e.g. 'long history of
8  safety and efficacy when used as indicated' Kadian
9  Marketing Overview, ACTAVIS0264972, page 31."
10        Did I read that right?
11    A.  Yes.
12    Q.  And as you note in your footnote, the
13  document states that for Kadian, there is a long
14  history of safety and efficacy when used as
15  indicated, right?
16    A.  Yes.
17    Q.  I'd like to now mark Exhibit Number 27 --
18  26.  I'm sorry.
19        (Perri Exhibit 26 was marked for
20  identification.)
21  BY MS. ZOLNER:
22    Q.  And again, this is -- the document that we
23  have just marked Exhibit 26 is a Kadian Marketing
24  Overview from Sales Representative Training on
25  October of 2011.  Do you see that?

Page 583

1    A.  Yes.
2    Q.  Could you look at Page 31?  It's the page
3  that says "Efficacy" at the top.
4    A.  Yes.
5    Q.  The very first bullet on Page 31 of
6  Exhibit 26 says:  "Kadian contains morphine as its
7  active ingredient and has a long history of safety
8  and efficacy when used as indicated."
9        Did I read that correctly?
10    A.  Yes.
11    Q.  Again, I know you've testified repeatedly
12  that you're not here to offer FDA expertise, but I
13  have a question on this.
14        Are you aware that before the FDA approves a
15  drug for marketing, it must first determine if a
16  drug is effective?
17    A.  Safe and effective, yes, safe and effective,
18  yes.
19    Q.  Okay.  And are you also aware that the FDA
20  is responsible for making sure that the benefits
21  outweigh its potential risks to patients?
22        MR. CHALOS:  Object to the form.
23    Q.  Let me rephrase that.
24        One of the other issues that the FDA is
25  considering before approving a drug for marketing is

Page 584

1  whether the benefits outweigh potential risks to
2  patients, correct?
3    A.  That's my understanding of what the FDA's
4  goal is.
5    Q.  Let's look now at Exhibit 27.
6        (Perri Exhibit 27 was marked for
7  identification.)
8  BY MS. ZOLNER:
9    Q.  Thank you.  This, Dr. Perri, is -- the
10  document that we just marked Exhibit 27 is the FDA
11  approval letter for Kadian that came in on July the
12  3rd, 1996, correct?
13    A.  Yes.
14    Q.  And the first paragraph of this letter
15  written to Mr. Wagner is:  Please refer to your June
16  29, 1995 new drug application, or NDA, submitted
17  under Section 505(b) of the Federal Food, Drug, and
18  Cosmetic Act for Kadian (morphine sulfate) Sustained
19  Released Capsules, 20 milligrams, 50 milligrams and
20  100 milligrams.
21        Did I read that correctly?
22    A.  Yes.
23    Q.  If you look down to the fourth paragraph,
24  this explains that in approving Kadian, the FDA
25  concluded that Kadian was safe and effective for the

Page 585

1 use as indicated, correct?
2 A. Yes.
3 Q. Are you aware if the FDA ever requested that
4 Kadian be removed from the market?
5 A. I don't know.
6 Q. Do you know if Kadian is still sold today?
7 A. I know that the generic forms pretty much
8 took over the marketplace for Kadian eventually, so
9 I don't know if it's still sold as a branded product
10 or not.
11 Q. You just don't know one way or the other?
12 A. No.
13 Q. Okay. Is it accurate to say that the
14 statement, "Kadian has a long history of safety and
15 efficacy when used as indicated," comes directly
16 from the FDA approval letter?
17 MR. CHALOS: Object to the form.
18 Q. And again, I was looking specifically at
19 Paragraph 4.
20 A. Yes, I see that.
21 MR. CHALOS: Object to the form.
22 A. I see that.
23 Q. Is it accurate to say that that statement
24 comes from Paragraph 4 of the FDA approval letter?
25 MR. CHALOS: Object to the form.

Page 586

1 A. Yes.
2 Q. I'm sorry. I couldn't hear your answer.
3 A. Yes.
4 Q. Do you have any reason to dispute that the
5 language in the FDA approval letter is accurate?
6 MR. CHALOS: Object to the form.
7 A. I have no reason to dispute that.
8 Q. Could you go back to your report now,
9 please? Sorry to have you shuffle so many papers.
10 A. That's okay.
11 Q. I'm looking now at Footnote 275.
12 A. Okay.
13 Q. You cite a document, ACTAVIS0567695 in
14 Note 275, right?
15 A. Yes.
16 Q. And in that footnote you cite that document
17 for the quote: "Opioid agonists are sought by drug
18 abusers and people with addiction disorders and are
19 subject to criminal diversion. These risks should
20 be considered when prescribing or dispensing Kadian
21 in situations where there is concern about increased
22 risk of misuse, abuse, or diversion. Concerns about
23 abuse, addiction, and diversion should not, however,
24 prevent the proper management of pain."
25 And that come from the Kadian PI Workshop

Page 587

1 with the Bates number ACTAVIS0567695, Page 17.
2 Did I read that right?
3 A. Yes.
4 Q. So that cite is part of a document that was
5 entitled the Kadian PI Workshop?
6 A. Yes.
7 Q. Did you review that document?
8 A. Yes.
9 Q. Would you remind the jury what PI means? I
10 know you previously gave a definition, but just for
11 purposes of my recollection.
12 A. Well, it's either package insert or
13 prescribing information, one or the other.
14 Q. A pharmaceutical manufacturer's marketing
15 claims must be consistent with PI; isn't that right?
16 A. Yes.
17 Q. In your report at Paragraph 89 --
18 A. Okay.
19 Q. -- you include a quote right after Footnote
20 166 that says: "This means marketers can be
21 selective in what they choose to talk about in a
22 sales encounter, but the information selected must
23 be consistent with the P.I."
24 Correct?
25 A. Yes.

Page 588

1 Q. Going back to Note 275, you state that
2 the --
3 MR. CHALOS: Hold on.
4 MS. ZOLNER: Sure.
5 MR. CHALOS: Okay.
6 MS. ZOLNER: Let me know when you're both
7 there.
8 MR. CHALOS: Oh, yeah. No, I'm sorry.
9 MS. ZOLNER: Okay.
10 MR. CHALOS: It's more important that you're
11 there.
12 MS. ZOLNER: I'll wait for both of you.
13 A. I'm there too, so --
14 Q. Okay.
15 A. Yeah.
16 Q. At Note 275 you state that the Kadian PI
17 Workshop makes the following claim, and this is I
18 think the third sentence in -- well, it's more than
19 the third sentence in that paragraph but it starts:
20 "Concerns about abuse, addiction, and diversion
21 should not, however, prevent the proper management
22 of pain."
23 Did I read that correctly?
24 A. Yes.
25 MS. ZOLNER: Can we mark the PI Workshop,

Page 589

1  the Kadian PI Workshop? It's Tab 15.
2      (Perri Exhibit 28 was marked for
3  identification.)
4  BY MS. ZOLNER:
5      Q.  I will turn your attention to Page 17 of the
6  document that we just marked Exhibit 28, Page 17.
7      A.  Okay.
8      Q.  This is under the heading "Abuse Potential,"
9  and if you look at the third bullet, I think that's
10 where we found the quote that we just found in your
11 report in Paragraph 137, Note 275.  Again the
12 language is identical:  "Concerns about abuse,
13 addiction, and diversion should not, however,
14 prevent the proper management of pain."
15     A.  Okay.
16     Q.  That's the statement you cited, right, from
17 the PI Workshop document?
18     A.  Wrong page.  Yes.
19     Q.  And if you turn to the front of this
20 document, the Kadian PI Workshop is dated March
21 2013.  Do you see that?
22     A.  I do.
23     Q.  Okay.  Now I'm going to show you -- yes.
24 I'm going to show you a different document.  This is
25 Exhibit 29.

Page 590

1      A.  Should I be keeping all these documents open
2  or --
3      Q.  You can just put them in a pile.  I don't
4  think we'll come back to any.
5      A.  Okay.
6      (Perri Exhibit 29 was marked for
7  identification.)
8      MS. ZOLNER:  We will come back to this one?
9  BY MS. ZOLNER:
10     Q.  My colleague tells me you might want to put
11 this one to the side after we talk about it because
12 we might talk about it twice.
13     A.  Okay.
14     Q.  So this is Exhibit 29.  Dr. Perri, if you
15 will look in the bottom right-hand corner, do you
16 see the revised date of July 2012?
17     A.  Yes.
18     Q.  Do you agree that this was the Kadian PI
19 that was in effect in July of 2012?
20     MR. CHALOS:  Object to the form.
21     A.  That looks like what that -- it looks as to
22 be -- it looks like this is what that is, yes.
23     Q.  Okay.  Could you turn to Page 6 of this
24 document, and I don't know that the pages are
25 numbered.

Page 591

1      A.  Section?
2      Q.  I'm actually looking at the page -- Section
3  5, Warnings and Precautions.
4      Right.  So it's Page 6 if you are counting
5  manually, and I am -- it's the reference ID in the
6  bottom -- I think, actually, all those numbers are
7  the same, but I am -- Section 5, Warnings and
8  Precautions, 5.1, Abuse Potential.
9      A.  I'm there.
10     Q.  Okay.  Could you read the last sentence in
11 the first paragraph under that subpoint?  It
12 starts --
13     A.  "Concerns about abuse, addiction, and
14 diversion should not, however, prevent the proper
15 management of pain."
16     Q.  Dr. Perri, would you agree that the sentence
17 you just read is identical to the sentence in the
18 FDA-approved prescribing information?
19     A.  Yes, I would agree with that.
20     MR. CHALOS:  Object to the form.
21     Q.  In your report on Page 93 you cite this
22 statement again, quoting a document called the
23 Kadian Stocking Offer, that's a document that is
24 again under the chart on Page 93, an Actavis --
25 acquired Activis document marked 00369188.  Just let

Page 592

1  me know when you are there.
2      A.  Okay.  I'm there.
3      Q.  That's the same sentence again, correct?
4      A.  It is.
5      Q.  "Concerns about abuse, addiction, and
6  diversion should not, however, prevent the proper
7  management of pain."
8      Is that sentence identical?
9      A.  It is.
10     Q.  Your report cites several statements found
11 in the Kadian marketing and training materials that
12 come directly from the Kadian PI, right?
13     A.  That's correct.
14     Q.  Let's look at Page 101 of your report where
15 you cite a July 2010 document.  That one has a Bates
16 number of ALLERGAN_MDL_00405512.  Could you read me
17 what you have in quotes by that document?  And the
18 date of that document is July 30th, 2010 in your
19 report.
20     A.  "Proper assessment of the patient, proper
21 prescribing practices, periodic reevaluation of
22 therapy and proper dispensing and storage are
23 appropriate measures that help limit the abuse of
24 opioid drugs."
25     Q.  Do recall what that -- do you recall what

Page 593

1 document that language comes from?
2 A. I would have to see the document to make
3 sure, but -- I mean, I don't remember the specific
4 document.
5 Q. Okay. I'll show it to you. Let's mark this
6 Exhibit 30.
7 A. Oh, yeah.
8 (Perri Exhibit 30 was marked for
9 identification.)
10 BY MS. ZOLNER:
11 Q. This document is titled: Objection Handling
12 Workshop, Training Class July 7th and 8th, 2010.
13 Correct.
14 A. Yes.
15 Q. In going back to your report, you explain in
16 Paragraph 135, Note 264 -- it's a footnote to
17 Paragraph 135, that: "Sales personnel were trained
18 on how to handle objections to multiple issues,
19 including concerns over addiction. See, e.g.,
20 Kadian objection handler ACTAVIS0003698."
21 And I think my question is a simple one. Is
22 the Objection Handling Workshop document that we
23 just marked Exhibit 30 the type of training
24 presentation that you're talking about in Paragraph
25 135?

Page 594

1 MR. CHALOS: Object to the form.
2 A. Yes.
3 Q. Earlier in your report, on Paragraph --
4 under Paragraph 89 you have a Note 169 where you
5 explain that: "Handling objections and reducing
6 concerns prescribers may have about a medication is
7 a staple of sales training and development."
8 Let me know when you are there. I'm sorry.
9 I thought you were already on Paragraph 89. I'm
10 looking specifically at Note 169.
11 A. Yes, I'm there.
12 Q. Looking again at Exhibit 30, I'm just asking
13 you to compare and contrast your report with what
14 I've marked as Exhibit 30, the Objection Handling
15 Workshop. If you turn to Page 8 of this document,
16 Exhibit 30, you see the statement you cited about
17 proper assessment of the patient, right? And it's
18 the page that begins with -- says at the top:
19 "Objection 4. I'm concerned about the abuse
20 potential of Kadian."
21 A. Right.
22 Q. Again, if you could just read that first
23 bullet.
24 A. "Proper assessment of the patient, proper
25 prescribing practices, periodic reevaluation of

Page 595

1 therapy, and proper dispensing and storage are
2 appropriate measures that help to limit abuse of
3 opioid drugs."
4 Q. Okay. And I told you you were going to need
5 Exhibit 29 again. That was the one I said to keep
6 close at hand. If you look at page 15 of that
7 document, this is Section 9.2, it's titled "Abuse."
8 A. Okay.
9 Q. Could you please read the second full
10 paragraph under 9.2?
11 A. "Drug abuse is the intentional and
12 nontherapeutic use -- "
13 Q. Actually, I'm sorry, I don't want you to
14 read something that you don't need to read. That is
15 not the right section.
16 Next page. Sorry about that. This is the
17 second full paragraph at the top of the next page,
18 right before you get to Section 9.3, Dependence.
19 A. "Proper assessment of the patient, proper
20 prescribing practices, periodic reevaluation of
21 therapy, and proper dispensing and storage are
22 appropriate measures that help to reduce abuse of
23 opioids."
24 Q. Do you agree that the statement that you
25 cited from the Objection Handling Workshop,

Page 596

1 Exhibit 30, comes directly from the Kadian
2 prescribing information that we marked as
3 Exhibit 29?
4 A. Yes.
5 MR. CHALOS: Object to the form. I'm sorry.
6 I lost you. Where did you say he -- I'm back
7 on -- I may be a few questions behind. Where did
8 he cite that in his report?
9 MS. ZOLNER: Where did he cite what?
10 MR. CHALOS: That sentence you just had him
11 read.
12 MS. ZOLNER: The sentence that I just read
13 was cited in his report in Paragraph 1 -- oh,
14 101.
15 MR. CHALOS: Page 101?
16 MR. CIULLO: Yes.
17 MR. CHALOS: Okay. Sorry. I'm just
18 having -- you're moving quickly through your
19 outline. I'm having trouble keeping up. Page
20 101.
21 BY MS. ZOLNER:
22 Q. Dr. Perri, again, not to be repetitive, but
23 can you identify a single specific physician or
24 prescriber in Cuyahoga or Summit County to whom
25 Actavis communicated any of the statements in any

Page 597

1　version of the Kadian learning system?
2　　A.　I did not -- I did not undertake that
3　specific analysis, but I know from the testimony and
4　the documents in this case that the marketing plans
5　and the marketing documents that I saw were
6　distributed nationally and used even locally in
7　Ohio.
8　　Q.　Do you know that these documents that we've
9　been looking at today were distributed in Cuyahoga
10　and Summit Counties?
11　　A.　Specifically this document, I don't have
12　any -- anything that points to its actual use there
13　other than, as I said, the testimony that the
14　marketing plans and the marketing materials were
15　developed nationally and implemented in Ohio.
16　　Q.　I think you're referring to what you've
17　referred to all day as some of the aggregate data
18　that you were referring to, right?
19　　　MR. CHALOS:　Object to the form.
20　　A.　There is actually a citation in my report I
21　think from -- quoting testimony from defendants that
22　specifically relates to this issue.　So I can look
23　for that and point you to that if you need me to.
24　　Q.　I think my question is much more simple.　I
25　just want to know if you can identify any physician

Page 598

1　or prescriber in Cuyahoga or Summit who Actavis or
2　Allergan communicated with with respect to anything
3　related to Kadian marketing?
4　　A.　I guess I'm confused because it sounds like
5　to me that your question is asking me that if I say
6　no, I can't, then the conclusion that you would draw
7　from that is that none of the materials that we're
8　looking at today were used in Ohio and specifically
9　to these counties, and that's not accurate.
10　　Q.　My question is a yes-or-no question.　Can
11　you identify a single physician or prescriber in
12　either Cuyahoga or Summit County to whom Actavis or
13　Allergan communicated any of the marketing
14　information we've looked at today?
15　　　MR. CHALOS:　Object to the form.
16　　Q.　And if you don't have any names, then --
17　　　MR. CHALOS:　Well, object to the form.
18　　A.　I actually have a long list of physicians
19　names in Cuyahoga and the other county that you
20　mentioned, they are from call notes from more than one
21　of the defendants, so I don't know that they would
22　reflect any activities by your company, but they
23　would reflect the names of physicians who were the
24　recipients of the marketing that occurred in Ohio.
25　　Q.　But you can't link it back to Allergan or

Page 599

1　Actavis, correct?
2　　A.　Well, this kind of goes along with what I
3　was saying yesterday, that -- when I was asked
4　another question along these same lines, that, you
5　know, the fact that I can't link a specific
6　advertisement to a specific doctor doesn't mean that
7　the advertisements weren't present in the
8　marketplace, it doesn't mean the doctors didn't see
9　them, it just means that I haven't the tools at my
10　disposal to make that connection.
11　　Q.　And you haven't made that connection,
12　correct?
13　　A.　I make the connection by virtue of the fact
14　that I know these materials were used in Ohio and I
15　know that doctors in Ohio saw them.
16　　Q.　My question is a different one.
17　　　Can you identify any of the doctors who saw
18　them?
19　　　MR. CHALOS:　Object to the form.
20　　A.　Yeah, I mean, I can give you the -- I can
21　give you doctors' names but it would be a
22　presumption that they did or didn't see it in any
23　individual case.
24　　Q.　Okay.　You talk about KOLs in your report.
25　　A.　Yes.

Page 600

1　　Q.　And KOLs are key opinion leaders, right?
2　The acronym KOL stands for key opinion leader?
3　　A.　That's right.
4　　Q.　In your report you talk about how KOLs are
5　influencers, right?
6　　A.　Yes.　I -- that's not my terminology
7　necessarily.　That's either industry or in some of
8　the defendants' terminology.
9　　Q.　Understood.　So in Paragraph 67 of your
10　report, you include a quote:　"Peer-to-peer
11　marketing uses key opinion leaders, or influencers,
12　and word of mouth to create an expanding awareness
13　and more rapid adoption of new pharmaceuticals by
14　prescribers and other stakeholders."
15　　　Did I read that right?
16　　A.　Yes.
17　　Q.　Would you agree that in the context of this
18　case, a KOL is an influential doctor in the field of
19　pain management?
20　　　MR. CHALOS:　Object to the form.
21　　A.　KOL could be a pain management, it could be
22　addiction, it could be just -- in this case, it
23　could have been a general practitioner.　It could
24　have been a nurse, it could have been a lot of
25　different people.

Page 601

1    Q.  Does simply being a doctor make someone a
2   KOL?
3    A.  No.  The --
4      MR. CHALOS:  Hold on.  Object to the form;
5   incomplete hypothetical.
6    A.  So the requirements for KOL are completely
7   subjective and they are really up to the company
8   hiring the KOL or employing that strategy.  The KOL
9   would be -- and I saw a lot of documents in the
10  record that were evaluations of people who were
11  being considered as key opinion leaders, of
12  databases of people who were either past, present or
13  being considered for the future key opinion leaders,
14  and those people would be evaluated.  Some of them
15  were eliminated because they weren't meeting up to
16  certain criteria.
17     So the whole idea of key opinion leadership
18  is one that is subjective to the company and if the
19  company thinks that it's a person that's an
20  influential prescriber or other type of
21  practitioner, then that's up to them to decide.  The
22  point about what they are is that they are people
23  who influence the opinions of others, and in my
24  report I refer to it -- and it was not my word, it
25  was the word of one of the defendant's witnesses --

Page 602

1   that said key opinion leaders are used to infect
2   other doctors with the ideas that they have.
3    Q.  Do you have any opinion as you sit here
4   today as to whether Actavis worked with key opinion
5   leaders?
6    A.  I think the answer to that is that I do
7   have -- I have seen evidence that Actavis did --
8   well, Actavis I don't know specifically.  Allergan
9   or Actavis, because in my analysis I made a note to
10  try and determine if each company did indeed work
11  with key opinion leaders or have key opinion leaders
12  in their sort of cadre of people that they went to,
13  and I know that I have a schedule in my report that
14  we can look at that's broken down by manufacturer.
15  So we can go to that if you need me to look for a
16  document that shows that.
17     Q.  Sure.  I mean, do you know if Allergan or
18  Actavis worked with key opinion leaders?  Is that
19  part of your opinion in this case?
20     A.  I will let you know.
21        So it appears that for Allergan I have four
22  entries:  Dr. Chester Chorazy, David Sua, a person
23  called Nutel and Stewart Lewis.
24     Q.  Are you looking at -- Dr. Perri, are you
25  looking at Schedule 18 in your report?

Page 603

1    A.  Yes, "Amounts Paid to Key Opinion Leaders."
2    Q.  Okay.
3    A.  Let me finish my review here.
4    Q.  Sure.  You just let me know when you are
5   done with your review.
6    A.  Yes, ma'am.  I'm sorry.  It's taking just a
7   moment but these materials were originally in a
8   spreadsheet that was a lot easier to click on tabs
9   than it is to look through them.
10     Q.  It's easier to search too, I'm sure.
11     A.  Yep.  Okay.  So other than those four I
12  mentioned, I don't see anything else that I can
13  point to at this time.
14     Q.  Okay.  And you've just identified four
15  names, right?
16     A.  Yes.
17     Q.  So let's take a step back.  I know earlier
18  today you mentioned that you read -- I think you
19  said portions of Doug Boothe's testimony in this
20  case.  Is that accurate?
21     A.  Yes.
22        MS. ZOLNER:  Do we have his testimony
23  available?
24        MR. CIULLO:  Uh-huh.
25        MS. ZOLNER:  Can we mark that?  Is that

Page 604

1   Exhibit 31?  It's Page 363.
2      (Perri Exhibit 31 was marked for
3   identification.)
4   BY MS. ZOLNER:
5    Q.  Dr. Perri, we are going to flip specifically
6   to Page 363.  Are you aware that Doug Boothe was the
7   CEO of Allergan?
8    A.  As I recall, his title was -- I can't recall
9   his exact title.
10     Q.  Okay.  Well, I'll represent to you that he
11  was the CEO.  And if you could look at Page 363,
12  starting at line 23, I'll read to you the question
13  and I'll eliminate the objections and then read the
14  answer.  Line 23 of page 363 of Doug Boothe's
15  deposition.
16        Question:  Were you aware of any KOL
17  development at either Alpharma or Actavis when
18  you were there?
19        Answer:  As I previously said, we at Actavis
20  did no KOL activity for Kadian or any of our
21  generic approved products.
22        Question:  Were you aware of any KOL
23  development for any opioid products at Alpharma
24  or Actavis?
25        Let's just focus on the first part.  Do you

Page 605

1  see where he said: Actavis did no KOL activity for
2  Kadian or any of our generic approved products?
3      A. Yes.
4      Q. Do you have any basis to dispute that
5  testimony?
6      A. No.
7      Q. Now, you referred to Schedule 18 of your
8  report.
9      A. Uh-huh.
10     Q. Which is the section about amounts paid to
11 KOLs and you first mentioned Chester Chorazy, right?
12     A. Yes.
13     Q. Who is Chester Chorazy?
14     A. I don't know.
15     Q. How long has he been a KOL?
16     A. I don't know.
17     Q. Who is he employed by?
18     A. I don't know.
19     Q. On what basis do you claim he was a KOL for
20 Allergan?
21     A. On the basis that he is on this list, but we
22 can pull that document and answer those questions.
23     Q. Do you know anything about Mr. Chorazy's
24 background as a KOL?
25     A. No, I don't.

Page 606

1      Q. Do you know anything about his area of
2  expertise?
3      A. As I said, his presence on this list tells
4  me there were amounts paid to him. That's what I
5  know.
6      Q. Okay. What about David Sua, Nutal, or
7  Stewart Lewis, would the answer be the same for all
8  of those individuals?
9      A. Same answer for all of those, yes.
10     Q. In other words, you don't know who they are
11 and you don't know how long they worked as a KOL?
12     A. I don't recognize those specific names, yes.
13     Q. Do you have any opinion as to whether
14 Actavis worked with pain advocacy organizations to
15 promote opioids?
16     A. I don't think they did.
17     Q. Do you have any opinion as to whether
18 Allergan worked with pain advocacy organizations to
19 promote opioids?
20     A. Same answer.
21     Q. I know this morning a drug called MoxDuo
22 came up, and I don't want to put words in your mouth
23 but according to my notes, I think you mentioned
24 MoxDuo as an example of a drug that never made it to
25 market, correct?

Page 607

1      A. Yes. It was not approved, right.
2      Q. Okay. So it was not approved by the FDA; is
3  that accurate?
4      A. Not approved by the FDA and not marketed by
5  the company, either one.
6      Q. Okay. So that means no patient was ever
7  prescribed MoxDuo?
8          MR. CHALOS: Object to the form.
9      A. I guess that's true, yes, unless somebody
10 did something untoward.
11     Q. And your voice dropped. I think you said
12 that MoxDuo was never marketed; is that accurate?
13         MR. CHALOS: Object to the form.
14     A. That is my understanding, that MoxDuo didn't
15 ever launch.
16     Q. Do you have any opinion as to whether
17 Actavis was involved in continuing medical education
18 courses?
19     A. I don't recall.
20     Q. What about Allergan, do you have any opinion
21 as to whether Allergan was involved in any
22 continuing medical education courses?
23     A. Again, I don't recall specifically Allergan.
24     Q. Is there anything that you could use to
25 refresh your recollection on those?

Page 608

1      A. Well, if I looked -- if I pulled the Kadian
2  marketing plans or other marketing plans, perhaps,
3  that would -- if they were going to do it, it would
4  be, generally speaking, in the marketing plans, so
5  we could look at that.
6      Q. Yes. Okay. So that's going to be Exhibit
7  Number 32.
8          (Perri Exhibit 32 was marked for
9  identification.)
10 BY MS ZOLNER:
11     Q. I'm going to show you another document,
12 Dr. Perri. This is ALLERGAN_MDL_01104711, for the
13 record. The document is titled "Healthcare
14 Compliance Business Rules."
15     A. Okay.
16     Q. Have you seen this document before?
17     A. It does not look familiar to me, but I've
18 looked at a lot of documents.
19     Q. You have looked at a lot of documents.
20     A. I'm just beginning. Let me scan through it
21 and --
22     Q. Sure.
23         MR. CHALOS: Is this number 32?
24         MS. ZOLNER: It is.
25     A. There are certainly things in here that look

Page 609

1 familiar to me, but again, I can't say I've seen
2 this specific document.
3    Q.   The title of this document is "Sales
4 Representative's Interactions with Healthcare
5 Professionals & Patients," correct?
6    A.   Yes.
7    Q.   And the effective date of this document is
8 January 5th, 2010?
9         MR. CHALOS:  Hold on.  Object to the form.
10 He just said he's never seen this document.  If
11 you are just asking him to read it and say that's
12 what it says, that's one thing, but I don't think
13 you can ask him to affirm that that's true.
14    Q.   Does the document represent that it was
15 effective as of January 5th, 2010?
16    A.   Yes.
17    Q.   If you could look at Page 7, under
18 Educational Grants -- this is Section 12.0.
19    A.   Yes.
20    Q.   Do you see under Section 12.2 in bold it
21 says: "At this time Actavis will not be offering
22 any educational grants?"
23    A.   It does say that in this document, yes.
24    Q.   Do you have any basis to dispute that
25 Actavis was not offering educational grants at this

Page 610

1 time?
2         MR. CHALOS:  Object to the form.
3    A.   So, I -- yeah.  I -- I mean, I'm not
4 disputing that they are not involved.  I don't have
5 a specific recollection of them being involved in
6 these programs, but I'm just uncomfortable drawing
7 conclusions from, you know, this cursory look at
8 this document that I haven't really had a chance to
9 review or a document that I am not exactly sure
10 where it fits into the big picture of things that
11 I've examined in this case.  I know that this --
12 what this appears to be is a document where
13 Allergan/Actavis was sort of setting out the rules
14 of the road for a sales force that they were going
15 to employ.
16    Q.   Right.
17    A.   So it -- it looks like it's consistent with
18 what I would expect to see and it definitely says at
19 this time Actavis will not be offering any
20 educational grants.  What I would point out is that
21 offering of educational grants is typically
22 something you find in the marketing plans for
23 branded products.  So the fact that they are saying
24 they're not going to do it at this time doesn't tell
25 me that they never did it.  It just says they

Page 611

1 weren't planning on doing it right now.
2    Q.   Right.  But a couple of questions ago I
3 think that you testified that you don't have any
4 recollection of whether Allergan or Actavis was
5 involved in any continuing medical education,
6 correct?
7         MR. CHALOS:  Object to the form.
8    A.   I think what I said was I didn't have a
9 specific -- a specific program that I could point to
10 that -- yes, so the answer is yes.
11    Q.   What about general?
12         MR. CHALOS:  Object to the form.
13    Q.   Do you have any general knowledge of any
14 continued medical education that Allergan or Actavis
15 was involved with?
16         MR. CHALOS:  Object to the form.
17    A.   As I sit here right now, I can't -- I can't
18 have a -- I don't have an answer for that because I
19 just don't remember.
20    Q.   Okay.  Do you have any opinion as to whether
21 Actavis ever hosted speakers bureaus?
22    A.   Again, I need to look at the Actavis
23 marketing or the marketing plans because --
24    Q.   Have you not looked at those plans?
25    A.   No, I have.  I've just -- I've looked at

Page 612

1 hundreds and hundreds of marketing plans and I can't
2 tell you off the top of my head what's in every
3 single one of them.  So if you are going to ask me a
4 specific question about that, I need to look at the
5 marketing plans to see if they laid out plans and
6 then I would know which documents or what to look at
7 to know if those were actually enacted.
8    Q.   Do you have any opinion as to whether
9 Allergan ever hosted speakers bureaus?
10    A.   Same answer.
11    Q.   Okay.  You just -- you don't know as you sit
12 here right now?
13    A.   I would need to look the marketing plans to
14 refresh my memory about what they did or didn't do
15 specifically in each category for all of the
16 categories of marketing that I put in my report.
17    Q.   You understand that Allergan is one of seven
18 manufacturing defendants that has been sued in this
19 MDL, correct?
20         MR. CHALOS:  Object to the form.
21    A.   The list is longer than seven but I
22 understand that that's what we're talking about here
23 today.
24    Q.   In preparation for your deposition today did
25 you do anything to try to determine which

Page 613

1  manufacturers were involved in what specific
2  marketing activity for purposes of preparation for
3  your deposition today?
4      MR. CHALOS:  Object to the form.
5      A.  I did a lot of review and a lot of
6  preparation for this deposition but, unfortunately,
7  I don't -- I don't have a perfect memory and can't
8  recall every single thing that I've seen.
9      Q.  I understand that, but I think you testified
10 earlier that you spent over 700 hours on this case
11 and you've been paid somewhere around $210,000, and
12 I am sure you spent a lot of time preparing for your
13 deposition today, and one of the key areas of
14 expertise you are providing expert opinion on is
15 peer-to-peer marketing, and I'm asking you questions
16 about that.
17     And so what I'm trying to figure out is if
18 you have any understanding of whether Actavis or
19 Allergan ever hosted speakers bureaus?
20     MR. CHALOS:  Object to the form;
21 argumentative.  It's a long admonishment
22 preceding a question that he's already answered.
23     MS. ZOLNER:  To be clear, I am not trying to
24 admonish the witness at all.  I'm just trying to
25 make sure I understand his answer.

Page 614

1      MR. CHALOS:  Okay.  Then don't admonish him.
2      MS. ZOLNER:  Agree to disagree on whether it
3  was an admonishment.  I think we're having a very
4  pleasant exchange.
5      MR. CHALOS:  Object to the form.
6      A.  So a couple of things:  Number one, I didn't
7  testify that I have been paid $210,000.  I gave that
8  as an estimate and I said if I get paid everything
9  that I billed.
10     Q.  Understood.
11     A.  That's number one.
12     Q.  I know how that works.
13     A.  Number two, in my preparation I've looked --
14 I can tell you all kinds of things about Jennifer
15 Altier and the marketing plans for Kadian, I just
16 can't remember as I sit here right now whether
17 continuing medical education or advisory boards were
18 part of all that.  I do recall this, and I will give
19 you this information, that from her testimony, she
20 said that the marketing was basically like a
21 glorified package insert, so my thinking is maybe
22 I'm not remembering because it didn't happen, but
23 until I see the documents, I can't tell you for sure
24 one way or the other.
25     MR. CHALOS:  Why don't we take a break?

Page 615

1  We've been going a little over an hour.
2      Q.  Do you want to take a break?
3      A.  Yes.
4      Q.  Okay.
5      A.  Yeah.
6      MS. ZOLNER:  Let's go off the record.
7      THE VIDEOGRAPHER:  We are now going off the
8  video record.  The time is currently 3:36 p.m.
9  This is the end of Media Number 5.
10     (Recess from 3:36 p.m. until 3:49 p.m.)
11     (Mr. Chalos is no longer present.)
12     THE VIDEOGRAPHER:  We are now back on the
13 video record with the beginning of Media
14 Number 6.  The time is currently 3:49 p.m.
15 BY MS. ZOLNER:
16     Q.  Dr. Perri, do you have any opinion as to
17 whether Actavis ever worked with medical science
18 liaisons?
19     A.  I don't recall specifically in the materials
20 that I reviewed reading about MSLs at Actavis, but
21 the -- I might not have seen that in the marketing
22 documents because MSLs are separate from marketing.
23 I might have seen it as a result of overlap, but I
24 don't recall specific to your -- to your defendant.
25     Q.  What about anything general that relates to

Page 616

1  Actavis?
2      A.  I only saw a couple of documents that
3  related to MSLs.  There is one place in my report
4  that I recited -- I cited MSLs with respect to
5  gathering of information at a -- like an American
6  Pain Society meeting, and I'm trying to remember
7  what the section of the report was, but I -- as I
8  sit here, I would have to look to see which
9  defendant that was.
10     Q.  But you don't recall specifically that it
11 would have been Actavis; is that right?
12     A.  I don't think it was Actavis, but again, I
13 wish I could type in MSL and go right to that
14 section in my report and give you an exact answer to
15 that question, because it is possible, I just need
16 to look, so --
17     Q.  What about Allergan, do you have any opinion
18 as to whether Allergan ever worked with medical
19 science liaisons?
20     A.  Same answer for Allergan.
21     Q.  Do you have any general opinions as to
22 whether Allergan --
23     A.  Did you or didn't you want me to get an
24 answer to that for you?  Because I was looking --
25     Q.  Oh, I'm sorry.  I didn't realize you were

Highly Confidential - Subject to Further Confidentiality Review

Page 617

1  looking.
2      A.  Yeah.
3      Q.  Dr. Perri, are you looking for where you
4  talk about MSLs in your report?
5      A.  Yes.
6      Q.  Do you want me to give you some help?
7      A.  It's up to you.
8      Q.  You might be looking at Paragraph 60.
9      A.  I'm at 69 going in that direction, so I was
10  in the right place.
11      Q.  Okay.  It's been a long day, so -- ease of
12  reference.
13      A.  Yeah.  So it was Allergan that is the
14  example that I cited in my report.
15      Q.  Are you referring to the line of your
16  report:  Allergan -- for example, Allergan MSLs
17  collected marketing intelligence at an American Pain
18  Society meeting focused on the potential dangers of
19  opioid use; is that right?
20      A.  Yes.
21      Q.  What Allergan MSLs are you speaking of here?
22      A.  Whichever ones the deponent was speaking
23  about in that deposition testimony.  I don't think I
24  have names.
25      Q.  You don't have any names.  Do you know what

Page 618

1  MSLs were collecting the market intelligence at an
2  American Pain Society meeting?
3      A.  So I remember this document pretty well but
4  I don't remember the specifics of who, but I know
5  there were -- there were sections for -- of input
6  from MSLs providing what I refer to as market
7  intelligence on the landscape of the pain -- on the
8  opioid market.
9      Q.  Do you know how many MSLs were at that
10  meeting?
11      A.  Without -- and I think -- I think I cite
12  that document in Number 88, so I'm sure if it's
13  important for you to know how many were there, we
14  can pull that document and look at it.
15      Q.  In your report it says:  For example,
16  Allergan MSLs collected marketing intelligence at an
17  American Pain Society meeting focused on the
18  potential dangers of opioid use.
19          It's singular in this report.  Is that
20  accurate?
21      A.  That it was one meeting?  An example, this
22  is a singular example, yes.
23      Q.  Okay.  Let's look at Exhibit 33.
24      MS. ZOLNER:  Thank you.  This is a document
25  that's Bates numbered Allergan_MDL_00194340.

Page 619

1      (Perri Exhibit 33 was marked for
2  identification.)
3      THE WITNESS:  Good idea.  Thank you.
4      MS. BAISCH:  Do you have another one of
5  those?
6      MR. CIULLO:  I do.
7  BY MS. ZOLNER:
8      Q.  This document is dated June 27, 2012.
9      A.  Yes.
10      Q.  And if you go down to the first e-mail, the
11  initial e-mail in this chain, it's from Terrence
12  Fullem.  Do you see where I am?
13      A.  Yes.
14      Q.  It says:  "All, as you know, we have had to
15  let the MSLs and NAMs go due to the CRL on Moxduo."
16          First of all, what is a NAM?
17      A.  National account manager.
18      Q.  Okay.  Do you have any understanding of what
19  this sentence means?
20      MS. BAISCH:  Object to form.
21      A.  So my purpose of citing this MSL example
22  here was to simply show the utility of these kind of
23  personnel within the marketing organization and to
24  demonstrate the role that they could play.  Whether
25  they were fired later on or let go because of the

Page 620

1  status of the product they might have been working
2  on, Moxduo not being launched, is really not
3  relevant to my analysis.  What is relevant is this
4  is how MSLs can interact within the marketing
5  organization within a company, that's all.
6      Q.  Understood.  And I'm just trying to
7  understand exactly to what extent Actavis or
8  Allergan used MSLs, and that's why I'm asking these
9  questions, just to get a sense of magnitude or lack
10  of magnitude.
11      A.  Okay.
12      Q.  The NAM that's referenced here, you've
13  defined that.  What about the CRL, what does that
14  acronym stand for?
15      A.  That, I don't know.  I've seen a lot of
16  acronyms that --
17      Q.  I think it might be a misprint and I think
18  it might be CLR -- or CRL, complete response letter?
19      A.  It could be that.  When I first saw it I
20  thought clinical research liaisons, but that doesn't
21  make any sense in the context of the sentence, so --
22      Q.  But this seems to indicate that in this
23  particular instance that you've cited in your
24  report, that the MSLs were released after the FDA
25  rejected the Moxduo product, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 621

1     MS. BAISCH: Object to form.
2     A. I don't think I cited that in my report. I
3 think that's evidenced here in this e-mail.
4     Q. Would you agree that this suggests that
5 Actavis was working with MSLs for purposes of going
6 to market with Moxduo?
7     MS. BAISCH: Object to form.
8     A. So given my recollection, even though we
9 don't have the document here in front of us, of the
10 document that's cited in Reference 88, the e-mail
11 and slide presentation, that lists a lot of the
12 factual things that the MSLs actually provided in
13 terms of market intelligence, and given this
14 document, it seems like that the MSLs were used
15 prior to the launch of Moxduo, and at least this
16 document says that the MSLs were let go because of
17 the fact that Moxduo didn't launch.
18     Q. Are you speculating right now?
19     A. I mean, I thought I was agreeing with you,
20 actually, but do you have a specific question?
21 Because maybe I --
22     Q. Let me try to unpack this in a different
23 way. We talked earlier about the fact that Moxduo
24 was a drug that never went to market, correct?
25     A. Correct.

Page 622

1     Q. And this document that we have marked
2 Exhibit Number 31 --
3     A. 33.
4     Q. -- 33, thank you, Dr. Perri, suggests that
5 MSLs were being used for purposes of Moxduo and a
6 potential launch of that drug, right?
7     A. Actually, I don't really read it that way,
8 it's that because Moxduo wasn't launching, they had
9 to let them go. I mean, it could be financial, it
10 could be that they just couldn't afford it anymore.
11     Q. Fair enough.
12     A. So I don't try to draw conclusions about
13 that.
14     Q. Fair enough. Well, let me ask you a simpler
15 question. Do you have any basis to believe that
16 Actavis worked with MSLs in connection with any
17 other drug besides Moxduo?
18     A. Well, I can tell you for sure that any
19 information they gained on the opioid marketplace as
20 a result of their attending of the American Pain
21 Society meeting that I cite in Reference 88 would
22 have benefited the companies marketing organization
23 for any product they were bringing to market.
24     Q. That wasn't my question. Do you have any
25 basis to believe that Actavis worked with MSLs in

Page 623

1 connection with any other drug besides Moxduo?
2     A. Again, you're making the connection that
3 this was completely related to Moxduo and I don't
4 draw that conclusion in my report.
5     Q. Can you give me other examples of Allergan
6 working -- Allergan or Actavis working with MSLs,
7 other than the document that we're looking at here
8 and the document you cite?
9     A. Okay. So let me finish what I was saying.
10     Q. Sure. I didn't mean to interrupt you.
11     A. So the connection that you're making is
12 that -- and it may be true, I don't know the answer
13 to this question, but you're drawing the conclusion
14 that the MSLs in this example were working for
15 Moxduo. It's possible that's true. It's possible
16 that it's not true. I don't -- I don't know the
17 answer to that question based on what I have here in
18 front of me.
19     What I do know is from a marketing
20 perspective, and this is my analysis in the case,
21 what I was concerned about, what I focused on
22 was did Allergan -- did any of the defendants
23 utilize MSLs in any way related to their marketing
24 organization, because in my experience, MSLs are a
25 valuable resource when it comes to providing

Page 624

1 information to the marketing department. And while
2 they aren't in the sales force, they're a very
3 valued part of the company and play a vital role.
4 So I was simply using this as an example to show how
5 the MSLs could collect information.
6     These other issues about Moxduo and whether
7 they were working for Moxduo or for something else
8 weren't on my radar screen.
9     Q. Got it. Okay. Will you opine in this case
10 that any particular opioid medication is more
11 dangerous than another?
12     A. I don't carry a specific opinion about the
13 drugs in this case per se, so no.
14     Q. What about general?
15     A. Just that opioids are dangerous drugs,
16 that's all.
17     Q. But again, you're not going to be opining on
18 any particular opioid medication being more
19 dangerous than another?
20     A. No, I don't think so, no.
21     Q. Will you opine that marketing for one type
22 of opioid product is more problematic than others?
23     A. No, and I'll just -- I will reiterate that
24 my analysis was based on the collective marketing
25 and the marketing is intertwined and you can't

Highly Confidential - Subject to Further Confidentiality Review

Page 625

1 single out one drug's marketing from the rest
2 without losing the richness of the context of the
3 marketing of opioids.
4 Q. You're looking at marketing in an aggregate
5 form, you're not looking at the sum of the parts?
6 A. I looked at the parts to form the aggregate
7 opinion.
8 Q. Is it your testimony that you looked at all
9 of the parts?
10 A. I looked at as many parts as I could locate
11 and had time to analyze, yes.
12 Q. But again, you're not offering any opinions
13 about any of the specifics about any of the
14 defendants in this case, meaning that when we first
15 started talking earlier today I asked if you were
16 offering any specific opinions about Allergan and
17 Actavis and you said no.
18 A. That's right.
19 Q. And I think that would be the case for all
20 of the defendants that are involved in this
21 litigation, correct?
22 A. It is, but I'm sure that everyone will still
23 ask me that question.
24 Q. You're right.
25 A. But just to be 100 percent clear, I don't

Page 626

1 have any opinions about any drugs or any particular
2 single actions. My opinions are the summation of
3 what I've reviewed all taken together. So while the
4 marketing behaviors were examined individually, in
5 other words, I did look at the Kadian marketing plan
6 by itself, regardless of whether Kadian was a
7 product of your company or some other company, I
8 looked at the Kadian marketing plan, and then beyond
9 that, I looked at the companies to the best degree
10 that I could, and then took all of those companies
11 together to form my aggregate opinion.
12 MS. ZOLNER: Thank you, Dr. Perri. I
13 appreciate your time.
14 THE WITNESS: Thank you.
15 MS. ZOLNER: I don't have any further
16 questions at this point.
17 THE WITNESS: Thanks.
18 THE VIDEOGRAPHER: We are now going off the
19 video record. The time is currently 4:02 p.m.
20 (Recess from 4:02 p.m. until 4:05 p.m.)
21 THE VIDEOGRAPHER: We are now back on the
22 video record. The time is currently 4:05 p.m.
23 CROSS-EXAMINATION
24 BY MS. BIERUT:
25 Q. Hello, Dr. Perri. My name is Elizabeth

Page 627

1 Bierut. I'm here on behalf of Ropes & Gray
2 representing Mallinckrodt. I just want to ask you a
3 few quick questions that pertain to my client.
4 I know that you've been asked this multiple
5 times today and yesterday, but am I correct that you
6 are not offering any Mallinckrodt-specific opinions
7 in your report?
8 A. Yes, that's correct.
9 Q. And if you are called to testify at trial,
10 you will not be offering any Mallinckrodt-specific
11 opinions, right?
12 A. Yes, that's correct.
13 Q. If you turn to your report at Page 75, you
14 have a heading "Marketing Information Bias Toward
15 Benefits, Not Harms."
16 Did I read that correctly?
17 A. Yes, you did.
18 Q. And then at Page 77, Paragraph 128, your
19 report states: "Mr. Webb..."
20 Do you see that?
21 A. I do.
22 Q. "Mr. Webb, testifying for Mallinckrodt, was
23 asked about risk information related to addiction in
24 marketing materials. He stated, '-- refresh my
25 memory on what we consider the fair balance in the

Page 628

1 important patient risk information that we put on
2 our material. But I know that we share with the
3 physician, anytime opioids were being discussed in
4 our promotional material, that there is a risk of
5 addiction. The degree of that, I can't speak to.'"
6 A. Right.
7 Q. Did I read that correctly?
8 A. You did.
9 Q. This testimony does not say that
10 Mallinckrodt downplays the risks of its products,
11 correct?
12 A. I don't have that whole testimony in front
13 of me but, no, it was just he wasn't able to say --
14 the reason that's included here is because he wasn't
15 able to say to any degree of how much they -- how
16 much time they actually focused on that. That's
17 all.
18 Q. Okay. And earlier today in response to
19 questioning by Mr. Carter you listed the transcripts
20 you read in full, correct, deposition transcripts
21 that you read in full?
22 A. Yes. Yes.
23 Q. And Mr. Webb's 30(b)(6) deposition was not
24 one of the ones you read in full?
25 A. I don't believe that it was. That was, you

Page 629

1　know, based upon a memory of what I was looking
2　through, that list of depositions. I know that
3　there were several sections of his that I recall,
4　but I can't say for sure, so I didn't include him on
5　the list.
6　　Q. Okay. And how about Mr. Webb's fact
7　deposition, did you read that as well?
8　　A. See, and that's the part that makes me
9　wonder if I read his 30(b)(6), because it is ringing
10　a bell, but again, I can't promise -- he asked me if
11　I read each and every word of those depositions, and
12　as I recall with Mr. Webb, I read part of his
13　depositions and other parts I skipped over.
14　　Q. How did you identify which parts to read?
15　　A. Well, for example, the parts on people's
16　background and education, if they had been deposed
17　before, I would skip through a lot of that.
18　　Q. Okay. Let's turn to your report at
19　Page 135, and at "Theme Three: Opioid should be
20　first-line therapy for pain."
21　　A. Yes.
22　　Q. Did I read that correctly?
23　　A. Uh-huh.
24　　Q. Okay. And then on Page 136, Note 311, one
25　of the documents you cite here is "Exalgo Account

Page 630

1　Executive Customer Presentation," correct?
2　　A. Yes.
3　　Q. And it's Bates number MNK-T1_0002321267?
4　　A. Yes.
5　　Q. Did you read this entire document before you
6　cited it?
7　　A. I'm sure I did. I'd need to look at the
8　document to see what is contained in it so I know
9　for sure.
10　　Q. Yeah. And are you aware that Exalgo is
11　indicated for a risk-tolerant -- I'm sorry, for
12　opioid-tolerant patients only?
13　　A. Yes.
14　　Q. Okay.
15　　A. Yeah.
16　　Q. Let's go to Page 82.
17　　A. Give me just one second, please.
18　　　So just in terms of that, this document is
19　cited with respect to breakthrough paper, so I'm
20　pretty sure that's why it's in this reference. So
21　I'm not sure exactly about your question, but we are
22　within a section but within that section there are
23　different topics being discussed.
24　　Q. Okay. But you do know that Exalgo is
25　indicated for breakthrough pain -- I'm sorry, for

Page 631

1　opioid-tolerant patients only?
2　　A. Yes. I mean, it's once daily dose sort of
3　dictates that that would be the case, yes.
4　　Q. Okay.
5　　A. Good.
6　　Q. Moving toward Page 82 of your report, you
7　state that: "One of the barriers to opioid
8　prescribing has been the potential for and fear of
9　addiction. Numerous marketing messages used by
10　Defendants communicated information that supported a
11　change in the paradigm regarding the link between
12　addiction and opioids."
13　　　Do you see that?
14　　A. I do.
15　　Q. Okay. And one of your examples is on the
16　next page, Page 83: "Mallinckrodt's communication
17　of the message that MNK-795 (oxycodone/APAP extended
18　release), 'provides fast-acting and long-lasting
19　relief without concerns about abuse.'"
20　　　Do you see that?
21　　A. I do.
22　　Q. And then in Footnote 266 --
23　　A. Yes.
24　　Q. -- you state that: "This is a compound that
25　would come to market as Xartemis."

Page 632

1　　　Correct?
2　　A. Yes.
3　　Q. So are you aware that Xartemis launched in
4　March 2014?
5　　A. About then, yes.
6　　Q. Okay. And then -- we're making good time.
7　　　Direct you to look at your report on
8　Page 14.
9　　A. Page 14?
10　　Q. Uh-huh. The last bullet on that page -- I'm
11　sorry.
12　　A. Yes.
13　　Q. Okay. The last bullet on that page is:
14　"Pharmaceutical marketers take advantage of the
15　medical community's reliance on scientific evidence
16　by not only providing science-based messages
17　directly through their marketing, but also through
18　funding and sponsoring clinical research, clinical
19　practice guidelines, and continuing medical
20　education."
21　　　Do you see that?
22　　A. I do.
23　　Q. And on page 86 is your marketing messages
24　table?
25　　A. Yes.

Page 633

1    Q.   The first entry there is a presentation at a
2  2015 American Academy of Pain Medicine Annual
3  Meeting with a Mallinckrodt-sponsored study; is that
4  right?
5    A.   Yes.
6    Q.   And you cite in the Bates column a link to
7  the abstract?
8    A.   Yes.
9    Q.   So was it clear to you from this citation
10  that the study was sponsored by Mallinckrodt?
11    A.   Do you happen to have a copy of the abstract
12  there or --
13    A.   Not on me.
14    A.   As I recall, and again, lots of documents
15  here, that it was linked to a support by
16  Mallinckrodt.
17    Q.   Okay.  And did you read the study itself?
18    A.   I know I read the abstract at least, yes.
19    Q.   So you have no opinions on the scope of the
20  study?
21    A.   Just what I would glean from the abstract,
22  which is basically included in this paragraph.
23    Q.   And no opinion on the methodology of the
24  study?
25    A.   No, I don't have an opinion on the

Page 634

1  methodology as we sit here.
2    Q.   And no opinion on whether the conclusion was
3  sound from a clinical perspective?
4    A.   No.
5    MS. BIERUT:  That's it for me.  Thank you.
6    THE VIDEOGRAPHER:  We are now going off the
7  video record.  The time is now currently
8  4:13 p.m.
9    (Recess from 4:13 p.m. until 4:16?p.m.)
10    THE VIDEOGRAPHER:  We are now back on the
11  video record.  The time is currently 4:16 p.m.
12    CROSS-EXAMINATION
13  BY MR. HENNESSY:
14    Q.   Good afternoon, Dr. Perri.  My name is Sean
15  Hennessy and I'm with the law firm Arnold & Porter
16  and I'm here today on behalf of the Endo and Par
17  Pharmaceutical defendants.  I understand that I'm
18  the last person that stands between you and the
19  door, so I will do my best to be appropriately
20  focused with my questions.
21    A.   Thank you.
22    Q.   Am I correct that you are not offering any
23  Endo-specific opinions in your report?
24    A.   Yes, you are.
25    Q.   Okay.  And I'm also correct that you're not

Page 635

1  offering any Par-specific opinions in your report?
2    A.   That would be correct.
3    Q.   And to put a finer point on that question,
4  specifically, you're not offering any opinion in
5  this case that any of Endo's marketing statements
6  were false or misleading?
7    A.   I was relying on other experts to make that
8  judgment, if they made it.
9    Q.   And you've stated in your report that the
10  assumption, relying on other experts, is consistent
11  with FDA documents, in particular warning letters,
12  regarding the false and misleading nature of
13  defendants' marketing; is that correct?
14    A.   For some products, yes.
15    Q.   Okay.  To your knowledge did Endo receive
16  any warning letters for any of its Opana promotional
17  materials?
18    A.   I can't recall, and I know that there is a
19  citation that lists all the drugs here in the
20  report, and there are about 11 or 12 that are named.
21  I just, as I sit here, I can't recall if Opana is
22  one of them.
23    Q.   And if the citations in your report don't
24  include any FDA warning or other letters regarding
25  Endo's Opana labeling, is it fair to say that you're

Page 636

1  not aware of any?
2    A.   I'm not aware of any in addition to this,
3  that's right.
4    Q.   Okay.  And we've talked a little bit or a
5  lot today about Table II in your report.  I noticed
6  that Table II in your report doesn't include any
7  Endo marketing statements regarding Percocet.  Does
8  that sound right?
9    A.   That's probably correct, yes.
10    Q.   Does any part of your opinion concern Endo's
11  marketing of Percocet?
12    A.   That is a more difficult question to answer
13  because the opinion apply -- my opinion applies to
14  all opioids being marketed, because it's my -- it's
15  my contention that the marketing by any -- the
16  marketing of any opioid is impacting the marketing
17  of all opioids by virtue of the impact that it has
18  on the marketplace, the education of physicians and
19  other prescribers, the other stakeholders, the
20  supply chain, so it's all interrelated.
21    Q.   Is it fair to say that you haven't
22  identified any specific messages relating to
23  Percocet that Endo used?
24    A.   I'm sure that's true.  There may be -- there
25  may be messages in the more complete listing of

Page 637

1  search -- the search results for marketing messages
2  that I requested contains a lot of documents that I
3  didn't cite in Table II, so there may be some in
4  there related to Percocet, but as I recall, I have
5  not seen specific marketing documents related to
6  Percocet other than perhaps a marketing plan, an old
7  marketing plan or something like that.
8      Q. Am I correct that you have not attempted to
9  measure the extent to which Endo's marketing
10  influenced opioid prescribing decisions?
11     A. Yes. So my opinion is that opioid marketing
12  influenced prescribing decisions, but I did not
13  undertake any analysis to assign blame or
14  percentages to any one drug or any one manufacturer.
15     Q. Okay. Are you offering any opinion as to
16  which doctors in Summit or Cuyahoga Counties
17  prescribed opioids because they were influenced by
18  Endo's marketing?
19     A. I think my opinion is, is that all doctors
20  in Summit and Cuyahoga Counties were influenced by
21  opioid marketing, but I cannot draw a link between a
22  particular ad and a particular doctor and say that
23  this ad caused that doctor to do some other
24  behavior. I've been asked that question a lot of
25  times today and I guess I am struggling with some

Page 638

1  way to answer it better, because I don't seem to be
2  getting my point across very well with it, but at
3  the end of the day, from a marketing perspective,
4  opioid marketing impacted doctors' prescribing. We
5  see that in the results the companies obtained
6  themselves in their marketing metrics and other
7  documents.
8      So to say that there is no link between
9  them, I can't do that, but again, I haven't
10  quantitated it and I can't point to a specific
11  doctor.
12     Q. And you can't point to a specific
13  manufacturer related to a doctor either; is that
14  correct?
15     A. That's right. My analysis was in the
16  aggregate, so I wouldn't point -- I wouldn't point
17  to any one manufacturer.
18     Q. Okay. Yesterday, if my memory serves me
19  correctly, I believe you testified that you reviewed
20  defendants' sales calls notes; is that correct?
21     A. Yes, but I think the sales calls notes were
22  primarily from just a couple manufacturers. I think
23  it was primarily Purdue.
24     Q. Do you remember if you reviewed Endo's sales
25  call notes?

Page 639

1      A. I don't recall Endo's sales call notes.
2      Q. And so fair that you didn't identify any
3  Endo sales call notes indicating that any doctor
4  changed his or her prescribing decision in any way
5  as a result of Endo's marketing?
6      MS. BAISCH: Object to form.
7      A. I think my answer to your previous question
8  would require me to answer that question the same
9  way, is that I don't -- I didn't do that analysis to
10  assign a doctor's behavior to a particular cause on
11  the marketing side.
12     Q. Can you say to a reasonable degree of
13  scientific certainty that the opioid crisis would
14  look any different in Cuyahoga or Summit Counties if
15  Endo did not market and sell opioids?
16     A. You know, that's -- again, that's not
17  something that I examined, but if you -- if you look
18  at my opinions and my Opinion 7 is that the opioid
19  marketing expanded the opioid market. If you were
20  to take -- in a hypothetical situation, if you were
21  to take one manufacturer out, that would have left
22  some kind of a void, would somebody else have filled
23  that void? I just don't know the answer to that
24  question, so I think the answer is I don't know.
25     Q. Okay. Do you have Exhibit 1 in front of

Page 640

1  you, your report?
2      A. I do, yes, sir.
3      Q. My understanding is that you identified
4  three marketing themes that you allege were used by
5  the defendants in this case, and one of those
6  themes, which I believe is cited on Page 82 of your
7  report, is that -- I'm quoting it. I should quote
8  from the document.
9      Is that: "Dependence, tolerance, addiction
10  and withdrawal should not be a concern in
11  prescribing opioids."
12     Is that correct?
13     A. That is one of the themes that I settled on,
14  yes.
15     Q. Okay. And I believe you testified that you
16  reviewed the FDA-approved prescribing information
17  for the defendants in this lawsuit; is that correct?
18     A. Yes. I said that I made an effort to find
19  the package inserts for the various products
20  involved in this litigation over time, and while I
21  can't -- I don't have a table that says I saw one
22  from each year, I think I've seen the vast majority
23  of the PIs that were available.
24     Q. Do you recall whether you reviewed Endo's --
25  any of Endo's FDA-approved PIs for Opana ER?

Highly Confidential - Subject to Further Confidentiality Review

Page 641

1    A.  I'm sure I did, yeah.
2    Q.  Are you aware that Endo's FDA-approved Opana
3  ER PI warned about the risks of dependence,
4  tolerance and addiction?
5    A.  Yes, I am.
6    Q.  And are you aware that among other places,
7  those risks were warned about in the black box
8  warning section of Endo's Opana ER PI?
9    A.  Yes.
10    Q.  You got a question earlier today about the
11  meaning or the significance of a black box warning,
12  and is it fair to say that a black box warning is a
13  concise and prominent way to warn about the serious
14  risks associated with a prescription opioid product?
15    A.  Precise I would agree with you.  Prominent
16  with respect to the PI itself, but in terms of the
17  overall marketing, no, I wouldn't agree with that,
18  so --
19    Q.  But as to the PI, would you agree with that
20  statement, that the black box warning is a concise,
21  prominent warning containing the serious risks
22  associated with an opioid product?
23    A.  And if you add to that within the PI --
24    Q.  Within the PI?
25    A.  Yes.

Page 642

1    Q.  In your review did you identify any
2  FDA-approved PIs for Opana ER that did not warn
3  about the risks of dependence, tolerance and
4  addiction?
5    A.  No, I did not.
6    Q.  I believe you've acknowledged in your
7  report, and in your testimony as well, that
8  pharmaceutical manufacturing materials -- excuse me.
9  Strike that.
10       I believe that you've acknowledged in your
11  report and in your testimony that pharmaceutical
12  manufacturers' marketing materials must be
13  consistent with the FDA-approved PI; is that
14  correct?
15    A.  Yes, and beyond that I've said that the PI
16  provides the boundaries as far as, you know, the
17  latitude that you have to -- the information.  So
18  it's not surprising at all that many of the
19  marketing messages are things that are found in the
20  PIs, as we've seen in some of the other testimony
21  and documents that I've been shown today.
22       The thing that I feel like it's overlooked
23  in all of this is two things:  Number one is that
24  the PI is not a prominent piece of information that
25  people, you know, are constantly relying on, are

Page 643

1  constantly being exposed to, and the other is, is
2  that it -- the information in the PI is expected to
3  be communicated in marketing.  That's why so many
4  times it's shown up in Table II.  The question is
5  what does all that marketing do, and that's what
6  I've tried to analyze in my report.
7    Q.  I believe that you also testified that
8  you've reviewed sales training materials as part of
9  your analysis; is that correct?
10    A.  I have reviewed some sales training
11  materials, yes.
12    Q.  Did you review Endo's sales training
13  materials?
14    A.  I would have to look to see specifically
15  what from Endo I might have seen.  The sections in
16  my report that deal with objection handlers and
17  those types of sales training materials would be
18  where I would go to look.
19    Q.  If it's helpful, there are a couple of sales
20  training materials for Endo that you cite in
21  Table II.
22    A.  Okay.
23    Q.  So that would suggest that you, as part of
24  your analysis, you reviewed Endo sales training
25  materials?

Page 644

1    A.  At least -- at least those documents, yes,
2  and my expect -- if they are cited in Table II, my
3  expectation is they are probably cited elsewhere
4  too.
5    Q.  Are you aware that Endo trained its sales
6  representatives on the promotional messages that
7  were approved for use with healthcare providers?
8    A.  The -- I think I answered that just a moment
9  ago when I said that the PI sets out the boundaries
10  and that the messages contained in the PI are the
11  ones that I would expect to see in the sales
12  training materials, so I think yes.
13    Q.  Okay.  And as part of your analysis did you
14  learn that Endo provided its sales reps with
15  approved promotional materials that they were
16  permitted to use when they were detailing healthcare
17  providers?
18    A.  Yes, Endo and others were -- had materials
19  that they had both approved for use and materials
20  that were not for general distribution, yes.
21    Q.  And often the materials that fall under the
22  latter category, not for general distribution, were
23  labeled as such with a footer or other sort of
24  marketing; is that correct?
25    A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 645

1   Q. Did you cite any materials that fall under
2   that latter category, that were not for promotional
3   use in Table II, do you recall?
4   A. I don't recall off the top of my head. I
5   feel like in my report, though, there are places
6   where materials that were not intended for
7   distribution were cited, yes.
8   Q. You testified yesterday, I believe --
9   A. Can I add something to that?
10  Q. Sure.
11  A. Specifically with respect to Endo, I know
12  that there were materials that are cited with regard
13  to Endo in particular that were never distributed.
14  Whether they were marked not to be distributed or
15  not, I can't recall, because it was -- it was -- the
16  example that's coming to mind is one that, as I
17  mentioned this morning, and you maybe are going to
18  ask me --
19  Q. I'm going to ask you about that.
20  A. Okay. Well, I'll just save it. That's
21  fine.
22  Q. I believe you testified yesterday that you,
23  in your analysis, you relied on defendants'
24  marketing plans; is that correct?
25  A. Yes.

Page 646

1   Q. And you would agree that marketing plans are
2   not used by pharmaceutical companies in their
3   communications with healthcare providers; is that
4   fair?
5   A. Yes, that's fair. The marketing plans are
6   internal company documents that are very detailed,
7   very specific, very much the rules of the road when
8   it comes to what we're going to do and not going to
9   do, and they are intended to guide and direct the
10  marketing effort.
11  Q. And you haven't seen any instances where
12  Endo's sales representatives took a marketing plan
13  out into the field and presented that to a doctor;
14  is that correct?
15  A. I have not, and that wouldn't make any sense
16  for them to do that. It wouldn't be relevant to
17  their -- to their efforts with the doctors, but what
18  the marketing plans do map out is the strategy, the
19  themes, the core messages, the focus.
20  Q. Marketing plans are not distributed to
21  anyone outside the company for promotional purposes?
22  A. In my experience, I have not seen that
23  happen, no.
24  Q. Are you familiar with Endo's master visual
25  aids for Opana ER?

Page 647

1   A. Master visual aids? That's not ringing a
2   bell.
3   Q. Okay. There is one that you --
4   A. Oh, yeah.
5   Q. There is one that you cite and I'm going to
6   show you that one in a moment. You cite it in
7   Table II. I'm just curious, do you recall whether
8   or not you reviewed all of the master visual aids
9   for Endo for Opana ER, or just that single --
10  A. The whole concept of the master visual aids,
11  I recall that term now, and I know that there were
12  numerous visual aids that were referred to in that
13  context, yeah.
14  Q. Do you understand that that master visual
15  aid for -- as far as Endo goes, it's the primary
16  document that Endo's sales representatives were
17  required to use when they were detailing doctors?
18  A. As I recall, that was the purpose of that
19  document.
20  Q. In formulating your report, did you consider
21  Endo's guidance to its sales representatives
22  concerning the information that they were required
23  to present to healthcare providers?
24  A. Could you do that one more time.
25  Q. Sorry.

Page 648

1   A. I lost you on the front end of that.
2   Q. Let me go a little slower on this one. In
3   formulating your report, did you consider Endo's
4   guidance to sales representatives concerning the
5   information that they were required to present to
6   healthcare providers?
7   A. Yes.
8   Q. Okay. And so do you understand that Endo's
9   sales representatives were required to present the
10  complete indication for Opana ER?
11  A. Yes, I do know that.
12  Q. And do you understand that Endo's sales
13  representatives were required to present the product
14  risks when they were detailing doctors?
15  A. The Opana marketing plans definitely would
16  support that, yes.
17  Q. And do you understand that Endo's sales
18  representatives were specifically instructed that
19  they must present the black box warning and the
20  important safety information for Opana ER?
21  A. Yes. Also, the marketing plans would
22  support that.
23  Q. Okay. Are you aware that Endo monitored its
24  sales representatives to ensure that they complied
25  with these promotional policies?

Page 649

1   A.  I know Endo monitored its employees, yes, to
2  the extent for monitoring that specific -- those
3  specific behaviors, and others, such as their sales
4  performance and so forth.
5   Q.  You identified in your report, I think it's
6  maybe in a couple places, the PhRMA, P-h-R-M-A, Code
7  of Interactions with Healthcare Providers as an
8  example of a standard that pharmaceutical companies
9  should adhere to in their marketing.  Is that right?
10   A.  That's correct.
11   Q.  Are you aware that Endo voluntarily adopted
12  the PhRMA code?
13   A.  I don't know that I was aware of that or
14  not.  I know that -- my understanding is, is that
15  all companies have adhered -- voluntarily adhered to
16  that.
17   Q.  Are you aware that Endo incorporated the
18  PhRMA code into its own compliance policies
19  requiring that all of its employees follow those
20  requirements?
21   A.  I don't have an opinion one way or the other
22  about that.  I -- it sounds like it would be
23  correct, if they are voluntarily adhering to the
24  code.
25   Q.  Is that something that you considered in

Page 650

1  formulating your opinion?
2   A.  So, you know, in the opinion it -- there are
3  different levels of adherence to the code.  I mean,
4  at one level we have:  "Hey, that's a great idea."
5       At another level:  "What are we doing in
6  your planning?"
7       In another level:  "What are we doing
8  operationally?"
9       But the analysis that I undertook was
10  slightly different than that.  It was to examine the
11  marketing of the opioids without respect to Endo or
12  Allergan or anybody else, but to look at the
13  marketing that was implemented for the opioids, and
14  then to assess at the end of the day did that
15  marketing, not Endo or somebody else, but did that
16  marketing violate principles in those codes, and
17  that was the analysis that I undertook.
18       That's why looking at the individual
19  behaviors of each company or for each drug were
20  important, but at the end of the day, what was most
21  important in my analysis was what did the
22  marketing -- what was the impact of the marketing,
23  why was it done, what impact did it have.
24   Q.  You talked about -- this may be my
25  characterization -- a couple of different ways that

Page 651

1  you could implement or adopt the PhRMA code.  Do you
2  happen to know specifically how Endo went about
3  adopting that code and incorporating it into its
4  compliance policies?
5   A.  So, again, with regard to Endo specifically,
6  I didn't do that analysis.  I looked at the
7  marketing, I looked at the marketing for Opana and
8  how that fits into the big picture of marketing for
9  opioids, and then assessed whether the marketing of
10  opioids adhered to that code.
11   Q.  Do you understand that Endo took
12  disciplinary action against sales representatives
13  that failed to adhere to its compliance policies?
14   A.  I don't have specific examples that I
15  recall, but I'm sure that that's consistent with
16  what my expectation would be for a pharmaceutical
17  company.
18   Q.  And as part of your analysis, did you review
19  Endo's compliance policies?
20   A.  I know I've reviewed compliance policies but
21  I can't specifically cite to an Endo document, no.
22   Q.  Are you familiar with Endo's policy that it
23  only promoted Opana ER to experienced opioid
24  prescribers?
25   A.  I recall from the Opana marketing plans that

Page 652

1  that was -- that was the strategy that was employed,
2  yes.
3   Q.  Do you agree that experienced opioid
4  prescribers are more likely to understand the risks
5  associated with opioids?
6       MS. BAISCH:  Object to form.
7   A.  That, I don't know for sure.  You know, that
8  fits into marketing a couple of different ways.
9  Experienced prescribers could be high prescribers,
10  but they might not be, they might just be more
11  experienced.  So it would have a different impact on
12  the marketing assess -- marketing analysis,
13  depending on the outcome of that.
14       In terms of the -- whether or not, you know,
15  that impacted my analysis of Endo, it was part of
16  Endo's marketing but again, I didn't look at Endo's
17  marketing, I looked at the marketing of opioids.
18   Q.  As part of your analysis did you become
19  familiar with Endo's internal promotional material
20  review process?
21   A.  I am aware that they have a promotional
22  review committee or a process for that.  I did not
23  undertake to assess the rules their -- the rules of
24  the road or the criteria that they use.
25   Q.  And so you -- fair to say you didn't factor

Page 653

1 the policies and procedures of that committee into
2 your analysis or your opinions?
3 A. Again, I wasn't looking at the integrity of
4 their marketing messages. I was looking at what the
5 messages were. So I didn't need to undertake that
6 analysis to understand, you know, if it was approved
7 or not approved. I assume that anything that made
8 it to market was approved. I know that there are
9 plenty of documents that discuss, you know, this is
10 being forwarded for approval or it's going to be
11 sent, or this has not yet been approved, so don't
12 use it for this or that or the other.
13     Again, the level of analysis that I did
14 was -- that wasn't critical. I needed to understand
15 what messages were used, if they were approved or
16 not approved, okay, but the messages that were
17 employed and what was the impact of those messages.
18 Q. Okay.
19     (Perri Exhibit 34 was marked for
20 identification.)
21 BY MR. HENNESSY:
22 Q. Dr. Perri, I'll test my throwing skills.
23 I'll toss to you what's been marked as Exhibit 34.
24     MR. HENNESSY: And for the record, this is a
25 document that's been marked Exhibit 34. The

Page 654

1 first page has a Bates stamp which I'll just
2 read: ENDO-CHI_LIT-00550036.
3 A. Okay.
4 Q. Dr. Perri, do you recognize this document?
5 A. Well, I certainly recognize parts of it.
6 I'm looking through the whole thing as we're
7 speaking here.
8 Q. Maybe I'll -- if it's okay with you, I'll
9 walk you through it.
10 A. Okay.
11 Q. If you start with the cover, this is the
12 Opana ER with Intac Digital MBA -- which stands for
13 master visual aid -- Navigator.
14 A. Right.
15 Q. And you will see on the bottom of the first
16 page, ending in 36, it says: Confidential, for
17 internal use only, it's intended for sales training
18 purposes.
19 A. Right.
20 Q. Do you -- fair to say or do you agree that
21 this appears to be the sales training document
22 instructing Endo sales reps on how to present
23 information in the master visual aid to healthcare
24 providers?
25 A. As I recall this document, which as we're

Page 655

1 talking about it I am recalling it, yes.
2 Q. Okay. Great. So this is a document that
3 you cite on Page 87 of your report, which, again, is
4 Exhibit 1, and my reading is that you allege that
5 this document is an example of how Endo downplayed
6 the risk of abuse and addiction. Is that fair?
7 A. Okay. So we are at --
8 Q. 87.
9 A. 87. 36.
10 Q. It's the second document in the table on
11 page 87.
12 A. So this is in the section of extended
13 release. This may be cited elsewhere in the table.
14 Q. If I read -- if I go back to Page 86 of your
15 report --
16 A. Okay.
17 Q. Heading A --
18 A. Right.
19 Q. -- says: Extended-release drugs and/or Q12
20 dosing had fewer peaks and valleys and less chance
21 of addiction and abuse.
22 A. Right.
23 Q. So I was paraphrasing that last part. Is it
24 fair to say that you're citing this as an example of
25 a document that downplayed the risk of abuse and

Page 656

1 addiction?
2 A. And less chance of it. I wouldn't go as far
3 with this table to say that. I do agree that my
4 opinion overall is that these messages tended to
5 downplay the risk of addiction, but in this table it
6 would just be more the exact messages that were
7 presented by the marketing documents that are cited
8 within it.
9 Q. Okay.
10 A. That title is paraphrased, so it's not
11 exactly what's in every document.
12 Q. Fair enough.
13 A. Okay.
14 Q. And you can put Exhibit 1 to the side. I'm
15 going to walk you through Exhibit 34.
16 A. Okay.
17 Q. Okay. I'd like to start out -- and let me
18 know if you need time to review any part of this,
19 but I wanted to start out on the page in the bottom
20 right that ends in 38. Are you there?
21 A. I am almost there.
22 Q. Okay. It's the --
23 A. Okay. I'm there.
24 Q. -- third page.
25 A. Oh, you said --

Page 657

1  Q.  38.
2  A.  I'm looking at Page 38 of the slide --
3  Q.  Oh, I apologize.  I'm looking at the Bates
4  numbering at the bottom.
5  A.  At Bates 38.  Okay.  That explains why I
6  wasn't getting there as fast as you thought I
7  should.
8  Q.  And in particular, I wanted to draw your
9  attention to the section on the right side of the
10  page labeled "Usage Notes."
11  A.  Okay.
12  Q.  And the middle paragraph there, can you read
13  that one to me?
14  A.  "When you select your desired asset, the
15  required Full Important Safety Information (ISI) is
16  automatically displayed.  It is mandatory to talk
17  through the ISI with the prescriber and tap Continue
18  at the bottom to go to your selected page."
19  Q.  Okay.  You can turn ahead to the next page
20  ending in Bates 39, and -- bear with me for a
21  moment.
22      Okay.  The middle paragraph under sales
23  message, are you with me?
24  A.  Uh-huh.
25  Q.  Okay.  Can you read that paragraph for me,

Page 658

1  please?
2  A.  "In order to make informed treatment
3  decisions, it is important that prescribers
4  understand the associated risks when prescribing
5  Opana ER with Intac, including the boxed warning.
6  It is your obligation to draw attention to all
7  components of the boxed warning and provide a fair
8  and balanced presentation to your healthcare
9  professionals."
10  Q.  Okay.  Flipping ahead a couple pages to the
11  page ending in Bates 41, and there is a section on
12  the right side, there is a box.  I'd like you to
13  read the part that starts with "Balancing Claims."
14  A.  "Balancing Claims:  To ensure that
15  prescribers are fully informed about the benefits
16  and risks as well as appropriate use of Opana ER
17  with Intac, it is required to balance your
18  presentation by reviewing the indication, boxed
19  warning, contraindications, warnings, precautions,
20  and adverse events.  Every product discussion must
21  also include an offer to provide the Full
22  Prescribing Information (PI) of Opana ER with Intac.
23  Q.  Thank you.  Is it fair to say, based on the
24  pages that we've just read in this training
25  document, that Endo's sales representatives were not

Page 659

1  permitted to select whether or not they presented
2  the risks in the black box warning and the Important
3  Safety Information when they were meeting with
4  doctors?
5  A.  Yes, at least to the extent that they were
6  using the iPad simulator that they had, certainly,
7  yes.
8  Q.  And this is one example of the master visual
9  aid which, as I mentioned before and I think you
10  agreed to, is the primary detailing document that
11  Endo sales representatives used with doctors; is
12  that fair?
13  A.  Right, at a certain period of time, yes.
14  Q.  If you go on -- and this is the last thing
15  that we'll take a look at in the document -- on
16  Page 4 -- the Bates page ending in 46.
17  A.  Okay.
18  Q.  I think you'll -- I have to line up a couple
19  documents here.  I think you will want to go also --
20  go back to Exhibit 1, because this is where the
21  language that you're quoting in Exhibit 1 shows up,
22  so if you go to Page 87 of your report.
23  A.  Okay.
24  Q.  Okay.  Bear with me.  I'm just trying to
25  find -- this is where your language is cited.  I'm

Page 660

1  just trying to figure out where it is.
2      Okay.  I see it.  Okay.  So in Exhibit
3  Number 34, we're on the page ending in Bates 46,
4  under Sales Message, in the second paragraph, I
5  believe you're quoting language from that paragraph
6  there that reads:  "The original formulation showed
7  a similar oxymorphone plasma concentration at all
8  time points over 12 hours."
9  A.  Yes.
10  Q.  Okay.  So if you look at other -- I want to
11  point you to a couple other portions of this Page 46
12  where you're quoting language in your report.  If
13  you look at the sample dialogue that sales reps are
14  given to use with healthcare providers, which
15  appears at the bottom of the document, it appears to
16  me that it contains multiple warnings about the risk
17  of abuse and addiction.  Is that fair?
18  A.  Yes.
19  Q.  The first one begins with:  "Doctor, Opana
20  ER with Intac contains oxymorphone which is an
21  opioid agonist and a Schedule II controlled
22  substance with an abuse liability similar to other
23  opioid analgesics."
24      And then immediately after that it says:
25  "Doctor, routinely monitor all patients receiving

Page 661

1  Opana ER with Intac for signs of misuse, abuse, and
2  addiction during treatment."
3      Is it -- do you agree with my statement that
4  there are multiple warnings on this page about abuse
5  and addiction?
6      A.  Yes.
7      Q.  You can put this one aside for a moment -- I
8  think for good.
9      I'm going to ask you about Table II,
10  although I don't think you need to look at it.  I
11  believe you testified that Table II includes
12  references from documents that you know never became
13  live actual marketing documents that were used in
14  the field.  Is that fair?
15      A.  I don't know that they were never used in
16  there, but I know they were not used in the form
17  they were presented in Table II, yes.
18      Q.  So if they were used --
19      A.  They would have been corrected.
20      Q.  -- they would have been corrected?
21      A.  Yes.
22      Q.  Okay.  Is it fair to say that Table II
23  contains other documents that you don't know one way
24  or the other if they ever turned into public
25  marketing messages?

Page 662

1      A.  I -- it's fair to say that there are
2  certainly other documents that didn't make it to
3  market, for example, there are documents related to
4  Moxduo in here, so it's fair to say that there are
5  some but I wouldn't say that it's the predominance
6  of the documents by any means.
7      Q.  I looked through --
8      A.  Can I -- let me just add to that.  These --
9  like, for example, the Exhibit 34 that we were just
10  looking at, regardless of if this was presented,
11  because this is what the sales reps were being
12  trained to work with with doctors, so even though
13  this is not intended for and it was not to be
14  distributed, certainly these messages were going out
15  there.
16      And when we look at Table II for this
17  particular document, it cited just the 12-hour
18  dosing and the peaks and troughs, this is not a
19  judgment being made about the product or the
20  message.  It's simply showing that this message was
21  used with respect to this product.
22      And, you know, as I've been answering
23  questions for the last two days, I've tried to make
24  that clear, that I didn't evaluate the messages from
25  a falsehood perspective, it was simply what messages

Page 663

1  were being used.
2      So that's why it didn't really matter if it
3  was for internal use only or external use.  It
4  didn't really matter if -- you know, for example,
5  with the Endo document in Table II that never got
6  used because it was incorrect, it was to simply show
7  the processes that were in place and how the
8  marketing messages were developed.
9      Q.  Okay.  So to your last point, I looked
10  through Table II.  By my count there are at least 18
11  Endo documents that are internal documents that
12  weren't actually approved in final promotional
13  pieces, that weren't documents that were ever used
14  with doctors.
15      A.  Okay.  Would that include Exhibit 34?
16      Q.  I didn't include Exhibit 34 in there because
17  it's a sales training document and those messages
18  were delivered to doctors.
19      A.  Okay.
20      Q.  These were more of the category of marketing
21  plans, other internal use only documents.
22      A.  Okay.  So, again, with any of the
23  documents that -- so 18 -- first of all, there are
24  hundreds of documents in these table -- in Table II,
25  but when you said there were marketing plans, for

Page 664

1  example, the marketing plans would never have been
2  expected to be distributed to customers, even though
3  they would have contained core messages that might
4  have been.
5      So we have to be careful not to, you know,
6  distort the view of what we're actually looking at,
7  messages that were contemplated, messages that were
8  implemented, some that were not ever presented to
9  customers, I think that's a very small number,
10  certainly not 18, and overall, I think we just have
11  to understand that this table is simply to identify
12  messages that were found in the marketing materials
13  without making judgment about those messages.
14      Q.  If you don't mind, I would just like to ask
15  a couple more questions about Table II and I think
16  we're close to wrapping up.
17      If a message is from an internal document
18  and you haven't cited a document where that specific
19  message was ever used with a healthcare provider, is
20  it fair to say that you're not going to offer the
21  opinion that that statement from the internal
22  document influenced any prescribing decision?
23      A.  Yes, I absolutely agree with that.  I would
24  never make that quantum leap, that a message that
25  was never presented to a customer influenced

Page 665

1  prescribing, but it did influence marketing and it
2  was part of the marketing program, so it was
3  important for me to identify that.
4       And, you know, methodologically, it's very
5  important for me to include everything that I saw so
6  that if somebody else were to try to repeat this
7  analysis, they would see all the documents that I
8  saw, so I find it important to be as complete as
9  possible in those documents.
10  Q.  Okay.  So I think I'm onto my last topic,
11 and this relates to the document that you referenced
12 earlier, an Endo document which is cited on Page 124
13 of Exhibit 1.
14  A.  Uh-huh.  Okay.
15  Q.  You beat me this time.  Bear with me.
16      Okay.  I believe the document that you were
17 referring to earlier in your testimony is at the
18 very bottom of Page 124 of Exhibit 1.
19  A.  It is.
20  Q.  It's the document with the Bates number
21 ENDO-CHI_LIT-00418075, and the message in your table
22 is:  "True 12-hour dosing for Veterans and Military
23 Personnel with mild-to-moderate chronic pain."
24      Are you aware that this piece was never
25 actually used by Endo for promotion -- for any

Page 666

1  promotional efforts?
2  A.  So I am aware that this piece wasn't used by
3  Endo because there was an error in the cover -- the
4  sort of the headline of this.  It said
5  mild-to-moderate pain when it should have said
6  moderate-to-severe.
7       My understanding from -- was that that would
8  be corrected but that the balance of the information
9  would still be used.
10  Q.  Did you find an example where a final piece
11 was ever used?
12  A.  I haven't found that yet, but I need to look
13 for that if I'm going to say that it was used.
14  Q.  And I looked and was not able to find a
15 final example of this piece being used.
16  A.  I want to ask -- I want to ask a question
17 but I know that's not my -- so --
18      MR. HENNESSY:  Thank you very much for your
19 time.  I appreciate it.
20      THE VIDEOGRAPHER:  We are now going off the
21 video record.  The time is currently 4:55 p.m.
22 This is the end of Media Number 6.
23      (Whereupon, the deposition concluded at
24 4:55 p.m.)
25

Page 667

1       C E R T I F I C A T E
2       I, SUSAN D. WASILEWSKI, Registered
3  Professional Reporter, Certified Realtime Reporter
4  and Certified Realtime Captioner, do hereby certify
5  that, pursuant to notice, the deposition of MATTHEW
6  PERRI, III, BS Pharm, Ph.D., RPh, was duly taken on
7  Wednesday, April 24, 2019, at 8:35 a.m. before me.
8       The said MATTHEW PERRI, III, BS Pharm, Ph.D.,
9  RPh, was duly sworn by me according to law to tell
10 the truth, the whole truth and nothing but the truth
11 and thereupon did testify as set forth in the above
12 transcript of testimony.  The testimony was taken
13 down stenographically by me.  I do further certify
14 that the above deposition is full, complete, and a
15 true record of all the testimony given by the said
16 witness, and that a review of the transcript was
17 requested.
18
19 _____
20 Susan D. Wasilewski, RPR, CRR, CCP
21 (The foregoing certification of this transcript does
22 not apply to any reproduction of the same by any
23 means, unless under the direct control and/or
24 supervision of the certifying reporter.)
25

Page 668

INSTRUCTIONS TO WITNESS

1
2
3
4       Please read your deposition over carefully
5  and make any necessary corrections.  You should
6  state the reason in the appropriate space on the
7  errata sheet for any corrections that are made.
8
9       After doing so, please sign the errata sheet
10 and date it.  It will be attached to your
11 deposition.
12
13      It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the deposition
16 transcript by you.  If you fail to do so, the
17 deposition transcript may be deemed to be accurate
18 and may be used in court.
19
20
21
22
23
24
25

Page 669

```
 1        ------
 2        E R R A T A
 3        ------
 4  PAGE  LINE  CHANGE
 5  ____ ____ _____
 6    REASON: _____
 7  ____ ____ _____
 8    REASON: _____
 9  ____ ____ _____
10    REASON: _____
11  ____ ____ _____
12    REASON: _____
13  ____ ____ _____
14    REASON: _____
15  ____ ____ _____
16    REASON: _____
17  ____ ____ _____
18    REASON: _____
19  ____ ____ _____
20    REASON: _____
21  ____ ____ _____
22    REASON: _____
23  ____ ____ _____
24    REASON: _____
25
```

Page 671

```
 1              LAWYER'S NOTES
 2  PAGE  LINE
 3  ____ ____ _____
 4  ____ ____ _____
 5  ____ ____ _____
 6  ____ ____ _____
 7  ____ ____ _____
 8  ____ ____ _____
 9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____
25
```

Page 670

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2
 3        I, _____, do hereby
 4  acknowledge that I have read the foregoing pages,
 5  352 through 669, and that the same is a correct
 6  transcription of the answers given by me to the
 7  questions therein propounded, except for the
 8  corrections or changes in form or substance, if any,
 9  noted in the attached Errata Sheet.
10
11
12  _____
13  MATTHEW PERRI, III, BS Pharm, Ph.D., RPh      DATE
14
15
16
17
18  Subscribed and sworn to before me this
19  ____ day of _____, 20___.
20  My Commission expires: _____
21
22  _____
    Notary Public
23
24
25
```