Highly Confidential - Subject to Further Confidentiality Review

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION
3

    -------------------------      )
4   IN RE: NATIONAL                ) MDL No. 2804
    PRESCRIPTION OPIATE            )
5   LITIGATION                     ) Case No.
    -------------------------      ) 1:17-MD-2804
6                                  )
    THIS DOCUMENT RELATES TO       ) Hon. Dan A. Polster
7   ALL CASES                      )
    -------------------------      )
8
9                    HIGHLY CONFIDENTIAL
10         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12              VIDEOTAPED DEPOSITION OF
13                   DOUGLAS PETERSON
14
15                   December 20, 2018
16
17                   Chicago, Illinois
18
19
20
21
22             GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
23                   deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1

2

3

4          The videotaped deposition of

5   DOUGLAS PETERSON, called by the Plaintiffs for

6   examination, taken pursuant to the Federal Rules of

7   Civil Procedure of the United States District

8   Courts pertaining to the taking of depositions,

9   taken before CORINNE T. MARUT, C.S.R. No. 84-1968,

10  Registered Professional Reporter and a Certified

11  Shorthand Reporter of the State of Illinois, at the

12  offices of Bartlit Beck Herman Palenchar & Scott,

13  Suite 600, 54 West Hubbard Street, Chicago,

14  Illinois, on December 20, 2018, commencing at 9:01

15  a.m.

16

17

18

19

20

21

22

23

24

Page 3

1   APPEARANCES:
2   ON BEHALF OF THE PLAINTIFFS:
3       LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY & PROCTOR P.A.
4       316 South Baylen Street, Suite 600
        Pensacola, Florida 32502
5       205-396-3982
    BY: JEFF GADDY, ESQ.
6       jgaddy@levinlaw.com
        LAURA DUNNING, ESQ.
7       ldunning@levinlaw.com
            (via livestream)
8
9
10  ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
    aka WALGREEN CO. and THE DEPONENT:
11
        BARTLIT BECK LLP
12      54 West Hubbard Street, Suite 300
        Chicago, Illinois 60654
13      312-494-4475
    BY: MARK LEVINE, ESQ.
14      Mark.Levine@BartlitBeck.com
        SHARON DESH, ESQ.
15      sharon.desh@bartlitbeck.com
16
17  ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
    ENDO PHARMACEUTICALS, INC.,
18  PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
    COMPANIES, INC. (f/k/a Par Pharmaceutical
19  Holdings, Inc.):
20      ARNOLD & PORTER KAYE SCHOLER LLP
        250 West 55th Street
21      New York, New York 10019-9710
        212-836-8000
22  BY: ZENO HOUSTON, ESQ.
        zeno.houston@arnoldporter.com
23          (via telephone/livestream)
24

Page 4

1   APPEARANCES (Continued):
2   ON BEHALF OF CARDINAL HEALTH, INC.:
3       WILLIAMS & CONNOLLY LLP
        725 Twelfth Street, N.W.
4       Washington, DC 20005
        202-434-5686
5   BY: MIRANDA PETERSEN, ESQ.
        mpetersen@wc.com
6           (via telephone/livestream)
7
        ON BEHALF OF AMERISOURCEBERGEN CORPORATION and
8   AMERISOURCEBERGEN CORPORATION:
        JACKSON KELLY PLLC
9       150 Clay Street, Suite 500
        P.O. Box 619
10      Morgantown, West Virginia 26501
        304-284-4138
11  BY: SYLVIA WINSTON NICHOLS, ESQ.
        silvia.winston@jacksonkelly.com
12
13
14  ON BEHALF OF WALMART:
15      JONES DAY
        77 West Wacker Drive
16      Chicago, Illinois 60601-1692
        312-782-3939
17  BY: JASON Z. ZHOU, ESQ.
        jzhou@jonesday.com
18
19  ON BEHALF OF HBC COMPANY:
20      MARCUS & SHAPIRA LLP
        One Oxford Centre, 35th Floor
21      Pittsburgh, Pennsylvania 15219
        412-338-4383
22  BY: ZACHARY FENSTEMAKER, ESQ.
        fenstemaker@marcus-shapira.com
23      ELLY HELLER-TOIG, ESQ.
        ehtoig@marcus-shapira.com
24          (via telephone/livestream)

Page 5

1   ALSO PRESENT:
2       KATIE MAYO, Paralegal
        kmayo@levinlaw.com
3       SARAH MERCED, Paralegal
        smerced@levinlaw.com
4       Levin Papantonio Thomas Mitchell
        Rafferty & Proctor P.A.
5
6
        RODERRICK CONCEPCION, Trial Technician
7
8
9
10
11  VIDEOTAPED BY: MICHAEL NEWELL
12
13  REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
14
15
16
17
18
19
20
21
22
23
24

## Page 6

```
 1             I N D E X
 2  DOUGLAS PETERSON           EXAMINATION
 3     BY MR. GADDY.................  11
        BY MR. LEVINE................ 299
 4     BY MR. GADDY................. 311
        BY MR. LEVINE................ 318
 5     BY MR. GADDY................. 321
        BY MR. LEVINE................ 323
 6
 7
 8           E X H I B I T S
 9  WALGREENS-PETERSON EXHIBIT      MARKED FOR ID
10  No. 1   Binder, "Settlement and        38
            Memorandum of Agreement";
11          WAGMDL00490963 - 00490978 with
            attachments
12
     No. 2   5/30/13 e-mail string;        57
13          WAGMDL00583296 - 00583301
14  No. 3   5/28/13 e-mail string;         65
            WAGMDL00585822 - 00585825
15
     No. 4   2/12/13 e-mail string;        70
16          WAGMDL478056 - 00478057
17  No. 5   Administrative Inspection      73
            Warrant;
18          WAGMDL00493697 - 00493700
19  No. 6   U.S. DOJ/DEA Subpoenas;        82
            WAGMDL00493694 - 00493718
20
     No. 7   2/18/13 e-mail;               89
21          WAGMDL00524429 - 00524430
22
23
24
```

## Page 7

```
 1           E X H I B I T S
 2  WALGREENS-PETERSON EXHIBIT      MARKED FOR ID
 3  No. 8   2/2/13 letter to DEA from      97
            Latham & Watkins;
 4          WAGMDL00674280 - 00674280
 5  No. 9   2/20/13 e-mail string;        103
            WAGMDL00357519 - 00357521
 6
     No. 10   2/21/13 e-mail string;      116
 7          WAGMDL00357543 - 00357548
 8  No. 11   2/26/13 e-mail string;       123
            WAGMDL00358459 - 00358462
 9
     No. 12   2/22/13 e-mail string;      138
10          WAGMDL00049750 - 00049751
11  No. 13   2/28/13 e-mail string;       143
            WAGMDL00524815 - 00524817
12
     No. 14   2/28/13 e-mail string;      153
13          WAGMDL00407724 - 00407726
14  No. 15   4/9/13 e-mail sting;         160
            WAGMDL00358578 - 00358580
15
     No. 16   2/27/13 appointment e-mail; 167
16          WAGMDL00335835 - 00335837
17  No. 17   2/28/13 e-mail;              175
            WAGMDL00541412
18
     No. 18   3/13/13 e-mail string;      178
19          WAGMDL00102642 - 00102644
20  No. 19   9/25/12 e-mail;              184
            WAGMDL00278104
21
     No. 20   101/12 e-mail string;       198
22          WAGMDL00252575 - 00252576
23
24
```

## Page 8

```
 1           E X H I B I T S
 2  WALGREENS-PETERSON EXHIBIT      MARKED FOR ID
 3  No. 21   10/1/12 e-mail string;       204
            WAGMDL00705318 - 00705320
 4
     No. 22   4/14/11 e-mail string;      215
 5          WAGFLDEA00001032 - 00001033
 6  No. 23   10/5/12 e-mail string;       218
            WAGMDL00127695
 7
     No. 24   8/15/12 e-mail string;      221
 8          WAGMDL0000107473 - 00107474
 9  No. 25   4/3/13 e-mail string with    228
            attachment;
10          WAGMDL0000525116 - 00525119
11  No. 26   4/4/13 e-mail string;        230
            WAGMDL00358567 -00358570
12
     No. 27   10/5/12 e-mail string with  242
13          attachment;
            WAGMDL00278108 - 00278111
14
     No. 28   Document, "Handling Suspicious  253
15          Drug Orders";
            WAGFLDEA00001584 - 00001855
16
     No. 29   Document, "Handling Suspicious  259
17          Orders and Loss of Controlled
            Drugs";
18          WAGFLDEA00000028
19  No. 30   2/11/11 e-mail string;       262
            WAGFLDEA00000891 - 00000901
20
     No. 31   Document, "Threshold        271
21          Violations-Monthly";
            WAGMDL00674619
22
23
24
```

## Page 9

```
 1           E X H I B I T S
 2  WALGREENS-PETERSON EXHIBIT      MARKED FOR ID
 3  No. 32   Document, "Threshold        275
            Violations-Monthly";
 4          WAGMDL00674620
 5  No. 33   Document, "Order Item Detail";  277
            WAGMDL00674553
 6
     No. 34   Documents, "Threshold       280
 7          Violations-Weekly";
            WAGMDL00574576 - 00674594
 8
     No. 35   Documents, "Order Item      284
 9          Detail";
            WAGMDL00674562 - 00674575
10
     No. 36   Document, "DEA Compliance   288
11          Documentation Update May 14,
            2008";
12          WAGMDL00491150 - 00491152
13  No. 37   2/5/13 e-mail with           293
            attachments;
14          WAGMDL00451632 - 00451636
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    THE VIDEOGRAPHER:  We are now on the record.
2    My name is Michael Newell.  I'm a videographer for
3    Golkow Litigation Services.
4        Today's date is December 20, 2018.  The
5    time is 9:00 a.m.
6        This video deposition is being held in
7    Chicago, Illinois in the matter of National
8    Prescription Opiate Litigation.
9        The deponent today is Douglas Peterson.
10        Will counsel please identify themselves.
11    MR. GADDY:  Jeff Gaddy for the Plaintiff.
12    MR. LEVINE:  Mark Levine for the witness and
13    Walgreens.  With me is Sharon Desh.
14    MR. ZHOU:  Jason Zhou, Jones Day, for Walmart.
15    MS. WINSTON:  Sylvia Winston, Jackson Kelly,
16    for AmerisourceBergen.
17    MR. GADDY:  Corinne, I think you've gotten the
18    folks on the phone or?
19    THE REPORTER:  Counsel on the phone, would you
20    mind announcing your appearance, please.
21    MR. FENSTEMAKER:  Zach Fenstemaker with
22    Marcus & Shapira on behalf of HBC.
23    MS. PETERSEN:  Miranda Petersen with
24    Williams & Connolly on behalf of Cardinal Health,

Page 11

1    Inc.
2    MR. HOUSTON:  Zeno Houston of Arnold & Porter
3    on behalf of Endo and Par Defendants.
4    THE VIDEOGRAPHER:  The Court Reporter today is
5    Corinne Marut and will now swear in the witness.
6        (WHEREUPON, the witness was duly
7        sworn.)
8        DOUGLAS PETERSON,
9    called as a witness herein, having been first duly
10    sworn, was examined and testified as follows:
11        EXAMINATION
12    BY MR. GADDY:
13    Q.   Good morning, Mr. Peterson.
14    A.   Good morning.
15    Q.   Could you state your name for the Court
16    Reporter, please.
17    A.   Douglas Peterson.
18    Q.   And where do you work?
19    A.   Walgreens.
20    Q.   What's your title?
21    A.   I am an IT manager.
22    Q.   Any particular area in which you're an
23    IT manager?
24    A.   Yes, logistics.

Page 12

1    Q.   I understand you've been with Walgreens
2    since 1980?
3    A.   Yes, that is correct.
4    Q.   How long have you been an IT manager?
5    A.   15 years.
6    Q.   And was that entire 15 years in
7    logistics?
8    A.   As a manager, yes.
9    Q.   Prior to becoming an IT manager in
10    logistics, and just make sure my math is right, so
11    approximately 2003 you became an IT manager in
12    logistics?
13    A.   Yes.
14    Q.   Prior to becoming an IT manager of
15    logistics in 2003, were you still in the logistics
16    area before that or were you doing something
17    different in IT?
18    A.   I did both finances, financial
19    programming, and then I moved about -- trying to
20    remember -- I'm going to say the late 1900s to
21    logistics.
22    Q.   1990s?
23    A.   I -- sorry.  1990s.
24    Q.   Sure.

Page 13

1    A.   Actually it was the middle of 1990s I
2    moved into logistics.
3    Q.   Okay.  So, mid-1990s through 2003 you
4    were a team member?
5    A.   Team member, writing programs.
6    Q.   Okay.  And you had a manager that you
7    reported to?
8    A.   Yes.
9    Q.   Okay.  And now you have folks that
10    report to you?
11    A.   Yes.
12    Q.   How many people are on your team?
13    A.   Five people are on my team.
14    Q.   I've had the opportunity to take a
15    couple other depositions in this case.  Another
16    individual in the IT department was Sean Barnes.
17    Do you know who that is?
18    A.   Yes, I know Sean.
19    Q.   Where does he relate to you?  Is he in
20    your department, a different department?
21    A.   He's in logistics IT.  He's a manager
22    for a different area within logistics.
23    Q.   Okay.  Another individual I've run into
24    is Brian Amend.  Do you know who that is?

Page 14

1    A.   Yes, I know who that is.
2    Q.   Describe your relationship to him as far
3  as hierarchical.
4    A.   He is the senior director of our
5  department.
6    Q.   So, you report to him?
7    A.   I report to him.
8    Q.   Who are the folks on your team?
9    A.   Who are the folks?  Pete Strohmayer,
10 Alla Rapoport, Ed Cuesta, Eugene Tan and Dave
11 Molidor.
12   Q.   I'm going to ask you some questions
13 today about your position primarily I think as
14 an -- as either a team member or a manager in the
15 supply chain logistics department.  Okay?
16   A.   Okay.
17   Q.   And I'm going to ask you some questions
18 going back to as far back as you've been involved
19 in that department.  Okay?
20   A.   (Nodding head.)
21   Q.   When is the first time that you had any
22 involvement with controlled substances as part of
23 your job duties?
24   A.   Early 2000s.

Page 15

1    Q.   And what was the first thing you did
2  with controlled substances?
3    A.   Created a system to manage warehousing
4  of controlled substance within Walgreens.
5    Q.   Would it be fair to characterize your
6  duties and the tasks that you performed beginning
7  in the early 2000s, were those programs that you
8  conceptualized yourself or were they programs that
9  were given to you and you were asked to implement
10 them?
11   A.   They were designs that were given to us
12 that we were asked to implement.  So we had to
13 write the code.  Some of it was existing code that
14 existed already in our -- in our distribution
15 centers that we were able to use for the controlled
16 drug distribution center as well.
17   Q.   Okay.  Would it be fair to say that
18 somebody higher up at Walgreens developed a
19 concept, gave you the design or the plans and you
20 were in charge of implementing it?
21   A.   Yes.
22   Q.   Is that still the case in your role as
23 an IT manager, that you quarterback your team
24 implementing a plan or are you now in a

Page 16

1  conceptualizing phase?
2    A.   I do both.  I will guide and sometimes
3  design for them or help.
4    Q.   So, are you the one coming up with new
5  plans or programs that need to be implemented or
6  are you the one who gets tasked with actually
7  making sure the plan gets put into place?
8    A.   We are told they need a new program and
9  I basically assign that to a person and try to get
10 it implemented.  Design it and then write the code
11 to implement the programs that they ask for.
12   Q.   So, somebody higher up than you --
13   A.   Yes.
14   Q.   -- tells you that they need a solution
15 to an issue?
16   A.   Yes.
17   Q.   And then you help design and implement
18 the solution?
19   A.   Yes.
20   Q.   You don't make the decision that we need
21 a solution to some issue, whatever it is?
22   A.   No.
23   Q.   You receive an order from somebody
24 higher up and you make sure it gets done?

Page 17

1    A.   Yes.
2    Q.   I got a little sidetracked.  Remind me
3  what you said, the first interaction you had with
4  controlled substances in the early 2000s.
5    A.   I helped build a system for us to
6  warehouse and distribute to our stores controlled
7  drug substances.  C-II as we would refer to them
8  as.
9    Q.   Do you know how long Walgreens has been
10 distributing C-IIs?
11   A.   I don't believe they distribute any
12 longer.  They stopped sometime in I think late
13 2000, but I don't remember exactly.
14   Q.   Okay.  If I said 2013, 2014, would that
15 sound accurate to you?
16   A.   It could be, yes.
17   Q.   My question is a little bit different.
18 Do you know when Walgreens began distributing
19 controlled substances to their own stores?
20   A.   That would have been sometime around the
21 early 2000s.
22   Q.   So, you assisted with implementing a
23 process that assisted Walgreens with distributing
24 controlled substances to their stores?

Page 18

1   A.   Yes.
2   Q.   Generally describe what program you were
3   asked to implement in the early 2000s.
4   A.   We were asked to implement an order and
5   picking system as well as a system to print the
6   C -- or the DEA 222 form via a printer instead of
7   having to handwrite them, and then basically
8   maintain the C 22 forms -- the DEA 222 forms, and
9   then that's basically it.
10      The stores would order.  We process that
11  order.  We decide if we are in -- if we have the
12  product in our DC or if it needs to be sent to a
13  jobber, which is a distributor outside of us, and
14  then we would split the order, pick the ones in our
15  DC, send the forms for the other orders, ordered
16  lines to the jobber --
17  Q.   Okay.
18  A.   -- to be picked.
19  Q.   I want to -- you used a couple terms
20  there that I want to make sure that I understand.
21  A.   Sure.
22  Q.   First you said "jobber."  Would it be
23  fair to say that that is an outside vendor, such as
24  Cardinal Health, AmerisourceBergen, McKesson, those

Page 19

1   types of?
2   A.   Yes.
3   Q.   You keep using the term "DC."  Do you
4   mean distribution center?
5   A.   Sorry.  Yes, distribution center.
6   Q.   Okay.  At some point in time in the
7   2000s were you involved in writing or implementing
8   a program that would identify line item limits for
9   orders of controlled substances?
10  A.   Line item limits, no.
11  Q.   What was the next project you worked on
12  related to controlled substances after implementing
13  a system to pick and ship controlled substances?
14  A.   Would have been opening of the next --
15  our next DC.
16  Q.   What was the first DC that opened?
17  A.   Orlando.
18  Q.   What was the second one?
19  A.   Perrysburg.
20  Q.   And these are DCs meant for
21  Schedule IIs, correct?
22  A.   Yes.
23  Q.   Briefly what did you have to do as it
24  relates to the Perrysburg distribution center as

Page 20

1   far as opening?
2   A.   Just setting up the environment, making
3   sure all the programs are there, make sure they
4   tested, make sure they work.  That basically is it.
5   They were already written, so...
6   Q.   What's the next thing you did?
7   A.   That would have been the Woodland
8   distribution center.
9   Q.   Just setting it up, same thing?
10  A.   Same thing.
11  Q.   Okay.  And those are the only three
12  distribution centers Walgreens ever had that
13  distributed C-IIs, correct?
14  A.   That I'm aware of, yes.
15  Q.   Okay.  After you assisted getting these
16  three distribution centers set up in what you
17  believe is the early 2000s, what was the next thing
18  you did related to controlled substances?
19  A.   Really nothing.  Supported them.  So, if
20  something broke, I would fix it, help fix it or
21  assign someone to fix it.
22  Q.   Are you aware of the concept that
23  Walgreens has certain obligations related to
24  controlled substances under federal statutes and

Page 21

1   federal regulations?
2   A.   No, I am not.
3   Q.   Are you aware of the concept of
4   reporting suspicious orders of controlled
5   substances?
6   A.   No.
7   Q.   Have you had any involvement in your
8   time with supply chain logistics related to
9   implementing thresholds or excessive query reports?
10  A.   We have an excessive order query that
11  was written for all of our distribution centers
12  that would look at orders before we processed them
13  through our system.
14  Q.   Okay.  And were you involved with
15  writing that excessive order query?
16  A.   I was -- I believe I was involved or I
17  was leading someone to actually write it.
18  Q.   Okay.  And when did that process happen?
19  A.   That would have been in early 1990s when
20  we went to our new distributions -- our warehouse
21  management system.  Sorry.
22  Q.   Okay.  I want to make sure we got our
23  dates right.
24      So, you think in the early 1990s is when

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  you wrote the -- what would you call it?  Is it an
2  excessive quantity query, excessive order query?
3      A.   Excessive order query.
4      Q.   And you've told me a couple times that
5  you believe the C-II distribution from Walgreens
6  began in the early 2000s, correct?
7      A.   I believe so, yes.
8      Q.   But this excessive order query was
9  written you believe in the early '90s?
10      A.   Yes.
11      Q.   And what involvement did you have in
12  writing the excessive order query?
13      A.   I probably led the -- I'm trying to
14  remember exactly, but I know I led my team or a
15  team member in how to write it and get it created.
16      Q.   Do you remember who else you worked with
17  on that?
18      A.   I don't.  I'm sorry.  No.
19      Q.   Okay.  What was the purpose of
20  implementing an excessive order query?
21      A.   The purpose of it is to try and catch
22  invalid -- product that was entered in excess of
23  what should normally be a normal value.
24      Q.   Would it be fair to characterize it as

Page 23

1  an inventory management type system?
2      A.   It's not really a management system.  It
3  just looked at orders that came in from a store,
4  checked against a value and if it was larger than
5  that, put it on a report.
6      Q.   Why did you want to see orders that
7  might be larger than a certain value?
8      A.   Because if product is not really wanted
9  and it was a mistake, then there was a lot of
10  excessive work that needed to be done both from the
11  distribution center and the store.  So, if it could
12  be prevented upfront, it would save trouble for
13  all.
14      Q.   So, the excessive order query was
15  implemented to catch mistakes that were coming in
16  from the Walgreens stores?
17      A.   Yes, on orders, yes, quantities.
18      Q.   Walgreens didn't want to have a
19  situation where they had an order come in with an
20  extra zero on it where they shipped the product to
21  the store and then had to go through the hassle of
22  getting it back?
23      A.   Yes.
24      Q.   And that process was in place for a

Page 24

1  significant period of time before Walgreens began
2  distributing any controlled substances?
3      A.   Yes, it was.
4      Q.   Anything change about the excessive
5  order query when Walgreens began distributing
6  controlled substances?
7      A.   No.
8      Q.   Any amendments or modifications made to
9  the excessive order query?
10      A.   We had to put their distribution center
11  number into the query so it would only look at its
12  orders and not pick up anything else.
13      Q.   But you didn't have to change the
14  formula?
15      A.   Nope, no.
16      Q.   There weren't any other factors or
17  criteria that were considered in tweaking the
18  formula for controlled substances?
19      A.   No.
20      Q.   What was the criteria that was utilized
21  to generate the excessive order query?
22      A.   It -- it looked at the order quantity
23  and if it was larger than a -- if it was greater
24  than a value that the distribution center entered

Page 25

1  into the query, it would report it, that particular
2  product on the report.
3      Q.   Was there any algorithm involved in that
4  excessive order query?
5      A.   No.
6      Q.   Was there any calculation involved in
7  establishing that excessive order query?
8      A.   No.
9      Q.   Was that excessive order query built
10  solely around a number that somebody at the
11  distribution center would type in for a particular
12  product?
13      A.   Yes.  And it's not product.  It's for
14  the entire order, store order.
15      Q.   Okay.  Thank you for that clarification.
16          Help me understand that a little bit.
17  Would it be -- obviously a particular pharmacy
18  might order Claritin, an allergy medication.  Is
19  the line item query written specifically for
20  Claritin or is it written for all orders of all
21  cold medications or allergy medications coming from
22  a particular store?
23      MR. LEVINE:  Objection to form.  You can
24  answer if you understand.

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1 BY THE WITNESS:
2    A.   It's for all items carried in the
3 warehouse, in the Walgreens stores.
4 BY MR. GADDY:
5    Q.   But is it line by line?  Is it product
6 by product that is the -- why don't you explain for
7 me what you meant when you told me that it's for
8 the entire store as opposed to by product?
9    A.   Well, the store can order any product.
10 I mean, we distribute products for most of the
11 items in our Walgreens store.  So, any ordered item
12 it would look at irregardless of what type of item
13 it is.  It could be paper towels.  It could be
14 toilet paper, shampoo.  It will look at any item we
15 have and if it is greater than the value specified,
16 it will appear on the report.
17    Q.   So, the distribution center enters in a
18 quantity or a number for paper towels, correct?
19    A.   No, they're entering a number just --
20 it's not item-specific.  It's just a number and if
21 it's greater than that number, it will display on a
22 report.  So, it's not product-specific.
23    Q.   Okay.  So, it's one number that's
24 entered for all products within the store?

Page 27

1    A.   Yes.
2    Q.   One number whether it's paper towels,
3 whether it's toilet paper, whether it's Claritin,
4 or whether it's OxyContin?
5    A.   Yes.
6    Q.   And that number is chosen by an
7 individual at the distribution center?
8    A.   Yes.  It's chosen by someone at the
9 distribution center.
10    Q.   Do you know the position of the person
11 at the distribution center that makes that
12 determination?
13    A.   No, I do not.
14    Q.   Have you heard the position of SAIL
15 coordinator, S-A-I-L coordinator?
16    A.   Yes.  I know SAIL coordinator.
17    Q.   Do you know whether or not the SAIL
18 coordinator is the person that makes the decision
19 that a certain number is going to be entered as the
20 criteria?
21    A.   I can't say for sure.
22    Q.   Regardless of who it is, that person has
23 discretion to raise or lower that number, correct?
24    A.   That is correct.

Page 28

1    Q.   Is there any approval process that
2 you're aware of for that person to raise or lower
3 that number?
4    A.   Not that I am aware of.
5    Q.   In the 2000s when Walgreens began
6 distributing controlled substances to its own
7 stores, from your understanding, is the excessive
8 order query just as you've been describing it thus
9 far?
10    A.   Yes.
11    Q.   Are you aware of any special practices
12 or procedures or approvals required regarding the
13 excessive order query as it related to controlled
14 substances in the 2000s?
15    A.   No, I am not.
16    Q.   And you were the person that helped
17 implement this program, correct?
18    A.   That is correct.
19    Q.   Were you ever asked to make any changes
20 or amendments to the program over the life of it?
21    A.   Not that I remember.
22    Q.   How often would that excessive query
23 report be run?
24    A.   It's really up to the DCs to determine

Page 29

1 that.  It could be daily.  It could be -- it's up
2 to their decision to how many times they would or
3 when they would run it.
4    Q.   From your understanding, do orders come
5 into the distribution center from -- from stores
6 pretty much on a daily basis?
7    A.   Yes.
8    Q.   It would make sense to run the report
9 daily?
10         Let me ask it this way:  If your goal is
11 to catch orders that might have been entered in
12 error, which I think is what you told us the
13 intention of the report was, it would make sense to
14 run it daily so that you don't ship any product
15 that wasn't intended to be shipped?
16    A.   Yes.
17    Q.   Are you aware of any policy or procedure
18 for what is supposed to be done if there are
19 certain orders that populate on that excessive
20 order query?
21    MR. LEVINE:  Objection; lacks foundation.
22 BY THE WITNESS:
23    A.   I'm not -- I'm not sure.  I don't know
24 of any policies personally, no.

Page 30

BY MR. GADDY:

1 Q. Were you asked to implement or design
2 any policies or procedures as far as what
3 individuals or what anybody was supposed to do if
4 any orders populated on that query?
5 A. No. I would just -- I just wrote the
6 program -- actually the query that created the
7 data. I wasn't involved in policies.
8 Q. Okay. You don't work in the
9 distribution center, correct?
10 A. I do not work in the distribution
11 center, no.
12 Q. Have you ever worked in a distribution
13 center?
14 A. No, I have not.
15 Q. Have you visited distribution centers?
16 A. Yes.
17 Q. Have you ever been to a distribution
18 center and watched the process of them running this
19 excessive order query?
20 A. Not that query in particular, no.
21 Q. That process of the excessive order
22 query, as far as you know, does that still happen
23 today?

Page 31

1 A. Yes.
2 Q. As far as you're aware, have there been
3 any changes or amendments to that -- to that
4 process, the excessive order query?
5 MR. LEVINE: Objection; foundation.
6 BY THE WITNESS:
7 A. I don't know of any, no.
8 BY MR. GADDY:
9 Q. Have you or your team within supply and
10 logistics been asked to make any changes or
11 amendments to the excessive order query?
12 A. No.
13 Q. At any point in time was you or your
14 team or anybody else that you're aware of in supply
15 and logistics to make any changes or
16 amendments to the excessive order query as it
17 related to running that report for controlled
18 substances?
19 A. No.
20 Q. Did the excessive order query report ask
21 or -- excuse me. Strike that.
22 Did the excessive order query report
23 suggest or recommend any particular line limit or
24 threshold that would be used to trigger any

Page 32

1 excessive orders?
2 A. Can you repeat that? I'm sorry.
3 Q. Sure. I think you told us that the
4 excessive order query would populate a report for
5 any items that were ordered in excess of whatever a
6 line limit was, is that accurate?
7 A. Yes.
8 Q. And I think you told us that that line
9 limit is inputted by somebody at the distribution
10 center?
11 A. That is correct.
12 Q. Was there any recommended or suggested
13 value for what that line limit should be that
14 you're aware of?
15 A. Not that I'm aware of, no.
16 Q. Did the report that you wrote, that you
17 implemented that you wrote the code for, did it
18 suggest or recommend any particular line limit?
19 A. No. That was up to the DC to make that
20 determination. Distribution center. Sorry.
21 Q. Sure. You can say "DC." I just wanted
22 to make sure we were clear on what you were talking
23 about.
24 Were the -- were the line limits that

Page 33

1 were implemented at distribution centers, do you
2 know whether or not they were static, the same
3 across all distribution centers, or do you not know
4 that?
5 A. I do not know that.
6 Q. Are you aware of any policies or
7 procedures about setting the line limits for
8 stores?
9 A. No, I am not aware of any.
10 Q. And, again, whatever line limit is set
11 would be the same for paper towels, for cold
12 medication and for controlled substances, correct?
13 A. Yes.
14 Q. Outside of writing the code and
15 implementing the excessive order query, during your
16 time at Walgreens have you been involved in any
17 other projects related to thresholds or ceilings as
18 it relates to controlled substances?
19 A. No.
20 Q. During your time at Walgreens have
21 you -- in supply and logistics have you been
22 involved in any projects that involve ARCOS
23 reporting?
24 A. The system that we run at the DCs

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  created a file that fed ARCOS, but that's as far as
2  my limitations went.
3      Q.   Tell me what you mean by that.
4      A.   As we ship out our product to the
5  stores, there is a -- the data is written to a file
6  that will feed into the ARCOS system, and we
7  created that file; but after that, I had no
8  involvement with the ARCOS system itself.
9      Q.   Okay.  Have you in your time at
10 Walgreens in supply chain and logistics had any
11 involvement with reporting of any controlled
12 substance information to the DEA?
13     A.   No.
14     Q.   During your time in supply and logistics
15 at Walgreens, have you had any involvement in
16 generating suspicious order reports?
17     A.   No.
18     Q.   Have you had any involvement in your
19 time with supply chain and logistics at
20 Walgreens with any type of due diligence reports as
21 it relates to controlled substances?
22     A.   No.
23     Q.   During your time at Walgreens did you
24 become aware that the controlled substance

Page 35

1  distribution center in Jupiter, Florida was
2  investigated by the DEA?
3      A.   I became aware of it when they asked us
4  to stop sending orders through it.
5      Q.   Tell me how you became aware that the
6  Jupiter distribution center was under investigation
7  by the DEA.
8      A.   I believe my boss at the time said we
9  need to look at ways to prevent orders from going
10 to -- to the Jupiter DC.
11     Q.   Okay.
12     A.   From a programmer point of view.
13     Q.   So, there is a -- would it be fair to
14 say there is an electronic system by which the
15 stores order product, including controlled
16 substances, from distribution centers?
17     A.   Yes, there is.
18     Q.   How long has that been an electronic
19 process?
20     A.   Since the early 1990s.
21     Q.   And also in the early 1990s is when
22 Walgreens began running these excessive order
23 queries?
24     A.   Yes.

Page 36

1      Q.   And specifically you were asked what, to
2  prevent controlled substances from going to stores
3  that are typically serviced by the Jupiter
4  distribution center?
5      A.   We were asked to, if I -- I don't
6  remember exactly.  But I believe it was to redirect
7  the orders to a different distribution center other
8  than Jupiter.
9      Q.   There were only three Walgreens
10 distribution centers that distributed controlled
11 substances, correct?
12     A.   That is correct, to my knowledge.
13     Q.   And that's Jupiter in Florida, correct?
14     A.   Yes.
15     Q.   Perrysburg in Ohio?
16     A.   Yes.
17     Q.   And Woodland in California?
18     A.   Yes.
19     Q.   When you were first asked by your
20 supervisor to or -- excuse me -- first informed by
21 your supervisor that you needed to have the orders
22 for stores that are typically serviced by Jupiter
23 diverted elsewhere, were they diverted to another
24 Walgreens distribution center or were they diverted

Page 37

1  to a jobber?
2      A.   I'm trying -- that was a long time ago.
3  But probably to both I would guess, but I don't
4  remember exactly.  Sorry.
5      Q.   Do you know why the orders that
6  typically were serviced by the Jupiter distribution
7  center for controlled substances needed to be
8  outsourced to either other Walgreens C-II
9  distribution centers or to jobbers?
10     A.   Not exactly except I was asked to do it.
11     Q.   Were you given any high level
12 presentation about why the DEA was involved in
13 Jupiter?
14     A.   No.
15     Q.   Were you given any explanation from
16 anybody higher than you at Walgreens about what was
17 going on as it related to the DEA and controlled
18 substances at the Jupiter distribution center?
19     A.   Not that I remember, no.
20     Q.   Were you aware that at some point in
21 time Walgreens and the DEA actually entered into a
22 settlement regarding the allegations stemming from
23 the Jupiter distribution center as it related to
24 controlled substances?

Page 38

1    A.   No, I do not.
2    Q.   Did anybody at Walgreens ever give you
3 any information about any litigation or settlement
4 between the DEA and Walgreens relating to -- to
5 that DEA investigation of the Jupiter distribution
6 center?
7    A.   No.
8    Q.   Let me show you what we're going to mark
9 as -- I'm going to show you P-WAG-1, which we're
10 going to mark as Peterson 1.
11         (WHEREUPON, a certain document was
12          marked as Walgreens-Peterson
13          Exhibit No. 1:  Binder, "Settlement
14          and Memorandum of Agreement";
15          WAGMDL00490963 - 00490978 with
16          attachments.)
17 BY MR. GADDY:
18   Q.   Mr. Peterson, you can flip open that
19 page. Do you see the top of the first page -- if
20 you look, I'm going to use -- at the bottom
21 right-hand corner there is page numbers and you
22 should be on page 1 out of 343.
23         Do you see that?
24   A.   Yeah.  1 out of 13 you mean?

Page 39

1    Q.   I'm sorry?
2    A.   Mine says 1 out of 13.
3    Q.   Look at the bottom right-hand corner.
4    A.   I don't --
5    MR. LEVINE:  You said 1 out of 43. That's
6 why. Or 343. You mean the 963 number at the
7 bottom?
8    MR. GADDY:  Yeah, let's do that.  Let's do
9 that. Mine is numbered differently, but I think we
10 are on the same page here. I'm sorry.
11 BY MR. GADDY:
12   Q.   You see at the top of that page it says
13 Settlement and Memorandum of Agreement?
14   A.   Yes, I do.
15   Q.   Have you ever seen this document before?
16   A.   No, I have not.
17   Q.   Flip through for me, please, it's going
18 to be about 12 pages in. If it's double-sided,
19 about 12 pages in. You should find an Appendix B
20 and then right after that there is a --
21   MR. LEVINE:  Do you know what the number is at
22 the bottom?
23   MR. GADDY:  I have a copy that doesn't have
24 the same numbers as you all.

Page 40

1 BY THE WITNESS:
2    A.   12 pages doubled. Did you say 12
3 double-sided or?
4    MR. LEVINE:  Are you looking for Appendix B?
5    MR. GADDY:  Correct, yes.
6    MR. LEVINE:  So, I think -- well, this one
7 doesn't have a number at the bottom.
8 BY THE WITNESS:
9    A.   I got Appendix A. Hang on. Maybe I can
10 find it.
11   MR. GADDY:  Let me see what you have got on
12 the next page there, Mark.
13   MR. LEVINE:  This.
14   MR. GADDY:  Absolutely. So, yours has -- does
15 yours say 23 of 343 on the bottom right?
16   MR. LEVINE:  No.
17   MR. GADDY:  On the bottom right.
18   MR. LEVINE:  I'm sorry. Page 23 of 343,
19 right.
20   MR. GADDY:  Correct.
21 BY MR. GADDY:
22   Q.   So, Mr. Peterson --
23   MR. LEVINE:  So, after Appendix A.
24   THE WITNESS:  Okay.

Page 41

1    MR. LEVINE:  Keep on going. You will get to
2 Appendix B.
3         There you go.
4 BY THE WITNESS:
5    A.   Got it.
6 BY MR. GADDY:
7    Q.   Great. Does yours on the bottom
8 right-hand corner say 23 of 343?
9    MR. LEVINE:  On the --
10 BY THE WITNESS:
11   A.   Yes, on the one side, yes.
12 BY MR. GADDY:
13   Q.   Okay. I think maybe there was just a
14 replacement of the beginning.
15        All right. So, that's the number I'll
16 look at from now on is that number on the bottom
17 right-hand side of the page.
18   A.   Okay.
19   Q.   All right. Do you see up in the top
20 right of this document here it says, "U.S.
21 Department of Justice, Drug Enforcement
22 Administration"?
23   A.   Yes.
24   Q.   Do you know if you've seen this document

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 before?

2    A.  No, I have never seen this document.

3    Q.  Okay. Do you see below the U.S.

4 Department of Justice there is a date here that

5 says September 13, 2012?

6    A.  Yes.

7    Q.  Does that sound about the time frame

8 that you were informed by your superior that you

9 needed to start looking at ways to divert the

10 orders of controlled substances that typically had

11 come from the Jupiter distribution center?

12    A.  I really don't remember.

13    Q.  If you go down a little bit to the left,

14 do you see it says, "In the matter of Walgreens

15 Company"? Do you see that?

16    A.  Just looking.

17    Q.  Still in the top of the page of the

18 heading.

19    A.  Oh. I'm sorry. Yes, I do.

20    Q.  Mr. Peterson, this screen up here is

21 going to kind of walk through it. So, from time to

22 time -- and you should have one right in front of

23 you too.

24    A.  Yes, I do. I see that now.

Page 43

1    Q.  Okay. Good deal. Then you see the

2 title of this document, it says "Order to Show

3 Cause and Immediate Suspension of Registration."

4    Do you see that?

5    A.  Yes.

6    Q.  And if you go down, it says in the body,

7 there is the first paragraph that starts

8 "Pursuant," but I'm going to start at the next

9 paragraph that starts "Notice."

10    Do you see that?

11    A.  Yes.

12    Q.  It says, "Notice is hereby given to

13 inform Walgreens Corporation of the immediate

14 suspension of Drug Enforcement Administration

15 Certificate of Registration RW0277752, pursuant to

16 21 United States Code Section 824(d), because such

17 registration constitutes an imminent danger to the

18 public health and safety."

19    Do you see that?

20    A.  Yes.

21    Q.  Did anybody at Walgreens make you aware

22 that the DEA had made allegations that Walgreens

23 was conducting business that constituted an

24 imminent danger to the public health and safety?

Page 44

1    A.  No.

2    Q.  If you skip down to the paragraph

3 numbered 1 at the bottom of the page.

4    Do you see that?

5    A.  Yes, I do.

6    Q.  It says, "Walgreens' Jupiter, Florida

7 distribution center is registered with the DEA as a

8 distributor in Schedules II through V pursuant to a

9 DEA Certificate of Registration."

10    Do you see that?

11    A.  Yes.

12    Q.  And then it gives an address, 15998

13 Walgreens Drive, Jupiter, Florida.

14    Do you see that?

15    A.  Yes, I do.

16    Q.  And is that consistent with your

17 understanding from your time in supply chains and

18 logistics that Walgreens had a distribution center

19 in Jupiter, Florida?

20    A.  Yes.

21    Q.  It goes on to say, it says, "The Jupiter

22 distribution center is one of 12 distribution

23 centers owned and operated by the Walgreens

24 Corporation."

Page 45

1    And if you flip to the next page, it

2 says it's headquartered in Deerfield, Illinois, and

3 "Walgreens also operates more than 7,800 Walgreens

4 retail pharmacies in the United States."

5    Do you see that?

6    A.  Yes.

7    Q.  Does that seem accurate to you at the

8 time back in September of 2012?

9    A.  Yes, it would.

10    Q.  If you look at paragraph 2, the first

11 sentence there says, "Since at least 2009, the

12 State of Florida has been the epicenter of a

13 notorious, well-documented epidemic of prescription

14 drug abuse."

15    Do you see that?

16    A.  Yes.

17    Q.  Back in 2012, in your time at Walgreens

18 going back to 2009 like is indicated here, did you

19 have an understanding that the State of Florida was

20 the epicenter of a notorious, well-known epidemic

21 of prescription drug abuse?

22    A.  No, I was not.

23    Q.  Did anybody at Walgreens ever make you

24 aware of there being a prescription drug abuse

Page 46

1 epidemic in Florida?

2     MR. LEVINE: Objection to form.

3 BY THE WITNESS:

4     A. No. There would be no need for that. I

5 mean, I -- I'm just a programmer, designing

6 programs.

7 BY MR. GADDY:

8     Q. And you get your orders about what to do

9 and what to implement from folks that are higher up

10 at Walgreens, correct?

11     A. Yes.

12     Q. Let me ask it this way. At any point in

13 time between 2009 and this document, which came out

14 in September of 2012, did anybody -- any of your

15 supervisors, anybody higher up at Walgreens come to

16 you or your team or any of the other supply chain

17 and logistics folks that you know of at Walgreens,

18 and ask you all to come up with any solutions or

19 implement any programs that would help address any

20 type of prescription drug abuse epidemic that was

21 happening in Florida?

22     MR. LEVINE: Objection to form, foundation.

23 BY THE WITNESS:

24     A. No, not that I'm aware of.

Page 47

1 BY MR. GADDY:

2     Q. If you go down to paragraph 3, it starts

3 "Oxycodone."

4     Do you see that?

5     A. Yes.

6     Q. Do you know what oxycodone is?

7     A. It's a controlled drug.

8     Q. Okay. And that's something that you

9 have an understanding of?

10     A. I do know what the drug is, yes.

11     Q. And do you have an understanding that

12 that's a drug that Walgreens has not only dispensed

13 in its pharmacies but has distributed to itself

14 from I guess the early 2000s until they stopped,

15 which we think was around '13 or '14?

16     A. I -- I don't remember all the drugs we

17 distributed, but I believe that was one of them.

18 But I'm not 100% sure.

19     Q. I understand. It goes on, it says there

20 in paragraph 3, "Oxycodone is a dangerously

21 addictive Schedule II controlled substance which is

22 known to be highly abused and diverted in the State

23 of Florida."

24     Do you see that?

Page 48

1     A. Yes.

2     Q. At any point in time during your

3 employment at Walgreens has anybody ever at

4 Walgreens made you aware that oxycodone is a

5 dangerously addictive Schedule II controlled

6 substance?

7     A. Nope.

8     Q. Do you have an independent understanding

9 of that, do you know that without reading it in

10 this document?

11     A. I know that it's prescribed for medical

12 use and if it's used for -- as prescribed by a

13 doctor, it serves a purpose.

14     Q. Do you have an understanding that it's

15 highly addictive?

16     A. No, I don't have an understanding.

17     Q. Nobody at Walgreens has ever told you

18 that it's highly addictive?

19     A. No.

20     Q. That paragraph goes on to say that

21 "According to the 2010 Florida Medical Examiner's

22 Commission Drug Report, the drug that caused the

23 most deaths in Florida for 2010 was oxycodone,

24 causing 1,516 deaths."

Page 49

1     Do you see that?

2     A. Yes.

3     Q. Did anybody at Walgreens ever make you

4 aware that this drug was causing that many deaths

5 in the State of Florida?

6     A. No.

7     MR. LEVINE: Objection to foundation.

8     You have to give me a chance to object

9 before you start your answer. Give me a second or

10 so. Thanks.

11     THE WITNESS: Sorry.

12 BY THE WITNESS:

13     A. No, I do not.

14 BY MR. GADDY:

15     Q. I asked you if anybody at Walgreens made

16 you aware of that, and you said, "No, I do not."

17 You mean nobody did?

18     A. No one made me aware of it.

19     Q. Did anybody at any time while you've

20 been at Walgreens in the supply chain and logistics

21 department, did anybody ask you or as far as you're

22 aware anybody else or any other teams in supply

23 chain and logistics to implement any programs or

24 write any code or implement any solutions

Page 50

1 specifically related to oxycodone?
2     MR. LEVINE: Objection to foundation.
3 BY THE WITNESS:
4     A.   Not that I'm aware of.
5 BY MR. GADDY:
6     Q.   Paragraph 4 says, "Since 2009 Walgreens'
7 Jupiter, Florida distribution center has been the
8 single largest distributor of oxycodone products in
9 Florida."
10        Do you see that?
11    A.   Yes.
12    Q.   Prior to reading that right here, did
13 you know that?
14    A.   No.
15    Q.   It goes on to say, "At about the same
16 time as the abuse of prescription drugs became an
17 epidemic in Florida, Walgreens' Florida retail
18 pharmacies, supplied by Respondent," and I will
19 represent to you the Respondent means Walgreens,
20 "commanded an increasingly large percentage of the
21 state's growing oxycodone business. In 2010, only
22 three Walgreens retail pharmacies were in the top
23 100 purchasers of oxycodone within Florida. In
24 2011, 38 Walgreens pharmacies made the top 100 and

Page 51

1 six were in the top 10."
2        Do you see that?
3     A.   Yes.
4     Q.   It says, "Through May 2012, 44 Walgreens
5 pharmacies are in the top 100 oxycodone purchasers,
6 all of them supplied by Respondent."
7        Do you see that?
8     A.   Yes.
9     Q.   Did you have an understanding, as a
10 person working in the supply chain and logistics
11 department of Walgreens during this time frame,
12 that Walgreens pharmacies were -- were ranked this
13 high as it related to oxycodone distributions and
14 dispensing in the State of Florida?
15    MR. LEVINE: Objection; foundation.
16 BY THE WITNESS:
17    A.   No. As I said before, I just -- I write
18 programs. I don't --
19 BY MR. GADDY:
20    Q.   You take orders from folks above you --
21    A.   Yes.
22    Q.   -- correct?
23        You implement the solutions they ask you
24 to implement?

Page 52

1     A.   Yes.
2     Q.   Nobody asked you to implement any
3 solution as it related to oxycodone going to
4 Florida, correct?
5     MR. LEVINE: Objection; asked and answered.
6 BY THE WITNESS:
7     A.   No.
8 BY MR. GADDY:
9     Q.   So, this report, the date of this
10 document that we're looking at is 2012, and I think
11 we've looked at -- we've seen that it's talking
12 about a time frame that generally starts in 2009.
13        Do you see that?
14    A.   Yes.
15    Q.   In 2009 you were a manager, correct?
16    A.   Yes.
17    Q.   In 2009 the -- the excessive order query
18 that we spent a little bit of time talking about
19 earlier this morning, that was in effect then,
20 correct?
21    A.   Yes.
22    Q.   That was in effect at all Walgreens
23 distribution centers, correct?
24    A.   Yes.

Page 53

1     Q.   I show you -- go to the -- there is the
2 next paragraph is paragraph 5, but then at the top
3 of the next page there is a chart.
4        Do you see that?
5     A.   Yes.
6     Q.   And you saw that we just read in that
7 last paragraph that all of these Walgreens
8 pharmacies throughout the State of Florida were
9 supplied by Walgreens. You understand that?
10    A.   That's what it said there, yes.
11    Q.   Okay. So, if we look at this chart on
12 the top of -- it's going to be page 25 of 343, do
13 you recognize the first column as to indicate store
14 numbers and store locations for different
15 Walgreens?
16    A.   Yes, that's what it looks like, yes.
17    Q.   And as we look at the next three
18 columns, do you see those to indicate oxycodone
19 purchases by dosage unit for the years of 2009,
20 2010 and 2011?
21    MR. LEVINE: Objection; foundation.
22 BY THE WITNESS:
23    A.   I see them, yes.
24 BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.   And if we look, just, for example, at
2 the second store listed there in Line No. 2, Store
3 03099 in Fort Myers, Florida.
4        Do you see that?
5    A.   Yes.
6    Q.   And according to this chart that's in
7 this document, in 2009 that particular store was
8 supplied by Walgreens 95,800 dosage units of
9 oxycodone, correct?
10   A.   That's what it says, yes.
11   Q.   And according to this chart, in the
12 following year, 2010, that particular store was
13 supplied by Walgreens 496,100 dosage units of
14 oxycodone, is that correct?
15   A.   That's what the chart says.
16   Q.   You agree that that's an approximate 5
17 times increase from 2009 to 2010, about 5-fold?
18   A.   Quick math, yes.
19   Q.   And at the time that the oxycodone
20 purchases to this Fort Myers store went from 95,000
21 to 496,000 and increased approximately 5-fold, this
22 excessive order query was in place at the Jupiter
23 distribution center, correct?
24   A.   Yes.

Page 55

1    Q.   Do you see there that on that chart it
2 indicates that in 2011 that same store was sent
3 approximately 2.1 million dosage units of
4 oxycodone?
5    A.   Yes, that's what the chart says.
6    Q.   And, again, rough math, do you agree
7 that from 2009 until 2011, the amount of oxycodone
8 supplied by Walgreens to this Fort Myers store
9 location increased over 20-fold?
10   A.   Yes. That's what it looks like.
11   Q.   And at the time that the number of
12 oxycodone dosage units shipped by Walgreens to this
13 particular Fort Myers store increased over 20-fold
14 from 2009 to 2011, the excessive order query was in
15 effect?
16   A.   Yes.
17   Q.   And it was in effect at the Jupiter
18 distribution center?
19   A.   It should have been, but I'm not 100%
20 sure if they were using it.
21   Q.   It was in effect at all distribution
22 centers, correct?
23   A.   Yes.
24   Q.   Whether anything flagged or popped or

Page 56

1 populated on that excessive order query, according
2 to this chart we're looking at here, the dosage
3 units sent to this particular Fort Myers Walgreens
4 store increased over 20-fold in a two-year time
5 period, correct?
6        MR. LEVINE:  Objection to form, foundation.
7 BY THE WITNESS:
8    A.   I'm not sure if I can answer that
9 question.  I'm not sure about that one.
10 BY MR. GADDY:
11   Q.   Okay.  That's fair.
12       Let's look at the next store.  Do you
13 see that it's line item 3, 06997 for Oviedo,
14 Florida?
15   A.   Yes.
16   Q.   And according to this chart, it
17 indicates that that store in 2009 was shipped by
18 Walgreens 80,900 dosage units of oxycodone,
19 correct?
20   A.   That's what the chart says, yes.
21   Q.   And if you look at the following year,
22 in 2010, it indicates that that same store was
23 supplied by Walgreens 223,500 dosage units,
24 correct?

Page 57

1    A.   Yes, that's what the chart says.
2    Q.   And quick math, would you agree with me
3 that's about a 2-1/2-fold increase, maybe a little
4 bit more?
5    A.   Sounds about right.
6    Q.   And at this point in time, that
7 excessive order query had already been implemented,
8 correct?
9    A.   It was implemented.
10   Q.   Do you see that according to this chart,
11 that the following year, in 2011, that same store
12 in Oviedo, Florida was shipped 1.6 million dosage
13 units of oxycodone by Walgreens.
14       Do you see that?
15   A.   Yes.
16   Q.   Would you agree with me that low-balling
17 it, that's at least a 16-fold increase?
18   A.   Yeah.  It looks that way from the chart.
19   Q.   Okay.  I show you what I'm going to mark
20 as Peterson 2.
21       (WHEREUPON, a certain document was
22        marked as Walgreens-Peterson
23        Exhibit No. 2:  5/30/13 e-mail
24        string; WAGMDL00583296 - 00583301.)

Page 58

BY MR. GADDY:

Q.   This is P-WAG-2069.  And, Mr. Peterson, if you don't mind, I'm going to use the Bates number on the bottom right-hand corner.  Turn to the page that ends 99.

Are you with me?

A.   Yes.

Q.   And I'm going to start about a third of the way down the page.  Do you see an e-mail from Denman Murray to John Merritello?

A.   Yes.

Q.   Can you tell me who Denman Murray is?

A.   He worked at Walgreens.  I don't remember the department he was in at that time.

Q.   Did you report to him or he report to you or anything in that form or fashion?

A.   No.  We did not report to each other.

Q.   He was not in IT?

A.   He was not in IT.  He was in business.

Q.   Do you know what function he served in the business?

A.   I don't remember back then.

Q.   Okay.  What about John Merritello?

A.   I know John, yes.

Page 59

Q.   Does John work in IT?

A.   No, he does not.

Q.   Where does he work?

A.   He's on the business side.

Q.   Okay.  Do you know what his function is on the business side?

A.   I don't remember.

Q.   Do you still work with John from time to time?

A.   No.

Q.   Copied on this individual is Brian Eliff, Barb Martin and Steve Bamberg.

Do you see that?

A.   Yes.

Q.   Do you know Brian?

A.   No, I do not.

Q.   Do you know Barb Martin?

A.   I know who she is, yes.

Q.   How do you know Barb Martin?

A.   She works on the business side.

Q.   Do you know what she does on the business side?

A.   No.  I'm not 100% sure.

Q.   Do you ever interact with Barb Martin?

Page 60

A.   No.

Q.   What about Steve Bamberg?

A.   Yes, I know Steve Bamberg.

Q.   Is Steve Bamberg in IT?

A.   Yes, Steve is in IT.

Q.   Describe for me, please, the relationship between you and Steve Bamberg as far as where you all would look on an organizational chart of the IT department.

A.   He -- he works on the store systems.  I work on the distribution systems.

Q.   What's the difference?

A.   Stores have their own AS400 and their own set of code that runs ordering, runs the system for the stores.  Distribution has its own AS400 and runs code that processes for the distribution center.

Q.   Do those two functions, stores and distribution, sometimes overlap?

A.   Yes.

Q.   All right.  Let's look at the e-mail Denny writes to John.  He says, "First fire of the week.  We need to turn off all C2 through 5 ordering for the six stores that lost their

Page 61

licenses.  Then remove any 2 through 5 ordering restrictions on the other stores."

Do you see that?

A.   Yes.

Q.   Does that mean anything to you as you read it right here?

A.   No.

Q.   Okay.  If you'd flip to the -- flip two pages backwards.  We're going to go to Bates No. ending 97 on the bottom right-hand corner.

A.   Yes.

Q.   Do you see about a third of the way down the page you've been brought into the loop here?

A.   Yes.

Q.   Okay.  And this is an e-mail from John Merritello to you, correct?

A.   Yes.

Q.   And this is -- the date of this e-mail is May 30 of 2013?

A.   Yes.

Q.   And this is -- I guess we had been looking at this document this morning, the Settlement Agreement and the Order to Show Cause, and we saw that was from September of 2012.  Do you

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 remember that?
2    A.   Yes.
3    Q.   So, this is several months after that
4 initial DEA action, correct?
5    A.   Yes.
6    Q.   Okay.  And John says to you, "Just
7 wanted to double-check to make sure we stopped
8 processing control orders for the six stores listed
9 above.  They have lost their DEA registration.  All
10 of these stores are in Florida."
11       Do you see that?
12   A.   I see it, yes.
13   Q.   Do you recall that there were stores in
14 Florida that lost their DEA registration?
15   A.   I don't remember that, no.
16   Q.   Were you given any understanding by
17 anybody at Walgreens as to why these different
18 stores lost their DEA registrations?
19   A.   No.
20   Q.   If you'd look back for me to that chart
21 we were just looking at in the first document, the
22 thick one.
23   A.   Okay.
24   Q.   And compare the numbers in the subject

Page 63

1 line of the e-mail to the store numbers in the
2 chart that we were just looking at and tell me
3 whether or not they match.
4    A.   They match.
5    Q.   So, is it your understanding from
6 looking at these two documents together that you
7 were asked to -- to assist with shutting down the
8 ability of these six stores, some of which we just
9 talked about in detail, and you were asked to
10 eliminate their ability to order controlled
11 substances?
12      MR. LEVINE:  Objection to form, foundation.
13 BY THE WITNESS:
14   A.   I don't remember being asked this,
15 but...
16 BY MR. GADDY:
17   Q.   Is that what the e-mail indicates?
18   A.   It certainly looks that way.
19   Q.   And if you turn to the first page of the
20 e-mail, it looks like you respond to John and you
21 ask him, "Were they planning on removing the DEA
22 number from the LDB for these stores?"
23      Do you see that?
24   A.   Yes.

Page 64

1    Q.   Can you tell me -- tell us what that
2 means?
3    A.   Our system will not ship any Rx item to
4 a store without a DEA number.
5    Q.   Okay.  So, you were -- what you were
6 doing here is kind of similar to what you've
7 described your role within Walgreens as being is
8 you were given a project to implement by somebody
9 with the business side and you're trying to
10 implement that directive.  Is that fair?
11   A.   Yes.
12   Q.   And the way that you're thinking of to
13 implement that directive is to remove the DEA
14 number from the -- what's the LDB?
15   A.   Location database file.
16   Q.   So, you're thinking if you can remove
17 the DEA number for these stores from the location
18 database file, that would prevent their ability to
19 order controlled substances?
20   A.   It appears that was my thinking back
21 then, yes.
22   Q.   So then you get a response from John
23 above.  He says he doesn't know.  "Doug, in any
24 event, we need to stop all orders."

Page 65

1       Do you see that?
2    A.   Yes.
3    Q.   Do you recall whether or not you were
4 able to shut down these six Walgreens stores that
5 had lost their DEA registration and prevent them
6 from ordering controlled substances?
7    A.   I don't remember, no.
8    Q.   Would that be consistent with kind of
9 your history at Walgreens that you're asked to
10 implement a task or a solution and that you keep
11 working on it until you get it done?
12   A.   That would be my job description, yes.
13   Q.   I'm going to show you what we are going
14 to mark as Peterson 3.  P-WAG-2070.
15       (WHEREUPON, a certain document was
16        marked as Walgreens-Peterson
17        Exhibit No. 3:  5/28/13 e-mail
18        string; WAGMDL00585822 - 00585825.)
19 BY MR. GADDY:
20   Q.   And I will represent to you this is a
21 similar e-mail chain that we were -- to the one
22 that we were just looking at.  It just kind of
23 spins in a different direction, and we get another
24 response that wasn't included in the last one.

Page 66

1 But if you look at the bottom of that
2 first page, do you see the e-mail from Denny that
3 we looked at just a few minutes ago?
4 A. Yes.
5 Q. Saying, "We need to turn off all C2s
6 through 5s for the six stores that lost their
7 licenses," correct?
8 A. Yes.
9 Q. We now understand that to be the six
10 stores that we -- some of which we just explored in
11 detail in the Order to Show Cause that was issued
12 to Jupiter by the -- to Walgreens Jupiter
13 distribution center by the DEA, correct?
14 MR. LEVINE: Objection; lacks foundation.
15 BY THE WITNESS:
16 A. I believe so, yes.
17 BY MR. GADDY:
18 Q. And at the top of the page we get a
19 response to that e-mail from Steve Bamberg,
20 correct?
21 A. Yes.
22 Q. And Steve writes -- and it looks like he
23 has included you in the "To" line here, correct?
24 A. Yes.

Page 67

1 Q. This is 5/28/13?
2 A. Yes.
3 Q. It says, "Is there a way at the DC to
4 prevent certain stores from ordering any controlled
5 drugs?"
6 Do you see that?
7 A. Yes.
8 Q. It wasn't just C-IIs that these stores
9 couldn't get anymore. They couldn't get controlled
10 III, controlled IVs or controlled Vs anymore,
11 correct?
12 A. That's what it appears, yes.
13 Q. He says, "We have six stores that need
14 to be shut off. We are turning off auto ordering
15 in these stores for these items, but that is not
16 100 percent since the stores can manually order,
17 too. Please advise."
18 Do you see that?
19 A. Yes.
20 Q. Does that e-mail make sense? Do you
21 understand what he is talking about there?
22 A. Reading the e-mail, yes, I have an idea
23 of what he is talking about, yes.
24 Q. Okay. In the previous e-mail that we

Page 68

1 looked at, you talked about removing -- the option
2 of removing the DEA code or the DEA registration
3 number from the database, right?
4 A. Yes.
5 Q. Would that have stopped the auto
6 ordering?
7 A. It wouldn't have stopped the auto
8 ordering, no.
9 Q. Would that have stopped the manual
10 ordering?
11 A. Yes, it would have.
12 Q. So, there were a couple of different
13 solutions that were needed to prevent these six
14 stores who lost their DEA registration, these six
15 Walgreens stores, from getting any controlled
16 drugs, correct?
17 A. That is what it appears.
18 Q. And from looking back at these now, and
19 I understand these documents are five or six years
20 old, but looking back at these now, you recall that
21 you were involved in implementing solutions to make
22 sure that these six Walgreens stores did not get
23 any more controlled drugs?
24 A. Honestly, I don't remember these six

Page 69

1 stores other than reading these e-mails.
2 Q. But from looking at the e-mails, you
3 understand and you're confident that you assisted
4 in preventing these six Walgreens stores from
5 ordering any more controlled substances from
6 Walgreens distribution centers, correct?
7 A. Me or my team was involved, yes.
8 MR. GADDY: Mark, I'm changing topics. Do you
9 want to keep going?
10 MR. LEVINE: Do you want to take a break?
11 THE WITNESS: We can take a break.
12 MR. LEVINE: Okay.
13 THE VIDEOGRAPHER: We are going off the record
14 at 10:04.
15 (WHEREUPON, a recess was had
16 from 10:04 to 10:16 a.m.)
17 THE VIDEOGRAPHER: We're back on the record at
18 10:16.
19 BY MR. GADDY:
20 Q. Mr. Peterson, we just spent a little bit
21 of time this morning talking about a DEA
22 investigation into the Jupiter distribution center
23 of Walgreens, correct?
24 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1    Q.   Do you also recall there being a DEA
2  investigation into Walgreens Perrysburg
3  distribution center?
4    A.   No, I don't recall that.
5    Q.   Do you recall being involved in some
6  Perrysburg meetings from time to time revolving
7  around moving product and rerouting orders that
8  originally came from the Perrysburg distribution
9  center?
10   A.   I don't remember any, no, not off the
11 top of my head.
12   Q.   Okay.  I'm going to show you what I'll
13 mark as Peterson No. 4 and see if we can refresh
14 your memory.  This is going to be P-WAG-2046.
15        (WHEREUPON, a certain document was
16         marked as Walgreens-Peterson
17         Exhibit No. 4:  2/12/13 e-mail
18         string; WAGMDL478056 - 00478057.)
19 BY MR. GADDY:
20   Q.   And we are going to flip to the second
21 page, please, Mr. Peterson.  And do you see there
22 is just a single e-mail on this page and it's an
23 e-mail from Sue Thoss.
24        Do you see that?

Page 71

1    A.   Yes.
2    Q.   And this e-mail was sent on Monday,
3  February 11, and you were one of the individuals
4  cc'd on this e-mail, correct?
5    A.   Yes.
6    Q.   Other folks on the e-mail were Brian
7  Amend who I think you indicated was your report?
8    A.   Yes.
9    Q.   Also Steve Bamberg who we've talked
10 about a little bit?
11   A.   Yes.
12   Q.   Okay.  And let's read the e-mail that
13 you got from Sue.  It says, "Last week the DEA came
14 into Perrysburg with subpoenas looking at records
15 for suspicious drug ordering dating back to
16 February 2011."
17        Do you see that?
18   A.   Yes.
19   Q.   It says, "We believe they could lock
20 Perrysburg up and not allow us to ship from there."
21        Did I read that right?
22   A.   Yes.
23   Q.   Looking at this now, does that refresh
24 your memory that there was a DEA investigation into

Page 72

1  Perrysburg?
2    A.   Based on this e-mail, yeah, I can see
3  that.
4    Q.   Okay.  The e-mail goes on to say, "If
5  that happens for C-II, the only alternative is to
6  utilize a wholesaler."  It says, "Due to the
7  volume, there is a large concern manually handling
8  the 222 forms.  We believe there will be a need to
9  get the CSOS (the controlled substance ordering
10 system) up pretty quickly."
11        Do you see that?
12   A.   Yes.
13   Q.   After looking at this e-mail, do you
14 remember that you had some involvement in assisting
15 with this task or solution that you were asked to
16 assist with or to implement as far as moving or
17 shifting some orders around that originally came
18 from the Perrysburg distribution center?
19   A.   I don't remember it, no.
20   Q.   Okay.  But you see here in the first
21 sentence that Sue told you that the DEA came into
22 Perrysburg with subpoenas, correct?
23   A.   Yes, that's what the document says, yes.
24   Q.   Do you recall anybody at Walgreens ever

Page 73

1  telling you what the subpoenas were looking for?
2    A.   No.
3    Q.   Did anybody tell you about an
4  administrative warrant being signed by a judge to
5  allow the DEA to go into the Perrysburg
6  distribution center?
7    A.   No.
8    Q.   Did you have any task or duties related
9  to pulling data or information, whether it's from a
10 computer system or an IT system or in hard copy, in
11 response to subpoenas to give that information to
12 the DEA?  Did you have any involvement in that that
13 you remember?
14   A.   Not that I remember, no.
15   Q.   I'm going to show you what I will mark
16 as Peterson Exhibit No. 5.
17        (WHEREUPON, a certain document was
18         marked as Walgreens-Peterson
19         Exhibit No. 5:  Administrative
20         Inspection Warrant; WAGMDL00493697
21         - 00493700.)
22 BY MR. GADDY:
23   Q.   And the first thing we'll do on this one
24 is turn to the last page to get the date of the

Page 74

1 document.
2     MR. GADDY:  This is P-WAG-15, Roderrick.
3 BY MR. GADDY:
4     Q.   Sorry.  Let's start on the first page.
5         Do you see at the top of the document it
6 says, "In the United States District Court for the
7 Northern District of Ohio, Western Division"?
8         Do you see that?
9     A.   Yes, I do.
10    Q.   And in the left-hand portion of the
11 heading, it says, "In the Matter of the
12 Administrative Inspection of Walgreens
13 Corporation," in Perrysburg, Ohio.
14        Do you see it?
15    A.   Yes, I see it on the document.
16    Q.   And that's the -- that's a location
17 where Walgreens had a controlled substance
18 distribution center, correct?
19    A.   Yes.
20    Q.   And if you go to the right-hand side of
21 the heading, you see it has a number stamped on the
22 page, it indicates the identity of the magistrate
23 judge, and then it also indicates this is an
24 Administrative Inspection Warrant.

Page 75

1         Do you see that?
2     A.   Yes, I see it on the document.
3     Q.   And then let's just quickly turn to the
4 last page of the document.  And do you see at the
5 bottom of the page you have the signature of the
6 magistrate judge?
7         Do you see that?
8     A.   Yes, I see it on the document.
9     Q.   And we see that it's dated February 5,
10 2013, right?
11    A.   Yes.
12    Q.   And we just looked at that e-mail from
13 Sue where she was telling you about the DEA coming
14 in with subpoenas.  You recall that that was about
15 a week after this February 5th date?  You can look
16 back at that e-mail.
17    A.   Can I?
18    Q.   Sure.
19    A.   Yes, it is.
20    Q.   So, about a week after this
21 administrative warrant was signed by a federal
22 magistrate, you got the e-mail from Sue telling you
23 about the DEA subpoenas, correct?
24    MR. LEVINE:  Objection; lacks foundation.

Page 76

1 BY THE WITNESS:
2     A.   It appears that way.
3 BY MR. GADDY:
4     Q.   Okay.  Let's go back to the first page,
5 and I'm just going to start at the body right there
6 after "To."
7         Do you see that?
8     A.   Yes.
9     Q.   It says this is to "Wayne Groves,
10 Diversion Investigator and any other authorized
11 Diversion Investigator Or Special agent of the Drug
12 Enforcement Administration of the United States
13 Department of Justice."
14        Do you see that?
15    A.   Yes.
16    Q.   It goes on to say, "Application having
17 been made and probable cause, as defined by the
18 provisions of" certain codes and certain
19 regulations, "having been shown by the affidavit of
20 Wayne Groves for an inspection of the controlled
21 premises of Walgreens Corporation in Perrysburg,
22 Ohio, it appears that such inspection is
23 appropriate under 21 USC Section 880."
24        Do you see that?

Page 77

1     A.   Yes, I see that on the document.
2     Q.   Other than the notification that you
3 received in that e-mail that we just looked at a
4 minute ago from Sue that DEA had come into
5 Perrysburg with subpoenas, were you ever given any
6 additional information from Walgreens about the
7 reasoning behind DEA coming into Perrysburg with
8 subpoenas?
9     A.   No, I was not.
10    Q.   It goes on to say in paragraph 2, it
11 says, "Pursuant to the provisions of" a certain
12 code "you are hereby authorized to enter the
13 above-described premises within business hours,
14 which includes night shift hours, for the following
15 purposes."
16        Do you see that?
17    A.   Yes.
18    Q.   And if you flip the page, it says, "To
19 inspect and copy records, reports, files, official
20 order forms, and other documents required to be
21 made, kept and maintained under the provisions of
22 the Controlled Substance Act."
23        Do you see that?
24    A.   Yes, I see that in the document, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.   In your role with logistics and IT, do
2  you have an understanding of the requirements that
3  relate to Walgreens under the Controlled Substance
4  Act?
5    A.   No, I do not.
6    Q.   It goes on to say that the purpose --
7  the DEA is allowed to do this "for the purpose of
8  verifying that said records, reports, files,
9  official order forms, other documents and
10 controlled substances are properly kept and
11 maintained for the time period of 2/1/11, beginning
12 of business, through 2/5/13 close of business."
13       Do you see that?
14   A.   Yes, I see that in the document.
15   Q.   It goes on to say that the DEA has the
16 ability "to inspect in a reasonable manner and to a
17 reasonable extent, including the collection of
18 samples if necessary, all pertinent equipment,
19 finished and unfinished controlled substances,
20 containers, and labeling found therein."
21       Do you see that?
22   A.   Yes.
23   Q.   And if we go -- I'm not going to read
24 every line of this.  But if you go, flip a page to

Page 79

1  the bottom of page 3, there is a paragraph that
2  starts 4, the number 4?
3    A.   Yes.
4    Q.   Sorry.  It says, "You are hereby further
5  authorized to remove for copying from the
6  above-described controlled premises the following
7  records, reports, documents, files and inventories,
8  including computerized records, as are appropriate
9  and necessary to the effective accomplishment of
10 the inspection."
11       Do you see that?
12   A.   I see that in the document, yes.
13   Q.   Do you see there it talks about
14 computerized records?  Were you asked to pull
15 anything in response to this investigative warrant
16 to turn over to the DEA that you recall?
17       MR. LEVINE:  Objection to form.
18 BY THE WITNESS:
19   A.   Not that I was -- not that I remember.
20 BY MR. GADDY:
21   Q.   It says the DEA is allowed to go in and
22 make copies of, "A, all other records which refer
23 to or relate to the distribution of controlled
24 substances."

Page 80

1        Do you see that?
2    A.   Yes.
3    Q.   Also, "B, all records pertaining to the
4  filing of suspicious order reports with the local
5  field division office of DEA pursuant to 21 CFR
6  1301.74(b) as well as records pertaining to a
7  distributor maintaining effective controls against
8  diversion pursuant to 21 USC Section 823(e) from
9  the period of 2/1/11 through 2/5/13."
10       Do you see that?
11   A.   Yes, I see that in the document.
12   Q.   I think I asked you earlier if any of
13 your tasks or duties during your time at Walgreens
14 ever involved suspicious order reports and you told
15 me no, is that correct?
16   A.   Yes, that is correct.
17   Q.   Did any of your tasks or duties during
18 your time at Walgreens involve, as far as you
19 understand, the maintenance of effective controls
20 against diversion?
21   A.   No.
22   Q.   Do you understand or do you have an
23 understanding of what the term "diversion" means as
24 it relates to controlled substances?

Page 81

1    A.   I would guess the diverting of
2  controlled substance, but I'm not sure.
3    Q.   Okay.  That's fine.  I just want to get
4  your understanding.
5        Did anybody at Walgreens ever -- ever
6  give you any training or education about what
7  diversion of controlled substance meant during --
8  during -- ever at your time at Walgreens?
9    A.   No.  Wouldn't be necessary for my job.
10   Q.   Because you just take orders from
11 business folks?
12   A.   Yes.
13   Q.   And get asked to implement systems?
14   A.   And then we implement programs too.
15   Q.   And are you aware of either yourself,
16 your team since you've been a manager or any of the
17 other IT -- any of the other IT teams who have been
18 asked to implement any programs or solutions
19 regarding around maintaining effective controls
20 against diversion of controlled substances?
21       MR. LEVINE:  Objection; foundation.
22 BY THE WITNESS:
23   A.   I'm not aware of any of that.
24 BY MR. GADDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.   Mr. Peterson, I'm going to show you what
2  I'm going to mark as Exhibit No. 6.  And do you
3  see -- and this is P-WAG-16.
4           (WHEREUPON, a certain document was
5           marked Walgreens-Peterson Exhibit
6           No. 6:  U.S. DOJ/DEA Subpoenas;
7           WAGMDL00493694 - 00493718.)
8  BY MR. GADDY:
9    Q.   Do you see at the top of the first
10 page that this is -- it says, "U.S. Department of
11 Justice Drug/Enforcement Administration, Subpoena."
12          Do you see that?
13   A.   Yes, I do.
14   Q.   And you recall in that e-mail from Sue,
15 I don't think she mentioned the warrant that we
16 just looked at, but she talked about the DEA coming
17 in with subpoenas, correct?
18   A.   I just want to...
19          Yes.
20   Q.   And I'll represent to you here that
21 there are several subpoenas and they are all
22 stapled together in one exhibit and we're just
23 going to flip through them and look at a couple of
24 different subpoenas.  Okay?

Page 83

1    A.   Okay.
2    Q.   Do you see on still kind of up in the
3  heading you see there is a "To" line as far as who
4  this subpoena is issued to?
5    A.   Yes.
6    Q.   And it's issued to Walgreens
7  Corporation?
8    A.   Yes, that's what the document says, yes.
9    Q.   And it indicates it goes to the
10 custodian of records at 28727 Oregon Road,
11 Perrysburg, Ohio.  Do you see that?
12   A.   Yes.
13   Q.   And that's where one of Walgreens'
14 controlled substance distribution centers was?
15   A.   Yes.
16   Q.   And we'll only read this first section
17 in this first subpoena, but it says, "Greeting:  By
18 the service of this subpoena upon you by DI Wayne
19 Groves who is authorized to serve it, you are
20 hereby commanded and required to appear before" I
21 believe that's "Diversion Investigator Groves, an
22 officer of the DEA, to give testimony and to bring
23 with you and produce for examination the following
24 books, records and papers at the time and place

Page 84

1  hereinafter set forth."
2          Do you see that?
3    A.   Yes, I see that.
4    Q.   And then if we get down to the next
5  paragraph, do you see that it starts to describe
6  the documents and records that Walgreens is
7  required to produce to the DEA?
8    A.   Yes.
9    Q.   And about the third line down it says,
10 the first set here, the first subpoena applies to
11 "any and all written and electronic records and
12 correspondence regarding the sale and purchase of
13 controlled substances between 2/1/11 and 2/5/13."
14          Do you see that?
15   A.   Yes.
16   Q.   As you continue to go down, the next
17 sentence says, "Also provide all standard operating
18 procedures relating to controlled substances and
19 ordering systems, controlled substance ordering
20 thresholds, and system and written procedures for
21 overriding or editing of controlled substances
22 ordered" -- "ordering thresholds by any Walgreens
23 Corporation component."
24          Do you see that?

Page 85

1    A.   Yes.
2    Q.   And if you flip for me three pages to
3  the Bates number ending 701, do you see another
4  subpoena?
5    A.   Yes.
6    Q.   And the heading looks to be identical,
7  right, as far as it's a subpoena from the U.S.
8  Department of Justice/DEA and it's directed to
9  Walgreens at Perrysburg, correct?
10   A.   Yes, it is.
11   Q.   And if we look at that middle body
12 paragraph where we see what exactly the DEA is
13 asking for, it says, "All written and electronic
14 correspondence of suspicious controlled substance
15 orders."
16          Do you see that?
17   A.   Yes.
18   Q.   If we flip three more pages to the
19 Bates No. ending 704, do you see another subpoena?
20   A.   Yes, I do.
21   Q.   And, again, the heading is identical as
22 far as the subpoena from the DEA directed to the
23 Perrysburg, Ohio Walgreens distribution center?
24   A.   Yes, it looks the same, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1   Q.   And it looks like here, if we go to that
2   middle body paragraph again, the second paragraph
3   in the body, what they're asking for here, it looks
4   like "any and all original security camera and
5   video monitoring system recordings of the
6   distribution center."
7       Do you see that?
8   A.   Yes, I do.
9   Q.   Do you recall anybody at Walgreens
10  talking to you about any of these subpoenas or the
11  different records that were requested by the DEA?
12  MR. LEVINE:  Objection; foundation.
13  BY THE WITNESS:
14  A.   No, I have no recollection of that.
15  BY MR. GADDY:
16  Q.   Do you know whether that did or didn't
17  happen?
18  A.   They would not have discussed it with
19  me.  It's not something I would need to know.
20  Q.   If we skip three more pages, we come to
21  yet another subpoena from the DEA.  Is that
22  correct?
23  A.   Is that 707 page?  Yes.
24  Q.   Yes, sir.  Thank you.

Page 87

1   A.   Okay.
2   Q.   And, again, the top in the heading of
3   the subpoena is identical to the other ones we've
4   looked at?
5   A.   Yes.
6   Q.   And here in the body of the second
7   paragraph, it's looking for "documentation stating
8   daily sales reports of all controlled substance
9   shipments, identified per day and customer."
10      Do you see that?
11  A.   Yes, I do.
12  Q.   The daily sales report, is that anything
13  that you had involvement in as it relates to
14  controlled substances during your time in supply
15  chain and logistics?
16  A.   No.
17  Q.   If you go, turn three more pages to the
18  one ending in 710, do you see yet another subpoena?
19  A.   Yep, I see that.
20  Q.   And this subpoena from the DEA to
21  Perrysburg Walgreens distribution center looks for
22  "the actual physical inventory counts of all
23  controlled substances that are on hand."
24      Do you see that?

Page 88

1   A.   Yes, I do.
2   Q.   Then it looks like the last one is going
3   to be on 6 -- ending 716.  And do you see this as
4   being yet another subpoena that was issued by the
5   DEA to Walgreens' distribution center?
6   A.   Yes.
7   Q.   Okay.  And let's go again to that body
8   paragraph, the second paragraph in the body, and
9   what they're looking for here is "any and all
10  e-mail communications, written correspondence,
11  notes and any other records of communication
12  occurring between 9/1/12 and 2/6/13 regarding
13  controlled substances of which were sent or
14  received by employees, contractors, agents,
15  et cetera the Walgreens Corporation."
16      Do you see that?
17  A.   Yes, I do.
18  Q.   At any point in time in response to
19  these subpoenas that were received by Walgreens
20  from the DEA or I should say served on Walgreens by
21  the DEA, did anybody at Walgreens come and ask you
22  about the excessive order queries that you had
23  designed the program for?
24  A.   Not that I remember.

Page 89

1   Q.   Do you recall anybody asking you for any
2   criteria or information about the excessive order
3   query that you wrote?
4   A.   Not that I remember.
5   Q.   I'm going to show you what I'm going to
6   mark as Peterson 7.  This is P-WAG-2055.
7       (WHEREUPON, a certain document was
8        marked as Walgreens-Peterson
9        Exhibit No. 7:  2/18/13 e-mail;
10       WAGMDL00524429 - 00524430.)
11  BY MR. GADDY:
12  Q.   Do you see that this -- it looks like an
13  e-mail, but appears to be a meeting invitation.
14  And let's just start at the top of the page.  It's
15  from Vinayak Pandit.  Did I say that right?
16  A.   Vinayak.
17  Q.   Vinayak.  Pinayak?
18  A.   Vinayak.
19  Q.   Vinayak.  Thank you.
20      And this was from February 18, 2013,
21  correct?
22  A.   Yes.
23  Q.   And I think we just looked at that
24  warrant that was issued on February, I believe it

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  was 4th or 5th.  Does that sound right?
2      A.   I think so, yes.
3      Q.   Okay.  And you had also gotten the
4  e-mail from Sue I think on February 11.  Does that
5  sound right?
6      A.   That sounds about right, yes.
7      Q.   This is about a week after that?
8      A.   Yes.
9      Q.   About a week after Sue's alerted you
10  that Walgreens' Perrysburg distribution center was
11  served with subpoenas, correct?
12      A.   Yes.
13      Q.   Okay.  And if we look at this e-mail
14  from Vinayak, and you look about a third of the way
15  down the "To" block there in the middle of the
16  page, do you see your name, Doug Peterson?
17      A.   Oh, in the "To," yes.  Yes, I do.
18      Q.   So, this was an e-mail that you
19  received, correct?
20      A.   It appears I did, yes.
21      Q.   Okay.
22      A.   I don't remember it, but...
23      Q.   And if you go down two lines, on the
24  left-hand side you see John Merritello, two down

Page 91

1  from you?
2      A.   Yes.
3      Q.   And two below John, do you see Steve
4  Bamberg is also on the "To" line there?
5      A.   Yes.
6      Q.   And if you go a couple down on the right
7  side of the page, do you see Denny Murray also?
8      A.   Yes.
9      Q.   Looks like just to the right of you, we
10  see Sue Thoss.  Correct?
11      A.   Yes.
12      Q.   And Sue is the one who had originally
13  sent you the notification that the DEA had come
14  into the Perrysburg distribution center with
15  subpoenas, right?
16      A.   Yes.  That was the e-mail, yes.
17      Q.   Okay.  And what's the subject of this
18  meeting?
19      A.   The document reads, "Perrysburg Plan -
20  week of 2/18."
21      Q.   And the first I guess header in this
22  e-mail says "C2," correct?
23      A.   Yes.
24      Q.   And below that in that first bullet

Page 92

1  point it says, "Perrysburg will continue to pick
2  what they can until the DEA comes and shuts them
3  down."
4      Do you see that?
5      A.   Yes, I see that in the document.
6      Q.   Okay.  Do you recall receiving this
7  e-mail from Vinayak about the Perrysburg plan?
8      A.   No, I don't recall it.
9      Q.   Do you recall attending any meetings
10  about the Perrysburg plan related to the DEA coming
11  into the Perrysburg distribution center and
12  planning on shutting them down?
13      A.   No, I don't recall any of those.
14      Q.   Okay.  The next heading is "C3 through
15  C5"?
16      A.   Yes.
17      Q.   And it says for -- let me ask you this.
18      When it said "C2," you understand that
19  to mean Schedule II controlled substances?
20      A.   Yes.
21      Q.   And when we see "C3 through C5," you
22  understand that to mean Schedules III through V
23  controlled substances?
24      A.   Yes.

Page 93

1      Q.   Let me ask you one more question about
2  the first bullet point under "C2."  It says,
3  "Perrysburg will continue to pick what they can."
4      What does that mean to you?
5  Specifically I'm interested in the term "pick."
6      A.   Pick means they are fulfilling store
7  orders.
8      Q.   Okay.  So, at this point in time, we
9  know that it's been approximately two weeks since
10  the DEA served the Perrysburg distribution center
11  with a subpoena, right?
12      MR. LEVINE:  Objection; lacks foundation.
13  BY THE WITNESS:
14      A.   Yes, it appears that way.
15  BY MR. GADDY:
16      Q.   Okay.  And in this e-mail from Vinayak
17  talking about the Perrysburg plan, he indicates
18  that "Perrysburg will continue to pick," which you
19  say means fill orders from the store, "until the
20  DEA comes in and shuts them down," is that right?
21      A.   That's what it reads in the document,
22  yes.
23      Q.   The next section that I had started on
24  was "C3 through C5," and we established that means

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  Schedule III to V controlled substances, correct?
2      A.   Yes.
3      Q.   And it says, "Perrysburg will make all
4  the quantity unavailable."
5          Do you see that?
6      A.   Yes.
7      Q.   And in the next bullet point it goes on
8  to say "ISE." What's ISE mean?
9      A.   Information system -- what is it? We
10 call it -- I always call it information system
11 engineers.
12     Q.   Is that software or computer program?
13     A.   It's just a name. It's a fancy name for
14 a programmer.
15     Q.   Okay. So, that refers to a person or a
16 position?
17     A.   In this -- in this one it's position,
18 yes.
19     Q.   Okay. So, that's talking about a person
20 that does the job?
21     A.   Yes.
22     Q.   And I guess there is several of them, so
23 they just refer to them by the position?
24     A.   It's just our title for all -- all of

Page 95

1  our -- all the employees in the logistics IT
2  department were considered ISEs unless you're a
3  manager as you promote up. You are just an
4  information system engineer.
5      Q.   Okay. So, before 2003 you would have
6  been an ISE?
7      A.   I would have been, yes.
8      Q.   How many ISEs are there at Walgreens?
9      A.   In our -- somewhere --
10     MR. LEVINE: Objection to form.
11 BY THE WITNESS:
12     A.   I would have to estimate between 10 and
13 25. Back in that time I don't remember, so, the
14 exact number.
15 BY MR. GADDY:
16     Q.   So, and, again, I'm not holding you to
17 any number, but you would estimate in this time
18 frame, early 2013, that there were approximately 10
19 to 25 ISEs?
20     A.   Yes.
21     Q.   All right. So, the first bullet point
22 says, "Perrysburg will make all the quantity
23 unavailable."
24         The second bullet point says, "ISE and

Page 96

1  Perrysburg team will follow the same process that
2  we followed over the weekend to manually redirect
3  orders to Mount Vernon, Lehigh and Windsor."
4          Do you see that?
5      A.   Yes, I do.
6      Q.   Does that indicate to you that
7  Perrysburg is no longer going to distribute C-IIIs
8  through C-Vs and that they're going to redistribute
9  those orders that come in to other distribution
10 centers?
11     A.   Reading that statement, yes, that's how
12 I would interpret that.
13     Q.   They had a different plan for the C-IIs,
14 though, right? They were going to continue to
15 distribute Schedule II controlled substances until
16 the DEA came in and shut them down?
17     A.   According to this document, yes.
18     Q.   The last heading is "PSE."
19         Do you see that?
20     A.   Yes.
21     Q.   And does that stand for pseudoephedrine?
22     A.   Yes, it does.
23     Q.   I'm going to show you what we're going
24 to mark as Peterson 8.

Page 97

1          (WHEREUPON, a certain document was
2           marked as Walgreens-Peterson
3           Exhibit No. 8: 2/2/13 letter to
4           DEA from Latham & Watkins;
5           WAGMDL00674280 - 00674280.)
6  BY MR. GADDY:
7      Q.   I'm going to represent to you,
8  Mr. Peterson, this is a letter from a law firm that
9  was representing Walgreens written to the DEA.
10         Do you know if you've ever seen this
11 letter before?
12     A.   I have never seen this letter before.
13     Q.   Okay. Do you see there is the name of a
14 firm up there on the top left-hand corner?
15     A.   Yes.
16     Q.   Okay. And then if you look in the
17 address blocks there, do you see that this letter
18 is going to, in the top line, Lee Reeves and Scott
19 Lawson and it says, "Office of the Chief Counsel,
20 DEA."
21         Do you see that?
22     A.   Yes, I see that in the document, yes.
23     Q.   Below that it looks like this letter is
24 also going to Wayne Groves, Diversion Investigator

Page 98

1  with the DEA.
2       Do you see that?
3    A.   Yes.
4    Q.   Do you recall Mr. Groves' name as being
5  the one that the subpoenas were issued to and a
6  warranty was issued to?  And if you don't, you can
7  flip back and look at them.
8    A.   Yeah, his name appears on those, yes.
9    Q.   Okay.  And do you see that this letter
10 is written regarding the Walgreens Perrysburg, Ohio
11 distribution center.
12      Do you see that?  That's the re line?
13   A.   Yes.
14   Q.   Okay.  And, again, if we look at the
15 date up there, this is February 20, 2013, so,
16 again, within a couple weeks after Walgreens
17 Perrysburg distribution center had received that
18 warrant and those subpoenas from the DEA, correct?
19      MR. LEVINE:  Objection; lacks foundation.
20 BY THE WITNESS:
21   A.   It appears to be, yes.
22 BY MR. GADDY:
23   Q.   Okay.  And this is also, if you recall
24 back to the -- to the thick document that we looked

Page 99

1  at this morning.
2    A.   Yeah.
3    Q.   You recall that that Order to Show Cause
4  that we went through a little bit was served on
5  Walgreens at the Jupiter distribution center in
6  September of 2012, right?
7       MR. LEVINE:  Objection; lacks foundation.
8  You're asking him if he recalls or if he can read
9  it?
10      MR. GADDY:  I'm asking if he recalls from
11 looking at the document earlier today.
12      MR. LEVINE:  Same objection.
13 BY THE WITNESS:
14   A.   From the document we looked at?  I think
15 it was about Jupiter, yes.
16 BY MR. GADDY:
17   Q.   Okay.  And that was approximately
18 September 2012, right?
19      MR. LEVINE:  Same objection; foundation.
20 BY THE WITNESS:
21   A.   I think so, yes.
22 BY MR. GADDY:
23   Q.   Okay.  And, so, this February 20 letter
24 would be approximately five months after that

Page 100

1  September 2012 Order to Show Cause on the Jupiter
2  distribution center, correct?
3       MR. LEVINE:  Objection; foundation.
4  BY THE WITNESS:
5    A.   It appears about that long, yes.
6  BY MR. GADDY:
7    Q.   And if you flip to the second page of
8  this letter, there is a paragraph in the middle of
9  the page that's a little bit thicker than the other
10 two.
11      Do you see that?
12   A.   Yes.
13   Q.   It says, "Walgreens is committed to
14 compliance.  We are not aware of any ongoing
15 compliance issue at the Perrysburg facility, and
16 would take the necessary steps to immediately
17 remedy any of the alleged non-compliance that you
18 can identify.  In order to facilitate further
19 discussions on these issues with DEA and to ensure
20 that Walgreens' ongoing pharmacy operations are not
21 disrupted, Walgreens has decided to voluntarily
22 discontinue distribution of controlled substances
23 from the Perrysburg facility."
24      Do you see that?

Page 101

1    A.   Yes, I see that in the document.
2    Q.   Do you recall being informed by anybody
3  at Walgreens that due to these subpoenas and
4  warrants that Walgreens was taking the step to
5  voluntarily discontinue the distribution of
6  controlled substances?
7    A.   No, I am not aware.
8    Q.   Okay.  And there were only three
9  Walgreens distribution centers that shipped
10 controlled substances, right?
11   A.   True.
12   Q.   And we've already seen that Jupiter was
13 being investigated by the DEA, right?
14   A.   Yes, the one document earlier today
15 showed that.
16   Q.   Right.  And you had been involved in --
17 from the documents we looked at, you were actually
18 involved with shutting down or shutting off six
19 separate Walgreens stores related to that Jupiter
20 investigation, right?
21   A.   It appears based on the document that,
22 yes, we had something to do with those six stores,
23 yes.
24   Q.   And we've also seen that you were

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1 involved in some Perrysburg meetings after they
2 were served with subpoenas with an understanding
3 that the DEA was investigating the Perrysburg
4 distribution center as well, correct?
5    A.  Yes, based on the e-mails that you are
6 showing me, yes.
7    Q.  So, the only distribution center that
8 Walgreens has left that's not under investigation
9 at this point would be the Woodland, California
10 distribution center, right?
11    A.  It appears that way, yes.
12    Q.  Regardless, at this point in time, at
13 least the attorneys for Walgreens are indicating
14 that Walgreens is going to stop distributing
15 controlled substances from Perrysburg?
16    A.  Was that a question? I'm sorry.
17    Q.  No. I'm sorry. Maybe it wasn't.
18      At least at this point in time,
19 according to this February 20 letter, February 20,
20 2013, Walgreens has indicated to the DEA that they
21 are going to stop distributing out of Perrysburg,
22 correct?
23    MR. LEVINE: Objection; lacks foundation.
24 BY THE WITNESS:

Page 103

1    A.  I'm -- I can't really answer that. I
2 don't know that for sure.
3 BY MR. GADDY:
4    Q.  Okay. Is that what the attorneys for
5 Walgreens wrote in this letter to the DEA?
6    MR. LEVINE: Objection; foundation.
7 BY THE WITNESS:
8    A.  I don't know anything about it. But if
9 I read the -- the letter, it appears to be that
10 way.
11 BY MR. GADDY:
12    Q.  I'm going to show you what I'm going to
13 mark as Peterson No. 9.
14      (WHEREUPON, a certain document was
15      marked as Walgreens-Peterson
16      Exhibit No. 9: 2/20/13 e-mail
17      string; WAGMDL00357519 - 00357521.)
18 BY MR. GADDY:
19    Q.  And we can start at the bottom of the
20 first page. Again, we're with this e-mail from
21 Vinayak.
22      Do you see that?
23    A.  Yes, I see that.
24    Q.  And, again, do you see on the first line

Page 104

1 of the "To" line there on that original e-mail from
2 Vinayak, Doug Peterson is listed and that's you,
3 right?
4    A.  Yes, that is me.
5    Q.  Okay. And it looks like it's a -- it
6 looks like maybe it's the same e-mail we just
7 looked at with just a response to it, but you see
8 in that first heading is "C2," and it indicates
9 "Perrysburg will continue to pick what they had
10 until the DEA comes and shuts them down." Correct?
11    A.  Yes. That was in the other e-mail, yes.
12    Q.  Okay. It looks like -- and I think that
13 that first e-mail we looked at was from 2/18. This
14 e-mail is from 2/20, right?
15    A.  Yes.
16    Q.  Okay. And it looks like below that
17 there is an update. It says, "Updates 2/20."
18      Do you see that?
19    A.  Yes, I do.
20    Q.  Okay. So, it looks like Vinayak has
21 re-sent his first e-mail. It looks like it's to a
22 smaller audience, and he's inserted some updates.
23      Do you see that?
24    A.  Yes, I see the updates.

Page 105

1    Q.  Okay. Even though it's a smaller
2 audience, he still included you in this e-mail
3 regarding the Perrysburg distribution center,
4 correct?
5    A.  That is correct.
6    Q.  Under the updates, the first one says,
7 "Bill Groth confirmed Perrysburg will stop shipping
8 C-IIs on March 1."
9      Do you see that?
10    A.  Yes, I see that.
11    Q.  Do you know who Bill Groth is?
12    A.  No, I do not recall.
13    Q.  For the next line, it says, "The DC,"
14 the distribution center, "has roughly 30 million in
15 C-II inventory which should be down to minimal
16 dollars by next Friday."
17      Do you see that?
18    A.  Yes.
19    Q.  So, if we look back up at the time of
20 this e-mail, this was sent on a Wednesday,
21 February 20.
22      Do you see that, in the sent line?
23    A.  It says the 20th. I don't see
24 Wednesday, but...

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.   Right under Vinayak's name.
2    A.   Mind just says the 20th.  If that was a
3  Wednesday, I can't disagree with you, but I don't
4  remember back then.
5    Q.   No, no.  Right here.
6    A.   Where are you talking?
7    Q.   I think it says it.
8    A.   Oh, on this one.  I'm looking at the
9  wrong one.  I apologize.
10   Q.   Sure.  No problem.
11   A.   Yes, it says Wednesday.
12   Q.   Okay.
13   A.   I forgot I got to look in that.  Sorry.
14   Q.   Yeah, no problem.
15        Okay.  Let's go back to the bullet point
16  at the bottom of the page, it says, "The DC has
17  roughly $30 million in C-II inventory which should
18  be down to minimal dollars by next Friday."
19        Right?
20   A.   That's what the document says, yes.
21   Q.   What does that mean to you?
22   A.   That means that the distribution
23  centers, the operation team is working on getting
24  the inventory down.

Page 107

1    Q.   How would the distribution center get
2  inventory down?
3    A.   I'm not sure how they would have
4  intended to do that.
5    Q.   Do you have an understanding whether or
6  not it would be common back in February of 2012 for
7  the Perrysburg distribution center to go through
8  $30 million worth of C-II inventory in a week and a
9  half?
10   MR. LEVINE:  Objection.
11  BY THE WITNESS:
12   A.   No.
13   MR. LEVINE:  Lacks foundation.
14  BY THE WITNESS:
15   A.   No, I have no idea at all.
16  BY MR. GADDY:
17   Q.   Okay.  If you go up to the middle of the
18  page, there is a response to this e-mail from
19  Vinayak from David Reiter, correct?
20        Do you see that in the middle of the
21  page?
22   A.   That's from David Reiter to Vinayak?
23  Yes.
24   Q.   Do you know who -- I don't think we've

Page 108

1  talked about David yet.  Do you know who David
2  Reiter is?
3    A.   I don't recall who he is, no.
4    Q.   He says, "Vinayak, who do we get
5  together to talk about the transfer of remaining
6  Perrysburg product to Woodland?  I'm guessing we're
7  going to have around 8 to $10 million in C-II
8  inventory on 3/14/13."
9        Do you see that?
10   A.   Yes.
11   Q.   And 3/4/13 would be after the date that
12  we saw below that Bill Goth said -- excuse me --
13  that Bill Groth said Perrysburg would stop shipping
14  C-IIs, correct?
15   A.   Yes.
16   Q.   And we know at this point that,
17  according to that last letter we looked at, that
18  Walgreens attorneys have already represented to the
19  DEA that they are going to stop distributing out of
20  Perrysburg.  Do you recall that?
21   MR. LEVINE:  Objection; lacks foundation.
22  BY THE WITNESS:
23   A.   I don't remember that, no.  I'd have to
24  look at the document again.

Page 109

1  BY MR. GADDY:
2    Q.   You can look at it again.
3    A.   Yes.  The document does say that.
4    Q.   Okay.  And, so, what we're seeing from
5  David Reiter here in the middle of the page is that
6  on 3/4, which is a couple days after Bill Groth
7  says Perrysburg is going to stop shipping, that
8  Perrysburg is still going to have 8 to $10 million
9  in C-II inventory there in the warehouse, correct?
10   A.   That's what the document says, yes.
11   Q.   It goes on to say, "We never got to the
12  point of transferring product out of Jupiter.  It
13  has never been attempted, only prepared for."
14        Do you see that?
15   A.   Yes.
16   Q.   It says, "It is still locked in the
17  vault."
18        Do you see that?
19   A.   Yes.
20   Q.   Did you have an understanding that when
21  the DEA came in to Jupiter during their
22  investigation there that they locked up the
23  controlled substances that were in the Jupiter
24  distribution center so that Walgreens could not

Page 110

1  access them?

2      A.   I was not aware of that, no.

3      Q.   Do you still have this document?

4      A.   Yeah, it's right here.

5      Q.   Can you turn for me, again, looking at

6  these numbers on the bottom right-hand corner of

7  the page, should be page 34 out of 343.

8      A.   Okay.

9      Q.   Are you with me?

10     A.   Yep.

11     Q.   And this is -- you can flip backwards

12 and look for yourself if you want to, but I'll

13 represent to you this is the same document we were

14 going through earlier that had the chart that we

15 talked -- that we looked through.

16         Do you recall that?

17     A.   Yes.

18     Q.   Okay.  The chart that showed the

19 increase of oxycodone purchases by dosage units

20 over time?

21     A.   Yes, I saw that chart.

22     Q.   Okay.  And you recognize that this is

23 the same document from the DEA?

24     A.   Yes.

Page 111

1      Q.   Okay.  So, if we go to page 34 of 343,

2  the top paragraph, top full paragraph starts, "In

3  view of the foregoing."

4          Do you see that?

5      A.   Yes.

6      Q.   It says, "In view of the foregoing, and

7  based on information before the Agency as of the

8  issuance of this notice, it is my preliminary

9  finding" pursuant to certain statutes "that

10 Walgreens' continued registration is inconsistent

11 with the public interest."

12         Do you see that?

13     A.   Yes, I see that in the document.

14     Q.   It goes on to say that "Under the

15 summarized facts and circumstances described

16 herein, it is also my preliminary finding,

17 significantly in light of the rampant and deadly

18 problem of prescription controlled substance abuse

19 in Florida, that Respondent's continued

20 registration while these proceedings are pending

21 constitutes an imminent danger to the public health

22 and safety."

23         Do you see that?

24     A.   I see that in the document, yes.

Page 112

1      Q.   Outside of the e-mails that we looked at

2  earlier where you were asked to assist with making

3  sure that certain Walgreens stores were no longer

4  able to order controlled substances, do you recall

5  you or your team or anybody else in the supply and

6  logistics chain at Walgreens being asked to take

7  any actions as it relates to the Florida stores

8  regarding controlled substances?

9          MR. LEVINE:  Objection; lacks foundation as to

10 others.

11 BY THE WITNESS:

12     A.   No, I do not remember.

13 BY MR. GADDY:

14     Q.   Did anybody at Walgreens tell you that

15 the DEA was making allegations against Walgreens,

16 and specifically the Walgreens Jupiter distribution

17 center, that their registration and their ability

18 to distribute controlled substances constituted an

19 imminent danger to the public health and safety?

20     A.   No.

21     Q.   If we go down to the next paragraph, it

22 starts "Pursuant."  Do you see where I am?

23     A.   Yes.

24     Q.   It says, "Pursuant to certain statutes,

Page 113

1  the special agents and diversion investigators of

2  the DEA who serve this Order to Show Cause and

3  Immediate Suspension of Registration are authorized

4  to place under seal or to remove for safekeeping

5  all controlled substances that Walgreens

6  possesses."

7          Do you see that?

8      A.   Yes, I see that.

9      Q.   And if we go back to that e-mail that we

10 were on just a second ago, which was Peterson

11 No. 9, P-WAG-2022, in the middle of the page of

12 Mr. Reiter's e-mail, you see where he said, "We

13 never got to the point of transferring product out

14 of Jupiter.  It has never been attempted, only

15 prepared for.  It is still locked in the vault."

16         Do you see that?

17     A.   Yes, I see that in the document.

18     Q.   And after looking at this Order to Show

19 Cause from the Jupiter investigation, do you see

20 where that -- the DEA was authorized to place those

21 drugs under seal?

22         MR. LEVINE:  Objection; lacks foundation.

23 BY THE WITNESS:

24     A.   I'm not sure if I really understand

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 that. So...
2    Q.   Okay.
3    A.   From this.
4    Q.   You saw where it said what we just read
5 where the DEA investigators were authorized to
6 place under seal or remove from safekeeping all
7 controlled substances that Walgreens had in its
8 possession?
9    A.   I can read that in the document, yes.
10    Q.   Okay. Do you recall -- let's go back
11 to -- stay on the same e-mail and go up to the top,
12 top e-mail in that chain.
13      Are you with me?
14    A.   Yes.
15    Q.   And it looks like Vinayak responds to
16 Mr. Reiter, still on February 20, 2013, and he
17 copies you, correct?
18    A.   Yes.
19    Q.   Among other folks?
20    A.   Yes.
21    Q.   And he says, "Doug, can you please set
22 up a quick call with David and others. He wants to
23 get this figured out. Please also invite Brian and
24 Dave."

Page 115

1      Do you see that?
2    A.   Yes, I do.
3    Q.   Now that we have looked at this
4 document, do you recall that you were asked to
5 assist and help implement a plan to help get drugs,
6 controlled substances I should say, out of the
7 Perrysburg distribution center so that they could
8 not be locked up by the DEA?
9    A.   I don't recall the meeting, but it
10 appears that I was to set one up, yes.
11    Q.   And from the e-mail, you could see that
12 at least David Reiter was estimating that there was
13 going to be 8 to $10 million in controlled
14 substances still in the Perrysburg distribution
15 center after this date of 3/1 that Walgreens wanted
16 to stop shipping out of that distribution center,
17 correct?
18    A.   Yes, that's what it says in the e-mail.
19    Q.   And did you ever come to have an
20 understanding that that was a high priority for
21 Walgreens to get those drugs out of the
22 distribution center before the DEA put a padlock on
23 the vault?
24    MR. LEVINE: Objection; lacks foundation.

Page 116

1 BY THE WITNESS:
2    A.   No, I am not aware of that.
3 BY MR. GADDY:
4    Q.   I'm going to show you what I'm going to
5 mark as Peterson 10. This is P-WAG-2024.
6      (WHEREUPON, a certain document was
7      marked as Walgreens-Peterson
8      Exhibit No. 10: 2/21/13 e-mail
9      string; WAGMDL00357543 - 00357548.)
10 BY MR. GADDY:
11    Q.   And if you flip to the second-to-last
12 page of that e-mail, it ends 547 in the bottom
13 right-hand corner.
14    A.   Yes.
15    Q.   And do you see we're still working off,
16 if you go to the bottom of the page, we're still
17 working off this original e-mail chain that started
18 with Vinayak.
19      Do you see that?
20    A.   Yes, I do.
21    Q.   And you still see there under "C2" or
22 the heading "C2" it says, "Perrysburg will continue
23 to pick what they can until the DEA comes and shuts
24 them down."

Page 117

1      Correct?
2    A.   That's what the document says, yes.
3    Q.   And then we see the same 2/20 update
4 that we went over just a second ago about the
5 intention that Perrysburg will stop shipping
6 starting March 1, correct?
7    A.   Yes, that's what it says.
8    Q.   And if we go up one e-mail, we see an
9 e-mail from it looks like Jeff Irwin.
10      Do you see that?
11    A.   Yes, I do.
12    Q.   And Jeff says, "Steve, Justin and
13 Vinayak - any idea on the value of the C-III to C-V
14 items going to Mount Vernon?" It says, "As of
15 right now, our initial plan is to have Perrysburg
16 load up one of the empty Putnam trailers with this
17 product and have Putnam pick it up tomorrow."
18      Do you see that?
19    A.   Yes, I do.
20    Q.   Is this consistent with your
21 understanding, now that we have looked at several
22 of these documents, that Walgreens was making a
23 concerted effort to get controlled substances out
24 of the Perrysburg distribution center before the

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 DEA came in and shut them down?

2    A. Based on these e-mail, it appears

3 they're trying to get rid of their C-III through

4 C-V. Move that out.

5    Q. If you go up one e-mail in the chain, it

6 looks like Vinayak loops you in.

7      Do you see that?

8    A. Yes, he did.

9    Q. And he says, "Doug, can we have someone

10 pull the value of the inventory at Perrysburg."

11 Correct?

12    A. That's what the e-mail says, yes.

13    Q. At this point in time, February 20 of

14 2013, you're an IT manager, right?

15    A. Yes.

16    Q. So, you had a team of at least several

17 folks that were beneath you that you could hand

18 this assignment off to?

19    A. Yes, there was.

20    Q. Okay. If you turn the page and look at

21 the bottom, do you see that you -- it looks like

22 you reach out to David Nelson?

23    A. Yes.

24    Q. And you say, "Dave, I think you can help

Page 119

1 Vinayak with this information here. Can you get

2 the dollar value of the remaining Schedule III

3 through V product in Perrysburg and can you send

4 the information to Vinayak and Jeff."

5      Do you see that?

6    A. Yes, I do see that in the document.

7    Q. Okay. And there is a couple pages of

8 back-and-forth, and I'll represent to you that it

9 looks like maybe Dave was asking for clarification

10 on exactly what we wanted, but ultimately we're

11 going to get his answer on the first page of the

12 e-mail if you want to go up to that.

13      And do you see that in the middle of the

14 page you have an e-mail from Vinayak, and it goes

15 to Dave Nelson and also to you, correct?

16    A. Yes. That is correct.

17    Q. And this is on February 21 of 2013,

18 correct?

19    A. Yes.

20    Q. It says, "Just so we are all on the same

21 page. The schedule 3-5 inventory value is" -- it

22 says FC and SC.

23      Do you see that?

24    A. Yes.

Page 120

1    Q. Do those acronyms mean anything to you?

2    A. It's full case and split case.

3    Q. Okay. What's the difference?

4    A. We will pick -- split case, we pick

5 individual pieces and send it to the store. A full

6 case is a case of, as an example, a case of 12, so

7 you got 12 bottles of something. So, that's a

8 case. The bottle itself is a split case piece.

9    Q. Okay. What I'm -- when you describe

10 that, what I'm seeing in my head is a cardboard box

11 with maybe cellophane wrapped around it and there

12 is maybe 12 bottles inside of it of any particular

13 drug.

14      Am I --

15    A. That would be a full case.

16    Q. Okay. And, so, if there was a full case

17 needed, that entire box wrapped in cellophane with

18 the 12 bottles in there would be shipped to the

19 store?

20    A. If that's what they ordered, yes.

21    Q. Okay. And a split case would mean you

22 cut open the cellophane and pull out maybe one or

23 two bottles to send to the store?

24    A. Yes, that is correct.

Page 121

1    Q. Gotcha. So, what we're seeing here for

2 this C-III to C-V value is counting up not only all

3 the big cardboard boxes wrapped in cellophane with

4 all the bottles in it but also the ones that are

5 just portion -- portions of what was originally in

6 there?

7    A. Yes.

8    Q. So, what is being reported here is that

9 the value of the Schedule III to V drugs still on

10 hand was $1.08 million.

11      Do you see that?

12    A. That is what the document says, yes.

13    Q. And it looks like the value of the

14 controlled substances, Schedule IIs, for full case

15 was at $14-1/2 million, correct?

16    A. That's what the document says, yes.

17    Q. And then the control IIs split case, so

18 that would mean the ones where there was only

19 portions of what was originally in the box, was

20 $404,000?

21    A. Yes, that's what the document says.

22    Q. And, again, from your memory and from

23 reviewing these documents because this was several

24 years ago, your understanding is one of the items

Page 122

1  or one of the solutions or tasks that you were --
2  helped to implement was to get this inventory out
3  of the Perrysburg distribution center before the
4  DEA came in and shut them down?
5      MR. LEVINE:  Objection; vague.
6  BY THE WITNESS:
7      A.   According to the documents, that's what
8  it looks like we were trying to do, yes.
9  BY MR. GADDY:
10     Q.   I'm going to show you -- let me ask you
11 this.
12          You've mentioned a time or two before
13 that some orders of controlled substances would be
14 filled by what you refer to as jobbers, right?
15     A.   Yes.
16     Q.   And that would be outside vendors such
17 as other wholesale distributors?
18     A.   Yes.
19     Q.   In this 2012, early 2013 time frame, do
20 you recall that Cardinal Health was one of the
21 jobbers that Walgreens utilized to fill -- to
22 sometimes fill orders of controlled substances?
23     A.   No, I don't remember if they were or
24 were not.

Page 123

1      Q.   Are you familiar with Cardinal Health?
2      A.   I have heard of the company, yes.
3      Q.   Are you familiar with them ever serving
4  as a jobber for Walgreens' controlled substances?
5      A.   I don't exactly remember, but I think
6  that was one of them.
7      Q.   Okay.  Do you have an understanding of
8  who the primary supplier or wholesaler of
9  controlled substances for Walgreens is currently?
10     A.   We get our Rx from ABC.
11     Q.   AmerisourceBergen?
12     A.   Yes.  Sorry.
13     Q.   No.  That's fine.
14          But you believe that Cardinal Health was
15 another vendor that you utilized at least at some
16 point in time?
17     A.   I think I recall them at one point in
18 time a while ago.
19     Q.   Okay.  I'm going to show you what I've
20 marked as Peterson 11.
21          (WHEREUPON, a certain document was
22           marked as Walgreens-Peterson
23           Exhibit No. 11:  2/26/13 e-mail
24           string; WAGMDL00358459 - 00358462.)

Page 124

1  BY MR. GADDY:
2      Q.   And do you see this is another e-mail
3  chain?
4      A.   Yes.
5      Q.   And if you would, Mr. Peterson, turn for
6  me again to the second-to-last page, it ends 461,
7  and in the middle of the page we are going to see
8  what looks to be kind of that original string or
9  original e-mail that we have been seeing from
10 Vinayak.  Do you see where I am?
11     A.   Yes, I do.
12     Q.   Okay.  And it looks like this, as
13 opposed to being an e-mail, is more of a meeting
14 invite.
15          Do you see that?
16          It says, "When:  8:00 to 8:30 a.m.,
17 February 27, 2013."
18     A.   Yes, it appears that way, yes.
19     Q.   Okay.  And then it looks like it's got
20 a -- the subject again is the Perrysburg
21 distribution center, and the location it looks like
22 it's maybe got a conference call number and dial-in
23 information?
24     A.   Yes.  It says Perrysburg C-III to IV.

Page 125

1  And, yes, that's a dial-in number for a conference
2  call.
3      Q.   Do you recall participating in any --
4  any meetings or conference calls regarding this
5  Perrysburg issue that we have been looking at for
6  the last 30 minutes or so?
7      A.   I don't recall the -- no, I don't recall
8  any meetings other than what you've shown me so
9  far.
10     Q.   Okay.  And if we continue to look at
11 this, again, we see it looks to be the same chain,
12 but under C-II it says, "Perrysburg will continue
13 to pick what they can get until the DEA comes and
14 shuts them down."
15          Do you see that?
16     A.   I see that in the document.
17     Q.   And we also see below that the 2/20
18 update, that Perrysburg will stop shipping
19 Schedule II controlled substances on March 1,
20 correct?
21          It's the third -- it looks like it's the
22 fourth bullet point under C-II.
23     A.   Yes.  I see it.
24     Q.   Now, above this, and you have to go --

Page 126

1  you have to flip the page to see who the e-mail is
2  from, but you see there is an e-mail from Vinayak
3  on February 26?
4      A.   Yes.
5      Q.   Okay.  And if you flip the page, at the
6  top we see the "To" line, correct?
7      A.   Yes.
8      Q.   And about the fourth or fifth name in is
9  you, correct, Doug Peterson?
10     A.   That is correct.
11     Q.   Also next to you is Sue Thoss who was
12 the one who had originally given you the heads-up
13 about the subpoenas?
14     A.   Yes.
15     Q.   On the next line we see John Merritello,
16 correct?
17     A.   Yes.
18     Q.   Next to him is Rob Varno.  Do you know
19 who Rob Varno is?
20     A.   He used to work in our distribution
21 centers.
22     Q.   Okay.  Do you remember him being -- do
23 you know what role he played there?  Was he the
24 supervisor of the distribution center?

Page 127

1      A.   I believe, if my mind reminds me right,
2  he was the manager of the distribution center in
3  Jupiter.
4      Q.   Manager.  Okay.  That was the -- would
5  the manager be the top position of the person, the
6  top person in the distribution center?
7      A.   Yes.
8      Q.   Okay.  Was he at the Perrysburg
9  distribution center as far as you remember?
10     A.   No, I remember him at Jupiter.
11     Q.   If you go to the next line down, at the
12 end of the line you see Denny Murray is invited or
13 included on this e-mail chain, correct?
14     A.   Yes.
15     Q.   And if you go down to the, it looks
16 like, second-to-last line, we see Deborah Bish is
17 included here?
18     A.   Yes.
19     Q.   Do you know who Deborah Bish is?
20     A.   Yes, I do know her.
21     Q.   Okay.  And what was her role?
22     A.   From what I remember, she was the head
23 of the C-II facility at Perrysburg I believe.
24     Q.   Okay.

Page 128

1      A.   That's what I remember.
2      Q.   Did you ever have to interact with Deb
3  as part of your duties?
4      A.   If there was an issue at the
5  distribution center from a program perspective,
6  yes, I would have dealt with her.
7      Q.   Do you recall Deb Bish ever asking you
8  to implement or design any programs or solutions to
9  any issues related to Schedule II controlled
10 substances?
11     A.   No, I do not remember that.
12     Q.   Okay.  Now, we see here in the body of
13 this e-mail from Vinayak, he says, "FYI:  Slight
14 change in plans."
15          Do you see where I am?
16     A.   Yes.
17     Q.   He says, "Cardinal has red flagged 367
18 stores that were serviced out of Perrysburg and
19 won't be able to service them.  Due to this change
20 there was a decision made that Perrysburg will
21 continue to pick Schedule IIs past March 1."
22          Do you see that?
23     A.   Yes, I see that in the document.
24     Q.   Do you recall getting this e-mail

Page 129

1  Vinayak telling you and these other folks that we
2  just mentioned that Cardinal Health had red-flagged
3  367 Walgreens stores?
4      A.   I don't remember getting it, no.
5      Q.   As you sit here today do you have an
6  understanding of what that means, that Cardinal
7  Health had red-flagged 367 Walgreens stores?
8      A.   I believe it would mean they don't want
9  those stores, but I'm not sure.
10     Q.   Okay.  Well, what it says is that they
11 had red-flagged 367 stores that were serviced out
12 of Perrysburg, right?
13     A.   Yes.
14     Q.   And does that mean to you that these
15 were stores that typically had been sent stores --
16 excuse me -- sent controlled substances out of that
17 Perrysburg distribution center?
18     A.   These are stores that we would have sent
19 to Cardinal any orders that we couldn't fulfill
20 from the Perrysburg distribution center.
21     Q.   Okay.  Well, we know from these e-mails
22 that we've looked at that the distribution center,
23 Perrysburg distribution center, was intending to
24 stop shipping C-IIs as of March 1, right?

Page 130

1    A.   Yes.  That's been stated, yes.
2    Q.   Okay.  And, so, what it looks like is
3  that Cardinal Health has now red-flagged 367 stores
4  that previously had been serviced by Perrysburg,
5  correct?
6    A.   That's what it's saying in the e-mail,
7  yes.
8    Q.   Okay.  And it says it won't be able to
9  service them, correct?
10   A.   Yes, that's what the e-mail says.
11   Q.   Do you know why Cardinal Health wouldn't
12  service those 367 Walgreens stores?
13   MS. PETERSEN:  Objection; foundation.
14       (Clarification requested by the
15        reporter.)
16   MS. PETERSEN:  Miranda Petersen.
17   MR. LEVINE:  Objection; foundation.
18  BY THE WITNESS:
19   A.   I have no idea why they would be
20  red-flagged.
21  BY MR. GADDY:
22   Q.   On the next sentence it says, "Due to
23  this change there was a decision made that
24  Perrysburg will continue to pick Schedule II drugs

Page 131

1  past March 1st."
2       Do you see that?
3    A.   I see that in the e-mail, yes.
4    Q.   If you go to the next e-mail in the
5  chain, do you see that Deb Bish sends an e-mail to
6  Vinayak?
7    A.   Yes, I do.
8    Q.   And she says, "With the update, please
9  provide the volume of the 367 stores so we can
10  determine how many TMs," meaning team members?
11   A.   TM would be team members, yes.
12   Q.   She says, "With the update, please
13  provide the volume of the 367 stores so we can
14  determine how many team members we need to keep in
15  Schedule II past Friday."
16       Do you see that?
17   A.   Yes, I see that.
18   Q.   And based on what you just told us that
19  Deb Bish was the manager or the supervisor of the
20  controlled substances section within the
21  distribution center, does this make sense that
22  she's reaching out trying to figure out how many
23  folks she might need on her team to continue to
24  service these 367 red-flagged stores?

Page 132

1    MR. LEVINE:  Objection; form.
2  BY THE WITNESS:
3    A.   I'm not sure what she is asking for.
4  BY MR. GADDY:
5    Q.   Well, the original plan had been for --
6  you see this e-mail is February 26, right?
7    A.   Yes.
8    Q.   The original plan had been for no more
9  C-IIs to go out of that Perrysburg distribution
10  center in five days, on 3/1, right?
11   A.   Yes.  That was the plan from that
12  document, yes.
13   Q.   Okay.  But now in this February 26
14  e-mail from Vinayak, the one just below it, they
15  just found out that Cardinal Health had red-flagged
16  367 of the Walgreens stores, right?
17   A.   Yes.  That was the previous e-mail.
18   Q.   And so now Perrysburg or Walgreens has
19  made the decision that Perrysburg won't stop
20  shipping on March 1st, but will instead continue to
21  ship controlled substances after that date?
22   MR. LEVINE:  Objection; lacks foundation.
23  BY MR. GADDY:
24   Q.   Correct?

Page 133

1    A.   Only from what I read in the e-mail that
2  I remember anything, yes.
3    Q.   Of course and that's why I gave you the
4  document, Mr. Peterson.
5    A.   Yes.
6    Q.   Because I understand this was about five
7  or six years ago.
8        Okay.  So, you see here Deb Bish is
9  asking the volume for these 367 stores.
10       Do you see that?
11   A.   Yes, I see that.
12   Q.   And does that mean, do you understand
13  that to mean that she's asking how many controlled
14  substances go to these stores so that she can
15  determine her staffing needs in the C-II facility?
16   A.   I would have to guess that's what she is
17  looking for is the volume of the store orders.
18   Q.   Okay.
19   A.   For those stores, yes.
20   Q.   And if you go to the next e-mail in the
21  chain, you see an e-mail from Vinayak to you with
22  Deb copied, correct?
23   A.   Yes.
24   Q.   And same day, February 26?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.   Yes.
2    Q.   And Vinayak writes, "Doug, can you
3  please have someone pull this information."
4        Do you see that?
5    A.   Yes, I see that in the e-mail.
6    Q.   And Vinayak goes on to say, "Deb, one
7  thing we don't know at this time is whether you are
8  picking all stores or just the ones that are
9  potential red flags."
10       Do you see that?
11   A.   I see that in the e-mail, yes.
12   Q.   Okay.  Do you understand that, A, that
13 Vinayak has asked you to look into the volume of
14 controlled substances that go to those 367
15 red-flagged stores?
16   A.   Based on this e-mail, yes, I understand
17 that's what he is asking me.
18   Q.   Okay.  And based on this e-mail, do you
19 understand that Vinayak is telling Deb that while
20 he knows Perrysburg is going to be servicing and
21 picking the red-flagged stores, he doesn't know if
22 there is going to be any others?
23   A.   That is what the e-mail says, yes.
24   Q.   Okay.  And you respond up at the top of

Page 135

1  the page that "As soon as we know what stores are
2  staying at the Perrysburg distribution center, we
3  can provide the information.  We probably won't
4  know the stores until Wednesday afternoon."
5        Do you see that?
6    A.   Yes, I do.
7    Q.   Looking at this e-mail, does this jog
8  your memory about you being involved with helping
9  to determine the volume of controlled substances
10 that was going to these 367 Walgreens stores that
11 Cardinal Health had red-flagged and said that they
12 would not ship controlled substances to?
13   A.   Based on this e-mail, I have a -- I
14 don't remember it, but I understand what they are
15 asking for.
16   Q.   Okay.  And based on this e-mail you see
17 that you were involved --
18   A.   Yes.
19   Q.   -- in looking into the volume -- no
20 problem.
21       You understand that you were involved in
22 looking into the volume of controlled substances
23 that went to these 367 Walgreens stores that had
24 been red-flagged by Cardinal?

Page 136

1    A.   Based on this, yes.
2    Q.   Sitting here today before we look at any
3  more documents, do you recall whether or not you
4  discovered the volume of controlled substances
5  going to those 367 red-flagged stores that Cardinal
6  Health wouldn't distribute to?
7    A.   I don't remember.
8    MR. LEVINE:  A good time for a break soon?
9    MR. GADDY:  Sure.
10   THE VIDEOGRAPHER:  We are going off the record
11 at 11:25.
12       (WHEREUPON, a recess was had
13        from 11:25 to 11:43 a.m.)
14   THE VIDEOGRAPHER:  We're back on the record at
15 11:43.
16 BY MR. GADDY:
17   Q.   Mr. Peterson, before we took a break, we
18 were talking a little bit about the stores that
19 Cardinal Health had red-flagged.
20       Do you remember that?
21   A.   Yes.
22   Q.   When I say that they had red-flagged
23 those stores, what does that mean to you?
24   A.   It would mean that they don't want to

Page 137

1  ship to those stores.
2    Q.   They don't want to ship what to those
3  stores?
4    A.   Orders.
5    Q.   Orders of what?
6    A.   C-II product.
7    Q.   Controlled substances?
8    A.   Yes.
9    Q.   Do you have an understanding of why or
10 what criteria was used by Cardinal Health to red
11 flag those 367 stores?
12   MR. LEVINE:  Objection; lacks foundation.
13   MS. PETERSEN:  Objection; form and foundation.
14 BY THE WITNESS:
15   A.   No, I have no idea why.
16 BY MR. GADDY:
17   Q.   Did anybody at Walgreens or, by that
18 matter, anybody at Cardinal Health ever explain to
19 you the criteria that was utilized to red-flag
20 those 367 stores?
21   A.   No.  As I state, I only -- I mean, I
22 just -- I write programs.
23   Q.   You were asked to help with some
24 solutions or gather some information --

Page 138

1  A.  Yes.

2  Q.  -- about these 367 stores, but would

3 that -- your understanding is that was the extent

4 of what you were asked to do with it?

5  A.  I was just asked to stop them.

6  Q.  I'm going to show you what's been marked

7 as Peterson 12.  This is P-WAG-1373.

8      (WHEREUPON, a certain document was

9      marked as Walgreens-Peterson

10     Exhibit No. 12:  2/22/13 e-mail

11     string; WAGMDL00049750 - 00049751.)

12 BY MR. GADDY:

13  Q.  And this is an e-mail, if you look at

14 the top of the first page of this document, you see

15 this is an e-mail from a Lisa Penn with a Cardinal

16 Health e-mail address?

17  A.  Yes, I see that.

18  Q.  And you see that this e-mail is written

19 February 22, 2013, correct?

20  A.  Yes.

21  Q.  And this -- you recall from the other

22 documents we have been looking at this is all in

23 the same general timeline when you and the other

24 folks at Walgreens are having these meetings about

Page 139

1 the Perrysburg plan?

2  A.  Yes.

3  Q.  And this e-mail from Ms. Penn at

4 Cardinal Health was sent to, it looks like,

5 Denman -- Denny Murray who we've seen on several

6 other e-mails today from Walgreens.

7      Do you see that?

8  A.  Yes.

9  Q.  It was also sent to Tasha Polster at

10 Walgreens?

11  A.  Yes.

12  Q.  And do you know who -- we've talked

13 about Denny.  Do you know who Tasha Polster is?

14  A.  No, I do not.

15  Q.  If we go down a couple lines, do you see

16 this e-mail was also sent to Mike Bleser at

17 Walgreens?

18  A.  Yes.

19  Q.  Do you know who Mike is?

20  A.  No, I do not.

21  Q.  And it was also sent to Chris Dymon and

22 Patty Daugherty at Walgreens.  Do you know who they

23 are?

24  A.  No, I do not.

Page 140

1  Q.  And you see in the body of the e-mail,

2 Lisa writes, "Hi everyone, in addition, please see

3 the table below which outlines the four colors that

4 we have identified on the attachment."

5      Do you see that?

6  A.  Yes.

7  Q.  Then do you see that there is a chart

8 that takes up the bulk of the rest of this page?

9  A.  Yes.

10  Q.  Do you see in the left-hand column is

11 the designation that was assigned?

12  A.  Yes.  I see that.

13  Q.  And then to the right of that there

14 would be a summary of the designation, a status as

15 of March 4 and any threshold limits that Cardinal

16 Health was placing on any orders of controlled

17 substances.

18      Do you see that?

19  A.  Yes, I do.

20  Q.  And then over to the right it says that

21 the -- it lists a column for the follow-up required

22 and the number of stores.

23      Do you see that?

24  A.  Yes.

Page 141

1  Q.  And the first designation that's listed

2 is red, correct?

3  A.  Yes.

4  Q.  And if you look under "Summary of

5 Designation," it says, "Stores that do not pass the

6 objective assessment and have monthly average

7 purchases of oxycodone above 5,000 or hydrocodone

8 above 10,000."

9      Do you see that?

10  A.  Yes.

11  Q.  And from looking at this document in

12 combination with some of the other ones that we

13 have looked at this morning, do you understand that

14 to mean that stores that had objectively high

15 purchases of either oxycodone or hydrocodone were

16 flagged red by Cardinal Health?

17  MR. LEVINE:  Objection; lacks foundation.

18 BY THE WITNESS:

19  A.  No, I have no knowledge of that.

20 BY MR. GADDY:

21  Q.  Okay.  Do you see that as of March 4 it

22 indicated that "No narcotic analgesic shipments and

23 all non-narcotic analgesic products will be shipped

24 up to the threshold limit"?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Do you see that?

2    A.   Yes.

3    Q.   Do you understand that to mean they are

4 not going to ship controlled substances to those

5 stores?

6    MR. LEVINE:  Objection; lacks foundation.

7 BY THE WITNESS:

8    A.   I'm not sure what that means.

9 BY MR. GADDY:

10    Q.   If you look under the threshold limit,

11 do you see that for these red stores, it sets the

12 opioid threshold limit at one and the threshold

13 limit setting methodology applied for non-narcotic

14 analgesic drug families?

15    Do you see that?

16    A.   Yes.

17    Q.   Do you understand that to mean that

18 Cardinal Health was setting the threshold limit at

19 a single dosage unit for these red-flagged stores?

20    MR. LEVINE:  Objection; foundation.

21    MS. PETERSEN:  Objection.

22 BY THE WITNESS:

23    A.   I don't understand it, no.

24 BY MR. GADDY:

Page 143

1    Q.   I'm going to show you what I'm going to

2 mark as Peterson 13.  This is P-WAG-2060.

3    (WHEREUPON, a certain document was

4    marked as Walgreens-Peterson

5    Exhibit No. 13: 2/28/13 e-mail

6    string; WAGMDL00524815 - 00524817.)

7 BY MR. GADDY:

8    Q.   And, again, you see that -- you

9 recognize this to be another e-mail chain?

10    A.   Yes.

11    Q.   And if we turn to the very last page of

12 the document, we see this chain starts with an

13 e-mail from you, correct?

14    A.   Yes.

15    Q.   And you sent this e-mail on February 28,

16 2013?

17    A.   Yes.

18    Q.   And, again, you recognize that to be in

19 the same general time frame that we have been

20 talking about as it relates to these meetings that

21 you were involved in revolving around the plan for

22 Perrysburg after the DEA came in and served them

23 with a warrant and subpoenas, correct?

24    A.   Yes.

Page 144

1    Q.   You write in this e-mail, you said, "I

2 had a meeting with Denny and John this morning to

3 discuss not sending certain items to Cardinal for

4 the 367 plus red-flagged stores."

5    Do you see that?

6    A.   Yes.

7    Q.   So you're talking about not sending

8 items to Cardinal Health, correct?

9    A.   Yes.

10    Q.   And that would make sense based on the

11 documents that we looked at this morning that

12 Cardinal Health has said that they would not ship

13 controlled substances to those stores, right?

14    A.   Yes.

15    Q.   Wouldn't make any sense to send the

16 orders to them if they are not going to fill

17 orders, right?

18    A.   True.

19    Q.   It goes on to say, "In regards to the

20 C-II items, John is going to provide us a list of

21 stores and items that should not be sent to a

22 Cardinal distribution center.  Dave Nelson is in

23 the process of changing our system to read the

24 file.  If a match is found, the system will not

Page 145

1 write a record to the jobber file.  Instead an

2 insufficient will be sent to the store.  We are

3 confident this will be done coding and testing the

4 changes by Saturday."

5    Do you see that?

6    A.   Yes.

7    Q.   And would it be fair to characterize

8 that what you're summarizing here in this e-mail is

9 a solution that you and your team is implementing

10 to prevent orders of C-IIs to going to a Cardinal

11 Health distribution center because they have

12 indicated they would not fill those orders?

13    A.   Yes.

14    Q.   Is this type of implementation of a

15 solution typical of the type of general task that

16 you and your IT team perform for folks within the

17 business side?

18    A.   Yes.  They would ask us to do something,

19 and we would write the code and the programs to --

20 to accommodate that request.

21    Q.   Okay.  You told us and you've made clear

22 that you get your directions from the business

23 side.  Is there anybody particular on the business

24 side that you, you or your team, typically gets

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 their direction from?

2     MR. LEVINE: Objection; overbroad as to time.

3 BY THE WITNESS:

4     A. No, there is no one in particular.

5 There is wide variety of business users.

6 BY MR. GADDY:

7     Q. I know you told us earlier that Brian

8 Amend I think was your supervisor, correct?

9     A. Yes.

10     Q. Is he the type of person that gives you

11 solutions or programs to implement or is it not him

12 as an IT person but people from the business side

13 that give you those programs to implement?

14     A. It would be from the business side.

15     Q. Okay. That includes people you

16 reference here, John and Denny. That would be

17 Denny Thompson and John Merritello?

18     A. Yes, they are from the business side,

19 yes.

20     Q. And those are examples of types of

21 people that would from time to time give you

22 projects or solutions to implement, correct?

23     A. One of many of the users we would deal

24 with, yes.

Page 147

1     Q. Fair to -- if you had to give me a rough

2 estimate, not a number I'm going to hold you to,

3 but a rough estimate, of number of people on the

4 business side that over your time as a manager, so

5 just going back to 2013 -- 2003, that would have

6 asked you for or assigned you projects or asked you

7 to implement solutions, can you give me an

8 approximate number of folks from the business side

9 that have asked you to do that?

10     A. Say 50, 60 different people.

11     Q. So, a lot of folks?

12     A. Yes.

13     Q. Okay. If you turn the page and look at

14 the next e-mail in the chain, it looks like you

15 then sent this e-mail to Denny and John and said,

16 "Whoops, sorry, this should have gone to you as

17 well as the other folks"?

18     A. Yes. If I mention their name, I

19 normally include them on the e-mails. And it looks

20 like I forgot.

21     Q. Sure. Just an oversight?

22     A. Yep.

23     Q. Okay. Let's go to the first page of the

24 e-mail. And at the bottom of the page we see an

Page 148

1 e-mail from you to Dave Nelson. Right?

2     A. Yes.

3     Q. And at the time was Dave Nelson on your

4 team?

5     A. Yes.

6     Q. Is he still on your team?

7     A. No.

8     Q. Is he still with the company?

9     A. No.

10     Q. Do you know where he is?

11     A. No.

12     Q. And you tell Dave in the e-mail, "Here

13 is an Excel document that contains the stores and

14 items that should not go to Cardinal."

15     Do you see that?

16     A. Yes.

17     Q. So, do you understand that not only were

18 you given a list of these 367 red-flagged stores,

19 but you were also given a list of products or items

20 that could not go to Cardinal Health?

21     A. Yes.

22     Q. It says, "If we have the product in our

23 DC," in our distribution center, "it is okay to

24 pick. We just do not want to send them to

Page 149

1 Cardinal."

2     Do you see that?

3     A. Yes, I do.

4     Q. And does that indicate to you that even

5 though these items won't be filled by Cardinal

6 Health, if you had those items within the

7 Perrysburg distribution center, that Perrysburg had

8 the green light to continue to fill these orders

9 back to the pharmacies?

10     A. Yes.

11     Q. You go on to say, "We just do not want

12 to send them to Cardinal." Correct?

13     A. We are to prevent them from going to

14 Cardinal.

15     Q. Because Cardinal wouldn't fill the

16 orders?

17     A. I don't know exactly why Cardinal didn't

18 want them. Just know we weren't supposed to send

19 them there.

20     Q. Okay. Well, we saw from the earlier

21 e-mails that Cardinal was refusing to fill orders

22 to those red-flagged stores, right?

23     A. Yes. But at the time this was, I had no

24 knowledge of that.

Page 150

1    Q.   Well, you were included in these e-mails
2 and you were included in routing these orders away
3 from Cardinal into the Perrysburg's distribution
4 center, right?
5    A.   Yes.
6    Q.   If you see Dave's response to you just
7 above, he says, "So each store should be combined
8 with each item?  Meaning 300 times 500 equals
9 150,000 records.  Is that correct?"
10    A.   Yes.
11    Q.   Okay.  Do you understand what he is
12 saying there?
13    A.   We are going to have a file that will
14 have 15 -- 150,000 records on there of stores and
15 items that we will compare every order against.
16    Q.   Okay.  So, one of these multipliers of 3
17 or 500, one of those numbers relates to -- again,
18 these are approximates I'm sure.  But one of these
19 relates to the number of red-flagged stores and one
20 of these would relate to the number of items that
21 are restricted from going to Cardinal Health.  Is
22 that correct?  Do I understand that right?
23    A.   Yes.
24    Q.   You then respond at the top of the

Page 151

1 page and say, "Yes, I did not realize that there
2 were so many items that we could not ship to these
3 stores, from a jobber."
4        Correct?
5    A.   Yes.
6    Q.   And the jobber you're talking about
7 there is Cardinal Health?
8    A.   Yes.
9    Q.   And you ask, "Is that going to be a
10 problem?"
11    A.   Yes, I did ask that.
12    Q.   What were you worried about?
13    A.   Just file sizes.
14    Q.   Okay.
15    A.   Do we have enough space, enough...
16    Q.   When you looked down at this rough
17 equation in the e-mail below from Dave, the 300
18 times 500, do you have an understanding as to which
19 of those two numbers represents the number of items
20 and which of those represents the number of stores?
21    A.   No, I do not.
22    Q.   Would it surprise you to know that there
23 were only -- that there were about approximately
24 500 separate controlled substance items that had to

Page 152

1 be prevented from going to Cardinal Health because
2 they weren't allowed to distribute them to their
3 stores?
4    A.   I had no knowledge of that.  So...
5    Q.   Do you know how many controlled
6 substance items or product lines were included or
7 were available to be shipped to Walgreens stores?
8    A.   I don't remember, no.
9    Q.   From Dave's e-mail, we can discern that
10 it's either approximately 300 or approximately 500.
11 Is that fair?
12    A.   That would be fair.
13    Q.   And the number that we've seen as far as
14 red-flagged stores I think is 376, correct?
15    A.   Yes.
16    Q.   And according to your e-mail at the top
17 of the page, you were at least a little bit
18 surprised that there were so many items that
19 couldn't be shipped to these certain Walgreens
20 stores, is that correct?
21    A.   I was surprised at the number of them,
22 yes.
23    Q.   I'm going to show you what we are going
24 to mark as Peterson 14.  It's P-WAG-2040.

Page 153

1        (WHEREUPON, a certain document was
2         marked as Walgreens-Peterson
3         Exhibit No. 14:  2/28/13 e-mail
4         string; WAGMDL00407724 - 00407726.)
5 BY MR. GADDY:
6    Q.   And if we go back to the middle page,
7 which is actually the last e-mail or the first
8 e-mail in the chain, it looks like we see the same
9 e-mail that we just started out with, correct?
10    A.   Yes.
11    Q.   This is the e-mail where you were
12 meeting with Denny and John and finding out a way
13 and developing or implementing a solution to make
14 sure that these controlled substances were not sent
15 to Cardinal for the 367 red-flagged stores,
16 correct?
17    A.   Yes.
18    Q.   And if you go up, you see again the
19 e-mail where you reforwarded it to Denny and John
20 because they weren't copied originally, right?
21    A.   Yes.
22    Q.   Okay.  And then if you go up to the
23 e-mail above that, it looks like Denny forwarded
24 this e-mail to Tasha Polster, Rex Swords and Mike

Page 154

1  Bleser.
2       Do you see that?
3  A.  Yes.
4  Q.  And I believe you already told me you
5  didn't -- you don't know who Tasha Polster is,
6  right?
7  A.  That is correct.
8  MR. GADDY:  And I'm actually on the next
9  e-mail down, Roderrick.
10 BY MR. GADDY:
11 Q.  Remind me.  I think you also told me you
12 don't know Mike Bleser?
13 A.  No, I do not recall him.
14 Q.  What about Rex Swords?
15 A.  No, I do not recall him either.
16 Q.  Do you remember hearing Rex's name at
17 all or knowing who he was even if you didn't have a
18 personal relationship with him?
19 A.  I don't remember, no.
20 Q.  Okay.  The only person you know on this
21 e-mail here is Denny Murray?
22 A.  Yes.
23 Q.  Do you have any understanding that -- if
24 I was to represent to you that Tasha Polster is the

Page 155

1  head of the Pharmaceutical Integrity unit and the
2  head of the Pharmacovigilance Department within
3  Walgrens, does that mean anything to you?
4  A.  No.
5  Q.  Are you aware of that department?
6  A.  No.
7  Q.  Have you ever heard of the Rx Integrity
8  team or the Rx Integrity unit?
9  A.  No.
10 Q.  Have you ever heard of the
11 pharmacovigilance team or the pharmacovigilance
12 unit within Walgreens?
13 A.  No.
14 Q.  Do you know what the term
15 "pharmacovigilance" means?
16 A.  No.
17 Q.  If I represented to you that Rex Swords
18 is an executive over pharmacy operations, does that
19 ring any bells with you?
20 A.  No.
21 Q.  So, if we recall, the original e-mail in
22 this chain, you were indicating that you'd met with
23 John and Denny and that you were coming up with a
24 solution to make sure that these 367 red-flagged

Page 156

1  stores did not have any of their orders go to
2  Cardinal Health, right?
3  A.  Yes.
4  Q.  And Denny's response here in the first
5  line is "Huge news."  Correct?
6  A.  Yes.
7  Q.  It says, "Brainstorming with Doug has
8  allowed us to find a way to send C-IIs to Cardinal
9  while blocking those items that would flag our red
10 stores to the DEA."
11      Do you see that?
12 A.  Yes.
13 Q.  During the time that you were asked to
14 implement this -- this program or this solution, do
15 you recall anybody at Walgreens, whether it was
16 Denny or John or anybody else, telling you that the
17 purpose of this implementation was to prevent items
18 from going to stores that would flag those stores
19 to the DEA?
20 A.  No, I have no knowledge of that.
21 Q.  It goes on to say, "This means that red
22 stores will be able to order Cardinal only C-IIs
23 and ISNs for all non-narcotic analgesics."
24      Do you see that?

Page 157

1  A.  Yes.
2  Q.  What does "ISNs" means?
3  A.  Insufficient notices.
4  Q.  What does that mean?
5  A.  Means we will not be able to fulfill
6  your store order.  It goes back to the store so
7  that they know they are not getting it.
8  Q.  Okay.  So, let me tell you what I
9  understand that to mean and you tell me if I'm
10 right or wrong.
11      Does that mean that you are going to set
12 up a system to where if one of those stores tries
13 to order these controlled substances from Cardinal,
14 they would get an error type message?
15 A.  No.  We are not setting up -- our
16 current system has it where if we don't fulfill the
17 order, we respond back to the store that you're not
18 getting this order from the DC.
19 Q.  Then he goes on to say, "The problem
20 with C35s."  You understand that to mean
21 Schedule III through Vs?
22 A.  Yes.
23 Q.  "The problem with C35s still remains.
24 The DC cannot separate narcotic analgesic orders

Page 158

1 going to Cardinal. That process resides in the
2 store's system as an all-or-none feature."
3     Do you see that?
4 A. Yes.
5 Q. What does that mean to you?
6 A. I'm not really sure what that means.
7 Q. The only workaround that you were able
8 to set up as it relates to these 367 red-flagged
9 stores related to the Schedule II controlled
10 substances, correct?
11 A. Yes.
12 Q. You weren't able to develop any type of
13 workaround to allow the red-flagged stores to
14 continue ordering Schedules III through V, correct?
15 A. Correct.
16 Q. Now, at this point in time when -- that
17 was February 2013, correct?
18 A. Yes. Yes.
19 Q. And you recall we've looked at the
20 documents from earlier, particularly the thick
21 document with the Order to Show Cause in it, that
22 it indicated that the controlled substances at
23 Jupiter had been locked up back in September of the
24 previous year, of 2012.

Page 159

1     Do you recall that?
2 MR. LEVINE: Objection; lacks foundation.
3 BY THE WITNESS:
4 A. I don't recall that, no.
5 BY MR. GADDY:
6 Q. Okay. Well, regardless, we saw in these
7 e-mails that we just looked at in early 2013 that
8 Walgreens was in the process of stopping to ship
9 Schedule II controlled substances from the
10 Perrysburg distribution center, correct?
11 A. We were asked to write code to stop
12 some.
13 Q. And you saw in the meeting notes where
14 the plan was to ship Schedule II controlled
15 substances from Perrysburg until the DEA came in
16 and shut them down. Do you recall that?
17 A. I recall the e-mail, but I don't recall
18 back from then.
19 Q. I understand. And what we just looked
20 at was some correspondence from Cardinal Health and
21 then some projects that you were involved with
22 where Cardinal Health had red-flagged several
23 stores, Walgreens stores, that were typically
24 serviced by the Perrysburg distribution center,

Page 160

1 correct?
2 A. From what I read in the e-mails, yes. I
3 don't recall them from back then.
4 Q. Okay. Do you recall as you sit here
5 today also dealing with stores that Cardinal Health
6 had red-flagged, meaning refused to distribute
7 controlled substances to, that were typically
8 serviced by the Woodland distribution center?
9 A. I do not recall any of that, no.
10 Q. Okay. I'm going to show you what I'm
11 going to mark as Peterson 15. P-WAG-2033.
12     (WHEREUPON, a certain document was
13     marked as Walgreens-Peterson
14     Exhibit No. 15: 4/9/13 e-mail
15     sting; WAGMDL00358578 - 00358580.)
16 BY MR. GADDY:
17 Q. And do you recognize this document again
18 as a -- as another e-mail chain?
19 A. Yes.
20 Q. And it looks like in the first e-mail,
21 that would be the last one in the chain that we'll
22 get to in a minute, it looks like it was ultimately
23 from you, correct, the first page?
24 A. Oh, the first page? Yes, that is my

Page 161

1 name.
2 Q. So, this is another e-mail chain,
3 whether or not you're in the first one we are going
4 to look at, ultimately you were involved in this
5 e-mail correspondence, correct?
6 A. Yes.
7 Q. So, if you flip the page, do you see a,
8 starting in about halfway down the page, an e-mail
9 from Lisa Penn at Cardinal Health?
10 A. Yes.
11 Q. And the date of this e-mail is April 9,
12 2013, correct?
13 A. Yes, it is.
14 Q. And, so, this is a month or two after
15 these last e-mails we were looking at where you
16 were developing a workaround for the red-flagged
17 stores out of Perrysburg, right?
18 A. Yes.
19 Q. And this e-mail goes to Denny Murray and
20 also Tasha Polster?
21 A. Yes.
22 Q. And the subject is "Walgreens Woodland
23 Data - Red Stores."
24     Do you see that?

Page 162

1    A.   Yes, I do.
2    Q.   It goes on to say, "Denny and Tasha, we
3  completed our analysis of the Woodland store data
4  and I have attached the results.  We applied the
5  same analytical framework to these stores as we did
6  for the Perrysburg stores.  Below are the totals in
7  terms of how the classifications were made."
8        Do you see that?
9    A.   Yes.
10   Q.   And then below that do you that there is
11 a chart that Lisa from Cardinal Health has included
12 which identifies which classifications were
13 assigned to how many different Walgreens stores?
14   A.   Yes, I see the chart.
15   Q.   And how many stores does Lisa indicate
16 were classified as red?
17   A.   190.
18   Q.   Okay.  And what percentages -- what
19 percentage of the stores serviced by the Woodland
20 distribution center did that encapsulate?
21   A.   12.29.
22   Q.   And from the earlier documents that
23 we've looked at, do you understand that to mean
24 that Cardinal Health is indicating that they have,

Page 163

1  on objective measures only, flagged 190 Walgreens
2  stores as red and therefore will not ship
3  controlled substances to them?
4    MS. PETERSEN:  Objection; foundation.
5  BY THE WITNESS:
6    A.   I'm -- no, I have no recollection of
7  that.  No.
8  BY MR. GADDY:
9    Q.   Well, let's keep reading.
10       The next e-mail looks like it comes from
11 Denny Murray.  The next e-mail in the chain.  If
12 you flip to the first page.
13   A.   Yes, I see that.
14   Q.   And that e-mail goes to you, John
15 Merritello and Steve Bamberg, correct?
16   A.   Yes.
17   Q.   And it looks like he's forwarded that
18 first e-mail to you that had the number of red,
19 orange, yellow and green stores on it, correct?
20   A.   Yes.
21   Q.   And he writes here, "Cardinal is now
22 restricting the distribution of C-II through V
23 narcotic analgesics for 190 stores out of Woodland
24 starting Friday, April 12."

Page 164

1        Do you see that?
2    A.   Yes.
3    Q.   Do you understand that to mean that
4  Cardinal Health is now refusing to ship controlled
5  substances to those 190 stores?
6    A.   I'm not really sure if that's what that
7  means or not.
8    Q.   Well, when we looked at the stores that
9  were red-flagged in Perrysburg, you understood that
10 Cardinal Health was not going to distribute them
11 controlled substances and therefore you had to come
12 up with a workaround, right?
13   A.   For Perrysburg, correct.
14   Q.   He goes on to say, "I will need you
15 gentlemen to put in place the same restrictions we
16 had for the 225 Perrysburg stores that blocked C-II
17 orders and PFL/OOS for the C-II through V narcotic
18 analgesics."
19       Do you see that?
20   A.   Yes, I see that.
21   Q.   First, when we see narcotic analgesics,
22 C-II through V narcotic analgesics, do you
23 understand that to mean Schedule II through V
24 controlled substances?

Page 165

1    A.   I'd say C-II through V, yes.
2    Q.   So, do you understand that Denny -- let
3  me ask you this.  This e-mail is from five and a
4  half years ago, right?
5    A.   Yes, it is.
6    Q.   As you sit here today, do you recall
7  getting this e-mail from Denny asking you to
8  develop a workaround for Woodland like you had for
9  Perrysburg?
10   A.   No, I do not remember that.
11   Q.   But do you understand from looking at
12 this document that that's what he was asking you to
13 do?
14   A.   Yes.
15   Q.   Okay.  And so then you respond in the
16 top e-mail and you say, "I just want to verify:
17 We're using same list of products" -- excuse me --
18 "same list of items from Perrysburg."  Correct?
19   A.   Yes.
20   Q.   And that would be either that 300 or 500
21 number that we saw in Dave's formula where he was
22 doing number of stores multiplied by number of
23 items?
24   A.   One of those, yes.

Page 166

1    Q.   Okay.  And "The Woodland distribution
2  center will still pick the product if it has
3  quantity."
4        Do you see that?
5    A.   Yes.
6    Q.   And do you understand that to mean that,
7  just like in Perrysburg, even though Cardinal
8  Health is refusing to distribute controlled
9  substances to these Walgreens stores, you're asking
10  whether or not the Woodland distribution center
11  will continue to still distribute to those stores
12  just like it did in Perrysburg?
13   A.   Yes, I'm asking if Woodland DC would
14  distribute that, this product.
15   Q.   And that is how it worked in Perrysburg,
16  right?
17   A.   Yes.
18   Q.   And you go on to say, "This should not
19  be a problem from the distribution center side,"
20  correct?
21   A.   Yes.
22   Q.   So, you agree that in addition to
23  Cardinal Health identifying red-flagged stores at
24  the Perrysburg -- that came out of the Perrysburg

Page 167

1  distribution center, they also identified
2  red-flagged stores that came out of the Woodland
3  distribution center, correct?
4    A.   I don't remember that, but based on the
5  e-mails, yes.
6    Q.   I want to show you what we are going to
7  mark as Peterson 16.  This is going to be
8  P-WAG-2016.
9        (WHEREUPON, a certain document was
10       marked as Walgreens-Peterson
11       Exhibit No. 16:  2/27/13
12       appointment e-mail; WAGMDL00335835
13       - 00335837.)
14  BY MR. GADDY:
15   Q.   And if we look at -- we can start just
16  on the first page here.  And it looks like this is,
17  if you go down to the subject line, this seems to
18  be the same kind of continuing meeting or e-mail
19  chain that we've looked at a couple times.  The
20  subject is Perrysburg C-III through V follow-up.
21       Do you see that?
22   A.   Yes.
23   Q.   And it looks like it's got a conference
24  call number there?

Page 168

1    A.   Yes.
2    Q.   And if you look up at the "To" line for
3  this meeting, it looks like Vinayak is the first
4  one in the list, and we've seen several, he has
5  been involved in a lot of these communications,
6  correct?
7    A.   Yes.
8    Q.   And then over on the right-hand side of
9  that top line, we see Denny Murray who we've seen
10  over and over, correct?
11   A.   Yes.
12   Q.   And then at the end of the third line
13  down we see you, Doug Peterson, correct?
14   A.   Yes.
15   Q.   So, you also received the invitation to
16  this conference call meeting?
17   A.   Yes.
18   Q.   And if you go down at the bottom of the
19  page where we start to see some of the updates, we
20  see the updates for March 1, correct?
21   A.   Yes.
22   Q.   And do you recall that the original plan
23  had been that Perrysburg would stop distributing by
24  March 1?

Page 169

1    A.   I don't recall at -- when this was, but
2  from the e-mails I do, yes.
3    Q.   Okay.  And, so, but this is the
4  March 1st update and what it says is, "Perrysburg
5  will continue to serve the 367 red-flagged stores
6  until April 1," right?
7    A.   Yes.
8    Q.   And the next bullet point says, "Jobber
9  list for redirects."
10       Do you see that?
11   A.   Yes.
12   Q.   It says, "ABC warehouse in New Jersey is
13  closing - Logistics needs an updated address for
14  the correct facility to print on the 222 forms."
15       Do you see that?
16   A.   Yes.
17   Q.   And you understand the 222 forms to be
18  the forms that the stores or the pharmacies have to
19  fill out to order controlled substances?
20   A.   Yes, I know that.
21   Q.   If you go to the next page and look at
22  the top of the page, you see it says, "New stores:
23  What would be the plan to assign C-II DCs to the
24  new stores after 3/1 when Perrysburg will be down

Page 170

1  to servicing only the 367 stores?"
2      Do you see that?
3   A.   Yes.
4   Q.   So, is it clear to you from looking at
5  this document that memorializes some of the events
6  leading up to this call that was being scheduled is
7  that as of March 1st it looks like Perrysburg was
8  going to be distributing controlled substances only
9  to those 367 red-flagged stores that Cardinal
10  Health would not distribute to, correct?
11   A.   Based on the e-mail, yes.
12   Q.   And if you look down -- the next heading
13  that you see in bold, it says, "Previous Updates."
14  Right?
15   A.   Yes.
16   Q.   And then if you -- you look at the first
17  one, it's the one that we've seen several times
18  under "C2," "Perrysburg will continue to pick what
19  they can until the DEA comes and shuts them down."
20      Do you see that?
21   A.   Yes.
22   Q.   And it looks like Vinayak essentially
23  just kept a running list so that folks could kind
24  of continue to see what had happened and what had

Page 171

1  changed over time.
2      Do you see that?
3   A.   Yes, I see.
4   Q.   And if we go down that page, do you see
5  there is a section that says, "Updates 2/27"?
6   A.   Yes.
7   Q.   And does that indicate to you that these
8  were the updates that were made to this plan as of
9  February 27?
10   A.   Yes.
11   Q.   And in the first bullet point there it
12  says, "Continue to service potentially red-flagged
13  stores."
14      Do you see that?
15   A.   Yes, I do.
16   Q.   And it says, "The Rx purchasing team is
17  working on the stores.  The plan is to send the
18  store list to the 367 stores to the distribution
19  center by EOD," which I assume means end of day,
20  correct?
21   A.   That's what it says, yes.
22   Q.   If you skip down a couple of bullet
23  points, there is then an asterisk that starts
24  "367 potentially red flag stores."

Page 172

1   A.   Okay.
2   Q.   And it says, "Denny/Doug to determine
3  what we need to do to process orders for these
4  stores to account for the order redirects
5  properly."
6      Do you see that?
7   A.   Yes.
8   Q.   You understand that to be talking about
9  you?
10   A.   Yes.  That's me.
11   Q.   And what they are talking about here,
12  would this be the solution that you ultimately were
13  able to implement to prevent those 367 stores from
14  submitting controlled substance orders to Cardinal
15  Health?
16   A.   Yes.
17   Q.   Then it says, "Redirects to Cardinal
18  need to be stopped as Cardinal is not filling
19  orders as they are considered suspicious."
20      Do you see that?
21   A.   I see that.
22   Q.   And this is consistent with your
23  understanding and what we've seen in some of these
24  documents earlier today that Cardinal Health was

Page 173

1  refusing to provide controlled substances to those
2  367 stores, correct?
3      MR. LEVINE:  Objection; lacks foundation.
4  BY THE WITNESS:
5   A.   I'm not 100% sure, no.
6  BY MR. GADDY:
7   Q.   Well, let's read what it says.  It says,
8  "Redirects to Cardinal need to be stopped."
9      Right?
10   A.   That's what the document says, yes.
11   Q.   And it says, "As Cardinal is not
12  fulfilling orders as they are considered
13  suspicious."
14      Correct?
15   A.   That is correct.
16   Q.   Despite that determination or decision
17  by Cardinal Health, Walgreens continued to supply
18  those stores with controlled substances out of
19  their Perrysburg distribution center, correct?
20      MR. LEVINE:  Objection to form, foundation.
21  BY THE WITNESS:
22   A.   I would have no knowledge of that.
23  BY MR. GADDY:
24   Q.   Okay.  Well, go back up to the -- go to

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 the first page and look at the bottom of the
2 page under "Updates 3/1."
3     A.   Okay.
4     Q.   What does it say there?  What's the
5 first bullet point say?
6     A.   "Perrysburg will continue to serve 367
7 red-flagged stores until 4/1."
8     Q.   From looking at this document and --
9 that you were copied on and invited to the meeting
10 and were asked to implement some solutions related
11 to working around orders going to Cardinal, do you
12 understand that despite Cardinal Health indicating
13 that they would not full these orders as they are
14 considered suspicious, Walgreens and specifically
15 the Perrysburg distribution center would continue
16 to serve those 367 red-flagged stores?
17     MR. LEVINE:  Objection to form, foundation.
18 BY THE WITNESS:
19     A.   I would not know that.  All I know is
20 the programs that I was asked to write into code.
21 BY MR. GADDY:
22     Q.   When you look at this on the document,
23 is that your understanding?
24     MR. LEVINE:  Objection to form, foundation.

Page 175

1 BY THE WITNESS:
2     A.   I only know we were asked to stop the
3 programs -- write programs to stop these stores.  I
4 can't --
5 BY MR. GADDY:
6     Q.   Mr. Peterson, I'm just asking you
7 whether or not the document indicates the
8 Perrysburg distribution center is going to continue
9 to serve those stores.  Is that what it indicates?
10     A.   Yes, it does indicate that.
11     Q.   I'm going to show you what I will mark
12 as Peterson 17.
13         (WHEREUPON, a certain document was
14         marked as Walgreens-Peterson
15         Exhibit No. 17:  2/28/13 e-mail;
16         WAGMDL00541412.)
17 BY MR. GADDY:
18     Q.   This is a one-page e-mail, looks like
19 it's coming from Vinayak, and it's to Bill Groth
20 and Megan Butterfield and I see you on the cc line.
21         Do you see that?
22     A.   Yes.
23     Q.   And the subject of this e-mail is "C-II
24 jobber list and red flag store list for

Page 176

1 Perrysburg."
2         Do you see that?
3     A.   Yes.
4     Q.   And it looks like what Vinayak is asking
5 for here is two separate lists.  The first would be
6 "C-II jobbers that we need to update on Perrysburg
7 so the orders would redirect correctly to them."
8         Do you see that?
9     A.   Yes.
10     Q.   Does that indicate to you that Vinayak
11 is asking for a list of potential vendors for
12 Perrysburg?
13     A.   Yes.
14     Q.   And they're also -- Vinayak is also
15 asking a list for the red-flagged stores for
16 Perrysburg so that we can pull the volume numbers
17 for the distribution center so they can plan their
18 labor and we'd also need to update our programs to
19 figure out how to handle these store orders.
20         Correct?
21     A.   Yes, that's what it says.
22     Q.   And these red-flagged stores are the
23 ones that Cardinal has considered suspicious but
24 the ones that Perrysburg is going to continue to

Page 177

1 supply controlled substances to, correct?
2     MR. LEVINE:  Objection; lacks foundation,
3 form.
4 BY THE WITNESS:
5     A.   I'm -- I'm not sure from this e-mail.
6 BY MR. GADDY:
7     Q.   Okay.  At any of your time at Walgreens
8 in the supply and logistics IT department, do you
9 recall having any involvement with thresholds as it
10 relates to controlled substances?
11     A.   No.
12     Q.   Do you recall ever being asked by
13 anybody on the business side to set or develop
14 thresholds that relate to controlled substances?
15     A.   No.
16     Q.   When I say "thresholds on controlled
17 substances," does that mean anything to you?
18     A.   Some kind of limit.
19     Q.   But you would have no idea what that
20 meant internally at Walgreens at it related --
21     A.   No, I would not know what that meant
22 from -- at Walgreens.
23     Q.   I'll show you what I'll mark as Peterson
24 Exhibit No. 8.

Page 178

1    MR. LEVINE:  You mean 18.

2    MR. GADDY:  Yes, 18.  Thank you.

3         (WHEREUPON, a certain document was

4         marked as Walgreens-Peterson

5         Exhibit No. 18:  3/13/13 e-mail

6         string; WAGMDL00102642 - 00102644.)

7    BY MR. GADDY:

8    Q.   This is P-WAG-2089.  And I'm just going

9    to show you this real quick and see if this jogs

10   your memory about anything as it relates to

11   thresholds.

12        If you look at the bottom of the page,

13   we are going to see the start of the first e-mail.

14   Bottom of the first page you see it's an e-mail

15   from Nicholas Rausch?

16   A.   Yes.

17   Q.   Do you know who he is?

18   A.   No, I do not.

19   Q.   And it looks like this e-mail goes to

20   Lisa Penn who we've seen a couple times now works

21   for Cardinal Health, and the subject of the e-mail

22   is "Walgreens Threshold Limits."

23   A.   Yes.

24   Q.   If you turn to the next page, it says,

Page 179

1    "Lisa, during one of the conference calls with

2    Denny and Tasha last week, they had asked us to

3    send us a list of threshold limits for each store.

4    Attached is the threshold limits that we

5    implemented this past weekend for all Walgreens

6    stores serviced from their Perrysburg distribution

7    center."

8         Do you see that?

9    A.   Yes.

10   Q.   It says, "I have included all C-II drug

11   families and the threshold limit that is in our

12   system as of this morning.  These values are

13   dynamic and can change as we continue to evaluate

14   the stores."

15        Do you see that?

16   A.   Yes.

17   Q.   And if you flip the page, you'll see a

18   spreadsheet that is titled "Walgreens Perrysburg

19   SOM Limits."

20        Do you see that?

21   A.   Yes.

22   Q.   Does the acronym SOM mean anything to

23   you?

24   A.   No, it does not.

Page 180

1    Q.   Do you see if we look at the -- see if

2    we look at the spreadsheet that it has what looks

3    like on the far left-hand column a DEA number and

4    then a store number and then a state?

5    MR. LEVINE:  Objection; lacks foundation.

6    BY THE WITNESS:

7    A.   I see that, yes.

8    MR. GADDY:  And Mr. Peterson and Mark, I'll

9    represent to you that this spreadsheet was a couple

10   hundred pages.  All that I have on here are the

11   Ohio stores.

12   MR. LEVINE:  Okay.

13   BY MR. GADDY:

14   Q.   I'm sorry, Mr. Peterson.  You saw where

15   I was?

16   A.   Yes.

17   Q.   Okay.  And then do you see as you go

18   across the top of the page there are the names of

19   different drug categories?

20   A.   I see that, but I'm not familiar with

21   this report.

22   Q.   I understand.  I just want to make sure

23   you see it and recognize it, and then I'm going to

24   ask you a question or two.  But I understand you

Page 181

1    haven't seen this report before.

2    A.   I have no idea.

3    Q.   If you look at the title "SOM," do you

4    see right underneath the SOM there is the column

5    for oxycodone?

6    A.   Yes.

7    Q.   And we talked about oxycodone a little

8    bit earlier today and you have indicated today that

9    you're aware of what that is, correct?

10   A.   I'm aware of the drug, yes.

11   Q.   Okay.  And do you see listed below

12   there, there are numbers, some of which are the

13   same but some of which are different that would

14   correspond to the different stores?

15   A.   There's numbers, yes.  I'm not sure what

16   they are but...

17   Q.   During the course of your time in supply

18   and logistics at Walgreens, did anybody ever -- let

19   me ask you this first.

20        Did you ever see any information or any

21   charts similar to this relating to line limits or

22   thresholds or ceilings for Walgreens stores as it

23   relates to amounts of or quantities of controlled

24   substances?

Page 182

1    A.   No, I have not.
2    Q.   And I think you've already told me that
3  you've never done anything with line limits or
4  controlled substance thresholds or ceilings.
5        But are you aware of anybody in the
6  IT department, whether it's the supply and
7  logistics chain or some other department within IT,
8  are you aware of any person, manager, division,
9  team, that has been asked to do anything as it
10 relates to thresholds or ceilings or line limits
11 for quantities of controlled substances being
12 ordered by Walgreens stores?
13       MR. LEVINE:  Objection; lacks foundation.
14 BY THE WITNESS:
15   A.   No, I do not know of anybody I can -- I
16 mean, I just write the programs that are asked of
17 me to write.  So...
18 BY MR. GADDY:
19   Q.   And nobody has ever asked you to write a
20 program such as this giving ceiling limits or
21 thresholds for controlled substance orders from
22 Walgreens stores?
23   A.   Nope.
24   Q.   Do you have that -- this thick document

Page 183

1  still in front of you?
2    A.   Yes, it's here.
3    Q.   I'm sorry.  Do you have the exhibit
4  number of that one?  I have forgotten what it was.
5  I think it's 1 but...
6    A.   It says Peterson 1, yes.
7    Q.   Thank you.  If you could look at
8  Peterson 1 for me, please, and flip -- if you
9  recall the -- it's going to be page 23 of 343 at
10 the bottom right-hand corner.
11   A.   23 of 343, yes.
12   Q.   Are you with me?
13       What's the -- the date on this document
14 is what?
15   A.   September 13, 2012.
16   Q.   And you see this is the -- in the title
17 on the page, this is the Order to Show Cause?
18   A.   Yes.  That's what it says, yes.
19       MR. LEVINE:  Objection; asked and answered.
20 BY MR. GADDY:
21   Q.   And you recall that this is the document
22 that we looked at that related to the investigation
23 of the Jupiter distribution center, right?
24   A.   Yes.

Page 184

1    Q.   Okay.  And I just want to get the date
2  before I moved on to the second document.
3        Do you see it's September 13, 2012,
4  right?
5    A.   Yes.
6    Q.   I'm going to show you what I'm going to
7  mark as Peterson 19.  This is P-WAG-2013.
8        (WHEREUPON, a certain document was
9        marked as Walgreens-Peterson
10       Exhibit No. 19:  9/25/12 e-mail;
11       WAGMDL00278104.)
12 BY MR. GADDY:
13   Q.   And do you see that this is an e-mail
14 from Denny Murray to several folks on which you
15 were copied and that this was sent on September 25,
16 2012?
17   A.   Yes.
18   Q.   So, this would be approximately two
19 weeks after that Order to Show Cause that we just
20 went back and looked at again, right?
21   A.   Yes.
22   Q.   And the subject is "PDQ letter"?
23   A.   Yes.
24   Q.   Do you know what PDQ means?

Page 185

1    A.   Pretty darn quick.
2    Q.   Is that an acronym that's used within
3  Walgreens relating to the format of an order from a
4  pharmacy to the distribution center?
5    A.   It relates to a type of order that will
6  be placed by the stores.
7    Q.   Maybe this is presumptuous of me.  Is it
8  some type of emergency type order or an expedited
9  order?
10   A.   It's a -- it's considered an emergency
11 order where to try and pick it and ship it within a
12 day to the store.
13   Q.   Gotcha.  It says here, "All, Mike Bleser
14 asked me to craft a communication that will be sent
15 to Suzanne, Dave and the other members of the
16 Control Substance Integrity Task Force (if that is
17 what it is called)."
18       Let me ask you that first.  Have you
19 ever heard of the Control Substance Integrity Task
20 Force?
21   A.   No, I have not.
22   Q.   Does that mean anything to you?
23   A.   No, it means nothing.
24   Q.   It says, "to tell them about Sue and

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 Doug's new process. I wanted to run it past you
2 first to check for accuracy and input."
3     Do you see that?
4 A. Yes.
5 Q. It says, "To all. Back in June, Rx
6 Purchasing and Supply Chain" -- is that where you
7 work?
8 A. I'm in supply chain.
9 Q. Okay.
10 A. IT, yes.
11 Q. It says, "Back in June, Rx Purchasing
12 and Supply Chain placed line limits on several
13 2/3" -- excuse me -- "C-II/C-III narcotic
14 analgesics."
15     Do you see that?
16 A. Yes.
17 Q. Do you understand that to mean that line
18 limits were placed on Schedule II and III
19 controlled substances?
20 A. I'm not really sure what it means.
21 Q. Okay. Let me ask you for a minute.
22 When it says "in June, Purchasing and Supply Chain
23 placed line limits on several C-II and C-III
24 narcotic analgesics," do you know what is being

Page 187

1 said there?
2 A. Not really, no.
3 Q. Do you know what line limits are?
4 A. I know how we use them in our
5 distribution centers. It puts a limit to the order
6 quantity that can be done by -- that we will, from
7 a store.
8 Q. Okay. Is that the same as or different
9 than the excessive order query?
10 A. That would be different.
11 Q. Okay. So, one issue -- one thing, and I
12 guess the best way to describe it is the program
13 that you helped code and helped implement was the
14 excessive order query, correct?
15 A. Yes.
16 Q. And that was where there would be a
17 single input -- a number inputted by the
18 distribution center and that if any product order
19 exceeded that number, it would flag or populate on
20 a report, correct?
21 A. That is correct.
22 Q. So, if the number was 100, if there was
23 more than 100 orders of paper towels or toilet
24 paper or OxyContin, it would flag on that report if

Page 188

1 it was more -- if any of those particular items
2 were more than 100?
3 A. Yes.
4 Q. Did you have any involvement in
5 establishing the line limits on Schedule II and III
6 controlled substances?
7 A. No, I have not.
8 Q. Do you know who did?
9 A. I don't remember.
10 Q. Do you remember it happening?
11 A. No, I don't remember that either.
12 Q. How do you understand the line limits to
13 work? I think you told me that you understand that
14 to be something that the distribution centers use?
15 A. It actually -- and I need to replace
16 something. As line limits are mainly for the
17 stores. They are not for -- the distribution
18 center doesn't have a line limit per se. They
19 just -- the line limits are at the store level.
20 Q. Okay. Was it Steve Bamberg that you
21 told me earlier was kind of a manager over the
22 store side?
23 A. Yes.
24 Q. Do you know if Steve was involved in

Page 189

1 setting up the line limits?
2 A. I don't know that.
3 Q. So, explain for me, please, your
4 understanding of a line limit.
5 A. It would put a limit on the order
6 quantity for an item.
7 Q. Can you give me an example of how that
8 would work in realtime?
9 A. If the line limit was 12, you couldn't
10 order more than 12 of that product.
11 Q. Okay. Was that on a weekly basis,
12 monthly basis, annual basis?
13 MR. LEVINE: Objection to form, foundation.
14 BY THE WITNESS:
15 A. I'm not really sure about that.
16 BY MR. GADDY:
17 Q. This sentence here indicates that line
18 limits were set on Schedule II and III controlled
19 substances. Are you aware of line limits being set
20 on all products or is it just set on controlled
21 substances?
22 MR. LEVINE: Objection; lacks foundation.
23 BY THE WITNESS:
24 A. I'm not sure at all.

Page 190

BY MR. GADDY:

1 BY MR. GADDY:
2    Q.   Is it your understanding that there is
3 still line limits in place on -- within the
4 Walgreens ordering system today?
5    MR. LEVINE:  Objection; foundation.
6 BY THE WITNESS:
7    A.   I'm not sure about that.  It's outside
8 of my area right now.
9 BY MR. GADDY:
10    Q.   You don't know if there is still line
11 limits on -- you don't know if that's still a
12 concept that operates within Walgreens today?
13    A.   I'm not familiar with it, no.
14    Q.   In the -- in the area that you are
15 familiar with it, what types of products did you
16 see it applied to?
17    A.   I don't remember.
18    Q.   Okay.  Let's start over.
19    It says, "Back in June, Rx Purchasing
20 and Supply Chain placed line limits on several C-II
21 and C-III narcotic analgesics."
22    Do you see that?
23    A.   Yes.
24    Q.   It says, "At that time, it was

Page 191

1 identified that stores would be able to order drugs
2 cut by the line limit through PDQ."
3    Do you see that?
4    A.   Yes.
5    Q.   What does that mean to you?
6    MR. LEVINE:  Objection; lacks foundation.
7 BY THE WITNESS:
8    A.   I'm not sure what that means.
9 BY MR. GADDY:
10    Q.   It says, "Supply Chain and Logistics has
11 identified a process in which they can turn off
12 specific items ordered through PDQ at the DC level,
13 essentially capping stores at the line limit
14 quantity."
15    Do you see that?
16    A.   Yes.
17    Q.   So, I'm going to tell you what I've
18 understood you to say and you tell me if I got it
19 right or not.
20    I understood you to tell me that line
21 limits are essentially caps on how much of a
22 product you could order.  I think the example you
23 did -- you told me was that if the line limit was
24 12, you could only order 12 of a product.  Is

Page 192

1 that --
2    A.   Yes.
3    MR. LEVINE:  Objection; asked and answered.
4 BY MR. GADDY:
5    Q.   It indicates here in this second
6 sentence that stores were able to order drugs cut
7 by the line limit through the PDQ process.
8    Do you see that?
9    A.   I see that, yes.
10    Q.   Okay.  So, even though stores, if their
11 order was 12, they got their 12 through the order
12 that was capped by the line limit, but this is
13 indicating they could then do a PDQ order, a pretty
14 darn quick order, that is what I think you termed
15 an emergency order, and continue to get more of the
16 product, correct?
17    MR. LEVINE:  Objection; lacks foundation.
18 BY THE WITNESS:
19    A.   I'm not sure about that.
20 BY MR. GADDY:
21    Q.   Is that what the document indicates?
22    MR. LEVINE:  Same objection.
23 BY THE WITNESS:
24    A.   I'm not really sure what they mean by

Page 193

1 that.
2 BY MR. GADDY:
3    Q.   Okay.  It says, "Identified that stores
4 would be able to order drugs cut by the line limit
5 through PDQ.  Supply Chain and Logistics has
6 identified a process in which they can turn off
7 specific items ordered through PDQ at the DC level,
8 essentially capping stores at the line limit."
9    Do you see that?
10    A.   Yes, I see that.
11    Q.   If you go back up to the first
12 paragraph, the second line, it says -- let's just
13 read it.
14    It says, "Mike Bleser asked me to craft
15 a communication that will sent to Suzanne, Dave and
16 other members of the Control Substance Integrity
17 Task Force to tell them about Sue and Doug's new
18 process."
19    Do you see that?
20    A.   Yes.
21    Q.   You're Doug, right?
22    A.   Yes.
23    Q.   But you don't remember any of this stuff
24 that I'm talking to you about in this lower

Page 194

1 paragraph?
2     A.   No, I do not remember it.
3     Q.   But this was a process that you were
4 involved in and you helped implement and you helped
5 design?
6     MR. LEVINE:  Objection to form.
7 BY THE WITNESS:
8     A.   I'm not sure about that.
9 BY MR. GADDY:
10     Q.   Okay.  Going back down below, it says,
11 "This enhancement will impact all stores in the
12 chain.  As part of the new process, the pharmacies
13 would order the product on SIMS/PDQ and not receive
14 an ISN notice until the next day.  We understand
15 that this may create a disruption in patient care."
16     Do you see that?
17     A.   Yes, I do.
18     Q.   If you go down to the next sentence, it
19 says, "Pharmacies will still be able to obtain
20 quantities above the corporate line limits by
21 asking their RXS to fill out a Control Substance
22 Override Order form."
23     Do you see that?
24     A.   Yes, I see it.

Page 195

1     Q.   Okay.  Do you know what that means?
2     A.   No, I do not.
3     Q.   Do you have an appreciation that this is
4 a project that you worked on back in 2012?
5     A.   I don't remember working on it.
6     Q.   Do you see that Denny from the business
7 side says this is "Sue and Doug's new process,"
8 right?
9     A.   Yes, I do see that.
10     Q.   And you understand that a line limit was
11 intended to cap the amount of product that a store
12 could receive, correct?
13     MR. LEVINE:  Objection; asked and answered.
14 BY THE WITNESS:
15     A.   Yes.
16 BY MR. GADDY:
17     Q.   And you understand from this e-mail that
18 there was a hole discovered in the system, that
19 stores could order drugs that had been capped by
20 the line limit through the PDQ process, correct?
21     MR. LEVINE:  Objection to form, lacks
22 foundation.
23 BY THE WITNESS:
24     A.   I'm not sure -- no, I'm not sure about

Page 196

1 that.
2 BY MR. GADDY:
3     Q.   Well, you see that what you were asked
4 to do here was to turn off the PDQ process, which
5 would cap the stores at their line limit.
6     Do you see that?
7     MR. LEVINE:  Objection to form, lacks
8 foundation.
9 BY THE WITNESS:
10     A.   I see that, yes.
11 BY MR. GADDY:
12     Q.   Okay.  Well, and this e-mail is from the
13 end of September, correct?
14     A.   Yes.
15     Q.   About two weeks after the DEA issued the
16 Order to Show Cause to the Jupiter distribution
17 center down in Florida, correct?
18     A.   Yes.
19     Q.   Several months after these line limits
20 were put in place and yet stores were able to get
21 around them with the PDQ process, correct?
22     MR. LEVINE:  Objection; lacks foundation.
23 BY THE WITNESS:
24     A.   I can't answer that question.

Page 197

1 BY MR. GADDY:
2     Q.   It goes on to say in the second-to-last
3 sentence of that paragraph, it says, "Unless there
4 is specific objections, all oxycodone products will
5 be turned off of PDQ by Friday, September 28."
6     Do you see that?
7     A.   Yes.
8     Q.   Assuming that actually happened, you
9 understand that until Friday, September 28, 2012,
10 Walgreens stores were able to order oxycodone
11 through the PDQ or the emergency order process?
12     MR. LEVINE:  Objection to form, foundation.
13 BY THE WITNESS:
14     A.   I'm not sure if they could or not.
15 BY MR. GADDY:
16     Q.   Does the document indicate that they
17 could?
18     MR. LEVINE:  Objection to form, foundation.
19 BY THE WITNESS:
20     A.   Again, I'm not really sure if they can
21 or not or could or not.
22 BY MR. GADDY:
23     Q.   Okay.  The second sentence says, second
24 sentence of that second paragraph says, "At that

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 time, it was identified that stores would be able
2 to order drugs cut by the line limit through PDQ."
3        Correct?
4    A.   Yes, it does say that.
5    Q.   Do you have any reason to disagree with
6 that?
7    MR. LEVINE:  Objection; form, foundation.
8 BY THE WITNESS:
9    A.   I'm not sure.
10 BY MR. GADDY:
11    Q.   Mr. Peterson, I'm going to show you what
12 we are going to mark as Exhibit No. 20.
13        (WHEREUPON, a certain document was
14         marked as Walgreens-Peterson
15         Exhibit No. 20:  101/12 e-mail
16         string; WAGMDL00252575 - 00252576.)
17 BY MR. GADDY:
18    Q.   If you look at the bottom half of this
19 page, do you see this is an e-mail written by you?
20    A.   Yes.
21    Q.   This was written Friday, September 28,
22 correct?
23    A.   Yes.
24    Q.   Of 2012?

Page 199

1    A.   Yes.
2    Q.   And you send this to several folks, it
3 looks like Jen Diebert, Deb Bish, Kristine Atwell.
4        Do you see that?
5    A.   Yes.
6    Q.   Who is Kristine Atwell?
7    A.   I don't remember.
8    Q.   Okay.  And the subject of your e-mail
9 here is "Oxycodone no longer being ordered via
10 PDQ."
11    A.   Yes.
12    Q.   Do you recall doing this project back in
13 September of 2012?
14    A.   No, I don't recall it.
15    Q.   It says, "This is to inform you that
16 effective today the attached oxycodone items can no
17 longer be ordered via the PDQ process.  We have
18 turned the PDQ order indicator for these items to
19 no.  If the store orders the items, they will
20 receive an insufficient code of 01, 'item not
21 allowed PDQ.'"
22        Do you see that?
23    A.   Yes, I do.
24    Q.   Do you understand that here on

Page 200

1 September 28 of 2012 you were communicating to Deb
2 Bish, among others -- I think you indicated Deb was
3 the manager of the controlled substance section or
4 department, the distribution center in Perrysburg?
5    A.   Yes.
6    Q.   You are communicating to Deb and other
7 folks that you have now turned off the PDQ process
8 for oxycodone for the first time, December 28 --
9 excuse me -- September 28, 2012, correct?
10    A.   Yes.
11    Q.   Prior to that date, oxycodone could be
12 ordered via emergency order, PDQ, right?
13    A.   Yes.
14    Q.   The e-mail goes on to say, "If the store
15 insists on getting this product, you will need to
16 use the current control drug override process."
17        Do you see that?
18    A.   Yes.
19    Q.   How did you know to write about the drug
20 override process?
21    A.   I don't remember.
22    Q.   As you sit here today, I understand you
23 to tell me that you don't know what that is?
24    A.   I don't know what that control drug

Page 201

1 process is.  Override process.
2    Q.   But here in this e-mail back in
3 September 28 of 2012, you're telling Deb Bish and
4 other folks like her in distribution centers that
5 the stores, A, can no longer get oxycodone on
6 emergency orders, right?
7    A.   Yes.
8    Q.   And, B, you're saying that if they do
9 want to get oxycodone above their line limit, they
10 need to use the control drug override process,
11 correct?
12    A.   It's stated in the e-mail, yes.
13    Q.   So, even -- even though you're -- strike
14 that.
15        Up until September 28, 2012, stores
16 could order oxycodone through their normal channels
17 from the distribution center, correct?
18    A.   Yes.
19    Q.   Up until September 28, 2012, stores
20 could order over and above any capped amount
21 through the PDQ process, correct?
22    A.   They could order through the PDQ
23 process, yes.
24    Q.   And even after September 28, 2012,

Page 202

1 stores could continue to order excess oxycodone if
2 they went through the control drug override
3 process, correct?
4    A.  I'm not sure about that.
5    Q.  Well, is that what you wrote?
6    A.  I don't remember that.
7    Q.  Is that what you wrote?
8    A.  Yes, it's written in this e-mail, yes.
9    Q.  Written by you?
10   A.  Yes.
11   Q.  And if you look at the attachment on the
12 next page, do you see the list of the oxycodone
13 products that it looks like you sent to Deb Bish
14 and the other folks in the distribution centers to
15 inform them of what products could no longer be
16 ordered on an emergency basis?
17   A.  I see the list, yes.
18   Q.  And it's all oxycodone products,
19 correct?
20   A.  Yes.
21   MR. LEVINE:  Are you getting to a good place
22 for a lunch break?
23   MR. GADDY:  Whenever is fine with me.
24   MR. LEVINE:  Okay.  Let's do it.

Page 203

1    MR. GADDY:  All right.
2    THE VIDEOGRAPHER:  We're going off the record
3 at 12:52.
4         (WHEREUPON, a recess was had
5         from 12:52 to 1:31 p.m.)
6    THE VIDEOGRAPHER:  We're back on the record at
7 1:31.
8 BY MR. GADDY:
9    Q.  Good afternoon, Mr. Peterson.
10   A.  Good afternoon.
11   Q.  I think we're past the halfway point, if
12 that gives you any comfort.
13   A.  Okay.
14   Q.  I'm going to keep asking you some
15 questions right now about the -- some of the work
16 you did on the PDQ process as it relates to
17 oxycodone.  Okay?  Do you remember that's what we
18 were talking about before lunch?
19   A.  Yes.
20   Q.  And you understand, don't you, that my
21 goal here is just to try to kind of find out
22 historically some of the projects and some of the
23 different implementations that you've been involved
24 in?  Correct?

Page 204

1    A.  Correct.
2    Q.  You understand I'm not accusing you of
3 anything or trying to throw you under the bus for
4 anything that you may or may not done back in --
5 related to your work at Walgreens?
6    A.  I understand that, yes.
7    Q.  I'm going to show you what I've marked
8 as Peterson 21.  It's going to be P-WAG-2112.
9         (WHEREUPON, a certain document was
10        marked as Walgreens-Peterson
11        Exhibit No. 21:  10/1/12 e-mail
12        string; WAGMDL00705318 - 00705320.)
13 BY MR. GADDY:
14   Q.  And if you go to the -- if you turn the
15 page, go to the bottom of the second page of this
16 document, you'll see an e-mail from you, correct?
17   A.  Yes.
18   Q.  And we're going to flip to it in a
19 moment, but I think it's going to be the same
20 e-mail that we saw just a minute ago, but we're
21 going to see after it some traffic from some other
22 folks within Walgreens.
23        Does that make sense?
24   A.  Yes.

Page 205

1    Q.  Okay.  And if we look at this e-mail,
2 this is the Friday, September 28 e-mail from you to
3 Deb Bish, Jen Diebert, Kristine Atwell and some
4 other folks within several of the distribution
5 centers that deal with controlled substances at
6 Walgreens?
7    A.  Yes.
8    Q.  And, again, this is that same e-mail
9 where the subject line is "Oxycodone no longer
10 being ordered via PDQ," correct?
11   A.  Yes.
12   Q.  And the PDQ is what you had told us was
13 kind of an emergency order, an order that was
14 supposed to be filled within a day?
15   A.  Yes.
16   Q.  And if we go to the next page and see
17 the e-mail, it says, "This is to inform you that
18 effective today the attached oxycodone items can no
19 longer be ordered via the PDQ process."
20        Correct?
21   MR. LEVINE:  Objection; asked and answered.
22 BY THE WITNESS:
23   A.  Yes.  That's what it says.
24 BY MR. GADDY:

Page 206

1    Q.   And you recognize this to be the same
2 original e-mail that we looked at right before
3 lunch?
4    A.   Yes, it is.
5    Q.   Okay.  Let's flip backwards, if you
6 don't mind, and do you see where Deb Bish in the
7 next e-mail up forwards this to it looks like a
8 list serve for all the pharmacy supervisors?
9    A.   That's what it looks like, yes.
10   Q.   Okay.  And then if you go up one more
11 e-mail, it looks like an individual named Kermit
12 Crawford jumps into the chain and sends this e-mail
13 to some other folks.
14        Do you see that?
15   A.   Yes.
16   Q.   Do you know who Kermit Crawford is?
17   A.   I heard the name a while back, but I
18 don't know who he is, no.
19   Q.   Okay.  Do you see the signature block
20 for his e-mail there?
21   A.   Yes.
22   Q.   What does it indicate that his position
23 is within Walgreens?
24   A.   President, pharmacy, health and

Page 207

1 wellness.
2    Q.   And what he writes to two individuals,
3 it looks like it's Suzanne Hansen and David
4 Lovejoy.  Do you know who either of those
5 individuals are?
6    A.   No, I do not.
7    Q.   Well, he writes to them and he says, "We
8 discussed this and I was not under the impression
9 this was a done deal.  Concerned we are 'all or
10 none.'  We have to do what's right for patients
11 also."
12        Do you see that?
13   A.   Yes, I see it.
14   Q.   From this e-mail chain do you understand
15 Mr. Crawford to be questioning the process that you
16 were asked to implement and that you did in fact
17 implement of eliminating the PDQ option for
18 oxycodone?
19   MR. LEVINE:  Objection; lacks foundation.
20 BY THE WITNESS:
21   A.   I can't tell that from this particular
22 e-mail, no.
23 BY MR. GADDY:
24   Q.   Okay.  Well, let's look to the next

Page 208

1 e-mail above, and you got to turn to the first
2 page and look at the bottom to see -- to see who
3 actually sent it.  Do you see that?
4    A.   Yes, I do.
5    Q.   And it looks like the follow-up e-mail
6 is from David Lovejoy who was one of the people
7 that Mr. Crawford sent his e-mail to, right?
8    A.   Yes.
9    Q.   And it looks like he responds to
10 Mr. Crawford, also Ms. Hansen and he copies Rex
11 Swords on his response, correct?
12   A.   Yes.
13   Q.   And Mr. Lovejoy writes, "Kermit, the
14 group did discuss system limitations versus store
15 needs for patients.  If I recall correctly, the
16 line limits apply to each order individually, not
17 as a whole or in cumulative."
18        Do you see that?
19   A.   Yes, I see that.
20   Q.   And is that your understanding of the
21 line limits, that they apply to each order
22 individually?
23   MR. LEVINE:  Objection; lacks foundation.
24 BY THE WITNESS:

Page 209

1    A.   I'm not sure what they mean by that.
2 BY MR. GADDY:
3    Q.   It says, "Therefore, a store could hit
4 the line limit on their weekly C-II WHS order and
5 then" -- do you know what WHS means?
6    A.   Warehouse order.
7    Q.   Okay.  It says, "Therefore, a store
8 could hit the line limit on their weekly C-II
9 warehouse order and then they could create a PDQ
10 order on a daily basis and far exceed the monthly
11 line limit total that we were trying to enforce."
12        Do you see that?
13   A.   I see that.
14   Q.   What does that sentence mean to you?
15   MR. LEVINE:  Objection; lacks foundation.
16 BY THE WITNESS:
17   A.   I'm not sure what they're talking about
18 right now.
19 BY MR. GADDY:
20   Q.   Okay.  Well, we've talked about a little
21 bit about the concept of line limit, right?
22   A.   Yes.
23   Q.   And I think the example that you gave to
24 me was that if a line limit was 12, that all that a

Page 210

1 store could order for whatever that time period
2 was, whether it was a week or a month, all that
3 that store could order was 12, correct?
4     MR. LEVINE: Objection to form.
5 BY THE WITNESS:
6     A. Yeah.
7 BY MR. GADDY:
8     Q. Okay. And, so, what Mr. Lovejoy is
9 saying here is that a store could hit the line
10 limit on their weekly C-II warehouse order and then
11 they could create a PDQ, that's the emergency
12 orders, the one-day fill orders, right?
13     MR. LEVINE: Object. Just asking what that
14 is, what a PDQ is?
15     MR. GADDY: Yes.
16 BY THE WITNESS:
17     A. He is asking what a PDQ is?
18 BY MR. GADDY:
19     Q. Let me start over.
20     A. Okay. I'm sorry.
21     Q. Yeah, no problem. What Mr. Lovejoy says
22 here, he says, "A store could hit the line limit on
23 their weekly C-II warehouse order."
24     Do you see that?

Page 211

1     A. Yes, I see that.
2     Q. In the example that you gave earlier,
3 that would mean that if a line limit for OxyContin
4 was 12, that a store has hit their line limit, they
5 have ordered their 12 bottles of OxyContin, right?
6     MR. LEVINE: Objection to form, misstates
7 testimony.
8 BY THE WITNESS:
9     A. Yes.
10 BY MR. GADDY:
11     Q. And it says, "They could then create a
12 PDQ order on a daily basis and far exceed the
13 monthly line limit that we were trying to enforce."
14     Do you see that?
15     A. I see that.
16     Q. Okay. So, what Mr. Lovejoy is
17 indicating is that a store could hit their line
18 limit, the 12 bottles of OxyContin in your example,
19 and then after hitting that limit, they could then
20 go in and create these PDQ or emergency orders and,
21 according to Mr. Lovejoy, far exceed the monthly
22 line total that Walgreens was trying to enforce.
23     Do you see that?
24     MR. LEVINE: Objection; lacks foundation.

Page 212

1 BY THE WITNESS:
2     A. I'm not sure what he really means by
3 that, no.
4 BY MR. GADDY:
5     Q. Well, regardless of what you can
6 determine Mr. Lovejoy means, you understand that
7 the project that you were asked to help with and
8 the solution that you were asked to implement was
9 to prevent oxycodone from being able to be ordered
10 on a PDQ basis, right?
11     A. Yes.
12     Q. And it would be typical or standard for
13 you to be asked to create or implement solutions to
14 address a problem that Walgreens business is
15 looking to correct. Is that fair?
16     MR. LEVINE: Objection; asked and answered.
17 BY THE WITNESS:
18     A. We would take information from a
19 business partner and write code and programs to
20 solve that, that request.
21 BY MR. GADDY:
22     Q. Sure. So, they have a problem. They
23 have something that they want addressed. They ask
24 you to write the code that makes the solution,

Page 213

1 correct?
2     A. Yes.
3     Q. And in this case the solution that they
4 needed was to prevent the stores from being able to
5 order oxycodone on a PDQ or emergency basis, right?
6     A. That is what they asked for, yes.
7     Q. If you go to the next e-mail up in the
8 chain, it looks like Rex Swords chimes in, correct?
9     A. Yes.
10     Q. And this is on the first page of the
11 document?
12     A. Yes.
13     Q. And Rex says, "Correct. PDQ orders did
14 not aggregate to the monthly cumulative limits,
15 although line limits are still imposed on the
16 individual order. Therefore, without this edit,
17 stores could order PDQ every day for Oxy and as
18 long as they didn't trip the line order limit edit,
19 they would receive the product and end up exceeding
20 our monthly cumulative order limits."
21     Do you see that?
22     A. Yes, I see it.
23     Q. And as a result of that issue or hole or
24 glitch in the system, you were asked to implement

Page 214

1  the solution of preventing stores from being
2  ordering oxycodone on a PDQ or emergency basis,
3  correct?
4      MR. LEVINE:  Objection to form, foundation.
5  BY THE WITNESS:
6      A.  That was our request, yes.
7  BY MR. GADDY:
8      Q.  It goes on in the next sentence to say,
9  "As Dave mentions, store still have access to
10  product if needed outside their normal ordering
11  process using the Controlled Substance Override
12  form on Storenet."
13      Do you see that?
14      A.  Yes, I see that.
15      Q.  Do you recognize the term "Storenet"?
16      A.  I know what Storenet is, yes.
17      Q.  Okay.  What's Storenet?
18      A.  It's the store Internet.
19      Q.  Is that like a -- is that like the
20  intranet?
21      A.  Intranet I guess is the correct.
22      Q.  With an A?
23      A.  Yes.
24      Q.  Intra.  Okay.  And so that's a, you

Page 215

1  know, essentially a private Internet system or a
2  private intranet network that only Walgreens stores
3  are able to connect to?
4      A.  Yes.
5      Q.  And, so, this indicates that what
6  Mr. Swords has indicated here is even though you've
7  deployed your solution of preventing stores from
8  ordering oxycodone on a PDQ basis, that stores
9  still have access to product if they need it using
10  the Controlled Substance Override form, correct?
11      A.  That's what's indicated in the e-mail.
12      Q.  I'm going to show you what I'm going to
13  mark as Peterson 22, which is another e-mail --
14  e-mail chain that describes some issues that some
15  folks were having with the PDQ system and ask you
16  if you're familiar with these issues.  Okay?
17      A.  Yes.
18      (WHEREUPON, a certain document was
19      marked as Walgreens-Peterson
20      Exhibit No. 22: 4/14/11 e-mail
21      string; WAGFLDEA00001032 -
22      00001033.)
23  BY MR. GADDY:
24      Q.  And this one prints a little bit weird,

Page 216

1  so the format is different than the others.
2      But if you see at about two-thirds of
3  the way down the page, what we see is the first
4  e-mail, which is ultimately going to be the
5  substance of it, is going to be on the second page;
6  but this is an e-mail from Kristine Atwell, and
7  over on the right-hand side you see that the e-mail
8  is going to Barb Martin.
9      Do you see that?
10      A.  Yes.
11      Q.  Okay.  And the date of this e-mail is
12  April 14, 2011.
13      Do you see that?
14      A.  Yes.
15      Q.  And if you flip the page, the subject is
16  a particular store number that's 6997?
17      A.  Yes.
18      Q.  And in the body of the e-mail it says,
19  "Store 6997 is manipulating the AS400 ordering
20  system to gain more bottles of WIC 682971 and
21  682972."
22      Do you see that?
23      A.  Yes.
24      Q.  And do you recognize those numbers to

Page 217

1  be -- relate to oxycodone products?
2      A.  No, I do not.
3      Q.  Okay.  What is the AS400 ordering
4  system?
5      A.  That's a store ordering system.
6      Q.  Okay.  Is that what the pharmacies
7  utilize to order product?
8      A.  They utilize that, yes.
9      Q.  It says, "The store is manipulating the
10  system to gain more bottles.  They have told us
11  they create a 'PDQ' but before it processes they go
12  back in and adjust the quantity from 9 to a greater
13  amount.  If you look at the history you will see
14  the system manipulation.  How does the system allow
15  this to happen when a PDQ should only be for 9 or
16  less?"
17      Do you see that?
18      A.  I see that, yes.
19      Q.  During your time in the supply and
20  logistics IT department, did anybody ever bring to
21  you this particular issue -- excuse me -- bring to
22  your attention this particular issue?
23      A.  No, I do not remember that.
24      Q.  Do you have any memory of ever being

Page 218

1 made aware of the fact that there were stores that
2 were manipulating the PDQ process to order more
3 than they were supposed to be able to get with that
4 process?
5     A.   No.
6     Q.   Are you aware of you or anybody else
7 within your department or any IT department within
8 Walgreens who was asked to address an issue such as
9 this where individual stores, individual Walgreens
10 stores, were able to manipulate the PDQ order
11 screen to order more bottles on an emergency basis
12 than they were supposed to?
13     MR. LEVINE:  Objection to form and lacks
14 foundation beyond him.
15 BY THE WITNESS:
16     A.   I do not remember, no.
17 BY MR. GADDY:
18     Q.   I will show you what we will mark as
19 Peterson 23.
20         (WHEREUPON, a certain document was
21         marked Walgreens-Peterson Exhibit
22         No. 23:  10/5/12 e-mail string;
23         WAGMDL00127695.)
24 BY MR. GADDY:

Page 219

1     Q.   We've seen a couple documents that talk
2 about the override request system.  Do you recall
3 that phrase or that term generally?
4     MR. LEVINE:  Objection to form.
5 BY THE WITNESS:
6     A.   Not really, no.
7 BY MR. GADDY:
8     Q.   Okay.  Showing you what's marked as
9 Peterson 23.  It's going to be P-WAG-2010.
10         And if you look at the bottom of the
11 page, it looks like this was an e-mail received by
12 you and it looks like the e-mail address that it
13 was received from is DR-Rx 14340?
14     A.   Yes.
15     Q.   Does that mean anything to you?
16     A.   It would be a store number.
17     Q.   Okay.
18     A.   Rx department.
19     Q.   And you get an e-mail that says, "Hi
20 Doug, please how does the current control drug
21 override process work?  How do we order for
22 oxycodone?"
23         Do you see that?
24     A.   Yes.

Page 220

1     Q.   Is this a typical e-mail that you would
2 get from different stores?
3     A.   No, it is not.
4     Q.   Okay.  It's signed "Mark."  Do you know
5 who that is?
6     A.   No, I do not.
7     Q.   Do you know why this individual would
8 have been contacting you?
9     A.   No, I'm not sure why they would.
10     Q.   Okay.  Do you remember if you ever got
11 any other e-mails similar to this asking about
12 either the override process or the PDQ process or
13 the line limit process from individual stores?
14     A.   I don't remember, no.
15     Q.   It looks like in the next e-mail up you
16 say you're not -- you forward -- I guess what you
17 do is you forward the e-mail to John Merritello,
18 right?
19     A.   Yes.
20     Q.   And you tell John, you say, "I'm not
21 sure of the override process and was wondering if
22 you could help this store or know who can."
23         And John writes back to you saying that
24 the store should contact a particular e-mail

Page 221

1 address, RxInventory@Walgreens.com, correct?
2     A.   That's what it says, yes.
3     Q.   Do you know what that e-mail address,
4 who that goes to?
5     A.   No, I do not.
6     Q.   Ever in your time at Walgreens were you
7 ever asked to do any work whatsoever on the
8 override request forms as it related to controlled
9 substances?
10     A.   No.
11     Q.   I'm going to show you a example of one
12 that we have and just make sure it doesn't refresh
13 your memory or ring any bells.
14         I'm going to mark this as Peterson 24.
15 It's going to be P-WAG-2120.
16         (WHEREUPON, a certain document was
17         marked Walgreens-Peterson Exhibit
18         No. 24:  8/15/12 e-mail string;
19         WAGMDL0000107473 - 00107474.)
20 BY MR. GADDY:
21     Q.   And if you look at this, start about
22 halfway down the first page, and you will see the
23 first e-mail in the chain.  Looks like it's from an
24 individual Satinder Sandhu.  Do you see that?

Page 222

1    A.   Yes.
2    Q.   It looks like it goes to that
3  Rx inventory e-mail address that we just saw John
4  Merritello give you?
5    A.   Yes.
6    Q.   The subject is "Controlled Substance
7  Order Quantity Override Form."
8        Do you see that?
9    A.   Yes.
10   Q.   Prior to looking at this right now, did
11 you know that such a form existed?
12   A.   No, I did not.
13   Q.   Okay.  And it looks like some of the
14 information that's given there is the store number,
15 the district number.  What would the DM and the
16 DLP -- do you know what those acronyms stand for?
17   A.   No, I'm not sure.
18   Q.   And as you go a little bit farther down,
19 you see it lists the pharmacy manager and it also
20 lists the pharmacy supervisor.
21       Do you see that?
22   A.   Yes, I do.
23   Q.   And then as you go down and turn the
24 page, it looks like they list the drug that they

Page 223

1  are asking for, the size of the package and the
2  number of bottles that they're asking for.
3        Do you see that?
4    A.   Yes, I see that.
5    Q.   And this particular one, they're asking
6  for ten bottles of hydrocodone?
7    A.   That's what it says on the document,
8  yes.
9    Q.   Okay.  And then it looks like it asked
10 for a reason for the -- for the override request.
11       Do you see that?
12   A.   Yes.
13   Q.   And it looks like here the pharmacy
14 supervisor indicated "Other."  And then it looks
15 like the next query is "Provide a detailed
16 explanation of this request including the Rx sales
17 history, 13 week item movement, current on hand
18 count, inventory adjustments, et cetera."
19       Do you see that?
20   A.   Yes.
21   Q.   Do you recall being asked at all to
22 generate a program that would allow pharmacy
23 supervisors to fill out such a form either on the
24 intranet or in hard copy format?

Page 224

1    A.   No.
2    Q.   Are you aware of anybody else within the
3  IT department being asked to do a task like this?
4    A.   It would be a store team, so probably
5  Steve Bamberg.
6    Q.   Do you specifically remember Steve
7  talking about this project or are you just saying
8  because it's a store function it would have fallen
9  under his purview?
10   A.   Because it's a store function, it would
11 fall under his.
12   Q.   Okay.  And what's indicated here in that
13 last -- to that last question by the pharmacy
14 supervisor is, "The store's current on hand count
15 is 1907.  Last 13 week average receipt is about 12
16 to 13 bottles per week and the sale is about 17 to
17 18 bottles per week.  There is only net positive
18 adjustment of 536 tablets.  The store serves high
19 workers' comp patients and serves several pain
20 management clinics.  All prescriptions are being
21 dispensed by following GFD policy."
22       Do you see that?
23   A.   Yes.
24   Q.   Do you know what GFD means?

Page 225

1    A.   No, I do not.
2    Q.   Okay.  Do you know whether or not there
3  was any information considered in deciding whether
4  to approve or deny this override request other than
5  what's written right here or do you not know at
6  all?
7    A.   I don't know anything about this --
8    Q.   Okay.
9    A.   -- override request.
10   Q.   Okay.  If we go back to the first page,
11 regardless, we see the e-mail from Steven Mills at
12 the top of the page that the order is approved,
13 correct?
14   A.   Yes.
15   Q.   And I had a couple more of those,
16 Mr. Peterson, but since you don't know about them,
17 I'll just skip those.
18       I think you told me this morning that
19 you have an understanding that currently the jobber
20 that handles at least the bulk of Walgreens
21 controlled substance distribution is
22 AmerisourceBergen, correct?
23   A.   Yes.
24   Q.   And what we know about kind of the

Page 226

1 timeline of Walgreens distributing or -- strike
2 that.
3      What we know from what we've looked at
4 this morning up until now about the timeline of
5 Walgreens stores being supplied controlled
6 substances is beginning in approximately the early
7 2000s, Walgreens began distributing to their own
8 stores, correct?
9    A.   That is correct.
10    Q.   And that was a process that you helped
11 bring online?
12    A.   Yes.
13    Q.   We know that in, at least in the 2012
14 range and probably earlier than that, that
15 Walgreens would sometimes utilize jobbers or
16 outside vendors, including Cardinal Health, to help
17 them fill some of their controlled substance
18 orders, correct?
19    A.   Yes, they would.
20    Q.   Okay.  And we've looked at some
21 documents today that indicated that Walgreens'
22 Jupiter, Florida distribution facility was shut
23 down by the DEA in late 2012 and that the Walgreens
24 Perrysburg distribution center was beginning to be

Page 227

1 investigated in early 2013, correct?
2    A.   Yes, we reviewed that this morning.
3    Q.   Okay.  And at the time we looked at some
4 documents where the bulk of the distribution
5 responsibilities were being shifted from those
6 Walgreens facilities, Jupiter and Perrysburg, over
7 to Cardinal Health and they were taking on a lot of
8 that distribution, correct?
9    MR. LEVINE:  Objection; lacks foundation.
10 BY THE WITNESS:
11    A.   I don't remember that but...
12 BY MR. GADDY:
13    Q.   Well, you remember that Cardinal Health
14 was going to distribute to a lot of the stores but
15 there were several stores, I think from Perrysburg
16 there were about 367, that they red-flagged and
17 said they wouldn't distribute to them?
18    A.   I remember that from this morning, yes.
19    Q.   Okay.  And you have an understanding
20 that currently Walgreens is supplied their
21 controlled substances by AmerisourceBergen
22 primarily?
23    A.   Yes.
24    Q.   I'm going to show you what I'll mark as

Page 228

1 Peterson 25.  This is P-WAG-2063.
2      (WHEREUPON, a certain document was
3      marked Walgreens-Peterson Exhibit
4      No. 25:  4/3/13 e-mail string with
5      attachment; WAGMDL0000525116 -
6      00525119.)
7 BY MR. GADDY:
8    Q.   And if you look at the top of this page,
9 you see this is an e-mail from Vinayak on April 3,
10 2013 that he sends to both Brian Amend and you?
11    A.   Yes.
12    Q.   And the subject is the "C-II transition
13 plan document."
14      Do you see that?
15    A.   Yes.
16    Q.   And there's also an attachment to that
17 document.  Let's turn the page and look at that
18 attachment.
19      Do you recall getting this e-mail and
20 attachment?
21    A.   I don't recall it, no.
22    Q.   Okay.  The title of the attachment is
23 "C-II Walgreens AmerisourceBergen Transition Plan."
24      Do you see that?

Page 229

1    A.   Yes, I do.
2    Q.   Do you recall how you first found out
3 that Walgreens was going to transition from
4 primarily utilizing Cardinal Health to primarily
5 utilizing AmerisourceBergen?
6    A.   No, I don't remember when I heard that.
7    Q.   Regardless, you see that this -- you
8 were sent this e-mail back in April of 2013
9 announcing or at least giving you the timeline for
10 the -- for the transition plan?
11    A.   Yes.
12    Q.   And what this indicates is that in
13 April of 2013 the Jupiter C-II was going to move to
14 AmeriSource from its current suppliers, correct?
15    A.   Yes, that's what it says, yes.
16    Q.   In May of '13 Perrysburg is going to
17 move to AmeriSource from its current suppliers,
18 correct?
19    A.   Yes, that's what it says.
20    Q.   And then in September, Woodland, which
21 is the third and final Walgreens distribution
22 center, is going to move from -- from its current
23 folks to AmerisourceBergen, correct?
24    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.   Is this consistent with your memory
2 about approximately when Walgreens not only moved
3 to AmerisourceBergen as their primary supplier but
4 kind of continues and starts the process of phasing
5 out Walgreens' actions as a distributor of these
6 controlled substances?
7    A.   Yes, it's about the same time frame.
8    Q.   And as we sit here in 2018, it's your
9 understanding that AmerisourceBergen continues to
10 be the primary distributor of controlled substances
11 for Walgreens?
12    A.   Yes.
13    Q.   Let me show you what I'm going to mark
14 as Peterson 26.  This is P-WAG-2032.
15         (WHEREUPON, a certain document was
16          marked as Walgreens-Peterson
17          Exhibit No. 26:  4/4/13 e-mail
18          string; WAGMDL00358567 -00358570.)
19 BY MR. GADDY:
20    Q.   And if you flip to the, it looks like
21 it's the second page and about halfway down the
22 page or, excuse me, about three-fourths of the way
23 down the page, there is an e-mail from it looks
24 like a John Trippe or John Trippe.

Page 231

1         Do you see that?
2    A.   Yes.  Sorry.  Yes.
3    Q.   And it looks like he has an
4 AmerisourceBergen e-mail address, correct?
5    A.   Yes, it does.
6    Q.   And it looks like he's sending this to
7 Sue Thoss.  Do you see that?
8    A.   Yes.
9    Q.   And you know who Sue is?
10    A.   Yes, I do.
11    Q.   And I think Sue is the one that we saw
12 earlier this morning that forwarded you an e-mail
13 telling you that the DEA had come into the
14 Perrysburg distribution center with subpoenas,
15 right?
16    A.   Yes, I remember that from this morning.
17    Q.   And the subject line of this e-mail is
18 "C-II customer list WAG Perrysburg start 4.9.13."
19         Do you see that?
20    A.   Yes.
21    Q.   And John says, "Sue, the attached
22 list" -- I think what he is trying to say is "The
23 attached list of stores assigned to the April 9th
24 Go-live date.  It's the original 225 plus 3 of the

Page 232

1 4 hospice locations.  The fourth hospice location
2 is still serviced out of Woodland and we haven't
3 loaded those stores yet.  Denny is aware and plans
4 to send me the store information."
5         Do you see that?
6    A.   Yes, I do.
7    Q.   It looks like in the next e-mail up, Sue
8 then forwards that e-mail to Deb Bish who was the
9 C-II manager at the Perrysburg distribution center,
10 correct?
11         Just above it.  In the middle.
12    A.   Oh, sorry.  Yes.
13    Q.   Yeah, sorry.
14    A.   Yes, I see it now.
15    Q.   So, Sue forwards that to Deb Bish,
16 right?
17    A.   Yes.
18    Q.   And she was in charge of the C-II
19 distribution function at Perrysburg, right?
20    A.   That's my memory, yes.
21    Q.   It also goes to Steve Kneller?
22    A.   Yes.
23    Q.   Do you know who Steve Kneller is?  I
24 don't think we've talked about him yet.

Page 233

1    A.   He was the distribution manager at the
2 time for Perrysburg.
3    Q.   Okay.  It also goes to you, correct?
4    A.   Yes.
5    Q.   And it goes to Vinayak?
6    A.   Yes.
7    Q.   I don't know that you have told me what
8 Vinayak does yet.  What was his role?
9    A.   At this time he was my director.
10    Q.   Okay.  So, he had Brian Amend's
11 position?
12    A.   That Brian has now today, yes.
13    Q.   Gotcha.  Okay.  So, at this time was he
14 above Brian?
15    A.   Yes.
16    Q.   So, it would have been Vinayak, Brian
17 and then you, is that right?
18    A.   At this time Brian and I were at the
19 same level.
20    Q.   Gotcha.  Thank you.
21         So, anyway, back to what we were talking
22 about in this e-mail here.
23         Sue forwards this e-mail to you that has
24 the list of customers that AmerisourceBergen is

Page 234

1 planning on, it looks like, going live with on
2 April 9, correct?
3     A.   Yes.
4     Q.   And a little bit higher up on the
5 page you respond, correct?
6     A.   Yes, I did.
7     Q.   And you say, "We still have the item
8 restrictions, based on John Merritello's list, in
9 place at the C-II distribution center for these
10 stores.  Do we need to remove that restriction?"
11       Do you see that?
12     A.   Yes.
13     Q.   Do you know what we're talking about
14 there or what you're talking about there I should
15 say?
16     A.   Yes, I do know.
17     Q.   Okay.  Explain it to me, please.
18     A.   We -- we had restrictions on certain
19 stores.  Those stores were still in our system and
20 if we didn't do anything with it, we would not be
21 sending orders to them.  So...
22     Q.   Okay.  So --
23     A.   So, the question was do we want to
24 remove it or not.

Page 235

1     Q.   Okay.  So, you had put restrictions on
2 these stores.  And does that go back to the -- to
3 the stores that Cardinal Health had red-flagged
4 that you had put the restrictions on so that those
5 orders wouldn't go to Cardinal Health?
6     A.   Those are the only ones I'm aware of,
7 yes.
8     Q.   So, that would be what you're talking
9 about here?
10     A.   Yes.
11     Q.   And if we flip the page, at the bottom
12 of the page we see that Denny chimes into the
13 conversation and says, "Once the stores are
14 transitioned to either ABC or ANDA, then yes."
15       Do you see that?
16     A.   Yes, I do.
17     Q.   And is ANDA another jobber that you all
18 have utilized from time to time?
19     A.   At the time, yes, it was.
20     Q.   Okay.
21     A.   I didn't remember that, though.
22     Q.   Okay.
23     A.   I just saw it now.  But, yes, we did
24 have that.

Page 236

1     Q.   Okay.
2     A.   It was another jobber.
3     Q.   Okay.  So Denny says, yes, "Once the
4 stores are transitioned to either ABA or ANDA, then
5 yes," meaning that he would want you to remove the
6 restriction, correct?
7     A.   Yes.
8     Q.   It says, "The," III to Vs, "C35s will
9 still need to be blocked from going to Cardinal,
10 either on a warehouse order or from a PFL/OOS, but
11 that file is different from yours."
12       Do you see that?
13     A.   Yes, I do.
14     Q.   So, all that you were in charge of was
15 the C-IIs?
16     A.   Yes.
17     Q.   If you go back up to your response in
18 the next e-mail up in the chain, you say, "Thanks,
19 since the restricted stores are all moved to
20 AmerisourceBergen starting Tuesday, April 9, 2013,
21 we will remove the stores from the C-II restricted
22 item file."
23       Correct?
24     A.   Yes.

Page 237

1     Q.   So, so that we have the chronology
2 correct with these stores, these were stores that
3 Cardinal Health had red-flagged and was not
4 shipping controlled substances to, correct?
5     MR. LEVINE:  Objection; asked and answered.
6 BY THE WITNESS:
7     A.   I'm assuming based on what we have
8 talked about previous, yes.
9 BY MR. GADDY:
10     Q.   Okay.  And to make that happen, to make
11 the orders not go to Cardinal Health, you had had
12 to put restrictions on them?
13     A.   Yes, we did put restrictions on.
14     Q.   And what you're contemplating here is
15 removing those restrictions so that those stores
16 can now be serviced by AmerisourceBergen?
17     A.   We were asked to remove those stores
18 from a file and, yes, we did do that.
19     Q.   Okay.  And, so, your understanding was
20 that those orders would now be cleared to go to
21 AmerisourceBergen so that AmerisourceBergen could
22 fill those orders?
23     A.   Yes.
24     Q.   During -- during the course of the

Page 238

1 morning I've been asking you about several folks
2 that I see on e-mails, just ask if you know them or
3 know who they are. And I've asked you about
4 several members of the Rx integrity team, but I
5 think one person I neglected to ask you about was
6 Ed Bratton. Do you know who that is?
7    A.   Yes, I do.
8    Q.   Okay. How do you know Ed Bratton?
9    A.   I met him in a meeting the other --
10 about a week ago.
11    Q.   Okay. You have an understanding that
12 Ed Bratton had to provide some testimony on behalf
13 of Walgreens as a whole and that he was kind of
14 doing some independent research to kind of learn
15 about Walgreens' historical policies and procedures
16 relating to controlled substances?
17    A.   Yes.
18    Q.   Okay. And to help Mr. Bratton get ready
19 to provide that testimony, is that what you had a
20 conversation with him about?
21    A.   Yes.
22    Q.   What topic in particular as it relates
23 to controlled substances policies and procedures
24 did you talk with Mr. Bratton about?

Page 239

1    A.   We talked about the excessive order
2 query.
3    Q.   Okay. Was there any other topic related
4 to controlled substances that you talked with
5 Mr. Bratton about?
6    A.   No.
7    Q.   Did you have any conversation with
8 Mr. Bratton about line limit reports?
9    A.   No.
10    Q.   Would you have known anything about the
11 line limit reports?
12    A.   No, I wouldn't have.
13    Q.   Would the line limit reports have been
14 something done by a team such as yours on the
15 distribution center side or a team such Steve
16 Bamberg's on the store side?
17    A.   Steve Bamberg's on the store side.
18    Q.   Do you know as far as the line limit
19 reports who is charged with setting the line
20 limits?
21    A.   No, I do not.
22    Q.   Do you know what criteria is involved in
23 setting a line limit?
24    A.   No, I do not.

Page 240

1    Q.   Do you know any of the factors that are
2 considered in setting a line limit?
3    A.   No, I do not.
4    Q.   We looked at an e-mail earlier, and I
5 can go back through and find it if we need to, but
6 it -- the e-mail started out and said, "We
7 instituted line limits for controlled substances in
8 June of 2012." Do you remember that?
9    A.   Yes, I remember something like that,
10 yes.
11    Q.   Okay. Do you -- does that mean anything
12 to you when you read that? Do you think yes,
13 that's when I remember line limits going into
14 effect or do you just take the words as they're
15 written?
16    A.   I'm taking the words as they're written.
17    Q.   If you didn't have that in front of you
18 and I asked you when line limits went into effect,
19 would you have been able to give me any answer at
20 all?
21    A.   No, I would not.
22    Q.   As it relates to controlled substances,
23 I think we have seen that you have gotten
24 directions or requests for solutions from Denny and

Page 241

1 John Merritello, right?
2    A.   Yes.
3    Q.   Who else on the business side, and I'm
4 just going back to, say, 2010, but who else on the
5 business side have you gotten direction or a
6 request from related to controlled substances?
7    A.   Those are the only two that I can really
8 think of right now that would -- I would have
9 talked to.
10    Q.   Okay. So, I think you told me earlier,
11 I wrote it down somewhere, but that you've received
12 orders from anywhere from 50 to 60 folks on the
13 business side over the course of your career,
14 right?
15    A.   Yes.
16    Q.   But as far as going back to 2010, as far
17 as folks on the business side who gave you orders
18 or asked you to implement solutions or protocols
19 related to controlled substances, you would limit
20 that to Denny and John?
21    A.   Yes, I would.
22    Q.   I will show you what I will mark as
23 Peterson 27. It's P-WAG-2014.
24         (WHEREUPON, a certain document was

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    marked Walgreens-Peterson Exhibit
2    No. 27: 10/5/12 e-mail string with
3    attachment; WAGMDL00278108 -
4    00278111.)
5  BY MR. GADDY:
6    Q.   Let's flip to the second page, please,
7  and go down to the bottom of the page so we can see
8  the first e-mail in this chain.
9    A.   Yes.
10   Q.   And, again, we got, to get our bearing,
11 this is -- this is an e-mail from October of 2012,
12 right?
13   A.   Yes.
14   Q.   So, this is going to be, to kind of put
15 it in context with some other things we have been
16 talking about today, this is after the
17 September 2012 Order to Show Cause to the Jupiter
18 distribution center but before the Perrysburg stuff
19 starts.  Does that sound right to you in context?
20   A.   Yes, sounds about right.
21   Q.   So, at this point in time, Walgreens is
22 still working with and utilizing Cardinal Health as
23 a distributor -- as a jobber I should say?
24   A.   It's very possible, yes.  I don't

Page 243

1  remember exactly, though.
2    Q.   I understand.  And it looks like this
3  e-mail is from Angie Thomas and she has a Cardinal
4  Health e-mail address?
5    A.   Yes.
6    Q.   And she writes to Denny and it looks
7  like Barb Martin is copied, correct?
8    A.   Yes.
9    Q.   And the subject line is "Walgreens Line
10 Limit Data for Blanks."
11       Do you see that?
12   A.   Yes, I do.
13   Q.   Does that subject line in and of itself
14 mean anything to you?
15   A.   No, it does not.
16   Q.   Do you know what is meant by "for
17 blanks"?
18   A.   No.
19   Q.   If you turn the page, we see the body of
20 the e-mail and Angie writes, "Denny, I just got off
21 the phone with Dave Reiter and he suggested
22 reaching out to you directly with the examples of
23 orders exceeding line limits and the original usage
24 provided.  You will also receive the actual blank

Page 244

1  for five examples that we pulled.  Please give me a
2  call when you're available to walk through the
3  example."
4        Do you see that?
5    A.   Yes, I see that.
6    Q.   Okay.  And if you flip back to the last
7  page and go up to the next e-mail in the chain, it
8  looks like Jenny forwards this -- excuse me.  It
9  looks like Denny forwards this to John Merritello.
10       Do you see that?
11   A.   Yes.
12   Q.   And if you flip the page one more time,
13 it looks like John sends it along to you.
14       Do you see that?
15   A.   Yes, I do.
16   Q.   Okay.  Do you recall this e-mail or this
17 issue that you were asked to work on by John
18 Merritello?
19   A.   No, I do not recall it.
20   Q.   John writes, "Doug - looks like the
21 entire quantity is going through to Cardinal for
22 C-II.  I do see an ISN reason code 31 but Cardinal
23 is showing we are transmitting the entire quantity.
24 The store is showing 7 for an order.  Can you

Page 245

1  check?"
2        Did I read that right?
3    A.   Yes.
4    Q.   Can you -- there are a couple of
5  acronyms or codes in there that don't mean anything
6  to me.
7        Can you explain to me what John is
8  saying in that couple of sentences?
9    A.   It appears that we wrote an insufficient
10 notice for reason code of 31, which I'm not 100%
11 sure what it was, but we still were transmitting
12 the quantity to Cardinal.
13   Q.   Okay.  Flip to the last page for me, if
14 you don't mind, which is going to be the report or
15 the attachment.  Do you see that?
16   A.   Yes, I see it.
17   Q.   And if you look at the top entry level,
18 I think this is the one that John referred to,
19 Walgreens drug, it looks like, store is 5338.
20       Do you see that?
21   A.   Yes.
22   Q.   And it has a customer number, correct?
23   A.   Yes.
24   Q.   And DC, is that a distribution center

Page 246

1 number?
2    A.  Yes.
3    Q.  And then it has a CIN and then a
4 description and it looks like for the first line
5 they are talking about Methadone, correct?
6    A.  That's what the document says, yes.
7    Q.  And as you continue over to the right,
8 you see the GCN, the invoice date, the blank ID,
9 the invoice number, the order number, and then you
10 see the original order quantity.
11     Do you see that?
12    A.  Yes, I do.
13    Q.  And, so, for this particular store for
14 this particular product they ordered 7.
15     Do you see that?
16    A.  Yes.
17    Q.  And it says, the next column is the
18 shipped quantity, correct?
19    A.  Yes.
20    Q.  And how many was shipped?
21    A.  It says 7.
22    Q.  Okay. And if we go to the next column,
23 it indicates Walgreens line limit.
24     Do you see that?

Page 247

1    A.  Yes, I do.
2    Q.  And the line limit is only two for that
3 product, correct?
4    A.  Yes.
5    Q.  So, does this document indicate that
6 this particular store was shipped seven units of
7 this particular drug, Methadone, which is over and
8 above the two, which is the line limit?
9    A.  The form would indicate that, yes.
10    Q.  Okay. And just to give you one more
11 example, if you go down to the last entry on the
12 page do you see there is an entry for Walgreen
13 store 10204?
14    A.  Yes.
15    Q.  And that that particular entry is
16 related to oxycodone?
17    A.  Yes.
18    Q.  And next to there it's indicated that
19 that's a Schedule II controlled substance?
20    A.  Yes, it does.
21    Q.  And if we follow over to the columns on
22 the right-hand side of the chart, you see that the
23 order quantity that was requested is 24, correct?
24    A.  Yes.

Page 248

1    Q.  And the quantity that was shipped is
2 also 24, correct?
3    A.  Yes.
4    Q.  And what was the line limit?
5    A.  17.
6    Q.  So, this document here is indicating
7 that this store was allowed to order oxycodone in
8 excess of its line limit?
9    A.  That's what the form would indicate, but
10 I'm not quite sure of this document and where
11 they're getting line limits. So, I can't conclude
12 that.
13    Q.  I understand that. But you see that
14 that's what the document indicates?
15    A.  That's what the document indicates, yes.
16    Q.  Okay. And if we go back to the first
17 page of the e-mail, tell me if I'm wrong, but it
18 looks like John Merritello is bringing this issue
19 or this problem to your attention and asking you to
20 look into it?
21    A.  Yes, it does appear that way.
22    Q.  Okay. It looks like a couple days go
23 by. He follows back up with you two days later. I
24 think he sends the first e-mail on October 1. He

Page 249

1 follows back up on October 4 asking if you had a
2 chance to look into it.
3     Do you see that?
4    A.  Yes.
5    Q.  And in the top e-mail you respond on
6 October 5 and give him some information on what you
7 were able to find out.
8     Do you see that?
9    A.  Yes.
10    Q.  As we've gone through this e-mail and
11 looked at the chart and looked at kind of the
12 timeline here, do you recall this issue now?
13    A.  I don't -- I don't recall this
14 particular issue, but it would be something that
15 would fall into our support if there was an issue.
16    Q.  And this would be the type of thing that
17 from time to time you were asked to look into and
18 craft or implement some type of solution to prevent
19 there being holes like this in the system?
20    MR. LEVINE: Objection to form.
21 BY THE WITNESS:
22    A.  It's possible, yes.
23 BY MR. GADDY:
24    Q.  This is the type of thing that you and

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  your team does from time to time?

2      A.   We investigate issues, yes.

3      Q.   You say that "I was asked by John

4  Merritello if our current system would adjust C-II

5  jobber orders if there was a line limit on an item.

6  Because Jupiter is sending everything to the

7  jobbers, I took a quick look at Jupiter and noticed

8  that were line limit insufficient codes on working

9  order scan.  Therefore, I assume we were sending

10  line limit insufficients to the stores.  But the

11  e-mail below suggested that I assume incorrectly."

12      Do you see that?

13      A.   Yes, I do.

14      Q.   Does that make sense to you?

15      A.   Yes.

16      Q.   Okay.  Can you explain it to me?  I

17  don't completely follow.

18      A.   It looks like our programs were working

19  as they were supposed to and we were -- were

20  creating insufficients, but it also looks like we

21  were still sending the order quantity on.

22      Q.   Okay.  Even if it was being ordered in

23  excess of the line limit?

24      A.   Yes.

Page 251

1      Q.   Do you know how long that was happening

2  for?

3      A.   No, I do not remember.

4      Q.   Okay.  You say, "I then looked at the

5  jobber history file and saw that the insufficient

6  code for the item below was 10 (no regular

7  quantity).  This suggests to me that once OP" --

8  what's OP?

9      A.   Order processing.  That's a system that

10  we run our orders through.

11      Q.   "This suggests to me that once order

12  processing determines that an item is insufficient

13  for no regular quantity that it does not check any

14  other insufficients (which is what I would expect).

15  Is it possible that you or somebody else on your

16  team could verify this?  Any help would be

17  appreciated."

18      Do you see that?

19      A.   Yes, I do.

20      Q.   So, for some period of time we

21  understand from this issue that you had to -- that

22  you were asked to look into and investigate by John

23  Merritello that there was an issue within the order

24  processing system for C-IIs being ordered out of

Page 252

1  Jupiter that were allowing the stores to order

2  product in excess of the line limit?

3      A.   It's saying there is possibly an issue,

4  but does not identify if there is or not.  That's

5  why I was asking help from someone else.

6      Q.   Okay.  Well, you were sent a spreadsheet

7  that had several examples of several stores that

8  had been permitted to order C-IIs over their line

9  limit, correct?

10      A.   That spreadsheet that's attached to here

11  showed that, yes.

12      Q.   And, so, it looks like that was an issue

13  as it related to orders coming through the Jupiter

14  distribution center and you were asking somebody to

15  try to look into that and try to help you out?

16      A.   Yes.

17      Q.   Do you remember whether or not you were

18  able to solve that issue?

19      A.   No, I do not remember.

20      Q.   Do you know whether or not the order

21  processing system was ever remedied to prevent

22  stores from ordering controlled substances above

23  their line limit?

24      A.   I don't remember a change like that, no.

Page 253

1      Q.   Is it possible that you weren't able to

2  fix that problem?

3      A.   Anything is possible, but I believe we

4  would have fixed it.

5      Q.   Do you know how long it would have taken

6  you?

7      A.   I don't remember.

8      Q.   Do you know how long stores were able to

9  order controlled substances above their line limits

10  before this problem was brought to your attention?

11      A.   No, I do not remember.

12      Q.   I will show you what I will mark as

13  Peterson No. 28.  It's two pages, but I'm pretty

14  sure it's the same document twice in a row.

15      (WHEREUPON, a certain document was

16      marked as Walgreens-Peterson

17      Exhibit No. 28:  Document,

18      "Handling Suspicious Drug Orders";

19      WAGFLDEA00001584 - 00001855.)

20  BY MR. GADDY:

21      Q.   Do you recognize this document?

22      A.   No, I do not recognize this.

23      Q.   Do you know if you've ever seen this

24  before?

Page 254

1    A.   To the best of my knowledge, I've never
2  seen this before.
3    Q.   Okay.  I'm just going to ask you a
4  couple questions about it.
5       Do you see below the text there it says
6  that -- the last thing written is that this policy
7  originated 9/8/98, and then right above it says
8  it was revised 2/15/05?
9    A.   Yes, I see that.
10   Q.   If we go down to the bottom of the page,
11 do you see an address that looks like this document
12 came from the Walgreens intranet?
13   A.   Yes, I would call that the Walgreen
14 Internet.
15   Q.   Okay.
16   A.   Intranet I mean.
17   Q.   Sure.  And are you familiar with the
18 concept that Walgreens at least at some places in
19 some times maintained some types of policies or
20 procedures on that intranet that its employees
21 could access?
22   A.   I understand that the distribution
23 centers write their own SOPs.  I don't normally --
24 I never look at them.  But yes.

Page 255

1    Q.   The reason I wanted to ask you about
2  this one is because it references Logistics and
3  Planning Department.  So let me just read this to
4  you and then ask if this is anything that you were
5  involved with.
6       It says, "The Logistics and Planning
7  Department sends the Suspicious Control Drug Orders
8  report to all distribution centers."
9       Do you see that?
10   A.   Yes, I do.
11   Q.   Okay.  It says -- let me pause there and
12 ask you a couple questions about that.
13      The Logistics and Planning Department.
14 Do you know what that is?
15   A.   I'm sorry.  Go back up one second.  Mine
16 is a little different than your document.
17   Q.   Okay.  That's not good.
18   A.   I mean, I don't -- I read it here, but I
19 don't see it on my document unless I'm misplacing
20 it.
21   MR. LEVINE:  It looks like the pages of what
22 you handed to me are different than the pages that
23 the witness has.
24   THE WITNESS:  Yes.

Page 256

1    MR. LEVINE:  In other words, they are both two
2  pages but the order is switched.
3    MR. GADDY:  Okay.  Mark, let me give this to
4  you first.  Does that look like what you have?
5    MR. LEVINE:  That's the first page of what I
6  got.
7    MR. GADDY:  Okay.
8  BY MR. GADDY:
9    Q.   I'm only going to -- I'm only going to
10 show you the first page.  Okay?  I think you got
11 the right one now.
12   A.   Yes.
13   Q.   Okay.  All right.  Thanks for pointing
14 that out, Mr. Peterson.  All right.  Let's start
15 over.
16      You have Peterson 28 in front of you?
17   A.   Yes, I do.
18   Q.   Okay.  And, again, if you look at the
19 bottom of the page, do you see the indication of
20 the Walgreens intranet?
21   A.   Yes, I do.
22   Q.   Okay.  And if you go back up to the top,
23 is the name of the document "Handling Suspicious
24 Drug Orders"?

Page 257

1    A.   Yes.
2    Q.   And same, the dates look to be the same
3  as I read earlier, "Originated 9/8/98.  Revised
4  2/15/05."  Is that correct?
5    A.   Yes, it is.
6    Q.   Okay.  And let's try again with the body
7  of the document.  It says, "The Logistics and
8  Planning Department sends the Suspicious Control
9  Drug Orders report to all distribution centers."
10      Do you see that?
11   A.   Yes, I do.
12   Q.   Are you aware of what the Logistics and
13 Planning Department is?
14   A.   No, I don't.  I mean -- let me.  Sorry.
15 I know what Logistics and Planning Department is,
16 yes.
17   Q.   Okay.
18   A.   Within Walgreens.
19   Q.   Is that -- you're supply and logistics.
20 Is that the same as or different than this?
21   A.   It would be different than that.
22   Q.   Okay.  What is the Logistics and
23 Planning Department?
24   A.   Well, it's another division within

Page 258

1 logistics that does more probably the planning --
2    Q.   Are they --
3    A.   -- area.
4    Q.   -- IT folks or?
5    A.   I'm -- from this e-mail, we don't have
6 an IT department that I know of that's called that.
7 So, it looks like it's a business area.
8    Q.   Are you able to give me like a
9 30,000-foot view of what the Logistics and Planning
10 Department does?
11   A.   No, I couldn't.
12   Q.   Okay.
13   A.   Off the top of my head, no.
14   Q.   Okay.  It says that that particular
15 department sends the control -- the Suspicious
16 Control Drug Orders report to all distribution
17 centers.
18        Do you see that?
19   A.   Yes, I see that.
20   Q.   Do you know what a Suspicious Control
21 Drug Order report is?
22   A.   No, I do not.
23   Q.   Have you ever heard of that phrase
24 before?

Page 259

1    A.   No.
2    Q.   Okay.  I'm going to show you what I'm
3 going to mark as Peterson 29.
4        (WHEREUPON, a certain document was
5        marked as Walgreens-Peterson
6        Exhibit No. 29:  Document,
7        "Handling Suspicious Orders and
8        Loss of Controlled Drugs";
9        WAGFLDEA00000028.)
10 BY MR. GADDY:
11   Q.   And this should be a one-page document,
12 right?
13   A.   Yes, it is.
14   Q.   And we should see the Walgreens intranet
15 down at the bottom of the page again?
16   A.   Yes.
17   Q.   And, again, looking at the chronology of
18 this particular policy, do you see that it
19 originated in '98, revised in 2005 and revised
20 again in April of 2012?
21   A.   Yes.
22   Q.   And the policy here is or the title is
23 "Handling Suspicious Orders and Loss of Controlled
24 Drugs."

Page 260

1        Do you see that?
2    A.   Yes.
3    Q.   It says, "Distribution centers must file
4 all Suspicious Control Drug Order reports for five
5 years."
6        You've already told us you don't know
7 what that means, right?
8    A.   True.
9    Q.   It goes on to say, "Effective calendar
10 year 2012, the Controlled Substance Order
11 Monitoring and Prevention System."
12       Let me stop right there.
13       Do you know what that is?
14   A.   No, I do not.
15   Q.   It says that particular system,
16 "prevents suspicious control drugs from being
17 shipped to the store.  In calendar year 2012,
18 because of the program mentioned, suspicious
19 control drug reports are no longer generated as
20 their shipment is prevented by the system."
21       Do you see that?
22   A.   Yes.
23   Q.   Now, Mr. Peterson, when I read that, it
24 occurred to me that it sounded like that was

Page 261

1 something that was probably designed or implemented
2 by an IT department.
3        So, my question for you is, based on
4 what we just read, does that sound familiar to you
5 as any type of program or protocol or solution that
6 you or your team was ever asked to implement during
7 your time at Walgreens?
8    A.   No, it is nothing I'm familiar with.
9    Q.   Okay.  Is that anything that you've ever
10 heard of, even if it's not you or your team, any of
11 the other IT teams at Walgreens being involved in
12 as far as designing a system that would prevent
13 suspicious control drugs reports from being
14 generated?
15   A.   No, I'm -- no, I'm not.  I do not know.
16   Q.   When you had the opportunity to talk
17 with Mr. Bratton, did any of your conversations
18 revolve around suspicious order -- or excuse me --
19 Suspicious Control Drug Order reports?
20   A.   No.
21   Q.   In any of your conversations with
22 Mr. Bratton, did you tell him that the excessive
23 order queries were designed to detect suspicious
24 orders of controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    A.   No, I did not.

2    Q.   And you agree that the suspicious order
3 query -- excuse me -- the excessive order queries
4 was not designed by you to be a tool required by
5 the Controlled Substance Act to monitor or detect
6 for suspicious orders of controlled substances?

7    A.   No, it was not.

8    Q.   I will show you what I'll mark as
9 Peterson 30.

10        (WHEREUPON, a certain document was
11         marked as Walgreens-Peterson
12         Exhibit No. 30: 2/11/11 e-mail
13         string; WAGFLDEA00000891 -
14         00000901.)

15 BY MR. GADDY:

16   Q.   Again, the format is a little funky
17 here.  This is going to be P-WAG-1016.

18        The format is a little funky here, but
19 you recognize this to be another e-mail chain?

20   A.   Yes, it looks that way, yes.

21   Q.   Okay.  And if you flip to the Bates
22 number ending in 900.

23   A.   Yes.

24   Q.   And you see that this is an e-mail

Page 263

1 starting on the top left-hand corner of the
2 page from Victoria Lau and it looks like it's to
3 Kristine Atwell.

4        Do you see that?

5    A.   Yes, I do.

6    Q.   And do you know who either of those
7 individuals are?

8    A.   No.  I do not.

9    Q.   And the subject of this e-mail is
10 "Oxycodone 30 milligram tab"?

11   A.   Yes.

12   Q.   At this point in time, in February of
13 2011, the excessive order query that you designed
14 back in the early '90s was -- was operational and
15 in effect, correct?

16   A.   As far as I know, yes.

17   Q.   The e-mail from Victoria says,
18 "Kristine, I know you're out of WIC 682971 again."

19        Do you see that?

20   A.   Yes.

21   Q.   And just so we can make sure we know
22 what that is, if you look up in the subject of the
23 e-mail, do you see that same number indicating the
24 hydrocodone?

Page 264

1    A.   Yes, I do.

2    Q.   "I know you are out of hydrocodone" --
3 excuse me.  Did I say hydrocodone?  I meant
4 oxycodone.

5    A.   Okay.

6    Q.   It says, "I know you are out of
7 oxycodone again.  The vendor was able to secure
8 some more supply and will be overnighting 5,136
9 tomorrow and shipping 31,680 ground.  I know it
10 won't last you that long but it's the most I could
11 obtain at this time."

12        Do you see that?

13   A.   Yes, I do.

14   Q.   And if you flip the page, do you see the
15 signature block for Victoria Lau and it indicates
16 that she's a replenishment buyer?

17   A.   Yes, it does.

18   Q.   Are you familiar with that position at
19 Walgreens?

20   A.   I'm familiar with buyers, yes.

21   Q.   Generally speaking, what would her role
22 be?

23   A.   To replenish.  They buy product for
24 our...

Page 265

1    Q.   So, as it relates to this particular
2 e-mail, it's talking about a particular store or
3 stores needing oxycodone, Victoria would be in
4 charge of buying the oxycodone from, I guess, the
5 manufacturers that would sell it.  Is that your
6 understanding?

7    A.   I'm not 100% sure about her herself, but
8 based on the e-mails, it looks like she's helping
9 to procure some medicine.

10   Q.   And that's your general understanding of
11 what the buyers do?

12   A.   Basically, yes.

13   Q.   Okay.  If you turn up a page or two,
14 we'll start at 898.

15   A.   Okay.

16   Q.   And it looks like Kristine responds to
17 Victoria.  Do you see that?  It's starting in the
18 middle of the page.

19   A.   Yes, I do.

20   Q.   Okay.  And then if you flip to the next
21 page, we're still in the same subject line, the
22 "Oxycodone 30 milligram tablets."

23        Do you see that?

24   A.   Yes.

Page 266

1    Q.    And it looks like Kristine says,
2  "I received a small pallet today but they were
3  oxycodone 15s and not 30s."
4        Do you see that?
5    A.   Yes, I do.
6    Q.   Do you have a general understanding that
7  many drugs, including oxycodone, can be different
8  strengths?
9    A.   Yes, I know they can have different
10 strengths.
11   Q.   For example, oxycodone can come in 15
12 milligram pills or 30 milligram pills?
13   A.   Not familiar with that particular one
14 but...
15   Q.   You see in the subject line she is
16 talking specifically about hydrocodone 30 milligram
17 pills?
18   A.   Yes.
19   Q.   And you have a general understanding
20 that a 30 milligram pill would be a stronger pill
21 than the 15 milligram pill?
22   A.   Would be a higher dosage?
23   Q.   Correct.
24   A.   Yes.

Page 267

1    Q.    Kristine says, "I received a small
2  pallet today but they were oxycodone 15s, not 30s.
3  Can you confirm that the 30s were set to delivery
4  today? Also, how long will we continue to struggle
5  getting this product if the manufacturer is
6  producing?"
7        Do you see that?
8    A.   Yes, I see it.
9    Q.   If you flip the page, it looks like we
10 see the response and she says, "Hi Kristine, I will
11 follow up again with the vendor to see if I can
12 obtain tracking. I did alert them that you were
13 out of 30 and that is what they were supposed to
14 overnight. I'll keep you posted on their
15 response."
16       Do you see that?
17   A.   Yes, I do.
18   Q.   She goes on to say, "The issue with this
19 item is the usage keeps increasing."
20       Do you see that?
21   A.   Yes.
22   Q.   "It's nearly doubled in usage in one
23 year and the C-II manufacturers have quotas on what
24 they can ship per the DEA."

Page 268

1        Do you see that?
2    A.   Yes.
3    Q.   "It has been confirmed" -- excuse me.
4        "It hasn't been confirmed but I am
5  hearing that this is mainly an issue in Florida and
6  it pertains to the issues surrounding the pain
7  clinics and dispensing."
8        Do you see that?
9    A.   Yes, I see it.
10   Q.   In the February 2011 time frame when
11 this particular e-mail traffic is happening within
12 Walgreens, that excessive order query that you
13 designed in the early '90s continued to be
14 operational, correct?
15       MR. LEVINE: Objection; asked and answered,
16 form.
17 BY THE WITNESS:
18   A.   To the best of my knowledge, yes.
19 BY MR. GADDY:
20   Q.   Flip two pages for me, please, to 896.
21 Are you with me?
22   A.   Yes, I am with you now.
23   Q.   And it looks like Kristine responds at
24 the bottom of the page. She says, "You are exactly

Page 269

1  correct regarding the Florida pain clinics. I have
2  stores that try to order 1,000 bottles per week. I
3  have alerted their pharmacy supervisors, but they
4  have all said that they require that much to fill
5  scripts."
6        Do you see that?
7    A.   Yes.
8    Q.   And we see there Kristine Atwell's
9  signature block that she is the C-II function
10 manager at Jupiter?
11   A.   Yes.
12   Q.   Do you have an understanding of the role
13 of the C-II function manager?
14   A.   They manage the distribution center
15 there. That's my understanding.
16   Q.   And specifically they would manage the
17 controlled substances for the distribution center?
18   A.   With hers, yes. Hers is C-II.
19   Q.   Would your understanding be that -- we
20 have talked about Deb Bish a little bit -- that she
21 would have an equivalent position at the Perrysburg
22 distribution center?
23   A.   Yes, I think so.
24   Q.   Okay. If you flip for me, please, to

Page 270

1 894. And it looks like we get Victoria's response
2 to Kristine, and we see it at the bottom of the
3 page.
4     And she says, "1000/ week per store?
5 That is unbelievable. Well, I did hear back from
6 the vendor and below was her response. I hope this
7 helps you out."
8     And if we turn the page, we see a report
9 from the vendor. It says, "Victoria, as promised,
10 a total of 5,136 units of the Oxy 30 milligrams
11 were shipped to Jupiter Florida yesterday for
12 delivery today. UPS tracking shows this order on
13 the truck for delivery. In addition to these 5,136
14 units we also shipped a total of 31,680 units out
15 yesterday via regular delivery. I am working on
16 getting that tracking as we speak."
17     Do you see that?
18 A.   Yes.
19 Q.   So, it looks like Victoria was able to
20 secure these approximately 36,000 additional
21 oxycodone 30s for the Walgreens Jupiter
22 distribution center, correct?
23     MR. LEVINE: Objection; lacks foundation.
24 BY THE WITNESS:

Page 271

1 A.   I wouldn't know that myself.
2 BY MR. GADDY:
3 Q.   Okay. Is that what Victoria has
4 indicated in her e-mail there?
5     MR. LEVINE: Objection; lacks foundation.
6 BY THE WITNESS:
7 A.   I don't really know.
8 BY MR. GADDY:
9 Q.   Okay. I'm going to show you what I'm
10 going to mark as Peterson 31.
11     (WHEREUPON, a certain document was
12     marked as Walgreens-Peterson
13     Exhibit No. 31: Document,
14     "Threshold Violations-Monthly";
15     WAGMDL00674619.)
16 BY MR. GADDY:
17 Q.   Can you tell me what this report is?
18 A.   No, I am not familiar with this report.
19 Q.   Do you see up at the top center of the
20 page that's underlined it says "Threshold
21 Violations-Monthly"?
22 A.   I see that, yes.
23 Q.   You see to the right of that up top,
24 it's got an order or -- excuse me -- a date of

Page 272

1 9/23/09?
2 A.   Yes.
3 Q.   And below that it says "Suspicious
4 Order"?
5 A.   Yes. I see that.
6 Q.   Below "Suspicious Order" it has it looks
7 like a month start and end date of 9/1 through
8 9/30.
9     Do you see that?
10 A.   Yes, I do.
11 Q.   And then down below that, do we see
12 several -- I guess let's start in the chart, start
13 on the left-hand side, it looks like it has a
14 district number and then a store number.
15     Do you see that?
16 A.   Yes.
17 Q.   And it looks like on this particular
18 page it's the same store?
19 A.   Yes.
20 Q.   And then to the -- to the right of that
21 we have a WIC number and then an item description.
22     Do you see that?
23 A.   Yes, I do.
24 Q.   And the column to the right of that

Page 273

1 would be the order date and then there is a reason
2 code.
3     Do you see that?
4 A.   Yes, I see them.
5 Q.   So, it looks like at the bottom of the
6 list there is three separate orders for OxyContin.
7     Do you see that?
8 A.   Yes.
9 Q.   And if we go chronologically, it looks
10 like the bottom entry is the earliest order date,
11 right, 9/2/09?
12 A.   Yes.
13 Q.   And it looks like it was an order for 40
14 milligram tablets. What does -- does the 100 mean
15 anything to you? Is that 100 pills, 100 bottles,
16 do you know?
17     MR. LEVINE: Objection; lacks foundation.
18 BY THE WITNESS:
19 A.   I'm not sure.
20 BY MR. GADDY:
21 Q.   And the reason -- and this is -- the
22 reason code, and do you know what the reason code
23 of T means?
24 A.   No, I do not.

Page 274

1    Q.   Do you know why this order for OxyContin
2 ended up on this particular suspicious order
3 report?
4    A.   No, I do not.
5    Q.   Above that, there is another order from
6 the store for OxyContin 20 milligram tablets, again
7 100, ordered on September 10 of 2009, and it's also
8 listed here as a suspicious order.
9         Do you see that?
10   A.   Yes, I do.
11   Q.   And, again, the same reason code of T is
12 given.
13        Do you see that?
14   A.   Yes.
15   Q.   And do you know whether that means
16 threshold or do you know what that means at all?
17   A.   I do not know what that reason code is.
18 I'm not familiar with this particular screen or
19 piece of paper you're showing me.
20   Q.   Okay.  Above that we see a third order
21 for OxyContin.  This time, 20 milligram tablets,
22 again 100 units, for 9/13/09; and we also see that
23 listed as a suspicious order here on this report,
24 correct?

Page 275

1    A.   Yes.
2    Q.   And do you know why that particular
3 order was listed as suspicious?
4    A.   No, I do not.
5    Q.   From looking at this report, do you have
6 any understanding of whether or not these orders
7 were shipped to the store?
8    A.   No, I can't tell that at all.
9    Q.   From looking at this report, do you know
10 whether or not these orders were reported to the
11 DEA?
12   MR. LEVINE:  Objection; lacks foundation.
13 BY THE WITNESS:
14   A.   No, I don't.
15 BY MR. GADDY:
16   Q.   I'm going to show you what I'm going to
17 mark as Peterson No. 32, which is a similar form.
18        (WHEREUPON, a certain document was
19        marked as Walgreens-Peterson
20        Exhibit No. 32:  Document,
21        "Threshold Violations-Monthly";
22        WAGMDL00674620.)
23 BY MR. GADDY:
24   Q.   Does this look to you to be in the same

Page 276

1 format as the last one that we looked at?
2    A.   Yes, it looks like the same.
3    Q.   Again, it says "Threshold
4 Violations-Monthly" at the top?
5    A.   Yes.
6    Q.   And it looks like right above that it
7 says, "MartinB."  I'm guessing that might be for
8 Barb Martin.  Do you know whether or not that's
9 true?
10   A.   I'm not sure.
11   Q.   And, again, the date to the top right
12 corner is 9/23/09, and you see there that it
13 lists -- has the term "Suspicious Order"?
14   A.   Yes, I see that.
15   Q.   Okay.  And if we look at this report, we
16 see two entries at the bottom of the page for
17 OxyContin which are both listed here as suspicious
18 orders.  Do you see that?
19   A.   Yes, I do.
20   Q.   And do you see about three or four up
21 from that there is an order for hydrocodone that's
22 listed here as a suspicious order.
23        Do you see that?
24   A.   Yes, I do.

Page 277

1    Q.   And it looks like these are orders that
2 were identified as suspicious back in September of
3 2009.
4         Are you able to tell from this report
5 whether or not any action was taken in response to
6 these orders being populated on this report?
7    A.   No, I do not.
8    Q.   I'm showing you what I am going to mark
9 as Peterson Exhibit 33.  This report is a little
10 bit different.  I'm going to show you this one.
11        (WHEREUPON, a certain document was
12        marked as Walgreens-Peterson
13        Exhibit No. 33:  Document, "Order
14        Item Detail"; WAGMDL00674553.)
15 BY MR. GADDY:
16   Q.   This is going to be P-WAG-2093.
17        I think the other ones that we said said
18 something along the lines of "Threshold Report" at
19 the top.  I think it said "Threshold Violations" on
20 the others.  This one at the top says "Order Item
21 Detail."
22        Do you see that?
23   A.   Yes, I do.
24   Q.   Okay.  Do you recognize this report?

Page 278

1    A.   No, I do not.
2    Q.   Do you see in the -- again, above it, it
3  says, "MartinB."
4         Do you see that?
5    A.   Yes.
6    Q.   And, again, in the top right-hand corner
7  we have the 8/25/09 date?
8    A.   Yes.
9    Q.   And below that it indicates, again, that
10 this is a suspicious order.
11        Do you see that?
12   A.   Yes, I do.
13   Q.   And under the "Item Description," which
14 is right above the line that goes across the page,
15 do you indicate that the item being described here
16 is morphine sulfate?
17   A.   Yes.
18   Q.   30 milligram tabs?
19   A.   Yes.
20   Q.   And if we go down to the bottom of the
21 page, I think maybe we get an answer to one of the
22 questions I was asking you earlier.  It says,
23 "Suspicious Reason Code."
24        Do you see that at the very bottom?

Page 279

1    A.   Yes, I do.
2    Q.   It says, "T - exceeds tolerance limit."
3         Do you see that?
4    A.   Yes, I do.
5    Q.   During your time at Walgreens in the
6  supply and logistics IT department, have you done
7  any work that you can recall on controlled
8  substance tolerance limits?
9    A.   No.
10   Q.   Are you aware of anybody in the supply
11 or logistics department within Walgreens who has
12 done any work on any tolerance limits related to
13 controlled substances?
14   MR. LEVINE:  Objection; lacks foundation.
15 BY THE WITNESS:
16   A.   No, I do not.
17 BY MR. GADDY:
18   Q.   Do you have an opinion on whether that
19 would be somebody on the distribution side or
20 somebody on the store side like Steve Bamberg?
21   A.   It would not be distribution.  Might be
22 stores.
23   Q.   I'm just going to go through maybe one
24 more of these.  This is Peterson 34, P-WAG-2103.

Page 280

1         (WHEREUPON, a certain document was
2          marked as Walgreens-Peterson
3          Exhibit No. 34:  Documents,
4          "Threshold Violations-Weekly";
5          WAGMDL00574576 - 00674594.)
6  BY MR. GADDY:
7    Q.   And, again, if we look at the top of
8  this page do we see the indication "Threshold
9  Violation-Weekly"?
10   A.   Yes.
11   Q.   Okay.  So, I think we looked at some of
12 these that were monthly and some of these are
13 weekly; and as far as you're concerned, you don't
14 know the difference between the two?
15   A.   No, I do not.
16   Q.   Okay.  The top right-hand corner of the
17 page, we see that this is a document from
18 February 17, 2010?
19   A.   Yes.
20   Q.   And, again, this indicates that what's
21 listed here are suspicious orders.
22        Do you see that?
23   A.   Yes.
24   Q.   And the week range that they are talking

Page 281

1  about here looks to be February 10 through
2  February 17.
3         Do you see that?
4    A.   Yes.
5    Q.   And if we start on the items that are
6  listed there for one particular store, there's a
7  listing for a hydrocodone product, correct?
8    A.   Yes.
9    Q.   And that's listed there as a suspicious
10 order?  Do you see that?
11   A.   Yes, it's on the report, yes.
12   Q.   Okay.  And if we skip down a little bit,
13 there is a different store, 2003, that's also
14 listed here as having a suspicious order of
15 hydrocodone.
16        Do you see that?
17   A.   Yes, I do.
18   Q.   And as we continue to go down, we see
19 similar suspicious order entries for codeine
20 products, Tramadol, more hydrocodone and more
21 Tramadol.
22        Do you see that?
23   A.   Yes, I do.
24   Q.   And if we look to the reason code to the

Page 282

1 right, several of these are indicated to be
2 suspicious orders because they're threshold
3 violations. Do you see that, the T?
4 MR. LEVINE: Objection; lacks foundation.
5 BY THE WITNESS:
6 A. I see the T, yes.
7 BY MR. GADDY:
8 Q. Do you recall we saw in the last
9 document that the T stood for the threshold
10 violations?
11 MR. LEVINE: Objection to form.
12 BY THE WITNESS:
13 A. Yes, I see that.
14 BY MR. GADDY:
15 Q. I said threshold. I think maybe it's
16 tolerance.
17 A. It's tolerance limit.
18 Q. Do you mind just reading it out what the
19 T stands for there?
20 A. "Exceeds tolerance limit."
21 Q. And you see the T here on this form?
22 A. Yes.
23 Q. There is also some Is on this form. Do
24 you know what those mean?

Page 283

1 A. No, I do not.
2 Q. If you don't mind, flip to page 579, the
3 bottom right-hand corner. Let's see if we can
4 figure out what the I stands for.
5 Do you see this particular report says
6 "Order Item Detail," from 2/17/10, "Suspicious
7 Order."
8 Do you see that?
9 A. Yes.
10 Q. And if we look above "Order Item
11 Detail," we have seen several that had -- it said,
12 "MartinB." This one says, "Ranick."
13 Do you see that?
14 A. Yes, I do.
15 Q. Are you familiar with a Marcy Ranick?
16 A. No, I am not.
17 Q. If we look at the item description, we
18 see that this particular suspicious order report
19 relates to hydrocodone.
20 Do you see that?
21 A. Yes, I do.
22 Q. And then at the bottom of the page,
23 again, we see the suspicious reason code and I is
24 given?

Page 284

1 A. Yes.
2 Q. And do you see here that I stands for
3 substantial inventory adjustment?
4 A. Yes.
5 Q. I will show you one more of these from a
6 different date range. This is going to be Peterson
7 35. It's going to be P-WAG-2102.
8 (WHEREUPON, a certain document was
9 marked as Walgreens-Peterson
10 Exhibit No. 35: Documents, "Order
11 Item Detail"; WAGMDL00674562 -
12 00674575.)
13 BY MR. GADDY:
14 Q. And do you see, Mr. Peterson, at the top
15 of this report it again -- this is one of the order
16 item detail reports. Do you see that?
17 A. Yes.
18 Q. And it's from August 18, 2010, and it's
19 listed there that this is designating a suspicious
20 order.
21 Do you see that?
22 A. Yes, I do.
23 Q. And the item description here above the
24 line indicates hydromorphone.

Page 285

1 Do you see that?
2 A. Yes, I do.
3 Q. And if we could go down to the bottom of
4 the page, it's indicated that the reason that this
5 item was flagged as suspicious is because it
6 exceeds the tolerance limit?
7 A. Yes.
8 Q. From looking at this, do you have any
9 understanding as to what was done with this order
10 after it was flagged on this suspicious order
11 report?
12 MR. LEVINE: Objection to foundation.
13 BY THE WITNESS:
14 A. No, I do not.
15 BY MR. GADDY:
16 Q. If you turn to page 571. Do you see
17 here another one that indicates it's a threshold
18 violation monthly report.
19 Do you see that?
20 A. Yes.
21 Q. In the top right-hand corner, this is
22 from 8/3/2010 and, again, it's listed as being a
23 suspicious order.
24 Do you see that?

Page 286

1    A.   Yes.
2    Q.   And the date range that they're looking
3  at here looks like it's June 2010 and the product
4  listed here on this suspicious order report is
5  oxycodone.
6        Do you see that?
7    A.   Yes, I do.
8    Q.   And the order or the reason that it's
9  given is T, correct?
10   A.   Yes.
11   Q.   And we understand that that's a
12  tolerance issue?
13   A.   From previous conversations, yes.
14   Q.   Okay.  Mr. Peterson, from time to time
15  have you participated in DEA compliance meetings
16  within Walgreens?
17   A.   I don't remember.  Sounds like something
18  I would, but I don't remember.
19   Q.   In what form or fashion would you expect
20  to have participated in DEA compliance meetings?
21   A.   Just from a system perspective.
22   Q.   What aspect of --
23   A.   Computer.
24   Q.   I'm sorry.

Page 287

1    A.   Computer side of our systems.
2    Q.   What aspect of DEA compliance would you
3  have been involved in?
4    A.   I'm really not sure.  It would have been
5  possibly -- I don't know.  Just our distribution
6  center computer, our computer systems at our
7  distribution center would be my representation for
8  any of those DEA meetings.
9    Q.   If I say that you were involved or if
10  you say that you were potentially involved with DEA
11  compliance meetings, compliance with what?  What
12  would the focus have been?
13   A.   I don't remember.
14   Q.   Okay.
15   A.   I don't remember.
16   Q.   Do you recall being given any laws or
17  regulations or industry standards or DEA handouts
18  or policies or procedures that you would have had
19  to make sure that Walgreens' systems were up to
20  speed on?
21   A.   That is not something I would normally
22  get, and I don't remember if I did or did not.
23  Would not have been in my -- what I would normally
24  see in my job.

Page 288

1    Q.   I will show you what I will mark as
2  Peterson 36.
3        (WHEREUPON, a certain document was
4         marked as Walgreens-Peterson
5         Exhibit No. 36:  Document, "DEA
6         Compliance Documentation Update May
7         14, 2008"; WAGMDL00491150 -
8         00491152.)
9  BY MR. GADDY:
10   Q.   And do you see at the top of the
11  page this says, "DEA Compliance Documentation
12  Update May 14, 2008."
13        Do you see that?
14   A.   Yes.
15   Q.   And as far as who was invited, you see
16  you are listed there at the end of the top row?
17   A.   Yes, I do.
18   Q.   And other folks who were indicated
19  there, looks like Sean Barnes is there who we
20  talked a little bit about this morning and Brian
21  Amend who is your direct superior, correct?
22   A.   He is today, yes.
23   Q.   Do you recognize the other people in
24  this list here?

Page 289

1    A.   Yes, I do.
2    Q.   Are all of them within the IT
3  department?
4    A.   Yes, all of them are.  Sharon was --
5  was -- was a secretary in the IT department.
6    Q.   Okay.  Anybody that was involved in this
7  meeting from the business side or from the legal
8  side?
9    A.   Dan Coughlin.
10   Q.   What was Dan Coughlin's role?
11   A.   He was a regional distribution manager
12  or -- he was over a series of distribution centers.
13   Q.   Okay.
14   A.   So, he was like a regional manager.
15   Q.   Was he -- since DEA's involved, I'm
16  going to make an assumption that he was over some
17  of the controlled substance distribution centers,
18  is that right, or do you know?
19   A.   I don't remember.
20   Q.   For the "Agenda" it says, "Gather a list
21  of any procedural or other DEA compliance-related
22  changes since the last DEA audit - estimated as
23  late as 2006 for Sharon in order for her to update
24  the compliance document."

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Do you see that?
2    A.   Yes, I do.
3    Q.   Specifically as it relates to the DEA
4 compliance or -- excuse me -- to the DEA audit,
5 what does that mean to you?
6    A.   I'm not sure.
7    Q.   Would DEA do audit of any of the IT
8 systems or computer systems?
9    A.   I do not remember them doing that, no.
10   Q.   Would DEA do audits of the distribution
11 centers?
12   MR. LEVINE:  Objection; lacks foundation.
13 BY THE WITNESS:
14   A.   I'm not really sure.
15 BY MR. GADDY:
16   Q.   Can you help me understand what the
17 purpose of -- purpose was of a DEA compliance
18 meeting such as this?
19       And take your time and look through the
20 agenda if you want to and the different items that
21 are on here.  And I think if you look at -- look
22 through this, you'll see that there is a couple of
23 different meeting dates that are -- that are
24 indicated in here.

Page 291

1    A.   There looks like there was some requests
2 in here for IT to look at.
3    Q.   What types of issues?
4    A.   One would be looks like the pink label
5 for PSE on the first page.  There were some inbound
6 changes to an audit report that was listed down
7 there.  That would have been an IT change.  And I
8 think they repeat some of these in here.  Pink
9 label again.
10       So, yes, those would have been requests
11 that we would have received from our business to --
12 to change our programs for.
13   Q.   Okay.  So, would it be fair to say this
14 kind of follows the model that you have been
15 telling us throughout the day, that you get a
16 request from business to implement a solution to a
17 problem that they've identified?
18   A.   Yes.
19   Q.   Okay.  Were you ever asked to -- to look
20 at rules, regulations, statutes, DEA guidance
21 materials and try to come up with or implement your
22 own solutions?
23   A.   No.
24   Q.   If you'd turn to the second page, which

Page 292

1 ends in 151, again, from the invite list, I see Dan
2 Coughlin on there.  Is he the only person on that
3 list not in the IT department?
4    A.   And Sharon.
5    Q.   Okay.  And Sharon was the secretary that
6 worked in the IT department?
7    A.   Yes.
8    Q.   Anybody from the legal department?
9    A.   No.
10   Q.   In doing -- performing your job with --
11 within supply chain and logistics, do you ever have
12 to liaison with the legal department about any
13 issues?
14   A.   No.  I do not.
15   Q.   If you look on this page under "Summary
16 of discussion, General," Item B, it says, "DEA is
17 interested in procedures, reports and practices
18 which document what controls are in place."
19       Do you see that?
20   A.   Yes, I see that.
21   Q.   What did that mean to you?
22   A.   I'm not really sure.
23   Q.   Do you recall being asked to gather any
24 types of policy or procedure or practice type

Page 293

1 information and get that to the DEA?
2    A.   No, I do not.  That wouldn't fall under
3 my work description.
4    MR. LEVINE:  Good time for a break?
5    MR. GADDY:  Yeah, yeah.  Sure.
6    THE VIDEOGRAPHER:  We are going off the record
7 at 3:06.
8       (WHEREUPON, a recess was had
9        from 3:06 to 3:21 p.m.)
10   THE VIDEOGRAPHER:  We're back on the record at
11 3:21.
12 BY MR. GADDY:
13   Q.   Mr. Peterson, I'm going to show you what
14 I've marked as Peterson 37, P-WAG-2042.
15       (WHEREUPON, a certain document was
16        marked as Walgreens-Peterson
17        Exhibit No. 37:  2/5/13 e-mail with
18        attachments; WAGMDL00451632 -
19        00451636.)
20 BY MR. GADDY:
21   Q.   And you will see this is an e-mail, but
22 then what I'm really going to ask you about are
23 some attachments, which are some more of these DEA
24 quarterly meeting minutes.

Page 294

1    Do you see that if you flip the page?
2    A.   Yes.
3    Q.   Okay.  Let's just start on the second
4  page.  And if you look at the top, it says,
5  "Meeting Agenda & Minutes, "Quarterly DEA Meeting
6  Minutes - November 15," and the date of the meeting
7  says 11/15/2012.
8    Do you see that?
9    A.   Yes, I do.
10    Q.   So, I think the first one we looked at
11  before the break was back in 2008 and this one
12  looks like it's in 2012.  Do you see that?
13    A.   Yes.
14    Q.   Okay.  And if we look at the invitees,
15  it looks like you are included on this list about
16  two-thirds of the way down; and there's a plus sign
17  next to your name, which I'm going to assume means
18  that you were able to attend this particular
19  meeting.
20    Do you see that?
21    A.   Yes, I do see that.
22    Q.   Okay.  First let's look at the purpose
23  of the meeting.  It says, "Review" -- this is above
24  where the list is.  It says, "Review and discuss

Page 295

1  any changes in our programs/procedures for handling
2  C-II through C-V controlled items and related
3  documents."
4    Do you see that?
5    A.   Yes, I do.
6    Q.   Do you remember this particular meeting?
7    A.   No, not this particular meeting, no.
8    Q.   Do you remember being involved in
9  quarterly DEA meetings where you would discuss
10  changes in programs or procedures for handling
11  controlled substances?
12    A.   I remember being in quarterly meetings
13  to discuss system changes for us.
14    Q.   And, again, would it be similar to some
15  of the stuff we saw on the last document from 2008
16  where there are specific nuanced IT-related issues
17  that you were asked to look into?
18    A.   Pretty -- yes.
19    Q.   As you look at this list of attendees,
20  do you recognize anybody on the list who was not
21  from IT?
22    A.   Again, Shaun, as I stated in the last
23  one, Anbil.  Anbil.  Sorry.
24    Q.   Oh.  Shaun Anbil?

Page 296

1    A.   Yes.
2    Q.   I don't know if he was on the last one.
3  Who is Shaun Anbil?
4    A.   She's the secretary I believe.
5    No.  Okay.  Shaun is -- Shaun is the
6  secretary.
7    Q.   Okay.
8    A.   But she took over for Sharon.
9    Q.   Gotcha.  Okay.
10    A.   At some point and it looks like around
11  the 12th.
12    Q.   Okay.  That makes sense.
13    A.   I know both of the ladies.  Sorry.
14    Q.   No problem.  So, Sharon was the
15  secretary for within the IT department in 2008?
16    A.   Yes.
17    Q.   But it looks like here in 2012
18  Shaun Anbil is filling her role?
19    A.   Yes.
20    Q.   Okay.  I also see Dan Coughlin on this
21  list, and I think he was the person that you told
22  us before was from the business side, correct?
23    A.   Yes.
24    Q.   Anybody else on this list that's not

Page 297

1  from IT?
2    A.   I'm not sure who Megan Eicker is.
3    Q.   Okay.  Anybody else that you don't know
4  of, know about?
5    A.   No.  I know all the other names.
6    Q.   Okay.  If you look down at the bottom of
7  the page in the "Meeting Notes," it says, "Kathy
8  Emery updated the document with Maspeth's
9  information," and Shaun sent the names to the
10  meeting participants.
11    Do you see that?
12    A.   Yes.
13    Q.   The next section I obviously can't ask
14  you about.
15    Then it looks like there's a section
16  related to Shaun reporting on an ARCOS-related
17  incident.
18    Do you see that?
19    A.   Yes.
20    Q.   If you look on the next page, it looks
21  like there was a particular action item which I'm
22  not able to see that was assigned to loss
23  prevention and management.
24    Do you see that?

Page 298

1  A.  Yes.
2  Q.  Is there anybody that we saw on that
3  attendance list, first of all, that was related or
4  from the legal department?
5  A.  No one I know on there, no.
6  Q.  Was there anybody on there from the loss
7  prevention department?
8  A.  Not that I recognize, no.
9  Q.  In what capacity would IT interact with
10 loss prevention and management?
11 A.  Unless they had a request for something
12 for us to write a program for, that would be our
13 only interaction.
14 Q.  Do you recall ever receiving a request,
15 just going back to, say, 2010, from loss prevention
16 to implement any programs or provide any solutions
17 to any issues that they had?
18 A.  No, I don't remember any.
19 MR. GADDY: Mr. Peterson, thank you.  Those
20 are all the questions I have for you today.
21 THE WITNESS: Thanks.
22 MR. LEVINE: I have a few questions.
23
24

Page 299

1  EXAMINATION
2  BY MR. LEVINE:
3  Q.  Before we begin, just to speed things up
4  when we are doing it, I want you to take out the
5  following exhibits: One.
6  You have to look through your pile here.
7  One.  That's the real big one.
8  A.  Okay.
9  Q.  That one is easy to find.
10 A.  Yes.  I have 1 is right here.
11 Q.  The next one is Exhibit 4.  That's the
12 warrant.
13 A.  I got out of sequence.  So, just give me
14 a second.
15 Q.  While you are looking for 4, because it
16 might be in the same neighborhood, 6 as well.
17 A.  Here is 4.
18 Q.  Also 34 and 35.  Those are ones we went
19 over just before the break.
20 A.  This would be in this pile probably.
21 You said 34 and 35, right?
22 Q.  Yes.
23 A.  Got them.
24 Q.  All right.  That's all.

Page 300

1  Mr. Peterson, how long have you been in
2  the IT department at Walgreens?
3  A.  38 years.
4  Q.  And how many of those 38 years have you
5  had involvement in drafting or coding computer
6  programs?
7  A.  35 of those years.
8  Q.  Is that the last 35 years?
9  A.  Yes, the last 35 years.
10 Q.  Have you ever had any responsibility in
11 designing Walgreens policies and procedures with
12 respect to suspicious order monitoring?
13 A.  No.
14 Q.  Have you had any involvement in or is
15 the suspicious order monitoring something that was
16 outside your job area?
17 MR. GADDY: Objection to form.
18 BY THE WITNESS:
19 A.  Yes.
20 BY MR. LEVINE:
21 Q.  Were there others in the IT group at
22 Walgreens who dealt with that issue?
23 A.  Yes.
24 Q.  And what group would that be in?

Page 301

1  A.  Store operations I believe it was.
2  Q.  Whose group is that?
3  A.  Steve Bamberg's.
4  Q.  You testified that you, several times in
5  response to questions from Plaintiff's counsel,
6  that you came up with solutions when the business
7  presented a problem.  Do you recall that?
8  A.  Yes.
9  Q.  Are all the solutions you're talking
10 about that you came up with referring to developing
11 or coding computer programs?
12 MR. GADDY: Objection to form.
13 BY THE WITNESS:
14 A.  Yes.
15 BY MR. LEVINE:
16 Q.  Let me ask this.  What particular area,
17 if any, did you develop solutions in when presented
18 with a problem by the business?
19 A.  Can you repeat the question?  I'm sorry.
20 Q.  When the business presented a problem,
21 what was your -- what was the area where you came
22 up with a solution?
23 A.  Oh, it would be -- we would write
24 computer programs to satisfy their needs.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    Q.   Were you able -- were you asked by the
2   business to come up with any solutions to problems
3   besides writing computer programs?
4    A.   No.
5    Q.   In your -- you said I think you're
6   involved in IT in logistics, is that right?
7    A.   Yes.
8    Q.   In your role as a computer programmer in
9   logistics, do you expect to be made aware of issues
10   with respect to the sale of prescription drugs in
11   your job at Walgreens?
12    MR. GADDY:  Objection to form.
13   BY THE WITNESS:
14    A.   No.
15   BY MR. LEVINE:
16    Q.   In your role as a computer programmer in
17   logistics, do you expect to be made aware of the
18   reasons for DEA investigations?
19    MR. GADDY:  Objection to form.
20   BY THE WITNESS:
21    A.   No.
22   BY MR. LEVINE:
23    Q.   In your role as a computer programmer in
24   logistics, do you expect to be made aware of DEA

Page 303

1   findings on a Walgreens distribution center?
2    MR. GADDY:  Objection to form.
3   BY THE WITNESS:
4    A.   No.
5   BY MR. LEVINE:
6    Q.   In your role as a computer programmer in
7   logistics, do you expect to be made aware of
8   Walgreens policies on diversion of controlled
9   substances?
10    MR. GADDY:  Objection to form.
11   BY THE WITNESS:
12    A.   No.
13   BY MR. LEVINE:
14    Q.   Now I ask you to take out these
15   exhibits.
16     Exhibit 1 is the long document that
17   includes a number of documents relating to the DEA
18   investigation and the proceedings with respect to
19   Jupiter, the Jupiter facility.  Do you recall that?
20    A.   Yes.
21    Q.   Have you ever seen this document before?
22    A.   No.
23    Q.   If you look at Exhibit 4, that's the
24   warrant with respect to Perrysburg.  Have you ever

Page 304

1   seen that document before, Exhibit 4?  The warrant.
2    MR. GADDY:  I think the warrant is No. --
3    MR. LEVINE:  I'm sorry.  You're right.
4   Exhibit 5.  My mistake.
5   BY MR. LEVINE:
6    Q.   My mistake.  Why don't you get out
7   Exhibit 5?
8    A.   I have to find 5.
9    Q.   No problem.  We can wait.
10    A.   I took out 4.
11    Q.   My mistake.
12    MR. GADDY:  Are you done with 1, Mark?
13   BY THE WITNESS:
14    A.   No, I am not aware of --
15   BY MR. LEVINE:
16    Q.   Let me -- do you have Exhibit 5 in front
17   of you now?
18    A.   Yes, I do.
19    Q.   And do you recall being asked questions
20   about language in this Administrative Inspection
21   Warrant?
22    A.   Yes.
23    Q.   Have you ever seen this document before?
24    A.   No, I have not.

Page 305

1    Q.   I will have you look at Exhibit 6.
2   That's a subpoena by the Justice Department Drug
3   Enforcement Administration.
4    A.   Don't tell me I mixed that up.
5    Q.   Do you have Exhibit 6 in front of you
6   now?
7    A.   Yes, I do.
8    Q.   Is that a subpoena by the Justice
9   Department Drug Enforcement Administration?
10    A.   Yes, it is.
11    Q.   And you were asked questions about
12   language in this subpoena by Plaintiffs' counsel,
13   is that right?
14    A.   Yes.
15    Q.   Have you ever seen this document before?
16    A.   No.
17    Q.   Did you have any involvement in
18   responding to the subpoenas?
19    A.   No.
20    Q.   And, by the way, on the warrant we just
21   saw before, Exhibit 5, did you have any involvement
22   responding to the warrant?
23    MR. GADDY:  Objection; form.
24   BY THE WITNESS:

Page 306

1    A.    No.
2  BY MR. LEVINE:
3    Q.    And on the Florida proceedings in
4  Jupiter, did you have any involvement in responding
5  to those?
6    A.    No.
7    MR. GADDY:  Objection to form.
8  BY MR. LEVINE:
9    Q.    If you look now at Exhibit 34 of the
10  ones I had you get out.
11    A.    Yep, right here.
12    Q.    Exhibit 34 says it's a "Threshold
13  Violations-Weekly" report of some sort.
14        Do you see that?
15    A.    Yes, I do.
16    Q.    Have you ever seen this report before
17  today?
18    A.    No.
19    Q.    Did you work on this type of report
20  during your time at Walgreens?
21    A.    No.
22    Q.    Look at Exhibit 35.  It's an "Order Item
23  Detail" report of some sort.
24        Do you see that?

Page 307

1    A.    Yes.
2    Q.    Did you -- have you ever seen this
3  document before?
4    A.    No.
5    Q.    Did you work on this kind of report at
6  Walgreens?
7    A.    No, I did not.
8    Q.    If you'll look at page 571 of
9  Exhibit 35, you were asked questions about this
10  page.  Do you recall that?
11    A.    Yes, I recall that.
12    Q.    And this refers to "Threshold
13  Violations-Monthly," correct?
14    A.    Yes.
15    Q.    Have you ever seen this before?
16    A.    No.
17    Q.    Do you work on this kind of report at
18  Walgreens?
19    A.    No, I do not.
20    Q.    You can put that aside.
21        You were asked some questions about
22  moving inventory from Jupiter and Perrysburg.  Do
23  you recall that?
24    A.    Yes, I do.

Page 308

1    Q.    What was your particular role with
2  respect to the moving of inventory?
3    A.    Would have been just been related to the
4  computer systems.
5    Q.    Did you have any role in the decision on
6  why to move the inventory?
7    A.    No.
8    Q.    There was a reference to moving
9  inventory to Mount Vernon.  Did Mount Vernon
10  distribute Class III to V controlled substances?
11    A.    Yes.
12    Q.    Are you aware of any DEA charges against
13  Mount Vernon?
14    MR. GADDY:  Objection to form.
15  BY THE WITNESS:
16    A.    No.
17  BY MR. LEVINE:
18    Q.    And there is -- there is also
19  discussion, there was discussion during your
20  earlier testimony about Woodland.  Was Woodland a
21  C-II controlled substance distribution facility?
22    A.    Yes.
23    Q.    Were you aware of any DEA charges
24  against Woodland?

Page 309

1    MR. GADDY:  Objection to form.
2  BY THE WITNESS:
3    A.    No.
4  BY MR. LEVINE:
5    Q.    Finally, you were asked some questions
6  about the excessive order query.  Do you recall
7  that?
8    A.    Yes.
9    Q.    And I think you testified the original
10  reason for the excessive order query was to try to
11  catch product that was entered in excess of what
12  should be a normal value.  Is that right?
13    MR. GADDY:  Objection to form,
14  mischaracterizes testimony.
15  BY MR. LEVINE:
16    Q.    What was the original reason for the
17  excessive order query?
18    MR. GADDY:  Objection to form.
19  BY THE WITNESS:
20    A.    It was to review the orders that came in
21  from the store for any quantity that seemed high.
22  BY MR. LEVINE:
23    Q.    And --
24    A.    And then to identify those items to the

Page 310

1 distribution center.
2    Q.   And when is it that the excessive order
3 query was initially drafted or coded?
4    A.   It would have been in the early 1900s --
5 1991 to 1995, somewhere in that range.
6    Q.   The early 1990s?
7    A.   Yes.  1990s.  Sorry.
8    Q.   And at some point was the -- did the
9 excessive order query begin being used with respect
10 to C-II controlled substances?
11    A.   Would have been in the early 2000s when
12 we opened our first DC.
13    Q.   Do you know all the purposes that people
14 in operations at Walgreens had for using the
15 excessive order query?
16    MR. GADDY:  Objection to form.
17 BY THE WITNESS:
18    A.   No, I do not.
19 BY MR. LEVINE:
20    Q.   If we wanted to find out the role of the
21 excessive order query in monitoring suspicious
22 orders of controlled substances, if any, are you
23 the right person to ask?
24    A.   No.

Page 311

1    Q.   Why not?
2    A.   That's a distribution operations
3 decision.
4    Q.   And what was your involvement?
5    A.   I was just to create it and get it to
6 work, and then I turned it over to the DC
7 distribution center and then they ran it.
8    Q.   So, in terms of how the excessive order
9 quantity query was used after you did the coding of
10 it, that's something you'd want to ask others?
11    A.   Yes.
12    MR. LEVINE:  Nothing further.
13    MR. GADDY:  Just a couple of quick follow-ups,
14 Mr. Peterson.
15          FURTHER EXAMINATION
16 BY MR. GADDY:
17    Q.   There were three -- Walgreens had three
18 distribution facilities that distributed
19 Schedule II drugs, correct?
20    A.   Yes.
21    Q.   And as far as you know, the DEA only
22 investigated and made allegations of two of those
23 three, correct?
24    A.   From today, yes.

Page 312

1    Q.   Okay.  You understand that they -- that
2 they shut down the Jupiter distribution center and
3 that they served a warrant and subpoenas on the
4 Perrysburg distribution center, correct?
5    A.   Based on the information provided, yes.
6    Q.   Okay.  You were also asked whether or
7 not you took any action related to the Jupiter
8 incident that's documented in Exhibit No. 1.  He
9 just asked you that and you responded no.
10        Do you recall that?
11    A.   Yes, I do.
12    Q.   Do you remember that we actually looked
13 at some documents this morning where you were asked
14 by the business side to make sure that six of the
15 Florida pharmacies were unable to order controlled
16 substances any longer?
17    A.   I remember that document.
18    Q.   So, you were actually asked to take some
19 action in regards to the DEA investigation and the
20 DEA closure of the Jupiter distribution center,
21 correct?
22    A.   If that's in this document -- in
23 Document 1, then yes.
24    Q.   And I think you've made it very clear

Page 313

1 today that the actions that you take were pretty
2 much always directed by the business side of
3 Walgreens.  Is that fair?
4    A.   That is correct.
5    Q.   That business side of Walgreens brings
6 something to your attention and you respond and try
7 to provide a solution to whatever issue it is that
8 they raise.  Is that correct?
9    A.   Yes.
10    Q.   Did anybody from the business side ever
11 tell you about the information that you have in
12 front of you in Exhibit No. 1 that's related to the
13 DEA serving an Order to Show Cause and putting a
14 lock on the controlled substance vault at the
15 Jupiter distribution center?
16    A.   No.
17    Q.   Did anybody from Walgreens ever ask you
18 to look into the fact and potentially develop a fix
19 for the solution that was causing oxycodone to be
20 shipped to Florida in such a volume that Walgreens
21 was the largest distributor of oxycodone to the
22 entire state?
23    MR. LEVINE:  Objection to form.
24 BY THE WITNESS:

Page 314

1    A.   No.
2    BY MR. GADDY:
3        Q.   Did anybody from the business side ever
4    come and tell you that Walgreens was shipping more
5    oxycodone to Florida than any other distributor in
6    the country?
7        MR. LEVINE:  Objection to form.
8    BY THE WITNESS:
9        A.   No.
10   BY MR. GADDY:
11       Q.   Did anybody ever come -- strike that.
12           We know from the e-mail that we saw
13   earlier today that after the DEA shut down Jupiter,
14   somebody sent you a list of six stores and said,
15   "Doug, we need to make sure no more C-IIs go to
16   these stores."  Do you recall that?
17       A.   Yes.
18       Q.   Okay.  And you recall that this morning
19   we went through some of those stores and we saw
20   that over a period of from 2009 to 2011, some of
21   those stores had increases in product of 16- and
22   even 20-fold.  Do you recall that?
23       A.   I recall the document.
24       Q.   Okay.  You recall that the product that

Page 315

1    was increasing in distribution to these stores by
2    16- or 20-fold was oxycodone dosages, correct?
3        MR. LEVINE:  Objection to form.
4    BY THE WITNESS:
5        A.   I'm not 100% sure.
6    BY MR. GADDY:
7        Q.   Do you remember the document we looked
8    at this morning was talking about oxycodone going
9    to Florida?
10       MR. LEVINE:  Objection to form, foundation.
11   BY THE WITNESS:
12       A.   Yes, I do remember it, yes, somewhat.
13   BY MR. GADDY:
14       Q.   At any point in time did anybody from
15   the business side of Walgreens come to you and say,
16   "Doug we have pharmacies that are getting orders in
17   excess of or orders that are increasing 16 or 20
18   times over a two-year period and we need to -- need
19   you to look into writing some code or developing
20   some type of program that can look into see whether
21   or not that should be happening"?
22           Did anybody from the business side ever
23   come and ask you to do that?
24       A.   No one from the business side told me

Page 316

1    anything.  Just asked if we can stop these stores
2    from receiving product.
3        Q.   And that was after the DEA had yanked
4    their registration, right?
5        A.   I'm not 100% sure, no.
6        Q.   That's what the e-mail said, right, is
7    "The DEA is taking their registration, so, Doug, we
8    need to make sure that these stores don't get any
9    more C-II products"?
10       MR. LEVINE:  Objection to form.
11   BY THE WITNESS:
12       A.   I don't remember the e-mail.  I guess --
13   I'm not sure.
14   BY MR. GADDY:
15       Q.   That's fair.  And, finally, you were
16   asked some questions just now about the excessive
17   order query and you created that query back in the
18   early 1990s, correct?
19       A.   Myself and team members did, yes.
20       Q.   Okay.  And the purpose of that query was
21   to make sure that orders that were entered by
22   mistake weren't actually filled by the distribution
23   center, right?
24       A.   That is true, yes.

Page 317

1        Q.   The purpose of that was to make sure
2    that the distribution wouldn't -- distribution
3    center wouldn't fill an order that hadn't been
4    intended to be placed and therefore there would
5    have to be the arduous process of getting the order
6    back from the store, correct?
7        A.   Yeah, the return process, yes.
8        Q.   Okay.  And the code that was written for
9    that allowed for a single quantity to be entered
10   and any product that was ordered in excess of that
11   quantity would populate on the report, is that
12   correct?
13       A.   Yes.
14       Q.   And it was not a -- the amount that was
15   entered wasn't differentiated by product, correct?
16   So, the number that would be entered would be the
17   same whether we're talking about cold medication,
18   whether we're talking about toilet paper or whether
19   we're talking about OxyContin, is that correct?
20       A.   That is correct.
21       Q.   And in no way, shape or form was that
22   program written to allow Walgreens to comply with
23   its obligations under the Controlled Substance Act?
24       A.   I did not write it for that purpose, no.

Page 318

1    MR. GADDY:  That's all I have, Mr. Peterson.
2 Thank you.
3    MR. LEVINE:  Some follow-up.
4       FURTHER EXAMINATION
5 BY MR. LEVINE:
6    Q.   First of all, you were just asked by
7 Plaintiffs' counsel about actions directed by the
8 business.
9       Did you do anything beyond creating
10 computer programs in response to what the business
11 requested?
12    MR. GADDY:  Objection to form.
13 BY THE WITNESS:
14    A.   No. No.
15 BY MR. LEVINE:
16    Q.   Were you the only person at Walgreens in
17 IT who created computer programs?
18    A.   No.
19    Q.   Were there other groups within the IT
20 department that handled computer programs for
21 quantities that were sent to stores?
22    A.   Yes.
23    Q.   And did that include the group by -- is
24 it Bamberg?

Page 319

1    A.   Yes.  Steve Bamberg.
2    Q.   And what was his group doing?
3    A.   He was the store side of ordering.
4    Q.   And do you know if he did anything with
5 respect to suspicious orders or that's just beyond
6 your knowledge?
7    MR. GADDY:  Objection to form.
8 BY THE WITNESS:
9    A.   It's -- I'm not sure, but he would be
10 the group that would have done it if it was.
11 BY MR. LEVINE:
12    Q.   Then you were just asked about the
13 excessive order query, and I want to make sure we
14 have this straight.
15       Originally, when it was developed by you
16 and your teammates in the 1990s, you said that was
17 for orders that were made by mistake, is that
18 right?
19    A.   Yes.
20    MR. GADDY:  Object to the form.
21 BY THE WITNESS:
22    A.   Yes.
23 BY MR. LEVINE:
24    Q.   Do you know -- and then later on was the

Page 320

1 excessive order query used in Class II distribution
2 facilities?
3    MR. GADDY:  Objection to form, foundation.
4 BY MR. LEVINE:
5    Q.   Let me ask this:  At the time that you
6 and your teammates drafted the excessive order
7 query in the early to mid-1990s, was Walgreens
8 distributing Class II controlled substances?
9    A.   No.
10    Q.   When did Walgreens begin distributing
11 Class II controlled substances, approximately?
12    A.   Early 2000s.
13    Q.   And in the early 2000s, when Walgreens
14 began distributing Class II controlled substances,
15 did -- were you involved in making sure that the
16 excessive quantity query could be used in those
17 distribution centers as well?
18    MR. GADDY:  Objection to form.
19 BY THE WITNESS:
20    A.   Yes.
21 BY MR. LEVINE:
22    Q.   Do you know whether the distribution
23 center operations people used the excessive order
24 query for purposes other than just orders sent by

Page 321

1 mistake with respect to controlled -- Class II
2 controlled substances auto?
3    MR. GADDY:  Objection to form.
4 BY THE WITNESS:
5    A.   I do not know.
6 BY MR. LEVINE:
7    Q.   If you wanted to find that out, how the
8 people in operations used the excessive order query
9 after the Class II controlled substances began to
10 be distributed, is that something that you would be
11 the person to ask about that?
12    A.   No.
13    Q.   Who would you want to talk to?
14    A.   You'd have to talk to the DC operations
15 team.
16    Q.   Is that distribution center operations?
17    A.   Yes, the distribution operations team.
18    MR. LEVINE:  Nothing further.
19       FURTHER EXAMINATION
20 BY MR. GADDY:
21    Q.   Counsel just asked you about in the
22 early 2000s -- the question he asked, "In the early
23 2000s when Walgreens began distributing Class II
24 controlled substances, were you involved in making

---

Page 322

1 sure that the excessive quantity query could be
2 used in those distribution centers?"
3     Did you do something with the program in
4 the early 2000s?
5    A.  We changed one field in the query to
6 point to the distribution, so it would look at the
7 distribution number associated to that distribution
8 center.  So...
9    Q.  So, it had to do with the C-II
10 distribution centers.  It didn't have to do with
11 any of the products?
12    A.  Nothing to do.  Just the numbers for the
13 distribution center.
14    Q.  Okay.  So, each distribution center has
15 its own DEA registration number or whatnot and you
16 had to input those distribution center numbers so
17 that the program would work with those distribution
18 centers as well?
19    A.  No.  What we did is each distribution
20 center has a number, 880 something, 14, 15, 100,
21 whatever it was.  That number is entered in the
22 query so then when it looks at the files, it's only
23 looking at that distribution data; and we changed
24 that so that it would be pointing at the C-II

---

Page 323

1 distribution number, and then that was it.
2    Q.  Okay.  You didn't input any suggested
3 threshold or line limit or quantity or anything of
4 that nature?
5    A.  No, I would not have.
6    Q.  Other than allowing it to look at the
7 products that the new distribution centers were
8 bringing online, there were no other changes made?
9    A.  None.
10    MR. GADDY:  Thank you.
11         FURTHER EXAMINATION
12 BY MR. LEVINE:
13    Q.  If you wanted to find out about
14 thresholds or quantity limits, is that something to
15 ask the people in operations, the distribution
16 center?
17    A.  Yes.
18    MR. LEVINE:  Nothing further.
19    MR. GADDY:  Thank you.
20    THE VIDEOGRAPHER:  We are going off the record
21 at 3:49 p.m.
22        (Time Noted:  3:49 p.m.)
23     FURTHER DEPONENT SAITH NAUGHT.
24

---

Page 324

1
2     I, CORINNE T. MARUT, C.S.R. No. 84-1968,
Registered Professional Reporter and Certified
Shorthand Reporter, do hereby certify:
3     That previous to the commencement of the
examination of the witness, the witness was duly
sworn to testify the whole truth concerning the
matters herein;
5     That the foregoing deposition transcript
was reported stenographically by me, was thereafter
6 reduced to typewriting under my personal direction
and constitutes a true record of the testimony
7 given and the proceedings had;
    That the said deposition was taken
8 before me at the time and place specified;
    That the reading and signing by the
9 witness of the deposition transcript was agreed
upon as stated herein;
10     That I am not a relative or employee or
attorney or counsel, nor a relative or employee of
11 such attorney or counsel for any of the parties
hereto, nor interested directly or indirectly in
12 the outcome of this action.
13
14     CORINNE T. MARUT, Certified Reporter
15
    (The foregoing certification of this
16 transcript does not apply to any
reproduction of the same by any means, unless under
17 the direct control and/or supervision of the
certifying reporter.)
18
19
20
21
22
23
24

---

Page 325

1     INSTRUCTIONS TO WITNESS
2
3     Please read your deposition over
4 carefully and make any necessary corrections.  You
5 should state the reason in the appropriate space on
6 the errata sheet for any corrections that are made.
7     After doing so, please sign the errata
8 sheet and date it.
9     You are signing same subject to the
10 changes you have noted on the errata sheet, which
11 will be attached to your deposition.
12     It is imperative that you return the
13 original errata sheet to the deposing attorney
14 within thirty (30) days of receipt of the
15 deposition transcript by you.  If you fail to do
16 so, the deposition transcript may be deemed to be
17 accurate and may be used in court.
18
19
20
21
22
23
24

---

Highly Confidential - Subject to Further Confidentiality Review

Page 326

```
1          - - - - - -
              E R R A T A
2          - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ___  _____
6       REASON: _____
7  ____  ___  _____
8       REASON: _____
9  ____  ___  _____
10      REASON: _____
11 ____  ___  _____
12      REASON: _____
13 ____  ___  _____
14      REASON: _____
15 ____  ___  _____
16      REASON: _____
17 ____  ___  _____
18      REASON: _____
19 ____  ___  _____
20      REASON: _____
21 ____  ___  _____
22      REASON: _____
23 ____  ___  _____
24      REASON: _____
```

Page 328

```
1         LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Page 327

```
1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I, DOUGLAS PETERSON, do hereby certify
5  under oath that I have read the foregoing pages,
6  and that the same is a correct transcription of the
7  answers given by me to the questions therein
8  propounded, except for the corrections or changes
9  in form or substance, if any, noted in the attached
10 Errata Sheet.
11
12
13 _____
14 DOUGLAS PETERSON           DATE
15
16
17 Subscribed and sworn
   to before me this
18 _____ day of _____, 20____.
19 My commission expires:_____
20
   _____ Notary Public
21
22
23
24
```