1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

3

     ------------------------    )

4    IN RE: NATIONAL             ) MDL No. 2804

     PRESCRIPTION OPIATE         )

5    LITIGATION                  ) Case No.

     ------------------------    ) 1:17-MD-2804

6                                )

     THIS DOCUMENT RELATES TO    ) Hon. Dan A. Polster

7    ALL CASES                   )

     ------------------------    )

8

9

10              HIGHLY CONFIDENTIAL

11     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

12

13            VIDEOTAPED DEPOSITION OF

14                 TASHA POLSTER

15              January 23, 2019

16

17              Chicago, Illinois

18

19

20

21

22

23          GOLKOW LITIGATION SERVICES

        877.370.3377 ph | 917.591.5672 fax

24             deps@golkow.com

## Page 2

The videotaped deposition of TASHA POLSTER,
called by the Plaintiffs for examination, taken
pursuant to the Federal Rules of Civil Procedure of
the United States District Courts pertaining to the
taking of depositions, taken before CORINNE T.
MARUT, C.S.R. No. 84-1968, Registered Professional
Reporter and a Certified Shorthand Reporter of the
State of Illinois, at the offices of Bartlit Beck
LLP, Suite 600, 54 West Hubbard Street, Chicago,
Illinois, on January 23, 2019, commencing at 9:16
a.m.

## Page 3

APPEARANCES:
ON BEHALF OF THE PLAINTIFFS:
    LEVIN PAPANTONIO THOMAS MITCHELL
    RAFFERTY & PROCTOR P.A.
    316 South Baylen Street, Suite 600
    Pensacola, Florida  32502
    205-396-3982
    BY:  PETER J. MOUGEY, ESQ.
       pmougey@levinlaw.com
         -and-
       PAGE A. POERSCHKE, ESQ.
       ppoerschke@levinlaw.com
       JEFF GADDY, ESQ.
       jgaddy@levinlaw.com
       LAURA DUNNING, ESQ.
       ldunning@levinlaw.com
         (via telephone/livestream)

ON BEHALF OF WALGREENS BOOTS ALLIANCE, INC.
aka WALGREEN CO.:

    BARTLIT BECK LLP
    1801 Wewatta Street, Suite 1200
    Denver, Colorado  80202
    303-592-3177
    BY:  LESTER C. HOUTZ, ESQ.
       Lester.Houtz@bartlitbeck.com
         -and-
    BARTLIT BECK LLP
    54 West Hubbard Street, Suite 300
    Chicago, Illinois  60654
    312-494-4475
    BY:  KASPAR STOFFELMAYR, ESQ.
       kaspar.stoffelmayr@bartlitbeck.com

## Page 4

APPEARANCES (Continued):
  ON BEHALF OF JOHNSON & JOHNSON,
  JANSSEN PHARMACEUTICALS, INC.,
  ORTHO-McNEIL-JANSSEN PHARMACEUTICALS, INC.
  n/k/a JANSSEN PHARMACEUTICALS, INC.;
  JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN
  PHARMACEUTICALS, INC.:

    TUCKER ELLIS LLP
    950 Main Avenue, Suite 1100
    Cleveland, Ohio  44113-7213
    216-696-3950
    BY:  SAVANNAH M. FOX, ESQ.
       s.fox@tuckerellis.com
         (via telephone/livestream)

  ON BEHALF OF ENDO HEALTH SOLUTIONS INC. and
  ENDO PHARMACEUTICALS, INC.,
  PAR PHARMACEUTICAL, INC., and PAR PHARMACEUTICAL
  COMPANIES, INC. (f/k/a Par Pharmaceutical
  Holdings, Inc.):
    ARNOLD & PORTER KAYE SCHOLER LLP
    601 Massachusetts Avenue, NW
    Washington, DC  20001-3743
    202-942-5000
    BY:  RYAN Z. WATTS, ESQ.
       ryan.watts@arnoldporter.com

  ON BEHALF OF McKESSON CORPORATION:
    TABET DIVITO & ROTHSTEIN LLC
    209 South LaSalle Street, 7th Floor
    Chicago, Illinois  60604
    312-762-9461
    BY:  DANIEL L. STANNER, ESQ.
       dstanner@tdrlawfirm.com
       KYLE A. COOPER, ESQ.
       kcooper@tdrlawfirm.com

## Page 5

APPEARANCES (Continued):
  ON BEHALF OF CARDINAL HEALTH, INC.:
    ARMSTRONG TEASDALE LLP
    7700 Forsyth Boulevard, Suite 1800
    St. Louis, Missouri  63105
    314-621-5070
    BY:  JULIE FIX MEYER, ESQ.
       jfixmeyer@ArmstrongTeasdale.com

  ON BEHALF OF AMERISOURCEBERGEN CORPORATION:
    JASZCZUK, P.C.
    311 South Wacker Drive, Suite 3200
    Chicago, Illinois  60606
    312-442-0509
    BY:  MARGARET M. SCHUCHARDT, ESQ.
       mschuchardt@jaszczuk.com


  ON BEHALF OF WALMART:

    JONES DAY
    77 West Wacker Drive
    Chicago, Illinois  60601-1692
    312-782-3939
    BY:  MIRIAM M. LIABO, ESQ.
       mliabo@jonesday.com

  ON BEHALF OF MALLINCKRODT PHARMACEUTICALS:
    HAHN LOESER & PARKS LLP
    200 Public Square, Suite 2800
    Cleveland, Ohio  44114
    216-621-0150
    BY:  SARAH LEWIS, ESQ.
       slewis@hahnlaw.com
         (via telephone/livestream)

Highly Confidential - Subject to Further Confidentiality Review

## Page 6

```
 1  ALSO PRESENT:
 2     ALEXANDRA M. GARLOCK, Paralegal
        agarlock@levinlaw.com
 3     KAROLYNN SCHNEEGAS, Paralegal
        kschneegas@levinlaw.com
 4    Levin Papantonio Thomas Mitchell
        Rafferty & Proctor P.A.
 5
 6     MICHAEL TOTH, Trial Technician
 7
 8
 9
    VIDEOTAPED BY:  BEN STANSON
10
11  REPORTED BY:  CORINNE T. MARUT, C.S.R. No. 84-1968
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 8

```
 1         E X H I B I T S
 2  WALGREENS-POLSTER EXHIBIT        MARKED FOR ID
 3  No. 9   7/2/12 e-mail with attachment;    162
           WAGMDL00077015 - 00077023
 4
    No. 10   6/23/08 memo;              180
 5         WAGMDL00624503 - 00624509
 6  No. 11   10/27/11 e-mail with       192
           attachment;
 7         WAGMDL00119542 - 00119548
 8  No. 12   4/27/12 e-mail with        205
           attachment;
 9         WAGMDL00119539 - 00119541
10  No. 13   8/9/17 e-mail string;      211
           WAGMDL00006645 - 00006652
11
12  No. 14   10/12/12 e-mail with       216
           attachments;
13         WAGMDL00319129 - 00319239
    No. 15   11/9/12 e-mail string;     225
14         WAGMDL00658246 - 00658248
15  No. 16   3/20/13 e-mail with        231
           attachment;
16         WAGMDL00574824 - 00574825
17  No. 17   12/16/12 e-mail string with   233
           attachments;
18         WAGMDL00659270 - 00659274
19  No. 18   10/1/12 e-mail string;     254
           WAGMDL00705318 - 00705320
20
    No. 19   8/26/09 Project Request    260
21         Estimate;
           WAGMDL00492067 - 00492069
22
23
24
```

## Page 7

```
 1            I N D E X
 2  TASHA POLSTER            EXAMINATION
 3    BY MR. MOUGEY................  12
 4    BY MR. HOUTZ................  367
 5
 6
 7         E X H I B I T S
 8  WALGREENS-POLSTER EXHIBIT        MARKED FOR ID
 9  No. 1   11/13/17 e-mail string with     12
           attachments; WAGMDL00064176 -
10         00064185
11  No. 2   Binder of Documents,        39
           "Settlement and Memorandum of
12         Agreement," et al.; first page
           is WAGMDL00490963
13
    No. 3   Ven diagram drawn by        86
14         Peter Mougey
15  No. 4   Tasha Polster, LinkedIn     112
           profile
16
    No. 5   1/28/13 memo; WAGMDL00708763    117
17
    No. 6   2/8/13 e-mail string;       131
18         WAGMDL00101769 - 00101770
19  No. 7   4/19/13 e-mail with         135
           attachment;
20         WAGMDL00245768 - 00245769
21  No. 8   8/9/13 e-mail string;       158
           WAGMDL00021425 - 00021427
22
23
24
```

## Page 9

```
 1         E X H I B I T S
 2  WALGREENS-POLSTER EXHIBIT        MARKED FOR ID
 3  No. 20   11/5/12 e-mail string;     264
           WAGMDL00113808 - 00113810
 4
    No. 21   9/28/12 e-mail with        285
 5         attachment;
           WAGMDL00113816 - 00113820
 6
    No. 22   Document, "MartinB, Threshold   306
 7         Violations-Monthly";
           WAGMDL00674623
 8
    No. 23   Spreadsheet;               308
 9         WAGMDL00673894
10  No. 24   1/21/13 e-mail string;     321
           CAH_MDL2804_00783520 - 00783522
11
    No. 25   5/23/16 e-mail with        328
12         attachment;
           WAGMDL00010887 - 00010924
13
    No. 26   6/19/13 e-mail with        356
14         attachments;
           WAGMDL00316771 - 00316785
15
    No. 27   2/19/13 e-mail string;     358
16         WAGMDL00101723 - 00101732
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1    THE VIDEOGRAPHER: We are now on the record.
2 My name is Ben Stanson. I am a videographer for
3 Golkow Litigation Services.
4    Today's date is January 23, 2019, and
5 the time is 9:16 a.m.
6    This video deposition is being held in
7 Chicago, Illinois, in the matter of the National
8 Prescription Opiate Litigation, MDL No. 2804,
9 pending in the U.S. District Court, Northern
10 District of Ohio, Eastern Division.
11    The deponent is Tasha Polster.
12    Will counsel please identify themselves
13 for the record.
14    MR. MOUGEY: Peter Mougey, Levin Papantonio,
15 for the Plaintiffs.
16    MS. GARLOCK: Alexandra Garlock for the
17 Plaintiffs.
18    MS. SCHNEEGAS: Karolynn Schneegas for the
19 Plaintiffs.
20    MS. SCHUCHARDT: Margaret Schuchardt, Jaszczuk
21 PC, for AmerisourceBergen Drug Corporation.
22    MS. FIX MEYER: Julie Fix Meyer, Armstrong
23 Teasdale, for Cardinal Health.
24    MR. COOPER: Kyle Cooper on behalf of McKesson

Page 11

1 Corporation.
2    MS. LIABO: Miriam Liabo from Jones Day on
3 behalf of Walmart.
4    MR. STOFFELMAYR: Kaspar Stoffelmayr for
5 Walgreens.
6    MR. HOUTZ: Les Houtz from Bartlit Beck for
7 Walgreens.
8    THE VIDEOGRAPHER: Counsel on the phone, if
9 you will announce yourselves for the record,
10 please.
11    MS. LEWIS: Good morning. This is Sarah Lewis
12 from Hahn Loeser & Parks on behalf of Mallinckrodt.
13    MR. WATTS: This is Ryan Watts from Arnold &
14 Porter on behalf of Endo Health Solutions, Inc.,
15 Endo Pharmaceuticals, Inc., Par Pharmaceutical,
16 Inc. and Par Pharmaceutical Company, Inc.
17    MS. FOX: Savannah Fox from Tucker Ellis on
18 behalf of Janssen and Johnson & Johnson.
19    THE VIDEOGRAPHER: Thank you. Our Court
20 Reporter today is Corinne Marut. Will you please
21 swear in the witness.
22    (WHEREUPON, the witness was duly
23    sworn.)
24

Page 12

1    TASHA POLSTER,
2 called as a witness herein, having been first duly
3 sworn, was examined and testified as follows:
4    EXAMINATION
5 BY MR. MOUGEY:
6    Q.   Good morning, Ms. Polster. My name is
7 Peter Mougey. I am with Levin Papantonio on behalf
8 of the Plaintiffs.
9    I hand you what we'll mark as Polster 1.
10    (WHEREUPON, a certain document was
11    marked as Walgreens-Polster Exhibit
12    No. 1: 11/13/17 e-mail string with
13    attachments; WAGMDL00064176 -
14    00064185.)
15 BY MR. MOUGEY:
16    Q.   Before we turn to Polster 1, you have
17 been employed by Walgreens since the beginning of
18 1982, correct?
19    A.   End of 1982, yes.
20    Q.   When you were still an undergrad, you
21 started working at Walgreens as a cashier and
22 various different roles while you were still
23 pursuing your academic degree, correct?
24    A.   I was in high school.

Page 13

1    Q.   And you continued and have continued
2 working for Walgreens in various capacities all the
3 way up to the present time, correct?
4    A.   Correct.
5    Q.   So, from 1982 to today, approximately 36
6 years, you've been employed by Walgreens in various
7 roles, correct?
8    A.   Yes.
9    Q.   And your undergraduate degree was a B.S.
10 in pharmacy, correct?
11    A.   Correct.
12    Q.   And you finished your degree in I
13 believe it was 1986 -- 1989, correct?
14    A.   Yes.
15    Q.   UC-Boulder?
16    A.   Yes.
17    Q.   And then you pursued a number of
18 positions within Walgreens using your academic
19 background primarily in roles related around the
20 pharmacy, correct?
21    A.   Yes.
22    Q.   And what I've handed in front of you,
23 you should have in front of you is Polster 1, I
24 believe, is one example of a resume or CV, a

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  document elaborating on your background.
2      Do you recognize that document?
3  A.  Yes.
4  Q.  Did you put -- are you familiar with the
5  contents?
6  A.  Yes.
7  Q.  You put this together?
8  A.  Yes.
9  Q.  And is this an accurate reflection of
10  the -- of your resume or CV?
11  A.  Yes, it is.
12  Q.  And today what we are primarily here to
13  talk about is Walgreens in its capacity as a
14  distributor and the -- what I believe on your
15  resume encompasses that time period is on the first
16  page, Bates No. -- bottom right corner.  I am going
17  to refer to the last three digits.  The full number
18  is WAGMDL64180.  It's page 3 of the document.  Are
19  you with me?
20  A.  Yes.
21  Q.  And Walgreens Company at the bottom,
22  "Deerfield, Illinois, Senior Director,
23  Pharmaceutical Integrity and Third Party
24  Operations, 2012 to 2014," correct?

Page 15

1  A.  Yes.
2  Q.  And this is the period of time that you
3  were selected to run a new department ultimately
4  titled Pharmaceutical Integrity, correct?
5  A.  Correct.
6  Q.  And you along with other individuals at
7  Walgreens built that department from the ground up,
8  correct?
9  A.  Yes.
10  Q.  Meaning you were named or identified
11  first to run the department and you developed,
12  first, kind of a mission, correct?
13  A.  Yes.
14  Q.  And then an organizational structure
15  with support in order for you to achieve the
16  mission that was identified, correct?
17  A.  Yes.
18  Q.  And then you went through a series of
19  interviews of others, predominantly also within
20  Walgreens, to help fill out that organizational
21  structure, correct?
22  A.  Yes.
23  Q.  Now, your experience prior to
24  Pharmaceutical Integrity, it's got a couple single

Page 16

1  pages here.
2      Would you agree with me generally that
3  your background after your degree up and to
4  Pharmaceutical Integrity was driven by both
5  in-store pharmacy operations and then growing into
6  more of an operational role where you took the
7  director of pharmacy operations optimization in
8  2007?  Is that a fair description generally of your
9  background?
10  A.  Yes.
11  Q.  So, if we go through a little more
12  detail, starting -- and you have a block at the
13  bottom of the page, '82 to '97, you worked your way
14  up from high school through college into a cashier,
15  a pharmacy intern, a staff pharmacist and then a
16  pharmacy manager, correct?
17  A.  Yes.
18  Q.  That gets us all the way to 1997,
19  correct?
20  A.  Yes.
21  Q.  And in 1997 you became a pharmacy
22  supervisor here in Chicago, Illinois, correct?
23  A.  No.  That's not correct.  I opened the
24  Kansas City market, and then eventually moved to

Page 17

1  Chicago a few years after that.
2  Q.  The third bullet in that entry is
3  "Opened the Kansas City market (also supervised
4  stores" -- "existing stores in Wichita)"?
5  A.  Yes.
6  Q.  And then ultimately moved back up to
7  Chicago as a pharmacy supervisor, correct?
8  A.  Correct.
9  Q.  And, now, the next entry was pharmacy --
10  manager, pharmacy operating systems.  Would you
11  just explain to me in general what you mean by
12  "operating systems."
13  A.  Sure.  It were -- it was systems that
14  pharmacists used that were outside of the
15  dispensing operating system.  So, how they logged
16  payroll was a big part of it and store scheduling,
17  how the markets would schedule pharmacists to fill
18  shifts in their stores; and then there was a lot of
19  disaster relief efforts that happened at the time
20  because Hurricane Katrina was going on.
21  Q.  So, anything inside the store, kind of
22  day-to-day management of the store from inventory
23  to scheduling to ensure the smooth operations
24  within one of the physical locations?

Page 18

1  A.   Not inventory per se.  Basically if it
2  didn't -- if it didn't have to do with the
3  prescription operating system, it usually fell on
4  to my team, to me and my team.
5       So, scheduling and how we pay
6  pharmacists, making sure that the payroll was sent
7  over to the department that, you know, paid out the
8  pharmacists and making sure we didn't underpay or
9  overpay pharmacists.
10  Q.   Okay.  The next position covers almost
11 an entire page, Walgreens Company, director,
12 pharmacy operations optimization.  I'm assuming
13 that was a promotion?
14  A.   Yes.
15  Q.   And essentially what you did in your
16 previous role as an operating systems manager but
17 you had ascended to more of a managerial role
18 overseeing a number of stores?
19  A.   Overseeing a team that helped develop
20 programs and for all the stores in the nation.
21  Q.   And those programs included training on
22 "oversight of processes, procedures, implementing
23 organization of strategic initiatives for all
24 retail pharmacies, translated major strategic and

Page 19

1  retail pharmacy operational initiatives into
2  deployable and early adoption models based upon
3  assessments of training needs."
4       I read that from your resume.  Did I get
5  that right?
6  A.   Yeah, that's correct.  I had -- of all
7  the programs and procedures or policies that we
8  would put in place were policies that were new, of
9  newly developed programs.
10  Q.   So, A, communicating and, B, rolling out
11 initiatives from corporate to the stores across the
12 country?
13  A.   Correct.
14  Q.   And the second paragraph underneath that
15 description was also your "insight into pharmacy
16 remodels, designs and layout to ensure targeted
17 fiscal and operational objectives, directed the
18 creation of metrics for retail pharmacy operations
19 and assess/measure performance to identify
20 performance trends."  Correct?
21  A.   Yes.
22  Q.   Walk me through, just briefly, the
23 pharmacy remodels, designs and layouts.  That kind
24 of caught my eye.  Something to me I thought was

Page 20

1  different than the rest of your resume.
2  A.   Sure.
3  Q.   Explain to me a little more about what
4  that entailed.
5  A.   So, we have what we call workflow back
6  in our pharmacy departments where we look to make
7  sure that the equipment is lined up in a way that
8  makes sense for the pharmacy staff to make it the
9  most efficient so people aren't tripping all over
10 each other or, you know, the flow of the patients
11 to the cash register makes sense.  We'll make sure
12 that we have the proper number of computers per
13 employees that are back there.
14      So, my team would work on ensuring that
15 if we had a new store that the equipment was placed
16 appropriately, that if the volume of the store
17 started to increase, we would add additional work
18 stations or phones so the employees could do their
19 job as efficiently as possible.
20  Q.   That process was designed or
21 operating -- let me do that another way.
22      That process was designed to identify
23 the most efficient layout for the Walgreens stores
24 for customer workflow and for employees to be able

Page 21

1  to undergo their jobs in the most efficient manner
2  possible?
3  A.   Yes.
4  Q.   And is that something you had a
5  background or training in prior to taking on that
6  role?
7  A.   No, other than experience in the stores
8  previously.
9  Q.   And the next paragraph, "Led the
10 development and deployment of training, new and
11 recurrent, for pharmacists and pharmacy technicians
12 based upon operational changes, pharmacy
13 acquisitions and regulatory requirements."
14      Would you explain to me in a little more
15 detail what you mean in that first sentence of the
16 third paragraph on Bates No. 80.
17  A.   Yes.  So, if we rolled out a new program
18 that required training, my team would put it
19 together.  We would put forth communications and
20 training out to the stores.
21      In terms of recurrent, if something
22 changed in the state from a regulatory nature and
23 we needed to update a policy or a training, that
24 would go through my team; and then we would update

| Page 22 |
|---|
| 1 it to the new regulation, and we would send it out |
| 2 to the stores. |
| 3      Q.   What I saw is a theme looking through |
| 4 your resume, in addition to your background as a |
| 5 pharmacist and your BS in pharmacy from Colorado, |
| 6 was that you appeared to be involved in rolling out |
| 7 initiatives starting in a more of a store and then |
| 8 district and then national level.  Is that an |
| 9 accurate statement? |
| 10      A.   Yes. |
| 11      Q.   And that obviously you have a strong |
| 12 skill set in communication, team building and |
| 13 organizational skills enough to kind of get a |
| 14 company like Walgreens with several thousand stores |
| 15 moving in the same direction at the same time.  Is |
| 16 that a fair assessment? |
| 17      A.   Yes. |
| 18      Q.   So, your skill set, twofold, and I'm |
| 19 sure you have more than two, but if we are going to |
| 20 put them in two buckets, one was that kind of |
| 21 technical pharmaceutical background with your |
| 22 degree from Colorado and then, secondly, operations |
| 23 communications side where you were highly |
| 24 organized, communicated well and helped roll out |

| Page 23 |
|---|
| 1 and get momentum for initiatives that were coming |
| 2 out of corporate. |
| 3           Are those two kind of general |
| 4 categories? |
| 5      A.   Yes. |
| 6      Q.   Now, I didn't see anything in your |
| 7 resume that you were heavily involved in, for |
| 8 example, compliance with any regulatory functions |
| 9 at the -- at Walgreens.  Is that fair? |
| 10      A.   Fair. |
| 11      Q.   All right.  And meaning you weren't at |
| 12 any point in time doing the deep dive on Walgreens' |
| 13 processes and procedures to ensure they were |
| 14 compliant with federal or state law.  Is that fair? |
| 15      A.   Yes. |
| 16      Q.   All right.  So, you were -- who asked |
| 17 you in 2012 would you consider becoming a part of |
| 18 the Pharmaceutical Integrity Department? |
| 19      A.   In 2012 there was a group of people that |
| 20 was cross-functional that was asked to come to a |
| 21 meeting and we all went to the meeting, started |
| 22 rolling up our sleeves to do some work. |
| 23           And then as the time progressed, a -- |
| 24 this was very late 2012 -- a job opportunity was |

| Page 24 |
|---|
| 1 posted on the -- on our website that they were |
| 2 posting a leader for this particular team, and I |
| 3 applied for it. |
| 4      Q.   Is that how you identified new |
| 5 opportunities through your career at Walgreens that |
| 6 you would somewhat monitor whatever new positions |
| 7 were available? |
| 8      A.   Sometimes.  You know, I had been in my |
| 9 current role for a long time.  So, when I heard |
| 10 that there was an opportunity to do something |
| 11 different, I applied for the role. |
| 12      Q.   And who called for the cross-functional |
| 13 meeting? |
| 14      A.   I don't remember. |
| 15      Q.   Do you remember who set it up? |
| 16      A.   No. |
| 17      Q.   And do you recall who attended? |
| 18      A.   I recall some of the people who |
| 19 attended. |
| 20      Q.   Okay. |
| 21      A.   You know, Rex Swords was there.  There |
| 22 was another leader at the time who is no longer |
| 23 with Walgreens.  Her name was Suzanne.  There were |
| 24 some loss prevention people.  Ed Svihra is one of |

| Page 25 |
|---|
| 1 them, and he is no longer with Walgreens.  I can't |
| 2 remember everybody that was there. |
| 3      Q.   Now, which -- do you remember anyone |
| 4 else other than Rex, Suzanne and Ed Svihra? |
| 5      A.   Not -- no. |
| 6      Q.   Do you remember Suzanne's last name? |
| 7      A.   Hansen. |
| 8      Q.   And do you remember which department she |
| 9 was in? |
| 10      A.   She led the pharmacy department at the |
| 11 time. |
| 12      Q.   I'm sorry.  I am drawing a blank in |
| 13 which department Rex was in. |
| 14      A.   The same one. |
| 15      Q.   Pharmacy? |
| 16      A.   Yeah, he reported in to Suzanne at the |
| 17 time. |
| 18      Q.   Okay.  Now, did you know Rex or Suzanne |
| 19 prior to this meeting? |
| 20      A.   Yes, I did. |
| 21      Q.   And did you know him well? |
| 22      A.   I -- all three of us had been with |
| 23 Walgreens for a very long time and although I |
| 24 didn't work directly for them, we all crossed paths |

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 because we were all in the same department.
2    Q.   I am still struggling with Walgreens'
3 organizational structure. So, if you could help me
4 just a little bit understand.
5       Which department would you have
6 considered yourself in up until 2012 when you
7 became the senior director for Pharmaceutical
8 Integrity?
9    A.   I was in the pharmacy department, but
10 there were many direct reports. So, direct reports
11 of Suzanne. So, Rex was a direct report of
12 Suzanne. My boss at the time was a direct report
13 of Suzanne. She led the department. And then
14 there were a lot of vice presidents, and then I was
15 under a vice president.
16    Q.   Before Pharmaceutical Integrity, who
17 were you -- who was your direct report? Who did
18 you report to?
19    A.   Rick Gates.
20    Q.   If you had to give me a 30,000-foot view
21 of what you believe that the pharmacy department
22 did at Walgreens, can you do that?
23    A.   Sure. Basically anything that touches
24 the pharmacy in terms of customer service,

Page 27

1 sometimes, you know, ensuring that the field has
2 access to policies and procedures. They have
3 access to training. They have support needed from
4 a workflow perspective, from an IT perspective.
5       We're kind of the liaison for the field,
6 whether it's store level or leadership in the
7 region or division to help troubleshoot anything
8 that the stores are needing.
9    Q.   Now, are you familiar with loss
10 prevention, the group within Walgreens?
11    A.   Yes.
12    Q.   And have you worked through the years
13 kind of closely with loss prevention?
14    A.   It depended on my job at the time. I
15 worked closer with them when I was in the field
16 because if I had a loss prevention issue, I would
17 work with my loss prevention manager to help solve
18 it. When I came to my role between '07 and '12, we
19 rarely crossed paths.
20    Q.   Prior to '07 when you were more at the
21 store level, not higher up in the organizational
22 structure, but more store level, you worked on
23 issues as they arose with loss prevention?
24    A.   Correct.

Page 28

1    Q.   For example, if there was a theft or if
2 there was some issue that brought loss prevention
3 into the store, an investigation, that would be
4 examples of when you would deal with loss
5 prevention?
6    A.   Yes.
7    Q.   Any other examples that you would?
8    A.   No.
9    Q.   Now, do you have an understanding of
10 just generally how loss prevention is set up, like
11 organizationally?
12    MR. HOUTZ: What time period?
13    MR. MOUGEY: Doesn't matter.
14 BY THE WITNESS:
15    A.   Well, I know they're, you know, set up
16 just like the pharmacy department is set up, right,
17 where you've got a group vice president, vice
18 presidents and then directors, managers, field
19 folks that are on the ground, you know, at the
20 local level.
21 BY MR. MOUGEY:
22    Q.   Do that one more time. You said group
23 vice presidents?
24    A.   Yeah, a group vice president and then

Page 29

1 the vice president. Then there will be directors.
2    Q.   Okay.
3    A.   And managers down to field level folks.
4    Q.   Do you have an understanding of how many
5 different groups there were? You say group vice
6 president.
7    A.   Well, there is one group vice president
8 that oversees the entire division of loss
9 prevention, and then I don't know how many
10 managers -- or vice presidents they would have or
11 directors.
12       And then at a local level, depending on
13 how many stores are in that area, you'll have, you
14 know, the number of field base folks to help
15 support the number of stores that are there.
16    Q.   So, the group vice president meant that
17 that was the loss prevention, the group, that was
18 who ran loss prevention, so to speak?
19    A.   Correct.
20    Q.   Do you have an understanding of what
21 their, if I use the word mission or charge, what
22 their scope of responsibility was?
23    A.   No.
24    Q.   When you were in the field, so prior to

Page 30

1 '07 when you ran kind of -- came into contact with
2 loss prevention, it was in the context of thefts in
3 the stores or some issue with shrinkage or
4 something along those lines?
5     A.   Yes, or injury, you know, if a patient
6 fell in a store, loss prevention would be notified
7 as well as, you know, the local leadership.
8     Q.   And you were dealing up until '07, when
9 you were still in the field, you were dealing
10 predominantly with more of the director, manager,
11 field level?
12     A.   Ask the question again, please.
13     Q.   When you were -- when you were still in
14 the field, up until manager of pharmacy operating
15 systems, '03-'07, you said that you still had some
16 contact with loss prevention.  Am I getting that
17 right or did I mix up my timeline?
18     A.   Before -- before '03, when I was in the
19 pharmacy supervisor role, the interaction that I
20 had with our loss prevention was if there was a
21 theft or a loss at a store, if there was a robbery
22 at a store or an injury at a store.
23     Q.   All right.  So, let's go back to the
24 cross-functional meeting.  And how many people do

Page 31

1 you recall being at that meeting?  Even if you
2 don't remember everyone's names, just estimate.
3     A.   The room was about this size, and I
4 would say it was about this same number of people.
5 So, maybe eight to ten maybe.
6     Q.   Okay.  And do you remember generally
7 what the purpose of the meeting was?
8     MR. HOUTZ:  Object on foundation.
9 BY THE WITNESS:
10     A.   We had received the Order to Show Cause
11 at one of the distribution centers, and it was
12 based on that.
13 BY MR. MOUGEY:
14     Q.   Would you say it was reactive in
15 response to the Order to Show Cause?
16     MR. HOUTZ:  Object to form.
17 BY THE WITNESS:
18     A.   I don't know about "reactive," but that
19 was the premise of the meeting.
20 BY MR. MOUGEY:
21     Q.   Okay.  And you say it was the premise of
22 the meeting.  Was it just tell everyone that we
23 received an Order to Show Cause?
24     A.   And it was to let the working team know

Page 32

1 that it had happened and then figure out what the
2 next steps were.
3     Q.   I'm sorry if I already asked you this,
4 but do you recall who led that meeting?
5     A.   I don't.
6     Q.   All right.  And, so, next steps.  Was
7 the group able to ascertain kind of action items or
8 follow-up items at the conclusion of the meeting?
9     A.   Well, there were a lot of meetings.
10     Q.   Okay.
11     A.   But, you know, we did come away with
12 next steps that each of us -- each of us had to do.
13 But, boy, I couldn't tell you every one of them.
14     Q.   All right.  How many meetings do you
15 think there were?
16     A.   Oh, my goodness.  A lot.
17     Q.   A few a week?
18     A.   Yes.
19     Q.   And it was -- there was a sense of
20 urgency after the Order to Show Cause was received?
21     A.   Yes.
22     Q.   And that was -- that Order to Show
23 Cause, I think you're referring to, the
24 distribution center was the Jupiter distribution

Page 33

1 center in Florida, correct?
2     A.   Yes.
3     Q.   And were the meetings in the Walgreens
4 corporate office in Deerfield?
5     A.   Yes.
6     Q.   And roughly, I'm sure the same people
7 weren't at every meeting, but roughly the same
8 group of people or did it change over time?
9     A.   It changed over time.
10     Q.   And do you recall who else was added to
11 that group other than the list you gave me?
12     A.   Well, there were people added.  My team
13 was added as I started hiring people in.  You know,
14 operation folks were brought in to help us with the
15 communication down to field level.
16     Q.   Now, when you say "my team was added,"
17 are you referring to Pharmaceutical Integrity?
18     A.   Yes.
19     Q.   So, when I asked you earlier about what
20 some of the take-aways were, I'm assuming that
21 early in this process there was a decision to form
22 a group?
23     MR. HOUTZ:  Object to form.
24 BY MR. MOUGEY:

Page 34

1    Q.   Probably wasn't named Pharmaceutical
2  Integrity at that point in time, but that was going
3  to oversee the suspicious order monitoring process,
4  is that fair?
5    MR. HOUTZ:  Object to form.
6  BY THE WITNESS:
7    A.   Not oversee suspicious order monitoring
8  per se, but to have an all-encompassing team and a
9  single point of contact during that time frame.
10 BY MR. MOUGEY:
11   Q.   All right.  Tell me what you mean by
12 "all-encompassing team."  All-encompassing what?
13   A.   So, my team for Pharmaceutical Integrity
14 does a lot more than controlled substance order
15 monitoring.  We are the single point of contact for
16 the DEA.  We pull data for subpoenas.  We are a
17 resource for the field for DEA audits.  Law
18 enforcement sometimes will contact us to get
19 prescription data for a certain store.  We manage
20 the controlled substance inventory counts that
21 happen annually.
22       I know I'm not going to list off
23 everything my team does.
24   Q.   That's okay.  I believe one of the first

Page 35

1  things that you said was in addition to the
2  suspicious order monitoring, and then you gave me
3  these laundry list.
4        Can you explain a little bit more what
5  you meant by suspicious order monitoring?
6    A.   Controlled substance order monitoring.
7  We ensure that the -- a number of tablets that go
8  into any one location, there is a very
9  sophisticated algorithm that was built about the
10 time that the Pharmaceutical Integrity team was
11 started.  I mean, I think we had it long before
12 that but when I came in, we were making changes and
13 adjustments to it.
14       It's based on a linear regression line
15 where that store is compared to stores of like size
16 and volume.  We called them peer groups.  And we --
17 my team will ensure that no one NDC number will go
18 outside of the volume that the store is calculated
19 out to need without proper documentation.
20   Q.   We just skipped some -- I think a bunch
21 of steps.  Let me go back.  We were starting at the
22 kind of the cross-function meeting and we all of a
23 sudden went to a group and what your goals were.
24 Let me take a few steps in between.

Page 36

1    A.   Sure.
2    Q.   Maybe help refresh your memory.  You
3  referenced the Order to Show Cause received from
4  the DEA to the Jupiter distribution center,
5  correct?
6    A.   Yes.
7    Q.   And it wasn't -- it wasn't just an Order
8  to Show Cause.  The DEA also issued an immediate
9  suspension of Walgreens distribution license at the
10 Jupiter center, correct?
11   A.   I don't know.
12   Q.   You don't know.  Do you recall that the
13 date that the Order to Show Cause and Immediate
14 Suspension of Registration was September 13, 2012?
15   A.   Because you told me it.  I didn't recall
16 they are the same date.
17   Q.   You said late 2012, you're comfortable
18 that you recall it was later 2012?
19   A.   Yes.
20   Q.   And you recall that the meeting, the
21 cross-function meeting, was set as a result of the
22 Order to Show Cause?
23   A.   Yes.
24   Q.   And it was here's what the Order to Show

Page 37

1  Cause elaborates.  Here's what it relays.  How are
2  we going to deal with this on a business front
3  internally at Walgreens.  Correct?
4    A.   Yes.
5    Q.   So, are you comfortable that the Order
6  to Show Cause also suspended Jupiter's ability to
7  distribute controlled substances, Schedule II and
8  III, out of that Jupiter distribution center?
9    MR. HOUTZ:  Object on foundation.
10 BY THE WITNESS:
11   A.   Yes.
12 BY MR. MOUGEY:
13   Q.   And that, as a result, there had to be
14 some contingency plans about how Walgreens
15 pharmacies would receive controlled substances II
16 and III to the pharmacies, correct?
17   A.   Yes.
18   Q.   And were you aware that the DEA actually
19 locked the cage in the Jupiter distribution center
20 so Walgreens staff couldn't access the controlled
21 substances?
22   A.   No.
23   Q.   So, there was a -- different pieces of
24 this meeting to cover the ramifications of the

Page 38

1 Order to Show Cause and immediate suspension from
2 the DEA?
3     MR. HOUTZ: Object on form.
4 BY THE WITNESS:
5     A.   Sorry. Can you ask that again.
6     MR. MOUGEY: What's your objection, Les?
7     MR. HOUTZ: I'm not seeing your exact
8 language, so I can't quote it.
9     MS. SCHUCHARDT: Is everybody else paused?
10    MR. HOUTZ: The transcript is paused.
11    MR. MOUGEY: We'll come back to it.
12    MR. HOUTZ: But I think it's something about
13 different pieces of the meeting. I just -- I
14 thought the question was vague.
15        (Clarification by the reporter.)
16 BY MR. MOUGEY:
17    Q.   My question was -- I'm sorry.
18    MR. HOUTZ: Peter, I will say you have been
19 using the term "meeting" and "meetings," and it's
20 not clear to me how many meetings you're talking
21 about sometimes, if you're talking about the first
22 meeting or a series of meetings.
23        (WHEREUPON, a certain document was
24         marked as Walgreens-Polster Exhibit

Page 39

1         No. 2: Binder of Documents,
2         "Settlement and Memorandum of
3         Agreement," et al.; first page is
4         WAGMDL00490963.)
5 BY MR. MOUGEY:
6     Q.   Ms. Polster, what I have just put in
7 front of you is Polster 2. On the very first
8 page it's Settlement and Memorandum of Agreement.
9         Do you see that?
10    A.   Yes.
11    MR. MOUGEY: And it's -- you guys ready now?
12 P-WAG-0001.
13 BY MR. MOUGEY:
14    Q.   What I'd like to direct your attention
15 to is paragraph 5 on this first page.
16        "On September 13, 2012, the DEA by its
17 administrator, Michele M. Leonhart, issued an Order
18 to Show Cause and Immediate Suspension of
19 Registration to Walgreens Jupiter." And do you see
20 it's referenced as Exhibit B?
21    A.   Yes.
22    Q.   And to make this a little easier, do you
23 see how there is two sets of page numbers, page 1
24 of 13?

Page 40

1     A.   Yes.
2     Q.   And then page 1 of 349. Do you see
3 that?
4     A.   Oh, yes.
5     Q.   All right. What I have done is
6 sequenced all of these pages together so when you
7 and I reference it, it's easier to follow rather
8 than in pieces. Okay?
9     A.   Okay.
10    Q.   I'm going to use that number.
11    A.   The bottom number?
12    Q.   Yes, ma'am.
13    A.   Okay.
14    Q.   Just for everyone on the phone, it's
15 Bates No. WAGMDL490963.
16        So, what I'd like to do, Ms. Polster, is
17 to take your attention to Exhibit B that's
18 referenced on paragraph 5 of this Settlement and
19 Memorandum of Agreement. All right? So you are on
20 page 28 of 349.
21        And I know this isn't necessarily a date
22 test. So, I wanted to put this document in front
23 of you so you could see the exact title of the
24 document.

Page 41

1     A.   Okay.
2     Q.   And the date.
3     A.   Yep.
4     Q.   I want to make sure when you're
5 referencing an Order to Show Cause and what I think
6 you're talking about is the same thing.
7     A.   Yes.
8     Q.   So, again, the date in the upper
9 right-hand corner September 13, 2012.
10        Do you see that?
11    A.   Yes.
12    Q.   And the -- this document is printed on
13 U.S. Department of Justice, Drug Enforcement
14 Letterhead letterhead.
15        Do you see that at the upper right-hand
16 corner?
17    A.   Yes.
18    Q.   And it's addressed to Walgreens and
19 Jupiter, Florida.
20        Do you see that?
21    A.   Yes.
22    Q.   Then the title is Order to Show Cause,
23 which is what you referenced earlier, and I want to
24 bring your attention in to the following language

Page 42

1  which is "and the Immediate Suspension of
2  Registration."
3      A.   Okay.
4      Q.   So, when you referenced earlier that
5  there was an Order to Show Cause in late 2012 that
6  was the catalyst for the first cross-function
7  meeting, do you have an understanding that this is
8  the Order to Show Cause that you were referencing?
9      A.   Yes.
10     Q.   And let's just spend just a couple
11 minutes generally going through this document.
12         The second paragraph that begins with,
13 "Notice," you see that the DEA, through the
14 Department of Justice is, "Notice was being given
15 to inform Walgreens Corporation of the immediate
16 suspension of Drug Enforcement Administration
17 Certificate of Registration," gives the number, and
18 then cites to a United States code, "before such
19 registration constitutes an imminent danger to the
20 public health and safety."
21         Do you see that?
22     A.   I see that.
23     Q.   If you continue down that paragraph on
24 the fifth line from the bottom, the Department of

Page 43

1  Justice cites that "Walgreens' continued
2  registration is inconsistent with the public
3  interest."
4          Do you see that?
5      A.   Sorry.  No, I don't -- oh, yeah, sorry.
6  Yeah.
7      Q.   Okay.  Now, if you look over both
8  page 28 and 29 of this document, the DEA walks
9  Walgreens through the opiate epidemic and
10 Walgreens' participation through its distributors
11 store in Jupiter, correct?
12     MR. HOUTZ:  Object to form.
13 BY MR. MOUGEY:
14     Q.   I used the word "store."  Let me redo
15 that.
16         This page 28 and 29, the DEA walks
17 Walgreens through some of the general issues
18 related to the Jupiter distribution center?
19     MR. HOUTZ:  Object to form.
20 BY THE WITNESS:
21     A.   Yes.
22 BY MR. MOUGEY:
23     Q.   Now, were you given this document at any
24 time in that first meeting, the cross-functional

Page 44

1  meeting?
2      A.   No.
3      Q.   Were you ever given the document that I
4  have in front of you to show what some of the scope
5  of the issues as perceived by the DEA?
6      A.   Yes.  Later in -- after I became the
7  leader of the Pharmacy Integrity team, I got the
8  document.
9      Q.   And so that was -- do you have a
10 recollection of when you became the leader?
11     A.   It was the end of 2012.
12     Q.   Okay.  So, from around September of 2012
13 towards the end of 2012, you continued as part of
14 this cross-function meeting or team to address the
15 issues raised in Exhibit Polster 2 but more
16 specifically Exhibit B, the Order to Show Cause and
17 Immediate Suspension of Walgreens' distributor
18 license, correct?
19     A.   Yes.
20     Q.   All right.  And if you turn your
21 attention to page 30 of 349, do you see the top
22 stores, 1 through 6 at the top?
23     A.   Yes.
24     Q.   And that Walgreens oxycodone dispensing

Page 45

1  from 2009 to 2011.  Do you see where it has the
2  table at the top?
3      A.   Yes.
4      Q.   And you see from 2009 to 2011 there are
5  dramatic increases in the number of oxycodones
6  dispensed through these pharmacies, correct?
7      A.   There are increases, but I wouldn't call
8  them dramatic.
9      Q.   Okay.  I was hoping to skip that step,
10 but let's go ahead and go through them.  Okay.
11         So, the Hudson store, No. 1, is 388,000
12 people.
13         Do you see that?  I'm sorry.
14         388,000 oxycodone dosage units?
15     A.   Yes.
16     Q.   And by 2011, that number had increased
17 approximately 600% to 2.2 million dosage units of
18 oxycodone, correct?
19     A.   Yes.  The number increased.
20     Q.   Not just increased by a marginal amount
21 but over 600%, correct?
22     A.   The number increased.  There was a lot
23 of changes in the industry between '09 and '11.
24     Q.   And I understand.  That really wasn't

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  the question I asked you.
2       So, the question I asked you is that the
3  number of dosage units of oxycodone from 2009,
4  388,000, increased over 600% by 2011, correct?
5    A.   Yes, increased to 2.2 million.
6    Q.   And the second, No. 2, the second in
7  Fort Myers -- well, before we leave Hudson, do
8  you -- do you have an understanding of how many
9  folks live in Hudson, Florida?
10   A.   No, I do not.
11   Q.   Would it surprise you that 15,000 people
12 live in Hudson, Florida?
13   A.   I don't know Florida well enough to know
14 if I'm surprised or not.
15   Q.   It with -- and Oxy is just one type of
16 Schedule II, correct?
17   A.   Correct.
18   Q.   There are many different kinds.  So,
19 we're just looking at one type of Schedule II
20 OxyContin, correct?
21   A.   We're looking just at oxycodone, but I
22 don't know what constituted those numbers, if it
23 was one NDC number or multiple.  But, yes, this
24 says, "Oxycodone purchases."

Page 47

1    Q.   Let's assume it was the same drug code.
2    A.   Okay.
3    Q.   9143 for oxycodone, correct?
4    A.   I don't know what 9143 is.
5    Q.   Is the drug code or the base code for
6  oxycodone?
7    A.   I wouldn't know that off the top of my
8  head.
9    Q.   You wouldn't know that.  Okay.  Shows
10 you how much reading I have been doing, then, that
11 I would know what the drug code is for oxycodone.
12      Let's do the second store, Fort Myers,
13 95,000 dosage units of oxycodone.  Okay?
14   A.   Yes.
15   Q.   And that's a town of about 64,000
16 people.  And from the end of 2009 to the end of
17 2011, those dosage units went to 2.1 million.
18      Do you see that?
19   A.   Yes.
20   MR. HOUTZ:  Object to form.
21 BY MR. MOUGEY:
22   Q.   You see that is approximately a 2,000%
23 increase, correct?
24   A.   Yes.

Page 48

1    Q.   And 80,000 pills to Oviedo, Florida of
2  oxycodone, population 34,000 people, climbs to
3  1.684 million into 2011.  Correct?
4    A.   Yes.
5    MR. HOUTZ:  Object to form again.
6  BY MR. MOUGEY:
7    Q.   And, again, over a 2,000% increase,
8  correct?
9    A.   Yes.
10   Q.   And No. 4, Port Richey, 344,000 dosage
11 units of oxycodone with a population of 5,000
12 people to 1.4 million --
13   MR. HOUTZ:  Object.
14 BY MR. MOUGEY:
15   Q.   -- pills in 2011, correct?
16   MR. HOUTZ:  Object; form.
17 BY THE WITNESS:
18   A.   Yes.
19 BY MR. MOUGEY:
20   Q.   And Fort Pierce, Florida, 153,000
21 people, moves to 1.192 million dosage units of
22 oxycodone, correct?
23   MR. HOUTZ:  Object to form.
24 BY MR. MOUGEY:

Page 49

1    Q.   And I said people for 153, didn't I?
2       153,000 dosage units of oxycodone in
3  2009 in Fort Pierce and by the end of 2011 has
4  moved to 1.192 million.
5       Do you see that?
6    A.   Yes.
7    Q.   So, you'd agree with me that those are
8  significant increases in dosage units out of
9  Walgreens pharmacies in Florida, correct?
10   A.   I would agree that they're increases.
11 I'm not sure that I would agree with the word
12 "significant."
13   Q.   Okay.  So, those -- the 2,000% increase
14 in oxycodone over the course of two years
15 increases, you don't think that's significant?
16   A.   I do not think that they are significant
17 because of the changes that happened in the
18 industry during that time.
19   Q.   What would you consider significant if
20 2,000% increase in dosage units, so a -- let's
21 take -- let's take Fort Myers, Florida, with a town
22 of 64,000 people, that it goes from 95,000 dosage
23 units of oxycodone at the end of 2009 to
24 2.1 million by the end of '11.  That's not

Page 50

1 significant is your -- as far as you define
2 significant.
3        So, help me to understand where is the
4 significant line?  Is it 3 million?  Is it
5 4 million?  Where is it?
6        MR. HOUTZ:  Object to form.
7 BY THE WITNESS:
8     A.   My definition of significant would be if
9 there wasn't a plausible reason as to why there was
10 an increase.
11        The industry had changed significantly
12 over that time where doctors that ran pain
13 management clinics could no longer dispense out of
14 their clinics.
15        Prior to this time, Walgreens didn't see
16 pain -- chronic pain patients.  We saw end-of-life
17 patients that were coming in for the medications to
18 get them through as comfortably as possible until
19 they passed.
20        During this time frame, the laws and the
21 regulations began to change where physicians could
22 no longer dispense out of their clinics, and we saw
23 patients coming into the retail stores for chronic
24 pain medications.

Page 51

1 BY MR. MOUGEY:
2     Q.   And the reason for the change in law was
3 that pill mills were a problem in the State of
4 Florida, correct?
5        MR. HOUTZ:  Object to form and foundation.
6 BY THE WITNESS:
7     A.   I don't know why the regulations
8 changed.
9 BY MR. MOUGEY:
10    Q.   Well, let's look at paragraph 2.
11    A.   Sorry.
12    Q.   On page 29 of 349.
13    A.   Okay.
14    Q.   "Since at least 2009, the State of
15 Florida has been the epicenter of a notorious,
16 well-documented epidemic of prescription drug
17 abuse."
18        Do you see that sentence?
19    A.   Yes.
20    Q.   Were you aware that since at least 2009
21 the State of Florida has been the epicenter of a
22 notorious, well-documented epidemic of prescription
23 drug abuse?
24    A.   I became aware when I was put on this

Page 52

1 team.
2     Q.   So, "In July of 2011, the Florida
3 Surgeon General declared a public health emergency
4 based on the prescription pill epidemic."  Correct?
5     A.   I see that on this sheet.
6     Q.   And you would think that Walgreens
7 somewhere, that somewhere in Walgreens somebody
8 would know that there is a problem in Florida,
9 correct?
10    A.   Walgreens is a very large company.  So,
11 the answer to that would be yes.  I was not part of
12 that, but yes.
13    Q.   We'd sure hope so.  Haven't yet to find
14 someone, but maybe I will, that knew about the
15 Florida problem.  But you didn't know about it
16 either, right?
17    A.   Correct.
18        MR. HOUTZ:  Object to form.
19 BY MR. MOUGEY:
20    Q.   Okay.  So, paragraph 3, the DEA relays
21 that "Oxycodone is a dangerously addictive
22 Schedule II controlled substance which is known to
23 be highly abused and diverted in the State of
24 Florida."

Page 53

1        Do you see that?
2     A.   Yes.
3     Q.   Now, let's break that into a couple
4 pieces.
5        Do you agree, with your background as a
6 pharmacist and all your years in the pharmacy side
7 at Walgreens, that oxycodone is a dangerously
8 addictive Schedule II drug?
9     A.   Yes.
10    Q.   And Paragraph No. 4, "Since 2009,
11 Walgreens' Jupiter Florida distribution center has
12 been the single largest distributor of oxycodone
13 pills in Florida."
14        Were you aware of that when you started
15 at the Pharmaceutical Integrity Department?
16    A.   Yes.
17    Q.   "And at about this same time as the
18 abuse of prescription drugs became an epidemic in
19 Florida, Walgreens' Florida retail pharmacies,
20 supplied by Respondent, commanded an increasingly
21 large percentage of the state's growing oxycodone
22 business.  In 2010, only three Walgreens pharmacies
23 were in the top 100 purchasers of oxycodone within
24 Florida.  In 2011, 38 Walgreens pharmacies made the

Page 54

1 top 100 and six were in the top 10."
2        And you believe that the reason for
3 Walgreens' increases in dispensing and distribution
4 of oxycodone was because of the change of the laws?
5        A.   Yes.
6        Q.   Now, let's just assume that was the
7 case.  If I were to look at CVS numbers and other
8 retail pharmacies, would I see corresponding
9 increases in their pharmacies like we just went
10 through on paragraph 30 of 349 with 6, 7, 800, even
11 2,000% increases?  Would we see those with other
12 pharmacies --
13        MR. HOUTZ:  Object.
14 BY MR. MOUGEY:
15        Q.   -- in the State of Florida?
16        MR. HOUTZ:  Object on foundation.
17 BY THE WITNESS:
18        A.   I don't know what the volume of those
19 stores were.  But as -- if it was a retail
20 pharmacy -- it was an industry change that
21 happened.  So, I would assume that their numbers
22 would increase.
23 BY MR. MOUGEY:
24        Q.   Well, you know what they say about

Page 55

1 assuming, right?
2        So, when you make that assumption today
3 and you're telling this jury in Cleveland that it
4 was because of the change in laws, you haven't done
5 any analysis of how the change in laws impacted
6 other pharmacies similar to Walgreens, have you?
7        A.   I have not done analysis, no.
8        Q.   So, you don't know if Walgreens is an
9 outlier with its increasing distribution levels
10 that we just went through, 6, 7, 800, 2,000%, or
11 whether that was an industry-wide shift?
12        A.   That's right.  I don't know.
13        Q.   You have no earthly idea sitting here
14 today, right?
15        A.   Right.
16        Q.   Let me do one more thing.
17        Page 7 of 13.
18        MR. HOUTZ:  I think he is back here.
19        THE WITNESS:  Oh, I'm sorry.  Thank you.
20 BY THE WITNESS:
21        A.   Okay.
22 BY MR. MOUGEY:
23        Q.   Now, just so you can get the context,
24 page 7 is part of -- it's a continuation of the

Page 56

1 title page, Settlement and Memorandum of Agreement.
2 Okay?
3        A.   Yes.
4        Q.   So now we're on page 7 of that first
5 part of the document, and I want to direct your
6 attention to page 7, paragraph 4, "Obligations of
7 DEA."  More specifically, I want you to go to B.
8        "Within five business days of the
9 effective date of this agreement, DEA agrees to
10 unlock the controlled substances storage area at
11 Walgreens Jupiter and make its contents available
12 to Walgreens for any lawful transfer or reverse
13 distribution of the inventory contained therein to
14 an appropriate DEA registrant."
15        Do you see that?
16        A.   Yes.
17        Q.   So, the date that this agreement was
18 signed is June 10 of 2013, and that's on page 11.
19        A.   Yes.
20        Q.   Okay.  So, within five days of the
21 effective date of this agreement, the DEA unlocked
22 the cage in Walgreens' distribution center?
23        MR. HOUTZ:  Object on foundation.
24 BY MR. MOUGEY:

Page 57

1        Q.   Were you aware that the -- that the DEA
2 locked the cage at Walgreens distribution center?
3        A.   When I was -- I was not part of that
4 workstream, but now that you're talking about it
5 and I'm re-seeing this, yes.
6        Q.   This is your Walgreens that you've spent
7 36 years with.  Your Walgreens, the DEA came and
8 locked the cage restricting Walgreens' access and
9 when I say -- to its own controlled substances,
10 correct?
11        A.   Yes.
12        Q.   And when I say "cage," you understand
13 that's a term of art and that is where all of the
14 controlled substances are stored and protected,
15 correct?
16        A.   Yes.
17        Q.   You would agree with me that the DEA
18 locking the cage restricting Walgreens' access is a
19 significant step?
20        A.   Yes.
21        Q.   Before we leave this document, I'd like
22 you to go to page 2 of 13, "Stipulation and
23 Agreement."
24        A.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  Q.   Are you there?

2  A.   Yep.

3  Q.   What is your understanding of what

4  "Stipulation and Agreement" means?

5  A.   I -- boy, I am not an attorney, but I

6  would -- I would take this as what we have to do in

7  order to comply with this Memorandum of Agreement.

8  Q.   Just take the word "agreement."  What is

9  the word "agreement"?

10  A.   Where Walgreens agreed with the parties

11  at DEA on what is in the document.

12  Q.   Okay.  So, let's look at paragraph 2.

13  A.   Under "Stipulation" or up here?

14  Q.   Under "Stipulation and Agreement."

15  A.   Okay.

16  Q.   On page 2.

17       "Walgreens acknowledges that suspicious

18  order reporting for distribution to certain

19  pharmacies did not meet the standards identified by

20  the DEA in three letters from the DEA's Deputy

21  Assistant Director" -- sorry -- "Deputy Assistant

22  Administrator, Office of Diversion Control, sent to

23  every registered manufacturer and distributor,

24  including Walgreens, on September 27, 2006,

Page 59

1  February 7, 2007, and December 27, 2007."

2       Do you see that?

3  A.   I see that.

4  Q.   Were you aware that Walgreens agreed

5  that it failed to fulfill its duties in regards to

6  suspicious order reporting for controlled

7  substances?

8  MR. HOUTZ:  Object to form.

9  BY THE WITNESS:

10  A.   I was aware after I saw the Memorandum

11  of Agreement, but I did not know anything about

12  that before all this.

13  BY MR. MOUGEY:

14  Q.   Now, when you became director of

15  Pharmaceutical Integrity in later 2012, did you sit

16  and read this document that I have in front of you

17  to have an understanding of what some of the issues

18  were with Walgreens?

19  A.   No.  I was -- I got a copy of it after

20  it was signed.

21  Q.   Okay.  And so it was signed in June 13.

22  Did you sit down -- fair enough.  My timeline was

23  off.

24       But did you sit down in June of '13 and

Page 60

1  read through this document as director of

2  Pharmaceutical Integrity so you could better

3  understand what the issues were with Walgreens?

4  A.   Yes.

5  Q.   Now, you understand what the word

6  "systemic" is?

7  A.   Yes.

8  Q.   What does the word "systemic" mean?

9  A.   When I'm thinking of it from healthcare

10  or a person's body, it would be throughout their

11  body.  When I think of it as an organization, it

12  would be in an organization.

13  Q.   So, organization-wide.  Is that fair?

14  A.   I think there is a generalization there.

15  But, yes, it's fair.

16  Q.   Okay.  So, when we say "systemic," that

17  means that it impacts the organization as a whole?

18  A.   Yes.

19  Q.   Let me direct your attention to page 38

20  of this document, paragraph 23.

21  A.   Okay.

22  Q.   "Voluntary dispensing restrictions

23  enacted either in anticipation of, or in reaction

24  to regulatory action, do not indicate to me that

Page 61

1  Respondent," when it says Respondent, that's

2  Walgreens, "and its parent company have recognized

3  and adequately reformed the systemic shortcomings

4  discussed herein."

5       Are you there with me?

6  A.   Yeah.

7  Q.   Now, when you had the opportunity to sit

8  down and read this document as director of

9  Pharmaceutical Integrity, do you recall reading

10  that the DEA believed that Walgreens had systemic

11  shortcomings?

12  A.   I don't remember reading the entire

13  Order to Show Cause.  I remember reading the

14  Memorandum of Agreement.

15  Q.   The first 13 pages?

16  A.   Yes.

17  Q.   So, do you understand in the next 336

18  pages that there is significant detail walking

19  through the numerous problems at Walgreens?

20  MR. HOUTZ:  Object to form.

21  BY THE WITNESS:

22  A.   I haven't read this entire document.

23  I've only -- I mean, really.  I've only -- my job

24  was responsible for executing the Memorandum of

Page 62

1  Agreement.  So, this Order to Show Cause, I did not
2  read every one of these.
3  BY MR. MOUGEY:
4      Q.   So, we're going to come back to those
5  meetings and you being appointed director of
6  Pharmaceutical Integrity in late 2012.  Let me just
7  get a general understanding.
8          So, the role that you took as director
9  of Pharmaceutical Integrity was charged with
10  overseeing Walgreens' responsibilities, A, to
11  identify and report suspicious orders and, B,
12  ensure that Walgreens was filling its
13  responsibilities as a pharmacy, correct?
14     A.   Yes.
15     Q.   And you as director were charged with
16  creating a mission to fill those ends, correct?
17     A.   Yes.
18     Q.   You were charged with identifying the
19  people you needed to monitor and report suspicious
20  orders and to oversee Walgreens' obligations as a
21  pharmacy, correct?
22     A.   Yes.
23     Q.   You were charged with pulling
24  individuals within Walgreens that you needed to

Page 63

1  help write the algorithm or code necessary to
2  fulfill those ends, correct?
3      A.   It was already done prior to my taking
4  the role.  So, right about the time that my team
5  came on board, they were handing over the
6  suspicious order monitoring that we had previous to
7  my team.
8      Q.   And that -- what you inherited when you
9  took over, there were modifications and changes to
10  that system along the way under your -- under you
11  as the director, correct?
12     A.   We did make recommendations for changes,
13  but -- and my understanding is that there were
14  quite a few numerations from all the time previous.
15  So, yes, your answer -- my answer is yes.  Sorry.
16     Q.   That's okay.  There were some changes
17  made --
18     A.   Yes.
19     Q.   -- under your -- when you were the boss,
20  right?
21     A.   Yes.
22     Q.   And there was version 5 and version 5.5,
23  and there was some tweaks and modifications to the
24  code, correct?

Page 64

1      A.   Yes.
2      Q.   All right.  Walgreens paid a significant
3  amount as part of this agreement with the DEA,
4  correct?
5      MR. HOUTZ:  Object on foundation.
6  BY THE WITNESS:
7      A.   There was a lot of money paid, yes.
8  BY MR. MOUGEY:
9      Q.   Do you recall how much?
10     A.   80 million.
11     Q.   And what started as a cross-function
12  meeting ultimately evolved into a group titled
13  Pharmaceutical Integrity that you ran, correct?
14     A.   Yes.
15     Q.   Now, that meeting culminating in
16  Pharmaceutical Integrity was created because of the
17  document in front of you, the Settlement and
18  Memorandum of Agreement, correct?
19     A.   I don't know why it was created.  It
20  just was created.  I...
21     Q.   So you don't know why.  This settlement
22  agreement, the 349 pages and all the exhibits
23  attached and the $80 million, are you comfortable
24  saying that that was the catalyst for the creation

Page 65

1  of the Pharmaceutical Integrity Department?
2      MR. HOUTZ:  Object to form and asked and
3  answered.
4  BY THE WITNESS:
5      A.   The assumption would be that, but I
6  don't know.
7  BY MR. MOUGEY:
8      Q.   But you are comfortable that the
9  cross-functional meeting was set after the
10  September 13, 2012 Order to Show Cause and
11  Immediate Suspension of Registration, correct?
12     A.   Yes.
13     Q.   Is it fair to say that when you took
14  over Pharmaceutical Integrity as it began in late
15  2012, that you felt a sense of urgency to get a
16  system implemented for Walgreens to fulfill its
17  obligations as a distributor?
18     A.   No, not a sense of urgency.  Maybe a
19  sense of urgency on myself to understand the
20  obligations that I was taking over.  But we already
21  had a system in place.
22         So, I had a lot of learning to do, so I
23  guess the sense of urgency would be that I had to
24  get up to speed and I had to ensure that anybody I

Page 66

1 hired was up to speed and understood the
2 obligations.
3    Q.   So, Pharmaceutical Integrity did not
4 create and design and implement a suspicious order
5 monitoring policy system.  It just used what was
6 already in place?
7    MR. HOUTZ:  Object to form.
8 BY THE WITNESS:
9    A.   Yes, there was a new version coming out
10 right about the time that I took over, and I was in
11 a couple of meetings right before the final
12 release.  There was lots of testing and things that
13 happened, and so it was kind of right around that
14 same time where we did the handover.
15 BY MR. MOUGEY:
16    Q.   So, how long -- do you have an
17 understanding of how long the system that was
18 adopted into Pharmaceutical Integrity, how long had
19 that system been in place?
20    MR. HOUTZ:  Object to form.
21 BY THE WITNESS:
22    A.   I don't know.
23 BY MR. MOUGEY:
24    Q.   You don't know.  So, are you comfortable

Page 67

1 with your group, Pharmaceutical Integrity, adopted
2 the previous system to fulfill its obligations to
3 monitor and identify and report suspicious orders?
4    A.   Yes.
5    Q.   Did Walgreens adopt a system prior to
6 your arrival to, once those orders were identified
7 as suspicious, that there was due diligence
8 performed on those orders?
9    A.   When you say "adopt," what do you mean?
10    Q.   What do you think the word "adopt"
11 means?
12    A.   Well, it was -- my understanding was a
13 homegrown system that was built and had lots of
14 tweaks and changes over the years.  There was --
15 there wasn't anything on the market that could --
16 we could have bought off the shelf.  So...
17    Q.   Okay.  So, is your assumption -- do you
18 know that for a fact, there was nothing that
19 Walgreens could have bought, or is that another
20 assumption?
21    A.   No, I know that there was nothing at the
22 particular time, that there wasn't anything out
23 there that we could have bought.
24    Q.   And that particular time is late '12,

Page 68

1 early '13?
2    A.   Before that time.  Otherwise we would
3 have bought it.
4    Q.   Okay.  So, we started this by you asking
5 me what I meant by "adopt."
6         That pharmaceutical adopted the policies
7 and procedures in place at Walgreens to use in your
8 department?
9    MR. HOUTZ:  Object to form.
10 BY THE WITNESS:
11    A.   We took what was in place and then we
12 made recommendations for modifications of how best
13 my team could efficiently use the system that they
14 had.  So, there were lots of tweaks of that system
15 to get it to where it is today.
16 BY MR. MOUGEY:
17    Q.   Okay.  So, lots of tweaks of the system.
18         Now, in June of 2013, this 349-page
19 document with the Department of Justice was entered
20 into by Walgreens, correct?
21    A.   Because you tell me that, yes, and I see
22 it on here, yes.
23    Q.   Flip to the very last page.  You will
24 see how many pages.  There is 349 pages.

Page 69

1    A.   Okay.
2    Q.   Do you know how many pharmacies are
3 identified in this document?
4    A.   No.
5    Q.   Look at very first page.
6    A.   Okay.
7    Q.   Paragraph 2.  "Walgreens owns or
8 operates pharmacies that are controlled or
9 registered with the DEA as Retail/Chain
10 Pharmacies."
11         You'd agree with that, right?
12    A.   Under "Procedural" you mean?
13    Q.   Yes, ma'am.
14    A.   Yes.
15    Q.   Okay.  And that's paragraph 2.
16         Paragraph 3.  "April 7, 2011, Walgreens
17 entered into a Settlement and Release Agreement and
18 Administrative Memorandum of Agreement with the
19 DEA."
20         Do you see that?
21    A.   Yes.
22    Q.   And that's attached as Exhibit A.  So,
23 why don't we -- were you aware that Walgreens
24 entered into an agreement in 2011?

Page 70

1    A.   Not until I became a director of
2  Pharmaceutical Integrity.
3    Q.   When you read the first 13 pages of this
4  349-page document, correct?
5    A.   Yes.
6    Q.   Okay.  So, if we turn to Exhibit A, this
7  is outside the first 13 pages, and this is an
8  Administrative Memorandum of Agreement with a
9  Walgreens pharmacy in California in 2011.
10        Do you see that?
11   A.   Yes.
12   Q.   And if you look at the scope under the
13  "Background" section, "The OTC," which is Order to
14  Show Cause, "alleged that Walgreens 06094," that's
15  a store number, right?
16   A.   Yes.
17   Q.   "Dispensed controlled substances to
18  individuals based on purported prescriptions issued
19  by physicians who are not licensed to practice
20  medicine in California."
21        That's a problem, right?
22   A.   Not necessarily is it a problem.
23   Q.   "Dispensed controlled substances to
24  individuals located in California based on Internet

Page 71

1  prescriptions issued by physicians for other than a
2  legitimate medical purpose."
3        Do you see that?
4    A.   I see that.
5    Q.   And then, 3, "Dispensed controlled
6  substances to individuals that Walgreens 06094 knew
7  or should have known were diverting the controlled
8  substances."  Okay?
9    A.   Yep.
10   Q.   And on the next page, 2 of 7,
11  "Obligations of Walgreens," paragraph A references
12  doctor shopping.  You know what doctor shopping is,
13  right?
14   A.   Yes.
15   Q.   Page 3 walks through -- take your
16  time -- a series of examples of issues the DEA is
17  addressing with Walgreens as a pharmacy.
18        Do you see that?
19   MR. HOUTZ:  Object to form.
20  BY THE WITNESS:
21   A.   Yes.
22  BY MR. MOUGEY:
23   Q.   Okay.  So, let's go back to the very
24  first page again.  So, that is Exhibit A as

Page 72

1  identified in paragraph 3.
2        Paragraph 4 is the distribution center,
3  and that's Exhibit B that we just went to.  First
4  page, paragraph 4.
5    A.   I'm sorry.
6    Q.   Very first page.
7    A.   Can you go to the bottom.
8    Q.   Yes, ma'am.  Very first page.
9    A.   Oh, oh.  Sorry.
10   Q.   That's okay.  Very first page.
11   A.   Yeah.
12   Q.   Paragraph 4, we already walked through.
13  That's Walgreens as a distributor?
14   A.   Yes.
15   Q.   Is Exhibit B that we already looked at?
16   A.   Yes.
17   Q.   That's the $80 million?
18   A.   Yep.
19   Q.   Now, paragraph 6 you will see references
20  stores, dispensaries, pharmacies in Florida,
21  correct?
22   A.   Yes.
23   Q.   And those are Exhibit C.  That's under
24  paragraph 6?

Page 73

1    A.   Yes.
2    Q.   So, if we look at 6, there are two
3  pharmacies identified in paragraph 6.
4        Do you see that?
5    A.   There is more on the other page.
6    Q.   There is more on the next page.  You're
7  right.  On the first page.
8    A.   Yep.
9    Q.   If you turn to the next page, there is a
10  third pharmacy in paragraph 6, correct?
11   A.   Yes.
12   Q.   And those are all referenced as
13  Appendix C.
14   A.   Yes.
15   Q.   Do you see that?
16        Paragraph 7 identifies another Walgreens
17  pharmacy as 03836, correct?
18   A.   Yes.
19   Q.   And that's also C?
20   A.   Yes.
21   Q.   8 identifies another Walgreens store,
22  04391, and that is also Appendix C, correct?
23   A.   Yes.
24   Q.   And paragraph 9 identifies another

Page 74

1 Walgreens pharmacy, and that is also Exhibit C,
2 correct?
3    A.   Yes.
4    Q.   So, Exhibit C, if you turn all the way
5 back to the C tab, at the bottom of the page 83 of
6 349.
7         Do you see that?
8    A.   Yeah.
9    Q.   And just from flipping through these
10 pages, you can see that Exhibit C on those
11 Walgreens pharmacies, there are approximately 250
12 pages of detailed allegations from the DEA covering
13 problems with Walgreens' dispensing practices in
14 its pharmacies?
15    MR. HOUTZ:  Object to form and foundation.
16 BY THE WITNESS:
17    A.   I see that there's a lot of pages on
18 here, but I -- I guess the DEA is saying there are
19 problems.  I'm not sure if it's problems or not.
20 BY MR. MOUGEY:
21    Q.   What I'm -- what I am struggling with is
22 you come in to take over Pharmaceutical Integrity
23 in late '12.  By the time this document is signed
24 in June of '13 you are setting up a department for

Page 75

1 both distributor and pharmacy regulatory issues.
2 You brought people in.  You're making sure the
3 systems are in place.  You are making sure that the
4 goals and objectives can be met.
5         And there is a document with 349 pages
6 detailing the DEA's belief that there are systemic
7 problems within Walgreens and you never read it.
8    MR. HOUTZ:  Object to form and object to the
9 speech.
10 BY MR. MOUGEY:
11    Q.   You never read this document, did you,
12 Ms. Polster?
13    A.   I read the Memorandum of Agreement.
14    Q.   Which is 13 pages of the 349, correct?
15    A.   Correct.
16    Q.   The other 336 pages, you never took time
17 to read the detailed allegations to see where the
18 DEA believed there were problems, correct,
19 Ms. Polster?
20    A.   I did not read every page of this
21 document, no.
22    Q.   You didn't read over 90% of this
23 document, correct?
24    A.   Correct.

Page 76

1    Q.   And all the while, while that document
2 is being negotiated and executed, you understand
3 that the opiate epidemic took over as the leading
4 cause of death in the United States?
5    A.   Yes.
6    Q.   But no one from Walgreens ever came to
7 you and said, "Ms. Polster, I think a good place
8 for you to start to identify potential problems
9 within Walgreens would be to read the
10 300-page playbook the DEA gave us identifying
11 numerous issues," correct?
12    MR. HOUTZ:  Object to form.
13 BY THE WITNESS:
14    A.   There was a lot of stuff going on during
15 that time.  I was not handed these 360 pages.
16 BY MR. MOUGEY:
17    Q.   To go back to page 2 of this document,
18 we read the first sentence under "Stipulation and
19 Agreement" about Walgreens failing to fulfill its
20 duties and the standards identified by the DEA as a
21 distributor.
22         But the next sentence begins with
23 "Furthermore, Walgreens acknowledges that certain
24 Walgreens retail pharmacies did on some occasions

Page 77

1 dispense certain controlled substances in a manner
2 not fully consistent with its obligations under the
3 Controlled Substance Act."
4         Did I read that right?
5    MR. HOUTZ:  Object to the preface.
6 BY THE WITNESS:
7    A.   I see it here.
8 BY MR. MOUGEY:
9    Q.   This is part of the section that you
10 read --
11    A.   Yes.
12    Q.   -- the 13 pages.  Did -- you never
13 wondered after reading paragraph 2 that Walgreens
14 stipulates and agrees that it did not meet the
15 standards identified by the DEA, you never stopped
16 and inquired or wondered, "Can someone give me the
17 specific examples so I know where to start"?
18    A.   You asked me did I read the document.
19    Q.   I did.
20    A.   I did not read these 360 pages.  I did
21 ask that question, which is why I have the Target
22 Drug Good Faith Dispensing Policy that we put in
23 place for consistency across all the stores in the
24 nation.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    Q.   So, who summarized for you the 300 pages
2  of issues identified by the DEA of weaknesses in
3  Walgreens' system?
4    MR. HOUTZ:  Object to form.
5  BY THE WITNESS:
6    A.   Dwayne Piñon and Patty Zagami.
7  BY MR. MOUGEY:
8    Q.   And how did they identify the details of
9  all of the issues identified by the DEA to you?
10 Was it in a memorandum?
11   A.   It was in a course of many meetings.
12   Q.   Yes, ma'am, but that wasn't what I
13 asked.
14       Was there a memorandum that you were
15 given the details of the issues with Walgreens
16 system as identified in this settlement
17 agreement -- Settlement and Memorandum of
18 Agreement?
19   MR. HOUTZ:  Object to form.
20 BY THE WITNESS:
21   A.   Can you tell me what you mean by
22 memorandum?  Did somebody just send a memo you
23 mean?
24 BY MR. MOUGEY:

Page 79

1    Q.   Yes, ma'am.
2    A.   Okay.
3    Q.   This document is titled Settlement and
4  Memorandum of Agreement.
5    A.   Yeah, I got this copy.
6    Q.   Okay.  All right.  So, when I say
7  "memorandum" outside of this context of the
8  Settlement and Memorandum of Agreement, to me, a
9  memo, a letter, could even just be an e-mail.
10   A.   I don't remember what form, but we
11 talked about all different kinds of things that we
12 were going to do for this.
13   Q.   So, let's go back to where we started,
14 then.
15   A.   Okay.
16   MR. HOUTZ:  Can we take a break?
17   MR. MOUGEY:  Of course we can.
18   MR. HOUTZ:  Because we are like an hour and a
19 quarter into it.
20   MR. MOUGEY:  Yes.
21   THE VIDEOGRAPHER:  We are off the record at
22 10:36 a.m.
23       (WHEREUPON, a recess was had
24         from 10:36 to 11:01 a.m.)

Page 80

1    THE VIDEOGRAPHER:  We are back on the record
2  at 11:01 a.m.
3  BY MR. MOUGEY:
4    Q.   Ms. Polster, were you aware when you
5  took over as director of Pharmaceutical Integrity
6  that opiate overdose had become one of the leading
7  causes of death in the U.S.?
8    A.   Yes.
9    Q.   What did you do to educate yourself when
10 you began attending the cross-function meetings
11 through the end of 2012 where you were ultimately
12 named the director of Pharmaceutical Integrity?
13   A.   I learned a lot in all the meetings that
14 we -- that we had.  Probably paid a little more
15 attention to news bites or articles that came out
16 about opioids since that was going to be the focus
17 of what the project was that I was working on.
18       But I would say I learned the most out
19 of all the meetings that we had as part of that
20 group.
21   Q.   So, we have meetings and news bites.  Is
22 that fair?
23   A.   That's fair.
24   Q.   So, let's walk through the meetings.

Page 81

1    A.   Sure.
2    Q.   You initially testified that there were
3  numerous meetings.  So, why don't we start with how
4  frequently the meetings were occurring beginning in
5  September of 2012.
6    A.   I cannot remember the exact number of
7  times that we met, but I would say frequently per
8  week is accurate.
9    Q.   And you identified a couple of groups of
10 people that were attending and some departments.
11 Were there people added in as late 2012 progressed
12 other than the individuals that you brought in to
13 work in Pharmaceutical Integrity?
14   A.   There would be people that would come
15 and go based on whatever specific issue that we
16 were working on.
17       So, for example, if we had a
18 communication specialist that would come in and
19 help us tweak our communication that we would send
20 out to the field or the training and development
21 people that would help us implement how we would
22 launch a training to the stores, those people would
23 be coming in and going out based on the workstream
24 efforts that were happening at the time.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.   Would you agree with me that the two
2  kind of big-picture issues were Walgreens'
3  responsibilities as a distributor in the context of
4  controlled substances, that was one issue, correct?
5    A.   An issue about --
6    Q.   That was being discussed in the
7  meetings.
8    A.   Can you form the question again.  I'm
9  sorry.
10   Q.   Sure.  I'm just trying to get two kind
11 of big-picture items that was part of the scope of
12 the what at that point was the functional --
13 function meeting.  Is that -- okay?
14   A.   Okay.
15   Q.   So, one was the attempting to ensure the
16 system that Walgreens used to fill its duties as a
17 distributor in the context of controlled substance
18 was adequately designed and put in place?
19   A.   So, the context of the meetings around
20 that specific thing that you're saying is getting
21 me up to speed of what I was taking over from a
22 team that was previously doing it.
23   Q.   Let's do it this way.  You understand
24 that Walgreens has duties under the federal code

Page 83

1  and regs as a pharmacy?
2    A.   Yes.
3    Q.   And you know what a Ven diagram is,
4  right?
5    A.   Yes.
6    Q.   And, so, we are going to just draw one
7  circle and just put "Dispensing duties."
8         Now, Walgreens also has obligations
9  under the United States code and the regs in
10 relation to its role as a distributor.  Correct?
11   A.   You need to clarify the time frame
12 because we do not distribute controlled substances
13 at all anymore.  So, clarify your --
14   Q.   If Walgreens doesn't distribute anymore,
15 they probably aren't applicable to them.  Is that a
16 fair statement?
17   A.   We dispense.
18   Q.   Right.  And if you don't distribute,
19 then I'm certainly not asking you about a time when
20 Walgreens doesn't distribute.  So, I'm talking
21 about a time when Walgreens was acting as a
22 distributor.
23   A.   Okay.
24   Q.   Okay?  So, in late 2012 and early '13

Page 84

1  Walgreens was a distributor, right?
2    A.   Yes.
3    Q.   And as we just went through in the
4  memorandum and agreement with the significant fine,
5  part of that included Walgreens as a distributor,
6  right?
7    MR. HOUTZ:  Object to form.
8  BY THE WITNESS:
9    A.   Yes.
10 BY MR. MOUGEY:
11   Q.   Okay.  So, back to your meetings and
12 your group.  You have dispensing duties in one
13 circle and then Walgreens also has, as a
14 distributor, also has duties and obligations,
15 correct?
16   A.   Yes.
17   Q.   Now, are you familiar with the word
18 "diversion"?
19   A.   Yes.
20   Q.   And what do you understand the word
21 "diversion" to mean?
22   A.   In context of internal diversion from an
23 employee who is perhaps pilfering, that would be
24 what I equated the word "diversion" to prior to me

Page 85

1  coming to the, you know, to the work group.
2         When I came into the work group and they
3  used the word "diversion," I was educated to what
4  DEA used the word "diversion" to.
5    Q.   Which was broader than internal theft or
6  shrinkage or within Walgreens, correct?
7    A.   Yes.
8    Q.   The definition that you were educated
9  when you started working with these -- with the
10 working group, correct?
11   A.   Yes.
12   Q.   And that included, in the context of
13 diversions, Walgreens' duties and obligations as a
14 distributor, correct?
15   A.   Yes.
16   Q.   Now, would you agree -- and I have two
17 circles on my Ven diagram here.  I have "Dispensing
18 duties/obligations" and I have "Distributor
19 duties/obligations."
20         Now, the diversion context encompasses
21 both the dispensing side of Walgreens' duties and
22 obligations and the pharmacy -- I'm sorry -- and
23 the distributor side of Walgreens' duties and
24 obligations, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    A.   Yes.
2    Q.   So, the last circle I'll put in place,
3  I'm going to put --
4    MR. MOUGEY:  We're on 3, right?
5    THE REPORTER:  Yes.
6         (WHEREUPON, a certain document was
7         marked as Walgreens-Polster Exhibit
8         No. 3:  Ven diagram drawn by Peter
9         Mougey.)
10  BY MR. MOUGEY:
11   Q.   I hand you what we've marked as -- what
12  I'm marking as Polster 3, my very expensive Ven
13  diagram.
14        And do you see in the left-hand circle
15  we have Walgreens as a distributor with their
16  obligations and duties, correct?
17   A.   Yes.
18   Q.   And the circle to the right, Walgreens
19  with its obligation as a pharmacy and its duties
20  and obligations.  Correct?
21   A.   Yes.
22   Q.   And the diversion, whether it be theft
23  internally, whether it be the DEA's broader
24  definition that you learned about when you started

Page 87

1  the working group, covers both the dispensing side
2  and the distributor side.  Correct?
3    A.   Yes.
4    Q.   And the objective of your working group,
5  which later became Pharmaceutical Integrity, was to
6  ensure that Walgreens was compliant with its
7  obligations as both a pharmacy and as a
8  distributor, correct?
9    A.   The objective and my role was to ensure
10  that any work that was being done that was taken
11  over by me I understood what to do and I was able
12  to continue to carry it out.
13   Q.   Okay.  And that's good and that's an
14  admirable goal that you understand it and that it
15  was being effectively implemented.  But what I
16  asked was a little bit different.  What I asked was
17  a little bit more specific.
18        And the objective of your group, which
19  ultimately became Pharmaceutical Integrity, was to
20  ensure that Walgreens was compliant with both its
21  dispensing duties and obligations and its duties
22  and obligations as a distributor to detect and
23  avoid diversion.  Correct?
24   A.   Yes.

Page 88

1    Q.   Now, that very expensive Ven diagram I
2  have in front of you, is that an accurate
3  representation of what we just went through, that
4  diversion covers both dispensing and Walgreens as a
5  distributor?
6    A.   Yes.
7    Q.   So, back to the meetings.  More than
8  once a week.  Is that fair?
9    A.   Yes.
10   Q.   Sometimes many times a week?
11   A.   Yes.
12   Q.   People would come and go based on
13  whatever was being discussed?
14   A.   That's right.
15   Q.   Now, I'm just kind of a redneck lawyer
16  from a small town in Florida and when I have
17  meetings, and I'm confident to some people's
18  chagrin, I actually have agendas, we keep notes,
19  and that helps us remember that the next time we
20  have a meeting what we talked about the time
21  previously and it keeps everybody on track.
22   A.   Yes.
23   Q.   Generally familiar with that concept,
24  right?

Page 89

1    A.   Yes.
2    Q.   Now, does this group, this working
3  group, did you have a name for it by the time '12
4  rolled in?
5    A.   We called it a task force.
6    Q.   Task force.  Sounds very official.
7        So, what was the -- was there a name for
8  the task force?
9    A.   Controlled substance task force maybe.
10   Q.   Controlled substance task force.  Okay.
11        Do you know why individual people were
12  asked to be on the controlled substance task force?
13   A.   No.
14   Q.   Did you observe in the meetings with the
15  controlled substance task force that there were
16  people in different departments in Walgreens that
17  had different kind of specialties?
18   A.   Yes.
19   Q.   So, you had loss prevention that had
20  kind of an investigatory function within Walgreens,
21  correct?
22   A.   Yes.
23   Q.   Folks like yourself that had more of
24  a -- had a pharmacy background, both academic and

Page 90

1  experience-wise, correct?
2      A.   Yes.
3      Q.   You had been in the field, correct?
4      A.   Yes.
5      Q.   And you kind of knew how day to day how
6  the pharmacies worked.  Is that fair?
7      A.   Yes.
8      Q.   And on top of that, it sounds to me like
9  you also had significant experience taking concepts
10 and initiatives at the corporate level and rolling
11 them out across a couple hundred thousand people
12 often at Walgreens, all the employees.  Is that
13 fair?
14     A.   Yes.
15     Q.   And that's not a small task to get that
16 Titanic ship moving from the corporate
17 communications side to get everyone on board and
18 understand and educated about whatever the
19 initiative is, correct?
20     A.   Correct.
21     Q.   And then we also had some folks from
22 corporate that attended these meetings and helped
23 give some perspective on the system that was
24 already in place.  Is that fair?

Page 91

1      A.   Yes.
2      Q.   Now, who was that already -- that
3  came to the table that's like this conference room
4  here with about 12 seats at it, who was it that
5  came that brought the, quote-unquote,
6  "institutional knowledge" of what had happened
7  prior to September '12?
8      A.   When you say "institutional knowledge,"
9  could you be a little more specific --
10     Q.   Sure.
11     A.   -- about which --
12     Q.   Fair enough.  About Walgreens'
13 suspicious order monitoring policies --
14     A.   Yeah.
15     Q.   -- and procedures and then there will be
16 a follow-up question about good faith dispensing.
17     A.   Sure.
18     Q.   But if I ask them both at one time, then
19 Les will object that it's compound.  So, I'll do
20 them one at a time.
21     A.   Okay.
22     Q.   Okay.  So, who brought to the table the
23 institutional knowledge about Walgreens' suspicious
24 order monitoring policies and procedures?

Page 92

1      A.   So, Steve Bamberg and Wayne Bancroft
2  were the ones that educated me on how it worked,
3  how it was designed in terms of the linear
4  regression line and the algorithm, which I wouldn't
5  be able to spit out because it's so complicated.
6      Q.   All right.  I think I'm terrible at
7  names.  I never can remember names.  And I think
8  someone is trying to pick on me that every name
9  here seems to end with a B.
10     A.   Right.
11     Q.   There's a lot of Bs.  I'm getting them
12 confused regularly.
13          Now, Wayne Bancroft I always remember is
14 he is kind of the math guy that wrote the
15 algorithm?
16     A.   That's right.
17     Q.   Now, Steve Bamberg is another of one of
18 a plethora of B names that I can't ever remember.
19          What's Steve's -- where was Steve --
20     A.   Steve --
21     Q.   -- prior to '12, September '12?
22     A.   I don't know his exact like title, but
23 he is the guy that his team built the and made
24 changes to the suspicious order monitoring system.

Page 93

1      Q.   Okay.  Is Steve a tech guy?
2      A.   Yes.
3      Q.   Now, we were talking about suspicious
4  order monitoring policies and procedures, and this
5  controlled substance task force brought Steve
6  Bamberg and Wayne Bancroft, as an example of maybe
7  others, but came and helped you all get up to speed
8  on what was being done at Walgreens.  Is that fair?
9      A.   Yes.
10     Q.   Okay.  So, let's switch over to the
11 dispensing side.
12     A.   Okay.
13     Q.   Okay.  Who -- and which you probably had
14 a little bit of background in already, but who from
15 the dispensing side was there to help flatten the
16 learning curve for this controlled substance task
17 force?
18     A.   Around good faith dispensing?
19     Q.   Yes.  Well, we can start there.
20     A.   Well, Walgreens has always had a Good
21 Faith Dispensing Policy ever since I can -- I can
22 remember.  So, we had that policy in place.  It was
23 referenced.  But we didn't necessarily need a
24 learning curve for that because it had already been

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 in place. Everybody in the room from an operations
2 side were pharmacists, and so we were all aware
3 that the policy was in place.
4    Q.   Okay.  Now, good faith dispensing,
5 though, was ultimately tweaked or modified and the
6 name was changed to targeted good faith dispensing,
7 right?
8    A.   There is two policies.  There is Good
9 Faith Dispensing Policy, which is the overarching
10 policy around all controlled substances, and then
11 the Target Drug Good Faith Dispensing Policy was
12 focused on the drugs that the DEA deemed the heart
13 of the opioid crisis.
14    Q.   Okay.  What would you consider to be the
15 heart of the opiate crisis?
16    A.   The DEA identified oxycodone,
17 hydromorphone and Methadone as drugs that they
18 focused on.
19    Q.   Oxycodone, hydrocodone, Methadone.
20    A.   No, not hydrocodone because hydrocodone
21 was not a Schedule II at the time.  Hydromorphone.
22    Q.   Okay.
23    A.   And Methadone.
24    Q.   Okay.  But hydrocodone became a

Page 95

1 Schedule II?
2    A.   Yes.
3    Q.   And once it became Schedule II, would
4 that be included on the list of the targeted drugs?
5    A.   We have not updated the targeted drug in
6 terms of drugs that are on there specifically.
7    Q.   And the targeted good faith dispensing
8 was redeployed?
9    A.   No, deployed.
10    Q.   Okay.  Good faith dispensing was
11 redeployed?
12    A.   Yes.
13    Q.   In 2013?
14    A.   Yeah.
15    Q.   Mid?
16    A.   I don't remember the exact date, but it
17 was 2013.
18    Q.   What does redeployed mean in the context
19 of good faith dispensing?
20    A.   So, we made tweaks to the Good Faith
21 Dispensing Policy.  Previously the Good Faith
22 Dispensing Policy was a policy that every
23 pharmacist had to read and acknowledge at time of
24 hire.

Page 96

1    Q.   Okay.
2    A.   What we did was we redeployed it so that
3 every pharmacist had to reread it.  So, if you had
4 been a pharmacist for ten years, you're going to
5 get a refresher.
6    Q.   So, it was kind of a continuing, "Here
7 you need to read this again.  It's been a while
8 since you've read it the last time" kind of a
9 thing?
10    A.   Yes.
11    Q.   Okay.  Now, let's go back to the other
12 side, and we've refreshed my memory.  Steve Bamberg
13 is from the IT department?
14    A.   Yes.
15    Q.   Okay.  So, you have got, no offense to
16 Mr. Bamberg and Mr. Bancroft, but you got two kind
17 of smart computer math guys, right?
18    A.   Yes.
19    Q.   All right.  So, I've gotten to talk to
20 Mr. Bancroft, very smart Ph.D. in math.  But who
21 was it that actually helped come to these meetings
22 and say, "Okay, these are what our duties and
23 obligations are and this is what we need to do.
24 This is what the code says.  This is what the reg

Page 97

1 says.  This is what we got to make sure we're
2 doing"?
3    A.   I don't know.
4    Q.   Well, you got math guys there.  Math
5 guys are good when you tell them, "This is what I
6 need a solution to."
7         Who helped tell them, "This is my
8 problem.  I need you all to come up with the
9 solution to address the issue"?
10    A.   At the --
11    MR. HOUTZ:  Object on foundation.
12 BY THE WITNESS:
13    A.   At the -- at the meeting specifically?
14 BY MR. MOUGEY:
15    Q.   Any meetings.
16    A.   Well, I -- prior to my involvement, I
17 don't know the answer to that.  Once I got
18 involved, you know, with the working group of the
19 meeting, we had folks in the room, our attorneys,
20 whatever, digesting all these pages, whatever, and
21 whittling it down to --
22    Q.   All right.
23    A.   -- what we needed to focus on.
24    Q.   Were there agendas for these meetings?

Page 98

1  A.  Probably.
2  Q.  You would think so, right?
3  A.  Right.
4  Q.  Are you a note-taker?
5  A.  Yes.
6  Q.  And when you sat through these meetings,
7  you took notes?
8  A.  I took notes of my to-dos, yes.
9  Q.  Yes, ma'am.  And what is your practice
10  with your notes when you're done with them and you
11  go back to your office?  What do you do with them?
12  A.  Once the project is underway --
13  Q.  Yes, ma'am.
14  A.  -- I pitch them.
15  Q.  Okay.  So, when you say "once the
16  project is underway," once it's finalized?
17  A.  Correct.
18  Q.  But this project, meaning the controlled
19  substance task force which ultimately became
20  Pharmaceutical Integrity, there were different
21  variations and tweaks of the system all the way up
22  until version 5.5, correct?
23  A.  I don't know the versions, but yes.
24  Q.  So, who was the -- if you had an agenda

Page 99

1  item that you wanted to put on this -- on these
2  meetings that sometimes happened more than once a
3  week, who would you tell to put it on the agenda?
4  A.  I would sometimes have, you know, be the
5  owner of the meeting and I would make my own agenda
6  or whoever was having the meeting, you know,
7  whoever the organizer of the meeting was, we would
8  just contribute to the agenda topics.
9  Q.  Would there be a call for agenda items?
10  A.  Call or we would send it in an e-mail.
11  Q.  That's what I meant.
12  A.  Yeah.
13  Q.  Just a call to action, "I need agenda
14  items for our meeting Thursday" --
15  A.  Yes.
16  Q.  -- "on XYZ topic," right?
17  A.  Yes.
18  Q.  And these all occurred, these meetings,
19  late 2012 and into '13, correct?
20  A.  That I was involved in, yes.
21  Q.  All right.  So, the meetings more than
22  once a week, sometimes frequent, occur.  How long
23  did that kind of number of meetings continue?
24  A.  Well, it was a long time, I mean, and

Page 100

1  then once -- once my team took over, then it was an
2  a much smaller group of just my internal folks as
3  we were getting everybody up to speed and ready.
4  Q.  So, into 2013.
5  A.  Yes.
6  Q.  That the group shifted from this
7  controlled substance task force to the folks that
8  you were filling out the Pharmaceutical Integrity
9  group.  Is that fair?
10  A.  Yes.
11  Q.  Where I'm struggling here is that
12  Walgreens just pays -- is in the middle of an open
13  investigation with the DEA.  There's a task force
14  that's formed.  There's meetings that are occurring
15  regularly.
16  What I am not seeing in the production
17  is any meeting minutes or e-mail traffic discussing
18  the objectives and goals and what your group is
19  doing.  So, help me to -- maybe I'm just missing it
20  and we're just bad document searchers, which some
21  of your lawyers will tell us we are.
22  So, tell me in the re line, would you
23  all put -- would you put a specific like
24  "Controlled substance task force" in the re line?

Page 101

1  How would you know which meeting this was?
2  A.  What's a re line?
3  Q.  Subject line, I'm sorry, of the e-mail.
4  A.  Sorry.  You're going to have to ask that
5  question again.
6  Q.  Okay.  You're confident there was
7  agendas?
8  A.  Yes.
9  Q.  You're confident that some people took
10  notes?
11  A.  Yes.
12  Q.  You're confident that there was e-mail
13  traffic discussing in-between meetings maybe the
14  topic of the meeting?
15  A.  Yes.
16  Q.  Are you confident that there were
17  presentations made during these meetings from the
18  folks that were brought in to help educate the
19  group or the task force on specific topics?
20  A.  I don't remember presentations to
21  educate the group.  Occasionally there were
22  presentations that would get sent up to leaders.  I
23  would have to provide topics to Rex so that he
24  could update his bosses.

Page 102

1    Q.   Okay.  But as far as educate -- where
2  I'm still -- kind of a missing hole to me is that
3  how did any one of this group understand the
4  regulatory component of Walgreens as a distributor?
5    MR. HOUTZ:  Object on foundation.
6  BY THE WITNESS:
7    A.   I don't know about the distributor part.
8  The meetings that I was in with -- we were working
9  on updating the policies.  I mean, we sat in a room
10  with the current policy up on a screen, and we
11  would go through it, paragraph by paragraph, to
12  make sure that everything was still relevant or if
13  we needed to add additional information.  And it
14  would depend on the -- what we were working on at
15  that point in time.
16  BY MR. MOUGEY:
17    Q.   Do you understand that there is
18  United States code, federal code, that governs
19  Walgreens' duties as a distributor?
20    A.   At the time, yes.
21    Q.   Do you understand that there are
22  regulations, regs, promulgated under the U.S. Code
23  that define further Walgreens' responsibilities as
24  a distributor?

Page 103

1    A.   I understand that there were codes and
2  regulations.  There were times when I needed them
3  spelled out to me more clearly, but yes.
4    Q.   So, when you needed them spelled out
5  more clearly to you, how did you -- where did you
6  go?
7    A.   The regulatory/law folks.
8    Q.   Okay.  And tell me the process with
9  that.  Would you ask for a meeting, would you call,
10  a little bit of both?
11    A.   It was a little bit of both.  Oftentimes
12  they were in the room because we had a lot of
13  questions and they would help, you know, translate
14  for us.  Sometimes I would call.  Sometimes I would
15  send an e-mail.  It just depended.
16    Q.   So, is it safe to say that almost your
17  entirety of your knowledge based on the code and
18  regs of Walgreens as a distributor came from
19  regulatory and legal?
20    A.   Yes.
21    Q.   Did you find that that information that
22  you got from regulatory compliance on -- I'm going
23  to call it the regulatory structure of Walgreens as
24  a distributor.  Did you find that complex?

Page 104

1    A.   Yes.
2    Q.   Did you -- did you ask for a memorandum,
3  a memo, or anything in writing kind of laying it
4  out so you could have it as a reference point?
5    A.   No.
6    Q.   Did you -- was there a purposeful
7  decision not to put anything in writing so some day
8  a lawyer like me might be sitting here asking
9  questions about it?
10    A.   No.
11    MR. HOUTZ:  Object to form and foundation.
12  BY MR. MOUGEY:
13    Q.   So, you got a complex topic.  You have a
14  resource, regulatory and legal, and do you have a
15  person that you typically dealt with when you had
16  questions?
17    A.   Yes.
18    Q.   And who was that person?
19    A.   Dwayne Piñon and Patty Zagami were our
20  usual points of contact.
21    Q.   Is Patty a lawyer?
22    A.   Yes.
23    Q.   And so when the task force needed
24  guidance on the details of the regulatory

Page 105

1  structure, it would contact Dwayne and Patty?
2    A.   Correct.
3    Q.   Did you keep the agendas at any place,
4  on a desktop, in a folder, printed out in a drawer,
5  for these meetings?
6    A.   Yes.
7    Q.   And do you still have them today?
8    A.   No.
9    Q.   How long did you keep them until?
10    A.   As soon as this Memorandum of Agreement
11  was signed and executed, it all went in the
12  garbage.  We have a very --
13    Q.   Was that at the direction of someone
14  internally?
15    A.   No.
16    Q.   You just happened on the date this was
17  signed to throw all of your notes out?
18    A.   Well, here's -- here's the deal.  We
19  went through a number of moves in our department to
20  different buildings and our space that we were
21  allotted has decreased substantially, and I didn't
22  need to keep it anymore because we had already
23  executed on what we signed.
24    Q.   Help me to understand what you described

Page 106

1  as a complex issue, which is the regulatory
2  structure of Walgreens as a distributor, what would
3  you use for a reference point as you were going
4  through this process to make sure you understood
5  what the rules and regulations were?
6      A.   When my team took over for the order
7  monitoring, we used the system that was put in
8  place.  Any questions that we had to the system or
9  how the system worked, we would get ahold of Steve
10 or Wayne and then if we needed further
11 clarification on to the regulations, then we would
12 talk to Patty or Dwayne.  But the system was
13 already in place when I took it over.
14     Q.   We'll get to that.
15     A.   Okay.
16     Q.   Were there minutes of the meetings from
17 the task force, the controlled substance task
18 force, so after the meeting there would be a
19 rendition of what was discussed?
20     A.   In some cases, yes.  In other cases, no.
21     Q.   Do you have an understanding of why
22 sometimes there were minutes and sometimes there
23 weren't?
24     A.   Probably depended on what was getting

Page 107

1  worked on.
2      Q.   Excuse me one second.  I want to check
3  on something.
4          In preparation for your testimony today,
5  did you look at specific documents?
6      A.   Yes.
7      Q.   And did you review any agendas or
8  minutes from the controlled substance task force?
9      A.   No.
10     Q.   Did you look at e-mails from the
11 controlled substance task force?
12     A.   No.
13     Q.   Was -- I'm going to mispronounce his
14 last name.  Is it Piñon?
15     A.   Yes.
16     Q.   And Patty's last name is?
17     A.   Zagami.
18     Q.   Mr. Piñon and Ms. Zagami, were you all
19 directed to include them on e-mails as part of this
20 task force?
21     A.   No.
22     Q.   Were they on e-mails routinely,
23 Mr. Piñon and Ms. Zagami, as part of this -- the
24 meetings in late 2012, early '13?

Page 108

1      A.   Yes.
2      Q.   If I use the word "listserv," do you
3  know what that means?
4      A.   No.
5      Q.   Like if you create in Outlook an e-mail
6  that you could just type "controlled substance task
7  force" and if there is 15 people on the committee,
8  you don't have to type everyone's name in.
9      A.   Yes.
10     Q.   Because if you're like me you always
11 forget.
12     A.   Right.
13     Q.   Did you have a listserv that you would
14 type in "task force" or "controlled substance task
15 force"?
16     A.   Not that I remember.
17     Q.   But you would agree with me that one of
18 the primary focus points of the controlled
19 substance task force was to review Walgreens'
20 existing policies and procedures with regard to
21 Walgreens as a distributor and Walgreens as a
22 pharmacy to ensure that it was in compliance?
23     A.   Yes.
24     Q.   And in order to fill that objective, you

Page 109

1  had to have an understanding of what that
2  regulatory structure was?
3      A.   Yes.
4      Q.   And you got that regulatory structure
5  definition from Mr. Piñon and Ms. Zagami?
6      A.   Sometimes I got it from that and
7  sometimes I got it from my own experience from
8  being a pharmacist and being in the field.
9      Q.   Fair enough.  On the dispensing side.
10 But on the distributor --
11     A.   Yes.
12     Q.   -- side, if you needed information or
13 details on Walgreens' existing regulatory
14 obligations as a distributor, you went to Mr. Piñon
15 and Ms. Zagami?
16     A.   Yes.
17     Q.   Let's go back to where we started, which
18 is, Ms. Polster, your CV, which is marked as
19 Polster 1, and go back to Walgreen Company
20 Deerfield, Illinois, Senior Director,
21 Pharmaceutical Integrity and Third Party
22 Operations.
23     A.   I'm sorry.  Which page are you on?
24     Q.   Bates No. 180.

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1   A.   Yes.
2   Q.   Let's just go through what you've
3 indicated here.
4        "Walgreens Company, Deerfield, Illinois.
5 Responsible for the overall strategy for the
6 Pharmaceutical Integrity Group including developing
7 system solutions and managing projects.  Constructs
8 the process for Third Party Operations to enable
9 the attainment of legal and ethical requirements of
10 pharmacy to increase efficiency/profitability and
11 improve overall pharmacy operations for handling
12 third party prescriptions."
13       You "oversee the design, development,
14 implementation and maintenance of contracted third
15 party prescription programs and all state Medicaid
16 programs.  Produces the strategy to mitigate risk
17 in both Rx Integrity and Third Party Operations to
18 minimize loss of company assets."
19       Did I read that right?
20   A.   Yes.
21   Q.   Where in that description does, as
22 you're head or the director of Pharmaceutical
23 Integrity, does it include ensuring that Walgreens
24 is compliant with its role as a distributor?

Page 111

1   A.   I mean, it's not specifically in here.
2   Q.   It's not even generally.  The word
3 "distributor" doesn't even appear, right?
4   A.   Right.
5   Q.   Is there a reason for that?
6   A.   Because I -- when I made this CV, it was
7 after we stopped distributing controlled
8 substances.
9   Q.   But that doesn't change the scope of
10 what your responsibility was during the time,
11 correct?
12   A.   True.
13   Q.   So, there is no description in your
14 resume about being affiliated in any shape, form or
15 fashion with ensuring that Walgreens was compliant
16 as a distributor, correct?
17   A.   Right.
18   Q.   Is that -- is that something you're
19 embarrassed about or that you wouldn't want people
20 to know that you were in a director role ensuring
21 that Walgreens was compliant as a distributor?
22   A.   No.
23   Q.   Well, let me hand you what I will mark
24 as Polster 4.

Page 112

1        (WHEREUPON, a certain document was
2        marked as Walgreens-Polster Exhibit
3        No. 4:  Tasha Polster, LinkedIn
4        profile.)
5 BY MR. MOUGEY:
6   Q.   I believe this is your resume on
7 LinkedIn.  Correct?
8   A.   Oh.  Yeah, you had to remind me what
9 this was, but yes.
10   Q.   Does this look like something you put
11 together?
12   A.   Yes.
13   Q.   And can you flip through it and tell me
14 if this looks like an accurate depiction of your
15 tenure?
16   A.   Yeah.
17   Q.   Okay.  Well, let's just start at the
18 back, and we will go through these quickly.  And
19 similar to the resume we just looked at as Polster
20 1, you start at the bottom with your education and
21 then walk through your cashier, your intern, your
22 staff pharmacist and then pharmacy manager.
23       Do you see that?
24   A.   Yep.

Page 113

1   Q.   And your pharmacy manager is you start
2 to have more significant roles, you give a
3 description underneath of the entry, correct?
4   A.   Yes.
5   Q.   And similar for the next entry, January
6 '97 to January of '03 as a pharmacy supervisor, you
7 give a description, correct?
8   A.   Yep.
9   Q.   And then the next, on page 3 of 5,
10 manager, pharmacy operating systems, you give
11 several paragraphs of description in that role,
12 correct?
13   A.   Yes.
14   Q.   And the next role you had at Walgreens,
15 from '07 to '12, director, pharmacy operations
16 optimization, you again have multiple paragraphs
17 elaborating on your --
18   A.   Right.
19   Q.   -- your job, correct?
20   A.   Yes.
21   Q.   But then we get to Walgreens, director
22 of Pharmaceutical Integrity and it says 2012 to the
23 present, which I think is around '14, and the entry
24 is blank, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    A.    What?

2    Q.    Under Pharmaceutical Integrity,

3 November 2012, on page 2 of 5.

4    A.    Oh.

5    Q.    You provide no details, correct?

6    A.    Yep, that's right.

7    Q.    So, not only do you not mention the word

8 "distributor," there is no job description in

9 Pharmaceutical Integrity, correct?

10    A.    Right.

11    Q.    Does that have anything to do with the

12 fact that you don't want the reader to know that

13 you were involved with Walgreens ensuring its

14 compliance as a role of distributor before the

15 settlement agreement was entered?

16    A.    No.

17    Q.    Nothing to do with that?

18    A.    No.

19    Q.    Just a coincidence that it's blank?

20    A.    I wouldn't say coincidence.  I think

21 it's an oversight on my part.

22    Q.    It's an oversight that you left it

23 blank?

24    A.    Right.

Page 115

1    Q.    And is it also an oversight in your

2 resume that when we look at the description of your

3 job as senior director Pharmaceutical Integrity,

4 that it doesn't list anything to do with

5 distributors?

6    A.    There is nothing malicious about this.

7 I just am not looking for a job.  Before I was

8 looking for a promotion.  That's why -- that's why

9 you put all your stuff in there, you know, so you

10 can get recruiters and whatnot to come, you know,

11 find you and perhaps offer you a job that was

12 paying you more money or whatever.

13        Man, by the time Pharmacy Integrity hit,

14 we hit the ground running and I was busy.  I wasn't

15 looking for a job.  So, let me tell you, my

16 LinkedIn profile was the least of my worries.

17    Q.    So, your LinkedIn profile doesn't

18 mention anything to do with Pharmaceutical

19 Integrity and your -- your detailed,

20 several-page CV doesn't even use the word

21 "distributor" in it, correct?

22    A.    Correct.

23    Q.    But you're not questioning today that

24 your job was to ensure that Walgreens' policies and

Page 116

1 procedures were compliant with federal code and reg

2 as a distributor?

3    A.    My job when I led the Pharmaceutical

4 Integrity team was to ensure that we were compliant

5 with the regulations around the controlled

6 substances that were getting shipped to our stores.

7 If that's what you were saying, then yes.

8    Q.    How long would these meetings take place

9 with the controlled substance task force in

10 September, October, November, December?

11    A.    I mean, it could be all over the board.

12 It depended on what we were working on

13 specifically.  It could be a 15-minute phone call.

14 It could be a two-hour meeting.  I mean, there were

15 a lot of workstreams that were within this, and I

16 was involved in a lot of them.

17    Q.    And was the pace pretty frantic in late

18 2012 with the controlled substance task force?

19    A.    I wouldn't use the word "frantic."  I

20 mean, there were -- there was a lot of work to do.

21 But frantic would not be my adjective.

22    Q.    Stressful?

23    A.    Busy, time-constrained maybe.

24    Q.    Busy.  Busy.  You are comfortable with

Page 117

1 busy?

2    A.    Yeah.

3    Q.    And to enable -- to coordinate multiple

4 people on a similar task, there had to have been a

5 significant amount of written communication

6 organizing everyone moving forward through late

7 '12, correct?

8    A.    Yes.

9    Q.    Are you familiar with a company called

10 Tableau?  I might be mispronouncing it.

11    A.    Oh.  Tableau, yes.

12    Q.    What do you understand that Tableau is?

13    A.    My very limited knowledge was that it

14 could take data and put it into charts for you.

15    Q.    An interface between taking large

16 datasets and turning it into something user

17 friendly like a dashboard?

18    A.    Sure.

19    Q.    I hand you what we are going to mark as

20 P-WAG-222 and Polster 5.

21        (WHEREUPON, a certain document was

22        marked as Walgreens-Polster Exhibit

23        No. 5:  1/28/13 memo;

24        WAGMDL00708763.)

Page 118

BY MR. MOUGEY:

Q.   This is dated January 28, 2013, and it's between you and Christopher Dymon, right?

A.   Yes.

Q.   And Mr. Dymon was ultimately part of the Pharmaceutical Integrity group, correct?

A.   Yes, at the time.

Q.   And he was one of the first hires into Pharmaceutical Integrity, correct?

A.   Yes.

Q.   And I forget his exact title.  Was he one of the regional managers?

A.   He was a -- yeah, divisional manager, yeah.

Q.   And do you remember which division geographically?

A.   No.

Q.   Did he have any kind of an analytic background?

A.   No.

Q.   Meaning kind of a data guy or was he more on the pharmacy?

A.   Yeah, he's a pharmacist by trade.

Q.   Okay.  So, if you go down to the -- it

Page 119

looks like -- 1, 2, 3 -- fourth header, "Controlled Substance District-Store Level Tableau Reports"?

A.   Yes.

Q.   So, what's entered here is "Goal is to visually summarize CSOM data into a useful and usable document on the district and store level."

So, were you all using Tableau?

A.   We weren't personally.  But the next line, Ray Stukel, he was working in the -- I think he was in the loss prevention division, and he had the Tableau license; and so he helped us put things into Tableau so that we could see charts and graphs.

Q.   If I use the word "dashboard," does that make sense to you?  So, like if you were to pull up a screen, a window on your computer and there might be, you know, charts and graphs and different boxes with different metrics?

A.   Yes.

Q.   Is that -- is that -- that's how I am using the word in the concept "dashboard."

A.   Okay.

Q.   Would Tableau give you a dashboard with different metrics related to with Walgreens data?

Page 120

A.   Yes.

Q.   All right.  So, and you said it was Mr. -- what was his name?

A.   Ray Stukel.

Q.   Ray Stukel.  It's right there in the second bullet.  And you believe that he was with loss prevention?

A.   Yes.

Q.   Do you know what his job was with loss prevention?

A.   No, but I know he was my data guy to help me put it into a chart.

Q.   Okay.  So, if you wanted to see data in a nice chart, you'd call -- Ray would be one of the people you'd call?

A.   Right.

Q.   Do you have an understanding of what Mr. Stukel was using Tableau for?

A.   I don't know what he was using it prior to us, that team.

Q.   Okay.  How about once your team got started and the task force and you identified Mr. Stukel as somebody that could help you with charts and graphs, did you have an understanding of

Page 121

what he was looking at as a member of loss prevention?

A.   I don't know what he was looking at specifically, but I know what I asked him for.

Q.   Okay.  Did he tell you what Tableau was capable of pulling?  Did he give you a menu or a --

A.   No.

Q.   -- a list?  How would you even know what to ask for?

A.   Well, what I was looking at specifically was related to the work that my team was doing, and, you know, how many -- how many orders was each division reviewing, did we have, you know, one division have more than others, depended on, you know, the number of stores that were in that area, et cetera.

Q.   Is it fair to say that Mr. Stukel provided support with pulling data for Pharmaceutical Integrity for you all to do your work on Walgreens' responsibility as both a distributor and a dispenser?

A.   Yes, he provided support for data.

Q.   And do you have a time context that Mr. Stukel provided support for data?

Page 122

1    A.   Well, definitely it was 2013, but he
2  went on to another job and I don't remember when
3  that was.  But for sure it was during 2013.
4    Q.   All right.  You suggest earlier that you
5  recalled what kind of data you asked him for?
6    A.   Yes.
7    Q.   Would you walk me through what you
8  believe you asked him for?
9    A.   I wanted to know the number of orders
10 that my team was reviewing in order to, and I know
11 I'm not going to remember all this, I will just put
12 that out there right now, but in order to make sure
13 that the workload or distribution was appropriate
14 for the number of people that we had working for
15 that particular manager in the division.
16   Q.   Now, you used the word "order," "number
17 of orders my team was reviewing."  What do you mean
18 by that?
19   A.   So, when the ordering system creates an
20 order based on usage at store level, the way the
21 order -- the order monitoring system works is it
22 gets reviewed and hits up against the algorithm
23 that Wayne built.
24   Q.   Okay.

Page 123

1    A.   And if that order exceeds that
2  threshold, then we would look at it to ensure
3  that -- well, no.  It's not even allowed to exceed
4  the threshold.
5       The stores have to submit a form that
6  has all the documentation as to why they would need
7  more than what the algorithm says that it should.
8    Q.   Okay.
9    A.   And then once it's reviewed, then we
10 release the order.  We released it at the time to
11 our distribution center and now we release it to
12 our wholesaler.
13   Q.   When you say they submit a form, is that
14 the override form?
15   A.   Yes.
16   Q.   So, you wanted help looking at the
17 number of orders that were assigned to each one of
18 your managers to review so that you knew how many
19 override forms they were looking at?
20   A.   Override forms and just work in general,
21 to make sure that we could get to all of the work
22 appropriately so that the stores were taken care of
23 if they needed anything.
24   Q.   Were you trying to make sure that the

Page 124

1  work was equally distributed?
2    A.   Not equally distributed because I had it
3  broken out by division.
4    Q.   Okay.
5    A.   But, you know, like, for example, a
6  Florida, Illinois, a California is going to have a
7  lot more stores than Idaho and Wyoming.
8       And so we had to make sure that we had
9  enough people that were overseeing those specific
10 states, right?
11   Q.   Right.
12   A.   Because you're going to see more
13 scripts -- sorry -- more orders come in if you've
14 got more stores in that area.
15   Q.   So, when you asked Mr. Stukel to help
16 you pull whatever charts or graphs it was, how
17 would it come to you?
18   A.   Generally came in a -- I can't
19 remember -- either a pie chart or one of those
20 waterfall charts or the bars.
21   Q.   Okay.  So, it would come in in some sort
22 of a chart or a graph?
23   A.   Yeah, yeah, a graph of some sort.
24   Q.   Did you ever go and sit with Mr. Stukel

Page 125

1  and look over his shoulder at the Tableau
2  interface?
3    A.   No.
4    Q.   Did your group ever use the Tableau
5  interface within Pharmaceutical Integrity?
6    A.   I don't -- I don't know if they used it.
7  It required a license, and I can't remember how
8  many licenses we had.
9    Q.   So, Walgreens was constrained just by
10 the number of licenses?
11   A.   Yes.
12   Q.   And you're obviously familiar if
13 Walgreens wanted to spend a little more money on
14 licenses, more people could have had it?
15   A.   I don't know how that worked.
16   Q.   You don't know.  Let me make sure we're
17 on the same page still.
18       So, Tableau is an interface that is able
19 to extract specific Walgreens data and could be
20 used for monitoring purposes for Walgreens to fill
21 its role as a distributor and a pharmacy?
22   MR. HOUTZ:  Object on foundation.
23 BY THE WITNESS:
24   A.   I don't know.

Page 126

BY MR. MOUGEY:
1   BY MR. MOUGEY:
2       Q.   You don't know what Tableau is?
3       A.   Well, I know Tableau is a -- is a user
4   interface for data.
5       Q.   Okay.
6       A.   But I don't know what all it was used
7   for.  I know what I used it for.
8       Q.   Well, that's fair enough.  I'm not
9   asking you for a crystal ball.  I'm asking what you
10  and your group used Tableau for.
11      A.   Okay.
12      Q.   You and your group used Tableau to
13  extract Walgreens data.  Yes?
14      A.   Yes.
15      Q.   And put it into a chart or a form,
16  correct?
17      A.   Yes.
18      Q.   That would assist you in determining
19  whether or not Walgreens was meeting its
20  responsibilities as a distributor?
21      A.   No.
22      Q.   You used the data extracted from
23  Mr. Stukel through Tableau to help you in your
24  day-to-day job in Pharmaceutical Integrity?

Page 127

1       A.   Yes.
2       Q.   Okay.  Now, late 2012, early 2013, are
3   you familiar with the word "war room"?
4       A.   Yes.
5       Q.   And that you and the team as it was
6   developing worked out of a war room frequently,
7   correct?
8       A.   Yes.
9       Q.   And would you describe, as you all used
10  the term "war room" internally, what you meant by
11  war room?
12      A.   There are lots of war rooms, you know,
13  depending on what the thing was and, you know, my
14  definition of it -- of a war room was a task force
15  of some sort that has one specific room that they
16  can go to to finish solving the problem of whatever
17  the problem is.
18           There were lots of war rooms.  There was
19  a war room for Hurricane Katrina.  There were, you
20  know, lots of war rooms.
21      Q.   So, material, documents, things would be
22  gathered in a room where people could go and meet
23  and it was spread out on a table for quick and easy
24  access.  Is that fair?

Page 128

1       A.   Yes.
2       Q.   And depending on the project, they would
3   be different war rooms?
4       A.   Yes.
5       Q.   And maybe a conference room just like
6   this where everybody could go and meet and the
7   material was already gathered and laid out there.
8   Is that fair?
9       A.   Yes.
10      Q.   So, in late 2012, there were some
11  references to a war room with Pharmaceutical
12  Integrity.  Do you recall that?
13      A.   Yeah, I was -- it was called lots of
14  things.  So, yes.
15      Q.   Okay.  So, did you have, you meaning
16  Pharmaceutical Integrity, have a -- I'm going to
17  call it an educational process where people that
18  came into your group on a rolling basis where you
19  educated them on what the system was prior to the
20  creation of Pharmaceutical Integrity?
21      MR. HOUTZ:  Object to form.
22  BY THE WITNESS:
23      A.   When you say "system," can you be more
24  specific?

Page 129

1   BY MR. MOUGEY:
2       Q.   Really just anything.
3       A.   Oh.
4       Q.   How did you get people up to speed --
5       A.   Yeah.
6       Q.   -- with what Walgreens' system was prior
7   to 2013?
8       MR. HOUTZ:  Object to form.
9   BY THE WITNESS:
10      A.   We would give a very short overview, but
11  we would -- listen, we had a lot of work and a lot
12  of things going on.  We didn't have a lot of time
13  to educate for days and days.
14           So, depended on what the project was.
15  Was it the learning and development team, was it
16  the communications team, which team was coming in,
17  we'd give them a high level overview, tell them
18  what we needed to do and then we'd get to work.
19  BY MR. MOUGEY:
20      Q.   When you say the learning and
21  development team and the communications team, what
22  do you mean?
23      A.   So, learning and development, that team
24  helps us launch policies and documents our

Page 130

1 pharmacists acknowledging those policies that they
2 saw them, that they understand them.
3        The communication team helps us take the
4 information that we're trying to get down to store
5 level and put it into consistent format so the
6 stores can read it efficiently and, you know, get
7 it to the point.
8        People that are not communication
9 specialists sometimes can be wordy. Stores don't,
10 you know, want to read all that. They just need to
11 understand what the point is of whatever it is
12 you're sending out.
13     Q.    Let me stick on this Tableau for a
14 minute. Do you know -- are you familiar with what
15 a Tableau workbook is?
16     A.    No. I may have seen one, but I don't
17 know.
18     Q.    Are you familiar with what a shared
19 drive is at Walgreens?
20     A.    Yes.
21     Q.    And that Rx Integrity had their own
22 folder?
23     A.    Yes.
24     Q.    And people from around Walgreens would

Page 131

1 include material in that shared Rx Integrity folder
2 so your team could access it?
3     A.    My team, yes.
4     Q.    Okay. I hand you what I will mark as
5 Polster 6.
6        (WHEREUPON, a certain document was
7        marked as Walgreens-Polster Exhibit
8        No. 6: 2/8/13 e-mail string;
9        WAGMDL00101769 - 00101770.)
10 BY MR. MOUGEY:
11     Q.    This is an e-mail exchange from the
12 beginning of 2013, February 7 to February 8,
13 between you and Mr. Stukel, the same gentleman we
14 were just referring to out of loss prevention.
15        Do you see that?
16     A.    Yep.
17     Q.    The data guy. So, you had asked him --
18 I'm in the middle of the page, Bates No. 1769 --
19 "Ray, would you run all HC products for this store.
20 I need to be able to see quantities per Rx for what
21 is written."
22        Do you see that?
23     A.    Yes.
24     Q.    Now, HC stands for?

Page 132

1     A.    Hydrocodone.
2     Q.    All right. And you wanted to know how
3 many dosage units per script so you could perform
4 some analysis. Is that what you're asking?
5     A.    Yes.
6     Q.    And if you needed data like that, is
7 that a typical exchange between you and Mr. Stukel
8 as you were trying to gather information?
9     A.    Yes, at the time, yes.
10     Q.    And Mr. Stukel responds. He said,
11 "Hi Tasha - the standard Tableau workbook is now on
12 the shared drive in the Rx Integrity folder under
13 'Ad Hoc Analyses.' The file is called 'District
14 116' because I pulled info for all the district
15 stores that we could compare 11137 to its local
16 peers."
17        Do you see that, sir?
18     A.    Yes.
19     Q.    "A quick review of the dashboard
20 suggests that this store is pretty similar to the
21 others within the district and there are a few
22 doctors who are writing substantial proportions of
23 the store's Rx for some of the high volume
24 hydrocodone products (seen most clearly on the PBR

Page 133

1 scatter page)."
2        Do you see that, sir -- ma'am?
3     A.    Yes.
4     Q.    So, this type of e-mail exchange with
5 Mr. Stukel was fairly common where you were asking
6 him to pull the underlying data through the Tableau
7 interface and asking him to organize it so that it
8 kind of made sense for you?
9     A.    Yes.
10     Q.    You'd agree that the amount of data at
11 Walgreens, you know, with 5,000 plus stores is a
12 little overwhelming?
13     A.    Yes.
14     Q.    And having it organized in some sort of
15 a chart or a graph or a scatterplot is very
16 helpful, correct?
17     A.    Yes.
18     Q.    And did you have the ability as director
19 of Pharmaceutical Integrity in 2013 to just pull
20 data from Walgreens' server so you could organize
21 pills and dosage units and find hot spots or any of
22 that?
23     A.    No, I could not do it.
24     Q.    And you couldn't do it because you

Page 134

1 didn't have the technical know-how or because there
2 wasn't an interface established for you to just
3 kind of click on what you wanted to pull?
4    A.   Both.
5    Q.   All right.  So, there was ultimately a
6 dashboard that was created for Pharmaceutical
7 Integrity, correct?
8    A.   I don't remember dashboard.  I know
9 that -- I mean -- and this was a long time ago.  I
10 remember working with Ray and having him pull data
11 and helping me understand the data.  But when you
12 say dashboard, I don't remember going in and
13 looking at a dashboard or anything like that.
14    Q.   He references even dashboard here, "a
15 quick review of the dashboard."
16       Do you see that?
17    A.   Yes.
18    Q.   All right.  What would you call it if
19 you pull it up and there were a lot of graphs and
20 charts organizing data like quantities for
21 hydrocodone for the store?
22    A.   Again, I don't remember this exact pull.
23 I don't remember what he gave me.  But I never went
24 into my shared drive, ever.  My people, they messed

Page 135

1 with the shared drive.  I did not.  If I needed
2 something, I asked them to send it to me directly.
3    Q.   Okay.  Who is somebody on your staff
4 that -- that you felt like had a good command of
5 the Tableau workbook and knew what information was
6 there?
7    A.   We didn't use Tableau much past 2013.  I
8 mean, after -- after Ray left his job and went to
9 whatever job he went to, I relied pretty heavily on
10 Ed Bratton to put together graphs and charts for
11 me.  But I don't remember if he used Tableau or if
12 he used some other form.
13    Q.   And Steve Mills was a member of your
14 group too, correct?
15    A.   Yes, he was.
16    Q.   Hand you what I will mark as -- it's
17 P-WAG-2619.
18       (WHEREUPON, a certain document was
19       marked as Walgreens-Polster Exhibit
20       No. 7: 4/19/13 e-mail with
21       attachment; WAGMDL00245768 -
22       00245769.)
23 BY MR. MOUGEY:
24    Q.   Do you see this is another internal memo

Page 136

1 between you and Mr. Mills, correct?
2    A.   Yes.
3    Q.   And it's dated February 14, 2013,
4 correct?
5    A.   Yes.
6    Q.   And another reference to Tableau in the
7 third section down, correct?
8    A.   Yep.
9    Q.   And Mr. Mills -- and what was Mr. Mills'
10 role within Pharmaceutical Integrity?
11    A.   He was an analyst that reported up into
12 one of the managers.
13    Q.   So, more -- more of a data guy?
14    A.   Yeah.
15    Q.   And "This week I gained access to the
16 queries Ray uses to create the Tableau tables."
17       Do you see that?
18    A.   Yep.
19    Q.   "I just need Tableau and we will be able
20 to access" -- "and we will be able to create the
21 tables as needed basis without going to Ray."
22       That would make sense, right?
23    A.   Yep.
24    Q.   Your group should be able to do that

Page 137

1 internally as you were building out and the process
2 was being able to build out within your own group,
3 correct?
4    A.   Yes.
5    Q.   Bullet, the next bullet under "Tableau
6 Reporting Dashboards, Rx checklist data is ready to
7 be deployed to the field.  We just need to agree on
8 a day to send out the reports."
9       Do you have an understanding what "Rx
10 checklist data" is?
11    A.   I don't remember what that was.
12    Q.   Let's go to the "Cardinal SOM."
13    A.   Okay.
14    Q.   A part of your job description was third
15 party -- I can't remember the exact terminology.
16    A.   Third party operations.
17    Q.   Third party operations.  Did that
18 include overseeing Walgreens' relationships with
19 third-party vendors who were distributors?
20    A.   No.
21    Q.   Okay.  What was that?
22    A.   Third party operations is the billing of
23 insurance cards.  So, when a patient comes in and
24 brings in insurance -- it has nothing to do with

Page 138

1 Pharmacy Integrity. Completely different
2 workstream entirely.
3         So, when you or a patient comes in with
4 your insurance card from Cigna or whatever, hand it
5 to the pharmacy. Pharmacy has to enter in the data
6 and then you have a -- when the prescription gets
7 processed, the co-pay comes out, and we ensure that
8 it's billed correctly.
9     Q.   If you had --
10    A.   Patients are taken care of.
11    Q.   Sorry.  Didn't mean to interrupt you.
12        If you had -- do you have an estimate in
13 2013 of how much of your time went to
14 Pharmaceutical Integrity and how much of your time
15 went to the third party operations you just
16 described?
17    A.   The majority of the work -- of the time
18 went to Pharmaceutical Integrity because it was new
19 and just getting up to speed and I'm still hiring
20 people and making sure they know what to do.
21    Q.   Did your pay come from two different
22 groups within Walgreens?
23    A.   My paycheck?
24    Q.   Your paycheck.

Page 139

1     A.   No.
2     Q.   Was it split between budget items
3 between two different groups?
4     A.   Oh. No.
5     Q.   So, when you say majority of your time,
6 is that 55, 60% went to Pharmaceutical Integrity?
7     A.   I'd say probably 75%.
8     Q.   Was that consistent all the way through
9 '13 or did it get -- lighten up?
10    A.   No, it stayed pretty consistent.  A
11 lot -- the majority of the time that I spent was on
12 Pharmaceutical Integrity because the third party
13 operations team was already up and running and I
14 had leaders on that team.
15    Q.   So, let's just go down to the Cardinal
16 entry.  I just want to understand.
17    A.   Sure.
18    Q.   You would agree that in addition to
19 Walgreens as a distributor, Walgreens also used the
20 services of other third party distributors,
21 correct?
22    A.   Yes.
23    Q.   Cardinal was one of them, correct?
24    A.   Yes.

Page 140

1     Q.   ANDA was another, correct?
2     A.   I don't remember when ANDA came on
3 board, but they are a distributor for us now.
4     Q.   Yes, ma'am.  And ABC as well, correct?
5     A.   Yes.
6     Q.   AmerisourceBergen.  Now, we're going to
7 get into the specifics of the suspicious order
8 monitoring policy, but while we are on this doc,
9 just bear with me for a second.
10        You've mentioned and just in the last
11 series of questions we talked about the number of
12 orders that your team was reviewing, correct?
13    A.   Yes.
14    Q.   And if an order exceeded a certain
15 threshold, Walgreens reduced that order, correct?
16    A.   No, we didn't reduce it.
17    MS. FIX MEYER:  Objection.
18 BY MR. MOUGEY:
19    Q.   That you canceled the order and told the
20 pharmacy that it had to be -- couldn't be any
21 higher than X, correct?
22    MR. HOUTZ:  Object to form.
23 BY THE WITNESS:
24    A.   Not exactly.

Page 141

1 BY MR. MOUGEY:
2     Q.   You just tell me what you think you did.
3     A.   Well, I can tell you what I know I did.
4     Q.   Go ahead.
5     A.   So, when the order exceeded the limit,
6 the store was not shipped product.  And then we
7 developed a tool to let the stores know if they
8 were reaching their ceiling, and we gave them
9 visibility into the number of bottles that they
10 would be able to order but they couldn't go over
11 the order unless they filled out the controlled
12 substance order form that had all the proper
13 documentation as to why they needed it.
14    Q.   Yes, ma'am.  I'm sure they did.
15        So, once you told them what the
16 threshold was and told them what they could order,
17 then they ordered up to that amount, correct, and
18 that's called -- that's called a threshold?
19    MR. HOUTZ:  Object to form.
20    MS. FIX MEYER:  Objection; form.
21 BY THE WITNESS:
22    A.   In some cases they used it.  In a lot of
23 cases they didn't.  It took a long time to get them
24 trained.

Page 142

BY MR. MOUGEY:
1 
2    Q.   I'm sure it did.  So, under "Cardinal
3 SOM," that stands for suspicious order monitoring,
4 correct?
5    MS. FIX MEYER:  Object to form.
6 BY THE WITNESS:
7    A.   Yes.
8 BY MR. MOUGEY:
9    Q.   On the third bullet down, "About 60% of
10 these orders are legitimate orders that should be
11 canceled."
12       The last sentence says, "These are
13 stores who are over their corporate ceiling."  And
14 corporate ceiling is Walgreens' corporate ceiling,
15 correct?
16    A.   Yes.
17    Q.   Means that they weren't allowed to order
18 any more, correct?
19    A.   Without proper documentation, yes.
20    Q.   And -- but "they are going to Cardinal
21 to request the product."
22       Do you see that?
23    A.   Yep.
24    MS. FIX MEYER:  Objection to form.

Page 143

1 BY MR. MOUGEY:
2    Q.   So, Walgreens' system, if a store
3 exceeded the ceiling, they were told no more
4 Schedule II or Schedule III controlled substances
5 from us, correct, Walgreens?
6    A.   They didn't know.  So --
7    Q.   They knew they couldn't order any more,
8 correct?
9    A.   They wouldn't know because -- they
10 wouldn't know until the order was due to show up.
11    Q.   And it didn't show up and they knew they
12 didn't get it, correct?
13    A.   Right, but they didn't know why.
14    Q.   So, they knew they didn't get the order
15 from Walgreens, correct?
16    A.   Correct.
17    Q.   And they didn't know why, but they
18 didn't get it from Walgreens but then Walgreens
19 allowed up until a period in time for that store to
20 put it in an order from another vendor, correct?
21    MR. HOUTZ:  Object to form and foundation.
22 BY THE WITNESS:
23    A.   Walgreens -- any pharmacy has secondary
24 wholesalers if the one wholesaler -- I'm just

Page 144

1 telling you the truth.  I mean, you got to take
2 care of the patients.  And so --
3 BY MR. MOUGEY:
4    Q.   The question I asked you was simple.
5       Does the store have the ability to go to
6 another vendor and order controlled substances
7 after they hit the ceiling at Walgreens?
8    MR. HOUTZ:  Next time please let her finish
9 her answer before you interrupt.
10    MR. MOUGEY:  The next time I'd like to have an
11 answer to the question that I asked.
12 BY MR. MOUGEY:
13    Q.   The vendors --
14    MR. HOUTZ:  If you allow her to finish your
15 answer, you may get an answer.
16 BY MR. MOUGEY:
17    Q.   The vendors -- I'm sorry.
18       The pharmacies are allowed to order
19 additional controlled substance, highly addictive,
20 like OxyContin that we talked about earlier, once
21 they hit the ceiling, that store can go to Cardinal
22 and order additional oxycodone, correct?
23    MS. FIX MEYER:  Objection; form, foundation.
24    MR. HOUTZ:  Same objection.

Page 145

1 BY MR. MOUGEY:
2    Q.   Yes or no.
3    A.   I'm not going to yes or no answer that.
4 I'm going to tell you what happened.
5    Q.   No, I want to know if they have the
6 ability.  That's all I asked.
7    A.   Yes.
8    Q.   Do they have the ability to order --
9    A.   Yes.
10    Q.   -- more oxycodone from another vendor
11 like Cardinal after Walgreens' ceiling has been
12 hit?
13    MS. FIX MEYER:  Objection; form, foundation.
14 BY THE WITNESS:
15    A.   On this date, yes.
16 BY MR. MOUGEY:
17    Q.   Yes.  Thank you.
18    MR. MOUGEY:  Les, if it's okay with you, it's
19 a good stopping point for me for lunch.
20    MR. HOUTZ:  Sure.
21    MR. MOUGEY:  I am planning on using the seven
22 hours today.  So, I just want to give everybody a
23 heads-up as we go through.  I'm happy to take a
24 shorter or longer lunch as you and Ms. Polster

Page 146

1  would like with that.
2    MR. HOUTZ: Let's do the 45 minutes lunch.
3    MR. MOUGEY: 45? How much time have we used?
4    THE VIDEOGRAPHER: We have been on the record
5  for 2 hours and 32 minutes.
6    MR. MOUGEY: 2-1/2 hours. Thank you. We will
7  take a 45-minute lunch. So, it means, let's just
8  come back in at 1:00. How's that?
9    MR. HOUTZ: We'll back at 1:00.
10   MR. MOUGEY: Thank you.
11   THE VIDEOGRAPHER: We are off the record at
12  12:13 p.m.
13       (WHEREUPON, a recess was had
14       from 12:13 to 1:05 p.m.)
15   THE VIDEOGRAPHER: We are back on the record
16  at 1:05 p.m.
17  BY MR. MOUGEY:
18   Q.  Ms. Polster, you're familiar with Edward
19  Bratton, correct?
20   A.  Yes.
21   Q.  And he's a member of your team, correct?
22   A.  Yes.
23   Q.  And he came on with Pharmaceutical
24  Integrity in the beginning of 2013, correct?

Page 147

1    A.  Yes.
2    Q.  And I think you mentioned that your
3  group was busy with its charge of working on issues
4  related to Walgreens as a distributor and a
5  pharmacy ensuring that it was in compliance with
6  federal regs and statutes, correct?
7    A.  Yes.
8    Q.  And the frequent meetings continued as
9  you brought new people on board like Mr. Bratton,
10  correct?
11   A.  Yes.
12   Q.  And Mr. Bratton was part of the process
13  of getting up to speed about what was necessary to
14  fill your group's mission, correct?
15   A.  Yes.
16   Q.  And just like all the members of your
17  group, you all had regular meetings covering the
18  topics that were necessary for you all to ensure
19  Walgreens was in compliance as a distributor,
20  correct?
21   A.  Yes.
22   Q.  And part of the topic of those meetings
23  was that you all looked at Walgreens' previous
24  system before your group was in place, correct?

Page 148

1    A.  No, we focused on the system that we
2  were using at the time for suspicious order
3  monitoring.
4    Q.  On Day 1, it didn't -- was there a
5  Day 1, when Pharmaceutical Integrity started?
6    A.  Well, the task force was doing its work
7  and then my team started getting hired and brought
8  in and then they handed over the suspicious order
9  monitoring to my team once I had people in place.
10   Q.  But the question I asked you was: You
11  all focused on the previous system. You said no,
12  we were using the system that was in place.
13       So, was there a clean line of on Monday
14  morning we began with our system and there was no
15  more previous system?
16   A.  No, but there was tweaks along the
17  system. So, I need to understand which system you
18  were talking about, but --
19   Q.  Actually I need to understand which
20  system you're talking about.
21   A.  Okay.
22   Q.  So, when you say there are tweaks, the
23  previous system, our system, I'm not quite
24  understanding. Okay?

Page 149

1    A.  Okay.
2    Q.  The basis for the system that
3  Pharmaceutical Integrity used was the algorithm
4  that Wayne Bancroft wrote, correct?
5    A.  Yes.
6    Q.  How about we'll call that the "Wayne
7  Bancroft algorithm"?
8    A.  Okay.
9    Q.  Okay. And that was the foundation of
10  the system from 2008 all the way until Walgreens
11  stopped distributing, correct?
12   MR. HOUTZ: Object to form.
13  BY THE WITNESS:
14   A.  I don't know.
15  BY MR. MOUGEY:
16   Q.  What part of that do you not know, from
17  the 2008 part?
18   A.  Correct.
19   Q.  So, how about from 2012 when you became
20  part of the controlled substance task force until
21  Walgreens stopped distributing, you're comfortable
22  that the Bancroft algorithm was the foundation?
23   A.  Yes.
24   Q.  And there were, I think in your words,

Page 150

1  tweaks to the Bancroft algorithm from the
2  controlled substance task force until Walgreens
3  stopped distributing.  Is that fair?
4      A.   We're still using that system today, but
5  yes.
6      Q.   Right.  But you're not distributing
7  today, correct?
8      A.   Correct.
9      Q.   So, that's why in my questions, so I
10 didn't have the confusion and the objections from
11 Mr. Les over there about continuing past the time
12 you were no longer distributing.
13          Walgreens stopped distributing late
14 2014. Fair enough?
15     A.   Yes.
16     Q.   Okay.  So, I'm talking about from when
17 you joined the task force in September of 2012 to
18 the point when Walgreens stopped distributing in
19 late '14, the Bancroft algorithm was the
20 foundation?
21     A.   Yes.
22     Q.   Is that fair?
23     A.   Yes.
24     Q.   Okay.  And there were modifications or

Page 151

1  tweaks made along the way, correct?
2      A.   Yes.
3      Q.   Now, so, when we were talking about what
4  system's in place, the core is Mr. Bancroft's
5  algorithm?
6      A.   Okay.
7      Q.   All right.  So, was part of the mission
8  of the controlled substance task force to look at
9  the algorithm that was in place from Mr. Bancroft
10 and add or tweak or modify?
11     A.   Not exactly in terms of looking at the
12 algorithm.
13     Q.   That the algorithm itself wasn't
14 changed, but there were kind of add-ons?
15     A.   Yes.
16     Q.   Some controls.  Is that fair?
17     A.   Yes.
18     Q.   So, is one of those controls -- why
19 don't you just walk me through what your
20 understanding or your recollection of the controls
21 were?
22     A.   So, the -- the system is designed to do
23 a historical lookback by NDC number, and one of the
24 controls that is put in place is that if the store

Page 152

1  does not have previous sales for that particular
2  drug, the system would not order in quantities as
3  readily as what they would need it.
4      Q.   Okay.
5      A.   So, for example, if a new manufacturer
6  became our primary for a certain NDC number, if we
7  didn't make a tweak in the system, none of the
8  stores would have gotten more than one bottle even
9  if they started dispensing it.
10          So, we would have to make a tweak in the
11 system in order to basically move the reordering
12 from the old NDC number to the new NDC number.
13     Q.   Okay.  Can I stop you there?  Am I
14 interrupting anything?
15     A.   Yeah.
16     Q.   So, what I'd like you to do is kind of
17 give me a laundry list that you can remember about
18 the modifications that were made.
19     A.   Sure.
20     Q.   Or the controls.
21     A.   Sure.
22     Q.   And then we'll drill down a little bit
23 more specifically.
24          So, what would you call what you just

Page 153

1  described?  The new manufacturer, is that --
2      A.   Yeah, yeah.  New manufacturer --
3      Q.   New manufacturer.
4      A.   -- was a tweak.
5      Q.   What was another tweak?
6      A.   Ensuring that every order went through
7  the system first before a store could get a product
8  regardless of where they were getting it from.
9      Q.   Okay.  So, whether they got it from
10 another vendor or interstore, it had to go through
11 the algorithm?
12     A.   Correct.
13     Q.   So, what do you want to call that, that
14 the algorithm reviewed all controlled substance
15 orders?
16     A.   Yes.
17     Q.   Is that fair?
18     A.   Yep.
19     Q.   Okay.  So, what other modifications?
20     A.   I don't remember.  Those are -- those
21 were the main ones that come to mind.
22     Q.   How about the modification about that --
23 that was pre-you -- that an order that was flagged
24 by the Bancroft algorithm was cut?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.    You mean not shipped?
2    Q.    Yes, ma'am.
3    A.    What about it?
4    Q.    That's pre-you, though, wasn't it?
5    A.    Yes.
6    Q.    Yes. When you got there, if an order
7  was flagged by the Bancroft algorithm, it was -- is
8  the word "cut"? Are you okay with that? Or what's
9  the right terminology you'd use?
10   A.    It was not shipped at all.
11   Q.    Not shipped?
12   A.    Right.
13   Q.    But the store was allowed to order up to
14 that threshold, correct? They had to enter a new
15 order in?
16   A.    Yes.
17   Q.    So, it was not shipped, but then the
18 store could reenter an order up to the ceiling
19 level, correct?
20   A.    Yes, but the store didn't have
21 visibility into that ceiling level.
22   Q.    I understand.
23   A.    Okay.
24   Q.    I understand that's your drumbeat.

Page 155

1    A.    Yeah.
2    Q.    But right now if the order wasn't
3  shipped, they were allowed to ship up to that
4  ceiling level, correct?
5    A.    Sure.
6    Q.    Okay. Now, your team knew that there
7  were modifications that needed to be made to the
8  Bancroft algorithm, correct?
9         Actually, you corrected me before about
10 the Bancroft. Let's use your language, whatever
11 you feel comfortable with.
12        So, rather than me saying changing the
13 algorithm, how about your team was aware that there
14 were -- that controls were needed to ensure that
15 all orders were going through the Walgreens
16 suspicious order monitoring system?
17   MR. HOUTZ:  Object to form.
18 BY THE WITNESS:
19   A.    I don't agree when you say they were
20 aware.
21 BY MR. MOUGEY:
22   Q.    Okay.
23   A.    I think as time progressed, things would
24 pop up and then we would ask for a change to be

Page 156

1  made based on that new information.
2    Q.    So, as you learned more and as you got
3  up to speed, there were a different -- there were
4  additional controls that needed to be implemented?
5    A.    There were -- there were changes that
6  needed to be made, yes.
7    Q.    All right. And it didn't all happen at
8  once --
9    A.    Right.
10   Q.    -- is what you're saying. It was over a
11 period of time?
12   A.    Right.
13   Q.    And when -- and I'm trying not to use --
14 I'm trying to use the word you feel comfortable
15 with. Is control, an additional control? What
16 term would you use?
17        You didn't like the modification to the
18 algorithm. So, I'm trying to find a word you're
19 comfortable with.
20   A.    Yeah, controls, that's fine.
21   Q.    Is control okay?
22   A.    Yeah.
23   Q.    That there were issues that your team
24 was identifying along the way, they were trying to

Page 157

1  find solutions and then implementing a control to
2  kind of close --
3    A.    The goal was to have consistency on how
4  the stores would order; and as things popped up
5  that created confusion for patient care and was
6  happening at store level, then we made adjustments
7  along the way to, you know, decrease any type of
8  confusion a store would have in getting a product.
9    Q.    Would you feel comfortable with the word
10 that when Pharmaceutical Integrity started, that
11 there were loopholes in the system that needed to
12 be closed with additional controls to ensure
13 compliance with Walgreens' duties as a distributor?
14   A.    Those -- I think there were gaps. I
15 don't know about loopholes.
16   Q.    Let's use the word "gaps." I'm
17 comfortable with "gaps."
18   A.    Okay.
19   Q.    So, there were gaps in Walgreens'
20 policies and procedures with its distribution of
21 controlled substances that your team was
22 identifying and addressing throughout '13 and early
23 '14?
24   A.    Yes.

Page 158

1    Q.   Now, would you agree that those gaps
2    enabled some stores to have significant growth in
3    shipments of Schedule II and Schedule III opiates
4    without being flagged and stopped as part of
5    Walgreens' system?
6    A.   No.
7    Q.   Let me hand you what we're going to mark
8    as P-WAG-1988, Bates No. WAGMDL429440.
9         And I apologize.  I'm going to change.
10   Shift gears.  It's P-WAG-1146, WAGMDL21425.
11        I will hand you what we will mark as
12   Polster 8.
13        (WHEREUPON, a certain document was
14        marked as Walgreens-Polster Exhibit
15        No. 8:  8/9/13 e-mail string;
16        WAGMDL00021425 - 00021427.)
17   BY MR. MOUGEY:
18   Q.   Mr. Bratton is a manager in
19   Pharmaceutical Integrity, correct?
20   A.   Yes.
21   Q.   And has remained in Pharmaceutical
22   Integrity for quite some time, correct?
23   A.   Yes.
24   Q.   And had an area of significant

Page 159

1    responsibility in Pharmaceutical Integrity,
2    correct?
3    A.   Yes.
4    Q.   And was an important component of the
5    Pharmaceutical Integrity team, correct?
6    A.   Yes.
7    Q.   And was part of the educational process
8    from the beginning of Pharmaceutical Integrity
9    throughout the summer of 2013, correct?
10   A.   Yes.
11   Q.   And this is -- what I put in front of
12   you is an e-mail from Mr. Bratton dated August 19,
13   2003 -- I'm sorry -- 2013.
14        Do you see that?
15   A.   Yes.
16   Q.   And I'm at the very top of the e-mail in
17   the second paragraph.
18        And Mr. Bratton, when speaking with
19   another Walgreens employee or exchanging e-mails,
20   relayed to her that "The previous system would
21   continue to send additional product to the store
22   without limit or review which made possible the
23   runaway growth of dispensing of products like
24   oxycodone."

Page 160

1    Did I read that correctly?
2    A.   Yes.
3    Q.   And this was at the time that
4    Mr. Bratton had been in your group for several
5    months in Pharmaceutical Integrity, correct?
6    A.   Yes.
7    Q.   And he was managing an entire geographic
8    region in Pharmaceutical Integrity, correct?
9    A.   Yes.
10   Q.   He was part of the process for reviewing
11   suspicious orders, correct?
12   A.   Yes.
13   Q.   He was part of the process in looking at
14   overrides, correct?
15   A.   Yes.
16   Q.   He was part of the process of
17   identifying gaps and specific controls to fill
18   those gaps, correct?
19   A.   Yes.
20   Q.   And based upon his work and what he
21   relayed to Ms. Patel is that the lack of those
22   controls allowed runaway growth for drugs like
23   OxyContin.  Do you see that?
24   A.   I see what he wrote, but I don't know

Page 161

1    what he meant.
2    Q.   Yes, ma'am.  It's confusing, isn't it,
3    where he says, "The previous system would continue
4    to send additional product to the store without
5    limit or review which made possible the runaway
6    growth of dispensing of products like oxycodone."
7         It's crystal clear what he meant, is it
8    not?
9    A.   There were a lot of tweaks to the system
10   and the system got changed many times.  So, yeah,
11   he is correct that the system was designed and
12   built way back in the day to ensure that the store
13   was able to get the product in that they needed to
14   take care of their patients.
15   Q.   Yes, ma'am.  And the lack of controls up
16   and to when your group took over in '13 allowed for
17   runaway growth of drugs like OxyContin, correct?
18   A.   I don't -- I don't agree with his --
19   with his language there.
20   Q.   That was one of your managers in your
21   group responsible for an entire geographic region,
22   that was his assessment, correct?
23   A.   That was his words.
24   Q.   I hand you -- it's P-WAG-5140, Bates

Page 162

No. 77015 and Polster 9.

1            (WHEREUPON, a certain document was
2       marked as Walgreens-Polster Exhibit
3       No. 9:  7/2/12 e-mail with
4       attachment; WAGMDL00077015 -
5       00077023.)
6  BY MR. MOUGEY:
7       Q.    Now, this is an e-mail from Raymond
8  Stukel, right?  Did I pronounce that correct?
9       A.    Yeah.
10      Q.    And Mr. Stukel, as you just identified,
11 was the gentleman that was in loss prevention and
12 using the Tableau interface to review Walgreens'
13 data, correct?
14      A.    Yes.
15      Q.    And the subject is "Discussion of
16 ceiling limits."
17           Do you see that?
18      A.    Yep.
19      Q.    And the ceiling limits are part of the
20 Bancroft algorithm that was used in Pharmaceutical
21 Integrity, correct?
22      A.    Yes.
23      Q.    That was just -- that was one of the

Page 163

1  lingos, ceiling limits and thresholds were two of
2  the tests, correct?
3       A.    Yes.
4       Q.    And ceiling limits replaced the
5  frequency?
6       A.    I think you're right there, but I'm not
7  100% sure.
8       Q.    You're not sure.  Pre-Tasha Polster?
9       A.    Right.
10      Q.    How does that sound?
11      A.    Yeah, that sounds great.
12      Q.    Okay.  So, Mr. Stukel is sending out an
13 e-mail to Mr. Merritello, Kristie Provost, Wayne
14 Bancroft and Ferdinand Dungca.
15           Do you see that?
16      A.    Yes.
17      Q.    And if you would turn to Bates No. 16,
18 this appears to be an overview of the controlled
19 substance order review web-based exception report,
20 correct?
21      A.    That's what it appears.  I have never
22 seen this document before.
23      Q.    I understand.  So, what I want to --
24 what I want you to do is help me look at this

Page 164

1  document and see if this kind of comports with your
2  understanding of the system that you inherited in
3  Pharmaceutical Integrity.  Okay?
4       A.    Okay.
5       Q.    All right.  So, the date, as we just
6  went through, is July 12th  -- I'm sorry --
7  July 2012.
8           Do you see that?
9       A.    No.
10      Q.    Very first page in the e-mail.  I'm
11 sorry.
12      A.    Oh, sorry.  Yeah.  I was looking at
13 June 22.  Okay.
14      Q.    So, this is approximately 60 days before
15 the controlled substance task force that you're a
16 part of when you start attending the frequent
17 meetings, correct?
18      A.    Yes.
19      Q.    And this is what I could find as kind of
20 the last kind of culmination, right when you start,
21 of what the system looked like.  Okay?
22      A.    Okay.
23      Q.    So, what I want you to do is tell me
24 yes, this kind of comports with my understanding or

Page 165

1  my recollection of the -- of the Bancroft algorithm
2  and the controls in place when I inherited it.  Is
3  that -- is that fair?
4       A.    Sure.
5       Q.    Okay.  So, underneath the first top of
6  Bates No. 16, under "Ordering" do you see those
7  kind of wheels or gears, A, B and C.
8           Do you see that?
9       A.    Yes.
10      Q.    And then off on the side it's
11 referencing phases and there is phase 3, phase 4
12 and phase 5.  Okay?  Do you see that in the first
13 box?
14      A.    Oh, yes, yes.
15      Q.    Okay.  So, phase 3, it says "In QA,"
16 which I would mean quality assurance?
17      A.    Yeah, testing.
18      Q.    Testing.
19           "Phase 4:  In design."
20           And then you see in the upper right-hand
21 side, "Phase 5:  In design, ceilings trump step A
22 below if/when necessary."
23           And you recall that ceilings were
24 ultimately put in place, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  A.  Yes.
2  Q.  Okay.  So, if you go to A, "Ongoing
3 Controlled Substance Order Review Logic includes
4 PSE."
5     Do you see that?
6  A.  Yes.
7  Q.  All right.  And then B is "Manual Line
8 Limits for select drugs" and C is "Automated
9 Ceilings."
10    Did I get all that?
11  A.  Yes.
12  Q.  And off to the left it says, "Interim
13 solution until automated ceilings are deployed."
14 Correct?
15  A.  I see that here.
16  Q.  Now, when you took over in late '12,
17 early '13, were the automated solutions deployed?
18  MR. HOUTZ:  Object on foundation.
19 BY THE WITNESS:
20  A.  I don't know.
21 BY MR. MOUGEY:
22  Q.  You don't know.  Okay.  So, the
23 right-hand side -- do you know what automated
24 ceilings are?

Page 167

1  A.  No.
2  Q.  Do you know what ceilings are?
3  A.  Yes.
4  Q.  What is your understanding of what a
5 ceiling is?
6  A.  A ceiling is the amount of drug that a
7 store can have at a -- at a point in time.
8  Q.  So, when it hits that point in time, and
9 you and I discussed this earlier, that order is
10 canceled and a pharmacy is allowed to enter an
11 order up to the ceiling limit, correct?
12  MR. HOUTZ:  Object to form and foundation.
13 BY THE WITNESS:
14  A.  You're making generalizations and you're
15 not really accurate.  So, can I tell you how it
16 worked?
17 BY MR. MOUGEY:
18  Q.  Go ahead.  You educate me on how this
19 works.
20  A.  All right.  So, yes, if the store hit
21 the ceiling or maybe the store didn't hit the
22 ceiling and they tried to order above the ceiling,
23 the order never got shipped.  But they wouldn't
24 know what the ceiling was.

Page 168

1     So, let's say they placed the order for
2 two bottles, but the ceiling was only one bottle.
3  Q.  Okay.
4  A.  So, if they placed an order for two
5 bottles or three bottles or whatever, they wouldn't
6 get it at all.  If they placed it for one bottle,
7 in addition to what the order algorithm was already
8 ordering, then it would allow them to get it as
9 long as they weren't above the ceiling.
10  Q.  So, let's use your example.  All right.
11     So, the -- I think your example said the
12 ceiling was one bottle, right?
13  A.  Allowed them to get it, yes.
14  Q.  Okay.  But they ordered -- there was an
15 order entered for three bottles.
16  A.  Okay.
17  Q.  So then what happens?  You tell me.
18  A.  They don't get an order at all.
19  Q.  No order?
20  A.  Right.
21  Q.  Not one, not two, not three.  Zero?
22  A.  Correct.
23  Q.  Okay.  So, how does the store become
24 alerted that they're not going to get anything?

Page 169

1  A.  Well, that was a gap that we had to
2 close to better communicate so that if they had a
3 patient waiting, that they weren't telling the
4 patient, "Please come back tomorrow, Mrs. Jones,
5 I'll have your prescription ready for you,"
6 Mrs. Jones shows up and they didn't get the product
7 because they were over their ceiling.
8     So, we had to train the stores not to
9 order.  We had to train the stores, leave your
10 orders alone.  Let the orders generate by
11 themselves based on the algorithm and if you feel
12 that you need more, fill out the controlled
13 substance override form so that we can look at it,
14 make sure why we have proper documentation as to the
15 reason why you need it, and then we will place the
16 order for you.
17  Q.  Okay.  So, if there was -- they only had
18 one bottle left before they hit the ceiling and
19 they ordered three, was the store allowed to order
20 one bottle without the override form?
21  A.  They didn't know what they were allowed
22 to order.  So, we had to -- we had to give them a
23 tool to help them, but that was much later in the
24 process.  At that point in time they didn't know.

Page 170

1 They just got nothing.

2     Q.  Okay.  So, how would the store know that

3 they could order one more bottle?

4     A.  They couldn't.  That was the problem.

5     Q.  So, when you fixed it, how did the

6 store?

7     A.  Oh.  We have a ceiling tool and they

8 have to go into the tool.  It tells them how many

9 bottles that they can order until they hit the

10 ceiling.

11     Q.  Okay.

12     A.  And if they need more, then they have to

13 fill out the controlled substance override form.

14     Q.  So, the override form wasn't necessary

15 until they went over the ceiling.  They asked to go

16 over the ceiling?

17     A.  Correct.

18     Q.  Okay.  So, but when did the gap -- when

19 was the gap fixed that the store would know how

20 many bottles, in your example, it had left before

21 it hit the ceiling?

22     A.  I don't remember the exact date that the

23 tool --

24     Q.  Give me a ballpark.

Page 171

1     A.  It was either -- man, I'm guessing.  I

2 don't know.  It was late 2013, early 2014.

3     Q.  Okay.  That's -- can't have been too

4 large a period of time.  Pharmaceutical Integrity

5 really got off the ground in the beginning of '13

6 and was out of the distribution business by --

7     A.  Right.

8     Q.  -- late '14, right?

9     A.  Right.

10     Q.  So, if you would, turn to the next page,

11 Bates No. 17, titled "Ongoing Controlled Drug Order

12 Review Logic."

13         It has three boxes across the top,

14 "Review all Controlled Drug and PSE orders," "Flag

15 select orders as suspicious," "Reduce order

16 quantity for subset of flagged orders."  Okay.

17         Do you understand those three boxes?  Do

18 you understand what's being referenced?

19     A.  Give me just a second.

20     Q.  Of course.

21     A.  I -- I see the words on the page, but

22 when I took over the system, we weren't reducing

23 order quantities.

24     Q.  You are referring to the third box,

Page 172

1 "Reduce order quantity for subset of flagged

2 orders," right?

3     A.  Right.

4     Q.  So, when you said earlier "I didn't

5 understand it," maybe I'm not the only one, right?

6 I mean, it says here that "Reduce order quantity

7 for subset of flagged orders," right?

8     A.  That's what it says, but I don't know

9 what -- what that means because when I took over

10 the system, we were not reducing orders.  If

11 they -- if the store tried to order outside of the

12 system, the order got cut.

13     Q.  All right.  Let me make sure you and I,

14 the lingo, we're saying the same thing because I'm

15 a little confused when you say "outside the

16 system."  What do you mean by that?

17     A.  If they tried to order above their

18 ceiling --

19     Q.  Yes.

20     A.  -- the order got cut.

21     Q.  The whole order?

22     A.  That's right.

23     Q.  And the process that you and I just

24 talked about where they would use the override tool

Page 173

1 would let them know what they could order up to the

2 ceiling, but that was later into '13, early '14?

3     A.  Right.

4     Q.  Okay.  By the time you got in, there was

5 no reducing order quantity for subset of flagged

6 orders, correct?

7     A.  Right.

8     Q.  Okay.  So, let's go back to your

9 understanding.  We're talking about the Bancroft

10 algorithm.

11     A.  Okay.

12     Q.  If an order came in, stick with your

13 example, with three bottles that are over the

14 ceiling, was that order flagged as suspicious?

15     A.  When I came in, no.  If it ordered

16 above -- if they were trying to order above their

17 ceiling, they would just not get it.

18     Q.  Okay.  So, that order, because it was

19 not shipped, Walgreens considered that order not

20 suspicious?

21     MR. HOUTZ:  Object on foundation and form.

22 BY THE WITNESS:

23     A.  No, they were ordering outside of what

24 our policy was and therefore we didn't ship it.

Page 174

BY MR. MOUGEY:

1 Q. Okay.

2 A. Whether it was suspicious or not did not
3 even come into play because we had an algorithm and
4 we told them that they weren't supposed to go over
5 it and if they needed to go over it, they had to
6 supply the necessary information so that we could
7 have the documentation we needed.

8 Q. Let's make -- let's go back to what the
9 overarching rules and regulations are from the
10 Federal Government and what your understanding is.
11 Okay.

12 Do you have an understanding that an
13 order that is flagged as suspicious by Walgreens
14 has to be reported to the DEA?

15 MR. HOUTZ: Object to form.

16 BY THE WITNESS:

17 A. That's not the regulation. It's if an
18 order is flagged, you have to investigate it and
19 then if you deem it suspicious, then you report it.

20 BY MR. MOUGEY:

21 Q. Okay. So, you don't think that an order
22 flagged as part of the Wayne Bancroft algorithm is
23 suspicious?

Page 175

1 A. No.

2 Q. Okay. What do you call an order flagged
3 by the Wayne Bancroft algorithm?

4 A. It was designed so that we could ensure
5 that the number of tablets or whatever that goes
6 into any one store makes sense for the peer group
7 and the business of that store.

8 I never felt like any pharmacy manager
9 or pharmacist was doing anything nefarious to get
10 more product into the store. What I -- the whole
11 point behind it was to have simplicity.

12 When you have that many locations,
13 you've got to figure out how are you going to train
14 all these 26,000 pharmacists in order to use a
15 system to get products in.

16 So, it wasn't necessarily considered
17 suspicious or even an order of interest, to be
18 honest with you. It was, hey, you're trying to
19 order above what we think your store needs. You
20 have to explain to us why our algorithm doesn't
21 make sense for the business of your location.
22 What's going on in your location that makes it
23 different? Was there a new hospice doctor that
24 moved in? Was there a new urgent care that moved

Page 176

1 in? Those are popping up all over the place. Was
2 there a surgical center that just opened by your
3 pharmacy? Why do you need more product than what
4 the system is generating for you? Tell us why.

5 We don't know. We don't know what's
6 going on in that specific area. We have to leave
7 it to the leader of the store and the leader of the
8 district, and that's why it goes through those
9 layers of approval before it comes to my team.

10 Q. Okay. I didn't want to interrupt you,
11 but you just gave about a three-paragraph answer
12 and the simple question I asked you was: What do
13 you call an order flagged by the Wayne Bancroft
14 algorithm?

15 A. I call it an order that was over the
16 algorithm that was designed for that specific store
17 and it didn't conform to the -- what we thought the
18 store needed. It's not a simple answer.

19 Q. So, if -- let's go back to the rules.

20 Do you understand that an order that's
21 flagged as suspicious needs to be reported to the
22 DEA?

23 MR. HOUTZ: Object to form.

24 BY THE WITNESS:

Page 177

1 A. An order that's flagged has to be
2 determined whether or not it's suspicious, but then
3 the answer to your question is yes.

4 BY MR. MOUGEY:

5 Q. Yes. Okay.

6 A. But you have to investigate it first.

7 Q. I understand. But I didn't ask you
8 anything about investigating or your steps. All I
9 simply asked you was: Is an order that's deemed to
10 be suspicious, does that have to be reported to the
11 DEA, and the simple answer is yes, right?

12 MR. HOUTZ: That wasn't your question.

13 BY MR. MOUGEY:

14 Q. Yes. Simple answer is yes, correct?

15 A. An order that's deemed suspicious has to
16 be reported to the DEA.

17 Q. Fair enough. Now, do you agree that an
18 order that's deemed suspicious and then sent to the
19 DEA cannot be shipped until Walgreens performs due
20 diligence on that order?

21 A. No, that's not correct.

22 Q. Okay.

23 A. If the -- if the order -- if we reported
24 to the DEA that the order was deemed suspicious,

Page 178

1  then you can't ship it at all and it has to be
2  reported.
3      Q.   So, if you deem an order suspicious,
4  when you say "you," Pharmaceutical Integrity deems
5  an order suspicious, you don't ship it at all?
6      A.   Right.
7      Q.   So, is it fair to say that you don't
8  perform any due diligence, then, on those orders
9  deemed suspicious?
10     MR. HOUTZ:  Object to form.
11 BY MR. MOUGEY:
12     Q.   You just don't ship?
13     MR. HOUTZ:  Object to form and foundation.
14 BY THE WITNESS:
15     A.   I don't know what you mean.  You're
16 generalizing things and this is so complicated.
17 So, if you want me to go through the -- how
18 everything is done, I am happy to do that.  But the
19 way you're answering -- asking the question is not
20 necessarily yes or no.
21 BY MR. MOUGEY:
22     Q.   And I appreciate that, and I will work
23 on my questioning and maybe some day I'll get
24 better at it.  But right now I'm stuck with just

Page 179

1  bad questions from maybe a bad lawyer.  Okay.
2      So, I mean, we've just identified one
3  example where the internal documents say something
4  60 days before you get there that you said was
5  wrong.  So, I'm kind of left with Walgreens'
6  documents.  All right.  Let's go back to my...
7      You don't think that if an order is
8  flagged as suspicious that any amount of due
9  diligence can enable or allow that order to be
10 shipped?
11     MR. HOUTZ:  Object to form.
12 BY THE WITNESS:
13     A.   That's correct because if it's not a --
14 if it's -- if you do your due diligence and you
15 determine it's not suspicious, then you ship.
16 BY MR. MOUGEY:
17     Q.   So, the determination of whether an
18 order is suspicious is critical when Walgreens is
19 implementing its duty as a distributor, correct?
20     A.   Sorry.  Can you read that back faster?
21     Q.   The question of whether an order or not
22 is suspicious is very important, correct?
23     A.   Yes.
24     Q.   And if Walgreens has parsed words or

Page 180

1  decided to change the definition in order to not
2  call an order suspicious, you'd agree that that
3  does not fill Walgreens' obligations as a
4  distributor?
5      MR. HOUTZ:  Object to form and foundation.
6  BY THE WITNESS:
7      A.   I don't agree with what you're saying or
8  asking.
9  BY MR. MOUGEY:
10     Q.   Have you seen any internal documents at
11 Walgreens that identify an order flagged by
12 Mr. Bancroft's algorithm as suspicious?
13     A.   Not that I recall off the top of my
14 head.
15     Q.   I will hand you what we will mark as
16 Polster 10.
17         (WHEREUPON, a certain document was
18          marked as Walgreens-Polster Exhibit
19          No. 10:  6/23/08 memo;
20          WAGMDL00624503 - 00624509.)
21 BY MR. MOUGEY:
22     Q.   You see this is a memorandum dated
23 June 23, 2008, "DEA Suspicious Order Reporting"
24 from Wayne Bancroft and Tracy Morris.

Page 181

1      Do you see that?
2      A.   Yes.
3      Q.   Do you know who Tracy Morris is?
4      A.   No.
5      Q.   But you know who Wayne Bancroft is,
6  correct?
7      A.   Yes.
8      Q.   And if you had questions about the
9  algorithm, he's one of the guys you brought in,
10 right?
11     A.   Yes.
12     Q.   And he is extremely knowledgeable about
13 what the algorithm is and how it's deployed,
14 correct?
15     A.   Yes.
16     Q.   And do you see the deliverable,
17 "Proposal for defining 'suspicious orders' in the
18 Walgreen distribution system"?
19     A.   Yes.
20     Q.   And the very first paragraph under
21 "Overview," "The DEA is requiring Walgreens to
22 monitor the orders, for control substances, that
23 our stores place on our distribution centers for
24 suspicious activity."

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1     Do you see that?

2    A.   Yes.

3    Q.   The next sentence says, "The document

4 proposes a methodology for identifying suspicious

5 orders in terms of order size and order frequency.

6 The reasoning behind the method is described.

7 Followed by the steps needed to perform the

8 analysis."

9     Did I read that right?

10   A.   Yes.

11   Q.   The next paragraph, "To monitor the

12 orders size, tolerance limits will be established

13 for each store/item combination. If an order is

14 placed on the DC that exceeds its tolerance limit,

15 the order is flagged as suspicious."

16     Do you see that?

17   A.   Yes.

18   Q.   So, according to Mr. Bancroft and his

19 algorithm, if an order exceeds its tolerance

20 limits, it's flagged as suspicious, correct?

21   A.   That's what it says here.

22   Q.   Do you agree with that?

23   A.   I don't know anything about this. I've

24 never seen this document.

Page 183

1   Q.   I understand, but you were in charge of

2 implementing Walgreens' policies and procedures for

3 reporting suspicious orders with Mr. Bancroft's

4 algorithm as the foundation, correct?

5   A.   In 2012. This was written in 2008.

6   Q.   I understand. What I'm asking you is:

7 Do you see where Mr. Bancroft as part of the

8 deliverable, if an order is placed on the DC that

9 exceeds its tolerance limit, the order is flagged

10 as suspicious. No one from Walgreens ever told you

11 that?

12   A.   That's correct. No one -- we did not

13 talk about this. This is four years after -- or

14 before I even took over.

15   Q.   I understand. And it would have been

16 helpful if someone from Walgreens as part of your

17 education process when coming in in 2012 had told

18 you that an order flagged by Mr. Bancroft's

19 algorithm was considered suspicious, correct?

20   MR. HOUTZ: Object to form.

21 BY THE WITNESS:

22   A.   I don't agree with you. I mean, the

23 system that we had in place that my team took over,

24 there -- it was -- I don't even know what version

Page 184

1 this was compared to what we had.

2     What we had, we went with and we went

3 from there; and then we made changes as we -- or

4 asked for changes as we saw things that needed to

5 come up.

6 BY MR. MOUGEY:

7   Q.   And you don't know if this algorithm is

8 the algorithm used in -- you have no idea?

9   A.   Correct.

10   Q.   So, previously when you testified that

11 Mr. Bancroft's algorithm was the foundation for

12 what your group was using, you weren't really sure?

13   A.   Foundation, yes. But how many versions

14 between '08 and 2012, I couldn't tell you.

15   Q.   So, according to this version, orders

16 that are flagged were deemed suspicious, correct?

17   A.   I see --

18   MR. HOUTZ: Object to form.

19 BY THE WITNESS:

20   A.   I see his language here.

21 BY MR. MOUGEY:

22   Q.   So the answer to my question is yes, the

23 orders flagged by the system by Mr. Bancroft's 2008

24 memo are deemed suspicious, correct?

Page 185

1   A.   I see his document.

2   Q.   Yes, ma'am. And I'm asking you, reading

3 the document that you understand that he, as part

4 of part of his deliverable, that orders are flagged

5 by the system are deemed suspicious, correct?

6   MR. HOUTZ: Object on foundation and asked and

7 answered.

8 BY THE WITNESS:

9   A.   In my opinion there is a difference

10 between "flagged" and "deemed."

11 BY MR. MOUGEY:

12   Q.   "If an order is placed on the DC that

13 exceeds its tolerance limit, the order is flagged

14 as suspicious."

15     Do you see that?

16   A.   Yes.

17   Q.   That's what his memo says, if an order

18 is flagged, it's suspicious, correct? And that's

19 different than the understanding you had in

20 Pharmaceutical Integrity, correct?

21   MR. HOUTZ: Object to form.

22 BY THE WITNESS:

23   A.   I am not understanding what you're

24 asking.

Highly Confidential – Subject to Further Confidentiality Review

Page 186

1 BY MR. MOUGEY:
2    Q.   An order that's flagged by
3 Mr. Bancroft's algorithm in late 2012, early 2013
4 is not deemed suspicious, correct?
5    MR. HOUTZ: Object on foundation. Object;
6 asked and answered.
7 BY THE WITNESS:
8    A.   It is deemed as something we need to
9 look at and look into and then we determine whether
10 or not it's suspicious and going to be reported to
11 the DEA.
12 BY MR. MOUGEY:
13    Q.   The order isn't shipped, correct?
14    In 2013, Tasha Polster, Pharmaceutical
15 Integrity, if an order is flagged by Mr. Bancroft's
16 algorithm, it's not shipped, correct?
17    A.   You're --
18    Q.   We just went through this.
19    A.   You're generalizing. You're putting
20 words in my mouth. So, can I tell you how it
21 worked?
22    Q.   An order -- you've already explained it.
23    A.   Okay.
24    Q.   The order that's flagged by

Page 187

1 Mr. Bancroft's algorithm in 2013, Pharmaceutical
2 Integrity, was not shipped, correct?
3    MR. HOUTZ: Object to form.
4 BY THE WITNESS:
5    A.   But it isn't even flagged. So, if the
6 order went over what the algorithm was, it didn't
7 even get shipped at all. It didn't even get
8 flagged because it didn't generate. The order did
9 not generate.
10 BY MR. MOUGEY:
11    Q.   The order is identified by Bancroft's
12 algorithm and it's not shipped, correct,
13 Ms. Polster?
14    A.   Yes, correct.
15    Q.   The third paragraph, "To monitor orders
16 frequency, the geometric distribution can be used
17 to determine the probability," and gives the
18 formula.
19    He goes on in the last sentence of that
20 paragraph, "If the next order is placed earlier
21 than expected, the order is flagged as suspicious."
22 Correct?
23    A.   Yes. I see he wrote that there.
24    MR. WATTS: Counsel, this is Ryan Watts. I'm

Page 188

1 sorry to interrupt, but I don't think we got the
2 WAG and Bates number for Exhibit 10. Would you
3 mind reading that for the record, please.
4    MR. MOUGEY: 624503.
5    MR. WATTS: Thank you.
6 BY MR. MOUGEY:
7    Q.   If you'd look at the last paragraph of
8 Mr. Bancroft's memo in 2008, "In either case, if
9 the order quantity does not exceed the SIMS
10 suggested order quantity then the order should no
11 longer be considered suspicious. If the order is
12 identified as suspicious, a detailed report should
13 be created to aid the analysis that has to make a
14 quick decision to allow or stop the order."
15    Did I read that correctly?
16    A.   Yes.
17    Q.   In Pharmaceutical Integrity, the order
18 identified by Mr. Bancroft's algorithm just was
19 simply not shipped, correct?
20    A.   That is correct.
21    Q.   There was no detailed analysis to make a
22 decision to allow or stop the order as indicated in
23 Mr. Bancroft's memorandum, correct?
24    A.   Ask the question one more time.

Page 189

1    Q.   There's no detailed analysis in
2 Pharmaceutical Integrity to make a decision to
3 allow or stop the order as indicated in
4 Mr. Bancroft's memorandum, correct?
5    MR. HOUTZ: Object to form.
6 BY MR. MOUGEY:
7    Q.   The order just simply isn't shipped?
8    A.   Right, yes.
9    Q.   Now, do you see on the "To" Mr. Piñon
10 identified?
11    A.   Yes.
12    Q.   So, in your meetings with him, you don't
13 ever recall Mr. Piñon advising you and your team
14 that orders flagged by Mr. Bancroft's system were
15 suspicious?
16    MR. HOUTZ: You're calling for advice from an
17 attorney. That's attorney-client privilege
18 information. So, I'd instruct you not to answer
19 what Dwayne Piñon told you or didn't tell you.
20    MR. MOUGEY: You're instructing Ms. Polster
21 not to answer about how she was educated about
22 Walgreens' suspicious order monitoring policies and
23 procedures?
24    MR. HOUTZ: I'm instructing her not to answer

Page 190

1 about advice she was given to legal questions by a
2 legal member of the staff of Walgreens, yes.
3      MR. MOUGEY: So, the fact that 100 percent of
4 her education on the distribution, Walgreens'
5 responsibilities came from a lawyer, I'm not
6 allowed to ask because Walgreens has attempted to
7 protect all that communication because it came from
8 a lawyer.
9      MR. HOUTZ: First of all, it's not 100 percent
10 and, correct, you may not ask.
11      MR. MOUGEY: It's abundantly clear that
12 Walgreens has taken the minutes, the agendas, the
13 e-mails, the communications, they are all buried on
14 some privilege log somewhere. We haven't seen any
15 of the documents Ms. Polster has referenced this
16 morning because an attorney is copied on the
17 communication. So --
18      MR. HOUTZ: It's not obvious at all. Have you
19 received a privilege log?
20      MR. MOUGEY: Yeah, the 48,000 entries on the
21 privilege log. So, where are all the minutes?
22 Where are all the agendas from all of these
23 meetings? Every deposition we come into we hear a
24 witness talk about references to documents and

Page 191

1 meetings and minutes and we don't see them in the
2 production. Everything has been scrubbed and
3 cleaned and the lawyers copied on all of it to
4 avoid production.
5      MR. HOUTZ: So you say.
6      MR. MOUGEY: Where are the agendas? Where are
7 the minutes from all these meetings? This task
8 force.
9      MR. HOUTZ: Don't ask me where the agendas
10 are. I don't know where the agendas are.
11      MR. MOUGEY: You don't know anything. There
12 is an order in place from ten days ago for you all
13 to identify the fields of the database that we have
14 gone through in all of the information and your
15 crack team of lawyers over the past ten days has
16 not given us one peep of information.
17      I'm sitting here continuing to take
18 depos and no one has complied with Judge -- Special
19 Master Cohen's order about identifying the fields
20 and what the history was.
21      MR. HOUTZ: You are continuing to burn your
22 seven hours if you want to complain more.
23      MR. MOUGEY: Thank you, Les. I appreciate
24 that. You are continuing to waste my time sitting

Page 192

1 here. This is the first witness I haven't had in a
2 week that didn't start with a medical warning.
3      Today I get to start off and find out
4 there is minutes and agendas and meetings and
5 communications that we don't have either.
6 Impressive.
7      Exhibit 51 -- I'm sorry. P-WAG-5179,
8 Bates No. 119542, Polster 10. Polster 11. I'm
9 sorry.
10      (WHEREUPON, a certain document was
11      marked as Walgreens-Polster Exhibit
12      No. 11: 10/27/11 e-mail with
13      attachment; WAGMDL00119542 -
14      00119548.)
15 BY MR. MOUGEY:
16 Q.   Now, do you know Barb Martin?
17 A.   Yes.
18 Q.   How do you know Barb Martin?
19 A.   She used to be a pharmacist for me when
20 I worked in the field, and then she took a
21 corporate position in the pharmacy inventory team.
22 Q.   Do you know what, if any, role
23 Ms. Martin had with Walgreens' suspicious order
24 monitoring policy and programs?

Page 193

1 A.   I don't know.
2 Q.   You don't know. Did you ever interview
3 or talk to her when you started Pharmaceutical
4 Integrity to find out what, if anything, her role
5 was?
6 A.   Not in regards to suspicious order
7 monitoring.
8 Q.   How about Marcella Ranick?
9 A.   Marcie worked in loss prevention.
10 Q.   Right. Do you have any understanding of
11 what her job or her role was in relation to
12 suspicious order monitoring policies?
13 A.   No.
14 Q.   This is a memo from Rakesh Khanna from
15 10/17/2011. Do you see that?
16 A.   Yes.
17 Q.   And the subject is "DEA Business Reason"
18 and the attachments are "DEA Presentation."
19      Do you see that?
20 A.   Okay.
21 Q.   If you turn, it appears to be a
22 couple-page memo regarding "DEA Intercepts
23 Suspicious Order."
24      Do you see that?

Page 194

1  A.  Yes.
2  Q.  And the overview references the
3 Controlled Substance Act.  You know what that is,
4 right?
5  A.  Yes.
6  Q.  And how did you find out about what the
7 requirements were for Walgreens under the
8 Controlled Substance Act?
9  A.  Well, which requirements, for --
10  Q.  Thank you.  Walgreens as a distributor.
11  A.  As a distributor.  I found out about it
12 during getting me up to speed in the task force
13 meeting starting in September or whatever.
14  Q.  And who got you up to speed on the
15 Controlled Substance Act as your job as director of
16 Pharmaceutical Integrity so Walgreens could abide
17 by its obligations under the Controlled Substance
18 Act?
19  A.  It was in the task force, which had a
20 whole bunch of people.  So, there were lots of
21 people talking.  I don't remember exactly.
22  Q.  So, who had a command, who understood
23 what Walgreens' responsibilities were under the
24 Controlled Substance Act?

Page 195

1  MR. HOUTZ:  Object on foundation.
2 BY THE WITNESS:
3  A.  Lots of people.  I don't know.
4 BY MR. MOUGEY:
5  Q.  Lots of people?
6  A.  Right.
7  Q.  Name one.  Name one.
8  A.  You're not going to like my answer.
9 Dwayne.
10  Q.  Mr. Piñon is the one that had the
11 understanding of what the obligations were for
12 Walgreens under the Controlled Substance Act?
13  A.  Dwayne honestly helped me translate some
14 of these documents.  Some of these legal jargon
15 documents are not the easiest to understand.
16  Q.  We're not talking about legal jargon
17 documents.  What I'm talking is understanding what
18 Walgreens' duties and obligations were under the
19 Controlled Substance Act, and your understanding
20 came from Mr. Piñon, correct?
21  A.  Yes.
22  Q.  So, again, please explain to me what
23 your understanding is of Walgreens' duties and
24 responsibilities under the Controlled Substance

Page 196

1 Act.
2  A.  So, any order of unusual size or unusual
3 frequency needs to be investigated or not shipped.
4 And if it's deemed suspicious, then you report it
5 to the DEA.
6  Q.  So, the determination of when an order
7 is deemed suspicious is the catalyst for when an
8 order is relayed to the DEA as suspicious?
9  A.  Correct.
10  Q.  Do you have any understanding that
11 Walgreens has changed its determination of when an
12 order was considered as suspicious to avoid
13 reporting to the DEA?
14  A.  No, we didn't -- we didn't do things to
15 avoid reporting.
16  Q.  I'm on Bates No. 43.
17  "The Controlled Substance Act is the
18 primary federal law regulating the flow of
19 controlled substances into the marketplace for
20 medical purposes."
21  Are you following me, first page?
22  A.  Sorry.  I was looking at page 43 back
23 here which -- all right.  Say again.  Which
24 paragraph are you on?

Page 197

1  Q.  The first sentence.  Go ahead and read
2 it to yourself.
3  A.  And what did you want to know about it?
4  Q.  Keep going.  I am on the sentence that
5 begins with "The DEA."
6  Do you see it on the right-hand side?
7  "The DEA is requiring that Walgreens
8 monitor orders for controlled substances that are
9 placed at the stores and sent to our DCs for
10 filling."
11  Do you see that?
12  A.  Yep.
13  Q.  "Such drugs are to be monitored for
14 suspicious activity."
15  Do you agree with that?
16  A.  I agree with that's what that -- I agree
17 with that is what is written, but I don't know who
18 this guy is.  So, he might be making
19 generalizations.
20  Q.  He's making generalizations, too.
21  So, what I'm asking you is:  Do you
22 understand what his sentence that "The DEA is
23 requiring that Walgreen monitor orders for
24 controlled substances that are placed at the stores

Page 198

1 and sent to our DCs for filling"?

2    A.   Yes, I agree with that.

3    Q.   "Such drugs are to be monitored for

4 suspicious activity."

5        Do you agree with that?

6    A.   I agree that's what was written.

7    Q.   I understand.  But do you agree with

8 that statement?

9    A.   Not necessarily.

10    Q.   What do you not agree with?

11    A.   Any controlled substance could be --

12 falls into this place.

13        So, "Such drugs are to be monitored for

14 suspicious activity," what drugs is he talking

15 about?  All controlled substances?  I mean...

16    Q.   It's confusing to you?

17    A.   The way he's got it worded, yes.  And I

18 don't know who this guy is.

19    Q.   I understand.  You've already said that.

20        MR. HOUTZ:  Hold on.  We lost the transcript a

21 few minutes back.  At least I lost the transcript.

22 Can we take a second to try to fix that.

23        (Clarification by the reporter.)

24        THE VIDEOGRAPHER:  We'll go -- we're off the

Page 199

1 record at 1:58 p.m.

2        (WHEREUPON, a recess was had

3           from 1:58 to 2:13 p.m.)

4        THE VIDEOGRAPHER:  We are back on the record

5 at 2:13 p.m.

6 BY MR. MOUGEY:

7    Q.   Ms. Polster, we are on Exhibit 12, Bates

8 No. -- I'm sorry -- 11, Bates No. 543.  I'd like to

9 direct your attention to the second paragraph.

10        "The purpose of this project is to

11 create a process to systematically identify and

12 prevent suspicious orders based on a formula used

13 to determine inconsistent (suspicious) ordering

14 patterns for controlled drugs."

15        Do you see that?

16    A.   Yes.

17    Q.   The next sentence begins, "Any Control

18 Drug Orders that are deemed suspicious will be

19 flagged as suspicious and populated in a file to be

20 sent up centrally to loss prevention and

21 prescription services for review/analysis."

22        What I'd like you to do is focus on that

23 second sentence.

24        Do you believe that the policy and

Page 200

1 procedure used in Pharmaceutical Integrity was

2 considering orders that were identified in the

3 Bancroft algorithm as suspicious?

4        MR. HOUTZ:  Object to form.

5 BY THE WITNESS:

6    A.   I don't know if I know enough about what

7 this was versus what -- I don't know the

8 differences between the system that I took over and

9 this.

10 BY MR. MOUGEY:

11    Q.   It's not the question I asked.

12    A.   I misunderstood, then.

13    Q.   The question I simply asked you was that

14 orders that are identified in Mr. Bancroft's

15 algorithm in Pharmaceutical Integrity, are they

16 flagged as suspicious?

17        MR. HOUTZ:  Object to form.

18 BY THE WITNESS:

19    A.   My understanding is they're flagged as

20 orders of interest.

21 BY MR. MOUGEY:

22    Q.   So, the answer to my question would be

23 no, they're not flagged as suspicious, correct?

24    A.   No.  Yes, you're correct.  I'm sorry.

Page 201

1    Q.   Orders of interest are not reported to

2 the DEA, correct?

3    A.   Correct.

4    Q.   Now, in these -- in the sentence that we

5 just read, in this memo, now we're into 2011,

6 orders identified by the Bancroft formula are

7 referred to as suspicious, correct?

8    A.   It's referred to as that in this

9 document, yes.

10    Q.   Yes, ma'am.  And I don't see any

11 reference to "orders of interest."  Do you?

12    A.   No.

13    Q.   Instead, the next sentence goes on and

14 says that "The order that is flagged as suspicious

15 on the store side will be intercepted and the order

16 quantity will be reduced to a non-suspicious (order

17 limit) level."

18        Do you see that?

19    A.   Yes.

20    Q.   But sitting here today, you don't have

21 any information or know whether or not the order

22 that was flagged as suspicious but intercepted and

23 the quantity reduced was reported to the DEA,

24 correct?

Page 202

1   A.   Correct.

2   Q.   Do you believe based on your

3 understanding of the requirements of the Controlled

4 Substance Act as director of pharmaceutical that an

5 order that's flagged as suspicious be reported to

6 the DEA even if it's reduced?

7   MR. HOUTZ:  Object to form.

8 BY THE WITNESS:

9   A.   My understanding and what my team does

10 is we do not report to the DEA or we did not report

11 to the DEA unless we did our due diligence and

12 determined that it was suspicious.

13 BY MR. MOUGEY:

14   Q.   But the sentence that we just read in

15 this memorandum in 2011 says that an order is

16 flagged as suspicious as a result of the Bancroft

17 algorithm and then it's reduced.

18       Do you believe the fact that the order

19 that was initially flagged as suspicious needs to

20 be reported to the DEA?

21   MR. HOUTZ:  Object to form, foundation.

22 BY THE WITNESS:

23   A.   I don't know.

24 BY MR. MOUGEY:

Page 203

1   Q.   But you'd agree with me that the

2 language that we are reading from this 2011

3 e-mail -- memorandum that you've never been shown

4 that it appears that Walgreens was -- were treating

5 orders that were identified by the Bancroft formula

6 as suspicious as late as 2011, correct?

7   MR. HOUTZ:  Object to form and foundation.

8 BY THE WITNESS:

9   A.   I don't know how this worked.

10   MR. MOUGEY:  I'm sorry.

11       (WHEREUPON, there was a short

12        interruption.)

13   THE VIDEOGRAPHER:  We are off the record at

14 2:18 p.m.

15       (WHEREUPON, discussion was had off

16        the record.)

17   THE VIDEOGRAPHER:  We are back on the record

18 at 2:19 p.m.

19 BY MR. MOUGEY:

20   Q.   And I'm not asking you, Ms. Polster, how

21 the whole system worked.  I'm not asking you --

22 what I'm asking you is:  From the plain language of

23 this memo, the orders that were identified or

24 flagged by the Wayne Bancroft algorithm as late as

Page 204

1 2011 were identified as suspicious, correct?

2   MR. HOUTZ:  Object to form and foundation and

3 asked and answered.

4 BY THE WITNESS:

5   A.   They were identified as going outside of

6 the limits and therefore not generated.  That's

7 what I'm reading.

8 BY MR. MOUGEY:

9   Q.   "Any Control Drug Orders that are deemed

10 suspicious will be flagged as suspicious."

11       Do you see that?

12   A.   Yes.

13   Q.   And those were orders that were

14 identified by the Bancroft algorithm, correct?

15   A.   Yes.

16   Q.   No one's ever showed you this memorandum

17 or anything similar where orders identified by the

18 Wayne Bancroft algorithm were determined or

19 identified as suspicious, correct?

20   A.   Correct.

21   MR. HOUTZ:  Object to form.

22 BY MR. MOUGEY:

23   Q.   I hand you what we will mark as Polster

24 12.

Page 205

1       (WHEREUPON, a certain document was

2        marked as Walgreens-Polster Exhibit

3        No. 12:  4/27/12 e-mail with

4        attachment; WAGMDL00119539 -

5        00119541.)

6 BY MR. MOUGEY:

7   Q.   Do you see this is an e-mail generated

8 by Wayne Bancroft, the gentleman that wrote the

9 algorithm, correct?

10   A.   Yes.

11   Q.   And it's dated 4/27/2012.  Correct?

12   A.   Yes.

13   Q.   So, this is a matter of four and a half

14 months, five months before you were part of the

15 controlled substance task force at Walgreens,

16 correct?

17   A.   Yes.

18   Q.   This is within eight or nine months of

19 you becoming director of Pharmaceutical Integrity,

20 correct?

21   A.   Yes.

22   Q.   And if you turn the page, it's Bates

23 No. 119540, it's titled "DEA Suspicious Store

24 Ordering Application Proposed Enhancement."

Page 206

1    Do you see that?
2    A.   Yes.
3    Q.   And the first sentence of this memo,
4  "The DEA Suspicious Store Ordering application was
5  developed based on DEA requirements for our DCs,"
6  distribution centers, "to monitor for suspicious
7  orders of control substances."
8       Did I read that right?
9    A.   Yes.
10    Q.   The second sentence, "To monitor for
11  order size, tolerance limits are established by
12  store/item," correct?
13    A.   Yes.
14    Q.   And the tolerance limits, that's
15  language similar to what you were using in
16  Pharmaceutical Integrity, correct?
17    A.   Yes.
18    Q.   Along with the ceiling limits, correct?
19    A.   Correct.
20    Q.   Along with the Bancroft algorithm as
21  kind of the foundation for what your group was
22  doing, correct?
23    A.   Yes.
24    Q.   The second -- the last sentence in the

Page 207

1  first paragraph, "Orders placed on the distribution
2  center that exceed its tolerance limits are flagged
3  as suspicious."
4       Do you see that?
5    A.   Yes.
6    Q.   Did anyone ever tell you that months
7  before you took over as Pharmaceutical Integrity
8  that orders placed on distribution centers that
9  exceed tolerance limits are flagged as suspicious?
10    A.   Not that I recall.
11    Q.   Once Pharmaceutical Integrity started
12  into 2013, orders that were flagged by
13  Mr. Bancroft's algorithm were referred to as
14  "orders of interest," correct?
15    A.   Yes.
16    Q.   Until a few months before you came in,
17  do you see any reference from Mr. Bancroft about
18  "orders of interest"?
19    A.   No.
20    Q.   Second paragraph, "This process allows
21  for any single order to be compared to the last 26
22  weeks of order history.  A critical design element
23  is that it removes outliers from the order history
24  used to calculate the mean order size and standard

Page 208

1  deviation."
2       Now, he continues on the next page,
3  "Comparing the average order size across time."
4       Do you see the paragraph below where he
5  is referencing a DEA crackdown on Florida
6  pharmacies?
7    A.   Oh, okay.  Yes.
8    Q.   "Where the market is notorious for
9  illicit prescription painkillers."
10       Do you see that?
11    A.   Yes.
12    Q.   And he takes a block quote out of the
13  Miami Herald indicating that Walgreen pharmacies
14  now account for 53 of the top 100 retailers of
15  oxycodone in the state, correct?
16    A.   Yes.
17    Q.   And he is citing to an affidavit filed
18  by the DEA in court, correct?
19    A.   Yes.
20    Q.   And he goes on to explain "Three years
21  ago, on Walgreens pharmacies were among the top 100
22  sellers of the drug, 'One Walgreens pharmacy in
23  Fort Myers now under investigation sold more than
24  2.1 million oxycodone pills in 2011 - more than 22

Page 209

1  times the oxycodone sales at the same pharmacy two
2  years earlier, the DEA said.'"
3       Do you see that?
4    A.   Yes.
5    Q.   Now, would you consider 22 times what
6  that pharmacy did two years earlier the same
7  runaway growth that was referenced in a previous
8  e-mail?
9    MR. HOUTZ:  Object on foundation.
10  BY THE WITNESS:
11    A.   What was your question?
12  BY MR. MOUGEY:
13    Q.   22 times growth.  Do you consider that
14  to be runaway growth?
15    A.   Not necessarily.  You have to understand
16  what's happening in the market at that point in
17  time.
18    Q.   Pardon me for one second.
19       I missed a document.  Maybe you can help
20  with the name.  The gentleman that wrote the e-mail
21  with the runaway growth from your group.
22    A.   Ed Bratton.
23    Q.   Ed Bratton.  Thank you.
24       Mr. Bancroft's cite to the Miami Herald

Page 210

1 and DEA affidavit that one of the Florida Walgreens
2 pharmacies sold 22 times pills from one year to the
3 next, is that the type of runaway growth that
4 Mr. Bratton was referring to?
5 MR. HOUTZ: Object to form, foundation.
6 BY THE WITNESS:
7 A. I don't agree with the way you're
8 wording the question. There is way more to the
9 story than just the number of tablets dispensed.
10 You have to understand what's happening in the
11 market. You have to understand what's happening in
12 the industry and why we were seeing these
13 prescriptions come into the stores.
14 BY MR. MOUGEY:
15 Q. So, as of 2012, April 2012,
16 Mr. Bancroft, the one who had written the
17 algorithm, was still referring to orders that were
18 identified as a result of his test as suspicious,
19 correct?
20 A. Yes, that's what he's got in the
21 document.
22 Q. So, we have now seen multiple documents
23 beginning in 2008 through 2009 through 2010 through
24 2011, all the way into months before you begin in

Page 211

1 Pharmaceutical Integrity, where orders that are
2 identified by Mr. Bancroft's algorithm as
3 suspicious, correct?
4 A. That's what he has in the document.
5 Q. But no one ever told you as part of the
6 task force or the beginning of Pharmaceutical
7 Integrity that for the last few years, since 2008,
8 orders flagged in Mr. Bancroft's algorithm were
9 considered suspicious?
10 MR. HOUTZ: Object to form.
11 BY THE WITNESS:
12 A. That's correct.
13 BY MR. MOUGEY:
14 Q. I hand you what we will mark as Polster
15 13.
16 (WHEREUPON, a certain document was
17 marked as Walgreens-Polster Exhibit
18 No. 13: 8/9/17 e-mail string;
19 WAGMDL00006645 - 00006652.)
20 BY MR. MOUGEY:
21 Q. This is an e-mail from Patricia
22 Daugherty. She is a member of your group, correct?
23 A. Yes.
24 Q. She is one of the regional managers of

Page 212

1 your group?
2 A. Yes.
3 Q. Again, a valued member, correct?
4 A. Yes.
5 Q. Knows what's -- knows the details of
6 what your group was doing, correct?
7 A. Yes.
8 Q. Went under the same educational process
9 as Mr. Bratton and the runaway growth, correct?
10 MR. HOUTZ: Object to form.
11 BY THE WITNESS:
12 A. She went under -- yeah, she was part of
13 the team.
14 BY MR. MOUGEY:
15 Q. So, August 9, 2017. Do you see the
16 date?
17 A. Yes.
18 Q. And she was responding to a question on
19 a one-pager on how the suspicious order monitoring
20 works in the system.
21 Do you see that?
22 A. Yes.
23 Q. And if you would, turn the page.
24 "Walgreens, DEA Suspicious Store

Page 213

1 Ordering Application Proposed Enhancement."
2 Do you see that?
3 A. Yes.
4 Q. Very similar to the document that we
5 just looked at from Mr. Bancroft in April of 2012,
6 correct?
7 A. Right.
8 Q. In fact, the date on the bottom of this,
9 April 26, 2012.
10 Do you see that in the bottom right-hand
11 corner?
12 A. Yes.
13 Q. Is he the author, Wayne Bancroft?
14 A. Yes.
15 Q. And one of your managers is forwarding a
16 portion of this memorandum when someone is asking
17 for a one-page summary, correct?
18 A. Yes.
19 Q. And as part of this one-page summary,
20 all the way until 2017 beginning in 2008, continues
21 to be the language, "Orders placed on the DC that
22 exceed its tolerance limit are flagged as
23 suspicious."
24 Do you see that in the very -- the third

Page 214

1 sentence in the very first paragraph?
2    A.   In the document that Wayne wrote?
3    Q.   Yes, ma'am.
4    A.   Yes.
5    Q.   The document that Wayne wrote and sent
6 around by one of your managers when asked for a
7 one-page summary, correct?
8    A.   Yes.  She sent this document.
9    Q.   But your testimony here today is that's
10 inaccurate; that orders -- that orders placed on
11 the DC that exceed its tolerance limits are not
12 flagged as suspicious but instead they are orders
13 of interest, correct?
14    A.   Correct.
15    Q.   Do you think that Steve Bamberg
16 understood the difference between orders of
17 interest or suspicious orders?
18    MR. HOUTZ:  Object on foundation.
19 BY THE WITNESS:
20    A.   I don't know.
21 BY MR. MOUGEY:
22    Q.   Have you ever talked to him about the
23 distinction between orders of interest and
24 suspicious orders?

Page 215

1    A.   No.
2    Q.   Are you familiar with a third-party
3 vendor Buzzeo?
4    A.   Yes.
5    Q.   And who do you understand that Buzzeo
6 is?
7    A.   It is a vendor that put together a
8 suspicious order monitoring system that I learned
9 about in late 2013 or 2014 at NACDS.
10    Q.   And NACDS is the acronym for the
11 National Association of Chain Drug Stores?
12    A.   Correct.
13    Q.   No one ever told you that Buzzeo was a
14 third-party vendor that had a kind of a
15 pre-packaged suspicious order monitoring system?
16    A.   No.  I learned it at the trade show.
17    Q.   And I think you said in late 2013?
18    A.   I can't remember which year I went to
19 the meeting, but that's when I learned of it.
20    Q.   It wasn't in the beginning of your
21 tenure at Walgreens on the controlled substance
22 task force or the beginning of Pharmaceutical
23 Integrity, right?
24    A.   No.

Page 216

1    Q.   So, when you found out at the
2 conference, NACD, that was one of the first times
3 you heard of it?
4    A.   Correct.
5    Q.   No one from Walgreens came and told you
6 about Buzzeo?
7    A.   No.
8    Q.   I will hand you what we will mark as
9 Polster 14.
10    (WHEREUPON, a certain document was
11    marked as Walgreens-Polster Exhibit
12    No. 14:  10/12/12 e-mail with
13    attachments; WAGMDL00319129 -
14    00319239.)
15 BY MR. MOUGEY:
16    Q.   You see the date of this e-mail is
17 October 12, 2012, correct?
18    A.   Yes.
19    Q.   And it's from -- do you know who Leslie
20 Lowry is?
21    A.   No.
22    Q.   And do you see in the bottom right-hand
23 corner that this has a Walgreens --
24    MS. LEWIS:  This is Sarah Lewis.  Excuse me.

Page 217

1 I don't think we have the Bates numbers for the
2 last two exhibits.
3    MR. MOUGEY:  The one I have in front of me is
4 319129.
5    MS. LEWIS:  Thank you.
6    MR. MOUGEY:  Certainly.
7 BY MR. MOUGEY:
8    Q.   And this appears to be a PowerPoint sent
9 to a list of individuals that attended a Buzzeo
10 seminar, correct?  That's what's indicated in the
11 first paragraph, correct?
12    A.   Yes.
13    Q.   And if you would, we don't have to go
14 through the entire thing, have you seen this
15 document --
16    A.   No.
17    Q.   -- in preparation for today?
18    Have you ever seen it before?
19    A.   No.
20    Q.   Let's just start on the very first
21 page of the PowerPoint, which is the back side of
22 the e-mail.  It says, "Welcome, Suspicious Order
23 Monitoring Seminar, Regulatory Issues and Handling
24 Increased Enforcement."

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1    A.   Okay.
2    Q.   Hyatt Regency O'Hare.  Right here in
3  Chicago, right?
4    A.   Yep.
5    Q.   October 11, 2012, correct?
6    A.   Yep.
7    Q.   Approximately around a month after the
8  controlled substance task force was created, right?
9    A.   Yes.
10   Q.   Would it have been helpful to have as a
11 consultant an outside vendor that had experience in
12 suspicious order monitoring and what the rules and
13 regulations were in late 2012 when you were on the
14 task force?
15   A.   I don't know.  I never -- I honestly
16 never thought of it.  We had a system and we were
17 using that system that we had built.
18   Q.   But the system that Walgreens had in
19 late 2012, you were acutely aware that Walgreens
20 was under investigation at both the distribution
21 side and the dispensing side, right?
22   A.   Yes.
23   Q.   And, so, clearly the system that
24 Walgreens had in place in late 2012 was still open

Page 219

1  to question, correct?
2    A.   I don't know if I agree with that.  I
3  think there is a lot of things happening in the
4  industry and there were changes that we learned and
5  made along the way.
6    Q.   On October 12, 2012, if you turn to
7  page 29 of this PowerPoint, Bates No. 164.  It's
8  titled "Investigative Challenges and Responses."
9        Do you see "Common SOM Pitfalls,"
10 suspicious order monitoring pitfalls, on page 165?
11   A.   Oh, 165.
12 MR. HOUTZ:  You said 164.
13 MR. MOUGEY:  I did.
14 MR. HOUTZ:  Which is I think what you mean.
15 BY MR. MOUGEY:
16   Q.   It's the beginning of the section.
17 "Common SOM Pitfalls."
18   A.   I'm sorry.  I wasn't looking at the
19 header.
20   Q.   That's okay.  I wasn't clear.
21        And then on page 165 it continues.  Do
22 you see that?
23   A.   Yeah.
24   Q.   And the subheading is "Investigative

Page 220

1  Challenges and Responses."  Follow me?
2    A.   Yes.
3    Q.   It says, "'Cutting' orders to a volume
4  that puts the order under a threshold is not
5  acceptable."
6        Were you aware that Walgreens prior to
7  you coming on board in Pharmaceutical Integrity was
8  cutting orders that came in to below what it
9  believed was a suspicious level?
10   A.   I was not --
11 MR. HOUTZ:  Object to form.
12 BY THE WITNESS:
13   A.   I was not aware until you showed --
14 started showing me all these documents that I had
15 not seen before.
16 BY MR. MOUGEY:
17   Q.   So, sitting here today, you didn't know
18 that Walgreens was cutting orders to below what it
19 believed was a suspicious order -- suspicious
20 level?
21   A.   I was not aware that we were cutting
22 orders.
23   Q.   And this third-party consultant gave a
24 PowerPoint right here in Chicago indicating that

Page 221

1  cutting orders to a volume that puts the order
2  under a threshold is not acceptable.  Correct?
3    A.   I see that here, yes.
4    Q.   And under your tenure, under your time
5  with Pharmaceutical Integrity, Walgreens was not
6  filling orders that came in over suspicious and
7  they were not filled, correct?
8    A.   We were not filling orders that exceeded
9  the ceiling and the tolerance that Wayne Bancroft's
10 system designed.
11   Q.   Let me make sure I understand.
12       An order that was not filled, is that
13 order an order of interest?
14   A.   No.  It was an order that didn't --
15 didn't get generated because it was over an amount
16 that the store should have had.
17   Q.   So, it wasn't even -- it was not
18 considered even an order of interest?
19   A.   Right.
20   Q.   And it also clearly -- you all did not
21 believe that it was a suspicious order, correct?
22   A.   That's correct.
23   Q.   Now, I'm a little confused by that.  So,
24 let me try and think of an analogy that maybe would

Page 222

1 help.
2     Let's assume that I have somebody on my
3 front porch looking through my windows to see if
4 someone was home and, if not, was potentially going
5 to break in my house.  Okay.  Are we on the same
6 page?
7     A.  Sure.
8     Q.  But I have an alarm system on my house
9 and as he puts his head up to my door, or she, and
10 looks through the window, the movement on the door
11 sets off an alarm.
12     A.  Okay.
13     Q.  And as a result of that alarm going off,
14 that person doesn't break into my house.  All
15 right.  Still on the same page?
16     A.  Um-hmm.
17     Q.  And flees.  Nothing bad happens to me
18 because I have that alarm.
19     A.  Okay.
20     Q.  Okay.  Now, would you consider the fact
21 that I have a potential intruder on my front porch
22 looking through my windows, do you think that's
23 suspicious activity?
24     A.  Yes.

Page 223

1     Q.  And the fact that I had a system in
2 place preventing him from breaking into my house,
3 does that change his conduct looking through the
4 windows and all of a sudden automatically turn that
5 into unsuspicious activity?
6     A.  You're asking me if just because he
7 didn't break into your house, does it not become
8 suspicious?
9     Q.  Right.
10     A.  No, it's still suspicious.
11     Q.  Of course not.  He is still looking
12 through my windows, still...
13     Now, Walgreens' system, similar to my
14 alarm, is there to detect a potential red flag.
15 Would you agree with that?
16     A.  It was put in place to ensure that the
17 stores had the proper quantities.  Not necessarily
18 to -- did you just call it a red flag?
19     Q.  Yes, ma'am.
20     A.  Not necessarily to detect a red flag.
21     The whole idea was to make sure that the
22 stores were getting the quantities that they needed
23 based on their peer group.  What made it suspicious
24 or what would make it something, you know, out of

Page 224

1 the ordinary is if somebody tried to go outside of
2 the system meaning one of the pharmacists at the
3 location tried to order in excess.  Those are the
4 ones that would be deemed orders of interest and
5 therefore reviewed and/or reported to the DEA if it
6 was deemed suspicious.
7     Q.  So, the fact an order came in that
8 exceeded the Wayne Bancroft algorithm but was not
9 shipped automatically converted that order to a
10 non-suspicious level, correct?
11     MR. HOUTZ:  Object to form.
12 BY THE WITNESS:
13     A.  Not when I had it.  Not when I had the
14 system.  We just didn't ship.
15 BY MR. MOUGEY:
16     Q.  That's right.  By not shipping --
17     A.  Right.
18     Q.  -- it converted an order that exceeded
19 the ceiling, by not shipping it, it wasn't
20 suspicious.  Correct?
21     MR. HOUTZ:  Object to form.
22 BY THE WITNESS:
23     A.  It wasn't even an order because it never
24 generated.

Page 225

1 BY MR. MOUGEY:
2     Q.  That's referred to as shipment, correct,
3 an order comes in and it wasn't shipped, correct?
4     A.  An order came in.  It exceeded the
5 threshold.  It never even generated.  And therefore
6 it was never shipped.
7     Q.  So, the order comes in and because it
8 exceeds the threshold, now it's no longer even an
9 order?
10     A.  That's right.
11     Q.  I hand you P-WAG-1050, Bates No. 658246.
12 Polster 15.
13     (WHEREUPON, a certain document was
14     marked as Walgreens-Polster Exhibit
15     No. 15:  11/9/12 e-mail string;
16     WAGMDL00658246 - 00658248.)
17 BY MR. MOUGEY:
18     Q.  Rex Swords is your boss, right?
19     A.  Was my boss, yes.
20     Q.  Was your boss.  During your time during
21 Pharmaceutical Integrity you reported directly to
22 him, correct?
23     A.  Yes.
24     Q.  And he is fairly senior at Walgreens,

Page 226

1 correct?
2    A.   Yes.
3    Q.   Was he fairly knowledgeable about the
4 suspicious order monitoring process?
5    A.   He became knowledgeable probably right
6 about the time I did.
7    Q.   And he was brought in to oversee the
8 Pharmaceutical Integrity group, correct?
9    A.   Yes.
10    Q.   Similar to you, correct?
11    A.   Yes.
12    Q.   And he was part of the same kind of
13 meeting and educational process as your group was,
14 correct?
15    A.   Yes.
16    Q.   And you see here that Mike Bleser sent
17 Denman Murray, Barb Martin and Frank DeStefano an
18 e-mail at the top, correct?
19    A.   Yes.
20    Q.   And that was a forward from an initial
21 e-mail from Rex Swords that's copied to you,
22 correct?
23    A.   Yes.
24    Q.   And Rex Swords' e-mail went to Kermit

Page 227

1 Crawford, correct?
2    A.   Yes.
3    Q.   And you know who Kermit Crawford is,
4 correct?
5    A.   Yes.
6    Q.   What was his title back in 2012?
7    A.   I don't remember exactly, but probably
8 president of pharmacy services or operations or
9 something.
10    Q.   Not -- not too far from the top of
11 Walgreens --
12    A.   Right.
13    Q.   -- correct?
14    A.   Right.
15    Q.   So, this was about as senior as you get
16 at Walgreens short of the CEO, correct?
17    A.   Yes.
18    Q.   So, you have Rex Swords and you would
19 agree that he is fairly senior, correct?
20    A.   Yep.
21    Q.   To his boss, correct?
22    A.   Yes.
23    Q.   And he relayed some thoughts after a
24 November 8th DEA meeting at NABP, correct?

Page 228

1    A.   Yes.
2    Q.   And what is NABP acronym again?
3    A.   National Association of Boards of
4 Pharmacy.
5    Q.   And he says, "I have the sense that
6 today's meeting was a condensed version of the
7 regional meetings the DEA is holding throughout the
8 country for pharmacists.  Although no attendance
9 list was available, I believe most, if not all, of
10 the major chain operators were there."
11        Correct?
12    A.   Yes.
13    Q.   And he references also who showed up
14 from the DEA, including Mr. Rannazzisi, correct?
15    Q.   And you recognize that Mr. Rannazzisi is
16 one of the senior folks from the DEA, correct?
17    A.   At the time, yes.
18    Q.   That's right.  And that Mr. Rannazzisi
19    A.   At the time, yes.
20    Q.   That's right.  And that Mr. Rannazzisi
21 presented a PowerPoint deck on prescription drug
22 trafficking and abuse for almost two hours?
23    A.   Yes.
24    Q.   Were you here at this presentation?
    A.   No.

Page 229

1    Q.   And -- but Mr. Swords apparently went?
2    A.   Yes.
3    Q.   And he was passing along his thoughts to
4 you, amongst others, correct?
5    A.   Yeah.
6    Q.   Including Patty Zagami, correct?
7    A.   Yes.
8    Q.   And if you would turn the page,
9 Mr. Swords cites to 21 CFR 1301.74.
10        Do you see where I am?
11    A.   Yes.
12    Q.   And that is the applicable reg that for
13 Walgreens as a distributor that it should "design
14 and operate a system to disclose to the registrant
15 suspicious orders of controlled
16 substances...suspicious orders include orders of
17 unusual size, orders deviating substantially from a
18 normal pattern and orders of unusual nature."
19        Do you see that?
20    A.   Yes.
21    Q.   And he says, "If suspicious - you don't
22 ship.  Decreasing the order and shipping is not
23 complying with the regulation."
24        Follow me?

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    A.   Yep.
2    Q.   "Ignoring suspicious orders will result
3  in civil penalties.  Cited Cardinal, ABC and
4  McKesson fines."
5         Did I read that right?
6    A.   Yes.
7    Q.   Was there any concerted effort within
8  Walgreens that you're aware of that Walgreens made
9  a determination to change orders flagged by
10  Mr. Bancroft's algorithm from suspicious into
11  orders of interest?
12    A.   I don't know.
13    Q.   You have never had any conversations
14  with anyone trying to determine how we can move
15  orders flagged by Mr. Bancroft's system from
16  suspicious to orders of interest?
17    MR. HOUTZ:  Object to form.
18  BY THE WITNESS:
19    A.   That's correct.
20  BY MR. MOUGEY:
21    Q.   Because if in fact there were orders
22  that were suspicious and flagged at Walgreens, they
23  had to be reported to the DEA, correct?
24    MR. HOUTZ:  Object.

Page 231

1  BY THE WITNESS:
2    A.   After they were investigated they had to
3  be reported.  An order isn't deemed suspicious
4  until after you have -- you've looked into it.
5  BY MR. MOUGEY:
6    Q.   Although we've just looked at document
7  after document after document from 2008 all the way
8  from a member of your own department in 2017 saying
9  that an order flagged by the Bancroft algorithm was
10  deemed suspicious, correct?
11    A.   That's what the document said.
12    Q.   Yes, ma'am.  But sitting here today
13  testifying in front of this jury, those several
14  years' worth of internal documents at Walgreens, we
15  should just disregard those because that really
16  isn't the system that was in place, correct?
17    A.   That wasn't the system I know about.
18  The system that I know about is what was in place
19  when I -- when I took over it.
20    MR. MOUGEY:  Bates No. 574824, Polster 16.
21         (WHEREUPON, a certain document was
22         marked as Walgreens-Polster Exhibit
23         No. 16:  3/20/13 e-mail with
24         attachment; WAGMDL00574824 -

Page 232

1         00574825.)
2  BY MR. MOUGEY:
3    Q.   Ms. Polster, this is an e-mail from you
4  to Mr. Stahmann, Ms. Daugherty, Christopher Dymon
5  and Edward Bratton.  Those are members of your
6  team, right?
7    A.   Yes.
8    Q.   Dated 3/20/2013, correct?
9    A.   Yes.
10    Q.   And attached is a memorandum from you to
11  Mr. Swords, correct?
12    A.   Yes.
13    Q.   And the second bullet down says, "SOM
14  meeting," suspicious order monitoring meeting,
15  correct?
16    A.   Yes.
17    Q.   So, November 30, 2012, right at the
18  beginning of Pharmaceutical Integrity, you and
19  Mr. Swords, your boss, are discussing putting
20  together a work group to begin the determination
21  between a suspicious order and an order of
22  interest, correct?
23    A.   Yes.
24    Q.   Because prior to this time, November 30,

Page 233

1  2012, Walgreens had identified orders flagged by
2  Mr. Bancroft's algorithm as suspicious and you and
3  Mr. Swords put a working group together to figure
4  out what we're going to call or what's going to
5  fall into the orders of interest bucket, correct?
6    MR. HOUTZ:  Object to form.
7  BY THE WITNESS:
8    A.   No, not correct.
9  BY MR. MOUGEY:
10    Q.   So, after November 30, 2012, from this
11  meeting, the discussion internally was the orders
12  flagged by Walgreens' Bancroft algorithm were now
13  going to be called orders of interest, correct?
14    A.   No.
15    Q.   I hand you what we are going to mark as
16  Polster 17.  Bates No. 659270.
17         (WHEREUPON, a certain document was
18         marked as Walgreens-Polster Exhibit
19         No. 17:  12/16/12 e-mail string
20         with attachments; WAGMDL00659270 -
21         00659274.)
22  BY MR. MOUGEY:
23    Q.   The bottom of this e-mail begins with an
24  e-mail from you to Dan Doyle, correct?

Page 234

1   A.   Yes.
2   Q.   Who is Dan Doyle?
3   A.   He is a vice president of finance.
4   Q.   And it's dated December 16, 2012,
5 correct?
6   A.   Yes.
7   Q.   You relay to Mr. Doyle that "The DEA has
8 alleged that Walgreens suspicious order monitoring
9 program for controlled substances is inadequate and
10 has taken aggressive enforcement actions against
11 three Florida pharmacies and the Jupiter
12 distribution center."
13     Correct?
14   A.   Yes.
15   Q.   And that three Florida pharmacies was
16 actually increased at the end of 2012 to six,
17 correct?
18   A.   Yes.
19   Q.   "In addition to the actions against
20 their registrations, DEA is demanding civil
21 penalties, potentially totaling hundreds of
22 millions of dollars."  Correct?
23   A.   Yes.
24   Q.   And you were updating Mr. Doyle from

Page 235

1 finance so he could have an understanding of what
2 the financial impact was on these fines from the
3 DEA?
4   A.   Yes.
5   Q.   And you go on to tell Mr. Doyle that
6 "The DEA has confirmed that additional regulatory
7 actions are pending against other Walgreen
8 facilities due to the issues uncovered in their
9 current investigation."
10     Is that correct?
11   A.   Yes.
12   Q.   And isn't it true, Ms. Polster, that the
13 reason that these enhancements were made at
14 Walgreens to the suspicious order monitoring
15 policies was to try and convince the DEA that it
16 should reduce the amount of fines that it was ready
17 to impose?
18   A.   No.
19   Q.   You've never said that?
20   A.   No.
21   Q.   You've never communicated with anyone
22 and said that the reason why we are doing the work
23 we are was to try to convince the DEA that it
24 should reduce its fines?

Page 236

1   A.   No.
2   Q.   You go on to tell Mr. Doyle, "In
3 response, the company has enhanced its suspicious
4 order monitoring system for controlled substances
5 in an effort to convince DEA that the proposed
6 penalty is excessive."
7     Correct, Ms. Polster?
8   A.   Where are you even reading that?
9   Q.   I am reading that in the second
10 paragraph, and I'll read it for you again.
11     "In response, the company has enhanced
12 its suspicious order monitoring program for
13 controlled substances in an effort to convince the
14 DEA that the proposed penalty is excessive."
15     Did I read that right?
16   A.   It's in there, yes.
17   Q.   So, this entire Pharmaceutical Integrity
18 group, the controlled substance task force was put
19 in place at the end of 2012 to try to convince the
20 DEA that the proposed penalty was excessive,
21 correct?
22   A.   I don't know that that was the reason
23 why it was put in place.  There was a lot of work
24 that needed to be done around the DEA.

Page 237

1   Q.   You have an understanding that at this
2 point in time there are people dying all over the
3 U.S. because of overdoses from controlled
4 substances, correct?
5   A.   Yes.
6   Q.   And that Walgreens is one of the largest
7 dispensers and distributors of controlled
8 substances, more specifically oxycodone,
9 hydrocodone, hydromorphone, in the United States,
10 correct?
11   A.   We have a large market share of pharmacy
12 business.
13   Q.   You have a large market share of the
14 distributor business, correct, Ms. Polster?
15   A.   I don't know the answer to that.
16   Q.   So, this entire Pharmaceutical Integrity
17 group that was set up in late '12 and 2013 was to
18 put a happy face on Walgreens for the DEA
19 demonstrating that it was trying to comply,
20 correct?
21   MR. HOUTZ:  Object to form, asked and
22 answered.
23 BY THE WITNESS:
24   A.   I don't agree with that.

Page 238

BY MR. MOUGEY:

1 Q. And we have just looked through several
2 documents going from 2008 all the way up to 2017
3 that orders that were flagged by Bancroft's system
4 were not reported to the DEA, correct?
5 A. I don't remember it saying that we never
6 reported to the DEA.
7 Q. When your system reduced an order below
8 a suspicious -- what was deemed suspicious, that
9 order was not reported to the DEA, correct?
10 A. Correct.
11 MR. HOUTZ: Object on foundation.
12 BY MR. MOUGEY:
13 Q. When an order was not shipped and then
14 magically became not an order, that was not relayed
15 to the DEA, correct?
16 A. Right.
17 Q. You go on in the third paragraph of this
18 memorandum to relay to him that "The updated
19 suspicious order monitoring program is currently
20 being piloted. Once turned on for all controlled
21 medications nationwide, it is expected to generate
22 thousands of 'orders of interest,'" and you put
23 those in quotes, correct?

Page 239

1 A. Yes.
2 Q. Orders of interest, correct? The same
3 orders of interest that you and Mr. Swords in a
4 memorandum needed to form a working group to help
5 define, correct?
6 MR. HOUTZ: Object to form.
7 BY THE WITNESS:
8 A. Yes.
9 BY MR. MOUGEY:
10 Q. Within a month of that memorandum,
11 "orders of interest," in air quotes, to the finance
12 side.
13 And you relayed that "These 'orders of
14 interest' will all require review prior to allowing
15 the drugs to be shipped to our pharmacies."
16 Correct?
17 A. Yes.
18 Q. And you went on at the bottom of this
19 memorandum to the finance side saying, "The SOM
20 system has been turned on to 'tracking' for the
21 chain for all controlled substances, per the chart
22 below, for last week we had 14,000 items that the
23 stores ordered across the chain that would have to
24 be investigated."

Page 240

1 Correct?
2 A. Correct.
3 Q. How many people were in Pharmaceutical
4 Integrity group as of the end of 2012?
5 A. I did not have many, which is -- which
6 was the point. I was building my team.
7 Q. Less than five.
8 A. Okay.
9 Q. And at its peak how many people did you
10 all have in Pharmaceutical Integrity?
11 A. 11.
12 Q. 11. With 14,000 items that the stores
13 across the chain would have to be investigated.
14 Correct?
15 A. Yep.
16 Q. Or we can magically call orders "orders
17 of interest" and not have to investigate them,
18 correct?
19 A. I don't agree with you.
20 Q. And that is ultimately what happened,
21 correct?
22 A. No.
23 Q. The orders were taken out of the
24 suspicious category, put into an order of interest

Page 241

1 category and those were not investigated, correct?
2 A. No, they were investigated.
3 Q. So, between the five and ten people that
4 Walgreens allocated to your department in 2013,
5 their job was to go through these 14,000 orders of
6 interest to investigate those, correct?
7 A. No. These were on tracking. This was
8 the updated system. And these were on tracking,
9 and they did not investigate these particular
10 14,000 because they were on tracking.
11 By that time we had to get the stores
12 trained to understand that they were not to do any
13 ordering outside of what SIMS ordered for them, and
14 any order that did get generated or placed or
15 whatever outside of SIMS ultimately became what
16 orders that we deemed as orders of interest and
17 then they went into being determined whether or not
18 they were suspicious or whether they were deemed
19 okay to ship.
20 MR. MOUGEY: Take a break.
21 THE VIDEOGRAPHER: We are off the record at
22 3:00 p.m.
23 (WHEREUPON, a recess was had
24 from 3:00 to 3:29 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    THE VIDEOGRAPHER:  We are back on record at
2  3:29 p.m.
3    MR. MOUGEY:  I apologize for the delay.  I was
4  just on the hearing with Special Master Cohen.
5        Les, while we are here today, would you
6  mind having someone from upstairs that knows -- we
7  have been asking -- is it Sharon Desh?  Is that her
8  name?
9    MR. HOUTZ:  Yes.
10    MR. MOUGEY:  We have been asking Sharon for
11  five days whether or not it intends to comply with
12  the Special Master Cohen's order on the 27 or 28
13  documents that privilege was waived, and I've asked
14  repeatedly when we can expect to get those
15  documents and I've never -- I don't think, I might
16  be mistaken, but I don't believe I have even had
17  the courtesy of a response.
18        Would you mind asking her if she can
19  come or tell you and you can let me know?
20    MR. HOUTZ:  Yes.  I can ask her.
21    MR. MOUGEY:  Thank you.
22  BY MR. MOUGEY:
23    Q.   Ms. Polster, would you please go back to
24  Polster 9, and it was the -- okay.  I'd like to go

Page 243

1  to Bates No. 17.
2    A.   Okay.
3    Q.   And it's up on the monitor behind you.
4        What I'd like to do is, we went through
5  the boxes on top, but we didn't go through the key
6  points; and I'd like you to go through those with
7  me.  Okay.
8    A.   Sure.
9    MR. HOUTZ:  You can also feel free to look at
10  the paper, whichever is more convenient.
11    THE WITNESS:  Okay.
12    MR. MOUGEY:  Whichever is easiest.
13    MR. HOUTZ:  It's the same thing.
14    MR. MOUGEY:  Absolutely.
15    THE WITNESS:  Okay.
16  BY MR. MOUGEY:
17    Q.   So, you see in "Phase" it has 1, 2, 3
18  and 4.  Do you see that?
19    A.   Yes.
20    Q.   And I believe ultimately there were 5.5
21  phases of the Wayne Bancroft algorithm, correct?
22    A.   Yes.
23    Q.   So, this document I believe is from
24  July of '12 and captures the modifications to that

Page 244

1  point.  Okay?
2    A.   Okay.
3    Q.   So, what I want to do is just have an
4  understanding of what you know and don't know.
5        So, under key point 1, from August of
6  '09 to 9 of 2010, "Reviews WAG DC orders only."
7  Correct?  Did I read that right?
8    A.   Yes.
9    Q.   Okay.  And WAG is obviously Walgreens
10  and DC is distribution center, correct?
11    A.   Yes.
12    Q.   Do you have an understanding that the
13  Bancroft algorithm only reviewed Walgreens
14  distribution center orders only?
15    A.   That's what it says here.
16    Q.   Do you have an understanding, do you
17  know that?
18    A.   I don't know any different than this.
19    Q.   We were talking about gaps earlier.  And
20  were you aware that up and until June of 2012 that
21  the -- that the only systems going through the
22  Bancroft algorithm were orders that were sent to
23  the Walgreens distribution centers?
24    MR. HOUTZ:  Object to form.

Page 245

1  BY THE WITNESS:
2    A.   It's not a cut-and-dry answer for your
3  yes and no.  I know you think it is, but it's not.
4        It wasn't going through the order, but
5  it was adding to the inventory quantity at the
6  store level.
7  BY MR. MOUGEY:
8    Q.   The question that I asked, though, was
9  that it was going through the Bancroft algorithm
10  that was used to detect orders that needed further
11  review, correct?
12    MR. HOUTZ:  Object to form.
13  BY THE WITNESS:
14    A.   I don't know.
15  BY MR. MOUGEY:
16    Q.   You don't know?
17    A.   All I know is what's here because you're
18  not letting me answer the question with all the
19  information I do know.
20    Q.   I haven't interrupted any of your
21  answers today, Ms. Polster.  I'm not really sure
22  what you're referring to.
23        What I simply asked is:  Were you aware
24  that the Bancroft algorithm used to detect

Page 246

1 suspicious orders only reviewed orders that went to
2 the Walgreens distribution center?
3     MR. HOUTZ:  Object to form.
4 BY THE WITNESS:
5     A.   That's what it says here.
6 BY MR. MOUGEY:
7     Q.   But you sitting here today you don't
8 know that.  You didn't know that --
9     A.   No.
10     Q.   -- before looking at this document?
11     A.   No.
12     Q.   You haven't seen this document before we
13 sat here today?
14     A.   I have not.
15     Q.   Did anyone as part of your educational
16 process when you started at Pharmaceutical
17 Integrity walk you through the different
18 reiterations of the Walgreens suspicious order
19 monitoring policies?
20     A.   No, I was walked through what was
21 currently in place and what I was taking over.
22     Q.   But not what the reiterations were?
23     A.   Correct.
24     Q.   So, you don't know that in the box

Page 247

1 phase 1, August of 2009 to September of 2010, that
2 there were no order reductions in phase 1?
3     A.   I did not know that.
4     Q.   You didn't know from September '10 to
5 the current that the reductions begin in phase 2
6 but only applies to WAG, Walgreens distribution
7 center orders?
8     MR. HOUTZ:  Object to form.
9 BY THE WITNESS:
10     A.   Correct.
11 BY MR. MOUGEY:
12     Q.   And from June of 2012 to July of 2012
13 that -- that the algorithm reviewed WAG
14 distribution center orders but for the first time
15 checks to see if vendor order placed within 48
16 hours for same drug?
17     MR. HOUTZ:  Object to form.
18 BY THE WITNESS:
19     A.   I did not know that.
20 BY MR. MOUGEY:
21     Q.   And then July of 2012, "Walgreens
22 distribution center orders plus applies to same
23 logic to vendor orders making them eligible for
24 flagging and order reduction."  Were you aware of

Page 248

1 that?
2     A.   When -- when I -- when I got the system
3 and it was -- my understanding was it was included
4 in there.
5     Q.   So, when you look at 4, "Both WAG
6 distribution center and vendor orders reduced if
7 thresholds exceeded"?
8     MR. HOUTZ:  Object to form.
9 BY MR. MOUGEY:
10     Q.   Do you see that?
11     A.   Yeah, I see it.
12     Q.   So that -- the fact that orders were
13 going from both Walgreen orders and orders that
14 were sent to outside vendors, for example,
15 Cardinal, for the first time in July of 2012, they
16 were being reduced pursuant to the algorithm?
17     MS. FIX MEYER:  Objection; foundation.
18 BY THE WITNESS:
19     A.   I don't know.
20 BY MR. MOUGEY:
21     Q.   You don't know?
22     A.   Other than what's here.  That's all I
23 know.
24     Q.   So, when Mr. Bratton was referring to

Page 249

1 runaway growth, do you have an understanding if
2 Mr. Bratton knew these gaps were in place until
3 late 2012?
4     A.   I don't --
5     MR. HOUTZ:  Objection; foundation.
6 BY THE WITNESS:
7     A.   I don't know.
8 BY MR. MOUGEY:
9     Q.   You'd agree with me, the fact that a
10 pharmacist -- a pharmacy, that order had been
11 reduced by Walgreens system but then they could
12 then order that same drug from another vendor like
13 Cardinal is a gap in Walgreens' system, correct?
14     MS. FIX MEYER:  Objection; form, foundation.
15 BY THE WITNESS:
16     A.   It's a gap that my team didn't see it.
17 I don't necessarily agree that it was a gap in the
18 Walgreens system.
19 BY MR. MOUGEY:
20     Q.   Well, if the Walgreens system detects an
21 order from a pharmacy and reduces it but then the
22 pharmacy is free to order it from another vendor,
23 that exception or gap kind of swallows the rule,
24 does it not?

Page 250

1    A.   I don't agree with that statement.
2    Q.   So, you don't see any problem with
3  Walgreens telling a pharmacy that order is not
4  going to get filled but allowing that pharmacy to
5  go to Cardinal and fill it there.  There is no
6  problem as far as you're concerned?
7    MS. FIX MEYER:  Objection; form, foundation,
8  calls for speculation.
9  BY THE WITNESS:
10    A.   We never said there was -- there was no
11  problem.  We never communicated to the store.  They
12  just didn't get the order.  And, so, they're trying
13  to take care of a patient that has a prescription
14  and they don't have the product.  It didn't come in
15  through the warehouse.  So they ordered it through
16  the wholesaler.  The wholesaler has their own
17  suspicious order responsibilities.
18  BY MR. MOUGEY:
19    Q.   So, you don't see any -- we are not --
20  you are not trying to pass your responsibilities --
21    A.   Of course not.
22    Q.   -- off to Cardinal, correct?
23    A.   Of course not.
24    Q.   You are not trying to pass your

Page 251

1  responsibilities over to AmerisourceBergen,
2  correct?
3    MS. SCHUCHARDT:  Objection; form.
4  BY THE WITNESS:
5    A.   Of course not.
6  BY MR. MOUGEY:
7    Q.   We're talking about Walgreens' system.
8        What I'm asking you is the fact that
9  Walgreens can identify an order, flag it and take
10  it to zero, but then that pharmacy can then place
11  it with another vendor, you don't see that as a gap
12  in Walgreens' system?
13    A.   It was a gap that my team didn't have
14  the visibility.  But if that vendor did ship into
15  the store, I had visibility and the quantities went
16  into the store and I was able to see that they had
17  exceeded their ceiling that we set for them.
18        Just because we set the ceiling does not
19  mean we were right.  That's why we changed our
20  policies and procedures to get the documentation we
21  needed to go -- if they wanted it over the ceiling
22  limit, we had to understand the reason why.
23    Q.   So, you tell the pharmacy no and they're
24  free to go get it from another vendor?

Page 252

1    A.   We never told them no.  They just didn't
2  know.
3    Q.   Ms. Polster, you cut the order down to
4  zero.  You didn't fill it.  The Walgreens pharmacy
5  orders it from an outside vendor.
6    MR. HOUTZ:  The question?
7  BY MR. MOUGEY:
8    Q.   You don't -- you don't see that as a
9  problem?
10    A.   The problem that I saw was that we
11  didn't do a good job of communicating to the stores
12  why they didn't get their order.  That is why we
13  changed the whole procedure and let them know,
14  listen, if you try to order outside of the
15  system-generated order, you have to go through the
16  processes so that we have the documentation that we
17  need.  Otherwise you're not going to get the order.
18  And that's what happened.
19  BY MR. MOUGEY:
20    Q.   And that was a gap in Walgreens' system
21  until your group closed it, correct?
22    A.   What was the gap?
23    Q.   The gap that the pharmacy could go to a
24  third-party vendor and order oxycodone that

Page 253

1  Walgreens had told it or pushed the order down to
2  zero.
3    A.   Again, I don't agree with you in the
4  gap.  The gap was there in that we had not good
5  communication between the support center and the
6  stores to let them know that they've reached the
7  limits that we set for them.
8        But until I had the documentation that I
9  needed or information that I needed and also
10  information that the wholesaler sometimes needs in
11  order to deem whether or not that order is
12  suspicious or not, there was no way for me to get
13  that information.  They just didn't get the order.
14    Q.   So they went and got it from another
15  vendor?
16    A.   So they went and got it from the other
17  vendor.
18    Q.   Are you familiar with PDQ at Walgreens?
19    A.   Yes.
20    Q.   And what does PDQ stand for?
21    A.   I don't remember what the Walgreens
22  acronym was, but we used it, I mean, in general
23  just -- I've also known it as PDQ, and my
24  definition is pretty darn quick.

Page 254

1    Q.   Hand you what we are going to mark as
2  Polster 18.
3         (WHEREUPON, a certain document was
4         marked as Walgreens-Polster Exhibit
5         No. 18:  10/1/12 e-mail string;
6         WAGMDL00705318 - 00705320.)
7  BY MR. MOUGEY:
8    Q.   It's an e-mail dated October 1, 2012
9  from Rex Swords, again, to senior people at
10 Walgreens, including Kermit Crawford, correct?
11   A.   Yes.
12   Q.   And Mr. Swords, as you can see in the
13 e-mail dated October 1, 2012 in the middle of the
14 page, that he is discussing oxycodone no longer
15 being ordered via PDQ, pretty darn quick?
16   A.   Okay.
17   Q.   And "PDQ orders did not aggregate to the
18 monthly cumulative limits," Mr. Swords is relaying
19 to Mr. Kermit, correct?
20   A.   Yes.
21   Q.   "Although line limits are still imposed
22 on the individual order.  Without this edit, stores
23 could order PDQ every day for Oxy and as long as
24 they didn't trip the line order limit edit, they

Page 255

1  would receive the product and end up exceeding our
2  monthly cumulative order limits."
3         Correct?
4    A.   Yes.
5    Q.   And that was a gap in Walgreens' system,
6  correct?
7    A.   I would agree.
8    Q.   "As Dave mentions, stores still have
9  access to growth if needed outside their normal
10 order process using the controlled substance
11 override form on Storenet."
12        This form allows for a manual order to
13 take place, but provides the documentation and
14 review needed to ensure the order is appropriate,
15 correct?
16   A.   Yes.
17   Q.   Pharmaceutical Integrity closed the gap
18 in late '12, early '13 with the PDQ ordering,
19 correct?
20   A.   In terms of it not counting and the
21 limits being imposed?
22   Q.   Yes, ma'am.
23   A.   Correct.
24   Q.   So, when Mr. Bratton was referring to

Page 256

1  the previous process contributed to the runaway
2  growth, this -- of OxyContin, this is one of the
3  gaps in Walgreens' system that contributed to the
4  runaway growth, correct?
5        MR. HOUTZ:  Object to form and foundation.
6  BY THE WITNESS:
7    A.   I don't know.
8  BY MR. MOUGEY:
9    Q.   Are you familiar with what 340B is?
10   A.   A little bit.
11   Q.   Explain to me what your general
12 understanding of what 340B is.
13   A.   340B is when prescriptions are paid for
14 for the underprivileged or underserved communities.
15   Q.   It's a Federal Government program that
16 folks that don't have enough money to pay for their
17 own prescriptions are paid for by the Federal
18 Government, correct?
19   A.   Yes.
20   Q.   And do you have an understanding of
21 whether or not Walgreens' 340B program was run
22 through its suspicious order monitoring policies
23 and procedures?
24   A.   At the time when I took over the team,

Page 257

1  no, but it is now.
2    Q.   That is another gap that Pharmaceutical
3  Integrity closed after it got started, correct?
4    A.   After we were made aware, yes.
5    Q.   Are you familiar with the term of art
6  within Walgreens "interstoring"?
7    A.   Yes.
8    Q.   And interstoring is when one pharmacy
9  that needed additional Schedule II or Schedule III
10 including oxycodone could go to a nearby Walgreens
11 and take its inventory for sale in its store,
12 correct?
13   A.   Yes.
14   Q.   Now, interstoring was another gap that
15 was identified by Pharmaceutical Integrity in early
16 2013 that was ultimately closed, correct?
17   A.   I wouldn't use the term "gap" in
18 terms -- when you say the gap that way, the way I'm
19 interpreting the way you're asking the question is
20 that nobody had any oversight over interstores.
21        There were policies in place around
22 controlled substance invoicing -- I mean
23 interstoring where it had to go through the
24 leadership.  So, the leadership knew that it was

Page 258

1 happening, but my team did not have visibility and
2 so therefore we closed that.
3    Q.   The -- you would agree with me that the
4 federal code and regs require every registrant such
5 as Walgreens to design a system to identify
6 suspicious orders, correct?
7    A.   Yes.
8    Q.   And that the -- we went over this this
9 morning.  The foundation of Walgreens' suspicious
10 order monitoring policy and procedure was the
11 Bancroft algorithm, correct?
12    A.   Yes.
13    Q.   And if one pharmacy interstores
14 oxycodone from another Walgreens pharmacy, that
15 interstoring, Oxy coming from one Walgreens to
16 another, is not run through Walgreens' suspicious
17 order monitoring policy and the Bancroft algorithm,
18 correct?
19    MR. HOUTZ:  Object to form.
20 BY THE WITNESS:
21    A.   Yes, that's right.
22 BY MR. MOUGEY:
23    Q.   So, when I use the term "gap," I mean
24 that Walgreens' system that was designed to

Page 259

1 identify suspicious orders, the foundation of which
2 is the Bancroft algorithm, that's what I'm
3 referring to as a gap.  Okay?
4    A.   I understand what you're saying, but
5 there is more than just what you're saying or
6 implying to the actual system.  So, ultimately the
7 quantity that was interstored is added to the
8 store's inventory, which is part of the algorithm.
9 So, it's not that it never got considered.  It just
10 didn't get run through the system in the beginning
11 and -- but they still had oversight.  Leadership
12 knew about it.
13    Q.   Just not Pharmaceutical Integrity?
14    A.   My team did not, correct.
15    Q.   And your team was the team designed, put
16 together and implemented to oversee the suspicious
17 order monitoring policies and procedures at
18 Walgreens, correct?
19    A.   Exactly, which is why we now do not
20 allow interstores of controlled substances.
21    Q.   And interstoring of controlled
22 substances was shut down, gap closed, in 2013,
23 correct?
24    A.   Yes.

Page 260

1    Q.   Are you aware that stores could be
2 removed from Walgreens' suspicious order monitoring
3 policies if there was a functional reason for them
4 not to be reviewed by Pharmaceutical Integrity?
5    A.   We had the ability to turn on and off
6 certain NDC numbers, but I don't know about a
7 specific store entirely.
8    Q.   I hand you P-WAG-1733.  I hand you what
9 we will mark as Polster 20.
10    MR. MOUGEY:  19?  I'm sorry.  Thank you.
11 Polster 19.
12       (WHEREUPON, a certain document was
13        marked as Walgreens-Polster Exhibit
14        No. 19: 8/26/09 Project Request
15        Estimate; WAGMDL00492067 -
16        00492069.)
17 BY MR. MOUGEY:
18    Q.   August 26, 2009, prior to Pharmaceutical
19 Integrity.
20       The bottom of the first paragraph under
21 "Description," "Rx Services will have the ability
22 to remove items from the order limitation process
23 or to remove an entire store from the order limit
24 program for a limited amount of time."

Page 261

1       Do you agree that that is a potential
2 gap in Walgreens' suspicious order monitoring
3 policies and procedures?
4    A.   Not necessarily.  You don't have enough
5 information to know whether or not it's a gap.
6    Q.   So, taking a store out of the suspicious
7 order monitoring policy, you don't believe that's a
8 gap?
9    A.   You have to understand why the store was
10 taken off.  As I mentioned before, if you have a
11 brand-new store that has no order history, brand
12 new, just opened, you have no information on that,
13 because the whole algorithm is working on previous
14 data, and so if there is no sales at all and then
15 all of a sudden there is product that comes in, you
16 have to be able to generate orders.  If it's
17 generating on zeros, then no orders are going to
18 generate.
19    Q.   So, the answer is to take it off of the
20 system and is there a policy and procedure in place
21 for how long they should stay off the system?
22    A.   I was not around for this time, but it
23 says right here for a limited amount of time.  So,
24 there must have been something, but I'm not aware.

Page 262

1    Q.    And are you aware -- I mean, when you
2  were at Pharmaceutical Integrity, did you have
3  stores that were off the system?
4    A.    We had stores that we had switched to
5  tracking, not off the system, but switched to
6  tracking to watch to make sure that, you know, the
7  orders made sense when they were brand-new stores.
8    Q.    And how long -- did you have policies
9  and procedures --
10   A.    Yeah, we --
11   Q.    Let me finish the question, please.
12   A.    Sorry.
13   Q.    Did you have policies and procedures in
14  place of how long a store should remain on
15  tracking?
16   A.    Yes, we had them in place.
17   Q.    And where were they?
18   A.    Where were what?
19   Q.    Where were the policies and procedures
20  of how long a store can stay on tracking?
21   A.    The team had them.  I don't know if it's
22  on the shared drive.  But I know we spoke about it.
23  I know we put quantity time -- sorry -- time limits
24  in place.  But I don't know where the documents

Page 263

1  are.
2    Q.    Was there criteria -- have you actually
3  seen the policies and procedures that you think
4  might be on the shared drive about how long a store
5  can stay on tracking?
6    A.    I don't remember seeing the actual
7  document.  I remember talking about it in meetings
8  to train my team on what we need to do.
9    Q.    But you don't recall seeing an actual
10  document?
11   A.    I never went to the shared drive.
12   Q.    Or any policies or procedures at all
13  about how long a store can stay on tracking?
14   A.    Correct.
15   Q.    Do you know who Michael Federico is?
16   A.    I would have to see his signature title.
17   Q.    District 293, pharmacy supervisor in
18  Modesto and East Bay.  Does that ring a bell?
19   A.    Yeah.  Yes.
20   Q.    Modesto was kind of -- that was an area
21  that was on you all's radar?
22   A.    That I don't know.  Sorry.
23   Q.    Steven Mills is a member of your group,
24  right?

Page 264

1    A.    Yes.
2    Q.    Was he an analyst or one of the
3  managers?
4    A.    Analyst.
5    Q.    I hand you what we are going to mark as
6  Polster 20, Bates No. 113808.
7            (WHEREUPON, a certain document was
8             marked as Walgreens-Polster Exhibit
9             No. 20:  11/5/12 e-mail string;
10            WAGMDL00113808 - 00113810.)
11  BY MR. MOUGEY:
12   Q.    Let's start at the top of this e-mail
13  dated 11/5/2012 from Murray Jr. Denman.  Did I read
14  that right?
15   A.    Yes.
16   Q.    All right.  And it's to you, correct?
17   A.    Yes.
18   Q.    And Mr. Murray is from inventory
19  management drugstores, correct?
20   A.    Yes.
21   Q.    And he relays to you -- and this is very
22  fresh when you're on the task force for controlled
23  substances at Walgreens, correct?
24   A.    That's right.

Page 265

1    Q.    Right as Pharmaceutical Integrity is
2  being developed, correct?
3    A.    That's correct.
4    Q.    And he relays to you, GFD, which stands
5  for good faith dispensing, correct?
6    A.    Yes.
7    Q.    "For store 2865 in Modesto, California.
8  Let me know if I am overstepping my boundaries by
9  suggesting this course of action.  I am trying to
10  keep some of the burden off of your shoulders until
11  you deem ready.  We'll also need to discuss my
12  team's role in assisting your people.  No need to
13  rush that now, I am comfortable being point for
14  Cardinal."
15          Do you see that?
16   A.    Yes.
17   MS. FIX MEYER:  Objection; form.
18  BY MR. MOUGEY:
19   Q.    So, late 2012, Walgreens has an
20  exclusive contract with Cardinal for distribution
21  services, correct?
22   MR. HOUTZ:  Objection; foundation.
23   MS. FIX MEYER:  Same objection.
24  BY THE WITNESS:

Page 266

1    A.   I don't know if it was exclusive.
2  BY MR. MOUGEY:
3    Q.   How about this.  Are you aware that
4  Walgreens was in a contractual agreement with
5  Walgreens -- I'm sorry -- with Cardinal for
6  distribution services?
7    A.   Yes.
8    Q.   And let's continue down the e-mail that
9  Mr. Mills and yourself sent, the e-mail from
10  Mr. Denman, and he says, "Steve, is this store
11  still on the SOM report?"
12       That's suspicious order monitoring,
13  correct?
14    A.   Yes.
15    Q.   "If so, share with Cardinal, but crop
16  out the last two paragraphs."
17       Do you see that?
18    A.   Yeah.
19    Q.   Now, Cardinal is also a distributor,
20  correct?
21    A.   Yes.
22    MS. FIX MEYER:  Objection; foundation.
23  BY MR. MOUGEY:
24    Q.   Cardinal as a distributor has similar

Page 267

1  obligations and responsibilities to Walgreens,
2  correct?
3    MR. HOUTZ:  Object to form and foundation.
4    MS. FIX MEYER:  Objection; form.
5  BY THE WITNESS:
6    A.   The DEA regulations apply to all
7  distribution centers.
8  BY MR. MOUGEY:
9    Q.   The last sentence says, "Tasha can
10  consult prn."  What does prn stand for?
11    A.   As needed.
12    Q.   Pardon me?
13    A.   As needed.
14    Q.   Okay.  Now, if you turn to the next two
15  pages of this document, Bates No. 09 and 10, and
16  Michael Federico is relaying his findings about
17  visiting store 2865, correct?
18    A.   Yeah.
19    Q.   And let's just walk through each one of
20  these.  I forgot to ask you this.  I apologize.
21       Mr. Murray, what's his title?
22    A.   He's director of pharmacy inventory.
23    Q.   Okay.  And, so, Michael Federico who is
24  the district pharmacy supervisor has visited store

Page 268

1  2865 and he's relaying to Mr. Murray, and let's
2  start under "GFD - Patient ID."
3    A.   Okay.
4    Q.   He relays that all C-II scripts were
5  audited and they had patient addresses written on
6  the hard copy as well as the name, phone number and
7  DOB.  Did I get all that?
8    A.   Yes.
9    Q.   If you read the rest of that paragraph,
10  he is passing along that everything appears to be
11  in compliance, correct?
12    A.   Yes.
13    Q.   And if you go to the next paragraph,
14  "GFD - Prescriber," "Prescriber DEA and state
15  license number were on 100% of the scripts audited.
16  Prescriptions written by out of town prescribers
17  are called on for diagnosis and general
18  validation."
19       Did I read that right?
20    A.   Yes.
21    Q.   And just take your time to review the
22  rest of that paragraph.  And similar to the first
23  paragraph, Mr. Federico was passing along to
24  Mr. Murray that everything appears in order for the

Page 269

1  GFD-prescriber, correct?
2    A.   Yes.
3    Q.   The next section, "GFD - PDMP," that's
4  the state monitoring prescription system, correct?
5    A.   Yes.
6    Q.   And "Pharmacy Manager uses PDMP system
7  extensively to verify out of town scripts, new
8  patients and cash scripts."
9       Similar to the first two paragraphs, he
10  is passing along to Mr. Murray that everything
11  is -- seems to be in order, right?
12    A.   Yes.
13    Q.   And then the next section,
14  "GFD - Documentation," similar to the first three
15  paragraphs, he is relaying that the documentation
16  is in order, correct?
17    A.   Yes.
18    Q.   The next section, "GFD - Notification of
19  the DEA."  "The store is maintaining a log of all
20  scripts sent to the DEA.  They do have scripts they
21  have sent in as well as an explanation of what was
22  sent."
23       And just as the previous few paragraphs,
24  Mr. Federico is passing along to Mr. Murray that

Page 270

1  GFD, good faith dispensing, notification of the
2  DEA, that that's in order, correct?
3     A.   Yes.
4     Q.   Now, the second-to-last paragraph, "This
5  store's average movement."
6        Do you see where I am?
7     A.   Where in the paragraph does it say
8  "average movement"?  Sorry.
9     Q.   It's okay.  It's the very first sentence
10 of the second-to-last paragraph.
11    A.   Oh, I'm sorry.  I was up here.  I look
12 at that as a sentence, not a paragraph down there.
13 So...
14    Q.   "This store's average movement on
15 hydro," has the strength and the combo product, "is
16 17,500 tabs," and that's essentially tablets or
17 dosage units, right?
18    A.   Yes.
19    Q.   "A week put them over the corporate
20 limit."  And that would be Walgreens' corporate
21 limit, correct?
22    A.   Yes.
23    Q.   "This changed their ordering habits with
24 Cardinal, which then led to an SOM with them."

Page 271

1        SOM, suspicious order monitoring,
2  correct?
3     A.   Yes.
4     Q.   "I submitted a report which was approved
5  by WAG but denied by Cardinal.  As such, this
6  location has had a large increase in interstores."
7        And interstores is what you and I were
8  discussing earlier as a potential gap that if a --
9  one Walgreens store needed oxycodone, hydrocodone,
10 it could simply interstore from a store down the
11 street, correct?
12    A.   Yes.  But not without leadership
13 approval.
14    Q.   When you say "leadership," who was
15 leadership?
16    A.   It would have been Michael.
17    Q.   And Michael is where, in which
18 department?
19    A.   Michael -- he is the guy who wrote the
20 e-mail.
21    Q.   "This increase" -- but not from your
22 department that's charged with suspicious order
23 monitoring, right?
24    A.   Right.

Page 272

1     Q.   "This increase in interstores has led to
2  short supplies at other locations in town."
3        Do you see that?
4     A.   Yes.
5     Q.   "We need to get Cardinal back on
6  shipping this location additional controls."
7        Correct?
8     A.   That's what it says.
9     Q.   Now, let's go back to Mr. Denman's
10 e-mail to Mr. Mills copied to you at the bottom of
11 that -- of the first page, Bates No. 08.  Okay?
12 Are you there with me?
13    A.   Yes, yes.
14    Q.   He says, "Is this store still on the SOM
15 report?  If so, share with Cardinal, but crop out
16 the last two paragraphs."
17        So, Walgreens has information that this
18 store is moving 17,500 tabs a week.  Do the math
19 with me.  4 times 17-5 is 70,000.  Do I have that
20 right?
21    A.   Yes.
22    Q.   70,000 tabs a month dosage units of
23 hydrocodone; and hydrocodone, Schedule III that
24 ultimately was Schedule II, correct?

Page 273

1     A.   Yes.
2     Q.   And he is relaying that this store is --
3  this pharmacy is interstoring to the point where it
4  is causing other stores to be out of supply,
5  correct?
6     A.   Yes.
7     Q.   And he suggests the way to fix this is
8  to get Cardinal back shipping to this location
9  again, correct?
10    A.   The way I am reading it is that he is
11 asking we've got to get this information to
12 Cardinal so that they have whatever they need for
13 their due diligence so they resume shipping.
14    Q.   But he says cut out the paragraph where
15 he relays that they're interstoring, correct?
16    A.   Yes.
17    Q.   So, Cardinal, when it's making its
18 decision of whether or not to ship because it's
19 suspicious, he is saying cut that information out
20 and keep Cardinal in the dark, correct?
21    MR. HOUTZ:  Object to form and foundation.
22 BY THE WITNESS:
23    A.   I -- I don't know.
24 BY MR. MOUGEY:

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  Q.   By not telling Cardinal that they're
2  interstoring, he's keeping Cardinal in the dark
3  about that fact, is he not?
4      A.   I don't know what he meant by that, but
5  I don't see where it's Walgreens' place or his
6  place to tell Cardinal to get back shipping on this
7  location to add controls.
8          That's Cardinal's responsibility and
9  their decision as to whether or not they will ship
10 or not ship based on the information that we can
11 give them.
12     Q.   And Walgreens through Mr. Federico is
13 consciously making the decision to cut out
14 important information like interstoring when
15 relaying the results of his visit to Store 2865,
16 correct?
17     MR. HOUTZ:  Object to form, mischaracterizes.
18 BY THE WITNESS:
19     A.   He's saying to cut out the paragraph,
20 yes.
21 BY MR. MOUGEY:
22     Q.   Yes, ma'am.  And keep Cardinal in the
23 dark about the interstoring, correct?
24     MR. HOUTZ:  Object to form.

Page 275

1  BY THE WITNESS:
2      A.   He is saying to cut out the paragraph.
3  BY MR. MOUGEY:
4      Q.   Yes, ma'am.  And keep Cardinal in the
5  dark about the interstoring, correct?
6      A.   I don't think it's keeping Cardinal in
7  the dark.
8      Q.   Cardinal --
9      A.   It's keeping Cardinal, you know -- it's
10 not our place to tell Cardinal to start shipping
11 again.
12     Q.   I'm not asking you if it's your place.
13     A.   I don't agree with you.
14     Q.   What I'm asking you, Ms. Polster, is
15 that Mr. Federico made a conscious decision to
16 exclude material information to Cardinal about this
17 store interstoring from other Walgreens pharmacies,
18 correct?
19     A.   It wasn't --
20     MR. HOUTZ:  Object to form.
21 BY THE WITNESS:
22     A.   It wasn't Michael that said to do it.
23 So, no.
24 BY MR. MOUGEY:

Page 276

1  Q.   You're right.  Thank you.
2      Mr. Murray said cut out the last
3  paragraph and keep Cardinal in the dark about the
4  interstoring, correct?
5      A.   Nowhere does it say to keep Cardinal in
6  the dark.
7      Q.   By cutting out that last paragraph,
8  Cardinal would not have the ability to see the
9  interstoring, correct?
10     MR. HOUTZ:  Object on foundation.
11 BY THE WITNESS:
12     A.   I don't know.
13 BY MR. MOUGEY:
14     Q.   You don't know.  You don't know what
15 Cardinal's visibility is?
16     A.   I don't.
17     Q.   Can you see what CVS is distributing to
18 its own pharmacies?
19     A.   No.
20     Q.   Can you see what Cardinal is
21 distributing to CVS?
22     A.   No.
23     Q.   Do you think that Cardinal can see what
24 this store is interstoring?

Page 277

1  A.   I don't -- I don't know what they can
2  see and what they can't see.
3      Q.   But you think it's entirely appropriate,
4  based on your 36 years at Walgreens starting from
5  when you were in high school until sitting here
6  today, this is the Walgreens you know that says cut
7  out the paragraph about interstoring when telling
8  Cardinal that everything is A-okay from the
9  previous paragraphs?
10     MR. HOUTZ:  Object to form.
11 BY THE WITNESS:
12     A.   I don't agree that we are saying
13 everything is A-okay.  I think we're documenting
14 that they went in and they did their due diligence
15 so Cardinal could have information.
16         Cardinal had every right to go into any
17 store they wanted to go into and audit it and
18 investigate it and, in fact, actually did make site
19 visits.
20 BY MR. MOUGEY:
21     Q.   Find me one thing, one -- one sentence
22 in this letter, this e-mail that is negative about
23 Store 2865 other than the paragraphs that were
24 being cut out?

Page 278

1    A.   I don't even agree that the paragraph
2  that's getting cut out is negative.  What I'm
3  seeing is that the paragraph that was cut out was,
4  hey, we're telling Cardinal we need to get them
5  back on shipping controls.  That is not our place
6  to do that.
7    Q.   I have not asked you whether it's your
8  place to tell Cardinal to ship or not.  What I'm
9  suggesting and what I'm asking, and I think I'm
10  getting a partial answer, is:  Is it appropriate to
11  take out information that Walgreens knows that a
12  store moving 75 -- 70,000 dosage units a month of
13  just hydrocodone and some of that volume is coming
14  from interstoring, getting it from other stores, is
15  that appropriate?
16    A.   I don't --
17    MR. HOUTZ:  Object to form.
18  BY THE WITNESS:
19    A.   You have to know the store and the area
20  and what is around it and is there a surgical
21  center, is there a hospice center.  That's why we
22  have store leaders on the ground.
23  BY MR. MOUGEY:
24    Q.   I didn't ask you --

Page 279

1    A.   That's why they are aware --
2    MR. HOUTZ:  Allow her to finish.
3    MR. MOUGEY:  Relax, Les.  Relax.  Every time
4  I --
5    MR. HOUTZ:  Let her finish an answer.
6    MR. MOUGEY:  Every time -- there hasn't been
7  an issue all day today about anybody interrupting
8  anybody.  If she has an answer, I've stopped.  So
9  just relax.  So --
10    MR. HOUTZ:  Well --
11    MR. MOUGEY:  Go ahead, Les.  What do you want
12  to do now?
13    MR. HOUTZ:  I would like her to have your
14  question and her answer read back to the point
15  where you interrupted her so she can determine if
16  she has anything more to say in response to the
17  question.
18    MR. MOUGEY:  Why don't you read it back for
19  her, Les.  If you want to read it back, go
20  ahead and read Ms. Polster the question and let's
21  find out if her answer -- I didn't even get an
22  answer to the question.
23    MR. HOUTZ:  I will be happy to do that.
24    MR. MOUGEY:  Thank you, Les.

Page 280

1    MR. HOUTZ:  Reading the draft transcript, she
2  had an answer, "I don't -- you have to know the
3  store and the area and what is around it and is
4  there a surgical center, is there a hospice center.
5  That's why we have store leaders on the ground."
6    You then said, "I didn't ask you --"
7    At which point I asked her -- I asked
8  you to let her finish her answer and she started to
9  say, "That's why they are allow --"
10    I don't know where the rest of that
11  answer was going.  But if you have anything more to
12  say, say it.
13  BY THE WITNESS:
14    A.   So, that's why we had the store leaders
15  involved and they had to know about any interstore
16  of a controlled substance so that they could
17  determine if there was an issue that they could --
18  they could -- I'm sorry.  I just lost my train of
19  thought.  But that they could get my team involved
20  so that we could help investigate it, make
21  determinations of quantity limits, et cetera.
22  BY MR. MOUGEY:
23    Q.   Is part of your investigation that's
24  important whether or not a store is interstoring?

Page 281

1    A.   Part of our investigation is the total
2  quantities that goes into the store.  We ultimately
3  shut down, as you know, the interstore because it
4  did muddy the waters and -- but we ultimately
5  always knew the total quantity that went into a
6  location.
7    Q.   So, the answer to my question is yes, it
8  is important to know the quantity that a store is
9  interstoring, correct?
10    A.   It's -- it's important for my team to
11  know.
12    Q.   I understand.  So, the answer to my
13  question is yes, it's important for your team
14  that's charged with implementing Walgreens'
15  suspicious order monitoring policies to know
16  whether or not a store is interstoring, correct?
17    A.   It's important for my team, yes.
18    Q.   Yes, ma'am.  So, the question I asked
19  you about three questions ago was:  Is it
20  appropriate to take out information that Walgreens
21  knows about a store interstoring when passing along
22  the results of an analysis from a store visit?
23    MR. HOUTZ:  Object to form.
24  BY THE WITNESS:

Page 282

1    A.   When passing along to whom?
2  BY MR. MOUGEY:
3    Q.   Cardinal in the context of this e-mail.
4    A.   I don't know what Cardinal used to
5  determine whether or not a store was allowed or not
6  allowed to get controlled substance shipped to
7  them.
8    Q.   I didn't ask you that.  Okay.  I didn't
9  ask you what Cardinal.
10      I said do you think it's appropriate
11  based on your 36 years at Walgreens, you running
12  Pharmaceutical Integrity, is it appropriate for
13  Walgreens to cut out information about a store
14  that's moving 70,000 dosage units of hydrocodone a
15  month that it's interstoring when passing along the
16  results of a store visit to Cardinal?
17    MR. HOUTZ:  Object to form, asked and
18  answered.
19  BY THE WITNESS:
20    A.   You have to know the entire picture of
21  the store.  You have to understand why they would
22  need that quantity.  What's the business model
23  happening at that particular location because every
24  store is different.

Page 283

1  BY MR. MOUGEY:
2    Q.   I didn't ask you if the 70,000 dosage
3  units were appropriate.  I didn't ask you to enter
4  an edict about whether or not what the store was
5  doing was okay.
6      What I've now asked about four or five
7  times and you have yet to answer:  Is it
8  appropriate based on your perspective for Walgreens
9  to cut out information about a store audit when
10  it's moving 70,000 dosage units of hydrocodone a
11  month --
12    MR. HOUTZ:  Object to form.
13  BY MR. MOUGEY:
14    Q.   -- that it is interstoring?
15    A.   I don't know what Cardinal would need to
16  know whether or not it's appropriate or not
17  appropriate.
18    Q.   You and I are talking past each other.
19  I'm not asking you what Cardinal thinks, what
20  Cardinal wants.
21      Would you want to know in your analysis
22  on this store that's moving 70,000 dosage units a
23  month, that it is receiving its inventory via
24  interstoring?  Would you want to know?

Page 284

1    A.   But I did know.
2    Q.   So, the answer to my question is, "Yes,
3  I would like to know"?
4    A.   My team found out when the order
5  quantity gets posted, it gets added to the ultimate
6  inventory into that location.
7    Q.   Yet when passing along the results of
8  the store audit, Walgreens cut the interstoring
9  information out when passing it along to Cardinal
10  to ensure that we could get Cardinal back on
11  shipping to this location, correct?
12    MR. HOUTZ:  Object.
13  BY THE WITNESS:
14    A.   I don't --
15    THE WITNESS:  Sorry.
16    MR. HOUTZ:  Object to form and foundation.
17  BY THE WITNESS:
18    A.   I don't agree with that.
19  BY MR. MOUGEY:
20    Q.   Is the fact the store is
21  intersourcing -- I'm sorry -- interstoring a
22  positive or negative to you?
23    A.   They're taking care of the patients.
24    MR. HOUTZ:  Peter, can we take a quick break

Page 285

1  now?
2    MR. MOUGEY:  Sure.  Do you want to get me an
3  answer from upstairs on whether or not -- I've been
4  asking for five days.
5    MR. HOUTZ:  Downstairs.
6    MR. MOUGEY:  Downstairs, upstairs, wherever.
7    MR. HOUTZ:  I will ask the question.
8    MR. MOUGEY:  Thank you.
9    THE VIDEOGRAPHER:  We are off the record at
10  4:17 p.m.
11      (WHEREUPON, a recess was had
12      from 4:17 to 4:37 p.m.)
13    THE VIDEOGRAPHER:  We are back on the record
14  at 4:37 p.m.
15  BY MR. MOUGEY:
16    Q.   Ms. Polster, I'm going to hand you what
17  we've marked as Polster 21.
18      (WHEREUPON, a certain document was
19      marked as Walgreens-Polster Exhibit
20      No. 21:  9/28/12 e-mail with
21      attachment; WAGMDL00113816 -
22      00113820.)
23  BY MR. MOUGEY:
24    Q.   You're familiar with Walgreens' Focus on

Page 286

1 Profit initiative, correct?
2     A.   Focus on Compliance?
3     Q.   No.  I think I said Focus on Profit.
4     A.   I don't know what that is.
5     Q.   You never heard of that?
6     A.   No.
7     Q.   So, you're not familiar with Walgreens'
8 Focus on Profit that morphed or changed into Focus
9 on Compliance?
10    A.   No.
11    Q.   Would you agree with me those are two
12 separate things, right, focusing on profit and
13 focusing on compliance?
14    A.   I guess it would -- it would -- you
15 would need to give me more context around it.  But,
16 yeah, the words mean two different things to me.
17    Q.   Sometimes to do things that are
18 compliant with rules and regulations means
19 sacrificing some profit on occasion, correct?
20    A.   Sometimes putting things in place
21 does -- like system enhancements or whatever does
22 cost money to do that.  So, yes.
23    Q.   But you are familiar with Focus on
24 Compliance?

Page 287

1     A.   Yes.
2     Q.   And what do you understand Focus on
3 Compliance was?
4     A.   I knew that there was a -- I don't even
5 know who developed this, but it was a way for us to
6 have compliance checks at store level to ensure
7 that -- and we would -- the stores would have to
8 answer a series of questions, and then we would be
9 able to get the aggregated data at the support
10 center.
11    Q.   What was your capacity when you received
12 this e-mail from Mike Umbleby in September 28,
13 2012?
14    A.   I was the director of pharmacy
15 operations optimization.  This is right when the
16 task force started.
17    Q.   Right around the same time period?
18    A.   Yes.
19    Q.   And the attachment is titled
20 "FOC Survey - June 2012."  Right?
21    A.   Yes.
22    Q.   So, do you recall how stores would fill
23 this out, meaning was it a paper form?  Was it
24 online where someone filled it out?  Was it pdf?

Page 288

1     A.   This looks to me like it's a web form.
2     Q.   Okay.
3     A.   And they would click on the link and
4 then fill in the -- either the bubble or the free
5 form type in the boxes.
6     Q.   Do you know who at the store was
7 required to fill it out?
8     A.   I haven't -- I don't know.  I mean, when
9 we send it out, it's generally the pharmacy
10 manager.
11    Q.   Generally the pharmacy manager.  And do
12 you understand Focus on Compliance, compliance with
13 what?
14    A.   My understanding was loss prevention had
15 many Focus on Compliance.  So, it depended on what
16 the topic was during that -- I can't remember if it
17 was quarterly or every other month, they would send
18 out a Focus on Compliance and the topics changed.
19    Q.   Was there always a form for the
20 pharmacies to fill out?
21    A.   As far as I know.
22    Q.   So, there were different forms that went
23 to the pharmacies from loss prevention asking them
24 to fill out or gather certain information?

Page 289

1     A.   And it wasn't always pharmacy.
2 Sometimes it could have been front of store too.
3     Q.   Okay.  Do you have an independent
4 recollection that there was more than one time that
5 loss prevention asked pharmacies to fill out or
6 pull information in relation to their dispensing
7 practices?
8     A.   We -- I didn't know about this until I
9 was on the task force, but since -- since that
10 date, I have worked with loss prevention to send
11 out Focus on Compliance for different things
12 around, you know, controlled substance dispensing,
13 following of policies, et cetera.
14    Q.   Let's walk through this form, if you
15 would be so kind.
16         So, on Bates No. 113816, and I'm now on
17 page 17 of the doc, which is the second page.  The
18 initial box, "Focus on Compliance, Store
19 Information," is just the routine, is this the
20 market, the district, the store, the month or the
21 date that they visited the store.
22         Does that tell you, give you some
23 information about who might have filled this out
24 when asked to fill it out?

Page 290

1    A.   It might have been the loss prevention
2  manager that filled it out, not the pharmacy
3  manager.
4    Q.   So, it asks, "Is this a 24-hour
5  location?"
6         And why is that important, Ms. Polster?
7    A.   Generally a 24-hour location was placed
8  near a hospital and so any emergency room patient
9  that was discharged would, you know, likely go to a
10 24-hour pharmacy to get their prescription filled.
11   Q.   Now, would that be important information
12 in your job, in Pharmaceutical Integrity, whether
13 it's a 24-hour store, when deciding whether or not
14 Walgreens was fulfilling its responsibilities as a
15 distributor?
16   A.   It would -- it would be a consideration.
17 It would make sense as to why the volume was
18 different than a store that was doing 100
19 prescriptions per day.
20   Q.   Now, we started off with that Ven
21 diagram, my real fancy diagram, this morning with
22 dispensing and distributor.
23   A.   On the yellow piece of paper.
24   Q.   Yes exactly.  I think it's Exhibit 3?

Page 291

1    A.   Yes.
2    Q.   And that you agreed with me that the
3  diversion circle overlapped with both dispensing
4  and distributor, correct?
5    A.   Yes.
6    Q.   And you'd agree that often information
7  could be used by Pharmaceutical Integrity with --
8  to ensure that Walgreens is complying with its
9  dispensing obligations, correct?
10   A.   I didn't understand your question.
11   Q.   Information that you use in this circle
12 with the pharmacy, that was information that you
13 used to ensure that Walgreens was complying with
14 its dispensing obligations --
15   A.   Yes.
16   Q.   -- correct?
17   A.   Yes.
18   Q.   And often that same information could
19 also be used if -- when analyzing whether or not
20 Walgreens as a distributor was complying with its
21 obligations under the federal code and regs,
22 correct?
23   A.   Yes.
24   Q.   So, often that information could be used

Page 292

1  to -- when analyzing dispensing and when analyzing
2  suspicious orders as a distributor, correct?
3    A.   Yes.
4    Q.   All right.  So, one example just might
5  be the simple 24-hour location, correct?
6    A.   Yes.
7    Q.   Because the next question is the average
8  number of prescriptions filled per day, and the
9  24-hour location gives context, correct?
10   A.   Yes.
11   Q.   And context both in the dispensing and
12 in the distributor, correct?
13   A.   Yes.
14   Q.   So, when we are looking at that little
15 circle of diversion, that's just a very elementary
16 example meaning the 24-hour location that could be
17 used for both, right?
18   A.   Yes.
19   Q.   And I say "both," I mean dispensing and
20 distributor, correct?
21   A.   Yes.
22   Q.   All right.  So, as this goes on, "Please
23 list the hospitals and pain management clinics from
24 which the store routinely receives prescriptions."

Page 293

1         And would your answer be the same under
2  5 that that's information that could be used for
3  both dispensing and distributor responsibilities?
4    A.   Yes.
5    Q.   And No. 6, "What are the names and DEA
6  numbers of the top 3 prescribers of controlled
7  substance medications for this store?"
8         And that also was information that you
9  would use in Pharmaceutical Integrity to analyze
10 both dispensing and distributor, correct?
11   A.   Yes.
12   Q.   And 7, "Is the pharmacist aware of any
13 increase in pain management prescriptions coming
14 into the store?"
15        And that answer would also be helpful
16 when analyzing Walgreens' responsibility as both a
17 dispenser and a distributor, right?
18   A.   Yes.
19   Q.   8, "When a prescriber is contacted
20 regarding a pain management prescription, is the
21 interaction annotated in IntercomPlus or documented
22 on the prescription hard copy?"
23        That too, No. 8, is information that
24 would be helpful for both dispensing and

Page 294

1  distributing from a Pharmaceutical Integrity
2  perspective, correct?
3      A.   Yes.
4      Q.   All right.  9, "Has the pharmacist seen
5  a lot of pain management prescriptions from
6  prescribers who practice in a different state?"
7          Same answer, right?  That information is
8  helpful in analyzing Walgreens' responsibilities as
9  a dispenser and as a distributor, correct?
10     A.   Yes.
11     Q.   No. 10, "Has the pharmacist seen a lot
12 of patients with pain management prescriptions who
13 reside in a different state?"
14         And that just like the previous 9,
15 helpful for both analyzing Walgreens as a dispenser
16 and Walgreens as a distributor, correct?
17     A.   Yes.
18     Q.   So, the next, No. 11, "Access the
19 52-week report in LPxRx report in LPD."
20         So, can you help me with what those
21 acronyms stand for?
22     A.   Sure.  The LPD is the loss prevention
23 dashboard.
24         The LPxRx, I don't know what LP -- I

Page 295

1  don't know what the Px stands for, but the premise
2  of the report showed the pharmacy manager or store
3  leadership, whether it was the store manager or the
4  loss prevention manager, if there was any drug that
5  had excessive negative adjustments would need
6  to be looked into and investigated at store level.
7      Q.   And when you say "the loss prevention
8  dashboard," how are you familiar with the loss
9  prevention dashboard?
10     A.   Right when I was leaving field
11 leadership, it was just starting to come out or
12 version 1 was starting to come out and so I used it
13 as a tool when I had stores to supervise.
14     Q.   Tell me, when you say "a tool," what
15 kind of tools were on there that you used?
16     A.   So, it would show controlled substances
17 and whether or not they were negative adjusted.
18 So, it would give -- give me where to look to see
19 if it didn't -- if those negative adjustments
20 didn't make sense or whatever was going on, that we
21 could investigate it further.
22     Q.   Okay.  Any other things that you --
23 information you can remember on the LP dashboard?
24     A.   No.

Page 296

1      Q.   Just negative adjustments?
2      A.   That's all I recall.
3      Q.   Okay.
4      A.   From the version I used.
5      Q.   Yes, ma'am.  Now, there were different
6  versions?
7      A.   (Nodding head.)
8      Q.   Could you opt in?  How did you know
9  there were different versions?
10     A.   I just know over the course of the years
11 they moved things or, you know, added more
12 information.  But when I used it, it was strictly
13 negative adjustments.
14     Q.   Do you believe that loss prevention had
15 a role in Walgreens' suspicious order monitoring
16 policies prior to Pharmaceutical Integrity?
17     A.   I don't know.
18     Q.   You don't know?
19     A.   Uh-uh.
20     Q.   Did -- when you came in, you kind of
21 analyzed who was doing what, right?
22     A.   They were part of the meetings.
23     Q.   Right.
24     A.   But I didn't know what their exact role

Page 297

1  was.
2      Q.   But did you ask them, "What have you
3  guys been doing for" --
4      A.   I didn't.
5      Q.   You don't remember that being discussed
6  at all?
7      A.   I got to tell you, man, we just rolled
8  up our sleeves and got busy.  I did not ask what
9  exactly they were doing.
10     Q.   All right.  No. 12 -- I'm sorry.  We are
11 still on 11, "Does oxycodone 15 milligram or Oxy
12 30 milligram appear on the LxRx report?" (As read.)
13         And the -- I apologize.  I was trying to
14 follow you.  But the LxRx (sic), was that something
15 different than negative adjustments?
16     A.   That would be the report that showed up
17 on the dashboard that would show the negative
18 adjustments.
19     Q.   Okay.  And, again, that information,
20 similar to the previous ten, would be helpful from
21 both a dispensing and a distributor analysis,
22 correct?
23     A.   Yes.
24     Q.   All right.  So then 12.  What's WIC

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 stand for?
2  A.  Walgreens item code.
3  Q.  Okay.  "Click on the Walgreens item code
4 to view the 52-week information on the bottom of
5 the screen.  Please enter the total 52-week net
6 adjustments and overbuys for oxycodone 15 milligram
7 and oxycodone 30 milligram (using (-) to indicate a
8 negative adjustment)."
9      Correct?
10  A.  Yes.
11  Q.  And -- now, bear with me here.
12     The WIC where you click on it, was that
13 a link?
14  A.  Yes.
15  Q.  Was it common when -- at Walgreens that
16 if you wanted to look at data or look at charts or
17 graphs, that there were links that you went to?
18  A.  If you were on a dashboard that we
19 were -- that we built at the support center, we
20 tried to take work out of the store so if they
21 wanted to see something, they could click on a link
22 and drill in further versus having to manually type
23 out the ten digits of the NDC number or the
24 six-digit Walgreens item code.

Page 299

1  Q.  So, there were -- you also got reports
2 that you asked for, right?  Maybe it was just
3 combining data or looking at charts or graphs or
4 something along those lines, right?
5  A.  When you say "you," you mean the store
6 personnel?
7  Q.  No, I mean -- I just mean whatever you
8 have knowledge of.  You, Tasha Polster.
9  A.  Well, there were various tools that were
10 developed, and obviously they changed over the
11 course of the years.  And this was one of the tools
12 and, yes, it did have a link and you could drill
13 in.
14  Q.  But what I'm -- I think my questions are
15 just not very artful.
16     What I'm trying to understand is that
17 there were links and dashboards that you could
18 click and drill down, right?
19  A.  Yes.
20  Q.  And that was fairly common at Walgreens,
21 right?
22  A.  I would say it was just becoming common
23 at Walgreens.
24  Q.  Okay.  The other way to look at data or

Page 300

1 information compiled, you might ask for someone to
2 send you a chart or a graph or a report comprised
3 of the underlying data.  Is that fair?
4  A.  The only other way that I knew how to
5 get to the data that you're referencing is the
6 52-week item movement which you could go into SIMS
7 to look at.
8  Q.  I'm just -- I'm just -- I'm very
9 30,000-foot.
10  A.  Okay.
11  Q.  I'm not asking about anything specific.
12  A.  Okay.
13  Q.  I'm just trying to understand --
14  A.  Yeah.
15  Q.  -- how you gathered information if you
16 wanted to look at something.  Not in the context of
17 12, but just generally.
18  A.  So, at store level.
19  Q.  Right.
20  A.  There was a dashboard that had various
21 KPIs and this was one of them.
22  Q.  Okay.
23  A.  One of the KPIs.
24  Q.  And KPI is again?

Page 301

1  A.  Key performance indicator.
2  Q.  Okay.  So, there were different kinds of
3 dashboards throughout Walgreens.  Is that fair?
4  A.  Yes.
5  Q.  So, loss prevention you mentioned had a
6 dashboard?
7  A.  Yes.
8  Q.  We mentioned the gentleman, I can't
9 remember his name, earlier this morning that used
10 Tableau as a dashboard, correct?
11  A.  Yes, but that was not at store level.
12  Q.  I understand.  I'm just talking about
13 Walgreens.
14  A.  Yeah.
15  Q.  I'm trying to understand.
16  A.  Got it.
17  Q.  We got Tableau.  We have dashboards at
18 the store level, correct?
19  A.  Yes.
20  Q.  We have dashboards at loss prevention,
21 correct?
22  A.  Yes.
23  Q.  And you even had access to some links or
24 dashboards on your computer in various capacities,

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 right?
2    A.   Yes.
3    Q.   And the same thing is true with
4 Pharmaceutical Integrity is that there were some
5 dashboards and links to gather some information,
6 right?
7    A.   Yes.
8    Q.   And then that there was also automated
9 reports being generated, correct?
10    A.   I'm sure there were automated reports.
11    Q.   Okay.  But if you wanted a report with
12 specific data, you could ask someone to run a
13 specific query and someone could pull the data for
14 you, correct?
15    A.   Yes.
16    Q.   All right.  So, I guess what I'm trying
17 to get to is that there were numerous ways to
18 gather and organize data at Walgreens other than
19 just a report?
20    A.   Yes.
21    Q.   Meaning the dashboards?
22    A.   Right.
23    Q.   And the links, correct?
24    A.   Yes.

Page 303

1    Q.   So, 13, "Has the pharmacy staff observed
2 any individuals dropping off pain management
3 prescriptions for multiple patients?"
4         Again, that is information that's
5 helpful to when analyzing Walgreens'
6 responsibilities as both a dispenser and a
7 distributor, correct?
8    A.   Yes.
9    Q.   And let's just kind of go through these
10 maybe a few at a time to make it a little quicker.
11         So, 14, I'm going to ask the same
12 questions, and you just tell me -- standing
13 question.  You just tell me yes or no.
14         "Does the state have a prescription drug
15 monitoring program?"
16         That's helpful for both dispensing and
17 distributor, right?
18    A.   I think it's helpful for dispensing.
19    Q.   All right.  How about 15, "Does the
20 pharmacy" -- "the pharmacist on duty have access to
21 the state's prescription drug monitoring program
22 website?"
23    A.   For dispensing.
24    Q.   Okay.  "When does the pharmacist use the

Page 304

1 state prescription drug monitoring program?"
2         And you think that's for dispensing as
3 well?
4    A.   Yes.
5    Q.   So, check for photo IDs is 18.  19, for
6 controlled substance.  Those are predominantly
7 dispensing, correct?
8    A.   Yes.
9    Q.   Now, if we go to DEA notification, 22,
10 "Is the DEA notified within two business days of
11 any forged or altered controlled substance
12 prescription?"
13         Do you see that?
14    A.   Yes.
15    Q.   And that's helpful for both dispensing
16 and distributor, correct?
17    A.   Yes.
18    Q.   All right.  Same thing for 23, correct?
19    A.   Yes.
20    Q.   And 24?
21    A.   Yes.
22    Q.   And 25?
23    A.   Yes.
24    Q.   And how about 26?

Page 305

1    A.   Yes.  Well, I don't know if it's about
2 distributor or dispensing, but I think from a
3 support center and a loss prevention point of view,
4 we need to understand, you know, are the
5 pharmacists scared.
6    Q.   Most -- there is a lot of pharmacists
7 that aren't big 6 foot 3, 230 pounds guys like me
8 and look a little more like you behind the counter,
9 and that's a safety issue, correct?
10    A.   They could feel --
11    Q.   Threatened?
12    A.   -- threatened, yes.
13    Q.   So, were the results of this survey
14 compiled somewhere and did you actually see the
15 results?
16    A.   I did not.
17    Q.   Never saw them?
18    A.   No.
19    Q.   So, we're 9/28/2012.  This isn't
20 something that your task force used trying to make
21 some decisions?
22    A.   No.  I knew that we sent it out, but I
23 don't recall going through all of the answers.  My
24 understanding was the answers went to loss

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 prevention guy.
2    Q.   All right.  But you don't know what
3 happened to it?
4    A.   Right.
5    Q.   But the loss prevention team or group
6 had representation on the task force, correct?
7    A.   Yes.
8    Q.   So, they may very well have reviewed the
9 results as part of the task force.  You're just not
10 sure?
11    A.   Correct.
12    Q.   I hand you P-WAG-2111, Bates No. 674623.
13 I just wanted to see if you knew what that was.
14       (WHEREUPON, a certain document was
15        marked as Walgreens-Polster Exhibit
16        No. 22:  Document, "MartinB,
17        Threshold Violations-Monthly";
18        WAGMDL00674623.)
19 BY MR. MOUGEY:
20    Q.   Have you seen that report or a similar
21 report to this?
22    A.   No.
23    Q.   Never have seen this?
24    A.   No.  I mean, the font and the columns

Page 307

1 indicate it came from SIMS, but I've never seen
2 this report.
3    Q.   The font and the columns, the way the
4 report is structured I guess?
5    A.   Right.
6    Q.   Do you see in the upper right-hand side
7 "Suspicious Order"?
8    A.   Yes.
9    Q.   And do you see the "Rsn Cd"?  I'm
10 interpreting that as reason code.  Do you know?
11    A.   I don't know, but that makes sense.
12    Q.   Do you recognize the T?
13    A.   No.
14    Q.   Are you familiar with what an override
15 report is?  Override form?  Sorry.
16    A.   Not in context to this.
17    Q.   No.  I'm sorry.
18    A.   My override --
19    Q.   Something totally different.  Override.
20       You understand what the override form
21 is, right?
22    A.   I understand what an override is, but
23 which override form are you talking about?
24    Q.   I'll pull it out in a minute.

Page 308

1       You have never seen something like this
2 before?
3    A.   I have not.
4    Q.   I hand you what we are going to mark as
5 Polster 23.  It's P-WAG-2637, Bates No. 673894.
6       (WHEREUPON, a certain document was
7        marked as Walgreens-Polster Exhibit
8        No. 23:  Spreadsheet;
9        WAGMDL00673894.)
10 BY THE WITNESS:
11    A.   Okay.
12 BY MR. MOUGEY:
13    Q.   Can you read it?  Is it big enough for
14 you to read?
15    A.   I can -- if I struggle, I can read it.
16    Q.   Okay.  Because I have a larger copy
17 here.
18    A.   No, I'm good.
19    Q.   I don't understand what this is.  And do
20 you recognize this report?
21    A.   No.
22    Q.   Let's just go through.  It appears like
23 it's Excel, right?
24    A.   Yes.

Page 309

1    Q.   So, "Location Type," under A, "S."  Do
2 you have any idea?
3    A.   I'm assuming store.
4    Q.   All right.  "Location Number," and those
5 numbers appear to comport with what Walgreens uses
6 for store numbers, right?
7    A.   Correct.
8    Q.   And then "Item Number"?
9    A.   That's the WIC.
10    Q.   Okay.  And then "Order Number"?
11    A.   Yes.
12    Q.   And "Order Number" is an internal number
13 within Walgreens indicating just a way to find a
14 particular order?
15    A.   Yeah, when an order is generated, it
16 would -- a number correlates with it, and you can
17 find it in SIMS.
18    Q.   "Order Type," I'm seeing Rs?
19    A.   Yeah, I don't know what that means.
20    Q.   You don't know.  Okay.
21       "Line Number."  Don't know?
22    A.   No.
23    Q.   Okay.  And "Product Identifier"?
24    A.   That looks like an NDC number to me

Page 310

1  without the dashes.
2      Q.   An NDC code without the dashes.  Okay.
3          And then we see an item -- I don't know
4  what that stands for.  M?
5      A.   Oh, mylar.
6      Q.   Mylar.  What's mylar mean?
7      A.   At store level, when you have product on
8  the shelf, you have a mylar that corresponds with
9  the item that has the WIC number, the NDC -- the
10  NDC number --
11     Q.   Okay.
12     A.   -- and where the product came from or
13  could come from.
14         So, there are some items that the
15  Walgreens DC didn't carry and the mylar would
16  indicate whether or not it was only an item that
17  you could get from a wholesaler or if you could get
18  it from the Walgreens DC.
19     Q.   Okay.  So, "Sales Category Y Code."  I'm
20  in column J.  It says "RX"?
21     A.   Yes.
22     Q.   Means a pharmacy, right?
23     A.   Right.
24     Q.   And then "Control DL Drug Class"?

Page 311

1      A.   Yeah, that's -- I don't know if that --
2  no, I think it just says "Control Drug Class."  I
3  think the ROL is the second line there.
4      Q.   Okay.
5      A.   But that just means is it a C-II, III,
6  IV or V.
7      Q.   So, you can see there in lines 3 and 4
8  with oxycodone 15 milligram tablets, that's
9  Schedule II, right?
10     A.   Yes.
11     Q.   All right.  Then L.  Do you have an
12  understanding of what L is?
13     A.   I know what a planogram is, but I don't
14  know what it makes sense to this report.  I guess
15  that it was in the pharmacy, but I don't know.
16     Q.   Okay.  M, the established delivery date?
17     A.   I don't know.
18     Q.   Does that date make sense to you under
19  M?
20     A.   No.  That's why I was saying I don't
21  know because it doesn't make sense.
22     Q.   Have you ever heard of a Julian date?
23     A.   No.
24     Q.   No?  That date looks like it has an

Page 312

1  extra digit, correct?
2      A.   On which side?
3      Q.   I don't know.
4      A.   I don't know.  Sorry.
5      Q.   M, N and O all appear to have an extra
6  digit, correct?
7      A.   Yeah.
8      Q.   And they all refer to a date but they
9  all seem to have an extra number in them, right?
10     A.   Yes.
11     Q.   And you don't know exactly what's extra?
12     A.   Right.
13     Q.   Okay.  So, you don't know either?
14     A.   No.
15     Q.   P, "Suggested Order Quantity"?
16     A.   Yes.
17     Q.   Do you understand what that's
18  referencing?
19     A.   Yes.
20     Q.   What is that?
21     A.   So, based on the volume of the store and
22  what they were dispensing, the suggested order
23  quantity by the system was 13.
24     Q.   Okay.  And that correlates with the NDC

Page 313

1  code for that store?
2      A.   Yes.
3      Q.   And then Q is "Tolerance Limit
4  Quantity"?
5      A.   Which was the maximum number of bottles
6  that could be shipped at any one time to that
7  location set by the algorithm that Wayne built.
8      Q.   Make sure I understand.  P with 13 is
9  the total number of orders for any given month, and
10  Q is the number of --
11     A.   I don't think given month.
12     Q.   Okay.
13     A.   I don't know the time frame on that for
14  sure.  But for that particular order, 13 was the
15  suggested order.  So, I don't know if that's by
16  week or by month.
17     Q.   Okay.  But does it seem odd to you that
18  the suggested quantity order quantity is higher
19  than the tolerance limit quantity?
20     A.   No, not necessarily.
21     Q.   Tell me why.
22     A.   Because when Steve built the -- sorry.
23  When Wayne built the tool and made all the tweaks
24  and the linear regression is we are trying to

Page 314

1 normalize by peer, it is possible that the system
2 would generate an order that was larger than that
3 because, you know, they may have used all the
4 tablets that they had in stock and so the system
5 was trying to order more so they would stay in
6 stock for the patients that were coming in.
7     As the linear regression tool started
8 being used and we started using the ceilings and
9 the tolerances, you know, we were trying to
10 normalize.  So, it doesn't surprise me that the
11 suggested order quantity would be different than
12 the tolerance.
13     Q.   And then R appears to be the difference
14 between P and Q?
15     A.   Yes.
16     Q.   And then S is "Order Quantity."
17     A.   Yes.
18     Q.   Now, I don't understand S and T.
19     T appears to be "Adjusted Order
20 Quantity," does it not?
21     A.   It says that, but I don't know where
22 that number came from unless at store level
23 somebody tried to order 14 bottles instead of the
24 13 that the order suggested.

Page 315

1     Q.   Do you know what the -- I asked you
2 earlier about an override form, right?
3     A.   Yeah.
4     Q.   So, the override form is on Walgreens
5 intranet, correct?
6     A.   Correct.
7     Q.   And the pharmacist will fill it out,
8 correct?
9     A.   Yes.
10     Q.   And someone from your group reviews the
11 override form?
12     A.   After it goes to store leadership and
13 then district leadership, then it would come to my
14 team to review.
15     Q.   Okay.  And were the results of the
16 override form compiled and stored anywhere?
17     A.   Yes.
18     Q.   Where?
19     A.   It's stored -- my team has access to
20 those.  I don't remember how long they're kept.
21     Q.   Okay.
22     A.   But we did keep them.
23     Q.   And that would include the reason for
24 the override?

Page 316

1     A.   If the override form was filled out,
2 yes.
3     Q.   Okay.  And it should have been filled
4 out, right?
5     A.   Well, I don't know the date on this
6 report.  Do you have a date?
7     Q.   We're just talking about override.
8 Generally override.  I'm just trying to understand
9 the override.
10     A.   Okay, yes.
11     Q.   The rationale for the override should be
12 in the form?
13     A.   Yes.
14     Q.   Correct?
15     A.   Yes.
16     Q.   And it should be recorded, correct?
17     A.   Yes.
18     Q.   And if you wanted to, Tasha Polster,
19 director of Pharmaceutical Integrity, wanted to
20 look and see how many times a store had received an
21 override, could you do that?
22     A.   Yes.
23     Q.   And could you look at the reasons why
24 the store had received an override?

Page 317

1     A.   Yes, I'd have my team pull it up.
2     Q.   But you're not certain how far back that
3 goes?
4     A.   I can't remember.  Sorry.
5     Q.   Okay.  So, as we go across this page,
6 "Adjusted User."  Any of those names ring a bell in
7 U?
8     A.   I don't know.  No, I don't -- none of
9 those names are anybody that was on my team.
10     Q.   And V, "Adjusted Date."  Again,
11 that's -- seems to have an extra digit in it,
12 right?
13     A.   Yes.
14     Q.   So, W, "Average Ordering Frequency."  Do
15 you see that?
16     A.   Yep.
17     Q.   Now, did your group use frequency?
18     A.   I -- I don't -- I mean, I don't know if
19 that's for sure what this means in terms of when I
20 look at that, I'm thinking order frequency for a
21 C-II is once a week.
22     Q.   So, is it okay if I -- if I tell
23 Walgreens counsel when it tells me that all the
24 answers are right here in all these reports and I

Page 318

1 can tell them I just sat here with Tasha Polster
2 for an hour and looked at this and she can't tell
3 what this is either? Because between the two of us
4 sitting here you don't know what this is, do you?
5 A. Right, correct.
6 Q. I don't know either.
7 A. Correct.
8 Q. It says, "Analysis data for Wayne.xls"
9 on top, right?
10 A. Yes.
11 Q. That doesn't really help me much. Does
12 it help you?
13 A. No.
14 Q. "Multiple items as suspicious" or "susp"
15 on the bottom. Does that tell you anything?
16 MR. HOUTZ: Object to form and foundation on
17 that.
18 BY THE WITNESS:
19 A. I don't know what it meant.
20 BY MR. MOUGEY:
21 Q. So, as we continue across this page, the
22 "Suspicious Reason Code." Do you see the T?
23 A. Where it says "Adjusted Order Quantity"?
24 Q. Yes, ma'am.

Page 319

1 A. Yes.
2 Q. Under the Z column.
3 A. Yes.
4 Q. That's why I was asking you earlier
5 about the T on that report that we looked at, the
6 last exhibit that we reviewed.
7 A. 22.
8 Q. Bates -- yes, ma'am. Bates No. 23 has
9 reason code T, and this has a reason code T.
10 A. Okay.
11 Q. But sitting here today, either of those
12 two documents, you don't know what that means
13 either?
14 A. No.
15 Q. And then it has -- as we continue to go
16 across, "District Location Type," just has "D." Do
17 you know what that means?
18 A. No. I mean, not exactly, no.
19 Q. Even generally?
20 A. I would assume that it just means it's
21 the district and then the next digit is the
22 district number.
23 Q. Okay.
24 A. The next column I mean. Sorry.

Page 320

1 Q. Is Walgreens is organized into
2 districts, right?
3 A. Yes.
4 Q. So, that might be that makes sense.
5 Then "Total Observations" for AC. Do
6 you know what that is?
7 A. No.
8 Q. Me either. "Calculation Sample Mean"
9 under AD, any idea?
10 A. No.
11 Q. Next one, "Standard Deviation," do you
12 know what that -- I know what standard deviation
13 is. I'm sure you do too. But do you know what
14 it's referencing? Standard deviation of what?
15 A. No.
16 Q. And the k-value. Any idea what that's
17 referencing?
18 A. All of those terms, I know that I have
19 heard Wayne use those as part of his complicated
20 algorithm.
21 Q. Right. So, looking at this, you really
22 can't give me much more direction than what I have
23 got?
24 A. Right.

Page 321

1 Q. You and I can't even figure out the
2 dates looking at this, right? We can't even tell
3 between the two of us what dates this applies to?
4 A. Right.
5 Q. I will hand you Bates No. 783520,
6 P-WAG-83. Mark as Polster 24.
7 (WHEREUPON, a certain document was
8 marked as Walgreens-Polster Exhibit
9 No. 24: 1/21/13 e-mail string;
10 CAH_MDL2804_00783520 - 00783522.)
11 BY MR. MOUGEY:
12 Q. The date of this e-mail is 1/21/2013.
13 Do you see that?
14 A. Yes.
15 Q. And this appears to be an internal
16 Cardinal e-mail. Do you see that, at the top?
17 A. Yes.
18 Q. Do you see the e-mail, the domain
19 exchanges?
20 A. Yes.
21 Q. And I just wanted to see if you had an
22 understanding of what some of the vernacular was.
23 As part of your job you were -- you
24 understood that some of the pharmacies were also

Page 322

1 entering orders obviously with Cardinal, correct?
2    A.   Yes.
3    MS. FIX MEYER:  Objection; foundation.
4 BY MR. MOUGEY:
5    Q.   And would you as part of Pharmaceutical
6 Integrity also take into consideration what stores
7 were -- what stores were ordering from Cardinal or
8 other third-party vendors?
9    MS. FIX MEYER:  Objection; form.
10 BY THE WITNESS:
11    A.   We would get that information when the
12 order was posted.
13 BY MR. MOUGEY:
14    Q.   Yes, ma'am.  But that was -- you took
15 that into consideration when analyzing a store's
16 compliance -- well, let me do that another way.
17        Walgreens as a pharmacy had visibility
18 into both what it was distributing to its own
19 stores and third-party vendors, correct?
20    A.   Yes.
21    Q.   And would you consider both what
22 Walgreens was distributing to your pharmacies as
23 well as third-party vendors when performing your
24 duties in Pharmaceutical Integrity?

Page 323

1    A.   Yes.
2    Q.   All right.  So, I just really want to
3 have an understanding.  You see the subject line
4 where it references Walgreens Co.?
5    A.   With the DEA number?
6    Q.   Yes, ma'am.
7    A.   Yes.
8    Q.   So, the last paragraph in the top part
9 of this e-mail says, "We do currently send a report
10 to all stores who reached 75% of their accrual."
11    A.   Yes.
12    Q.   Do you understand what accrual means?
13    MS. FIX MEYER:  Objection.
14 BY THE WITNESS:
15    A.   It meant the amount that Cardinal
16 shipped into any one location for any one NDC
17 number.  I don't know what the -- their actual
18 number was.  No wholesaler will give you the actual
19 number.  But Cardinal did allow us to know if the
20 store was approaching the limit on their end and
21 helped us to communicate to the stores if the store
22 was reaching the maximum amount that they were
23 allotted during that time frame.
24 BY MR. MOUGEY:

Page 324

1    Q.   When you said they sent it to you, do
2 you mean you meaning Pharmaceutical Integrity or
3 they sent it to each store?
4    MS. FIX MEYER:  Objection; foundation.
5 BY THE WITNESS:
6    A.   It ultimately ended up on the invoice.
7 Some type of notation.  I don't remember the actual
8 language.  But to help us communicate to the stores
9 when they were reaching their limit.
10 BY MR. MOUGEY:
11    Q.   So, do you see any potential problems
12 with Cardinal informing stores that they were
13 nearing 75% of their accrual?
14    MS. FIX MEYER:  Objection; form, foundation,
15 misstates.
16 BY THE WITNESS:
17    A.   No.
18 BY MR. MOUGEY:
19    Q.   No issue at all?
20    A.   No.
21    Q.   So, the report says, "We do currently
22 send a report of all stores who reached 75% of
23 their accrual."
24        Do you see that?

Page 325

1    A.   Yes.
2    Q.   Walgreens was aware that Cardinal was
3 sending 75% accruals to all stores?
4    MS. FIX MEYER:  Objection; form, foundation.
5 BY THE WITNESS:
6    A.   Yes.
7 BY MR. MOUGEY:
8    Q.   Did you in Pharmaceutical Integrity know
9 that Cardinal was sending reports alerting stores
10 that they had reached 75% of their accrual?
11    MS. FIX MEYER:  Objection; form, foundation,
12 misstates the document.
13 BY THE WITNESS:
14    A.   As part of the integrity team we were
15 learning as we were going obviously.  I knew that a
16 report was being sent.  I don't recall whether or
17 not it was being sent originally to my team or --
18 well, I mean, it wasn't sent originally to my team.
19 It must have sent somewhere else.
20        But the whole point of how we were
21 trying to communicate to the stores so they could
22 give an accurate representation to take care of the
23 patients was we had to somehow notify them whether
24 or not they would or would not get the product on

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1 the order that they were generating or why, why
2 they didn't get it.
3 BY MR. MOUGEY:
4    Q.   Do you have an understanding of how many
5 distribution centers at Walgreens distributed
6 Schedule II and Schedule III opiates?
7    A.   I don't know the exact number.
8    Q.   Do you have a general understanding?
9    A.   I know Jupiter did and I know Perrysburg
10 did, but I can't remember if there were more
11 outside of those two.
12    Q.   How about Woodland?
13    A.   We have a Woodland DC, but I don't
14 know --
15    Q.   You don't know?
16    A.   -- if they did C-IIs.
17    Q.   A year, a year and a half in
18 Pharmaceutical Integrity with Walgreens as a
19 distributor, you're not sure of whether the
20 Walgreens distribution center sent Schedule II and
21 III opiates?
22    A.   I don't know which -- which schedules
23 came out of which DCs.
24    Q.   Obviously, Perrysburg was shut down as a

Page 327

1 result of the DEA investigation in 2013, correct?
2    A.   I don't remember Perrysburg being shut
3 down.
4    Q.   Did I say Perrysburg?
5    A.   Yes.
6    Q.   I'm sorry.  Let me redo that.
7         Jupiter.
8    A.   Yes.
9    Q.   Jupiter was shut down in 2013 as a
10 result of the DEA investigation --
11    A.   Yes.
12    Q.   -- correct?
13    A.   Yes.
14    Q.   And Perrysburg also received subpoenas
15 from the DEA.  Were you aware of that in 2013?
16    A.   Not off the top of my head.  I might
17 have been, but I don't remember.
18    Q.   Do you recall that shortly on the heels
19 after Jupiter was shut down, that Walgreens also
20 shut down Perrysburg?
21    A.   I recall that a decision was made that
22 we were no longer going to distribute controlled
23 substances, but I don't know the reason why.
24    Q.   So, you're not aware as a director of

Page 328

1 Pharmaceutical Integrity in 2013 whether or not
2 there were issues with the Perrysburg distribution
3 center, when I say issues, regulatory issues?
4    A.   I was, no, not aware.
5    Q.   P-WAG-213, Bates No. 10887, and we are
6 going to mark this as Polster 25.
7         (WHEREUPON, a certain document was
8          marked as Walgreens-Polster Exhibit
9          No. 25:  5/23/16 e-mail with
10         attachment; WAGMDL00010887 -
11         00010924.)
12 BY MR. MOUGEY:
13    Q.   This is an e-mail from Mr. Bratton who
14 is in your group to yourself, correct?
15    A.   Yes.
16    Q.   And it's titled, the attachment is,
17 "State of Integrity."  Correct?
18    A.   Yes.
19    Q.   And this was kind of an overview or a
20 state of Pharmaceutical Integrity as of May 23,
21 2016, correct?
22    A.   Yes.
23    Q.   Who put together this PowerPoint, do you
24 recall?

Page 329

1    A.   It must have been Ed Bratton.  His name
2 is not on the PowerPoint, but it's on the e-mail
3 and he does do data analysis for me.
4    Q.   Okay.  And there is nobody's names on
5 the PowerPoint that I see, correct?
6    A.   Yeah.
7    Q.   And why don't you flip through it.  Have
8 you seen this PowerPoint?
9    A.   Yes.
10    Q.   Do you recall seeing it?
11    A.   Yes.
12    Q.   Familiar with it generally?
13    A.   Yes.
14    Q.   And did you look at it in preparation
15 for today?
16    A.   I don't remember looking at it before
17 today.
18    Q.   Okay.
19    A.   I mean, in preparation.
20    Q.   So, as you flip through these pages,
21 would you agree with me this is a pretty detailed
22 report?
23    A.   Yes.
24    Q.   And that this took some time to put

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 together?
2     A.   Yes.
3     Q.   And it required a lot of different data
4 pulls to come up to compile the data points in this
5 PowerPoint, right?
6     A.   Yes.
7     Q.   I'd like to take you to Bates No. 904
8 and it's a section titled "Flagged Orders."
9     A.   Okay.
10    Q.   And you will see on page 903 it's titled
11 "Flagged Orders," and then you can see the title on
12 904 in the upper right-hand corner "Flagged
13 Orders."  Okay?
14    A.   Yep.
15    Q.   Is "flagged orders" a term that
16 Pharmaceutical Integrity used internally?
17    A.   Yes.
18    Q.   And what did you use -- what did it
19 mean?
20    A.   That was the orders that hit the
21 tolerance or the ceiling and were deemed orders of
22 interest to be reviewed before release.
23    Q.   Okay.  So, let's walk through Bates
24 No. 904.  It says, "Fiscal Year 2014, Fiscal Year

Page 331

1 2015," correct?
2     A.   Yes.
3     Q.   And at the bottom is a line graph with
4 the dates October '13 to October '15, approximately
5 a two-year period, correct?
6     A.   Yes.
7     Q.   And it's titled "Orders Flagged and
8 Canceled Chain-Wide."  Okay?
9     A.   Okay.
10    Q.   Do you see that?
11    A.   Yep.
12    Q.   Let me make sure I understand.
13        Orders flagged and canceled, are those
14 orders that were flagged on Wayne Bancroft's
15 algorithm and then canceled?
16    A.   If the order was generated over what the
17 system -- Wayne's system did, then it was canceled
18 into zero.  The orders that were flagged were
19 orders that came in and my team reviewed and, you
20 know, did their due diligence before shipping or
21 reporting to the DEA.
22    Q.   So, walk me through some of that.  Break
23 that out for me.  Okay?
24        So, orders that were I'm going to say

Page 332

1 identified by Mr. Bancroft's algorithm and reduced
2 to zero, are those flagged orders?
3     A.   Those -- those would be the orders that
4 exceeded tolerance limit, where it went in, it came
5 over the amount, and we're not going to ship you
6 anything.
7     Q.   All right.  Let's start on the left-hand
8 side, the pie chart.
9     A.   Okay.
10    Q.   So, a flagged order is -- and I
11 apologize.  I'm just not following you.
12        A flagged order is an order that was
13 identified by Wayne Bancroft's algorithm?
14    A.   The flagged orders were the orders that
15 came in that we needed to review.  The canceled
16 orders were orders that exceeded the limits and
17 were not shipped at all.
18    Q.   Okay.  Give me the criteria for a
19 flagged order that were orders that came in that we
20 needed to review.
21    A.   They would come in with an override
22 form.
23    Q.   What I see here in the left-hand side of
24 this page in the pie chart is the red, 74.16% of

Page 333

1 the flagged orders exceeded tolerance limit.  Am I
2 reading that right?
3     A.   That's what it says, yes.
4     Q.   Okay.  And the green, 22.88% of the
5 flagged orders were reduced by ceiling, correct?
6     A.   Right.
7     Q.   And blue, reduced tolerance/ceiling,
8 2.86%, correct?
9     A.   Yes.
10    Q.   Those were flagged orders, correct?
11    A.   They were orders that my team reviewed,
12 yes.
13    Q.   Okay.  And fiscal year does -- has
14 approximately very similar results as '14?
15    A.   Yes.
16    Q.   I still want to make sure you and I are
17 on the same page because what I asked was that the
18 fiscal year '14, the pie chart, the exceeded
19 tolerance limit, tolerance/tracked ceiling, reduced
20 by ceiling and reduced tolerance/ceiling, those
21 were flagged orders, correct?
22    A.   I don't remember all the weeds about all
23 of this.  But if the order exceeded the tolerance
24 limit, it was not -- it was canceled.  It wasn't

Page 334

1  shipped at all.
2       But I don't remember all the weeds of
3  what the definitions for everything was.
4     Q.   Because as we look below, "Orders
5  Flagged and Canceled Chain-Wide."
6     A.   That includes all of the numbers in the
7  pie chart there.
8     Q.   Okay.  So, orders that were flagged and
9  canceled based on those four color-coded criteria
10 on Bates No. 04 ranged between 4 and 6,000 orders,
11 correct?
12    A.   Where do you see the number?
13    Q.   Off the left-hand axis.
14    A.   Oh, I see what you're saying.  Yes.
15    Q.   2, 4, 6 and 8,000, correct?
16    A.   Yep, right.
17    Q.   And this is broken out by month,
18 correct?
19    A.   Yes.
20    Q.   So, approximately 4 to 6,000 orders, and
21 I understand sometimes it's a little high or
22 sometimes it's a little lower, per month were
23 flagged and canceled chain-wide?
24    A.   Flagged or canceled.

Page 335

1     Q.   I'm sorry.  But I'm looking at page 04,
2  it says, "Orders Flagged and Canceled" at the
3  bottom, correct?
4     A.   Right.  It's the combination of all of
5  them.
6     Q.   Flagged and canceled?
7     A.   Right.
8     Q.   4 to 6,000 orders approximately, give or
9  take a month, correct?
10    A.   Yes.
11    Q.   So, we are talking somewhere in the
12 ballpark of 40, 50, 60, 70,000 orders on any given
13 year that were flagged and canceled, correct?
14    A.   Yes, but they're two separate things.
15    Q.   I understand.
16    A.   Okay.  Yes.
17    Q.   And Walgreens did not consider an order
18 flagged or an order that was canceled as
19 suspicious, correct?
20    MR. HOUTZ:  Object to form.
21 BY THE WITNESS:
22    A.   An order that was canceled never even
23 came in to be reviewed because the store was doing
24 what they were not supposed to be doing based on

Page 336

1  policy, which was trying to order outside of the
2  system.
3       If they ordered outside of the system
4  and they -- and they did what they were supposed to
5  do and it was over the amount that Wayne's system
6  that he put together allowed for them to have, then
7  it was flagged for us to review to make sure we had
8  proper documentation to determine whether or not we
9  felt it was suspicious or whether or not we felt it
10 was okay to ship.
11 BY MR. MOUGEY:
12    Q.   Just the simple fact that it was flagged
13 or canceled, Walgreens did not consider that as
14 suspicious to report to the DEA, correct?
15    A.   A canceled order wouldn't even have been
16 considered.
17    Q.   So, the answer is --
18    A.   And it could be --
19    Q.   The answer is -- I just -- I understand.
20 You want to tell me that it's not an order.  Okay.
21 But it says on this document, created by your
22 group, it says, "Orders Flagged and Canceled."
23 Okay.
24       So, all I'm simply asking is the

Page 337

1  language based on this document that if an order
2  was canceled by Walgreens as a result of the
3  algorithm, Walgreens did not consider that to be
4  suspicious and report to the DEA, correct?
5     A.   Exactly.
6     Q.   Okay.  Thank you.
7       Similarly, an order flagged by the
8  algorithm did not automatically get reported to the
9  DEA --
10    A.   That's correct.
11    Q.   -- as suspicious either?
12    A.   Because the regulations say to review
13 the order before you report it.  It says the order
14 must be deemed suspicious.  You have to look at it
15 to know whether or not it's suspicious.
16    Q.   Can you point me to any language that
17 the regulation says you have to look at it to
18 determine whether or not it's suspicious?
19    A.   So, you're taking my words as literal.
20 But it says --
21    Q.   That's kind of what we do here.
22    A.   Okay.
23    Q.   We get to ask questions.
24    A.   That's fair.

Page 338

1    Q.   And I'm trying to understand what
2  Walgreens thought the applicable regulations were.
3  So --
4    A.   The way my team interpreted -- the way I
5  interpreted it along with my team along with the
6  group of people, we had -- to determine whether or
7  not that prescription -- sorry -- the order was
8  deemed as suspicious, you had to review it.  You
9  had to look at what makes sense for that particular
10 store and that particular drug at that particular
11 point in the time.
12      And if it didn't make sense for their
13 business or they didn't give us proper
14 documentation, we automatically reported it to the
15 DEA.
16   Q.   Let's keep going on this document.
17      Do you have any understanding on Bates
18 No. 04, of the orders that were flagged and
19 canceled chain-wide, how many of those
20 percentage-wise were actually reported to the DEA?
21   A.   I don't know.
22   Q.   Do you have any idea of annual numbers
23 of how many of these orders that were flagged and
24 canceled chain-wide were reported to the DEA?

Page 339

1    A.   I don't know.
2    Q.   Do you have any understanding of how
3  many of these orders that were flagged and canceled
4  that Walgreens performed due diligence on before
5  they shipped?
6    A.   I don't know the numbers.
7    Q.   On Bates No. 05, "If stores checked the
8  ceiling limits tool before ordering, they can avoid
9  having orders being flagged and reduced due to
10 tolerance or ceiling limits."
11      That's the ceiling limits tool you were
12 referencing earlier, correct?
13   A.   Yes.
14   Q.   So, the store would know by looking at
15 the ceiling limits tool what that number is and
16 avoid having an order being flagged due to
17 tolerance or ceiling limits, correct?
18   A.   Or cut.
19   Q.   Yes, ma'am.
20   A.   Right.
21   Q.   So, the answer to my question is "Yes,
22 or cut," correct?
23   A.   Yes.
24   Q.   So, if it got to be the end of the month

Page 340

1  and the store wanted to avoid having an order being
2  flagged, they could simply wait until the beginning
3  of next month, correct?
4    A.   Not for the Walgreens system.  The
5  Walgreens system was a rolling six-week period of
6  time.  It wasn't by month.  So, you never really
7  knew where you were in the cycle of the six weeks.
8    Q.   Excepting for you looked at the ceiling
9  limits tool --
10   A.   Right.
11   Q.   -- and it would tell you, right?
12   A.   Right.
13   Q.   So, the ceiling limits tool, if I'm in a
14 pharmacy and I wanted to avoid having an order
15 being flagged, I can tell where that -- where that
16 threshold is, correct?
17   A.   Yes.
18   Q.   If you would, please, turn to Bates
19 No. 07.  "Flagged Orders vs. Ceiling Tool," the
20 last 6 months.  Last 12 months.  I'm sorry.
21      So, the blue bar graph, the ceiling tool
22 usage, what does that indicate?
23   A.   It indicates how many times the ceiling
24 tool was used by the chain, by all the pharmacies.

Page 341

1    Q.   So, by the time you got into 2015, it
2  was being referenced 40 or 50,000 times per month,
3  correct?
4    A.   Yep.
5    Q.   And the flagged orders were -- is the
6  green line, correct?
7    A.   Yes.
8    Q.   And the gray is just a linear between
9  the -- all the green or the flagged orders,
10 correct?
11   A.   Yep, that's what it says.
12   Q.   If you turn to Bates No. 09, "Controlled
13 Substance Override Forms."
14      Do you have any understanding of how
15 many override request forms were approved?
16   A.   Well, based on this --
17   Q.   Percentage-wise.
18   A.   Based on this, yeah, it says that 95%
19 were approved.
20   Q.   95%?
21   A.   Right.
22   Q.   So, an override was a mechanism for the
23 store to fill out a form and have it approved by
24 Walgreens to order more Schedule II or Schedule III

Page 342

1  opiates, correct?
2      MR. HOUTZ:  Object to form.
3  BY THE WITNESS:
4      A.   Not exactly.  The override form
5  contained questions that my team needed to have
6  information on in order to make a decision as to
7  whether or not that product made sense to go into
8  that store at that point in time based on the
9  business that was happening at that location.
10 BY MR. MOUGEY:
11     Q.   But the question that I asked was a
12 little different.
13          I just said that an override was a
14 mechanism for the store to fill out a form and have
15 it approved by Walgreens to order more Schedule II
16 and Schedule III opiates, correct?
17     MR. HOUTZ:  Object to form, asked and
18 answered.
19 BY THE WITNESS:
20     A.   Approved or not approved.  I mean, my
21 team would deny -- would deny also if we didn't
22 have -- felt -- if the reviewer didn't feel that it
23 had appropriate information or the pharmacy manager
24 entered in information that was vague or didn't

Page 343

1  give specifics, we wouldn't approve it and we would
2  report it.
3  BY MR. MOUGEY:
4      Q.   Sure.  And if you look at Bates No. 09,
5  we can see that your team of investigators declined
6  4.48% of all of the override forms in fiscal year
7  '14, correct?
8      A.   My team of analysts, yes.
9      Q.   Yes, ma'am.  Your team of analysts?
10     A.   Yes.
11     Q.   All this criteria that stores have to go
12 through and all this multifaceted approval process,
13 4.48% of the override forms were denied, correct?
14     A.   That's what it says.
15     Q.   And if you look above, on the blue line
16 and the green line, it provides the number of
17 override forms, correct?
18     A.   Yes.
19     Q.   So, other than the months July and
20 August on the green line, your group receives
21 somewhere north of 1,000, south of 3,000 override
22 requests per month, correct?
23     A.   Yes.
24     Q.   All right.  Now, help me do some math on

Page 344

1  that.  Let's just say it's about 2,000 a month.
2      A.   Okay.
3      Q.   Okay.  So, how many people do you have
4  in your group reviewing these override forms?
5      A.   I have 11 people that can review them.
6      Q.   In day-to-day practice how many people
7  review them?
8      A.   They all do a lot of work.  So, I will
9  be honest with you, I don't know if they all do
10 every one of them or if I've got a group that does
11 some and then others focus on the DEA subpoenas and
12 requests.
13     Q.   So, you don't know how many people are
14 looking at these -- the override
15 forms?
16     A.   No, the deal is they have to get them
17 done.  We have to take care of the patients at
18 store level and they need -- and the store level
19 needs to know whether or not they are going to get
20 the product or not so they can let the patient
21 know.
22     Q.   So, 2000 -- you're counting yourself as
23 one of the 11, right?
24     A.   No.

Page 345

1      Q.   Are you counting your administrative
2  assistant as one of the 11?
3      A.   No.
4      Q.   You have four regions and you have a
5  manager in every region and an analyst in every
6  region, correct?
7      A.   At this -- in 2015, the answer to that
8  was yes.  Currently, no.
9      Q.   Let's just do '13, '14, '15.
10     A.   Okay.
11     Q.   You had approximately eight people, an
12 analyst and the manager in the four regions total,
13 right?
14     A.   I had 11 people and they were broken
15 into divisions.
16     Q.   So, you had -- just make the math easy,
17 let's do it by 10.  So, you had an average per
18 month per person about 200 override forms in your
19 group.  Does that seem about fair?
20     A.   You mean overrides that they approved?
21     Q.   If you look at the green and blue lines,
22 they range from a little over 1,000 to a little
23 less than 3,000.  Do you see the green and blue
24 lines?

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    A.   Yes.
2    Q.   So, just to make the math easy, I just
3  said 2,000.
4    A.   Okay.
5    Q.   Okay?  Because I don't believe I have
6  any spreadsheets --
7    A.   I get it.
8    Q.   -- or reports from Walgreens, heaven
9  forbid, trying to tell me how many override
10 requests there are or it's Chinese like the last
11 spreadsheet we just looked at.
12      So, let's just do some rough math,
13 between you and I, and it's 2,000.
14   A.   Okay.
15   Q.   Okay?
16   A.   2,000 override forms.
17   Q.   2,000 override forms.  And there is
18 approximately -- let's just call it 10 people to
19 make the math easy because it's late in the day and
20 we're both a little tired.  All right.
21      So, 200 -- I'm sorry.  2,000 a month
22 divided by 10 is 200, right?
23   A.   Okay.
24   Q.   So, there is approximately, I know this

Page 347

1  varies, but approximately 20 business days in a
2  month, right?
3    A.   Yes.
4    Q.   So, that would mean your group per
5  person just on average, and I understand these are
6  rough, is looking about 10 override forms per
7  day?
8    A.   Correct.
9    Q.   How long do you think it takes one of
10 your folks to approve one of these or disapprove in
11 the case of the 4.48% an override form?
12   A.   It depends on whether or not the proper
13 information was submitted.
14   Q.   Okay.
15   A.   If it isn't, it takes longer.
16   Q.   Why don't you help walk me through what
17 kind of information they are supposed to look at?
18   A.   Sure.  Has the business changed, has
19 there been new -- new things that happened in terms
20 of an urgent care clinic opening, a surgical
21 center, a hospice.  Perhaps they got a brand-new
22 patient that moved to the area.
23      There's all -- I don't remember all the
24 exact questions, but they can't just say, "I was

Page 348

1  down to one bottle and I need more."  That's not
2  sufficient.
3    Q.   They're performing an audit essentially,
4  correct?
5    A.   My team?
6    Q.   Yes.
7    A.   My team is reviewing that all of the
8  answers have been filled out and they have
9  sufficient information to determine whether or not
10 that order is deemed appropriate.
11   Q.   Do you recall Ronald Reagan's famous
12 quote, "Trust but verify"?
13   A.   Sure.
14   Q.   Do you -- does your team, if they're
15 told that a new hospice center opens, do they
16 verify that?
17   A.   So, before the override form gets to my
18 team, the local leadership has to look at it also.
19 So, there is a chain of command, right?  So --
20   Q.   So the answer to my question is no, they
21 don't.  They just trust what the local pharmacy and
22 the supervision over that pharmacy tells them?
23   A.   Everybody has accountability and if they
24 have any questions at all, they can contact the

Page 349

1  store or contact the leadership.
2    Q.   So, the question I asked was:  Does your
3  group verify if a new hospice center opens?
4    A.   I don't know every step that they take.
5    Q.   So you don't know.
6       Do you know if the -- one of the reasons
7  is a new hospice center opens and someone goes and
8  looks at the actual prescriptions to see if the
9  increase is attributable to that hospice center?
10   A.   It is part of an analysis that they can
11 do, but I don't know if they do it for every one.
12   Q.   So, same thing with a new pain clinic.
13      Would -- if the answer was there's a new
14 pain clinic down the street, would your group go
15 and look to see if in fact there is a new pain
16 clinic?
17   A.   We would verify it with the local
18 leadership if they felt that there was something
19 amiss.
20   Q.   But only if there was something amiss.
21 Otherwise they just approved it.
22      So, the trust but verify part really
23 didn't come into play at Pharmaceutical Integrity.
24 They just trusted what the local store told them?

Page 350

1    A.   I don't think --
2         MR. HOUTZ:  Object to form.
3    BY THE WITNESS:
4    A.   I don't agree with what you're saying.
5    BY MR. MOUGEY:
6    Q.   Was it part of the policies and
7    procedures in your group, when approving these
8    thousands of override forms, that they would go and
9    verify the information on these forms?
10   A.   Would depend on what the answers were.
11   Q.   So, let's go back to my example of the
12   pain clinic.  A new pain clinic comes in down the
13   street.  Would they go and verify?
14   A.   They could go and verify.  I don't know
15   if every one of them that they did.
16        Listen, nobody is doing anything
17   nefarious.  They are trying to take care of the
18   patients.  They are trying to get product in to
19   tell the patient, "Yes, I can have your
20   prescription ready for you tomorrow.  I'm sorry I'm
21   out of your medicine today.  I'm trying -- you
22   know, I'll work on getting it for you tomorrow," or
23   whatever.
24        They fill out the override form.  They

Page 351

1    answer the questions.  If they don't answer the
2    questions appropriately, my team can call
3    leadership, can call the store, they have access to
4    the Internet.  They go through all different steps.
5         I don't do these overrides.  We give
6    them parameters.  And you know what?  Everybody's
7    got a job to do.
8    Q.   So, pharmacies from Walgreens here in
9    Cuyahoga County increase 2 to 300% over a period of
10   a couple of years.
11   A.   Was that one of the stores on this thing
12   that you showed me earlier?
13   Q.   It's not.
14   A.   Okay.
15   Q.   So, an override form comes in and it
16   says that a new pain clinic has opened up down the
17   street.
18        Is there a written policy or procedure
19   within Pharmaceutical Integrity that your group go
20   and verify?
21   A.   As part of the -- in terms of a policy,
22   no.
23   Q.   There we go.  So, to go back to the --
24   one of the six examples that we looked at earlier

Page 352

1    in the Memorandum of Agreement between Walgreens
2    and the DEA, there was a store that increased 22
3    times from 2009 to 2011, correct?
4    A.   Yes.
5    Q.   Have you seen any policies and
6    procedures at Walgreens that would require those
7    individuals that were responsible for suspicious
8    order monitoring policy and procedure to verify
9    information on these override request forms?
10        MR. HOUTZ:  Object to form.
11   BY THE WITNESS:
12   A.   I -- I was not in place during that
13   time.  I don't know.
14   BY MR. MOUGEY:
15   Q.   Bates No. 10, "Ceiling Limits Tool
16   Usage."
17        "Store visits to the ceiling limits tool
18   for fiscal year 2015."
19        The second kind of bullet or arrow says,
20   "42% of all stores who've logged into the tool used
21   it 10 times or less during the year."
22        Right?
23   A.   Yes.
24   Q.   And the last bullet says, "Increase

Page 353

1    awareness around the importance of using the
2    ceiling limits tool in the ordering process will
3    help reduce flagged orders and mitigate delay of
4    product delivery."
5         Correct?
6    A.   Yes.
7    Q.   And that is Walgreens' objective is to
8    ensure that there was no delay of product delivery,
9    correct?
10   A.   Right.  We have patients to take care
11   of.
12   Q.   Sitting here today, do you have any
13   understanding that the purpose of Walgreens'
14   suspicious order monitoring policy was to
15   ensure that the number of pills, OxyContin,
16   hydrocodone, that entered into our communities were
17   only used for legitimate purposes?
18        MR. HOUTZ:  Object to form.
19   BY THE WITNESS:
20   A.   We filled prescriptions that were
21   written by prescribers that had valid DEA numbers,
22   and our pharmacists went through their processes
23   for good faith dispensing and did their
24   corresponding responsibility and dispensed the

Page 354

1 prescriptions.
2 BY MR. MOUGEY:
3    Q.   So, as long as the prescription came in
4 from a legitimate doctor on a legitimate
5 prescription pad --
6    A.   And the pharmacist --
7    Q.   -- Walgreens did their job?
8    A.   And the pharmacist did their due
9 diligence.
10    Q.   Some of these pharmacies get 4 or 500
11 prescriptions a day, do they not, Ms. Polster?
12    A.   Yes.
13    Q.   How much due diligence when you get 4 or
14 500 prescriptions a day does the pharmacist have
15 the ability to do?
16    A.   It's their responsibility to do it.
17    Q.   And --
18    A.   We don't put time limits on that you
19 have to have the prescription done at a certain
20 time.  Take your time and do your job.
21    Q.   And it was the job -- the pharmacists
22 were on the front line.  That was not the job of
23 Walgreens headquarters to ensure that its
24 obligations as a distributor were being filled,

Page 355

1 correct?
2    MR. HOUTZ:  Object to form.
3 BY MR. MOUGEY:
4    Q.   Fulfilled.
5    A.   I'm sorry.  Do I answer that question?
6 I didn't understand what you meant by "fulfilled."
7    Q.   No, I understand.  I get it.
8       The pharmacists were the front line and
9 they were the ones making sure that Walgreens was
10 filling its role as a distributor, correct?
11    MR. HOUTZ:  Object to form.
12 BY THE WITNESS:
13    A.   I don't even understand that question.
14 BY MR. MOUGEY:
15    Q.   Do you believe that Pharmaceutical
16 Integrity was designed to protect the distribution
17 centers and stores from losing their DEA licenses?
18    A.   No.
19    Q.   Who were -- who was Pharmaceutical
20 Integrity -- who were -- if I use the word
21 "constituents," does that make sense to you?
22    A.   Of my team?  Constituents of my team?
23    Q.   Who was the -- what was -- who was
24 Pharmaceutical Integrity designed to protect?

Page 356

1    A.   I wouldn't say it was designed to
2 protect as much as there was work that was coming
3 in, in terms of who the DEA would contact for
4 questions, for data, we would get subpoenas.  All
5 of it was encompassing, and we needed a team to be
6 able to coordinate and do it.  And that's -- that's
7 the reason why, and to my knowledge, the team was
8 formed.
9    Q.   I hand you what we will mark as Polster
10 26.  P-WAG-2225, Bates No. 316771.
11       (WHEREUPON, a certain document was
12       marked as Walgreens-Polster Exhibit
13       No. 26:  6/19/13 e-mail with
14       attachments; WAGMDL00316771 -
15       00316785.)
16 BY MR. MOUGEY:
17    Q.   I just want to understand the timeline.
18 This is an e-mail from you dated June 19, 2013?
19    A.   Yes.
20    Q.   And the bottom of this e-mail, from you,
21 "It's been a long year and a half getting this DEA
22 settlement in place.  We want to ensure we have the
23 proper documentation and accountability for this
24 compliance piece."

Page 357

1       Do you see that?
2    A.   Yes.
3    Q.   The DEA settlement had been ongoing from
4 the beginning of 2012?
5    A.   I don't know that piece, but when I got
6 involved, I knew that we were working towards
7 something.
8    Q.   Let's just take your plain language from
9 this e-mail.
10    A.   Okay.
11    Q.   "It's been a long year and a half
12 getting this DEA settlement in place."  Is that
13 accurate?
14    A.   That's what I have here.
15    Q.   Yes, ma'am.
16    A.   Yes.
17    Q.   And I understand that's what it has and
18 that's what I just read, but the question I asked
19 was:  Is that accurate?
20    A.   From my understanding, there was work
21 being done at the beginning of 2012 that I was not
22 involved in until I came into my role.
23    Q.   So, the answer is yes, I believe from
24 what I heard at Walgreens that that was an --

Page 358

1  that's an accurate --

2  A.   Yes.

3  Q.   -- statement?

4  A.   Yes.

5  Q.   Thank you.

6  MR. MOUGEY:  P-WAG-1687.  Polster 27.

7       (WHEREUPON, a certain document was

8       marked as Walgreens-Polster Exhibit

9       No. 27:  2/19/13 e-mail string;

10      WAGMDL00101723 - 00101732.)

11 BY MR. MOUGEY:

12 Q.   This is an e-mail from Steve Miller

13 (sic) to Rob Braley.

14      Do you see that?

15 A.   Yes.

16 Q.   And Mr. Mills is part of your group,

17 correct?

18 A.   Yes.

19 Q.   And Mr. Mills, in the middle of the

20 paragraph at the bottom of Bates No. 101723, relays

21 to Mr. Braley, "I have concerns that store 09144 is

22 not following through enough with GFD policy,"

23 that's good faith dispensing, "and the RxS should

24 consider reeducating the store."

Page 359

1       Do you see that?

2  A.   Yes.

3  Q.   The sentence goes on, "We are here to

4  protect the DC," which is distributors --

5  distribution centers, "and stores from losing their

6  DEA licenses and it becomes harder to defend these

7  types of stores to the DEA when a store is

8  purchasing 8 times more than the chain average."

9       Do you see that?

10 A.   Yes.

11 Q.   Was it the mission of your group,

12 Pharmaceutical Integrity, that you were there to

13 protect the distribution centers and stores from

14 losing their DEA licenses?

15 A.   No.  Steve is putting words in the -- in

16 there.

17 Q.   You don't have any idea where Steve

18 would have gotten that information?

19 A.   No, I mean, we never said that out loud

20 in a meeting.

21 Q.   That wasn't part of the culture at

22 Walgreens that Pharmaceutical Integrity and similar

23 units were there to protect the distribution center

24 and stores from losing their DEA license?

Page 360

1  A.   No, we had a much larger job than that.

2  Q.   Would you please go back to Polster 26.

3  A.   Okay.

4  Q.   And turn to the second page of this

5  document that -- where you're introducing yourself

6  and your team.  Okay?

7  A.   Yes.

8  Q.   So, we just reviewed the e-mail from

9  Mr. Mills wherein he said he was there to protect

10 the DCs and stores from losing their DEA licenses,

11 and you would agree with me that this bio sent

12 around to the distribution centers was introducing

13 yourself and the Pharmaceutical Integrity

14 Department in June of 2013, correct?

15 A.   Yes.

16 Q.   And you have no earthly idea where

17 Mr. Mills would have come up with the thought that

18 he was there to protect the distribution center and

19 stores, right?  Certainly wasn't from you?

20 A.   It was part of the job, part of our

21 team's job to do all kinds of things.

22 Q.   Ms. Polster, you just testified that you

23 never heard that in a meeting, that that wasn't

24 part of your mission.

Page 361

1       So, was it part of Pharmaceutical

2  Integrity's mission to protect the stores or wasn't

3  it?

4  A.   Of course, protect the stores, protect

5  the company, protect everything.

6  Q.   Yes, ma'am.  So, if you turn to the

7  bio that you sent around, you tell the distribution

8  centers that Pharmaceutical Integrity "was created

9  to protect and grow Walgreens controlled substance

10 business."

11      Is that an accurate statement of what

12 Pharmaceutical Integrity was designed to do by

13 June of 2013?

14 A.   That was part of the statement.  Not

15 all-encompassing.

16 Q.   You understand at this point in time

17 that the number of deaths from opiate overdoses

18 year to year to year beginning in 2000 to 2013 was

19 increasing exponentially, correct?

20 A.   It was -- yes, it was increasing, but it

21 was starting to slow by the time all this happened.

22 The industry started to change in 2012.

23 Q.   You understand that there were open

24 Congressional investigations for almost a decade

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 prior to your June '13 e-mail about the over --
2 oversupply of OxyContin, correct?
3     A.  I don't know about the decade part.
4     Q.  Do you have any idea that there were
5 open investigations in Congress about the
6 oversupply of OxyContin?
7     A.  I -- not in those exact words.
8     Q.  And yet you believe the mission of
9 Pharmaceutical Integrity, you and Mr. Mills telling
10 Walgreens employees that you were there to protect
11 and grow Walgreens controlled substance business.
12          Is that what you're telling the
13 distribution centers?
14     A.  The intent of this document was to let
15 them know that my team was in place and that we
16 were the point of contact.  We were letting them
17 know when the DEA inspectors came into that site,
18 one of the questions that the DEA asked was who has
19 oversight over controlled substance monitoring.
20 This was a bridge document.
21          I mean, we're not going to put -- first
22 off, nobody reads 350 pages when we send it out in
23 an e-mail to these poor people who are busy with
24 their own job.

Page 363

1     Q.  You didn't even read 350 pages --
2     A.  You're exactly right.
3     Q.  -- and you were in charge of
4 Pharmaceutical Integrity, right?
5     A.  Exactly right.
6     Q.  You were too busy to read the 350 pages
7 of examples that the DEA provided to Walgreens of
8 gaps in their system, correct?
9     A.  My job --
10    MR. HOUTZ:  Object to form.
11 BY THE WITNESS:
12    A.  -- was to ensure that the Memorandum of
13 Agreement that we signed was put in place and
14 executed on.
15 BY MR. MOUGEY:
16    Q.  A half a day's worth of reading to go
17 through that document to understand the gaps in
18 Walgreens' position, you did not think it was
19 important as the director of Pharmaceutical
20 Integrity to review that document, correct, ma'am?
21    MR. HOUTZ:  Same objection.
22 BY THE WITNESS:
23    A.  I did not read the document.  I relied
24 heavily on the attorneys to tell me, to make sure

Page 364

1 that we were -- to make sure that when they put
2 together the Memorandum of Agreement, that I could
3 execute upon it.
4 BY MR. MOUGEY:
5     Q.  And the reason because -- the reason why
6 you didn't take the time to read that
7 350-page roadmap from the DEA with almost 300 pages
8 of examples of problems within Walgreens' system
9 was because you were charged internally at
10 Walgreens to protect and grow Walgreens' controlled
11 substance business, correct?
12    A.  No.
13    Q.  There are children and people in our
14 communities dying from overdoses on a day-to-day
15 basis in our communities, and you put in writing to
16 your distribution centers that your job was to grow
17 your controlled substance business?
18    MR. HOUTZ:  Object to form.
19 BY THE WITNESS:
20    A.  You're putting words and twisting them
21 around so that they fit what you want to say.
22 BY MR. MOUGEY:
23    Q.  Ms. Polster, I'm not putting words in
24 your mouth.  You did that for me.

Page 365

1          You said that Pharmaceutical Integrity
2 "was created to protect and grow Walgreens
3 controlled substance business," correct, ma'am?
4     A.  That's what's in here.
5     MR. MOUGEY:  I don't think I have any more
6 questions.
7          Les, could you give me just a few
8 minutes just to kind of reorganize and let me see.
9     MR. HOUTZ:  Sure.
10    MR. MOUGEY:  I think I'm done.
11    THE VIDEOGRAPHER:  We are off the record at
12 6:01.
13    MR. MOUGEY:  Before we go off, Les, during
14 this break, would you mind please trying to track
15 down your folks downstairs or upstairs or wherever
16 we are and the production of those 27 pages we have
17 been asking about since last week.
18    MR. HOUTZ:  I had the answer to that after the
19 last break.
20    MR. MOUGEY:  Okay.  And what was the answer?
21    MR. HOUTZ:  The answer to that was that Sharon
22 Desh who you asked about sent an e-mail to the
23 Plaintiffs side, including yourself, Monday morning
24 and also sent an e-mail to Special Master Cohen

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 Monday morning asking him to formalize his ruling
2 on those documents so that we could take an appeal.
3     MR. MOUGEY: That's not what I asked you to
4 figure out. I saw the e-mail about him formalizing
5 the ruling. What I asked was were they going to
6 produce them.
7     MR. HOUTZ: We are going to appeal the ruling.
8     MR. MOUGEY: So, the answer is you are not
9 going to produce the documents.
10     MR. HOUTZ: We are going to produce the
11 documents when the judge or somebody who is the
12 final word tells us we have to produce the
13 documents.
14     MR. MOUGEY: So, you're not going to abide by
15 Special Master's order. You are going to take it
16 to Judge Polster and you are not going to produce
17 the documents.
18     MR. HOUTZ: We are going to appeal his order.
19     MR. MOUGEY: Go look at her e-mail. It
20 doesn't say that she's not going to produce them.
21 She asks him to formalize, and I followed up for
22 about three times afterwards asking her to answer
23 the simple question of whether they are going to
24 produce them or not.

Page 367

1     But thank you for following up with her.
2 I appreciate the straight answer.
3     THE VIDEOGRAPHER: We are off the record at
4 6:02 p.m.
5     (WHEREUPON, a recess was had
6        from 6:02 to 6:12 p.m.)
7     THE VIDEOGRAPHER: We're back on the record at
8 6:12 p.m.
9     MR. HOUTZ: We established during the break
10 that none of the attorneys in the room has any
11 questions. Does anybody on the phone have any
12 questions?
13     MR. WATTS: None here.
14     MS. LEWIS: No.
15         EXAMINATION
16 BY MR. HOUTZ:
17     Q.   Good afternoon, Ms. Polster. We're in
18 the homestretch.
19     I want to ask you questions about two of
20 the documents that were marked earlier in your
21 deposition, beginning with the very last document,
22 Exhibit 26.
23     Do you have that?
24     A.   Yes.

Page 368

1     Q.   Take a look at the third page in the
2 document with Bates stamp 773.
3     A.   Yes.
4     Q.   In particular, the first sentence.
5     A.   Yes.
6     Q.   Can you read that to yourself.
7     A.   Yes.
8     Q.   Better yet -- well, could you read it
9 out loud.
10     A.   "Rx Integrity was created to protect and
11 grow Walgreens controlled substance business while
12 transforming community pharmacy to play a greater
13 role in the Opioid Narcotic Epidemic and protect
14 our business against high risk prescribers."
15     Q.   Now, Mr. Mougey asked you questions
16 about the first part of that sentence about
17 protecting and growing Walgreens' controlled
18 substance business. Do you recall that?
19     A.   Yes.
20     Q.   What did you mean by protecting and
21 growing Walgreens' controlled substance business?
22     A.   We wanted to ensure that our pharmacists
23 understood that we are not pressuring them to fill
24 prescriptions but that they were -- we're asking

Page 369

1 them to do their due diligence and any pharmacy
2 manager and myself as a pharmacy manager or even as
3 a pharmacy supervisor, the whole idea of being a
4 manager is to grow your business.
5     I know it says "grow controlled
6 substance business," but the job of a pharmacy
7 manager was to grow their overall business, not
8 specifically controlled substances.
9     So, what we meant there was just that.
10 I mean, we're asking our stores to protect and grow
11 their business, but my team was there to support
12 them in doing that.
13     Q.   The next part of that sentence talks
14 about "transforming community pharmacy to play a
15 greater role in the Opioid Narcotic Epidemic."
16     What did you mean by that?
17     A.   The role of the pharmacist and the
18 regulations around everything to do with narcotics
19 has been very fluid over the last -- you know,
20 since 2012, for example, Naloxone. It was not
21 allowed at the time for a pharmacist to dispense a
22 Naloxone prescription without a patient-specific
23 prescription and it is now in 49 states.
24     We wanted the pharmacist to be available

Page 370

1 there to help and be a resource for patients should
2 questions come up, things happen that they wanted
3 to know about, anything around the narcotic
4 epidemic. We wanted to be at the forefront of
5 that, and we've dot a lot of things to do that.
6     Q.   And then the last part of that sentence
7 talks about protecting "our business against high
8 risk prescribers."
9         What did you mean by that?
10    A.   Walgreens was the first in the industry
11 to push back against prescribers that we felt were
12 not writing prescriptions in good faith. We were
13 the first to go on record publicly that we would
14 not fill prescriptions. We would support our
15 pharmacists if they felt that those prescriptions
16 did not meet their corresponding responsibility,
17 and it was just that. I mean, just basically
18 letting the -- the reader understand that, you
19 know, we are looking out for the stores and the
20 prescribers.
21    Q.   Did you get any pushback from others in
22 the industry in that regard?
23    A.   Oh, yes.
24    Q.   What kind?

Page 371

1     A.   I would say I would get anywhere from
2 three to five calls a week personally of doctors
3 upset that our pharmacists weren't filling their
4 prescriptions. I would get calls from leaders all
5 the way up to the CEO would get calls and then it
6 would roll downhill to me. The AMA got involved.
7 It was -- it was something.
8     Q.   How did the AMA get involved?
9     A.   They -- they wrote a -- I call it a
10 letter, but I think it's called something else,
11 where they went on record saying that our
12 pharmacists were practicing medicine and their
13 doctors wrote prescriptions and we should just fill
14 them and we shouldn't question them.
15        I refer to it very affectionately as the
16 "Don't call us, we'll call you" letter because they
17 flat us told us, "Don't bother calling us, just
18 fill our prescriptions. When our members write
19 prescriptions, we expect you to fill them."
20    Q.   And how did you respond to that?
21    A.   I told them that -- we had a lot of
22 meetings and phone calls with them and every call
23 was our pharmacists have a corresponding
24 responsibility. It's in the regulation. And if

Page 372

1 they feel the prescription doesn't meet good faith,
2 then we support their decision in not filling the
3 prescription.
4     Q.   Let me ask you about some other
5 statements in this letter or this document.
6         The second sentence says, "Rx Integrity
7 is responsible for managing, creating and
8 maintaining controlled substance dispensing,
9 monitoring and reporting programs including the
10 Good Faith Dispensing Policy and the National Good
11 Faith Dispensing program."
12        Is that an accurate statement of some of
13 the things that Rx Integrity was responsible for?
14    A.   Yeah, but I notice there is a typo here.
15 National Target Good Faith Dispensing program
16 was -- is what's supposed to be in that second word
17 there around the policy.
18    Q.   Tell me, then, what's the difference
19 between the Good Faith Dispensing Policy and the
20 National Target Good Faith Dispensing program.
21    A.   So, the Good Faith Dispensing Policy has
22 been a policy that's been in place ever since I can
23 remember with Walgreens when I started dispensing
24 controlled substance prescriptions.

Page 373

1         The National Target Good Faith
2 Dispensing program was an additional policy that
3 was put in place to have the pharmacists take
4 additional steps to document when they filled
5 prescriptions for what drugs the DEA deemed as
6 being high risk, like Oxy, hydromorphone,
7 Methadone.
8     Q.   What were some of the main components of
9 the original Good Faith Dispensing Policy?
10    A.   Reiterating -- reiterating regulations
11 around the responsibilities of a pharmacist when
12 filling a controlled substance prescription. It
13 gave high level, if a patient is not, you know --
14 of red flags basically that a pharmacist should be
15 looking for when filling a controlled substance
16 prescription.
17    Q.   And what sort of things did the National
18 Target Good Faith Dispensing program add on top of
19 that?
20    A.   We -- we implemented a checklist that
21 went along with that program where the pharmacist
22 had to document all the steps that they took before
23 determining whether or not that prescription should
24 be filled, and those -- those pieces were primarily

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 based on the red flags that the DEA had identified.

2    Q.  Are you proud of the job that

3 Rx Integrity did in carrying out those

4 responsibilities?

5    A.  Yes.

6    Q.  A little further down in the paragraph

7 it says, "The Rx Integrity team will investigate

8 and report potential violations of laws,

9 regulations or Company policy internally and

10 suspicious orders externally to the DEA, State

11 Boards, and other agencies as required."

12      Is that an accurate statement about what

13 the Rx Integrity team did?

14    A.  Yes.

15    Q.  And are you satisfied that your people

16 did that well?

17    A.  Yes.

18    Q.  Then the paragraph below that says,

19 "The team works with various departments, including

20 Legal, Government Affairs, Logistics, Loss

21 Prevention, IT and others, to ensure company-wide

22 awareness and adhere federal, state and local laws

23 and regulations."

24      Did Rx Integrity do that?

Page 375

1    A.  Yes.

2    Q.  How did your team work with various

3 other departments to assure company-wide awareness

4 and compliance with regs?

5    A.  Oh, they were part of meetings.

6 Occasionally we would have town halls or like legal

7 meetings where I would present of all the work that

8 my team was doing around controlled substances

9 since the team was formed.

10      We worked closely with loss prevention

11 if we had concerns that would filter up to us from

12 the field about anything, you know. They are

13 missing controlled substances and they need

14 somebody to investigate it or they have a doctor

15 they're concerned of.

16      Sometimes we would have -- ask loss

17 prevention to do a drive-by the doctor's office to

18 see if there was anything that didn't look right

19 based on some of the red flags that I had learned

20 in some of my industry meetings that I was in

21 around, you know, what was considered a pill mill

22 or how you would identify a pill mill, those sort

23 of things.

24    Q.  And then the last sentence in this

Page 376

1 paragraph says, "Rx Integrity is tasked in

2 developing a collaborative working relationship

3 with government, law enforcement and industry

4 organizations (e.g., DEA, FDA, State Boards of

5 Pharmacy, National Retail Federation, Retail

6 Industry Leaders Association, National Association

7 of Drug Diversion Investigators) to drive industry

8 leading solutions to pharmaceutical diversion."

9      Was your group involved in driving

10 industry-leading solutions to pharmaceutical

11 diversion?

12    A.  Yes.

13    Q.  How so?

14    A.  We were part of opioid task force with

15 NACDS. We went to numerous meetings.

16      This is an industry-wide problem, and

17 it's going to take everybody to help solve it.

18      So, I am still currently involved as

19 well as, you know, trying to come up with other

20 ideas of things that we could do differently or

21 better, taking what's happening in the industry,

22 taking what's happening, you know, in pharmacy and

23 trying to make changes for the better.

24    Q.  That's all for that document. Could you

Page 377

1 also pull out Exhibit 16.

2    A.  Yes.

3    Q.  You're on the second page of the

4 document, correct?

5    A.  Yes.

6    Q.  And there is a paragraph that says

7 "SOM Meetings" and the bullet point is, "Work group

8 has been put together to begin the determination

9 between a suspicious order and an order of

10 interest."

11      Do you remember that you were asked some

12 questions about that earlier today?

13    A.  Yes.

14    Q.  Let me ask you what you meant by that.

15      What does it mean to say you were put

16 together to begin the determination between a

17 suspicious order and an order of interest?

18    A.  Well, my team needed to understand when

19 an order of interest came in, what made it

20 suspicious. So, we had to give them a type of

21 criteria or some type of guidelines as to whether

22 or not that order should be reported to the DEA or

23 it should ultimately be -- go on to the DC or the

24 wholesaler in order to fill.

Page 378

1    Q.   So, did you develop guidelines?
2    A.   I don't know if I've got anything
3  written down, but I know we had meetings about it
4  and worked with my team to determine if it's
5  suspicious -- if it was a suspicious order or an
6  order of interest.
7    Q.   Now, was every order of interest
8  investigated in some way, to your knowledge?
9    A.   Yeah, to my knowledge, if it came in
10 through the controlled substance override form,
11 yes.
12   Q.   And what kind of investigation was done?
13   A.   It really depended on what the ask was,
14 but history of the stores ordering, how much extra
15 quantity the store wanted at the time, what was
16 happening in the store, what's changed their
17 business, was there a buyout where we had volume
18 coming into the store because we, you know -- the
19 pharmacy down the street closed and therefore we
20 were getting new business. What changed in that
21 area or what's different in that area that would
22 require more of that particular drug to go into the
23 store.
24   Q.   So, after you conducted that

Page 379

1  investigation and you determined, if you
2  determined, that the order was appropriate, what
3  would you do?
4    A.   Then the team would place the order on
5  behalf of the store and document, you know -- file
6  that document for the override so that we would
7  have something to refer back to.
8    Q.   And after the investigation, if you
9  determined that you thought the order was not
10 appropriate, what would you do?
11   A.   We would send it to the DEA as a
12 suspicious order.
13   Q.   Did you send it to the DEA every time as
14 a suspicious order when after investigation you
15 thought it wasn't appropriate?
16   A.   Yes. If it was not deemed appropriate,
17 we sent it to the DEA.
18   Q.   One last topic. You had mentioned that
19 Walgreens does not act as a distributor of
20 controlled substances anymore, correct?
21   A.   Correct.
22   Q.   And when did Walgreens stop being a
23 distributor of controlled substances?
24   A.   I don't remember the exact date, but we

Page 380

1  started using the primary wholesaler and then we
2  were whittling down what was in the inventory of
3  the DCs to exhaust that. So, it took some time,
4  but I think it was the beginning of '14 maybe
5  before we were completely out of the business.
6    Q.   Since -- assuming it was the beginning
7  of '14, do you know how the pharmacies have gone
8  about purchasing drugs since then?
9    A.   Yes.
10   Q.   So, today, if a Walgreens store wants to
11 purchase a controlled substance, they can't get
12 them from Walgreens distribution, correct?
13   A.   Correct.
14   Q.   Where do they go?
15   A.   They have to use the ordering system
16 that we have. So, they have to place it through
17 the ordering system which goes -- goes into Wayne's
18 algorithm and if they try to exceed that, it --
19 it's right back to where it was, cut to zero.
20        They have to -- then they go into the
21 ceiling tool and they can use the ceiling tool to
22 tell them that they -- they have room in their --
23 the amount of inventory that they can get in and if
24 the ceiling tool -- if they need more than what the

Page 381

1  ceiling tool recommends, they have to use a CSO
2  override form.
3    Q.   And if they go through that process,
4  Pharmaceutical Integrity is convinced that the
5  order is okay, how does that order get submitted
6  and who does it get submitted to?
7    A.   Then the order is released and then it
8  goes into -- to the wholesaler, and right now it's
9  ABC.
10   Q.   And if a store puts in an override
11 request form, does that go directly from the store
12 to Pharmaceutical Integrity or are there some stops
13 along the way?
14   A.   Yeah, stops along the way. The
15 leadership has to know that they're requesting
16 extra and then if the leadership approves it, then
17 it goes into my team.
18   Q.   So, you wouldn't see any override
19 request coming from a store until their leadership
20 told you they thought it was okay?
21   A.   That's correct.
22 MR. HOUTZ:  Thanks. Nothing else.
23      Peter, anything else?
24 MR. MOUGEY:  I don't have anything further.

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1  Thank you.
2      MR. HOUTZ:  We're done.
3      MR. MOUGEY:  Thanks, everybody.
4      THE VIDEOGRAPHER:  We are off the record at
5  6:30 p.m.
6          (Time Noted:  6:30 p.m.)
7      FURTHER DEPONENT SAITH NAUGHT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 383

1
2      I, CORINNE T. MARUT, C.S.R. No. 84-1968,
   Registered Professional Reporter and Certified
   Shorthand Reporter, do hereby certify:
3          That previous to the commencement of the
   examination of the witness, the witness was duly
4  sworn to testify the whole truth concerning the
   matters herein;
5          That the foregoing deposition transcript
   was reported stenographically by me, was thereafter
6  reduced to typewriting under my personal direction
   and constitutes a true record of the testimony
7  given and the proceedings had;
          That the said deposition was taken
8  before me at the time and place specified;
          That the reading and signing by the
9  witness of the deposition transcript was agreed
   upon as stated herein;
10          That I am not a relative or employee or
   attorney or counsel, nor a relative or employee of
11  such attorney or counsel for any of the parties
   hereto, nor interested directly or indirectly in
12  the outcome of this action.
13
14      _____
       CORINNE T. MARUT, Certified Reporter
15
          (The foregoing certification of this
16  transcript does not apply to any
   reproduction of the same by any means, unless under
17  the direct control and/or supervision of the
   certifying reporter.)
18
19
20
21
22
23
24

Page 384

1          INSTRUCTIONS TO WITNESS
2
3          Please read your deposition over
4  carefully and make any necessary corrections.  You
5  should state the reason in the appropriate space on
6  the errata sheet for any corrections that are made.
7          After doing so, please sign the errata
8  sheet and date it.
9          You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12          It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within thirty (30) days of receipt of the
15  deposition transcript by you.  If you fail to do
16  so, the deposition transcript may be deemed to be
17  accurate and may be used in court.
18
19
20
21
22
23
24

Page 385

1          - - - - - -
             E R R A T A
2          - - - - - -
3
4  PAGE LINE CHANGE
5  ____ ____ _____
6          REASON: _____
7  ____ ____ _____
8          REASON: _____
9  ____ ____ _____
10          REASON: _____
11  ____ ____ _____
12          REASON: _____
13  ____ ____ _____
14          REASON: _____
15  ____ ____ _____
16          REASON: _____
17  ____ ____ _____
18          REASON: _____
19  ____ ____ _____
20          REASON: _____
21  ____ ____ _____
22          REASON: _____
23  ____ ____ _____
24          REASON: _____

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4      I, TASHA POLSTER, do hereby certify
5 under oath that I have read the foregoing pages,
6 and that the same is a correct transcription of the
7 answers given by me to the questions therein
8 propounded, except for the corrections or changes
9 in form or substance, if any, noted in the attached
10 Errata Sheet.
11
12
13    _____
14    TASHA POLSTER      DATE
15
16
17 Subscribed and sworn
    to before me this
18 _____ day of _____, 20____.
19 My commission expires:_____
20
    _____ Notary Public
21
22
23
24

Page 387

1        LAWYER'S NOTES
2 PAGE  LINE
3 _____ _____ _____
4 _____ _____ _____
5 _____ _____ _____
6 _____ _____ _____
7 _____ _____ _____
8 _____ _____ _____
9 _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21 _____ _____ _____
22 _____ _____ _____
23 _____ _____ _____
24 _____ _____ _____