Highly Confidential - Subject to Further Confidentiality Review

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4

5

6    *********************************

7    IN RE:

8    NATIONAL PRESCRIPTION OPIATE        MDL No. 2804

     LITIGATION                          Case No. 17-md-2804

9                                        Hon. Dan A. Polster

     This document relates to:

10

     All cases

11

     *********************************

12

13       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14              CONFIDENTIALITY REVIEW

15             VIDEOTAPED DEPOSITION OF:

16                  AMY PROPATIER

17                   MOTLEY RICE

18                 55 Cedar Street

19             Providence, Rhode Island

20          November 29, 2018      9:15 a.m.

21

22              Darlene M. Coppola

23            Registered Merit Reporter

24            Certified Realtime Reporter

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1  APPEARANCES:
2  Representing the Plaintiffs:
3    LEVIN PAPANTONIO THOMAS MITCHELL
4    RAFFERTY PROCTOR PA
5    316 Baylen Street
6    Pensacola, FL 32506
7    BY: WILLIAM BAKER, ESQUIRE
8      STEPHANIE HACKMAN, PARALEGAL
9    T 850.485.4160
10
11 Representing the Plaintiffs:
12    WEISMAN, KENNEDY & BERRIS CO., L.P.A.
13    101 West Prospect Avenue
14    Midland Building
15    Suite 1600
16    Cleveland, OH 44115
17    BY: DANIEL P. GOETZ, ESQUIRE
18      JAMES A. DE ROCHE, ESQUIRE
19      (via telephone)
20    T 216.781.1111
21    E dgoetz@weismanlaw.com
22      Jderoche@weismanlaw.com
23
24 (Continued on the next page)

Page 3

1  APPEARANCES (Continued):
2  Representing the Plaintiffs:
3  (Via telephone)
4    MOTLEY RICE, LLC
5    28 Bridgeside Boulevard
6    Mount Pleasant, SC 29464
7    BY: MICHAEL E. ELSNER, ESQUIRE
8    T 843.216.9000
9    E Melsner@motleyrice.com
10
11 Representing the Defendant CVS Indiana, CVS RX
12 Services and the Witness, Amy Propatier:
13    ZUCKERMAN SPAEDER LLP
14    1800 M Street NW
15    Suite 1000
16    Washington, DC 20036
17    BY GRAEME W. BUSH, ESQUIRE
18    T 202.778.1800
19    E gbush@zuckerman.com
20
21
22
23 (Continued on the next page)
24

Page 4

1  APPEARANCES (Continued)
2  Representing the Defendant Discount Drug Mart:
3  (Via telephone)
4    CAVITCH FAMILO & DURKIN, CO., L.P.A.
5    1300 East Ninth Street
6    Twentieth Floor
7    Cleveland, OH 44114
8    BY: L. WILLIAM "CHIP" ERB, ESQUIRE
9    E LWErb@cavitch.com
10
11 Representing the Defendants Endo Health
12 Solutions Inc., Endo Pharmaceuticals Inc.,
13 Par Pharmaceutical, Inc.; Par Pharmaceutical
14 Companies, Inc. (FKA Par Pharmaceutical
15 Holdings, Inc.):
16 (Via telephone)
17    ARNOLD & PORTER KAYE SCHOLER, LLP
18    777 South Figueroa Street
19    44th Floor
20    Los Angeles, CA 90017-5844
21    BY: ERIC SHAPLAND, ESQUIRE
22      ANDREW BERGMAN, ESQUIRE
23    T 213.243.4238
24    E Eric.Shapland@arnoldporter.com

Page 5

1  APPEARANCES (Continued):
2  Representing the Defendants Defendants
3  AmerisourceBergen Drug Corporation,
4  AmerisourceBergen Corporation:
5  (Via telephone)
6    REED SMITH LLP
7    1301 K Street, N.W.
8    Suite 1000  East Tower
9    Washington, DC  20005
10    BY: MOLLY Q. CAMPBELL, ESQUIRE
11    T 202.414.9200
12    E mqcampbell@reedsmith.com
13
14 Representing the Defendant Prescription
15 Supply, Inc:
16    PELINI, CAMPBELL & WILLIAMS, LLC
17    Bretton Commons
18    Suite 400
19    8040 Cleveland Avenue NW
20    North Canton, OH 44720
21    BY: NICOLE H. RICHARD, ESQUIRE
22    T 330.305.6400
23    E mrichard@pelini-law.com
24 (Continued on next page)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1 Appearances (Continued):
2 Representing the Defendant Rite Aid of
3 Maryland:
4 (Via telephone)
5    MORGAN LEWIS & BOCKIUS, LLP
6    1000 Louisiana Street
7    Suite 4000
8    Houston, TX 77002
9    BY: JAMES NORTEY, ESQUIRE
10   T 713.890.5472
11   e james.nortey@morganlewis.com
12
13 Representing the Defendant Walmart:
14 (Via telephone)
15   JONES DAY
16   325 John H. McConnell Boulevard
17   Suite 600
18   Columbus, OH 43215
19   BY: EDWARD M. CARTER, ESQUIRE
20   T 614.469.3939
21   E emcarter@jonesday.com
22
23 (Continued on the next page)
24

Page 7

1 APPEARANCES (Continued):
2 Representing the Defendant HBC Company:
3 (Via telephone)
4    MARCUS & SHAPIRA LLP
5    One Oxford Centre
6    35th Floor
7    Pittsburgh, PA 15219
8    BY: PAUL M. MANNIX, ESQUIRE
9    T 412.471.3490
10   E mannix@marcus-shapira.com
11
12 Representing the Defendant McKesson:
13 (Via telephone)
14   COVINGTON & BURLING LLP
15   1999 Avenue of the Stars
16   Los Angeles, CA 90067
17   BY: MICHAEL LANOSA, ESQUIRE
18   T 424.332.4780
19   E mlanosa@cov.com
20
21
22
23 (Continued on next page)
24

Page 8

1 APPEARANCES (Continued):
2 Representing the Defendant Cardinal Health:
3 (Via telephone)
4    WILLIAMS & CONNOLLY LLP
5    725 Twelfth Street, NW
6    Washington, DC 20005
7    BY: MIRANDA PETERSEN, ESQUIRE
8    T 202.434.5686
9    E mpetersen@wc.com
10
11
12 Also Present:
13 Gina Veldman, Trial Services
14 Robert Martignetti, CLVS
15
16
17
18
19
20
21
22
23
24

Page 9

1            INDEX
2          EXAMINATION
3 Witness Name                          Page
4 AMY PROPATIER
5    Direct By Mr. Baker ................................ 14
6    Continued Direct By Mr. Baker ..................... 201
7    Cross By Mr. Goetz ................................ 299
8
9          EXHIBITS
10 Propatier-CVS   Description              Page
11 No. 2         Diversion Control          19
               Division Document
12
   No. 1         Subchapter 1, Control     21
13             and Enforcement, Part
               C, Section 823, of 21
14             U.S. Code
15 No. 3         United States Drug         23
               Enforcement
16             Administration Office
               of Diversion Control
17             Chart
18 No. 19        Press Release,             40
               CVS-MDLT1-000003070
19             through 3071
20 No. 23        E-mail,                    43
               CVS-MDLT1-000003749
21             through 3777
22 No. 25        Track One,                 56
               CVS-MDLT1-000007362
23             through 364
24

Page 10

INDEX
EXHIBITS
Propatier-CVS    Description                                    Page

No. 100      CVS SOP,                                            58
             CVS-MDLT1-000034375
             through 378

No. 37       E-mail dated 1/14/2014                              61
             and Attached Letter
             dated December 27,
             2007

No. 61       E-mail,                                             68
             CVS-MDLT1-000055266
             through 269

No. 12       SOM Program,                                        72
             CVS-MDLT1-000002188

No. 98       E-mail,                                             83
             CVS-MDLT1-000089188

No. 97       E-mail,                                             87
             CVS-MDLT1-000088956
             through 89025

No. 94       E-mail,                                             93
             CVS-MDLT1-000087889
             through 890

No. 81       E-mail,                                             97
             CVS-MDLT1-000075299
             through 5312

No. 36       E-mail,                                            105
             CVS-MDLT1-000012286

No. 17       Memoranduml,                                       109
             CVS-MDLT1-000024539
             through 552

No. 67       E-mail,                                            114
             CVS-MDLT1-000055834


Page 11

INDEX
EXHIBITS
Propatier-CVS    Description                                    Page

No. 82       E-mail,                                            118
             CVS-MDLT1-000075542

No. 55       Business Idea                                      122
             Description,
             CVS-MDLT1-000034175
             through 177

No. 54       E-mail,                                            134
             CVS-MDLT1-000034168
             through 171

No. 53       E-mail,                                            203
             CVS-MDLT1-000033579
             through 581

No. 45       E-mail,                                            210
             CVS-MDLT1-000022896
             through 22900

No. 104      E-mail,                                            212
             CVS-MDLT1-000103329

No. 76       E-mail,                                            225
             CVS-MDLT1-000059258
             through 260

No. 102      E-mail,                                            231
             CVS-MDLT1-000091508
             through 518

No. 68       E-mail,                                            239
             CVS-MDLT1-000057736
             and 737

No. 103      E-mail,                                            251
             CVS-MDLT1-000093961


Page 12

INDEX
EXHIBITS
Propatier-CVS    Description                                    Page

No. 34       Copies of DOJ Business                             257
             Cards,
             CVS-MDLT1-000010525
             and 530

No. 33       Inventory,                                         260
             CVS-MDLT1-000010522
             and 558

No. 92       E-mail,                                            267
             CVS-MDLT1-000083855

No. 101      E-mail,                                            275
             CVS-MDLT1-000090581
             with attachment

No. 99       E-mail,                                            278
             CVS-MDLT1-000089768

No. 78       Settlement Agreements,                             281
             CVS-MDLT!-0000805,
             856, 872, 907, 847,
             839

No. 223      E-mail,                                            301
             CVS-MDLT1-000066963
             through 966

No. 224      Shared P&Ps,                                       305
             CVS-MDLT1-000066969
             through 976

No. 62       E-mail,                                            309
             CVS-MDLT1-000013534
             through 536


Page 13

INDEX
PREVIOUSLY MARKED EXHIBITS -- REFERRED TO
Exhibit      Description                                        Page

No. 204      SOP Manual Excerpt,                                 75
             CVS-MDLT1-000008506
             through 8571

No. 205      E-mail,                                            163
             CVS-MDLT1-000066574
             and 575

No. 203      SOP Manual,                                        168
             CVS-MDLT1-000066576
             through 6641

Page 14

1    THE VIDEOGRAPHER: We are now on
2 the record. My name is Robert Martignetti.
3 I'm a videographer for Golkow Litigation
4 Services. Today's date is November 29, 2018
5 and the time is 9:15 a.m. This is this video
6 deposition is being held in Providence, Rhode
7 Island. In re: National Prescription Opiate
8 Litigation. The deponent is Amy Propatier.
9 Counsel will be noted on the stenographic
10 record. The court reporter is Darlene Coppola
11 and will now swear in the witness.
12
13         AMY PROPATIER,
14    witness, having first been
15 satisfactorily identified and duly sworn,
16 testifies and states as follows:
17
18         DIRECT EXAMINATION
19 BY MR. BAKER:
20    Q. Good morning. My name's William
21 Baker. Today's date is November 29, 2018 and
22 we are here with Ms. Amy Propatier; is that
23 correct?
24    A. Propatier.

Page 15

1    Q. Propatier. Could you please tell us
2 who your employer is?
3    A. CVS Pharmacy.
4    Q. How long have you been employed with
5 CVS Pharmacy?
6    A. Since May of 1999.
7    Q. What was your position when you first
8 came onboard in May of 1999?
9    A. I was the customer service rep for
10 store services.
11    Q. Was that in retail?
12    A. It was at the corporate office, yes,
13 for retail stores.
14    Q. Did that include pharmaceutical
15 products?
16    A. No.
17    Q. When did you change positions?
18    A. I changed positions in 2003 to
19 transportation and in 2005 that position moved
20 to logistics planning where I started getting
21 involved in pharmaceuticals.
22    Q. What is was your job in
23 pharmaceuticals in 2005?
24    A. 2005, I was called a logistics liaison

Page 16

1 for the distribution centers, so I was support
2 between the distribution centers and the
3 corporate office, just helping them contact
4 people in the corporate office for support for
5 store ordering, standard operating procedures.
6    Q. Where did you move to in 2006?
7    A. In 2006?
8    Q. What was your position in 2006?
9    A. Oh, it was still -- it was called
10 hazardous material and logistics liaison.
11    Q. What did you do in 2007?
12    A. The same position.
13    Q. What did you do in 2008?
14    A. My position changed to logistics Rx
15 services manager.
16    Q. What is an Rx services manager?
17    A. It was a similar position. I was a
18 liaison between the distribution center and
19 the corporate office. I was doing ARCOS
20 reporting, state drug reporting, SOP
21 consolidation and maintenance, coding
22 hazardous materials that came into the
23 distribution centers.
24    Q. What did you do in 2009?

Page 17

1    A. The same position.
2    Q. What about 2010?
3    A. Same position.
4    Q. Have you maintained that same position
5 since 2008?
6    A. No. I changed positions in February
7 of 2014.
8    Q. To what?
9    A. A pharmacy inventory manager.
10    Q. So if we were to describe what your
11 position was from 2006 through 2014, begin
12 with 2006, and then tell us what it was.
13    A. My position?
14    Q. Yes, ma'am.
15    A. Oh. I was hazardous materials
16 specialist and logistics liaison.
17    Q. And then in 2008 is when you switched?
18    A. The position evolved, yes, to the
19 logistics Rx services manager.
20    Q. So physically where were you located
21 from 2008 forward?
22    A. One CVS Drive in Woonsocket, Rhode
23 Island.
24    Q. That's near Providence, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    A.  Yes.
2    Q.  Are you familiar with the term
3  "narcotics"?
4    A.  Yes.
5    Q.  Do you agree that opioids are
6  narcotics?
7    A.  Yes.
8    Q.  Do you agree that hydrocodone and
9  hydrocodone combination products are
10  narcotics?
11    A.  Yes.
12    Q.  Do you agree that OxyContin is
13  narcotics?
14    A.  Yes.
15    Q.  Do you agree that a oxymorphone is
16  narcotics?
17    A.  Yes.
18    Q.  Do you agree that narcotics are drugs
19  that are controlled under the federal law of
20  the Controlled Substances Act?
21    A.  Yes.
22    Q.  Could you pull up Exhibit No. 2,
23  please?
24

Page 19

1      (Exhibit No. 2 marked for
2  identification.)
3
4  BY MR. BAKER:
5    Q.  And could you highlight Section
6  1301.74B?
7      MR. BUSH:  Could you give us the
8  copy?
9      MR. BAKER:  I'm sorry, sir.
10      VOICE:  If you could read into
11  the record what Exhibit 2 is, that would be
12  much appreciated.
13      MR. BAKER:  Okay.  Exhibit 2 is
14  a copy of Title 21, Code of Federal
15  Regulation, Part 1301, specifically directing
16  you to Part 1301.74, Subparagraph B.
17      MR. BUSH:  This was Exhibit 2;
18  is that correct?
19      MR. BAKER:  Yes, yes.
20  BY MR. BAKER:
21    Q.  Do you see that?
22    A.  Uh-huh.
23    Q.  Yes, ma'am?
24    A.  Yes.

Page 20

1    Q.  Are you familiar with that?
2    Let me read it to you.  It says, "The
3  registrant shall design and operate a system
4  to disclose to the registrant suspicious
5  orders of controlled substances.  The
6  registrant shall inform the field division
7  office of the administration in his area of
8  suspicious orders when discovered by the
9  registrant.  Suspicious orders include orders
10  of unusual size, orders deviating
11  substantially from a normal pattern, and
12  orders of unusual frequency."
13    Did I read that correctly?
14    A.  Yes.
15    Q.  Are you familiar with that law?
16    A.  Yes.
17    Q.  Is that law part of what guides you in
18  your job?
19    A.  In my job today?
20    Q.  Yes, ma'am, in your job between 2008
21  and 2014.
22    It's a yes or no.
23    A.  Yes.
24    Q.  Were you guided by that law in your

Page 21

1  job between 2008 and 2014?
2    A.  Yes.
3    Q.  Let's go to exhibit -- let's go to
4  Exhibit 1, please.
5
6      (Exhibit No. 1 marked for
7  identification.)
8
9      MR. BAKER:  Exhibit 1 is
10  Subchapter 1, Control and Enforcement, Part C,
11  Section 823, of 21 U.S. Code.
12  BY MR. BAKER:
13    Q.  Could you highlight, at the bottom,
14  Subsection E, Parentheticals 1 and 2?
15    Let me read this to you.  It's titled
16  21 U.S. Code, Section 823, Subsection E,
17  Parenthetical 1 and 2.
18    It says, "The attorney general" --
19  it's talking about distributors of controlled
20  substances in Schedules III, IV, or V.
21    "The attorney general shall register
22  an applicant to distribute controlled
23  substances in Schedule III, IV, V unless he
24  determines that the issuance of such

Page 22

1  registration is inconsistent with the public
2  interest.  In determining the public interest,
3  the following factors shall be considered:
4  No. 1, maintenance of effective controls
5  against diversion of particular controlled
6  substances into other than legitimate medical
7  scientific and industrial channels;
8  Subparagraph 2, compliance with applicable
9  state and local law."
10       Did I read that correctly?
11     A.  Yes.
12     Q.  Have you seen this law before?
13     A.  I can't say that I've read it directly
14  from here, no.
15     Q.  Have you been tutored in this law
16  within your job or trained in this law within
17  your job?
18     A.  Yes.
19     Q.  Between the period of 2008 through
20  2014, who trained you in this law within your
21  job?
22     A.  I can't recall a particular person
23  that trained me in this law.
24     Q.  Were you guided by this law in your

Page 23

1  job between 2008 and 2014?
2     A.  Yes.
3     Q.  Do you agree that you had a duty to
4  follow this law between 2008 and 2014 in your
5  position with CVS?
6     A.  Yes.
7     Q.  Would you agree that this country has
8  been in the midst of an opioid crisis for the
9  past ten years?
10     A.  Yes.
11     Q.  Could you pull up Exhibit 3, please?
12
13       (Exhibit No. 3 marked for
14  identification.)
15
16       MR. BAKER:  It's composite
17  Exhibit 3.  Off record while that's being
18  pulled up.
19       THE VIDEOGRAPHER:  The time is
20  9:25 a.m.  We're off the record.
21
22       (Recess taken from 9:25 a.m.
23  to 9:28 a.m.)
24

Page 24

1       THE VIDEOGRAPHER:  The time is 9:28
2  a.m.  On the record.
3  BY MR. BAKER:
4     Q.  Could you pull up Exhibit 3, please?
5  Exhibit 3 is a United States Drug Enforcement
6  Administration Office of Diversion Control
7  chart depicting a bar graph of drug-poisoning
8  deaths involving opioid analgesics or heroin
9  in the United States from 1999 through 2013.
10       Ma'am, my question is have you ever
11  seen this chart before?
12     A.  No.
13     Q.  Ma'am?
14     A.  No.
15     Q.  As part of your job, you are
16  responsible for DEA compliance of CVS with
17  respect to their suspicious order monitoring
18  programming; am I correct?
19     A.  No.
20     Q.  As part of your job, what do you do to
21  reference the DEA website, if anything?
22     A.  I didn't need to reference the website
23  for my job.
24     Q.  Let me ask you, are you familiar with

Page 25

1  who the DEA is?
2     A.  Yes.
3     Q.  Okay.  That's the Drug Enforcement
4  Administration, which is an arm of the
5  Department of Justice of the United States.
6  You understand that, correct?
7     A.  Yes.
8     Q.  And you understand that the DEA is who
9  CVS would report suspicious orders to in the
10  event that their suspicious order monitoring
11  program showed a suspicious order to exist?
12     A.  Yes.
13     Q.  And do you do that as part of your
14  job?  Do you help do that?
15     A.  No.
16     Q.  Are you familiar with the statistics
17  depicted in this chart that I'm showing in
18  front of you?  Do you see the statistics
19  there?
20     A.  Yes.
21     Q.  Are you familiar with those
22  statistics?
23     A.  Familiar as in knowing them offhand,
24  no.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1　　Q.　Are you familiar with them in general
2　knowing that there has been a steady increase
3　in the number of thousands of deaths that have
4　occurred as a result of drug-poisoning deaths
5　involving opioid and analgesics or heroin in
6　the United States from 1999 to 2013?
7　　A.　No.
8　　Q.　You didn't know that?
9　　A.　Not these numbers, no.
10　　Q.　But you knew in general that --
11　　A.　Oh, in general --
12　　Q.　That there was --
13　　A.　-- yes.
14　　Q.　You knew in general that there was an
15　increase in the thousands of drug-poisoning
16　deaths involving opioid analgesics or heroin
17　in the United States from 1999 to 2013,
18　correct?
19　　A.　Yes.
20　　Q.　And you see that that number reached,
21　from 1999, a figure of 4,000 all the way up to
22　16.9 thousand in 2011 and it stayed at about
23　that 16,000 level all the way through 2013
24　and -- 2012 and 2013.  Do you see that?

Page 27

1　　A.　Yes.
2　　Q.　Do you see what that comparison is to
3　the deaths of heroin?
4　　A.　Yes.
5　　Q.　For instance, in 2013, heroin deaths
6　accounted for 8.3 million deaths whereas
7　opioid analgesic deaths were at 16.2 million,
8　correct?
9　　A.　Yes.
10　　　　MR. BUSH:  Objection.
11　BY MR. BAKER:
12　　Q.　Is that what the chart indicates?
13　　A.　Yes.
14　　Q.　Does the chart indicate, according to
15　DEA statistics, that there were 8.3 million
16　heroin deaths in the year 2013 and 16.2
17　million opioid analgesics deaths?  Does the
18　chart indicate that?
19　　A.　No.  It says thousands.
20　　Q.　8.3 thousand, I'm sorry.  And 16.2
21　thousand opioid deaths?
22　　A.　Yes.
23　　Q.　Is that correct?
24　　A.　(Witness nodding.)

Page 28

1　　Q.　That's all part of your knowledge of
2　the fact there's an opioid epidemic in the
3　United States that's been going on for over
4　ten years; is that correct?
5　　　　MR. BUSH:  Objection.
6　BY MR. BAKER:
7　　Q.　Is that correct, ma'am?
8　　A.　Can you say that again?
9　　Q.　This helps with your knowledge of the
10　fact that there's been an opioid epidemic in
11　the United States for at least the past ten
12　years?
13　　　　MR. BUSH:  Objection.
14　　　　MR. BAKER:  I'll withdraw the
15　question.
16　BY MR. BAKER:
17　　Q.　Could you move on to the next chart,
18　please?  Go to the U.S. rate of opioid
19　overdose death sales and treatment admissions
20　from 1999 to 2010.
21　　　　MR. BUSH:  Hold on, could you
22　show me that chart because this is not in the
23　same order?
24　　　　MR. BAKER:  Right here.

Page 29

1　　　　MR. BUSH:  This one?
2　　　　MR. BAKER:  This one right here.
3　BY MR. BAKER:
4　　Q.　Have you ever seen this chart that's
5　published by the United States Drug
6　Enforcement Administration?
7　　A.　No.
8　　Q.　I'd like you to look at that chart for
9　the period between 1999 and 2010.  And it
10　graphs the correlation between opioid sales,
11　opioid deaths, and opioid treatment
12　admissions; is that correct?
13　　A.　Yes.
14　　Q.　Okay.  Do you see the top line, opioid
15　sales -- the increase in opioid sales from
16　1999 to 2000.  Do you see that, the rate of
17　increase?
18　　A.　Yes.
19　　Q.　Okay.  And do you see the rate of
20　increase in opioid deaths correlate with that
21　in the red line right below it?
22　　A.　Yes.
23　　　　MR. BUSH:  Objection.
24　BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    Q.   Do you see that, ma'am?
2    A.   Yes.
3    Q.   Would you agree that those two lines
4  correlate, meaning that the number of opioid
5  sales, as opioid sales have increased over
6  that same period of time, between 1999 and
7  2010, so have opioid deaths correspondingly
8  increased?
9         MR. BUSH:  Objection.
10 BY MR. BAKER:
11   Q.   Would you agree with that?
12        MR. BUSH:  I'm sorry, objection.
13 BY MR. BAKER:
14   Q.   Ma'am?
15   A.   I can't say I agree.
16   Q.   Would you agree that those lines run
17 parallel to each other upward on the graph?
18        MR. BUSH:  Objection.
19 BY MR. BAKER:
20   Q.   Just look at the red line and look at
21 the green line.  Would you agree that those
22 lines --
23   A.   Uh-huh.
24   Q.   -- correlate and run parallel to each

Page 31

1  other increasingly between 1999 and 2010; yes
2  or no?
3         MR. BUSH:  Objection.
4  BY MR. BAKER:
5    Q.   Ma'am?
6    A.   Yes, they're parallel.
7    Q.   Okay.  That would show correlation
8  between those two; is that correct?
9         MR. BUSH:  Objection.
10 BY MR. BAKER:
11   Q.   Opioid sales and opioid deaths,
12 correct?
13        MR. BUSH:  Objection.
14 BY MR. BAKER:
15   Q.   Yes?
16   A.   I can't say what the correlation is.
17   Q.   Would you look at the -- at the next
18 line, opioid treatment admissions?  Does that
19 line also run parallel to the lines above it,
20 which is opioid deaths and opioid sales?
21        MR. BUSH:  Objection.
22 BY MR. BAKER:
23   Q.   Yes or no?
24   A.   Yes.

Page 32

1    Q.   Would you agree there's a correlation
2  between opioid treatment, opioid deaths, and
3  opioid sales as depicted by this graph of
4  reporting information through the United
5  States Drug Enforcement Administration?
6         MR. BUSH:  Objection.
7    A.   I can't say what the correlation is.
8  BY MR. BAKER:
9    Q.   You can't say that looking at this
10 graph?  Honestly, look at this graph and tell
11 me whether you think you could or couldn't say
12 that.
13        MR. BUSH:  Objection.
14   A.   I can't say what the correlation is.
15 BY MR. BAKER:
16   Q.   Can you say that those lines do
17 correlate?
18   A.   I can say the line increased.
19   Q.   That they do correlate?
20        MR. BUSH:  Objection.
21   A.   I can say it increased.
22 BY MR. BAKER:
23   Q.   That they increased correspondingly?
24        MR. BUSH:  Objection.

Page 33

1    A.   I don't know.
2  BY MR. BAKER:
3    Q.   You don't know from looking at this
4  chart?  Look at this chart, ma'am.  Look at
5  those three lines.
6    A.   Yeah.
7    Q.   Using common sense, would you say that
8  those three lines run parallel to each other
9  correlate; yes or no?
10        MR. BUSH:  Objection.
11   A.   I can say they run parallel.  I don't
12 know how they correlate.  I can't say how they
13 correlate.
14 BY MR. BAKER:
15   Q.   Could you pull up the top ten list,
16 please, as the next chart?  It's the United
17 States Drug Enforcement Administration top ten
18 list of consumers in kilograms of opioid
19 analgesics.
20        MR. BUSH:  Objection.  Actually,
21 my objection is I don't really see where it
22 says that.
23        MR. BAKER:  Narcotic drugs in
24 grams.  We'll just go with narcotic drugs in

Page 34

1  grams. The source
2  BY MR. BAKER:
3     Q. Let's do it this way. Let's go to
4  this chart right here.
5        Have you ever seen this chart?
6     A. No.
7     Q. Are you familiar with the statistics
8  reported by the United States DEA that the
9  U.S. was the country, in 2012, with the
10 highest consumption of hydrocodone, which is
11 approximately 45.5 tons or 99 percent of
12 global consumption? Were you familiar with
13 that?
14    A. No.
15    Q. Would you agree that this chart
16 indicates that?
17    A. The chart -- yeah.
18    Q. Yes?
19    A. Yes, the statement indicates it.
20    Q. Would you go to the next chart, which
21 is the Ohio -- 2012 Ohio drug overdose deaths
22 chart. Do you see that chart? Do you have
23 that chart in front of you, ma'am?
24    A. Yes.

Page 35

1     Q. Do you see at the bottom where the
2  source of this information is the Ohio
3  Department of Health Office of Vital
4  Statistics Analysis Conducted by Injury
5  Prevention Program? Do you see that?
6     A. Yes.
7     Q. So this is a publication by the Ohio
8  Department of Health. Are you familiar with
9  the Ohio Department of Health?
10       MR. BUSH: Objection.
11    A. Familiar with it?
12 BY MR. BAKER:
13    Q. Yes, ma'am.
14    A. I've heard of it. I can't say how
15 familiar I am.
16    Q. Do you see what's reported in there?
17 At the top of that chart, it says, "Drug
18 overdose deaths continued to be a public
19 crisis in Ohio with a 366 percent increase in
20 the number of deaths from 2000 to 2012."
21 And it references that chart at the bottom.
22       Do you see it?
23    A. Yes.
24    Q. Do you see there where it says that

Page 36

1  opioid -- "Opioids, prescription or heroin,
2  remain the driving factor behind the
3  unintentional drug overdose epidemic in Ohio.
4  Approximately two-thirds or 1,272 or 66.5
5  percent of the drug overdoses involved any
6  opioid in 2012 similar to 2011."
7        Do you see that?
8     A. Uh-huh.
9     Q. Is that yes?
10    A. Yes.
11    Q. Is that all part of a crisis that you
12 have been aware of that's been going on in the
13 United States for the past several years?
14       MR. BUSH: Objection.
15 BY MR. BAKER:
16    Q. When I asked you initially in your
17 deposition if you were familiar with the
18 opioid crisis that was going on in the United
19 States for the past ten years, your answer was
20 yes; is that correct?
21       MR. BUSH: Objection.
22    A. Yes.
23 BY MR. BAKER:
24    Q. Okay. Is this part of what you're

Page 37

1  talking about, the increased opioid deaths in
2  Ohio as depicted in this chart?
3        MR. BUSH: Objection.
4  BY MR. BAKER:
5     Q. Is this what you're talking about?
6     A. I can't say specifically.
7     Q. Can you say generally that's what
8  you're talking about?
9        MR. BUSH: Objection.
10    A. Generally, yes.
11 BY MR. BAKER:
12    Q. Okay. Do you see where it says, right
13 below that, "Prescription opioids are involved
14 in most of the unintentional drug overdoses
15 and have largely driven the rise in deaths
16 over the past decade."
17       Do you see that?
18    A. Yes.
19    Q. Would you agree with that statement?
20       MR. BUSH: Objection.
21    A. I -- I don't have enough information.
22 BY MR. BAKER:
23    Q. Would you disagree with that
24 statement?

Page 38

1        MR. BUSH:  Objection.
2     A.  I can't agree or disagree.
3  BY MR. BAKER:
4     Q.  Could you pull up the next chart,
5  which is the drug diversion migration out of
6  Florida?  Have you seen this chart before?
7     A.  No.
8     Q.  You have not?
9     A.  No.
10    Q.  Are you familiar with what's called
11  the opioid express?
12        MR. BUSH:  Can I just make a
13  statement, Bill, on the record?  This, at
14  least the version of this I'm seeing on the
15  screen and in our copy, is largely
16  illegible.
17        MR. BAKER:  This is how it was
18  presented to us in the CVS documentation.
19        MR. BUSH:  Okay.
20        MR. BAKER:  Okay.  So we just
21  have to live with it.
22        MR. BUSH:  It does say McKesson
23  at the top.  This is a CVS document.
24        MR. BAKER:  This is a CVS

Page 39

1  document.  I'll show you, but it is a CVS
2  document.
3        MR. BUSH:  Okay.  I accept your
4  representation.
5        MR. BAKER:  Okay.
6  BY MR. BAKER:
7     Q.  Have you seen this document before?
8     A.  No.
9     Q.  Are you familiar with the Oxy Express?
10  Are you familiar with that?
11    A.  No.
12    Q.  Are you familiar with the way drugs
13  are diverted out of Florida up through states
14  north of Florida into Ohio?
15    A.  No.
16    Q.  You're not familiar with that?
17    A.  No.
18    Q.  Let's move on.  Could you pull up
19  Exhibit 103, please.  Strike that.
20        Let's pull up Exhibit No. 19, please,
21  and go to page 2.
22        MR. BAKER:  We'll mark that as
23  the next number.
24

Page 40

1
2        (Exhibit No. 19 marked for
3  identification.)
4
5        MR. BUSH:  Can I have a copy of
6  that?  Thank you.
7  BY MR. BAKER:
8     Q.  Now, this is a CVS document that's
9  Bates Numbered 3070 and 3071.  Do you see that
10  at the bottom?
11    A.  Yes.
12    Q.  Any time you see that in the context
13  of this litigation, that means that's a
14  document that's been produced to plaintiff's
15  counsel by CVS as part of a request for
16  production in this case.  So you'll know that
17  this is a CVS document.  Fair enough?
18    A.  Yes.
19    Q.  Do you see at the top where this is an
20  e-mail from the United States Drug Enforcement
21  Administration to Judy Hughes of CVS on
22  8/21/2014?
23    A.  Yes.
24    Q.  Do you know who Judy Hughes is?

Page 41

1     A.  Yes.
2     Q.  Who is she?
3     A.  She works in loss prevention.
4     Q.  She works in loss prevention?
5     A.  (Witness nodding.)
6     Q.  Do you see that this was a press
7  release that was published and given to Ms.
8  Hughes at CVS?  Do you see that?
9     A.  Uh-huh.
10    Q.  Yes?
11    A.  Yes.
12    Q.  Were you provided this information as
13  well?
14    A.  Not that I recall.
15    Q.  Go to the second page of that document
16  at the top.  Do you see the second sentence
17  there?
18        Highlight that, the current analysis.
19  Keep going.  It says, "The current analysis of
20  HCP"  Now stop.
21        HCP, you know to be hydrocodone
22  combination products, correct?
23    A.  I did not know that was --
24    Q.  For instance, hydrocodone

Page 42

1  acetaminophen, or Lortab, is an HCP. Did you
2  know that?
3      A.  I did not know that.
4      Q.  Did you know that Vicodin is an HCP, a
5  hydrocodone combination product?
6      A.  No.
7      Q.  Okay. Any time you see HCP, do you
8  now understand that's what we're talking
9  about?
10     A.  Yes.
11     Q.  So the current analysis of HCPs by
12 Health and Human Services, which is HHS, and
13 DEA, which is the Drug Enforcement Agency,
14 shows they had "a high potential for abuse and
15 abuse may lead to severe psychological or
16 physical depends. Adding non-narcotic like
17 acetaminophen to a hydrocodone does not
18 diminish its abuse potential. The many
19 findings by the DEA and HAS (sic) and the data
20 that support these findings are presented in
21 detail in the final rule on the website."
22         Did I read that correctly?
23     A.  Yes.
24     Q.  And is this, according to the

Page 43

1  documentation, a press release that was sent
2  to Judy Hughes at CVS --
3         MR. BUSH:  Objection.
4  BY MR. BAKER:
5      Q.  -- on 8/21/2014?
6      A.  (Witness reviews document.)
7         Yes.
8         MR. BUSH:  Excuse me, what
9  number was that? Was that --
10        MR. BAKER:  That's all part of
11 Exhibit No. 19.
12        MR. BUSH:  Exhibit 19, okay.
13 Thank you.
14 BY MR. BAKER:
15     Q.  Could you go to Exhibit No. 23,
16 please?
17
18        (Exhibit No. 23 marked for
19 identification.)
20
21 BY MR. BAKER:
22     Q.  Are you familiar with a person by the
23 name of Dean Vanelli?
24     A.  Yes.

Page 44

1      Q.  Who is Dean Vanelli?
2      A.  He's the Director of Logistics
3  Planning.
4      Q.  And are you familiar with --
5         VOICE: Could you read into
6  the record what Exhibit 19 is? Is that a
7  Bates number?
8         MR. BAKER:  I will get there.
9  It's Exhibit 19?
10        MR. BUSH:  23.
11 BY MR. BAKER:
12     Q.  Exhibit 23 starts with Bates Number
13 3749 and runs through Bates Number 3777. It
14 is an e-mail from Mr. Vanelli and -- it's
15 actually a string of e-mails from Mr. Vanelli
16 to various people and from Nicole Harrington
17 to Mr. Vanelli, from Donald Walker to various
18 people.
19         Do you see that --
20     A.  Yes.
21     Q.  -- on the front page?
22     A.  Yes.
23     Q.  Do you see that?
24     A.  Yes.

Page 45

1      Q.  Ma'am?
2      A.  Yes.
3      Q.  And do you see that the attachment to
4  it starts with something that says "McKesson"
5  at the top.
6         Do you see that?
7      A.  Yes.
8      Q.  Now, McKesson is one of the outside
9  vendors from whom CVS does business; is that
10 correct?
11     A.  Yes.
12     Q.  And sometimes a company like McKesson
13 will provide information like you're seeing to
14 CVS, which it has done in this instance,
15 according to this e-mail; is that correct?
16        MR. BUSH:  Objection.
17     A.  I can't say that I know that.
18 BY MR. BAKER:
19     Q.  At the bottom of the front page, it
20 says, "Nicole, attached at three files for
21 your use," probably a typo, probably should
22 have said "all three files for your use."
23         Do you see that?
24     A.  Yes.

Page 46

1    Q.  And it talks about, "Our Rx drug abuse
2  materials in which we have compiled
3  information on the global issue."
4        Do you see that?
5    A.  Yes.
6    Q.  Okay.  So turn to those materials, if
7  you would, on page 1, which was Bates Number
8  3750, all part of Exhibit 23 we're referring
9  to here today.
10        Do you see that first page there?
11    A.  Yes.
12    Q.  Do you see there where it says,
13  "According to the DEA's 2012 ARCOS data, the
14  following are a few commonly abused drugs with
15  the annual averages, number of dosage units
16  purchased by retail pharmacy for each of the
17  following drugs:  hydrocodone, 131,381;
18  oxycodone, 75,584."  And then it goes down to
19  discuss, "hydromorphone, 5,903; oxymorphone,
20  2,190."
21        Did I read that correctly?
22    A.  Yes.
23    Q.  At the bottom it says, "These numbers
24  are not guidelines for appropriate dispensing.

Page 47

1  They are simply national averages derived from
2  the DEA ARCOS data.  Diversion can occur in
3  purchases below the DEA national averages."
4        Did I read that correctly?
5    A.  Yes.
6    Q.  Go two more pages to where you get to
7  Bates No. 3752.  It's entitled, "Prescription
8  drug abuse."
9        Do you see that?
10    A.  Uh-huh, yes.
11    Q.  This is all part of the materials that
12  were attached to that e-mail that were sent to
13  CVS, according to the document I presented to
14  you, correct?
15        MR. BUSH:  Objection.
16  BY MR. BAKER:
17    Q.  Let's move on.  Do you see the next
18  document?  It says 3753 at the bottom.  It's
19  CVS Bates Number 3753.
20        Do you see that?
21    A.  Yes.
22    Q.  Do you see that it said "In 2007,
23  approximately 27,000 unintentional drug
24  overdose deaths occurred in the United States,

Page 48

1  one death every 19 minutes," that
2  "prescription drug abuse is the
3  fastest-growing drug problem in the United
4  States."
5        Did you see that?
6    A.  Yes.
7    Q.  This is -- this is right before you
8  assumed your new position in 2008, correct?
9        MR. BUSH:  Objection.
10  BY MR. BAKER:
11    Q.  2007 would be before you assumed your
12  new position in 2008, correct?
13    A.  Yes.
14    Q.  And when you assumed your new position
15  in 2008, did you study up on the existence of
16  the opioid epidemic?
17    A.  No.
18    Q.  You did no study at all on that?
19    A.  No.
20    Q.  Did you try to do any reading on it?
21    A.  No, not that I recall.
22    Q.  It just didn't concern you at all?
23    A.  I can't recall.
24    Q.  Turn to Bates Number 3755 at the

Page 49

1  bottom.  Do you see it?
2    A.  Uh-huh.
3    Q.  Yes?
4    A.  Yes.
5    Q.  You see where it talks about the
6  prescription drug abuse is an epidemic in the
7  United States, that prescription drugs cause
8  more deaths than heroin or cocaine combined.
9        Do you see that?
10    A.  Yes.
11    Q.  At the bottom it says "The U.S.
12  consumes 83 percent of the world's oxycodone
13  and 99 percent of the world's hydrocodone, two
14  highly prescribed opioid drugs for pain."
15        Do you see that?
16    A.  Yes.
17    Q.  As part of your job, do you know that
18  hydrocodone is a highly prescribed opioid drug
19  for pain?
20        MR. BUSH:  Objection.
21    A.  No, I don't know that.
22  BY MR. BAKER:
23    Q.  You don't know that.
24        Go to Bates Number 3761, all part of

Page 50

1 Exhibit No. 23. Could you highlight in the
2 first -- every portion that deals with Ohio
3 under oxycodone, hydrocodone, hydromorphone,
4 and oxymorphone?
5     Do you see the report here, that
6 current drug -- prescription drug diversion
7 trends dealing with states with the highest
8 pharmacy dispensing in 2012 shows that
9 oxycodone -- that Ohio is the fifth
10 highest-rated state for oxycodone relative to
11 the states with the highest pharmacy
12 dispensing in 2012? Do you see that?
13     MR. BUSH:  Objection.
14     A.  Yes, I can see that.
15 BY MR. BAKER:
16     Q.  Do you see that this chart indicates
17 that Ohio is the seventh highest state with
18 pharmacy dispensing in 2012 with respect to
19 the drug hydrocodone? Do you see that?
20     MR. BUSH:  Objection.
21     A.  Yes, I see that.
22 BY MR. BAKER:
23     Q.  Do you see in this chart where Ohio is
24 the eighth highest pharmacy dispensing state

Page 51

1 in 2012 for the drug hydromorphone?
2     MR. BUSH:  Objection.
3     A.  Yes, I see that.
4 BY MR. BAKER:
5     Q.  Do you see that Ohio is the seventh
6 highest pharmacy dispensing state in 2012 for
7 the drug oxymorphone?
8     MR. BUSH:  Objection.
9     A.  Yes, I see that.
10 BY MR. BAKER:
11     Q.  Did you know these statistics before I
12 just showed them to you?
13     A.  No, I did not.
14     Q.  Do you remember that chart that I
15 showed you about drug diversion migration out
16 of Florida that -- if you go to Bates Number
17 3766. Do you remember that drug migration
18 chart that I showed you just a few minutes ago
19 in a prior exhibit?
20     A.  Uh-huh, yes.
21     Q.  Yes?
22     A.  Yes.
23     Q.  Okay. This is where this came from.
24 This is a document -- that's a CVS document,

Page 52

1 Bates Number 3766, which means that it was
2 produced to us by CVS in this litigation. You
3 understand that?
4     MR. BUSH:  Objection.
5     A.  Yes.
6 BY MR. BAKER:
7     Q.  Okay. Do you see where in this chart
8 it delineates where drugs divert out of
9 Florida, up through Georgia, up through
10 Tennessee, Kentucky, ultimately into Ohio? Do
11 you see that?
12     MR. BUSH:  Objection.
13 BY MR. BAKER:
14     Q.  Do you see that on that? Is that
15 what's depicted on that chart?
16     A.  I see lines, yes.
17     Q.  And do you -- have you read about or
18 studied about the drug diversion migration out
19 of Florida as part of your job?
20     A.  No.
21     Q.  Have you been taught about that as
22 part of your job?
23     A.  No.
24     Q.  Have you attended DEA conferences on

Page 53

1 drug diversion?
2     A.  No.
3     Q.  Your employer does not send you to DEA
4 conferences to learn about drug diversion?
5     A.  No.
6     Q.  And you've never attended a DEA
7 conference on drug diversion?
8     A.  I've been to a DEA conference.
9     Q.  Dealing with the topic of drug
10 diversion with respect to opioids?
11     A.  I don't recall what the topics were
12 that were discussed.
13     Q.  Which DEA conference did you attend,
14 in what year, and what was the name of it?
15     A.  I don't recall the name of it. It was
16 in October of 2013.
17     Q.  Where was it located?
18     A.  Outside Washington, D.C.
19     Q.  Was it at the Gaylord hotel?
20     A.  Yes.
21     Q.  Now, in general, CVS has distribution
22 centers that serve or that supply opioid
23 medications to CVS retail stores; is that
24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    A.  Yes.
2    Q.  And those are narcotic drugs,
3  correct?
4    A.  Yes.
5    Q.  And the --
6    A.  Some.
7    Q.  -- the CVS distribution center
8  licensures that you know to exist are for
9  Schedule III through Schedule V drugs; is that
10 correct?
11   A.  Yes.
12   Q.  And you know that Schedule III drugs,
13 up until October of 2014, included hydrocodone
14 and hydrocodone combination products,
15 correct?
16   A.  Yes.
17   Q.  And you know that Schedule II drugs,
18 up until October 2014 and continuing, have
19 included OxyContin- and oxymorphone-related
20 drugs?
21   A.  I can't say if I specifically know
22 that they were Schedule II.
23   Q.  You know that hydrocodone combination
24 products were rescheduled to Schedule II by

Page 55

1  the FDA October 6 of 2014?  Do you know
2  that?
3        MR. BUSH:  Objection.
4    A.  I didn't know that.
5  BY MR. BAKER:
6    Q.  With respect to the distribution
7  centers located in Indianapolis -- you're
8  familiar with that, the Indianapolis
9  distribution center, correct?
10   A.  Yes.
11   Q.  And you're familiar with the
12 distribution center in Chemung, New York; is
13 that correct?
14   A.  Yes.
15   Q.  What is your job in the context of
16 having any contact with or review of anything
17 that is shipped to or shipped out of those
18 distribution centers?
19   A.  As reviewing shipments?
20   Q.  Anything.  Do you have any -- does
21 your job have any connection to those two
22 distribution centers whatsoever?
23   A.  Not for reviewing shipments, no.
24   Q.  What connection does your job have

Page 56

1  with respect to those two distribution
2  centers?
3    A.  My job now or previous?
4    Q.  Between 2008 and 2013.
5    A.  I was a liaison for the distribution
6  centers, so they would reach out to me when
7  they needed to get assistance as far as being
8  a central point of contact for the corporate
9  office.
10   Q.  Are you familiar with whether or not
11 those two distribution centers served the CVS
12 stores that are retail pharmacies in the state
13 of Ohio?
14   A.  I can't say off the top of my head if
15 I knew what states they serviced.
16   Q.  Let me show you what's marked as
17 Exhibit No. 25.
18
19      (Exhibit No. 25 marked for
20 identification.)
21
22 BY MR. BAKER:
23   Q.  It's the Track 1 CVS store
24 information.

Page 57

1        What I've shown you is a list of CVS
2  pharmacy stores that are located in Ohio.
3  Have you ever seen this list before?
4    A.  No, not this list.
5    Q.  And you're telling me you don't know
6  one way or the other if the Chemung, New York,
7  distribution center or the Indianapolis
8  distribution center served these Track 1 CVS
9  stores in Ohio?  You don't know?
10   A.  I don't -- I don't recall which
11 distribution center services which stores.
12   Q.  Do they -- do any of the -- did any of
13 those two distribution centers or either of
14 those two distribution centers serve any of
15 these stores on this list?
16   A.  I can't say -- I don't recall which
17 distribution center services which stores, off
18 the top of my head.
19   Q.  Let's move on.  Let's go to the next
20 one.
21        MR. BAKER:  Let's take a short
22 break off record.
23        THE VIDEOGRAPHER:  The time is
24 10:01 a.m.  We're off the record.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1
2          (Recess was taken from 10:01 a.m.
3      to 10:08 a.m.)
4
5          THE VIDEOGRAPHER:  The time is
6  10:08 a.m. and we're on the record.
7  BY MR. BAKER:
8      Q.  I'm going to hand you Exhibit No. 58,
9  which is the CVS standard operating procedures
10  manual.  It's Bates-numbered 34375.  Have you
11  ever seen this manual before?
12
13          (Exhibit No. 58 marked for
14  identification.)
15
16          MR. BUSH:  Can I get a copy of
17  that?
18      A.  (Witness reviews document.)
19          MR. BUSH:  Well, objection.  I'm
20  not sure that your statement accurately
21  describes it, but go ahead.  You can answer.
22  BY MR. BAKER:
23      Q.  What does it say on the first page,
24  ma'am, of the Document No. 58, Exhibit 58?

Page 59

1      A.  "CVS standard operating procedures."
2      Q.  Is that what I said it was or not?
3      A.  Yes.
4      Q.  Okay.  And would you turn to the
5  last -- excuse me, to page No. 34378, at the
6  bottom, Bates number?
7      A.  Yes.
8      Q.  Now, this document indicates an
9  introduction to the CSA, which is the
10  Controlled Substance Act, and DEA, which is
11  the Drug Enforcement Agency, regs, which is
12  regulations, correct?
13      A.  Yes.
14      Q.  And you understand this to be a CVS
15  document, correct?  I mean, look at page 1
16  where I said it shows the CVS standard
17  operating procedures.
18          Do you see that?
19      A.  I see that.
20      Q.  Can you say yes, that this is a CVS
21  document?
22      A.  I can't say if it's a CVS -- it says
23  CVS on it, but I can't say if I know it to be
24  a CVS document, no.

Page 60

1      Q.  Okay.  All right.  Do you see where it
2  says, "Controlled Substance Act passed in
3  1971."
4          Do you see that?
5      A.  Uh-huh, yes.
6      Q.  Do you know that the Controlled
7  Substance Act has been on the books since
8  1971?
9      A.  No, I did not know.
10      Q.  Did you know that the Controlled
11  Substance Act established the concept of
12  controlled substances, combined narcotics and
13  dangerous drugs?  Did you know that?
14      A.  No.
15      Q.  Is that what that document
16  indicates?
17      A.  The document indicates, yes.
18      Q.  Did you know that it places
19  enforcement into the Department of Justice of
20  those types of drugs?
21      A.  No, I didn't know that.
22      Q.  Did you know that there are
23  established quotas with respect to those types
24  of drugs?

Page 61

1      A.  No, I did not know that.
2      Q.  Did you know that it provides for a
3  closed system of distribution for those types
4  of drugs?
5      A.  I did not know that.
6      Q.  Do you know what closed system of
7  distribution even is with respect to narcotic
8  drugs?
9      A.  I can't say I know the details, no.
10      Q.  So let's move on to the next exhibit,
11  please.
12
13          (Exhibit No. 37 marked for
14  identification.)
15
16  BY MR. BAKER:
17      Q.  I'm handing you Exhibit No. 37 which
18  is an e-mail with an attached letter dated
19  December 27, 2007 from a Mr. Joseph Rannazzisi
20  of the United States Department of Justice
21  Drug Enforcement Administration.
22          Have you ever seen that letter dated
23  December 27, 2007?
24      A.  (Witness reviews document.)

Page 62

1    No, I can't say that I have.

2    Q.  Have you ever seen the e-mail that's

3    attached or that is dated 1/14/2014 that I've

4    handed to you as Exhibit No. 37?

5    A.  I can't say that I have.

6    Q.  Let me read the e-mail to you.  It

7    says, "Team" -- and this is an e-mail from a

8    person named Craig Schiavo to several people

9    within CVS, January 14, 2014, correct?

10   A.  Yes.

11   Q.  And the subject matter is SOM

12   communications from DEA, correct?

13   A.  Yes.

14   Q.  SOM is suspicious order monitoring,

15   correct?

16   A.  Yes.

17   Q.  All right.  And it references this

18   12/27/2007 DEA letter, correct?

19   A.  Yes.

20   Q.  It says, "Team, attached are FYIs.

21   These are communications from the DEA to DEA

22   registrants.  The 2007 letter from the DEA is

23   the letter that put registrants on notice that

24   the DEA was going to start heavily enforcing

Page 63

1    the SOM regulations."  Correct?

2    A.  Yes, that's what it says.

3    Q.  You stated earlier that -- I can't

4    remember if you said you either did not see

5    this letter before or can't recall.  Which one

6    is it?

7    A.  I don't recall seeing this letter

8    before.

9    Q.  Is it possible that you've seen this

10   letter before?

11   A.  I don't recall.

12   Q.  All right.  Are you familiar -- well,

13   go to page 2 of the letter, if you would.

14       Now, you're familiar with the

15   suspicious order monitoring system that was

16   used by CVS from 8/25/2010 forward?

17       MR. BUSH:  Objection.

18   BY MR. BAKER:

19   Q.  Am I correct?

20       MR. BUSH:  Objection.

21   A.  I don't know what you mean by

22   "familiar."

23   BY MR. BAKER:

24   Q.  Did you have anything to do with

Page 64

1    inserting a suspicious order monitoring policy

2    into the CVS system?

3    A.  No.

4        MR. BUSH:  Objection.

5    BY MR. BAKER:

6    Q.  You did not?

7    A.  No.

8    Q.  Are you familiar with that occurring

9    8/25/2010?

10       MR. BUSH:  Objection.

11   A.  I don't recall.

12   BY MR. BAKER:

13   Q.  You don't know?

14   A.  (Witness nodding.)

15   Q.  We'll get to that in a minute.

16       You see where it says -- at the top of

17   page 2 it says, "Registrants that rely on

18   rigid formulas to define whether an order is

19   suspicious may be failing to detect suspicious

20   orders."

21       Do you see that?

22   A.  Yes.

23   Q.  Do you see where the next sentence

24   says, "For example, a system that identifies

Page 65

1    orders as suspicious only if the total amount

2    of a controlled substances ordered during one

3    month exceeds the amount ordered the previous

4    month by a certain percentage or more is

5    insufficient."

6        Do you see that?

7    A.  Yes.

8    Q.  Do you know what that means?

9        MR. BUSH:  Objection.

10   BY MR. BAKER:

11   Q.  Do you?

12       MR. BUSH:  Objection.

13   BY MR. BAKER:

14   Q.  Do you understand what that means?

15       MR. BUSH:  Objection.

16   A.  Yes.

17   BY MR. BAKER:

18   Q.  What does it mean to you?

19       MR. BUSH:  Objection.

20   A.  The example is saying if you are using

21   the number from the previous month to

22   calculate by percentage is insufficient.

23   BY MR. BAKER:

24   Q.  You see the next sentence says, "This

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  system fails to identify orders placed by a
2  pharmacy if the pharmacy placed unusually
3  large orders from the beginning of its
4  relationship with the distributor."
5      Do you see that?
6      A.  Yes.
7      Q.  Let me give you an example.
8          Suppose -- suppose you had a CVS store
9  that was not monitored all the way up until a
10  certain time frame and during that time frame
11  it reached an average purchase of say 30,000
12  hydrocodone combination products per month,
13  and now we start monitoring at CVS through the
14  suspicious order monitoring system whether or
15  not drugs ordered the following month are
16  consistent with what was ordered the prior
17  month to determine whether or not it might be
18  more ordered the following month than the
19  prior month.
20      Do you understand that example --
21          MR. BUSH:  Objection.
22  BY MR. BAKER:
23      Q.  -- as a hypothetical?
24          MR. BUSH:  Objection.

Page 67

1  BY MR. BAKER:
2      Q.  Do you understand what I just said?
3      A.  If more are ordered the next month?
4      Q.  Yes, ma'am.
5      A.  I understand your example.
6      Q.  If the -- if the 30,000 that had
7  already been ordered in that hypothetical
8  example had not been monitored properly before
9  it's compared against the months subsequent to
10  that, then we're starting with a number to
11  compare subsequent months against -- that is
12  an unmonitored number to begin with to compare
13  it against; am I correct?
14          MR. BUSH:  Objection.
15  BY MR. BAKER:
16      Q.  Using that example hypothetically?
17          MR. BUSH:  Objection.
18      A.  Yeah, hypothetically, for that
19  example, yes.
20  BY MR. BAKER:
21      Q.  You see where it says here -- the next
22  sentence it says, "Although this system would
23  not identify orders as suspicious if the order
24  were solely one highly abused controlled

Page 68

1  substance, if orders never grew
2  substantially."
3      Do you see that?
4      A.  Yes.
5      Q.  Do you see it says, "Nevertheless,
6  ordering one highly abused controlled
7  substance and little or nothing else deviates
8  from the normal pattern of what pharmacies
9  generally order."
10      Do you see that?
11      A.  Yes.
12      Q.  To you, does that mean that if a
13  pharmacy orders hydrocodone combination
14  products and little or nothing else that it
15  deviates from the normal pattern of what
16  pharmacies generally order?
17          MR. BUSH:  Objection.
18      A.  I don't think I can say.
19      Q.  Let's move on to the next exhibit.
20
21      (Exhibit No. 61 marked for
22  identification.)
23
24  BY MR. BAKER:

Page 69

1      Q.  Let me show you Exhibit No. 61.  Have
2  you ever seen Exhibit No. 61 before?  It's an
3  e-mail dated 5/8/2013 with CVS Bates Number
4  55266.  It's from Craig Schiavo to a man named
5  Aaron Burtner regarding an attachment of a DEA
6  letter, that same DEA letter that I just
7  discussed with you dated December 27, 2007.
8      A.  Not that I recall.
9      Q.  Do you know who Craig Schiavo is?
10      A.  Yes, I know who he is.
11      Q.  Who is Mr. Schiavo?
12      A.  He's -- he used to work at CVS.
13      Q.  In what capacity?
14      A.  I don't know his exact positions, but
15  I -- he was in pharmacy operations at one
16  time.
17      Q.  And who is Aaron Burtner?
18      A.  I believe Aaron -- I know the name,
19  but I can't really recall what he did.
20      Q.  Did his job have something to do with
21  suspicious order monitoring within the CVS
22  companies?
23      A.  I can't recall.
24      Q.  Do you see where this e-mail says, "In

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  case you haven't read the letter that started
2  all of this SOM stuff and the wholesalers
3  getting fined, attached is what started it
4  all.  Thank you.  Craig."
5      Do you see that?
6      A.  Yes, I do.
7      Q.  Did anybody at CVS tell you that it
8  was the DEA letter of December 27, 2007 that
9  started all of this suspicious order
10 monitoring stuff?
11     A.  Not that I can recall.
12     Q.  Do you remember the document I had
13 shown you previously earlier today that talked
14 about the Controlled Substance Act, which
15 required suspicious order monitoring has been
16 in effect since 1971?  Do you remember that
17 document?
18     A.  Yes.
19     Q.  Is it true that CVS only started
20 taking notice of the need to implement a
21 suspicious order monitoring policy as a result
22 of this letter that was received December 27,
23 2007?
24     A.  I can't --

Page 71

1          MR. BUSH:  Objection.
2      A.  I can't -- I can't answer that.
3  BY MR. BAKER:
4      Q.  Is it true that this letter dated
5  December 27, 2007 was the catalyst to get CVS
6  started on suspicious order monitoring
7  policies, yes or no?
8          MR. BUSH:  Objection.
9      A.  I can't -- I can't answer that.
10 BY MR. BAKER:
11     Q.  You're not familiar with CVS having
12 any written suspicious order monitoring policy
13 that became part of its SOP or standard
14 operating procedures at any time in 2006, are
15 you?
16     A.  I can't recall.
17     Q.  You're not familiar with there being
18 any suspicious order monitoring policy of CVS
19 that is in written form and became part of a
20 policy and procedure or standard operating
21 procedure within CVS in 2007; am I correct?
22     A.  I can't recall.
23     Q.  Does it appear to you from reading
24 this letter that -- I mean, from reading the

Page 72

1  e-mail dated 5/18/34 (sic) between Mr. Schiavo
2  of CVS and Mr. Burtner of CVS that it, indeed,
3  was this letter dated December 27, 2007 that
4  started this SOM stuff?
5          MR. BUSH:  Objection.
6      A.  I can't answer that.
7  BY MR. BAKER:
8      Q.  Well, you're not familiar with any SOM
9  stuff that CVS was engaging in before 2007,
10 correct?
11         MR. BUSH:  Objection.
12     A.  I can't recall.
13 BY MR. BAKER:
14     Q.  You can't recall.  Is that what your
15 answer was?
16     A.  Yes.
17     Q.  All right.  Next I'm going to show you
18 what's marked as Exhibit No. 12 and it is CVS
19 Bates Document No. 2188.
20
21     (Exhibit No. 12 marked for
22 identification.)
23
24 BY MR. BAKER:

Page 73

1      Q.  And at the top, it says, "SOM
2  Program."  Do you see that?
3      A.  Yes, I see that.
4      Q.  Do you know what a SOM program means,
5  yes or no?
6      A.  Yes, suspicious order monitoring.
7      Q.  As an employee of CVS, in your job do
8  you have anything at all to do with suspicious
9  order monitoring programs?
10     A.  No.
11     Q.  Have you ever had anything at all to
12 do with suspicious order monitoring programs?
13     A.  No.  The program itself, no.
14     Q.  Have you ever had anything to do with
15 drafting or implementation of suspicious order
16 monitoring programs within CVS?
17     A.  Not a program, no.
18     Q.  Have you ever had anything to do with
19 drafting or inserting into the standard
20 operating procedures of CVS a suspicious order
21 monitoring policy?
22         MR. BUSH:  Objection.  Compound.
23     A.  I wasn't responsible for drafting any
24 SOM policies.

Highly Confidential - Subject to Further Confidentiality Review

BY MR. BAKER:

Q. Have you ever been responsible for or participated within the process of inserting a suspicious order monitoring policy within the suspicious -- within the policies and procedures or standard operating procedures of CVS?

MR. BUSH: Objection.

A. I was responsible for updating SOPs.

Q. Are you familiar with the know-your-customer policy of the DEA?

A. No.

Q. You've never heard of that?

A. Not that I recall.

Q. Let me show you this DEA policy and what it states according to this CVS document.

The policy states, "It is fundamental for sound operations that handlers take reasonable measures to identify their customers, understand the normal and expected transactions typically conducted by those customers, and consequently identify those transactions conducted by their customers that are suspicious in nature."

Have you ever heard of that policy before today?

A. I don't recall ever seeing this policy.

Q. Have you ever heard of that policy before today?

A. I don't recall.

Q. In your job with CVS pharmacy, you never were instructed on this policy?

A. Instructed how?

Q. In any manner.

A. Not that I recall.

Q. Let's move on. I'm going to show you --

MR. BAKER: Let's go off record for a second.

THE VIDEOGRAPHER: The time is 10:27 a.m. and we're off the record.

(Recess taken from 10:27 a.m. to 10:37 a.m.)

(Exhibit No. 204 previously marked for identification.)

THE VIDEOGRAPHER: The time is 10:37 a.m. and we're on the record.

BY MR. BAKER:

Q. Ms. Propatier, I'm going to hand you Plaintiff's Exhibit 204.

MR. BAKER: I'll give a copy to your counsel.

BY MR. BAKER:

Q. Do you recognize this to be the Controlled Drug DEA Standard Operating Procedures Manual of the CVS distribution center, effective date 12/1/07, with revision dates having several but last revised under this revision 11/8 of 2011?

Do you see that up at the top?

A. Yes.

Q. You've seen these before, have you not?

A. Yes.

Q. Okay. Let me direct your attention to Section X, which would be 10-8, which is going to be page number -- Bates Number 8559.

VOICE: Can we get a

beginning Bates number for the document?

MR. BAKER: Yes. The beginning Bates number is 8506. The ending Bates number is 8571.

MR. BUSH: 85590 (sic) is where you would like her to --

MR. BAKER: Yes.

MR. BUSH: -- look, right?

MR. BAKER: Yes, sir. Could we show this under the document?

MR. BUSH: Take your time to be familiar with the document. It's a long document.

(Witness reviews document.)

BY MR. BAKER:

Q. Go to X-5. The Bates is 8556.

Could I get you, please, to highlight the last sentence of Paragraph 11, beginning with "Amy Propatier."

Ms. Propatier, are you familiar with this document that is now before you?

A. Yes.

MR. BUSH: Asked and answered.

BY MR. BAKER:

Page 78

1  Q.  The answer is yes?
2  A.  Yes.
3  Q.  I'd like you to look at Paragraph 11
4  on page X-5, which is 10 -- Subsection 10-5.
5  Do you see that?
6  MR. BUSH:  I would ask you to
7  make sure that you've had a chance to look
8  through the documents.
9  THE WITNESS:  I'm trying.
10  MR. BUSH:  Make sure you
11  understand where it is.
12  THE WITNESS:  Yeah.
13  (Witness reviews document.)
14  BY MR. BAKER:
15  Q.  Ma'am, I'll hand it to you, if you
16  would like.
17  MR. BUSH:  She has it, don't
18  you?
19  THE WITNESS:  Yeah, I'm just
20  reading.  I'm just reading where I am.
21  BY MR. BAKER:
22  Q.  Ma'am, are you familiar with the
23  document in front of you?
24  MR. BUSH:  Objection.  Asked and

Page 79

1  answered.
2  A.  Yes.
3  BY MR. BAKER:
4  Q.  Yes?
5  A.  Yes.
6  Q.  Okay.  And would you please direct
7  your attention to page X-5, which is 10-5,
8  Paragraph 11, last sentence?
9  Do you see that?
10  A.  Uh-huh.
11  Q.  Yes?
12  A.  Yes.
13  Q.  Your name is Amy Propatier, correct?
14  A.  Yes.
15  Q.  And this document says that "Amy
16  Propatier (CVS DEA compliance coordinator) and
17  Frank Devlin, director of logistics loss
18  prevention."  Is that correct?
19  A.  Yes.
20  Q.  Were you, at the time of this
21  document, the CVS DEA compliance
22  coordinator?
23  MR. BUSH:  Well, objection.
24  A.  That was a title for reference in

Page 80

1  SOPs.  My title -- my job position title was
2  logistics pharmacy services manager.
3  BY MR. BAKER:
4  Q.  Did you ever hold the title of CVS DEA
5  compliance coordinator?
6  A.  Yes.  As a title for SOP reference,
7  yes.
8  Q.  And did you perform duties as a DEA
9  coordinator or not -- DEA compliance
10  coordinator for CVS?  Let me repeat the
11  question.
12  Did you perform duties as a CVS DEA
13  compliance coordinator while under the employ
14  of CVS?
15  A.  What type of duties?  I don't know
16  what you mean.
17  Q.  Did you perform any type of DEA
18  compliance coordinator duties while under the
19  employ of CVS?
20  A.  I submitted ARCOS reporting, yes.
21  Q.  Did you have anything at all to do
22  with suspicious order monitoring?
23  MR. BUSH:  Objection, but you
24  can answer.

Page 81

1  A.  No, only updating the SOP with what
2  was provided for the program.
3  Q.  Let's go to the next numbered exhibit.
4  Now, who, other than this document,
5  ever called you by the title CVS DEA
6  compliance coordinator?  Who within the
7  company ever called you that other than this
8  document?
9  MR. BUSH:  Objection.  If you
10  understand, you can answer.
11  A.  I don't -- I'm not sure what you mean.
12  BY MR. BAKER:
13  Q.  You've told me about your logistics
14  title, correct?
15  A.  Yes.
16  Q.  And name that title again, what it is.
17  A.  Logistics pharmacy services manager.
18  Q.  At any place within CVS, other than
19  within this document that I showed you, were
20  you ever listed within CVS as a DEA compliance
21  coordinator?
22  A.  Do you mean like in personnel, like as
23  the company?
24  Q.  Yes, ma'am.

Page 82

1    A.  Not in personnel records, no.
2    Q.  Okay.  Do you know why CVS put you in
3  here as the CVS DEA compliance coordinator
4  within their controlled drug DEA Standard
5  Operating Procedures Manual?
6    A.  It was a title just for SOP purposes
7  because people change positions, that it would
8  be -- that would be the position they referred
9  to because the person in title may change.  So
10  if they had one specific title for this point
11  of contact, it could change if the person or
12  position changed.
13    Q.  Were you ever the CVS DEA compliance
14  coordinator?
15    A.  In regards to?
16    Q.  Your job at CVS.
17    A.  My job was the pharmacy services
18  manager.  This title was for SOP purposes.
19    Q.  Were you ever -- for personnel
20  purposes ever considered the CVS DEA
21  compliance coordinator?
22    A.  No, I was not.
23    Q.  It's just something that's listed
24  within the Controlled Drug DEA Standard

Page 83

1  Operating Procedures Manual that says that's
2  what you are; is that correct?
3        MR. BUSH:  Objection.
4    A.  In this manual, yes.
5  BY MR. BAKER:
6    Q.  Were you employed by CVS on 8/23/2010?
7    A.  Yes.
8    Q.  Let me show you what's marked as
9  Exhibit No. 98.
10
11        (Exhibit No. 98 marked for
12  identification.)
13
14  BY MR. BAKER:
15    Q.  This is Bates Number 89188.  It's an
16  e-mail dated 8/23/2010 from John Mortelliti to
17  Frank Devlin with a copy going to you, Amy
18  Propatier, correct?
19    A.  Yes.  Yes.
20    Q.  It's actually an e-mail string,
21  correct?
22    A.  Yes.
23    Q.  Okay.  Have you ever seen this e-mail
24  before or do you recall this e-mail?

Page 84

1    A.  I don't recall it.
2    Q.  Let me read the e-mail.  It says,
3  "Good morning, Amy."  That would be you,
4  correct?
5    A.  Yes.
6    Q.  And this is from Mr. Mortelliti?
7    A.  Yes.
8    Q.  And who is Mr. Mortelliti at this
9  time?
10    A.  He was the loss prevention in the
11  Lumberton distribution center.
12    Q.  It says, "I attached the PSE SOP to
13  this e-mail.  The controlled drug SOP is being
14  reviewed by counsel."
15        Do you know what the controlled drug
16  SOP means?
17    A.  I can't recall --
18    Q.  Would that --
19    A.  -- what he's referring to.
20    Q.  Would that be controlled drug standard
21  operating procedure?
22    A.  I can't recall if that's what he was
23  referring to.
24    Q.  Do you know what a controlled drug SOP

Page 85

1  is?
2    A.  I know what controlled drug SOPs are,
3  yes.
4    Q.  What are they?
5    A.  They would be our SOPs for our
6  distribution centers.
7    Q.  Which are standard operating
8  procedures --
9    A.  Yes.
10    Q.  -- with respect to controlled drugs?
11    A.  Yes.
12    Q.  Controlled drugs include narcotics
13  such as hydrocodone-combination products,
14  correct?
15    A.  Correct.
16    Q.  Controlled drugs also include
17  OxyContin and oxymorphone drugs, correct,
18  although the distribution centers did not
19  handle those, correct?
20    A.  Correct.
21    Q.  Those drugs were sold at CVS retail
22  stores though, correct, the oxymorphone and
23  oxycodone?
24    A.  I would assume, but I can't say for

Page 86

1    certain because I didn't work in retail.
2        Q.  It then goes on to state, "I hope to
3    receive it back today.  I will forward it as
4    soon as I get the information, that the draft
5    is acceptable."
6        Do you see that?
7        A.  Yes, I see that.
8        Q.  Did I read that correctly?
9        A.  Yes.
10       Q.  The next is -- in that string is an
11   e-mail dated August 23, 2010 from Frank Devlin
12   to John Mortelliti copying you, Amy Propatier,
13   correct?
14       A.  Yes.
15       Q.  And it's regarding the DEA SOP.
16       Do you see that?
17       A.  Yes.
18       Q.  It says, "Good morning, John.  Can you
19   work with Amy to get the PSE IRR and
20   controlled drug IRR inserted into our DEA SOP
21   under suspicious order monitoring?  We
22   promised this to the DEA by Wednesday."
23       Do you see that?
24       A.  Yes.

Page 87

1        Q.  Do you know what that is referencing
2    "We promised this to the DEA by Wednesday,"
3    what that's all about?
4        A.  I don't recall.
5        Q.  Did you know at the time of this
6    e-mail that there was an inspection by the DEA
7    going on at the Indianapolis distribution
8    center?
9        A.  I can't say if I recall.
10       Q.  Do you recall what the reason was that
11   this SOM policy -- this written SOM policy was
12   attempting to be inserted into the standard
13   operating procedure of CVS during that same
14   time frame that the inspection was going on at
15   the Indianapolis facility?
16           MR. BUSH:  Objection.
17       A.  I can't say I recall.
18   BY MR. BAKER:
19       Q.  Now, let me show you what's marked as
20   Exhibit No. 97.
21
22       (Exhibit No. 97 marked for
23   identification.)
24

Page 88

1    BY MR. BAKER:
2        Q.  This is Bates Number 88956 through
3    89025, correct, the first page and the last
4    page?
5        A.  Yes.
6        Q.  This is an e-mail from you, Amy
7    Propatier, to Annette Lamoureux, dated
8    8/26/2010; is that correct?
9        A.  Correct.
10       Q.  And this relates to a DEA SOP
11   8/25/2010, correct?
12       A.  8/26?
13       Q.  It says DEA SOP --
14       A.  Oh wait, sorry.
15       Q.  -- 8/25/2010, does it not?
16       A.  Yes.
17       Q.  And then you turn the next page and it
18   has the effective date of the standard
19   operating procedures manual, was 12/1/07,
20   correct?
21       A.  Correct.
22       Q.  That was the initial written standard
23   operating procedures manual of CVS.  That's
24   the first one, 12/1 of 2007, correct --

Page 89

1           MR. BUSH:  Objection.
2    BY MR. BAKER:
3        Q.  -- in this series?
4        A.  In this series.
5        Q.  Correct?  Is that correct?
6        A.  For this document, yes.
7        Q.  And this revision is 8/25/2010,
8    correct?
9        A.  Correct.
10       Q.  And what was going on is that CVS, for
11   the first time, was adding a written
12   suspicious order monitoring policy within its
13   standard operating procedure manual, correct?
14       A.  I can't say --
15           MR. BUSH:  Objection.
16       A.  -- that.
17   BY MR. BAKER:
18       Q.  Are you familiar with whether -- let
19   me ask you this:  Do you know of any
20   suspicious order monitoring written policy
21   that was ever made part of a standard
22   operating procedures manual for CVS before
23   this date, 8/25/2010, reflected in your
24   e-mail?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    A.  I can't recall.
2    Q.  Would the answer be no, you're not
3  familiar with any prior written standard
4  operating suspicious order monitoring written
5  policy being inserted within an SOP before
6  8/25/10?  You're not familiar with that?
7       MR. BUSH:  Objection.  Asked and
8  answered.
9  BY MR. BAKER:
10   Q.  You say you don't recall?
11   A.  Yeah I don't recall.
12   Q.  Let me ask you this way:  Have you
13  ever seen a written SOM, suspicious order
14  monitoring, policy of CVS at any time that was
15  part of the standard operating procedures
16  manual of CVS at any time before 8/25/2010?
17      MR. BUSH:  Objection.  Asked and
18  answered.
19   A.  Yeah, I don't recall.
20  BY MR. BAKER:
21   Q.  All right.  Did you read this document
22  that's called "DEA SOP 8/25/10" that's
23  attached to this e-mail before you wrote this
24  e-mail that says, "Can you please post?  We

Page 91

1  added this suspicious order monitoring"?
2       Did you read the document before you
3  asked for it to be posted?
4    A.  I can't remember.
5    Q.  At any time in your preparations for
6  your testimony, have you reviewed this
7  document?
8    A.  I've seen --
9       MR. BUSH:  You can say yes or
10  no --
11   A.  Yes.
12      MR. BUSH:  -- but --
13   A.  Yes.
14  BY MR. BAKER:
15   Q.  Yes?
16   A.  I've seen this document.
17   Q.  When did you last review this
18  document?
19   A.  I saw it yesterday.
20   Q.  And when did you last see it before
21  yesterday?
22   A.  I don't know.  I can't recall.
23   Q.  Is this something that you review
24  annually, something that you never reviewed

Page 92

1  before yesterday, something that you review
2  every week?  Tell me.  Tell me.
3    A.  I don't work with this document in my
4  current role.
5    Q.  Had you ever read this document before
6  yesterday?
7    A.  I'm sure I have, yes.
8    Q.  Do you know when that would have
9  been?
10   A.  I can't remember.
11   Q.  Let me direct you to section Roman
12  numeral 8, Subsection D.  And it's Roman
13  numeral 8-5.
14      MR. BUSH:  This is Bates Number
15  8995; is that right?
16      MR. BAKER:  Yes.  This is going
17  to be page Number 8995.  Give me just a
18  second.  Let's go off record for just a
19  second.
20      THE VIDEOGRAPHER:  The time is
21  10:55 am.  We're off the record.
22
23      (Recess taken from 10:55 a.m.
24       to 10:58 a.m.)

Page 93

1
2       THE VIDEOGRAPHER:  The time is
3  10:58 a.m.  We're on the record.
4       MR. BUSH:  I'm going to object
5  in the future for going off the record to try
6  and figure out where you are in your
7  questioning.  This is your time.
8       And I understand if there were
9  problems with the witness answering, taking
10  too long.  And I understand you've got a time
11  limit, but I don't think it's appropriate to
12  go off the record while you try to figure out
13  where you are in your questions.
14      I'm just putting that on the record.
15  We'll worry about that in the future.
16      MR. BAKER:  I'll just use my
17  time as I deem appropriate.
18      MR. BUSH:  Well, I'm not
19  necessarily agreeing that you get to go off
20  the record.  I'm telling you that now.
21  Hopefully it won't be an issue.
22  BY MR. BAKER:
23   Q.  Let me show you Exhibit No. 94.
24

Page 94

1    (Exhibit No. 94 marked for
2 identification.)
3
4 BY MR. BAKER:
5    Q.  I would ask you if you've ever seen
6 this exhibit before.  That's an e-mail dated
7 11/5/2009.
8       Do you see that?
9    A.  Uh-huh, yes.
10   Q.  Do you see where this is an e-mail
11 from Mr. John Mortelliti to Christopher Knight
12 dated 11/5/2009?
13   A.  Yes.
14   Q.  Who is John Mortelliti at this time of
15 2009?
16   A.  He worked in loss prevention in the
17 Lumberton distribution center.
18   Q.  And who is Christopher Knight
19 11/5/2009?
20   A.  I do not know.
21   Q.  Let me read the e-mail.  Tell me if
22 this is a correct reading.
23      It says, "Sounds good.  I'm trying to
24 get a rough draft SOM SOP to you prior to the

Page 95

1 meeting.  This is a big issue with CVS and the
2 DEA."
3       Do you see that?
4    A.  Yes.
5    Q.  Do you know what the context of that
6 big issue is with CVS and the DEA relative to
7 an SOM SOP being drafted?
8    A.  I do not.
9       MR. BUSH:  Objection.
10   Q.  Okay.  Let me --
11      MR. BUSH:  Let me just object.
12 BY MR. BAKER:
13   Q.  I'll ask the question again because he
14 overrode your answer.
15      MR. BUSH:  No.  Actually, I
16 think it's reflected on the record.
17 BY MR. BAKER:
18   Q.  Let me read this again.  It says,
19 "Sounds good.  I'm trying to get a rough draft
20 SOM SOP to you prior to the meeting.  This is
21 a big issue with CVS and the DEA."
22      Do you see that, where I read that?
23   A.  Yes.
24   Q.  Is that a correct reading of that

Page 96

1 e-mail?
2    A.  Yes.
3    Q.  Okay.  Are you familiar with what the
4 big issue was with CVS and the DEA relative to
5 getting a rough draft of the SOM SOP?
6       MR. BUSH:  Objection.  Go ahead.
7    A.  I don't know what he's referring to.
8 BY MR. BAKER:
9    Q.  Other than participating with
10 requesting that the suspicious order
11 monitoring policy be inserted into the SOP on
12 8/25/2010, did you have anything at all to do
13 with that policy, whether it be drafting it or
14 implementing it, in your job at CVS?
15   A.  With the whole policy?
16   Q.  Yes, ma'am, the suspicious order
17 monitoring policy.
18   A.  I worked with implementing it, the
19 DCs, like sending it out to make sure
20 everybody had it, and updating information in
21 it.
22   Q.  Other than that, did you have anything
23 to do with it?
24   A.  As far as?

Page 97

1    Q.  You've answered the question.  Other
2 than that, did you?
3    A.  Not that I recall.
4    Q.  And insofar as you're implementing it,
5 the implementation of it would have been which
6 title job, the one listed in the SOM SOP or
7 the one that you're listed in personnel?
8    A.  Both titles were on my name, so I
9 would have e-mailed it out as my -- in my
10 script line.
11   Q.  Let me show you an exhibit that's an
12 e-mail dated 9/1/2010.  And we'll mark it as
13 Exhibit No. 81.
14
15      (Exhibit No. 81 marked for
16 identification.)
17
18 BY MR. BAKER:
19   Q.  It's Bates Number 75299 through 75312.
20 Have you ever seen this e-mail before or this
21 e-mail string?
22   A.  (Witness reviews document.)
23      MR. BUSH:  Take your time and
24 look through it.

Page 98

1 　　　THE WITNESS:  I am.
2 　　A.  (Witness reviews document.)
3 　　　Not that I recall.
4 BY MR. BAKER:
5 　　Q.  Now, you recall that in that 8/25/10
6 SOP and ones thereafter, you had a title that
7 was DEA compliance coordinator.  Do you
8 remember that?
9 　　A.  Yes.
10 　　Q.  Now, let me ask you to look at the
11 e-mail -- well, before I go to my next
12 question, you remember that in personnel at no
13 time were you ever listed in that position; is
14 that correct?
15 　　A.  Correct.
16 　　Q.  Now, look at the e-mail on this
17 document dated September 1, 2010 at 10:53 a.m.
18 between John Mortelliti and various people.
19 　　　Do you see that?
20 　　A.  Yes.
21 　　Q.  It talks about -- the subject is "DEA
22 Speaking Points."
23 　　　Do you see that?
24 　　A.  Yes.

Page 99

1 　　Q.  And the importance is high, correct?
2 　　A.  Yes.
3 　　Q.  It says, "Team, these are the final
4 approved speaking points for the DEA agents if
5 they come out -- if they come to one of your
6 facilities and question suspicious monitoring.
7 It is okay to share this document.  Please be
8 sure your team understands it before
9 presenting it so it doesn't look like a prop
10 instead of a tool."
11 　　　Is that what it says?
12 　　A.  That's what it says.
13 　　Q.  Is "prop" is something that's a false
14 premise; is that correct?
15 　　　MR. BUSH:  Objection.
16 　　A.  I don't know the definition off the
17 top of my head.
18 BY MR. BAKER:
19 　　Q.  What is a prop?  What is a prop?
20 　　　MR. BUSH:  Objection.
21 BY MR. BAKER:
22 　　Q.  What do you -- what is your definition
23 of a prop?
24 　　A.  My definition of a prop?  I don't --

Page 100

1 something that's just there.
2 　　Q.  Okay.  As opposed to a tool.  What's a
3 tool?
4 　　　MR. BUSH:  Objection.
5 　　A.  I guess my definition of a tool is
6 something you use.
7 BY MR. BAKER:
8 　　Q.  Was your name being inserted into the
9 SOM portion of the policies and procedures
10 manual simply a prop when you were being
11 described as DEA compliance coordinator?
12 　　　MR. BUSH:  Objection.
13 BY MR. BAKER:
14 　　Q.  Is that what it was?
15 　　　MR. BUSH:  Objection.
16 　　A.  I don't recall my name in the SOM
17 portion of the SOP.
18 BY MR. BAKER:
19 　　Q.  I showed you one at a later date where
20 you were put in there.
21 　　　MR. BUSH:  Objection.  That
22 misstates the record.  Objection.
23 　　A.  Yeah, I don't recall that that
24 referred to me in the SOM capacity.

Page 101

1 BY MR. BAKER:
2 　　Q.  Could you hand me Exhibit 204, please?
3 　　　MR. BUSH:  You want her to hand
4 you the one that she has or you want your own?
5 　　　MR. BAKER:  Exhibit 204.
6 　　　MR. BUSH:  She's going to need
7 to look at it.
8 BY MR. BAKER:
9 　　Q.  Do you remember, in Exhibit 204, I
10 asked you to look at page X-8, which is 10-8,
11 on Bates Number 8559?
12 　　　MR. BUSH:  Okay.  Hold on.  Let
13 me get where we are.
14 BY MR. BAKER:
15 　　Q.  Do you remember that?  Do you remember
16 that?
17 　　A.  Yes, yes.
18 　　Q.  Do you remember where in this
19 manual -- and this is the one that's
20 updated -- this is 12/1/07 that was updated on
21 8/25/10 where insertion of the SOM into the
22 SOP exists.  And now the most recent revision
23 date in this document is 11/8/11 -- that it
24 lists you as CVS DEA compliance coordinator?

Page 102

1    Do you see that?
2         MR. BUSH:  Objection.  You can
3    answer.
4      A.  Yes.
5    BY MR. BAKER:
6      Q.  Do you see in this document -- because
7    there's an objection.  I'm not sure what the
8    objection is, so I'm going to keep asking the
9    question until I get it right.
10         There is a document that I've shown
11    you on page X-8, which is Bates Number 8559,
12    that lists you, Amy Propatier, as CVS DEA
13    compliance coordinator, correct?
14      A.  Yes.
15      Q.  And this is part of controlled drug
16    DEA Standard Operating Procedures Manual of
17    CVS distribution center, effective date
18    12/1/07, last updated 11/8/11, correct?
19      A.  Correct.
20      Q.  Were you the CVS DEA compliance
21    coordinator when you participated via e-mail
22    to have the SOM inserted into the SOP 8/25/10,
23    yes or no?
24      A.  Yes.

Page 103

1      Q.  Were you considered the CVS DEA
2    compliance coordinator as a prop or as a
3    tool?
4         MR. BUSH:  Objection.
5      A.  As a tool.
6    BY MR. BAKER:
7      Q.  And your tools that you used to be CVS
8    DEA compliance coordinator, 8/25/10, that you
9    were implementing on 8/25/10 were exactly
10    what?
11      A.  I was updating an SOP.
12      Q.  Other than updating an SOP, did you do
13    anything in your duties as a DEA compliance
14    coordinator 8/25/10?
15      A.  Not that I can recall.
16      Q.  And had you been doing anything up to
17    8/25/10 as a CVS DEA compliance coordinator?
18         MR. BUSH:  May I ask a point of
19    clarification?
20         MR. BAKER:  You can object to
21    form.
22         MR. BUSH:  Well, I object to
23    form.  I think it's ambiguous, what you --
24    whether you're asking about the whole SOP or

Page 104

1    just the SOM part.
2         MR. BAKER:  I'll restate the
3    question.
4    BY MR. BAKER:
5      Q.  Do you recall performing any duties as
6    a CVS DEA compliance coordinator before
7    8/25/10?
8      A.  In reference to the SOP?  My title was
9    pharmacy manager, but I don't recall
10    specifically.
11      Q.  My question then is with you being
12    described as the CVS DEA compliance
13    coordinator on 8/25/10, was that a prop or was
14    that a tool?
15         MR. BUSH:  Objection.
16      A.  That was --
17         MR. BUSH:  Go ahead.
18      A.  That was a contact tool.
19    BY MR. BAKER:
20      Q.  A contact tool?
21      A.  Yes.
22      Q.  Other than a contact tool, was there
23    any reason for you to be named as a DEA
24    compliance coordinator 8/25/10, that you're

Page 105

1    aware of?
2      A.  Not that I recall.
3      Q.  As a contact tool, that means that if
4    the DEA comes knocking that they're supposed
5    to contact you; is that right?
6      A.  No.
7      Q.  You're just a contact tool for the
8    purpose of being somebody that has a title
9    named DEA compliance coordinator to put into
10    an SOM at that time; is that correct?
11      A.  No.
12      Q.  Are you familiar with what an IRR is?
13      A.  No.
14      Q.  If I told you that it was an internal
15    review report would that surprise you?
16      A.  No.
17      Q.  Did you have anything to do as DEA
18    compliance coordinator for CVS with either
19    drafting policies and procedures that dealt
20    with IRRs or implementing the IRR program?
21      A.  No.
22      Q.  Let me show you Exhibit No. 36.
23
24         (Exhibit No. 36 marked for

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 identification.)

2

3 BY MR. BAKER:

4    Q.  It is Bates Number 12286.  It's an

5 e-mail dated 12/26/2011, subject matter, "IRR

6 bullet points revised DEA speaking points."

7       Do you see that?

8    A.  Yes.

9    Q.  The prior e-mail I showed you that

10 discussed a prop versus a tool.  That was also

11 a DEA speaking point e-mail, correct?  We'll

12 let it speak for itself --

13    A.  Yes.

14    Q.  -- but you recall that, right?

15    A.  Yes, I recall that.

16    Q.  And it was a DEA speaking point e-mail

17 was it not?

18          MR. BUSH:  Exhibit 81.

19    A.  Was it this one?

20       (Witness reviews document.)

21       That's what it refers to.

22 BY MR. BAKER:

23    Q.  And here's another DEA speaking points

24 e-mail dated 12/26/2011, correct?

Page 107

1    A.  Yes.

2    Q.  This says -- below, at the bottom, the

3 last paragraph, this is from Paul Lawson to

4 Joseph Scholl, 12/26/2011, correct?

5    A.  Yes.

6    Q.  And do you know who Paul Lawson was at

7 the time of this e-mail?

8    A.  I know the name.

9    Q.  Do you know what department he was in?

10    A.  I don't remember.

11    Q.  Do you know Joseph Scholl at the time

12 of this e-mail?

13    A.  I know the name.

14    Q.  Do you know what department he was in?

15    A.  I don't recall.

16    Q.  Let me read the last paragraph of this

17 e-mail.  It says, "The IRR is mandated by the

18 DEA; therefore, we have to adhere to this

19 monitoring policy."

20       Is that a correct reading of that

21 e-mail?

22    A.  Yes.

23    Q.  And do you understand, as DEA

24 compliance coordinator, at least in the

Page 108

1 context of being named that, whether you

2 actually did anything or not, that the IRR's

3 mandated by the DEA; therefore, CVS had to

4 adhere to this monitoring policy?

5          MR. BUSH:  Objection.

6    A.  Can you say that again?

7 BY MR. BAKER:

8    Q.  In your title as DEA compliance

9 coordinator, were you ever taught that the IRR

10 is mandated by the DEA?

11    A.  Not that I recall.

12    Q.  Do you disagree with this e-mail that

13 Mr. Lawson is sending to Mr. Scholl, that the

14 IRR is mandated by the DEA, therefore, "we,"

15 meaning CVS, have to adhere to this monitoring

16 policy?

17          MR. BUSH:  Objection.

18 BY MR. BAKER:

19    Q.  Do you disagree with that?

20          MR. BUSH:  Objection.

21    A.  No.

22 BY MR. BAKER:

23    Q.  You were never told as DEA compliance

24 coordinator -- in your title as a DEA

Page 109

1 compliance regulator that an IRR program was

2 even going on within CVS?

3          MR. BUSH:  Objection.  Misstates

4 her title.

5 BY MR. BAKER:

6    Q.  What was your title?

7    A.  Coordinator.

8          MR. BUSH:  You used the word

9 "regulator."

10    A.  Yes, yes.

11 BY MR. BAKER:

12    Q.  As DEA compliance coordinator at CVS,

13 were you ever even told about the IRR program

14 and what it meant and how it was

15 implemented?

16    A.  Not that I recall.

17    Q.  As DEA compliance coordinator, did you

18 ever participate in conference calls relative

19 to the controlled drug IRR implementation?

20    A.  No, not that I recall.

21    Q.  Let me show you Exhibit No. 17.

22

23       (Exhibit No. 17 marked for

24 identification.)

Page 110

1

2    BY MR. BAKER:

3       Q.   Could you pull up Exhibit 17, please?

4    And do you see where this is called "A

5    controlled drug IRR implementation conference

6    call"?  Do you see that?  It's dated

7    9/24/2010.

8       A.   Yes, I do.

9       Q.   Now, this is about a month after you

10   participated in inserting the SOM into the SOP

11   for CVS, correct?

12      A.   Yes.

13      Q.   When I say "inserted," you inserted

14   the written SOM into the written SOP for CVS;

15   is that correct?

16      A.   Yes.

17      Q.   Exactly how did you perform this task

18   of insertion of the SOM into the SOP when you

19   performed that insertion task?  What did you

20   do -- what exactly did you do to physically or

21   electronically insert that SOM into the SOP?

22      A.   I don't recall specifically, but I can

23   speculate that I probably copied and pasted

24   the document from the resource that I got it

Page 111

1    from.

2       Q.   That's insertion?

3       A.   Yeah.

4       Q.   Copying and pasting a document into

5    another document makes it become part of an

6    inserted policy within the SOP?

7       A.   Yes.

8       Q.   Other than that, did you have anything

9    to do with the insertion process?

10           MR. BUSH:  Objection.

11      A.   I don't know what you mean.

12   BY MR. BAKER:

13      Q.   Let's take a look at Exhibit No. 17.

14   Have you ever seen this before?

15      A.   Not that I recall.

16      Q.   Again, it's a subject controlled drug

17   IRR implementation conference call 9/24/2010,

18   Bates Number 24559, correct?

19           MR. BUSH:  Take your time and

20   look at it.

21      A.   (Witness reviews document.)

22           Correct.

23   BY MR. BAKER:

24      Q.   Now, at the time, in addition to being

Page 112

1    DEA compliance coordinator for CVS at least as

2    a title put within the SOM -- written SOM, you

3    were also working in logistics; is that

4    correct?

5       A.   Correct.

6       Q.   And logistics would include somebody

7    that would have been briefed on the IRR

8    process, according to this conference call,

9    down at the bottom, where it says, "Friday,

10   9/24, logistics will be briefed on the IRR

11   process."

12           That would be you; is that correct?

13      A.   I can't --

14           MR. BUSH:  Objection.

15      A.   I can't say if that would have been

16   me.

17   BY MR. BAKER:

18      Q.   Let me ask you to read this with me.

19   Does this document say, "Friday, 9/24,

20   logistics will be briefed on the IRR process."

21           MR. BUSH:  Objection.

22   BY MR. BAKER:

23      Q.   Does it say that?

24           MR. BUSH:  Objection.

Page 113

1       A.   It says that.

2    BY MR. BAKER:

3       Q.   At the time this document was

4    generated, 9/24/2010, your title within

5    logistics was what again?

6       A.   Logistics pharmacy services manager.

7       Q.   And would logistics pharmacy services

8    managers have anything to do with the

9    controlled drug IRR implementation?

10      A.   Not that I can recall.

11      Q.   Not that you ever recall being

12   involved with?

13      A.   No.

14      Q.   It says "All DCs have confirmed the

15   IRRs available."

16           Were you one of those DC people who

17   confirmed the IRRs available?

18      A.   No.

19      Q.   It goes on to state "Monday, 9/27,

20   through 10/1" -- again, we're referencing 2010

21   in this document?

22      A.   Uh-huh.

23      Q.   Correct?

24      A.   Correct.

Page 114

1    Q.  -- "that all DCs will begin reviewing

2  the IRRs and reporting any questions to the LP

3  manager or John Mortelliti.  During this time,

4  John Mortelliti will be updating and preparing

5  the field LP team."

6      Do you know what that means when it

7  says, "All DCs will begin reviewing the IRRs"?

8    A.  I do not know what it means.

9    Q.  Let's go to the next document.

10

11     (Exhibit No. 67 marked for

12  identification.)

13

14  BY MR. BAKER:

15    Q.  I'm going to show you what's marked as

16  Exhibit No. 67.

17     This is an e-mail from Aaron Burtner

18  to Christopher Tulley and Pamela Hinkle dated

19  11/11/2012 with Bates Number 55834.

20      Do you see that?

21    A.  I do see that.

22    Q.  Okay.  It says -- this says, "Chris,

23  Pam will be able to shed more light, but two

24  big reasons, review consistency with having

Page 115

1  just one person completing the reviews rather

2  than 11 people.  With Pam in Knoxville, they

3  wanted the reviews completed there so she

4  could manage the process."

5      Do you have any idea what that's

6  talking about?

7    A.  I do --

8        MR. BUSH:  Objection.

9    A.  I do not.

10  BY MR. BAKER:

11    Q.  You do not.  Below that, it discusses

12  what's going on as to why that answer's being

13  given November 11, 2012 at 7:15 a.m., an

14  e-mail from Christopher Tulley to Pamela

15  Hinkle with a copy to Aaron Burtner.  And it

16  says "Hi, guys.  I met with John A. and Ellen

17  on Friday.  They advised when this program was

18  initially designed, it was meant for the

19  review that Aaron does to be done in all 11

20  DCs.  Do you know why and when it was

21  consolidated to just one DC doing the review?

22  Thanks, Chris."

23      Did I read that correctly?

24    A.  You did.

Page 116

1    Q.  Is it true that at the time this

2  e-mail was written, November 2012, that one

3  person was reviewing all of the internal

4  review reports for CVS instead of having it

5  done in all 11 distribution centers?

6        MR. BUSH:  Objection.

7  BY MR. BAKER:

8    Q.  Is it true?

9        MR. BUSH:  Objection.

10    A.  I can't say if I know that to be true.

11  BY MR. BAKER:

12    Q.  Is that what the document indicates,

13  that just one person was doing the IRR reviews

14  at the time this e-mail was written, November

15  11, 2011?

16        MR. BUSH:  Objection.

17    A.  I can't say if that's what it

18  indicates.

19  BY MR. BAKER:

20    Q.  Do you know what it meant when the

21  answer was given above that question as to

22  review consistency with just having one person

23  completing the reviews rather than 11 people?

24  Do you know what that meant?

Page 117

1        MR. BUSH:  Objection.

2    A.  I can't say I know what it means.

3  BY MR. BAKER:

4    Q.  Do you know why CVS chose to only have

5  one person review all of the IRRs for CVS as

6  opposed to 11 people in 11 different

7  distribution centers?

8        MR. BUSH:  Objection.

9    A.  I can't answer that.

10  BY MR. BAKER:

11    Q.  As a DEA compliance coordinator, did

12  you ever take an interest in learning about

13  IRRs and how they were implemented by CVS?

14    A.  IRR didn't fall under my

15  responsibilities.

16  BY MR. BAKER:

17    Q.  As the DEA compliance coordinator, it

18  didn't fall under your responsibilities?

19    A.  Correct.

20    Q.  Now, you saw the e-mail earlier where

21  it was discussed within your organization that

22  these IRRs are mandated by the DEA.  Do you

23  remember me showing you that e-mail?

24        MR. BUSH:  Objection.

Page 118

1    A.  Yes.
2          MR. BUSH:  Well --
3    BY MR. BAKER:
4    Q.  Do you remember seeing that e-mail?
5    A.  I remember seeing that e-mail.
6    Q.  Okay.  And something that's mandated
7    by the DEA would fall under DEA compliance,
8    would it not?
9          MR. BUSH:  Objection.
10   BY MR. BAKER:
11   Q.  Yes or no?
12   A.  Yes.
13   Q.  And so if something's mandated by the
14   DEA, why would you as the DEA compliance
15   person not be familiar with anything having to
16   do with the IRR?
17   A.  Because I had different areas of
18   responsibility.
19   Q.  Are you familiar with the term "active
20   ingredient"?
21   A.  Yes.
22   Q.  Let me show you an e-mail that's
23   marked Exhibit 82.
24

Page 119

1          (Exhibit No. 82 marked for
2    identification.)
3
4    BY MR. BAKER:
5    Q.  And it's Bates Number 75542.  The
6    e-mail is dated 10/12/2010 from John
7    Mortelliti to Todd Janson within CVS.
8          You know John Mortelliti, correct?
9    A.  Yes, I know who he is.
10   Q.  And you know Todd Janson?
11   A.  I know who Todd Janson is?
12   Q.  Who was Todd Janson at the time this
13   e-mail was written?
14   A.  I believe at the time he was loss
15   prevention in Vero Beach.
16   Q.  It goes on to state "Todd" -- this is
17   from John Mortelliti, 10/12/2010 -- "Todd, I
18   sent you an e-mail about two weeks ago
19   explaining why I am handling the controlled
20   drug IRR for the time being."
21          Did I read that correctly?
22   A.  Yes.
23   Q.  Is it true that John Mortelliti was
24   singularly handling the controlled drugs IRR

Page 120

1    at the time this was written, 10/12 of 2010?
2          MR. BUSH:  Objection.
3    A.  I can't say if I know that to be
4    true.
5    BY MR. BAKER:
6    Q.  As DEA compliance coordinator, were
7    you informed that John Mortelliti, on
8    10/12/2010, was handling the controlled drug
9    IRR for CVS?
10         MR. BUSH:  Objection.
11   A.  Can you say that again?
12   BY MR. BAKER:
13   Q.  As DEA compliance -- what was it, DEA
14   compliance what?
15   A.  Coordinator.
16   Q.  As DEA compliance coordinator, were
17   you ever informed that one person, John
18   Mortelliti, in October of 2010, was handling
19   the controlled drug IRRs for CVS?
20         MR. BUSH:  Objection.
21   A.  Not that I recall.
22   BY MR. BAKER:
23   Q.  Is that what was going on at the time?
24   A.  I can't answer that to be true or not.

Page 121

1    Q.  Okay.  Did you -- read the next
2    sentence.  It says, "Dean, there's a rewrite
3    we are trying to get approved for the
4    controlled drug IRR.  The current report shows
5    controlled drugs by item instead of active
6    ingredients, such as PSE."
7          Were you familiar with that, that the
8    controlled drug IRR at the time did not show
9    drugs by active ingredient?
10   A.  I'm not familiar with the IRR report.
11   Q.  Do you know the significance of not
12   having a drug described by active ingredient
13   in the context of suspicious order monitoring?
14   A.  I can't say I'm familiar with it.
15   Q.  As DEA compliance coordinator, is it
16   important for you to understand whether the
17   DEA might require that in order to conduct
18   suspicious order monitoring a drug needs to be
19   described by active ingredient?
20         MR. BUSH:  Objection.
21   A.  I can't say.  I was not responsible
22   for suspicious order monitoring.
23   BY MR. BAKER:
24   Q.  Do you know whether or not it's

Page 122

1 required to describe a drug by active
2 ingredient in order to be in compliance with
3 DEA standards?
4     A.  I do not know.
5         MR. BAKER:  Let's take a short
6 break.  This will count as my time.
7         MR. BUSH:  This will what?
8         MR. BAKER:  Count as my time.
9         MR. BUSH:  Okay.  So we're still
10 on the record?
11         MR. BAKER:  Yes.
12         MR. BUSH:  All right.
13         MR. BAKER:  Off the record
14 insofar as --
15         MR. BUSH:  We can talk?
16         MR. BAKER:  Yes.
17     (Pause in proceedings.)
18 BY MR. BAKER:
19     Q.  I'm going to show you Exhibit No. 55.
20 It's Bates Number 34175.
21
22     (Exhibit No. 55 marked for
23 identification.)
24

Page 123

1 BY MR. BAKER:
2     Q.  It's from CVS pharmacy.  It's called a
3 Business Idea Description and it's from
4 Mr. John Mortelliti.
5         Do you see that?
6     A.  Yes.
7     Q.  Could you highlight in the summary
8 description and objectives, please, in that
9 box, the first box down?
10         So you see in the summary description
11 and objectives that John Mortelliti for CVS
12 pharmacy -- he's saying that "DEA expects CVS
13 to prevent suspicious orders from being filled
14 out of our DCs."
15         Is that correct that -- did I state
16 that correctly?
17     A.  Uh-huh.
18     Q.  Yes?
19     A.  Yes.
20     Q.  It says, "The current IRR does not
21 provide the proper information to meet the
22 DEA's needs."
23         Is that correct?  Did I state that
24 correctly?

Page 124

1     A.  Yes.
2     Q.  It says, "We need controlled drugs to
3 be monitored by active ingredient.  Currently,
4 the controlled drugs are monitored by item.
5 The IRR loses all order history when the info
6 on the team changes" --
7         MR. BUSH:  The item, item on
8 the --
9 BY MR. BAKER:
10     Q.  "The item changes, causing CVS to be
11 noncompliant with DEA expectations."  Is that
12 what it states?
13     A.  That's what it states.
14     Q.  I made a grammatical error.  Let me
15 just repeat the sentence.
16         "The IRR loses all history when the
17 info on the item changes causing CVS to be
18 noncompliant with DEA expectations."
19         Is that what the sentence says in that
20 document?
21     A.  Yes.
22     Q.  And this is John Mortelliti drafting
23 this sentence; is that correct?
24         MR. BUSH:  Objection.

Page 125

1     A.  I can't say for sure.  That's what it
2 looks like.
3 BY MR. BAKER:
4     Q.  This -- this is a CVS document called
5 a Business Idea Description?
6     A.  Uh-huh.
7     Q.  Correct?
8     A.  Uh-huh.
9     Q.  Yes?
10     A.  Yes.
11     Q.  And so as DEA compliance coordinator,
12 you know that CVS needs to -- needs controlled
13 drugs to be monitored by active ingredient in
14 order to be compliant with DEA expectations,
15 correct?
16         MR. BUSH:  Objection.
17     A.  I can't say I know.
18 BY MR. BAKER:
19     Q.  You cannot disagree with that
20 statement, can you?
21         MR. BUSH:  Objection.
22     A.  I can't agree with it.
23 BY MR. BAKER:
24     Q.  You cannot disagree with that

Page 126

1  statement, can you, that the IRR loses all
2  history -- all order history when the info on
3  the item changes causing CVS to be
4  noncompliant with DEA expectations?  You don't
5  disagree with that statement, do you?
6          MR. BUSH:  Objection.
7      A.  I don't have enough information to
8  have an opinion on it.
9  BY MR. BAKER:
10     Q.  So you can neither agree nor disagree,
11 with that statement; is that correct?
12     A.  That's correct.
13     Q.  Did you ever talk to John Mortelliti
14 as DEA compliance coordinator -- in your job
15 as DEA compliance coordinator about the
16 problems associated with controlled drugs
17 being monitored -- not being monitored by
18 active ingredient?
19     A.  Not that I recall.
20     Q.  Did you ever get involved as a DEA
21 compliance coordinator with CVS with anything
22 dealing with active ingredient?
23     A.  Not that I recall.
24     Q.  As DEA compliance coordinator, did you

Page 127

1  ever get involved with any activities that
2  caused CVS to be DEA complaint?
3          MR. BUSH:  Objection.
4  BY MR. BAKER:
5      Q.  As DEA compliance coordinator, did you
6  ever get involved in any activities that would
7  have caused CVS to be DEA compliant?
8          MR. BUSH:  In any respect?
9          MR. BAKER:  In any respect.
10     A.  In any respect?
11 BY MR. BAKER:
12     Q.  Yes, ma'am.
13     A.  Yes.  In some respects, yes.
14     Q.  In some respects.  Tell us exactly
15 what you did as DEA compliance coordinator to
16 cause CVS to be DEA compliant, if anything.
17     A.  I submitted ARCOS reporting.
18     Q.  Other than that?
19     A.  Not that I recall.
20     Q.  ARCOS reporting is simply what?
21     A.  Narcotic drug reporting.
22     Q.  Of how much is distributed by the
23 distribution center to the retail
24 pharmacies?

Page 128

1      A.  Yes.
2      Q.  Other than that, did you do anything
3  as a DEA compliance coordinator?
4      A.  Not that I recall.
5      Q.  Except for we know, according to the
6  e-mails at least, you will agree with me, that
7  you --
8      A.  Updated SOPs.
9      Q.  -- that you inserted the SOM --
10     A.  Yes.
11     Q.  -- into is SOP --
12     A.  Yes.
13     Q.  -- 8/25/10?
14     A.  Yes.  I was a central point of contact
15 for SOPs.
16     Q.  Were you a central point of contact if
17 the DEA came for inspections?
18     A.  I would be notified, yes.
19     Q.  Would you inform the DEA what was
20 being done to be compliant with DEA
21 expectations --
22     A.  Would I --
23     Q.  -- when the DEA came?
24     A.  Would I inform --

Page 129

1      Q.  Yes, yes.
2      A.  -- the DEA?
3      Q.  Yes, yes.
4      A.  No.
5      Q.  Did you ever represent CVS as DEA
6  compliance coordinator when there were
7  inspections done of CVS distribution
8  centers?
9          MR. BUSH:  Objection.
10     A.  No.
11 BY MR. BAKER:
12     Q.  Did you ever -- were you ever informed
13 that there was a movement within CVS to try to
14 get the controlled drug IRR described by
15 active ingredient?  Were you ever informed of
16 that?
17     A.  Not that I recall.
18     Q.  Were you ever informed by CVS, as DEA
19 compliance coordinator, that there was an
20 algorithm system that was attempted to be used
21 by CVS for suspicious order monitoring
22 purposes?
23     A.  Not that I recall.
24     Q.  Were you ever informed, as DEA

Page 130

1  compliance coordinator at CVS, that there was
2  some scoring system used within the algorithm
3  system?
4       A.  Not that I recall.
5       Q.  Were you ever informed by CVS, as DEA
6  compliance coordinator, that there was a
7  request to change the parameters within that
8  algorithm system?
9       A.  Not that I recall.
10      Q.  As DEA compliance coordinator, did you
11  ever review anything about the algorithm
12  system that CVS was attempting to use for
13  suspicious order monitoring?
14      A.  No, not that I recall.
15      Q.  As CVS DEA compliance coordinator, did
16  you ever have anything to do with hiring or
17  consulting with outside consultants for the
18  purpose of trying to develop a suspicious
19  order monitoring program?
20      A.  Not that I recall.
21      Q.  As DEA compliance coordinator, did you
22  ever have anything to do with retuning any of
23  the suspicious order monitoring programs that
24  had been developed by outside companies for

Page 131

1  CVS?
2       A.  Not that I recall.
3       Q.  As CVS compliance coordinator, did you
4  ever see the CVS algorithm based suspicious
5  order monitoring system implemented?
6       A.  No, not that I recall.
7       Q.  Are you familiar with the term "store
8  metrics report"?
9       A.  No.
10      Q.  You do not even know what a store
11  metrics report is, do you?
12      A.  No.
13      Q.  As CVS compliance coordinator, you
14  were never informed by anybody within CVS or
15  otherwise about the importance of a store
16  metrics report?
17      A.  Not that I recall.
18      Q.  Do you even know what a store metrics
19  report measures or how it is measured?
20      A.  I can't say that I do know.
21      Q.  Do you know the importance of store
22  metrics within the context of operating a
23  suspicious order monitoring system?
24      A.  No.

Page 132

1       Q.  As CVS compliance coordinator, would
2  you not be interested in knowing how a store
3  metrics system would affect a suspicious order
4  monitoring system for CVS?
5           MR. BUSH:  Objection.
6  BY MR. BAKER:
7       Q.  Would you not be interested in that?
8           MR. BUSH:  Objection.
9       A.  I didn't oversee SOM.
10  BY MR. BAKER:
11      Q.  Have you ever seen a store metrics
12  sheet for CVS?
13      A.  Not that I recall.
14      Q.  Do you know what a LAG is?
15      A.  In reference to?
16      Q.  The suspicious order monitoring
17  system?
18      A.  No, I can't say that I do.
19      Q.  Let me repeat the question.
20      Do you know what a LAG is in the
21  context of a suspicious order monitoring
22  system for CVS?
23      A.  No, I can't say that I do.
24      Q.  Do you know what a threshold is in the

Page 133

1  context of a suspicious order monitoring
2  system for CVS?
3       A.  I can't say I know.
4       Q.  As DEA compliance coordinator, you do
5  not know what a threshold is in the context of
6  suspicious order monitoring for CVS; is that
7  correct?
8       A.  I can't say for certain what it is,
9  no.
10      Q.  As DEA compliance coordinator for CVS,
11  you do not know whether or not the threshold
12  system is the basis for the suspicious order
13  monitoring system, do you?
14      A.  No, I can't say.
15      Q.  As the -- as a --
16          MR. BAKER:  Let's go off record
17  for just a second.  What time is it?
18          MR. BUSH:  11:42.
19          THE VIDEOGRAPHER:  The time is
20  11:43 a.m.  We're off the record.
21
22  (Off the record at 11:43 a.m.)
23
24          MR. BAKER:  Let's go back on the

Page 134

```
1   record.
2           THE VIDEOGRAPHER:  The time is
3   11:43 a.m. and we're on the record.
4   BY MR. BAKER:
5       Q.  The place where you're considered DEA
6   compliance coordinator is in the corporate
7   office; is that correct?
8       A.  In reference -- in SOP reference.
9       Q.  And corporate would mean CVS Pharmacy;
10  is that correct?
11      A.  Yes.
12      Q.  Does CVS Pharmacy write these
13  suspicious order monitoring policies for CVS
14  distribution centers?
15      A.  I can't say that I know.
16      Q.  As CVS corporate DEA compliance
17  coordinator, are you familiar with how the
18  description of drugs by drug companies to CVS
19  Pharmacy and CVS distribution centers affects
20  the adequacy or efficacy of a suspicious order
21  monitoring program?
22      A.  No, I can't say that I do.
23      Q.  Let me show you an e-mail that I'll
24  mark as Exhibit No. 54.
```

Page 135

```
1
2           (Exhibit No. 54 marked for
3   identification.)
4
5   BY MR. BAKER:
6       Q.  And it's Bates Numbers 34168 through
7   34171.  It's dated 10/14/2010 by a person
8   named Gary --
9       A.  Misiaszek.
10      Q.  -- Misiaszek to John Mortelliti.  I'll
11  hand you a copy.
12          Go to the second page there, if you
13  would.  It's Bates Number 34169 and it's an
14  e-mail dated October 6, 2010 from John
15  Mortelliti to Gary Misiaszek, copy to Frank
16  Devlin, regarding "controlled drug IRR
17  important info, importance high."
18          Is that what that says?
19      A.  Yes.
20      Q.  Have you ever seen this e-mail before?
21      A.  Not that I recall.
22      Q.  Its starts with "Gary, all but one
23  item in the network was missing, three to four
24  items of LAG info on today's report.
```

Page 136

```
1   Something else changed or just about every
2   company we deal with has changed the
3   description on their drugs.  Whatever you can
4   do to help expedite this process would be
5   greatly appreciated.  I'm now reviewing the
6   network control IRR on common sense as opposed
7   to IRR historical data.  I know that is scary.
8   Be nice."
9           Were you familiar with that e-mail
10  being sent?
11      A.  No, I'm not.
12      Q.  Do you know what a controlled drug IRR
13  is as DEA compliance coordinator?
14      A.  No.
15      Q.  Were you aware that a person who was
16  reviewing LAGs on IRR reports for CVS, that
17  being John Mortelliti, October 6, 2010,
18  according to this e-mail, was concerned to the
19  point where he called it "scary" that he was
20  reviewing drugs based upon changes of the
21  names by the drug companies in the context of
22  reviewing LAG reports?  Do you know that?
23          MR. BUSH:  Objection.
24      A.  No, I don't recall that.
```

Page 137

```
1   BY MR. BAKER:
2       Q.  Did this issue that's described in
3   this e-mail dated October 6, 2010 from John
4   Mortelliti to Gary Misiaszek concern you as
5   DEA compliance coordinator?
6           MR. BUSH:  Hold on for a second.
7       A.  I can't say.
8           MR. BUSH:  Hold on.
9           THE WITNESS:  I'm sorry.
10          MR. BAKER:  I'll repeat the
11  question.
12          MR. BUSH:  Thank you.
13  BY MR. BAKER:
14      Q.  Did this e-mail dated October 6, 2010
15  from John Mortelliti to Gary Misiaszek where
16  he's describing the experience as being
17  "scary," concern you as the DEA compliance
18  coordinator?
19          MR. BUSH:  Objection.
20      A.  I can't say I was aware of the
21  situation.
22      Q.  It was never brought to your attention
23  as DEA compliance coordinator for the
24  corporate office of CVS?
```

Page 138

1    A.  No, not that I recall.
2          MR. BAKER:  Before we move on
3    into the next topic, which is going to take me
4    a while, would this be a good lunch break time
5    for everybody?
6          MR. BUSH:  It's fine with me,
7    although I guess we haven't ordered.
8          (Pause in proceedings.)
9          THE VIDEOGRAPHER:  The time is
10   11:48 a.m. and we're off the record.
11
12          (Recess taken from 11:48 a.m.
13            to 12:40 p.m.)
14
15          THE VIDEOGRAPHER:  The time is
16   12:40 p.m.  We're on the record.
17          MR. GOETZ:  Hi, Ms. Propatier.
18   My name is Dan Goetz and I'm going to ask you
19   questions for a few minutes.
20   BY MR. GOETZ:
21    Q.  Could you go back to Exhibit 204,
22   please?  I believe you had testified earlier
23   that from 2008 through 2014 you had the same
24   job title and responsibilities at CVS; is that

Page 139

1    correct?
2     A.  Yes.
3     Q.  In Exhibit 204, could you look at
4    8510, please?
5          MR. BUSH:  page 85?
6    BY MR. GOETZ:
7     Q.  page 8510, please.
8          And do you see where it says "CVS DEA
9    Compliance Coordinator"?
10    A.  Uh-huh.
11    Q.  Could you read that please out loud?
12    A.  "CVS DEA Compliance Coordinator
13   reports to the senior manager of logistics
14   planning and is designated as responsible for
15   assuring compliance with applicable CSA
16   requirements implemented by each CVS
17   distribution center.  This person will have
18   responsibility to monitor the required systems
19   and procedures implemented by each DC for
20   controlled substance in coordination with
21   senior manager of logistics planning and
22   director of logistics loss prevention."
23    Q.  From 2008 to 2014, that was you,
24   correct?

Page 140

1     A.  Yes.
2     Q.  Okay.  And so you were responsible for
3    assuring compliance with applicable CSA
4    requirements; is that correct?
5     A.  Yes.
6     Q.  Yes?
7     A.  Yes.
8     Q.  Okay.  Could you read the 13A above
9    it, where it says, "DC DEA Compliance
10   Coordinator"?
11    A.  "It means the individual designated as
12   responsible for assuring compliance with
13   applicable CSA requirements at each CVS
14   distribution center.  This person will have
15   the responsible to implement the required
16   systems and procedures for controlled
17   substances in coordination with the CVS DEA
18   Compliance Coordinator, the senior manager of
19   logistics, and the director of logistics loss
20   prevention."
21    Q.  So part of what the -- DC is
22   distribution center.  Part of what the
23   distribution center DEA Compliance
24   Coordinator -- part of their job, they worked

Page 141

1    in coordination with you, right, to implement
2    all the regulations related to the CSA?
3     A.  I didn't say -- some, that I can
4    recall, yes.
5     Q.  Okay.  They had the responsibility and
6    you, as the CVS DEA Compliance Coordinator,
7    had the responsibility, correct?
8          MR. BUSH:  Objection.
9     A.  Certain -- certain responsibilities.
10   BY MR. GOETZ:
11    Q.  Well, the applicable CSA requirements
12   that were implemented by each CVS distribution
13   center, correct?
14    A.  Yes.  Certain ones, yes.
15    Q.  You kept saying, "I'm only responsible
16   for the SOP."
17    A.  Uh-huh.
18    Q.  Do you remember that testimony?
19    A.  Yes.
20    Q.  The SOP is actually -- that's Exhibit
21   204.  And the title of that is actually
22   Controlled Drug DEA Standard Operating
23   Procedures Manual, correct?
24    A.  Correct.

Page 142

1    Q.  And this document is actually all the
2  rules and regulations that CVS has passed to
3  try to meet their requirements under the CSA
4  and what the DEA requires as it relates to the
5  distribution of controlled substances,
6  correct?
7    A.  Can you say that again?
8    Q.  Okay.  This document, 204 --
9    A.  Uh-huh.
10   Q.  -- is actually the standard operating
11  procedures and it is the rules and regulations
12  that CVS has passed to try to meet the
13  requirement of the DEA in the Controlled
14  Substances Act as it relates to distribution
15  of controlled substances, correct?
16   A.  I can't say for certain that it's
17  everything, but it covers certain areas.
18   Q.  Well, as the DEA Compliance
19  Coordinator, what other document covers
20  anything from -- from 2008 -- or 12/1 of '07,
21  when this is implemented, until 2013, the end
22  of 2013, what -- what else covers it?  What
23  else governs it?
24   A.  I don't know if I know everything that

Page 143

1  governs it.
2    Q.  As the DEA Compliance Coordinator, you
3  can't say this isn't all the rules, can you?
4        MR. BUSH:  Objection.
5    A.  I can't.  No, I can't say if it's all
6  or not.
7  BY MR. GOETZ:
8    Q.  I'm going to hand you what's been
9  marked as Exhibit 203.  And that begins at
10  Bates number 66576?
11   A.  Uh-huh.
12        MR. BUSH:  Do I get one of
13  those?
14        THE WITNESS:  Is one of these
15  for him?
16        MR. BAKER:  Yes.
17        MR. GOETZ:  Yes, I have three of
18  them.  I handed you three of them.  I
19  apologize for handing you everything at once.
20  BY MR. GOETZ:
21   Q.  Can you read the cover of that, what
22  that says?
23   A.  "CVS Distribution Center Controlled
24  Drug DEA Standard Operating Procedures

Page 144

1  Manual."
2    Q.  And it's the SOPs, right, that we were
3  talking about earlier?
4    A.  SOPs, yes.
5    Q.  Do you know when this version was
6  implemented?
7    A.  I do not know.
8    Q.  I will represent to you that it's my
9  understanding this is the December 1, 2007
10  SOP.
11   A.  Okay.
12   Q.  And so it's my belief that this is
13  actually the first standard operating
14  procedure that existed relative to this, okay?
15   A.  Uh-huh, okay.
16   Q.  Are you aware -- are you aware of any
17  standard operating procedures related to the
18  distribution of controlled substances prior to
19  December 1 of 2007?
20   A.  I can't say I recall.
21   Q.  Can we agree, in your role as CVS DEA
22  Compliance Coordinator, that an essential
23  element of any compliance system is the
24  ability to audit that system?

Page 145

1    A.  Can I agree -- was that my role, for
2  my role?
3    Q.  No.  Do you agree with that, that an
4  essential role -- an essential element of any
5  compliance system is the ability to audit that
6  system?
7    A.  For compliance system?  I guess it
8  would be.
9    Q.  If you can't audit the system, we have
10  no idea if it's working or not working?
11   A.  Uh-huh.
12   Q.  Do you agree with that?
13   A.  I would --
14        MR. BUSH:  Objection.
15   A.  I would agree.
16  BY MR. GOETZ:
17   Q.  And would you agree that you have to
18  be able to audit the system, meaning audit the
19  processes and the output?  Would you agree
20  with that?
21        MR. BUSH:  Objection.
22   A.  I guess for a system I would agree.
23  BY MR. GOETZ:
24   Q.  And part of this controlled drug

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1   operating, SOP -- a large part of this related
2   to audits; is that correct?
3            MR. BUSH:  Take your time if you
4   need to look through it.
5            THE WITNESS:  I am.
6            (Witness reviews document.)
7   BY MR. GOETZ:
8     Q.   And you can look through the whole
9   document.  I'm totally fine with that.  I'll
10  withdraw my question.  But if you'd like the
11  to look through the whole document, it's fine,
12  but I would direct your attention to 66632 and
13  I'll ask you what that is.  But if you want to
14  peruse the whole document while you're doing
15  it, that's fine.
16    A.   (Witness reviews document.)
17    Q.   Do you know what that is?
18           MR. BUSH:  Referring to 66632?
19           MR. GOETZ:  Yes, and --
20           MR. BUSH:  And subsequent pages?
21           MR. GOETZ:  Yes.
22    A.   It says it's an inspection report,
23  DEA.
24  BY MR. GOETZ:

Page 147

1     Q.   Do you know what that is?
2     A.   Do I know what it is?  I believe it's
3   a form loss prevention used.
4     Q.   Do you have any -- as the CVS DEA
5   Compliance Coordinator, do you have any
6   knowledge beyond that?
7     A.   No.
8     Q.   There was, at one time, when you were
9   responsible for gathering these.  Do you
10  remember that?
11    A.   For gathering the reports?
12    Q.   Yes.
13    A.   For the SOP?
14    Q.   Yes.
15    A.   I was responsible for -- yes, for
16  updating the SOP.
17    Q.   Do you remember that you were actually
18  responsible for gathering the results of this
19  inspection report?
20    A.   Not that I recall.
21    Q.   Can you turn to 6606 of that document,
22  please?
23           MR. BUSH:  6606.
24  BY MR. GOETZ:

Page 148

1     Q.   Do you see that?
2     A.   Okay.
3     Q.   There has been testimony -- strike
4   that.
5            Did you read Mr. Vernanza's (phonetic)
6   testimony?
7     A.   No, I did not.
8     Q.   I want you to assume what I tell you
9   is true, and I want you to assume that until
10  August of 2010 there was no SOM, suspicious
11  order monitoring, section in the SOP, okay, in
12  the standard operating procedures.
13    A.   Okay.
14    Q.   Okay?
15    A.   Okay.
16    Q.   Are you aware of that?  I was unsure
17  this morning what you testified.
18    A.   I had -- I know there was a
19  placeholder while they were working on the
20  documents.
21    Q.   And that placeholder was a placeholder
22  until when?
23    A.   Until I was provided with the
24  documents to update it.

Page 149

1     Q.   And that was in August of 2010; is
2   that correct?
3     A.   I believe that was the date.
4     Q.   And so from 12/1 of '07, we can agree,
5   until August of 2010, there was no SOM,
6   suspicious order monitoring, section in the
7   standard operating procedures, correct?
8     A.   There was a placeholder in the SOP.
9     Q.   Were there any active policies in the
10  SOP --
11           MR. BUSH:  For SOM?
12  BY MR. GOETZ:
13    Q.   -- for SOM?
14    A.   Not that I recall.
15    Q.   There was nothing that somebody could
16  go to and say, here is our suspicious order
17  monitoring process, if they went and read the
18  standard operating procedure, correct?
19    A.   Maybe outside of that manual, but not
20  within that manual.
21    Q.   Okay.  And again, what was outside of
22  that manual prior to August of 2010?  Can you
23  direct me to anything as the CVS DEA
24  Compliance Coordinator?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    A.   No.  I wasn't responsible for SOM.
2    Q.   You were responsible for CVS DEA
3  compliance, correct?
4    A.   Certain aspects of it.
5    Q.   When we went to 203 and 204, that
6  doesn't distinguish -- I'm talking about
7  Exhibit 203 and 204 -- that doesn't
8  distinguish your role as only being
9  responsible as the CVS DEA Compliance
10 Coordinator for things other than SOM, does
11 it?
12   A.   I'm sorry, like --
13        MR. BUSH:  Objection.
14   A.   Can you repeat that?  I don't know
15 what you're talk --
16   Q.   You just said you were not responsible
17 for the SOM.
18   A.   For managing the SOM program, no.
19   Q.   Okay.  So tell me, from 2008 through
20 2014, who was the CVS DEA Compliance
21 Coordinator for SOM?
22   A.   For SOM specifically?
23   Q.   Yes.
24   A.   I -- I don't know if there was a

Page 151

1  specific coordinator for SOM.
2    Q.   It's nowhere in the document, is it?
3    A.   I don't recall.
4    Q.   Okay.  And these --
5    A.   I would need to look through it.
6    Q.   These are documents that you give to
7  the DEA.  Are you aware of that?
8    A.   I've never given them to the DEA, but
9  I can't say if they haven't been given to the
10 DEA.
11   Q.   Are you aware if they've been given to
12 the DEA?
13   A.   Not specifically aware of someone
14 giving them to the DEA.
15   Q.   Can you go to page 6606 of 203,
16 please?  And do you see where it says,
17 "Procedure"?
18   A.   Uh-huh, yes.
19   Q.   And it says -- tell me if I'm reading
20 this correct in the first paragraph -- "Loss
21 prevention will conduct compliance reviews."
22   A.   Yes.
23   Q.   And then the last sentence of that
24 paragraph says, "The compliance review will

Page 152

1  also include a comparison of CVS's SOPs to the
2  operations of the DC," correct?
3    A.   Correct.
4    Q.   Is that correct?  Did I read that
5  correctly?
6    A.   Yes, you did.
7    Q.   So what they're speaking about is they
8  compare how the distribution center operates
9  to the requirements of this SOP; is that
10 correct?
11   A.   I would assume that's what they're
12 referring to.
13   Q.   And so since we did not have any
14 written SOM as part of this SOP, would you
15 agree with me that we could not do this in
16 2008?
17   A.   I can't answer that.
18   Q.   Do you know of some SOM that they
19 could do a comparison to the CVS operations of
20 the DC?
21   A.   I don't recall.  I can't answer that.
22   Q.   They couldn't do it in 2009 either,
23 could they?
24   A.   I can't answer that.

Page 153

1    Q.   And they couldn't do it until at least
2  through August of 2010, could they?
3    A.   I can't answer that.  I don't know
4  what they were capable of.
5    Q.   And we know they couldn't do it in
6  2006 or 2007 because there was no written
7  procedure, correct?
8    A.   I don't know that to be true.
9    Q.   Well, when you say that, what -- as
10 the compliance coordinator -- we're here
11 trying to find out information -- what do you
12 think there was?
13   A.   I can't answer that.  I don't know.
14   Q.   If we go back to the DC DEA Compliance
15 Coordinator and the CVS DEA Compliance
16 Coordinator, were you the person responsible
17 for assuring compliance with applicable CVS
18 requirements --
19        MR. BUSH:  CSA.
20        MR. GOETZ:  CSA requirements.
21 Thank you.
22 BY MR. GOETZ:
23   Q.   -- implemented by each CVS
24 distribution center, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    A.  Uh-huh.
2    Q.  Is that correct?
3    A.  That's what it says.
4    Q.  Is that correct?  Was that your role?
5    A.  I was responsible for being a liaison
6  for the distribution centers.
7    Q.  That's not what I asked.
8        Were you responsible for assuring
9  compliance with applicable CSA requirements
10  implemented by each CVS distribution center?
11        MR. BUSH:  Objection.  Asked and
12  answered.
13    A.  I was responsible for working -- being
14  a liaison with the distribution centers for
15  their compliance that they implemented
16  themselves at the distribution center.
17    Q.  This is -- and I'm not trying to
18  become hypertechnical.  It's really a yes or a
19  no.
20        Were you responsible for assuring
21  compliance with the applicable CSA
22  requirements implemented by each CVS
23  distribution center?
24        MR. BUSH:  I object to that.

Page 155

1  The question has now been answered twice.
2    A.  Yes.
3  BY MR. GOETZ:
4    Q.  Did you say yes?
5        MR. BUSH:  No.  You can answer
6  now.  I just objected.
7    A.  No.  I said I was responsible, yes,
8  for being a liaison with the distribution
9  centers for compliance that they had
10  implemented there on-site.
11  BY MR. GOETZ:
12    Q.  Is that a yes?
13        MR. BUSH:  Objection.
14  BY MR. GOETZ:
15    Q.  I'm just trying to find out, yes or
16  no, if that was your role as was told to the
17  DEA.
18    A.  My role --
19        MR. BUSH:  Objection.
20    A.  -- was a logistics pharmacy services
21  manager.  The CVS DEA Compliance Coordinator
22  refers to a title that was given as a
23  reference point in the SOP.
24  BY MR. GOETZ:

Page 156

1    Q.  Ma'am, you used to send e-mails,
2  right, with the tagline --
3    A.  Right.
4    Q.  -- CVS DEA Compliance Coordinator?
5    A.  Right.
6    Q.  Correct?
7    A.  It was an identifying point of
8  contact, yes.
9    Q.  And so --
10    A.  For --
11        MR. BUSH:  Wait a second.
12        THE WITNESS:  Sorry.
13        MR. BUSH:  Wait.  Don't talk
14  over each other.
15        MR. GOETZ:  I apologize, I'm
16  very sorry.
17    A.  No.  It was identifying point of
18  contact for standard -- a standard contact in
19  an SOP.  People and titles change.  They
20  implemented that point of contact in case I
21  was to leave and somebody else went into the
22  position with a different -- they have a
23  different name.  They also could have had a
24  different title.  It was a standard point of

Page 157

1  contact that that referred to.  My actual job
2  title was Logistics Rx Services Manager.
3  BY MR. GOETZ:
4    Q.  Did you put on your e-mails, as a
5  tagline, Corporate CVS DEA Compliance
6  Coordinator?
7    A.  Yes.
8    Q.  Okay.  And when you say this was put
9  in here as a point of contact, if I am at a
10  distribution center and I go, I would like to
11  know who is responsible for assuring
12  compliance with applicable CSA requirements
13  implemented by each CVS distribution center, I
14  would find you as that person, correct?
15    A.  You may, yes.
16    Q.  Who else would I find?
17    A.  There were -- there could be other
18  people that were also involved in compliance.
19  I can't recall off the top of my head, but,
20  yes, you could reach out to me.
21    Q.  Were there other people from 2008 to
22  2014 that were ever identified as holding that
23  title?
24    A.  Not that I recall.

Page 158

1   Q. It was only you that actually CVS
2   identified as holding that title?
3      A. I guess. The SOP, not CVS. Like as
4   far as my job -- my job at CVS, my personnel
5   identified me as a logistics services. The
6   SOP identifies me as the compliance
7   coordinator.
8      Q. You understand that the SOP is CVS
9   document --
10     A. Yes.
11     Q. -- a CVS document?
12     A. Yes.
13     Q. And you understand that that SOP was
14  implemented, adopted by CVS?
15     A. Yes.
16     Q. Okay. Could you go to 6608, please?
17     Do you see where it says, "Report"?
18  And it says, "After the review is complete, a
19  detailed mock DEA audit will be prepared and
20  furnished to the pharmacy manager" --
21     A. Uh-huh.
22     Q. -- "DC, DEA Compliance Director and DC
23  Director"?
24     A. Uh-huh.

Page 159

1      Q. Did you ever receive that report as
2   the CVS Compliance Director?
3      A. Not that I recall.
4      Q. So it was never important enough to
5   give to the top person?
6      A. I was not the top person. I would not
7   refer to myself as the top person.
8      Q. Okay. It was never important enough
9   to give to the CVS director of compliance?
10     A. I was not the director of compliance.
11     Q. I'll get it exactly right, I
12  apologize.
13     CVS DEA Compliance Coordinator.
14     Again, this report on Paragraph 3
15  indicates that "There will be a comparison of
16  the operations of the CVS's SOPs and identify
17  those areas that are not in compliance with
18  the SOP requirements."
19     Did I read that correctly?
20     A. Which part are you reading, I'm sorry?
21     Q. Paragraph 3.
22     MR. BUSH: It's on 08.
23     THE WITNESS: Oh, this one.
24  Okay, sorry.

Page 160

1      A. Yes you read it correctly.
2   BY MR. GOETZ:
3      Q. And assuming that there was no SOM in
4   the SOP until August of 2010, that would not
5   have been possible, would it have been? In
6   2007, 2008, 2009 and through August of 2010,
7   you could not do a comparison of the SOM to
8   figure out if they were in compliance with SOP
9   requirements?
10     A. I can't answer that. I didn't conduct
11  the audits.
12     Q. You -- you received the audits at
13  times?
14        MR. BUSH: Objection.
15     A. No, not that I recall.
16  BY MR. GOETZ:
17     Q. Did you ever review the audits?
18     A. Not that I recall.
19     Q. As the CVS DEA Compliance Coordinator,
20  you never felt it necessary to review the
21  audits?
22     A. Not that I recall.
23     Q. Could you turn to 6619, please? And
24  if you -- you go back to 6616, this section of

Page 161

1   the SOP deals with a DEA investigation,
2   correct?
3      A. Yes, correct.
4      Q. Is that correct?
5      A. Yes.
6      Q. And this section deals with what the
7   DEA will do, what it's going to want to see,
8   what it might find, those sorts of things,
9   correct?
10     A. Correct.
11     Q. Can you go to the Paragraph 13? And
12  the bottom of Paragraph 13, the last sentence,
13  it says, "The diversion investigators will
14  also review the DC's registration and
15  suspicious order monitoring systems and
16  programs to ensure compliance with the
17  regulations."
18        Do you see that?
19     A. I see that.
20     Q. Prior to August of 2010, what would be
21  provided to the DEA?
22     A. I can't answer that. I didn't -- I
23  wasn't there.
24     Q. Is it your testimony that you didn't

Page 162

1  know what would be told to the DEA during an
2  audit when there weren't any SOM programs in
3  the SOP?
4      A.  I don't recall that I would know.
5      Q.  Do you know what SOM program was in
6  the SOP before August of 2010?
7      A.  I don't know.
8      Q.  Do you know anything about the
9  suspicious order monitoring program, written
10 or unwritten, before August of 2010?
11     A.  I don't recall.
12     Q.  Do you know, as you sit here today?
13         MR. BUSH:  Know what?
14     A.  No what?
15 BY MR. GOETZ:
16     Q.  Anything about any SOM program,
17 written or unwritten, before August of 2010.
18     A.  As far as?
19     Q.  Anything related to suspicious order
20 monitoring.
21     A.  I know there's a suspicious order
22 monitoring program, but I can't speak to
23 the -- how the system works.
24     Q.  Pre-August of 2010, what was the

Page 163

1  suspicious order monitoring program?
2      A.  I can't speak to how it worked.
3      Q.  How do you know then that one existed?
4      A.  I've heard them speak of it.
5      Q.  Who?
6      A.  Frank Devlin.
7      Q.  What did he say?
8      A.  I don't recall specifically.  But I
9  know I recall hearing about a suspicious order
10 monitoring program, but I don't recall
11 specifically.
12     Q.  Did you hear about that maybe there
13 wasn't one?
14     A.  I don't recall that.
15     Q.  Is that -- could that have been what
16 you heard?
17     A.  I don't recall that.
18         MR. BUSH:  Hold on, guys.  Both
19 of you need to wait for the other one to stop,
20 so we don't speak over each other.
21 BY MR. GOETZ:
22     Q.  You can keep those in front of you,
23 but I'm going to show you Exhibit 205.
24

Page 164

1      (Exhibit No. 205 previously marked
2  for identification.)
3
4          MR. BAKER:  Can I get a copy.
5  BY MR. GOETZ:
6      Q.  Exhibit 205 is a document Bates
7  numbered 66574.  Do you see the second e-mail,
8  the e-mail on the bottom?
9      A.  Yes.
10     Q.  And could you read that, please, the
11 first paragraph?
12     A.  "Attached is the DEA SOP, which was
13 implemented in December 2007.  We have made
14 recent updates to the SOP.  Please note we
15 have updated the record retention period from
16 five years to two years.  Also, the SOM
17 section is not included.  In the event of an
18 audit and questions come up, please direct
19 them to corporate (Frank or myself) for an
20 explanation of the program.  Please review
21 with your teams and forward to anyone I may
22 have missed."
23     Q.  And this is April 3 of 2009, correct?
24     A.  Yes, that's what it says.

Page 165

1      Q.  *And so this e-mail is to what I would
2  consider a lot of people, but the document
3  will speak for itself.
4          But you were telling all these people,
5  hey, if the DEA wants to know about what our
6  SOM program is, have them contact me or Frank
7  and we will give them an explanation, correct?
8      A.  This section, if a question comes up
9  it directed them to contact us.
10     Q.  Was that a yes?
11         MR. BUSH:  Objection.
12     A.  I'm sorry, what was the question?
13         MR. GOETZ:  Can you read it
14 back?
15         *(Question read.)
16     A.  No.
17 BY MR. GOETZ:
18     Q.  No?
19     A.  No.
20         MR. BUSH:  I'm sorry, what was
21 the answer?
22         THE WITNESS:  I said no.
23         MR. BUSH:  No, okay.
24         THE WITNESS:  It's -- his

Page 166

1 question said program.
2          MR. BUSH:  Right.
3 BY MR. GOETZ:
4     Q.  I'll read it to you.  "Also, the SOM
5 section is still not included in the SOP.  In
6 the event of an audit and questions come up,
7 please direct them to corporate (Frank or
8 myself) for the explanation of the program."
9          Did I read that correctly?
10     A.  Yes.
11     Q.  In the event of a DEA audit --
12     A.  Uh-huh.
13     Q.  -- what were you going to tell them in
14 April of 2009?
15     A.  I don't recall.
16     Q.  You have no idea?
17     A.  I do not remember.
18     Q.  You can't remember anything?  It
19 was -- or Frank were the only ones that
20 could give the explanation of the program and
21 you don't remember anything?
22          MR. BUSH:  Objection.
23     A.  I do not remember.
24 BY MR. GOETZ:

Page 167

1     Q.  Did you have notes of the program in
2 2009 so you could tell the DEA?
3          MR. BUSH:  Objection.
4     A.  Not that I recall.
5 BY MR. GOETZ:
6     Q.  Okay.  There was no written policy --
7 written SOM policy as of April of 2009, was
8 there?
9     A.  I do not know.
10     Q.  Assuming there was no written policy,
11 where were you going to get the information to
12 tell the DEA what was happening?
13          MR. BUSH:  Objection.
14     A.  I do not recall.
15 BY MR. GOETZ:
16     Q.  Do you, in your office, keep notes of
17 important things?
18     A.  I may for certain things.
19     Q.  Do you keep handwritten notes or do
20 you keep notes on a computer?
21     A.  I could have both.
22     Q.  Did you ever search for any documents
23 related to this litigation through your
24 office?

Page 168

1     A.  Not that I recall, no.
2     Q.  You never searched to see, hey, what
3 was I going to tell the DEA in April of '09
4 whether you had a document that might have
5 spoken to that?
6     A.  No.
7     Q.  Do you know if Frank would be able to
8 tell us what was going to be told to the DEA?
9     A.  I don't know.  I can't speak for
10 Frank.
11          (Exhibit No. 203 previously marked
12 for identification.)
13
14 BY MR. GOETZ:
15     Q.  And just so the record's clear -- we
16 talked about it earlier, but this has a
17 tagline, right, as Logistics Rx Services
18 Manager Corporate CVS DEA Compliance
19 Coordinator, right?
20     A.  Yes.
21     Q.  Would you agree with me if we go back
22 to -- I apologize -- Exhibit 203 and --
23     A.  What page?
24     Q.  6619.

Page 169

1          Exhibit 203.  And it's Bates number
2 6619 and we go back to Paragraph 13.  And it
3 says, "The diversion investigator will also
4 review the DC's registration and suspicious
5 order monitoring systems and programs to
6 ensure compliance with the regulations," that
7 that implies that there are written SOM
8 programs?
9          MR. BUSH:  Objection.
10     A.  What was the question?
11 BY MR. GOETZ:
12     Q.  If you read that last sentence --
13     A.  Yes.
14     Q.  -- of Paragraph 13 --
15     A.  (Witness reviews document.)
16          Okay.
17     Q.  -- would you agree with me that that
18 implies that there are written SOM policies?
19          MR. BUSH:  Objection.
20     A.  No, I wouldn't agree.
21 BY MR. GOETZ:
22     Q.  Okay.  How would the DEA review the
23 suspicious order monitoring systems and
24 programs otherwise?

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    A.  I don't know.  I can't speak for how
2  the DEA reviews during an audit.
3    Q.  Did you know that in April of 2009?
4        MR. BUSH:  Know what?
5        MR. GOETZ:  How the DEA -- what
6  their expectations with were of an audit in
7  April of 2009.
8    A.  I can't say that I recall or know.
9  BY MR. GOETZ:
10   Q.  Did you know what they would be
11 looking for in April of 2009?
12   A.  I can't say I recall.
13   Q.  Could you turn to 6614, please, of
14 this document just so we're clear?
15       And Section D, which says, "suspicious
16 order monitoring SOM," that is the section --
17 this language is the section that is just a
18 placeholder; is that correct?
19   A.  From -- yeah.  From what I believe,
20 yes.
21   Q.  And Paragraph B of that section, where
22 it says, "These parameters are documented in
23 SOP - 'order quantity parameters for
24 controlled drugs' - being developed and

Page 171

1  written."
2        Did I read that correctly?
3    A.  Yes.
4    Q.  So we know that, at this point at
5  least, any order quantity parameter was
6  unknown, correct?
7    A.  I can't agree with that.
8    Q.  Okay.  Well, how would you know it?
9    A.  I don't have enough information, like,
10 to agree with it.
11   Q.  What information would you need?
12   A.  I didn't own the program, so I can't
13 speak to it.
14   Q.  As the CVS DEA Compliance Coordinator,
15 what information would you need to know
16 whether or not the order quantity parameters
17 for controlled drugs were finished?
18       MR. BUSH:  I'm sorry, was
19 finished?
20   A.  Finished?
21 BY MR. GOETZ:
22   Q.  Yes, were established.
23   A.  I would need to know the system.
24   Q.  Did you know the system?

Page 172

1    A.  No, I did not.  I did not work with
2  the system.
3    Q.  Would you agree with me that the DEA
4  requirements are not hard to meet?
5        MR. BUSH:  Objection.
6    A.  Would I agree?  No, I wouldn't agree.
7  BY MR. GOETZ:
8    Q.  You wouldn't?  Do you think that the
9  DEA requirements are burdensome?
10   A.  I think it would depend on what
11 capacity we're talking.  There's lots of DEA
12 requirements.
13   Q.  The DEA requirements, as they relate
14 to controlled drug substances and the
15 distribution of those, do you think they are
16 difficult to meet?
17   A.  I don't know if I can say if they're
18 difficult to meet.
19   Q.  You --
20   A.  I don't know all of them.
21   Q.  As the CVS DEA Compliance Coordinator,
22 the ones that you know of, do you believe they
23 are difficult the meet?
24   A.  The ones that I know of?  I don't -- I

Page 173

1  don't myself feel they're -- they -- they're
2  difficult to meet.
3    Q.  Okay.  As the CVS DEA Compliance
4  Coordinator, do you believe that the
5  requirements, as it relates to controlled
6  substances distribution, are difficult to
7  meet?
8    A.  Speaking for CVS?
9    Q.  Yes.
10   A.  I mean, in my opinion, I would say no,
11 they're not difficult to meet.
12   Q.  They're relatively easy, correct?
13   A.  I -- I don't know if I would use the
14 word "easy," but they're requirements.
15   Q.  You think they're lax?
16   A.  I don't feel they're lax.
17   Q.  Do you agree that the DEA's goals are
18 to prevent diversion of controlled substances
19 and to ensure an adequate supply?
20   A.  Yes, I would agree.
21   Q.  And that's it, correct?
22   A.  Yes.
23   Q.  And so everything that we relate to
24 this document, the DEA Standard Operating

Page 174

1 Procedures Manual, is about controlling
2 diversion and an adequate supply, correct?
3    A.  Yes.
4    Q.  And that is what your job was, right,
5 to manage that, to be the DEA Compliance
6 Coordinator for that?
7       MR. BUSH:  Objection.
8    A.  No.  I would not say that was my job.
9 My job was to be a central contact and keep a
10 consolidated point of contact for all our
11 distribution centers to get information to
12 support them.
13 BY MR. GOETZ:
14    Q.  Did you ever tell anybody at CVS, hey,
15 I don't think this being a DC or a DEA
16 Compliance Coordinator is actually my job?
17    A.  Not that I recall.
18    Q.  Okay.  And did you ever tell anybody
19 at CVS, hey, I don't think I'm responsible for
20 assuring compliance with applicable CSA
21 requirements implemented by each CVS
22 distribution center?
23    A.  Not that I recall.
24    Q.  CVS believes you were doing that,

Page 175

1 correct?
2       MR. BUSH:  Objection.
3    A.  I don't know what CVS was -- I can't
4 speak for what CVS believed.
5 BY MR. GOETZ:
6    Q.  Did you ever get reprimanded for not
7 doing it?
8    A.  Not that I recall.
9    Q.  And they gave you that title in these
10 documents, correct, CVS DEA Compliance
11 Coordinator?
12    A.  They as in who?
13    Q.  CVS.
14    A.  CVS -- I don't -- I don't know if --
15 how to answer that.  My boss, yes, I guess.
16 If he's CVS, yes, my boss did.
17    Q.  Could you go to 6623, please, of that
18 document?
19    A.  What page?
20       MR. BUSH:  6623.  Is that right?
21       MR. GOETZ:  Yes.  I'm sorry, I
22 apologize, 66622 and 66623.  So 66623, please.
23       MR. BUSH:  I'm sorry, 666 -- oh.
24       THE WITNESS:  23.

Page 176

1       MR. BUSH:  I have 666 --
2       MR. GOETZ:  You have no 66623?
3    (Pause in proceedings.)
4       MR. BUSH:  I have 66623, but it
5 seems to follow 66624.  Let's see.
6       THE WITNESS:  Yes, me too.
7       MR. BUSH:  They're out of order.
8 I don't know why.
9       THE WITNESS:  So we're going to
10 23?
11       MR. BUSH:  Ask him.  He's in
12 charge.
13       MR. GOETZ:  Yes, please.
14       MR. BUSH:  Do you see what's
15 going on?  6624, and then 6623 comes after it.
16 Unclear why that happened, but there it is.
17       MR. GOETZ:  My children might
18 have numbered this.
19 BY MR. GOETZ:
20    Q.  The first paragraph up top --
21       MR. BUSH:  So which one?
22       MR. GOETZ:  6623.
23       MR. BUSH:  23, okay, got it.
24 BY MR. GOETZ:

Page 177

1    Q.  The first paragraph up top, where it's
2 Paragraph C.  It says, "Use CVS's standard
3 operating procedures, SOPs, for all DEA
4 requirements in our facility to ensure
5 continuance and complete adherence to all
6 requirements," correct?
7       MR. BUSH:  Okay.  Wait a second.
8 Make sure you have the context for that.  So
9 it's the carry over from X-3, which is
10 actually 6622.
11       THE WITNESS:  I'm out of...
12    (Witness reviews document.)
13    A.  So does it read that?
14 BY MR. GOETZ:
15    Q.  Yes.
16    A.  Yes, that's what it reads.
17    Q.  And do you understand that what
18 they're talking about, where it says,
19 "Adherence to all requirements," are all DEA
20 requirements, correct?
21    A.  Yes, for all DEA requirements in our
22 facility.
23    Q.  And if you go to Paragraph 2, which
24 precedes this on 6622, you just looked at

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  it --
2      A.  Paragraph 2, yes.
3      Q.  -- what that says is, "While
4  comprehensive, DEA requirements are not
5  difficult to meet if they are viewed as a
6  continuing -- continuous process.  The
7  following steps will help."
8          So that Paragraph C that we just read,
9  it's fair to say, according to the CVS SOP,
10  that that is one of the steps that needs to be
11  followed to meet -- to make it easy to meet
12  the DEA requirements, correct?
13          MR. BUSH:  Objection.
14          MR. GOETZ:  I butchered that
15  question.  I'll withdraw it.
16  BY MR. GOETZ:
17      Q.  If you read Paragraph 2 on 66622 --
18      A.  Yes.
19      Q.  -- that outlines, here are steps that
20  will make it easy to meet the DEA
21  requirements, correct?
22      A.  Yes.
23      Q.  And Paragraph C is one of those steps,
24  correct?

Page 179

1      A.  Yes.
2      Q.  And Paragraph C talks about using the
3  CVS standard operating procedures to ensure
4  continuous and complete adherence to all DEA
5  requirements, correct?
6      A.  Yes.
7      Q.  Correct?
8      A.  Yes.
9      Q.  And would you agree with me that since
10  there was no SOM until August of 2010, it was
11  impossible for CVS to use the SOP, standard
12  operating procedures, for the DEA SOM
13  requirements to make it easy to meet the DEA
14  requirements?
15          MR. BUSH:  Objection.
16      A.  What is the question?
17  BY MR. GOETZ:
18      Q.  In 2007, there were no SOM written
19  requirements, correct?
20      A.  I don't know if -- I can't answer
21  that.  I don't know for sure.
22      Q.  We established earlier that they
23  were -- they were put in in August of 2010?
24      A.  Into the --

Page 180

1      Q.  Right.
2      A.  -- into in SOP?
3      Q.  Into this SOP.
4      A.  Yes.  But outside of this SOP, I can't
5  speak to if there was anything written.
6      Q.  Right.  There might be some phantom
7  document that we don't know about?
8          MR. BUSH:  Objection.
9  BY MR. GOETZ:
10      Q.  But in this standard operating
11  procedure in 2007, it was not possible to use
12  this SOP -- the 2007 SOP to meet the DEA
13  requirements in the facility to ensure
14  continuous and complete adherence to all
15  requirements because they didn't exist,
16  correct?
17      A.  The written part of SOM didn't exist
18  in this SOP.
19      Q.  So it was impossible to follow
20  Paragraph C, correct?
21      A.  Correct.
22      Q.  And it was impossible in 2008 to
23  follow Paragraph C, correct?
24      A.  Correct.

Page 181

1      Q.  And it was impossible in 2009 to
2  follow Paragraph C, correct?
3      A.  Correct.
4      Q.  It was impossible at least through
5  August of 2010 to follow Paragraph C,
6  correct?
7      A.  Correct.
8      Q.  Could you turn to 6628, please?
9      A.  28?
10      Q.  Yes.  Who was the DC DEA Compliance
11  Coordinator for Indianapolis in 2007?
12      A.  I don't recall.
13      Q.  What about 2006?
14      A.  I don't recall.
15      Q.  What about 2008?
16      A.  I don't recall.
17      Q.  What about 2009?
18      A.  I don't recall.
19      Q.  '10?
20      A.  I don't recall.
21      Q.  '11?
22      A.  I don't recall.
23      Q.  Do you recall any year?
24      A.  I don't remember.

Highly Confidential – Subject to Further Confidentiality Review

Page 182

1    Q.  Do you recall any year?
2    A.  For the compliance coordinator?
3    Q.  Yes.
4    A.  I can't remember.
5    Q.  The DC DEA Compliance Coordinator was
6  actually kind of anybody they chose to pick,
7  right, there were no requirements?
8        MR. BUSH:  Objection.
9    A.  I didn't pick them, so I can't speak
10 to it.  I think in general it would usually be
11 the pharmacy manager or supervisor, I would
12 think.
13 BY MR. GOETZ:
14   Q.  You don't know?
15   A.  I don't know for certain.
16   Q.  There was nothing written about how to
17 pick one, was there?
18   A.  Not that I recall.
19   Q.  There were no requirements on what
20 type of role they were fulfilling in addition
21 to being the DC DEA Compliance Coordinator,
22 was there?
23   A.  Not --
24        MR. BUSH:  Objection.

Page 183

1    A.  Not that I recall.
2  BY MR. GOETZ:
3    Q.  In fact, it was a tagalong position,
4  correct?  It was just something that they
5  had -- someone else was doing a job and they
6  said, hey, you're now the DC DEA Compliance
7  Coordinator?
8        MR. BUSH:  Objection.
9    A.  I can't speak to that.  I don't know
10 how they were chosen.
11   Q.  Do you know that the distribution
12 centers chose them?
13   A.  I can't recall.
14   Q.  Do you know if there's any corporate
15 policy on how they were to be chosen?
16   A.  Not that I recall.
17   Q.  When you said it was -- did you say it
18 was usually the pharmacy manager?
19   A.  From what I can remember.
20   Q.  And what -- what does the pharmacy
21 manager do at the DC?
22   A.  I don't know their specific job
23 functions, but they would usually oversee the
24 pharmacy operation in the distribution center.

Page 184

1    Q.  What -- I don't know what that means.
2    A.  Like picking store orders.
3    Q.  So the pharmacy manager would be a
4  picker?
5    A.  No, would oversee the pickers.
6    Q.  Would they actually be a picker or
7  would they work in an office somewhere?
8    A.  I don't believe they would be a
9  picker.  I believe they would work in an
10 office.
11   Q.  And how would they oversee a picker?
12 Do you have any idea?
13   A.  I do not have any idea.
14   Q.  Beyond what you've told me, do you
15 have any idea what pharmacy store managers
16 were doing from '08 to '14?
17   A.  I can't answer that, no.
18   Q.  No, you don't have any --
19   A.  No.
20   Q.  Could you go to 66628, please?
21   A.  Uh-huh.
22   Q.  And do you see where it says,
23 Paragraph A, "Policy review and revision for
24 administrative actions"?

Page 185

1    A.  Uh-huh.
2    Q.  Could you read Paragraph A --
3  Paragraph 1 into the record?
4    A.  "The DC DEA Compliance Coordinator
5  will insure that all CVS DC personnel involved
6  in the activities of controlled substances
7  read the CVS/DEA distributor standard
8  operating procedure at least once a year and
9  receive the proper training in the
10 requirements of the CVS/DEA distributor
11 standard operating procedures."
12   Q.  Again, there were no SOM in these
13 standard operating procedures until August of
14 2010, correct, no suspicious order monitoring
15 section?
16   A.  Correct.
17   Q.  And so it would be impossible -- even
18 though it's here in a big paragraph, it would
19 be impossible to ensure that all CVS DC
20 personnel involved in the activity of
21 controlled substances read the suspicious
22 order monitoring section of the SOP, correct?
23 That would be impossible in 2007?
24   A.  Correct.

Page 186

1    Q.  Correct?
2    A.  Correct.
3    Q.  That would be impossible in 2008?
4    A.  Correct.
5    Q.  It would be impossible in 2009?
6    A.  Correct.
7    Q.  It would be impossible in 2010 until
8   August?
9    A.  Correct.
10    Q.  An awful lot of the training, the
11  auditing for compliance, making sure people
12  comply, it was not possible in the DCs until
13  August of 2010 because there was no written
14  SOM in the SOP; isn't that true?
15        MR. BUSH:  Objection.
16    A.  I can't speak to that.
17  BY MR. GOETZ:
18    Q.  What have I -- what have we gone
19  through that could have been done before
20  August of 2010?
21    A.  I didn't oversee SOM, so I don't know
22  if there was something outside of this policy
23  that existed.
24    Q.  As the CVS DEA Compliance Coordinator,

Page 187

1   would it have been important for you to know
2   that?
3    A.  No, because I didn't work with the SOM
4   system.
5    Q.  As -- but again, we don't know who was
6   the SOM DEA Compliance Coordinator for CVS, do
7   we?
8    A.  I can't say that I do.
9    Q.  There was nobody that was ever listed
10  in the document as an SOM DEA Compliance
11  Coordinator, was there?
12    A.  I don't think so no.
13    Q.  In fact, in every document given to
14  the DEA, it's you who's listed as the CVS DEA
15  Compliance Coordinator, correct?
16        MR. BUSH:  Objection.
17  BY MR. GOETZ:
18    Q.  Is that correct?
19    A.  I'm listed as the compliance
20  coordinator, yes.
21    Q.  DEA Compliance Coordinator?
22    A.  DEA Compliance Coordinator.
23    Q.  Can you go to staff training,
24  Paragraph B, please?

Page 188

1    A.  6628?
2    Q.  66628, please.
3        Do you see Paragraph 1?
4    A.  Uh-huh, yes.
5    Q.  Could you read that, please, into the
6   record?
7    A.  "The DC DEA Compliance Coordinator,
8   the pharmacy manager, and the operations
9   manager are responsible for assuring that the
10  SOPs are implemented."
11    Q.  And again, as the CVS DEA director
12  of -- I'm sorry, compliance coordinator, you
13  would agree that the SOPs contained no
14  suspicious order monitoring program until
15  August of 2010, correct?
16    A.  I would agree that this SOP did not
17  contain an SOM portion.
18    Q.  And we don't know of any other SOP,
19  correct?
20    A.  I do not know of.
21    Q.  Well, I --
22        MR. BUSH:  That's all she can
23  answer, is what she knows.
24    A.  I can't -- I don't know.

Page 189

1   BY MR. GOETZ:
2    Q.  I also don't know.
3        You would agree that then the DC DEA
4   Compliance Coordinator, the pharmacy manager,
5   and the operations manager could not assure
6   that the SOM SOP was implemented in 2007
7   because there was none?
8    A.  There was no SOM SOP in here, portion,
9   you mean?
10    Q.  Right.  There was none, correct?
11        MR. BUSH:  In this document.
12    A.  In this document, there was not.
13  BY MR. GOETZ:
14    Q.  And none that we know of?
15    A.  None that I can speak to.
16    Q.  So in 2007, this was impossible,
17  correct, to assure compliance?
18        MR. BUSH:  Objection.
19  BY MR. GOETZ:
20    Q.  To assure that the SOP related to the
21  SOM was implemented?
22    A.  With this SOP, yes.
23    Q.  It was impossible?
24    A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  Q. 2008, impossible?

2  A. With this SOP.

3  Q. 2009?

4  A. With this SOP, yes.

5  Q. All the way through August of 2010,

6  impossible?

7  A. With this SOP, yes.

8  Q. Assuming that we don't discover some

9  other SOP containing an SOM pre-August of

10  2010, would you agree it's impossible? You

11  keep saying, "With this SOP."

12  A. If you don't find -- yes, if we don't

13  have an SOP.

14  Q. Right.

15  A. (Witness nodding.)

16  Q. And you have no evidence that you do

17  have one?

18  A. I do not have one. I wasn't

19  responsible for the program.

20  Q. Can you go to staff training Paragraph

21  4 of that, please? Could you read that,

22  please?

23  A. "It is CVS's intention that the

24  training will be ongoing and continual. There

Page 191

1  will be no exceptions to the training

2  requirement."

3  Q. You would agree with me that it was

4  impossible to do any training as it relates to

5  the SOM, suspicious order monitoring, in 2007?

6  A. As it refers to the SOP, yes.

7  Q. Impossible in 2008 to do any training

8  on this suspicious order monitoring?

9  A. With a written portion in this SOP,

10  yes.

11  Q. Impossible in 2009?

12  A. For a written portion, yes, in this

13  SOP.

14  Q. And impossible at least until August

15  of 2010?

16  A. For a written portion in this SOP,

17  yes.

18  Q. As the DEA Compliance Coordinator,

19  sitting here today, does it concern you that

20  at least from January 1 of '06 until August of

21  2010 it was impossible to audit the suspicious

22  order monitoring system?

23  A. I don't know if that's a true

24  statement.

Page 192

1  Q. We haven't seen anything in here where

2  they could do any compliance audits, correct?

3  Everything we've read, it wouldn't be

4  possible, correct, because there was no

5  document to audit it against?

6  A. From what I know in this SOP, there's

7  nothing written.

8  Q. Okay. Does that concern you?

9  A. I'm not familiar enough to know, with

10  the system, if what was in place at that time.

11  Q. Okay.

12  A. But as it refers to the SOP, there's

13  nothing written.

14  Q. If you -- if you take -- assume that

15  there's nothing else besides this document

16  before August of 2010, does that concern you?

17  A. I don't know if it concerns me at this

18  point in time.

19  Q. I'm sorry?

20  A. At today's point in time, I don't know

21  enough to say if it would have concerned me

22  that there wasn't a written document.

23  Q. You looked at a bunch of charts

24  earlier, right, about the opioid crisis --

Page 193

1  A. Uh-huh.

2  Q. -- all encompassing this time period,

3  correct?

4  MR. BUSH: Well, objection.

5  A. I believe it was during this time

6  period, yes.

7  BY MR. GOETZ:

8  Q. And you testified that you were aware

9  of the opioid crisis at least ten years ago,

10  correct?

11  A. Yes.

12  Q. And so being aware of the opioid

13  crisis and being the DEA Compliance

14  Coordinator and if you assume and accept what

15  I'm telling you, there was no other document

16  before August of 2010, does it worry you that

17  there was no ability to audit DEA compliance

18  as it relates to the suspicious order

19  monitoring?

20  MR. BUSH: Objection.

21  A. Does it concern me?

22  BY MR. GOETZ:

23  Q. Yes.

24  A. That there was none? At -- I -- I

Page 194

1  don't know.
2      Q.  Does it -- assuming all of those
3  former things are true, does it concern you
4  that there was no written policy so that you
5  could do staff training as it relates to
6  suspicious order monitoring?
7          MR. BUSH:  Objection.
8      A.  I don't know what was available.
9  BY MR. GOETZ:
10     Q.  Assuming that there wasn't.
11         MR. BUSH:  Objection.
12 BY MR. GOETZ:
13     Q.  I'm sorry, did you answer?
14     A.  No.  I don't know what's available for
15 training.
16     Q.  Okay.  Assuming that we haven't seen
17 any -- I'm telling you there wasn't any before
18 August of 2010 -- understanding there was an
19 opioid crisis, at least according to your
20 testimony that you were aware of going back to
21 August of -- or 2008 -- you were the DEA
22 Compliance Coordinator -- does it concern you
23 that there was no documents upon which to
24 train staff about suspicious order

Page 195

1  monitoring?
2          MR. BUSH:  Objection.
3      A.  I don't know if it concerns me.
4  BY MR. GOETZ:
5      Q.  Are you saying it does -- you don't
6  know if it concerns you today --
7      A.  Yes.
8      Q.  -- or you don't know if it would have
9  concerned you in 2008?
10     A.  Today.
11     Q.  What about in 2008, had you known
12 that?
13     A.  I don't recall what I remember about
14 SOM in 2008, so I don't -- I can't say if it
15 would concern me then.
16     Q.  What about 2009?
17     A.  I can't say what I recall about it
18 back then.
19     Q.  What about 2010?
20     A.  Again, I can't say if -- what I recall
21 about it back then.
22     Q.  '11?
23     A.  Same thing, I don't recall -- I can't
24 say if I can recall.

Page 196

1      Q.  Will that be the same all the way
2  through '14?
3      A.  Yeah.
4      Q.  And yet, we agreed earlier that the
5  entirety of this document and the entirety of
6  the DEA, as it relates to controlled
7  substances, is to prevent diversion?
8      A.  Uh-huh.
9      Q.  And to make sure we have adequate
10 supply, correct?
11     A.  Correct.
12     Q.  Is that correct?
13     A.  Yes.
14     Q.  And a huge portion of preventing
15 diversion is this suspicious order monitoring
16 program, correct?
17         MR. BUSH:  Objection.
18     A.  I -- a huge portion?  I don't know if
19 I could specifically say it's a huge
20 portion.
21     Q.  Significant portion?
22         MR. BUSH:  Objection.
23 BY MR. GOETZ:
24     Q.  Strike that.

Page 197

1          What is the importance of a suspicious
2  order monitoring program in preventing
3  diversion?
4      A.  What is the purpose of it?
5      Q.  No.  What's the importance?  How
6  important is it?
7      A.  How do I feel how important it is?
8      Q.  Uh-huh.
9          MR. BUSH:  Are you talking --
10         THE WITNESS:  Personally how
11 important?
12         MR. BUSH:  I don't -- no.  Just
13 are you talking about at CVS or generally?
14         THE WITNESS:  Right.  Thank you.
15         MR. BUSH:  In the whole world?
16         THE WITNESS:  In the world or my
17 feeling like --
18         MR GOETZ:  Well, for one, it's
19 not a 30(b)(6), right?  She's a fact
20 witness.
21         THE WITNESS:  So just me?
22         MR. GOETZ:  Yes.
23         MR. BUSH:  No, I understand
24 that, but you could still be asking about the

Page 198

1  whole world or you could be asking how
2  important was it for CVS to have it.  That was
3  the distinction I was making.  It doesn't have
4  to do whether she's a 30(b)(6), but I've
5  already spoken too much.
6  BY MR. GOETZ:
7      Q.  Do you remember the question?
8      A.  How important is suspicious order
9  monitoring?
10     Q.  Yes.
11     A.  I don't know if I could put a weight
12  on it.  I've never thought about it in those
13  terms.
14     Q.  It's critical in preventing diversion,
15  do you not agree with that?
16         MR. BUSH:  Objection.
17     A.  I believe it plays a piece in
18  identifying diversion.
19  BY MR. GOETZ:
20     Q.  From a distribution perspective, okay,
21  from a distribution perspective, what else
22  plays a piece?
23         MR. BUSH:  Objection.
24     A.  Yeah, I can't speak to what else plays

Page 199

1  a piece in the distribution.  There could be
2  multiple factors that play pieces.
3  BY MR. GOETZ:
4      Q.  As the CVS DEA Compliance Coordinator,
5  are you aware of any other system other than a
6  suspicious order monitoring system that
7  prevents diversion?
8          MR. BUSH:  Objection.
9      A.  At CVS?
10  BY MR. GOETZ:
11     Q.  Yes, or anywhere.  Tell me anywhere.
12     A.  Oh, I don't know.
13     Q.  What about at CVS?
14     A.  I don't know.  I don't think so.  I
15  think it's just SOM.
16     Q.  Right.  So SOM is -- we can agree it's
17  critical.  You can't think of anything else.
18  We can at least agree it's critical?
19     A.  It's important.
20         MR. BUSH:  Objection.
21  BY MR. GOETZ:
22     Q.  It's important?
23     A.  (Witness nodding.)
24     Q.  Okay.  Understanding that an SOM

Page 200

1  policy is important in preventing diversion,
2  understanding that you were aware of the
3  opioid crisis at least until 2008, and
4  understanding that you were the CVS DEA
5  Compliance Coordinator, does it concern you
6  that you had no written policy such that you
7  couldn't audit it and then you couldn't
8  correct any deficiencies as it related to your
9  suspicious order monitoring?
10         MR. BUSH:  Objection.
11     A.  Yeah, I don't know if I can answer
12  that, like, for that point in time because I
13  wouldn't have been looking at it to audit it.
14  It didn't fall under my responsibility as far
15  as managing the program.
16     Q.  I hate to keep doing this, but you --
17  unless you tell me there's somebody else,
18  you're responsible for assuring compliance
19  with applicable CSA requirements implemented
20  by each CVS distribution center.
21         And if they don't have a written SOM,
22  how can we assure compliance?
23         MR. BUSH:  Objection.
24     A.  I don't know what else was available

Page 201

1  for SOM.
2      Q.  Again, we're -- you don't know of
3  anything else available?
4      A.  Yes.
5      Q.  Okay.  How long have we been at
6  this?
7          MR. BUSH:  I don't know.  We've
8  got --
9          THE VIDEOGRAPHER:  An hour and
10  eight minutes.
11         MR. GOETZ:  Let's take a
12  break.
13         THE VIDEOGRAPHER:  The time is
14  1:48 p.m.  We're off the record.
15
16         (Recess taken from 1:48 p.m.
17         to 2:04 p.m.)
18
19         THE VIDEOGRAPHER:  The time is
20  2:04 p.m. and we're on the record.
21
22         CONTINUED DIRECT EXAMINATION
23  BY MR. BAKER:
24     Q.  Ms. Propatier, Bill Baker back asking

Page 202

1   you questions.
2         Are you familiar with the term
3   "Outside vendors"?
4         A.  Yes.
5         Q.  Outside vendors means that -- well,
6   let's take some history.
7         CVS distribution centers distribute --
8   or distributed Schedule III through Schedule V
9   drugs to CVS retail pharmacies, correct?
10        A.  Yes.
11        Q.  CVS distribution centers never
12  distributed or housed Schedule II drugs.  That
13  was always something that was purchased from
14  outside vendors by the retail stores, correct?
15        A.  Correct.
16        Q.  And with respect to the suspicious
17  order monitoring policy that was first
18  inserted by you into the SOP, which was August
19  25, 2010, that dealt with the suspicious order
20  monitoring of Schedule III narcotics that were
21  distributed and supplied out of the CVS
22  distribution centers to the CVS retail
23  pharmacies; is that correct?
24        A.  Yes, III through V.

Page 203

1         Q.  To the extent that CVS retail
2   pharmacies also purchased either Schedule III
3   narcotics or Schedule II narcotics from
4   outside vendors, that would not be something
5   that CVS Pharmacy or CVS distribution centers
6   would be able to monitor; is that correct?
7             MR. BUSH:  Objection.
8         A.  From what I know, I wouldn't think so
9   by.
10  BY MR. BAKER:
11        Q.  In fact, that's something that they
12  don't monitor; is that right?
13            MR. BUSH:  Objection.
14        A.  Yeah I don't believe so, no.
15  BY MR. BAKER:
16        Q.  Okay.  Let me show you what is marked
17  as Exhibit 53.
18
19            (Exhibit No. 53 marked for
20  identification.)
21
22            MR. BUSH:  I'm sorry, you said
23  this was 53?
24            MR. BAKER:  Yes, sir.

Page 204

1   BY MR. BAKER:
2         Q.  It's Exhibit 53 and it's Bates number
3   33579, correct, at the bottom?
4         A.  Yes.
5         Q.  And it is an e-mail dated 10/8/2012
6   from Pamela Hinkle to Aaron Burtner.
7             Do you see that?
8         A.  Yes.
9         Q.  And this says, "Regarding conference
10  call notes, 10/5/12."
11            Do you see that?
12        A.  Conference call notes, 10/5 yes.
13        Q.  Do you know Pamela Hinkle?
14        A.  Yes, I know Pam.
15        Q.  Who is Pamela Hinkle?
16        A.  In 2012?
17        Q.  Yes, ma'am.
18        A.  She worked in loss prevention.
19            MR. BUSH:  Wait for --
20        A.  Sorry, she was based in Tennessee.
21            MR. BUSH:  I was asking him to
22  let you finish your answer.
23  BY MR. BAKER:
24        Q.  I'm sorry if I overstepped your

Page 205

1   answer.
2         A.  That's okay.
3         Q.  So who was Pamela Hinkle?
4         A.  She worked in loss prevention out of
5   Tennessee.
6         Q.  Who was Aaron Burtner at that time?
7         A.  I know the name Aaron, but I don't
8   know -- I don't know the specifics about
9   Aaron.
10        Q.  Would you turn to the next page?  Do
11  you see at the bottom there it says -- we'll
12  highlight this if you would, technology --
13  "All orders," where it says -- now this --
14  taken in context, is an AGI CVS discussion on
15  10/5/12; is that correct?
16        A.  Yes, that's what it says.
17            MR. BUSH:  This does not reflect
18  she participated in it, correct?
19            THE WITNESS:  Correct.
20            MR. BAKER:  I'm sorry?
21            MR. BUSH:  I mean, I'm just
22  noting she's not on this list.
23            THE WITNESS:  No.
24            MR. BAKER:  No.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  BY MR. BAKER:
2      Q.  This is for pharmacy DC ordering
3  process, conference call recap, correct, at
4  the top?
5      A.  Yes, that's what it says.
6      Q.  And it says here, "All orders
7  generated from outside vendors are not pushed
8  through the SOM process," correct?
9      A.  That's what it says.
10     Q.  And that would be an accurate
11 statement, that at no time have outside vendor
12 orders for CVS retail pharmacies been pushed
13 through the SOM process that CVS had in place;
14 is that correct?
15         MR. BUSH:  Objection.
16     A.  I cannot speak to that.
17 BY MR. BAKER:
18     Q.  Well, as of 2012, this document
19 clearly indicates that all orders generated
20 from outside vendors are not pushed through
21 the SOM process, correct?
22     A.  This line says all orders generated
23 from outside vendors have not pushed through
24 SOM, but I --

Page 207

1      Q.  That would be as late as October 5,
2  2012, that was still an issue, correct?
3      A.  I can't speak --
4          MR. BUSH:  Objection.  Go
5  ahead.
6      A.  I can't speak to if that was an issue.
7  BY MR. BAKER:
8      Q.  It --
9      A.  I have no idea.
10     Q.  It was still a fact, as of October 5,
11 2012, that all orders generated for outside
12 vendors were not pushed through the SOM
13 process, correct?
14         MR. BUSH:  Objection.
15     A.  I can't speak to that.
16 BY MR. BAKER:
17     Q.  The document says that, correct?
18     A.  Correct, the document says that.
19     Q.  And you would have no reason to
20 disagree with what this document says; is that
21 correct?
22         MR. BUSH:  Objection.
23     A.  I can't speak to it.  I don't know the
24 context.

Page 208

1  BY MR. BAKER:
2      Q.  Because you can't speak to it, that
3  doesn't give you any reason at all to disagree
4  with it, correct?
5          MR. BUSH:  Objection.
6      A.  It also doesn't give me reason to
7  agree with it.
8  BY MR. BAKER:
9      Q.  So you can neither agree nor
10 disagree?
11     A.  Correct.
12     Q.  But you will agree that this is a CVS
13 document that does say that as of October 5,
14 2012, all orders generated from outside
15 vendors are not pushed through the SOM
16 process?  You would agree with that,
17 correct?
18     A.  I can agree that this says that.
19     Q.  And you did not know the process to be
20 any different than what is stated on this
21 document; is that correct?
22     A.  I cannot speak to the process.
23     Q.  Because you can't speak to the
24 process, you can't speak to the process as

Page 209

1  being any different than what's stated on the
2  document, correct?
3      A.  Yeah, I cannot speak to it either way.
4      Q.  As CVS DEA Compliance Coordinator, you
5  were aware, as late as October 5, 2012, that
6  all orders generated for outside vendors were
7  not pushed through the suspicious order
8  monitoring process, correct?
9          MR. BUSH:  Objection.
10     A.  I can't agree with that.
11 BY MR. BAKER:
12     Q.  Well, tell me, what process was there
13 for suspicious order monitoring at CVS for
14 outside vendors as of 10/5/12?
15     A.  I cannot speak to that.  I do not
16 know.
17     Q.  As CVS DEA Compliance Coordinator,
18 shouldn't you have known one way or the other,
19 in your duties as CVS DEA Compliance
20 Coordinator in 2012, whether or not outside
21 vendor orders would or would not be pushed
22 through the SOM process?
23         MR. BUSH:  Objection.
24     A.  I can't agree with that or not.  I

Page 210

1  wasn't -- I wasn't involved in the SOM
2  management.
3  BY MR. BAKER:
4     Q.  Let me show you what's marked as
5  Exhibit No. 45.
6
7        (Exhibit No. 45 marked for
8  identification.)
9
10  BY MR. BAKER:
11     Q.  Now, this is a document dated
12  5/8/2013, Bates number 22896, an e-mail from
13  Dean Vanelli to Christopher Tulley regarding a
14  staff meeting update and logistics planning.
15  Do you know Dean Vanelli?
16     A.  Yes, I do.
17     Q.  Who was he at the time of this e-mail?
18     A.  He was the director in logistics
19  planning.
20     Q.  And who was Christopher Tulley at the
21  time of this e-mail?
22     A.  Christopher Tulley worked in
23  logistics, I believe, as a project manager.
24     Q.  May I see the copy that I've just

Page 211

1  handed you, please, ma'am?
2     A.  Yes.
3     Q.  I'll give you another copy.
4        MR. BUSH:  A better copy.
5  BY MR. BAKER:
6     Q.  If you would, under the suspicious
7  order monitoring page, page 2 of the document,
8  at the top, if you would highlight the fifth
9  bullet down, about SOM process.
10        Now, if you go back to the beginning
11  of this document, this document is a logistics
12  planning document dated May 13, 2013,
13  correct?
14     A.  Yes.
15     Q.  And if you page in to that document,
16  it shows that the SOM process will include
17  store controlled-substance orders placed with
18  CVS warehouses and outside vendors, Cardinal
19  and McKesson, as well as store orders of DEA
20  listed chemicals, which is PSEE acetone,
21  iodine, known meth precursors.  That's what it
22  says, correct?
23     A.  That's what it says, yes.
24     Q.  So this is a planning document for the

Page 212

1  future, is it not, logistics planning?
2        MR. BUSH:  Objection.
3     A.  I cannot speak to this.
4  BY MR. BAKER:
5     Q.  At the time this document was written
6  though, there was not already in place a
7  suspicious order monitoring system by CVS for
8  outside vendors; is that correct?
9        MR. BUSH:  Objection.
10     A.  I can't speak to that.  I don't know.
11  BY MR. BAKER:
12     Q.  I'll hand you that.  So hand it to the
13  court reporter, please?
14     A.  Do you want this back?
15     Q.  Yes, please, ma'am.
16        Let's go to Exhibit 104.
17
18        (Exhibit No. 104 marked for
19  identification.)
20
21        MR. BUSH:  Guys, could we go off
22  the record for one second?  I just got a phone
23  call that I really need to take.
24        MR. BAKER:  Yes, no problem.

Page 213

1        THE VIDEOGRAPHER:  The time is
2  2:14 p.m. and we're off the record.
3
4        (Recess was taken from 2:14 p.m.
5        to 2:16 p.m.)
6
7        THE VIDEOGRAPHER:  The time is
8  2:16 p.m. and we're on the record.
9  BY MR. BAKER:
10     Q.  Yes.  I'm showing you right now
11  Exhibit 104.  It is Bates number 103329.  It
12  is an e-mail, 1/18/2013, of Mr. Craig Schiavo
13  to Mr. Tom Bourque.
14        Who was Craig Schiavo at the time of
15  this e-mail?
16     A.  I believe Craig worked in compliance.
17     Q.  And who was Tom Bourque at the time of
18  this e-mail?
19     A.  I believe he was the director in
20  compliance.
21     Q.  The e-mail says -- if you would
22  highlight this, please.  Highlight everything
23  in the first two paragraphs.
24        It begins with "Tom, below are some

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  bullets on the importance of including OV
2  orders in the SOM algorithm."
3       That's what it says, correct?
4       A.  Correct.
5       Q.  OV orders means outside vendor orders,
6  correct?
7       A.  Correct.
8       Q.  It says, "Why it is needed:  DEA know
9  your customer requirements," correct?
10      A.  Correct.
11      Q.  And do you remember, earlier in your
12 deposition today, when I asked had you
13 familiarized yourself with the
14 know-your-customer requirement of the DEA?  Do
15 you remember that?
16      A.  Yes.
17      Q.  Okay.  Do you remember your answer to
18 that question?
19      A.  Yes.  I believe I said I don't
20 remember.
21      Q.  You weren't familiar with it?
22      A.  Yeah.
23      Q.  Were you?
24      A.  Yeah.

Page 215

1       Q.  But you know from reading this e-mail,
2  at least that -- according to Mr. Schiavo
3  within CVS, that including outside vendor
4  orders in the SOM algorithm is needed in order
5  to meet the DEA know-your-customer
6  requirement, correct?
7            MR. BUSH:  Objection.
8       A.  I -- I don't know if I can say reading
9  from this e-mail.
10      Q.  Well, that's what it says.  It
11 says --
12      A.  He says --
13      Q.  -- why it is needed because DEA
14 know-your-customer requirements, correct?
15 Doesn't it say that?
16      A.  Craig says it, correct.
17      Q.  Okay.  And it also says why it is
18 needed is "In order for dispensing data
19 contained in the algorithm to be useful, we
20 must account for all controlled substances
21 ordered," correct?
22      A.  According to Craig's e-mail, yes.
23      Q.  Do you even know how dispensing data
24 was used in the algorithm within the SOM

Page 216

1  process going on at that time?
2            MR. BUSH:  Objection.
3       A.  No.
4  BY MR. BAKER:
5       Q.  As DE -- as CVS DEA Compliance
6  Coordinator, you could not tell us what the
7  role of dispensing data was as contained in
8  the algorithm for suspicious order
9  monitoring?
10           MR. BUSH:  Objection.
11      A.  No.
12 BY MR. BAKER:
13      Q.  Okay.  Would you agree that -- as CVS
14 DEA Compliance Coordinator, that CVS must
15 account for all controlled substances ordered
16 inclusive of outside vendor orders?
17           MR. BUSH:  Objection.
18      A.  Would I agree -- I'm sorry.
19      Q.  Would you agree, as CVS DEA Compliance
20 Coordinator, that CVS must account for all
21 controlled substances ordered by CVS
22 pharmacies inclusive of outside vendor
23 orders?
24           MR. BUSH:  Objection.

Page 217

1       A.  I don't know if I would agree with
2  that.
3       Q.  Does this document indicate that CVS
4  must account for all controlled substances
5  ordered, including outside vendor orders?  Is
6  that what this document indicates?
7            MR. BUSH:  Objection.
8       A.  His document states we must account
9  for all control substance ordered, so
10 according to Craig, yes.
11 BY MR. BAKER:
12      Q.  Okay.  It also says that why it is
13 needed is to track all NDC numbers.  Do you
14 know what NDC numbers are?
15      A.  Yes, I know what a NDC is.
16      Q.  What is an NDC?
17      A.  The identifying number on the bottles.
18      Q.  Ordered by -- it says "To track all
19 NDC numbers ordered by store and have the
20 ability to add unknown first-time item orders
21 into our SOM system," correct?
22      A.  That's what it says, yes.
23      Q.  It says potential issues, if not
24 accounted for in realtime.  First is "store

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1   may order a little from both the outside
2   vendor and the distribution center to stay
3   under the radar," correct?
4      A. That's what it says, correct.
5      Q. So let me give you an example
6   hypothetically. So suppose you have a CVS
7   retail store that decides it wants to order --
8   the pharmacist wants to order 30,000
9   hydrocodone-combination pills from the
10  distribution center that CVS actually owns,
11  whether it be Indiana or Chemung, New York,
12  all right.
13       In this hypothetical, let's suppose
14  that 30,000 runs through the SOM system and is
15  not flagged as an irregular order. Are you
16  with me so far?
17      A. Uh-huh.
18      Q. And I want you to assume that when the
19  pharmacist hangs up the phone, the pharmacist
20  then orders 30,000 more from McKesson or
21  Cardinal of the same drug, high hydrocodone
22  combination products.
23       That's the premise of the hypothetical
24  facts that I want you to assume. Are you with

Page 219

1   me so far?
2      A. I'm with you.
3      Q. The question is: If outside vendor
4   orders of that store are not being monitored
5   by CVS corporate or CVS distribution centers,
6   then how would CVS monitor that extra 30,000
7   pills that are being ordered from an outside
8   vendor by that pharmacy?
9        MR. BUSH: Objection.
10     A. I don't know. I can't speak to the
11  system.
12     Q. This system didn't monitor it at all,
13  did it, the -- CVS's system?
14       MR. BUSH: Objection.
15     A. I don't know.
16  BY MR. BAKER:
17     Q. And when things like that aren't
18  monitored, it can lead to diversion, can it
19  not?
20       MR. BUSH: Objection.
21     A. I assume if something's not monitored
22  it could.
23  BY MR. BAKER:
24     Q. Okay. In fact, let's look at what

Page 220

1   happened in the potential issues, if not
2   accounted for in realtime.
3       Could you highlight that last sentence
4   where it says, "Stores can place phone
5   orders," then the two bullets below it?
6       It says, "Stores can place phone
7   orders which have no visibility to -- until a
8   later time," and then as a bullet, "currently
9   have a store which had a 68,000 hydrocodone
10  pill loss and was placing phone orders to
11  outside vendor." Isn't that what it says?
12     A. That's what it says.
13     Q. This is a CVS store, correct?
14     A. That's what it says.
15     Q. And when CVS pharmacies lose 68,000
16  hydrocodone pills, that's diversion, is it
17  not?
18       MR. BUSH: Objection.
19     A. I can't speak to that.
20     Q. That's classic diversion, is it not?
21       MR. BUSH: Objection.
22     A. I can't speak to that. I don't have
23  enough information.
24  BY MR. BAKER:

Page 221

1     Q. Did CVS corporate or CVS at any level,
2   distribution center, pharmacy or any level,
3   report that loss of 68,000 hydrocodone pills
4   to the DEA, yes or no?
5       MR. BUSH: Objection.
6     A. I don't know. I'm not familiar with
7  it.
8   BY MR. BAKER:
9     Q. As CVS DEA Compliance Coordinator,
10  would you expect somebody within CVS to report
11  that 68,000 hydrocodone pill loss to the DEA
12  to be in compliance with the DEA
13  regulations?
14       MR. BUSH: Objection.
15     A. I don't know. I don't know what the
16  circumstances are regarding it.
17  BY MR. BAKER:
18     Q. 68 -- according to this document,
19  ma'am, you're looking at 68,000 hydrocodone
20  pills that were lost, correct?
21     A. That's what this says, but I don't
22  know what the circumstances are.
23     Q. And if those pills are lost, that
24  means they're unaccounted for in some way,

Page 222

1  shape or form, correct?
2      MR. BUSH: Objection.
3      A. I don't know.
4      Q. And as CVS DEA Compliance Coordinator,
5  you don't know whether or not a 68,000
6  hydrocodone pill loss should be reported to
7  the DEA?
8      A. I don't enough information --
9      MR. BUSH: Objection.
10     A. -- to -- to know.
11 BY MR. BAKER:
12     Q. Well, in 2013, when this occurred,
13 were you the CVS DEA Compliance Coordinator in
14 corporate headquarters?
15     A. I was the CVS DEA Compliance
16 Coordinator, yes.
17     Q. And was this brought to your attention
18 by anybody, that there was a 68,000
19 hydrocodone pill loss?
20     A. Not that I recall.
21     MR. BUSH: Objection.
22 BY MR. BAKER:
23     Q. If this had been brought to your
24 attention, would you have reported it to the

Page 223

1  DEA as CVS DEA Compliance Coordinator?
2      MR. BUSH: Objection.
3      A. I don't know the circumstances.
4  BY MR. BAKER:
5      Q. If the pills remained unaccounted
6  for -- that means lost -- would you, as CVS
7  DEA Compliance Coordinator, have an obligation
8  to report that to the drug enforcement agency
9  of the United States of America, yes or no?
10     MR. BUSH: Objection.
11     A. My position -- at the time I didn't
12 work with the stores directly.
13 BY MR. BAKER:
14     Q. But you're the CVS DEA Compliance
15 Coordinator. If this had been brought to your
16 attention and nobody else within CVS had
17 reported it up until the time that you became
18 knowledgeable of it, would you, in carrying
19 out your duties as CVS DEA Compliance
20 Coordinator, feel an obligation to report it
21 to the DEA, yes or no?
22     MR. BUSH: Objection.
23     A. I can't say what I would have done
24 then. I don't know.

Page 224

1  BY MR. BAKER:
2      Q. If this happened today and you were
3  the CVS DEA Compliance Coordinator, would you
4  report it to the DEA?
5      MR. BUSH: Objection.
6      A. I don't know the circumstances
7  surrounding it, if it's reportable or not.
8  BY MR. BAKER:
9      Q. A 68,000 hydrocodone pill loss,
10 irrespective of circumstances, if they remain
11 lost and unaccounted for, that is something
12 that you should report to the DEA; am I
13 correct?
14     MR. BUSH: Objection.
15     A. If I had the correct information and
16 knew what I was reporting, yes, potentially it
17 would be reported. I don't know the
18 circumstances.
19 BY MR. BAKER:
20     Q. Who, if anybody, within CVS, CVS
21 corporate, CVS Pharmacy, or any other portion
22 of CVS, whether it be the distribution centers
23 or any other entity of CVS, reported this
24 68,000 hydrocodone pill lost to the DEA?

Page 225

1      A. I do not know.
2      MR. BUSH: Objection.
3  BY MR. BAKER:
4      Q. Let's go to the next numbered exhibit,
5  No. 76.
6
7      (Exhibit No. 76 marked for
8  identification.)
9
10 BY MR. BAKER:
11     Q. Now, do you remember, back when I
12 showed you the logistics planning update,
13 and -- there was consideration in the prior
14 document -- that is Exhibit No. 45 -- that May
15 13, 2013, there was consideration for putting
16 into the SOM -- into the future SOM, a process
17 for monitoring outside vendor orders? Do you
18 remember that?
19     A. Yes.
20     Q. Now, fast-forward to February 10 of
21 2014. And this is the document that you're
22 looking at right now, marked Exhibit No. 76,
23 that begins with Bates number 59258 through
24 Bates number 59260, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.   Yes.
2    Q.   Turn to page 2 of that document,
3  because this is a string of e-mails.  I'd like
4  you to go down to the bottom of page 2, and
5  the top of page 3, okay?
6        At the bottom of page 2, it says from
7  Caitlyn Batty, B-a-t-t-y, to Dean Vanelli,
8  Craig Schiavo, Noah Zimmerman, and Amy
9  Propatier.  That's you, right?
10   A.   Uh-huh.
11   Q.   Yes?
12   A.   Yes.
13   Q.   February 5, 2014, "I think the SOP
14  looks good.  I just had a couple of comments.
15  Please see attached."
16        That's what it says, correct?
17        MR. BUSH:  I think you misspoke
18  about who that's from.  You said from Batty.
19  It's from Vanelli, right?
20        THE WITNESS:  This one,
21  Caitlyn.
22        MR. BAKER:  No.  It's from
23  Caitlyn Batty.  I'm looking right here.
24        MR. BUSH:  Maybe I'm on the

Page 227

1  wrong page.
2        THE WITNESS:  Second page.
3        MR. BUSH:  I've got it.  I'm
4  sorry, I apologize.
5  BY MR. BAKER:
6    Q.   I stated it correctly.  This is from
7  Caitlyn Batty to Dean Vanelli, Craig Schiavo,
8  Noah Zimmerman, and Amy Propatier.  That's
9  you, correct?
10   A.   Correct.
11   Q.   And this is February 5, 2014, correct?
12   A.   Correct.
13   Q.   And what you're discussing here,
14  throwing around with each other in these
15  e-mails, is the SOM SOP on an updated basis
16  that's going to be posted to the portal in
17  February of 2014, correct?
18   A.   I believe so.
19   Q.   Well, that's what it says.  If you
20  look right above there, it says, "Regarding
21  SOM SOP for posting to the portal," correct?
22   A.   Correct.
23   Q.   And that's what this is discussing,
24  correct?

Page 228

1    A.   Correct.
2    Q.   Okay.  And you're familiar with the
3  fact that in 2014 there was an update of the
4  SOM inserted into the SOP once again; is that
5  correct?
6        MR. BUSH:  February of '14.
7    A.   February of 2014?
8  BY MR. BAKER:
9    Q.   Yes, ma'am.
10        That's what this is discussing and
11  that's what's being done, right?
12   A.   I don't recall it.
13   Q.   At the time were you CVS DEA
14  Compliance Coordinator or not?
15   A.   At this time I was transitioning to
16  another position.
17   Q.   Well, you're included on the e-mail?
18   A.   Yes, I'm on the e-mail.
19   Q.   So if you're included on the e-mail,
20  you presume that you're familiar with it,
21  right?
22   A.   Yes.
23        MR. BUSH:  Objection.
24   A.   I don't recall this e-mail.

Page 229

1  BY MR. BAKER:
2    Q.   But did you review the SOM that was to
3  be inserted into the SOP on an updated basis
4  in February of 2014 as reflected in this
5  e-mail?
6    A.   I don't recall.
7    Q.   Well, then let's take a look.  If you
8  continue down the bottom of the page, it
9  says -- there's an e-mail sent from Dean
10  Vanelli to Craig Schiavo, Noah Zimmerman, and
11  Amy Propatier, which is you, correct?
12   A.   Correct.
13   Q.   And it's regarding SOM SOP for posting
14  to P and P portal, correct?
15   A.   Correct.
16   Q.   P and P portal is CVS's policies and
17  procedures portal, correct?
18   A.   Correct.
19   Q.   And it says here, at the top of the
20  next page, "Please review and provide Noah
21  with feedback."  Then it says -- and let's
22  highlight this sentence please.
23        It says, "We should ensure there is no
24  mention of OV orders as suspicious,"

Page 230

1  correct?
2      A.   That's what it says.
3      Q.   And this is something that -- you were
4  a party to this e-mail; is that correct?
5      A.   I don't recall this e-mail.
6      Q.   Well, aren't you a party on the
7  e-mail, Ms. Amy Propatier?
8      A.   I'm on the e-mail.
9      Q.   At the time were you DEA Compliance
10  Coordinator for CVS?
11      A.   I believe I may have been.
12      Q.   And at the time did you -- did you
13  condone, as CVS DEA Compliance Coordinator,
14  the notion that, as indicated in this e-mail,
15  CVS should ensure there's no mention of
16  outside -- outside vendor orders as
17  suspicious?  Do you agree with that?
18          MR. BUSH:  Objection.
19      A.   I don't recall this.
20      Q.   Do you agree that that is a position
21  that should be taken by a CVS DEA Compliance
22  Coordinator, that "We should ensure there is
23  no mention of outside vendor orders as
24  suspicious"?

Page 231

1          MR. BUSH:  Objection.
2      A.   I can't answer that because I don't
3  know the context.
4  BY MR. BAKER:
5      Q.   Well, you're on the e-mail, so I'm
6  asking you the context.
7      A.   I don't recall the e-mail.
8
9      (Exhibit No. 102 marked for
10  identification.)
11
12  BY MR. BAKER:
13      Q.   Next is Exhibit No. 102.  It is an
14  e-mail from Ron Buzzeo to Amy Lynn Brown dated
15  2/21/08.  It begins with Bates number 91508.
16  It has an attachment of a DEA letter dated
17  September 27, 2006.  And the last page on the
18  Bates is 91518.  Could you take a look at
19  that, please?
20      Now, this is an e-mail that is dated
21  2/21/08 from Ron Buzzeo to Amy Lynn Brown.
22  That would be your last name at the time this
23  e-mail was written, correct?
24      A.   Correct.

Page 232

1      Q.   When did you take the last name
2  Propatier?
3      A.   May of 2008.
4      Q.   So any time in these e-mails we see
5  the name Amy Lynn Brown up to that date, it's
6  you.  And then after that date, it's Amy
7  Propatier, correct?
8      A.   Correct.
9      Q.   So in 2008, when you received this
10  from Ron Buzzeo, you were the CVS DEA
11  Compliance Coordinator, correct?
12      A.   Correct.
13      Q.   And that's why Mr. Buzzeo was
14  communicating with you, correct?
15          MR. BUSH:  Objection.
16      A.   I can't answer that.  I don't know why
17  he sent it.
18  BY MR. BAKER:
19      Q.   Mr. Buzzeo on the company that -- or
20  strike that.
21      Mr. Buzzeo was affiliated with the
22  company that CVS had hired to help write
23  suspicious order monitoring policies, correct?
24      A.   I don't know specifically what he was

Page 233

1  hired for.  I can't speak to what he was
2  specifically hired for.
3      Q.   The e-mail says, "Amy, as we
4  discussed, I've attached the DEA letters that
5  address suspicious orders.  The letter dated
6  12/07 is especially interesting."
7      And, of course, we've already gone
8  over the letter dated 12 of '07 because that's
9  the one that we previously went over, December
10  27, 2007.  But there's also one dated February
11  7, 2007 and there's also one dated September
12  27, 2006 attached to this e-mail, correct?
13      A.   Correct.
14      Q.   So let's just get it straight.  There
15  are three letters from the DEA attached to
16  this e-mail dated 2/21 of 2008 from Ron Buzzeo
17  to you, correct?
18      A.   Correct.
19      Q.   And those letters sequentially are
20  dated September 27, 2006 -- that's the first
21  letter.  The second letter is dated February
22  7, 2007 and the third letter is dated December
23  27, 2007, correct?
24      A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  Q. So we know that the CVS DEA Compliance
2  Coordinator, which is you, was aware of the
3  contents of all three of these letters from
4  the DEA that are dated as such, correct?
5          MR. BUSH: Objection.
6  A. I don't recall seeing this.
7  BY MR. BAKER:
8  Q. Well, they were sent to you to read,
9  correct?
10          MR. BUSH: Objection.
11  A. They were -- sorry, they were sent to
12  me. I can't recall if -- what I did or if I
13  read them.
14  Q. If you had received these letters from
15  the DEA, at least from Mr. Buzzeo, these -- he
16  sent you these DEA letters on 2/21/08. And at
17  the time you were CVS DEA Compliance
18  Coordinator, didn't you have a duty to read
19  these letters?
20          MR. BUSH: Objection.
21  A. I can't answer if I did have a duty.
22  I don't -- I don't know if I did.
23  Q. Didn't you part as the -- as part of
24  your job have an obligation to make it your

Page 235

1  business to read these letters from the DEA
2  that were being sent to you by Mr. Buzzeo?
3          MR. BUSH: Objection.
4  A. I don't recall receiving this e-mail.
5  BY MR. BAKER:
6  Q. Okay. Did these letters just have of
7  no concern to you?
8          MR. BUSH: Objection.
9  A. I don't remember this e-mail, so I
10  don't know if they were of concern to me.
11  BY MR. BAKER:
12  Q. Have you ever seen these three letters
13  before?
14  A. I mean, I saw one earlier. I don't --
15  I don't recall seeing them.
16  Q. Okay. Well, let's just go over them,
17  if we could, beginning with the letter dated
18  September 26, of 2007. It talks about the
19  background on the first page. We go to
20  background and we'll go to Paragraph 2 and
21  talk about what the purpose of the Controlled
22  Substances Act is.
23          If you highlight under background --
24  Paragraph 2 starts with "thus CSA." We're

Page 236

1  looking at the letter dated September 27,
2  2006. I'm going to read this to you and I
3  want you to tell me if I've accurately stated
4  what this letter says.
5          It says, "Background: The CSA was
6  designed by congress to combat diversion by
7  providing for a closed system of drug
8  distribution in which all legitimate handlers
9  of controlled substances must obtain a DEA
10  registration and as a condition of maintaining
11  such registration must take reasonable steps
12  to ensure that the registration is not being
13  utilized as a source of diversion."
14          Isn't that what it says?
15  A. Yes.
16  Q. So you know from reading this, you're
17  informed by reading this, that the purpose of
18  the Controlled Substances Act is, in part, to
19  prevent diversion of narcotics, correct?
20          MR. BUSH: Objection.
21  BY MR. BAKER:
22  Q. You know that from reading this,
23  right?
24          MR. BUSH: Objection.

Page 237

1  A. (Witness reviews document.)
2          Yes. From reading this, it says that.
3  BY MR. BAKER:
4  Q. And this is something that was
5  available for you to read, whether you did or
6  not, when it was sent to you February 21 of
7  2008, correct?
8  A. I don't recall it.
9  Q. Go to the next page of that letter.
10  And about halfway down it begins with, "The
11  DEA regulations require." If you could
12  highlight that in the subparagraph right below
13  it.
14          This says, "The DEA regulations
15  require all distributors to report suspicious
16  orders of controlled substances, specifically
17  the regulations within 21 CFR 1301.74 B, the
18  registrant shall design and operate a system
19  to disclose to the registrant suspicious
20  orders of controlled substances. The
21  registrant shall inform the field division
22  office of the administration in his area of
23  suspicious orders when discovered by the
24  registrant. Suspicious orders include orders

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1   of unusual size, orders deviating
2   substantially from a normal pattern, and
3   orders of unusual frequency."
4        That's what that letter says,
5   correct?
6        A.  Yes.
7        Q.  And so it gives you a clear definition
8   of what a suspicious order is, correct?
9             MR. BUSH:  Objection.
10       A.  It gives a definition, yes.
11       Q.  Okay.  And the definition that they
12   gave you is that suspicious orders include
13   orders of unusual size, orders deviating
14   substantially from a normal pattern, and
15   orders of unusual frequency, correct?
16       A.  Correct.
17       Q.  So tell me, how was it that you, as
18   CVS DEA Compliance Coordinator, defined a
19   suspicious order in the context of suspicious
20   order monitoring?
21            MR. BUSH:  Objection.
22       A.  What was your question?
23   BY MR. BAKER:
24       Q.  Tell me how you, as CVS DEA Compliance

Page 239

1   Coordinator, defined a suspicious order within
2   the CVS suspicious order monitoring system
3   while you were in your role as CVS DEA
4   Compliance Coordinator.
5             MR. BUSH:  Objection.
6        A.  I did not work with the SOM system.
7   BY MR. BAKER:
8        Q.  As CVS DEA Compliance Coordinator, are
9   you telling me you had nothing at all to do
10   with the SOM system?
11       A.  Correct.
12       Q.  You're the one that implemented it.
13   You're the one that put it into the SOP, am I
14   right, 8/25 of '10, right?
15       A.  I did not implement the system.  I put
16   the document on SOM into the SOP.
17       Q.  This definition of suspicious order,
18   it's discussed by CVS in what I'm going to
19   mark as Exhibit No. 68 which is an e-mail
20   dated 5/6/2011 from Frank Devlin to Judy
21   Hughes.
22
23        (Exhibit No. 68 marked for
24   identification.)

Page 240

1
2   BY MR. BAKER:
3        Q.  And it's CVS Bates number 57736
4   through 57738.  Please review that with me.
5        Now, this is an e-mail from Frank
6   Devlin who, at the time this was written in
7   May of 2011, held what position with CVS?
8        A.  I believe he was the Director of Loss
9   Prevention.
10       Q.  And Judith Hughes, who at the time
11   this was written, held what position with CVS?
12       A.  I do not know what her exact position
13   was.  I believe she worked in loss prevention
14   also.
15       Q.  Okay.  If you could highlight on the
16   next page -- is it already highlighted under
17   "process of identifying suspicious order"?
18       This is -- if you look at the top,
19   it's talking about the components of control
20   IRR report, correct?
21       A.  That's what it says yes.
22       Q.  Do you even know what a control IRR
23   report is?
24       A.  I've never seen one, that I can

Page 241

1   recall.
2        Q.  As CVS DEA Compliance Coordinator, at
3   that time were you ever presented with what a
4   control IRR report was or what it looked
5   like?
6        A.  Not that I recall.
7        Q.  As CVS DEA Compliance Coordinator,
8   were you familiar with what the process of
9   identifying suspicious orders was at CVS?
10       A.  No, not that I recall.
11       Q.  Let me read it to you.
12       It says, "Process of identifying
13   suspicious orders:  In order to determine
14   which items on the control IRR report are
15   suspicious, the orders-quantity field is
16   observed by the DC IRR analyst for a quantity
17   ordered of ten or more.  The month-to-date
18   field is then observed and compared to LAGs 1,
19   2, and 3.  If the month-to-date quantity is at
20   least three times greater than the quantities
21   in LAGs 1, 2 or 3, then that item is labeled
22   as being suspicious."
23       Did I read that correct?
24       A.  You did.

Page 242

1    Q.  So the way it was defined by CVS at
2  this time, according to this document, if the
3  month-to-date quantity at least three times
4  greater than the quantities in LAGs 1, 2 or 3,
5  three times greater, then that item is labeled
6  as being suspicious; is that correct?
7          MR. BUSH:  Objection.
8    A.  That's what this says.
9  BY MR. BAKER:
10    Q.  Now, go to the paragraph above that,
11  where it describes what a LAG is.  If you look
12  at the last two sentences of the components of
13  the control IRR report, it says, "The
14  month-to-date order quantity states the amount
15  of the item in question ordered during the
16  current month.  LAG 1 is the amount ordered
17  the month before, LAG 2 is the amount ordered
18  two months before, and LAG 3 is the amount
19  ordered three months before."
20          Is that what it states?
21    A.  That's what it says.
22    Q.  So now you know what LAGs are,
23  correct?
24          MR. BUSH:  Objection.

Page 243

1  BY MR. BAKER:
2    Q.  You know what they are from reading
3  this now?
4          MR. BUSH:  Objection.
5    A.  All I know is this saying -- is LAG.
6    Q.  Right.  And this a CVS document,
7  correct?
8    A.  I can't say for sure, but...
9    Q.  Well, let's say this:  It has CVS
10  Bates number written on it and it's also
11  attached to a CVS e-mail 5/16/2011 from Frank
12  Devlin to Judith Hughes, correct?
13    A.  It's -- yeah, it's an e-mail from
14  Frank to Judy.
15    Q.  Right.  And this is the attachment to
16  it, correct?
17    A.  Yeah.
18    Q.  Okay.  And so you know from at least
19  two people inside of CVS who hold positions
20  that deal with these issues of an IRR and a
21  suspicious order that there's been a
22  definition of LAG laid out for you in writing
23  right there, correct?
24          MR. BUSH:  Objection.

Page 244

1    A.  I see a definition for LAG.  I don't
2  see it saying it's CVS.
3  BY MR. BAKER:
4    Q.  I want you to assume that this is a
5  CVS document, okay?
6    A.  Uh-huh.
7    Q.  Assume that that definition -- LAG 1
8  is the amount ordered the month before, LAG 2
9  is the amount ordered two months before, and
10  LAG 3 is the amount ordered three months
11  before.
12    A.  Uh-huh.
13    Q.  If you assume this is a CVS document,
14  then that gives you the definition of what
15  LAGs are as it relates to CVS and the IRR
16  report, correct?
17          MR. BUSH:  Objection.
18    A.  According to this, yes.
19  BY MR. BAKER:
20    Q.  Okay.  And then the next paragraph
21  tells you how LAGs are used in order to
22  determine what is or is not a suspicious order
23  by definition within CVS, correct?
24          MR. BUSH:  Objection.

Page 245

1  BY MR. BAKER:
2    Q.  Do you not know the answer to that
3  question?
4          MR. BUSH:  Objection.
5    A.  Yeah, I'm not familiar with this,
6  so --
7  BY MR. BAKER:
8    Q.  Well, let's get familiar.  Okay.  It
9  says, "The month-to-date field is then
10  observed and compared to LAGs 1, 2 and 3.  If
11  the month-to-date quantity is at least three
12  times greater than the quantities in LAGs 1, 2
13  or 3, then that item is labeled as being
14  suspicious."
15          Do you understand those words?
16    A.  Yes.
17          MR. BUSH:  Objection.
18  BY MR. BAKER:
19    Q.  Do you comprehend those words?
20          MR. BUSH:  Objection.
21    A.  Yes.
22  BY MR. BAKER:
23    Q.  Okay.  Do you understand that is how
24  CVS defined a suspicious order within its

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    system at the time this was written?  Do you
2    understand that --
3            MR. BUSH:  Objection.
4    BY MR. BAKER:
5        Q.  -- now?
6            MR. BUSH:  I'm sorry, objection.
7    BY MR. BAKER:
8        Q.  Yes or no?
9        A.  No.  I don't know if this is how CVS
10    identified it.  It's not saying it's --
11        Q.  According to this --
12        A.  -- the SOP.
13        Q.  According to this document, that's how
14    they defined a suspicious order, correct?
15            MR. BUSH:  Objection.
16        A.  I don't know that to be true.
17    BY MR. BAKER:
18        Q.  Well, doesn't the document
19    specifically in plain English say it in plain
20    words that you understand?
21            MR. BUSH:  Objection.
22        A.  I don't see where it says this is the
23    CVS policy we're using to identify suspicious
24    orders.

Page 247

1    BY MR. BAKER:
2        Q.  If you assume this is what Frank
3    Devlin attached to his e-mail, if you assume
4    it's a CVS definition, then that's plain
5    English for you to say yes or no.  Do you
6    understand it, yes or no?
7            MR. BUSH:  Objection.
8        A.  If I'm assuming it's an SOP, but it
9    doesn't state that this is the operating
10    procedure.
11        Q.  Do you understand the plain English of
12    that sentence?
13            MR. BUSH:  Objection.
14        A.  I understand the sentence.
15    BY MR. BAKER:
16        Q.  Is there anything ambiguous about that
17    sentence to you?
18        A.  No, I understand the sentence.
19            MR. BUSH:  Objection.
20    BY MR. BAKER:
21        Q.  Okay.  Thank you.  So let's move on.
22        Were you present at the time the
23    Indianapolis facility was visited by the DEA
24    in August of 2013?

Page 248

1        A.  Was I present at the DC?
2        Q.  When the Indianapolis distribution
3    center was visited by the DEA in August of
4    2013.
5        A.  Was I --
6            MR. BUSH:  Present where?
7        A.  -- at the distribution center?
8    BY MR. BAKER:
9        Q.  Were you present at the distribution
10    center?
11        A.  No.
12        Q.  Did you participate in any way with
13    the DEA visit to the Indianapolis facility for
14    an inspection in August of 2013?
15        A.  No.
16        Q.  Were you informed about the results of
17    the DEA inspection of the Indianapolis
18    facility -- distribution center facility from
19    their August 13 visit?
20        A.  I don't recall.
21        Q.  Is that something that you, as CVS DEA
22    Compliance Coordinator, would expect to be
23    informed about?
24        A.  No.

Page 249

1        Q.  Let me make sure I understand.  The
2    DEA, the Drug Enforcement agency, is visiting
3    a distribution center of a -- of CVS.  At the
4    time they're visiting the distribution center
5    of CVS, you are CVS DEA Compliance
6    Coordinator.  Are you telling me that you
7    don't have any knowledge of that or that
8    you're not informed of it?
9        A.  I may have been informed that there
10    was someone auditing on-site, but I wasn't
11    involved in audits.  It wasn't my area of
12    responsibility.
13        Q.  Were you involved, as CVS DEA
14    Compliance Coordinator, with trying to
15    understand the results of that visit?
16        A.  No, I was not.
17        Q.  Was that of no concern to you as DEA
18    Compliance Coordinator?
19        A.  It wasn't in my responsibilities.
20        Q.  Isn't the DEA visiting these
21    facilities to determine compliance, or lack
22    thereof, with DEA regulations?
23        A.  Was it my responsibility?
24        Q.  Isn't that something the DEA is doing

Page 250

1  when they're visiting these facilities?
2      A.  Is the DEA looking at compliance?
3      Q.  Yes.
4      A.  Yes.
5      Q.  Okay.  And you are the DEA Compliance
6  Coordinator at the time, correct?
7      A.  Yes, that was my title.
8      Q.  But you're neither there at the time
9  the compliance visit is going on, correct?
10     A.  Correct.
11     Q.  Nor are you informed of the results of
12  the compliance visit, correct?
13     A.  Correct.
14     Q.  Nor did you even seek to try to
15  determine the results of the DEA compliance
16  visit, correct?
17     A.  Not that I recall.
18     Q.  Now, these DEA compliance visits don't
19  occur every year, do they?
20     A.  No.  I believe they're random.
21     Q.  The last time the Indianapolis
22  distribution center had been visited by the
23  DEA for a compliance visit before August 2013
24  was three years earlier, in 2010, correct?

Page 251

1          MR. BUSH:  Objection.
2      A.  I don't recall.
3  BY MR. BAKER:
4      Q.  About the time this August 2013 visit
5  was going on, this is the time that you, as
6  DEA Compliance Coordinator, was attempting to
7  insert the SOM into the SOP for the first
8  time; is that correct?
9          MR. BUSH:  Objection.
10     A.  I don't recall.
11  BY MR. BAKER:
12     Q.  You don't recall if it was done as
13  either a tool or a prop?  You remember that
14  e-mail?
15     A.  I don't recall.
16     Q.  You don't recall whether or not you
17  were attempting to do it to make it look like
18  it had been in existence and had been used as
19  a tool at the time this August 2013 inspection
20  was going on by the DEA?  You don't recall
21  that?
22          MR. BUSH:  Objection.
23     A.  No, I don't recall that.
24  BY MR. BAKER:

Page 252

1      Q.  So let me have you review Exhibit 103
2  with me, if you would.
3
4          (Exhibit No. 103 marked for
5  identification.)
6
7  BY MR. BAKER:
8      Q.  This is an e-mail dated May 15, 2014
9  from Andy Echt (phonetic)to John Mortelliti
10  and Brian Morrison and Jerome Kerry (phonetic)
11  and several other people on copy.  Do you see
12  that?
13     A.  Yes, I do.
14     Q.  Those are all CVS employees, correct?
15     A.  Yes.
16     Q.  And this deals with DEA closing
17  remarks relative to the DEA visit back in
18  August of 2013, correct?
19     A.  That's what it says, yes.
20     Q.  And it says -- starts out, "Today, May
21  15, 2014, Dan Gillen, supervisor" -- that's
22  DEA supervisor, correct?
23     A.  I believe so.
24     Q.  -- "and Andrew Radcliffe,

Page 253

1  investigator" -- that's DEA investigator,
2  correct?
3      A.  I believe so.
4      Q.  -- "came in Indi to do their closing,"
5  correct?
6      A.  That's what it says, yes.
7      Q.  Look down under the area of suspicious
8  order monitoring at the bottom.  Would you
9  take a look at that?
10     A.  Yes.
11     Q.  Could you highlight that, those two
12  bullets, for me, please?
13         It says, "Suspicious order monitoring,
14  DEA thought this process was not sufficient."
15  Isn't that correct?
16     A.  That's what it says.
17     Q.  And this is the suspicious order
18  monitoring process that you put into the SOP
19  as a written policy beginning 8/25 of 2013,
20  correct?
21         MR. BUSH:  Objection.
22     A.  I cannot speak to it that's what
23  they're referring to, but...
24  BY MR. BAKER:

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    Q.  Well, we're talking about a visit in
2  August of 2013 and we're talking about the SOM
3  that you put into the SOP -- inserted into the
4  SOP August 25 2013, correct?
5        MR. BUSH:  Objection.
6    A.  I updated the SOP in 2013.
7  BY MR. BAKER:
8    Q.  Did you insert the SOM into the SOP
9  August 25, 2013, yes or no?
10   A.  Yes.
11       MR. BUSH:  Objection.
12 BY MR. BAKER:
13   Q.  Yes, you did, correct?
14   A.  Uh-huh, yes.
15   Q.  And it -- what they're saying is that
16 the DEA thought this process was not
17 sufficient, correct, because they're looking
18 at it and doing closing remarks many months
19 later, in 2014, correct?
20   A.  Yes.
21   Q.  Okay.  By that time, there's been an
22 opportunity to go see whether or not this is a
23 tool or whether or not it is a prop,
24 correct?

Page 255

1        MR. BUSH:  Objection.
2    A.  I'm sorry, I don't understand your
3  question.
4  BY MR. BAKER:
5    Q.  Do you remember that e-mail about the
6  tool versus the prop?  Do you remember that?
7    A.  Yes.
8    Q.  And the context of whether or not this
9  SOM being inserted into the SOP, as timely as
10 it was around the time that this August visit
11 is going on by the DEA, was actually a tool or
12 a prop?  Do you remember that?
13       MR. BUSH:  Objection.
14 BY MR. BAKER:
15   Q.  Do you remember that e-mail?
16       MR. BUSH:  Objection.
17   A.  I don't remember the tool or the prop
18 referring to the SOM process.  I remember the
19 tool or the prop as in regards to you saying
20 my title.
21   Q.  That, too.
22       MR. BUSH:  Objection.
23   A.  I don't remember the SOM part.
24 BY MR. BAKER:

Page 256

1    Q.  Was your title a tool or a prop?
2        MR. BUSH:  Objection.
3    A.  It was a tool.
4  BY MR. BAKER:
5    Q.  And how did you use that tool, as DEA
6  Compliance Coordinator, to monitor suspicious
7  orders?  How did you personally use that tool
8  to monitor suspicious orders?
9        MR. BUSH:  Objection.
10   A.  I was not responsible for suspicious
11 orders.
12   Q.  So in actuality, calling you DEA
13 Compliance Coordinator was really a prop, was
14 it not?
15   A.  No.
16       MR. BUSH:  Objection.
17   A.  It was not.
18       MR. BUSH:  Please give me time
19 to object.
20       THE WITNESS:  Sorry, sorry.
21 BY MR. BAKER:
22   Q.  What they said in this document at the
23 bottom -- these are people from CVS -- they
24 said, "Suspicious order monitoring, DEA

Page 257

1  thought this process was not sufficient."
2  Correct?
3    A.  That's what it says.
4    Q.  It talks about -- they question --
5  "There's a question on the number of inventory
6  that leaves our facility."  Correct?
7    A.  Yes, that's what it says.
8    Q.  And then on the next page, if you
9  highlight that bullet, it says, "Concerned
10 that their office did not receive any
11 communication of suspicious ordering in the
12 last three years."  Is that correct?
13   A.  That's what it says.
14   Q.  Let's move on to the next one please.
15       Now, you remember in this last exhibit
16 I -- No. 103, there were questions on the
17 number of inventory that leaves the facility,
18 correct?
19   A.  Yes.
20   Q.  That would deal with quantity of
21 narcotic drugs, correct?
22   A.  I believe that's what they're
23 referring to.
24   Q.  So let's look at that.  This is a

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1    document that I'll mark as Exhibit No. 34.

2

3         (Exhibit No. 34 marked for

4    identification.)

5

6    BY MR. BAKER:

7        Q.   It is Bates numbered 10529 through

8    10532.  And these are CVS documents because

9    they're Bates-stamped as such.  You recognize

10   that, correct?

11            MR. BUSH:  Recognize what?

12       A.   The document or the stamp?

13   BY MR. BAKER:

14       Q.   The CVS stamp at the bottom?

15       A.   Yeah.  The stamp, yes.

16       Q.   And you know that to mean that these

17   document were produced to the plaintiffs

18   counsel during the discovery phase of this

19   cases in response to our request for

20   production?  You know that, right?

21       A.   Yes.

22       Q.   So the U.S. Department of Justice, DEA

23   employees, the investigators and supervisor

24   and diversion investigator who came to the

Page 259

1    Indianapolis facility, their cards are

2    attached to that first page of that document,

3    correct?

4        A.   Correct.

5        Q.   And then these are handwritten notes,

6    correct?

7        A.   Correct.

8        Q.   And it talks about -- this is being

9    generated by a CVS employee, correct?

10            MR. BUSH:  Objection.

11       A.   I can't tell from this.

12            MR. BUSH:  What's the date of

13   this?

14            THE WITNESS:  5/14/14.

15            MR. BAKER:  5/14/14, consistent

16   with when the closing was done that we

17   discussed in just the prior e-mail.

18   BY MR. BAKER:

19       Q.   You remember the closing remarks?

20       A.   Yes.

21       Q.   So I'd like you to look at the last

22   page of those closing notes where at the top,

23   it says, "SOM."

24            Do you see that?

Page 260

1        A.   Yes.

2        Q.   If you highlight where it says,

3    "quantity going out is concerning."

4            Do you see that sentence where it

5    says, "QTY," which is a abbreviation for

6    quantity, "going out is concerning"?

7            Do you see that?

8        A.   Yes, I do.

9        Q.   Let's move to the next document.

10

11           (Exhibit No. 33 marked for

12   identification.)

13

14   BY MR. BAKER:

15       Q.   This is Exhibit Number -- give me a

16   second to find the exhibit number.  This will

17   be Exhibit No. 35 -- I'm sorry, it's going to

18   be Exhibit No. 33.

19           Are you familiar with the concept of

20   doing physical inventories of narcotic drugs

21   at distribution centers?

22       A.   Yes, I'm familiar with the concept.

23       Q.   Is that part of what you do?

24       A.   Did I do physical inventories?  No.

Page 261

1        Q.   Is that part of your job, to monitor

2    that, as DEA Compliance Coordinator?

3        A.   No.

4        Q.   If you would go to page 2 of that

5    document, it is -- at the bottom it is Bates

6    number 10558.  Could you pull that one up,

7    please?

8            So if you look at the inventory of CVS

9    Indiana, that's what this is, CVS Indiana,

10   LLC.  And that's the distribution center that

11   we're talking about that was being

12   investigated by the DEA in August of 2013,

13   correct?

14       A.   Yes, correct.

15       Q.   And that's the one that -- in the

16   closing statements, there was a suggestion

17   that there was concern about the quantity of

18   product leaving that distribution center,

19   correct?

20       A.   That's --

21            MR. BUSH:  Objection.

22   BY MR. BAKER:

23       Q.   Yes?

24       A.   That's what the paper said.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 Q. Yes. And if you look at this quantity
2 of initial inventory beginning in the upper
3 right-hand column on 12/31/05 and -- that's
4 the initial inventory. The ending inventory
5 is 8/28/06.
6 Do you see that?
7 A. Yes.
8 MR. BUSH: Objection.
9 BY MR. BAKER:
10 Q. Do you see that right here?
11 A. Yes.
12 Q. Yes?
13 A. Yes.
14 Q. Okay. It talks about controlled
15 substances hydrocodone 7.5, 500 milligrams,
16 then below that is hydrocodone 10, 650
17 milligrams, both Schedule III narcotics,
18 correct?
19 A. Correct.
20 Q. And it says that there were 1,920
21 bottles of these on hand, 12/31 of '05,
22 correct?
23 MR. BUSH: Objection.
24 A. Yes, that's what it says.

Page 263

1 BY MR. BAKER:
2 Q. What does COB stand for?
3 A. I don't know.
4 Q. And then it says 3,735 were all of a
5 sudden there on 8/28 of '06, correct?
6 MR. BUSH: Objection.
7 A. Yes.
8 BY MR. BAKER:
9 Q. So roughly double the inventory is
10 there at that point, just from the period of
11 12/31/05 to 8/28/06, correct?
12 MR. BUSH: Objection.
13 A. Yes.
14 BY MR. BAKER:
15 Q. And then it talks about the tablets
16 for hydrocodone 10, 650 milligrams, increasing
17 from 12/31/05, 4,520 bottles to 6,693 bottles,
18 8/28/06, correct?
19 MR. BUSH: Objection.
20 BY MR. BAKER:
21 Q. Correct?
22 A. Yeah.
23 Q. So between '05 and '06, there's a
24 substantial increase in the quantity of those

Page 264

1 two products on hand in the inventory,
2 correct?
3 MR. BUSH: Objection.
4 A. I can't answer that.
5 BY MR. BAKER:
6 Q. Now, let's fast-forward to 2012.
7 In 2012, if you go to the initial
8 inventory, 8/5/12 and then highlight the
9 inventory 8/5/13 and then you follow those
10 columns down sequentially, if you highlight
11 the numbers below 8/25/12 and highlight the
12 numbers below 8/5/13, that's the report --
13 this is the physical inventory done at CVS
14 Indiana on those dates, correct?
15 MR. BUSH: Objection.
16 BY MR. BAKER:
17 Q. Yes?
18 A. Correct.
19 Q. And it talks about hydrocodone 7.5,
20 325 milligrams, which is Schedule III, that
21 this is -- these are 100-count bottles and
22 that -- at the beginning inventory, 8/25/12,
23 there's 36,187 whereas at the ending
24 inventory, 8/5/13, it's increased to 58,784,

Page 265

1 correct?
2 MR. BUSH: Objection.
3 A. That's what it says.
4 BY MR. BAKER:
5 Q. Okay. And then it talks about
6 hydrocodone 5, 325 milligrams. The beginning
7 inventory, 8/25/12 is 26,654 and the ending
8 inventory, 8/5/13, is 101,192 bottles,
9 correct?
10 MR. BUSH: Objection.
11 A. That's what it says.
12 BY MR. BAKER:
13 Q. Then it talks about hydrocodone 10,
14 500 milligrams, there were zero bottles of
15 that at the beginning inventory, 8/25/12, and
16 then 8/5 of '13, there's 6,083 bottles,
17 correct?
18 MR. BUSH: Objection.
19 A. That's what it says.
20 BY MR. BAKER:
21 Q. And this is -- this is the same month
22 that the DEA is paying a visit to the
23 Indianapolis facility saying that these are
24 the inventories of these opioids, correct?

Page 266

1          MR. BUSH:  Which is the same
2    month.  There's multiple dates on this.
3    BY MR. BAKER:
4          Q.  8/5 of '13 is August of '13 which is
5    the same month we've been talking about that
6    the DEA paid Indi a visit, correct?
7          A.  Yes.
8          Q.  And so this is the same time frame
9    that we're seeing substantial increases in the
10   inventory of hydrocodone combination products
11   between August of 2012 and August of '13,
12   according to this document, correct?
13         A.  I can't say it's a substantial
14   increase.
15         Q.  Well, it's -- it's a notable increase,
16   is it not?
17         A.  It's an increase.  I can't say if it's
18   substantial.
19         Q.  Well, when you increase from zero of
20   hydrocodone 10, 500 milligrams -- zero bottles
21   to 6,083 bottles, that's a substantial
22   increase, is it not?
23         A.  It may not have been carried in the
24   previous year.

Page 267

1          Q.  When you increase the hydrocodone 5,
2    325 milligrams, 100-count bottles from 26,654
3    in August of 2012 to a count of 101,192
4    bottles in August of 2013, that's a
5    substantial increase, is it not?
6          A.  I can't say if it's substantial.  I
7    don't know the factors and how many stores
8    they're servicing at each time.
9          Q.  Is this the inventory that was on hand
10   when the DEA paid a visit to Indi -- to the
11   Indianapolis distribution center in August of
12   2013?
13         MR. BUSH:  Objection.
14         A.  I can't speak to that.  I wasn't
15   there.
16   BY MR. BAKER:
17         Q.  The count on that I want to correct
18   because I'm looking at the transcript.  The
19   count of the bottles from 8/25/12 was 26,654
20   bottles, the count on 8/5 of 2013 was 101,192
21   bottles; is that correct?
22         MR. BUSH:  Objection.
23         A.  That's what this says.
24   BY MR. BAKER:

Page 268

1          Q.  Let's move to Exhibit No. 92.
2
3          (Exhibit No. 92 marked for
4    identification.)
5
6    BY MR. BAKER:
7          Q.  Exhibit No. 92 is an e-mail dated July
8    10, 2012 from Pamela Hinkle to Ronald
9    McCreery, is that correct?  At e-SupplyLink,
10   is that correct?  With a copy to John Andretti
11   and a blind copy to Pamela Hinkle, correct?
12         A.  Where are we looking?
13         Q.  Yes, that's the top.
14         A.  Not on mine.  I don't think I have the
15   right -- I think I'm missing a page or
16   something.  Is that the right one?
17         MR. BUSH:  Maybe --
18         MR. BAKER:  No, that's the wrong
19   one.
20         MR. BUSH:  I've got the second
21   copy of what I think you were intending to
22   give her.  Do you want to put a mark on it?
23         MR. BAKER:  Let me do this.  I'm
24   sorry, let me re-mark it.  This is Exhibit 92.

Page 269

1
2    BY MR. BAKER:
3          Q.  If you look at the e-mail at the
4    bottom there, it's an e-mail July 10, 2012
5    from John Andretti to Pamela Hinkle,
6    correct?
7          A.  Correct.
8          Q.  All right.  It says, "There are 18 CVS
9    distribution centers.  11 are DEA licensed to
10   ship controlled substances III through V.  CVS
11   does not ship Schedule II products," correct?
12   That's what it says?
13         A.  Correct.
14         Q.  Then if you turn over to the next
15   page, under volume of orders, it says, "Volume
16   of orders, Rx controls, Schedule III through V
17   and PSE comprises 30,000 to 40,000 line
18   items."
19         And then it says, "No. 2, front store
20   Rx promo, et cetera, total approximately to
21   six to eight million records nightly."
22         Is that correct?
23         A.  That's what it says, yes.
24         Q.  That's what's going on in the

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  distribution centers nightly; is that
2  correct?
3          MR. BUSH:  Objection.
4      A.  I can't speak to what this means.
5  BY MR. BAKER:
6      Q.  It speaks to the volume of the orders
7  that are being processed out of the
8  distribution centers for CVS, does it not?
9          MR. BUSH:  Objection.
10     A.  I do not know.
11 BY MR. BAKER:
12     Q.  Is there any other context that you
13 could take that e-mail other than it speaking
14 to the volume of orders coming out of CVS
15 distribution centers?
16         MR. BUSH:  Objection.  She's not
17 even on this e-mail.
18     A.  Yeah, I don't know.
19 BY MR. BAKER:
20     Q.  I know you're not on it.  But you're
21 the CVS DEA Compliance Coordinator, so I have
22 a right to ask you questions about the
23 volume --
24     A.  I don't know what it refers --

Page 271

1          MR. BUSH:  Wait, wait, wait.
2  BY MR. BAKER:
3      Q.  -- I have the right to ask you
4  questions about the volume of product being
5  slipped out of your distribution centers.  You
6  understand that, don't you?
7          MR. BUSH:  Understand what, that
8  you have the right to ask her the question?
9          MR. BAKER:  Yes.
10 BY MR. BAKER:
11     Q.  So whether you got the e-mail or not
12 is not a valid objection.  I'm just asking
13 about your reiteration of the volume that's
14 going out of your distribution centers of the
15 company that you work for.  Do you understand
16 that?
17     A.  I understand what you're saying.
18     Q.  Okay.
19     A.  But --
20     Q.  So what we're talking about is a
21 volume of orders of approximately six to eight
22 million records nightly; is that correct?
23         MR. BUSH:  Objection.
24     A.  That's what this e-mail says.

Page 272

1      Q.  Then "Rx controls" -- that's drug
2  controls, is that not?
3          MR. BUSH:  Objection.
4      A.  I -- assuming that's what they're
5  referring to.
6  BY MR. BAKER:
7      Q.  Okay.  -- "comprises 30 to 40 line
8  items."
9          Is that correct?
10         MR. BUSH:  Objection.
11     A.  That's what the e-mail says.
12     Q.  That's a very high volume, is it not?
13     A.  I don't know --
14         MR. BUSH:  Objection.
15     A.  -- what it relates to.  I can't answer
16 that.
17 BY MR. BAKER:
18     Q.  Are you familiar with the concept of
19 due diligence?
20     A.  I've heard due diligence, yes.
21     Q.  Do you know what due diligence is in
22 the context of implementing an SOM policy?
23     A.  I can't say I know off the top of my
24 head, no.

Page 273

1      Q.  As CVS DEA Compliance Coordinator, is
2  it true that you do not know what due
3  diligence is in the context of implementing an
4  SOM policy?
5      A.  I didn't -- did not manage SOMs, so,
6  no, I don't know.
7      Q.  So you don't know what CVS did or
8  failed to do with respect to due diligence
9  during the entire time that you were the CVS
10 DEA Compliance Coordinator, true?
11     A.  I did not manage SOMs, so I do not
12 know what they did.
13     Q.  Okay.  Earlier you were asked several
14 questions about whether or not you could audit
15 a system that was not already in place,
16 specifically referencing the suspicious order
17 monitoring system that was first put into
18 the -- that was put into the standard
19 operating procedure 8/25/10.  Do you recall
20 that line of questions?
21         MR. BUSH:  I object to that.  I
22 don't think that's an accurate account of what
23 the questions were, but --
24         MR. BAKER:  I'll withdraw the

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1  question.
2  BY MR. BAKER:
3      Q.  Let me show you Exhibit No. 100.
4
5          (Exhibit No. 100 marked for
6  identification.)
7
8  BY MR. BAKER:
9      Q.  This is an e-mail by you dated 8/26 of
10 '08.  Have you seen this e-mail before?
11     A.  I don't recall it.
12     Q.  Do you recall sending this e-mail?
13     A.  I don't recall.
14     Q.  Did you send this e-mail?
15     A.  This says I did.  I don't recall.
16     Q.  Does it look like you sent this
17 e-mail?  Is that your name, Amy Propatier?
18     A.  Yes.
19     Q.  And is this referencing the final DEA
20 SOP of 2008?
21     A.  That's what it looks like it's
22 referencing, yes.
23     Q.  There was no suspicious order
24 monitoring program described in the DEA SOP of

Page 275

1  2008, correct?
2      A.  Correct.
3      Q.  In fact, this e-mail says it doesn't
4  include SOM, which is suspicious order
5  monitoring, because we were still working on
6  that piece, correct?
7      A.  That's what it says.
8      Q.  Let's move to Exhibit No. 101.
9
10         (Exhibit No. 101 marked for
11 identification.)
12
13 BY MR. BAKER:
14     Q.  This is an e-mail dated 2/24/09 from
15 you, Amy Propatier, correct --
16     A.  Yes.
17     Q.  -- to Laura Miranda; is that correct?
18     A.  She's cc'd on it.
19     Q.  And in that e-mail it says, "Regarding
20 the DEA SOP 2/20/09."  It says, "Attached
21 is the Rx SOP."
22         And you see it is attached, correct?
23     A.  Correct.
24     Q.  And could you pull up that attachment,

Page 276

1  please?  Go to the portion that has
2  Subparagraph B at the bottom.
3          Now, you see there where it talks
4  about suspicious order monitoring.  It says,
5  "These parameters are documented in SOP," and
6  then it's blank.
7          And then it says, "Order quantity
8  parameters for controlled drugs," then it
9  says, "developed and written," correct?
10     A.  That's what it says.
11     Q.  So there was no SOM to insert into the
12 SOP as of 2/20/09.  It's because you were
13 working on it, correct?
14     A.  I can't say that I was working on it.
15 People were working on it.
16     Q.  Who is "we"?
17     A.  I said people were working on it.
18         MR. BUSH:  Excuse me, I'm just
19 trying to understand the document which
20 looks -- I'm not sure I've got what -- this
21 looks like a --
22         THE WITNESS:  It's the -- just a
23 portion of the SOP.
24         MR. BAKER:  Correct.

Page 277

1          MR. BUSH:  Right, but the -- I
2  got two pages.
3          MR. BAKER:  Here you go, here,
4  here.  That's what you should be looking at.
5          THE WITNESS:  It's just a
6  portion.  They just pulled out a page.  They
7  didn't print the full SOP.
8          MR. BUSH:  Why does it have the
9  same Bates number for two different pages
10 though?
11         MR. BAKER:  I do not know.
12         MR. BUSH:  90582, whatever.
13         MR. BAKER:  It's probably a
14 pullout, 90582.
15         MR. BUSH:  Okay.
16         MR. BAKER:  The Bates number
17 90581, 582, and 90620.  So there's -- not the
18 same.
19         MR. BUSH:  Yeah, it's not
20 sequential.  I don't know what's going on, but
21 it's okay.
22         MR. BAKER:  It's okay.
23 BY MR. BAKER:
24     Q.  So we know that there really is no SOM

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  to insert into the SOP, 2/20/09, correct?
2      A.  SOM document.
3      Q.  Correct.  It's being worked on at that
4  time, correct?
5      A.  Document, correct.
6      Q.  Correct?
7      A.  Correct.
8      Q.  If you go back to 2007, we'll look at
9  Exhibit No. 99.
10
11         (Exhibit No. 99 marked for
12  identification.)
13
14  BY MR. BAKER:
15      Q.  This is an e-mail dated November 28,
16  2007 from Amy Lynn Brown to James Morris,
17  correct?
18      A.  Yes.
19      Q.  That's when you were going by the last
20  name Brown before you took the name Propatier,
21  correct?
22      A.  Correct.
23      Q.  And this is regarding the new Rx DEA
24  SOP, correct?

Page 279

1      A.  Yes, correct.
2      Q.  And the reason it's new is because
3  there wasn't one in existence beforehand,
4  correct?
5      A.  This SOP, no.
6      Q.  And it says that -- at the bottom it
7  says, from Amy Lynn Brown, Tuesday, November
8  27, 2007.  It says, "In late August, we meet
9  to review a new SOP in development for the DEA
10  and controlled drug process," correct?
11      A.  Correct.
12      Q.  This is August of when -- or late
13  August we meet -- should it have said "in late
14  August we met"?  Is that what it probably
15  should have said?
16      A.  It's probably what it should have
17  said.
18      Q.  It says, "Not all Rx DCs had a
19  representative at the meeting, so I'm
20  forwarding a copy for your review.  We are
21  looking to implement the new SOP in early
22  December."
23         That's what it says, correct?
24      A.  Correct.

Page 280

1      Q.  And of course, on the next page, it
2  says, "We are still in the process of writing
3  the suspicious order monitoring section of the
4  SOP.  We will forward it once it is
5  completed," correct?
6      A.  Yeah, correct.
7      Q.  So we know historically now that there
8  was no suspicious order monitoring document
9  that was inserted into the SOP at 2007,
10  correct?
11      A.  For this SOP, no.
12      Q.  We know, from looking at Exhibit 101
13  that I just showed you, as of 2/24/09, when
14  there was a DEA SOP dated 2/20/09, that there
15  was no suspicious order monitoring document
16  inserted into that SOP either, correct?
17      A.  Correct.
18      Q.  Because it was being developed and
19  written, correct?
20      A.  The written portion, yes.
21      Q.  And we know that -- from the documents
22  presented today that there was no suspicious
23  order monitoring system in a written form put
24  into the SOP, the standard operating

Page 281

1  procedure, until August 25 of 2010, correct?
2      A.  The written portion, right, 2010.
3         MR. BUSH:  Do you want a break?
4         THE WITNESS:  We can keep
5  going.
6         MR. BAKER:  I'm going to take a
7  break.
8         THE VIDEOGRAPHER:  The time is
9  3:23 p.m. and we're off the record.
10
11         (Recess taken from 3:23 p.m.
12         to 3:37 p.m.)
13
14         THE VIDEOGRAPHER:  The time is
15  3:37 p.m. and we're on the record.
16  BY MR. BAKER:
17      Q.  We're back on record.  William Baker.
18  I'm talking to Amy Propatier.
19         Ms. Propatier, I'm going to show you
20  what's marked as Exhibit 78.
21
22         (Exhibit No. 78 marked for
23  identification.)
24

Page 282

1  MR. BAKER: Excuse me, we're
2 back on the record. If you all could put your
3 phones on mute, we would appreciate it. Could
4 you do that, please?
5  MR. BUSH: I have some extra
6 documents from you at one point.
7  (Pause in proceedings.)
8  MR. BAKER: Back on the record.
9 BY MR. BAKER:
10  Q. Ms. Propatier, I handed you Exhibit
11 78. This is a settlement agreement.
12  Have you ever seen this settlement
13 agreement before?
14  A. No.
15  Q. The first one is Bates Number 60805.
16 Do you see that? It's a settlement agreement
17 with -- in Maryland with a CVS entity that was
18 fined $8 million for dispensing drugs with no
19 valid prescription.
20  Do you see that?
21  MR. BUSH: Objection.
22  A. I don't see where it says that, I'm
23 sorry.
24 BY MR. BAKER:

Page 283

1  Q. Have you ever seen this settlement
2 agreement before?
3  MR. BUSH: Objection.
4  A. No, I have not.
5 BY MR. BAKER:
6  Q. As CVS DEA Compliance Coordinator,
7 were you ever told about this settlement
8 agreement?
9  A. No, I was not.
10  Q. Okay. Are you familiar with CVS being
11 fined that amount of money, $8 million, for
12 dispensing controlled substances without a
13 valid prescription for legitimate medical
14 purposes?
15  MR. BUSH: Objection.
16  A. No, I am not.
17 BY MR. BAKER:
18  Q. Let me ask you to look at the next
19 one. It's Bates number 60839. This is a
20 settlement agreement with Long Island,
21 New York.
22  Have you ever seen this document?
23  A. No, I have not.
24  MR. BUSH: You said it's a

Page 284

1 settlement agreement with Long Island?
2  MR. BAKER: I'm sorry, let me
3 repeat the question.
4 BY MR. BAKER:
5  Q. This is Document No. 60839. It's part
6 of Exhibit 78 composite. It's a settlement
7 agreement with CVS for violations that
8 occurred in Nassau and Suffolk counties in
9 Long Island in the State of New York.
10  Do you see that?
11  MR. BUSH: Objection. Go ahead.
12  A. Yes, I see it.
13 BY MR. BAKER:
14  Q. This resulted in a fine of $1.5
15 million to CVS regarding thefts and losses of
16 controlled substances and, in particular,
17 hydrocodone.
18  Are you familiar with this?
19  A. No, I am not.
20  Q. Were you informed about this
21 settlement agreement when it occurred?
22  A. No, I was not.
23  Q. The date on this settlement agreement,
24 on Bates No. 60846, is June 15 2018. What was

Page 285

1 your position with the company at that point?
2  A. I'm sorry, June 15 2018?
3  Q. Yes, ma'am.
4  A. Pharmacy inventory manager.
5  Q. Did you cease to be CVS DEA Compliance
6 Coordinator?
7  A. Yes.
8  Q. The next agreement is dated 7, August
9 2015. It's Bates number 60847. Do you see
10 that?
11  A. Yes.
12  Q. It's a settlement agreement between
13 CVS and the United States Attorney's Office
14 for the District of Rhode Island on behalf of
15 the United States DEA.
16  Do you see that in the first
17 paragraph?
18  A. Oh, all right, sorry. Yes, I see
19 that.
20  Q. And this is related to filling
21 prescriptions without a legitimate medical
22 purpose on October 2013 through March of 2015
23 and the Rhode Island CVS pharmacies being
24 investigated.

Page 286

1      Are you familiar with this?

2      A.  I am not.

3      Q.  Were you at the time that

4  investigation was going on, between October of

5  2013 and March 2015, the CVS DEA Compliance

6  Coordinator?

7      A.  I left that position in February of

8  2014.

9      Q.  During a portion of the time, were you

10  then CVS DEA Compliance Coordinator at least

11  between October 2013 and the month of '14 that

12  this investigation was going on?

13      A.  Yes.

14      Q.  The violation is -- according to this

15  agreement is for filling prescription without

16  a valid -- without valid DEA numbers

17  associated with the prescriptions.

18      Are you familiar with that?

19      A.  I am not.

20      Q.  And these were for Class III drugs or

21  Schedule III drugs, which are hydrocodone.

22  Did you know that?

23          MR. BUSH:  Objection.

24      A.  I did not.

Page 287

1      Q.  And the fine was $450,000.  Are you

2  familiar with that, according to this

3  agreement?

4      A.  I am not.

5      Q.  The next is a settlement agreement

6  Bates 60856.  And this is a settlement

7  agreement between CVS and the Eastern District

8  of California on behalf of the Drug

9  Enforcement Administration for the United

10  States of America.

11      Do you see that in the first paragraph

12  there?

13      A.  Yes.

14      Q.  And the document describes the

15  violations as theft and unexplained losses of

16  hydrocodone reported by numerous CVS stores in

17  early 2012 in the State of California.

18      Have you ever been informed of this?

19      A.  No, not that I recall.

20      Q.  As CVS DEA Compliance Coordinator,

21  holding that title at the time this settlement

22  agreement was entered into, was this part of

23  what the CVS DEA Compliance Coordinator would

24  have been responsible for handling?

Page 288

1          MR. BUSH:  Objection.  I think

2  that misstates the dates in the record.

3          MR. BAKER:  I think --

4          MR. BUSH:  I'm looking at the

5  same document you are.

6          MR. BAKER:  Let me go back on

7  record.  The objection's well taken.

8  BY MR. BAKER:

9      Q.  If you look at Page 2 of the

10  agreement, Paragraph F, it says, "The United

11  States contends that in early 2012 DEA

12  Sacramento Field Division noticed an increased

13  number of thefts and unexplained losses of

14  hydrocodone, a Schedule III controlled

15  substances, at that time reported by numerous

16  EDCA CVS pharmacy retail stores."

17      Do you see that?

18      A.  I see that.

19      Q.  And do you remember earlier I was

20  showing you a document where 68,000

21  hydrocodone pills had disappeared?

22      Do you remember that?

23      A.  I remember that.

24      Q.  Here's another example of it occurring

Page 289

1  in California, correct?

2          MR. BUSH:  Objection.

3  BY MR. BAKER:

4      Q.  Is that correct?

5          MR. BUSH:  Objection.

6      A.  It's showing a theft.

7  BY MR. BAKER:

8      Q.  Is that diversion?

9          MR. BUSH:  Objection.

10      A.  I don't have enough information.

11  BY MR. BAKER:

12      Q.  Okay.  If you look at Paragraph G, it

13  says, "United States contends that the

14  violations were failure to maintain Schedule

15  III to V invoices, failure to maintain

16  Schedule III to V records separate from

17  noncontrolled substance record, failure to

18  conduct a biennial inventory on one specific

19  day, failure to maintain complete and accurate

20  records, failure to record the date of

21  acquisition of controlled substances.  CVS

22  failed to record the amount received on

23  Schedule III to V invoices.  CVS failed to

24  record the amount received and the date

Page 290

1  received on DEA 222 forms. CVS failed to
2  maintain DEA 222 forms and CVS failed to
3  maintain DEA 222 forms separate from other
4  records."
5      Do you see those are the violations
6  recorded?
7          MR. BUSH: Excuse me, objection.
8  Those are -- this is contentions of the U.S.
9  BY MR. BAKER:
10     Q. Do you see those are the contentions
11  within the settlement agreement?
12     A. I see that.
13     Q. And do you have any reason to disagree
14  that CVS committed those contentious
15  violations?
16         MR. BUSH: Objection.
17     A. Do I have any reason to believe what,
18  I'm sorry?
19  BY MR. BAKER:
20     Q. CVS did not commit those violations
21  within those contentions.
22     A. I don't know enough about this to
23  answer that.
24     Q. Do you see that -- on Page 60859 of

Page 291

1  that agreement that CVS was fined $5 million
2  for those contentions of violations?
3          MR. BUSH: Objection.
4     A. I see a settlement agreement for
5  5,000.
6     Q. $5 million?
7     A. I mean, 5 million.
8     Q. It says, "In consideration of the
9  obligations of the parties set forth in this
10  settlement agreement, CVS shall pay to the
11  United States the total sum of $5 million
12  within fourteen days after the effective date
13  of this agreement."
14      Is that what it says?
15     A. Yes.
16     Q. So CVS was fined $5 million by the
17  DEA, correct?
18         MR. BUSH: Objection. Misstates
19  the document.
20     A. I don't know if that's a fine.
21     Q. CVS entered into settlement agreement
22  and paid $5 million for contended violations,
23  correct?
24         MR. BUSH: Objection.

Page 292

1     A. I -- yeah, I see they settled into an
2  agreement.
3     Q. The next one is a settlement agreement
4  that begins on Bates number 60872. "This is a
5  settlement agreement entered into between the
6  United States of America acting through the
7  United States Department of Justice and its
8  DEA for the New England Field Division, Boston
9  Office of Diversion, collectively the United
10  States and CVS Pharmacy, Inc., hereafter
11  referred to as the parties."
12      Do you see that?
13     A. I see.
14     Q. And it talks about the CVS being a
15  Rhode Island corporation, headquarters located
16  in Woonsocket, Rhode Island.
17      Do you see that?
18     A. Yes, I do.
19     Q. That's where you work; is that
20  right?
21     A. It is.
22     Q. Were you not familiar with this
23  settlement agreement?
24     A. I don't recall ever seeing this.

Page 293

1     Q. You see that on the terms of the
2  settlement agreement, on Paragraph 1, it says,
3  "No later than ten days after the date on
4  which this agreement is signed by all parties,
5  CVS shall pay the United States $3.5 million."
6      Do you see that?
7     A. I see that.
8     Q. And these were for alleged violations
9  of the Controlled Substances Act.
10      Are you familiar with that?
11         MR. BUSH: Objection.
12     A. Am I familiar with these violations?
13  BY MR. BAKER:
14     Q. Yes, ma'am?
15     A. No, I'm not.
16     Q. It says here, in Paragraph E, in the
17  recitals on Page 1, that "United States
18  contends that it has certain civil claims
19  against CVS arising from CVS having filled --
20  filled the 523 forged opioid prescriptions
21  listed in Attachment A hereto."
22      Do you see that?
23     A. I see that.
24     Q. And it says, "The filling of these 523

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    forged prescriptions is referred to below as
2    the covered conduct."
3         Do you see that?
4         A.  I see that.
5         Q.  And that's what CVS was fined $3.5
6    million for in this settlement agreement; is
7    that correct?
8              MR. BUSH:  Objection.
9         A.  I -- I don't know.
10   BY MR. BAKER:
11        Q.  That's what CVS --
12             MR. BUSH:  Let her finish the
13   answer, okay.
14             MR. BAKER:  She said she didn't
15   know.
16   BY MR. BAKER:
17        Q.  That's -- that is the contention of
18   violation that resulted in a terms of
19   agreement for CVS to pay $3.5 million to the
20   DEA, correct --
21             MR. BUSH:  Objection.
22   BY MR. BAKER:
23        Q.  -- according to this?
24             MR. BUSH:  Objection.

Page 295

1         A.  I mean, I'm not really sure what I'm
2    reading, so I can't say.
3    BY MR. BAKER:
4         Q.  Well, the agreement will speak for
5    itself, but it does say, "No later than ten
6    days after the date on which this agreement is
7    signed by all parties, CVS shall pay the
8    United States $3.5 million."  Does it not say
9    that?
10        A.  It does say that.
11        Q.  The next is an agreement stipulated
12   September 2, 2014, between United States of
13   America and the Southern District of Texas
14   acting on behalf of the DEA.
15        Do you see that?
16        A.  I do.
17        Q.  And also includes, in the settlement
18   agreement, "CVS Pharmacy, Inc., whose
19   corporate headquarters are in Woonsocket,
20   Rhode Island."
21        Do you see that?
22        A.  Yes.
23        Q.  And that's where you work; is that
24   correct?

Page 296

1         A.  I do.
2         Q.  Now, go to Paragraph 7 on Page 2.  It
3    says, "The United States contends that it has
4    certain civil claims against CVS for engaging
5    in the following conduct from April 1, 2012 to
6    July 31, 2012," and then it lists those.
7         Do you see those?
8         A.  Yes.
9         Q.  The question is:  Were you the acting
10   CVS DEA Compliance Coordinator during the time
11   that these alleged civil claims occurred?
12        A.  Yes.
13        Q.  It says here -- describes the civil
14   claims.  It says "During a DEA investigation
15   into the prescription writing practice of
16   Dr. Pedro Garcia, it was discovered that eight
17   separate CVS pharmacies filled 153
18   prescriptions for controlled substances
19   written by Dr. Garcia during a time period
20   during which his Texas Department of Public
21   Safety Controlled Substances registration was
22   expired."
23        Is that correct?  That's what it
24   says?

Page 297

1         A.  That's what it says.
2         Q.  It says "Specifically the following
3    CVS pharmacies filled the invalid
4    prescriptions for controlled substances issued
5    by Dr. Garcia:  CVS Pharmacy 06989 at 4102
6    Ayers Street, Corpus Christi, Texas, 7841 DEA
7    registration number," and it gives it; CVS
8    Pharmacy 06911, Corpus Christi, Texas, gives
9    DEA registration number; CVS Pharmacy 07004 in
10   Corpus Christi, Texas and it gives its DEA
11   registration; CVS Pharmacy in Portland, Texas
12   and it gives its DEA registration; CVS
13   pharmacy in Corpus Christi, Texas and it gives
14   the DEA registration number; CVS Pharmacy in
15   Edinburg, Texas and gives its DEA registration
16   number; CVS pharmacy in Corpus Christi, Texas;
17   CVS Pharmacy 02580 in Corpus Christi, it gives
18   its DEA registration number; and CVS Pharmacy
19   07080 in Robstown, Texas, giving its CVS
20   registration number.
21        Did you see those listed pharmacies
22   where the alleged violations occurred within
23   the agreement?
24        A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    Q.  And it says "The above detailed
2  actions were in violation of 21 U.S.C. 829 and
3  842, A.1, and the applicable regulations
4  promulgated thereunder," correct?
5        MR. BUSH:  You're asking whether
6  it says that?
7  BY MR. BAKER:
8    Q.  Does it say that?
9    A.  I'm sorry, where does --
10    Q.  It says that "Above detailed actions
11  were in violation of 21 U.S.C, Section 829 and
12  842, A.1."
13        Does it say that?
14    A.  It does say that.
15    Q.  And under the terms and conditions, it
16  says that -- under Paragraph 13, "CVS will pay
17  the sum of $1,912,500 to the United States by
18  electronic funds transfer pursuant to written
19  instructions provided by the United States,"
20  correct?
21    A.  It does say that.
22    Q.  Were you informed about this when you
23  were CVS DEA Compliance Coordinator?
24    A.  No, I was not.

Page 299

1    Q.  Were you informed, while you were CVS
2  DEA Compliance Coordinator, that there were
3  violations in the State of Florida alleged by
4  the United States DEA through the Department
5  of Justice against Florida distribution
6  centers related to failure to timely and
7  detect and report suspicious orders?
8    A.  Not that I recall.
9    Q.  Were you aware that $22 million fine
10  was issued against CVS for those violations in
11  Florida?
12    A.  Not that I recall.
13    Q.  Has CVS been guilty of diversion with
14  respect to hydrocodone combination products
15  during the past six years?
16    A.  I can't answer that.  I don't know.
17        MR. BAKER:  I'm going to turn it
18  over to my partner and I'm finished with my
19  questions.
20        THE WITNESS:  Thank you.
21        THE VIDEOGRAPHER:  The time is
22  3:56 p.m.  We're off the record.
23
24

Page 300

1        (Recess taken from 3:56 p.m.
2        to 3:57 p.m.)
3
4        THE VIDEOGRAPHER:  The time
5  is 3:57 p.m.  We're on the record.
6
7        CROSS-EXAMINATION
8  BY MR. GOETZ:
9    Q.  Good afternoon, Ms. Propatier.  I will
10  only be a few minutes.  Who is Ron Link?
11    A.  Ron Link was the vice president of
12  logistics.
13    Q.  Pretty high-up individual at CVS?
14    A.  Yes.
15    Q.  And what is VAWD?
16    A.  Verified accredited wholesale
17  distributor.
18    Q.  And the CVS distribution centers would
19  want to be VAWD certified, correct?
20    A.  Correct.
21    Q.  And that was a big deal, correct?
22    A.  It was -- it was nice to have.
23    Q.  And, in fact, some states, it's
24  necessary in order to distribute drugs.  Are

Page 301

1  you aware of that?
2    A.  I'm not sure.
3    Q.  Do you remember, in 2010, when CVS had
4  a problem with its VAWD certification?
5    A.  I don't recall.
6    Q.  Do you -- are you aware that VAWD
7  resurveys the facilities every three years?
8    A.  Yes.
9    Q.  And so if there was a survey in mid to
10  late 2010, we can assume that the earlier
11  survey was mid to late 2007, correct?
12    A.  I would imagine, yes.
13    Q.  I'm going to show you what's been
14  marked as Exhibit 203 and -- 223.  And I
15  apologize, I only have two copies.  I haven't
16  marked it.
17
18        (Exhibit No. 223 marked for
19  identification.)
20
21        VOICE:  Is there a Bates number?
22        MR. GOETZ:  There is a Bates
23  number, 66963.
24        VOICE:  Thank you.

Page 302

1    MR. BUSH: To 66966.
2 BY MR. GOETZ:
3    Q.  Are you done reviewing it? Take your
4 time.
5    A.  (Witness reviews document.)
6       Yeah.
7    Q.  Did you have a chance to review
8 that?
9    A.  I looked at it, yes.
10   Q.  Do you recognize that document?
11   A.  I don't recall it.
12   Q.  It's an e-mail that you are copied on,
13 at least part of the string, correct?
14   A.  Yes.
15   Q.  And it's an e-mail related to the VAWD
16 recertification where CVS was having problems
17 with VAWD recertification, correct?
18   A.  I don't know if it's problems, but it
19 talks about, yes, recertification.
20   Q.  Well -- I'm sorry, did I cut you off?
21   A.  No, no, I'm okay.
22   Q.  If you -- let's -- instead of going
23 through all three pages, if you --
24   A.  Yeah.

Page 303

1    Q.  -- look at 66965 --
2    A.  Okay.
3    Q.  -- there's an e-mail from Paul Hamby.
4 Do you know who Paul Hamby is?
5    A.  I don't recall who he is.
6    Q.  Do you know who Cegedim is?
7    A.  I don't think that's how you say it,
8 but you've seen the name, yeah.
9    Q.  Do you know how to say it?
10   A.  I think they say it Cegedim, Cegedim
11 Dendrite.
12   Q.  We've been call it CCS because I don't
13 know how to say it.
14   A.  Don't worry.
15   Q.  It's Paul Hamby to Frank Devlin. And
16 it says, "Hi, Frank. I understand you guys
17 may need some help with NABP/VAWD. I think I
18 understand from Ron you need assistance with
19 resolving some items to get your VAWD renewals
20 processed."
21      Did I read that correctly?
22   A.  You did.
23   Q.  Okay. And so that is the first e-mail
24 in this string that relates to some VAWD

Page 304

1 issues that have to be resolved?
2    A.  Uh-huh.
3    Q.  Correct?
4    A.  Yes.
5    Q.  And the last e-mail of the string is
6 actually from Frank Devlin.
7       Do you see that?
8    A.  The at the very top?
9    Q.  Yes.
10   A.  Yes.
11   Q.  It's to Ron Link, correct?
12   A.  Uh-huh, yes.
13   Q.  And it says, "VAWD items," correct?
14   A.  Yes.
15   Q.  And it has an importance of high?
16   A.  Yes.
17   Q.  And if you're sending something to Ron
18 Link who's high up at CVS, it has to be
19 important if you're sending it high
20 importance. Do you agree?
21   A.  I don't know if I disagree, so.
22   Q.  Did you send much e-mail to Ron Link?
23   A.  I've sent him e-mails. I can't recall
24 specifically how many or what they regarded,

Page 305

1 but I did send him e-mails.
2    Q.  It was unusual?
3    A.  I don't know -- I wouldn't say if it
4 was unusual.
5    Q.  Okay. It says -- this is what Frank
6 says: "Ron, we need to get our VAWD
7 recertification completed. Amy is continuing
8 to run into issues. I have enlisted Buzzeo's
9 group to work with her, Frank."
10      Can you tell me what issues you were
11 running into?
12   A.  I don't recall.
13   Q.  Do you remember that a report was
14 generated?
15   A.  I remember they gave, like, a report.
16   Q.  Okay. And do you remember what that
17 report said?
18   A.  I don't recall.
19
20      (Exhibit No. 224 marked for
21 identification.)
22
23 BY MR. GOETZ:
24   Q.  I'm going to hand you what has been

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1 marked as Exhibit 224 and it is Bates
2 number -- begins at 66969. Do you recognize
3 that document as the VAWD report?
4 A. Yes. It looks like a VAWD report,
5 yes.
6 Q. And this is a VAWD report from
7 September 16 of 2010, correct?
8 A. Yes.
9 Q. And it relates to different facilities
10 -- CVS distribution facilities, correct?
11 A. I think it relates to Indianapolis,
12 but -- it says "Indianapolis" at the top, yes.
13 Q. And could you go to -- feel free to
14 read the whole thing, if you want. I have
15 time.
16 A. Where did you want me to go?
17 Q. Could you go to 66972, please? And,
18 the last block where it says, "reviewer
19 comments"?
20 A. Yes.
21 Q. And those are comments that are
22 actually made by VAWD, correct?
23 A. I don't recall.
24 Q. I think if you read the whole

Page 307

1 structure of this document, that would become
2 apparent?
3 A. Okay.
4 Q. But here's what it says. Could you
5 read that into the record?
6 A. Starting at the -- that bullet?
7 Q. Yeah, where it says "applicant," yes.
8 A. "Applicant has provided a response
9 that inventory controls are addressed in drug
10 enforcement administration SOP, 8/25/10. This
11 is a well-written document, but it does not
12 address prescription products for
13 authentication of order -- suspicious orders,
14 reporting of suspicious orders, losses, record
15 retention, and the entire disposal process
16 including documentation and witnessing."
17 Q. And so part of the VAWD problem --
18 does this refresh your recollection since you
19 were working on this -- Ron Link, who's high
20 up, was aware of it -- part of the VAWD issue
21 was that their feeling that suspicious and
22 reporting of suspicious orders were
23 inadequate?
24 A. They were referring to prescription

Page 308

1 product, not controlled product there.
2 Q. So what is the difference?
3 A. They're nonregulated. They're just
4 regular noncontrolled drugs.
5 Q. I appreciate that. I didn't know
6 that.
7 A. Yeah, that's -- C6s.
8 Q. Does this at all relate, this
9 document -- was any of the VAWD certification
10 related to the controlled substances?
11 MR. BUSH: You want her to look
12 through the whole document?
13 BY MR. GOETZ:
14 Q. Or do you remember?
15 A. Do any of their --
16 Q. Yes. Do you remember that?
17 A. (Witness reviews document.)
18 Q. Let me ask you a question.
19 A. Yes.
20 Q. We can maybe make this quicker.
21 A. Yes.
22 Q. Is it your understanding that VAWD
23 requirements would require your SOP to contain
24 a section on prescription products?

Page 309

1 A. Yes --
2 Q. Okay. And --
3 A. -- or its own SOP.
4 Q. And was that ever changed?
5 A. I don't recall.
6 Q. Was there a separate SOP for
7 prescription products ever?
8 A. I don't remember.
9 MR. GOETZ: That is all I have.
10 Thank you for clearing that up.
11 THE WITNESS: Oh, thank you.
12 MR. BUSH: Anybody else? All
13 done?
14 MR. BAKER: I'm done.
15
16 (Exhibit No. 62 marked for
17 identification.)
18
19 THE VIDEOGRAPHER: The time is
20 4:07 p.m. This deposition has concluded and
21 we are off the record.
22
23 (Deposition concluded at 4:07 p.m.)
24

Highly Confidential - Subject to Further Confidentiality Review

Page 310

CERTIFICATION

1
2      I, DARLENE M. COPPOLA, a Notary Public, do hereby
3   certify that AMY PROPATIER, after having satisfactorily
4   identifying herself, came before me on the 29th day of
5   November, 2018 in Providence, Rhode Island, Massachusetts,
6   and was by me duly sworn to testify to the truth and
7   nothing but the truth as to her knowledge touching and
8   concerning the matters in controversy in this cause; that
9   she was thereupon examined upon her oath and said
10  examination reduced to writing by me; and that the
11  statement is a true record of the testimony given by the
12  witness, to the best of my knowledge and ability.
13      I further certify that I am not a relative or
14  employee of counsel/attorney for any of the parties, nor a
15  relative or employee of such parties, nor am I financially
16  interested in the outcome of the action.
17      WITNESS MY HAND THIS 2nd day of December, 2018.
18
19
20
21  DARLENE M. COPPOLA          My commission expires:
22  NOTARY PUBLIC              November 11, 2022
23  REGISTERED MERIT REPORTER
24  CERTIFIED REALTIME REPORTER

Page 311

1       IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4
5
6   ***********************************
7   IN RE:
8   NATIONAL PRESCRIPTION OPIATE
    LITIGATION
9
    This document relates to:
10
    All cases
11
    ***********************************
12
13      I, AMY PROPATIER, say that I have read the
14  foregoing deposition and hereby declare under penalty of
15  perjury the foregoing is true and correct:
16  (as prepared)  (as corrected on errata.)
17      Executed this _____ day of _____ 20____,
18  at _____, _____.
19
20
21
22      _____
23      AMY PROPATIER
24

Page 312

1           CORRECTION PAGE
2   DEPONENT:  AMY PROPATIER
3   DATE TAKEN: NOVEMBER 29, 2018
4   CASE:    NATIONAL PRESCRIPTION OPIATE LITIGATION
5   ***********************************************
6   PAGE / LINE / SHOULD READ/REASON
7   _____/_____/_____
8   _____/_____/_____
9   _____/_____/_____
10  _____/_____/_____
11  _____/_____/_____
12  _____/_____/_____
13  _____/_____/_____
14  _____/_____/_____
15  _____/_____/_____
16  _____/_____/_____
17  _____/_____/_____
18  _____/_____/_____
19  _____/_____/_____
20  _____/_____/_____
21  _____/_____/_____
22  _____/_____/_____
23  _____/_____/_____
24  _____/_____/_____