```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4                      - - -

 5   IN RE:  NATIONAL        )

     PRESCRIPTION OPIATE     )  MDL No. 2804

 6   LITIGATION              )

     _____)  Case No. 1:17-MD-2804

 7                           )

     THIS DOCUMENT RELATES   )

 8   TO ALL CASES            )  Hon. Dan A. Polster

 9                      - - -

10

11          Thursday, December 6, 2018

12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

               CONFIDENTIALITY REVIEW

13

14                      - - -

15        Videotaped deposition of Gilberto Quintero,

16   held at the offices of BakerHostetler, 200 Civic

17   Center Drive, Suite 1200, Columbus, Ohio, commencing

18   at 7:04 a.m., on the above date, before Sara S. Clark,

19   Registered Merit Reporter and Notary Public.

20

21                      - - -

22

23          GOLKOW LITIGATION SERVICES

          877.370.3377 ph | 917.591.5672 fax

24              deps@golkow.com
```

**Page 2**

A P P E A R A N C E S:

On behalf of the Plaintiffs:
McHUGH FULLER LAW GROUP
AMY J. QUEZON, ESQUIRE
amy@mchughfuller.com
MICHAEL J. FULLER, JR., ESQUIRE
(via teleconference)
mike@mchughfuller.com
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
601-261-2220
and
GRAY & WHITE
BY: MARK K. GRAY, ESQUIRE
mgray@grayandwhitelaw.com
MATTHEW L. WHITE, ESQUIRE
mwhite@grayandwhitelaw.com
713 East Market Street
Louisville, Kentucky 40202
502-805-1800
and
SIMMONS HANLY CONROY, LLC
BY: RICK KROEGER, ESQUIRE
rkroeger@simmonsfirm.com
HOLEY NIGHBERT, ESQUIRE
hnighbert@simmonsfirm.com
One Court Street
Alton, Illinois 65002
618-259-2222

On behalf of Cardinal Health, Inc.:
WILLIAMS & CONNOLLY LLP
BY: JENNIFER WICHT, ESQUIRE
jwicht@wc.com
NEELUM WADHWANI, ESQUIRE
nwadhwani@wc.com
MIRANDA PETERSEN, ESQUIRE
mpetersen@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5331
CARDINAL HEALTH, INC.
BY: CAITLIN E. ANDERSON, ESQUIRE
caitlin.anderson@cardinalhealth.com

**Page 3**

A P P E A R A N C E S

On behalf of AmerisourceBergen:
REED SMITH LLP
BY: BRIAN T. HIMMEL, ESQUIRE
bhimmel@reedsmith.com
Reed Smith Centre
225 Fifth Avenue, Suite 1200
Pittsburgh, Pennsylvania 15222
412-288-4058

On behalf of Walmart:
JONES DAY
BY: BRANDY H. RANJAN, ESQUIRE
branjan@jonesday.com
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio 43215-2673
614-469-3939

On behalf of McKesson:
COVINGTON & BURLING, LLP
BY: MEGHAN MONAGHAN, ESQUIRE
mmonaghan@cov.com
850 Tenth Street, NW
Washington, DC 20001
202-662-5531

On behalf of Prescription Supply, Inc.:
FOX ROTHSCHILD, LLP
BY: ZACHARY MARTIN, ESQUIRE
(via teleconference)
zmartin@foxrothschild.com
2700 Kelly Road, Suite 300
Warrington, Pennsylvania 18976-3624
215-345-7500

**Page 4**

A P P E A R A N C E S

On behalf of CVS Indiana, LLC and CVS RX Services, Inc.:
ZUCKERMAN SPAEDER LLP
BY: R. MILES CLARK, ESQUIRE
(via teleconference)
mclark@zuckerman.com
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
202-778-1800

On behalf of Endo Pharmaceuticals, Inc., and Endo Health Solutions, Inc.:
ARNOLD & PORTER KAYE SCHOLER, LLP
BY: BRYAN L. ADKINS, ESQUIRE
bryan.adkins@arnoldporter.com
(via teleconference)
601 Massachusetts Avenue, NW
Washington, DC 20001
202-942-5000

On behalf of the Allergan Defendants:
KIRKLAND & ELLIS LLP
BY: TUCKER HUNTER, ESQUIRE
tucker.hunter@kirkland.com
(via teleconference)
300 North LaSalle
Chicago, Illinois 60654
312-862-3429

On behalf of Validus:
FOX ROTHSCHILD, LLP
BY: EILEEN OAKS MUSKETT, ESQUIRE
(via teleconference)
emuskett@foxrothschild.com
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, New Jersey 08401-7212
609-572-2355

**Page 5**

A P P E A R A N C E S

On behalf of C&R Pharmacy:
COLLINSON, DAEHNKE, INLOW & GRECO
BY: AMANDA E. ROSENTHAL, ESQUIRE
(via teleconference)
amanda.rosenthal@cdiglaw.com
2110 E. Flamingo Road, Suite 305
Las Vegas, Nevada 89119
(702) 979-2132

ALSO PRESENT:
Darnell Brown, Videographer
Zachary Hone, Trial Technician

- - -

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1          I N D E X
 2            - - -
 3  WITNESS                        PAGE
 4  GILBERTO QUINTERO
 5  Examination By Mr. Kroeger:       12
 6  Examination By Mr. Gray:         249
 7            - - -
 8  EXHIBIT        DESCRIPTION      PAGE
 9  Cardinal-Quintero 1   2010-2012 Org Chart,   30
        P1.4591
10
    Cardinal-Quintero 2   Declaration of Gilberto   36
11        Quintero, Bates
          CAH_MDL_PRIORPROD_DEA12
12        _00000518 through 533
13  Cardinal-Quintero 3   2008 MOA, Bates       114
          CAH_MDL2804_02309014
14        through 9062
15  Cardinal-Quintero 4   3/11/13 e-mail from de   121
          Gutierrez-Mahoney,
16        Bates MCKMDL00545341
          through 47
17
    Cardinal-Quintero 5   2/22/12 Government's   127
18        Prehearing Statement,
          Bates
19        CAH_MDL_PRIORPROD_DEA12
          _00000001 through 54
20
    Cardinal-Quintero 6   9/19/10 e-mail from   146
21        Rausch, Bates
          CAH_MDL2804_00704499
22        through 504
23
24
```

Page 7

```
 1  EXHIBIT        DESCRIPTION      PAGE
 2  Cardinal-Quintero 7   10/22/10 e-mail from   153
        Rausch, Bates
 3      CAH_MDL2804_01103874
        through 76
 4
    Cardinal-Quintero 8   3/22/12 e-mail from   162
 5      Rausch, Bates
        CAH_MDL2804_01087475
 6      through 490
 7  Cardinal-Quintero 9   1/6/11 letter to   178
        Farley, Bates
 8      CAH_MDL_PRIORPROD_DEA12
        _00011853 through 854
 9
    Cardinal-Quintero 10   Warrant for Inspection,   195
10      Bates
        CAH_MDL_PRIORPROD_DEA12
11      _00003808 through 817
12  Cardinal-Quintero 11   11/3/11 e-mail, Bates   201
        CAH_MDL2804_00864847
13      through 849
14  Cardinal-Quintero 12   Attachment 48 to   252
        Defendants' Opposition
15      to Plaintiff's Motion
        for Preliminary
16      Injunction, P1.4050
        through P1.4050.5
17
    Cardinal-Quintero 13   21 CFR 1301.74, P1.4915   262
18
    Cardinal-Quintero 14   2/15/18 Letter from   269
19      Congress, P1.43 through
        P1.43.11
20
    Cardinal-Quintero 15   Attachment 15 to   297
21      Defendants' Opposition
        to Plaintiff's Motion
22      for Preliminary
        Injunction, P1.4019
23      through P1.4019.6
24
```

Page 8

```
 1  EXHIBIT        DESCRIPTION      PAGE
 2  Cardinal-Quintero 16   Administrative   316
        Memorandum of
 3      Agreement, P1.565
        through P1.565.8
 4
    Cardinal-Quintero 17   Consent Order, P1.4222   322
 5      through P1. 4222.12
 6            - - -
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 9

```
 1            - - -
 2       P R O C E E D I N G S
 3            - - -
 4       VIDEOGRAPHER:  Good morning.  We
 5  are now on the record.  My name is
 6  Darnell Brown, and I'm the videographer
 7  with Golkow Litigation Services.
 8  Today's date is December 6th, 2018, and
 9  the time is 7:04 a.m.
10       This video deposition is being
11  held in Columbus, Ohio, in the matter of
12  National Prescription Opioid Litigation
13  for the United States District Court for
14  the Northern District of Ohio.  The
15  deponent is Gilberto Quintero.
16       Counsel, please identify
17  yourselves for the record.
18       MR. KROEGER:  Rick Kroeger for
19  Plaintiffs.
20       MS. NIGHBERT:  Holly Nighbert for
21  the Plaintiffs.
22       MS. QUEZON:  Amy Quezon,
23  Plaintiffs.
24       MR. GRAY:  Mark Gray for the
```

Page 10

1 Plaintiffs.

2     MR. WHITE:  Matt White for the
3 Plaintiffs.

4     MS. RANJAN:  Brandy Ranjan from
5 Jones Day on behalf of Walmart.

6     MS. MONAGHAN:  Meghan Monaghan
7 from Covington & Burling on behalf of
8 McKesson.

9     MR. HIMMEL:  Brian Himmel from
10 Reed Smith for AmerisourceBergen
11 Corporation.

12     MS. ANDERSON:  Caitlin Anderson,
13 in-house counsel at Cardinal Health.

14     MS. PETERSEN:  Miranda Petersen,
15 Williams & Connolly, Cardinal Health.

16     MS. WADHWANI:  Neelum Wadhwani,
17 Williams & Connolly, Cardinal Health.

18     MS. WICHT:  Jennifer Wicht from
19 Williams & Connolly, also for Cardinal
20 Health.

21     VIDEOGRAPHER:  Counsel on the
22 phone?

23     MS. MUSKETT:  Eileen Muskett from
24 Fox Rothschild for Validus.

Page 11

1     MR. MARTIN:  Zach Martin of Fox
2 Rothschild on behalf of Prescription
3 Supply.

4     MR. HUNTER:  Tucker Hunter from
5 Kirkland & Ellis on behalf of Allergan
6 Finance, LLC.

7     MR. CLARK:  Miles Clark from
8 Zuckerman Spaeder on behalf of CVS
9 Indiana, LLC and CVS RX Services, Inc.

10     MR. FULLER:  Mike Fuller on behalf
11 of Plaintiffs.

12     MR. ADKINS:  Bryan Adkins,
13 Arnold & Porter, on behalf of the Endo
14 and Par Defendants.

15     MS. ROSENTHAL:  Amanda Rosenthal
16 from Collinson, Daehnke, Inlow & Greco,
17 on behalf of C&R Pharmacy.

18     VIDEOGRAPHER:  Anyone else?

19     The court reporter is Sara Clark,
20 who will now swear in the witness.

21

22

23

24

Page 12

1     GILBERTO QUINTERO

2   being by me first duly sworn, as hereinafter
3 certified, testifies and says as follows:

4     EXAMINATION

5 BY MR. KROEGER:

6     Q.   Would you state your full name for
7 the record, please.

8     A.   My name is Gilberto Quintero.

9     Q.   Mr. Quintero, where are you
10 currently employed?

11     A.   I'm currently employed at Cardinal
12 Health.

13     Q.   And you've been with Cardinal
14 Health since December of 2009; is that right?

15     A.   December 1st, 2009, that's
16 correct.

17     Q.   Prior to that, what did you do?

18     A.   I used to work for the -- Wyeth
19 Pharmaceutical, and -- which was acquired by
20 Pfizer.

21     Q.   And at Wyeth, what was your job?
22 What were your duties?

23     A.   I had different roles while at
24 Wyeth.  I was section leader for a period of

Page 13

1 time.  I also was the manager of an R&D group.
2 I was associate director of quality control, I
3 was director of quality operations.  I was
4 assistant vice president of quality operations,
5 and I was vice president of technical services.

6     Q.   Okay.  So essentially, what were
7 your specific duties, if you can recall?

8     A.   Is manage a small group of
9 scientists.

10     Q.   Who were doing research for Wyeth?

11     A.   Research for Wyeth.

12     Q.   And that goes back to your sort of
13 analytical chemistry background?

14     A.   Exactly.

15     Q.   And then manager of R&D with
16 Wyeth, what were your duties there?

17     A.   Is similar.  Managing a group of
18 scientists that develop analytical methods, and
19 also were involved in product development.

20     Q.   And then did you say associate
21 director of quality control?

22     A.   Yes.

23     Q.   And your duties there?

24     A.   I manage a laboratory that was

Page 14

1 responsible for ensuring that the products that
2 we made at the manufacturing facility were made
3 according to the specifications that we had for
4 the product and that we made the regulatory
5 requirements that the government had for us.
6    Q.   Okay.  So just so I understand, so
7 that would be more of the -- you were quality
8 control for the manufacturing, the creation of
9 some sort of a pharmaceutical product?
10    A.   Right.  I'm making sure the
11 product was made right, according to the
12 regulation and according to our specifications.
13    Q.   And then after the associate
14 director?
15    A.   Yeah.  I became the director of
16 that particular manufacturing facility.
17    Q.   So same duties, just a step up?
18    A.   Higher, but also I have the
19 quality assurance group, the communication
20 group, the deviations group, the change control
21 group.
22    Q.   And then what was your next
23 position at Wyeth?
24    A.   System vice president of quality

Page 15

1 operations.  That was in Puerto Rico.  I was
2 sent to Puerto Rico for two years to address
3 some regulatory compliance issues that our
4 company had at the manufacturing site in Puerto
5 Rico.
6    Q.   So were those issues related to
7 the -- following proper guidelines, things like
8 that, with regard to the creation of products?
9    A.   No.  Making the product according
10 to the government expectations.
11    Q.   Okay.  And so was that the final
12 position at Wyeth before you joined Cardinal on
13 December 1st?
14    A.   No.  I then came to the
15 headquarters of the pharmaceutical business in
16 Collegeville, Pennsylvania.  I became the head
17 of technical services.
18    Q.   And at technical services -- head
19 of technical services, what were your duties?
20    A.   My duties was ensuring -- I mean,
21 working with the manufacturing facility across
22 the world, making sure that the execution of the
23 processes were optimized, that we improved the
24 quality of our work processes and systems.

Page 16

1    Q.   Processes and systems related to
2 production of product?
3    A.   Product -- products, yeah.
4    Q.   At any point while you were at
5 Wyeth, did you oversee distribution services
6 that Wyeth had?
7    A.   I managed manufacturing facility,
8 we had a warehouse and we distributed products
9 to our distribution centers.
10    Q.   But not the same kind of
11 distribution services that Cardinal provides?
12    A.   Not like we do here, no.  It went
13 from our manufacturing facility to a
14 distribution center.
15    Q.   And your primary duties at Wyeth
16 was to oversee how the product was made, whether
17 it followed guidelines and manufacturing
18 requirements?
19    A.   Correct.
20    Q.   And so then in December of 2009,
21 Cardinal brought you in and they brought you
22 straight into senior vice president of QRA,
23 which is quality regulatory -- remind me the A.
24 It's not affairs, it is --

Page 17

1    A.   It's regulatory affairs.
2    Q.   Okay.  And so your duties in that
3 position were what?
4    A.   Was supposed to make sure that the
5 departments that I managed comply with the
6 regulations and expectations from the
7 government, and that we execute according to our
8 quality procedures.
9    Q.   And you were brought in to -- you
10 were brought in by Cardinal to make sure that
11 QRA was improving, correct?
12    A.   Yes.
13       MS. WICHT:  Objection to the form
14    of the question.
15       Go ahead.  You can answer.
16    A.   I was brought in to make sure that
17 we have a solid quality and regulatory program
18 at Cardinal Health.
19    Q.   You were brought in, though, to
20 fix QRA, right?
21       MS. WICHT:  Object to the form of
22    the question.
23    A.   I don't believe I -- you know, my
24 understanding, I was brought in to make sure the

Page 18

1 company had a robust quality and regulatory
2 compliance program.
3     Q. And when you got there, did it
4 have a robust quality and regulatory program?
5     A. There were some things that I
6 wanted to improve, like my philosophy over my
7 career is to take what is -- what we have today
8 and try to make it better.
9     Q. And that's why Cardinal brought
10 you in?
11        MS. WICHT: Object to the form of
12    the question.
13     A. I mean --
14     Q. To your knowledge, that's why
15 Cardinal brought you in?
16        MS. WICHT: Object to the form of
17    the question.
18     A. To my knowledge, Cardinal brought
19 me in to make sure that the company had a robust
20 quality and regulatory compliance program.
21     Q. And the purpose of the quality
22 regulatory compliance at Cardinal is to
23 prevent -- to prevent diversion of their
24 products; is that one of the primary goals?

Page 19

1        MS. WICHT: Object to the form of
2    the question.
3     A. They are -- I mean, I was
4 responsible for different compliance programs.
5 Repack -- our -- I was responsible for our
6 repackaging operations, for our pharmacy
7 services operations. I was responsible for the
8 over-the-counter sourcing program.
9     And one of the programs that I was
10 responsible for, too, it was the anti-diversion
11 program.
12     Q. And aside from anyone who was
13 above you at Cardinal, you were solely
14 responsible for overseeing the anti-diversion
15 and those who were working in that department,
16 correct?
17     A. When I came --
18        MS. WICHT: Object.
19    If you could just pause for one
20    moment before you answer, just in case I
21    need to lodge an objection.
22        THE WITNESS: Okay, sorry.
23        MS. WICHT: No, that's fine. No
24    problem.

Page 20

1        Object to the form of the
2    question.
3     And now you can answer, if you
4    remember what the question was.
5     A. Can you repeat the question,
6 please?
7 BY MR. KROEGER:
8     Q. Sure. So you had at least one
9 person above you when you joined Cardinal,
10 right?
11     A. I had reporting to Craig Morford.
12     Q. Okay. And there was no one
13 between you and Craig Morford who was also
14 responsible for the anti-diversion; is that
15 right?
16     A. Correct.
17     Q. And then you oversaw the
18 anti-diversion program in its total?
19     A. There were -- when I got there,
20 there were two people between me and the vice
21 president of the anti-diversion program.
22     Q. Who were those two people?
23     A. Mark Hartman was reporting
24 directly in to me, and then Michael reported in

Page 21

1 to Mark Harman.
2     Q. By "Michael," you mean Michael
3 Moné?
4     A. Michael Moné, yes.
5     Q. But as you said, Hartman reported
6 to you, correct?
7     A. Correct.
8     Q. And you then reported to
9 Mr. Morford?
10     A. And I reported in to Craig
11 Morford, yes.
12     Q. And so I'm just trying to
13 understand the chain of command there. There's
14 not an equal to you; there's Mr. Hartman, who's
15 reporting to you, Mr. Moné, who is reporting to
16 him; is that right?
17     A. That was the chain of command,
18 yes.
19     Q. Okay. And so then that puts you
20 on top of the anti-diversion for Cardinal at the
21 time you entered, correct?
22        MS. WICHT: Object to the form of
23    the question.
24     A. That put me in charge of that

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 program, as well as other programs at Cardinal
2 Health.
3     Q.   No, I understand that Cardinal
4 gave you many duties.  But in particular, you
5 were responsible for the anti-diversion programs
6 at Cardinal, correct?
7         MS. WICHT:  Object to the form of
8     the question.
9     A.   Myself and other folks in my
10 management team.
11     Q.   The other folks reported to you,
12 though, correct?
13     A.   Reported to me, and correct, I
14 reported to Craig Morford.
15     Q.   Okay.  In that role, you had to
16 oversee compliance with the DEA; is that right?
17         MS. WICHT:  Object to the form of
18     the question.
19     A.   I was supervising the group that
20 was responsible for ensuring compliance with DEA
21 regulations.
22     Q.   And that group that you were
23 supervising, you were responsible for ensuring
24 that their decisions were within guidelines the

Page 23

1 DEA had put forward; is that right?
2         MS. WICHT:  Object to the form of
3     the question.
4     A.   We were responsible -- I was
5 responsible for making sure that we have robust
6 processes and systems to ensure that we comply
7 with the regulations set in -- by DEA.
8     Q.   Okay.  But my question -- and I
9 understand what your answer was, but the
10 question I was asking was:  You were responsible
11 for ensuring that those below you were complying
12 and making decisions that were in compliance
13 with DEA regulations?
14     A.   My role was to supervise the
15 group.
16     Q.   Right.
17         So the buck stopped with you in
18 terms of that, aside from it going up to
19 Mr. Morford should he disagree with decisions
20 you made?
21         MS. WICHT:  Object to the form of
22     the question.
23     A.   The responsibility is mine, as
24 well as my direct reports, and as well as my

Page 24

1 boss, and other people in the company, too.
2     Q.   Okay.  And then that's true, also,
3 for compliance with FDA regulations?
4         MS. WICHT:  Object to the form of
5     the question.
6     A.   Similarly.
7     Q.   And with regard to boards of
8 pharmacy for various states --
9         MS. WICHT:  Same objection.
10         Sorry.
11 BY MR. KROEGER:
12     Q.   If the question isn't clear,
13 because I know it was a half question.  Let me
14 just say it another way.
15         So your duties to supervise those
16 who were dealing with compliance, your duty to
17 ensure that the company was in compliance, was
18 also with regard to regulations put forth by
19 state boards of pharmacy, correct?
20         MS. WICHT:  Object to the form of
21     the question.
22         You can answer.
23     A.   My role is to ensure that we have
24 robust system and management control to ensure

Page 25

1 that we comply with the regulations from Board
2 of Pharmacy, as well as federal agencies.
3     Q.   So a robust system to comply -- do
4 you want to say it one more time for me?
5         MS. WICHT:  Say his answer again?
6         MR. KROEGER:  If you don't mind.
7     A.   Repeat the question.
8     Q.   Well, it seems that you have --
9 your job was to create a robust system to comply
10 with -- and then you have -- you said something
11 else.
12     A.   My role is to ensure that we have
13 processes, systems in place to ensure that we
14 adhere to federal and Board of Pharmacy
15 regulations.
16     Q.   Okay.  In addition to compliance
17 with DEA, FDA, Boards of Pharmacy regulations,
18 did you also have a voice in trade
19 organizations?
20         MS. WICHT:  Object to the form of
21     the question.
22     A.   I was not an active member of
23 trade organizations.  I participated in several
24 meetings, but myself, I was not on the board or

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1  any -- any leadership position with trade
2  groups.
3      Q.   But in your role as senior vice
4  president of QRA and Cardinal, did you have a
5  voice with, for instance, the HDMA or HDA?
6          MS. WICHT:  Object to the form of
7      the question.
8      A.   We participated in meetings where
9  we provided our opinion and position as a
10  company.
11      Q.   Okay.  And so within Cardinal's
12  company position that they would present to HDA
13  or HDMA, you had a voice in that process; is
14  that right?
15          MS. WICHT:  Object to the form of
16      the question.
17      A.   In some meetings I did.
18      Q.   Okay.  During your time at
19  Cardinal, and in your role -- you're still at
20  Cardinal, correct?
21      A.   I'm still at Cardinal, yes,
22  correct.
23      Q.   And your position, you're still
24  with QRA; is that right?

Page 27

1      A.   Yes.
2      Q.   But your position has changed a
3  bit, I think in title, and you've moved up,
4  correct?
5      A.   I'm the chief quality and
6  regulatory affairs officer with the focus on
7  manufacturing operations.
8      Q.   Okay.  So more back to your
9  background that you had at Wyeth?
10          MS. WICHT:  Object to the form of
11      the question.
12      A.   I have some similar
13  responsibilities that I had at Wyeth but with a
14  wider scope now.
15      Q.   Okay.  How long were you senior
16  vice president of QRA?
17      A.   Specifically to a segment or
18  specifically to the company as a whole?
19      Q.   I don't know that I know the
20  difference.  So you were brought in
21  December 1st, 2009 as senior vice president of
22  quality regulatory affairs, correct?
23      A.   For the pharmaceutical segment.
24      Q.   Okay.  And the other segment is

Page 28

1  the --
2      A.   Medical segment.
3      Q.   Okay.  So that's like medical
4  devices and the like?
5      A.   Yes, correct.
6      Q.   Okay.  So how long were you senior
7  vice president for QRA of pharmaceuticals?
8      A.   From -- still have responsibility
9  over some portions of the pharmaceutical
10  segment, so I started in December 2009, I
11  believe, until September 2015, I believe.  But I
12  still have some responsibilities in the
13  pharmaceutical segment.
14      Q.   Because that falls under the
15  umbrella of the chief of QRA?  Is that what --
16  I'm sorry.  Your title -- current title is
17  chief --
18      A.   Quality and regulatory affairs
19  officer.
20      Q.   Okay.  And so you still have the
21  pharmaceutical under you because you have all of
22  QRA for Cardinal?
23      A.   There are portions of the
24  pharmaceutical segment quality unit that do not

Page 29

1  report in to me.
2      Q.   Okay.  And that's as of 2015?
3      A.   As of 2015 and there have been
4  some minor changes to it after that.
5      Q.   Which portion of the
6  pharmaceutical QRA no longer reports to you?
7      A.   The anti-diversion group.
8      Q.   Oh.  And when did that start?
9      A.   That was September 2015.
10      Q.   So in September of 2015, the
11  anti-diversion portion of QRA was -- was it
12  moved, or were you moved?  How did that happen
13  that it no longer reported to you?
14      A.   I received additional
15  responsibility over the medical segment, and
16  that particular department was transferred
17  directly to my boss.
18      Q.   Which is Craig Morford?
19      A.   Craig Morford.
20      Q.   So from 2015, and is that
21  currently still the case?
22      A.   I think Todd Cameron now reports
23  in to Jessica Mayer.
24      Q.   Todd Cameron reports in to who?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  I'm sorry.
2      A.   Jessica Mayer.
3           - - -
4      (Cardinal-Quintero Exhibit 1 marked.)
5           - - -
6  BY MR. KROEGER:
7      Q.   Okay.  So from 2009 to '15 -- I'm
8  going to hand you 4591.
9           If you could just take a look at
10 that for me.  So obviously 2009 is when you
11 started, December 1st, but there's only a month
12 of 2009 and then we get to 2010.
13          So from the beginning of 2010
14 until 2012, does this accurately reflect the
15 chain of command for QRA?
16     A.   I never --
17          MS. WICHT:  Can I just pause?
18          I just want to ask a clarifying
19     question.  Is this a document that was
20     produced, or is this something -- like a
21     demonstrative that plaintiffs created?
22          MR. KROEGER:  To my knowledge,
23     it's something that we've created,
24     but...

Page 31

1           MS. WICHT:  Okay.  I just wanted
2      to clarify which was the case.  Okay.
3      A.   I don't believe it is 100 percent
4  correct.  I never interacted with Gary Dolch,
5  so...
6      Q.   Okay.
7      A.   I know that he was in the company
8  before me, but I don't know who he is.
9      Q.   He may not have --
10     A.   I've never met him.
11          Also, lacking from this
12 organizational chart is Mark Hartman that was
13 with me for a portion of 2010.
14     Q.   And as we said earlier, Mark
15 Hartman reported to you, correct?
16     A.   Yes.
17     Q.   So generally speaking, aside from
18 Gary Dolch, your not being familiar with him
19 having worked with you or for you, and missing
20 Mark Hartman, this is accurate?
21     A.   No, because Michael Moné and Steve
22 Reardon, during that period of time, reported in
23 to Mark Hartman.
24     Q.   I see.  Okay.

Page 32

1           And then from 2010 -- I'm sorry,
2  2012 to '15, who reported to you; do you recall?
3  It's not on that.
4      A.   Okay.  I have recollection.  I
5  have many people reporting to me, including
6  Michael Moné, Steve Reardon.
7           What was the period of time again?
8      Q.   '12 to '15.
9      A.   Kathy Kwarcinski was reporting in
10 to me at one point.
11     Q.   Are these direct reports?
12     A.   Yeah, direct reports.
13          I have, from what I remember,
14 between five and seven direct reports, but I
15 will have to review the organizational chart
16 from that period of time to be able to tell you
17 exactly how many people reported in to me.
18     Q.   Michael Moné, though, was a direct
19 report of yours from when you started until
20 2015; is that fair?
21     A.   Not from when I started.
22     Q.   Not from when you started?
23     A.   No.
24     Q.   Because he reported to

Page 33

1  Mr. Hartman, who reported to you?
2      A.   Correct.
3      Q.   And then Mr. Hartman left in 2010,
4  sometime in 2010, he left Cardinal; is that
5  right?
6      A.   I believe that he left sometime in
7  2010 or early 2011.  I don't recall the exact
8  date.
9      Q.   And once he left, is that when
10 Mr. Moné became a direct report to you?
11     A.   Correct.
12     Q.   During your time at Cardinal, I
13 think you've made a declaration in the past that
14 millions have been devoted to anti-diversion; is
15 that true?
16          MS. WICHT:  Object to the form of
17     the question.
18     A.   We have invested millions of
19 dollars in creating a program that is effective
20 against the prevention of diversion of drugs.
21     Q.   How many millions would you
22 estimate?
23     A.   I will say with certainty, more
24 than $25 million, but I don't recall the exact

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  amount.
2      Q.   And that's over the course of the
3  time you've been with Cardinal?
4      A.   That is over the time that I was
5  at Cardinal.  Probably some of this investment
6  was before I got there, too.
7      Q.   So that's not a yearly $25 million
8  investment, that's a sum total from possibly
9  right before you got there until now?
10     A.   And when --
11         MS. WICHT:  Object to the form of
12     the question.  Mischaracterizes prior
13     testimony.
14     A.   When I was talking about
15  investment, I thought you were asking me about
16  capital investment.  We continuously invest.  We
17  have a program with people that we pay on an
18  annual basis, and those investments are ongoing.
19     Q.   And how much over those same
20  number of years would you imagine or do you know
21  Cardinal has invested in sales?
22         MS. WICHT:  Object to the form of
23     the question.
24     A.   I wouldn't know that because I'm

Page 35

1  not part of the sales group.
2      Q.   So you have no idea how many
3  millions Cardinal may have invested over those
4  same years?
5         MS. WICHT:  Object to the form of
6     the question.
7      A.   I don't know the answer to that
8  question.
9      Q.   And can you explain the purpose of
10  anti-diversion?  I think we've kind of touched
11  on it, but specifically, what is the purpose of
12  having an anti-diversion program at Cardinal?
13     A.   The purpose is to make sure that
14  we comply with the element of the Controlled
15  Substances Act, that we have effective controls
16  against diversion, that we identify and report
17  suspicious orders to the government.
18     Q.   Okay.
19     A.   Plus --
20     Q.   Go ahead.  Sorry.  I didn't want
21  to cut out off.
22     A.   That's basically the foundation of
23  our responsibility of the anti-diversion
24  process.

Page 36

1         ---
2     (Cardinal-Quintero Exhibit 2 marked.)
3         ---
4  BY MR. KROEGER:
5      Q.   I'm going to hand you what's been
6  marked as Exhibit 2.  And since this is the
7  first exhibit I'm handing you with multiple
8  pages, I want to explain a little bit about how
9  we're trying to keep track of page numbers, just
10  to avoid confusion.
11         If you notice at the top right
12  corner of the document that you have, there's a
13  P1 number.
14     A.   Uh-huh.
15     Q.   P1.4091.
16     A.   Yes.
17     Q.   If you turn to the second page
18  you'll notice there's now 4091.2.
19     A.   Uh-huh.
20     Q.   So throughout the day, any
21  exhibits that we use, we're going to be
22  referring to the page numbers at the top because
23  some of these documents may have disjointed page
24  numbers, other issues.  This is just a way to

Page 37

1  keep track.
2      A.   Okay.
3      Q.   So if I ask you to go to Page 2,
4  which I am, you'll go to that top right corner.
5         So if you'll go to Page 2 of
6  Exhibit 2, and I want to draw your attention to
7  Paragraph 4.
8      A.   Uh-huh.
9      Q.   So your responsibilities, if you
10  could -- in this role, do you see that sentence
11  in Paragraph 4?
12     A.   Yes, I do.
13     Q.   Could you read that, please.
14     A.   "I have held the current position,
15  senior vice president of quality and regulatory
16  affairs, since I joined Cardinal Health in
17  December of 2009.  In this role, I am
18  responsible for overseeing all the quality and
19  compliance programs within the company's
20  pharmaceutical segment."
21     Q.   Okay.  So it's all quality and
22  compliance programs within the pharmaceutical
23  segment that you're overseeing, correct?
24     A.   Correct.

Page 38

1      Q.   And if we can go down to Paragraph
2  5, the second sentence in Paragraph 5, if you
3  could read that.
4      A.   "We have invested millions of
5  dollars in people and technology to support our
6  anti-diversion programs."
7      Q.   Continue, please.
8      A.   "To the best of my knowledge, the
9  company has not distributed controlled
10 substances to any customer that it believed
11 would divert those drugs into other than
12 legitimate medical channels."
13     Q.   So since 2009 -- and I know this
14 statement that you're looking at actually was
15 from April of 2012.  So it's not necessarily
16 current, but you still stand by that statement?
17         MS. WICHT:  Object to the form of
18     the question.
19     A.   I stand by the statement that we
20 have a program in place that provides effective
21 controls against diversion.
22     Q.   So since 2012, you're backing off
23 of your statement that you don't believe
24 Cardinal has distributed controlled substances

Page 39

1  to any customer that it believed would divert
2  those drugs into other than legitimate medical
3  channels?
4      A.   We have never --
5          MS. WICHT:  Object to the form of
6      the question.  Mischaracterize.
7      A.   To the best of my knowledge, we
8  have never distributed drug products other than
9  for legitimate medical purposes.
10     Q.   Okay.  But it sounds like you've backed
11 off from this statement a bit since 2012.
12         MS. WICHT:  Object to the form of
13     the question.
14     A.   I don't believe so.
15     Q.   Okay.  So --
16     A.   It's consistent with what I'm
17 saying.
18     Q.   All right.  Just let me -- to be
19 clear, then, as you sit here today, 2018, you
20 believe that, to the best of your knowledge, the
21 company, Cardinal Health, has not distributed
22 controlled substances to any customer that it
23 believed would divert those drugs into other
24 than legitimate medical channels?

Page 40

1      A.   I believe so.
2      Q.   Okay.  In order to get there, to
3  come to that belief, you've had to supervise and
4  oversee the anti-diversion program.
5          How many employees did you have in
6  the anti-diversion program over the -- when you
7  started and until you left?
8      A.   I do not recall the exact count,
9  but I can tell you some of the numbers.  In
10 people that were reporting directly into Michael
11 Moné's group, we had between 16 and 22,
12 somewhere in that range.  And people that
13 reported in to Steve Reardon, we had anywhere
14 from 20 to 30 employees.  Those numbers may have
15 changed over time as we were, you know, either
16 adding resources for investigations.
17         We also brought in companies from
18 the outside to help us with several of the
19 elements of the anti-diversion program.
20     Q.   So 16 to 22 people from Michael
21 Moné?
22     A.   In that range.
23     Q.   And what specifically was he
24 tasked with within anti-diversion?

Page 41

1      A.   He was tasked with -- this program
2  has several elements.  He has a -- part of his
3  program was our Know Your Customer program.
4  Part of his program was the monitoring of
5  orders.  Part of his program was making
6  decisions of which customers to continue selling
7  drug product and which customers we should
8  terminate because they had the potential to pose
9  a risk for diversion of drug product.
10     Q.   Okay.  And so with regard to
11 Michael Moné's responsibility for the Know Your
12 Customer portion of anti-diversion, he reported
13 to you with regard to that, correct?
14     A.   All his responsibility, you know,
15 he reported in to me.  I was his supervisor.
16     Q.   Okay.  And I just want to make
17 sure, though.  I want to be clear that there
18 wasn't a part of this, there's not -- the Know
19 Your Customer or the order monitoring or the
20 customer decisions in terms of termination or
21 continuing, none of those were reported to
22 someone besides you, correct?
23     A.   He reported directly in to me.
24     Q.   On all of those issues?

Highly Confidential - Subject To Further Confidentiality Review

Page 42

1    A.   On the activities of his
2  department.
3    Q.   And so you had oversight and had
4  to determine whether or not he was doing those
5  things properly?
6        MS. WICHT:  Object to the form of
7    the question.
8    A.   My job was to, you know, supervise
9  him and assess his performance.
10   Q.   And to make sure that he was doing
11  his job well?
12       MS. WICHT:  Object to the form of
13    the question.
14   A.   Correct.
15   Q.   And to make sure that he was doing
16  his job correctly?
17       MS. WICHT:  Object to the form of
18    the question.
19   A.   To supervise activities that he
20  was performing, yes.
21   Q.   And you mentioned briefly earlier
22  about complying with DEA regulations and the
23  like, correct?
24       MS. WICHT:  Object to the form of

Page 43

1    the question.
2    Q.   You mentioned it?  That's the
3  question right now.
4    A.   One of his roles was to make sure
5  that we, you know, met the regulations.
6    Q.   And so one of your roles as his
7  supervisor was to ensure that his decisions were
8  in line with those regulations?
9        MS. WICHT:  Object to the form of
10    the question.
11   A.   My role as his supervisor was to
12  supervise his activities and determine whether
13  or not he was doing an adequate job or he needed
14  some guidance from me.
15   Q.   Okay.  And the question, though,
16  is a slightly different one than what you're
17  answering.  So as you're supervising him and his
18  duties and deciding whether or not he was doing
19  well or needed additional guidance from you,
20  part of that supervision was to ensure that his
21  actions and decisions were in line with DEA
22  regulations?
23   A.   To supervise --
24       MS. WICHT:  Object to the form of

Page 44

1    the question.  Sorry.
2    A.   It was to supervise him and ensure
3  that he was executing according to my
4  expectations and that we were executing
5  according to the regulations.
6    Q.   Okay.  So it was -- the
7  regulations was part of your consideration with
8  determining whether or not he was executing
9  things properly?
10   A.   It was one of the factors, yes.
11   Q.   You certainly wouldn't have wanted
12  him to make decisions outside of the
13  regulations?
14       MS. WICHT:  Object to the form of
15    the question.
16   A.   No.
17   Q.   And then with Mr. Reardon, what
18  were his responsibilities?
19   A.   His responsibility was to manage
20  and supervise the compliance personnel that we
21  had at our distribution centers.
22   Q.   And the compliance personnel, was
23  that -- were those the individuals -- there was
24  maybe one at each distribution center?

Page 45

1    A.   In general, we have one person at
2  each distribution center.
3    Q.   And Mr. Reardon supervised those
4  27 individuals?
5    A.   Well, he supervised people that
6  supervised those individuals.  He also managed
7  the -- some of the training activities that we
8  had, and he also managed our document management
9  system.
10   Q.   "Document management system,"
11  meaning what?
12   A.   The system that we use to publish
13  standard operating procedures.
14   Q.   I'm sorry.  I didn't understand.
15  To --
16   A.   To manage and distribute standard
17  operating procedures.
18   Q.   Okay.  Any other duties with
19  regard to anti-diversion for Mr. Reardon at that
20  time?
21   A.   He managed -- he was responsible
22  for ensuring that we had the proper controls in
23  place at the distribution center to make sure
24  that we don't have internal diversion of product

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 and that our carriers were complying with our
2 expectation in terms of delivering products to
3 our customers.
4      Q.   So then is it fair to say that
5 between Mr. Moné and Mr. Reardon, they both had
6 certain oversight with regard to distribution
7 centers?
8           MS. WICHT:  Object to the form of
9      the question.
10      A.   Mr. Moné was responsible for the
11 anti-diversion program, mainly dealing with our
12 customers, and Mr. Reardon had responsibilities
13 for our internal controls that we had at the
14 distribution center to ensure that we did not
15 have internal diversion of product.
16      Q.   Okay.  So Mr. Reardon -- the
17 diversion that Mr. Reardon was most concerned
18 with, then, was internal diversion, so if an
19 employee might steal drugs or lose drugs or
20 something to that effect?  Is that an accurate
21 description?
22      A.   He had those responsibilities, but
23 he also had responsibility for making sure if
24 employees at the distribution center saw an

Page 47

1 order that, for them, was of unusual size, that
2 they could raise the hand and notify Michael
3 Moné's group for an investigation.
4      Q.   Okay.  So a picker or a checker,
5 are those the people you're talking about?
6      A.   Picker or checker.
7      Q.   So if a picker or checker sees an
8 order that seems too large to them, they then
9 report to Mr. Reardon, we have an order that's
10 suspicious because it's just too big,
11 Mr. Reardon then tells Mr. Moné?
12           MS. WICHT:  Object to the form of
13      the question.
14      A.   Essentially, it's a little bit
15 different than that.  It's if a picker or a
16 checker determined the order was unusual, it
17 goes through their supervisor.  Supervisor
18 communicates to the compliance officer, which
19 then has some communications with personnel in
20 the anti-diversion group.
21      Q.   Which personnel in the
22 anti-diversion group?
23      A.   Could be a pharmacist in the
24 anti-diversion group.  I don't recall exactly

Page 48

1 what was the chain of communication, but it was
2 somebody in the anti-diversion group.
3      Q.   And whichever somebody that may
4 have been in the anti-diversion group, that was
5 someone whose decisions you were also
6 responsible for, correct?
7           MS. WICHT:  Object to the form of
8      the question.
9      A.   I was responsible for supervising
10 Michael Moné's team.
11      Q.   And those anti-diversion personnel
12 you were talking about are on Michael Moné's
13 team, correct?
14      A.   That's correct.
15      Q.   So decisions that they made,
16 Michael Moné was responsible for ensuring that
17 they were proper, correct?
18           MS. WICHT:  Object to the form of
19      the question.
20      A.   He was responsible for supervising
21 people in his group.
22      Q.   And within his responsibilities
23 for supervising people within his group, that
24 included ensuring that they made proper, lawful

Page 49

1 decisions?
2           MS. WICHT:  Object to the form of
3      the question.
4      A.   That they made decisions with --
5 in the spirit of complying with our own internal
6 expectations and with the regulatory
7 requirements.
8      Q.   Okay.  You added a bit of a caveat
9 there.  So you said "in the spirit of
10 complying."  Was that in the spirit of complying
11 with Cardinal's internal, or in the spirit of
12 complying with Cardinal's internal policies and
13 in the spirit of complying with the law?
14           MS. WICHT:  Object to the form of
15      the question.
16      A.   With the intent of complying with
17 both.
18      Q.   Completely?
19           MS. WICHT:  Object.
20      A.   Our intent to comply with
21 regulations.
22      Q.   Completely?
23           MS. WICHT:  Object to the form of
24      the question.

Page 50

1      A.   It's our intent always to comply
2  with regulations.
3      Q.   Okay.  The only reason I'm asking
4  this in this way is because you said "in the
5  spirit of complying" to start this answer.  And
6  so I want to ensure that I know whether or not
7  the job was to comply with regulations and laws
8  and policies partially because it's in the
9  spirit of it or completely because it simply has
10  to be followed?
11      MS. WICHT:  Object to the form of
12  the question.
13      A.   Maybe because English is my second
14  language, but it's with the intent of complying
15  with the regulations.
16      Q.   Completely?  With your -- it's the
17  intent to comply with the regulations
18  completely?
19      MS. WICHT:  Object to the form of
20  the question.
21      A.   Our intent is always to comply
22  with the regulations.
23      Q.   And why is it that you won't say
24  your intent is to comply with the regulations

Page 51

1  completely?
2      MS. WICHT:  Object to the form of
3  the question.
4      A.   Because our intent, that's
5  implied.  If our intent is to comply with the
6  regulations, it means the same thing that you're
7  saying.
8      Q.   And that's why I was asking,
9  because I wanted to make sure that it does.  So
10  I was choosing that word carefully, I wanted to
11  make sure.
12      So the intent is to comply with
13  regulations completely?
14      MS. WICHT:  Object to the form of
15  the question.
16      A.   Our intent is to always comply
17  with federal regulatory requirements.
18      Q.   Okay.  So you just -- okay.
19      Was there also a group of
20  executives who met and regularly looked at
21  anti-diversion?
22      MS. WICHT:  Object to the form of
23  the question.
24      A.   We provided updates to my boss and

Page 52

1  other members of the leadership team.
2      Q.   And is that the name of that
3  group, was the leadership team?
4      A.   That's the way that I call it.  I
5  don't think that there was a specific name.
6      Q.   And you said "we provided that
7  information."  Who's the "we"?
8      A.   Michael Moné, myself, Bob
9  Giacalone, which was -- he is our senior
10  regulatory counsel, and we provided updates on
11  our program to Craig Morford and to Mike
12  Kaufmann at that time.
13      Q.   Within -- I'm trying to figure out
14  who's where.  So were there -- it sounds like
15  Mr. Reardon's compliance personnel that reported
16  to him, they were generally located at the
17  distribution centers; is that accurate?
18      A.   We have many of them that are --
19  were in distribution centers.  Others were
20  regional directors that managed those folks.
21  They worked from home or from one of the DCs.
22  And we had a few individuals that worked in our
23  Dublin headquarters.
24      Q.   Did they work in the Dublin

Page 53

1  headquarters because they had a particular need
2  to be in Dublin for executive reasons, or it
3  just happened that that's where they worked?
4      A.   It could be because they were
5  managing the document management system, which
6  for standard operating procedures, and we did
7  that out of our headquarters.  It could be
8  because they were managing a region that were
9  near the headquarters.
10      Q.   Okay.  And then with Mr. Moné's
11  group, you said 16 to 22 people who would
12  oversee Know Your Customer policies, also
13  oversee order monitoring, and decide on
14  customers to terminate or keep, were those
15  people centered in Dublin?
16      A.   We have a large portion of those
17  people in Dublin, but we also have some people
18  sitting at distribution centers.  I'm trying to
19  recall.
20      To the best of my knowledge, most
21  of them were either in Dublin, distribution
22  centers, or there were field investigators that
23  worked out of their home.
24      Q.   Sure.

Page 54

1 Because the field investigators
2 had to actually go to various places, so there
3 was no need for them to be in Dublin?
4     A.   Correct.
5     Q.   But the other part of Mr. Moné's
6 team that you oversaw was centered in Dublin,
7 sort of an executive group who decided on -- who
8 monitored and made decisions about orders,
9 monitored and made decisions about customers?
10     MS. WICHT:  Object to the form of
11 the question.
12     A.   The day-to-day decisions on
13 threshold events and shipping orders was not
14 done by the executive team.  It was done by
15 either analysts and pharmacists that their job
16 was to evaluate threshold events and make
17 decisions on suspicious orders.
18     Q.   And those evaluations and
19 decisions on suspicious orders ultimately were
20 the responsibility of Mr. Moné, as well,
21 correct, in that he was overseeing those people?
22     A.   He oversaw the people that made
23 those decisions.
24     Q.   Because of that, he took -- had to

Page 55

1 have responsibility for how those decisions were
2 made?
3     MS. WICHT:  Object to the form of
4 the question.
5     A.   He had responsibility for
6 supervising, managing, and developing procedures
7 to execute those decisions.
8     Q.   And ensuring that those decisions
9 were made in compliance with Cardinal rules and
10 laws?
11     MS. WICHT:  Object to the form of
12 the question.
13     A.   Can you repeat the question again?
14     Q.   In supervising those and
15 overseeing those decisions, he had to also
16 ensure that those decisions were made in
17 compliance with Cardinal rules, as well as laws?
18     A.   In supervising that group, he was
19 responsible for having processes in place to
20 make sure that his people were following our own
21 internal procedures, as well as meeting
22 regulatory requirements.
23     Q.   And as Mr. Moné's supervisor, you
24 were also then, in turn, responsible for those

Page 56

1 decisions and ensuring that they were in
2 compliance with Cardinal rules, as well as laws,
3 correct?
4     MS. WICHT:  Object to the form of
5 the question.
6     A.   As Michael Moné's supervisor, my
7 responsibility is that Michael had the proper
8 program to execute our anti-diversion program,
9 to ensure that we meet the regulations, and also
10 meet our own internal procedures.
11     Q.   With regard to those internal
12 procedures, were there -- you had a number of
13 different standard operating procedures within
14 Cardinal, correct?
15     A.   We have hundreds of standard
16 operating procedures within Cardinal.
17     Q.   And some of those -- let's focus
18 on the anti-diversion standard operating
19 procedures.  There would be one for how
20 distribution centers are supposed to monitor
21 orders, right?
22     A.   I'm assuming so.  I don't recall
23 all of the procedures that we had.
24     Q.   To your knowledge, though, the

Page 57

1 standard operating procedures, the very reason
2 that they're called that is because they apply
3 company-wide, correct?
4     A.   They applied to more than one
5 facility.
6     Q.   So the distribution centers would
7 be acting under the same standard operating
8 procedures?
9     A.   In most cases.
10     Q.   What cases would they not?
11     A.   Well, if they do something
12 different.  If they don't -- I mean, they have a
13 different -- for example, if a distribution
14 center doesn't have a vault and doesn't
15 distribute C2 substances, so that would not be
16 applicable to those.
17     Q.   But then all distribution centers
18 that have a vault and do distribute C2
19 substances -- and for the record, controlled
20 substance Schedule II -- those would all have
21 the same operating procedure with regard to how
22 they handle those drugs?
23     A.   In the same business units, yes.
24     Q.   Same business units?

Page 58

1    A.   Yeah.

2    Q.   Meaning what?

3    A.   Well, we had other business units
4 that we acquired over time.  We had bought a
5 distribution business in China, so they may have
6 different operating procedures according to
7 their regulations in China.

8    Q.   Sure.

9         Kind of like the Puerto Rico
10 distribution center and some of the issues there
11 were different than the United States --

12   A.   Yep.  Puerto Rico had some
13 different requirements based on local laws.

14   Q.   But within the United States,
15 within the -- there were 27 distribution centers
16 in the United States?

17   A.   I don't recall the exact number.
18 I know that it's somewhere between 20 and 30,
19 but it's possible it's 27.  I don't recall.

20   Q.   And to your knowledge, they -- if
21 they had a vault, if they were distributing
22 controlled substances -- Schedule II controlled
23 substances, they would be following the same
24 standard operating procedures as to those?

Page 59

1    A.   Only if it was noted in a
2 procedure that somebody else had a different
3 procedure.

4    Q.   Unless a distribution center said
5 they had their own procedure, they followed the
6 standard procedure?

7    A.   No.  There may be specific reasons
8 why -- like I use the example of China, the
9 example of Puerto Rico.

10   Q.   Sure.  But I want to stick with
11 just the United States-based distribution
12 centers.  I understand that there may be other
13 distribution centers across the world that have
14 different rules for a variety of reasons.  I'm
15 focused solely on, and my question is only
16 about, the distribution centers in the United
17 States.

18   A.   Including Puerto Rico?  Because
19 Puerto Rico is part of the United States.

20   Q.   It is.  It is.  And I certainly
21 don't intend to say that it's not.  But because
22 of local laws and local policies in Puerto Rico,
23 I want to exclude that from this particular
24 question.  Okay?

Page 60

1    A.   Okay.

2    Q.   Okay.  So the question, then, is:
3 Within -- and we can just say The Continental
4 United States, I think, to really capture it as
5 well as I need to -- within The Continental
6 United States, the distribution centers all
7 acted under the same standard operating
8 procedures as one another?

9    A.   The pharmaceutical distribution
10 centers operate under similar procedure -- under
11 the same procedures.

12   Q.   So, for instance, the facility --
13 the distribution center in Auburn, Washington,
14 has the same standard operating procedures as to
15 pharmaceuticals as the distribution center in
16 Wheeling, West Virginia?

17   A.   To the best of my knowledge,
18 that's the case.

19   Q.   And you were supervising those
20 distribution centers in your role as senior vice
21 president of QRA?

22        MS. WICHT:  Object to the form of
23     the question.

24   A.   They were -- those distribution

Page 61

1 centers, the compliance officers reported in
2 to -- through the chain of command through -- in
3 to somebody that reported in to me.

4    Q.   So it ultimately came to you,
5 those decisions and compliance with those
6 procedures?

7         MS. WICHT:  Object to the form of
8     the question.

9    A.   It is part of my role to ensure
10 that our company complies with our standard
11 operating procedures and the regulations.

12   Q.   Okay.  And so just like Auburn
13 distribution center and Wheeling distribution
14 center have the same standard operating
15 procedure with regard to pharmaceuticals,
16 Wheeling distribution center and Lakeland have
17 the same standard operating procedures?

18   A.   To the best of my knowledge, they
19 have the same standard operating procedures.

20   Q.   And that's been true from the day
21 you started December 1st, 2009 until today, to
22 your knowledge?

23   A.   To the best of my knowledge,
24 that's the case.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    MR. KROEGER: How long have we
2  been going?
3    VIDEOGRAPHER: 51 minutes.
4    MR. KROEGER: I don't know if now
5  is a good time. I know you have a
6  scheduled flight. That was the other
7  thing we weren't sure about this
8  morning. We were trying to remember.
9  You need to be out of here by when to
10 catch your flight?
11   MS. WICHT: I would say probably
12 4:30, if that's workable, but we're
13 happy to talk with you about it
14 throughout the day.
15   MR. KROEGER: Okay. All right.
16 Why don't we go off the record and take
17 a break.
18   MS. WICHT: Sure. Thank you.
19   VIDEOGRAPHER: Time is now 7:56.
20 Going off the record.
21   (Recess taken.)
22   VIDEOGRAPHER: Time is now 8:14.
23 Back on the record.
24

Page 63

1  BY MR. KROEGER:
2    Q.   Mr. Quintero, I wanted to go back
3  to a couple things that you said. You mentioned
4  the $25 million in capital investments over your
5  time at Cardinal.
6    A.   I believe so.
7    Q.   So that was 25 million in capital,
8  and that was since -- December of 2009, maybe
9  2010?
10   A.   I think that was --
11   MS. WICHT: Object to the form of
12 the question.
13   A.   I believe that some of those
14 investments were made before I got into Cardinal
15 Health, but I cannot tell you the exact time of
16 that.
17   Q.   So, then, at least, like, 10,
18 maybe 11 or 12 years, that that $25 million
19 capital investment has been spent?
20   MS. WICHT: Object to the form of
21 the question. Mischaracterizes his
22 prior testimony.
23   A.   I cannot tell you the exact
24 amount. Sorry.

Page 64

1    Q.   But you did say, though, that it
2  went -- precedes your time starting there, so
3  it -- you can say that it's at least the time
4  that you've been there that 25 million capital
5  investment has been spent?
6    MS. WICHT: Object to the form of
7  the question.
8    Q.   That's your testimony so far?
9    A.   From the time that I've been
10 there, I believe -- I don't recall the exact
11 amount, but I recall that we have invested
12 significant amount of money in our
13 anti-diversion program.
14   Q.   Earlier in your testimony, though,
15 was that it was around 25 million; that was the
16 number that you said, correct?
17   MS. WICHT: Object to the form of
18 the question. Mischaracterizes.
19   A.   To the best of my knowledge,
20 around $25 million have been invested in capital
21 as part of our anti-diversion program. I cannot
22 tell you the beginning or the end date of that.
23   Q.   Okay. And so can you explain to
24 the jury what that capital investment of

Page 65

1  $25 million was.
2    MS. WICHT: Object to the form of
3  the question.
4    A.   We have invested in an electronic
5  monitoring system. We invested in an
6  anti-diversion centralization system. We have
7  invested in analytical tools to evaluate
8  customers. We have invested in software. We
9  have invested in physical security at our
10 distribution centers.
11   Q.   When you say "physical security,"
12 are you talking about the cages and vaults?
13   A.   Cages, vaults, cameras. Reports
14 that we generate for the distribution personnel.
15   Q.   When you talked about the
16 electronic monitoring system, what is that?
17   A.   The electronic monitoring system
18 that we use to monitor orders.
19   Q.   So software?
20   A.   It is software. It is -- they use
21 codes.
22   Q.   Algorithms?
23   A.   Algorithms.
24   Q.   And is that something you got

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 through Deloitte, for instance?
2          MS. WICHT: Object to the form of
3     the question.
4     A.   I don't recall who was the person
5 who developed the electronic monitoring system.
6     Q.   Was Deloitte a company that you
7 believed that $25 million -- part of that $25
8 million capital investment would have gone to?
9          MS. WICHT: Object to the form of
10     the question.
11     A.   We have used Deloitte in parts of
12 our anti-diversion program.
13     Q.   Which parts?
14     A.   The parts that I can talk to is
15 the part where I used them.  I used them for
16 project management on some improvements that we
17 wanted to our anti-diversion program.
18     Q.   And how much do you think that
19 Cardinal spent on Deloitte's services?
20     A.   I don't recall.
21     Q.   Do you have a ballpark that you --
22          MS. WICHT: Object to the form of
23     the question.
24     A.   I don't recall.

Page 67

1     Q.   Have you ever had to send those
2 numbers to anyone else in Cardinal?
3          MS. WICHT: Object to the form of
4     the question.
5     A.   Trying to recollect, but I don't
6 recall.
7     Q.   Ever send the numbers or
8 expenditures for Deloitte to Mike Kaufmann, for
9 instance?
10     A.   It's possible, but I don't
11 recollect.
12     Q.   You sent -- you did send
13 expenditures to Mike Kaufmann, though, over your
14 time there, didn't you?
15          MS. WICHT: Object to the form of
16     the question.
17     A.   My expenditures were approved by
18 my boss, Craig Morford, not by Mike Kaufmann.
19     Q.   Did you ever have an opportunity
20 to send reports of any sort to Mike Kaufmann?
21          MS. WICHT: Object to the form of
22     the question.
23     A.   What kind of reports are you
24 talking here?

Page 68

1     Q.   Any.  I don't -- I -- I'm trying
2 to learn more about the inner workings of
3 Cardinal so I understand how things function and
4 don't.  So to that extent I don't know what kind
5 of reports.
6          Let me say it this way:  You
7 said -- in a declaration you mentioned at some
8 point that you had a dotted line connection
9 to -- or dotted line reporting, dotted line
10 relationship to Mike Kaufmann.
11     A.   I don't believe I said that today.
12     Q.   Not today, no, no, no.  I think it
13 was a dec -- the declaration that you have in
14 front of you.  I can find it.  But do you think
15 that you've never had a dotted line
16 relationship --
17     A.   I --
18          MS. WICHT: Go ahead.  Sorry.  I
19     was looking at the document.  Maybe you
20     can repeat the question so we know what
21     it is.
22     Q.   Currently, are you saying that
23 you've never previously had a dotted line
24 relationship to Mike Kaufmann?

Page 69

1     A.   I don't believe I said that.
2     Q.   Okay.  So you have had a dotted
3 line relationship to Mike Kaufmann?
4     A.   I had a dotted line to Mike
5 Kaufmann.
6     Q.   And what does that mean?
7     A.   That I was supposed to give him
8 updates on our quality programs and provide him
9 advice on quality and regulatory compliance to
10 him.
11     Q.   And was he the chief financial
12 officer at the time you had that dotted line
13 connection?
14     A.   No.
15     Q.   What was his position when you had
16 that?
17     A.   He was the chief executive officer
18 of the pharmaceutical segment.  I have never
19 reported to anybody in the finance organization.
20     Q.   Aside from what you mentioned
21 already about Deloitte sometimes helping you
22 with presentations and the like -- is that what
23 you said?
24     A.   I didn't say "presentations."  I

Page 70

1 said "project management."
2        Q.   Project management.
3             What else did Deloitte do for
4 Cardinal?
5        MS. WICHT:  Object to the form of
6        the question.
7        A.   During the time that I was there,
8 their primary role was project management.  They
9 also provided, you know, labor that could help
10 us, either do calculations or evaluate certain
11 things.
12        Q.   Do you recall which projects
13 Deloitte worked on?
14        A.   Not all.  I recall they worked for
15 me in some of the improvements that I wanted to
16 make on the anti-diversion program.
17        Q.   Okay.  So within the
18 anti-diversion program, what were the projects
19 they worked on for you?
20        A.   We were working on developing a
21 threshold methodology using additional
22 information that we had collected.
23        Q.   Can you explain that to me?  I
24 don't -- what is the threshold methodology you

Page 71

1 and Deloitte were able to come up with?  What
2 was it?
3        A.   Well, I don't think Deloitte came
4 up with.  I mean, we provided the information --
5 some of the information to Deloitte and they
6 helped us develop some of the principles of our
7 threshold methodology.
8        Q.   Which principles?
9        A.   Is that we are using script counts
10 from the pharmacy and national averages and
11 standard deviations to establish thresholds.
12        Q.   What's a script count?  I think I
13 know what a national average is, but what's a
14 script count?
15        A.   Is when you go to a pharmacy with
16 a script, that's one script.  If a hundred
17 people go to a pharmacy to fill the script,
18 that's a hundred scripts.
19        Q.   And script counts for all
20 prescriptions that a pharmacy fills or for a
21 particular section of scripts, such as for
22 controlled substances?
23        A.   The script count is the total
24 script count, which is all of the prescription

Page 72

1 that that pharmacy fills.
2        Q.   So it could be oxycodone, but it
3 also could be albuterol?
4        A.   It could be oxycodone.  It could
5 be albuterol.  It could be a beta-blocker.  It
6 could be a Lipitor.
7        Q.   And then with regard to the
8 national average, rather than me assuming I
9 know, what did Deloitte help you with in terms
10 of the national average, or how was that
11 employed?
12        MS. WICHT:  Object to the form of
13        the question.
14        A.   Deloitte didn't provide the
15 national average.  I got that information from
16 other sources.
17        Q.   What sources?
18        A.   IMS.
19        Q.   Okay.  Any other sources?
20        A.   We got additional information on
21 national averages from Symphony.
22        Q.   Symphony, is that a consulting
23 firm?  I don't know what Symphony is.
24        A.   Symphony is the data -- as I know

Page 73

1 them, it's a data collection firm.  I do not
2 know all the businesses that they have, but they
3 provide data to customers.
4        Q.   What data do they provide to
5 Cardinal?
6        A.   They provided data on script
7 counts, on average dispensing of controlled
8 substances for different drug families.
9        Q.   Anything else?
10        A.   Not that I recall at this point in
11 time.
12        Q.   So you talked about the script
13 counts, the national average that Deloitte
14 helped you bring into a new threshold
15 methodology; is that accurate?
16        A.   The primary role of Deloitte was,
17 you know, project management and they provided
18 additional resources as we required them.  But
19 they work under our direction.
20        Q.   What other projects do they work
21 on?
22        A.   Projects on different aspects of
23 our anti-diversion program, but if you ask me
24 the details at this point in time, I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 recall all of the products that they worked. I
2 can tell you --
3     Q.   Can you tell me the ones you do?
4     A.   The one that are most significant
5 to me was our project of establishing a new
6 threshold methodology.
7     Q.   And when was that new threshold
8 methodology?
9     A.   It was a process that probably
10 started in -- sometime in 2012, but I don't
11 remember the exact date.
12     Q.   And when did that project get
13 completed?
14     A.   We're continuously looking at how
15 to improve our system, so I cannot tell you
16 after my departure in 2015 if other changes were
17 made.
18     Q.   So at the time you shifted anti --
19 at the time that anti-diversion was no longer
20 under you in 2015, was Deloitte still assisting
21 with the threshold methodologies?
22     A.   I don't believe so.
23     Q.   Any other projects you recall
24 Deloitte working on?

Page 75

1     A.   Not that I recall.
2     Q.   Who did your algorithms?
3         MS. WICHT:  Object to the form of
4     the question.
5     A.   Can you elaborate on that?
6     Q.   You talked about algorithms
7 briefly.  Did you come up with the algorithms
8 yourself?
9         MS. WICHT:  Object to the form of
10     the question.
11     A.   No, we did not come up with the
12 algorithms ourselves.  It was a combination --
13 it was an evolution.  We used some internal
14 statisticians in our department.  We also hired
15 a mathematician.
16     Q.   Do you recall who that was?
17     A.   Her first name was Jen Marie.  She
18 is no longer with the company.  She moved out of
19 state.
20         We also used -- we validated some
21 of our models through a college professor at
22 Ohio State.
23     Q.   Is that the same college professor
24 who worked on Generation Rx?

Page 76

1     A.   I believe it is a different
2 person.
3     Q.   Do you recall who?
4     A.   I don't recall his name.  I mean,
5 most of the dealings with that college professor
6 was done by our anti-diversion team.
7         We also hired a company called
8 Healthcare Advising.
9     Q.   Who are they?
10     A.   They're an outfit out of San
11 Antonio, Texas.
12     Q.   What do they do?
13     A.   They do -- they advise the company
14 on healthcare, and they had some capabilities on
15 statistics.
16     Q.   When did you first work with
17 Healthcare Advising?
18     A.   The exact period of time, I don't
19 recall.  It had to be between '12 -- '07 and '12
20 or '07 and '13, in that period of time.
21     Q.   And do you recall for how long you
22 worked with Healthcare Advising?
23     A.   I don't recall the exact
24 engagement period that they worked for us.

Page 77

1     Q.   Any other projects that Deloitte
2 worked on?
3     A.   I believe you asked me that
4 question already, and I don't recall any other
5 projects.
6     Q.   Did you ever work with Dendrite?
7     A.   We used their services.
8     Q.   What services of theirs did you
9 use?
10     A.   To the best of my knowledge, we
11 used them to do field inspections.
12     Q.   Can you explain that to me,
13 please.
14     A.   Inspections or reviews of
15 pharmacies in the field.  Customers.
16     Q.   So Dendrite would send individuals
17 out to do a site visit; is that what you mean?
18     A.   Yes.
19     Q.   What kind of oversight did
20 Cardinal have of Dendrite personnel?
21         MS. WICHT:  Object to the form of
22     the question.
23     A.   Those people were supervised by
24 one of their supervisors, but they provided

Page 78

1  different work of site visits.
2      Q.   Framework of -- I'm sorry.  I
3  didn't understand.
4      A.   Of the site visits.
5      Q.   Of the site visits, okay.
6          So they would provide the
7  framework of the site visits?
8      A.   (Nods head.)
9      Q.   What does that mean?  Does that --
10         MS. WICHT:  Object to the form of
11     the question.
12         Sorry.  Go ahead.
13         I don't know who -- you said
14     "they" in your question, and it's not
15     clear to me that we're all talking about
16     the same person.
17         MR. KROEGER:  Yeah.
18 BY MR. KROEGER:
19     Q.   You were talking about Dendrite,
20  and the role -- and I was asking about the role
21  that they played in site visits.  I was also
22  asking about what oversight Cardinal had of
23  Dendrite personnel and what specifically
24  Dendrite personnel did with regard to site

Page 79

1  visits.  And so my understanding is that you
2  said that Dendrite employees would provide a
3  framework for the site visits.  Is that
4  accurate?
5      A.   No, I did not say that.
6      Q.   Okay.
7      A.   They provide the services of doing
8  the site visit.  We provided the forms that they
9  had to complete during site visits and we
10  provided the list of the customers that we
11  wanted them to visit.
12     Q.   When you say you provided the
13  forms, you mean physical forms, Cardinal would
14  provide paper forms that Dendrite personnel
15  would then go to a pharmacy and fill out?
16     A.   It could be paper, it could be
17  electronic forms.
18     Q.   But a questionnaire of sorts that
19  they would have to answer?
20     A.   They would be the forms that we
21  use to document our customer visits.
22     Q.   And when is it that Cardinal began
23  to delegate site visits to Dendrite personnel?
24         MS. WICHT:  Object to the form of

Page 80

1  the question.
2      A.   The word "delegation" is probably
3  not the right -- we used their services to help
4  us complete a number of visits.  We didn't
5  delegate.  We used their services.
6      Q.   Was it Cardinal personnel that was
7  performing the site visits, or was it Dendrite
8  personnel?
9      A.   We had both.  We have our own
10  personnel, and we used the services from
11  Dendrite at that time, I believe, to help us
12  perform some of the visits.
13     Q.   And was that because Cardinal
14  didn't have sufficient personnel to do all the
15  site visits needed on their own?
16         MS. WICHT:  Object to the form of
17     the question.
18     A.   It was because we were reacting to
19  changes in the regulatory environment, and there
20  were some additional visits that we wanted to
21  perform in a short period of time, so we used
22  outside resources to assist us with that.
23     Q.   Okay.  So the first question I
24  have about that is:  What period of time are we

Page 81

1  talking about that Dendrite was assisting you,
2  Cardinal, with site visits?
3      A.   To the best of my knowledge, they
4  were involved with some of our site visits from
5  sometime in 2012 and sometime in 2013, but I
6  don't recall the exact dates.
7      Q.   And you said this was due to
8  changes in the regulatory environment.  What
9  were the changes in the regulatory environment
10  that led Cardinal to decide we need to hire or
11  bring on Deloitte -- or Dendrite personnel to
12  assist us in site visits?
13     A.   Where we follow, you know, what's
14  going on in the public media, so we understand
15  there's, you know, an increase in use of certain
16  drugs in certain markets.  We may ask our team
17  to go to those markets and review the stores
18  that we have as customers or that we have
19  concerns.
20     Q.   Maybe I missed it, but I don't
21  understand where in your answer you talked about
22  changes in the regulatory environment.
23     A.   Well, there's changes in -- have
24  been changes in the expectations in the

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  regulatory environment over time. So -- and
2  expectations of pharmacies, expectations of
3  distributors.
4      Q.   And what were the changes?
5      A.   There have been changes over time.
6      Q.   Okay. But specific to what we're
7  talking about right at this moment, is there's a
8  point in time, you think it's in 2012 to
9  sometime in 2013 -- you're not certain of the
10 dates -- but in that two-year period, you said
11 that Cardinal enlisted assistance from Dendrite
12 to do site visits because there were changes in
13 the regulatory environment. So those are the
14 specific changes I'm asking about right now.
15     What were those changes in 2012
16 and '13 that you're talking about?
17     MS. WICHT: Object to the form of
18     the question.
19     A.   Some of the changes is the
20 expectations that the agency had with us and
21 other registrants.
22     Q.   The agency, being the DEA?
23     A.   DEA.
24     Q.   Drug Enforcement Agency of the

Page 83

1  United States?
2      A.   (Nods head.)
3      Q.   Is that a yes?
4      A.   Yes.
5      Q.   Sorry. That's just for the
6  record. Sometimes we have the nods of the head,
7  which the camera will catch it but the
8  transcript won't.
9      So what were the changes in
10 expectations that the agency had with Cardinal
11 and other registrants in 2012 and '13?
12     A.   One of the changes that I recall,
13 we had an understanding with the DEA that we
14 will investigate threshold events, and if we
15 found that those threshold events resulted in
16 customer that had the potential for diversion,
17 that they wanted us to communicate those to
18 them.
19     Q.   So your testimony today is that
20 sometime in 2012 or 2013, the DEA, for the first
21 time, said that Cardinal and other registrants
22 need to investigate threshold events, and if
23 they find that a customer has a potential for
24 diversion, they need to report that to the DEA?

Page 84

1      A.   When we terminated the customer.
2      MS. WICHT: Object to the form of
3      the question.
4      Q.   Say again?
5      A.   Is when the termination of that
6  particular customer, they wanted us, based on
7  the communications between my staff and the DEA,
8  that's the information that they wanted us to
9  communicate as suspicious order. Later in time,
10 we learned that the agency had changed their
11 expectations and they wanted to know every
12 single order that hit a threshold event after a
13 small investigation, had to be communicated to
14 them.
15     Q.   So it's the every single threshold
16 event after a small investigation has been
17 communicated to the DEA, that's the change that
18 occurred in 2012 and '13?
19     A.   That's the -- yes.
20     Q.   And what was the small
21 investigation that would have to occur after a
22 threshold event?
23     A.   Is like a quick review of the
24 customer order to determine whether the customer

Page 85

1  was likely due to a typographical error, and we
2  were, you know, expected to make a decision very
3  quickly. And if we could not resolve that order
4  in a short period of time, we had to report it
5  to the DEA and continue our investigation in
6  regards to the customer, because that takes a
7  longer period of time.
8      Q.   And this review, this short
9  investigation, where did that occur?
10     MS. WICHT: Object to the form of
11     the question.
12     A.   That review of investigation
13 occurs as part of our electronic monitoring
14 system with the personnel that is responsible
15 for that.
16     Q.   And so do you recall, who at the
17 DEA communicated this change to Cardinal?
18     A.   The initial agreement between
19 Cardinal Health and the DEA occurred between --
20 to the best of my knowledge, between Michael
21 Moné, Barbara Boockholdt, Sue Langston, and Nick
22 Rausch, I believe, was at that meeting, too.
23     Q.   But you were not?
24     A.   I was not. That was before I

Page 86

1  joined Cardinal Health.
2      Q.   So there was a meeting with those
3  four individuals you just named.  Nick Rausch
4  and Michael Moné are the two Cardinal
5  representatives?
6      A.   That is my understanding.
7      Q.   And when you started, was it
8  conveyed to you that this is a new change we
9  have?
10     A.   My understanding was these are the
11 expectations from the agency, that we evaluate
12 orders, determine if the customer had the
13 potential to divert the order, and our practice
14 was:  Terminate the customer and communicate
15 that termination to the DEA.
16     Q.   And so what I'm confused about now
17 is that you're talking about a meeting prior to
18 you joining Cardinal between Michael Moné, Nick
19 Rausch and the DEA, correct?
20     A.   Correct.
21     Q.   And that is in response to me
22 asking you about the regulatory changes that
23 took place in 2012 and '13 that required
24 Cardinal Health to employ Dendrite to assist in

Page 87

1  site visits?
2      A.   Well, we had --
3          MS. WICHT:  Object to the form of
4      the question.
5      A.   -- we had a regulatory action from
6  the agency in 2012.  So that was definitely --
7  there was a change in the expectation from the
8  agency from what we had done before, which had
9  been reviewed in numbers of time, not only by
10 the meeting the DEA had at our corporate
11 headquarters, but also during dozens of cyclical
12 inspections.  We did not express concern until
13 we received the administrative action from the
14 agency.
15     Q.   So Cardinal Health was
16 communicated changes -- regulatory changes that
17 the DEA expected in -- prior to December 1st,
18 2009, when Michael Moné and Nick Rausch meets
19 with the DEA, correct?
20     A.   We presented the program that we
21 had for anti-diversion, our intent on how to
22 execute the program.  And my understanding was
23 that there was an agreement that the program
24 fulfilled the expectations of the agency and

Page 88

1  that met the regulatory requirements.
2      Q.   And that was at a meeting prior to
3  you joining Cardinal?
4      A.   That was the meeting that occurred
5  before I joined Cardinal Health.
6      Q.   And did you ever see any agreement
7  in writing between the DEA and Cardinal with
8  regard to that meeting?
9      A.   I did not see any agreement in
10 writing, but I got a consistent message from
11 Michael, from Bob Giacalone, from Mr. Morford
12 that that was our agreement with the agency, so
13 we needed to make sure that we keep compliant
14 with that agreement.
15     Q.   And as the supervisor of
16 anti-diversion, you didn't confirm that in
17 writing?
18         MS. WICHT:  Object to the form of
19     the question.
20     A.   I believe the information that was
21 provided by my staff, by our senior legal
22 regulatory counsel, and by my boss.
23     Q.   And what I'm still trying to
24 understand is, this meeting occurred before you

Page 89

1  joined Cardinal on December 1st, 2009.  And in
2  that meeting was conveyed to Cardinal that the
3  DEA had additional expectations with regard to
4  reporting threshold events after a small
5  investigation, correct?
6          MS. WICHT:  Object to the form of
7      the question.
8      A.   My understanding of what occurred
9  in the meeting was we provided a presentation to
10 two members of the Drug Enforcement
11 Administration.  That presentation was an
12 overview of our anti-diversion program and our
13 suspicious order monitoring program.  And the
14 agency didn't have any objections, didn't have
15 any concerns with the way that we were executing
16 our program.
17     Q.   But I thought you said that this
18 meeting -- we're talking about one meeting that
19 happened before you got there, just to be clear,
20 there's only one meeting we're talking about
21 between Michael Moné, Nick Rausch, as
22 representatives of Cardinal, and the DEA.
23         I thought your testimony earlier
24 was that at that meeting the DEA conveyed to

Page 90

1 Cardinal regulatory changes, in particular, that
2 upon a threshold event, Cardinal would do a
3 small investigation and then report to the DEA
4 if a customer had to be terminated?
5        MS. WICHT:  Object to the form of
6     the question.
7     A.   That's incorrect.  I didn't say
8 that.
9     Q.   Okay.
10     A.   I didn't say that.  I think as a
11 result of the regulatory action that we had in
12 2012, those were new expectations that were
13 communicated to us.
14     Q.   Okay.  So you're testifying that
15 in 2009 -- well, I'm sorry.  Before you joined
16 Cardinal in 2009, there was a meeting between
17 Michael Moné, Nick Rausch and the DEA, and at
18 that meeting, there weren't new expectations --
19 new regulatory changes that were conveyed to
20 Cardinal.  That's your testimony now?
21        MS. WICHT:  Object to the form of
22     the question.
23     A.   That is not what I said.  What I
24 said was, there was a meeting between

Page 91

1 representative from DEA and Cardinal Health,
2 where Cardinal Health presented our suspicious
3 order monitoring program to the agency.  As we
4 were executing the program at that time, the
5 agency appeared to be satisfied with our
6 execution of the program, did not express any
7 concern.
8        Also, that program has been
9 presented to the agency during multiple
10 inspections of our distribution centers.  And to
11 the best of my knowledge, there has not been a
12 single concern about that until we got the
13 administrative action in 2012.
14     Q.   And so between your start date of
15 December 1st, 2009 and the action in 2012 --
16 early February, 2012, does that sound --
17     A.   Sounds about right.
18     Q.   -- sounds about right?
19        Between December 1, 2009 and early
20 February 2012, did you ever have any contact
21 with the DEA to determine if the suspicious
22 order monitoring program of Cardinal was in line
23 with their expectations?
24     A.   I personally did not have a

Page 92

1 meeting with DEA.  Members of my staff did.
2 Michael Moné, I believe, was in routine
3 communication with Barbara Boockholdt and other
4 members of the DEA.  I also attended, you know,
5 presentations from the DEA but never had
6 personal interaction with the agency.
7        Michael had most of those
8 interactions, and Steve Reardon and some other
9 members of my staff.
10     Q.   How about above you?  Did Craig
11 Morford ever have conversations or contact with
12 the DEA, to your knowledge?
13     A.   I would speculate if I say yes or
14 no.  I don't know that.
15     Q.   So you're not aware of any time
16 that he did?
17        MS. WICHT:  Object to the form of
18     the question.
19     A.   During that period of time, I
20 would not be able to recall.
21     Q.   All right.  Well, during the
22 period of time that you've been with Cardinal,
23 from December 1st, 2009, are you aware of any
24 time that Craig Morford had contact with the

Page 93

1 DEA?
2     A.   I have personally not been in any
3 of the meetings that either Craig or somebody
4 else may have with personnel from the DEA.
5     Q.   Okay.  And maybe you weren't
6 present, but I'm asking right now if you're
7 aware of any meetings between Craig Morford and
8 the DEA.
9     A.   I believe there was a meeting --
10 one meeting between Cardinal Health and DEA
11 where we made another presentation of our
12 program.  And my understanding was Craig may
13 have been there.  I'm not 100 percent sure.  I
14 know Todd Cameron was there.
15     Q.   And when was that?
16     A.   I cannot tell the date, but it
17 could be '15 to '17.  But I don't even recall if
18 I was involved with the program at that time or
19 not.
20     Q.   And do you know who from the DEA
21 was involved?
22     A.   I'm trying to recollect if I
23 remember.  I'm not very good with names.  But I
24 do not recall from the top of my head.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1    Q.   Is it fair to say, then, if you
2  can't recall, that at least it wasn't Barbara
3  Boockholdt?
4        MS. WICHT:  Object to the form of
5    the question.
6    A.   I don't recall.  I mean -- or they
7  didn't tell me who was there, or I don't recall
8  if Barbara was there or not.
9    Q.   Okay.  That's fair.
10       So we -- I want to go back because
11 I still don't think I have a full understanding
12 of what it was in 2012 that was communicated to
13 Cardinal that led Cardinal to employ the
14 services of Dendrite to assist with site visits.
15   A.   Our understanding was that the
16 agency expectations and definition on suspicious
17 orders had changed.
18   Q.   In what way?
19   A.   In the past, the program that we
20 presented to the agency, which the agency had no
21 objection, was that when we had a threshold
22 event, we had to investigate the threshold event
23 if we concluded that the customer had posed a
24 risk for diversion or we couldn't conclude

Page 95

1  that -- at that point in time, after an
2  investigation, that we should report that
3  customer as suspicious.
4        The expectations changed in 2012
5  were the time frame that we allowed to do
6  an investigation, and the agency decided that
7  each threshold event, after a quick
8  investigation -- when I say "quick
9  investigation," is a very short period of time
10 to be communicated to them as a suspicious
11 order, even though that threshold event not
12 necessarily met all of the requirements of a
13 suspicious order.
14   Q.   So what kind of threshold events
15 would not meet the requirements of a suspicious
16 order?
17       MS. WICHT:  Object to the form of
18   the question.
19   A.   For example, we're reporting them
20 as suspicious, but is a pharmacist going on
21 holiday weekend and he ordered twice as many
22 drugs because he's not going to be at the site
23 to order the drugs the next week?  I mean, that
24 will -- potentially could hit a threshold event.

Page 96

1    Q.   Could potentially also signal that
2  a number of people have decided they want to buy
3  a bunch of oxycodone for a party on the weekend,
4  couldn't it?
5        MS. WICHT:  Object to the form of
6    the question.
7    A.   Not necessarily.
8    Q.   Not necessarily, but it could,
9  couldn't it?
10       MS. WICHT:  Object to the form of
11   the question.
12   A.   Not necessarily.  Everything is
13 possible, but it's not necessarily.  So we want
14 to do an investigation on that customer to look
15 at the fact on why there was an increase in
16 order, and we want -- that takes time.  But with
17 our current system and the current expectations
18 of the agency, we report those as suspicious.
19   Q.   You said you want to investigate
20 those but that takes time.  I don't understand.
21 What kind of time does it take to find out if a
22 threshold event is suspicious or not?
23   A.   It takes -- to determine if the
24 order is likely to be diverted, it takes time.

Page 97

1  It takes some time, customer visit.  It takes
2  time interacting with the customer.  It takes
3  time maybe having a salesperson drive by to get
4  additional information.
5        It takes time to evaluate an order
6  and determine whether Cardinal Health feels
7  comfortable either filling that order or we
8  decide to -- not to longer do business with that
9  particular customer because it poses a risk of
10 diversion.
11   Q.   And in order to meet that
12 requirement, Cardinal employed Dendrite to
13 assist with site visits?
14       MS. WICHT:  Object to the form of
15   the question.
16   A.   We used Dendrite to help us to --
17 more site visits so we can have more recent
18 information on our customer.
19       MR. KROEGER:  There's someone on
20   the phone who is not muted.  If you
21   could please mute.
22   Q.   But prior to 2012, you did not use
23 Dendrite to assist with site visits, correct?
24   A.   During the time that I was there

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 in 2009 to 2012, I don't recall us using
2 Dendrite. That doesn't necessarily mean that we
3 had not used them, but I don't recall.
4     Q.   But your testimony is that, to
5 your knowledge, Dendrite was employed by
6 Cardinal in order to assist with this new
7 requirement from the DEA that threshold events
8 get a fast investigation?
9         MS. WICHT: Object to the form of
10 the question.
11     A.   Not -- not for that. It was to
12 assist us to do -- we wanted to have more site
13 visits done. We wanted to refresh all of our
14 files, so we used Dendrite to help us do
15 additional visits.
16     Q.   And you say you wanted, but in
17 2012, didn't the DEA tell you that you had to do
18 those site visits within 120 days?
19     A.   I don't recall the terms of the
20 agreement. It could be in the agreement, but I
21 would have to review the agreement to say if
22 that was the case.
23     Q.   Okay. We can do that.
24         But your testimony so far is that

Page 99

1 you, Cardinal, that Cardinal employed Dendrite
2 to assist with these site visits because you
3 wanted to do more of them; is that correct?
4     A.   I believe that we wanted to do
5 more site visits.
6     Q.   And you think that this is
7 something that Cardinal decided on its own, its
8 own accord, to do more site visits in 2012; is
9 that your testimony?
10        MS. WICHT: Object to the form of
11 the question.
12     A.   I can tell you as a member of the
13 management team, we wanted to do more site
14 visits. And even today, we continue to do a lot
15 of site visits.
16     Q.   And why is it -- strike that.
17        In 2010 and 2011, why is it that
18 Cardinal didn't have the same desire to visit
19 all the sites to which they sold controlled
20 substances that they did in 2012?
21        MS. WICHT: Object to the form of
22 the question.
23     A.   We did plenty of site visits. We
24 investigated every single suspicious customer

Page 100

1 and every single suspicious order was reported
2 to the agency, based on the understanding that
3 we had at the time.
4     Q.   What was that understanding?
5     A.   I already explained to you the
6 understanding that we had of investigating the
7 order, investigating the customer, and if we
8 deemed that a customer had the potential for --
9 to pose a risk for diversion to -- the agency
10 wanted to know that suspicious order and that
11 suspicious customer that was terminated.
12     Q.   But suddenly in 2012 Cardinal had
13 a greater desire to do site visits than it had
14 in 2010 and '09 -- or 2010 and '11; is that
15 right?
16     A.   Well, we had --
17        MS. WICHT: Object to the form of
18 the question.
19     A.   We had a regulatory action, so to
20 me, the agency had changed the expectations on
21 how we executed the program. So we wanted to
22 make sure that we cover all the bases. We do
23 not want another regulatory action against
24 Cardinal Health, and we employ not only internal

Page 101

1 resources, but external resources to make sure
2 that we not only met the expectations of the
3 agency, but that we exceeded those.
4     Q.   But Cardinal didn't have the same
5 desire to avoid that regulatory action or exceed
6 expectations of the DEA in 2010 or '11?
7        MS. WICHT: Object to the form of
8 the question.
9     A.   That's not what I said.
10     Q.   But Cardinal decided to wait until
11 2012 to ask Dendrite to assist with site visits
12 across the country?
13     A.   Cardinal always had the same
14 desire to comply with all regulatory
15 requirements. That desire has never changed as
16 far as I know. At least since I joined the
17 company. I can attest to that. Our management
18 team has to have -- wants to have a good
19 regulatory record, which we have demonstrated
20 over many, many years.
21        These regulatory actions that we
22 got in 2012 was a surprise to us because, to the
23 best of my knowledge, we were meeting the
24 expectations of the agency.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1    MS. WICHT:  And if you would note
2  my objection to the form of the last
3  question.  I didn't want to interrupt,
4  Mr. Quintero.  Thank you.
5  BY MR. KROEGER:
6    Q.   But, again, just to be clear, it
7  wasn't until 2012 when the regulatory action
8  commenced against Cardinal that Cardinal
9  decided, we want to and need to employ Dendrite
10 to assist with site visits across the country?
11 That's your testimony, correct?
12    MS. WICHT:  Object to the form of
13  the question.
14    A.   My testimony is that since I got
15 to Cardinal Health on December 1st, 2009, the
16 company intended to comply with all regulatory
17 requirements, including DEA regulations, and
18 that we executed a program that was presented to
19 the agency, that the agency accepted as a good
20 program, we executed according to those
21 expectations.
22    We did hundreds of visits.  We cut
23 hundreds of customers during that period of time
24 before 2012.  To the best of my knowledge, we

Page 103

1  cut over 300 customers during that period of
2  time.
3    Q.   And yet it wasn't until 2012 that
4  you -- that Cardinal realized it needed
5  assistance to conduct appropriate site visits?
6    MS. WICHT:  Object to the form of
7    the question.  Foundation.
8    Mischaracterizes.
9    A.   We were always conducting
10 appropriate visits.  We decided to increase the
11 number of site visits that we did because the
12 expectations of the agency appeared to have
13 changed and we were adapting to the changes in
14 expectations from the agency.
15    But in terms of whether or not we
16 were doing inspections according to the
17 expectations of the agency at that time, we were
18 doing hundreds of inspections.  We dedicated
19 personnel to do those inspections.  We used our
20 compliance officers to do inspections, too.  And
21 we required our salespeople to notify us of any
22 concerns that they had with any customer.
23    And those inspections were
24 conducted and they resulted in over 300

Page 104

1  customers being cut, which most of them today
2  still have a DEA license to dispense product.
3    Q.   How many customers does Cardinal
4  distribute controlled substances to?
5    A.   I will speculate.  I'm not
6  involved with that particular group now, so I
7  would be speculating on a number.
8    Q.   Prior to 2012?
9    A.   There were thousands of customers.
10    Q.   Thousands.  Tens of thousands?
11    MS. WICHT:  Object to the form of
12    the question.
13    A.   I wouldn't know the exact number.
14 So if I tell you a number, I would be
15 speculating.  I would have to go and ask
16 somebody in the sales department to tell me the
17 exact number of customers that we have.
18    Q.   Okay.  Aside from assisting with
19 site visits in 2012, what else did Dendrite do
20 for Cardinal?
21    A.   I'm trying to recollect.
22    To the best of my knowledge, that
23 was their primary services that they were
24 providing to Cardinal Health.

Page 105

1    Q.   And to the best of your knowledge,
2  did that -- did those services end in 2012, '13,
3  or do they continue?
4    A.   I think we have used them after
5  that, but since I was removed from the -- I
6  mean, I'm not in the department anymore managing
7  that particular area, I couldn't tell.  But I
8  know that we have used them occasionally.
9    Q.   So we've talked about Deloitte.
10 Dendrite.  Health Advisory.
11    A.   Uh-huh.
12    Q.   What other outside organizations
13 has Cardinal used for anti-diversion assistance?
14    A.   We used IBM Watson.
15    Q.   What do you use IBM Watson for?
16    A.   We use IBM Watson to help us
17 develop our anti-diversion -- it's called ADC.
18 It's --
19    Q.   It's called what?  I'm sorry.
20    A.   ADC.
21    Q.   ADC.
22    A.   ADC.  Centralized system.  I'm
23 trying to recall the meaning of each one of
24 those words.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q.    And what is that system?

2    A.    It is a centralized system where

3 we have information about customers, we see

4 threshold events that they had in the past.  We

5 can even have a street view of where the

6 pharmacy is located to see the surroundings.

7    Q.    And that system -- the one benefit

8 of a centralized system such as that is so that

9 people who are at corporate headquarters in

10 Dublin can determine if there are suspicious

11 customers who may need to be shut down in Texas,

12 right?

13        MS. WICHT:  Object to the form of

14    the question.

15    A.    It is used to review customers and

16 also to review customers' orders.

17    Q.    But the -- is it true, though,

18 that having a centralized system in Dublin,

19 Ohio, or a system that's accessible in Dublin,

20 Ohio, the capital -- the headquarters of

21 Cardinal, allows the executives at Cardinal to

22 see what might be going on at distribution

23 centers around the country?

24        MS. WICHT:  Object to the form of

Page 107

1    the question.  Foundation.

2    A.    First, I mean, the activity of

3 review of customers is done by different levels

4 of employees.  The executive -- like, I don't

5 know what you call.  I consider myself an

6 executive.  We generally are not involved in the

7 day-to-day review of those threshold events.

8    Q.    But you have access to that

9 information through the centralized system?

10    A.    I can ask one of the analysts in

11 the group or one of the members of that team to

12 provide me with that information that is there.

13    Q.    And that's one of the many ways

14 that you supervise the anti-diversion programs

15 within Cardinal?

16        MS. WICHT:  Object to the form of

17    the question.

18    A.    One of the ways that I inquired

19 about information that I may be interested at a

20 particular time.

21    Q.    Okay.  What else, besides the ADC,

22 did IBM provide Cardinal?

23    A.    To the best of my knowledge --

24 they may have done other things -- that's what

Page 108

1 they performed for us.

2    Q.    Any other outside agencies or

3 corporations, companies that Cardinal has

4 employed for anti-diversion?

5    A.    We had Avantha.

6    Q.    What's Avantha do for Cardinal?

7    A.    What Avantha did for Cardinal

8 Health, they provided an expert in the field

9 that will advise us on anti-diversion and any

10 other trends that were going on in the

11 regulatory environments regarding to DEA.

12    Q.    During what time period did

13 Avantha provide such services?

14    A.    I don't recall the exact time.  I

15 will have to go back and look at the engagement.

16 It could have been '12, '13, '14 and '15.  I

17 don't recall the exact time frame.

18    Q.    What other outside organizations

19 or companies?

20    A.    We use Healthcare Advising.

21    Q.    What do they do?

22    A.    They provided assistance with

23 developing a new threshold methodology with some

24 of the information that we received from other

Page 109

1 sources.

2    Q.    What other sources?

3    A.    Symphony or IMS or our own

4 internal data.

5    Q.    What other outside organizations

6 do you recall?

7    A.    We use also another organization,

8 use Pharmacy Services or Pharmacy Solutions.  I

9 don't recall the name.

10    Q.    What services did they provide

11 Cardinal?

12    A.    They provided resources to do --

13        VIDEOGRAPHER:  Counsel on the

14    phone, could you put yourself on mute,

15    please.

16 BY MR. KROEGER:

17    Q.    I'm sorry.  Could you repeat that

18 answer, please.

19    A.    I don't recall the exact name, but

20 it was Pharmacy Services or Pharmacy Solutions,

21 one of the two.  They provided resources,

22 investigators, to do field visits.

23    Q.    Was this also in 2012 and '13?

24    A.    It was during 2012, '13.  Could

Page 110

1 have been '14, too.
2     Q.   Any other outside services
3 Cardinal received?
4     A.   There could be others, but those
5 are the ones that I recall, to the best of my
6 knowledge.
7     Q.   Okay.
8         MR. KROEGER:  I think this is
9     probably a good time for a quick break.
10        MS. WICHT:  Okay.
11        VIDEOGRAPHER:  Time is now 9:11.
12    Going off the record.
13        (Recess taken.)
14        VIDEOGRAPHER:  Time is now 9:33.
15    Back on the record.
16 BY MR. KROEGER:
17    Q.   Mr. Quintero, I just wanted to
18 clarify something that we were going through, I
19 think, a number of times.
20        You were talking about the change
21 in regulations -- the changing expectations of
22 the DEA.
23    A.   Yeah.  I never have spoken about
24 changes in regulations.  The regulations were

Page 111

1 established in 1971 and still basically the same
2 regulations.
3     Q.   Right.  But there was -- your
4 testimony was that there was a change in the
5 expectations of the agency with regard to
6 Cardinal and other distributors, correct?
7     A.   That was my testimony, yes.
8     Q.   And prior to that change, Cardinal
9 had been reporting to the DEA when there was a
10 suspicious customer that Cardinal had determined
11 they needed to terminate; is that right?
12    A.   Yes.  And --
13        MS. WICHT:  Object to the form of
14    the question.
15    Go ahead.
16    A.   Yes.  And in some examples also
17 where we couldn't collect enough information to
18 determine whether or not, you know, the customer
19 was suspicious -- there was no reason to believe
20 the customer was suspicious, but we didn't have
21 enough information.  So we reported some of
22 those orders, too.
23    Q.   Okay.  But generally speaking, the
24 suspicious order policy of Cardinal, prior to

Page 112

1 2012, was to report suspicious customers when
2 Cardinal deemed appropriate to terminate them,
3 and then a handful of other suspicious orders
4 that you just couldn't figure out?
5        MS. WICHT:  Object to the form of
6    the question.
7    A.   Based on the agreement that we
8 have with the agency, our practice was, you
9 know, customer would have threshold events,
10 we'll investigate those threshold events, do an
11 in-depth investigation, determine if the
12 customer posed a risk of diversion, and if we
13 determine that there was a potential for that,
14 then we communicated that to the agency, we
15 reported that.
16    Q.   Reported the customer?
17    A.   We reported the customer that had
18 that order placed, that triggered the reason for
19 us to look at the customer.
20    Q.   When you started at Cardinal, did
21 anyone show you the Memorandum of Agreement with
22 regard to the 2007-2008 events for Cardinal?
23    A.   I don't recall.  I don't recall.
24 Could have.  Could have not, but I don't recall

Page 113

1 whether or not they show it to me.
2    Q.   Are you aware of what happened for
3 Cardinal in 2007-2008?
4    A.   I believe --
5        MS. WICHT:  Object to the form of
6    the question.
7    A.   I believe I read, before joining
8 Cardinal, that had something to do with sales to
9 Internet pharmacies.
10    Q.   And distribution centers having
11 the registration suspended?
12    A.   That's my understanding.
13    Q.   But then when you started in
14 December of 2009, no one, to your recollection,
15 showed you the Memorandum of Agreement as to
16 what Cardinal's duties were?
17        MS. WICHT:  Object to the form of
18    the question.
19    A.   I requested an overview of, you
20 know, what happened in 2008 and what were the
21 actions that Cardinal took to address the
22 concerns that the agency had.  That overview was
23 provided to me by members of my staff, as well
24 as our senior legal regulatory counsel, as well

Highly Confidential - Subject to Further Confidentiality Review

---

Page 114

1 as my boss.
2      And the communication that I got
3 from each one of them was very consistent with
4 the agreement that had been made with the agency
5 and the program that we've put in place that was
6 deemed acceptable by the agency after the agency
7 had reviewed our program.
8           - - -
9   (Cardinal-Quintero Exhibit 3 marked.)
10           - - -
11 BY MR. KROEGER:
12    Q.  I'm going to hand you what I'm
13 marking as Exhibit 3.  It's Document 3813.
14      MR. HUNTER:  Can you give the
15 Bates number for that document?
16      MR. KROEGER:  I can for this one.
17 It's CAH_MDL2804_02309017.
18    Q.  Mr. Quintero, if you would turn to
19 Page 4 --
20      MS. WADHWANI:  Sorry.  014.
21      MR. KROEGER:  Sorry.  Thank you.
22 Neelum corrected it.  It's 014.
23 BY MR. KROEGER:
24    Q.  If you'll turn to Page 4 of this.

Page 115

1    A.  This is the top of the page, that
2 4 here or 4 --
3    Q.  Correct, 4 top right.
4    A.  Okay.
5    Q.  And if you want to look, I mean
6 obviously you're more than welcome to look at
7 this document, look at the first page to see
8 what it is, but I'll represent to you that it's
9 the memorandum of understanding -- of agreement
10 between Cardinal and the DEA that we were just
11 talking about.
12      If you go to -- because I see what
13 you're looking at.  If you go --
14    A.  What does it mean -- I mean, just
15 a question because I'm reading, and it's
16 different to what you read.  It says "2008 MOA
17 Reference in Background."  What does that mean?
18    Q.  So this was an appendix, and this
19 document, if you turn to what is actually Page 2
20 of the exhibit itself, you will see the title of
21 the document that we're going to be talking
22 about.
23    A.  Where is it?
24    Q.  It is in Appendix B.  Okay?  And

Page 116

1 if you'll turn to Page 4 --
2      MS. WICHT:  So this copy came --
3 is -- this copy is Appendix B to some
4 other document?
5      MR. KROEGER:  Yes.
6      MS. WICHT:  But you're not asking
7 right now about whatever that other
8 document is or what --
9      MR. KROEGER:  I'm asking about a
10 very specific part of this MOA that I
11 have from this appendix, which is
12 attached to the 2012 action, but...
13      MS. WICHT:  Okay.
14      MS. ANDERSON:  For clarification,
15 which page number are you on?
16      MR. KROEGER:  4.  P1, top right,
17 P1, 4.
18 BY MR. KROEGER:
19    Q.  Most importantly, Mr. Quintero, do
20 you see Roman numeral II, Number 1, Paragraph A,
21 "Obligations of Cardinal"?
22    A.  Uh-huh.
23    Q.  Can you read that to us, please.
24    A.  "Cardinal agrees to maintain a

Page 117

1 compliance program designed to detect and
2 prevent diversion of controlled substances as
3 required under the CSA and applicable DEA
4 regulations.  This program shall include
5 procedures to review orders for controlled
6 substances, orders that exceed established
7 thresholds and criteria will be reviewed by a
8 Cardinal employee trained to detect suspicious
9 orders for the purpose of determining whether,
10 (I) such orders should not be filled and
11 reported to the DEA based on a detailed review,
12 the order is for a legitimate purpose and the
13 controlled substances are not likely to be
14 diverted into other than legitimate medical,
15 scientific, and industrial channels.
16      "Orders identified as suspicious
17 will be reported to the DEA as discussed in
18 Subsection II(1)(c).  This compliance program
19 shall apply to all customers and future Cardinal
20 distribution centers registered with the DEA in
21 the United States and its territories and
22 possessions.
23      "Cardinal acknowledges and agrees
24 that the obligations undertaken in this

---

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 subparagraph do not fulfill the totality of its
2 obligations to maintain effective controls
3 against the diversion of controlled substances
4 or to detect and report the suspicious orders
5 for controlled substances."
6     Q.   So, Mr. Quintero, this is the
7 agreement that Cardinal signed after a number of
8 its distribution centers were investigated,
9 suspended, et cetera?
10     A.   (Nods head.)
11     Q.   And identifying suspicious orders
12 and reporting those to the DEA is a baseline
13 that Cardinal agreed to; isn't that true?
14         MS. WICHT:  Object to the form of
15     the question.
16     A.   Yeah, but there's additional
17 language here, you know, which says, you know,
18 established threshold criteria and --
19     Q.   Show me in that paragraph where
20 Cardinal agreed to report customers when they
21 decided to terminate those customers?
22     A.   As I told you, we reported
23 suspicious orders as the agreement that was
24 reached between Cardinal Health and senior

Page 119

1 members from the DEA based on the program and
2 the interpretation of the agreement.
3     Q.   So you're saying that the DEA
4 allowed Cardinal, after a meeting, to supplement
5 this Memorandum of Agreement and do less than
6 what it says here?
7         MS. WICHT:  Object to the form of
8     the question.  Foundation.
9     Mischaracterizes.
10     A.   I don't believe that's what I
11 said.  I said that Cardinal had an
12 interpretation of the agreement.  That
13 interpretation of the agreement was shared with
14 senior members of the DEA and DEA was in
15 agreement with that definition.
16         And it was reviewed in the 2009
17 meetings, and also it was reviewed during dozens
18 of cyclic inspections and we were never found to
19 be in noncompliance with the agreement.
20     Q.   And -- but it's still your
21 position that it was in 2012 that the DEA
22 suddenly wanted Cardinal to report all
23 suspicious orders --
24         MS. WICHT:  Object to --

Page 120

1     Q.   -- and that was a new
2 understanding?
3         MS. WICHT:  Object to the form of
4     the question.  Foundation.
5     Mischaracterizes.
6     A.   My position is that the
7 interpretation and the expectations of the
8 agency of what was suspicious order had changed
9 over time; that to the best of my knowledge,
10 Cardinal Health, every time, reported suspicious
11 orders, from the time that I was there in 2009
12 until recent, based on the interpretation that
13 it had other regulations and the understanding
14 that we had from the agency.
15         MS. WICHT:  I'm sorry to
16     interrupt.
17         Madam Court Reporter, the -- this
18     is indicating it has a low battery.  It
19     is below 10 percent.  Is it possible to
20     have a charger that connects to this?
21         MR. KROEGER:  We can go off the
22     record for a moment.
23         VIDEOGRAPHER:  Time is now 9:45.
24     Going off the record.

Page 121

1         (Discussion held off the record.)
2         VIDEOGRAPHER:  Time is now 9:46.
3     Back on the record.
4             - - -
5     (Cardinal-Quintero Exhibit 4 marked.)
6             - - -
7 BY MR. KROEGER:
8     Q.   I'm going to hand you what I've
9 marked as Exhibit 4.  We talked earlier about
10 the fact that you sometimes would attend HDMA
11 events, sometimes had a voice in the company for
12 HDMA.
13         If you would read this e-mail.  Do
14 you know a Bill de Gutierrez-Mahoney?
15         MS. WICHT:  May I -- while the
16     witness is looking at the document, may
17     I just inquire, since it's a -- this is
18     a McKesson highly confidential document,
19     whether permission has been granted to
20     show it and use it in this document?
21         MR. KROEGER:  It has been noticed
22     and used at previous Cardinal
23     depositions.
24         MS. WICHT:  Okay.  Thank you.

Page 122

1    MS. MONAGHAN: I would like to
2  note for the record --
3    MR. HUNTER: Excuse me. Do you
4  mind just reading the Bates numbers when
5  you're entering exhibits because we need
6  to know which document it is, who is on
7  the phone.
8    MS. MONAGHAN: I would like to
9  note for the record that we agreed to
10  allow the use of this document in Steve
11  Reardon's deposition. We did not permit
12  it in this deposition and we were not
13  asked permission for this deposition.
14    MS. QUEZON: Are you objecting to
15  the use of it?
16    MS. MONAGHAN: You can proceed.
17  I'm just noting our objection for the
18  record.
19  BY MR. KROEGER:
20    Q. Mr. Quintero, did you have a
21  chance to look at this document I've handed you?
22    A. I've reviewed Page 1 and I'm
23  starting to read Page 2.
24    Q. I'm only going to ask you about

Page 123

1  Page 1.
2    A. Okay.
3    Q. This is an e-mail. Do you
4  recognize the names at the top: Bill
5  Gutierrez-Mahoney, and Donald Walker, Bruce
6  Russell, Gary Hilliard?
7    A. I remember Gary Hilliard.
8      I remember Gary and Don. The
9  other two names are not that familiar to me.
10    Q. And this e-mail is from March of
11  2013. Do you see that?
12    A. Yep.
13    Q. And apparently there had been a
14  conference the week before, an HDMA conference,
15  that Gary and Bill had attended.
16      And would you read the second
17  paragraph of the e-mail, please.
18    A. It says, "Gary and I attended the
19  HDMA conference last week. These are my notes.
20  Perhaps the most surprising revelation was Steve
21  Reardon and Gilberto Quintero saying that
22  Cardinal Health does not report to DEA --
23  suspicious orders to DEA. No upside."
24    Q. So as of 2013, you were still not

Page 124

1  reporting suspicious orders?
2    MS. WICHT: Objection to form.
3  Foundation.
4    A. This is not true. I don't know
5  why -- who is this -- Bill de Gutierrez-Mahoney
6  wrote that, because that's not the fact.
7    Q. You started reporting suspicious
8  orders in 2012 when the DEA amended their
9  expectations of Cardinal?
10    A. We reported --
11    MS. WICHT: Object to form.
12  Foundation. Mischaracterizes prior
13  testimony.
14    A. We reported -- if you look at the
15  record and the number of suspicious orders to
16  DEA, we reported thousands of orders in 2012 and
17  thousands of orders in 2013, '14, '15 as
18  suspicious orders.
19    Q. So the years you just chose to
20  list are '12, '13, '14, and '15, correct?
21    A. Yes. Because you're giving me a
22  document that is dated 2013.
23    Q. Did you report thousands of
24  suspicious orders in 2011?

Page 125

1    A. We reported suspicious orders, as
2  defined by our program and as agreed by DEA, in
3  2009, '10, and '11.
4    Q. So the answer is no?
5    MS. WICHT: Objection to the form.
6  Mischaracterizes.
7    A. The answer is no to what?
8    Q. That Cardinal reported thousands
9  of suspicious orders in 2011.
10    A. We -- the answer is we reported
11  suspicious orders, as defined by our program, as
12  defined with agreement with DEA in 2009, '10,
13  and '11.
14    Q. Mr. Quintero, are you aware of an
15  opioid epidemic in this nation?
16    A. I'm aware that there's an opioid
17  epidemic in this nation.
18    Q. And to your knowledge, what does
19  that mean?
20    A. That means that there are
21  individuals in society that are using opiates
22  for other than legitimate medical use.
23    Q. A few, or thousands?
24    A. I believe thousands.

Page 126

1   Q.   Hundreds of thousands?

2   A.   I could not say that.  If I had

3   documents in front of me that -- from healthcare

4   professionals that have done the studies, but I

5   do not recollect what the number is.

6   Q.   And to your knowledge, what role

7   did Cardinal play in causing that opioid

8   epidemic in the United States?

9   A.   We did not --

10       MS. WICHT:  Object to the form of

11       the question and on the basis that I

12       believe Special Master Cohen has ruled

13       that's an inappropriate area for

14       questioning in depositions in this case.

15       But I'll allow you to answer,

16       Mr. Quintero.

17   A.   I do not believe Cardinal Health

18   played a role in the opioid epidemic.  We had a

19   program in place that was designed to prevent --

20   to -- we had the proper controls against

21   diversion of drug products other than for

22   legitimate medical uses, as demonstrated by the

23   actions that we have taken, as demonstrated by

24   the hundreds of pharmacies that we have

Page 127

1   terminated, not because we know they are

2   diverting.  It's because we may have the

3   suspicion that they may engage in practices that

4   they are not consistent with the expectations

5   that we have.

6           ---

7   (Cardinal-Quintero Exhibit 5 marked.)

8           ---

9   BY MR. KROEGER:

10   Q.   I'm going to hand you what is

11   marked as Exhibit 5,

12   CAH_MDL_PRIORPROD_DEA12_000001.  We have it

13   listed as P1.4085.  And I'd ask you to turn to

14   Page 4 of that, Mr. Quintero.  You're welcome to

15   take a look at the document and familiarize

16   yourself with it, but I'm going to ask you about

17   Page 4 to start.

18   A.   Is this our document or the

19   government document?

20   Q.   It's the government's document.

21       So if you turn to Page 4.  If I

22   could get you to -- well, I'll read it for you.

23   The first full paragraph.

24       "The illicit pain clinics, the

Page 128

1   pharmacies that fill the scripts, and the

2   wholesale distributors who supply pharmacies

3   without appropriate due diligence (including

4   Respondent), have caused and continue to cause

5   millions of dosage units of oxycodone and other

6   controlled substances to be diverted and pose an

7   imminent threat to public health and safety.

8       "According to the Florida Medical

9   Examiner's Office, they have seen a 345.9

10   percent increase in the number of overdose

11   deaths associated with oxycodone between 2005

12   and 2010.  For 2010, their data showed that

13   approximately 4,091 persons died in Florida

14   alone from an overdose caused by just five

15   drugs:  Methadone, oxycodone, hydrocodone,

16   benzodiazepines, or morpheme.

17       "This is an average of 11.2

18   persons dying in the state of Florida every day

19   from just these five drugs alone."

20       Clearly the government,

21   Mr. Quintero, disagrees with your position that

22   Cardinal had no role in causing the opioid

23   epidemic.

24       MS. WICHT:  Object to the form of

Page 129

1   the question.

2   Q.   Do you believe that illicit pain

3   clinics are responsible for the opioid epidemic?

4       MS. WICHT:  Object to the form of

5   the question.

6   A.   There are many reports from

7   different healthcare professionals that have

8   theories on how the epidemic was initiated, why

9   we still have an epidemic.  And so there are

10   healthcare professionals out there still

11   debating what is the cause.  I still do not have

12   a firm position on who initiated this, what is

13   the cause of this.

14   Q.   I'm talking about a cause.  A

15   cause.

16   A.   I couldn't say that we are a

17   cause, because we have the proper controls in

18   place to prevent diversion, and we do not sell

19   products to pharmacies that we believe are

20   dispensing products for other than legitimate

21   medical use.

22   Q.   Would you agree that illicit pain

23   clinics, as mentioned here, are part of a cause

24   of the opioid epidemic?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    MS. WICHT: Object to the form of
2    the question. Asked and answered.
3    A.    To be honest with you, without
4    having a conclusion that can be reached, a
5    consensus among healthcare professionals, that
6    what is the cause of this epidemic, it will be
7    very difficult for me to have a clear position
8    for that because the issue is still being
9    debated.
10    Q.    So sitting here today, as the
11    person who has been overseeing anti-diversion at
12    Cardinal Health from 2010 until 2015, you can't
13    say whether you think illicit pain clinics are a
14    problem in the -- or a cause in the opioid
15    epidemic?
16    MS. WICHT: Object to the form of
17    the question.
18    A.    It could but it could not. I
19    mean, I would have to have more in-depth studies
20    done by people that are experts in the field for
21    me to reach that conclusion.
22    Q.    Do you understand --
23    A.    There are still debates on that
24    issue.

Page 131

1    Q.    Do you understand that illicit
2    pain clinics are clinics in which there is no
3    real or actual doctor/patient relationship?
4    MS. WICHT: Object to the form of
5    the question.
6    A.    I'm not --
7    MS. WICHT: Foundation.
8    A.    I'm not an expert in the field. I
9    wouldn't know that.
10    Q.    And yet, December 1st, 2009,
11    Cardinal tasked you with overseeing their
12    anti-diversion programs?
13    MS. WICHT: Object to the form of
14    the question.
15    A.    Cardinal asked me in December 1st,
16    2009 to oversee a number of programs, while the
17    regulatory compliance program, including
18    anti-diversion. And it's my belief that we had
19    a good program in place that was agreed with the
20    agency and that we were meeting the expectations
21    of the agency at that particular time.
22    Q.    What were the expectations of the
23    agency at that time, prior to 2012, with regard
24    to Cardinal reporting chain pharmacies?

Page 132

1    MS. WICHT: Object to the form of
2    the question.
3    A.    Can you repeat that question
4    again?
5    Q.    What were the expectations of the
6    agency, prior to 2012, in terms of Cardinal
7    reporting chain pharmacies?
8    MS. WICHT: Object to the form.
9    A.    My understanding on the agreement
10    that we had with the agency is that we could
11    rely on the investigation from the
12    anti-diversion program from the chain pharmacies
13    to make our decisions in terms of -- in terms of
14    suspicious orders and whether or not we should
15    continue the sales to those pharmacies.
16    Q.    Okay. I'm going to ask you to
17    return to Exhibit 3, if you would. P1.3813.
18    And if you'll go to Page 4, and
19    will you show me under the "Obligations of
20    Cardinal," the paragraph we've already read,
21    where it says that Cardinal can rely on chain
22    pharmacies to do their due diligence and
23    Cardinal doesn't have to report chain pharmacies
24    to the DEA?

Page 133

1    MS. WICHT: Object to the form of
2    the question. Mischaracterizes his
3    testimony.
4    A.    I just can tell you about the
5    agreements that were reached between the agency
6    and Cardinal Health, which I was not there but
7    those agreements were communicated to me by
8    members of my staff, by Bob Giacalone, which was
9    our senior regulatory counsel at that time, by
10    my boss, and that we were meeting all the
11    expectations of the agency at that point in
12    time.
13    Now, one of the agreements that
14    was made is that we relied on investigations
15    done by the headquarters of chain pharmacies
16    when we have threshold events that needed to be
17    investigated.
18    Q.    Can you show me in the document
19    that I handed you where it says that, under
20    Cardinal's obligations?
21    A.    What I'm communicating to you
22    is --
23    Q.    I'm just -- I'm asking if you can
24    show it to me. It's a yes or no, either you can

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    and you do, or you can't.
2          MS. WICHT:  Object to the form.
3          Q.   Can you show me, Mr. Quintero,
4    where, under the "Obligations of Cardinal," it
5    says that Cardinal may rely on the due diligence
6    done by a chain pharmacy to determine if a
7    suspicious order has been placed?
8          A.   What I can tell you is, we reached
9    the agreement.  That agreement was reviewed
10   during many years between 2012, including the
11   meeting between Barbara Boockholdt, Sue
12   Langston, Michael Moné and Nick Rausch.  We
13   never got a single call from the FDA saying,
14   hey, by the way, Gilberto, I have concerns that
15   you guys are not meeting the spirit of the MOA
16   during the cyclic inspection.  We never got that
17   indication.
18         Q.   Can you show me in the document in
19   front of you where that is?
20         A.   I cannot show you that, but I can
21   show you the discussions between -- I can tell
22   you about the discussions that --
23         Q.   Would you agree --
24         A.   -- that occurred between --

Page 135

1          Q.   You've told me about the
2    discussions.  But would you agree that under the
3    Memorandum of Agreement that was signed by
4    Cardinal Health and the United States
5    Government, through the DEA, that that is not in
6    here?
7          A.   The interpret --
8          MS. WICHT:  Object to the form of
9    the question.
10         A.   The interpretation of this
11   agreement was discussed with members of the
12   agency, which have found it to be -- which was
13   found at that time to be satisfactory with the
14   spirit of the agreement or the language of the
15   agreement.
16         Q.   And there's that word again, "the
17   spirit" of the agreement.  You said that earlier
18   with regard to your supervision of
19   anti-diversion, making sure that people are
20   acting within the spirit of the rules and the
21   laws.
22              What I have asked and you have not
23   answered still is:  Is there anywhere in that
24   document in front of you a spot where it says,

Page 136

1    Cardinal may rely on the due diligence done by
2    chain pharmacies to determine suspicious orders?
3          MS. WICHT:  Object to the form of
4    the question.
5          A.   (Witness reviews document.)
6              Repeat the question again so I
7    can -- now that I've read the paragraph again, I
8    can answer your question.
9          Q.   Okay.  Is there anywhere in that
10   document in front of you, a spot where it says,
11   Cardinal may rely on the due diligence done by
12   chain pharmacies to determine suspicious orders?
13         MS. WICHT:  Object to the form.
14         A.   There's not that language, but
15   there's no language that says that we could not
16   rely on that either.
17         Q.   Okay.  So your position is that
18   because you don't see anything that says you
19   can't rely on someone else's due diligence, that
20   it's okay?
21         MS. WICHT:  Object to form.
22   Foundation.  Calls for a legal
23   conclusion.
24         A.   No.  That's -- you're not

Page 137

1    characterizing my testimony appropriately.  What
2    I said, there's not language here either that
3    says that we cannot rely on other sources as
4    part of our due diligence process.  And in
5    communications with the agency, when we told
6    them we designed our program, they were in
7    agreement with that.
8          Q.   If you would turn to Exhibit 5
9    again.  And you may want to keep that one aside
10   because we're going to talk about that one quite
11   a bit today.
12         MS. WICHT:  3, you mean?
13         MR. KROEGER:  5.
14         MS. WICHT:  5.
15         MR. KROEGER:  It's P1.4085.
16   BY MR. KROEGER:
17         Q.   If you could turn to Page 12.
18   Down towards the bottom of the full paragraph,
19   have you heard the name Mike Arpaio before?
20         A.   No.
21         Q.   I'm going to read this for you.
22   "DEA staff coordinator Mark -- Mike Arpaio
23   communicated to Mr. Moné" -- that would be
24   Michael Moné, wouldn't you imagine?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.   Yes.

2    Q.   -- "that due diligence
3    investigations must be performed on all
4    customers, chain pharmacies included, when it
5    appears that suspicious high volume orders are
6    requested of controlled substances and
7    questionnaires should be sent to these chains.

8         "Mr. Moné stated in turn that QRA
9    is unable to look at chain pharmacy systems in
10   order to identify problem areas when there is
11   not an order of interest or their threshold is
12   not exceeded."

13        So from this, DEA staff
14   coordinator Mark -- Mike Arpaio communicated to
15   Cardinal prior to 2012 that chain pharmacies and
16   retail -- independent retail pharmacies should
17   be treated alike, correct?

18        MS. WICHT:  Object to form.
19   Foundation.

20   A.   I was not a party to that
21   conversation.  I don't have that knowledge of
22   that that particular conversation occurred, the
23   time that it occurred.  I don't know what role
24   Mark [sic] Arpaio had in the agency.  So I mean,

Page 139

1    I would be speculating if I gave you an answer.

2    Q.   So if -- if the government has
3    pled in this that Mike Arpaio communicated that
4    to Mr. Moné, are you sitting here today
5    disagreeing with that?

6         MS. WICHT:  Object to the form.

7    A.   I wasn't a party of the
8    communication between the both of them.  You
9    would have to ask Mark Arpaio and Michael Moné.

10   Q.   Did Michael Moné communicate to
11   you that Cardinal, based on communications with
12   the DEA, was able to treat chain pharmacies
13   different than independent retail pharmacies?

14   A.   My understanding from Michael,
15   from the time that I came here, is that we have
16   reached an agreement with the agency and senior
17   members of the agency on how we were to manage
18   our program.  We provided a description of our
19   program, which includes the reliance of
20   investigations from chain pharmacy as part of
21   our due diligence process.

22        And to the best of my knowledge,
23   that agreement was in place in 2012.  So I do
24   not recognize Mark Arpaio's name.  I do not

Page 140

1    recall the conversation -- Michael having a
2    conversation with Mark Arpaio.  I was not a
3    party in that conversation.

4    Q.   You do supervise Michael Moné or
5    you did at this time, didn't you?

6    A.   Yes, I did.

7    Q.   Part of your job, within Cardinal,
8    was to ensure that he was following DEA
9    regulations, correct?

10        MS. WICHT:  Object to the form of
11        the question.

12   A.   My job is to make sure that we
13   have a system that will have programs to ensure
14   that we comply with regulatory requirements.

15   Q.   And you've talked a bit about the
16   fact that it was in 2012 that the DEA
17   suddenly changed their expectations in terms of
18   what Cardinal and other distributors had to do;
19   is that right?

20   A.   I think it was a surprise to us
21   that we got an administrative action against
22   Cardinal Health, because to the best of our
23   knowledge, at that time, we were complying, not
24   only with the regulations, but also with the

Page 141

1    expectations of the agency.

2    Q.   So that surprise came in 2012; is
3    that what you're saying?

4    A.   That surprise came in 2012.  Late
5    2011, when we had an investigational warrant.
6    We were surprised that we got one because, to
7    the best of our knowledge, at that time we were
8    complying with the expectations of the agency
9    and we were meeting our regulatory requirements.

10   Q.   Will you turn to Page 13 of
11   Exhibit 5.  Same one you're on, 4085.  Page 13.
12   Middle of the page, it was in July, July 7th,
13   2011, that DEA representatives from DEA
14   headquarters met with Cardinal.  And moving
15   down, "DEA representatives further advised
16   Cardinal Health that, with respect to their due
17   diligence responsibilities, Cardinal Health
18   should examine their Florida customers,
19   particularly Cardinal Health's retail pharmacy
20   chain customers."

21        So in July, you were notified --
22   Cardinal was notified of an issue in Florida,
23   and specifically about chain customers; isn't
24   that correct.

Page 142

1    MS. RANJAN: Object to form.
2    A.  I was not a party of that
3 conversation.  I don't know.  It doesn't say
4 between who in DEA and who at Cardinal Health,
5 so I don't know the facts behind this statement
6 dated July 7th, 2011.
7    Q.  So do you dispute that the letter
8 was sent from the DEA warning Cardinal about the
9 chain retail pharmacies in Florida, or do you
10 just say that as the senior vice president of
11 QRA, you were unaware of that warning from the
12 DEA?
13    MS. WICHT: Object to form.
14 Foundation.  Mischaracterizes the
15 document.
16    MR. KROEGER: Counsel, can we keep
17 it as object to form, please, as
18 protocol requires.
19    A.  That there was a letter?  I mean,
20 I don't see here there was a letter.
21    Q.  I apologize.  They advised
22 Cardinal.  The letter came later.
23    Do you deny that DEA
24 representatives advised Cardinal in July of 2011

Page 143

1 of their -- with respect to their due diligence
2 responsibilities that Cardinal should examine
3 their Florida customers, particularly Cardinal
4 Health's retail pharmacy chain customers?
5    A.  I cannot --
6    MS. WICHT: Object to form.
7    A.  I cannot confirm or deny that
8 particular statement, but I can tell you, me
9 personally, if I was DEA and they were having
10 problems with a compliance program, it would
11 have taken a single call for them to tell me
12 that they had concern.  They never did that.
13 And I called DEA more than once, and those calls
14 were never returned to me.
15    Q.  And then on -- if you move down
16 the next paragraph, after a meeting that DEA had
17 with Mallinckrodt, Mallinckrodt sent a letter to
18 43 distributors, including Cardinal Health.
19 "The letter stated that it was no longer
20 processing chargebacks from distributor sales of
21 Mallinckrodt's product to certain pharmacies,
22 including Gulf Coast Pharmacy."
23    Moving down that they "made our
24 decision based on our recent site visits to

Page 144

1 these locations and suggested that if you have
2 sold controlled substances to any of these
3 pharmacies, you consider conducting an on-site
4 audit as part of your suspicious order
5 monitoring program."
6    Do you recall receiving that
7 letter from Mallinckrodt?
8    A.  I remember Cardinal Health
9 having -- communications with Cardinal Health,
10 including several letters that they sent.
11    Q.  Warning you of particular
12 customers?
13    MS. WICHT: Object to the form.
14    A.  Which in every single case, those
15 customers were investigated and decisions were
16 made whether or not to continue doing business
17 with those customers.  The particular one that
18 is mentioned in this letter, Cardinal Health
19 terminated that customer.
20    Q.  And what investigations did
21 Cardinal Health do before Mallinckrodt told them
22 that they were going to cut off their
23 chargebacks if they didn't investigate Gulf
24 Coast?

Page 145

1    A.  We --
2    MS. WICHT: Object to the form.
3    A.  We -- I think, for this particular
4 customer, recall, we had multiple site visits
5 and investigations.
6    Q.  None of which led to termination
7 until after Mallinckrodt's letter?
8    A.  I'm not sure if we cut them before
9 Mallinckrodt letter or after Mallinckrodt
10 letter, but I can tell you, we investigated
11 every time that Mallinckrodt had a concern
12 because they had better visibility than us on
13 the purchases of drugs from pharmacies.
14    And every time, every single time
15 that we were told that they had a concern about
16 a pharmacy, we investigated the pharmacy and we
17 made a conclusion whether or not we should
18 continue doing business with that pharmacy
19 because that pharmacy represented a potential
20 for diversion.
21    Q.  And I want to go back to 2010,
22 because you had additional notice of the issues
23 in Florida besides the DEA communication to
24 you -- to Cardinal, the letter from

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  Mallinckrodt.
2       You yourself were aware of some
3  issues that CVS in particular had in Florida,
4  weren't you?
5       MS. WICHT:  Object to the form of
6  the question.
7       A.  I was concerned about some of the
8  trends that we were seeing in some of the CVS
9  Florida pharmacy.
10      ---
11  (Cardinal-Quintero Exhibit 6 marked.)
12      ---
13  BY MR. KROEGER:
14      Q.  I'm going to hand you what has
15  been marked as Exhibit 6.  It's P1.3778.
16      MR. HUNTER:  Can you provide the
17  Bates number, please?
18      MR. KROEGER:  Yes.  It's
19  CAH_MDL2804_00704499 the underscores
20  between CAH, MDL, and then 280400.
21      A.  (Witness reviews document.)
22      Q.  Mr. Quintero, have you had a
23  chance to look at the document?
24      A.  Yes.

Page 147

1       Q.  Do you recognize that?
2       A.  I recognize as a document that
3  Nick Rausch may have sent to me.  Do not recall
4  all of the details of it.
5       Q.  September 19th, 2010 is when
6  Mr. Rausch sent this to you, correct?
7       A.  Yes.  From Nick Rausch to me and
8  Michael Moné, yes.
9       Q.  Yes.  And if you'll turn to Page 4
10 of the document, it's an analysis of SOM events.
11 And "SOM" is suspicious order monitoring?
12      A.  Yes.  Threshold events, yes.
13      Q.  Can you read the first bullet
14 point for me, please.
15      A.  "August 2010 experienced a
16 19 percent increase in the number of SOM events
17 when compared to previous four months."
18      Q.  And the underlying reasons for the
19 increase include -- can you read the next?
20      MS. RANJAN:  Object to form.
21      MR. KROEGER:  Who's objecting?
22      MS. RANJAN:  Brandy.
23      Q.  You can go ahead.
24      THE WITNESS:  Do I go ahead?

Page 148

1       Somebody objected?
2       MS. WICHT:  Yes.  She objected to
3  the form.  I think he's just asking you,
4  as I understand it, to read the text
5  that's on the page.
6       A.  Oh, the text, okay.
7  BY MR. KROEGER:
8       Q.  Yes.  "The underlying reasons for
9  increase include," and then if you could read
10 after that.
11      A.  So jumping to the third bullet,
12 "Underlying reasons for the increase include:
13 Increased number of SOM events within national
14 chain segment, specifically CVS; increase in
15 demand of oxycodone products (reformulation of
16 Oxycontin); AAP, which is a GPO, continued
17 increase in controlled substances demand;
18 competitive pricing, changes drove increased
19 demand; increased demand in Florida -- Lakeland
20 had twice the number of SOM events as any other
21 distribution center."
22      Q.  So as of September of 2010, you
23 were aware, based on this slide sent from Nick
24 Rausch to you, that there were increased SOM

Page 149

1  events and that in particular, Lakeland had
2  twice the number of SOM events as any other
3  distribution center in Cardinal's centers?
4       A.  I was aware of this, yes.  I was
5  aware of this document.
6       Q.  Okay.  And because of this
7  agreement you think that you had with the DEA,
8  there was no additional due diligence you needed
9  to do with regard to CVS because they were a
10 chain pharmacy, correct?
11      MS. WICHT:  Object to form.
12 Foundation.  Mischaracterizes.
13      A.  I disagree with that.  Something
14 that is not included in this is that in -- I
15 don't believe -- I don't recall it was 2009,
16 2010, Florida didn't allow prescribing
17 physicians to dispense C2 products in the
18 doctor's office, so that volume went to some
19 pharmacies, including some national pharmacies,
20 some retail pharmacies.
21      However, I will have to say that
22 we took this seriously and we increased our
23 scrutiny of Florida stores, including chains.
24      Q.  And when you say that Florida

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 prohibited doctors from prescribing and
2 dispensing the drugs at the same time --
3      A.   They could prescribe, but I
4 believe they were not allowed to dispense
5 drugs -- controlled substances that are C2s.  I
6 don't recall the schedules that were included,
7 but I remember C2 were one of them.
8      Q.   And those --
9      MS. WICHT:  Mr. Quintero, I'm
10     sorry, could you -- the videographer is
11     asking if you could move your microphone
12     up just a little bit, please, because I
13     think it's rubbing when you're sitting.
14     THE WITNESS:  A little bit more?
15     Can you hear me okay?  Okay.
16 BY MR. KROEGER:
17     Q.   What you're talking about are the
18 illicit pain clinics we were talking about
19 earlier today that you said you're not an expert
20 so you can't say whether or not they were a
21 cause of the opioid epidemic?
22     A.   Well, I wouldn't say --
23     MS. WICHT:  Object to the form of
24     the question.

Page 151

1      A.   I would be speculating it was in
2 at least the pain clinic.  I think that law
3 applied to all physicians.
4      Q.   And as the person who was brought
5 in by Cardinal to help improve and make a more
6 robust system for anti-diversion, you would
7 agree, wouldn't you, that the reason, or one of
8 the reasons, that Florida may have enacted such
9 a law would be because a lot of people were
10 illegitimately getting controlled substances
11 through those pain clinics, wouldn't you?
12     MS. WICHT:  Objection to form.
13     Foundation.  Speculation.
14     A.   I don't know the reason why the
15 Florida legislature implemented that.  We had to
16 adapt to that reality.  I'm assuming that that
17 also limited the ability of oncologists to
18 dispense pain medication to cancer patients.
19     Q.   Okay.  But as the senior vice
20 president of QRA brought in, you would agree
21 that a tremendous amount of illegitimate
22 controlled substances were gained through those
23 pain clinics, wouldn't you?
24     MS. WICHT:  Object to the form.

Page 152

1      A.   I wouldn't say that all of that
2 volume went to pharmacies.  Actually, in a
3 deposition made by Joe Rannazzisi to Congress,
4 he said 99 percent of the pharmacies do good
5 business and they fill prescriptions for
6 legitimate medical use.
7      Q.   That's not my question in the
8 slightest.
9      A.   What was your question?
10     Q.   As the senior vice president of
11 QRA, would you agree, and in your role -- many
12 roles you've had overseeing anti-diversion,
13 would you agree that those pain clinics where
14 there was a doctor prescribing and dispensing
15 and they were shut down, would you agree that
16 those were a large contributor to the
17 illegitimate opioid products getting into the
18 country?
19     MS. WICHT:  Object to form.
20     A.   I wouldn't know what the
21 percentage of the pain clinics were doing
22 illicit business versus doing business that were
23 not in the best interests of patient.  I
24 couldn't tell you that number.

Page 153

1      Q.   And since you couldn't tell me
2 that number, you also couldn't tell me how many
3 of those illegitimate patients were now getting
4 their drugs from CVS, could you?
5      MS. WICHT:  Object to form.
6      Foundation.
7      A.   There's no way for us to know the
8 reasons why patients are getting their
9 medications -- I mean, there is government
10 regulations that prevent us from having access
11 to individuals' medical records.
12          - - -
13     (Cardinal-Quintero Exhibit 7 marked.)
14          - - -
15 BY MR. KROEGER:
16     Q.   I hand you Exhibit 7.  It's 3786.
17 The Bates is CAH_MDL2804_01103874.
18     A.   Uh-huh.
19     Q.   If you would take a look at that
20 document for me, please.
21     A.   (Witness reviews document.)
22          Yep.
23     Q.   And this is another e-mail sent
24 from Nick Rausch to you in 2010; is that right?

Page 154

1    A.   Correct.
2    Q.   October 22nd, 2010, Nick sent this
3 to you?
4    A.   Correct.
5    Q.   And on Page 2, you see a specific
6 pharmacy that this is in relation to, don't we?
7    A.   Yeah.  It's pharmacy -- CVS
8 Pharmacy 219.
9    Q.   That's a familiar number, right?
10    A.   Yep.
11    Q.   So as early as October of 2010,
12 you had asked for and received information
13 specific to this one pharmacy in Sanford,
14 Florida, correct?
15    A.   Uh-huh.
16       MS. WICHT:  Object to the form.
17    Q.   And that pharmacy, as you'll see
18 on Page 2, had high quantities when compared to
19 other CVS stores, high quantities of oxycodone,
20 correct?
21    A.   Correct.
22    Q.   In fact, they had 2800 percent
23 more than average CVS store over the past three
24 months, 725,000 units of oxycodone compared to

Page 155

1 average of 25,000.  Correct?
2    A.   Correct.
3    Q.   So when you received this
4 information in 2010, did you report 219 to the
5 DEA?
6    A.   No.  We requested to have the
7 meeting with CVS to better understand why this
8 particular pharmacy had an increase in the
9 purchase of some controlled substances.  CVS
10 committed to do a thorough investigation on the
11 reasons why, and they provided us with a
12 statement on why those particular stores were
13 buying more than the average CVS store.
14    Q.   Okay.  If you'll go back to
15 Exhibit 5 for me.  It's the 4085.  And you'll
16 turn to Page 27, please.  It's the large one
17 we've been doing.
18    A.   Uh-huh.
19    Q.   If you will turn to Page 27, I
20 think we can find the text of that response.
21    A.   27?
22    Q.   Yes, sir.
23       You see at the top how it says,
24 "Carter will also testify"?  I just want to make

Page 156

1 sure we're on the same page.
2    A.   Yes, we're on the same page.
3    Q.   And this is in regard to CVS 219
4 and an e-mail dated September 30th, 2010.
5 Skipping down to the middle of the paragraph,
6 the e-mail stated that, "At that time, CVS
7 experienced an increase in sales of oxycodone
8 due to the DEA closing stores in the area.
9 Again earlier this week, because of our request,
10 he sent another e-mail to LP (loss prevention)
11 asking them to take a fresh look.  He received a
12 response yesterday and they have reviewed the
13 store's activities and they have been closely
14 monitoring store 219 for a couple of weeks.
15       "None of these stores show
16 significant growth or shrink issues.  They
17 acknowledge that Florida has been cracking down
18 on 'pill mills' and that is driving more
19 legitimate traffic to CVS stores."
20       Is this the response you're
21 talking about?
22       MS. WICHT:  Object to form.
23    A.   This is some of the language that
24 was used in -- I believe in a memo that was sent

Page 157

1 back to us.
2    Q.   What's a "pill mill"?
3    A.   My understanding of a pill mill is
4 a pharmacy that may fill some of their
5 prescriptions for other than legitimate medical
6 use.  But that there's a language here that it
7 was driving legitimate traffic to the CVS
8 stores.
9    Q.   So Florida cracks down on pill
10 mills, which you acknowledge are places where
11 illegitimate pills may be sold, right?
12    A.   Could be part of the sales of that
13 particular store maybe for legitimate medical
14 reasons and not for legitimate medical reasons.
15    Q.   Florida cracks down on those pill
16 mills and then suddenly CVS has a growth in
17 business?
18       MS. WICHT:  Object to the form.
19    A.   If there's less pharmacies in the
20 area, I'm assuming that some of that will drive
21 legitimate traffic to the CVS stores.
22    Q.   So if the flow of opioids going to
23 pill mills is diverted by the government
24 shutting them down, then that flow is going to

Page 158

1 go to CVS? Would you agree?
2        MS. WICHT: Object to the form of
3 the question.
4        A.   I wouldn't say that would be the
5 case. I'm assuming the pharmacists at CVS were
6 doing their correspondence responsibility in
7 determining whether or not those particular
8 scripts were for legitimate medical purposes and
9 that the traffic -- that additional traffic that
10 they were getting was as a result of other
11 stores in the area that had been closed. That
12 may have had legitimate traffic as well as
13 traffic that is illegitimate.
14        Q.   So you're agreeing, then, that
15 there may be illegitimate traffic that had gone
16 to CVS as a result of the pill mills?
17        A.   No, I never said that.
18        MS. WICHT: Object to the form of
19 the question.
20        A.   I never said that. I said that,
21 you know, my understanding at that time was that
22 the pharmacist at CVS was doing their
23 corresponding responsibility, and according to
24 the text, is that they -- if the traffic that

Page 159

1 was getting to the CVS stores were legitimate
2 traffic, as stated here by -- this document, I
3 think, came from Ruth Carter.
4        Q.   So as a senior vice president of
5 QRA, responsible for the entire anti-diversion
6 program of Cardinal Health, is it your testimony
7 that when Florida shuts down these pill mills
8 that you acknowledge are a source of
9 illegitimate opioids, that the resulting flow of
10 opioid patients, people getting opioids, only
11 the legitimate people go to CVS?
12        MS. WICHT: Object to the form.
13        A.   The illegitimate?
14        Q.   The legitimate.
15        A.   Well, I couldn't tell -- I
16 couldn't answer that question, but I can answer
17 that, in addition to this document that we got
18 from CVS, I sent one member of my staff to park
19 in front of store 219 and determine whether
20 there were obvious signs of diversion, like cars
21 with license plates from out of states, long
22 lines. And when he came back to me, he said, I
23 did not see anything unusual in 219.
24        Q.   What time did he go? What time of

Page 160

1 day did he go?
2        A.   I don't recall the time. I cannot
3 tell you from the top of my head.
4        Q.   Morning, afternoon, evening?
5        MS. WICHT: Object to form.
6        A.   I cannot remember from the top of
7 my head when he go, but when he went there --
8 and he was there for a period of time -- he did
9 not observe a single sign of diversion. So I
10 mean, I trust his judgment, I -- that his
11 opinion, with the language that we got from CVS,
12 led me to believe that that store at that
13 particular time was operating as any good
14 pharmacy should operate.
15        Q.   A store that had a 2800 percent
16 more oxycodone over three months than the
17 average CVS, and you as the senior vice
18 president of QRA for Cardinal Health took CVS's
19 word and one site visit to determine that it was
20 all legitimate traffic?
21        MS. WICHT: Object to the form.
22        Mischaracterizes.
23        A.   Based on the information that I
24 received from CVS, as well as our own site

Page 161

1 visit, we did not have a reason to believe that
2 CVS 219 was filling prescriptions other than for
3 legitimate medical purposes.
4        Q.   And who did the site visit?
5        A.   Chris Forst.
6        Q.   And you don't know what time of
7 day Chris Forst went?
8        A.   Don't recall.
9        Q.   Are you aware that this CVS was
10 selling so much oxycodone that they regularly
11 ran out before noon?
12        MS. WICHT: Object to the form.
13        A.   I don't know that.
14        Q.   Okay. As senior vice president of
15 QRA, shouldn't you?
16        MS. WICHT: Object to form.
17        A.   I don't monitor when drugs are
18 being dispensed. I don't think that that is
19 possible to do.
20        Q.   To be clear, are you saying it's
21 not possible for Cardinal to monitor when drugs
22 are being sold? Is that what you just said?
23        A.   You will have to have --
24        MS. WICHT: Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    A.   You will have to have somebody in
2 front of the store 24/7 to see when the drugs
3 are being filled.  If you want me to tell you,
4 you know, my assumption is, customer goes to
5 pharmacies throughout the day, not only at one
6 particular time.  I don't even remember if these
7 are 24-hour stores or not.  Could be.  But it
8 would require having a member of my staff in
9 front of each single pharmacy in the United
10 States to see the dispensing patterns of all
11 those stores.
12    Q.   Or it might just require some due
13 diligence; would you agree?
14         MS. WICHT6:  Object to the form.
15 Is that a question?
16         MR. KROEGER:  It is.  I said
17 "would you agree."
18         MS. WICHT:  Object to the form.
19 Why don't you answer that before
20 you -- or --
21    A.   We did our due diligence.
22             - - -
23    (Cardinal-Quintero Exhibit 8 marked.)
24             - - -

Page 163

1 BY MR. KROEGER:
2    Q.   I've handed you 3782,
3 CAH_MDL2804_01087475.
4         THE WITNESS:  Is that this one?
5         MS. WICHT:  Yes, that's this
6 document.  That was the number that he
7 read in, I believe.
8         THE WITNESS:  Okay.
9 BY MR. KROEGER:
10    Q.   Do you have 3782 at the top?
11    A.   Yep.
12    Q.   Okay.  We can walk through this.
13 This is -- can you tell who this e-mail is from?
14    A.   This is from Nick Rausch.
15    Q.   When did he send it to you?
16    A.   Sent it to me in -- on March 22,
17 2012.
18    Q.   And what is it exactly that he is
19 sending you?
20    A.   Sending me a PowerPoint
21 presentation of CVS stores that were being
22 reviewed.
23    Q.   When were they being reviewed?
24    A.   I'm assuming in -- when he sent me

Page 164

1 the e-mail.
2    Q.   Okay.  And that's -- I wanted to
3 try to clarify.  So if you could stay on the
4 first page real quick.  Just -- I want to make
5 clear what this is.
6         It says, "Gilberto, per your
7 request, attached please find the presentation
8 prepared for the December 2010 meeting with
9 CVS."
10    A.   Okay.  So it's likely that it was
11 for a presentation that we made to CVS in 2010.
12    Q.   Do you remember that meeting in
13 2010 that you had with CVS?
14    A.   Yes, I remember that meeting.
15    Q.   And the purpose of that meeting
16 was what?
17    A.   Was to discuss with CVS our -- I
18 need to -- can I go over the slides just to
19 refresh my mind first?
20    Q.   Absolutely.
21    A.   (Witness reviews document.)
22         (Pause in proceedings.)
23    A.   Yes.
24    Q.   Do you recall this presentation?

Page 165

1    A.   Yeah, I remember this presentation
2 now.
3    Q.   And this was from a meeting that
4 you were personally at with CVS in 2010?
5    A.   I was with Michael Moné and some
6 of the members of the CVS management team.
7    Q.   But you were personally there?
8    A.   I was there.
9    Q.   Okay.  And it was December of 2010
10 that you had the meeting?
11    A.   It appears that was the date.  I
12 don't have any reason to believe that it did not
13 occur during December 2010.
14    Q.   If you turn to Page 5 of this.
15    A.   You asked me first, and I didn't
16 answer your question, which I don't know if I
17 should, is what was the purpose of the meeting.
18    Q.   Go ahead.
19    A.   Do you want me to answer that
20 question?
21    Q.   Sure.
22    A.   Should we -- sorry about that.
23         MS. WICHT:  I won't object to the
24 witness' own question.  That's okay.

Page 166

1      Go ahead.
2      A.    The purpose of the meeting was to
3  go over our program with CVS and provide them
4  with a few of -- some stores that we needed more
5  information.
6      Q.    Okay.  And on Page 5, CVS stores
7  created 468 suspicious order monitoring events
8  in 2010.
9      A.    Uh-huh.
10     Q.    How many of those were resolved
11  with the order being released?
12     A.    I could not say that.
13     Q.    If you look down the slides, you
14  can.
15     A.    I guess, according to this
16  document, it's 90 percent of them were reviewed
17  and resolved and the order was released.
18     Q.    So that means that there was a
19  suspicious order monitoring event and -- 468 of
20  them, and 90 percent of the time those orders
21  were reviewed and released, correct?
22     A.    According to this document, that's
23  what it says, yes.
24     Q.    And 6 percent of the 468

Page 167

1  suspicious order monitoring events were
2  confirmed order entry errors; is that right?
3      A.    That's what it says there.
4      Q.    So then, does that mean that only
5  4 percent of the 468 suspicious order monitoring
6  events had any issue at all that was suspicious?
7          MS. WICHT:  Object to the form of
8      the question.
9      A.    I wouldn't say that the event
10  itself, just by hitting the threshold was
11  suspicious, it required the analysts or the
12  investigators to do additional evaluation and do
13  that determination.
14     Q.    Do you know what evaluation they
15  did?
16     A.    I don't recall.  This was -- this
17  happened in 2010, so I don't recall exactly what
18  was going on.  I recall that we requested CVS
19  additional information about the stores that are
20  listed in this document.
21     Q.    So if we turn to Page 11, CVS
22  pharmacy 1136, November of 2010.
23          Do you see that?
24     A.    Uh-huh.

Page 168

1      Q.    November of 2010, quantity is 537
2  percent above CVS store monthly average of 8300
3  dosage units.
4      A.    Uh-huh.
5      Q.    That caused concern?
6          MS. WICHT:  Object to the form.
7      Q.    That caused Cardinal some concern,
8  didn't it?
9      A.    That caused, you know, us being
10  concern of wanting to have more information
11  about that particular store.
12     Q.    And if that had been an
13  independent retail pharmacy, would you have
14  asked that independent retail pharmacy the
15  reason, or would you have done your own due
16  diligence?
17          MS. WICHT:  Object to form.
18     A.    We would have first called the
19  pharmacy to try to understand the reason.
20     Q.    And if they gave you any reason at
21  all, would you just accept it?
22          MS. WICHT:  Object to the form.
23     A.    Depending on the reason that it is
24  and whether or not it seems credible or not.

Page 169

1      Q.    What's a credible reason for 537
2  percent above the monthly average of 8300 dosage
3  units?
4          MS. WICHT:  Object to form.
5      A.    There could be many valid reasons.
6  I don't know for this particular one, but I can
7  tell you that sometimes, pharmacies take over
8  hospices to provide drugs to cancer patients
9  that are about to die and they have a new
10  account with a hospice, or there may be a new
11  hospital opening nearby.  There are many -- it
12  could be they bought, you know, the script
13  from -- the account from other pharmacies that
14  closed in the nearby area.
15     Q.    Okay.
16     A.    So there are many reasons for
17  that.  And these particular reasons, I do not
18  recall from the top of my head.
19     Q.    As senior vice president of QRA at
20  the time, is that something you would like to
21  have known?
22          MS. WICHT:  Object to form.
23     A.    Our process, as I described
24  before, and during this deposition, is we had an

Highly Confidential - Subject to Further Confidentiality Review

---

Page 170

1 agreement with DEA that we will use the
2 investigations from the chain pharmacies to help
3 us reach our own conclusions.
4        In this particular case, I
5 remember asking the members of the CVS staff to
6 do an investigation of all these particular
7 stores and to get to me back in writing the
8 conclusions of their investigations, which they
9 did at a future date.
10   Q.   Okay.  To try to summarize what I
11 think you just said -- I want to be clear -- it
12 sounds to me as if you're saying that you
13 believed the DEA had told Cardinal that you
14 could rely on CVS to do the due diligence as to
15 these kinds of suspicious orders, and because of
16 that agreement with the DEA, CVS gave you a
17 reason that you found sufficient, then you
18 needed to do nothing more?
19        MS. WICHT:  Object to form.
20   A.   I'm not saying that.  In many
21 cases we did more investigation, our own
22 investigations, like what I showed you in 219.
23 CVS gave us a reason.  I wanted to confirm that
24 the reason was credible, so I sent my own

---

Page 171

1 investigator to CVS 219 to do a surveillance
2 inspection of that particular pharmacy, and he
3 didn't find a single sign of diversion at that
4 time.
5   Q.   Okay.  If you turn to Page 12 for
6 me, please.  This is another CVS.  CVS Pharmacy
7 0174.  And another November 2010 quantity.  This
8 one is 6977 percent above CVS store monthly
9 average of 700.  And that causes Cardinal some
10 concern, doesn't it?
11        MS. WICHT:  Object to form.
12   A.   It gave us concern and we wanted
13 to know the reasons why the store had an
14 increased volume for particular controlled
15 substances.  We wanted an explanation --
16 investigation and an explanation in writing from
17 CVS, which they submitted at a later time.
18   Q.   And in this particular case, store
19 174, over 60 percent of purchases are for
20 controlled substances.
21        Would that be a red flag to you?
22   A.   Not necessarily, because CVS
23 warehouses all their noncontrolled substances.
24 We only sell a fraction of what CVS store sells

---

Page 172

1 in their stores.  But they do not have a vault,
2 so we are their primary supplier of controlled
3 substances, at least for those stores in that
4 region of the country.
5   Q.   So because they don't have a
6 vault, a nearly 7,000 percent over monthly
7 average isn't concerning?
8   A.   That was --
9        MS. WICHT:  Object to form.
10   A.   That wasn't the question that you
11 asked me.  You asked me if 60 percent of the
12 purchases, if that was concerning that they were
13 controlled substances.  And I said, probably not
14 because we had the agreement with CVS because
15 they don't a vault, we supply all of their C2.
16 They supply most of their other drugs out of
17 their own warehouses.
18   Q.   Including, at that time,
19 hydrocodone?
20   A.   I don't recall at that time if
21 that particular warehouse that CVS was using had
22 a vault.
23   Q.   And if you'll turn to Page 13.
24 Again, another CVS with, this time, 453 percent

---

Page 173

1 above CVS store monthly average of dosage units
2 of oxycodone.  Right?
3   A.   Yep.  That's what it says in the
4 document.
5   Q.   And that caused you concern, is
6 Cardinal Health distributing that much oxycodone
7 to a single CVS store?
8   A.   The increase gave us concern.
9 That's why we met with CVS.  We expressed our
10 concerns, and we requested an investigation of
11 these stores that are listed in this document.
12   Q.   And on Page 14, CVS 3639 had a 244
13 percent above CVS monthly average of 8,300; is
14 that right?
15   A.   Correct.  That's what it says in
16 the document.
17   Q.   And again, that caused Cardinal
18 concern?
19   A.   All the stores that are presented
20 in this document we highlighted as stores that
21 we needed more information from CVS.
22   Q.   Okay.
23   A.   So the answer is the same for all
24 the stores.  We wanted to have additional

---

Page 174

1 information from CVS. Our system were to
2 identify stores that we needed additional
3 information, and according to our process and
4 the agreement that we had with the agency, we
5 executed that. And on top of that, we sent
6 people with some of the stores to do
7 surveillance inspections.
8     Q.  And some of these stores in
9 particular?
10    A.  Well, I don't know if this store,
11 but some of the CVS stores we have performed
12 surveillance inspections.
13    Q.  Well, these are the stores that in
14 December of 2010 you thought suspicious enough
15 that you wanted to bring it to CVS's attention
16 directly, right?
17    A.  Yep.  And --
18        MS. WICHT:  Object to the form of
19 the question.
20    A.  -- these were stores that the data
21 provided here gave -- an analysis that we did
22 highlighted these stores as stores that we
23 needed additional information and that we
24 requested additional information from CVS.  We

Page 175

1 requested for them to do an investigation of
2 each one of those stores and to provide us with
3 the conclusion of their investigation.
4     Q.   And for any of these stores, did
5 Cardinal do any of its own due diligence, aside
6 from asking CVS?
7        MS. WICHT:  Object to the form.
8     A.   Right now, I recall me asking
9 about going to 219, but I'm not in a position to
10 say whether or not we went to any of these
11 stores.  Michael Moné may have made that
12 request.  Nick Rausch may have made that
13 request.  I do not remember that.  I do not
14 know.
15    Q.  Anything besides site visits that
16 you can recall for any of these stores that
17 Cardinal did with regard to due diligence?
18    A.  I know there were conversations
19 between Michael and members of the CVS
20 anti-diversion program.
21    Q.  And all of that would be
22 documented in the due diligence files for each
23 of these stores?
24        MS. WICHT:  Object to the form.

Page 176

1     A.  I cannot tell you whether or not
2 we documented every single conversation that we
3 had with CVS.
4     Q.  Can you tell me that Cardinal
5 documented the due diligence that you did with
6 regard to these stores?
7     A.  We documented, you know --
8        MS. WICHT:  Object to the form.
9     A.  -- the outcome of our presentation
10 to CVS and also the conclusion of their
11 investigation.  I know that for a fact, because
12 I remember seeing those documents.  Anything
13 else, I'm not into the day-to-day execution of
14 the program, so you're asking me for questions
15 that are based on day-to-day execution, and I'm
16 not the best person to answer those.
17    Q.  No.  But you, at this time,
18 oversaw all of those people and were responsible
19 for them following the law, weren't you?
20    A.  I over --
21        MS. WICHT:  Object to the form of
22 the question.
23    A.  I oversee over 2,000 people in my
24 department.  I don't have intimate knowledge of

Page 177

1 what each one of those members in my department
2 execute on a daily basis.
3     Q.  Ultimately, the responsibility
4 comes all the way up to you for them doing their
5 job correctly, though, doesn't it?
6     A.  I have responsibility --
7        MS. WICHT:  Object to the form.
8     A.  I have responsibility for having
9 programs to help Cardinal Health meet all of the
10 regulatory requirements.
11    Q.  Okay.  And so you said for each of
12 these stores, you -- the purpose of this meeting
13 was to have CVS look into these stores and then
14 they would let you know what they found?
15    A.  Correct.
16    Q.  And that was the due diligence you
17 were going to do for these particular stores, to
18 your knowledge?
19        MS. WICHT:  Object to form.
20    A.  Based on the agreement that we had
21 with DEA in 2009, the process was, when we had a
22 concern about a chain store is to have the chain
23 stores perform an investigation on any pharmacy
24 that belonged to them that we had, you know, the

Page 178

1 need for additional information.
2     Q.   Okay.  And after that December
3 2010 meeting, CVS got back to you with the
4 results of their investigation, correct?
5     A.   CVS wrote us a memo.
6          - - -
7     (Cardinal-Quintero Exhibit 9 marked.)
8          - - -
9 BY MR. KROEGER:
10    Q.   I'm going to hand you what's been
11 marked as Exhibit 9.  It's 4334.  It is
12 CAH_MDL_PRIORPROD_DEA12_00011853.
13    A.   Uh-huh.
14    Q.   If you would look at that,
15 Mr. Quintero.  Is this the memo that you're
16 talking about that CVS got back to you?
17    A.   (Witness reviews document.)
18        (Pause in proceedings.)
19    A.   Yes, this is the -- one of the
20 memos that I'm talking about.
21    Q.   Were there any other memos that
22 they may have sent?
23    A.   I wouldn't know, but I remember
24 seeing this particular one.

Page 179

1     Q.   And if they had sent any other,
2 would those go in the due diligence files for
3 those particular stores?
4         MS. WICHT:  Object to the form.
5     A.   I'm assuming those are in the
6 possession of somebody at Cardinal Health.  I
7 would assume that.
8     Q.   But this isn't something that
9 would go into a due diligence file for store
10 174, for instance?
11    A.   It will go to -- it will be filed.
12 But like I told you before, I don't have an
13 intimate knowledge of what -- every single
14 activity that is done out of the 2000 people
15 that report into my organization.  So my
16 assumption is they have some kind of filing
17 system, and I recall this document.  This
18 document was important to me because I was part
19 of that meeting, so I requested to see this
20 document.
21    Q.   And as senior vice president of
22 QRA for Cardinal at this time, you don't know
23 what goes into the due diligence files?
24    A.   I know --

Page 180

1         MS. WICHT:  Object to form.
2     A.   I know information that goes into
3 the due diligence file, but you were asking me
4 if every single document goes into due diligence
5 file, and I couldn't tell you that.
6     Q.   So you know what goes into it but
7 you don't know what doesn't go into it?
8         MS. WICHT:  Object to the form.
9     Q.   I'm unclear.
10    A.   Unclear about what?
11    Q.   About what you mean when you say
12 you know what goes into the due diligence files
13 but you don't know if this would have gone into
14 it or not.
15    A.   I know about the content of some
16 due diligence files because I have seen some of
17 the due diligence files.  Can I tell you that I
18 know every single document that goes into a due
19 diligence files?  I don't think that I can tell
20 you that.
21    Q.   And after you had this
22 presentation -- or Cardinal had this
23 presentation with CVS in December of 2010, CVS,
24 as we go down to the last two paragraphs of this

Page 181

1 page, Page 1, they let you know that they --
2 that teams interviewed pharmacy staff, reviewed
3 controlled substance ordering, receiving and
4 dispensing procedures, controlled substance
5 records and reports and security.  The teams
6 also audited certain drugs.
7         Do you know which drugs?
8     A.   No, I don't know what drugs they
9 were referring to.
10    Q.   Okay.  But CVS let you know that
11 they audited certain drugs?
12    A.   They did that.
13    Q.   Do you know which pharmacy staff
14 they interviewed?
15    A.   In the previous paragraph that you
16 are not reading, it says they met with CVS
17 stores 0174, Daytona Beach; 1136 in Homestead;
18 2732 Hollywood; 2848 in Pompano Beach; and
19 3939 -- 36 -- pardon me, 3639 in Bushnell.
20        I'm assuming -- the assumption is
21 that they visited those stores and they talked
22 to personnel from those stores, including
23 pharmacy staff, according to the previous
24 paragraph.

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    Q.   Right.  But you don't know which
2  pharmacy staff at those various stores that they
3  talked to?
4        A.   It indicates pharmacy staff.
5        Q.   And my question to you is:  Do you
6  know which pharmacy staff they spoke to at those
7  stores?
8        A.   I could not tell you.  I would be
9  speculating if I tell you which pharmacy staff.
10       Q.   But you're aware there are
11 multiple different types of jobs and roles and
12 positions in a pharmacy, right?
13            MS. WICHT:  Object to the form.
14       A.   In a pharmacy, there may be
15 different people at the pharmacy.
16       Q.   Pharmacists in charge, or
17 pharmacist tech; any number of different
18 positions in a pharmacy, right?
19       A.   Uh-huh.
20       Q.   But you can't say which of those
21 staff members CVS may or may not have spoken to
22 at these stores?
23            MS. WICHT:  Object to the form.
24       A.   Or in the previous paragraph, two

Page 183

1  paragraphs before that, they talk about meeting
2  with the pharmacist at the site to make sure
3  that they understood, you know, the
4  dispensing --
5        Q.   Go ahead and read directly from
6  it, if you don't mind.
7        A.   "Since our meeting, CVS has
8  undertaken action to address your concerns about
9  those specific pharmacies to address suspicious
10 ordering and dispensing generally.  CVS has
11 distributed guidelines that reinforce the
12 company's position that pharmacists use their
13 professional judgment when determining whether
14 to fill prescriptions.
15            "The guidelines identify
16 inappropriate prescription-seeking behavior and
17 advise pharmacists how to minimize risk of
18 dispensing for other than legitimate
19 prescriptions."
20       Q.   So this paragraph doesn't say that
21 CVS went and interviewed pharmacists; it says
22 that it sent guidelines to those pharmacists,
23 correct?
24            MS. WICHT:  Object to the form.

Page 184

1        A.   My assumption, when reading the
2  letter, is that the team interviewed pharmacy
3  staff included pharmacists, because they're the
4  one dispensing the product.
5        Q.   But you don't know that based on
6  what CVS told you, do you?
7        A.   I think that would be a good
8  assumption to make, based on this memo.
9        Q.   So when you take the time to meet
10 with CVS, present to them a number of stores
11 that cause Cardinal concern, you as a senior
12 vice president of QRA feel comfortable basing
13 your decision to continue shipping to these
14 stores on an assumption that they must have
15 talked to the pharmacist?
16            MS. WICHT:  Object to form.
17            Mischaracterizes.
18       A.   It is not -- not on the
19 assumption.  This is based on the facts that CVS
20 conducted an investigation of those particular
21 pharmacies and that they deemed that those
22 pharmacies were dispensing product for
23 legitimate medical purpose.
24       Q.   What receiving --

Page 185

1        A.   As stated in the last paragraph of
2  Page 1.
3        Q.   We'll get there.
4            What receiving and dispensing
5  procedures did CVS review with -- in this
6  investigation?
7        A.   I don't know the details of that.
8  I wasn't there during the investigation.
9        Q.   No, you weren't.
10           What controlled substance records
11 and reports did they review?
12       A.   I wasn't there during the
13 investigation, so I cannot tell you that.
14       Q.   What security did they review?
15       A.   I cannot tell you that because I
16 was not part of the investigation.
17       Q.   But CVS told you that they did
18 some sort of a review of all of these things,
19 but you don't know what specifically they
20 reviewed, do you?
21           MS. WICHT:  Objection.  Asked and
22           answered.
23       A.   Can you repeat the question again?
24       Q.   CVS told you that they reviewed a

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1 number of different things, but you don't
2 actually know what specifically they reviewed.
3 You don't know which pharmacy staff they
4 interviewed, do you?
5        MS. WICHT:  Objection.  Asked and
6    answered.
7    A.   Here it's stated on Paragraph --
8 "The teams interviewed pharmacy staff, reviewed
9 controlled substances ordering, receiving,
10 dispensing procedures, controlled substances
11 records and report and security.  The teams also
12 audited certain drugs."
13        But it chose that they did an
14 investigation, including those elements listed
15 in -- in Paragraph 4.
16    Q.   And again, the question, though,
17 is:  The specifics of those reviews, you don't
18 know anything more than what's right here, do
19 you?
20    A.   Again, I have --
21        MS. WICHT:  Objection.  Asked and
22    answered.
23    A.   I have told you that I was not a
24 party in the audit, so I cannot tell you the

Page 187

1 specifics of it, but I trust that CVS did what
2 they committed to us, which was to do an
3 investigation based on the data that we
4 presented to them and that the investigation was
5 valid.
6    Q.   Do you know if CVS has any sort of
7 profit motive in their business model?
8        MS. WICHT:  Object to the form.
9    A.   I don't understand --
10        MS. WICHT:  And speculation.
11    A.   I don't understand the question.
12    Q.   Do you think that CVS is a
13 corporation that seeks to make profits?
14        MS. WICHT:  Object to the form.
15    A.   I believe CVS is a public company,
16 that like all the public companies, seek to make
17 a profit.
18    Q.   And would you agree that if CVS
19 doesn't receive opioids from Cardinal, they will
20 lose some of those profits because they can't
21 sell them?
22        MS. WICHT:  Object to form.  Calls
23    for speculation.
24    A.   I wouldn't -- I couldn't tell you

Page 188

1 the proportion of opiates that is their business
2 versus other business.
3    Q.   Would you agree, though, that
4 whatever proportion it is, it could be directly
5 impacted by Cardinal deciding not to sell
6 opioids to CVS?
7        MS. WICHT:  Object to form.  Calls
8    for speculation.
9    A.   That would be speculating if I
10 give you a specific answer.  I do not know that.
11    Q.   And counsel has done a good job of
12 guiding you into that answer.  But would you
13 agree that CVS, as a public corporation that has
14 a profit motive, would lose some profits if it
15 was no longer able to sell opioids that Cardinal
16 distributed?
17        MS. WICHT:  Object to form.  Calls
18    for speculation.
19        MR. KROEGER:  Can you keep it to
20    object to form, please?
21        MS. WICHT:  I understand you're
22    accusing me of coaching.  You're asking
23    the witness to testify about the profit
24    structure and the income of an entirely

Page 189

1 separate company.
2        MR. KROEGER:  All objections are
3    to be as to form only.
4        MS. WICHT:  Object to form.  Calls
5    for speculation.
6    A.   You know, if -- I don't even know
7 if -- there are sometimes that you have to carry
8 products in a supermarket that makes no profit,
9 but you have to have it in order for the -- to
10 be a complete offering.  I don't know if they
11 sold -- I mean, what are the profits of opioids
12 for CVS?  I don't work there.
13        And even if I work there, I'm a
14 quality professional, not a salesperson or in
15 the finance department to determine what is the
16 profit margin on opioids that they made.  I
17 don't know that.  I don't even know if that will
18 stop other customers from going to the store.  I
19 do not know that.  I would be speculating.
20 You're asking me to answer something that I have
21 no knowledge of.
22    Q.   You were the senior vice president
23 of QRA at Cardinal Health, correct?
24    A.   I am.

Page 190

1    Q.   And in that role, a primary duty
2  was to ensure a robust anti-diversion program
3  from Cardinal, correct?
4    A.   It requires us to meet our
5  regulatory requirements, yes.
6    Q.   And the only reason -- well,
7  you're now also saying that you don't know if
8  opioids are profitable for CVS?
9    A.   I don't know the profit structure
10 of -- CVS has on opioids.  I cannot tell you
11 that.
12   Q.   You won't even go so far as to say
13 that you believe, as someone who has worked with
14 CVS and who has worked in the business world,
15 you won't even go so far as to say that CVS
16 likely profits off of opioids?
17       MS. WICHT:  Object to the form.
18   A.   I cannot tell you the answer to
19 that because I would be speculating.  I don't
20 know how much money they make in opioids, what
21 are the investment that they have to do to be
22 able to sell opioids.  So I cannot tell you
23 that.  I mean, you're asking me to answer a
24 question that is beyond my understanding about

Page 191

1  CVS business model.
2    Q.   I'm asking you to answer a real
3  world question about the fact that opioids are
4  profitable for corporations.
5        MS. WICHT:  Is that a question?
6        MR. KROEGER:  Yeah.
7        MS. WICHT:  What's the question?
8  BY MR. KROEGER:
9    Q.   Can you tell me if they are?
10       MS. WICHT:  Object to the form.
11       Calls for speculation.
12   A.   Yeah.  I would be speculating,
13 so...
14   Q.   Okay.  So then, let's move down to
15 the final paragraph on Page 1.  CVS's conclusion
16 that they sent to you, "The teams found no
17 evidence of controlled substance diversion or
18 significant losses.  CVS is confident that
19 pharmacists and their staff at these pharmacies
20 understand how to minimize the risk of
21 dispensing controlled substances, particularly
22 opioids for pain management for nonlegitimate
23 purposes."
24       That's the conclusion CVS sent to

Page 192

1  Cardinal; is that right?
2        MS. WICHT:  Object to the form.
3    A.   And there's more language in there
4  on the second page, too.
5    Q.   But that paragraph, is that
6  correct?
7    A.   That paragraph that you read is in
8  the letter, yes, correct.
9    Q.   So based on some sort of a review
10 that you weren't a part of, so you don't know
11 the details of, CVS has told you that they found
12 no evidence of controlled substance diversion or
13 significant losses?
14   A.   That's the information --
15       MS. WICHT:  Object to the form.
16   A.   That's the information that was
17 provided to us by CVS.
18   Q.   And then if we turn to the last
19 paragraph that you were -- based on that review
20 that you don't know the details of, CVS is
21 telling you, "CVS is comfortable with Cardinal
22 continuing to ship controlled substances to
23 these pharmacies and look forward to continuing
24 to work with you to address matters of mutual

Page 193

1  concern.  Please let me know if you still have
2  concerns about these pharmacies or if you have
3  concerns about others."
4    A.   Uh-huh.
5    Q.   So after a meeting with CVS in
6  December of 2010, where you outlined a number of
7  pharmacies that had anywhere from 200 percent
8  over the average to 6,799 percent over the
9  average, this is the result of CVS's due
10 diligence, correct?
11       MS. WICHT:  Object to the form.
12   A.   This is a summary of the
13 conclusion of their investigation.
14   Q.   And it's based on this summary of
15 their conclusion of their investigation that
16 Cardinal determined it was appropriate to
17 continue shipping to these individual CVS
18 stores, correct?
19       MS. WICHT:  Object to the form.
20   A.   We didn't have any reason to
21 believe that the information provided to us was
22 not valid.
23   Q.   What reason did you have to
24 believe that it was valid?

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    A.   Is that representations that they
2  make to us, the meeting that we had with them,
3  they expressed, you know, concerns that we were
4  concerned about these stores, and they committed
5  to do thorough investigations on these
6  particular pharmacies.
7    Q.   And at no point did Cardinal do
8  any of its own due diligence on these
9  pharmacies?
10    MS. WICHT:  Object to the form.
11    Mischaracterizes his prior testimony.
12    A.   Like I told you, you know, we, you
13  know, kept looking at trends of pharmacies.  We,
14  on occasion, visited CVS pharmacy.  I cannot
15  tell you which specific one.  The only one that
16  I recall from the top of my head is 219.  It is
17  possible that we went to some other stores.
18    Q.   Later in 2011 --
19    MS. WICHT:  Would it be a good
20    time for a short break?
21    MR. KROEGER:  Now is fine.
22    VIDEOGRAPHER:  Time is now 11:14.
23    Going off the record.
24    (Recess taken.)

Page 195

1    VIDEOGRAPHER:  Time is now 11:33.
2    Back on the record.
3  BY MR. KROEGER:
4    Q.   Mr. Quintero, we have talked a bit
5  about what happened in terms of the DEA action
6  against Cardinal in late 2011, early 2012 today.
7    The first thing that happened,
8  though, was that an administrative investigative
9  warrant was served?
10    A.   (Nods head.)
11    Q.   Do you recall that being served?
12    A.   Yes, I do.
13    Q.   Did you see a copy of it?
14    A.   I saw a copy of that at that time.
15    ---
16    (Cardinal-Quintero Exhibit 10 marked.)
17    ---
18  BY MR. KROEGER:
19    Q.   This will be Exhibit 10.  It's
20  3776.  And the Bates is
21  CAH_MDL_PRIORPROD_DEA12_00003808.
22    So this is the warrant for
23  inspection.  Did you receive this at some point?
24    A.   Yes, we did.  I got a copy of this

Page 196

1  at one point.
2    Q.   And one of the things that was
3  requested is in Paragraph c -- 2c, do you see
4  that, "To inspect all records, files, papers,
5  processes, controls, facilities appropriate for
6  verification of the records, reports and
7  documents required to be kept under the
8  provisions of the act and regulations
9  promulgated thereunder."
10    Do you see that?
11    A.   Correct.
12    Q.   Now, this is a warrant served on
13  Cardinal with regard to Lakeland Distribution
14  Center, correct?
15    A.   Correct.
16    Q.   And this is the DEA telling
17  Cardinal that we want more information about
18  Lakeland Distribution Center, correct?
19    MS. WICHT:  Object to the form.
20    A.   This is an inform -- I mean, a
21  warrant for inspection, which some of the
22  requirements have to inspect records and they
23  ask for records.
24    Q.   And they're looking

Page 197

1  specifically -- at least one part of what
2  they're looking for are the records that are
3  required to be kept under the act, the
4  Controlled Substances Act, correct?
5    A.   Correct.
6    Q.   And if Cardinal has an agreement
7  with the DEA and an understanding in terms of
8  what their obligations are to -- as to what to
9  record and report, then Cardinal should have
10  what the DEA's looking for under the provisions
11  of the act.  Wouldn't you agree?
12    MS. WICHT:  Object to the form.
13    Calls for a legal conclusion, I think,
14    if I'm understanding it.
15    A.   We should have the records that
16  are required.  Per the regulations, we should
17  have that.
18    Q.   Okay.  And was Cardinal or was
19  Cardinal not keeping proper records of its due
20  diligence during -- prior to October 26, 2011?
21    MS. WICHT:  Object to the form.
22    A.   My understanding is Cardinal
23  Health has always kept all the records required
24  per the regulations.

Page 198

1    Q.   And was Cardinal Health, prior to
2  October 26th, 2011, doing all of the due
3  diligence that had been required of it?
4        MS. WICHT:  Object to the form.
5    A.   What was the question again?
6    Q.   Was Cardinal, prior to
7  October 26th, 2011, doing all of the due
8  diligence required of it with regard to
9  controlled substances?
10       MS. WICHT:  Object to the form.
11   A.   We were executing according to the
12  regulatory requirement stated in the act.
13   Q.   And you were keeping records of
14  such due diligence actions, correct?
15       MS. WICHT:  Object to the form.
16   A.   We were keeping records that are
17  required by the act to be kept.
18   Q.   So when you received this warrant
19  to inspect from the DEA, you should be able to
20  comply and show them that Cardinal has done its
21  due diligence, correct?
22       MS. WICHT:  Object to the form.
23   A.   We should provide the agency with
24  all the records that are required, per the

Page 199

1  regulations.
2    Q.   Are there records required of
3  Cardinal that are not in the regulation?
4    A.   That are required of Cardinal?
5    Q.   Yeah.
6    A.   The only records that are required
7  are the ones that are in the regulation, right?
8    Q.   I would imagine.  And so I'm
9  asking -- because you said, we kept all of the
10  records that were required of the regulation,
11  correct?
12   A.   Yeah.  And we filed those with the
13  DEA, like the ARCOS report.
14   Q.   Okay.  And you did all of the due
15  diligence that was required of the act, as well,
16  correct?
17       MS. WICHT:  Object to the form.
18  Foundation.  Calls for a legal
19  conclusion.
20   A.   We -- what I'm telling you, we did
21  everything that was required per the regulation
22  that we had to do.
23   Q.   So, then, wouldn't the
24  conclusion -- logical conclusion be that if you

Page 200

1  provided all of those records that you did keep
2  because you were required to, that showed you
3  did the due diligence that you were required to,
4  that if you had provided that to the DEA, this
5  investigation would likely end?
6        MS. WICHT:  Object to the form.
7  Foundation.  Speculation.
8    A.   I need to hear the question again.
9    Q.   Sure.  And I know it's -- it's --
10  would you agree that because Cardinal was doing
11  what it was supposed to do under its due
12  diligence requirements and keeping records of
13  all such actions, that if Cardinal provided all
14  of those records to the DEA in response to this
15  warrant, that the investigation would likely
16  end?
17       MS. WICHT:  Object to the form.
18  Foundation.  Speculation.
19   A.   I would be speculating if I say
20  that.  I know that we kept all the records that
21  were required by the regulations, and we
22  provided all the records that the regulations
23  required to the agency.
24   Q.   Okay.  So in your mind -- and your

Page 201

1  testimony is that Cardinal had complied
2  completely with the regulations, both with
3  regard to due diligence and recordkeeping as to
4  that due diligence, correct?
5        MS. WICHT:  Object to the form.
6  Foundation.
7    A.   I mean, I keep stating that we
8  provided all the records that are required by
9  the regulation.  To the best of my knowledge, we
10  did that, and there's not missing records that
11  we did not provide to the agency that are
12  required by regulations.
13   Q.   Okay.  And you have no reason,
14  sitting here today, as having been the senior VP
15  of QRA back in October of 2011, to believe that
16  Cardinal didn't do its due diligence, do you?
17       MS. WICHT:  Object to the form.
18   A.   I do not have any reason to
19  believe that we did not meet the requirements of
20  the regulations in 2011, as you stated.
21   Q.   Okay.
22            ---
23   (Cardinal-Quintero Exhibit 11 marked.)
24            ---

Page 202

BY MR. KROEGER:

Q.  I'm going to hand you what's been marked as Exhibit 11.  It's 3773.

(Pause in proceedings.)

A.  Yes.

Q.  So, Mr. Quintero, per the e-mail, you can see that this document is from Monday, October 31st, 2011, correct?

A.  Correct.

Q.  If we go to Page 3 of the exhibit, we see the actual release that was sent as an attachment to that e-mail?

MS. WICHT:  Object to the form.

Q.  Correct?

A.  What date are you referring to? October 31st?

Q.  Yes, sir.

A.  I'm assuming that's the date this version was approved.

Q.  Correct.  Because it says, "Approved version, October 31st, 4:00 p.m. eastern."

A.  Yeah.  I don't know when it was sent out.

Page 203

Q.  If you look back -- we can go through it -- the initial e-mail from Jon Giacomin -- is that how you pronounce it?

A.  Jon Giacomin.

Q.  Jon Giacomin was sent Monday, October 31st, 2011 at 9:43 a.m., correct?

A.  Yes, on the 31st, 2011.

Q.  And later in that day, we see Kara Forester has attached a document, "Support Team Talking Points," correct?

A.  They have -- they are talking points on -- this says -- does it say talking points?

Q.  If you look at the PDF -- if you look at the screen, if you don't mind, or you can go to Page 1 of the document, you'll see the Support Team Talking Points.LA.

A.  I see talking points, yes.

Q.  And that's the document that's attached as Page 3 to this exhibit.

A.  Okay.

Q.  So this document was approved five days after the DEA served the warrant on Lakeland; is that correct?

Page 204

MS. WICHT:  Object to the form.

A.  What was the date the warrant was served?

Q.  October 26th, 2011.

A.  I see October 25.  I see it signed on 25.  I don't see when it was served.

Q.  Okay.  25, 26.

A.  Okay.

Q.  Within a week of the warrant being served on Cardinal.

And Cardinal's response -- well, first, Cardinal -- is this -- this is something that would have been put out for the employees, correct?

A.  I don't think this message was intended to the general employees.  I see in the "to" list members of the legal team and some members of -- that reported in to either Jon Giacomin or Mike Kaufmann.

Q.  And you had a chance to review this document, the talking points document?

A.  I can glance through it if you could give me a little bit of time.

Q.  We'll read it together.

Page 205

"The prescription drug abuse problem."

A.  Uh-huh.

Q.  "The prescription drug abuse problem has continued to grow throughout the United States.  One of the most problematic areas of the country is Florida, where pill mills are prevalent."

Do you agree that that's what it says?

A.  That's what is in the document.

Q.  "Last week, Drug Enforcement Administration (DEA), alongside with state and local authorities, announced increased measures to combat the prescription drug abuse problem in Florida, Operation Pill Nation II."

Do you agree with that?

MS. WICHT:  Agree that's what --

A.  I agree that that's the language that is in the document.

Q.  This is the language that's in the document that Cardinal agreed or approved on October 31st, 2011 at 4:00 p.m., correct?

MS. WICHT:  Object to the form.

Page 206

1  A.   That's the language that is in
2  this document that somebody in Cardinal approved
3  on October 31st.  The approval, I don't
4  believe, was my approval.
5  Q.   And "These measures included a
6  number of arrests of pharmacists and
7  physicians"?
8  A.   That's in the third bullet of this
9  document.
10  Q.   Okay.  And it talks -- the next
11  section is about -- it says, "What Cardinal
12  Health is doing."
13      And I want you to read the second
14  bullet.  It's, "Our suspicious order monitoring
15  system evaluates pharmacy orders to determine if
16  the orders are unusually large, unusually
17  frequent, or deviate from the normal pattern."
18  A.   Correct.
19  Q.   Skipping to the -- skipping one,
20  "Since 2008, Cardinal Health has conducted
21  hundreds of on-site pharmacy inspections, ceased
22  distribution to more than 300 pharmacies we
23  believe presented a significant risk of
24  diversion, and in the last two years, we have

Page 207

1  denied the applications from over 40 pharmacies
2  seeking to have a controlled substance
3  relationship with us."
4  A.   Yes, I see that statement there.
5  Q.   Do you agree with that statement?
6  A.   I believe that statement is likely
7  accurate.
8  Q.   "We believe in the foundational
9  elements of our SOM program and are continuously
10  working to improve it.  We have also partnered
11  with the Ohio State University College of
12  Pharmacy on a Generation RX outreach initiative,
13  a free program designed to create awareness
14  about the dangers of prescription drug abuse and
15  diversion."
16      Do you agree with those statements
17  in terms of what Cardinal Health is doing?
18  A.   I agree that we were executing all
19  of the stuff that is in the -- in that
20  particular section of this document.
21  Q.   And earlier, you also said that
22  with regard to Lakeland and the due diligence,
23  Cardinal has done its due diligence and has the
24  proper records of that due diligence as required

Page 208

1  by regulation?
2  MS. WICHT:  Object to the form.
3  Foundation.
4  A.   What I told you is that Cardinal
5  Health retained all the records required by the
6  regulations.
7  Q.   Okay.  And in response to the DEA
8  serving a warrant on Cardinal asking for those
9  records to show it had done its due diligence,
10  Cardinal decides to create a business continuity
11  plan.  You can read along.
12      "Due to the increased DEA activity
13  in Florida, we have decided to ready our
14  business continuity plans for Lakeland, Florida.
15  Part of this preparation includes steps that we
16  need to take to be ready to transfer customers
17  from Lakeland to the designated secondary
18  distribution center, Jackson or Greensboro."
19      What does that mean?
20  MS. WICHT:  Object to the form.
21  Foundation.
22  A.   It means that we have business
23  continuity plans for many different reasons,
24  including hurricanes, potential closure of

Page 209

1  sites.  So we were initiating a business
2  continuity plan.
3  Q.   Okay.
4  A.   For Jackson and Greensboro.
5  Q.   So -- well, the business
6  continuity plan was for Lakeland, Florida,
7  right?
8  A.   For Lakeland, but --
9  Q.   And so --
10  A.   Service centers were out of
11  Lakeland.
12  Q.   Do you remember October of 2011?
13  A.   Yes, I do.
14  Q.   Were you expecting any hurricanes
15  in Florida in October of 2011?
16  A.   No.  I don't know -- I don't
17  know -- I mean, I don't remember.
18  Q.   Do you think --
19  A.   October is hurricane season, but
20  I -- I do not know if there was hurricanes in
21  that time.
22  Q.   But that's the first reason you
23  chose to give in terms of why a continuity plan
24  would be --

A. No. I told you there are many reasons for it.

Q. And the first you chose to list was hurricane?

A. Because that's the primary reason that we have business continuity plans, is for natural disasters.

Q. And in this particular case of Lakeland in October of 2011, was it a natural disaster that Cardinal was concerned about?

A. We were concerned --

MS. WICHT: Object to the form of the question.

A. We were concerned about the administrative action of the inspection warrant that we received from DEA, which surprised us, because to the best of our knowledge at that particular time, we felt that we were complying with the regulatory requirements of the Controlled Substances Act.

So we were completely caught off guard when we got this inspection warrant and we could not understand why the agency was having any concerns about the Lakeland facility,



especially because Michael has been in continuous contact with Barbara Boockholdt and have never shown an indication in which she was concerned about the way that we were executing our program and also meeting the regulatory requirements of the Controlled Substances Act.

Q. So Cardinal Health believes it's done all its due diligence, has the proper records of having done that due diligence, believes that they have an agreement with the DEA that all such due diligence and records are appropriate and what is required, and yet in response to a warrant asking for that documentation, Cardinal decides to initiate a business continuity plan for Lakeland Distribution Center?

A. Like I --

MS. WICHT: Object to the form. Foundation. Mischaracterizes the testimony on the document.

Sorry. Go ahead.

A. We were caught off guard, and we could not understand why DEA was giving us an inspection warrant. They could have asked us



for the information over the phone. Barbara had a good line of communication between her and Michael. Why she didn't do that and they went directly to an inspection warrant, we could not understand that, but we have an obligation to serve patients that need this medications in all parts of the United States. So we were caught off guard and we were concerned of why.

Q. If the DEA is going to suspend a distribution center, as they did, Cardinal initiates a business continuity plan to ensure that all of the drugs that were going to be shipped out of that suspended facility get shipped, correct?

MS. WICHT: Object to the form.

A. We try to serve all our customers that need drugs for legitimate medical purposes out of any facility that we have.

Q. So in response to a DEA warrant and this business continuity plan, is there anywhere in this business continuity plan where Cardinal says, we need to reevaluate the orders out of Lakeland that landed us in getting a warrant?



MS. WICHT: Objection to --

Q. Is that part of the business continuity plan?

MS. WICHT: Objection to the form.

A. The business continuity plan is separate from what we do in our anti-diversion program. It's completely different.

Q. This plan is just to make sure that all the opioids and everything else just keeps getting shipped?

MS. WICHT: Objection to form. Foundation. Mischaracterizes.

A. The plan is to ensure that customers that need drugs, all kind of drugs, for legitimate medical use, they can have those drugs available to serve their patients.

VIDEOGRAPHER: Counsel on the phone, could you put yourself on mute.

BY MR. KROEGER:

Q. If you go back to Exhibit 5, it's the 4085 document, and if you can turn to Page 16 of that document.

The first full paragraph there, "Based on its review of the documents Cardinal

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 Health provided in response to the October 26,
2 2011 AIW and the November 8th, 2011
3 administrative subpoena, the investigation at
4 respondent revealed a persistent failure to
5 exercise due diligence to ensure that controlled
6 substances were not being diverted."
7        So that's the conclusion the DEA
8 reached in reviewing the documents Cardinal
9 Health provided in response to the warrant and
10 the subpoena. Do you disagree with the DEA's
11 conclusion?
12        MS. WICHT: Objection to form.
13    A. I disagree with that conclusion
14 because my understanding is that we were
15 retaining all the documents that were required
16 by regulation.
17    Q. Do you have that additional
18 requirement in writing anywhere?
19    A. Additional requirement of what?
20    Q. Well, several times today you've
21 talked about this agreement that Cardinal Health
22 had with the DEA that was separate and apart
23 from the 2008 Memorandum of Agreement. Because
24 we looked at that document and you couldn't show

Page 215

1 me anywhere where these different requirements
2 were.
3        So is there anything in writing
4 that Cardinal Health has from the DEA saying,
5 Cardinal Health, these requirements, on top of
6 or below the Memorandum of Agreement, apply to
7 Cardinal?
8        MS. WICHT: Object to the form.
9    A. The agreement -- the agreement's
10 not the regulation. That's citing the
11 regulations, not the agreement.
12    Q. I'm asking if you have anything in
13 writing. Does Cardinal have anything in writing
14 to support that this agreement had been made
15 with Cardinal Health and the DEA, outside of the
16 Memorandum of Agreement?
17    A. I don't know if we have anything
18 in writing.
19    Q. As the senior vice president of
20 QRA for Cardinal Health, shouldn't you know?
21        MS. WICHT: Object to the form of
22     the question.
23    A. Like I told you before, when I
24 came to Cardinal Health, I was given an overview

Page 216

1 of our anti-diversion program and the agreements
2 that were made between the agency and Cardinal
3 Health. I was updated on the visit that Barbara
4 Boockholdt and Sue Langston had in our building,
5 and the review of the presentation that was
6 given to them. And there was not a single sign
7 out there, not even from that meeting or from
8 other interactions with the agency, that our
9 agreement was not valid and that they had some
10 concerns about us.
11    Q. But you, as the senior vice
12 president of QRA in charge of anti-diversion,
13 never saw such an agreement in writing, did you?
14    A. I don't believe I requested to see
15 the agreement in writing, and I requested to
16 have the information that was agreed by not only
17 Michael Moné, but I verified that information
18 from Bob Giacalone and also from my boss.
19    Q. From your boss, Mr. Corford?
20    A. Mr. Craig Morford.
21    Q. Morford.
22        So Craig Morford also acknowledged
23 to you that the DEA had agreed to this with
24 Cardinal Health?

Page 217

1        MS. WICHT: Object to the form.
2    A. There was a consistent message
3 between Craig Morford and myself, Michael Moné
4 and myself, Bob Giacalone and myself, that DEA
5 had reviewed our program as it was in 2009 when
6 I got there, and that they have found our
7 program satisfactory and that they had not
8 expressed any concerns.
9    Q. Okay. And obviously we know from
10 what happened to Lakeland in 2012 that the DEA
11 concluded otherwise in 2012, correct?
12        MS. WICHT: Object to the form.
13     Calls for speculation.
14    A. We were completely surprised by
15 the inspection warrant that we got in 2012,
16 because all the -- in 2011, because all the
17 indications that we had up to that point was
18 that we were meeting the expectations of the
19 agency. And it's my understanding, and I
20 believe so, that we were meeting all of the
21 regulatory requirements.
22    Q. Okay. We'll continue on Page 16.
23 Just following along where we were already.
24        "The DEA concluded that over a

Page 218

1  period of approximately three years, November
2  2008 to December 2011, respondent's
3  anti-diversion controls were inadequate to meet
4  their due diligence responsibilities.  This
5  conclusion was based on the totality of several
6  factors.
7          "Some of the most important
8  factors were:  Exceedingly large increasing
9  volume of shipments of oxycodone to its largest
10  Florida retail customers, which volumes were
11  supported by inadequate documentation."
12          Do you disagree with that
13  conclusion by the DEA that --
14          MS. WICHT:  Object to -- I'm
15  sorry.
16      Q.  -- Cardinal had an exceedingly
17  large increasing volume of shipments of
18  oxycodone to its largest Florida retail
19  customers and that those volumes were not
20  supported by -- or were supported by inadequate
21  documentation?
22      A.  I disagree --
23          MS. WICHT:  Object to the form.
24      A.  I disagree that we were not

Page 219

1  meeting our regulatory requirements and that we
2  were not meeting the agreement that we had with
3  the agency in 2009.
4      Q.  Okay.  And you have made that
5  abundantly clear today.  What I'm asking right
6  now is if you disagree with the DEA's conclusion
7  that one of the factors was that exceedingly
8  large increasing volume of shipments of
9  oxycodone to its largest Florida retail
10  customers, which volumes were supported by
11  inadequate documentation, was part of the reason
12  that they concluded you were not meeting your
13  due diligence responsibilities?
14      A.  That was the conclusion of the
15  agency --
16          MS. WICHT:  Objection to form.
17      A.  -- not my conclusion.
18      Q.  So you disagree with the agency's
19  conclusion?
20          MS. WICHT:  Object to the form.
21      A.  I disagree with the fact that the
22  agency agreed with us in 2009 on the execution
23  of our anti-diversion program, and we were
24  executing according to our understanding of the

Page 220

1  agreement that we had with the agency and
2  meeting all the regulatory requirements.
3      Q.  And do you also disagree with
4  factor number 2, that there was a low number of
5  suspicious orders reported?
6          MS. WICHT:  Object to the form.
7      A.  Again, what I -- I go back to the
8  meeting that we have in 2009 on how our program
9  was executed and the agreement that the agency
10  made with our personnel, and there were, you
11  know, high levels of DEA at that meeting,
12  Barbara Boockholdt and Sue Langston, and both of
13  them agreed that our execution of the program
14  was appropriate.
15      Q.  So I don't know if that means you
16  agree or disagree with the fact that there may
17  have been a low number of suspicious orders
18  reported.
19          Do you agree or disagree that
20  there was a low number of suspicious orders
21  reported?
22      A.  I will agree that --
23          MS. WICHT:  Object to the form of
24      the question.

Page 221

1      A.  I will agree that we reported the
2  number of suspicious orders as our program was
3  designed in 2009.
4      Q.  And was that number low or high?
5          MS. WICHT:  Object to the form of
6      the question.
7      A.  That number was adequate based on
8  the program that we had at that time.
9      Q.  And do you agree or disagree that
10  there was a low number of on-site visits to
11  these top retailers and no site visits to retail
12  chain pharmacy customers?
13          MS. WICHT:  Object to the form.
14      A.  I know that we have visited
15  hundreds of pharmacies.  I cannot tell you the
16  distribution of -- I don't recall the number of
17  store visits that we did in Florida, so I could
18  not agree with that statement because I don't
19  have those facts in front of me.
20      Q.  Well, do you put site visits into
21  the due diligence files?  Is that -- let me
22  rephrase that.
23          When Cardinal -- when someone from
24  Cardinal does a site visit, does that then go

Highly Confidential – Subject to Further Confidentiality Review

Page 222

1  into the due diligence file for the store to
2  which they did the site visit?
3      A.   They go into a system that we call
4  Content Manager.
5      Q.   Is that system that's called
6  Content Manager, is that a system that tracks
7  the due diligence and on-site visits per store?
8      A.   It stores the visits that we do to
9  stores.
10     Q.   And when the DEA served a warrant
11 and a subpoena on you asking for those -- for
12 all such due diligence files, did you give them
13 the contents of that?
14     A.   My assumption is that we gave all
15 the information that was asked by the agency at
16 that time.
17     Q.   So if there were site visits, they
18 would have received those?
19     A.   They received --
20         MS. WICHT:  Object to the form.
21     A.   They received all the information
22 that they requested from us.
23     Q.   And in that information that they
24 received, there were no site visits to retail

Page 223

1  chain pharmacy customers?
2         MS. WICHT:  Object to the form.
3      A.   I don't recall that.  I don't
4  recall the document production for that
5  particular time, so I cannot say that.
6      Q.   Okay.  Lastly, do you agree or
7  disagree that there's evidence -- there was
8  evidence that respondent's due diligence
9  practices were inconsistent with both the 2008
10 MOA and Cardinal Health's own policies, the
11 purpose of which was to reduce diversion?
12         MS. WICHT:  Object to the form.
13     A.   I completely disagree with that as
14 shown by the fact that we have terminated over
15 300 pharmacies at that point in time, and most
16 of those pharmacies continue to have a DEA
17 license today and they're still in business.
18     Q.   Cardinal still has a DEA license
19 and is still in business, correct?
20     A.   We regained our DEA license for
21 Lakeland.
22     Q.   So that doesn't necessarily prove
23 or disprove due diligence at any given time,
24 does it?

Page 224

1         MS. WICHT:  Object to the form.
2      A.   I'm not aware that DEA has taken
3  action against all of those pharmacies that we
4  have terminated.  Maybe a fraction of them they
5  have, but most of those pharmacies continue to
6  have their license.  I'm not aware that DEA has
7  taken an action against those pharmacies.
8      Q.   Are you familiar with the numbers
9  of opioids that were sent to the two CVSs that
10 were at issue in Lakeland?
11     A.   I don't recall.
12     Q.   If you turn to Page 18 of this
13 Exhibit 5.  Do you see the paragraph starting
14 with "Publix"?
15     A.   I'm on the wrong page.
16     Q.   18 on the top right.
17         Do you see the paragraph that
18 starts with "Publix"?
19     A.   Yep.
20     Q.   "Publix Pharmacy Number 0641,
21 located at 5240 West State Road 46, Sanford,
22 Florida 32771, is within two miles of CVS 5195.
23 In 2011, CVS 5195 purchased 1.2 million dosage
24 units of oxycodone, while Publix Pharmacy 0641

Page 225

1  purchased only 25,700 units of oxycodone."
2         Do you dispute those numbers?
3         MS. WICHT:  Objection.
4      A.   Those are the numbers that are in
5  the document.  I don't have any reason to
6  dispute the numbers.
7      Q.   Do you have any reason to believe
8  that in response to those numbers, Cardinal did
9  even a site visit to CVS 5195?
10         MS. WICHT:  Objection to the form.
11     A.   I don't recall if we did a visit
12 or we didn't do a visit.
13     Q.   Well, according to what we read
14 just a moment ago, the DEA received no
15 documentation of any site visits to any chain
16 pharmacies, correct?
17         MS. WICHT:  Object to the form.
18     A.   We may have done a visit, but I
19 don't know that.
20     Q.   In order for you to have done a
21 visit, you would have had to do it and then not
22 document it.  Is that fair given that the DEA
23 never received any documentation of it?
24         MS. WICHT:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A.   I wouldn't know that.  If somebody
2  did a surveillance visit and they didn't put it
3  in the file, I mean that could happen, but I
4  don't know that.
5    Q.   Were you -- were people at
6  Cardinal in the practice of doing site visits to
7  CVSs and not putting it in the file?
8    A.   We did some site visits to some
9  CVS stores.  I don't -- I was not running the
10  day-to-day of activities of the program, so I'm
11  not a good person to say that every single site
12  visit was included in Content Manager.  I cannot
13  attest to that.
14    Q.   The next paragraph, "Two
15  pharmacies are located within one mile of CVS
16  219.  Walgreens 6970, located at 3803 South
17  Orlando Drive, Sanford, Florida, and Walmart
18  Pharmacy number 10-0857, located at 3653 Orlando
19  Drive, Sanford, Florida.  In 2011, CVS 219
20  purchased 1.8 million dosage units of oxycodone,
21  while the Walgreens 6970 purchased 176,500
22  dosage units of oxycodone and Walmart Pharmacy
23  10-0857 purchased 30,500 dosage units of
24  oxycodone."

Page 227

1        Do you dispute those numbers?
2        MS. WICHT:  Objection.  Asked and
3    answered.
4    A.   I think those numbers are what is
5  quoted in there.
6    Q.   And after selling 1.8 million
7  dosage units of oxycodone to a single CVS in
8  Sanford, Florida, was there a site visit in the
9  due diligence file for that store?
10        MS. WICHT:  Object to the form.
11    A.   I'm sure there was a site visit
12  because I requested a site visit for that store
13  and I was provided with a summary of the site
14  visit.
15    Q.   And since you were directly in
16  contact with the person who did the site visit,
17  directly requested it, certainly you would have
18  also ensured that it made it into the due
19  diligence file for CVS 219, wouldn't you?
20        MS. WICHT:  Object to the form.
21    A.   Like I told you below -- before, I
22  don't run the details of the program on a
23  day-to-day basis.  I was interested on
24  information -- asking for additional information

Page 228

1  on CVS 219.  I personally requested a visit to
2  that -- the pharmacy to see if there was obvious
3  signs of diversion, and the conclusion of that
4  visit was provided to me by the person that did
5  the visit.
6    Q.   Did you review the due diligence
7  file for CVS store 219 at any point in 2010 or
8  '11?
9    A.   I reviewed information that was
10  provided to me by Nick Rausch.
11    Q.   Was that the due diligence file of
12  CVS 219?
13    A.   That was information that Nick
14  Rausch provided to me.  I don't know what was in
15  the due diligence file for any of those stores.
16  It's the day-to-day execution of the program.
17    Q.   But this was a store that you took
18  a personal interest in.
19    A.   I did.
20    Q.   You directed a site visit.  That's
21  not something you do on a daily basis, is it?
22    A.   No.
23    Q.   And yet you still didn't look at
24  the due diligence file for that store?

Page 229

1        MS. WICHT:  Object to form.
2    Mischaracterizes.
3    A.   I didn't.  I rely on my staff to
4  review the diligence files, and for this
5  particular one, I was provided some additional
6  information from Nick Rausch, and I believe that
7  it was appropriate to conduct a site visit of
8  219 to confirm that information that CVS had
9  given us was credible.
10        And the report that I got back for
11  219 is that the visit resulted in no obvious
12  signs of diversion when our investigator was
13  doing a surveillance audit of that particular
14  pharmacy.
15    Q.   Do you agree that selling 1.8
16  million dosage units of oxycodone to a single
17  CVS in Sanford, Florida should cause concern?
18        MS. WICHT:  Object to the form.
19    A.   I think selling large amounts of
20  controlled substances to any pharmacy is a good
21  reason to review that pharmacy, and we did.
22    Q.   And based on a single site visit
23  and CVS saying, we've done our own internal
24  investigation, you felt comfortable continuing

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 to sell 1.8 million dosage units of oxycodone to
2 a single CVS in Sanford, Florida?
3          MS. WICHT:  Object to the form.
4      A.   We believed that all of the sales
5 to that store were for legitimate medical use,
6 and we didn't have any reason to believe
7 otherwise based on the information that we had
8 obtained.
9      Q.   And if you had reason to believe
10 that there might be a risk of diversion, what
11 would you have done?
12          MS. WICHT:  Object to the form.
13      A.   We would have -- if we had a
14 reason to believe that was suspicious or likely
15 of those drugs to be sold or prescription to be
16 filled for orders not legitimate medical use, we
17 would have stopped shipment for that particular
18 store and we would have reported that store to
19 DEA, as we did in many, many occasions.
20      Q.   Would you agree that one of the
21 ways to determine if there's a likelihood of
22 diversion is to follow Cardinal Health's own
23 suspicious order monitoring plan?
24          MS. WICHT:  Object to the form.

Page 231

1      A.   It's following the regulation and
2 executing according to our standard operating
3 procedures.
4      Q.   Sorry.  I said "plan."  I should
5 have said "standard operating procedures."  So
6 let me say that again.
7          You would agree, wouldn't you,
8 that a key to stopping diversion, spotting
9 stores that might be the source of diversion, is
10 to follow the suspicious order monitoring
11 standard operating procedure that Cardinal has
12 in place?
13          MS. WICHT:  Object to the form.
14      A.   It is following the regulations
15 and agree -- adhering to the program that we had
16 in place at that time.
17      Q.   Okay.  If you'll turn to Page 19
18 of this Exhibit 5.  This is part of Cardinal's
19 suspicious order monitoring program.
20          It says --
21          MS. WICHT:  No.  This is the
22 government's --
23          MR. KROEGER:  This is the
24 government's finding.

Page 232

1          MS. WICHT:  Okay.
2 BY MR. KROEGER:
3      Q.   But as part of your suspicious
4 order monitoring SOP, you set thresholds, didn't
5 you?
6      A.   We set thresholds.
7      Q.   Okay.  And Paragraph i says,
8 "Respondent set monthly thresholds for oxycodone
9 distributions to each of its stores.  But from
10 April 2009 to August 2011, respondent
11 disregarded the oxycodone thresholds for its top
12 four retailers at least 44 times.  Sometimes by
13 a few thousand pills, and sometimes by tens of
14 thousands.  This unexplained disregard for its
15 own thresholds suggests that respondent did not
16 take its own policies seriously."
17          Do you disagree with that
18 statement from the DEA?
19      A.   I completely disagree with that
20 statement.  Threshold is a reason for us to
21 evaluate an order, and the analyst reviews the
22 information that they have available to them and
23 they make decisions whether or not to release
24 the order or not.  So we didn't disregard these

Page 233

1 threshold events.  Every one of them was
2 evaluated.  The system doesn't allow for
3 thresholds to be released without somebody
4 evaluating the threshold.
5      Q.   Okay.  So you disagree with that
6 conclusion the DEA reached with regard to --
7      A.   Completely disagree with that
8 conclusion.
9      Q.   Okay.  If you'll turn to Page 21,
10 Paragraph i.  "According to DEA review, Cardinal
11 Health's SOM policies do not exclude chain
12 retailers from the site visit requirement.
13 Indeed, the written policies made available to
14 DEA do not indicate any company policy of
15 treating chain retailers differently than
16 independent retailers in terms of the diligence
17 Cardinal Health's distribution centers are
18 required to conduct."
19          Do you disagree with that
20 statement?
21      A.   I disagree with that statement.  I
22 believe that our agreement with the agency in
23 2009 was very clear, and explained how we were
24 going to treat chain pharmacies.

Page 234

1    Q.   So, then, this is talking about
2  the -- Cardinal's own SOM policy.  So based on
3  what you're saying, then, if we went back to the
4  2009, 2010, 2011 suspicious order monitoring
5  program standard operating procedure that
6  Cardinal had in place, it would clearly outline
7  that chain pharmacies are to be dealt with
8  differently than independent retail pharmacies?
9    A.   I will have to --
10       MS. WICHT:  Object to the form.
11   A.   I will have to look at the SOP.  I
12 don't have the SOP available to determine if
13 that's the case or not.
14   Q.   Well, this conclusion that you
15 just disagreed with in Paragraph i is the DEA
16 saying that you -- that Cardinal Health failed
17 to follow its own SOM policies.
18   A.   My understanding is that the
19 program that we put in place in 2009 was
20 consistent with the expectations of the agency
21 and that it was the understanding and the
22 agreement that chain pharmacies will conduct
23 their own investigation and provide those
24 investigations to us.

Page 235

1    Q.   If you'll turn to Page 22.  In the
2  middle of the Paragraph i under Subsection D,
3  low numbers of suspicious orders reported, "From
4  October 1st, 2008" -- do you see where I am?
5    A.   Uh-huh.
6    Q.   -- "through October 26th, 2011,
7  respondent reported only 41 suspicious orders to
8  the DEA."
9        So in a three-year period,
10 Cardinal reported 41 -- sorry, Lakeland reported
11 41 suspicious orders to the DEA.  Is that
12 number -- do you agree with that number?
13   A.   It -- I'm assuming that number is
14 correct.  I will have to verify the fact, but my
15 assumption is that is correct.
16   Q.   And do you believe that number to
17 be the proper number of suspicious orders to
18 have been reported during that time?
19   A.   Based on the understanding that we
20 have with the agency at that time, it was the
21 correct number.  The agreement that we had with
22 the agency at that time is that we will do
23 investigation of threshold events.  If those
24 investigations led us to believe that the

Page 236

1  pharmacy was potentially engaging in practices
2  that were not consistent with filling legitimate
3  prescriptions or that we couldn't get enough
4  information to make that assessment, that we
5  would report them as suspicious orders.  As it
6  happened, out of those 41 customers, 19 of those
7  customers we terminated.
8    Q.   Right.
9        Once you terminate a customer, you
10 can no longer profit from them anyway, so
11 reporting their orders doesn't really hurt the
12 profit of Cardinal, does it?
13       MS. WICHT:  Object to the form of
14       the question.
15   A.   I don't even -- I don't understand
16 the question.
17       MS. WICHT:  Is that a serious
18       question?
19       MR. KROEGER:  Yeah, it is.
20   A.   I don't understand the question.
21   Q.   So when a pharmacy orders opioids
22 from Cardinal Health, Cardinal Health makes a
23 profit on those opioids that they distribute to
24 that pharmacy, correct?

Page 237

1        MS. WICHT:  Object to the form of
2        the question.
3    A.   I'm not in the finance or in the
4  sales team.  We sell product for legitimate
5  medical use.  I'm assuming that we make money
6  making the product.  I don't know if we make any
7  money on opioids, to be honest with you.
8    Q.   You don't give them away, do you?
9    A.   Well, there are sometimes that we
10 do things and we don't make any profit because
11 if -- consistent with the total offerings that
12 we have to offer.
13   Q.   As an executive with Cardinal
14 Health, who was at one time the senior vice
15 president of QRA and is now chief QRA officer,
16 you're not honestly sitting here telling me you
17 don't know if Cardinal Health profits from
18 opioids, are you?
19   A.   No.
20       MS. WICHT:  Object to the form of
21       the question.  Argumentative.
22   A.   No.  Because, I mean, selling
23 opioids is -- is -- to have all the system in
24 place that you need to have is a lot more

Page 238

1 expensive than we have for our regular drugs.
2 You have to have a cage. You have to have a
3 vault. You have to have employees in the cage
4 and the vault. You have to have audits of those
5 cages and the vault. You have reporting
6 responsibility. You have to do a lot more work
7 to sell one dosage unit of oxycodone than one
8 dosage unit of Lipitor. A lot more work.
9     Q.   A lot more work.
10     But, Mr. Quintero, you're not
11 telling me that you believe Cardinal Health,
12 this Forbes 500 -- I think 21st on the Forbes
13 500 list, would continue to sell opioids if the
14 cost of doing that business was greater than the
15 profit made from it, are you?
16     MS. WICHT: Object to the form.
17     A.   I don't know. It is possible, but
18 I don't know.
19     Q.   Okay.
20     A.   My role in the company is
21 regulatory compliance, and I stick to my role
22 and make sure that my team executes according.
23     Q.   You don't do your job for free, do
24 you?

Page 239

1     A.   I don't do -- I work for Cardinal
2 for a salary.
3     Q.   Yes.
4     Now, after the warrant was served
5 in October of 2011, Paragraph ii, "Between
6 October 26th, 2011 (the day following the
7 execution of the AIWs) and January 31st,
8 2012" -- so in this three-month period --
9 "respondent terminated 28 customers."
10     A.   Uh-huh.
11     Q.   Is there any reason for that
12 increase in three months compared to the only 19
13 previously?
14     MS. WICHT: Object to the form.
15     A.   Like I told you, we -- during that
16 period of time, we have terminated over 300 -- I
17 feel like the number was 343 customers in the
18 United States. I don't know the exact number in
19 Florida. We were concerned with the inspection
20 warrant that was filed. We could not understand
21 why, so we became, you know, concerned that the
22 agency had changed their expectation of the
23 standards. So I mean, we changed -- we were
24 changing with the expectations of the agency.

Page 240

1     Q.   As the senior vice president of
2 QRA, did you personally have any concern that
3 Cardinal itself was not following its own
4 policies and procedures?
5     A.   I believe --
6     MS. WICHT: Object to the form.
7     A.   I believe that Cardinal Health was
8 following our policies and procedures and that
9 we were meeting regulatory requirements and
10 expectations of the agency.
11     Q.   If you'll turn to Page 37 of
12 Exhibit 5. Towards the bottom of the page, five
13 lines up, "On October 5th."
14     Do you see that?
15     A.   Yep.
16     Q.   "On October 5th, 2010,
17 Mr. Moellering" --
18     Do you know who Mr. Moellering is?
19     A.   Yes, Vince Moellering.
20     Q.   Who is he?
21     A.   He is one of the field
22 investigators.
23     Q.   Employed by Cardinal?
24     A.   Employed by Cardinal Health.

Page 241

1     Q.   Employed to do site visits?
2     A.   That's -- that was his role, to do
3 site visits.
4     Q.   And in that role, his job was to
5 communicate to Cardinal up the chain to people
6 in anti-diversion whether or not a store was
7 high or low risk of diversion, correct?
8     A.   The form had a portion at the end
9 of the investigation form that provided
10 different rankings for pharmacies.
11     Q.   And that was part of his duty, was
12 to communicate that ranking to people above him,
13 correct?
14     A.   To communicate that ranking to the
15 head of the investigations group, which was
16 Steve Morris.
17     Q.   And that's because, just like you
18 can't be involved in every day-to-day decision,
19 people directly beneath you or one or two steps
20 beneath you, can't be involved in every single
21 site visit, right?
22     A.   It's impossible to be at every
23 single site.
24     Q.   So just as you rely on Michael

Page 242

1 Moné and Steve Reardon to make the right
2 decisions with regard to policies, procedures,
3 and regulations, they, in turn, have to rely on
4 those below them to do the same, correct?
5      MS. WICHT: Object to the form.
6      A.   We relied on our staff to execute
7 procedures and make sure that we are meeting
8 our -- all of the regulatory requirements.
9      Q.   Do you have any reason, sitting
10 here today, to believe that Mr. Moellering
11 didn't do his job well?
12      MS. WICHT: Object to the form of
13      the question.
14      A.   I did not supervise Mr. Moellering
15 directly. My understanding is that he was --
16 his performance was acceptable.
17      Q.   Okay. And then the next -- and
18 Mr. Moro. Do you know who Mr. Moro is?
19      A.   I don't recall who Mr. Moro is.
20      Q.   So you can't say whether he was or
21 was not a good employee either way?
22      A.   I don't recall.
23      Q.   Okay.
24      A.   It's possible, but I don't recall

Page 243

1 a person working in my team, which last name is
2 Moro. It's possible, but I don't recall.
3      Q.   And October 5th, 2010, anyone
4 doing site visits would have been part of your
5 team, correct?
6      A.   Correct.
7      Q.   So Mr. Moellering and Mr. Moro
8 conducted a site visit. The notes from this
9 particular site visit reflected the following:
10 CAH -- that's Cardinal Health, right?
11      A.   Uh-huh.
12      Q.   PBC, what's that stand for?
13      A.   I believe -- I'm trying to
14 recollect. Somebody -- now that I'm reading the
15 context, it's probably Lenny Moro is somebody in
16 the sales team, but I don't know that for sure,
17 but I believe that's...
18      Q.   "Lenny Moro has observed groups of
19 white males and females coming into the pharmacy
20 during his late afternoon visits to have their
21 scripts filled. They leave in small groups.
22 The report also stated, 'Owner requested
23 increase his oxycodone threshold to even
24 higher.'"

Page 244

1      If you turn the page, "Dispensing
2 data revealed that 462,776 units of oxycodone
3 dispensed within two months. Quote, I am not
4 convinced that the owner is being forthright
5 pertaining to his customers' origin or
6 residence. I have requested permission to
7 contact DEA to resolve this issue. High risk of
8 diversion.
9      "Despite Mr. Moellering's findings
10 and recommendations, respondent did not contact
11 the DEA. Respondent not only continued to ship
12 oxycodone 30 milligram tablets to Gulf Coast,
13 but subsequently increased shipments shortly
14 thereafter -- shortly afterwards. On
15 November 24th, 2010, respondent adjusted Gulf
16 Coast's monthly volumes of oxycodone from
17 141,000 to 207,200."
18      Is that the appropriate response
19 under Cardinal's suspicious orders -- under
20 their -- the standard operating procedures to
21 respond to a site visit that results in a high
22 risk of diversion by increasing opioids from
23 141,000 to 207,000?
24      MS. WICHT: Object to the form of

Page 245

1      the question.
2      A.   I'm familiar with some of the
3 aspects of this particular visit, and I'm -- I
4 believe, to the best of my knowledge, that there
5 were follow-up conversations between Mr. Morse,
6 which is the pharmacist which used to work for
7 the Board of Pharmacy, and the pharmacist in
8 charge at Gulf Coast to understand increase in
9 involve.
10      My understanding is that Gulf
11 Coast was nearby or part of a medical plaza or
12 medical center or across from a hospital.
13 That's my recollection. It's my recollection
14 too that Vince Moellering tried to call DEA,
15 left a message, but the message was never
16 responded back to him.
17      Q.   So do you have reason to believe
18 that Mr. Moellering was incorrect with the high
19 risk of diversion in his conclusion?
20      A.   Based on --
21      MS. WICHT: Object to the form.
22      A.   Based on the facts at that point
23 in time, Mr. Morse reevaluated the pharmacy
24 based on the information that he received from

Page 246

1 the pharmacist at Gulf Coast and made the
2 determination that the pharmacist was not high
3 risk at that point in time.
4     Q.   Do you know what happened in 2011
5 to Gulf Coast?
6     A.   I believe we stopped selling
7 prescription to Gulf Coast before the
8 administration warrant was provided to us based
9 on additional site visits and additional
10 analysis that we performed on that particular
11 pharmacy.
12     Q.   So you -- QRA received a site
13 visit report of high risk of diversion,
14 continued to increase the dosage units to that
15 very pharmacy, and a year later that pharmacy
16 surrendered its DEA registration?
17     MS. WICHT:  Object to form.
18 Mischaracterizes his testimony.
19     A.   My understanding of the situation
20 with Gulf Coast was there was an inspection done
21 by Vince.  Vince expressed some concern to his
22 management, identified the pharmacy as high
23 risk.  The person in charge of the investigation
24 group requested additional information from the

Page 247

1 pharmacy.  The pharmacy provided that
2 information.
3         Mr. Morse felt that the volume was
4 justifiable based on the location of the
5 pharmacy and other facts.  He decided to
6 maintain the pharmacy as a customer but to keep
7 monitoring that pharmacy.  Additional visits
8 were performed, and we terminated that pharmacy
9 at one point in time because we didn't feel
10 comfortable with explanation given by the
11 pharmacist anymore.
12     Q.   So the explanation given in
13 October 2010 became unsatisfactory sometime
14 later on?
15     MS. WICHT:  Objection to form.
16 Mischaracterizes.
17     A.   If I knew all the facts, if we
18 knew all the facts then that we knew at the time
19 that we terminated the pharmacy, we would have
20 caught the pharmacy much sooner.  But we learn
21 about certain facts after.
22     Q.   It sounds like you learned about
23 those facts in October of 2010 and chose to
24 ignore them and increase the oxycodone.

Page 248

1     A.   I don't agree with that statement.
2     MS. WICHT:  Is that a question?
3 It sounded like a statement.
4     A.   I don't agree with the statement.
5     MR. KROEGER:  Now is a good time
6 for a break.
7     VIDEOGRAPHER:  Time is now 12:35.
8 Going off the record.
9         - - -
10     Thereupon, the luncheon recess was
11 taken at 12:35 p.m.
12         - - -

Page 249

1     December 6, 2018
2     Thursday Afternoon Session
3     1:18 p.m.
4         - - -
5     VIDEOGRAPHER:  Time is now 1:18.
6 Back on the record.
7         EXAMINATION
8 BY MR. GRAY:
9     Q.   Mr. Quintero, my name is Mark
10 Gray.  We met briefly before your deposition.
11 I'm going to ask some follow-up questions and
12 some additional questions possibly.
13         And you understand you're still
14 under oath even though somebody else is
15 questioning you?  You understand that?
16     A.   Yes, I understand.
17     Q.   Okay.  So when you first -- before
18 you came to Cardinal, you were with Wyeth, the
19 pharmaceutical company; is that right?
20     A.   Wyeth Pharmaceutical.
21     Q.   Okay.  And prior to taking your
22 position in December of 2009 with Cardinal, had
23 you ever worked for a distributor of opioid
24 narcotic drugs?

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    A.   No.
2    Q.   Okay.  So in 2009, when you went
3 to work at Cardinal Health, that was your first
4 experience in regulatory with a distributor of
5 opioid drugs, correct?
6    A.   Not controlled substances, but
7 opioids, yes.
8    Q.   And when you took that position,
9 would you have expected Cardinal to give you all
10 of the information that you needed to do your
11 job?
12       MS. WICHT:  Object to the form.
13    A.   I expected Cardinal to allow me to
14 work with my staff to learn the programs that we
15 were executing.
16    Q.   Well, you wanted them to give you
17 all the information you needed to do your job,
18 didn't you?
19    A.   I was expecting -- my job is
20 highly broad, so I was expecting my staff to
21 give me orientations on the different programs
22 that we had.  And I educated myself on the
23 different regulatory requirements that we were
24 obligated to meet.

Page 251

1    Q.   Okay.  And if Cardinal withheld
2 anything from you that would be important to
3 your job, you wouldn't have expected that, would
4 you?
5       MS. WICHT:  Object to the form.
6    A.   I don't believe Cardinal ever
7 withheld any information that I requested.
8    Q.   Okay.  And you would expect out of
9 your employees and the people that worked with
10 you and around you, that you wanted them not to
11 withhold any information from you, as well,
12 correct?
13       MS. WICHT:  Object to the form.
14    A.   My expectation is if I request
15 that information, that the employees that work
16 in my department make that information available
17 to me.
18    Q.   And if it was important for you to
19 do your job, whether you asked for it or not,
20 they should have given you that information,
21 correct?
22       MS. WICHT:  Object to the form.
23    A.   If I have to -- I expect my
24 employees to give me information that is

Page 252

1 relevant, they believe is relevant for them and
2 that they need to escalate to me.
3    Q.   Okay.  Let's look at 4050.
4       - - -
5    (Cardinal-Quintero Exhibit 12 marked.)
6       - - -
7 BY MR. GRAY:
8    Q.   Mr. Quintero, I'm going to show
9 you a document which has been marked P1.4050,
10 Exhibit 12 to your deposition.  And if you turn
11 to the second page of that document, do you see
12 this -- have you ever seen this letter before?
13    A.   Yes, I have.
14    Q.   Okay.  And when did you see this
15 letter for the first time?
16    A.   I've seen it many years ago.
17    Q.   When you first started working,
18 correct?
19    A.   Probably soon after.
20    Q.   Okay.  And this is a letter from
21 the US Department of Justice Drug Enforcement
22 Administration, correct?
23    A.   It seems that way, yeah.  It's
24 titled Drug Enforcement Administration at the

Page 253

1 top, so...
2    Q.   Okay.  And that's to Cardinal
3 Health, correct?
4    A.   It's to Cardinal Health.
5    Q.   Okay.  And was this one of the
6 documents that you looked at to understand what
7 the regulatory process was and -- with respect
8 to the distribution of opioid narcotics, as well
9 as what the DEA expected of Cardinal Health?
10       MS. WICHT:  Object to the form.
11    A.   One of the first documents that I
12 looked at was actually the actual regulation,
13 the Controlled Substances Act.
14    Q.   Okay.  But did you also look at
15 this one at the time to familiarize yourself, as
16 you testified earlier, to --
17    A.   I looked at this record, yeah.
18    Q.   -- what the DEA expected in the
19 regulatory framework?
20    A.   This letter is not regulations.
21 It's just a letter.
22    Q.   Okay.  But did you understand my
23 question?
24    A.   Not entirely.

Page 254

1   Q.   Okay.  Just listen to my question.
2       Was this one of the documents that
3   you looked at to familiarize yourself with what
4   the Drug Enforcement Administration of the
5   United States Department of Justice expected of
6   Cardinal Health?
7   A.   I reviewed the letter, yes, I did.
8       MS. WICHT:  Object to the form.
9   Q.   Was the purpose of reviewing the
10  letter so you could understand the framework
11  that the DEA expected of Cardinal Health in
12  distributing opioid narcotics?
13      MS. WICHT:  Object to the form.
14  A.   It is one of the tools that I used
15  to educate myself on the expectations of the
16  agency, and I used -- also went to the
17  Controlled Substances Act to understand the
18  regulation.
19  Q.   Okay, sir.  So let's look at the
20  expectations of the agency.  Let's look at the
21  next page, 4050.3.  And if you look, sir, at the
22  third paragraph.
23  A.   Okay.
24  Q.   And as you know, sir, you also

Page 255

1   have it on the screen, correct?  It's on that
2   screen and the screen in front of you, if you
3   need to refer to that.
4   A.   Okay.
5   Q.   Second sentence of the third
6   paragraph, "Listed first among these factors is
7   the duty of a distributor to maintain effective
8   controls against diversion of controlled
9   substances into other than legitimate medical
10  scientific and industrial channels."
11      Do you see that, sir?
12  A.   Yes, I do.
13  Q.   And after you reviewed this when
14  you first took the job at Cardinal Health, did
15  you understand that it was the duty of a
16  distributor to maintain effective controls
17  against diversion?
18  A.   It's a regulatory --
19      MS. WICHT:  Object to the form.
20  A.   It's a regulatory requirement to
21  maintain controls against diversion of
22  controlled substances.
23  Q.   Okay, sir.  But not just controls,
24  but effective controls.  You understand that?

Page 256

1   A.   I believe that's the language that
2   is used in the regulations, as well.
3   Q.   Okay.  But do you understand that
4   that's what the DEA told Cardinal Health, that
5   they had to have effective controls against
6   diversion?
7   A.   Which is consistent with the
8   regulations, yes.
9   Q.   Okay.  And then if you go down to
10  the indented paragraph, which is the next one,
11  one down, "The registrant" -- that's Cardinal
12  Health, correct?
13  A.   Yes.
14  Q.   -- "shall design and operate a
15  system to disclose to the registrant suspicious
16  orders of controlled substances."
17      You understand that to be one of
18  the requirements, correct?
19  A.   The requirement in the regulation
20  is to report suspicious orders, have a system to
21  report.
22  Q.   Yeah, okay.  Report suspicious
23  orders.  And "Suspicious orders include orders
24  of an unusual size."

Page 257

1       You understand that, correct?
2   A.   Uh-huh.
3       MS. WICHT:  Object to the form.
4   Q.   "Orders deviating substantially
5   from a normal pattern," correct?
6   A.   Uh-huh.
7   Q.   "And orders of unusual frequency."
8       You understand that, too, correct?
9   A.   Yes.
10  Q.   Okay.  So a suspicious order is
11  something that has -- is an order that's of
12  unusual size, correct?
13      MS. WICHT:  Object to the form.
14  A.   Unusual size is, yeah, one of the
15  components.
16  Q.   Okay.  Well, it's one of the ways
17  that you have a suspicious order, is unusual
18  size.  That's what the DEA's telling you in this
19  letter, correct?
20      MS. WICHT:  Object to the form.
21  A.   That's what it says in the letter.
22  Q.   Okay.  And it's not only what it
23  says in the letter, but you said earlier, this
24  is one of the expectations that the DEA had of

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1 Cardinal Health. That's the way you interpreted
2 this when you looked at it; is that correct?
3    A.   Yeah. We --
4        MS. WICHT: Object to form.
5    A.   We discussed our interpretation
6 with members of the Drug Enforcement
7 Administration, and our interpretation of our
8 suspicious order monitoring, our reporting
9 requirements, was executed in agreement with the
10 agency after the meeting of 2009.
11    Q.   Well, do you have -- did they send
12 you a letter like this P1.4050, after this 2009
13 meeting that somebody at Cardinal Health had?
14    A.   It was not a letter, but it was an
15 interactive session between members of Cardinal
16 Health and members of the Drug Enforcement
17 Administration.
18    Q.   And who was there for Cardinal
19 Health?
20    A.   Was Michael Moné.
21    Q.   Well, let me ask you this. Were
22 you there?
23    A.   I wasn't there.
24    Q.   So you weren't there, so you don't

Page 259

1 actually know what was said? It was just
2 something that Mr. Moné conveyed to you,
3 correct?
4    A.   Mr. Moné, not only Mr. Moné, but
5 also Mr. Bob Giacalone and Mr. Craig Morford.
6    Q.   And did they ever give you a piece
7 of paper or a letter from the DEA, like this
8 document here that we've been looking at, that
9 gave you guidance so you could read it and
10 understand it?
11        MS. WICHT: Object to the form of
12    the question.
13    A.   They gave me an overview of our
14 suspicious order monitoring program, gave me an
15 update on the meeting that they had in our
16 corporate center with members of DEA, including
17 Barbara Boockholdt, Sue Langston, and also the
18 results of all the inspections that we were
19 having. And no indication whatsoever that we
20 were not meeting the expectations of the agency.
21    Q.   Sir, what I'd really like is if
22 you just listen to my question, okay, and see if
23 you can answer the question that I'm asking.
24 Okay?

Page 260

1    A.   I thought I was answering your
2 question.
3    Q.   I know. I know you thought you
4 were, but I just want you to listen to what I'm
5 asking you.
6        What I'm asking you is, this group
7 of people that you've talked about, did they
8 ever give you a document or a letter, similar to
9 4050 that we've just looked at, that outlined
10 from the DEA what they expected of Cardinal
11 Health after this meeting that you've talked
12 about?
13        MS. WICHT: Object to --
14    Q.   Yes or no?
15        MS. WICHT: Object to the form.
16    A.   I don't have a document from them.
17    Q.   They never gave you a document?
18    A.   (Shakes head.)
19    Q.   So if they withheld that document
20 from you, that would be something that would
21 have been difficult for you to do your job, them
22 withholding it, correct?
23        MS. WICHT: Object to the form.
24    Speculation.

Page 261

1    A.   I don't believe they had any cause
2 to be withholding any documents from me.
3    Q.   Okay. You just said the DEA never
4 sent a document out about it, correct?
5        MS. WICHT: Object to the form of
6    the question.
7    A.   What did you say again? I didn't
8 hear you.
9    Q.   You can strike the question.
10        So the only document -- how many
11 documents have you seen -- how many letters like
12 this have you seen from the DEA?
13    A.   I believe two letters.
14    Q.   Okay. One in 2006 and one in
15 2007?
16    A.   Yep.
17    Q.   And the 2006 is the one we just
18 referenced here?
19    A.   Yep.
20    Q.   And from 2007 forward until -- you
21 haven't seen any other letters from the DEA
22 describing Cardinal's responsibilities?
23    A.   It is possible, but I don't
24 recall.

Page 262

1    Q.   Okay.  And if we could look also
2  at P1.4915.
3            - - -
4    (Cardinal-Quintero Exhibit 13 marked.)
5            - - -
6        MR. HUNTER:  What are the Bates
7    numbers, please?
8  BY MR. GRAY:
9    Q.   And, sir, this is 21 CFR Section
10  1301.74.  You're familiar with this section; is
11  that correct?
12    A.   With the 21 CFR, yes.  Not within
13  the specific of all the sections, so I will have
14  to review this one.
15        MS. WICHT:  This is -- it's one
16    section of it, correct?
17        MR. GRAY:  Correct.
18        (Pause in proceedings.)
19    A.   Yeah, I read the content.
20    Q.   And when did you first become
21  familiar with 21 CFR 1301.74?
22    A.   I was -- I started reading soon
23  before and soon after, educating myself on some
24  of the aspects of the regulation.  I was

Page 263

1  familiar with some of the regulation because one
2  of my -- the manufacturing facilities that I was
3  responsible for had controlled substances, so we
4  had to be familiar with the Controlled
5  Substances Act.
6    Q.   Okay.  And you understood, as we
7  talked about in the previous exhibit, 4050, that
8  one of the requirements that the law placed upon
9  Cardinal Health was that "The registrant shall
10  design and operate a system to disclose the
11  registrant's suspicious orders of controlled
12  substances," correct?
13        MS. WICHT:  Object to the form.
14    A.   The regulatory requirement is to
15  operate a system to detect and report suspicious
16  orders, which we did.
17    Q.   And that "The registrant shall
18  inform the field division office of the
19  administration in his area of suspicious orders
20  when discovered by the registrant," correct?
21    A.   My understanding is we were
22  operating a system consistent with this
23  requirement as we agreed on the interpretation
24  of this requirement during the 2009 meeting

Page 264

1  between DEA and Cardinal Health.
2    Q.   Yeah.  Well, we're going to talk
3  about that later.  But what I'm asking you right
4  now is, you understood that as the registrant
5  shall inform the DEA of suspicious orders when
6  discovered by the registrant.  You understood
7  that was the rule and the law of the United
8  States as it related to Cardinal Health
9  distributing opioid narcotics, correct?
10        MS. WICHT:  Object to the form.
11    A.   Correct.  I agree with the
12  regulatory requirements stated in 21 CFR
13  1301.74.
14    Q.   And this regulation has never
15  changed, has it?
16    A.   Not to the best of my knowledge.
17    Q.   Okay.  So -- and then further,
18  "The suspicious orders include orders of unusual
19  size."
20        You understand that, don't you?
21        MS. WICHT:  Object to the form.
22    A.   Unusual size, yeah.  That's one of
23  the elements.
24    Q.   And suspicious orders also include

Page 265

1  "orders deviating substantially from a normal
2  pattern."
3        You understand that, don't you?
4    A.   It's what the regulation says.
5    Q.   And you understand that the
6  regulation tells Cardinal Health that suspicious
7  orders include orders of unusual frequency, as
8  well, correct?
9    A.   That's what the regulation says.
10    Q.   Okay, sir.  Could you look back at
11  Exhibit 5, which is P1.4085.
12        Do you have that in front of you,
13  sir?
14    A.   Yes.
15    Q.   And Page 12, down at the bottom.
16  My colleague was asking you, Mr. Kroeger, about
17  this earlier.  Do you have that, sir?
18        Down at the bottom, Mr. Arpaio of
19  the DEA "communicated to Mr. Moné that due
20  diligence investigations must be performed on
21  all customers, chain pharmacies included, when
22  it appears that suspicious high volume orders
23  are requested of controlled substances and
24  questionnaires should be sent to these chains."

Page 266

1        Now, did Mr. Moné ever tell you
2   about his conversation with the DEA Mike Arpaio?
3        MS. WICHT: Object to form.
4        A.   I don't recall this particular
5   conversation, if he had it with me or not.
6        Q.   Well, if he would have had it with
7   you, do you think you would have recalled it?
8   Because at the time, you were not doing that
9   with chain pharmacies, were you?  You were not
10  doing due diligence investigation on chain
11  pharmacies.
12       MS. WICHT: Object to the form.
13       A.   We were doing -- we were -- had a
14  threshold system applied to chain pharmacies,
15  and when they trigger the threshold events, each
16  threshold event was investigated and determined
17  whether or not additional information was needed
18  before we could classify that as a suspicious
19  order.
20       Q.   But you weren't doing due
21  diligence investigation on chain pharmacies,
22  were you?
23       A.   We were doing --
24       MS. WICHT: Object to the form.

Page 267

1        Sorry.
2        A.   We did investigations in
3   partnership with chain pharmacies.
4        Q.   Okay.  Well, what you actually did
5   was you called or otherwise corresponded with
6   the chain and had them do their investigation
7   and get back with you about whether or not they
8   felt like it was suspicious or not, correct?
9        MS. WICHT: Object to the form.
10       A.   We communicated with the chain and
11  requested additional investigation on particular
12  pharmacy, which included the results of their
13  investigation.
14       Q.   But you relied on the results of
15  their investigation, correct?
16       MS. WICHT: Object to the form.
17       A.   We used the result of the
18  investigation as one of the elements to -- for
19  us to make a decision.  Like, for example, on
20  219, I requested one of our members of our staff
21  to go to the store and do a surveillance
22  inspection.
23       Q.   Okay.  And -- but Mr. Moné never
24  informed you of what Mr. Arpaio of the DEA said

Page 268

1   concerning chain pharmacies, or at least you
2   don't recall having that -- understood that?
3        A.   I don't recall having that
4   conversation with Michael.
5        Q.   Okay.  Would that have been
6   something that you think you would have
7   recalled?  Because that's pretty important.
8   It's a DEA communication to Mr. Moné, who at the
9   time was head of anti -- or was underneath you
10  in anti-diversion, correct?
11       MS. WICHT: Object to the form.
12       A.   Don't recall this conversation.
13  Don't recall -- I don't know who Mike Arpaio is.
14  So to the best of my knowledge, I cannot judge
15  whether this conversation took place or not.
16  You will have to ask Mr. Moné or Mike Arpaio
17  about this conversation.
18       Q.   So Mr. Moné would be a better
19  person to discuss his communication with the DEA
20  Mike Arpaio than you because you don't recall
21  the conversation Mr. Moné had with you and
22  whether he did or not, correct?
23       A.   Mr. Moné would be a better person
24  to comment on any interaction that he may have

Page 269

1   or not have with Mike Arpaio.
2             - - -
3        (Cardinal-Quintero Exhibit 14 marked.)
4             - - -
5   BY MR. GRAY:
6        Q.   Mr. Quintero, I've showed you what
7   has been marked as Plaintiff's Exhibit 14 to
8   your deposition, P1.43.
9        A.   Uh-huh.
10       Q.   And I'd ask you if you've ever
11  seen this document before.
12       A.   No, I haven't.
13       Q.   No one at Cardinal Health ever
14  showed you Exhibit 14 to your deposition?
15       A.   I'm not -- I was not in charge of
16  the anti-diversion department at this point in
17  time, so I did not have responsibilities over
18  this.
19       Q.   But you've never been shown this
20  letter before?
21       A.   I don't recall me having this
22  document or seeing this document before.
23       Q.   And no one ever discussed this
24  document with you before at Cardinal Health?

Page 270

1    MS. WICHT: You should just --
2  Mr. Quintero, if there's -- I don't know
3  whether there have been conversations
4  that you would have had with lawyers for
5  Cardinal about this document. If there
6  were, you should just exclude those from
7  your answer because those would be
8  privileged. But you can answer
9  otherwise.
10 BY MR. GRAY:
11   Q.  Have you ever had -- go ahead and
12 answer my question if you can.
13   A.  To be honest with you, I don't
14 recall seeing this document before. This is the
15 first time that I've -- that I believe I've seen
16 it.
17   Q.  And you don't recall ever having
18 any conversations with anyone about this
19 document, correct?
20   A.  I don't recall that.
21   Q.  Okay. And, well, let's just go
22 through this document. It's from the Congress
23 of the United States House of Representatives.
24   Do you see that at the very top?

Page 271

1    A.  I see it, yes.
2    Q.  So it's a letter from United
3  States Congress to George Barrett.
4    Who's Mr. Barrett?
5    A.  George used to be the CEO for the
6  corporation. He became executive chairman of
7  the board.
8    Q.  And Michael Kaufmann, who is
9  Michael Kaufmann?
10   A.  Michael Kaufmann used to be the
11 chief executive officer for the pharma segment
12 and chief financial officer for the corporation
13 and became the chief executive officer for
14 Cardinal Health.
15   Q.  Okay. And if you look at the
16 second paragraph, it says, "As part of our
17 investigation, the committee wrote to you on
18 May 8th, 2017."
19   Did you ever see a letter from the
20 Congress of the United States to Cardinal Health
21 dated May 8, 2017, to your recollection?
22   A.  I don't recollect seeing that
23 letter. Like I told you before, you know, my
24 involvement with the anti-diversion program

Page 272

1  ended sometime in 2015, so I was not involved
2  with the day-to-day activities of this
3  particular program.
4    Q.  All right. And if you turn to the
5  next page, sir. And the reason why I wanted to
6  know if anybody ever discussed this document
7  with you is because if you look in the very
8  first paragraph, it involves the sale of
9  hydrocodone and oxycodone in West Virginia by
10 Cardinal Health there 2007 through 2012.
11   Do you see that?
12   A.  I see that.
13   Q.  And so that was a period of time
14 that you were the vice president of regulatory,
15 correct?
16   A.  That period of time. Not entire
17 time. I became --
18   Q.  2009, you became -- you were
19 there?
20   A.  December 2009.
21   Q.  Yes, sir.
22   So 2009 to 2012, so that was a big
23 portion of the time that you were the vice
24 president, right?

Page 273

1    MS. WICHT: Object to the form.
2    A.  I was the vice president of QRA
3  for the pharmaceutical segment from
4  December 1st, 2009. That included 2012.
5    Q.  Yeah.
6    So -- and that's what we're
7  talking about here, right, or the Congress of
8  the United States is asking Mr. Barrett and
9  Mr. Kaufmann about, about the sale and
10 distribution of hydrocodone and oxycodone from
11 2009 to '12. That's a big portion of this 2007
12 to '12 time frame, isn't it?
13   MS. WICHT: Object to the form.
14   A.  So they're asking Mr. Kaufmann and
15 Mr. Barrett about 2007 to 2012, I see that.
16   Q.  Yeah, okay. But nobody ever came
17 to you, Mr. Kaufmann or Mr. Barrett, and said,
18 hey, we got this letter from Congress? This is
19 when you -- a lot of this time was when you were
20 in charge, can we talk to you about it?
21   A.  I did not talk to Mr. Kaufmann or
22 Mr. Barrett about this letter.
23   Q.  Okay. You didn't talk to anybody
24 about the letter, did you?

Page 274

1    A.   Not that I recall.

2    Q.   All right.  Let's look at what the
3  Congress of the United States is saying to
4  Cardinal.  They're saying that you distributed
5  from 2007 to 2012 -- this is the first
6  paragraph -- 241,122,241 doses of hydrocodone
7  and oxycodone to West Virginia.

8         Now, do you believe those numbers
9  to be true?

10    A.   I don't have the information.  I'm
11  assuming that Congress collected this
12  information from somebody, but I don't have
13  information in front of me.  So -- and I haven't
14  done the analysis, so I don't know if that
15  number is accurate or not.

16    Q.   Okay.  Well, you don't think
17  Congress got it wrong, do you?

18         MS. WICHT:  Object to the form of
19    the question.

20    A.   I don't have the data to say
21  Congress calculated the numbers right or
22  Congress calculated the numbers wrong, because I
23  don't have the data.

24         MS. WICHT:  They put the source of

Page 275

1    their information in the letter, so it's
2    whatever it is.

3    Q.   Now when you were -- are you --

4         MR. GRAY:  Counsel, object to the
5    form if you'd like.

6  BY MR. GRAY:

7    Q.   When you were vice president of
8  regulatory, did you receive the number of doses
9  of hydrocodone and oxycodone distributed to West
10  Virginia from 2009 to 2012?

11    A.   We did analysis, but I don't
12  recall specifically somebody gave me a number
13  for dosage that went to West Virginia.  Our
14  analysis were based on a pharmacy-by-pharmacy
15  basis, and that's how our program operated,
16  based on pharmacy and our assessment of their
17  due diligence in terms of filling prescriptions
18  for legitimate medical purpose.

19    Q.   Did you ever receive information
20  on a statewide basis of the number of oxycodone
21  or hydrocodone doses distributed to a specific
22  state for a specific year when you were vice
23  president of regulatory?

24    A.   I remember some hit maps based on

Page 276

1  distribution of drug product, but I don't recall
2  that they contained the actual number.  I don't
3  remember.

4    Q.   Would that have been important to
5  you in your job to know that there were
6  241,122 -- or 241,122,241 doses of hydrocodone
7  and oxycodone being distributed to West Virginia
8  between 2007 and 2012?

9         MS. WICHT:  Object to the form.

10    A.   All of the information that is
11  provided in terms of dosage unit has to be taken
12  into context with the number of pharmacies that
13  we serve in a particular state, size of the
14  state, number of hospitals in the state, the
15  type of customers that we have in the state.  So
16  there's -- all that information has to be taken
17  into consideration in regards to the volume.

18    Q.   When you were vice president of
19  regulatory, did you ever go to West Virginia?

20    A.   I've been in West Virginia.  I
21  went to our Wheeling DC at least once that I
22  remember.

23         (Reporter clarification.)

24    Q.   And do you know what the

Page 277

1  population of the state of West Virginia is?

2    A.   Not aware of that.

3    Q.   1.8 million.

4         Is 241,122,241 doses of
5  hydrocodone and oxycodone in relation to 1.8
6  million people an unusual size?

7         MS. WICHT:  Object to the form.

8    A.   I wouldn't know.  We have to take
9  into the context and I would have to do an
10  analysis to determine that whether or not -- I
11  mean, this is total volume, you know.  How many
12  pharmacies?  I don't know.  The size of the
13  pharmacies.  So there's a lot of information
14  that is needed for me to be able to have a
15  judgment on that.

16    Q.   Well, why do you need to know any
17  more than the population?  Why does the number
18  of pharmacies matter?  Isn't it driven by the
19  population of the state?

20         MS. WICHT:  Object to the form.

21    A.   The number of pharmacies that we
22  have is that we have as customers is relevant to
23  the analysis.

24    Q.   Well, if the ratio between 1.8

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1   million people and 241 million dosage units, is
2   that relevant to what -- to unusual size?
3       A.   Like I tell you --
4           MS. WICHT:  Object to the form.
5   Sorry.
6       A.   -- we can take one piece of
7   information in isolation.  It has to be done in
8   totality, including other information that are
9   relevant to the analysis.  It cannot be done
10  only when -- like if you send 2 million dosage
11  units to a veteran hospital, is that a high
12  size?  Yeah, but it's probably a hospital that
13  needs 2 million dosage unit.
14      Q.   Let's go down to Family Discount
15  Pharmacy, Mount Gay-Shamrock, West Virginia.
16      A.   Uh-huh.
17      Q.   Do you know where Mount
18  Gay-Shamrock, West Virginia, is?
19      A.   No, sir.  I'm not from West
20  Virginia.  I'm from Puerto Rico.  Lived in
21  Texas, Tennessee, Virginia, Pennsylvania, Ohio,
22  but never in West Virginia.
23      Q.   Okay.  But do you know what county
24  Mount Gay-Shamrock, West Virginia is in?

Page 279

1       A.   Sorry, sir.  I don't know exactly
2   where that county is.
3       Q.   Let's look at this.  It says, in
4   the middle of that paragraph, "According to the
5   DEA data, between 2006 and 2016, Family Discount
6   Pharmacy in Mount Gay-Shamrock received a total
7   of 16,591,208 doses of hydrocodone and oxycodone
8   from all distributors.  According to US census
9   data in 2010, Mount Gay-Shamrock had a
10  population of 1,779 people."
11          Do you see that?
12      A.   I see that.
13      Q.   Now, is that ratio significant to
14  you, 1,779 people, as far as the population,
15  receiving 16.5 million dosage units?
16      A.   I don't know where --
17          MS. WICHT:  Object to the form.
18      A.   I don't know where Mount Gay is
19  located.  I don't know if there are other
20  population centers close to Mount Gay.  I don't
21  know if there's a cancer hospital in Mount Gay.
22  There's a lot of information that I will have to
23  do an assessment on the question that you're
24  asking me.

Page 280

1       Q.   But that in and of itself is not
2   significant to you?
3           MS. WICHT:  Object to the form.
4       Q.   The population and the number of
5   pills?
6           MS. WICHT:  Object to the form.
7       A.   What I'm saying is that to make a
8   fair assessment of any distribution to any
9   region of the country, you need to have
10  additional data.  And many healthcare
11  professionals would agree with me.
12      Q.   Let's go down to the next full
13  paragraph.  "The DEA Automation of Reports and
14  Consolidated Orders System (ARCOS) data provided
15  to the committee and referenced in the chart
16  below indicate that over a five-year period,
17  Cardinal Health supplied Family Discount
18  Pharmacy with over 6.5 million hydrocodone and
19  oxycodone pills."
20          Do you see that, sir?
21      A.   Yes.
22      Q.   Now, was that 6.5 million pills to
23  one pharmacy, correct, sir?
24      A.   Over a period of five years.

Page 281

1       Q.   Yeah.
2           Do you see that, sir?
3       A.   According to this document.
4       Q.   Yeah.
5           Now, we know from looking up top
6   that there's only 1,779 people in Mount Gay.  So
7   wouldn't that be an unusual size?
8       A.   Like I told you --
9           MS. WICHT:  Object to the form.
10      A.   -- you need to take the totality
11  of the information, not only the volume.  There
12  are other factors that would make a volume like
13  that justifiable.
14      Q.   Okay.  And if -- keep going.  "If
15  accurate, this means that during this period,
16  Cardinal Health shipped an average of 3,561
17  hydrocodone and oxycodone pills every day to
18  this one pharmacy in rural West Virginia."
19          Would that meet the definition,
20  under the CFR, of unusual frequency?
21          MS. WICHT:  Object to the form.
22      A.   Like I said before, you would need
23  the totality of the information to make an
24  assessment whether or not that volume is

Highly Confidential – Subject to Further Confidentiality Review

Page 282

1  appropriate for that particular pharmacy.  I
2  don't know if that pharmacy was serving a
3  hospice clinic or hospice facility.  I would
4  have to have a lot more information to make that
5  assessment.
6      Q.   And when your staff brought this
7  information at Family Discount Pharmacy to your
8  attention, did you do that analysis that you're
9  talking about?
10         MS. WICHT:  Object to the form.
11     A.   I don't -- I review hundreds of
12  pharmacy.  I don't review this particular
13  pharmacy.
14     Q.   Okay.  You never reviewed this
15  one?  Nobody ever brought this one to your
16  attention?
17     A.   No, I'm not saying that.  I'm
18  saying that I don't recall the review of this
19  particular pharmacy.
20     Q.   So this size volume just really
21  didn't hit your radar screen?  Because you would
22  have recalled it if it was something that was
23  significant, wouldn't you?
24         MS. WICHT:  Object to the form.

Page 283

1      Mischaracterizes.
2      A.   I disagree with your statement.  I
3  review hundreds of pharmacies with my team, and
4  the recollection of the name of a particular
5  pharmacy is not something that I could tell you
6  that I remember this particular one or any other
7  particular one.
8      Q.   Last sentence, "This means that
9  Cardinal Health alone shipped an average of
10  approximately 731 opioid pills per year to every
11  man, woman, and child in Mount Gay."
12         Now, that, sir, that would be an
13  unusual size order pursuant to 21 CFR that we
14  discussed earlier, correct?
15     A.   I could not say that --
16         MS. WICHT:  Object to the form.
17     A.   I could not say that without
18  reviewing the totality of information that we
19  have for this particular pharmacy.
20     Q.   All right.  Let's go to 43.4.
21  Hurley -- in the middle there, Hurley Drug
22  Company, Williamson, West Virginia.
23         Do you know where Williamson, West
24  Virginia is?

Page 284

1      A.   No, sir.  Sorry about that.
2      Q.   Never been there?
3      A.   I don't remember ever being in
4  Williamson, West Virginia.
5      Q.   Okay.  What if I told you that
6  Williamson County -- Williamson, West Virginia
7  is in Mingo County and Family Discount Drug is
8  in Logan County, they're right next to each
9  other?  Two small, little counties in West
10  Virginia.
11         MS. WICHT:  Object.  I don't know
12     what the question is.
13  BY MR. GRAY:
14     Q.   You don't know?  You've never
15  investigated, never been to West Virginia,
16  except one time to your DC, correct?
17         MS. WICHT:  Let him ask a question
18     before you give an answer, please.
19     Okay?
20         Go ahead and pose a question.
21  BY MR. GRAY:
22     Q.   Is that true, sir?  The only
23  place --
24     A.   What was the question?

Page 285

1      Q.   The only place you've been in West
2  Virginia is your DC?
3      A.   I've driven by West Virginia.  I
4  don't remember ever staying in West Virginia.  I
5  remember visiting our DC.  I don't remember if
6  it was once or more than once, but I have
7  visited our DC in West Virginia.
8      Q.   Never been to Mingo County?
9         MS. WICHT:  Objection.  Asked and
10     answered.
11     A.   Sir, I don't know where Mingo
12  County is.
13     Q.   Okay.  According -- right under
14  this, Hurley Drug, Williamson, West Virginia.
15  I'm reading this.  "According to DEA data,
16  between 2006 and 2016, distributors shipped a
17  total of 20,827,620 hydrocodone and oxycodone
18  pills to Williamson, West Virginia."
19         Do you see that, sir?
20     A.   Is that on the next page?
21         MS. WICHT:  I think he's on 4.
22         THE WITNESS:  4?
23         MS. WICHT:  Yeah.
24     A.   That's what it says in this

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1  document.
2  BY MR. GRAY:
3      Q.   Okay, sir.  And down at the
4  next-to-the-last paragraph, it says, "According
5  to US census data, Williamson's population was
6  3,191 in 2010."
7          Do you see that?
8      A.   Where is that in the document?
9      Q.   Page 43.4.
10     A.   Okay.  Towards the end of the
11 document.
12     Q.   Very last paragraph.
13     A.   Okay.
14     Q.   So, again, the ratio of population
15 to the amount of pills, 3,191 population, and
16 20.8 million pills, under the rules and
17 regulations that we talked about, the letter and
18 the CFR, does that -- as the vice president of
19 regulatory, is that something that you would say
20 is an unusual size under the regulation?
21         MS. WICHT:  Object to the form.
22     A.   The letter is not the regulation.
23 The regulation is the Controlled Substances Act.
24     Q.   Under the Controlled Substances

Page 287

1  Act, would you say that's an unusual size for a
2  population of 3,191 people?
3      A.   You would have to see the totality
4  of information, like I told you before.  You'd
5  have to look at other factors to determine if
6  that particular size was appropriate for that
7  pharmacy during that period of time.
8      Q.   Okay.  And what are the factors
9  you would want to look at?
10     A.   There's many factors as
11 demographics of the area.
12     Q.   What specifically about the
13 demographics of 3,191 people?
14     A.   Demographics in terms of, we have
15 employees, workers' compensation because they've
16 got injuries, you have to check their hospitals
17 in the area, if they serve hospice, if that
18 particular county is close to other counties
19 that have larger population.  Many, many
20 factors.
21         Our focus is -- in the due
22 diligence process is, is the pharmacy conducting
23 their due diligence and filling prescriptions
24 for legitimate medical use.

Page 288

1      Q.   How big would the hospice need to
2  be?
3          MS. WICHT:  Object to the form of
4      the question.
5      A.   I personally do not know that, but
6  is one of the -- is one of the information that
7  my team at that time will ask the pharmacy if
8  they served hospices.
9      Q.   So that would be something that
10 Mr. Moné would be better to answer, right, the
11 size of -- that a hospice would need to be?
12         MS. WICHT:  Object to the form.
13     A.   I think Mr. Moné had more details
14 on the mechanics of the program at that time
15 than I do in terms of the details.
16     Q.   And in a town of 3,191 people, how
17 many beds would the hospital need to have?
18         MS. WICHT:  Object to the form.
19     A.   You're asking me for details that
20 I was not involved in the day-to-day execution
21 of the program and the evaluation of this
22 pharmacy, but I'm sure my staff evaluated this
23 pharmacy, then made decisions according to their
24 best judgment and information that they had.

Page 289

1      Q.   Well, you just told us that you
2  looked at hundreds of pharmacies every year,
3  right?
4      A.   I look -- I have looked at
5  hundreds of pharmacies.
6      Q.   Do you recall looking at Hurley
7  Drug Company in Williamson, West Virginia?
8      A.   I don't recall.  It's possible,
9  but I don't recall.
10     Q.   Doesn't stand out to you, correct?
11         MS. WICHT:  Object to the form.
12     A.   I don't recall.  I've reviewed so
13 many pharmacies.  I've had -- reviewed so many
14 pieces of information in my company that I don't
15 recall every single item that I have reviewed
16 over a nine-year period.
17     Q.   So in your role as vice president
18 at Cardinal Health over regulatory, a pharmacy
19 like Hurley Drug Company would not stand out,
20 and doesn't stand out, because you don't recall
21 it, correct?
22         MS. WICHT:  Objection to the form.
23 Mischaracterizes testimony.
24     A.   I think the characterization is

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 inaccurate. I think it would have been reviewed
2 by somebody. I don't know when and how and the
3 determinations that were made. I don't recall
4 that.
5      Q.   Did you ever instruct your staff
6 on these issues about how big a pharmacy -- I
7 mean, how big a hospice should be or how big a
8 hospital should be? Did you ever have
9 discussions with them about that in these --
10 concerning these small, rural counties in West
11 Virginia?
12          MS. WICHT: Object to the form.
13      A.   I don't recall having specific
14 discussions on the size of hospice. I remember
15 discussing the number of beds and -- but do not
16 recall the details on what would that mean in
17 terms of volume.
18      Q.   Well, what do you recall
19 discussing about the number of beds of a
20 hospital?
21      A.   At a hospital?
22      Q.   Yeah.
23      A.   Hospital? We develop an algorithm
24 for hospitals based on the type of hospital, the

Page 291

1 specialty for that particular hospital. I
2 believe it included beds, too.
3      Q.   And in your discussions, did you
4 ever -- well, during the period of time that you
5 were vice president of regulatory, did West
6 Virginia, as a state in the amount and number of
7 opioid drugs being distributed by Cardinal
8 Health to West Virginia, was that ever a focus
9 at any meetings that you had with your team?
10      A.   I remember reviewing pharmacies in
11 West Virginia.
12      Q.   But the state as a whole, did you
13 ever look at the state as a whole?
14      A.   I remember reviewing several
15 pharmacies in West Virginia. I do not have
16 recollection of the names of those pharmacies.
17      Q.   You don't recall any of those
18 pharmacies, correct?
19          MS. WICHT: Object to the form.
20      A.   If you ask me to mention name of
21 pharmacies right now, I would not recollect. We
22 have thousands of customers.
23      Q.   And when -- and no one ever came
24 to you after Cardinal received this letter to

Page 292

1 discuss Hurley Drug with you, correct?
2      A.   I don't recall --
3      Q.   And no one --
4      A.   -- this letter being discussed
5 with me.
6      Q.   Okay. Well, Hurley Drug, did they
7 ever come to you to discuss Hurley Drug with
8 you?
9      A.   I don't recall.
10      Q.   And did they ever come and discuss
11 with you Family Discount Pharmacy?
12      A.   I don't recall.
13      Q.   And when you were vice president
14 of regulatory, in your role, did you ever
15 discuss with your team the volume of opioids
16 being distributed in the state of West Virginia?
17          MS. WICHT: Object to the form of
18      the question.
19      A.   I recall us discussing volumes to
20 specific pharmacies in West Virginia, but do not
21 recall specific what pharmacies we evaluated.
22      Q.   Okay, sir. I really want you to
23 listen to my question, okay, because I know
24 you've got a flight to catch, and you need to

Page 293

1 listen to my question and see if you can answer
2 it. Okay?
3      A.   Uh-huh.
4      Q.   My question is: When you were the
5 vice president at Cardinal Health in charge of
6 regulatory, did you ever discuss the amount of
7 opioid narcotics being distributed by Cardinal
8 Health in the entire state of West Virginia?
9 Yes or no?
10          MS. WICHT: Object to the form.
11      A.   I cannot say that I recall one way
12 or another. I remember us reviewing hit maps
13 where it shows where there were large volume of
14 opioids being distributed and us deciding to do
15 investigations for those particular areas. If
16 West Virginia was one of them, it's possible,
17 but I don't recall.
18      Q.   For a state of 1.8 million people,
19 what would be a large volume of opioids being
20 distributed in that state per year?
21          MS. WICHT: Object to the form.
22      A.   Sir, I cannot tell you. What I
23 told you before, you have to look at the
24 totality of information.

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  Q.  Okay.  Well, why don't you know
2  the totality of West Virginia?  I mean, Cardinal
3  Health had a distribution center, didn't they,
4  in West Virginia?
5      MS. WICHT:  Object to the form.
6  A.  We did have -- we do have a
7  distribution center in Wheeling, West Virginia.
8  Q.  Okay.  And did you ever spend the
9  night in West Virginia?
10  A.  I don't remember spending the
11  night.  It's possible that I stay in West
12  Virginia when I visited them, but it's possible
13  that I drove back that day.  I don't recall.
14  Q.  You don't recall, all right.
15      Do you have -- are you familiar,
16  in your role as vice president of regulatory
17  that distributed narcotic opioids to West
18  Virginia, how many hospitals there are in West
19  Virginia?
20  A.  Sir, I don't have that -- I don't
21  recall that information.  I don't have that
22  information.
23  Q.  How about how many hospices there
24  are?

Page 295

1  A.  Sir, I don't recall that
2  information.
3  Q.  How about any of the demographics
4  that you talked to me about earlier, do you know
5  that about West Virginia?
6  A.  I don't --
7      MS. WICHT:  Object to the form.
8  A.  I don't recall any of that
9  information about West Virginia or any other
10  state in the nation.
11  Q.  Okay.  Don't know about it Ohio,
12  do you?
13  A.  I don't -- know the population of
14  Puerto Rico.  I think it's 3.4 million.  But
15  other than that, I cannot tell you what the
16  population of Ohio is.
17  Q.  Don't know what the population of
18  Ohio is.
19      Do you know the population of
20  Cuyahoga County, Ohio?
21  A.  No, sir.
22  Q.  How about Summit County, do you
23  know that population?
24  A.  No, I don't.

Page 296

1  Q.  Do you know the demographics of
2  Cuyahoga County, Ohio?
3  A.  I don't know, sir.
4  Q.  Do you know the demographics of
5  Summit County, Ohio?
6  A.  (Shakes head.)
7  Q.  Do you know where Cuyahoga County
8  is?
9  A.  No, sir.
10  Q.  You don't know --
11  A.  I know Franklin County.
12  Q.  You're telling this jury that you
13  don't know where Cuyahoga County, Ohio is?
14      MS. WICHT:  Object to the form of
15      the question.
16  A.  I don't know that, sir.
17  Q.  Are you telling this jury you
18  don't know where Summit County, Ohio is?
19  A.  Sir, I don't know where Summit,
20  Ohio, County is.
21  Q.  Never been there, as far as you
22  know?
23  A.  I don't know.  I could have driven
24  by it in my -- some place.  I drive all over the

Page 297

1  place, so I'm assuming I've been in many
2  different places.  But if you tell me a county,
3  I will not know what the name of the county.
4  Counties that I'm familiar with:  Franklin
5  County, Delaware County.  That's where I reside
6  and that's where I work.
7  Q.  Okay.  Do you know the population
8  of Cuyahoga County?
9  A.  Sir, I told you I didn't know
10  where Cuyahoga County was, so how can I know the
11  population if I don't even know where it is.
12  Q.  How about Puerto Rico, do you know
13  the population of Puerto Rico?
14  A.  Around 3.4 million people.
15  Q.  How about San Juan?
16  A.  I'm not sure of the population.  I
17  think it's closer to a million, but I'm not sure
18  of that either.
19  Q.  Closer to a million?
20  A.  I think.  I'm not sure.
21      MR. GRAY:  4019, please.
22          - - -
23  (Cardinal-Quintero Exhibit 15 marked.)
24          - - -

Page 298

1  BY MR. GRAY:

2      Q.   Sir, let me show you what is

3  P1.4019, if you turn to Page 2.  We've marked

4  that as Plaintiff's Exhibit Number 15 to your

5  deposition.

6          Have you ever seen this document

7  before, sir?

8      A.   Yes, I have seen this document

9  before.

10         MS. WICHT:  Maybe mine is just

11  missing some pages.  I don't have a

12  Page 1 or a Page 2 in my copy.

13         MR. GRAY:  Oh, really?

14         MS. WICHT:  It may be that the

15  witness does.  I can't tell whether we

16  have the same thing or not.

17         MR. GRAY:  I'm sorry.

18         MS. WICHT:  It's okay.

19         MS. WADHWANI:  I don't either, but

20  I'm not necessary.

21         MR. GRAY:  I apologize.

22         MS. WICHT:  That's okay.  I just

23  want to make sure it's the same thing.

24  That's all.

Page 299

1          Would you turn to Page 3 on yours

2  and I can just check that it's the same

3  thing?

4          MR. GRAY:  Why don't you check and

5  make sure he's got --

6          MS. WICHT:  Okay.  It appears to

7  be.  It's -- we can go ahead, and if

8  there's something I need to take a look

9  at, I will do that.

10         MR. GRAY:  Okay.  I'm sorry.

11         MS. WICHT:  That's okay.

12  BY MR. GRAY:

13     Q.   Actually, sir, if you look at

14  Page 3, 40193 --

15     A.   Yes.

16     Q.   -- now -- well, actually, if you

17  turn back to Page 2.  I'm sorry.  Just the first

18  sentence of paragraph -- numbered paragraph 2

19  which says, "On September 30th, 2008, Cardinal

20  entered into an Administrative Memorandum of

21  Agreement with the DEA."

22         Do you see that, sir?  I'm just

23  using it as a reference.  And you talked to my

24  colleague, Mr. Kroeger, about the 2008 MOA.

Page 300

1          Do you recall that?

2      A.   Uh-huh.

3      Q.   Okay.  And if you turn to the next

4  page, despite the -- and if you look at

5  Paragraph 3, "Despite the MOA, the specific

6  guidance provided to Cardinal by the DEA, and

7  despite the public information readily available

8  regarding oxycodone epidemic in Florida,

9  Cardinal has failed to maintain effective

10  controls against the diversion of controlled

11  substances into other than legitimate medical,

12  scientific, and industrial channels, in

13  violation of 21 USC Section 823(b)(1) and

14  (e)(1)."

15         Do you see, that sir?

16     A.   I see that language in the

17  document.

18     Q.   And so the DEA indicated here that

19  they gave you specific guidance and you failed

20  to follow it.

21         Do you see that?

22         MS. WICHT:  Object to the form.

23     A.   This is in the first sentence it

24  says that?

Page 301

1      Q.   Yeah.  And, in fact, they're

2  telling you that you violated the law, correct?

3          MS. WICHT:  Object to the form.

4      A.   I think the language there says in

5  violation of 21 USC (b)(1) and (1)(e) -- I

6  believe that's an (l) or (1).

7      Q.   And do you recall earlier when we

8  were going through the 2006 letter that you

9  looked at when you first came to 2009, that it

10  talked about what 21 USC -- what the DEA thought

11  21 USC Section 823 instructed Cardinal on?  Do

12  you recall that?

13         MS. WICHT:  Object to the form,

14  foundation.

15         MR. GRAY:  You can look at the

16  foundation.  It's in the letter.  You

17  and I talked about it.  It's effective

18  controls.

19         THE WITNESS:  Is this the document

20  you're talking about (indicating)?

21         MR. GRAY:  No, sir.  It's this

22  document here, 4050, the letter that you

23  reviewed from 2006 from the DEA.

24

Page 302

BY MR. GRAY:

Q.   Specifically, sir, if you just go back and look at 4050.3.

Could you pull that up, sir.

4050.3, and in the third full paragraph, 21 USC 823(e).

Do you see that in the middle, sir? And what the DEA in this letter's telling Cardinal Health is that they have a duty of a distributor to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels.

And you understood that; we talked about it earlier. You understood that was one of the requirements that the DEA placed on Cardinal Health in order to distribute opioids, correct?

MS. WICHT:  Object to the form of the question.

A.   The regulations of the Controlled Substances Act requires us to have effective controls against diversion, which I believe --

Q.   Yes, sir.

Page 303

A.   -- we have and we have done in the past.

Q.   Well, I know you believe it, but if you go to this document that I've just shown you, P1.4019, Page 3, the DEA said you failed to maintain effective controls against diversion in violation of the law, correct?

A.   We disagree with that statement. We have fulfilled our regulatory requirements of developing effective controls against diversion of controlled substances, as we had shown by our termination over 350 customers during the period of time that I remember.

Q.   Sir --

A.   I believe that number is probably much higher now.

Q.   Okay.  Well, sir, are you aware that your company paid a $34 million fine for this failure?

MS. WICHT:  Object to the form of the question.

A.   I'm aware that we reached a settlement with the US Department of Justice and that we paid a sum of money as part of the

Page 304

settlement.

Q.   Do you understand it was $34 million?

A.   I understand that we paid in settlement.

Q.   You don't know it was 34 million?

A.   I think it's -- I don't recall the exact number.  Don't have any reason not to believe that it's 34, but I would have to check the settlement to refresh my mind.

Q.   It's really 44 million, but we'll get to that.  But for this problem, you paid 34 million.

Do you understand that?

MS. WICHT:  Objection.

Q.   Did anybody at Cardinal Health ever tell you that they paid $34 million for this failure?

MS. WICHT:  Object to the form of the question.

A.   Repeat the question again.

Q.   Did anybody at Cardinal Health ever tell you they paid $34 million for this failure to maintain effective controls?

Page 305

MS. WICHT:  Object to the form of the question.

A.   Cardinal Health, they had -- I was told that we paid an amount of money, and I don't disagree with $34 million, as part of a settlement that we reached with the food and drug -- I mean, the Drug Enforcement Administration.

Q.   Is $34 million a lot of money to Cardinal Health?

MS. WICHT:  Object to the form of the question.

A.   $34 million is a lot of money.

Q.   It's more than you put into your capital improvements for diversion, correct?

MS. WICHT:  Object to the form of the question.  Mischaracterizes prior testimony.

A.   $34 million is a lot of money.

Q.   A lot of money, okay.

And you put $25 million into your capital improvements, right?

MS. WICHT:  Object to the form.

Q.   To your -- during the period of

Page 306

1 time that you were in diversion?
2          MS. WICHT:  Object to the form of
3     the question.
4     A.    Plus thousands of dollars and
5 millions of dollars in operating the
6 anti-diversion system.
7     Q.    Do you know what the total revenue
8 of Cardinal Health was from 2009 to 2018?
9     A.    Don't recall, sir.
10    Q.    Trillion dollars.  More than a
11 trillion.
12          Is 25 million a lot compared to a
13 trillion?
14          MS. WICHT:  Object to the form of
15     the question.
16    A.    It depends what the profit margin
17 is for those amount of money.  I don't believe
18 that we made that much money in profit.
19    Q.    Yeah, profit's important.
20          Okay.  Let's go back to 4019.3.
21 Let's look at what the DEA said.  I want to ask
22 you some questions about that.
23          In 4a, from 2008 to 2009,
24 Cardinal's sales to its top four retail pharmacy

Page 307

1 customers increased to approximately 803
2 percent.
3          Now, what I want to ask you about
4 that is, you and I have talked about the law.
5 Do you think that 803 percent increase is
6 unusual size or frequency for pattern?
7          MS. WICHT:  Object to the form of
8     the question.
9     Q.    And I'm asking you this in your
10 context as a vice president of regulatory.
11    A.    It's an --
12          MS. WICHT:  Same objection.
13    A.    It's an increase in volume that
14 should be looked at.
15    Q.    Okay.  So it would meet one of
16 those three criteria, correct, as a suspicious
17 order?
18          MS. WICHT:  Objection to the form
19     of the question.
20    A.    I did not -- I did not say that
21 and you're mischaracterizing my answer.  It's a
22 volume that I think would be appropriate to
23 evaluate to determine if it's concerning or not.
24    Q.    Well, if we go back to 21 CFR

Page 308

1 Section 1301.74, which is P1.419 [sic], which we
2 have up here on the screen, at the very last
3 sentence, sir, it says, "Suspicious orders
4 include orders of unusual size."
5          Okay?  And then it says,
6 "Suspicious orders include orders deviating
7 substantially from a normal pattern."  And then
8 it says, "Suspicious orders include orders of
9 unusual frequency."
10          So this 803 percent in one year,
11 which one of those three would it -- in your
12 mind, as vice president of regulatory, which one
13 of those three would it meet?
14          MS. WICHT:  Object to the form of
15     the question.  Foundation.
16     Mischaracterize.
17    A.    The increase would hit likely a
18 threshold event, which requires other members of
19 our staff to assess whether or not that increase
20 is justifiable for legitimate medical reasons.
21 And if it is justifiable, that was the system
22 that we had at that time and that was agreed
23 with the agency in our meeting of 2009 that the
24 order didn't have to be reported as suspicious

Page 309

1 after that assessment was done.
2     Q.    Yeah, but --
3     A.    It cannot be determined to be
4 suspicious until an assessment was done.  That
5 was the agreement that we had with the agency at
6 that time.
7     Q.    Now, I want you to -- it's right
8 there on the screen.  I want you to look at the
9 law, and I want you to tell me where all of that
10 that you just said is in the law.
11    A.    It says --
12          MS. WICHT:  Object to the form of
13     the question.
14    A.    The interpretation that we had
15 with the agency at that time, based on the
16 meeting that we had in 2009 with Ruth Carter and
17 Sue Langston was the definition that we were
18 using to determine what was a suspicious order,
19 which was consistent with the regulatory
20 requirements as we understood it and as we
21 thought expectations of the agency were at that
22 time.
23    Q.    Okay.  Well, obviously you got it
24 wrong, correct?

Page 310

1     MS. WICHT:  Object to the form of
2  the question.  Argumentative.
3     A.   I wouldn't say that we got it
4  wrong.  I would say that the agency changed the
5  interpretation of the regulations and we had
6  multiple opportunities for the agency to tell us
7  that our interpretation was wrong and it was
8  never done.
9     Q.   Okay.  Well, go back to my
10  question.  Where in the law does it say all of
11  that stuff you're talking to me about?  What the
12  law says is, suspicious orders include orders of
13  unusual size; suspicious orders include orders
14  deviating substantially from the normal pattern;
15  orders of unusual frequency.
16     So this 803 percent, which one of
17  those would it be?
18     MS. WICHT:  Objection.  Asked and
19  answered.
20     Q.   Is it unusual size, or is it
21  deviating from normal pattern or frequency?
22  Which one is it?
23     MS. WICHT:  Objection.  Asked and
24  answered.

Page 311

1     Q.   I want you to look at the law, not
2  your interpretation.
3     MS. WICHT:  Objection.  Asked and
4  answered.  Several times.
5     A.   I'm looking at -- I've answered
6  that question more than once.  And I told you,
7  you know, we had a meeting with the DEA --
8     Q.   Sir, sir, I'm not asking about the
9  meeting --
10     A.   -- in 2009 where, we discussed --
11     Q.   -- what I'm asking about is the
12  law.  The law.
13     MS. WICHT:  Okay.  Let him answer
14  the question.
15     MR. GRAY:  We're going to be here
16  all day.
17     MS. WICHT:  Well, you have seven
18  hours total, so keep going.
19  BY MR. GRAY:
20     Q.   Where under the law is Section 21
21  CFR 1301.74, P1.4915, does it say anything other
22  than a suspicious order includes orders of
23  unusual size, orders deviating substantially
24  from a normal pattern, and orders of unusual

Page 312

1  frequency?
2     MS. WICHT:  Object to the form.
3  And asked and answered.
4     A.   We were following the regulations
5  as we understood at that time.
6     Q.   Sir, answer my question.  Where
7  does it say anything other than what I read?
8     MS. WICHT:  Object to the form.
9     A.   I maintain my previous answer
10  that, this language was discussed with members
11  of DEA and headquarters.  We agreed on the
12  interpretation of the language and we were
13  executing our program according to that
14  interpretation.
15     Q.   Okay.  And you weren't at this
16  meeting?
17     A.   Like I told you before, I got to
18  Cardinal Health December 1st, 2011.  That
19  meeting occurred earlier that year.
20     Q.   And nobody ever showed you a
21  document from the DEA about that meeting?
22     MS. WICHT:  Objection.  Asked and
23  answered.
24     A.   I had updates from several members

Page 313

1  of the Cardinal Health team, including Michael
2  Moné, including Bob Giacalone, including my
3  boss, with a consistent interpretation of the
4  outcome of the meeting with the DEA.  The DEA
5  had plenty of opportunity to tell us that our
6  interpretation was not adequate during the
7  dozens and dozens of cyclic inspections that we
8  had, and that was --
9     Q.   And that's exactly what they're
10  doing in this document, 4019, is telling you
11  that you failed and you broke the law, correct?
12     A.   We were --
13     MS. WICHT:  Object to the form of
14  the question.
15     Q.   Is that true, sir?
16     A.   We were surprised by the agency
17  taking this action against us because it was our
18  understanding that we were meeting the
19  expectations of the agency.  And it was our
20  understanding that we were performing according
21  to the regulatory requirements of the Controlled
22  Substances Act.
23     Q.   Well, you were -- you were so
24  surprised -- did Cardinal Health put you in

Page 314

1 charge of trying to get the $34 million back you
2 paid in a fine?
3          MS. WICHT:  Object to the form of
4     the question.
5     A.   I don't work for sales.  My job is
6 in regulatory, it's make sure that we have
7 regulatory programs that helps the company
8 comply with the regulatory requirements.
9     Q.   In fact, you were so surprised
10 that you were just clearly interpreting the
11 rules and regulation and laws concerning
12 distribution just completely improperly, right?
13          MS. WICHT:  Object.
14     Q.   I mean, you're going --
15     A.   I don't believe that --
16          MS. WICHT:  Object to the form of
17     the question.
18     A.   I don't believe that at that time we
19 had that understanding.  At that time, we felt
20 that we were meeting our regulatory
21 requirements, as I told you, and that was the
22 understanding that we had with -- from the
23 meeting that we had with Barbara Boockholdt and
24 Sue Langston.

Page 315

1     Q.   And despite this document in front
2 of you right now, P1.4019.2 and the $34 million
3 fine and everything that's contained in it,
4 you're still surprised, aren't you?
5          MS. WICHT:  Object to the form of
6     the question.
7     A.   I was -- we were surprised at that
8 time and we made changes to the program.
9     Q.   And you're still surprised.  My
10 question is, are you still surprised?
11          MS. WICHT:  Let him finish his
12     answer, please.
13          MR. GRAY:  Well, he's not
14     answering the question.
15 BY MR. GRAY:
16     Q.   Are you still surprised?  That's
17 the question.
18     A.   We were surprised at that time,
19 and no longer surprised.  I mean, that happened
20 a long time ago, so we -- I was surprised at
21 that time.  We made changes to our program
22 according to the new expectations from the
23 agency.
24          MS. WICHT:  We've been going about

Page 316

1 an hour and ten minutes.  Whenever it is
2 a good time to take a short break.
3          MR. GRAY:  Okay.  That's fine.
4          VIDEOGRAPHER:  Time is now 2:28.
5 Going off the record.
6          (Recess taken.)
7          VIDEOGRAPHER:  Time is now 2:46.
8 Back on the record.
9          - - -
10 (Cardinal-Quintero Exhibit 16 marked.)
11          - - -
12 BY MR. GRAY:
13     Q.   Mr. Quintero, I'm showing you what
14 we've marked as Plaintiff's Exhibit 16 to your
15 deposition, P1.565.  I want to ask you if you've
16 ever seen this document before.
17     A.   I believe I have seen this before.
18     Q.   And at the very top,
19 "Administrative Memorandum of Agreement," do you
20 see that, sir?
21     A.   Yep.
22     Q.   Okay.  And if you look at 5a, can
23 you read that into the record for me, please.
24     A.   5a?

Page 317

1     Q.   Yes, sir.
2     A.   "The Order to Show Cause" --
3     Q.   No, 5 -- well, just 5a.
4          MS. WICHT:  You can't read a
5     subparagraph without reading the
6     heading.
7          MR. GRAY:  He can read the whole
8     document in the record.  That's fine.
9          MS. WICHT:  Sure.
10          MR. GRAY:  If counsel doesn't like
11     you to read just a sentence, go ahead
12     and just read the whole thing.
13          MS. WICHT:  Just trying to not be
14     misleading.
15          MR. GRAY:  Okay.  I'll tell you
16     what.
17 BY MR. GRAY:
18     Q.   5a, I'll read it.  "Despite the
19 2008 MOA, Cardinal Lakeland failed to maintain
20 effective controls against diversion of
21 particular controlled substances into other than
22 legitimate medical, scientific, and industrial
23 channels as evidenced by sales of certain
24 customers of Cardinal."

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1      Do you see that, sir?
2      A.   I see that.
3      Q.   And did anyone at Cardinal Health,
4  or did you direct anyone at Cardinal Health, to
5  do a list of all the problems that the DEA found
6  at the Cardinal Lakeland facility?
7          MS. WICHT:  Object to the form of
8      the question.
9      A.   Repeat that again.
10     Q.   Let's do it this way.  Did you
11  direct anyone to come up with a list of all of
12  the ways that Cardinal Health Lakeland failed to
13  maintain effective controls against diversion?
14         MS. WICHT:  Object to the form of
15     the question.
16     A.   I spoke with my staff about some
17  of the allegations made by the agency, and we
18  talked about, how do we make sure that we meet
19  the new requirements that the agency was
20  imposing on us.
21     Q.   These aren't really allegations,
22  are they?
23         MS. WICHT:  Object to the form of
24     the question.  The document refers to it

Page 319

1      as an allegation, counsel.
2      A.   This says above "alleged."
3      Q.   Okay.  Let's look at the next
4  page.  First paragraph, "Cardinal admits that
5  its due diligence efforts for some pharmacy
6  customers and its compliance with the 2008 MOA,
7  in certain respects, was inadequate."
8          Do you see that?
9      A.   I'm trying to locate where that
10  language -- what number?
11     Q.   Do you see it?  See it?  See it?
12  "Cardinal admits."  Do you see that?  First
13  paragraph.
14     A.   Oh.
15     Q.   Yeah.
16         Do you see that admission,
17  "Cardinal admits"?
18     A.   I see that's what it says in the
19  agreement -- the Memorandum of Agreement.
20     Q.   Okay.
21     A.   But my understanding is that we
22  were meeting the expectations of the agency, and
23  those expectations changed over time.
24     Q.   Well, you said you'd seen this

Page 320

1  document.  Who did you talk to about Cardinal's
2  admission that its due diligence efforts for
3  some pharmacy customers and its compliance with
4  the 2008 MOA, in certain respects, were
5  inadequate?  Who did you talk to at the company
6  about that?
7          MS. WICHT:  Mr. Quintero, you
8      can -- I don't know whether you had
9      discussions with lawyers about that
10     subject.
11         MR. GRAY:  If you had it with
12     lawyers, don't tell me what you -- the
13     discussion with the lawyers, but you can
14     tell me you had it with legal.
15         MS. WICHT:  Sir, I'll instruct him
16     on issues of privilege.  It's Cardinal
17     Health's privilege, and I'll instruct
18     him about what he can and cannot reveal
19     under the privilege.
20         I agree that if -- what I was
21     about to tell him, if you wouldn't have
22     interrupted me, was that if he had
23     discussed it with lawyers, he could
24     identify those lawyers, but he should

Page 321

1      not reveal the substance of any
2      communications.
3      A.   Most of those conversations that I
4  remember, probably all conversations, were in
5  front of our chief legal regulatory counsel, Bob
6  Giacalone, or with Mr. Morford, our chief legal
7  counsel.
8      Q.   Okay.  So you had -- and as your
9  lawyer said, you don't have to tell us the exact
10  discussions, but you learned of this -- these
11  Cardinal admissions with discussions with legal,
12  correct?
13         MS. WICHT:  Object to the form of
14     the question.
15         THE WITNESS:  Can I answer?
16         MS. WICHT:  You can answer that
17     yes or no, if you're able to, if you
18     understand the question.
19     A.   Yes.
20  BY MR. GRAY:
21     Q.   Okay, sir.
22         Just so the record's clear, sir,
23  you were the vice president of regulatory when
24  that last exhibit, 565, was in place, correct,

Page 322

1 2012?
2     A.   I was the senior vice president of
3 quality and regulatory affairs for the
4 pharmaceutical segment.
5         - - -
6     (Cardinal-Quintero Exhibit 17 marked.)
7         - - -
8 BY MR. GRAY:
9     Q.   Let me show you what's P1.4224
10 [sic], and has been marked as Plaintiff's
11 Exhibit 17 to your deposition, sir, and ask you
12 if you've ever seen this document.
13     A.   What's the date of the document?
14     Q.   12/22/16.  It's on the front
15 stamped.
16     A.   I don't recall seeing this
17 particular document.  This document was probably
18 produced after I did not have direct
19 responsibility for supervising the
20 anti-diversion program.
21     Q.   Okay.  When did you leave that
22 position?
23     A.   I believe during the summer of
24 2015.  Could have been August or September of

Page 323

1 2015.
2     Q.   Okay.  And no one at the company
3 has ever showed you this consent order before?
4     A.   I don't remember seeing it.
5     Q.   Okay.  Did anyone at the company
6 ever discuss this consent order with you?
7     A.   We may have had some conversations
8 with the members of the legal team.
9     Q.   Okay.  All right.  Sir, if you
10 look at 4222.2, the next page, third paragraph.
11 "Whereas, the complaint alleges that between
12 January 1, 2011 and May 14, 2012."
13         Now, that period of time, you were
14 the vice president of QRA, correct?
15     A.   I was senior vice president --
16     Q.   Senior vice president.
17     A.   -- of quality and regulatory
18 affairs for the pharmaceutical segment.
19     Q.   Okay.  And it indicates, "The
20 complaint alleges that between January 1, 2011
21 and May 14, 2012, Defendant committed reporting
22 violations of the CSA regulations by failing to
23 adequately operate a system designed to identify
24 suspicious orders of controlled substances and

Page 324

1 inform the DEA of those suspicious orders
2 pursuant to 21 CFR Section 1301."
3         Do you see that, sir?
4     A.   Yes, I see it.
5     Q.   Okay.  And if you -- if we can go
6 back to P1.1941, please.  I believe that's
7 Exhibit -- I'm not exactly sure what exhibit it
8 is.  Exhibit 4 to your deposition.
9         Do you have it, sir?  Mr. Kroeger
10 asked you about this document.  Now, in 4222.2,
11 the government is indicating that you failed to
12 inform the DEA of suspicious orders pursuant to
13 21 CFR 1301, and in Exhibit 4, 1941, Mr. Mahoney
14 is indicating that you told them that Cardinal
15 does not report suspicious orders to the DEA.
16         Do you see that?
17         MS. WICHT:  Object to the form of
18     the question.
19     A.   Yeah.  And I told you that -- told
20 your colleague that statement is completely
21 incorrect.  If you see, during that period of
22 time of 2013, we had reported thousands of
23 suspicious orders to DEA.  Thousands.
24     Q.   In 4222, Exhibit 17, the

Page 325

1 government's saying you didn't do it.  You
2 didn't report suspicious orders pursuant to
3 21 CFR Section 1301.
4         Do you see that?
5     A.   We always report suspicious
6 orders, and if you look at the record, during
7 when conversation took place, I'm not sure who
8 Mr. Mahoney is, but he has his information
9 incorrect, because at this point in time, I can
10 tell you we were reporting thousand of orders to
11 DEA.
12     Q.   Well, what I want you to look at,
13 sir, is 4222.  Okay?  Exhibit 17 to your
14 deposition.  Do you see that?
15     A.   Uh-huh.
16     Q.   Okay.  Well, the DEA -- the
17 government's saying -- actually, the United
18 States Attorney for the Southern District of New
19 York in Manhattan is saying that your company
20 failed to inform the DEA of those suspicious
21 orders pursuant to 21 CFR Section 1301.
22         Do you see that?
23     A.   If you're asking me about this and
24 about the memo, they're two different dates

Page 326

1 related here.
2 Q. Okay.
3 A. But I can assure you that we were
4 reporting thousands of suspicious orders in
5 March 11th, 2013, where Mr. Mahoney was
6 attesting that we didn't. And I can assure you,
7 without any doubt, that we were reporting
8 thousands of orders.
9 Q. Okay. Well, let's talk about 4222
10 and all those thousands of orders you reported
11 and what the US Attorney for the Southern
12 District of Manhattan found. And if you go down
13 to numerical Paragraph Number 2, why don't you
14 read that into the record.
15 MS. WICHT: I'm sorry.
16 Paragraph 2, is that what you said?
17 MR. GRAY: Yes. Numerical
18 Paragraph 2.
19 A. "Defendant admits, acknowledges,
20 and accepts responsibility for the following
21 violations of the regulations promulgated by DEA
22 pursuant to its authority in the Controlled
23 Substances Act."
24 Q. Okay. Next paragraph.

Page 327

1 A. "Between January 1st, 2011 and
2 May 14, 2012, Defendant failed to inform DEA
3 that certain orders for controlled substances it
4 received from some customers were suspicious, as
5 required by 21 CFR 1301.74."
6 Q. Okay. So the government, the
7 United States Department of Justice from
8 Manhattan, found that, just like you said over
9 here in 1941, that you didn't report suspicious
10 orders.
11 A. I didn't ever say --
12 MS. WICHT: Object to the form of
13 the question. Mischaracterizes the
14 document.
15 A. You mischaracterize what I said.
16 I never said that we have failed to report
17 suspicious --
18 Q. Well, we'll ask Mr. Mahoney what
19 you said to him. But what I'm saying is, if you
20 look at 4222.2, the United States Government
21 Department of Justice made those allegations
22 against Cardinal and they admitted it, didn't
23 they?
24 MS. WICHT: Object to the form of

Page 328

1 the question.
2 A. They made -- I believe they made
3 those allegations. Me personally, I disagree
4 with those allegations. I believe that we were
5 reporting suspicious orders as our program was
6 designed and consistent with the regulatory
7 requirements.
8 Q. Okay.
9 MS. WICHT: Counsel, I'm sure you
10 know Mr. Mahoney has already been asked
11 and has testified that those notes are
12 wrong, so I just urge you to not ask
13 misleading questions on the record.
14 MR. GRAY: Strike the testimony of
15 the lawyer from the record.
16 BY MR. GRAY:
17 Q. What I'm asking you is, during the
18 period of time that you were the vice president,
19 okay, this -- senior vice president, January 1,
20 2011 through May 14, 2012.
21 Do you see that period of time?
22 A. I see that period of time.
23 Q. Your company admitted that they
24 failed to inform the DEA of certain orders of

Page 329

1 controlled substances, you understand that,
2 correct?
3 A. I was not --
4 MS. WICHT: Object to the form of
5 the question.
6 A. -- a party in the write-up of the
7 agreement between the Department of Justice and
8 DEA -- and Cardinal Health, but I can tell you
9 today, and I have told you throughout the day
10 today, to the best of my knowledge, we were
11 complying with the Controlled Substances Act and
12 we have been reported since the time that I
13 joined the company in 2009 suspicious orders to
14 the government. The expectations have changed
15 over time and we have adapted to the
16 expectations of the agency.
17 Q. Okay. But the law hasn't changed,
18 right?
19 A. The law still --
20 MS. WICHT: Object to the form of
21 the question.
22 A. The law is still the same until --
23 from, I believe, 1970 -- I don't remember the
24 exact year, until today.

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    Q.   The law stayed the same, but as
2  you read this document -- I mean, you're still
3  an employee of Cardinal Health, right?
4    A.   I still am an employee of Cardinal
5  Health, correct.
6    Q.   And what's your current position?
7    A.   Chief quality and regulatory
8  affairs officer.
9    Q.   So you're chief quality in
10 regulatory affairs.  Is that higher than senior
11 vice president?
12   A.   Similar role, but in a
13 different -- in a different capacity.
14   Q.   The chief's higher up on the
15 order -- the chain of command than senior vice
16 president, right?
17     MS. WICHT:  Object to the form of
18     the question.
19   A.   I think we have -- I believe we
20 have the same pay grade, if that's what you
21 mean.
22   Q.   And in that capacity, you
23 understand this document to mean that Cardinal
24 Health admitted that they violated the law when

Page 331

1  they didn't inform the DEA of certain orders of
2  controlled substances; you understand that?
3     MS. WICHT:  Object to the form of
4     the question.  Mischaracterizes the
5     document.
6    A.   Understand what?  The language
7  that is in the document?  I see the language
8  that is in the document.  It doesn't mean that I
9  agree with the language.
10   Q.   Okay.  And then it goes on to say
11 your company paid a $10 million fine for that
12 problem.
13     Do you understand that?
14   A.   It says in the document that the
15 Defendant shall pay $10 million to the United
16 States.
17   Q.   And that $10 million were for acts
18 and actions while you were the senior vice
19 president over regulatory, January 1, 2011
20 through May 14, 2012, correct?
21   A.   According to this document, there
22 was an agreement made by Cardinal Health and the
23 Department of Justice and that was the
24 settlement agreement that they reached.

Page 332

1     MR. GRAY:  Nothing further.
2     VIDEOGRAPHER:  Time is now 3:04.
3  Going off the record.
4     MS. WICHT:  You wouldn't mind if
5  we just consult for a minute or two?
6     MR. GRAY:  No.
7     (Recess taken.)
8     VIDEOGRAPHER:  Time is now 3:12.
9  Back on the record.
10    MS. WICHT:  We have no questions.
11 We will read and sign.
12    And the transcript is highly
13 confidential under the terms of the
14 protective order for a period of time
15 until we make more detailed
16 designations.  Thank you.
17    MR. GRAY:  Okay.  Thank you.
18    VIDEOGRAPHER:  Time is now 3:12.
19 This concludes the deposition.
20    Going off the record.
21    (Signature not waived.)
22          - - -
23    Thereupon, at 3:12 p.m., on Thursday,
24 December 6, 2018, the deposition was concluded.

Page 333

1         CERTIFICATE
2  STATE OF OHIO      :
               SS:
3  COUNTY OF FRANKLIN  :
4
5     I, GILBERTO QUINTERO, do hereby certify that
6  I have read the foregoing transcript of my
7  cross-examination given on December 6, 2018; that
8  together with the correction page attached hereto
9  noting changes in form or substance, if any, it is
10 true and correct.
11 _____
12 GILBERTO QUINTERO
13    I do hereby certify that the foregoing
14 transcript of the cross-examination of GILBERTO
15 QUINTERO was submitted to the witness for reading and
16 signing; that after he had stated to the undersigned
17 Notary Public that he had read and examined his
18 cross-examination, he signed the same in my presence
19 on the _____ day of _____, 2018.
20
   _____
21
   NOTARY PUBLIC - STATE OF OHIO
22 My Commission Expires:
   _____, _____.
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1           CERTIFICATE
2    STATE OF OHIO        :
                  SS:
3    COUNTY OF DELAWARE   :
4        I, Sara S. Clark, a Registered Merit
     Reporter and Notary Public in and for the State of
5    Ohio, duly commissioned and qualified, do hereby
     certify that the within-named GILBERTO QUINTERO was by
6    me first duly sworn to testify to the truth, the whole
     truth, and nothing but the truth in the cause
7    aforesaid; that the deposition then given by him was
     by me reduced to stenotype in the presence of said
8    witness; that the foregoing is a true and correct
     transcript of the deposition so given by him; that the
9    deposition was taken at the time and place in the
     caption specified and was completed without
10   adjournment; and that I am in no way related to or
     employed by any attorney or party hereto or
11   financially interested in the action; and I am not,
     nor is the court reporting firm with which I am
12   affiliated, under a contract as defined in Civil Rule
     28(D).
13
         IN WITNESS WHEREOF, I have hereunto set my
14   hand and affixed my seal of office at Delaware, Ohio
     on this 11th day of December 2018.
15
16
17
18
     _____
19
     SARA S. CLARK, RMR
20   NOTARY PUBLIC - STATE OF OHIO
     My Commission Expires:  March 10, 2023.
21
22           - - -
23
24

Page 335

1        DEPOSITION ERRATA SHEET

2    I, GILBERTO QUINTERO, have read the transcript

     of my deposition taken on the 6th day of December

3    2018, or the same has been read to me.  I request that

     the following changes be entered upon the record for

4    the reasons so indicated.  I have signed the signature

     page and authorize you to attach the same to the

5    original transcript.

6    Page  Line  Correction or Change and Reason:

7    ____  ____  _____

8    ____  ____  _____

9    ____  ____  _____

10   ____  ____  _____

11   ____  ____  _____

12   ____  ____  _____

13   ____  ____  _____

14   ____  ____  _____

15   ____  ____  _____

16   ____  ____  _____

17   ____  ____  _____

18   ____  ____  _____

19   ____  ____  _____

20   ____  ____  _____

21   ____  ____  _____

22   ____  ____  _____

23   ____  ____  _____

24   Date _____ Signature _____