1               UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3  IN RE: NATIONAL        )  MDL No. 2804
    PRESCRIPTION OPIATE    )

4  LITIGATION,          )  Case No.
                      )  1:17-MD-2804

5                     )
    THIS DOCUMENT RELATES TO  )  Hon. Dan A.

6  ALL CASES           )  Polster
                     )

7

8                — — —

9        Thursday, January 10, 2019

                — — —

10

     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11         CONFIDENTIALITY REVIEW

                — — —

12

13

14

15     Videotaped Deposition of ROXANNE REED,
    held at 4206 South J.B. Hunt Drive, Rogers,

16  Arkansas, commencing at 8:08 a.m., on the
    above date, before Debra A. Dibble, Certified

17  Court Reporter, Registered Diplomate
    Reporter, Certified Realtime Captioner,

18  Certified Realtime Reporter and Notary
    Public.

19

20

21

                — — —

22

         GOLKOW LITIGATION SERVICES

23     877.370.DEPS | fax 917.591.5672
           deps@golkow.com

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2         CARELLA, BYRNE, CECCHI, OLSTEIN,
           BRODY & AGNELLO
 3         BY:  MICHAEL A. INNES, ESQUIRE
                minnes@carellabyrne.com
 4              ZACHARY BOWER, ESQUIRE
                zbower@carellabyrne.com
 5         5 Becker Farm Road
           Roseland, New Jersey 07068-1739
 6         (973) 994-1700
           Counsel for Plaintiffs
 7
 8         JONES DAY
           BY:  TARA A. FUMERTON, ESQUIRE
 9              tfumerton@jonesday.com
                JASON McDONELL, ESQUIRE
10              jmcdonell@jonesday.com
           77 West Wacker
11         Chicago, Illinois 60601-1692
           312-782-1692
12         Counsel for Walmart
13
14         MARCUS & SHAPIRA, LLP
             (appearing telephonically)
15         BY:  DARLENE NOWAK, ESQUIRE
                dnowak@marcus-shapira.com
16         301 Grant Street
           35th Floor
17         Pittsburgh, Pennsylvania 15219-6401
           (412) 338-4690
18         Counsel for HBC
19
           WRIGHT, LINDSEY & JENNINGS, LLP
20         BY:  CALEY B. VO, ESQUIRE
                cvo@wlj.com
21         3333 Pinnacle Hills Parkway
           Suite 510
22         Rogers, Arkansas 72758-8498
           (479) 986-0888
23         Counsel for McKesson
24
25
```

```
 1        BARBER LAW FIRM, LLP
          BY:  J. CARTER FAIRLEY, ESQUIRE
 2            cfairley@barberlawfirm.com
          425 West Capitol Avenue
 3        Suite 3400
          Little Rock, Arkansas 72201
 4        (501) 707-6182
          Counsel for Cardinal Health, Inc.
 5
 6        ARNOLD & PORTER KAYE SCHOLER, LLP
           (appearing telephonically)
 7        BY:  JAKE MILLER, ESQUIRE
               jake.miller@arnoldporter.com
 8        777 South Figueroa Street
          44th Floor
 9        Los Angeles, California 90017-5844
          (202) 942-5000
10        Counsel for Endo Health Solutions
          Inc.; Endo Pharmaceuticals Inc.; Par
11        Pharmaceuticals, Inc.; Par
          Pharmaceutical Companies, Inc.
12        formerly known as Par Pharmaceutical
          Holdings, Inc.
13
14        JACKSON KELLY, PLLC
          BY:  ANGELA L. FREEL, ESQUIRE
15            alfreel@jacksonkelly.com
          221 NW Fifth Street
16        Evansville, IN 47708
          (812)442.9444
17        Counsel for AmerisourceBergen
18
19        ALSO PRESENT:
20        Paul D. Morris
          Senior Associate Counsel
21        Walmart, Inc.
22        THE VIDEOGRAPHER:
23        Chris Ritona
          GOLKOW LITIGATION SERVICES
24
                     — — —
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1
                    I N D E X
2
    ROXANNE REED                              PAGE
3
      DIRECT EXAMINATION BY MR. BOWER           9
4
5                 E X H I B I T S
6     No.              Description            PAGE
7   Walmart-  Roxanne Reed LinkedIn            11
      Reed 1  profile
8
      Walmart-  Roxanne Reed Performance       11
9     Reed 2  Evaluations.
10   Walmart-  January 2014 email chain.       69
      Reed 3  Subj: The raw data along
11             with questions.
               WMT_MDL-000009635-9637.
12
     Walmart-  1-30-14 email from              70
13     Reed 4  Aishwarya Shukla  Subj:
               Methodology for flagging of
14             store orders_30JAN.
               WMT_MDL-000009629-9630 with
15             attachment.
16   Walmart-  11/3/14 email from Roxy        126
      Reed 5  Reed to Maria Smith.
17             WMT_MDL_000048562-48598.
18   Walmart-  November 2014 email.  Subj:    147
      Reed 6  FW: Executive Summary for
19             October Scorecard.
               WMT_MDL-000026982-26988.
20
     Walmart-  12-3-14 email from Miranda     154
21     Reed 7  Johnson to Roxy Reed.
               Subj: SOM - Archer.
22             WMT_MDL-000009489-9491.
23   Walmart-  12-4-18 email from Roxy        193
      Reed 8  Reed to Miranda Johnson
24             Subj:
               Step_2_Threshold_Calc.xlsx.
25             WMT_MDL_000029318-29319
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1<br>2<br>3 | Walmart-<br>Reed 9 | 12-23-14 email from Roxy<br>Reed to Phyllis Harris.<br>Subj: H&W Compliance<br>Scorecard - November FY15.<br>WMT_MDL_000027994-27999. | 205 |
| 4<br>5<br>6 | Walmart-<br>Reed 10 | Friday, August 21, 2015<br>Jabber communication<br>between Kristy Spruell and<br>Roxy Reed.<br>WMT_MDL_000009035. | 219 |
| 7<br>8 | Walmart-<br>Reed 11 | August 2015 email chain.<br>Subj: RE: Email<br>Notification of SOM Eval.<br>WMT_MDL_000008688-8689. | 226 |
| 9<br>10<br>11 | Walmart-<br>Reed 12 | 8-18-15 email from Roxy<br>Reed.  Subj: 6045 Threshold<br>File.<br>WMT_MDL_000053351-53352<br>with attachment. | 252 |
| 12<br>13<br>14 | Walmart-<br>Reed 13 | July 2015 email chain.<br>Subj: RE: Project ID 28098-<br>Wal-Mart - 62128 - Drug<br>Tracking.<br>WMT_MDL_000020529-20531. | 267 |
| 15<br>16<br>17 | Walmart-<br>Reed 14 | 5-12-16 email chain.  Subj:<br>[Updated] "SOM Eval - Add<br>CS schedule for Top 3 Docs"<br>WMT_MDL_000009030. | 338 |
| 18<br>19<br>20<br>21<br>22 | Walmart-<br>Reed 15 | June 2016 email chain.<br>Subj: FW: SOM Cloud Data<br>Document - Current Version<br>ver. 1.3.  5-12-16 email<br>chain.  Subj: [Updated]<br>"SOM Eval - Add CS schedule<br>for Top 3 Docs"<br>WMT_MDL_000009030.04624-<br>4626. | 343 |
| 23<br>24<br>25 | Walmart-<br>Reed 16 | August 2017 email chain.<br>Subj: EXT: RE: SOM<br>Algorithm Score - 20.<br>WMT_MDL_000007071-7072. | 359 |

| | | |
|---|---|---|
| 1 | Walmart- | December 2017 email chain. 368 |
| | Reed 17 | Subj: RE: Follow-up |
| 2 | | Materials - Controlled |
| | | Substance Discussion. |
| 3 | | WMT_MDL_000003598-3599. |
| | Walmart- | Subj: RE: SOM Talking 375 |
| 4 | Reed 18 | Points & FAQs Updated Jan. |
| | | 5. WMT_MDL_000007350-7354. |
| 5 | | |
| | Walmart- | January 2018 email chain. 382 |
| 6 | Reed 19 | Subj: Re: EXT: Suspicious |
| | | Order Reports. |
| 7 | | WMT_MDL_000008865-8866. |
| 8 | Walmart- | October 2015 email chain. 387 |
| | Reed 20 | Subj: RE: Stores Needing |
| 9 | | Threshold Evaluation. |
| | | WMT_MDL_000028865-28866. |
| 10 | | |
| | Walmart- | Walmart U.S. Ethics & 389 |
| 11 | Reed 21 | Compliance Q3 Nominees. |
| | | WMT_MDL_000046435-46441. |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| | CERTIFICATE | 395 |
| 16 | | |
| | ERRATA | 397 |
| 17 | | |
| | ACKNOWLEDGMENT OF DEPONENT | 398 |
| 18 | | |
| | LAWYER'S NOTES | 399 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2              (January 10, 2019 at 8:08 a.m.)
 3              THE VIDEOGRAPHER:  We are now
 4        on the record.  My name is
 5        Chris Ritona.  I'm the videographer
 6        for Golkow Litigation Services.
 7        Today's date is January 10, 2019.  The
 8        time is approximately 8:08 a.m.  This
 9        video deposition is being held in
10        Rogers, Arkansas at Mitchell Williams,
11        4206 South J.B. Hunt Drive, Suite 200,
12        in the matter of National Prescription
13        Opiate Litigation, MDL No. 2804, Case
14        No. 17-MD-2804.  U.S. District Court,
15        Northern District of Ohio, Eastern
16        Division.
17              The deponent today is
18        Roxanne Reed.  The court reporter
19        today is Debbie Dibble.  Counsel will
20        now please -- will counsel note
21        themselves for the stenographic
22        record?
23              MS. FUMERTON:  Tara Fumerton on
24        behalf of Walmart and the witness.
25              MR. McDONELL:  Jason McDonell,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Jones Day, also on behalf of Walmart

2        and the witness.

3             MR. MORRIS:  Paul Morris from

4        Walmart legal.

5             MR. FAIRLEY:  Carter Fairley on

6        behalf of Cardinal.

7             MR. VO:  Caley Vo, Wright

8        Lindsey & Jennings, on behalf of

9        McKesson.

10             MR. INNES:  Michael Innes,

11        Carella Byrne, on behalf of plaintiffs

12        in the MDL.

13             MR. BOWER:  Zach Bower, also

14        Carella Byrne, on behalf of plaintiffs

15        in the MDL.

16             THE VIDEOGRAPHER:  Will the

17        court reporter please swear in the

18        witness.

19             (Telephonic interruption.)

20             THE VIDEOGRAPHER:  Anyone on

21        the phone remotely, please identify

22        yourselves for the record as well.

23             MR. MILLER:  Hi.  This is

24        Jake Miller from Arnold & Porter on

25        behalf of the Endo and Par defendants.
```

```
 1              MS. FREEL:  Hi, this is
 2         Angela Freel with Jackson Kelly on
 3         behalf of AmerisourceBergen Drug Corp.
 4              MS. NOWAK:  This is
 5         Darlene Nowak for Marcus & Shapira, on
 6         behalf of HBC Services.
 7              ROXANNE REED,
 8    having first been duly sworn, was examined
 9    and testified as follows:
10              DIRECT EXAMINATION
11    BY MR. BOWER:
12         Q.    Would you please state your
13    full name and spell your last name for the
14    record?
15         A.    Roxanne Reed, R-E-E-D.
16         Q.    And good morning, Ms. Reed.
17    Thank you for being here today.
18              Have you ever given a
19    deposition before?
20         A.    I have not.
21         Q.    Okay.  So just before we get
22    started, we'll go over a few ground rules to
23    hopefully make your day a little bit easier.
24    Okay?
25         A.    Okay.
```

```
 1             Q.      First, and perhaps most

 2    important, is if I ask a question and you

 3    don't understand it, please let me know.

 4    Okay?

 5             A.      Okay.

 6             Q.      Okay.  So if you don't

 7    understand the question, I will try to

 8    rephrase it so that we can both be on the

 9    same page.  Okay?

10             A.      Okay.

11             Q.      If you do not let me know that

12    you don't understand a question, I will

13    assume that you do understand the question.

14                     Do you understand that?

15             A.      Yes.

16             Q.      Also very important, if a

17    question calls or an answer calls for a "yes"

18    or "no," please provide a verbal answer and

19    don't shake your head.  That way, the court

20    reporter can take down your answer.  Okay?

21             A.      Okay.

22             Q.      Any questions you have before

23    we begin?

24             A.      No.

25             Q.      Is there any reason or anything
```

Highly Confidential - Subject to Further Confidentiality Review

1    that would prevent you from testifying

2    truthfully today?

3         A.    No.

4         Q.    And if you want to take a break

5    at any time, please let us know and we'll do

6    so.  I just ask that you would answer any

7    question that's pending.

8              Do you understand that?

9         A.    Okay.

10        Q.    So when we get started, I'm

11   going to give you a couple of documents to

12   kind of get us started, which is going to be

13   your annual performance review.  So that will

14   help us kind of frame our discussion.

15             (Walmart-Reed Deposition

16        Exhibit 1 was marked for

17        identification.)

18        Q.    (BY MR. BOWER)  I don't want

19   this to be a guessing game here.  And also

20   I'm going to give you your LinkedIn profile.

21        A.    Okay.

22             (Walmart-Reed Deposition

23        Exhibit 2 was marked for

24        identification.)

25        Q.    (BY MR. BOWER)  And you can

1    certainly review those as we go throughout

2    the day.  I don't have any questions on them

3    right now.  I just wanted you to have them in

4    case you need to refer to them.  Okay?

5         A.    Okay.

6         Q.    So I just want to start this

7    morning with a bit of your background.

8         A.    Okay.

9         Q.    And kind of your earlier years

10   at Walmart.

11              MS. FUMERTON:  And, Zach, just

12         to make sure, this is going to be

13         Exhibit 1?

14              MR. BOWER:  Yeah, sorry.

15         That's important for the record.

16         Thank you.

17              I believe that Exhibit 1 is

18         your LinkedIn profile.  And Exhibit 2

19         will be your performance review.

20              THE WITNESS:  Okay.

21              MR. BOWER:  Okay?

22              Thank you for that, Tara.

23              MS. FUMERTON:  And so you don't

24         want her to take time to review this

25         now.  We'll just have it.

```
1                MR. BOWER:  She can review it

2        as questions come up.  I just want her

3        to have it there.  If she needs to

4        refer to it, certainly do.  But

5        there's no reason to review it at the

6        moment.

7                MS. FUMERTON:  Okay.  Can I

8        just at least let her, then, flip

9        through the review just to see what's

10       in it?

11               MR. BOWER:  Sure.

12               MS. FUMERTON:  I'm not sure she

13       would understand -- this would even be

14       helpful for a question.

15       Q.     (BY MR. BOWER)  While you're

16  doing that, are you able to see your

17  performance reviews at Walmart?

18       A.     Yes.

19       Q.     So you've seen this document?

20       A.     Yes.  We receive them when we

21  actually do the review.

22       Q.     Okay.  Yes, so why don't you

23  flip through it and just familiarize yourself

24  with it, and then we'll start at least

25  briefly on kind of your early days at
```

1    Walmart.

2          A.    Okay.

3          Q.    Okay.  Thanks.  And certainly

4    if I ask specific questions on this or you

5    need to refer to it throughout the day,

6    please do so --

7          A.    Okay.

8          Q.    -- okay?

9                So can you just describe

10   briefly for us your -- any education that you

11   received after high school?

12         A.    Yes.  I went to Arkansas Tech

13   University.  I have a major in chemistry and

14   a minor in biology.

15         Q.    Okay.  And then what did you do

16   immediately after graduating from

17   Arkansas Tech?

18         A.    I worked for a water filtration

19   company.  And then a liquor store part time.

20         Q.    Okay.  And then you graduated

21   in approximately 2006; is that correct?

22         A.    Yes.  December 2006.

23         Q.    Okay.  And then in 2007, you

24   began working at Walmart; is that correct?

25         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     And what was your first job at

2    Walmart?

3      A.     It was an optical contract

4    coordinator.

5      Q.     Can you just describe very

6    briefly what that means?

7      A.     Yes.  Walmart contracts with

8    optometrists, and so I worked on the team

9    that helped manage those leases with the

10    optometrists.

11      Q.     And those optometrists lease

12    space in Walmart facilities?

13      A.     Yes.

14      Q.     And then what was your next job

15    at Walmart?

16      A.     It was an audit manager with

17    health and wellness compliance.

18      Q.     Can you just describe briefly

19    what that means?

20      A.     Yes.  We audited health and

21    wellness compliance programs, things like our

22    partial bill program and Medicaid

23    tamper-resistant prescriptions.

24      Q.     And that was from approximately

25    October 2008 to April 2010?

Highly Confidential - Subject to Further Confidentiality Review

```
1          A.     Yes.
2          Q.     Okay.  And I'm referring to
3    Exhibit 1, which is your LinkedIn profile.
4          A.     Mm-hmm.  (Witness nods.)
5          Q.     During that -- strike that.
6                 In that position, did you have
7    any involvement in Walmart's suspicious order
8    monitoring?
9          A.     No.
10         Q.     Did you have any involvement in
11   the distribution of Schedule II narcotics?
12         A.     No.
13         Q.     And then, what did you --
14                MR. MILLER:  I'm sorry, I
15         apologize.  On the phone, I don't know
16         if others can hear, but I can hear
17         almost nothing.
18                MS. NOWAK:  Same here.
19                MR. BOWER:  All right.  Well,
20         why don't we go off the record for a
21         moment and we'll try to rearrange the
22         phone.
23                THE VIDEOGRAPHER:  8:15.  We
24         are off the video record.
25                (Recess taken, 8:16 a.m. to
```

```
 1              8:16 a.m.)

 2                  THE VIDEOGRAPHER:  8:17.  We

 3          are on video record.

 4          Q.    (BY MR. BOWER)  All right.

 5   Let's continue where we left off, then.

 6                  After your position as a health

 7   and wellness audit manager, what was your

 8   next position at Walmart?

 9          A.    It was a systems manager in

10   health and wellness compliance.

11          Q.    And what -- how did your duties

12   and responsibilities change with that change

13   in title?

14          A.    I started focusing more on data

15   and analytics, and system-related things,

16   databases, queries, that kind of thing.

17                  Oh, I guess technically the

18   next position was a compliance analyst.

19   Sorry, I skipped a position.

20          Q.    That's fine.  That's why I

21   wanted to supply this, to kind of make sure

22   we get it right.

23          A.    Yes.

24          Q.    So the compliance analyst

25   position was before the systems manager; is
```

1    that correct?

2         A.    Yes.

3         Q.    And you held the compliance

4    analyst position for approximately three and

5    a half years?

6         A.    Yes.

7         Q.    Okay.  And then just briefly,

8    what did you do as a health and wellness

9    compliance analyst?

10        A.    I created databases, created

11   reports, pulled data.  Anything data and

12   analytics-related.

13        Q.    And just generally, what do you

14   mean by "analytics"?

15        A.    So any kind of reports that

16   they needed.  If -- for audit purposes, if we

17   needed to pull data and then find trends and

18   see if some -- find out why or -- it's that

19   kind of thing.

20        Q.    And who would ask you to pull

21   this data?

22             MS. FUMERTON:  Objection to

23        form.

24             MR. BOWER:  I'll strike that.

25        Q.    (BY MR. BOWER)  Your answer

Highly Confidential - Subject to Further Confidentiality Review

1    referred to reports that they needed.

2         A.    Yes.

3         Q.    Who is the "they"?

4         A.    Our team supported all of

5    health and wellness compliance.  So requests

6    could come from billing compliance.  Anything

7    billing-related.  It could come from the

8    audit team.  Practice compliance.  HIPAA.

9               I worked most often with HIPAA

10   in the 2010 through 2013 frame.

11        Q.    And just generally -- well,

12   maybe for the record, what do you mean by

13   "HIPAA"?

14        A.    HIPAA is our privacy team,

15   Health Information Protection.

16        Q.    And just --

17        A.    Yeah.

18        Q.    -- at a very high level, what

19   would you do for those HIPAA requests?

20        A.    So I built the database that

21   they used to manage potential breaches if

22   somebody in a pharmacy received information

23   that wasn't their own.

24        Q.    Can you just describe what that

25   means?  What do you mean when you say "I

1    built the database that" used -- that "was

2    used to manage potential breaches"?

3          A.    So I built a database that the

4    team used to track when -- when a breach

5    occurred.  So if a patient received another

6    patient's pamphlet that had their name on it,

7    that would be a potential HIPAA breach.

8                And I built the database that

9    managed that.  It did some risk scoring.  It

10   helped create a notification letter, if

11   needed.  And then tracked whether the OCR was

12   notified of those incidents.

13         Q.    And what is an OCR?

14         A.    The -- I don't know what the

15   exact acronym stands for.

16         Q.    Okay.  What does --

17         A.    It's a regulatory agency.

18         Q.    Okay.  Thank you.

19               And what do you mean by "risk

20   scoring"?

21         A.    It was a way for the team to

22   identify what information was potentially

23   released, and then the risk of that

24   information being used inappropriately.

25         Q.    And how would you determine

Highly Confidential - Subject to Further Confidentiality Review

1    what the risk was?

2          A.      That was not me.  I built the

3    database.  And so there were multiple factors

4    that went into -- went into that, including

5    things like what is the Social Security

6    number involved, and what the potential harm

7    to the patient would be if that information

8    were released.

9          Q.      Okay.  So someone else provided

10   you with that information.  You simply built

11   into a database; is that correct?

12         A.      Yes.  Yes.

13         Q.      I'm sorry, another instruction

14   I should have given is -- I apologize I

15   didn't.  Just please -- I know it's difficult

16   sometimes -- let me finish my question.

17         A.      Sorry.

18         Q.      So the -- just to make it easy

19   on the court reporter so that she can take

20   down the question, then your answer, and give

21   your attorney an opportunity to object.

22   Okay?

23              MS. FUMERTON:  Yes.  You're

24         both actually starting to interrupt

25         each other a little bit, so just slow

Highly Confidential - Subject to Further Confidentiality Review

1    it down a little bit to make sure he's

2    finished, and then if you could also

3    do the same, make sure she's finished.

4         Q.    (BY MR. BOWER)  And then when

5    did you first become in Walmart's suspicious

6    order monitoring program?

7         A.    So I officially started working

8    with the suspicious order monitoring program

9    in July of 2015, when I moved into the senior

10   analyst of controlled substances position.

11        Q.    Okay.  And you're referring

12   now, if we look at Exhibit 1, your LinkedIn

13   page, the one at the top there, senior

14   analyst, "Health and Wellness Controlled

15   Substances"?

16        A.    Yes.

17        Q.    I want to take a step back,

18   though, before we get there.  So if we look

19   at Exhibit 2, okay?  If you note there on the

20   first page, work with -- at the bottom of the

21   first page, "Work with Mu Sigma."

22             Do you see that?

23        A.    Yes.

24        Q.    And it's "Work with Mu Sigma on

25   the delivery of their rolling 30-60-90 day

1    plan to achieve analytic objectives for the

2    roadmap for Q1."  Do you see that?

3         A.    Yes.

4         Q.    Was that in connection with

5    Walmart's SOM algorithm?

6         A.    No, sir.

7         Q.    What was that in connection

8    with?

9         A.    That was with our metrics for

10   compliance programs and Tableau dashboards

11   that were created as a result of that.

12        Q.    Is Mu Sigma a third party?  Or

13   is it part of Walmart?

14        A.    A third party.

15        Q.    Did Mu Sigma also assist in

16   Walmart's -- strike that.

17              Did you also work with Mu Sigma

18   in connection with thresholds for -- in

19   connection with Walmart's SOM program?

20              MS. FUMERTON:  Objection, form.

21        Q.    (BY MR. BOWER)  At any time,

22   then.

23              MS. FUMERTON:  Objection, form.

24        And if I object, unless I instruct you

25        not to answer, you still go ahead and

Highly Confidential - Subject to Further Confidentiality Review

```
 1           answer his question.

 2                     THE WITNESS:  Okay.

 3                     MS. FUMERTON:  He may or may

 4           not rephrase it.  He may just ask you

 5           to answer as stated.

 6                     THE WITNESS:  Okay.

 7                     I did not.

 8           Q.     (BY MR. BOWER)  Okay.  Did

 9      anyone in Walmart perform that function at

10      any time?

11                     MS. FUMERTON:  Objection, form.

12                     THE WITNESS:  So did anybody

13           work with Mu Sigma?

14           Q.     (BY MR. BOWER)  In connection

15      with Walmart's SOM, yes.

16           A.     Yes.  My understanding is

17      Walmart did work with Mu Sigma.

18           Q.     Okay.  Do you know who would

19      have done that work with Mu Sigma?

20           A.     Kristy Spruell.

21           Q.     Do you have any knowledge as to

22      when that work may have been done?

23           A.     I do not.

24           Q.     Was it already underway when

25      you -- in July of 2015?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    When I joined the team, we were

2   no longer using Mu Sigma.

3      Q.    So when you joined the team in

4   July of 2015, the thresholds that Mu Sigma

5   had worked on with Kristy were no longer in

6   place; is that correct?

7            MS. FUMERTON:  Objection, form.

8            THE WITNESS:  That is not

9        correct.

10      Q.    (BY MR. BOWER)  Okay.  What --

11   how would you correct that statement?

12      A.    So Mu Sigma was no longer

13   involved in the process.  Thresholds were

14   most definitely in place.

15      Q.    Okay.  So when you started

16   working on the team in July 2015, the

17   thresholds that Mu Sigma was involved in were

18   still in place in connection with monitoring

19   for controlled substances; is that correct?

20            MS. FUMERTON:  Objection, form.

21            THE WITNESS:  When I started

22        working on the team, thresholds were

23        being used and we were developing

24        thresholds for the other DCs.

25      Q.    (BY MR. BOWER)  And when you

```
1     say "thresholds were being used," are you

2     referring to thresholds for DC 6045?

3           A.     I'm not sure which DC was in --

4     was rolled out in July of 2015.

5           Q.     So as you sit here today --

6     strike that.

7                  When you began work on

8     controlled substances in July 2015, were

9     thresholds in place at DC 6045?

10                 MS. FUMERTON:  Objection, form.

11                 MR. BOWER:  What's the nature

12           of that objection?

13                 MS. FUMERTON:  It's unclear

14           from your question whether you're

15           talking about any thresholds at all or

16           the thresholds that you were asking

17           questions about that Mu Sigma worked

18           in.

19                 MR. BOWER:  You can answer.

20                 THE WITNESS:  Okay.  I know

21           DC 6045 had thresholds.  The enhanced

22           Reddwerks thresholds that were being

23           implemented at that time, I don't know

24           the exact roll-out schedule as we sit

25           here right now.
```

1    Q.    (BY MR. BOWER)  Okay, but my

2    question is a little bit simpler.  I just

3    want to know whether thresholds were already

4    in place at 6045 when you began working in

5    controlled substances in July of 2015.

6              MS. FUMERTON:  Objection, form.

7              THE WITNESS:  There were the

8         original thresholds in place.

9              MR. BOWER:  Okay.  Thank you.

10   Q.    (BY MR. BOWER)  And who worked

11   on those original thresholds, if you know?

12   A.    I do not know.

13   Q.    How did you familiarize

14   yourself in July of 2015 as to the thresholds

15   process?

16             MS. FUMERTON:  Objection, form.

17             THE WITNESS:  Which threshold

18        process?

19   Q.    (BY MR. BOWER)  Okay.  Well,

20   that's a fair point.

21             When you began work on

22   controlled substances in July of 2015, was

23   there more than one threshold process in

24   place?

25             MS. FUMERTON:  Objection, form.

```
 1                 THE WITNESS:  The existing

 2          process was in place.  I didn't learn

 3          a whole lot about that as we were

 4          updating and enhancing Reddwerks to

 5          updated thresholds.

 6                 And as far as the new

 7          thresholds, I had worked with Kristy

 8          earlier, in my previous role, to help

 9          create the database that created

10          those.

11          Q.     (BY MR. BOWER)  In order to

12   work on the new thresholds, did you have to

13   have an understanding as to what the existing

14   thresholds were?

15                 MS. FUMERTON:  Objection, form.

16                 THE WITNESS:  No.

17          Q.     (BY MR. BOWER)  Did the

18   updating or new threshold project that you

19   were working on take into account the old

20   threshold or was it a completely new way of

21   calculating thresholds?

22                 MS. FUMERTON:  Objection, form.

23                 THE WITNESS:  It was an updated

24          way of calculating thresholds and

25          using thresholds.  I don't know enough
```

1        about how the original thresholds were

2        set up or used to speak to them.

3            Q.      (BY MR. BOWER)  All right.

4    Well, let me try to ask it a different way,

5    then.

6            When you say it was "an updated

7    way," what do you mean?

8            A.      It was a new way.  I don't know

9    what the existing -- the previous way was,

10   but we were using the Reddwerks system in a

11   way that was different.  In my understanding,

12   there were some things updated and we used

13   the data, the past data to create an

14   individual threshold.

15           Q.      Okay.  And we'll talk about, I

16   guess, these new or updated thresholds in a

17   moment.  I just want to circle back for a

18   moment when you said you had worked with

19   Kristy earlier in a previous role to help

20   create a database for those older thresholds.

21           What does that mean?

22           A.      So the order data is a lot of

23   data, and Excel can't handle that many rows

24   of data, especially in 2013.  Walmart was a

25   couple Excel versions behind, and so it just

1    couldn't handle the amount of data.  And so

2    Access was used to do the math.

3            Q.    And what was your role, or what

4    did you do with respect to the old

5    thresholds?

6                  MS. FUMERTON:  Objection, form.

7                  MR. MILLER:  I'm sorry to

8            interrupt again.  This is Jake Miller

9            on the phone.  I can hear virtually

10           nothing any longer.

11                 MR. BOWER:  All right.  Well

12           let's go off the record.

13                 THE VIDEOGRAPHER:  8:31.  We

14           are off the video record.

15                 (Recess taken, 8:31 a.m. to

16           8:33 a.m.)

17                 THE VIDEOGRAPHER:  8:34.  We

18           are on the video record.

19           Q.    (BY MR. BOWER)  So let's try to

20   pick back up where we left off.  And I think

21   I asked a poor question, so let me ask a

22   different question.

23                 Your testimony was that Walmart

24   was a couple of Excel versions behind, so it

25   just couldn't handle the amount of data.  So

Highly Confidential - Subject to Further Confidentiality Review

1    Access was used to do the math.  Can you

2    describe what that means?

3           A.     Yes.  So with the thresholds,

4    we used past order data.  And so for each

5    store and drug, we had a certain number of

6    weeks.  I don't remember the exact number of

7    weeks that we went back -- history that were

8    used to calculate the threshold.  And so when

9    we have 5,000 stores, as many controlled

10   substance items as we had, and then weeks'

11   worth of history, it was more than the number

12   of rows that Excel could handle.  And Access

13   doesn't have a limit for records.  And so I

14   used Access to do the math that was done to

15   calculate the thresholds.

16                 And then that was exported back

17   into Excel.

18          Q.     And approximately in what time

19   period did this work occur?

20          A.     2014.

21          Q.     And when you say -- I just want

22   to make sure that throughout the day your --

23   our time periods are aligning up.  When you

24   say "2014," are you talking about the year

25   2014?

1       A.      Yes.

2       Q.      Or fiscal year 2014?

3       A.      No, the year 2014.

4       Q.      So that would have been

5    Walmart's fiscal year 2015?

6       A.      Yes.

7       Q.      And as we go today, just

8    generally speaking, when you refer to a year,

9    you're referring to the actual year, not the

10   fiscal year; correct?

11      A.      The majority of the time, yes.

12      Q.      And I understand it's

13   difficult, just if you're not -- if you're

14   referring to fiscal year, please just let us

15   know so we can have an accurate timeline.

16      A.      Yeah.  I'll typically say

17   fiscal year, because my brain doesn't work in

18   fiscal years.

19              MS. FUMERTON:  And I would just

20          ask the same courtesy.  If you're

21          talking fiscal year, obviously to make

22          that clear as opposed to calendar

23          year.

24              MR. BOWER:  Yep.  Absolutely.

25          Thank you.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. BOWER)  In part of your

2    answer you say, "And so I used Access to do

3    the math that was done."  Do you know what

4    math was done?

5    A.    Yes.  The order history for

6    each store and item, the average was

7    calculated and then the standard deviation.

8    Q.    And this was done on a -- I

9    just want to be sure -- on an item number; is

10   that correct?

11   A.    Yes.

12   Q.    And is that the same as an NDC

13   number?

14   A.    It's not the same, but they are

15   related.

16   Q.    And how are they related?

17   A.    The item is the Walmart item

18   number.  The NDC is the national drug code

19   not set by Walmart.

20         So each item only -- it's a

21   one-to-one relationship.

22   Q.    Thank you.  That was going to

23   be my next question.  And for every item

24   there is a one-to-one relationship; is that

25   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      So let's just break that down a

 3   little bit more, if we can.  Your statement

 4   was, "The order history for each store, an

 5   item" -- "for each store and item, the

 6   average was calculated and then the standard

 7   deviation."

 8                  So on the first step, how was

 9   the average calculated back in 2014?

10          A.      How was the average calculated?

11          Q.      Yes.

12          A.      An Access formula that took the

13   average of the store item orders.

14          Q.      And for how long would it look

15   back to determine that average in 2014?

16          A.      I don't remember the exact

17   number of weeks.

18          Q.      Do you remember the approximate

19   number of weeks it would consider?

20          A.      I do not.

21          Q.      Okay.  And let me just try to

22   make it hopefully a little easier for you.

23   I've seen four weeks throughout the

24   documents.  Do you recall whether there was

25   ever a different average looked at than a
```

```
 1     four-week average?
 2                    MS. FUMERTON:  Objection, form.
 3                    MR. BOWER:  And if you don't
 4          recall, that's fine.  I don't want to
 5          make this a test.  We can look at
 6          documents as we go through today to
 7          maybe put a finer point on that.
 8                    THE WITNESS:  I don't recall.
 9          Q.    (BY MR. BOWER)  Do you recall
10     how the standard deviation was calculated?
11          A.    The Access formula for standard
12     deviation.
13          Q.    And who would have provided
14     that formula to Access?
15                    MS. FUMERTON:  Objection, form.
16                    THE WITNESS:  So I programmed
17          the formula into Access, the preset
18          Access formula.  I did not, like,
19          enter in manually the standard
20          deviation formula.  I used the preset
21          standard deviation, but as far as --
22          so is that your question?
23          Q.    (BY MR. BOWER)  Well, in
24     order -- what do you -- I'll strike that.
25                    Yes, that's my question.  And I
```

Highly Confidential - Subject to Further Confidentiality Review

1    appreciate your answer.

2              So in your answer you say you

3    programmed a formula into Access.  Correct?

4         A.    Yes.

5         Q.    Was that a formula that you

6    yourself came up with or did someone provide

7    you with a formula to program?

8              MS. FUMERTON:  Objection, form.

9              THE WITNESS:  So the standard

10        deviation function is built within

11        Access.  It's a preset formula that

12        you pick standard deviation, and then

13        select which fields you want to

14        calculate the standard deviation for.

15        Q.    (BY MR. BOWER) Okay.  So in

16    2014, the Access was programmed to run the

17    standard deviation for the field that was

18    populated with the average; is that correct?

19              MS. FUMERTON:  Objection, form.

20              THE WITNESS:  So it was doing

21        the standard deviation of the order

22        data.  There is an average calculated

23        and then the standard deviation.

24              So it's -- the standard

25        deviation is for each column -- or for

```
 1              each row, the deviation from the
 2              average.
 3         Q.    (BY MR. BOWER)  Okay.  That's
 4    helpful.  And when you say "the deviation
 5    from the average," you mean how that order
 6    for that item differed from the average;
 7    correct?
 8              MS. FUMERTON:  Objection, form.
 9              THE WITNESS:  So it's -- the
10              standard deviation would be the
11              difference.  So if you have a set of
12              ten numbers that are used to calculate
13              the average, what the standard
14              deviation is from those numbers from
15              the average.
16         Q.    (BY MR. BOWER)  And I'm just
17    trying to figure out what number is reflected
18    in that column in Access that was exported to
19    Excel.  Is that the standard deviation or is
20    that the difference between the standard
21    deviation and that item order number?
22              MS. FUMERTON:  Objection, form.
23              THE WITNESS:  So are you asking
24              for what the threshold was that was
25              exported?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BOWER:  Yes.

 2                    THE WITNESS:  Okay.  That

 3          answer is the average plus three

 4          standard deviations.

 5          Q.    (BY MR. BOWER)  And that was

 6    the case while you were working on this

 7    database in 2014; correct?

 8          A.    Yes.

 9                    MS. FUMERTON:  Objection, form.

10                    THE WITNESS:  Yes.

11          Q.    (BY MR. BOWER)  And do you

12    know, back in 2014, who determined that would

13    be how the threshold was calculated?

14                    MS. FUMERTON:  Objection, form.

15                    THE WITNESS:  I don't know who

16          was involved in the decision to use

17          that -- that calculation.

18          Q.    (BY MR. BOWER)  Other than, I

19    believe you mentioned -- was it Kristy

20    Spruell --

21          A.    (Witness nods.)

22          Q.    -- who asked you to help with

23    the creation or work with Access; is that

24    correct?

25          A.    Yes.
```

1          Q.    Other than Ms. Spruell, are you

2    familiar with anyone else who worked on that

3    project?

4               MS. FUMERTON:  Objection, form.

5               THE WITNESS:  Yes.

6          Q.    (BY MR. BOWER)  Okay.  Who were

7    those folks?

8          A.    So I know Miranda Johnson

9    worked on the project.

10         Q.    Okay.  So let's go back to the

11   LinkedIn profile.  Take a -- finish up the

12   time before you worked as a senior analyst in

13   the health and wellness controlled substance.

14            So going back to your work as

15   health and wellness compliance analyst from

16   April 2010 to September 2013.

17            Do you see that?

18         A.    Yes.

19         Q.    What data would you analyze for

20   health and wellness compliance?

21               MS. FUMERTON:  Objection, form.

22               THE WITNESS:  I was supporting

23       all of health and wellness compliance

24       at that time.  Most often in that

25       timeframe, I was helping the HIPAA

```
 1              team or the billing compliance team.
 2              Q.    (BY MR. BOWER)  And what data
 3      would you use?
 4                    MS. FUMERTON:  Objection, form.
 5                    THE WITNESS:  So with the HIPAA
 6              team, we were looking at breach
 7              information.  So anything regarding
 8              somebody inappropriately getting
 9              somebody else's information.
10                    With the billing team, it would
11              be billing data, dispensing data and
12              including the billing information.
13              Q.    (BY MR. BOWER)  Okay.  And
14      where would you access that billing and
15      dispensing data?
16                    MS. FUMERTON:  Objection, form.
17                    THE WITNESS:  So the billing
18              and dispensing data came from
19              Teradata.  Or if I wasn't pulling the
20              data out, there's a system we used
21              called Super Putty that allows you to
22              log into kind of the background and
23              see transactions.
24              Q.    (BY MR. BOWER)  And that is
25      called, you said, Super Putty; is that
```

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2            A.      Yes.

3            Q.      Does Super Putty access the

4    Teradata database or some other database?

5            A.      It's not Teradata.  I don't

6    know which database it's -- what database

7    it's hitting.

8            Q.      Is the data that's accessed by

9    Super Putty different than the data in

10   Teradata?

11           A.      No.

12           Q.      So what would be the reason to

13   access Super Putty instead of Teradata?

14           A.      It allows you to see one

15   prescription in kind of a step-by-step form

16   so you can log in and see the prescription.

17   And then you can log in and see the fill

18   history, and you can log in and see the

19   billing, without having to run all of those

20   different queries.  There's just commands

21   given.

22           Q.      And I keep wanting to say

23   "Silly Putty."  Was Super Putty a third-party

24   database or was it --  or information source

25   or was it in-house at Walmart?

```
 1          A.     Oh, no.

 2                 MS. FUMERTON:  Objection, form.

 3                 Excuse me.  Again, so just give

 4          me, again, a little --

 5                 THE WITNESS:  Sorry.

 6                 MS. FUMERTON:  Once I stop

 7          objecting, you guys start going

 8          faster, so I feel like I keep

 9          getting -- but, yes, just give me a

10          second to object.

11                 THE WITNESS:  No, it was

12          in-house.  All of our databases that

13          house pharmacy information, dispensing

14          pharmacy information, are internal.

15          And so this is just -- and I don't

16          know if Silly Putty is a Walmart -- or

17          Silly Putty -- sorry.  Super Putty is

18          a Walmart-developed application or if

19          it was another application that

20          Walmart uses.  I don't know the answer

21          to that.

22                 MR. BOWER:  Okay.

23          Q.     (BY MR. BOWER)  Are you

24   familiar with any data bases at any time

25   while you've been at Walmart that has data
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    that is not Walmart-specific?
2              MS. FUMERTON:  Objection --
3              MR. BOWER:  For example -- let
4         me finish and then you can --
5              MS. FUMERTON:  Yeah.
6         Q.   (BY MR. BOWER)  For example,
7    you mentioned dispensing information.  Do any
8    of Walmart's databases have dispensing
9    information from pharmacies that are not
10   Walmart or Sam's Club pharmacies?
11             MS. FUMERTON:  Objection, form.
12             THE WITNESS:  No.
13        Q.   (BY MR. BOWER)  Have you been
14   involved in any discussions regarding whether
15   Walmart should have access to any type of
16   data that is not Walmart-specific data?
17             MS. FUMERTON:  I'm going to
18        object to the question just in case
19        it -- I don't know that it would --
20        involves communications with legal.
21        But if it's communications outside of
22        legal --
23             MR. BOWER:  No, it's a
24        yes-or-no question.  It doesn't call
25        for legal advice.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. FUMERTON:  You and I have
2          talked about this before.  "Yes" or
3          "no" question can sometimes invade
4          attorney-client privilege.  I'm not
5          saying whether this does.  I'm just
6          cautioning the witness that if she had
7          conversations with counsel about a
8          specific topic, not to answer those
9          communications.  It goes to the level
10         of detail.
11             So as I said, this may not be
12         an issue, but you can go ahead and
13         answer the question as long as it's
14         not going to reveal your
15         communications with counsel.
16             THE WITNESS:  No.
17         Q.    (BY MR. BOWER)  Have you ever
18     had any conversations with Walmart's counsel
19     regarding the need to access data that is not
20     housed at Walmart?
21         A.    No.
22             MS. FUMERTON:  Objection.  I
23         was going to say the same objection.
24         Q.    (BY MR. BOWER)  So in your
25     LinkedIn profile, you state, "Analyze data
```

1    for health and wellness compliance."

2                  What does that refer to?  What

3    does "compliance" there refer to?

4         A.    So health and wellness

5    compliance is a team.  And it's a subset of

6    our corporate compliance organization.

7         Q.    Okay.  And during this time

8    period, April 2010 to September 2013, what

9    was the scope of that compliance work?

10                 MS. FUMERTON:  Objection, form.

11        Q.    (BY MR. BOWER)  What were you

12   trying to comply with?

13                 MS. FUMERTON:  Same objection.

14                 THE WITNESS:  I was working on

15          multiple projects, helping support the

16          entire health and wellness compliance

17          organization.  What the organization's

18          goals were, and the exact rules that

19          they were complying to, I wouldn't

20          have insight into those specifics.

21        Q.    (BY MR. BOWER)  Other than what

22   we've discussed today, did you have any other

23   involvement in analyzing data for diversion

24   on or before September 2013?

25                 MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. BOWER:  I'll strike that.
 2          Q.    (BY MR. BOWER)  Did you have
 3   any involvement or any discussions regarding
 4   analyzed diversion data prior to
 5   September 2013?
 6                 MS. FUMERTON:  Objection, form.
 7                 THE WITNESS:  So in this
 8           timeframe -- I don't know the exact --
 9           whether it was 2013, early '14, maybe
10           even 2012 -- I did work with our
11           global investigations team that works
12           with diversion.  And in my mind, our
13           Walmart term of "diversion" is
14           associates leaving inappropriately
15           with pills.  And so I worked with our
16           global investigations diversion
17           investigators on projects
18           periodically.
19          Q.    (BY MR. BOWER)  And do you
20   recall anything specific about those projects
21   as you sit here today?
22          A.    I know I helped with queries.
23   I know we had one where there was some
24   billing fraud happening with a pharmacist,
25   and so trying to identify those
```

1    prescriptions.  But other than that, it was

2    just kind of general Teradata query-type

3    help.

4        Q.    And what would be an example of

5    a type of query you would run in connection

6    with this work on diversion?

7        A.    So looking at what was

8    dispensed, and then they could use that to

9    look for dummy names, you know, that kind of

10   thing.  And then also looking at the -- at

11   our point of sale, POS information, to see if

12   something was filled, was it sold, making

13   sure it had a corresponding sold record.

14       Q.    And who from global

15   investigations would you work with?  If you

16   can recall their names.

17       A.    Greg Beam was the head of that

18   team, and there were multiple investigators

19   that I worked with along the way.

20       Q.    Can you recall any of their

21   names as you sit here today?

22       A.    John Oldfather, Kathy Stowe.

23   Those are the two that I recall.  I know

24   there's definitely more of them.

25       Q.    Okay.  Thank you.  I appreciate

1    that.

2              Other than what we've discussed

3    today, did you have any involvement in

4    Walmart's suspicious order monitoring program

5    prior to September 2013?

6              MS. FUMERTON:  Objection, form.

7              THE WITNESS:  No.

8         Q.    (BY MR. BOWER)  Who was your

9    supervisor in 2013?

10        A.    Casey Campbell.

11        Q.    And then was Casey also your

12   supervisor when you became the health and

13   wellness Systems Manager II?

14        A.    Yes.

15        Q.    How did the change from health

16   and wellness compliance analyst to health and

17   wellness Systems Manager II impact your

18   duties and responsibilities?

19        A.    So it was an in-seat promotion.

20   So I was doing the same job, just some

21   expanded responsibilities, including more

22   Archer, taking over some of the Tableau

23   dashboarding that Mu Sigma had helped us

24   with, things like that.

25        Q.    What is Tableau dashboarding?

1        A.      So Tableau is a computer

2    program that is used to display reports.

3        Q.      Okay.  And why does Walmart use

4    Tableau?

5                MS. FUMERTON:  Objection, form.

6                THE WITNESS:  I can't speak to

7           why Walmart uses Tableau as a whole.

8           We use Tableau for the ease of getting

9           the reports to the stakeholders that

10          needed the reports.

11       Q.      (BY MR. BOWER)  What do you

12   mean when you say "for the ease of getting

13   the reports"?  How does that work?

14       A.      It's a -- part of it is

15   web-based.  And so you don't have to have a

16   special program.  It doesn't look all jumbled

17   up.  You don't have to export it to like PDF.

18   You can send a read-only version of the

19   pretty web view without them having to have

20   crazy-different software or anything.

21       Q.      Why not just use a PDF?

22               MS. FUMERTON:  Objection, form.

23               THE WITNESS:  So the PDF would

24          be static, and Tableau allows you to,

25          like, click and go into, like, more

Highly Confidential - Subject to Further Confidentiality Review

1          detail of a specific graph, that kind

2          of thing.

3          Q.     (BY MR. BOWER)  So if you're

4     looking at the live Tableau, you can actually

5     click on something within that screen to see

6     additional information?

7          A.     If it's set up that way, yes.

8          Q.     So if you receive, for example,

9     a PDF of a Tableau screen, that PDF would

10    have less information than the Tableau screen

11    would have, assuming that that live setting

12    was active; correct?

13               MS. FUMERTON:  Objection, form.

14               THE WITNESS:  It depends on how

15          it was set up.

16               So you can export and -- export

17          the deeper dive information as another

18          page, or you can just export the main

19          page.  So it really depends on how the

20          export is done.

21          Q.     (BY MR. BOWER)  And when you

22    refer to "export," do you mean export from

23    Tableau to PDF; correct?

24          A.     Yes.

25          Q.     So, and just to put a finer

1    point on that, just looking at your LinkedIn

2    profile, Exhibit 1, you say "Create a Tableau

3    dashboard to monitor compliance."  How would

4    a dashboard Tableau monitor compliance?

5              MS. FUMERTON:  Objection, form.

6              THE WITNESS:  So the dashboard

7         allowed us to see the metrics that

8         were determined to help keep a pulse

9         on our compliance with different

10        regulations.  And so it allowed you to

11        see those metrics all together.

12        Q.    (BY MR. BOWER)  Then I just

13   have a couple of kind of broader questions on

14   kind of the format of Exhibit 2, which is

15   your performance evaluation.

16             So let's, for example, look at,

███  ████████████████████████████  ██

███  ██████████

19             Would that be something that's

20   entered by you, or is that something that's

21   entered by the supervisor?

22             MS. FUMERTON:  Yeah, take your

23        time to familiarize yourself with the

24        document, if you need to, to answer

25        his questions.  Because I know there's

```
 1              additional detail.
 2                   I mean --
 3                   MR. BOWER:  Right.
 4                   MS. FUMERTON:  I'm not
 5              testifying, but ...
 6                   MR. BOWER:  And I appreciate
 7              that.  I'm just trying to get a sense
 8              as to how this is formatted.  Because
 9              if you notice, like on the bottom of
10              the first page, it appears to have
11              ratings by both Mr. Campbell and
12              yourself.  So you do write a
13              self-evaluation; correct?
14                   THE WITNESS:  Yes.
15              Q.    (BY MR. BOWER)  And
16         Mr. Campbell also does an evaluation;
17         correct?
18              A.    Yes.
19              Q.    I'm just trying to understand,
20         so that when we go through this document, who
21         is entering what information.  Okay?  I just
22         want to try to see if we can figure that out.
23         And so that's why I asked you who -- and I'll
24         ask you again:  Who enters the kind of the
25         status of things on here?
```

1        A.      I am not sure.

2        Q.      Okay.

3        A.      I don't remember -- I'm trying

4    to -- let me look at the most recent one.

5        Q.      Sure.

6        A.      I'm not sure.

7        Q.      Okay.  That's fine.  And what

8    about the dates on the right?  Where does

9    that information come from?

10       A.      So the dates are from our

11   goals.  And those are set earlier in the

12   year, and they just pull into the evaluation

13   form.

14       Q.      And who sets those goals?

15   Would that be you or your supervisor or

16   somebody else?

17               MS. FUMERTON:  Objection, form.

18               THE WITNESS:  So it depends.

19           Goals can be cascaded.  So it could be

20           a goal that started many levels above,

21           and then they've cascaded it down to

22           the appropriate people that will do

23           the work.  So there's not a clear-cut

24           answer for that.

25       Q.      (BY MR. BOWER)  Okay.  What is

1    SME?  Or I've seen it referred to frequently

2    throughout this.  So, for example, page 5,

3    three pages in, 56048, if you look at like

4    the column on the left, second paragraph,

5    halfway through it says, "Additionally, Roxy

6    has helped facilitate training to different

7    HW compliance SMEs."

8              What does an "SME" refer to?

9         A.    Subject matter expert.

10        Q.    What does the "art of insights"

11   refer to, in that same sentence?

12              MS. FUMERTON:  And take your

13         time to read any of the context.

14              MR. BOWER:  Yeah.

15              THE WITNESS:  Where is the

16         "arts of insight"?

17              MR. BOWER:  Sorry.

18              THE WITNESS:  Is that in the --

19              MR. BOWER:  It's in the same

20         sentence.  It says, "Additionally,

21         Roxy helped facilitate training to

22         different HW compliance SMEs on the

23         'art of insights.'"  It's in quotes

24         there.  It's on the left column,

25         again, the second --

```
 1              MS. FUMERTON:  I think she
 2       might be on the wrong page.
 3              THE WITNESS:  I think I might
 4       be on the wrong page.
 5              MR. BOWER:  Page ending in
 6       56048, the third page in.
 7              THE WITNESS:  I was on the
 8       fifth page.  I don't know how I got
 9       there.
10              MR. BOWER:  That's probably my
11       fault.
12              THE WITNESS:  Because there
13       happened to be SMEs on that page too.
14              MR. BOWER:  Oh, okay.  That's
15       why I asked, because they are
16       throughout.  Sorry about that.
17              THE WITNESS:  Okay.
18       Q.    (BY MR. BOWER)  So again, the
19       second full paragraph, I guess the third
```





```
23       which enhanced their ability to understand
24       and draw conclusions from data represented
25       within HW compliance score card or their
```

1    program-specific dashboards."

2              Do you see that now?

3         A.    Yes.

4         Q.    Okay.

5              Do you know what "art of

6    insights" refers to?

7         A.    I don't specifically.  Reading

8    this, I can -- I remember having meetings,

9    but I don't -- I think that was just a Casey

10   term.

11        Q.    Okay.  Well, just generally,

12   what were the meetings that this triggered by

13   this --

14        A.    So --

15        Q.    -- language?

16             MS. FUMERTON:  Let him finish

17        his question first.  You're starting

18        before he's really just getting where

19        he's going.  Go ahead.

20             THE WITNESS:  Okay.  So it

21        would have been helping the subject

22        matter experts understand that saying

23        these numbers are decreasing isn't an

24        insight.  That's stating what's

25        happening in the data.

```
 1              So trying to get them to look

 2         deeper in understanding the why and

 3         the insights of why things are

 4         happening with the data.

 5         Q.     (BY MR. BOWER)  Okay.  Thank

 6    you for that.

 7              And then in the next paragraph,

 █    ████████████████████████████████████

 █    ██████████████████████████████████

 █    ████████████████████████████████████

11              Do you know what that refers

12    to?

13         A.     Yes.

14         Q.     Okay.  What does that refer to?

15         A.     Okay.  It is the controlled

16    substance loss we're reporting that could

17    result in a DEA 106 being filed.

18         Q.     And what enhancements were you

19    making to the DEA database?

20         A.     So that's not really the best

21    use of terms there.  It was the team started

22    using Archer to track the losses and then the

23    DEA 106 filing process.

24         Q.     Does a DEA database refer to

25    Archer or something else?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Archer.
 2          Q.      So we're still right in the --
 3   if you could turn to page -- strike that.  I
 4   want to start over.
 5               If you turn to page 56053,
 6   which is a few more pages in.
 7               Okay?  Are you there?
 8          A.      Yes.
 9          Q.      Okay.  And this is while you
10   are still in the role as health and wellness
11   systems manager II; correct?
12          A.      Yes.
13          Q.      Okay.  And I just want to
14   focus, if we could, on the -- kind of the
     █  ████████████████████████████████████████
16   left.  It says, "Task/Milestones,
17   Task/Description."  Do you see that?
18          A.      Yes.
19          Q.      It says, "Develop a documented
20   approach to back up and recovered data
21   captured and maintained within 'home grown'
22   databases/spreadsheets used by H&W Compliance
23   SMEs."
24               Do you see that?
25          A.      Yes.
```

1    Q.    Do you know what that refers

2    to?

3    A.    Yes.

4          So by this point, I had

5    developed a couple different Access

6    databases, which is the homegrown databases.

7    And because I was the only person that had

8    the knowledge of those databases, we wanted

9    to make sure that it was documented how to

10   back them up and then how to recover them if

11   something were to happen.

12   Q.    Would this include Teradata

13   database?

14   A.    No.

15   Q.    Are you familiar with how that

16   is backed up, Teradata?

17   A.    I do not know the specifics of

18   how that's backed up.

19   Q.    Who is responsible and who

20   would know those specifics for Teradata?

21   A.    It would be our information

22   systems division.

23   Q.    Do you know anyone's name in

24   that division who might have been

25   specifically -- had that responsibility?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do not.

2    Q.    Okay.  And would this have

3  included Archer?

4    A.    No.

5    Q.    Do you know who was responsible

6  for that information, or the preservation of

7  that information in Archer?

8        MS. FUMERTON:  Objection, form.

9        THE WITNESS:  So Archer is also

10      supported by our information systems

11      division.

12   Q.    (BY MR. BOWER)  Okay.  So what

13  is this -- what "databases/spreadsheet" does

14  this refer to, then?

15   A.    So this would have been, at the

16  time, the HIPAA database that I mentioned

17  earlier, and then I also created a database

18  for our third-party audits.

19   Q.    Okay.  And then I just want to

20  have a few more questions on here and then

21  maybe we'll take a break and move to a more

22  relevant time period.  Okay?  And I

23  appreciate your cooperating with us this

24  morning on some of this older stuff.

25           A couple more questions right

1    at this section here.  We say, "The Archer

2    development counsel."

3              Do you see that a couple of

4    lines down?  "Participate and represent

5    health and wellness compliance interests as

6    part of the Archer development council?"

7         A.    Yes.

8         Q.    Do you see that?

9              And what does that refer to,

10   the "Archer development council"?

11        A.    That is our internal governance

12   counsel, for Archer.

13        Q.    And during this time period,

14   what was Archer being used for?

15        A.    So within the company as a

16   whole, Archer was used for many things.

17   Within health and wellness compliance, it was

18   used for the controlled substance loss

19   information.  It was used for pick change

20   information.

21              Sorry, I'm trying to think back

22   what was --

23              So those are examples of things

24   it was being used for at the time.

25        Q.    Well, what about broader?  I'm

1    just trying to get a sense within the entire

2    organization.  What else was it used for?

3         A.    Okay.  So our SRCR (sic)

4    process is managed in Archer, security

5    compliance risk reviews.

6              And so those are managed in

7    Archer, outside of our team.  There's a

8    review, compliance review process.  At the

9    time, it was called "court."  It's where --

10   regional compliance managers is what they

11   were called -- would go into the field and

12   assess compliance in all of the different

13   areas of compliance, not just health and

14   wellness.  And at this time we also had a

15   compliance assessment that the regional

16   compliance directors did specifically for

17   health and wellness.

18        Q.    And during this time, was

19   Archer also being used for Walmart's SOM

20   program?

21              MS. FUMERTON:  Objection, form.

22              THE WITNESS:  The exact

23        timeframe that Archer started getting

24        used, I think was slightly after -- it

25        was in 2015, but I don't think it was

1          fiscal year 2015.  I think it happened

2          a little bit later in the actual year

3          of 2015.

4                I think.

5     Q.     (BY MR. BOWER)  That's fine.

6  We'll look at the documents and that will

7  help clarify the record.

8     A.     Yes.

9     Q.     I just want to close up a

10  couple of things and then we'll take a break.

11  While you were -- strike that.

12                How long were you on the Archer

13  development council?

14     A.     So the way the council's set up

15  is every business area has to have a

16  representative on the council to be able to

17  participate in Archer.  And so I started

18  participating when I was trained in 2010, and

19  we started using Archer more extensively in

20  2011.  And then I actually led the council in

21  2015.

22     Q.     Okay.  So --

23     A.     And I was on the council until

24  it was no longer used recently.

25     Q.     And when was that?

1          A.     I don't know exact time.

2    Earlier this year.

3          Q.     Okay.  And so while you were on

4    the council, and, in fact, while you were

5    leading the council, Archer was being used as

6    part of Walmart's SOM program; is that

7    correct?

8                 MS. FUMERTON:  Objection, form.

9                 THE WITNESS:  So exact

10          timeframe, I'm not sure, but yes, it

11          was used for the SOM program.

12                MR. BOWER:  Okay.

13         Q.     (BY MR. BOWER)  And then, we'll

14   talk more about that as the day goes on.

15                And then just one more question

16   on this page here.  The next entry it says,

17   "Develop reporting plans for analytics."

18                Do you see that?

19                Just under that line we were

20   looking at about the Archer development

21   council.

22         A.     Yes.

23         Q.     Okay.  What does that refer to?

24         A.     So that is the plan of who

25   needs to be reported, or who needs to receive

1    reports.  Like the compliance dashboards that

2    we mentioned earlier, who needed to receive

3    them, why, when, and how they received them.

4         Q.     Okay.  What were the options

5    for how to receive them?

6              MS. FUMERTON:  Objection, form.

7         Q.     (BY MR. BOWER)  Well, strike

8    that.

9              What do you mean by "how"?

10             And I'm not trying to make this

11   a trick question.  I'm just trying to

12   understand, because you talked earlier about

13   Tableau; right?

14        A.     Mm-hmm.

15        Q.     That was one form they could

16   receive them in; correct?

17        A.     Yes.

18        Q.     What other formats were

19   available?

20        A.     Okay.  So depending on what

21   their report was, they could receive an

22   Excel.  So not a pretty, formatted version.

23   They could receive a PDF.  It could just be

24   an email.

25        Q.     Okay.  And you were involved in

Highly Confidential - Subject to Further Confidentiality Review

1    deciding how those reports would be received;

2    correct?

3              MS. FUMERTON:  Objection, form.

4              THE WITNESS:  I would make

5         recommendations of the most meaningful

6         way to receive it.

7         Q.    (BY MR. BOWER)  And who would

8    you make those recommendations to?

9              MS. FUMERTON:  Objection, form.

10             THE WITNESS:  So my manager,

11        and then whoever the stakeholder was.

12        So the stakeholder was involved in how

13        they would best use whatever report it

14        was that was being sent.

15        Q.    (BY MR. BOWER)  Okay.  And for

16   example, going back to your LinkedIn profile,

17   was it your recommendation to use Tableau

18   dashboards to monitor compliance?

19             MS. FUMERTON:  Objection, form.

20             THE WITNESS:  No.  That was --

21        so Mu Sigma helped us develop our

22        dashboards, and that was their

23        recommendation of the platform to use.

24        Q.    (BY MR. BOWER)  Did you agree

25   with that recommendation?

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. FUMERTON:  Objection, form.
2              THE WITNESS:  At the time I
3         didn't know enough to agree or
4         disagree.
5         Q.    (BY MR. BOWER)  So what -- did
6    you do anything to educate yourself as to
7    whether Tableau would be an appropriate
8    format to receive these -- this information?
9              MS. FUMERTON:  Objection, form.
10             THE WITNESS:  So, yes, I did
11        research on Tableau to make sure that
12        I understood it.  But the decision to
13        use Tableau was made well above me.
14        And so my job was to learn how to use
15        it.
16        Q.    (BY MR. BOWER)  And who made
17   that decision?
18             MS. FUMERTON:  Objection, form.
19             MR. BOWER:  Well, strike that,
20        then.
21        Q.    (BY MR. BOWER)  What's your
22   basis for your statement that the decision to
23   use Tableau was "made well above me"?
24        A.    At the time, I was in no way a
25   decision-maker as a manager.  There were -- I
```

Highly Confidential - Subject to Further Confidentiality Review

1    mean, my senior manager made decisions like

2    that.  And even that decision, I don't know

3    if that would have been made at his level, or

4    if it was kind of a decision that was made

5    higher and they're, like, everybody needs to

6    use it.  Because at this time, I know

7    corporate compliance started using Tableau

8    for their reporting as well.

9              MS. FUMERTON:  Is it a good

10         time to take a break or ...

11             MR. BOWER:  I think so.  Yeah.

12         Let me just make sure I don't have

13         anything else on this time period, at

14         least at the moment.

15             Yeah, why don't we take a

16         break.  We've been going a while.

17             THE VIDEOGRAPHER:  9:16.  We

18         are off video record.

19             (Recess taken, 9:17 a.m. to

20         9:34 a.m.)

21             THE VIDEOGRAPHER:  9:34.  We

22         are on video record.

23         Q.    (BY MR. BOWER)  All right.

24    Ms. Reed, we're back on the record.  I'm just

25    going to hand you a couple more exhibits.

Highly Confidential - Subject to Further Confidentiality Review

1   And these I do want you to take a moment to

2   review.

3            Exhibit 3, which is an email

4   string that you are not on.  The reason I'm

5   handing it to you, just so you know, is it

6   was produced as part of your custodial file.

7   So I'm trying to understand whether or not

8   you have any personal knowledge of this

9   document, okay?

10           MS. FUMERTON:  Zach, do you

11       have copies of that?

12           MR. BOWER:  Oh, yeah.  Sorry.

13           (Walmart-Reed Deposition

14       Exhibit 3 was marked for

15       identification.)

16       Q.    (BY MR. BOWER)  So take a

17   moment, take a look at that document, and I'm

18   going to hand you one more which was also

19   part of your custodial file but does not

20   appear to include you on the email string.

21   Okay?

22       A.    Okay.

23           MR. MILLER:  Could somebody

24       read the Bates numbers of the

25       documents that are being marked in the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              exhibits, please?
 2                   MR. BOWER:  Sure.  We'll do
 3              that in one moment.
 4                   So while the witness is
 5              reviewing Exhibits 3 and 4, I'll note
 6              for the record that Bates No. 3 is a
 7              Walmart document ending in 9635, and
 8              the last page is 9638.
 9                   And it includes the attachment.
10                   And Exhibit 4 is starting with
11              9629, and then the attachment is 9630,
12              which is in native format as part of
13              the record.
14                   [Document review.]
15         Q.   (BY MR. BOWER)  So why don't we
16    start on Exhibit 3.
17                   MS. FUMERTON:  Did you get time
18              to -- you've reviewed Exhibit 3?
19                   THE WITNESS:  Yes.
20                   MS. FUMERTON:  But you haven't
21              reviewed that one yet.
22                   MR. BOWER:  We'll start with
23              Exhibit 3 and then we'll go to
24              Exhibit 4.
25         Q.   (BY MR. BOWER) Are you familiar
```

1    with Exhibit 3?

2         A.    No, I'm not.

3         Q.    Do you have any understanding

4    why it was produced as represented to be in

5    your custodial file?

6         A.    No, I do not.

7         Q.    Okay.  Before, we talked about

8    standard deviation.  Do you recall that?

9         A.    Yes.

10        Q.    Okay.  And do you see the

11   reference here in No. 8 for example, the

12   email, "Please find attached the methodology

13   document by Kristy"?

14             Do you see that No. 8 in that

15   cover email?

16        A.    Yes.

17        Q.    Would that be Kristy Spruell?

18        A.    Yes.

19        Q.    Okay.  And would this have been

20   related to the standard deviation you

21   testified about to earlier?  And by "this,"

22   I'm referring to the attachment page 9636,

23   the data steps.

24             Do you see that halfway down?

25             MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  So I've never

2         seen this document, but these are --

3         steps 2 through 4 are the steps that

4         were taken within the Access database.

5         Q.    (BY MR. BOWER)  And thank you

6    for that.  I was just trying to get an

7    understanding of what was actually put in the

8    Access database during this timeframe.  Okay?

9         A.    Okay.

10        Q.    And you mentioned standard

11   deviation before, correct?

12        A.    Yes.

13        Q.    And when you said "2 through

14   4," 4, in fact, refers to one standard

15   deviation in A, two standard deviations in B,

16   and then three standard deviations in C; is

17   that correct?

18        A.    Yes.

19        Q.    Do you recall which one of

20   those, if any, were used by you in the Access

21   database?

22              MS. FUMERTON:  Objection, form.

23              THE WITNESS:  So the three

24        standard deviations was used in the

25        Access database.

1    Q.    (BY MR. BOWER)  So when you

2    referred earlier to standard deviation, it

3    was three standard deviations; is that

4    correct?

5              MS. FUMERTON:  Objection, form.

6              THE WITNESS:  To get to three

7         standard deviations, you first have to

8         calculate one standard deviation.

9    Q.    (BY MR. BOWER)  Were both of

10   those calculations reflected in Access?  And

11   by "both," I mean the one standard deviation

12   and the two standard deviation?

13        A.    Yes.

14             MS. FUMERTON:  Just give me a

15        second.  That's fine.

16   Q.    (BY MR. BOWER)  And did you --

17   I'll strike that.  Let me see if you --

18             Okay.  Steps 2 through 4 were

19   taken in the Access database; correct?

20             MS. FUMERTON:  Objection, form.

21             THE WITNESS:  Yes.

22   Q.    (BY MR. BOWER)  Step 5, to the

23   best of your knowledge, was not taken in

24   Access database?

25             MS. FUMERTON:  Objection, form.

```
 1                 THE WITNESS:  Step 5 doesn't
 2          look like a step, as far as the math
 3          goes.
 4          Q.    (BY MR. BOWER)  Okay.  I see
 5    what you're saying, because step 5 is simply
 6    a numeric entry; correct?
 7                 MS. FUMERTON:  Objection, form.
 8                 THE WITNESS:  So it looks like
 9          step 5 is just saying that if a store
10          has a low volume, it could trigger a
11          false alert.
12          Q.    (BY MR. BOWER)  And its further
13    goes on to state, "For stores that fall under
14    the minimum threshold, we replace their
15    individual average with the average for all
16    stores (300)."
17                 Do you see that?
18          A.    Yes.
19          Q.    Was that information part of
20    the Access database?
21                 MS. FUMERTON:  Objection, form.
22                 THE WITNESS:  It was not part
23          of the Access database.
24          Q.    (BY MR. BOWER)  Is there some
25    other database that reflected this minimum
```

1    threshold in 5(a)?

2                    MS. FUMERTON:  Objection, form.

3                    THE WITNESS:  So the 300, I

4         don't know what that's referring to.

5              Once the thresholds were

6         created in Access, they were exported

7         to Excel.  And then borders were put

8         on the thresholds.  So a minimum was

9         put if it was below a -- below 20.

10        The minimum was put.  And then there

11        was a maximum as well.

12        Q.    (BY MR. BOWER)  And do you

13   recall what that maximum was?

14        A.    400-count bottles.  Let me

15   clarify.  The 20, and then maximum was 50 for

16   100-count bottles.

17        Q.    Okay.

18        A.    Liquids would be different, and

19   then other bottle sizes would be different.

20        Q.    And if you go back to the cover

21   page of this email, it, in fact, has an

22   explanation in No. 8 for the maximum.

23              Do you see that?

24        A.    Yes.

25        Q.    Okay.  And indeed a reason for

1   creating that maximum was because "Business

2   intuitively identified the outlier order

3   sizes and decided that order size 5,000

4   should be a reasonable large cap."

5                  Do you see that?

6                  MS. FUMERTON:  Objection, form.

7                  THE WITNESS:  Yes.

8        Q.      (BY MR. BOWER)  So that number,

9   that 5,000 refers to 50 bottles; correct?

10       A.      For a 100-count bottle, yes.

11       Q.      And that appears, from this

12  document, was a decision made by business

13  intuition; correct?

14                 MS. FUMERTON:  Objection, form.

15                 THE WITNESS:  Based on this

16         document, that's what it appears to

17         be.

18       Q.      (BY MR. BOWER)  Okay.  And do

19  you know who the folks are on this email?

20                 Let's start with the first one,

21  Prachi -- P-R-A-C-H-I, last name -- I'm not

22  going to try and pronounce it.  It's

23  G-U-R-U-R-A-J.

24                 Do you know who that gentleman

25  is?  Or woman?

```
 1          A.      That lady, yes, I do.

 2          Q.      And is she a Walmart employee?

 3          A.      No.

 4          Q.      Okay.  Where does she work?

 5          A.      She --

 6                  MS. FUMERTON:  Objection, form.

 7                  THE WITNESS:  She was the

 8          Mu Sigma -- what's the word?  The

 9          on-site Mu Sigma person.

10          Q.      (BY MR. BOWER)  Was she

11   physically on-site at Walmart?

12                  Strike that.  What do you mean

13   by "on-site"?

14          A.      She worked at the home office

15   with whoever she was supporting.

16          Q.      By "home office," you mean a

17   Walmart home office; correct?

18          A.      Yes.

19          Q.      What about the other folks on

20   here?  We don't need to read them all in the

21   record.  They'll be in the document.  But are

22   you familiar with any of these folks, is the

23   first question?

24          A.      A couple of them look like the

25   same names, which very well could be
```

1   different people, that worked on our Tableau

2   dashboard project with health and wellness

3   compliance.

4         Q.    Do any of these names -- strike

5   that.

6         Do you know whether any of

7   these folks in this email were Walmart

8   employees during this time period, which is

9   January 2014?

10         MS. FUMERTON:  And I don't -- I

11       haven't looked, but I'm assuming the

12       entire document?

13         MR. BOWER:  No, I'm just

14       talking about this top email here.

15         Thank you for that

16       clarification.

17         THE WITNESS:  These names do

18       not look like any Walmart associates

19       that I would have known.

20         Q.    (BY MR. BOWER)  Do you have any

21   understanding, then, as to how this document

22   came to appear in your custodial file?

23         A.    I have no idea.

24         Q.    Okay.  Just a couple more

25   questions, then, based upon your experience

1    with the Access and other work in the

2    databases.

3              The approach, for example,

4    references -- do you see that?  It has key

5    deliverables and purpose and then approach?

6    Kind of headings to the left of the page?

7              Do you see that?

8    A.      Yes.

9    Q.      Okay.  Under "Approach," it

10   says, "Use 52 week order history to establish

11   'normal' order amounts."

12             Do you see that?

13   A.      Yes.

14   Q.      During this time period, which

15   is January 2014, where would Walmart -- where

16   within Walmart would that data have been

17   available?

18             MS. FUMERTON:  Objection, form.

19             THE WITNESS:  The order

20        history, I do not know.

21   Q.      (BY MR. BOWER)  Do you know

22   whether order history was available anywhere

23   within Walmart during this time period?

24   A.      As far as order history, I

25   don't know where within Walmart order history

1    was kept.

2          Q.      What information was used in

3    Access to perform these calculations that you

4    referred to earlier?

5          A.      The shipment history would be

6    used.

7          Q.      And where was that information

8    located?

9          A.      Teradata.

10         Q.      Do you have any knowledge as to

11   how far back Teradata maintains shipment

12   history?

13               MS. FUMERTON:  Objection, form.

14               MR. BOWER:  I'll strike that.

15         Q.      (BY MR. BOWER)  In other words,

16   2014, if you were to access Teradata, how far

17   back could you go to determine shipment

18   history to a particular pharmacy?

19         A.      I don't know what the retention

20   period is specifically for the logistics

21   data.

22         Q.      What's the farthest back you've

23   ever gone to pull purchase -- sorry, shipment

24   history in Teradata?

25         A.      Exact numbers, I wouldn't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1      I know at any point in time recently I've

 2      pulled up to two years back.  So I haven't

 3      pulled more than two years back at any one

 4      time.

 5             Q.    Okay.  And do you know whether

 6      the information in Teradata is backed up by

 7      Walmart?

 8                    MS. FUMERTON:  Objection, form.

 9                    THE WITNESS:  I don't know the

10             exact backup policies for the Teradata

11             system.

12                    I do know that there are --

13             there's processes in place for

14             duplication of the database, and like

15             if one goes down, there's another,

16             like, data center that houses it.  But

17             I don't know the exact backup

18             schedule.

19             Q.    (BY MR. BOWER)  And, I mean,

20      the data in Teradata is important to Walmart;

21      correct?

22                    MS. FUMERTON:  Objection, form.

23                    THE WITNESS:  Teradata does

24             house important information for

25             different business segments, yes.
```

1    Q.    (BY MR. BOWER)    Right.

2  Walmart uses the data in Teradata for many

3  reasons; correct?

4    A.    Yes.

5    Q.    So you would expect that

6  Walmart would have a process in place to make

7  sure that data is maintained, wouldn't you?

8           MS. FUMERTON:  Objection, form.

9           THE WITNESS:  So Teradata is a

10        big database that I know is duplicated

11        to maintain the integrity of the data

12        and the security of the database and

13        the information within it.

14    Q.    (BY MR. BOWER)  So just

15  going -- a couple more questions on this

16  page.  At the top of the page references a

17  project goal.  Do you see that?

18           And we're still on page ending

19        in 9626.

20    A.    Yes.

21    Q.    Do you see that?

22           Project goal is stated as "To

23  identify and report suspicious orders of

24  controlled substances and other frequently

25  abused drugs."

Highly Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2    A.    Yes.

3    Q.    Do you know whether Walmart

4    asked the folks at Mu Sigma to work on this

5    project?

6           MS. FUMERTON:  Objection, form.

7           THE WITNESS:  I don't know.

8    Q.    (BY MR. BOWER)  Do you know who

9    would know that?  Would it be Kristy?

10   A.    Since Kristy worked with them,

11   I would assume she would have been involved.

12   Q.    Do you know what the reference

13   on the top of this page to "frequently abused

14   drugs" means?

15   A.    I do not.

16   Q.    Are you aware that our country

17   is in the middle of an opioid crisis?

18   A.    Yes.

19          MS. FUMERTON:  Objection, form.

20   Q.    (BY MR. BOWER)  And when did

21   you first become aware of the opioid crisis?

22          MS. FUMERTON:  Objection, form.

23          THE WITNESS:  I don't know the

24      exact time.

25   Q.    (BY MR. BOWER)  Do you know an

Highly Confidential - Subject to Further Confidentiality Review

```
 1    approximate time?
 2         A.     I would say that those terms I
 3    first heard in the media within the last
 4    couple of years.
 5         Q.     By "those terms," you mean
 6    opioid crisis?
 7         A.     Yes.
 8         Q.     What about a broader issue with
 9    respect to abuse of controlled substances?
10              MS. FUMERTON:  Objection, form.
11              THE WITNESS:  What's your
12         question?
13         Q.     (BY MR. BOWER)  I'm just trying
14    to figure out.  You seem to be stuck on my
15    term "opioid crisis."  I'm just trying to
16    figure out if you use different terms, if you
17    define it as abuse of prescription drugs, of
18    drug issues with respect to Schedule II
19    narcotics.  Anything broader than that.  When
20    did you first become aware that our country
21    was having a problem with prescription drug
22    abuse?
23              MS. FUMERTON:  Objection, form.
24              THE WITNESS:  So I've worked in
25         the health and wellness space the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            majority of my career.  Now, I've
 2            worked in an independent pharmacy when
 3            I was in high school, in college.  And
 4            so I would say that's been something
 5            that's been known by me for the
 6            majority of my career, that ...
 7            Q.    (BY MR. BOWER)  I don't want to
 8    cut you off.  Are you --
 9            A.    Yeah.
10            Q.    Did you have any discussions
11    about prescription drug abuse with folks at
12    Walmart?
13                  MS. FUMERTON:  Objection, form.
14                  THE WITNESS:  I don't know of
15            any specific conversations about
16            prescription drug abuse.
17                  So it could come up in context
18            of a diversion investigation, or a
19            controlled substance loss
20            investigation.  And of course later,
21            in SOM.  But not -- not specifically
22            meetings about drug abuse issues.
23            Q.    (BY MR. BOWER)  And I
24    appreciate that clarification.
25                  So -- and I don't want to spend
```

1    too much time on this, but, for example, how

2    would it come up in connection with, for

3    example, SOM -- you said, "of course, later

4    in SOM."  How would that come up?

5                    MS. FUMERTON:  Objection, form.

6                    THE WITNESS:  So when reviewing

7              an order, part of what we were looking

8              for are signs that something

9              inappropriate may be going on.  So a

10             red flag wasn't cleared.  And that

11             could be an indication of

12             inappropriate use.  And so generally,

13             you know, the possibility of

14             inappropriate use would be talked

15             about during any kind of alert review.

16        Q.    (BY MR. BOWER)  And when you

17    were reviewing an order, what type of

18    information were you looking at?

19                    MS. FUMERTON:  Objection, form.

20                    THE WITNESS:  It -- there was a

21             wide array of information, including

22             dispensing trends, past order history.

23             Things like that.

24        Q.    (BY MR. BOWER)  What do you

25    mean by "dispensing trends"?

1          What specific information would

2    you look at?

3               MS. FUMERTON:  Objection, form.

4               THE WITNESS:  The actual trend

5          of dispensing:  Has the amount of that

6          particular drug in question gone up or

7          down, or was it steady.

8               What the quantity of pills per

9          prescription.

10              We would look at insurance,

11         what we call distribution.  So whether

12         insurance was used or whether cash was

13         used.

14              How far patients were

15         traveling.  How far away prescribers

16         were from the location.

17              Things like that.

18    Q.    (BY MR. BOWER)  And I

19    appreciate that information.  I just want to

20    go through each one of those to make sure I

21    understand what you're actually looking at.

22              So the first one you mentioned

23    was -- it would help if I could read my own

24    writing.

25              So the first thing you

```
 1    mentioned was the actual trend of dispensing.

 2    Has that amount of that particular drug in

 3    question gone up or down or is it steady?

 4              So that information, was it

 5    specific to a pharmacy?

 6         A.     Yes.  It was the pharmacy and

 7    drug that alerted.

 8         Q.     And by "drug," do you mean NDC?

 9    Or something else?

10         A.     When a -- so a specific item,

11    so NDC would alert.  We would look at the

12    entire GPI for that drug.

13         Q.     And I appreciate that.  So can

14    you just, for the record, clarify what you

15    mean by "GPI"?

16         A.     So GPI is the global product

17    indicator.

18         Q.     Okay.  And what does that mean?

19         A.     It is a more universal term.

20    The NDC is manufacturer-specific, and the

21    GPI, each number means something.  I don't

22    know what they all mean.  But the entire

23    number together refers to a drug.

24              So, for instance, hydrocodone

25    10/325 has one GPI regardless of the multiple
```

1    NDCs that are made.

2         Q.    Okay.  Does the GPI

3    consider different -- for example, you

4    mentioned hydrocodone -- different strengths

5    of hydrocodone?

6         A.    The entire GPI would be one

7    strength of hydrocodone.  If you back off a

8    couple numbers, then it would be a different

9    strength of hydrocodone -- or it would be

10   like a hydrocodone as a drug class, and then

11   a couple more numbers would mean like the

12   opioid, you know, drug class.  Things like

13   that.  They stair-step.

14        Q.    Okay.  I appreciate that.  I

15   didn't mean to cut you off.

16             When reviewing an order, would

17   you limit your review to the GPI or would you

18   back off and look at the more broader

19   information?

20             MS. FUMERTON:  Objection, form.

21             THE WITNESS:  For what

22        timeframe?

23        Q.    (BY MR. BOWER)  Well, that's a

24   fair point.  Let's start with when was the

25   first time you would have used this

Highly Confidential - Subject to Further Confidentiality Review

1    information in connection with your duties

2    and responsibilities?

3              MS. FUMERTON:  Objection, form.

4              THE WITNESS:  So when I started

5         in my position, July-August timeframe,

6         would have been the first time that we

7         used it.

8         Q.    (BY MR. BOWER)  And we're

9    talking July-August 2015; correct?

10        A.    Yes.

11        Q.    So during that time, would you

12   have looked at the GPI information or would

13   you have looked at the broader data

14   available?

15             MS. FUMERTON:  Objection, form.

16             THE WITNESS:  During that time,

17        it would have been the GPI, the entire

18        GPI.

19        Q.    (BY MR. BOWER)  And by "entire

20   GPI," you just mean that strength and that

21   drug; correct?

22             MS. FUMERTON:  Objection, form.

23             THE WITNESS:  Yes.

24        Q.    (BY MR. BOWER) And at some

25   point in time, did you consider the broader

1    GPI information?  For example, different

2    strengths of one drug?  Let's take that

3    first.

4                    MS. FUMERTON:  Objection, form.

5                    THE WITNESS:  Yes.

6            Q.     (BY MR. BOWER)  Okay.  And when

7    did that change occur?

8            A.     In November of 2017.

9            Q.     And I'm just curious.  How is

10   it that you're certain about that date?

11           A.     Because we upgraded systems in

12   November of 2017.

13           Q.     And did the upgraded systems

14   allow you to access this additional

15   information?

16                   MS. FUMERTON:  Objection, form.

17                   MR. BOWER:  And I'll strike

18       that.

19           Q.     (BY MR. BOWER)  I'm just trying

20   to understand.  Why is it that -- and I'll

21   ask it this way.  Why is it that the upgrade

22   in systems allows you to tell us that in

23   November 2017, you began looking at

24   additional information?

25                   MS. FUMERTON:  Objection, form.

 1          THE WITNESS:  The change in

 2     systems alerted orders differently

 3     than the Reddwerks system did.

 4     Q.    (BY MR. BOWER)  And what system

 5 are you referring to that was changed in

 6 November of 2017?

 7     A.    It's now IQVIA, but you'll hear

 8 us refer to it as "Buzzeo."

 9     Q.    Thank you for that.

10          So let's go back now to the

11 original kind of things that you considered.

12 We've talked about the first one, which

13 was -- which you just talked about.  I don't

14 want to raise any objections, so we'll go to

15 the second one.

16          "Quantity of pills/

17 prescription."  What does that mean?

18          MS. FUMERTON:  Objection, form.

19          THE WITNESS:  So the number of

20     pills per prescription.

21     Q.    (BY MR. BOWER)  And is that

22 information at the pharmacy level?

23     A.    Yes.

24     Q.    And do you recall how far back

25 that information would look?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. FUMERTON:  Objection, form.

 2                THE WITNESS:  For each alert,

 3         when we pull data, we looked at six to

 4         nine months of past data.

 5         Q.    (BY MR. BOWER)  The third

 6   factor I think you mentioned was payments,

 7   being insurance or by cash; correct?

 8                MS. FUMERTON:  Objection, form.

 9                THE WITNESS:  Yes.

10         Q.    (BY MR. BOWER)  Was that also

11   at the pharmacy level?

12         A.    Yes.

13         Q.    Did you also look at that data,

14   start looking at that data in July 2015?

15                MS. FUMERTON:  Objection, form.

16                THE WITNESS:  Yes.

17         Q.    (BY MR. BOWER)  Did your

18   consideration of that data change from

19   July 2015 through your involvement in this

20   process?

21         A.    The payment information or the

22   data as a whole?

23         Q.    The payment information now.

24         A.    No.

25         Q.    A couple more things and then
```

1    we'll be done with this for the moment.

2              The fourth thing you mentioned

3    was how far patients were traveling; correct?

4              MS. FUMERTON:  Objection, form.

5              THE WITNESS:  Yes.

6         Q.    (BY MR. BOWER)  And can you

7    just be more specific as to what that means

8    and whether -- strike that.

9              What does that mean?

10        A.    So that means how far away is

11   the patient's address that we have on file

12   from the pharmacy in question.

13        Q.    And all of this data we're

14   talking about, I'm now talking about the 1

15   through 5.  Was this in Archer that you were

16   looking at this information?

17        A.    No.

18        Q.    Okay.  Where was this

19   information made available?  Strike that.

20              How was this information made

21   available to you?

22        A.    Which timeframe?

23        Q.    All right.  I appreciate that

24   clarification.  Let's start in July of 2015.

25        A.    So when we first -- when I

1    first started in July of 2015, the data was

2    pulled directly from Teradata, put into

3    Excel, and then it grouped together to find

4    all of those different metrics.

5         Q.    Did that process change at some

6    point?

7         A.    Yes.

8         Q.    And when did that change occur?

9               Approximately.

10        A.    Later in 2015.

11        Q.    Okay.

12        A.    I was made aware of a system,

13   an analytical system, Alteryx.  And so I

14   started pulling all of the information using

15   the Alteryx system.

16        Q.    Okay.  I don't want to get off

17   track on that kind of project, so we'll talk

18   about that Alteryx project maybe in a bit.  I

19   just want to close this out.

20              Did the information that you

21   considered, with respect to how far patients

22   travel, change at any point from July 2015

23   through the time that you would have used

24   this information?

25        A.    No.

1    Q.    And then the same question for

2  how far away prescribers were.

3    A.    No.

4    Q.    And that information was also

5  at the pharmacy level?  The prescriber

6  information?  Is that correct?

7    A.    Yes.

8    Q.    I think I got ahead of myself

9  because we jumped ahead to this.

10         And this was -- this started --

11  you started doing these reviews in 2015;

12  correct?

13    A.    Yes.

14    Q.    In other words, prior to taking

15  the job as senior analyst, looking now to

16  your LinkedIn profile, "Senior Analyst,

17  Health and Wellness Controlled Substance,"

18  July 2015, prior to that date, you didn't

19  have any role in reviewing this type of data;

20  is that correct?

21         MS. FUMERTON:  Objection, form.

22         THE WITNESS:  I didn't look at

23      this type of data for the purposes of

24      suspicious order monitoring.

25    Q.    (BY MR. BOWER)  So for what

1    reasons would you have looked at this type of

2    data prior to July 2015?

3         A.    So multiple projects that I

4    have helped with, I would pull data similar

5    to this.  Especially the dispensing trends

6    and looking at payment information.  That was

7    something we commonly looked at, with other

8    investigations.  I helped a lot with billing

9    compliance, and they -- that was common data

10   that they looked at.

11        Q.    Did you ever look at that data

12   in connection with your work on diversion

13   projects?

14             MS. FUMERTON:  Objection, form.

15             THE WITNESS:  Yes.

16        Q.    (BY MR. BOWER)  And do you

17   recall approximately when that would have

18   been?

19             Maybe just if you could look at

20   your LinkedIn profile, maybe just give us an

21   estimate as to what job you would have been

22   in when that would have occurred?

23        A.    So I started working with

24   diversion, the diversion analytics team in --

25   when I was in the compliance analyst

1    position.  We all went to Teradata training

2    together.  And so it was during that

3    timeframe that I started working with them.

4    And so periodically over the last eight

5    years, I've helped them with different

6    queries and pulling data and looking at

7    things.  But an exact timeframe, I'm not

8    sure.

9         Q.    And I appreciate this is going

10   back a bit.  Maybe we can put a finer point

11   on it, though, when we -- if we asked you

12   when you went to the Teradata training.  Or

13   maybe not.

14              Well, but certainly it would

15   have started sometime before September 2014;

16   correct?

17        A.    Yes.

18        Q.    So before I forget, let's just

19   talk about Exhibit 4, since I already gave it

20   to you.

21              Take a moment to review it.

22   And same as Exhibit 3, this was also produced

23   as part of your custodial file.  So I just

24   want to know if you're familiar with it, and

25   then we can have some -- I do have some

1    specific questions on the spreadsheet.

2              So take a moment to review it

3    and then we can talk about it.

4              [Document review.]

5         Q.    (BY MR. BOWER)   And I see now

6    you're looking at the -- kind of the longer

7    spreadsheet with the columns; is that

8    correct?

9         A.    Yes.

10        Q.    Take your time.  I don't want

11   to cut you off, but I do want to point out

12   that my questions will primarily be focused

13   on just the column headings there.  I'm not

14   going to ask you about the specific numbers,

15   so ...

16             But with that in mind, please

17   take your time.

18        A.    Okay.

19             [Document review.]

20             MS. FUMERTON:  And hopefully

21        not about specific numbers on this

22        page. (Indicating)

23             MR. BOWER:  Yes.  That's

24        correct.  We won't be using that page.

25             But it may be -- I'm not

1        exactly sure how this document was

2        formatted natively, but it may be

3        helpful to turn to the second page,

4        the one that's landscape.  It has more

5        information that I will be asking

6        about in those columns.

7                [Document review.]

8                I'm not going to ask you to

9        look at that page.

10               THE WITNESS:  Okay.  I couldn't

11       even begin to say what that one is.

12               MR. BOWER:  I'm not sure why

13       that one came out so small.

14               [Document review.]

15               THE WITNESS:  Okay.

16       Q.    (BY MR. BOWER)  Okay.  So let's

17   start on the email.  Do you recognize any of

18   these folks as Walmart employees?

19       A.    No.

20       Q.    And do you have any

21   understanding as to how this document came to

22   reside in your custodial file?

23               MS. FUMERTON:  Objection, form.

24               THE WITNESS:  No.

25       Q.    (BY MR. BOWER)  Do you have any

Highly Confidential - Subject to Further Confidentiality Review

1  knowledge as to why this document was

2  produced as part of your custodial file in

3  connection with this case?

4                MS. FUMERTON:  Objection, form.

5                THE WITNESS:  No.

6        Q.     (BY MR. BOWER)  And let me just

7  ask just so I get an understanding of what

8  your familiarity is.

9                Why do you think you're here

10 today?

11               MS. FUMERTON:  I -- I object to

12        that question to the extent that it is

13        seeking any information relating to

14        conversations with counsel.

15               To the extent you can answer

16        that question without revealing those

17        questions, you can answer the

18        question -- revealing those

19        communications, you can answer the

20        question.

21               THE WITNESS:  Okay.  So I'm

22        here because of my involvement with

23        the suspicious order monitoring

24        program, and that involves opioids

25        which are included in this case.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. BOWER)  Do you have any

2    understanding, other than what you've just

3    told us, what this case is about?

4              MS. FUMERTON:  Again, the

5         witness can answer to the extent that

6         she can do so without revealing any

7         communications with counsel, but

8         otherwise I instruct her not to answer

9         that question.

10             THE WITNESS:  The only way I

11        know is because of counsel.

12   Q.    (BY MR. BOWER)  Okay.  So other

13   than in communications with counsel, you

14   didn't do anything else to educate yourself

15   as to why Walmart is involved in this case;

16   is that correct?

17   A.    Correct.

18   Q.    You haven't reviewed the

19   complaint, for example?

20   A.    No, I have not reviewed the

21   complaint.

22   Q.    You're not familiar with the

23   allegations that are being made against

24   Walmart; is that correct?

25             MS. FUMERTON:  Again, in the

Highly Confidential - Subject to Further Confidentiality Review

1          context, outside of communications

2          with counsel, you can answer that.

3                    If you have such knowledge, you

4          can answer that question, but it's not

5          directed based, I think, on his

6          earlier ones, on our communications.

7                    I know, it's a tricky --

8                    THE WITNESS:  I think the

9          answer is still no.

10                   MR. BOWER:  Okay.

11         Q.    (BY MR. BOWER)  And have you

12    ever been asked whether you have documents

13    that may be responsive to the allegations in

14    this case?

15                   MS. FUMERTON:  Objection, form.

16         And to the extent -- objection, form.

17         If you can understand and answer his

18         question, you can answer "yes" or

19         "no."

20                   THE WITNESS:  Can you rephrase

21         the question?  Try it that way?

22         Q.    (BY MR. BOWER)  Sure.  And let

23    me do it this way.

24                   We'll see today some documents,

25    some emails from you to others in Walmart and

1    some other documents that were produced to us

2    in this case.  Okay?

3         A.    Okay.

4         Q.    Has anyone ever asked you

5    whether you might have documents to produce

6    to us that might relate to the allegations in

7    this case?

8              MS. FUMERTON:  Again, objection

9         to the form of the question.

10             If the question is has anybody

11        asked her to -- whether or not she has

12        documents -- my objection is to the

13        "allegations in this case" portion of

14        the question.  If you could rephrase.

15        And I'm not trying to be difficult.

16        I'm just trying to be helpful to get

17        you the information you want without

18        getting into any privileged

19        information.

20        Q.    (BY MR. BOWER)  Do you

21   understand the question?

22        A.    The basic form of the question,

23   I think so, yes.

24        Q.    Okay.  I'm just trying to get

25   at whether anyone said, hey, Roxy, do you

```
 1    have -- we've been sued in this case.  Do you

 2    have anything that might be relevant to the

 3    case?

 4                  Anyone ever talk to you about

 5    that?

 6         A.     With that wording, no.

 7         Q.     What about with any wording

 8    similar to that?

 9         A.     Similar to that, no.

10         Q.     What about in any capacity?

11                I mean, I'm not trying to play

12    games here.  I'm just trying to figure out --

13    we've made certain document requests to

14    Walmart.  Right?  Certain documents were

15    produced.  I'm just wondering whether anyone

16    ever came to you and said, "Hey, do you have

17    anything that we might need to produce in

18    connection with this opioid case?"

19                  MS. FUMERTON:  Okay.  So I

20            think she's answered that question,

21            and I think this is getting into

22            complicated attorney -- potentially

23            attorney-client privileged information

24            that may be difficult for her to

25            navigate on her own.  I can make this
```

1    representation, if this helps.

2         There is Archer data that

3    counsel -- as we have discussed

4    before, that has been produced in this

5    case that Ms. Reed assisted in

6    pulling.  And so she is familiar with

7    that data and its production.

8         MR. BOWER:  Okay.  That is

9    helpful.

10        Q.    (BY MR. BOWER)  So other than

11   what your counsel just said, have you, for

12   example, been asked whether you have emails

13   that might relate to the allegations that

14   have been made against Walmart?

15        A.    No.

16        Q.    So let's go back to -- sorry

17   for that.

18             Let's go back to Exhibit 4.

19   And I'm not sure whether I allowed you to

20   answer my question.  So let me ask it again.

21   And I think you have, but let me just ask it

22   again.

23             Are any of the folks on the

24   email Walmart employees, to the best of your

25   knowledge?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Not that I know.

2    Q.    So let's look -- the email

3    reflects that the attachment is titled

4    "Methodology for flagging of store orders."

5          Do you see that?

6    A.    Yes.

7    Q.    And so if we look at the first

8    page of the attachment, which at the top says

9    "Steps taken to create the" file number of

10   order alerts, do you see -- the "final number

11   of order alerts."  Do you see that?

12   A.    Yes.

13   Q.    Would these have been steps

14   that you would have taken within Access to

15   create these alerts?

16         MS. FUMERTON:  Objection, form.

17         MR. BOWER:  I'll strike it.

18   That was a poor question.

19   Q.    (BY MR. BOWER)  Would you have

20   taken any of these steps in Access as

21   reflected in this chart?

22         MS. FUMERTON:  Objection, form.

23         THE WITNESS:  So the steps,

24   steps 1, 2, and 3, were taken to

25   create the initial thresholds that

Highly Confidential - Subject to Further Confidentiality Review

1          were then manually bound, that we

2          talked earlier with the 20 and 50.

3                But this looks like they were

4          trying to get a number of alerts, and

5          the actual alerts would have happened

6          in the Reddwerks system.  So the

7          Access database wouldn't have

8          calculated a number of alerts.  It was

9          calculating the threshold.

10         Q.    (BY MR. BOWER)  Do you know

11    where, during this time period, the alerts

12    would have been calculated?

13               MS. FUMERTON:  Objection, form.

14               THE WITNESS:  So alerts weren't

15         calculated.  The alert happened in the

16         Reddwerks system.  This document, they

17         were testing their methodology, from

18         what I can tell, and they were trying

19         to figure out, with this threshold,

20         would it have alerted and calculating

21         the number of alerts to test before

22         putting it in the Reddwerks system to

23         create actual alerts.

24         Q.    (BY MR. BOWER)  In other words,

25    it appears that they were trying to determine

Highly Confidential - Subject to Further Confidentiality Review

1    whether these thresholds would create too

2    many or too few alerts.

3                    Would you agree with that?

4                    MS. FUMERTON:  Objection, form.

5                    THE WITNESS:  I would say they

6          were trying to gauge the number of

7          alerts.

8          Q.    (BY MR. BOWER)  If we look at

9    the next page in that attachment -- so I'm

10   looking at the column "Shortcomings."  Okay?

11                   If you see -- if you look down,

12   one, two, three -- the fourth box down there?

13   That box states, "For stores which don't have

14   '0' order entries and have their minimum

15   thresholds limit replaced at 1764 (3*

16   standard deviation of all stores), the

17   current process won't detect aberrant order

18   sizes."

19                   Do you see that?

20         A.    Yes.

21         Q.    And this is referring to

22   minimum thresholds; correct?

23         A.    It looks like that, yes.

24         Q.    Were those thresholds reflected

25   in Access at this time?

```
 1                    MS. FUMERTON:  Objection, form.

 2                    THE WITNESS:  Would which

 3          thresholds?

 4          Q.    (BY MR. BOWER)  Well, that's an

 5    inappropriate question, so I'll rephrase.

 6                    Were there minimum thresholds

 7    in the Access database at this time?

 8                    MS. FUMERTON:  Objection, form.

 9                    THE WITNESS:  So the Access

10          database would not have the minimum

11          threshold.

12          Q.    (BY MR. BOWER)  Those would

13    have been in Reddwerks?

14          A.    They would have been later

15    imported into Reddwerks, but they would be in

16    the Excel spreadsheets.

17          Q.    Okay.  Do you know how long

18    this data was in those Excel spreadsheets?

19          A.    Okay, which --

20                    MS. FUMERTON:  Objection, form.

21                    Go ahead.  Ask --

22          Q.    (BY MR. BOWER)  Yeah, so I'm

23    just trying to get a handle on kind of the

24    sequence of events.  At some point thresholds

25    are housed in Excel spreadsheets; is that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      correct?
 2           A.     Yes.
 3           Q.     During that time period did
 4      that occur?
 5                  MS. FUMERTON:  Objection, form.
 6                  THE WITNESS:  The thresholds
 7           were always in -- while I worked on
 8           the program, the thresholds were
 9           always in Excel -- sorry.
10                  They were in Excel and imported
11           into Reddwerks.
12           Q.     (BY MR. BOWER)  During the time
13      you were on the program, were they always
14      imported into Reddwerks?
15                  MS. FUMERTON:  Objection, form.
16                  THE WITNESS:  Depending on the
17           timeframe.
18           Q.     (BY MR. BOWER)  And I
19      appreciate that.  That's why my question was
20      broader.
21                  During the time that you were
22      involved in programming, were they always
23      imported into Reddwerks?
24           A.     So not always into Reddwerks,
25      no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Can you explain what you mean
 2    by that?
 3          A.     So in November of 2017, when we
 4    moved to the Buzzeo program, Reddwerks was no
 5    longer used to alert.
 6          Q.     So prior to November of 2017,
 7    were the thresholds always imported into
 8    Reddwerks?
 9                 MS. FUMERTON:  Objection, form.
10                 THE WITNESS:  Yes.
11          Q.     (BY MR. BOWER)  Okay.  And who
12    would have had -- strike that.
13                 Who would have had
14    responsibility for importing the thresholds
15    into Reddwerks?
16          A.     Me.
17          Q.     And when did you start to have
18    that responsibility?
19          A.     When I first joined the team,
20    Miranda did that.  And so shortly thereafter,
21    once I was trained on how to do it -- so a
22    month, two months, I don't remember
23    exactly -- I took that over once I was
24    trained.
25          Q.     So I'm just trying to walk
```

Highly Confidential - Subject to Further Confidentiality Review

1  through kind of the process while you were

2  responsible for it.  Okay?

3           The first step is the

4  calculations of those thresholds in the

5  Access database; is that correct?

6      A.    So the first step would have

7  been pulling data out of Teradata, shipment

8  data out of Teradata and putting it in the

9  Access database.

10      Q.    And then what's the next step?

11      A.    So then after that, the initial

12  threshold would be calculated using the

13  formulas in Access.

14      Q.    And then after that?

15      A.    Exported to Excel.

16      Q.    Okay.

17           So after the calculations are

18  made in Access, were there ever adjustments

19  made before exporting to Excel?

20      A.    Not in Access.

21      Q.    What about in anywhere?

22      A.    In Excel is where we would put

23  the upper and lower limits.  And then adjust

24  for any odd bottle sizes, the 500-count

25  bottles, the 1,000-count bottles, and

1    liquids.

2         Q.    And do you know -- strike that.

3               You mentioned that Miranda had

4    been doing this for -- at some time period

5    before you; correct?

6         A.    Yes.

7         Q.    Do you know when this procedure

8    or process that you just described first

9    began at Walmart?

10        A.    I do not.

11        Q.    If you look at Exhibit 3 or 4,

12   based on your experience and your involvement

13   in Access, does it appear that this procedure

14   was being performed in January 2014?

15        A.    No.

16        Q.    And why do you say that?

17        A.    As far as the Access part of

18   it, I didn't create that database until later

19   in 2014.  So I'm not sure how they would have

20   been doing it prior to late 2014.

21        Q.    So if we could go, then, to --

22   let's see, the third page of the attachment.

23               MS. FUMERTON:  Which exhibit

24        are we on now?

25               MR. BOWER:  Sorry, Exhibit --

Highly Confidential - Subject to Further Confidentiality Review

1           sorry.  That's a good -- fair point.

2                   Exhibit 4.

3                   MS. FUMERTON:  Okay.

4                   MR. BOWER:  The third page of

5           the attachment, kind of the page

6           before the landscape page which --

7           store number in the top left?

8                   THE WITNESS:  Yes.

9           Q.      (BY MR. BOWER)  That just

10    reflects the Walmart store number; correct?

11          A.      Yes.

12          Q.      And then, do you have any

13    knowledge as to what "Q3 + 1.5 (Q3-Q1)"

14    means?

15          A.      No.

16          Q.      What about the next column,

17    "Threshold"?

18          A.      I can assume what it is, would

19    be the calculated threshold.  But without

20    knowing more context of the rest of the

21    data ...

22          Q.      Well, these were in your

23    custodial file.  Okay?  So I'm just trying to

24    understand what the data means.  If you don't

25    know, do you know who at Walmart might know

1   the answer to that question?

2        A.    I don't know based off this

3   document.  I don't know who at Walmart it was

4   sent to.

5        Q.    Do you know who at Walmart

6   would have been working thresholds in

7   January 2014?

8        A.    Kristy.

9        Q.    And based on your experience,

10  do you know what "Average" would refer to?

11       A.    I would assume the average, but

12  I don't know if it would be the average of

13  the threshold or Q3.  I've never seen this

14  before today.

15       Q.    What about "Max"?  Have you

16  seen that?

17       A.    I don't know.

18       Q.    Okay.  So I guess we'll have to

19  ask Kristy.

20            Let's go to the next page,

21  then.  I want to just see if you have any

22  familiarity with these column headings.

23  Okay, again, we have the store number; right?

24       A.    Yes.

25       Q.    And here we have average of all

Highly Confidential - Subject to Further Confidentiality Review

1    non-0 entries.  Do you see that?

2         A.    Yes.

3         Q.    Do you know what that would

4    refer to?

5         A.    So for all of this, without

6    seeing the data, I could make assumptions of

7    what this means based off the headers, but I

8    haven't seen it nor was I involved in the

9    data pulling or the data manipulation, so I

10   can't really answer many questions about the

11   data.  Especially headers.  You never know

12   what the exact header means.

13        Q.    Well, I'm not asking you to --

14   specific questions about the data, but I am

15   asking you based on your experience at

16   Walmart, based on your work in the Access

17   database, your involvement in this process.

18   And the fact that these were in your

19   custodial file.  So I'm going to ask the

20   questions.  If you tell me you don't know,

21   that's okay.  But I have to ask them.  Okay?

22        A.    Okay.

23        Q.    Do you know what "Average of

24   all order entries" would refer to?

25        A.    I'm assuming all of -- the

1    average of the orders that were in the data

2    set.

3        Q.    And, again, just going back for

4    a moment and based on your experience, when

5    they say "Order" here, they're really

6    referring to an order of a specific item

7    number; correct?

8            MS. FUMERTON:  Objection, form.

9            THE WITNESS:  I would assume

10    so, yes.

11        Q.    (BY MR. BOWER)  And why would

12    you assume that?

13        A.    Based on the fact that the

14    thresholds were on an item-specific level,

15    then I would assume that that's what this

16    analysis was on as well.

17        Q.    Okay.  Thank you.

18            Instead of me going through

19    these one by one, why don't you take a

20    moment, read them, and tell me if you are

21    familiar with what any of them mean.

22            MS. FUMERTON:  And limited to

23        this page.

24            MR. BOWER:  Limited to this

25        page, yes.  Sorry.  Thank you.  I'm

1    just trying to make it easier for

2    everybody.

3         THE WITNESS:  So again, I could

4    make assumptions of what these mean

5    based off the headers.

6    Q.    (BY MR. BOWER)  Okay.  Well,

7    why don't we just go through them quickly and

8    have you at least tell us based on your

9    experience what you believe them to mean.  I

10   think that might be helpful for us down the

11   road.

12   A.    Okay.

13   Q.    Okay?

14        So why don't we just start

15   where we left off.  "Difference of non-0

16   average from overall mean."

17   A.    So it looks like they were

18   taking the difference of that individual

19   store, non-0 average, so excluding the 0s, to

20   the overall mean for that drug.

21   Q.    And --

22   A.    I'm assuming.

23   Q.    And the overall mean would be

24   overall for all stores?  All Walmart

25   pharmacies, rather?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.      That's the way I would
2    interpret it.
3           Q.      Okay.  Has Walmart ever looked
4    at, for example, the mean for pharmacies in
5    addition to Walmart pharmacies?
6                   MS. FUMERTON:  Objection, form.
7                   THE WITNESS:  So looking at
8           other -- like competitors?
9                   MR. BOWER:  Yes.
10                  THE WITNESS:  Not that I'm
11          aware of.
12          Q.      (BY MR. BOWER)  Okay.  Have you
13   ever been involved in any discussions of
14   whether Walmart should consider, you know,
15   the ordering patterns for other pharmacies?
16                  MS. FUMERTON:  Objection, form.
17                  THE WITNESS:  I have not.
18          Q.      (BY MR. BOWER)  Okay.  And then
19   what -- "percentage change in mean," what,
20   based on your experience, would that refer
21   to?
22                  MS. FUMERTON:  Objection, form.
23                  THE WITNESS:  I think that's
24          just the percent change between the
25          different -- of the difference.
```

```
 1          Q.     (BY MR. BOWER)  In other words,
 2    when you strip out the non-0 orders, how that
 3    impacts the mean?
 4                  MS. FUMERTON:  Objection, form.
 5                  THE WITNESS:  It's hard to tell
 6           from the header.  I assumed it was the
 7           difference -- the percent change from
 8           that drug to the overall mean.
 9          Q.     (BY MR. BOWER) I see.  Okay.
10                  But it's hard to tell from
11    looking at the document; right?
12          A.     Absolutely.
13          Q.     I think the next few are pretty
14    self-explanatory with respect to standard
15    deviation of all non-0 entries.  That's just
16    stripping out orders of 0; correct?
17                  MS. FUMERTON:  Objection, form.
18          Q.     (BY MR. BOWER)  All right, well
19    let me just ask it, then.
20                  What does standard -- based on
21    your experience, "standard deviation of all
22    non-0 entries" refer to?
23          A.     So it's excluding the non-0
24    entries which were excluded in the average,
25    and then the standard deviation of those
```

Highly Confidential - Subject to Further Confidentiality Review

1    orders.

2         Q.    And then what about -- three

3    standard deviations is that number just times

4    3; correct?

5         A.    Yes.

6         Q.    What about "MU plus 3 Sigma"?

7               Do you know what that refers

8    to?

9         A.    Yes.  So "MU" would be the

10   mean.  That's the symbol for mean.  And then

11   "Sigma" is the symbol for the standard

12   deviation.

13              So that would be the mean plus

14   three standard deviations.

15        Q.    Very helpful.  Thank you.

16              Do you know what the next one

17   refers to when it says, "Calculate a

18   threshold from present methodology"?

19              Do you see that?

20        A.    I do.

21        Q.    Do you know what "present

22   methodology" would refer to?

23        A.    I do not.

24        Q.    What about if you look at the

25   actual -- now I am asking you to look at the

Highly Confidential - Subject to Further Confidentiality Review

```
1    actual numbers.  Do you see -- at least on
2    this page, they all appear to be the same
3    except for one.  Does that help you in any
4    way answer that question?
5          A.    Well, there's a hand -- it
6    looks like three --
7          Q.    I apologize.  Right.
8          A.    -- or four that are different.
9    It does not help.
10         Q.    And then the next column,
11   "Difference from threshold" is just -- maybe
12   it's not so clear.
13               It's just subtracting that
14   calculated threshold from present methodology
15   from the MU plus 3 Sigma; correct?
16         A.    That looks to be correct, yes.
17         Q.    Do you know what the "Maximum
18   order," going over a few, refers to?
19         A.    My best guess would be the
20   maximum order for that store for the
21   timeframe.
22         Q.    (BY MR. BOWER)  Is there any
23   way to tell what that timeframe is by looking
24   at this document?
25               MS. FUMERTON:  I think his
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          question is broader, so I just want to

 2          make sure you take the time to look.

 3          Q.    (BY MR. BOWER)  Yeah.  Is there

 4   anywhere in here where you would look to know

 5   what kind of timeframe we're looking at here?

 6          A.    So the first page of the

 7   attachment says "Time period for calculating

 8   mean and standard deviation was from Walmart

 9   week 201249 to 201348."

10          Q.    Okay.  So would that refer to

11   week 49 in the year 2012?

12          A.    I think so.  I think it's real

13   year, not fiscal year.

14          Q.    Okay.

15          A.    This was --

16          Q.    This was early '14 -- really

17   early year 2014, if that helps.

18          A.    Yeah.  So I think that's real

19   year, based on that.

20          Q.    Okay.

21          A.    So because that would be --

22   January of 2014 would be fiscal year '14.

23          Q.    Right.

24          A.    And so I don't -- logically

25   they would have used just the weeks prior and
```

Highly Confidential - Subject to Further Confidentiality Review

1    then a year back.

2          Q.    Okay.  So based on that, this

3    looks to be approximately a year's worth of

4    data?  Would you agree with that?

5          A.    Yes.

6          Q.    And I think the rest are

7    self-explanatory there.

8                Oh, I do have a couple more

9    questions on, not this page, but a couple

10   pages further, after the page with the --

11         A.    After the extremely small page?

12         Q.    Yes.

13         A.    Okay.

14         Q.    So on the top of that page, it

15   says that "Stores flagged by method one, but

16   not Dixon test."  Do you know what "Dixon

17   test" refers to?

18         A.    I do not.

19         Q.    Okay.  I think we're done with

20   that document.

21               MS. FUMERTON:  We have been

22         going approximately an hour.  A little

23         over an hour.  Is now a --

24               MR. BOWER:  Yeah, it is.  I

25         might have just one follow-up

Highly Confidential - Subject to Further Confidentiality Review

1          question, but we can certainly take a

2          break.  Let me just read my notes.

3                  No, we can take a break.

4                  MS. FUMERTON:  Okay.

5                  THE VIDEOGRAPHER:  10:44.  We

6          are off the video record.

7                  (Recess taken, 10:44 a.m. to

8          10:59 a.m.)

9                  THE VIDEOGRAPHER:  10:59.  We

10         are on video record.

11         Q.     (BY MR. BOWER)  Now we're back

12   on the record.

13         A.     Okay.

14         Q.     Let me hand you what's marked

15   as Exhibit 5.

16                (Walmart-Reed Deposition

17         Exhibit 5 was marked for

18         identification.)

19         Q.     (BY MR. BOWER)  And you will

20   see it's a rather lengthy document.  So do

21   take your time and review it.  I'm not going

22   to ask you too many questions on it.  Just

23   have a couple of questions on the cover

24   email.  And then I want to talk about kind of

25   why you're sending this document in end of

```
 1    2014.  And then a couple of the slides on the

 2    attachment.

 3                   But certainly feel free to

 4    review them all, but I'll direct you to the

 5    ones I'll have questions on.  And that's

 6    ending in 582 and 583.

 7                   MS. FUMERTON:  Okay.  But you

 8         still can take time to review the --

 9                   MR. BOWER:  Yes.

10                   MS. FUMERTON:  -- entire

11         document --

12                   MR. BOWER:  Yes.

13                   MS. FUMERTON:  -- for context.

14                   MR. MILLER:  And while the

15         witness is reviewing the document, can

16         someone read the entire Bates range of

17         the document?

18                   MR. BOWER:  Sure.  The first

19         Bates number is a Walmart document

20         ending in 48562, and it goes through

21         48598.

22                   [Document review.]

23                   MS. FUMERTON:  And while she's

24         reviewing --

25                   Zach, I understand that
```

1    Exhibit 4 -- and I'm not objecting to

2    the exhibit.  I just want to make a

3    record that there were additional tabs

4    in the native file that aren't

5    reflected here.

6              MR. BOWER:  Okay.  Thank you

7    for that.

8              [Document review.]

9        Q.    (BY MR. BOWER)  Have you had a

10   chance to review the document?  Or are you

11   still looking?

12       A.    Well, I have reviewed --

13   skimmed through it, yes.

14       Q.    And what I'm going to do is

15   I'll start the questions.  If you need more

16   time to look at it, then we can give you some

17   more time to look at it.  Okay?

18       A.    Okay.

19       Q.    So just going to the cover

20   email, the email from yourself to

21   Maria Smith?  Do you see that?

22       A.    Yes.

23       Q.    Dated 11-3-2014; correct?

24       A.    Yes.

25       Q.    Who is Maria Smith?

1      A.     Maria Smith was the director of

2     the -- it included the systems analytics team

3     that I was on.  I think, based on the second

4     page, she's the director of health and

5     wellness compliance monitoring risk and

6     governance.

7          Q.     Oh, I see it there.

8               Do you have any recollection as

9     to why you would be sending her this document

10    in November 2014?

11         A.     I had to go all the way to the

12    very last page to see my involvement.

13         Q.     Okay.

14         A.     It would have been the national

15    assessment program.

16         Q.     Okay.  And you were looking

17    at -- just so the record is clear, what's the

18    Bates number on the page you're looking at?

19              MS. FUMERTON:  And the Bates

20         number is on the thing on the corner.

21              MR. BOWER:  On the bottom.

22         Sorry, yeah.

23              THE WITNESS:  The last numbers

24         are 48598.

25         Q.     (BY MR. BOWER)  Okay.  And what

1   was the national assessment program?

2       A.      So it is the compliance

3   assessment program that we assessed a

4   sampling of our stores in regards to their

5   compliance to different programs.

6       Q.      I'm just trying to kind of

7   unpack exactly what that means.

8               So can you identify for us what

9   programs you were attempting to assess

10  compliance of?

11      A.      So there would have been

12  multiple different compliance-related things

13  involved in the assessment.

14      Q.      Okay.  Maybe I can streamline

15  this a little bit.

16      A.      Okay.

17      Q.      Did any of those relate to

18  diversion?

19              MS. FUMERTON:  Objection, form.

20              THE WITNESS:  Not that I

21      recall.

22      Q.      (BY MR. BOWER)  Did any of

23  those relate to suspicious order monitoring?

24      A.      No.

25      Q.      Did any of those relate to

1    dispensing in connection with red flags for

2    prescribers or C-II products?

3                    MS. FUMERTON:  Objection, form.

4                    THE WITNESS:  So there were

5              questions involving following our

6              policies, and so that would include

7              the proper drop-off procedures,

8              reviewing other prescriptions, things

9              like that.  And then there were

10             security-related questions with

11             controlled substances.

12             Q.    (BY MR. BOWER)  Okay.  Can you

13    just give a -- give us an example of what you

14    mean by "security-related questions"?

15             A.    So are the keys to the C-II

16    drawer on the manager at all times?

17                    Is the -- is the drawer locked

18    at all times?

19                    Things like that.

20             Q.    And these were questions

21    because Walmart was concerned with employee

22    pilferage; is that correct?

23                    MS. FUMERTON:  Objection, form.

24                    THE WITNESS:  So they were

25             questions to be sure that our policies

1    were being followed.

2         Q.    (BY MR. BOWER)  And those

3    policies were designed to minimize employee

4    pilferage of C-II narcotics; is that correct?

5              MS. FUMERTON:  Objection, form.

6              THE WITNESS:  The policies were

7         in place, and the result of those was

8         to minimize inappropriate employee

9         actions.

10        Q.    (BY MR. BOWER)  And, in fact,

11   Walmart tracked employee pilferage, didn't

12   it?

13             MS. FUMERTON:  Objection, form.

14             THE WITNESS:  We have a global

15        investigations team that would have

16        handled that.  I'm -- I'm not sure

17        what kind of tracking they have.

18        Q.    (BY MR. BOWER)  So let's look

19   back at this exhibit, then.

20             Given what you said, I just

21   have a couple of questions.  And I misspoke

22   earlier.  I do have a question on page ending

23   48581.  So if we could turn to that.  That

24   page says "Risk overview," and the first

25   bullet point says "Upgrades to security

Highly Confidential - Subject to Further Confidentiality Review

1     cameras required under MOA with DEA."

2                 Do you see that?

3         A.      Yes.

4         Q.      Do you know what "MOA" stands

5     for?

6         A.      I've heard the term multiple

7     times.  I can't recall what the acronym

8     means.

9         Q.      Do you know what was required

10    of Walmart relating to this MOA with the DEA?

11        A.      I don't know everything that

12    was required, no.

13        Q.      Well, what do you know about

14    it?

15        A.      I do know that the -- our

16    refusal-to-fill process stemmed from the MOA.

17        Q.      Do you know when Walmart

18    entered into the MOA?

19                Just provide a verbal answer so

20    the --

21        A.      Umm --

22        Q.      Oh, sorry.  Were you still

23    thinking?

24        A.      Yeah.

25        Q.      I'm sorry about that.

```
1           A.     I was like, okay.

2           Q.     Sorry about that.  I thought I

3      had missed a head nod or a shake.

4           A.     No.

5                  MS. FUMERTON:  Again, I just

6           want to question, and again, I don't

7           know if there is anything here, but

8           again, to the extent you have

9           knowledge, you can answer his

10          questions, but to the extent that it

11          would reveal communications with

12          attorneys, then I would instruct you

13          not to answer.  But otherwise, please

14          answer the question.

15                 MR. BOWER:  Well, the answer

16          just calls for a date, so I think she

17          can answer.

18                 MS. FUMERTON:  No, I agree.

19          I'm just saying in general with

20          respect to --

21                 MR. BOWER:  This issue?

22                 MS. FUMERTON:  Yeah, this

23          issue.

24                 THE WITNESS:  Yeah, I don't

25          know -- I know the refusal-to-fill
```

Highly Confidential - Subject to Further Confidentiality Review

1           process, as I worked with it, started

2           in 2011, and I knew it was involving

3           the MOA.  But other than that, I

4           wouldn't have been involved in that

5           section at all.

6      Q.     (BY MR. BOWER)  And what is

7   that refusal-to-fill process that you're

8   referring to?

9      A.     So the refusal-to-fill process

10  is where our pharmacists document when they

11  refuse to fill a prescription.

12     Q.     And it's your understanding

13  that Walmart adopted that process in

14  connection with an MOA with the DEA; is that

15  correct?

16          MS. FUMERTON:  Objection, form.

17          THE WITNESS:  Walmart started

18          reporting the results of that process

19          because of the MOA.

20     Q.     (BY MR. BOWER)  Okay.  Do you

21  have any knowledge as to whether Walmart made

22  changes to the process as a result of the

23  MOA?

24          MS. FUMERTON:  Objection, form.

25          THE WITNESS:  I do not know.

1    Q.    (BY MR. BOWER)  Do you know who

2    would know that?

3    A.    Somebody on the now practice

4    compliance team.

5    Q.    This page, going back to this

6    page on this exhibit, page ending in 48581,

7    refers to "Upgrades to security cameras

8    required under MOA with DEA."

9    Do you see that?

10   A.    Yes.

11   Q.    Do you know what that refers

12   to?

13   A.    Based on this, it seems like we

14   had to update our closed-circuit TVs, but

15   other than what this says, I don't know.

16   Q.    And also based on this, it

17   refers to general controlled substance

18   security requirements; correct?

19   A.    Yes.

20   Q.    And that's also in connection

21   with the MOA with the DEA; correct?

22   MS. FUMERTON:  Objection, form.

23   Q.    (BY MR. BOWER)  Well, let me

24   just read the whole thing in the record,

25   then.  It says, "Refill overview.  Upgrades

```
 1    to security cameras required under MOA with

 2    DEA and general controlled substance security

 3    requirements."

 4              Do you see that?

 5       A.    Yes.

 6       Q.    And then it has a chart there;

 7    right?

 8       A.    Yes.

 9       Q.    And the chart reflects

10    number of installations for CCT -- CCTV

11    cameras; right?

12       A.    Yes.

13       Q.    And those installations appear

14    to go from approximately less than -- well,

15    strike that.

16              What is -- let me try that

17    again.

18              The first date on the bottom of

19    the chart is 5-8.

20              Do you see that?

21       A.    Yes.

22       Q.    What's the approximate number

23    of cameras identified on 5-8, based on the

24    chart?

25              MS. FUMERTON:  Objection, form.
```

```
 1            Q.     (BY MR. BOWER)  It appears to
 2     be less than 25; right?
 3                   Would you agree it's less than
 4     100?  Make it easier?
 5            A.     Yes.
 6            Q.     And then throughout the year it
 7     tracks upward; correct?
 8            A.     Yes.
 9            Q.     And it ends approximately --
10     the chart ends approximately on, I would say
11     around -- sometime around 11-6?
12                   MS. FUMERTON:  Is there a
13            question?
14            Q.     (BY MR. BOWER)  Give or take?
15     Would you agree with that?
16                   MS. FUMERTON:  Objection, form.
17            Q.     (BY MR. BOWER)  With the line
18     on the chart?  Ends approximately 11-6.
19                   Would you agree with that?
20            A.     Yes.
21            Q.     And at that point, it appears
22     that there are now well over 2,000 CCTV
23     cameras.  Would you agree with that?
24                   MS. FUMERTON:  Objection, form,
25            lack of foundation.
```

```
 1                    THE WITNESS:  Yes.
 2          Q.    (BY MR. BOWER)  So it appears
 3   from this chart on this slide that Walmart
 4   has added more than 2,000 security cameras in
 5   less than a year as a result of an MOA with
 6   DEA related to controlled substances.
 7                Would you agree with that?
 8                MS. FUMERTON:  Objection, form.
 9       Lack of foundation.
10                THE WITNESS:  Yes.
11          Q.    (BY MR. BOWER)  Okay.  Let's
12   turn to the next page, ending in 582.
13                Do you see this has a chart
14   regarding dispensing trends?
15          A.    Yes.
16          Q.    Would you have any personal
17   involvement in the information that was
18   included in this chart?
19          A.    No.
20          Q.    Do you know whether -- for
21   example, if you look at the -- it's a little
22   bit hard to tell because this is not in
23   color, but you can tell by the format of the
24   line, if you look at, for example, the top
25   one, which is HCP or hydrocodone combination
```

Highly Confidential - Subject to Further Confidentiality Review

1    products.

2                    Do you see that?

3         A.      Yes.

4         Q.      Which is the -- kind of the

5    gray line with the square?

6                    MS. FUMERTON:  They're all

7          gray.  Just for the record.

8          I guess --

9         Q.      (BY MR. BOWER)  Well, let's go

10   through it.

11                   MS. FUMERTON:  I just want to

12         make the record to be clear.

13        Q.      (BY MR. BOWER)  Yeah, so the

14   record will reflect we're looking at page

15   ending in 48582.  There's four lines in this

16   chart.  The oxycodone line is just a darkish

17   gray line.  There's a title on all three

18   lines, which is lighter gray with a box

19   outlined in darker gray.

20                   And there is an HCP line with a

21   similar line, but that box is not outlined in

22   darker gray, and there's a Tramadol line

23   which is the darkest gray.  Okay?

24                   So can you tell from that kind

25   of -- those indications in the bottom right,

Highly Confidential - Subject to Further Confidentiality Review

1    which of these lines, for example, tracks the

2    hydrocodone combination products?

3        A.    The top one.

4        Q.    Okay.  And do you know where

5    Walmart would have pulled this information

6    from?

7        A.    So my best guess, having not

8    pulled the data, would be either Teradata or

9    Retail Link.

10        Q.    Is it your understanding, based

11    on your experience with pulling data at

12    Walmart, that this data reflects Walmart

13    dispensing and not some other dispensing

14    number?

15            MS. FUMERTON:  Objection, form.

16            THE WITNESS:  Yes, it would

17        just be Walmart data.

18        Q.    (BY MR. BOWER)  So it appears

19    here that Walmart is, for example, tracking

20    dispensing of oxycodone products during this

21    year; correct?

22            MS. FUMERTON:  Objection, form.

23            THE WITNESS:  Oxycodone

24        products appear to be on here.

25            MR. BOWER:  Right.

```
 1              THE WITNESS:  As far as the
 2      dispensed.
 3         Q.     (BY MR. BOWER)  And this chart
 4   reflects dispensing trends; right?
 5         A.     Yes.
 6              MS. FUMERTON:  Objection, form.
 7         Q.     (BY MR. BOWER)  The top of this
 8   notes, the first bullet point, as of 10-6-14,
 9   hydrocodone combination products are
10   Schedule II controlled substances and subject
11   to heightened security requirements.
12              Do you see that?
13              MS. FUMERTON:  Objection, form.
14      Misstates the document.
15         Q.     (BY MR. BOWER)  You can answer
16   it.
17              MS. FUMERTON:  It's not a test.
18      You said "heightened security
19      requirements."  The word "security" is
20      not in there.
21              MR. BOWER:  Oh, okay.
22         Q.     (BY MR. BOWER)  So basically
23   heightened requirements.
24              Do you see that?
25         A.     Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      Do you know what that refers

2  to?

3      A.      Hydrocodone change schedule

4  from a -- I think it was a III to a II.

5      Q.      And do you know what heightened

6  requirements were required when it became a

7  Schedule II?

8              MS. FUMERTON:  Objection, form.

9              THE WITNESS:  So Schedule II

10         drugs have different requirements than

11         the other schedules, such as different

12         prescription requirements, different

13         security requirements for the actual

14         drugs themselves.

15     Q.      (BY MR. BOWER)  Do you know

16  whether the requirements for suspicious order

17  monitoring are different for Schedule II

18  products versus Schedule III products?

19             MS. FUMERTON:  Objection, form.

20             THE WITNESS:  Do I know if --

21         can you restate the question?

22     Q.      (BY MR. BOWER)  Sure.  I'll

23  just read back the question.

24             Do you know whether the

25  requirements for suspicious order monitoring

1    for distributors are different for

2    Schedule II products versus Schedule III

3    products?

4                    MS. FUMERTON:  Objection, form.

5                    THE WITNESS:  I do not.

6         Q.    (BY MR. BOWER)  If you'd turn

7    to the next page.

8                    Okay.  This is titled "DEA

9    activity."  Do you see that at the top?

10        A.    Yes.

11        Q.    And then it says "DC 6028

12   inspection"?  Do you see that?

13        A.    Yes.

14        Q.    Okay.  The first bullet point

15   states, "DEA requested additional information

16   about our suspicious order monitoring program

17   in late September."  Do you see that?

18        A.    Yes.

19        Q.    Do you know anything about

20   that?

21                   MS. FUMERTON:  Objection, form.

22                   THE WITNESS:  So I was involved

23            in helping pull some data in late

24            September for 6028.

25                   I did not know at the time that

1      it had anything to do with the

2      suspicious order monitoring.

3           Q.     (BY MR. BOWER)   Okay.   Well

4   just -- I was asking about what you did then,

5   not whether it was involved in this.

6           Okay.   What did you do in late

7   September for data with respect to 6028?

8           A.     So that was four years ago.

9           Q.     Right.

10          A.     And so I don't remember

11  specifics.   I remember pulling large amounts

12  of data, and then there were conversations

13  about the data with legal.

14          Q.     Okay.   Do you remember who

15  asked you to pull the data?

16          A.     With this one, I don't remember

17  specifically who pulled me into the project.

18          Q.     Okay.   Do you recall the names

19  of others who may have been involved in the

20  project?

21          A.     So Kristy Spruell was, as well

22  as George Chapman.   And then there were

23  logistics folks that I weren't -- I didn't

24  have any interaction with.

25          Q.     And what were the names of the

Highly Confidential – Subject to Further Confidentiality Review

```
 1    folks from legal who you would discuss the

 2    data with?

 3          A.      She was outside counsel.

 4    Jodie -- I do not remember her last name.

 5          Q.      Do you know what firm she was

 6    with, for example?

 7          A.      No.

 8          Q.      Did you speak with her on the

 9    phone or in person?

10          A.      We spoke on the phone a couple

11    of times, and then I know there were some

12    emails that she was included in.

13          Q.      Okay.  Do you recall anything

14    else about the data that was pulled?

15          A.      All I know is it was shipment

16    data.

17          Q.      Okay.  As you sit here today,

18    nothing else you can recall about a request

19    related to pulling data for 6028 that we

20    haven't discussed already?

21                MS. FUMERTON:  And I would just

22          like to add as a limit around that

23          question, that was not discussed with

24          counsel.

25                THE WITNESS:  No.
```

```
 1                    (Walmart-Reed Deposition

 2          Exhibit 6 was marked for

 3          identification.)

 4          Q.     (BY MR. BOWER)  Okay.  You've

 5   been handed what's been marked as Exhibit 6.

 6   So please take your time to review it, to --

 7   it's relatively short, two-page email, with

 8   an attachment.

 9                    So while you're doing that,

10   I'll read the Bates number.  It begins in

11   26982, ending in 26988.  And again, it's a

12   Walmart document.

13                    [Document review.]

14                    MS. FUMERTON:  I'm sorry.  Do

15          you need to ask me a question?

16                    THE WITNESS:  Yes.

17                    Can I ask her a question?

18                    MS. FUMERTON:  Is it a question

19          about potentially privileged

20          information?

21                    THE WITNESS:  Yes.

22                    MS. FUMERTON:  Okay.  Can we

23          please go off the record?

24                    MR. BOWER:  Sure.

25                    THE VIDEOGRAPHER:  11:23.  We
```

1      are off the video record.

2            (Recess taken, 11:23 a.m. to

3      11:25 a.m.)

4            THE VIDEOGRAPHER:  11:26.  We

5      are on the video record.

6            MS. FUMERTON:  And I just

7      wanted to -- I don't think a question

8      was pending.  She's in the process of

9      reviewing, so if she can continue to

10     review the document before you ask

11     questions, that would be appreciated.

12            MR. BOWER:  Sounds good.

13     Please do so.

14            THE WITNESS:  Okay.

15        Q.    (BY MR. BOWER)  So let's start,

16     I guess, on the cover email.  At the top is

17     an email from Miranda Johnson to yourself.

18     Correct?

19        A.    Yes.

20        Q.    Cc'ing a few others.

21            And this is dated November 7,

22     2014; correct?

23        A.    Yes.

24        Q.    Do you have any understanding

25     as you sit here today why Miranda is sending

1    this to you in November of 2014?

2         A.    Yes.

3         Q.    And --

4         A.    And --

5         Q.    Go ahead.

6               MS. FUMERTON:  Let him ask his

7    question.

8               THE WITNESS:  Sorry.

9         Q.    (BY MR. BOWER)  And what is

10   that understanding?

11        A.    So I was in charge of the

12   health and wellness compliance dashboard that

13   was sent to our VP.  At the time it looks

14   like it was Phyllis Harris.

15              And part of that scorecard

16   included a quantitative part, which would

17   have been the Tableau dashboard.  And then

18   there was a qualitative section.

19              So I sent out -- earlier in the

20   email, I sent to the leaders of the team, the

21   stakeholders, asking for updates to the

22   qualitative section, and they would send me

23   back their updates.

24        Q.    So was that the full scope of

25   your responsibility in connection with the

1    update?  Simply sending it out?

2            MS. FUMERTON:  Objection, form.

3        Misstates the testimony.

4            MR. BOWER:  Well, I'll strike

5        it, then.

6        Q.    (BY MR. BOWER)  Were you

7    involved in putting this update together at

8    all?

9            MS. FUMERTON:  Objection, form.

10           THE WITNESS:  The information

11       in each of the different sections came

12       from the leaders of that area, and I

13       combined them all into one document to

14       go to leadership.

15       Q.    (BY MR. BOWER)  Okay.  If you'd

16   turn to the last page of the document, it

17   refers to suspicious order monitoring.

18   Right?

19       A.    Yes.

20       Q.    Were you involved in suspicious

21   order monitoring during this time period?  In

22   any way?

23           MS. FUMERTON:  Objection, form.

24           THE WITNESS:  I was still on

25       Casey's team working with the systems

1          analytics, but there were portions of

2          this I was supporting at that time.

3          Q.     (BY MR. BOWER)  Okay.  And what

4     were you supporting at that time?

5               This is, again, November of

6     2014.

7          A.     So that would have been at the

8     time that I was helping with the Access

9     database, that created the thresholds.  And

10    there's also a reference to the store

11    profile.  And that would be in Archer that I

12    would have helped develop.

13         Q.     Why don't I just ask about that

14    store profile, since you mentioned it.  Do

15    you recall what information is in the store

16    profile?

17               MS. FUMERTON:  Objection, form.

18               THE WITNESS:  The information

19          that was in the store profile at the

20          time would be different than now.

21               At the time, I know that there

22          was basic store information, so DEA

23          number, where the store is located,

24          things like that.

25               So if my memory serves me

1    right, at the time it would have been

2    the more basic information.

3         Q.    (BY MR. BOWER)  Let me ask kind

4    of a related question.  Earlier, if you

5    recall, we talked about certain information

6    such as quantity of pills per prescription,

7    whether payments were made in insurance

8    versus cash.  Was that information included

9    in the store profile at any time?

10             MS. FUMERTON:  Objection, form.

11             THE WITNESS:  That information

12    is now linked to the store profile.

13    It's not a part of the store profile.

14    It's linked to it.

15         Q.    (BY MR. BOWER)  Do you have

16    any, as you sit here today, recollection of

17    when Walmart began linking that information

18    to the store profile?

19         A.    We started in late 2015, and

20    did all the data for 2015.

21         Q.    And do you have any

22    recollection -- strike that.

23             Do you have any knowledge as to

24    why Walmart started linking that information

25    to the store profile?

```
 1              MS. FUMERTON:  Objection, form.
 2              THE WITNESS:  So that was done
 3         after I joined the team, and it was an
 4         enhancement to the store profile based
 5         on the "know your customer"
 6         information.
 7         Q.    (BY MR. BOWER)  And was that in
 8    connection with Walmart's suspicious order
 9    monitoring program?
10         A.    Yes.
11         Q.    And if you look at -- oh,
12    sorry.  Yeah, you already answered that
13    question.
14              If you look at page 2 of the
15    attachment, there is a reference to that
16    hydrocodone reclassification.
17              Do you see that?
18         A.    Yes.
19         Q.    Okay.  Did that
20    reclassification impact in any way your
21    duties and responsibilities?
22         A.    No.
23         Q.    When did you first become
24    involved in Archer?  I think I asked this,
25    but ...
```

1          I think we're getting closer to

2    that time period now, so let me ask it again.

3          A.    I was initially trained in

4    Archer in 2010.

5          Q.    Okay.

6          A.    And we started using it in

7    2011.

8          Q.    Let me be more specific, then.

9          When did you first become

10   involved in Archer in connection with

11   Walmart's suspicious order monitoring process

12   for controlled II substances?

13          And I don't want to make -- let

14   me show you a document, because I don't want

15   to make this a --

16          A.    Okay.

17          Q.    Before you answer it.  I can

18   strike that question and ...

19          A.    Okay.

20          (Walmart-Reed Deposition

21          Exhibit 7, was marked for

22          identification.)

23          Q.    (BY MR. BOWER)  Okay.  You've

24   been handed what's been marked as Exhibit 7.

25   It's just a cover email with a short

1    attachment.  It's an email from Miranda to

2    yourself dated December 3rd, 2014.  The Bates

3    is 9489 through 9491.

4           And so going back to my

5    question before, which I withdrew, when did

6    you first become involved with Archer in

7    connection with Walmart's suspicious order

8    monitoring program for controlled II

9    substances?

10   A.    So based on this email, I would

11   assume it would have been around November of

12   2014, because by December 3rd, I had a kind

13   of process flow for Archer.  So it would have

14   been sometime in October or November that we

15   would have initially talked about it, to get

16   kind of the ball rolling as far as creation

17   goes.

18   Q.    And can you just, in your own

19   words, describe what you mean by "the ball

20   rolling as far as creation goes"?  Describe

21   what that means.

22   A.    So system creation, you have to

23   find requirements and make sure that, for

24   one, that the system is the right system to

25   meet the needs of what the process would be.

1    And then what the requirements are, what the

2    fields are, what kind of configuration needs

3    to happen.  Things like that.

4         Q.    And you were involved in that

5    for Archer in connection with SOM; is that

6    correct?

7                   MS. FUMERTON:  Objection, form.

8                   THE WITNESS:  Yes.

9         Q.    (BY MR. BOWER)  So let's break

10   that down, then, a little bit more.

11                   How did you determine whether

12   Archer was the right system to meet the needs

13   for Walmart's suspicious order monitoring

14   program?

15                   MS. FUMERTON:  Objection, form.

16                   THE WITNESS:  I don't remember

17        the initial conversations about using

18        Archer.  We were already using Archer

19        for some incident management things,

20        so this would have been a natural fit.

21        It's another type of incident.  So

22        Archer is quite good at the incident

23        management portion.  So I don't

24        remember initial conversations.

25        Q.    (BY MR. BOWER)  Well, did you

1    have, at that time -- and "that time" being

2    kind of the end of 2014 -- understanding as

3    to what the needs were for Walmart's

4    suspicious order monitoring program?

5                    MS. FUMERTON:  Objection, form.

6                    THE WITNESS:  So I would have

7           understood, based on conversations,

8           enough to know that fields we needed

9           to capture.  What the needs were as

10          far as meeting requirements or

11          anything like that, I wouldn't have

12          had any insight into.

13          Q.    (BY MR. BOWER)  Okay.  So your

14    involvement was more on the kind of

15    requirements for the application itself?

16    Would that be accurate?

17          A.    For the Archer application?

18          Q.    Correct.

19          A.    Yes.

20          Q.    Okay.

21                Do you recall who told you what

22    those requirements were?

23                    MS. FUMERTON:  Objection, form.

24                    THE WITNESS:  Based on this

25          email, I would have been working with

Highly Confidential - Subject to Further Confidentiality Review

1    Miranda.

2         Q.    (BY MR. BOWER)  Okay.  Is there

3    anyone else other than Miranda that would

4    have been involved in discussions with

5    respect to what the requirements were in

6    using Archer for Walmart's suspicious order

7    monitoring for Schedule II products?

8              MS. FUMERTON:  Objection, form.

9              THE WITNESS:  So at some point,

10         Kristy would have been involved, but

11         she also was out for a while at a

12         point in this time.  So she probably

13         was involved at some point in limited

14         fashion as well.

15        Q.    (BY MR. BOWER)  What do you

16    mean by "she was out for a while"?

■         ■              ■

18        Q.    Thank you.  And just for the

19    record, just so we can have any clarity as to

20    why she was out.

21             She was out, you believe,

22    during this time period?

23        A.    Yes.

24        Q.    Or in or about this time

25    period?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      So let's turn to the

 3      attachment, then.  You see it says "Order of

 4      Interest Evaluation"?

 5              A.      Yes.

 6              Q.      Do you know what that refers

 7      to?

 8              A.      Yes.  Orders that were flagged.

 9              Q.      And do you know for what

10      purpose they were flagged?

11                      MS. FUMERTON:  Objection, form.

12                      THE WITNESS:  So they would

13              have been flagged because they met or

14              exceeded their threshold.

15              Q.      (BY MR. BOWER)  So at this

16      point, threshold is already in place;

17      correct?

18              A.      Yes.

19              Q.      And those are thresholds in

20      Reddwerks; correct?

21              A.      Yes.

22              Q.      And this is before the

23      Reddwerks enhancements have kicked in; is

24      that correct?

25                      And let me strike that and be
```

1    more specific.

2              I'm talking -- asking about for

3    6045.  Do you know whether Reddwerks

4    enhancements had been implemented at 6045 as

5    of December 3rd of 2014?

6         A.    I don't know.

7         Q.    And is there anything on this

8    document that would shed light on the timing

9    of that?

10        A.    No.

11        Q.    What is your understanding as

12   to what is reflected in this document?  And

13   by the document, I mean the attachment to the

14   email.

15             MS. FUMERTON:  Objection, form.

16             THE WITNESS:  So these are the

17        different fields in sections that

18        would have been included in Archer.

19        Q.    (BY MR. BOWER)  Okay.  And

20   did -- let's just talk about a couple

21   examples.

22             Archer had an order quantity;

23   right?

24        A.    Yes.

25        Q.    And that order quantity was by

1    item number; is that correct?

2          A.    Yes.

3          Q.    Archer also had the threshold.

4    Do you see that?

5          A.    Yes.

6          Q.    Okay.  So you have the general

7    info at the top; right?

8          A.    Yes.

9          Q.    With the information you

10   mentioned earlier, for example, the DEA

11   number.  Right?

12         A.    Yes.

13         Q.    And then, down below it has

14   "Store profile review."

15               Do you see that?

16         A.    Yes.

17         Q.    Do you know what information

18   was going to be in Archer with respect to

19   that information?

20               MS. FUMERTON:  Objection, form.

21         Q.    (BY MR. BOWER)   Well, strike

22   that.

23               Do you know what information

24   was contemplated to be part of a store

25   profile review at this time period?

1             MS. FUMERTON:  Objection, form.

2             THE WITNESS:  So it would have

3        been the -- things like were refusals

4        to fill being done.

5             That's the main thing that pops

6        into my head, but anything revolving

7        around the store, including things

8        like refusal to fill.

9        Q.    (BY MR. BOWER) And how would,

10   for example, that refusal-to-fill information

11   get populated into Archer?

12             MS. FUMERTON:  Objection, form.

13             THE WITNESS:  So depending on

14        the timeframe, things --

15        Q.    (BY MR. BOWER)  Well, I'm

16   asking now about this time period.  So this

17   is in end of 2014.

18             What was the plan for

19   populating the refusal-to-fill information

20   into Archer?

21             MS. FUMERTON:  Objection, form.

22             THE WITNESS:  Sorry, I'm

23        working on the timeline.  So

24        refusal-to-fill information was moved

25        into Archer in July of 2015.  Archer

1            started being used as the system to

2            track refusal to fills.

3            Q.    (BY MR. BOWER)  Okay.  And how

4    was that information entered into Archer?

5            A.    So the refusal to fills are

6    entered by the pharmacist directly into

7    Archer.

8            Q.    Okay.

9            A.    So at the time of this

10   document, refusal to fills weren't in Archer.

11   And I don't recall if that was already on the

12   road map to be done, so I'm not positive if

13   that's what was meant by the store profile

14   review at this time.  I know that's what

15   ended up going into the store profile notes.

16           Q.    Okay.  Let's look at one under

17   the store profile review.  It has McKesson

18   data.  Do you see that?

19           A.    Yes.

20           Q.    Do you know whether that ended

21   up being included in Archer?

22           A.    Yes.

23           Q.    It did?

24           A.    Well, the data itself wouldn't

25   have been included into Archer.  The fact

Highly Confidential - Subject to Further Confidentiality Review

1    that the data was reviewed would have been

2    put into Archer.  And if there was anything

3    that affected the order of interest.

4         Q.    Can you explain what you mean

5    by that?

6         A.    So we wouldn't have pulled data

7    from McKesson and then put it into the Archer

8    record that we were looking at.

9         We would have pulled McKesson

10    data, reviewed the data to see if there was

11    another drug, the same drug that we were

12    ordering on the McKesson report, and then

13    that would be entered -- the fact that that

14    was done, and whether there was anything of

15    interest in doing that would have been

16    entered into that field.

17         Q.    So that field simply would have

18    held information as to whether McKesson data

19    was reviewed?  Is that correct?

20         MS. FUMERTON:  Objection, form.

21         Q.    (BY MR. BOWER)  In other words,

22    what did the McKesson data field look like

23    when Archer was rolled out?

24         MS. FUMERTON:  Objection, form.

25         Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  It's a text field
 2           that has whatever is entered in.  So,
 3           you know, McKesson data reviewed,
 4           nothing of substance found.  Or
 5           McKesson data reviewed and they only
 6           ordered one bottle from McKesson.  Or
 7           nothing was ordered.  That kind of
 8           thing.
 9           Q.    (BY MR. BOWER)  Were certain of
10      the fields reflected here required to be
11      filled out in Archer for an order of
12      interest?
13           A.    At which level?
14           Q.    At any level.
15           A.    So there were --
16                  MS. FUMERTON:  Objection, form.
17                  Go ahead.
18                  THE WITNESS:  There are --
19           there were required fields, and they
20           were different depending on who was
21           doing the review.
22                  MR. BOWER:  Okay.
23           Q.    (BY MR. BOWER)  And did those
24      required fields change over time?
25           A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you recall who had the

2    discretion or ability to change those

3    required fields?

4              MS. FUMERTON:  Objection, form.

5              MR. BOWER:  I'll strike that.

6         I'll break that down.

7         Q.    (BY MR. BOWER)  Do you recall

8    who had the ability to change those required

9    fields within Archer?

10             MS. FUMERTON:  Objection, form.

11             THE WITNESS:  I would have been

12        the only person that could make

13        changes to the actual form.

14        Q.    (BY MR. BOWER)  And who were

15   the folks who would have been tasked with the

16   ability to decide that changes needed to be

17   made?

18             MS. FUMERTON:  Objection, form.

19             MR. BOWER:  I'll strike that.

20        Q.    (BY MR. BOWER)  Who would have

21   decided to make the changes?

22             MS. FUMERTON:  Objection, form.

23             THE WITNESS:  So there were --

24        it could have been possible that as I

25        was reviewing data, I could go to

```
 1            Miranda and say, "Hey, we're having

 2            problems with this field not being

 3            filled out correctly.  Is it okay if I

 4            make it a required field to force --

 5            make sure that it's filled out?"

 6                 And so in that case, the

 7            approval would come from her.

 8                 She could also make the same --

 9            the same ask of, "Hey, you know, I

10            think this should be required."

11                 There were times that the

12            logistic team asked for something to

13            be required because she kept

14            forgetting to fill in a certain field.

15            So it could come from any level.

16            Q.    (BY MR. BOWER)  And do you

17       recall making changes to the required fields

18       in Archer?

19            A.    Yes.

20            Q.    And what changes do you recall

21       making?

22            A.    So lots of changes were made

23       when we went to the Buzzeo system.  The

24       Archer fields looked completely different

25       than what they looked like in Reddwerks.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            Q.    So let's separate that time

2   out.  Let's say before the Buzzeo system was

3   implemented, what changes do you recall

4   making in the Archer fields?

5            A.    So, for instance, one thing I

6   remember is this title "interview store

7   associate."  At some point I don't remember

8   exactly when we changed the header of that to

9   something about an increase.  Like why -- why

10  have you seen an increase in this.  Because

11  if there's an alert, there would have been

12  some kind of increase, at least in that

13  specific order, to help drive the

14  conversations that the logistics people were

15  having with the store folks.

16                So I remember changing that.

17                And, like, I don't remember

18  this, "verify info from store field."  I

19  don't know that that ended up in the system

20  at all.

21                So things like that.  Like, I

22  don't -- I mean, there were lots of changes

23  made along the way.  Some of them larger and

24  some just ...

25            Q.    Do you recall any changes made
```

1    with respect to whether a field was required

2    or not?

3              MS. FUMERTON:  Objection, form.

4         Asked and answered.

5              THE WITNESS:  I don't remember

6         exactly which fields were required

7         initially and then which ones we

8         changed to be required later.

9         Q.    (BY MR. BOWER)  When a change

10   was to be made, how would you go about doing

11   so?  Would it be, for example, a call?  An

12   email?  Meeting?

13             MS. FUMERTON:  Objection, form.

14             THE WITNESS:  So clarify the

15        question.  Who -- who would we tell or

16        how would I make the change?

17        Q.    (BY MR. BOWER)  Sure.  Let's

18   say -- okay, I'll rephrase.

19             Let's say, for example, Miranda

20   comes to you and says, "We need to make a

21   change in one of the Archer fields."

22             What would you do?

23        A.    I would go into the back end of

24   Archer and make the change.

25        Q.    So you could make the change

Highly Confidential - Subject to Further Confidentiality Review

1  yourself; is that correct?

2       A.     Yes.

3       Q.     That's what I was trying to get

4  at, whether you had to ask Archer to make the

5  change or whether you could make the change

6  yourself.

7       A.     I'm an admin.

8       Q.     You're an admin for the Archer

9  database; correct?

10      A.     Yes.

11      Q.     Do you remember whether the

12 McKesson data was a required field at any

13 point?

14             MS. FUMERTON:  Objection, form.

15             THE WITNESS:  Not during the

16 Reddwerks portion.

17      Q.     (BY MR. BOWER)  Just so your

18 testimony is clear, is it your statement that

19 the McKesson data field was not a required

20 field during the Reddwerks portion?

21             MS. FUMERTON:  Objection, form.

22             THE WITNESS:  Yes.

23      Q.     (BY MR. BOWER)  And then just

24 going back to kind of this document for a few

25 more questions.

1    MS. FUMERTON:  And we're still

2    on Exhibit 7?

3    MR. BOWER:  Yes.

4    Q.    (BY MR. BOWER)  So we have

5    three kind of -- well, there's multiple kind

6    of sections here.  We have "General info";

7    right?  "Order details," "Evaluation," and

8    then "Personnel," "Logistics resolution," and

9    then "Practice compliance" elevation.

10   "Evaluation."  Sorry.

11   Do you see that?

12   A.    Yes.

13   Q.    Okay.  During this time, was

14   there a discussion as to when a practice

15   compliance evaluation would be required in

16   Archer?

17   MS. FUMERTON:  Objection, form.

18   THE WITNESS:  At this time I

19   would not have been involved in what

20   those conversations were.

21   Q.    (BY MR. BOWER)  Well, do you

22   understand you were involved in kind of

23   developing the workflow; right?

24   A.    Yes.

25   Q.    So what was contemplated to

Highly Confidential - Subject to Further Confidentiality Review

1    happen here?  Was it practice compliance

2    evaluation would be required to review all

3    orders of interest?  Or something less than

4    all orders of interest?

5             MS. FUMERTON:  Objection, form.

6             THE WITNESS:  So what I knew at

7         the time was the logistics resolution.

8         The logistics team would select

9         appropriate order or send a practice

10        compliance for additional evaluation.

11        At that time, the practice compliance

12        evaluation portion was done.

13        Q.    (BY MR. BOWER)  Do you recall

14   whether in fact that's what happened when

15   Archer was rolled out?

16        A.    Yes.

17        Q.    So, in other words, practice

18   compliance would only get an order of

19   interest if the logistics team selected that

20   order to be sent to them; is that correct?

21        A.    Yes.

22        Q.    And do you recall approximately

23   how far or how long after this Archer began

24   to be used for suspicious order monitoring?

25             MS. FUMERTON:  Objection, form.

```
 1                   THE WITNESS:  Early 2015.
 2          Q.    (BY MR. BOWER)  So fairly soon
 3   after this, Archer begins to be used;
 4   correct?
 5          A.    Yes.
 6          Q.    Between kind of this time
 7   period and this work reflected here, what
 8   else did you do prior to Archer being used
 9   for suspicious order monitoring for
10   controlled II substances?
11                   MS. FUMERTON:  Objection, form.
12                   THE WITNESS:  So I implemented
13          this into Archer.
14          Q.    (BY MR. BOWER)  Okay.  Let's
15   just go back, then, for a second.
16                   So go back to the order details
17   there.
18          A.    Mm-hmm.
19          Q.    It has a threshold bullet
20   point.  Do you see that?
21          A.    Mm-hmm.  (Witness nods.)
22          Q.    Was Archer populated with
23   thresholds when it was rolled out initially?
24                   MS. FUMERTON:  Objection, form.
25                   THE WITNESS:  No.  Each order
```

Highly Confidential - Subject to Further Confidentiality Review

1          of interest, this data would be

2          populated.

3          Q.    (BY MR. BOWER)  Okay.  So, in

4    other words, for each order of interest that

5    was flagged in Archer, the threshold data

6    would be populated?

7               MS. FUMERTON:  Objection, form,

8          lack of foundation.

9               THE WITNESS:  The orders were

10          flagged in Reddwerks, and then

11          information was entered into Archer.

12          Q.    (BY MR. BOWER)  How does the

13    information get from Reddwerks to Archer for

14    orders of interest?

15          A.    So most often the -- a member

16    of the logistics team would pull up the alert

17    in Reddwerks and then transpose, type in

18    whatever information that was in Reddwerks

19    into Archer and then work the rest of the

20    incident.

21          Q.    So when Archer was rolled out,

22    the folks in the logistics side had to

23    manually type in all this information into

24    Archer for each order of interest?  Is that

25    correct?

```
 1              MS. FUMERTON:  Objection, form.
 2              THE WITNESS:  Not all of it.
 3         Like, they would select the store, and
 4         then the store would populate -- like,
 5         the personnel of the store --
 6         alignment information.  They would
 7         select the appropriate DC, which would
 8         populate the DC alignment information.
 9         Some of the dates would enter as soon
10         as they opened it, like the date here
11         would have been the date received.
12         And as soon as they created the
13         record, that would populate.
14              Everything else, they would
15         select or enter in.
16         Q.    (BY MR. BOWER) So, for example,
17    when the drug was entered, the threshold
18    field wouldn't automatically populate in
19    Archer; is that correct?
20              MS. FUMERTON:  Objection, form.
21              THE WITNESS:  It would not
22         automatically populate.
23         Q.    (BY MR. BOWER) So, in other
24    words, the folks from the practice compliance
25    would have to manually enter that threshold
```

1    information; is that correct?

2                    MS. FUMERTON:  Objection, form.

3                    THE WITNESS:  No, the folks

4          from the logistics team entered it.

5          Q.    (BY MR. BOWER)  Sorry, let me

6    ask it the right way.

7                    When Archer was rolled out, and

8    the logistics team was notified on an order

9    of interest, would they have to manually

10   enter the threshold information for that

11   specific drug?

12         A.    Yes.

13         Q.    And where would they obtain

14   that threshold information that was needed to

15   be entered?

16         A.    From Reddwerks.

17         Q.    What specifically would folks

18   on the logistics team receive from Reddwerks

19   when an order of interest was flagged?

20                    MS. FUMERTON:  Objection, form.

21                    THE WITNESS:  So Reddwerks had

22         the drug name, the item, the quantity

23         of that order, the threshold, and then

24         the weekly quantity.

25         Q.    (BY MR. BOWER)  And again, I

1    want to make sure we're abundantly clear on

2    this.  When you say "that order," you mean

3    that item; is that correct?

4                   MS. FUMERTON:  Objection, form.

5            Q.    (BY MR. BOWER)  Well, can you

6    explain what you mean by "that order? "

7                   I'll strike that question.

8                   And in your answer, you

9    referenced that the Reddwerks would provide

10   the logistics team with the drug name, the

11   item, the quantity of that order.  What do

12   you mean by "the quantity of that order"?

13           A.    The quantity ordered for that

14   item.

15           Q.    So, in other words, the folks

16   on the logistics team did not receive the

17   quantity ordered for any other item; is that

18   correct?

19                  MS. FUMERTON:  Objection, form.

20                  THE WITNESS:  They received the

21          quantity of the flagged order.

22                  MR. BOWER:  Right.

23                  THE WITNESS:  So whichever

24          portion of the order flagged, they

25          would receive that quantity.

1    Q.    (BY MR. BOWER)  So, for

2    example, if an order for Oxy 5 milligrams was

3    flagged, the folks on the logistics teams

4    wouldn't see the amount ordered for Oxy of 10

5    milligrams if that order was also not

6    flagged; is that correct?

7                MS. FUMERTON:  Objection, form.

8                THE WITNESS:  Correct.

9    Q.    (BY MR. BOWER)  And further, if

10   an order for Oxy 5 milligrams was flagged,

11   the folks on the logistics teams also

12   wouldn't see other orders of Oxy 5s that may

13   be manufactured by other manufacturers unless

14   that item was also flagged.  Isn't that

15   correct?

16               MS. FUMERTON:  Objection, form.

17               THE WITNESS:  Yes.

18   Q.    (BY MR. BOWER)  And that's true

19   because those two items have different NDC

20   numbers; correct?

21   A.    Yes.

22   Q.    And different items numbers

23   within Walmart; correct?

24               MS. FUMERTON:  Objection, form.

25               THE WITNESS:  Yes.

1    Q.    (BY MR. BOWER)  And so when

2  this Archer is rolled out and the folks at

3  the logistics team are receiving orders of

4  interest, how logistically did they receive

5  them?  Is it an email?  Is it a phone call?

6  How are they receiving orders of interest?

7              MS. FUMERTON:  Objection, form.

8              THE WITNESS:  So Reddwerks is a

9        system platform that they would log

10       into.  And there was a queue that they

11       would work from.

12   Q.    (BY MR. BOWER)  During this

13  time period when Archer is rolled out, do you

14  know approximately how many orders of

15  interest are being flagged for Schedule II

16  narcotics on a daily basis?

17   A.    I do not.

18   Q.    At any point do you know

19  approximately how many orders are being

20  flagged at Reddwerks for Schedule IIs on a

21  daily basis?

22   A.    I do not.

23              MS. FUMERTON:  Zach, it's noon.

24       So I don't know when a good time would

25       be for lunch or if the witness or the

Highly Confidential - Subject to Further Confidentiality Review

1          court reporter are okay to keep going.

2          Or if it's a good time to take a

3          break.

4                  MR. BOWER:  How long have we

5          been on?

6                  MS. FUMERTON:  A little bit

7          over an hour.

8                  THE VIDEOGRAPHER:  35 minutes

9          since we took that little quick break.

10                 MR. BOWER:  We can take a break

11         now.  Do you want to take a break for

12         lunch?

13                 THE WITNESS:  Sure.

14                 MR. BOWER:  Let's do that.

15                 THE VIDEOGRAPHER:  It's 12:01.

16         We are off the video record.

17                 (Recess taken, 12:01 p.m. to

18         12:34 p.m.)

19                 THE VIDEOGRAPHER:  12:34.  We

20         are on the video record.

21         Q.    (BY MR. BOWER)  Okay.  We're

22    back on the record after lunch.  You

23    understand you're still under oath?

24         A.    Yes.

25         Q.    A couple of times today we've

1    referred to "Reddwerks enhancements."

2              Do you recall that term?

3         A.    Yes.

4         Q.    Okay.  What does that mean to

5    you?

6         A.    The Reddwerks system was

7    changed and updated.

8         Q.    And how was it changed?

9         A.    The individual calculated

10   thresholds were included.

11        Q.    Can you explain what you mean

12   by "individual calculated thresholds"?

13        A.    So that the thresholds were

14   calculated for an individual store and item

15   combination.

16        Q.    What was your involvement in

17   the enhancements to Reddwerks, if any?

18              MS. FUMERTON:  Objection, form.

19              THE WITNESS:  The actual

20        enhancements to Reddwerks, nothing.

21        Q.    (BY MR. BOWER)  Did you do any

22   type of analysis prior to the Reddwerks

23   enhancements that related to those

24   enhancements?

25              MS. FUMERTON:  Objection, form.

```
 1              THE WITNESS:  Analysis of
 2         which -- of what data?  Reddwerks
 3         data?
 4         Q.    (BY MR. BOWER)  Of any data
 5    related to the enhancements.
 6              MS. FUMERTON:  Objection, form.
 7              THE WITNESS:  So I pulled data
 8         and calculated the thresholds using
 9         shipment data, that were then input
10         into the Reddwerks platform.
11         Q.    (BY MR. BOWER)  Did you do any
12    analysis in connection with -- I'm going to
13    strike that.
14              And what specifically did you
15    do with respect to calculating the thresholds
16    using shipment data?
17              How did you do that?
18              MS. FUMERTON:  Objection, form.
19              THE WITNESS:  So I pulled the
20         data out of Teradata, the shipment
21         data.  Input that into an Access
22         database.  The Access database was set
23         up to calculate the average and
24         standard deviations for those stores
25         and items.
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    And then that was exported out
 2          of Access into Alteryx and then
 3          manipulated manually to get to the
 4          ultimate thresholds.
 5                    MS. FUMERTON:  You just said
 6          "Alteryx."
 7                    THE WITNESS:  Did I say
 8          Alteryx?
 9                    MS. FUMERTON:  Yes.  I just
10          want to make sure the record --
11                    THE WITNESS:  Sorry, not
12          Alteryx.  Access.
13                    MR. BOWER:  No, your testimony
14          as you exported out of Access and into
15          Alteryx.
16                    THE WITNESS:  Oh, sorry, not
17          Alteryx.  Reddwerks.
18          Q.    (BY MR. BOWER)  Okay.  And then
19     you manipulated the data manually in
20     Reddwerks?
21          A.    No.  The --
22          Q.    So let's just read back your
23     testimony and then you can clarify it.  Okay?
24                    Your testimony is then that --
25     "The Access database was set up to calculate

1  the standard deviations for those stores and

2  items.  And then that was exported out of

3  Access into Alteryx and then manipulated

4  manually to get to the ultimate thresholds."

5       A.    Okay.  It was exported out of

6  Access into Excel, and then the thresholds

7  were updated manually to add them in in max

8  and to accommodate the odd sizes, so the

9  500-count bottles, liquids, things like that.

10  And then the Excel spreadsheet was imported

11  into Reddwerks.

12       Q.    So prior to the Reddwerks

13  enhancements, the Reddwerks thresholds were

14  not store-specific; is that correct?

15            MS. FUMERTON:  Objection, form.

16            THE WITNESS:  I don't have a

17       lot of details about what the

18       thresholds were prior to the

19       enhancements that I helped with.

20       Q.    (BY MR. BOWER)  Okay.  Is it a

21  true statement that after the enhancements,

22  the thresholds for a particular item were

23  store-specific?

24       A.    Yes.

25       Q.    What information did Walmart

Highly Confidential - Subject to Further Confidentiality Review

1    use to set the store-specific thresholds?

2              MS. FUMERTON:  Objection, form.

3              MR. BOWER:  I'll strike that.

4         Q.    (BY MR. BOWER) What information

5    are you aware of that Walmart used or

6    considered in setting the store-specific

7    thresholds?

8              MS. FUMERTON:  Objection, form.

9              MR. BOWER:  Sorry, I want a

10         clean record on this.  Let me just ask

11         it both ways.

12        Q.    (BY MR. BOWER)  What

13   information are you aware of that Walmart

14   used to set the store-specific thresholds?

15             MS. FUMERTON:  Objection, form.

16             MR. BOWER:  What's the nature

17        of that objection?

18             MS. FUMERTON:  Again, time

19        period.  And --

20             MR. BOWER:  Okay.  Okay.  I

21        appreciate that.  So let me ask it

22        again and we'll clarify the time

23        period.  Okay?

24        Q.    (BY MR. BOWER)  When the

25   advancements to Reddwerks first rolled out,

1    what information did Walmart use to set the

2    store-specific item thresholds?

3           A.     Previous shipment data.

4           Q.     Was there any other information

5    considered by Walmart in setting the

6    store-specific thresholds when Reddwerks was

7    initially rolled out?

8           A.     I wouldn't have insight into

9    what else was considered.

10          Q.     Are you aware of whether any

11   other information was considered in setting

12   the store-specific thresholds when Reddwerks

13   was -- strike that.

14                 Are you aware of whether any

15   other information was considered in setting

16   the store-specific thresholds when the

17   Reddwerks enhancements were initially rolled

18   out?

19                 MS. FUMERTON:  Objection, form.

20                 THE WITNESS:  I don't know.

21          Q.     (BY MR. BOWER)  Are you aware

22   of any other information that was considered?

23   That's the only thing I'm trying to get at.

24          A.     I don't know.

25          Q.     So the question is not whether

 1    you know or not know, just whether -- are you

 2    aware of any other information that was

 3    considered or are you not aware of any other

 4    information that was considered?

 5              MS. FUMERTON:  Objection, form.

 6         Q.    (BY MR. BOWER)  Let me get at

 7    it a different way.

 8              Is your answer you don't know

 9    whether other information was considered?

10         A.    Yes.

11         Q.    So it may have been considered.

12    You're just not aware of it; is that correct?

13         A.    I don't know.

14         Q.    You don't know whether it was

15    considered or not; is that correct?

16         A.    Yes.

17         Q.    Okay.  Sorry for that.  I just

18    want to make sure the record is clear as to

19    what you do or do not know.

20              And after Reddwerks was

21    initially rolled out, did Walmart consider

22    additional information in setting the

23    store-specific item thresholds?

24         A.    Yes.

25         Q.    What other information did

1    Walmart consider in setting the

2    store-specific item thresholds?

3         A.    Which -- the traited -- what

4    item was traited for that store.

5         Q.    Can you explain what that

6    means?

7         A.    Yes.  Walmart gets -- there are

8    some drugs that Walmart receives more than

9    one manufacturer from.  So there's more than

10   one NDC.  One of those NDCs would be the

11   primary traited item for a specific store

12   based on DC alignment.  So we have five DCs

13   and, for instance, a store in Arkansas would

14   be part of DC 6001.  And that store would

15   receive one of the NDCs as their primary

16   traited item.  So replenishment would -- that

17   item would be the one that replenishment

18   would pick to replenish.  The other item

19   would be a non-traited item.  So it would not

20   automatically be replenished by

21   replenishment.

22        Q.    And that process you described,

23   would that apply to Schedule II products?

24        A.    Yes.

25        Q.    And I should have been more

Highly Confidential - Subject to Further Confidentiality Review

1     specific in my question earlier.  So let me

2     ask -- let me ask it a little bit better than

3     I did before.  Well, strike that.  Let me ask

4     it a different way.

5              Was there any difference in the

6     way Walmart set store-specific item

7     thresholds at any point in time between

8     Schedule II products and any other products?

9              MS. FUMERTON:  Objection, form.

10             THE WITNESS:  No, there was no

11         difference between Schedule II and

12         Schedule III, for instance.  The

13         threshold was set the same for all

14         controlled substances.

15        Q.    (BY MR. BOWER)  Well, after the

16     Reddwerks enhancements, did Walmart have

17     thresholds for non-controlled substances?

18        A.    Yes.

19        Q.    Okay.  Were those thresholds

20     calculated differently than thresholds for

21     controlled substances?

22        A.    Yes.

23        Q.    And what was the difference?

24        A.    I'm not sure what -- I did not

25     recall what the thresholds for the

1    non-controls were at that time, or ever,

2    really.  That wasn't part of my position.  I

3    worked with the controlled substances, but

4    the non-controls were a part of that same

5    file that was imported.

6         Q.    So what's the basis for your

7    statement that the threshold calculations for

8    store-specific items for non-controls was

9    different than the calculations that was done

10   for controls?

11        A.    The non-controls were not ran

12   through the database and calculated through

13   the process that I had set up.

14        Q.    Can you just describe, then,

15   that process?  What do you mean by that?

16   What process did you set up?

17             MS. FUMERTON:  Objection, form.

18             MR. BOWER:  I'll strike that.

19        Q.    (BY MR. BOWER)  Your answer to

20   my last question was "The non-controls were

21   not ran through the database and calculated

22   through the process that I had set up."

23             What process had you set up?

24        A.    The process of creating

25   thresholds.  So importing the data into

1    Access, calculating the standard deviation

2    and adding it back and then exporting it.

3    Because we had five different DCs, I built it

4    once, and all that had to be done was change

5    the data and then the rest of it, there were

6    queries that did the rest of it.  It didn't

7    have to be created every time that a

8    threshold was updated or created.

9        Q.    And specifically with respect

10   to Schedule IIs, how often would the

11   thresholds be updated after the initial

12   Reddwerks enhancements?

13       A.    On an ad hoc basis, as needed.

14       Q.    And who -- strike that.

15             Do you know who determined

16   whether an update was needed?

17       A.    It would depend on the

18   situation.  When -- it could be the result of

19   a review, so a store had alerted multiple

20   times, and it was made apparent that it was a

21   new store when it was created, and so the

22   threshold was no longer applicable.  Or it

23   could be that something changed bottle sizes

24   from a 500-count bottle to a 100-count

25   bottle.  And so we'd have to recalculate in

Highly Confidential - Subject to Further Confidentiality Review

1    that instance.

2         Q.    And who would be the one to

3    like actually do the updated thresholds in

4    Reddwerks?  Would that be you?

5               MS. FUMERTON:  Objection, form.

6               THE WITNESS:  So I would be the

7         one to import the new file.

8         Q.    (BY MR. BOWER)  Right.  Thank

9    you for that proper language.  I wasn't sure

10   how to ask that question.

11              So other than yourself, did

12   anyone else have the capability to import a

13   new file into Reddwerks that would update

14   thresholds for Schedule II narcotics?

15        A.    So there wasn't a different

16   process for Schedule II compared to others.

17   Miranda was the other person that would

18   import as needed.

19        Q.    Did Miranda import updated

20   thresholds after the Reddwerks enhancements?

21        A.    Only if I wasn't available.

22        Q.    Can you just walk us through

23   what that process is like?  How do you

24   actually update a threshold?

25              And maybe -- I have a

```
 1   document -- maybe it helps if I give you a

 2   document, so ...

 3        A.    Is there a question how you

 4   update the threshold in Reddwerks or how the

 5   spreadsheet is updated?

 6        Q.    Well, both.  I wanted to walk

 7   through the whole process.

 8        A.    Okay.

 9             MS. FUMERTON:  He's going to

10        show you a document.

11             MR. BOWER:  Yeah.  Let me just

12        show you -- if I could find it.

13             So this may be it.

14             Sorry, just give me a sec.  I'm

15        going to combine these and then I'll

16        give it to you.

17             (Discussion off the record.)

18             (Walmart-Reed Deposition

19        Exhibit 8, was marked for

20        identification.)

21             MS. FUMERTON:  And just so I

22        know, I see you're changing things.

23        Was it just an error in how they're

24        compiled?

25             MR. BOWER:  No, I had the
```

1          metadata also included, but I don't

2          want to include that in the exhibit.

3                    MS. FUMERTON:  Okay.

4                    MR. BOWER:  I had it in mine,

5          and then I think I just included it in

6          them.

7                    MS. FUMERTON:  That's fine.

8                    MR. BOWER:  Yeah.

9          Q.    (BY MR. BOWER)  Okay.  You've

10   been handed what's been marked as Exhibit 8,

11   which is at least I think part of what we're

12   talking about.  But that's going to be my

13   first question.

14                   And it's an email from yourself

15   to Miranda, dated 12-4-2014. (sic)  and the

16   attachment is included, and it's an Excel

17   spreadsheet and appears to be titled

18   "Step_2_thresholds_Calc."  So just take a

19   minute to review that and then we can talk

20   about it.

21                   For the record, the Bates

22   number is Walmart document ending in 29318

23   and it includes the attachment which is

24   29319.

25                   And this is in Excel, so I just

Highly Confidential - Subject to Further Confidentiality Review

1    included the first page so we can talk about

2    the columns.  Okay?

3              MS. FUMERTON:  Oh, okay.  So

4         this is not the entire export.  It's

5         just a --

6              MR. BOWER:  I don't believe so.

7         But it may -- it may be.

8              MS. FUMERTON:  Okay.

9              MR. BOWER:  I don't want to

10        represent, though, that it is,

11        without knowing.

12             MS. FUMERTON:  That's fine.

13             I am told it's likely not.

14             MR. BOWER:  I didn't think it

15        was.

16             THE WITNESS:  I would say no.

17        Q.    (BY MR. BOWER)  All right.  So

18   I've asked you a few questions about the

19   steps for changing the thresholds.  This

20   document that I've given you as Exhibit 8,

21   though, is dated 12-4-2014.  So this is

22   before the Reddwerks enhancements; correct?

23             MS. FUMERTON:  Objection, form.

24             THE WITNESS:  This is when they

25        were working to get the thresholds all

1          set up to put in Reddwerks for the

2          enhancement.

3          Q.     (BY MR. BOWER)  So this

4    document was created as part of that work?

5          A.     Yes.

6          Q.     So would this document reflect

7    at least part of the process in creating the

8    store and item-specific thresholds in

9    connection with the Reddwerks enhancements?

10         A.     Yes.

11         Q.     And can you just -- so this

12   document is titled "Step_2 threshold_CALC."

13                Do you see that?

14         A.     Yes.

15         Q.     Do you know what that refers

16   to?

17         A.     Yes.

18         Q.     Okay.  What does that refer to?

19         A.     So within the Access database,

20   there were two separate queries that did the

21   math.  The first one calculated the average,

22   and then the second one, which is this one,

23   did the standard deviations and then

24   converted that down to bottles.

25         Q.     And that was done on a store

Highly Confidential - Subject to Further Confidentiality Review

1    and item-specific level; is that correct?

2         A.    Yes.

3         Q.    So if you turn to the

4    attachment, you'll see the column all the way

5    to the right is titled "Bottle threshold";

6    correct?

7         A.    Yes.

8         Q.    Okay.  And is that what you're

9    referring to when you say, on this one, did

10   the standard deviation and then converted

11   that down to bottles?

12        A.    Yes.

13        Q.    And so how was this information

14   used to calculate the store in item-specific

15   thresholds?

16        A.    So this is the -- this would be

17   the step that would then be manually updated.

18             So this is the export from

19   Access into Excel that would then be updated

20   with the minimum and maximums.

21             So if you change for -- so if

22   you look at line 12, that item is Hydroxy

23   plus C-H-L-E-R-S-U-S, 4 ounces.

24        Q.    Yep.

25        A.    That is a liquid.

1      Q.      Okay.

2      A.      And so that would be treated

3  differently than a bottle of 100.

4              It wouldn't be a 50 maximum and

5  a 20 minimum.

6      Q.      Okay.  Were those maximum and

7  minimums that you just referenced still

8  applied after the Reddwerks enhancements?

9              MS. FUMERTON:  Objection, form.

10             THE WITNESS:  So with the

11             thresholds, there was still a maximum

12             threshold and a minimum.  So all of

13             the thresholds fell between 20 and 50

14             when everything was first set up.

15     Q.      (BY MR. BOWER)  And when you

16  say "when everything was first set up," are

17  you referring to when everything was first

18  set up after the Reddwerks enhancements

19  occurred?

20     A.      Yes.  With the -- with the

21  Reddwerks enhancements.

22     Q.      Okay.  At some point did

23  those -- strike that.

24             At some point did Walmart

25  decide to stop using those 20 and 50

Highly Confidential - Subject to Further Confidentiality Review

1  maximum/minimums?

2      A.    The 20 minimum was in effect

3  the entire time that Reddwerks was used.

4            The 50 maximum, there were

5  instances where that was raised.

6      Q.    Okay.  So based on your

7  experience, let's talk about the minimum for

8  a moment.

9            During the time that Reddwerks

10  was used, any order that was below 20 bottles

11  would not be flagged as an order of interest;

12  is that correct?

13            MS. FUMERTON:  Objection, form.

14            THE WITNESS:  No, that is not

15      correct.

16      Q.    (BY MR. BOWER)  Okay.  Can you

17  please tell us what's incorrect about my

18  statement?

19      A.    So what makes things a little

20  different is there's non-traited and traited

21  items.  So with non-traited items, the

22  threshold was lower.  The threshold was only

23  ten bottles for a non-traited item for that

24  store.

25            And then for large bottle

Highly Confidential - Subject to Further Confidentiality Review

1    counts, the threshold would have -- the

2    minimum threshold would have been four

3    bottles, say, for a 500-count bottle.  So ...

4         Q.    Thank you for that

5    clarification.

6               And is there a way to determine

7    in Reddwerks whether an item number is

8    traited or non-traited?

9         A.    Not in Reddwerks.

10        Q.    So, in other words, when

11   someone gets an alert from Reddwerks that an

12   item has been flagged as an order of

13   interest, how does that person know whether

14   the item is a traited item or a non-traited

15   item?

16             MS. FUMERTON:  Objection, form.

17             THE WITNESS:  So the quick way

18        to know, once we made the upgrade, to

19        making sure that non-traited items

20        were taken into account separately

21        would have been the threshold itself.

22        So a threshold of ten, unless it's a

23        larger count bottle, would have been

24        an indication that it was a

25        non-traited item.  The logistics team

1      that was working on SOM were also from

2      the DCs, and they were more familiar

3      with what -- what was traited and what

4      wasn't.  And there's a system that

5      they can log in to to actually see

6      what item -- if it's a traited item

7      for that store or not.

8          Q.    (BY MR. BOWER)  Okay.  And

9  we've been talking, you and I both, about

10  these traited items.  Are you -- the word

11  you're using, is it traded or T-R-A-I-T-E-D,

12  traited?

13          A.    Traited.

14          Q.    Thank you.

15          And then we asked some

16  questions about the 20 minimum.  Now I'm

17  going to ask some questions about the

18  maximum.  Okay?

19          You testified that the

20  50 maximum, there were instances where that

21  was raised.  What are circumstances under

22  which the 50 maximum would be raised?

23          A.    If we had a high-volume store

24  that was alerting but there were no red flags

25  and nothing of concern, then there were times

1    that we increased that threshold.

2         Q.     And in connection with

3    increasing that threshold, you would review

4    dispensing patterns; isn't that correct?

5         A.     Yes.

6         Q.     What specifically would you

7    look for in dispensing patterns?

8         A.     So we would look to be sure

9    that there wasn't an increase of that drug

10   without a corresponding, like, overall

11   business increase.  So if that drug was

12   increasing but business was staying steady,

13   that would be more of a red flag.

14        Q.     And what do you mean by

15   "business" in that answer?

16        A.     Overall dispensing.  Not just

17   controlled substances, and/or the drug in

18   question.

19        Q.     And where would you look to get

20   that dispensing information?

21             MS. FUMERTON:  Objection, form.

22             MR. BOWER:  Strike that.

23        Q.     (BY MR. BOWER)  In determining

24   whether to increase threshold for an item for

25   a specific pharmacy, what source would you

1    look to to determine whether dispensing

2    information would allow for that increase?

3                MS. FUMERTON:  Objection, form.

4                THE WITNESS:  Teradata was the

5           source of information for any

6           dispensing-related data.

7           Q.    (BY MR. BOWER)  Are you

8    familiar with the database Retailing?

9           A.    Yes.

10          Q.    Did you ever have occasion to

11   use that database?

12                MS. FUMERTON:  Objection, form.

13                THE WITNESS:  I used the

14          database early on in my career in the

15          systems role, but I typically use

16          Teradata.

17          Q.    (BY MR. BOWER)  Before I go to

18   this next document, why don't we finish up on

19   the document I already gave you.

20                So if you'd turn back to this

21   document, you mentioned that a -- in response

22   to my question on step 2, you spoke about

23   step 1.  Are there any other steps that were

24   involved in calculating the thresholds in

25   connection with the Reddwerks enhancement?

1          MS. FUMERTON:  Objection, form.

2          THE WITNESS:  The other step

3     would be manually updating this to --

4     the bottle threshold listed here to

5     reflect the minimum and the maximums.

6     Q.     (BY MR. BOWER)  And that's that

7  Excel step that you also mentioned?

8     A.     Yes.

9     Q.     Other than that, anything else

10  that you would do?

11     A.     Not that I can recall.

12     Q.     And this process, this two-step

13  calculations and then the Excel, did that

14  process change at any point after Reddwerks

15  enhancements rolled out at 6045 in connection

16  with threshold updates?

17          MS. FUMERTON:  Objection, form.

18          THE WITNESS:  We used the same

19     process until we no longer used

20     Reddwerks.

21     Q.     (BY MR. BOWER)  And I asked you

22  before whether you ever considered additional

23  information, and you mentioned that you at

24  some point began considering -- considered

25  the traited information for that store.

1    Other than that, did you consider any other

2    additional information in that

3    threshold-setting process?

4                    MS. FUMERTON:  Objection, form.

5                    THE WITNESS:  I don't know of

6            any other information that was

7            considered.

8                    MR. BOWER:  Okay.

9                    (Walmart-Reed Deposition

10           Exhibit 9, was marked for

11           identification.)

12           Q.    (BY MR. BOWER)  You've been

13    handed what's been marked as Exhibit 9.

14                    Please take a moment and review

15    that.  It's an email from you to a bunch of

16    folks, attaching the H and W compliance

17    scorecard for November of fiscal year '15.

18    The Bates number is 27994 through 27999.  And

19    just let me know when you've had a chance to

20    review that, okay?

21           A.    Okay.

22                    [Document review.]

23                    THE WITNESS:  Okay.

24           Q.    (BY MR. BOWER)  Now, this is

25    the email from yourself to Phyllis Harris;

```
 1      correct?

 2           A.      Yes.

 3           Q.      And who is Ms. Harris?

 4           A.      She was the VP of corporate

 5      compliance.

 6           Q.      And why are you sending this to

 7      her?

 8           A.      We sent the compliance

 9      scorecard to her every month.

10           Q.      And for how long did you send

11      it to her every month?

12           A.      I don't remember when it

13      started.  I think sometime in 2013.  And it's

14      still being done now, to the current VP.

15           Q.      And who is that?

16           A.      Cindy Moehring.

17      M-O-E-H-R-I-N-G.

18           Q.      Are you still sending those?

19           A.      I do not know.

20           Q.      Who sends those today?

21           A.      She's going to love this one.

22      Sreevid Hydaeaswaran, S-R-E-E-V-I-D

23      H-Y-D-A-E-A-S-W-A-R-A-N, I think.  Close

24      enough.

25           Q.      Thank you.
```

Highly Confidential - Subject to Further Confidentiality Review

1             When did you stop sending these

2     to Phyllis?

3             MS. FUMERTON:  Objection, form.

4             THE WITNESS:  I moved to

5         Miranda's position in July of 2015.

6         So I would have stopped either that

7         month or shortly thereafter.  There

8         was some time where I was helping

9         Casey until he replaced me.

10        Q.    (BY MR. BOWER)  So after you

11    moved to work with Miranda, Casey replaced

12    you and would have been sending these; is

13    that correct?

14        A.    Yes.

15        Q.    So let's just look at the cover

16    email for a moment.

17            And then, so my first question

18    is, do you see the cc here?  Is there a

19    reason, or are you familiar with the way

20    those email addresses are -- appear on here?

21        A.    I have no idea why they would

22    appear like that.

23        Q.    Okay.  Do you know who else in

24    addition to Ms. Harris would have received

25    these scorecards?

1    A.    So based on what looks to be

2    the user ID, the first one is likely

3    Jim Langman, who's no longer with the

4    company, but he was our VP of health and

5    wellness compliance.  Tariq Abdullah was in

6    billing compliance.  T.O. Koch is Tim Koch.

7    JM Som is Jennifer Sommer.  Shelly Tustiton,

8    Diane Kazimi, Beau Sylvester, Rebeka Burgess.

9    Will Center.  The only reason I know these

10   user IDs is I need them sometimes in Archer.

11             Caroline Riogi.

12             Those are the ones I recognize

13   by going through here.

14        Q.    And why would you need their

15   IDs in Archer?

16        A.    So the back end of Archer uses

17   user ID for -- to -- I use user ID to check

18   Access.  Because I'm an admin, I would use it

19   in that way.

20        Q.    So you would go in Archer and

21   look whether someone had access to the

22   database?

23        A.    Yes.

24        Q.    And so in your email attaching

25   the scorecard, you write, "Also attached is a

Highly Confidential - Subject to Further Confidentiality Review

1    web link to the Tableau version of the

2    scorecard, which provides interactive and

3    detailed views for each program area."

4               Do you see that?

5         A.    Yes.

6         Q.    What does that mean?

7         A.    So for this scorecard, there

8    wasn't any interlinking of reports.  Like I

9    mentioned earlier, the Tableau can -- if you

10   click on one, it goes to another report.

11   That wasn't built into this scorecard at this

12   time.  I don't know what it does now, but at

13   the time that I was creating them, it wasn't

14   dynamic.

15               You could jump to a section, so

16   there was like a menu.  And if you wanted --

17   and if you'd look in the report, there's like

18   the billing compliance section.  The HIPAA

19   section.  If you wanted to jump to the

20   practice compliance section, instead of

21   scrolling all the way through the Tableau

22   dashboard, you could hit practice compliance

23   and it would jump to that portion of the

24   Tableau.

25               So that was the interactive

Highly Confidential - Subject to Further Confidentiality Review

1    piece.  You could just click and go where you

2    wanted to go instead of scrolling.

3          Q.    So if I were to -- if you look

4    again at where you're looking at which is

5    starting on 27997; right?  If I were to go

6    into this same information on Tableau, would

7    I see anything different?

8          A.    No.

9          Q.    Could I scroll over these

10   things and have additional information pop

11   up?

12         A.    Not that I know.  It would just

13   tell you the number.  Like if it was one that

14   had a line, which I don't think any of these

15   do.

16               No, they're all bar graphs.  It

17   would -- if you scroll over it, it would just

18   say like 168.  But all the ones we have would

19   be labeled in that way as well.

20         Q.    Why are you providing -- why

21   not just provide this document?  Why are you

22   providing a link to the Tableau?

23         A.    To allow for people to jump to

24   the section that they want to go to.

25         Q.    Well, this document appears to

1    be three pages; right?

2        A.    Yes.

3        Q.    So are you telling me that

4    this -- if I were to receive this document

5    and click on the link -- receive your email,

6    click on the link, this is the exact same

7    thing I would see in Tableau?

8        A.    Yes.

9        Q.    So what's the reason for using

10   Tableau?

11       A.    Because it makes it look pretty

12   like this.  It's visually appealing.  This

13   would be hard to get at if you used Excel.

14   Like, this format would be hard to achieve in

15   another program, like, to get, you know, each

16   graph like they are with the headers and

17   things like that.  It would be much more

18   cumbersome to do in Excel than it is to do in

19   Tableau.

20            So visually it's more appealing

21   in Tableau.

22       Q.    And how do you get from Excel

23   to this up in Tableau?

24            MS. FUMERTON:  Objection, form.

25            THE WITNESS:  How was Tableau

1          created?

2          Q.     (BY MR. BOWER)  Yeah, how was

3     this document that you attached to your email

4     created?

5                 MS. FUMERTON:  Objection, form.

6                 THE WITNESS:  So Tableau links

7          to data sources, and in this case

8          there's multiple data sources, some of

9          which are -- the majority of this is

10         an Excel document.

11              For this, there was a SAS.  Are

12         you familiar with what SAS is?

13         Q.     (BY MR. BOWER)  Why don't you

14    just explain it for the record.

15         A.     SAS is another analytical tool.

16    It uses a language -- I don't know what

17    language it is.

18              So it's an analytical tool that

19    you program it to do things.  And so Mu Sigma

20    helped develop this SAS code that would like

21    say -- for example, with the billing data, it

22    would pull data out of Teradata, and then

23    analyze that data, look for outliers, things

24    like that, and then create a spreadsheet that

25    would then be used to create this portion of

Highly Confidential - Subject to Further Confidentiality Review

1      the Tableau worksheet.

2           Q.     What data sources does this

3      Tableau worksheet pull from?

4                  MS. FUMERTON:  Objection, form.

5                  THE WITNESS:  So there's --

6           there's multiple data sources

7           depending on -- on which section.

8           Q.     (BY MR. BOWER)  Okay.  So let's

9      just focus on maybe a more relevant section

10     than the first page.  Let's turn to the

11     second page and do -- look at "Practice

12     compliance controlled substances"?

13          A.     Okay.

14          Q.     Do you see that?

15                 Where does this information

16     come from?  For example, let's start with

17     number of investigation cases.

18          A.     That information is in Archer.

19          Q.     Okay.  So Tableau pulls

20     information from Archer; is that correct?

21                 MS. FUMERTON:  Objection, form.

22                 MR. BOWER:  I'll strike that,

23          then.

24          Q.     (BY MR. BOWER)  How did Archer

25     information come to appear in this document?

1    A.    The report is pulled out of

2  Archer.  So the report is ran, exported into

3  Excel.  SAS takes that Excel report that came

4  from Archer, runs it through the code that's

5  looking for errors, making sure that all the

6  fields that are needed for this are filled

7  out.  If it's not, it kicks back an error

8  report for the analyst that's working it to

9  make sure that the data is correct and

10  accurate.

11          Once the data clears all the

12  error checks, another spreadsheet is created.

13  That is then used for Tableau.

14    Q.    Is all -- that process you just

15  described, is that done manually on a monthly

16  basis?

17          MS. FUMERTON:  Objection, form.

18          THE WITNESS:  The reports are

19      pulled out of Archer manually on a

20      monthly basis.  The code in SAS is all

21      automated.

22    Q.    (BY MR. BOWER)  Is there any

23  automated workflow that's connected to the

24  creation of this Tableau document?

25          MS. FUMERTON:  Objection, form.

```
 1              THE WITNESS:  So the way
 2       Tableau is set up, you have
 3       essentially a template that's
 4       connected to data sources.  And so all
 5       of this -- all the headers and all the
 6       pretty graphs are set up.  And then
 7       the analyst goes in and updates the
 8       references to the updated data sets.
 9              So instead of pointing at
10       October's data, it's now going to
11       point at November's data.
12       Q.    (BY MR. BOWER)  And the analyst
13  does that manually?
14       A.    At the time I did it, it was
15  manually.  I went in and changed the data
16  sources to the updated data.  I don't know if
17  they've changed that as -- you know, new
18  coding and new updates have been made as
19  Tableau has changed.  I'm not sure.
20       Q.    So let's go -- we talked about
21  investigation cases.  What about this more
22  specific information, like loss in transit or
23  employee pilferage.  Do you see that?
24       A.    Yes.
25       Q.    Is that information also pulled
```

Highly Confidential - Subject to Further Confidentiality Review

1    from Archer?

2         A.    Yes.

3         Q.    Okay.

4         A.    It would be the same report.

5         Q.    Okay.  And what about -- going

6    all the way over to the right, the percent of

7    split of sources investigation information.

8    Is that also pulled from Archer?

9         A.    Yes.  In the same report.

10        Q.    Do you know what the Archer

11   cleanup refers to, kind of in the box?  Under

12   it says, "Open cases, closed cases and DEA

13   106."

14              Do you see that?

15              And then that next box has -- a

16   couple sentences in, it says, "The number of

17   DEA 106s files are increased TY" -- which I

18   assume means this year -- "versus LY" --

19   which was last year -- "due to Archer

20   cleanup."

21              Do you know what that refers

22   to?

23        A.    So if I remember correctly, it

24   was incidents were -- or investigations and

25   then determined that they're using it -- were

Highly Confidential - Subject to Further Confidentiality Review

1 worked and everything was done, but the

2 record was left open instead of finishing out

3 the step to close out the record in Archer.

4     Q.    A few sentences further, it

5 refers to the team, and it says, "The team is

6 also undertaking initiatives to decrease the

7 amount of losses occurring at the store level

8 (e.g., increased diversion controls)."

9         Do you see that?

10     A.    Yes.

11     Q.    Do you know what that refers

12 to?

13     A.    I do not.

14     Q.    Do you know what team it refers

15 to?

16     A.    That would be practice

17 compliance, and with diversion controls, I --

18 and partnership with the global

19 investigations.

20     Q.    If you could go back down to

21 the bottom of the document for a moment.

22         It says "Practice

23 compliance-board orders."

24         Do you see that?

25     A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Do you know what a "board

2  order" refers to?

3      A.     It is an order from a pharmacy

4  board.

5      Q.     What does that mean?

6      A.     My understanding, which I don't

7  deal with pharmacy boards, it's some

8  communication that's been had with a pharmacy

9  board, and some action has to take place

10  because of that.

11           And based on this, it looks

12  like there's, you know, multiple different

13  reasons that we could receive a board order.

14      Q.     Well, what did -- do you know

15  what, for example, "controlled substance

16  loss" refers to?

17      A.     Controlled substance loss is

18  anytime that there's a loss of controlled

19  substances.  So the controlled substance on

20  hand is different than once they actually

21  count the pills.

22      Q.     And then what does the next one

23  over, "diversion," refer to?

24      A.     So in this case, I would be

25  assuming it was Walmart diversion, which

1    would be a loss of a controlled substance by

2    an employee.

3          Q.     And where is this pulling

4    information from?

5          A.     Archer.

6          Q.     How does diversion occurrences

7    get populated into Archer?

8          A.     So in this instance, this is

9    talking about the board action that resulted

10   from diversion.  So that would be an analyst

11   on a practice compliance team would have

12   entered that into Archer.

13         Q.     What do you mean by "board

14   action that occurred from diversion"?

15         A.     The reason for the board order

16   in this instance is diversion.  So something

17   happened with diversion that led to a board

18   order.

19         Q.     Would Archer have additional

20   information on those orders, for example,

21   where they occurred?

22         A.     Yes.  It would have the store

23   or the state that it occurred in.

24                (Walmart-Reed Deposition

25         Exhibit 10, was marked for

1      identification.)

2      Q.      (BY MR. BOWER)  You've been

3  handed what's been marked as Exhibit 10 to

4  today's deposition.  It's just a one-page

5  document numbering 9035.  It's a Walmart

6  document.

7            Just let me know when you have

8  a chance -- have had a chance to review it.

9  My first question is going to be whether this

10 refers to the Reddwerks enhancements.  Okay?

11     A.      Yes.

12     Q.      You've reviewed --

13     A.      Sorry.

14            MS. FUMERTON:  Have you read

15     the document?

16            THE WITNESS:  Yes.  Yes.

17            MS. FUMERTON:  And you're

18     answering his question?

19            I'll let you clean it up.

20     Q.      (BY MR. BOWER)  Have you had a

21 chance to review the document?

22     A.      Yes.

23     Q.      And does that conversation

24 refer to the Reddwerks enhancements at 6045?

25     A.      Yes.

1    Q.    Okay.  Just generally speaking,

2    in what format are these communications

3    taking place?

4    A.    This would be -- it would be an

5    instant message, in, I'm assuming, Jabber?

6    Q.    Okay.  What is Jabber?

7    A.    It's a program that's used by

8    Walmart for instant messaging.

9    Q.    And under what circumstances

10   would you use Jabber?

11   A.    I use Jabber on a daily basis

12   to quickly communicate something.  If

13   somebody's in a meeting and you can't call

14   them, you could quickly send them a Jabber,

15   and so they could kind of answer, multitask a

16   little bit more.

17   Q.    And do you have a Jabber

18   application on your phone?

19   A.    I do.

20   Q.    Okay.  Do you know whether that

21   application preserves Jabber communications?

22   A.    As far as I know, yes.

23   Q.    Do you know for how long it

24   preserves those communications?

25   A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What's the basis for your

2    statement that the communications are

3    preserved?

4    A.    I've seen them on my computer.

5    Q.    Okay.

6    A.    And you can search for them on

7    your computer.  Like, if you search for a

8    title, Jabber communications come up.

9    Q.    And you would expect, since you

10   use it on a daily basis, to have hundreds of

11   communications come up for you; correct?

12         MS. FUMERTON:  Objection, form.

13         MR. BOWER:  Strike that.

14   Q.    (BY MR. BOWER)  How long have

15   you been using Jabber on a daily basis?

16   A.    I'm not sure.  I don't know how

17   long we've had Jabber.

18   Q.    Certainly you've had it

19   since --

20   A.    Since 2015 at least, yes.

21   Q.    Did you, in addition to Jabber,

22   use any other type of instant messaging

23   program at Walmart to communicate?

24   A.    So prior to Jabber, we had a

25   program called Link, I think was the name of

1    it.

2            And then we currently have

3    Zoom.

4        Q.    Okay.  When did Walmart stop

5    using Link?

6        A.    I don't recall.

7        Q.    Do you remember approximately?

8        A.    I have no idea.

9        Q.    Do you recall using Link

10   yourself?

11       A.    Yes.

12       Q.    Do you recall, if you refer

13   back to maybe Exhibit 1, what positions you

14   would have been in when you were using Link?

15            If that's not helpful, then

16   it's not helpful.

17       A.    Yeah.  I mean, it's not super

18   helpful.

19       Q.    Okay.

20       A.    I don't know.  We change, you

21   know, and get new systems and evolve, and I

22   don't necessarily keep track of when we

23   started using something new.

24       Q.    What's the basis for your

25   statement that you recall using Jabber on a

 1    daily basis?

 2                MS. FUMERTON:  Objection, form.

 3                THE WITNESS:  I work remote,

 4         and so I don't have the ability to

 5         just, you know, walk down the aisle

 6         and talk to somebody.  And so Jabber

 7         is a primary mode of me keeping in

 8         touch with my peers.

 9         Q.    (BY MR. BOWER)  And how long

10    have you used it as the primary mode for

11    keeping in touch with your peers?

12                MS. FUMERTON:  Objection, form.

13         Misstates testimony.

14                MR. BOWER:  Well --

15                THE WITNESS:  I've used it

16         since it rolled out.

17                MR. BOWER:  Okay.

18                THE WITNESS:  And I don't know

19         exactly when that is.

20                MR. BOWER:  Okay.  Thank you.

21         Q.    (BY MR. BOWER)  Did you ever

22    use text message to communicate with your

23    peers at work?

24         A.    Not about work-related things.

25         Q.    Okay.  You would have used

Highly Confidential - Subject to Further Confidentiality Review

1    Jabber for those communications; correct?

2         A.    Yes.

3         Q.    Well, I just want to clean up

4    this record, then, since there was an

5    objection made.

6              Your testimony was, "So Jabber

7    is a primary mode of me keeping in touch with

8    my peers."

9              And I just want to have a clean

10   record with respect to the time period that

11   you're talking about.  What time period would

12   you use Jabber as the primary mode of keeping

13   in touch with your peers at Walmart?

14              MS. FUMERTON:  Objection, form

15         and misstates testimony.

16              You keep switching one word in

17         there.

18              MR. BOWER:  You can answer.

19              THE WITNESS:  So I've used

20         instant message, which is Jabber or

21         Zoom, as a main way to keep in touch

22         with my peers, since we've had instant

23         message, which has been as long as I

24         remember working at -- working here

25         for Walmart.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. BOWER:  Okay.  Thank you.

 2                    (Walmart-Reed Deposition

 3             Exhibit 11, was marked for

 4             identification.)

 5             Q.    (BY MR. BOWER)  You've been

 6     handed what's been marked as Exhibit 11.  An

 7     email from yourself to Miranda Johnson, dated

 8     8-28-2015, and the subject is "Email

 9     notification of SOM eval."  I just had a

10     couple of questions on this document.  So

11     please let me know when you've had a chance

12     to review it.

13                    MR. MILLER:  Is there a Bates

14          on this document?

15                    MR. BOWER:  Oh, the Bates

16          number, sure.

17                    It's 8688 through 8689.

18                    [Document review.]

19                    THE WITNESS:  Okay.

20             Q.    (BY MR. BOWER)  Do you recall

21     this email exchange?

22             A.    Yes.

23             Q.    And what was this regarding?

24             A.    This was the email notification

25     that would go out to the field leadership --
```

Highly Confidential - Subject to Further Confidentiality Review

1   so the market directors -- regarding the fact

2   that we were holding an order and evaluating

3   it.

4        Q.    And when would these emails or

5   notifications go out to the field leadership?

6        A.    It would be if the order was

7   held and reviewed by practice compliance.

8        Q.    So, in other words, if an order

9   is flagged as an order of interest; correct?

10             Strike that.

11             During this time period,

12  August 2015, what is the process or procedure

13  in place after an order is flagged as an

14  order of interest?

15             MS. FUMERTON:  Objection, form.

16             THE WITNESS:  So the --

17             MR. BOWER:  I'll strike that.

18       I'll ask it a different way.

19             THE WITNESS:  Okay.

20       Q.    (BY MR. BOWER)  During this

21  time period in August 2015, what happens to

22  an order that is flagged as an order of

23  interest?

24       A.    The logistics team would

25  review, and they could clear the order at

Highly Confidential - Subject to Further Confidentiality Review

1    their level or they would send the order to

2    practice compliance for review.

3              This email would go out if it

4    was sent to practice compliance for review.

5         Q.    Okay.

6              So the field leadership is only

7    informed of an order of interest if it's not

8    cleared or approved by the logistics team; is

9    that correct?

10        A.    During the Reddwerks period,

11   yes.

12        Q.    Okay.  Was that procedure

13   different at a different point in time?

14        A.    Yes.

15        Q.    And how was it different?

16        A.    During the Buzzeo program,

17   stores were notified immediately that an

18   order was being held and the market

19   leadership had visibility into Archer -- in

20   Archer regarding the orders that were being

21   held.

22        Q.    So it sounds like a couple of

23   changes were made in connection with Buzzeo;

24   is that correct?

25              MS. FUMERTON:  Objection, form.

1          THE WITNESS:  Yes.  Changes

2     were made.

3          Q.    (BY MR. BOWER) In connection

4     with this specific notification; right?

5          A.    Yes.

6          Q.    One of those is that now the

7     field leadership is notified immediately of

8     an order that's flagged as an order of

9     interest; correct?

10          A.    The pharmacy leadership was

11     notified.

12          Q.    And one of the other changes

13     that occurs is that market leadership was

14     also notified.  Correct?

15          A.    They had visibility into

16     Archer.

17              An email wasn't sent to them.

18     They could go into Archer at any one time and

19     see the orders that were pending.

20          Q.    Well, at any point was market

21     leadership affirmatively notified of a pended

22     order?

23              MS. FUMERTON:  Objection, form.

24              MR. BOWER:  I'll strike that.

25          Q.    (BY MR. BOWER)  Did Walmart at

1    any point in time notify market leadership of

2    an order that had been flagged as an order of

3    interest?

4             MS. FUMERTON:  Objection, form.

5             THE WITNESS:  They were

6        notified when practice compliance

7        reviewed an order during the Reddwerks

8        period.

9        Q.    (BY MR. BOWER)  And what about

10   notification for market leadership during the

11   Buzzeo period?

12       A.    During the Buzzeo period, it

13   was a pull instead of a push.  So they would

14   go to look at the data instead of us pushing

15   the data to them.

16       Q.    During the Reddwerks period,

17   did you do -- ever do an analysis as to the

18   percentage of orders of interest that were

19   cleared by the logistics team versus

20   escalated to the home office?

21       A.    There was a weekly report that

22   I would run and provide to Miranda and the

23   logistics leadership about the number of

24   orders that were pended and the number of

25   orders we reviewed, appropriate orders, you

1    know, suspicious orders, those type of

2    metrics.

3         Q.    Did the Reddwerks enhancement

4    change that procedure for reviewing of an

5    order of interest?

6              MS. FUMERTON:  Objection, form.

7              MR. BOWER:  I'll ask it a

8         different way.

9         Q.   (BY MR. BOWER)  Did the

10   Reddwerks enhancement change the process by

11   which an order of interest was reviewed by

12   Walmart?

13        A.    I wasn't involved in the

14   process before, so I can't speak to the

15   differences.

16        Q.    Did you ever do any type of

17   analysis to determine whether the Reddwerks

18   enhancement was an improvement over the

19   period prior to the enhancement?

20             MS. FUMERTON:  Objection, form.

21             THE WITNESS:  I did not.

22        Q.    (BY MR. BOWER)  Do you know

23   whether Walmart ever did such an analysis?

24             MS. FUMERTON:  Objection, form.

25             THE WITNESS:  I'm not sure.

```
1        Q.     (BY MR. BOWER)  Do you know why
2    Walmart enhanced Reddwerks?
3               MS. FUMERTON:  Objection, form.
4               THE WITNESS:  I do not.
5        Q.     (BY MR. BOWER)  Do you know who
6    might know that question?
7               Sorry, do you know -- strike
8    that.
9               Do you know who might know the
10   answer to that question?
11       A.     Logistics and compliance
12   leadership.
13       Q.     Do you have any -- as you sit
14   here today, any understanding as to why
15   enhancements were needed to Reddwerks?
16               MS. FUMERTON:  Objection, form.
17               THE WITNESS:  I don't.
18       Q.     (BY MR. BOWER)  As you sit here
19   today, do you have any understanding as to
20   why enhancements were made to Reddwerks?
21       A.     No.
22       Q.     As you sit here today, do you
23   have any understanding as to why Walmart
24   decided to use Buzzeo?
25               MS. FUMERTON:  Objection, form.
```

1                    THE WITNESS:  I don't know the

2          why.

3          Q.     (BY MR. BOWER)  Do you have any

4    knowledge as to the factors that went into

5    deciding to change from Reddwerks to Buzzeo?

6                    MS. FUMERTON:  Objection, form.

7                    THE WITNESS:  I know that

8          Buzzeo was a -- was a dynamic option.

9          So they looked at rolling numbers and

10         they looked at active ingredients

11         other than item-specific.  But other

12         than that, I wasn't involved in the

13         decision to switch from one to the

14         other.

15         Q.     (BY MR. BOWER)  And who --

16   strike that.

17                  Do you know who was involved in

18   that decision?

19         A.     I don't know of any one person.

20   It was -- there was a council, an advisory

21   council for controlled substances at the

22   time, and I'm sure they were involved.

23         Q.     When did you first become aware

24   that Walmart would be switching to Buzzeo?

25         A.     I knew Buzzeo was an option in

1    the 2014 timeframe, because things like this

2    document say, an example, Buzzeo.  So there

3    was a process of vetting other vendors.  And

4    I don't know when for sure I knew that Buzzeo

5    was the plan.  I know by July of 2015, there

6    was more information about Buzzeo

7    specifically in my training documents, so ...

8              In between that time, I don't

9    know that I knew specifically that the RFP

10   process had been completed.

11        Q.     When you say "I know by

12   July 2015, there was more information about

13   Buzzeo specifically in my training

14   documents," what are you referring to?

15        A.     So I remember when I received

16   my training documents, there was

17   information -- a presentation, I think, about

18   Buzzeo.  Just what they did and what it was

19   and kind of what our plan was with them.

20        Q.     Did Walmart work with any third

21   parties in its decision to hire a third party

22   to assist with its SOM program?

23             MS. FUMERTON:  Objection, form.

24             THE WITNESS:  I have no idea.

25        Q.     (BY MR. BOWER)  Are you

Highly Confidential - Subject to Further Confidentiality Review

1    familiar with a company by the name of

2    Accenture?

3          A.    No.

4          Q.    Let's go back to Exhibit 11 for

5    a moment, before I forget about it.

6                So I do have a couple of

7    questions on kind of the substance of the

8    email.

9                So what is -- what are you

10   writing about in your email to Miranda, when

11   you say "team"?

12         A.    So this was a draft of an

13   email, so this was my first stab at an email

14   that we would use.  So that's like the

15   template.

16               As you can see, it has XXX

17   bottles in store XXX.

18         Q.    So this was a template for an

19   email that would go out to the field

20   leadership when an order was escalated by the

21   logistics team and not cleared; is that

22   correct?

23               MS. FUMERTON:  Objection, form.

24               Misstates testimony.

25               MR. BOWER:  Oh, strike that.

 1          Q.     (BY MR. BOWER)  When would this
 2    notification go out to the --
 3                 MR. BOWER:  Well, I'll -- if it
 4          misstates testimony, then I'll have to
 5          go back.
 6          Q.     (BY MR. BOWER)  To whom was
 7    this notification to be sent?
 8                 MS. FUMERTON:  Objection, form.
 9                 THE WITNESS:  This notification
10          is a draft.  It wasn't what was
11          ultimately sent, but the email, in its
12          final form, would have been sent to
13          the market leadership.
14          Q.     (BY MR. BOWER)  And what about
15    the field leadership?
16                 Would they have received this?
17    The same correspondence?
18          A.     Who are you referring to when
19    you say "field leadership"?
20          Q.     I'm just using your language.
21    That was going to be my follow-up question.
22    You earlier referred to at some point field
23    leadership.  So what does that mean?
24          A.     So market leadership, field
25    leadership.  Same thing.  Sorry, I tend to

Highly Confidential - Subject to Further Confidentiality Review

1    use them interchangeably.  The market leaders

2    are in the field.

3         Q.    And what specific positions are

4    you referring to?

5         A.    The market directors and the

6    regional directors.  There's also a

7    divisional director at a higher level, and I

8    don't recall whether they received this email

9    or not.

10        Q.    And what was the reason for

11   sending it to these folks?

12             MS. FUMERTON:  Objection, form.

13             MR. BOWER:  Go ahead.

14             You can answer it if you

15        understand.  If not, I'm happy to

16        rephrase.

17             THE WITNESS:  So the email was

18        sent at this point because the order

19        was delayed.  So that way they would

20        be aware if their source started

21        calling them to say, "Hey, we haven't

22        gotten an order that we placed."  They

23        would know where that order was.

24        Q.    (BY MR. BOWER)  You're not

25   sending this to the pharmacy, are you?

1       A.      No.

2       Q.      So why are you informing these

3    folks that an order has been delayed?  What's

4    the reason for that?

5               Why not just send to the

6    pharmacy?

7               MS. FUMERTON:  Objection, form.

8               MR. BOWER:  Well, that's a

9         compound question, so let me ask it

10        again.

11       Q.      (BY MR. BOWER) Instead of

12   sending this to the field leadership or

13   others, why not just send it directly to the

14   pharmacies themselves?

15       A.      So my understanding is

16   partially so the market leader is aware that

17   there's an investigation -- or an evaluation

18   happening.

19       Q.      And why would Walmart be

20   interested or want to inform the market

21   leader that an evaluation was happening?

22               MS. FUMERTON:  Objection, form.

23               THE WITNESS:  They're

24        responsible for the stores, and to let

25        them -- the pharmacies, and just to

1          let them know, for one, we could reach

2          out to the market director for

3          additional information.  So it's kind

4          of a heads-up that, "Hey, we might be

5          calling you."

6                And sometimes they would reach

7          out to us directly to give us

8          additional information.  But part of

9          this is we'll be reaching out to the

10         market director for more information.

11         Q.    (BY MR. BOWER)  And what

12    information would you be seeking to get from

13    the market director?

14         A.    So if it was -- if it was

15    needed, it would be verifying what the

16    pharmacist said, making sure that they agree

17    with what the pharmacist said.

18                Finding out if this store

19    differs any from the other stores in their

20    market.  And if there was any special

21    circumstances that they knew of that made

22    this particular store in question different

23    than its peers.

24         Q.    Who would be the person to

25    contact the market director?

1          A.      Most of the time it was me.

2                  Later in the program, I was out

3      for a while and we had a temporary analyst

4      there filling in for me.  And he would do it

5      while I was out.

6                  And then later, we had analysts

7      that would help as well.

8          Q.      And for what time period did

9      you have this responsibility?

10         A.      2015, after I was in role, to

11     2017, when we stopped using Reddwerks.

12         Q.      And approximately how much of

13     your time was spent in contacting market

14     directors?

15         A.      I'm not sure that I could

16     answer that, because we didn't contact market

17     directors for every order that we reviewed.

18     And I would contact market directors for

19     other things outside of SOM, so that's kind

20     of a hard question to answer.

21         Q.      Okay.  And I appreciate that

22     clarification.

23                 So I'm just trying to

24     understand kind of how the process worked.

25                 So under what circumstances

1    would you contact a market director in

2    connection with your SOM applications?

3            A.    If there was any question about

4    the data that just wasn't clear that we

5    thought maybe the market director could have

6    some additional insight into, if there was

7    anything that the pharmacist said to the

8    logistics team that wasn't clear that we

9    wanted clarification from, those type things

10   would involve a market director.

11           Q.    And how would you know, for

12   example, if there was anything that the

13   pharmacist said to the logistics team that

14   wasn't clear?

15           A.    That information was -- their

16   notes were documented in Archer.

17           Q.    So you would review those notes

18   and then determine whether you needed to

19   contact the market director; is that correct?

20           A.    I would review the entire

21   Archer record, their notes, the data that was

22   entered in Archer as far as the order goes.

23   I would pull the data, the dispensing data we

24   talked about earlier, and review all of that

25   and then determine whether I needed to talk

1    to the market director.

2         Q.     And did you have, during this

3    time period, the authority to approve an

4    order that had been flagged as an order of

5    interest for shipment?

6         A.     No.

7         Q.     What would you do with the

8    information that you learned from the market

9    director when you spoke with them?

10        A.     There was a field in Archer to

11   enter in my notes.

12        Q.     And then what would happen with

13   the order after you spoke with the market

14   director?

15        A.     I would document any notes that

16   I needed to in Archer.  There was a field for

17   additional evaluation notes.  And in the

18   beginning of the program, I would let Miranda

19   know that it was ready for her review.  She

20   would ask me of any questions, and then she

21   and Chad Ducote would review the alert.

22        Q.     In the beginning of the

23   program, you know, August-September 2015, do

24   you know approximately how many orders for

25   Schedule II narcotics were being flagged on a

1    daily basis by Reddwerks?

2           A.     I do not.

3           Q.     Did you ever do that analysis?

4                  MS. FUMERTON:  Objection, form.

5           Asked and answered.

6                  THE WITNESS:  I don't know.

7           Q.     (BY MR. BOWER)  Do you recall

8    ever doing that analysis?

9           A.     I don't recall.

10          Q.     I'm just trying to nail down

11   the procedure.

12                 How would you know whether an

13   order was waiting for you to contact the

14   market director before it was escalated to

15   Miranda?

16                 MS. FUMERTON:  Objection, form.

17                 MR. BOWER:  I'll strike that.

18          Q.     (BY MR. BOWER)  How would you

19   know when to contact the market director

20   about an order that was flagged as an order

21   of interest?

22                 MS. FUMERTON:  Objection, form.

23                 THE WITNESS:  So logistics

24          would review an order.  They would

25          market it as send to practice

1          compliance for additional evaluation.

2          Archer sends an email to our team, at

3          the time Miranda and I.  That would be

4          the start of my investigation.

5               I would review everything, pull

6          data, make a determination whether to

7          call a market director, and then

8          prepare, make sure the Archer record

9          was updated with all my information,

10         and then Miranda would review.

11    Q.    (BY MR. BOWER)  So during this

12    initial time period, was there anyone else

13    besides yourself that would review orders

14    that had been escalated by the logistics

15    team?

16              MS. FUMERTON:  Objection, form.

17              MR. BOWER:  I'll strike that.

18    I want to ask a better question.

19    Q.    (BY MR. BOWER)  So during this

20    initial time period when the Reddwerks

21    enhancements had been rolled out and you were

22    now involved in the SOM program, okay?  I'm

23    going to focus you there.

24              During that time period, was

25    there anyone else besides yourself and

1    Miranda that was involved in reviewing an

2    order of interest that had not been cleared

3    by the logistics team?

4              MS. FUMERTON:  Objection, form.

5              THE WITNESS:  No.  The team was

6         just Miranda and I.

7         Q.    (BY MR. BOWER)  So during this

8    time period, every order of interest that was

9    not cleared by the logistics team would have

10   had to have been either cleared or otherwise

11   addressed by either yourself and Miranda; is

12   that correct?

13        A.    So any order that wasn't

14   approved at logistics level would be sent to

15   practice compliance.  I would do the initial

16   evaluation, then Miranda would circle back

17   with logistics and review with him before a

18   decision was made.

19        Q.    And who is the "him" you were

20   referring to?

21        A.    Chad Ducote at the time.

22        Q.    And based on your experience, I

23   mean, how -- how many orders were you

24   receiving during August-September time period

25   on a daily basis?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      I don't remember.

2          Q.      Do you remember approximately

3    how many?

4          A.      I do not.

5          Q.      So your job was to review

6    everything; right?

7                  MS. FUMERTON:  Objection, form.

8          Misstates the testimony.

9                  THE WITNESS:  My job was to

10         review the incidents that had been

11         sent on to practice compliance.

12         Q.      (BY MR. BOWER)  And for those

13   instances, I think your words were I would

14   review all the data -- review everything;

15   right?

16         A.      Review all the data that we

17   talked about earlier.  Those data points that

18   we reviewed, I had a spreadsheet that -- that

19   would be populated.

20         Q.      Okay.  So you're referring now

21   to that prescriber data; correct?

22                 MS. FUMERTON:  Objection, form.

23                 THE WITNESS:  To the

24         prescribing data or dispensing data.

25                 MR. BOWER:  Sorry, dispensing

Highly Confidential - Subject to Further Confidentiality Review

```
 1              data.

 2                   THE WITNESS:  Yes, yes.

 3         Q.    (BY MR. BOWER)  Just so the

 4    record is clear, you're referring now, when

 5    you say in your answer, "Those data points

 6    that we reviewed, I had a spreadsheet that

 7    would be populated," that spreadsheet you're

 8    referring to would have dispensing data;

 9    correct?

10         A.    Yes.

11         Q.    And you would review that in

12    connection with your duties and

13    responsibilities of reviewing orders of

14    interest; correct?

15         A.    Yes.

16         Q.    And would you make a

17    recommendation to Miranda as to what should

18    happen to an order of interest?

19         A.    Early on, no.

20         Q.    How would Miranda know what

21    your review had uncovered?  In connection

22    with an order of interest.

23                   MS. FUMERTON:  Objection, form.

24                   THE WITNESS:  There was a field

25         in Archer for my notes.  There was an
```

Highly Confidential - Subject to Further Confidentiality Review

1        additional evaluation field, and I put

2        any notes that were applicable in that

3        field.

4        Q.    (BY MR. BOWER)  Okay.  And when

5    I asked you, "Would you make a recommendation

6    to Miranda as to what should happen to an

7    order of interest?"  You said, "Early on,

8    no."  At some point did that change?

9        A.    So in 2017, I started

10   presenting the information to Miranda.  And

11   then it was -- Chad had left, and Debbie --

12   she's in logistics.  I cannot think --

13       Q.    Debbie Hodges?

14       A.    Yes.  Was the logistics

15   representative.  And I would present the

16   information to them, and at that time, I

17   would give a recommendation on, "Hey, I think

18   this is suspicious," or this -- "This seems

19   like it's okay."

20       Q.    During this time period -- and

21   let's talk about at least August-September

22   2015, and then you tell me if it changed.

23   But at least in August-September of 2015,

24   what were the options that you and Miranda

25   had for an order of interest that had not

Highly Confidential - Subject to Further Confidentiality Review

1    been cleared by the logistics team?

2                    MS. FUMERTON:  Objection, form.

3                    THE WITNESS:  During the early

4         timeframe, that August-September

5         timeframe, if I recall correctly, our

6         only options were either appropriate

7         or suspicious.

8         Q.    (BY MR. BOWER)  And what would

9    happen if an order was appropriate?

10        A.    The order would be shipped.

11        Q.    And how would you notify the DC

12   that the order was ready to be shipped?

13        A.    We would change the Archer

14   record to the resolution of appropriate

15   order.  That would trigger an email to go

16   back to the logistics team.  They would then

17   go into Reddwerks and clear the order.

18        Q.    And just so we're clear, the

19   logistics team that we've been talking about

20   today, those folks are located at the DCs;

21   right?

22        A.    No.

23        Q.    Okay.  Where are they located?

24        A.    Well, at the time they were

25   located in the home office.  Like, I don't

Highly Confidential - Subject to Further Confidentiality Review

1    know that that team exists today in the form

2    that it was, but at the time, they were in

3    the Walmart home office.

4        Q.    Okay.  Well, let's go back

5    to -- so at that time in 2015, were folks at

6    the DC reviewing orders of interest?

7                MS. FUMERTON:  Objection, form.

8                THE WITNESS:  I'm not sure what

9        level of involvement the folks at the

10       DC had.

11       Q.    (BY MR. BOWER)  And do you know

12   whether they were involved in reviewing an

13   order of interest in late 2015?

14               MS. FUMERTON:  Objection, form.

15               THE WITNESS:  I do not know.

16               MR. BOWER:  And let me ask a

17       complete question, because I think

18       that was a good objection to make.

19       The question was poor.

20       Q.    (BY MR. BOWER)  In late 2015,

21   do you know whether folks at DC 6045 --

22   strike that.

23               In late 2015, do you know

24   whether anyone at DC 6045 was involved in

25   reviewing orders of interest that had been

Highly Confidential - Subject to Further Confidentiality Review

1    flagged in Reddwerks?

2         A.    I don't know.  I'm not familiar

3    enough with the how.  I know how the process

4    works at the home office side.  I'm not sure

5    how it works on the DC side.

6         Q.    Okay.

7              MR. BOWER:  Do you want to take

8         a break now or do you want to --

9              THE WITNESS:  If this is a

10        logical stopping point, that's fine.

11             MR. BOWER:  I think it's a

12        logical -- I'm not sure how long --

13             We can go off.

14             THE VIDEOGRAPHER:  1:57.  We

15        are off the video record.

16             (Recess taken, 1:57 p.m. to

17        2:15 p.m.)

18             THE VIDEOGRAPHER:  2:15.  We

19        are on video record.

20        Q.    (BY MR. BOWER)  All right.

21   We're back on the record.  I'm handing you

22   what's been marked as Exhibit 12.  Just take

23   a moment to review the document.  And I'm

24   just trying to -- as you review it, I'm just

25   trying to understand whether this document

1    would have been the threshold file in

2    connection with the enhanced Reddwerks when

3    it was rolled out in 2015.

4              (Walmart-Reed Deposition

5         Exhibit 12, was marked for

6         identification.)

7              MS. FUMERTON:  And just for the

8         record, again, this is an excerpt to

9         the larger file.

10             MR. BOWER:  Yes.  I believe

11        this one was very large, so ...

12             MR. MILLER:  Is there a Bates

13        number for this document?

14             MR. BOWER:  Yep.  It's 53351,

15        and then the attachment is 53352.

16             THE WITNESS:  Okay.

17        Q.    (BY MR. BOWER)  Okay.  Do you

18   know whether this is the initial threshold

19   for the Reddwerks enhancements?

20        A.    For 6045?

21        Q.    This is 45, yes, thank you.

22        A.    It looks that way, yes.

23        Q.    And then I just have a couple

24   of questions.  I think I got all the columns,

25   though I'm not sure, but let me just ask

Highly Confidential - Subject to Further Confidentiality Review

1    about the ones we do have here.

2              What does, if you know, "Ship

3    to store number" mean?

4              Do you see the fifth column

5    over from the right?

6         A.    That's the store number.

7         Q.    Okay.  That's the ship -- got

8    it.

9              Would you expect, if this had

10   been in connection with the Reddwerks

11   rollout, to have the bottle thresholds be the

12   same for all of these stores?

13        A.    Potentially, considering it's

14   an excerpt, we're not seeing all of the data.

15        Q.    It could be that these are ten

16   because they were the non-traited products?

17        A.    Based on the pack size, this

18   WHPK quantity, that's the pack size.

19              And then what the dosage

20   threshold, or the dosage unit threshold, no,

21   because it's 5,000 dosage units, which

22   would -- if it was 100-count bottle would be

23   50 bottles.  But since this is a 500, it's

24   ten.  It's likely because it's sorted.  It's

25   the way it's sorted.

1    Q.    Okay.  I appreciate that.

2    That's very helpful.

3         Did the thresholds that were

4    provided -- or uploaded into Reddwerks have

5    the thresholds for the non-titrated [sic]

6    item numbers in them?

7    A.    Non-traited.

8    Q.    Non-traited, right.

9    A.    Yes.

10   Q.    Okay.  And then, just going

11   back to your cover email there, was that the

12   email address at Reddwerks?  Who was that

13   person's name?

14        Do you know?

15   A.    I have no idea.

16   Q.    Okay.  Other than sending

17   Reddwerks a threshold file, was there

18   anything else that you needed to do to update

19   thresholds for 6045 in Reddwerks?

20        MS. FUMERTON:  Objection, form.

21        THE WITNESS:  So it looks like

22   for this first one that was sent, I

23   sent an email.

24        This was not the typical way

25   going forward that we updated

1          thresholds.

2                I don't know why -- I don't

3          recall why an email was sent this

4          time, but later I would have imported

5          them directly into Reddwerks.

6                There was a page on the website

7          that we used that was for SOM import.

8          And so you would go there and select

9          the file and it would validate and

10         then it would impart into the

11         Reddwerks system.

12         Q.    (BY MR. BOWER)  And did you

13    save -- after you imported those files, did

14    you save them anywhere in the Walmart system?

15         A.    Yes.  So before they were

16    imported, they were saved on our shared

17    drive.  And then that's where I pulled it

18    from to import it.

19         Q.    And who would have been the

20    person at Walmart to save it on the shared

21    drive?

22         A.    Me.

23         Q.    Was it Walmart's policies and

24    procedures to save all of those files on the

25    shared drive?

```
 1                    MS. FUMERTON:  Objection, form.
 2                    THE WITNESS:  So all of --
 3            anytime an update was made, that
 4            version was saved as well.
 5            Q.    (BY MR. BOWER)  And your answer
 6     also helped me, because I was looking at some
 7     other updates that didn't have cover emails.
 8     So that wouldn't be unusual in your
 9     experience; is that correct?
10            A.    That would be the norm.
11            Q.    Okay.
12                  So other than looking to the
13     files saved on the shared drive, would there
14     be any other way of determining whether
15     threshold updates were made?
16            A.    So this shared drive would have
17     the different versions of the threshold file,
18     and then if the -- if a threshold was updated
19     because of a review, Archer would indicate
20     updated threshold in the record.
21            Q.    And can you just explain what
22     you mean by "if a threshold was updated
23     because of a review"?
24            A.    So if a store item continued to
25     alert, and we -- we determined that it was
```

Highly Confidential - Subject to Further Confidentiality Review

1    alerting because it was a new store, when the

2    thresholds were initially developed, and so

3    the initial threshold that developed wasn't

4    accurate now, we would -- and by "we," I mean

5    myself -- would pull the data and then update

6    the threshold accordingly.

7         Q.    And would there ever -- strike

8    that.

9              Was there ever a circumstance

10   where the threshold was updated that wasn't a

11   new store?

12        A.    Yes.

13        Q.    And under what circumstances

14   would that occur?

15        A.    It could occur if it was just a

16   high-volume store that we'd reviewed multiple

17   times and determined that there were no red

18   flags, nothing of concern.  They were just

19   higher volume than the 50-set limit.

20        Q.    And how would you become

21   comfortable yourself that a high-volume

22   store's orders were not suspicious?

23        A.    Reviewing the order and the

24   dispensing data, and all the other relevant

25   information, refusal-to-fill information,

1    things like that.

2         Q.    Well, other than the order

3    itself, and that -- by "order," you mean

4    order -- that specific item order; correct?

5         A.    Yes.

6         Q.    And the dispensing data, what

7    else would you look at to get comfort that a

8    high-volume store's orders were not

9    suspicious?

10        A.    So the dispensing data would

11   say a lot.  There's a lot covered in

12   dispensing data.  But the store profile also

13   has a lot of information.  Mainly refusal to

14   fills.  The refusal to fills are a good

15   indicator that the pharmacists are doing

16   their due diligence when it comes to

17   prescriptions.  Whether there's been any

18   other alerts for other drugs that were

19   suspicious, that would come into effect.

20             Where the store is located.  If

21   there's no other stores around and it is

22   truly a high-volume store, things like that.

23        Q.    Thank you for that answer.  And

24   that led me to think of another circumstance

25   that I had a question on, which is SOM

1    remediation.

2            Are you familiar with that

3    term?

4        A.    Yes.

5        Q.    And what does that term mean to

6    you?

7        A.    So when an order was determined

8    to be suspicious, the store was held to

9    remediation limit, most often their

10   threshold.

11           So if the -- if an order was

12   placed the next week that was over their

13   threshold, the order would be limited to

14   their threshold amount.

15       Q.    So I have a couple of questions

16   on SOM remediation, then.  The first of which

17   is, is a store -- strike that.

18           When you say, "A store was held

19   to remediation limit," what does that mean?

20       A.    So it became a hard limit.

21       Q.    Okay.

22           And would a store that's in SOM

23   remediation -- strike that.

24           Would a store only go into SOM

25   remediation if they had made an order that

```
1    had been deemed suspicious?
2         A.    Yes.
3         Q.    Are there any other
4    circumstances that would cause a store to go
5    into SOM remediation?
6         A.    Not that I know of.
7         Q.    Okay.  And then when a SOM
8    store is under SOM remediation and they
9    ordered above their threshold, what would
10   happen?
11             MS. FUMERTON:  Objection, form.
12             THE WITNESS:  So I want to
13        clarify who "they" are.
14        Q.    (BY MR. BOWER)  Okay.  So let's
15   assume a store is in SOM remediation.
16        A.    Mm-hmm.  (Witness nods.)
17        Q.    Okay?
18             And that store places an order
19   for a Schedule II product that is above its
20   threshold.
21             What happens?
22        A.    So the store may not have
23   placed the order.  Our replenishment may have
24   placed the order for the store.  So there are
25   system orders and manual orders.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Regardless of who the "they"

2    is, if a -- if an order is placed for a -- an

3    item that is on SOM remediation, that order

4    would be cut and kept at the threshold level.

5         Q.    So let me just make sure I

6    understand.

7          So if a store is on SOM

8    remediation, and any order comes in that's

9    above its threshold, that order is cut to its

10   threshold and then shipped; is that correct?

11             MS. FUMERTON:  Objection, form.

12             THE WITNESS:  So orders that

13        come in, when in SOM remediation, that

14        weekly amount is kept at the threshold

15        level.

16             The reason for that is the

17        replenishment system most often is

18        who's placing the orders.  And it uses

19        a 13-week history to place orders.

20        And so to teach the order system to

21        order a lower amount, we had the

22        orders capped at the threshold amount.

23        Q.    (BY MR. BOWER)  Okay.  But I'm

24   just trying to figure out what happened to

25   that order, though, that a store has placed

1    either by the store or by the replenishment,

2    that's in remediation.  Okay?

3              So we have a store in SOM

4    remediation.  An order is placed either by

5    the store itself or by the replenishment

6    system.  And that order is above an item

7    threshold.

8              What happens to that order?

9    A.    If the store had not already

10   received their threshold, they would have

11   received up to their threshold, and that

12   would be it.

13             If they had already received

14   their threshold amount for that week, they

15   would not receive that order.

16   Q.    Would that order be reported to

17   the DEA?

18             MS. FUMERTON:  Objection, form.

19             THE WITNESS:  The order that

20        they did not receive because they were

21        under SOM remediation, no.

22   Q.    (BY MR. BOWER)  Okay.  And just

23   so that the record is clear, let's say, for

24   example, a store is under SOM remediation and

25   their weekly limit for Oxy 10 milligrams is

Highly Confidential - Subject to Further Confidentiality Review

1    50 and they placed an order for 60.

2                    What happens to that order for

3    60?

4         A.      The order would be --

5                    MS. FUMERTON:  Objection, form.

6         Q.      (BY MR. BOWER)  And we're

7    talking about bottles now, just so we're all

8    clear.

9                    MS. FUMERTON:  Objection, form.

10                    THE WITNESS:  The order would

11        be cut to 50 bottles and then shipped.

12        Q.      (BY MR. BOWER)  And for how

13   long was that policy in place?

14        A.      The remediation policy, or ...

15        Q.      Yes, the policy we just

16   discussed, where a store is under SOM

17   remediation and the orders that are above its

18   threshold are cut to its threshold and

19   shipped.

20        A.      Until the Buzzeo system went

21   into place.

22        Q.      Okay.  And how did the Buzzeo

23   system change that policy?

24                    MS. FUMERTON:  Objection, form.

25                    Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  The Buzzeo system

2        was dynamic and looked at a rolling

3        history.  And so if an order was held

4        and reviewed and was -- the red flags

5        were not cleared, that order wasn't

6        shipped.

7              And then if there were three

8        orders for that store that were --

9        that red flags weren't shipped, then

10       we would put them into a remediation.

11       Q.    (BY MR. BOWER)  And we'll talk

12  more about maybe the Buzzeo --

13       A.    Okay.

14       Q.    -- period a little bit later.

15  But thank you for that.

16             I want to clear up one other

17  thing regarding the Reddwerks enhancement.

18             So we talked a little bit

19  before about what happens when yourself and

20  Miranda, during this time period, were either

21  deciding to approve or -- well, let me ask it

22  a different way.

23             During the late 2015 time

24  period, would you and Miranda be able to cut

25  an order and ship it?

1        A.      No.

2                MS. FUMERTON:  Objection, form.

3                Go ahead.

4                THE WITNESS:  No.

5        Q.      (BY MR. BOWER)  So under the

6    circumstance where you determined that an

7    order was appropriate and ready to be

8    shipped, how would that information be

9    conveyed to the home office?

10               Sorry, strike that.

11               During this time period in late

12   2015, when you and Miranda determined that an

13   order was appropriate for shipment, how would

14   that information be conveyed to the folks who

15   needed to get it out for shipment?

16       A.      I would go into Archer, update

17   their resolution to appropriate.  That would

18   trigger an email to go out to the logistics

19   compliance analyst, and they would then clear

20   the alert in Reddwerks.

21       Q.      So let me just make sure I have

22   the process nailed down.

23               You would go into Archer and

24   manually update the order status; correct?

25       A.      Yes.

1    Q.    And once that manual update

2    occurred, an automatic email would go out to

3    the logistics compliance analyst; correct?

4    A.    Yes.

5    Q.    And that email would inform the

6    logistics compliance analyst that that order

7    was ready for shipment; is that correct?

8    A.    That the order had been

9    reviewed and cleared, yes.

10    Q.    And what was the next step in

11    getting that order shipped to the pharmacy?

12         MS. FUMERTON:  Objection, form.

13         THE WITNESS:  The logistics

14         analyst would go into Reddwerks and

15         clear the alert.  And then from there,

16         it would follow the Reddwerks process

17         to go to the DC.

18    Q.    (BY MR. BOWER)  So the next

19    step would be the logistics analyst would

20    have to manually go into Reddwerks to clear

21    the alert; is that correct?

22    A.    Yes.

23    Q.    And then that would alert the

24    folks at the DC that the order was ready for

25    shipment?

```
 1              A.     I'm not sure how that flows,

 2     but it would -- it would then follow the

 3     typical flow of Reddwerks to get to the DC.

 4              Q.     Okay.  You're not as familiar

 5     with the stuff on the DC end; is that

 6     correct?

 7              A.     Correct.

 8                     (Walmart-Reed Deposition

 9              Exhibit 13, was marked for

10              identification.)

11              Q.     (BY MR. BOWER)  Okay.  You've

12     been handed what's been marked as Exhibit 13

13     to today's deposition.

14                     Just take a moment to review

15     this.

16                     My first question is going to

17     be whether this refreshes your recollection

18     whether a company by the name of Accenture,

19     A-C-C-E-N-T-U-R-E, was involved in the

20     Buzzeo.

21              A.     Yes, it looks like it.

22                     MS. FUMERTON:  Did you review

23              the document?

24                     THE WITNESS:  I'm reading this,

25              yes.
```

1           MR. BOWER:  So just take a

2       moment and tell me when you're done

3       and then I'll ask the question again.

4           MR. MILLER:  Is there a Bates

5       number for Exhibit 13?

6           MR. BOWER:  Yes.  Sorry.  It's

7       20529 through 31.

8           THE WITNESS:  Okay.

9       Q.    (BY MR. BOWER)  Okay?  Do you

10  know who Edgar Rivera is?

11      A.    I do not.

12      Q.    Does this refresh your

13  recollection that Walmart used a company by

14  the name of Accenture in connection with its

15  search for a SOM cloud proposal?

16          MS. FUMERTON:  Objection, form.

17          THE WITNESS:  I can tell that

18      Accenture was on this email with

19      regards to Buzzeo, but other than

20      that ...

21      Q.    (BY MR. BOWER)  Well, you

22  received this email; right?

23      A.    Yes.

24      Q.    Okay.  And if you'd look at the

25  third page of the email, it states, in the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    email from Edgar Rivera, Accenture, to
 2    Gary Glotz, Edgar writes, "Good afternoon,
 3    Gary.  As you may know, Accenture has been
 4    working with Walmart for a
 5    procurement/sourcing perspective on their
 6    need for the SOM solution."
 7              Do you see that?
 8    A.    Yes.
 9    Q.    Do you have any reason to doubt
10    that the information conveyed there by Edgar
11    is incorrect?
12    A.    No.
13    Q.    Do you have any idea what --
14    why there was a need for a SOM solution?
15    A.    I do not.
16              MS. FUMERTON:  Objection, form.
17    Q.    (BY MR. BOWER) Do you know what
18    that refers to, "SOM solution"?
19              MS. FUMERTON:  Objection, form.
20              THE WITNESS:  Not specifically.
21    Q.    (BY MR. BOWER)  What about just
22    generally?
23    A.    A program to do SOM work would
24    be the way I would read into that.
25    Q.    Walmart was looking for a more
```

1    robust SOM program, wasn't it?

2                    MS. FUMERTON:  Objection, form.

3                    THE WITNESS:  They were looking

4          to continuously improve their SOM

5          program, which is the nature of

6          Walmart.

7          Q.    (BY MR. BOWER)  Well, had

8    Walmart sought to continuously improve its

9    SOM program up into June 19, 2015?

10                   MS. FUMERTON:  Objection, form.

11                   THE WITNESS:  Yes.  Things --

12         they were talking about Phase 2, a

13         statistical approach to the SOM

14         program in 2014 documents that we were

15         looking at.  So it was something that

16         they were looking at doing.

17         Q.    (BY MR. BOWER)  And, in fact,

18   the Reddwerks enhancement was one of the ways

19   that Walmart sought to improve its SOM

20   program; correct?

21         A.    Yes.

22         Q.    Are you aware whether Walmart

23   ever did any analysis as to whether the

24   Reddwerks enhancement actually was an

25   improvement to the SOM program?

1          MS. FUMERTON:  Objection, form.

2          THE WITNESS:  I'm not aware.

3     Q.    (BY MR. BOWER)  Would you

4  expect that Walmart would do such an

5  analysis?

6          MS. FUMERTON:  Objection, form.

7          THE WITNESS:  I'm not sure.

8     Q.    (BY MR. BOWER)  What's your

9  basis for your statement that Walmart was

10  always looking to improve?

11    A.    My personal knowledge of

12  Walmart and in our culture is one of

13  continual improvement.

14          I mean, I -- I'm encouraged to

15  do so in my own work, in the things that I

16  create, continually look for ways to do

17  better and be better and learn from the ways

18  we've done things in the past.

19    Q.    And is it your experience that

20  someone actually looks at whether that

21  improvement has taken place?

22          MS. FUMERTON:  Objection, form.

23          THE WITNESS:  Can you restate

24     the question?

25    Q.    (BY MR. BOWER)  Yeah.  You say

Highly Confidential - Subject to Further Confidentiality Review

1   you're "encouraged to do some of my own work,

2   in the things that I create, continually look

3   for ways to do better and better."  And

4   someone in fact reviews you to determine

5   whether you're doing better and better;

6   right?

7              MS. FUMERTON:  Objection, form.

8              THE WITNESS:  No, that's not

9         always the case.  Like, we have

10        performance evaluations, but nobody's

11        ever said, you know, Here's the way

12        you -- here's the way this module

13        worked before, and here's the way this

14        module works now, and it's better in

15        X, Y, and Z ways.

16        Q.    (BY MR. BOWER)  No one's ever

17   said that to you?

18             MS. FUMERTON:  Objection, form.

19             THE WITNESS:  Not that I can

20        recall.

21        Q.    (BY MR. BOWER)  You were never

22   nominated for any awards?

23             MS. FUMERTON:  Objection, form.

24             THE WITNESS:  Not that I know

25        of.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    (BY MR. BOWER)  And your

2    expectation that Walmart always seeks to

3    improve is based on your experience at

4    Walmart; is that correct?

5    A.    Yes.

6    Q.    And is it your experience that

7    when Walmart improves something, it then gets

8    out of the business of doing that same thing?

9         MS. FUMERTON:  Objection, form.

10        THE WITNESS:  I'm not sure how

11        to answer that question.  Like, that

12        that -- yeah, I'm just not sure how.

13        Can you restate, maybe?

14        MR. BOWER:  Sure.

15    Q.    (BY MR. BOWER) You are aware,

16    aren't you, that Walmart no longer

17    distributes controlled II narcotics?

18    A.    Yes.

19    Q.    So you're aware that Walmart

20    improving that business, why did it get out

21    of that business?

22        MS. FUMERTON:  Objection, form.

23        Lack of foundation.

24        THE WITNESS:  I was not

25        involved -- we are still very much in

Highly Confidential - Subject to Further Confidentiality Review

1          the pharmacy business.  The

2          distributing business, I was not

3          involved in those conversations about

4          why we were no longer distributing.

5          Q.    (BY MR. BOWER)  You never

6     wondered why Walmart was working to

7     continually improve this business, and then

8     got out of the business?

9               MS. FUMERTON:  Objection, form.

10              THE WITNESS:  There's always

11         decisions being made about the way the

12         business is headed in whatever Walmart

13         is doing.  And things change on a

14         regular basis.  And so it's not

15         something that surprises me when we

16         change the direction that we're going.

17         Q.    (BY MR. BOWER)  Were you

18    surprised when Walmart decided to no longer

19    distribute Schedule II narcotics?

20              MS. FUMERTON:  Objection, form.

21              THE WITNESS:  Walmart decided

22         not to distribute controlled

23         substances as a whole, not just

24         Schedule II narcotics.

25              And it wasn't something that I

1           expected, no, but it was explained

2           that that was the way the business was

3           going, and that's ...

4           Q.    (BY MR. BOWER)  Did Walmart's

5     decision to stop distributing controlled

6     substances affect the jobs of any of the

7     folks that you work with at Walmart?

8                 MS. FUMERTON:  Objection, form.

9                 THE WITNESS:  "Affect the

10          jobs."  Can you clarify?

11          Q.    (BY MR. BOWER)  Did anyone lose

12    their job as a result of Walmart's decision?

13          A.    So we had temporary associates

14    that were given notice that those temporary

15    positions would no longer be necessary.

16                We -- some positions, we had a

17    handful of people that moved on before that

18    notice, and then from there we ended up

19    keeping the other people.

20          Q.    And you never discussed with

21    any of those, for example, associates that

22    lost their jobs why Walmart was deciding to

23    get out of the business?

24          A.    So --

25                MS. FUMERTON:  Objection, form.

1          THE WITNESS:  We told them the

2     same thing I was told, that Walmart

3     made the decision that they were

4     switching gears in their business

5     practice and would be using McKesson

6     for all the controlled substances.

7          Q.    (BY MR. BOWER)  And how were

8  you told that Walmart was switching gears in

9  its business practice?

10          Was there an email?  A meeting?

11  Something else?

12          MS. FUMERTON:  If it was --

13     because she's -- if it was --

14          MR. BOWER:  You can say it was

15     an attorney that told you.  Yeah.

16          THE WITNESS:  Okay.  Yeah.

17          MS. FUMERTON:  If it was an

18     attorney -- if this is from -- if you

19     learned this from communications with

20     counsel, you can say that it was from

21     communications with counsel.  But do

22     not go into the details of it, and

23     we'll see what appropriate or

24     inappropriate questions he asks after

25     that.

```
 1              THE WITNESS:  So with
 2        communication from counsel.
 3        Q.      (BY MR. BOWER)  Do you know
 4   whether that counsel was a Walmart counsel or
 5   outside counsel?
 6        A.      Walmart counsel.
 7        Q.      Do you know who communicated
 8   that to you?  The name of the person?
 9        A.      I'm -- Karen Davila.  I'm
10   almost 100 percent sure.
11        Q.      And was it an email?  Or was it
12   something else?
13        A.      There was a meeting, and then
14   an email was sent with a nondisclosure
15   agreement.
16        Q.      Did you -- were you required to
17   sign a nondisclosure agreement in connection
18   with Walmart's decision to stop distributing
19   controlled substances?
20        A.      Yes.
21        Q.      When did you sign that
22   agreement?
23        A.      Early 2018.
24        Q.      Okay.  Did you have any of your
25   own attorneys review that agreement before
```

Highly Confidential - Subject to Further Confidentiality Review

1    you signed it?

2          A.      No.

3          Q.      Were you required to sign that

4    agreement to continue your employment at

5    Walmart?

6          A.      No.

7          Q.      Are you aware of other Walmart

8    employees that did not sign the agreement?

9          A.      I do not know.

10         Q.      Did you have any discussions

11   about the agreement with anyone else besides

12   counsel for Walmart?

13         A.      No.

14         Q.      Did you receive any

15   compensation in return for signing your

16   agreement?

17              MS. FUMERTON:  I'm going to

18         object to this.

19              MR. BOWER:  That's not a

20         privileged question.  Whether she had

21         a conversation in exchange for signing

22         an agreement?

23              MS. FUMERTON:  I don't know

24         enough --

25              It could be part of -- I don't

Highly Confidential - Subject to Further Confidentiality Review

1          know the circumstances of this.

2                    MR. BOWER:  Well, I'm going to

3          ask the question.

4                    MS. FUMERTON:  I'm going to

5          instruct her not to answer.

6          Q.    (BY MR. BOWER)  Did you receive

7    any compensation in connection with signing a

8    nondisclosure agreement related to Walmart's

9    decision to stop distributing controlled

10   substances?

11                   MS. FUMERTON:  Unless I have an

12         opportunity to consult with her, I'm

13         going to instruct her not to answer.

14         I can consult with her during a break.

15                   MR. BOWER:  Why don't you do

16         that.

17                   MS. FUMERTON:  Consult now?

18                   MR. BOWER:  Yes.

19                   MS. FUMERTON:  Okay.

20                   THE VIDEOGRAPHER:  2:46.  We

21         are off the video record.

22                   (Recess taken, 2:46 p.m. to

23         3:26 p.m.)

24                   THE VIDEOGRAPHER:  3:26.  We

25         are on the video record.

```
 1              MS. FUMERTON:  There was a

 2        pending question that the witness had

 3        asked to consult me about with respect

 4        to privilege.  I am going to instruct

 5        her not to answer the pending

 6        question.

 7              MR. BOWER:  Okay.  And I just

 8        note for the record that we've been

 9        off the record now for about

10        45 minutes, which I think is a little

11        bit peculiar to consult on one

12        question.  And I do have some other

13        questions which I understand your

14        counsel may instruct you not to

15        answer, but I'm going to ask them and

16        then we'll see how it goes.

17              MS. FUMERTON:  And I would just

18        like to make a statement on the record

19        that I had asked you during the break

20        whether or not we could move on from

21        this question and potentially get back

22        to it at a later point in time during

23        today.  And you refused to do that

24        accomodation.  And so you have an

25        obligation with respect to your
```

1   clients; I have an obligation with

2   respect to my clients, and I will

3   exercise that zealously.

4             MR. BOWER:  And I understand

5   that you will.  I didn't realize we

6   were making those statements on the

7   record.  So in fairness to myself,

8   your question was broader.  You asked

9   me to move on from this entire topic,

10  and you asked for a lot of time to get

11  answers on this.  You stated you were

12  unaware of this prior to now, which I

13  think is very unusual and suspect.

14            And I said I don't think that's

15  appropriate.  We're entitled to

16  truthful testimony from this witness,

17  and you're entitled to make your

18  instructions as you see appropriate.

19            After you made that request,

20  you then took the half an hour that

21  you requested from me, so now you have

22  had all the time that you need, and I

23  expect you will be prepared to

24  instruct your witness as you see fit.

25            MS. FUMERTON:  And I disagree

1      with your characterization of our

2      conversation and the extent to which I

3      asked us to move on.  It was specific

4      to the nondisclosure agreement.  I was

5      not asking for a broader sort of

6      subject matter change.  It was just

7      with respect to that one issue.  And

8      let's move on.

9           MR. BOWER:  I believe your

10     specific request was, "Can we please

11     move on from this topic?"

12          MS. FUMERTON:  I said specific

13     to the nondisclosure.

14          MR. BOWER:  Right.  Which is, I

15     think, inappropriate.  She's here for

16     a deposition.  Unless you're going to

17     give us more than seven hours, we need

18     to ask her our questions.  So we're

19     going to have to do that now.

20          MS. FUMERTON:  Well, I was

21     actually being respectful of the

22     record and not having this lengthy

23     discussion on the record and going off

24     the record and have that conversation

25     with you so that you would have your

Highly Confidential - Subject to Further Confidentiality Review

1          entire seven hours.  So I think we

2          should move on, and I will instruct

3          the witness appropriately.

4                    MR. BOWER:  So thank you.

5          Q.     (BY MR. BOWER) And are you

6    going to follow your counsel's instructions

7    and not answer the question as to whether you

8    received compensation in connection with

9    signing the nondisclosure agreement?

10         A.     Yes.

11         Q.     So I'm going to take a step

12   back, then, and ask some other questions

13   which I hope that you are willing to answer.

14   Okay?

15                First of those questions is,

16   you mentioned that there was a meeting

17   that -- where the decision by Walmart to get

18   out of the distribution of controlled

19   substances was first discussed.

20                Do you recall that?

21         A.     There was a meeting where I was

22   first told of it.

23         Q.     Okay.  I appreciate the

24   clarification.

25                And who was at that meeting?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I know for sure myself,

2    Jamie Newell and Miranda Johnson, and Karen

3    Davila.

4          Q.    And Karen Davila is from which

5    law firm?

6          A.    She's internal Walmart counsel.

7          Q.    Were there any counsel there

8    that were not internal to Walmart?

9          A.    I don't recall.

10          Q.    Other than Ms. Davila, were

11    there any other attorneys there?

12          A.    Not that I recall.

13          Q.    Were there other folks that

14    were at the meeting that you cannot recall as

15    you sit here today?

16              MS. FUMERTON:  Objection to the

17          form of the question.

18          Q.    (BY MR. BOWER)  Well, you

19    said -- your testimony was -- and I'll

20    clarify -- you said you know for sure myself,

21    Jamie, and Miranda and Karen Davila; correct?

22          A.    Yes.

23          Q.    Do you recall there being more

24    than five people there?

25          A.    I do not.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.    Okay.  Do you know whether
 2    Miranda Johnson signed a nondisclosure
 3    agreement?
 4                    MS. FUMERTON:  I am going to
 5              instruct her not to answer that
 6              question if she only knows the answer
 7              because of meetings with counsel.
 8                    MR. BOWER:  So is your
 9              instruction suggesting that the fact
10              of whether Miranda signed a
11              nondisclosure agreement is privileged?
12                    MS. FUMERTON:  My objection is
13              that if she knows the answer to that
14              question only because of
15              communications with counsel, that is
16              privileged.
17                    MR. BOWER:  And why would that
18              be privileged?
19                    MS. FUMERTON:  Because
20              communications with counsel are
21              privileged.
22                    MR. BOWER:  Well, all
23              communications with counsel are
24              privileged?
25                    MS. FUMERTON:  I mean, I'm not
```

1          going to get into the treatise of what

2          can be and cannot be privileged, but

3          most communications with counsel are

4          privileged.  And in this instance --

5          if she has knowledge of whether or not

6          Miranda signed a nondisclosure

7          agreement outside of communications

8          with counsel, I'm fine with her

9          answering that question.  I'm just not

10         going to allow her to answer that

11         question if the only reason she knows

12         whether or not that's true or not is

13         because of communications with

14         counsel.

15              MR. BOWER:  Okay.  I

16         understand.

17         Q.    (BY MR. BOWER)  Do you have

18    knowledge of whether she signed outside of

19    communication with counsel?

20         A.    I do not know.

21         Q.    And who else did you mention

22    was a Walmart employee that was present at

23    that meeting?

24         A.    Jamie Newell.

25         Q.    Do you know, outside of

 1    conversations with counsel, whether Jamie

 2    signed a nondisclosure agreement?

 3         A.    Yes.

 4         Q.    Was that something you spoke

 5    with her about?

 6         A.    Him.

 7         Q.    Sorry, him.

 8         A.    No, we didn't speak about it.

 9    We both signed it at the same time, and the

10    email was sent back to legal together.

11         Q.    And how is it that you both

12    signed at the same time?

13         A.    Well --

14         Q.    Can you just explain what

15    happened?

16         A.    So we had a meeting, and --

17              MS. FUMERTON:  And, look.  I

18         think portions of that question can be

19         answered in a way that doesn't reveal

20         privileged information.  I think some

21         of it cannot.  So I instruct you to

22         answer that question only to the

23         extent that you can do so without

24         revealing communications with counsel.

25              THE WITNESS:  Okay.  We were

Highly Confidential - Subject to Further Confidentiality Review

1          together at the time the meeting was

2          had, and so instead of both sending a

3          separate email, we -- the email was

4          sent.  So we signed; we scanned the

5          documents; they were sent.

6     Q.    (BY MR. BOWER)  Okay.  Did you

7   receive the nondisclosure agreements at the

8   meeting?

9               MS. FUMERTON:  I'm going to

10         object to that --

11              I'm not going to object.

12              Go ahead.

13              THE WITNESS:  I don't recall.

14    Q.    (BY MR. BOWER)  How long after

15  the meeting did you receive the email that

16  attached the nondisclosure agreement?

17    A.    I don't recall.

18    Q.    Did you receive the email while

19  you were at the meeting?

20              MS. FUMERTON:  Objection, asked

21         and answered.

22              THE WITNESS:  I don't recall.

23    Q.    (BY MR. BOWER)  Did you sign --

24  strike that.

25              Do you recall signing the

1   nondisclosure agreement the same day that the

2   meeting occurred?

3       A.      I don't recall.

4       Q.      What do you recall about the

5   circumstances surrounding the signing of the

6   nondisclosure agreement?

7               MS. FUMERTON:  I'm going to

8           object to that question because it

9           calls for attorney-client privilege

10          and instruct the witness not to

11          answer.

12      Q.      (BY MR. BOWER)  Do you have any

13  recollection as you sit here today

14  approximately the sequence of events as to

15  how long after this meeting occurred that you

16  received the nondisclosure agreement?

17              Was it the same day?  Days?

18  Weeks?  Months?

19      A.      I don't recall.  It wouldn't

20  have been months.  It wasn't months until we

21  weren't --

22              MS. FUMERTON:  I would -- just

23          answer the question, and not go

24          beyond.

25              THE WITNESS:  Yes, it wasn't

Highly Confidential - Subject to Further Confidentiality Review

```
 1            months.   Sorry.
 2                    MS. FUMERTON:  And again, I'm
 3            instructing the witness -- I'm giving
 4            that -- the witness that guidance
 5            only, again, to protect the
 6            attorney-client privilege, not for any
 7            other reason.
 8                    THE WITNESS:  Okay.
 9       Q.    (BY MR. BOWER)  Well, I'm just
10   trying to figure out how much time occurred
11   between when this meeting occurred; right?
12   And when the agreement was provided to you.
13   That's all I'm trying to get at.
14                    MS. FUMERTON:  And object to
15            form, asked and answered.
16                    MR. BOWER:  Okay.
17                    MS. FUMERTON:  Go ahead.
18                    THE WITNESS:  I don't recall
19            the timing of the meeting, and then
20            the receiving of the document.  I
21            just -- I don't recall that timing.
22       Q.    (BY MR. BOWER)  And why is it
23   that you recall signing the document at the
24   same time as Jamie?
25                    MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

1           Asked and answered.

2                  THE WITNESS:  I can't explain

3           why I recall some things and not other

4           things.

5           Q.    (BY MR. BOWER)  Well, did you

6    get -- when you got the email with the

7    nondisclosure agreement, did you print it

8    out?

9           A.    I would have had to print it

10   out to sign it.

11          Q.    Did you print a copy out for

12   Jamie?

13          A.    Not that I recall.

14          Q.    And what's Jamie's full name

15   again?

16          A.    Jamie Newell.

17          Q.    Who sent the email with the

18   signed agreements for both you and

19   Mr. Newell -- or Ms. Newell.  Is it Jamie --

20          A.    He's a male.

21          Q.    Okay.  Sorry.

22                 MS. FUMERTON:  Objection, form.

23                 THE WITNESS:  If I recall

24          correctly, Jamie sent the email.

25          Q.    (BY MR. BOWER)  Okay.  So you

1    printed out the nondisclosure agreement;

2    right?

3          A.    Yes.

4          Q.    Did you sign it the same day

5    you printed it out?

6          A.    I don't recall.  I would assume

7    that I did.

8          Q.    Okay.

9          A.    But I -- I don't recall exact

10   timing.

11         Q.    Okay.  And then once you print

12   it out, you sign a hard copy, correct?

13         A.    Yes.

14         Q.    And then you scanned it in at

15   Walmart in some fashion?

16         A.    Yes.

17         Q.    You made an electronic version

18   of it; correct?

19         A.    Yes.

20         Q.    Okay.  You sent that electronic

21   version to Jamie?

22         A.    I don't recall.  I don't know

23   if I scanned it back in or if he scanned both

24   of them together.  Like, I don't recall.

25         Q.    Do you recall seeing the

1    agreement that Jamie signed?

2        A.    I don't know that I looked.  I

3    was cc'd on the email when it was sent back

4    to the attorneys, and it would have included

5    mine and his.  But I did not -- I don't

6    recall looking at his compared to mine.

7        Q.    Do you know whether his

8    agreement is identical to yours?

9        A.    I would not know.

10       Q.    Did you speak with anyone about

11   the agreement prior to signing it other than

12   Walmart counsel?

13       A.    No.

14       Q.    And why not?

15       A.    Because I --

16             MS. FUMERTON:  Objection, form.

17             THE WITNESS:  I didn't have any

18       reason to speak to anybody.

19       Q.    (BY MR. BOWER)  How long was

20   the agreement?

21       A.    I don't recall.

22       Q.    Approximately how many pages

23   was the agreement?

24       A.    I don't recall.  It was a short

25   document.  It wasn't -- it wasn't a novel.

1    Q.    Okay.

2    A.    And I don't think it was ten

3    pages.  I would -- if I recall correctly, it

4    was two.

5    Q.    Thank you.  I'm just trying to

6    get a sense.  And I understand it's difficult

7    to recall certain details.

8          The email that provided the

9    agreement to you, who sent that email?

10   A.    Deanna McNeill.

11   Q.    Is it Dana?  Is that the first

12   name?

13         Is it based on your

14   recollection?

15   A.    I thought it was Deanna.

16   Q.    Deanna?

17   A.    Deanna.  Yeah.

18   Q.    Is she also an attorney at a

19   law firm?  Or is she at Walmart?

20   A.    I think she's --

21         MS. FUMERTON:  Objection, form.

22         Go ahead.

23         THE WITNESS:  I think she's

24   internal Walmart, but I don't know for

25   sure.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     (BY MR. BOWER)  Had you ever
 2   met her before?
 3          A.     Not that I know of.
 4                 MS. FUMERTON:  I am going to
 5          amend my prior objection.
 6                 MR. BOWER:  Okay.
 7                 MS. FUMERTON:  I will still
 8          object to any questions about
 9          communications with legal, about the
10          circumstances or the meeting in which
11          you were in discussing that you
12          testified about before, but to the
13          extent that the witness has
14          recollection about a nondisclosure
15          agreement, I will allow her to testify
16          about that.
17                 Other than what she's already
18          testified.  So I can't parse through
19          your questions as to which this
20          affects or doesn't.  But go ahead.
21          Q.     (BY MR. BOWER)  So are you
22   going to allow her to answer the compensation
23   question?
24                 MS. FUMERTON:  Yes.
25          Q.     (BY MR. BOWER)  Did you receive
```

Highly Confidential - Subject to Further Confidentiality Review

1    compensation in connection with signing the

2    nondisclosure agreement that related to

3    Walmart's decision to stop distributing

4    controlled substances?

5         A.    I did not receive any

6    compensation for signing that document.  I

7    received my normal paycheck like I always do,

8    but not for signing that document.

9         Q.    And were you ever informed as

10   to what would happen if you refused to sign

11   the document?

12              MS. FUMERTON:  Again, to the

13        extent that that reveals

14        communications with counsel, I'm going

15        to object to her answering that

16        question.

17              But to the extent that there

18        was discussions outside of

19        communications with counsel, you can

20        answer.

21              THE WITNESS:  That

22        communication would have been with

23        counsel.

24        Q.    (BY MR. BOWER)  Did

25   Miranda Johnson sign the agreement?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.      I don't know.

 2                    MS. FUMERTON:  Again -- well --

 3            Q.      (BY MR. BOWER)  That's why I

 4    have to ask them again?  Are you --

 5                    MS. FUMERTON:  No, no, I

 6          appreciate it.  That's what I was just

 7          trying to avoid.  But that's why I

 8          have to give the same set of

 9          instructions.

10                    To the extent that you can

11          answer his questions.

12                    MR. BOWER:  So that hasn't

13          changed?

14                    MS. FUMERTON:  Correct, that

15          instruction does not change --

16                    MR. BOWER:  Okay.  So your

17          answer won't change?

18                    MS. FUMERTON:  Yes.

19            Q.      (BY MR. BOWER)  Who were the

20    parties to the agreement?

21            A.      I don't know.

22            Q.      Do you know whether Walmart is

23    a party to the agreement?

24            A.      I don't know.  I'm not a

25    lawyer.  I don't know what all the different
```

1    terms were.

2         Q.    Okay.  Did anyone at Walmart

3    suggest that you should have your own

4    attorney review the agreement before signing

5    it?

6              MS. FUMERTON:  Again, to the

7         extent that you can answer that

8         question outside of communications

9         with counsel, you can answer the

10        question.

11             If you can only answer that

12        question in consultation with

13        communications with counsel, you

14        cannot.

15             THE WITNESS:  That would be a

16        counsel conversation.

17        Q.    (BY MR. BOWER)  Do you recall

18   whether you had a deadline with which you had

19   to decide whether to sign the agreement or

20   not?

21             MS. FUMERTON:  Same question --

22        or same instruction.

23             THE WITNESS:  That would be

24        counsel.

25        Q.    (BY MR. BOWER)  Were you ever

Highly Confidential - Subject to Further Confidentiality Review

1    instructed not to discuss the agreement with

2    anybody?

3                    MS. FUMERTON:  Same

4         instruction.

5                    THE WITNESS:  Yes, that would

6         be counsel.

7         Q.    (BY MR. BOWER)  Did you ever

8    discuss the agreement with anybody, other

9    than counsel?

10        A.    No.

11        Q.    Discuss the agreement with any

12   family members or friends?

13        A.    No.

14        Q.    What are the terms of the

15   agreement?  How long does it last?

16        A.    I don't know.

17        Q.    What is your understanding as

18   to how long the agreement lasts?

19                   MS. FUMERTON:  And again, if

20        you have an understanding independent

21        of your communications with counsel,

22        you can answer the question.  But if

23        your understanding is only based on

24        your communication with counsel, you

25        cannot.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. BOWER:  Well, wouldn't your
 2          understanding come from the agreement
 3          itself?
 4                MS. FUMERTON:  It could.
 5          That's why I'm giving the instruction
 6          that I'm giving.  So there is a
 7          potential way ...
 8     Q.     (BY MR. BOWER)  Let me ask it a
 9  different way.
10                Does the agreement have a
11  defined term?  In other words, does the
12  agreement define how long it will last?
13     A.     I'm not sure.
14     Q.     Is that something you
15  considered before signing the agreement?
16     A.     I'm not sure.
17     Q.     Okay.
18     A.     I understood the reason they
19  asked me to sign the document, and so I
20  trusted counsel and signed the document.
21     Q.     And what was that reason?
22                MS. FUMERTON:  Objection.  I
23          instruct you not to answer that
24          question.
25                THE WITNESS:  Okay.
```

```
 1              MS. FUMERTON:  That was
 2         specifically a question, Counsel.
 3              MR. BOWER:  I understand your
 4         objection.
 5              MS. FUMERTON:  That's fine.
 6         But sometimes I'm saying like
 7         partial -- like if you have separate.
 8         That one fully -- I'm instructing you
 9         not to answer.
10         Q.    (BY MR. BOWER)  So you signed
11    the agreement based on the statements made by
12    Walmart counsel; is that correct?
13              MS. FUMERTON:  Objection, form.
14              THE WITNESS:  I signed the
15         document based on my understanding,
16         and part of that was counsel and -- I
17         don't remember reading it, but I'm
18         sure I read it.  I don't tend to sign
19         things without reading them, but I
20         don't remember exact wording.
21         Q.    (BY MR. BOWER)  Was this the
22    first nondisclosure agreement you've signed
23    while being employed at Walmart?
24              MS. FUMERTON:  Okay.  Now, I'm
25         instructing you not to answer that
```

1    question unless you are certain

2    that -- and I don't know whether any

3    such exist -- that there isn't some

4    other provision that would prohibit

5    you from disclosing that information.

6         MR. BOWER:  I'm not sure I

7    understand that instruction, but

8    the --

9         MS. FUMERTON:  Here's my

10   instruction.

11        MR. BOWER:  The question

12   doesn't call for privileged

13   information, so you can't instruct her

14   not to answer.  I mean, it's --

15        MS. FUMERTON:  Well, no, the --

16        MR. BOWER:  The fact of another

17   agreement isn't privileged.  I don't

18   even think the agreement itself is

19   privileged, but ...

20        MS. FUMERTON:  Sometimes

21   agreements can -- it might not be

22   privileged, but some agreements can be

23   confidential.  And I don't know --

24   sometimes they have notice provisions

25   and other things that are involved

Highly Confidential - Subject to Further Confidentiality Review

1         before they can reveal the existence.

2         And those things, I'm not going to

3         allow her to answer.

4         Q.      (BY MR. BOWER)  Okay.  So are

5    you going to follow your counsel's

6    instruction and not answer that question of

7    whether you've ever signed another

8    nondisclosure agreement with Walmart?

9         A.      Yes.  I'm going to follow my

10   attorney's guidance.

11        Q.      Okay.

12        MR. BOWER:  And I do have more

13        questions, but I don't want to forget

14        to put this on the record.  It would

15        be our position that these documents

16        should be produced, should have been

17        produced, at the very minimum should

18        have been included on a privilege log

19        including the occurrence of the

20        meeting, any communications regarding

21        a meeting, any communications to any

22        of the Walmart witnesses regarding the

23        meeting, and anything related to this

24        issue should have certainly been

25        included in our privilege log at a

Highly Confidential - Subject to Further Confidentiality Review

1       minimum.

2            And so we will keep this

3       deposition open, and we will seek to

4       reopen all the other depositions of

5       the folks who signed this agreement

6       but we were not aware of the agreement

7       prior to today.

8            MS. FUMERTON:  Okay.  Well,

9       first of all, your statement was a

10      little bit meandering.

11           So with respect to the specific

12      nondisclosure agreement that I have

13      permitted her to testify about, I do

14      not think that you have any right to

15      keep that deposition open.

16           MR. BOWER:  She said she

17      doesn't recall the terms of the

18      agreement.  How do we ask her about

19      the terms if we don't have the

20      agreement?  You should have it here

21      today.

22           MS. FUMERTON:  Well, here is

23      the other issue.  I said -- I do not

24      recall whether or not you said all

25      these other things should have been on

```
1         the privilege log.  I don't know that
2         they aren't.  So I'm not -- for all I
3         know that they are actually on a
4         privilege log.  I'm not saying they
5         are.  I'm just saying I don't know one
6         way or another.
7              MR. BOWER:  Well, I would be
8         surprised.  They were given -- your
9         representation is that this was the
10        first you've heard about it.  So I
11        would be surprised if it was on there
12        if counsel for Walmart in this case
13        doesn't know about it.
14             MS. FUMERTON:  That's -- no,
15        no, no, no.  Listen, I'm not the only
16        counsel for Walmart, but that's a
17        different issue altogether, and
18        whether you find shocking or not I
19        cannot comment on -- please let me
20        finish.
21             But all I'm saying is I think
22        it's inappropriate.  I think you
23        should -- need to exhaust your
24        questions to what she recalls about
25        the nondisclosure agreement, and I
```

Highly Confidential - Subject to Further Confidentiality Review

1       will not agree that the deposition can

2       be kept open.  You can make whatever

3       statements you want, but to be clear,

4       I'm permitting her to testify about

5       what she recalls about the

6       nondisclosure agreement other than

7       communications with counsel, and so

8       those questions should be exhausted

9       today.

10              MR. BOWER:  Okay.  Appreciate

11      that.

12      Q.    (BY MR. BOWER)  You've

13 testified already that you don't recall the

14 term of the agreement; is that correct?

15              MS. FUMERTON:  Objection, form.

16      Q.    (BY MR. BOWER)  Well, I'll just

17 ask you again.

18              Do you recall how long the

19 agreement lasts?

20      A.    No.

21      Q.    Do you believe if you had the

22 agreement here today, you could answer that

23 question?

24      A.    I would assume there would be a

25 term listed in the agreement.

```
1          Q.     Do you recall my questions

2    regarding who the parties are to the

3    agreement?

4          A.     Yes.

5          Q.     And do you know who the parties

6    are to the agreement?

7          A.     I do not.

8          Q.     Do you believe you could answer

9    that question if we had the agreement here

10   today?

11         A.     Possibly.

12                MS. FUMERTON:  I'll also just

13         say that the terms of the agreement

14         will speak for themselves.  So I don't

15         know, you know, what additional

16         insights she could possibly offer to

17         that, since, as I said before, you

18         could ask other things about the

19         agreements.  Communications with

20         counsel, whether or not you choose to

21         reopen it or not, are still not going

22         to be answered because they're

23         communications with counsel and are

24         privileged.

25                MR. BOWER:  So let me just
```

Highly Confidential - Subject to Further Confidentiality Review

1        keep -- despite those statements, let

2        me just keep going, okay?

3        Q.    (BY MR. BOWER)   What is the

4   scope of the agreement?   What does it cover?

5             MS. FUMERTON:  You can answer

6        to the best of your recollection.

7             THE WITNESS:  Okay.

8             MS. FUMERTON:  And other than

9        communications with counsel.  But

10       based on your recollection of the

11       agreement.

12            THE WITNESS:  My understanding

13       was to not disclose the fact that we

14       were stopping distribution of our

15       controlled substances because the

16       project was still underway.

17       Q.    (BY MR. BOWER)   Did the

18  agreement cover anything else?

19       A.    I don't recall.

20       Q.    Would you be able to answer

21  that question if you had the agreement in

22  front of you?

23       A.    I'm assuming that the rest of

24  the terms would be in the agreement.

25            MR. BOWER:  And I'm just a

1       little bit curious that if that's the

2       scope of the agreement, I'm not sure

3       why there's any -- the facts have

4       already been revealed, so I don't know

5       the basis for any of these objections.

6            MS. FUMERTON:  Well, I

7       disagree, because your question has

8       been broader.  I've not been objecting

9       or instructing her not to answer about

10      the facts of the agreement.  I've been

11      objecting to any questions you ask

12      that go beyond that with

13      communications with counsel about the

14      agreement.

15      Q.     (BY MR. BOWER)  Who are the

16  names of the temporary associates that lost

17  their jobs when Walmart decided to stop

18  distributing controlled substances?

19           MS. FUMERTON:  Objection, form

20      and lack of foundation.

21           THE WITNESS:  So our temporary

22      associates, none of them lost their

23      jobs.  They moved on to other

24      positions and/or went back to their

25      original position.  It was a temporary

1    position from the get-go.

2         Q.    (BY MR. BOWER)  Well, earlier,

3    I believe you testified that there were some

4    folks who lost their jobs in connection with

5    Walmart's decision to stop distributing

6    controlled substances.

7         A.    Well, there were some.

8              MS. FUMERTON:  Objection, form,

9         form.  And that was actually just a

10        statement about what he believed, so

11        wait for a question.  And I don't know

12        if you were finished.  You jumped in.

13        Q.    (BY MR. BOWER)  Is that true?

14             MS. FUMERTON:  Well, objection,

15        form.

16             THE WITNESS:  So there are --

17        there were people -- that position was

18        no longer needed.  So there were

19        people that were no longer in that

20        position.

21             There was nobody that I'm aware

22        of that was left without a job.

23        People transferred to other positions.

24        We had people to go back to the

25        stores.  So nobody was let go from

Highly Confidential - Subject to Further Confidentiality Review

```
1            Walmart as -- on our team as part of
2            this.
3            Q.    (BY MR. BOWER)  Okay.  What are
4    some -- who are some of the people that were
5    repositioned back to the stores?
6            A.    So Carrie Bohl, B-O-H-L, made
7    the decision to go back to the store.
8            Q.    Anyone else?
9            A.    She, I think, is the only one
10   that went back to the store, from what I
11   recollect.
12           Q.    Let's go back to the
13   nondisclosure agreement, then, for a minute.
14           Do you have any understanding
15   as to why Walmart wanted you to sign the
16   agreement?
17           MS. FUMERTON:  I object to the
18      question and instruct you not to
19      answer to the extent that it would --
20      your answer would reveal
21      communications with counsel.
22           If you have an independent
23      understanding, you can answer the
24      question.
25           THE WITNESS:  That would have
```

Highly Confidential - Subject to Further Confidentiality Review

1       been a counsel conversation.

2       Q.    (BY MR. BOWER)  Well, did the

3  agreement itself provide you any explanation

4  as to why it was necessary?

5       A.    I don't recall what was

6  actually in the document.

7       Q.    So if we had the document, we

8  might be able to get an answer to that

9  question; right?

10              MS. FUMERTON:  Objection, form.

11              THE WITNESS:  It's possible.

12       Q.    (BY MR. BOWER)  Did you keep --

13  strike that.

14              Do you know whether Walmart

15  ever signed the agreement?

16       A.    I don't know.

17       Q.    Did you ever receive a signed

18  copy back?

19       A.    Not that I recall.

20       Q.    Did you keep the original

21  signed copy that you signed?

22       A.    I'm not sure.

23       Q.    You don't know where that

24  resides today, do you?

25       A.    No.

1     Q.     And I think I asked this, but I

2  just want to be sure.

3           Did you receive instructions at

4  the time not to discuss the fact of the

5  agreement with anyone?

6           MS. FUMERTON:  Again, to the

7           extent that that was -- those

8           instructions were given by counsel, I

9           instruct you -- well, I should say

10          that they were, assumes they were.  To

11          the extent the answer to that question

12          would reveal communications with

13          counsel, I instruct you not to answer.

14          THE WITNESS:  That would have

15          been a counsel conversation.

16     Q.     (BY MR. BOWER)  Well, does the

17  agreement itself provide a provision that you

18  were not allowed to discuss the fact of its

19  existence?

20     A.     I don't know.

21     Q.     Would you know the answer to

22  that question if you had the agreement in

23  front of us today?

24     A.     I'm assuming that that's in the

25  document.  I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     Other than the folks we've

2    discussed already, are you aware of anyone

3    else that signed the agreement other than

4    what you may have learned in communications

5    with counsel?

6      A.     I wouldn't know.

7      Q.     I'm going to ask just a few

8    more questions on this agreement and then I

9    can move on.  I'm just trying to get a sense

10   of a timing here.

11            Approximately how long before

12   Walmart actually exited its distribution

13   operations for controlled substances did you

14   sign the agreement?

15     A.     I don't know exact timing.  It

16   was a couple months before the process

17   started of moving the controlled substances

18   to McKesson.

19     Q.     And does the agreement then

20   expire once Walmart has completed the

21   movement of controlled substances to

22   McKesson?

23     A.     I'm not sure.

24     Q.     All right.  Let's kind of take

25   a step back and go back to where we were

1    before we got here.  I may have some -- a few

2    more questions at the end, but hopefully

3    not -- okay? -- on the agreement.  But let's

4    move on for now.

5            A.    Okay.

6            Q.    At some point, did you become

7    involved in working on "know your customer"

8    data?

9            A.    Yes.

10           MS. FUMERTON:  Objection, form.

11           THE WITNESS:  Yes.

12           Q.    (BY MR. BOWER)  And what was

13   your involvement with that?

14           A.    I built the queries in the

15   Alteryx module that was used to pull the data

16   that we thought was relevant with the "know

17   your customer" information, and then built

18   the application in Archer to house that

19   information.

20           Q.    Let's try to break that down a

21   little bit more, if we can.

22                 What did you do to build the

23   queries in the Alteryx module to pull data --

24   to pull the data?

25           A.    So I built queries.  So Miranda

Highly Confidential - Subject to Further Confidentiality Review

1    and I worked together to come up with metrics

2    that were needed.  And then I built queries

3    to gather that information.  And then Alteryx

4    was used to get it in the format that would

5    be needed to import into Archer.

6         Q.    And what data source did you

7    use to run those queries?

8               MS. FUMERTON:  Objection, form.

9               THE WITNESS:  So Alteryx is the

10        system that I used to run the queries.

11        Teradata is the source of the query.

12        Q.    (BY MR. BOWER)  And why did you

13   use Alteryx to run the queries on the

14   Teradata?

15        A.    Why did I use Alteryx instead

16   of Teradata?

17        Q.    No, why did you use Alteryx to

18   run the queries in the Teradata database?

19               MS. FUMERTON:  Object to form.

20               THE WITNESS:  So I used Alteryx

21        because it's an easy-to-use, for me,

22        analytic tool that allows us to build

23        modules that allow you to do the same

24        thing, to replicate the information so

25        it can be pulled on a routine basis

1    and get the same results.

2         Q.    (BY MR. BOWER)  So can you just

3    explain a little bit more precisely how that

4    works?  How does Alteryx pull information

5    from Teradata?

6         A.    So Alteryx has a connection

7    that allows it to essentially talk to

8    Teradata.  A query is pulled -- is put into

9    an Alteryx tool, and that, then, connects to

10   Teradata and pulls back the information.

11        Q.    And does that query tell

12   Alteryx what information to pull from

13   Teradata?

14        A.    Yes.

15        Q.    And then how does that

16   information get populated in Archer?

17             MS. FUMERTON:  Objection, form.

18             MR. BOWER:  Strike that.

19        Q.    (BY MR. BOWER)  What happens

20   after Alteryx pulls the data from Teradata?

21        A.    So Alteryx pulls the data.

22   Runs it through the module that I build.

23   There's a couple of different calculations

24   and grouping of data and things like that in

25   the Alteryx module.  It spits out an Excel

Highly Confidential - Subject to Further Confidentiality Review

1    spreadsheet.  That Excel spreadsheet is then

2    imported into Archer.

3          Q.    Is that an automated process?

4                MS. FUMERTON:  Objection, form.

5                THE WITNESS:  No.

6          Q.    (BY MR. BOWER)  Okay.  And is

7    that process set up to run so that the

8    information is continuously updated in

9    Archer?

10         A.    My team pulls the data every

11   quarter, and it's updated in Archer on a

12   quarterly basis.

13         Q.    And does your team -- strike

14   that.

15               When did this work start?

16         A.    In mid-to-late 2015.

17         Q.    Okay.  And has the data you're

18   pulling from Teradata changed since

19   mid-to-late 2015?

20         A.    Not significantly.  We use a

21   different query now than we did in 2015.

22         Q.    Okay.  Is this work, this "know

23   your customer" work still ongoing today?

24               MS. FUMERTON:  Objection, form.

25               THE WITNESS:  Yes.

1          Q.     (BY MR. BOWER)  And why is

2     that?

3                  MS. FUMERTON:  Objection, form.

4                  THE WITNESS:  The data has

5          proved useful in other investigations

6          that don't involve SOM.

7          Q.     (BY MR. BOWER)  And how else

8     has the data proven useful?

9                  MS. FUMERTON:  If these -- if

10         you're discussing -- are you talking

11         about investigations with counsel, or

12         are you talking about something

13         outside of work with counsel?  With

14         the legal -- with legal?

15                 Well, I'm now asking questions.

16                 I'm going to instruct you not

17         to -- I apologize.

18                 I'm going to instruct you not

19         to answer the question to the extent

20         that you could only answer that

21         question based on communication with

22         counsel.

23                 If you have an -- if there is

24         another use outside of communications

25         with counsel or legal, you can

1          testify.

2               THE WITNESS:  Sorry, I'm trying

3          to --

4               MR. BOWER:  No problem.

5               THE WITNESS:  I do lots of work

6          with legal, and so I'm trying to make

7          sure that I'm using an example

8          that ...

9               MR. BOWER:  I will just say I

10         don't think the fact that you're doing

11         something necessarily reveals legal

12         advice and I don't think it's

13         privileged.

14              MS. FUMERTON:  That's not what

15         you asked.  You asked why would it be

16         useful.

17         Q.    (BY MR. BOWER)  Okay.  So let

18    me ask it a different way.

19              What are you doing with the

20    data today?

21         A.    So currently, I can't think of

22    anything that we're using the data for.  We

23    continue to pull it because there have been

24    circumstances where we -- where it's come in

25    handy.

1      Q.     And what are those

2  circumstances?

3              MS. FUMERTON:  I'm going to

4        instruct her not to answer that

5        question on the basis that it's

6        privileged.  She made it clear earlier

7        that she cannot think of any examples

8        that would not involve legal.

9              MR. BOWER:  She didn't make it

10       clear, and I don't think that the

11       fact -- the circumstance is a legal

12       advice.  I'm just asking what the

13       circumstances are.

14             MS. FUMERTON:  No, you're

15       asking the circumstances that made it

16       useful.  And I think that that

17       would --

18             Again, if she can give an

19       example that would not have been in

20       connection with a request from legal,

21       she can answer the question.  If she

22       can only answer the question in

23       connection with a request from legal,

24       I'm going to instruct her not to

25       answer the question.

```
 1                   THE WITNESS:  Can I answer it
 2           in a very generic term?
 3                   MS. FUMERTON:  If it will not
 4           reveal communications with counsel.
 5                   THE WITNESS:  Okay.  Then I can
 6           answer generically.
 7                   MR. BOWER:  Okay.
 8                   THE WITNESS:  So part of the
 9           information that we gather in "know
10           your customer" is patient distance.
11           So the patient -- the distance that a
12           patient is traveling from their home
13           location that we have on file, to the
14           store.  And we have that for all
15           prescriptions and then for controlled
16           substances.  So having that base
17           number comparison to compare to a drug
18           in question data could be useful as an
19           example.
20           Q.    (BY MR. BOWER)  Okay.  And
21      that's helpful, thank you.
22                   Has Walmart -- strike that.
23                   Since Walmart has stopped
24      distributing controlled substances, has
25      Walmart ever done an analysis as to how the
```

1    shifting in that business for McKesson has

2    impacted Walmart pharmacies?

3              MS. FUMERTON:  Objection, form.

4              THE WITNESS:  Can you restate?

5              MR. BOWER:  Sure.  Has anyone

6         at Walmart gone back and looked at the

7         impact of the pharmacies ordering,

8         that the shift to McKesson has caused?

9              THE WITNESS:  So I can't answer

10        if anybody has.  I have not.

11    Q.    (BY MR. BOWER)  Do you know

12    whether Walmart has done that analysis?

13    A.    I can't answer that.

14    Q.    Do you know whether the

15    decision to move controlled substances to

16    McKesson was another example of Walmart

17    seeking to improve the way it does its

18    business?

19              MS. FUMERTON:  Objecting to the

20        form of the question.  I'm just

21        asking -- you're interrupting the

22        witness.  Let her finish.  So she was

23        continuing with her answer.  I think

24        we're fine.  Let's move on.  That was

25        all I was going to say.

1          MR. BOWER:  Okay.  Sorry about

2     that.

3          THE WITNESS:  I don't know.

4     Q.    (BY MR. BOWER)  Do you know

5  whether Walmart today monitors orders placed

6  by its pharmacies to McKesson?

7          MS. FUMERTON:  Objection, form.

8          THE WITNESS:  We have looked at

9     our orders, of course, that we placed

10     to McKesson.  And there have been

11     times that we -- that we review that,

12     yes.

13     Q.    (BY MR. BOWER)  And for what

14  purpose does Walmart review orders that it

15  places with McKesson?

16     A.    If there is a store that meets

17  McKesson's threshold, then that store reaches

18  out to us for help as to why they met their

19  threshold.  And so then we review those

20  orders to find out what the problem is.

21     Q.    And what happens after you

22  review the orders?

23          MS. FUMERTON:  Objection, form.

24     Q.    (BY MR. BOWER)  Well, strike

25  that.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    What's the purpose of reviewing
 2    the orders?
 3                    MS. FUMERTON:  Objection, form,
 4            and asked and answered.
 5                    THE WITNESS:  So we review the
 6            order to see if there was a mistake in
 7            the order and then potentially request
 8            a threshold increase from McKesson.
 9        Q.    (BY MR. BOWER)  Well, let me
10    ask the question, then, because that's a
11    little bit confusing to me.
12                    Why would a store reach out to
13    you if they had a mistake in the order?
14                    MS. FUMERTON:  Objection, form.
15                    THE WITNESS:  Because they
16            don't realize there was a mistake.
17        Q.    (BY MR. BOWER)  So they reach
18    out to you, and then who realizes it's a
19    mistake?
20                    MS. FUMERTON:  Objection, form.
21                    THE WITNESS:  It depends on who
22            is reviewing the order.
23        Q.    (BY MR. BOWER)  And then what
24    happens if it was a mistake?
25                    MS. FUMERTON:  Objection, form.
```

Highly Confidential - Subject to Further Confidentiality Review

 1                    MR. BOWER:  Let's take a step

 2         back, then.

 3         Q.    (BY MR. BOWER) The store

 4    reaches out to you because McKesson has --

 5    they trigger a McKesson threshold; right?

 6    How does the store realize they've triggered

 7    McKesson's threshold?

 8                    MS. FUMERTON:  Objection, form.

 9                    THE WITNESS:  They receive an

10         email.

11         Q.    (BY MR. BOWER)  At that point

12    they reach out to you?

13                    MS. FUMERTON:  Objection, form.

14         Q.    (BY MR. BOWER)  Is that

15    correct?

16         A.    It can come from multiple

17    different ways.  They might reach out to

18    their market director.  But it filters up

19    through to my team.

20         Q.    Okay.

21                    And then what do you do with

22    that information?

23         A.    So the first thing I do is look

24    at the reports that McKesson sends to us, to

25    see what it was that made them go over their

1    threshold.

2         Q.    And then what do you do next?

3         A.    So it depends.  If it's that

4    the store entered 300 bottles, when they

5    meant to order three bottles, then I call the

6    store and I'm like, "Did you intend to order

7    300 bottles?"  And they're like, "Well, no."

8    And my response is, "Well that's why you hit

9    your threshold."

10         And Walmart pharmacists are

11   used to thinking in dosage units, so when

12   they order it, they often think, you know, I

13   need 300 tablets, and so they enter in 300

14   and they mean three bottles.

15         And so most often that's the

16   case that happened, is it -- they ordered in

17   dosage units instead of bottles.

18        Q.    And in those circumstances, do

19   you rely on the statements by Walmart

20   pharmacists in reaching the conclusion that

21   the order was entered in error?

22         MS. FUMERTON:  Objection, form.

23        Q.    (BY MR. BOWER)  In other words,

24   how do you know that the store didn't intend

25   to order 300 bottles?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     Because there's nowhere to put

2   300 bottles in a pharmacy.

3      Q.     How do you know that's not a

4   suspicious order?

5              MS. FUMERTON:  Objection, form.

6              THE WITNESS:  That's why

7          McKesson has a program in place.  I

8          mean, they're also -- they have a

9          suspicious order program and so, yes,

10         we trust our pharmacists.  Because

11         it's also, you know, logical.  But

12         especially when they're calling to

13         complain about it.  People that are

14         doing nefarious things don't tend to,

15         like, bring it up.

16     Q.     (BY MR. BOWER)  So what happens

17   if an order like that is placed and no one

18   calls to complain?  What happens to the

19   order?

20             MS. FUMERTON:  Objection, form.

21             THE WITNESS:  It would be

22         omitted by McKesson and then handled

23         on the McKesson side.

24     Q.     (BY MR. BOWER)  Would any

25   product be shipped to the pharmacy?

```
1                    MS. FUMERTON:  Objection, form.
2                    THE WITNESS:  Omitted means not
3           shipped.
4           Q.    (BY MR. BOWER)  So no -- in
5    that case, there would be -- the order would
6    be cut to 0 and not shipped; is that correct?
7                    MS. FUMERTON:  Objection, form.
8                    THE WITNESS:  I don't know the
9           term "cut."  I know the order is not
10          shipped.
11                  So I don't know the -- I don't
12          know their processes in any way,
13          shape, or form.  I know that we are
14          notified when things aren't shipped.
15          Q.    (BY MR. BOWER)  And who
16   notifies you when things are not shipped?
17                  MS. FUMERTON:  Objection, form.
18                  THE WITNESS:  There's an
19          automatic email that comes to our
20          email distribution.
21          Q.    (BY MR. BOWER)  And in the
22   scenario that you mentioned before, where an
23   order was placed for 300, if that order was
24   not shipped, would that be -- order be
25   reported to the DEA?
```

```
 1              MS. FUMERTON:  Objection, form.
 2         Lack of foundation.
 3              THE WITNESS:  I don't know
 4         McKesson's process.
 5         Q.    (BY MR. BOWER)  Would anyone
 6    from Walmart report that order?
 7              MS. FUMERTON:  Objection, form.
 8              THE WITNESS:  No.  The order
 9         was placed to McKesson.
10         Q.    (BY MR. BOWER)  And let's say,
11    for example, I speak to the pharmacist,
12    right, and they state that the order should
13    have been 3 instead of 300.  What happens
14    next?
15         A.    So that order -- they would not
16    receive that order.  They would then proceed
17    to place the correct order that they intended
18    to place.
19         Q.    They would have to reorder the
20    item through to McKesson?
21         A.    Yes.
22         Q.    In other words, place an
23    entirely new order; correct?
24         A.    Yes.
25         Q.    At that point would you speak
```

1    with anyone on the McKesson end and inform

2    them that their order was placed in error?

3        A.    Not typically, no.

4        Q.    Would McKesson ever be informed

5    that the order that they flagged as being

6    over the threshold was placed in error?

7             MS. FUMERTON:  Objection, form.

8        Lack of foundation.

9             THE WITNESS:  Not that I know

10       of.

11       Q.    (BY MR. BOWER)  And let's say,

12   for example, an order was flagged by the

13   McKesson threshold when it wasn't placed in

14   error.  It was an intentional order.  What

15   would happen then?

16            MS. FUMERTON:  Objection, form.

17            THE WITNESS:  So we don't

18       review every order that's flagged.

19       The orders that we do review are ones

20       where the pharmacy or the market

21       director say, "Hey, we have a need for

22       this, and we're not getting -- we've

23       met our threshold."  And so in that

24       case, we pull data and look at very

25       similar data points that we looked at

1        during our SOM process, dispensing

2        trends, things like that, and see if

3        it makes sense that they're no longer

4        meeting their threshold, or if it's a

5        timing issue.

6             So this month they -- so last

7        month, two patients came in -- didn't

8        come in that typically come in and

9        they came in in January instead.

10            And so that would shift kind of

11       their numbers around.  And so if it's

12       a case like that, then we leave it as

13       is.  But if it's a case where, most

14       often a new pharmacy, that the

15       threshold was different, or a case

16       that there's, you know, closing

17       pharmacies around it and so the

18       climate has changed in that area, then

19       we send data to McKesson and request a

20       threshold increase.

21       Q.    (BY MR. BOWER)  And who sends

22   the data to McKesson?

23       A.    I do.

24       Q.    Okay.  And what data would you

25   send them?  What's an example of the type of

1    data you would send?

2         A.    So we send the reason that

3    we're -- that we are requesting, and then

4    they have a template of data that they

5    request that we send.

6         Q.    Okay.  And then in that

7    scenario, once you send the data to McKesson,

8    is there anything else that you do?

9         A.    No.

10        Q.    Do you receive word from

11   McKesson back as to whether the order has

12   shipped or not?

13             MS. FUMERTON:  Objection, form.

14             THE WITNESS:  When we're having

15        communication, it's not about a

16        specific order.  It's about the

17        threshold in general.  And so we do

18        receive communication back, whether

19        the threshold was increased or not.

20        Q.    (BY MR. BOWER)  Just going

21   back, a few more follow-up questions on now

22   back to the time period when Walmart was

23   distributing controlled substances back in

24   late 2015.  Okay?  In connection with your

25   "know your customer" work?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      (Witness nods.)

2          Q.      Other than the data that you

3    mentioned regarding dispensing, what -- any

4    other data that you looked at in connection

5    with the "know your customer" work?

6          A.      So when you say "know your

7    customer work," that's a kind of broad --

8    broad statement.

9          Q.      Okay.

10         A.      And I'm assuming has a

11   different meaning from what I mean.  So when

12   I am talking about the "know your customer"

13   data, I'm referring to the data set that I

14   pull out of -- out of Teradata and insert

15   into one portion of our store profile.  But

16   the store profile would be included in the

17   "know your customer" information, because it

18   has basic store information and other things

19   about the store.

20         Q.      Right.  And I'm just asking you

21   today about the process that you described

22   where you pulled data in connection with

23   Walmart's "know your customer" program and

24   imported it into Archer.  And whether that

25   program used information other than

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing data.

2             MS. FUMERTON:  Objection, form.

3             THE WITNESS:  So the "know your

4        customer" information that I imported

5        into Archer was dispensing

6        information.

7        Q.    (BY MR. BOWER)  And it was

8    limited to dispensing information; is that

9    correct?

10       A.    What was imported into Archer

11   was limited as far as the dispensing piece of

12   "know your customer."

13            So our store profile is -- the

14   complete store profile is our customer

15   information.  So it's not limited to

16   dispensing data.

17       Q.    Other than dispensing data,

18   what does the store profile include?

19            MS. FUMERTON:  Objection, form.

20            And your time period.  Are you

21       talking today or back then?

22       Q.    (BY MR. BOWER)  No, we're still

23   back in --

24            MS. FUMERTON:  Okay, I'm sorry.

25            MR. BOWER:  -- at least 2015.

Highly Confidential - Subject to Further Confidentiality Review

1              Sorry about that.

2              THE WITNESS:  Okay.  So the --

3      late 2015.

4              So the basic store information

5      is there.

6              MR. BOWER:  Okay.

7              THE WITNESS:  So the DEA

8      number.

9              MR. BOWER:  Okay.

10             THE WITNESS:  Who the

11     pharmacist in charge is.  The refusal

12     to fills that they've had.  The other

13     controlled substance loss incidents

14     that they've had.  Things like that

15     are all included.

16     Q.    (BY MR. BOWER)  Okay.  Do you

17  consider refusal-to-fill information

18  dispensing information?

19             MS. FUMERTON:  Objection, form.

20             THE WITNESS:  No.  It would

21     actually be the lack thereof.

22             MR. BOWER:  Okay.  Right.

23             And so -- and just -- I know I

24     asked this, but I don't recall what

25     the answer was, so I'm just going to

Highly Confidential - Subject to Further Confidentiality Review

1       ask it again.

2           Q.    (BY MR. BOWER)   The

3   refusal-to-fill information is manually

4   populated by the pharmacist; is that correct?

5           A.    At the timeframe that we're

6   talking about here?

7           Q.    Yes.

8           A.    Yes.

9           Q.    Okay.

10          A.    I did back-populate 2014 data.

11          Q.    And how did you go about doing

12  that?

13          A.    We had the refusal-to-fill

14  information that had been filled out via web

15  form.  And it was imported into Archer.

16          Q.    And then at some point, you

17  began creating weekly reports regarding your

18  team's reviews of orders of interest; is that

19  correct?

20              MS. FUMERTON:  Objection, form.

21              THE WITNESS:  Yes.

22          Q.    (BY MR. BOWER)  And do you

23  recall when you started doing that?

24          A.    I do not.

25              MS. FUMERTON:  Is this a --

```
 1            could we take a quick break?  I mean,

 2            like five minutes?  It looks like we

 3            have about an hour left on the record.

 4            So that may be natural.

 5                      THE VIDEOGRAPHER:  4:17.  We

 6            are off the video record.

 7                      (Recess taken, 4:17 p.m. to

 8            4:36 p.m.)

 9                      THE VIDEOGRAPHER:  4:36.  We

10            are on the video record.

11                      (Walmart-Reed Deposition

12            Exhibit 14, was marked for

13            identification.)

14            Q.    (BY MR. BOWER)  We are back on

15      the record.  Let me just hand you Exhibit 14.

16      It's Bates number ending in 9030.  It's just

17      a one-page email, and I just have some

18      general questions on this document.

19                      So let me know when you've had

20      a chance to review it, okay?

21                      [Document review.]

22                      THE WITNESS:  Yes.

23            Q.    (BY MR. BOWER)  Just a couple

24      of questions on this, then.

25                      What is -- if you note it there
```

1    this is from -- in the "From" line, do you

2    know what that refers to?

3         A.    So this is an email generated

4    from LeanKit.  L-E-A-N-K-I-T, LeanKit.

5         Q.    And what is that?

6         A.    It's a task management system,

7    I believe is the best way to describe it.

8         Q.    Okay.  And when did Walmart

9    start using LeanKit?

10        A.    Walmart as a whole, I can't

11   speak to.

12              Our team, Miranda and I,

13   started using it early 2016, if I remember

14   correctly.

15        Q.    And what does the reference to

16   "Add CS schedule for top three docs" mean?

17        A.    So further down, the

18   question -- so this is from Miranda.  So

19   Miranda created a card --

20        Q.    Okay.

21        A.    -- in LeanKit, which is just a

22   task.  And the description of the task would

23   be can we add the number of prescriptions for

24   each drug schedule on the "top three doctors"

25   tab.  This is in reference to the SOM eval.

Highly Confidential - Subject to Further Confidentiality Review

1    So the SOM eval spreadsheet that we create.

2         Q.    Is that within the Archer

3    database or is that something different?

4         A.    No.  When -- I know we've

5    talked earlier about kind of the flow of

6    things.  When overview came up to practice

7    compliance for review, I pulled data, using

8    Alteryx, out of using Teradata, to pull

9    dispensing data.  And that's referring to

10   that spreadsheet that we used for the review.

11        Q.    So would you create one of

12   those spreadsheets for each order of interest

13   that your team reviewed?

14        A.    Yes.  For each order that was

15   elevated to our team to review.

16        Q.    Okay.  And would you save those

17   spreadsheets anywhere?

18        A.    Yes.  They would be saved on

19   the server.

20        Q.    Were you able to add the number

21   of prescriptions for each drug schedule on

22   the "top three doctors" tab?

23        A.    To the best of my recollection,

24   yes.

25        Q.    Okay.  And where would that

1    information have come from?

2          A.     Teradata.

3          Q.     At some point did you become

4    involved in pulling information for Buzzeo?

5                 MS. FUMERTON:  Objection, form.

6                 MR. BOWER:  Strike that.

7          Q.     (BY MR. BOWER)  Do you recall

8    receiving a request that had come from Buzzeo

9    for Walmart order information?

10         A.     Yes.

11         Q.     Okay.  What do you recall about

12   that?

13         A.     I recall that there was an ask

14   to pull 24 months of order history.

15         Q.     And were you able to provide

16   Buzzeo with that information?

17         A.     No.

18         Q.     And why not?

19         A.     Because we did not know -- I

20   did not know where to obtain 24 weeks of

21   order history.

22         Q.     Well, did anyone in Walmart

23   know to obtain that information?

24         A.     No.  The most we could find was

25   eight weeks.

1    Q.    Was Buzzeo ever provided with

2    24 weeks of order history from Walmart

3    pharmacies?

4              MS. FUMERTON:  Objection to

5         form.

6              THE WITNESS:  They were not

7         provided with 24 weeks of order

8         history.

9         Q.    (BY MR. BOWER)  Do you know

10   whether they were provided any data in lieu

11   of the order history information they

12   requested?

13        A.    Yes.

14        Q.    What data were they provided?

15        A.    They were provided 24 --

16   24 months of shipment history.

17        Q.    And do you recall Buzzeo taking

18   the position that it preferred to have order

19   history instead of shipped history?

20             MS. FUMERTON:  Objection, form.

21             THE WITNESS:  I don't recall

22        the specific -- that specific

23        conversation.

24        Q.    (BY MR. BOWER)  Do you

25   recall -- do you know who Scott Hardy is?

1        A.      Yes.

2        Q.      Do you recall him telling you

3   that "the quantity ordered is, of course,

4   preferred over the quantity shipped"?

5        A.      I don't recall that

6   specifically.

7                (Walmart-Reed Deposition

8            Exhibit 15, was marked for

9            identification.)

10       Q.      (BY MR. BOWER)  Okay.  You've

11  been handed what's been marked as Exhibit 15.

12  I don't really have any other questions than

13  those I've already asked, so I'm just going

14  to ask whether this refreshes your

15  recollection as to whether Mr. Hardy informed

16  you and others at Walmart that "Quantity

17  ordered was preferred over quantity shipped."

18       A.      Yes.

19       Q.      And just so the record is

20  clear, is it your testimony that this email

21  refreshes your recollection that Buzzeo

22  stated that it preferred to have data

23  regarding quantity ordered instead of the

24  quantity shipped?

25                MS. FUMERTON:  Objection, form.

Highly Confidential - Subject to Further Confidentiality Review

```
1                    THE WITNESS:  Yes.
2         Q.    (BY MR. BOWER)  And let's just
3    read it so everyone is on the same page.
4    Okay?
5                    Mr. Hardy writes to yourself,
6    Eric Welch, and Miranda Johnson, okay?
7         A.    Yes.
8         Q.    And he writes, "Okay.  Quantity
9    ordered is, of course, preferred.  And maybe
10   you supply as much of that data as you can
11   and also include the 24-month quantity
12   shipped."  Do you see that?
13        A.    Yes.
14        Q.    Do you understand that to mean
15   that Buzzeo -- in here it's ims -- those are
16   the same; correct?
17        A.    Yes.
18        Q.    Did you understand him to mean
19   that they preferred to have information
20   regarding the quantity ordered when compared
21   to information regarding quantity shipped?
22        A.    Yes.
23             MS. FUMERTON:  Objection, form.
24             THE WITNESS:  Yes.
25        Q.    (BY MR. BOWER)  Were you able
```

1    to provide that information?

2              MS. FUMERTON:  Objection, form.

3         Q.    (BY MR. BOWER)  Strike that.

4              Was Walmart able to provide

5    that information to Buzzeo in connection with

6    its SOM program?

7              MS. FUMERTON:  Objection, form.

8              THE WITNESS:  We were not able

9         to provide 24 months or 13 months of

10        historical order data, no.

11        Q.    (BY MR. BOWER)  How much

12   historical order data were you able to

13   provide?

14        A.    Based on my previous email, I

15   said, "We've only been able to identify eight

16   weeks of history."  So my assumption would be

17   I sent that eight weeks of history.  I don't

18   recall doing so.

19        Q.    Do you recall whether, after

20   Walmart tried to look for historical order

21   data and couldn't find it, whether it started

22   to maintain that data?

23              MS. FUMERTON:  Objection, form.

24              THE WITNESS:  I'm not sure.

25        Q.    (BY MR. BOWER)  Do you know why

 1     Walmart wouldn't maintain order data?

 2                    MS. FUMERTON:  Objection, form.

 3                    THE WITNESS:  I do not.

 4          Q.     (BY MR. BOWER)  Who is

 5     Aaron Williams?

 6          A.     Aaron is an analyst that

 7     reports to me.

 8          Q.     What does the "SOM eval macro

 9     in Alteryx" refer to?

10          A.     It is the module in Alteryx

11     that is actually a macro that we used to

12     create the SOM eval spreadsheets.

13          Q.     And what do you mean it's

14     "actually a macro"?

15                    For those who aren't so

16     technically inclined?

17          A.     So a module is set up to run --

18     run once, and you have to go into each

19     individual tool and make updates for whatever

20     is in question to update.

21                    A macro makes it more simple in

22     that it's -- you select pieces that you'll

23     always want to update in the query or in a

24     filter or in a formula, wherever in the

25     module, and the macro is set up to update

1    with the information that you provide it.

2         Q.     And this macro in Alteryx,

3    who -- how did Walmart go about selecting the

4    pieces?  What does that mean?  Of the data?

5              MS. FUMERTON:  Objection, form.

6              THE WITNESS:  What do you mean?

7         Q.     (BY MR. BOWER)  Well, I'm just

8    trying to understand your answer.  You say,

9    "A macro makes it more simple in that you

10   select the pieces that you always want to

11   update in the query."  What does that mean?

12        A.     Okay.  So a query is -- the

13   purpose of a query is to limit data down to

14   what you want to look at.  So it's pulling

15   from big data sources to get the data that

16   you want to look at.

17              So, for instance, for SOM, we

18   would limit by store number, by GPI, and by

19   date range.

20              And in the regular module,

21   anytime we wanted to pull for a different

22   store, or a different drug, or a different

23   timeframe, we would have to go into that tool

24   and make those updates.

25              So you'd have to open up the

1    module, wait for it to load, wait for the

2    connection, make those changes and then run

3    it.

4                  A macro is set up where I say,

5    store number, I want to be able to update

6    that to whatever I enter into either a

7    spreadsheet, into a little form that I

8    create.

9                  And then GPI, I want to be able

10   to update that with the information that I

11   provide.

12                 And then it runs.  You enter

13   the data, the store number, the GPI, the date

14   range into -- depending on the timeframe, you

15   would enter it into a form in Alteryx, or in

16   a spreadsheet that would then run the data

17   and spit out the spreadsheets that we -- that

18   we needed to look at.

19        Q.    And what do you mean when you

20   say "A spreadsheet would run the data"?  How

21   does that happen?

22        A.    So that's called a batch macro.

23                 And you can have a spreadsheet

24   that has a list of store numbers, a list of

25   GPI numbers, and it would run the first one.

```
 1    It would update the store and the GPI, run it

 2    all the way through the macro -- or the

 3    module, and spit out the answer.  Then it

 4    would automatically go to the next one on the

 5    list.  Run it all the way through the process

 6    and spit out the answer.

 7              And so it goes all the way

 8    through the spreadsheet instead of a person

 9    having to enter in one combination and let it

10    run, enter in another combination and let it

11    run.  It automates the process slightly.

12         Q.    And is that batch macro in

13    addition to the Alteryx that you described

14    previously or is that part of the same

15    process?

16         A.    It's a type of Alteryx.

17         Q.    Okay.

18              So that's also within Alteryx;

19    is that correct?

20         A.    Yes.

21         Q.    And Alteryx, during this time

22    period that you were using it for SOM, was

23    pulling -- still pulling data from Teradata;

24    is that correct?

25              MS. FUMERTON:  Objection, form.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2          Q.    (BY MR. BOWER)  Are there any

 3    other sources of data that it was pulling

 4    from?

 5                    MS. FUMERTON:  Objection, form.

 6          Q.    (BY MR. BOWER)  At any time did

 7    the Alteryx macro pull data from any other

 8    source other than Teradata?

 9                    MS. FUMERTON:  Objection, form.

10                    THE WITNESS:  There -- during

11          the Buzzeo period there were also some

12          spreadsheets that it attached to.

13          Q.    (BY MR. BOWER)  Do you recall

14    what information or data was on those

15    spreadsheets?

16          A.    It was the list of active

17    ingredients and the GPI drug class code.

18    Because --

19          Q.    Did -- I didn't mean to cut you

20    off.  Please finish.

21          A.    Because the drug class code

22    which is a portion of the GPI, when we used

23    Buzzeo, that was used to pull the data.

24          Q.    And did that information --

25    strike that.
```

1          Was that information added to

2     the Alteryx macro at the same time that

3     Walmart began using Buzzeo for its SOM

4     program?

5               MS. FUMERTON:  Objection, form.

6               THE WITNESS:  There are two

7          different Alteryx modules.  So there's

8          the one we used for the Reddwerks

9          period, and then there is a completely

10         different one that we used for the

11         Buzzeo period.

12              MR. BOWER:  Okay.  Thank you.

13         Q.    (BY MR. BOWER)  When the SOM

14    program was moved over to Buzzeo, did that

15    change the process for which Walmart reviewed

16    an order of interest?

17              MS. FUMERTON:  Objection, form.

18              THE WITNESS:  Yes.

19         Q.    (BY MR. BOWER)  And how did

20    that process change at that time?

21         A.    The logistics team was no

22    longer involved in the reviewing of orders.

23    So --

24         Q.    Sorry, go ahead and finish.

25         A.    So our analysts reviewed the

1    orders.

2        Q.    What do you mean by "our

3    analysts"?

4        A.    The temporary analysts that we

5    had on the practice compliance controlled

6    substances team.

7        Q.    Do you know why that change was

8    made?

9        A.    I do not.

10        Q.    Do you know who would know the

11    answer to that question?

12        A.    Leadership and practice

13    compliance and logistics.

14        Q.    And who was that at that time?

15        A.    Miranda Johnson and

16    George Chapman on our side and Debbie Hodges

17    on the logistics side.

18        Q.    Other than that change where

19    the logistics team was no longer involved in

20    reviewing orders of interest, were there any

21    other changes made in the way that Walmart

22    was reviewing orders of interest that reflect

23    like Buzzeo?

24            MS. FUMERTON:  Objection, form.

25            THE WITNESS:  Yes.  We -- so

1       our controlled substances analysts

2       started reviewing the data.  We -- the

3       alerts, and then the data that we

4       created because of that.

5           The next level of review was at

6       a senior manager level, and that would

7       have been myself, and then we had

8       three pharmacists that were involved

9       in that on a temporary basis.

10          And depending on the level, a

11      director would also review before a

12      final decision was made.

13      Q.      (BY MR. BOWER)  And what do you

14  mean when you say "three pharmacists"?  Can

15  you just explain what that means?

16      A.      So we had temporary assignments

17  for three pharmacists -- or four pharmacists.

18  Four.  Three of them came from our mail order

19  facility in Dallas.  Two worked with us full

20  time.  One of them was kind of a part-time,

21  as-needed basis.

22          And then the other pharmacist

23  was a local pharmacist that came up to the

24  Walmart home office to work with us.

25      Q.      So did these four pharmacists

1   physically relocate to the home office in

2   connection with this assignment?

3        A.    No.

4        Q.    Okay.  Can you just explain,

5   then, generally how that would work?

6        A.    So one pharmacist relocated to

7   the home office.  The other three were

8   located in their facility in Dallas.

9             And since it was a web-based

10  system between Archer and Buzzeo, you didn't

11  have to be at the home office.

12       Q.    And this is -- the pharmacists

13  weren't brought in until the change was made

14  to Buzzeo; is that right?

15            MS. FUMERTON:  Objection, form.

16            THE WITNESS:  Yes.

17       Q.    (BY MR. BOWER)  Okay.  Was that

18  at the same time that Buzzeo took over or was

19  it after -- a period of time after Buzzeo

20  took over?

21       A.    It was slightly --

22            MS. FUMERTON:  Objection,

23       form -- give me a chance to object.

24            THE WITNESS:  Oh, sorry.

25            MS. FUMERTON:  Object to form.

1          Go ahead.

2          THE WITNESS:  It was slightly

3     before to account for training.

4          Q.    (BY MR. BOWER)  And who

5     provided the training for the pharmacists?

6          A.    Myself and Miranda.

7          Q.    And what did that training

8     entail?

9          A.    From what I recollect, we

10    trained them on the -- the Archer system, the

11    Buzzeo system, why we were doing what we were

12    doing and exactly what we would be doing.

13         Q.    And what was the training with

14    respect to why you were doing what you were

15    doing?

16         A.    I don't recall specifically.

17    It was, you know, we're complying with SOM

18    regulations.  This is a new, enhanced

19    program, Buzzeo program, not compliance

20    program.  And so ...

21         Q.    I don't want to cut you off.

22         A.    No, I don't know what else I

23    was going to say.

24         Q.    Okay.

25               Would you agree that the

1    Buzzeo -- strike that.

2            Would you agree that the Buzzeo

3    method for identifying orders of interest was

4    more robust than the method used at

5    Reddwerks?

6            MS. FUMERTON:  Objection, form.

7            THE WITNESS:  I'm not sure I

8        would use the term "robust."  I would

9        say it was more dynamic.

10       Q.    (BY MR. BOWER)  And what do you

11   mean by "dynamic"?

12       A.    Because it changed.  As orders

13   changed, it was a 30-day kind of roll -- it

14   looked at a 30-day rolling information.  So

15   it was more dynamic.  Changing more often.

16       Q.    Do you understand that Walmart,

17   when it was distributing controlled II

18   substances, had an obligation to monitor for

19   suspicious orders?

20           MS. FUMERTON:  Objection, form.

21           THE WITNESS:  So I understand

22       that there was a suspicious order

23       monitoring requirement for

24       distributing entities, yes.

25       Q.    (BY MR. BOWER)  And you

Highly Confidential - Subject to Further Confidentiality Review

1    understand that that was a legal requirement;

2    correct?

3              MS. FUMERTON:  Objection, form.

4              THE WITNESS:  Yes.

5         Q.    (BY MR. BOWER)  And do you

6    understand, as you sit here today, that

7    Walmart had an obligation, when it

8    distributed controlled substances, to review

9    orders for unusual size?

10             MS. FUMERTON:  Objection, form.

11             THE WITNESS:  Yes.

12        Q.    (BY MR. BOWER)  Did you

13   understand, back in 2017, that Walmart had an

14   obligation to review orders for unusual

15   pattern?

16             MS. FUMERTON:  Objection, form.

17             THE WITNESS:  Yes.

18        Q.    (BY MR. BOWER)  How did the

19   Reddwerks platform review orders that may

20   have been an unusual pattern?

21             MS. FUMERTON:  Objection, form.

22             THE WITNESS:  I don't know the

23        exact answer to that.

24        Q.    (BY MR. BOWER)  And did you

25   understand back in 2007 that Walmart had an

1      obligation to review orders for unusual

2      frequency?

3                    MS. FUMERTON:  Objection, form.

4                    THE WITNESS:  2007, no.

5            Q.    (BY MR. BOWER)  You don't

6      believe Walmart had that obligation in 2007?

7            A.    No, in 2007, I don't know that

8      I understood that.

9            Q.    Okay.  When did you first

10     understand that Walmart had a legal

11     obligation to review orders for Schedule II

12     products?

13                   MS. FUMERTON:  Objection, form.

14                   THE WITNESS:  So I don't know

15           that I was aware of our policy or the

16           statute, law, whatever it is that

17           dictates that until I started working

18           with the program, helping out in 2014.

19           Q.    (BY MR. BOWER)  And did you

20     understand in 2017 that Walmart had an

21     obligation to review orders that may have

22     represented an unusual pattern?

23                   MS. FUMERTON:  Objection.

24           Form.

25                   THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1              Q.    (BY MR. BOWER)  And how did
2      Reddwerks go about doing that?
3                    MS. FUMERTON:  Objection, form.
4                    THE WITNESS:  I don't know.
5                    (Walmart-Reed Deposition
6              Exhibit 16, was marked for
7              identification.)
8                    MR. MILLER:  Can we get a Bates
9              number on Exhibit 15?  I don't think
10             that was established.
11                   MR. BOWER:  Sure.  It's 7071
12             through 7072.
13                   MR. MILLER:  That's 16.
14                   MR. BOWER:  Sorry, yeah, we're
15             on 16.  Did I say 17?
16                   MR. MILLER:  No, he asked about
17             15, I think.
18                   THE WITNESS:  You put 17 on
19             here.
20                   MS. FUMERTON:  All right.  Can
21             we -- because I have the last one
22             before that as 15.
23                   MR. BOWER:  Why don't we go off
24             the record just for a moment just to
25             clear that up.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE VIDEOGRAPHER:  Stand by.
 2          5:01.  We are off the video record.
 3                    (Recess taken, 5:01 p.m. to
 4          5:02 p.m.)
 5                    THE VIDEOGRAPHER:  5:02.  We
 6          are on the video record.
 7          Q.    (BY MR. BOWER)  We are back on
 8     the record now and let me clear up my
 9     mistake.  Exhibit 15 is ending in Bates
10     No. 4624 and 46 for -- to 4626.  And then
11     Exhibit 16 is 7071 and 7072.
12                    MS. FUMERTON:  Okay.  And I
13          don't think you've had a chance to
14          review yet, so why don't you go ahead
15          and review the document.
16                    [Document review.]
17                    THE WITNESS:  Okay.
18          Q.    (BY MR. BOWER)  So this is --
19     who is the person sending this email?  Who is
20     the "From" in that email at the top there?
21          A.    So we always just call them
22     Monique.
23          Q.    Okay.  And he is at -- is he at
24     ims, or Buzzeo?
25          A.    Yes.
```

```
 1              Q.     And he refers -- and Miranda's
 2     email below refers to a score.
 3                     Do you see that?
 4       A.     Yes.
 5              Q.     And what does that mean?  What
 6     does a score refer to?
 7                     MS. FUMERTON:  Objection, form.
 8                     MR. BOWER:  Well, strike that.
 9              Q.     (BY MR. BOWER)  Do you know
10     what "the score" refers to?
11                     MS. FUMERTON:  Objection, form.
12                     THE WITNESS:  Yes.  That's the
13         algorithm score.
14              Q.     (BY MR. BOWER)  And what does
15     an algorithm score reflect?
16                     MS. FUMERTON:  Objection, form.
17              Q.     (BY MR. BOWER)  For example,
18     here, we're seeing -- she notes on her email
19     to -- cc'ing herself, some folks at ims and
20     some other folks at Walmart, that "seeing
21     some scores of minus 22."
22                     Do you see that?
23       A.     Yes.
24              Q.     Do you know what that means?
25       A.     Based on this email, Monique
```

1    explains what those scores are.

2         Q.    And he states, "That particular

3    store is an internal representation"; right?

4    "And should not be shown on UI"?

5         A.    Yes.

6         Q.    What is "UI"?

7              MS. FUMERTON:  Let him finish

8         his question.

9              THE WITNESS:  Sorry.

10             MS. FUMERTON:  Go ahead.  I was

11        going to object, but just go on.

12             THE WITNESS:  UI is user

13        interface.

14        Q.    (BY MR. BOWER)  And do you know

15   why he's saying those should not be shown on

16   a user interface?

17        A.    I do not.

18        Q.    And do you know this little

19   screenshot here, whatever you would call it,

20   do you know, is that from the Buzzeo

21   platform?

22        A.    Yes.

23        Q.    Other than the columns here,

24   does it have any other columns that you are

25   aware of?

Highly Confidential - Subject to Further Confidentiality Review

1          MS. FUMERTON:  Objection, form.

2          THE WITNESS:  Not that I

3    recall.

4     Q.    (BY MR. BOWER)  Have you ever

5    heard of the term "augmented orders"?

6     A.    Yes.

7     Q.    And what is an augmented order?

8     A.    An augmented order is a system

9    order that is placed outside of the projected

10   order.

11    Q.    And what do you mean by

12   "projected order"?

13    A.    So our replenishment system

14   sets up their projections of what should be

15   ordered.  And if the store sells more than

16   they projected for that day or sells a

17   different amount in some way, then the

18   replenishment system would augment the

19   projected system order.

20    Q.    What about the term "stress

21   bars" in connection with SOM?

22    A.    So with Buzzeo, in Buzzeo, an

23   individual order would have stress bars, so

24   bars that indicate green, yellow, red, based

25   on some different criteria.

1      Q.      Are those bars order-specific?

2    Item-specific?  Or something else?

3              MS. FUMERTON:  Objection, form.

4              THE WITNESS:  Those bars are

5         comparing an order of an active

6         ingredient to multiple different

7         things.

8      Q.      (BY MR. BOWER)  Okay.  If we

9    wanted to understand what those multiple

10   different things that it was looking at were,

11   where would we go?

12             MS. FUMERTON:  Objection, form.

13             THE WITNESS:  So Buzzeo itself

14        would have what those stress bars are.

15        I can't remember everything off the

16        top of my head, but there are -- there

17        were -- there was at least one

18        document I know of that had what the

19        different stress bars were.

20             MR. BOWER:  Okay.

21     Q.      (BY MR. BOWER)  And did you

22   have -- in the time that Buzzeo was active,

23   did you have access to information that would

24   inform you what or how those stress bars were

25   calculated?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. FUMERTON:  Objection, form.
 2                THE WITNESS:  I don't recall
 3          seeing anything with the specific
 4          math.
 5          Q.    (BY MR. BOWER)  And do you
 6    recall a document that explained what the
 7    stress bars meant; is that correct?
 8          A.    Yes.
 9          Q.    Do you recall anything else
10    about that document?
11          A.    I do not.
12          Q.    At some point did you begin
13    reporting orders of interest to the DEA?
14          A.    Yes.
15          Q.    And whose decision was it to --
16    strike that.
17                Do you know why you began
18    reporting orders of interest to the DEA?
19          A.    It was after the Masters
20    decision.
21          Q.    And what is the Masters
22    decision you're referring to?
23          A.    It was a court case involving
24    Masters, and it was related to SOM.
25          Q.    How did you learn about the
```

Highly Confidential - Subject to Further Confidentiality Review

1    Masters decision?

2              MS. FUMERTON:  If it was

3         with -- communications with counsel,

4         you can say that.

5              If your concern is about some

6         other privileged conversation, we can

7         talk.

8              THE WITNESS:  No, I don't think

9         so.

10             It was initially communication

11        from Miranda.

12        Q.    (BY MR. BOWER)  Do you recall

13   approximately when that communication took

14   place?

15        A.    I do not.  I know it happened

16   in 2017, but I don't remember.

17        Q.    And it's your understanding

18   that the reason that you began reporting

19   orders of interest to the DEA was as a result

20   of Masters; is that correct?

21        A.    Yes.

22        Q.    Was it your understanding that

23   Masters had reflected some change in the

24   legal requirements for Walmart?

25             MS. FUMERTON:  To the extent

1       you can answer that question without

2       revealing communications with counsel,

3       you can answer.  Otherwise, I instruct

4       you not to answer.

5              THE WITNESS:  My understanding

6       was that it changed some

7       interpretations of that requirement.

8       Q.     (BY MR. BOWER)  Did it change

9   Walmart's interpretation of that requirement?

10             MS. FUMERTON:  Well, I object

11      to the form of the question.  I also

12      instruct you not to answer that

13      question to the extent the answer

14      would reveal communications with

15      counsel.

16             THE WITNESS:  So I sent the

17      email, the fax that went to the DEA

18      that specified why we were changing

19      what we did.  And I do know that that

20      document said that, pursuant to

21      Masters, we changed the

22      interpretation.

23      Q.     (BY MR. BOWER)  And who drafted

24  that document?

25      A.     Miranda's name is on the

Highly Confidential - Subject to Further Confidentiality Review

1    document.

2           Q.     Who drafted the document?

3                  MS. FUMERTON:  Objection, form.

4           Answer to your knowledge.

5                  THE WITNESS:  My understanding

6           is Miranda drafted it, and I'm sure

7           counsel was involved with the drafting

8           of that.

9           Q.     (BY MR. BOWER)  Were you

10   involved in the drafting of it?

11          A.     No.

12          Q.     Did Miranda provide you with a

13   final version of that document to send to the

14   DEA?

15          A.     Yes.

16                 (Walmart-Reed Deposition

17          Exhibit 17, was marked for

18          identification.)

19          Q.     (BY MR. BOWER)  Let me hand you

20   Exhibit 17.

21                 And for those on the phone,

22          this is 3598 and 3599.

23                 Just take a moment and review

24          this document.

25                 And my first question is going

1     to be why you were meeting with folks

2     at Deloitte regarding controlled

3     substances.

4     A.     Okay.

5     Q.     What did you -- why did you

6  meet with the folks at Deloitte regarding

7  controlled substances?

8            MS. FUMERTON:  Objection, form.

9            MR. BOWER:  Strike that.

10    Q.     (BY MR. BOWER)  Did you meet

11 with anyone at Deloitte regarding controlled

12 substances?

13    A.     Yes.  We did meet with somebody

14 from Deloitte.

15    Q.     And why did you meet with them?

16    A.     They were given our contact

17 information.  They were working on some

18 other -- working with other parts of health

19 and wellness compliance, and they were given

20 our contact information to see if there was

21 anything that Deloitte could provide.

22    Q.     And what sorts of things were

23 they offering to provide?

24    A.     Based on this email and what I

25 recall of the conversation is one of the

1    gentlemen was from the DEA in a past life,

2    and they were just looking at analytics and

3    automation of things and all in all, from

4    what I can tell, just advice in general.

5         Q.    Did they show you a video?  Do

6    you see where it says, "I've attached a

7    simple set of slides with some screen prints

8    from the dashboard and automation video we

9    showed"?

10        A.    I don't remember the exact --

11   the exact presentation.

12        Q.    But this email certainly

13   purports to suggest that they are sending

14   this presentation to you after the meeting;

15   right?

16             MS. FUMERTON:  Objection, form.

17             THE WITNESS:  Yes.

18        Q.    (BY MR. BOWER)  Do you recall

19   what the presentation was about?

20        A.    It was -- it was automation.

21   So as Jamie states, they were working with

22   another client in the DEA 222 space about

23   automation.  And so they were -- they were

24   trying to sell their services.

25        Q.    You traveled to North Carolina

Highly Confidential - Subject to Further Confidentiality Review

```
1    to meet with them?

2         A.    No.

3         Q.    Where did you meet with them?

4         A.    At the home office.

5         Q.    Miranda was based in

6    North Carolina at the time?

7         A.    Yes.

8         Q.    Did they travel to Bentonville

9    to meet with you?

10             MS. FUMERTON:  Objection, form.

11             THE WITNESS:  My understanding

12        was they were already in Northwest

13        Arkansas, that they were based in

14        Northwest Arkansas.

15        Q.    (BY MR. BOWER)  How did they

16   arrange a meeting with you?

17        A.    I don't recall.  I think they

18   worked through -- it was either Miranda or

19   Jamie.  I was not -- I attended the meeting.

20        Q.    Well, this is December of 2017;

21   right?

22        A.    Yes.

23        Q.    A few months before you signed

24   the agreement with Walmart not to discuss

25   controlled II substances?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. FUMERTON:  Objection, form,
 2        misstates the prior testimony.
 3              THE WITNESS:  It wasn't
 4        discussing controlled substances.
 5        Nothing was signed that I couldn't
 6        discuss controlled substances.  That
 7        was my job.
 8        Q.    (BY MR. BOWER)  Right.  But
 9   this was approximately two to three months
10   before you signed that NDC with Walmart;
11   right?
12              MS. FUMERTON:  Objection, form.
13        Misstates testimony and lack of
14        foundation.
15        Q.    (BY MR. BOWER)  Didn't you --
16              MR. BOWER:  I'll strike that.
17        Q.    (BY MR. BOWER)  When did you
18   sign the NDC with Walmart?
19              MS. FUMERTON:  Objection, form.
20              THE WITNESS:  The NDA?
21        Q.    (BY MR. BOWER) Yeah.  The NDA.
22        A.    It was in early 2018.
23        Q.    And this is -- this meeting
24   occurred in December 2018; right?
25        A.    Yes.
```

1    Q.    A couple of months after you

2  signed the NDA; right?

3              MS. FUMERTON:  Objection, form.

4        Misstates testimony.

5              THE WITNESS:  No, before.  I

6        signed it in 2018.

7    Q.    (BY MR. BOWER) This meeting

8  occurred a couple of months before you signed

9  the NDA; correct?

10    A.    Yes.

11    Q.    And this meeting was about

12  Walmart's controlled substances monitoring

13  program; right?

14              MS. FUMERTON:  Objection, form,

15        lacks foundation and misstates prior

16        testimony.

17              THE WITNESS:  This was a

18        meeting for them trying to sell

19        services to us.  It wasn't about what

20        we were currently doing.

21    Q.    (BY MR. BOWER)  And they were

22  trying to sell services related to suspicious

23  order monitoring; correct?

24    A.    That was included.

25    Q.    And they were trying to sell

1    Walmart services because Walmart's program at

2    that time wasn't meeting its legal

3    obligations; right?

4                    MS. FUMERTON:  Objection, form.

5                    THE WITNESS:  That is not

6         correct?

7         Q.    (BY MR. BOWER)  And, in fact,

8    they attach a link to a 60 Minutes report on

9    opioid investigations; right?

10                   MS. FUMERTON:  Objection, form.

11                   THE WITNESS:  Yes, that is what

12        that link appears to be.

13        Q.    (BY MR. BOWER)  And it appears

14   that this story on 60 Minutes was going to

15   focus on McKesson; right?

16                   MS. FUMERTON:  Objection, form,

17        lack of foundation.

18        Q.    (BY MR. BOWER)  Do you see the

19   reference there, "This one focuses on

20   McKesson"?

21        A.    That's what the email says,

22   yes.

23        Q.    Did you at the meeting discuss

24   other reporting on other distributors for

25   controlled substances?

```
 1              MS. FUMERTON:  Objection, form,
 2         lack of foundation.
 3              THE WITNESS:  I do not recall
 4         any other reporting by other people.
 5         Q.    (BY MR. BOWER)  And
 6   approximately two months after the folks at
 7   Deloitte refer you folks at Walmart about
 8   this McKesson report, Walmart decides to use
 9   McKesson for its distribution of controlled
10   substances; correct?
11              MS. FUMERTON:  Objection, form.
12         Lack of foundation.
13              THE WITNESS:  So, yes, we were
14         notified, and yes, that decision was
15         made.
16              (Walmart-Reed Deposition
17         Exhibit 18, was marked for
18         identification.)
19         Q.    (BY MR. BOWER)  Okay.  You've
20   been handed what has been marked as
21   Exhibit 18.  This is Walmart Document 7350
22   through 7354.  It's an email chain with
23   yourself, Jamie Newell, and Chad Corbin.
24   Please take a moment and review that, and I
25   have some questions on this.
```

1                    [Document review.]

2          Q.     (BY MR. BOWER)  Have you had a

3    chance to review the document?

4          A.     Yes.

5          Q.     What is being discussed in this

6    document?

7                  Sorry, let me ask a better

8    question than that.

9                  What does the reference to "SOM

10   talking points" and "FAQs updated" refer to?

11         A.     So on our intranet, we had a

12   section that related to talking points and

13   FAQs for the SOM process.

14         Q.     And this was an attempt to

15   update those FAQs; is that right?

16         A.     Yes.

17         Q.     And part of that was, if you

18   note Jamie's email there on the first page

19   from -- to yourself and Chad, on Friday,

20   January 5th.  She writes, "Yes, they should."

21   They are all -- "They all should be.  We are

22   going to help change the practices of our

23   profession and our company with our continued

24   focus on this topic."

25                 Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1              A.     Yes.

2              Q.     Did you agree that there needed

3      to be change regarding this topic?

4                     MS. FUMERTON:  Objection, form.

5              Misstates the document -- and

6              misstates the document.

7                     THE WITNESS:  So I think this

8              goes back to the continuous

9              improvement.  You know, improving

10             the -- what this is referring to is

11             the pharmacist's knowledge of data

12             points that we mention on page 2 and

13             improving their knowledge of that data

14             at their locations.

15             Q.     (BY MR. BOWER)  And Jamie

16     writes, "We are going to help change the

17     practice of the profession in our company

18     with our continued focus on this topic";

19     right?

20             A.     Yes.

21             Q.     That was why, one of the

22     reasons why you were doing this; right?  To

23     "help change the practice of the profession

24     in our company"?

25                    MS. FUMERTON:  Objection, form.
```

```
1              THE WITNESS:  The reason we

2         were updating FAQs is to make sure

3         everybody understood.  That was

4         Jamie's comment and his feeling on how

5         that -- what we were focusing on, the

6         effect it was going to have.

7         Q.    (BY MR. BOWER)  And indeed,

8   Walmart's been -- even going back to your --

9   starting with your work in SOM in 2005,

10  Walmart's been continuously trying to improve

11  its SOM program; right?

12             MS. FUMERTON:  Objection, form.

13        Lack of foundation.

14             THE WITNESS:  I wasn't even

15        with the company in 2005.

16        Q.    (BY MR. BOWER)  Would you agree

17  that at least since 2015, Walmart has been

18  endeavoring to improve its SOM program?

19        A.    We have continually worked to

20  make process improvements, yes.

21        Q.    Do you disagree that Walmart

22  has been working to improve its SOM program

23  since you began working with that program in

24  2015?

25             MS. FUMERTON:  Objection, form.
```

1      Asked and answered.

2          THE WITNESS:  No, I don't

3      disagree that we've been working to

4      make continual improvements.

5      Q.    (BY MR. BOWER)  And indeed,

6  those work on improvements were continuing

7  even into early 2018; correct?

8      A.    Yes.

9      Q.    But shortly hereafter, Walmart

10  gets out of the business; right?

11          MS. FUMERTON:  Objection, form.

12          THE WITNESS:  We get out of the

13      business of distributing controlled

14      substances, yes.

15      Q.    (BY MR. BOWER)  Right.  You get

16  out of the business that you've been trying

17  to improve for at least the past four years;

18  correct?

19          MS. FUMERTON:  Objection, form.

20          THE WITNESS:  Yes.

21      Q.    (BY MR. BOWER)  And one of the

22  things discussed here, right, is Jamie's

23  concern and certainly Chad's concerns that

24  folks started talking about on order --

25  delays that were being caused by order

1    review; right?

2         A.     Yes.

3         Q.     And why was that a concern?

4         A.     Nobody wanted to cause any more

5    of a delay than was needed to do our job

6    properly.

7         Q.     In other words, you wanted to

8    move the orders of interest as quickly as

9    possible; correct?

10              MS. FUMERTON:  Objection, form.

11              THE WITNESS:  No.

12              MS. FUMERTON:  Misstates

13         testimony.

14              THE WITNESS:  No.  Not

15         necessarily.  We wanted to be sure

16         that we did a thorough, correct job,

17         but also meet legitimate customer need

18         as well.

19         Q.     (BY MR. BOWER)  And Jamie's

20   writing, if you look at the email that Jamie

21   writes on, for example, the bottom of page

22   ending in 7352.

23              Do you see that?

24              Jamie to -- on Friday,

25   January 5th, 2018 at 10:51 a.m.

1          Do you see that?

2     A.     Yes.

3     Q.     Jamie is writing, "Can we use

data to help us tell the story of what number

percentage of orders have been delayed and

rejected because of our work?"

7          Do you see that?

8     A.     Yes.

9     Q.     Did Walmart ever use data to

help tell that story?

11          MS. FUMERTON:  Objection, form.

12          THE WITNESS:  We did look at

13          data to look and see the number of

14          orders that were being delayed.

15     Q.     (BY MR. BOWER)  And who looked

at that data?

17     A.     Myself.

18     Q.     And what did you find?

19          MS. FUMERTON:  Objection, form.

20          THE WITNESS:  I don't remember

21          specifically.  I do remember that

22          there -- there were delays, nothing

23          significant, when you look at the

24          grand scheme of how many orders

25          Walmart filled on a daily, weekly

1      basis.

2              (Walmart-Reed Deposition

3      Exhibit 19, was marked for

4      identification.)

5      Q.    (BY MR. BOWER)  Hand you what's

6  been marked as Exhibit 19.  It's just a

7  one-page email on a conversation with

8  yourself and Ms. Johnson, Bates No. 8865 and

9  8866.

10             [Document review.]

11             THE WITNESS:  Okay.

12     Q.    (BY MR. BOWER)  Did someone

13  from the U.S. Department of Justice contact

14  you or Ms. Johnson in January 2018?

15             MS. FUMERTON:  Objection, form.

16             THE WITNESS:  It was somebody

17     from the DEA.

18     Q.    (BY MR. BOWER)  Okay.

19  Contacted you or Ms. Johnson?

20     A.    So they initially contacted me,

21  and I forwarded them on to Ms. Johnson.

22     Q.    Okay.  I was just confused

23  about how that worked.

24     A.    Yes.

25     Q.    Thank you for that.  And you

1  write to Ms. Johnson, "Well, here's contact.

2  Keep me posted!"  Right?

3           MS. FUMERTON:  Objection, form.

4           I withdraw my objection.

5           THE WITNESS:  Yes.

6      Q.    (BY MR. BOWER)  And what did

7  you mean by "Here's contact"?

8      A.    So when we sent the initial

9  email, or fax, in 2017, we were curious as to

10  what response, if any, we would receive from

11  the DEA to the change from our reporting.

12      Q.    And what response did you

13  receive?

14      A.    This is the only contact we

15  received.

16      Q.    And did Ms. Johnson keep you

17  posted?

18      A.    I actually do not recall what

19  came of this conversation.

20      Q.    Well, what came of this

21  conversation is Walmart gets out of the

22  business; right?

23           MS. FUMERTON:  Objection, form.

24      Lack of foundation.

25           THE WITNESS:  Yeah, I don't

1          know the -- I am definitely not making

2          that correlation between this.

3          Q.     (BY MR. BOWER)  Well, let's

4    just talk about the facts; right?

5                 This is in January 19, 2018;

6    right?

7          A.     Yes.

8          Q.     So when the DEA contacts

9    Walmart regarding suspicious order reports;

10   right?

11         A.     Yes.

12         Q.     Walmart gets out of the

13   business of distributing controlled

14   substances soon thereafter; correct?

15                MS. FUMERTON:  Objection, form.

16                THE WITNESS:  Yes, but that was

17         definitely a much longer project.

18         Q.     (BY MR. BOWER)  And how do you

19   know that?

20         A.     I've testified that I signed an

21   NDA in early 2018, and that would have been

22   in the process before.  I definitely wasn't

23   brought in at the grand -- at the opening of

24   such a discussion, at my level, and it was a

25   big shift, and so it took work to get done.

1    Q.    And who -- do you have any

2  information as to who did that work to get it

3  done?

4              MS. FUMERTON:  Objection, form.

5              THE WITNESS:  There was a lot

6       of different teams that were involved.

7       Q.    (BY MR. BOWER)  And who was

8  involved?

9       A.    Replenishment.  Our team was

10  involved.  And I'm sure there were other

11  teams.  I know for sure replenishment and our

12  team were involved.

13      Q.    And what specifically are you

14  referring to now when you say "involved"?

15  Involved in what?

16      A.    Involved in the switch, like in

17  paperwork.

18      Q.    Okay.  And my question more is

19  focused on the process to make the change.

20  Okay?

21              Was your team involved in the

22  decision to make the change?

23              MS. FUMERTON:  Objection, form.

24              THE WITNESS:  Absolutely not.

25      Q.    (BY MR. BOWER)  Who was

1   involved in that decision?

2           MS. FUMERTON:  Objection, form.

3       Lack of foundation.

4           MR. BOWER:  Do you know --

5       strike that.

6       Q.    (BY MR. BOWER)  Do you know who

7   was involved in Walmart's decision to change

8   the distribution of controlled substances to

9   McKesson?

10      A.    I am not.

11      Q.    (BY MR. BOWER)  Do you know who

12  would know the answer to that question?

13      A.    I do not.

14          MS. FUMERTON:  And, Zach, you

15      have just three minutes left on the

16      record.

17          MR. BOWER:  How much time do we

18      have left?

19          THE VIDEOGRAPHER:  More like

20      six.

21          MS. FUMERTON:  I stand

22      corrected.

23          MR. BOWER:  So let me just

24      finish up this email, and then we'll

25      take a quick break and I'll finish up.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. FUMERTON:  Okay.

 2          Q.    (BY MR. BOWER)  So just at the

 3    top of this email, you write to Ms. Johnson,

 4    "In the SOM folder there is a folder

 5    DEA/state reports."

 6                    Do you see that?

 7          A.    Yes.

 8          Q.    What does that refer to?

 9          A.    That is where the different

10    reports that were sent out would be stored.

11                    MR. BOWER:  Okay.  Thank you.

12          Why don't we just take a quick break.

13                    MS. FUMERTON:  Okay.

14                    MR. BOWER:  We can keep it

15          quick.

16                    THE VIDEOGRAPHER:  5:34.  We

17          are off the video record.

18                    (Recess taken, 5:34 p.m. to

19          5:42 p.m.)

20                    THE VIDEOGRAPHER:  5:42.  We

21          are on the video record.

22                    (Walmart-Reed Deposition

23          Exhibit 20, was marked for

24          identification.)

25          Q.    (BY MR. BOWER) We are back on
```

1    the record.  I just have two quick --

2    hopefully -- documents I'm going to show you.

3    I'm going to give them to you one at a time

4    so we can hopefully move quickly through

5    them.  Exhibit 20.  Bates No. 28865 through

6    66.

7              And my only question on this

8    document -- or the only thing I want to

9    discuss on this document is a reference to

10   Kristy's email to you regarding SOM audits

11   from 6045.

12             On the bottom of that page, the

13   first part of the email from Kristy to

14   yourself and Miranda Johnson.  "Roxy/Miranda,

15   As we've been working on SOM audits from

16   6045?"

17             Do you see that?

18        A.    Yes.

19        Q.    Do you know what that refers

20   to?

21        A.    I do not.

22        Q.    We'd have to ask Kristy that?

23        A.    Yes.

24        Q.    Okay.

25             (Walmart-Reed Deposition

Highly Confidential - Subject to Further Confidentiality Review

1           Exhibit 21, was marked for

2           identification.)

3           Q.     (BY MR. BOWER)   The next

4    document is marked Exhibit 21.  Bates

5    No. 46437.

6                 Oh, sorry.  That's not the

7    first page.  The first page is 46435 through

8    46441, and then my questions are on

9    page 46437, and they relate to your

10   nomination on -- for a quarterly impact

11   award.

12                Do you see that, on page 3

13   there of the document?

14                "Nominee, Roxy Reed, Senior

15   Analyst, Health and Wellness Compliance

16   Controlled Substances."

17                Do you see that?

18   A.     Yes.

19   Q.     Do you recall being nominated?

20   A.     I do not.

21   Q.     Do you recall developing a

22   process for analyzing data that would

23   identify appropriate dispensing as reflected

24   here?

25                MS. FUMERTON:  Objection, form,

Highly Confidential - Subject to Further Confidentiality Review

```
 1           and this is now getting back into a

 2           much longer topic.  She hasn't said

 3           this is going to refresh her

 4           recollection.

 5                 I mean, if there's a way to do

 6           that shortly, but ...

 7                 Answer the question.

 8                 THE WITNESS:  No, I'd have to

 9           read this a little bit more to -- and

10           I'm not sure this would give me the

11           information I need to refresh my

12           recollection.

13           Q.    (BY MR. BOWER)  Okay.  Well,

14     what about the -- at the bottom of the page,

15     where it says, "She has been instrumental in

16     helping us meet our board of directors'

17     objectives related to suspicious order

18     monitoring this year."

19                 Do you see that?

20           A.    I do.

21           Q.    Do you know what that refers

22     to?

23           A.    I do not.

24           Q.    You don't know what the "board

25     of directors' objectives" refers to?
```

1          A.      I know that the board of

2     director has objectives.  I don't know what

3     the specific one was regarding suspicious

4     order monitoring.

5          Q.     (BY MR. BOWER)  Do you have any

6     reason to disagree that they had an objective

7     related to suspicious order monitoring for

8     this year?

9               MS. FUMERTON:  Objection, form.

10              THE WITNESS:  Based on this,

11          I'm assuming yes, there was a board of

12          director objective.

13         Q.     (BY MR. BOWER)  And you would

14    assume that this document would be accurate;

15    right?

16              MS. FUMERTON:  Objection, form.

17          And I'll actually object that

18          apparently there's a cover email that

19          was produced with this that's missing

20          that would have given more context.

21              So I object to the exhibit in

22          its entirety.

23              MR. BOWER:  You can object to

24          it.

25         Q.     (BY MR. BOWER)  The question

```
 1    is, do you have any reason to doubt the

 2    veracity of this statement in this document?

 3              MS. FUMERTON:  Objection, form.

 4         She's testified that she has no

 5         knowledge of it.

 6              THE WITNESS:  I don't even know

 7         who put in the recommendation, so I --

 8         I wouldn't know their level of

 9         involvement and so I -- I don't know

10         that I can answer that, because I

11         really don't know.

12    Q.    (BY MR. BOWER)  Well, the --

13              MS. FUMERTON:  And you're

14         over -- we're over --

15              She says she doesn't know.

16         This does not refresh her

17         recollection, that she has no

18         knowledge of that document, and we're

19         over our seven hours.

20              MR. BOWER:  Well, look.  We're

21         over our seven hours for a variety of

22         reasons, a lot of which was discussion

23         with counsel on the record, so I'm

24         going to -- do you want to cut me off?

25              I have a few more questions.
```

```
 1           It's your decision.
 2                MS. FUMERTON:  We're ending the
 3      deposition.
 4                Are we at seven hours?
 5                We're ending the deposition.
 6                MR. BOWER:  Okay.
 7                And just for the record, I do
 8      have more questions on this document,
 9      and other documents, and we will keep
10      the deposition open from our
11      perspective based on the witness's
12      refusal to answer certain questions
13      that were raised today based on the
14      lack of documents, including the
15      nondisclosure agreement, and based on
16      the other reasons discussed on the
17      record today.
18                MS. FUMERTON:  Okay.  Well, we
19      obviously disagree with that, but that
20      will be, I'm sure, a fight for another
21      day.
22                THE VIDEOGRAPHER:  5:47 p.m.
23      We are off the video record.
24                This concludes the video
25      deposition.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    (Proceedings recessed at

 2         5:47 p.m.)

 3                         --o0o--

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2           I, DEBRA A. DIBBLE, Registered
      Diplomate Reporter, Certified Realtime
 3    Reporter, Certified Realtime Captioner,
      Certified Court Reporter and Notary Public,
 4    do hereby certify that prior to the
      commencement of the examination, ROXANNE REED
 5    was duly sworn by me to testify to the truth,
      the whole truth and nothing but the truth.
 6
             I DO FURTHER CERTIFY that the
 7    foregoing is a verbatim transcript of the
      testimony as taken stenographically by and
 8    before me at the time, place and on the date
      hereinbefore set forth, to the best of my
 9    ability.
10           I DO FURTHER CERTIFY that pursuant
      to FRCP Rule 30, signature of the witness was
11    not requested by the witness or other party
      before the conclusion of the deposition.
12
             I DO FURTHER CERTIFY that I am
13    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
14    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
15    that I am not financially interested in the
      action.
16
19    _____
      DEBRA A. DIBBLE, RDR, CRR, CRC
20    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
21    Certified Court Reporter
22
      Dated: 15 January 2019
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.

10              You are signing same subject to

11    the changes you have noted on the errata

12    sheet, which will be attached to your

13    deposition.

14              It is imperative that you return

15    the original errata sheet to the deposing

16    attorney within thirty (30) days of receipt

17    of the deposition transcript by you.  If you

18    fail to do so, the deposition transcript may

19    be deemed to be accurate and may be used in

20    court.

21

22

23

24

25
```

Highly Confidential - Subject To Further Confidentiality Review

```
 1                            ERRATA

 2      Page   LINE   CHANGE

 3      _____  _____  _____

 4             REASON: _____

 5      _____  _____  _____

 6             REASON: _____

 7      _____  _____  _____

 8             REASON: _____

 9      _____  _____  _____

10             REASON: _____

11      _____  _____  _____

12             REASON: _____

13      _____  _____  _____

14             REASON: _____

15      _____  _____  _____

16             REASON: _____

17      _____  _____  _____

18             REASON: _____

19      _____  _____  _____

20             REASON: _____

21      _____  _____  _____

22             REASON: _____

23      _____  _____  _____

24             REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, ROXANNE REED, do hereby certify
        that I have read the foregoing pages and that
 5      the same is a correct transcription of the
        answers given by me to the questions therein
 6      propounded, except for the corrections or
        changes in form or substance, if any, noted
 7      in the attached
        Errata Sheet.

 8

 9

10

11

12      _____

         ROXANNE REED                        DATE
13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      _____

20      Notary Public

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                          LAWYER'S NOTES

2

3        PAGE      LINE

4        _____     _____     _____

5        _____     _____     _____

6        _____     _____     _____

7        _____     _____     _____

8        _____     _____     _____

9        _____     _____     _____

10       _____     _____     _____

11       _____     _____     _____

12       _____     _____     _____

13       _____     _____     _____

14       _____     _____     _____

15       _____     _____     _____

16       _____     _____     _____

17       _____     _____     _____

18       _____     _____     _____

19       _____     _____     _____

20       _____     _____     _____

21       _____     _____     _____

22       _____     _____     _____

23       _____     _____     _____

24       _____     _____     _____

25