Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                    -   -   -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                    -   -   -
          Thursday, January 24, 2019
11                    -   -   -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
13
                      -   -   -
14
             Videotaped deposition of
15   LARRY RINGGOLD, taken pursuant to notice,
     was held at Homewood Suites by Hilton
16   4170 Philadelphia Road, Bel Air, Maryland
     21015, beginning at 5:01 p.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19                    -   -   -
20
21
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

Page 2

APPEARANCES:

BARON & BUDD, P.C.
BY: WILLIAM POWERS, ESQUIRE
EMMA KABOLI, PARALEGAL
600 New Hampshire Avenue NW
Suite 10A
Washington, DC 20037
Wpowers@baronbudd.com
Ekaboli@baronbudd.com
Representing the Plaintiffs

MORGAN, LEWIS & BOCKIUS LLP
BY: JOHN P. LAVELLE, JR., ESQUIRE
1701 Market Street
Philadelphia, Pennsylvania 19103
(215) 963-4824
John.lavelle@morganlewis.com
- and -
BY: MATTHEW R. LADD, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6141
Matthew.ladd@morganlewis.com
Representing the Defendant,
Rite Aid

Page 3

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

GIBBONS PC
BY: PAUL E. ASFENDIS, ESQUIRE
One Pennsylvania Plaza
37th Floor
New York, New York 10119
(212) 613-2000
Pasfendis@gibbonslaw.com
Representing the Defendant,
AmerisourceBergen Corporation

JONES DAY
BY: JASON Z. ZHOU, ESQUIRE
77 West Wacker
Chicago, Illinois 60601
(312) 782-3939
Jzhou@jonesday.com
Representing the Defendant,
Walmart

ARNOLD & PORTER KAYE SCHOLER LLP
BY: JOHN D. LOMBARDO, ESQUIRE
44th Floor
777 South Figueroa Street
Los Angeles, California 90017
(213) 243-4000
John.lombardo@arnoldporter.com
Representing the Defendant,
Endo Pharmaceuticals, Endo Health,
and Par Pharmaceuticals

ALSO PRESENT:
Dan Lawlor, Videographer
Jeff Sayres, Trial Technician

Page 4

- - -
I N D E X
- - -

Testimony of: LARRY RINGGOLD

By Mr. Powers          8
By Mr. Lavelle          107

- - -
E X H I B I T S
- - -

NO.     DESCRIPTION          PAGE
Rite Aid-Ringgold
Exhibit-1   Rite_Aid_OMDL_0049982-993   39

Rite Aid-Ringgold
Exhibit-2   Rite_Aid_OMDL_0032421    46
Rite Aid-Ringgold
Exhibit-3   Rite_Aid_OMDL_0032422    46

Rite Aid-Ringgold
Exhibit-4   Rite_Aid_OMDL_0027551-552   57
Rite Aid-Ringgold
Exhibit-5   Rite_Aid_OMDL_21461-463    64

Rite Aid-Ringgold
Exhibit-6   Rite_Aid_OMDL_23456-457    69
Rite Aid-Ringgold
Exhibit-7   Rite_Aid_OMDL_0012020-021   79

Rite Aid-Ringgold
Exhibit-8   Rite_Aid_OMDL_0011115-116   90

Page 5

- - -
E X H I B I T S
- - -

NO.     DESCRIPTION          PAGE
Rite Aid-Ringgold
Exhibit-9   Rite_Aid_OMDL_0003108-109   95

Rite Aid-Ringgold
Exhibit-10   Rite_Aid_OMDL_0010795-796   100
Rite Aid-Ringgold
Exhibit-11   Rite_Aid_OMDL_0003562     111

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1         - - -

2       DEPOSITION SUPPORT INDEX

3         - - -

4

5   Direction to Witness Not to Answer

6   Page Line    Page Line    Page Line

7   None

8

9

10  Request for Production of Documents

11  Page Line    Page Line    Page Line

12  None

13

14

15  Stipulations

16  Page Line    Page Line    Page Line

17  7    1

18

19

20  Question Marked

21  Page Line    Page Line    Page Line

22  None

23

24

Page 7

1         - - -

2       (It is hereby stipulated and

3   agreed by and among counsel that

4   sealing, filing and certification

5   are waived; and that all

6   objections, except as to the form

7   of the question, will be reserved

8   until the time of trial.)

9         - - -

10      VIDEO TECHNICIAN:  We are

11  now on the record.  My name Ray

12  Moore, I'm a videographer for

13  Golkow Litigation Services.

14  Today's date is January 24, 2019,

15  and the time is 5:01 p.m.

16      This video deposition is

17  being held in Bel Air, Maryland,

18  in the matter In Re National

19  Prescription Opiate Litigation for

20  the United States District Court

21  for the Northern District of Ohio,

22  Eastern Division, MDL Number 2804.

23      The deponent is Larry

24  Ringgold.  Counsel will be noted

Page 8

1   on the stenographic record.  The

2   court reporter is Amanda Miller

3   and will now swear in the witness.

4         - - -

5       LARRY RINGGOLD, after having

6   been duly sworn, was examined and

7   testified as follows:

8         - - -

9       EXAMINATION

10        - - -

11  BY MR. POWERS:

12      Q.   Good evening, Mr. Ringgold.

13  My name is Will Powers, and I represent

14  the plaintiffs in this litigation.

15      Before we get started, can

16  you please just state your full name and

17  spell it for the record?

18      A.   Larry Ringgold, Junior,

19  L-A-R-R-Y, R-I-N-G-G-O-L-D.

20      Q.   And we're here for your

21  deposition today.

22      Do you understand that?

23      A.   Yes.

24      Q.   Have you ever been deposed

Page 9

1   before?

2       A.   No.

3       Q.   I want to just go over a

4   couple of ground rules before we get

5   started to make sure we're all on the

6   same page.

7       Because the court reporter

8   is writing down what is being said, it's

9   important that only one of us is speaking

10  at a time.  So even if you think you know

11  where I'm going with a question, please

12  don't jump in.  We want to make sure I

13  finish my question before you answer --

14  give your answer, and I'll let you give

15  your answer before I ask the question.

16      Is that okay?

17      A.   Yes.

18      Q.   And also, when you're

19  answering my questions, I need verbal

20  answers; so no nods of the head, shrugs

21  of the shoulders, uh-huh or uh-uh, stuff

22  like that.

23      Is that all right?

24      A.   That's all right.

Page 10

1    Q.   And if for any reason you
2  don't understand a question or it
3  requires some sort of clarification, you
4  have to tell me, and we can get that
5  matter resolved before you answer the
6  question.
7        Is that okay?
8    A.   Yes.
9    Q.   So I'll assume, then, if you
10 answer a question, you understand my
11 question.
12       Is that all right?
13   A.   Yes.
14   Q.   Are you currently suffering
15 from any medical diseases or illnesses
16 that in any way interfere with your
17 ability to answer truthfully and
18 completely my questions here tonight?
19   A.   No.
20   Q.   And I just ask that you keep
21 your voice up a little bit, because
22 everything is being recorded as well,
23 okay?
24   A.   Yes.

Page 11

1    Q.   Are you currently taking any
2  medication or drugs that may in any way
3  interfere with your ability to answer my
4  questions truthfully and completely?
5    A.   No.
6    Q.   And do you understand the
7  court reporter has sworn you in and
8  you're under oath here today just as you
9  would be in a courtroom at trial?
10   A.   Yes.
11   Q.   And because you are under
12 oath, if you lie or provide intentionally
13 misleading answers, you may be subject to
14 criminal or civil penalties.
15       Do you understand that?
16   A.   Yes.
17   Q.   And your counsel may, from
18 time to time, object.  But I'm still
19 entitled to answer to my question, unless
20 your counsel specifically instructs you
21 not to answer.
22       Do you understand that?
23   A.   Yes.
24   Q.   And we can take breaks when

Page 12

1  you need them.  But if you have a
2  question pending while -- I need you to
3  answer that question before we take the
4  break.
5        Is that okay?
6    A.   Yes.
7        MR. LAVELLE:  The witness
8    reserves the right to consult with
9    counsel on issues of privilege.
10 BY MR. POWERS:
11   Q.   Okay, Mr. Ringgold.  I want
12 to start with your educational
13 background.
14       Did you complete high
15 school?
16   A.   Yes.
17   Q.   Where did you complete high
18 school?
19   A.   Aberdeen Senior High School.
20   Q.   And what year was that?
21   A.   1985.
22   Q.   Any education beyond high
23 school?
24   A.   Yes.

Page 13

1    Q.   What education do you have
2  beyond high school?
3    A.   Some years at Bowie State
4  University.
5    Q.   And that's spelled
6  B-O-W-I-E, right?
7    A.   Yes, sir.
8    Q.   Did you get a degree from
9  Bowie State?
10   A.   I didn't finish, no.
11   Q.   Did you ever complete a
12 college degree?
13   A.   No.
14   Q.   Besides your years at Bowie
15 State, any other education beyond high
16 school?
17   A.   Just military, military
18 stuff.
19   Q.   When were you in the
20 military?
21   A.   From 1990 to 1998.
22   Q.   What did you do after you
23 left the military in 1998?
24   A.   I think I worked at, in

Highly Confidential – Subject to Further Confidentiality Review

---

Page 14

1 19 -- when I got out -- I think while I
2 was still in, I was still working, it was
3 the Army National Guard.  So I worked at
4 The Gap.
5       Q.   So just to be clear, when
6 you're in the military, you were with the
7 Army National Guard?
8       A.   Yes, sir.
9       Q.   And you also had employment
10 at The Gap while you were concurrently
11 employed with the Army National Guard?
12      A.   Yes.
13      Q.   And you said you had some
14 education while you were in the military.
15           What was the nature of that
16 education?
17      A.   I worked on the Arcola
18 helicopter weapon systems.  So they would
19 send us out to different schools, and we
20 would do different things in Texas to
21 kind of keep us up to speed on different
22 electronics and troubleshooting the
23 aircraft.
24      Q.   Any other education that we

---

Page 15

1 have not talked about yet?
2       A.   Not that I can recall.  I
3 have some other stuff that I'm missing,
4 but that's basically it.
5           MR. LOMBARDO:  Apologies for
6       the interruption.  The telephone
7       is not picking up the witness's
8       testimony.  Is there a mic near
9       the witness?
10           - - -
11      (Whereupon, a discussion off
12      the record occurred.)
13           - - -
14 BY MR. POWERS:
15      Q.   So, Mr. Ringgold, as you
16 just heard, I think we both have to just
17 keep our voices up a little bit so
18 everyone on the phone can hear.
19           Is that okay?
20      A.   Yes.
21      Q.   You said that there might
22 be -- might be some other education that
23 you might be missing.
24           Do you have any idea what

---

Page 16

1 that would be?
2       A.   I'm just thinking, I mean,
3 just general stuff with the job.  They
4 would send us on little stuff.  I can't
5 really recall at the moment.
6       Q.   Any education on controlled
7 substances?
8       A.   Education on controlled
9 substances?  The only thing we did do a
10 DEA -- like a little thing they sent us
11 to, I think it was Fort Lauderdale once.
12      Q.   And who is "they"?
13      A.   The job.
14      Q.   When you say "the job," you
15 mean your job at --
16      A.   Rite Aid.
17      Q.   -- Rite Aid?
18           MR. LAVELLE:  And just wait
19      until the question is finished
20      before you answer the question.
21           THE WITNESS:  Yes, sir.
22 BY MR. POWERS:
23      Q.   So besides what you just
24 talked about there when you were with

---

Page 17

1 Rite Aid, any other education about
2 controlled substances prior to joining
3 Rite Aid?
4       A.   No.
5       Q.   And when did you join Rite
6 Aid?
7       A.   September of 2000.
8       Q.   And you mentioned previously
9 there that they, meaning Rite Aid, sent
10 you to Fort Lauderdale once.
11           When was that?
12      A.   I don't remember.  It was a
13 long time ago.
14      Q.   More than ten years ago?
15      A.   Possibly.
16      Q.   And why did Rite Aid send
17 you to Fort Lauderdale?
18      A.   It was a DEA conference.
19 Just to get the experience of being
20 around some of the DEA and things like
21 that.
22      Q.   Did anyone else go with you
23 to this conference from Rite Aid?
24      A.   They meaning who?

---

Page 18

1 Q. You said you went to a DEA
2 conference in Fort Lauderdale.
3 Did anyone else from Rite
4 Aid come with you to go to that DEA --
5 A. Yes.
6 Q. -- conference?
7 Let me finish my question.
8 I know you know where I'm going with it,
9 but just let me finish and then you can
10 answer, okay?
11 A. Yes.
12 Q. So let me ask that again.
13 The DEA conference that Rite
14 Aid sent you to in Fort Lauderdale, did
15 anyone else from Rite Aid come with you?
16 A. Yes.
17 Q. Who?
18 A. Debra Chase.
19 Q. And who is Debra Chase?
20 A. At the time, Debra Chase was
21 DEA coordinator for the Rx department.
22 Q. And you called it a DEA
23 conference.
24 Was it a conference that was

Page 19

1 put on by the DEA?
2 A. They did have actual DEA
3 folks there. We wasn't privy to that.
4 We was with the -- I guess the store
5 side, not the actual DEA.
6 I think the gentleman's name
7 was Mr. Buzzeo who was in charge of the
8 conference, which somehow he was
9 connected with Rite Aid.
10 Q. What kind of topics were
11 discussed at the DEA conference you went
12 to?
13 A. I don't remember.
14 Q. Did you get any written
15 materials from that conference?
16 A. I don't remember. It's been
17 so long.
18 Q. Do you remember, just
19 generally, what the topics were at the
20 DEA conference?
21 MR. LAVELLE: Object to
22 form. Objection. Asked and
23 answered.
24 THE WITNESS: I don't

Page 20

1 remember.
2 BY MR. POWERS:
3 Q. Do you know, when you went
4 back to your job at Rite Aid, did you
5 talk to anyone about what you saw at the
6 conference?
7 A. No.
8 Q. Did you go to any other
9 conferences put on by Buzzeo besides the
10 one in Fort Lauderdale?
11 A. No.
12 Q. Did you go to any other
13 conferences where the DEA had a presence?
14 A. No.
15 Q. Did you talk to any DEA
16 agents at the Buzzeo conference in Fort
17 Lauderdale?
18 A. No.
19 Q. Do you know if Debra Chase
20 talked to any DEA agents at the
21 conference in Fort Lauderdale?
22 A. I would not know that.
23 Q. Did you ever go to any other
24 conferences as part of your job duties at

Page 21

1 Rite Aid?
2 A. Yes.
3 Q. Can you give me an example?
4 A. My -- I went to a conference
5 in, I think, Virginia. And that was on
6 the lines of -- if I can recollect, on
7 the lines of, I guess, pharmacists
8 stealing product, writing scripts or
9 something, people -- you know, something
10 along that line.
11 That was a while ago, too.
12 Q. Was that also over ten years
13 ago?
14 A. That was probably, if I
15 would have to say, 2008, maybe; '07 or
16 '08.
17 Q. And you referred to the
18 conference in Fort Lauderdale as a
19 conference put on by Buzzeo.
20 Do you know who the VA --
21 the Virginia conference was put on by?
22 A. I don't remember.
23 Q. Who else was at that
24 conference with you from Rite Aid?

Page 22

1    A.   Rick Snyder.
2    Q.   Who is Rick Snyder?
3    A.   Rick Snyder was one of the
4  leads, at the time, for security.
5    Q.   Was he working at the
6  Perryman distribution center?
7    A.   Yes.
8    Q.   Anyone else besides Rick
9  Snyder go to that conference with you?
10   A.   Yes.
11   Q.   Who else?
12   A.   Ms. Joyce Sweitzer.
13   Q.   And who is Joyce --
14   A.   She was --
15   Q.   -- Sweitzer?
16        MR. LAVELLE:  Wait until the
17   question is finished before you
18   answer.
19        THE WITNESS:  Go ahead.
20   BY MR. POWERS:
21   Q.   Who is Joyce Sweitzer?
22   A.   They was the asset
23  protection manager.
24   Q.   And was that also for the

Page 23

1  Perryman distribution center?
2    A.   Yes.
3    Q.   Anyone else besides Rick
4  Snyder and Joyce Sweitzer?
5    A.   No.
6    Q.   Besides the conference down
7  in Virginia and the Fort Lauderdale
8  conferences, any other conferences you
9  went to as a Rite Aid employee?
10   A.   No.
11   Q.   Did you receive any written
12  materials from the conference that you
13  went to in Virginia?
14   A.   Yes.
15   Q.   What kind of written
16  materials did you get?
17   A.   Some printouts, brochures.
18   Q.   What did you do with those
19  written materials?
20   A.   We left them at the middle
21  office, we call it, if anybody wanted to
22  take a look at any of that material.
23   Q.   You say you left them at the
24  middle office?

Page 24

1    A.   Right, at my job.
2    Q.   At the Perryman distribution
3  center?
4    A.   Yes.  We have a security,
5  like a middle meeting area, we left the
6  information in case anybody wanted to
7  look at it.  That was about it.
8    Q.   Did you ever talk to anyone
9  about what you learned at that conference
10  in Virginia?
11   A.   No.
12   Q.   Do you know what those
13  brochures that you left in the middle
14  area were about?
15   A.   I believe, like I said, it
16  was about information on people that
17  would try to get extra scripts.  That's
18  about all I can remember of that.
19        As I say, that's been a
20  while ago as well.
21   Q.   So you said that you started
22  working at Rite Aid in September of 2000,
23  right?
24   A.   Yes.

Page 25

1    Q.   And are you currently still
2  employed by Rite Aid?
3    A.   Yes, I am.
4    Q.   And from September 2000
5  until current, have you always worked at
6  the Perryman distribution center?
7    A.   Yes.
8    Q.   What was your title when you
9  first started at the Perryman
10  distribution center?
11   A.   Security associate.
12   Q.   How long did you hold the
13  position of security associate?
14   A.   If I can recollect, maybe
15  six months.
16   Q.   After security associate,
17  did you have a different position?
18   A.   Yes.
19   Q.   What was that position?
20   A.   They created a position
21  called DEA coordinator for security.
22   Q.   How long were you the DEA
23  coordinator for security?
24   A.   I want to say 2001 until

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 present.
2    Q.   Have you ever had any
3 different titles besides security
4 associate or DEA coordinator for
5 security?
6    A.   Yes.
7    Q.   What other titles have you
8 had?
9    A.   Lead.
10    Q.   And the title is just lead?
11 There's no --
12    A.   Security lead.
13    Q.   Security lead, okay.
14    A.   Yes.
15    Q.   When did you first get the
16 title of security lead?
17    A.   2002.
18    Q.   How long were you a security
19 lead for?
20    A.   Pretty much up until the --
21 well, we got the -- we got promoted maybe
22 two years ago.  So I would say from 2002
23 to 2016, maybe.
24    Q.   You said "we got promoted,"

Page 27

1 what are -- who are you referring to
2 when --
3    A.   Everybody.  Because we went
4 from leads to supervisors.
5    Q.   So everyone who was a
6 security lead got promoted to security
7 supervisor around 2016?
8    A.   Yes, sir.
9    Q.   Why was that?
10    A.   They did a change and
11 decided to do without the leads
12 throughout the whole facility.  So for
13 security, they changed us to -- from
14 leads to supervisors.
15    Q.   So you were both a security
16 lead and the DEA coordinator for security
17 from 2002 until around 2016?
18    A.   Until present.
19    Q.   Well, you're not a security
20 lead any more, you're a security
21 supervisor, right?
22    A.   Yes, sir.
23    Q.   So you stopped being a
24 security lead in 2016, correct?

Page 28

1    A.   Yes.
2    Q.   So from 2002 to 2016, you
3 were both a security lead and the DEA
4 coordinator for security, right?
5    A.   Yes.
6    Q.   Any other titles besides the
7 ones we've already talked about?
8    A.   No, sir.
9    Q.   As the DEA coordinator for
10 security, who did you report to?
11    A.   Still to my boss, which was
12 Nathan Williams at the time.
13    Q.   Was Nathan Williams your
14 boss the entire time you were a DEA
15 coordinator for security?
16    A.   No.
17    Q.   Who else was your boss?
18    A.   A gentleman named Joseph
19 Beck.
20    Q.   Anybody else?
21    A.   Joyce Sweitzer.
22    Q.   Besides Williams, Beck and
23 Sweitzer, anyone else?
24    A.   In security, I think that

Page 29

1 should be it.
2    Q.   Did you report to anyone
3 different as a security lead?
4    A.   No.
5    Q.   What department in the
6 distribution center were you a part of as
7 a DEA coordinator for security?
8    A.   Could you repeat the
9 question, please?
10    Q.   Sure.
11       What department were you a
12 part of as the DEA coordinator for
13 security?
14    A.   Security.
15    Q.   There's a department called
16 the security department at the
17 distribution center?
18       MR. LAVELLE:  Object to
19       form.
20       THE WITNESS:  The security
21       department.  Asset protection now.
22 BY MR. POWERS:
23    Q.   Do you know when it switched
24 from security to asset protection?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.   I don't remember.
2    Q.   Are there other people who
3 have held the role of DEA coordinator for
4 security at the Perryman distribution
5 center?
6    A.   No.
7    Q.   You're the only one who has
8 that title?
9    A.   Yes.
10   Q.   How about security lead,
11 does anyone else have the title of
12 security lead for the period of 2002
13 through 2016?
14   A.   Yes.
15   Q.   Who else were the security
16 leads?
17   A.   All right.  You're going --
18 I got to go back.
19   Q.   The ones you can remember.
20   A.   Okay.  Ronald Welsh, Derrick
21 Johnson, Howard Johnson, Richard Snyder,
22 Jesse Jones.
23        Let's see, who else can I
24 remember?  Cindy Smith.

Page 31

1        That's all I can remember.
2    Q.   When you started your job as
3 the DEA coordinator for security, how
4 were you trained for your -- for that
5 job?
6    A.   I was partnered up with
7 Kevin Mitchell.
8    Q.   And who is Kevin Mitchell?
9    A.   At the time, Kevin Mitchell
10 was the DEA for corporate.
11   Q.   Kevin Mitchell worked in the
12 corporate office, not the distribution
13 center; is that right?
14   A.   Yes, sir.
15   Q.   How did Kevin Mitchell train
16 you for your job as the DEA coordinator
17 for security?
18   A.   Also, Joe Beck.
19   Q.   Besides Kevin Mitchell and
20 Joe Beck, anyone else train you for your
21 job?
22   A.   No.
23   Q.   Who was Joe Beck?
24   A.   Joe Beck was my supervisor.

Page 32

1    Q.   So when Kevin Mitchell
2 trained you for your job as DEA
3 coordinator for security, how did he do
4 that?
5    A.   Through phone calls.
6 Through Joe Beck, with information that
7 Joe Beck had gotten from Kevin Mitchell.
8 Other information, just what he told us,
9 hey, this is what we needed to do, kind
10 of verbal.
11       And then through mock --
12 through mock -- mock -- what's it called,
13 the word I'm looking for?  Mock
14 inspections, things like that.
15   Q.   Did you ever receive any
16 written training materials from Kevin
17 Mitchell or Joe Beck?
18   A.   Not that I can recall.
19   Q.   Did Kevin Mitchell ever come
20 in person to the Perryman distribution
21 center for your training?
22   A.   Yes.
23   Q.   How about your training with
24 Joe Beck, how did Joe Beck train you for

Page 33

1 your job as the DEA coordinator for
2 security?
3    A.   At the time, it was all kind
4 of new.  We was kind of preparing for
5 when DEA would come.  So a lot was
6 verbal.  Information that I believe he
7 received from Kevin Mitchell.
8    Q.   Did Joe Beck ever give any
9 written materials about how to perform
10 your job?
11   A.   I don't remember.  He
12 possibly did.  He could have.
13   Q.   And besides when you first
14 started as the DEA coordinator for
15 security, did you receive any other
16 trainings about how to perform your job
17 duties?
18   A.   I got some hands-on, later
19 on, from Nathan Williams.
20   Q.   And when you say you "got
21 some hands-on," is that hands-on
22 training?
23   A.   Yes.
24   Q.   And by "hands-on training,"

Page 34

¹ what do you mean?
²     A.   Investigation for shortages.
³     Q.   How did Nathan Williams
⁴ train you on investigating shortages?
⁵     A.   He showed us how to start an
⁶ investigation, step by step.  So --
⁷ because he -- being the asset protection
⁸ manager, he was in charge of a lot of the
⁹ investigations.
¹⁰     But he partnered up myself
¹¹ and other folks so we could learn.  So
¹² later on down the road, that became --
¹³ that became part of what we did, as far
¹⁴ as our investigations.
¹⁵     Q.   Did you ever receive any
¹⁶ written materials from Nathan Williams
¹⁷ about how to do investigations?
¹⁸     A.   I don't remember.
¹⁹     Q.   Were there any standard
²⁰ policies and procedures that you used
²¹ during your job as a DEA coordinator for
²² security?
²³     A.   Repeat the question, please.
²⁴     Q.   Sure.

Page 35

¹     Were there any standard
² policies and procedures that you used
³ during your job as a DEA coordinator for
⁴ security?
⁵     A.   I believe so.
⁶     Q.   What were those?
⁷     A.   I don't remember.
⁸     Q.   Do you still use those
⁹ today?
¹⁰     A.   We don't really do much with
¹¹ the investigations anymore, when it comes
¹² to -- because there's no drugs,
¹³ controlled.
¹⁴     Q.   Are you referring to the
¹⁵ fact that Rite Aid stopped distributing
¹⁶ controlled substances in 2014?
¹⁷     A.   Yes.
¹⁸     Q.   And we talked about your
¹⁹ training as the DEA coordinator for
²⁰ security.
²¹     Did you receive different
²² training for the position of security
²³ lead?
²⁴     A.   It's been so long, I can't

Page 36

¹ recall.
²     Q.   Did you get any new training
³ when you became a security supervisor?
⁴     A.   No.
⁵     Q.   What were your job
⁶ responsibilities for your time as a DEA
⁷ coordinator for security?
⁸     A.   Just we had to do any
⁹ shortages that came from the stores, if
¹⁰ they was a product or two short, they
¹¹ would call customer service.  Customer
¹² service would then call Rx.  Rx would
¹³ call us and say, hey, can you guys look
¹⁴ to see if, possibly, where the product
¹⁵ went or to show that we did actually send
¹⁶ what we was supposed to send to the
¹⁷ stores.
¹⁸     That's what -- that's what I
¹⁹ did.
²⁰     Q.   Besides the investigation of
²¹ the shortages from the stores, anything
²² else you did as DEA coordinator for
²³ security?
²⁴     A.   Meaning?  Could you

Page 37

¹ elaborate a little bit more on that, or
² repeat it?
³     Q.   Sure.
⁴     MR. POWERS:  I'm sorry.
⁵ Someone on the phone needs to mute
⁶ their line.  Thank you.
⁷ BY MR. POWERS:
⁸     Q.   So you said one of your job
⁹ responsibilities as the DEA coordinator
¹⁰ for security was to investigate shortages
¹¹ from stores, right?
¹²     A.   Yes.
¹³     Q.   What else did you do as DEA
¹⁴ coordinator for security?
¹⁵     A.   We did monthly motion tests.
¹⁶     Q.   Anything else besides those
¹⁷ two things?
¹⁸     A.   My role was small.  Monthly
¹⁹ motion tests.  Like I said, shortages we
²⁰ would check out.
²¹     That was pretty much it.
²² Mainly, like, compliance stuff.
²³     Q.   As a security lead, what
²⁴ were your job responsibilities?

Page 38

1    A.   To run the day-to-day of the
2 shift.
3    Q.   What does that mean, "run
4 the day-to-day shift"?
5    A.   Make sure everybody was
6 where they were supposed to be, either on
7 the block, front ops, making sure
8 everything was going good at the guard
9 station, make sure controls were being
10 done.
11    Q.   The day-to-day shift of the
12 security personnel, is that what --
13    A.   Security.  Yes.  I'm
14 referring to security.
15    Q.   Let me make sure I get that
16 clearly on.
17        So when you say that you ran
18 the day-to-day shift as the security
19 lead, you're referring to the day-to-day
20 shift of the personnel involved with the
21 security of the Perryman facility, right?
22    A.   That is correct.
23    Q.   I'm going to hand you what's
24 been marked as Ringgold Exhibit-1.  It's

Page 39

1 Bates number Rite_Aid_OMDL_0049982
2 through 49993.
3            - - -
4        (Whereupon,
5    Rite Aid-Ringgold Exhibit-1,
6    Rite_Aid_OMDL_0049982-993, was
7    marked for identification.)
8            - - -
9 BY MR. POWERS:
10    Q.   Just take a brief look at
11 that and just let me know when you're
12 done.
13        Does this document,
14 Exhibit-1, look familiar to you?
15    A.   Yes, it does.
16    Q.   What is the document
17 reflected in Exhibit-1?
18    A.   Checklist for certain areas.
19    Q.   I'll direct you to the first
20 page of Exhibit-1.
21        It looks like it says your
22 name there in the blank for associate
23 name at the top, right?
24    A.   Yes, sir.

Page 40

1    Q.   Below it, it says, Security.
2        Does that mean that you're
3 in the security department?
4    A.   Yes.
5    Q.   And then it looks like it
6 has a list of different procedures on the
7 left-hand side of the page there.
8        Do you see those?
9    A.   I do.
10    Q.   What are these different
11 procedures representing on the left side
12 of the page here?
13    A.   Well, as you see, background
14 check, monitoring, drug diversion, these
15 were some of the things that you had to
16 have some basic knowledge of, trash
17 removal, controlled cage inventory, et
18 cetera.
19    Q.   How come you have an NA in
20 the post picking procedures row?
21    A.   Probably because I don't
22 pick.  I'm security.  I -- we don't pick
23 in Rx.
24    Q.   Is that the same reason why

Page 41

1 you have an NA in the Federal Express
2 totes row?
3    A.   Yes.
4    Q.   And it looks like, back at
5 the top there, the background check row,
6 it looks like the date column says,
7 7/30/2001.
8        Do you see that?
9    A.   I do.
10    Q.   Does that mean you got your
11 first background check in July 30th,
12 2001?
13    A.   I couldn't say yes to that.
14 I know a background check was done.  I
15 could not say to the -- if that's the
16 first time or not.
17    Q.   How about the updates in the
18 next two columns over in that same row
19 about background checks, what do those
20 two dates represent?
21    A.   According to the paper, it's
22 background -- it says, Background checks
23 with the dates.
24    Q.   Did you get a background

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1 check on any set schedule?
2     A.   I believe -- I believe so.
3     Q.   Do you know what that
4 schedule was?
5     A.   I do not.
6     Q.   Do you know why there was a
7 seven-year gap in between your background
8 check in 2001 and your update in 2008?
9     A.   I do not.
10     Q.   Who was in charge of running
11 the background checks?
12     A.   At the time, Keith Ross,
13 Marian Wood.  And they would partner, I
14 guess, with HR.
15         I wasn't privy to any of
16 that.  I just knew, hey, background check
17 had to be done.
18     Q.   And the next row down says,
19 Above-average monitoring.  And it looks
20 like the first date there is January
21 26th, 2010.
22         Do you see that?
23     A.   I do.
24     Q.   Why did you fill out the

Page 43

1 above-average monitoring procedure?
2     A.   I did not fill that out.
3     Q.   Yes, sorry.  That was a bad
4 phrasing.
5         It looks like, on the second
6 page of Exhibit-1, that's actually an
7 acknowledgment that you read and
8 understand the above-average order
9 monitoring program, and it's the same
10 date, January 26th, 2010.
11         Do you see that?
12     A.   Yes, I do.
13     Q.   Why did you sign this form
14 on the second page of Exhibit-1?
15     A.   I believe we had to read
16 something dealing with -- saying that
17 monitoring -- and monitoring program
18 meaning as far as cameras, camera
19 coverage, to my understanding.
20     Q.   Do you know if 2010 was the
21 first time you signed a form like the one
22 here in the second page of Exhibit-1?
23         MR. LAVELLE:  Object to
24     form.

Page 44

1         THE WITNESS:  It's been so
2     long, I don't remember, to be
3     honest.
4 BY MR. POWERS:
5     Q.   It looks like the first page
6 of Exhibit-1 has dates back as far as
7 2001, right?
8     A.   On the first page?
9     Q.   Correct.
10     A.   Drug diversion, yes, I see
11 that.
12     Q.   Any reason why you did not
13 sign the above-average monitoring until
14 2010?
15     A.   I do not know why, no.
16     Q.   And then the next row there
17 says, Drug diversion.
18         Do you see that?
19     A.   I do.
20     Q.   What is drug diversion?
21     A.   I don't remember.
22     Q.   Do you remember the contents
23 of drug diversion generally?
24     A.   It means stealing.

Page 45

1     Q.   Does drug diversion mean
2 anything to you besides stealing of
3 controlled substances?
4     A.   No.
5     Q.   Are you aware of anyone,
6 during your time at Rite Aid, who was
7 disciplined for stealing controlled
8 substances?
9     A.   I do recall a gentleman,
10 don't remember his name, don't remember
11 the year, he got in trouble for -- it
12 wasn't in the cage, though, he was
13 stealing Viagra.
14     Q.   Anyone else you can recall
15 that was stealing controlled substances?
16     A.   No.  Another lady took some
17 Viagra.  That was about it.
18     Q.   And it looks like there's a
19 bunch of different procedures on this
20 page.
21         Do you know if anyone got in
22 trouble for not following the
23 above-average monitoring procedure?
24     A.   I wasn't privy to that, so I

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 do not know.
2     Q.   You can put that exhibit
3 aside.
4           - - -
5       (Whereupon,
6       Rite Aid-Ringgold Exhibit-2,
7       Rite_Aid_OMDL_0032421, was marked
8       for identification.)
9           - - -
10       (Whereupon,
11       Rite Aid-Ringgold Exhibit-3,
12       Rite_Aid_OMDL_0032422, was marked
13       for identification.)
14           - - -
15 BY MR. POWERS:
16     Q.   I'm going to hand you next
17 what's been marked as Exhibits-2 and 3.
18 The first exhibit, Exhibit-2, is Bates
19 stamped Rite_Aid_OMDL_0032421. And then
20 Exhibit-3, which is the e-mail attachment
21 to Exhibit-2, is Bates stamped
22 Rite_Aid_OMDL_0032422.
23     And the Exhibit-3 is -- has
24 a bunch of pages. I'm just going to ask

Page 47

1 you about a couple of questions -- I'm
2 just going to ask you a couple of
3 questions about a couple particular
4 pages.
5     So in Exhibit-2, the cover
6 e-mail that you have in front of you --
7     A.   Yes.
8     Q.   -- it looks like it's an
9 e-mail from you to Nathan Williams,
10 correct?
11     A.   Nathan Williams to myself,
12 yes. Oh, no, it's from me, yes.
13     Q.   So it's an e-mail from you
14 to Nathan Williams, right?
15     A.   Yes.
16     Q.   And it looks like you sent
17 it in 2011, December 16th, right?
18     A.   Yes, sir.
19     Q.   And Nathan Williams would
20 have been your manager at this time?
21     A.   Yes.
22     Q.   And it looks like you
23 attached a document entitled Weekly Case
24 Track.xls.

Page 48

1     Do you see that?
2     A.   I do.
3     Q.   What is the weekly case
4 track.xls?
5     A.   Some -- he asked me to keep
6 track and keep him updated weekly on
7 shortage cases.
8     Q.   And the weekly case track is
9 what is reflected in Exhibit-3, right?
10     A.   Exhibit-3?
11     Q.   Yeah, the one with the
12 colorful graph on the front page.
13     A.   Can I take a look?
14     Q.   Sure.
15     A.   Yes.
16     Q.   Can you explain to me what's
17 the information that's on the first page
18 of Exhibit-3? The very first page with
19 the graph on it.
20     A.   I don't know what that is,
21 but it looks like it might be the number
22 of cases, possibly.
23     Q.   Did you create this
24 weekly -- I forget the name now -- the

Page 49

1 weekly case track?
2     A.   I don't remember if I
3 created it or if my boss created it for
4 me to input.
5     Q.   When you say "your boss"
6 there, you're referring to Nathan
7 Williams?
8     A.   Nathan Williams.
9     Q.   So you don't know what the
10 first page of Exhibit-3 represents?
11     A.   Well, this first page was
12 not created by me.
13     Q.   Turning to the second and
14 third pages -- let's look at the third
15 page. It has a little 3 in the bottom
16 right-hand corner.
17     A.   Which one?
18     MR. LAVELLE: This one. You
19 got it.
20     THE WITNESS: Okay.
21 BY MR. POWERS:
22     Q.   Can you explain to me what
23 this particular page represents?
24     A.   Weekly investigation



Page 50

1 tracking sheet, meaning for that week,
2 store numbers, as it explains, dates
3 received, the product, shortage claim,
4 pending date, open or close.
5     Q.   So the store number there
6 all the way in the left column would be
7 the store that this particular row
8 pertains to?
9     A.   Yes.
10    Q.   And what does the date
11 received column show?
12    A.   The date received.
13    Q.   At the store itself?
14    A.   That's probably the date
15 that we received it, meaning security.
16    Q.   When you received it, what
17 do you mean by "it"?
18    A.   The shortage claim.
19    Q.   And the product name is just
20 the product that the shortage claim is
21 for, right?
22    A.   Yes.
23    Q.   And that looks like
24 hydrocodone/AP?

Page 51

1     A.   Hydrocodone/APAP, yes.
2     Q.   And that's a hydrocodone
3 combination product; is that right?
4     A.   I believe so.
5     Q.   And the next column over,
6 shortage claim, what does that negative 2
7 in that column represent?
8     A.   The number that was -- that
9 the store claimed to be short.
10    Q.   What is the unit being used
11 there in the shortage claim column?
12    A.   Excuse me?
13    Q.   So it says negative 2,
14 right?
15    A.   Yes.
16    Q.   Negative 2 what?
17    A.   I guess bottles or
18 whatever -- however it was packaged, the
19 products.
20    Q.   And then the next columns
21 over, pending, date open and closed, what
22 do those columns represent?
23    A.   Just the dates it was closed
24 or if it was still open, because we had a

Page 52

1 time limit on trying to close cases.
2     Q.   Those would be shortage
3 claim cases?
4     A.   Yes.
5     Q.   What was the time limit to
6 close those?
7     A.   I believe we had 48 hours.
8     Q.   And what did you do to close
9 a shortage claim case?
10    A.   Just investigate.
11    Q.   What did you do to
12 investigate?
13    A.   I would start getting
14 information from either Debra Chase,
15 Marian Woods or Keith Frost.
16    Q.   What kind of information
17 would you get from those individuals?
18    A.   Who picked, who was the
19 person that picked it, who was the person
20 that inventoried it at the desk.

Page 53

9     Q.   So when you have an X in the
10 column closed here on Page 3 of
11 Exhibit-3, what does the X there mean in
12 the closed column?
13    A.   Meaning we were done.
14 Meaning, we close it out on the security
15 side.
16    Q.   Does that mean you found the
17 missing product?
18    A.   On that particular one, I
19 can't -- I could not say yes or no to.
20 But it was closed out on our end.
21    Q.   Where would you find the
22 information about how this was closed
23 out?
24    A.   Repeat that question,

Page 54

1 please.
2    Q.   Yes.  Maybe it wasn't the
3 best question.
4         So it's marked closed on
5 this tracking sheet.  Where would I find
6 the information about how this particular
7 claim for negative 2 bottles of
8 hydrocodone/APAP went?
9    A.   Where it went?  Normally, if
10 I can go back in my memory, I believe
11 when I say closed, meaning it was found.
12    Q.   Was there any record of
13 where the -- where the product was found,
14 besides just the information here that it
15 was closed?
16    A.   I don't remember.
17    Q.   In the next row down, it
18 looks like it's for Store 7766?
19    A.   Yes.
20    Q.   And over in the shortage
21 claim column, it says, One each, and in
22 parentheses, Rx overstock.
23         Do you see that?
24    A.   I do.

Page 55

1    Q.   What does that mean?
2    A.   That might have been the
3 area where it was.  I don't remember.
4    Q.   Would a positive number in
5 the shortage claim column here represent
6 that the store got an extra unit of
7 whatever the product name was?
8    A.   I don't remember.
9    Q.   Do you still use these sort
10 of weekly investigation tracking sheets?
11    A.   No.
12    Q.   When did you stop using
13 them?
14    A.   Once we stopped doing the
15 drug investigations back in 2014.
16    Q.   So these weekly
17 investigation tracking sheets were only
18 for controlled drugs?
19    A.   I can't remember.
20    Q.   Did you personally fill out
21 these weekly investigation tracking
22 sheets?
23    A.   Yes.
24    Q.   Did anyone else?

Page 56

1    A.   I can't remember.
2         But I'm sure if I was out,
3 my boss -- I mean, they still -- things
4 still have to go on if I'm not there,
5 so --
6    Q.   And what did you use these
7 tracking sheets for after they were
8 filled out?
9    A.   I didn't use them for
10 anything.
11    Q.   Do you know if your boss
12 used them for anything?
13    A.   I could not say.
14    Q.   Do you know if anyone else
15 used them for anything?
16    A.   I could not say.  I would
17 not know.
18    Q.   So besides just filling
19 these out, that's your involvement with
20 them?
21    A.   Yes.  Like I said, my role
22 was small.  Yes.
23    Q.   You can put that exhibit
24 over to the side, Mr. Ringgold.

Page 57

1         - - -
2         (Whereupon,
3         Rite Aid-Ringgold Exhibit-4,
4         Rite_Aid_OMDL_0027551-552, was
5         marked for identification.)
6         - - -
7 BY MR. POWERS:
8    Q.   I've got an Exhibit-4 here.
9 And the Bates number on this exhibit is
10 Rite_Aid_OMDL_0027551 through 7552.
11         Go ahead and take a look at
12 that.
13    A.   Thank you.
14    Q.   So what I placed in front of
15 you as Exhibit-4 appears to be an e-mail
16 from Joyce Sweitzer to William Miller,
17 Andrew Palmer, David Howery and copying
18 Nathan Williams and Larry Ringgold.
19         Do you see that?
20    A.   I do.
21    Q.   I believe you said before
22 that Joyce Sweitzer was one of the
23 managers of loss prevention at the
24 Aberdeen distribution center?

Page 58

1    A.   She was a senior, yes.
2    Q.   Would you have reported to
3 Joyce Sweitzer during this time frame in
4 2011?
5    A.   Yes.
6    Q.   Who are -- well, let me
7 start it this way, who is William Miller?
8    A.   He was our direct boss from
9 corporate.  I can't remember his title at
10 the time, but I know he was above us.
11    Q.   You said he was with
12 corporate.
13         So he would not have worked
14 at the distribution center itself?
15    A.   No, sir.
16    Q.   And who is Andrew Palmer?
17    A.   I don't know.
18    Q.   How about David Howery, who
19 is that?
20    A.   I don't know.
21    Q.   And it looks like Joyce's
22 e-mail says, Bill, Andy and David, please
23 see below the reported CD shortages from
24 November 2010 to present.

Page 59

1         What are "CD shortages"?
2    A.   Controlled drug shortages.
3    Q.   And then Joyce goes on to
4 say, These are concerning.
5         Do you see that?
6    A.   I do.
7    Q.   Weren't the controlled drug
8 shortages part of your responsibility as
9 a security department member?
10    A.   Repeat that question.
11    Q.   The controlled drug
12 shortages would be something that fell
13 under your responsibility in the security
14 department, right?
15    A.   It is no.
16    Q.   Who would have had those --
17 responsibility for the controlled drug
18 shortages?
19    A.   We're not responsible for
20 the shortages.  We would investigate the
21 shortages.
22    Q.   Who was responsible for the
23 shortages, then?
24         MR. LAVELLE:  Object to

Page 60

1    form.
2         THE WITNESS:  I wouldn't
3    know.
4 BY MR. POWERS:
5    Q.   You investigated the
6 shortages, but you did not know who was
7 responsible for them?
8         MR. LAVELLE:  Object to
9    form.
10         THE WITNESS:  That's
11    correct.
12 BY MR. POWERS:
13    Q.   What department would have
14 been responsible for the CD shortages?
15         MR. LAVELLE:  Object to
16    form.
17         THE WITNESS:  Rx.
18 BY MR. POWERS:
19    Q.   When you say "Rx," you mean
20 the pharmacy department?
21    A.   Yes.
22    Q.   I'm sorry, you have to keep
23 your voice up.
24    A.   Yes.  Pharmacy.

Page 61

1    Q.   And Joyce says that the
2 losses, it looks like in the table below,
3 are concerning, right?
4    A.   That is correct.
5    Q.   Why were they concerning, if
6 you know?
7         MR. LAVELLE:  Object to
8    form.
9         THE WITNESS:  It looks like
10    from the amount.
11 BY MR. POWERS:
12    Q.   Why do you say that?
13    A.   Just from reading the
14 e-mail.
15         But if you look, it says,
16 Deliveries were Fed Ex.  So I guess
17 that's the part that was concerning.
18    Q.   Were these types of drugs
19 not supposed to be delivered via Fed Ex?
20    A.   I wouldn't know.
21    Q.   Who would know that?
22    A.   I wouldn't know.
23    Q.   And you said the amounts
24 stuck out to you here on this e-mail,

Page 62

1 right?
2     A.   Not to me, no.  This is
3 coming from Ms. Sweitzer.
4     Q.   And it looks like that at
5 least nine of the -- excuse me, seven of
6 the nine on this particular list are
7 opioids, right?
8     A.  I believe so.
9     Q.  How would I figure out if
10 these particular orders were ever found?
11     MR. LAVELLE:  Object to
12     form.
13     THE WITNESS:  These here, I
14     wouldn't know.  Ms. Joyce could
15     have took -- could have handled
16     this.  I don't know.
17 BY MR. POWERS:
18     Q.  Do you know why she copied
19 you on this e-mail?
20     A.  I do not.  Just to keep me
21 in the loop.
22     Q.   And then in the column all
23 the way to the right there, it says, 106
24 filed.

Page 63

1     Do you see that?
2     A.  Where we at?
3     Q.  The column all the way to
4 the right.
5     A.  I see it.
6     Q.  And it looks like it's cut
7 off a little bit, and I'll say to you
8 that's how we got the document ourselves.
9     But do you know what this
10 column represents?
11     A.  Which?  106 filed?
12     Q.  Yes.
13     A.  I guess just what it says,
14 106 filed.
15     Q.  What is a 106?
16     A.  I don't remember, but I had
17 no responsibility on 106s.  I cannot
18 remember what -- exactly what the 106 --
19 I know it had something to do with things
20 missing.  But that was -- had nothing to
21 deal with myself.
22     Q.  Who had responsibility for
23 the 106s?
24     A.  Rx department, I would

Page 64

1 imagine.
2     Q.  Okay.  That's all.  We're
3 done with that exhibit.
4     - - -
5     (Whereupon,
6     Rite Aid-Ringgold Exhibit-5,
7     Rite_Aid_OMDL_21461-463, was
8     marked for identification.)
9     - - -
10 BY MR. POWERS:
11     Q.  I want to hand you what's
12 been marked as Exhibit-5.  It is an
13 e-mail string, and the Bates number is
14 Rite_Aid_OMDL_21461 through 21463.
15     Take a second to review
16 that.
17     A.  Thank you.
18     Q.  I'll direct your attention
19 to the second-to-last page of Exhibit-5.
20     It looks like it's an e-mail
21 from you.  And it's sent October 28th,
22 2009 to Joyce Sweitzer, Nathan Williams,
23 Kim Brown, Tahir Senoussa,
24 █████@riteAid.com, ████e@riteAid.com and

Page 65

1 ██████████████████
2     Do you see that?
3     A.  I do.
4     Q.  Who is Kim Brown?
5     A.  She might have had something
6 to do with Rx at the time.  I can't
7 remember her exact position.
8     Q.  How about Tahir Senoussa?
9     A.  Same.  He was one of the
10 managers at the time.  He might have been
11 in Rx at the time as well.
12     Q.  And is M. Wood, Marian Wood?
13     A.  That is correct.
14     Q.  And D. Chase, is that Debra
15 Chase?
16     A.  Yes.
17     Q.  And L.N. Ringgold, is that
18 you, Larry Ringgold?
19     A.  That is correct.
20     Q.  How come you copied yourself
21 on this e-mail?
22     A.  I don't remember.
23     Q.  You say in the e-mail, Hello
24 to all.  I would like to have a quick

Page 66

1 briefing with day and night shift
2 associates that work in the cage. I just
3 want to go over a few procedures with the
4 scanning of their badges in and out of
5 the cage. I would like to get with all
6 the cage associates next week.
7        Do you see that?
8    A.   I do.
9    Q.    What were you referring to
10 here when you wanted -- when you were
11 referring to the procedures about
12 scanning their badges in and out of the
13 cage?
14    A.    We had a few folks that was
15 getting locked in the cage. So what was
16 happening, they weren't doing a proper
17 swipe. They would swipe in. But to go
18 out, sometimes if you hit it twice, it
19 would think you were still in the cage
20 but you would actually be out.
21        So I just had to explain to
22 them how to swipe in and out, because we
23 were getting a lot of calls to the front,
24 hey, I'm stuck in the cage. So we had to

Page 67

1 let them know, hey, when it happens,
2 don't swipe it, just call us and we would
3 hit the anti-passback button.
4        So I just wanted to brief
5 folks on that. That was it.
6    Q.    Going to the first page of
7 Exhibit-5, at the bottom there, it looks
8 like an e-mail from Marian Wood to you
9 saying, Larry, would it be possible for
10 Kim and I to see what you are going over
11 with them?
12        Do you see that?
13    A.   I do.
14    Q.    In the e-mail above that,
15 it's Marian Wood just to Kim Brown,
16 saying, Kim, I want to be sure what he is
17 going over and make sure it is in line
18 with our procedures.
19        Do you see that?
20    A.   I do.
21    Q.    And Marian -- excuse me, Kim
22 Brown responded, at the top e-mail, there
23 to Marian Wood, Good call, dot, dot, dot.
24        Do you see that?

Page 68

1    A.   I do.
2    Q.    Why did -- do you know why
3 Marian Wood and Kim Brown wanted to see
4 what you were going over with the cage
5 associates?
6        MR. LAVELLE: Object to
7    form.
8        THE WITNESS: I would -- I
9    don't know why, no.
10 BY MR. POWERS:
11    Q.    It sounds like Marian Wood
12 wanted to make sure it's in line with the
13 procedures of the distribution center,
14 right?
15        MR. LAVELLE: Object to
16    form.
17        THE WITNESS: According to
18    the e-mail.
19 BY MR. POWERS:
20    Q.    Was there any time when you
21 gave procedures that were not in line
22 with the procedures at the Rite Aid
23 distribution center?
24    A.    Not that I'm aware of.

Page 69

1    Q.    It seems like Marian Wood
2 thinks there were, right, from that
3 e-mail on the first page of Exhibit-5?
4        MR. LAVELLE: Object to
5    form.
6        THE WITNESS: I couldn't
7    speculate for Marian.
8 BY MR. POWERS:
9    Q.    And it seems like Kimberly
10 Brown agrees, because she says, Good
11 call.
12        Do you see that at the top
13 there?
14    A.   I see that.
15        MR. LAVELLE: Object to
16    form.
17 BY MR. POWERS:
18    Q.    You can place that exhibit
19 to the side.
20            - - -
21        (Whereupon,
22    Rite Aid-Ringgold Exhibit-6,
23    Rite_Aid_OMDL_23456-457, was
24    marked for identification.)



Page 70

1              - - -
2  BY MR. POWERS:
3      Q.   I'm going to hand you what's
4  been marked as Ringgold Exhibit-6.  It is
5  Bates stamped Rite_Aid_OMDL_23456 through
6  23457.
7      A.   Thank you.
8      Q.   So on the second page of
9  Exhibit-6, it looks like you're sending
10  an e-mail.  And you say, FYI, the monthly
11  Rx cage and vault test was conducted
12  today.
13          Do you see that?
14  A.   I do.
15      Q.   What is the monthly Rx cage
16  and vault test?

Page 71

4          MR. LAVELLE:  You have to
5  wait until the question is
6  finished before you answer it.
7  BY MR. POWERS:
8      Q.   I'll ask that again to be
9  clear.

Page 72

6      Q.   And why are you sending it
7  to the particular group of individuals
8  here on the top of the second page of
9  Exhibit-6?
10      A.   Just to let them know they
11  were done.
12      Q.   Who is Bill Morrow?
13      A.   At the time, he was one of
14  the senior ops.  He was over top of the
15  Rx department.
16      Q.   So he was in the pharmacy
17  department, then?
18      A.   He was over top the pharmacy
19  department.
20      Q.   When you say "over top,"
21  what do you mean?
22      A.   He overseen -- he was the
23  senior manager or ops manager for that
24  area, operations manager.

Page 73

1      Q.   Did you do any other kinds
2  of monthly tests for the Rx cage and
3  vaults besides the ones you're talking
4  about here?
5      A.   No.
6      Q.   Turning to the first page of
7  Exhibit-6, it looks like it's a
8  conversation between Marian Wood and
9  Keith Frost.
10          And Keith wrote at the
11  bottom there -- Keith Frost is asking
12  Marian Wood, Marian, do you put a copy of
13  this in a folder?
14          Do you see that?
15          MR. LAVELLE:  Object to
16  form.
17  BY MR. POWERS:
18      Q.   It's the first full e-mail
19  on the bottom of Page -- the first page
20  of Exhibit-6.
21      A.   I see it.
22      Q.   Then Marian responds to
23  Keith saying, No, because Larry keeps a
24  log.

Page 74

1    Do you see that?
2    A.   I do.
3    Q.   So Marian Wood is saying
4  that you kept a log of all the Rx cage
5  and vault tests, right?
6        MR. LAVELLE:  Object to
7  form.  Objection.  Vague.
8        The question is about the
9  e-mails that Mr. Ringgold was not
10 copied on and did not send or
11 receive.
12       MR. POWERS:  John, just
13 objection to form is fine.
14 BY MR. POWERS:
15   Q.   Mr. Ringgold, did you keep a
16 log of the Rx cage and vault tests?
17   A.   I did not keep a log.
18   Q.   You did not keep a log?
19   A.   No.

Page 75

9    Q.   Was it a written report?
10   A.   It was -- yes.  Not really
11 written, but just showed actual motion 1,
12 motion 2, whatever, that it would go off.
13       And that was part of the DEA
14 compliance.
15   Q.   Was that a -- was that,
16 like, a printout or something or --
17   A.   Yes, it was a printout
18 from --
19       MR. LAVELLE:  Wait until the
20 question is finished before you
21 answer it.
22       THE WITNESS:  Yes.
23       MR. LAVELLE:  Otherwise the
24 record is going to be messed up.

Page 76

1  BY MR. POWERS:
2    Q.   So let me just clarify.
3        The -- you kept the
4  printouts from the Rx cage and vault
5  tests, right?
6    A.   Yes.
7    Q.   Were those printouts
8  generated by the Rite Aid systems or the
9  security company's system?
10   A.   Security company.
11   Q.   And where did you keep those
12 printouts?
13   A.   In a file.
14   Q.   Where did you keep that
15 file?
16   A.   In the office.
17   Q.   What office was that?
18   A.   Security.
19   Q.   You kept it in paper copy in
20 the office, the security office?
21   A.   Yes.
22   Q.   Did you ever have problems
23 keeping that particular file of the cage
24 and vault tests?

Page 77

1        MR. LAVELLE:  Object to
2  form.
3        THE WITNESS:  "Problems"
4  meaning?
5  BY MR. POWERS:
6    Q.   Did you ever miss a
7  particular month or anything like that?
8    A.   One time, I believe, in 18
9  years.
10   Q.   The first page of Exhibit-6
11 there, there's an e-mail in the middle of
12 the page from Keith Frost to Marian Wood.
13       And Keith Frost says, How do
14 you know if he misses one or it isn't
15 done correctly?  Remember how they used
16 to mess this up.
17       Do you see that?
18       MR. LAVELLE:  Object to
19 form.
20       THE WITNESS:  I see it.
21 BY MR. POWERS:
22   Q.   Do you know why Keith Frost
23 thinks that you used to mess up keeping
24 these records about the Rx cage and vault

Highly Confidential - Subject to Further Confidentiality Review



Page 78

1 tests?

2     MR. LAVELLE: Object to

3 form.

4     THE WITNESS: I would not

5 know.

6 BY MR. POWERS:

7     Q. Did Keith Frost ever talk to

8 you about that?

9     A. No, he did not.

10     Q. Did Marian Wood?

11     A. No.

12     Q. Did anyone else?

13     A. Not that I can recall.

14     Q. As part of your job as a

15 security -- DEA security coordinator --

16 let me get the title right here.

17     As part of your job for the

18 DEA coordinator for security, did you do

19 any other periodic tests regarding the

20 security of the controlled drug cage?

21     A. No.

22     MR. LAVELLE: Counsel, is

23 this a convenient time? We've

24 been going for over an hour. Can

Page 79

1 we take a break?

2     MR. POWERS: We can take a

3 break if you'd like. I'll say, if

4 you want to power through for

5 another 20 minutes or so, we might

6 be all ready to go home.

7     MR. LAVELLE: I appreciate

8 that, but I do need to use the

9 restroom.

10     MR. POWERS: We'll take a

11 short break, then.

12     VIDEO TECHNICIAN: The time

13 is now 6:07 p.m. We are going off

14 the record.

15     - - -

16     (Whereupon, a brief recess

17 was taken.)

18     - - -

19     VIDEO TECHNICIAN: The time

20 is now 6:20 p.m. We are back on

21 the record.

22 BY MR. POWERS:

23     Q. Welcome back, Mr. Ringgold.

24     - - -

Page 80

1     (Whereupon,

2 Rite Aid-Ringgold Exhibit-7,

3 Rite_Aid_OMDL_0012020-021, was

4 marked for identification.)

5     - - -

6 BY MR. POWERS:

7     Q. I'm going to hand you what

8 has been marked as Exhibit-7. And the

9 Bates number on this exhibit is

10 Rite_Aid_OMDL_0012020 through 12021.

11     Take a look at that e-mail.

12     A. Thank you.

13     Q. On the bottom of the first

14 page of Exhibit-7, it looks like an

15 e-mail from you, sent March 19, 2011, to

16 Joyce Sweitzer and Nathan Williams.

17     Do you see that?

18     A. I do.

19     Q. And you write, Ms. Sweitzer,

20 I came in this afternoon at 1300, and

21

22

23

24     Do you see that?

Page 81

1     A. I do.

2     Q. What does that mean,

3

4

5

6

7

8

9

10

11

12

13     Do you see that?

14     A. I do.

15     Q. And then you continue on in

16 the sentence starting with, I am bringing

17 this to your attention due to the audit

18 team coming in next week.

19     Do you see that?

20     A. I do.

21     Q. Who is the audit team you're

22 referring to here?

23     A. The in-house Rite Aid audit

24 team.

Page 82

1    Q.   Who was on that audit team?
2    A.   I could not tell you.
3    Q.   Do you know what the audit
4  team would come and look at, at the
5  distribution center?
6    A.   Everything from Rx -- this
7  is compliance things, just to prepare us
8  for audit.
9    Q.   And what responsibilities
10 did you have with regard to that audit
11 team coming in?
12   A.   To the audit team, no
13 responsibility for the audit team coming
14 in.
15   Q.   Let me ask that question a
16 different way.
17       Did the audit team audit any
18 particular functions that you were
19 responsible for?
20   A.   Yes.
21   Q.   What were those functions?



Page 83

If that is asked, we

Page 84

1  might get a gig, due to not being armed
2  until 1330.
3        Do you see that?
4    A.   I do.
5    Q.   What do you mean when you
6  say "we might get a gig due to not being
7  armed until 1330"?
8    A.   Gig meaning -- saying, hey,
9  you know, you guys know this is supposed
10 to be done.  We got to prepare -- to get
11 us prepared for the actual audits.
12       So they would always send a
13 team in prior to an actual audit.  So
14 what I meant by gig is we could lose a
15 couple of points.
16   Q.   So there was a team that
17 came in before the actual audit team; is
18 that right?
19   A.   Yes.  We would get people
20 come in before the actual team, yes.
21   Q.   Was the team -- actually,
22 let me ask it this way:  Was the audit
23 team composed of Rite Aid employees?
24   A.   Yes.

Page 85

1    Q.   Was the team that came in
2  before the audit team all Rite Aid
3  employees as well?
4    A.   Yes, yes.
5    Q.   So you had advanced notice
6  of when these audits were happening,
7  right?
8    A.   Sometimes.
9    Q.   Did the pre-audit team
10 always come in before the audit --
11   A.   No.
12   Q.   -- team did?
13   A.   No.
14       MR. LAVELLE:  You have to
15 wait until the question is
16 finished before you answer.
17 BY MR. POWERS:
18   Q.   Let me make sure we have a
19 clear record on that.
20       So I referred to the audit
21 team, and then there's a team that comes
22 in before the audit team, right?
23   A.   Yes.
24   Q.   Can we call that team that

Page 86

1 comes in before the pre-audit team?
2       A.   Yes.
3       Q.   Or was there a formal name
4 for that team?
5       A.   No.
6       Q.   Was that pre-audit team from
7 the distribution center in Perryman?
8       A.   I can't remember.
9       Q.   How about the audit team,
10 were they composed of people who worked
11 at the Perryman distribution center?
12       A.   No.
13       Q.   Do you know where the audit
14 team employees were located?
15       A.   Other DCs.
16       Q.   Did you ever have any role
17 on an audit team?
18       A.   No.
19       Q.   Do you if people were
20 selected for the audit teams?
21       A.   Do I know people?
22       Q.   I'm saying, do you know how
23 people were selected to --
24       A.   I do not.

Page 87

1       Q.   Just let me finish the
2 question.
3             Do you know how people were
4 selected to be on the audit teams?
5       A.   No, I do not.
6       Q.   And I believe you said that
7 when the audit team came in, there
8 sometimes was a pre-audit team that came
9 in before the audit team, right?
10       A.   Yes, just to check us.
11 Right.
12       Q.   So you would have notice if
13 the audit team was coming in; is that
14 right?
15       A.   Re-ask the question, please.
16       Q.   Sure.
17             Did you have notice when the
18 audit team was coming to the distribution
19 center?
20             MR. LAVELLE:  Object to
21 form.  Objection.  Asked and
22 answered.
23             THE WITNESS:  On these, yes,
24 we would know.  But, like I said

Page 88

1       before, on a date we wouldn't be
2       privy to, if the actual real audit
3       team came, meaning DEA.
4             But for these, we had
5       notice.
6 BY MR. POWERS:
7       Q.   Okay.  So let me make sure
8 that I'm differentiating between the
9 different audit teams here.
10             When you're referring to the
11 audit team in this e-mail in Exhibit-7,
12 are you referring to the DEA audit team
13 or Rite Aid audit team?
14       A.   Rite Aid audit team.
15       Q.   Did you always have prior
16 notification of when the Rite Aid audit
17 team was coming in?
18       A.   No.
19       Q.   Did you always have prior
20 notice before the DEA audit team came in?
21       A.   No.
22       Q.   Did you ever have prior
23 notice before the DEA audit team came in?
24       A.   No.

Page 89

1       Q.   Do you know why or why not
2 you would get notice about the Rite Aid
3 audit team coming in?
4             MR. LAVELLE:  Object to
5       form.
6             THE WITNESS:  I do not know.
7 BY MR. POWERS:
8       Q.   And back to Exhibit-7 here.



Page 90

[REDACTED]

4   Q.   Do you remember if you
5 actually got points off for this
6 particular instance of the alarm not
7 being armed?
8   A.   I don't remember.
9   Q.   I'm going to move on to a
10 new exhibit here.  You can put that one
11 to the side.
12     - - -
13     (Whereupon,
14     Rite Aid-Ringgold Exhibit-8,
15     Rite_Aid_OMDL_0011115-116, was
16     marked for identification.)
17     - - -
18 BY MR. POWERS:
19   Q.   I marked Ringgold Exhibit-8,
20 it is a two-page document with the Bates
21 number Rite_Aid_OMDL_0011115 through
22 11116.
23     So on the second page of
24 Exhibit-8, it looks like at the top

Page 91

1 there, there's an e-mail -- actually,
2 it's -- the "from" line is on the first
3 page of Exhibit-8, it's from Keith Frost
4 down there at the bottom, and then it
5 looks like it's sent to Marian Wood,
6 Larry Ringgold, Keith Frost and Nathan
7 Williams.
8     Do you see that?
9   A.   Where we looking at?
10   Q.   The very top of the second
11 page of Exhibit-8.
12   A.   Second page.  I see it.
13   Q.   And it looks like Keith
14 Frost writes, Larry should not have given
15 her access without her having done a
16 background check and went through the
17 training.
18     Do you see that?
19   A.   I do.
20   Q.   And it looks like Keith
21 Frost is referring to you giving access
22 to a woman named Tammy Coakley, right?
23   A.   Uh-huh.
24     MR. LAVELLE:  You need to

Page 92

1 give an audible answer, such as
2 yes, no, I don't know.
3     THE WITNESS:  Yes.
4 BY MR. POWERS:
5   Q.   And then it looks like, on
6 the first page of Exhibit-8, you respond
7 to Keith Frost by saying, Keith, Tammy
8 was given access due to me talking with
9 Anna Karn, and she said that she was
10 starting in the cage today.  So I would
11 never just give access without confirming
12 it with a manager.
13     Do you see that?
14   A.   I do.
15   Q.   Skipping ahead there, it
16 says, I know that in the past they
17 normally have their background check done
18 before they start in the cage.
19     Do you see that?
20   A.   I do.
21   Q.   But you gave access to Tammy
22 Coakley even though she didn't have a
23 background check done, right?
24   A.   According to the e-mail.

Page 93

1   Q.   And that's not something you
2 should have done, right?
3     MR. LAVELLE:  Object to
4     form.
5     THE WITNESS:  It came
6     through a manager.
7 BY MR. POWERS:
8   Q.   Marian responds in the top
9 there, and says, As has always been done,
10 Keith and I received confirmation that a
11 background check was completed and
12 approved, then I send an e-mail/SYSM out
13 to you, Nathan, Rick, assistants, et
14 cetera, that the associate has been
15 approved for cage access.  To my
16 knowledge, this process has not been
17 changed.
18     Do you see that?
19   A.   I'm trying to see where
20 you're at.
21   Q.   The top e-mail there on the
22 first page.
23   A.   I do see -- I see it.
24   Q.   So Marian is saying here

Page 94

1 that the process of giving cage access
2 has never changed, right?
3     A.   According to the e-mail.
4     Q.   And you didn't follow that
5 policy when you gave Tammy Coakley access
6 to the cage, right?
7     A.   I got confirmation from a
8 manager, who was part of Rx that
9 particular day.
10     Q.   But the policy was that the
11 particular person, before getting access
12 to the cage, had to have a background
13 check, right?
14         MR. LAVELLE:  Object to
15     form.
16         THE WITNESS:  Normally.
17 BY MR. POWERS:
18     Q.   The policy was not just
19 whether a manager signed off, right?
20         MR. LAVELLE:  Object to
21     form.
22         THE WITNESS:  I don't
23     remember on that.
24 BY MR. POWERS:

Page 95

1     Q.   And these e-mails are dated
2 February 20th, 2012, correct?
3     A.   That is correct.
4          - - -
5         (Whereupon,
6     Rite Aid-Ringgold Exhibit-9,
7     Rite_Aid_OMDL_0003108-109, was
8     marked for identification.)
9          - - -
10 BY MR. POWERS:
11     Q.   You can put that exhibit to
12 the side.  I'm going to hand you what's
13 been marked as Exhibit-9.  It's a
14 two-page document with the Bates stamp of
15 Rite_Aid_OMDL_0003108 through 3109.
16         Take a look at that one.
17     A.   Thank you.
18     Q.   So these e-mails in
19 Exhibit-9 are dated March 5th, 2012,
20 right?
21     A.   Yes.
22     Q.   And the e-mail string starts
23 there at the bottom with an e-mail from
24 Marian Wood to Keith Frost saying, Keith,

Page 96

1 didn't you tell Larry to remove Tammy
2 Coakley from cage access?  She's on the
3 access list from Friday, 3/2.
4         Do you see that?
5     A.   I do.
6     Q.   And then it looks like
7 Marian, in her response to Keith, copies
8 you right above that saying, Yes, I did
9 last month.
10         Right?
11     A.   Where we at?
12     Q.   I'm sorry.  I'm looking at
13 the e-mail.  It's sort of hard, because
14 it's split across the two pages there.
15         But it looks like an e-mail
16 from Keith Frost to Marian Wood and
17 yourself, indicating that Keith asked you
18 to remove Tammy Coakley from cage access,
19 right?
20         MR. LAVELLE:  Object to
21     form.
22         THE WITNESS:  As per the
23     e-mail.
24 BY MR. POWERS:

Page 97

1     Q.   And then Marian follows up
2 on that e-mail saying, Larry -- right
3 above that on the front page of
4 Exhibit-9, Larry, please remove Tammy
5 Coakley from cage access until we can get
6 a current background check.
7         Do you see that?
8     A.   I do see that.
9     Q.   And then you respond, Access
10 has been taken off as requested.
11         Right?
12     A.   Yes.
13     Q.   And this is on March 5th,
14 2012, correct?
15     A.   That is correct.
16     Q.   And the previous exhibit we
17 were looking at, Exhibit-8, that was also
18 about Tammy Coakley, right?
19     A.   Yes.
20     Q.   And those e-mails were
21 February 20th, 2012, right?  The
22 previous --
23     A.   Which --
24     Q.   I'm sorry, the previous

Page 98

1 exhibit, Exhibit-8.
2       Those e-mails were dated
3 February 20th, 2012, right?
4       A.   Yes.
5       Q.   And those were also about
6 giving Tammy Coakley cage access, right?
7       A.   That is correct.
8       Q.   So Tammy Coakley had cage
9 access from February 20th, 2012 through
10 at least March 5th, 2012, right?
11      A.   That is possible.
12      Q.   But she was not ever
13 supposed to have gotten cage access in
14 the first place, right?
15           MR. LAVELLE:  Object to
16      form.
17           THE WITNESS:  That doesn't
18      come through me.  Authorization
19      does not come through me.
20 BY MR. POWERS:
21      Q.   But in Exhibit-8, Marian
22 Wood is saying that she should not have
23 gotten -- Tammy Coakley should not have
24 gotten cage access, right?

Page 99

1       A.   Where we at now?  Where we
2 at?
3       Q.   Exhibit-8.
4       A.   Exhibit-8.
5       Q.   And if you look at the
6 second page of Exhibit-8 there, it's
7 actually Keith Frost who says, Larry
8 should not have given her access without
9 having done a background check and went
10 through the training, at the top there on
11 the second page of Exhibit-8.
12      A.   I see that.
13      Q.   So Tammy Coakley should not
14 have had cage access, but yet she did
15 from 2/20/2012 through 3/5/2012, right?
16           MR. LAVELLE:  Object to
17      form.
18           THE WITNESS:  From here, it
19      looks like she had it February
20      2020.  But I could not say she had
21      it the entire time until March
22      5th.
23 BY MR. POWERS:
24      Q.   I'm sorry, I think you said

Page 100

1 February 2020, but I think you meant --
2       A.   No.
3       Q.   -- February 20, 2012, right?
4       A.   That is correct.
5             -  -  -
6           (Whereupon,
7      Rite Aid-Ringgold Exhibit-10,
8      Rite_Aid_OMDL_0010795-796, was
9      marked for identification.)
10            -  -  -
11 BY MR. POWERS:
12      Q.   I'll hand you an exhibit
13 that's been marked Exhibit-10.  It's
14 Bates stamped Rite_Aid_OMDL_0010795
15 through 0010796.
16      A.   Thank you.
17      Q.   The first e-mail in the
18 chain here, which is on the last page of
19 Exhibit-10 and goes on to the first page
20 of Exhibit-10, looks like it's from David
21 Berger.
22           Do you know who that is?
23      A.   I do not remember David
24 Berger.

Page 101

1       Q.   And it's dated June 23rd,
2 2011, right?
3       A.   That is correct.
4       Q.   And it looks like, on the
5 first page of Exhibit-10 here, that
6 Marian Wood forwards that e-mail chain
7 below to you, right?
8       A.   Yes.  Yes.
9       Q.   And in that e-mail chain
10 that you were forwarded, that was written
11 by David Berger, David Berger says on the
12 top of the second page of Exhibit-10 --
13 looking at the second page at the very
14 top.
15      A.   It starts at the bottom.
16      Q.   Right.  It starts at the
17 bottom, but I'm going to talk about the
18 top of the page.
19      A.   Go ahead.
20      Q.   The second page of
21 Exhibit-10.
22           It says, ███████████████
23 ████████████████████████████████
24 ██████████████████████████████



Page 102

5    Do you see that?
6    A.   I do.
7    Q.   What is David Berger saying
8  here?
9        MR. LAVELLE:  Object to
10  form.
11       THE WITNESS:  He's saying
12  just what it states in the e-mail.
13 BY MR. POWERS:

18    A.   That's what it says.
19    Q.   And that's -- that's against
20  the protocol, right?
21       MR. LAVELLE:  Object to
22  form.
23       THE WITNESS:  Yes and no.
24 BY MR. POWERS:

Page 103

1    Q.   Why do you say no?

Page 104

19    Q.   You can put that exhibit to
20  the side.
21       I want to go back to
22  something we were talking about earlier,
23  the Buzzeo conference that you went to
24  down in Fort Lauderdale.

Page 105

1        Do you know why you were
2  selected to go to that particular
3  conference?
4        A.   I don't remember.  I believe
5  because I was security DEA.
6        Q.   Who made that decision that
7  you would go to that conference?
8        MR. LAVELLE:  Object to
9  form.
10       THE WITNESS:  I wouldn't
11  know.  It could have possibly been
12  the GM.  I'm not sure.
13 BY MR. POWERS:
14    Q.   And how about the conference
15  in Virginia that you went to with Rick
16  Snyder, Joyce Sweitzer, do you know why
17  you were selected to go to that
18  conference?
19    A.   I do not.
20    Q.   Who told you that you could
21  go to that conference?
22    A.   Ms. Joyce Sweitzer.
23    Q.   Is there any reason why you
24  didn't attend any other Buzzeo

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 conferences after the one you attended in
2 Fort Lauderdale?
3    A.   Budget.
4    Q.   How do you know that?
5    A.   I think we were -- we wanted
6 to go to some other stuff, but they said
7 because of budgets, we could not go.
8    Q.   Do you know when that was?
9    A.   I do not remember, no.
10    Q.   Did anyone from the Perryman
11 distribution center go to those other
12 Buzzeo conferences that you were not able
13 to?
14    A.   I wouldn't know.
15        MR. POWERS:  That's all I
16 have.
17        MR. LAVELLE:  I have some
18 brief questioning of the witness,
19 but I guess we should switch
20 places.
21        VIDEO TECHNICIAN:  The time
22 is now 6:47 p.m.  We're going off
23 the record.
24            - - -

Page 107

1        (Whereupon, a brief recess
2 was taken.)
3            - - -
4        VIDEO TECHNICIAN:  The time
5 is now 6:54 p.m.  We are back on
6 the record.
7            - - -
8        EXAMINATION
9            - - -
10 BY MR. LAVELLE:
11    Q.   Hello, Mr. Ringgold.  John
12 Lavelle, representing Rite Aid.  I have
13 just a few questions for you.
14    I'd like to ask you first
15 to -- following up on the documents
16 Ringgold-8 and 9 that were discussed with
17 you by counsel for plaintiff earlier.
18        Do you have those in front
19 of you, sir?
20    A.   Yes, I do.
21    Q.   Okay.  And these documents
22 were about someone named Tammy Coakley;
23 is that right?
24    A.   That is correct.

Page 108

1        Q.   All right.  I'd like to ask
2 you first to turn to Ringgold-8, and go
3 to the second page of that document.
4 It's Rite_Aid_OMDL_0011116.
5        Do you have that in front of
6 you, sir?
7    A.   Yes, I do.
8    Q.   And you'll see that there is
9 an e-mail at the bottom of this chain
10 from Marian Wood to Keith Frost, dated
11 Monday, February 20th, 2012.
12        Do you see that part of the
13 e-mail in front of you?
14    A.   I do.
15    Q.   Okay.  Would you please read
16 for the members of the jury viewing this
17 video the fourth sentence of Ms. Wood's
18 e-mail to Mr. Frost?  It starts with, Do
19 we know.
20    A.   Do you give approval?  Do we
21 know when her last background check was?
22    Q.   Stop right there.
23        Now, turn to Ringgold-9,
24 please.

Page 109

1        Do you have that in front of
2 you, sir?
3    A.   I do.
4    Q.   Rite_Aid_OMDL_0003108.
5    You see that the third
6 e-mail on that page is an e-mail from
7 Marian Wood to you and Nathan Williams,
8 among other people?
9        Do you see that?  It's on
10 the first page, sir.
11    A.   First page.
12    Q.   A Marian Wood e-mail dated
13 Monday, March 5th, 2012, 10:09 a.m. to
14 you and Nathan Williams and R. Snyder?
15    A.   Yes.
16    Q.   You see that?
17    A.   I see that.
18    Q.   Would you read, please, for
19 the members of the jury, what Ms. Wood
20 wrote to you in that e-mail?
21    A.   Larry, please remove Tammy
22 Coakley from cage access until we can get
23 a current background check.  Thanks,
24 Marian.

Page 110

1    Q.   So, Mr. Ringgold, do you
2  have an understanding of whether Tammy
3  Coakley had a background check prior to
4  March of 2012?
5         MR. POWERS:  Objection to
6  form.
7         THE WITNESS:  Yes.
8  BY MR. LAVELLE:
9    Q.   And what's your
10 understanding, sir?
11   A.   Background checks are done
12 every so often.
13   Q.   Had Tammy Coakley worked
14 previously at Rite Aid?
15   A.   Yes.
16   Q.   Had she worked in the cage
17 previously?
18   A.   Yes.
19   Q.   Had she received a
20 background check previously in order to
21 work in the cage?
22   A.   To my understanding, yes.
23   Q.   After all of these e-mails
24 that went back and forth, Ringgold-8 and

Page 111

1  Ringgold-9, do you know whether Ms.
2  Coakley did, ultimately, pass another
3  background check?
4    A.   Yes.
5    Q.   Do you know whether she was
6  given access to the cage again?
7    A.   Yes.
8    Q.   All right.  I'd like to mark
9  an exhibit.
10         - - -
11        (Whereupon,
12        Rite Aid-Ringgold Exhibit-11,
13        Rite_Aid_OMDL_0003562, was marked
14        for identification.)
15         - - -
16 BY MR. LAVELLE:
17   Q.   Mr. Ringgold, I'm going to
18 give you what we've marked for
19 identification as Ringgold-11.
20        Please take a look at it and
21 tell me when you've had a chance to
22 review it.
23        It is Bates number
24 Rite_Aid_OMDL_0003562.  Again, that's

Page 112

1  Ringgold-11.
2    A.   I've read it.
3    Q.   Mr. Ringgold, do you
4  recognize this document we've marked for
5  identification as Ringgold-11?
6    A.   Yes, I do.
7    Q.   What is it?
8    A.   This is a case overview.
9    Q.   A case overview.
10        Is it an e-mail that you
11 sent?
12   A.   Yes.
13   Q.   You're in the "from" line of
14 this e-mail; is that correct?
15   A.   Yes.
16   Q.   Who did you send this e-mail
17 to?
18   A.   Marian Wood, Charlotte
19 Winder, Keith Frost.  I think her name
20 was Kim Temple, Bill Morrow, I attached
21 myself, Nathan Williams, Joyce Sweitzer,
22 Jesse Jones.
23   Q.   When did you send this?
24   A.   November 11th, 2010.

Page 113

1    Q.   And what is the subject?
2    A.   Store shortage for negative
3  2 of hydroco/APAP.
4    Q.   Why did you write up this
5  case overview in an e-mail to these
6  people?
7    A.   That's what I always did
8  after an investigation.
9    Q.   So would it be fair to say
10 that this is an e-mail that summarizes
11 your investigation?
12   A.   Yes.
13        MR. POWERS:  Objection to
14 form.
15 BY MR. LAVELLE:
16   Q.   All right.  Let's walk
17 through this e-mail.
18        Can you read the first
19 sentence of the e-mail, please?
20   A.   Yes.  Charlotte, as per our
21 discussion yesterday in reference to
22 Store 2760's claim of negative 2
23 hydroco/APAP.
24   Q.   Can you explain to the

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 members of the jury viewing this video
2 what you meant in that sentence? What
3 does that -- what does that say?
4     A.   This is stating that I did
5 an overview, as per our discussion,
6 with -- from the drug shortage.
7     Q.   So what is Store 2760?
8     A.   It's one of the Rite Aid
9 stores that claimed to be missing two
10 bottles of the hydroco/APAP.
11     Q.   Please read the next
12 sentence.
13     A.   On November 8th, at 0250 at
14 Station Number 5 Shannon Plourde was the
15 verifier on the tote in question.
16     Q.   How did you know -- or how
17 did you learn the information that is in
18 that sentence?
19     A.   Two ways.  I get a list of
20 who is picking what at different times
21 from Marian, or whoever is inside the
22 cage.

Page 115

23     Q.   And what does that mean?
24     A.   We get an actual pick list

Page 116

1 of what they're supposed to pick for that
2 particular tote.  So I, in turn, get a
3 copy so I can make sure everything that
4 was supposed to go into that tote went
5 into the tote.

12       MR. POWERS:  Objection to
13 form.
15 BY MR. LAVELLE:
16     Q.   And is that typically how
17 you would conduct an investigation?
18     A.   That is correct.
19     Q.   What's the next sentence of
20 this e-mail?

23     Q.   What is your basis for what
24 you say in that sentence?

Page 117

1     A.   There was a total number of
2 ten hydroco/APAP.
3     Q.   Is that something that you
4 were able to determine from the video?
5     A.   Yes.
6     Q.   What's the next sentence
7 say?
8     A.   Shannon continued to go by
9 the pick list until all 93 items were on
10 the table by 0257.
11     Q.   And what was your basis for
12 what you just said in that sentence?
13     A.   Just to show, although they
14 were -- it was ten total bottles of the
15 hydroco/APAP, I was still showing that
16 everything that was supposed to be in
17 that tote came out of that tote and went
18 back into the tote.
19     Q.   What is a tote?
20     A.   It's where all the product
21 is put to ship to the stores.
22     Q.   Does each order go into a
23 tote?
24       MR. POWERS:  Objection.





Page 118

1    Form.

12    Q.    Why would Shannon Plourde
13    have put the items into bags?
14        A.    That is part of the
15    procedure that they have to do.  Before
16    they enter it into the tote, it goes into
17    a bag.

Page 120

14        A.    That's where they store the
15    controlled drugs when it's going out for
16    shipment.

Page 121

7        Q.    What does it mean to load a
8    tote onto a trailer?
9        A.    Meaning they put all the
10    totes into the trailer to get shipped to
11    the stores.
12        Q.    The trailer is the truck
13    that takes it to the store?
14        A.    That is correct.

Highly Confidential - Subject to Further Confidentiality Review



Page 122

2  Q.  What does it mean to seal a
3  trailer?
4  A.  Once the trailer is fully
5  loaded, we have to seal it with a seal
6  for chain-of-custody purposes.

Page 123

4  Q.  What's your conclusion in
5  the next paragraph?
6  MR. POWERS:  Objection to
7  form.
8  THE WITNESS:  So after all
9  were checked, we were 100 percent
10 intact and DEA compliant at DC 10.

Page 124

1  Q.  So is this e-mail which
2  we've just gone over, Ringgold-11, is
3  that typical of the type of report by
4  e-mail that you would send after
5  completing an investigation?
6  A.  Yes.
7  MR. POWERS:  Objection to
8  form.
9  BY MR. LAVELLE:
10 Q.  All right.  You were shown
11 earlier by counsel Exhibits Ringgold-2
12 and 3.
13 Do you recall those
14 documents?  Ringgold-2 was a one-page
15 e-mail, and then Ringgold-3 was a thick
16 document.  Take your time and see if you
17 can find it.
18 A.  Excuse me, which document is
19 that?
20 Q.  Ringgold-3 is the one I'd
21 like you to put in front of you if you
22 could.
23 A.  I see it.  All right.
24 Here we go.

Page 125

1  Q.  I think you have it.
2  A.  I do.
3  Q.  Can you turn to the second
4  page of Ringgold-3?
5  A.  I got it.
6  Q.  Do you recall how you were
7  asked questions by counsel about this
8  tracking sheet earlier today, the weekly
9  investigation tracking sheet?
10 A.  Yes.
11 Q.  And you were asked about
12 investigations being marked as either
13 open or closed on this sheet?
14 A.  That's correct.
15 Q.  When you completed an
16 investigation like the one that you've
17 done on Ringgold-11, would that be
18 reflected in a tracking sheet like this?
19 A.  That is correct.
20 Q.  How would it be reflected?
21 A.  X meaning it's closed,
22 meaning our part on the security side is
23 complete and our investigation is done.
24 Q.  So the investigation that's

Page 126

1  described in Ringgold-11 was closed by
2  the time you sent this e-mail?
3      A.   That is correct.
4      Q.   And this is typical of the
5  type of investigation that you conducted
6  as the DEA coordinator for security?
7          MR. POWERS:  Object to the
8  form.
9          THE WITNESS:  That is
10 correct.
11         MR. LAVELLE:  I have no
12 further questions.
13         MR. POWERS:  I don't have
14 any follow-up.
15         VIDEO TECHNICIAN:  The time
16 is now 7:11 p.m.  This concludes
17 today's deposition.  We're going
18 off the record.
19         - - -
20     (Whereupon, the deposition
21 concluded at 7:11 p.m.)
22         - - -
23
24

Page 127

1          CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
11     Amanda Maslynsky-Miller
       Certified Realtime Reporter
       Dated:  January 27, 2019
12
13
14
15
16
17     (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

Page 128

1          INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8          After doing so, please sign
9  the errata sheet and date it.
10         You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14         It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 129

1          - - - - - -
            E R R A T A
2          - - - - - -
3  PAGE  LINE  CHANGE/REASON
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____

Page 130

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 126, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
LARRY RINGGOLD          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Page 131

## LAWYER'S NOTES

PAGE  LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____