```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3   IN RE: NATIONAL          )    MDL No. 2804
     PRESCRIPTION OPIATE      )
 4   LITIGATION               )    Case No.
                              )    1:17-MD-2804
 5                            )
     THIS DOCUMENT RELATES TO )    Hon. Dan A. Polster
 6   ALL CASES                )
                              )
 7

 8

 9
                      ── ── ──
10

             Friday, February 22, 2019
11                    ── ── ──
12      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
13                    ── ── ──
14

15

16

17       Videotaped Deposition of MATTHEW ROGOS,
     held at Marcus & Shapira LLP, One Oxford
18   Centre, Suite 3500, Pittsburgh, Pennsylvania,
     commencing at 1:09 p.m., on the above date,
19   before Michael E. Miller, Fellow of the
     Academy of Professional Reporters, Registered
20   Diplomate Reporter, Certified Realtime
     Reporter and Notary Public.
21

22

                      ── ── ──
23
24           GOLKOW LITIGATION SERVICES
         877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1   A P P E A R A N C E S:
2   WAGSTAFF & CARTMELL LLP
    BY:  ERIC D. BARTON, ESQUIRE
3       ebarton@wcllp.com
        BRITT WICKLUND, ESQUIRE
4       bwicklund@wcllp.com
    4740 Grand Avenue
5   Suite 300
    Kansas City, Missouri 64112
6   (816) 701-1100
    Counsel for MDL Plaintiffs
7
8   MARCUS & SHAPIRA LLP
    BY:  JOSHUA A. KOBRIN, ESQUIRE
9       jkobrin@marcus-shapira.com
    One Oxford Centre
10  301 Grant Street, 35th Floor
    Pittsburgh, Pennsylvania 15219
11  (412) 471-3490
    Counsel for HBC Service Company
12
13  PIETRAGALLO GORDON ALFANO BOSICK &
    RASPANTI LLP
14  BY:  JENNIFER H. BOURIAT, ESQUIRE
        jhb@pietragallo.com
15  One Oxford Centre
    301 Grant Street, 38th Floor
16  Pittsburgh, Pennsylvania 15219
    (412) 263-2000
17  Counsel for Cardinal Health
18
19  JACKSON KELLY PLLC
    BY:  GRETCHEN M. CALLAS, ESQUIRE
20      gcallas@jacksonkelly.com
        (via teleconference)
21  500 Lee Street
    Suite 1600
22  Charleston, West Virginia 25301
    (713) 469-3842
23  Counsel for AmerisourceBergen Drug
    Corporation
24
25

Page 3

1   A P P E A R A N C E S:
2   JONES DAY
    BY:  PATRICIA OCHMAN, ESQUIRE
3       pochman@jonesday.com
        (via teleconference)
4   North Point
    901 Lakeside Avenue
5   Cleveland, Ohio  44114-1190
    (216) 586-3939
6   Counsel for Walmart Corporation
7
8   ARNOLD & PORTER KAYE SCHOLER LLP
    BY:  DAVID KOUBA, ESQUIRE
9       david.kouba@arnoldporter.com
        (via teleconference)
10  601 Massachusetts Ave, NW
    Washington, DC 20001-3743
11  (202) 942-5000
    Counsel for Endo Health Solutions
12  Inc., Endo Pharmaceuticals Inc., Par
    Pharmaceutical, Inc. and Par
13  Pharmaceutical Companies, Inc.
14
15  COVINGTON & BURLING LLP
    BY:  MARY ZHAO, ESQUIRE
16      mzhao@cov.com
        (via teleconference)
17  3000 El Camino Real
    5 Palo Alto Square
18  Palo Alto, California 94306
    (650) 632-4700
19  Counsel for McKesson Corporation
20
21
22
23
24
25

Page 4

1   A P P E A R A N C E S:
2   TRIAL TECHNICIAN:
3       MICHAEL KAUFFMANN,
        Precision Trial
4
5   VIDEOGRAPHER;
6       DEVYN MULHOLLAND,
        Golkow Litigation Services
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1               INDEX
2
3   APPEARANCES              2
4   PROCEEDINGS              8
5
6   EXAMINATION OF MATTHEW ROGOS:
7       BY MR. BARTON        8
8       BY MR. KOBRIN        132
9       BY MR. BARTON        140
10      BY MR. KOBRIN        152
11
12  CERTIFICATE              153
13  ERRATA              155
14  ACKNOWLEDGMENT OF DEPONENT          155
15  LAWYER'S NOTES              157
16
17
18
19
20
21
22
23
24
25

Page 6

```
 1              DEPOSITION EXHIBITS
 2                MATTHEW ROGOS
 3           February 22, 2019
    HBC SERVICE-ROGOS EXHIBITS        PAGE
 4  Exhibit 1  P-GEN-00145        11
              Resume
 5            [No Bates]
 6  Exhibit 2  P-HBC-6009         21
              Meeting Presentation
 7            HBC_MDL00068314
 8  Exhibit 3  P-HBC-6021         23
              E-mail(s) w/Attachment(s)
 9            HBC_MDL00136653 -
              HBC_MDL00136654
10
11  Exhibit 4  P-HBC-6022         27
              E-mail(s) w/Attachment(s)
12            HBC_MDL00136141 -
              HBC_MDL00136213
13  Exhibit 5  P-HBC-05040        38
              E-mail(s) w/Attachment(s)
14            HBC_MDL00140166 -
              HBC_MDL00140204
15
16  Exhibit 6  P-HBC-01266        52
              E-mail(s) w/Attachment(s)
              HBC_MDL00180061 -
17            HBC_MDL00180088
18  Exhibit 7  P-HBC-01271        66
              Inventory Control Doc
19            HBC_MDL00052107 -
              HBC_MDL00052110
20
21  Exhibit 8  P-HBC-01272        78
              10/13/14 Memo
22            w/Attachment(s)
              HBC_MDL00132908 -
23            HBC_MDL00132924
24  Exhibit 9  P-HBC-05045        90
              E-mail(s) w/Attachment(s)
25            HBC_MDL00133435 -
              HBC_MDL00133463
```

Page 7

```
 1  HBC SERVICE-ROGOS EXHIBITS        PAGE
 2
    Exhibit 10  P-HBC-05042       97
 3             E-mail(s) w/Attachment(s)
               HBC_MDL00181521 -
 4             HBC_MDL00181555
 5  Exhibit 11  P-HBC-05043       107
               E-mail(s) w/Attachment(s)
 6             HBC_MDL00181482 -
               HBC_MDL00181511
 7
    Exhibit 12  P-HBC-05003       118
 8             E-mail(s) w/Attachment(s)
               HBC_MDL00078594 -
 9             HBC_MDL00078668
10  Exhibit 13  P-HBC-01184       127
               E-mail(s) w/Attachment(s)
11             HBC_MDL00133670 -
               HBC_MDL00133748
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1              PROCEEDINGS
 2        (February 22, 2019 at 1:09 p.m.)
 3        THE VIDEOGRAPHER:  We're now on
 4  the record.  My name is Devyn
 5  Mulholland.  I am the videographer for
 6  Golkow Litigation Services.  Today's
 7  date is February 22nd, 2019.  The time
 8  is 1:09 p.m.
 9        This video deposition is being
10  held in Pittsburgh, Pennsylvania in
11  the matter of National Prescription
12  Opiate Litigation.  The deponent is
13  Matthew Rogos.
14        Counsel will be noted on the
15  stenographic record.  The court
16  reporter is Mike Miller, and he will
17  now swear in the witness.
18        MATTHEW ROGOS,
19     having been duly sworn,
20       testified as follows:
21          EXAMINATION
22  BY MR. BARTON:
23     Q.   All right.  Mr. Rogos, my name
24  is Eric Barton.  We met just before the
25  deposition.  I am one of the attorneys
```

Page 9

```
 1  representing the plaintiffs in some
 2  litigation involving the opioid epidemic, and
 3  we're here to take your deposition today.
 4        Have you ever had your
 5  deposition taken?
 6     A.   No.
 7     Q.   Okay.  I'll explain a little
 8  bit about the process, and I know that you've
 9  probably talked with counsel about the
10  process as well.
11        But first, do you understand
12  that you have just taken an oath the same as
13  if you were sitting in a courtroom in front
14  of a jury?
15     A.   I do.
16     Q.   Okay.  And so the oath is to
17  tell the truth under penalty of perjury, and
18  you understand that, correct?
19     A.   I do.
20     Q.   Thank you.
21        The -- because we have a court
22  reporter who will be making a transcript of
23  what we say today, I will need you to give
24  audible answers and try not to interrupt me
25  as I try not to interrupt you.
```

Page 10

1    Is that okay?
2    A.    That's fine.
3    Q.    All right.  If you don't
4  understand a question that I ask, please feel
5  free to tell me so and ask me to try to
6  clarify it for you.  Is that all right?
7    A.    That's fine.
8    Q.    Okay.  And you are represented
9  today in this deposition?
10    A.    I am.
11    Q.    Okay.  And your counsel is here
12  with you, correct?
13    A.    That's correct.
14    Q.    Okay.  Who is your current
15  employer?
16    A.    ABARTA Coca-Cola.
17    Q.    Okay.  And how long have you
18  worked for Coca-Cola?
19    A.    Since May of 2015.
20    Q.    We're here today to ask you
21  questions primarily about your work for Giant
22  Eagle's HBC Service Company.
23    Do you understand that?
24    A.    I do.
25    Q.    When did you work for Giant

Page 11

1  Eagle's HBC Service Company?
2    A.    I worked for them from the time
3  period approximately November 2013 to May of
4  2015.
5    Q.    Okay.  Let me hand you -- let's
6  just use this one as Exhibit 1.
7    (HBC-Rogos Deposition Exhibit 1
8  marked.)
9  BY MR. BARTON:
10    Q.    Okay.  I've marked a document
11  as Exhibit 1, I'm handing it to you.  I'll
12  represent this document Exhibit 1 has an
13  identifying number, our own identifying
14  number at the top that's P-GEN-00145.
15    But does this appear to be a
16  r?sum? of yours that summarizes your
17  education and experience?
18    A.    Yes.
19    Q.    Is this something that you
20  prepared?
21    A.    It is.
22    Q.    Okay.  And does it fairly and
23  accurately summarize your education and work
24  history?
25    A.    It does.

Page 12

1    Q.    When you first started working
2  for Giant Eagle's HBC Service Company, was
3  that in the title of distribution operations
4  manager?
5    A.    In 2013, yes.
6    Q.    Okay.  And you retained that
7  role for the entirety of your tenure with
8  HBC?
9    A.    Until I left, yep.
10    Q.    Okay.  And so prior to working
11  for HBC, you had been working for other
12  divisions or subsidiaries of Giant Eagle; is
13  that right?
14    A.    That's correct.
15    Q.    And those are listed there on
16  the second page of your r?sum??
17    A.    Uh-huh.
18    Q.    During those positions, from
19  2003 up until November of 2013, had you --
20  had you had any experience or training in any
21  of those positions dealing with controlled
22  substances or pharmaceuticals?
23    A.    Prior to getting to HBC, you
24  mean?
25    Q.    Correct.

Page 13

1    A.    No.
2    Q.    Okay.  When you left HBC in May
3  of 2015, was that -- was that a voluntary
4  decision on your part?
5    A.    It was.
6    Q.    The role of distribution
7  operations manager, did you have essentially
8  kind of overall supervisory responsibility
9  for all operations of the warehouse?
10    A.    Yes.
11    Q.    And your counsel almost
12  objected.  That reminded me just as a process
13  point.  There may be some objections to
14  questions that I ask today, and if there are,
15  unless your counsel instructs you not to
16  answer, you understand that you will go ahead
17  and try to answer my question?
18    A.    I'll try.
19    Q.    Okay.  So the operations of the
20  HBC warehouse, as I understand it, it was
21  only a portion of the overall warehouse that
22  was identified and specific to the
23  pharmaceutical distribution piece, correct?
24    A.    That's correct.
25    Q.    And within that pharmaceutical

Page 14

1 distribution piece, there was also a separate
2 defined area that was secured for controlled
3 substances; is that true?
4  A.  It is.
5  Q.  Okay.  But in terms of the
6 entire HBC warehouse, the pharmaceutical and
7 controlled substances part of that warehouse
8 was a relatively small part of the entire
9 warehouse; is that true?
10  A.  That's correct.
11  Q.  Okay.  I asked you if you'd had
12 any, I think, training or experience prior to
13 HBC with -- dealing with distribution of
14 pharmaceuticals or controlled substances, and
15 you said you had not, correct?
16  A.  That's correct.
17  Q.  Do you recall any education --
18 and I'll ask you a little bit about your
19 education here in a second, but had you had
20 any education concerning Federal laws or
21 regulations concerning controlled substances?
22  MR. KOBRIN:  Object to form.
23 Do you mean formal education or job
24 training, anything?
25  MR. BARTON:  Well, yeah.  I

Page 15

1  mean, really anything.
2 BY MR. BARTON:
3  Q.  Anything you would consider
4 education, whether it be formal education or
5 education through job training or anything.
6  A.  Prior to getting to HBC?
7  Q.  Correct.
8  A.  No.
9  Q.  Let's -- let me ask a little
10 bit about your education quickly, just -- it
11 appears you graduated from Penn State with a
12 Bachelor of Science in marketing; is that
13 right?
14  A.  It is.
15  Q.  With a minor in business
16 logistics?
17  A.  Uh-huh.
18  Q.  And that was 1997?
19  A.  That's correct.
20  Q.  Okay.  And then after entering
21 the workforce, it appears you got an M.B.A.
22 from University of Pittsburgh, correct?
23  A.  I did.
24  Q.  That was in 2008?
25  A.  It was.

Page 16

1  Q.  Okay.  So did you leave work to
2 be a full-time student in the M.B.A., or were
3 you able to do that while working at Giant
4 Eagle?
5  A.  I took night classes while
6 working at Giant Eagle.
7  Q.  Okay.  In your role as
8 distribution operations manager, did you
9 directly supervise managers underneath you,
10 so to speak?
11  A.  I did.
12  Q.  And how many managers were
13 under you at HBC?
14  MR. KOBRIN:  Object to form.
15 BY MR. BARTON:
16  Q.  How many managers did you
17 directly supervise?
18  A.  I'm trying to think.  I think
19 there was a minimum of three.
20  Q.  Did any of those managers have
21 exclusive responsibilities to the
22 pharmaceutical area of the warehouse?
23  A.  Not that I can remember.
24  Q.  Okay.  Yeah, I just wondered
25 if -- if there was someone who kind of had

Page 17

1 that role who you supervised, but you don't
2 recall that being the way managerial
3 responsibilities were divided underneath you?
4  A.  No.
5  Q.  Okay.  Let me just ask you
6 about the physical setup for you at the HBC
7 warehouse.
8  I assume your -- you spent your
9 days at the warehouse, correct?
10  A.  That's correct.
11  Q.  And did you have an office
12 there on site?
13  A.  I did.
14  Q.  And was that an office that,
15 you know, kind of had walls and a door, or
16 was it just an area?
17  A.  It was a walls-and-door office.
18  Q.  Okay.  Like a full-on office?
19  A.  Full-on office.
20  Q.  All right.  And you had a
21 computer?
22  A.  I did.
23  Q.  I assume you had an office
24 phone?
25  A.  I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.    The computer that you had, was
2  that like a desktop computer with a monitor,
3  or did you just use a laptop?
4    A.    I can't recall.  I think it
5  might have been a laptop, but I can't recall.
6    Q.    Okay.  I assume, but you tell
7  me if -- otherwise, that your computer was
8  linked or networked to a company network of
9  some kind?
10   A.    I would assume, yes.
11   Q.    Yeah.  And for e-mail
12 communications, did you occasionally e-mail
13 people through the course of your work?
14   A.    I did.
15   Q.    And was that -- if you recall,
16 did you use -- did you and the company use an
17 Outlook, Microsoft Outlook-based system for
18 e-mail, or was it some other e-mail provider,
19 if you recall?
20   A.    I believe it was Outlook.
21   Q.    And likewise, for word
22 processing, if you worked on documents and
23 drafted or edited and sent documents, word
24 processing, did you use Microsoft Word there,
25 do you recall?

Page 19

1    A.    Yes.
2    Q.    Okay.  Was there -- in addition
3  to any e-mails that you might use in the
4  course of your work, was there also a company
5  intranet, if you will, where you could do
6  instant messaging directly to other employees
7  without using e-mail?
8    A.    I believe there was.
9    Q.    Okay.  Is that -- do you know
10 what -- do you know what that -- did it have
11 a name?
12   A.    I don't recall.
13   Q.    Okay.  Was that something that
14 you often used, if you recall?
15   A.    I don't think I used it too
16 much.
17   Q.    Was there any other way,
18 besides direct face-to-face conversations
19 with people or using the office telephone or
20 using e-mail or the instant messaging
21 function, if you used that, were there any
22 other ways that you communicated with other
23 people at HBC?
24   A.    I think we communicated with
25 supervisors over a walkie-talkie system.

Page 20

1    Q.    Okay.  And so that -- that was
2  just for kind of talking to people who might
3  be in another part of the warehouse far
4  enough away that you can't have a
5  face-to-face conversation, but you're just
6  having kind of an immediate communication
7  with them that way?
8    A.    That's correct.
9    Q.    All right.  Any other ways you
10 can think of?  I'm just trying to understand
11 what all those were.
12   A.    I think there might have been
13 an intercom, so if we had to call somebody to
14 the office there was an intercom that would
15 communicate a message across the warehouse.
16   Q.    Okay.  How many offices like
17 yours were there at the HBC warehouse?
18       MR. KOBRIN:  Object to form.
19   A.    You mean where other people
20 would also perform work that had walls and
21 doors?
22 BY MR. BARTON:
23   Q.    Yeah.
24   A.    Okay.  My recollection, one,
25 two, three, four -- we had four on the same

Page 21

1  kind of platform and location where I was,
2  and then there was -- there were two others
3  in the center of the warehouse that served as
4  an inventory warehouse office.
5    Q.    Okay.  And who were the people
6  who had the other four -- or the other three,
7  I guess.  There were four you said in your
8  area.
9    A.    Uh-huh.
10   Q.    Who were the other people and
11 like, kind of what were their titles?  Just
12 getting a sense of who --
13   A.    We had a maintenance supervisor
14 who had his own office.  There was an office
15 administrator.  Our HR department had an
16 office and our payroll support had an office.
17 And I recollect we also had -- I want to say
18 a receptionist.  She had an office as well.
19       MR. BARTON:  Okay.
20       (HBC-Rogos Deposition Exhibit 2
21 marked.)
22 BY MR. BARTON:
23   Q.    I'm going to hand you a series
24 of documents and just ask you questions about
25 them, and that's how we'll largely proceed

Page 22

```
1   here.
2          First of all, I'll hand you
3   what we marked as Exhibit 2.  I may not have
4   many questions about this.  This is a
5   document that was produced by HBC.  The
6   metadata associated with the document on the
7   first page seems to suggest it was created
8   perhaps before you came to HBC, in March of
9   2013.
10         So I point that out only to
11  suggest -- my first question about this is,
12  is this a document that you recognize or
13  recall seeing?
14         MR. KOBRIN:  Do you know who's
15  the custodian on it?
16         MR. BARTON:  I don't.
17         MR. KOBRIN:  You don't, okay.
18         MR. BARTON:  If it's not
19  listed, and it isn't, I don't know who
20  it is.
21         MR. KOBRIN:  So it may not be
22  from his custodial file either.  He
23  may have never seen it.
24         MR. BARTON:  Yeah, which is
25  really my question.  And if he hasn't,
```

Page 23

```
1   then I don't have any other questions.
2      A.    This is the first time I've
3   seen this.
4   BY MR. BARTON:
5      Q.    Okay.  If you had authored this
6   or edited it or something, I'd have more
7   questions about it, but if you've never seen
8   it before, I don't need to have you answer
9   any other questions about it because you
10  haven't seen before.  Okay.
11         And from looking at that real
12  quick, you can't discern who may have
13  authored it, or can you, just based on having
14  worked at HBC?
15         MR. KOBRIN:  If you can tell.
16  You don't need to speculate.
17     A.    Yeah, unless there's a name at
18  the end, I can't tell.
19         MR. BARTON:  Okay.  That's
20  fine.
21         (HBC-Rogos Deposition Exhibit 3
22  marked.)
23  BY MR. BARTON:
24     Q.    I've handed you what we've
25  marked as Exhibit 3.  And this is a
```

Page 24

```
1   document -- the Bates number on the bottom
2   right of the first page of this document is
3   HBC_MDL00136653; is that correct?
4      A.    Yes.
5      Q.    Okay.  This is a multiple-page
6   document that has an e-mail on the -- what
7   appears to be an e-mail on the first page
8   from a Jeanine Singer to several people.
9          You are listed as one of the cc
10  recipients of this, correct?
11     A.    Looks like it.
12     Q.    And the date was Tuesday, the
13  12th of November 2013, correct?
14     A.    Yes.
15         MR. KOBRIN:  If I may, Eric, I
16  object to this.  Per our agreement
17  prior to this deposition, plaintiffs'
18  counsel agreed to tell us the topics
19  about which you would be talking and
20  questioning Mr. Rogos, and this
21  appears to be a document that is about
22  McKesson's suspicious order monitoring
23  program, and I don't think that falls
24  into any of the topics that you
25  advised us in advance you'd be asking
```

Page 25

```
1   Mr. Rogos about.
2          MR. BARTON:  I don't have many
3   questions about this document, but I
4   don't -- I don't believe it's outside
5   the scope of us providing you with
6   topics, including asking about
7   suspicious order monitoring programs.
8          So I'm not going to ask him
9   about the details of McKesson's
10  program, but that's -- so, I mean, I
11  have a few questions I will ask him
12  about this document.
13         MR. KOBRIN:  You can ask.  I
14  don't think it falls in any of the six
15  topics you advised us of in advance.
16         MR. BARTON:  That's fine.  You
17  can make that objection.  It will be
18  reserved.
19  BY MR. BARTON:
20     Q.    First, you confirmed your name
21  is shown as one of the cc recipients,
22  correct?
23     A.    It is.
24     Q.    Do you recall the call that
25  this e-mail appears to be referencing?  It
```

Page 26

1 says for our call at 9:00 Pacific Time, 12:00
2 Eastern Time.
3 　　　Do you recall the call that may
4 have followed this e-mail?
5 　　A.　No.
6 　　Q.　Okay.  And then the attachment
7 to the e-mail, which appears to relate to a
8 controlled substance monitoring program of
9 McKesson, do you recall reviewing that
10 attachment as you sit here today?
11 　　A.　No.
12 　　Q.　Okay.  Do you recall having any
13 kind of communications with representatives
14 of McKesson about their controlled substance
15 monitoring program?
16 　　A.　No.
17 　　Q.　Do you recall having attended a
18 DEA distributor conference in late 2013?
19 　　A.　No.
20 　　Q.　Okay.  Do you recall attending
21 a conference with Joe Millward where there
22 were presentations given about the
23 distribution of controlled substances and
24 regulations applicable to that?
25 　　A.　I do.

Page 27

1 　　Q.　Okay.  Do you recall when you
2 attended that presentation?
3 　　A.　I believe it was October of
4 2014.
5 　　Q.　October of 2014.  Okay.  Well,
6 let me show you -- I'll hand to you
7 Exhibit 4.
8 　　　(HBC-Rogos Deposition Exhibit 4
9 marked.)
10 BY MR. BARTON:
11 　　Q.　Exhibit 4 is a document that
12 begins with a Bates number in the lower
13 right-hand corner of HBC_MDL00136141, and
14 it's many pages, because it has a couple of
15 attachments.  I think the last page of this
16 exhibit is HBC_MDL00136214.
17 　　　Is that correct?
18 　　A.　Uh-huh, yes.
19 　　Q.　So on the first page of this
20 document, Exhibit 4, it appears to be an
21 e-mail from Joe Millward to several people.
22 You're not listed among the recipients of
23 this e-mail, correct?
24 　　A.　No.
25 　　Q.　But he does reference you in

Page 28

1 it, and I want to direct your attention to
2 that, just in terms of trying to place the
3 timing of that conference.
4 　　A.　Yeah.
5 　　Q.　Do you see that this is an
6 e-mail that appears to have been sent Friday,
7 13th of December 2013?
8 　　A.　I do.
9 　　Q.　And Mr. Millward is saying in
10 the body of the e-mail: In order to help
11 guide the discussion for next Wednesday's
12 meeting, I have attached two presentations
13 that were given at the DEA's distributor
14 conference that Matt Rogos and I attended.
15 　　　Do you see that?
16 　　A.　I do.
17 　　Q.　Okay.  Does that refresh your
18 recollection about the timing of that
19 conference, whether it was 2014 or 2013?
20 　　A.　Yeah, I was mistaken.  It was
21 2013.
22 　　Q.　Okay.  So sometime in the late
23 fall, I guess, of 2013 is when you believe
24 you attended that conference with Joe
25 Millward?

Page 29

1 　　A.　Correct.
2 　　Q.　And do you have a recollection
3 of at least being there and some of what you
4 did attending that conference?
5 　　A.　I do.
6 　　Q.　So the attachments to this
7 e-mail from Mr. Millward have basically two
8 presentations; one is a number of pages
9 called Distributor Initiative, A National
10 Perspective, and then if you flip through to
11 almost the end of the exhibit, there's just a
12 handful of pages, really three or four pages,
13 that's a presentation called ARCOS Reporting.
14 　　　Do you see that?
15 　　A.　I do.
16 　　Q.　Okay.  First of all, where was
17 this conference?
18 　　A.　I believe it was outside of DC
19 in Maryland.
20 　　Q.　And actually, I guess, there's
21 a date on this first presentation of
22 October 22, 2013.  Does that -- does that
23 sound consistent now?
24 　　A.　It does.
25 　　Q.　Okay.  Was -- and at this point

Page 30

1 in time, and I guess earlier in my
2 questioning I think you might have given me a
3 start date of around November of 2013 with
4 HBC. This of course was in late October.
5     Do you recall whether at the
6 time you attended this conference with
7 Mr. Millward, had you started as distribution
8 operations manager for HBC?
9     A. I don't believe.
10     Q. Was attending this conference
11 something you did, though, in anticipation of
12 beginning your work for HBC?
13     A. I believe so.
14     Q. So in some respects, was
15 attending this conference with Mr. Millward
16 part of your initial education and training
17 on some of the issues that were new to you
18 and applicable to the distribution of
19 controlled substances?
20     A. Uh-huh.
21     Q. Okay. Yes?
22     A. Yes.
23     Q. Do you have any recollection of
24 being at the conference and actually watching
25 these presentations or listening to them?

Page 31

1     A. I do.
2     Q. Okay. Were there other
3 presentations? Mr. Millward just attached
4 two, but were there other presentations at
5 the conference as well?
6     A. Not that I can recall.
7     Q. Okay. Was this -- was your
8 attendance at this conference your first
9 significant exposure to regulatory compliance
10 issues facing distributors of controlled
11 substances?
12     A. It was.
13     Q. Yes?
14     A. Yes.
15     Q. Okay. Sorry --
16     A. It was, yes.
17     Q. Thanks.
18     Do you recall leaving this
19 conference with any takeaways or realizations
20 of something that you thought was important
21 to know going back and starting work for HBC?
22     MR. KOBRIN: Object to form.
23     A. I didn't realize how much the
24 writing of prescriptions was kind of rampant
25 on a lot of these prescription medications.

Page 32

1 Primarily, I think they focused on Florida.
2 BY MR. BARTON:
3     Q. And when you say the writing of
4 prescriptions on these medications was
5 rampant, you're referring to opioid narcotic
6 pain medications?
7     A. I believe that's what the
8 majority of the subject matter was at the
9 conference.
10     Q. Okay. Yeah.
11     So the conference focused on
12 opioids primarily from the distributor
13 perspective; is that right?
14     A. I believe so. Yeah, I can kind
15 of look through to refresh my memory.
16     Q. So having not worked in the
17 pharmaceutical industry or the distribution
18 of pharmaceuticals prior to this, one
19 takeaway that you recall is realizing perhaps
20 for the first time just how rampant the
21 opioid prescribing was in the United States;
22 is that right?
23     A. Correct.
24     Q. And you recall Florida being a
25 big subject of discussion about what was

Page 33

1 happening there?
2     A. Again, I believe it was.
3     Q. Okay. Any other takeaways that
4 you recall sitting here? I know it's been
5 over five years, but...
6     A. I know I sat next to Joe, and I
7 had a lot of questions for him since he was
8 in the business longer than I was, and asked
9 him if we had concerns. And he said that we
10 had SOPs and processes in place that -- on
11 several different levels with our
12 distribution that would prevent us from
13 getting in a situation like this.
14     Q. Okay. And Joe at the time,
15 what did you understand his position to be in
16 the company?
17     A. The first time I'd met him at
18 this conference?
19     Q. Uh-huh.
20     A. I didn't really know his exact
21 position, but I just knew that he was -- or
22 he had a role in the pharmacy department
23 within Giant Eagle.
24     Q. Okay. And did you later come
25 to learn that he also, as part of his role

Page 34

1 within the pharmacy side, it had to do with
2 compliance issues? He had some role with
3 compliance?
4    A.    I believe.
5    Q.    Okay. Do you recall any
6 conversations with Joe at or shortly after
7 this conference where he may have relayed to
8 you any takeaways or concerns or realizations
9 he gleaned from this conference?
10         MR. KOBRIN: Object to form,
11 speculation.
12    A.    I do not.
13 BY MR. BARTON:
14    Q.    And I'm not asking you to tell
15 me what was in his head. I'm asking, do you
16 recall anything he told you about significant
17 things that he learned at this conference?
18    A.    I do not.
19    Q.    Okay. Apart from what either
20 of you kind of took away from it, do you
21 recall discussing with Joe, either at the
22 conference or after, any specific plans or
23 next steps for HBC as a result of what you
24 both heard at this conference?
25    A.    I can't recall specifically,

Page 35

1 no.
2    Q.    If you turn to a page in the
3 first presentation on this document, it's the
4 page that has 2012 oxycodone state rankings,
5 and so it's HBC_MDL00136189. It's about
6 two-thirds of the way through.
7         Do you see that?
8    A.    Uh-huh.
9    Q.    So that page starts several
10 pages of state rankings of different narcotic
11 pain medications.
12         Do you see that?
13    A.    I do.
14    Q.    If you turn to the second one,
15 2012 hydrocodone state rankings.
16         Do you see that?
17    A.    I do.
18    Q.    Do you see, as you mentioned, I
19 believe, on the previous page, Florida is the
20 number 1 in retail pharmacies for oxycodone.
21 Florida also appears on the hydrocodone state
22 rankings as number 5.
23         Do you see that Ohio appears as
24 one of the top ten states for hydrocodone
25 from retail pharmacies? Do you see that?

Page 36

1    A.    I do.
2    Q.    And you understood, of course,
3 that HBC was at that time distributing
4 hydrocodone combination products to retail
5 pharmacies in Ohio, correct?
6         MR. KOBRIN: Object to form.
7    A.    I do.
8 BY MR. BARTON:
9    Q.    You did understand that?
10    A.    I did understand, correct.
11    Q.    Maybe by this point in time in
12 2012, Giant Eagle may not have gotten into
13 Indiana by then. Had they?
14    A.    2013, you mean?
15    Q.    Right. Well, this is actually
16 just saying the 2012 ranking.
17    A.    For 2012?
18    Q.    Yeah. Are there any other
19 states on that top ten list besides Ohio
20 where Giant Eagle would have been
21 contributing hydrocodone combination products
22 to retail pharmacies?
23    A.    No.
24    Q.    Okay. You see that Ohio is
25 actually among the top ten states on this

Page 37

1 list for all four of the drug compounds that
2 are ranked there.
3         Do you see that?
4         MR. KOBRIN: Object to form and
5    object to relevance. I don't think
6    HBC was distributing all of these at
7    that time or anytime.
8 BY MR. BARTON:
9    Q.    I'm just asking if you see
10 what's reflected on the presentation that
11 Ohio is kind of one of the top ten states on
12 all of those drugs.
13         Do you see that?
14    A.    Yes, I do.
15    Q.    Do you recall having an
16 understanding at this conference, given that
17 you were just in the process of getting to
18 know HBC -- do you recall having an
19 understanding of what drugs and drug
20 combination products HBC was distributing at
21 that point in time when you were at this
22 conference?
23         MR. KOBRIN: Object to form.
24    A.    No.
25    ///

Page 38

BY MR. BARTON:

1 Q. Okay. Is that something that,
as distribution operations manager, you later
came to have an understanding of, of kind of
what opioid and narcotic controlled
substances HBC was distributing?

A. It was, yes.

(HBC-Rogos Deposition Exhibit 5
marked.)

BY MR. BARTON:

Q. And yeah, it's good to keep
them, as you are, in front of you because
there may be occasions where I may refer back
to something as we go. That just happens
sometimes. So I'm glad you're keeping those
in a nice pile there.

(Comments off the stenographic
record.)

BY MR. BARTON:

Q. Okay. I hand you Exhibit 5.
This is a multiple-page document, Bates
number on the bottom right, beginning page is
HBC_MDL00140166; is that right?

A. Yes.

Q. Okay. And then the last page

Page 39

of this exhibit, bottom right, Bates number
HBC_MDL00140204; is that right?

A. Correct.

Q. Okay. This document, the first
two pages are -- appear to be an e-mail chain
in which you are a participant; is that true?

A. It is.

Q. Okay. And then the remainder
of the exhibit appears to be an attachment
that was included within this e-mail chain at
some point, which I'll ask you a little bit
about here in a second.

But let me ask you: Was there
a decision -- or do you recall a decision
being made in or around January of 2014 at
HBC to move forward with seeking VAWD
certification for the HBC warehouse?

A. Yes.

Q. Okay. And were you a part of
that decision-making process of deciding to
pursue VAWD certification?

A. More than likely, yeah, because
I was at HBC, yes.

Q. Right. In general terms, what
is your understanding as you sit here today

Page 40

of what VAWD certification was and why it was
something HBC was interested in?

MR. KOBRIN: Object to form.

A. My belief is that we needed the
VAWD certification in order to distribute to
our company stores and pharmacies in -- that
were currently in Maryland and that were
going to be in Indiana.

BY MR. BARTON:

Q. And if you recall, was it your
understanding that Giant Eagle was seeking to
expand into those states and -- but in order
to do so and distribute to pharmacies from a
warehouse, distribute pharmaceuticals and
controlled substances, that the warehouse had
to have this VAWD certification?

A. At the time we made the
decision, or at least started to consider
getting into VAWD in January 2014, we already
had Giant Eagle pharmacies in Maryland.

Q. Okay.

A. I can't recall the exact time
when the Giant Eagles were going to start
being built in Indianapolis, but I do
remember the VAWD certification from -- from

Page 41

our, just understanding was not something
that you could get done in 30 to 60 days.

It was a -- like a six- to
nine-month, if not a year, process to compile
the SOPs, put them into a format that the
VAWD National Board -- Association of Boards
of Pharmacy wanted them in and make sure that
we had essentially everything in place when
they not only reviewed the documents but came
in and did an audit of the pharmacy.

Q. Okay. So -- and we've been
referring to VAWD. VAWD is actually an
acronym spelled, all caps, capital V, capital
A, W-D, correct?

A. Correct.

Q. And that standards for Verified
Accredited Wholesale Distributors; is that
right?

A. Yes.

Q. And that is a program that is
run by the National Association of Boards of
Pharmacy; is that right?

A. Correct.

Q. And the National Association of
Boards of Pharmacy sometimes is referred to

Page 42

1 by its acronym, NABP, correct?
2    A.    Correct.
3    Q.    The -- is it your understanding
4 then that not every state has, through its
5 own state board of pharmacy -- not every
6 state has adopted a regulation or requirement
7 that pharmacies in that state can only
8 receive products from VAWD-accredited
9 warehouses; is that true?
10    A.    I believe, yeah, from my
11 recollection there were only certain states
12 that needed the VAWD certification for us to
13 ship to.
14    Q.    Right.  But what you came to
15 understand is that if the HBC warehouse, at
16 least, was going to ship to pharmacies in
17 Maryland or Indiana, that those states would
18 require HBC's warehouse to be VAWD
19 accredited, right?
20    A.    Correct.
21    Q.    And you explained that in order
22 to get that accreditation from the NABP, that
23 would be a process that there would be an
24 application and reviews and it would take
25 some time to get that accreditation, correct?

Page 43

1    A.    Correct.
2    Q.    But HBC, and you as a part of
3 HBC, the decision was made to go ahead and
4 seek that accreditation, correct?
5    A.    It was, correct.
6    Q.    Okay.  And that process more or
7 less began in or around January of 2014 as
8 you recall?
9    A.    Yes.
10    Q.    Okay.  As part of that process
11 of getting ready to apply, did you understand
12 and recognize that one of that -- one part of
13 that process was going to have to be
14 gathering and reviewing and perhaps adding to
15 the written policies and procedures that HBC
16 had in place for its distribution of
17 controlled substances?
18    A.    Yes.
19        MR. KOBRIN:  Object to form.
20 BY MR. BARTON:
21    Q.    In this Exhibit 5, on the first
22 page, there's several e-mails that appear to
23 be reflected there.  Down at the bottom of
24 this page -- well, actually, let's turn over
25 to the second page, just so we kind of walk

Page 44

1 through real quick for the context.
2        The first e-mail doesn't have a
3 date associated with it on this printout, but
4 the first e-mail appears to be an e-mail from
5 you to Greg, and would that have been Greg
6 Carlson?
7    A.    Yes.
8    Q.    You write:  Should we begin to
9 talk about moving the VAWD certs forward in
10 Maryland and Indiana since it appears that
11 there may be justification now?
12        Correct?
13    A.    Yes.
14    Q.    And that is something you wrote
15 to Greg Carlson at whatever date it was,
16 probably in January?
17    A.    Yes.
18    Q.    Okay.  And the justification,
19 do you recall kind of what you understood the
20 justification to be that you were referring
21 to there?
22    A.    Again, I think it was the
23 opening of -- or I guess proposed opening of
24 several stores in Indiana as well as I
25 thought that there was a date, and I can't

Page 45

1 recall what it was, but I thought there was
2 a -- there was a timeline in Maryland that we
3 needed to be VAWD certified in order to ship
4 to the stores we had down there.
5    Q.    Right.  And one option, I
6 guess, for Giant Eagle and HBC would have
7 been to not seek VAWD certification at all,
8 but in that event, those stores in Maryland
9 or Indiana, those pharmacies, retail
10 pharmacies, they wouldn't have then been able
11 to get product from HBC, correct?
12    A.    Correct.
13    Q.    So whatever, you know, cost or
14 economic benefits there were to Giant Eagle
15 and to HBC of having its retail pharmacies
16 supplied through HBC, that -- those benefits
17 would have been lost if the HBC warehouse
18 didn't obtain the VAWD certification,
19 correct?
20        MR. KOBRIN:  Object to form, no
21 foundation.
22    A.    Yeah, I didn't see the specific
23 return on investment, but we wouldn't be able
24 to ship to Maryland and Indiana if we didn't
25 have the VAWD certification.

Page 46

BY MR. BARTON:
Q. Right.
The -- moving up the e-mails, just the conversation here, the next e-mail above, which the heading of it is on the first page and then the text is on the second page of this exhibit, but it's from Greg Carlson back to you and others, Mike Bianco and Joe Millward and George Chunderlik, correct?
A. Correct.
Q. And that's on Wednesday, January 22, 2014, true?
Do you see that?
A. Yes.
Q. So Greg appears to write, on the second page is where the text is: Yes, I would definitely like to step this up. Who on your end would be part of this project? All the folks on this e-mail would be the key pharmacy team.
Do you see that?
A. I do.
Q. And do you think that -- do you agree with what Mr. Carlson was saying there,

Page 47

that the people he put on that e-mail would at that point in time kind of be the key pharmacy team for that project?
A. I do.
Q. Okay. The next e-mail up the conversation is later that same day, January 22nd, from Joe Millward, and he writes that part of the process is having all SOPs in one location. We may have to create a number of SOPs from scratch.
Do you see that?
A. I do.
Q. And what -- SOPs, what's he referring to there?
MR. KOBRIN: Object to form.
A. I can only guess standard operating procedures.
BY MR. BARTON:
Q. Okay. Yeah. And do you -- do you believe you received that e-mail as part of this e-mail conversation?
A. I can't tell because -- on the sheet, but I would assume that he probably hit "reply to all" just to make sure that, again, the key pharmacy team was all aware

Page 48

that all SOPs needed to be in one location.
Q. Okay. And there's an e-mail then above his that again doesn't have the heading and the date, but there's a sentence -- a couple of sentences there with your name below it, and it says: I think we have a library of SOPs at HBC for Rx. I'll start to compile a VAWD file for the info hat -- and it's probably that -- we have, signed Matt.
Is that you?
A. Yes.
Q. And did you write that?
A. I did.
Q. Okay. And the -- and likewise, you assume you probably hit "reply all" and sent this to the key pharmacy team that was discussing this at that time?
A. I'm assuming so, yes.
Q. Okay. And do you recall then starting to, you know, compile a VAWD file for the -- for the SOPs and the other information that you thought you'd need for VAWD?
A. I do.

Page 49

Q. Okay. Did you -- did you go and seek out the library of SOPs, if you will, kind of the collection of standard operating procedures as part of that process to start your VAWD file?
A. I did.
Q. And do you have a recollection today of where you found that library, like how it existed? Hard copy or on -- on the computer?
A. I know we had hard copies in my office. I kept them in my office.
Q. Okay. Were they in like a notebook, a binder or something?
A. It was a three-ring binder.
Q. Okay. Were they also available on some -- in some folder on your computer that you had access to, maybe a networked folder?
A. I can't recall specifically.
Q. Okay. The top e-mail on this document, before we leave it, is -- appears to be a meeting organization message where Greg Carlson is listed as the organizer and a number of people, including you, are listed

Page 50

1 as required attendees.
2　　　Do you see that?
3　　A.　I do.
4　　Q.　And so it's describing a
5 conference call with a number and an access
6 code for February 6th, 2014.
7　　　Do you see that?
8　　A.　I do.
9　　Q.　And do you have any
10 recollection today of that particular
11 conference call?
12　　A.　No.
13　　Q.　Okay.  Do you believe it likely
14 went forward consistent with this effort to
15 begin the VAWD certification process?
16　　A.　Yes.
17　　Q.　And did you probably have more
18 than one conference call along the way like
19 this, where people who were key participants
20 in the process got together to talk about the
21 project?
22　　A.　We did.
23　　Q.　Okay.  Just looking at the
24 attachment to this exhibit, which follows
25 those two pages of e-mails, do you see that

Page 51

1 this is a document that is entitled Policies
2 and Procedures Guidance Checklist for the
3 National Association Board of Pharmacy, VAWD
4 Program.
5　　　Do you see that?
6　　A.　Yes.
7　　Q.　Okay.  And do you recall
8 looking at this document at some point in
9 time in the process of trying to prepare for
10 seeking VAWD certification?
11　　A.　I do.
12　　Q.　Okay.  And is it a document
13 that you recall, you know, maybe looking at
14 more than one time, kind of as a reference to
15 try to prepare to meet the VAWD requirements?
16　　A.　We used it quite extensively to
17 prepare.
18　　Q.　Okay.  Did you ever personally
19 edit this document, in other words, you know,
20 go into it and make notes?  And we'll see a
21 version of it where there have been notes
22 made, and I'll ask you then if you made them.
23 But I'm just recalling -- I'm just asking you
24 now if you recall ever -- you actually ever
25 going in and editing this document?

Page 52

1　　　MR. KOBRIN:  Do you mean hand
2 notes or --
3　　　MR. BARTON:  Typewritten notes.
4 We'll see in the next exhibit, I
5 think, but I'm just --
6　　A.　I don't recall making any edits
7 to the specific content, no.
8　　　MR. BARTON:  Okay.  All right.
9　　　(HBC-Rogos Deposition Exhibit 6
10 marked.)
11 BY MR. BARTON:
12　　Q.　I'm handing you Exhibit 6.
13 This is also a multiple-page document and the
14 first page is HBC_MDL00180061.
15　　　Do you see that?
16　　A.　I do.
17　　Q.　And then the last page of this
18 exhibit, the Bates number is HBC_MDL00052110;
19 is that right -- or did I pull it wrong?  I'm
20 sorry, I read it wrong.  I looked at the
21 wrong one.
22　　　The last page is
23 HBC_MDL00180088; is that right?
24　　A.　Correct.
25　　Q.　Okay.

Page 53

1　　　MR. BARTON:  Did I do that
2 right?
3　　　MS. WICKLUND:  Uh-huh.
4 BY MR. BARTON:
5　　Q.　Okay.  In Exhibit 6, the
6 e-mails -- again, this is similar to what we
7 just saw in Exhibit 5.  Does this document
8 have about two pages of kind of e-mail
9 conversation followed by that same VAWD
10 Policies and Procedures Guidance Checklist?
11　　A.　Yes.
12　　Q.　Okay.  Looking at the e-mails
13 then, they appear to be early April of 2014,
14 correct?
15　　A.　Yes.
16　　Q.　And if you look on the second
17 page, kind of the bottom of the e-mail chain,
18 it starts with an e-mail from Dolly Stevens
19 that is on April 4, 2014 and she just says:
20 Attached please find the agenda for Monday's
21 meeting.
22　　　Correct?
23　　A.　Correct.
24　　Q.　And I think you are -- yeah,
25 your name appears among a number of people,

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  and the subject is a VAWD status meeting of
2  April 7, right?
3      A.    Correct.
4      Q.    Okay.  And Dolly Stevens, she
5  lists her title as Project Manager, Supply
6  Chain/Logistics Technologies, Giant Eagle,
7  correct?
8      A.    Yes.
9      Q.    I assume she kind of became
10 part of the team, so to speak, that was going
11 to be pursuing the VAWD certification for
12 HBC, right?
13     A.    Yes.
14     Q.    The next e-mail up the chain is
15 again from Dolly to the same group on Monday,
16 and she has in the body of that e-mail kind
17 of a chart with a little bit of a timeline,
18 correct?
19     A.    Yes.
20     Q.    And, first of all, looking at
21 this e-mail, I'm wondering if it refreshes
22 your recollection at all and if you remember
23 the April 7, 2014 VAWD status meeting?
24     A.    Not the specifics, but I
25 remember we had a meeting, correct, yeah.

Page 55

1      Q.    Okay.  The first -- looking at
2  Dolly's timeline on the first page of this
3  exhibit, that first item says all documents
4  sent to Dolly with a target date of March 20,
5  2014.
6            Do you see that?
7      A.    Uh-huh.
8      Q.    And that March 20 would have
9  already occurred as of April 7, 2014,
10 correct?
11     A.    Correct.
12     Q.    So do you recall whether you --
13 whether you would have been one to send to
14 Dolly any documents relating to this VAWD
15 status meeting, such as the library of SOPs
16 that you had referenced in that earlier
17 e-mail?
18     A.    More than likely, I would have
19 sent them to her, yes.
20     Q.    Okay.  Do you recall doing it?
21 Do you have any specific recollection of
22 doing it?  I'm not -- I'm not suggesting
23 whether you did or didn't.  I'm just asking
24 if you recall it.
25     A.    I'm assuming I did, yeah.

Page 56

1  Yeah.
2      Q.    Do you -- well, yeah, suffice
3  it to say, as part of this project, I'm just
4  trying to find out if you think that would
5  have been your role, because you had
6  referenced checking for the library of SOPs.
7  So do you think that's one thing you would
8  have done as part of getting this project
9  going --
10     A.    Correct.
11     Q.    -- was send her the policies
12 that you were able to get your hands on?
13     A.    Right.
14     Q.    Okay.
15     A.    She was asked to coordinate
16 these types of meetings.
17     Q.    Right.  And everyone on the
18 team had various areas of responsibility or
19 interest.  You, among others, would likely
20 have been the one to send to her the policies
21 and procedures that you could find for HBC?
22     A.    Correct.
23     Q.    Okay.  And as you sit here, do
24 you have any specific recollection of any --
25 having any problems or difficulties

Page 57

1  completing that task for her?
2      A.    Of sending her the SOPs?
3      Q.    Yeah.
4      A.    No.
5      Q.    Okay.  No.
6            Now, if we look at the
7  attachment to this exhibit, which again is
8  this policies and procedures checklist,
9  correct?
10     A.    Correct.
11     Q.    If we go through this, there
12 are places where there are some notes typed
13 in after certain checklists that identify
14 responsible people or sometimes identify
15 policies that appear to relate to the topic
16 being discussed, correct?
17     A.    Correct.
18     Q.    Okay.  And do you -- so now
19 seeing those, do you recall whether you may
20 have ever entered any of those notes on this
21 document?
22     A.    Yeah, I didn't remember it, but
23 I -- we used this as a checklist, and I would
24 write summary notes on where we were on the
25 different topics.

Page 58

1    Q.   Okay.  And who's we, when you
2  say we did that?
3    A.    It was -- it would be myself,
4  Dolly, and the Nancy that's referenced there
5  was my administrative assistant at HBC.  She
6  was helping me out.
7    Q.   Okay.  Would any of the three
8  of you may have actually edited this document
9  at times?
10    A.   The only thing that we would
11  edit on the document was below the -- again,
12  from my recollection, below the solid line.
13    So, for instance, if you look
14  on the licensing, it has, on page 68 -- you
15  know, it has a licensing policy and
16  procedures for detail with three processes
17  there.  We never edited any of that wording.
18    Q.   Okay.
19    A.    But we would edit under the
20  portion where it says:  List names of
21  policies and procedures and documents that
22  meet this requirement.
23    And that's where we would list
24  either who was responsible for it, the files
25  that we had, the certifications or licenses

Page 59

1  for this instance, what files they were in,
2  and then what states we had the licenses and
3  certification.
4    Q.   Okay.  Very good.  Yeah.  And
5  thank you for that.
6    And you're -- we're looking
7  right now, as you said, at the page that is
8  entitled Licensing and the Bates number page
9  ends in 68.
10    What about the check marks in
11  those boxes?  I think when I compared that to
12  the earlier exhibit, I don't think any of the
13  boxes in the earlier exhibit, Exhibit 5, had
14  check marks in them, and some of these do and
15  some don't.  So I'm just wondering if you
16  guys checked boxes as well.
17    A.   I don't recall specifically if
18  we had the ability to check those.
19    Q.   Okay.
20    A.   We might have, but I don't
21  recall.
22    Q.   For example, let's just --
23  let's look at temperature and humidity
24  controls on page 70.  It's two more pages.
25  Because the licensing one, all the boxes are

Page 60

1  checked.  This one has some that are and some
2  that aren't, so that's why I asked the
3  question.
4    A.   Uh-huh.
5    Q.   On that -- on that page, there
6  appear to be some of the boxes that are
7  checked and some are not, and if you do flip
8  back to Exhibit 5, the same page, I don't
9  think there's any checks in any of the boxes.
10  So I just...
11    A.   We must have been -- had the
12  ability to edit at least the check marks.
13    Q.   Okay.  That's what this
14  document is called is kind of a guidance and
15  checklist, I think, right, so that's kind of
16  one way you can use this document is using it
17  as a checklist, right?
18    A.   Correct.
19    MR. KOBRIN:  Do you want to
20  take a break?  We've been going about
21  an hour, an hour ten.
22    MR. BARTON:  Yeah, that's fine.
23  We can do it.
24    THE VIDEOGRAPHER:  Off the
25  record at 2:12 p.m.

Page 61

1    (Recess taken, 2:12 p.m. to
2  2:27 p.m.)
3    THE VIDEOGRAPHER:  We're back
4  on the record at 2:27 p.m.
5  BY MR. BARTON:
6    Q.   Okay.  Mr. Rogos, a few more
7  questions about Exhibit 6 that you have in
8  front of you.
9    As I'm flipping through the
10  checklist, which as you've noted, this
11  version has some edits made to it, and some
12  of those edits are identifying responsible
13  parties for a given topic and then others at
14  times identify -- appear to identify
15  documents that relate to the topic, correct?
16    A.   Correct.
17    Q.   And so if we turn to the
18  inventory controls topic, which is page 8 of
19  the document itself, Bates number page ending
20  in 73, you see that?
21    A.   I do.
22    Q.   Okay.  So the inventory
23  controls section of this checklist has a
24  couple of pages, and the first page is just
25  kind of checklist stuff, and then the second

Page 62

1  page lists names of policies and responsible
2  party. And the responsible party for
3  inventory controls is Matt/Nancy.
4        Do you see that?
5     A.   I do.
6     Q.   And that's referring to you,
7  correct?
8     A.   It does.
9     Q.   And Nancy was your
10 administrative assistant?
11    A.   She was.
12    Q.   And the two of you are named as
13 the responsible party on many -- although not
14 all, but many of these topics in this
15 checklist.
16       Did you see that?
17    A.   I did.
18    Q.   And that's consistent with your
19 role as director of warehouse operations kind
20 of having overall supervisory responsibility
21 for the policies?
22    A.   Correct.
23    Q.   And the documents that are
24 identified here on this version of the -- of
25 the checklist on page 9, under Inventory

Page 63

1  Controls, there's a document or something
2  called Inventory Control Policy.
3        Do you see that?
4     A.   I do.
5     Q.   And so do you recall that there
6  was in existence, as of the time this was
7  being reviewed and circulated, which it
8  appears to be around April of 2014, there was
9  a document at least called an inventory
10 control policy?
11    A.   There was.
12    Q.   Okay. And the other documents
13 that are listed below that also -- do
14 those -- do you understand those to each be
15 identifying a separate policy or procedures
16 document?
17    A.   I do.
18    Q.   Okay. And do you believe that
19 at the time this version was circulated, that
20 someone had undertaken the effort based on
21 the -- all of the library of policies that
22 you were able to put your hands on, somebody
23 had undertaken the effort to go through the
24 policies and try to match up which policies
25 went with which of these VAWD-required topics

Page 64

1  in this checklist?
2        MR. KOBRIN: Object to form.
3     A.   I do.
4  BY MR. BARTON:
5     Q.   Okay. And were you involved in
6  that task of trying to see where your
7  existing policies matched up with the VAWD
8  checklist?
9     A.   Yes.
10    Q.   Okay. Do you believe as you
11 sit here that you made the edits on this
12 document, actually typed them in?
13    A.   On the notation of who the
14 responsible party are and what documents we
15 had.
16    Q.   Yes. You believe you did that?
17    A.   Yes.
18    Q.   Okay. And then we talked about
19 the checklist that you'll see on page 8, for
20 example. This is another one where there are
21 some boxes checked and some boxes not
22 checked, correct?
23    A.   Correct.
24    Q.   Do you recall being one who
25 kind of went through the checklist to try to

Page 65

1  identify which of these topics appeared to be
2  addressed by existing policies?
3        MR. KOBRIN: Object to form,
4     asked and answered.
5     A.   I can't specifically remember
6  whether I was the one checking them, but I do
7  remember going through and verifying with our
8  current policies what we had and what needed
9  to be updated, yeah.
10 BY MR. BARTON:
11    Q.   Right.
12       And so would you agree that on
13 the inventory controls page on page 8, the
14 second topic from the top is identified as:
15 Reporting suspicious prescription orders, and
16 then (where criminal activity is suspected)
17 to Food and Drug Administration, state agency
18 and (if controlled substance) Drug
19 Enforcement Administration within three days
20 (not applicable for reverse distributors).
21       Do you see that?
22       MR. KOBRIN: Object to form.
23    A.   I do.
24 BY MR. BARTON:
25    Q.   Whoever was going through this

Page 66

1  as of this point in time did not check that
2  box on this list, correct?
3      A.   It's not checked, yes.
4          (HBC-Rogos Deposition Exhibit 7
5  marked.)
6  BY MR. BARTON:
7      Q.   I'm handing you Exhibit 7.
8  Exhibit 7 is a four-page document beginning
9  Bates HBC_MDL0052107, correct?
10     A.   Yes.
11     Q.   And then it goes through 52110,
12 correct?
13     A.   Correct.
14     Q.   This document has the HBC
15 Service Company name and address in the upper
16 left-hand corner and then below that the
17 words Inventory Controls, with an effective
18 date for this document showing as
19 August 1, '14.
20         Do you see that?
21     A.   I do.
22     Q.   Now, it identifies on the last
23 page of the exhibit, page 4, there is a
24 document owner identified, and you're
25 identified as the document owner.

Page 67

1          Do you see that?
2      A.   I do.
3      Q.   Okay.  Now, do you know if
4  this -- the substance of this document,
5  Inventory Controls, is the same or
6  substantially similar to the document that
7  was listed on that inventory controls list on
8  page 9 of the previous exhibit?
9          MR. KOBRIN:  Object to form.
10     You're just saying the inventory
11     control policy document or any of the
12     documents?
13 BY MR. BARTON:
14     Q.   I'm just asking him if he
15 believes that the inventory control policy
16 document that is listed in Exhibit 6 under
17 the inventory control section on page 9 of
18 that exhibit, where it lists inventory
19 control policy, if you believe that the
20 document that is Exhibit 7 is likely the
21 document you were referencing in Exhibit 6?
22     A.   It should be, yes.
23         MR. KOBRIN:  Are you going to
24     give him a copy of that document or do
25     you have a copy of that document to

Page 68

1  show him so that...
2          MR. BARTON:  That's why I'm
3  asking because I don't know.  There
4  wasn't -- these -- these -- these are
5  just listed policies on this
6  Exhibit 6.
7          MR. KOBRIN:  No, I understand
8  that.  I'm just wondering if you're
9  asking him -- my understanding is
10 you're asking him if 7, if he thinks
11 Exhibit 7 is similar or like one of
12 these bulleted listed policies --
13         MR. BARTON:  Correct, if that's
14 what he believes he was referring to.
15         MR. KOBRIN:  -- from four years
16 ago.
17         Well, he's not referring to
18 anything in this document.
19         MR. BARTON:  Well, I get to ask
20 him questions and we'll see what he
21 says.
22         MR. KOBRIN:  I hear you.  Are
23 you going to show him anything,
24 though, before you ask him if
25 something is similar or...

Page 69

1          MR. BARTON:  Yeah.  I've showed
2  him Exhibit 7.
3  BY MR. BARTON:
4      Q.   I think you've already answered
5  my question, but all I'm trying to do is to
6  see if you think, from your recollection of
7  having been involved in this project, if the
8  document that we're looking at in Exhibit 7
9  is likely, in substance, the same document
10 you were identifying there in Exhibit 6.
11     A.   Probably likely, yes.
12     Q.   Yeah.  Okay.
13         And do you believe, just based
14 on your recollection and having been involved
15 in the project, do you believe that what is
16 shown here in Exhibit 7, this document, was
17 likely existing in the library of SOPs that
18 you had, you know, in your office and
19 provided to Dolly at the start of this VAWD
20 certification process?
21     A.   Yes.
22     Q.   Okay.  Do you recall -- looking
23 at Exhibit 7, do you recall yourself having
24 any role or hand in drafting the content of
25 what is shown in Exhibit 7?

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  A.  Myself personally?

2  Q.  Yes.

3  A.  No.

4  Q.  Okay.  Did -- by this time of
5  August of 2014, do you recall having had any
6  role in reviewing this inventory control
7  policy and, you know, approving it or
8  anything like that, or was it just a
9  preexisting policy that was in your set of
10 policies?

11  A.  It was a preexisting policy --

12  Q.  Okay.

13  A.  -- that we were using.

14  Q.  Okay.  So it was -- but as part
15 of the VAWD certification process, do you
16 then recall taking this policy and, you know,
17 adding to it or revising it consistent with
18 VAWD's expectations?

19      MR. KOBRIN:  Object to form.

20  A.  What I recall is the inventory
21 policy that was in the library of SOPs was in
22 a different format than VAWD -- the VAWD
23 application asked us to put the policies in.

24      As we transferred the
25 information from our previous policies into

Page 71

1  the format, there might have been some edits
2  that, as a group, the pharmacy key team, if
3  we had questions amongst us, we would ask to
4  see how we wanted to, I guess, update the
5  policy, or if there were things in the VAWD
6  checklist that we needed to ensure that were
7  in the policies to get the certification, we
8  needed to put those in.

9  BY MR. BARTON:

10  Q.  Okay.  So as of August of 2014,
11 looking kind of at the effective date shown
12 here for this policy on this document, on
13 Exhibit 7, as of -- as of August 1st of 2014,
14 do you recall having directed at HBC that
15 there be any training of HBC employees on how
16 one might identify an order from a pharmacy
17 of controlled substances as suspicious?

18      MR. KOBRIN:  Object to form.

19  A.  What employees?

20  BY MR. BARTON:

21  Q.  Any.  Anyone at the warehouse,
22 I guess.  Anyone under your supervision
23 ultimately.

24  A.  I don't recall any specific
25 training.  There were employees that were in

Page 72

1  place prior to my arrival at HBC that might
2  have gotten training.

3  Q.  Okay.  Do you recall whether,
4  at HBC at the time we're talking about now,
5  in 2014, was there like a learning management
6  system for employees to get all kinds of
7  training that they may need for their jobs?

8      MR. KOBRIN:  Object to form.

9  A.  I can't recall.

10 BY MR. BARTON:

11  Q.  Okay.  You understand what I'm
12 referring to, though, in terms of like an
13 LMS, learning management system, for employee
14 training?  Is that something you have had
15 familiarity with in your career?

16  A.  It is.

17  Q.  And one of the things that an
18 LMS system can do if an employer sets it up
19 this way is to have training for its
20 employees, for example, on policies and
21 procedures, correct?

22  A.  I would assume, yes.

23  Q.  Okay.  But as you sit here, you
24 don't recall whether that existed in that --
25 whether that functionality existed in HBC at

Page 73

1  the time in 2014?

2  A.  An LMS system?

3  Q.  Yes.

4  A.  I can't recall, no.

5  Q.  With respect to this policy in
6  Exhibit 7, one of the things that it purports
7  to address or it does address is the
8  reporting of suspicious prescription product
9  orders, correct?

10  A.  Yes.

11  Q.  That's both mentioned in the
12 overview at the top of the document and then
13 also there's a section on the first page of
14 the document with that heading, Reporting
15 Suspicious Prescription Product Orders,
16 correct?

17  A.  It is, yes.

18  Q.  And there are four bullet
19 points below that heading, correct?

20  A.  There are.

21  Q.  And that appears to be the part
22 of this document that specifically addresses
23 reporting suspicious prescription product
24 orders, correct?

25  A.  Yes.

Page 74

1    Q.    Okay.  Would you agree that the
2  substance of this document, where it
3  addresses reporting suspicious product
4  orders, it does not identify, for example,
5  any criteria for how to screen orders for
6  whether they're suspicious?
7          MR. KOBRIN:  Object to form.
8    A.    I don't really understand the
9  question.
10 BY MR. BARTON:
11   Q.    Yeah.
12         Do you see anywhere in this
13 document, Exhibit 7 -- do you see anywhere
14 where the policy lists or describes any
15 criteria that someone who is trying to follow
16 this policy and implement it might use to
17 decide whether a given order from a Giant
18 Eagle pharmacy is suspicious or not for any
19 reason?
20         MR. KOBRIN:  Object to form.
21   A.    When you -- I just have -- when
22 you say an order from a Giant Eagle pharmacy,
23 you're saying a pharmacy orders it from the
24 warehouse?
25              ///

Page 75

1  BY MR. BARTON:
2    Q.    Right.  Isn't that what would
3  typically happen?
4    A.    Uh-huh, yep.
5    Q.    And because we're talking
6  about -- in this instance we're talking about
7  prescription product orders or orders for
8  prescribed products, drugs, right?
9    A.    Correct.
10   Q.    And so did you understand by
11 this time, having gone to the DEA conference
12 and starting to, you know, learn what you
13 were learning -- did you understand at that
14 point in time that one of the things a
15 wholesaler or distributor of controlled
16 substances has to do is at least monitor for
17 potentially suspicious orders of the
18 controlled substances?
19         MR. KOBRIN:  Object to form.
20   A.    I did.
21 BY MR. BARTON:
22   Q.    Okay.  Yeah.
23         And so my question about this
24 document is just whether you would agree that
25 this document itself, Exhibit 7, doesn't --

Page 76

1  it doesn't try to describe or identify what
2  might make an order suspicious, true?
3          MR. KOBRIN:  Object to form.
4    A.    I think it would probably
5  depend on the item that the pharmacy was
6  ordering from us.
7  BY MR. BARTON:
8    Q.    Whether an order is suspicious
9  might depend on what is being ordered?  Is
10 that what you're saying?
11   A.    Based on the quantity, yeah.
12   Q.    So the quantity of an order
13 might be suspicious.  If somebody puts in an
14 order for a really large quantity of narcotic
15 pain medication, that might be suspicious,
16 correct?
17   A.    It would.
18   Q.    Okay.  And are there other
19 criteria that you can think of or came to
20 understand would be good to look for?  Are
21 there other criteria that might make an order
22 suspicious?
23   A.    I believe that there were
24 controls at the corporate level, which Mike
25 Bianco and others monitored, that would

Page 77

1  identify if a certain pharmacy within our
2  Giant Eagle system was ordering over -- or I
3  guess overordering a certain prescription.
4          I know that they did monitor
5  that and would send out monthly reports on
6  thresholds to us if any store was over the
7  threshold.
8    Q.    Okay.  So there was a company
9  system, what you're referring to, that you
10 understood was in place to be monitoring for
11 orders that somehow were flagged by the
12 system as potentially suspicious?
13   A.    Correct.
14   Q.    Based on quantity or frequency
15 or size or anything that the system might be
16 flagging?
17   A.    I don't know what the specifics
18 were on the flags, but yes.
19   Q.    Right.  You didn't set up that
20 system to kind of put in whatever parameters
21 it had, correct?
22   A.    No.
23   Q.    So that -- and my question was
24 really just about what's -- what was in this
25 written policy as of this point in time

Page 78

1  that -- none of that that you've just
2  described, the companywide system or any
3  other criteria that employees might use for
4  identifying an order of suspicious -- an
5  order as suspicious, that's not -- that's not
6  explained in this document, correct?
7      A.   No.
8      Q.   Okay.  What this document does
9  do is it addresses how HBC intended to
10  respond if it identified or suspected an
11 order as suspicious?
12         MR. KOBRIN:  Object to form.
13     A.   That's correct.
14         MR. BARTON:  Okay.
15         (HBC-Rogos Deposition Exhibit 8
16 marked.)
17 BY MR. BARTON:
18     Q.   I'm handing you Exhibit 8.
19 Exhibit 8 is a multiple-page document
20 starting with page Bates number
21 HBC_MDL00132908; is that correct?
22     A.   Yes.
23     Q.   And the last page of this
24 exhibit, Bates HBC_MDL00132924; is that
25 right?

Page 79

1      A.   Correct.
2      Q.   Okay.  This -- this exhibit
3  has, again, a couple of pages of e-mail
4  conversation in the first two pages and
5  then -- or first three pages -- four, sorry.
6         The first four pages are
7  e-mails, and then there's a document that is
8  a Buzzeo PDMA pre-VAWD inspection report that
9  was attached to one of the e-mails; is that
10 correct?
11     A.   Yes.
12     Q.   Okay.  So looking at the
13 e-mails, the first e-mail in the chain, which
14 is down -- starts on the bottom of page --
15 the third page of the exhibit, carries over
16 to the fourth page of the exhibit.
17        So the third page of the
18 exhibit, ending in 910, that -- is that an
19 e-mail from you to Greg Carlson, Mike Bianco,
20 Dolly Stevens, George Chunderlik, Joe
21 Millward and Carmen Forde dated September 30,
22 2014?
23     A.   Yes.
24     Q.   And do you believe that to be
25 an e-mail that you did send to them on that

Page 80

1  date?
2      A.   Yes.
3      Q.   Okay.  The subject of the
4  e-mails, Items for NABP.  NABP, again, is the
5  National Association of the Board of
6  Pharmacy.
7         Did I say that right?
8      A.   Yes.
9      Q.   And so on the second page of
10 your e-mail, you state to the group in the
11 third paragraph down:  We should also be
12 getting our review from Tina Posey of Buzzeo
13 based upon her visit last week.
14        Do you see that?
15     A.   Uh-huh.
16     Q.   Do you recall Tina Posey of
17 Buzzeo coming to visit HBC to help consult on
18 the VAWD certification?
19     A.   I do.
20     Q.   Were you one of the people who
21 requested help from Buzzeo to prepare for
22 VAWD certification?
23     A.   I was.
24     Q.   Okay.  So what -- what did Tina
25 come do when she visited?  Do you recall?

Page 81

1      A.   I know that she looked through
2  our SOPs that we had currently at the
3  warehouse.  She also looked at the controls
4  that we had in place, security controls, with
5  regards to access, recordkeeping that we had
6  in the pharmacy and essentially the
7  procedures we had in place back in that
8  pharmacy room.
9      Q.   You go on and state:  My
10 assumption from speaking with her last week
11 is that we will have to do significant work
12 in order to rearrange our SOPs in the way
13 that the NABP auditor will want to see them.
14        Is that what you said?
15     A.   Yes.
16     Q.   And do you recall any verbal
17 feedback you got from Ms. Posey about your
18 SOPs as they were existing at the time she
19 came out and visited?
20     A.   Not specifically beyond the
21 format that they should be in when we submit
22 them so they will be familiar to the NABP
23 VAWD process.
24     Q.   What you recall as you sit here
25 is that the significant work that needed to

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  be done had more to do with format than
2  substance?
3      A.    Correct.
4      Q.    Do you recall there being
5  concerns about substance from Ms. Posey?
6      A.    I can't specifically recall,
7  no.
8      Q.    Okay.  Do you recall yourself
9  having any concerns at this point in time
10 about just are the substance of our policies
11 sufficient for VAWD certification purposes?
12     A.    There might have been several
13 that we didn't have SOPs for, yes.
14     Q.    Okay.  So there may have been
15 some SOPs that VAWD would expect you to have
16 but you didn't have at that point in time?
17     A.    Correct.
18     Q.    And might there have been some
19 policies that you had but that were not as
20 complete or detailed as VAWD might want to
21 see them?
22     A.    Correct.
23     Q.    Well, going on, you -- a couple
24 more paragraphs down, you say:  Getting
25 these, our SOPs, updated quickly will be

Page 83

1  important in order for our supervisors,
2  managers and support staff to be properly
3  trained on them.
4          Do you see that?
5      A.    Uh-huh.
6      Q.    "This was one area where Buzzeo
7  stated that we need to complete very
8  quickly."
9          Did you say that?
10     A.    Yes.
11     Q.    Okay.  Why did -- why do you
12 think Buzzeo said you needed to complete that
13 very quickly?
14     A.    On the items that we needed to
15 update where she thought we may have some
16 deficiencies, we just needed to make sure
17 that we had everybody who worked back
18 there -- and I guess when I say everyone, it
19 should be the support staff, supervisors and
20 any managers that come in and out, they
21 should understand the SOPs that we were
22 updating -- had already in place, updating,
23 in order to get ready for VAWD.
24     Q.    Okay.  And is it important --
25 if you have SOPs that are written, is it

Page 84

1  important from an operational standpoint that
2  your supervisors, managers and support staff
3  be properly trained on the SOPs?
4      A.    That was one of the
5  requirements for VAWD, and that's what we --
6  we wanted to make sure -- we had some
7  turnover in HBC during my tenure, and we
8  wanted to make sure we had documentation that
9  everybody was properly trained on those SOPs.
10     Q.    So it was your expectation that
11 VAWD was not only going to inspect what SOPs
12 you had on paper in writing, but they were
13 also going to look into whether your people,
14 your staff, actually understood them and
15 could implement them?
16         MR. KOBRIN:  Object to form.
17     A.    I believe so.
18 BY MR. BARTON:
19     Q.    Okay.  That was -- that was
20 your expectation of what you were going to
21 need to do in order to get VAWD
22 certification --
23     A.    Correct.
24     Q.    -- is have not only the right
25 policies, but also have your people trained

Page 85

1  on them?
2      A.    Correct.
3      Q.    Continuing to look at
4  Exhibit 8, the -- your e-mail started the
5  conversation that this chain includes.  Your
6  e-mail was September 30.
7          Moving up the conversation, so
8  now looking at the second page of this
9  exhibit, there's an e-mail from Dolly Stevens
10 on Monday, October 13.  I'm looking at the
11 top of page 2, the exhibit.
12         Are you with me?
13     A.    Yes.
14     Q.    And so Ms. Stevens writes on
15 Monday:  Good morning.  Attached the Pre-VAWD
16 Inspection Report from the onsite visit by
17 Buzzeo.  Matt has already addressed that
18 there is significant work in order to
19 rearrange our SOPs.
20         Do you see that?
21     A.    I do.
22     Q.    And so that appears to be where
23 she attached the document that is at the back
24 of this exhibit starting on Bates page ending
25 912; is that correct?

Page 86

1    A.    I believe so, yes.
2    Q.    Yeah.  I didn't ask a very good
3 question.
4          Do you believe this document
5 starting at the Bates ending 912 -- do you
6 believe that is the pre-VAWD inspection
7 report that she's referencing in the e-mail?
8    A.    Yes.
9    Q.    And the -- looking now at that
10 inspection report, the attachment to these
11 e-mails, it appears to be a letter dated --
12 it starts with a letter dated October 10,
13 2014 to Dolly Stevens from a Scott Hardy at
14 Buzzeo, correct?
15    A.    Yes.
16    Q.    And his letter states:
17 Attached are the results of the Pre-VAWD
18 inspection performed on September 22, 2014
19 and September 23, 2014 by Tina Posey.
20       Correct?
21    A.    Yes.
22    Q.    Okay.  So just kind of putting
23 together the sequence here with these e-mails
24 and this attachment, it sounds like Ms. Posey
25 came out on the 22nd and 23rd of September

Page 87

1 and met with you and talked with you and
2 looked at your policies, among other things,
3 correct?
4    A.    Correct.
5    Q.    And she gave you some feedback
6 at that time verbally, I assume, and that's
7 what you were referring to in your
8 September 30 e-mail to the group when you --
9 when you said:  My assumption from speaking
10 with her last week is we have significant
11 work to do.
12       Right?
13    A.    Correct.
14    Q.    And then the e-mail that Dolly
15 sent on October 13 attached the letter and
16 the report that had come on October 10th from
17 Buzzeo, right?
18    A.    Yep.  Correct.
19    Q.    And so looking at the Buzzeo
20 report, for example, looking at page 8 of 13
21 of the Buzzeo report, when you got the Buzzeo
22 pre-VAWD inspection report, did you read it?
23    A.    This report?
24    Q.    Yes.
25    A.    Yes.

Page 88

1    Q.    And was that something that you
2 think other key members of the team read this
3 as well?
4    A.    I would hope so.
5    Q.    On page 8, there's a section
6 addressing policies and procedures.
7       Do you see that?
8    A.    I do.
9    Q.    And the -- that begins by
10 saying that VAWD requires that Wholesale
11 Distributors maintain and -- excuse me --
12 maintain, enforce and adhere to written
13 policies and procedures covering -- and then
14 it just describes the things the policies
15 have to cover, correct?
16    A.    Correct.
17    Q.    The -- it then says:  Several
18 policies and procedures were reviewed as part
19 of the pre-VAWD inspection.  The majority of
20 them were very high level.  All of the
21 procedures require review and updates in
22 order to meet VAWD criteria for the type of
23 information that is required to be
24 documented.
25       Do you see that?

Page 89

1    A.    I do.
2    Q.    So did you understand that
3 Buzzeo was suggesting, not only that the
4 format of the policies needed to be reviewed
5 and revised for VAWD inspection, but that the
6 substance of them required some review and
7 updates as well?
8    A.    I do.
9       MR. KOBRIN:  Object to form.
10 BY MR. BARTON:
11    Q.    So the recommendation of Buzzeo
12 at the bottom of this section is:  Update all
13 VAWD-related policies and procedures to
14 incorporate the standard VAWD requirements.
15       Correct?
16    A.    Correct.
17    Q.    So that, among other things,
18 was part of the project that the team knew it
19 needed to work on in order to prepare for
20 VAWD inspection, true?
21    A.    Correct.
22    Q.    Likewise, if you'll turn to
23 page 12 of 13 of this exhibit, of this Buzzeo
24 report, there's a paragraph there of
25 additional recommendations, paragraph C.

Page 90

1    Do you see that?
2    A.   Uh-huh, I do.
3    Q.   And there, was Buzzeo reporting
4 to you that:  Several of the procedures
5 provided are very high level and do not
6 reference all the VAWD criteria or reference
7 additional documentation covering "how" a
8 process is performed.
9    Do you see that?
10   A.   I do.
11   Q.   And so did you have an
12 understanding of what some of the policies
13 were that Buzzeo was referring to there?
14   A.   I do.
15   Q.   And did you agree and
16 understand at that point in time that there
17 needed to be some substantive changes to some
18 of your policies in order to have the content
19 that VAWD would expect?
20   MR. KOBRIN:  Object to form.
21   A.   I did.
22   (HBC-Rogos Deposition Exhibit 9
23   marked.)
24 BY MR. BARTON:
25   Q.   I'm handing you what we've

Page 91

1 marked as Exhibit 9.  All right.  Exhibit
2 again is multiple pages with e-mails and
3 attachments.
4    Just for the record, the first
5 page of this exhibit is HBC_MDL00133435; is
6 that correct?
7    A.   Correct.
8    Q.   And last page of this exhibit,
9 HBC_MDL00133463; is that right?
10   A.   Correct.
11   Q.   The -- this exhibit starts with
12 a couple of e-mails on the first page.
13 You're not a sender or recipient of the
14 e-mails, but again, you're referenced in
15 them, so I just want to ask you your
16 familiarity and understanding of what's being
17 discussed here.
18   The e-mail at the bottom -- or
19 the lower e-mail on the first page from
20 George Chunderlik to Joe Millward dated
21 Thursday, December 4.
22   Do you see that?
23   A.   I do.
24   Q.   And he's referring to updating
25 our policies and procedures for the Drug

Page 92

1 Supply Chain Security Act.
2    Do you see that?
3    A.   I do.
4    Q.   Was that a project that was --
5 that was going on kind of simultaneously with
6 the VAWD certification project, or was it
7 part of the VAWD certification project or a
8 totally different project?
9    Do you recall?
10   A.   I don't recall, no.
11   Q.   Do you have any recollection as
12 you sit here of what updates were needed for
13 the Drug Supply Chain Security Act?
14   A.   I don't remember.
15   Q.   Okay.  Down in his e-mail, I
16 just want to ask you because he's referring
17 to where some policies existed on the
18 computer, so I just want to ask you if that
19 is familiar to you or --
20   He says:  The remaining Word
21 documents were all written for the VAWD
22 accreditation and are currently residing on
23 the S: drive via the following path.  And he
24 describes the path.
25   Do you see where I'm talking

Page 93

1 about?
2    A.   I do.
3    Q.   And then he lists in bullet
4 points a number of documents.  Included in
5 that is a document called Inventory Control
6 Doc.
7    Do you see that?
8    A.   I do.
9    Q.   Okay.  So does that refresh
10 your recollection or does that -- do you
11 recall whether there was a folder on your
12 system or your network that, you know, had
13 kind of the pathway that he describes there
14 on an S: drive.  Well, first of all, let me
15 just go through it.
16   Do you recall there being an
17 S: drive that you could access on your
18 computer?
19   A.   I believe there was.
20   Q.   And then I assume once you
21 access the S: drive there might be folders
22 that you could click on to look at documents
23 within those folders, correct?
24   A.   Correct.
25   Q.   And folders could have

Page 94

1 subfolders in them like you can do with Word,
2 correct?
3    A.   Correct.
4    Q.   So he appears to be describing
5 a place on the S: drive that was a VAWD
6 certification folder and then NABP
7 application docs within that folder, and then
8 a folder of required policies and procedures
9 within that.
10       Is that how you would read
11 that?
12    A.   Yes.
13    Q.   And is that consistent with
14 what you believe there to have been on the
15 S: drive at that time?
16    A.   I don't recall if there were
17 more documents, but that looks familiar, yes.
18    Q.   Right.  Okay.
19       Yeah, you -- without sitting
20 here looking at it, you don't know whether he
21 listed them all, but that basic
22 organizational pathway appears to be
23 something familiar to you?
24    A.   Correct.
25    Q.   Okay.  So the e-mail back from

Page 95

1 Joe to -- excuse me, from -- yeah, from Joe
2 back to Greg Carlson states that George and
3 I, along with Matt --
4       He's referring to you there,
5 correct, you assume?
6    A.   I would assume.
7    Q.   Okay.
8       -- and possibly Mike will have
9 to review how the existing documents already
10 cover the DSCSA.
11       Do you see that?
12    A.   Uh-huh.
13    Q.   Okay.  And attachments to this
14 e-mail in December of 2014 are listed there
15 at the top.
16       Do you see that?
17    A.   Yes.
18    Q.   And one of them is Inventory
19 Control Doc as an attachment.  And if we turn
20 forward in the exhibit, there's -- on the
21 page that has Bates number ending in 445, we
22 see that inventory controls policy that we
23 looked at earlier, correct?
24    A.   Yes.
25    Q.   And that's the one with the

Page 96

1 effective date of August 1, '14, and it's
2 four pages, and at the end it's -- you're the
3 document owner of that document, correct?
4    A.   Correct.
5    Q.   It would appear to be the same
6 one that we previously went over in an
7 earlier exhibit, right?
8    A.   It appears to be.
9    Q.   Okay.  So as of this point in
10 time in December of 2014, is it your
11 recollection or understanding that that
12 document, inventory controls, that we just
13 looked at, that document continued to be the
14 written policy at HBC that addressed the
15 reporting of suspicious prescription product
16 orders?
17       MR. KOBRIN:  Object to form.
18    A.   You're saying from August 1st?
19 BY MR. BARTON:
20    Q.   Yes.  And -- yeah, so what I'm
21 really asking, because I want to be clear.
22       What I'm really asking is now,
23 this is being sent in December of 2014, so a
24 few months later.  So we're now four months
25 from August 1.  So I'm just asking if you

Page 97

1 believe that this continued to be the version
2 of the written policy for HBC addressing
3 suspicious prescription product orders.
4       MR. KOBRIN:  Object to form.
5    A.   After December?
6 BY MR. BARTON:
7    Q.   As of December, when it was
8 being sent from Joe Millward to Greg Carlson,
9 December 5, 2014.
10       MR. KOBRIN:  Object to form.
11    A.   I believe so.
12 BY MR. BARTON:
13    Q.   And we're about to get
14 where it gets edited and changed and updated.
15 We'll go through that.  I'm just kind of
16 trying to understand the timeline of if you
17 believe this was the version still in effect
18 in December.
19       And you believe it was?
20    A.   I do.
21       (HBC-Rogos Deposition
22 Exhibit 10 marked.)
23 BY MR. BARTON:
24    Q.   Okay.  I hand you Exhibit 10.
25 Again, this is a multiple-page document with

Page 98

1  some attachments we've seen before and some
2  new ones.  For the record, the first page of
3  this is HBC_MDL00181521; is that right?
4      A.   Yes.
5      Q.   And the last page of this
6  exhibit is HBC_MDL00181555; is that right?
7      A.   Yes.
8      Q.   Okay.  Now, this -- this
9  exhibit has some correspondence, e-mail and
10 letters, in the February and March of 2015
11 time frame.  So we've moved forward a couple
12 of months from the last exhibit, which was in
13 December of 2014, right, just for context?
14     A.   Yes.
15     Q.   Okay.  The -- now, there's a
16 letter -- on the third page of this exhibit,
17 there's a letter dated February 23rd, 2015,
18 and it appears to be from you on Giant Eagle
19 letterhead; is that right?
20     A.   Yes.
21     Q.   Do you recall sending this
22 letter?
23     A.   I do.
24     Q.   Okay.  And the letter is to an
25 Alejandro Aranda, accreditation coordinator

Page 99

1  for the NABP; is that right?
2      A.   Correct.
3      Q.   And you had some
4  correspondence, e-mail and written
5  correspondence, with Mr. Aranda; is that
6  right?
7      A.   Uh-huh, I did.
8      Q.   The letter first says:  Thank
9  you for providing the NABP assessment
10 findings concerning VAWD to us recently.
11         So you had received, by the
12 time you sent this, some assessment findings
13 from NABP, correct?
14     A.   I believe so.  I can't
15 specifically recall.
16     Q.   Okay.  And you go on to say:
17 We've now had -- had -- we have now had an
18 opportunity to review those findings in
19 depth.
20         So do you recall receiving some
21 assessment findings from NABP and reviewing
22 them carefully?
23     A.   Vaguely, yeah.
24     Q.   Yeah.
25         You go on to say:  Based on our

Page 100

1  team's review of NABP's findings, we believe
2  we need an extension in which to respond
3  properly to NABP.  We are officially
4  requesting a 90-day extension to allow time
5  to address the issues that NABP raised.
6         Do you see that?
7      A.   I do.
8      Q.   Then you go on to say:  At this
9  point, we are considering engaging a third
10 party consultant, Buzzeo, to assist us with
11 closing any gaps before the resubmission of
12 our documents to complete the VAWD assessment
13 form.
14         Right?
15     A.   Right.
16     Q.   So do you recall these events
17 of getting an initial assessment from NABP
18 and realizing we need a little more time to
19 respond to what they're telling us and we
20 might want to get some help from Buzzeo as
21 well?
22     A.   I do.
23     Q.   The next page of the exhibit is
24 the beginning of what appears to be the VAWD
25 Policy & Procedure Assessment from the NABP

Page 101

1  for HBC Service Company.
2         Do you see that?
3      A.   I do.
4         MR. KOBRIN:  I just want to
5  flag the letter that you just went
6  over appears to be a draft.  It
7  appears to be incomplete.  Are we in
8  agreement on that, that there are gaps
9  in the letter that he hadn't filled in
10 yet, so I'm not sure that this letter
11 was ever sent or was ever finalized.
12         MR. BARTON:  Okay.
13 BY MR. BARTON:
14     Q.   Well, do you believe you ever
15 sent the letter that is -- that we were just
16 referring to?  Do you believe you sent that
17 letter in one form or another to Mr. Aranda?
18     A.   I believe so, yes.
19     Q.   And what counsel is referring
20 to as blank is a phone number that wasn't
21 filled in in this version that we're looking
22 at, correct?
23     A.   Correct.
24     Q.   But do you believe you likely
25 either filled that in or didn't fill it in,

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  but you sent the letter?
2      A.    Yes.
3      Q.    Okay.  The -- looking at the
4  assessment then, this -- is this the
5  assessment that you believe you're referring
6  to in that February 23rd letter back to
7  Mr. Aranda?
8      A.    It is.
9      Q.    Okay.  And it has a date of
10 February 10, 2015, looking at the first page
11 of it in the upper right corner.
12         Do you see that?
13     A.    I do.
14     Q.    All right.  And so this --
15 again, this is a policy and procedure
16 assessment, and there are some general
17 comments on the first page that I want to ask
18 you about down at the bottom.
19         Do you see where I am?
20     A.    I do.
21     Q.    So the reviewer comments state:
22 The policies and procedures (P&P) submitted
23 by the applicant lack detail and often do not
24 reference the requirements.  VAWD requires
25 that the criteria as noted in the assessment

Page 103

1  be incorporated into documentation and with
2  sufficient definition that would demonstrate
3  that the requirements are part of operational
4  activities.
5          Did I read that correctly?
6      A.    Yes.
7      Q.    So did you understand that one
8  of the items of feedback you were getting
9  from the NABP as of February 2015 was that in
10 some respects your policies and procedures
11 lacked detail and didn't meet VAWD's
12 expectations?
13     A.    Yes.
14     Q.    Okay.  So among other concerns
15 that you had as trying to ultimately succeed
16 in getting VAWD certification, you knew you
17 needed to do further work yet on your
18 policies and procedures?
19     A.    We did.
20     Q.    Okay.  The assessment goes
21 through lots of topics, similar to the Buzzeo
22 report we looked at earlier.  We won't go
23 through all of them, but the -- let's see.
24         Looking at page 9 of the NABP
25 assessment report, that one is the one

Page 104

1  addressing inventory controls.
2          Do you see that?
3      A.    I do.
4      Q.    And so that, for example, lists
5  various topics that VAWD is looking for -- or
6  the NABP is looking for, and there's -- in
7  the third column over from the left there's a
8  policy and procedure name and number, and a
9  number of them are noted as still being
10 needed, correct?
11     A.    Correct.
12     Q.    So there's -- that's just one
13 area, among others, but that's one area where
14 you knew there were still going to be some
15 additional policies needed to meet VAWD's
16 expectations, right?
17     A.    The ones that said still
18 needed, yes.
19     Q.    Okay.  And there are also some
20 reviewer comments after that section as well
21 as there are after several of the sections,
22 but there's some specific reviewer comments
23 there about the inventory control area as to
24 how those policies look, correct?
25     A.    Correct.

Page 105

1      Q.    Okay.  The first reviewer
2  comment notes that a process for conducting
3  authentication of prescription customer
4  orders for product is a VAWD requirement.
5  How legitimate orders are received, reviewed
6  and processed and how orders are screened for
7  suspicious order criteria must be identified
8  and documented.
9          Do you see that?
10     A.    I do.
11     Q.    Okay.  So you understood that
12 one of the items of feedback you were getting
13 from the review of your existing policies on
14 inventory controls was that you were being
15 told that how orders are screened for
16 suspicious order criteria must be identified
17 and documented, right?
18         MR. KOBRIN:  Object to form,
19     misrepresents the evidence.
20     A.    Correct, among with the regular
21 orders as well.
22 BY MR. BARTON:
23     Q.    The -- let's see.  Okay.
24         If you turn still within the
25 exhibit, after the assessment report that we

1  were just looking at, there is an e-mail
2  within the exhibit.  It's Bates number ending
3  542.  And that's an e-mail from Mr. Aranda to
4  you on February 10, 2015.
5        Do you see that?
6        A.   Uh-huh.
7        Q.   So this appears to be the
8  e-mail in which he attached and sent to you
9  the policies and procedures assessment that
10 we were just looking at.
11       Do you agree?
12       A.   Yes.
13       Q.   And he says in the third
14 paragraph:  Please respond to all action
15 items within 30 days in order to move forward
16 with the VAWD application process.
17       Do you see that?
18       A.   I do.
19       Q.   And then your letter to him on
20 February 23rd that we looked at earlier, your
21 response was, you know, we would like a
22 90-day -- we need 90 days to fully respond to
23 all of your questions, correct?
24       A.   Correct.
25            MR. BARTON:  Okay.  This is

1  5043.
2            MR. KOBRIN:  What number is
3  this?
4            MR. BARTON:  This will be
5  Number 11.
6            (HBC-Rogos Deposition
7       Exhibit 11 marked.)
8  BY MR. BARTON:
9        Q.   Okay.  Exhibit 11 is a document
10 with the first page being HBC_MDL00181482; is
11 that right?
12       A.   Yes.
13       Q.   And the last page of the
14 exhibit, HBC_MDL00181511; is that right?
15       A.   Yes.
16       Q.   Okay.  This exhibit again has
17 several e-mails followed by what appear to be
18 attachments to those e-mails.  We'll just
19 confirm that with you.
20            The first e-mail in the chain
21 on the second page started on March 24 of
22 2015 from Dolly Stevens to a number of people
23 identified there, and that's appearing to
24 just list and discuss some notes of a
25 discussion that day; is that right?

1        A.   Correct.
2        Q.   Okay.  And then she says at the
3  bottom:  Next meeting set for Monday,
4  March 30 at 9:00 a.m.
5            So the group here that's part
6  of this e-mail chain, does that look familiar
7  to you as kind of the group that was meeting
8  and discussing Buzzeo's various
9  recommendations for VAWD certification?
10       A.   Yes.
11       Q.   Okay.  And the e-mail -- the
12 next e-mail up is from Tina Posey, and she
13 was with Buzzeo, correct?
14       A.   She was.
15       Q.   And that's on Sunday, March 29.
16 It's just to you and Dolly with also a Scott
17 Hardy cc'd.
18            Do you see that?
19       A.   I do.
20       Q.   Okay.  And so Tina says, among
21 other things, she says:  Hi Dolly - Per your
22 e-mail below, I was to receive all revised
23 Giant Eagle VAWD documents by end of day
24 Friday, March 27th.  I only received two
25 revised SOPs out of the 17 SOPs I reviewed

1  and returned for revisions.
2            And she identifies the two that
3  she had received.  And so she just goes on to
4  say:  I believe that our conference call
5  scheduled for March 30 was to review any
6  additional edits or comments, and so she's
7  really just asking if we still have that call
8  on Monday.
9            Is that right?
10            MR. KOBRIN:  Object to form.
11       A.   I believe so, yeah.
12 BY MR. BARTON:
13       Q.   And then she does say also, at
14 the bottom of her e-mail:  I need to see the
15 revisions that are made.  The GE team should
16 utilize "track changes" so I can see when
17 information is new, removed or if the GE team
18 is accepting the edits that I entered.
19            Do you see that?
20       A.   I do.
21       Q.   And you're familiar with what
22 track changes is on Word if you're editing a
23 document and showing someone what edits
24 you've made, it's just a way for those edits
25 to show up?

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    A.    I do.
2    Q.    Okay.  The top e-mail on this
3  exhibit then was -- is from Dolly Stevens to
4  you and Joe Millward and kind of that team
5  identified there, and she says that -- well,
6  what are listed are a bunch of attachments to
7  her e-mail.
8        Do you recall kind of -- do you
9  recall this e-mail and these -- these events?
10   A.    I do.
11   Q.    Okay.  Listed in the e-mail
12 attachments are an Inventory Control Policy -
13 Suspicious Order Policy, and then also an
14 Inventory Control Policy with revisions.
15       Do you see that, where I'm
16 referring to at the top, in the attachments,
17 the list?
18   A.    Yes.
19   Q.    Okay.  So I want to turn to
20 what I think those are, and we'll see if you
21 agree what is listed there.
22       Then if you turn forward in the
23 exhibit to what's Bates number ending 491,
24 there's a document there that's called
25 Suspicious Order Policy.

Page 111

1        Do you see that?
2    A.    I do.
3    Q.    And this one has an effective
4  date of 8/1/14.  It's got revision number 2.
5  You're the policy owner.  It's in a little
6  different format from the inventory control
7  policy we've seen earlier, correct?
8    A.    Yes.
9    Q.    Okay.  And this one then is
10 followed by a document that appears to be the
11 redline or track changes version leading to
12 the clean one that we just looked at.
13       Would you agree?
14   A.    Yes.
15   Q.    Okay.  And so do you believe
16 both of these were attached to Dolly's e-mail
17 on March 29 of 2015?
18   A.    Yes.
19   Q.    And do you -- do you know who
20 made the revisions that are shown in the
21 track changes here on this document?
22   A.    Most likely, that would have
23 been me.
24   Q.    Okay.  Do you recall who else
25 reviewed and approved those changes before

Page 112

1  they became effective?
2    A.    It would have been a
3  combination -- and I don't know specifically,
4  but of the key pharmacy team that was on the
5  previous e-mails.
6    Q.    Okay.  And looking at the
7  redlines, do you -- so do you believe that
8  you took the prior document that we've looked
9  at earlier that was called Inventory Controls
10 with a -- you know, an effective date of
11 8/1/14, do you believe you took that document
12 as kind of your starting point of the
13 substance and then made changes to it that
14 are shown here on the track changes?
15   A.    On the suspicious order policy?
16   Q.    Yes.
17   A.    Yes.
18   Q.    Yeah, and one of the things
19 that you changed was the title of it.  It
20 used to be Inventory Control as the title,
21 and you -- you changed the title and called
22 this a Suspicious Order Policy, correct?
23   A.    I remember that now, yes.
24   Q.    And you did some other things,
25 too, that are shown with the underlining.

Page 113

1  You understand the underlining to be new
2  content and the strike-throughs to be deleted
3  content?
4    A.    Correct.
5    Q.    Okay.  So one of the things
6  that you put into this policy down at the
7  bottom is a bullet point that states:
8  Suspicious order criteria include, but are
9  not limited to the following.
10       And then you identify some
11 criteria for suspicious orders, correct?
12   A.    Correct.
13   Q.    And you would agree that that's
14 the first time you put any criteria for
15 suspicious orders into a written policy for
16 HBC and Giant Eagle?
17       MR. KOBRIN:  Object to form.
18   A.    I believe so.
19 BY MR. BARTON:
20   Q.    Okay.
21       MR. KOBRIN:  You want to take
22 another break?  We're at about two
23 hours.
24       MR. BARTON:  Yeah, we can do
25 that.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  THE VIDEOGRAPHER: Off the
2  record at 3:35 p.m.
3  (Recess taken, 3:35?p.m. to
4  4:08?p.m.)
5  THE VIDEOGRAPHER: We're back
6  on the record at 4:08 p.m.
7  BY MR. BARTON:
8  Q.  Okay.  Mr. Rogos, I am still
9  looking at Exhibit 11, and just a couple more
10 questions about that before we leave it.
11 The suspicious order policy
12 with the redlines that we were looking at
13 which is on the page numbered 493, that's the
14 end of the Bates number.  Do you see that?
15 A.  I do.
16 Q.  So those redlines that you
17 thought you might have done, do you -- would
18 you assume that those were likely done
19 sometime in the time frame between February
20 of 2015, when you had received the assessment
21 from NABP about policies, and then you're in
22 the time period of trying to respond to their
23 concerns in that 90-day period?
24 I'm just asking:  Do you
25 believe that's probably when you revised that

Page 115

1  policy?
2  MR. KOBRIN:  Object to form.
3  A.  I believe so.
4  BY MR. BARTON:
5  Q.  A better way to ask the
6  question is:  Do you remember when you did
7  those redlines?
8  A.  Not specifically, no.
9  Q.  Okay.  But based on -- based on
10 what we have seen so far, you think it's most
11 likely that it did occur in the time frame
12 between February 10, 2015 and March 29 of
13 2015?
14 A.  And where are those dates?
15 Q.  The February 10 was the date of
16 the NABP assessment and policies.
17 A.  Right.
18 MR. KOBRIN:  And what exhibit
19 was that?
20 MR. BARTON:  That was
21 exhibit -- I think that was Exhibit 8.
22 No, it's not.  Sorry.  It might be
23 Exhibit 9.  Was it Exhibit 10?  Yeah,
24 yeah, okay.
25 THE WITNESS:  Okay.

Page 116

1  BY MR. BARTON:
2  Q.  In Exhibit 10, that's when we
3  went through the NABP assessment feedback
4  that they had given you on policies, and that
5  was dated February 10 of 2015.  That's why I
6  used that date.
7  And then -- and so you sent the
8  letter back asking for the 90-day extension
9  on February 23rd, but you got the assessment
10 on February 10.  So I'm just kind of trying
11 to, again, kind of keep a timeline together
12 here.
13 And do you believe, looking at
14 these redlines, it's most likely that you
15 would have made them sometime after the NABP
16 assessment report of February 10, 2015 and
17 March 29, which is when Dolly is forwarding
18 these around that have those redlines?
19 MR. KOBRIN:  Object to form.
20 A.  I believe so.
21 BY MR. BARTON:
22 Q.  Okay.  The -- so -- and the
23 clean version is immediately preceding that
24 redline version of the suspicious order
25 policy, correct?

Page 117

1  You're looking at -- we're now
2  looking at the clean version, 491?
3  A.  Yeah.
4  Q.  The page is ending 491.
5  Would you agree that the policy
6  regarding reviewing orders and trends to
7  identify suspicious drug orders, that it --
8  it still doesn't have a lot of detail on
9  exactly how orders are reviewed, like just
10 sort of the mechanism or the steps for
11 reviewing them.
12 Would you agree with that?
13 MR. KOBRIN:  Object to form.
14 A.  In terms of the warehouse
15 reviewing them, like identifying those steps?
16 BY MR. BARTON:
17 Q.  Yes.
18 A.  Wouldn't it identify them in
19 the second bullet point?
20 Q.  Well, it does identify
21 criteria, and so it identifies things you're
22 looking for, correct, purchases over a
23 defined top period that exceed a
24 predetermined threshold.
25 So, I mean, that suggests that

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 somebody would set a threshold and then
2 orders would be reviewed against a threshold,
3 right?
4     A.    Correct.
5     Q.    And orders of unusual
6 quantities compared to a customer's order
7 history -- so, yeah, I'm just simply asking
8 if you would agree that this doesn't explain
9 exactly the steps of who does what in terms
10 of how that happens?
11         MR. KOBRIN:  Object to form.
12     A.    I'm not really -- I'm kind of
13 understanding the question, but I don't, in
14 the same form.
15 BY MR. BARTON:
16     Q.    Okay.  All right.  Okay.
17 That's fine.
18         (HBC-Rogos Deposition
19         Exhibit 12 marked.)
20 BY MR. BARTON:
21     Q.    Okay.  I'm handing you
22 Exhibit 12.  Oh, let's see.  Hold on.  Mine's
23 off.  My staple's come out.  Okay.
24         Exhibit 12, just make sure
25 we've got the same exhibit here.  It's a

Page 119

1 multiple-page document, the first number
2 HBC_MDL00078594; is that right?
3     A.    Correct.
4     Q.    And the last page,
5 HBC_MDL00078668.
6     A.    Correct.
7     Q.    Okay.  This exhibit appears to
8 be an e-mail from a Sara Green, executive
9 secretary at Giant Eagle, to the same people
10 who have been on other e-mails, largely, in
11 terms of the team that appears to have been
12 working on VAWD certification, including you;
13 is that right?
14     A.    Correct.
15     Q.    And the subject of her e-mail
16 is: All policies for VAWD reflected as of
17 5:00 p.m. today.
18         Do you see that?
19     A.    I do.
20     Q.    Okay.  And then it appears to
21 list a number of attachments, PDF attachments
22 to the e-mail, correct?
23     A.    Correct.
24     Q.    And then her text of her e-mail
25 to the group says:  Attached are all final

Page 120

1 PDF version policies for VAWD as well the
2 document retention policy and chart.  If you
3 have any questions, let us know.
4         Do you see that?
5     A.    I do.
6     Q.    Okay.  So do you recall kind of
7 the effort to finish and get into final form
8 the policies for the VAWD application in and
9 around early April of 2015?
10     A.    Yes.
11     Q.    Okay.  And you were personally
12 involved in that effort as part of that team?
13     A.    I was.
14     Q.    Okay.  And some of that would
15 have included you continuing to revise and
16 edit policies as needed to try to get them
17 into the final form?
18     A.    Correct.
19     Q.    Okay.  The -- if we turn to the
20 suspicious order policy that is attached to
21 this e-mail, and you can see it's -- it is
22 listed in the attachments on the first page.
23 There's an Inventory Control - Suspicious
24 Order Policy.  I find it -- sorry, I had it.
25 Okay.

Page 121

1         Page -- the Bates number is
2 ending 638.  Do you see that?
3     A.    I do.
4     Q.    Okay.  Now, actually, the best
5 thing to do just to make this easy is let's
6 also open back up from the previous exhibit
7 the suspicious order policy that was
8 attached.  I'm sorry, I should have had you
9 keep your thumb in it, I just wasn't
10 thinking.
11         So from Exhibit 11 let's go
12 back to the clean version of the suspicious
13 order policy there.
14         MR. KOBRIN:  I'm going to
15 object to relevance to any of this
16 because I don't believe we are -- HBC
17 is distributing any of the relevant
18 products at this time.
19         MR. BARTON:  I think that's
20 probably right, but I just am trying
21 to get the history on the policy here
22 just nailed down, get the timeline,
23 but...
24         I mean, I don't agree that it's
25 irrelevant, but I agree with your

Page 122

1 factual --
2     MR. KOBRIN:  You don't agree
3 it's irrelevant?
4     MR. BARTON:  I agree with your
5 representation about the time frame.
6 Okay.
7 BY MR. BARTON:
8     Q.    So just a couple of questions
9 here.  So the -- there are a few changes, not
10 too many, but there's a few changes between
11 the document that is the suspicious order
12 policy we saw in Exhibit 11, the clean
13 version on Bates number 181491, and this --
14 which was attached to an e-mail March 29 from
15 Dolly Stevens, and then now this final
16 version being circulated April 9 of 2015.
17     MR. KOBRIN:  Object to form.
18 BY MR. BARTON:
19     Q.    Well, would you agree that just
20 comparing these two, while very similar,
21 there are a few small changes?
22     MR. KOBRIN:  Object to form.
23     A.    It looks like there are.
24 BY MR. BARTON:
25     Q.    Okay.  We can just kind of note

Page 123

1 them.  The -- well, for one, the one in
2 Exhibit 12, the -- being circulated on
3 April 9 as a final version, it has a revision
4 date of 4/9/2015 and a last reviewed date of
5 4/9/2015.
6     Do you see that?
7     A.    I do.
8     Q.    And those dates don't appear in
9 the one that we had seen earlier, which was
10 being circulated on March 29, 2015, correct?
11     A.    Correct.
12     Q.    Okay.  The -- in the -- the
13 purpose/objective and the scope are basically
14 the same.  There's a little bit of a
15 formatting difference, but substantively I
16 think they say the same thing.
17     The policy section is where
18 there's just a little -- there's been a
19 change.  In the Exhibit 11 version, Bates
20 number 181491, the policy version has -- the
21 policy section, I'm sorry, is broken out into
22 five bullet points, and the policy section on
23 the final version in Exhibit 12, Bates
24 number 78638, that's just broken out into two
25 bullet points, correct?

Page 124

1     A.    Yes.
2     Q.    Do you recall whether you made
3 those changes between March 29 and April 9 to
4 this policy?
5     A.    I don't remember.
6     Q.    Do you recall any discussion
7 about why those changes were made?
8     A.    I don't recall specifically.
9     Q.    Do you know who made them?
10     MR. KOBRIN:  Object to form,
11 asked and answered.
12     MR. BARTON:  Is that what I
13 asked him?
14 BY MR. BARTON:
15     Q.    I think I asked you if you made
16 them.  Do you know -- do you know who made
17 them?
18     A.    No.
19     Q.    Okay.  As part of the team that
20 was reviewing and revising policies for
21 purposes of VAWD certification, do you
22 believe that as of April 9 when this policy
23 was being circulated as a final policy for
24 VAWD certification, do you believe you had
25 reviewed and approved this policy as -- as a

Page 125

1 final?
2     MR. KOBRIN:  Object to form.
3     A.    I probably reviewed it and
4 forwarded it on, either just saved it and
5 then -- along with other policies in the
6 S: drive.
7     MR. KOBRIN:  Don't speculate if
8 you're not sure.
9     THE WITNESS:  Okay.
10 BY MR. BARTON:
11     Q.    Do you believe you reviewed all
12 of the policies that were being submitted to
13 VAWD for purposes of applying for VAWD
14 certification to make sure that you felt like
15 they were complete?
16     MR. KOBRIN:  At what time?
17     MR. BARTON:  As of April 9,
18 2015.
19     MR. KOBRIN:  Because this is
20 not being submitted to VAWD here.
21     MR. BARTON:  Correct.
22     MR. KOBRIN:  Okay.
23     THE WITNESS:  So --
24     MR. BARTON:  Yeah, let me back
25 up.

Page 126

BY MR. BARTON:

Q. When Ms. Green circulated these to the group on that cover e-mail on the first page of this exhibit, she just said: Attached are all final PDF versions of policies for VAWD.

I'm asking you, then: Do you believe that her statement or characterization of these as final policies for VAWD -- do you believe that was accurate at the time? Do you believe you considered these to be final for VAWD?

MR. KOBRIN: Object to form.

A. Yes.

BY MR. BARTON:

Q. Okay. One of the last items on this suspicious order policy on page 2 of it -- I'm now looking at Exhibit 12, so Bates number -- I'm on page 78639.

One of the last items just deals with records retention. It says: HBC retains the records of the investigation and outcome for six years.

Do you see that?

A. I do.

Page 127

Q. Do you have any understanding of whether that part of this policy was a new policy or just memorialized as a previously existing policy?

A. I don't know.

Q. Okay. At least during the time that you continued to be at HBC, do you believe that HBC complied with that retention policy stated in this document?

MR. KOBRIN: Object to form.

A. I don't know. I would assume so, but I don't know.

BY MR. BARTON:

Q. Okay. You would expect it to have been followed as director of warehouse operations?

A. Yes.

(HBC-Rogos Deposition Exhibit 13 marked.)

BY MR. BARTON:

Q. Okay. I'm handing you Exhibit 13. Okay. Again, just to identify the exhibit, this is a multiple-page exhibit with some e-mails on the first page and a number of attachments.

Page 128

The first page is HBC_MDL00133670; is that right?

A. Yes.

Q. And the last page is HBC_MDL00133748; is that right?

A. Correct.

Q. Okay. The first page of the exhibit has two e-mails, and the lower one appears to be from you on Friday, April 10 of 2015, correct?

A. Yes.

Q. And it is to -- it is written to Alejandro Aranda at NABP; is that correct?

A. Correct.

Q. And so there's several recipients of the e-mail, including Mr. Aranda, and then a VAWD address at nabp.net, and then a number of people on your team, true?

A. Yes.

Q. And this one actually, the subject says: HBC VAWD Application and Documents, Part 2, right?

A. Yes.

Q. And in your e-mail you say to

Page 129

Mr. Aranda, Alejandro: Attached are the remainder of the SOPs for our VAWD application, which kind of suggests there may have been a Part 1 e-mail, correct?

A. I'm assuming so.

Q. Which is fine. I just am making sure you kind of agree that's what you're doing there.

You go on to say: You will see that attached to this e-mail I have included the VAWD PP Assessment Final that references the pages of the SOPs where you will be able to find the answers to the assessment questions.

Is that what you said?

A. Yes.

Q. And so what -- in part what you were trying to do for Mr. Aranda there was to not only provide him the policies that you had revised and pulled together for VAWD, but also to direct him to the assessment they had given you kind of to show where you had responded to their concerns?

A. I believe so, yes.

Q. Is that kind of the idea there?

Page 130

1    A.   Yeah.
2    Q.   The -- and so, then again,
3 included in this document are obviously a
4 number of policies, including the suspicious
5 order policy that we've gone over, and that
6 appears -- it appears at Bates number 133730.
7         Do you agree with that?
8    A.   Yes.
9    Q.   Okay.  And then back to the
10 e-mails, the e-mail above yours on this
11 document, on this exhibit, appears to be from
12 Greg Carlson to Mark Doerr sent that same day
13 with Mr. Carlson saying VAWD on the way.
14        Do you see that?
15   A.   I do.
16   Q.   Who is Mr. Doerr?
17   A.   I don't know.
18   Q.   Okay.  But it would appear that
19 Mr. Carlson was kind of forwarding your
20 e-mail with the -- with those VAWD documents
21 for the application to Mr. Doerr and just
22 reporting to him that the VAWD application
23 was on its way?
24   A.   Looks like it.
25   Q.   Okay.  Now, you left HBC in May

Page 131

1 of 2015; is that right?
2    A.   I did.
3    Q.   So once you left, I assume you
4 obviously had no involvement in any further
5 dealings trying to get VAWD certification,
6 correct?
7    A.   No, I did not.
8    Q.   Were you contacted, after you
9 left, by HBC for any kind of follow-up
10 questions, just as they may have continued in
11 that process?
12   A.   Not that I can remember.
13   Q.   Okay.  Did you ever hear
14 anything more from anybody at HBC about their
15 VAWD application?
16   A.   Nothing specific, no.
17   Q.   Okay.  And -- yeah, that's
18 fine.  I don't want you to reveal anything
19 that you talked about with counsel.  I just
20 meant from HBC people at that time, and you
21 don't remember anything it sounds like.
22   A.   No.
23        MR. BARTON:  Okay.  Give me --
24 let's just take a very short break.  I
25 think I'm done, but let me just make

Page 132

1 sure.
2         THE VIDEOGRAPHER:  Off the
3 record at 4:30 p.m.
4         (Recess taken, 4:30 p.m. to
5 4:40 p.m.)
6         THE VIDEOGRAPHER:  We're back
7 on the record at 4:40 p.m.
8         MR. BARTON:  Mr. Rogos, I
9 appreciate your time today, and I
10 don't have any further questions.
11        THE WITNESS:  Thank you.
12        EXAMINATION
13 BY MR. KOBRIN:
14   Q.   Mr. Rogos, I just have a couple
15 of follow-up questions for you.
16        Could you do me a favor and
17 grab Exhibit 7.  Do you recall discussing
18 this document with opposing counsel?
19   A.   I do.
20   Q.   And as I recall, this is the
21 first version of a document that you
22 formatted in this way in part to prepare for
23 a VAWD application; is that correct?
24        MR. BARTON:  Object to form.
25   A.   That's correct.

Page 133

1 BY MR. KOBRIN:
2    Q.   Did you format this document?
3    A.   I did.
4    Q.   And the content of this
5 document, where did it come from?
6    A.   This was taken -- the content
7 was taken from an existing standard operating
8 procedures and policies notebook that I had
9 regarding the HBC pharmacy room.
10   Q.   And that was the notebook, the
11 three-ring binder that you mentioned earlier
12 in your testimony to opposing counsel?
13   A.   That's correct.
14   Q.   So this is a preexisting policy
15 that existed in writing prior to August 1st,
16 2014?
17   A.   It did, yes.
18   Q.   And this document here is a
19 reformatting of that policy in order to try
20 and meet the formatting specifications of the
21 VAWD application; is that what's being done
22 here?
23   A.   Yes, that's it exactly.
24   Q.   Could you turn to Exhibit 6.
25 Do you recall looking at this document with

Page 134

1   opposing counsel?
2       A.   I do.
3       Q.   And if you turn to the page
4   Bates-marked HBC_MDL00180073, when you were
5   looking at this page you talked to opposing
6   counsel about certain check marks that were
7   on this document.
8           Do you recall that?
9       A.   I do.
10      Q.   And as I recall, you testified
11  that you weren't sure who had entered the
12  check marks onto the document?
13      A.   That's correct.
14      Q.   And opposing counsel asked you
15  if there was a check mark under the second
16  box on the page that begins with reporting
17  suspicious prescription product orders; is
18  that correct?
19      A.   Correct.
20      Q.   What did it mean if there was a
21  check mark next to one of these tasks on
22  these lists?
23          Do you recall what that meant?
24          MR. BARTON:  Object to form.
25  BY MR. KOBRIN:

Page 135

1       Q.   Do you recall what it meant if
2   there was a check mark versus whether there
3   was not a check mark on these lists?
4       A.   Yes.  From my recollection, the
5   check mark meant that we had the procedure
6   documented and in place.
7           Something that might not have
8   been checked, like the first box, might have
9   meant that we still needed to get that in the
10  format and then with the specific detail that
11  was required by VAWD.  It didn't mean that we
12  did not have that policy.
13      Q.   Thank you.
14          Could you turn to Exhibit 10.
15  This is an e-mail from Dolly Stevens, and it
16  has an attachment that has the VAWD
17  assessment that you guys received on
18  February 10th, 2015.
19          Do you recall discussing this
20  with opposing counsel?
21      A.   I do.
22      Q.   Now, if you could go to the
23  attachment and go to the tenth page of the
24  attachment which is Bates-stamped
25  HBC_MDL00181533.

Page 136

1       A.   Okay.
2       Q.   Opposing counsel asked you
3   about the first bullet under Reviewer
4   Comments at the top of that page.
5           Do you see that first bullet?
6       A.   I do.
7       Q.   And that first bullet says:  A
8   process for conducting authentication of
9   prescription customer orders for product is a
10  VAWD requirement.
11          Do you see that?
12      A.   I do.
13      Q.   Do you recall what this bullet
14  was about or having conversations with VAWD
15  contacts about what they were commenting on
16  in this bullet?
17      A.   Yeah.  Mike Bianco and I had a
18  conversation with Alejandro specifically
19  about that bullet point.  Alejandro wanted
20  verification on how we authenticate a valid
21  order.
22          What we had to explain to
23  Alejandro and what he did not know is that
24  the HBC pharmacy warehouse only shipped to
25  Giant Eagle pharmacies.

Page 137

1           Those Giant Eagle pharmacies
2   placed their orders and submitted those
3   orders to HBC in a closed system, so someone
4   outside of that system, a non-Giant Eagle
5   pharmacy, could not put an order for
6   prescriptions into our pharmacy.
7           What we had to explain to him,
8   that was our authentication process, that
9   those orders were authentic because they came
10  from Giant Eagle pharmacies.
11      Q.   So the entire concern expressed
12  in this bullet regarding how orders are
13  received, reviewed, processed or screened for
14  suspicious order criteria, that all related
15  to the authentication issue?
16          MR. BARTON:  Object to form.
17      A.   Correct.  Correct.
18          MR. KOBRIN:  Strike the prior
19  question.
20  BY MR. KOBRIN:
21      Q.   The issue that was raised here
22  about how orders are received, reviewed,
23  processed or screened for suspicious order
24  criteria, did those all relate to that
25  authentication question that you explained to

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 Alejandro?
2　A.　Yes.
3　Q.　Would you look at Exhibit 11
4 very quickly.  This is a document that has
5 policies and then markups of those policies
6 as attachments to the e-mail.
7　　　Do you recall looking at this
8 document?
9　A.　I do.
10　Q.　Could you go to the markup of
11 the suspicious order policy, which is at
12 HBC_MDL00181493.
13　A.　Okay.
14　Q.　Opposing counsel asked you a
15 lot about the markups and the additional text
16 that you added under the procedures here.
17　　　Do you recall talking about
18 that?
19　A.　I do.
20　Q.　This additional text that you
21 were involved in adding to the policy, what
22 is this additional text based upon?
23　A.　The additional text was based
24 upon detailing very specifically what we had
25 been doing in the HBC pharmacy prior to

Page 139

1 creating this document.
2　　　The policies previous did not
3 explain or detail what exactly was being done
4 in the pharmacy or what was occurring on a
5 day-to-day basis, so this just made sure that
6 we were detailing that in the specificity
7 that VAWD required.
8　Q.　So before you -- before you put
9 these into this new version 2 of the
10 suspicious order policy, did the employees at
11 the warehouse, did they know about these
12 details that you've itemized here?  Were they
13 aware of them?
14　A.　Yes.
15　Q.　And were they acting upon them?
16　A.　Yes.
17　Q.　And were you aware of them?
18　A.　I was.
19　Q.　And were you supervising your
20 warehouse employees in their actions in
21 relation to these details?
22　A.　I was.
23　　　MR. KOBRIN:  I have no further
24 questions.  Pass the witness.
25　　　MR. BARTON:  I have a few

Page 140

1 follow-up questions.
2　　　　EXAMINATION
3 BY MR. BARTON:
4　Q.　The -- tell me how is it you
5 know that the employees in the warehouse
6 during -- prior to you making the revisions
7 in this policy that you were just asked about
8 in the suspicious order policy, tell me how
9 is it that you know that the employees of the
10 warehouse knew about the suspicious order
11 criteria and how they should be factored into
12 looking for suspicious orders?
13　　　MR. KOBRIN:  Object to the
14 form.
15　A.　There were conversations with
16 the employees specifically, the support staff
17 that worked not only on the daily shifts, but
18 afternoon shifts, with individuals who
19 ordered and monitored those orders at our
20 corporate office.
21 BY MR. BARTON:
22　Q.　So you had conversations with
23 people who worked at the warehouse, and
24 that's your basis for believing they
25 understood it?

Page 141

1　A.　My understanding, yes, uh-huh.
2　Q.　There -- was there ever, during
3 the time that you were director of warehouse
4 operations, was there ever any specific
5 training that you directed or conducted of
6 your employees on suspicious order
7 monitoring?
8　A.　Not that I did.
9　Q.　Okay.  Did it ever occur?  I
10 mean, apart from whether you actually did the
11 training, did you -- do you know whether your
12 employees ever got training on the specifics
13 of suspicious order monitoring while you were
14 director of warehouse operations?
15　A.　No.
16　Q.　Okay.  And I think you've
17 testified there wasn't, to your recollection,
18 or at least you're not able to say there was,
19 an LMS training system where it would be
20 documented somewhere that every employee was
21 trained on these policies, correct?
22　A.　I'm not aware of that.
23　Q.　Okay.  After -- after this
24 policy was revised to include the suspicious
25 order criteria that counsel was just pointing

Page 142

1  out -- after those revisions occurred in
2  early 2015, do you -- understanding you left
3  by May of 2015, so I know we're talking about
4  a short window there, but during that window
5  of time, do you know whether employees were
6  trained on this new policy in that window?
7      A.   I hadn't --
8          MR. KOBRIN:  Object to form.
9  Object to form in that you're
10  describing the month between April of
11  2015 and May of 2015?
12         MR. BARTON:  Yeah, or whenever
13  these edits were made prior to April.
14         MR. KOBRIN:  The edits that he
15  already testified people were already
16  acting on, those particular changes
17  that we talked about that people were
18  already performing.
19         MR. BARTON:  I'm asking whether
20  there was any new training on this new
21  policy after the policy was edited.
22     A.   From the time it was sent to
23  VAWD, we did not do any training due to the
24  fact it was not verified if we needed to make
25  further edits on those policies.

Page 143

1  BY MR. BARTON:
2      Q.   Okay.  All right.  And -- and
3  then you were gone, so you don't know what
4  happened after you left, correct?
5      A.   I don't.
6      Q.   Okay.  Back on -- just to
7  follow up here, on Exhibit 6 that you were
8  just asked about by counsel, Exhibit 6 has
9  the check marks, the inventory controls,
10  page -- so I'm looking within Exhibit 6 at
11  Bates number 180073.
12     A.   Okay.
13     Q.   Okay.  And counsel asked you
14  about the absence of the check mark in
15  reporting suspicious prescription product
16  orders, and I believe that what you said is
17  that the absence of the check mark doesn't
18  mean you didn't have that policy.  Instead,
19  you said a check mark meant that you had the
20  policy in place and it was documented, but
21  the absence of the check mark doesn't mean
22  you didn't have the policy?
23         MR. KOBRIN:  Object to form,
24  misrepresents his testimony.
25         MR. BARTON:  I'm sorry, yeah,

Page 144

1  I'm just -- I'm trying to understand
2  what your testimony was.
3  BY MR. BARTON:
4      Q.   What -- let me ask it this way.
5          What we went through earlier is
6  that on this document, there are both some
7  boxes that are checked and some that are not
8  checked, but there's also a list of policies
9  at the end of this section that were believed
10  to be relevant and responsive to this topic,
11  correct?
12     A.   Correct.
13     Q.   And we -- and I believe we've
14  already identified that there was an
15  inventory control policy in place that you
16  found and formatted the way it was formatted
17  as of August 1 of 2014, correct?
18     A.   Correct.
19     Q.   And so that -- and that
20  document was the document that you recall
21  associating with this inventory control
22  section of the VAWD checklist, right?
23     A.   I do.
24     Q.   Okay.  Other than that
25  inventory control document, which eventually

Page 145

1  had the date of August 1, 2014 associated
2  with it when it got formatted that way, other
3  than that document, were there any other
4  written documents or policies that you were
5  aware of in your library of SOPs that
6  addressed the reporting of suspicious product
7  orders?
8          MR. KOBRIN:  Object to form.
9          Do you remember?
10     A.   No.  No.
11  BY MR. BARTON:
12     Q.   You can't -- as you sit here,
13  you are not aware of any other document that
14  did address specifically the reporting of
15  suspicious prescription product orders?
16     A.   I can't say there was and I
17  can't say there wasn't.  No, I don't
18  remember.
19     Q.   Right.  And so the -- for
20  example, any of these other documents that
21  were listed after the checklist on that
22  following page, after inventory control
23  policy, there's the receiving controlled
24  drugs final.  There's the final stocking SOP.
25  There's the flow rack selection SOP.

Page 146

1    You don't know whether any of
2 those, for example, may have somehow
3 addressed the reporting of suspicious drug
4 orders, correct?
5    MR. KOBRIN:  Object to form.
6    He said he didn't remember whether any
7    did or didn't.
8    A.   I don't remember.
9    MR. BARTON:  Okay.  I'm just
10    directing him to the documents listed
11    on the page.
12 BY MR. BARTON:
13    Q.   And so what your testimony also
14 is, is that you don't know whether there were
15 any other additional documents not listed
16 here that addressed reporting of suspicious
17 prescription orders, right?
18    A.   I don't recall.
19    Q.   If there had been any that
20 directly addressed reporting of suspicious
21 orders, it would have been your intent to try
22 to identify those, list them here and account
23 for whether they adequately met the VAWD
24 requirements, right, because that was your
25 objective in this project, right?

Page 147

1    MR. KOBRIN:  Object to form.
2    A.   That's correct.
3 BY MR. BARTON:
4    Q.   And on Exhibit 10, just
5 following up on the questions counsel asked
6 about the Exhibit 10 assessment from VAWD, I
7 think you clarified what you understood one
8 of Alejandro's misunderstandings to be, which
9 was that he didn't understand initially that
10 HBC only shipped to Giant Eagle retail
11 pharmacies, correct?
12    A.   That's correct.
13    Q.   And that makes HBC different
14 from some wholesalers or distributors that
15 might ship to any number of potential
16 pharmacies that they may not have as much
17 familiarity with as HBC and Giant Eagle did
18 with its own retail pharmacies, correct?
19    A.   Correct.
20    Q.   Based on that, do you believe
21 that any order from a Giant Eagle retail
22 pharmacy that is received by the HBC -- that
23 was received by the HBC warehouse could not
24 have been a suspicious order?
25    MR. KOBRIN:  Object to form,

Page 148

1 beyond the scope.
2    A.   What type of order?
3 BY MR. BARTON:
4    Q.   An order for controlled
5 substances.
6    Was it possible, then, if --
7 I'm asking you if you -- your understanding
8 of what a suspicious order could be.
9    Was it even possible for a
10 Giant Eagle pharmacy to place a suspicious
11 order to HBC?
12    MR. KOBRIN:  Object to form,
13    same reason.
14    A.   We had controls in place at not
15 only our own -- at the pharmacy level, but at
16 the corporate level and at the warehouse
17 level.
18    Anything's possible.  If we did
19 have an order that came through that we
20 thought should have been flagged, we
21 contacted the folks that would monitor those
22 types of levels.
23    So could it happen?  It could,
24 but we would have flagged it along the way.
25 BY MR. BARTON:

Page 149

1    Q.   Because there's a difference --
2 would you agree there's a difference between
3 verifying that an order is authentic, like a
4 legitimate order from a pharmacy wanting
5 product.  There's a difference between just
6 verifying that an order is authentic and
7 evaluating whether the order is suspicious,
8 authentic but suspicious.
9    Those are two different things,
10 right?
11    MR. KOBRIN:  Objection, beyond
12    the scope.
13    A.   I'm not sure I understand the
14 question.
15 BY MR. BARTON:
16    Q.   Well, I think -- I think that
17 you were -- you had indicated that, you know,
18 one of the first items in this bullet point
19 from the NABP was a process for conducting
20 authentication of prescription customer
21 orders, and I think what you're indicating is
22 you knew -- through your system, your
23 internal system of who was ordering, you knew
24 that your orders were authentic, right, from
25 Giant Eagle pharmacies?

Page 150

1  A.  Correct.
2  Q.  Because it was a closed system,
3  you couldn't get an order from a stranger,
4  correct?
5  A.  Could not.
6  Q.  Okay.  So you knew through your
7  own processes that the orders were authentic,
8  and you had to explain that to Alejandro,
9  correct?
10  A.  That's right.
11  Q.  Because he didn't understand
12  that about HBC and who its customers were,
13  right?
14  A.  He did not.
15  Q.  But I'm just saying authentic
16  is one thing.  It's -- you know, you want to
17  verify that the orders are authentic and not
18  being placed by some rogue non-real pharmacy,
19  correct, but you knew that yours would be,
20  true?
21  A.  Correct.
22  Q.  But that's not the same as
23  evaluating whether an order -- there are
24  reasons why an order, authentic as an order,
25  may still be suspicious.  That's a separate

Page 151

1  inquiry, right?
2      MR. KOBRIN:  Object to form.
3  He's already testified about this.
4  His testimony on redirect was about
5  the concern on the reviewer comment
6  and whether their concern about
7  authentication was tied to all these
8  issues.
9      Your distinction between
10  whether an authentic order is
11  different from a suspicious order is
12  completely beyond the scope.
13      MR. BARTON:  I don't think it's
14  beyond the scope at all.  I'm just
15  asking him if he understands that
16  distinction.
17  BY MR. BARTON:
18  Q.  Do you agree that's a
19  distinction?
20  A.  There's a difference between an
21  authentic and a suspicious order.
22  Q.  Right.  Okay.
23      And the -- both the feedback
24  from Alejandro and NABP and the checklist of
25  things that NABP and VAWD is interested in

Page 152

1  encompasses both authenticity and whether
2  orders are suspicious, correct?
3      MR. KOBRIN:  Object to form,
4  misrepresents prior testimony.
5  A.  Correct.
6      MR. BARTON:  Okay.  No further
7  questions.
8      EXAMINATION
9  BY MR. KOBRIN:
10  Q.  I just have one quick
11  follow-up.  Looking at your r?sum? on
12  Exhibit 1, you started working at HBC Service
13  Company in late 2013; is that accurate?
14  A.  That's correct.
15  Q.  Were you aware of training that
16  occurred prior to the time that you started
17  working as the manager at HBC in late 2013?
18  A.  I was not.
19      MR. KOBRIN:  Thank you.
20      MR. BARTON:  Nothing further.
21      THE VIDEOGRAPHER:  This
22  concludes this deposition.  The time
23  is 5:02 p.m.  Off the record.
24      (Proceedings recessed at
25      5:02 p.m.)

Page 153

1      CERTIFICATE
2      I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
3  Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
4  and Notary Public, do hereby certify that
prior to the commencement of the examination,
5  MATTHEW ROGOS was duly sworn by me to testify
to the truth, the whole truth and nothing but
6  the truth.
7      I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
ability.
10
      I DO FURTHER CERTIFY that pursuant
11  to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
12  before the conclusion of the deposition.
13      I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
14  nor counsel of any of the parties to this
action, and that I am neither a relative nor
15  employee of such attorney or counsel, and
that I am not financially interested in the
16  action.
17
18
    MICHAEL E. MILLER, FAPR, RDR, CRR
19  Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
20  NCRA Certified Realtime Reporter
Certified Court Reporter
21
Notary Public
22  My Commission Expires:  7/9/2020
23  Dated: February 24, 2019
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 154

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 156

## ACKNOWLEDGMENT OF DEPONENT

I, MATTHEW ROGOS, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
MATTHEW ROGOS                    DATE

Subscribed and sworn to before me this
_____ day of _____, 20 _____.
My commission expires: _____

_____
Notary Public

Page 155

## ERRATA

PAGE  LINE  CHANGE

____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____
____ ____ _____
    REASON: _____

Page 157

## LAWYER'S NOTES

PAGE   LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____