Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION


----------------------------x

IN RE: NATIONAL PRESCRIPTION   ) Case No.

OPIATE LITIGATION              ) 1:17-MD-2804

APPLIES TO ALL CASES           ) Hon. Dan A. Polster

----------------------------x


HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW
VIDEOTAPED DEPOSITION OF LARRY W. ROMAINE

CHARLOTTESVILLE, VIRGINIA

THURSDAY, JANUARY 10, 2019

9:06 A.M.


Pages: 1 - 531

Reported by: Leslie A. Todd

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1     Deposition of LARRY W. ROMAINE, held in the
2  conference room at:
3
4     .
5          OMNI HOTEL
6          212 Ridge McIntire Road
7          Charlottesville, Virginia 22903
8
9
10
11
12     Pursuant to notice, before Leslie Anne Todd,
13  Court Reporter and Notary Public in and for the
14  Commonwealth of Virginia, who officiated in
15  administering the oath to the witness.
16
17
18
19
20
21
22
23
24

Page 4

1  APPEARANCES (Continued):
2
3     SANDRA DI LORIO, ESQUIRE
4     ENDO
5     1400 Atwater Drive
6     Malvern, Pennsylvania 19355
7     (4840 574-2921
8
9  ON BEHALF OF WALMART:
10     CHRISTOPHER LOMAX, ESQUIRE
11     JONES DAY
12     600 Brickell Avenue
13     Suite 3300
14     Miami, Florida 33131
15     (305) 714-9700
16
17  ON BEHALF OF PERNIX THERAPEUTICS HOLDINGS, INC.:
18     BRUCE CLARK, ESQUIRE (Telephonically)
19     CLARK MICHIE, LLP
20     220 Alexander Street
21     Princeton, New Jersey 08540
22     (609) 206-1104
23
24

Page 3

1        A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3     JENNIFER SCULLION, ESQUIRE
4     ERICA KUBLY, ESQUIRE
5     SEEGER WEISS, LLP
6     77 Water Street, 8th Floor
7     New York, New York 10005
8     (212) 584-0780
9
10  ON BEHALF OF THE TENNESSEE PLAINTIFFS:
11     JOE P. LENISKI, JR., ESQUIRE
12     BRANSTETTER, STRANCH & JENNINGS, PLLC
13     223 Rosa L. Parks Avenue, Suite 200
14     Nashville, Tennessee 37203
15     (615) 254-8801
16
17  ON BEHALF OF ENDO PHARMACEUTICALS AND THE WITNESS:
18     SEAN MORRIS, ESQUIRE
19     NEDA HAJIAN, ESQUIRE (Telephonically)
20     ARNOLD & PORTER KAYE SCHOLER, LLP
21     777 South Figueroa Street
22     44th Floor
23     Los Angeles, California 90017-5844
24     (213) 243-4222

Page 5

1  APPEARANCES (Continued):
2
3  ON BEHALF OF AMERISOURCEBERGEN:
4     MARY BALASTER, ESQUIRE (Telephonically)
5     REED SMITH, LLP
6     811 Main Street, Suite 1700
7     Houston, Texas 77002-6110
8     (713) 469-3800
9
10
11  ALSO PRESENT:
12     SABRINA TYJER (Paralegal - Seeger Weiss)
13     DANIEL HOLMSTOCK (Videographer)
14     RICK CHRISTIAN (Trial Technician)
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1          C O N T E N T S

2   EXAMINATION OF LARRY W. ROMAINE     PAGE

3    By Ms. Scullion        17

4    By Mr. Leniski       414

5    By Mr. Morris        472

6

7

8

9          E X H I B I T S

10     (Attached to transcript)

11   ENDO-ROMAINE DEPOSITION EXHIBITS     PAGE

12   No. 1    Amended Notice of Deposition of

13      Larry Romaine     26

14   No. 2    Subpoena to Testify at a

15      Deposition in a Civil Action     30

16   No. 3    Separation Agreement & General

17      Release     28

18   No. 4    Chart showing Endo's history     45

19   No. 5    E-mail re Deck, and attachment,

20      Bates ENDO-CHI_LIT-00151712 to

21      00151713     51

22   No. 6    ENDOSell Training Program, Power

23      Point presentation, Bates E0842.1

24      to 0842.19     94

Page 7

1       E X H I B I T S (Continued)

2     (Attached to transcript)

3   ENDO-ROMAINE DEPOSITION EXHIBITS     PAGE

4   No. 7    Demonstrative Script, Bates

5      ENDO-CHI_LIT-00207903     101

6   No. 8    E-mail re Voice Mail Message

7      (2 minutes 35 seconds), Bates

8      ENDO-CHI_LIT-00207902 to

9      00207903     101

10   No. 9    PowerPoint presentation, OPANA

11      Titration MD Workshop, Bates

12      ENDO-CHI_LIT-00473817 to 00473883   111

13   No. 10   Oxymorphone Learning System,

14      Module 3, Bates ENDO-OPIOID_MDL-

15      05654763 to 05654814     111

16   No. 11   E-mail string re OPANA ER Successful

17      Rep Research Final Report & Brand

18      IQ Summary Attached, Bates

19      ENDO-OPIOID_MDL-02162731 to

20      02162734     123

21   No. 12   E-mail string re ECRs, Bates

22      ENDO-OPIOID_MDL-02147122 to

23      02147123     171

24

Page 8

1       E X H I B I T S (Continued)

2     (Attached to transcript)

3   ENDO-ROMAINE DEPOSITION EXHIBITS     PAGE

4   No. 13   E-mail re Opana FIR 11-30-06,

5      with attachment, Bates

6      ENDO-OPIOID_MDL-00881701 to

7      00881704     187

8   No. 14   E-mail re Final OPANA and OPANA

9      ER MVA and Navigator, with

10      attachment, Bates ENDO-OPIOID_MDL-

11      01655584 to 01655647     203

12   No. 15   Document entitled "For your

13      appropriate patients with moderate

14      to severe pain. Designed for

15      Durable Pain Control," Bates

16      ENDO00000105 to 00000118     206

17   No. 16   Package Insert for Opana ER,

18      Bates ENDO-CHI_LIT-00032928 to

19      00032943     206

20   No. 17   E-mail re Pharmacies that stated

21      RECALL as a Decline Reason/REFUSAL-

22      PRESCRIBING PHYSICIAN/REFUSAL-NOT

23      NOT ACCEPTING NEW PATIENTS, Bates

24      ENDO-OPIOID_MDL-00468003 to 00468004 212

Page 9

1       E X H I B I T S (Continued)

2     (Attached to transcript)

3   ENDO-ROMAINE DEPOSITION EXHIBITS     PAGE

4   No. 18   E-mail re ECR (with attachment),

5      Bates ENDO-OPIOID_MDL-00684000 to

6      00684001     217

7   No. 19   ENDOSell Coaching Report, Bates

8      E0879.1 to E0879.4     217

9   No. 20   E-mail re BMT Meeting - Brand

10      Strat's for Review, Bates

11      E0502.1 to E0502.35     225

12   No. 21   Brochure "New Options to Help

13      Physicians," Bates ENDO-OPIOID_MDL-

14      04929187 to 04929194     233

15   No. 22   E-mail re Slides from Turnberry,

16      (with attachment), Bates E1180.1

17      to E1180.53     235

18   No. 23   2003 Objectives Update, May 7, 2003,

19      Bates ENDO-OPIOID_MDL-05589327 to

20      05589328     244

21   No. 24   Spreadsheet, Bates E1218.1 to

22      E1218.76     245

23

24

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1       E X H I B I T S (Continued)
2          (Attached to transcript)
3    ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
4    No. 25   Percocet History, Time & Events
5       in the News Media, Bates E0142.1 to
6       E0142.18            250
7    No. 26   E-mail string re OPANA and OPANA ER
8       Pls, Bates ENDO-OPIOID_MDL-00879677
9       to 00879738          259
10   No. 27   E-mail re Info for your meeting on
11      Tuesday, Bates ENDO-OPIOID_MDL-
12      04920194            259
13   No. 28   E-mail string re OPANA and OPANA ER
14      Marketing Update, Bates E1200.1 to
15      E1200.2             262
16   No. 29   E-mail string re Opana Weekly -
17      11/17, Bates ENDO-OPIOID_MDL-
18      00858402 to 00858403       265
19   No. 30   CMR Summary (2006 - 2017) Opana
20      Net Sales, Bates ENDO_DATA_OPIOID_
21      MDL-000000008 to 00000019      272
22   No. 31   E-mail re Play to WIN! - Weekly
23      Update, Bates E1187.1 to E1187.50  276
24

Page 12

1       E X H I B I T S (Continued)
2          (Attached to transcript)
3    ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
4    No. 39   E-mail re OPANA ER Response Memo,
5       Bates ENDO-CHI_LIT-00166187 to
6       00166188            334
7    No. 40   Brochure entitled "ENDO
8       Pharmaceuticals, Opana ATU Pulse 3
9       Summary of Findings, June 2007,"
10      Bates E0974.1 to E0974.17      340
11   No. 41   Opana ATU Final Report Wave 6,
12      Bates E0914.1 to E0914.115     347
13   No. 42   E-mail string re Opana mentioned
14      in Pitts. Post story on abuse --
15      FYI, Bates E1178.1 to E1178.3    369
16   No. 43   E-mail re Library Program
17      Utilization Update - November,
18      Bates E1230.1 to E1230.282     364
19   No. 44   Document Bates E1247.1 to
20      E1247.122           378
21   No. 45   E-mail re Opana ER WPS Report -
22      National 5.25.12, Bates E1212.1 to
23      E1212.9             385
24

Page 11

1       E X H I B I T S (Continued)
2          (Attached to transcript)
3    ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
4    No. 32   2009 Performance Coaching and
5       Development, Bates ENDO-OPIOID_MDL-
6       02312040 to 02312054       280
7    No. 33   E-mail string re Opana ER speaker
8       program update - Midwest Region,
9       Bates ENDO-OPIOID_MDL-00644449   286
10   No. 34   E-mail re Opana Top 50 Writers
11      (with attachment), Bates
12      E1175.1 to E1175.8        293
13   No. 35   E-mail re IMPORTANT - Walgreens
14      stores that have stocked Opana,
15      Bates E0524.1 to E0524.58      305
16   No. 36   E-mail re Documents, Bates
17      E0832.1 to E0832.100       312
18   No. 37   E-mail re West Opana ER Feedback,
19      Bates E1215.1 to E1215.4     318
20   No. 38   E-mail string re Primary Care MDs
21      and Opioids, Bates E0924.1 to
22      E0924.2             331
23
24

Page 13

1       E X H I B I T S (Continued)
2          (Attached to transcript)
3    ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
4    No. 46   Attachment 16, Bates ENDO-OR-CID-
5       00694084 to 00694087       390
6    No. 47   E-mail re Request to move Opana
7       ER NDA 21-610 to the Orange Book
8       Discontinued List, Bates
9       ENDO-CHI_LIT-00008100 to 00008101  392
10   No. 48   E-mail string re Communication to
11      the field, Bates ENDO-OPIOID_MDL-
12      01968698 to 01968700       399
13   No. 49   E-mail re TENNCARE Medicaid Win,
14      Bates ENDO-OPIOID_MDL-01067350 to
15      01067351            421
16   No. 50   Larry Romaine, 2011 Objectives,
17      Bates ENDO-OPIOID_MDL-01006528 to
18      01006529            426
19   No. 51   E-mail string re FW: "Don't Be
20      Blue" Opana ER BCBS of Tennessee
21      Initiative - Update,
22      Bates ENDO-OPIOID_MDL-00361036 to
23      00361037            432
24

4  (Pages 10 to 13)

Highly Confidential - Subject to Further Confidentiality Review

Page 14

```
 1        E X H I B I T S (Continued)
 2            (Attached to transcript)
 3   ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
 4   No. 52   E-mail string re BCBS TN Opana ER
 5       Performance, Bates ENDO-OPIOID_MDL-
 6       01005844 to 01005851       436
 7   No. 53   E-mail re Opana ER conf call,
 8       Bates ENDO-OPIOID_MDL-01018226 to
 9       01018227                   438
10   No. 54   E-mail string re Request for
11       Information, Bates ENDO-OPIOID_MDL-
12       02317224 to 02317226       445
13   No. 55   E-mail re 11/4/2011 5:27:25 PM,
14       Bates EPI001232307 to 001232322   452
15   No. 56   E-mail string re Lower Performing
16       OER Footprints, Bates ENDO-OPIOID_
17       MDL-01007694 to 01007695   459
18   No. 57   E-mail re Pharmacy Report -
19       Update (with attachment), Bates
20       EPI002036707 to 002036708  464
21   No. 58   E-mail re Report of Suspected
22       Diversion Form, Bates ENDO00747664   484
23   No. 59   E-mail string re RBD Prescriber
24       Removals for 2P13 (with attachment) 487
```

Page 15

```
 1        E X H I B I T S (Continued)
 2            (Attached to transcript)
 3   ENDO-ROMAINE DEPOSITION EXHIBITS        PAGE
 4   No. 60   E-mail string re Physician removed
 5       from Opana ER call plan by Colleen
 6       Craven, Bates ENDO-OPIOID_MDL-
 7       01861288 to 01861292       516
```

Page 16

```
 1            P R O C E E D I N G S
 2            --------------------
 3        THE VIDEOGRAPHER:  We are now on the
 4   record.
 5        My name is Daniel Holmstock.  I am the
 6   videographer for Golkow Litigation Services.
 7        Today's date is January 10th, 2019.  The
 8   time on the video screen is 9:06 a.m.
 9        This video deposition is being held at
10   the Omni Hotel at 212 Ridge McIntire Road in
11   Charlottesville, Virginia, in the matter of In Re:
12   National Prescription Opiate Litigation.  It's
13   pending before the United States District Court
14   for the Northern District of Ohio, Eastern
15   Division.
16        Our deponent today is Mr. Larry
17   Romaine.
18        Counsel will be noted for appearances on
19   the stenographic record.
20        Our court reporter is Leslie Todd, who
21   will now administer the oath to the witness.
22        LARRY W. ROMAINE,
23    and having been first duly sworn,
24    was examined and testified as follows:
```

Page 17

```
 1            DIRECT EXAMINATION
 2   BY MS. SCULLION:
 3    Q   Good morning, Mr. Romaine.
 4    A   Good morning.
 5    Q   We met briefly off the record, but I'm
 6   Jennifer Scullion, counsel for the plaintiffs in
 7   this action.
 8        Mr. Romaine, have you been deposed
 9   before?
10    A   I have.
11    Q   How many times?
12    A   Once.
13    Q   When was that?
14    A   I believe it was in 2011, but I'm not
15   specific on the date.
16    Q   Was that in connection with a particular
17   lawsuit?
18    A   It was in connection with overtime pay
19   for employees in the pharmaceutical industry.
20    Q   And that was with respect to Endo
21   employees?
22    A   Yes.
23    Q   Was that for sales reps' overtime?
24    A   Sales reps.
```

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q   Okay.  Have you testified in any other
2  depositions?
3    A   No.
4    Q   Have you ever testified in court?
5    A   No.
6    Q   All right.  Have you ever submitted any
7  sworn testimony?
8    A   No.
9    Q   Were you -- did you testify before the
10  New York Attorney General --
11    A   No, I did not.
12    Q   -- ever?  Okay.  Okay.  Great.
13        Well, so you've been through one
14  deposition, and I'm sure counsel has explained to
15  you some of the -- the rules and guidances, but
16  let me just go over some that I think are really
17  helpful.
18        First is I'm going to be asking
19  questions and asking you to answer those
20  questions.  If you don't understand my questions,
21  would you please let me know?
22    A   Okay.
23    Q   Thank you.  Otherwise, I'm going to
24  assume that you understood it.

Page 19

1        There may be objections from time to
2  time, but unless you're instructed not to answer
3  on the ground of privilege and you choose to
4  follow that instruction, you will need to answer
5  the questions.
6        Do you understand that?
7    A   Yes.
8    Q   Okay.  I'm going to try not to speak
9  over your answers, and I'd ask that you not try to
10  speak over my questions.
11    A   Okay.
12    Q   It can get a little difficult.  The
13  reason for that is Leslie, our court reporter,
14  will have difficulty taking everything down if
15  we're talking over each other.
16    A   Okay.
17    Q   Thank you.  We're also going to need to
18  make sure that you give verbal answers, so you
19  can't just nod your head or say "uh-huh" or
20  "huh-uh."  It's got to be actual words so, again,
21  that Leslie can record those.
22    A   Okay.
23    Q   Thank you.
24        We're going to be taking breaks from

Page 20

1  time to time.  If you need a break, please let me
2  know, and we'll try to do that.  The only thing is
3  I would ask that we can't take a break during a
4  question.  So if I ask you a question and it
5  hasn't been answered, we can't take a break.
6  Okay?
7    A   Okay.
8    Q   Okay, great.  Is there any reason that
9  you can't give your best testimony today?
10    A   No.
11    Q   No medication that impairs your -- your
12  cognitive abilities?
13    A   No.
14    Q   Okay.  Fantastic.
15        Are you represented by counsel today?
16    A   I am.
17    Q   And who is that?
18    A   Arnold & Porter.
19    Q   Did you do anything to prepare for
20  today's deposition?
21    A   Yes.
22    Q   What did you do?
23    A   I met with Arnold & Porter and the Endo
24  attorney on Tuesday afternoon and then yesterday,

Page 21

1  which was Wednesday.
2    Q   Did you meet with anyone at any other
3  time to prepare for today's deposition?
4    A   No, I did not.
5    Q   Did you speak with anybody on the phone
6  to prepare for the deposition?
7    A   I spoke with Joanna about the logistics
8  of this prior to coming here.
9    Q   Okay.  Did you speak with anyone else
10  about -- in preparation for the deposition?
11    A   No, I did not.
12    Q   Okay.  Did you -- did you review any
13  documents to prepare for the deposition?
14    A   I did.
15    Q   And what did you review?
16        MR. MORRIS:  I'm going to object and
17  instruct the witness not to answer.  If you want
18  to ask about a specific document, that's fine, but
19  he's not going to give you a list of documents
20  that he reviewed.
21  BY MS. SCULLION:
22    Q   Let me ask you this:  Did you review any
23  documents other than in the presence of counsel to
24  prepare for the deposition?

6  (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1      A   I did not.
2      Q   Did you go, for example, and look at any
3   former e-mails or calendars, any journals,
4   diaries, notes, anything of that sort?
5      A   I did not.
6      Q   Okay.  When you reviewed documents with
7   counsel, did any of those refresh your
8   recollection about events from your employment at
9   Endo?
10     A   Yes.
11     Q   Do you recall what events you had your
12  recollection refreshed on?
13     A   I do.
14     Q   What were those?
15     A   The risk map and the director removal
16  process.
17     Q   The director removal process?
18     A   Mm-hmm, to remove physicians from the
19  call plan.
20     Q   Okay.  The -- risk map, was that the
21  risk map for Opana ER?
22     A   Correct.
23     Q   Was that a document you had been
24  familiar with when you were employed by Endo?

Page 23

1      A   I was familiar with it at one time, but,
2   obviously, over time I -- I had forgotten about
3   it.
4      Q   Hadn't committed that to memory?
5      A   No.
6      Q   And the -- you said the director removal
7   process.  Is that the -- a prescriber removal
8   process?
9      A   Correct.
10     Q   Okay.  And that's a process to remove
11  prescribers from a -- from call plans?
12     A   That's correct.
13     Q   Okay.  And was that something you were
14  familiar with when you were employed with Endo?
15     A   I was familiar with it.
16     Q   Okay.  Any other topics on which your
17  recollection was refreshed by reviewing documents
18  for the deposition?
19     A   We reviewed a lot of documents, but
20  nothing that stands out.
21     Q   Okay.  Was there anything that you
22  wanted to see that you weren't able to see to take
23  a look at?
24     A   No, not that I remember.

Page 24

1      Q   Anything you asked for?
2      A   No.
3      Q   Okay.  All right.  Putting aside
4   preparation for the deposition, did you discuss
5   today's deposition with anyone other than your
6   counsel?
7      A   Just one other person.
8      Q   And who is that?
9      A   My wife.
10     Q   And what did you discuss with her about
11  it?
12     A   That I was coming to the deposition and
13  would be giving a deposition for the next three
14  days.
15     Q   Okay.  Did you have any communication
16  with any former Endo colleagues about today's
17  deposition?
18     A   I did not.
19     Q   Have you had any communication with any
20  former Endo colleagues about this litigation, and
21  that is the In Re:  National Prescription Opiates
22  MDL?
23     A   I have not.
24     Q   Okay.  How did -- how did you come to be

Page 25

1   familiar with this litigation?  How did you come
2   to know about it?
3      A   I was contacted by Joanna.
4      Q   Had you heard about the case before
5   that?
6      A   No.
7      Q   Do you recall approximately when
8   Ms. Percio -- when Ms. Percio contacted you?
9      A   Actually, I take that back.  It was
10  Jobina, and I don't know her last name, at Endo
11  that contacted me first.
12     Q   Okay.  And I apologize, I don't remember
13  Jobina's last name.
14     A   I don't either.
15         MR. MORRIS:  Jones --
16         MS. SCULLION:  Jones?
17         MR. MORRIS:  Jones-McDonnell.
18         MS. SCULLION:  Jones-McDonnell.  Thank
19  you.
20  BY MS. SCULLION:
21     Q   Do you recall approximately when
22  Ms. Jones-McDonnell contacted you?
23     A   It was either late June or early July
24  of -- of last year.

7  (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    MR. MORRIS: And I'll just jump in.
2  Obviously these kinds of questions are fine, and
3  I'm sure that Ms. Scullion is not going to ask
4  you, but don't reveal the content of any
5  discussions that you had with counsel.
6    THE WITNESS: Okay.
7    (Romaine Exhibit No. 1 was marked
8  for identification.)
9  BY MS. SCULLION:
10   Q  Okay. Let's show you what's been marked
11 as Exhibit No. 1.
12   And this is the Amended Notice of
13 Deposition of Larry Romaine. Mr. Romaine, have
14 you seen Exhibit 1 before?
15   A  I have not.
16   Q  So Exhibit 1 is the amended notice of
17 your deposition here today.
18   A  Okay.
19   Q  And in the second paragraph at the end,
20 we've indicated that you were to bring a copy of
21 your most recent curriculum vitae or similar
22 summary of education and work history.
23   Did you bring such a document with you
24 today?

Page 27

1    A  I did not.
2    Q  Were you asked --
3    THE VIDEOGRAPHER: We never set up the
4  speakerphone.
5    (A discussion was held off the record.)
6    MS. SCULLION: So for the record, we
7  just got notice that the speakerphone was not set
8  up for the dial-in. So we're going to take a
9  quick break, get that set up, and we'll continue.
10   THE VIDEOGRAPHER: The time is 9:16 a.m.
11 We're going off the record.
12   (Pause.)
13   THE VIDEOGRAPHER: The time is 9:19 a.m.
14 We're back on the record.
15 BY MS. SCULLION:
16   Q  So we're back on.
17   Mr. Romaine, do you have a -- a CV or a
18 resume that you keep?
19   A  I -- I don't.
20   Q  Okay. Do you have any summary of
21 your -- of your work history that you maintain?
22   A  I don't have anything with me.
23   Q  I'm sorry. I meant, do you -- just at
24 home or on a computer, is that something you keep

Page 28

1  is a CV or a resume?
2    A  I probably have a hard copy somewhere in
3  my home.
4    Q  Okay.
5    MS. SCULLION: Counsel, we -- we have
6  asked for these documents to be produced to
7  release in the deposition. I'm not sure why that
8  hasn't happened, but we would like to get a copy
9  of his -- of his CV as we've asked for.
10   MR. MORRIS: Okay. Well, we'll take
11 that under submission, and you can ask him
12 obviously his employment history.
13   MS. SCULLION: More quickly, let me have
14 that.
15   MS. SCULLION: Let's give -- number 3.
16   (Romaine Exhibit No. 3 was marked
17 for identification.)
18 BY MS. SCULLION:
19   Q  I'm going slightly out of order on the
20 exhibits, so just bear with me.
21   I'm going to hand you what's marked as
22 Exhibit No. 3.
23   A  Do you want this one back?
24   Q  No, you should keep all the exhibits as

Page 29

1  they're handed to you.
2    A  Okay.
3    Q  You can put them aside if you like, but
4  we'll be coming back to exhibits, so just so you
5  know.
6    So Exhibit No. 3 is the Separation
7  Agreement and General Release entered into between
8  Larry Romaine and Endo Pharmaceuticals, Inc.
9    And if you turn to the very last --
10 sorry, second to last page of the exhibit, it is
11 signed by, it looks like, Mr. Romaine on
12 September 1st, 2013. And this was provided to us
13 today by counsel for Endo.
14   Mr. Romaine, do you recognize Exhibit 3?
15   A  I do.
16   Q  And what is it?
17   A  It was my separation agreement from
18 Endo.
19   Q  Okay. And on the page 7 of the
20 agreement, that is your signature?
21   A  Yes.
22   Q  Okay. And if you will look at
23 paragraph 7 on the same page, it's labeled
24 "Cooperation."

8  (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  A  Mm-hmm.
2  Q  Are you here today testifying pursuant
3  to this Cooperation provision in this agreement?
4  A  I'm just reading through Section 7.
5  Q  Sure.
6  A  (Peruses document.)
7  MR. MORRIS:  Objection to form.
8  BY MS. SCULLION:
9  Q  Are you here today pursuant to that
10  provision?
11  A  I'm here today because I was asked to --
12  to come.
13  Q  Okay.  Have you provided any cooperation
14  to Endo in connection with any opioids litigation
15  aside from this deposition?
16  A  I have not.
17  Q  Okay.  Have you been asked to?
18  A  I have not.
19  Q  Okay.  All right.  Let's put Exhibit 3
20  aside.
21  (Romaine Exhibit No. 2 was marked
22  for identification.)
23  BY MS. SCULLION:
24  Q  And I'm going to hand you what's been

Page 31

1  marked as Exhibit No. 2.
2  A  Thank you.
3  Q  Sure.  And Exhibit No. 2 is a copy of
4  the subpoena to testify at deposition in a civil
5  action dated December 31st, 2018, directed to
6  Mr. Romaine in care of Arnold & Porter.
7  And, Mr. Romaine, have you seen
8  Exhibit No. 2 before?
9  A  I have not.
10  Q  Okay.  Were you aware that a subpoena
11  had been served calling for your testimony as well
12  as documents?
13  A  I was aware that when I talked to
14  Jobina that I was being subpoenaed to be -- to do
15  a deposition.
16  Q  Were you aware you were also being
17  subpoenaed to produce documents in connection with
18  the deposition?
19  A  I was requested to bring any documents
20  that I had in my possession.
21  Q  Okay.  Did you search for documents?
22  A  I did.
23  Q  Okay.  And did you find any?
24  A  I did not.

Page 32

1  Q  All right.  When you were with Endo,
2  your principal responsibility was -- was in
3  connection with sales, correct?
4  A  Correct.
5  Q  All right.  And from time to time there
6  were pieces of promotional materials that were
7  used in sales, correct?
8  A  Correct.
9  Q  So it might be, for example, a master
10  visual aid, slim jim, some piece of premium like a
11  lanyard or a pen or anything.  Do you have in your
12  possession at home any such promotional materials
13  with respect to Endo?
14  A  I do not.
15  Q  Okay.  Sometimes people keep these
16  things.
17  A  It's been a while since I left.
18  Q  Okay.  So let's go through your
19  employment history just really very quickly.
20  A  Okay.
21  Q  To remind me, when did you graduate from
22  college?
23  A  1980.
24  Q  Okay.  And what was your degree?

Page 33

1  A  Bachelor in business administration.
2  Q  Okay.  And that was from James Madison?
3  A  Correct.
4  Q  Okay.  And did you then go to work for
5  Bristol-Myers Squibb?
6  A  I actually worked for a year and a half
7  for my father.
8  Q  Okay.  And what were you doing for him?
9  A  He owned a glass company, so I worked
10  with him.
11  Q  Okay, fantastic.  And then you worked
12  for Bristol-Myers Squibb?
13  A  Correct.  It was Bristol-Myers at the
14  time, and then after the merger, Bristol-Myers
15  Squibb.
16  Q  Got it.  And that was as marketing
17  director?
18  A  Well, I started as a sales
19  representative and went through many different
20  roles within the company, but I eventually became
21  a marketing director.
22  Q  Can you just give me a brief overview of
23  the roles that you had.
24  A  I was a sales representative, and then a

9  (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    hospital representative, and then I was a home
2    office trainer, and then a district manager, and
3    then a manager of promotion in the home office.
4    And then I was a product manager, and then a
5    director of one of the divisions.  In marketing.
6        Q    Did you sell or promote any opioids?
7        A    No.
8        Q    When you were product manager, what
9    products did you manage?
10       A    It was a product called Duricef, which
11   was an antibiotic.
12       Q    All right.  And you said you were --
13   ended as a director of a division within
14   marketing.  Which division?
15       A    The anti-infective division.
16       Q    All right.  As a home office trainer,
17   what were you providing training on?
18       A    All the promoted products for the
19   division that I supported, which was the
20   anti-infective division.
21       Q    Were you training on sales techniques,
22   disease state, all of the above?
23       A    Product knowledge and sales skills.
24       Q    Okay.  Thank you.

Page 35

1            Did you provide training on the legal or
2    regulatory constraints on sale and promotion of
3    pharmaceuticals?
4        A    I did not, but we had a department that
5    did that.
6        Q    Okay.  And as a sales rep, you were out
7    calling on physicians?
8        A    Correct.
9        Q    What territory were you in, what area?
10       A    Richmond, Virginia.
11       Q    How long did you do that for?
12       A    About a year.
13       Q    Okay.  And why did you leave
14   Bristol-Myers?
15       A    I got an offer from another
16   pharmaceutical company.
17       Q    And that was ESI?
18       A    Correct.
19       Q    And were you a field sales director
20   there?
21       A    I was a regional director there.
22       Q    Let me make sure I got the dates -- we
23   have some dates, let me make sure they're right.
24   My understanding is Bristol-Myers, you were

Page 36

1    employed from approximately April 1981 to about
2    May 1996; is that right?
3        A    Yes.
4        Q    Okay.  You joined -- is it Eisai?
5        A    Eisai.
6        Q    Thank you.  Eisai.  Whew.  All right.
7            You joined Eisai in around June 1996?
8        A    Yes.
9        Q    And you said as field sales director,
10   correct?
11       A    I was -- started as a regional director
12   and --
13       Q    Thank you.
14       A    -- then became a fields sales director.
15       Q    And did you stay with Eisai till May
16   2003?
17       A    Correct.
18       Q    Did you sell -- sell or promote any
19   opioid products there?
20       A    No.
21       Q    Any controlled substances?
22       A    No.
23       Q    What kind of products were you selling
24   and promoting with Eisai?

Page 37

1        A    We had a product for Alzheimer's
2    disease, and we had a product for GERD, the
3    stomach.
4        Q    Okay.  And then am I correct you joined
5    Endo in June 2003?
6        A    Correct.
7        Q    And what was your title when you joined
8    Endo?
9        A    Director of specialty sales.
10       Q    Let's make sure I have then the whole
11   sequence.
12           Did you -- were you promoted from
13   director of specialty sales directly to VP of
14   sales?
15       A    Correct.
16       Q    When were you promoted?
17       A    June of 2007.
18       Q    Were you the immediate successor to Ron
19   Wickline?
20       A    Yes.
21       Q    Thank you.  And you stayed on as VP of
22   sales through September of 2013; is that right?
23       A    Correct.
24       Q    Okay.  Who hired you at Endo?

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review



Page 38

1    A   Ron Wickline.
2    Q   Did you know Mr. Wickline before?
3    A   I did not.
4    Q   When you were hired as director of
5  specialty sales, Mr. Wickline was then VP of
6  sales, correct?
7    A   Correct.
8    Q   So you reported to him.
9    A   Yes.
10   Q   And do you know who he reported to, by
11 title?
12   A   I believe at the time it was Peter
13 Lankau, who was the, I think, executive
14 vice president of sales and marketing.
15   Q   Okay.  All right.  And you said you were
16 director of specialty sales.  What was specialty
17 sales?
18   A   Specialty sales was the division that
19 called on specialists.
20   Q   As opposed to primary care physicians?
21   A   Primary -- correct.
22   Q   Were there particular specialities that
23 Endo's sales force was calling on at that time
24 when you joined?

Page 39

1    A   I know physical medicine and rehab
2  was -- was one of the specialties.  Pain
3  management physicians were another specialty.  And
4  I don't recall others after that.
5    Q   Okay.  And we'll get into some more
6  detail of that, but when you then became
7  vice president of sales, I take it you then had
8  responsibility for both the specialty and the --
9  is it called pharma --
10   A   Yes.
11   Q   -- side of the sales?
12   A   Correct.
13   Q   And pharma would have been handling the
14 primary care physicians, correct?
15   A   Correct.
16   Q   All right.  When you were promoted in
17 June of 2007, who gave you that promotion?
18   A   David -- I reported to David Kerr at
19 that time.
20   Q   And he was senior vice president for
21 commercial?
22   A   Commercial, mm-hmm.
23   Q   Okay.  And why did you leave Endo in
24 September 2013?

Page 40

1    A   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮
5    MR. MORRIS:  Objection to form.
6  BY MS. SCULLION:
7    Q   If you know.
8    A   Loss of patent protection, loss of
9  revenue.
10   Q   You say loss of patent protection.  Loss
11 of patent protection on a particular product?
12   A   It was several products.
13   Q   On which products?
14   A   I believe Opana ER as well as Voltaren
15 Gel.
16   Q   So if I understand correctly, up until
17 that time Endo had been promoting both of those as
18 branded products, and then when the patent
19 protection was lost, there was a decline in
20 revenue in those products and that resulted ▮▮▮▮
21 ▮▮▮▮▮▮▮▮▮▮▮▮
22   MR. MORRIS:  Objection to form.
23 BY MS. SCULLION:
24   Q   Is that correct?

Page 41

1    A   Correct.
2    Q   Okay.  Thanks.
3  ▮
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5    A   I did.
6    Q   And health -- sorry.  Thank you.
7    And that was September 2013?
8    A   Yes.
9    Q   And did you stay with inVentiv until May
10 2014?
11   A   No, I stayed with them until September
12 of 2018.  They actually merged --
13   Q   To Syneos?
14   A   Yes.
15   Q   Yeah.  Thank you.
16   Okay.  What was your title -- when you
17 first joined inVentiv Health, were you VP of sales
18 and sales support?
19   A   Yes.
20   Q   Okay.  Did you then become senior vice
21 president of sales?
22   A   Yes.
23   Q   And that was in June 2014?
24   A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q   Okay.  And you said you stayed with --
2    and that was when it became Syneos in 2014; is
3    that right?
4    A   I actually -- I think it was later than
5    that.  I don't know the specific date.
6    Q   But at some point inVentiv became
7    Syneos.
8    A   Syneos.
9    Q   All right.  And you stayed with then
10   Syneos through September 2018?
11   A   Correct.
12   Q



24   Q   Okay.  And have you been employed since

Page 43

1    leaving Syneos?
2    A   I have not.
3    Q   Okay.  Since you left Endo, have you
4    kept in touch with any of your former Endo
5    colleagues?
6    A   Several.
7    Q   Which ones?
8    A   Kevin O'Brien, Ron Jackson, and Janett
9    Mendez DeTore.
10   Q   Any others?
11   A   No, not really.
12   Q   Ron Wickline?
13   A   No.
14   Q   David Kerr?
15   A   No.
16   Q   Demir Bingol?
17   A   No.
18   Q   Kristin Vitanza?
19   A   No -- I actually saw Kristin.  She
20   worked for a company that I did some work for when
21   I was at Syneos.
22   Q   Okay.
23   A   But I just saw her one time in a
24   meeting.

Page 44

1    Q   And that was just in the work context?
2    A   Mm-hmm.
3    Q   I apologize, we're going to need to say
4    "yes" and "no."
5    A   Yes.  Yes.
6    Q   It's not easy to remember.
7        MR. MORRIS:  You've been doing great so
8    far, but good -- good reminder.
9        MS. SCULLION:  Yeah.
10   BY MS. SCULLION:
11   Q   Linda Kitlinski?
12   A   No.
13   Q   Okay.  Neil Shusterman?
14   A   No.
15   Q   Okay.  Brian Lortie?
16   A   No.
17   Q   Okay.
18   A   I -- I have seen Brian Lortie since --
19   actually, in a restaurant one time, but I have not
20   kept in contact with him.
21   Q   Have you kept in contact with any sales
22   reps from Endo?
23   A   None that I can recall.
24   Q   And just to make sure, with Mr. Jackson,

Page 45

1    have you ever discussed this litigation with
2    Mr. Jackson?
3    A   No.
4    Q   Have you since leaving Endo discussed
5    with any of the folks you mentioned, Mr. O'Brien,
6    Mr. Jackson, Ms. DeTore -- or Mendez-DeTore,
7    Endo's sale or promotion of opioids?
8    A   No.
9        MS. SCULLION:  Let me get the
10   demonstrative.  We're going to mark.
11       So we have two demonstratives we plan to
12   use today.  I was thinking about marking those
13   separately than just regular exhibits as DX, or do
14   you have a preference?
15       MR. MORRIS:  Well, let's mark them -- I
16   think just mark them as exhibits.
17       MS. SCULLION:  Just mark them as
18   exhibits.  All right.  So this will be Exhibit 4.
19   Sorry about that.
20       (Romaine Exhibit No. 4 was marked
21       for identification.)
22   BY MS. SCULLION:
23   Q   So, Mr. Romaine, I'm handing you what
24   has been marked as Exhibit No. 4, and this is just

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  a timeline that we thought would be helpful for
2  orientation throughout the day about certain
3  events.
4        A   Okay.
5        Q   I'll present to you we have put at the
6  bottom of the -- of Exhibit 4 in footnotes
7  citations to documents from where we're getting
8  these dates for various events.  If at any point
9  you believe any of these dates are actually wrong,
10  please let me know, but they really are just --
11  just for orientation purposes today.
12        A   Okay.
13        Q   Because it has been I think some years,
14  and these -- this spans some years, and I think it
15  will be helpful.
16        MR. MORRIS:  And I'll just insert an
17  objection noting that, you know, foundation.
18  Whether he knows whether dates are wrong, he may
19  not know any of that too.  But you asked him to
20  note if the dates are wrong, he may not even know.
21  So...
22  BY MS. SCULLION:
23        Q   I certainly only want you to speak today
24  on things you actually know.

Page 47

1        A   Okay.
2        Q   Before you get into the timeline, we've
3  been talking today about -- or I've been using the
4  term "Endo."  I just want to be clear when I'm
5  using the term "Endo," I'm talking about both the
6  defendants in this action, which are Endo
7  Pharmaceuticals, Inc. -- I believe that was --
8  that was your employer, correct?
9        A   Correct.
10        Q   Okay.  That's on the separation
11  agreement we looked at.
12        -- as well as Endo Health Solutions,
13  Inc.  I'm going to just call them both together
14  Endo.
15        And Endo Health Solutions, Inc., I
16  think, used to be called Endo Pharmaceuticals
17  Holdings, Inc., was the former name.  That also is
18  included when I say "Endo."
19        A   Okay.
20        Q   And if -- if there were any companies
21  that were acquired, brought in as operating
22  companies, subsidiaries of Endo, those are
23  going -- those are included within the term "Endo"
24  when I use that.

Page 48

1        Is that okay?
2        A   Yes.
3        MR. MORRIS:  And I'm going to object
4  on -- to form, legal conclusion, and lack of
5  foundation.  He may or may not know the details of
6  any of those companies.
7  BY MS. SCULLION:
8        Q   I'm just -- I'm just -- I'm not asking
9  you to sort of separate out Endo and any Endo
10  subsidiaries that may have come in while you were
11  employed with them.  If they're under Endo, I'm
12  just calling it all Endo.
13        A   Okay.
14        Q   If you have any questions about that
15  along the way, if you want to be clear about
16  whether I'm talking about one entity or a
17  subsidiary, please let me know.
18        A   Okay.
19        Q   Okay.  Thanks.
20        MR. MORRIS:  I'll still object to form,
21  foundation, legal conclusion.
22  BY MS. SCULLION:
23        Q   So, Mr. Romaine, just to make sure we're
24  all on the same page, do you recall Endo was

Page 49

1  founded in 1997; is that correct?
2        MR. MORRIS:  Objection to form.
3        THE WITNESS:  I think so.
4  BY MS. SCULLION:
5        Q   Okay.  Do you remember Carol Emon --
6  Ammon and some others had acquired a portfolio of
7  products from DuPont Merck when they formed Endo?
8        A   Yes.
9        Q   Okay.  And -- and those products
10  included Percocet, correct?
11        A   Correct.
12        Q   Those products also included something
13  called Numorphan, correct?
14        MR. MORRIS:  Objection to form and
15  foundation.
16        THE WITNESS:  I'm not familiar with
17  Numorphan.
18  BY MS. SCULLION:
19        Q   Okay.  But do you -- do you recall that
20  the Endo name itself though went back to like the
21  1920s and had quite a history?
22        MR. MORRIS:  Objection.  Form,
23  foundation, legal conclusion.
24        THE WITNESS:  I wasn't -- I didn't have

13  (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  the knowledge of that.
2  BY MS. SCULLION:
3     Q   Okay.  Do you recall that Percocet
4  itself was introduced in 1976?
5     A   I--
6        MR. MORRIS:  Objection.  Form and
7  foundation.
8        THE WITNESS:  I don't know the date of
9  that.
10       MS. SCULLION:  Okay.  Just one second.
11       (Counsel conferring.)
12  BY MS. SCULLION:
13    Q   Percocet was a product that you sold
14  when you were with Endo?
15    A   They were phasing it out as I was coming
16  in.
17    Q   But it was sold while -- while you were
18  with Endo, correct?
19    A   By our sales force.
20    Q   Okay.  And do you recall that's a
21  product that was oxycodone and APAP?
22    A   Yes.
23    Q   Okay.  And oxycodone, that's a class 2
24  narcotic, correct?

Page 51

1     A   Yes.
2     Q   All right.  And it's the same narcotic
3  that's in OxyContin?
4     A   I -- yes.
5     Q   Okay.
6        MS. SCULLION:  Can we mark this as the
7  next exhibit.
8        (Romaine Exhibit No. 5 was marked
9        for identification.)
10       MS. SCULLION:  No, I marked my copy.
11       Thanks.
12  BY MS. SCULLION:
13    Q   Let me hand you what's been marked as
14  Exhibit No. 5.  And this is Bates-stamped
15  ENDO-CHI_LIT-00151712.
16       Mr. Romaine, before we look through the
17  document, I just want to orient you a little bit
18  to one of the things we tried to do here.
19       If you look in the upper right-hand
20  corner of the document, you see it says E1186.1?
21    A   I'm sorry.  Can --
22    Q   The top right.
23    A   Oh, yes.  I'm sorry.
24    Q   Yeah.  So what we try to do throughout

Page 52

1  the day is we're going to try and have these "E"
2  numbers on the documents so it's a little bit
3  easier to follow through than the lengthy numbers
4  at the bottom, but just to give you some
5  orientation.
6        And if you look at Exhibit No. 5, this
7  is an e-mail from you to Meera Mehta in March of
8  2011, correct?
9     A   Yes.
10    Q   And you're telling Ms. Mehta that you've
11  made some adjustments to the attached document,
12  let's use this as the final version.
13       The documents attached appears to be a
14  PowerPoint presentation that you used for new hire
15  training in March of 2011, correct?
16    A   That's what it looks like.
17    Q   Okay.  And if you will turn to page
18  E1186.8, it says "The Endo Story."
19    A   Oh.
20    Q   And this looks like it's essentially a
21  timeline overview of some history with respect to
22  Endo, correct?
23    A   That's what it looks like.
24    Q   Okay.  And is this something that you

Page 53

1  would present to new hires as a way to sort of
2  orient them to the company?
3     A   I don't recall, but that's -- looks like
4  what it could be.
5     Q   Okay.  If you'll look on the bottom
6  left-hand corner of the page, you see it says,
7  "Endo founded 1920"?
8     A   Yes.
9     Q   Does that sound about right to you?
10       MR. MORRIS:  Objection.  Form.
11       THE WITNESS:  I -- I don't recall.
12  BY MS. SCULLION:
13    Q   Okay.  And then you see it says, "Endo
14  sold to DuPont in 1969"?
15    A   Yes.
16    Q   Okay.  And then above that, it says,
17  "Percocet launched 1976."
18    A   Yes.
19    Q   And again, does -- does that seem about
20  right to you?
21    A   Again, I don't recall.
22    Q   Do you recall that Percocet, though, had
23  launched many years before the Endo that you
24  worked for was founded?

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    A   Yes.
2    Q   Okay. It was -- it was a pretty mature
3 product by the time you came to the company,
4 correct?
5    A   I don't --
6        MR. MORRIS: Object to form.
7        THE WITNESS: I don't -- I don't know.
8 BY MS. SCULLION:
9    Q   You don't know whether it was mature or
10 not?
11   A   I -- I don't know when it was -- I
12 wasn't at the company at the time.
13   Q   No, when you joined in 2003 --
14   A   Yes.
15   Q   -- and Endo was still selling Percocet,
16 by that point it was -- it was a fairly mature
17 product, though, right?
18   A   I would assume so.
19   Q   Okay. And that's what it indicates here
20 in your presentation, that Percocet was launched
21 in 1976, and Endo was still selling Percocet in
22 2003, correct?
23       MR. MORRIS: Objection to form.
24       THE WITNESS: They were still selling it

Page 55

1 in 2003.
2 BY MS. SCULLION:
3    Q   Okay. And moving up the timeline on
4 this page, it says, "Opana brand launched 2006."
5 Do you see that?
6    A   Yes.
7    Q   Okay. And the Qualitest acquisition at
8 the very top, 2010, do you see that?
9    A   Yes.
10   Q   Did you have any role in the Qualitest
11 acquisition?
12   A   I did not.
13   Q   Okay. All right. So put this aside for
14 a moment.
15       When you joined Endo in 2003, the
16 specialty sales force was at that point detailing
17 on Percocet, right?
18   A   Yes.
19   Q   Okay. And when you left Endo in 2013,
20 Endo as a company was still selling Percocet,
21 correct?
22   A   I wasn't involved in that. I don't -- I
23 don't know.
24   Q   Are you aware that Endo, even if it

Page 56

1 wasn't promoting it for the sales force, was still
2 selling Percocet in 2013?
3    A   I'm assuming other areas or functions in
4 the company had responsibility for that. I did
5 not. So I was taken away from that.
6    Q   Okay. But from time to time did you see
7 reports that would show they were still selling
8 Percocet in 2013, sales numbers?
9    A   I never -- I don't recall. I don't
10 recall seeing reports.
11   Q   Okay. If you go back to Exhibit No. 4,
12 the little timeline. Now, you joined in
13 June 20 -- 2013 -- no, sorry, June 2003.
14   A   Correct.
15   Q   And do you recall, though, that Endo had
16 launched some various strengths and variants on
17 Percocet over the years? So on this timeline,
18 January of 2003, there was a launch of a couple of
19 variants, 7.5/500, 10/650, 2.5/325, and then in
20 January of 2002, there is a launch of the 7.5/325
21 and the 10/325.
22       Do you recall that?
23       MR. MORRIS: Objection. Form and
24 foundation.

Page 57

1        THE WITNESS: I don't recall.
2 BY MS. SCULLION:
3    Q   Okay. And then January of 2004, do
4 you recall that Endo had a relaunch of the 2.5/325
5 strength?
6    A   Yes.
7    Q   All right. That was something that you
8 were involved in?
9    A   Yes.
10   Q   All right. And then next on the
11 timeline, you see "June 2005, Launch of generic
12 oxycodone." Do you recall that Endo for a period
13 did sell generic oxycodone?
14   A   I -- I don't recall that.
15   Q   Do you recall one way or the other?
16   A   No.
17   Q   Okay. And then next is June 2006, the
18 approval of Opana ER/IR. Do you recall that?
19   A   Yes.
20   Q   Okay. And then in December 2011, there
21 was approval for a reformulated version of -- of
22 Opana ER, correct?
23   A   Correct.
24   Q   All right. And do you recall that in

15 (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  February of 2012, there was discontinuation of the
2  original version of Opana ER?
3         MR. MORRIS: Objection to form.
4         So my -- I have an objection to form and
5  foundation, but if you can answer the -- if you
6  can answer the question, you can.
7         THE WITNESS: Oh, I didn't hear the
8  question. I'm sorry.
9  BY MS. SCULLION:
10     Q   So I apologize. Let me try a new
11  question. It may be easier.
12         So there was approval for reformulated
13  Opana ER in December of 2011.
14     A   Yes.
15     Q   Do you recall then after that in 2012,
16  the original version of Opana ER was discontinued,
17  and then approximately April 2012 there was the
18  actual commercial launch of the reformulated
19  version?
20     A   Yes.
21     Q   Okay. And I think you explained that
22  then in 2013, Opana ER faced generic competition
23  for -- from a generic version of oxymorphone,
24  correct?

Page 59

1     A   Correct.
2     Q   As VP of sales, were you aware that Endo
3  was also selling not only Opana in tablet oral
4  form but also in IV and suppository forms?
5     A   Yes.
6     Q   Okay. And those were also oxymorphone
7  preparations, correct?
8     A   Correct. That was outside of my scope
9  of responsibility, though.
10     Q   But you were aware those were being
11  sold.
12     A   I was aware that there was --
13         In fact, there -- there was some effort
14  to have a continuum of care between the forms
15  used in the hospital setting and -- and after
16  hospital?
17         MR. MORRIS: Objection. Foundation.
18         THE WITNESS: I don't recall that.
19  BY MS. SCULLION:
20     Q   Okay.
21     A   I didn't have hospital responsibility.
22     Q   Okay. All right. "Outpatient" was the
23  word I was looking for and lost. Thank you.
24         MR. MORRIS: Noted for the record. It

Page 60

1  never kicked in.
2         MS. SCULLION: There are more coming.
3  That happens these days.
4  BY MS. SCULLION:
5     Q   And do you recall that the -- that the
6  IV and suppository preparations of oxymorphone had
7  at one point been branded as Numorphan?
8     A   I don't recall that.
9     Q   Don't remember the name at all for
10  Numorphan?
11     A   No.
12     Q   Okay. Are you aware, though, that the
13  IV and suppository forms of oxymorphone had been
14  sold by Endo prior to the June 2006 approval of
15  Opana ER and IR?
16         MR. MORRIS: Objection. Form and
17  foundation --
18         THE WITNESS: I don't recall that.
19         MR. MORRIS: -- legal conclusion.
20         Just as a reminder, you've been doing
21  great, but not speaking over also includes my
22  objections. It's hard for the court reporter. So
23  we apologize. Question, if I object, then go
24  ahead with your answer.

Page 61

1         THE WITNESS: Okay.
2         MR. MORRIS: You're doing great, though.
3         THE WITNESS: Sorry.
4         MR. MORRIS: No, that's okay. You're
5  doing great. This is a totally unnatural
6  environment.
7  BY MS. SCULLION:
8     Q   So we spoke a little bit about the
9  concept of controlled substances. Let's make sure
10  that we're on the same page.
11         You understand that opioids are a
12  controlled substance?
13     A   Yes.
14     Q   And they are classified as a class 2
15  narcotic?
16     A   Yes.
17     Q   All right. And is it fair to say
18  class 2 narcotics are not regulated the same as
19  other prescription medications, correct?
20     A   I -- I believe so.
21     Q   Okay. They're tightly controlled due to
22  the known inherent risks of those products?
23     A   Right, with a black box warning.
24     Q   Okay. What are some of the risks that

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  you understand are inherent in prescription
2  opioids?
3      A  I think if they're taken inappropriately
4  or prescribed inappropriately, based on the black
5  box warning, there is risk for addiction.
6      Q  So the risk for addiction, your
7  understanding, is only if they're taken
8  inappropriately?
9      A  It -- there's a black box warning, so,
10 you know, patients have to be aware.
11     Q  Just to make sure I understand, though,
12 is there a risk of addiction if they are taken
13 inappropriately?
14     A  There's risk for addiction when you're
15 taking those.  So physicians have to warn
16 patients, and patients have to be aware of that.
17     Does that answer your question?
18     Q  I guess the question is, are those
19 risks -- those risks exist only when the product
20 is being taken inappropriately?
21     MR. MORRIS:  Objection.  Form,
22 foundation.
23 BY MS. SCULLION:
24     Q  I'm just trying -- and you said --

Page 63

1  that's how you initially phrased it.  I'm just
2  making sure I understand.
3      A  Yeah, the risks -- the risk exists, and
4  patients and physicians have to be aware of that.
5      Q  Okay.  Do those risks exist if the
6  product is being taken appropriately?
7      A  The risk is at any time.  Hence, the
8  black box warning.
9      Q  Okay.  Are there other risks associated
10 with prescription opioids?
11     MR. MORRIS:  Objection.  Foundation.
12     THE WITNESS:  I don't -- I don't recall.
13 BY MS. SCULLION:
14     Q  Do you recall there's risks of abuse?
15     A  I think based on the black box warning
16 that there is -- there is abusive potential.
17     Q  Okay.  A risk of misuse?
18     A  Risk of misuse.
19     Q  Risk of diversion?
20     A  Risk of diversion.
21     Q  What do you understand "diversion" to
22 mean?
23     A  Being prescribed inappropriately or
24 taken when you're not -- it's not really

Page 64

1  indicated.
2      Q  Does diversion also include phony
3  prescriptions, for example?
4      A  Yes.
5      Q  What other channels of diversion did you
6  become aware of with respect to prescription
7  opioids?
8      MR. MORRIS:  Objection.  Form.
9      THE WITNESS:  I don't recall.
10 BY MS. SCULLION:
11     Q  Internet pharmacies?
12     A  I wasn't aware of internet pharmacies.
13     Q  Okay.  You weren't aware that there was
14 a widespread problem of internet pharmacies
15 selling prescription opioids?
16     A  I don't recall that.
17     Q  Okay.  How about just plain theft of
18 opioids from a relative's medicine cabinet?
19     A  Yes.
20     Q  That was a problem?
21     MR. MORRIS:  Objection to form.
22     THE WITNESS:  Obviously it could be a
23 problem.
24 BY MS. SCULLION:

Page 65

1      Q  That was a problem you became aware did
2  occur from time to time?
3      A  I -- I have heard of it in the news,
4  yes.
5      Q  Okay.  How about patients getting
6  multiple prescriptions for opioids and selling
7  their pills?
8      A  I'm not -- I'm not specifically aware of
9  any of that.
10     Q  Were you aware that that was an issue
11 that did occur, though, with prescription opioids?
12     A  I've heard that in the news, yes.
13     Q  Okay.  You only heard it in the news?
14     A  I -- I don't recall any other time.
15     Q  As vice president of sales for Endo, you
16 were overseeing Endo's sale of Opana ER, correct?
17     A  I was overseeing our sales organization.
18     Q  Okay.  And that included the sales
19 organization with respect to Opana ER, correct?
20     A  Correct.
21     Q  And they were also selling Opana IR,
22 correct?
23     A  For a short period of time, yes.
24     Q  Okay.  And when you first joined Endo,

17  (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    I'm sorry, as director of specialty --
2        A  Specialty sales.
3        Q  -- specialty sales, you were overseeing
4    the specialty sales -- sales force that was
5    selling Percocet, at least for some time, correct?
6        A  Correct.
7        Q  And those are all prescription opioids,
8    right?
9        A  Correct.
10       Q  Did you ever get any training on what
11   the various known channels of diversion were with
12   respect to prescription opioids?
13       A  We were trained if we heard any
14   information about diversion to call a compliance
15   hotline.  That's how we trained our sales force.
16   They weren't involved in that.
17       Q  Let me make sure I understand.
18           Did you, though -- did you get training
19   about what all the possible channels of diversion
20   are with respect to prescription opioids?
21       A  I don't recall specifically that I
22   was -- we were trained.
23       Q  You mentioned there was a compliance
24   hotline, I think you said, correct?

Page 67

1        A  Mm-hmm.
2        Q  We're going to need you to say "yes" or
3    "no."
4        A  Yes.
5        Q  Thank you.
6           And so tell me again, what was your
7    understanding of the -- the procedure with respect
8    to reporting diversion?
9        A  There was a number that the
10   representatives could call if they suspected
11   diversion.
12       Q  So if a -- a representative means a
13   salesperson, correct?
14       A  Mm-hmm.
15       Q  Okay.  So the --
16       MR. MORRIS:  You've got to -- sorry.
17       THE WITNESS:  Yes.  I'm sorry.
18   BY MS. SCULLION:
19       Q  So if a salesperson, an Endo salesperson
20   in the field suspects there is diversion occurring
21   in the geographic area that they're working in,
22   what are they supposed to do -- what were they
23   supposed to do?
24       A  They would contract their district

Page 68

1    manager, and then they -- and the district manager
2    would tell them or they would know to call this
3    hotline for investigation.
4        Q  Were they supposed to do anything else?
5        A  They reported up through the channels,
6    and that came through their district manager, and
7    then it would go to our compliance department for
8    investigation.
9        Q  Were you ever involved in any of those
10   investigations?
11       A  No.
12       Q  Was anyone outside compliance involved
13   in the investigations?
14       A  I don't know that.
15       MR. MORRIS:  Objection.  Form and
16   foundation.
17   BY MS. SCULLION:
18       Q  Was the sales department involved in
19   those investigations?
20       A  No.
21       Q  And if the result of that
22   investigation -- well, let me ask you, so -- so
23   what would compliance do after they completed
24   their investigation?  Would they ever communicate

Page 69

1    back to the sales department on the results of
2    their investigation?
3        A  They would communicate back if -- if
4    they -- if they found it to be a -- that there was
5    diversion and that that person was removed from
6    our -- our call plan.
7        Q  So if compliance confirmed there was
8    diversion, then the provider would be removed from
9    the call plan?
10       A  Yes.
11       Q  Would anything else happen?
12       A  I -- I don't know what happened after
13   that.  It was outside of my responsibility.  I'm
14   sure there were -- I do know that other people --
15   it was triaged to other departments to work --
16   work on, but I don't know what that was.
17       Q  So what do you -- what do -- what's your
18   understanding of what you mean by "triaged to
19   other department to work on"?
20       A  So if -- if there was diversion taking
21   place, it was triaged to and probably -- and other
22   departments were responsible for reporting that,
23   and an investigation through the government
24   probably at that point.

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1     Q   Do you know one way or the other about
2   whether other departments were in fact responsible
3   to report diversion to any government authorities?
4     A   I do know there were -- there were
5   departments that had that responsibility, but I --
6   I didn't work closely with them.
7     Q   Which departments were those?
8     A   I don't know the names of the
9   departments.  I don't recall.
10    Q   Do you have a sense of what -- what the
11  areas of responsibility they had generally?  I
12  mean you don't need to give names.  I'm just
13  trying to understand -- you're thinking of
14  something.  I'm trying to understand what you're
15  thinking of.
16    A   I -- I just know it was -- that it was
17  triaged to other departments to be handled, but I
18  don't know what happened after that.
19    Q   Okay.
20    A   I do know the company took it very
21  seriously.
22    Q   Took what very seriously?
23    A   Took any form of potential diversion.
24    Q   But you don't recall, for example, ever

Page 71

1   getting any training as VP of sales -- sales
2   specifically about diversion?
3     A   We did train on what to look for with
4   diversion.
5     Q   And when you say "what to look for,"
6   what do you mean?
7     A   You know, potential factors that might
8   give you a clue that diversion could be taking
9   place in some of these offices.
10    Q   Are you talking about looking for pill
11  mills?
12    A   Yes.
13    Q   All right.  What's your understanding of
14  what a pill mill is?
15    A   My understanding of a pill mill is that
16  it's a -- it's a -- it was physicians' offices
17  that were prescribing but maybe didn't have a
18  brick and mortar office, and they were just
19  prescribing for patients who were looking for
20  opioids.
21    Q   And Endo provided the sales force with
22  training on what to look for to try to see if
23  there was a pill mill, correct?
24    A   Tried to identify if it could

Page 72

1   potentially be a pill mill, correct.
2     Q   Okay.  All right.  Was there any other
3   training that Endo provided with respect to
4   potential diversion?
5     A   I -- I don't recall.
6     Q   Okay.  And so -- and going back to our
7   discussion of the risks inherent in a prescription
8   opioid, was overdose a -- an inherent risk?
9     A   I think it is a risk, and that was
10  included in the black -- issues in the black box
11  warning.
12    Q   Okay.  And the risks that are in the
13  black box and that we've talked about, addiction,
14  abuse, misuse, diversion, overdose, those are real
15  risks with prescription opioids, correct?
16        MR. MORRIS:  Objection.  Form.
17        THE WITNESS:  Yes.
18  BY MS. SCULLION:
19    Q   They're not some theoretical phobia,
20  anything like that; those are actual risks.
21    A   Correct.
22    Q   Okay.  And you would agree that
23  companies that manufacture and sell and distribute
24  prescription opioids have obligations to -- to

Page 73

1   take reasonable steps to -- to address those
2   risks.
3     A   Correct.
4     Q   Okay.  And so, for example, an
5   obligation to monitor for possible diversion.
6     A   Yes.
7         MR. MORRIS:  Objection to form.
8   BY MS. SCULLION:
9     Q   And an ob- --
10        MR. MORRIS:  Legal conclusion.
11  BY MS. SCULLION:
12    Q   And an obligation to -- to report
13  suspected diversion.
14        MR. MORRIS:  Objection to form, legal
15  conclusion, foundation.
16        THE WITNESS:  Yes.
17  BY MS. SCULLION:
18    Q   Okay.  And an obligation to try to -- to
19  prevent potential diversion?
20        MR. MORRIS:  Objection to form, legal
21  conclusion, foundation.
22        THE WITNESS:  Yes.
23  BY MS. SCULLION:
24    Q   And your counsel is raising an objection

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  to legal conclusion.
2       I'm asking -- let me ask the same
3  questions about an obligation to try to prevent
4  diversion, monitor for diversion, report
5  diversion. Even putting aside legal obligations,
6  you would agree that a reasonably responsible
7  corporation should be undertaking those -- those
8  steps, correct?
9       MR. MORRIS: Objection. Form,
10  foundation, legal conclusion still.
11       THE WITNESS: Yes. Which is why we had
12  processes in place to be able to report.
13  BY MS. SCULLION:
14       Q   And the process that -- that you
15  identified is sales reps and district managers
16  being able to report suspected pill mills and have
17  compliance investigate, correct?
18       A   For further investigation, correct.
19       Q   Okay. Anything else that the sales
20  department was doing to monitor for potential
21  diversion?
22       A   They had -- I mean, they had a way to
23  report it. That's all I can -- that's all I
24  remember.

Page 75

1       Q   As vice president of sales, were you
2  ever asked to undertake any -- any other efforts
3  to monitor potential diversion of Endo's
4  prescription opioids?
5       A   I don't recall that.
6       Q   Did you ever inquire whether further
7  steps should be taken to monitor for potential
8  diversion beyond having the -- the compliance
9  hotline that can be called?
10       MR. MORRIS: Objection. Form,
11  foundation.
12       THE WITNESS: I did not, because, again,
13  it was out of my area of responsibility and
14  expertise.
15       MS. SCULLION: Okay. We've actually
16  been going just about an hour. I was going to
17  suggest we take a quick break and then come back.
18  Is that okay?
19       MR. MORRIS: Sure.
20       THE WITNESS: Yes.
21       THE VIDEOGRAPHER: The time is
22  10:07 a.m. We're going off the record.
23       (Recess.)
24       THE VIDEOGRAPHER: The time is

Page 76

1  10:23 a.m., and we're back on the record.
2  BY MS. SCULLION:
3       Q   Welcome back, Mr. Romaine. You
4  understand that you're still under oath?
5       A   I do.
6       Q   Thank you.
7       When you joined Endo in 2003, is it
8  correct that Endo was in the process of revamping
9  its -- its sales force?
10       MR. MORRIS: Objection to form.
11       THE WITNESS: I don't recall the
12  specifics.
13  BY MS. SCULLION:
14       Q   Do you recall at some point in time
15  before you had joined, Endo's sales force was
16  largely outsourced through inVentiv --
17       A   Yes.
18       Q   -- correct?
19       Okay. And we're going to try not to
20  speak over each other. I apologize.
21       And when you joined in 2003, was there
22  an effort ongoing at that time to create a larger
23  in-house sales force within Endo?
24       A   When -- when I joined in 2003, we had

Page 77

1  a -- an in-house sales force of 70
2  representatives.
3       Q   And by the time you left Endo, do you
4  know what that grew to approximately?
5       A   I don't recall specifics, but I think at
6  one point with inVentiv as well as Endo, there
7  were probably in the neighborhood of four to 500
8  representatives.
9       Q   Can I show you -- I have 1186.
10       MS. SCULLION: Oh, that's Exhibit 5?
11  Thank you very much.
12  BY MS. SCULLION:
13       Q   Can we look back at Exhibit 5.
14       And if you will turn --
15       A   Let me double-check this it -- this --
16  okay.
17       Q   Yeah. And, again, this is the new hire
18  presentation from 2011 that you were using.
19       If you go to the page we've marked at
20  the top E1186.10, it says "Targeted Sales &
21  Marketing."
22       And again, this is in 2011. It
23  indicates here that the national sales force
24  consisted at that point of 418 Endo sales

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    representatives, 228 inVentiv sales professionals,
2    75 urology representatives, and 27 medical center
3    representatives.
4          Do those numbers sound about right for
5    2011?
6       A   Yes.
7       Q   All right.  So the size of the sales
8    force had grown considerably since the time you
9    had joined Endo.
10      A   Correct.  Keep in mind, though, we had
11   different divisions that had -- these people were
12   selling different products.  So...
13      Q   Okay.  And as vice president of sales in
14   2011, you were overseeing the entire national
15   sales force, though, correct?
16      A   I -- I did not have urology
17   representatives or the medical center
18   representatives.
19      Q   Okay.  Who oversaw --
20      A   And the inVentiv representatives were
21   obviously contract.
22      Q   Let me take those pieces apart.
23          Urology representatives, who oversaw
24   those?

Page 79

1       A   A gentleman by the name of Marty Lutz.
2       Q   And the medical center representatives,
3    who oversaw those?
4       A   I think Marty had those as well.
5       Q   I take it the urology representatives
6    were calling on urologists specifically?
7       A   Correct.
8       Q   All right.  And was that in connection
9    with the Fortesta product?
10      A   Yes.
11      Q   Okay.  And the medical center
12   representatives, I assume they're calling on
13   medical centers, but what types of medical centers
14   were they calling on?
15      A   I'm not sure, but I know they had a
16   product called Supprelin, which they sold.
17      Q   Okay.  So neither the urology nor the
18   medical center representatives were detailing on
19   the -- on Opana, correct?
20      A   Correct.
21      Q   All right.  But as to the Endo sales
22   professionals and the inVentiv sales
23   professionals -- let me just back up.
24          The inVentiv sales professionals were

Page 80

1    contracted in, correct?
2       A   Correct.
3       Q   But as VP of sales, were you still
4    overseeing their contracted work?
5       A   Yes.
6       Q   All right.  Did the Endo sales
7    professionals and the inVentiv sales professionals
8    all receive the same training?
9       A   Yes.
10      Q   All right.  So they would receive
11   training in sales skills, for example?
12      A   And product knowledge.
13      Q   All right.  And -- okay.  And by
14   "product knowledge," that includes disease state?
15      A   Correct.
16      Q   All right.  And just to sort of orient
17   and make sure we're on the same page, I want to
18   talk about the structure of -- of the sales force.
19          So -- so starting at the field level,
20   you've got salespeople in the field and some of
21   them are employed by Endo and some are contracted
22   through inVentiv, correct?
23      A   Correct.
24      Q   And we've talked about that they're

Page 81

1    split between pharma and specialty divisions,
2    correct?
3       A   Well, and at one point -- the structure
4    of the sales force ebbed and flowed a lot over the
5    years, but at one point they became all one.  So a
6    representative would have responsibility for all
7    the physicians in a certain geography.
8       Q   Do you recall what point in time that
9    occurred?
10      A   I don't recall specifically.
11      Q   Was it towards the end of your time with
12   Endo?
13      A   It was probably in the 2011 period,
14   yeah.
15      Q   And to make sure I understand correctly,
16   whatever time frame that happened, sounds like
17   maybe 2011, the distinctions between pharma and
18   specialty ceased to exist and it became one
19   unified sales force?
20      A   Correct.
21      Q   All right.  And did it remain that way
22   until you left Endo?
23      A   Yes.
24      Q   Okay.  In terms of -- I think you

21 (Pages 78 to 81)

Page 82

1    mentioned the word "territory."  Each salesperson
2    was assigned to at least one sales territory,
3    correct?
4         A    There were -- yes, but there were
5    overlaps sometime of physicians.
6         Q    So you could have two different sales
7    reps responsible for a given physician if there
8    was overlap.
9         A    Right.
10        Q    Okay.
11        A    And in many cases it might have been an
12   Endo representative and an inVentiv representative
13   in the same overall geography.
14        Q    Okay.  One thing I did want to clarify,
15   were there -- within the inVentiv group, were
16   those also split between pharma and specialty, or
17   was specialty solely Endo in-house?
18        A    Specialty was mainly Endo in-house.
19        Q    Okay.  And was pharma mainly inVentiv,
20   or was that split?
21        A    It was mainly inVentiv.
22        Q    Okay, so pharma.  And then the -- there
23   were sales territories that -- geographic areas
24   that were assigned out, correct?

Page 83

1         A    Correct.
2         Q    Okay.  And the territories were then
3    grouped into districts; is that right?
4         A    Yes.
5         Q    All right.  And did each district have a
6    district manager?
7         A    Yes.
8         Q    And am I correct that the district
9    manager would be working within that geographic
10   district, would be in that district itself?
11        A    Yes.
12        Q    Okay.  And the district manager, you're
13   talking about being district manager with
14   Bristol-Myers, right?
15        A    Many years ago, yes.
16        Q    Okay.  And is it typically the case at
17   Endo that the district manager was someone who had
18   been a salesperson?
19        A    Yes.
20        Q    All right.  They were experienced.
21        A    Yes.
22        Q    Okay.  And they're working with the
23   sales -- salespeople within their district,
24   correct?

Page 84

1         A    Correct.
2         Q    They're leading that district?
3         A    Yes.
4         Q    All right.  And the districts were then
5    organized into regions, correct?
6         A    Yes.
7         Q    All right.  And each region had a
8    regional business director assigned to it,
9    correct?
10        A    Correct.
11        Q    Now, the regional business director,
12   were they -- were their offices in the region or
13   were they sometimes back at Endo's headquarters in
14   Pennsylvania?
15        A    They worked from their home, so they
16   worked out of a home office in their home.
17        Q    Okay.
18        A    But they also spent a lot of time in our
19   home -- home office.
20        Q    That would be in Chadds Ford,
21   Pennsylvania?
22        A    Chadds Ford.
23        Q    Okay.  And the regional business
24   director again is someone who generally had -- had

Page 85

1    some field sales experience themselves?
2         A    Yes.
3         Q    And then they probably had some
4    managerial experience before they were made a
5    regional business director, correct?
6         A    Plus other experiences in a home office
7    environment like operations or marketing or
8    something like that.
9         Q    Okay.  And the district managers report
10   up to their regional business directors?
11        A    That's correct.
12        Q    And the regional business directors
13   reported to you?
14        A    That's correct.
15        Q    And the regional business directors,
16   they were leading their regions.
17        A    Yes.
18        Q    Correct?  Okay.
19             We talked about some of the numbers over
20   time.  Okay.
21             So for the sale -- the field
22   salespeople, those are sometimes called sales
23   reps, correct?
24        A    Mm-hmm.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 86

1    Q   If I use the term --
2    A   Yes.
3    Q   -- salespeople --
4    A   Yes.
5    Q   -- that means the same thing?
6    A   Yes.
7    Q   Okay.  And the principal activity they
8    engaged in was going out and calling on healthcare
9    professionals in their territory, correct?
10   A   That's correct.
11   Q   And that's called detailing?
12   A   Yes.
13   Q   Okay.  How many days a week were they
14   out detailing on average?
15   A   It was --
16       MR. MORRIS:  Objection to form.
17       THE WITNESS:  The -- can you clarify,
18   the sales representative?
19   BY MS. SCULLION:
20   Q   Yes.
21   A   Five.
22   Q   And they're generally trying to see
23   around eight to ten healthcare providers a day?
24   A   Usually around six.

---

Page 87

1    Q   Okay.  Sometimes more, sometimes less?
2    A   Mm-hmm.
3    Q   I need you to say "yes" or "no."
4    A   Yes.  I'm sorry.
5    Q   Thank you.
6        And when we talk about a detailing, can
7    you describe what detailing would entail, what it
8    would look like?
9    A   A representative would go in for a sales
10   presentation to a physician and they would give
11   full prescribing information.  So there may be
12   several products that they're talking to that
13   individual physician about, so they would go
14   through their -- their sales presentation and
15   they would have materials that would guide them,
16   that were marketing pieces that they would use to
17   guide them.  And then they would talk about the
18   benefits the product might have for a particular
19   patient or the dosing of that particular product
20   and -- and the side effects that could potentially
21   happen with a product like that.
22   Q   Okay.  When a salesperson is going to --
23   to detail, they're also talking to the office
24   staff?

---

Page 88

1    A   That's correct.
2    Q   The nurses?
3    A   Yes.
4    Q   Physicians assistants?
5    A   Yes.
6    Q   They're expected to sort of get to know
7    the entire office, correct?
8    A   They had -- yeah, they built a
9    relationship with the office, yes.
10   Q   Okay.  What was the value of building a
11   relationship for a salesperson?
12       MR. MORRIS:  Objection.  Form.
13       THE WITNESS:  To enhance their
14   relationship in the overall office.
15   BY MS. SCULLION:
16   Q   And why was that important for a
17   salesperson?
18   A   It's a trusting relationship that
19   they -- they created and built.
20   Q   Okay.  And they're building that
21   trusting relationship with -- again, with the
22   staff of the -- of the office?
23   A   The entire office, yes.
24   Q   Including the -- the physicians.

---

Page 89

1    A   Yes.
2    Q   Okay.  Were they -- I think you
3    mentioned they're using marketing materials, so
4    those would include, for example, what, brochures?
5    A   Brochures.
6    Q   Dosing guides?
7    A   Yes.
8    Q   It could include reprints of articles --
9    of studies?
10   A   That were approved for use.
11   Q   Correct.  Okay.
12       I think also we talked about they can
13   include premiums like pens, lanyards, things that
14   just have the brand name on them, correct?
15       MR. MORRIS:  Objection to form.
16       THE WITNESS:  Yes, but those were phased
17   out based on pharma guidelines.
18   BY MS. SCULLION:
19   Q   Can you explain what you mean by that?
20   A   Pharma guidelines changed where you
21   couldn't use promotional -- we called it
22   tchotchkes in -- in the industry.  So they only
23   used promotional pieces with information about the
24   product.

---

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q   Okay.  And the promotional pieces
2  would -- would include, for example, as we said,
3  sort of the dosing guides, correct?
4    A   Correct.
5    Q   Approved reprints?
6    A   Correct.
7    Q   Okay.  And you said that sales reps
8  would talk to the physicians, correct?
9    A   Correct.
10    Q   And they're trying to persuade the
11  physician about why this product may be
12  appropriate for certain patients, correct?
13    MR. MORRIS:  Objection to form.
14    THE WITNESS:  I don't know if I would
15  use the word "persuade."  I think they're -- they
16  built a trusting relationship, and they're
17  educating and providing resources as far as what
18  the product can and cannot do.
19  BY MS. SCULLION:
20    Q   Okay.  Sometimes they would also have
21  lunch with the -- the office staff, correct?
22    A   That's correct.
23    Q   Would they have lunch with the
24  physician?

Page 91

1    A   Yes.
2    Q   Might be showing a promotional video on
3  a portable CD player, for example?
4    A   Correct.
5    Q   All right.  And on average, how much
6  time would a salesperson have with a physician to
7  be presenting information about a product?
8    MR. MORRIS:  Objection to form and
9  foundation.
10    THE WITNESS:  Just to clarify, for --
11  for a lunch are you speaking of?
12  BY MS. SCULLION:
13    Q   Actually, let me put aside -- putting
14  aside lunches, if they're just coming in and just
15  speaking --
16    A   Okay.
17    Q   -- on average, how much time are they
18  getting?
19    A   They're independent.  Could be 5
20  minutes, it could be 15 minutes.
21    Q   Okay.  But that -- that would -- in your
22  experience, that would be sort of the --
23    A   The window.
24    Q   -- the window.  Okay.

Page 92

1    It could be a lot less than 5 minutes
2  sometimes?
3    A   At times it could be less than
4  5 minutes.
5    Q   Okay.  As you said, sometimes they --
6  they would have lunch, and those presumably would
7  be a little bit longer?
8    A   Correct.
9    Q   Okay.  And were representatives,
10  salespeople also going out and visiting
11  pharmacies?
12    A   Throughout the course of my tenure at
13  Endo, there were times that we did call on
14  pharmacies and there were times when we did not.
15    Q   So you said "call on pharmacies."  When
16  did representatives calls on pharmacies?
17    A   From -- just to clarify, from like what
18  years did they call an pharmacies?
19    Q   Yes.
20    A   I don't recall specifics there.  I do
21  remember towards the end we didn't call on
22  pharmacies.
23    Q   Okay.  And when you say "call on
24  pharmacies," what do you mean by "call on

Page 93

1  pharmacies"?
2    A   Typically we would stop in and just say
3  that you're in this area, you're calling on
4  several physicians in this area, and what products
5  you're actually promoting to see if they had any
6  questions.
7    Q   Okay.  Would the representatives be
8  expected to also check in on whether their
9  products -- sorry, the products that they were
10  promoting with Endo were being stocked by the
11  pharmacies?
12    A   They could potentially ask that
13  question.
14    Q   Okay.
15    A   Most of the time they would know.
16    Q   Most of the time, I say --
17    A   They would know if they --
18    Q   -- they would already know?
19    A   Yeah.
20    Q   Okay.  They were expected to know that?
21    MR. MORRIS:  Objection to form.
22    THE WITNESS:  I don't -- I wouldn't say
23  they were expected to know that, but -- but they
24  did know it.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1  BY MS. SCULLION:
2      Q   They generally did know.
3      A   Yeah.
4      Q   Okay.  All right.
5          MS. SCULLION:  Can we have E842, please.
6          (Romaine Exhibit No. 6 was marked
7          for identification.)
8  BY MS. SCULLION:
9      Q   I hand you what's been marked as
10 Exhibit No. 6, and it's Bates-stamped ENDO_OPIOID_
11 MDL-02489842.
12     And, Mr. Romaine, again, to make it a
13 little bit easier, especially with a document like
14 this, in the top corner we've put these "E"
15 numbers.  This says E0842.1 on the front page.
16     A   Okay.
17     Q   And if you see, the "E" numbers continue
18 in the upper right-hand corners of the PowerPoint
19 presentation.
20         Mr. Romaine, do you recognize Exhibit 6,
21 the PowerPoint attached?
22     A   I do not.
23     Q   Okay.  Do you see that this is -- on the
24 page E842.3, the front page of the PowerPoint says

Page 95

1  it's "ENDOSell Training Program.  Your Custom
2  Guide for Selling Success."  On the right-hand
3  side, it says "Pharma/Specialty," and then it says
4  "Released July 2006."
5      Do you see that?
6      A   Yes.
7      Q   Do you recall there being an ENDOSell
8  training program that was provided to pharma and
9  specialty salespeople in 2006?
10     A   I don't recall specific -- specifically
11 the training program, but I do know that
12 throughout my course there we constantly trained.
13     Q   Okay.  So this would be an example of --
14 of a training program on sales skills given to the
15 sales representatives, correct?
16         MR. MORRIS:  Objection to form and
17 foundation.
18 BY MS. SCULLION:
19     Q   You can look through it.
20     A   I need to look it over, yeah.  (Peruses
21 document.)  I'm sorry.
22     Q   Have you had a chance to look through
23 the document?
24     A   Yes.

Page 96

1      Q   Does it appear to be a PowerPoint
2  presentation for a sales skills training?
3      A   Yes.
4      Q   All right.  If you'll go to the next
5  page E842.4, sort of a visual.  Is this a visual
6  representation of the sales process on which the
7  representatives were being trained at this time?
8          MR. MORRIS:  Objection.  Form,
9  foundation.
10         THE WITNESS:  I don't recall, but it
11 looks -- looks like something that would be part
12 of a training program.
13 BY MS. SCULLION:
14     Q   And does it -- it looks like a
15 representation of a sales process, right?  I mean
16 you start with "Engender Thinking."  There is a
17 "Needs Identification" that would be identifying
18 the needs of the prescribers, correct?
19     A   Correct.
20     Q   All right.  Having a dialogue is the
21 next one, that you might have a dialogue with the
22 prescriber, correct?
23     A   Correct.
24     Q   And it says there:  "Deliver the Core

Page 97

1  Selling Message."
2      A   Yes.
3      Q   Those would be the core selling messages
4  that Endo had determined for a particular product,
5  correct?
6      A   That's correct.
7      Q   All right.  And the representatives were
8  expected to deliver those messages, correct?
9      A   Correct.
10     Q   Okay.  And then next there's, "Objection
11 Handling, Addressed -- Addressing Questions and
12 Concerns."
13     What was objection handling in your
14 experience?
15     A   My experience would be if there was --
16 if there was a concern as to why they weren't
17 using a certain product, to try to understand what
18 their big issue was so that they could clarify and
19 be a resource.
20     Q   Okay.  And what was the purpose of
21 clarifying and being a resource?
22     A   Well, I think one is to make sure you
23 understand what the needs of the customer are; and
24 two, is there a way to provide the benefit the

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1    product could give them for their offices.
2         Q   So is there a way to address the
3    objection such that the prescriber might consider
4    then using the product?
5         A   Yes.
6         Q   Okay.  And then the next step is:
7    "Summary Close, Actionable, Measurable."
8             So that's closing -- closing the sale,
9    correct?
10        A   Correct.
11        Q   Okay.  And you agree that the bottom
12   line job of a sales representative for Endo was in
13   fact to get the physicians to write prescriptions
14   in the end for the products, right?  That was --
15   that was the goal of their job.
16            MR. MORRIS:  Objection to form.
17            THE WITNESS:  I think -- I don't agree
18   with the way that you've phrased that.  I think
19   the goal and the responsibility of the
20   representative is to be a resource and an educator
21   for an office and provide information.
22   BY MS. SCULLION:
23        Q   But if they couldn't actually get the
24   physicians to use the products clinically, then

Page 99

1    they really couldn't stay on as a sales rep,
2    correct?
3             MR. MORRIS:  Objection to form.
4             THE WITNESS:  I go back to, I think, you
5    know, a good representative is building a
6    relationship with the office, they're being a
7    resource, they're educating the office, and if
8    they do that correctly, everything else will come.
9    BY MS. SCULLION:
10        Q   Meaning that prescriptions will be
11   written for products?
12        A   If they -- if they satisfy the needs of
13   the office, yes.
14        Q   Okay.  But that's -- and their job was
15   to try and figure out how to satisfy those needs
16   so that there would be prescriptions written for
17   the products they're promoting, correct?
18        A   Their job is to be a resource and an
19   educator for the office.
20        Q   Okay.  But -- but you -- your message
21   was -- to your sales professionals was that
22   representatives had to sell, for example, Opana ER
23   clinically, and if they couldn't do that, they
24   couldn't stay with Endo.

Page 100

1             MR. MORRIS:  Objection to form --
2             THE WITNESS:  I think if --
3             MR. MORRIS:  -- foundation.
4             THE WITNESS:  I think if they can't be a
5    resource for the office, and they don't have the
6    information, they're not qualified for the
7    position.
8    BY MS. SCULLION:
9         Q   But that -- but what that meant, bottom
10   line, was if they can't sell Opana ER clinically,
11   they can't stay with Endo, correct?
12        A   I wouldn't say --
13            MR. MORRIS:  Objection to form.
14            THE WITNESS:  -- you can't stay with
15   Endo.  I don't -- I don't -- I don't agree with
16   kind of the terminology here.  Because I think the
17   representative -- a good representative is a
18   professional, and they're an educator and they're
19   providing a benefit to the office.  They're
20   educating them on the benefits of the product,
21   side effects, all of the information, so the
22   physician can make an informed decision.  And in
23   the end, if they make a good informed decision,
24   sales will come.

Page 101

1             MS. SCULLION:  Well, let's get E1203 and
2    the demonstrative that goes along with that.
3             Let's mark the demonstrative first and
4    then the other.
5             (Romaine Exhibit Nos. 7 and 8 were
6    marked for identification.)
7    BY MS. SCULLION:
8         Q   Mr. Romaine, I'm going to hand you
9    what's marked as Exhibits 7 and 8.
10        A   Thank you.
11        Q   And Exhibit 7 is a demonstrative we put
12   together, which is a transcription of what is in
13   Exhibit 8, which is a voicemail recording produced
14   to us.
15            And, Mr. Romaine, what I was going to
16   suggest is if you read along -- along in Exhibit 7
17   while we play Exhibit 8.
18        A   Okay.
19            MS. SCULLION:  Can we play Exhibit 8.
20            (Exhibit No. 8 played:)
21            "MR. ROMAINE:  Good morning, this is
22   Larry, and this message is going out to the region
23   business directors, Tom and Ian.  Hope you guys
24   had a great weekend.  And we're starting off a new

26  (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   week, which is great, and the second week, the
2   second run of our POAs.  And as we all know, these
3   meetings are extremely important for us to ensure
4   that we get our people laser-focused on what we
5   have to deliver on the second half of the year,
6   and more importantly, Opana ER.
7         "I sent you a couple e-mails yesterday.
8   There are a few glimmers of maybe we're seeing
9   some, some trendline growth with Opana ER, mainly
10  from retail source ordering from wholesalers have
11  been going up and all -- across all strengths and
12  also our factory orders.  What we ship to trade
13  the wholesalers have been going up as well.  So we
14  had a couple of really good days last week, which
15  was the first since supply disruption.  So I'm
16  hoping those are all critical signs that we're
17  going to see a pop in the TRx's.  And granted, the
18  pop in TRx's is what we absolutely need.  If you
19  noticed, our stock went down, dropped below 30 on
20  Friday, which was really a tipping point I think
21  for the organization.  So we're going to have to
22  keep a close eye on it over the course of the next
23  couple of weeks here, but the conference call, the
24  staff meeting today I think is really important

Page 103

1   for us to kind of ground in what we saw, what we
2   need to deliver on this week, and what we have to
3   see from our people from the targeting and a
4   messaging standpoint with -- with customers right
5   now.  And my biggest concerns are there's still a
6   lot of discussions around supply disruption, a lot
7   of discussion around AEs, a lot of discussion
8   around just new formation and copay card versus a
9   clinical sell.  And if we have reps out there, I
10  don't care who they are, that can't sell Opana ER
11  clinically, they can't be with Endo.  Okay?  So
12  let's -- let's make sure that we're really
13  validating that.  The other is that I really
14  mandated internally that we minimize the time that
15  people are out of the field.  I saw a note the
16  other day where reps were assisting with
17  interviewing.  I don't want that to happen.  I
18  want to make sure our people are in the field
19  selling, not doing other ancillary things.  Those
20  are nice things to do, but right now we are in
21  crisis mode to get Opana ER up and running, and
22  we've got to have every rep in the field whenever
23  we possibly can.  So I appreciate your focus on
24  this and making sure this happens.

Page 104

1         "Thanks, guys.  Have a great day.  Talk
2   to you today in the staff meeting."
3   BY MS. SCULLION:
4         Q    Thank you.
5             Mr. Romaine, do you recognize what we
6   just played as a voicemail that you sent out to
7   the region business directors?
8         A    Yes.
9         Q    And that was, according to the metadata
10  provided to us, in June of 2012.  Does that sound
11  about right?
12        A    Yes.
13        Q    Okay.  And June 2012, Endo was beginning
14  its commercialization of the reformulated version
15  of Opana ER, right?
16        A    Yes.
17        Q    Okay.  And -- and you described in the
18  voicemail that Endo was -- was in crisis mode at
19  that point, correct?
20        A    Correct.
21        Q    And the crisis mode was that it was time
22  to get Opana ER reformulated up and running,
23  right?
24        A    Well, the crisis mode really -- this

Page 105

1   refers to we had a supply outage, so we had many
2   pharmacies, many wholesalers that no longer had
3   product, and we were trying to get it back into
4   the distribution channels.
5         Q    But you're talking to the region --
6         A    I think the crisis mode, just to go back
7   to that --
8         Q    Go ahead.
9         A    -- was we had a lot of patients that
10  were on Opana ER, and we wanted to make sure that
11  we could continue to provide them with supply,
12  because it's -- it's a -- it was a long duration
13  of product that they were taking, and there was a
14  concern they would have to be switched to other
15  products if we could not do that.  So that was
16  really the crisis of it.
17        Q    But -- but you're not talking to --
18  you're not sending this voicemail out to the folks
19  who are in the supply chain and distribution --
20        A    No.
21        Q    -- functions, right?  This is going to
22  the sales force.
23        A    This is -- this was going to regional
24  business directors --

27 (Pages 102 to 105)

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Q   To region, and they're in charge of the
2  sales force.
3    A   Correct.
4    Q   Right?  So you're -- you're talking
5  about the crisis mode to get Opana ER up and
6  running with respect to the sales force.
7    A   Right.  Which --
8    Q   All right.
9    A   Which goes back to we had a number of --
10 a lot of patients out there that were on Opana
11 that no longer could get supply.  We had to find a
12 way to get supply to them.
13   Q   When you say "get supply," how would
14 the -- how would the regional business directors
15 get supply to them?
16   A   They would -- the reps would be calling
17 on physicians and they would prescribe for -- for
18 an existing patient a new supply of product.
19   Q   Right.  So -- so -- so the getting
20 Opana ER up and running from a sales perspective
21 was reps going out to physicians and getting
22 prescriptions for the reformulated version of
23 Opana ER.
24   A   I don't recall --

Page 107

1        MR. MORRIS:  Objection to form --
2        THE WITNESS:  I'm sorry.
3        MR. MORRIS:  Objection to form and
4  foundation.
5        THE WITNESS:  I don't recall at the time
6  if it was the reformulated or not.  I just -- I
7  don't remember that.
8  BY MS. SCULLION:
9    Q   Okay.  And you said in this voicemail,
10 you were clear that:  "If we have reps out there,
11 I don't care who they are, that can't sell
12 Opana ER clinically, they can't be with Endo."
13 Right?
14   A   Correct.
15   Q   And you meant that they should no longer
16 be a sales representative with Endo, correct?
17   A   Well, their role and responsibility is
18 to clinically be able to sell and educate and be a
19 resource for offices, and if they can't do that
20 job, they shouldn't be with the company.
21   Q   Okay.  But -- but bottom line, that is
22 they have to sell Opana ER clinically, right?
23   A   They have to sell it --
24       MR. MORRIS:  Objection to form.

Page 108

1        THE WITNESS:  They have to be able to
2  sell it clinically.
3  BY MS. SCULLION:
4    Q   Okay.  And you in fact said that further
5  up in the voicemail, that you're looking --
6  "You're going to see a pop in the TRx's, and the
7  pop in the TRx's is what we absolutely need."
8        That meant an increase in prescriptions,
9  correct?
10   A   I'm just going back to that.  Just one
11 moment.
12   Q   Yeah.
13   A   (Peruses document.)
14   Q   It's on Exhibit 7, it's about halfway
15 through the paragraph.
16   A   Correct.
17   Q   So the pop in TRx's meant an increase in
18 prescriptions, right?
19   A   Yes.
20   Q   All right.  Now, going down from "pop in
21 TRX's" -- one, two, three, four, five -- about six
22 lines where you were discussing "my biggest
23 concerns are."  Do you see that?
24   A   I'm -- I'm just trying to catch up.  I

Page 109

1  apologize.
2    Q   Sure.
3    A   Can you say that one more time what I'm
4  looking for?
5    Q   Yeah, it's the sentence where you began,
6  "And my biggest concerns are there are a lot of
7  discussions around supply disruption."
8    A   Yes.
9    Q   So you said your concerns were
10 discussions around supply disruption, a lot of
11 discussion around AEs -- that's adverse events,
12 right?
13   A   Correct.
14   Q   A lot of discussion around just new
15 formulation and copay card versus a clinical sell,
16 right?
17   A   Yes.  Yes.
18   Q   And so you were saying you wanted to see
19 less discussion around supply disruption, AEs, new
20 formulation and copay card; what you really wanted
21 to see was discussion around clinical sell.
22       MR. MORRIS:  Objection.  Found-- --
23 BY MS. SCULLION:
24   Q   Right?

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1      MR. MORRIS: Objection. Foundation and
2  form.
3          THE WITNESS: I don't recall
4  specifically what -- what this was meaning at the
5  time. But I know they -- it's important for them
6  to be able to provide a clinical sell to the
7  office.
8  BY MS. SCULLION:
9      Q   Okay. And you thought they were
10  spending too much time discussing supply
11  disruption, adverse events, and new formulation?
12          MR. MORRIS: Objection. Form,
13  argumentative.
14          THE WITNESS: I -- I don't recall that.
15  BY MS. SCULLION:
16      Q   Well, that's what it says here, right?
17  I mean, "My biggest concerns are there are a lot
18  of discussions around supply disruption, a lot of
19  discussion around AEs, a lot of discussion around
20  just new formulation, and copay card versus a
21  clinical sell."
22      A   I don't --
23      Q   That's what it says.
24      A   I don't recall this specific dialogue

Page 111

1  having it, but I mean I heard my voice, so --
2      Q   That's what you said in your own voice.
3      A   And that was based on information I was
4  getting from the regional directors.
5      Q   Okay.
6          MS. SCULLION: Can I have 1202?
7          I'm sorry, you know what, actually you
8  can hold it. We can hold it.
9  BY MS. SCULLION:
10      Q   So we looked at the sales skills
11  training, one example of sales skill training.
12  That was the ENDOSell, Engender Thinking
13  PowerPoint?
14      A   Yes.
15          MS. SCULLION: Okay. Can we look at 396
16  and 247. Thank you.
17          (Romaine Exhibit Nos. 9 and 10
18          were marked for identification.)
19  BY MS. SCULLION:
20      Q   I hand you what's been marked as
21  Exhibits 3 -- oh, sorry -- 9 and 10. And is it --
22  9 is -- is that -- is that what you have your hand
23  on, 9?
24      A   This is -- yes, this is 9.

Page 112

1      Q   Thank you. I handed you the right one.
2          So Exhibit 9, for folks on the phone, is
3  ENDO-CHI_LIT-00473817, and we marked it E396, and
4  Exhibit 10 is Bates-stamped ENDO-OPIOID_
5  MDL-05654763, and we've marked it as E247.
6          And, Mr. Romaine, my only question is,
7  on Exhibit 9, if you look through that, is that an
8  example of again a PowerPoint presentation used in
9  connection with training of sales representatives,
10  this time with respect to the specialty doctor and
11  their use of opioids? So really disease state.
12  Well, a little more than disease state.
13  "Understanding the specialty MD and their use of
14  opioids."
15          MR. MORRIS: Objection to form and
16  foundation.
17          THE WITNESS: I'm just taking a moment
18  to --
19  BY MS. SCULLION:
20      Q   Yeah, please.
21      A   -- to review the document.
22          (Peruses document.)
23      Q   So, Mr. Romaine --
24      A   I'm sorry, I don't remember your

Page 113

1  question.
2      Q   That's okay. For Exhibit 9, this is a
3  PowerPoint presentation of the training provided
4  to Endo sales reps, correct?
5      A   I -- I don't recall this -- this
6  presentation.
7      Q   Well, if you look on page E396.2, the
8  second page, you see in the bottom left corner of
9  the PowerPoint page there, it says: "For Sales
10  Training Purposes Only."
11      A   Yes.
12      Q   So this was intended to be used for
13  sales training, correct?
14      A   That's what it looks like, yes.
15      Q   Okay. And in fact, if you turn to
16  page E396.35.
17      A   396. --
18      Q   -- 35.
19          Do you see this PowerPoint is talking
20  about physicians -- physician attitudes?
21      A   Mm-hmm.
22      Q   "What are the biggest concerns that PCPs
23  have in using opioids to manage chronic pain?"
24  You see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    A  Yes.
2    Q  And PCPs there means primary care
3  physicians, right?
4    A  Yes.
5    Q  All right.  And if you look underneath
6  at the speaker's notes, do you see A, B -- the C:
7  "Ask about the last quote.  How many of you think
8  that some of your customers confuse
9  pseudoaddiction with drug seekers?  Is this fair?"
10      Do you see that?
11   A  Yes.
12   Q  And customers there would be referring
13  to physicians, correct?
14   A  I don't know.  I'm -- I'm not going to
15  assume.  I don't know what it means there because
16  I don't recognize this document.
17   Q  Okay.  I mean, but this -- this pretty
18  clearly is a document that was prepared to train
19  Endo's sales representatives on -- on this page,
20  for example, one of the biggest concerns that
21  primary care physicians have in using opioids to
22  manage chronic pain, right?  That's what it says.
23   A  Yes.
24   Q  Okay.  And this is the kind of training

Page 115

1  that Endo did provide to its sales representatives
2  in connection with the promotion of Opana ER,
3  correct?
4      MR. MORRIS:  Object -- objection.  Form,
5  foundation.  Excuse me.
6      THE WITNESS:  I -- I -- I'm not familiar
7  with this document, but there was ongoing training
8  that took place at all times --
9  BY MS. SCULLION:
10   Q  Was there training, for example --
11   A  -- for our sales team.
12   Q  I'm sorry, I didn't mean to cut you off.
13   A  No, I -- I'm finished.  I'm sorry.
14   Q  Was there training, for example, on the
15  concerns that primary care physicians had in using
16  opioids to manage chronic pain?  Was that an area
17  of the training?
18   A  I -- I don't recall that specifically
19  myself.
20   Q  Do you recall there being training on
21  the -- the risks associated with prescription
22  opioids that we discussed earlier, diversion,
23  abuse, addiction?
24   A  There was training.  The company took it

Page 116

1  very seriously.  We always trained on that, yes.
2    Q  Okay.  There was training provided to
3  sales representatives on those issues, correct?
4    A  Yes, that is correct.
5    Q  Okay.  And if you look at Exhibit 10, do
6  you see it says, "The Oxymorphone Learning System,
7  Module 3"?
8    A  Yes.
9    Q  "Oxymorphone Risk Management Program" --
10   A  Yes.
11   Q  -- "for sales training background
12  purposes only," correct?
13   A  Correct.
14   Q  And this was a module used as part of
15  that training on the risks associated with, in
16  this case, oxymorphone?
17   A  Yes.
18   Q  Okay.  Mr. Romaine, in addition to
19  training -- and we've talked about some training
20  on sales skills, training on risks associated
21  with -- with prescription opioids -- sales
22  representatives were also provided with various
23  sales tools, correct?
24   A  Yes.

Page 117

1    Q  Those could be, for example, master
2  visual aids.
3    A  Yes.
4    Q  Correct?
5      All right.  Sell sheets?
6    A  Yes.
7    Q  Slim jims?
8    A  Yes.
9    Q  Approved reprints, we talked about.
10   A  Yes.
11   Q  Right?
12      Dosing guides?
13   A  Yes.
14   Q  Conversion guides with respect to
15  opioids?
16   A  Yes.
17   Q  Okay.  And we talked about videos,
18  correct?
19   A  Mm-hmm.  Yes.
20   Q  Okay.  And sales representatives were
21  compensated, in part, through incentive
22  compensation plans, correct?
23   A  That's correct.
24   Q  All right.  And those basically were

30  (Pages 114 to 117)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  cash bonuses if sales of specified products grew
2  by certain amounts or met certain levels during
3  specified periods, correct?
4       A   They had --
5           MR. MORRIS:  Objection.  Form.
6           THE WITNESS:  They had goals in their
7  territory, and if they met those goals, they
8  received incentive compensation for reaching those
9  goals.
10  BY MS. SCULLION:
11      Q   Okay.  And those were goals with respect
12  to sales of particular products that were being
13  promoted, correct?
14      A   Right.
15      Q   All right.  And is it fair to say the
16  incentive compensation was an important part of
17  compensation for sales representatives?
18      A   Well, it wasn't the bulk of their
19  compensation.  The bulk of their compensation was
20  their salary.
21      Q   But it was an important part.
22      A   It was -- it was a percentage of their
23  total compensation.
24      Q   It was intended to incentivize them to

Page 119

1  meet or exceed their sales goals, for example.
2       A   It was intended to make sure that they
3  were a resource and an educator for their
4  physicians that they called on.
5       Q   Well, that was -- that was their basic
6  job, right, was to -- to be that resource and --
7       A   That was their job.
8       Q   That was their job.  The incentive
9  compensation was designed to incentivize them to
10  reach those sales goals.  That was part of that
11  job.
12      A   It was designed to reward them for their
13  overall performance.
14      Q   Well, they're called incentive
15  compensation plans, right?
16      A   Mm-hmm.  Yeah, that's correct.
17      Q   And so this was compensation that was
18  designed to be an incentive, correct?
19          MR. MORRIS:  Object to the form.
20          THE WITNESS:  It -- it was an incentive
21  for them to, you know, reach their overall goals.
22  BY MS. SCULLION:
23      Q   Okay.  And would they be -- could they
24  earn greater bonuses if they exceeded their sales

Page 120

1  goals?
2       A   Yes.
3       Q   Okay.  So there is also incentive to
4  exceed your sales goals.
5       A   Yes.
6       Q   Okay.  And so the salespeople had
7  incentive compensation.  Is it correct also that
8  the district managers and regional business
9  directors also had incentive compensation?
10      A   Yes.
11      Q   All right.  And did you have incentive
12  compensation?
13      A   I did.
14      Q   All right.
15      A   It was based on corporate goals.
16      Q   Right.  So --
17      A   Overall corporate goals.
18      Q   -- to make sure I understand, so the
19  district managers and regional business directors,
20  their incentive compensation, though, was based on
21  sales goals for the district level or the regional
22  level; is that right?
23      A   That's correct.
24      Q   All right.  Whereas you, as the

Page 121

1  vice president of sales, your incentive
2  compensation was based on overall corporate goals.
3       A   Overall corporate goals and objectives.
4       Q   Okay.  All right.  And with respect to
5  the salespeople in the field, in addition to
6  incentive compensation plans, from time to time
7  there were specific contests that might be run for
8  a shorter period focused on a particular product,
9  correct?
10      A   That's correct.
11      Q   All right.  And there were some of those
12  contests that were run with respect to Percocet,
13  for example.
14      A   I don't recall that.
15      Q   We'll maybe show you some documents and
16  we'll see.
17      A   Okay.
18      Q   Okay.  Do you recall there being
19  contests run for Opana ER?
20      A   I don't specifically recall that, but --
21      Q   Okay.  Again, we'll try and look at some
22  documents then.
23      A   Okay.
24      Q   In addition to contests, were there also

31  (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    awards given to sales representatives; for
2    example, President's Club, Circle of Excellence?
3        A    Yes.
4        Q    Okay.  And in the contests, the sales
5    representatives might earn cash rewards, correct?
6        A    Can you restate that question?  I'm
7    sorry.
8        A    Sure.  In the contests, going back to
9    the contests, sales representatives could earn
10   cash awards?
11       A    I think there were multiple ways of
12   rewarding them, but cash was one, yes.
13       Q    Okay.  Were there sometimes rewards of
14   being given a pretty nice car to be used as
15   your -- your company car, like a BMW?
16       A    When I first joined the company, there
17   was one contest I do recall like that.
18       Q    Okay.  Was that the Grand Prix contest?
19       A    Yes.
20       Q    Yeah, it goes with the car, I guess.
21   Okay.
22            Sometimes the reps could earn hotel
23   rooms for the national sales meeting, that might
24   be a reward?

Page 123

1        A    I don't recall that one specifically,
2    but potentially could, yes.
3        Q    Okay.  So you mentioned you did recall
4    they sometimes could earn cash rewards.  What
5    other kind of rewards could they earn in these
6    contests?
7        A    I'm trying to think.  Sometimes there
8    were gifts, things like that, that they could earn
9    as part of the incentive contests.
10       Q    Okay.  Do you recall that in 2007,
11   Endo --
12            This was after Opana ER was launched.
13       A    Okay.
14       Q    -- that Endo had specifically analyzed
15   what makes a successful sales rep?
16       A    I don't recall that.
17            MS. SCULLION:  So let's mark the --
18   1249, please.
19            And this is 11, right?  Thank you.
20            (Romaine Exhibit No. 11 was marked
21            for identification.)
22   BY MS. SCULLION:
23       Q    Mr. Romaine, I'm going to hand you
24   what's been marked as Exhibit No. 11.

Page 124

1        A    Thank you.
2        Q    And it is Bates-stamped ENDO_OPIOID_
3    MDL-02167 -- I'm sorry, 6273, and there's a number
4    cut off.
5            MS. SCULLION:  Do you have the last
6    digit?
7            MR. MORRIS:  It's 1.
8            MS. SCULLION:  Thank you.
9    BY MS. SCULLION:
10       Q    So 2162731.
11           All right.  And in the top right-hand
12   corner, again we have the E numbers.  This is
13   E1249.  It starts at 1249.1.
14           So, Mr. Romaine, at the top of the first
15   page of Exhibit 11, do you see this is an e-mail
16   from you to Maria Lane, Mike Weber, Bret Anderson?
17       A    Yes.
18       Q    Okay.  And this was sent in December --
19   December 20, 2007.  Do you see that?
20       A    Yes.
21       Q    And it's referring to -- it says the
22   subject line, "Opana ER Successful Rep Research -
23   Final Report and Brand IQ Summary attached."  Do
24   you see that?

Page 125

1        A    Yes.
2        Q    All right.  And just -- we'll talk in
3    some more specifics, but just to orient you to the
4    document, if you go to page 1249.3 and .4, it
5    looks to be a summary of Opana brand -- from the
6    Opana brand IQ team research -- successful rep
7    research.
8            Do you see that?
9        A    Yes.
10       Q    And then if you go to page 1249.7 and
11   the --
12       A    It's hard to find.
13       Q    -- rest of this document you'll see this
14   looks like it's a presentation --
15       A    I'm trying to find the number here.
16           MR. MORRIS:  Hold on, Counsel, because
17   the numbers are harder to see.
18   BY MS. SCULLION:
19       Q    You know what, so it's the first page of
20   the PowerPoint --
21       A    This one here.  Okay.
22       Q    Correct, it says "Opana ER Successful
23   Rep Study - Final Report."
24       A    Yes.

32  (Pages 122 to 125)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1      Q   And I'm going to ask you some specifics
2   about the report, but I just want to orient you.
3   Do you seeing this recall generally this -- this
4   report being done?
5      A   I don't.
6      Q   Okay.
7      A   I don't remember it.
8      Q   Do you recall that Endo, though, did
9   from time to time undertake research to assess
10  what was working and not working with its sales
11  representatives?
12     A   We did market research, yes.
13     Q   Okay.  Did you also, though, do specific
14  research with respect to the sales force and how
15  they were doing?
16     A   I don't specifically recall that, but
17  that could have taken place.
18     Q   Okay.  Well, let's go back to the first
19  page of Exhibit 11.
20     A   Okay.
21     Q   Because -- so clearly the bottom e-mail
22  from Ms. Blunt, Laurie Blunt to you and others on
23  December 19th --
24     A   Mm-hmm.

Page 127

1      Q   -- she says: "Please see attached final
2   report and Brand IQ Summary for the Opana ER
3   successful rep research."  And then she discusses
4   the objectives of the research.
5          And then your e-mail at the top --
6      A   Mm-hmm.
7      Q   -- you say: "This is very important
8   information for us to know and address with our
9   business plan in '08."  Correct?
10     A   Yes.
11     Q   "And I see this as a roadmap to consider
12  when we make decisions moving forward."  Correct?
13     A   Yes.
14     Q   And that -- that's what you wrote in
15  December of 2007, correct?
16     A   Yes.
17     Q   And it's clear that you had reviewed the
18  plan, and your review was this was important
19  info-- I'm sorry, you reviewed the report, and
20  your review was this is important information.
21         MR. MORRIS:  Objection to form,
22  foundation.
23         THE WITNESS:  That's what the memo says,
24  right.

Page 128

1   BY MS. SCULLION:
2      Q   That's what you said, right?
3      A   Yes.
4      Q   Okay.  And you said it was very
5   important information, and you thought it would be
6   useful to do business planning, correct?
7      A   Yes.
8      Q   All right.  So then you say it would
9   be -- you thought it would be a good roadmap to
10         MR. MORRIS:  Objection to form.
11         THE WITNESS:  Is that a question?
12  BY MS. SCULLION:
13     Q   Yeah, you said it would be a roadmap to
14  consider when making decisions moving forward,
15  right?  That's what you said.
16     A   Yes.
17     Q   All right.  Let's go ahead and take a
18  look at some of this roadmap.  If you go to --
19  you know what, we'll do it this way.  I think
20  there should be slide numbers.  Do you see those
21  in the orange boxes?
22     A   Oh, yes, yes.
23     Q   Let's try that.
24     A   Okay.

Page 129

1      Q   Because the "E" numbers I think did get
2   a little bit hard to see.
3          If you'll go to slide 7, and it should
4   say at the top "Executive Summary."  Do you see
5   that?
6      A   Yes.
7      Q   Okay.  And so the summary was:
8   "Overall, the sales force is able to tell a story
9   about Opana ER using the available sales tools.
10  They're also able to differentiate Opana ER from
11  the competition on safety issues, true Q12H
12  dosing," open parens, "BID versus TID for
13  OxyContin," close parens, "durable efficacy over
14  time, the PK profile with steady plasma levels,
15  and no CYP 450 interaction," open parens, "no
16  drug-drug interactions," close parens.
17         Do you see that?
18     A   Yes.
19     Q   Okay.  I mean, so in 2007, was that an
20  important attribute for -- for sales
21  representatives for you, that they should be able
22  to tell a story about Opana ER using the available
23  sales tools?
24     A   Well, they should be able to tell full

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1   prescribing information -- give full disclosure.
2      Q   Okay. And that's using the available
3   sales tools?
4      A   Correct.
5      Q   They should also be able to
6   differentiate Opana ER from the competition on
7   safety issues?
8      A   Yes.
9         MR. MORRIS: Objection to form and
10  foundation.
11  BY MS. SCULLION:
12     Q   And -- well, I mean, since you say you
13  don't remember the report, I'm really asking you
14  from your position, you know, in 2007, and this is
15  December of 2007, when you've been promoted to VP
16  of sales.
17     A   Right.
18     Q   So I'm asking from that perspective,
19  these are things that you would expect sales
20  representatives to be able to do.
21     A   Well, granted --
22        MR. MORRIS: Objection. Form and
23  foundation.
24        THE WITNESS: -- it was 11 years ago,

Page 131

1   but --
2   BY MS. SCULLION:
3      Q   Right.
4      A   -- I would expect that the
5   representative would understand the product and be
6   able to give full product disclosure.
7      Q   Okay. And you would expect them to be
8   able to differentiate Opana ER from the
9   competition on safety issues?
10        MR. MORRIS: Objection. Foundation.
11        THE WITNESS: They should be able to
12  provide full information on the product.
13  BY MS. SCULLION:
14     Q   And that --
15     A   Based on the package insert.
16     Q   Okay. And that would include
17  differentiating it on safety issues, the things
18  listed here: Safety issues, true Q12-hour dosing,
19  they are expected to be able to do this, correct?
20        MR. MORRIS: Objection. Foundation.
21  He's already said he didn't remember the
22  information on this.
23        MS. SCULLION: Here -- Counsel, you have
24  now crossed the line to coaching. You can say

Page 132

1   "objection to form," but keep your objections to
2   the appropriate level, but you cannot cross
3   into coaching, or we will go to the special master.
4   BY MS. SCULLION:
5      Q   So the question just is these are things
6   you would expect the sales representative to be
7   doing in 2007, right, in terms of differentiating
8   Opana ER from the competition?
9      A   I don't recall, you know, what my
10  expectations would have been in 2007.
11     Q   Okay.
12     A   Okay.
13     Q   At any point in time when you were VP of
14  sales, would you have been anticipating that sales
15  representatives would be differentiating Opana ER
16  from the competition on these various bases?
17     A   I would --
18        MR. MORRIS: Objection. Foundation,
19  form.
20        THE WITNESS: I would expect that they
21  can give full prescribing information on the
22  product that they're representing.
23  BY MS. SCULLION:
24     Q   And that would include differentiating

Page 133

1   Opana ER from the competition, right?
2      A   It would include providing the benefits
3   of Opana ER based on the package insert.
4      Q   Okay. And they would be providing that
5   in part to differentiate Opana ER from the
6   competition.
7         MR. MORRIS: Objection. Form.
8         THE WITNESS: I -- I -- I can't -- I
9   can't speak to that.
10  BY MS. SCULLION:
11     Q   Well, I mean you said in December of
12  2007 that this report provided very important
13  information. I'm trying to understand the very
14  important information.
15        Was this important information, that
16  your sales force was able to differentiate
17  Opana ER from the competition on safety issues?
18     A   As I -- as I said, I don't recall from
19  2007, 11 years ago, exactly what I meant by that.
20     Q   Okay. Well, going on, the next
21  paragraph on the same page said: "Reps also have
22  the ammunition to handle objections, such as,
23  Opana ER is not covered by many plans in this
24  area, I tried Opana ER but it didn't work, or

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Opana ER is like all other long-acting opioid
2  analgesics."
3      Do you see that?
4      A   Yes.
5      Q   As VP of sales, was that something you
6  wanted your reps to have was ammunition to handle
7  those kind of objections?
8      MR. MORRIS:  Objection to form.
9      THE WITNESS:  I -- I don't recall from
10 that period of time what my expectations were.
11 BY MS. SCULLION:
12     Q   Did you -- sorry.
13         Well, did you expect your reps to be
14 able to handle objections about the products they
15 were detailing?  We talked about that before,
16 right?
17     A   I expected them to be able to present
18 products to physicians based on the package
19 insert, yes.
20     Q   And -- and to handle objections from the
21 physicians, correct?
22     A   They should be able to be professional
23 and be able to handle any questions that came up
24 from physicians.

Page 135

1      Q   Okay.  And some of those questions would
2  be, is Opana ER like all other long-acting
3  opioids?  Right?
4      A   Well, I -- I didn't create this
5  information that's in front of me, so I'm not
6  quite sure.
7      Q   Putting aside -- again, just using this
8  as, you know, an example, but you can put the
9  document aside, and just, you know, as VP of
10 sales, was that a question that providers were
11 asking sales reps, you know, is Opana ER any
12 different from the other long-acting opioids?
13     A   Well, they would present the package
14 insert and the information in the package insert
15 of what Opana actually is.
16     Q   Okay.  All right.
17         Now, Mr. Romaine, I think you've said a
18 few times that you did expect the reps to provide
19 the information that was in the package insert,
20 right?
21     A   Yes.
22     Q   And so if this information, for example,
23 that Opana ER was differentiated based on safety
24 issues, if that was in the product insert, they

Page 136

1  could present that to physicians, right?
2      A   They would -- they would present the
3  package -- they would present the safety aspects
4  of the product in the package insert, yes.
5      Q   And -- and if differentiation of
6  Opana ER based on safety issues was not in the
7  package insert, they would not be allowed to
8  present that to physicians, correct?
9      A   I don't recall what other marketing
10 materials at the time were approved.  They -- they
11 were allowed to, whatever the approved messaging
12 was, to use that.
13     Q   Okay.  And that could be approved
14 messaging whether it was from the package insert
15 or not, correct?
16     A   It would be approved by our regulatory
17 review board.
18     Q   Okay.  If you go to the next page.
19     A   Page -- slide 8?
20     Q   Yes.  Thank you.
21     A   Okay.
22     Q   And it says here:  "All reps are aware
23 of the current milieu for providing a long-acting
24 opioid (LAO).  Physicians are being monitored by

Page 137

1  DEA.  OxyContin is in the news with abuse and
2  diversion issues at the forefront, and Palladone
3  was pulled from the market in 2005."
4      Do you recall that being the milieu, as
5  the word is used here, in which Opana ER was being
6  promoted in 2007?
7      A   I don't know what the word "milieu"
8  refers to.
9      Q   Okay.  Do you remember that within the
10 market at the time in 2007, these were some of the
11 issues being discussed concerning long-acting
12 opioids?
13     A   I don't recall that.
14     Q   You don't recall physicians being
15 concerned about the fact that they were being
16 monitored by the DEA?
17     A   At that time, I don't recall that, no.
18     Q   Do you recall that at any time?
19     A   Not -- no, not specifically.  I can't
20 give you a specific instance where I do recall
21 that.
22     Q   Understood not a specific instance, but
23 do you recall that being a general fact that
24 physicians were concerned at any point between

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1   2007 and 2013 that they were being monitored by
2   the DEA with respect to prescribing of long-acting
3   opioids?
4       A   I -- I --
5           MR. MORRIS:  Objection to form.
6           THE WITNESS:  I don't recall that.  I'm
7   sorry.
8   BY MS. SCULLION:
9       Q   Not even in a general way?
10      A   No.
11      Q   Do you recall that OxyContin was in the
12  news with abuse and diversion issues at the
13  forefront?
14      A   I -- I see that, yes.
15      Q   Do you recall that that was -- that was
16  a fact?
17      A   I don't recall that.  I'm sorry.
18      Q   You don't recall from your six years as
19  vice president of sales in which you were selling,
20  among other things, a long-acting opioid, a
21  controlled substance, you don't recall the news
22  discussions about OxyContin and abuse and
23  diversion?
24      A   Oh, I do.  I don't recall this.  I do

Page 139

1   recall OxyContin in the news.
2       Q   Okay.  That's the question.  So that
3   was -- that was one of the things that was out in
4   the marketplace was that OxyContin was in the news
5   with respect to abuse and diversion issues, right?
6       A   Okay.  Yes.
7       Q   Okay.  And -- and Palladone was pulled
8   from the market, it says in 2005.  Do you recall
9   Palladone, though, being pulled from the market?
10      A   I -- I don't recall specifically.  I
11  remember they were being pulled from the market,
12  but I don't recall any information around that.
13      Q   Okay.  And do you remember that issues
14  like this about OxyContin's abuse and diversion
15  issues, Palladone being pulled from the market,
16  that those were issues that the sales organization
17  had to address when considering how to go out and
18  sell and promote Opana ER?
19          MR. MORRIS:  Objection to form.
20          THE WITNESS:  I don't quite understand
21  your question.  I'm sorry.
22  BY MS. SCULLION:
23      Q   Sure.  Well, were sales reps, you know,
24  encountering objections from physicians saying,

Page 140

1   you know, I'm really concerned, I'm hearing about
2   OxyContin, for example, abuse and diversion?  Is
3   that something that sales reps were encountering?
4       A   I specifically did not hear that
5   specific objection from physicians.
6       Q   Did you hear any -- any objections from
7   physicians around their concerns about abuse and
8   diversion --
9       A   I did not --
10      Q   -- of opioids?
11      A   -- specifically, no.
12      Q   Were you aware that physicians were
13  raising those kind of objections at any point in
14  time between 2007 and 2013?
15      A   I know there were concern amongst the
16  medical community that there was OxyContin issues.
17      Q   Okay.  What -- and what was the basis
18  for your awareness?  How did you know that?
19      A   Just communication through the news.
20      Q   Okay.  Internal communications, internal
21  discussions at Endo?
22      A   There was always internal communication
23  about making sure we did the right thing and stay
24  focused on our messaging, our promotional

Page 141

1   messaging.
2       Q   But there was a discussion too about
3   how -- that the concerns about OxyContin might
4   impact sales of Opana ER, right?
5       A   I think it was more about how do we
6   ensure that we provide the right information to
7   physicians so that patients are getting the
8   benefit of the product and not diverted.
9       Q   So you didn't want the physicians'
10  concerns, for example, about OxyContin abuse and
11  diversion to detract from the presentation of the
12  package insert information, for example, with
13  respect to Opana ER?
14          MR. MORRIS:  Objection to form.
15          THE WITNESS:  Well, we tried to keep the
16  representatives -- we kept the representatives
17  focused on -- on staying focused on Opana ER, not
18  other issues like OxyContin, a very different
19  molecule.
20  BY MS. SCULLION:
21      Q   Okay.  Well, the molecule in Opana was
22  oxymorphone, right?
23      A   Right.  Right.
24      Q   That was twice as -- as potent as

Highly Confidential - Subject to Further Confidentiality Review

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    OxyContin.  You remember that?
2        A    Well, probably a poor choice of words.
3    I apologize for that, but -- but --
4        Q    I'm sorry, I didn't understand.  What
5    was a poor choice of words?
6        A    "The molecule."  When I said "the
7    molecule."
8        I said we tried to keep our sales team
9    focused on selling Opana ER and promoting Opana ER
10   to the physicians, and not discussing things that
11   they didn't have information on such as OxyContin.
12       Q    If you go to the slide 9, the next page.
13       A    Okay.
14       Q    And the second bullet point reports
15   that: "Specialty reps speak passionately and with
16   enthusiasm about the importance of selling
17   Opana ER."
18       Do you see that?
19       A    Yes.
20       Q    And was that -- were those qualities you
21   wanted to see in your -- in your specialty reps?
22       A    Professionalism and energy, yes.
23       Q    Passion?
24       A    Passion.

**Page 143**

1        Q    Enthusiasm?
2        A    I refer to it as professional.  I don't
3    know if I would use those words.
4        Q    Okay.  And then the next sentence says:
5    "They feel it is a great product for those in
6    serious pain."  And then says: "Even if they do
7    not believe that Opana ER is as different as Endo
8    would like it to be, their focus is on helping
9    patients and doctors."
10       Do you see that?
11       A    Yes.
12       Q    And was there a concern raised by
13   representatives that Opana ER was not as different
14   as Endo would like it to be?
15       A    I don't recall that.
16       Q    Even putting aside the document, do you
17   recall representatives having a concern when
18   Opana ER was first launched that the product was
19   hard to differentiate from the other prescription
20   opioids already on the market?
21       A    I don't recall that.
22       Q    Not at all?
23       A    No.
24       Q    Okay.  And then you see going along in

**Page 144**

1    that paragraph, there's a quote from one of the
2    sales representatives: "I like selling Opana ER
3    for a symptomatic disease state.  People know they
4    will get relief and the symptoms will go away.
5    This product will improve their quality of life."
6    And it says it was a specialty rep.
7        Were -- were those the kind of attitudes
8    you wanted to see in your specialty reps as well?
9        A    When you say "attitudes," what -- what
10   are you referring to?
11       Q    The fact that the person likes selling
12   Opana ER for symptomatic disease state because it
13   will improve their quality of life.
14       A    Well, I like to see the representatives
15   being professional in their approach with their
16   physicians and enjoying their job.
17       Q    Okay.  And would it be -- was it
18   important to you that reps -- yeah, that reps
19   believed that Opana ER would improve quality of
20   life in the patients?
21       MR. MORRIS:  Object --
22   BY MS. SCULLION:
23       Q    Was that an important factor for you?
24       MR. MORRIS:  Objection.  Foundation.

**Page 145**

1        THE WITNESS:  I think it's important
2    that -- that Opana ER was a -- an effective
3    product and used appropriately, and that the
4    physician saw that.
5        Does that answer your question?  I'm not
6    quite sure I'm following.
7    BY MS. SCULLION:
8        Q    Sure.  I mean, so the specialty rep is
9    calling out that he likes -- he or she,
10   apologize -- likes selling Opana ER for a
11   symptomatic disease state.  People know that they
12   will get their relief and the symptoms will go
13   away, and this product will improve their quality
14   of life.
15       Was that a -- a mindset for a specialty
16   rep that you thought was appropriate at the time?
17       A    I -- I can't say that I thought about it
18   one way or the other, quite honestly, and this is
19   the first time I'm seeing this.  So...
20       Q    Okay.  Well, just in general, is that
21   the kind of mindset you would have approved of for
22   a specialty rep, that they're enjoying selling the
23   product and they believe it's improving the
24   quality of life for the patients?

37  (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A   Yes.
2         MR. MORRIS:  Objection to form.
3         THE WITNESS:  Yes.
4    BY MS. SCULLION:
5    Q   If you go to the very next page, which
6    is slide 10, and this is a continuation of the
7    executive summary, and now it's switching to
8    talking about the results from the interviews of
9    the pharma reps.
10        Do you see it says, "In contrast, pharma
11   reps," in the first paragraph?
12   A   Yes.
13   Q   Okay.  And the prior information we were
14   just reading on the prior page was specialty reps.
15        And it says that:  "Pharma reps talked
16   about the challenges in a more negative light and
17   feel that marketing is CII -- marketing of CII to
18   PCPs in the current market setting is very
19   difficult.  PCPs are afraid of the consequences of
20   writing long-acting opioids."
21        The last sentence there, "PCPs are
22   afraid of the consequences of writing long-acting
23   opioids," was that a phenomenon that you were
24   familiar with as VP of sales, that primary care

Page 147

1    physicians were afraid of the consequences of
2    writing long-acting opioids?
3    A   I -- I --
4         MR. MORRIS:  Objection to form.
5         THE WITNESS:  I can't say that I
6    differentiated between a specialty physician and a
7    primary care physician in rely -- in relating to
8    that issue.
9    BY MS. SCULLION:
10   Q   Okay.  But putting it more generally,
11   were you aware that physicians were afraid of the
12   consequences of writing long-acting opioids in
13   this time period?
14        MR. MORRIS:  Objection.  Form,
15   speculation.
16        THE WITNESS:  I -- I don't recall,
17   honestly.
18   BY MS. SCULLION:
19   Q   Okay.  It goes on to quote a pharma rep,
20   who says:  "Promoting Opana ER compared to other
21   non-opioid products is like night and day, black
22   and white.  Words I hear all the time are 'abuse,
23   diversion and litigation.'  PCPs are afraid to
24   prescribe an opioid in a rural conservative area."

Page 148

1         What the quote there is discussing,
2    about words heard all the time about abuse,
3    diversion and litigation, was that something you
4    were aware of that reps were hearing from
5    providers in the field?
6    A   You know, I don't recall that coming up.
7    Q   Then it goes on -- now to switch back to
8    specialty reps, and that's the next bullet point,
9    it says:  "Specialty reps speak from a more
10   confident position of perceiving themselves as a
11   consultant to the physicians and practices.  To
12   differing degrees, dependent upon the office and
13   the established relationship, they are an asset
14   that the practice has come to accept as part of
15   the team."
16        Is that along the lines of what we
17   discussed earlier about reps building a
18   relationship with the office, a relationship of
19   trust?
20        MR. MORRIS:  Objection to form.
21        THE WITNESS:  I -- I can't say.  I -- I
22   don't know.
23   BY MS. SCULLION:
24   Q   Okay.  Well, we talked about reps

Page 149

1    building a relationship of trust.  Would it be
2    fair to say that it would be good if they got
3    themselves to be perceived as a consultant of sort
4    or an asset to the practice?
5    A   Well, they wanted to be perceived as an
6    asset, a resource, you know, a training -- for
7    training.
8    Q   Okay.  If you can go to slide 22.
9         And you see at the top it says,
10   "Pre-call Planning"?
11   A   Yes.
12   Q   What was pre-call planning?
13   A   Preparing for a sales presentation.
14   Q   All right.  So this would be sales reps
15   preparing to make their sales presentations to
16   providers, correct?
17   A   I'm assuming that's what this is
18   referring to.  I shouldn't assume, but --
19   Q   Is that -- is that what you called
20   pre-call planning?
21   A   We called pre-call planning preparing
22   for a sales call.
23   Q   Okay.  And how would a rep plan for a
24   sales call?  What kind of things would they be

38  (Pages 146 to 149)

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1   doing?
2        A    They would be looking at the offices,
3   making sure they remembered the names of the
4   office administrators, the nurses, that sort of
5   thing; best time to go into the office.  And then
6   looking at, you know, the most recent call
7   presentation they made and how they can build off
8   of that.
9        Q    Okay.  When you say "looking at the most
10  recent call presentation they -- they made," where
11  would they look for that?
12       A    They typically would have call notes in
13  their laptop, iPad, I think at the time.
14       Q    What are call notes?
15       A    Call notes are just notes from the
16  previous presentation to the physician.
17       Q    So, for example, when you were a sales
18  rep, did you keep call notes?
19       A    I did.
20       Q    What kind of things would you write down
21  in your call notes?
22       A    The best time to see the office, who the
23  office staff names were, and then what products I
24  actually promoted on my last call.

Page 151

1        Q    Okay.  Would you ever make notes about
2   what needs of the physician have been discussed
3   that you might try to use to follow up on?
4        A    Yes.
5        Q    Okay.  Would you keep notes with respect
6   to discussions about potential use of a product
7   with an appropriate patient type?
8        A    Yes.
9        Q    Okay.  So some pretty specific notes
10  about discussion, the nature of the discussion you
11  had with the provider, right?
12       A    Correct.
13            MR. MORRIS:  Objection.  Form.
14  BY MS. SCULLION:
15       Q    And were Endo sales reps also keeping
16  sort of similar kinds of call notes like that?
17            MR. MORRIS:  Objection.  Form.
18            THE WITNESS:  No.  They had what we call
19  drop-down notes.
20  BY MS. SCULLION:
21       Q    Okay.  And what were drop-down notes?
22       A    They would click on a drop-down box, and
23  it would have certain things and they would click
24  on it.

Page 152

1        Q    Okay.  And that would be within the TREX
2   system?
3        A    No, it was separate -- separate from
4   that.
5        Q    But was it within a system?
6        A    It was in a system they had, yes.
7        Q    Okay.  And I apologize, I probably have
8   the wrong name of the system.
9        A    No, that's okay.
10       Q    Do you remember what the name of the
11  system was?
12       A    I don't.
13       Q    Okay.  And in addition to -- to the
14  drop-down notes, would reps also keep handwritten
15  notes just to keep track of the same kind of
16  things you kept track of, who actually I spoke
17  with and what kind of things I might want to
18  follow up?
19            MR. MORRIS:  Objection.  Foundation and
20  form.
21            THE WITNESS:  I -- I don't think that --
22  I don't recall, but I don't think they had follow
23  -- they had written notes.
24  BY MS. SCULLION:

Page 153

1        Q    Okay.  If you look at slide -- I
2   apologize, slide 22, where we are, and 23, the
3   next page, the discussion there about data
4   provided on the Endo intranet.  There is reference
5   to TREX data analytics, the "Prescribes Sales
6   Report."  And on the next page, there is a
7   reference in that first point to reps are also
8   viewing the WK data.
9            Do you see those references?
10       A    Yes.
11       Q    Were these examples of data that sales
12  reps would be looking at as part of their pre-call
13  planning process at Endo?
14       A    Let me just finish reading these.
15       Q    Sure.
16       A    (Peruses document.)  Yes.
17       Q    Okay.  What kind of data was the -- for
18  taking the WK data on slide 23, what kind of data
19  was that?
20       A    That was TRx data.
21       Q    Meaning prescription data?
22       A    Prescription data.
23       Q    Okay.  And that would show prescriptions
24  written by specific physicians within, in this

39  (Pages 150 to 153)

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    case, a sales rep's territory?
2        A    Correct.
3        Q    Okay.  And it would indicate the number
4    of prescriptions for a given product written?
5        A    For their product, yes.
6        Q    Okay.  Would -- did sales reps also have
7    information about the number of prescriptions
8    being written for competitor products?
9        A    They would have market data, not
10   competitive products.
11       Q    And what does that mean, "market data"?
12       A    So if you look at a class of products,
13   like a migraine drug, they would see how often a
14   physician was writing migraine drugs.
15       Q    Okay.
16       A    But not specific products.
17       Q    All right.  And the prescriber sales
18   report, what was that?
19       A    I don't -- I don't recall.
20       Q    It says it's a -- it says it's an
21   important indicator of the pain market in the
22   rep's territory in a month, three months' and six
23   months' time frame.
24           Does that refresh your recollection at

Page 155

1    all?
2        A    It does -- I don't recall the actual
3    report itself.  They did receive data, information
4    like Wolters Kluwer, that WK data, but I don't
5    recall that report.
6        Q    Okay.  And if you go again to slide 23
7    where it discusses viewing the WK data.
8        A    Excuse me.
9        Q    The paragraph says at the end:
10   "However, it was mentioned that it is two weeks
11   behind and not quite as accurate as the prescriber
12   sales report."
13           Do you see that?
14       A    Yes.
15       Q    So the WK is Wolters Kluwer, right?
16       A    Yes.
17       Q    The Wolters Kluwer data was lagging by
18   maybe two weeks behind, right?
19       A    That's what it --
20           MR. MORRIS:  Objection to form.
21           THE WITNESS:  -- looks like in this
22   presentation.
23   BY MS. SCULLION:
24       Q    Okay.  But -- but it was still fairly

Page 156

1    current data.  It wasn't from a year ago what this
2    physician was prescribing.  It was relatively
3    current what that physician is prescribing, right?
4        A    You know, I don't recall specifically,
5    but that's what this information is sharing.
6        Q    Okay.  And if you go to slide 24, and
7    the last bullet point says:  "Post-call planning
8    often occurs in the car after the call or at the
9    end of the day.  While reps do use the noting
10   system provided, many make additional notes so
11   that they know where to pick up in the call
12   continuum.  The majority are taking -- making
13   notes or using the drop-down boxes provided on
14   TREX."
15           Do you see that?
16       A    Yes.
17       Q    Okay.  And so does this indicate that
18   many reps were making additional notes in addition
19   to the TREX noting system?
20       A    I --
21           MR. MORRIS:  Objection.  Foundation.
22           THE WITNESS:  I don't know.
23   BY MS. SCULLION:
24       Q    Okay.

Page 157

1        A    I don't know.
2        Q    And again, I mean, do you recall whether
3    reps were taking additional notes outside of the
4    drop-down menus?
5        A    I never saw a rep take additional notes
6    other than a drop-down.
7        Q    Did you ever hear about reps doing that?
8        A    No.
9        Q    Were reps allowed to do that?
10       A    They were not supposed to do that.
11       Q    And why was that?
12       A    It just wasn't efficient.
13       Q    You had done it when you were a sales
14   rep, right?
15       A    We didn't have laptops and information
16   that we have today.  The technology.
17       Q    Was there a point in time when you
18   joined Endo -- strike that.
19           When you joined Endo in 2003, were reps
20   allowed to keep handwritten notes?
21       A    I -- I don't recall when that change
22   took place.  I don't know.
23       Q    But there was a change at some point in
24   time, right?

40  (Pages 154 to 157)

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1     A   At some point in the industry, yes.
2     Q   Okay.
3         MR. MORRIS:  Counsel, we've been going
4   for close to an hour and a half, so at some point,
5   if we could --
6         MS. SCULLION:  Yeah, we can take a quick
7   break.  Sure.
8         THE VIDEOGRAPHER:  The time is 11:46
9   a.m., and we're going off the record.
10        (Recess.)
11        THE VIDEOGRAPHER:  The time is
12  12:04 p.m., and we're back on the record.
13  BY MS. SCULLION:
14    Q   Mr. Romaine, welcome back.
15    A   Thank you.
16    Q   A reminder, you're still under oath.
17    A   Yes.
18    Q   Looking -- staying on Exhibit 11, if you
19  go all the way towards almost the end of the
20  document to slide 55.  Okay.  And to make sure
21  we're on the same page, at the top it says
22  "Challenging aspects of job," correct?
23    A   Yes.
24    Q   All right.  And do you see the second

Page 159

1   quoted paragraph, it says: "Territory size with
2   two reps.  I don't know if we will be able to
3   generate the numbers.  The goals are very, very
4   aggressive.  I wonder if it's even attainable.
5   This year from market share to goal, I did well at
6   the beginning of the year, but the second half I
7   did not even get one-third of my goal.  In some
8   regard it is punitive for doing well at the
9   beginning."
10        And again, it's quoting a specialty rep.
11        Do you recall -- putting aside the
12  document, do you recall in 2007 sales reps being
13  concerned about sales goals being aggressive?
14    A   I don't recall that.
15    Q   Okay.  Did you ever think that the sales
16  goals were too aggressive?
17    A   No.
18    Q   Okay.  So if you were hearing this --
19  this rep face to face, what -- what would your
20  response have been if they said the sales -- the
21  goals are very, very aggressive?
22    A   Well, I would --
23        MR. MORRIS:  Objection to form.
24        THE WITNESS:  I would ask them to

Page 160

1   clarify.
2   BY MS. SCULLION:
3     Q   Okay.
4     A   And explain what they meant by that.
5     Q   And when it says "the sales goals," in
6   December of 2007, when you were VP of sales, what
7   was your role in determining sales goals for
8   Opana ER?
9     A   Well, we had a forecasting team that did
10  all of that for us, along with operations.  So,
11  you know, I received my goal from, you know,
12  senior leadership and -- and the forecasting team.
13    Q   And did you have an understanding about
14  how those forecasts were developed?
15    A   Yes.
16    Q   And what were the forecasts based on?
17  What were they using to develop the forecasts?
18    A   It was based on potential within
19  geography and then historical background.
20        You know, I think the one thing that
21  you have to realize is Opana -- Opana ER, I mean,
22  it never really achieved probably more than 8 or 9
23  percent market share in the opioid market.  So I'm
24  surprised when I see something like this, that it

Page 161

1   was aggressive or high.
2     Q   I just want to go back.  When you were
3   explaining the forecasting, you said --
4     A   Mm-hmm.
5     Q   -- "potential within a geography."
6     A   Geography.
7     Q   All right.  What do you mean by that?
8     A   It was the potential of the number of
9   physicians, the number of experienced opioid
10  writers that existed within that geography.
11    Q   So would there be data that you could --
12  that Endo would look at, the forecasters would
13  look at that would tell them how many physicians
14  in a given geography had experience writing
15  opioids, right -- prescribing opioids; is that
16  right?
17    A   I don't know exactly how they did that.
18    Q   Okay.
19    A   I just know that they -- they looked
20  at -- those were some of the parameters.
21    Q   Okay.  And you also said historical
22  background was the other aspect of forecasting.
23    A   Previous Rx's for Opana ER or Opana.
24    Q   So looking -- so if you're in 2008,

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  you're looking at 2007 using it as a basis for
2  forecasting?
3      A   Correct.
4      Q   Okay.  Do you know whether any aspect of
5  forecasting depended upon an attempt to understand
6  the medical needs within a given population within
7  a geographic area, whether they needed the
8  medication?
9      A   I don't know that for a fact, but I know
10  that looking at the physician populations there,
11  probably took that into account.
12      Q   Was -- putting aside forecasting, was
13  the medical need within a given -- let's say a
14  territory or let's say a district, medical needs
15  in a district, was that ever something you tried
16  to assess as a sales organization to understand,
17  well, really how -- you know, how many patients
18  need how many pills in a particular area?
19      A   Well, can you maybe describe "medical
20  need" to me?  I -- I'm not quite following your --
21  your question.
22      Q   Sure.  I mean -- so I mean, would -- so,
23  for example, would -- would you have looked to
24  understand, well, what's the number of pain --

Page 163

1  chronic pain patients within a given geographic
2  area?  Would that be something you would be
3  considering in thinking about sales goal?
4      A   Well, because I didn't set the -- the
5  goal, I didn't, but others in the organization may
6  have.  I'm just not aware of that.
7      Q   You don't know one way or the other
8  whether it happened?
9      A   I don't know.
10      Q   Okay.  Was it something that -- that you
11  ever considered, though -- putting aside
12  forecasting, was it something that you ever
13  considered as an Endo executive, what are the
14  actual medical needs within any given community?
15      A   I -- I --
16      MR. MORRIS:  Objection to form.
17      THE WITNESS:  I did not look at that.
18  BY MS. SCULLION:
19      Q   Okay.  Now, coming back to Exhibit 11.
20      A   Okay.
21      Q   Going back to the very first page, I
22  think you said you don't recall specifically the
23  report, but again, it's clear from your e-mail
24  that you did read the report at the time and you

Page 164

1  found it to be very important information,
2  correct?
3      A   Correct.
4      MR. MORRIS:  Objection to form.
5  BY MS. SCULLION:
6      Q   Okay.  And do you recall -- strike that.
7      So you understood, at least at the time,
8  you would have read and seen what sales reps were
9  saying about the messages they were delivering to
10  physicians, correct?
11      MR. MORRIS:  Objection to form.
12      THE WITNESS:  I -- just to clarify,
13  this -- this is a market research, so it was a
14  point in time and it was one rep.
15  BY MS. SCULLION:
16      Q   Yeah.
17      A   So you couldn't extrapolate that to the
18  whole sales force, right.
19      Q   Well, understood, although this wasn't
20  an attempt to assess aspects of the sales force --
21      A   Right.
22      Q   -- right?
23      A   Right.
24      Q   Okay.  I'm just saying, so you -- when

Page 165

1  you read the report, you would have seen at least
2  what was quoted with respect to what sales reps --
3  those sales reps were saying, correct?
4      A   I would have seen it at the time.
5      Q   You would have seen that.  Okay.
6      And you would have seen the analysis in
7  the report about what overall sales reps were
8  saying about the difficulties, for example, in
9  selling Opana ER.  You would have seen those
10  statements.
11      MR. MORRIS:  Objection.  Form and
12  foundation.
13      THE WITNESS:  If there were those
14  statements.
15  BY MS. SCULLION:
16      Q   Okay.  Well, we saw some.  I mean, you
17  don't remember them, but we saw they're in the
18  report.  I'm just saying you would have seen these
19  statements in the report, right?
20      MR. MORRIS:  Objection.  Form and
21  foundation.
22      THE WITNESS:  I would have seen them in
23  the report.
24  BY MS. SCULLION:

42  (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    Q   You would -- I mean you would have read
2  the whole report.
3    A   Yeah.
4    Q   Okay.  That's an easy way --
5    A   Yes.
6    Q   -- easy way to put it.
7        And do you recall taking any corrective
8  action having seen the statements reported in the
9  report to say, for example, Well, no, sales reps
10  shouldn't be making those statements?
11    A   I don't recall that at the time.  I
12  don't recall it.
13    Q   Do you -- do you recall whether any
14  investigation, any further investigation was made
15  about why reps would be making certain reported
16  statements in the report?
17    A   I don't recall that either.
18    Q   Okay.  So I take it you also don't
19  recall anyone being disciplined with respect to
20  delivering any of the messages reported in this
21  report?
22    A   No.
23    Q   Okay.  And do you recall there being --
24  any change being made to the messaging that sales

Page 167

1  reps were delivering based on what was reported in
2  this report?
3        MR. MORRIS:  Objection to form.
4        THE WITNESS:  I do know, just to
5  clarify, that market -- marketing would look at
6  these reports to make sure that their materials
7  met the needs of the customer.
8  BY MS. SCULLION:
9    Q   Okay.
10    A   And they may have made adjustments and
11  additional training based on that.
12    Q   Okay.  But you don't specifically recall
13  one way or the other whether that ever happened in
14  response to this report.
15    A   Well, I -- I don't know specifically to
16  this report, no.
17    Q   Okay.  Let's put Exhibit 11 aside.
18        Okay.  Mr. Romaine, we talked about this
19  a little bit already in terms of salespeople in
20  the field getting to know obviously the physicians
21  on whom they're calling, they're trying to get to
22  know those physicians, correct?
23    A   Correct.
24    Q   And they're trying to get to know people

Page 168

1  in the office, right?
2    A   Yes.
3    Q   Okay.  And -- and they also were going
4  to pharmacies in their territories and trying to
5  understand, for example, the stocking at the
6  pharmacy, correct?
7    A   Yeah, just to clarify, there was a
8  period of time when they did that, and then
9  they -- we stopped calling on pharmacies.
10    Q   Thank you.  I -- I -- you did say that
11  before.
12        But there was a period of time when that
13  was part of their responsibility as well.
14    A   Yes.
15    Q   Okay.  And were reps sort of more
16  generally expected to try to get to know the --
17  the medical needs of the community that they
18  were -- in which they were selling?
19        MR. MORRIS:  Objection to form.
20        THE WITNESS:  I'm not quite sure.
21  Through the -- I'm -- maybe clarify the question
22  just a little.
23  BY MS. SCULLION:
24    Q   Sure.

Page 169

1        Just, in general, were they expected to
2  try to understand, you know, what the -- what the
3  population looked like, the demographics, was it
4  an older population, a younger population, a
5  population that had, you know, a more frequent
6  occurrence of any particular disease state?  Was
7  that something they were expected to try to get to
8  understand?
9        MR. MORRIS:  Objection to form.
10        THE WITNESS:  I think -- to clarify, I
11  think how they would learn that is just through
12  the offices that they called on in a certain
13  geography.
14  BY MS. SCULLION:
15    Q   Okay.  Were they expected to try to be
16  familiar with -- strike that.  Sorry.
17        Would they have been expected to know
18  the various clinics that would be in their
19  territory, let's say pain clinics, to know
20  which -- what clinics are out there?
21    A   The clinics that they would be calling
22  on?
23    Q   Or just even if they weren't calling on
24  them, they're expected to know the pain clinics.

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1      A   If they didn't have them on their call
2   plan, they weren't expected to know them.
3      Q   They weren't expected to have any idea
4   about them at all, any knowledge?
5      A   They wouldn't have a knowledge of them
6   because they stuck to a specific call plan --
7      Q   Mm-hmm.
8      A   -- that they were responsible for.
9      Q   Okay.  We discussed a little bit earlier
10   the district managers working with the salespeople
11   within their district.
12      A   Yes.
13      Q   And -- and that they were working with
14   them on sort of a day-to-day basis?
15      A   Yes.
16      Q   Okay.  Were they working with them on
17   training with respect to the core messages around
18   the products being promoted?
19      A   Their responsibility would be to coach
20   on -- on the delivery of the message, yes.
21      Q   Okay.  Did they from time to time go on
22   ride-alongs with the reps?
23      A   Yes.
24      Q   And what's a ride-along?

Page 171

1      A   They would go with the representative to
2   their offices and observe their sales
3   presentations.
4      Q   And after observing, would they provide
5   then coaching to the sales rep?
6      A   Yes.
7      Q   All right.  Do you recall Endo using
8   something called an ECR, an ENDOSell Coaching --
9      A   Report.
10      Q   -- Report?
11      A   Yes.
12      Q   Okay.
13          MS. SCULLION:  Do we have 1184?
14          (A discussion was held off the record.)
15          (Romaine Exhibit No. 12 was marked
16          for identification.)
17          MS. SCULLION:  Thank you.
18   BY MS. SCULLION:
19      Q   I hand you what's marked as
20   Exhibit No. 12.
21      A   Thank you.
22      Q   And this is Bates stamped ENDO_OPIOID_
23   MDL-02147122, and we've marked it E1184 in the top
24   right-hand corner.

Page 172

1      A   Mm-hmm.
2      Q   This is an e-mail -- two e-mails, one
3   from Mike Weber and then another e-mail from you.
4          I'm going to start with Mr. Weber's
5   e-mail --
6      A   Okay.
7      Q   -- at the bottom on the first page.
8      A   Yes.
9      Q   And this is dated February 12th, 2007,
10   from Mike Weber to a few different folks, and then
11   cc'd to you, Ron Jackson, and two other
12   individuals.  Subject matter "ECRs."
13          Who was Mike Weber?  In February of
14   2007, what was his position?
15      A   Mike Weber was the director of primary
16   care sales force, and I was the director of the
17   specialty sales force at the time.
18      Q   Okay.  And do you see he's writing to
19   the Midwest leadership team?
20      A   Yes.
21      Q   And the folks in the "to" line, were
22   they -- were they the Midwest leadership team at
23   the time?
24      A   It looks like that's who they were, yes.

Page 173

1      Q   Okay.  And Midwest, that was -- that was
2   a region?
3      A   The Midwest was a -- yes, I'm assuming
4   it was a region, yes.
5      Q   Okay.  And it included Ohio?
6      A   I -- I don't know that for a fact.
7      Q   Okay.  Do you remember one of the people
8   in the "to" line is Teresa Leigh?  Do you see
9   that --
10      A   Yes.
11      Q   -- Leigh, Teresa?
12      A   Mm-hmm.
13      Q   Do you recall Ms. Leigh being a district
14   manager in Ohio?
15      A   She was a district manager in Ohio.
16      Q   Okay.  Okay.  And so Mr. Weber is
17   telling the Midwest leadership team that the ECR,
18   ENDOSell Coaching Report, should be completed no
19   later than 48 hours after every field ride.
20          Do you see that?
21      A   Yes.
22      Q   And if you read through that first
23   paragraph, he goes on to state that:  "Opana ER
24   needs to be highlighted appropriately since

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  nothing is more important than the success of this
2  launch at this time."
3        Do you see that?
4     A   Yes.
5     Q   And that -- that was true at that time
6  in February 2007, there was really nothing more
7  important to the sales force than the success of
8  the Opana ER launch, correct?
9     A   I --
10        MR. MORRIS: Objection. Foundation.
11        THE WITNESS: I can't say that that's
12  correct. I mean, they had other responsibilities
13  as well.
14  BY MS. SCULLION:
15     Q   Okay. You did get this e-mail, you were
16  cc'd on it from Mike Weber, correct?
17     A   Mm-hmm.
18     Q   Did you -- you need to say "yes" or
19  "no."
20     A   Yes. Yes.
21     Q   Did you -- did you go back to him and
22  say, Mike, that's not an appropriate message to be
23  delivering to your district managers?
24     A   I -- I don't recall.

Page 175

1     Q   Okay. And I mean, he was your
2  counterpart, so fairly senior within the sales
3  organization, right?
4     A   That's correct.
5     Q   All right. And this is how he's
6  directing these district managers to -- to run
7  their business with respect to Opana ER, right?
8     A   I don't know what his method is here,
9  but --
10     Q   I'm saying that these are the
11  instructions he's conveying to them, correct?
12     A   Correct.
13     Q   Okay. All right. And then with respect
14  to the ECR itself, in the last sentence of that
15  paragraph, he says: "Keep in mind that this is
16  the only document that shows what exactly was
17  discussed and coached by you with the
18  representative regarding his or her success of
19  Opana ER and the actions that need to be taken."
20        Do you see that?
21     A   I do see that.
22     Q   And that's an accurate description of --
23  of the ECR, right?
24     A   An ECR is -- it's a coaching report for

Page 176

1  the time that they were in the field with the
2  representative.
3     Q   Right. And it's -- and that is the
4  document that will tell you what was discussed --
5  exactly what was discussed and coached --
6     A   It's a summary of what was discussed --
7     Q   -- with the representative.
8     A   -- during that, yes.
9     Q   Okay. So it's a pretty important
10  document in terms of the operation of the sales
11  force?
12     A   It's a doc- --
13        MR. MORRIS: Objection to form.
14        THE WITNESS: It's a document to -- to
15  help the representative understand what they need
16  to continue to improve on.
17  BY MS. SCULLION:
18     Q   It's an important document that
19  representatives are supposed to read and pay
20  attention to, right?
21     A   Yes.
22     Q   Okay. If you go to the next paragraph,
23  Mr. Weber refers to: "Attached is a good example
24  I pulled from an ECR DM summary."

Page 177

1        Do you see that --
2     A   Yes.
3     Q   -- second sentence in the next
4  paragraph? Okay.
5        And I don't know that we have an
6  attachment to this particular document, but do you
7  see the DM summary at the bottom of Exhibit 12,
8  correct?
9     A   Yes.
10     Q   All right. And this -- the DM summary
11  was the district manager summary, correct?
12     A   Yes.
13     Q   So this is an example of a district
14  manager summary from an ECR.
15     A   I'm assuming that's what he -- it's a
16  cut and paste.
17     Q   That's -- that's what he says, right?
18     A   Yeah.
19     Q   Okay. And the DM summary that Mr. Weber
20  is pulling out as an example, a good example, says
21  in paragraph 1: "Hypertargeting top five through
22  seven. You consistently hypertarget using sales
23  data to identify those targets, seeing them more
24  than once a week and pressuring sales."

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 178

1          Did I read that correctly?
2     A   Yes.
3     Q   And what was hypertargeting?
4          MR. MORRIS:  Objection.  Form and
5     foundation.
6     BY MS. SCULLION:
7     Q   Was hypertargeting something that Endo
8     was using in February of 2007 with respect to
9     Opana ER sales?
10    A   I -- I don't recall that terminology
11    being used or -- and -- or terminology being used
12    for Opana ER.
13    Q   Okay.  And then he goes on to say
14    that -- the DM goes on to say:  "Opana ER was
15    presented in a primary position on all calls
16    trying to move the customer to writing or
17    expanding their writing from trial to adoption."
18         Do you see that?
19    A   Yes.
20    Q   And then the DM is coaching:  "Call on
21    some targets, two to three a week, through year
22    end and get them writing."
23         Do you see that?
24    A   Yes.

---

Page 179

1     Q   And so that was coaching that one of
2     Endo's district managers was providing to a sales
3     rep in February of 2007, correct?
4          MR. MORRIS:  Objection.  Form and
5     foundation.
6          THE WITNESS:  I -- I don't know -- I
7     don't know how he took this to put it into this
8     document.
9     BY MS. SCULLION:
10    Q   Well, I mean -- I mean he says that he's
11    pulled it from an ECR DM summary, right?
12    A   Right.
13    Q   Mr. Weber says?
14    A   Right.
15    Q   You knew Mr. Weber pretty well?
16    A   I knew Mike, yes.
17    Q   Okay.  And he was an honest person?
18    A   Yes.
19    Q   You wouldn't expect him to be
20    misrepresenting this in the e-mail, right?
21    A   No.
22    Q   Okay.  So, I mean, you would expect
23    that -- in fact, he's pulled this DM summary from
24    an actual ECR, right?

---

Page 180

1          MR. MORRIS:  Objection.  Foundation.
2          THE WITNESS:  I don't -- I don't know.
3     I can't say yes to that because I don't know.
4     BY MS. SCULLION:
5     Q   Okay.  But regardless, he's putting in
6     this e-mail to the Midwest leadership team, he's
7     using this as an example.  Whether it's from an
8     ECR or not, he's using this as an example,
9     correct?
10    A   Correct.
11    Q   And he said, "This is a good example,"
12    right?
13    A   Yes, he says that.
14    Q   He says it's a good example of the
15    coaching that should be provided -- he thinks
16    should be provided to reps, including through the
17    Midwest leadership team, right?
18         MR. MORRIS:  Objection.  Form.
19         THE WITNESS:  Can you repeat the
20    question again?  I'm sorry.
21    BY MS. SCULLION:
22    Q   So this is an example of what he thinks
23    is good coaching that should be provided to the
24    reps through the Midwest leadership team, right?

---

Page 181

1     A   I -- I don't know if he -- I don't know
2     what he was thinking as he wrote this.  I'm not
3     sure if he thought this was a good example or not.
4     Q   Well, he says, "Attached is a good
5     example."
6     A   Okay.
7     Q   Right?
8     A   Yes.
9     Q   He does say that.
10    A   Okay.
11    Q   So this is the example he's choosing to
12    present to the Midwest leadership team.
13    A   Right.
14    Q   Okay.  And the example he's choosing to
15    present includes coaching that says, with respect
16    to hypertargeting, seeing them more than once a
17    week and pressuring sales, right?  That's what
18    he -- that's what the example says.
19    A   Yes.
20    Q   And the example says that the reps
21    should call on some targets two and three times a
22    week through the year and get them writing, right?
23    A   Correct.
24    Q   And writing within this sales force

---

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    meant writing prescriptions. Get them writing
2    prescriptions is what that would refer to.
3         A   I don't know what he's referring to
4    there. I --
5         Q   Is there anything else that --
6         A   It's not specific, I guess is what I'm
7    saying.
8         Q   Is there anything else a sales rep would
9    be getting a provider writing other than a
10   prescription?
11        A   From my perspective, just to clarify, I
12   mean, I don't -- I would never use that
13   terminology. So it's about, you know, performing
14   your duties as a professional and encourage
15   physicians to understand the business and
16   understand the product, and then if the patient
17   would benefit from that product, based on a
18   physician's experience, then they would write --
19   they would write a prescription for it.
20        Q   All right. But that -- that's what
21   physicians do is they actually write
22   prescriptions, or writing usually --
23        A   Right.
24        Q   -- was referring to writing a

Page 183

1    prescription.
2         A   They write prescriptions, yes.
3         Q   Okay. And as we heard earlier from your
4    voicemail, your view was that that was the job of
5    the sales rep, they had to get physicians
6    prescribing the product clinically, that was their
7    job.
8             MR. MORRIS: Objection. Form.
9             THE WITNESS: Well, to go back to what I
10   just referenced, clinically is providing full
11   product information so they can make an informed
12   decision.
13   BY MS. SCULLION:
14        Q   But -- but the -- but the idea is that
15   they make an informed decision, and the result is
16   that they're writing a prescription.
17        A   If it clinically matched the needs of a
18   patient. But that's the decisions -- that's a
19   physician's decision.
20        Q   Okay. But they're making that decision
21   after getting detailed by the sales rep, and the
22   sales rep is providing --
23        A   Education.
24        Q   -- providing the PI, right?

Page 184

1         A   Resources.
2         Q   He's also providing -- he or she is also
3    providing the promotional materials, correct?
4         A   Correct.
5         Q   All right. Providing the reprints --
6    the approved reprints, right?
7         A   Yes.
8         Q   Okay. And in the end, if that -- if
9    that sales rep is not able to get physicians
10   clinically writing prescriptions, they really
11   can't continue as a sales rep. That's what you
12   said in your voicemail.
13        A   Their role is to clinically present
14   the -- the information to a physician, and
15   they're -- they are responsible for generating
16   business --
17        Q   Right.
18        A   -- if there is a patient population that
19   would benefit from it.
20        Q   Right.
21        A   Correct.
22        Q   If you go to the second page of
23   Exhibit 11, a little bit at the very top in this
24   example, again, it says: "Maximize speaker

Page 185

1    program" --
2             MS. KUBLY: Exhibit 12.
3             MS. SCULLION: Thank you very much.
4    BY MS. SCULLION:
5         Q   Exhibit 12, second page, E1184.2 says:
6    "Maximize speaker program attendance."
7             Do you see that?
8         A   Yes.
9         Q   Did Endo use a speaker program in
10   connection with the promotion of Opana ER in 2007?
11        A   We did. I don't recall it that year,
12   but I do -- we did use speaker programs.
13        Q   And can you explain what a speaker
14   program was -- or what that speaker program was?
15   Sorry.
16        A   You would have a resident expert
17   physician come in and speak to other physicians
18   about their practice and the -- the clinical
19   benefit where they saw one of our products fit
20   with their patient population.
21        Q   And these were other physicians that
22   Endo identified to participate in the speaker
23   program, correct?
24        A   Yeah. They were -- they were invited to

47 (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    attend based on the -- the representative that was
2    having the program.
3          Q   Who would -- who would make the
4    invitation to a specific physician to be a speaker
5    at one of those programs?
6          A   Well, they had preprinted and approved
7    speaker invitations that they used.
8          Q   The -- the sales reps had preprinted
9    invitations?
10         A   Yes.
11         Q   Okay.  Do you know which department
12   within Endo identified speakers that were invited
13   to -- to come to those presentations -- come and
14   make those presentations, I should say?  Thank
15   you.
16         A   Oh, they would be -- it would be a
17   combination of our medical team as well as our
18   marketing team.
19         Q   Was -- was the speaker program helpful
20   to Endo's sales efforts for Opana ER?
21         MR. MORRIS:  Objection to form.
22         THE WITNESS:  I would say it's very hard
23   to -- to tell.  You know, if -- if physicians
24   came, I think it was a learning experience for

Page 187

1    them.
2    BY MS. SCULLION:
3          Q   Okay.  Were sales reps encouraged to
4    invite the physicians they were calling on to
5    attend these -- the speaker programs, as is
6    highlighted in this example?
7          A   Yes, it was an educational tool that
8    they could use.
9          Q   Okay.  And that was an educational tool
10   that the sales reps were providing as part of
11   their sales process, correct?
12         A   Correct.
13         MS. SCULLION:  Can I have 1183?
14         (Romaine Exhibit No. 13 was marked
15         for identification.)
16   BY MS. SCULLION:
17         Q   I'm going to hand you what's been marked
18   as Exhibit No. 13.
19         A   Thank you.
20         Q   And this is Bates-stamped ENDO_OPIOID_
21   MDL-00881701, and we've numbered it E1183.1 at the
22   top.
23         This is 13; is that right?  Yeah.
24         And, Mr. Romaine, looking at the first

Page 188

1    page of Exhibit 13, this is an e-mail from you to
2    a number of individuals within Endo in various
3    departments, right?  I think --
4          A   Yes.
5          Q   -- we see folks in marketing, in
6    medical.  We see Mr. Weber, correct?
7          A   Yes.
8          Q   Okay.  And this is dated December 7,
9    2006, and the subject is "Opana FIR,
10   November 30th, 2006."  Do you see that?
11         A   Yes.
12         Q   And FIR, that's a reference to a field
13   intelligence report, right?
14         A   That's -- that's correct.
15         Q   All right.  And then starting at
16   page E1183.2, and the next two pages is the Opana
17   field intelligence reports for November 30th,
18   2006, correct?
19         A   Correct.
20         Q   What was a field intelligence report?
21         A   It was just information that was
22   captured from the representative through the
23   district managers that was rolled up through the
24   regional directors and then eventually to me.

Page 189

1          Q   Okay.  And was -- were field
2    intelligence reports done on a somewhat frequent
3    basis, monthly or --
4          A   I don't know if there was a routine to
5    the --
6          Q   Okay.
7          A   -- to the timing of them, but they
8    were -- they were done.
9          Q   And you said that it was from reps to
10   DMs up to you, correct?
11         A   To the regional directors, and then up
12   to me.
13         Q   I'm sorry.
14         A   So it was a summary.
15         Q   Now, this particular report is from
16   November of 2006 before your promotion.  Did you
17   continue to receive field intelligence reports
18   after your promotion?
19         A   I don't recall if I continued that
20   process.
21         Q   Okay.  So -- but this is a report
22   that -- did you prepare the field intelligence
23   report itself, actually put the document together?
24         A   No.  That was done for me.  The regional

48  (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    directors provided it, and it was put together.
2        A   Okay.  You would have reviewed it at the
3    time, however?
4        A   Yes.
5        Q   Okay.  And then you're passing it on.
6    Was it your practice when you reviewed the reports
7    that to -- to double-check if anything seemed to
8    be suspicious, inaccurate?  Like if you would say,
9    That doesn't make sense, would you double-check
10   and make sure it was right before passing it on?
11       A   Yeah, I --
12           MR. MORRIS:  Objection to form.
13           THE WITNESS:  I don't recall.
14   BY MS. SCULLION:
15       Q   I mean, would it have been your practice
16   to -- to just pass it on without even reviewing it
17   at all?
18       A   I just don't recall this -- the field
19   intelligence report, if I -- if I double-checked
20   it or not.
21       Q   Okay.  But you were -- is it safe to say
22   if you passed it on, you were passing it on
23   because you thought it was useful information,
24   correct?

Page 191

1        A   Yes.
2        Q   Okay.  And on this first page of your --
3    of the field intelligence report for
4    November 30th, 2006, under the heading "Key
5    Objections to Opana from Physicians" --
6        A   Yes.
7        Q   -- do you see the second bullet point
8    says: "One objection that has been arising is
9    that they don't feel the need for another opioid
10   at this point, regardless of the formulation."
11           Do you see that?
12       A   Yes.
13       Q   So that was a piece of information that
14   was coming up from the field in November of 2006,
15   correct?
16       A   That was a piece of information that
17   someone had -- had brought forward, yes.
18       Q   And that you passed on within Endo,
19   correct?
20       A   Yes.
21       Q   All right.  And the next bullet point
22   that came up from the field was: "Not willing to
23   try a new ER opioid" -- and that's extended-
24   release opioid, right?

Page 192

1        A   Yes.
2        Q   "Not willing to try a new ER opioid
3    without hearing some success from thought
4    leaders/specialists."
5            Do you see that?
6        A   Yes.
7        Q   And that was another piece of
8    intelligence obviously coming up from the field
9    that you passed on?
10       A   Yes.
11           MR. MORRIS:  Objection to form.
12   BY MS. SCULLION:
13       Q   What -- what's the reference to "thought
14   leader"?  What is a "thought leader"?
15       A   A thought leader is someone that has a
16   steep knowledge in -- in the treatment of the
17   disease, has a lot of experience using product,
18   many different products in that marketplace -- in
19   that disease state.
20       Q   Did -- did Endo make use of thought
21   leaders as part of its sales and promotion of
22   Opana ER?  Start with that.
23       A   Thought leaders were used a lot in
24   speaker programs as an example.

Page 193

1        Q   Okay.  And we just spoke about speaker
2    programs.
3        A   Yes.
4        Q   How else were thought leaders used in
5    connection with Opana ER?
6        A   We also used them in training to educate
7    our sales team.  And marketing team.
8        Q   And there -- it says here "thought
9    leaders/specialists."  Is there a distinction
10   between thought leaders and specialists?
11           MR. MORRIS:  Objection to form,
12   foundation.
13           THE WITNESS:  I don't know.  I don't
14   know what they're referring to, or I -- I don't
15   see a difference.
16   BY MS. SCULLION:
17       Q   Okay.  And in your experience, did the
18   use of thought leaders in connection with Opana ER
19   help support Endo's sales efforts for that
20   product?
21       A   I can't -- I can honestly say I don't
22   recall any specific -- where they actually had a
23   difference one way or the other.
24       Q   Just to go back a bit, when you joined

49  (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    Endo in 2003, Ms. Ammon was still with the
2    company, correct?
3        A   She was the CEO at the time, yes.
4        Q   Did you ever have a chance to meet her?
5        A   I did.
6        Q   Okay.  Did you find her to be a -- a
7    thoughtful person?
8        A   Yes.
9        Q   Good business person?
10       A   Yes.
11       Q   Honest?
12       A   Yes.
13       Q   Proud of how Endo built its business?
14       A   Yeah.  I didn't know her very well.  I
15   only met her once at a Christmas party.
16       Q   Okay.
17       A   But -- but she seemed --
18       Q   That was the impression.
19       A   -- like a very nice person.
20       Q   Okay.  But that was the impression, that
21   she was a -- I mean, putting aside being at a
22   Christmas party, did she have a reputation for
23   being a good business leader?
24       A   A lot of integrity.

Page 195

1        MR. MORRIS:  Objection to form.
2    BY MS. SCULLION:
3        Q   Okay.  A lot of integrity.
4        THE REPORTER:  Excuse me.
5        MR. MORRIS:  Yeah, sorry.
6        THE REPORTER:  I can't get --
7        MR. MORRIS:  Same rule of talking over,
8    I've got to get my words in too.
9        THE WITNESS:  My fault.
10       MS. SCULLION:  I was also speaking over.
11   BY MS. SCULLION:
12       Q   And so if Ms. Ammon had said that the
13   use of thought leaders to help move the medical
14   community around the treatment of chronic pain was
15   an important part of Endo's success, would you
16   believe that was probably a pretty accurate
17   statement?
18       MR. MORRIS:  Objection.  Form and
19   foundation.
20       THE WITNESS:  I -- I don't know.  I --
21   I've never heard her make that statement, so I --
22   I don't know.  I can't imagine she would get to
23   that level in the business.
24   BY MS. SCULLION:

Page 196

1        Q   But if -- but if she did make that kind
2    of statement, you would expect that she would know
3    what she was talking about, right?
4        A   Yes.
5        Q   Okay.  If you continue back on
6    Exhibit 13, the same page we were on, going down
7    two more -- three more bullet points, you see
8    under "Key Objections to Opana from Physicians,"
9    it says "Abuse."  Do you see that?
10       A   Let me just -- on the -- under "Key
11   Objections for Opana"?
12       Q   "Key Objections" --
13       A   Oh, I'm sorry.
14       Q   -- "to Opana from Physicians."  That's
15   okay, there's two similar ones.  The first
16   heading, "Key Objections to Opana from
17   Physicians."
18       A   Okay.
19       Q   And go down to the second to last bullet
20   point is easier.
21       A   Yes.
22       Q   It says "Abuse."  So that was an
23   objection that was being reported up from the
24   field in November of 2006, correct?

Page 197

1        A   That came from somebody within the
2    organ- -- sales organization.
3        Q   And you passed that on within Endo.
4        A   Yeah.
5        Q   And then the next heading is "Key
6    Objections to Opana from Pharmacists."
7        A   Mm-hmm.
8        Q   And it says:  "The key objection to
9    Opana from pharma -- from my pharmacists is cost
10   to stock in the pharmacy before a prescription
11   comes through the pharmacy."
12       Do you see that?
13       A   Yes.
14       Q   The second bullet point says:  "Cost and
15   fear of having another opioid in the store."
16       Was that a -- an objection that Endo was
17   hearing from pharmacists with respect to Opana ER
18   in November 2006?
19       MR. MORRIS:  Objection.  Form and
20   foundation.
21       THE WITNESS:  I can honestly say --
22   again, this -- I didn't write this, so I can
23   honestly say I did not hear that, that there was a
24   fear of stock -- because there was a black -- they

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1   had a storage box in the pharmacies for opioids,
2   so they were locked up.
3   BY MS. SCULLION:
4       Q   Okay.  But -- but clearly somebody
5   within -- somebody in the field was reporting that
6   there was some cost and fear of having another
7   opioid in the stores among some pharmacists,
8   correct?
9       A   Yeah.  And just to clarify, I mean this
10  could be --
11      Q   I'm sorry, if you could answer just that
12  question.  That somebody was reporting that some
13  pharmacists had that fear, correct?
14      A   Some --
15          MR. MORRIS:  Objection.  Foundation.
16          THE WITNESS:  I'm assuming that is --
17  looking at this --
18  BY MS. SCULLION:
19      Q   Okay.
20      A   I shouldn't say assume, but, yes, it
21  looks like someone reported that.
22      Q   And then you reported that again back up
23  to Endo.
24      A   This report went to Endo.

Page 199

1       Q   Right.  Okay.  And then the last section
2   on this page is:  "How much time are physicians
3   providing you to discuss Opana and the brand's
4   benefits?"  Do you see that?
5       A   Yes.
6       Q   And here the bullet points talk about
7   three to five minutes to discuss Opana and the
8   brand's benefits.  With an appointment or lunch,
9   it's more than adequate, 30 minutes.  Without an
10  appointment or lunch, it's more -- it's no more
11  than two minutes.  Someone else is reporting up in
12  the last bullet point it can be anywhere from a
13  few seconds to 15 minutes.
14          And those are all consistent with --
15  with your experience of sort of a variety of
16  amount of time that reps would have to discuss
17  Opana ER and the brand's benefits with physicians,
18  right?
19          MR. MORRIS:  Objection.  Foundation.
20          THE WITNESS:  I would say that -- and
21  again, you have to realize this -- this report, it
22  could be one person saying this.  So, you know,
23  you have to take it in the correct context.
24          But I would say that representatives

Page 200

1   typically got, you know, four to five, six, ten
2   minutes to -- to present their -- their products
3   to the physician.
4   BY MS. SCULLION:
5       Q   Okay.  And when they're presenting the
6   products to the physician, they in fact often were
7   presenting more than one product at the same time,
8   right?
9       A   Yes.
10      Q   So that whole time period, whatever it
11  was, if it was three minutes, five minutes, six
12  minutes, wouldn't be spent just on one product,
13  right?
14      A   That's right.
15      Q   Okay.
16      A   But just to put that in context also,
17  you know, let's say it's three products, they
18  would spend most of their time on the first one,
19  and then much less on the second and third.
20      Q   Okay.  And then if you go down -- I'm
21  sorry, I'm on the next page, E1183.3.  And if you
22  would go down to the last section, which is headed
23  "What messages or data in the MVA are the most
24  compelling to your customers?"  Do you see that?

Page 201

1       A   Mm-hmm, yes.
2       Q   And the MVA, again that's the master
3   visual aid, correct?
4       A   Correct.
5           (Counsel conferring.)
6   BY MS. SCULLION:
7       Q   We're going to pull that MVA just so you
8   can --
9       A   Okay.
10      Q   -- you can take a look at it.
11          But what's reported here is that the
12  most compelling message -- messages to the
13  customers include -- there's pharmacokinetics,
14  durable efficacy over a three-month period, no
15  known CYP-450 inhibitions, efficacy, and true
16  every 12-hour dosing.  They like the TIMERx
17  delivery system.  Is that how you pronounce that,
18  TIMERx or TIME Rx?
19      A   I think it was TIME Rx.
20      Q   Okay, TIME Rx.  That makes more sense.
21          Let me ask you about that one, efficacy
22  and true every 12-hour dosing, was that -- that
23  was a core message for Opana ER in November of
24  2006, right?

51  (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    A   Yes.
2    Q   Okay. And then if you go to the last
3  page of Exhibit 13, you see the section headed
4  "What messages or data in the MVA are the least
5  compelling" --
6    A   Yes.
7    Q   -- "to your customers?" Do you see
8  that?
9    A   Yes.
10    Q   And here what's reported up are a few
11  things: The mean concentration, the front cover,
12  the promise info, black box, and the indication
13  additional safety information.
14        And so if I understand correctly, what
15  was being reported up was, among other things, is
16  the black box was one of the least compelling
17  messages or data being presented to the customers.
18        MR. MORRIS: Objection. Foundation.
19  BY MS. SCULLION:
20    Q   Right?
21    A   I -- I don't know that other than
22  through this, but I can put it in context to say
23  they were calling on experienced opioid writers,
24  so they are very familiar with the black box, even

Page 203

1  though we covered it.
2    Q   Right. So you say they were calling on
3  experienced opioid writers.
4    A   Mm-hmm.
5    Q   Was your field intelligence report just
6  coming up from specialty reps?
7    A   Yes.
8    Q   Okay. These were coming up from the
9  specialty reps. Okay.
10        But -- so fair to say that the specialty
11  reps, though, are saying that their customers are
12  find -- are not finding the black box a
13  particularly compelling selling message.
14    A   Correct.
15    Q   Okay. And that's true as well for the
16  indication of additional safety information,
17  right?
18    A   Correct.
19        MR. MORRIS: Objection. Foundation.
20        (Romaine Exhibit No. 14 was marked
21        for identification.)
22  BY MS. SCULLION:
23    Q   Okay. Let me -- let me hand you what's
24  been marked as Exhibit 14.

Page 204

1    A   Thank you.
2        MS. SCULLION: And I apologize, I don't
3  have another one.
4        THE WITNESS: Oh, are we done with this
5  one for now?
6  BY MS. SCULLION:
7    Q   We might come back to it, so just hold
8  on to it.
9    A   Okay.
10    Q   So I've handed you exhibit -- I'm sorry,
11  this is 14, right?
12    A   Yes.
13    Q   Okay. Exhibit 14, which is Bates-
14  stamped ENDO_OPIOID_MDL-01655584, and we've
15  numbered at the top E1023.
16        And you can see on the first page of
17  Exhibit 14, this is an e-mail from Ms. Vitanza to
18  you and others dated September 18th, 2006. The
19  subject matter is "Final Opana and Opana ER MVA
20  and Navigator." Correct?
21    A   Yes.
22    Q   Okay. And then if you turn back within
23  Exhibit 14, do you recognize pages E1023.2 going
24  on through 1023.17 as the master visual aid in use

Page 205

1  in September 2006 for Opana ER?
2    A   I -- it looks familiar. I can't
3  honestly say I do remember it from 2006.
4    Q   Okay. But you do remember this -- this
5  campaign of "Help your patient stay ahead of pain"
6  as the campaign -- a campaign that was used for
7  Opana ER, right?
8    A   I -- I don't remember that specifically,
9  but I remember we had master visual aids --
10    Q   Okay.
11    A   -- to use with our sales force.
12    Q   All right. And do you recall that there
13  were a series of master visual aids used to help
14  promote Opana ER?
15    A   Yes, over time.
16    Q   Okay. Do you recall there was one in
17  2006, one in 2007 and one in 2008?
18    A   That sounds familiar.
19    Q   And they were typically launched at the
20  national sales meeting each year?
21    A   I can't say they were honestly done at
22  the beginning of every year, but they were -- we
23  had master visual aids that constantly changed
24  based on education and training.

Page 206

1  Q  Okay.
2      MS. SCULLION:  Do we have the others?
3  I'm just going to let you see the others
4  as well.
5      THE WITNESS:  Okay.
6      (Romaine Exhibit Nos. 15 and 16
7      were marked for identification.)
8  BY MS. SCULLION:
9  Q  I'm handing you what's marked as
10  Exhibit 15. And Exhibit 16. If you give me a
11  moment, I'll read the numbers into the record.
12      So Exhibit 17 -- I apologize for
13  starting that out of order -- Exhibit 17 is
14  ENDO_CHI_LIT -- I apologize. I got it wrong? So
15  16.
16      MR. MORRIS:  Yeah, we only got up to 16,
17  I think.
18      THE WITNESS:  Yeah.
19      MS. SCULLION:  Yeah, no, I thought I
20  definitely got it.
21      MR. MORRIS:  Okay.
22      MS. SCULLION:  So thank you.
23  BY MS. SCULLION:
24  Q  Exhibit 16 is ENDO_CHI_LIT-00032928, and

Page 207

1  it's marked E786.
2      And Exhibit 15 is Bates-stamped a couple
3  different numbers. ENDO-0000105. It also has a
4  number E0049029. And those are in the lower
5  right-hand corner.
6  A  Oh, okay. I'm sorry.
7  Q  There's a lot of numbers.
8  A  Yeah.
9  Q  There's a lot of numbers. We're just
10  doing that for the record --
11  A  Okay.
12  Q  -- so later on someone can find it --
13  A  Yeah.
14  Q  -- and people on the phone can find it.
15  A  Okay.
16      MR. MORRIS:  You won't be tested on the
17  numbers later.
18  BY MS. SCULLION:
19  Q  And let's look at Exhibit 15, which has
20  the vault illustration on the front --
21  A  Mm-hmm.
22  Q  -- designed for durable pain control.
23  Do you generally recognize this as a master visual
24  aid used in connection with Opana ER?

Page 208

1  A  Yes.
2  Q  Okay. I'll represent to you our
3  understanding is this was used in 2007 -- 2007.
4  A  Okay.
5  Q  Okay. Our understanding was that
6  Exhibit 14 was used in 2006. 15, 2007.
7      And then Exhibit 16, do you recognize
8  that as another master visual aid used in
9  connection with the promotion of Opana ER?
10  A  Yes, it looks familiar.
11  Q  Okay. And this one was represented -- I
12  represent it was used in 2008.
13  A  I just don't recall the years in which
14  they were used.
15  Q  Understood.
16      MS. SCULLION:  Oh, great. Thanks.
17  BY MS. SCULLION:
18  Q  And Erica helpfully points out to me, if
19  you want to go to the back of Exhibit 16, at the
20  bottom left-hand corner, you can see has a date of
21  May 2008 under Chadds Ford, Pennsylvania.
22  A  Okay.
23  Q  Do you see that?
24      Do you see those numbers 0P -- or OP,

Page 209

1  rather, OP-0301/May 2008?
2  A  Yes.
3  Q  And that's -- that's a designation that
4  Endo would put on its promotional terms in order
5  to be able to track the number of -- for the item
6  and the date on which it was authorized to be
7  issued -- authorized to be used, rather?
8  A  I don't know. I never -- I never --
9  Q  Never looked at those.
10  A  -- paid attention to that.
11  Q  Okay. And similarly, on Exhibit 15, if
12  you look at the very last page at the bottom, you
13  will see that's dated November 2007. You see
14  that?
15  A  I'm trying to catch up -- oh, it's to
16  the right side. Okay.
17  Q  Yeah. Do you see that?
18  A  Yes.
19  Q  Okay. So that's part of our basis for
20  understanding when these were used.
21      And let's -- hold on one second. I got
22  off track here. Okay.
23      So back in Exhibit 13, field
24  intelligence report.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    A   Okay.
2    Q   There's a reason I got to the MVAs.  On
3  that last page, E1183.4, the third bullet point
4  down references as one of the least compelling
5  messages or data in the MVA, it says "Promised
6  info."  Do you see that?
7    A   Yes.  I'm sorry.
8    Q   Okay.  And that was a reference to the
9  PROMISE program that Endo had put in place in
10  connection with the promotion of Opana ER,
11  correct?
12    A   I don't -- I don't recall the PROMISE
13  program.
14    Q   That's why I was going to show you the
15  MVA.  If you will go to Exhibit 14 now.  Probably
16  the easiest thing to do is just flip right to the
17  very last page.
18    A   Okay.
19    Q   Turn it over and see the very last page?
20    A   Oh, I've got it on -- I'm sorry.
21    Q   And this is page E1023.64.  There, you
22  got it.
23    A   Got it.
24    Q   All right.  And at the bottom of this

Page 211

1  page, do you see the reference to PROMISE
2  initiative?
3    A   Yes.
4    Q   The Partnership for Responsible Opioid
5  Management through Information, Support and
6  Education.
7    A   Yes.
8    Q   And seeing that, does that refresh your
9  recollection about what PROMISE was?
10    A   I remember the word "PROMISE."  I just
11  don't remember anything really about it.
12    Q   Okay.  Safe to say, though, that again
13  someone in the field was reporting to you in
14  November of 2006 that that was one of the least
15  compelling pieces of the MVA, correct?
16    A   Someone in the sales force said that,
17  correct.
18    Q   Okay.  All right.
19    MS. SCULLION:  I was going to suggest
20  that we take a break here for lunch is a good
21  place.  Is that good?  All right.
22    MR. MORRIS:  That sounds good.
23    THE VIDEOGRAPHER:  The time is 12:57
24  p.m.  We're going off the record.

Page 212

1    (Lunch recess.)
2    THE VIDEOGRAPHER:  The time is
3  1:55 p.m., and we're back on the record.
4  BY MS. SCULLION:
5    Q   Welcome back, Mr. Romaine.
6    A   Thank you.
7    Q   We're still under -- you're still under
8  oath.
9    A   Yes.
10    Q   Okay.
11    (Romaine Exhibit No. 17 was marked
12      for identification.)
13  BY MS. SCULLION:
14    Q   Let me hand you -- sorry, what's been
15  marked Exhibit 17.
16    A   And we're done with these visuals for
17  right now?
18    Q   For now, yes.  Thank you.
19    And for the record, Exhibit 17 is marked
20  ENDO_OPIOID_MDL-00468003, and we've marked it
21  E1204.
22    And, Mr. Romaine, this is an e-mail from
23  Alicia Logan to Javier Avalos and Jason Jones
24  dated February 12th -- sorry, February 9th, 2012.

Page 213

1  The subject matter, "Pharmacies that stated recall
2  as a decline reason, refusal; prescribing
3  physician, refusal; not accepting new patients."
4    Do you -- do you remember who Alicia --
5  what Alicia Logan's position was?  What department
6  she was in?
7    A   She -- she was in -- she -- I think she
8  was in the marketing department.  She was with
9  different products, but I think at the -- at the
10  time of this document, she was in the marketing
11  department for Opana.
12    Q   Okay.  And then Mr. Avalos and
13  Mr. Jones, were they in trade?
14    A   In trade.
15    Q   Okay.  And trade refers to the folks who
16  deal with pharmacies and pharmacy stocking?
17    A   Mainly wholesalers, yes.
18    Q   Okay.  Great.  And the e-mail attaches,
19  as you see, a report that has a couple different
20  sections.
21    A   Okay.
22    Q   The first section of the report says:
23  "Pharmacies that stated recall as a decline
24  reason."

54  (Pages 210 to 213)

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    A   Okay.
2    Q   Second says: "Pharmacies that stated
3    refusal prescribing physician as a decline
4    reason."
5        And my question is, is this an example
6    of information that Endo had available to it
7    concerning pharmacies that were refusing
8    prescriptions from certain prescribing physicians?
9        A   I -- I don't know.  I don't recall and
10   I -- I don't know actually.
11       Q   Okay.
12       A   I don't think I've ever actually seen
13   this report before.
14       Q   Putting aside Exhibit 17, were you aware
15   at any point in time whether Endo had information
16   about pharmacies refusing to honor prescriptions
17   written by specific physicians with respect to
18   Opana?
19       A   I don't recall that.
20       Q   Do you recall it either way?
21       A   No.
22       Q   You don't recall.
23       A   No, neither way.
24       Q   Okay.  Would it surprise you to know

Page 215

1    that Endo had information about pharmacies that
2    were declining prescriptions for -- for various
3    reasons?
4        MR. MORRIS:  Objection to form.
5        THE WITNESS:  I -- I just -- I don't
6    know if I have an opinion on that one way or the
7    other.
8    BY MS. SCULLION:
9        Q   Okay.  You mentioned earlier the process
10   by which sales reps and district managers could
11   call a compliance hotline --
12       A   Mm-hmm.
13       Q   -- to report suspected diversion.  Do
14   you remember that?
15       A   Yes.
16       Q   Okay.  And as part of the investigation
17   into suspected diversion, would you agree it would
18   have been useful to use information about
19   pharmacies that were declining to honor
20   prescriptions for certain prescribers?
21       MR. MORRIS:  Objection.  Form,
22   foundation.
23   BY MS. SCULLION:
24       Q   Let me put it this way:  If -- if

Page 216

1    somebody reported a doctor as being engaged in
2    suspected diversion, do you think it would be
3    useful to also know whether the pharmacies were
4    refusing to honor prescriptions written by that
5    doctor?
6        A   I guess I'm a little confused by that,
7    because pharmacies get prescriptions from many
8    different doctors, so I'm not sure if one doctor
9    would have an impact or not.  I don't -- I don't
10   know.
11       Q   But would you want to know, for example,
12   if -- if a rep had identified a doctor that they
13   suspected was engaged in diversion was a pill
14   mill --
15       A   Okay.
16       Q   -- would you think it would be useful in
17   investigating that to look to see whether
18   pharmacies in that territory were declining to
19   honor that prescriber's prescriptions?
20       MR. MORRIS:  Objection.  Form,
21   foundation.
22       THE WITNESS:  Yeah, I can't answer that
23   from my role or the reps' role.  I think it --
24   it's probably helpful for other divisions within

Page 217

1    the organization to have that information.
2    BY MS. SCULLION:
3        Q   So did -- did reps have knowledge of
4    whether pharmacies were declining to -- to honor
5    prescriptions written by physicians in their
6    territory?  Was that something they would have
7    known?
8        A   Not to my knowledge.
9        Q   Okay.  And again, I think you said that
10   in your experience as VP of sales, certainly you
11   didn't realize that Endo had any information about
12   pharmacies declining to honor prescriptions by
13   particular doctors.  You didn't know that
14   information existed?
15       A   Yeah, I -- I don't recall it existing.
16       Q   Okay.  Okay.
17       (Romaine Exhibit Nos. 18 and 19
18       were marked for identification.)
19   BY MS. SCULLION:
20       Q   Let me hand you what's been marked as
21   Exhibit 18 and 19.
22       For the record, Exhibit 18 is Bates-
23   stamped ENDO_OPIOID_MDL-0068400 -- is there
24   another -- I have it cut off.  I apologize.

55  (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1      MR. MORRIS: Ours is cut off too. Let's
2  see --
3      MS. SCULLION: We'll try to -- we'll try
4  to get the number for the record. We can look
5  that up.
6  BY MS. SCULLION:
7      Q   We have marked it as E966, and it is
8  Exhibit 18.
9      And Exhibit 19, similarly, the Bates
10  number is cut off. We will get it. We have
11  marked it as E879.
12      Mr. Romaine, do you remember earlier
13  today testifying that you did not recall reps
14  comparing Opana ER to OxyContin in the course of
15  their sales presentations, right?
16      A   Yeah, I think the way I worded it is
17  that they were instructed and -- to focus on Opana
18  and not competitors.
19      Q   Were they permitted to compare Opana to
20  OxyContin in their sales presentations?
21      A   I don't --
22      MR. MORRIS: Objection to form.
23      THE WITNESS: I don't recall. I do
24  remember they were instructed to focus on selling

Page 219

1  Opana ER or Opana.
2  BY MS. SCULLION:
3      Q   Okay. Well, if you look at Exhibit 18,
4  Exhibit 18 is --
5      A   Okay.
6      Q   -- starts with an e-mail from Chris --
7  is it Getters (phonetic)?
8      A   Goeters.
9      Q   Goeters. Thank you.
10      Chris Goeters to James Kasik, May 25th,
11  2007. Subject matter, "ECR." And Mr. Goeters is
12  attaching then an E -- an ECR and skill tracker
13  for Mr. Kasik, correct?
14      A   Yes.
15      Q   And Mr. Goeters was a district manager?
16      A   A district manager.
17      Q   In which district, do you recall?
18      A   I -- he was in Texas. But I don't know
19  what geography. He might have covered more than
20  Texas.
21      Q   Fine. And Mr. Kasik was -- was one of
22  his sales representatives?
23      A   I -- I don't recall his name.
24      Q   Fair enough. If you go to the ECR

Page 220

1  itself, looking at page E966.2, and we go to the
2  row under "Needs Identification" --
3      Do you see the second --
4      A   Yes.
5      Q   -- row down, "Needs Identification"?
6      A   Mm-hmm.
7      Q   And then I'm looking in the section of
8  that under "DM Comments." It starts with "You
9  asked some good questions." Do you see that?
10      A   Yes.
11      Q   And again, the DM comments, these would
12  then be the district manager's comments on this
13  representative's performance and coaching to the
14  representative with respect to, in this case, the
15  concept of needs identification, right?
16      A   Right.
17      Q   All right. And Mr. Goeters is coaching
18  that some of the good questions that Mr. Kasik
19  asked to uncover needs were: "How many rescue
20  meds do your patients take, and how many is too
21  many? Do they take too many Oxy ER? Those are
22  very important needs identification questions."
23      Did I read that correctly?
24      A   You read that correctly.

Page 221

1      Q   Okay. So fair to say Mr. Goeters is
2  coaching Mr. Kasik that it is a good thing to try
3  to ask the prescriber about their needs with
4  respect to Oxy ER, correct?
5      MR. MORRIS: Objection to form.
6      THE WITNESS: I don't know if I can make
7  that correlation or not, but I do see the writing
8  on the -- the report here.
9  BY MS. SCULLION:
10      Q   It's certainly what he coached the
11  witness -- sorry, excuse me -- certainly what he
12  coached the sales representative, correct?
13      A   Or what he documented here in this
14  report.
15      Q   I apologize for that. That was just a
16  brain slip.
17      And Oxy ER is a reference to OxyContin,
18  that's your understanding?
19      A   I -- I don't know what he -- I don't
20  know that's what he was referring to.
21      Q   Would you assume that's what he's
22  referring to?
23      A   I don't like to assume.
24      Q   Okay.

56  (Pages 218 to 221)

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    A  So I don't know.
2    Q  Did you ever call OxyContin Oxy?
3    A  No.
4    Q  Okay.  Do you know any other drug called
5  Oxy ER?
6    A  No.
7    Q  And if you can go to Exhibit 19, which
8  is another ECR.  This is from Andy Watson,
9  district manager --
10    A  Yes.
11    Q  -- to Cedric Corbett.  Do you see that?
12    A  Yes.
13    Q  All right.  And this is dated February
14  of 2007.  If you go to the second page, E879.2, in
15  the box for dialogue, and under the district
16  manager's comments, Mr. Watson's comments, he's
17  commenting on a call with Dr. Marcom yesterday.
18      And he goes on to -- he says in here,
19  the patient that they were discussing with the
20  prescriber, Dr. Marcom:  "The patient was on
21  OxyContin and was using a large quantity of PRN
22  medications, and you effectively used your MVA to
23  and the opioid experienced patient data to deliver
24  a key benefit of Opana ER therapy, fewer occasions

Page 223

1  for PRN meds because of its true Q12 dosing and
2  durability of effect."  Correct?
3    A  That's -- yes.
4    Q  That's the coaching that Mr. Watson is
5  providing to the sales representative with respect
6  to a discussion of a patient that was then on
7  OxyContin, right?
8      MR. MORRIS:  Objection.  Form and
9  foundation.
10      THE WITNESS:  It looks like that that's
11  what he wrote in the document after the --
12  BY MS. SCULLION:
13    Q  It's certainly --
14    A  -- after the call.
15    Q  It's certainly -- certainly what he
16  wrote.  And again, we saw earlier that ECRs were
17  intended to be an accurate summary of what the
18  district manager discussed with the
19  representative, right?
20    A  They -- they were intended to be a
21  summary of what the physician --
22    Q  It intended to --
23    A  -- or what the -- what the DM discussed
24  with the representative.

Page 224

1    Q  And intended to be an accurate summary,
2  correct?
3    A  I think as accurate as possible.
4    Q  Okay.
5    A  A lot more information obviously is
6  shared in a coaching environment versus what's
7  written in -- on the paper.
8    Q  Okay.  So we do know at least, though,
9  that's what's written here indicates that there
10  was a discussion about a patient on OxyContin, and
11  the representative's use then of the MVA and
12  messaging about the key benefit of Opana ER
13  therapy, fewer occasions for PRN meds because of
14  its true Q12 dosing and durability of effect,
15  that's what -- that's what we know from this
16  document --
17    A  Right.
18    Q  -- with the coaching, right?
19    A  Correct.
20      MR. MORRIS:  Objection.  Form and
21  foundation.
22  BY MS. SCULLION:
23    Q  Did regional -- regional business
24  directors review the ECRs prepared by the DMs

Page 225

1  after the fact?
2    A  I -- I can say they -- they reviewed
3  some.  I can only -- I can't say they actually
4  reviewed all of them.
5    Q  Okay.  And what was the purpose of -- of
6  them reviewing the ECRs?
7    A  To overall look at, one, how -- how the
8  district manager was coaching the representative.
9  And, two, to ensure that -- to ensure if there's
10  other needs in the organization that needed to be
11  discussed with marketing to create training or,
12  you know, ongoing materials that might be
13  important for use in the field in the future.
14    Q  Okay.  Are you aware of any regional
15  business director reviewing either of these ECRs
16  and -- and coaching that -- that this needed to be
17  corrected, any of the messaging needed to be
18  corrected?
19    A  I'm not aware of that.
20    Q  Okay.
21      MS. SCULLION:  Can I have E502 and
22  E1180, please.
23      (Romaine Exhibit No. 20 was marked
24      for identification.)

Page 226

1     MS. SCULLION:  I need an extra copy too.
2  Mine is --
3        (Counsel conferring.)
4  BY MS. SCULLION:
5     Q  Let me hand you what's been marked as
6  Exhibit 20.
7     A  Thank you.
8     Q  And it's Bates-stamped ENDO_OPIOID_
9  MDL-04908831.  And again, we've marked it in the
10  upper right-hand corner E502.
11        And this is an e-mail from Amy Lohr to
12  Peter Lankau and others dated July 23rd, 2002.
13  Subject matter "BMT Meeting Brand Strats for
14  Review."
15        Do you see that?
16     A  Yes.
17     Q  Okay.  And if you just go to page 502.8.
18  I apologize.  Hold on one second.
19  I apologize.  Let me take you back to
20  502.5 to orient you to the document.
21     A  0.5?
22     Q  It's "Brand Strategies and Budget
23  Summary."  Do you see that?
24     A  Yes.

Page 227

1     Q  All right.  If you turn to the next
2  page, 502.6, the first brand discussed there is
3  Percocet, correct?
4     A  Yes.
5     Q  All right.  And 502.7 is discussing
6  Percocet key strategies, and this is with respect
7  to -- it says in bullet point 1, "Promote Percocet
8  7.5/325 and 10/325."  Do you see that?
9     A  Yes.
10     Q  And those I think you testified earlier
11  were strengths of Percocet that when you first
12  joined Endo were still being promoted by sales
13  reps, correct?
14     A  Correct.
15     Q  All right.  And it says here:  "The
16  strategy -- the key strategy was promote Percocet
17  7.5/325 and 10/325 for patient types who are
18  likely treatment candidates to expand their usage
19  in the moderate to moderately severe acute and
20  chronic pain market."  Do you see that?
21     A  Yes.
22     Q  And when you joined Endo and the sales
23  reps were selling these two strengths of Percocet,
24  were they promoting it for usage in moderate to

Page 228

1  moderately severe acute and chronic pain market?
2        MR. MORRIS:  Objection.  Form and
3  foundation.
4        THE WITNESS:  I -- I don't recall what
5  the indication for -- for those products were at
6  this time.
7  BY MS. SCULLION:
8     Q  Do you recall that -- though, that reps
9  were promoting it for the chronic pain market?
10     A  I --
11        MR. MORRIS:  Same objection.  Form and
12  foundation.
13        THE WITNESS:  I do remember they were
14  promoting it for -- in the pain market, but I
15  don't remember the specific indication they were
16  promoting it for.
17  BY MS. SCULLION:
18     Q  So you don't recall whether it was
19  chronic or acute?
20     A  I -- I don't at this time.
21     Q  Do you recall at any point in time that
22  Percocet was being promoted for use in the chronic
23  pain market?
24     A  I -- I don't.

Page 229

1     Q  Okay.  But certainly that's what is
2  indicated here as the key strategy for Percocet,
3  correct?
4     A  Correct.
5        MR. MORRIS:  Objection.  Form and
6  foundation.
7  BY MS. SCULLION:
8     Q  And similarly, if you go now to
9  page E502.8, again, what's indicated here is that
10  a Percocet key strategy -- it again repeats the
11  strategy from the prior page, and it indicates
12  examples of patient types, and one of the patient
13  types indicated here is chronic low pain, correct?
14  Chronic low back pain.
15     A  Yes.
16     Q  All right.  And it says "the product
17  target OxyContin," do you see that?
18     A  Yes.
19     Q  Was OxyContin a competitive product that
20  Endo was targeting with respect to its promotion
21  of Percocet 7.5/325 and 10/325?
22        MR. MORRIS:  Objection.  Form and
23  foundation.
24        THE WITNESS:  I don't recall at the

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    time.
2    BY MS. SCULLION:
3        Q    But certainly that's what's indicated in
4    the brand strat, correct?
5        A    Yes.  Yes.
6            MR. MORRIS:  Objection.  Form and
7    foundation.
8    BY MS. SCULLION:
9        Q    What's a -- what is a brand strat?
10       A    Brand strategy.
11       Q    And in your experience at Endo, what --
12   what was a brand strategy used for?  What was the
13   purpose of the brand strategy?
14       A    It was the strategy that the marketing
15   team used to -- to drive the performance of a
16   brand, their focus.
17       Q    And would that include identification of
18   competitive products from which Endo sought to
19   take market share, for example?
20           MR. MORRIS:  Objection.  Form and
21   foundation.
22           THE WITNESS:  I don't know because I
23   wasn't involved in a lot of their brand strat
24   meetings or did I receive a lot of information

Page 231

1    from them.
2    BY MS. SCULLION:
3        Q    Okay.  And you see that on page E502.1,
4    the very beginning?
5        A    Yes.
6        Q    It states here that this is a 2003 brand
7    strat.
8        A    Yes.
9        Q    So this would indicate that this was the
10   strategy to be used in 2003, correct?
11       A    Yes.
12       Q    All right.  And again, we see that -- if
13   you go to page E502.9.
14       A    Yes.
15       Q    "Percocet 2003 A&P Budget Summary."
16       A    Yes.
17       Q    And that would be the budget for
18   advertising and promotion of Percocet for 2003,
19   correct?
20           MR. MORRIS:  Objection.  Form and
21   foundation.
22           THE WITNESS:  I -- my experience, A&P
23   does stand for that.
24   BY MS. SCULLION:

Page 232

1        Q    Okay.  And it -- and this document is
2    saying that's -- this is the budget for Percocet
3    for A&P for 2003.  That's what the document says,
4    right?
5        A    Yes.
6        Q    Okay.  And that includes, at least on
7    the first line, a budget of almost 1.5 million for
8    sales support materials, correct?
9        A    Correct.
10       Q    And a budget of a little more than
11   2.3 million for journal advertising, correct?
12       A    Correct.
13       Q    When you joined Endo in 2003 and were
14   selling Percocet 7.5/325 and 10/325, did -- did
15   you use sales support materials to do that?
16       A    The sales force did use support
17   materials.
18       Q    And are you aware that there was journal
19   advertising for those strengths at the time?
20       A    I can honestly say I never -- I don't
21   think I ever saw journal advertising, but I never
22   paid pay much attention to it.
23       Q    You didn't pay much attention.  So you
24   don't know either way.

Page 233

1        A    Right.
2        Q    Okay.  All right.
3            MS. SCULLION:  Can I have E1214?
4            (Romaine Exhibit No. 21 was marked
5            for identification.)
6    BY MS. SCULLION:
7        Q    I'll hand you what's marked as
8    Exhibit 21.
9        A    Thank you.
10       Q    And it's Bates-stamped ENDO_OPIOID_
11   MDL-04929187.  And at the top right-hand corner
12   we've marked it as E1214.1.  Do you see that?
13       A    Yes.
14       Q    Would you prefer -- I can give you like
15   the color copy.  Let me switch those out.
16       A    Thank you.
17       Q    And do you recognize Exhibit 21 as an ad
18   campaign used by Endo in connection with the
19   promotion of Percocet 7.5/325 and 10/325?
20       A    I don't --
21           MR. MORRIS:  Objection to form.
22           THE WITNESS:  I don't recognize it.
23   BY MS. SCULLION:
24       Q    Do you recognize it either way?

59 (Pages 230 to 233)

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    A   No.
2    Q   All right.  When you joined Endo and
3  were helping to sell the 7.5/325 and 10/325
4  strengths of Percocet, was one of the conditions
5  it was promoted to treat low back pain?
6    A   I just don't recall.
7    Q   You don't recall either way?
8    A   Yeah, I don't recall.
9    Q   Okay.  Just to finish up here, if you go
10  to page E1214.6.
11    A   Yes.
12    Q   And it should say "Stay on top of low
13  back pain."  Do you see that?
14    A   Yes.
15    Q   And it states there:  "Safe and
16  effective for patients not responding to standard
17  first-line therapy," and then you see the chart
18  underneath of that discussing double the pain
19  relief.  Do you see that?
20    A   Yes.
21    Q   Just looking that over, do you recall
22  this messaging being delivered in connection with
23  the promotion of Percocet 7.5/325 and 10/325, that
24  there was an open label clinical study showing

Page 235

1  double the pain relief?
2    A   I don't recall it.
3        (Counsel conferring.)
4        (Romaine Exhibit No. 22 was marked
5        for identification.)
6  BY MS. SCULLION:
7    Q   Let me hand you what's been marked as
8  Exhibit 22.  And this is Bates-stamped
9  ENDO_OPIOID_MDL-04911467, and we've stamped it as
10  E1180 in the top right-hand corner.
11        Now, Mr. Romaine, this is an e-mail
12  from -- is it Joseph Ambrefe?
13    A   Yes.
14    Q   Ambrefe?
15    A   Yes.
16    Q   And it was to you, Mr. Wickline and --
17  I'm sorry, it was to the Pharma DMs and specialty
18  sales force DMs, and you were cc'd, alone with
19  Mr. Wickline and Mr. Pearson, correct?
20    A   Yes.
21    Q   And this was in -- in June 2003, right
22  around the time that you joined, correct?
23    A   Yeah.  In fact, this was the -- this
24  meeting is the first meeting I attended after I

Page 236

1  joined.  Do you remember this meeting?
2    Q   Do you remember this meeting?
3    A   I do.
4    Q   Okay.  And subject matter, just for
5  completion of the e-mail, is "Slides from
6  Turnberry."  Was there a meeting in Turnberry?
7    A   Turnberry, Florida.
8    Q   Great.  And if you go to page E1180.3,
9  it references the Endo State of the Union for
10  looks like the first quarter of 2003.
11    A   Yes.
12    Q   So is this a review of the sales force
13  performance for that quarter?
14    A   For that period of time, that's what it
15  looks like.
16    Q   Okay.  And if you go to E1180.4, the
17  next page, the very first product for which sales
18  performance for that quarter is reviewed is
19  Percocet 7.5/325 and Percocet 10/325, correct?
20        MR. MORRIS:  Objection.  Foundation.
21  BY MS. SCULLION:
22    Q   It's just -- it's the first product
23  discussed.
24    A   Oh, I'm sorry.  I'm looking -- I'm

Page 237

1  looking at 5.  It's 4?  4, yes.
2    Q   Yes.  Thank you.  So this is the first
3  product that's being discussed in this State of
4  the Union.
5    A   Yes.
6    Q   Okay.  Let's go to E1180.6.  And the
7  title of the slide is "Performance to Goal."
8    A   Yes.
9    Q   And it indicates here that specialty is
10  at 105 percent.  Is that they were at 105 percent
11  of the goal for that quarter?
12        MR. MORRIS:  Objection.  Form and
13  foundation.
14        THE WITNESS:  I -- I don't know, because
15  I wasn't there at that time, but based on what
16  this slide says.
17  BY MS. SCULLION:
18    Q   Well, you -- but you went to the
19  meeting --
20    A   I went to the meeting --
21    Q   -- where the slides were presented,
22  correct?
23    A   I was.  But I don't remember the slides
24  being presented in -- you know, 15 years ago.

60  (Pages 234 to 237)

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Q   Okay.  So just dropping down underneath
2  of the PowerPoint in the speaker's notes, it says:
3  "Last year we began the year well ahead of the
4  demand," open parens, "launch," close parens,
5  "goals for Percocet with Tsunami."  Do you see
6  that?
7    A   Yes.
8    Q   Do you recall Tsunami being an incentive
9  compensation plan in place at Endo in 2002?
10   A   I don't.
11       MR. MORRIS:  Objection to form.
12  BY MS. SCULLION:
13   Q   Okay.  All right.  If you can go to
14  page 1180.22.
15   A   80.20 --
16   Q   80.22, in the upper right-hand corner.
17       Or, you know what, there may be a better
18  page than that.  Let me see.
19       And this is a slide entitled "Primary
20  Action Items," and the first bullet point says:
21  "Stay on call plan."
22       And just -- can you just briefly
23  summarize for us what a call plan was.
24   A   A call plan is the -- the physicians

Page 239

1  that are on your -- call plan is a -- that
2  physicians in your geography that you have a
3  responsibility to call on.
4    Q   Okay.  So they would be physicians
5  within say a sales rep's territory that they had
6  responsibility to call on.
7    A   Correct.
8    Q   All right.  And it says:  "Focused
9  activity within high deciles."  Do you see that?
10   A   Yes.
11   Q   And the deciles refers to taking those
12  physicians and splitting them up into tenths
13  according to their prescribing history, correct?
14   A   My experience is, yes, deciles are based
15  on 1 through 10.
16   Q   Okay.
17   A   I'm not sure what he's referring to
18  here, but that's my experience.
19   Q   Did you refer to "high deciles" from
20  time to time when you were at Endo --
21   A   I did.
22   Q   -- as a phrase?
23   A   I did.
24   Q   What did you mean by "high deciles"?

Page 240

1    A   "High deciles" were physicians that were
2  the most experienced physicians that typically saw
3  a larger portion of patients in that therapeutic
4  class for the product that you had.
5    Q   When you say that they were -- had --
6  tended to have more experience, was decile
7  determined by experience or just by the sales
8  prescription records for that physician?
9    A   I think it -- it was both.  I think they
10  used both prescription data as well as patient
11  population data to understand that.
12   Q   Okay.  So prescription data and patient
13  population data, correct?
14   A   Correct.
15   Q   But not necessarily years of experience,
16  for example.
17   A   No.  No.
18   Q   Okay.  And again, the bullet here says:
19  "Focused activity within high deciles."
20       With respect to promotion of Percocet,
21  was the sales force -- the specialty sales force
22  focused on the high deciles when you joined?
23   A   Well, they were focused on all the
24  deciles that they had responsibility for.

Page 241

1    Q   From time to time was there an
2  encouragement to reps to focus on high deciles
3  with respect to Percocet?
4    A   Yes.
5    Q   And why was that?
6    A   I can't say in respect to Percocet, but
7  in respect to all brands --
8    Q   Fair enough.
9    A   -- to correct myself.
10   Q   And what -- why would there be -- why
11  would Endo be encouraging reps to focus on high
12  deciles?
13   A   They had the largest patient population.
14  So, historically, typically that's the area where
15  representatives are going to have the greatest
16  impact, the greatest help for -- for a particular
17  practice, physician practice.
18   Q   So, in other words, you're looking at
19  the folks who are already prescribing --
20   A   And experienced.
21   Q   -- the most, and those are going to most
22  likely be the prescribers from whom you will be
23  able to generate the most prescriptions going
24  forward.

61  (Pages 238 to 241)

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    A  Correct.
2    Q  Okay.  Did you ever hear Mr. Wickline
3  use the phrase "Fish where the fish are"?
4    A  I don't recall that.
5    Q  Okay.  And if you'd just go to E1180.49.
6    A  Okay.
7    Q  And this is the slide, the title is
8  "Grand Prix Contest."  We talked about the Grand
9  Prix contest earlier today.  Do you remember that?
10    A  Yes.
11    Q  All right.  And I think you said the
12  Grand Prix was a contest that Endo did run in
13  connection with the sales of Percocet, correct?
14    A  Correct.
15    Q  All right.  And it says here, "One
16  metric: Percocet TRx increase."  Do you see that?
17    A  Yes.
18    Q  Is that -- is that accurate, to your
19  recollection, that was the one metric used for
20  Grand Prix?
21    A  You know, I don't remember specifically
22  what the contest rules were.  I just remember the
23  contest -- a Grand Prix contest when I first
24  joined the company.

Page 243

1    Q  Okay.  But this does indicate that
2  there's just one metric, and that is increase in
3  Percocet prescriptions, right?
4    MR. MORRIS:  Objection.  Form and
5  foundation.
6    THE WITNESS:  Based on this slide.
7  BY MS. SCULLION:
8    Q  That's what it says.
9    A  Yes.
10    Q  And these are the slides that were
11  presented at this Turnberry, Florida meeting,
12  correct?
13    A  I don't --
14    MR. MORRIS:  Objection.  Form and
15  foundation.
16    THE WITNESS:  I don't remember the
17  slides being presented, but --
18  BY MS. SCULLION:
19    Q  Well, that's what the cover --
20    A  -- I see what it says.
21    Q  -- e-mail says is the slides, correct?
22    A  Correct.
23    Q  All right.  And the Turnberry, Florida
24  meeting, what was that meeting?

Page 244

1    A  My recollection, and I'm going back 15,
2  16 years, it was a national meeting that we had
3  for all of our representatives.  So it was a
4  training meeting for the next period of time.
5    Q  And that would be --
6    A  Typically it was -- we did one a year.
7  I don't know why it was done in June of that year,
8  but we did one a year.
9    Q  Okay.  So this is at the what also
10  has been referred to the national sales meeting?
11    A  Yes.
12    Q  Thank you.  That is helpful for me to
13  orient.
14    MS. SCULLION:  And then can I have
15  E1172.
16    (Romaine Exhibit No. 23 was marked
17    for identification.)
18  BY MS. SCULLION:
19    Q  I hand you what's marked as Exhibit 23,
20  which is Bates-stamped ENDO_OPIOID_MDL-05589327,
21  and we've marked it E1172.  And it's entitled
22  "2003 Objectives Update, May 7th, 2003."
23    And I just want to turn your attention
24  to the second page of the exhibit, and the very,

Page 245

1  very last bullet point on the page, which refers
2  to "The Endo Grand Prix contest," which we just
3  saw a reference to in Exhibit 22, "has been rolled
4  out beginning April 1st, 2002, and ending
5  March 31st, 2004."
6    Do you see that?
7    A  Yes.
8    Q  And then it goes on to explain:
9  "Representatives and managers compete for prizes
10  and the opportunity to drive one of the six -- one
11  of six BMWs as their company car starting in
12  mid-2004."  Do you see that?
13    A  Yes.
14    Q  And -- and do you recall that that was
15  in fact one of the prizes for Grand Prix, was the
16  opportunity to drive one of six BMWs as a company
17  car?
18    A  Yes.
19    Q  Okay.
20    MS. SCULLION:  Can I have 1218, and then
21  also pull out 142, please.
22    (Romaine Exhibit No. 24 was marked
23    for identification.)
24  BY MS. SCULLION:

62  (Pages 242 to 245)

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1    Q   I'm going to hand you what's been marked
2  as Exhibit 24.  And this is Bates-stamped ENDO_
3  DATA_OPIOID_MDL- -- we're going to get the Bates
4  number.  I apologize, I didn't realize these were
5  cut off.
6        MR. MORRIS:  Sometimes if it comes on
7  the screen, you can see it, so if you want to pop
8  that there.
9        MS. SCULLION:  Yeah, E1218.
10       MR. MORRIS:  Yeah.
11       MS. SCULLION:  Thank you.
12       MR. MORRIS:  So the first -- oh, what's
13  happening, I think, is there's a cover page that
14  isn't on here maybe.
15       MS. SCULLION:  No, it's a different --
16  that's a different document.  The history is
17  different.  1218 --
18       MR. MORRIS:  Oh, yeah, this one --
19       MS. SCULLION:  It's a data- -- it's a
20  datasheet.  I apologize, we will get the Bates
21  numbers.
22       Sabrina, can you keep track of which
23  ones we have to read into the record later?  Thank
24  you.

Page 247

1  BY MS. SCULLION:
2    Q   So Exhibit 24.
3    A   No, there's no cover sheet with this
4  one.
5        MR. MORRIS:  No, no, there's
6  different --
7  BY MS. SCULLION:
8    Q   There is not.
9        MR. MORRIS:  A different document.
10  BY MS. SCULLION:
11   Q   This is -- I'll represent to you this is
12  a printout of a datasheet that was produced to us
13  in this litigation --
14   A   Okay.
15   Q   -- by Endo.
16       And my understanding of this datasheet
17  is it represents sales of Percocet in Ohio for the
18  year 2007.  And I -- I just wanted to bring you to
19  the datasheet itself, and see in the upper
20  left-hand corner it says "IMS_ID"?
21   A   Mm-hmm.
22   Q   I apologize, you're going to need to say
23  "yes" and "no."
24   A   Oh, yes.

Page 248

1    Q   Do you have an understanding of what
2  IMS_ID refers to?
3    A   I believe it stands for an ID number
4  that was assigned to a physician for tracking
5  purposes.
6    Q   Okay.  And then you'll see in this
7  datasheet, it states the -- the first and last
8  names of the physicians, the street address, city,
9  state code, zip, a specialty description, the
10  product, the year, the prescription and the
11  prescription units.  Do you see that?
12   A   Yes.
13   Q   Is Exhibit 24 representative of the
14  level of detail of information you had available
15  to you at Endo with respect to prescriptions of,
16  in this case, Percocet?
17       MR. MORRIS:  Objection.  Form and
18  foundation.
19       THE WITNESS:  I don't recall ever seeing
20  this data or document.  I -- TRx units, is that
21  market units?  I don't know what that means.
22       MR. MORRIS:  Form.
23       MS. SCULLION:  Okay.  I'm not sure, and
24  I'm certainly not going to testify today, only

Page 249

1  because that would be problematic.
2        MR. MORRIS:  You could try that for a
3  while.
4        MS. SCULLION:  No, it's not good.
5  BY MS. SCULLION:
6    Q   But -- so putting aside the specific
7  data, did you when you were VP of sales have this
8  level of data available to you, though, of
9  prescriptions for the products that your reps were
10  selling in the field?
11       MR. MORRIS:  Objection.  Form.
12       THE WITNESS:  We had data.  I never
13  looked at down to the territory level obviously,
14  but more at the national and regional levels.
15  BY MS. SCULLION:
16   Q   Okay.  But the territory level, they had
17  this level of data?
18   A   They did have this level of data.  I
19  don't know if it was in this form or not.  I don't
20  recall this.
21   Q   I -- I doubt that it was.  Again,
22  this -- this form was produced to us specifically
23  in this litigation, but it comes from a -- a
24  database of some sort, I understand.

63 (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 250

1    A   Okay.
2        MS. SCULLION:  See, I testified.
3        May I have E142.  Thank you.
4        (Romaine Exhibit No. 25 was marked
5        for identification.)
6    BY MS. SCULLION:
7        Q   Now, I'm going to hand you what's been
8    marked as Exhibit 25.  And the Bates number is
9    ENDO_CHI_LIT-00543478, and we've marked it E142 in
10   the top right corner of the --
11       A   Yes.
12       Q   -- PowerPoint pages.
13           Now, Endo, as we saw, sold Percocet when
14   you joined in 2003.  We saw just now sales in
15   2007.  You're aware that Percocet had a -- a long
16   history of -- of abuse, correct?
17           MR. MORRIS:  Objection.  Form,
18   foundation.
19           THE WITNESS:  I'm not aware of that.
20   BY MS. SCULLION:
21       Q   Okay.  Let's look to page E142.4.  Which
22   is entitled "Scheduled Drug Survey Statistics."
23       A   Okay.
24       Q   So the first bullet point states:

---

Page 251

1    "Percocet is ranked among the top three opioids,"
2    open parens, "out of 14," close parens, "to
3    potentially abuse as per OAS, Opioid
4    Attractiveness Scale, developed by a team of FDA
5    advisors."  And it's citing to the Harm Reduction
6    Journal, February of 2006.
7            Were you aware when you were selling
8    Percocet that it was ranked among the top three
9    opioids by this scale developed by a team of FDA
10   advisors?
11       A   I don't recall that.
12       Q   Is that something you would have wanted
13   to know when you were selling Percocet?
14           MR. MORRIS:  Objection.  Form.
15           THE WITNESS:  I -- I don't know.  I -- I
16   don't know the impact it would've had.
17   BY MS. SCULLION:
18       Q   Do you think that the doctors on whom
19   sales reps were calling to sell Percocet would
20   have wanted to know about this ranking?
21           MR. MORRIS:  Objection to form.
22           THE WITNESS:  Well, to put it in
23   context, the reps have very limited information
24   they can share that -- and it's got to be approved

---

Page 252

1    through medical, regulatory and legal review
2    boards.
3    BY MS. SCULLION:
4        Q   Right.
5        A   So it would have to come through them as
6    an approved piece before they could share it.
7        Q   Do you think the physicians that they
8    were calling to have wanted to have such an
9    approved piece of information shared with them
10   about the controlled substance they're prescribing
11   to their patients?
12       A   I don't know what they would want.
13           MR. MORRIS:  Objection to form.
14   BY MS. SCULLION:
15       Q   Did you ever make any effort to find out
16   whether doctors would have wanted to know about
17   the abuse history of Percocet?
18       A   I did not.  But I'm sure people in the
19   organization were probably -- it was triaged to
20   them, and it was handled in that way.
21       Q   To your recollection, were -- were sales
22   reps ever given any information to provide to
23   doctors beyond the PI about the potential for
24   abuse of Percocet?

---

Page 253

1    A   I don't recall.  And to probably put
2    this in context too, when I joined the company, we
3    were at the very end of the Percocet promotion by
4    the sales force.  So we ceased promotion, I want
5    to say in 2004.  I don't know if that was true or
6    not.  Sometime in that period of time.
7        Q   And that was after the Grand Prix
8    contest for sales of 7.5 and 10?
9        A   Yeah, I think that ended in '04,
10   sometime in '04, based on a previous document.
11       Q   And similarly, the next bullet point
12   indicates:  "OxyContin is the most commonly abused
13   prescription opioid analgesic while oxycodone
14   preparations, like Percocet, are ranked third."
15   And they're citing to RADARS as of June 7th,
16   2000 -- 2006.
17           Do you see that?
18       A   Mm-hmm.
19       Q   I need a --
20       A   Yes.
21       Q   -- "yes" or "no."
22           Did you ever look at any RADARS
23   information when you were with Endo?
24       A   I did not.

---

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1   Q   With respect to Percocet?
2   A   I did not.
3   Q   With respect to Opana?
4   A   Not that I recall.
5   Q   Do you know what RADARS is?
6   A   I don't even know the name.
7   Q   And similarly, I assume you're not aware
8   of Endo ever making any effort to provide approved
9   materials for sales reps to give to physicians
10  concerning RADARS data with respect to Percocet?
11  A   I don't recall that.
12  Q   Let's now go back and talk about Opana.
13  A   Okay.
14      MS. SCULLION:  We can take this exhibit
15  down.  Thank you.
16  BY MS. SCULLION:
17  Q   So I think we established earlier -- and
18  again, it may help to look at this demonstrative,
19  Exhibit 4.  We've been through a lot of dates at
20  this point.
21      Do you recall that Endo launched
22  Opana ER as well as Opana IR in June of 2006,
23  correct?
24  A   Correct.

Page 255

1   Q   Do you recall if that was later than
2   Endo had hoped -- had hoped to actually launch it
3   earlier?
4   A   I don't recall that.
5   Q   Okay.  Would it surprise you to know if
6   that was the case?
7       MR. MORRIS:  Objection to form.
8       THE WITNESS:  I don't even know if it
9   would surprise me.  I just don't -- I don't
10  remember if it was due to be launched before that
11  or not.
12  BY MS. SCULLION:
13  Q   Okay.  And it's correct, isn't it, that
14  Endo launched Opana ER just using the -- the
15  package insert, right?
16  A   I don't recall that either.  That
17  was in -- 12 years ago.  I don't recall what
18  materials we had at the time.
19      (Romaine Exhibit No. 25 was marked
20          for identification.)
21  BY MS. SCULLION:
22  Q   Let me hand you what's been marked as
23  Exhibit 25.  And it's Bates-stamped ENDO_OPIOID_
24  MDL-00879677, and at the top we've marked it E964.

Page 256

1       And if you start at the bottom of that
2   first page, 964.1, you will see an e-mail from
3   Demir Bingol to Catherine -- is it Loghed
4   (phonetic)?
5   A   Loughead.
6   Q   Loughead.  Thank you.
7       And that then gets forwarded on to you
8   as a cc on an e-mail going out to pharma all and
9   specialty all, and that would be all the reps,
10  correct?
11  A   Correct.
12  Q   All right.  And Demir Bingol, at the
13  time he was the product manager for Opana ER; is
14  that right?
15  A   He was a product director.
16  Q   A product director.  Thank you.
17      And Mr. Bingol is writing to the -- the
18  sales force.  He says:  "This is an exciting time
19  for Endo as we move forward toward full
20  commercialization of the Opana brand."
21      So really this is -- this was really
22  just the commercial launch for the Opana brand on
23  July 24th, correct?
24  A   Yes.

Page 257

1   Q   And he says in the next paragraph:  "It
2   was originally intended that an enlarged version
3   of the PI would be sent to you after the cluster
4   meetings for use with your customers.  However,
5   due to an unexpected post-approval request by the
6   FDA for minor revisions to the Opana and Opana ER
7   labels, the enlarged PI will now be available
8   immediately following the launch meeting in
9   Orlando.  In the interim, the attached PDF Opana
10  and Opana ER package insert files are the
11  currently approved PIs and should be used to
12  facilitate product discussions with your
13  customers."
14      So, does this refresh your recollection
15  that in July -- July 2006 when the
16  commercialization of Opana ER began, the reps were
17  using the PI?
18      And there's a copy of it attached to
19  this Exhibit 25.  Does that refresh your
20  recollection that's what the reps were using?
21  A   I don't remember specifically that.  But
22  based on this data and the information I'm
23  reading, it sounds like that's what happened.
24  Q   Okay.  And the PI, that discloses what

65  (Pages 254 to 257)

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1   the product has been found safe and effective to
2   treat --
3       A   It's got all the --
4       Q   -- correct?
5       A   -- information on -- on the product,
6   indication, dosing, side effect profile, et
7   cetera.
8       Q   Okay.  And that's all that Endo lawfully
9   can promote the -- actively promote the product
10  for is what's in the PI, right?
11      A   Correct.
12          MR. MORRIS:  Objection.  Form,
13  foundation, legal conclusion.
14  BY MS. SCULLION:
15      Q   Okay.  And so actively making health
16  claims about the safety or efficacy of the product
17  beyond what's in -- in the PI, that would be
18  unlawful -- unlawful off-label marketing, right?
19          MR. MORRIS:  Objection.  Form,
20  foundation, legal conclusion.
21  BY MS. SCULLION:
22      Q   It's not permitted, correct?
23          MR. MORRIS:  Same -- same objection.
24          THE WITNESS:  Yeah, I -- it's not

Page 259

1   permitted.
2           MS. SCULLION:  Can I have E1219?
3           (Romaine Exhibit Nos. 26 and 27
4           were marked for identification.)
5   BY MS. SCULLION:
6       Q   I'll hand you what's been marked as
7   Exhibit 27.
8       A   Thank you.
9           MS. SCULLION:  Thank you.  Somehow I got
10  the wrong number.
11  BY MS. SCULLION:
12      Q   And It's Bates-stamped ENDO_OPIOID_
13  MDL-04920194, and we've marked it E1219.1.
14          MR. MORRIS:  Before -- excuse me, I am
15  confused.  Do we have a 26?
16          MS. SCULLION:  Let's stop and make sure
17  then.
18          MR. MORRIS:  I'm not trying to interrupt
19  unnecessarily.
20          MS. SCULLION:  That's okay.
21          THE WITNESS:  This -- this is 26, I
22  think.
23          MR. LOMAX:  On the record, I think she
24  said 25 --

Page 260

1           MR. MORRIS:  Ah.  I see.  Got it.
2           MS. SCULLION:  I apologize.
3           MR. MORRIS:  I wrote it down wrong.
4           MS. SCULLION:  Someone was paying
5   attention.
6           MR. MORRIS:  Excellent.  Thank you.
7           MS. SCULLION:  So is it E964 is 26?
8   Thank you.  I apologize for that.
9   BY MS. SCULLION:
10      Q   All right.  So Exhibit 27 we have in
11  front of you.
12      A   Yes.
13      Q   This is an e-mail from you to
14  Mr. Wickline on August 21st, 2006.  Subject
15  matter, "Info for your meeting on Tuesday."  Do
16  you see that?
17      A   Yes.
18      Q   And you're writing to convey to
19  Mr. Wickline a response to the question:  "How
20  effectively are we able to communicate Opana's key
21  features and benefits by using only the PI and our
22  clinical study?"
23          Do you see that under your name?
24      A   Yes.  Mm-hmm.

Page 261

1       Q   Okay.  So this is a reference to
2   promoting Opana using only the PI and the clinical
3   studies, right?
4       A   Correct.
5       Q   Okay.  And then the answer says:  "DM
6   team unanimous -- unanimously agreed that the use
7   of the PI is not limiting our effectiveness.
8   Physicians are very interested in the PK and
9   clinical efficacy data contained within the PI."
10          Do you see that?
11      A   Yes.
12      Q   And do you recall that -- I'm sorry.
13  What was the DM team?
14      A   District manager team.
15      Q   So this is the district managers saying,
16  Using the PI is not limiting our effectiveness, we
17  can do that.  Right?
18      A   And I -- to put this in context, I think
19  it was during the period we only had the PI.
20      Q   Right.
21      A   Yeah.
22      Q   Right.  So, in other words, so the
23  district manager is saying, We can do this, we can
24  promote this product using just the PI.

66  (Pages 258 to 261)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1       MR. MORRIS: Objection. Form and
2   foundation.
3       THE WITNESS: For that period of time.
4   BY MS. SCULLION:
5       Q   Right. It's not limiting the
6   effectiveness, correct?
7       A   For that period of time until we get
8   additional materials.
9       Q   But they agree at that point in time it
10  was not limiting their effectiveness, right?
11      A   Correct.
12      Q   Okay. As you said, then more materials
13  are getting rolled out over time, right?
14      MS. SCULLION: So let's have E1200.
15      (Romaine Exhibit No. 28 was marked
16      for identification.)
17      MS. SCULLION: Thank you.
18  BY MS. SCULLION:
19      Q   This is Exhibit 28. It's Bates-stamped
20  ENDO_OPIOID_MDL-00880262, and we've labeled it
21  E1200.
22      Do you see this begins with an e-mail
23  from Kristin Vitanza to Catherine Loughead, and
24  cc'd to you on August 24th, 2006, correct?

Page 263

1       A   Correct.
2       Q   All right. And this is Ms. Vitanza
3   announcing the launch of additional materials
4   beyond the PI.
5       A   Correct.
6       Q   For example, a new sales aid, correct?
7       A   Correct.
8       Q   A Pharm/alert she's announcing, right?
9       A   Correct.
10      Q   Okay. Two more down she says there is a
11  now available journal ad, right?
12      A   Correct.
13      Q   All right. Go to the next page, and
14  Ms. Vitanza indicates that: "We anticipate Opana
15  and Opana ER pens, lanyard pens and Post-It
16  notepads will be available in mid-October with
17  respect to premiums." Correct?
18      A   Correct.
19      Q   Do you recall that those premiums were
20  made available with respect to Opana and Opana ER?
21      A   They were made available.
22      Q   And they were distributed in the field?
23      A   Correct.
24      Q   And then again, there's a reference to

Page 264

1   the PROMISE initiative. Does this any better
2   refresh your recollection about what the PROMISE
3   initiative was?
4       A   No, I just saw that, but it doesn't.
5   I'm sorry.
6       Q   That's okay.
7       And if you look at the e-mails above
8   that, Ms. Romero is writing to Mr. Wickline and
9   says: "FYI, Opana noise update."
10      And Mr. Wickline then writes back:
11  "Noise is good. Thanks."
12      Do you see that?
13      A   Mm-hmm.
14      Q   So noise is just -- okay, now we're
15  going -- starting to generate a little more buzz
16  around Opana ER through these various tools,
17  correct?
18      MR. MORRIS: Objection. Form and
19  foundation.
20      THE WITNESS: So just to put this in
21  context, if you look at the previous document we
22  talked about, it also stated that programs seem to
23  be in demand to learn more and discuss with
24  colleagues. So I think this was in -- in -- you

Page 265

1   know, this was a follow-up from that is that more
2   information would be coming. Right.
3   BY MS. SCULLION:
4       Q   Okay. So more information is coming?
5       A   Yes.
6       Q   And that's -- that's the noise around
7   Opana?
8       A   Well, these were approved materials that
9   could be used in -- in the promotion of Opana,
10  yes.
11      Q   Understood.
12      A   Yeah.
13      Q   So these are -- these are going to help
14  support sales, correct?
15      A   Right. Like the return policy, a good
16  example. I mean we needed a return policy.
17      Q   Okay.
18      MS. SCULLION: And then E1202.
19      And then I need the exhibit number we
20  used for the MVA.
21      (Counsel conferring.)
22      (Romaine Exhibit No. 29 was marked
23      for identification.)
24  BY MS. SCULLION:

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q   I'm going to hand you what's been marked
2    Exhibit 29.  And Exhibit 29 is Bates-stamped
3    ENDO_OPIOID_MDL-02309518, and we've stamped it --
4    oops, I got two documents together.  This is not
5    correct.
6        MS. SCULLION:  May I have that back.  I
7    apologize.
8        MR. MORRIS:  I think the one you gave me
9    actually doesn't have the --
10       MS. SCULLION:  We -- we need to take a
11   look at this document.  There's like three
12   different versions going on there.  So...
13       MR. MORRIS:  We've been going for about
14   an hour.  Do you want to just take a quick break?
15   You can do that while you're doing that or --
16       MS. SCULLION:  Yeah, we can do that, but
17   this just needs to be a quick break, we'll fix
18   that.  That's good.
19       THE VIDEOGRAPHER:  The time is 2:54 p.m.
20   We're going off the record.
21       (Recess.)
22       THE VIDEOGRAPHER:  The time is 3:04
23   p.m., and we're back on the record.
24       (Romaine Exhibit No. 29 was marked

Page 267

1        for identification.)
2    BY MS. SCULLION:
3        Q   Mr. Romaine, I'm going to hand you
4    what's been marked as Exhibit 29.  And this is
5    Bates-stamped ENDO_OPIOID_MDL-00858402.  And at
6    the bottom you will see an e-mail from David Kerr
7    to yourself, Mr. Wickline, and others.  Subject
8    matter, "Forward:  Opana Weekly, November 17th."
9        Do you see that?
10       A   Yes.
11       Q   And at the time David Kerr, as you say,
12   was senior vice president, commercial business,
13   correct?
14       A   Yes.
15       Q   He was at that point Mr. Wickline's
16   boss.
17       A   Correct.
18       Q   Okay.  And Mr. Kerr is commenting on the
19   report of Opana weekly prescriptions dated
20   November 17th, correct?
21       A   Correct.
22       Q   And he's noting an increase of 4 percent
23   on the Opana ER, correct?
24       A   Yes.

Page 268

1        Q   All right.  He says:  "With five weeks
2    to go to year end, 2500 prescriptions per week
3    appears to be a stretch."
4            And in his -- he is then asking for
5    thoughts.  He says at the end:  "We have all,
6    unlike the field, staked a big chunk of IC on
7    hitting the 2500 TRx per week.  What can we do to
8    help drive more traction?  Getting it done while
9    doing it right."  In quotation, "I am all ears."
10           So do you remember that Mr. Kerr was
11   looking for suggestions on how to increase sales
12   to try to hit the 2500 prescriptions per week
13   mark?
14       A   Yeah, I don't remember this specific
15   e-mail, but reading the e-mail, it seems like he's
16   asking for feedback.
17       Q   On how to try and hit this 2500
18   prescriptions per week mark?
19       A   Well, I read it more about how to
20   continue to make the launch of Opana ER
21   successful, but...
22       Q   Okay.  But he does say, "We've all" --
23   he says, "We've all, unlike the field, staked a
24   big chunk of IC."  So --

Page 269

1        A   I don't know what that means.  That's --
2    I was curious about that.
3        Q   So -- okay.  Do you think IC refers
4    there to incentive compensation?
5        A   Yes.
6        Q   Okay.  And I think you said this -- the
7    level of yourself and Mr. Wickline and others,
8    incentive compensation would be based on corporate
9    goals and objectives, right?
10       A   Yes.  However --
11       MR. MORRIS:  Objection.  Foundation.
12       THE WITNESS:  -- to put it in context,
13   I mean, there was a number of objectives and
14   expectations we had for corporate IC, which
15   Opana ER would not have been a huge portion of
16   that.
17   BY MS. SCULLION:
18       Q   Well, clearly Mr. Kerr is -- is
19   conveying that there's a big chunk of the IC on --
20   staked on hitting --
21       A   Right.
22       Q   -- the mark for -- for Opana.
23       A   Right.
24       Q   Mr. Kerr would know best about that with

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1   respect to the commercial -- commercial business
2   department at the time at Endo, correct?
3          MR. MORRIS: Objection. Form and
4   foundation.
5          THE WITNESS: I -- all I know is that
6   my -- my incentive comp was based on the
7   objectives of the organization, and Opana ER is
8   one of many.
9   BY MS. SCULLION:
10     Q   Okay. In response to Mr. Kerr,
11  Mr. Wickline does provide some -- some ideas, and
12  one of the things he says is, in the second
13  paragraph: "This week we are kicking off a
14  five-week context -- contest for growth in each
15  district between now and December 29th."
16         So that's an indication there's going to
17  be a contest to try to grow Opana ER sales?
18     A   I just want to read the entire e-mail.
19     Q   Sure.
20     A   (Peruses document.) Okay.
21     Q   So there's an indication that there's
22  going to be a contest to try and grow Opana ER
23  sales, correct?
24     A   Correct.

Page 271

1      Q   All right. And he's also indicating
2   that reps are being asked to concentrate on the
3   top five customers in their territory, which he
4   calls the Fab Five, right?
5      A   I'm not sure what the Fab Five refers
6   to, but --
7      Q   Well, if you go up to the first
8   paragraph --
9      A   Okay.
10     Q   -- the second sentence he says: "Since
11  the completion of the meetings, we've provided
12  direction to concentrate on the top five customers
13  in each territory (Fab Five)."
14     A   Yes. Okay, got you.
15     Q   And that's -- so he's saying go see
16  those top five customers in each territory and to
17  target them twice per week.
18     A   Correct.
19     Q   All right. Okay. So there's some
20  activity happening to try to increase Opana ER
21  sales, right?
22         MR. MORRIS: Objection to form.
23         THE WITNESS: Oh, I'm sorry. Based on
24  his e-mail, that's what he's saying.

Page 272

1   BY MS. SCULLION:
2      Q   Okay. So there's --
3          MS. SCULLION: And then can we have the
4   CMR demonstrative.
5   BY MS. SCULLION:
6      Q   Do you recall that sales did begin to
7   build for Opana ER 2007, 2008, 2009? They did
8   build over time, right?
9      A   Sales did grow over that period of time.
10     Q   Okay.
11     A   Again, in context, compared to other
12  opioids, it was much smaller.
13     Q   I understand. I'm just talking about
14  the growth for Opana ER.
15         (Romaine Exhibit No. 30 was marked
16            for identification.)
17  BY MS. SCULLION:
18     Q   Let me hand you what's been marked as
19  Exhibit 30.
20         MS. SCULLION: And, Counsel, let me
21  explain what we've done here. Exhibit 30 in front
22  of the witness has a summary sheet of the CMR data
23  that was produced to us. The Bates numbers at the
24  top here, ENDO_DATA_OPIOID_MDL-8 through 19, which

Page 273

1   are each individual CMR summary sheets, behind the
2   witness's exhibit is a copy of each of those CMR
3   summary sheets. So the exhibit for the deposition
4   will be the complete set of those CMRs as well as
5   the summary. So we're just going to proceed from
6   there.
7          MR. MORRIS: Okay. I'll object to the
8   use of this demonstrative, particularly on
9   foundation and form.
10         MS. SCULLION: Okay.
11  BY MS. SCULLION:
12     Q   So, Mr. Wickline, we summarized some of
13  the data.
14     A   Romaine. Romaine.
15     Q   I'm so sorry.
16     A   That's okay.
17     Q   I'm so sorry. That's terrible.
18     A   He's older than I am, so...
19     Q   Mr. Romaine, we've summarized for you
20  the data provided to us in this litigation with
21  respect to Opana and Opana ER net sales. The
22  information is in the sheets that are attached to
23  your Exhibit 30 --
24     A   Okay.

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1      Q   -- if you wanted to look at them, but I
2   just really wanted to -- to look at the growth
3   over time.
4      A   Okay.
5      Q   So it starts -- let's look at Opana ER's
6   net sales.  It starts at about 23 million.  That's
7   starting midyear or so.
8      A   Correct.
9      Q   So it's a half year.
10      MR. MORRIS:  Objection.  Form and
11   foundation.
12   BY MS. SCULLION:
13      Q   And in 2007, we see net sales of 66 --
14   about 66 million, and then it more than doubles to
15   2008 to about 142 million, right?
16      MR. MORRIS:  Objection.  Form and
17   foundation.
18      THE WITNESS:  Yeah, the report says
19   142 million.
20   BY MS. SCULLION:
21      Q   Okay.  And then again, 2009 further
22   increased to 172.  And in 2010 were increasing up
23   to 239 million.  And by 2011, it's at 384,300 --
24   340,359.  Do you see that?

Page 275

1      A   I see that number.
2      Q   And that's just for --
3      MR. MORRIS:  Objection.  Form and
4   foundation.
5   BY MS. SCULLION:
6      Q   And that's just for Opana ER.
7      So as you said, although Opana sounds
8   like it didn't meet -- make the market share that
9   Endo had hoped, it did have some pretty nice
10   growth over time --
11      MR. MORRIS:  Objection --
12   BY MS. SCULLION:
13      Q   -- correct?
14      MR. MORRIS:  Objection.  Form and
15   foundation.
16      THE WITNESS:  It had growth over time.
17   BY MS. SCULLION:
18      Q   Okay.  I mean, we saw again almost
19   double sales -- more than double sales, rather,
20   from 2007 to 2008, there is a 40 percent increase
21   from 2009 to 2010, another 60 percent increase
22   from 2010 to 2011.  Those are some increases to be
23   proud of, correct?
24      A   Well --

Page 276

1      MR. MORRIS:  Objection.  Form and
2   foundation.
3      THE WITNESS:  -- I guess to put it in
4   context with the other promoted opioids, it was
5   much smaller.
6   BY MS. SCULLION:
7      Q   I understand it was much smaller, but
8   that was -- that was growth that was generated
9   through the efforts -- the promotional efforts by
10   Endo, correct?
11      MR. MORRIS:  Objection.  Form.
12      THE WITNESS:  Correct.
13      MS. SCULLION:  All right.  Can we have
14   1187?
15      (Romaine Exhibit No. 31 was marked
16      for identification.)
17   BY MS. SCULLION:
18      Q   I'm handing you what's been marked as
19   Exhibit 31.
20      A   Thank you.
21      Q   And Exhibit 31 is Bates-stamped
22   END0097420, and we've marked it E1187.  And this
23   is an e-mail chain.  It starts with an e-mail from
24   Greg -- Pyszczymuka?

Page 277

1      A   Pyszczymuka.
2      Q   -- Pyszczymuka, dated November 3rd,
3   2011.  Subject matter, "Play to Win Weekly
4   Update."
5      Do you recall the Play to Win initiative
6   in 2011?
7      A   I don't.
8      MR. MORRIS:  Objection.  Form and
9   foundation.
10   BY MS. SCULLION:
11      Q   Okay.  If you go down to -- in
12   Mr. Pyszczymuka's e-mail at the bottom of the
13   page, he notes:  "Opana ER" -- the very bottom --
14   "Opana ER weekly TRx highs achieved post-Nucynta
15   ER launch."
16      Do you see that?
17      A   Yes.
18      Q   And he says for September 30th, the
19   sales were -- the TRx's were at an all-time high,
20   right?
21      A   Yes.
22      Q   And again, in the week of October 7th,
23   Opana ER weekly TRx's were at an all-time high,
24   right?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    A   Yes.
2         MR. MORRIS:  Objection.  Form and
3    foundation.
4    BY MS. SCULLION:
5    Q   We talked earlier about what a sales rep
6    does on a -- on a daily basis, right?  So -- and
7    as you said, they're going out average five days a
8    week, they're visiting, trying to -- trying to see
9    six prescribers.
10        I assume that they work roughly 48 weeks
11   a year?
12   A   Mm-hmm.
13   Q   Yes?
14   A   Yes.
15   Q   Okay.  And by 2011, Endo's been
16   promoting Opana ER for a full five years, 2007 to
17   2011, right?
18   A   Correct.
19   Q   So that's going to be well in excess of
20   200 actual -- 200,000 actual details being
21   delivered during that time period, correct?
22        MR. MORRIS:  Objection.  Form and
23   foundation.
24        THE WITNESS:  Well, I would have to do

Page 279

1    the math, but --
2    BY MS. SCULLION:
3    Q   It's --
4    A   -- I'm assuming you're correct.
5    Q   It's a substantial number of details
6    over that time period.
7         And during that period, 2007 to 2011,
8    was Opana ER -- strike that.
9         So those are the details.  You also had
10   the lunches, the speaker series, the approved
11   reprints, these were all the promotional efforts
12   that were going on at this time?
13   A   That were used by the sales force.
14   Q   Okay.  And 2007 to 2011, most of that
15   period you were VP of sales, right?
16   A   Yes.
17   Q   Okay.  And it was -- it was your job to
18   make those -- make sure that the sales efforts
19   were as successful as they could be, correct?
20   A   Well, it was to make sure that they were
21   educated, trained effectively, and could
22   communicate the promotional message effectively,
23   yes.
24   Q   Okay.  But they -- but they were

Page 280

1    executing their sales as effectively as they
2    could?
3    A   Executing the company strategy, yes.
4    Q   Okay.  And the company strategy,
5    execution was with respect to sales within your
6    department.  That was -- you were responsible for
7    the execution of the sales, correct?
8    A   By using the approved promotional
9    pieces.
10   Q   But through sales.  It's the sales
11   department --
12   A   Yes.
13   Q   -- that's doing that?
14   A   Yes.
15   Q   Okay.  And if we look at E1243.
16        (Romaine Exhibit No. 32 was marked
17        for identification.)
18   BY MS. SCULLION:
19   Q   Do you recall that Mr. Lortie in fact
20   commended you for your leadership in helping
21   achieve those sales levels?
22        Sorry, I apologize.  I will hand you --
23   do you recall Mr. Lortie commending you for your
24   leadership?

Page 281

1    A   Brian Lortie was my -- my supervisor, so
2    we had many meetings on my performance.
3    Q   Okay.  Let me hand you what's been
4    marked as Exhibit No. 32.  And it's marked
5    ENDO_OPIOID_MDL-02312040.
6         Do you recognize Exhibit 32 as a copy of
7    your 2009 performance coaching and development
8    report?
9    A   I don't -- don't recognize it as a copy,
10   but it looks like it is.
11   Q   Okay.
12   A   It's been a long time since I saw one of
13   these.
14   Q   Okay.  If you go to the second page of
15   the exhibit, E1243.2.
16   A   .2.  Okay.
17   Q   Just to orient you again, it lists your
18   name as the employee, correct?
19   A   Correct.
20   Q   And it lists your manager as Brian
21   Lortie, right?
22   A   That's correct.
23   Q   And it says this is -- goals and
24   development plan were finalized on March 31st,

71  (Pages 278 to 281)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    '09, and the discussion was had on February 16th,
2    2010, correct?
3        A    Correct.
4        Q    So this is really reviewing your
5    performance with respect to that goal and
6    development plan from March 2009, right?
7        A    Correct.
8        Q    All right.  And if you go to the next
9    page, E1243.3, in the bottom half of the page
10   under the box on the left side that says
11   "Year-end."  Do you see that?
12       A    Yes.
13       Q    It starts with the revenue number and
14   ERS guidance?
15       A    Oh, yes, I'm sorry.  Mm-hmm.
16       Q    We're in the same place?  Good.
17       A    Yes.
18       Q    And at the bottom it says, Opana
19   franchise year-to-date, October, 566,749
20   prescriptions, 123.7 percent to plan.
21            So that's above plan for prescriptions,
22   right?
23       A    Correct.
24       Q    And 200 -- 230.8 million.  Do you see

Page 283

1    that?
2        A    Yes.
3        Q    Okay.  And then on the -- just in the
4    box next to that indicates this is Mr. Lortie's
5    comments on that performance.
6            He says: "Larry's strong leadership of
7    the pain solutions sales team through a
8    challenging year has contributed in a very
9    significant way to the success of the enterprise."
10           Would you agree that you did contribute
11   to the success of the enterprise in that year?
12       A    Yes.
13       Q    In a very significant way?
14       A    In --
15           MR. MORRIS:  Objection.
16           THE WITNESS:  -- what was asked of me.
17           MR. MORRIS:  Foundation.
18   BY MS. SCULLION:
19       Q    Okay.  And the success of the enterprise
20   year is being measured by the sales of the
21   products within the pain solutions team, correct?
22       A    Well, I think he was measuring me not
23   only through the results but also through my
24   leadership --

Page 284

1        Q    Okay.
2        A    -- and behaviors.
3        Q    Well, he goes on to say, he does comment
4    on your -- "Several points during the year, the
5    achievement of the forecast is uncertain," he
6    says, sorry, "and during these times of
7    uncertainty," he comments on your clarity of
8    thinking, focus and positive attitude, right?
9        A    Yes.
10       Q    And then he says: "He also demanded
11   these things from his leadership team, and that
12   this contributed to a focused, energized sales
13   team, which ultimately delivered an above-budget
14   result."  Right?
15       A    Yes.
16       Q    So again, so he's commending you for
17   achieving -- delivering, rather, an above-budget
18   result that year, right?
19       A    I think he's commending me for the
20   skills that I used which allowed us to achieve
21   above-plan budget performance.
22       Q    Right.  And part of the above-budget
23   performance was with respect to the Opana
24   franchise, the 123 --

Page 285

1        A    And all the other business as well.
2            THE REPORTER:  Wait, wait, wait.
3            MS. SCULLION:  Sorry.
4            THE WITNESS:  Oh, I'm sorry.
5            THE REPORTER:  You're talking at the
6    same time.  I think you need to repeat that.
7            MS. SCULLION:  That's fine.
8    BY MS. SCULLION:
9        Q    But part of the above-budget result was
10   with respect to the Opana franchise for which you
11   achieved 123.7 percent to plan result?
12       A    Yes.  But also in clarity, all the other
13   brands performed well also.
14       Q    Understood.
15           So we saw the growth over time for
16   Opana ER from 2006 to 2011.  And similarly, there
17   was -- there was growth for the reformulated
18   version of Opana ER, right?
19       A    Correct.
20       Q    All right.  Now, Opana ER launched -- it
21   was approved in December of 2011, correct?
22       A    I don't remember the exact date,
23   honestly.
24       Q    If you look at Exhibit 4.

Page 286

1    A   Oh, I'm sorry.
2    Q   Okay.  The approval in December of 2011,
3    right?
4         MR. MORRIS:  Objection.  Form and
5    foundation.
6         THE WITNESS:  That's what this document
7    says, yes.
8    BY MS. SCULLION:
9    Q   And then it was actually commercially
10   launched in the spring of 2012, correct?
11   A   That sounds accurate.
12   Q   Okay.
13        MS. SCULLION:  Can I have 1189?
14        (Romaine Exhibit No. 33 was marked
15        for identification.)
16   BY MS. SCULLION:
17   Q   And when it launched in the spring of
18   2012, do you recall you were trying to -- to lift
19   sales at that point for Opana ER?
20        MR. MORRIS:  Objection.  Form.
21        THE WITNESS:  I --
22   BY MS. SCULLION:
23   Q   Do you recall that?
24   A   I recall that we had a sales number that

Page 287

1    we were held accountable to.
2    Q   Okay.  Let me hand you what's been
3    marked as Exhibit 33.  And it's Bates-stamped
4    ENDO_OPIOID_MDL-00644449.
5         And I'm looking at the top of
6    Exhibit 33, which is your e-mail to Kenneth Price
7    on June 24th, 2012, concerning the Opana ER
8    speaker program update for the Midwest region.  Do
9    you see that?
10   A   I do.
11   Q   And you write to Mr. Price:  "All these
12   programs are critical to our ability to lift
13   Opana ER."  And you end with:  "Please keep your
14   teams focused on how important it is right now to
15   get the lift."
16        Do you see that?
17   A   Yes.
18   Q   And again, that was a reference to
19   lifting Opana ER sales during this period, right?
20   A   Yes.
21   Q   Okay.
22   A   But this was in reference to doing
23   speaker programs in his geography.
24   Q   Understood.

Page 288

1    A   Right.
2    Q   But in general, you were looking to --
3    to lift Opana ER during this period.
4    A   Right, but I was responding back to his
5    e-mail --
6    Q   Sure.
7    A   -- that I read below on speaker
8    programs.
9    Q   So that was one of the ways that you
10   were hoping to lift Opana ER sales during this
11   period.
12   A   One of the ways to continue to support
13   the business.
14   Q   Okay.  And to support business here
15   meant to lift Opana ER sales, right?
16        MR. MORRIS:  Objection to form.
17        THE WITNESS:  To continue to grow sales.
18   BY MS. SCULLION:
19   Q   Okay.  And then we heard your -- your
20   voicemail earlier that during 2012, you described
21   that there was a crisis period, and that you were
22   being very direct with your sales management team
23   that if the Endo sales reps could not get doctors
24   to clinically write Opana ER, those sales reps

Page 289

1    should no longer be with Endo, correct?
2         MR. MORRIS:  Objection to form.
3         THE WITNESS:  Yeah, I think the way it
4    was stated is that they had to be able to be a
5    good education and good resource and clinically
6    provide information to physicians so they could
7    prescribe the product if it was fit for the
8    patient population.
9    BY MS. SCULLION:
10   Q   But you -- but that was because Endo was
11   in crisis mode at that point, and you need to have
12   the sales reps being very effective at that point,
13   correct?
14   A   Yes.
15        MR. MORRIS:  Objection to form.
16        THE WITNESS:  Because if I recall back,
17   that was right after we had an outage and we
18   were -- and I think we talked about this earlier,
19   we were trying to make sure that patients who were
20   on Opana ER were able to get Opana ER.
21   BY MS. SCULLION:
22   Q   Okay.  And then if you can go back to
23   Exhibit 30, which is that summary of the net
24   sales, I want to focus now on the right-hand

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    column --
2        A   Okay.
3        Q   -- which is entitled "Opana TRF ER-2."
4    Do you see that?
5        A   Yes.
6        Q   And Opana TRF ER-2, that's referring to
7    the reformulated version of Opana ER?
8        MR. MORRIS:  Objection.  Form,
9    foundation, and continuing objection with respect
10   to the use of the demonstrative.
11   BY MS. SCULLION:
12       Q   Is that correct?
13       A   Opana -- yes.
14       Q   That's how it was referred to internally
15   within Opana TRF ER?
16       A   I don't recall that.  We referred to it
17   as Opana with -- with INTAC technology.
18       Q   Okay.  Do you recall seeing Opana TRF ER
19   being used within Endo?
20       A   You know, I don't -- I don't
21   specifically recall that title, but yeah.
22       Q   Okay.  So then -- so looking at the --
23   the figures, it begins in 2012.
24       A   Yes.

Page 291

1        Q   And you've got 221 million in net sales
2    for 2012, and that's just for the reformulated
3    version, correct?
4        A   Correct.
5        Q   As we said, that reformulated version,
6    it launched sometime in the spring, so it's not
7    even a full year, right?
8        A   Yes.
9        Q   Okay.  And then in 2013, we see some
10   growth in the sales to 222 million, correct?
11       MR. MORRIS:  Objection.  Form and
12   foundation.
13       THE WITNESS:  That's on this paper, yes.
14   BY MS. SCULLION:
15       Q   Okay.  And I think you explained
16   earlier, in 2013 is when a variety of products
17   came off patent.  Opana ER was one of those
18   products that came off patent, correct?
19       A   That's correct.
20       Q   So -- and so in 2013, Opana ER began to
21   face generic competition, correct?
22       A   I probably left by the time that
23   happened, but -- yeah.
24       Q   Okay.  In your experience in

Page 292

1    pharmaceutical sales when a product faces generic
2    competition, do the branded product sales
3    generally decline?
4        A   Yes.
5        MR. MORRIS:  Objection.  Foundation.
6    BY MS. SCULLION:
7        Q   So there wasn't time to make too much of
8    a -- of a track record with the reformulated
9    version of Opana ER, but again, that's a
10   respectable showing in terms of the sales efforts
11   and the results, right?
12       MR. MORRIS:  Objection.  Form and
13   foundation.
14       THE WITNESS:  Yes.
15   BY MS. SCULLION:
16       Q   Okay.  And again, these are the results
17   from the sales force out there.  They're calling
18   on healthcare providers, they're delivering
19   approved reprints, they're inviting people to
20   speaker series, and that's helping to generate
21   those sales, correct?
22       A   Yes.
23       MS. SCULLION:  Could we have E1175,
24   please.

Page 293

1        (Romaine Exhibit No. 34 was marked
2         for identification.)
3    BY MS. SCULLION:
4        Q   I hand you what I just marked as
5    Exhibit 34, and it's Bates-stamped ENDO_OPIOID_
6    MDL-00869053, and we have Bates -- and we stamped
7    it in the top right corner E1175.
8        Mr. Romaine, if you look at the first
9    page of Exhibit 34, do you see this is an e-mail
10   and attachment from you to Mr. Kerr, Mr. Baglin,
11   Mr. Bingol, and Deanne Melloy in September of 2007
12   entitled -- or subject matter, rather, "Opana Top
13   50 Writers"?
14       A   Yes.
15       Q   Okay.  And if you'd just turn to the
16   attachment, which begins at E1175.5.  Is this a
17   set of data that you received in September of 2007
18   concerning the top 50 Opana ER writers for the
19   period January 7th to July -- sorry, January '07
20   to July '07?
21       A   I don't recall specifically receiving
22   this, but it looks like a document I would have
23   gotten in my position.
24       Q   Okay.  Did you from time to time ask for

74  (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  reports of the top 50 or top other segment of --
2  of Opana ER writers?
3      A  You know, I don't recall if I asked for
4  it or if it was provided.
5      Q  Okay.  So this is information that --
6  that was available --
7      A  Yes.
8      Q  -- to you at Endo.
9      A  Yes.
10     Q  So you could -- you could go in and say,
11  Let me see which prescribers are prescribing the
12  most at any given period for a given product.
13  That was available to you to do?
14     A  Yes.
15     Q  All right.  And then if you go back to
16  the front page --
17     A  Mm-hmm.
18     Q  -- of Exhibit 34, you're explaining that
19  -- you said:  "This is some very interesting
20  data."  And you're looking to quantify why certain
21  physicians are jumping up in their sales -- or
22  prescriptions, rather, of Opana and starting to
23  write at a point in time.  And you give an example
24  of one doctor, Dr. Plotnick, who's served by the

Page 295

1  pharma division.
2      Do you see that?
3      A  Yes.
4      Q  Okay.  And you say at the end:  "The
5  point that we need to find is what triggered
6  individuals to start and see if there is a common
7  thread."
8      A  Right.
9      Q  Do you see that?
10     A  Yes.
11     Q  So you're trying to figure out for
12  these -- these top writers, Okay, well, what's --
13  what's triggering them for Opana ER, because you
14  thought that might help understand how you might
15  support sales more broadly for Opana ER, correct?
16     A  Well, I think it was looking at are
17  there tools or resources that the sales force
18  might need or have and not used that somebody is
19  using that is important to the physicians that
20  we're calling on.
21     Q  Okay.  And -- but you're -- you're
22  making an inquiry by looking at, Well, who's
23  writing -- who's prescribing the most?  Let's look
24  at our top customers and see what we can learn

Page 296

1  from them, correct?
2      A  Correct.
3      Q  All right.  Now, if you go back to the
4  exhibit for the -- I'm sorry, the attachment to
5  the exhibit, which is the actual data for the
6  top 50.
7      A  Yes.
8      Q  Let's look at page E1175.5.  There's
9  obviously a good deal of information here.  You've
10  got in the left hand the information about the
11  representative, right, that's servicing the
12  doctor?
13     A  Correct.
14     Q  And the district manager, correct?
15     A  Correct.
16     Q  All right.  And then for the prescriber
17  information, again, you know their name, their
18  prescriber ID, their specialty, correct?
19     A  That's correct.
20     Q  And their address, correct?
21     A  Yes.
22     Q  And then we see the column for "Monthly
23  Sales."  So this is again a -- data showing
24  monthly prescriptions, in this case for Opana ER,

Page 297

1  for each of those individual providers, correct?
2      A  Correct.
3      Q  All right.  And then you have
4  information on the right-hand side that tells you
5  the total that they've written during that period,
6  correct?
7      A  Yes.
8      Q  All right.  So you could tell in any
9  given period again which prescriber is writing the
10  most number of prescriptions for Opana ER,
11  correct?
12     A  Correct.
13     Q  All right.  And when it says "market
14  volume," that's referring to the total
15  prescriptions for Opana ER in that given
16  provider's market?
17     A  I think what that refers to, market
18  volume is the total prescriptions of all opioids
19  in that -- for that physician has written.
20     Q  Okay.  So you could also tell not only
21  how many -- how many prescriptions for Opana ER
22  the prescriber has written but for all opioids
23  during the period.
24     A  Correct.  Market class.

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    Q   Okay.  And when it says "share," is that
2  Opana's share of that prescriber's total market
3  volume?
4    A   That's correct.  That's the way I read
5  this.
6    Q   Okay.  And just looking -- stay on this
7  page, in this period -- so if I read it correctly,
8  two of the top five Opana writers served by the
9  specialty division are in Ohio, correct?
10    A   Let me -- just one second, let me
11  just --
12    Q   Sure.
13      MR. MORRIS:  Objection.  Form and
14  foundation.
15  BY MS. SCULLION:
16    Q   I'm starting with the top is -- it says
17  Edwin Villalobos --
18    A   Yes.
19    Q   -- that gentleman is in Florida.
20      The next two are in Ohio, correct?
21    A   Correct.
22      MR. MORRIS:  Objection to form and
23  foundation.
24  BY MS. SCULLION:

Page 299

1    Q   And as you say, and one is in -- one --
2  sorry.
3      And two are also in Florida, the top
4  five:  Mr. Villalobos at the top and Mr. Scott
5  Tennanbaum is number five, correct?
6    A   That's what the report says, yes.
7    Q   Okay.  And then again, if you look on
8  the next page, 1175.7, this is the top 50 Opana
9  prescribers for the period that were serviced by
10  the pharma division, correct?
11    A   Yes.  Sorry, I wanted to make sure that
12  was specialty on the first.
13    Q   Sure.  So this -- this page, 1175.7,
14  this is the pharma division, correct?
15    A   Correct.
16    Q   All right.  And again, within the top
17  five prescribers you've got a gentleman from
18  Florida, David Hicks, and a gentleman from Ohio,
19  Howard Schertzinger, correct?
20      MR. MORRIS:  Objection.  Form and
21  foundation.
22      THE WITNESS:  There is someone from Ohio
23  there, yes.
24  BY MS. SCULLION:

Page 300

1    Q   It says Howard Schertzinger, right?
2    A   Yes.
3    Q   Okay.  So using the data available to
4  you, you would have been able to see whether a
5  prescriber's volume had changed over the course of
6  any given period.  Right?
7    A   Correct.  I had information available to
8  me.
9    Q   Okay.  And you could have been able to
10  tell if there was an unusual spike in
11  prescriptions for any given prescriber, correct?
12      MR. MORRIS:  Objection.  Form and
13  foundation.
14      THE WITNESS:  Over the month period --
15  prior period, yes.
16  BY MS. SCULLION:
17    Q   Okay.  You could have been able to use
18  it to look to see if there was some unusual
19  pattern in the prescribing for a particular
20  provider, correct?
21      MR. MORRIS:  Objection to form and
22  foundation, legal conclusion.
23      THE WITNESS:  At my level, though, I
24  rarely looked at -- down to that granular.

Page 301

1  BY MS. SCULLION:
2    Q   But this is data that one could have
3  looked at to -- to look at patterns of prescribing
4  for individual doctors, right?
5    A   Correct.
6      MR. MORRIS:  Same objection.
7  BY MS. SCULLION:
8    Q   And similarly, because you have
9  information obviously that tells you that the
10  geographic territory in which each doctor is in,
11  you could also tell whether that doctor's
12  prescriptions were fairly high compared to other
13  prescribers in any given territory, correct?
14      MR. MORRIS:  Objection.  Form.
15      THE WITNESS:  The -- just to clarify,
16  the number of prescriptions that they're writing,
17  is that what you're asking?
18  BY MS. SCULLION:
19    Q   Yes.
20    A   Yes, that was available.
21    Q   Okay.  So you could have seen if
22  Doctor X had ten times the number of prescriptions
23  as the next highest doctor in that territory,
24  right?

76  (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    A   Based on this report, yes.
2    Q   You could have done that.  Okay.
3        MS. SCULLION:  Can I have E524.
4    BY MS. SCULLION:
5    Q   While they are getting that, and just to
6    be clear, did you ever undertake any -- any
7    analysis to see if any prescriber was suspiciously
8    prescribing too much based on information you were
9    seeing?
10   A   I don't recall that.  But I know the
11   organization, the company, in marketing did that
12   at times to look and see if there was any
13   suspicious activity, and then that would have been
14   reported.
15   Q   Okay.  So -- but you did not -- you did
16   not analyze it for that purpose?
17   A   I did not analyze it to that level.
18   Q   Who do you understand within marketing
19   conducted any analysis to look for anything, I
20   think you said, suspicious?
21   A   Well, I would assume -- and I shouldn't
22   use the word "assume" -- but the brand group would
23   look at that.  The regional directors would look
24   at it that close, and if there was suspicion then,

Page 303

1    then that would be reported and handled through
2    the appropriate channels in the company.
3    Q   So let's make sure that we're talking
4    about the same thing.  Start with the regional
5    directors.
6        Would the regional directors, were they
7    required to review sales data within their region
8    to see if there was any unusual pattern?
9        MR. MORRIS:  Objection.  Form and
10   foundation.
11       THE WITNESS:  I don't recall if that
12   was -- I don't recall if that was a directive, but
13   I know that they looked at the data.
14   BY MS. SCULLION:
15   Q   But you don't know if it was actually a
16   compliance directive?
17   A   No, I don't know.
18   Q   Did you ever have any discussions with
19   any regional directors about their review of -- of
20   data to -- to look for suspicion patterns?
21   A   I don't recall.
22   Q   Do you recall anyone ever coming to you
23   and saying, We have identified what we think is a
24   suspicious pattern?

Page 304

1    A   I don't recall that.
2    Q   And by suspicious pattern here, we're
3    talking about a suspected pill mill.  Is that what
4    we're talking about?
5        MR. MORRIS:  Objection to form.
6        THE WITNESS:  Is that what you're
7    asking?
8    BY MS. SCULLION:
9    Q   Yeah.
10   A   So I don't recall -- I mean, I don't
11   recall ever having those discussions.
12   Q   All right.  You said also that folks
13   within brand, the brand group would have been
14   looking at data.  Were they looking at data to try
15   to look for suspicions of pill mills?
16   A   I don't know why they would look at it.
17   It's probably a question you'd have to ask them.
18   Q   Okay.  So you don't know if they were
19   looking at data for that purpose?
20   A   I don't know that.  I know they looked
21   at data.  I don't know for what purpose.
22   Q   And just to be clear, do you know
23   whether regional directors were looking at data
24   for the purpose of trying to see if there were

Page 305

1    suspicious -- suspicions of a pill mill?
2    A   I don't know specifically for that
3    reason.  I know they looked at data.
4    Q   But none of them ever talked to you
5    about having any suspicions about a potential pill
6    mill based on their review of data, right?
7        MR. MORRIS:  Objection to form.
8        THE WITNESS:  I don't recall that.
9    BY MS. SCULLION:
10   Q   Okay.  In your entire, you know --
11   A   Tenure.
12   Q   -- tenure with Endo, you don't ever
13   recall that?
14   A   I don't recall that.
15       MR. MORRIS:  Objection to form.
16       MS. SCULLION:  Do you have 524?  Thank
17   you.
18       (Romaine Exhibit No. 35 was marked
19   for identification.)
20   BY MS. SCULLION:
21   Q   Let me hand you what's been marked as
22   Exhibit 35.  And this is Bates-stamped
23   ENDO_OPIOID_MDL-00856807, and we've stamped it
24   E524 in the top right-hand corner.

77  (Pages 302 to 305)

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    And, Mr. Romaine, I'm focusing on the
2   e-mail on the bottom half of the first page from
3   Mike Weber to the pharma DMs, cc'ing you twice, it
4   looks like.  It says Larry Romaine, Larry Romaine.
5    A  Mm-hmm.
6    Q  Did you have more than one e-mail
7   address?
8    A  No.
9    Q  Just somebody typed it twice.
10   A  Yeah.
11   Q  Okay.  And others.
12    And the subject of the e-mail is
13  "Important - Walgreens stores that have stocked
14  Opana," and this is October 20th, 2006.  Do you
15  see that?
16   A  Yes.
17   Q  And as I understand it, Mr. Weber is
18  writing to advise the pharma DMs of a list of
19  approximately -- it says:  "1500 Walgreens, high
20  opioid potential stores that have stocked Opana
21  5 milligram, Opana ER 5 milligram, and Opana ER
22  20 milligram."  Is that right?
23   A  Do you mind if I read -- read the
24  e-mail?

Page 307

1    Q  Please, go ahead.
2    A  (Peruses document.)  Okay, thank you.
3    Q  So do I understand correctly that that's
4   what Mr. Weber is writing about, to advise that
5   there's approximately 1500 Walgreens, high opioid
6   potential stores that are being stocked with the
7   indicated strengths of Opana and Opana ER?
8    A  Yes.
9    Q  All right.  What's a high opioid
10  potential store, do you know?
11   A  It must -- I don't recall what he's
12  referring to there, and so I shouldn't assume.
13  So, I don't know.
14   Q  Okay.  Now, this is stocking of these
15  stores in October 2006, and if I understand
16  correctly, the stores are being stocked before
17  prescriptions have been written for all of the
18  Opana that's being stocked in those stores, right?
19   A  Can -- can you restate --
20   Q  You're putting -- putting the Opana in
21  the stores to then go out and get prescriptions,
22  correct?
23   A  To begin promotion of -- of Opana ER,
24  yes.

Page 308

1    Q  Okay.  So it's not as if you have
2   prescriptions backed up, and you're saying, Okay,
3   now -- now we have the prescriptions, we can go
4   fill the Walgreens stores with Opana in order to
5   fill those prescriptions.
6    A  Correct.
7    Q  All right.  And if you look in the
8   second paragraph, the last sentence, Mr. Weber
9   refers to "Let's show Walgreens that our Endo team
10  can pull through this product quickly."
11    Do you see that?
12   A  Yes.
13   Q  Did you ever discuss the concept of
14  pulling through product from Walgreens or a
15  similar store?
16   A  I don't -- I don't recall those -- that
17  terminology.
18   Q  Do you have any understanding about what
19  "pull through" means?
20   A  Yes.
21   Q  What does it mean?
22   A  For not -- for a product to be stocked
23  and then be utilized by a physician, by
24  prescribing for a patient.

Page 309

1    Q  And why is Mr. Weber saying, "Let's show
2   Walgreens that our Endo team can pull through this
3   product quickly"?  Why would you need to show
4   Walgreens anything?
5    A  I don't know --
6     MR. MORRIS:  Objection to form.
7     THE WITNESS:  -- what he's referring to
8   here.
9   BY MS. SCULLION:
10   Q  Okay.  I mean, was it -- was she saying
11  that Endo had convinced Walgreens to go ahead and
12  stock this -- this product, and now we want to
13  show them that we can move the product off their
14  shelves for prescriptions?
15   A  I --
16    MR. MORRIS:  Objection to form and
17  foundation.
18    THE WITNESS:  I don't -- I don't know
19  what he's referring to here.
20  BY MS. SCULLION:
21   Q  Okay.  But was that something that --
22  that was one of Endo's goals during this time
23  period was to try to get Opana off of the retail
24  shelves as quickly as it could after it was

78  (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 310

1    stocked?
2        A   Well, our -- our goal was to ensure that
3    we had adequate stocking of the product so we
4    could promote the product to healthcare providers.
5        Q   Okay.  And was it a goal to -- to have
6    product pulled through quickly?
7        A   I don't know if I would term it quickly,
8    but obviously to have it stocked so that it's
9    available.
10       Q   Okay.  And remind me, at this point in
11   time Mr. Weber's position was what?
12       A   He was the director of the pharma
13   division.
14       Q   Thank you.  I had forgotten.
15           And he's writing to his district
16   managers in the pharma division, right?
17       A   In the -- in the -- yes, the pharma
18   division.
19       Q   Okay.  And then in the last paragraph,
20   second sentence, his directive -- following up on
21   the communications from the regional directors,
22   his directive to the pharma DMs is:  "Let's get
23   five high opioid decile MDs in each territory to
24   try Opana ER for the first time on at least one

---

Page 311

1    patient next week."  Right?
2        A   Yes, I see that.
3        Q   Okay.
4            MR. MORRIS:  Objection.  Form and
5    foundation.
6    BY MS. SCULLION:
7        Q   And he's referring to high opioid decile
8    doctors in each territory, correct?
9            MR. MORRIS:  Objection.  Form and
10   foundation.
11   BY MS. SCULLION:
12       Q   MDs is doctors.
13       A   That's what he's written here.
14       Q   Okay.  And -- and again, so that was his
15   directive as to, Let's get the five high opioid
16   doctors to try Opana ER for the first time on at
17   least one patient in each territory this week.
18           MR. MORRIS:  Objection to form.
19           THE WITNESS:  That's what this statement
20   says.
21   BY MS. SCULLION:
22       Q   Pretty aggressive goal, correct?
23           MR. MORRIS:  Objection to form.
24           THE WITNESS:  I -- I don't know that.

---

Page 312

1            MS. SCULLION:  Okay.  Let's take a quick
2    break, we'll get some documents together, and then
3    we can try and move quickly.
4            MR. MORRIS:  Okay.
5            THE VIDEOGRAPHER:  The time is
6    3:50 p.m., and we're going off the record.
7            (Recess.)
8            THE VIDEOGRAPHER:  The time is 4:06 p.m.
9    We're back on the record.
10           (Romaine Exhibit No. 36 was marked
11            for identification.)
12   BY MS. SCULLION:
13       Q   Mr. Romaine, welcome back.
14       A   Thank you.
15       Q   I hand you what's been marked as
16   Exhibit 35, which is Bates-stamped ENDO_OPIOID_
17   MDL-02324335.  And in the lower right-hand corner,
18   we also have our E832.
19           MR. MORRIS:  Oh, it's 36.
20           MS. SCULLION:  She has 30 -- I'm sure
21   you're right.  Erica likes to keep me on my toes.
22           THE WITNESS:  This is 35.
23           MR. MORRIS:  Yeah, so you want to --
24           MS. SCULLION:  We're going to restamp

---

Page 313

1    it.  Yeah, we're going to restamp it.  It's all
2    right.
3            THE WITNESS:  Thank you.
4    BY MS. SCULLION:
5        Q   Mr. Romaine, Exhibit 36, if you look at
6    the first page, starts with an e-mail from Vanessa
7    Costa to Jon Smollen, and she's attaching a number
8    of documents and she's sending them to him on
9    April 11th, 2013.
10           My questions are going to refer to the
11   documents attached, not the e-mail, but you're
12   welcome to read the e-mail if you'd like.
13       A   Okay.
14       Q   So I'm going to actually start with
15   page 832.2, the next page.
16       A   Yes.
17       Q   It's "Call Plans and Controls."
18       A   Mm-hmm.
19       Q   We discussed call plans a little bit
20   earlier today, and I just wanted to confirm, if
21   you look under "Call Plans and Controls," there's
22   a series of bullet points under the paragraph
23   there.
24       A   Yes.

---

79  (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    Q   And the fifth bullet point indicates:
2   "Opana ER.  Physicians are excluded based on
3   scripts 48 or more over a 12-month period."  Do
4   you see that?
5    A   Yes.
6    Q   Do you recall that there was a -- a
7   requirement of a minimum of 48 long-acting opioid
8   prescriptions over a 12-month period for a
9   physician to be included on the call plan for
10  Opana ER?
11   A   I do know there was an exclusion
12  criteria.  I didn't know it was 48.
13   Q   Okay.  Do you have -- but -- okay.
14      Did you know it was a script-based
15  exclusion criteria, number of scripts?
16   A   I -- I don't recall it from that period
17  of time.
18   Q   Okay.  And then if you go to E832.18.
19  That in addition to the 48 -- sorry, that --
20  although there was a 48 prescription exclusion
21  criteria, as it states on this page, that an
22  Opana ER non-target provider, one that has not met
23  the 48 prescription minimum threshold, must meet
24  at least one of the following, and it has certain

Page 315

1   criteria.  So that people could be included on the
2   call plan even if they didn't meet the 48
3   prescription minimum threshold, correct?
4    A   Correct.
5    Q   All right.  Do you recall that was
6   introduced after a number of years of using the 48
7   prescription minimum threshold?
8    A   I don't recall when that was -- was
9   added.
10   Q   Okay.  But do you recall that it was
11  added?
12   A   I do -- it was -- there was criteria
13  added later on, I do recall that, yes.
14   Q   Okay.  And that allowed then more
15  providers to be -- to be called on than under the
16  48 prescription threshold criteria, correct?
17      MR. MORRIS:  Objection to the form.
18      THE WITNESS:  I think it -- it allowed
19  for the right -- the correct physicians to be
20  added who were opioid experienced physicians.
21  BY MS. SCULLION:
22   Q   Okay.  And as well as -- also as it says
23  here, the nurse practitioners and physician
24  assistants, correct?

Page 316

1    A   Correct.
2    Q   Okay.  While we're in this document --
3   it's right here -- if you could quickly turn to
4   page 0832.7, you'll see a big map.
5      Do you see that?
6    A   Yes.
7    Q   Okay.  If I understand correctly, this
8   is a -- a map of -- of the territories assigned to
9   reps, correct?
10   A   Yes.
11   Q   Okay.  And I see -- if you look on the
12  map where Ohio is, do you see that on the map?
13   A   Bear with me just one moment.
14   Q   It's okay.  Look just below the word
15  "Chicago" and a little to the right.
16   A   Okay.  Yes, I have it.
17   Q   Okay.  And am I correct to understand
18  that Ohio -- every part of Ohio had at least one
19  rep serving it, if not more?
20   A   I don't know that --
21      MR. MORRIS:  Objection.  Foundation.
22      THE WITNESS:  -- to be accurate.  There
23  may have been geographies that because of
24  physician accounts didn't have a representative

Page 317

1   calling on them.
2   BY MS. SCULLION:
3    Q   The map indicates most of Ohio is this
4   sort of light green color, correct?
5    A   Yes.
6    Q   Okay.  And if you look at the -- the key
7   to the map in the lower left-hand corner, it says
8   "Number of reps by footprint," and the light green
9   color indicates two reps.
10   A   Correct.
11      MR. MORRIS:  Objection to form and
12  foundation.
13  BY MS. SCULLION:
14   Q   Okay.  And then other sizable chunks of
15  Ohio are this light yellow color.  Do you see
16  that?
17   A   Yes, that's what the map reflects.
18   Q   Okay.  And then the key indicates that
19  that means there's three reps by footprint for
20  those areas, correct?
21   A   Correct.
22      MR. MORRIS:  Objection.  Form and
23  foundation.
24  BY MS. SCULLION:

80  (Pages 314 to 317)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 318

1      Q   Okay.  Do you see any parts of Ohio on
2  this map that are -- that don't have one of the
3  colors indicated in the key for reps by footprint
4  of at least one?
5      A   I do not on this map.
6      Q   Okay.
7          MS. SCULLION:  Can we have 1215?
8          (Romaine Exhibit No. 37 was marked
9          for identification.)
10 BY MS. SCULLION:
11     Q   I'm going to hand you what's been marked
12 as -- thank you -- Exhibit 37.  And this is
13 Bates-stamped ENDO_OPIOID_MDL-01968614.
14         And it's an e-mail from Ellen Keane to
15 Ian McConkey, copying you and Kathleen Cronshaw in
16 August of 2012, and titled "West Opana ER
17 Feedback."
18         Do you see that?
19     A   Yes.
20     Q   West Opana ER refers to the western
21 region for -- sorry, the -- yeah, the western
22 region?
23     A   Correct.
24     Q   Okay.  And if you go to page E1215.2.

---

Page 319

1      A   Yes.
2      Q   It's a summary of feedback from the
3  western region business unit.
4      A   An overall view, is that what you're
5  looking at?
6      Q   Is a summary of, yeah, the overall view
7  of the region.
8      A   Overall view, okay.
9      Q   Is that what this is?
10     A   Yes.
11     Q   Okay.  And if you go to the middle of
12 the page under the heading "Feedback from HCPs'
13 Offices," do you see that?
14     A   I -- I'm not following you.  I'm sorry.
15     Q   It's okay.  There's a heading that says
16 "Feedback from" --
17     A   Oh, yes, I'm sorry.
18     Q   -- "HCPs' Offices."
19     A   I was looking at the top.
20     Q   Okay.  And this is feedback from the
21 healthcare providers in this region?
22         MR. MORRIS:  Objection.  Form and
23 foundation.
24         THE WITNESS:  Can you repeat the

---

Page 320

1  question?
2  BY MS. SCULLION:
3      Q   This is feedback from the healthcare
4  providers in this region?
5          MR. MORRIS:  Same objection.
6          THE WITNESS:  This is feedback that the
7  representatives provided their manager and then
8  provided to the region director.
9  BY MS. SCULLION:
10     Q   And the third bullet point under that
11 feedback refers to "Seattle speaker program,
12 August 2nd."  Do you see that?
13     A   Yes.
14     Q   And that would be part of the speaker
15 program we discussed earlier as part of the
16 promotion of Opana ER?
17         MR. MORRIS:  Objection.  Form and
18 foundation.
19         THE WITNESS:  I don't know that, but
20 I'm -- it looks like a speaker program, yes.
21 BY MS. SCULLION:
22     Q   Well, it's referring to a speaker
23 program, correct?
24     A   It's refer -- referring to a speaker

---

Page 321

1  program in this document, yes.
2      Q   Okay.  And the document says "Opana ER
3  Feedback," right?
4      A   Correct.
5      Q   Okay.  And it describes the Seattle
6  speaker program for August 2nd that:  "Dr. Jutla
7  urged the attendees not to give in to the," quote,
8  "opioid phobia," close quote, "that has taken root
9  in Washington state, but at the same time reminded
10 them of their due diligence in treating a chronic
11 pain patient with opioid therapy."
12         Do you see that?
13     A   Yes.
14     Q   And so Dr. Jutla was an invited speaker
15 to the speaker program in Seattle, correct?
16         MR. MORRIS:  Objection.  Form and
17 foundation.
18         THE WITNESS:  I don't know who that
19 doctor is.
20 BY MS. SCULLION:
21     Q   Okay.  But this is indicating, though,
22 that Dr. Jutla did urge the attendees at that
23 program not to give into, quote, opioid phobia,
24 correct?

---

81  (Pages 318 to 321)

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    MR. MORRIS: Objection. Form and
2 foundation.
3    THE WITNESS: I see that. I just don't
4 know if that was a -- an attending physician or if
5 it was the actual speaker themselves.
6 BY MS. SCULLION:
7    Q   If it was the attending physician,
8 the -- the speaker programs were reviewed before
9 being presented by Endo, correct?
10    A   Yeah, they -- they went through a -- the
11 PMRB process.
12    Q   So if Dr. Jutla was the presenting
13 physician at that speaker program and did in fact
14 deliver that message not to give into, quote,
15 opioid phobia, that would have been a message that
16 would have been reviewed prior to being delivered
17 by Endo, correct?
18    MR. MORRIS: Objection. Form and
19 foundation.
20    THE WITNESS: I don't know that. I
21 was -- I did not sit in on the -- the educational
22 process.
23 BY MS. SCULLION:
24    Q   Okay.

Page 323

1    A   What I don't know, and just to bring
2 clarity, is that that doctor, I don't know if they
3 were actually the speaker or they happened to be
4 attending and made a comment.
5    Q   I understand that you don't know.
6 That's why I'm saying if she -- if this doctor
7 were --
8    A   Oh.
9    Q   -- a presenting doctor, those comments
10 would have been reviewed and approved by Endo --
11    MR. MORRIS: Objection. Form and
12 foundation.
13 BY MS. SCULLION:
14    Q   -- before being delivered.
15    A   I don't -- I don't know that because I
16 wasn't -- I didn't attend the reviewing committee.
17    Q   Okay. And if we can look back at
18 Exhibits 9 and 10.
19    And we can start with Exhibit 9 when you
20 find that.
21    A   Okay. I'm there.
22    Q   So Exhibit 9, which we -- we looked at
23 earlier, is a PowerPoint presentation. It was for
24 sales training purposes only for Endo

Page 324

1 Pharmaceuticals entitled "Understanding the
2 Specialty MD and Their Use of Opioids."
3    And if you turn to page E396.35, do you
4 see again in the speaker notes at the bottom in
5 point C --
6    A   Can -- can you just tell me the document
7 number again?
8    Q   Absolutely. So this is Exhibit 9.
9    A   Yes.
10    Q   And turn to page, in the upper
11 right-hand corner, E396.35.
12    A   .35. Okay.
13    Q   And looking in the speaker notes under
14 the presentation, looking at point C, again
15 there's a reference there to the term
16 "pseudoaddiction."
17    Do you see that?
18    A   Yes.
19    Q   And -- and that's used twice in those
20 speaker's notes asking at the end, "How confident
21 is the audience that their customers know the
22 differences, tolerance, dependence, addiction,
23 pseudoaddiction?" Do you see that?
24    A   I do see that.

Page 325

1    Q   So pseudoaddiction was a concept on
2 which Endo sales reps were trained in connection
3 with the promotion of Opana ER; is that right?
4    MR. MORRIS: Objection. Form and
5 foundation.
6    THE WITNESS: I don't recall that term.
7 BY MS. SCULLION:
8    Q   You don't recall the term
9 "pseudoaddiction" at all?
10    A   No.
11    Q   So I take it -- well, hold on. Let's go
12 to Exhibit 10 for a moment and see if this helps.
13 Exhibit 10.
14    A   Okay.
15    Q   If you go to page 247.15.
16    A   .15?
17    Q   Correct. And it says -- it's headed
18 "Definitions." Do you see that?
19    A   Yes.
20    Q   And the third definition down for --
21 well, hold on.
22    It says "Definitions," and the paragraph
23 before the bullet point says: "The following list
24 includes definitions of five important but

82  (Pages 322 to 325)

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  commonly misunderstood terms."  Do you see that?
2      A  Yes.
3      Q  And so this is part of the oxymorphone
4  learning system module given to the Endo sales
5  reps, correct?  The front page?
6      A  Yes.
7      Q  Right?
8      And Endo is training the sales reps that
9  the definitions of the following terms are
10  commonly misunderstood.  "Abuse" is a commonly
11  misunderstood word, that's what Endo was teaching
12  its reps, correct?
13      MR. MORRIS:  Objection.  Form and
14  foundation.
15      THE WITNESS:  I don't recall that, but I
16  see it's in the document.
17  BY MS. SCULLION:
18      Q  Same thing, "addiction," Endo is
19  teaching its sales reps that that was a commonly
20  misunderstood term?
21      MR. MORRIS:  Objection.  Form and
22  foundation.
23      THE WITNESS:  Again, I don't recall it,
24  but it's in the document.

Page 327

1  BY MS. SCULLION:
2      Q  And "pseudoaddiction" is -- is used here
3  as well as the next bullet point.  Could you read
4  through that definition and just see if it
5  refreshes your recollection on that term.
6      A  Okay.  "A term used to describe an
7  iatrogenic phenomenon in which a patient with
8  undertreated pain is perceived by healthcare
9  professionals to exhibit behaviors similar to
10  those seen in addiction but is not truly
11  addicted."
12      Q  Does reading that refresh your
13  recollection about the concept of pseudoaddiction?
14      A  It -- it does not.  I don't recall it.
15      Q  But as indicated in this learning
16  module, it was a concept on which the sales reps
17  were being trained, correct?
18      MR. MORRIS:  Objection.  Form and
19  foundation.
20      THE WITNESS:  It was -- it is in the
21  training module.
22  BY MS. SCULLION:
23      Q  Okay.  And it was, again, presented as a
24  commonly misunderstood term, correct?

Page 328

1      A  I don't know how it was presented.
2      Q  That's what the -- the first paragraph
3  before the bullet point says, right, "These are
4  five definitions of five important but commonly
5  misunderstood terms"?
6      A  Okay.  Yes.
7      Q  Okay.  Same thing with "physical
8  dependence," Endo is teaching its reps that that
9  was a commonly misunderstood term?
10      MR. MORRIS:  Objection.  Form and
11  foundation.
12      THE WITNESS:  It's in the document.
13  BY MS. SCULLION:
14      Q  And the same thing on the next page for
15  "tolerance," Endo is teaching its reps that that
16  was a commonly misunderstood term.
17      MR. MORRIS:  Objection.  Form and
18  foundation.
19      THE WITNESS:  It's in the document.
20  BY MS. SCULLION:
21      Q  Okay.  And just under the bullet point
22  where it says "Tolerance," the next paragraph, the
23  second and third sentences there begins:  "The
24  physician can differentiate addiction from

Page 329

1  pseudoaddiction by speaking to the patient about
2  his or her pain, and increasing the patient's
3  opioid dose to increase pain relief."
4      Do you see that?
5      A  I'm -- I'm trying to catch up with you.
6  Where -- where are you?
7      Q  Sure.
8      A  Okay.
9      Q  I'm under the paragraph that begins "A
10  consensus statement."
11      A  I see it now.
12      Q  And at the next sentence it says:  "The
13  physician can differentiate addiction from
14  pseudoaddiction by speaking to the patient about
15  his or her pain, and increasing the patient's
16  opioid dose to increase pain relief."
17      Do you see that?
18      A  Yes.
19      Q  Do you recall that was a concept on
20  which sales reps were being trained by Endo?
21      A  I don't recall it.
22      Q  But it is in the -- the learning module,
23  correct?
24      A  Yes.

83  (Pages 326 to 329)

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  Q  Okay.  And similarly, the next sentence:
2  "Sales reps are being taught pseudoaddictive
3  behaviors, such as clock watching," open parens,
4  "counting down the time until the next dose,"
5  close parens, "will resolve when the pain is
6  properly treated."
7          That was a concept that sales reps were
8  being taught, correct?
9          MR. MORRIS:  Objection.  Form and
10  foundation.
11         THE WITNESS:  It's in the document.  It
12  didn't say sales representatives are -- are
13  trained on pseudo behaviors such as.  It just says
14  "pseudo behaviors such as," but your point, it's
15  in --
16  BY MS. SCULLION:
17         Q  Understood, but it's -- it's in the
18  oxymorphone learning system module delivered to
19  the sales representatives.
20         A  Yes.
21         Q  Okay.
22         MS. SCULLION:  And do you have 924?
23         THE WITNESS:  Are -- should we refile
24  these?

Page 331

1          MR. MORRIS:  Just put them on the side.
2          MS. SCULLION:  I would just put them on
3  the side for now.  Thank you.
4          THE WITNESS:  Okay.
5          (Romaine Exhibit No. 38 was marked
6          for identification.)
7  BY MS. SCULLION:
8          Q  I'm handing you what's been marked as
9  Exhibit 38.
10         A  Thank you.
11         Q  And this is Bates-stamped --
12         MS. SCULLION:  I don't have a Bates
13  stamp number on here.  Is there a Bates stamp
14  number?  Thank you.
15         MR. MORRIS:  It looks like somebody --
16  somebody wrote on it.
17         THE WITNESS:  I have one on this one.
18  Is that what you're referring to as a Bates stamp?
19  BY MS. SCULLION:
20         Q  No.  So the Bates number for this for
21  the record is ENDO_OPIOID_MDL-00773070 through 71,
22  and we've stamped it E924.
23         Just starting at the bottom of
24  Exhibit 38, there's an e-mail there from Ashu

Page 332

1  Fernandes to the pharma district managers for the
2  Midwest dated October 31st, 2007.
3          A  Yes.
4          Q  Do you see that?
5          A  Yes.
6          Q  And who was Mr. Fernandes?
7          A  He was a district manager in the pharma
8  group.
9          Q  Do you know what district he served?
10         A  I -- I don't know.  I want to say
11  Oklahoma.
12         Q  Oh, I apologize.  It's Indianapolis.
13         A  And -- well, I was close.
14         Q  It's right there.
15         And -- and Mr. Fernandes refers to an
16  article from PainEDU.org.  Do you see that, "Hey,
17  folks, below is an article from PainEDU.org"?
18         A  Yes.
19         Q  PainEDU.org, that was a website to which
20  Endo referred practitioners with respect to
21  prescribing of opioids, correct?
22         MR. MORRIS:  Objection.  Foundation.
23         THE WITNESS:  I don't recall that.
24  BY MS. SCULLION:

Page 333

1          Q  Okay.  And Mr. Fernandes explains that
2  he's found an article on PainEDU.org, and one of
3  the things that discussed is addiction,
4  pseudoaddiction, tolerance or physical dependence.
5  Do you see that?
6          A  Yes.
7          Q  Okay.  So again, so this is -- the
8  concept of pseudoaddiction is a concept that in
9  fact district managers were discussing in
10  connection with the promotion of opioids, and here
11  Mr. Fernandes is referring the concept on to the
12  other pharma district managers in the Midwest,
13  correct?
14         MR. MORRIS:  Objection.  Form.
15         THE WITNESS:  Correct, except if you
16  read through the entire e-mail from when he says,
17  "This information is for educational purposes
18  only."
19  BY MS. SCULLION:
20         Q  Understood.  So education of -- of the
21  sales reps?
22         A  Education I'm assuming of the district
23  managers that he's sending it to.
24         Q  Okay.  And education of the district

84  (Pages 330 to 333)

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    managers on pseudoaddiction.
2        A  On --
3            MR. MORRIS:  Objection.  Form.
4    BY MS. SCULLION:
5        Q  And the other concepts.
6        A  All those concepts.
7        Q  Okay.
8            MS. SCULLION:  Can I have E873 and 974
9    and 914.  I'll take one at a time.
10           (Romaine Exhibit No. 39 was marked
11           for identification.)
12   BY MS. SCULLION:
13       Q  Mr. Romaine, when you were VP of sales
14   for -- for Endo, it was true, was it not, that
15   sales reps were delivering a message to doctors
16   that Opana ER had a low abuse profile, correct?
17       A  I don't recall that.
18       Q  Did it ever come to your attention
19   that's --
20       A  Not that I can recall.
21       Q  Did it ever come to your attention that
22   reps were discussing with doctors the relative
23   risks of Opana ER versus other long-acting
24   opioids?

Page 335

1        A  Well, I know they -- in their promotion
2    they discussed the black box warning, that there's
3    -- the addictive potential with opioids.
4        Q  But did it come to your attention that
5    reps were discussing the potential for addiction
6    of Opana ER versus other long-acting opioids?
7        A  I -- I don't recall that.
8        Q  Okay.  Let me hand you what's been
9    marked as Exhibit 39.  And Exhibit 39 is
10   Bates-stamped ENDO_CHI_LIT-00166187.
11           And, Mr. Romaine, the second page of the
12   exhibit is a -- a memorandum, I guess I would call
13   it, from you to the Endo pharma and specialty
14   sales teams dated August 2008, correct?
15       A  Correct.
16       Q  And the subject matter is "Approved
17   Promotional Messages for Opana ER."  Correct?
18       A  Yes, that's what it says.
19       Q  And you indicate this was a mandatory
20   reading for the entirety of the pharma and
21   specialty sales team, correct?
22       A  Correct.
23       Q  All right.  And you explain in the very
24   first paragraph of your memorandum:  "The

Page 336

1    questions have been received from the field
2    regarding discussions with customers relating to
3    the abuse potential of Opana ER."  Correct?
4        A  Yes, I see that.
5        Q  And the questions that were received,
6    those were questions that were raised because in
7    fact those discussions were being had with
8    customers relating to the abuse potential of
9    Opana ER, correct?
10           MR. MORRIS:  Objection.  Form.
11           THE WITNESS:  I don't know that for a
12   fact.  I -- this -- just in context, this document
13   was created from our PMRB process, and I was asked
14   to send it out to the field.  But I don't know the
15   context behind why it was created.
16   BY MS. SCULLION:
17       Q  To make sure I understand, so
18   August 2008, you're vice president of sales --
19       A  Yes.
20       Q  -- overseeing sales of, among other
21   things, Opana ER, correct?
22       A  Yes.
23       Q  And a memorandum is prepared entitled
24   "Mandatory Reading."  Did those kind of

Page 337

1    memorandums go out from you very often, "Mandatory
2    Reading"?
3        A  Training documents and so forth, yes.
4        Q  Okay.  And it was going out to all of
5    the reps across the country, correct?
6        A  Yes.
7        Q  And are you saying that you never
8    inquired as to the context for this, why this memo
9    was being sent out to --
10       A  Oh --
11       Q  -- the entirety --
12       A  -- all I'm saying was this was crafted and
13   went through our review process before it did go
14   out.
15       Q  Understood.  But did you understand why
16   this memorandum was going out?
17           MR. MORRIS:  Objection.  Form.
18           THE WITNESS:  I -- I don't know if I
19   follow your line of questioning --
20   BY MS. SCULLION:
21       Q  Sure.
22       A  -- what you're asking me.
23       Q  Why was there a need to send out this
24   memorandum at this point in time?

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1      A   I don't know if it was specifically to
2  that point in time, but -- because we were
3  promoting an opioid which had a black box warning,
4  we routinely trained our sales force or reminded
5  our sales force on issues.
6      Q   But this -- the memorandum doesn't say
7  it's routine training.  It says:  "Questions have
8  been received from the field regarding discussions
9  with customers relating to the abuse potential of
10 Opana ER."  Is that a true statement?
11     A   I don't recall, but I assume it is since
12 it's in the -- I shouldn't assume -- but it's in
13 this -- it's in this document.
14     Q   Okay.  Well, so this is dated August of
15 2008.  And if you go through your memorandum, at
16 the bottom you have "Examples of unapproved
17 promotional messages that may not be used in a
18 promotional discussion."  Do you see that?
19     A   Yes.
20     Q   "These and similar messages are also
21 prohibited from use in responding to unsolicited
22 questions."  Do you see that?
23     A   Yes.
24     Q   Okay.  And the examples provided are:

Page 339

1  "Opana ER has a lower abuse potential than other
2  long-acting opioids."  That's the very first one,
3  right?
4      A   Yes.
5      Q   So reps were prohibited from conveying
6  that message either on their own or in response to
7  unsolicited questions, correct?
8      A   Yes.
9      Q   And similarly, they are prohibited from
10 delivering a message that Opana ER has no street
11 value.  That's the next --
12     A   Correct.
13     Q   -- example, right?
14         And similarly, the last example,
15 "Opana ER has less abuse liability or potential
16 abuse liability because when water is added to
17 Opana ER, the tablet turns into a gummy
18 substance."
19         Reps were not allowed to convey any of
20 those messages at any point in time to providers,
21 correct?
22         MR. MORRIS:  Objection to form and
23 foundation.
24         THE WITNESS:  That's correct.

Page 340

1  BY MS. SCULLION:
2      Q   And that was true whether they did it
3  affirmatively or whether they were responding to
4  an unsolicited question from a provider, correct?
5      A   Correct.
6      Q   Okay.  But in fact, Endo knew that those
7  messages were being delivered to physicians,
8  correct?
9      A   I -- I don't know that to be a fact.
10         (Romaine Exhibit No. 40 was marked
11          for identification.)
12 BY MS. SCULLION:
13     Q   All right.  Let me hand you what's been
14 marked as Exhibit 40, which bears Bates No.
15 ENDO_OPIOID_MDL-00685033.
16         And, Mr. Romaine, Exhibit 40, if you
17 will turn to what we marked as page E974.3,
18 indicates this document is a summary of findings
19 for the Opana ATU Pulse 3 dated June 2007.  Do you
20 see that?
21     A   Yes.
22     Q   Are you familiar with the ATU studies
23 that Endo commissioned with respect to Opana?
24     A   Yes, it was market research.

Page 341

1      Q   Okay.  You reviewed those studies as
2  they came through?
3      A   I don't recall specifically documents
4  that I did review, but I did review market
5  research, yes.
6      Q   Let me be more precise.  Would you have
7  reviewed the summary presentation of the ATU Pulse
8  findings in June of 2007?
9      A   I don't recall.
10     Q   Do you think it's more likely than not
11 you did review it?
12     A   I don't recall.
13         MR. MORRIS:  Objection to form.
14         MS. SCULLION:  Okay.  Could we mark this
15 as Exhibit 41.  Okay.
16 BY MS. SCULLION:
17     Q   Let's go to page E974.13.  Are you on
18 that page?
19     A   Yes.
20     Q   At the top it says:  "While
21 safety/tolerability continues to be regarded as
22 the main advantage of Opana ER, especially as its
23 low abuse potential cost formulary availability
24 remain as top of mind disadvantages."

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1          Do you see that?
2      A   Yes.
3      Q   And was that true that a main advantage
4  seen for Opana ER as of June 2007 was safety and
5  tolerability?
6          MR. MORRIS: Objection to form and
7  foundation.
8          THE WITNESS: I don't recall that.
9  BY MS. SCULLION:
10     Q   And this -- this indicates especially
11 low abuse potential was seen as a main advantage
12 for Opana ER, correct?
13         MR. MORRIS: Objection. Form and
14 foundation.
15         THE WITNESS: I don't recall that
16 information.
17 BY MS. SCULLION:
18     Q   The ATU studies, these were studies to
19 go out to the providers to see what messages they
20 were retaining with respect to Opana, correct?
21     A   It was market research with physicians,
22 yes.
23     Q   But they were looking to see what
24 messages were retained by those physicians?

Page 343

1      A   Yes.
2      Q   Okay.  And also to see what the
3  physicians' perceptions were of Opana ER, correct?
4      A   Correct.
5          MR. MORRIS: Objection to form and
6  foundation.
7  BY MS. SCULLION:
8      Q   And if we look again at page 974.13,
9  this report is indicating as of June 2007 that low
10 abuse potential and safety and tolerability were
11 regarded as the main advantage of Opana ER,
12 according to this study, correct?
13     A   According --
14         MR. MORRIS: Objection. Form and
15 foundation.
16         THE WITNESS: According to this study
17 that I'm looking at now.
18 BY MS. SCULLION:
19     Q   Yeah.  And this is a study that Endo
20 would have reviewed when received in June 2007?
21     A   Yes.
22     Q   Okay.  So they would have seen it.  That
23 was what the study was finding was that the
24 perception was that Opana ER had low abuse

Page 344

1  potential, and that was an advantage with respect
2  to other long-acting opioids, correct?
3          MR. MORRIS: Objection. Form and
4  foundation.
5          THE WITNESS: That's what -- that's what
6  this data reflects.  But to put this in context,
7  that's what physicians were feeding back.  So
8  where they heard that could be anywhere.  It could
9  be talking to other colleagues.  I -- I don't know
10 how to interpret this.
11 BY MS. SCULLION:
12     Q   Do you know if anyone went to go find
13 out to see, Gee, is it possible that physicians
14 are getting an impression of Opana ER as having
15 low abuse potential compared to other long-acting
16 opioids based on messages that the sales reps are
17 delivering?  Did anyone ever check that?
18     A   I --
19         MR. MORRIS: Objection to form and
20 foundation.
21         THE WITNESS: I don't recall that, but I
22 will say they take information like this
23 seriously, and there would have been some
24 investigation based on what came out of this

Page 345

1  information to say where did that comment come
2  from.
3  BY MS. SCULLION:
4      Q   But as -- as VP of sales -- I mean, as
5  former VP of sales, you don't recall any
6  investigation that was triggered by the results
7  reported here, correct?
8          MR. MORRIS: Objection.  Form,
9  foundation.
10         THE WITNESS: I don't recall it, but
11 that doesn't mean it didn't exist because other
12 departments would have been responsible for
13 handling that, such as our compliance department.
14 BY MS. SCULLION:
15     Q   That would have been a pretty serious
16 issue of noncompliance if -- if reps were
17 delivering a clearly prohibited message about the
18 abuse potential of a controlled substance, right?
19     A   Yes.
20     Q   You would have expected to --
21         MR. MORRIS: Objection.  Form and
22 foundation.
23 BY MS. SCULLION:
24     Q   I'm sorry.  You would have expected to

87  (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1   have been notified if there were in fact an
2   investigation into such a serious incidence of
3   noncompliance?
4           MR. MORRIS: Objection. Form.
5           THE WITNESS: I wouldn't have been
6   notified until after the investigation was
7   completed.
8   BY MS. SCULLION:
9       Q   And were you ever notified of such an
10  investigation being completed?
11      A   I don't recall. I do recall being
12  notified of other investigations being completed.
13  I don't recall this one specifically.
14      Q   Okay.
15      A   Okay.
16      Q   So that was June 2007. Your memo goes
17  out in August of 2008. And the same message,
18  though, of how abuse liability continued to be
19  delivered after your memo went out, correct?
20          MR. MORRIS: Objection to form.
21          THE WITNESS: I -- I don't -- I don't
22  know that.
23  BY MS. SCULLION:
24      Q   Well, let's look at --

Page 347

1           MS. SCULLION: Can I see E914?
2           (Romaine Exhibit No. 41 was marked
3           for identification.)
4   BY MS. SCULLION:
5       Q   Let me hand you what's been marked as
6   Exhibit 41.
7       A   Thank you.
8       Q   Yeah. And Exhibit 41 is Bates-stamped
9   ENDO_CHI_LIT-00547543.
10          And if you turn to the page we've marked
11  as E914.3 in the lower right-hand corner, it's the
12  first page of the presentation.
13      A   Okay.
14      Q   Do you see that?
15      A   Yes.
16      Q   And this is a final report for Opana ATU
17  W6. That means Wave 6, right?
18      A   Correct.
19      Q   All right. It's dated in December 2008,
20  so after your mandatory reading memo had gone out,
21  correct?
22      A   Correct.
23      Q   And what is reported in December of
24  2008, if you go to page E914.12, as key insights,

Page 348

1   the very first one: "On the most important
2   characteristics, physicians rate Opana ER
3   significantly lower than all other ER opioids on
4   insurance/formulary availability, and
5   significantly higher than all others on does not
6   have reputation for street abuse." Correct?
7       A   I see that in your document.
8       Q   Okay. So this is a report that
9   physicians are rating Opana ER as having a better
10  reputation than other ER opioids with respect to
11  reputation for street abuse, correct?
12          MR. MORRIS: Objection. Form and
13  foundation.
14          THE WITNESS: It's in this document. I
15  just want to put it back in context that, again,
16  these physicians, it might be their
17  interpretation, so they may believe it has to this
18  point not much street value or low street value.
19  I don't know whether -- where the information was
20  received from.
21  BY MS. SCULLION:
22      Q   And then the report goes on to state:
23  "Therefore, Opana ER's position in doctors' minds
24  is around the drug's lack of street value leading

Page 349

1   to a perception of lower potential for street
2   abuse." Correct?
3       A   I see that.
4           MR. MORRIS: Objection. Form.
5   BY MS. SCULLION:
6       Q   So here we are, after you put out the
7   mandatory memo, and the message that's still
8   coming back from -- from doctors is that their
9   perception is that Opana has a lower potential for
10  street abuse than other long-acting opioids,
11  correct?
12          MR. MORRIS: Objection to form.
13          THE WITNESS: That's what the document
14  states.
15  BY MS. SCULLION:
16      Q   Okay. And you say, Well, doctors may
17  have gotten that information perception just on
18  their own, right?
19      A   I don't know. I don't know where they
20  would have gotten it.
21      Q   Right. And did you ever try to find out
22  again after reading -- would you have read this
23  report in December 2008?
24      A   I'm sure I --

88  (Pages 346 to 349)

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1          MR. MORRIS: Objection to form.
2          THE WITNESS: I don't recall, but I'm
3   sure I would have read it back in the day.
4   BY MS. SCULLION:
5          Q   And did you, again, ask for an
6   investigation to find out why are doctors still
7   having this perception when we've been very clear
8   that reps should not be delivering a message of
9   lower abuse?
10         MR. MORRIS: Objection. Form,
11  foundation.
12         THE WITNESS: I don't recall it, but
13  because of the information that was shared here,
14  I'm sure there was information and investigation
15  as to why that took place, but I can't give
16  specifics.
17  BY MS. SCULLION:
18         Q   So you say you're sure. I mean, do you
19  know -- do you actually know or you're just
20  assuming?
21      A   I don't know. I do not know.
22      Q   Okay, you don't.
23      A   But I know the company took information
24  like this very seriously and would have done an

Page 351

1   investigation.
2          Q   No such investigation ever came to your
3   attention, correct?
4      A   It did not, because it wouldn't have
5   gone through my department. It would have been
6   handled through our compliance group.
7          Q   And if, as you said before, compliance
8   had conducted such an investigation, you would
9   have been told about it after the completion of
10  the investigation.
11      A   That's correct.
12         Q   You were never told about the completion
13  of any such investigation, correct?
14         MR. MORRIS: Objection. Form and
15  foundation.
16         THE WITNESS: I don't recall.
17  BY MS. SCULLION:
18         Q   The next key insight states: "MDs" --
19  that is doctors, right?
20      A   Yes.
21         Q   "MDs who anticipate prescribing
22  increases for Opana ER over the next six months
23  continue to mention low abuse potential and
24  efficacy as the major reasons."

Page 352

1          So this is reporting that the doctors
2   that were contacted as part of this study, of
3   those who said that they anticipated increasing
4   their prescriptions of Opana over the next six
5   months, said low abuse potential was a major
6   reason that they would prescribe more Opana ER,
7   correct?
8          MR. MORRIS: Objection. Form and
9   foundation.
10         THE WITNESS: That's in the document.
11  BY MS. SCULLION:
12         Q   Okay. So -- and Endo knew that Opana ER
13  did not have a lower abuse potential than other
14  opioids, correct?
15         MR. MORRIS: Objection. Foundation.
16         THE WITNESS: That's in the package
17  insert.
18  BY MS. SCULLION:
19         Q   Right, so it -- there is not a lower
20  abuse potential for Opana ER, correct?
21      A   Correct.
22         Q   And there is not a low abuse potential
23  for Opana ER, correct?
24      A   Correct.

Page 353

1          Q   So this report is telling you that
2   doctors are prescribing Opana ER based on
3   something that Endo knows not to be true about its
4   product, correct?
5          MR. MORRIS: Objection. Form,
6   foundation.
7          THE WITNESS: I don't know that, going
8   back to the context of this, if it was perception
9   or how that information was shared.
10  BY MS. SCULLION:
11         Q   Understood. But Endo did know when it
12  received this report that doctors were out there
13  prescribing based on something about Opana ER that
14  was not true, that Endo knew not to be true, and
15  that is its abuse potential.
16         MR. MORRIS: Objection. Form,
17  foundation.
18         THE WITNESS: I don't know that they --
19  they could -- they were prescribing because of
20  that, because there were other things such as
21  efficacy that's listed here, or reasons for them
22  to -- to use Opana ER and to treat.
23  BY MS. SCULLION:
24         Q   Understood. The report says: "The

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1   major reasons mentioned are low abuse potential
2   and efficacy," correct?
3          MR. MORRIS:  Objection.  Form and
4   foundation.
5          THE WITNESS:  That's in the document.
6   BY MS. SCULLION:
7      Q   Right.  So that low abuse potential was
8   a major reason that these physicians said that
9   they would be increasing -- increasing their
10  prescriptions for Opana ER, correct?
11         MR. MORRIS:  Objection.  Form,
12  foundation.
13         THE WITNESS:  What -- what you're saying
14  is in this document is correct, that the words are
15  here.  Again, I don't know how the perception of a
16  physician, how they got that information.  I don't
17  know the answer to that.
18  BY MS. SCULLION:
19     Q   Wouldn't it have been of concern to Endo
20  that doctors were prescribing Opana ER based on a
21  perception of the product that Endo knew was not
22  true, and that is low abuse potential?  Wouldn't
23  that be a concern?
24     A   Absolutely, it would have been a

Page 355

1   concern.
2      Q   And did you raise as a concern, having
3   seen this report, and say, This is terrible?
4      A   As I mentioned, I don't recall ten years
5   ago what we did, but I -- I know the company took
6   these things seriously.  A lot of people looked at
7   these reports, and I'm sure an investigation took
8   place.
9      Q   But -- but you can't sitting here today
10  remember --
11     A   I can't specifically --
12     Q   -- any investigation being -- I
13  apologize.
14     A   I'm sorry.
15     Q   Please continue.
16     A   I can't specifically say ten years ago
17  that I know that an investigation took place
18  because of this.
19     Q   Do you recall any investigation into why
20  doctors were prescribing Opana ER based on a
21  perception of the product that was not true?  Did
22  it ever happen at all?
23         MR. MORRIS:  Objection.  Form and
24  foundation.

Page 356

1          THE WITNESS:  I -- I can't recall
2   specifically a incidence, but I know that there
3   were always compliance investigations taking
4   place.
5   BY MS. SCULLION:
6      Q   But you don't recall any -- anything
7   specific to Opana ER?
8      A   I don't remember a specific.
9      Q   Okay.  If you go to page E914.17, what's
10  highlighted here in this report, if you look at
11  the top, the last phrase says that: "Opana ER has
12  an opportunity to build on one of its most
13  important strengths:  Low abuse potential."
14         Do you see that?
15     A   Yes.
16     Q   So that was what was identified to Endo
17  as an important strength for this product,
18  correct?
19         MR. MORRIS:  Objection.  Form and
20  foundation.
21         THE WITNESS:  I see that here.  I'm just
22  reading through this document.  I'm sorry, I'm
23  just trying to catch up.
24  BY MS. SCULLION:

Page 357

1      Q   Sure.  Do you want to read through this
2   page?
3      A   Yeah, I do want to read through this
4   page.
5      Q   Okay.
6      A   (Peruses document.)  Okay.  I'm sorry.
7      Q   That's okay.
8          So this report is identifying low abuse
9   potential as one of the most important strengths
10  for Opana ER, correct?
11     A   I see that in the document.
12     Q   And it's recommending that there's an
13  opportunity to build on that strength, correct?
14         MR. MORRIS:  Objection.  Form and
15  foundation.
16         THE WITNESS:  I see that in the
17  document.  To keep -- put this in context too,
18  these are market research people that are just
19  relaying back what they heard from physicians.
20  BY MS. SCULLION:
21     Q   Well, but they're relaying it to you and
22  others at Endo, correct?
23     A   Other leadership at Endo, yes.
24     Q   Okay.  And having seen that

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  recommendation, do you recall what your reaction
2  was to that recommendation?
3       MR. MORRIS: Objection. Form and
4  foundation.
5       THE WITNESS: I don't recall
6  specifically my reaction, but I'm sure what we
7  would have done is said that can't happen. That's
8  not -- it's outside of our guidelines.
9  BY MS. SCULLION:
10      Q   But you don't actually recall that
11 happening, right?
12      A   I don't recall that happening. But
13 hence, these things like this, which were constant
14 reminders to the sales organization that -- for
15 retraining, constantly took place.
16      Q   But sitting here today under oath, you
17 can't say that anyone at Endo rejected this
18 identification of an opportunity for Opana ER
19 based on low abuse potential.
20      MR. MORRIS: Object --
21 BY MS. SCULLION:
22      Q   You don't know that to be a fact that
23 anyone actually rejected that.
24      MR. MORRIS: Objection. Form,

Page 359

1  foundation and argumentative.
2       THE WITNESS: I -- I don't know that.
3  BY MS. SCULLION:
4       Q   Okay. And that was true even -- if you
5  look at the second bullet point on this page,
6  which again says: "Physicians who anticipate an
7  increase in prescribing of Opana ER in the next
8  six months say that their estimates are primarily
9  driven by low abuse potential and efficacy
10 factors."
11      Do you see that?
12      A   Yes.
13      Q   So before it had indicated a major
14 factor, now it said low abuse potential and
15 efficacy are the -- were primarily driving the
16 decisions of those who say that they will increase
17 prescribing of Opana ER in the next six months.
18      And again, do you remember saying to
19 anyone at Endo, Well, that's very concerning; we
20 have to do something about that? Do you actually
21 remember ever doing that?
22      A   From ten years ago --
23      MR. MORRIS: Objection. Form,
24 foundation.

Page 360

1       THE WITNESS: -- I don't remember saying
2  that. Not that it wouldn't have happened. I just
3  do not remember saying that.
4  BY MS. SCULLION:
5       Q   Now, you mentioned Exhibit 39, the
6  August 2008 memoranda, as an example of messages
7  that went out to the sales reps with respect to
8  the issue of discussions of abuse potential.
9       But Endo could have sent out a Dear
10 Doctor letter to the prescribers it was servicing,
11 correct, with respect to Opana ER?
12      A   Correct.
13      MR. MORRIS: Objection. Form,
14 foundation and legal conclusion.
15 BY MS. SCULLION:
16      Q   So if Endo had information that told it,
17 Wow, doctors have a misperception of an important
18 aspect of our product, and for some physicians
19 it's a primary factor driving their prescription
20 decisions, that Endo could have said, We need to
21 correct through a Dear Doctor letter, correct?
22      MR. MORRIS: Objection. Form,
23 foundation, legal conclusion.
24      THE WITNESS: That could have happened,

Page 361

1  yes.
2  BY MS. SCULLION:
3       Q   Did it happen?
4       A   I don't know. I don't remember.
5       Q   Do you ever recall it happening?
6       A   I don't recall.
7       Q   I will tell you we haven't seen that
8  letter produced in this case, and we definitely
9  asked for it.
10      Do you recall any disciplinary action
11 being taken against anyone in the sales department
12 for delivering a message to healthcare providers
13 that Opana ER has low abuse potential?
14      A   I don't recall that specific issue. I
15 do recall disciplinary actions against the sales
16 force.
17      Q   What disciplinary actions do you recall?
18      A   Termination.
19      Q   For -- on what grounds? What did they
20 do?
21      A   I don't recall specifically, but I do
22 recall that we did terminate representatives over
23 time for disciplinary action.
24      Q   And that was in connection with Opana ER

91 (Pages 358 to 361)

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1   promotion?
2       A   I don't recall if it was in connection
3   with Opana ER or not.
4       Q   So you just generally recall there were
5   from time to time terminations.
6       A   Correct.
7       Q   Okay.  We looked at -- I believe it's
8   exhibit -- I apologize.
9           (Counsel conferring.)
10  BY MS. SCULLION:
11      Q   Okay.  Look at Exhibit 9.  Thank you.
12      A   Okay.
13      Q   That's why we keep them there.
14          I -- I --
15      A   Yes.  Oh, that's 7.  Sorry.
16      Q   You know what, I -- I --
17      A   I've lost my --
18      Q   That's okay.  Before you go further,
19  actually what I want is Exhibit 10.  That's my
20  fault.
21          That's the learning module.
22      A   Yes.
23      Q   That's okay.  We'll -- we can -- we can
24  just move on because I mislaid my copy of

Page 363

1   Exhibit 10 for the moment.
2       A   Do you want mine?
3       Q   No, that's okay.  Thank you.  That won't
4   work.
5           We talked about various tools that reps
6   used in connection with the promotion of Opana ER,
7   and those included dosing guides, correct?
8       A   Correct.
9       Q   Conversion guides to help convert from
10  one opioid to another, correct?
11      A   Correct.
12      Q   All right.  Thank you.
13          Do they also provide educational
14  information to doctors about titration for opioid
15  products?
16      A   Yes.
17      Q   Okay.  And "titration" means the process
18  of initiating a patient on to opioid therapy, in
19  this case Opana ER.
20      A   Correct.
21      Q   Okay.  Did Endo ever provide any similar
22  tools to physicians to help them take patients off
23  of opioids?
24      A   There was a -- if -- I -- I do recall

Page 364

1   there was a titration schedule to bring patients
2   down, but I can't give you specifics on it.
3       Q   Did Endo ever conduct any specific --
4   or, sorry, offer any specific CMEs with respect to
5   taking patients off of opioids?
6       A   I don't recall that.
7       Q   Okay.
8           MS. SCULLION:  Now would be a good place
9   for a good quick break so we can get some
10  documents together.
11          THE WITNESS:  Okay.
12          THE VIDEOGRAPHER:  The time is 4:57 p.m.
13  We're going off the record.
14          (Recess.)
15          THE VIDEOGRAPHER:  The time is 5:09
16  p.m., and we're back on the record.
17          (Romaine Exhibit No. 43 was marked
18          for identification.)
19  BY MS. SCULLION:
20      Q   Mr. Romaine, I'm going to hand you
21  what's been marked as Exhibit 43.  I know that we
22  have 42 coming.  We're taking this a little bit
23  out of order.
24      A   Thank you.

Page 365

1       Q   So this is 43.  There you go.
2           And Exhibit 43 is Bates-stamped
3   ENDO_OPIOID_MDL-817302.  And as you can see, it
4   includes an attachment that has a fairly sizable
5   set of data that we've attached.
6           And Exhibit 43 is dated December 5,
7   2010.  The e-mail is from Molly Fiore to Chad
8   Simon.  Subject matter, "Library Program
9   Utilization Update."
10          Do you see that?
11      A   Yes.
12      Q   Do you recall that there was a library
13  program at Endo through which physicians could be
14  provided textbooks?
15      A   I don't remember specifically that
16  program, but -- but it looks like we had one.
17      Q   Okay.  I mean that -- that's described
18  here by Ms. Fiore in her note to Mr. Simon,
19  correct?
20      A   Yes.
21      Q   His library program utilization as of
22  December 1st, 2010.
23      A   Yes.
24          MR. MORRIS:  Objection.  Form.

92  (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    BY MS. SCULLION:
2        Q   Okay.  And then she references the
3    spreadsheets attached, which she says contain the
4    financial budget information, and a second that
5    can be forwarded to your field sales managers so
6    they can see their activity in their particular
7    area or region, correct?
8        A   Yes.
9        Q   Okay.  So this is information that she
10   is sending on to be used in the ordinary course
11   of -- of Endo's business, correct?
12       MR. MORRIS:  Object -- objection to form
13   and foundation.
14       THE WITNESS:  I don't -- I don't know
15   that, but I see the document.  So...
16   BY MS. SCULLION:
17       Q   She's sending it on to be used, yes?
18       MR. MORRIS:  Objection.  Form and
19   foundation.
20       THE WITNESS:  I guess if that's what
21   it's for, yes.
22   BY MS. SCULLION:
23       Q   She's sending it on so that --
24       A   I was just trying to read through -- I

Page 367

1    was trying to read through the e-mail.  I'm sorry,
2    I was --
3        Q   That's okay.  Bless you.
4            Do you want to read through the e-mail?
5        A   Yeah, do you mind?  I just want to take
6    a minute to do that.
7        Q   No problem.
8        A   (Peruses document.)  Okay.
9        Q   Okay.  And having read through the
10   e-mail, do you understand again that this is a
11   library program being referenced for physicians
12   that Endo was -- Endo sales reps were calling on?
13       A   Yes.
14       Q   Okay.  If you could go -- we've tabbed
15   it for you in the spreadsheet, there's a little
16   pink tab on the --
17       A   Yes.
18       Q   -- side.  Because there's no page --
19       A   Oh, on the side.  Okay.  Got you.
20       Q   -- there that's useful.
21           The page is numbered by us as E1230.156
22   in the upper right hand.
23       A   Yep.
24       Q   Great.  And it should be highlighted for

Page 368

1    you.  Do you see a highlighted line, P108F1?
2        A   Yes.
3        Q   Okay.  And if you follow that across to
4    the middle of the page, you see it says Oliver
5    Herndon?
6        A   Yes, I do.
7        Q   And if you look, that's the column for
8    the clinicians' first and last name.  Do you see
9    that?
10       A   Yes.
11       Q   At the top of the page?
12       A   Yes.
13       Q   Okay.  So this is the name of the
14   physician, Oliver Herndon.
15       A   Herndon.
16       Q   Correct?
17       A   Yes.
18       Q   All right.  And so this would indicate
19   that that physician did participate in the library
20   program as of the date here on the same line as
21   July 2nd, 2010.  Do you see that?
22       A   Yes.
23       MR. MORRIS:  Objection.  Form,
24   foundation.

Page 369

1    BY MS. SCULLION:
2        Q   Does Dr. Herndon's name ring a bell?
3        A   It does not.
4        Q   Let me --
5        MS. SCULLION:  Can we have Exhibit 42.
6        (Romaine Exhibit No. 42 was marked
7        for identification.)
8    BY MS. SCULLION:
9        Q   I hand you what's been marked as
10   Exhibit 42.
11       A   Thank you.
12       Q   And this is Bates-stamped ENDO_OPIOID_
13   MDL-02314929, and we've marked it as E1178.
14           And, Mr. Romaine, you will see this is a
15   copy of a Pittsburgh Post-Gazette article dated
16   June 18th, 2012 --
17       A   Mm-hmm.
18       Q   -- that was sent by e-mail by Greg
19   Thomas to Mr. Pyszczymuka, Ms. Logan, Ms. Vitanza,
20   Chris Clark and Glenn Astley at Endo.  Do you see
21   that?
22       A   Yes.
23       Q   And then Mr. Astley forwards it on to,
24   among others, Janett Mendez-DeTore, who I think

Highly Confidential - Subject to Further Confidentiality Review

---

Page 370

1    you mentioned earlier, correct?
2        A    Yes.
3        Q    All right.  And she in turn forwards it
4    on to you as an FYI.  Do you see that?
5        A    Yes.
6        Q    Did you read the story when it was
7    forwarded on to you by Ms. Mendez-DeTore?
8        A    I don't recall.
9        Q    Okay.  Does this -- looking at
10   Exhibit 42, does this refresh your recollection
11   about a story -- sorry -- an article in the
12   Pittsburgh Post-Gazette?
13       A    It does not.  I don't remember it.
14       Q    Okay.  Let's look at the article itself.
15       A    Okay.
16       Q    E1178.2.  And if you go down about
17   middle of that page, it starts with -- sorry --
18   the paragraph that starts with:  "It's well known
19   that many prescription narcotic users..."  Do you
20   see that?
21       A    It's the start of a paragraph?
22       Q    Yeah.  "It's well known that many
23   prescription narcotic users..."
24       A    Okay, I see that.

---

Page 371

1        Q    Okay.  And this paragraph goes on to
2    discuss the unveiling of a nine-count indictment
3    of 15 people accused of bringing prescription
4    Opana and heroin from Detroit to Pennsylvania.
5            Do you see that?
6        A    Yes.
7        Q    Were you aware of that indictment?
8        A    I was not -- I don't recall that
9    indictment.
10       Q    Okay.  That would be an example of
11   diversion of Opana, correct?
12       A    Correct.
13       Q    All right.  And the article goes on to
14   indicate:  "That's a disturbing change from the
15   traditional demarcation between pill pushers and
16   street drug dealers.  Experts said it reflects
17   market realities."
18           Do you see -- see that?
19       A    Yes.
20       Q    By 2012, had it in fact become a market
21   reality that Opana was being diverted and sold
22   along with street drugs like heroin?
23           MR. MORRIS:  Objection.  Form.
24           THE WITNESS:  I'm not quite sure I

---

Page 372

1    understand your line of questioning.  Are you
2    asking me it was well known that --
3            BY MS. SCULLION:
4        Q    No, I'm asking was -- yeah, was -- was
5    that a market reality at that point?
6            MR. MORRIS:  Objection.  Form.
7            THE WITNESS:  That -- I -- I don't know.
8    I don't know -- I don't remember that being a
9    market reality.
10           BY MS. SCULLION:
11       Q    Okay.  And then if you go further along
12   in the article, two paragraphs later it begins
13   with a quote:  "Here is a pill person who has now
14   worked their way up through Percocets and Vicodin.
15   Now they say they want something stronger, so
16   they're moving to Opana."
17           Were you familiar with people who had
18   been abusing Percocets and Vicodin moving their
19   way up to Opana?  Was that a phenomenon that you
20   knew about in June of 2012?
21       A    No, not that I know of.
22       Q    Okay.  If you go to the bottom of this
23   page, it begins "Mr. Larcinese is blamed for
24   selling more than..."

---

Page 373

1            Do you see that?
2        A    Yes.
3        Q    If you go a couple of sentences in, the
4    statement that:  "Mr. Hickton" -- and this is U.S.
5    Attorney David Hickton -- "Mr. Hickton's office
6    recently took another link from the supply chain
7    with the conviction of Oliver W. Herndon, a doctor
8    who pleaded guilty last month to healthcare fraud
9    and improper distribution of oxycodone and
10   oxymorphone.  Dr. Herndon prescribed Opana and
11   other potent narcotics based on three-minute
12   office visits devoid of physical examinations or
13   case histories."
14           Do you see that?
15       A    Yes.
16       Q    The description there of what Mr. --
17   sorry, what Dr. Herndon did, that's a description
18   of a classic pill mill, correct?
19           MR. MORRIS:  Objection.  Form.
20           THE WITNESS:  I'm not an expert in that,
21   but that's what that looks like.
22           BY MS. SCULLION:
23       Q    Okay.  Just three-minute office visits,
24   not really doing any examinations, not taking case

---

94  (Pages 370 to 373)

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  histories, those are classic indications of a pill
2  mill, right?
3      A   Correct.
4      Q   And this article is indicating that
5  Dr. Herndon prescribed Opana as well as other
6  potent narcotics as part of that pill mill,
7  correct?
8      A   He did prescribe that, yes.
9      Q   Okay.  And according to the next
10 paragraph, the assistant special agent in charge
11 of the DEA office in Pittsburgh, Gary Davis, says
12 that taking Dr. Herndon off the market made a
13 major impact in Pittsburgh.
14         Do you see that?
15     A   Yes.
16     Q   And then going back to the first page of
17 Exhibit 42 where Ms. Mendez-DeTore has forwarded
18 this article on to you as an FYI, she notes:
19 "Dr. Herndon was the number one prescriber of OER
20 in the nation."  Correct?
21     A   I see that.
22     Q   And OER means Opana ER, correct?
23     A   I'm assuming that's what she's referring
24 to in her e-mail.

Page 375

1      Q   Okay.  So she's telling you that this
2  doctor who -- yeah, who's pled guilty to improper
3  distribution of oxymorphone and had -- was
4  described as running a pill mill for Opana, was in
5  fact the number one prescriber for Opana ER in the
6  nation.  That's what she's telling you, right?
7      A   That's correct.
8      Q   Did that stick out in your mind when you
9  got it?
10     A   I don't remember this specifically.
11     Q   Okay.
12     A   I'm assuming this would be one where
13 they would have been removed from our -- our call
14 plan obviously immediately had we had this
15 information.  So this would have gone through
16 compliance.
17     Q   Okay.  Do you know if it went through
18 compliance?
19     A   I think at this point -- I don't know
20 specifically what happened at the back end of
21 this.  But I -- but I have to believe, based on
22 the processes that were in place at Endo, that we
23 would have referred this to the departments that
24 would have taken care of it.

Page 376

1      Q   Now, we saw from Exhibit 43, which is
2  from December of 2010 --
3      A   Yes.
4      Q   -- that Dr. Herndon had been on the call
5  list for -- for some time.  He's on in 2010; he's
6  getting library books, correct?
7      A   Yes.
8      Q   And then if you will pull up Exhibit 17.
9  It's in your pile.
10     A   Oh.
11     Q   It's going to look like that
12 (indicating).
13     A   Okay.
14     Q   That's it.
15     A   Got it.
16     Q   And if you look at Exhibit 17, now this
17 is a list that Alicia Logan has as of February
18 2012 showing which Opana ER prescribers -- sorry,
19 which pharmacies are declining to fill Opana ER
20 prescriptions, and she's listing -- if you look in
21 the right-hand corner, that Dr. Oliver Herndon is
22 listed already in February 2012 as a physician
23 that Endo knows pharmacies are refusing to fill
24 prescriptions for, correct?

Page 377

1      A   Correct.
2      Q   But he's -- he's still on the call list
3  at that point.  He's just -- the pharmacies are
4  refusing to fill his prescriptions, correct?
5          MR. MORRIS:  Objection.  Form and
6  foundation.
7          THE WITNESS:  I don't know if he is on
8  the call list.
9  BY MS. SCULLION:
10     Q   Well, Ms. Logan is -- it's when she's
11 pulling data with respect to relevant physicians
12 for Endo, correct, for Opana?
13     A   I don't know where she pulled the data
14 from.  I don't know if they're -- they're call
15 list physicians or not based on her e-mail.
16     Q   Okay.  Do you recall discussing the
17 concept of an exclusion list?
18     A   Yes.
19     Q   Okay.
20         MS. SCULLION:  Can we have Exhibit 44.
21 Thank you.
22         THE WITNESS:  We're done with this --
23 this one for temporarily right now?
24         MS. SCULLION:  Actually, yes.

95  (Pages 374 to 377)

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1        (Romaine Exhibit No. 44 was marked
2        for identification.)
3    BY MS. SCULLION:
4        Q   I'm going to hand you what's been marked
5    as Exhibit 44.  And again, this is a rather large
6    set of data.  The Bates stamp is ENDO_OPIOID_
7    MDL-0924490.
8        And it doesn't have the cover e-mail,
9    but we've pulled up on the screen the metadata
10   that came with it when it was produced to us.  And
11   it states: "1P15, prescriber removal list, IMS
12   update, date created November 2012."
13       A   Okay.
14       Q   And that should be on the screen in
15   front of you.
16       MS. SCULLION:  If you could expand --
17       THE WITNESS:  Do you see that?
18       MS. SCULLION:  -- expand that box a
19   little bit?  The creation date.  There, date last
20   modified.  I apologize.
21   BY MS. SCULLION:
22       Q   There it is, date created, do you see
23   November 2012?
24       A   Yes.

Page 379

1        Q   I'll represent to you that having looked
2    at the removal list provided to us, November 2012
3    is the first remove -- time we see Dr. Herndon
4    actually appear on a removal from the call list.
5        A   And where do you see -- I'm trying to
6    catch up.  Where do you see his name?
7        Q   I'm going to bring you to that.
8        A   Okay.
9        Q   Which is if you go to the tabbed page in
10   Exhibit 44.  And just to make sure we're on the
11   same page, it's E1247.65 in the upper right-hand
12   corner.  Do you see that?
13       A   Oh, yes, I'm sorry.  I'm following you
14   there.  Okay.
15       Q   And we've highlighted for you, towards
16   the bottom of the page, you see the line that says
17   "Oliver Herndon," and lists his address in
18   Pittsburgh?
19       A   Yes.
20       Q   And -- I apologize.  Hold on one second.
21       And it lists that the reason on the far
22   right-hand column, the reason for the request
23   for -- to remove him from the list was simply no
24   access.

Page 380

1        MR. MORRIS:  Objection.
2    BY MS. SCULLION:
3        Q   Do you see that?
4        MR. MORRIS:  Objection.  Form and
5    foundation.
6        THE WITNESS:  I see that.
7    BY MS. SCULLION:
8        Q   Do you see on the same page, other --
9    other physicians, the reason for the request for
10   removal is retired, right, or compliance?
11       MR. MORRIS:  Objection.  Form and
12   foundation.
13       THE WITNESS:  Yes.
14   BY MS. SCULLION:
15       Q   So this is not indicating he's being
16   removed for compliance; he's just being removed
17   for no access, correct?
18       MR. MORRIS:  Form and foundation.
19       THE WITNESS:  Again, this is not my
20   report.  I -- I don't know the answer to that.  It
21   could have been a typo.  I don't -- I just don't
22   know.  It's not my information.
23   BY MS. SCULLION:
24       Q   So -- again, so we see him in 2010

Page 381

1    getting library books, so he's on the call list.
2    We don't see him being -- even requested to be
3    removed until November of 2012.  And this is
4    someone, who based on the description in the
5    article, should have been setting off alarm
6    bells --
7        A   Mm-hmm.
8        Q   -- in that district, correct?
9        MR. MORRIS:  Objection.  Form and
10   foundation.
11       THE WITNESS:  Yes.
12   BY MS. SCULLION:
13       Q   The -- the rep clearly should have known
14   this was a pill mill based on what was being
15   described, right?
16       A   And --
17       MR. MORRIS:  Objection.  Form,
18   foundation.
19       THE WITNESS:  And just for clarity, we
20   don't know that they didn't and then didn't refer
21   it inside to compliance.
22   BY MS. SCULLION:
23       Q   Well, but again we see that they've
24   been -- this Dr. Herndon has been detailed since

96  (Pages 378 to 381)

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1 at least 2010. That was in the library book, the
2 library program list.
3        A   Correct.
4        Q   And we don't see him actually being
5 requested to be removed until 2012. So that's a
6 fair amount of time to go by to have him not be
7 removed from the call list, correct?
8        MR. MORRIS: Objection. Form and
9 foundation.
10        THE WITNESS: And I don't know what -- I
11 don't have the information to -- to clarify that.
12 BY MS. SCULLION:
13        Q   And when you received this article and
14 Ms. Mendez-DeTore's e-mail telling you that
15 Dr. Herndon is not only a physician on the call
16 list in Pittsburgh, was in fact the number one
17 prescriber of Opana ER in the nation, and he's
18 busted as a pill mill, did that cause you to have
19 concerns about what is going on in terms of our
20 monitoring for pill mills?
21        A   Well, I don't recall from seven years
22 ago what had happened. But this is a classic
23 example where it would have gone to the different
24 departments to be triaged to.

Page 383

1        Q   Did it concern you that the fact that
2 the number one prescriber of Opana ER turned out
3 to be a pill mill?
4        MR. MORRIS: Objection to form.
5        THE WITNESS: I -- I don't recall this
6 specific situation.
7 BY MS. SCULLION:
8        Q   You have no recollection whatsoever of
9 that, number one prescriber gets busted as a pill
10 mill?
11        A   From seven years ago, I don't.
12        Q   And that article that Ms. Mendez-DeTore
13 reported to you not only talked about the number
14 one prescriber of Opana ER being busted as a pill
15 mill, it also discussed a number of other
16 circumstances of diversion and abuse of Opana in
17 Pittsburgh and in Pennsylvania, correct?
18        A   I haven't read the article.
19        Q   -- haven't -- we read through those. It
20 talks about the indictment of 15 people accused of
21 bringing prescription Opana from Detroit to
22 Pennsylvania, correct?
23        A   I see that.
24        Q   Did any of this cause you to say, Wow,

Page 384

1 we really need to take a look at Pittsburgh,
2 there's a problem here?
3        A   I -- I don't recall that.
4        Q   Do you know whether --
5        A   Not that I didn't. I just don't recall.
6        Q   Do you know whether anyone at Endo said,
7 We need to do an investigation into Pittsburgh and
8 see what's going on here, there seems to be a hot
9 bed of Opana diversion?
10        A   I know there were areas in the country
11 where they -- where they suspected that diversion
12 was taking place and investigations took place.
13 That's what I know.
14        Q   And as VP of sales, were you informed
15 when investigations were being -- were being
16 conducted with respect to specific locales?
17        A   No. That was confidential information,
18 and I would be informed after the fact.
19        Q   Wouldn't it have been important to you
20 to know that Endo was investigating diversion and
21 pill mills within an area where you're sending out
22 sales reps to sell these pills? Wouldn't you have
23 wanted to know that they might be selling to pill
24 mills that are under investigation?

Page 385

1        A   Not until the --
2        MR. MORRIS: Objection to form.
3        THE WITNESS: Not until the
4 investigation was completed.
5 BY MS. SCULLION:
6        Q   Do you know how long the investigation
7 would take?
8        A   I do not know that.
9        Q   So it could take --
10        A   I'm assuming it could be varying.
11 Right.
12        Q   Right, so it could take months.
13        MR. MORRIS: Objection. Form.
14 BY MS. SCULLION:
15        Q   It could take years.
16        A   I don't -- I don't know that.
17        Q   You didn't know -- you didn't know how
18 long pill mills could be under investigation, and
19 your sales reps are out there selling pills to
20 them before compliance would complete its
21 investigation, you just didn't know that?
22        A   I didn't know the length that it would
23 take for due process.
24        (Romaine Exhibit No. 45 was marked

97 (Pages 382 to 385)

Highly Confidential - Subject to Further Confidentiality Review

Page 386

1    for identification.)
2    BY MS. SCULLION:
3        Q   We have -- I'm sorry.  I'm handing you
4    what's been marked as Exhibit 45, and Exhibit 45
5    is Bates-stamped END00562948.  And we've stamped
6    it E1212.
7            And this is an e-mail from Jodi Block to
8    Kenneth Price dated June 15th, 2012, and it states
9    that there's an attachment of the -- a copy of the
10   Nation Weekly Prescriber Sales.
11           Do you see that?
12       A   Yes.
13       Q   So this is June 2012.  If you will turn
14   to the attachment to the e-mail, and go to page
15   E1212.9 in the top right corner.
16       A   Yes.
17       Q   And towards the bottom of the page --
18   one, two, three, four -- six lines from the
19   bottom, do you see here Oliver Herndon listed and
20   his sales indicated in 2012, correct?
21           MR. MORRIS:  Objection to form and
22   foundation.
23   BY MS. SCULLION:
24       Q   Do you see the line with Oliver Herndon

Page 387

1    listed there?
2        A   I do see that.
3        Q   So this is indicating -- if you go to
4    the first page, you can see that there's a header
5    that tells you that the columns are showing weekly
6    sales, the current 15-week volume descending.  Do
7    you see that?
8        A   Yes.
9        Q   All right.  So -- I mean, this is
10   telling us that Dr. Herndon was clearly still on
11   the -- sorry -- that Dr. Herndon was still
12   prescribing Opana ER, and recorded in Endo's
13   records as of June 2012, correct?
14       A   At what month -- say that again, please.
15       Q   As of June 2012, the date of the e-mail.
16           You know, I apologize, the e-mail says
17   that -- it refers to a May 2012 --
18       A   Yeah.
19       Q   -- report.  So the report is as of May
20   2012, Dr. Herndon is still a customer of Endo with
21   respect to Opana ER, correct?
22           MR. MORRIS:  Objection.  Form.
23   Foundation.
24           THE WITNESS:  That's what the report

Page 388

1    says.
2    BY MS. SCULLION:
3        Q   That's what the report says.
4        A   However, in the report also, it's -- I'm
5    trying to patch this together.
6        Q   Yep.
7        A   It looks like he's not prescribing in
8    May.  Is it -- he really hasn't prescribed since
9    March.
10       Q   So --
11       A   Or maybe February.
12       Q   -- do you remember that in Exhibit 42,
13   and we can look at it, the article states that he
14   was -- pled guilty?
15       A   Okay.
16       Q   Let's go to the bottom of -- in
17   Exhibit 42, the bottom of page E1178.2.
18       A   Okay.
19       Q   This article is dated June 18, 2012, and
20   says, "Dr. Herndon pled guilty last month."
21           Do you think that the sales dropped off
22   because he -- he pled guilty?
23       A   I don't know.  I don't know how -- I
24   don't remember this physician.

Page 389

1        Q   But clearly he was -- you know, he was
2    still being -- he was still a customer of Endo in
3    the -- as of March 2012, as you said, right?
4            MR. MORRIS:  Objection.  Form and
5    foundation.
6            THE WITNESS:  I don't know.  I don't
7    know.
8    BY MS. SCULLION:
9        Q   But you're seeing Opana sales listed for
10   him, correct?
11       A   Correct.  It doesn't mean he was called
12   on, but he might have still been prescribing.
13       Q   And Endo was still receiving money for
14   those sales of Opana ER from his prescriptions,
15   correct?
16           MR. MORRIS:  Objection.  Foundation.
17           THE WITNESS:  I -- I don't know how that
18   transpired, but --
19   BY MS. SCULLION:
20       Q   And if -- it's paid for the
21   prescriptions of its products eventually, correct?
22       A   Correct.
23       Q   When you were VP of sales for Endo, was
24   your office in Chadds Ford, PA?

98  (Pages 386 to 389)

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1    A   Yeah, Chadds Ford and Malvern.
2    Q   And then Malvern?
3    A   Yes.
4    Q   Okay.  And that's right near Philly --
5    A   Yeah.
6    Q   -- Philadelphia, correct?
7    A   Yes.
8    Q   Okay.
9        MS. SCULLION:  Can I have E563?
10       (Romaine Exhibit No. 46 was marked
11       for identification.)
12   BY MS. SCULLION:
13   Q   Let me hand you what's been marked as
14   Exhibit 46.  And this is Bates-stamped
15   ENDO-OR-CID-000694084, and we've stamped it E563
16   at the top.
17       And you're welcome to read the document.
18   A   Okay.
19   Q   It is a May 2011 DEA brief coming out of
20   the Philadelphia Division of the DEA.
21   A   (Peruses document.)
22   Q   Have you read through it?
23   A   Yes.
24   Q   So, again, this is a DEA brief from the

Page 391

1    Philadelphia Division alerting to Opana
2    oxymorphone abuse, correct?
3    A   Yes.
4    Q   And it indicates that:  "The oxymorphone
5    brand name Opana has been reported by several
6    sources of information as," quote, "the big thing
7    right now in pharmaceutical drug abuse in the
8    region."
9        Correct?
10   A   I see that.
11   Q   And it goes on to note that:  "In fact,
12   oxymorphone had been abused back in the early
13   1970s and was one of the most sought after and
14   well regarded opioids at that time."  Do you see
15   that?
16   A   Yes.
17   Q   And in fact, it had a street name, and
18   the street names were Blues, correct?
19   A   That's what I see on the document.
20   Q   It goes on to indicate there is in fact
21   a lot of slang terms for oxymorphone:  Blues,
22   Biscuits, Blue Heaven, New Blues, Octagons,
23   Octagon Stop Signs, Pink, Pink Heaven.  Are you
24   familiar with those street names for Opana?

Page 392

1    A   I'm not, until we had a discussion
2    yesterday about Stop Signs, the first time I've
3    heard it.
4    Q   Okay.  Never came to your attention when
5    you were vice president of sales?
6    A   No.
7    Q   Okay.  And this is though -- even though
8    sales reps are supposed to be out there looking
9    for pill mills, looking for diversion, you never
10   heard about this?
11   A   I never heard about the slang names.
12   Q   Okay.  Were you aware of the Philly
13   DEA's report?
14   A   I don't recall it.
15   Q   Now, in fact, Endo knew that Opana ER
16   original formulation had been so widely abused
17   that it was determined to be not safe, correct?
18       MR. MORRIS:  Objection.  Form and
19   foundation.
20       THE WITNESS:  I -- I don't recall that.
21       MS. SCULLION:  Do you have 419?
22       (Romaine Exhibit No. 47 was marked
23       for identification.)
24   BY MS. SCULLION:

Page 393

1    Q   Okay.  I'm handing you what's been
2    marked as Exhibit 47.  And it's Bates-stamped
3    ENDO_CHI_LIT-0008100.  And this is a May 31st,
4    2012 e-mail from Tara Chapman to Maryann Holovac
5    at the FDA.  Subject:  "Request to move Opana ER,
6    NDA 21-610, to the Orange Book discontinued list."
7        Do you see that?
8    A   Yes.
9    Q   And Ms. Chapman at the time, as it says
10   in her signature block, was a director of
11   Regulatory Affairs liaison for Endo, correct?
12   A   Correct.
13   Q   And what Ms. Chapman says to the FDA --
14       And the FDA was the principal regulator
15   for Endo's pharmaceuticals, correct?
16   A   Correct.
17   Q   And what she says to the FDA in the
18   second paragraph was:  "While the original
19   formulation of Opana ER was deemed by FDA to be
20   safe and effective when taken according to the
21   prescribing information, the original formulation
22   was subject to both intentional and inadvertent
23   abuse and misuse."  Correct?
24   A   I see that.

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1      Q    And so Endo was aware of abuse and
2   misuse of the original formulation of Opana ER,
3   correct?
4          MR. MORRIS:  Objection.  Form and
5   foundation.
6          THE WITNESS:  The product had a black
7   box warning.
8   BY MS. SCULLION:
9      Q    Ms. Chapman doesn't say the product had
10  a black box warning.  She says:  "The original
11  formulation was subject to both intentional and
12  inadvertent abuse and misuse," correct?
13     A    I--
14         MR. MORRIS:  Objection to form.
15         THE WITNESS:  This is -- that's her --
16  that's what she says in her memo.
17  BY MS. SCULLION:
18     Q    And that's what she says to the FDA,
19  right?
20     A    Right.
21     Q    And you expected that to be accurate
22  when she said it, correct?
23     A    I've not dealt with the FDA directly, so
24  I --

Page 395

1      Q    Would you expect that -- Endo's director
2   of Regulatory Affairs to be making accurate
3   statements to the regulatory agency for the
4   products?
5      A    I don't know --
6          MR. MORRIS:  Objection to form.
7          THE WITNESS:  I don't know why she would
8   not, so...
9   BY MS. SCULLION:
10     Q    Correct.
11         And then she goes on to say:  "Endo
12  believes the new formulation of Opana ER, which is
13  designed to be crush-resistant, offers safety
14  advantages over the original formulation, and the
15  original formulation should be discontinued for
16  safety reasons."  Correct?
17     A    I see that.
18     Q    And so it was Endo's position that the
19  original formulation of Opana ER was not safe as
20  of this point, correct?
21         MR. MORRIS:  Objection.  Form, and
22  foundation.
23         THE WITNESS:  If prescribed
24  appropriately, it was effective.

Page 396

1   BY MS. SCULLION:
2      Q    But that's not what Endo -- Endo told
3   the FDA that because of intentional and
4   inadvertent abuse and misuse, the product was not
5   safe.
6      A    But this is out of my wheelhouse.  You
7   know, this is not an area that I -- I have
8   expertise in.
9   BY MS. SCULLION:
10     Q    Okay.  And we saw the DEA's report on
11  Opana abuse, correct, in 2011?  We saw that.
12     A    Correct.
13     Q    But Endo was still aggressively selling
14  Opana ER throughout 2011, correct?
15         MR. MORRIS:  Objection.  Form.
16         THE WITNESS:  We were -- we were
17  promoting it based on the package insert with full
18  describing -- prescribing information.
19  BY MS. SCULLION:
20     Q    Do you recall that we looked earlier --
21         MS. SCULLION:  Do we have that -- the
22  exhibit.
23  BY MS. SCULLION:
24     Q    If we look at Exhibit 31, we saw that by

Page 397

1   the end of 2011, sales of Opana were at an
2   all-time high.
3      A    This (indicating), right?
4      Q    No, Exhibit 31.
5      A    Oh.
6      Q    Which describes -- it's Ms. Vitanza's
7   e-mail --
8      A    Oh.
9      Q    -- forwarding on Mr. Pyszczymuka's Opana
10  weekly -- Opana ER Weekly.  Exhibit 31.
11     A    Got it.  Sorry.
12     Q    Great.
13         And if you look at the bottom of the
14  first page of Exhibit 31, again, the report is
15  that the weekly sales in September -- end of
16  September, beginning of October for Opana ER were
17  at an all-time high, correct?
18     A    Correct.
19     Q    And this is a time when DEA in
20  Philadelphia, Endo's own backyard, is saying that
21  Opana is becoming the new OxyContin, correct?
22     A    I think you have to keep in mind, just
23  full context, the market share was six, six and a
24  half percent.  So in the marketplace, it was very

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1    small.
2    Q   You think it was very small to --
3    A   Six percent compared to --
4    Q   -- to folks who would overdose on it
5    if --
6    A   Well, taken inappropriately --
7        MR. MORRIS:  Object -- objection.  Form
8    and foundation.
9    BY MS. SCULLION:
10    Q   But the DEA is not talking about taking
11   it appropriately.  The DEA is talking about a
12   known phenomenon of abuse and diversion of Opana
13   that's occurring, and it's occurring right in
14   Endo's own backyard in Philadelphia.  Right?
15       MR. MORRIS:  Objection to form.
16   Argumentative.
17       THE WITNESS:  I -- I don't remember that
18   report until you showed it to me.  But I've seen
19   it today.
20   BY MS. SCULLION:
21    Q   Do you -- having seen it, do you
22   remember it?
23    A   Yes.
24    Q   You do remember seeing that?

Page 399

1    A   Today.
2    Q   Do you remember seeing it at the time?
3    A   No, I do not remember.
4    Q   Okay.  In fact, I want to start with
5    that.
6        MS. SCULLION:  Do you have that?  Oh,
7    these are all the copies.  Don't give me all the
8    copies.
9        (Romaine Exhibit No. 48 was marked
10       for identification.)
11   BY MS. SCULLION:
12    Q   I will hand you what's been marked as
13   Exhibit 48.  Exhibit 48 is Bates-stamped
14   ENDO_OPIOID_MDL-01968698, and we've stamped it
15   E1179.
16       And this is a series of two e-mails.  So
17   the first is an e-mail from you to Endo Pain Sales
18   All, CSO Pain Sales All, dated October 30th, 2012.
19   Do you see that?
20    A   Yes.
21    Q   And Endo Pain Sales All, would that have
22   been the entirety of the pain sales representative
23   sales force?
24    A   Yes.

Page 400

1    Q   What is CSO Pain Sales All?
2    A   That was a contract, inVentiv sales
3    force.
4    Q   Okay.  So this is going out to both the
5    contracted and in-house sales force, right?
6    A   Yes.
7    Q   And I apologize, we should have started
8    with the very bottom e-mail, which is sent by Jane
9    Clifford on your behalf.
10    A   Yes.
11    Q   Is that right?
12    A   Yes.
13    Q   Okay.  And the body of that e-mail
14   appears on page E1179.2.
15    A   Okay.
16    Q   And you are sending this out to convey
17   that: "The FDA issued a statement on their
18   website in the drug alerts and statement section
19   to alert that Opana ER with INTAC technology may
20   cause a serious blood disorder if abused via
21   intravenous injection."
22       Do you see that?
23    A   Yes.
24    Q   Do you remember that alert -- that

Page 401

1    statement, rather?
2    A   I don't particularly remember this
3    e-mail, but I -- I do remember that period of
4    time.
5    Q   That period of time --
6    A   When -- when this occurred.
7    Q   -- being fall of 2012?
8    A   Yes.
9    Q   And do you remember that by that time,
10   Endo was aware that Opana ER with INTAC technology
11   may cause a serious blood disorder if abused via
12   intravenous injection?
13       MR. MORRIS:  Objection to form.
14       THE WITNESS:  I -- I don't specifically
15   remember that occurring, that specific issue, but
16   I do remember drafting this -- this e-mail was
17   drafted for me so I could forward it to the sales
18   force.
19   BY MS. SCULLION:
20    Q   When you say you don't remember that
21   specific issue, you don't remember that it may
22   cause a serious blood disorder; is that what you
23   mean?
24    A   Yes.

101  (Pages 398 to 401)

Highly Confidential - Subject to Further Confidentiality Review

Page 402

1    Q   Were you aware that there was a concern
2  about a blood disorder being caused by intravenous
3  abuse of Opana ER?
4    A   I do recall a period of time when
5  that -- that did occur, when we heard about this.
6    Q   Okay.  And this -- the e-mail sent out
7  on your behalf goes on in the next paragraph to
8  advise:  "Please review the following FAQs, which
9  are for internal use only and not to be discussed
10  or distributed to customers."
11    Do you see that?
12    A   Yes.
13    Q   And the paragraph goes on that:  "Please
14  direct any questions your customers may have about
15  TTP to medical information.  While this
16  information is not to be used in discussions with
17  healthcare professionals, we wanted to provide you
18  an update on the FDA's statement and background
19  information."
20    Do you see that?
21    A   Yes.
22    Q   So the instructions to the district
23  managers was not to go out and affirmatively
24  advise customers about the FDA's statement and

Page 403

1  concern about Opana ER causing a serious blood
2  disorder if used by IV injection, and not to use
3  this information in discussions with healthcare
4  providers, correct?
5    A   Correct.
6    Q   The only thing that was to be done was
7  that if a customer raised a question themselves,
8  the question was to be referred up to medical
9  information, correct?
10    A   Correct.
11    Q   And again, as we discussed earlier, Endo
12  could have sent out a Dear Doctor letter to all
13  its customers to affirmatively alert them to the
14  FDA's statement, correct?
15    MR. MORRIS:  Object -- objection.  Form,
16  foundation, legal conclusion.
17    THE WITNESS:  Again, that -- that wasn't
18  in my department, so I don't recall whether that
19  happened or not.
20  BY MS. SCULLION:
21    Q   That would have been an option that
22  the -- that Endo would have had, though.
23    MR. MORRIS:  Objection.  Form and
24  foundation --

Page 404

1    THE WITNESS:  Again, that's not in my
2  department --
3    MR. MORRIS:  Objection.  Form,
4  foundation, and legal conclusion.
5  BY MS. SCULLION:
6    Q   That would have been an option Endo --
7    THE REPORTER:  What was your answer?
8  I'm sorry.
9    MS. SCULLION:  Thank you.
10    THE WITNESS:  That was not within my
11  department.
12  BY MS. SCULLION:
13    Q   Okay.  But Endo could have undertaken to
14  affirmatively advise its customers about this
15  serious blood disorder that the FDA was raising an
16  alert about, correct?
17    MR. MORRIS:  Objection.  Form and
18  foundation.
19    THE WITNESS:  Well, if you read this, if
20  questions came up from physicians, then there --
21  we instructed the representatives to make sure
22  they call so they could get answers.
23  BY MS. SCULLION:
24    Q   Right, that's if -- if the physicians

Page 405

1  themselves asked.
2    A   Right.
3    Q   But if they didn't know about this risk
4  from -- a serious blood disorder from intravenous
5  abuse of Opana ER, they wouldn't know to ask that
6  question, right?
7    MR. MORRIS:  Objection.  Form and
8  foundation.
9    THE WITNESS:  I -- I can't answer that
10  question.  I don't under- -- that's not my -- my
11  area of expertise, so that would go to our medical
12  department.
13  BY MS. SCULLION:
14    Q   But -- but the customers wouldn't
15  necessarily know that there was that risk to even
16  ask the question, would they?
17    MR. MORRIS:  Objection.  Form.
18    THE WITNESS:  I -- I don't know.  I
19  don't know the answer to that.
20  BY MS. SCULLION:
21    Q   Well, and your e-mails were not telling
22  anyone in sales, though, to make sure that the
23  customers knew that information.
24    A   We were instructed, as you can see

102  (Pages 402 to 405)

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1   through this e-mail, that if questions came up,
2   don't answer them; have them call this number to
3   get that specific information. Because they're
4   not the expert in that.
5          And just to provide clarity, as you look
6   at this e-mail, I mean the focus here was to make
7   sure the representatives stayed focused on the
8   training and what they could present and what --
9   and stay within a fair balance of the product.
10      Q   So, Mr. Romaine, again, we saw the DEA
11  alert from 2011 that included information about
12  how oxymorphone had been abused back in the 1970s,
13  right?
14      A   You showed us that.
15      Q   Right. And then -- the DEA was raising
16  concerns about abuse of Opana ER in the
17  Philadelphia area and other areas in 2011 itself.
18  Right?
19      A   Right.
20      Q   Okay. And then here in October of 2012,
21  the FDA is saying reformulated Opana ER with INTAC
22  also has a serious blood disorder associated
23  with -- with it when it's abused by IV injection,
24  right?

Page 407

1       A   Right.
2       Q   So the reformulated version of Opana ER
3   also was being abused just like the original
4   Opana ER was being abused, correct?
5       A   I -- I don't --
6           MR. MORRIS: Objection. Form and
7   foundation.
8           THE WITNESS: I can't answer that
9   question. I'm not the expert in that field.
10  However, it did have a black box
11  warning. So in the full context of this, if
12  taken -- if prescribed appropriately to the right
13  patient, that -- that wouldn't have been an issue.
14  BY MS. SCULLION:
15      Q   But the concern here is not prescribed
16  appropriately to the right patient. The concern
17  is someone intentionally or inadvertently abusing
18  the product, correct?
19          MR. MORRIS: Objection. Form and
20  foundation.
21          THE WITNESS: I -- I can't answer.
22  Again, my -- my area of expertise was to make sure
23  my sales force stayed focused on providing
24  resource and education to the offices regarding

Page 408

1   the use of Opana ER.
2   BY MS. SCULLION:
3       Q   Right. So October 2012, the FDA thinks
4   this is important enough to actually issue a
5   statement, despite the black box. The FDA issues
6   a statement saying that Opana ER with INTAC may
7   cause a serious blood disorder if abused
8   intravenously. And Endo doesn't affirmatively go
9   out and tell physicians. And your instruction to
10  the sales force, as you've been describing, is
11  business as normal.
12          MR. MORRIS: Objection. Foundation,
13  form.
14          THE WITNESS: And business as normal is
15  to go to your offices and provide full, fair
16  balanced prescribing information, including the
17  black box warning. That's business as normal.
18  And it goes on to state that -- to ensure that the
19  offices use our meds appropriately.
20  BY MS. SCULLION:
21      Q   Your response to the FDA issuing this
22  statement, if you look at the top of page E1179,
23  in your communication to the regional directors --
24  correct?

Page 409

1       A   Correct.
2       Q   -- was "Our promotion of Opana ER is
3   business as normal." That's what you said.
4       A   "Keep your teams focused on their
5   responsibility to the offices who use the meds
6   appropriately."
7       Q   Right.
8       A   Business as normal, just to bring
9   clarity to it, is to go out and promote our
10  products with full fair balance so physicians
11  understand the side effects, the adverse events,
12  and so forth with the product.
13      Q   And that was despite the clear notice
14  that Opana ER with INTAC technology was being
15  abused intravenously, and in some cases that abuse
16  was causing a serious blood disorder.
17          MR. MORRIS: Objection. Form.
18          THE WITNESS: I -- I -- I can't answer
19  it any other way than I already have. We had
20  clear responsibilities to our offices.
21  BY MS. SCULLION:
22      Q   And those responsibilities, though, did
23  not include affirmatively going out and informing
24  them of this risk of a serious blood disorder,

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 410

1  correct?
2       A    That would have been outside of my realm
3  of responsibility in the organization.
4       Q    Do you know if it ever happened?
5       A    I don't know that.
6       Q    Did you ever ask anyone if it ever
7  happened?
8       A    I did not ask. I don't remember asking,
9  let me put it that way.
10      Q    Did you ever ask anyone, Are we going to
11 send a Dear Doctor letter out?
12      A    I don't recall that.
13      Q    Did you ever ask anyone, This is
14 problematic, the original Opana ER was subject to
15 abuse, we know it was abused, and now we're seeing
16 our new product is also abused?
17      A    I don't --
18           MR. MORRIS: Objection to form.
19           THE WITNESS: -- recall that.
20 BY MS. SCULLION:
21      Q    Was that a concern for you that the new
22 formulation of Opana ER was also being abused?
23           MR. MORRIS: Objection. Form.
24           THE WITNESS: I -- I think we all take

Page 411

1  responsibility for ensuring that the product is
2  used appropriately, and that was my focus.
3  BY MS. SCULLION:
4       Q    But the concern was that there was
5  knowledge that the product was not being used
6  appropriately out there, even after reformulation,
7  correct?
8           MR. MORRIS: Objection. Form.
9           THE WITNESS: I -- I -- there were --
10 just like with any other opioid, there were
11 abusers who didn't take the product or -- or
12 diverted the product.
13 BY MS. SCULLION:
14      Q    But this wasn't like any other opioid,
15 right? I mean, again, the DEA notice confirms
16 there was a history going back to the '70s of
17 oxymorphone being attractive for street abuse,
18 right?
19      A    I can't speak to --
20           MR. MORRIS: Objection. Form,
21 argumentative.
22           THE WITNESS: I can't speak to the '70s.
23 I'm sorry.
24 BY MS. SCULLION:

Page 412

1       Q    That's what the DEA notice said, right?
2       A    That's what the -- the data that you
3  provided me said, yes.
4       Q    Right. And -- and you're saying in your
5  entire tenure as VP of sales at Endo, you had no
6  knowledge of the history of abuse of oxymorphone
7  as a street drug.
8           MR. MORRIS: Objection to form.
9           THE WITNESS: I -- I did not say that.
10 The product was used -- if used appropriately, was
11 effective. There were -- we're not saying it
12 wasn't abused because it did have a black box
13 warning.
14 BY MS. SCULLION:
15      Q    I'm saying, you saying that you didn't
16 have knowledge of the abuse of oxymorphone as a
17 street-bought drug before the launch of
18 Opana ER --
19      A    I did not.
20      Q    -- that it had a history?
21      A    I did not.
22      Q    You never had knowledge of that?
23      A    I don't recall that.
24      Q    Okay. Ever see the movie "Drugstore

Page 413

1  Cowboy"?
2       A    No.
3       Q    Okay. Would it surprise you to learn
4  "Drugstore Cowboy," the movie, mid-'80s, Gus Van
5  Sant, in the opening dialogue in that movie talks
6  about abuse of Blues, of oxymorphone pills?
7           MR. MORRIS: Objection.
8  BY MS. SCULLION:
9       Q    Would it surprise you to know that?
10          MR. MORRIS: Objection. Form.
11          THE WITNESS: You're surprised I didn't
12 know that?
13 BY MS. SCULLION:
14      Q    Are you surprised to know that?
15      A    No, I don't know anything about the
16 movie.
17          MR. MORRIS: What's the time, please?
18          THE VIDEOGRAPHER: 6 hours, 45.
19          MS. SCULLION: We can take a break.
20          THE VIDEOGRAPHER: The time is 6:06 p.m.
21 We're going off the record.
22          (Recess.)
23          THE VIDEOGRAPHER: The time is 6:21
24 p.m., and we're back on the record.

104 (Pages 410 to 413)

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1    MS. SCULLION: Mr. Romaine, welcome
2  back.
3        THE WITNESS: Thank you.
4        MS. SCULLION: We have no further
5  questions for you today. Thank you for your time.
6  I believe my colleague will be questioning you
7  now.
8        THE WITNESS: Thank you.
9        THE VIDEOGRAPHER: Do you want to go off
10 the record?
11       MR. MORRIS: I guess so.
12       THE VIDEOGRAPHER: The time is 6:21 p.m.
13 We're going off the record.
14       (Pause.)
15       THE VIDEOGRAPHER: The time is 6:23 p.m.
16 We're back on the record.
17          DIRECT EXAMINATION
18 BY MR. LENISKI:
19    Q   Good afternoon, Mr. Romaine. My name is
20 Joe Leniski. We were introduced earlier. I
21 represent district attorneys and babies born with
22 prenatal neo-abstinence syndrome in Tennessee, and
23 I'm going to ask you some questions specifically
24 about some areas about my case.

Page 415

1    A   Okay.
2        MR. LENISKI: Before we go on the
3  record, I just want to state that our clients have
4  an objection -- we're taking these depositions
5  while reserving all rights due to our standing
6  objection to cross-notices in the MDL as a result
7  of production failures under the standing NDA
8  order and lack of sufficient notice, and on the
9  basis there is no time limits in Tennessee when it
10 comes to depositions.
11       But, nonetheless, we're cooperating and
12 here to take the deposition today.
13       MR. MORRIS: Okay. And I'll just simply
14 note that we disagree with that position, but
15 nothing more needs to be said on the record about
16 it today.
17       MR. LENISKI: Okay. Thank you.
18 BY MR. LENISKI:
19    Q   During your employment at Endo, did you
20 have any understanding as to the level of opioid
21 use in Tennessee relative to other states?
22    A   I can't say specifically that I recall
23 anything different regarding the use of -- of
24 opioids in that area.

Page 416

1    Q   Okay. So you had no understanding
2  whether the use of opioids in Tennessee was
3  relatively high when compared to other states
4  while you were employed at Endo?
5    A   I did know that there was an area called
6  Appalachia, which I guess Tennessee maybe would
7  fall within that, but Kentucky, West Virginia,
8  that there was a high use of opioids in that area.
9    Q   Okay. And --
10   A   Both through the news and through the
11 company.
12   Q   Yeah, I was going to ask: What's your
13 understanding about opioid use in Appalachia being
14 high?
15   A   Just that there was some -- there was
16 some potential for abuse there.
17   Q   And when did you first learn that
18 information?
19   A   I can't say if -- I can't remember a
20 specific date or time period.
21   Q   Was it in connection with your job
22 responsibilities as it pertained to Opana that you
23 learned that information?
24   A   I would say yes, but also I've heard

Page 417

1  that since I left the company as well.
2    Q   Do you know what, if anything, about
3  that information in any way influenced your
4  performance of your job at Endo?
5    A   No.
6        MR. MORRIS: Objection. Form.
7  BY MR. LENISKI:
8    Q   In other words, the fact about
9  Appalachia having relative high opioid use, to
10 your knowledge, that didn't influence the manner
11 in which you gave instructions to sales reps in
12 Tennessee or parts of Appalachia?
13   A   No. Same instructions: Make sure
14 you're well educated and a resource for the
15 offices, and give full prescribing information,
16 cover the black box warning.
17   Q   Okay. Did you ever gain any
18 understanding about the level of opioid abuse in
19 Tennessee relative to other states?
20   A   The amount are you asking?
21   Q   (Counsel nods.)
22   A   I can't recall that.
23   Q   Well, and more generally, did you ever
24 get any understanding about the relative level of

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    abuse of opioids in the state of Tennessee
2    relative to other states?
3        A    I can't --
4            MR. MORRIS:  Objection to form.
5            THE WITNESS:  I can't say specifically
6    to the state of Tennessee.
7    BY MR. LENISKI:
8        Q    Okay.  How about -- well, strike that.
9            With respect to Appalachia, did you gain
10   any -- any understanding about the relative level
11   of opioid abuse occurring in Appalachia compared
12   to other areas in the United States?
13       A    I know that there was -- we had
14   discussions around the abuse in the Appalachian
15   state.  I don't remember in context compared to
16   other states.
17       Q    So you had no understanding during your
18   employment at Endo whether there was relatively
19   higher levels of abuse occurring in Appalachia
20   versus other areas of the United States?
21       A    I -- I --
22           MR. MORRIS:  Objection to form.
23           THE WITNESS:  I don't recall that.
24   BY MR. LENISKI:

Page 419

1        Q    Is that information that you believe was
2    relevant to the performance of your job duties at
3    Endo?
4        A    Well, my -- my responsibilities was to
5    ensure that the sales force was well educated, a
6    resource for offices, professional, and provide a
7    full, fair balance when they're calling on
8    physicians.  So to that answer, no.
9        Q    Were the reps that you oversaw in --
10   working in Tennessee or in Appalachia, were any of
11   the messages or training they received different
12   and apart from other training that was occurring
13   elsewhere in the United States?
14       A    Well, they also -- I mean they received
15   training on, you know, how to look for diversion,
16   how to report diversion, numbers to call, that
17   sort of thing.
18       Q    And my question, though, was a bit more
19   specific to Tennessee and Appalachia.
20           Is it your testimony that any of the
21   training or messaging that those reps were
22   performing in Tennessee or Appalachia, that that
23   was any different from other training and
24   messaging that other reps at Endo were responsible

Page 420

1    for companywide?
2        A    I -- I -- at the sales rep level, I
3    can't recall that it was specifically different.
4    I know in the company we probably did different
5    things there that I -- you know, outside of my
6    realm of responsibility, but at the rep level, I
7    know we trained very specifically on --
8        Q    Can you think of any aspect of the
9    manner in which sales reps were trained or
10   instructed for messaging in Tennessee or
11   Appalachia that differed from other areas in the
12   country?
13       A    I can't recall that.  No.
14       Q    While employed in sales at Endo, did you
15   have any understanding about the relative
16   importance of Tennessee to Endo's Opana ER sales?
17           MR. MORRIS:  Objection.  Form.
18           THE WITNESS:  I can't recall that at
19   this point, no.
20   BY MR. LENISKI:
21       Q    Do you --
22       A    Not Tennessee specifically.
23       Q    Okay.  Do you recall having any
24   recollection as to whether or not Endo's Opana ER

Page 421

1    sales were relatively higher in Tennessee when
2    compared to other states?
3        A    Again, I can't recall that.  I'm sure
4    there were reports I could have looked at the
5    time, but I can't recall that now.
6        Q    Is that something that in your job
7    responsibilities you would have been aware of or
8    you think you would have been aware of is where a
9    particular state ranks in terms of having
10   relatively high levels of Opana ER sales for Endo?
11       A    Not necessarily by state, but by the
12   region I would, and if -- I would look at that
13   region.  And there would be many states in that
14   region obviously.
15       Q    Do you recall what region Tennessee was
16   in while you were employed at Endo?
17       A    I think it was in Mid-Atlantic, but I --
18   I don't know that for sure.  I believe it was.
19           (Romaine Exhibit No. 49 was marked
20           for identification.)
21   BY MR. LENISKI:
22       Q    Mr. Romaine, I've handed you a document
23   identified as Exhibit 49 to your deposition.
24       A    Okay.

106 (Pages 418 to 421)

Highly Confidential - Subject to Further Confidentiality Review

---

Page 422

1    Q   My question to you is going to be
2  whether you recognize the document.
3    A   I don't recall the document.
4    Q   Okay.  This is a document Bates-stamped
5  ENDO_OPIOID_MDL-01067350.
6        It's an e-mail from Albert Weeks.
7    A   Yes.
8    Q   Who is that?
9    A   I know Albert Weeks.  I don't recall his
10 title in the organization.
11   Q   Okay.  And he's e-mailing several
12 people, including yourself in the cc line,
13 correct?
14   A   Correct.
15   Q   That's on September 25th, 2008.  The
16 subject is "TennCare Medicaid Win."  Did I read
17 that correctly?
18   A   Yes.
19   Q   And he writes: "Tennessee field sales
20 team: TennCare has made a decision to add
21 Opana ER to their preferred drug list."
22   A   Yes.
23   Q   "This will provide product access to
24 Medicaid recipients and provide healthcare

---

Page 423

1  providers with an additional option to treat
2  patients that require a strong opioid."
3        Did I read that correctly?
4    A   Yes.
5    Q   Okay.  It says: "Medicaid represents an
6  additional opportunity to expand our business, and
7  in many cases, Medicaid can provide spillover
8  opportunities within your territory."
9        Did I read that correctly?
10   A   Yes.
11   Q   "However, we will also need to continue
12 to drive demand across the entire book of business
13 in order to maximize the full potential of
14 Opana ER."
15       Did I read that correctly?
16   A   Yes.
17   Q   And it says: "Ultimately we are
18 striving for an outcome where the Medicaid and
19 commercial opportunities work synergistically."
20 Correct?
21   A   Yes.
22   Q   And it says: "Therefore, you may want
23 to focus your efforts on key physicians who treat
24 both Medicaid patients and commercial patients

---

Page 424

1  where we have unrestricted access to truly
2  optimize your effort."
3        Did I read that correctly?
4    A   Yes.
5    Q   Do you know what Mr. Weeks was referring
6  to when he refers to "unrestricted access"?
7    A   What I believe he's referring to -- and
8  again, this is his e-mail, so it's -- it's -- I
9  think he's referring that -- that patients,
10 whether they're Medicaid patients or they're
11 commercial patients, would have access for pain,
12 for Opana ER, so that physicians could be able to
13 prescribe the product and it would be covered
14 by --
15   Q   And is what -- I'm sorry.
16   A   -- by healthcare providers.
17   Q   And is what Mr. Weeks is describing here
18 having Tennessee's version of Medicare, TennCare,
19 add Opana ER to the preferred drug list, is that
20 going to have the effect of increasing the
21 potential prescribing power of doctors who want to
22 prescribe Opana ER to their patients?
23       MR. MORRIS:  Objection.  Form and
24 foundation.

---

Page 425

1        THE WITNESS:  Yeah, I --
2  BY MR. LENISKI:
3    Q   If you know.
4    A   Just to clarify, what -- what that
5  actually does is it provides the opportunity for
6  physicians who had Medicaid patients or TennCare
7  patients, they would be more likely to prescribe
8  because it was covered by a healthcare plan.
9    Q   Were you involved ever in any efforts in
10 the state of Tennessee to attempt to have Opana ER
11 added to TennCare's preferred drug list?
12   A   No, that would have been handled by
13 our -- our managed care group.
14   Q   Do you know, in fact, if Endo did lobby
15 to have Opana ER placed on the preferred drug list
16 in Tennessee?
17   A   I don't know if it was a lobby.  I don't
18 know how this took place.  I just know that they
19 did win TennCare at some point.
20   Q   Was Endo, to your knowledge, aware of
21 doctors or other healthcare professionals who were
22 involved in the decision-making where it concerns
23 the placement of Opana ER on TennCare's preferred
24 drug list?

---

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1    A  Can -- can --
2         MR. MORRIS:  Objection to form.
3         THE WITNESS:  Can you repeat that --
4    that question for me?
5    BY MR. LENISKI:
6    Q   To your knowledge, was Endo aware of
7    which doctors or healthcare professionals were
8    involved in the decision-making where concerns of
9    placement of Opana ER on TennCare's preferred drug
10   list?
11        A  I'm not -- I'm not aware.
12        Q   And I asked you if you know if Endo was
13   aware, others at Endo were aware.
14        A  I don't know.
15        Q   Okay.  I'm done with that.
16        A  Okay.
17        (Romaine Exhibit No. 50 was marked
18            for identification.)
19        MR. LENISKI:  I have one more copy.  I
20   apologize.
21   BY MR. LENISKI:
22        Q   Did I give you the one that I wrote on?
23        A  No.  Oh, unless it's on the back.  No.
24        Q   Okay, got one more.  Here you go.

Page 427

1         I've handed you a document we've
2    identified as Exhibit 50 to your deposition.  Do
3    you recognize the document?
4         A  I -- it looks familiar.  I don't
5    remember, but it looks familiar.
6         Q   And it says, "Larry Romaine, 2011" --
7         MR. MORRIS:  Before you go on, can I
8    read the number?
9         MR. LENISKI:  Sure, absolutely.
10        MR. MORRIS:  It's ENDO_OPIOID_
11   MDL-01006528.
12        MR. LENISKI:  Thank you.
13   BY MR. LENISKI:
14        Q   This says at the top "Larry Romaine,
15   2011 Objectives," correct?
16        A  Correct.
17        Q   Do you think -- is it likely you drafted
18   this document?
19        A  I have a -- I think these were the
20   object -- objectives that I probably received that
21   I was responsible for.
22        Q   And who would have assigned you those
23   objectives, to your knowledge?
24        A  My manager at the time, which would have

Page 428

1    been -- do you want the name?
2         Q   Yes.
3         A  Brian Lortie.
4         Q   Okay.  And under item number 3, "Pain
5    products" --
6         A  Yes.
7         Q   -- it says:  "Exceed revenue and profit
8    objectives across total portfolio."
9         A  Yes.
10        Q   And then Roman numeral number II says:
11   "Opana ER, 315 to 325 million," correct?
12        A  Correct.
13        Q   And then it says:  "Stretch objective."
14   Do you know what that means?
15        MR. MORRIS:  Objection.  Form and
16   foundation.
17        THE WITNESS:  I -- I don't recall at the
18   time.
19   BY MR. LENISKI:
20        Q   Was that a term that was used in
21   parlance in Endo during your tenure to describe a
22   goal or an objective that someone may set for
23   somebody?
24        A  It could have been.  I -- but I don't

Page 429

1    recall.
2         Q   Okay.  It says:  "Develop a competitive
3    focus on OxyContin share acquisition."
4         What did that mean?
5         MR. MORRIS:  Objection.  Form.
6         THE WITNESS:  I'm not quite sure what --
7    going back now, I don't quite remember what --
8    what -- what Brian is referring to there.
9    BY MR. LENISKI:
10        Q   Do you recall any effort by Endo to try
11   and acquire the OxyContin market share away from
12   OxyContin towards Opana ER?
13        A  Well, OxyContin was the market leader,
14   so it was always -- you know, our focus is that if
15   we're going into those offices, it's highly likely
16   that those physicians are prescribing OxyContin.
17   So you have to provide a full, fair balance of the
18   benefits that Opana would provide to that office
19   and their patients if they're prescribing it.
20   So...
21        Q   Was focusing on OxyContin's share
22   acquisition a consistent goal or effort by the
23   sales department at Endo, to your knowledge?
24        A  I -- I --

108  (Pages 426 to 429)

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1      MR. MORRIS: Objection. Form.
2      THE WITNESS: I don't recall.
3  BY MR. LENISKI:
4      Q   Then it goes on: "-- and create a novel
5  IC approach in key CBSAs." Correct?
6      A   Yes.
7      Q   Okay. I'm going to try to break that
8  out. First of all, what is a CBSA?
9      A   I -- I remember the term CBSA, but I
10  can't remember what it stands for, but it's a
11  geographic -- basically what it is is a geographic
12  area. We used to call them MSAs, which were
13  metropolitan areas, but I don't know what a CB --
14  C -- SA is. I'm sorry.
15      Q   But that -- as you sit here today, the
16  best of your recollection is it refers to a
17  geographic area.
18      A   Correct.
19      Q   Okay. And then what is meant by "create
20  a novel IC approach"?
21      A   I think at the time we were looking
22  at -- looking at different incentive comp plans
23  based on the parts of the country that
24  representatives happened to be, but that never --

Page 431

1  that never occurred.
2      Q   So IC stands for incentive compensation?
3      A   I think that's what he's referring to
4  here.
5      Q   Okay. And when it refers to key CBSAs,
6  was there a general understanding of what the key
7  CBSAs were at Endo about this time of 2011?
8      A   Well, I believe he's referring to each
9  of the regions is what he's referring to as far as
10  CBSAs.
11      Q   And a CBSA would be a subsection of a
12  region at large; is that correct?
13      A   I --
14      MR. MORRIS: Objection. Form.
15      THE WITNESS: I don't know that. I -- I
16  don't recall how that was broken out.
17  BY MR. LENISKI:
18      Q   Okay. And then to the second page,
19  there's a number 5, it says: "Operationalize the
20  region business unit strategy."
21      Do you see that?
22      A   Yes.
23      Q   And what does that mean, "the region
24  business unit strategy," to your knowledge?

Page 432

1      MR. MORRIS: Objection. Form,
2  foundation.
3      THE WITNESS: I -- I don't -- I don't
4  recall.
5  BY MR. LENISKI:
6      Q   Did Endo have region-specific business
7  strategies as opposed to having one overarching
8  unitary strategy for the whole company?
9      A   Each region had their own business plan.
10  And then that rolled up to a national plan or
11  rolled down from the national plan to the region,
12  but I don't specifically remember any content of
13  it.
14      Q   Okay. We're done with that.
15      (Romaine Exhibit No. 51 was marked
16      for identification.)
17  BY MR. LENISKI:
18      Q   Mr. Romaine, I've handed you a document
19  identified as Exhibit -- what number's on this
20  one? What is that, 52?
21      A   51.
22      Q   51, I apologize. It is Bates-stamped
23  first page ENDO_OPIOID_MDL-00361036.
24      My question to you is if you recognize

Page 433

1  the document.
2      A   I don't recognize it.
3      Q   This is an e-mail from John Gilbert, and
4  I think you talked about him earlier, correct?
5      A   Correct.
6      Q   And it's addressed to, among others,
7  yourself dated February 11th, 2011.
8      A   Yes.
9      Q   Do you see that?
10      A   Actually I'm copied on it. It's
11  addressed to others, but I'm copied on it.
12      Q   That's fair.
13      And he writes: "Team: Everyone should
14  be looking for the same opportunities to drive the
15  growth of Opana ER."
16      Did I read that correctly?
17      A   Yes.
18      Q   And before we get too far ahead, in the
19  bottom e-mail, he -- he's actually forwarding an
20  e-mail from someone named Robert Arment.
21      A   Yes.
22      Q   Do you know who that is?
23      A   He was a district manager in the state
24  of Tennessee.

109 (Pages 430 to 433)

Highly Confidential - Subject to Further Confidentiality Review

Page 434

1   Q   Okay. And the subject of his e-mail
2  below is: "Don't Be Blue. Opana ER, BCBS" --
3       That's Blue Cross Blue Shield, correct?
4   A   Yes.
5   Q   -- "of Tennessee Initiative - Update."
6       And he is -- in that e-mail, he is
7  reporting on some data about the numbers that
8  they've received from Blue Cross Blue Shield
9  Tennessee which shows prescribing levels of
10 Opana ER, correct?
11  A   Yes. I just can't read the -- whatever
12 was highlighted at the -- in Bob's e-mail, I can't
13 read that.
14  Q   I think it says: "Baseline data is the
15 current three-month average scripts written for
16 BCBS of Tennessee" --
17  A   Oh, Blue Cross Blue Shield. Okay.
18  Q   -- "commercial patients as of the
19 December 2011 from the Vantage Care" -- I think it
20 says PU, but I'm not sure.
21  A   Okay.
22  Q   Pull-through report maybe?
23  A   Okay.
24  Q   Does that sound familiar --

Page 435

1   A   Yes.
2   Q   -- pull-through report?
3   A   Yes.
4   Q   Okay. So going back then to the e-mail
5  above, John writes to others, and is copying you,
6  says: "Everyone should be looking for the same
7  opportunities to drive the growth of Opana ER."
8  He makes the statement: "Knoxville is a key CBSA
9  for the region."
10      Did I read that correctly?
11  A   Yeah. Yes.
12  Q   And is that something that you were
13 aware of during your time at Endo?
14  A   That Knoxville was a key?
15  Q   Yes.
16  A   I wouldn't have -- I personally wouldn't
17 have said it was key just because of
18 geographically it wasn't as big as many of the
19 other markets, but to John it might have been in
20 his -- his business unit.
21  Q   And did you ever correct John or express
22 your opinion to John, do you recall, that you
23 didn't think Knoxville was a key CBSA?
24  A   Well, to John it could have been a key

Page 436

1  CBSA because it was within his region. Just
2  nationally it wasn't a key one.
3   Q   And is that -- was that your opinion the
4  entire time you were at Endo?
5       MR. MORRIS:  Objection to form.
6       THE WITNESS:  I -- I -- I don't recall.
7  BY MR. LENISKI:
8   Q   In other words, do you have any
9  recollection that Tennessee or any of its cities,
10 like Knoxville, ever gained an importance or being
11 a key area for Opana ER sales territory?
12  A   I -- I don't remember Knoxville being a
13 key area.
14  Q   Okay.
15      (Romaine Exhibit No. 52 was marked
16      for identification.)
17 BY MR. LENISKI:
18  Q   I hand you a document identified as
19 Exhibit 52 to your deposition. And this is a
20 document Bates-stamped ENDO_OPIOID_MDL-01005844.
21      The question will be if you recognize
22 the document.
23  A   I don't recognize the document, but I --
24 I am copied on the document.

Page 437

1   Q   Okay. And this document is another
2  e-mail forward from John Gilbert, similar in
3  subject to the one we saw previously. He's
4  forwarding an e-mail titled "BCBS-TN," Tennessee,
5  "Opana ER Performance," correct?
6   A   Correct.
7   Q   And he writes above: "Tennessee
8  leaders," and he is including you as a copy, so he
9  wants you to know about this, correct?
10  A   Correct.
11  Q   He writes: "As evidenced by Bonnie
12 below, we have strong business in the state of
13 Tennessee, and I -- I would ask that this week
14 during your POA you reinforce the ownership that
15 we need to have with the Opana ER brand."
16      Did I read that correctly?
17  A   Yes.
18  Q   Okay. And the -- his message is going
19 to -- it's addressed to several individuals, and
20 do you know who the individuals are?
21  A   They were his district managers at the
22 time.
23  Q   Okay. So that district included the
24 state of Tennessee, correct?

Highly Confidential - Subject to Further Confidentiality Review

---

Page 438

1    A   Correct.
2         (Romaine Exhibit No. 53 was marked
3         for identification.)
4    BY MR. LENISKI:
5    Q   I hand you a document identified as
6    Exhibit 53 to your deposition.  This is Bates-
7    stamped ENDO_OPIOID_MDL-01018226.
8    A   Yes.
9    Q   Do you recognize the document?
10   A   I don't recognize the document, but I
11   have -- I have the copy in front of me.
12   Q   Okay.  And this is an e-mail from
13   Kenneth Price, correct?
14   A   Yes.
15   Q   And he was the regional business manager
16   for the Midwest region include -- which included
17   Tennessee, correct?
18   A   Correct.  I think there were changes to
19   geographies over time, yes, so he would have
20   picked it up from John.
21   Q   But at this time, as of the date of this
22   e-mail, which is November 30th, 2012, he was the
23   regional business director for the Midwest region,
24   correct?

---

Page 439

1    A   Correct.
2    Q   Which again included Tennessee at this
3    time.
4    A   Yes.
5    Q   Okay.  And he -- he reported to you; is
6    that accurate?
7    A   That's -- that's correct.
8    Q   Okay.  And he copies you on an e-mail
9    that he writes to a list of individuals, and would
10   those have been district managers within his
11   region?
12   A   Yes.  Yes.
13   Q   And he writes: "Thank you for your
14   leadership in coordinating the Opana ER conference
15   call with the Tennessee and Kentucky teams today
16   and sharing the product knowledge, competitive
17   information, and therapeutic knowledge to the
18   reps.  I really appreciate everyone's commitment,
19   drive and passion to make Opana ER very successful
20   again.
21        "As I've discussed, the Tennessee and
22   Kentucky markets are critical to rebuilding and
23   growing our Opana ER business as we close out
24   2012, but also build a strong platform and

---

Page 440

1    foundation for 2013."
2         Did I read that correctly?
3    A   Yes.
4    Q   Okay.  And did you have that
5    understanding as of this time while you were at
6    Endo that Mr. Price believed that Tennessee and
7    Kentucky markets were critical to rebuilding and
8    growing the Opana ER business?
9         MR. MORRIS: Objection.  Form and
10   foundation.
11        THE WITNESS: I do believe he believed
12   it, yes.
13   BY MR. LENISKI:
14   Q   And did you -- you're saying you didn't
15   believe that?
16   A   No.  The question I think you asked
17   is -- was -- did Kenny Price believe that this was
18   critical, and I do believe he did.
19   Q   Okay.  And did you have any similar
20   opinion about Tennessee and Kentucky being
21   critical to rebuilding and growing ER -- Opana ER
22   business?
23   A   Yeah, I can't say I specifically recall
24   those two states as -- as critical overall.

---

Page 441

1    Q   And I may have asked you before, but we
2    talked a little bit at the opening of your
3    deposition about your understanding about the
4    relative level of opioid abuse in the state of
5    Tennessee.  Do you recall that?
6    A   Yes.
7    Q   And with respect to specific instances
8    of abuse in Tennessee with respect to Opana ER,
9    what was your knowledge, do you recall?
10   A   My knowledge -- my knowledge of --
11   the -- can you restate the question?
12   Q   Did you have any knowledge of particular
13   instances of abuse in -- that occurred in
14   Tennessee with respect to Opana ER during your
15   employment in sales at Endo?
16   A   I didn't have any knowledge of any
17   specific situation where there was abuse that took
18   place.
19   Q   Could you find Exhibit 48 for me that
20   you were shown earlier.
21        It would have been some of the last --
22   one of the last documents you were shown.
23   A   Yeah, unfortunately, they're not in
24   sequence any longer.

---

Page 442

```
 1        THE WITNESS: Did you -- can you find
 2   it?
 3        MR. MORRIS: I can -- I have it for you
 4   here.
 5        THE WITNESS: Do you mind if I look at
 6   his?
 7   BY MR. LENISKI:
 8    Q   Yes.
 9    A   Okay.
10    Q   Exhibit 48, you were asked some
11   questions about -- and this was with respect to
12   the abuse that had occurred where Endo discovered
13   that patient -- or that individuals were
14   injecting --
15    A   Mm-hmm.
16    Q   -- the reformulated Opana ER.  Is
17   that -- is that correct?
18    A   Yes, that's correct.
19    Q   Okay.  And we didn't -- you weren't
20   asked questions about this specifically, but
21   according to this e-mail, those cases were being
22   reported at least some of that was occurring in
23   Tennessee.
24    A   Okay.
```

Page 443

```
 1    Q   Correct?
 2    A   Yes.
 3    Q   Okay.  And as you sit here today, do you
 4   recall -- does that refresh your recollection at
 5   all about -- the reports about the IV or
 6   injecting -- injectable abuse of reformulated
 7   Opana ER occurring in Tennessee about this time?
 8    A   Yeah, after our discussion today, I do
 9   recall this memo in which it highlighted that some
10   of those cases occurred in Tennessee.
11    Q   Okay.  And specifically, do you recall
12   that that was occurring in East Tennessee or in
13   the Appalachia region?
14    A   I don't recall specifically the
15   geography of Tennessee.
16    Q   Okay.  And in the e-mail you were asked
17   some questions about your comment in the e-mail at
18   the top of Exhibit 48 where you said: "Our
19   promotion of Opana ER is business as normal."
20    A   Yes.
21    Q   Do you recall that?
22    A   Yes.
23    Q   To the best of your recollection, did
24   any of the reports about the intravenous abuse of
```

Page 444

```
 1   the reformulated Opana ER that Endo was receiving
 2   about this time of October of 2012 change any of
 3   the messaging that Endo sales reps were using in
 4   the state of Tennessee specifically?
 5        MR. MORRIS: Objection to form.
 6        THE WITNESS: I don't recall at the time
 7   if it actually changed the -- the messaging.  I
 8   think we stayed focused on the package insert to
 9   promote the product.  They were always educated
10   and looking for diversion, things like that, so
11   they could report it to our compliance department.
12   But from a training perspective and from the
13   messaging that they brought to those offices, it
14   did not change.
15   BY MR. LENISKI:
16    Q   So these reports of abuse occurring in
17   Tennessee did not alter to your knowledge any of
18   the messaging that reps in the state of Tennessee
19   specifically were delivering to their targets?
20        MR. MORRIS: Objection.  Form and
21   foundation.
22        THE WITNESS: I don't recall that that
23   actually took place.
24   BY MR. LENISKI:
```

Page 445

```
 1    Q   Do you recall whether Endo restricted or
 2   otherwise -- or stopped or otherwise restricted
 3   the selling or detailing of Opana ER in the state
 4   of Tennessee in reaction to receiving these
 5   reports about intravenous abuse in the
 6   reformulated ER?
 7    A   I don't recall that.
 8        (Romaine Exhibit No. 54 was marked
 9        for identification.)
10   BY MR. LENISKI:
11    Q   Mr. Romaine, I've handed you a document
12   we've identified as Exhibit 55 (sic) to your
13   deposition.  This is ENDO_OPIOID_MDL-02317224.
14        Do you recognize the document?
15    A   I don't recognize the document.
16    Q   Okay.  The top e-mail in this chain is
17   from yourself to Mike Newbould -- I'm sorry, Bill
18   Newbould, correct?
19    A   Yes.
20    Q   And it's dated September 11th, 2006.
21    A   Yes.
22    Q   Who is Bill Newbould?
23    A   Bill Newbould was in -- I -- I think he
24   was in corporate communications.  It's 12 years
```

112 (Pages 442 to 445)

Highly Confidential - Subject to Further Confidentiality Review

Page 446

1   ago -- 13 years ago, hard to remember, but I think
2   he was in corporate communications.
3        Q   Okay.  And the first e-mail in this
4   chain looks -- well, actually, go to the second
5   e-mail --
6        A   Yes.
7        Q   -- down, do you see from Amy Romero?
8        A   Yes.
9        Q   And she's writing to yourself and Mike
10  Weber on December 8th.
11       A   Yes.
12       Q   And she's forwarding what's called
13  Requests for Information.  Do you see that?
14       A   Yes.
15       Q   And she says: "Can you help with the
16  DM/rep request below from Bill N.?  Thanks, guys."
17  Correct?
18       A   Correct.
19       Q   Okay.  And if you look through the
20  e-mail, and you -- you can have every opportunity
21  to read it if you wish, but I'm going to point you
22  specifically to the very first e-mail in the
23  chain, which looks like it came from someone named
24  Terry Brimer at Midtown Drug Company in

Page 447

1   Morristown, Tennessee.
2        Do you see that e-mail?
3        A   Yes.
4        Q   And he's addressed it to "Customer
5   Service."
6        A   I'm trying to -- okay.  Yes.
7        Q   And he says in his e-mail: "I just
8   received info in the mail regarding Opana.  Every
9   time that I think the greed of the drug companies
10  has peaked, someone comes out with something like
11  this, exorbitant and useless.  To stock this, I
12  must spend $2,291.  Equipped with it, we can
13  addict a whole new generation.  We have no choice
14  here but to phone prescribers when they write this
15  stuff, share with them the criminal cost involved,
16  and plead for a different drug.  You should be
17  ashamed."
18       Did I read that correctly?
19       A   Yes.
20       Q   Okay.  And then if we pour through the
21  chain, there is a suggestion from Mr. Newbould as
22  to how -- a potential response to Dr. Brimer,
23  correct?
24       A   Yes.  Bill Newbould would be the person

Page 448

1   that would be responsible for responding back to
2   that individual at that time.
3        Q   Okay.  Now, was it your practice at Endo
4   or part of your job duties to field such concerns
5   being received by reps in the field from
6   pharmacists or other healthcare prescribers with
7   respect to their thoughts or opinions about
8   Opana ER?
9        A   No.
10       Q   Well, do you know why this was brought
11  to your attention?
12       A   I don't know, other than -- the only
13  thing I can think of is if -- if they thought
14  someone might have the knowledge of this
15  individual or who it might be so they knew how to
16  respond back to him.
17       Q   Okay.  Well, in your e-mail at the very
18  top of the exhibit, you write: "We have
19  identified where this pharmacist is located and
20  plan to see him next week, as we will have a
21  specialty rep in that area."
22       Did I read that correctly?
23       A   Yes.
24       Q   Do you know in fact -- were you

Page 449

1   referring to you were going to go see him or -- or
2   we as in someone from Endo is going to go see him?
3        A   I think someone from Endo was going to
4   see him.
5        Q   Okay.  So you don't have any
6   recollection of you specifically --
7        A   No.
8        Q   -- going to see this pharmacist.
9        A   No.
10       Q   Okay.  Then you write: "He was called
11  on in July during the stocking blitz."
12       A   Right.
13       Q   Do you know what that refers to?
14       MR. MORRIS:  Objection.  Form and
15  foundation.
16       THE WITNESS:  Stocking blitz typically
17  is when we have a new product that's on the
18  market, to go out and stock the product in the
19  pharmacies.
20  BY MR. LENISKI:
21       Q   Okay.  And so about this time of
22  September 2006 that was happening with Opana ER.
23  Is that your recollection?
24       A   Yes.  That would have been about the

113 (Pages 446 to 449)

Page 450

1  time frame in which we would have been stocking
2  the product.
3      Q   Okay.  And how does a stocking blitz
4  occur?  What's the -- what are the particulars of
5  that?
6      A   They typically would have a stocking
7  sheet with information on the -- the -- the ID
8  number for -- for the product that they could
9  order through their wholesaler and the pricing,
10  and they would deliver that, and then the -- the
11  pharmacist would order it into their store.
12      Q   Okay.  And was that something under your
13  umbrella of responsibility or someone else's?
14      A   No, typically it would be under somebody
15  else's responsibility, into our managed care team.
16      Q   Okay.  And then you go on:  "We will get
17  to the issues with Terry and see how we can be
18  supportive."  Correct?
19      A   Correct.
20      Q   And when you say Terry, I guess you're
21  referring to --
22      A   I think that must be -- yeah, the
23  person's name is Terry.
24      Q   Okay.  Did -- did you know Terry Brimer?

Page 451

1      A   No.
2      Q   Okay.  And then you write:  "As an FYI,
3  he is on the board for TennCare."
4      A   Yeah.
5      Q   And why did you write that?
6      A   Just so --
7      MR. MORRIS:  Object to form.
8      THE WITNESS:  I think at the time just
9  because that was a fact, he's on the board for
10  TennCare.
11  BY MR. LENISKI:
12      Q   Did -- was it important to you and the
13  purpose of writing that -- scratch that.
14      Was it -- were you intending to impart
15  on the recipient of that message that this person
16  is on the board for TennCare, that they needed to
17  pay extra attention to this person because he is
18  somebody who has potential influence with
19  TennCare, which could potentially have something
20  to do with how Opana ER gets placed with TennCare?
21      A   I -- I don't recall.  This is 13 years
22  ago.  I don't recall why I was -- why I put that
23  in there.
24      Q   Okay.  Do you know if Dr. Brimer was

Page 452

1  ultimately convinced that he was wrong about his
2  opinions about Opana ER.
3      A   I don't recall.
4      (Romaine Exhibit No. 55 was marked
5      for identification.)
6  BY MR. LENISKI:
7      Q   I hand you Exhibit 50 -- what is that?
8      A   Five.
9      MR. MORRIS:  You handed him 55, but I
10  think we're on 56.  No?
11      (A discussion was held off the record.)
12      THE WITNESS:  No, 50 -- yeah, this was
13  54.
14      MR. MORRIS:  Oh, I see.  I think maybe
15  you said 55 when you meant 54.  But it's been
16  marked as 54, so we're now on 55.
17      MR. LENISKI:  Okay.
18      THE WITNESS:  Okay.
19  BY MR. LENISKI:
20      Q   I hand you Exhibit 55.  This is a
21  document Bates-stamped EPI001232307.  Correct?
22      A   Correct.
23      Q   Do you recognize the document?
24      A   I don't recognize the specific document,

Page 453

1  but I recognize John Gilbert wrote this document.
2      Q   And he wrote it to you on November 4th,
3  2011?
4      A   Correct.
5      Q   It says:  "Larry, attached is
6  documentation for our one-to-one on Tuesday, as
7  well as some additional backup on performance
8  versus goals."  Correct?
9      A   Correct.
10      Q   And when he says "one-to-one," do you
11  know what he's referring to there?
12      A   We were going to have a one-on-one
13  business meeting.
14      Q   Okay.  And below he writes under the
15  header:  "Feedback for Larry Romaine."  Do you see
16  that?
17      A   Yes.
18      Q   He says:  "Ideally you need dedicated
19  government affairs director.  Significant public
20  and political issues related to opioid abuse and
21  diversion will increase substantially in 2012."
22      Did I read that correctly?
23      A   Yes.
24      Q   Do you recall discussing that with

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1   Mr. Gilbert during your one-to-one?
2       A   I don't recall this specifically, but I
3   had one-on-ones routinely with all the directors.
4       Q   Well, this is a topic about significant
5   public and political issues related to opioid
6   abuse and diversion increasing substantially in
7   2012. Was that discussed?
8       A   I don't recall specifically discussing
9   this issue, but it's on his report, so I assume --
10  or I'm sure we did discuss it.
11      Q   Were you generally aware of others'
12  opinions at Endo similar to Mr. Gilbert's that
13  issues relating to opioid abuse and diversion
14  would increase substantially in 2012?
15      A   I was not --
16          MR. MORRIS:  Objection.  Form and
17  foundation.
18          THE WITNESS:  I was not aware of that.
19  BY MR. LENISKI:
20      Q   Did you ever find out why Mr. Gilbert
21  felt that way?
22      A   I'm sure -- I don't recall specifically
23  that issue, but I'm sure we had a discussion about
24  it.

Page 455

1       Q   So as you sit here today, you have no
2   recollection as to the basis for his statement
3   about abuse and diversion of opioids increasing
4   substantially in 2012?
5       A   I'm sure he was looking for additional
6   support. HR -- you know, individual people's
7   support for his region.
8       Q   Support in what sense, can you explain
9   that?
10      A   I was -- I'm just reading the e-mail, it
11  says "government affairs director." He's looking
12  for a government affairs director for his -- for
13  his -- his region.
14      Q   Okay. Then he goes on: "Need
15  additional resources and buy-in from internal
16  partners to pursue partnership opportunities with
17  Endo, key political leaders and law enforcement in
18  the Mid-Atlantic, specifically in the states of
19  Tennessee, Virginia and West Virginia." Correct?
20      A   Correct.
21      Q   And then he writes: "The state of
22  Tennessee contributes the second highest number of
23  OER" --
24          That's Opana ER, correct?

Page 456

1       A   Correct.
2       Q   -- "TRx's in the United States, second
3   to New York only." Correct?
4       A   Correct.
5       Q   Okay. So according to Mr. Gilbert then,
6   if that's to be believed that the state of
7   Tennessee contributes the second highest number of
8   Opana ER prescriptions in the United States, then
9   that puts Tennessee in a very key position as
10  Endo's concern, correct?
11          MR. MORRIS:  Objection.  Form and
12  foundation.
13          THE WITNESS:  I don't know that -- the
14  validity of this, whether he was correct or not.
15  I don't recall that.  But I'm sure if we discussed
16  it, we would have -- we would have triaged it to
17  the right individuals in the organization that
18  would have helped and supported him.
19  BY MR. LENISKI:
20      Q   But you would agree, if he's correct
21  that Opana ER prescriptions in Tennessee are the
22  second highest in the nation, then that makes
23  Tennessee a very important state to Endo in terms
24  of Opana ER sales, correct?

Page 457

1           MR. MORRIS:  Objection.  Form and
2   foundation.
3           THE WITNESS:  I -- I just don't -- I
4   don't -- I don't know whether that statement is
5   actually true, that it's the second highest.  I
6   don't know that.  I don't remember that, I should
7   say.
8   BY MR. LENISKI:
9       Q   I understand, but --
10      A   Yeah.
11      Q   -- if that's true, then that would have
12  made -- you certainly would have wanted to make
13  sure that Mr. Gilbert had the resources he needed
14  to commit to Tennessee because Tennessee --
15      A   Sure.
16      Q   -- would have been very important to
17  Endo, correct?
18      A   Right.
19          MR. MORRIS:  Objection to form and
20  foundation.
21  BY MR. LENISKI:
22      Q   And if you go over to the page that ends
23  17 in this document, this would be -- this part of
24  the e-mail, this would be an attachment to the

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1  e-mail that Mr. Gilbert would have put together,
2  correct?
3      A   Correct.
4      Q   In the third bullet down, he writes:
5  "Abuse/diversion issues will be a key area of
6  concern in Tennessee, West Virginia and Kentucky
7  in 2012." Correct?
8      A   Correct.
9      Q   Do you recall discussing that point with
10 Mr. Gilbert in your one-on-one?
11     A   I don't recall specifically discussing
12 that with him.
13     Q   Do you recall, in general, awareness
14 that abuse and diversion issues would be a key
15 area of concern as far as Endo is concerned in
16 Tennessee, West Virginia, and Kentucky in 2012?
17     MR. MORRIS: Objection to form and
18 foundation.
19     THE WITNESS: Can -- can you repeat the
20 question again? I'm sorry.
21 BY MR. LENISKI:
22     Q   Yeah. Did you have a general
23 awareness -- do you recall having a general
24 awareness, rather, that abuse and diversion was a

Page 459

1  key area of concern in Tennessee, West Virginia,
2  and Kentucky for Endo in 2012?
3      A   Well, I -- I do recall -- I remember,
4  and we talked about it earlier, that we -- the
5  area of Appalachia, that there was a concern that
6  there was diversion taking place, and that we
7  ensured the reps were trained on our diversion
8  process and how to -- how to report that.
9      Q   Okay. And was that topic or issue
10 discussed with -- frequently at Endo?
11     A   I don't know if I can use the word
12 "frequently," but it was discussed.
13     Q   Okay.
14     MR. MORRIS: Okay. So, Counsel, when we
15 were off the record, I asked you how long you had,
16 and you said about 30 or 45 minutes, and we've
17 been going about 45. How much longer?
18     MR. LENISKI: I've got -- hold on.
19 Thanks for your patience.
20     We're on 56 now, right?
21     THE WITNESS: Yes.
22     (Romaine Exhibit No. 56 was marked
23     for identification.)
24 BY MR. LENISKI:

Page 460

1      Q   This is an exhibit we've labeled 56 to
2  your deposition. It's ENDO_OPIOID_MDL-01007694.
3      Do you recognize the document?
4      A   It's an e-mail that -- that I had sent
5  back to John Gilbert.
6      Q   Okay. And you're responding to an
7  e-mail from Mr. Gilbert below dated June 25th,
8  2012, correct?
9      A   Correct.
10     Q   Okay. And he starts the e-mail saying:
11 "Larry, just a bit of commentary directly from
12 some of the footprints and DMs that are performing
13 at the lower end of goal attainment in the
14 Mid-Atlantic region." Correct?
15     A   Correct.
16     Q   If you skip down, do you see the header
17 "N Knoxville"?
18     A   Yes.
19     Q   That's -- do you understand that meant
20 North Knoxville?
21     A   Yes.
22     Q   Okay. And he writes: "Goal attainment
23 is currently 76 percent. Prior to supply
24 disruption in the state of Tennessee" -- I'm

Page 461

1  sorry. Let me start over.
2      "Prior to supply disruption, the state
3  of Tennessee had the highest OER volume of any
4  state in the country."
5      Did I read that correctly?
6      A   Yes.
7      Q   Okay. And he says: "See the below
8  quotes from representatives in this footprint
9  based on their local knowledge. With such high
10 volume, the one unknown is the percent of abuse
11 that has now been curtailed by the new formulation
12 and gone to a non-TRF product."
13     Did I read that correctly?
14     A   Yes.
15     Q   So he's expressing with that last
16 sentence that this is occurring at a time when the
17 reformulated Opana ER is on the market, and there
18 is also generic Opana ER on the market, correct?
19     MR. MORRIS: Objection. Form.
20     THE WITNESS: Plus we had a supply
21 outage at the same time, yes.
22 BY MR. LENISKI:
23     Q   Okay. So if you look over to one of the
24 quotes from one of the representatives in this

Highly Confidential - Subject to Further Confidentiality Review

Page 462

1   Knoxville footprint, that second bullet on the
2   second page of the exhibit.
3        A   Okay.  Yeah.
4        Q   That rep states:  "We believe" -- and
5   there's a -- it's a quote from the rep, correct?
6        A   Yes.
7            MR. MORRIS:  Objection.  Form,
8   foundation.
9   BY MR. LENISKI:
10       Q   And that's your understanding of what
11  Mr. Gilbert was saying, this was a quote from a
12  rep in his territory, correct?
13       A   Correct.
14       Q   Okay.  It says:  "We believe that
15  several of the patients in our footprint were
16  abusing the previous formulation of Opana ER.
17  Here are some signs we witnessed:  Patients
18  requested the old formulation of Opana ER at the
19  pharmacy, asked the providers in some instances to
20  switch them from 40 milligrams of Opana ER to
21  generic 15 milligrams, and they complained about
22  adverse events so that -- so they could be
23  switched from 30 milligrams of Opana ER to two
24  15-milligram pills of generic formulation."

Page 463

1            With me so far?
2        A   Yes.
3        Q   "I have even had pharmacies tell me that
4   patients are calling them acting like they are
5   with the Opana ER pharmacy locator service.  They
6   are asking if the pharmacy in question carries the
7   old formulation of Opana ER."
8            Did I read that correctly?
9        A   Yes.
10       Q   Did you -- upon receiving this
11  information from Mr. Gilbert about one of his --
12  one of his reps in this territory said, did you do
13  anything with this information?
14       A   I don't recall the e-mail, this specific
15  e-mail.  But what would have happened, we would
16  have triaged this to our compliance department for
17  an investigation.  So we had processes in place is
18  what I'm saying to do the investigations.
19       Q   And who would have been responsible for
20  taking or initiating that triage?
21       A   John would have been responsible for
22  kicking off the initial investigation.  Reporting
23  it, John Gilbert.
24       Q   And do you recall discussing this

Page 464

1   particular quote from this particular rep with
2   John?
3        A   I don't recall discussing this
4   particular quote --
5        Q   Okay.
6        A   -- with John.
7        Q   I've got one more exhibit for you.
8            57.  This is one of those fun oversized
9   ones.
10           (Romaine Exhibit No. 57 was marked
11           for identification.)
12  BY MR. LENISKI:
13       Q   I've handed you a document that we've
14  labeled Exhibit 57 to your deposition.  The cover
15  is an e-mail that's Bates-stamped EPI002036707.
16       A   Yes.
17       Q   I will represent to you that we have
18  only attached an excerpt from the attachment to
19  the e-mail in Exhibit 57.  And there's a -- should
20  be a cover page that explains that.  So it's a --
21  it's a demonstrative --
22       A   Okay.
23       Q   -- as well.
24       A   Okay.

Page 465

1        Q   Okay?  I'll represent that to you.
2            So let's first look at the e-mail.  Do
3   you recognize the e-mail?
4        A   I don't recognize the e-mail.  I know it
5   came from me, but I don't recall sending it and --
6   it's six years ago.
7        Q   Okay.  So this is an e-mail that you
8   forwarded to Endo Pain RDs.  That's regional
9   directors, correct?
10       A   Correct.
11       Q   And you copied Kristin Vitanza and
12  Randall Mastrangelo --
13       A   Right.
14       Q   -- on February 25th, 2013.
15       A   Yes.
16       Q   And you were forwarding something called
17  a Pharmacy -- I think it's a misspelling.  It's
18  supposed to be pharmacy, it says pharmacry --
19       A   Yeah.
20       Q   That's probably a typo.
21           -- "Pharmacy Report Update?"
22       A   Correct.
23       Q   So the e-mail with the original pharmacy
24  report that you received came from someone named

Highly Confidential - Subject to Further Confidentiality Review

Page 466

```
 1    Laurie Sutherland below.  Do you see that?
 2         A   Yes.
 3         Q   Who is Laurie Sutherland?
 4         A   I -- I don't remember who Laurie was.
 5    Her title would have been down here somewhere, but
 6    it doesn't look like it copied well.
 7         Q   Well, it says "Director, Enterprise data
 8    and field sales reporting."
 9         A   Right.
10         Q   Does that refresh your recollection who
11    she is?
12         A   No.
13         Q   And --
14         A   Oh, she was a director -- so she -- I
15    think she was in the operations group that
16    provided field sales reports.
17         Q   Okay.  And you --
18         A   I think.
19         Q   And you -- would you receive such
20    reports --
21         A   Yes, from her.
22         Q   -- from Ms. Sutherland?
23         A   Yes.
24         Q   In connection with your job duties?
```

Page 467

```
 1         A   Yes.
 2         Q   And would you share those reports with
 3    the regional managers or --
 4         A   Yeah, where appropriate, I would, yes.
 5         Q   Okay.  And this -- what she's attaching
 6    she says is an updated pharmacy report.
 7         "This is an update to the report that
 8    Ian sent last April.  The report shows the top
 9    5,000 Opana ER stocking pharmacies."  Correct?
10         A   Yes.
11         Q   She does say:  "Keep in mind this
12    report, just as the last -- the one last year,
13    does not include national retail pharmacies."
14         And she lists CVS, Walgreens, Rite-Aid
15    and Walmart, correct?
16         A   Correct.
17         Q   Okay.  And then above, you are
18    forwarding this, as we said, to your Endo Pain
19    regional directors, and you write:  "Please
20    provide this to your teams:  It is critical that
21    we are messaging the importance of filling
22    Opana ER scripts with Opana ER with INTAC.  We
23    should also be focused on those key chains that
24    dispense C-II."
```

Page 468

```
 1         A   Correct.
 2         Q   Correct?
 3         A   Yes.
 4         Q   Okay.  So what was your purpose to
 5    forwarding this pharmacy report?
 6         A   So --
 7         MR. MORRIS:  Objection to form and
 8    foundation.
 9         THE WITNESS:  So they had the
10    information so they could see stores that were
11    stocked in their geographies.
12    BY MR. LENISKI:
13         Q   And what were you anticipating that the
14    regional managers would do with this information?
15         A   Just knowledge for them, where it was
16    stocked and where it was not.
17         Q   Well, how did you expect them to use
18    this information from a practical standpoint?
19         A   I don't recall what my expectation was
20    for this.
21         Q   Were -- was Endo calling on these
22    pharmacies, to your knowledge?
23         A   The sales organization didn't call on
24    pharmacies, but others -- we had a managed care
```

Page 469

```
 1    team and trade team that did.
 2         Q   Then what was -- again, I guess I'm
 3    confused about why your regional managers -- how
 4    they -- how they would have known what to do with
 5    this information you were forwarding to them.
 6         MR. MORRIS:  Objection to form and
 7    foundation.
 8         THE WITNESS:  The only reason I would
 9    have sent this is just so they would know where
10    pharmacies were stocked with the new formulation.
11    BY MR. LENISKI:
12         Q   Do you recall having any other
13    communications with the district managers on this
14    list about what to do with this list beyond what
15    you said in this e-mail?
16         A   I don't recall any other communication.
17         Q   Okay.  And then if you go to the
18    attachment, as represented on the second page of
19    the exhibit, I included only the Tennessee
20    pharmacies that were on this six-month top 5,000
21    list.
22         Q   Okay.
23         Q   And that is true for the first -- one,
24    two, three -- first eight pages.  And that's for
```

118 (Pages 466 to 469)

Highly Confidential - Subject to Further Confidentiality Review

| | Page 470 |
|---|---|

1    the tab that was "Midwest." Okay?
2        A   Okay.
3        Q   And then if you look over to the second
4    to last page, there was a second tab in this
5    spreadsheet that was labeled "Southeast," and it
6    also includes Tennessee pharmacies.
7        A   Okay.
8        Q   Was it your recollection that Tennessee
9    was actually divided between two different
10   territories at this time?
11       A   I do not recall that.
12       Q   Okay. In any event, under the tab for
13   "Southeast," there's additional pharmacies listed
14   there for the cities of, for example, Kingsport,
15   Johnson City, and Bristol, Tennessee. Do you see
16   those?
17       A   Yes.
18       Q   And do you know where Kingsport, Johnson
19   City and Bristol are located relative to
20   Appalachia?
21       A   I know that Kingsport and Johnson City
22   are in the southern -- southeastern portion of
23   Tennessee.
24       Q   I think Bristol, Tennessee -- I don't

| | Page 472 |
|---|---|

1    the exhibits --
2        MR. MORRIS:  Oh, of the -- yes.
3        THE VIDEOGRAPHER:  The time is 7:19 p.m.
4    We're going off the record.
5        (Recess.)
6        THE VIDEOGRAPHER:  The time is 7:59 p.m.
7    We're back on the record.
8        CROSS-EXAMINATION
9    BY MR. MORRIS:
10       Q   Mr. Romaine, thank you again for being
11   here today. I know it's been a long day. I have
12   a few questions myself for you.
13       And there's a few questions that I'm
14   going to go over your background, not to retread
15   old ground necessarily, but to kind of orient us
16   for our series of questions.
17       A   Okay.
18       Q   Can you remind us again when you began
19   at Endo.
20       A   June of 2003.
21       Q   And how long did you remain at the
22   company?
23       A   I left in September of 2013. So 10
24   years.

| | Page 471 |
|---|---|

1    think you can get much further east in Tennessee.
2    It's right on the border there between Virginia
3    and Tennessee and North Carolina.
4        A   Yeah, I think they call it the
5    Tri-Cities area.
6        Q   That's right.
7        A   Yeah, that's right.
8        Q   Okay. So in any event, at this time,
9    because these cities were located in the
10   southwest -- I'm sorry -- "Southeast" tab, that
11   would indicate, am I correct, that that -- those
12   cities at this time frame were in the southeast
13   region as far as Endo was concerned for
14   territories?
15       A   Yeah, I don't know that for a fact, but
16   that makes sense.
17       MR. LENISKI:  Okay. I have no further
18   questions at this time.
19       MR. MORRIS:  Thank you.
20       So let's take a break. I will have
21   questions. I'm going to organize, and we'll come
22   back in 15 minutes or so.
23       MS. SCULLION:  Let me suggest when we
24   start, then we will read the numbers in of

| | Page 473 |
|---|---|

1        Q   Okay. So what title did you have when
2    you left the company?
3        A   Vice president of sales.
4        Q   So you left in 2013, so how many years
5    ago approximately is that?
6        A   Yeah, six years -- six years -- six-ish
7    years ago.
8        Q   So it's been quite a while since you've
9    been at the company, correct?
10       A   Yes.
11       Q   Have you been required to think much
12   about Endo Opana sales in those intervening six
13   years?
14       A   No.
15       MS. SCULLION:  Objection to form.
16   BY MR. MORRIS:
17       Q   You said that when you left the company,
18   you held the title of VP sales. How long did you
19   hold that title?
20       A   From 2007 until -- June of 2007 until I
21   left in September of 2013.
22       Q   And I know you described earlier some of
23   your job duties, but can you describe in general
24   what your responsibilities were as VP of sales.

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1    A   Yeah, my role and responsibility was
2  to -- to lead the sales organization.  So I was
3  responsible to make sure that they were well
4  trained, they would continually be tested to
5  ensure that they were well trained, and that they
6  could go out and deliver a clinical message to
7  physicians.
8    Q   Are you proud of the time that you
9  worked at Endo?
10   A   Absolutely.
11   Q   And why is that?
12   A   I worked with great people.  I felt like
13  we achieved very good results.  I thought, you
14  know, everybody I worked with, both in the home
15  office as well as in the field, were ethical, high
16  integrity, a passion to -- to do what's right for
17  patients and for the physician offices that they
18  called on.
19       So there was a lot of energy around the
20  company and the work that we did every day and
21  what we achieved.
22   Q   Now, eventually you were downsized from
23  the company, right?
24   A   That's correct.

Page 475

1    Q   Did anybody at the company tell you why
2  you were being downsized?
3    A   No, not at the time.
4    Q   Now, you mentioned that the Endo sales
5  representatives received training on how to do
6  their job.  How did the sales representatives
7  receive that training from Endo?
8    A   Well, when they were hired, they went
9  through a home office -- their home office
10  training program where they actually read through
11  binders and literature and modules, and then they
12  came into the home office for training.  And then
13  every year we would have three to four training
14  meetings where we would actually reeducate the
15  sales force on different aspects of the business
16  or new materials.
17   Q   Was there a way for Endo to gauge how
18  well the sales representatives were understanding
19  the training?
20   A   Well, they were always tested, and they
21  also had to be certified.  So verbalization of the
22  message had to be certified, and they had to
23  deliver it to their manager.
24   Q   Can you describe how Endo sales reps

Page 476

1  were trained to -- or what -- I'm sorry.
2       Can you describe what Endo sales reps
3  were trained to cover with healthcare providers
4  when they went out on sales calls?
5    A   Well, they're -- they were required to
6  cover a full balance.  So they were required to
7  cover the package insert, they were required to
8  talk about the indication, the dosing, any adverse
9  events, the entire portfolio of the product.
10   Q   Did Endo monitor how well sales
11  representatives performed in adhering to the
12  required sales procedures?
13   A   Yes.  Their district managers routinely
14  rode in the field with them and observed them and
15  documented that -- that information.
16   Q   And how often did that occur?
17   A   The district managers were in the field
18  approximately four days out of the week.  So they
19  were with that -- the same rep about every five
20  weeks, they would be with them for two days.
21   Q   And did the sales representatives
22  receive feedback?
23   A   Yes.  Both verbal coaching as well as
24  written coaching.

Page 477

1    Q   You touched on this a little bit before,
2  but was there any limitation on the kinds of
3  healthcare professionals that sales
4  representatives were allowed to call on for sales
5  visits?
6    A   Well, they had to be experienced
7  physicians prescribing in that therapeutic class.
8  There were excludes, depending on the -- on the
9  specialty, that if they didn't really prescribe
10  that therapeutic class of drugs, there would be an
11  exclude on their call plan.  But they had to be
12  experienced prescribers of the class that they
13  were calling on.
14   Q   And what constituted being an
15  experienced prescriber?
16   A   Someone that had a practice that, you
17  know, treated the types of patients that we had a
18  product that would fit.  Someone that had had a
19  lot of experience as far as patient population
20  that was coming into the -- their practice for
21  treatment.
22   Q   And do you have an understanding about
23  why there was that requirement placed on -- or
24  limitation on healthcare providers who could be

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1   called upon by sales representatives?
2       A   Well --
3           MS. SCULLION:  Objection.  Foundation.
4           THE WITNESS:  -- to ensure that we
5   were -- we were meeting the needs of the clinical
6   practitioners out there and that -- and we were
7   following a set of guidelines as far as, you know,
8   where products should be written and where we
9   shouldn't be going.
10  BY MR. MORRIS:
11      Q   Were there -- you mentioned that there
12  were categories of healthcare providers that
13  were -- fell into the grouping that could be
14  called upon.  Were there particular practice areas
15  that were excluded?
16      A   Yeah --
17          MS. SCULLION:  Objection to form.
18          THE WITNESS:  -- excludes would be
19  dentists -- depending on -- again, on the
20  therapeutic class we're talking about, but
21  specifically with Opana ER, dentists would be
22  excluded, psychiatrists as a practice would be
23  excluded, things like that.
24  BY MR. MORRIS:

Page 479

1       Q   And did you have an understanding about
2   why those types of practices were excluded?
3           MS. SCULLION:  Objection.  Foundation.
4           THE WITNESS:  Well, they weren't
5   experienced in the class.  They didn't typically
6   see the type of patient with moderate to severe
7   pain routinely.
8   BY MR. MORRIS:
9       Q   And the descriptions you've been giving
10  about the kind of healthcare providers that could
11  be called upon and -- in the requirement of the
12  call plan, was that for Opana specifically?
13      A   Yes.
14      Q   If you could look at Exhibit 14, please.
15      A   I don't know if --
16      Q   And I know it might take you a minute to
17  find that, but that could also be called -- called
18  up.
19      A   I -- I don't think I'm going to find it
20  here.
21      Q   It's the one that looks like that
22  (indicating).
23      A   What was the number again?
24      Q   14.

Page 480

1       A   Here's 15.  16.  14.  Okay.  I'm sorry.
2       Q   That's okay.  A lot of documents over
3   there.
4           Can you take a look at what had been --
5   what's been marked as Exhibit 14.  You talked
6   about this document earlier today.  Can you just
7   describe what that document is again.
8       A   It's the master visual aid.
9       Q   Okay.  And if you go into the document
10  to the page that at the top has E1023.37.
11          And before I ask you some specific
12  questions about this portion of the document, can
13  you describe again what master visual aid is.
14      A   It's the -- the detail aid that the
15  representatives would use in front of a physician.
16      Q   And if you just take a quick peek at the
17  first page of this exhibit, do you see what date
18  is on the e-mail that's on there?
19      A   September 18th, 2006.
20      Q   And when did -- approximately when did
21  Opana launch, come onto the market?
22      A   June of 2006, I think was the time
23  frame.
24      Q   Okay.  Now, I'm drawing your attention

Page 481

1   specifically to page 1023.37.  Do you know what
2   this portion of the exhibit is?
3       A   Yeah, this is a -- what they call a
4   navigator.  It's a sales training tool.
5       Q   And is this something that would have
6   been provided to the sales force?
7       A   With each new master visual aid, yes.
8       Q   Okay.  And is that something that the
9   sales representatives were trained on?
10      A   Yes.
11      Q   If you turn a few pages in to the page
12  that at the top has 1023.40.
13      A   Okay.  Okay.
14      Q   Can you read -- there's a box on the
15  left-hand side that begins "Prescribers --
16  Prescribers of Schedule II opioids."  Do you see
17  that?
18      A   Yes.
19      Q   Can you read that?
20      A   "Prescribers of Schedule II opioids
21  carry the responsibility of understanding the
22  associated risks in order to make informed
23  treatment decisions."
24      Q   And then there's a box underneath that,

121  (Pages 478 to 481)

Page 482

1  at the bottom of the page, that begins "Opana is a
2  Schedule II opioid" --
3     A   Yes.
4     Q   -- "that carries the risk."  Do you see
5  that?
6     A   Yes.
7     Q   And can you just read the first sentence
8  of that, please.
9     A   "Opana is a Schedule II opioid that
10  carries the risk of other schedule -- carries the
11  risks of other Schedule II opioids."
12     Q   And what was the purpose of having these
13  types of boxes pulled out for the training
14  material that was provided to the sales force?
15     A   To ensure that they knew exactly what
16  were important pieces that they needed to
17  reinforce with physicians when they were making
18  the sales presentations.
19     Q   Okay.  If you could turn to the next
20  page that's .41.
21     A   Okay.
22     Q   And on this page there's a box that
23  includes the -- starts with the phrase "Balancing
24  claims."  Can you read that?

Page 483

1     A   Yeah.  "To ensure HCPs are fully
2  informed about the appropriate use of Opana, it's
3  important to balance your presentation by
4  reviewing the abuse liability, contraindications
5  and precautions when making claims such as those
6  on this page."
7     Q   And as the VP of sales, what did you
8  understand that to mean?
9        MS. SCULLION:  Objection.  Foundation.
10        THE WITNESS:  To provide full balance
11  when they're making sales presentations.
12  BY MR. MORRIS:
13     Q   And that's something that the -- all the
14  sales force was trained on?
15     A   Yes.
16        MS. SCULLION:  Objection.  Leading.
17  BY MR. MORRIS:
18     Q   You talked a little bit about this
19  before, but I want to go back to it.  You've heard
20  the term "diversion"?
21     A   Yes.
22     Q   And what's your understanding of what
23  "diversion" is?
24     A   When a product is prescribed

Page 484

1  inappropriately or it's taken illegally.
2     Q   And during your tenure at Endo, did the
3  company have policies requiring its employees to
4  report suspected diversion --
5     A   Yes.
6     Q   -- of opioid medications?
7     A   Yes.
8     Q   And how were the sales representatives
9  advised about those policies?
10     A   Well, they were trained on -- on what to
11  look for in diversion, and then they had a number
12  that they could call to report diversion.  And
13  they also had their district managers available to
14  them as well that they could -- they were supposed
15  to report to as well.
16        MR. MORRIS:  I can't figure out what
17  number that is.  Oh, it's because there isn't a
18  number yet.
19        Anybody know what number we're on?
20        MS. SCULLION:  I do not know.  Joe?
21        MR. LENISKI:  58, I think.
22        MR. MORRIS:  Okay, we'll go with 58.
23        (Romaine Exhibit No. 58 was marked
24        for identification.)

Page 485

1  BY MR. MORRIS:
2     Q   I'm handing you Exhibit 58.
3        MS. SCULLION:  Thank you.
4  BY MR. MORRIS:
5     Q   And that bears the production number at
6  the very bottom END00747664.
7        I'll ask you to take a look at that.
8  It's an e-mail from you dated September -- I'm
9  sorry -- July 30th, 2012.
10        Do you recognize what's been marked as
11  Exhibit 58?
12     A   Yes.
13     Q   And what is Exhibit 58?
14     A   It's an e-mail that I sent out to the
15  region business directors.
16     Q   And what was the purpose of your sending
17  out this e-mail?
18     A   Reinforcing tools and resources that the
19  reps had available to them to report diversion.
20     Q   Okay.  And so can you read what you
21  wrote in the body of the e-mail.
22     A   Yes.
23        MS. SCULLION:  Objection.  Form.
24        THE WITNESS:  "Please discuss the

122  (Pages 482 to 485)

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1   suspected diversion form with your teams.  I
2   realize that they have this information, but it's
3   always good to revisit.  Please advise me of any
4   issues in your RBU."
5   BY MR. MORRIS:
6       Q   And if you could take a look at the
7   second page of Exhibit 58, can you describe what
8   that is?
9       A   Yeah, that is the diversion form that we
10  used.
11      Q   And is that something that was provided
12  to the sales force?
13      A   Yes.
14      Q   And if you look at the middle of the
15  page, there's some enumerated items there.  What
16  are those?
17      A   Those would be areas to -- or -- to look
18  for suspected diversion.
19      Q   And can you read the first one, please.
20      A   "A large portion of prescriptions being
21  paid for in cash."
22      Q   And is that a potential indicator of
23  diversion?
24      A   Yes.

Page 487

1       Q   And can you read the second one, please.
2       A   "Drugs and doses being prescribed that
3   are not individualized."
4       Q   Is that also a potential indicator of
5   diversion?
6       A   Yes.
7       Q   Okay.  And you -- there are several
8   others here that are listed, and these are all
9   indicators that the sales force was trained to
10  look out for for potential diversion.
11      A   Correct.
12          (Romaine Exhibit No. 59 was marked
13          for identification.)
14  BY MR. MORRIS:
15      Q   Let me show you what has been marked as
16  Exhibit 59.
17          MS. SCULLION:  Thank you.
18  BY MR. MORRIS:
19      Q   Mr. Romaine, do you -- and, I'm sorry, I
20  should identify it with the production numbers.
21  Hold on just one second.
22          It has production number at the bottom
23  ENDO_OPIOID_MDL-00770609.
24          MS. SCULLION:  Sean, you may have a

Page 488

1   different document.  Mine does not have any Bates
2   numbers on it.
3           MR. MORRIS:  I think it may be because
4   of the copy.
5           MS. SCULLION:  Oh, okay.
6           MR. MORRIS:  It should be the same --
7   let's just make sure.  It's the e-mail entitled
8   "RBD Removals."
9           MS. SCULLION:  April 5th, 2013?
10          MR. MORRIS:  April 5th, 2013.
11          MS. SCULLION:  Yeah.  Thank you.
12  BY MR. MORRIS:
13      Q   First, I'll ask whether you recognize
14  the cover e-mail on this exhibit.
15      A   I do recognize the e-mail.  Not
16  specifically, but I do recognize this e-mail.
17      Q   Okay.  And you're a cc on that e-mail?
18      A   Correct.
19      Q   The e-mail references the "RBD
20  prescriber removals."  Do you see that?
21      A   Yes.
22      Q   Do you have an understanding about what
23  the "RBD removals" refers to?
24      A   It's the -- a removal list of physicians

Page 489

1   that were removed from the representatives' call
2   plan.
3       Q   And is -- the exhibit notes that there
4   is an attachment, "The RBD Removals."  Do you see
5   that?
6       A   Yes.
7       Q   For P -- 2P13.  Do you see that?
8       A   Yes.
9       Q   And is that information that you would
10  receive in your position as the VP of sales?
11      A   Not typically, but I would -- typically
12  this -- I would get copied on it, to your point.
13      Q   Understood.  I'll represent to you that
14  there is an attachment to this document that had,
15  it looks like, an Excel spreadsheet in native
16  form, and the particular exhibit that's in front
17  of you has an excerpt from that.
18      A   Yes.
19      Q   Can you turn to the first page behind
20  the e-mail.
21      A   Okay.
22          MS. SCULLION:  I'm just going to note
23  our objection to -- to using an incomplete
24  exhibit.

123  (Pages 486 to 489)

Highly Confidential - Subject to Further Confidentiality Review

Page 490

BY MR. MORRIS:
Q   Can you read, please, the information under the top heading there, "Criterion Guidelines."
A   Yes.  "Criterion Guidelines.  This process provides you with a mechanism to proactively address prescriber issues that have a significant impact at the territory level while maintaining accountability within your region."
Q   Okay.  And there's a -- underneath that there's some examples.  Can you read the first bullet point.
A   "Inappropriate for reps to call on:  Safety issues, valid licenses but suspension -- suspicious practice, apparent pill mill that cannot be located, et cetera."
Q   Okay.  And there's an asterisk after the words "call on," and then there's an asterisk right below that.  Can you read that, please.
A   Yeah.  "Suspicion of diversion should continue to be submitted to corporate compliance for investigation and removal through the -- through that process."
Q   And who is corporate compliance?

Page 491

A   It's our -- that's our compliance department within sales -- within the Endo organization.
Q   If you could turn to -- I'm going to use the page numbers that are -- the page of 59 at the bottom there, and once you get into the actual Excel spreadsheet.
A   Okay.
Q   Do you see that?
A   Yes.
Q   If you could turn to page 26.
MS. SCULLION:  Sean, can I just have a continuing objection to using an incomplete document?
MR. MORRIS:  Yes.
MS. SCULLION:  Thanks.
BY MR. MORRIS:
Q   Now, Mr. Romaine, do you see the -- there are several columns on this page, and at the top, the second column over says "Current Status Category."  Do you see that?
A   Yes.
Q   And after that it says "Justification Required."  Do you see that?

Page 492

A   Yes.
Q   What does the first line say under "Current Status Category"?
A   "Remove from goals compliance."
Q   And then under "Justification," what does it say there?
A   "Inappropriate office, diversion suspicion."
Q   Is this an example of a healthcare provider that was noted as potentially being someone who should be removed for diversion suspicion?
A   Yes.
MS. SCULLION:  Objection.  Foundation and form.
THE WITNESS:  Yes.
BY MR. MORRIS:
Q   Are there other compliance issues that you see noted on this page?
A   Yes.
Q   And if you go down like two -- two lines below that, there's a compliance issue.  Do you see that?
A   Yes.

Page 493

Q   And then a few lines further down, there are two more compliance issues in a row.
A   Yes.
Q   And those are noted as "Inappropriate office to call on"?
A   Correct.
Q   And if you go down a few more lines, there are three more "inappropriate offices to call on."  Do you see that?
A   Yes.
Q   And then the one right below that says:  "Inappropriate prescribing of opioids, diversion suspicion"?
A   Yes.
Q   Are those all examples of healthcare providers being noted on the RBD list as those that are potentially subject to removal --
MS. SCULLION:  Object --
BY MR. MORRIS:
Q   -- for compliance issues?
MS. SCULLION:  Objection.  Foundation and form.
THE WITNESS:  Yes.
BY MR. MORRIS:

124  (Pages 490 to 493)

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1      Q   Now, in your role as the VP of sales,
2   would you have done anything with the RBD removal
3   list?
4          MS. SCULLION:  Objection.  Form,
5   hypothetical.
6          THE WITNESS:  No.
7   BY MR. MORRIS:
8      Q   Once somebody appears on the RBD
9   prescriber removal list, what was the process
10   following that?
11      A   That would go --
12          MS. SCULLION:  Objection.  Foundation.
13          THE WITNESS:  That would go directly to
14   compliance for an investigation, and then
15   depending on the investigation, the outcome, there
16   would be a result from that.
17   BY MR. MORRIS:
18      Q   And were you part of any of the
19   investigations with respect to potential
20   compliance issues with providers on the call list?
21      A   I was not.
22      Q   Earlier today counsel asked you some
23   questions about Dr. Herndon.  Do you recall those
24   questions?

Page 495

1      A   Yes.
2      Q   As you sit here today, do you have any
3   information about or recollection about
4   Dr. Herndon?
5      A   I don't.
6      Q   Do you know if you ever had any
7   information about Dr. Herndon?
8      A   I don't recall.
9      Q   And would that be something in your role
10   as senior VP, would that -- would the -- any
11   investigation of him as potential diversion fall
12   within your roles and responsibilities as a senior
13   VP of sales?
14      A   No, that would be --
15          MS. SCULLION:  Objection.  Foundation
16   and form.  Sorry.
17          THE WITNESS:  No.
18   BY MR. MORRIS:
19      Q   Earlier today counsel also asked you
20   some questions about -- I'm going to pull it up as
21   Exhibit 7.
22      A   Oh, gosh.  Okay.
23      Q   And maybe we can do it just by pulling
24   it --

Page 496

1      A   It might take me a while.
2          Can I look on here?  Okay.
3      Q   Do you recall the voicemail message that
4   was played earlier today?
5      A   Yes.
6      Q   And I believe on the second page, there
7   is a transcript.
8          MS. SCULLION:  I think we may have
9   marked that as a separate exhibit.
10          MR. MORRIS:  Oh, that was 8?
11          MS. SCULLION:  Yeah.
12          MS. TYLER:  The transcript is 7.  The
13   e-mail is 8.
14          MR. MORRIS:  Right, I -- I'm sorry, I
15   asked for 7.
16          MS. SCULLION:  I believe we marked it as
17   a demonstrative -- as a demonstrative.
18          MR. MORRIS:  Right.  I have it marked as
19   Exhibit 7, the actual transcript.  Is that not
20   correct?
21          (A discussion was held off the record.)
22          MR. MORRIS:  Oh, I'm sorry.  Do you need
23   a different number for that?  E -- E1203.
24   BY MR. MORRIS:

Page 497

1      Q   Okay.  And there were questions about
2   one of -- well, first of all, to whom did this
3   voicemail go?
4      A   The region business directors.
5      Q   And how many regional business directors
6   were there?
7      A   Six.
8      Q   And what was the role of the regional
9   business directors?
10      A   They managed a region of the country --
11   sales region of the country.
12      Q   And were those the people that reported
13   directly to you?
14      A   Yes.
15      Q   And you knew them pretty well?
16      A   Yes.
17          MS. SCULLION:  Objection.  Leading.
18          THE WITNESS:  Yes.
19   BY MR. MORRIS:
20      Q   And do you think that they knew you
21   pretty well?
22          MS. SCULLION:  Objection.  Leading.
23          THE WITNESS:  Yes.
24   BY MR. MORRIS:

125  (Pages 494 to 497)

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1    Q    If you go to -- a third of the way up
2   from the bottom, there's a sentence that says:
3   "And if we have reps out there" -- do you see
4   that?
5        A    Yes.
6        Q    Can you read that sentence again,
7   please.
8        A    Just a second -- yes.
9             "And if we have reps out there, and --
10  there, I don't care who they are, that can't sell
11  Opana ER clinically, they can't be with Endo.
12  Okay?"
13       Q    Can you explain what you meant by that
14  sentence?
15            MS. SCULLION:  Objection.  Foundation.
16            THE WITNESS:  I think I talked about it
17  earlier today when this was addressed, but my
18  expectation is to have a highly -- all the sales
19  force should be highly trained, highly effective,
20  very professional, and they should have a very
21  good knowledge and be able to communicate
22  effectively full disclosure information to
23  physicians.  And if they can't do that, they
24  shouldn't be in the role and responsibility they

Page 499

1   have.
2   BY MR. MORRIS:
3        Q    And you used the phrase "If they can't
4   sell Opana ER clinically."  What did that refer
5   to?
6        A    Being able to walk through the package
7   insert, being able to walk through the pack -- the
8   master visual aid with the physician, and cover
9   all aspects of the product, including the box
10  warning.
11       Q    I'm going to show you now Exhibits 40
12  and 41.  And so you don't have to look through
13  your pile, I'm just going to give you my copies
14  that I marked.
15            Do you recall those exhibits?
16       A    From today, yes.
17       Q    From today.  And had you seen those
18  documents prior to today?
19       A    I don't recall them.
20       Q    And what are those two documents?  What
21  kind of documents are they?
22            MS. SCULLION:  Objection.  Form.
23            THE WITNESS:  They're summaries of
24  market research.

Page 500

1   BY MR. MORRIS:
2        Q    How many people would have received the
3   documents like that?
4            MS. SCULLION:  Objection.  Form,
5   foundation.
6   BY MR. MORRIS:
7        Q    Let me ask it this way:  Market
8   research, do you know how many people within the
9   company would receive that kind of information?
10       A    30 to 40, approximately.
11       Q    And as the VP of sales, were you
12  expected to do anything in response to receiving
13  that market research if you received it?
14       A    No.
15            MS. SCULLION:  Objection to form.
16            MR. MORRIS:  Why don't we just take a
17  quick pause here.  We don't even have to leave.  I
18  just want to confer and see if there's any further
19  questions.
20            THE WITNESS:  Okay.
21            THE VIDEOGRAPHER:  The time is 8:28 p.m.
22  We're going off the record.
23            (Pause.)
24            THE VIDEOGRAPHER:  The time is 8:29 p.m.

Page 501

1   We're back on the record.
2            MR. MORRIS:  Mr. Romaine, thank you very
3   much.  I don't have any further questions at this
4   time.
5            THE WITNESS:  Thank you.
6            THE VIDEOGRAPHER:  The time is 8:29 p.m.
7   We're going off the record.
8            (Recess.)
9            THE VIDEOGRAPHER:  The time is 8:51 p.m.
10  We're back on the record.
11            REDIRECT EXAMINATION
12  BY MS. SCULLION:
13       Q    Welcome back, Mr. Romaine.
14       A    Thank you.
15       Q    You realize you're still under oath?
16       A    Yes.
17       Q    Thank you.
18            Mr. Morris had asked you about whether
19  sales reps were required to review the -- in the
20  PI, the risks, adverse events, contraindications,
21  et cetera, for a product, correct?
22       A    Yes.
23       Q    And now, you testified earlier that reps
24  could have as little as two to five minutes with a

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1   physician, correct?
2       A   I -- I think -- yeah, I think I said
3   five to six, but somewhere in that range, yes.
4       Q   Okay.  And they might be reviewing
5   multiple products, right?
6       A   Yes.
7       Q   And is it really realistic for them
8   to -- they're not going to read verbatim, for
9   example, the black box warning during that time
10  with the physician, right?
11      A   They -- they would, but they have to --
12  they can, and they also have to provide them with
13  the -- the black box.  They have to provide them
14  with a package insert.
15      Q   But they're not -- they're not sitting
16  there reading verbatim the black box warning to
17  the physician every time they make a call.
18      A   No.
19      Q   Okay.  And they're not sitting there
20  reading verbatim the contraindications every time
21  they're making a call on a physician, right?
22      A   No.
23      Q   And they're not sitting there reading
24  verbatim all of the risks indicated in -- in the

Page 503

1   PI, correct?
2       A   Correct.
3       Q   All right.  In fact, they're spending
4   most of their time discussing the benefits of the
5   product, correct?
6       A   Features and the benefits.
7       Q   Okay.  And that includes spending time,
8   for example, pointing out the studies that are in,
9   for example, the master visual aid?
10      A   Yeah, anything that's approved.
11          MR. MORRIS:  Objection to form.
12  BY MS. SCULLION:
13      Q   I'm sorry?
14      A   Anything that's approved, yes.
15      Q   Correct.  Okay.
16          And then you were asked about the master
17  visual aid, and that was Exhibit 14.
18      A   Okay.  I have it right here.
19      Q   And I believe Mr. Morris took you back
20  to the navigator portion, which begins at
21  E1023.18.  Can you turn to that page?
22      A   Yes.  Okay.  I'm sorry.
23      Q   Okay.  And do you recall Mr. Morris was
24  asking you about in this section the callout boxes

Page 504

1   on the sides of the master visual aids?
2       A   Yes.
3       Q   And you were asked:  What was the
4   purpose of having these types of boxes pulled out
5   for the training material that was provided to the
6   sales force?
7           And your answer was:  To ensure that
8   they knew exactly what were important pieces if
9   they need to reinforce to physicians when they're
10  making the sales presentations.  Correct?
11      A   Correct.
12      Q   And so that would include, for example,
13  on page E1023.19 --
14      A   Okay.
15      Q   -- do you see the callout box at the
16  bottom of the page there that begins "Stress our
17  product promise"?
18      A   Yes.
19      Q   It says:  "Stress our product promise,
20  Opana ER helps patients stay ahead of pain."
21          Can you read the next sentence in that
22  box?
23      A   "If HCPs take away one thing from your
24  sales call, it should be that Opana ER provides

Page 505

1   durable efficacy and dosing advantages."
2       Q   And again, that was called out in a
3   callout box in this navigator to ensure reps knew
4   exactly -- that was an important piece they needed
5   to reinforce with physicians when they were making
6   sales presentations about Opana ER, correct?
7       A   Yes.
8       Q   All right.  And in the top right-hand
9   corner of the same page, you see the callout box
10  that says:  "'New' is one of the most powerful
11  words in promotion."
12      A   Yes.
13      Q   Do you see that?
14          Again, that then would have been an
15  important piece for sales reps to reinforce with
16  physicians that Opana ER was new, correct?
17      A   Yes.
18      Q   If you will turn to E1023.27.
19      A   Okay.
20      Q   The top of this page, do you see where
21  it says under the heading "Pages 8-9"?
22      A   Yes.
23      Q   "Dialogue"?
24      A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1      Q    And the dialogue there says:  "Tailoring
2    the message to your customers.  Stress steady
3    delivery for steady sales."  Do you see that?
4      A    Yes.
5      Q    And that also was an indication to the
6    sales force of an important piece that they need
7    to reinforce with physicians when they're making
8    the sales presentations, correct?
9         MR. MORRIS:  Objection to form.
10        THE WITNESS:  Yes.
11   BY MS. SCULLION:
12     Q    Okay.  Can you pull back Exhibit 59,
13   which Mr. Morris reviewed with you.
14     A    Do you know which -- what that was
15   actually?
16     Q    Yeah, it's the removal list.
17     A    Okay.
18     Q    Thank you.
19     A    Yes.
20     Q    Do you have Exhibit 59 in front of you?
21        And Mr. Morris had you turn to some of
22   the pages attached at the back where it was noted
23   in various places -- let's go to page 26 of 59.  I
24   think that's what you were on.

Page 507

1      A    Okay.
2      Q    It was noticed -- I'm sorry.  It's
3    noted:  "Remove from goals compliance
4    inappropriate office diversion suspicion."
5      A    Yes.
6      Q    Do you see that?
7      A    Yes.
8      Q    And so that was an indication of if
9    there was a removal for suspected diversion,
10   that's how it would be noted on the list, right?
11     A    I -- I don't know how this was put
12   together.  I don't know if they used other
13   terminologies or not.
14     Q    Well, when Mr. Morris was asking you
15   questions, you were answering about what the
16   notation in this list meant, right?
17     A    I read -- I read those.
18     Q    But did you know what they actually
19   meant?
20     A    I -- I -- I don't recall.
21     Q    You don't -- you don't really know how
22   this document was put together, correct?
23     A    No.
24     Q    Okay.

Page 508

1      A    It came from a different department.
2      Q    All right.  And as we saw when we looked
3    at the removal list -- sorry -- in Exhibit 44, for
4    Dr. Herndon, do you recall there, there was no
5    notation for Dr. Herndon of removal for compliance
6    for in- -- for inappropriate office diversion
7    suspicion.  The removal notation there was "no
8    access," right?
9      A    Correct.
10     Q    So if -- if the terminology -- sorry --
11   if the notation for removing a physician for
12   suspected diversion were "Compliance inappropriate
13   office diversion suspicion," we would know that
14   was not why Dr. Herndon was being removed from the
15   list.
16     A    Yeah, as I --
17        MR. MORRIS:  Objection to form.
18        THE WITNESS:  As I mentioned before, I
19   don't have any real knowledge of the Dr. Herndon
20   situation.
21   BY MS. SCULLION:
22     Q    So you really can't speak to what
23   Exhibit 59 really does indicate about why
24   physicians were or were not being removed from

Page 509

1    this list.
2      A    Well, I know it was the -- the process
3    that was used in order to have compliance, do an
4    investigation if they showed up on this list.
5      Q    Okay.  But in terms of how to read this
6    list and what it means, you really can't speak to
7    it.
8         MR. MORRIS:  Objection to form.
9         THE WITNESS:  That's not my -- that's
10   not my area of expertise.
11   BY MS. SCULLION:
12     Q    Okay.  And I think you testified in
13   response to Mr. Morris's questions that you were
14   not responsible for investigating suspected
15   diversion, correct?
16     A    Correct.
17     Q    And diversion consists of inappropriate
18   use of the medication, correct?
19     A    Correct.
20     Q    But you did testify earlier, and this I
21   think at page 356 of the rough:  "I think we all
22   take responsibility for ensuring that the product
23   is used appropriately, and that was my focus."
24        That's what you testified to, correct --

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1    A   Correct.
2    Q   -- under oath here today?
3    A   Yes.
4    Q   "That we all take responsibility for
5  ensuring the product is used appropriately."
6    A   Right.
7        MR. MORRIS:  Objection to form.
8  BY MS. SCULLION:
9    Q   And that included you.
10   A   Yes.
11       MR. MORRIS:  Objection to form, legal
12  conclusion.
13  BY MS. SCULLION:
14   Q   And then with respect to addressing
15  diversion, you pointed to -- sorry, you were asked
16  about the diversion suspicion request -- diversion
17  suspicion form.  Correct?
18   A   Well --
19   Q   Let me make this easier.
20       MS. SCULLION:  Do we have the exhibit?
21       THE WITNESS:  This one, yes.
22  BY MS. SCULLION:
23   Q   What is the exhibit number, please?
24   A   58.

Page 511

1    Q   58.  Thank you.
2        MS. SCULLION:  Do we have that?  That's
3  okay.
4  BY MS. SCULLION:
5    Q   You have Exhibit 58 in front of you --
6    A   Yes.
7    Q   -- and you were asked about that, and
8  you explained that's the form that reps were
9  trained and told to use to report suspected
10  diversion if they observed it in the field,
11  correct?
12   A   Right.
13   Q   Is that correct?
14   A   Yes.
15   Q   Thank you.  I didn't hear.  I apologize.
16   A   Yes, sorry.
17   Q   But using that form, that would require
18  reps to -- to see and recognize suspected
19  diversion in the field, correct?
20   A   Correct.
21   Q   And it would then require reps to
22  actually report the suspected diversion for that
23  process to work, correct?
24   A   Correct.

Page 512

1    Q   And that would mean that reps would have
2  to want to report suspected diversion if they saw
3  it, correct?
4    A   Yes.
5        MR. MORRIS:  Objection to form.
6  BY MS. SCULLION:
7    Q   And you would agree that there could be
8  reasons that a rep might not want to report
9  suspected diversion, correct?
10       MR. MORRIS:  Objection to form.
11       THE WITNESS:  I -- I don't know why they
12  would not want to.
13  BY MS. SCULLION:
14   Q   For example, is it possible that some
15  reps would say, I'm too busy, I'm not going to
16  take the time?  That's possible, right?
17       MR. MORRIS:  Objection to form.
18       THE WITNESS:  I -- we hire ethical
19  people.  I can't imagine that would happen.
20  BY MS. SCULLION:
21   Q   Okay.  But it's possible that someone
22  could say, I'm just too busy, I'm not going to do
23  it.
24   A   Well, anything could happen.

Page 513

1        MR. MORRIS:  Objection to form.
2  BY MS. SCULLION:
3    Q   And it could also be that a rep might
4  not want to report because some people just don't
5  like turning somebody in.
6        MR. MORRIS:  Objection.
7  BY MS. SCULLION:
8    Q   Is that correct?
9        MR. MORRIS:  Objection to form.
10       THE WITNESS:  Well, it's part of their
11  responsibility as a professional, ethical sales
12  representative.
13  BY MS. SCULLION:
14   Q   Okay.
15   A   And they were trained on it.
16   Q   But that depended on them actually
17  following the training --
18   A   Right.
19   Q   This system depended on them following
20  the training, correct?
21   A   Right.  But keep in mind also, just for
22  clarity, their district manager also would be
23  riding with them, and if he or she saw that, that
24  that would be their responsibility to make sure

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1  that it did get reported.
2      Q   Okay.  But again, the system depended on
3  someone actually seeing the pill mill, correct?
4          MR. MORRIS:  Objection to form.
5          THE WITNESS:  Correct.
6  BY MS. SCULLION:
7      Q   Okay.  And do I understand correctly
8  that in terms of incentive compensation, if there
9  were a pill mill in a rep's territory that they
10  hadn't yet recognized, hadn't yet seen, hadn't yet
11  reported, the sale -- the sales generated by that
12  pill mill, those would be credited to that rep?
13     A   If the physician --
14         MR. MORRIS:  Objection.  Foundation.
15         THE WITNESS:  -- was on their call plan.
16  BY MS. SCULLION:
17     Q   Okay.  So if a physician is on the call
18  plan, and they haven't yet been reported as a pill
19  mill, the rep is going to be getting credit for
20  those sales, correct?
21     A   Correct.
22     Q   All right.  And so is it possible, for
23  example, that reps might be concerned about their
24  compensation being negatively impacted if they

Page 515

1  were to report a suspected pill mill?  Is that a
2  possibility?
3      A   Well, if that existed in their territory
4  or their geography and they weren't reporting it,
5  then that could be an issue that they could lose
6  their position if the district manager observed it
7  too and asked why they didn't report that.
8      Q   Sure.
9      A   And most of their compensation, as you
10  know, came from salary versus incentive comps.  So
11  there's an incentive for them to be -- to be
12  ethical in the way they approached the business.
13     Q   Would you agree that for some people
14  there would be incentive to say, There's --
15  there's a -- there's a physician generating a lot
16  of scripts in my territory, and I don't even have
17  to do any work to get them?  That they may have an
18  incentive to say, I'm going to let that sit?
19         MR. MORRIS:  Objection to form.
20         THE WITNESS:  I -- I wouldn't agree with
21  that.  I would think the people that we hired were
22  ethical and professional, and they wouldn't --
23  they wouldn't act in that manner.
24  BY MS. SCULLION:

Page 516

1      Q   You don't think that a person from time
2  to time might have a conflict of interest when
3  money is on the line for them, when their
4  compensation is on the line?
5          MR. MORRIS:  Objection to form.
6          THE WITNESS:  I do believe that -- I do
7  believe that they would -- they would be more
8  concerned for their job than for making any kind
9  of money off of something like that.
10         MS. SCULLION:  Can we mark as exhibit --
11  what are we on?  60?  Thank you.
12         (Romaine Exhibit No. 60 was marked
13         for identification.)
14  BY MS. SCULLION:
15     Q   Let me hand you what's been marked as
16  Exhibit 60.  This is an e-mail from -- it's
17  Bates-stamped ENDO_OPIOID_MDL-01861288.
18         And if you turn back, you can see this
19  is an -- an e-mail chain that starts on page
20  E852.3.  It starts as an e-mail from Margaret
21  Takasu-Cronan to Paul Badley, Kevin Johnston, and
22  is cc'd to Ron Jackson.
23     A   Yes.
24     Q   The subject:  "Physician removed from

Page 517

1  Opana ER call plan by Colleen Craven."  Do you see
2  that?
3      A   Yes.  Yes.
4      Q   And who was Margaret Takasu-Cronan?
5      A   She was a district manager.
6      Q   Does she sometimes go by the name Nana?
7      A   Yes.
8      Q   Okay.  And if you turn to the first page
9  of Exhibit 60.
10     A   The -- the front page you're referring
11  to?
12     Q   Correct, the front page.  Thank you.
13  852.1.
14         This chain ends with Ms. Takasu-Cronan
15  saying to Mr. Jackson:  "I reread the message that
16  Paul sent me, and I guess it makes sense if they
17  remove everything out, goals, IC, et cetera."  And
18  she goes on to say:  "I can see how someone could
19  play the system and not report an action right
20  away in order to not have the credit for their
21  Opana ER sales taken away for the entire semester,
22  especially if the physician was writing more than
23  what he/she is deciled for.  Thanks for your
24  follow-up regarding the situation, especially

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1   since PC is on the line for Jeremy."
2       Do you see that?
3       A  Yes.  I don't know what PC stands for.
4       Q  Okay.  But -- so Ms. Takasu-Cronan,
5   though, is saying that she could see how someone
6   could play the system and not report a suspected
7   pill mill right away in order to not have their
8   credit for Opana ER sales taken away for the
9   entire semester, correct?
10      MR. MORRIS:  Objection to form,
11  speculation.
12      THE WITNESS:  It looks like her opinion.
13  BY MS. SCULLION:
14      Q  Yeah.  And how long was
15  Ms. Takasu-Cronan a district manager with -- with
16  Endo?
17      A  I -- I don't recall.
18      Q  Was she there for -- as a district
19  manager for most of your time as VP of sales?
20      A  I don't know if I -- I don't recall
21  specifically.  She was there for several years.
22      Q  She was an experienced district manager
23  with Endo, correct?
24      A  Yes.

Page 519

1       Q  And an experienced manager -- district
2   manager with Endo was saying she could see how
3   someone would play the system.  Correct?
4       MR. MORRIS:  Objection to form.
5       THE WITNESS:  That's what she's saying
6   on her e-mail.
7   BY MS. SCULLION:
8       Q  Okay.  So you agree it's possible that
9   someone would try to play the system if they
10  believed that it might impact their compensation
11  to report a suspected pill mill, correct?
12      MR. MORRIS:  Objection to form and
13  foundation.
14      THE WITNESS:  I can't say that.  Again,
15  I go back to I think -- you know, I think there
16  would be more at risk if they did that versus the
17  benefit they were to receive from it.
18  BY MS. SCULLION:
19      Q  But that -- that would be an analysis
20  that they would have to make, correct?
21      A  That would be a decision they would
22  make.
23      Q  Okay.  And then Mr. Morris was asking
24  you about the criteria for a physician to be

Page 520

1   included on the -- on the call plan, and you said
2   that these would have to be experienced
3   physicians, correct?
4       A  Experienced in the therapeutic class
5   that we were calling on for, yes.
6       Q  Right.  But as we saw, the measure for
7   an experienced physician was just whether they had
8   written 48 -- for Opana ER, which is whether they
9   had written 48 prescriptions for a long-acting
10  opioid in the prior 12 months, correct?
11      A  Correct.
12      Q  And that was -- that was the threshold
13  cutoff that a physician had to meet in order to be
14  included on the list, correct?
15      A  Correct.
16      Q  Was there -- and there was no cutoff at
17  the top, though.  There was no number of
18  prescriptions that was too much --
19      A  Not that I recall.
20      Q  -- for a physician to be included.
21      A  Not that I recall.
22      Q  All right.  So, for example, as we saw
23  with Dr. Herndon, someone could be the number one
24  Opana prescriber in the nation and be included on

Page 521

1   the list, even though it turned out they were a
2   pill mill, right?
3       MR. MORRIS:  Objection -- objection to
4   form.
5       THE WITNESS:  I -- I -- I can't speak to
6   that.
7   BY MS. SCULLION:
8       Q  Okay.  There's never any effort to -- to
9   have a cutoff and say, If someone is prescribing
10  too much, we're not going to have them on the
11  list.
12      A  I don't recall that.  I don't know.
13      Q  Okay.
14      MS. SCULLION:  And then can we pull up
15  1207 again, please.  Is that 1207, the script?
16      MS. TYJER:  1203.
17      MS. SCULLION:  I'm so sorry.  Thank you.
18  BY MS. SCULLION:
19      Q  Okay.  So Mr. Morris brought you back to
20  the -- the voicemail from June of 2012 --
21      A  Yes.
22      Q  -- in which you stated:  "And if we have
23  reps out there, I don't care who they are, that
24  can't sell Opana ER clinically, they can't be with

131 (Pages 518 to 521)

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1  Endo.  Okay?"
2         And you said that what you meant there
3  was were they educating the physician, were they
4  presenting the balanced approach of benefits and
5  risks of the product.  That's what you said you
6  meant by that, right?
7      A  Correct.
8      Q  But that's not what you said, right?
9  You said that they can't sell --
10     A  Clinically.
11     Q  -- sell Opana ER clinically.
12     A  Right.
13     Q  Right?
14     A  Clinically is going through the entire
15  master visual aid, full disclosure.
16     Q  And in the end, it was a matter of
17  whether they could sell Opana ER in that setting,
18  correct?
19     A  Clinically.
20     Q  Right.
21     A  Again, I go back to just in context that
22  these were going out to region directors that I
23  had worked very closely with for a long period of
24  time who knew me very well.

Page 523

1      Q  But as we discussed earlier, ultimately
2  the salesperson's job was to sell the product to
3  the customers, correct?
4      A  Educate and provide -- provide
5  resources.
6      Q  Well, we discussed the fact that sales
7  reps had sales goals set for them, correct?
8      A  Sure.  Yes.
9      Q  And those sales goals were measured by
10  the number of prescriptions, correct?
11     A  Correct.
12     Q  It wasn't measured by how educated your
13  physicians were.  In the end, it was measured by
14  how many prescriptions got written by the
15  physicians you called on.
16     A  That's how --
17        MR. MORRIS:  Objection to form.
18        THE WITNESS:  That's how it was
19  measured.
20  BY MS. SCULLION:
21     Q  That's right, that's how it was
22  measured.  And --
23     A  How they -- just going back to full
24  context.

Page 524

1      Q  Yes.
2      A  But how they received -- how they got to
3  that point was making sure they could go in and
4  provide full product information, provide
5  resources to the office, provide data and
6  information.
7      Q  But the goal itself, though, is measured
8  by one thing, and that was the number of
9  prescriptions written, correct?
10     A  Correct.
11        MR. MORRIS:  Objection.  Form.
12  BY MS. SCULLION:
13     Q  Okay.  And the incentive compensation
14  you said was tied to whether the sales rep met or
15  exceeded their sales goal, correct?
16     A  Correct.
17     Q  And again, so it's tying back the
18  incentive compensation then to the number of
19  prescriptions written by the physicians in their
20  territory, correct?
21     A  Correct.
22     Q  Okay.  Sorry.  The sales reps, that they
23  were calling on in their territory.
24     A  Right.

Page 525

1      Q  And we also saw over the course of today
2  again various contests that Endo put out there for
3  the sales reps, and there again, the awards were
4  based on number of prescriptions written, correct?
5      A  Correct.
6      Q  All right.  And then again, whether they
7  ultimately could even stay on as an Endo sales
8  rep, ultimately was determined by whether all the
9  efforts they were making in fact wound up
10  generating prescriptions, correct?
11        MR. MORRIS:  Objection to form.
12        THE WITNESS:  As long as they were doing
13  it in the right way.
14  BY MS. SCULLION:
15     Q  But in the end --
16     A  Ethical way.
17     Q  -- if they weren't generating
18  prescriptions -- even if they're doing it the
19  right way, if they're not generating
20  prescriptions, they couldn't stay on as a sales
21  rep, right?
22     A  Correct.  But they also wouldn't stay on
23  if they were not an ethical, well-trained
24  representative.

132  (Pages 522 to 525)

Highly Confidential - Subject to Further Confidentiality Review

Page 526

1    Q   But even if they were an ethically,
2    well-trained representative and presenting the way
3    that they were trained, if in the end they weren't
4    generating prescriptions, they couldn't stay on as
5    a sales rep, right?  That was the job.
6    A   They had to perform.
7    Q   Okay.
8    A   They had responsibilities.
9        MS. SCULLION:  Thank you.  I have no
10   further questions for today.
11       THE WITNESS:  Okay.
12       MR. MORRIS:  Yes, except weren't you
13   going to read something?
14       MS. SCULLION:  Yes.  So --
15       MR. MORRIS:  The -- the numbers.
16       MS. SCULLION:  I have them in my pocket.
17       So for the record, here's the Bates
18   numbers for certain exhibits where the Bates
19   numbers were cut off.
20       Exhibit 18 was ENDO_OPIOID_MDL-00684008
21   through 011.
22       Exhibit 19 was ENDO_OPIOID_MDL-00686202
23   through zero -- 205.  So 202 through 205.
24       And Exhibit 24 was

Page 528

1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2        The undersigned Certified Shorthand Reporter
3    does hereby certify:
4        That the foregoing proceeding was taken before
5    me at the time and place therein set forth, at
6    which time the witness was duly sworn; That the
7    testimony of the witness and all objections made
8    at the time of the examination were recorded
9    stenographically by me and were thereafter
10   transcribed, said transcript being a true and
11   correct copy of my shorthand notes thereof; That
12   the dismantling of the original transcript will
13   void the reporter's certificate.
14       In witness thereof, I have subscribed my name
15   this date:  January 15, 2019.
16
17       _____
18       LESLIE A. TODD, CSR, RPR
19       Certificate No. 5129
20   (The foregoing certification of
21   this transcript does not apply to any
22   reproduction of the same by any means,
23   unless under the direct control and/or
24   supervision of the certifying reporter.)

Page 527

1    ENDO_DATA_OPIOID_MDL-0000021.
2        MR. MORRIS:  Okay.  Now we're done.
3        THE VIDEOGRAPHER:  The time is
4    9:15 p.m., January 10th, 2019.  Going off the
5    record, concluding the videotaped deposition.
6        (Whereupon, the deposition of
7        LARRY W. ROMAINE was concluded
8        at 9:15 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 529

1        INSTRUCTIONS TO WITNESS
2        Please read your deposition over carefully and
3    make any necessary corrections. You should state
4    the reason in the appropriate space on the errata
5    sheet for any corrections that are made.
6    After doing so, please sign the errata sheet
7    and date it.
8        You are signing same subject to the changes
9    you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

133 (Pages 526 to 529)

Highly Confidential - Subject to Further Confidentiality Review

Page 530

```
 1           ------
 2          E R R A T A
 3           ------
 4    PAGE LINE CHANGE
 5    ___ ___ _____
 6    REASON: _____
 7    ___ ___ _____
 8    REASON: _____
 9    ___ ___ _____
10    REASON: _____
11    ___ ___ _____
12    REASON: _____
13    ___ ___ _____
14    REASON: _____
15    ___ ___ _____
16    REASON: _____
17    ___ ___ _____
18    REASON: _____
19    ___ ___ _____
20    REASON: _____
21    ___ ___ _____
22    REASON: _____
23    ___ ___ _____
24    REASON: _____
```

Page 531

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2       I,_____, do hereby
 3    certify that I have read the foregoing pages, and
 4    that the same is a correct transcription of the
 5    answers given by me to the questions therein
 6    propounded, except for the corrections or changes
 7    in form or substance, if any, noted in the
 8    attached Errata Sheet.
 9
10    _____
11    LARRY W. ROMAINE              DATE
12
13
14    Subscribed and sworn to
15    before me this
16    _____day of_____,20___.
17    My commission expires:_____
18    _____
19    Notary Public
20
21
22
23
24
```

134 (Pages 530 to 531)