Highly Confidential - Subject to Further Confidentiality Review

```
  1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
  2                   EASTERN DIVISION

  3

      *************************

  4

      IN RE:  NATIONAL          MDL No. 2804
  5   PRESCRIPTION OPIATE
      LITIGATION                Case No.
  6                             1:17-MD-2804

      *************************

  7

      THIS DOCUMENT RELATES TO    Hon. Dan A. Polster
  8   ALL CASES
  9   *************************
 10
 11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 12             CONFIDENTIALITY REVIEW
 13      VIDEOTAPED DEPOSITION OF CRAIG SCHIAVO
 14
 15           Thursday, January 17th, 2019
 16                 8:06 a.m.
 17
 18      Held At:
 19           Omni Hotel
 20           One West Exchange Street
 21           Providence, Rhode Island
 22
 23   REPORTED BY:
 24   Maureen O'Connor Pollard, RMR, CLR, CSR
```

## Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
      MICHAEL E. ELSNER, ESQ.
4     KAITLYN EEKHOFF
         MOTLEY RICE LLC
5        28 Bridgeside Boulevard
         Mt. Pleasant, South Carolina 29464
6        843-216-9250
         melsner@motleyrice.com
7
         -and-
8
      JAMES A. DeROCHE, ESQ., of Counsel
9     WEISMAN, KENNEDY & BERRIS CO., LPA
         101 W. Prospect Avenue
10       Cleveland, Ohio 44115
         800-747-9330
11       lderoche@garson.com
12
13 FOR McKESSON CORPORATION:
14    CHRISTOPHER N. DAWSON, ESQ.
         WHELAN, CORRENTE, FLANDERS, KINDER
15       & SIKET LLP
         100 Westminster Street, Suite 710
16       Providence, Rhode Island 02903
         401-270-4500
17       cdawson@whelancorrente.com
18
19 FOR AMERISOURCEBERGEN DRUG CORPORATION:
20    ANDREW SCHOCK, ESQ. (Remotely)
         JACKSON KELLY PLLC
21       500 Lee Street East, Suite 1600
         Charleston, West Virginia 25301
22       304-340-1146
         anschock@jacksonkelly.com
23
24

## Page 3

1  APPEARANCES (Continued):
2  FOR WALMART:
3     PAMELA YAACOUB, ESQ. (Remotely)
         JONES DAY
4        77 West Wacker
         Chicago, Illinois 60601
5        312-782-3939
         pyaacoub@jonesday.com
6
7  FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.:
8     ALEXANDRA W. MILLER, ESQ.
         ZUCKERMAN SPAEDER LLP
9        1800 M Street NW, Suite 1000
         Washington, DC 20036-5807
10       202-778-1800
         smiller@zuckerman.com
11
12 FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
   SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
13 INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
14    DAVID KOUBA, ESQ. (Remotely)
         ARNOLD & PORTER KAYE SCHOLER, LLP
15       601 Massachusetts Avenue, NW
         Washington, DC 20001-3743
16       202-942-5000
         david.kouba@arnoldporter.com
17
18 FOR HENRY SCHEIN, INC., and HENRY SCHEIN MEDICAL
   SYSTEMS, INC.:
19
      BRANDAN MONTMINY, ESQ.
20       LOCKE LORD LLP
         2200 Ross Avenue, Suite 2800
21       Dallas, Texas 75201
         214-740-8445
22       brandan.montminy@lockelord.com
23
      VIDEOGRAPHER: Robert Sweig
24    TRIAL TECHNICIAN: Gina Veldman

## Page 4

1              INDEX
2  EXAMINATION                    PAGE
3  CRAIG SCHIAVO
4   BY MR. ELSNER                  8
5   BY MS. MILLER                  386
6
7
8       E X H I B I T S
9  NO.      DESCRIPTION          PAGE
10 CVS-Schiavo-1   Craig Schiavo's LinkedIn
         profile...................... 18
11
   CVS-Schiavo-2   E-mail chain with
12       attachment, Bates
         his-MDL-00495778 through
13       5785........................ 35
14 CVS-Schiavo-3   PowerPoint, The Challenge to
         "Know Your Customer," and
15       Best Practices, November
         2010........................ 42
16
17 CVS-Schiavo-4   12/27/07 letter from the
         DEA, Bates
         CVS-MDLT1-000013535 and 3536.. 51
18
19 CVS-Schiavo-5   9/27/06 letter from the FDA,
         Bates CVS-MDLT1-000010552
         through 555.................. 53
20
21 CVS-Schiavo-6   10-20-09 e-mail with
         attached PowerPoint, Bates
         his-MDL-00231976 and 1977..... 80
22
23 CVS-Schiavo-7   1/24/13 e-mail, Bates
         CVS-MDLT1-000057796 and 7797.. 113
24

## Page 5

1
   CVS-Schiavo-8   DEA PowerPoint, Drug Trends,
2        Long Island, New York,
         September 2012................ 134
3
   CVS-Schiavo-9   Craig Schiavo's Year-End
4        Review, 2012, Bates
         CVS-MDLT1-000120596 through
5        606......................... 147
6  CVS-Schiavo-10  E-mail chain with
7        attachment, Bates
         CVS-MDLT1-000083064 through
8        3069........................ 151
9  CVS-Schiavo-11  12/13/12 e-mail with
         attachment, Bates
10       CVS-MDLT1-000078045 through
         8047........................ 178
11 CVS-Schiavo-12  E-mail chain with
12       attachment, Bates
         CVS-MDLT1-000025365 through
13       5369........................ 190
14 CVS-Schiavo-13  Craig Schiavo's Year-End
         Review - 2013, Bates
15       CVS-MDLT1-000120580 through
         588......................... 223
16 CVS-Schiavo-14  Craig Schiavo's Mid-Year
17       Review - 2013, Bates
         CVS-MDLT1-000120589 through
18       595......................... 229
19 CVS-Schiavo-15  1/22/13 e-mail with
         attachment, Bates
20       CVS-MDLT1-000103327 and 3328.. 236
21 CVS-Schiavo-16  E-mail chain with
         attachment, Bates
22       CVS-MDLT1-000078060 through
         8069........................ 250
23 CVS-Schiavo-17  DEA Government's Prehearing
         Statement, Bates
24       CAH_MDL_PRIORPROD_DEA12_
         00000001 through 54.......... 278

CVS-Schiavo-18   Craig Schiavo's Year-End Review - 2014, Bates CVS-MDLT1-000120573 through 579.................. 288

CVS-Schiavo-19   11/26/12 e-mail with attached SOM End State Enhancement Solution, Bates CVS-MDLT1-000058034 through 8037.................. 307

CVS-Schiavo-20   12/19/12 e-mail with attachment, Bates CVS-MDLT1-000111913 through 1917.................. 309

CVS-Schiavo-21   12/12/12 e-mail with attachment, Bates CVS-MDLT1-000103373 through 3380.................. 327

CVS-Schiavo-22   2/4/13 Memo, Bates CVS-MDLT1-000028143 through 8147.................. 340

CVS-Schiavo-23   E-mail chain, Bates CVS-MDLT1-000076114 through 6117.................. 349

CVS-Schiavo-24   E-mail chain, Bates CVS-MDLT1-000078127 through 8129.................. 356

CVS-Schiavo-25   E-mail chain, Bates CVS-MDLT1-000077942 through 7945.................. 358

CVS-Schiavo-26   E-mail chain, Bates CVS-MDLT1-000078116 through 8119.................. 368

CVS-Schiavo-27   6/19/14 e-mail with attachment, Bates CVS-MDLT1-000103344 through 3372.................. 371

CVS-Schiavo-28   6/17/14 e-mail with attachment, Bates CVS-MDLT1-000103342 and 3343.. 374

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  My name is Robert Sweig, and I'm a videographer for Golkow Litigation Services.

Today's date is January 17, 2019, and the time is 8:06 a.m.

This video deposition is being held in Providence, Rhode Island in the matter of In Re National Prescription Opiate Litigation pending before the United States District Court for the Northern District of Ohio, Eastern Division.

The deponent is Craig Schiavo.

Counsel appearances will be as noted on the stenographic record.

The court reporter is Maureen Pollard who will now swear in our witness.

CRAIG SCHIAVO, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ELSNER:

Q.  Good morning.

A.  Good morning.

Q.  My name is Mike Elsner, and I'm from the law firm of Motley Rice, and I represent the plaintiffs in these actions.

Can you please tell us your name?

A.  My name is Craig Schiavo.

Q.  When were you born?

A.  February 12, 1982.

Q.  So how old are you?

A.  36.

Q.  36.

And where do you live?

A.  Medway, Massachusetts.

Q.  And you graduated from Lasalle University, is that right?

A.  That's right.

Q.  And that's in Philadelphia?

A.  That's in Philadelphia.

Q.  In 2004?

A.  Yes.

Q.  Okay.  Did you graduate with a degree?

A.  Yes.

Q.  What is the degree?

A.  My major was business management.

Page 10

1    Q.  Okay.  Did you take any courses in
2  pharmaceuticals or pharmacy?
3    A.  Not that I recall.
4    Q.  Before joining Henry Schein, did you
5  have any coursework or take any studies in DA
6  regulations?
7    A.  Not that I recall.
8    Q.  Okay.  When did you join Henry Schein?
9  Was that your first job out of college?
10   A.  I joined Henry Schein in June of 2004,
11 and that was my first full-time job out of
12 college.
13   Q.  Okay.  And what were you hired to do?
14   A.  When I started in 2004, I was doing
15 product recalls.
16   Q.  And what did that involve?
17   A.  We would receive recalls or
18 withdrawals from manufacturers or distributors,
19 and my responsibility was to coordinate the --
20 making sure that our distribution centers put a
21 block on the product, and then if required
22 whatever notifications needed to go to either
23 our customers, or just coordinate the recall.
24   Q.  Okay.  And Henry Schein is a wholesale

Page 11

1  distributor of medical products and drugs, is
2  that right?
3    A.  That's part of their services, yes.
4    Q.  What else do they do?
5    A.  They distribute a lot of things.
6    Q.  Okay.  But they do distribute
7  controlled substances, is that right?
8    A.  At the time that I worked there, yes.
9    Q.  Okay.  And did that include Schedule
10 II narcotics as well as Schedule III narcotics?
11       MS. MILLER:  Object to form.
12   A.  Yes.
13 BY MR. ELSNER:
14   Q.  And can you give us a description of
15 Henry Schein's customer base as it related to
16 the sale of controlled substances?
17   A.  We distributed mainly to the
18 office-based practitioner from what I remember.
19   Q.  Okay.  So that would include medical
20 doctors in their offices, is that right?
21   A.  Yes.
22   Q.  And dentists?
23   A.  I believe we distributed to dentists,
24 yes.

Page 12

1    Q.  And veterinary clinics?
2    A.  For -- I don't think so the whole time
3  that I worked there, but at some point they did.
4    Q.  Okay.  Did it include retail
5  pharmacies?
6    A.  For most of the time that I was there,
7  no.  At the very end of my time with Henry
8  Schein I vaguely remember going or dealing with
9  a pharmacy, a few pharmacies.
10   Q.  And would these be large retail
11 pharmacy chains like CVS or Walgreen's, or are
12 we talking about smaller pharmacies?
13   A.  To the best of my recollection, I
14 think it was just smaller pharmacies.
15   Q.  Okay.  And how long did you perform
16 your job for Henry Schein in product recalls?
17 You started in June, 2004, and when did that
18 position end, and what was your next position
19 there?
20   A.  I don't remember exactly how long I
21 was in the role.  It might have been a couple
22 years, two, two and a half years.  And then
23 after that my role was dealing with inspections
24 and controlled substances and suspicious order

Page 13

1  monitoring.
2    Q.  Did you begin that roughly in 2007?
3  Does that sound about right?
4    A.  I don't recall.
5    Q.  Okay.  How was it that you
6  transitioned from product recalls into
7  regulatory specialist related to DEA compliance?
8        MS. MILLER:  Object to form.
9    A.  Can you just repeat the question?
10 BY MR. ELSNER:
11   Q.  Yes.  Well, let me ask it a different
12 way.
13       What was your title after you moved
14 from recall coordinator?  What was your next
15 title at Henry Schein?
16   A.  I don't remember the specific title.
17   Q.  Okay.  But what were you responsible
18 for in your new position?
19   A.  I think I was still supporting
20 recalls.  And then when I first started the role
21 I don't remember exactly what my
22 responsibilities were.
23   Q.  Did it include any responsibilities
24 for DEA compliance with respect to controlled

Page 14

1 substances?
2   A.   When I first transitioned into the
3 role, I don't know what my responsibilities
4 were, but it was learning the new role, and part
5 of that was around controlled substances and
6 inspections in our distribution centers.
7   Q.   And as you evolved into that role
8 after the training period, then what were your
9 general responsibilities in that position?
10   A.   Continued to be government
11 inspections, training of some employees, and
12 then compliance with controlled substances and
13 suspicious order monitoring.
14   Q.   How many -- did you have employees
15 that worked for you in that position?
16   A.   I had no direct reports.
17   Q.   Okay.  How large was the team that
18 dealt with compliance related to controlled
19 substances at Henry Schein in that period?
20   A.   I'm not sure -- I mean, a lot of
21 people had a part in the process.  I don't know
22 how many.
23   Q.   Were you involved in establishing
24 Henry Schein's suspicious order monitoring

Page 15

1 program for controlled substances?
2       MR. MONTMINY:  Objection.  Form,
3 outside the scope.
4   A.   I was part of a team that worked on
5 suspicious order monitoring.
6 BY MR. ELSNER:
7   Q.   How many people were in that team?
8   A.   Again, I don't recall how many.  There
9 was a team of people.  I can't remember
10 everyone.
11   Q.   Less than ten?  Less than five?
12 What's your best estimate?
13   A.   Again, I don't recall.  It wasn't just
14 compliance.  There were other departments that
15 were participating.  I can't even give a good
16 guess on how many people.
17   Q.   When did Henry Schein develop its
18 suspicious order monitoring system initially?
19       MR. MONTMINY:  Objection to form.
20   A.   I'm not sure.
21 BY MR. ELSNER:
22   Q.   Was it in place in 2007 when you
23 transitioned into that position, or was it
24 something that you developed in that position?

Page 16

1       MR. MONTMINY:  Objection.  Form, asked
2 and answered.
3   A.   I don't recall what the system was
4 prior to me going to that role.
5 BY MR. ELSNER:
6   Q.   Did it exist?
7   A.   I don't recall.
8   Q.   At some point in time you became a
9 senior regulatory specialist at Henry Schein, is
10 that right?
11   A.   I believe so.
12   Q.   Okay.  And was that in 2012?
13   A.   I don't recall when that happened.
14   Q.   Was it shortly before you left Henry
15 Schein?
16   A.   I'm not sure what you mean by
17 "shortly," but I don't remember exactly when I
18 went into that role, or got that title.
19   Q.   How long did you serve in that role?
20   A.   Again, I don't remember when I -- I
21 think that was a promotion.  I don't remember
22 when that happened.
23   Q.   Did your responsibilities change in
24 any way?

Page 17

1   A.   I don't remember.
2   Q.   Did you have direct reports?
3   A.   I don't believe I ever had direct
4 reports at Henry Schein.
5   Q.   I want to show you something on the
6 screen, I didn't print it for you, but it might
7 help your recollection with some of the dates,
8 if that's okay.
9   A.   Sure.
10       MS. MILLER:  Mike, do you have hard
11 copies?
12       MR. ELSNER:  I'll have hard copies of
13 most everything else, but not this.  This is his
14 LinkedIn page.  I'm going to show it to him and
15 see if it helps him remember some of the dates.
16       MS. MILLER:  Craig, are you able to --
17       MR. ELSNER:  There's a screen, but
18 it's not there yet.
19       Can we just go off the record for a
20 quick minute while we get this?  Sorry.
21       THE VIDEOGRAPHER:  We're going off the
22 record at 8:17 a.m.
23       (Pause.)
24       THE VIDEOGRAPHER:  We're back on the

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 record at 8:18 a.m.
2     (Whereupon, CVS-Schiavo-1 was marked
3     for identification.)
4 BY MR. ELSNER:
5   Q. Mr. Schiavo, we've placed before you
6 what we're going to mark as Exhibit 1. Is this
7 a copy of your LinkedIn page?
8   A. It looks to be my LinkedIn page.
9   Q. That's your picture?
10   A. That is my picture.
11   Q. Okay. Did you draft -- did you create
12 your own LinkedIn page?
13   A. Yes.
14   Q. Okay. Let's move down to the portion
15 that deals with your work experience at Henry
16 Schein. I think it starts on the bottom of the
17 first page there. It says that you worked there
18 for roughly eight years. Is that accurate?
19   A. That seems about right.
20   Q. Okay. When did you create your
21 LinkedIn page?
22   A. I don't remember when I created it.
23   Q. It says here that your work for Henry
24 Schein was in Greenville, South Carolina. Is

Page 19

1 that where you were working when you worked for
2 them?
3   A. Part of the time that I worked for
4 them it was in Greenville.
5   Q. What period of time did you spend in
6 Greenville?
7   A. It was my last year with the company.
8   Q. Your last year.
9     Where were you before that?
10   A. I was in Melville, Long Island.
11   Q. In New York?
12   A. In New York.
13   Q. Okay. What year did you move to
14 Greenville?
15   A. I believe it was 2011.
16   Q. Okay. On the second page of your
17 LinkedIn page it lists -- the top of the second
18 page, it says "Senior Regulatory Specialist -
19 DEA Compliance," and it's listed there from June
20 of 2004 to August of 2012, if I can read that
21 correctly. Is that accurate?
22   A. That's what it says there. I started
23 in June of 2004. I wasn't handling anything
24 with DEA compliance that I recall in 2004.

Page 20

1   Q. Okay. The first time you started
2 handling DEA compliance, was that 2007?
3   A. I don't remember the exact year.
4   Q. If we go back to the first page, I'm
5 sorry we're fumbling through this a little bit,
6 there's a summary of your work experience, and
7 it lists on the bottom that you were a
8 regulatory associate from 2004 to 2007. Does
9 that sound right?
10   A. That seems about right. I don't
11 specifically recall those dates, but...
12   Q. When you drafted your LinkedIn page,
13 did you make an effort to make sure it was
14 accurate?
15     MS. MILLER: Object to form.
16   A. I don't recall doing anything to
17 intentionally not be accurate, but I don't spend
18 much time on LinkedIn or use LinkedIn very
19 often.
20 BY MR. ELSNER:
21   Q. Okay. Above that you listed
22 "Regulatory Specialist - DEA Compliance" from
23 2007 to 2012. Does that -- is that accurate?
24   A. That's what it says there. Again, I

Page 21

1 don't specifically recall the dates where I
2 started the position, but that's what it says.
3   Q. Okay. And then in 2012 you were a
4 senior regulatory specialist for DEA compliance,
5 is that right?
6   A. I know in 2012 I was a senior
7 regulatory specialist.
8   Q. Okay. And Henry Schein hired the
9 Buzzeo Group as consultants to work on the
10 suspicious order monitoring program for
11 controlled substances, is that right?
12     MR. MONTMINY: Objection. Outside the
13 scope.
14   A. I don't recall exactly why we hired
15 Buzzeo, if it was there specifically for SOM or
16 just general compliance.
17 BY MR. ELSNER:
18   Q. Do you know when Henry Schein hired
19 Buzzeo?
20   A. I don't recall.
21   Q. Do you know what Buzzeo -- what was
22 your understanding of what work Buzzeo was doing
23 for Henry Schein?
24     MR. MONTMINY: Objection. Outside the

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 scope.

2     A.  We worked with Buzzeo on general DEA

3 compliance issues, as I remember it.

4 BY MR. ELSNER:

5     Q.  Such as what?

6     A.  Inspections, SOM, anything that had to

7 do with DEA compliance.

8     Q.  Who specifically at Buzzeo did you

9 work with?

10     A.  There were a number of people.  I

11 can't recall everyone that I worked with at

12 Buzzeo.

13     Q.  You said that Buzzeo did work for

14 Henry Schein on their SOM program.  What type of

15 work did they do?

16     MR. MONTMINY:  Objection.  Outside the

17 scope.

18     A.  So I recall working with Buzzeo on --

19 I mean, I used to speak to Buzzeo for guidance

20 on lots of topics, not specific to SOM, but they

21 helped us develop the newer system, I guess,

22 that I was a part of.  That was part of the role

23 that they played.

24 BY MR. ELSNER:

Page 23

1     Q.  The newer system is a newer suspicious

2 order monitoring system for controlled

3 substances, is that what you mean?

4     A.  Yeah, it was either the newer or

5 enhanced system that was being worked on.

6     Q.  Were they -- what was --

7     A.  The enhanced system.

8     Q.  The enhanced system.

9     Did Buzzeo assist Henry Schein in

10 developing an algorithm for its suspicious order

11 monitoring program?

12     MR. MONTMINY:  Objection.  Outside the

13 scope.

14     A.  I believe so.

15 BY MR. ELSNER:

16     Q.  And did Buzzeo create training

17 materials and train employees at Henry Schein on

18 the suspicious order monitoring system?

19     A.  What exactly do you mean by

20 "training"?

21     Q.  Well, did they develop training

22 materials for Henry Schein to train their

23 employees on the suspicious order monitoring

24 system for controlled substances?

Page 24

1     A.  I don't recall any specific

2 documentation or training materials.

3     Q.  Did they come into Henry Schein and

4 offer training, seminars, or sessions with

5 employees at Henry Schein?

6     MR. MONTMINY:  Objection.  Outside the

7 scope.

8     A.  I recall at least one training.

9 BY MR. ELSNER:

10     Q.  Who did the training, do you recall?

11     A.  I don't recall who it was.

12     Q.  What work were you doing on the

13 suspicious order monitoring system at Henry

14 Schein for controlled substances?

15     A.  At which point are you referring to?

16     Q.  Walk me through from 2007 to 2012.

17     A.  I know in 2007, if that's when I

18 transitioned based on my LinkedIn page, I was

19 probably just learning.  And then by the end in

20 2012, my role was again -- specifically to SOM?

21     Q.  Yes.

22     A.  I was conducting site visits on

23 customers and reviewing orders that were flagged

24 by the SOM system.

Page 25

1     Q.  So as I understand it, the suspicious

2 order monitoring system would use an algorithm

3 to identify potentially suspicious orders, is

4 that generally accurate?

5     MS. MILLER:  Object to form.

6     A.  The suspicious order monitoring system

7 was a piece of the process used to identify

8 orders of interest, but that wasn't the only way

9 to identify orders.

10 BY MR. ELSNER:

11     Q.  And once orders were identified of

12 interest, did you have responsibility for

13 reviewing those orders to determine whether they

14 were potentially suspicious of diversion or not?

15     MS. MILLER:  Object to form.

16     A.  That was part of my responsibilities.

17 BY MR. ELSNER:

18     Q.  What would you do to do that when you

19 worked at Henry Schein?

20     A.  It all depended on the order.  There

21 were tons of approaches to take to review an

22 order.

23     Q.  Do you know what the criteria that

24 Henry Schein was using at that time, what its

Page 26

1 algorithm was pulling orders for to determine
2 whether they should be -- whether they should
3 have an enhanced review?
4     MR. MONTMINY: Objection. Form,
5 outside the scope.
6     A.  The specific logic used by the
7 algorithm, I didn't know that.  I knew at a high
8 level the system was looking for orders of
9 unusual size, buying pattern, or frequency.
10 BY MR. ELSNER:
11     Q.  When they identified those orders,
12 what were the tools that you used to determine
13 whether an order was -- should be further
14 investigated?
15     MS. MILLER: Object to form.
16     A.  There is no limitation on what I could
17 use.  Whatever information that was available to
18 me or that I could use, I did.
19 BY MR. ELSNER:
20     Q.  What information was available to you?
21 Were there databases that you could pull upon,
22 or was there order history you could review?
23 What were the items you could look at to
24 determine whether a particular order was worthy

Page 27

1 of enhanced investigation?
2     MR. MONTMINY: Objection. Form,
3 outside the scope.
4     A.  I can't remember everything that I
5 used.  Some of the things you mentioned were
6 data sources that we used.  It also included
7 phone calls or site visits or internet searches.
8 I mean, there were -- any resource that I could
9 use, I would -- was available.
10 BY MR. ELSNER:
11     Q.  Did you have databases that you could
12 pull upon, outside databases that you could pull
13 upon to search for information about particular
14 physicians?
15     MS. MILLER: Object to form.
16     A.  I'm not sure what you're referring to
17 by outside databases.
18 BY MR. ELSNER:
19     Q.  Well, you mentioned that you could
20 access information on the internet about people,
21 and you do research and internet searches.  So
22 what type of searches are we talking about?
23     A.  There were lots of searches.  One
24 example would be if it was a doctor's office, I

Page 28

1 would just Google the doctor office name.
2     Q.  Okay.  Anything else?
3     A.  There are lots of things.  Anything
4 that I would see or could research, I would do.
5     Q.  I appreciate there are lots of things,
6 but I need to get a more specific sense of what
7 you actually did.
8     So did you look to determine whether
9 they had a valid DEA license?
10     MS. MILLER: Object to form.
11     A.  That specifically was not my role.
12 BY MR. ELSNER:
13     Q.  Okay.  Did you look to see whether
14 they had a criminal background, or a criminal
15 history?
16     MS. MILLER: Object to form.
17     A.  I don't recall ever specifically
18 looking for that.
19 BY MR. ELSNER:
20     Q.  What determined whether you would make
21 a site visit to a particular doctor's office or
22 dentist's office or something else like that?
23     MS. MILLER: Object to form.
24     A.  I don't think there was one criteria

Page 29

1 that when I saw it I said, this needs a site
2 visit.
3 BY MR. ELSNER:
4     Q.  Well, you didn't visit every doctor's
5 office that was identified by the suspicious
6 order monitoring system, right?
7     A.  I don't believe so.
8     Q.  Okay.  So what were among the criteria
9 you would use to determine whether you were
10 going to conduct a site visit?
11     MR. MONTMINY: Object to form.
12 Outside the scope.
13     A.  There's lots of situations that would
14 cause me to do a site -- there is not one or
15 two, but there were lots.
16 BY MR. ELSNER:
17     Q.  Well, give us some examples.
18     A.  If there was -- if I felt that an
19 order was significantly higher than someone's
20 previous order.
21     Q.  What would make it significantly
22 higher?
23     A.  I don't know.  Determination at the
24 time.

Page 30

1   Q.  How far back in the order history
2  would you look to determine whether this
3  particular order was significantly higher than
4  prior orders?
5      MR. MONTMINY: Objection. Form,
6  outside the scope.
7   A.  I don't recall it.  I'm sure it was
8  different for every situation.
9  BY MR. ELSNER:
10  Q.  Was there a particular database at
11  Henry Schein that contained that information?
12  A.  We had a data warehouse.
13  Q.  What data was contained in the data
14  warehouse that you used to conduct your
15  suspicious order monitoring review?
16     MR. MONTMINY: Objection. Form.
17  A.  I don't recall everything that I
18  pulled out of there.  I know order history was
19  one.
20  BY MR. ELSNER:
21  Q.  What else?
22  A.  I don't recall what else was in there.
23  Q.  Did you ever seek from a physician's
24  office information about their patients?

Page 31

1      MR. MONTMINY: Objection. Form,
2  outside the scope.
3   A.  I'm not sure what you mean by
4  information on patients.
5  BY MR. ELSNER:
6   Q.  Well, did you determine what kind of
7  physician the doctor was and what kind of
8  patients the physician was providing services
9  to?
10     MR. MONTMINY: Objection. Form,
11  outside the scope.
12  A.  Part of when I spoke to a physician I
13  would ask what their practice was, and typically
14  I get a high level what are your visits like
15  with patients.  I never got to details.
16  BY MR. ELSNER:
17  Q.  When you say high level what were your
18  visits like with patients, you'd ask them how
19  long they'd spend with a patient?
20     MS. MILLER: Object to form.
21  A.  Not specifically.  Every conversation
22  with a doctor was different.  But I'd ask how
23  many patients you'd seen, as an example, but
24  every conversation was different.

Page 32

1  BY MR. ELSNER:
2   Q.  How long do those calls generally
3  last?
4      MR. MONTMINY: Objection. Form,
5  outside the scope.
6   A.  Every call was a different length.
7  BY MR. ELSNER:
8   Q.  Every call was unique and completely
9  different?  You never asked the same question,
10  you never had a set of questions that you were
11  sure to follow up with with each physician?
12     MR. MONTMINY: Objection. Form.
13  A.  I believe there are guidelines that I
14  used, but every call was unique.
15  BY MR. ELSNER:
16  Q.  So other than how many patients the
17  doctor had seen, what else would you ask?
18     MR. MONTMINY: Objection. Form,
19  outside the scope.
20  A.  It all depends on why I was following
21  up on the order.
22  BY MR. ELSNER:
23  Q.  Did you ever ask for dispensing
24  history from a physician's office?

Page 33

1      MR. MONTMINY: Objection. Form.
2   A.  I don't recall.
3  BY MR. ELSNER:
4   Q.  Did you ever ask whether that
5  physician was ordering controlled substances
6  from other wholesale distributors?
7      MR. MONTMINY: Objection. Form.
8   A.  I might have.  I don't specifically
9  remember.
10  BY MR. ELSNER:
11  Q.  What else do you remember about what
12  you'd ask physicians for?
13     MR. MONTMINY: Objection. Form.
14  A.  Again, it all depended on why I was
15  conducting the order.
16  BY MR. ELSNER:
17  Q.  When you were going to do a site
18  visit, what was it that you were looking for?
19     MR. MONTMINY: Objection. Form.
20  A.  It all depends on why I decided to do
21  the site visit.
22  BY MR. ELSNER:
23  Q.  Give me an example, any example.
24  A.  At a high level I was looking to see

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 that they were a legitimate physician.
2    Q. How did you do that?
3    MS. MILLER: Object to form.
4    A. Doing a site visit and speaking with
5 the doctor or, like I said, Google searches and
6 reviews. I mean, there was tons of resources.
7 BY MR. ELSNER:
8    Q. Did you look at dispensing history
9 from those physicians' offices? When you
10 conducted a site visit, would you ask to see
11 their dispensing records?
12    MR. MONTMINY: Object to form.
13 Outside the scope.
14    A. I don't recall ever asking to see
15 dispensing records.
16 BY MR. ELSNER:
17    Q. There came a time when you -- strike
18 that.
19    Buzzeo had annual conferences for
20 controlled substances, is that right?
21    A. I believe they were annual.
22    Q. And you attended some of those?
23    A. Yes.
24    Q. How many of them did you attend?

Page 35

1    A. I don't recall.
2    Q. More than one?
3    A. I attended more than one.
4    Q. How many?
5    MS. MILLER: Object to form.
6 BY MR. ELSNER:
7    Q. Five?
8    MS. MILLER: Object to form.
9    A. I don't recall the exact number.
10 BY MR. ELSNER:
11    Q. They had a conference at the Crystal
12 Gateway Marriott in Arlington, Virginia in
13 October of 2008. That was the sixth one. Did
14 you attend that one in 2008?
15    MS. MILLER: Object to form.
16    A. I don't specifically remember the
17 year, but it's possible.
18    MR. ELSNER: We'll mark this document
19 as Exhibit 2.
20    (Whereupon, CVS-Schiavo-2 was marked
21    for identification.)
22 BY MR. ELSNER:
23    Q. This is MR 98.
24    MS. MILLER: One copy is for me. You

Page 36

1 keep that one.
2    MR. MONTMINY: Do you have an extra
3 copy of that?
4 BY MR. ELSNER:
5    Q. Mr. Schiavo, I placed before you a
6 series of e-mails. And if you start on the
7 bottom e-mail on the first page, which is
8 495778, you are among the recipients of this
9 e-mail from Leslie Lowry. Do you see your name
10 there?
11    A. Yes.
12    Q. And this relates to the "8th Annual CS
13 Conference - Agenda & Speaker Information," is
14 that right?
15    A. That's what the subject says.
16    Q. Do you know who Leslie Lowry is?
17    A. I don't remember exactly what her role
18 was. I do remember having conversations and
19 talking with her.
20    Q. And she's with the Buzzeo Group, is
21 that right?
22    A. She -- at that time it looks like they
23 were Cegedim, but...
24    Q. Previously they were the Buzzeo Group,

Page 37

1 they changed names?
2    A. As I understand it, yes.
3    Q. And it attaches an agenda to the 8th
4 Annual Controlled Substances Conference, is that
5 right?
6    A. That's what it says.
7    Q. Okay. And if you look at the
8 conference schedule, you're listed as a speaker
9 at this conference, is that right?
10    A. Which page are we looking at?
11    Q. If we start toward the back, 495784.
12    A. It has me listed as a speaker.
13    Q. Okay. And then there you're listed --
14 your title on this is "Regulatory Specialist/DEA
15 Compliance, Henry Schein," correct?
16    A. That's what it says.
17    Q. Was that accurate?
18    A. I don't have reason to believe it
19 wasn't accurate.
20    Q. Okay. And it appears that you're on
21 two back-to-back panels, one from 4 to 4:45, and
22 then on the second panel on SOM compliance,
23 you're listed at the top of the following page
24 at 495785, is that right?

Page 38

1   A.  I see that.
2   Q.  Did you speak at this conference?
3   A.  I don't remember it to be the 8th, but
4 I did speak at a Buzzeo conference, yes.
5   Q.  Did you do it one time, or did you do
6 it more than once?
7   A.  I remember speaking at one Buzzeo
8 conference.
9   Q.  Could it have been more?
10   MS. MILLER:  Object to form.
11   A.  When you say "speak," you mean
12 present?
13 BY MR. ELSNER:
14   Q.  Well, let's start with present.  Did
15 you present at more than one conference?
16   A.  I don't believe I presented at more
17 than one conference.
18   Q.  Did you otherwise speak at more than
19 one conference?
20   A.  While at the conference I've had
21 conversation with colleagues.
22   Q.  I meant in a public way.
23   A.  No.
24   Q.  Was there a reason that you asked me

Page 39

1 whether you -- you seem to define my term of
2 presentation to speak or not, so was there a
3 reason that you did that?
4   MS. MILLER:  Object to form.
5   A.  I just want to make sure I answered
6 your question.
7 BY MR. ELSNER:
8   Q.  And I want to make sure I've exhausted
9 your participation in these conferences.  Did
10 you -- other than speak at this particular
11 conference, did you otherwise participate in the
12 conference in any other way than as an observer,
13 if you attended others?
14   MS. MILLER:  Object to form.
15   A.  Aside from speaking at this one
16 conference, that was the only time I can recall
17 being asked to contribute anything to the
18 conference.
19 BY MR. ELSNER:
20   Q.  Who asked you to speak?
21   A.  I don't remember who originally asked
22 me to speak.
23   Q.  Do you know why they asked you to
24 speak?  What did they tell you?

Page 40

1   MS. MILLER:  Object to form.
2   A.  I don't remember the specific
3 conversation where they asked me to speak.
4 BY MR. ELSNER:
5   Q.  This is the 8th Annual Controlled
6 Substance Conference.  Had you attended any
7 conferences before this conference where you
8 were asked to speak?
9   MS. MILLER:  Object to form.
10   A.  Not that I recall.
11 BY MR. ELSNER:
12   Q.  So they asked you to speak at the very
13 first conference you attended, is that your
14 testimony?
15   MS. MILLER:  Object to form.
16   A.  That's not my testimony.  I don't
17 recall if this was the first one that I went to.
18 BY MR. ELSNER:
19   Q.  Did you have a -- when you attended
20 these conferences, did you keep any of the
21 materials from the conferences you attended?
22   MS. MILLER:  Object to form.
23   A.  Did I keep them for -- I'm sure I
24 brought materials home with me.

Page 41

1 BY MR. ELSNER:
2   Q.  What would you do with them when you
3 brought them home?
4   MS. MILLER:  Object to form.
5 BY MR. ELSNER:
6   Q.  Did you save them at your office?
7 Would you save them at home?  What would you do
8 with them?
9   A.  I don't recall.
10   MS. MILLER:  Object to form.
11 BY MR. ELSNER:
12   Q.  Do you have a file of all these
13 materials at your office or at home?
14   MS. MILLER:  Object to form.
15   A.  Are you asking presently, or at the
16 time of the conference?
17 BY MR. ELSNER:
18   Q.  Let's say at the time of the
19 conferences when you were at Henry Schein, did
20 you keep a file of the conferences that you
21 attended at your office or at home?
22   MS. MILLER:  Object to form.
23   A.  I don't recall.
24 BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.  What about today, do you have a file
2  of the conferences that you attend or the
3  conferences that you've spoken at either at your
4  office or at your home?
5         MS. MILLER:  Object to form.
6    A.  I know I have a copy of a
7  presentation.  I don't recall having any other
8  documentation from previous conferences.
9  BY MR. ELSNER:
10    Q.  So when I speak at a conference, a lot
11  of times I'll write out what I'm going to say
12  and sometimes I'll prepare a PowerPoint and I
13  have one of each.  Did you do the same thing, or
14  do you just have a copy of the PowerPoint?
15         MS. MILLER:  Object to form.
16    A.  I honestly don't recall how I prepared
17  or what I prepared for speaking.
18  BY MR. ELSNER:
19    Q.  Let me show you what we've marked as
20  Exhibit 3.
21         (Whereupon, CVS-Schiavo-3 was marked
22         for identification.)
23  BY MR. ELSNER:
24    Q.  This is a copy of a PowerPoint

Page 43

1  presentation.  Do you see on the top left-hand
2  side it says "8th Annual Controlled Substance
3  Conference"?  Did I read that correctly?
4    A.  I see that.
5    Q.  And the title of the PowerPoint is
6  "The Challenge to 'Know Your Customer' and Best
7  Practices."  Did I read that right?
8    A.  You read that right.
9    Q.  Okay.  And then it lists "Craig
10  Schiavo, Regulatory Specialist/DEA Compliance,
11  Henry Schein, November 2010."  Did I read that
12  right?
13    A.  You read that correctly.
14    Q.  Did you create this PowerPoint
15  presentation?
16         MR. MONTMINY:  Objection.  Form.
17         Counsel, could I ask, there's no Bates
18  numbers on this document, do you know where this
19  came from?
20         MR. ELSNER:  Yes, we'll get you the
21  Bates number.
22         MS. MILLER:  So this wasn't
23  produced --
24         MR. ELSNER:  It was produced by Henry

Page 44

1  Schein, and it was produced in native, so we'll
2  get you the Bates number for that.
3    A.  I'm sorry, can you just repeat the
4  question?
5  BY MR. ELSNER:
6    Q.  I asked if I created this PowerPoint
7  presentation.
8    A.  Can I look through it?
9    Q.  Sure.
10         (Witness reviewing document.)
11    A.  I recall giving input on it.
12    Q.  What input?  Did you assist in
13  providing the information to someone to create
14  the slides?
15    A.  At some point I might have.
16    Q.  Well, is this the PowerPoint you used
17  for your presentation at this conference?
18         MR. MONTMINY:  Objection.  Form.
19    A.  I'm not sure if this is the exact
20  presentation.
21  BY MR. ELSNER:
22    Q.  Does it look like it is?
23         MR. MONTMINY:  Objection.  Form.
24  BY MR. ELSNER:

Page 45

1    Q.  Do you have reason to believe that
2  it's not?
3         MR. MONTMINY:  Objection.  Form.
4    A.  I don't have reason to believe that
5  it's not, but I don't remember this whole
6  presentation.
7  BY MR. ELSNER:
8    Q.  If you turn to Page 3 of the
9  presentation, there's an overview of Henry
10  Schein.  It says "Henry Schein - Over 75 Years
11  of Quality Service."  Do you see that?  Did I
12  read that correctly?
13    A.  You read that correctly.
14    Q.  Okay.  And the second bullet -- or the
15  first bullet, it says that "Henry Schein is the
16  largest distributor of healthcare products and
17  services to office-based practitioners."  Did I
18  read that correctly?
19    A.  You read that correctly.
20    Q.  Was that true --
21         MR. MONTMINY:  Object to form.
22  BY MR. ELSNER:
23    Q.  -- at the time?
24    A.  It says it there.

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1   Q.  You didn't intend to put misleading
2  information in the PowerPoint, right?
3       MR. MONTMINY:  Object to form.
4       MS. MILLER:  Object.
5  BY MR. ELSNER:
6   Q.  Correct?
7   A.  I don't think I would put misleading.
8   Q.  In the second bullet it says that
9  Henry Schein has 700,000 customers worldwide and
10  386,000 domestic customers, is that right?
11       MR. MONTMINY:  Objection.  Form.
12   A.  I don't recall those numbers.
13  BY MR. ELSNER:
14   Q.  That's the presentation that you gave
15  at this conference, though, is that right?
16       MR. MONTMINY:  Objection.  Form.
17   A.  That's what it says in the deck.
18  BY MR. ELSNER:
19   Q.  It then says that "Customers include
20  dental practices and laboratories, physician
21  practices, and animal health clinics."  Is that
22  right?
23       MS. MILLER:  Object to form.
24   A.  That's what it says.

Page 47

1  BY MR. ELSNER:
2   Q.  Is that consistent with your
3  understanding of Henry Schein's customer base?
4       MR. MONTMINY:  Objection.  Form,
5  outside the scope.
6   A.  I do recall those being part of the
7  customer base.
8  BY MR. ELSNER:
9   Q.  If you turn to the next page, the top,
10  the heading on the top is "Why Due Diligence Is
11  Required," is that right?
12   A.  That's what it says.
13   Q.  And it refers to the December, 2007
14  letter from the DEA, is that right?
15   A.  That's what it says.
16   Q.  This is a reference to the letter that
17  was authored by Joseph Rannazzisi to all
18  manufacturers and distributors of controlled
19  substances, is that right?
20       MS. MILLER:  Object to form.
21   A.  As I recall, that's the letter.
22  BY MR. ELSNER:
23   Q.  Okay.  And you had seen that letter,
24  obviously, before with your work at Henry

Page 48

1  Schein, is that right?
2       MS. MILLER:  Object to form.
3   A.  I had seen that letter while at Henry
4  Schein.
5  BY MR. ELSNER:
6   Q.  Okay.  And that letter refers to, and
7  in your first bullet you quote, to "Design and
8  operate a system to disclose to the registrant
9  suspicious orders of controlled substances," and
10  then there's a citation.  You understand that to
11  be a citation to the Controlled Substances Act,
12  is that right?
13       MR. MONTMINY:  Object to form.
14       MS. MILLER:  Object to form.
15   A.  I know that's straight out of the CFR.
16  BY MR. ELSNER:
17   Q.  Do you understand that that's part of
18  the Controlled Substances Act?
19       MS. MILLER:  Object to form.
20   A.  I know the CFR has regulations from
21  the DEA.
22  BY MR. ELSNER:
23   Q.  Did you know that the Controlled
24  Substances Act had been in place since 1970?

Page 49

1       MS. MILLER:  Object to form.
2   A.  I didn't know the exact date.
3  BY MR. ELSNER:
4   Q.  At the last bullet on this page, it
5  states "Suspicious orders include orders of
6  unusual size, orders deviating substantially
7  from a normal pattern, and orders of an unusual
8  frequency."  Did I read that correctly?
9       MR. MONTMINY:  Objection.  Form.
10   A.  You read that correctly.
11  BY MR. ELSNER:
12   Q.  Okay.  And this is also a quote from
13  the letter, the 2007 letter from the DEA
14  relating to reporting suspicious orders of
15  controlled substances, is that right?
16       MS. MILLER:  Object to form.
17   A.  Can you just repeat the question?
18  BY MR. ELSNER:
19   Q.  This is a quote from the December,
20  2007 letter from the DEA, is that right?
21       MS. MILLER:  Object to form.
22   A.  I see the quotes around it.  I don't
23  know if that's exactly from the letter.
24  BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    Q.   And the heading of this slide is the
2    December, 2007 letter from the DEA?
3        A.   That's what it says.
4        Q.   Do you understand that to be a quote
5    from the DEA letter?
6            MS. MILLER:  Object to form.
7        A.   I see what the title says.  I see the
8    quote.  I can't remember if I pulled that
9    directly out of the letter.
10   BY MR. ELSNER:
11       Q.   Well, you're familiar with the letter,
12   right?  You know that's what's in the letter
13   from the DEA in December of 2007?  You've seen
14   it before?
15           MS. MILLER:  Object to form.
16       A.   I read the letter.  I haven't read
17   that letter in a long time, I can't remember
18   every word in the letter, or every quote in the
19   letter.
20   BY MR. ELSNER:
21       Q.   That was a pretty important part of
22   the letter, though, from the DEA in December of
23   2007, wasn't it?
24           MS. MILLER:  Object to form.

Page 51

1            MR. MONTMINY:  Objection.
2        A.   It was part of the letter.
3    BY MR. ELSNER:
4        Q.   Here's the Exhibit 4 which is the
5    December 27, 2007 letter from the DEA.
6            (Whereupon, CVS-Schiavo-4 was marked
7            for identification.)
8    BY MR. ELSNER:
9        Q.   This is the letter that was sent to
10   every manufacturer and distributor of controlled
11   substances, is that right?
12           MS. MILLER:  Object to form.
13       A.   That's how I understood the letter.  I
14   don't know if I can confirm that was --
15   BY MR. ELSNER:
16       Q.   Is that what it says in the first
17   letter of the -- the first sentence of the
18   letter?  It says "This letter is being sent to
19   every entity in the United States registered
20   with the Drug Enforcement" Agency -- sorry --
21   "Administration to manufacture or distribute
22   controlled substances."  Is that what it says?
23       A.   That is what it says in the letter.
24       Q.   The next sentence says "The purpose of

Page 52

1    this letter is to reiterate the responsibilities
2    of controlled substance manufacturers and
3    distributors to inform DEA of suspicious orders
4    in accordance with 21 CFR 1301.74," is that
5    right?
6            MS. MILLER:  Object to form.
7    BY MR. ELSNER:
8        Q.   Is that what it says?
9        A.   That's what it says.
10       Q.   Okay.  And that's what you put in the
11   very first bullet in your presentation on
12   Page 4?
13           MR. MONTMINY:  Objection.  Form.
14       A.   That looks to be what I put.
15   BY MR. ELSNER:
16       Q.   Okay.  And if you look at the last
17   bullet on your presentation on Page 4,
18   "Suspicious orders include orders of unusual
19   size, orders deviating substantially from a
20   normal pattern, and orders of unusual
21   frequency."  Is that what you wrote?
22           MR. MONTMINY:  Object to form.
23           MS. MILLER:  Objection.  Form.
24       A.   That's what it says here.

Page 53

1    BY MR. ELSNER:
2        Q.   And if you go to the last paragraph of
3    the DEA letter from December 27, 2007 in the
4    first line, the last paragraph there.  Do you
5    see where I am, beginning "The regulation
6    specifically states"?  Are you with me?
7        A.   I'm with you.
8        Q.   It says "The regulation specifically
9    states that suspicious orders include orders of
10   unusual size, orders deviating substantially
11   from a normal pattern, and orders of unusual
12   frequency."  Is that what it says?
13       A.   That's what it says.
14       Q.   Okay.  And that's what's quoted on
15   Page 4 of your presentation?
16           MS. MILLER:  Object to form.
17       A.   That looks to align.
18   BY MR. ELSNER:
19       Q.   Turn to Page 5 of your presentation.
20   Actually, let me show you Exhibit 5 real quick.
21           (Whereupon, CVS-Schiavo-5 was marked
22           for identification.)
23   BY MR. ELSNER:
24       Q.   This is MR 5.

Page 54

1      MS. MILLER: What is the MR?

2      MR. ELSNER: It's our internal number

3  so she knows what exhibit.

4      MS. MILLER: For Motley Rice. I got

5  it.

6  BY MR. ELSNER:

7      Q. This is Exhibit 5 to the deposition.

8  This is a letter from the DEA dated

9  September 27, 2006.

10      Were you aware that the DEA had sent a

11  letter to distributors of controlled substances

12  the year prior to the December 27, 2007 letter?

13      MS. MILLER: Object to form.

14      Mike, was this produced in connection

15  with an e-mail, or is this the --

16      MR. ELSNER: This?

17      MS. MILLER: Yes.

18      MR. ELSNER: It was produced by CVS.

19      MS. MILLER: No, I understand. I

20  understand. But I'm just asking whether there

21  was a cover e-mail or if this is the whole

22  document.

23      MR. ELSNER: I don't know. I'm not

24  sure that it matters. I'm just referencing the

Page 55

1  DEA letter.

2      MS. MILLER: I just want to make sure

3  the document --

4      MR. ELSNER: She knows. That's why

5  she's asking.

6  BY MR. ELSNER:

7      Q. Could you refer to the letter? In

8  September -- the letter is dated September 27,

9  2006. Have you seen that?

10      MS. MILLER: Object to form.

11      A. I see the date on the letter.

12  BY MR. ELSNER:

13      Q. Okay. And have you ever seen this

14  letter before?

15      MS. MILLER: Object to form.

16  BY MR. ELSNER:

17      Q. Have you seen --

18      MS. MILLER: I object -- let me just,

19  I'm going to object based on attorney work

20  product to the extent the question calls for a

21  response that would reveal any documents shown

22  to the witness in prep, and instruct you not to

23  answer to the extent you would reveal any

24  communications during our time meeting in prep.

Page 56

1  BY MR. ELSNER:

2      Q. I can clarify this.

3      Were you aware when you gave this

4  presentation in the Buzzeo Group that the letter

5  that you were referencing, the December, 2007

6  letter from the DEA, was not the first letter

7  that had been sent to distributors of controlled

8  substances? Were you aware of that?

9      MS. MILLER: Object to form.

10      A. I don't recall at that time if I was

11  aware of that.

12  BY MR. ELSNER:

13      Q. Before you began preparation for

14  today's deposition in any fashion, while you

15  were working at CVS or while you were working at

16  Henry Schein, were you aware that the DEA had

17  sent a letter in September of 2006 to all

18  distributors of controlled substances?

19      MS. MILLER: Object to form.

20      Do you want to take a minute to look

21  at the letter?

22      A. Yeah, can I read the letter?

23  BY MR. ELSNER:

24      Q. You're welcome to look at it.

Page 57

1      (Witness reviewing document.)

2      MR. ELSNER: Why don't we go off the

3  record. If you're going to read the entire

4  letter into the record, I prefer we go off.

5  BY MR. ELSNER:

6      Q. Have you had enough time to look at

7  it?

8      MS. MILLER: I don't think we should

9  go off the record while the witness has an

10  opportunity to review the document. Are you

11  ready --

12      MR. ELSNER: Well, I have limited

13  time. If he's going to read every document in

14  full every time I ask a question, we're going to

15  go off the record.

16      MS. MILLER: He has a right to review

17  the document.

18      MR. ELSNER: He does. He can

19  generally familiarize himself with it. If you

20  prepped him on it a couple of days ago, he's

21  seen it before.

22      MS. MILLER: Object to form.

23  Objection to the statement on the record.

24  There's no statement by the witness, nor will

Page 58

1 there be, as to the documents he reviewed in
2 prep.
3          MR. ELSNER: I don't think he's
4 entitled to privilege here.
5 BY MR. ELSNER:
6    Q. Are you ready to answer the questions,
7 or do you need more time?
8    A. Specifically to your question of have
9 I seen this before?
10    Q. Yes.
11    A. I have not read the whole letter, but
12 this is not -- this doesn't look familiar to me.
13    Q. Okay. In the second sentence of the
14 letter it says "The purpose of this letter is to
15 reiterate the responsibilities of controlled
16 substance distributors in view of the
17 prescription drug abuse problem our nation
18 currently faces."
19          Were you aware that there is a
20 prescription drug abuse problem in the United
21 States?
22          MS. MILLER: Object to form.
23          MR. MONTMINY: Object to form.
24    A. Are you referring to in 2006 when I

Page 59

1 read --
2 BY MR. ELSNER:
3    Q. We can start in 2006 through today.
4    A. In 2006, I'm not sure if I was aware
5 of that.
6    Q. What about in 2007 through '12 while
7 you were working in DEA compliance at Henry
8 Schein?
9          MS. MILLER: Object to form.
10          MR. MONTMINY: Object to form.
11    A. I think I became aware that there are
12 people who have used drugs.
13 BY MR. ELSNER:
14    Q. When?
15    A. I'm not sure what you're asking.
16    Q. I'm asking are you aware, and if so
17 when, that there's a prescription drug abuse
18 problem that the nation currently faces? A
19 prescription drug abuse problem, not any type of
20 drug abuse.
21          MR. MONTMINY: Object to form.
22          MS. MILLER: Object to form.
23    A. Yeah, I'm aware that there are people
24 who abuse prescription drugs and other drugs and

Page 60

1 other substances. I'm aware of that.
2 BY MR. ELSNER:
3    Q. Are you aware that that was the reason
4 that the DEA was sending this letter in 2006 and
5 sending a follow-up letter in December of 2007?
6 Do you understand that that was the reason those
7 letters were being sent?
8          MS. MILLER: Object to form.
9    A. At the time of these letters, I don't
10 know.
11 BY MR. ELSNER:
12    Q. What about when you joined CVS, were
13 you aware of it then?
14          MS. MILLER: Object to form.
15    A. I'm aware that people abuse drugs,
16 that that happens.
17 BY MR. ELSNER:
18    Q. Are you aware that that's the purpose
19 behind the Controlled Substances Act and the
20 regulations that we're discussing?
21          MS. MILLER: Object to the form.
22    A. I don't think I know that's why they
23 wrote the Controlled Substances Act, no.
24 BY MR. ELSNER:

Page 61

1    Q. Were you aware that Congress had
2 expressly declared that the illegal distribution
3 of controlled substances has a substantial and
4 detrimental effect on the health and the general
5 welfare of the American people?
6          MS. MILLER: Object.
7 BY MR. ELSNER:
8    Q. Were you aware of that?
9          MS. MILLER: Object to form.
10    A. I'm not aware of that from Congress.
11 BY MR. ELSNER:
12    Q. Okay. This is in the third paragraph,
13 the last sentence, do you see where I'm at,
14 "Congress has expressly declared"?
15    A. I'm sorry, where is it?
16    Q. It's in the third paragraph in the
17 last sentence. It says "This responsibility is
18 critical, as Congress has expressly declared
19 that the illegal distribution of controlled
20 substances has a substantial and detrimental
21 effect on the health and general welfare of the
22 American people." Were you aware of that?
23          MS. MILLER: Object to form.
24    A. I see that written in the letter.

Page 62

1 This is my first time seeing this -- or
2 recalling seeing this letter.
3 BY MR. ELSNER:
4    Q.  If you turn back to your presentation,
5 which is Exhibit 3, the PowerPoint presentation.
6 It has in the next -- on Page 5 there's a title
7 that says October 2009 Meeting with the DEA.  Do
8 you see that?
9    A.  On Page 5.
10    Q.  The heading.
11    A.  I see that.
12    Q.  Okay.  Did I read that accurately?
13    A.  "October 2009 meeting with DEA."
14    Q.  And this refers to a meeting that
15 Henry Schein had with the DEA in New York, is
16 that right?
17        MR. MONTMINY:  Objection.  Form.
18    A.  I don't remember exactly when that
19 meeting took place, but I know that we had a
20 meeting with the DEA.
21 BY MR. ELSNER:
22    Q.  Did you attend that meeting?
23    A.  I attended that meeting.
24    Q.  That was in Long Island?

Page 63

1    A.  Yes, that was on Long Island.
2    Q.  And in the first bullet here, you --
3 it states "Reiterated what was documented in the
4 December 2007 letter."  That refers to the DEA
5 letter of December of 2007 that we were
6 discussing, is that right?
7        MS. MILLER:  Object to form.
8    A.  Although I don't specifically recall
9 that, it makes sense that that's what it's
10 referring to.
11 BY MR. ELSNER:
12    Q.  Okay.  And then next it says "Advised
13 what was expected of HSI as a distributor of
14 controlled substances."  This is the DEA
15 advising Henry Schein as to what is expected as
16 a distributor of controlled substances.  Was
17 that part of the discussion?
18    A.  I don't exactly remember the full
19 conversation with the DEA, but that's what it
20 says there.
21    Q.  Okay.  It says here that there was a
22 binder provided by the DEA which contained
23 regulations, case studies, and ARCOS
24 information.  Did the DEA provide Henry Schein

Page 64

1 with these materials in the DEA meeting?
2        MR. MONTMINY:  Objection to form.
3 Outside the scope.
4    A.  I remember getting a binder during
5 that meeting, or binders being provided.
6 BY MR. ELSNER:
7    Q.  Where did you keep those at Henry
8 Schein, if you kept them?
9        MR. MONTMINY:  Objection.  Form,
10 outside the scope.
11    A.  I don't remember where those were
12 maintained.
13 BY MR. ELSNER:
14    Q.  Did you maintain them, or did somebody
15 else that attended the meeting take them with
16 them?
17        MR. MONTMINY:  Objection.  Form,
18 outside the scope.
19    A.  I really don't recall.
20 BY MR. ELSNER:
21    Q.  Who else was there from Henry Schein
22 other than you?
23        MR. MONTMINY:  Objection.  Form,
24 outside the scope.

Page 65

1    A.  The only other individuals I
2 specifically recall being there were Len David
3 and Sergio Tejeda.
4    Q.  Who is Sergio Tejeda?
5        MR. MONTMINY:  Objection to form.
6    A.  He was my manager at the time.
7 BY MR. ELSNER:
8    Q.  In the last -- do you recall what was
9 in the binder other than what's listed here?
10    A.  I don't recall all this being listed
11 being in the binder.  I see it says it there.  I
12 don't recall -- if this was it, I don't recall
13 what else was in there.
14    Q.  In the last bullet it says "Put HSI on
15 notice."  Is that what it says?
16    A.  That is what it says.
17    Q.  And that was to put Henry Schein on
18 notice of its obligations with respect to the
19 distribution of controlled substances, is that
20 right?
21        MR. MONTMINY:  Objection.  Form.
22    A.  I'm not exactly sure what I meant by
23 that.
24 BY MR. ELSNER:

Page 66

1    Q.   You're not sure what you meant by "Put
2  HSI on notice"?  Is there anything else they
3  could have put you on notice about that came up
4  in that meeting?
5        MS. MILLER:  Object to form.
6        MR. MONTMINY:  Object to form.
7    A.   I don't recall.
8  BY MR. ELSNER:
9    Q.   But that's what you wrote, is that
10  right?
11        MR. MONTMINY:  Object to form.
12    A.   Again, I don't know if I wrote that,
13  but that's what it says in here.
14  BY MR. ELSNER:
15    Q.   That's in the presentation you gave,
16  is that right?
17        MS. MILLER:  Object to form.
18        MR. MONTMINY:  Object to form.
19    A.   I don't know if this is the exact
20  presentation I gave, but that is in this
21  presentation that we're reviewing.
22  BY MR. ELSNER:
23    Q.   You have no reason to believe that
24  it's not in the presentation that you gave to

Page 67

1  everyone that attended this conference, is that
2  right?
3        MR. MONTMINY:  Objection.  Form.
4    A.   If you're saying that's what this is,
5  I don't have reason to believe that it isn't,
6  but I don't recall this being the exact
7  presentation.
8  BY MR. ELSNER:
9    Q.   If you turn to the -- let me ask one
10  other question.
11        Who asked for the meeting?  Did Henry
12  Schein ask for the meeting with the DEA, or did
13  the DEA ask to meet with Henry Schein?
14        MR. MONTMINY:  Objection.  Form,
15  outside the scope.
16    A.   I believe the DEA asked for this
17  meeting.
18  BY MR. ELSNER:
19    Q.   Okay.  Do you understand why the DEA
20  asked for the meeting?
21        MS. MILLER:  Object to form.
22    A.   I don't know if I ever knew the exact
23  reason why.
24  BY MR. ELSNER:

Page 68

1    Q.   If you turn to the next page of the
2  PowerPoint, this is "HSI SOM Implementation
3  Challenges."  Is that what the heading says?
4    A.   That is what the heading says.
5    Q.   Okay.  One of the challenges that
6  Henry Schein faced from a suspicious order
7  monitoring point of view was the amount of
8  customers that they had, which is listed in the
9  second bullet, right?  It says "Amount of
10  customers (386,000 total/36,300 purchase
11  controls)."
12        What does purchase controls refer to?
13        MR. MONTMINY:  Objection.  Form,
14  compound.
15    A.   I'm not exactly sure.
16  BY MR. ELSNER:
17    Q.   One of the challenges that Henry
18  Schein faced in its suspicious order monitoring
19  program was the number of customers that it had,
20  is that correct?
21        MR. MONTMINY:  Objection.  Form,
22  outside the scope.
23    A.   It's documented there as a challenge.
24  BY MR. ELSNER:

Page 69

1    Q.   And it says it had a "Vast/complicated
2  customer base (Dental/Mental/Vet)," right?
3        MS. MILLER:  Object to form.
4        MR. MONTMINY:  Objection.  Form.
5    A.   That is what it says.
6  BY MR. ELSNER:
7    Q.   In the fourth bullet, one of the
8  challenges in the SOM implementation at Henry
9  Schein was a "Lack of resources."  Is that what
10  it says?
11        MR. MONTMINY:  Objection.  Form.
12    A.   That is what it says.
13  BY MR. ELSNER:
14    Q.   Lack of resources to do due diligence
15  on new accounts, correct?
16        MR. MONTMINY:  Objection.  Form.
17    A.   That's what it says.
18  BY MR. ELSNER:
19    Q.   To review pending accounts, is that
20  right?
21        MR. MONTMINY:  Objection.  Form,
22  outside the scope.
23    A.   That's what it says.
24  BY MR. ELSNER:

Page 70

1    Q.   And a lack of resources for site
2  visits, correct?
3        MR. MONTMINY: Objection. Form,
4  outside the scope.
5    A.   That is what it says.
6  BY MR. ELSNER:
7    Q.   Okay.  One of the other implementation
8  challenges for the SOM program under
9  "Sales/Field Sales Representatives" in the
10  second bullet says a "Conflict of interest?"
11       What are you referring to there?
12       MR. MONTMINY: Objection. Form,
13  outside the scope.
14    A.   I don't know exactly what I meant when
15  I put that.
16  BY MR. ELSNER:
17    Q.   Was there a conflict of interest
18  between those who were trying to sell products
19  and obtain new customers for controlled
20  substances versus compliance?
21       MR. MONTMINY: Objection. Form,
22  outside the scope.
23    A.   I guess there could be, but I guess --
24  I think that depends on the person, but again I

Page 71

1  don't know exactly what I was referring to here.
2  BY MR. ELSNER:
3    Q.   Is that a potential conflict of
4  interest that could exist within a company
5  related to the monitoring for suspicious orders
6  of controlled substances?
7        MR. MONTMINY: Objection. Form.
8    A.   I don't know.  I know specifically at
9  Henry Schein that was not a concern of mine.
10  BY MR. ELSNER:
11    Q.   But you wrote "Sales/Field
12  Representatives Conflict of Interest."  Is that
13  what you wrote?
14       MR. MONTMINY: Object to form.
15    A.   That's what this document says.
16  BY MR. ELSNER:
17    Q.   It also says one of the implementation
18  challenges is "Cooperation from customers,"
19  correct?
20       MR. MONTMINY: Objection. Form.
21    A.   That's what it says.
22  BY MR. ELSNER:
23    Q.   What did you mean by that?
24       MS. MILLER: Objection. Form.

Page 72

1    A.   Again, I don't know exactly what I
2  meant when I put this together.
3  BY MR. ELSNER:
4    Q.   Well, did you have any difficulties in
5  the Henry Schein customers that you were
6  interacting with to obtain information from them
7  in order that you can conduct your due
8  diligence?
9        MR. MONTMINY: Objection. Form.
10    A.   I can't remember any specific
11  examples, but every interaction with the
12  prescriber was different.  Some were easier to
13  work with than others.
14  BY MR. ELSNER:
15    Q.   You don't recall a single instance
16  where there was a client at Henry Schein where
17  you had requested information and they were not
18  cooperating fully with your request for the
19  information?
20       MR. MONTMINY: Objection. Form.
21    A.   I can't recall a time where we had a
22  customer who -- I mean, I recall there being
23  difficult conversations with customers.  I don't
24  recall any situations where I couldn't get what

Page 73

1  I needed to conduct due diligence.
2  BY MR. ELSNER:
3    Q.   Do you recall conversations with
4  clients that were angry or frustrated that Henry
5  Schein had not distributed or sold a controlled
6  substance to them?
7        MR. MONTMINY: Objection. Form,
8  outside the scope.
9    A.   I don't remember any specific
10  conversations.
11  BY MR. ELSNER:
12    Q.   Do you recall that there were
13  physicians that Henry Schein was distributing
14  drugs to, some of whom were self-medicating?
15       MR. MONTMINY: Objection. Form,
16  outside the scope.
17    A.   I don't recall any specific prescriber
18  that we knew that was self-medicating that we
19  would distribute to.  I believe -- sorry.
20  BY MR. ELSNER:
21    Q.   Sorry, I didn't mean to interrupt.  I
22  thought you were done.
23    A.   I believe our process or our policy
24  was not to distribute to self-medicating.

Page 74

1    Q.  Why?
2        MR. MONTMINY: Objection. Form,
3  outside the scope.
4    A.  That was our policy. I don't think I
5  wrote the policy.
6  BY MR. ELSNER:
7    Q.  It's because the drugs are highly
8  addictive, right?
9        MR. MONTMINY: Objection. Form,
10 argumentative.
11   A.  Not necessarily.
12 BY MR. ELSNER:
13   Q.  You don't understand a controlled
14 substance to be potentially highly addictive?
15       MS. MILLER: Object to form.
16       MR. MONTMINY: Object to form.
17   A.  I know that some controlled substances
18 can be addictive.
19 BY MR. ELSNER:
20   Q.  If you turn to the next page in your
21 presentation under "Henry Schein's Suspicious
22 Order Monitoring" on Page 7. Do you see where
23 I'm at?
24       MR. MONTMINY: Objection. Form.

Page 75

1    A.  I see where you're at.
2  BY MR. ELSNER:
3    Q.  And there's a title there about
4  "Active Ingredients," is that right?
5    A.  I see that.
6    Q.  It says "All quantities and values
7  calculated and used in this system are at the
8  active ingredient level." What does that mean?
9    A.  I believe that's looking at both brand
10 name and generic drugs if they had the same
11 active ingredient.
12   Q.  So Henry Schein had a -- as a
13 component of its suspicious order monitoring
14 program was measuring drugs it was selling by
15 active ingredient, is that right?
16       MS. MILLER: Object to form.
17   A.  Can you just ask that one more time,
18 please?
19 BY MR. ELSNER:
20   Q.  So Henry Schein had as a component of
21 its suspicious order monitoring program a system
22 to measure drugs it was selling by active
23 ingredient?
24       MR. MONTMINY: Objection to form.

Page 76

1  Outside the scope.
2    A.  Drugs that were ordered, we took
3  active ingredient into account.
4  BY MR. ELSNER:
5    Q.  So that you understood that if
6  somebody ordered two different drugs' names, but
7  they had the same active ingredient, you could
8  calculate those two together to understand the
9  total amount of that substance they were
10 ordering, isn't that the purpose?
11       MS. MILLER: Object to form.
12       MR. MONTMINY: Objection. Form.
13   A.  I don't recall what the exact purpose
14 is, but it was to see for that active ingredient
15 how much was being ordered.
16 BY MR. ELSNER:
17   Q.  And the only way to do that is to
18 measure by active ingredient, you couldn't do it
19 by drug name, correct?
20       MR. MONTMINY: Object to form.
21       MS. MILLER: Object to form.
22   A.  I don't know that to be the case.
23 BY MR. ELSNER:
24   Q.  When did Henry Schein have a system in

Page 77

1  place -- you gave this presentation in November
2  of 2010. When did Henry Schein have a system in
3  place to calculate drugs by active ingredient as
4  a component of its suspicious order monitoring
5  system?
6        MS. MILLER: Object to form.
7        MR. MONTMINY: Objection to form.
8  Outside the scope.
9    A.  I don't recall when that happened.
10 BY MR. ELSNER:
11   Q.  Well, it was in place in 2010, right?
12       MS. MILLER: Object to form.
13   A.  I don't recall.
14 BY MR. ELSNER:
15   Q.  That's what this presentation says,
16 right?
17       MS. MILLER: Object to form.
18   A.  It looks like that's what this is
19 indicating.
20 BY MR. ELSNER:
21   Q.  Do you know whether it was in the new
22 system that Henry Schein created or whether it
23 was in the existing system that Henry Schein
24 created when you arrived and took over these

Page 78

1 roles?
2     MR. MONTMINY: Objection. Form,
3 outside the scope.
4     A. I don't recall what -- prior to me
5 getting involved in this, I don't recall what
6 the old system had or used, but that was a
7 component of the new enhanced system that we
8 had.
9 BY MR. ELSNER:
10    Q. It was a component of the newer
11 enhanced system. And when did that come into
12 place?
13    MR. MONTMINY: Objection. Form,
14 outside the scope.
15    A. I don't recall.
16 BY MR. ELSNER:
17    Q. Well, was the enhanced system the
18 system that you were working on when you moved
19 into a new role at Henry Schein related to DEA
20 regulations in 2007?
21    MR. MONTMINY: Objection. Form,
22 outside the scope.
23    A. I'm not sure I understand the
24 question.

Page 79

1 BY MR. ELSNER:
2     Q. I'm trying to understand the time
3 frame. You said that there was a SOM system,
4 and then at Henry Schein there was an enhanced
5 SOM system. So I'm trying to understand the
6 time frame of when you were working on the
7 enhanced SOM system. That's part of what you
8 were working on, is that right?
9     MR. MONTMINY: Object to form.
10    MS. MILLER: Object to form.
11    A. At some point during my role we worked
12 on enhancing our SOM system.
13 BY MR. ELSNER:
14    Q. But at some time when, 2007, '8, '9?
15    A. I really don't recall.
16    Q. That's part of what you were working
17 on was the enhanced system, though, when you
18 moved into that position in 2007, is that right?
19    MR. MONTMINY: Objection. Form.
20    A. I don't recall what I was doing when I
21 went into that position.
22 BY MR. ELSNER:
23    Q. Well, what's your best memory of what
24 system was in place when you moved into that

Page 80

1 position in 2007 and when you were working on
2 the enhanced system?
3     MR. MONTMINY: Objection. Form.
4     A. I really don't recall much about the
5 old system, and I don't remember.
6 BY MR. ELSNER:
7     Q. Did you work on the enhanced system?
8     A. I was part of a team that worked on
9 the enhanced system.
10    Q. Okay. What's your best estimate of
11 when you were doing that work?
12    MR. MONTMINY: Objection. Form.
13    A. I don't remember. Sometime when I
14 started the role.
15 BY MR. ELSNER:
16    Q. When you gave this presentation in
17 November of 2010, was the enhanced system fully
18 active or not?
19    MR. MONTMINY: Objection. Form.
20    A. I don't recall.
21    MR. ELSNER: I'm going to mark this
22 next document as Exhibit 6.
23    (Whereupon, CVS-Schiavo-6 was marked
24    for identification.)

Page 81

1 BY MR. ELSNER:
2     Q. This is MR 268. Do you see the first
3 page is a cover e-mail from you to three
4 individuals? Who are the three individuals that
5 you sent this e-mail to?
6     A. Len David, Mike DiBello, and Sergio
7 Tejeda.
8     Q. Who are they?
9     A. Sergio was my manager at the time.
10 Mike was -- I believe he was the director in
11 compliance who Sergio reported up to. And I
12 believe at the time Len David was our chief
13 compliance officer who Mike reported up to.
14    Q. This e-mail is dated October 20, 2009,
15 is that right?
16    A. That's what it says.
17    Q. The subject of the e-mail is "DEA
18 Meeting 10-21-09," is that right?
19    A. That's what it says.
20    Q. And it says "Len." This is you
21 writing. "Len, Attached please find the handout
22 we prepared for tomorrow's meeting with the
23 DEA." Is that right?
24    A. I don't recall writing this e-mail,

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 but that's what it says.

2 Q. Okay. And it's sent by you to these

3 individuals, correct?

4 A. It appears to be.

5 Q. And it attaches -- you see an

6 attachment, "DEA Meeting 10-21-09" on the little

7 image there on the first page, is that right?

8 A. Yes. I see that.

9 Q. It attaches a PowerPoint presentation

10 dated October 21, 2009, is that right?

11 A. That's what it says.

12 Q. And this is the PowerPoint

13 presentation you sent to the group?

14 A. If this is that attachment, then it

15 appears to be what I must have sent.

16 Q. Did you create this PowerPoint

17 presentation?

18 A. I don't recall this PowerPoint,

19 looking at the cover page.

20 Q. On the second page there's an overview

21 of Henry Schein's business, is that right?

22 A. That's what it appears to be.

23 Q. And if you turn to the third page of

24 the PowerPoint, it lists under "Active

Page 83

1 Ingredients" -- do you see where I'm at?

2 A. Yes.

3 Q. Okay. It says something strikingly

4 similar, "All quantities and values calculated

5 and used in this system are at the active

6 ingredient level," is that right?

7 MR. MONTMINY: Object to form.

8 A. That's what it says. So I don't

9 remember putting this document together, I don't

10 remember if there was input from our legal team,

11 so I would like to talk to my lawyer to see what

12 I can discuss or -- I don't remember this

13 document or the reason it being put together.

14 BY MR. ELSNER:

15 Q. Well, that's what's written in the

16 PowerPoint presentation, right, that under

17 Active Ingredients it says "All quantities and

18 values calculated and used in this system are at

19 the active ingredient level"? Is that what it

20 says?

21 MS. MILLER: Mike, let's take a break.

22 He's asked to confer. He's asked to confer

23 about privilege issues.

24 MR. ELSNER: All right. We'll go off

Page 84

1 the record. I generally do not -- the

2 conversation needs to be limited to privilege

3 issues and not a conversation about the

4 document.

5 MS. MILLER: Understood. Understood.

6 THE VIDEOGRAPHER: We're going off the

7 record at 9:29 a.m.

8 (Whereupon, a recess was taken.)

9 THE VIDEOGRAPHER: We're back on the

10 record at 9:42 a.m.

11 BY MR. ELSNER:

12 Q. Mr. Schiavo, before we broke I was

13 showing you the DEA PowerPoint presentation, and

14 we were looking at -- and the date of this is

15 October 21, 2009, and we were looking at the

16 third page under Henry -- the topic heading of

17 that page is "Henry Schein, Inc.'s Suspicious

18 Order Monitoring."

19 Do you see that?

20 A. I see that.

21 Q. Okay. And there's a topic here, it

22 says "Active ingredients," and it reads "All

23 quantities and values calculated and used in

24 this system are at the active ingredient level."

Page 85

1 Did I read that correctly?

2 A. That is what it says.

3 Q. Okay. So it's true, is it not, that

4 as of October of 2009 Henry Schein had a

5 suspicious order monitoring system in place that

6 tracked drugs by active ingredient?

7 MS. MILLER: Object to form.

8 A. That's the date of this presentation.

9 That's what it says. I don't remember exactly

10 when we started doing that, but that's what it

11 says.

12 BY MR. ELSNER:

13 Q. Okay. Meeting with the DEA was an

14 important event, right?

15 MR. MONTMINY: Objection to form.

16 A. We met with the DEA, they asked.

17 BY MR. ELSNER:

18 Q. But you recognize that to be an

19 important event?

20 MS. MILLER: Object to form.

21 A. I'm not sure what you mean by

22 important, but --

23 BY MR. ELSNER:

24 Q. Well, the DEA regulated Henry Schein's

Highly Confidential - Subject to Further Confidentiality Review

Page 86

distribution of controlled substances, correct?

1   A.  Henry Schein was a DEA registrant, and
2   there are certain regulations that as a
3   registrant we needed to follow.
4   Q.  And if you don't follow those
5   regulations, one of the things that the DEA can
6   do is remove your license to sell those drugs,
7   correct?
8       MS. MILLER:  Object to form.
9   A.  We have a DEA registration.  I know
10  there's penalties if you don't comply with
11  certain regulations.
12  BY MR. ELSNER:
13  Q.  And one of those penalties could be
14  suspending or removing the registrant's license,
15  correct?
16      MS. MILLER:  Object to form.
17  A.  I guess there's various degrees of
18  penalties.
19  BY MR. ELSNER:
20  Q.  But you understood those to be
21  included among them, correct?
22      MR. MONTMINY:  Objection to form.
23  A.  I mean, it's a DEA registration, so...

Page 87

1   BY MR. ELSNER:
2   Q.  Well, do you know or don't know
3   whether the DEA could revoke someone's license?
4       MS. MILLER:  Object to form.
5   A.  It's a DEA license.  That could be one
6   of the penalties.
7   BY MR. ELSNER:
8   Q.  Do you know, or are you just guessing?
9       MS. MILLER:  Object to form.
10  A.  I know that if you don't follow
11  certain DEA regulations there's various degrees
12  of penalties.
13  BY MR. ELSNER:
14  Q.  And it would be important for you,
15  wouldn't it, in meeting with the DEA that the
16  information that you told them was accurate,
17  right?
18      MR. MONTMINY:  Objection to form.
19  A.  I don't ever recall putting anything
20  together with the intent of being inaccurate.
21  BY MR. ELSNER:
22  Q.  Because -- and you were careful,
23  weren't you?
24      MS. MILLER:  Object to form.

Page 88

1   A.  I try to be careful.  But in terms of
2   this document, I don't remember putting it
3   together.
4   BY MR. ELSNER:
5   Q.  And the document says that as of this
6   date in October of 2009 that Henry Schein had a
7   suspicious order monitoring system in place that
8   calculated quantities and values using the
9   active ingredient level, correct?
10      MR. MONTMINY:  Objection.  Form.
11  A.  I see that it says that.
12  BY MR. ELSNER:
13  Q.  Okay.  And you understand that Henry
14  Schein did have such a system in place, is that
15  right?
16      MR. MONTMINY:  Objection.  Form.
17  A.  I understand at some point that was an
18  aspect of the system.
19  BY MR. ELSNER:
20  Q.  And you have no reason to believe that
21  this is inaccurate, that you told the DEA
22  something that was not actually truthful, is
23  that right?
24      MR. MONTMINY:  Objection.  Form.

Page 89

1   A.  I don't recall nor do I -- would I
2   intend to be inaccurate to the DEA, but
3   specifically to this, I don't remember putting
4   this together, I don't specifically know exactly
5   what it was referring to, so...
6   BY MR. ELSNER:
7   Q.  Here's what I'm trying to understand,
8   because given the way that your answers are to
9   me, it sounds like maybe you were telling the
10  DEA one thing that actually wasn't happening in
11  place at Henry Schein, is that true?
12      MR. MONTMINY:  Objection to form.
13  BY MR. ELSNER:
14  Q.  Or is it that you really, truthfully
15  try to make the information you told DEA as
16  accurate as possible?
17      MR. MONTMINY:  Objection.  Form.
18  A.  Speaking for me personally, I would
19  not try to be inaccurate.
20  BY MR. ELSNER:
21  Q.  Okay.  You would try to be truthful to
22  the DEA, right?
23  A.  I can speak for myself, yes, I would
24  try to be truthful.

Page 90

1    Q.   Okay.  So if you turn two pages later
2  to the same DEA presentation, it says "Henry
3  Schein, Inc.'s Suspicious Order Monitoring" on
4  the top.
5       Do you see that?
6    A.  I see that.
7    Q.  Okay.  And among the factors that the
8  model looks at at the end, it reads "The types
9  of indicators that the model will be looking for
10 are the customers monthly activity compared to
11 his:  Six month average, Twelve month average,
12 Twelve month maximum, Twenty-four month maximum,
13 and Other various trending factors."  Did I read
14 that correctly?
15   A.  That is what it says.
16   Q.  Okay.  So is it true that Henry Schein
17 had a system in place that you were monitoring a
18 customer's monthly purchases of controlled
19 substances based on the prior 6-month and prior
20 12-month average?
21      MR. MONTMINY:  Objection.  Form.
22   A.  At the time of this meeting, I cannot
23 remember exactly what the system was.
24 BY MR. ELSNER:

Page 91

1    Q.  But this is what was written and
2  presented to the DEA, correct?
3       MR. MONTMINY:  Objection.  Form.
4    A.  Based on that cover e-mail, this looks
5  like what was reviewed with the DEA.
6  BY MR. ELSNER:
7    Q.  And you wouldn't try to tell the DEA
8  something that was untrue, right?
9    A.  I would not intend to be untrue to the
10 DEA.
11   Q.  Okay.  So then it also says that the
12 system is looking at 12-month maximums and
13 24-month maximums, is that right?
14      MR. MONTMINY:  Objection.  Form.
15   A.  That's what it says.
16 BY MR. ELSNER:
17   Q.  Okay.  And then it says "Other various
18 trending factors."  What does other various
19 trending factors mean?
20   A.  I don't recall what that's referring
21 to.
22   Q.  Who at Henry Schein set the 12-month
23 max and the 24-month max?
24      MR. MONTMINY:  Objection.  Form,

Page 92

1  outside the scope.
2       MR. ELSNER:  Can you explain that
3  objection?  Because I don't understand it.
4       MR. MONTMINY:  Sure.  We can have a
5  running objection if you want, but essentially
6  he's here to speak in his personal capacity.
7  There was no notice provided to Schein that he
8  was a former employee and no opportunity to
9  prepare for this, and as of yet you haven't
10 asked a single question about CVS.
11      MR. ELSNER:  Well, under the protocol
12 I don't need to separately notice it.  I do need
13 to notify you if I intend to use a document he
14 hasn't seen before, which I haven't.  And I
15 think this is all fair game.  So I'm happy to
16 let you have a continuing objection to the use,
17 but I don't think we need to interrupt the
18 deposition with the same scope objections
19 throughout.
20      MR. MONTMINY:  Okay.
21 BY MR. ELSNER:
22   Q.  Can we go back to my question?  I
23 asked you if you could explain to me what the
24 other various trending factors means.

Page 93

1    A.  I don't recall what that's referring
2  to.
3    Q.  Okay.  And then I also asked who at
4  Henry Schein, to your knowledge, set the
5  12-month max and the 24-month maximums?
6    A.  I don't recall who set that.
7    Q.  Do you know what those maximums were?
8    A.  I don't recall how that worked.
9    Q.  You said that the suspicious order
10 monitoring system was only one component of the
11 due diligence program at Henry Schein.  What
12 were the others for controlled substances?
13   A.  I mean, at a high level it was -- we
14 had an algorithm, or algorithms, and we had a
15 due diligence process.  Those were two main
16 parts.
17   Q.  And the algorithm is a component of
18 the suspicious order monitoring system, right?
19   A.  The algorithm or algorithms were part
20 of the process.
21   Q.  Okay.  And then so the other component
22 to that is due diligence based on orders that
23 were flagged or triggered by the suspicious
24 order monitoring system, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1      MR. MONTMINY: Objection. Form.
2      A. That was part of the process.
3  BY MR. ELSNER:
4      Q. If you go two pages further under
5  "Standard Operating Procedures/Policies," it
6  says "Henry Schein Has Implemented and Enhanced
7  Many of Our Policies and Procedures," and then
8  it lists some things, including "Suspicious
9  Order Monitoring Policy."
10     Does this refresh your recollection
11 that as of 2009 the enhanced system had been put
12 into place at Henry Schein with respect to
13 suspicious order monitoring?
14     A. At the time of this meeting, I don't
15 recall what was in place.
16     Q. Is that what's written in the
17 presentation?
18     MR. MONTMINY: Object to form.
19     A. It says that "Henry Schein Has
20 Implemented and Enhanced Many of Our Policies
21 and Procedures."
22 BY MR. ELSNER:
23     Q. Including the suspicious order
24 monitoring program, correct?

Page 95

1      A. That is one of the sub-bullets.
2      Q. And then if you go two pages further,
3  there's a "New Account Setup" page, and there's
4  a list of items that you -- one page forward.
5  Do you see where I'm at?
6      A. Okay.
7      Q. And this is the due diligence done for
8  new account setups at Henry Schein as of 2009,
9  is that right?
10     A. Again, at this time I don't exactly
11 recall what the processes were.
12     Q. But that's what's in the presentation
13 that you gave to the DEA?
14     A. That is what's --
15     MR. MONTMINY: Object to form.
16     A. That is what's in this presentation.
17 BY MR. ELSNER:
18     Q. Okay. And it included a customer
19 questionnaire for every customer ordering
20 controlled substances, is that right?
21     A. I see that's what it says there.
22     Q. And did you work with that customer
23 questionnaire for customers while at Henry
24 Schein?

Page 96

1      A. I knew of a customer questionnaire.
2      Q. Did you use it?
3      A. Specifically the one that it's
4  referring to, I don't know. I know we had a
5  customer questionnaire that we used to guide due
6  diligence.
7      Q. Did you use it, the customer
8  questionnaire?
9      MR. MONTMINY: Objection. Form, asked
10 and answered.
11     A. At this time?
12 BY MR. ELSNER:
13     Q. At any time.
14     MR. MONTMINY: Same objection.
15     A. At my time at Henry Schein, I had used
16 a customer questionnaire to -- as a guideline
17 for due diligence.
18 BY MR. ELSNER:
19     Q. And you would send that questionnaire
20 out to doctors and others that were ordering
21 controlled substances, is that right?
22     A. Potentially.
23     Q. And you'd review those responses?
24     A. Either myself or someone else on the

Page 97

1  team would review responses.
2      Q. And on the last page under "Pain
3  Management Clinics - Due Diligence Process," the
4  third bullet, it reads "Mandatory full
5  regulatory audit is required for final approval"
6  to receive controlled substances, is that right?
7      A. That's what it says.
8      Q. Okay. And included "Inventory
9  controls, Security systems/protocols, Interview
10 with the doctor or owner, and a Comprehensive
11 audit report including pictures of the facility
12 and background information," is that right?
13     MR. MONTMINY: Object to form.
14     A. That is what it says.
15 BY MR. ELSNER:
16     Q. Were you involved in this process at
17 Henry Schein to collect the information for this
18 mandatory full regulatory audit?
19     A. Specifically at this time I don't
20 fully recall what my role is or was with doing
21 that.
22     Q. What about later on at Henry Schein?
23     A. At some point while I worked at Henry
24 Schein that was part of my responsibilities, to

Page 98

1  do due diligence.
2     Q.  And this was a component of Henry
3  Schein's know your customer policies, is that
4  right?
5        MR. MONTMINY:  Object to form.
6  BY MR. ELSNER:
7     Q.  To collect this information?
8        MS. MILLER:  Object to form.
9        MR. MONTMINY:  I'd like to re-assert
10 my objection and make it clear that this witness
11 does not represent Henry Schein in this
12 deposition.
13       MR. ELSNER:  You can object.  Speaking
14 objections are not permitted.
15 BY MR. ELSNER:
16    Q.  Go ahead.
17    A.  Can you just repeat the question?
18    Q.  I had asked whether these -- reviewing
19 these questionnaires and reviewing the
20 information in the mandatory regulatory audits
21 is the know your customer information that was
22 collected at Henry Schein.
23       MR. MONTMINY:  Objection.  Form.
24    A.  I know at some part -- at some point

Page 99

1  these do look like pieces of information that we
2  might look at for customers if doing due
3  diligence.
4  BY MR. ELSNER:
5     Q.  If you turn back to the PowerPoint
6  presentation that you gave at the conference, on
7  Page 10 under the --
8        MR. MONTMINY:  Object to the form of
9  that statement.
10 BY MR. ELSNER:
11    Q.  Page 10 under "The Pend Process."  Do
12 you see where I'm at?
13    A.  Page 10, "The Pend Process."
14    Q.  Under "Know Your Customer" in the
15 middle, do you see where I am?
16    A.  I see where you are.
17    Q.  It says "questionnaire is sent to
18 account.  Once received back and we are still
19 not comfortable releasing the order, a more
20 extensive questionnaire is sent out.  If still
21 not comfortable, a phone interview or site visit
22 will be scheduled if necessary."  Those are the
23 components in part of the know your customer
24 process at Henry Schein, is that correct?

Page 100

1        MR. MONTMINY:  Object to form.
2     A.  I see that written there.  In
3  reference to know your customer policy, I don't
4  recall a know your customer policy that we had.
5  BY MR. ELSNER:
6     Q.  But that's what's written here?
7     A.  "'Know Your Customer' questionnaire is
8  sent to account" I see is what is written there.
9     Q.  Did Henry Schein have a know your
10 customer policy in 2010?
11       MR. MONTMINY:  Objection.  Form.
12    A.  I don't recall.
13 BY MR. ELSNER:
14    Q.  If you turn to Page 13 of the
15 PowerPoint presentation for the Buzzeo
16 conference, under -- the topic there is
17 "Questionnaires," is that right?
18    A.  Questionnaires, yes.
19    Q.  Okay.  And there are "3 categories of
20 questionnaires developed," it reads.  "Know your
21 customer" is one, correct?
22    A.  I see that.
23    Q.  "Self Assessment Questionnaire" and
24 "Extensive Site Visit Questionnaire," is that

Page 101

1  right?
2        MS. MILLER:  Object to form.
3     A.  I see where that's written.
4  BY MR. ELSNER:
5     Q.  And it lists some sample questions at
6  the bottom of the PowerPoint presentation,
7  correct?
8     A.  I see that.
9     Q.  It includes "Do you accept medical
10 insurance?"  And "What percentage pay insurance"
11 versus pay in cash?  Is that one of the sample
12 questions?
13    A.  "Cash, credit," yes.
14    Q.  Okay.  And "Do you dispense...to
15 out-of-state patients" is another inquiry,
16 correct?
17    A.  I see that as one of the questions
18 listed.
19    Q.  All right.  On Page 14, the next page,
20 it refers to site visits.  Do you see that?
21    A.  "Site visits consist of."  I see that.
22    Q.  Okay.  And they're "Conducted on 'high
23 risk' accounts and accounts that we are not
24 comfortable with after initial due diligence,"

Page 102

1 is that right?
2     MS. MILLER: Object to form.
3     A. I don't know if it was always the case
4 for just high-risk accounts, but I see where it
5 says here on high-risk accounts.
6 BY MR. ELSNER:
7     Q. Was it sometimes for other accounts,
8 not high-risk accounts?
9     A. I don't remember all the instances we
10 did site visits.
11     Q. The process, under item 2, could take
12 anywhere from 6 to 8 weeks to complete, is that
13 right?
14     MS. MILLER: Object to form.
15     A. I don't remember the exact time frame
16 it took to complete.
17 BY MR. ELSNER:
18     Q. That's what it says here, though,
19 right?
20     A. It says "Initially, the process could
21 took anywhere from six to eight weeks to
22 complete."
23     Q. Okay. And on the bottom it says,
24 "Site visits consist of," and it lists a number

Page 103

1 of things, including observing patients in the
2 waiting room. Is that one?
3     MR. MONTMINY: Objection. Form.
4     A. That's what it says.
5 BY MR. ELSNER:
6     Q. Cars in the parking lot?
7     A. That is what it says.
8     Q. What were you looking for for cars in
9 the parking lot, what kind of cars?
10     MR. MONTMINY: Object to form.
11     A. Could be anything from was it a full
12 parking lot to out of state license plates.
13 BY MR. ELSNER:
14     Q. Because out of state license plates
15 may be an indicator of diversion, is that right?
16     MS. MILLER: Object to form.
17     A. No, not necessarily.
18 BY MR. ELSNER:
19     Q. It could be a red flag?
20     MS. MILLER: Object to form.
21     A. It was one of the things that we
22 looked at. Could be nothing.
23 BY MR. ELSNER:
24     Q. Could be nothing, could be something,

Page 104

1 right?
2     MS. MILLER: Object to form.
3 BY MR. ELSNER:
4     Q. Yes, no?
5     A. I can't say. It's case-by-case.
6     Q. It's on the criteria that you listed,
7 is that right?
8     MS. MILLER: Object to form.
9     A. It's listed as one of the elements we
10 looked at.
11 BY MR. ELSNER:
12     Q. Okay. "Inventory reconciliations."
13 What's that?
14     A. I don't recall exactly what that is,
15 but some kind of inventory review.
16     Q. Inventory of what, the controlled
17 substances they had on hand?
18     MR. MONTMINY: Objection to form.
19     A. I think just inventory in general.
20 BY MR. ELSNER:
21     Q. The site visit also consisted of
22 security controls, is that right?
23     MR. MONTMINY: Objection. Form.
24     A. That's what it says.

Page 105

1 BY MR. ELSNER:
2     Q. Pictures?
3     MR. MONTMINY: Same objection.
4     A. It says that there.
5 BY MR. ELSNER:
6     Q. Observing the surrounding
7 neighborhood?
8     MR. MONTMINY: Object to form.
9     A. That's what it says.
10 BY MR. ELSNER:
11     Q. And "Recordkeeping/Protocols"?
12     MR. MONTMINY: Object to form.
13 BY MR. ELSNER:
14     Q. Correct?
15     MS. MILLER: Object to form.
16     A. That's what it says.
17 BY MR. ELSNER:
18     Q. These were in elements of the know
19 your customer or site visit review. They were
20 part of the presentation that you gave in this
21 conference, correct?
22     MR. MONTMINY: Objection. Form.
23     A. That is what it says in this document.
24 BY MR. ELSNER:

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  Q. You said you had a copy of this
2 document. Where do you maintain a copy of this
3 presentation?
4      MR. MONTMINY: Objection. Form.
5  A. I don't know.
6 BY MR. ELSNER:
7  Q. Was it home, or is it at work?
8      MR. MONTMINY: Objection. Form.
9  A. I don't recall. I haven't seen this
10 in a long time.
11 BY MR. ELSNER:
12  Q. Do you recall telling me in the
13 beginning that you had a copy of this
14 presentation?
15      MR. MONTMINY: Objection. Form.
16  A. I recall saying I might have a copy.
17 BY MR. ELSNER:
18  Q. If you had a copy, where would it be?
19      MS. MILLER: Object to form.
20      MR. MONTMINY: Object to form.
21  A. I don't know.
22      MR. ELSNER: I'd ask that counsel
23 speak with the witness and see if they can
24 locate a copy of the presentation. If they can,

Page 107

1 if they produce it to us.
2      MS. MILLER: We can discuss it off the
3 record.
4 BY MR. ELSNER:
5  Q. When did you join CVS?
6  A. 2012.
7  Q. And what were you hired at CVS to do?
8      MS. MILLER: Object to form.
9 BY MR. ELSNER:
10  Q. As you understand it.
11  A. I know some of my early projects were
12 working on a compliance review program as well
13 as some pharmacy initiatives that the company
14 was working on.
15  Q. Your title was senior compliance
16 manager when you were hired in August of 2012,
17 is that right?
18  A. That sounds right.
19  Q. Did you replace someone when you were
20 hired by CVS, or was this a new position?
21      MS. MILLER: Object to form.
22  A. I believe the position that I was
23 going into, I don't believe I was replacing
24 someone in that position.

Page 108

1 BY MR. ELSNER:
2  Q. Okay. Why did you decide to leave
3 Henry Schein for CVS?
4  A. I don't recall all the reasons, but I
5 thought it was a good opportunity.
6  Q. Tell me about the process. Did you
7 see an advertisement and apply to it, or did you
8 send out a resume to CVS? How was it that you
9 came to be hired by CVS, as you understand it?
10      MS. MILLER: Object to form.
11  A. I believe I was contacted by CVS, and
12 had conversations through them reaching out.
13 BY MR. ELSNER:
14  Q. Who was it that contacted you from
15 CVS?
16  A. I don't remember exactly who it was.
17 It was someone from the talent acquisitions
18 department.
19  Q. And did they meet you at a conference,
20 or did they cold call you?
21      MS. MILLER: Object to form.
22  A. I'm not sure what caused them to reach
23 out.
24 BY MR. ELSNER:

Page 109

1  Q. Were you working at Henry Schein at
2 the time?
3  A. Yes.
4  Q. Had you met anyone from CVS as part of
5 your work in the area of compliance for Henry
6 Schein?
7      MS. MILLER: Object to form.
8  A. Not that I recall.
9 BY MR. ELSNER:
10  Q. Did they tell you that they were
11 looking to fill a particular position at CVS?
12      MS. MILLER: Object to form.
13  A. I believe they called me about a
14 specific position.
15 BY MR. ELSNER:
16  Q. What was your understanding of the
17 position that they called you about?
18      MS. MILLER: Object to form.
19  A. I don't recall.
20 BY MR. ELSNER:
21  Q. At the time you were in Greenville,
22 South Carolina, is that right?
23  A. Yes, I believe so.
24  Q. Were you hired by CVS Pharmacy or CVS

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1  Health?  What entity of CVS hired you?
2      MS. MILLER:  Object to form.
3      A.  I don't recall.  It was CVS.
4  BY MR. ELSNER:
5      Q.  Who was your supervisor at CVS when
6  you were hired in August of 2012?
7      A.  It was Tom Bourque.
8      Q.  What was Tom Bourque's position?
9      A.  At the time I believe he was the
10  director of regulatory compliance.
11      Q.  Did he interview you for the position?
12      A.  Yes.
13      Q.  Did anyone else participate in the
14  interview process?
15      A.  Yes.
16      Q.  Who else?
17      A.  I can recall meeting with talent
18  acquisition, and then other members of the, at
19  the time, the regulatory compliance team.
20      Q.  What are their names?
21      A.  Aside from Tom, I remember Karen
22  DiStefano.
23      Q.  Any others?
24      A.  And Susan Delmonico.

Page 111

1      Q.  What is Susan Delmonico's position?
2      A.  At the time of the interview?
3      Q.  Yes.
4      A.  I don't exactly recall what her role
5  was.
6      Q.  Did you have any people who reported
7  to you when you were hired by CVS in August of
8  2012?
9      A.  There was one person.
10      Q.  Who was that?
11      A.  Cassandra Castro.
12      Q.  And what was her title and what were
13  her job responsibilities?
14      MS. MILLER:  Object to form.
15      A.  At that time I don't recall.
16  BY MR. ELSNER:
17      Q.  What was she doing for you under your
18  supervision?
19      A.  I think at the time I was hired, I
20  think she was also learning the company as I
21  was.  And then I know one of her big
22  responsibilities was the regulatory review
23  program.
24      Q.  Was anyone who was involved in the

Page 112

1  suspicious order monitoring system other than
2  Tom Bourque involved in any of -- let me strike
3  that.
4      When you were hired by CVS, did you
5  receive any training on the system in place for
6  suspicious order monitoring of controlled
7  substances at CVS?
8      A.  Not that I recall.
9      Q.  Did you meet with anyone to discuss
10  the suspicious order monitoring system in place
11  at CVS when you were first hired?
12      A.  When you say first hired...
13      Q.  In August of 2012 and through the
14  remainder of that year.
15      A.  At some point before the end of the
16  year I do remember having contact with --
17  actually I don't know who ran the SOM at that
18  point so I don't -- I can't -- I don't know.
19      Q.  Well, one of the tasks that you were
20  hired to perform by CVS was to create and
21  implement the distribution center's order
22  monitoring system, right?
23      MS. MILLER:  Object to form.
24      A.  Can you repeat that?

Page 113

1  BY MR. ELSNER:
2      Q.  One of the tasks that you were hired
3  by CVS to perform was to create and implement
4  the distribution center's order monitoring
5  system, correct?
6      MS. MILLER:  Object to form.
7      A.  That was never relayed to me as my
8  responsibility during the interview process.
9      MR. ELSNER:  Mark this next document
10  as the next exhibit.
11      (Whereupon, CVS-Schiavo-7 was marked
12      for identification.)
13  BY MR. ELSNER:
14      Q.  This is Schiavo Exhibit 7.  This is an
15  e-mail from you to Cassandra Castro dated
16  January 24, 2013, right?  Do you see that on the
17  top of the e-mail?
18      A.  I see that.
19      Q.  Okay.  And if you look to the third
20  paragraph -- sorry.  Strike that.
21      If we go to the very top of the
22  e-mail, it says "Various Projects I Have Been
23  Involved in."
24      Do you see that?

Page 114

1    A.  I see where it says that.
2    Q.  Okay.  And then there's a list of
3 bullets, right?
4    A.  Yes.
5    Q.  They're faint, though they're there, I
6 think.  If you go to the third bullet, it reads
7 as one of the various projects that you've been
8 involved in the "Creation and Implementation of
9 our Distribution Center's Suspicious Order
10 Monitoring System - In order for CVS to comply
11 with 21 CFR 1301.74(b)," correct?
12        MS. MILLER:  Object to form.
13    A.  I see where it says that.
14 BY MR. ELSNER:
15    Q.  And this is what you wrote, correct?
16        MS. MILLER:  Object to form.
17    A.  I see my -- this e-mail is from me.  I
18 don't remember writing this.
19 BY MR. ELSNER:
20    Q.  But that's what the e-mail states,
21 correct?
22    A.  That's what it says.
23    Q.  So if one of your tasks was to create
24 and implement the distribution center's order

Page 115

1 monitoring system, what effort did you undertake
2 when you were hired by CVS to understand what
3 current system was in place?
4        MS. MILLER:  Object to form.
5    A.  I don't recall what steps I took to
6 understand the current process they had in
7 place.
8 BY MR. ELSNER:
9    Q.  Did you ever meet with John Mortelliti
10 and sit down with him and ask him to explain to
11 you how the suspicious order monitoring system
12 was working at CVS?
13        MS. MILLER:  Object to form.
14    A.  I don't recall.
15 BY MR. ELSNER:
16    Q.  What about Frank Devlin, did you ever
17 sit down with him and discuss CVS's suspicious
18 order monitoring system?
19        MS. MILLER:  Object to form.
20    A.  I know that I spoke to Frank Devlin.
21 I can't remember the specifics of any
22 conversation.
23 BY MR. ELSNER:
24    Q.  Well, what effort -- did you make an

Page 116

1 effort before creating a new system to
2 understand what system was in place?
3        MS. MILLER:  Object to form.
4    A.  I don't recall the extent of the
5 effort.  I knew there was a system in place.
6 BY MR. ELSNER:
7    Q.  How did you know?
8        MS. MILLER:  Object to form.
9    A.  I don't recall how I became aware.
10 BY MR. ELSNER:
11    Q.  The system at this time was being
12 operated out of the Indianapolis distribution
13 center for CVS.  Did you ever travel to
14 Indianapolis in 2012 to meet with anyone to
15 understand the system?
16        MS. MILLER:  Object to form.
17    A.  No.
18 BY MR. ELSNER:
19    Q.  Did you ever have any conference calls
20 with them in 2012 that you recall for an
21 explanation of how the system was operating in
22 2012?
23        MS. MILLER:  Object to form.
24    A.  I don't recall.

Page 117

1 BY MR. ELSNER:
2    Q.  Prior to joining CVS, you did not have
3 a great deal of experience in distribution or
4 dispensing of controlled substances by
5 pharmacies, correct?
6        MS. MILLER:  Objection to form.
7    A.  Not sure I understand the question.
8 BY MR. ELSNER:
9    Q.  Well, prior to joining CVS, you didn't
10 have a lot of experience in working with
11 pharmacies, right?  Henry Schein's customer base
12 were medical practitioners, dentists, and vets,
13 right?
14        MS. MILLER:  Object to form.
15    A.  And at some point I believe there was
16 pharmacies.
17 BY MR. ELSNER:
18    Q.  Well, did you feel like you had a lot
19 of pharmacy experience when you joined CVS?
20        MS. MILLER:  Object to form.
21    A.  I never felt like I didn't.
22 BY MR. ELSNER:
23    Q.  If you look at the same e-mail, in the
24 fourth bullet it references a conference that

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 you attended that was run by the DEA on 9/15.
2 Do you see that reference?
3    A.  I do.
4    Q.  Okay.  And in the second sentence it
5 reads "Coming from a background of working for a
6 wholesale distributor, the conference was very
7 beneficial to see the 'hot topics' among the DEA
8 as they pertain to pharmacies and pharmacists."
9 Correct?  Did I read that correctly?
10      MS. MILLER:  Go ahead.
11    A.  I see where it says that.
12 BY MR. ELSNER:
13    Q.  The next sentence reads "After the
14 conference, I had a much clearer understanding
15 of a pharmacist's responsibility when filling
16 prescriptions and the process they are required
17 to go through in order to vet each prescription.
18 Also, the conference clearly laid out the
19 consequences for a pharmacist who does not
20 effectively use their professional judgment."
21 Did I read that correctly?
22    A.  I see where I wrote that.
23    Q.  And you attended the DEA conference
24 in -- on 9/15 in New York, is that right?

Page 119

1    A.  I don't remember the date, but that's
2 what it says.
3    Q.  Before we go to the conference, I just
4 want to ask a couple other questions.
5      When you were hired by CVS, did you
6 undergo any training procedures?
7      MS. MILLER:  Object to form.
8    A.  I'm not sure what you're referring to
9 in regards to --
10 BY MR. ELSNER:
11    Q.  Well, did you have any training
12 presentations that you attended?
13      MS. MILLER:  Object to form.
14    A.  I don't recall any specific training.
15 I don't recall.
16 BY MR. ELSNER:
17    Q.  There's no training on
18 responsibilities with controlled substances that
19 you were shown or given?
20      MS. MILLER:  Object to form.
21    A.  I don't recall.
22 BY MR. ELSNER:
23    Q.  Did you receive any other training on
24 controlled substances when you joined CVS in

Page 120

1 2012?
2      MS. MILLER:  Object to form.
3    A.  I don't recall.
4 BY MR. ELSNER:
5    Q.  Did you review the standard operating
6 procedures for suspicious order monitoring when
7 you joined CVS in 2012?
8    A.  I don't recall.
9    Q.  So you don't recall any training, any
10 manuals, any procedures, any effort that you
11 undertook to understand the current suspicious
12 order monitoring system at CVS in 2012, is that
13 your testimony?
14      MS. MILLER:  Object to form.
15 Misstates testimony.
16    A.  I'm saying I specifically don't
17 remember if there were or were not.
18 BY MR. ELSNER:
19    Q.  What about since, have you received
20 any training at CVS in controlled substances?
21    A.  I'm not sure what you mean by
22 training.
23    Q.  Well, did you attend any presentations
24 at CVS?  Has anyone given you any training

Page 121

1 manuals on controlled substances?
2      MS. MILLER:  Object to form.
3 BY MR. ELSNER:
4    Q.  Watched any videos about the
5 procedures?
6      MS. MILLER:  Object to the form.
7    A.  I don't know what you would constitute
8 as training.  Have I seen videos on controlled
9 substances?  Maybe.
10 BY MR. ELSNER:
11    Q.  I'm talking about the procedures at
12 CVS to prevent for the diversion of controlled
13 substances.  Are there any training manuals,
14 training videos, any information that you
15 reviewed to understand the system in place at
16 CVS to prevent the diversion of controlled
17 substances?
18      MS. MILLER:  Object to form.
19    A.  We have a number of policies and
20 procedures that, I don't know if you'd refer to
21 them as training, but we have policies and
22 procedures.
23 BY MR. ELSNER:
24    Q.  No, I understand you have policies and

Page 122

1 procedures. I'm trying to -- is there anything
2 other than the policies and procedures? Is
3 there any document that explains the policies
4 and procedures, the importance of the policies
5 and procedures, the reasons behind the policies
6 and procedures with respect to controlled
7 substances that you reviewed or that someone
8 showed to you at CVS?
9     MS. MILLER: Object to form.
10    A. I don't specifically remember specific
11 trainings. We do have LEARNet trainings that
12 are available. I don't remember specifically.
13 BY MR. ELSNER:
14    Q. Have you ever gone to those?
15        MS. MILLER: Object to form.
16    A. I have taken LEARNet trainings.
17 BY MR. ELSNER:
18    Q. Is it something online?
19    A. Yes, you can take them online.
20    Q. How did you take them?
21    A. I don't recall if I took them all
22 online.
23    Q. Is online one of the options, and is
24 there another option, another format that you

Page 123

1 can take the LEARNet?
2    A. I believe there are options --
3        MS. MILLER: Object to form.
4    A. -- where you can take them not online.
5 BY MR. ELSNER:
6    Q. What were the topics that you took
7 these sessions on?
8    A. Are you talking in this time frame?
9    Q. Any time frame.
10    A. I have taken a lot of LEARNet courses.
11 I don't --
12    Q. Have any of those courses dealt with
13 the opioid epidemic in the United States?
14        MR. MONTMINY: Object to form.
15        MS. MILLER: Object to form.
16    A. I don't recall any training
17 specifically speaking to an opioid epidemic.
18 BY MR. ELSNER:
19    Q. Did any of the LEARNet programs deal
20 with the proper dispensing of controlled
21 substances that you took?
22        MS. MILLER: Object to form.
23    A. There are trainings that speak to
24 corresponding responsibility.

Page 124

1 BY MR. ELSNER:
2    Q. And did you take that LEARNet program?
3    A. During this time frame?
4    Q. Let's start with ever.
5    A. I know I've reviewed a training that
6 has corresponding responsibility.
7    Q. What was the date?
8    A. I don't recall.
9    Q. Well, after August, 2012, right?
10    A. I know that there are trainings out
11 there that I've seen after 2012.
12    Q. When did you -- when did CVS first put
13 in place these LEARNet sessions, to your
14 knowledge?
15    A. I don't recall.
16    Q. Are you on any kind of medication that
17 would impair your ability to remember? Did you
18 take any kind of medication today that would
19 impact your memory?
20        MS. MILLER: I'm going to object to
21 that question. That's an improper questioning
22 of the witness.
23        MR. ELSNER: It's not. I need to
24 know. That's a standard deposition question at

Page 125

1 every deposition.
2 BY MR. ELSNER:
3    Q. Are you on any medications today?
4        MS. MILLER: I object. It's an
5 inappropriate question.
6 BY MR. ELSNER:
7    Q. You can answer. She's raised an
8 objection.
9    A. I'm not on any medication.
10    Q. Thank you.
11        Would you agree with me that there's
12 an opioid crisis in the United States?
13        MS. MILLER: Object to form.
14    A. I know that there are people who abuse
15 drugs.
16 BY MR. ELSNER:
17    Q. Do you understand that the number of
18 people that -- well, do you know that there are
19 people who abuse prescription drugs including
20 opioids?
21        MS. MILLER: Object to form.
22    A. I am aware there are people who have
23 used opioids that have led in an overdose. I am
24 aware of that.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

BY MR. ELSNER:

Q. Are you aware that the DEA and certain government officials have referred to this overdose that people are acquiring from opioids as an epidemic?

MS. MILLER: Object to form.

A. I am not aware that I've heard the term epidemic. I'm not aware that that is specifically to prescription medications.

BY MR. ELSNER:

Q. So you're not aware of whether there's an opioid epidemic in the United States today?

MS. MILLER: Object to form.

A. I think, like I said, I'm aware that there are people who abuse drugs.

BY MR. ELSNER:

Q. Well, certainly there are people who abuse drugs. I'm asking a much more different and targeted question.

Are you aware of the number of people that have abused opioids has risen to the point of reaching an epidemic proportion in the United States?

MS. MILLER: Object to form.

Page 127

MR. DAWSON: Objection.

A. Well, you keep using the term "epidemic." I am aware that there are people who abuse prescription medications, illicit drugs such as heroin. I'm aware that people have overdosed on drugs.

BY MR. ELSNER:

Q. And you understand that's a huge problem in the United States?

MS. MILLER: Object to form.

BY MR. ELSNER:

Q. Do you agree with that or disagree with that?

MS. MILLER: Object to form.

A. I would agree that any time that someone passes away that it's not something I'd want to see.

BY MR. ELSNER:

Q. Well, for sure.

But do you agree that it's a huge problem?

MS. MILLER: Object to form.

A. I'm not sure what you mean by "a huge problem." I'm aware that people overdose on

Page 128

drugs with prescription, illicit, fentanyl-laced products.

BY MR. ELSNER:

Q. How would you -- what level of concern was there within CVS about the number of people overdosing on prescription opioids?

MS. MILLER: Object to form.

A. I'm not sure I can speak to the level of concern.

BY MR. ELSNER:

Q. Did you have a level of concern?

MS. MILLER: Object to form.

A. I'm not sure I understand the question.

BY MR. ELSNER:

Q. Did you have a level of concern about the number of people that were overdosing as a result of taking prescription opioids in the United States?

MS. MILLER: Object to form.

A. A level of -- a level of concern. My focus while being at CVS was to work on the programs that I was working on and implement programs and comply with our processes.

Page 129

BY MR. ELSNER:

Q. Why?

MS. MILLER: Object.

BY MR. ELSNER:

Q. Why was CVS doing that?

MS. MILLER: Object to form.

A. Well, I know as a DEA registrant there are DEA regulations that as a company we need to comply with. But the decision on implementing, I mean, that's not -- that wasn't my decision.

BY MR. ELSNER:

Q. Well, what was the purpose behind the DEA regulations? Did you understand that the DEA regulations were in place to prevent the diversion of controlled substances, including opioids?

MS. MILLER: Object to form.

A. I understand there are DEA regulations.

BY MR. ELSNER:

Q. Do you understand the purpose behind the DEA regulations?

MS. MILLER: Object to form.

A. I can't say that I'm aware of the

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 reasoning behind why the DEA wrote the
2 regulations.
3 BY MR. ELSNER:
4    Q.  No one at CVS or no one at Henry
5 Schein has ever told you that we need to make
6 sure that our systems concerning the
7 distribution and the sale of controlled
8 substances need to be robust because there is a
9 danger that these products get in the wrong
10 hands through diversion and cause overdoses?  No
11 one ever told you that?
12       MS. MILLER:  Object to form.
13    A.  I don't recall any conversations
14 specifically.
15 BY MR. ELSNER:
16    Q.  Did you make any effort to --
17       MS. MILLER:  Can you please just let
18 him finish his answer?
19       MR. ELSNER:  I'm sorry.
20       MS. MILLER:  Do you remember where you
21 were?
22    A.  I just don't recall any specific
23 conversations.
24 BY MR. ELSNER:

Page 131

1    Q.  Did you yourself make any effort to
2 determine the purpose behind the regulations
3 that you were trying to create systems to
4 protect against the diversion of controlled
5 substances?
6       MS. MILLER:  Object to the form.
7    A.  Can you repeat the question?
8 BY MR. ELSNER:
9    Q.  Did you make any efforts to seek to
10 determine the purpose behind the regulations
11 that you were creating systems to prevent
12 diversion of controlled substances for?
13       MS. MILLER:  Object to form.
14    A.  I don't recall ever researching a
15 regulation as to the reason why it was written.
16 BY MR. ELSNER:
17    Q.  Have you ever read anything about
18 opioid abuse problem in the United States?
19       MS. MILLER:  Object to form.
20    A.  I can't specifically recall anything,
21 but I've read about articles or about people
22 overdosing.
23 BY MR. ELSNER:
24    Q.  In what kind of publications?

Page 132

1    A.  I've seen it on the news, online,
2 newspaper.
3    Q.  Do you get a newspaper at your house,
4 or do you read online newspapers?
5    A.  I mean, I obtain news through
6 different sources.
7    Q.  I'm trying to understand the sources.
8       Do you get the New York Times or the
9 Boston Globe, or do you get any local paper to
10 your home?
11    A.  I believe I might get the Town of
12 Medway news or something.
13    Q.  Okay.  What's your best recollection
14 of any publication that you've read an article
15 about the opioid overdoses in the United States?
16       MS. MILLER:  Object to form.
17    A.  I can't remember a specific article
18 that I've read.
19 BY MR. ELSNER:
20    Q.  Have you written any -- have you read
21 any books about opioid abuse?
22       MR. MONTMINY:  Object to form.
23    A.  Not that I recall.
24 BY MR. ELSNER:

Page 133

1    Q.  Seen any movies about it?
2       MS. MILLER:  Object to form.
3    A.  I have seen movies in which characters
4 have overdosed on medications or drugs.
5 BY MR. ELSNER:
6    Q.  Opioids?
7       MS. MILLER:  Object to form.
8    A.  Specifically, I don't recall a
9 specific movie that comes to mind.  But I've
10 seen movies where part of the plot are people
11 die of drug overdoses.
12 BY MR. ELSNER:
13    Q.  Do you understand that more people
14 died of a drug overdose from a prescription drug
15 than died in a car accident in recent years?
16       MS. MILLER:  Object to form.
17    A.  I don't believe I'd heard that before.
18 BY MR. ELSNER:
19    Q.  Did you know that overdose from
20 prescription drugs has been the leading cause of
21 death in the United States?
22       MS. MILLER:  Object to form.
23    A.  I don't believe I specifically knew
24 that.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 BY MR. ELSNER:
2    Q.  I'm going to show you what we marked
3 as Exhibit 8.
4        (Whereupon, CVS-Schiavo-8 was marked
5 for identification.)
6 BY MR. ELSNER:
7    Q.  This is the PowerPoint presentation
8 from the DEA.  This is MR 3.  This is from
9 September of 2012 in Long Island, New York.
10 This is the conference that you attended, the
11 DEA conference that you attended.  And this
12 presentation was put together by Joseph
13 Rannazzisi who is the deputy assistant
14 administrator of the DEA.
15       Do you see that on the first page?
16       MR. MONTMINY:  Object to form.
17    A.  I see that.
18 BY MR. ELSNER:
19    Q.  I want you to turn to the fourth page
20 of the document, and it says "Commonly Abused
21 Controlled Pharmaceuticals."
22       Do you see that?
23    A.  I see where it says that.
24    Q.  And you're aware, are you not, that

Page 135

1 hydrocodone was one of the commonly abused
2 pharmaceuticals?
3       MS. MILLER:  Object to form.
4    A.  I am aware that hydrocodone is one of
5 the drugs that someone can abuse.
6 BY MR. ELSNER:
7    Q.  Are you aware that it's a commonly
8 abused controlled substance?
9       MS. MILLER:  Object to form.
10    A.  I don't know what you mean by common,
11 but I'm aware that it can be abused.
12 BY MR. ELSNER:
13    Q.  As well as OxyContin and oxycodone,
14 would you agree?
15       MS. MILLER:  Object to form.
16    A.  I am aware that those are drugs that
17 can be abused.
18 BY MR. ELSNER:
19    Q.  Okay.  I'm going to have you turn --
20       MR. ELSNER:  Can we go off the record
21 for about 15 seconds?
22       THE VIDEOGRAPHER:  We're going off the
23 record at 10:38 a.m.
24       (Whereupon, a recess was taken.)

Page 136

1       THE VIDEOGRAPHER:  We're back on the
2 record at 10:55 a.m.
3 BY MR. ELSNER:
4    Q.  Mr. Schiavo, I'm going to ask you to
5 go to the next tab which you now have in front
6 of me from this PowerPoint that the DEA
7 presented at the conference you attended, and it
8 describes the "Economic Impact - the Cascading
9 Effect."  That's the title of the slide, is that
10 correct?
11       MS. MILLER:  Object to form.
12    A.  That is what the slide says.
13 BY MR. ELSNER:
14    Q.  It says that in 2006 the estimated
15 cost in the United States from non-medical use
16 of prescription opioids was $53.4 billion.  Did
17 I read that correctly?
18    A.  I see where it says that.
19    Q.  And it lists five drugs on the bottom
20 which account for two-thirds of the economic
21 burden.
22       Do you see that?
23    A.  I don't see where it says that they
24 account for two-thirds, but I see drugs listed

Page 137

1 at the bottom.
2       There, it says it, yes.
3    Q.  And those drugs include OxyContin,
4 oxycodone, hydrocodone, among others, correct?
5       MS. MILLER:  Object to form.
6    A.  It looks like there's two other drugs
7 listed than you named.
8 BY MR. ELSNER:
9    Q.  And it includes all of those, correct?
10    A.  That's what it says.
11       MS. MILLER:  Object to form.
12 BY MR. ELSNER:
13    Q.  And these are drugs that were
14 dispensed by CVS pharmacies, correct?
15       MS. MILLER:  Object to form.
16    A.  I did not -- I didn't work for CVS in
17 2006.  I can't answer that.
18 BY MR. ELSNER:
19    Q.  Were these drugs that were dispensed
20 by CVS in 2012 when you joined CVS?
21       MS. MILLER:  Object to form.
22    A.  I can't say for sure that all of these
23 were.
24 BY MR. ELSNER:

Page 138

1    Q.  Hydrocodone is among the drugs that
2 were distributed by CVS when you joined them in
3 2012, correct?
4         MS. MILLER:  Object to form.
5    A.  Hydrocodone was one of the drugs that
6 pharmacies dispensed in 2012.
7 BY MR. ELSNER:
8    Q.  And it was also a drug that CVS
9 distributed to its own pharmacies in 2012,
10 correct?
11        MS. MILLER:  Object to form.
12   A.  I do believe some of our distribution
13 centers distributed hydrocodone to pharmacies.
14 BY MR. ELSNER:
15   Q.  Okay.  If you turn to the next tab,
16 the next Post-it, it says "Emergency Room Data
17 2004 to 2009."
18        Do you see that?
19   A.  I see that.
20   Q.  Okay.  And it reads the increase of
21 98.4 percent of ER visits attributable to
22 pharmaceuticals alone.
23        Did I read that correctly?
24   A.  I see where it says that.

Page 139

1    Q.  Okay.  And beneath that it says,
2 "Prescription drugs most frequently implicated:
3 Opiates/opioids pain relievers," and it lists
4 "Oxycodone products 242.2 percent increase,"
5 correct?  Is that what it says?
6         MS. MILLER:  Object to form.
7    A.  It looks like that's what it says.
8 BY MR. ELSNER:
9    Q.  Between 2004 and 2009 for hydrocodone
10 there was 124.5 percent increase in ER visits,
11 correct?
12        MS. MILLER:  Object to form.
13 BY MR. ELSNER:
14   Q.  Is that what it says?
15        MS. MILLER:  Object to form.
16   A.  Can you reread what part you were
17 reading.
18 BY MR. ELSNER:
19   Q.  So we're talking about emergency room
20 data from 2004 to 2009, right?
21   A.  Yes.
22   Q.  And we're talking about increases in
23 ER visits attributable to those pharmaceuticals.
24 Are you with me?

Page 140

1         MS. MILLER:  Object to form.
2    A.  I see the top bullet.
3 BY MR. ELSNER:
4    Q.  Now we're talking about, we're
5 breaking it down, "Prescription Drugs most
6 frequently implicated:  Opiates/Opioids pain
7 relievers," and it lists hydrocodone products as
8 124.5 percent increase.
9         Do you see that?
10        MS. MILLER:  Object to form.
11   A.  I see where it lists hydrocodone and
12 124.5 percent increase.
13 BY MR. ELSNER:
14   Q.  Okay.  If you go to the next sticky,
15 there's been an increase and rise in poisoning
16 deaths from opioids and analgesics, correct,
17 from 1999 through 2007?  Do you see that?
18        MS. MILLER:  Object to form.
19   A.  I see the chart.
20 BY MR. ELSNER:
21   Q.  Okay.  Were you aware prior to this
22 conference that there was this rising death --
23 poisoning deaths from opioids?
24        MS. MILLER:  Object to form.

Page 141

1    A.  I don't believe I was aware of this
2 exact data in this chart.
3 BY MR. ELSNER:
4    Q.  Okay.  If you go to the next tab, the
5 title is "Number of Forensic Cases, 2001 to
6 2010."
7         Do you see that?
8         MS. MILLER:  Object to form.
9    A.  I see that on the slide.
10 BY MR. ELSNER:
11   Q.  And you see in 2001 there's sort of --
12 if you just look at the hydrocodone tab, which
13 is the green.  Are you with me?  In 2010 it's
14 slightly over 10,000, correct?
15        MS. MILLER:  Object to form.
16 BY MR. ELSNER:
17   Q.  In 2001, slightly over 10,000?
18   A.  It looks like that's what the chart is
19 indicating.
20   Q.  Okay.  And that by 2010 for
21 hydrocodone there's been a 253 percent increase
22 in forensic cases, correct?
23        MS. MILLER:  Object to form.
24   A.  I see that on the chart.  I am not

Page 142

1 sure what's meant by "forensic cases," though.
2 I'm not sure what this is saying.
3 BY MR. ELSNER:
4    Q.  Okay.  Were you aware that there had
5 been a 250 percent increase in hydrocodone
6 overdoses from 2001 to 2010 before this
7 conference?
8        MS. MILLER:  Object to form.
9    A.  Yeah, I'm not exactly sure what
10 forensic cases mean, and I'm not sure, so I
11 can't say I know what that 253 percent --
12 BY MR. ELSNER:
13    Q.  You don't know that forensic cases
14 refers to an overdose?
15        MS. MILLER:  Object to form.
16 BY MR. ELSNER:
17    Q.  What's your understanding of the word
18 forensic?
19    A.  Not exactly sure what the definition
20 is.
21    Q.  Forensic refers to death.
22        MS. MILLER:  Object to form.
23 BY MR. ELSNER:
24    Q.  You don't know?

Page 143

1    A.  I don't know the exact definition.
2    Q.  If you go to the next sticky, sort of
3 a cover page, an introductory page, it reads
4 that the most commonly prescribed prescription
5 medicine is hydrocodone/acetaminophen.
6        Did I read that correctly?
7    A.  That looks to be what it says.
8    Q.  Okay.  Were you aware prior to this
9 conference that hydrocodone/acetaminophen was
10 the most commonly prescribed prescription
11 medicine in the United States?
12        MS. MILLER:  Object to form.
13    A.  I don't recall if I knew that.
14 BY MR. ELSNER:
15    Q.  If you go to the next tab, which is on
16 the very next page, the title is the "Top Five
17 Prescription Drugs Sold in the United States."
18 Do you see that?  Is that what the title says?
19    A.  That is what the title says.
20    Q.  Okay.  And do you see that hydrocodone
21 is significantly higher than all the other
22 drugs, prescription drugs, sold in the United
23 States?
24        MS. MILLER:  Object to form.

Page 144

1    A.  I don't know exactly what's meant by
2 sold.  And I do see that the hydrocodone line is
3 higher than other lines.
4 BY MR. ELSNER:
5    Q.  Well, what do you believe sold means?
6    A.  In terms of --
7        MS. MILLER:  Object to form.
8    A.  In the terms of this slide, I'm not
9 sure.
10 BY MR. ELSNER:
11    Q.  Were you aware that there were more
12 prescriptions filled and sales of hydrocodone
13 than there were for Lipitor in the United
14 States?
15        MS. MILLER:  Object to form.
16    A.  Just based on this chart saying
17 "Prescription Drugs Sold," which I'm not --
18 still not sure exactly what sold means, the
19 hydrocodone bar is larger than the Lipitor bar.
20 BY MR. ELSNER:
21    Q.  Do you know whether CVS sold more
22 hydrocodone than it did Lipitor?
23        MS. MILLER:  Object to form.
24    A.  I don't know if I would -- I wouldn't

Page 145

1 know that.
2 BY MR. ELSNER:
3    Q.  Given the large economic costs as a
4 result of opioid overdoses, and the large number
5 of forensic cases related to overdoses of
6 hydrocodone, and the significantly higher
7 numbers of hydrocodone drugs sold in the United
8 States, did it concern you that there needed to
9 be a robust system at CVS to prevent diversion?
10        MS. MILLER:  Object to form.
11    A.  In terms of this chart, I don't know
12 what this is showing me because I don't know
13 what sold is referring to.
14        And in terms of having a system at
15 CVS, I knew we needed to have policies or
16 procedures.  I knew we had to have a system.
17 BY MR. ELSNER:
18    Q.  Did you know that hydrocodone was one
19 of the most widely diverted and abused drugs in
20 the United States?
21        MS. MILLER:  Object to form.
22    A.  I don't know if I knew it was one of
23 the most highly diverted drugs.
24 BY MR. ELSNER:

Page 146

1    Q.   Do you have an understanding of what
2  the most highly diverted drugs are in the United
3  States that would be implicated by your
4  suspicious order monitoring system at CVS?
5         MS. MILLER:  Object to form.
6    A.   So during this time frame I don't know
7  if I had an idea on what they were.
8  BY MR. ELSNER:
9    Q.   What about after this time frame when
10 you were at CVS from 2012 on?
11        MS. MILLER:  Object to form.
12   A.   I don't know if I know all of the
13 highest diverted, all of the drugs, I don't
14 know.
15 BY MR. ELSNER:
16   Q.   Who asked you to attend this
17 conference in New York?
18        MS. MILLER:  Object to form.
19 BY MR. ELSNER:
20   Q.   If anyone.
21   A.   I don't recall.
22   Q.   Did someone at CVS ask you to go, or
23 did you decide to go on your own?
24   A.   I don't recall.

Page 147

1    Q.   I'm going to show you what we've
2  marked as Schiavo Exhibit 9.
3         (Whereupon, CVS-Schiavo-9 was marked
4         for identification.)
5  BY MR. ELSNER:
6    Q.   This is your year-end review for 2012.
7  It's MR 269.  Do you see the document?
8    A.   MR 260 --
9    Q.   I'm just asking do you recognize this
10 as your year-end review from 2012.  It says
11 "Craig Schiavo" on the left-hand side.
12        Do you see that?
13   A.   I see it says my name, and I see it
14 says "Year-End Review."
15   Q.   You wrote a year-end review while you
16 worked at CVS in 2012 and '13, is that right?
17        MS. MILLER:  Object to form.
18   A.   I don't remember writing this, but it
19 says this is my year-end review.
20 BY MR. ELSNER:
21   Q.   Okay.  If you turn to Page 8 of 11,
22 the very last paragraph there, it reads
23 "Attended a conference on 9/15 run by the DEA in
24 New York to stay up on current issues as they

Page 148

1  relate to the DEA and pharmacies."  Is that what
2  you wrote?
3    A.   Again, I don't remember writing this
4  document, but that's what it says.
5    Q.   Okay.  And then it next says "Coming
6  from a background of working for a wholesale
7  distributor, the conference was very beneficial
8  to see the 'hot topics' among the DEA as they
9  pertain to pharmacies and pharmacists."  Is that
10 what you wrote?
11   A.   I don't remember writing this, but
12 that's what it says.
13   Q.   Okay.  And in the last sentence of the
14 paragraph, it reads "Also, the conference
15 clearly laid out the consequences for a
16 pharmacist who does not effectively use their
17 professional judgment."  Is that what you wrote?
18        MS. MILLER:  Object to the form.
19   A.   Again, I don't remember writing this,
20 but that's what it says.
21 BY MR. ELSNER:
22   Q.   If you turn to page right before that,
23 the very -- at the top "Various Projects I Have
24 Been Involved in."

Page 149

1         Do you see that?
2    A.   "Various Projects I Have Been Involved
3  in."
4    Q.   Page 7 of 11, is that what it says?
5    A.   I see where it says that.
6    Q.   Okay.  And it says at the very bottom
7  of the page, the very last paragraph there, it
8  says "Creation."  Do you see where I'm at?
9    A.   Yes.
10   Q.   "Creation and implementation of our
11 Distribution Center Suspicious Order Monitoring
12 System" - In order for CVS to comply with 21 CFR
13 1301.74(b), we are required to build and operate
14 a system to track suspicious orders of
15 controlled substances from our CVS Retail
16 Pharmacies."
17        Do you see that?
18        MS. MILLER:  Object to form.
19   A.   And I don't remember writing this, but
20 I see it's written.
21 BY MR. ELSNER:
22   Q.   And then you wrote "By implementing
23 this system along with the appropriate policies
24 and procedures, we will mitigate the risk of

Page 150

1  potentially receiving substantial fines from the
2  DEA and possibly the suspension of our DEA
3  registration in both our distribution centers
4  and individual retail pharmacies." Is that what
5  you wrote?
6       MS. MILLER: Object to form.
7    A. I don't remember writing this, but
8  that's what this says.
9  BY MR. ELSNER:
10    Q. And then it says "To date, I have
11  contributed to the following." And the first
12  one is "Identify gaps in the current SOM system
13  that needed to be addressed when developing the
14  new system." Did I read that correctly?
15    A. That's what it says.
16       MS. MILLER: Object to form.
17  BY MR. ELSNER:
18    Q. And this is a review that you wrote
19  and presented to your boss at CVS, is that
20  right?
21       MS. MILLER: Object to form.
22    A. I don't remember writing this, but
23  this is my year-end review, it appears.
24  BY MR. ELSNER:

Page 151

1    Q. You don't have any reason to doubt
2  that it is, right?
3    A. I don't have a reason to doubt this is
4  my year-end review.
5    Q. You don't think anyone at CVS took
6  over your name and did this in secret, do you?
7       MS. MILLER: Object to form.
8    A. This document has my name on it, it
9  says "Year-End Review." I don't have any reason
10  to believe this is not my year-end review.
11       MR. ELSNER: Okay. Mark this next
12  document as Exhibit 10.
13       (Whereupon, CVS-Schiavo-10 was marked
14       for identification.)
15  BY MR. ELSNER:
16    Q. This is an e-mail from you dated
17  November 29, 2012. It's MR 79. Is that right?
18    A. I see that.
19    Q. Okay. And you send this to a variety
20  of people including your boss, Tom Bourque, is
21  that right?
22    A. I don't remember sending this e-mail,
23  but Tom is on this e-mail, and it says it's from
24  me.

Page 152

1    Q. Okay. And he's your boss at this
2  time?
3    A. At this time Tom is my boss.
4    Q. Okay. And it was also sent to Dean
5  Vanelli, is that right?
6    A. It appears to be.
7    Q. Okay. And to Aaron Burtner?
8    A. Aaron is on here.
9    Q. Okay. Who is Aaron Burtner?
10    A. Part of Aaron's role I knew to be as
11  one of the analysts for the suspicious order
12  monitoring system.
13    Q. That was in place in November of 2012,
14  right?
15       MS. MILLER: Object to form.
16  BY MR. ELSNER:
17    Q. That was his position in 2012?
18    A. I don't know exactly what Aaron's
19  position was in 2012.
20    Q. Did you know he was working on the
21  suspicious order monitoring system?
22       MS. MILLER: Object to form.
23    A. I believe I knew that Aaron, part of
24  his responsibility had to do with suspicious

Page 153

1  order monitoring.
2  BY MR. ELSNER:
3    Q. Okay. It says "Team, As discussed on
4  our call earlier today, please find the attached
5  documents." And the first item is "List of
6  opportunities (My notes) from our meeting on
7  November 27th." Is that what it says?
8    A. That is what it says.
9    Q. Okay. That's what you wrote?
10    A. I don't remember writing this, but the
11  e-mail seems to be from me, and that's what's
12  written there.
13    Q. So yes?
14    A. I don't remember writing this.
15    Q. And attached is a document entitled
16  "Opportunities - Current SOM Process."
17       Do you see that?
18    A. "Opportunities - Current SOM Process,"
19  yes.
20    Q. Let me ask you one question. When you
21  came back from the DEA conference that you
22  attended, other than writing the review in your
23  report, did you discuss what you heard at the
24  conference with anyone at CVS?

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1      MS. MILLER:  Object to form.
2      A.  Again, I don't remember writing the
3  review, and I don't remember specific
4  conversations I had around the conference.
5  BY MR. ELSNER:
6      Q.  Was this -- did you attend any other
7  DEA conferences while you were employed by CVS?
8      A.  I don't recall any other conferences
9  in 2012.
10     Q.  I didn't ask about 2012.  I said at
11  any time at CVS.
12     MS. MILLER:  Object to form.
13     A.  The only conference I can recall was
14  in the last year.
15  BY MR. ELSNER:
16     Q.  What was that on?
17     MS. MILLER:  Object to form.
18     A.  It was a controlled substance
19  conference.
20  BY MR. ELSNER:
21     Q.  Where was it held?
22     A.  Savannah, Georgia.
23     Q.  Did you save the materials from the
24  conference?

Page 155

1      A.  I don't recall.
2      Q.  Going back to this document, were your
3  notes from the meeting of November 27th, 2012,
4  it says "Opportunities -- Current SOM Process."
5  This memo is meant to describe opportunities to
6  change or fix the current SOM process at CVS, is
7  that right?
8      MS. MILLER:  Object to form.
9      A.  So again, I don't -- I don't remember
10  drafting this document, especially for the
11  purposes of it being my notes from a meeting.  I
12  see where it says that on the previous.  I don't
13  recall what specific my intentions were in
14  drafting this document.
15  BY MR. ELSNER:
16     Q.  Would you agree with me that at this
17  time in November of 2012 that there was a lack
18  of understanding as to what characteristics make
19  up the current algorithm for the suspicious
20  order monitoring system at CVS?
21     MS. MILLER:  Object to form.
22     A.  I see what the first line says, but I
23  can't say that there was a lack of understanding
24  by everyone at CVS.

Page 156

1  BY MR. ELSNER:
2      Q.  But that's what you wrote, right,
3  "Lack of understanding as to" the
4  "characteristics make up the current Algorithm."
5  Is that what you wrote?
6      MS. MILLER:  Object to form.
7      A.  I see that written there, but I'm
8  not -- I don't see it specified who I'm talking
9  about.
10  BY MR. ELSNER:
11     Q.  Well, these are notes of the meeting,
12  right?
13     MS. MILLER:  Object to form.
14     A.  I don't recall what meeting this is in
15  reference to.
16  BY MR. ELSNER:
17     Q.  These are the opportunities to fix the
18  current SOM program, right?  And one of the
19  opportunities that you list that could be
20  improved upon was that there's a lack of
21  understanding as to the characteristics of the
22  algorithm that ran the suspicious order
23  monitoring program, right?
24     MS. MILLER:  Object to form.

Page 157

1      A.  Again, I don't recall why I put this
2  document together.  But I don't recall there
3  ever being a time where I thought the current
4  process needed to be fixed.
5  BY MR. ELSNER:
6      Q.  Well, do you agree that there was an
7  opportunity -- you didn't think there was any
8  opportunity to fix anything at all about the
9  current SOM system as it existed in November of
10  2012 at CVS?
11     MS. MILLER:  Object to form.
12     A.  I don't recall ever an instance where
13  the system needed to be fixed.
14  BY MR. ELSNER:
15     Q.  It was perfect?
16     MS. MILLER:  Object to form.
17     A.  I believe it met our obligations.
18  BY MR. ELSNER:
19     Q.  That wasn't the question.
20     You said you didn't think it needed to
21  be fixed.  Was it perfect?
22     MS. MILLER:  Object to form.
23     A.  I'm not sure what you mean by
24  "perfect," but it met -- my understanding was it

Page 158

1 met our obligations.
2 BY MR. ELSNER:
3    Q. You spent in fall of 2012, through all
4 of 2012, all of 2013 into 2014 creating an
5 enhanced and new SOM program at CVS. That was
6 part of your responsibilities, correct?
7       MS. MILLER: Object to form.
8    A. I can't recall exactly how long I
9 spent working on suspicious order monitoring. I
10 had other responsibilities. My role was never
11 to fix a system. I played a part on a team that
12 was working on enhancing or implementing a new
13 system.
14 BY MR. ELSNER:
15    Q. And it took two years to do that,
16 right?
17       MS. MILLER: Object to form.
18    A. I don't recall how long it took.
19 BY MR. ELSNER:
20    Q. It wasn't a quick fix, right?
21       MS. MILLER: Object to form.
22    A. Again, I don't recall us ever doing a
23 project to fix our system. We were looking to
24 enhance or implement a new system.

Page 159

1 BY MR. ELSNER:
2    Q. And it took two years to do that,
3 right?
4       MS. MILLER: Object to form.
5    A. I don't recall how long it took.
6 BY MR. ELSNER:
7    Q. You next list that -- it says "Can we
8 do all checks up front?" And then it says
9 "Stores won't get orders in time if all checks
10 are completed up front."
11       Under the current system if you did
12 all the checks up front, the stores wouldn't get
13 their orders in time, is that correct?
14       MS. MILLER: Object to form.
15    A. I see the bullet says "Can we do
16 checks up front?" I'm not exactly sure what
17 that's referring to.
18 BY MR. ELSNER:
19    Q. But that's the question you asked, can
20 we do all the checks up front, right?
21       MS. MILLER: Object to form.
22    A. I don't remember drafting this
23 document. That is what it says.
24 BY MR. ELSNER:

Page 160

1    Q. Then it says "Stores won't get their
2 orders in time if all the checks are completed
3 up front," right?
4       MS. MILLER: Object to form.
5    A. I see that's what the document says.
6 I'm not exactly sure what that's referring to.
7 BY MR. ELSNER:
8    Q. What is CAP underneath that in little
9 Roman Numeral i, C-A-P?
10       MS. MILLER: Object to form.
11    A. I don't recall what CAP --
12 BY MR. ELSNER:
13    Q. You don't know what CAP is?
14    A. I don't recall.
15    Q. MAX/MIN?
16    A. I don't recall MAX/MIN.
17    Q. Well, there's a maximum/minimum in the
18 amount of drugs, controlled substances, that can
19 be shipped to a pharmacy, is that right?
20       MS. MILLER: Object to form.
21    A. I don't recall what that MAX/MIN is
22 referring to.
23 BY MR. ELSNER:
24    Q. You don't know that maximum and

Page 161

1 minimum is one of the elements of a suspicious
2 order monitoring system? You had one at Henry
3 Schein that did that, right?
4       MR. MONTMINY: Object to form.
5       MS. MILLER: Object to form.
6    A. I see this document says "MAX/MIN."
7 I'm not sure what that's referring to.
8 BY MR. ELSNER:
9    Q. No idea?
10       MS. MILLER: Object to form.
11    A. I'm not sure what that process is or
12 what that is.
13 BY MR. ELSNER:
14    Q. Under number 3 it says "Aaron" -- and
15 this is Aaron Burtner, right?
16    A. Aaron was on the e-mail that I think
17 this attachment was in, so it might be Aaron
18 Burtner.
19    Q. Could be any other Burtner?
20       MS. MILLER: Object to form.
21 BY MR. ELSNER:
22    Q. Is there any other Aarons that you're
23 familiar with at CVS that were working on the
24 suspicious order monitoring program?

Page 162

1    A.  Not that I recall.
2    Q.  Okay.  So "Aaron reviews orders pushed
3  through after it is reviewed.  Aaron gets all
4  the following information:  CAP, Algorithm
5  Output, Minimum/Maximum."
6        What does it mean that Aaron reviews
7  the orders pushed through after it is reviewed?
8    A.  I'm not sure what I was referring to
9  there.
10   Q.  Aaron was in charge of the suspicious
11  order monitoring system, and he was based in
12  Indianapolis at this time, correct?
13       MS. MILLER:  Object to form.
14   A.  I don't recall exactly what Aaron's
15  role was especially at this time.
16  BY MR. ELSNER:
17   Q.  Were you aware of anyone else that was
18  reviewing suspicious orders in the suspicious
19  order monitoring system in CVS at this time in
20  2012?
21   A.  I don't recall the individuals that
22  were on the SOM team at that time.
23   Q.  Why is it important to do a due
24  diligence review up front as opposed to after?

Page 163

1        MS. MILLER:  Object to form.
2  Mischaracterizes the document.
3        MR. ELSNER:  I'm not talking about the
4  document.
5  BY MR. ELSNER:
6    Q.  Why is it important to do your reviews
7  up front as opposed to after?
8        MS. MILLER:  Object to form.
9    A.  I'm not sure what up front is.  And
10  looking at the document, it's a question mark,
11  so I don't know if I'm even stating that, it's a
12  question.  And I don't know what up front is
13  referring to.
14  BY MR. ELSNER:
15   Q.  In number 3 it says that "Aaron is
16  reviewing orders pushed through after it is
17  reviewed," meaning he gets all the information
18  afterwards, not up front, correct?
19       MS. MILLER:  Object to form.
20   A.  I don't know what up front means, so I
21  can't say what you're saying is accurate.
22  BY MR. ELSNER:
23   Q.  You wrote "Aaron reviews orders pushed
24  through after it is reviewed," right?

Page 164

1        MS. MILLER:  Object to form.
2  BY MR. ELSNER:
3    Q.  Is that what you wrote?
4        MS. MILLER:  Object to form.
5    A.  I see what's written there, but I
6  don't know what "pushed through" means.  I don't
7  know what that's referring to.
8  BY MR. ELSNER:
9    Q.  Under number 4 it says "By doing the
10  'CAPS' we are modifying the order and not
11  looking at the actual order from the store."
12  What does that mean?
13       MS. MILLER:  Object to form.
14   A.  I don't recall what CAPS are, and I
15  don't recall ever a time that we weren't looking
16  at actual orders from the store.  I don't know
17  what that means.
18  BY MR. ELSNER:
19   Q.  I believe CAPS is modifying the actual
20  order that comes into the store, putting it in a
21  different form for someone else to review rather
22  than looking at the actual order of the
23  pharmacy.  Were you aware that was a potential
24  weakness of the SOM system?

Page 165

1        MS. MILLER:  Object to form.
2    A.  I don't recall CAPS being a weakness
3  of a system that we had.
4  BY MR. ELSNER:
5    Q.  You wrote "By doing the 'CAPS' we are
6  modifying the order and not looking at the
7  actual order from the store."  That's what you
8  wrote, correct?
9        MS. MILLER:  Object to form.
10   A.  That's what this document says.  I
11  don't recall drafting this document, and I don't
12  recall exactly what it's referring to.
13  BY MR. ELSNER:
14   Q.  One of the other weaknesses of the SOM
15  system in November of 2012 is that if a store
16  ordered a controlled substance and it was
17  cleared at the beginning of the month, then the
18  store could order additional controlled
19  substances in the same month without triggering
20  the suspicious order monitoring system, isn't
21  that right?
22       MS. MILLER:  Object to form.
23   A.  I don't -- I don't see where that --
24  you state that's a weakness, nor do I recall

Page 166

1  that ever being a weakness of the system.
2  BY MR. ELSNER:
3      Q.  Well, these are opportunities to
4  enhance the system, correct, to fix it, right?
5          MS. MILLER:  Object to form.
6  BY MR. ELSNER:
7      Q.  Is that what it says in the title?
8          MS. MILLER:  Object to form.
9      A.  The document says opportunities.
10  Opportunities to me don't mean fixes, they're
11  opportunities.  This was during a time where we
12  were looking to enhance our system, so these are
13  my thoughts on paper for enhancement.
14  BY MR. ELSNER:
15      Q.  Opportunities to make it better,
16  right?
17          MS. MILLER:  Object to form.
18      A.  They're opportunities that we were
19  talking about at the time we were putting
20  together and developing and enhancing a new
21  system.
22  BY MR. ELSNER:
23      Q.  To make the system better, right?
24          MS. MILLER:  Object to form.

Page 167

1  BY MR. ELSNER:
2      Q.  They weren't opportunities to make it
3  worse, right?  You weren't talking about ways to
4  make it weaker, were you?
5          MS. MILLER:  Object to form.
6      A.  I mean, we were looking to make the
7  process better.  But at the time it's not that
8  our process was broken, I felt we had a good
9  process.  This is an opportunity for
10  enhancement.
11  BY MR. ELSNER:
12      Q.  And one of those opportunities that
13  you wrote is if an "order is cleared on the 1st
14  of the month and cleared, and store then orders
15  again that month it won't be looked at."  Is
16  that what you wrote?
17          MS. MILLER:  Object to form.
18      A.  Again, I don't remember drafting this
19  document.  That's what it says.  But I don't
20  ever remember that being the case.
21  BY MR. ELSNER:
22      Q.  But that's what the document says, is
23  that right?
24      A.  That is what this document says.

Page 168

1      Q.  And you'd agree with me that that is a
2  weakness in the system, would you not?
3          MS. MILLER:  Object to form.
4  BY MR. ELSNER:
5      Q.  If the store orders in the beginning
6  of the month and then it has a subsequent order
7  that's not looked at or looked at using old
8  data, that's a weakness in the system, correct?
9          MS. MILLER:  Object to form.
10      A.  No.
11  BY MR. ELSNER:
12      Q.  You don't think so?
13          MS. MILLER:  Object to form.
14      A.  No, not necessarily.
15  BY MR. ELSNER:
16      Q.  What's your title at CVS today?
17      A.  Director, business compliance officer.
18      Q.  And what are your responsibilities as
19  the director of the business compliance?
20      A.  My focus is on our retail business,
21  and focusing on new laws and regulations.
22      Q.  And you don't think as the director of
23  business compliance that it would be a weakness
24  if a store ordered some controlled substance in

Page 169

1  the beginning of the month and then had a
2  subsequent order in that same month, that that
3  information reviewed is not based on a current
4  review of the information but on an old review
5  of that information?
6          MS. MILLER:  Object to form.
7      A.  I see what the document says.  That's
8  not how I remember the process being.
9  BY MR. ELSNER:
10      Q.  But that's what you wrote, right?
11          MS. MILLER:  Object to form.
12      A.  That's what this document says.  I
13  don't recall writing this document.
14  BY MR. ELSNER:
15      Q.  Fair to say that your memory about
16  what was happening in 2011 is better based on
17  your notes of that meeting taken the day of or
18  the next day than your memory sitting here
19  today?
20          MS. MILLER:  Object to form.
21  BY MR. ELSNER:
22      Q.  Is that true?
23          MS. MILLER:  Object to form.
24      A.  Again, I don't remember drafting this

Page 170

1  document, I don't remember the meeting that this
2  is referring to, I don't recall this being the
3  process that we followed.
4  BY MR. ELSNER:
5      Q.  But your notes of that meeting would
6  be a more accurate recitation of what was
7  discussed than your memory of it today since you
8  have no memory of the meeting, right?
9          MS. MILLER:  Object to form.
10     A.  This is a document of opportunities.
11 I don't remember writing it, I don't remember
12 that being the process, nor do I know if what is
13 in here is accurate since this is not what I
14 recall the process being.
15 BY MR. ELSNER:
16     Q.  That wasn't my question.
17         My question is that what you wrote,
18 your notes of that meeting, would be more
19 accurate as to what took place than your memory
20 of it sitting here today when you've testified
21 that you have no memory of attending the
22 meeting, correct?
23         MS. MILLER:  Object to form.
24 BY MR. ELSNER:

Page 171

1      Q.  What's more accurate, your memory now
2  or the notes you took of the meeting then?
3          MS. MILLER:  Object to form.
4      A.  I don't recall this being my notes
5  from the meeting, or a meeting.
6  BY MR. ELSNER:
7      Q.  But you sent them around to people as
8  your notes of the meeting, right?
9          MS. MILLER:  Object to form.
10 BY MR. ELSNER:
11     Q.  Sir, it's a basic question.  What's
12 more reliable, the notes you took at the time,
13 or your memory of those events when you've
14 testified already that you don't remember
15 writing the memo and you don't even remember the
16 meeting?
17         MS. MILLER:  Object to form.
18 BY MR. ELSNER:
19     Q.  You would agree with me that your
20 notes at the time are more accurate, right?
21         MS. MILLER:  Object to form.
22     A.  I don't remember writing this
23 document, and I can't confirm this is my notes
24 from the meeting or a meeting.

Page 172

1  BY MR. ELSNER:
2      Q.  It's potentially your e-mail that was
3  produced to us by CVS.  You're denying that it
4  took place.  You're denying the e-mail exists
5  and the notes took place.  Is that what you're
6  doing?
7          MS. MILLER:  Object to form.
8  Misstates his testimony.
9          MR. ELSNER:  It does not.
10     A.  I'm not denying there's an e-mail.  I
11 see the e-mail.
12 BY MR. ELSNER:
13     Q.  And you see that these are your notes,
14 correct?
15     A.  I can't say that these are my notes.
16 I don't remember writing this document.
17     Q.  Sir, I'm entitled to an answer to the
18 question.
19         What's more accurate in your mind,
20 your memory of a meeting that you can't remember
21 or your actual notes taken from the meeting,
22 which is more reliable and accurate in your
23 mind?
24         MS. MILLER:  Object to form.

Page 173

1      A.  I cannot say that these are my
2  reliable notes from a meeting that I don't
3  remember took place and I don't remember
4  writing.
5  BY MR. ELSNER:
6      Q.  Number 6, another opportunity to
7  create a better system is to have an automatic
8  hard stop of orders for controlled substances,
9  correct?
10         MS. MILLER:  Objection to form.
11     A.  I see that Number 6, "No automatic
12 hard stops of orders."  I see where that's
13 written.
14 BY MR. ELSNER:
15     Q.  It would be better if the system was
16 automatic and didn't require someone to send an
17 e-mail and then hope that someone received the
18 e-mail and stopped the order, correct?
19         MS. MILLER:  Object to form.
20     A.  Not necessarily.
21 BY MR. ELSNER:
22     Q.  Does the new system have a hard stop
23 or not?
24         MS. MILLER:  Object to form.

Page 174

1    A.  The new system, when an order is
2  flagged, it holds the order.
3  BY MR. ELSNER:
4    Q.  Why?  Is it a better system than
5  relying on e-mails and phone calls?
6        MS. MILLER:  Object to form.
7    A.  Not necessarily.
8  BY MR. ELSNER:
9    Q.  Why did you change it?
10       MS. MILLER:  Object to form.
11   A.  The decision was made to change it.
12  BY MR. ELSNER:
13   Q.  Did you agree to change it?
14   A.  I don't recall having an objection.
15   Q.  Did you support it?
16       MS. MILLER:  Object to form.
17   A.  I don't know if this is the only
18  solution that I would have supported.  There's
19  multiple ways of stopping orders, there could
20  have been others, but this is the decision we
21  went with, and I believe I supported the
22  decision we went with.
23  BY MR. ELSNER:
24   Q.  Okay.  And so that was another

Page 175

1  opportunity to enhance or fix or remedy or
2  create a better system at CVS was to have an
3  automatic hard stop of the order.  That's what
4  you wrote, correct?
5        MS. MILLER:  Object to form.
6    A.  Like I said, I don't recall writing
7  this, and at no time do I recall there ever
8  needing to be a fix of the current SOM system.
9  BY MR. ELSNER:
10   Q.  But it was changed, right --
11       MS. MILLER:  Object to form.
12  BY MR. ELSNER:
13   Q.  -- to a hard stop of the order?
14       MS. MILLER:  Object to form.
15   A.  Today our process, I believe, has a
16  hard stop.
17  BY MR. ELSNER:
18   Q.  Under the old system, in order for the
19  stop to occur someone would either have to send
20  an e-mail or place a phone call in order to do
21  that, correct?
22       MS. MILLER:  Object to form.
23   A.  I don't fully recall what that process
24  was.

Page 176

1  BY MR. ELSNER:
2    Q.  Well, that's what you wrote under 6A,
3  right, "Happens via e-mail/phone call - DC and
4  LP Manager"?  Is that what you wrote?
5        MS. MILLER:  Object to form.
6    A.  Again, I don't recall writing this
7  document.  I see that it says that there.  I
8  don't fully recall what the process was.
9  BY MR. ELSNER:
10   Q.  In November of 2012 when a suspicious
11  order was flagged or stopped by the system, not
12  all controlled substances to that pharmacy were
13  stopped, correct?
14       MS. MILLER:  Object to form.
15   A.  So the system flagged orders of
16  interest.
17  BY MR. ELSNER:
18   Q.  Yes.
19   A.  So that's what it was designed to do.
20   Q.  Okay.  And when those orders of
21  interest were reviewed and it was determined
22  that there was a potentially suspicious order,
23  additional orders of that same controlled
24  substance would be stopped from being shipped to

Page 177

1  the pharmacy, correct?
2        MS. MILLER:  Object to form.
3    A.  I recall the system when an order
4  flagged, whatever flagged was reviewed.
5  BY MR. ELSNER:
6    Q.  Right.  And then if there was a
7  decision made that it was a suspicious order,
8  then there would be a stop placed on further
9  shipments of that same drug to that pharmacy,
10  correct?
11       MS. MILLER:  Object to form.
12   A.  I don't recall what that process was.
13  BY MR. ELSNER:
14   Q.  You wrote "Only the order in question
15  is stopped, not all controlled substances" are
16  stopped, correct?
17       MS. MILLER:  Object to form.
18   A.  I don't remember writing this
19  document, but that is what it says.
20  BY MR. ELSNER:
21   Q.  You did a whole risk analysis for CVS
22  on what the procedure should be, right?  Whether
23  we stop only that drug, whether we stop all
24  controlled substances, whether we stop only the

Page 178

1  drugs in that family of drugs, you did a whole
2  risk analysis of that, correct?
3      MS. MILLER:  Object to form.
4      A.  I know there were discussions around
5  how to approach it.  I don't know if I ever did
6  a deep dive risk assessment.
7  MR. ELSNER:  All right.  This is Exhibit 11.
8      (Whereupon, CVS-Schiavo-11 was marked
9      for identification.)
10 BY MR. ELSNER:
11     Q.  This is an e-mail from you to your
12 boss, Tom Bourque, dated December 13, 2012,
13 correct?
14     A.  That's what it looks like.
15     Q.  It says "Attached is what I put
16 together for our options on what to do if an
17 order flags."  Correct?  Is that what you wrote?
18     A.  That's what it says.
19     Q.  Okay.  And the attachment that you
20 sent to your boss, Tom Bourque, says "Suspicious
21 Order Monitoring.  Holding of Flagged Order
22 Options," right?
23     A.  That's the title of this document.
24     Q.  Okay.  And on the very bottom of the

Page 179

1  page, the first page there, 78046, there's a
2  Risks, there's a "Risks" column in the middle.
3      Do you see that?
4      A.  I see the Risks column.
5      Q.  Okay.
6      MS. MILLER:  Do you want to take a
7  minute to review this?
8      A.  Yeah, can I read through?
9  BY MR. ELSNER:
10     Q.  Sure.
11     (Witness reviewing document.)
12     A.  Okay.
13     Q.  Are you with me?
14     So if we go to the very bottom of the
15 page, there are three options discussed, right?
16 The last option, the very bottom one says "Hold
17 only the Controlled Substances that was flagged
18 by the SOM System on the order from being sent
19 to the store, along with Future Orders."
20 Meaning they were just going to hold the exact
21 controlled substance that was flagged, correct?
22     MS. MILLER:  Object to form.
23 BY MR. ELSNER:
24     Q.  Is that what it says?

Page 180

1      MS. MILLER:  Object to form.
2      A.  So I see that on this document.
3  Again, this is a document, until seeing it now,
4  I don't recall writing this document or
5  reviewing this document.
6  BY MR. ELSNER:
7      Q.  Okay.  And you assessed the risk of
8  that policy and procedure to be high, correct?
9      MS. MILLER:  Object to form.
10     A.  I see the risk level there indicated
11 high, but I don't know if that was me making
12 that determination or if this was --
13 BY MR. ELSNER:
14     Q.  That's what's written on the chart
15 that you sent to your boss Tom Bourque, correct?
16     MS. MILLER:  Object to form.
17     A.  It appears from the cover e-mail I did
18 send this, and it says "Risk Level, High."
19 BY MR. ELSNER:
20     Q.  Okay.  And the risk that you describe
21 is that by holding only the controlled substance
22 that is flagged in an order, the store could
23 easily switch to a similar drug of abuse,
24 correct?

Page 181

1      MS. MILLER:  Object to form.
2  BY MR. ELSNER:
3      Q.  Is that what you wrote?
4      A.  I see the document says that.  I don't
5  know if I wrote that.
6      Q.  But it's on the document that you sent
7  to Tom Bourque, your boss, correct?
8      MS. MILLER:  Object to form.
9      A.  It's on this document that seems to be
10 that attachment in that e-mail.
11 BY MR. ELSNER:
12     Q.  And then under "Comments" you say
13 "This option carries the most risk and would
14 possibly create more 'Suspicious Orders' for
15 that store (from CVS and Outside Vendor), that
16 will be required to be reported to the DEA.
17 This will increase the likelihood of an
18 inspection."  Correct?
19     MS. MILLER:  Object to form.
20     A.  I see where this document says that.
21 BY MR. ELSNER:
22     Q.  Okay.  It also increases the risk of
23 diversion, right?
24     MS. MILLER:  Object to form.

Page 182

1     A. It doesn't say that. I don't know.
2 BY MR. ELSNER:
3     Q. Does it increase the risk of
4 diversion? It does, doesn't it?
5        MS. MILLER: Object to form.
6     A. No.
7 BY MR. ELSNER:
8     Q. It increases the risk because the
9 pharmacy, as you wrote, could switch from one
10 drug to another drug of abuse, right?
11        MS. MILLER: Object to form.
12     A. Again, I don't remember writing this
13 document, nor this process that you're referring
14 to. I don't know this to be a process we ever
15 had, and I don't believe this is a process we
16 ever implemented. And I don't know if it would
17 increase diversion.
18 BY MR. ELSNER:
19     Q. You wrote under Risks in the middle
20 column "the store will easily be able to switch
21 to a similar drug of abuse." Correct?
22        MS. MILLER: Object to form.
23     A. I see where the document says that. I
24 don't remember writing that.

Page 183

1 BY MR. ELSNER:
2     Q. Under the second option, it says "Hold
3 All High Risk Controlled Substances, Known
4 Combination, and/or Drugs in the Same Family on
5 the same flagged order from being sent to the
6 store, along with future orders."
7     Did I read that correctly?
8        MS. MILLER: Object to form.
9     A. It looks like that's what the document
10 says.
11 BY MR. ELSNER:
12     Q. And you assessed this as a medium
13 risk, correct?
14        MS. MILLER: Object to form.
15     A. I can't recall if that is my risk
16 assessment on that.
17 BY MR. ELSNER:
18     Q. But that's what the document says,
19 right?
20     A. I can see on this document under risk
21 level, that one indicates medium.
22     Q. And under the third bullet under Risks
23 it says "Possible that diversion of another
24 controlled substance will take place while the

Page 184

1 flagged drug is being held." Is that what you
2 wrote?
3     A. I don't know if I wrote that.
4     Q. That's what the document says that you
5 sent to your boss, right?
6     A. That is what this document says.
7     Q. And then you say "If another
8 controlled substance hits our SOM system, or an
9 Outside Vendor's SOM system on the next order,
10 we or they will be required to report that as
11 well. This could trigger questions from the DEA
12 on why we are shipping to a store or letting a
13 store order that we already identified as
14 Suspicious." Is that what you wrote?
15        MS. MILLER: Object to form.
16     A. I don't remember writing that.
17 BY MR. ELSNER:
18     Q. Is that what's in the document that
19 you sent to your boss?
20     A. That is what's in this document.
21     Q. Do you understand that to be a risk of
22 this medium option of holding all the drugs in
23 the same family group?
24        MS. MILLER: Object to form.

Page 185

1     A. I can't say whether that is
2 specifically a risk of this option, but this is
3 another option that I don't know if we ever --
4 this was ever our process, nor is it our process
5 today.
6 BY MR. ELSNER:
7     Q. In the last comment in that middle
8 column, it reads "As part of the DEA
9 Regulations, they expect the registrant to 'know
10 your customer,' by reporting an order as
11 suspicious, while continuing to ship controlled
12 substances, the DEA could argue that drugs were
13 being shipped without us fully knowing" -- I
14 think you mean our, whoever drafted this -- "our
15 customers." Is that correct? Did I read that
16 correctly?
17        MS. MILLER: Object to form.
18     A. It says "knowing out customer," as it
19 reads.
20 BY MR. ELSNER:
21     Q. I'm sure it's a typo. That means our,
22 right?
23     A. Could mean our.
24     Q. And that was another comment or risk

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1  that the DEA might conclude that CVS doesn't
2  know who its customer is if we adopt this middle
3  ground, correct?
4      MS. MILLER:  Object to form.
5      A.  That is what this document says under
6  this option.  But again, I don't recall if we
7  ever -- this was ever our policy, nor is it our
8  policy today.
9  BY MR. ELSNER:
10     Q.  The lowest risk option would be that
11 if you identify a suspicious order for a
12 controlled substance would be to stop shipments
13 of all controlled substances into that pharmacy
14 until you resolve the issue, correct?
15     MS. MILLER:  Object to form.
16     A.  The option "Hold all Controlled
17 Substances on the Flagged Order from being sent
18 to the store, along with future orders" is what
19 it says.
20 BY MR. ELSNER:
21     Q.  And that would be the lowest risk
22 option, correct?
23     MS. MILLER:  Object to form.
24     A.  This document says under Risk Level

Page 187

1  "Low."
2  BY MR. ELSNER:
3      Q.  Right.  Lowest risk of diversion,
4  right?  Because you're stopping all future, all
5  controlled substances, not just the family group
6  and not just the individual drug, right?
7      MS. MILLER:  Object to form.
8      A.  I can't say specific to what that risk
9  level is referring to.
10 BY MR. ELSNER:
11     Q.  What does CVS do today with respect to
12 suspicious orders for controlled substances?  Do
13 you block all future orders to the pharmacy from
14 the family group, all controlled substances, or
15 only that drug?
16     MS. MILLER:  Object to form.
17     A.  If an order is deemed suspicious we
18 report it to the DEA, and I believe we hold the
19 family group of the drug that was identified to
20 be suspicious.
21 BY MR. ELSNER:
22     Q.  So CVS's approach is the medium
23 approach in terms of the risk levels identified
24 in this document, correct?

Page 188

1      MS. MILLER:  Object to form.
2  BY MR. ELSNER:
3      Q.  To hold all the high-risk controlled
4  substances, known combination, and/or drugs in
5  the same family as the flagged order, correct?
6      MS. MILLER:  Object to form.
7      A.  No, I don't believe that's the exact
8  solution that we went with.
9  BY MR. ELSNER:
10     Q.  You told me that today CVS blocks all
11 of the orders of controlled substances in the
12 same family group as the suspicious order along
13 with future orders in that family group,
14 correct?
15     MS. MILLER:  Object to form.
16     A.  I'm just reading what's on the
17 document.  It says "Hold All High Risk
18 Controlled Substances," which I don't know what
19 drugs that's referring to, "Known combinations,
20 and/or Drugs in Same Family."  This seems to be
21 different than I recall our process being.
22 BY MR. ELSNER:
23     Q.  If we turn back to item 7 in the
24 opportunities document.  Are you with me, Number

Page 189

1  7?
2      A.  Number 7.
3      Q.  You wrote only the order in question
4  is stopped, not all controlled substances,
5  correct?
6      A.  Again, we're back on the document I
7  don't remember writing, but it says "Only order
8  in question is stopped, not all controlled
9  substances."
10     Q.  Okay.  So not all controlled
11 substances to the pharmacy were stopped, and not
12 all drugs of the same family group were stopped,
13 right, only order in question is stopped, is
14 that what you wrote?
15     MS. MILLER:  Object to form.
16     A.  I can't say that I wrote that, and I
17 don't recall if that was the process, was or was
18 not the process.
19 BY MR. ELSNER:
20     Q.  But that's what's written here,
21 correct?
22     A.  The document here reads "Only order in
23 question is stopped, not all controlled
24 substances."

Page 190

1    MR. ELSNER: Okay. I'm going to mark
2  this next document as the next exhibit. This is
3  MR 12. It's also Schiavo 12. That doesn't
4  happen very often.
5    (Whereupon, CVS-Schiavo-12 was marked
6    for identification.)
7  BY MR. ELSNER:
8    Q. This is another e-mail from you to
9  your boss, Tom Bourque, dated January 23, 2013.
10  The subject is "Stop Order_Order Resumption."
11  And then it states "Updated SOM SOP. Thank you,
12  Craig."
13    Is that what you wrote to your boss,
14  Tom Bourque?
15    A. Looking at this e-mail, it looks like
16  I wrote that.
17    Q. And it looks like you received in the
18  e-mail prior to that an e-mail from Aaron
19  Burtner who made some recommendation --
20  recommended changes, and you've attached the
21  updated SOP for stopped order resumption,
22  correct? Is that what Aaron Burtner wrote to
23  you, among others?
24    MS. MILLER: Object to form.

Page 191

1    A. I see Aaron's e-mail. I'm in the
2  "To," and then I see an e-mail to my boss with
3  an attachment.
4  BY MR. ELSNER:
5    Q. Okay. And if you look at the
6  attachment, this is actually the SOM process,
7  the Stop Order/Order Resumption process,
8  Revision Number 3 dated January 21, 2013,
9  correct?
10    MS. MILLER: Object to form.
11    A. That's the date on this document.
12  BY MR. ELSNER:
13    Q. Okay. And you know from manuals at
14  CVS that if you look on the last page you can
15  look at the history of the revision of the
16  document, correct?
17    MS. MILLER: Object to form.
18    A. I believe most of our policies at CVS
19  have a section like this at the end.
20  BY MR. ELSNER:
21    Q. Okay. And so it says that this
22  document was created for the first time on
23  January 7, 2013, right? That was the first
24  version of this?

Page 192

1    A. That's what it says under "Revision
2  Documentation."
3    Q. Okay. So CVS never had a policy
4  before January 1, 2013, a written policy, with
5  respect to when an order should be stopped and
6  how that order should be resumed as part of its
7  standard operating procedures, correct?
8    MS. MILLER: Object to form.
9    A. I don't recall that to be the case.
10  BY MR. ELSNER:
11    Q. Well, that's what the document says,
12  right, that this is the first -- that the first
13  version of this standard operating procedure
14  with respect to stop orders was January 7, 2013,
15  right?
16    MS. MILLER: Object to form.
17    A. That's what it says under "Revision
18  Documentation." That's not to say this wasn't
19  covered in another policy.
20  BY MR. ELSNER:
21    Q. Was it?
22    MS. MILLER: Object to the form.
23    A. I don't recall.
24  BY MR. ELSNER:

Page 193

1    Q. Isn't it true that the practice at the
2  time in 2012 if there was a suspicious order
3  that was presented, that CVS would only stop
4  that same drug from being shipped to the
5  pharmacy?
6    MS. MILLER: Object to form.
7    A. I don't recall what that process was.
8  BY MR. ELSNER:
9    Q. If you turn to Page 2 of 3 of the
10  document, sort of the first full paragraph
11  beginning with the sentence "Once." Do you see
12  the paragraph I'm speaking about?
13    A. "Once an order of interest"?
14    Q. Yes. It reads "Once an order of
15  interest is identified, the SOM Analyst will
16  complete all the necessary due diligence and the
17  SOM Manager will be notified to review the
18  order." And then it describes the due diligence
19  and what it will include, "contacting the
20  pharmacist, reviewing dispensing data, reviewing
21  ordering data, etcetera." Then it reads "If the
22  SOM Manager agrees that the order is an order of
23  interest, the Distribution Center will be
24  contacted, both by e-mail and telephone, by the

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 SOM Manager to place a Hold on the drug family
2 in question on the order of interest." Is that
3 what it says?
4    A.  It appears that's what it says.
5    Q.  Okay.  So CVS said part of this new
6 policy is going to hold the drug family in
7 question for the order of interest, the middle
8 ground risk level that we just discussed in your
9 risk analysis, correct?
10        MS. MILLER:  Object to form.
11    A.  So like I said, I see that this is the
12 creation of this document.  I can't say whether
13 or not that is a new process or we implemented
14 it into this process and that was the process.
15 BY MR. ELSNER:
16    Q.  Okay.  But at least at this point in
17 time, January 21, 2013, the process would be
18 there's an order of interest, you hold all the
19 drug family in question on that order of
20 interest and don't ship that family of drugs,
21 the middle risk policy that you described in
22 your prior document, correct?
23        MS. MILLER:  Object to form.
24        If you want to look at the other

Page 195

1 document he's referring to --
2    A.  Which was the other document, this?
3 BY MR. ELSNER:
4    Q.  I'm talking about the risk analysis
5 that you did.  We're talking about the middle
6 ground, right, hold the family in question?
7    A.  These don't seem to be exactly the
8 same.
9    Q.  What's the difference?
10    A.  On this previous document that we
11 reviewed that I think you said I drafted, I
12 don't remember drafting it.  This is talking
13 about known combinations, high-risk controlled
14 substances, which I don't know what that's
15 referring to.  Doesn't seem to be exactly the
16 same.
17    Q.  Okay.  Would you agree that it's a
18 middle risk to hold all the drugs in the same
19 family group, whereas it would be a lower risk
20 to stop all controlled substances being shipped
21 to that pharmacy after an order of interest or
22 suspicion?
23        MS. MILLER:  Object to form.
24    A.  Not sure I'm the one who determines

Page 196

1 the risk on something like that.
2 BY MR. ELSNER:
3    Q.  Well, you're the director of business
4 compliance at CVS, right?
5        MS. MILLER:  Object to form.
6    A.  My current title is director, business
7 compliance officer.
8 BY MR. ELSNER:
9    Q.  Okay.  Would you agree that it would
10 be less risky if you just stopped all controlled
11 substances as opposed to only the controlled
12 substances in the family group identified?
13        MS. MILLER:  Object to form.
14    A.  I can't say that that would be more or
15 less risky.
16 BY MR. ELSNER:
17    Q.  If you go to the bottom, if we're back
18 to the manual, in the -- there's sort of two big
19 bullets at the end of the document, beginning
20 with a sentence that starts "If the order of
21 interest is determined to be suspicious, the
22 following steps, but not limited to, may be
23 taken."
24        Do you see where I'm at?

Page 197

1        MS. MILLER:  Mike --
2        MR. ELSNER:  We're on Page 25368.
3        MS. MILLER:  Got it.  Thank you.
4 Where on the page?
5        MR. ELSNER:  It's blown up for you
6 right next to you.
7 BY MR. ELSNER:
8    Q.  "If the order of interest is
9 determined to be suspicious, the following
10 steps, but not limited to, may be taken."  Do
11 you see where I'm at?
12    A.  I see where you are in the document.
13    Q.  And it says "The SOM Manager will
14 contact the Distribution Center and instruct
15 to," and it says "Cancel the items previously
16 held (family group); Complete a Mark Out on all
17 items to be cancelled; Provide the SOM Manager
18 with a copy of the Quality Scan for the tote
19 containing the suspicious order (family group);
20 and Discontinue shipping the drug family in
21 question to the store in question until further
22 instruction is received."
23        Is that what the policy was as of
24 January 21, 2013?

Page 198

1    A.  I don't recall that exact process.
2    Q.  Is that what the document says?
3    A.  How you read it is accurately how it
4  appears in the document.
5    Q.  If we go back to your opportunities
6  chart -- actually just one last question on
7  this.
8        Who made the decision to draft this
9  stop order policy?
10       MS. MILLER:  Object, basis of
11  attorney/client privilege.
12       To the extent you can answer without
13  revealing attorney/client communications, you
14  may answer.
15   A.  I don't recall.
16  BY MR. ELSNER:
17   Q.  Okay.  If you go back to MR 12 that we
18  were looking at, which is the e-mail.  That's
19  the right document.
20       MS. MILLER:  The cover e-mail on the
21  same document?
22  BY MR. ELSNER:
23   Q.  The cover e-mail.  The stop order
24  policy.  Do you see where we're at?

Page 199

1    A.  I see the document.
2    Q.  If you go to the second page, it's
3  25366.
4    A.  Okay.
5    Q.  This is an e-mail from you to Aaron
6  Burtner.  It says "Aaron, I made a couple of
7  suggestions and had a couple questions, anything
8  I added is in green.  If you don't agree with
9  any of the suggestions, please feel free to
10  leave them out.
11       "Nice job putting this together, it
12  looks really good and covers the entire process
13  very clearly."
14       Is that what you wrote?
15   A.  That e-mail is from me, and it is to
16  Aaron.
17   Q.  So Aaron drafted the first policy and
18  procedure manual, is that right?
19       MS. MILLER:  Object to form.
20   A.  I don't recall if he was the one to
21  draft this policy.
22  BY MR. ELSNER:
23   Q.  But you congratulated him for putting
24  this together, is that what you wrote?

Page 200

1        MS. MILLER:  Object to form.
2    A.  I see that the e-mail says "Nice job
3  putting this together."
4  BY MR. ELSNER:
5    Q.  And that indicates that he put it
6  together?
7        MS. MILLER:  Object to form.
8    A.  It indicates I said nice job putting
9  it together.
10  BY MR. ELSNER:
11   Q.  But it doesn't indicate he did?
12       MS. MILLER:  Object to form.
13   A.  I don't know if Aaron is the one who
14  created this document.
15  BY MR. ELSNER:
16   Q.  Okay.  If you look at the next
17  document -- e-mail above it, you send an e-mail
18  to Christopher Tulley and Dean Vanelli.  "Stop
19  Order_Order Resumption" process.  "Chris and
20  Dean, I made a couple suggestions to Aaron's
21  changes.  I got his out of office as I forgot he
22  was leaving early today.  Thank you."
23       So this is you forwarding the policy
24  and procedure to Chris Tulley and Dean Vanelli,

Page 201

1  is that right?
2    A.  That's what it appears to be.
3    Q.  Okay.  Then Dean Vanelli in the next
4  e-mail, he makes some changes in blue font, and
5  he forwards those changes to the same document
6  to you and Aaron Burtner, among others, is that
7  right?
8        MS. MILLER:  Object to form.
9    A.  I see an e-mail from Dean to -- and I
10  am on the list of people who received it.
11  BY MR. ELSNER:
12   Q.  So Dean made some edits, right?
13       MS. MILLER:  Object to form.
14   A.  I don't recall this e-mail trail, but
15  Dean's e-mail here indicates that he made
16  changes in blue.
17  BY MR. ELSNER:
18   Q.  Okay.  And then after that Aaron made
19  some -- made the recommended changes, and he's
20  attached the updated SOP, correct?
21       MS. MILLER:  Object to form.
22  BY MR. ELSNER:
23   Q.  Is that what he wrote?
24   A.  Aaron has an e-mail stating "I made

Page 202

1  recommended changes and have attached updated
2  SOP." And I am on that "To" list.
3      Q. And you sent that to Tom Bourque,
4  right?
5      A. It looks like I forwarded this to Tom
6  Bourque.
7      Q. Okay. So you participated in the
8  drafting of the SOM SOP as it relates to stop
9  orders, right?
10         MS. MILLER: Object to form.
11     A. I don't recall reviewing or providing
12 feedback. Going off of this document, it looks
13 like I made some suggestions.
14 BY MR. ELSNER:
15     Q. If we go back to the opportunities
16 document, it's true at this time that when the
17 algorithm for the suspicious order monitoring
18 program flagged certain orders, that about 2 to
19 3 percent of the orders that were flagged would
20 be reviewed for an enhanced review by Aaron
21 Burtner, correct?
22         MS. MILLER: Object to form.
23     A. I don't remember that to be the case.
24 BY MR. ELSNER:

Page 203

1      Q. Okay. If you look under number 8, it
2  says "100-plus Orders flagged by the system,
3  looked (past history, Algorithm, MAX/MIN)."
4      Do you see that line? Did I read it
5  right?
6      A. I see where it says that.
7      Q. Okay. And it says "2 to 3 were
8  stopped by Aaron for review."
9      Did I read that correctly?
10     A. I see where it says that.
11     Q. And then there are three things
12 listed, "Deeper dive review; Dispensing versus
13 Ordering; Reach out to store."
14     Do you see that?
15     A. I see where it says that.
16     Q. So do you understand that of the 100
17 orders flagged by the system, about 2 to 3 of
18 those 100 orders would be stopped by Aaron for
19 review and then he would do a deeper dive on
20 those 2 to 3 orders considering the dispensing
21 and ordering history, and he'd reach out to some
22 of the stores.
23     Do you see that?
24         MS. MILLER: Object to form.

Page 204

1      A. I see where this document says
2  "100-plus orders flagged by system, looked." I
3  don't know what that means. I don't know where
4  I'm getting 100-plus orders from or the time
5  frame or -- I see where it says it in the
6  document. I'm not sure exactly what it means.
7  BY MR. ELSNER:
8      Q. Were you aware that Aaron Burtner was
9  looking at about 2 to 3 percent of 100 orders
10 flagged by the suspicious order monitoring
11 system to do a deeper dive?
12         MS. MILLER: Object to form.
13     A. The document says "100-plus orders
14 flagged by system, looked (past history,
15 Algorithm, MAX/MIN)." Then "2-3 were stopped."
16 I don't exactly know what order that's referring
17 to or, again, I don't recall drafting this
18 document or seeing this document.
19 BY MR. ELSNER:
20     Q. When the suspicious order monitoring
21 system flagged an order as potentially
22 suspicious, Aaron Burtner was reviewing those
23 orders at this time, correct?
24         MS. MILLER: Object to form.

Page 205

1      A. At this time I don't know exactly who
2  was reviewing orders. I do know at one time
3  Aaron's responsibilities were reviewing orders.
4  BY MR. ELSNER:
5      Q. And it says in this document, "2 to 3
6  were stopped by Aaron." That's Aaron Burtner,
7  right?
8          MS. MILLER: Object to form.
9      A. Based on the cover page of this e-mail
10 and Aaron being on the e-mail, that is probably
11 Aaron.
12 BY MR. ELSNER:
13     Q. Okay. You understand that when the
14 SOM system flags suspicious orders that Aaron
15 Burtner didn't call every single pharmacy about
16 every single order that was identified or
17 flagged under the suspicious order monitoring
18 system, right?
19         MS. MILLER: Object to form.
20     A. So I don't know the full process and
21 detail that the SOM team followed. I wasn't
22 involved in the day-to-day. But the system
23 itself wasn't necessarily the algorithms,
24 weren't necessarily designed to flag suspicious

Page 206

1 orders. My understanding was they were to
2 identify orders of interest.
3 BY MR. ELSNER:
4    Q. What's the difference?
5       MS. MILLER: Object to form.
6 BY MR. ELSNER:
7    Q. Orders of interest for what?
8       MS. MILLER: Object to form.
9    A. My understanding is the system was
10 designed to look at orders that potentially were
11 just different than other orders and the team
12 looked at it.
13 BY MR. ELSNER:
14    Q. I mean, orders that were unusual in
15 size, right?
16       MS. MILLER: Object to form.
17    A. I don't really know exactly what
18 the -- how the system was designed.
19 BY MR. ELSNER:
20    Q. This is important. So did the system
21 look at orders for unusual size, frequency, and
22 pattern?
23       MS. MILLER: Object to form.
24    A. My understanding is the system was

Page 207

1 designed to meet the -- our requirements as a
2 wholesale distributor.
3 BY MR. ELSNER:
4    Q. And those requirements are to identify
5 orders of suspicious size, frequency, and
6 deviation, right?
7       MS. MILLER: Object to form.
8    A. As I understand the regulation, it's
9 size, frequency, pattern, but the requirement is
10 that we have a system that identified orders,
11 and I was comfortable we had a system that did
12 that.
13 BY MR. ELSNER:
14    Q. So these are the orders of interest
15 that are being identified. These are the orders
16 of unusual size, frequency, or pattern, correct?
17 That's what the SOM system was designed to
18 detect?
19       MS. MILLER: Object to form.
20 BY MR. ELSNER:
21    Q. Or was it not? Was it not designed
22 that way?
23    A. I wasn't part of the design of the
24 system at this point. My understanding was we

Page 208

1 had a system, and I didn't have any concerns
2 with the system at that time.
3    Q. Well, part of what you were hired to
4 do was to create and implement for the
5 distribution centers a suspicious order
6 monitoring system, that's what you wrote in your
7 review, right?
8    A. Again, I don't --
9       MS. MILLER: Object to form.
10    A. I don't remember writing that review.
11 And if that's what it says, and I don't have it
12 in front of me, but I don't recall ever being
13 hired to do that.
14 BY MR. ELSNER:
15    Q. But in order to create a system, you
16 needed to understand the system that was in
17 place. So did you understand the system in
18 place to be identifying orders of interest based
19 on unusual size, frequency, or pattern?
20       MS. MILLER: Object to form.
21 BY MR. ELSNER:
22    Q. Yes or no, or I don't know.
23    A. I knew the SOM process at a high
24 level, and the way I understood it was that we

Page 209

1 built a system to comply with DEA regulation.
2    Q. And that DEA regulation at the time
3 was to identify orders of suspicious size and
4 the like, right?
5       MS. MILLER: Object to form.
6    A. The way I understand the requirement
7 is we needed to have a system.
8 BY MR. ELSNER:
9    Q. You needed to just have a system?
10    A. We needed to have a system that a -- a
11 suspicious order monitoring system.
12    Q. That would do what?
13    A. Report suspicious orders.
14    Q. And a suspicious order by the DEA was
15 considered to be what?
16       MS. MILLER: Object to form.
17    A. I don't recall ever seeing guidance
18 from the DEA as to what was suspicious.
19 BY MR. ELSNER:
20    Q. Did the system in place in 2012 at
21 CVS -- was there a system in place to identify
22 orders that deviated substantially from a normal
23 pattern or size? Did you understand that system
24 to be able to do that?

Page 210

1    MS. MILLER: Object to form.
2    A.  In 2012, I didn't -- I don't believe I
3  recall the specifics or ever knew the specifics
4  of the suspicious order monitoring system.
5  BY MR. ELSNER:
6    Q.  So you don't know whether it was in
7  compliance with DEA regulations or not, correct?
8    MS. MILLER: Object to form.
9    A.  I don't recall ever hearing or having
10  a concern that we were not fulfilling our
11  requirements.
12  BY MR. ELSNER:
13    Q.  And you didn't do any steps to
14  determine whether the system met the
15  requirements or not, correct?
16    MS. MILLER: Object to form.
17    A.  In 2012 when I first started with the
18  company, I don't recall exactly what steps I
19  took.
20  BY MR. ELSNER:
21    Q.  Well, do you know one way or the other
22  whether the system that existed before the new
23  system came into place tracked orders for --
24  orders of unusual size, deviating from a normal

Page 211

1  pattern or orders of unusual frequency?  Did the
2  system track that?
3    A.  I can't speak to the system that I
4  wasn't part of it being developed.  I just
5  recall not having any concerns that we were not
6  meeting our requirements.
7    Q.  But you didn't know one way or the
8  other, right?  You didn't know whether the
9  system tracked for that information, correct?
10    MS. MILLER: Object to form.
11    A.  I don't recall the specifics of the
12  algorithms or the system.
13    MS. MILLER: Object to form.
14  BY MR. ELSNER:
15    Q.  The orders of interest that were
16  identified by the SOM system in place in
17  November of 2012, not every order of interest
18  resulted in a deeper dive review, including
19  reaching out to the particular pharmacy in
20  question, correct?
21    MS. MILLER: Object to form.
22    A.  I can't say.  I was not part of the
23  day-to-day process.
24  BY MR. ELSNER:

Page 212

1    Q.  Do you know why one order would be
2  subject to a deeper dive than another?
3    MS. MILLER: Object to form.
4    A.  I wasn't part of that process.
5  BY MR. ELSNER:
6    Q.  Who would we ask to determine whether
7  the SOM system complied with the DEA regulations
8  in 2012?  Who at CVS?
9    MS. MILLER: Object to form.
10    A.  I would think our lawyers are the ones
11  who make that determination.
12  BY MR. ELSNER:
13    Q.  In order to determine what the system
14  was at CVS in November of 2012, if I asked you
15  to do that today, figure out for me what the
16  system was doing in 2012, who would you go talk
17  to?
18    MS. MILLER: Object to form.
19    Can we take a break soon for lunch.
20    MR. ELSNER: Not in the middle of a
21  question.
22    MS. MILLER: No, not right now, after
23  this.
24    MR. ELSNER: I've got a few more in

Page 213

1  this area and then we can move on.
2    A.  I don't recall who ran or owned the
3  SOM process at this time.
4    MS. MILLER: Craig, are you ready for
5  a break?
6    THE WITNESS: I could use a break
7  soon.
8    MS. MILLER: Can we take a break?
9  We've been going now -- we talked about 12:15.
10  We've been going at least an hour and
11  15 minutes.
12    MR. ELSNER: Okay.
13    THE VIDEOGRAPHER: We're going off the
14  record at 12:17 p.m.
15    (Whereupon, a luncheon recess was
16    taken.)
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    AFTERNOON SESSION

2

3        THE VIDEOGRAPHER: We're back on the

4    record at 12:57 p.m.

5    BY MR. ELSNER:

6        Q.  Mr. Schiavo, if we look at item number

7    9 in the opportunities list from your notes from

8    the meeting in 2012, it says "Hold or cancel

9    orders when flagged?"  And then under A it says

10   "Holding order until due diligence is completed

11   may be the best option."  Did I read that

12   correctly?

13       A.  I see that is written on this

14   document.  And just as I said earlier, I don't

15   remember writing this document.

16       Q.  Okay.  Would you agree as a matter of

17   policy that it would be best to hold an order

18   until due diligence is completed before sending

19   out that order?

20       MS. MILLER: Object to form.

21       A.  Where it's written here, I don't know

22   what hold is referring to, what part of the

23   process.

24   BY MR. ELSNER:

Page 215

1        Q.  Well, would you agree generally that

2    holding an order until you complete the due

3    diligence would be a sound due diligence

4    process?

5        MS. MILLER: Object.

6    BY MR. ELSNER:

7        Q.  Irrespective of the document.

8        MS. MILLER: Object to form.

9        A.  I'm not sure exactly what's meant by

10   hold.

11   BY MR. ELSNER:

12       Q.  Under item 10 it reads "Process in DCs

13   needs to be developed."  Is that the

14   distribution centers?

15       A.  I believe DC stands for distribution

16   centers.

17       Q.  And that's what it says, that the

18   process in the DCs needs to be developed, the

19   distribution centers, is that correct?  Is that

20   what's written here?

21       MS. MILLER: Object to form.

22       A.  I see that is written there.  I don't

23   know what process that's referring to.

24   BY MR. ELSNER:

Page 216

1        Q.  If we go to the second page, item

2    number 15, it reads "OV."  I believe that stands

3    for other vendors, is that right?

4        A.  I believe that stands for outside

5    vendors.

6        Q.  Outside vendors, okay.  Outside

7    vendors and DC, that's the distribution center,

8    is that right?

9        A.  I believe so.

10       Q.  Okay.  So "outside vendors and

11   distribution center orders don't get

12   reviewed/monitored together.  Both pieces of

13   information need to run through the same

14   system."  Did I read that correctly?

15       A.  That is what this document says.

16       Q.  Is it your opinion that given the

17   volume of controlled substances that CVS is

18   dispensing that an automated system is an

19   important component of a suspicious order

20   monitoring program or system?

21       MS. MILLER: Object to form.

22       A.  I don't believe that an SOM system

23   needs to have an automatic element to it.  I

24   don't know exactly -- I'm not exactly sure what

Page 217

1    automatic element is.

2    BY MR. ELSNER:

3        Q.  I might not have been clear.

4            Would you agree that given just the

5    volume of controlled substances that we're

6    dealing with at CVS, that having an electronic

7    system in place to monitor those orders would be

8    important?

9        MS. MILLER: Object to form.

10       A.  I can't say it would be important.

11   BY MR. ELSNER:

12       Q.  Well, would it be effective to use a

13   manual system?

14       MS. MILLER: Object to form.

15       A.  It very well could be.

16   BY MR. ELSNER:

17       Q.  Do you think it would be better to use

18   a manual system at CVS to review all the

19   controlled substances as opposed to an

20   electronic one?

21       MS. MILLER: Object to form.

22       A.  That's a hard question to answer.

23   There's a lot of elements that go into a SOM

24   process.  It depends.

Page 218

1  BY MR. ELSNER:
2      Q.  So you think you could have an
3  effective system at CVS for the dispensing of
4  controlled substances that's not electronically
5  based?
6          MS. MILLER:  Objection to form.
7      A.  Again, I don't think I'm -- when you
8  say dispensing of controlled substances at the
9  pharmacy, I don't know the processes well enough
10 to make that assumption.
11 BY MR. ELSNER:
12     Q.  I'm just talking generally.  I mean,
13 CVS dispenses millions and millions if not
14 billions of prescriptions in a given year,
15 right?
16         MS. MILLER:  Object to form.
17     A.  I don't know the exact number that we
18 dispense.
19 BY MR. ELSNER:
20     Q.  Well, would you agree it's in the
21 millions or higher?
22         MS. MILLER:  Object to form.
23     A.  I haven't seen exact data on the
24 number of prescriptions dispensed.

Page 219

1  BY MR. ELSNER:
2      Q.  So it could be less than a million?
3          MS. MILLER:  Object to form.
4      A.  I haven't seen the exact numbers of
5  how much CVS dispenses in a given year.
6  BY MR. ELSNER:
7      Q.  What's your best estimate?
8          MS. MILLER:  Object to form.
9      A.  Again, I haven't seen numbers, so I
10 wouldn't even be able -- be comfortable guessing
11 the number.
12 BY MR. ELSNER:
13     Q.  Well, you were developing a suspicious
14 order monitoring system for the distribution
15 centers, and you have no idea what the volume is
16 that CVS is distributing.  You don't even know
17 if you need an electronic system, or could use a
18 manual system, right?
19         MS. MILLER:  Object to the form.
20     A.  I wasn't the one developing the
21 system.  I was on a team or part of a team that
22 was working to implement a new or enhanced
23 system.
24 BY MR. ELSNER:

Page 220

1      Q.  Anyone recommend we should, instead of
2  having electronic system, go back to paper?
3          MS. MILLER:  Object to form.
4      A.  I don't recall any specific
5  conversations around a manual system or
6  electronic system and how we should operate.
7  BY MR. ELSNER:
8      Q.  Because that would be crazy, right?
9          MS. MILLER:  Object to form.
10 BY MR. ELSNER:
11     Q.  It would be crazy to try to use a
12 manual paper system for all these drugs orders,
13 wouldn't it?
14         MS. MILLER:  Object to form.
15     A.  I can't say that.
16 BY MR. ELSNER:
17     Q.  I'm going to -- if we go back to item
18 number 14, did CVS have a system in place in
19 November of 2012 to monitor for orders for
20 controlled substances made by pharmacies to
21 outside vendors?
22         MS. MILLER:  Object to form.
23     A.  I don't recall what the process was in
24 2012 in terms of outside vendor orders.

Page 221

1  BY MR. ELSNER:
2      Q.  Did you understand -- you understand
3  that reviewing outside vendor orders for
4  controlled substances would be an -- important
5  to know so that you know how many controlled
6  substances a particular pharmacy was ordering,
7  correct?
8          MS. MILLER:  Object to form.
9      A.  Outside vendor orders is a piece of
10 information that can be utilized, but that is
11 not the only piece of information that can be
12 utilized.
13 BY MR. ELSNER:
14     Q.  No, I understand that.  But it would
15 be important to know, wouldn't it, from a due
16 diligence perspective?  If the pharmacy was
17 ordering hydrocodone products from you, it would
18 be important to know whether that pharmacy was
19 also ordering hydrocodone products from other
20 outside vendors at the same time, right?
21         MS. MILLER:  Object to form.
22     A.  You mean -- you keep saying
23 "important."  I don't know what you mean by
24 important.  But it's a piece of information that

Page 222

1 can be utilized.
2 BY MR. ELSNER:
3    Q. Should it be?
4       MS. MILLER: Object to form.
5    A. I don't think it necessarily has to
6 be.
7 BY MR. ELSNER:
8    Q. Do you have a system to monitor that
9 today?
10      MS. MILLER: Object to form.
11   A. My understanding of the system today
12 is that outside vendor orders are taken into
13 consideration.
14 BY MR. ELSNER:
15   Q. Why?
16      MS. MILLER: Object to form.
17   A. Because that's the decision that was
18 made.
19 BY MR. ELSNER:
20   Q. Why?
21      MS. MILLER: Object to form, and to
22 the extent -- objection on attorney/client
23 privilege to the extent you -- an answer would
24 involve disclosing communications with counsel.

Page 223

1    A. I don't recall who made that final
2 decision.
3 BY MR. ELSNER:
4    Q. Do you understand why it was made?
5       MS. MILLER: Same objection, and
6 object to form.
7    A. I don't recall who made the decision.
8 BY MR. ELSNER:
9    Q. Okay. I'm going to put before you
10 Exhibit 13.
11      (Whereupon, CVS-Schiavo-13 was marked
12      for identification.)
13 BY MR. ELSNER:
14   Q. Well, let me ask. That was a new
15 system, though. It's now an enhanced system to
16 monitor outside vendor orders for controlled
17 substances. That wasn't in the prior system,
18 right?
19      MS. MILLER: Object to form.
20   A. It is part of the new system. And I
21 can't speak to whether or not that was part of
22 the old system. It might have been.
23 BY MR. ELSNER:
24   Q. I'm going to mark this next document

Page 224

1 as Schiavo 13. So this is another year-end
2 review. This is the one that's finalized. It's
3 dated 3/04/2014.
4       Do you see that?
5    A. I see where it says that.
6    Q. Okay. And it lists Craig Schiavo, is
7 that right?
8    A. I see my name.
9    Q. Okay. If you turn to Page 3 of 9,
10 which is 120582.
11   A. Okay.
12   Q. Do you see under the -- there's some
13 bullets on the right-hand side of the page.
14 There's a bullet that begins "The Suspicious
15 Order Monitoring SOP."
16      Do you see that?
17   A. I see that.
18   Q. And it says that "Aaron Burtner and I
19 worked together to draft and implement our
20 current SOM policies and procedures, as well as
21 have completed the draft of our enhanced SOM SOP
22 for when the system goes live in February."
23      That's what you did with Aaron
24 Burtner, correct?

Page 225

1       MS. MILLER: Object to form.
2    A. That's what this says. And I'm sure I
3 worked with Aaron Burtner, but I don't think we
4 were the only two who reviewed that policy or
5 drafted that policy.
6 BY MR. ELSNER:
7    Q. But you said that you worked with
8 Aaron Burtner to draft and implement that
9 policy, correct?
10      MS. MILLER: Object to form.
11   A. This looks to be my year-end review
12 for 2013. If I went into the details of
13 everyone that I worked with and everything that
14 I did, that would -- I might still be writing
15 this document. So this doesn't include
16 everything that I did and everyone that I worked
17 with.
18 BY MR. ELSNER:
19   Q. But you worked on it and you wrote it
20 with Aaron Burtner and maybe some other people,
21 right?
22      MS. MILLER: Object to form.
23   A. I don't know exactly which policy this
24 is referring to.

Page 226

BY MR. ELSNER:

Q. If you go further down, three bullets down, it reads "Grouping the Controlled Substance Drug Families to categorize the potential level of diversion for the SOM System. These groups will determine how each drug family is analyzed in the SOM algorithm."

Did you do that?

MS. MILLER: Object to the form.

A. I don't believe -- I don't recall being part of the -- I don't recall being the person that did that.

BY MR. ELSNER:

Q. That's what you wrote, right, that you grouped the controlled substance drug families to categorize the potential level of diversion for the SOM system? That's what you wrote in your review, correct?

A. I see at the very beginning it says "I participated in," that last bullet says "Grouping the Controlled Substance Drug Families." That is not something I recall having significant input in.

Q. Well, on the top right before the

Page 227

first bullet we read -- it says "Some of the main milestones that I participated in achieving, or was responsible for their completion were," and then it lists all these different bullets, and one of the bullets you list is one of the main milestones that you participated in achieving or were responsible for completing was to group the controlled substance drug families to categorize the potential level of diversion for the SOM system. Is that what you wrote?

MS. MILLER: Object to form.

A. I don't remember writing this and reading the way that it's written at the time. I'm saying that I participated in. I don't see anywhere where I indicate the level of my participation. The last bullet says grouping of controlled substances, and I don't see in there the level of my participation, and I don't recall my level of participation, but I don't believe that it was something that I provided significant input on.

BY MR. ELSNER:

Q. This indicates that at this point in

Page 228

time you were grouping together controlled substances in the SOM so that you could have stop orders in effect by drug family as opposed to individual drug, correct?

MS. MILLER: Object to form.

A. I don't recall, and I don't see where this would indicate that we were not doing it in the past.

BY MR. ELSNER:

Q. Were you doing it in the past? Why would you be grouping them now if you already had them grouped?

MS. MILLER: Object to form.

A. I don't recall, and I wasn't familiar with how the system looked at it in the past. It says here that one of the things that I participated in at some level was grouping of the controlled substances.

BY MR. ELSNER:

Q. By family group, right, as opposed to by individual drug?

MS. MILLER: Object to form.

A. It says "Grouping Controlled Substance Drug Families."

Page 229

Q. By drug families.

MR. ELSNER: This is Exhibit 14.

(Whereupon, CVS-Schiavo-14 was marked for identification.)

BY MR. ELSNER:

Q. This is your midyear review from 2013, last updated September 18, 2013. Do you see it lists your name, Craig Schiavo? Is that right?

A. I do.

Q. Can I ask you to turn to Page 3 of 7?

A. Okay.

Q. I ask you to -- this is another listing of bullets of things in your midyear review. And there's a bullet towards the bottom, sort of the last bullet. It begins "Quarantine Policy and Procedure."

Do you see that?

A. I see that.

Q. Okay. And it says "Worked closely with Pharmacy Ops to create the policy on what to do if an Outside Vendor Order of Interest is deemed to be suspicious."

Did I read that correctly?

A. That is what this says.

Page 230

1    Q.  Okay.  So were you involved in
2  creating a policy for suspicious orders related
3  to outside vendors of controlled substances?
4        MS. MILLER:  Object to form.
5    A.  I don't ever remember creating a
6  policy around -- I don't ever remember creating
7  a quarantine policy and procedure around outside
8  vendor orders, nor do I remember that being
9  something that we had ever implemented.
10 BY MR. ELSNER:
11   Q.  Do you know whether there was a system
12 in place at CVS in November of 2012 to track
13 outside vendor orders of controlled substances?
14       MS. MILLER:  Object to form.
15   A.  I don't recall how outside vendor
16 orders were looked at in that time frame.
17 BY MR. ELSNER:
18   Q.  If you go back to the prior year-end
19 review, the exhibit just before this one dated
20 March 4, 2014, and if you turn to Page 7 of 9.
21 The third bullet down on the right-hand side of
22 the page beginning with "Controlled Substance
23 SOP."
24       Do you see that?

Page 231

1    A.  I do.
2    Q.  It says "I am currently working to
3  create an SOP that covers all Controlled
4  Substance Activities in our Pharmacies.  To
5  date, the initial draft of this SOP was provided
6  to Legal for feedback which was received back
7  requesting for us to expand the scope from just
8  dispensing to all controlled substance
9  activities.  The second draft of this SOP will
10 be ready for review by the middle of January of
11 2014."  Did I read that correctly?
12   A.  Looks to be that's what it says.
13   Q.  Okay.  So you were creating a standard
14 operating procedure for controlled substance
15 activities at all CVS pharmacies in 2013 with
16 the hope that a second draft of the policy would
17 be ready by January, 2014, is that right?
18       MS. MILLER:  Object to form.  Object
19 on attorney/client privilege grounds.
20       You may answer to the extent you can
21 do so without revealing communications with
22 counsel.
23   A.  So this policy, I don't remember what
24 the feedback from legal was, but I do

Page 232

1  remember --
2        MS. MILLER:  Objection.  I'm going
3  to --
4  BY MR. ELSNER:
5    Q.  I'm not asking --
6        MS. MILLER:  Yeah, and I'm going to --
7  BY MR. ELSNER:
8    Q.  I'm not asking you what the feedback
9  from legal was.  What I want to know is just
10 that you were working on this policy and it was
11 not finalized as of January of 2014.
12       MS. MILLER:  Mike, I'd just like to
13 say on the record, I think for that sentence
14 related to legal that we would want to redact
15 that and claw that back.
16       MR. ELSNER:  I don't think it --
17       MS. MILLER:  Yeah, I'm going to say --
18       MR. ELSNER:  -- discloses a privilege,
19 but --
20       MS. MILLER:  I'm going to say on the
21 record, you don't want to go into it, you just
22 said.  I'm just making a record.
23 BY MR. ELSNER:
24   Q.  Why don't I reread it, and I'll read

Page 233

1  it without that in there.  The year-end review
2  for -- dated March 4, 2014 stated that the
3  controlled -- you were working on the controlled
4  substance SOP, standard operating procedure.  "I
5  am currently working to create an SOP that
6  covers all Controlled Substance Activities in
7  our Pharmacies."  Is that true in 2013?
8    A.  I don't remember this specific time
9  frame or specifically the policy this is
10 referring to.
11   Q.  Well, was there a policy at CVS in
12 2013 before you started working on it to monitor
13 for controlled substance activities at
14 pharmacies?
15       MS. MILLER:  Object to form.
16   A.  I know that there were policies at CVS
17 that covered controlled substance related
18 activities.
19 BY MR. ELSNER:
20   Q.  Was there a standard operating
21 procedure that related to controlled substance
22 activities in pharmacies at CVS?
23       MS. MILLER:  Object to form.
24   A.  I believe there were many policies

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1 that addressed controlled substances in them.
2 BY MR. ELSNER:
3    Q.  The system that you -- the description
4 that you wrote as item 15 in your enhancements
5 document lists OV and DC orders don't get
6 reviewed and monitored together.  So there
7 needed to be a system that would review outside
8 vendor orders along with the orders from the
9 distribution center together in order to create
10 an effective monitoring system, is that true?
11       MS. MILLER:  Object to form.
12    A.  I don't believe that is required to
13 have an effective system, no.
14 BY MR. ELSNER:
15    Q.  Would you agree that one element of a
16 know your customer procedure is knowing whether
17 your pharmacy customer is ordering controlled
18 substances from multiple vendors?
19       MS. MILLER:  Object to form.
20    A.  I don't believe that that must be a
21 part of a suspicious order monitoring system.
22 BY MR. ELSNER:
23    Q.  Do you agree that understanding the
24 amount of opioids purchased by a pharmacy is

Page 235

1 only useful if you know if they are purchasing
2 opioids from other vendors?
3       MS. MILLER:  Object to form.
4    A.  I don't believe that you need to know
5 that in order to have an effective system.
6 BY MR. ELSNER:
7    Q.  Would you agree with me it would be
8 important to have that information to have an
9 effective suspicious order monitoring system?
10       MS. MILLER:  Object to form.
11    A.  I'm not sure what you mean by
12 important, but it's not necessary.  I don't
13 believe that it's necessary.
14 BY MR. ELSNER:
15    Q.  So you could do without it?
16       MS. MILLER:  Object to form.
17    A.  What I'm saying is I don't necessarily
18 believe that you have to have it.
19 BY MR. ELSNER:
20    Q.  Right.  You're saying you don't need
21 it, it could be left out, right?
22       MS. MILLER:  Object to form.
23    A.  What I'm saying is I don't believe it
24 is a required element to have in order to have

Page 236

1 an effective system.
2       MR. ELSNER:  Let's mark Exhibit 15,
3 Schiavo 15.
4       (Whereupon, CVS-Schiavo-15 was marked
5       for identification.)
6 BY MR. ELSNER:
7    Q.  This is another e-mail from you to Tom
8 Bourque dated January 22, 2013, and the subject
9 is "Importance of Incorporating OV Orders."
10 That's outside vendor orders.  Did I read that
11 correctly?
12    A.  That's what it says.
13    Q.  Okay.  And it says "Tom, For the
14 meeting with Pawlik today.  Thanks, Craig."
15 Who is Pawlik?
16    A.  That is Tom Pawlik who Tom Bourque
17 reported up to.  He was the VP of compliance.
18    Q.  And there's an attachment, and the
19 attachment is the "Importance of Incorporating
20 OV Orders," correct?  Is that right?
21       MS. MILLER:  Object to form.
22    A.  The title is "Importance of
23 Incorporating OV Orders Into the SOM."
24 BY MR. ELSNER:

Page 237

1    Q.  "Into the SOM Algorithm," correct?
2    A.  That's what it says.
3    Q.  Okay.  And written here is why it's
4 needed, and the first bullet is the "DEA 'Know
5 Your Customer' Requirements," right?
6       MS. MILLER:  Object to form.
7    A.  It says "DEA 'Know Your Customer'
8 Requirements."
9 BY MR. ELSNER:
10    Q.  So one of the reasons why you need to
11 incorporate outside vendor orders into the
12 suspicious order monitoring algorithm is to
13 comply with the DEA's know your customer
14 requirements, right?
15       MS. MILLER:  Object to the form.
16    A.  I don't believe that is a required
17 element in order to know your customer.
18 BY MR. ELSNER:
19    Q.  But that's what you wrote in this
20 memo, correct?
21       MS. MILLER:  Object to form.
22    A.  I don't remember writing this.  I see
23 what it says, why it is needed, and I see that
24 it says "DEA 'Know Your Customer' Requirements."

Page 238

BY MR. ELSNER:

Q. Okay. And under number two it reads "In order for dispensing data contained in the algorithm to be useful, we must account for all controlled substances ordered." Is that what it says?

MS. MILLER: Object to form.

A. That is what it says. But I know that you do not need to have outside vendor orders incorporated into a system in order to have an effective system, where it says we must account for all controlled substances ordered.

BY MR. ELSNER:

Q. But you wrote that in these bullets, right?

MS. MILLER: Object to form.

A. I don't remember drafting this document. That is what the bullet says.

BY MR. ELSNER:

Q. Okay. Just so you know, we have the metadata on these documents, if your counsel didn't know, so it's not that we can sit around and craft up and create documents. We didn't make up documents, okay? These are the

Page 239

documents produced from your files to us as part of CVS's obligation. Do you understand that?

MS. MILLER: Object to form.

BY MR. ELSNER:

Q. Do you understand that's how this works?

MS. MILLER: Object to form.

A. I understand that this is a document provided to you by CVS.

BY MR. ELSNER:

Q. From your files.

MS. MILLER: Object to form.

A. I have no reason to believe that that's not true.

BY MR. ELSNER:

Q. Okay. Under the second item it lists "Potential Issues If Not Accounted For In Realtime." Did I read that correctly?

A. "Potential Issues If Not Accounted For In Realtime."

Q. And it reads that one issue -- one potential issue under bullet one is a "Store may order a little from both the outside vendor and the distribution center to stay under the

Page 240

radar." Is that what it reads?

MS. MILLER: Object to form.

A. That is what that first bullet says.

BY MR. ELSNER:

Q. Okay. And would you agree that that's a potential issue, that a store could order a little bit from the distribution center and a little bit from outside vendors and stay under the detection radar of the algorithm?

MS. MILLER: Object to form.

A. I don't know that to be true. I don't know what algorithm we're referring to. This is very early in the process. OV orders are something that we discussed. This is a document going over potential issues as I read this.

BY MR. ELSNER:

Q. And then under number three bullet, potential issues, "If we bring in the outside vendor data later in the process, we may ship a potentially reportable suspicious order from our distribution center." Did I read that correctly?

MS. MILLER: Object to form.

A. I see that written under "Potential

Page 241

Issues If Not Accounted For In Realtime."

BY MR. ELSNER:

Q. Okay. And then the last bullet in that section, the last main bullet, "Stores can place phone orders which we have no visibility to until a later time." Did I read that correctly?

A. That is what it says there, although I don't ever remember that being a process at CVS.

Q. Exactly.

So under that it says currently we have a store which had a 68,000 hydrocodone pill loss and they were placing phone orders to outside vendors. Did I read that correctly?

MS. MILLER: Object to form.

A. That is what that says.

BY MR. ELSNER:

Q. Were you aware that there was a CVS Pharmacy that had a 68,000 hydrocodone pill loss?

A. I don't recall this loss.

Q. Do you remember what pharmacy it was, or what state it was in?

MS. MILLER: Object to form.

Page 242

1   A.  No, I don't recall.
2   BY MR. ELSNER:
3       Q.  When a pharmacy has a theft like that
4   or a loss like that of 68,000 pills of
5   hydrocodone, the system would stop sending those
6   hydrocodone pills from the distribution center,
7   right?
8       MS. MILLER:  Object to form.
9       A.  The SOM system under -- in 2013, I
10  think, when this was drafted, I don't know
11  exactly how it was designed or exactly what it
12  looked at, but I do know that at CVS we had a
13  policy to report controlled substance losses or
14  thefts or armed robberies.  And if this turned
15  out to be a loss, which I don't recall, this
16  could have turned out to not be a loss and
17  incorrect, then I'm confident that we reported
18  it to the DEA, and I'm confident that whatever
19  remediations needed to be put in place were put
20  in place.
21  BY MR. ELSNER:
22      Q.  So it was a requirement in your
23  understanding at this point in time that if
24  there was a 68,000-pill loss for a controlled

Page 243

1   substance that it was an obligation for CVS to
2   report it to the DEA, right?
3       MS. MILLER:  Object to form.
4       A.  CVS reports substantial losses of
5   controlled substances to the DEA.
6   BY MR. ELSNER:
7       Q.  So you're confident it was done here
8   because that's a requirement, but you don't know
9   for sure?
10      MS. MILLER:  Object to form.
11      A.  I'm confident that whatever situation
12  or store that is being referred to here, that I
13  don't know what store, what the situation was,
14  what kind of loss or even if there was a loss,
15  I'm sure that CVS -- I'm very confident that CVS
16  complied with whatever they needed to do to
17  deal.
18  BY MR. ELSNER:
19      Q.  I want to make sure.  Is it CVS's
20  policy at this time to report to the DEA a loss
21  of controlled substances of this size?
22      MS. MILLER:  Object to form.
23      A.  I understand that CVS is required to
24  report significant losses.

Page 244

1   BY MR. ELSNER:
2       Q.  Okay.  And would this qualify as a
3   significant loss?
4       MS. MILLER:  Object to form.
5       A.  I think 68,000 pills is a significant
6   loss of hydrocodone if, in fact, this is
7   accurate, which I don't know it to be.
8   BY MR. ELSNER:
9       Q.  Okay.  And would it concern you that
10  if you had a CVS Pharmacy that had a 68,000
11  hydrocodone pill loss, if that pharmacy was
12  placing additional orders by phone with outside
13  vendors other than through CVS's distribution
14  center?
15      MS. MILLER:  Object to form.
16      A.  Not knowing any other information on
17  this loss, no.
18  BY MR. ELSNER:
19      Q.  It would not concern you if a CVS
20  Pharmacy had a 68,000 hydrocodone pill loss,
21  that pharmacy couldn't order any more
22  hydrocodone from the distribution center, and
23  that pharmacy was placing orders to outside
24  vendors to get hydrocodone shipped to them, that

Page 245

1   would not concern you?
2       MS. MILLER:  Object to form.
3       A.  I feel like you're assuming that this
4   store could not place an order to our DC and
5   could only place an order to the OV, and I don't
6   know that to be the case, so I can't answer that
7   question.
8   BY MR. ELSNER:
9       Q.  Well, if that were true, would that
10  concern you?
11      MS. MILLER:  Object to form.
12      A.  You're asking me to assume, and I
13  don't have enough information to assume.
14  BY MR. ELSNER:
15      Q.  It's a hypothetical.  There's a 68,000
16  hydrocodone pill loss, and that pharmacy
17  couldn't get any more from the distribution
18  center because the distribution center was
19  investigating that, and then that same pharmacy
20  ordered from an outside vendor more hydrocodone.
21  Under that hypothesis or -- would that concern
22  you?
23      MS. MILLER:  Object to form.
24      A.  Even in that hypothetical situation

Page 246

1 that you laid out, I still cannot make the
2 determination that I would be concerned.
3 BY MR. ELSNER:
4     Q. It says underneath that bullet that
5 the BOP requested phone records to identify the
6 orders placed in the store from the outside
7 vendor. What is BOP?
8     A. I believe that refers to the Board of
9 Pharmacy.
10     Q. Did you know that the Board of
11 Pharmacy had actually requested the phone
12 records to identify the orders placed by this
13 particular CVS store from outside vendors?
14       MS. MILLER: Object to form.
15     A. Again, I don't recall this loss, I
16 don't recall the store, I don't recall the
17 state. It does say that on the document.
18 BY MR. ELSNER:
19     Q. And that's the document you wrote,
20 correct? You wrote this document?
21       MS. MILLER: Object to form.
22     A. I don't recall writing this document.
23 I see that I did send the document to Tom
24 Bourque.

Page 247

1 BY MR. ELSNER:
2     Q. And then there's a listing here of
3 "Other Positives With Accounting for Outside
4 Vendor Orders." Do you see that as another
5 bold?
6     A. I see that.
7     Q. And listed there at the very end is
8 that the "SOM algorithm will have be better
9 equipped to identify a potential suspicious
10 order, minimizing the risk of shipping a
11 potential suspicious order."
12       MS. MILLER: Object to form.
13     A. I see where it says that.
14 BY MR. ELSNER:
15     Q. Do you agree with that?
16       MS. MILLER: Object to form.
17     A. I don't agree that including OV orders
18 is the only way that you could potentially
19 identify suspicious orders and minimizing risk
20 of shipping a potential suspicious order. I
21 don't believe that is the only way to do that,
22 no.
23 BY MR. ELSNER:
24     Q. That's not what I said. I asked you

Page 248

1 whether you agreed with the statement that the
2 SOM algorithm will be better equipped to
3 identify a potential suspicious order,
4 minimizing the risk of shipping potential
5 suspicious orders. Would you agree with that?
6       MS. MILLER: Object to form.
7     A. I cannot -- I can't say that's an
8 accurate statement because this early in the
9 process I didn't know all aspects that would be
10 part of the system that we were building, so I
11 don't know if that's an accurate statement
12 because there's a lot of other things that
13 potentially could have been put in the system
14 that would have done just as effective of a job.
15 BY MR. ELSNER:
16     Q. You wouldn't even agree that adding it
17 to the system would make the system more
18 effective?
19       MS. MILLER: Objection to form.
20     A. I agree that adding OV is a potential
21 element that someone could use when reviewing an
22 order.
23 BY MR. ELSNER:
24     Q. When did CVS, to your knowledge, have

Page 249

1 a fully operational system to -- in place to
2 monitor orders from other vendors as required by
3 the DEA's know your customer policy?
4       MS. MILLER: Object to form.
5     A. So I don't know of having outside
6 vendor orders is a requirement of the DEA and
7 know your customer. I don't know that to be
8 true. Or I don't know that to be true. And I
9 don't know when CVS started utilizing outside
10 vendors.
11 BY MR. ELSNER:
12     Q. What's your best estimate?
13     A. I don't know. I don't recall when
14 they started using it.
15     Q. Did CVS have a system in place at this
16 point in time to monitor for drugs for
17 controlled substances dispensed from its
18 pharmacies?
19       MS. MILLER: Object to form.
20     A. I don't recall how CVS monitored at
21 this time controlled substances dispensed from
22 their pharmacies. I don't recall the process.
23 BY MR. ELSNER:
24     Q. Did you work on a process like that at

Page 250

1 CVS?
2      MS. MILLER:  Object to form.
3      A.  I was involved in a project that
4 focused on controlled substance dispensing.
5 BY MR. ELSNER:
6      Q.  When was that?
7      A.  I don't recall when I started working
8 on that.
9      Q.  2013, '14?
10      A.  I honestly don't recall the date.
11      Q.  Was there a system in place when you
12 started working on that?
13      MS. MILLER:  Object to form.
14      A.  I don't recall how CVS monitored
15 dispensing at our retail pharmacies.
16 BY MR. ELSNER:
17      Q.  I'm going to show you what we've
18 marked as Schiavo 16.
19      (Whereupon, CVS-Schiavo-16 was marked
20           for identification.)
21 BY MR. ELSNER:
22      Q.  The bottom e-mail is an e-mail that
23 you sent to Tom Bourque dated January 15, 2014,
24 the subject is the "SOM Presentation 1-16-2014,"

Page 251

1 correct?
2      A.  I see that.
3      Q.  Okay.  And you write "Tom, As I was
4 driving home last night I thought of some
5 additional things I wanted to add.  Attached are
6 the updates."
7      And then there's a response from Tom
8 to you a few hours later on January 15, 2014,
9 and the attachment is the SOM presentation
10 1-16-14.
11      Do you see that?
12      A.  I see that.
13      Q.  Then he says "Craig, This is good.  I
14 added our department organization chart to the
15 front.  I will speak to it, as well as roles and
16 responsibilities of our team, and how each
17 department works together...then I'll turn it
18 over to you to finish, and after the deck, go
19 through Archer SOM system highlights.
20      "Let's make sure we have a projector
21 and copies for all the attendees."  Correct?
22      A.  I see where it says that.
23      Q.  Okay.  And then attached is PowerPoint
24 presentation for "Suspicious Order Monitoring

Page 252

1 January 16, 2014," and you and Tom are listed on
2 the first page of the PowerPoint, is that right?
3      A.  I see both of our names there.
4      Q.  Okay.  And you worked on this
5 PowerPoint, correct?
6      A.  Can I flip through it?
7      Q.  Sure.  I mean, you reference the fact
8 that you added things to it in the e-mail.
9      MS. MILLER:  Do you have a better copy
10 of this?  I know this is as produced --
11      MR. ELSNER:  I was going to ask you.
12 I'd like it in native.  Do you have it?
13      MS. MILLER:  Keep looking at it.  But
14 it's over --
15 BY MR. ELSNER:
16      Q.  If it's helpful, we can pull up some
17 sections.  I'm going to go through it with you.
18      MS. MILLER:  Why don't you flip
19 through it.  It's hard to read, so you can
20 always look at the screen.
21      A.  The e-mail indicates I had input into
22 this document.  I don't know exactly what my
23 input was.
24 BY MR. ELSNER:

Page 253

1      Q.  Okay.  And the first, or slide 3 is
2 a -- there's a page there and it lists DEA's
3 expectations.
4      Do you see that?
5      A.  I see where it says that.
6      Q.  If you turn to Page 6 of the
7 PowerPoint under "Keys to an Effective SOM
8 Program."
9      Do you see that?
10      A.  I see that.
11      Q.  And the first thing listed there is to
12 "Know Your Customer.  The DEA expects
13 registrants to 'Know Your Customer' and even to
14 Know Your Customers Customer...No order would
15 be released unless the team is comfortable that
16 it is for legitimate purposes."  Correct?
17      MS. MILLER:  Object to form.
18      A.  I see where it says that.
19 BY MR. ELSNER:
20      Q.  And then it goes on, there's a whole
21 section on documentation, is that right?
22 There's a number of bullets there.
23      Was it CVS's policy that any kind of
24 correspondence and due diligence would be

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 documented in their systems?
2 　　MS. MILLER: Object to form.
3 　　A. I know that in our current system
4 documentation is something that we do and we
5 keep. I don't know if there's any specifics
6 around what documents need to be kept.
7 BY MR. ELSNER:
8 　　Q. If you look at Page 9 of the
9 presentation and to "Key Takeaways," it reads
10 "Documentation, Documentation, Documentation"
11 with three or four exclamation marks all in caps
12 and all bolded, correct?
13 　　MS. MILLER: Object to form.
14 　　A. I see where it says that, and it looks
15 like it's bolded.
16 BY MR. ELSNER:
17 　　Q. Okay. And then beneath that it says
18 "Documenting all activities that lead to the
19 disposition of an order is key to a defensible
20 SOM Program." Did I read that correctly?
21 　　A. You read that correctly.
22 　　Q. "If it is not documented, it was not
23 done." Is that what you wrote?
24 　　MS. MILLER: Object to form.

Page 255

1 　　A. I don't know if I wrote that.
2 BY MR. ELSNER:
3 　　Q. Is that in the presentation?
4 　　A. That is what it says there, although I
5 don't know how accurate that is, that if it was
6 not documented it was not done.
7 　　Q. But you would agree, though, it is
8 important to document the due diligence work
9 that was being undertaken as part of your
10 suspicious order monitoring program, correct?
11 　　MS. MILLER: Object to form.
12 　　A. There is a documentation piece to our
13 process.
14 BY MR. ELSNER:
15 　　Q. And why is it there?
16 　　MS. MILLER: Object to form.
17 　　A. Because the company made a decision
18 that we were going to document parts of our due
19 diligence process.
20 BY MR. ELSNER:
21 　　Q. Well, would you agree with me that
22 audit is an important component of any kind of
23 program or system that you have in place?
24 　　MS. MILLER: Object to form.

Page 256

1 　　A. I don't know how important audit is to
2 have an effective program. I don't think that
3 makes a program effective.
4 BY MR. ELSNER:
5 　　Q. In order to determine whether a
6 program is acting effectively, one way to do
7 that would be audit the program, right?
8 　　MS. MILLER: Object to form.
9 　　A. I assume that is one way to do it. I
10 don't think that's the only way to do it.
11 BY MR. ELSNER:
12 　　Q. Did you ever review any audit records
13 of CVS's suspicious order monitoring system in
14 2012 or 2013 to determine its effectiveness?
15 　　MS. MILLER: Object to form.
16 　　A. I don't recall there being any audit
17 documentation that I reviewed.
18 BY MR. ELSNER:
19 　　Q. Do you know whether any was done?
20 　　MS. MILLER: Object to form and
21 attorney/client privilege grounds.
22 　　You may answer to the extent it
23 doesn't reveal any attorney/client
24 communications.

Page 257

1 　　A. In 2012, 2013, I don't recall.
2 BY MR. ELSNER:
3 　　Q. Is it done today?
4 　　MS. MILLER: Same objection, and
5 object to form.
6 　　A. I'm not familiar with the audit
7 process and everything that is audited.
8 BY MR. ELSNER:
9 　　Q. Okay. It says on Page 8 of the
10 PowerPoint under "DEA Reporting Requirements" at
11 the very top, it says "CVS is obligated to
12 report orders determined to be Suspicious that
13 were placed to our Distribution Centers," and
14 "placed to our distribution centers" is
15 underlined and in bold, correct?
16 　　A. I see that it is underlined, and it
17 appears that at least part of it is in bold.
18 　　Q. Okay. And then if you look down to
19 the third bolded item, it reads that "Orders
20 that are placed to an Outside Vendor that we
21 identify as an order deviating from the normal
22 size, frequency, and/or buying pattern and
23 deemed to not be for legitimate purposes or are
24 at the risk of being diverted are not required

Page 258

1 to be reported to the DEA."
2      Did I read that correctly?
3      MS. MILLER: Object to form.
4      A.  That's what it says, but I don't know
5 how we would identify an order placed to an
6 outside vendor deviating from normal size,
7 frequency, but I don't believe that part of our
8 process monitoring specific orders to the OV
9 when they are placed.
10 BY MR. ELSNER:
11      Q.  So I guess my first question is, does
12 CVS have a system in place to monitor the orders
13 that are being placed by its pharmacies, whether
14 from the distribution center or to outside
15 vendors for controlled substances?
16      MS. MILLER: Object to form.
17      A.  I know that CVS monitors orders of
18 controlled substances.
19 BY MR. ELSNER:
20      Q.  From its pharmacies?
21      A.  From its retail pharmacies.
22      Q.  Okay.  And it monitors them for
23 suspicious size, frequency, is that right?
24      MS. MILLER: Object to form.

Page 259

1      A.  So current process today, CVS has a
2 suspicious order monitoring system that was
3 designed to monitor orders placed to our
4 distribution centers from our pharmacies, and
5 part of that monitoring is for orders of unusual
6 size, frequency, and buying pattern.
7 BY MR. ELSNER:
8      Q.  But that's a system for the
9 distribution center to monitor the pharmacies'
10 orders from the distribution center, correct?
11 These are not -- it's not a process that's
12 monitoring the pharmacies' orders from Cardinal
13 or McKesson or other outside vendors, correct?
14      MS. MILLER: Object to form.
15      A.  Well, we monitor orders of controlled
16 substances placed by our pharmacies.
17 BY MR. ELSNER:
18      Q.  From outside vendors?
19      MS. MILLER: Object to form.
20      A.  We order -- we monitor orders from our
21 pharmacies to outside vendors and to our
22 distribution centers.  As part of our
23 distribution center process, outside vendor
24 information is taken into consideration.

Page 260

1 BY MR. ELSNER:
2      Q.  Okay.  And so when did that begin?
3      MS. MILLER: Object to form.
4 BY MR. ELSNER:
5      Q.  I mean, that's part of the new system
6 that was created and put into place in 2014, is
7 that right?
8      MS. MILLER: Object to form.
9      A.  That is part of our new system, but
10 that's not to say it was not part of our old
11 system or our old due diligence process.
12 BY MR. ELSNER:
13      Q.  You don't know one way or the other
14 whether it was?
15      MS. MILLER: Object to form.
16      A.  I don't recall when CVS started
17 utilizing outside vendor orders.
18 BY MR. ELSNER:
19      Q.  Regardless, though, it was CVS's
20 policy that when reviewing orders to outside
21 vendors, if CVS identified an order that
22 deviated from the normal size, frequency or
23 buying pattern from the outside vendor, it was
24 CVS's policy not to report that to the DEA, is

Page 261

1 that right?
2      MS. MILLER: Object to form.
3      A.  I honestly don't know of that to be in
4 any policy that we have.
5 BY MR. ELSNER:
6      Q.  I'm sure it's not.
7      It was CVS's practice, wasn't it, that
8 if it discovered an order to an outside vendor
9 for a controlled substance and you discovered
10 that that order was not of its normal size,
11 frequency, or buying pattern, and it's deemed
12 not to be for a legitimate purpose and that
13 there's a risk of that drug being diverted, then
14 CVS would not report that to the DEA, right?
15      MS. MILLER: Object to form.
16      A.  I'm not aware of any regulation that
17 would require us to report that to the DEA.
18 BY MR. ELSNER:
19      Q.  And it was CVS's policy not to do it,
20 right?
21      MS. MILLER: Object to form.
22      A.  I don't know if we had a policy, and I
23 don't recall a policy that says it is CVS's
24 policy not to do it.  I don't recall there being

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1 a policy for that.
2 BY MR. ELSNER:
3    Q.  It was CVS's practice not to report
4 those orders to the DEA, correct?
5    MS. MILLER:  Object to form.
6 BY MR. ELSNER:
7    Q.  And all that --
8    MS. MILLER:  Mischaracterizing the
9 testimony, assuming he said that they determined
10 suspicious --
11    MR. ELSNER:  You can object to form.
12    MS. MILLER:  -- that they determined
13 that orders from outside vendors at some point
14 were determined to be --
15    MR. ELSNER:  Your objection is noted.
16 BY MR. ELSNER:
17    Q.  It was CVS's practice not to report
18 those orders to the DEA, correct?
19    MS. MILLER:  Object to form.
20    A.  So to clarify, we -- determining
21 whether an outside vendor order is suspicious is
22 not a practice or, as I'm aware, requirement for
23 CVS.  I'm confident that CVS does meet all of
24 their reporting requirements when it comes to

Page 263

1 suspicious order monitoring.
2 BY MR. ELSNER:
3    Q.  Does CVS report orders placed through
4 an outside vendor for a controlled substance
5 that CVS discovers is not for a legitimate
6 purpose, and does CVS report those orders to the
7 DEA?
8    MS. MILLER:  Objection to form.
9    A.  You're referring to outside orders
10 that are deemed suspicious, and that is not a
11 practice that I'm familiar with.  But I am
12 confident that we meet all of our reporting
13 requirements.  I have no reason to believe that
14 we do not.
15 BY MR. ELSNER:
16    Q.  Does CVS report to the DEA orders from
17 outside vendors that CVS deems are not orders
18 for a legitimate purpose?
19    MS. MILLER:  Object to form.
20    He hasn't testified any deeming of
21 outside vendor orders occurred, and asked and
22 answered.
23    A.  I can say confidently that CVS is
24 complying with all of our responsibilities of

Page 264

1 reporting.
2 BY MR. ELSNER:
3    Q.  That's not my question.
4    My question is, did CVS report orders
5 to the DEA -- was it CVS's practice to report
6 orders to the DEA if CVS determines that those
7 orders were not legitimate?
8    MS. MILLER:  Object.
9 BY MR. ELSNER:
10    Q.  Would it report it to the DEA?
11    MS. MILLER:  Object to form.  Asked
12 and answered.
13    A.  Anything that would be above and
14 beyond what we were required to do would not be
15 something that I would decide.  That probably
16 would be our legal counsel to make those calls.
17 BY MR. ELSNER:
18    Q.  This is what you wrote -- this is
19 what's written in the PowerPoint presentation.
20    MS. MILLER:  I just want to instruct
21 the witness not to testify in any way that would
22 reveal any attorney/client communications.
23    MR. ELSNER:  You --
24    MS. MILLER:  And, Mike, I think

Page 265

1 we've -- at this point, this is now, I think,
2 the tenth time you've asked him this question.
3    MR. ELSNER:  I'm asking a different
4 question.
5 BY MR. ELSNER:
6    Q.  Written in this PowerPoint
7 presentation here, I just want to make sure I've
8 got it correctly, is that orders that are placed
9 to an outside vendor that we identify as an
10 order deviating from the normal size, frequency,
11 and/or buying pattern and deemed to not be for
12 legitimate purposes or are at risk of being
13 diverted are not required to be reported to the
14 DEA at CVS.  Is that what's written here?
15    MS. MILLER:  Object to form.
16    A.  I see that is what's written there.  I
17 don't know if I'm the one who wrote that there,
18 and I'm not aware of the requirement that
19 requires CVS to report outside vendor orders.
20 BY MR. ELSNER:
21    Q.  Okay.  And then it says what we should
22 do is that "Pharmacy Operations must be alerted
23 that there is an order of interest that was
24 placed by the store so that remediation plans

Page 266

1 can be developed and implemented." Is that
2 what's written there?
3          MS. MILLER: Object to form.
4     A.  I see that that is written there.
5 BY MR. ELSNER:
6     Q.  And then it says "Until all the
7 remediations are implemented, the store will not
8 be allowed to order from our distribution
9 center." Is that what's written there?
10         MS. MILLER: Object to form.
11    A.  I see that is written there. And as
12 you go through these bullets, this is not a
13 process that I'm familiar with currently at CVS.
14 BY MR. ELSNER:
15    Q.  So CVS would alert pharmacy operations
16 of an order that's not for a legitimate purpose,
17 but would not report that order to the DEA if it
18 was through an outside vendor, right?
19         MS. MILLER: Object to form.
20         He hasn't testified that. He's
21 testified already that he doesn't even know that
22 this ever was in place.
23 BY MR. ELSNER:
24    Q.  Am I right?

Page 267

1          MS. MILLER: Object to form.
2     A.  This is not a policy I'm familiar with
3 so I can't speak to what would or would not have
4 been done or is done.
5 BY MR. ELSNER:
6     Q.  Would you agree with me it would be
7 better to report it to the DEA so the DEA could
8 take action?
9          MS. MILLER: Object to form.
10    A.  I'm confident we are complying with
11 our reporting requirements, and I know that at
12 CVS we have policies in place that deal with
13 situations if we think there's something such as
14 what you're reading on this slide.
15 BY MR. ELSNER:
16    Q.  My question was, would you agree with
17 me it would be better to report it to the DEA?
18         MS. MILLER: Object to form.
19    A.  No.
20 BY MR. ELSNER:
21    Q.  You don't think it would be better?
22         MS. MILLER: Object to form.
23    A.  No.
24 BY MR. ELSNER:

Page 268

1     Q.  Better to clean it up inside before
2 the DEA finds out, right?
3          MS. MILLER: Object to form.
4 BY MR. ELSNER:
5     Q.  Right?
6          MS. MILLER: Object to form.
7          That's not at all what his testimony
8 is.
9          MR. ELSNER: Your objection is noted.
10         MS. MILLER: The implication of that
11 in that question is outrageous.
12 BY MR. ELSNER:
13    Q.  Right?
14         MS. MILLER: Object to form.
15    A.  I don't see anything here that speaks
16 to us trying to hide anything from the DEA. And
17 as I said, we meet our reporting -- I'm
18 confident we meet our reporting requirements.
19 And if we identify something within CVS, I am
20 also aware that we have policies, procedures,
21 processes to address that. But no, we would not
22 hide anything from the DEA.
23 BY MR. ELSNER:
24    Q.  Well, you said it's better not to

Page 269

1 report it to the DEA, and this says what you're
2 going to do is you're going to inform pharmacy
3 ops so that they can create a remediation plan,
4 and internally at CVS we're not going to
5 distribute any more controlled substances to
6 that pharmacy until it's fixed, but it's not the
7 policy to inform the DEA, better to fix it
8 in-house before the DEA finds out, right?
9          MS. MILLER: Object to form. Asked
10 and answered.
11         I don't think we should be continuing
12 to go down this road. He has not even testified
13 that these -- that orders of outside vendors
14 were ever deemed to be suspicious. It's a
15 faulty premise and we've been spending too much
16 time on it. I think we should move on.
17 BY MR. ELSNER:
18    Q.  Right? Yes or no?
19         MS. MILLER: Object to form. Object
20 to form.
21 BY MR. ELSNER:
22    Q.  I'm entitled to an answer. Yes or no?
23    A.  So there was a lot in that statement
24 or question, but CVS complies with our reporting

Page 270

1  requirements, and certainly nothing that I
2  worked on or anyone that I know who works at CVS
3  has any intention of hiding anything from the
4  DEA.
5      Q.  But it was CVS's policy or practice
6  not to report it to the DEA, right?
7      MS. MILLER:  Object to form.
8      A.  Again, I don't believe we have a
9  policy on this.  And what we've been going over
10 I don't believe to be something that is relevant
11 or applicable to our current policies,
12 practices.
13     MR. ELSNER:  Why don't we take a quick
14 break.  I'll organize my documents.
15     THE VIDEOGRAPHER:  We're going off the
16 record at 2:00 o'clock p.m.
17     (Whereupon, a recess was taken.)
18     THE VIDEOGRAPHER:  We're back on the
19 record at 2:29 p.m.
20 BY MR. ELSNER:
21     Q.  Mr. Schiavo, we took about a 25-minute
22 break from the deposition.  Did you discuss the
23 content of the deposition with your counsel
24 during the break?

Page 271

1      MS. MILLER:  Object to form.  Instruct
2  him not to answer.  He has attorney/client
3  privilege --
4      MR. ELSNER:  He is under oath and
5  testifying like he's at trial.
6  BY MR. ELSNER:
7      Q.  Did you have a conversation with your
8  counsel, yes or no, about the content of the
9  deposition?
10     MS. MILLER:  Objection.  Instruct him
11 not to answer.
12 BY MR. ELSNER:
13     Q.  Will you answer yes or no?  It can't
14 reveal a privilege if you -- whether you had a
15 conversation or not.
16     MS. MILLER:  You're asking him whether
17 he and I -- what we talked about.
18     MR. ELSNER:  I asked him, did you
19 discuss with counsel, yes or no, the content of
20 your deposition.
21     MS. MILLER:  I'm going to object and
22 instruct him not to answer.
23     MR. ELSNER:  Even to yes or no?
24     MS. MILLER:  Yes.

Page 272

1      MR. ELSNER:  You understand that he's
2  under oath?  This is like trial.  Any
3  conversations you have with him during a break
4  are admissible.
5      MS. MILLER:  That's not -- that's
6  absolutely not true.
7      MR. ELSNER:  That is absolutely not
8  true.
9      MS. MILLER:  That is not true.  We are
10 able to confer -- I'm able to confer with the
11 witness.
12     MR. ELSNER:  In the middle of his
13 testimony concerning the content of his
14 testimony?
15     MS. MILLER:  Yes.
16     MR. ELSNER:  Is that what was done?
17     MS. MILLER:  Wait, wait.
18     MR. MONTMINY:  Not in our court you're
19 not.
20     MS. MILLER:  No, wait, wait.  Let
21 me --
22     MR. MONTMINY:  There are protocols in
23 this case.
24     MS. MILLER:  The protocol --

Page 273

1      MR. ELSNER:  I'd like to preserve the
2  record and have an answer of this, yes or no,
3  and a description of what was discussed.
4      MS. MILLER:  No, I object.
5      MR. ELSNER:  He can't even remember
6  tomorrow what color tie he wore today, so
7  there's no way that if this goes on that I'm not
8  going to get an answer to this question.
9      MS. MILLER:  Well, I object on
10 attorney/client privilege grounds, and he's not
11 answering these questions.
12     MR. ELSNER:  I think that's totally
13 inappropriate.
14 BY MR. ELSNER:
15     Q.  Sir, if I can have you turn back to
16 the PowerPoint you were looking at that you
17 presented with Tom Bourque.  Who was this
18 presentation made to?
19     A.  I don't recall everyone we covered
20 this with.
21     But I did want to clarify on what we
22 had discussed before we left, that this
23 paragraph talking about outside vendor orders, I
24 was trying to distinguish between outside vendor

Page 274

1 order information that is taken into account in
2 reviewing a distribution center order, not
3 suggesting that outside vendor orders are run
4 through our SOM system, which they are not
5 today. They haven't been, to the best of my
6 recollection. So anything about reporting
7 outside vendor suspicious orders would be a
8 hypothetical situation and not something that I
9 recall ever happening. So that would have been
10 a hypothetical, anything that I answered under
11 those circumstances.
12     Q. Is this a conversation you had with
13 counsel during the break?
14         MS. MILLER: Objection. Instruct you
15 not to answer. Objection on attorney/client
16 privilege grounds.
17 BY MR. ELSNER:
18     Q. Are you going to follow your counsel's
19 advice?
20         MS. MILLER: Objection. He's been
21 instructed by his counsel not to answer. He's
22 not going to answer the question.
23 BY MR. ELSNER:
24     Q. So if I understand it correctly, CVS

Page 275

1 does not have a system in place to monitor
2 purchases of controlled substance by its
3 pharmacies through a suspicious order monitoring
4 system, is that your testimony?
5         MS. MILLER: Objection to form.
6     A. CVS does not run outside vendor orders
7 through our suspicious order monitoring system.
8 BY MR. ELSNER:
9     Q. Okay. And that would include for
10 controlled substances and Schedule II drugs like
11 OxyContin, correct?
12         MS. MILLER: Objection to form.
13     A. Currently today, and I don't recall a
14 time where we ever ran any outside vendor orders
15 through our suspicious order monitoring system.
16 BY MR. ELSNER:
17     Q. In Page 4 of the PowerPoint
18 presentation -- well, strike that. Before we --
19 I think I had a question, and I don't know that
20 I got an answer to it. I think you diverted to
21 something else.
22         But who did you prepare this
23 presentation for, and who was it given to?
24         MS. MILLER: Object to form.

Page 276

1     A. So I know it indicates I'd given
2 feedback or input on this presentation. I don't
3 remember that I put it together, and I don't
4 recall everyone that we presented this to.
5 BY MR. ELSNER:
6     Q. Well, the cover of the e-mail to the
7 presentation says "Craig, This is good," this is
8 the -- talking about the SOM presentation that
9 you sent him your revisions to, right? Tom,
10 your boss, writes "Craig, This is good. I added
11 our department organizational chart to the
12 front. I will speak to it, as well as the roles
13 and responsibilities of our team, and how each
14 department works together...then I'll turn it
15 over to you" -- you, Craig Schiavo -- "to you to
16 finish, and after the deck, then I'll go through
17 the Archer SOM system highlights."
18         So, in fact, it was the intention that
19 you were going to participate in this
20 presentation and give the presentation with Tom
21 Bourque, correct?
22         MS. MILLER: Object to form.
23     A. Reading this e-mail, it looks like I
24 was going to take part.

Page 277

1 BY MR. ELSNER:
2     Q. Okay. And in the first page of the
3 PowerPoint presentation, both you and Tom are
4 listed under the title, correct?
5     A. Both of our names are there.
6     Q. Okay. If you go to Page 4 of the
7 PowerPoint presentation, it says "Penalties
8 Levied by the DEA."
9         Do you see that?
10     A. I do see that.
11     Q. Did you collect information about the
12 DEA's investigations and penalties leveled by
13 the DEA against other distributors and
14 pharmacies?
15     A. At a high level it looks like there
16 are situations documented here.
17     Q. Okay. And you included in the
18 presentation a penalty levied by the DEA on
19 Cardinal Health in February of 2012, is that
20 right? Go to the first bullet under Cardinal
21 Health.
22     A. I see that.
23     Q. Okay. And it reads, and if it's
24 easier for you to read on the screen next to you

Page 278

1  where it's blown up, "DEA Registration is
2  suspended for two years in Florida distribution
3  center because of sales of oxycodone to
4  pharmacies in Florida," and then in parenthesis
5  it says "2 CVS's."
6      Do you see that?
7      A.  I do see that.
8      Q.  Okay.  You were aware, were you not,
9  that the DEA investigated Cardinal Health and
10  suspended their license with respect to their
11  distribution of controlled substances to two CVS
12  stores in Florida?
13      MR. DAWSON:  Object to the form.
14      A.  I see what it says here.  I don't
15  recall exactly the circumstances or all the
16  circumstances that led to Cardinal Health having
17  their registration suspended, or am I even
18  positive that it was actually suspended.
19  BY MR. ELSNER:
20      Q.  Okay.  Exhibit 17.
21      (Whereupon, CVS-Schiavo-17 was marked
22      for identification.)
23  BY MR. ELSNER:
24      Q.  This is the Government's Prehearing

Page 279

1  Statement in the matter of Cardinal Health dated
2  February 22, 2012.  And I'm going to ask you to
3  turn to Page 17 of the document.  Let me ask you
4  to look at the second to last paragraph on the
5  page.  It says "CVS 219 and 5195, two of
6  Respondent's" -- and I'll let you know that
7  means Cardinal's -- "top four retail pharmacy
8  customers, are located in Sanford, Florida."
9      And then it reads -- if you look in
10  the last paragraph on the page, it starts "In
11  2011, Respondent" -- that's Cardinal --
12  "collectively distributed over 3 million dosage
13  units of oxycodone to six Sanford, Florida
14  pharmacies.  Of this volume, Respondent shipped
15  over 3 million dosage units (96 percent) to the
16  two CVS stores named in the ISO.  This volume
17  dwarfs the oxycodone volume purchased by other
18  chain pharmacies in Sanford."  And then it goes
19  on to explain the dosage.
20      Were you aware that two CVS Pharmacy
21  stores had received over 3 million dosage units
22  of oxycodone in 2011?
23      MR. DAWSON:  Objection.
24      MS. MILLER:  Object to form.

Page 280

1      A.  This is my first time seeing this
2  document, and these numbers are not something I
3  am or was aware of.
4  BY MR. ELSNER:
5      Q.  In the second to last paragraph, it
6  reads "According to the 2010 US Census Bureau
7  Facts Sheet, Sanford, Florida has a population
8  of 53,570 people."  Did I read that correctly?
9      A.  That's what it says.
10      Q.  Okay.  And then it says "Based on
11  these numbers, Respondent's distribution of
12  oxycodone could supply every resident of
13  Sanford, Florida with approximately 58.6 dosage
14  units of oxycodone."
15      Did I read that correctly?
16      A.  That is what this says.
17      Q.  Would you agree with me that the size
18  of the community in which a pharmacy is based
19  should be one of the factors that one should
20  look at in terms of due diligence for suspicious
21  order monitoring or due diligence of reviews of
22  sales for controlled substances to determine
23  whether the amount of opioids or controlled
24  substances being shipped to that pharmacy is

Page 281

1  proportional with the community in which it
2  lives?
3      MS. MILLER:  Object to form.
4      A.  I wouldn't necessarily say that is
5  something that you have to include.
6  BY MR. ELSNER:
7      Q.  I didn't say you had to.  I said,
8  would you agree with me that that's a factor?
9      MS. MILLER:  Object to form.
10      A.  I don't believe that is a factor that
11  you have to include.
12  BY MR. ELSNER:
13      Q.  Do you believe it's a factor that you
14  should include?
15      MS. MILLER:  Object to form.
16      A.  I don't think it's something that is
17  necessary to be included.
18  BY MR. ELSNER:
19      Q.  Do you think it's important to
20  include?
21      MS. MILLER:  Object to form.
22  BY MR. ELSNER:
23      Q.  How important or unimportant is it?
24      MS. MILLER:  Object to form.

Page 282

BY MR. ELSNER:

Q. Scale of 1 to 10, 1 being totally not important at all, 10 essential.

MS. MILLER: Object to form.

A. I don't know if I can put a number on how important that is to include. There's lots of factors that are included in reviewing or conducting due diligence.

BY MR. ELSNER:

Q. I'm sure there are, but do your best.

MS. MILLER: Object to form.

A. We're not talking about any specific order situation that -- I don't know. I don't know if it would be important or not. I can't say.

BY MR. ELSNER:

Q. Okay. You can't say whether the size of the community in which the pharmacy sits would be an important factor in looking at the volume of oxycodone products or other opioids shipped into the pharmacy in that community? You wouldn't think -- you can't say whether that's important or not?

MS. MILLER: Object to form.

Page 283

A. I can't say that there aren't other elements that would be just as important or not important or couldn't get you to the same information that you needed.

BY MR. ELSNER:

Q. Did CVS track that information?

MS. MILLER: Object to form.

A. This is before I even started at CVS. I have no idea.

BY MR. ELSNER:

Q. In 2012 when you joined CVS, was it looking at this information?

MS. MILLER: Object to form.

A. I'm not sure at that time all of the elements that were looked at as part of the SOM.

BY MR. ELSNER:

Q. After Cardinal's license was suspended by the DEA and this investigation was going on, after that did CVS have a policy to look at the size of the community in which its pharmacies were sitting to determine whether the orders to that pharmacy were proportional to the community in which that pharmacy was situated?

MS. MILLER: Object to form.

Page 284

MR. DAWSON: Objection.

A. This is before I was even in the -- with the company. I --

BY MR. ELSNER:

Q. I said after this. At any point after this, after the DEA suspended Cardinal's license, did CVS create a system like that, after February, 2012?

MR. DAWSON: Objection.

MS. MILLER: Object to form.

A. I don't recall if that is part. I don't recall if that's an element of the system.

BY MR. ELSNER:

Q. Okay. Don't recall if it's an element of the system, and you can't give it a score from 1 to 10 in terms of importance, is that right?

MS. MILLER: Object to form.

A. I wouldn't be able to assign it a score if it's important or not important.

BY MR. ELSNER:

Q. Okay. The next thing that the government discusses in the brief on Page 18, if you flip the page, about in the middle of the

Page 285

page there's a line there that begins "Publix Pharmacy 641." Do you see that? Do you see that paragraph?

A. I see the paragraph starting with Publix Pharmacy.

Q. Okay. And then the next sentence reads "In 2011, CVS 5195 purchased 1.2 million dosage units of oxycodone, while Publix Pharmacy 0641 purchased only 25,700 units of oxycodone. The two stores are located within two miles of one another."

Do you think it's important to have a system that tracks sales of controlled substances like opioids in comparison with other pharmacies in the same geographic area?

MS. MILLER: Object to form.

A. I don't think that information is necessary to have an effective system.

BY MR. ELSNER:

Q. In terms of scale 1 to 10, 1 being totally useless, 10 being essential, where would you place the relationship between a pharmacy's sales of controlled substances compared to other pharmacies in the same geographic area?

Page 286

1    MS. MILLER: Object to form.
2    A.  Based on the limited information I
3  have to answer that question, I couldn't even
4  think about how to assign that a score.
5  BY MR. ELSNER:
6    Q.  So you can't assign a score for the
7  importance of geographic area.  Can you tell us
8  whether CVS had a policy in place to look at the
9  geographic area in which a store sat and compare
10  the sales of controlled substances to other like
11  pharmacies in the same geographic area?
12    MS. MILLER: Object to form.
13    A.  During this time frame I did not work
14  for CVS, and I can't answer that, I don't know.
15  BY MR. ELSNER:
16    Q.  I'm talking about at any time, today,
17  yesterday, all the way back to 2012.
18    A.  I'm not familiar with the process of
19  how CVS monitors, sells, and incorporates other
20  factors of where those sales are taking place.
21  I'm not familiar with those.
22    Q.  What about the distribution of
23  controlled substances, would it be important as
24  part of a due diligence system to look at where

Page 287

1  a particular store is sitting and compare the
2  distribution of opioids to that store in
3  comparison with other stores in the same
4  geographic area?  Yes or no.
5    MS. MILLER: Object to form.
6    A.  Again, there's no information to go on
7  that I can assign a score to something or rate
8  its importance of one data element.
9  BY MR. ELSNER:
10    Q.  Okay.  Did CVS have a system ever to
11  look at the -- where a store sits in a community
12  and compare the purchases of that store for
13  controlled substances to other like stores in
14  the same geographic area?
15    MS. MILLER: Object to form.
16    A.  I'm not saying that they don't, but I
17  don't know what that process would be.  I don't
18  know.
19  BY MR. ELSNER:
20    Q.  Was that ever part of the due
21  diligence follow-up process that you were aware
22  of in terms of reviewing potentially suspicious
23  orders for hydrocodone?
24    MS. MILLER: Object to form.

Page 288

1    A.  I personally never reviewed suspicious
2  orders or orders of interest or any orders.
3  BY MR. ELSNER:
4    Q.  Well, you managed people who did that,
5  right?  In 2014 you managed the people who did
6  that process, right?
7    A.  I never had anyone on the suspicious
8  order monitoring team in 2014 that reported to
9  me.
10    MR. ELSNER: We'll mark this as the
11  next exhibit.
12    (Whereupon, CVS-Schiavo-18 was marked
13    for identification.)
14  BY MR. ELSNER:
15    Q.  This is Schiavo Exhibit 18.  If you --
16  this is another one of your year-end reviews.
17  This one is dated the first of -- I'm sorry,
18  January 22, 2015.  This is your year-end review
19  for 2014.
20    I'm going to ask you to take a look at
21  Page 2.  Top of the page it reads "I continue to
22  be an active contributor to the SOM team.  My
23  main responsibilities as it relates to this team
24  are as follows."

Page 289

1    Number 1, "I acted as the team's
2  manager for part of 2014 until Susan was brought
3  on to manage the team."
4    Does that refresh your recollection
5  that you were the team manager for the SOM
6  program in 2014?
7    A.  I think that's really poorly worded.
8  At no point did the SOM team ever report to me
9  that I recall.
10    Q.  That's what you wrote, though, in your
11  annual review?
12    MS. MILLER: Object to form.
13    A.  I don't specifically remember writing
14  that, but this seems to be my year-end review in
15  2014.
16  BY MR. ELSNER:
17    Q.  Okay.  So we're on Exhibit 18?
18    A.  18.
19    MS. MILLER: Is this 18?  Okay.
20  BY MR. ELSNER:
21    Q.  We're on Exhibit 18, and I've shown
22  you documents from 2012 through 2014, many of
23  which you wrote.  Is it true that you don't have
24  any memory of any of the documents I've shown

Page 290

1  you today?
2      MS. MILLER: Object to form.
3      A.  I don't recall specifically writing
4  these words that are on the page.  I see them
5  written there.  I don't have any reason to
6  believe that I didn't, if that's what it's
7  indicating, but I do not recall writing these
8  documents.
9  BY MR. ELSNER:
10     Q.  Okay.  I just want to make sure that I
11 haven't missed one.
12     Out of all the documents I've shown
13 you that you've authored, you haven't remembered
14 writing any of them, right?
15     MS. MILLER: Object to form.
16     A.  I don't recall a document that we've
17 reviewed today that I recall actually sitting
18 there and drafting the document.
19 BY MR. ELSNER:
20     Q.  I just asked if you remembered it.  I
21 didn't ask if you remember the day you sat there
22 and where you were and how you wrote it.  I just
23 asked if you remember the document.  Do you
24 remember any of them?

Page 291

1      MS. MILLER: Object to form.
2      A.  I don't recall seeing a document today
3  that I recall drafting or remembering everything
4  that was in those documents.
5  BY MR. ELSNER:
6      Q.  Okay.  If you go down on the bullets
7  on the same Page 2 of 7, it then says "Once
8  Susan was hired, I worked to get her up to speed
9  on the program and expectations/requirements."
10 Did I read that correctly?  If it's easier to
11 read, you can see it on the screen blown up.
12     A.  Where was that last piece?
13     Q.  When Susan was hired --
14     MR. ELSNER: Gina, back up at the top.
15     Q.  "Once Susan was hired," second
16 sentence, first bullet.
17     A.  Okay.
18     Q.  Did I read that right?
19     A.  It appears that you did.
20     Q.  Who is Susan?
21     A.  That would be Susan Delmonico, I
22 believe.
23     Q.  What was her position at CVS when she
24 was hired?

Page 292

1      A.  I don't know what Susan's position was
2  when she was originally hired at CVS.
3      Q.  Do you remember that she was
4  responsible for managing the SOM program?
5      A.  I remember at some point Susan was
6  hired as the manager of the SOM program.
7      Q.  And you worked to get her up to speed
8  on the program, right?
9      MS. MILLER: Object to form.
10 BY MR. ELSNER:
11     Q.  Is that what you wrote?
12     A.  That's what it says.  I did work with
13 Susan once she was hired.
14     Q.  Okay.  And then it says that you
15 "Assisted with the rollout of the SOM system to
16 all CVS Distribution Centers."  Did I read that
17 right?
18     A.  Looks like --
19     Q.  Second bullet.
20     A.  Looks like you read that correctly.
21     Q.  Okay.  Is that true?  Did you do that?
22     A.  At some level I assisted with the
23 process, I participated in the process.
24     Q.  Okay.  And that you were "part of the

Page 293

1  interviewing process for all new hires," I
2  assume you were meaning related to the SOM
3  system.  Did you do that?
4      A.  I participated in the interview
5  process of, what I can remember, the SOM team
6  members that were hired.
7      Q.  Okay.  And next bullet, you provided
8  "continuous training to the team as needed and
9  provided ongoing support to both the Management
10 team as well as the SOM analysts."  Did I read
11 that correctly?
12     A.  It looks like that's what it says.
13     Q.  And then it says you participated in
14 weekly meetings where we reviewed the SOM cases
15 and we talked through the due diligence
16 process."  Did you write that?
17     A.  That's what it says, but I don't
18 remember how long I did that for.
19     Q.  Then it says "The SOM team has me
20 review all identified 'Suspicious Orders' before
21 the block is removed and controlled substances
22 are shipped to the store."
23     Did I read that correctly?
24     A.  That's what it says.

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    Q.  Okay.  So if we go back to my
2  question, I was asking you whether one of the
3  factors that the SOM analysts would look at when
4  doing a due diligence review was the shipments
5  of controlled substances to a pharmacy and how
6  those shipments compared with other pharmacies
7  in the same geographic area.  Did they evaluate
8  that?
9        MS. MILLER:  Object to form.
10    A.  Again, I don't recall if that was part
11  of the review process.
12  BY MR. ELSNER:
13    Q.  Okay.  If you go to Page 25 --
14        MS. MILLER:  17, Exhibit 17?
15        MR. ELSNER:  Yes, back to 17.
16  BY MR. ELSNER:
17    Q.  There's a heading there that says "CVS
18  219."  Do you see that?  This is Page 25 of the
19  brief.
20    A.  I see CVS 219 underlined.
21    Q.  Yes.  Okay.  And they're talking about
22  the testimony that's going to potentially be
23  given by GS Carter.  And then in the second
24  sentence it reads "According to an analysis

Page 295

1  conducted by GS Carter, between January 1, 2010
2  and October 18, 2011, 42 percent of the
3  30-milligram oxycodone prescriptions at CVS 219
4  were paid for in cash, using no insurance to pay
5  for the medication."  Did I read that correctly?
6    A.  That appears to be what it says.
7    Q.  Were you aware that that was taking
8  place at the CVS Pharmacy 219 as part of the
9  DEA's investigation into Cardinal Health that
10  you described in your PowerPoint?
11        MS. MILLER:  Object to form.
12    A.  This is my first time seeing the
13  document.  I wasn't at CVS at this time.  I
14  don't -- these details are not something that
15  are familiar to me.
16  BY MR. ELSNER:
17    Q.  Would you agree with me that paying
18  for prescriptions of controlled substances in
19  cash is one of the red flags for diversion?
20        MS. MILLER:  Object to form.
21    A.  It could potentially be a red flag.  I
22  don't know specifically for diversion.
23  BY MR. ELSNER:
24    Q.  Red flag for what?

Page 296

1    A.  Could be a red flag for many things.
2    Q.  Under the suspicious order monitoring
3  system and the due diligence review conducted by
4  the SOM analysts, was it one of the elements
5  they were looking at, whether there were
6  purchases of controlled substances from
7  pharmacies paid for in cash?
8    A.  Again, I wasn't at CVS at this time.
9  I don't know exactly what they were looking at
10  during due diligence.
11    Q.  Well, when you were overseeing the SOM
12  analysts, were they -- was that one of the
13  factors that they were taking into the account,
14  whether prescriptions were being paid for in
15  cash?
16        MS. MILLER:  Object to form.
17    A.  I believe that is one of the data
18  elements that's available to the analysts today.
19  BY MR. ELSNER:
20    Q.  How important is that element, 1 to
21  10, 1 being totally useless, 10 being essential?
22        MS. MILLER:  Object to form.
23    A.  Again, like the previous times you've
24  asked me to put a number or rating on something,

Page 297

1  without, I think, a lot more specifics I'm not
2  comfortable -- I can't guess at what rating it
3  would be.
4  BY MR. ELSNER:
5    Q.  Well, if we turn back to Exhibit 17 on
6  Page 25, the percentage there was 42 percent of
7  the 30-milligram oxycodone prescriptions at CVS
8  219 were paid for in cash using no insurance.
9  And if you go further down to the very end of
10  that paragraph the government wrote that "Data
11  from the IMS Institute for Healthcare
12  Informatics indicates that approximately
13  6.9 percent of prescriptions were paid for in
14  cash in 2010."
15        Would it be important as part of the
16  due diligence process to know that if the
17  average for prescription payments in cash was
18  6.9 percent, and there was a CVS Pharmacy that
19  was selling prescriptions for controlled
20  substances and 42 percent of them were being
21  paid for in cash, would that cause you to
22  believe that it's a potentially suspicious order
23  and that it should be investigated?
24        MS. MILLER:  Object to form.

Page 298

1  A.  That one data element, knowing nothing
2  else about where this store is located or other
3  information that the analyst is looking at, I
4  can't say that would cause me concern.  I don't
5  know enough about the situation.
6  BY MR. ELSNER:
7  Q.  What else would you want to know?
8  What else were your analysts calling to find out
9  in 2014 when they were doing this work?
10       MS. MILLER:  Object to form.
11  A.  I was not part of the day-to-day
12  process.  The analysts made a determination of
13  what they thought was important to look at
14  and --
15  BY MR. ELSNER:
16  Q.  No suspicious orders would be cleared
17  without your approval --
18       MS. MILLER:  Object to form.
19  BY MR. ELSNER:
20  Q.  -- so what did you look at to
21  determine whether they should be approved or
22  not?
23       MS. MILLER:  Object to form.
24  BY MR. ELSNER:

Page 299

1  Q.  What were the data points?
2  A.  I don't recall my role ever being
3  reviewing every single thing, looking at every
4  single thing that an analyst did on every single
5  suspicious order.  I would look at what actions
6  were taken to address whatever concern the
7  analysts had and feel comfortable that the --
8  whatever the concern was was addressed.  That
9  was my role in providing feedback as to whether
10  or not I felt an order should be released, or
11  should resume.
12  Q.  You had weekly meetings with the SOM
13  analyst team to go over potentially suspicious
14  orders, and I want to know, what were they doing
15  when they were doing a deep dive to determine
16  whether an order was suspicious or not?  What
17  were they looking at?
18       MS. MILLER:  Object to form.
19  A.  Every situation is different.
20  BY MR. ELSNER:
21  Q.  Tell me what the factors were.
22       MS. MILLER:  Object to form.
23  A.  Man, there are hundreds and hundreds
24  of factors that they can consider.  Every

Page 300

1  situation is different, every situation might
2  require that they look at different -- well, not
3  require, but if they feel like they might look
4  at different factors.  I can't sit here and tell
5  you when an order flags what exactly they should
6  do.  I wasn't part of that process, and that's
7  up to their determination.
8  BY MR. ELSNER:
9  Q.  But you managed that program in 2014,
10  right?
11       MS. MILLER:  Object to form.
12  BY MR. ELSNER:
13  Q.  That's what you wrote, right?
14  A.  I know what that says, but I was not
15  the manager of anyone on that team.
16  Q.  Who was?
17  A.  I don't recall who they reported to.
18  Q.  They reported to you, right?  You
19  hired that team, they reported to you until
20  Susan was hired, right?
21       MS. MILLER:  Object to form.
22  A.  My role is not to hire the team.  I
23  participated in the interviews.
24  BY MR. ELSNER:

Page 301

1  Q.  You managed them until Susan was
2  hired, right?
3       MS. MILLER:  Object to form.
4  A.  I mean, that's what it says.  Nobody
5  on that team ever reported to me.  I provided
6  guidance and support.
7  BY MR. ELSNER:
8  Q.  You provided continuous training to
9  the team, right?
10  A.  At the time I wrote that, I don't know
11  what I meant by training, but I did continue to
12  support the team as needed.
13  Q.  Okay.  So I need you to tell me, what
14  are, like, the top ten criteria that they would
15  be looking at when they were doing a deep dive
16  on a store?
17       MS. MILLER:  Object to form.
18  A.  I can't say.  Every order is
19  different.  There is no top ten that I can think
20  of.  It's --
21  BY MR. ELSNER:
22  Q.  Give me some factors.  Give me some
23  elements that they were asked to look for.  You
24  had to tell them to look for something, so what

Page 302

1 did you tell them to do?
2      MS. MILLER: Object to form.
3   A.  There was information available for
4 them to look at, depending on a wide flag and
5 the information they were looking at. There was
6 no one way where I said this has to be done. I
7 don't know of any official rule book on what has
8 to be done.
9 BY MR. ELSNER:
10  Q.  Okay. So there are no -- there's no
11 set minimum standard of what they had to look at
12 before they decided an order was clear, is that
13 right?
14      MS. MILLER: Object to form.
15  A.  It's up to the analyst to decide
16 what's the appropriate level of review in order
17 to feel comfortable with releasing an order.
18 BY MR. ELSNER:
19  Q.  And there was no official rule book on
20 what was to be done at CVS regarding the
21 analyst's review of suspicious orders, correct?
22      MS. MILLER: Object to form.
23  A.  So in 2014 I know we had policies
24 around SOM, and then, as I understand, policies

Page 303

1 and the SOM policy. It gives high-level
2 guidelines on what the team should follow, but I
3 don't recall it specifically calling out the
4 exact steps that need to be taken on every
5 single order that is flagged as an order of
6 interest as they're all different and all
7 require a different even level of attention or
8 due diligence.
9 BY MR. ELSNER:
10  Q.  When you started at -- let me see. Do
11 you agree with me that -- strike that.
12      When you started at CVS, did you
13 investigate whether any suspicious orders had
14 been reported to the DEA regarding the
15 distribution of any controlled substances?
16      MS. MILLER: Object to form.
17  A.  I don't recall ever looking into
18 suspicious orders that were reported.
19 BY MR. ELSNER:
20  Q.  Well, you were sort of looking at the
21 old system, developing an enhanced or new
22 system, did you ever make any assessment or
23 determine whether -- you know, how are we doing,
24 have we ever reported a suspicious order to the

Page 304

1 DEA from our distribution centers? Did you ever
2 do that?
3      MS. MILLER: Object to form.
4   A.  I don't ever recall requesting
5 information on recorded orders.
6 BY MR. ELSNER:
7   Q.  Did you know that in February of 2012
8 there had only been -- that there was a
9 suspicious order reported in February of 2012
10 but none others at CVS from its distribution
11 practices to the DEA?
12      MS. MILLER: Object to form.
13  A.  I wasn't with the company in that
14 time.
15 BY MR. ELSNER:
16  Q.  Well, when you joined in August of
17 2012, there had only been one suspicious order
18 reported to the DEA ever from CVS related to its
19 distribution practices from controlled
20 substances. Were you aware of that?
21      MS. MILLER: Object to form.
22  A.  I don't know if that is true.
23 BY MR. ELSNER:
24  Q.  Would that concern you?

Page 305

1      MS. MILLER: Object to form.
2 BY MR. ELSNER:
3   Q.  That CVS had only reported one
4 suspicious order from its distribution centers
5 related to controlled substances?
6      MS. MILLER: Object to form.
7   A.  Would that have concerned me when I
8 started at CVS, having -- knowing nothing
9 about -- not knowing much about the company and
10 the processes, policies, but I wouldn't -- I
11 don't think it would concern me. I wouldn't
12 know enough for it to be concerning.
13 BY MR. ELSNER:
14  Q.  Well, I mean, you're in the position
15 that you are now, and you're familiar with the
16 Rannazzisi letter all the way back to 2007,
17 December of 2007. You worked in compliance for
18 Henry Schein for years. You then move over to
19 CVS. Now you've been working at CVS for a very
20 long time. Looking back on that whole history,
21 does it concern you that CVS had only reported a
22 single order to the DEA through February of 2012
23 related to a suspicious order for a controlled
24 substance?

Page 306

1    MS. MILLER: Object to form.
2    A. Again, at the time I was hired I don't
3 think I knew enough to say whether or not it
4 would or would not be concerning. But I don't
5 think it's fair to compare Henry Schein to CVS,
6 that's apples and oranges between business
7 models.
8 BY MR. ELSNER:
9    Q. Well, I'm asking you today. You're
10 the -- the position that you hold at CVS today,
11 holding that position with your years of
12 experience, do you find it concerning that at
13 the time when you started at the company in
14 August of 2012 that CVS had only reported a
15 single order to the DEA related to its
16 distribution of controlled substances?
17    MS. MILLER: Object to form.
18    A. Sitting here today, knowing what I
19 know, no, I don't think that would be
20 concerning. Knowing all of the policies and
21 processes and programs and the field alignment
22 and how LP, loss prevention, is involved, no,
23 that wouldn't be concerning. I wouldn't expect
24 that there would be a lot of controlled

Page 307

1 substance suspicious orders.
2 BY MR. ELSNER:
3    Q. Do you know what the system was in
4 2012 when you started at CVS?
5    MS. MILLER: Object to form.
6    A. I don't recall the specifics of the
7 system.
8 BY MR. ELSNER:
9    Q. So you don't know whether it was a
10 robust system or not a robust system in 2012
11 when you joined CVS, right?
12    MS. MILLER: Object to form.
13    A. I don't know the specifics of the
14 system, but I don't ever recall having any
15 concerns throughout my time at CVS that we
16 didn't have an effective system.
17    MR. ELSNER: Okay. This is
18 Exhibit 19.
19    (Whereupon, CVS-Schiavo-19 was marked
20    for identification.)
21 BY MR. ELSNER:
22    Q. This is another e-mail from you to Tom
23 Bourque dated 11/26/12, subject is the "SOM
24 System End State Solution." You write "Tom, I

Page 308

1 made some updates to the SOM Solutions based on
2 our conversation. Should I send this to
3 everyone in the meeting tomorrow?
4    "I will bring handouts as well, but I
5 know some people won't be able to make it.
6 Thanks, Craig."
7    Did I read that correctly?
8    A. That's what it says.
9    Q. Okay. What does SOM end state
10 enhancement solution mean?
11    A. I'm not sure. This is in October of
12 2012 -- November of 2012, I was with the company
13 for about three months at this time, and I know
14 at this time I don't think there's any way that
15 I could have known what the end state solution
16 could be, so I'm not sure what that's referring
17 to.
18    Q. We talked earlier about the Buzzeo
19 Group. You did a presentation for them while
20 you were working at Henry Schein, is that right?
21    MR. MONTMINY: Objection. Form.
22    A. While I was working at Henry Schein, I
23 did speak at one of their conferences.
24 BY MR. ELSNER:

Page 309

1    Q. And Buzzeo was one of the consultants
2 that Henry Schein had hired, and you had worked
3 with them in the past, correct?
4    MR. MONTMINY: Objection. Form.
5    A. I knew Buzzeo from Henry Schein and
6 work we had done.
7 BY MR. ELSNER:
8    Q. Okay. And you knew that, when you
9 joined CVS, that Buzzeo was one of the
10 consultants that was working with CVS on its
11 suspicious order monitoring system, correct?
12    MS. MILLER: Object to form.
13    A. I don't recall when I became aware
14 that CVS and Buzzeo had any relationship.
15    MR. ELSNER: I'm going to mark this as
16 the next exhibit.
17    (Whereupon, CVS-Schiavo-20 was marked
18    for identification.)
19 BY MR. ELSNER:
20    Q. This is MR 82.
21    A. Thank you.
22    Q. This is a letter that was addressed to
23 you on the second page as the manager of
24 regulatory compliance and also to your boss, the

Page 310

1 director of regulatory compliance, Tom Bourque,
2 correct?
3     A.  That's what it appears to be.
4     Q.  Okay.  Dated December 19, 2012?
5     A.  That's what it says.
6     Q.  Okay.  And the subject is the "SOM
7 Model Services Proposal," right?
8     A.  "CVS_BuzzeoPDMA_SOM Model Services
9 Proposal."
10     Q.  And you had a meeting with them to
11 discuss the proposal, is that right?
12     A.  I don't recall this proposal ever
13 being discussed.
14     Q.  All right.  It says in the first line
15 "Dear Tom and Craig, As a follow-up to our
16 meeting last week, I am pleased to provide you
17 with our proposal that outlines our SOM Model
18 support services."
19     Did I read that right?
20     A.  "Please find our proposal to support
21 your new SOM initiatives" is what it says.
22     Oh, you're on the document.  I'm
23 sorry, I'm still on the e-mail.
24     Q.  I'm talking about the letter to you,

Page 311

1 which is the second page of the document 111914,
2 "Dear Tom and Craig, As a follow-up to our
3 meeting last week, I am pleased to provide you
4 with our proposal that outlines our SOM Model
5 support services that will assist in meeting
6 your regulatory and operational requirements."
7     Did I read that correctly?
8     A.  That's what it says.
9     Q.  And this is a company that was
10 formerly the Buzzeo Group, is that right?
11     A.  Yes.
12     Q.  Okay.  If you turn to the second page
13 of the letter, it lists under "Project 1:  SOM
14 Statistical Model Development."
15     Do you see that?
16     A.  Where is --
17     Q.  There's a heading on the top of that
18 page.
19     Do you see that?
20     A.  I see that.
21     Q.  All right.  And it says that, at the
22 end of that paragraph, "This SOM statistical
23 model will incorporate a number of new
24 enhancements to your current model to include:

Page 312

1     "Number 1.  Combining all Controlled
2 Substances (CII through CV) and Listed Chemicals
3 into one SOM model."  That's one of the
4 enhancements they were going to make to the SOM
5 program, right?
6     MS. MILLER:  Object to form.
7     A.  That seems to be in their proposal
8 that they provided to us.
9 BY MR. ELSNER:
10     Q.  That indicates there wasn't one in
11 existence, right, that they were going to create
12 this as an enhancement to the current SOM
13 system, right?
14     MS. MILLER:  Object to form.
15     A.  I see it says there -- I can't confirm
16 and I don't recall that that was not part of the
17 system.
18 BY MR. ELSNER:
19     Q.  They were providing a proposal for
20 something which they call as a new enhancement
21 that you already had, is that your testimony?
22     MS. MILLER:  Object to form.
23     A.  I see it says it there, but I don't
24 recall if that was -- I'm not sure what that's

Page 313

1 referring to.  I don't recall if we were not
2 doing that.
3 BY MR. ELSNER:
4     Q.  Under number 2, it's to "Incorporate
5 third-party distribution data into the new SOM
6 model as available."
7     Do you see that?
8     A.  I see where it says that.
9     Q.  Okay.  So we're going to incorporate
10 outside vendor distribution data into the SOM
11 model, correct?
12     MS. MILLER:  Object to form.
13     A.  I don't know what they mean by
14 third-party distribution data.
15 BY MR. ELSNER:
16     Q.  You were part of the team that was
17 analyzing who CVS would hire to develop the new
18 SOM program, correct?
19     A.  I participated in those discussions.
20     Q.  And Buzzeo wasn't selected as the
21 vendor to use -- as the consultant to use for
22 that program, correct?
23     A.  The system that we developed and
24 currently have in place today, we did not use

Page 314

1 Buzzeo.
2    Q.  If you turn back to Mod Release 20,
3 which is the prior exhibit, this is Exhibit 19,
4 SOM End State Enhancement Solution.
5    A.  Okay.
6    Q.  And it says "Actions to Be Taken to
7 Enhance CVS Process."  Do you see where I'm
8 reading?
9    A.  I see that.
10    Q.  Okay.  And then under number 1, it
11 says "Current Algorithm/Enhancements to
12 Algorithm/Create New Algorithm," and then under
13 "a" it says "Review our contracts with Buzzeo."
14    Did I read that correctly?
15    A.  That's what that says.
16    Q.  Okay.  And under that little Roman
17 Numeral i, you write "Were they fired?"
18    Do you see that?
19    A.  I see that.
20    Q.  Were they fired?
21    MS. MILLER:  Object to form.
22    A.  I'm not really sure what I was
23 referring to when I wrote that.  They were a
24 consultant, and the term fired, I don't think we

Page 315

1 would fire, so I don't know what that means.
2 BY MR. ELSNER:
3    Q.  That's what you wrote, right?
4    MS. MILLER:  Object to form.
5    A.  That's what the document says.
6 BY MR. ELSNER:
7    Q.  Interesting, everyone else that's been
8 asked this question that I'm aware of answered
9 "I'm not sure if you can fire a consultant, you
10 have you to ask the person who wrote it."  So
11 you're the person who wrote it.  So what did you
12 mean when you wrote "were they fired?"  There's
13 no one else for me to ask.  I've asked everyone
14 else.  You're it.  What is CVS's answer?
15    MS. MILLER:  Object to form.
16    A.  I don't remember writing this
17 document, but in 2012, three months into my time
18 at CVS, I do not recall what I meant by were
19 they fired.
20 BY MR. ELSNER:
21    Q.  Why did CVS hire AGI instead of
22 Buzzeo?
23    MS. MILLER:  Object --
24 BY MR. ELSNER:

Page 316

1    Q.  To the extent you know.
2    MS. MILLER:  -- to form.  Object.
3    To the extent it would reveal
4 attorney/client communications, I instruct you
5 not to answer.
6    A.  It wasn't my decision or call who was
7 hired.
8 BY MR. ELSNER:
9    Q.  Did anyone discuss with you any
10 difficulties, frustrations with the Buzzeo
11 Group?
12    MS. MILLER:  Object to form.  Object
13 on attorney/client privilege grounds.
14    I instruct you not to answer to the
15 extent it would reveal attorney/client
16 communications.
17    A.  I don't recall any conversations
18 regarding frustrations with Buzzeo as it relates
19 to our SOM.
20 BY MR. ELSNER:
21    Q.  Was there any criticisms of the Buzzeo
22 Group from anyone at CVS that you're aware of?
23    MS. MILLER:  Object to form.  Object
24 on attorney/client privilege grounds.

Page 317

1    I instruct you not to answer.  I
2 instruct the witness not to answer to the extent
3 it would reveal any attorney/client
4 communications.
5    A.  I can't recall any specific
6 frustrations or conversations around it.
7 BY MR. ELSNER:
8    Q.  Did you have a conversation with any
9 attorney at CVS, and I don't want you to tell me
10 what that conversation was, but did you have a
11 conversation with any attorney at CVS before you
12 prepared for this deposition today related to
13 the firing of the Buzzeo Group?
14    MS. MILLER:  Object.
15 BY MR. ELSNER:
16    Q.  Just yes or no.
17    MS. MILLER:  I'm going to object and
18 instruct him not to answer.
19    MR. ELSNER:  On yes or no, whether he
20 had a conversation about the topic --
21    MS. MILLER:  Well, you're saying --
22    MR. ELSNER:  -- without asking what
23 the content of the conversation was?
24    MS. MILLER:  Well, you're saying in

Page 318

¹ your question, did you have a conversation with
² any attorney related to the firing of the Buzzeo
³ Group.
⁴ BY MR. ELSNER:
⁵     Q.  Did you have a conversation with any
⁶ attorney at CVS prior to your preparation for
⁷ this deposition today concerning the Buzzeo
⁸ Group?
⁹     A.  Not that I recall.
¹⁰     MR. ELSNER:  I don't understand the
¹¹ basis of the objection.
¹²     Q.  To prepare for the deposition today,
¹³ what did you do?
¹⁴     A.  I had meetings with our internal and
¹⁵ outside counsel.
¹⁶     Q.  How long did you meet with counsel
¹⁷ inside CVS to prepare for today's deposition?
¹⁸     MS. MILLER:  Object to form.
¹⁹     A.  I believe we met three or four times.
²⁰ BY MR. ELSNER:
²¹     Q.  How long were those meetings?
²²     MS. MILLER:  Object to form.
²³     A.  They varied in length.
²⁴ BY MR. ELSNER:

Page 319

¹     Q.  What's your best estimate of the total
² number of hours you met with inside counsel to
³ prepare for today's deposition?
⁴     MS. MILLER:  Object to form.
⁵     A.  I don't recall how long I prepared
⁶ with inside counsel, counsel at -- our internal
⁷ CVS counsel.  I don't recall.  I can't put hours
⁸ on it.  I can't recall how long.
⁹ BY MR. ELSNER:
¹⁰     Q.  What about your outside counsel, how
¹¹ many days, hours did you spend preparing for
¹² your deposition with them?
¹³     A.  We met three or four times.
¹⁴     Q.  Did you meet yesterday?  Don't say you
¹⁵ don't recall.
¹⁶     MS. MILLER:  Object to form.
¹⁷ Objection.
¹⁸ BY MR. ELSNER:
¹⁹     Q.  Did you meet with counsel yesterday?
²⁰     A.  Yes.
²¹     Q.  How long?
²²     A.  Most of the day.
²³     Q.  Seven hours, six hours?
²⁴     MS. MILLER:  Object to form.

Page 320

¹     MR. ELSNER:  What's the objection?  He
² said most of the day, I asked six or
³ seven hours.  What's the objection?
⁴     MS. MILLER:  Six or seven hours of the
⁵ day yesterday?
⁶     MR. ELSNER:  Yes.
⁷     MS. MILLER:  Just wasn't clear.
⁸     MR. ELSNER:  That's not a valid
⁹ objection.
¹⁰ BY MR. ELSNER:
¹¹     Q.  How many hours did you meet with your
¹² counsel yesterday?
¹³     A.  We were probably together for seven
¹⁴ hours.
¹⁵     Q.  Okay.  Did you review documents?  Yes
¹⁶ or no.
¹⁷     MS. MILLER:  Objection.
¹⁸     I'm going to instruct you not to
¹⁹ answer to the extent it would reveal any of the
²⁰ documents that we discussed based on privilege
²¹ and work product.  You may answer the question.
²²     A.  We reviewed documents.
²³ BY MR. ELSNER:
²⁴     Q.  Did you meet with counsel before

Page 321

¹ yesterday?
²     A.  Yes.
³     Q.  When was the prior meeting and how
⁴ long did it last, roughly?
⁵     A.  Prior meeting was Tuesday.
⁶     Q.  How long?
⁷     A.  Most of the day.
⁸     Q.  Six, seven hours?
⁹     A.  I don't remember exactly.
¹⁰     MS. MILLER:  Object to form.
¹¹     A.  I don't remember exactly how long.
¹² BY MR. ELSNER:
¹³     Q.  What time did you start?
¹⁴     A.  Sometime after 10:00 o'clock.
¹⁵     Q.  Where did you meet?
¹⁶     A.  At One CVS.
¹⁷     Q.  When did the meeting end; before
¹⁸ lunch, after lunch?
¹⁹     A.  I don't recall when it ended.
²⁰     Q.  Dark outside, or not dark outside?
²¹     MS. MILLER:  Object to form.
²² BY MR. ELSNER:
²³     Q.  This was Tuesday, right?
²⁴     MS. MILLER:  Object to form.

Page 322

1    A.  I don't recall exactly the time that
2 it ended.
3 BY MR. ELSNER:
4    Q.  Did you meet for more or less than
5 four hours that day?
6    A.  I don't remember exactly how long we
7 met.  It was for a number of hours.
8       MR. ELSNER:  To move this along, can
9 you give us an idea of how long you spent with
10 the witness preparing for the deposition?  He
11 seems unable to recall what happened this week.
12       MS. MILLER:  I'm not going to make a
13 representation.  Ask your questions.
14       MR. ELSNER:  You're unwilling to tell
15 us how long you met with the witness?
16       MS. MILLER:  No, I just --
17       MR. ELSNER:  He can't answer the
18 question.
19       MS. MILLER:  He is answering the
20 question.  He's trying --
21       MR. ELSNER:  He says he can't
22 remember.
23       MS. MILLER:  Well, he said --
24       MR. ELSNER:  He can't remember when

Page 323

1 the meeting ended on Tuesday.  It began at
2 10:00 in the morning, and he can't tell me when
3 it ended.
4 BY MR. ELSNER:
5    Q.  Did you go past lunch?  Did you work
6 into the evening?  I mean, five, six hours?
7 Please, someone, either of you, tell me.  Can
8 you answer the question?
9    A.  Tuesday we met for a good part of the
10 day.  I don't remember exactly.
11    Q.  What does that mean, "a good part of
12 the day"?
13    A.  I had many other meetings during the
14 day, so I don't know exactly how long we met
15 for.
16    Q.  Prior to that meeting on Tuesday and
17 the one yesterday, did you meet with counsel to
18 prepare for the deposition before that?
19    A.  We met on Monday.
20    Q.  So you met on Monday, you met on
21 Tuesday, and you met yesterday.  How long did
22 you spend on Monday preparing for the
23 deposition?
24    A.  I believe Monday was a good part of

Page 324

1 the day.
2    Q.  You spent a good part of the day
3 meeting with counsel on Monday, a good part of
4 the day meeting with counsel on Tuesday, and you
5 spent seven hours yesterday, is that right?
6    A.  I don't know --
7       MS. MILLER:  Object to form.
8       MR. ELSNER:  That's what his testimony
9 was, right?
10    A.  I don't know exactly how long we spent
11 yesterday, but it was most of the day, a good
12 part of the day.
13 BY MR. ELSNER:
14    Q.  I thought you said seven hours.
15       Did you meet over the weekend?
16    A.  We did not meet over the weekend.
17    Q.  Did you meet last week?
18    A.  We did not meet last week.
19    Q.  And none of the process and system,
20 the questions that I've talked with you about
21 today, from 2014 to 2012, you did not have any
22 memory of any of those things we discussed,
23 correct?
24       MS. MILLER:  Object to form.

Page 325

1       That's not what he testified to.  He
2 testified --
3       MR. ELSNER:  Well, the jury can
4 determine that.
5 BY MR. ELSNER:
6    Q.  Is there something in particular that
7 you remember that we discussed today that you
8 can highlight for me?
9       MS. MILLER:  Object to form.
10       The record speaks for itself.  He's
11 testified about the processing systems between
12 2012 and 2014.
13       MR. ELSNER:  You can say object to
14 form.
15 BY MR. ELSNER:
16    Q.  What's the answer, please?
17    A.  Nothing that we have reviewed today,
18 to the best of my recollection, I recall from
19 the time either they were created or they were
20 first reviewed by me.  I don't recall the
21 documents.
22    Q.  Did you meet with the Analysis Group
23 to consider their proposal to develop and
24 enhance suspicious monitoring system for CVS?

Page 326

1    A.  I participated in meetings with AG
2  where enhancements to the system or the new
3  system were discussed.
4    Q.  You were among the team that
5  reviewed -- that solicited and reviewed
6  proposals to partner with CVS in the development
7  of a suspicious order monitoring algorithm and
8  system, correct?
9    MS. MILLER:  Objection.  I'd like to
10  lodge an objection right after the prior question
11  in 296:04.  It's a follow-up to the prior question
12  I'd objected to, but I'd like that reflected on
13  the record.  Thank you.
14    I apologize for interrupting on the
15  record.
16  BY MR. ELSNER:
17    Q.  You were among the team that reviewed
18  and solicited -- that solicited and reviewed
19  proposals for consultants to assist CVS with its
20  development of an SOM algorithm and enhanced
21  program, correct?
22    A.  I was part of a team that was
23  participating in conversations prior to
24  selecting a vendor.  I don't remember viewing

Page 327

1  any specific proposals.
2    Q.  How many other vendors submitted
3  proposals?  Was it anyone other than the Buzzeo
4  Group and the Analysis Group?
5    A.  Those are the only two that I recall.
6    Q.  Who would know if there are others?
7    MS. MILLER:  Object to form.
8    A.  I don't know who would know that.
9    MR. ELSNER:  This is Motley Rice 9.
10  I'm going to mark this as the next exhibit.
11    (Whereupon, CVS-Schiavo-21 was marked
12    for identification.)
13  BY MR. ELSNER:
14    Q.  This is another e-mail that you sent
15  to Tom Bourque.  The date here is December 12,
16  2012.  It reads "Opportunity Page, SOM Flow
17  Chart," and then you wrote "These are documents
18  mentioned in my status report just in case
19  Pawlik wants to see them when we are going over
20  the SOM slide or Inventory Cycle count slide."
21    Did I read that correctly?
22    A.  That's what it says.
23    Q.  Okay.  And then it appears to be a
24  list of kind of action items, and there's an a

Page 328

1  column for Duration, Start, Finish, and
2  Percentage Complete.
3    Do you see that?
4    A.  I see that.
5    Q.  Okay.  And you drafted this?
6    A.  I don't know if I drafted this.
7    Q.  You sent it to your boss, right?
8    A.  I sent it to my boss.
9    Q.  And you said these are the documents
10  that you mentioned in your status report, so are
11  these documents that you drafted or did somebody
12  else draft these?
13    A.  I don't recall.  I don't remember
14  drafting this.
15    Q.  Would there have been anyone else that
16  would have drafted this, to your knowledge, that
17  you would have sent to Mr. Bourque?  I couldn't
18  see any other e-mails where someone forwarded it
19  to you.
20    MS. MILLER:  Object to form.
21    A.  It's very possible someone else
22  drafted this.
23  BY MR. ELSNER:
24    Q.  Who would it be?

Page 329

1    A.  It could have been anyone on the
2  current SOM team.
3    Q.  Okay.  Can I ask you to look at
4  Page 103375?  You see there's an ID number that
5  lists sequential numbers.  If you go down to 48.
6  Do you see where I am?  You go across 48.  It
7  reads "Gap Analysis between current SOM & New."
8    Do you see that?
9    A.  I see that.
10    Q.  All right.  And then if you go over to
11  Percentage Complete, it says 50 percent.
12    Do you see that?
13    A.  I see where it says that.
14    Q.  Okay.  And then the Resource Names
15  associated with that analysis are you and
16  Tulley.  Is that right?
17    A.  Yes.
18    Q.  Okay.  So you were to perform a gap
19  analysis between the current SOM system in place
20  in 2012 and the new system that you were going
21  to develop, is that right?
22    MS. MILLER:  Object to form.  Object
23  on attorney/client privilege grounds.
24    To the extent the witness can answer

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 the question without revealing attorney/client
2 communications, you can answer.
3    A.  I see what it says there.  I see my
4 name with Tulley's name.  I don't recall doing a
5 gap analysis.  I don't recall doing that.
6 BY MR. ELSNER:
7    Q.  Did CVS ever compare the old system
8 and come up with a list of items that are going
9 to be in the new system other than the documents
10 that I've shown you today that you drafted about
11 that?  Is there anyone at CVS, to your
12 knowledge, that would do that?
13       MS. MILLER:  Object to form.  Object
14 on attorney/client privilege grounds.
15       And to the extent the witness can
16 answer the question without revealing
17 attorney/client communications, he can answer.
18 Otherwise I instruct him not to answer.
19    A.  I don't recall anyone that did that.
20 BY MR. ELSNER:
21    Q.  Your name is listed next to that task,
22 correct, with Tulley?  Who is Tulley?
23    A.  I believe that's Chris Tulley.
24    Q.  And your name is listed with his as

Page 331

1 responsible for that task, correct?
2    A.  My name with Chris's is in the
3 resources name.
4    Q.  You were also responsible for
5 identifying all the DEA requirements in the next
6 item, correct, item 49?
7    A.  I see my name there, but I don't think
8 I would be relied on to identify all DEA
9 requirements.
10    Q.  If you go to the next page under 53,
11 it says "Develop an algorithm methodology to
12 find orders of interest (using Thresholding
13 approach)."  You and Tulley are listed there,
14 correct?
15       MS. MILLER:  Mike, where are you?
16       MR. ELSNER:  I'm at 63.
17       MS. MILLER:  63.
18       MR. ELSNER:  103376.
19       MS. MILLER:  Thank you.
20    A.  I see my name there.
21 BY MR. ELSNER:
22    Q.  Okay.  It's one of your
23 responsibilities under the new SOM system, is
24 that right?

Page 332

1       MS. MILLER:  Object to form.
2    A.  I see what it says there, but at no
3 time do I recall it being my responsibility to
4 develop any kind of algorithm.  I don't know how
5 I would do that.
6       MR. ELSNER:  Why don't we go off the
7 record quickly?
8       THE VIDEOGRAPHER:  We're going off the
9 record at 3:41 p.m.
10       (Whereupon, a recess was taken.)
11       THE VIDEOGRAPHER:  We're back on the
12 record at 3:47 p.m.
13 BY MR. ELSNER:
14    Q.  Mr. Schiavo, I put back before you
15 your year-end review from 2012.  This is
16 Exhibit 9.  We looked at this earlier.  It's
17 dated January 25th, 2013.  I'm going to ask you
18 to look at Page 8 of 11, which is at 120603.
19    A.  Okay.
20    Q.  Okay.  And at the end of that first
21 full paragraph, it says "To date, I have
22 contributed to the following."
23       Do you see where I'm at?
24    A.  I see where you're at.

Page 333

1    Q.  Okay.  And the first plus there, it
2 says "To identify gaps in the current SOM system
3 that need to be addressed when developing the
4 new system."
5       Did I read that correctly?
6    A.  That's what that says.
7    Q.  And did you do that?
8       MS. MILLER:  Object to form.
9    A.  I don't recall ever doing a deep dive
10 into the system at this time and identifying
11 CAPS.  I think at the time of this review I was
12 probably with CVS for a few months.
13 BY MR. ELSNER:
14    Q.  That's what you wrote, though, right,
15 "Identify gaps in the current SOM system that
16 need to be addressed when developing the new
17 system," correct?
18    A.  That's what it says in my year-end
19 review.
20    Q.  Okay.  And that's what it said in the
21 document we just looked at, that you were going
22 to do a gap review, correct?
23       MS. MILLER:  Object to form.
24    A.  It's -- I recall it saying something

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  about doing a gap analysis in the other
2  document.
3  BY MR. ELSNER:
4      Q.  Comparing the old system to the new
5  system, right?
6          MS. MILLER:  Object to form.
7      A.  Can I look to see what the exact
8  wording was?
9  BY MR. ELSNER:
10     Q.  Sure.
11     A.  Do we know which number it was?
12     Q.  I believe it was 48 or 49.
13         MS. VELDMAN:  63.
14     A.  63 was "Develop algorithm
15  methodology."
16  BY MR. ELSNER:
17     Q.  I think it's the page before that.
18     A.  48 says "Gap analysis between current
19  SOM and new SOM."
20     Q.  And that's what you wrote in your
21  review, "Identify gaps in the current SOM system
22  that need to be addressed when developing the
23  new system," right?
24         MS. MILLER:  Object to form.

Page 335

1      A.  It says I contributed to that process.
2  I don't remember to what extent.
3  BY MR. ELSNER:
4      Q.  Okay.  Two more plusses down it says
5  "Selecting AGI as the vendor to help develop an
6  algorithm in order to identify potentially
7  suspicious orders."
8          Did I read that correctly?
9      A.  That's what it says.
10     Q.  Okay.  And then on 63 of the prior
11  exhibit, line 63, it says "Develop algorithm
12  methodology to find orders of interest."
13  Correct?
14         MS. MILLER:  Object to form.
15     A.  This is saying with my name next to it
16  "Develop algorithm methodology."  But again, I
17  don't ever recall being in charge of developing
18  an algorithm.
19  BY MR. ELSNER:
20     Q.  Well, one of the items that you wrote
21  in your annual review was "Selecting AGI as the
22  vendor to help develop an algorithm in order to
23  identify potentially suspicious orders."  Is
24  that one of the things listed in your annual

Page 336

1  review?
2      A.  It says that one of the things that I
3  contributed with was "selecting AGI to help
4  develop an algorithm," and I read that much
5  differently from me being responsible for
6  developing an algorithm.
7      Q.  But you worked on it, right?
8          MS. MILLER:  Objection to form.
9  BY MR. ELSNER:
10     Q.  I didn't say you were the only one
11  responsible.  That was one of the things you
12  worked on, right?
13     A.  I was -- I participated in meetings
14  with other team members, but I don't think I had
15  a role in developing, writing the algorithm.
16     Q.  Okay.  Toward the bottom it says
17  "Drafting of the Stop Order/Order Resumption
18  SOP."  You contributed to that, right?
19         MS. MILLER:  Object to form.
20         You're on the --
21  BY MR. ELSNER:
22     Q.  Back on your annual review, second to
23  last plus.
24     A.  I see "Drafting of Stop Order/Order

Page 337

1  Resumption SOP."  But that's not a -- that is
2  not a policy that I'm -- I recall or am familiar
3  with.  I don't know if that was ever an official
4  policy.
5      Q.  Well, we saw those documents today.
6  Was it not an official policy of CVS, the policy
7  that you drafted with Aaron Burtner?
8          MS. MILLER:  Object to form.
9          And maybe it would be helpful to show
10  him the exhibit that you're referring to so he
11  can take a look.
12  BY MR. ELSNER:
13     Q.  You don't recall working on that
14  policy with Aaron Burtner, a stop order policy,
15  whether we were going to ship -- whether we were
16  going to stop the order of that exact drug or
17  the family of drugs?  We discussed it for about
18  20 minutes.
19         MS. MILLER:  Object to form.  He's
20  already given testimony on it.
21         MR. ELSNER:  I know, that's why I
22  thought it would be simple to say one of the
23  things that was listed was the drafting of the
24  stop order/order resumption SOP.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 BY MR. ELSNER:
2    Q.  That's one of the things listed in the
3 review, correct?
4    A.  I don't recall the title of the policy
5 we reviewed today is the same policy that's
6 referred to right here.  I don't recall the
7 title of the policies we reviewed today.
8    Q.  Did you write in your annual review --
9 did you write "Drafting of the Stop Order/Order
10 Resumption SOP"?  Yes or no.
11    A.  It says there that I drafted the stop
12 order/order resumption SOP, which is a policy.
13 I'm not sure what policy that's referring to.
14    Q.  I know, we've established you can't
15 remember.
16       MS. MILLER:  Object to form.
17 BY MR. ELSNER:
18    Q.  The next plus says "Providing input on
19 key decisions (Reporting to DEA offices, what
20 drugs to hold when an order flags, whether or
21 not to include outside vendor orders)."
22 Correct?
23    A.  That's what that says.
24    Q.  Okay.  So there was a discussion at

Page 339

1 CVS whether or not to include outside vendor
2 orders as part of the SOM process in 2012,
3 correct?
4       MS. MILLER:  Object to form.
5    A.  In 2012 I believe we discussed the
6 potential of including OV order in the new or
7 enhanced system that we were building.
8 BY MR. ELSNER:
9    Q.  Okay.  And it did not exist in the old
10 system, right?
11       MS. MILLER:  Object to form.
12    A.  I don't recall if OV orders were part
13 of the old system or not.
14 BY MR. ELSNER:
15    Q.  I'm going to mark this.
16       Also in there is you provided input on
17 another key decision, which was what drugs to
18 hold when an order flags, is that right, whether
19 to hold that specific drug or whether to hold
20 the family of drugs?  That's one of the other
21 things that you provided input on for key
22 decisions, correct?
23       MS. MILLER:  Object to form.
24    A.  That's what it says.  But again, this

Page 340

1 is in 2012 when I don't believe any final
2 decisions have been made on how our new or
3 enhanced system was -- all the elements that
4 were going to be in there.
5 BY MR. ELSNER:
6    Q.  I understand.  But that's one of the
7 things you provided input on, right, whether to
8 do the family of drugs or specific drugs or all
9 controlled drugs, right?
10    A.  That's what it says.
11    Q.  It also says you were going to provide
12 input on reporting to the DEA offices, correct?
13    A.  That's what it says.
14       MR. ELSNER:  Okay.  Mark this next
15 document as Exhibit 22.  This is Motley Rice 23.
16       (Whereupon, CVS-Schiavo-22 was marked
17       for identification.)
18 BY MR. ELSNER:
19    Q.  CVS did hire the Analysis Group as a
20 consultant, right?
21    A.  That's who we used to develop -- help
22 develop our SOM system.
23    Q.  And so CVS hired them as a consultant,
24 is that right?  Well, they didn't do it for

Page 341

1 free, right?
2    A.  That's -- yes, that's who we used to
3 do it.
4    Q.  And you hired them?
5    A.  I didn't personally hire them.
6    Q.  I asked if CVS hired them.
7       MS. MILLER:  Object to form.
8 BY MR. ELSNER:
9    Q.  Did CVS hire the Analysis Group to
10 assist it in developing its SOM program?
11    A.  Yes, the Analysis Group helped us
12 developed our SOM.
13    Q.  In February of 2013 there is this
14 note, that memo, from the Analysis Group which
15 is a request for data for the SOM algorithm data
16 inputs.  Do you see that in the "Re" line?  The
17 date is February 4, 2013.
18    A.  I see that.
19    Q.  And there's some -- there's a listing
20 here at the end of the second paragraph, there's
21 sort of some numbers here, 1 through 10.  This
22 is the data that the Analysis Group was
23 requesting in order to build the algorithm.
24       Do you see that?

Page 342

1    A.  I see the listing of elements there
2  that it looks like they're requesting.
3    Q.  Okay.  Who at CVS was responsible for
4  gathering this information to provide to the
5  Analysis Group, to the extent you know?
6    A.  I don't know who would have provided
7  this information.
8    Q.  Did you ever review the information or
9  the data that the Analysis Group was going to
10  use to compile the algorithm?
11    A.  I don't recall reviewing any specific
12  data provided to Analysis Group.
13    Q.  Under 8 it says "Store dispensing,"
14  and it lists under A, B, C and D, prescription
15  information, patient information, prescriber
16  information, pharmacist information.  Is this
17  information -- was that a component of the SOM
18  program in place in 2012 at CVS and early 2013?
19      MS. MILLER:  Object to form.
20    A.  I don't recall whether it was or was
21  not included.
22  BY MR. ELSNER:
23    Q.  But it was information that was
24  include -- was sent to the Analysis Group to be

Page 343

1  included in its new algorithm for CVS, correct?
2      MS. MILLER:  Object to form.
3    A.  I see from this document that they
4  requested it.
5  BY MR. ELSNER:
6    Q.  Do you know whether it was used by the
7  Analysis Group as a component of the algorithm?
8      MS. MILLER:  Object to form.
9    A.  I'm not -- I'm not familiar with
10  exactly what is in the algorithms.
11  BY MR. ELSNER:
12    Q.  Well, do you know whether the system
13  analyzes dispensing information?
14      MS. MILLER:  Object to form.
15    A.  The current system we have today I
16  know takes into account dispensing information.
17  BY MR. ELSNER:
18    Q.  And that system is based on the system
19  that the Analysis Group built for CVS, is that
20  right?
21    A.  Yes, the current system we have today
22  is what the Analysis Group assisted with.
23    Q.  And that includes prescribing
24  information, patient information, and pharmacist

Page 344

1  info, correct?
2      MS. MILLER:  Object to form.
3    A.  Speaking specifically to the
4  algorithms, I don't know what is in all of the
5  algorithms.  However, I'm aware that these are
6  data elements that would be available to the SOM
7  analysts during due diligence.
8  BY MR. ELSNER:
9    Q.  Today?
10    A.  Today.
11    Q.  Do you know what was available to the
12  SOM analysts in 2012 before this system went
13  into effect?
14      MS. MILLER:  Object to form.
15    A.  I don't know of all the information
16  that was available to them back in 2012.
17  BY MR. ELSNER:
18    Q.  There was a period of time in which
19  the current SOM system was working at CVS and
20  you were working with the Analysis Group to
21  develop the new SOM system, correct?
22    A.  I believe so.
23    Q.  And the new SOM system that went into
24  effect did not go into effect until 2014, is

Page 345

1  that right?
2    A.  I believe the new SOM system started
3  to roll out in 2014.
4    Q.  2014.  It was on a rolling basis; you
5  did a few distribution centers at a time, is
6  that right?
7    A.  I don't remember the exact dates, but
8  I know it was a rollout approach to the
9  distribution centers.
10    Q.  You didn't hit all distributions at
11  one exact time with the new system, correct?
12    A.  No, I don't believe they were all
13  rolled out at the same time.
14    Q.  Okay.  And that process of rollout
15  continued throughout 2014 into November of 2014,
16  is that right?
17    A.  I don't recall the rollout schedule
18  and when it completed.
19    Q.  But at least through 2012 when you
20  started through some point in 2014 CVS was using
21  the old system until the rollout for each
22  distribution center, and as the rollout came
23  into effect the new system would come into place
24  for that distribution center, is that right?

Page 346

1      MS. MILLER: Object to form.
2  BY MR. ELSNER:
3      Q.  And the old distribution centers were
4  still using the old process, correct?
5      MS. MILLER: Object to form.
6      A.  I know that at the time of the
7  rollout, obviously the rollout involved
8  distribution centers going onto the new
9  developed algorithm and may have also used the
10 old algorithm as well or old system as well.
11 And I believe at the time of the rollout the
12 distribution centers that it hadn't been rolled
13 out to were still utilizing the older suspicious
14 order monitoring process.
15 BY MR. ELSNER:
16     Q.  Okay.  There never came a point in
17 time where you, you know, went to Indianapolis
18 and sat down with the SOM analysts there that
19 were using the old SOM system to understand it,
20 is that true?
21     MS. MILLER: Object to form.
22     A.  I've never been to the Indianapolis
23 distribution center.
24 BY MR. ELSNER:

Page 347

1      Q.  Okay.  Have you ever sat down with
2  anyone at CVS and reviewed an IRR report from
3  the old suspicious order monitoring system at
4  CVS?
5      MS. MILLER: Object to form.
6      A.  I am aware there were IRR reports.  I
7  don't recall going through one with anyone on
8  the SOM team.
9  BY MR. ELSNER:
10     Q.  Do you know how to read one?
11     MS. MILLER: Object to form.
12     A.  I don't recall having read an IRR.  I
13 can't even think about it, whether -- I can't
14 remember what it looks like.
15 BY MR. ELSNER:
16     Q.  Okay.  That wasn't part of what you
17 did at CVS, right?
18     MS. MILLER: Object to form.
19     A.  No, my role was never to review
20 orders.
21 BY MR. ELSNER:
22     Q.  Okay.  And no one from CVS sat down
23 with you and explained to you the system that
24 was in place with respect to suspicious order

Page 348

1  monitoring at CVS in 2012 or 2013 or '14 as that
2  system was being used before the new enhanced
3  system was put into place, is that right?
4      MS. MILLER: Object to form.
5      A.  At a high level I think I understood
6  the process, but no, I never recall a
7  conversation that went into details of exactly
8  what that old system -- how it functioned.
9  BY MR. ELSNER:
10     Q.  Okay.  Were you aware that they had
11 staffing issues with respect to the SOM
12 management team in Indianapolis in 2013?
13     MS. MILLER: Object to form.
14     A.  I don't recall any management staffing
15 issues.
16 BY MR. ELSNER:
17     Q.  Do you recall any staffing shortages
18 or other staffing problems in the SOM review
19 team in 2013?
20     A.  I don't recall any situations where we
21 couldn't review, well, orders of interest
22 that -- well, I don't remember there ever being
23 an instance where that was an issue.
24     Q.  That wasn't my question.  I asked you

Page 349

1  whether you were aware of any staffing shortages
2  or staffing issues in 2013.
3      MS. MILLER: Object to form.
4      A.  I don't recall any staffing issues
5  that affected the SOM process.
6  BY MR. ELSNER:
7      Q.  In June of -- in June of 2013, Aaron
8  Burtner left CVS, and Kelly Baker assumed Aaron
9  Burtner's responsibilities until a replacement
10 could be found, is that true?
11     A.  I recall at some point Aaron left.  I
12 don't remember exactly when that date was.  And
13 I remember -- I somewhat remember working with
14 Kelly Baker on certain things.  I don't know the
15 time frames.
16     (Whereupon, CVS-Schiavo-23 was marked
17     for identification.)
18 BY MR. ELSNER:
19     Q.  This is Exhibit 23.  If you go -- you
20 know, with all e-mails you've got to sort of
21 look at the first one first -- last one first if
22 you want to see the flow.  So I'm going to ask
23 you to turn to Page 76116, which is the third
24 document of the e-mail I placed before you.

Page 350

1    A.  Okay.
2    Q.  And this e-mail is from Shawna
3  Leuhring.  Did I say that correctly?
4    A.  I'm not sure how to pronounce her last
5  name.
6    Q.  Have you ever met her?
7    A.  I don't recall meeting Shawna.
8    Q.  Do you know who she works for?
9    A.  At this time I'm not sure who she
10  reported to.
11    Q.  But she was with CVS?
12    A.  It says "Contractor" next to her name,
13  but I remember her working at CVS.
14    Q.  Okay.  And this is an e-mail that she
15  wrote to you dated July 1, 2013, is that right?
16    A.  Yes.
17    Q.  And she says "Craig and Team, I've
18  updated the Archer SOM prototype with the
19  'Prescriber' changes, by removing the Letter and
20  Call fields from the 'Review' tab and moved the
21  'Action' tab section over to the 'Review' tab.
22  Attached, please find screenshots of the revised
23  SOM record.  Please review and let me know if
24  you see the need for any other changes."

Page 351

1      And then it says below "I'll also need
2  to get requirements for Access Control."  And
3  then there's a question and it says "Who will be
4  entering in the SOM cases?"
5      Do you see that, question number 1?
6    A.  I see where it says that.
7    Q.  Okay.  And if you see above her e-mail
8  there is an e-mail from you dated Tuesday,
9  July 2, 2013 to a number of people, including
10  Tom Bourque, Kelly Baker, Dean Vanelli.
11      Do you see that?
12    A.  I see that.
13    Q.  Okay.  It says "Team, My comment are
14  in red, please review and make any
15  additions/changes necessary."
16      So basically what is happening here is
17  Shawna sends you an e-mail asking who is going
18  to gain access control, and then you write in
19  red the answers to those questions, and they're
20  bolded here.
21      And next to question 1, you -- next to
22  "Who will be entering in the SOM cases?", you
23  wrote "Kelly Baker and his team (yet to be
24  hired)," correct?

Page 352

1    MS. MILLER:  Object to form.
2    A.  That's what it says.
3  BY MR. ELSNER:
4    Q.  Okay.  So at this point in time we had
5  Kelly Baker reviewing -- doing the SOM review
6  for CVS, and you were going to include a team
7  which was yet to be hired, is that right?
8    A.  That's what it says.
9    Q.  And then it says "Who will be
10  approving the SOM cases" under question 4.
11      Do you see that?
12    A.  I see what -- I see what it says, and
13  I'm not sure what that means.
14    Q.  Okay.  It says "Who will be approving
15  the SOM cases?"  And you write in response
16  "Kelly Baker or Kelly's manager, or both."
17      So at this point in time Kelly Baker
18  did not have a manager because Aaron Burtner had
19  left, correct?
20    MS. MILLER:  Object to form.
21    A.  I don't know that to be true.
22  BY MR. ELSNER:
23    Q.  Well, was there a manager of the SOM
24  program in Indianapolis in 2013?

Page 353

1    MS. MILLER:  Object to form.
2    A.  I'm sure there was.  I don't remember
3  that team ever not having someone that managed
4  them, but I don't know who that was.
5  BY MR. ELSNER:
6    Q.  Why are you sure?
7    A.  I don't know if you're --
8    Q.  It's about the only thing you've been
9  sure about today.  What makes you so sure there
10  was a manager in place?
11    MS. MILLER:  Objection to form.
12    A.  Because I don't ever know of a
13  situation where someone worked at CVS and did
14  not have a manager.
15  BY MR. ELSNER:
16    Q.  Well, there was a manager -- there was
17  a SOM manager position that Aaron Burtner had,
18  and he left CVS, right?
19    MS. MILLER:  Object to form.
20    A.  At some point he left CVS.
21  BY MR. ELSNER:
22    Q.  Okay.  And so they needed to fill that
23  position, right?
24    A.  I don't know if they needed to fill

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 that position, but -- I don't know if they
2 needed to fill that position.
3     Q.  Do you know whether they tried to,
4 sent out an ad to fill the position?
5     A.  I don't recall this process.  I don't
6 know if I was even a part of that process.
7     Q.  If we move forward in the -- to the
8 prior page of the e-mail, at the very top
9 there's an e-mail from Kelly Baker to you dated
10 July 9, 2013.
11        Do you see that?
12     A.  The one at 3:51 p.m.?
13     Q.  That's the one, yes.
14     A.  I see that e-mail.
15     Q.  Okay.  And he writes "Craig, not
16 really pertaining to your question, but I did
17 want to highlight to the group that you note
18 that I do not," in all caps, "have a backup.
19 Even our hourly assistant has limited access.
20 If something happens to me via act of nature or
21 illness, the current daily SOM process would
22 come to a complete halt."
23        Did I read that correctly?
24     A.  That's what it says.

Page 355

1     Q.  So at this point in time Kelly Baker
2 didn't have anyone else helping him with the SOM
3 review process, and if something were to happen
4 to him, he writes "the system would come to a
5 complete halt," is that right?
6        MS. MILLER:  Object to form.
7     A.  It looks like he says "Even our hourly
8 assistant has limited access," so it seems as if
9 he did have someone else that was helping him
10 based on that e-mail.
11 BY MR. ELSNER:
12     Q.  With limited access, yes.  But no one
13 else, right?
14        MS. MILLER:  Object to form.
15     A.  I don't know what he's referring to by
16 limited access.  And I see where he's indicating
17 "I do not have a backup."
18 BY MR. ELSNER:
19     Q.  And he indicated that if something
20 were to happen to him "via act of nature or
21 illness, the current daily SOM process would
22 come to a complete halt."  Is that what he
23 wrote?
24     A.  That's what he wrote.  I don't know

Page 356

1 that to be true, but that's what he wrote.
2     Q.  He said -- then he writes "I am not
3 aware of a risk assessment or action plans in
4 place to address."
5        Is that what he wrote?
6     A.  I see that written there.
7     Q.  Okay.  And your response to Kelly,
8 just Kelly, which is about a little over a half
9 hour later, you write "Kelly, Thanks for the
10 heads up!  That is something we will need to
11 discuss."
12        Is that your response?
13     A.  That's what it says.
14        MR. ELSNER:  This is Exhibit 24.
15        (Whereupon, CVS-Schiavo-24 was marked
16        for identification.)
17 BY MR. ELSNER:
18     Q.  Now, you take this same exact e-mail
19 that Kelly Baker sent to you and to Tom Bourque
20 and to others on July 9, 2013 at 3:51 p.m., and
21 then you forwarded that e-mail a minute later to
22 Tom Bourque, and you write "This is not good..."
23 correct?
24     A.  I see that.

Page 357

1     Q.  Okay.  So it's not good, agreeing that
2 there's not a risk assessment or action plan in
3 place to address this, right?
4        MS. MILLER:  Object to form.
5     A.  I see that it's written that it's not
6 good.  But in terms of what we just reviewed, I
7 don't see anything in concerns with -- in
8 concern to SOM not functioning appropriately.
9 BY MR. ELSNER:
10     Q.  Well, in response to Kelly Baker's
11 e-mail to you saying that he didn't have backup
12 and "If something happens to me via act of
13 nature or illness, the current SOM process would
14 come to a complete halt," you take that e-mail
15 and forward it to your boss, Tom Bourque, with
16 the message "This is not good," right?
17        MS. MILLER:  Object to form.
18     A.  I forwarded what Kelly said to Tom
19 Bourque saying "This is not good" referring to
20 the hypothetical situation of if Kelly was out
21 and him saying the SOM process would come to a
22 halt, although --
23 BY MR. ELSNER:
24     Q.  Is that what you wrote?

Page 358

1    A.   That's what I wrote.
2         MR. ELSNER:  This is Exhibit 25.
3         (Whereupon, CVS-Schiavo-25 was marked
4         for identification.)
5    BY MR. ELSNER:
6    Q.   The prior exhibit, Tom Bourque
7    responds to you in Motley Rice 89 that "We can
8    discuss with Dean" in response to your e-mail.
9         Do you see that?
10   A.   At the top, yes, "We can discuss with
11   Dean."
12   Q.   So that was Tom's response.
13        And Dean Vanelli writes a response on
14   July 9th to you and to Kelly Baker.  Do you see
15   that in the middle of Motley Rice 90, this
16   exhibit?
17   A.   I see that.
18   Q.   It says the action plans include
19   backfilling Aaron's role is already in progress
20   and creating a staffing plan to operate under
21   the new system.
22        So this indicates that they're trying
23   to find a manager to fill Aaron Burtner's role,
24   correct, an SOM manager?

Page 359

1    A.   I don't recall Kelly reporting to
2    Aaron, but this is Dean saying that they're
3    looking to backfill Aaron's role.
4    Q.   And two sentences -- or the next
5    sentence later, the last sentence in the first
6    paragraph of Dean Vanelli's e-mail, he writes "I
7    agree there is a short-term risk if something
8    were to happen with Kelly, especially until
9    we...fill Aaron's role and on board the planned
10   staffing increase on the Indy SOM team."
11        So Dean Vanelli agrees that there's a
12   short-term risk, the risk that Kelly Baker
13   highlights, correct?
14        MS. MILLER:  Object to form.
15   A.   Dean wrote this e-mail.  You'd have to
16   ask him what he meant by short-term risk and
17   what the risk was.
18   BY MR. ELSNER:
19   Q.   But that's what he wrote, right, "I
20   agree there's a short-term risk" in response to
21   Kelly Baker's e-mail to you?
22   A.   He wrote there's a short-term risk.
23   Q.   If something were to happen to Kelly,
24   right?

Page 360

1    A.   That's what he wrote.
2    Q.   Okay.  Then he separately at the
3    bottom of that e-mail says "Craig" -- do you see
4    where I'm at?
5    A.   At the bottom, yes.
6    Q.   It says "We will fill in additional
7    players as we backfill Aaron's head count and
8    build the team to support the new process."
9         Do you see that?
10   A.   I see that.
11   Q.   Then he says "Over and above, I would
12   add the following individuals to the read only
13   list:  Mark Nicastro (Indy DC director) and Amy
14   Propatier (my backup)."  Did I read that
15   correctly?
16   A.   I see that.
17   Q.   Okay.  Did you know that Mark Nicastro
18   and Amy Propatier have no idea how to read an
19   IRR report?
20        MS. MILLER:  Object to form.
21   A.   I don't recall ever knowing whether
22   they could or could not read an IRR report.
23   BY MR. ELSNER:
24   Q.   Okay.  So Dean Vanelli's suggestion to

Page 361

1    you is to add them, the two of them, to the
2    list of -- list of people that you were
3    creating, to the read only list, and you don't
4    know whether or not they can read an IRR report,
5    correct?
6         MS. MILLER:  Object to form.
7    A.   I don't recall whether I knew if they
8    could or could not.
9    BY MR. ELSNER:
10   Q.   You have no knowledge about whether
11   they were qualified to perform that role,
12   correct?
13        MS. MILLER:  Object to form.
14   A.   I do not recall whether I knew or did
15   not know if they could read an IRR report.
16   BY MR. ELSNER:
17   Q.   Did you add them as the backup?
18        MS. MILLER:  Object to form.
19   A.   I don't recall.
20   BY MR. ELSNER:
21   Q.   You didn't do any other investigation
22   to determine whether it was appropriate to add
23   Mark Nicastro or Amy Propatier to the system,
24   did you?

Page 362

1    A.  I can't recall if I did or I didn't,
2  nor at that time would it be my role.  Dean was
3  in logistics, I believe that would be his
4  decision.
5    Q.  Okay.  And you didn't do any
6  investigation to determine whether that decision
7  was appropriate or not, right?
8        MS. MILLER:  Object to form.
9    A.  I don't recall whether I did or did
10  not, or whether or not Mark or Amy could read an
11  IRR.  I don't know.
12  BY MR. ELSNER:
13    Q.  Was that part of your practice, if
14  your boss said add someone to the list, would
15  you do it, or would you do your own
16  investigation to determine whether they're
17  qualified to do that?
18        MS. MILLER:  Object to form.
19    A.  Dean was not my boss.
20  BY MR. ELSNER:
21    Q.  Sorry?
22    A.  Dean was not my boss.
23    Q.  Okay.  Did you rely on Dean's
24  recommendation, or did you conduct your own

Page 363

1  investigation, or was it your practice to
2  conduct an investigation, or no?
3        MS. MILLER:  Object to form.
4    A.  In this case I don't recall doing my
5  own investigation.  In reading this, I don't
6  even know what Dean is referring to or if I had
7  the ability to add anyone to anything.  I don't
8  know what he's referring to here.
9  BY MR. ELSNER:
10    Q.  If we go back to Exhibit 23, which is
11  the initial e-mail exchange that we started
12  with.
13    A.  Okay.
14    Q.  On the very first page, 76114, there's
15  an e-mail from Kelly Baker to you in reply to
16  the e-mail that you sent to him on July 9th.  He
17  then sends you an e-mail on Thursday, July 11,
18  2013.
19        Do you see that?
20    A.  I see that.
21    Q.  Okay.  And he writes "Craig, another
22  concern I have is the Store Metric Report I use
23  to analyze the BVRs on the IRR."
24        Do you see that?

Page 364

1    A.  I see that.  And I do not recall what
2  BVRs means.
3    Q.  You actually didn't recall then
4  either, so you sent him an e-mail and asked, and
5  he said -- and he answered the question.  If I
6  can find the e-mail, I'll send it to you.
7        "The data snapshot is a three-month
8  window that is a year old.  Any analysis that I
9  make from the data is, for the most part,
10  irrelevant and pointless."
11        Do you see that?
12    A.  I see where he wrote that.
13    Q.  Do you agree with him?
14        MS. MILLER:  Object to form.
15    A.  I don't have any other information to
16  make a determination whether or not I would
17  agree with that.
18  BY MR. ELSNER:
19    Q.  Okay.  He then writes, "I know this
20  tool will be going away and may not be cost
21  effective to update.  But I'm wasting a lot of
22  man-hours.  I don't understand why they just
23  can't rerun the query for a token amount.  They
24  would not have to rewrite the scripts or code.

Page 365

1        "In any event, the big issue is of
2  false negatives and the risks associated with
3  something slipping by."
4        Kelly Baker thought because he was
5  reviewing outdated data that there was a risk
6  that a suspicious order would slip by him,
7  correct?
8        MS. MILLER:  Object to form.
9    A.  I see what Kelly wrote here.  I can't
10  speak to what he was thinking.
11  BY MR. ELSNER:
12    Q.  Did it concern you that when you
13  received this e-mail that he was relying on
14  outdated data and that he was worried that there
15  was the possibility that an order for -- a
16  suspicious order for a controlled substance
17  would slip by him?
18        MS. MILLER:  Object to form.
19    A.  I don't recall what I thought when I
20  received this e-mail.
21  BY MR. ELSNER:
22    Q.  Do you know what you did with it?
23        MS. MILLER:  Object to form.
24    A.  I don't recall this situation.

Page 366

BY MR. ELSNER:

Q. Kelly then writes to Mark Nicastro above and he says "Mark, I didn't include you on this original because of your full mailbox. The BVR are orders flagged based on volume, ratio or both."

Do you see that?

A. I see where it says that.

Q. And he then writes, "Really just a CYA for me. I'm pretty sure Aaron mentioned this to the SOM development team, but I don't want them to use me as the sacrificial lamb when or if it hits the fan because something slipped through." Did I read that correctly?

A. That's what that e-mail says.

Q. Were you aware that Kelly Baker was afraid that he was going to take the blame for suspicious orders slipping through based on the old data he was provided to produce suspicious orders?

MS. MILLER: Object to form.

A. The e-mail that you're showing me I'm not even on, and I don't ever recall that being a concern. I don't recall that being a concern.

Page 367

BY MR. ELSNER:

Q. Well, he was concerned about it, right?

MS. MILLER: Object to form.

A. He sent that e-mail to Mark. I don't know what follow-up conversations or -- I don't know, I'm not on that e-mail, I didn't have further conversations on that.

BY MR. ELSNER:

Q. He sent the first e-mail to you, and he said the same thing, he's worried about the risks associated with something slipping by. That's what he wrote you, correct?

MS. MILLER: Object to form.

A. It says in that e-mail -- that's what it says in the e-mail.

BY MR. ELSNER:

Q. Why did he write this to you?

MS. MILLER: Object to form.

A. I don't know why he sent this to me.

BY MR. ELSNER:

Q. Did he think you could help him try to fix this?

MS. MILLER: Object to form.

Page 368

A. I don't know why he sent this to me. You'd have to ask Kelly.

BY MR. ELSNER:

Q. Did you think that he -- did he think that you were the best person to try to fix the system that was broken at CVS?

MS. MILLER: Object to form.

A. You would have to ask Kelly. I don't know what Kelly thought.

BY MR. ELSNER:

Q. You weren't his supervisor, right?

A. I was not Kelly's supervisor.

Q. Mark Nicastro was one of the people he reported to, and Mark's mailbox was full so he then reaches out to you.

MS. MILLER: Object to form.

BY MR. ELSNER:

Q. Why?

A. You would have to ask Kelly.

Q. I will.

MR. ELSNER: This is Exhibit 26.

(Whereupon, CVS-Schiavo-26 was marked for identification.)

BY MR. ELSNER:

Page 369

Q. This is Motley Rice 78116, and Exhibit 26. If you look at the top of the second page, if you look at the top of the second page, this is the e-mail that Kelly Baker sent to you, and you have an exchange with him on what BVR is, as I promised you I'd show you, right? You asked -- you said "Kelly, Quick question that I should probably know the answer to... what is a BVR?" Right?

A. Where is that? I'm sorry.

Q. I'm sorry. The bottom of the first page.

A. An e-mail from me?

Q. I'm sorry, are you on Exhibit 26?

A. Yes.

Q. Okay. "Kelly, Quick question that I should probably know the answer to...what is a BVR?" And he responds to you what it is. And then you forward this e-mail exchange to Tom Bourque on July 16, 2013, correct, and you write to Tom and you write -- and this is your boss, right?

A. At this time Tom Bourque is my boss.

Q. Okay. And you write to Tom, "FYI -

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1　Kelly brings up another concern about the
2　current process and the data he is looking
3　at...seems that some of the information he is
4　using is very old and not helpful.  Don't think
5　there is anything we can do about it now, but
6　just wanted to let you know."
7　　　　Is that what you wrote to him?
8　　　　MS. MILLER:  Object to form.
9　　　A.  That's what it says.
10　BY MR. ELSNER:
11　　　Q.  And there wasn't anything done to
12　change the process, correct?
13　　　　MS. MILLER:  Object to form.
14　　　A.  I don't know that to be the case.
15　　　　MR. ELSNER:  Why don't we go off the
16　record for a minute.
17　　　　THE VIDEOGRAPHER:  We're going off the
18　record at 4:34 p.m.
19　　　　(Whereupon, a recess was taken.)
20　　　　THE VIDEOGRAPHER:  We're back on the
21　record at 4:37 p.m.
22　BY MR. ELSNER:
23　　　Q.  Mr. Schiavo, I'm going to show you
24　what's been marked as Exhibit 27.

Page 371

1　　　　(Whereupon, CVS-Schiavo-27 was marked
2　　　　for identification.)
3　BY MR. ELSNER:
4　　　Q.  This is an e-mail that you sent to Tom
5　Bourque, the subject being the "SOM Team" dated
6　June 19, 2014.
7　　　　Do you see that?
8　　　A.  I see that.
9　　　Q.  Okay.  And it reads, "I wanted to run
10　this by you before I sent.  I know we" are
11　having "the meeting with Pawlik today to discuss
12　SOM so I don't know if you want me to hold off
13　on sending the e-mail below to Susan but I
14　looked at some information today that is
15　concerning and I feel need to be addressed."  Is
16　that right?
17　　　A.  I see that's what it says.
18　　　Q.  Okay.  Then you send him a sort of
19　draft note that you had drafted to send to
20　Susan, correct?
21　　　A.  It looks like that's what I did.
22　　　Q.  Okay.  And it reads "As we discussed
23　earlier this week, I have heard some concerns
24　from the SOM team around Shan going ahead in the

Page 372

1　queue and assigning easy drug families to
2　herself in order to not have to pick drug
3　families that normally would require more due
4　diligence."  Did I read that right?
5　　　A.  That's what it says.
6　　　Q.  Okay.  And so at this point in time
7　you were doing a review?  Shan was one of the
8　suspicious order monitoring analysts, right?
9　　　A.  Yes, I believe so at the time.
10　　　Q.  Okay.  And in the second paragraph you
11　write, "Also, when going through some of the
12　cases she is reviewing it looks like she is copy
13　and pasting quite frequently which leads me to
14　believe she is not putting in the time to review
15　each case separately and reviewing all
16　applicable data to make a decision on whether or
17　not an order is legitimate."  Did I read that
18　correctly?
19　　　A.  That's what it says.
20　　　Q.  The next paragraph you write "I think
21　it is important that this gets addressed as soon
22　as possible as this could pose a huge risk to
23　our company if this function is not done
24　effectively."  Correct?

Page 373

1　　　　MS. MILLER:  Object to form.
2　　　A.  I see where that is written.
3　BY MR. ELSNER:
4　　　Q.  And it was accurate, right?  You
5　believed that to be true?
6　　　　MS. MILLER:  Object to form.
7　　　A.  At the time I recall believing that at
8　times Shan would cherry-pick some orders.
9　BY MR. ELSNER:
10　　　Q.  And cut and paste her suspicious order
11　monitoring review as well, correct?
12　　　A.  I don't recall her ever just a blanket
13　copy and paste that led me to -- I don't recall
14　ever thinking that she wasn't doing a review.  I
15　think she was just copying and pasting in some
16　cases.
17　　　Q.  Well, you wrote, did you not, that
18　"Some of the cases she is reviewing it looks
19　like she is copying and pasting quite frequently
20　which leads me to believe she is not putting in
21　the time to review each case separately and
22　reviewing all applicable data to make a decision
23　on whether or not an order a legitimate."
24　Correct?

Page 374

1    MS. MILLER: Object to form.
2    A. I see that's what's written there.
3 But this is a draft, I don't know if that's
4 exactly how I meant that to read. I was sending
5 this to Tom for feedback. So I don't know if we
6 changed this to be more clear on exactly what I
7 meant.
8 BY MR. ELSNER:
9    Q. But that's what you wrote, right?
10    MS. MILLER: Object to the form.
11    A. That's what this draft of a potential
12 e-mail says, but I don't believe that's what I
13 meant, or that I had concern she wasn't doing a
14 good job at reviewing orders.
15 BY MR. ELSNER:
16    Q. You don't believe that's accurate?
17 You purposely wrote something inaccurate to your
18 boss?
19    MS. MILLER: Object to form.
20    A. I wouldn't say I was writing something
21 to purposely be inaccurate. I think it might be
22 poorly worded.
23    (Whereupon, CVS-Schiavo-28 was marked
24    for identification.)

Page 375

1 BY MR. ELSNER:
2    Q. If you go to the next document I've
3 shown you, we've marked it as Exhibit 28. This
4 is another e-mail to Tom Bourque actually two
5 days before the e-mail we just looked at, "SOM
6 Risk Analysis." You write "Tom, I have made the
7 updates we discussed." And then you say there
8 may be one we want to change from medium to high
9 or both. And attached to that is an SOM risk
10 analysis that you created, correct?
11    A. This is an SOM risk analysis that was
12 created. I don't recall creating the document,
13 but it's a risk analysis.
14    Q. Okay. And did somebody else create
15 it?
16    MS. MILLER: Object to form.
17    A. I don't recall if I was the one who
18 started this document, but I clearly made
19 updates to it, based on the e-mail.
20 BY MR. ELSNER:
21    Q. And there's lists of potential risks.
22 And the first one, the risk level there is
23 listed as high, and you write "The SOM team is
24 inconsistent in the way they perform their due

Page 376

1 diligence. Not each team member is aligned with
2 the importance of reaching out to our stores in
3 order to comply with the 'Know Your Customer'
4 expectation. This could also lead to
5 inconsistencies in the...process of what orders
6 should be released or blocked," correct?
7    A. That --
8    MS. MILLER: Object to form.
9    A. That is what that potential risk says.
10 BY MR. ELSNER:
11    Q. And then it writes in the comments,
12 "In May, the following is the percentage of
13 calls each team member made for flagged orders:
14 Annette, 19 percent." Then there's another
15 individual at 15 percent, Noah at 13 percent,
16 Caitlin at 7 percent, and Shan at 4 percent.
17 Did I read that correctly?
18    A. That's what that says.
19    Q. Okay. So part of the due diligence
20 process at CVS at this time in June of 2014 --
21 and this is under the new system, right?
22    MS. MILLER: Object to form.
23    A. I don't recall if it's rolled out to
24 all distribution centers, but I believe at some

Page 377

1 point this was just newly rolled out to some
2 distribution centers.
3 BY MR. ELSNER:
4    Q. Well, these individual are the
5 suspicious order monitoring analysts working in
6 Rhode Island that you participated in hiring to
7 work on the new SOM system, right?
8    A. These are the SOM analysts who I
9 recall being part of the interview process.
10    Q. Okay. And less than 20 percent of
11 flagged orders were calls made to pharmacies,
12 correct?
13    MS. MILLER: Object to form.
14    A. Based on what that's indicating there,
15 yes. I don't know how those percentages could
16 be pulled or how they were pulled, but that's
17 what that's saying.
18 BY MR. ELSNER:
19    Q. Well, if you turn to the last page of
20 your e-mail to Tom Bourque on the prior exhibit,
21 the very last page of the exhibit, there's a
22 chart there of the percentage of phone calls,
23 correct?
24    MS. MILLER: Sorry, where are you,

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 Mike?
2          MR. ELSNER: Prior exhibit, last page.
3          MS. MILLER: That one -- oh, last
4 page.
5     A. It says "Team Member. Count of Case
6 Status." It has the percent of phone calls. I
7 don't see how that's calculated or how someone
8 would indicate from this the percent of phone
9 calls, though.
10 BY MR. ELSNER:
11    Q. Okay. If you go back to Exhibit 28,
12 the third item down for lack of -- that's listed
13 as a high risk is "Lack of engagement by the
14 Management team." Did I read that correctly?
15    A. It says that under "Potential Risk."
16    Q. Okay. And you write "The team is not
17 receiving the support and guidance they need to
18 effectively do their jobs. Since Susan has
19 started she has not taken an active role in
20 learning the position and finding the area of
21 opportunity within the team." Did I read that
22 correctly?
23    A. That's what the document says.
24    Q. And you believe that that was a high

Page 379

1 risk, correct?
2          MS. MILLER: Object to form.
3     A. It says the risk level is high. I
4 don't know how risk level was interpreted or
5 what the risk is referring to, but under "Risk
6 Level" for that one it does say "High."
7 BY MR. ELSNER:
8     Q. And also then the next one, another
9 high risk you identify is the "Lack of
10 communication from the SOM Management team to
11 the SOM Analysts, as well as a lack of foresight
12 by the Management team." Did I read that
13 correctly?
14          MS. MILLER: Object to form.
15    A. That's what this document says.
16 BY MR. ELSNER:
17    Q. And the next item, another high risk,
18 "Lack of resources to handle the rollout of all
19 distribution centers. This could freeze the
20 rollout of the remaining six distribution
21 centers or cause the team to not get to every
22 flagged order each day," correct? Is that what
23 you wrote?
24          MS. MILLER: Object to form.

Page 380

1     A. That is what this form says. I don't
2 know if I wrote that. That's what the form
3 says.
4 BY MR. ELSNER:
5     Q. That's in the chart that you forwarded
6 to your boss, correct?
7          MS. MILLER: Object to form.
8     A. That appears to be in the chart that I
9 sent to Tom.
10 BY MR. ELSNER:
11    Q. Okay. And then in the middle under
12 "Comments," it says "To date the team is
13 struggling to complete the amount of flagged
14 daily orders. With six more distribution
15 centers still to be rolled out, there has been
16 no plan communicated on how the team intends to
17 handle the increased volume." Did I read that
18 correctly?
19          MS. MILLER: Object to form.
20    A. That's what it -- that's what it says.
21 BY MR. ELSNER:
22    Q. And that was another high risk
23 identified, correct?
24          MS. MILLER: Object to form.

Page 381

1     A. It's under "Risk Level. High."
2 Again, I don't know what thought process went
3 into putting these risk levels, and for that one
4 I'm not really sure exactly what the risk would
5 be.
6 BY MR. ELSNER:
7     Q. Go to the next one. Another high risk
8 level, "Today we are unclear how well the system
9 is identifying orders that should actually be
10 flagged (false positive rate and tests that need
11 to be more stringent?)" Did I read that
12 correctly?
13    A. That's what it says.
14    Q. And --
15          MS. MILLER: I just -- I understand
16 we're at seven hours. Are we past seven hours?
17          THE VIDEOGRAPHER: We're just at seven
18 hours now.
19          MS. MILLER: Okay. So after this
20 question.
21          MR. ELSNER: I'll probably ask two
22 questions here, three.
23          MS. MILLER: Okay.
24 BY MR. ELSNER:

Page 382

1  Q.  "The SOM Algorithm" in the next one
2  "is not flagging the drugs which are diverted
3  the most at our retail locations at a high
4  enough rate."  And that's identified as a
5  medium/high risk, correct?
6       MS. MILLER:  Objection to form.
7  A.  High/medium is under the risk level
8  column.
9  BY MR. ELSNER:
10  Q.  Okay.  And so --
11       MS. MILLER:  Mike, you're out of time.
12  So you can ask --
13       MR. ELSNER:  I'm just going to finish
14  this.  I've got another question to ask, and
15  I'll just finish with this document.
16       MS. MILLER:  This is the last
17  question.  This is the last question.
18  BY MR. ELSNER:
19  Q.  As of June of 2014, you were still
20  finding high risk levels even with the new
21  rollout of the new system with respect to
22  staffing issues, resources to handle the review
23  of orders, and consistent performance of due
24  diligence reviews, correct?

Page 383

1       MS. MILLER:  Objection to form.  And
2  I'm going to instruct him not to answer.  We're
3  out of time.
4       MR. ELSNER:  No, I'll get an answer to
5  that question.
6       MS. MILLER:  We're out of time.
7       MR. ELSNER:  No.
8  BY MR. ELSNER:
9  Q.  Answer the question.
10       MS. MILLER:  It's seven hours.  It's
11  up.
12       MR. ELSNER:  It's a summary question,
13  and I'm going to ask for more time from the
14  court in any event.
15       MS. MILLER:  Objection.
16  BY MR. ELSNER:
17  Q.  Please answer the question.
18       MS. MILLER:  Objection.
19  I instruct you not to answer.
20       MR. ELSNER:  You can't instruct him
21  not to answer.
22       MS. MILLER:  You're out of time.
23       MR. ELSNER:  You said one more
24  question, I asked him the question, now you

Page 384

1  won't let him answer the question.  You wanted
2  to see what the question was first?  You said
3  one more question, and I asked him one more
4  question.
5       MS. MILLER:  But now I've realized --
6       MR. ELSNER:  It's a good question?
7       MS. MILLER:  -- it's not fair for
8  you -- no, it's not fair for you to continue
9  after seven hours, and I think we should cut it
10  off.
11       MR. ELSNER:  No, you said I could get
12  one more question, and that's what I've done.
13  Let him answer the question.
14       MS. MILLER:  I'm instructing him not
15  to answer.  We're done.  We're out of time.
16       MR. ELSNER:  I think you should answer
17  the question.
18       I'm going to go to the court and ask
19  for more time.  I think this has been
20  ridiculous.  I think he hasn't admitted at any
21  point offering any document, remembering any
22  documents.  You had three days prepping him, and
23  he's giving us nothing that he could potentially
24  remember at all at CVS.  And you told me I could

Page 385

1  ask one more question, and now you won't let him
2  answer the question.
3       MS. MILLER:  Okay.  You may answer the
4  question.
5       MR. ELSNER:  Can you go back to what
6  the question is so I can read it?
7       MS. MILLER:  But I object to it, and I
8  don't think it should be part of the record
9  given that you're out of time.
10  BY MR. ELSNER:
11  Q.  As of June of 2014, you were still
12  finding high risk levels even with the new
13  rollout of the new SOM monitoring system with
14  respect to staffing issues, resources to handle
15  the review of orders, and consistent performance
16  of due diligence reviews, correct?
17  A.  As I stated, I don't know how these
18  risk levels were determined, and at this point
19  in the process I had no concerns or no reason to
20  believe -- in fact, I was very confident that we
21  were meeting our obligation to have a suspicious
22  order monitoring system.
23  Q.  But that's what you wrote in the
24  document, correct?

Page 386

1      MS. MILLER: Okay. We're done. We're
2  done. I instruct you not to answer. You're out
3  of time.
4      Can we go off the record?
5      MR. ELSNER: I'll just say on the
6  record that I will consider seeking more time
7  from the court, and I don't consider the
8  deposition complete.
9      MS. MILLER: And I object to that.
10  He's used his seven hours. He's out of time,
11  and we're done. I need to --
12      THE VIDEOGRAPHER: We're going off --
13      MS. MILLER: Just to state for the
14  record, I'd like to take a little break and come
15  back with potential redirect. I don't think
16  that it will -- it's going to take much time.
17      THE VIDEOGRAPHER: We're going off the
18  record at 4:53 p.m.
19      (Whereupon, a recess was taken.)
20      THE VIDEOGRAPHER: We're back on the
21  record at 5:09 p.m.
22          EXAMINATION
23  BY MS. MILLER:
24      Q.  Mr. Schiavo, I just have one quick

Page 387

1  question.
2      Exhibit 28 that Mr. Elsner showed you
3  towards the end of his examination, do you have
4  that before you?
5      A.  I do.
6      Q.  And I just wanted to clarify, in the
7  first row under the "Comments" section, can you
8  read what that says to me?
9      A.  "In May, the following is the
10  percentage of calls each team member made for
11  flagged orders: Annette 19 percent, Khalilul
12  15 percent, Noah 13 percent, Caitlin 7 percent,
13  Shan 4 percent."
14      Q.  And the document reflects that those
15  statistics are for May, is that right?
16      A.  This document is -- it says in May, so
17  I would assume that these are May numbers.
18      Q.  Thank you.
19      MS. MILLER: That's all I have.
20      MR. ELSNER: Okay.
21      THE VIDEOGRAPHER: This concludes the
22  videotaped deposition of Craig Schiavo. The
23  time is 5:10 p.m., and we are now off the
24  record.

Page 388

1      (Whereupon, the deposition was
2  concluded.)

Page 389

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2
3      I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Commissioner in the State of Rhode Island
5  and Providence Plantations, do certify that on
6  the 17th day of January, 2019, at 8:06 o'clock,
7  the person above-named was duly sworn to testify
8  to the truth of their knowledge, and examined,
9  and such examination reduced to typewriting
10  under my direction, and is a true record of the
11  testimony given by the witness.
12      I further certify that I am neither
13  attorney, related or employed by any of the
14  parties to this action, and that I am not a
15  relative or employee of any attorney employed by
16  the parties hereto, or financially interested in
17  the action.
18      In witness whereof, I have hereunto
19  set my hand this 20th day of January, 2019.
20
21  _____
22  COMMISSIONER
23  My Commission Expires April 30, 2020
24

Page 390

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 391

- - - - - -

### E R R A T A

- - - - - -

PAGE LINE CHANGE

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

REASON: _____

____ ____ _____

Page 392

## ACKNOWLEDGMENT OF DEPONENT

I, _____, do Hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
WITNESS NAME          DATE

Subscribed and sworn
To before me this
_____ day of _____, 20____.
My commission expires: _____

_____
Notary Public

Page 393

LAWYER'S NOTES

PAGE LINE

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____

____ ____ _____