```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                      - - -
 5   IN RE:  NATIONAL           :
     PRESCRIPTION               :   MDL No. 2804
 6   OPIATE LITIGATION          :
     _____ :   Case No.
 7                              :   1:17-MD-2804
     THIS DOCUMENT RELATES       :
 8   TO ALL CASES               :   Hon. Dan A. Polster
 9                      - - -
10          Wednesday, February 27, 2019
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                CONFIDENTIALITY REVIEW
12
                        - - -
13
             Videotaped deposition of JAMES T. SCHOEN,
14
     held at the Hilton Garden Inn, Perrysburg, Ohio,
15
     commencing at 12:59 p.m., on the above date, before
16
     Carol A. Kirk, Registered Merit Reporter and Notary
17
     Public.
18
19                      - - -
20
21          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 917.591.5672 fax
22              deps@golkow.com
23
24
```

Page 2

A P P E A R A N C E S:

On behalf of the Plaintiffs:
MCHUGH FULLER LAW GROUP
BY: LANCE REINS, ESQUIRE
lance@mchughfuller.com
ALLAN (A.J.) L. ELKINS, ESQUIRE
allan@mchughfuller.com
(via teleconference)
97 Elias Whiddon Road
Hattiesburg, Mississippi 39402
601-261-2220

On behalf of AmerisourceBergen Corporation (via teleconference and text/video streaming):
JACKSON KELLY PLLC
BY: SANDRA K. ZERRUSEN, ESQUIRE
skzerrusen@jacksonkelly.com
50 South Main Street, Suite 201
Akron, Ohio 44308
330-252-9060

On behalf of HBC (via teleconference and text/video streaming):

MARCUS & SHAPIRA LLP
BY: ELLY HELLER-TOIG, ESQUIRE
ehtoig@marcus-shapira.com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

On behalf of Walmart (via teleconference and text/video streaming):

JONES DAY
BY: PATRICIA OCHMAN, ESQUIRE
pochman@jonesday.com
901 Lakeside Avenue East
Cleveland, Ohio 44114
216-586-3939

Page 3

On behalf of Prescription Supply, Inc.
FOX ROTHSCHILD LLP
BY: JAMES C. CLARK, ESQUIRE
jclark@foxrothschild.com
STEPHAN A. CORNELL, ESQUIRE
scornell@foxrothschild.com
(via teleconference and text/video streaming)
2700 Kelly Road, Suite 300
Warrington, Pennsylvania 18976-3624
215-345-7500

On behalf of Johnson & Johnson and Janssen Pharmaceuticals:

TUCKER ELLIS LLP
BY: JEFFREY M. WHITESELL, ESQUIRE
jeffrey.whitesell@tuckerellis.com
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113
216-592-5000

On behalf of McKesson (via teleconference and text/video streaming):
COVINGTON & BURLING LLP
BY: MARY YANG, ESQUIRE
myang@cov.com
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
202-662-5110

On behalf of HBC:

MARCUS & SHAPIRA LLP
BY: MOIRA CAIN-MANNIX, ESQUIRE
cain-mannix@marcus-shapira.com
One Oxford Center, 35th Floor
301 Grant Street
Pittsburgh, Pennsylvania 15219-6401
412-338-3345

Page 4

ALSO PRESENT:

Michael Newell, Videographer
Zachary Hone, Trial Technician

- - -

Page 5

VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN

INDEX TO EXAMINATION

WITNESS                              PAGE

JAMES T. SCHOEN

    CROSS-EXAMINATION BY MR. REINS:          9

    REDIRECT EXAMINATION BY MR. CLARK        143

    RECROSS-EXAMINATION BY MR. REINS:        144

Page 6

1    VIDEOTAPED DEPOSITION OF JAMES T. SCHOEN
2         INDEX TO EXHIBITS
3  PSI - J. SCHOEN    DESCRIPTION         PAGE
4  PSI - J. Schoen 1  DEA Notice of Inspection of   124
                 Controlled Substances,
5                Bates-stamped PSI-0000077
6  PSI - J. Schoen 2  State of Ohio Board of       142
                 Pharmacy, Written Responses
7                for Prescription Supply,
                 Inc., Wholesaler/
8                Manufacturer, Category
                 Three, Wholesale
9                Distributor Inspection,
                 October 25, 2017,
10               Bates-stamped PSI0000007
                 through 83

Page 8

1 Prescription Supply.
2     MR. WHITESELL: Jeff
3 Whitesell of Tucker Ellis on behalf
4 of Johnson & Johnson and Janssen.
5     MS. OCHMAN: Patricia Ochman,
6 Jones Day, for Walmart.
7     MS. HELLER-TOIG: Elly
8 Heller-Toig for HBC Services
9 Company from Marcus & Shapira.
10     MS. YANG: Mary Yang with
11 Covington Burling for McKesson.
12     MR. ELKINS: A.J. Elkins,
13 McHugh Fuller Law Group,
14 Plaintiffs.
15     MR. CORNELL: Stephan
16 Cornell, Fox Rothschild, for
17 Prescription Supply.
18     MS. ZERRUSEN: Sandy Zerrusen
19 from Jackson Kelly for
20 AmerisourceBergen.
21     THE VIDEOGRAPHER: The court
22 reporter today is Carol Kirk and
23 will now swear in the witness.
24          - - -

Page 7

1          - - -
2     P R O C E E D I N G S
3          - - -
4     THE VIDEOGRAPHER: We are now
5 on the record. My name is Michael
6 Newell and I'm a videographer for
7 Golkow Litigation Services.
8     Today's date is
9 February 27th, 2019, and the time
10 is 12:59 p.m.
11     This video deposition is
12 being held in Perrysburg, Ohio, in
13 the Matter of National Prescription
14 Opiate Litigation for the Northern
15 District of Ohio, Eastern Division.
16     The deponent today is James
17 Schoen.
18     Will counsel please identify
19 themselves.
20     MR. REINS: Lance Reins with
21 McHugh Fuller Law Group on behalf
22 of the Plaintiff.
23     MR. CLARK: Jim Clark with
24 Fox Rothschild on behalf of

Page 9

1     JAMES T. SCHOEN
2 being by me first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4     EXAMINATION
5 BY MR. REINS:
6     Q.   Good afternoon.
7     A.   Hi.
8     Q.   Could you please tell us your
9 name.
10     A.   James T. Schoen.
11     Q.   And have you been through a
12 deposition before?
13     A.   Years ago with an auto accident.
14 I think I was maybe 18.
15     Q.   Got it. The reason I ask is I'm
16 just going to go over some of the ground rules
17 for depositions. Your counsel has probably
18 advised you, but better safe than sorry.
19     So, obviously, I'm going to be
20 taking down -- I'm going to be asking the
21 questions here today. We have a court reporter
22 who types everything that we say. Because of
23 that, if you could please verbalize all your
24 answers, no huh-uhs, um-hmms, or head nods

Page 10

1 because those can't be taken down, okay?

2 　　A.　Okay.

3 　　Q.　If you do so, I may say "Is that a

4 yes or is that a no," because I'm looking for a

5 verbal response. All right?

6 　　A.　Okay.

7 　　Q.　Please let me finish my question

8 before you begin answering. Let me add a caveat

9 to that.

10 　　　　Your counsel is going to object to

11 some my questions. So after I finish my

12 question, if you could just wait a moment, allow

13 him to object, and then you can respond. That

14 way we're not talking over one another, okay?

15 　　A.　Okay.

16 　　Q.　Lastly, if you answer my question,

17 I'm going to assume that you are doing two

18 things. One, you understand the question, and,

19 two, most importantly, you're telling the truth;

20 is that fair?

21 　　A.　Yes.

22 　　Q.　If you don't know something or you

23 don't understand my question, just let me know

24 and I'll rephrase.

Page 11

1 　　A.　Okay.

2 　　Q.　If you need a break for any

3 reason, just let me know. It's not a marathon.

4 We'll take a break when you need to, okay?

5 　　A.　Fine.

6 　　Q.　Can you please tell me what you do

7 for a living.

8 　　A.　I work at Prescription Supply.

9 I'm presently the controlled substance manager.

10 　　Q.　And what is Prescription Supply,

11 Inc. in the business of doing?

12 　　A.　We're a pharmaceutical wholesaler.

13 　　Q.　And you distribute or provide

14 medications to what type of customers?

15 　　A.　Mostly independent pharmacies,

16 some doctors, and some outpatient pharmacies

17 that are in hospitals.

18 　　Q.　And how long have you worked with

19 the company?

20 　　A.　Since like 1986.

21 　　Q.　Was your grandfather the founder?

22 　　A.　Yes.

23 　　Q.　What was his name?

24 　　A.　Clarence J. Schoen.

Page 12

1 　　Q.　Do you know what year he started

2 the company?

3 　　A.　1955.

4 　　Q.　Your dad is now the president?

5 　　A.　Yes.

6 　　Q.　His name is?

7 　　A.　Thomas G. Schoen.

8 　　Q.　And he runs the company along with

9 his sister?

10 　　A.　Yes.

11 　　Q.　And what's her name?

12 　　A.　Jacquelyn Harbauer.

13 　　Q.　Do you know what her position is?

14 　　A.　Secretary.

15 　　Q.　How long have you held the

16 position as controlled substance manager?

17 　　A.　Around 20 years.

18 　　Q.　Can you tell for us what that

19 means to be the controlled substance manager for

20 PSI?

21 　　　　MR. CLARK: Objection; form.

22 　　Q.　What are your duties and

23 responsibilities?

24 　　A.　What are my duties and

Page 13

1 responsibilities? Pick and fill orders that

2 come in, okay. Look at sales history. I do

3 inventory. A lot of different things.

4 　　Q.　That's okay.

5 　　A.　I put in orders also, okay, and I

6 release orders that come in that go to hold.

7 All the C-IIs go to holds. So I have to release

8 those.

9 　　Q.　PSI deals in the business of

10 distributing narcotics; is that correct?

11 　　A.　That's some of our business,

12 correct.

13 　　Q.　Are you aware of the risks and

14 dangers associated with narcotics in our

15 society?

16 　　　　MR. CLARK: Objection to

17 　　form.

18 　　A.　Can you repeat?

19 　　Q.　Sure.

20 　　　　Are you aware that there are

21 certain narcotics that you're distributing that

22 are highly addictive?

23 　　　　MR. CLARK: Objection. Form.

24 　　A.　I've heard that.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  Q.   What have you heard?
2       MR. CLARK:  Objection to
3  form.
4       A.   That on some of the labels, it
5  says they can be addictive.
6       Q.   Which ones?
7       MR. CLARK:  Objection to
8  form.
9       A.   I think OxyContin was one and
10 maybe hydrocodone.
11      Q.   And your company distributes both
12 of those?
13      MR. CLARK:  Objection to
14 form.
15      A.   Yes.
16      Q.   I've asked this question of, I
17 think, two of your other family members, whether
18 there has ever been any internal meetings
19 regarding the addictive nature of oxycodone
20 specifically, and I've been told there has not
21 been.
22      Do you agree with that?
23      A.   Yes.
24      Q.   Would you agree with me, though,

Page 15

1  that we are in the middle of an opioid epidemic
2  and/or crisis right now?
3       MR. CLARK:  Objection to
4  form.
5       A.   I -- I see that in the news.  I've
6  never been affected, but I don't know anybody
7  that has, you know, a problem with addiction.
8       Q.   I think -- is Candace your aunt?
9       A.   My cousin.
10      Q.   Cousin.  I'm sorry.  She said
11 she's seen it on the news.
12      Have you seen it on the news, that
13 it's a problem?
14      MR. CLARK:  Objection to
15 form.
16      A.   Have I seen -- yes, I've seen
17 stuff on the news regarding opioids.
18      Q.   Have you ever attended any
19 seminars, lectures, or meetings outside of your
20 company regarding the addictive nature of
21 oxycodone?
22      A.   No.
23      Q.   Have you ever read any of the
24 congressional hearings or reports regarding the

Page 16

1  addictive nature of oxycodone?
2       MR. CLARK:  Objection to
3  form.
4       A.   No.
5       Q.   Other than the news, have you
6  educated yourself as to the risks and dangers of
7  oxycodone?
8       MR. CLARK:  Objection to
9  form.
10      A.   Have I --
11      Q.   Educated yourself on what the
12 risks and/or dangers might be.
13      MR. CLARK:  Same objection.
14      A.   No.
15      MR. REINS:  Did you get the
16 answer "I don't know"?
17      THE COURT REPORTER:  Yes.
18 BY MR. REINS:
19      Q.   All right.  Sir, based on the fact
20 that your company does distribute narcotics
21 which have been certified or identified by the
22 government, are you aware that there's federal
23 regulations governing the distribution of the
24 products that you sell?

Page 17

1       A.   Yes.
2       Q.   Okay.  So, for instance, you're
3  aware of the Controlled Substances Act, I would
4  presume?
5       A.   I'm aware of it, yes.
6       Q.   Okay.  Specifically --
7  specifically, are you aware that distributors of
8  controlled substances and Schedule I or II, the
9  Attorney General shall register an applicant to
10 distribute a controlled substance in Schedule I
11 or II unless he determines that the issuance of
12 such registration is inconsistent with the
13 public interest.
14      In determining the public
15 interest, the following factors shall be
16 considered:  Maintenance of effective control
17 against diversion of particular controlled
18 substances into other than legitimate medical,
19 scientific, and industrial channels.
20      Do you agree that PSI has the duty
21 to maintain effective controls against
22 diversion?
23      MR. CLARK:  Objection.  Form.
24      A.   No.  The DEA issues us a license.

Page 18

1    Q.   Yes, sir, and that's fair.  But do
2  you agree that your company is responsible for
3  coming up with effective plans to prevent drug
4  diversions of the products that you distribute?
5        MR. CLARK:  Objection to
6        form.
7    A.   That's what the law is.
8    Q.   Yes, sir.  And the law is also
9  that any suspicious orders, pursuant to the
10 federal regulations, include orders of unusual
11 size, orders deviating substantially from a
12 normal pattern, and orders of unusual frequency
13 shall be reported, correct?
14       MR. CLARK:  Objection to
15       form.
16   A.   That's what the law says.
17   Q.   Yes, sir.  And I believe I asked
18 your dad about this.  This is going to be in his
19 deposition when he was taken specifically as the
20 30(b), which means a corporate representative of
21 PSI speaking on behalf of the company.
22       And this is going to be on page 59
23 of that deposition, specifically line 11.
24       Your father was asked, as the

Page 19

1  president -- let me restate that -- as the 30(b)
2  representative of PSI:
3        "What is your understanding of the
4  shipping requirement?  And, quite honestly, it
5  shouldn't be the shipping requirement.  It
6  should be the anti-shipping requirement, right?"
7        "Answer:  That's correct."
8        "Okay.  And is it your
9  understanding that the shipping requirement
10 means that if we have a suspicious order, we
11 need not to ship it?"
12       "Answer:  Yes."
13       "And that has been the obligation
14 not just upon PSI, but all the distributors, to
15 your understanding, since 1971 when this
16 regulation was passed?"
17       Answer on the next page at line 2,
18 "Yes."
19       You understand as -- you
20 understand that that not only is the law but has
21 been the law since 1971, correct?
22       MR. CLARK:  Objection to
23       form.
24   Q.   And I can show you the regulations

Page 20

1  when these were passed in 1970 and '71,
2  respectively.
3        MR. CLARK:  Same objection.
4    Q.   Did your father testify honestly
5  and truthfully?
6        MR. CLARK:  Objection to
7        form.  There's a question pending.
8        I don't think he answered the prior
9        question.
10   Q.   Okay.
11   A.   I'm not sure if I really
12 understand what you want.
13   Q.   Yes, sir.  I'm just saying, you
14 agree with your father, who is also the 30(b)
15 representative, that there's a requirement that
16 suspicious orders, specifically regarding
17 preventing diversion into our society of
18 narcotics, that that shipping requirement
19 requires that suspicious orders not be shipped,
20 correct?
21       MR. CLARK:  Objection to
22       form.
23   Q.   You're aware of that?
24   A.   They should -- suspicious orders

Page 21

1  should not be shipped.
2    Q.   Yes, sir.  The law has been that
3  way since these Acts.  These laws were enacted
4  in the early '70s, correct?
5        MR. CLARK:  Objection.
6    Q.   As your father testified?
7        MR. CLARK:  Objection.  Same
8        objection.
9    Q.   Correct?
10       MR. CLARK:  Same objection.
11   A.   Okay.  Ask the second -- ask the
12 second question again.
13   Q.   Of course.  Yes.
14       I'm saying you're aware that these
15 regulations that I read to you that we spoke
16 about were enacted in the early '70s; did you
17 know that?
18   A.   Yes.
19   Q.   Okay.  And so the shipping
20 requirement that I'm speaking to you about has
21 been in place since the early '70s?
22   A.   Correct.
23   Q.   Okay.  Now I want to talk to you
24 about -- you mentioned the DEA.  Before we get

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 to that, let's cover some basic principles.
2          It appears that you have been or
3 are the one responsible for establishing
4 thresholds for varying families of narcotics for
5 some time; is that fair?
6          MR. CLARK: Objection to
7     form.
8     A.   Yes.
9     Q.   I'd like you to take a moment and
10 describe for us the process and how you go about
11 establishing a threshold?
12     A.   Okay.  I go about that by -- a lot
13 of things determine that.  How many orders they
14 do per day, how many scripts they fill.  They
15 fill out my questionnaire and I go off of that,
16 okay?
17          So I read the questionnaire, okay?
18 And that's basically the basis point of how I
19 determine what they -- you know, what they
20 receive.
21     Q.   Okay.
22     A.   Okay.  And I also, you know,
23 check -- I can check the population around them,
24 you know.  They have to be a customer for a

Page 23

1 little while before they get controls.
2     Q.   All right.  Take that one at a
3 time, if you don't mind.  Let's start with the
4 questionnaire.
5          Did you come up with the
6 questionnaire?
7     A.   I helped.
8          MR. CLARK: Objection to
9     form.
10          Go ahead.
11     A.   I helped with it, yes.
12     Q.   Okay.  And this questionnaire is
13 going to be asking what types of questions?
14     A.   It asks pharmacy information, if
15 they're affiliated with any other pharmacies,
16 how long they've been in business, what are
17 their store hours and what days are they open a
18 week, what is the percentage of controls to
19 non-controls they plan on purchasing, also what
20 they dispense, the amount of cash for controlled
21 substance prescriptions compared to credit
22 cards, insurance, Medicaid.
23          It asks certain questions about
24 certain items, all right?  If they plan on

Page 24

1 dispensing more than a certain number of --
2 phentermine is one of them, hydrocodone,
3 oxycodone.  Fentanyl is on there, prometh with
4 codeine.  Tramadol is on there.  Carisoprodol is
5 on there.
6     Q.   And you have them fill out this
7 questionnaire when you first start doing
8 business with them?
9     A.   It's before we do business -- when
10 they fill out their application, that is filled
11 out if they want -- if they expect to get
12 controls.  Only about maybe 30 percent of our
13 customers get controls.
14     Q.   Okay.
15     A.   So not everybody fills one out.
16 In order to get controls, it must be filled out
17 and completed.
18     Q.   Will the questionnaire also
19 have -- will it ask them kind of their -- well,
20 let me just ask it this way:  You maintain all
21 these questionnaires for your customers?
22          MR. CLARK: Objection to
23     form.
24     Q.   You keep them?

Page 25

1     A.   They're in a customer file,
2 correct.
3     Q.   And based off the answers to those
4 questions, if I'm hearing you right, from that,
5 you come up with a threshold?
6          MR. CLARK: Objection to
7     form.
8     A.   That's very helpful.  Yes.
9     Q.   Okay.  You said -- one of the
10 things you said, it's the population around the
11 area.  Do you look at that every time you set a
12 threshold?
13     A.   Not every time.  If it's somebody
14 new and it's an area I'm not familiar with, I
15 will.
16     Q.   Okay.  Any other information?
17 Does anyone -- let me ask you that.  Any other
18 information you look at beyond the questionnaire
19 and potentially the population surrounding the
20 area if it's an area you're not familiar with?
21     A.   I sometimes will call the police
22 department and ask them if there's any areas of
23 concerns with controlled substances in that
24 area.

Page 26

1    Q.   All right.  Do you document
2  those -- the steps that you take in setting the
3  threshold?
4         MR. CLARK:  Objection to
5  form.
6    Q.   Like will you keep a file and say,
7  "Hey, I called the police department," or, you
8  know, "I've reached out, got some statistics on
9  the population"?
10   A.   No.
11        MR. CLARK:  Just let me --
12  objection to form.
13        Go ahead.
14   Q.   I didn't hear your answer.  I'm
15  sorry.
16   A.   No.  No.
17   Q.   All right.  Any other information
18  that goes into your analysis?
19   A.   I sometimes will look to see how
20  many other pharmacies are in the immediate area
21  also.
22   Q.   Okay.  Anything else?
23        MR. CLARK:  Objection to
24  form.

Page 27

1    Q.   I'm not suggesting there is.  I'm
2  just asking.  Does that cover it?
3    A.   Not that I can think of.
4    Q.   Fair enough.
5         Do you take the duty and
6  responsibility of setting a threshold seriously,
7  especially when it comes to narcotics -- well,
8  do you only set thresholds for narcotics?
9    A.   No.
10        MR. CLARK:  Objection.
11   A.   No.
12   Q.   What other medications?
13   A.   We have -- phentermine is on
14  there, carisoprodol, tramadol, prometh with
15  codeine.  That is, codeine is an opioid, so
16  narcotics, yes.
17   Q.   Okay.  So the setting of the
18  threshold, is that a duty and responsibility you
19  take very seriously?
20   A.   Yes.
21   Q.   And do you put the time and the
22  effort in there in order to ensure you perform
23  the due diligence to come up with what you
24  believe to be an accurate threshold?

Page 28

1         MR. CLARK:  Objection to
2  form.
3    A.   Yes.
4    Q.   Why have a threshold?
5    A.   Why have a threshold?
6    Q.   Yeah.  Why have one, specifically
7  for opioids?
8         MR. CLARK:  Objection to
9  form.
10   A.   Okay.  Well, a threshold is very
11  important.
12   Q.   Why?
13   A.   If somebody tells me they only --
14  you know, dispense so many tablets a month,
15  okay, and I set the threshold at that amount,
16  I'm more aware, all right, when they reach that
17  amount, if they do reach that amount.  It's just
18  very important to our use.
19   Q.   Why not just have unlimited
20  opioids flowing into society?  Why have a limit?
21        MR. CLARK:  Objection to
22  form.
23   A.   That's not the right thing to do.
24   Q.   Why?

Page 29

1         MR. CLARK:  Same objection.
2    A.   Because they have to be prescribed
3  for a legitimate purpose and it's -- you know.
4    Q.   Let me show you what -- your
5  father's words.  This is going to be on page 28
6  of his deposition as a 30(b) rep, line 4.
7         "Tell us, tell the jury why we
8  want to prevent diversion of controlled
9  substances."
10        "Well, as it states, we -- it can
11  be dangerous.  People can die.  People can have
12  bad effects and they can be abused.  None of
13  that is something that we want to happen.  We
14  want the good effects, not the bad effects."
15        Do you agree?
16        MR. CLARK:  Objection to
17  form.
18   A.   I agree that's his opinion.
19   Q.   Not yours?
20        MR. CLARK:  Same objection.
21   A.   I agree it could be dangerous,
22  yes.
23   Q.   People can die, right?
24        MR. CLARK:  Same objection.

Page 30

1    A.    It's a possibility.

2    Q.    Does that play into why you want

3  to set a threshold, so that you can control the

4  amount of opioids that are flowing into specific

5  geographical areas of our country?

6          MR. CLARK:  Objection to

7     form.

8    A.    Well, I set a threshold by what

9  the customer tells me.

10   Q.    What do you mean, what they tell

11 you?

12   A.    On their questionnaire.

13   Q.    You're the one that decides,

14 though, right?  Ultimately.

15         MR. CLARK:  Objection to

16    form.

17   A.    How do I say -- I don't know if I

18 totally agree with that, but ...

19   Q.    But you do know that the law puts

20 the duty on your shoulders as the distributor to

21 ensure that there aren't unusual amounts or

22 frequency of amounts into society, right?

23         MR. CLARK:  Objection to

24    form.

Page 31

1    A.    That's what the law says, yes.

2    Q.    And you're required to abide by

3  the law, right?

4          MR. CLARK:  Objection to

5     form.

6    A.    Yes.

7    Q.    Let's talk about what you do if

8  someone meets their thresholds on an opioid.

9  They've reached their limit, so to speak.  What

10 is your process in order to determine -- well,

11 what is your process when that happens?

12         And I want to be clear.  If that's

13 changed in the last -- let's say since 1996.  If

14 your process has changed, let me know.

15         But if somebody hits their limit,

16 I'm told you're notified; is that accurate?

17   A.    The computer, yes, lets me know,

18 yes, correct.

19   Q.    Yes, sir.  And then I want to be

20 in your shoes in that chair when that happens.

21 What do you do?

22         MR. CLARK:  Objection to

23    form.

24   A.    Okay.  So the thresholds don't go

Page 32

1  back to '96.

2    Q.    Okay.  Fair enough.  Let's deal

3  with that.  Okay.  When were the thresholds set?

4    A.    2008.

5    Q.    Okay.  You didn't have thresholds

6  before then?

7          MR. CLARK:  Objection.  Asked

8     and answered.

9    Q.    And I'm not here to confuse you.

10 I know that in 2008 you instituted a program

11 that did a stop based on the thresholds.  I

12 understand that and I'm not here -- I'm not here

13 to trick you or anything.  But I believe I've

14 seen documentation that there were thresholds

15 set before then, even though they may have been

16 handled differently.

17         So before 2008 and after 2008 may

18 be how we tackle this.

19         Before 2008, when you had the stop

20 shipment threshold system -- am I right?  You

21 had a threshold system implemented in 2008?

22         MR. CLARK:  Objection to

23    form.

24   A.    In 2008, yeah.

Page 33

1    Q.    Yes, sir.

2    A.    Yes.

3    Q.    And so before that, did you have

4  thresholds on opioids or not?

5          MR. CLARK:  Same objection.

6    A.    I can't recall.

7    Q.    Okay.  I know you've worked there

8  for some time now, but you don't recall whether

9  there were thresholds on opioids before 2008?

10   A.    Before 2008, a lot of people sent

11 C-II forms in, all right, and I was able to put

12 orders in.  I could look at history, and that's

13 how I, you know, was able to determine if

14 somebody was buying more than what they usually

15 did.  So it was a sales history tool I used at

16 that time.

17   Q.    All right.

18   A.    And I still use that today.

19   Q.    Let's talk about that process

20 before 2008 as best you can recall, okay?

21   A.    Uh-huh.

22   Q.    All right.  So would you still be

23 notified if somebody hit their threshold before

24 2008?

Page 34

1       MR. CLARK: Objection to
2  form.
3       A.  I don't believe there was a
4  threshold.
5       Q.  Okay.
6       A.  I would -- you know, if a customer
7  sent me in a form, okay, I'd put the order in
8  the computer.
9       Q.  Right.
10      A.  And as I'm putting it in by items,
11 I can go back and look at sales history to
12 determine what they bought, you know, in the
13 past.
14      Q.  I see.
15      A.  Okay?  And that's how I determined
16 a lot of -- you know, how I could tell where
17 they were at for the month and what they were
18 buying and if it was unusual.
19      Q.  I got it.  And you're right.
20 There wasn't a quote/unquote "threshold" before
21 2008 established by your company, correct?
22      MR. CLARK: Objection to
23 form.
24      Q.  Not that you didn't review things.

Page 35

1  I'm not disputing what you just told me.  But
2  there wasn't a number-of-pills threshold
3  established by you before 2008, correct?
4       MR. CLARK: Same objection.
5       A.  Not one that was set in the
6  computer.
7       Q.  Right.
8       A.  So --
9       Q.  Did you have one not set in the
10 computer?
11      A.  No.  No.
12      Q.  Okay.  All right.  And then 2008,
13 that's when you established the threshold system
14 and you established thresholds, and you did it
15 the way you just described to me, correct?
16      MR. CLARK: Objection to
17 form.
18      Q.  Questionnaire and the other
19 information you may review, right?
20      A.  That's -- yes.
21      Q.  But before that time, you
22 basically -- you would get the orders coming in
23 and you would see what's being filled and what's
24 being -- you would monitor it, I guess, more

Page 36

1  with your eyeball with the sales history; is
2  that fair to say?
3       MR. CLARK: Objection to
4  form.
5       A.  No.  I monitor it with the
6  computer.  The computer told me that, you know,
7  what they bought in the past of those particular
8  items, yes.
9       Q.  So you would look at that when you
10 were filling new orders?
11      A.  That's correct.
12      Q.  Got it.
13      2008 forward, how would you
14 determine whether to raise a threshold?
15      A.  The questionnaire, okay, how many
16 scripts they do, all right, a day, the type of
17 business they are, okay, if -- just the type of
18 pharmacy.
19      Q.  That sounds like -- correct me if
20 I am wrong.  That sounds like the same
21 information you would use to set the actual
22 initial threshold.
23      MR. CLARK: Objection to
24 form.

Page 37

1       Q.  When I asked you how you would
2  establish a threshold initially with these
3  folks, I thought you said those very same
4  things; is that right?
5       A.  That's correct, yes.
6       Q.  So the same information would
7  allow you to raise the threshold?
8       A.  Are you asking about raising?
9       Q.  Yeah.
10      MR. CLARK: I think you
11 misunderstood.  He said "raise"
12 versus "set."
13      A.  Okay.  All right.
14      Q.  I did.
15      A.  Okay.
16      Q.  So let me go ahead and ask it
17 again, fair?
18      A.  Yes.
19      Q.  Will you please let me know, if
20 you would, 2008 moving forward to present day,
21 what type of information you would review in
22 order to raise that initial threshold?
23      A.  Okay.  So the initial thresholds
24 sometimes are set lower because it's a newer

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 customer, okay?
2    Q.   Okay.
3    A.   And as they get established with
4 me, I know more about the buying pattern, okay,
5 communication with the pharmacy. I call the
6 pharmacies a lot, talk to the pharmacist. I
7 have paperwork they fill out that asks them
8 questions about why they would want an increase
9 on a particular item.
10    Q.   And so what type of paperwork
11 would that be that you would provide to them?
12    A.   I have -- when I call them on the
13 phone, I will let them know there's an
14 increase -- there's a paperwork where they can
15 get -- they can ask for an increased amount of a
16 particular product they are in need of.
17    Q.   Okay.
18    A.   Okay.
19    Q.   So you'll look at that form?
20    A.   I'll fax it to them or it goes
21 with the driver to them and gets dropped off
22 after I call them, okay. And then when I get it
23 back, that's when I review it, yes.
24    Q.   What in your mind are legitimate

Page 39

1 reasons for increasing a threshold based on
2 their filling out of that paperwork?
3       MR. CLARK: Objection to
4    form.
5    A.   There could be many things. A
6 pharmacy in the area could have closed.
7    Q.   Okay.
8    A.   There may be new doctors in that
9 particular area. Population growth. Maybe
10 they're getting more patients now.
11       There's a lot of reasons that come
12 into play that --
13    Q.   Any others that you can think of?
14 And I know you're not doing an exhaustive list,
15 but any others you can think of?
16       MR. CLARK: Objection to
17    form.
18    A.   Sometimes the pharmacy will call
19 and let me know that if a pharmacist is going to
20 be off, okay, if the main pharmacist or the
21 pharmacist in charge is going to be off and
22 somebody else is there who has not the
23 capability to buy -- purchase controls, they'll
24 ask me, okay, if I can raise it for them for

Page 40

1 that time so that they can put an order in,
2 because they'll be on vacation for a week or so,
3 just so they have the stock.
4    Q.   All right. I want to show you a
5 document. So this is going to be PSI
6 30(b)-301-001.
7       You're looking at a letter that
8 was issued to Cardinal September 27th, 2006, and
9 I'll tell you that it's basically been
10 stipulated that all the distributors got a
11 letter such as this, similar to this, and I
12 think your dad and your cousin, Candace, has
13 already testified to that.
14       Do you remember seeing this
15 letter? Not this letter, but obviously a
16 similar letter.
17       MR. CLARK: Objection to
18    form.
19    Q.   And you can take a moment to look
20 it over. I'm not trying to rush you.
21       You don't have to read the whole
22 thing.
23    A.   I don't recall. I don't recall
24 it, no.

Page 41

1    Q.   Fair enough.
2       So I do want to talk to you a
3 little bit about kind of some of the things that
4 are brought up in this letter, see if these are
5 concepts that you recall. So we'll talk about
6 the first paragraph, if you don't mind.
7       It says, "This letter is being
8 sent to every commercial entity in the
9 United States registered with the Drug
10 Enforcement Administration to distribute
11 controlled substances."
12       That would certainly be PSI,
13 correct?
14    A.   Yes.
15    Q.   "The purpose of this letter is to
16 reiterate the responsibilities of controlled
17 substance distributors in view of the
18 prescription drug abuse problem our nation
19 currently faces."
20       Under "Background," it says, "As
21 each of you is undoubtedly aware, the abuse,
22 non-medical use, of controlled prescription
23 drugs is a serious and growing health problem in
24 this country. DEA has an obligation to combat

Page 42

1 this problem as one of the agency's core
2 functions is to prevent the diversion of
3 controlled substances into illicit channels."
4           You're aware that that's one of
5 their duties and responsibilities, the DEA?
6      A.   Yes.
7      Q.   "Congress assigned DEA to carry
8 out this function through enforcement of the
9 Controlled Substance Act and DEA regulations
10 that implement the Act."
11           Specifically, on the second page,
12 middle part there, I want to talk to you about
13 where it says, "The DEA regulations require all
14 distributors to report suspicious orders of
15 controlled substances."  Specifically, the
16 regulations state in 21 C.F.R. 1301.74(b), "The
17 registrant shall design and operate a system to
18 disclose to the registrant suspicious orders of
19 controlled substances.  The registrant shall
20 inform the Field Division Office of the
21 Administration in this area of suspicious orders
22 when discovered by the registrant.  Suspicious
23 orders include orders of unusual size, orders
24 deviating substantially from a normal pattern,

Page 43

1 and orders of unusual frequency."
2           Are you aware that your company,
3 PSI, specifically submitted reports in writing
4 every month from approximately 1997 to 2013?
5      MR. CLARK:  Objection to
6 form.
7      A.   There was a variance report, yes.
8 I did look at that too.
9      Q.   Okay.  And you're aware that the
10 law requires a suspicious order report be
11 submitted?
12      A.   Yes.
13      MR. CLARK:  Objection.  Form.
14      Q.   And that qualified, pursuant to
15 PSI, as meeting your responsibilities under the
16 federal law, specifically the one that you're
17 looking at right here in that regard; fair to
18 say?
19      MR. CLARK:  Objection to
20 form.
21      A.   No, I don't agree with that.  That
22 didn't meet suspicious order monitoring.
23      Q.   Okay.  You had a different
24 monitoring system?

Page 44

1      A.   That wouldn't meet -- if there was
2 a suspicious order, I would have sent them
3 information separate from this.
4      Q.   Separate from that?
5      A.   That's right, yes.  That's
6 correct.
7      Q.   We'll talk about the report
8 specifically, but why don't you tell me what
9 type of information you would send to the DEA
10 before 2008, when you initiated the --
11 specifically, the threshold system.
12      MR. CLARK:  Objection to
13 form.
14      Q.   What did you send?
15      A.   Okay.  Can you repeat that?
16      Q.   Sure.  Yeah.  Your -- Kirk, do you
17 know who Kirk is?
18      A.   Yes, I do.
19      Q.   He testified here today he was the
20 IT guy and he would do these reports pursuant to
21 these rules and submit those reports every
22 month.
23      A.   Yes.
24      Q.   Okay.  As part of the suspicious

Page 45

1 order monitoring requirement under the federal
2 regulations, but you're saying no --
3      MR. CLARK:  Objection to
4 form.  Misstates prior testimony.
5      Q.   You're saying no, he wasn't doing
6 it pursuant to the regulations; is that right?
7      MR. CLARK:  Same objection.
8      A.   No.  No.  These were sent, but
9 this didn't -- just because this was sent
10 doesn't constitute those as suspicious orders.
11 There could have been a suspicious order that
12 wouldn't show up on that report.
13      Q.   That wouldn't have shown up?
14      A.   Yeah.  It's possible, yes.
15      Q.   For example?
16      MR. CLARK:  Objection to
17 form.
18      A.   I -- I -- I never had one, but,
19 you know, it would be possible.  This report was
20 a variance report which just said, you know, if
21 somebody bought more than what the average was
22 we sold per month.
23      Q.   All right.  So you did not -- your
24 testimony here today is that report was not in

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 fulfillment of the duties and responsibilities
2 of the Code of Federal Regulations, correct?
3          MR. CLARK:  Objection to
4     form.
5     A.   I can't answer that.  I don't
6 know -- I mean, it requires more than that.
7          MR. CLARK:  Objection.  Calls
8     for legal conclusion.
9     Q.   You said, "We sent" -- "I sent
10 other reports."  What other reports did you
11 send?
12          MR. CLARK:  Objection.
13     Misstates his testimony.
14     A.   Yeah.  I didn't say I sent
15 reports.
16     Q.   All right.  What did your company
17 do, PSI, in regards to -- well, first of all,
18 let's get on the same page.  What's a suspicious
19 order?  How do you define a suspicious order?
20     A.   How do I define -- a suspicious
21 order to me is if I contact the customer after
22 an order goes on hold that I'm curious about, an
23 order of interest, and I don't get an answer
24 that I believe I can be comfortable with, then

Page 47

1 that is a suspicious order.
2     Q.   All right.  Let's baby-step that.
3 So a suspicious order for you isn't a
4 significant variance of what they've ordered
5 before, right?
6     A.   That can be part of it.
7     Q.   It can be part of it.
8          So the suspicious order, if I'm
9 hearing you right, you are the only one in the
10 company that can determine what a suspicious
11 order is?
12          MR. CLARK:  Objection to
13     form.
14     Q.   Is that right?
15          MR. CLARK:  Same objection.
16     A.   I -- that's my job.
17     Q.   All right.  Well, I'm glad you're
18 here.
19          So tell me the criteria for you
20 being the sole person responsible for knowing
21 what a suspicious order is for PSI.  What
22 qualifies as a suspicious order pursuant to you?
23          MR. CLARK:  Objection to
24     form.

Page 48

1     Q.   What is the criteria?
2          MR. CLARK:  Same objection.
3     Q.   One at a time, if you don't mind.
4     A.   Okay.  So what's the first
5 question?
6     Q.   I want you to define a suspicious
7 order since you're the only one that can do that
8 for PSI.
9          MR. CLARK:  Objection to
10     form.  Asked and answered.
11     A.   Okay.  So a suspicious order to me
12 is --
13     Q.   Yeah, what defines as a -- well,
14 let me say this:  Can you and I agree that the
15 law defines what a suspicious order is, right?
16          MR. CLARK:  Objection to
17     form.
18     A.   That's what the law is, yes.
19     Q.   Unusual size, orders deviating
20 substantially from a normal pattern, an order of
21 unusual frequency.  That is a suspicious order,
22 correct?
23          MR. CLARK:  Objection to
24     form.

Page 49

1     A.   According to the law, correct.
2     Q.   According to the law?
3     A.   Yes.
4     Q.   Do you have a different
5 understanding in PSI?
6     A.   No.  I go -- do I have a different
7 understanding?  No.
8     Q.   Okay.  So my understanding is, is
9 that you came up with -- or Online Systems or
10 Services, Inc. came up with a reporting
11 mechanism for your company in May of 1997 with
12 the help of the DEA to fulfill this requirement.
13          MR. CLARK:  Objection to
14     form.
15     A.   I wasn't -- I was not part of
16 that.
17     Q.   Do you have an understanding of
18 why those reports that were submitted from May
19 of 1997 to 2013, what the purpose of those
20 reports were, or did you even know they were
21 submitting reports?
22          MR. CLARK:  Hold on a second.
23     Let me get my objection.
24          Objection to form.

Page 50

1 Go ahead.
2 Q. You knew they were submitting
3 them --
4 THE COURT REPORTER: I didn't hear
5 the answer.
6 Q. What is your understanding of what
7 the purpose of those forms are?
8 MR. CLARK: Objection to
9 form.
10 A. Okay. So those forms were -- that
11 report gave the average amount of what we sold
12 to all of our customers for that month, okay?
13 And anybody that went above that average showed
14 up on the report that was submitted to the DEA.
15 Q. That is, by definition, orders
16 that deviate according to this rule, right?
17 MR. CLARK: Objection to
18 form.
19 Q. Let me strike that.
20 Why was that the system that was
21 developed with the help of the DEA? What was
22 your understanding of the purpose of working
23 with the DEA to submit those reports that were
24 specifically called suspicious order monitoring

Page 51

1 reports?
2 You're aware they're called that?
3 A. Yes.
4 MR. CLARK: Objection to
5 form. Objection; argumentative.
6 You can answer.
7 Q. But it's your testimony today, is
8 they were not suspicious order monitoring
9 reports?
10 MR. CLARK: Objection to
11 form.
12 A. That's what they were called.
13 Q. Were they misleading?
14 MR. CLARK: Objection to
15 form. Objection; argumentative.
16 A. I wasn't involved -- I wasn't
17 involved in naming the report.
18 Q. Do you believe the DEA was misled
19 into that report -- the purpose of what
20 that report was for?
21 MR. CLARK: Objection to
22 form.
23 A. No.
24 Q. Do you believe that Kirk, who

Page 52

1 testified here today what he thought the purpose
2 was for, knew what the purpose of the form was
3 for?
4 MR. CLARK: Objection to
5 form. Objection; argumentative.
6 Let me get my objections in
7 before you answer, Jim.
8 A. Are you asking me Kirk's opinion?
9 Q. Do you think Kirk knew what his
10 job was?
11 MR. CLARK: Objection to
12 form. Objection; argumentative.
13 A. Yes.
14 Q. Okay. Let's go beyond Kirk.
15 Let's go beyond his testimony. Let's talk about
16 the company's policies and procedures.
17 Are you aware there's policies and
18 procedures?
19 MR. CLARK: Objection to
20 form.
21 A. Yes.
22 Q. Okay. All right. We're going to
23 look -- the first one is going to be called the
24 Controlled Substances, which was initiated or

Page 53

1 effective date of 2000, June of 2000.
2 All right. This is the policy
3 specifically dealing with controlled substances
4 for your company.
5 MR. CLARK: Do you have a
6 copy of that?
7 MR. REINS: I told you I was
8 going to reuse it, what we used
9 earlier.
10 MR. CLARK: I'm sorry. Yeah.
11 BY MR. REINS:
12 Q. "Regarding controlled substances,
13 Prescription Supply, Inc. will maintain proper
14 security, document and monitor all transactions
15 according to state and federal regulations."
16 The scope of this will apply to
17 several folks, including yourself and the IT
18 manager, correct?
19 MR. CLARK: Objection. Form.
20 Q. Under "Scope," second paragraph?
21 A. Okay. So what was your -- I see
22 that.
23 Q. Under "Responsibilities," it says,
24 third paragraph, "IT manager shall compile

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 reports monthly regarding purchases of
2 controlled substances threshold limits and
3 suspicious order monitoring."
4          Do you see that?
5     A.   Yes.
6     Q.   Okay.  If you go on the next page,
7 it says on the first full paragraph, "IT manager
8 shall compile reports monthly regarding
9 purchases of controlled substances, threshold
10 guidelines, and suspicious order monitoring.
11 Reports are to automatically be forwarded to
12 relevant agencies and DEA as appropriate."
13          Kirk, who is the IT manager -- can
14 we agree on that?
15     A.   Yes.
16     Q.   -- talks about that these reports
17 were the reports that he forwarded in compliance
18 with the federal regulations and the company's
19 policies and procedures regarding suspicious
20 order monitoring, to be clear, the suspicious
21 order monitoring reports.
22          Are you testifying here today that
23 in contradiction to Kirk, the policy, procedure,
24 federal regulation, that those reports were not

Page 55

1 submitted for that purpose?
2          MR. CLARK:  Objection to
3     form.  Objection to speech.
4     Objection; misstates Kirk's prior
5     testimony.
6          You can answer.
7     A.   No, they were part of that.
8     Q.   Okay.
9     A.   They were part of the submittal,
10 yes.
11     Q.   All right.  Now, the next part --
12 actually, forgive me.  The next paragraph
13 says -- or actually, the last sentence, it says,
14 "Copies are to be given to DR/DR supervisor with
15 all concerns discussed."
16          Who would that be, the DR/DR
17 supervisor?
18     A.   My dad saw those, Thomas Schoen.
19     Q.   Fair enough.
20     A.   And I also reviewed them.
21     Q.   You reviewed it as well?
22     A.   Yes.
23     Q.   Okay.  It says, "DR/DR supervisor
24 shall review all relevant purchase and sales

Page 56

1 agreements" -- "reports," I'm sorry -- "consult
2 with IT manager for necessary changes, and
3 handle any concerns or problems as they arise.
4 Notification of appropriate agencies is to be
5 done in the event of concern regarding any
6 suspicious order."
7          You've read this policy before
8 today, right?
9     A.   Yes.  It's been a while.  Yes.
10     Q.   All right.  Now we're going to
11 look at -- oh, and I'm sorry.  I don't know if
12 I -- for the record, that was PSI653 and 654.
13          We're going to now look -- yeah.
14 We're going to now look at another policy and
15 procedure, PSI, starting with 84, and this is
16 Inventory Controls.
17          I think I might have an extra copy
18 of this one.  Yep.
19     A.   Thanks.
20     Q.   Yes, sir.
21          Now, have you seen this policy
22 before?
23     A.   Yes.
24     Q.   It says, "Prescription Supply,

Page 57

1 Inc. will monitor inventory for cyclical
2 accounts, suspicious purchases and losses,
3 theft, or otherwise missing products."
4          And this was effective again in
5 June of 2000, correct?
6          MR. CLARK:  Objection to
7     form.
8     A.   That's what it says, yes.
9     Q.   Are you aware of any policies and
10 procedures that were enacted regarding
11 controlled substances and/or inventory controls
12 before 2000?
13     A.   Ask that one more time.
14     Q.   Are you aware of any policies and
15 procedures that came before these in 2000
16 dealing with the issues we're discussing here
17 today?
18          MR. CLARK:  Objection to
19     form.
20     A.   I can't remember.
21     Q.   Fair enough.
22          "Policy:  Prescription Supply,
23 Inc. will monitor inventory for" -- I'm sorry.
24 Forgive me.  This applies again to a number of

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1 folks, including you and the IT manager.
2 I want to talk to you about
3 "Responsibilities" at the bottom of the page.
4 "IT managers shall be responsible for suspicious
5 order monitoring reports and sharing concerns
6 with DR/DR supervisor. He/she is responsible
7 for sending all reports to DEA and governing
8 state agencies and maintaining records for at
9 least six years as required by law."
10 And you understand that at least
11 from 1997 to 2013, according to Kirk's
12 testimony, these were the only reports that were
13 submitted during that time period? You're aware
14 of that, correct?
15 MR. CLARK: Objection to
16 form.
17 A. Yes.
18 Q. Okay. Now, next paragraph,
19 "Controlled substance handler shall be
20 responsible for monitoring all controlled drug
21 purchases in coordination with IT manager.
22 He/she shall report any unaccounted losses or
23 problems to DR/DR supervisor, and when
24 delegated, to appropriate authority, Northwood

Page 59

1 Police/DEA. Controlled substances handlers
2 shall also document all transactions and
3 communications, holding copies of all paperwork
4 as required by law for at least six years."
5 We talked about establishing the
6 thresholds, right? I think I asked you, you did
7 not create any documentation when you
8 established the initial threshold. Did you
9 create any documentation when you raised
10 thresholds?
11 MR. CLARK: Objection to
12 form.
13 A. What do you mean, "create"?
14 Q. Did you create a form? Did you
15 have any documentation to show why you raised
16 it, what your thought processes were?
17 MR. CLARK: Objection to
18 form.
19 A. I have the paper that is the
20 increase for the customer that I give them.
21 Q. Yeah. I got it; you get the
22 questionnaire back. But do you create any
23 paperwork justifying the raising of a threshold
24 that you initially set?

Page 60

1 MR. CLARK: Objection to
2 form.
3 A. Not the question -- this is
4 separate from the questionnaire, after the fact,
5 after I have talked and spoken to the pharmacy.
6 Q. What do you create? What's the
7 document?
8 MR. CLARK: Objection to
9 form.
10 A. It's an increased controlled
11 substance purchase form they fill out.
12 Q. Do you specify the reasons for
13 which you approve the increase of the threshold?
14 A. I ask the pharmacist for the
15 reasons why they want an increase.
16 Q. Right. But the form that you fill
17 out, you fill out the form, right?
18 A. No. The pharmacy fills out the
19 form.
20 Q. Okay. What I'm asking you, is
21 there any documentation that you create for
22 justifying the increase of a threshold that you
23 document, that you create?
24 MR. CLARK: Objection to

Page 61

1 form.
2 A. No.
3 Q. Okay. Do you still have that
4 letter from the DEA?
5 MR. CLARK: The one you
6 showed him here?
7 MR. REINS: Yes.
8 MR. CLARK: It's a broad
9 question.
10 A. The Cardinal Health one?
11 Q. The one I handed you, yes, sir.
12 A. Yes.
13 Q. The one dated September 27, 2006?
14 A. Yes.
15 Q. We kind of got a little off track
16 through my fault, but what I want to talk to you
17 about -- I think we got through the regulation.
18 You agree that the increasing of a
19 threshold is an important responsibility?
20 You've got to be careful before
21 you increase a threshold, right?
22 MR. CLARK: Objection to
23 form.
24 A. I have to verify with the customer

Page 62

1 the reasoning for that.
2     Q.   Right. Is it more than just a
3 phone call and taking their word, though?
4     A.   Yes. I have paperwork I give
5 them.
6     Q.   Right. For instance --
7     A.   Yes.
8     MR. CLARK: Go ahead. Do you
9     have something you want to say?
10     A.   It is more than that. It is the
11 relationship I've established with the customer,
12 how long I've been dealing with them. A lot of
13 things take place.
14     Q.   Sure. Especially if they've been
15 ordering a consistent amount of narcotics, and
16 then after all these years of a relationship,
17 they ask for more, right?
18     MR. CLARK: Objection to
19     form.
20     Q.   That would be something you'd
21 consider, right?
22     MR. CLARK: Objection to
23     form.
24     A.   What do you mean?

Page 63

1     Q.   That's okay. I'll ask it
2 differently.
3     Look at page 3, if you don't mind,
4 on the DEA letter.
5     A.   Okay.
6     Q.   Can you and I agree that a
7 pharmacist -- or a customer, let me just say,
8 requesting more than the threshold that you
9 established, is suspicious?
10     MR. CLARK: Objection to
11     form.
12     A.   No.
13     Q.   Okay. All right. I'd like to
14 talk to you about -- so on this page, it says,
15 "Circumstances that might be indicative of
16 diversion. DEA investigations have revealed
17 that certain pharmacies engaged in
18 dispersing" -- "dispensing controlled substances
19 for other than a legitimate medical purpose
20 often display one or more of the following
21 characteristics in their pattern of ordering
22 controlled substances: "1. Ordering excessive
23 quantities of a limited variety of controlled
24 substances, ergo ordering only" -- do you know

Page 64

1 the name of that first medicine, narcotic?
2     A.   Phentermine.
3     Q.   And then what's the next one?
4     A.   Hydrocodone.
5     Q.   And then the last one?
6     A.   Alprazolam.
7     Q.   "While ordering few, if any, of
8 other drugs."
9     Would you agree that that is
10 potentially indicative of diversion, that
11 behavior?
12     MR. CLARK: Objection to
13     form.
14     Q.   Number 1.
15     A.   No, not always.
16     Q.   No. I'm just asking you if that's
17 a circumstance that might be indicative of
18 diversion.
19     MR. CLARK: Objection to
20     form.
21     A.   That's a circumstance why I may
22 want to call the pharmacy, yes.
23     Q.   Well, you'd definitely want to
24 call the pharmacy --

Page 65

1     MR. CLARK: Objection to
2     form.
3     Q.   -- at a minimum, right?
4     MR. CLARK: Objection to
5     form.
6     A.   Yes, I'd do that.
7     Q.   "2. Ordering a limited variety of
8 controlled substances in quantities
9 disproportionate to the quantity of
10 non-controlled medications ordered."
11     Would you agree that could raise a
12 red flag?
13     A.   At times, yes.
14     Q.   "3. Ordering excessive quantities
15 of a limited variety of controlled substances in
16 combination with excessive quantities of
17 lifestyle drugs."
18     Would that raise a concern?
19     A.   What's a lifestyle drug? Can you
20 explain it to me, what they mean by that?
21     Q.   Did you ever ask the DEA what they
22 meant by that?
23     MR. CLARK: Objection to
24     form.

Page 66

1    A.   No.
2    Q.   "4.  Ordering the same controlled
3  substance from multiple distributors."
4         That would certainly raise a flag,
5  right?
6         MR. CLARK:  Objection to
7    form.
8    A.   Yeah.  That's very hard to tell.
9  I can't tell if people do that, but I do ask
10  that question on the questionnaire.
11   Q.   And that's fair.  You put a lot of
12  weight in the questionnaire.  Do you believe
13  these pharmacists are all -- do you believe
14  there's a high level of honestly in the
15  completion of these questionnaires that you give
16  them?
17        MR. CLARK:  Objection to
18   form.
19   A.   When I get the questionnaires?
20   Q.   Yeah.  Do you believe they're
21  being honest with you?
22        MR. CLARK:  Objection to
23   form.
24   A.   I've had questionnaires that have

Page 67

1  been falsified, yes, that I've identified.
2    Q.   So you know that that can happen,
3  right?
4    A.   Yes.
5    Q.   Meaning just because they say it
6  doesn't mean it's necessarily true, right?
7        MR. CLARK:  Objection to
8    form.
9    A.   Possibly, yes.
10   Q.   So it says, "A distributor" --
11  underneath that -- "seeking to determine whether
12  a suspicious order is indicative of diversion of
13  controlled substances to other than legitimate
14  medical channels may wish to inquire with the
15  ordering pharmacy about the following:  1, what
16  percentage of the pharmacy's business does
17  dispensing controlled substances constitute?"
18        You agree that's a legitimate
19  question?
20        MR. CLARK:  Objection to
21   form.
22   A.   Yes.
23   Q.   Is that a question --
24   A.   Yes, I do.  Yes.

Page 68

1    Q.   Sorry.  Is that a question that
2  you should ask if they -- before raising a
3  threshold?  Or actually, even before
4  establishing a threshold, right?
5        MR. CLARK:  Objection to
6    form.
7    A.   You mean before establishing as a
8  customer?
9    Q.   Yes.
10   A.   Yeah, I ask that on the
11  questionnaire.  I do ask this question.  And
12  they will -- I will get a dispensing report too
13  that I will sometimes try to match up with what
14  they tell me on their purchases.
15   Q.   What is a dispensing report?
16   A.   Pharmacy, a dispensing report --
17  you know, it's what they dispense, all the
18  medications they dispense for the month.
19   Q.   Okay.
20        "2.  Is the pharmacy complying
21  with the laws of every state in which it is
22  dispensing controlled substances?"
23        Is that something you ask?
24   A.   I ask what they're licensed in.

Page 69

1    Q.   Okay.  Do you ask if they're
2  compliant with the laws?
3    A.   Do I ask that on the
4  questionnaire?
5    Q.   Or when you pick up the phone?
6        MR. CLARK:  Objection to
7    form.
8    A.   I believe that question is on the
9  questionnaire.
10   Q.   "3.  Is the pharmacy soliciting
11  buyers of controlled substances via the Internet
12  or is the pharmacy associated with an Internet
13  site that solicits orders for controlled
14  substances?"
15        Is that on your questionnaire?
16   A.   Yes.  We do ask if it's an
17  Internet pharmacy, if that's what you're asking.
18   Q.   Yes.
19   A.   Yes.  We've never dealt with an
20  Internet pharmacy.
21   Q.   You don't?
22   A.   Never.
23   Q.   Okay.  Do you deal with a
24  pharmacy -- so you don't deal with any

Page 70

1 pharmacies that solicit via the Internet?
2        MR. CLARK:  Objection to
3    form.
4    A.   We don't deal with any pharmacies
5 that are Internet pharmacies at all.  You have
6 to walk into the pharmacy to pick up your
7 prescription.
8    Q.   I know, but can a pharmacy solicit
9 Internet business, even if it's a bricks and
10 mortar?
11        MR. CLARK:  Objection.
12    A.   They can have a website.
13    Q.   Right.  And can they solicit
14 business that way?
15        MR. CLARK:  Objection to
16    form.
17    A.   Solicit business?
18    Q.   Yes, via the Internet.
19        MR. CLARK:  Same objection.
20    A.   They can make people aware they
21 are there.
22    Q.   "4.  Does the pharmacy or Internet
23 site affiliated with the pharmacy offer to
24 facilitate the acquisition of a prescription for

Page 71

1 a controlled substance from a practitioner with
2 whom the buyer has no preexisting relationship?"
3        Do you ask that question?
4    A.   Which page is that?
5    Q.   Number 4.  Do you ask that?
6    A.   We ask that question, yes.
7    Q.   Okay.  "5.  Does the pharmacy fill
8 prescriptions issued by practitioners based
9 solely on an online questionnaire without a
10 medical examination or bona fide doctor/patient
11 relationship?"
12        Do you ask that question, if you
13 know?
14    A.   Okay.  We don't ask that specific
15 question, no.
16    Q.   Seem like a good question to ask?
17        MR. CLARK:  Objection to
18    form.
19    A.   So that question is asking if they
20 just -- they don't see the patient?
21    Q.   Right.
22    A.   It's just online?
23    Q.   Right.
24    A.   Well, I don't believe that's

Page 72

1 appropriate.
2    Q.   Okay.  And you would be nervous if
3 a pharmacy filled scripts that way, right?
4        MR. CLARK:  Objection to
5    form.
6    A.   I would not be comfortable with
7 that.
8    Q.   May be a good question to ask them
9 in the future?
10        MR. CLARK:  Objection to
11    form.
12    A.   Yeah.
13    Q.   "6.  Are the prescribing
14 practitioners licensed to practice medicine in
15 the jurisdictions to which the controlled
16 substances are being shipped, if such a license
17 is required by state law?"
18        Do you ensure or do you require
19 that you get a license -- proof of license of
20 all the pharmacists?
21    A.   Yes, of the pharmacists, yes.
22    Q.   Is that going to be in your file?
23        MR. CLARK:  Objection to
24    form.

Page 73

1    A.   We ask for the license number and
2 stuff like that, and we review them and we go
3 online to make sure they're still active.
4    Q.   Has it come to your attention that
5 some of the pharmacists you supplied were not
6 licensed in the state they represented?
7        MR. CLARK:  Objection to
8    form.
9    A.   Say that one more time.
10    Q.   Have you ever found out that any
11 of the pharmacists were unlicensed?
12        MR. CLARK:  Objection to
13    form.
14    A.   No.
15    Q.   You don't remember any
16 investigations into that?
17    A.   I don't recall, no.
18    Q.   "7.  Are one or more of the
19 practitioners writing a disproportionate share
20 of the prescriptions for controlled substances
21 being filled by the pharmacy?"
22        Is that a question you ask?
23    A.   Yes.
24    Q.   "8.  Does the pharmacy offer to

Page 74

1 sell controlled substances without a
2 prescription?"
3        Do you ask that?
4    A.   No, we do not ask that.
5    Q.   "9.  Does the pharmacy charge
6 reasonable prices for controlled substances?"
7        Do you ask that?
8    A.   No.
9    Q.   "10.  Does the pharmacy accept
10 insurance payment for purchases of controlled
11 substances made via the Internet?"
12        Do you ask that question?
13    A.   Yes.
14        Well, wait.  Does the pharmacy
15 accept insurance payment on purchases of
16 controlled substances made via the Internet?  I
17 don't deal with pharmacies that -- explain --
18 okay.  So does the pharmacy show ... I don't ask
19 that question.
20    Q.   Let me just step back.  Let's just
21 step back and take a breath.
22        If you've set a threshold with a
23 company and you put the time and the effort into
24 setting that threshold and they want to raise

Page 75

1 it -- and I understand there's paperwork that's
2 required -- you're going to do your due
3 diligence, right, before you raise the
4 threshold; fair to say?
5        MR. CLARK:  Objection to
6 form.
7    A.   Yes.
8    Q.   You're going to ask all the
9 questions.  You're going to make sure they fill
10 out that form.  If there's areas you're going to
11 inquire, any of these questions, you're going to
12 do all of that; is that fair to say?
13        MR. CLARK:  Objection to
14 form.
15    A.   All of these questions
16 (indicating)?
17    Q.   Well, you're going to do -- you're
18 going to do -- I mean, it may not be every one
19 of these, but you're going to investigate and
20 ensure, before you raise a threshold, that it's
21 a safe practice to do so, right?
22        MR. CLARK:  Objection to
23 form.
24    A.   Yes.

Page 76

1    Q.   And that takes time, right?
2        MR. CLARK:  Objection to
3 form.
4    A.   Yes.
5    Q.   How much time does it take?
6        MR. CLARK:  Objection to
7 form.
8    A.   That can vary.
9    Q.   What would it vary between?
10        MR. CLARK:  Objection to
11 form.
12    A.   There's just a lot of reasons.
13 Sometimes it could take a day or two.
14    Q.   Okay.  Take longer?
15    A.   Not usually.
16    Q.   In that day or two that you take,
17 are these all the inquiries that you should be
18 making?
19        MR. CLARK:  Objection to
20 form.
21    A.   It wouldn't be inquiries.
22    Q.   What satisfies you before you
23 raise a threshold again?
24        Because here's why I'm asking.

Page 77

1 You told me you put a lot of time and effort
2 into that initial threshold, and you do your
3 research, you do your due diligence, you come up
4 with a number.
5        So if somebody wants to elevate
6 that number after you take those steps, sitting
7 here I'm thinking that's kind of a big deal,
8 because you've done the work on the front end,
9 right?
10        MR. CLARK:  Objection to
11 form.
12    Q.   Correct?
13    A.   I've done some work, yes.  The
14 pharmacy can change, though.  I mean, you know.
15    Q.   Right.
16    A.   I'm very conservative on what I
17 set my thresholds at.  Not everybody is set at
18 the same limit.
19    Q.   If someone wanted to look at you
20 and you raised a threshold -- let's say you
21 raised a threshold and they want to ask you and
22 they want to say, "Hey, why did you do that?"
23 Do you have any supporting documentation?
24        You said -- you gave me a few

Page 78

1 reasons why you may do that. Do you have any
2 supporting documentation that shows why you
3 would have allowed that to happen?
4         MR. CLARK: Objection to
5 form.
6     Q.   Other than the paperwork I think
7 that you said you make them fill out, right?
8         MR. CLARK: Same objection.
9     A.   Uh-huh.
10    Q.   That's a "yes"? You just need to
11 verbalize the answer.
12    A.   Okay. Ask the question again.
13    Q.   The only documentation I recall
14 you saying that you get before you raise a
15 threshold, if I heard you correctly, is you make
16 them, you fax them, or you give them a document
17 for the increase and they need to fill it out,
18 the reason why they need an increase, correct?
19        MR. CLARK: Objection to
20 form.
21    A.   That is a lot of it, yes.
22    Q.   And then if that satisfies you,
23 then you feel comfortable raising it, correct?
24        MR. CLARK: Objection to

Page 79

1 form.
2     A.   Yes.
3     Q.   And then if they want to raise it
4 again in the same month, you're going to require
5 that document to be filled out again, right?
6         MR. CLARK: Objection to
7 form.
8     A.   I've never had anybody ask me for
9 twice in the same month.
10    Q.   Okay. That would be alarming,
11 wouldn't it?
12        MR. CLARK: Objection to
13 form.
14    A.   I -- no.
15    Q.   It would not be alarming?
16    A.   Not alarming.
17    Q.   Concerning?
18        MR. CLARK: Objection to
19 form.
20    A.   I would ask a lot more questions,
21 yes.
22    Q.   How about if they asked you to do
23 it a third time?
24        MR. CLARK: Same objection.

Page 80

1     Q.   Would that be alarming?
2     A.   That would be very unusual.
3     Q.   Yes, sir.
4         THE VIDEOGRAPHER: We're
5 going off the record at 2:03.
6         (Recess taken.)
7         THE VIDEOGRAPHER: We're back
8 on the record at 2:11.
9 BY MR. REINS:
10    Q.   You discussed with us today about
11 the setting of the threshold limits and then the
12 elevating or raising of those limits.
13        Are there any policies and
14 procedures within PSI which provides some
15 guidance or parameters for doing either of those
16 tasks?
17        MR. CLARK: Objection to
18 form.
19    Q.   That you've seen.
20    A.   No.
21    Q.   So not to oversimplify it, it
22 really comes down to your discretion, right?
23        MR. CLARK: Objection to
24 form.

Page 81

1     A.   Yes.
2     Q.   Based on the things you've already
3 talked to us about?
4         MR. CLARK: Same objection.
5     Q.   The criteria you said?
6     A.   And my experience.
7     Q.   Yeah.
8         I'm going to now show you a chart,
9 and this is a summary which we have created from
10 PSI600, which is transactional data that PSI has
11 produced to us. So we're going to look at that
12 real quick.
13        MR. REINS: I have an extra
14 copy for you, but I'm going to have
15 to use it from the last deposition,
16 which I believe it was Number 6.
17 So the witness can have one.
18 BY MR. REINS:
19    Q.   All right. So I tell you where it
20 comes from so that you understand where it comes
21 from, okay? So what we've done is we've
22 isolated some transactions in certain periods of
23 time. And if you zoom in to the top left there
24 column, there's a pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  Are you familiar with this
2  pharmacy?
3  A.  Yes.
4  Q.  And you can see the screen in
5  front of you it may be helpful because this is
6  small.
7  A.  Yes.
8  Q.  Do you know when you started doing
9  work with them?  Is it Kahler Pharmacy?
10  A.  Kahler Pharmacy.
11  Q.  My question is, do you know when
12  you started a relationship with them?
13  A.  I believe it was in the 1980s.
14  Q.  Okay.  So a long time --
15  A.  Maybe earlier.  Correct.
16  Q.  So a pharmacy you're pretty
17  familiar with?
18  A.  Yes, sir.
19  Q.  Okay.  Because sometimes, in
20  fairness to you, and -- you know, you may set a
21  threshold and it's just a new customer and you
22  may not know kind of the traffic or the
23  business, right, that they may have?
24  MR. CLARK:  Objection to

Page 83

1  form.
2  Q.  Is that a yes?  She just needs a
3  verbal answer.
4  A.  Yes.
5  Q.  All right.  So when we look at
6  this one, we look at -- if you branch it out a
7  little bit.  So we've got this particular
8  pharmacy.  If you look at the dates --
9  MR. REINS:  If you could
10  highlight just the March dates
11  there.
12  BY MR. REINS:
13  Q.  All right.  So we've got -- this
14  is, it looks like, March 5th through March 30th.
15  MR. CLARK:  It's up here on
16  the screen.  It's a little bit
17  easier.
18  MR. REINS:  It may be easier.
19  MR. CLARK:  I'm going to put
20  on the record that the hard-copy
21  document is difficult.
22  MR. REINS:  It's super small.
23  I agree with you.  But I have a
24  magnifying glass.  But hopefully

Page 84

1  this -- blowing it up will make it
2  easier for you.
3  But don't answer anything if
4  you can't read it, okay?
5  MR. CLARK:  Just one other
6  clarification.  Blowing it up makes
7  it easier to see different parts,
8  but when blown up, it's difficult
9  to see the document in its
10  entirety.
11  MR. REINS:  I can't argue
12  with that.
13  BY MR. REINS:
14  Q.  All right.  So we've got -- but
15  you can reference, we've got -- obviously, this
16  is for -- the month of March is what I want to
17  focus on.  We want to focus on Kahler Pharmacy.
18  Do you know this Walter or Jim,
19  the order takers?
20  A.  Yes.
21  Q.  Okay.  You've known them, I guess,
22  for a long time?
23  A.  I'm Jim.
24  Q.  Oh, you're the order taker.  Who's

Page 85

1  Walter?
2  A.  He's my -- he helps me in the
3  cage.
4  Q.  Got it.  Okay.  So that means you
5  actually got the order when it says "Jim,"
6  right?
7  A.  Correct.  Yes.
8  Q.  But we know that, based on your
9  position, all of the orders you review, correct?
10  A.  Yes.
11  Q.  And you're the only one that can
12  elevate the thresholds; is that right?
13  A.  Yes.
14  Q.  All right.  So if we go over to
15  the right a little more, this is dealing with
16  oxycodone, and specifically, what is Endocet?
17  A.  Endocet is the -- it's a generic
18  for Percocet.  It's the same as the
19  oxycodone 10/325.  It's just a different brand.
20  Q.  Got it.
21  And then we've got varying
22  strengths over here.  And then if we now go to
23  this side, we've got the size and number of
24  units and some information, and then if we keep

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1 going, we've got the total units sold this month
2 and the max units per month.
3          The max units per month is the
4 threshold, right?
5      A.   Uh-huh.
6      Q.   Yes?
7          MR. CLARK:  You've got to
8      verbalize.
9      Q.   Say it out loud.
10     A.   Yes.
11     Q.   So it looks like at the beginning
12 of the month, which would be March, there was a
13 7,000 threshold, right, of pills?
14         MR. CLARK:  Objection to
15     form.
16     A.   Yes.
17     Q.   All right.  And they ordered
18 6,100, no problem.  But then in --
19         MR. REINS:  And I don't know
20     if we can split-screen it and show
21     the dates so he can see the dates
22     along with it?  Or maybe just that
23     way, yeah.
24

Page 87

1 BY MR. REINS:
2      Q.   So that's on March 5th, and then
3 on March 7th, it looks like we got two orders,
4 which got us to 12,000, correct?
5          MR. CLARK:  Objection to
6      form.
7      A.   That's what it shows, yes.
8      Q.   All right.  And assuming this is
9 accurate, of course.
10         So in response to that order, the
11 threshold was raised from 7,000 to 12,000,
12 correct?
13     A.   Yes.
14     Q.   And you would have obviously had
15 to approve that?
16     A.   Yes.
17     Q.   All right.  And I think you've
18 told us pretty honestly here today there's not
19 going to be documentation to support that, but
20 obviously you felt it was okay.
21         MR. CLARK:  Objection to
22     form.
23     Q.   Or you wouldn't have done it,
24 right?

Page 88

1          MR. CLARK:  Same objection.
2      A.   There was a reason.
3      Q.   There was a reason.  And the
4 reason should be -- there should be the due
5 diligence of all the things you talked to me
6 about, all the questions should have been asked,
7 the form would have been filled out and refilled
8 out regarding the questionnaire, correct?
9          MR. CLARK:  Objection to
10     form.
11     A.   Can I tell you what this was?
12     Q.   Sure.
13     A.   Okay.  I believe -- Brent Kahler
14 passed away, okay, and this was owned by -- a
15 new pharmacist purchased it, okay?  So here was
16 a new customer for whoever -- whatever
17 wholesalers is going to be primary for.  They
18 would not allow him to buy this -- buy controls
19 without establishing a relationship, okay?
20         So at the time, he was not able to
21 buy them from his primary.  He turned to me to
22 get his controlled substances.  It's a very big
23 pharmacy, had been around for years, and they do
24 a lot of scripts a day.

Page 89

1      Q.   You're going to need to just break
2 it down so we can verify that, okay?
3          First of all, you know this to be
4 true?
5          MR. CLARK:  Objection to
6      form.
7      A.   I spoke to the pharmacist.
8      Q.   Okay.  So tell me -- I'm sorry.
9 That was a little fast and I didn't quite get it
10 all.  So why don't we just baby-step what you
11 just said.
12         You said, After I know what this
13 is.  Say it, and I may interrupt you.  What
14 happened?
15         MR. CLARK:  Asked and
16     answered.
17         Go ahead.
18     A.   Okay.
19     Q.   So this -- let's start with the
20 basics, which is this is -- this is -- this
21 pharmacy, is it Kahler Pharmacy?
22     A.   Correct.
23     Q.   Is that a standing building?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    Q.   And where is it located?  Oh,
2  we've got the address.
3    A.   Toledo, Ohio, on Airport Highway.
4    Q.   So this is a standalone pharmacy,
5  correct?
6    A.   Correct.
7    Q.   Which you've been dealing with
8  since the '80s?
9    A.   If not longer, yes.
10   Q.   If not longer.
11   A.   Yes.
12   Q.   Okay.  And you're saying, "Here's
13  what happened," and then I just got lost.  So a
14  little slower, if you don't mind.
15       MR. CLARK:  Objection.  Asked
16    and answered.
17   Q.   I'm just trying to understand what
18  happened.  I didn't understand what you were
19  saying.
20       MR. CLARK:  We could have the
21    court reporter read it back.
22   Q.   Well, I mean, did someone buy the
23  pharmacy, you said?
24       MR. CLARK:  Objection to

Page 91

1    form.  Go ahead.
2    A.   Yes.
3    Q.   Okay.  Someone bought the -- the
4  guy you've been dealing with's pharmacy since
5  the '80s, someone bought it in 2013?
6    A.   A pharmacist that was working
7  there, correct.
8    Q.   Bought it?
9    A.   Yeah.  I don't know when he bought
10  it.  It was in 2013, because this is 2012.
11   Q.   Okay.  I'm sorry.  2012.  So in
12  2012, there was a pharmacist that you dealt with
13  since the '80s before that?
14       MR. CLARK:  Objection to
15    form.
16    A.   There was a pharmacist that owned
17  that pharmacy, yes.
18   Q.   Okay.  And what was his name or
19  her name?
20    A.   Brent Kahler.
21   Q.   Brent.  Can you spell the last
22  name?  Kahler is going to be --
23    A.   Same as the pharmacy.
24   Q.   Okay.  Brent Kahler owned it until

Page 92

1  2012?
2    A.   Well, he passed away, so you know.
3    Q.   When did he pass away?
4    A.   I can't exactly remember.
5    Q.   Before this or at this time?
6       MR. CLARK:  Objection to
7    form.
8    A.   I can't remember that.  I don't
9  know that answer.
10   Q.   Okay.  So the gentleman -- the
11  pharmacist that owned it passed way, and you
12  don't know if that was in 2000 or 2010 or 2011?
13   A.   I can't recall what year.
14   Q.   Okay.  All right.  So he passed
15  away at some point in the last decade?
16       MR. CLARK:  Objection to
17    form.
18   A.   Yes.
19   Q.   Okay.  And then there was a new
20  owner of the pharmacy?
21   A.   Correct.
22   Q.   What is the name of the new owner?
23   A.   Nick.  I'm not sure of the last
24  name.

Page 93

1    Q.   All right.  So Nick -- whatever
2  last name -- buys the pharmacy, right?  Yes?
3    A.   Correct.
4    Q.   Okay.  And you had established
5  these thresholds for Brent, right?
6       MR. CLARK:  Objection to
7    form.
8    Q.   When he owned it.
9    A.   I would assume he was part of it.
10   Q.   Well, I mean, you had -- there was
11  a threshold here at the beginning of the month
12  of 7,000.  You had established that, correct?
13   A.   Yes.
14   Q.   And you're saying, "Brent died so
15  we had a whole new business on our hands."
16       Is that what you're saying?
17       MR. CLARK:  Objection to
18    form.
19   A.   No.
20   Q.   Okay.
21   A.   No.  No.  Brent died, okay?  And
22  the pharmacist that has worked there for a while
23  bought the pharmacy, okay?
24   Q.   Okay.

Page 94

1    A.   He -- he switched his primary
2 wholesaler to somebody else.  They had no
3 history with him, sales history.
4    Q.   I'm going to stop you because I
5 don't want -- if you don't mind, I'm just going
6 to stop so I can digest it.
7    A.   Okay.
8    Q.   So Nick, the new owner, along with
9 some other pharmacists, bought the place?
10    A.   Nick bought the place.
11    Q.   Nick bought the place?
12    A.   I --
13        MR. CLARK:  Let him ask the
14    question.
15    Q.   All right.  And they -- and they
16 had -- and you said the primary wholesaler --
17 which they wanted to deal with?
18    A.   They switched primary wholesalers.
19    Q.   Okay.  And what happened?
20        MR. CLARK:  Objection to
21    form.
22    A.   So the new pharmacist -- you know,
23 the new primary wholesaler had no sales history
24 with that pharmacy or very little sales history.

Page 95

1    Q.   Okay.
2    A.   So they will not sell until they
3 get an establishment with that pharmacy over a
4 certain amount of controlled substances.
5    Q.   Okay.  So you filled it?
6        MR. CLARK:  Objection to
7    form.
8    A.   I was the one that filled,
9 correct, at that time.
10    Q.   Do you know Nick?
11    A.   Yes, I've met Nick.  I've been to
12 this pharmacy numerous times.
13    Q.   Okay.  But before you -- before
14 this month of March, had you met Nick; do you
15 know?
16        MR. CLARK:  Objection to
17    form.
18    A.   Yes.  I actually went to the
19 pharmacy and talked to Nick.
20    Q.   Okay.
21    A.   Okay, about this.
22    Q.   And when did that happen; do you
23 know?
24    A.   It would have been in March,

Page 96

1 during this time.
2    Q.   Okay.  So you went and spoke to
3 Nick.  Is that -- did you know Nick before that,
4 or is that the first time you met him?
5    A.   I've met him before, yes.
6    Q.   Okay.  Do you remember his last
7 name?
8    A.   I think it's Tabb, T-a-b-b.
9    Q.   All right.  So the reason you go
10 meet him is why?
11        MR. CLARK:  Objection.  Form.
12    A.   I went to see him to ask him about
13 the increases in his purchases, okay, and him
14 wanting more.  That's why I went personally to
15 the pharmacy, to talk to him and get an
16 explanation --
17    Q.   Okay.
18    A.   -- for this reasoning.
19    Q.   Okay.  So the prior owner, Brent,
20 was he dealing with a wholesaler?
21    A.   Yes.  I was a secondary for them.
22    Q.   Okay.
23    A.   Okay.
24    Q.   Do you know -- did you do your due

Page 97

1 diligence and find out how much Brent was
2 getting from the wholesaler versus what he was
3 getting from you?
4        MR. CLARK:  Objection to
5    form.
6    A.   I asked Nick what his purchases
7 were before, okay?
8    Q.   Did you see any documentation to
9 support that?
10    A.   It was patient information.  I
11 couldn't see it.
12    Q.   You could see the ordering sheets,
13 though, right, with the names redacted?
14        MR. CLARK:  Objection to
15    form.
16    A.   What do you mean, "ordering sheets
17 with names" --
18    Q.   Well, I mean, you're saying
19 there's no way for you to verify that
20 information, what their prior orders were,
21 without seeing patients' names?
22        MR. CLARK:  Objection to
23    form.
24    Q.   You couldn't look at documents

Page 98

1 like this?
2 MR. CLARK: Objection to
3 form.
4 A. I couldn't fulfill them because I
5 didn't have, you know, that history from them
6 either, okay? I went on where they're located,
7 okay, how many scripts they do a day, you know,
8 how big they are.
9 I've been dealing with them for
10 years. There's no new pharmacies in the area.
11 They were in a neighborhood.
12 Q. The variable for you that you were
13 sufficient with is this guy says to you, "The
14 wholesaler won't deal with us because we're so
15 new, we don't have a relationship. Will you
16 provide all of our narcotics?"
17 Is that right?
18 MR. CLARK: Objection to
19 form.
20 A. He wanted me to -- he wanted me,
21 yes, to provide, you know, certain narcotics for
22 him, that's correct.
23 Q. Other than what he told you, did
24 you see any documentation or --

Page 99

1 A. I can't --
2 MR. CLARK: Wait for his
3 question.
4 Q. -- is there anything else you did
5 other than meet with him?
6 MR. CLARK: Objection to
7 form.
8 Go ahead.
9 A. I can't recall.
10 Q. Any other proof of any sort that
11 you can recall seeing other than meeting him at
12 the store and him saying he needs you to supply
13 him?
14 MR. CLARK: Objection to
15 form.
16 A. I can't remember.
17 Q. Did you call the wholesale
18 retailer and verify that they wouldn't deal with
19 him?
20 MR. CLARK: Objection to
21 form.
22 A. No, but I've heard that before.
23 Q. So based on that conversation with
24 Nick, you went from a 7,000 threshold to a

Page 100

1 31,000 threshold; is that right?
2 MR. CLARK: Objection to
3 form.
4 A. That was the conversation, yeah.
5 It was helpful.
6 Q. That's not my question. My
7 question is, you went from a 7,000 threshold to
8 a 33,000 threshold.
9 MR. CLARK: Objection to
10 form.
11 Q. Right?
12 A. That's what I --
13 MR. CLARK: I think he's
14 highlighting here. Just use that
15 in the document.
16 A. Yeah, yeah, that's correct.
17 Q. Almost five times the amount of
18 your initial threshold, right?
19 A. Correct.
20 Q. And that threshold was raised from
21 7 to 12 to 18 to 22 to 25 to 26 to 29 to 33?
22 A. Uh-huh.
23 MR. CLARK: You've got to
24 answer.

Page 101

1 Q. Is that a yes?
2 A. Yes.
3 Q. Is that unusual?
4 MR. CLARK: Objection to
5 form.
6 A. Not when I did my due diligence.
7 Q. Tell me about your due diligence.
8 Other than meeting with Nick and having a
9 conversation with him, tell me what else you
10 did.
11 A. Well, I have a longstanding
12 relationship with that pharmacy. It's a very
13 big pharmacy. They do a lot of scripts.
14 Q. No doubt.
15 A. They've been around for years,
16 have a good reputation.
17 Q. But you didn't know Nick.
18 MR. CLARK: Objection to
19 form. Misstates his testimony.
20 Q. Did you know Nick before that?
21 A. I've met Nick before that, yes.
22 Q. You didn't know him, though, did
23 you?
24 MR. CLARK: Objection to

Page 102

1  form.
2      A.   I've spoken to him on the phone
3  too.
4      Q.   Anything else, sir, you can point
5  to, to your quote/unquote "due diligence," other
6  than speaking with Nick?
7          MR. CLARK:  Objection to
8      form.
9      A.   Not that I can recall.
10     Q.   That's a hell of an increase,
11 isn't it?
12         MR. CLARK:  Objection to
13     form.  Objection; argumentative.
14     Q.   That is one heck of an increase,
15 isn't it, sir?
16         MR. CLARK:  Same objection.
17     A.   That's an increase, yes.
18     Q.   All right.  And, again, in the
19 family of PSI, you can do this on your own
20 without any procedures and any oversight of
21 anybody else being involved, right?
22         MR. CLARK:  Objection to
23     form.
24     A.   I do discuss these with my father,

Page 103

1  Tom.
2      Q.   Do you remember discussing it with
3  him?
4          MR. CLARK:  Objection to
5      form.
6      A.   I cannot recall that, no.
7      Q.   You and I can agree on one thing:
8  That's a heck of a lot of Oxy for that
9  community, right?
10         MR. CLARK:  Objection to
11     form.
12     Q.   I'll rephrase.
13         So if I wanted any documentation
14 to support this decision-making by you, there
15 wouldn't be any, right?
16         MR. CLARK:  Objection to
17     form.
18     A.   I -- I just can't recall.
19     Q.   Okay.
20     A.   I know I went to the store to talk
21 to him, spoke to him on the phone a few times.
22     Q.   All right.  Moving along.  Let's
23 go back to the policy dealing with inventory
24 controls.

Page 104

1          Well, before we do that, you
2  understand we talked in the very beginning of
3  this deposition about you don't want to ship a
4  suspicious order.
5          Are you aware -- is there any
6  policy or procedure regarding when an order
7  should not be shipped?  Is there a policy on
8  that?
9      A.   Yes.
10     Q.   There is?  What is it called?
11         MR. CLARK:  Objection to
12     form.
13     A.   It's -- I don't know what it's
14 called, you know.
15     Q.   Let me --
16         MR. CLARK:  Were you done
17     answering?
18         MR. REINS:  I think he was
19     done.
20         THE WITNESS:  Yes.
21 BY MR. REINS
22     Q.   Let's look at this one, and this
23 may be what you're talking about.  Again, I'm
24 not here to trick you or anything.

Page 105

1          The inventory control one, let's
2  go to -- this is going to be PSI86 on that
3  document, on the bottom there.  It says, "IT
4  manager shall be responsible for running
5  suspicious order monitoring reports."
6          We've covered that, right?
7          "Automatically sending all reports
8  to DEA and governing state agencies as required.
9  He or she shall share the information with the
10 DR/DR supervisor each month."
11         That was Candace and your dad,
12 right?
13     A.   Correct.
14     Q.   "IT manager shall stay current of
15 changing regulations and requirements for
16 reporting and system adjustments to meet these
17 requirements.  Our suspicious ordering system
18 prevents Prescription Supply, Inc. from shipping
19 a suspicious order or an excessive order if a
20 customer exceeds a present limit in eight
21 specific families of drugs."
22         So is that telling us that back in
23 2000, when this policy was created, that if
24 somebody ordered or sought to order an exceed of

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1 their threshold, that the order would be stopped
2 from shipping?
3          MR. CLARK:  Objection to
4     form.
5     Q.   Let me rephrase it.
6          What does that mean, "Our
7 suspicious ordering system prevents Prescription
8 Supply, Inc. from shipping a suspicious order or
9 an excessive order if a customer exceeds a
10 present limit in eight specific families of
11 drugs."
12          What do you understand that to
13 mean?
14     A.   Okay.  So that would not have been
15 2000.
16     Q.   Yeah.
17     A.   There would have been a revision
18 on this.
19     Q.   Nope.  If you look on the front
20 page there -- I can't make this stuff up -- June
21 of 2000 is the effective date.
22     A.   But there were revision dates too.
23     Q.   Oh, do you believe this was not
24 the policy back when it was started?

Page 107

1     A.   That, I don't know.  But there
2 were revisions to this.
3     Q.   I'm not arguing with you, and
4 that's a fair point.
5          Is it your testimony you
6 believe -- you just said it wasn't this way in
7 2000.  You believe that policy was enacted in
8 2008?
9     A.   Okay.
10          MR. CLARK:  Objection to
11     form.
12     A.   Well, the eight families would
13 have been in 2008.
14     Q.   Got it.  That's helpful.
15          So that addition or that revision
16 would have been added to this policy, to the
17 best of your knowledge and belief, in 2008,
18 then?
19     A.   From what I see.
20     Q.   All right.  Then that makes it a
21 little bit easier, the transitional question,
22 because that's when you established your
23 threshold system, correct?
24     A.   Correct.

Page 108

1     Q.   Which did the automatic stop when
2 someone tried to order more than their
3 threshold, right?
4     A.   Correct.
5     Q.   However, that's where you come
6 back in.  If they try to order more than the
7 threshold, you have the ability -- you alone is
8 my understanding -- to raise that threshold like
9 you did for that pharmacy, right?
10          MR. CLARK:  Objection to
11     form.
12     A.   For Kahler, yes.
13     Q.   Yeah.
14     A.   That is my responsibility.
15     Q.   So here's what I want to know, if
16 you know.  My understanding is there's a log, a
17 log created when someone tries to order more
18 than their threshold.
19          Do you understand that?
20          MR. CLARK:  Objection to
21     form.
22     A.   There is a log, yes.
23     Q.   And then do you get -- after 2008,
24 would you get something pop up on your screen or

Page 109

1 an e-mail letting you know someone tried to do
2 that?
3          MR. CLARK:  Objection to
4     form.
5     A.   What do you mean?
6     Q.   I'm just wondering if you're
7 notified somehow, like a notification pops up,
8 "Hey, Kahler wants another 10,000 pills"?  Like
9 do you get a pop-up or something?
10     A.   Yeah.
11          MR. CLARK:  Objection to
12     form.
13     A.   Yeah.  It's on an ordering screen.
14     Q.   Okay.
15     A.   Like every C-II is stopped, okay?
16 So on our ordering screen, if somebody is trying
17 to order more than what I have established with
18 this threshold, okay, it will -- let's say they
19 tried to order five bottles, okay?  The
20 threshold is 4,900, okay, and they tried to
21 order five bottles of 100 count.  They're only
22 allowed to order one, okay, because that would
23 meet the threshold.  Underneath that would be an
24 "M," which would identify that as a threshold

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 was met. So, yes, I do see that.
2      Q.   And then is your process then the
3 same in order to decide whether you're going to
4 let that go through or not?
5          MR. CLARK:  Objection to
6 form.
7      Q.   We talked about raising thresholds
8 and what your criteria is.  I'm not here to make
9 you say it for a third time.
10         Would your process when that hits
11 your screen be the same as what you've described
12 to me before, on whether you don't ship it, on
13 whether you report it, or on whether you fulfill
14 or allow it to go through?
15         MR. CLARK:  Objection to
16 form.
17      A.   What I do is I'll look in the
18 sales history.  I'll do my due diligence on the
19 customer.  Okay.  I'll look at sales history,
20 see if he purchases that particular product,
21 okay.
22         There's different forms of
23 oxycodone with different -- you know, there's
24 some with acetaminophen, some with ibuprofen, a

Page 111

1 bunch of different forms, okay?  So I look at
2 sales history, find out what he's been buying,
3 okay?  And, you know, that's -- I call him and
4 do my due diligence.
5      Q.   Due diligence is kind of that word
6 that's kind of a loaded word.  So other than
7 calling and looking at sales history, is there
8 anything else you do?
9          MR. CLARK:  Objection to
10 form.
11      A.   Well, I do the paperwork, okay.
12      Q.   What does that mean?
13      A.   The increased, you know, sales,
14 you know, request.
15      Q.   You send them the form which they
16 complete, identifying why they want an increase?
17      A.   That's -- yes, part of it, yes.
18      Q.   Part of it?
19      A.   Yeah.
20      Q.   The other part of it is you talk
21 to them or -- do you talk to everybody in that
22 situation or do you talk to --
23      A.   Yes, I do.
24      Q.   Okay.

Page 112

1          MR. CLARK:  Let him finish
2 his question.  Let me get my
3 objection.  Objection to form.
4          Go ahead.
5      Q.   So you give him a call.  You get
6 them to complete the form, why they want an
7 increase.  You look at their sales history.
8          Anything else that qualifies as
9 your due diligence, so to speak?
10         MR. CLARK:  Objection to
11 form.
12      A.   Yes.  I also would go back and
13 look at their questionnaire.
14      Q.   The initial questionnaire?
15      A.   Correct.
16      Q.   Right, because you initially set a
17 threshold, right, so you want to see what they
18 put initially, right?
19      A.   I want to see what they put on
20 that form that says how many they dispense per
21 month.
22      Q.   Anything else you do other than
23 that?
24         MR. CLARK:  Objection to

Page 113

1 form.
2      A.   I -- there's just all kinds of
3 stuff that -- I don't know.  There is.
4      Q.   They're what?
5      A.   There is stuff I do, yes.
6      Q.   Tell me.  This is my one chance.
7      A.   Okay.  So like I said, I look at
8 the questionnaire.  If it says they dispense
9 12,000 a month, okay, that doesn't mean I set
10 the threshold at 12,000.  I could set the
11 threshold at 4,000.  Just because they dispense
12 that much a month doesn't mean they're going to
13 purchase all that from me, okay?  I also look to
14 see the percentage of non-controls to controlled
15 substances they're buying.
16      Q.   That's on the questionnaire?
17      A.   Yes.  And I look it up in sales
18 history too.  There's a graph that I can look
19 at, okay, that tells me -- like a piechart that
20 tell me what the percentages of non-controls and
21 controls is.
22         Plus I can go back and look at
23 every order individually for that customer, go
24 back two, three months, and I can look at every

Page 114

1  single order they've ordered, comparing
2  non-controlled to controls --
3      Q.   Got it.
4      A.   -- what their pattern is, what
5  type of medications they buy, okay.  There's a
6  really lot involved.
7      Q.   It sounds like it.
8          And then are there times where you
9  have not increased the threshold?
10     A.   Yes.
11     Q.   If I wanted to verify that, no
12 offense, how would I verify that?
13         MR. CLARK:  Objection to
14     form.
15     Q.   I think I know.  The log
16 information which shows that they attempted and
17 then the sales history to see that you shut it
18 down, right?
19         MR. CLARK:  Objection to
20     form.
21     A.   As far as I know, that's the way
22 to tell, yes.
23     Q.   In fairness, though, that's the
24 only way I think I could be able to tell, right?

Page 115

1          MR. CLARK:  Same objection.
2      A.   Yes.
3      Q.   Yeah?
4      A.   Yeah.
5      Q.   All right.  Sitting here today,
6  can you testify under oath that you recall how
7  many times you refused to raise a threshold
8  since 2008?
9          MR. CLARK:  Objection to
10     form.
11     Q.   If you know.
12     A.   I have no idea.
13     Q.   Got it.
14         Can you tell me -- now, let's say
15 you do that analysis, okay, and then you go --
16 well, let's just say this:  You do that
17 analysis.  When if ever -- because after 2013
18 you all stopped sending those forms monthly.
19         So when, if ever, after 2013, when
20 those forms stopped, would you report a
21 quote/unquote "suspicious order"?  Since then,
22 how many times?
23         MR. CLARK:  Objection to
24     form.

Page 116

1      A.   Zero.
2      Q.   Zero.  All right.
3          Now, when we were talking about
4  policies, we looked at that part -- and I
5  appreciate that.  That was on PSI86.  You said,
6  "Look, this is something that we revised."
7          Is this what you meant by the
8  policy on dealing with shipments when I asked
9  you about that earlier, that revision in there?
10         MR. CLARK:  Objection to
11     form.
12     A.   For the families?
13     Q.   Yes, sir.  You said there is a
14 policy on stopping shipments and we went through
15 that paragraph, if you remember, this one right
16 here (indicating).
17         Is that what you recall the policy
18 being?
19     A.   That would be part of it.
20     Q.   Moving back for one moment.  Since
21 2013, I know you said you can't remember the
22 number, but when somebody gives you their
23 explanations and you decided -- you said, "You
24 know what?  I'm not going to increase your

Page 117

1  threshold."
2          Have you done that at all?
3      A.   I'm sure I have, yes.
4      Q.   Do you recall ever doing that?  I
5  don't want you to guess, but can you testify
6  here today under oath that you have a
7  recollection of doing that?
8          MR. CLARK:  Objection to
9     form.
10     A.   I -- I don't -- I really don't
11 know.
12     Q.   Okay.  That's okay.
13         Hypothetically, if you did refuse
14 to raise the threshold because you weren't
15 satisfied, can you and I agree that would be, by
16 definition, a suspicious order?
17         MR. CLARK:  Objection to
18     form.  Objection; calls for
19     speculation.
20     A.   Okay.  So there are reasons that I
21 would not, okay, increase somebody, okay?
22     Q.   Okay.
23     A.   And my thresholds are set very
24 conservatively, all right?  I might not have a

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 good enough establishment with that customer,
2 okay, where I'm just not comfortable. Until I'm
3 comfortable with that customer, I will not
4 change a threshold, all right?
5          And that would deal with sales
6 history, the percentage of non-controls to
7 controls they buy, what particular controls
8 they're buying, what particular item they're
9 buying, and what particular item they want,
10 okay?
11          A suspicious order would not have
12 to hit a threshold to be suspicious to me, you
13 know.
14      Q.   You said you have to be
15 comfortable?
16      A.   Yes.
17      Q.   You were comfortable with Nick
18 when you went from 7,000 to 31,000 in less than
19 three weeks?
20      A.   Yes.
21          MR. CLARK:  Objection to
22 form.
23      Q.   All right.
24      A.   At least comfortable with that

Page 119

1 pharmacy, yes.
2      Q.   Sure. All right. We're going to
3 talk about another DEA letter.
4          All right. And this is after the
5 other one. This is going to be PSI
6 30(b)-301-001. This is dated December 27th,
7 2007. Again, this letter was sent to all the
8 distributors.
9          It says, "This letter is being
10 sent to every entity in the United States
11 registered with the Drug Enforcement
12 Administration, DEA, to manufacture or
13 distribute controlled substances.
14          "The purpose of this letter is to
15 reiterate the responsibilities of the controlled
16 substance manufacturers and distributors to
17 inform DEA of suspicious orders in accordance
18 with 21 C.F.R. 1301.74(b).
19          "In addition to and not in lieu of
20 the general requirement of 21 USC 23 that
21 managers and distributors maintain effective
22 controls against diversion, DEA regulations
23 require all manufacturers and distributors to
24 report suspicious orders of controlled

Page 120

1 substances.
2          "The regulation also requires that
3 the registrant inform the local DEA division
4 office of suspicious orders when discovered by
5 the registrant."
6          Is that what you understand the
7 rules to include?
8          MR. CLARK:  Objection to
9 form.
10      Q.   That when you get a suspicious
11 order, you should let them know when you receive
12 it, correct?
13          MR. CLARK:  Objection to
14 form.
15      A.   I've heard different things with
16 that from DEA.
17      Q.   You have?
18      A.   Yes.
19      Q.   What else have you heard?
20      A.   I went to a wholesaler -- DEA
21 wholesaler meeting -- I believe it was in
22 Indianapolis -- where the DEA has
23 representatives there and they talk to the
24 wholesalers and keep us updated on the laws and

Page 121

1 regulations.
2          One of the attorneys that works
3 for DEA had said that do our due diligence first
4 and then, you know, make that judgment. So she
5 was an attorney that worked for DEA.
6      Q.   "Make that judgment," meaning
7 what?
8      A.   On if it's a suspicious order or
9 not.
10      Q.   Okay. And if you think it's a
11 suspicious order, you should report it
12 immediately, correct?
13      A.   Yes.
14          MR. CLARK:  Objection to
15 form.
16      Q.   Okay. All right.
17          "Filing a monthly report of
18 completed transactions ergo excessive purchase
19 report or high unit purchases does not meet the
20 regulatory requirement to report suspicious
21 orders."
22          Sitting here today, you're aware
23 that the reporting you guys did from 2000 -- I'm
24 sorry -- from 1997 to 2013, that that monthly

Page 122

1  report that Kirk did, that was after those had
2  all been shipped; you're aware of that, right?
3          MR. CLARK:  Objection to
4      form.
5      A.   Yes, on the report, correct.
6      Q.   "Registrants are reminded that
7  their responsibility does not end merely with
8  the filing of a suspicious order report.
9  Registrants must conduct an independent analysis
10 of suspicious orders prior to completing a sale
11 to determine whether the controlled substances
12 are likely to be diverted from legitimate
13 channels."
14         Sitting here today, do you know if
15 you ever stopped a shipment because you thought
16 it was suspicious?
17         MR. CLARK:  Objection to
18     form.
19     A.   So -- I've never shipped a
20 suspicious order.
21     Q.   I asked you a little bit
22 differently, which is, have you ever stopped a
23 shipment that you thought was suspicious?
24         MR. CLARK:  Objection to

Page 123

1      form.
2      A.   Have I ever stopped a shipment
3  that I thought was suspicious?
4      Q.   Yeah.
5      A.   No.
6      Q.   Okay.  All right.  I'll take that
7  back from you.
8          I've got a document here, and I'm
9  sorry, I don't have extra copies.  I just don't
10 know what it is.  We'll make it Plaintiffs'
11 Exhibit Number 1, I guess.  I haven't been
12 marking a bunch because we've used the same
13 documents.
14         So I'll show it to your attorney
15 first, if you don't mind, and then I'm just
16 going to have you identify what that is.
17     A.   It's a DEA inspection.
18     Q.   Okay.  And you're signing off that
19 you're aware that there's an inspection, I
20 guess, in the building?  Strike that.
21         What is the purpose of this form,
22 if you know?
23         MR. CLARK:  Objection to
24     form.

Page 124

1      Q.   Just that you acknowledge that
2  they're there?
3          MR. CLARK:  Same objection.
4      A.   They always give me this form and
5  I always sign it, okay, when they come in, all
6  right.
7      Q.   Okay.
8      A.   You know, I have no reason not to
9  sign it.  They're there for an inspection.  I'm
10 fine with that.
11     Q.   Okay.
12     A.   I'm not sure why they give you
13 this paper.  I'm not with DEA.
14     Q.   Fair enough.  Can I see it back if
15 you don't mind.  We'll just mark that.
16         - - -
17     (PSI - J. Schoen Exhibit 1 marked.)
18         - - -
19     Q.   Do you remember a Thomas Ohliger,
20 I guess, a pharmacist?
21     A.   Ohliger Pharmacy, yes.
22     Q.   Yeah.  Do you remember the
23 situation with him?
24         MR. CLARK:  Objection to

Page 125

1      form.
2      A.   Yes.
3      Q.   Tell me what you recall.
4      A.   He was a customer of ours, okay.
5  I believe the State -- State Board of Pharmacy
6  came into his pharmacy and there was an
7  argument.  I guess he hit the guy.  That's what
8  I've heard.
9      Q.   Okay.  Do you remember the issue
10 was a laptop, stealing a laptop?
11         MR. CLARK:  Objection to
12     form.
13     A.   I don't really know.
14     Q.   Was that someone that you were
15 familiar with?  I know you had personal
16 relationships.  Was he someone you had a
17 personal relationship with?
18     A.   I've probably spoken to him on the
19 phone.
20     Q.   Okay.  Now, you were investigated
21 by the Ohio Pharmacy Board.  Do you remember
22 that in 2017?
23         MR. CLARK:  Objection to
24     form.

Page 126

1    A.    It was an inspection.
2    Q.    Inspection?
3    A.    Yes.
4    Q.    And --
5    A.    Yes, I do remember that.
6    Q.    And there was an inspection and
7  then you guys had to fill out a written
8  response.
9          Do you recall that?
10   A.    Yes.
11   Q.    Okay.  You can't give these back.
12         (Discussion held off the record.)
13   Q.    All right.  So we're looking at
14  this document.  Were you involved in the
15  completion of this?
16   A.    Yes.
17   Q.    Okay.  Tell me what you -- before
18  we talk about the nuts and bolts of it, tell me
19  what you recall about this.
20         MR. CLARK:  Objection; form.
21   A.    Okay.  So the State Board of
22  Pharmacy came to do an inspection, okay?
23   Q.    Yes.
24   A.    They completed their inspection.

Page 127

1  They left.  I believe a couple months later they
2  wanted to ask some additional questions.  I
3  believe they e-mailed this to us to ask us some
4  additional questions on some customers we had.
5    Q.    Okay.
6    A.    So we completed this and sent it
7  back to them.
8    Q.    All right.  Do you remember the --
9  do you remember the gist of the allegations?
10         MR. CLARK:  Objection to
11  form.
12   Q.    Let's go through it.  If you don't
13  mind, we'll look at the -- I believe it's -- so
14  this is PSI Number 9, which is the third page of
15  the document?
16   A.    Okay.  I don't believe they were
17  allegations.  What I believe is they just wanted
18  to make sure I was doing my due diligence with
19  my customers.
20   Q.    Gotcha.
21         So it says, "The facility has a
22  system in place to identify and report
23  suspicious orders for drugs to the Ohio State
24  Board of Pharmacy.  Written response required."

Page 128

1          It says, "Observation 1:  An
2  inspection was performed by agents with the Ohio
3  State Board of Pharmacy on May 22nd, 2017.
4  During that inspection, agents asked a
5  Prescription Supply representative for their
6  policies and procedures on reporting suspicious
7  orders to the Ohio State Board of Pharmacy.
8          "Prescription Supply provided the
9  agents the following suspicious order monitoring
10  statement and retail pharmacy questionnaire
11  2016.  However, Prescription Supply has not
12  reported a suspicious drug order to the Ohio
13  State Board of Pharmacy during at least the
14  years of 2014, '15, '16, and '17."
15         Corresponds with your memory,
16  right?
17   A.    Yes.
18   Q.    "Therefore, it appears that
19  Prescription Supply does not have a suspicious
20  order reporting process compliant with
21  Rule 4729-9-16(H)(1)(e)(i), which states in
22  part:  Wholesale drug distributors shall
23  establish and maintain inventories and records
24  of all transactions regarding the receipt and

Page 129

1  distribution or other disposition of dangerous
2  drugs.  These records shall include but shall
3  not be limited to the following information:  A
4  system shall be designed and operated to
5  disclose orders for controlled substances and
6  other dangerous drugs subject to abuse.
7  Wholesalers shall inform the State Board of
8  Pharmacy of suspicious orders for drugs when
9  discovered.  Suspicious orders are those which
10  in relation to the wholesaler's records as a
11  whole are of unusual size, unusual frequency, or
12  deviate substantially from established buying
13  patterns."
14         Let me ask you.  If you report one
15  of your customers for attempting a suspicious
16  order, do you think they'll like that?
17         MR. CLARK:  Objection to
18  form.
19   A.    If they're attempting a suspicious
20  order?
21   Q.    Yeah.  Do you think they'll
22  appreciate if you report them, one of your
23  customers?
24         MR. CLARK:  Objection to

Page 130

1    form.
2        A.   It doesn't really matter to me if
3    they're happy with it or not.
4        Q.   Got it.  It could affect your
5    business, though, right?
6            MR. CLARK:  Objection to
7        form.
8        A.   If it's a bad customer, somebody
9    is doing somebody wrong, I don't want them as a
10   customer.
11       Q.   But you haven't lost any business
12   for reporting a suspicious order because you've
13   never reported any, right?
14           MR. CLARK:  Objection to
15       form.
16       A.   I haven't reported any suspicious
17   orders.
18       Q.   So you haven't lost business over
19   that reporting.
20           MR. CLARK:  Were you done
21       answering?
22           THE WITNESS:  Yes.
23       Q.   So you've never lost a customer
24   because you reported them, obviously?

Page 131

1            MR. CLARK:  Objection to
2        form.
3        A.   I've never had anybody with a
4    suspicious order, though.
5        Q.   Right.  No, I'm with you.  In your
6    whole career?
7            MR. CLARK:  Objection to
8        form.
9        A.   I wouldn't say in my whole career,
10   no.
11       Q.   Have you ever?
12       A.   Yes.
13       Q.   When?
14       A.   A long time ago.
15       Q.   How many years ago?
16           MR. CLARK:  Objection to
17       form.
18       A.   I'm not sure.
19       Q.   Like in the '70s or '80s?
20           MR. CLARK:  Objection to
21       form.
22       A.   No.
23       Q.   2000s?
24       A.   Good possibility, yes.

Page 132

1        Q.   Do you remember, did you talk --
2    did you report that one?
3        A.   I would assume, yes.  It was on
4    Tussionex.
5        Q.   Do you remember reporting it?
6        A.   Yes.  Yeah, it was on Tussionex,
7    yeah.
8        Q.   It was on Tussionex?
9        A.   Yes.  I may have just called.  I'm
10   not sure, though.  But it was an issue with
11   Tussionex.
12       Q.   Is that the only one you ever
13   remember reporting?
14           MR. CLARK:  Objection to
15       form.
16       A.   That I can recall.
17       Q.   Okay.  And you've been doing this
18   for how many years?
19       A.   Right around 20.
20       Q.   Twenty.
21           What is Tussionex?
22       A.   It's a -- I believe it's used for
23   colds.  It has hydrocodone in it.
24       Q.   Gotcha.

Page 133

1        A.   It was a Class III at the time.
2        Q.   What was it about that one time
3    that set you off?
4            MR. CLARK:  Objection to
5        form.
6        A.   Somebody was ordering it that, as
7    far as I can recall, was ordering more than I
8    usually see from anyone else.
9        Q.   Okay.  Do you know who that
10   pharmacy was?
11       A.   No idea.  I can't recall.
12       Q.   You don't remember how long ago,
13   but it was some time ago?
14       A.   Correct.
15       Q.   On the second page, at the top, it
16   says, "A subsequent review of wholesale data
17   reported to the Ohio State Board of Pharmacy for
18   drugs containing oxycodone 10 milligrams and
19   oxycodone 30 milligrams indicated many sales
20   appeared to be of unusual size, unusual
21   frequency, or that deviate substantially from
22   established buying patterns, but were not
23   reported to the Board of Pharmacy as suspicious
24   orders.  Specifically, we observed spikes in

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  sales for specific months and sales that seemed
2  to steadily increase or spike and then abruptly
3  stop."
4        Do you know that Kahler is one of
5  the pharmacies they looked at?
6    A.  Yes.
7        MR. CLARK:  Objection to
8  form.
9    Q.  Was that with Nick still or no, or
10  a different owner?
11   A.  I believe that was Nick.
12   Q.  Nick.
13       If you go to PSI65, which is more
14  than halfway through, on the bottom right-hand
15  side.  Take your time.
16   A.  Is it this page (indicating)?
17       MR. CLARK:  65.
18   A.  Okay.
19   Q.  This is a form called "Increased
20  Purchase Request for Controlled Substances."
21  Earlier you testified that when someone wants to
22  increase beyond the threshold, you would require
23  this form to be filled out.
24       Is this the form you were speaking

Page 135

1  of?
2    A.  Yes, sir.
3    Q.  Okay.  So let me ask you, like, if
4  they don't actually fill out answers, is that
5  concerning to you?  Like this person didn't
6  answer 1 through 3.  Is that concerning?
7        1 is "Has the pharmacy
8  prescription count increased?"  2, "Did the
9  pharmacy change its business activities?"  3,
10  "Has there been an increase in prescribers?  Yes
11  or no."  And they just left it blank.
12       Should that concern you before you
13  approve a threshold increase?
14       MR. CLARK:  Objection to
15  form.
16   A.  Not when the reason they gave me
17  for the increase was that their primary was out
18  of stock.
19   Q.  Okay.
20   A.  So there were no changes, so --
21   Q.  So how do you verify if Cardinal
22  was actually out of stock?  Is there a way to
23  verify, or no?
24   A.  It's really hard, really hard.

Page 136

1    Q.  Okay.  All right.  I'm going to go
2  to 67, if you don't mind.  This is Shaffer
3  Pharmacy.  They want some more Oxy, and the
4  reason is "Supplier mentioned an industry short
5  supply.  New" -- is that MOK?
6    A.  M.D.
7    Q.  Oh, I'm sorry.  "M.D. moved in
8  building."  So they're saying, "Hey, supplier
9  mentioned that there's a short supply and we've
10  got a new doctor."
11       Is that satisfactory to you?
12       MR. CLARK:  Objection to
13  form.
14   Q.  As an explanation to increase Oxy?
15       MR. CLARK:  Same objection.
16   A.  This particular case, he didn't
17  meet his threshold.
18   Q.  Okay.
19   A.  Okay?  I called him because I
20  wasn't used to what he was ordering at the time.
21  This did not meet his threshold, okay?
22   Q.  Forget about threshold.  It was --
23       MR. CLARK:  Were you still
24  answering?

Page 137

1    A.  Yes.
2        So I had called him to find out
3  why he was ordering this particular item,
4  because it was unusual for him to do, okay?  So
5  I called Tom and talked to him personally and
6  asked him about it, okay?  He told me that his
7  supplier was short, his primary, and that he had
8  two new doctors move in, okay?  So this form was
9  sent to him and returned to me.
10   Q.  That is by definition -- the
11  unusual pattern which you just described, that
12  is, by definition, a suspicious order, right?
13       MR. CLARK:  Objection to
14  form.
15   A.  I did my investigating and
16  determined it was not, though.
17   Q.  Well, it was suspicious and then
18  you made the phone call, right?
19       MR. CLARK:  Objection to
20  form.
21   A.  No.  It wasn't what he usually
22  ordered from me.
23   Q.  It was unusual?
24   A.  So I made the call.

Page 138

1   Q.   Right.  It was unusual?
2       MR. CLARK:  Objection to
3   form.
4   A.   It was -- it was -- yeah, it was
5   unusual, yes.
6   Q.   And so "Supplier mentioned" -- did
7   you fill this out or did he?
8   A.   The pharmacist fills this out,
9   yeah.
10  Q.   "Supplier mentioned an industry
11  short supply."  What would the supplier be?
12  A.   His primary wholesaler.
13  Q.   Do we know who that is or --
14      MR. CLARK:  Objection to
15  form.
16  A.   No.
17  Q.   Okay.  Did you verify two
18  physicians moved into the building?
19  A.   At the time, no, I did not, no.
20  Q.   Okay.
21  A.   No.  He's in a doctors' building,
22  multiple doctors' buildings, and I've had a
23  relationship with him for -- probably since he's
24  opened the pharmacy.

Page 139

1   Q.   I'm just saying, you know,
2   hypothetically, you could have two leave and two
3   come in, like two replace two.  That would be
4   something you'd want to know, right?
5       MR. CLARK:  Objection to
6   form.
7   Q.   Two doctors leave, two come in,
8   shouldn't affect the numbers that much, right?
9       MR. CLARK:  Same objection.
10  A.   It depends on what the specialty
11  is.
12  Q.   Okay.  Did you ask them what their
13  specialties are?
14      MR. CLARK:  Same objection.
15  A.   I can't recall.
16  Q.   Okay.  All right.  And then we've
17  got 69.  Tabb Enterprises, Inc.  Is that Nick,
18  Nick Tabb, right?
19  A.   Yes.
20  Q.   Okay.  So they wanted more, and
21  this is going to be in 2015.  This is years
22  after the event we looked at earlier, right?
23  That was 2012, I guess?
24  A.   Correct.

Page 140

1   Q.   All right.  And what does Nick
2   say?  Why do they need an increase here?
3   A.   He said they have a prescription
4   count increase, and on -- it says they have 110
5   new scripts per month, okay, for the last six
6   months.
7   Q.   That's a reason?  That's good
8   enough?
9       MR. CLARK:  Objection to
10  form.
11  A.   With my relationship with him and
12  knowledge of that store?
13  Q.   Yeah.  I'm asking.
14  A.   I believe, yeah, that's -- yeah.
15  And I did call him.  Before I send these out, I
16  call them.
17  Q.   Sure.
18  A.   I call and talk to them.  Because
19  if I just send these out, they're not going to
20  know what this is.  So I call and talk to the
21  pharmacist.
22  Q.   Do you know that part of the --
23  part of the issue with the abuse of getting Oxy
24  is more scripts are being written?

Page 141

1       MR. CLARK:  Objection to
2   form.
3   Q.   For a period of time?
4       MR. CLARK:  Same objection.
5   Q.   And the fact that there's more
6   scripts doesn't mean there's not a problem,
7   right?
8       MR. CLARK:  Objection.
9   Q.   That's actually part of the
10  problem, isn't it?
11      MR. CLARK:  Same objection.
12  A.   But the 110 could be scripts just
13  in general, not scripts for a particular item.
14  I think he's referring to 110 additional scripts
15  per month on this, you know, overall.  Not that
16  I believe --
17  Q.   You said it's overall?
18  A.   Yeah, not on what I believe is a
19  certain item.
20  Q.   Do you remember talking to him
21  about that?
22      MR. CLARK:  Objection to
23  form.
24  A.   I remember calling him, yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    Q.   Do you remember --
2    A.   I would have called him.  I don't
3 know if I remember it, but I would have called
4 him to get this paperwork.
5    Q.   I'm not doubting that you called
6 him, but do you remember the conversation?
7    A.   I can't be sure, no.
8         MR. REINS:  Mark that as
9    Plaintiffs' Exhibit Number 2.
10        ---
11   (PSI - J. Schoen Exhibit 2 marked.)
12        ---
13        MR. CLARK:  Are we continuing
14   from Kirk or are these new?
15        MR. REINS:  They're new, but
16   I'll tell you what I've done here.
17   I've gotten really revolutionary.
18   I've identified a number of the
19   documents that have been exhibits
20   in other depos by Bates numbers so
21   we know what they are, but I
22   haven't attached them all again
23   because, frankly, I have one copy
24   left.

Page 143

1         MR. CLARK:  That's fine.
2         MR. REINS:  Okay.
3         THE WITNESS:  Are we done
4    with this, then?
5         MR. REINS:  Yes, sir, we are.
6    And honestly, we're going to take a
7    quick break because I may be done.
8         THE VIDEOGRAPHER:  We're
9    going off the record at 3:04.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  We're back
12   on the record at 3:14.
13        MR. REINS:  I have no more
14   questions.
15        ---
16        REDIRECT EXAMINATION
17 BY MR. CLARK:
18   Q.   I just want to ask you one
19 question, Mr. Schoen.  I want to clarify
20 something that Mr. Reins asked you about earlier
21 on and just make sure that we get this right.
22        Have you stopped orders before?
23   A.   Yes.  From going out?  Yes.
24   Q.   Okay.  So it is not as if you've

Page 144

1 allowed every order that has come into
2 Prescription Supply to be filled in the way that
3 it came in; is that right?
4    A.   No.
5    Q.   And you've stopped many orders?
6    A.   Yes.
7    Q.   Okay.  And over your 20 years,
8 there have been many orders that you did not
9 allow to go out?
10   A.   Correct.  Yes.
11   Q.   I just wanted to clarify that one
12 point.
13   A.   Yes, sir.
14        MR. CLARK:  Okay.  I have
15   nothing further.
16        ---
17        RECROSS-EXAMINATION
18 BY MR. REINS:
19   Q.   Here's what I understood you to
20 say earlier, if I understood you.
21        You said to me, you said, "Hey,
22 man, there's a bunch of reasons why I may not
23 ship something," and you gave me multiple
24 examples.

Page 145

1         I believe I then asked you at some
2 point later in the questioning if you had ever
3 stopped a shipment or prevented a shipment from
4 going out because you thought it was suspicious,
5 and your answer was "No, I have not."
6         Now, I understand you've stopped
7 orders and I respect that, and I understood
8 those to be consistent, but are you now telling
9 me that you have -- is it your testimony -- and
10 I don't think it's different than what your
11 counsel just asked you.  I understand you've
12 stopped orders.
13        But are you testifying here today
14 that you've stopped shipments of orders from
15 going out or getting completed because they were
16 quote/unquote "suspicious"?
17        MR. CLARK:  Objection to
18   form.
19   Q.   Because I believe you testified
20 earlier you have not.
21        MR. CLARK:  Same objection.
22   Q.   Or you couldn't recall ever doing
23 that is what I recall, actually.
24        MR. CLARK:  Same objection.

Page 146

1    A.   Possible.  You know, I've stopped
2  lots of orders.
3    Q.   I don't doubt that.  But my
4  question to you was, did you -- can you recall
5  specifically here today stopping an order or not
6  shipping an order because it was suspicious, and
7  I believe your testimony was "I just don't
8  recall."
9         MR. CLARK:  Objection to
10       form.
11   Q.   Is that accurate?
12   A.   Well, I would have stopped them if
13 they were suspicious or not suspicious if I
14 didn't feel comfortable with that order going
15 out.
16   Q.   I'm not arguing with you.  I'm
17 just asking you here today, here today, under
18 oath, based on what you can recall, based on
19 what you can remember -- I'm not saying it
20 didn't happen, but can you testify here today
21 you remember stopping a shipment because you
22 thought the order was suspicious?
23        MR. CLARK:  Objection to
24       form.

Page 147

1    Q.   Can you remember that?
2         MR. CLARK:  Same objection.
3    Q.   I'm not saying it didn't happen,
4  but do you have a recollection?
5         MR. CLARK:  Same objection.
6    A.   I've stopped orders because I just
7  wasn't comfortable with them, for whatever
8  reason that may be, okay?  Lots of orders.
9    Q.   Have you ever -- I understand, but
10 can you testify here today -- do you remember
11 when we talked about this earlier?
12        MR. CLARK:  Objection to
13       form.
14   Q.   I know there has been a lot of
15 questions.
16   A.   There has been a lot of questions
17 so ...
18   Q.   I get it.
19        MR. CLARK:  And I'm just
20       going to put a standing objection
21       down to the extent that this calls
22       for a legal conclusion over the
23       definition of suspicious.
24   Q.   Part of your job is to not ship

Page 148

1  suspicious orders, correct?  That's your job?
2         MR. CLARK:  Objection to
3        form.
4    Q.   Right?
5    A.   That's part of my job.
6    Q.   Darn right, and you need to know
7  what "suspicious" means in order to do your job,
8  right?
9         MR. CLARK:  Same objection.
10   Q.   That's okay.
11   A.   I agree with that.
12   Q.   Yeah.  All right.  All I'm asking
13 you is this:  And I'm not -- this isn't some
14 kind of trick like I'm getting you to say you've
15 never held an order.  I know you've held orders.
16 I get it.  And I'm not disputing that.
17        But what I believe you testified
18 earlier is, when I said "Can you recall stopping
19 a shipment because you thought the order was
20 suspicious, that one reason, do you remember
21 doing it?"
22        Do you remember doing it?
23        MR. CLARK:  Objection.
24   Q.   And that's what I'm asking.

Page 149

1         MR. CLARK:  Objection to
2        form.
3    A.   Because it was suspicious?
4    Q.   Yes.  That you can recall.
5         MR. CLARK:  Objection to
6        form.
7    A.   That one with the Tussionex, yes.
8    Q.   Fair enough.  Any others that you
9  can recall?
10   A.   I recall the Tussionex.
11   Q.   And that's fair.  And I'll even be
12 more of what I hope is fair to you, which is, if
13 we look at the log and we see the log
14 triggered -- and we see a sales history, and we
15 see that it was triggered and then it wasn't
16 shipped, that's something else that you and I
17 spoke about that we can look at, even if you
18 don't remember it here today, right?
19        MR. CLARK:  Objection to
20       form.
21   Q.   Correct?
22   A.   Yeah.
23   Q.   Now, the Tussionex -- and I
24 thought I covered it -- you said that that

Page 150

1 particular order you were uncomfortable with
2 because it was very much unusual from what that
3 person had ordered before, right?
4         MR. CLARK:  Objection to
5 form.
6     A.   No.  From what other people have
7 ordered from me.
8     Q.   Okay.
9     A.   Okay?
10    Q.   Now, did you --
11    A.   Yes.
12    Q.   Sorry.
13        Did you pick up the phone and talk
14 to that pharmacy?  Did you send them the form?
15        MR. CLARK:  Objection to
16 form.
17    A.   That was before the form.  That
18 was a long time -- I can't recall when that was.
19    Q.   That was a long time ago?
20    A.   Yes.
21        MR. REINS:  Gotcha.
22        I have no more questions.
23 Thanks for your time.
24        MR. CLARK:  Nothing further.

Page 151

1         THE VIDEOGRAPHER:  We're
2 going off the record at 3:20 p.m.
3         (Signature not waived.)
4         - - -
5         Thereupon, at 3:20 p.m., on Wednesday,
6 February 27, 2019, the deposition was concluded.
7         - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 152

1         CERTIFICATE
2 STATE OF OHIO      :
                SS:
3 COUNTY OF _____:
4
5     I, JAMES T. SCHOEN, do hereby certify that I
6 have read the foregoing transcript of my
7 cross-examination given on February 27, 2019; that
8 together with the correction page attached hereto
9 noting changes in form or substance, if any, it is
10 true and correct.
11     _____
         JAMES T. SCHOEN
12
13    I do hereby certify that the foregoing
14 transcript of the cross-examination of JAMES T. SCHOEN
15 was submitted to the witness for reading and signing;
16 that after he had stated to the undersigned Notary
17 Public that he had read and examined his
18 cross-examination, he signed the same in my presence
19 on the _____ day of _____, 2019.
20
21     _____
         NOTARY PUBLIC - STATE OF OHIO
22
23 My Commission Expires:
24 _____, _____.

Page 153

1         CERTIFICATE
2 STATE OF OHIO      :
                SS:
3 COUNTY OF FRANKLIN  :
4     I, Carol A. Kirk, a Registered Merit
   Reporter and Notary Public in and for the State of
5 Ohio, duly commissioned and qualified, do hereby
   certify that the within-named JAMES T. SCHOEN was by
6 me first duly sworn to testify to the truth, the whole
   truth, and nothing but the truth in the cause
7 aforesaid; that the deposition then given by him was
   by me reduced to stenotype in the presence of said
8 witness; that the foregoing is a true and correct
   transcript of the deposition so given by him; that the
9 deposition was taken at the time and place in the
   caption specified and was completed without
10 adjournment; and that I am in no way related to or
   employed by any attorney or party hereto or
11 financially interested in the action; and I am not,
   nor is the court reporting firm with which I am
12 affiliated, under a contract as defined in Civil Rule
   28(D).
13
14     IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Columbus, Ohio
15 on this 4th day of March 2019.
16
17
18     _____
         CAROL A. KIRK, RMR
19         NOTARY PUBLIC - STATE OF OHIO
20 My Commission Expires:  April 9, 2022.
21         - - -
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1        DEPOSITION ERRATA SHEET

2 I, JAMES T. SCHOEN, have read the transcript

  of my deposition taken on the 27th day of February

3 2019, or the same has been read to me. I request that

  the following changes be entered upon the record for

4 the reasons so indicated. I have signed the signature

  page and authorize you to attach the same to the

5 original transcript.

6 Page Line Correction or Change and Reason:

7 ___ ___ _____

8 ___ ___ _____

9 ___ ___ _____

10 ___ ___ _____

11 ___ ___ _____

12 ___ ___ _____

13 ___ ___ _____

14 ___ ___ _____

15 ___ ___ _____

16 ___ ___ _____

17 ___ ___ _____

18 ___ ___ _____

19 ___ ___ _____

20 ___ ___ _____

21 ___ ___ _____

22 ___ ___ _____

23 ___ ___ _____

24 Date _____ Signature _____