```
 1              UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF OHIO

 2                    EASTERN DIVISION

 3                        - - -

 4    IN RE:  NATIONAL           )

      PRESCRIPTION              )  MDL No. 2804

 5    OPIATE LITIGATION         )

      _____ )  Case No.

 6                              )  1:17-MD-2804

      THIS DOCUMENT RELATES     )

 7    TO ALL CASES              )  Hon. Dan A. Polster

 8                        - - -

 9      VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN

10           Wednesday, September 5, 2018

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

12

                        - - -

13

14        Videotaped deposition of THOMAS G. SCHOEN, held

15    at the Hilton Inn Garden Toledo, 6165 Levis Commons

16    Boulevard, Perrysburg, Ohio, commencing at 9:03 a.m., on

17    the above date, before Carol A. Kirk, Registered Merit

18    Reporter and Notary Public.

19

20                        - - -

21

22

            GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax

                 deps@golkow.com

24
```

| | Page 2 |
|---|---|

```
 1              A P P E A R A N C E S:
 2   On behalf of the Plaintiffs:
 3       MCHUGH FULLER LAW GROUP
         BY:  MICHAEL J. FULLER, JR., ESQUIRE
 4         mike@mchughfuller.com
           AMY J. QUEZON, ESQUIRE
 5         amy@mchughfuller.com
         97 Elias Whiddon Road
 6       Hattiesburg, Mississippi  39402
         601-261-2220
 7   On behalf of the Cardinal Health, Inc.:
 8       WILLIAMS & CONNOLLY LLP
         BY:  JOSEPH S. BUSHUR, ESQUIRE
 9         jbushur@wc.com
         725 Twelfth Street, N.W.
10       Washington, DC  20005
         202-434-5420
11   On behalf of the AmerisourceBergen:
12       REED SMITH LLP
         BY:  JAMES A. PETKUN, ESQUIRE
13         jpetkun@reedsmith.com
         Three Logan Square
14       1717 Arch Street, Suite 3100
         Philadelphia, Pennsylvania  19103
15       215-851-8100

16   On behalf of HBC:
         MARCUS & SHAPIRA LLP
17       BY:  JOSHUA A. KOBRIN, ESQUIRE
           kobrin@marcus-shapira.com
18         (VIA TELECONFERENCE)
         One Oxford Center, 35th Floor
19       301 Grant Street
         Pittsburgh, Pennsylvania  15219-6401
20       412-338-5208
21
22
23
24
```

| | Page 4 |
|---|---|

```
 1   On behalf of Teva Pharmaceuticals USA, Inc., Cephalon,
     Inc., Watson Laboratories, Inc., Actavis LLC, Actavis
 2   Pharma, Inc., f/k/a Watson Pharma, Inc.:
         MORGAN, LEWIS & BOCKIUS LLP
 3       BY:  ELLIOTT E. BROWN, ESQUIRE
           elliott.brown@morganlewis.com
 4         (VIA TELECONFERENCE)
         1111 Pennsylvania Avenue, NW
 5       Washington, DC  20004
         202-739-5833
 6
     On behalf of the Allergan Defendants:
 7       BARNES & THORNBURG LLP
         BY:  WILLIAM E. PADGETT, ESQUIRE
 8         wpadgett@btlaw.com
           (VIA TELECONFERENCE)
 9       11 South Meridian Street
         Indianapolis, Indiana  46204
10       317-236-1313
11
12   ALSO PRESENT:
13       A.J. Elkins, McHugh Fuller
         Darnell Brown, Videographer
14       Gina Veldman, Trial Technician
15
16              - - -
17
18
19
20
21
22
23
24
```

| | Page 3 |
|---|---|

```
 1   On behalf of Walmart:
 2       JONES DAY
         BY:  KRISTIN S.M. MORRISON, ESQUIRE
 3         kmorrison@jonesday.com
         901 Lakeside Avenue East
 4       Cleveland, Ohio  44114
         216-586-7375
 5   On behalf of Prescription Supply, Inc.:
         PELINI, CAMPBELL & WILLIAMS LLC
 6       BY:  PAUL B. RICARD, ESQUIRE
           pbricard@pelini-law.com
 7         CRAIG G. PELINI, ESQUIRE
           cgp@pelini-law.com
 8         SAMANTHA VOLEK, ESQUIRE
           svolek@pelini-law.com
 9       8040 Cleveland Avenue NW, Suite 400
         North Canton, Ohio  44720
10       330-305-6400
11   On behalf of Miami-Luken:
         JACKSON KELLY PLLC
12       BY:  WILLIAM J. AUBEL, ESQUIRE
           william.j.aubel@jacksonkelly.com
13         (VIA TELECONFERENCE)
         500 Lee Street East, Suite 1600
14       Charleston, West Virginia  25301
         304-340-1092
15
16   On behalf of McKesson:
         COVINGTON & BURLING LLP
17       BY:  MEGHAN E. MONAGHAN, ESQUIRE
           mmonaghan@cov.com
18       One CityCenter
         850 Tenth Street, NW
19       Washington, DC  20001
         202-662-5531
20   On behalf of Endo Pharmaceuticals, Inc. and
     Endo Health Solutions Inc.:
21       ARNOLD & PORTER KAYE SCHOLER LLP
         BY:  ANGEL TANG NAKAMURA, ESQUIRE
22         angel.nakamura@apks.com
           (VIA TELECONFERENCE)
23       777 S. Figueroa Street, Suite 4400
         Los Angeles, California  90017
24       213-243-4000
```

| | Page 5 |
|---|---|

```
 1     VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN

 2          INDEX TO EXAMINATION

 3   WITNESS                         PAGE

 4   THOMAS G. SCHOEN

 5     EXAMINATION BY MR. FULLER:        12

 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 6

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
INDEX TO EXHIBITS

| PSI-SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Second Amended First Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(2) and Rule 34 to Defendant Prescription Supply, Inc. | 14 |
| Exhibit 2 | Second Amended Second Notice of Deposition Pursuant to Rule 30(b)(6) and Document Request Pursuant to Rule 30(b)(2) and Rule 34 to Defendant Prescription Supply, Inc. | 15 |
| Exhibit 3 | Prescription Supply, Inc.'s Objections and Responses to First and Second Notice of Deposition to Rule 30(b)(6) | 15 |
| Exhibit 4 | Document titled "United States Code Annotated; Title 21. Food and Drugs; Chapter 13. Drug Abuse Prevention and Control; Subchapter I. Control and Enforcement; Parts A through C | 18 |
| Exhibit 5 | Legislative findings and history of the Controlled Substances Act, 101 pages | 30 |
| Exhibit 6 | 21 C.F.R. 1301.74 | 39 |
| Exhibit 7 | Document titled HathiTrust | 47 |
| Exhibit 8 | 861 Federal Reporter, 3d Series, Bates-stamped PSI 30b_106-001 through 025 | 54 |
| Exhibit 9 | Document titled "Ohio Administrative Code - 2002," Bates-stamped PSI 30b_ 112 - 001 through 004 | 61 |

## Page 7

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
INDEX TO EXHIBITS (CONT'D)

| PSI-SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 10 | Document titled "United States General Accounting Office GAO Report to the Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, House of Representatives, May 2002, Prescription Drugs, State Monitoring Programs Provide Useful Tool to Reduce Diversion" | 73 |
| Exhibit 11 | Document titled "HathiTrust, OxyContin: Its Use and Abuse" | 77 |
| Exhibit 12 | The National Center on Addiction and Substance Abuse at Columbia University, "Under the Counter: The Diversion and Abuse of Controlled Prescription Drugs in the U.S." | 88 |
| Exhibit 13 | Letter to Cardinal Health from Mr. Rannazzisi, dated 9/27/06, Bates-stamped PSI 30b_ 301 - 001 through 004 | 95 |
| Exhibit 14 | Diagram prepared by Attorney Fuller | 106 |
| Exhibit 15 | PowerPoint presentation titled "Drug Enforcement Administration Pharmaceutical Industry Conference, Wholesale Distribution Diversion Control Program, September 11, 2007," Bates-stamped PSI 30b_ 601 - 001 through 044 | 113 |

## Page 8

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
INDEX TO EXHIBITS (CONT'D)

| PSI-SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | Memorandum for Asa Hutchinson from Mr. Fine, Bates-stamped PSI 30b_ 204 - 001 through 039 | 118 |
| Exhibit 17 | Letter to Cardinal Health from Mr. Rannazzisi, dated 12/27/07, Bates-stamped PSI 30b_ 303 - 001 through 002 | 127 |
| Exhibit 18 | Document titled "HDMA Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," Bates-stamped PSI 30b_ 305 - 001 through 015 | 134 |
| Exhibit 19 | PSI policies and procedures, Bates-stamped PSI 30b_ 404 - 001 through 005 | 153 |
| Exhibit 20 | Document titled "Maximum Monthly Quantity," 10/2/08, Bates-stamped PSI0000280 through 285 | 190 |
| Exhibit 21 | Document titled "Prescription Supply Maximum Monthly Units for OLS Systems," 10/2/2008, Bates-stamped PSI0000274 through 279 | 190 |
| Exhibit 22 | State of Ohio Board of Pharmacy Written Response, October 25, 2017, Bates-stamped PSI0000007 through 83 | 193 |
| Exhibit 23 | Thumbdrive containing macro spreadsheet | 206 |

## Page 9

VIDEOTAPED DEPOSITION OF THOMAS G. SCHOEN
INDEX TO EXHIBITS (CONT'D)

| PSI-SCHOEN | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 24 | E-mail to Mr. J. Schoen from Mr. Thomas Schoen, dated May 2, 2018, Bates-stamped PSI0003024 | 218 |
| Exhibit 25 | Spreadsheet, Shaffer Pharmacy | 221 |
| Exhibit 26 | Shaffer Pharmacy Total Monthly Oxycodone Sales, January 2008 - April 2009 | 221 |
| Exhibit 27 | Shaffer Pharmacy Total Monthly Oxycodone Sales January 2013 - November 2014 | 221 |
| Exhibit 28 | Letter to Mr. Ohliger from the State of Ohio Board of Pharmacy, dated 10/6/15, Bates-stamped PSI0003419 through 3421 | 234 |
| Exhibit 29 | HDMA Boards of Directors newsletter | 241 |
| Exhibit 30 | Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal Health, Inc. | 243 |

Page 10

```
 1              - - -
 2       P R O C E E D I N G S
 3              - - -
 4       THE VIDEOGRAPHER:  Good morning.  We are
 5  now on the record.  My name is Darnell Brown, and
 6  I am a videographer with Golkow Litigation
 7  Services.  Today's date is September 5, 2018, and
 8  the time is 9:03 a.m.
 9       This video deposition is being held in
10  Perrysburg, Ohio, in the matter of In Re:  Opioid Deps
11  for the United States District Court for the Northern
12  District of Ohio.  The deponent is Thomas Schoen.
13       Counsel will be noted on the stenographic
14  record.  The court reporter is Carol Kirk who will now
15  swear in the witness.
16       (Witness sworn.)
17       THE VIDEOGRAPHER:  You may begin.
18       MR. FULLER:  Aren't we supposed to all
19  introduce ourselves?
20       THE VIDEOGRAPHER:  Yeah.
21       MR. FULLER:  All right.  Mike Fuller on
22  behalf of the Plaintiff.
23       MR. ELKINS:  AJ Elkins on behalf of the
24  Plaintiff.
```

Page 11

```
 1       MS. QUEZON:  Amy Quezon on behalf of the
 2  Plaintiff.
 3       MS. VELDMAN:  Gina Veldman on behalf of
 4  the Plaintiff.
 5       MR. PELINI:  Craig Pelini.  I represent
 6  PSI.
 7       MR. BUSHUR:  Joseph Bushur on behalf of
 8  Cardinal Health.
 9       MR. PETKUN:  James Petkun for
10  AmerisourceBergen Corporation.
11       MS. MONAGHAN:  Meghan Monaghan on behalf
12  of McKesson.
13       MS. MORRISON:  Kristin Morrison on
14  behalf of Walmart.
15       MS. VOLEK:  Samantha Volek on behalf of
16  PSI.
17       MR. RICARD:  Paul Ricard, PSI.
18       MR. FULLER:  And anybody on the phone?
19  Can you note your appearance for the record.
20       MR. PADGETT:  Bill Padgett on behalf of
21  HD Smith.
22       MR. BROWN:  Elliott Brown on behalf of
23  Teva.
24       MR. KOBRIN:  Joshua Kobrin on behalf of
```

Page 12

```
 1  HBC.
 2       MS. NAKAMURA:  Angel Nakamura on behalf
 3  of the Endo and Par Pharmaceutical Defendants.
 4       MR. AUBEL:  Bill Aubel on behalf of
 5  Miami-Luken, Inc.
 6       MR. FULLER:  I'm assuming that's
 7  everybody.
 8              - - -
 9       THOMAS G. SCHOEN
10  being by me first duly sworn, as hereinafter certified,
11  deposes and says as follows:
12       EXAMINATION
13  BY MR. FULLER:
14       Q.  Mr. Schoen, please state your name,
15  spelling your last name for the record.
16       A.  My name is Thomas G. Schoen.  Last name
17  Schoen, S-c-h-o-e-n.
18       Q.  And, Mr. Schoen, are you the owner and
19  operator of a company called Prescription Supply,
20  Inc.?
21       A.  I am an owner.  There are more than one.
22  And I'm president of Prescription Supply,
23  Incorporated.
24       Q.  Who are the other owners?
```

Page 13

```
 1       A.  All family members.
 2       Q.  Okay.  Your family, I'm assuming?
 3       A.  My family and my sister's family.
 4       Q.  Fair enough.
 5       And your company has been around since,
 6  I think, about 1955; is that correct?
 7       A.  That's correct.
 8       Q.  And has it always been family owned --
 9       A.  It has.
10       Q.  -- and operated?
11       A.  Yes, it has.
12       Q.  Okay.  And you're aware that -- and tell
13  me if it's okay -- but I heard counsel do it, so
14  I'm assuming it is -- referring to Prescription
15  Supply, Inc., as PSI.
16       A.  That's acceptable.
17       Q.  Okay.  And you're aware that PSI has
18  been sued in this litigation involving the opioid
19  epidemic, correct?
20       A.  I'm aware.
21       Q.  You were also -- well, let me just
22  attach the exhibits.  We're going to attach as
23  Plaintiff's 1 a copy of the notice.  And this is
24  more housekeeping for counsel and I.  It's the
```

Page 14

1  second amended first notice will be Exhibit 1.
2      Here. Let me just give you all the copies and
3  you can pass them out.
4          - - -
5      (PSI-Schoen Exhibit 1 marked.)
6          - - -
7  BY MR. FULLER:
8      Q. Mr. Schoen, just so you know, the first
9  little bit here, we're going to just -- sort of
10 going to be like housekeeping, just some notices
11 and objections and things like that that I'll make
12 sure as we get as part of the record of this
13 deposition. Okay?
14     Now, I'm going to assume -- and correct
15 me if I am wrong -- that you have seen this notice
16 prior to today; is that correct? Take a minute
17 and flip through it.
18     A. Actually, I don't know that I've seen
19 this notice. But, yes, I've seen perhaps the
20 first notice.
21     Q. Fair enough. And particularly starting
22 on page 5, I believe it is, the areas of inquiry.
23 Do you see those listed there? And it goes on to
24 page 6.

Page 15

1      A. Yes.
2      Q. And have you had an opportunity to
3  review those before today?
4      A. I have.
5          - - -
6      (PSI-Schoen Exhibit 2 marked.)
7          - - -
8      Q. Okay. The second exhibit is going to be
9  the second amended notice for the second 30(b).
10     Mr. Schoen, it also starts on page 5,
11 certain topic areas. And, again, I'd just ask if
12 you have had an opportunity to make yourself
13 familiar with those areas of inquiry prior to
14 today?
15     A. I have.
16         - - -
17     (PSI-Schoen Exhibit 3 marked.)
18         - - -
19     Q. Okay. And the third exhibit is going to
20 be the Defendants' objections to our notice.
21     We're just making those part of the
22 record. I don't know if you've reviewed them or
23 not, and it really doesn't matter to me, so don't
24 worry about it.

Page 16

1      A. Actually, I have not reviewed this one.
2      Q. Fair enough.
3      Now, today -- and I'm sure you've been
4  told -- you've been designated as a 30(b) witness,
5  okay? And what that means is that you're here
6  today to speak on behalf of a company; in this
7  particular case, PSI.
8      Are you aware of that?
9      A. Yes.
10     Q. So it's going to be a little awkward
11 probably at times because I'm going to be asking
12 you for information that PSI knows, not just
13 Thomas Schoen; is that fair?
14     A. Fair.
15     Q. And for purposes of the 30(b), we're
16 going to be limited to the subject matters set
17 out, with one exception. Your counsel and I have
18 talked over the past couple of weeks and reached
19 certain agreements with certain topics set out in
20 the notices.
21     MR. FULLER: And, Counsel, you can
22 correct me if I am wrong, but I'm going to read
23 from my e-mail as to what we, I think, agreed to.
24 And the first 30(b) notice, Subject Matter O, will

Page 17

1  be subject to a written response. And the second
2  30(b) notice is going to be numbers 1, 2, 3, 4, 5,
3  9, 10, 11, and 18.
4      Here you go, Counsel. Here's a copy of that
5  e-mail that I sent you.
6      MR. RICARD: That's correct.
7      MR. FULLER: Okay.
8  BY MR. FULLER:
9      Q. So, Mr. Schoen, what your counsel and I
10 did for you is hopefully shortened the amount of
11 time that you have to sit here today.
12     A. Thank you.
13     Q. You're more than welcome. And, again, I
14 appreciate you coming and being here for us.
15     Now, you mentioned that you don't really
16 operate. What is your role currently with PSI?
17 What do you do on a day-to-day basis?
18     A. I'm the president. I do pretty much
19 everything. I -- okay.
20     Q. Give me, if you will, just a thumbnail
21 sketch of what your average day is these days.
22     A. We're going through constant changes in
23 our software, so I'm reviewing and giving some
24 ideas on software changes. I'm hiring people

Page 18

1 because we need them at this time of year. I
2 don't know. It just -- I don't have any more
3 fixed responsibilities, as far as I do whatever
4 has to be done when it has to be done.
5     Q. Fair enough. Fair enough. I get that.
6 I get that.
7         Now, Prescription Supply is a registrant
8 with the DEA related to controlled substances,
9 correct?
10     A. Yes.
11     Q. And as such, you take on certain
12 statutory and regulatory obligations; is that
13 correct?
14     A. Yes.
15     Q. And we're going to mark as Plaintiff's
16 Exhibit Number 4 --
17         MR. FULLER: It's going to be 101, Gina.
18             - - -
19         (PSI-Schoen Exhibit 4 marked.)
20             - - -
21 BY MR. FULLER:
22     Q. Now, I'm going to assume that you are
23 somewhat familiar, Mr. Schoen, with the Controlled
24 Substances Act; is that correct?

Page 19

1     A. Yes, in general.
2         THE VIDEOGRAPHER: Could the person on
3 the phone -- could you guys please put your phone
4 on mute, because we can now hear you in the
5 background. Please.
6         MR. FULLER: I'm sorry. I wasn't paying
7 attention to it.
8 BY MR. FULLER:
9     Q. And what you have -- and you have a hard
10 copy, which has been marked as an exhibit. You
11 should also have a digital copy in that screen
12 right in front of you. And then there's a big
13 screen up to your right as well. And you can look
14 at any or all of them, okay?
15         And what's going to happen is, as I go
16 through some of this document, the one in front of
17 you on the digital copy, Mr. Schoen, is going to
18 be highlighted as to wherever I'm referring to to
19 help direct you to certain areas. Okay?
20     A. Yes.
21     Q. Okay.
22         MR. RICARD: Before you start on this,
23 can we, notwithstanding any form objections, agree
24 to a standing objection to any -- to the extent

Page 20

1 that this seeks any legal conclusions?
2         MR. FULLER: Sure.
3 BY MR. FULLER:
4     Q. And you'll see up there to the upper
5 left, Mr. Schoen, that -- the seal of the United
6 States Congress, correct?
7     A. I do.
8     Q. And this is part of the United States
9 Code, which is the statutes promulgated by the
10 federal government. And you'll see this is
11 Chapter 13. Drug Abuse, Prevention, and Control.
12         Do you see that? If you look on the
13 screen right in front of you, it's highlighted.
14     A. Okay. Yes.
15     Q. Okay. The screen is sort of like your
16 cheat sheet.
17     A. All right.
18     Q. It will help get you right where I'm
19 looking, too, okay? And you're aware that that is
20 part of the Controlled Substances Act?
21     A. Yes.
22     Q. Okay. And this is Section 801, and it
23 says the Congressional findings and declarations
24 related to controlled substances. "The Congress

Page 21

1 makes the following findings and declarations."
2         Could you read, in all fairness, the
3 first declaration that they made to us,
4 Mr. Schoen.
5     A. "Many of the drugs included within this
6 subchapter have a useful and legitimate medical
7 purpose and are necessary to maintain the health
8 and general welfare of the American people."
9     Q. And does PSI accept that declaration by
10 U.S. Congress as being true?
11     A. Yes.
12     Q. And many of the drugs that you deliver,
13 Schedules II through Vs, do have legitimate
14 medical purposes --
15     A. Yes.
16     Q. -- is that correct?
17         And another thing, Mr. Schoen, is we
18 go -- if you will let me finish my question
19 completely before you answer -- in normal
20 conversation when you know what I'm going to ask,
21 we usually start answering each other, but because
22 of Madam Court Reporter and we want to make sure
23 the record is clear, you let me finish.
24         Your counsel may object from time to

Page 22

1 time. Let him get out his objection. And then
2 you can answer. And I'll certainly try to let you
3 finish your answer before I ask another question.
4 Okay?
5     A. Yes.
6     Q. Now, if you will, read the second
7 declaration to us, please.
8     A. "The illegal importation, manufacture,
9 distribution, and possession and improper use of
10 controlled substances has a substantial and
11 detrimental effect on the health and general
12 welfare of the American people."
13     Q. And does PSI as a registrant agree and
14 accept that declaration by the U.S. Congress?
15         MR. RICARD: Objection to form.
16     Q. That's him stating his objection for the
17 record, but you can go ahead and answer the
18 question.
19     A. Yes.
20     Q. Now, with one caveat. The only time you
21 wouldn't answer is if he tells you "Hey,
22 Mr. Schoen, don't answer that question." Okay?
23     A. I'm afraid I didn't understand that.
24     Q. I'm sorry. The only time you wouldn't

Page 23

1 answer the question is if counsel tells you not to
2 answer.
3     A. Oh, okay.
4     Q. Fair enough?
5     A. Fair enough.
6     Q. Okay. Now, PSI -- you sitting here as
7 PSI are a distributor, correct?
8     A. That's correct.
9     Q. And Section 2 here refers to the --
10 amongst other things, the illegal distribution?
11     A. Yes.
12     Q. And you would agree as PSI that the
13 illegal distribution of controlled substances have
14 a substantial and detrimental effect on the health
15 and general welfare of the American people,
16 correct?
17         MR. RICARD: Objection to form.
18     A. Yes.
19     Q. Okay. If you'll turn to the next page,
20 you'll see again the -- on the upper left, a
21 symbol of the great U.S. Congress, correct?
22     A. Yes.
23     Q. And it's still Chapter 13, but this is
24 Section 812, and it deals with schedules of

Page 24

1 controlled substances.
2         Do you see that there?
3     A. Yes.
4     Q. And PSI is aware that there are several
5 different schedules for controlled substances
6 depending on certain factors that relate to that
7 particular medication, correct?
8     A. Yes.
9     Q. Now, I'm going to tell you that most of
10 today we're going to be talking about what is
11 called Schedule IIs. And you know what those are;
12 is that right?
13     A. Yes.
14     Q. PSI is also a distributor of Schedule
15 IIs; are they not?
16     A. Yes.
17     Q. Tell us what -- under Schedule II, what
18 the three factors are, and start with factor A, if
19 you would.
20     A. "The drug or other substance has a high
21 potential of abuse.
22         "(B) The drug or other substance has a
23 currently accepted medical use in treatment in the
24 United States or is currently accepted medical use

Page 25

1 for severe -- with severe restrictions.
2         "Abuse of the drug or other substance
3 may lead to severe psychological or physical
4 dependency."
5     Q. And PSI accepts those as all the
6 requirements for Schedule II drugs, correct?
7         MR. RICARD: Object to form.
8     A. Yes.
9     Q. Now -- and let's talk about it just for
10 a second. The reason we have these different
11 schedules, as PSI is well aware, is because there
12 are some medications out there that have -- while
13 legitimate purposes, if they go unchecked, can be
14 very dangerous, correct?
15         MR. RICARD: Objection to form.
16     A. Yes.
17     Q. And one of the things that we want to
18 ensure -- and I say "we." One of the things that
19 PSI wants to ensure is that we're dealing with
20 these dangerous drugs in the right way, that we're
21 preventing them from getting into the illicit
22 market?
23         MR. RICARD: Objection to form.
24     Q. Correct?

Page 26

1    A.  Yes.

2    Q.  Okay.  If you'll turn to the next page,
3  and you see this is Section 821 of Chapter 13.

4       Do you see that?

5    A.  I do.

6    Q.  Okay.  And this deals with rules and
7  regulations, and it says, "The Attorney General is
8  authorized to promulgate rules and regulations and
9  to charge reasonable fees related to the
10  registration and control of the manufacture,
11  distribution, and dispensing of controlled
12  substances and listed chemicals."

13       Does PSI accept that the Attorney
14  General is the one with the authority to regulate
15  its industry?

16    A.  Yes.

17       MR. RICARD:  Objection to form.

18    Q.  And if you'll turn to the final page, I
19  think, of this exhibit.  We're at Section 823,
20  registration requirements.

21       Do you see that there?

22    A.  I do.

23    Q.  And then -- and, again -- and I may not
24  have stated this in the beginning.  These are

Page 27

1  portions of the regs -- or excuse me -- portions
2  of the code that I've pulled out, so it doesn't
3  have the whole code.  I only pulled out what I
4  needed for the purposes of this deposition, okay,
5  Mr. Schoen?  I just want you to understand it's
6  not every section, and that's why this section
7  starts with (b).  Fair enough?

8    A.  Yes.

9    Q.  Okay.  It says, "In determining the
10  public interest, the following factors should be
11  considered:  The maintenance of effective controls
12  against diversion of particular controlled
13  substances into other than legitimate medical,
14  scientific, and industrial channels."

15       Do you see that there?

16    A.  Yes.

17    Q.  And PSI agrees that it has an obligation
18  to maintain effective controls against diversion
19  when it comes to controlled substances, correct?

20       MR. RICARD:  Objection to form.

21    A.  Yes.

22    Q.  Now -- and I'm asking you as PSI.  When
23  we see effective controls against diversion, that
24  means the systems in place and controls to prevent

Page 28

1  diversion; is that correct?

2       MR. RICARD:  Objection to form.

3    A.  Yes.

4    Q.  Tell us, tell the jury, why we want to
5  prevent diversion of controlled substances.

6    A.  Well, as it states, we -- it can be
7  dangerous.  People can die.  People can have bad
8  effects, and they can be abused.  None of that is
9  something that we want to happen.  We want the
10  good effects, not the bad effects.

11    Q.  Right.  And we're talking about
12  diversion.  Just so we're on the same page, we're
13  talking about diversion, the non-proper medical
14  use, correct?

15    A.  Correct.

16    Q.  And when we have increased diversion,
17  we're likely to have increased abuse and addiction
18  as you mentioned, right?

19       MR. RICARD:  Objection to form.

20    A.  Yes.

21    Q.  And when we're talking about that, we're
22  talking about the general public at large, our
23  children and our communities, correct?

24    A.  Yes.

Page 29

1    Q.  And you understand that the Controlled
2  Substances Act that was enacted back in October of
3  1970 was Congress' attempt to try to keep our
4  children and our community safe from these
5  controlled substances?

6       MR. RICARD:  Objection to form.

7    A.  Yes.

8    Q.  Okay.  Now, Mr. Schoen, your family has
9  been in the business a very long time.  When did
10  you first start working in the industry?  Probably
11  as a little kid, huh?

12    A.  I'm afraid that's true, yes.  1958.  As
13  an eighth grader, I tore down some shelving.

14    Q.  Wow.

15    A.  Yes.  I've been active somewhat most of
16  my life.

17    Q.  So you literally started at the bottom
18  and worked your way up, huh?

19    A.  I certainly have.  I've worked roughly
20  every position.

21    Q.  Holy cow.  Well, good for you.

22       I'm going to now -- and that was
23  actually even before the Controlled Substances Act
24  was enacted, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    A.  Well, yes.  I was in the Army '68 to
2 '69.
3    Q.  Okay.  And when you got out of the Army,
4 did you come back home to the family business, or
5 did you go somewhere else first?
6    A.  I was in graduate school for a short
7 time.
8    Q.  Where at?
9    A.  University of Minnesota.
10    Q.  Okay.  As long as it wasn't OSU.  Me and
11 Mr. Craig, at the end of the table, have some
12 issues with OSU.
13    MR. PELINI:  We'll stipulate to that,
14 Mr. Fuller.
15    MR. FULLER:  Thank you.  Thank you,
16 Counsel.
17 BY MR. FULLER:
18    Q.  Now, Mr. Schoen, you're not an OSU fan,
19 are you?
20    A.  Is that really a --
21    Q.  No, no.  You can plead the Fifth on that
22 one.
23         - - -
24    (PSI-Schoen Exhibit 5 marked.)

Page 31

1         - - -
2    Q.  What I have marked as Exhibit
3 Number 5 -- and you have in front of you -- is the
4 legislative findings and history of the Controlled
5 Substances Act.
6    A.  All right.
7    Q.  And I'm going to ask that you read all
8 211 pages.  No.  I'm kidding.  I'm kidding.
9         And you're welcome to follow along in
10 the document.  But, again, in front of you,
11 Mr. Schoen, is a digital copy.
12    A.  To be honest, I can't read the digital
13 copy.
14    Q.  Oh.  Well, now, the parts I read from do
15 blow up.
16    A.  Okay.
17    Q.  So that may help, okay?
18    A.  Yes.
19    MR. RICARD:  Mike, before you start --
20    MR. FULLER:  Yes, sir.
21    MR. RICARD:  -- I'd just like to note a
22 standing objection to any questions pertaining to
23 this document, as it calls for a legal conclusion.
24    MR. FULLER:  Fair enough.

Page 32

1    MR. FULLER:  Gina, if you could go to
2 page -- you're already there.  Page 5.
3    THE WITNESS:  I can't read that either.
4    Q.  Well, see if this helps.  How about now?
5    A.  That helps, yeah.
6    Q.  It helps me, too.  I'm getting to that
7 age where my eyesight is going as well.
8         So, Mr. Schoen, this is the legislative
9 history and findings related to the Controlled
10 Substances Act, the things Congress did when it
11 was passing the act and some of the reasoning
12 behind it, and we're not going to go through the
13 whole thing.  We're going to go through certain
14 portions of it, if that's okay.  All right?
15    A.  Yes.
16    Q.  All right.  And this says, "Title 2:
17 Control and Enforcement."  It says, "This bill
18 provides for the control by the Justice Department
19 of problems related to drug abuse through
20 registration of manufacturers, wholesalers,
21 retailers, and all others in the legitimate
22 chain -- excuse me -- legitimate distribution
23 chain that makes transactions outside the
24 legitimate distribution chain illegal."

Page 33

1         Does PSI concur that that is the goal
2 behind the Controlled Substances Act?
3    MR. RICARD:  Objection to form.
4    MR. FULLER:  I'm sorry.
5    A.  Yes.
6    Q.  Okay.  And PSI understands that the way
7 the Controlled Substances Act works is that
8 everybody in that chain of distribution starting
9 from the manufacturer all the way down to the
10 pharmacy has to be registered with the Department
11 of Justice via the DEA?
12    A.  Yes.
13    Q.  And, again, as we mentioned earlier, PSI
14 is one of those registrants?
15    A.  Yes.
16    Q.  Does PSI also agree that transactions
17 outside of this legitimate chain or a
18 noncompliance with the Controlled Substances Act
19 would be illegal, meaning breaking the law?
20    MR. RICARD:  Objection to form.
21    A.  Yes.
22    Q.  If you go to page 8.
23    MR. RICARD:  For the record, we're
24 looking at the Bates number 89, not the Westlaw?

Page 34

1    MR. FULLER: I'm sorry. Yes, sir.
2 Upper right-hand corner of the page.
3 BY MR. FULLER:
4    Q.  Mr. Schoen, not the page number on the
5 bottom. I apologize. It's the one on the upper
6 right-hand side --
7    A.  Okay.
8    Q.  -- which looks like they're one page off
9 from each other. Sorry. It can be confusing. I
10 apologize.
11    On page 8, it says, "This bill is
12 designed to improve the administration and
13 regulation of the manufacturing, distribution, and
14 dispensing of controlled substances by providing
15 for a closed system of drug distribution for
16 legitimate handlers of such drugs."
17    Do you have an understanding,
18 Mr. Schoen, of what it means by "closed system"?
19    A.  I believe so.
20    Q.  And that is that there are limited
21 participants, right?
22    A.  Yes.
23    Q.  Not just anybody can do what PSI does?
24    A.  Yes.

Page 35

1    Q.  You have a special ticket or
2 registration to be a manufacturer, distributor, or
3 a pharmacy, correct?
4    MR. RICARD: Objection to form.
5    A.  We're a distributor, yes.
6    Q.  Right. It goes on to say that "Such a
7 closed system should significantly reduce the
8 widespread diversion of these drugs out of
9 legitimate channels into the illicit market, while
10 at the same time providing the legitimate drug
11 industry with a unified approach to narcotic and
12 dangerous drug control."
13    Does PSI understand and agree that this
14 closed system is probably one of the best ways to
15 try to prevent diversion?
16    A.  Yes.
17    Q.  And that what Congress has done here is
18 it's basically done away with, to some degree,
19 capitalism. It says not anybody can participate
20 in this market. For example, Paul, your counsel,
21 and myself, we can't go out today and start buying
22 and selling controlled substances, at least not
23 legally, correct?
24    MR. RICARD: Objection to form.

Page 36

1    A.  Correct.
2    Q.  It's given certain -- it's given certain
3 persons a specific right to do that, for example,
4 PSI, and you agree with that, correct?
5    A.  Yes.
6    Q.  Now, if you go to page 11 as numbered in
7 the upper right-hand corner. It says, "The price
8 for participation in this traffic should be
9 prohibitive. It should be made too dangerous to
10 be attractive."
11    And there this code section or this code
12 of this Congressional history is talking about the
13 illegal traffic. And PSI agrees that what
14 Congress is trying to do is trying to make
15 penalties for the illegal market so significant
16 that people won't want to take part in the illicit
17 market, correct?
18    A.  Yes.
19    MR. RICARD: Objection to form.
20    A.  Yes.
21    MR. RICARD: Tom, give me a second to
22 object if I need to.
23    THE WITNESS: Yes.
24    MR. RICARD: Thanks.

Page 37

1 BY MR. FULLER:
2    Q.  And you have seen that over the history
3 of your operation in this industry, correct?
4    A.  Yes.
5    Q.  Not only with illegal doctors getting
6 arrested and fined and put in prison, but also
7 with other wholesale distributors, correct?
8    MR. RICARD: Objection to form.
9    A.  Yes.
10    Q.  For example, you know that Cardinal and
11 McKesson both had agreements with the federal
12 government to pay certain fines, and those fines
13 have gotten larger over time, correct?
14    MR. RICARD: Objection to form.
15    MS. MONAGHAN: Objection.
16    A.  I'm aware that they've been fined, yes.
17    Q.  Okay. And are you aware that those
18 fines have increased over time?
19    A.  Yes.
20    MR. BUSHUR: Objection; form.
21    Q.  And does PSI agree that as it relates to
22 the illegal traffic, that the fines should be high
23 so we can try to be prevent any potential
24 diversion from occurring?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    MR. RICARD:  Objection to form.
2    A.  Yes.
3    Q.  If you go to page 34, Mr. Schoen.  And
4 if you can -- and, again, if you can see it,
5 Mr. Schoen, can you read that out loud to us?
6    A.  "The illegal importation, manufacture,
7 distribution, and possession and improper use of
8 controlled substances has a substantial
9 detrimental effect on the public health and
10 general welfare."
11    Q.  And does PSI agree and accept that
12 Congressional finding as well?
13    A.  Yes.
14    Q.  And does PSI in its operations strive to
15 prevent any illegal distribution of controlled
16 substances?
17    A.  Yes.
18    Q.  And when we're talking about the general
19 effect on the public's health and welfare, we're
20 talking about the impact it can have on our
21 children and our communities, correct?
22    A.  Among others, yes.
23    Q.  Because what you do is you distribute
24 these controlled substances into different

Page 39

1 pharmacies and doctors' offices and drugstores;
2 and for your company, mainly in the Ohio area,
3 correct?
4    MR. RICARD:  Objection to form.
5    A.  We distribute in a number of states.
6    Q.  Sure.
7    A.  Okay.  But, yes, in general, yes, that's
8 correct.
9    Q.  And we'll get into actually where and
10 all that detail down the road.
11    A.  Okay.
12    Q.  So, Mr. Schoen, what we're going to do
13 is mark next as Plaintiff's Exhibit 6 part of the
14 Code of Federal Regulations.
15    MR. RICARD:  Same objection to legal
16 conclusions, Mike.
17    MR. FULLER:  Sure.
18         - - -
19    (PSI-Schoen Exhibit 6 marked.)
20         - - -
21 BY MR. FULLER:
22    Q.  It's 21 C.F.R. 1301.74.
23    Do you see that, Mr. Schoen?
24    A.  I see it.

Page 40

1    Q.  Now, up in the upper left and upper
2 right respectfully we now have the seals of the
3 Department of Justice who you testified earlier is
4 the ones that regulate this industry that you
5 operate in, correct?
6    A.  Yes.
7    Q.  And on the right, we have United States
8 Justice Department, Drug Enforcement
9 Administration, or the DEA, who carries out that
10 function on behalf of the Department of Justice,
11 correct?
12    A.  Yes.
13    Q.  And that's who you're registered with;
14 is that right?
15    A.  Yes.
16    Q.  And you see it's Chapter 2, Part 1301,
17 and it deals with security requirements.
18    Do you see that there?
19    A.  Oh, yes.  Yes.
20    Q.  And it says under Section 1301.74,
21 "Other security controls for non-practitioners,
22 narcotic treatment programs, and compounders for
23 narcotic treatment programs."
24    And you see letter b down there?

Page 41

1    A.  Yes.
2    Q.  Where it says, "The registrant shall
3 design and operate a system to disclose to the
4 registrant suspicious orders of controlled
5 substances.  The registrant shall inform the Field
6 Division Office of the Administration in his area
7 of suspicious orders when discovered by the
8 registrant.  Suspicious orders include orders of
9 unusual size, orders deviating substantially from
10 a normal pattern, and orders of unusual
11 frequency."
12    You are familiar with this regulation as
13 it pertains to suspicious orders, correct?
14    A.  Yes.
15    Q.  And PSI is aware that it has to comply
16 with this regulation as it relates to suspicious
17 orders?
18    A.  Yes.
19    Q.  When we say "suspicious orders," it's
20 PSI's understanding that we're talking about
21 orders that may be suspicious for potential
22 diversion, correct?
23    MR. RICARD:  Objection to form.
24    A.  Yes.  It may be, yes.

Page 42

1    Q.  And it's not that PSI has to know for
2  sure they're being diverted.  You just have to
3  have a suspicion, correct?
4        MR. RICARD:  Objection to form.
5    A.  I would guess that's true, yeah.
6    Q.  Well --
7    A.  I mean, we -- you know, we -- go ahead.
8    Q.  Sure.  And I don't want you to guess,
9  okay?  That's what I don't want you to do here
10 today.  I want to know what you know.  And if you
11 don't know, I want you to tell us that, okay?
12       When we're talking about suspicious
13 orders, we have to know -- as a registrant, as
14 PSI, we have to know suspicious of what, correct?
15   A.  Correct.
16   Q.  And we know it's suspicious of diversion
17 or illicit activity, correct?
18   A.  Yes.
19       MR. RICARD:  Objection to form.
20   Q.  And we know as PSI that the DEA has told
21 us that we can look for orders of unusual size,
22 orders deviating substantially from a normal
23 pattern, and orders of unusual frequency as some
24 of the factors to look to, correct?

Page 43

1        MR. RICARD:  Objection to form.
2    A.  Yes.
3    Q.  And, again, when we're talking about
4  suspicious, it's suspicious of diversion or some
5  sort of illicit activity because that is what
6  you're trying to prevent as a wholesale
7  distributor?
8        MR. RICARD:  Same objection.
9    A.  Yes.
10   Q.  Okay.  Now, let's go back to that part
11 where we had that little hiccup a moment ago.
12       There's nothing in this regulation that
13 says PSI has to determine that they're actually
14 being diverted, does it?
15   A.  No.
16   Q.  It's the mere suspicion of diversion
17 that should be reported, correct?
18       MR. RICARD:  Objection to form.
19   A.  Yes.
20   Q.  And there's a reason for that, right?
21 And the reason is because we want to get those
22 involved, the DEA, if there's even the potential
23 for diversion so that they can do their
24 investigation to determine whether a pharmacy or a

Page 44

1  doctor or somebody else in the distribution chain
2  needs to be shut down, right?
3        MR. RICARD:  Objection to form.
4    A.  Yes.
5    Q.  And unless we're telling them and
6  providing them that information as a registrant,
7  it makes it much harder on them to do their jobs,
8  correct?
9    A.  Yes.
10   Q.  So one of the ways that we're trying to
11 keep our -- again, our communities and our
12 children safe is by putting upon the registrant,
13 such as PSI, the obligation to report suspicious
14 orders --
15       MR. RICARD:  Objection to form.
16   Q.  -- correct?
17   A.  Yes.
18   Q.  Okay.  Now, we're going to talk about it
19 in more detail later, but you're aware that there
20 is a know your customer requirement, due diligence
21 that has to be done, when you're dealing with
22 suspicious orders and controlled substances as
23 well, correct?
24   A.  Yes.

Page 45

1    Q.  And you may find this interesting.  So I
2  will fully admit I'm a little bit of a book nerd,
3  okay?  And if you -- in studying history in
4  college, if you look back -- well, strike that.
5  Let me start with another premise.
6        You would agree that we are in the
7  middle of an opioid epidemic in this country,
8  correct?
9    A.  Yes.
10   Q.  Okay.  And if you go back and look
11 through history, it's not the first time that
12 we've had opioid issues in this world.  If you
13 think back, back at the late 18th century, early
14 19th, you had the opium wars going on --
15   A.  Yes.
16   Q.  -- on the other side of the world.
17   A.  In China, yes.
18   Q.  And then I don't know if you're familiar
19 with the Harrison Act that was passed in the early
20 1900s.
21   A.  I'm not.
22   Q.  So I went and pulled the Congressional
23 Record from the Harrison Act, and this is going to
24 be -- let me grab it.  And I told you I'm a little

Page 46

1 bit of a book nerd. I really mean I'm a little
2 bit of a book nerd.
3         So -- and tell me -- and, again, not to
4 pick on you at all, but have you ever heard that
5 history tends to repeat itself?
6     A. Yes.
7     Q. And if we look back through time, it
8 seems to be true, doesn't it?
9     A. Yes.
10    Q. Now, the Harrison Act, that was
11 legislation that was passed back in the early
12 1900s, and this is a legislative history and
13 another tidbit -- I'm not really going to go into
14 with you, but Donald McKesson actually spoke at
15 this legislative hearing.
16        Do you know who Donald McKesson is?
17    A. I certainly know what McKesson is, yes.
18    Q. He is one of the founders of that
19 company that now exists still today.
20    A. Yes.
21    Q. The Harrison Act was being considered
22 back during the early 1900s because we were having
23 a problem with opium dens in the United States,
24 and there wasn't a way to control it. And the

Page 47

1 Harrison Act is actually a tax-based act, because
2 way back then, the great U.S. Congress didn't have
3 the expansive powers of the commerce clause to do
4 anything they wanted to. They could only do
5 things they were specifically given power, and one
6 was tax. So this is the Congressional history
7 related to that.
8            - - -
9     (PSI-Schoen Exhibit 7 marked.)
10            - - -
11    Q. And we're just going to touch on a
12 couple sections. Page 25 -- and before I actually
13 start reading that with you, Mr. Schoen, are you
14 aware that the U.S. uses over 95 percent of the
15 opium produced in the entire world?
16    A. No, I'm not aware of that.
17    Q. Okay. Would it surprise you to know
18 that the U.S. uses over 95 percent of the opium
19 produced in the entire world?
20    A. It does surprise me that 95 percent,
21 yes.
22    Q. And, remember, history repeats itself.
23 So let's take a look. And this is a Mr. Wright
24 speaking to our United States Congress. And he

Page 48

1 says, "I would like to point out, as is shown by
2 my report, that this country -- that in this
3 country, we are importing over 400,000 pounds of
4 opium and using it. Over 75 percent of that
5 opium, gentlemen, is manufactured into morphine."
6        And, Mr. Schoen, you know what morphine
7 is, correct?
8     A. I do.
9     Q. And it's another type of pain
10 medication?
11    A. Yes.
12    Q. Okay. "And I have reliable information
13 that 75 percent to 90 percent of that morphine is
14 used outside of legitimate medical channels,"
15 which would be the equivalent to our illicit
16 market today, correct?
17        MR. RICARD: Objection to form.
18    A. Apparently, yes.
19    Q. And in the next section, "In Germany, as
20 I have pointed out in my report, with a population
21 nearly equal to that of the United States, they
22 have a net consumption of 16,000 pounds of opium
23 against 400,000 pounds in this country."
24        Seems shocking, doesn't it, Mr. Schoen?

Page 49

1     A. Yes. I mean, it's --
2     Q. Now, let's go to page 29. And many of
3 these people speaking during this Congressional
4 hearing, Mr. Schoen, were members of the industry,
5 for example, Mr. McKesson.
6        And here on 29, again, the highlighted
7 area, it says, "Gentlemen, it is the manufacturers
8 and wholesalers, the people higher up, that sell
9 these drugs promiscuously that we want to reach
10 and must reach if we ever hope to break up this
11 traffic. Scotch the snake at its lair."
12        Have you ever heard that saying before,
13 "Scotch the snake at its lair"?
14    A. Never.
15    Q. I looked it up. It's a quote from
16 Macbeth. It means go to the home of the snake and
17 kill it. Okay?
18        Now, here it's talking about
19 manufacturers and wholesalers selling drugs
20 promiscuously. And you have an understanding of
21 what that means, correct?
22    A. Outside the appropriate channels, I
23 think.
24    Q. Sure. And you are aware that -- I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  going to exclude PSI from this.
2      You are aware that other distributors
3  have sold drugs outside of the legitimate
4  channels --
5      MR. RICARD:  Objection to form.
6      Q.  -- correct?
7      A.  I really -- I really don't know that
8  they have, no.  I mean, it's just because I don't
9  know.
10     Q.  Sure.  I will tell you with the second
11 memorandum of agreements that both McKesson and
12 Cardinal entered with the United States
13 government, that they admitted to breaking the
14 law.
15     MR. RICARD:  Objection to form.
16 Objection to scope.
17     Q.  If that is the case, then you could
18 agree then that others have acted promiscuously in
19 this industry, correct?
20     MR. RICARD:  Same objection.
21     A.  Apparently, yes.
22     Q.  Let's go on.  "The poor unfortunate
23 'dope fiend' is more sinned against than sinning.
24 Had the law provided sufficient safeguards around

Page 51

1  the sale and distribution of these drugs, he would
2  never have acquired such a habit."
3      Do you see that there, Mr. Schoen?
4      A.  I see it.
5      Q.  And does PSI agree that the system as
6  set up with the Controlled Substances Act is
7  designed with safeguards to protect people from
8  becoming addicts, or at least to try to?
9      A.  Yes.
10     Q.  And that's part of the purpose behind
11 it, correct?
12     A.  Yes.
13     Q.  It says, "Had the manufacturers who sell
14 these drugs any conscious, he would make his
15 business to know who to he sold them in unusual
16 quantities."
17     Now, think about that for one second,
18 and let me ask you, does that sound like the know
19 your customer requirement?
20     A.  Yes.
21     MR. RICARD:  Objection to form.
22     Q.  You have to know who you're selling to
23 before you just selling to them?
24     A.  Yes.

Page 52

1      Q.  And this is way back from 1910.  It's
2  pretty impressive how history repeats itself,
3  isn't it?
4      A.  Yes.
5      Q.  It goes on to say, "Since he won't do it
6  on moral grounds, it becomes the duty of the
7  government to compel him to do it by law."
8      Do you see that?
9      A.  I see that.
10     Q.  And it's the same thing with the
11 enactment of the Controlled Substances Act, right?
12     MR. RICARD:  Objection to form.
13     Q.  We needed governmental safeguards out
14 there to ensure that the people in the supply
15 chain were doing the right thing, correct?
16     A.  Yes.
17     Q.  The next section reads, "Throw on the
18 limelight of publicity such as this act provides.
19 Make every man that handles these drugs
20 responsible for his actions so that we have a
21 record of the transactions from the time of
22 manufacture until it reaches the consumer."
23     And, again, that is why the Controlled
24 Substances Act is created, correct?

Page 53

1      A.  That's their attempt, yes.
2      Q.  And even in 1910, it's sort of crazy how
3  people saw that being part of the solution on how
4  to get control of these controlled substances,
5  correct?
6      A.  Yes.
7      Q.  And PSI recognizes that if we don't have
8  these safeguards, these what we call them safety
9  rules, that it becomes dangerous for the American
10 public?
11     A.  Yeah.
12     MR. RICARD:  Objection to form.
13     Q.  Now, as an operator and, again, one who
14 is a registrant, you have a special
15 responsibility, do you not, when you're dealing
16 with controlled substances?
17     A.  Yes.
18     Q.  And that responsibility is to act in a
19 manner which tries to make the safest decisions
20 for the American public, correct?
21     MR. RICARD:  Objection to form.
22     A.  Yes.
23     Q.  And that includes complying with these
24 safety rules that we've already been discussing?

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    A.  Yes.
2        MR. FULLER:  Okay.  And then next is
3   Exhibit 8, which, Gina, is 108 -- or, no, it's
4   not.
5        MS. VELDMAN:  It's good.  I've got it.
6        MR. RICARD:  Same objection on legal
7   conclusions, Mike.
8        MR. FULLER:  Sure.
9        Gina, it's 106.
10        - - -
11       (PSI-Schoen Exhibit 8 marked.)
12        - - -
13  BY MR. FULLER:
14   Q.  Now, Mr. Schoen, I know you are not a
15  lawyer.
16   A.  Correct.
17   Q.  I completely understand that.  So I'm
18  going to make this brief.
19       Now, I believe you probably have been
20  given a copy of this case, am I correct, Masters
21  Pharmaceutical?
22   A.  I've seen a copy of it.  I haven't read
23  it.  Yes.
24   Q.  Well, where did you get your copy?

Page 55

1   These guys?
2    A.  Yes.
3    Q.  Okay.  Now, I would assume that that may
4   have been more recently when you were getting
5   ready for this deposition, correct?
6    A.  Correct.
7    Q.  Okay.  Now, this decision came out in
8   June of last year.  Were you made aware -- did
9   anybody talk to you about the ramifications of
10  this case back in June of last year when the
11  opinion was rendered by the DC Circuit Court of
12  Appeals?
13   A.  No.
14   Q.  And before -- well, up until the point
15  where you were preparing for your deposition, had
16  you ever heard of this case or its implications?
17   A.  No.  I'd heard -- I heard Masters got in
18  trouble, but that's it.
19   Q.  Well, they did.  Whoever told you that
20  was right.  They got in trouble.
21       Let me ask you -- and I'll ask you to
22  turn to page 7.  Now, you can either turn or look
23  at the electronic copy, because the print on that
24  printout is small as well.

Page 56

1        MR. FULLER:  And, Gina, if you'll
2   highlight or enlarge that highlighted section for
3   me.
4   BY MR. FULLER:
5    Q.  Now, do you see that there?  This is
6   just a portion of the opinion that I'm just going
7   to focus on for a brief moment, okay, Mr. Schoen?
8   And it talks about -- you see "The security
9   requirement" in quotes there?
10   A.  Yes.
11   Q.  Now, that has significance, because if
12  we go back to the earlier exhibit that was 21
13  C.F.R. 1301.74, that suspicious order regulation,
14  it was entitled the security requirements section,
15  wasn't it?
16        MR. RICARD:  Objection to form.
17   A.  Yes.
18   Q.  Okay.  It says -- and this opinion
19  reads, "The security requirement at the heart of
20  the case mandates that distributors design and
21  operate a system to identify suspicious orders of
22  controlled substances and report those orders to
23  the DEA."  And then in parentheses, it has "the
24  Reporting Requirement."

Page 57

1        Have you ever heard, Mr. Schoen, of "the
2   Reporting Requirement"?
3    A.  Yes.
4    Q.  Okay.  And that was that regulation we
5   looked at earlier, correct?
6    A.  Correct.
7    Q.  And PSI agrees that it has had a
8   reporting requirement since that regulation was
9   enacted in 1971, correct?
10        MR. RICARD:  Objection to form.
11   A.  Yes.
12   Q.  And that reporting requirement by law
13  requires PSI or any distributor to report
14  suspicious orders that it receives to the DEA,
15  correct?
16        MR. RICARD:  Objection to form.
17   A.  Yes.
18   Q.  And that if it doesn't report suspicious
19  orders to the DEA, then that distributor is
20  breaking the law, correct?
21   A.  Yes.
22        MR. RICARD:  Objection to form.
23   Q.  Okay.  Now, it goes on to say that "The
24  reporting requirement is a relatively modest one.

Page 58

1 It requires only that a distributor provide basic
2 information about certain orders to DEA so that
3 DEA investigators in the field can aggregate
4 reports from every point along the legally
5 regulated supply chain and use the information to
6 ferret out potential illegal activity."
7         Did I read that correctly?
8     A.  I wasn't following it, but I'm sure you
9 have, yes.
10    Q.  You're too trusting, Mr. Schoen.  I'm
11 kidding.
12        What I read to you exemplifies what we
13 talked about earlier; does it not?
14    A.  Yes.
15    Q.  And that the design of the system is
16 such that distributors have to provide information
17 to the DEA for the DEA to be able to do their job
18 effectively to prevent diversion?
19        MR. RICARD:  Objection to form.
20    A.  Yes.
21    Q.  And PSI agrees with that, understands
22 that, and lives up to that obligation, correct?
23        MR. RICARD:  Objection to form.
24    A.  Yes.

Page 59

1     Q.  Okay.  Next it goes on -- it says, "Once
2 a distributor has reported a suspicious order, it
3 must make one of two choices:  Decline to ship the
4 order or conduct due diligence."
5         Do you see that there?
6     A.  I see it.
7     Q.  This is ultimately referred to as "the
8 shipping requirement."
9         Have you ever heard of that term?
10    A.  I've heard the term.
11    Q.  What is your understanding of the
12 shipping requirement?  And, quite honestly, it
13 shouldn't be the shipping requirement.  It should
14 be the anti-shipping requirement, right?
15    A.  That's correct.
16    Q.  Okay.  And is it your understanding that
17 the shipping requirement means that if we have a
18 suspicious order, we need not to ship it?
19        MR. RICARD:  Objection to form.
20    A.  Yes.
21    Q.  And that that has been the obligation
22 not just upon PSI but upon all distributors, to
23 your understanding, since 1971 when this
24 regulation was passed?

Page 60

1         MR. RICARD:  Objection to form.
2     A.  Yes.
3     Q.  Okay.  Now, let's talk about it and why
4 that makes sense, okay?
5         If you get a suspicious order -- strike
6 that.
7         Not you.  Somebody at your business.  If
8 PSI gets a suspicious order, we understand that
9 that means it's suspicious for potential
10 diversion, correct?
11    A.  There's something about it brought our
12 attention to it, yes.
13    Q.  And something is wrong with it, correct?
14    A.  Potentially, yes.
15    Q.  We don't want to then -- if we think
16 there's a potential of it being diverted, we don't
17 want to send that order off, do we?
18    A.  No.
19    Q.  Because --
20    A.  If we think it's going to be diverted,
21 we won't send it off.
22    Q.  And that's because that's part of your
23 obligation under the regulations, to maintain an
24 effective system to prevent diversion, correct?

Page 61

1     A.  Yes.
2     Q.  Okay.  All right.  We're done with that.
3 No more legal cases.  I can't say that for sure.
4 There may be another one, now that I think about
5 it.
6         All right.
7         MR. RICARD:  Are you doing okay?
8         THE WITNESS:  Fine.
9         MR. FULLER:  Okay.  This is going to be
10 112, Gina.
11             - - -
12        (PSI-Schoen Exhibit 9 marked.)
13             - - -
14 BY MR. FULLER:
15    Q.  So what I'm going to pass you next is
16 Plaintiff's Exhibit Number 9, and I'll explain it
17 to you first, Mr. Schoen.  It is a State of Ohio
18 Administrative Code 202 -- or 2002.  And I'll
19 represent to you that it is the current code.  As
20 you can see from the bottom of the enlarged area,
21 current through December 31, 2002.
22        Do you see that there?
23    A.  I see it.
24    Q.  Okay.

Page 62

1    MR. RICARD:  Real quick, same objection
2  as to legal conclusion.
3    MR. FULLER:  Absolutely.
4  BY MR. FULLER:
5    Q.  And it's Ohio Administrative Code
6  Section 4729-9-16.
7    Have you ever seen this before,
8  Mr. Schoen?
9    A.  Not that I recall.
10    Q.  Okay.  Fair enough that you may have
11  seen it; you just don't recall it?
12    A.  That's true.
13    Q.  Okay.  And it says it's Baldwin's Ohio
14  Administrative Code, Board of Pharmacy, relating
15  to dangerous drugs.
16    Do you see that there?
17    A.  Okay.  Yes.
18    Q.  And I'm not going to do much with this.
19  I just wanted to get your attention to --
20    MR. FULLER:  Gina, I think it's page 6.
21    A.  Page 6?
22    MR. RICARD:  We only have four pages.
23    MS. VELDMAN:  I don't have a page 6.
24    MR. FULLER:  It's actually page 6.

Page 63

1    Do you not have a page 6?
2    MR. RICARD:  It has four pages.
3    MR. FULLER:  Hold on.  Maybe I've got
4  the wrong one.
5  BY MR. FULLER:
6    Q.  Mr. Schoen, that's what happens when you
7  don't copy stuff yourself.
8    A.  That happens.
9    Q.  See, you know.  You've been there, huh?
10    MR. RICARD:  Could I look at that real
11  quick?
12    MR. FULLER:  Yeah.  It's just the State
13  code on suspicious orders.
14    Will it focus?
15  BY MR. FULLER:
16    Q.  Okay.  Not that that is real clear --
17  and I apologize for that, Mr. Schoen, but I'm
18  going to read it to you this time.  And this deals
19  with the Ohio State Board of Pharmacy Code.
20  You're aware there is a Board of Pharmacy Code,
21  correct?
22    A.  Yes.
23    Q.  Okay.  And this says, "A system shall be
24  designed and operate to disclose orders for

Page 64

1  controlled substances and other dangerous drugs
2  subject to abuse."
3    And Section i says that -- did we lock
4  someone out of this room?
5    MR. PELINI:  Locked the old man out.
6    MR. FULLER:  Dude, you can't take a
7  hint?
8    MR. PELINI:  I can now.
9    MR. FULLER:  You leave again, we're not
10  letting you back in.
11    MR. PELINI:  I understand.
12    MR. FULLER:  That bladder, huh?
13  Kidding.
14  BY MR. FULLER:
15    Q.  It says under Section i, "The wholesaler
16  shall inform the State Board of Pharmacy of
17  suspicious orders for drugs when discovered.
18  Suspicious orders are those which, in relation to
19  the wholesaler's record as a whole, are of unusual
20  size, unusual frequency, or deviates substantially
21  from established buying patterns."
22    Correct?
23    MR. RICARD:  Objection to form.
24  Objection to scope.

Page 65

1    A.  Yes.
2    Q.  Okay.  And PSI as a distributor here in
3  Ohio has to comply with that regulation as well?
4    MR. RICARD:  Same objections.
5    A.  Yes.
6    Q.  Okay.  So let's take a minute and recap
7  what we just went over, okay, so I can make sure
8  it's clear and that you and I are on the same
9  page.
10    Prescription Supply, Inc., agrees that
11  it must comply with the Controlled Substances Act
12  as enacted in 1970 by the U.S. Congress, correct?
13    A.  Yes.
14    Q.  Prescription Supply also agrees that as
15  a licensed entity to distribute controlled
16  substances, it has an obligation to try to make
17  the safest choices to keep our children and
18  communities safe related to those drugs?
19    A.  Yes.
20    MR. RICARD:  Objection to form.
21    Q.  Prescription Supply agrees and accepts
22  that from 1971 forward, that there is a suspicious
23  order reporting requirement requiring
24  suspicious -- or excuse me -- requiring

Page 66

1 Prescription Supply to report any suspicious
2 orders that it receives from any of its potential
3 customers?
4     MR. RICARD: Objection to form.
5     A. Yes.
6     Q. And that the reason and basis for
7 reporting suspicious orders is to enable the DEA
8 to do its job in enforcement of the law in
9 preventing diversion?
10     A. Yes.
11     Q. That Prescription Supply also agrees and
12 accepts that since 1971, there has been a shipping
13 requirement, meaning that it cannot ship orders
14 that are in any way suspicious?
15     MR. RICARD: Objection to form.
16     A. Yes.
17     Q. And that the reason we don't ship
18 suspicious orders is because we don't want to
19 contribute to potential diversion of controlled
20 substances?
21     A. Yes.
22     Q. And that, as we've seen through history,
23 Congress not just once, but now twice, has put
24 into place a regulatory scheme, we'll call them

Page 67

1 safety rules, to try to keep the communities, our
2 children, safe from these dangerous drugs?
3     MR. RICARD: Objection to form.
4 Objection to scope.
5     A. Yes.
6     Q. And that as a link in the chain of
7 distribution, wholesalers have an obligation to
8 make the safest choices when distributing these
9 dangerous drugs to protect our children and our
10 families and our communities?
11     MR. RICARD: Objection to form.
12     A. Yes.
13     Q. And Prescription Supply, Inc., would
14 agree that in distributing these controlled
15 substances, every distributor needs to comply with
16 the public safety rules and make the safest
17 choices related to the distribution of these
18 controlled substances?
19     MR. RICARD: Objection to form.
20     A. Yes.
21     Q. Now -- and I'll be upfront. I've seen
22 it in the documents that have been provided by
23 your counsel that Prescription Supply has on
24 occasion declined to do business with potential

Page 68

1 customers because they look sketchy, correct?
2     A. That's correct.
3     Q. Because of one factor or another. Maybe
4 they were off in a far different state. Maybe
5 there were other indicators. But Prescription
6 Supply has declined to do business with people who
7 it felt may be involved in some sort of diversion?
8     A. Many.
9     Q. Making those type of choices has a
10 financial impact on the company's operation; does
11 it not?
12     A. It does.
13     Q. It can actually hamper a company's
14 operations financially, correct?
15     A. Yes. So can not making those choices.
16     Q. Absolutely. But Prescription Supply
17 would agree that a less safe choice should not be
18 made just for financial gain?
19     A. Yes.
20     Q. The financial gain should not weigh in
21 when trying to decide whether to report a
22 suspicious order or to halt orders?
23     A. Yes.
24     Q. And that if it does, it's not good for

Page 69

1 the American public?
2     A. Yes.
3     MR. FULLER: Okay. Guys, we've been
4 going a little over an hour. Do you want to take
5 a break?
6     MR. RICARD: Sure.
7     THE VIDEOGRAPHER: The time is now
8 10:13. Going off the record.
9     (Recess taken.)
10     THE VIDEOGRAPHER: The time is now
11 10:27. Back on the record.
12 BY MR. FULLER:
13     Q. And, Mr. Schoen, I'm sorry because I
14 didn't tell you this at the beginning. If you
15 need a break at any time for anything, use the
16 restroom, take a phone call, whatever it may be,
17 just let us know. This isn't meant to be
18 unbearable, uncomfortable. I know it's not
19 necessarily pleasurable being here.
20     A. It's not meant to be, yes.
21     Q. But we'll try to do everything we can,
22 including keeping you with some Diet Coke, if
23 necessary.
24     A. Thank you.

Page 70

1    Q.  Now, you put cream in tea?
2    A.  I'd rather put milk in it, but -- that's
3  the way I was brought up.  You know, it's a
4  very --
5    Q.  English thing?
6    A.  Yes.
7    Q.  I was going to say.
8    A.  My mother-in-law, who has passed away,
9  was a war bride.
10   Q.  Oh, really?
11   A.  And she -- but she was there during the
12 war, and during the depression, which didn't hit
13 England as hard.
14   Q.  Sure.
15   A.  So she never used milk in her tea.
16   Q.  No?
17   A.  She never used it in her tea because
18 they couldn't afford it.
19   Q.  Not because she didn't want it?
20   A.  It's the world, you know.
21   Q.  Not because she didn't want it?
22   A.  Well, perhaps.  What she doesn't know --
23 what she didn't know, she didn't --
24   Q.  You don't miss, right?

Page 71

1    A.  That's right.
2    Q.  What I always tell everybody, growing up
3  we didn't have air-conditioning until I was in
4  high school, which wasn't necessarily back in the
5  depression.  I mean, this is in the --
6    A.  Where were you --
7    Q.  I was born and raised in Plant City,
8  Florida.  It's a strawberry farming town outside
9  of Tampa.
10       MS. QUEZON:  You need air conditioning.
11   Q.  So it's the south.
12       All right.  And, Mr. Schoen,
13 Prescription Supply, Inc., does recognize that we
14 are currently in an opioid crisis, correct?
15   A.  Yes.
16   Q.  And that currently -- I think the last
17 number was somewhere around 120 people are dying
18 of prescription-related overdoses every day in
19 this country?
20   A.  I wasn't aware of that, but I'll accept
21 it.
22   Q.  Assuming that that figure is correct, is
23 that shocking to you?
24   A.  Certainly anybody dying is shocking.

Page 72

1    Q.  But 120 people a day?
2    A.  It was shocking to me that Limbaugh got
3  hooked on it.
4    Q.  And let me ask, unlike a lot of the
5  other Defendants here, you've been in the industry
6  personally yourself for a very long time.  Did you
7  ever think you would see an epidemic develop like
8  has developed in this country?
9    A.  There -- I was in college just before
10 the -- I'm going to say the drug revolution at
11 least hit in my area.  I wasn't -- I graduated
12 St. Thomas in Saint Paul, Minnesota.
13   Q.  Yes, sir.
14   A.  We didn't know about -- I mean, we knew
15 marijuana, but we didn't use it.  I never knew
16 anybody that used it.  We knew that at the
17 university, some people were experimenting with
18 LSD, but I didn't know anybody personally.
19       I went into the Army, came back, went
20 into graduate school.  I graduated in '67, went in
21 the Army '68, '69, came back, went to graduate
22 school, and the world was a different place.
23       And to that extent, I'm not surprised
24 that addiction is a problem in this country.  And

Page 73

1  people that claim that marijuana is not a problem
2  are wrong as far as I'm concerned.
3    Q.  Well, I appreciate that.  I do.  Now
4  we're facing an opioid epidemic on top of
5  everything else, which Prescription Supply
6  recognizes, correct?
7    A.  I do.
8    Q.  And we're going to talk a little bit now
9  about that crisis and how long it's been going and
10 developing.
11       MR. FULLER:  Hey, AJ, give me 201.
12 Thanks.
13              - - -
14       (PSI-Schoen Exhibit 10 marked.)
15              - - -
16 BY MR. FULLER:
17   Q.  Mr. Schoen, have you ever heard of the
18 United States General Accounting Office or
19 sometimes referred to as the GAO?
20   A.  Probably I've heard of it.  I don't know
21 anything about it.
22   Q.  So it is a federal body that does
23 accountability, integrity, and reliability related
24 to different issues going on in our country, as

Page 74

1 well as within our federal government. So there
2 has been a GAO looking into the DEA. This one is
3 looking into, as you can see, prescription drugs.
4 And as you can see, it's entitled "United States
5 General Accounting Office, GAO Report to
6 Subcommittee on Oversight and Investigations,
7 Committee on Energy and Commerce, House of
8 Representatives."
9      And you understand that that is one of
10 the investigative bodies within our United States
11 House of Representatives, correct?
12      MR. RICARD:  Objection to form.
13 Objection to scope.
14      A.  I do.
15      Q.  And that the title of this -- and it's
16 dated May of 2002.  So we're going back about 16
17 years, correct --
18      A.  Apparently.
19      Q.  -- if I did my math right?
20      A.  Yes.
21      Q.  And it says, "Prescription Drugs, State
22 Monitoring Programs Provide Useful Tool to Reduce
23 Diversion."
24      And you know what state monitoring

Page 75

1 programs are, correct?
2      A.  I do.
3      Q.  Okay.  And if you turn -- and I'll tell
4 you, I didn't provide you the whole document, I
5 don't think.  I think I just provided you the
6 relevant page.  So if you'll turn to the second
7 page where it talks to the background, and it
8 says, "The diversion and abuse of prescription
9 drugs are associated with incalculable costs to
10 society in terms of addiction, overdose, death,
11 and related criminal activities."
12      Does Prescription Supply agree that
13 diversion -- it's foreseeable that diversion would
14 cause all those issues; addiction, overdose,
15 death, and criminal related activities?
16      MR. RICARD:  Objection to form.
17 Objection to scope.
18      A.  Yes.
19      Q.  It goes on to say the "DEA has stated
20 that the diversion and abuse of legitimately
21 produced controlled pharmaceuticals constitutes a
22 multibillion-dollar illicit market nationwide."
23      Does Prescription Supply recognize that
24 the controlled substances that you deal in has a

Page 76

1 substantial value on the black market?
2      MR. RICARD:  Objection to form.
3 Objection to scope.
4      A.  I do.
5      Q.  And that's part of the problem, because
6 that incentivizes people to participate in the
7 illicit market when you're dealing with controlled
8 substances, correct?
9      A.  Yes.
10      Q.  And that takes us back to what we looked
11 at earlier on the Congressional history from 1970,
12 is we basically got to make sure the punishment or
13 potential punishment significantly outweighs
14 whatever potential gains are there in order for
15 the system to be effective, correct?
16      A.  Yes.
17      Q.  PSI recognizes that and suggests that
18 that's part of the way we can get control of this
19 epidemic, correct?
20      MR. RICARD:  Objection to form.
21      A.  Yes.
22      Q.  They go on to state, "A single
23 40-milligram OxyContin tablet legally selling for
24 about $4 is worth about $40 on the illicit

Page 77

1 market."
2      Does that coincide with what you've
3 heard as Prescription Supply, Inc.?  Not to
4 suggest that you've been out buying pills
5 illegally.
6      A.  Yes.
7      Q.  Okay.  Now, keep in mind -- and this is
8 in 2002.  So we're going back well over a decade,
9 16 years.
10      MR. FULLER:  202.  Well, I've got one
11 copy of 202.  It's this whole folder.  There we
12 go.
13 BY MR. FULLER:
14      Q.  I put my sticker on my copy.  I do that.
15 I get like -- multitasking, not my strong suit.
16      A.  Which is why you let other people do
17 your copying.
18      Q.  Yeah, and then see what happens.
19          - - -
20      (PSI-Schoen Exhibit 11 marked.)
21          - - -
22      Q.  All right.  This is going to be
23 Plaintiff's Exhibit Number 11.  And we've seen
24 this once before, I think, Mr. Schoen.  Do you see

Page 78

1 this? And I'm holding it up. The HathiTrust?

2    A.   Yes.

3    Q.   You've probably never heard of it, have

4 you?

5    A.   I have not, no.

6    Q.   It is a non-profit that collects -- and

7 I didn't learn about it until this litigation --

8 collects old documents or older documents. That's

9 how I gained access to that 1910 Congressional

10 Record, because otherwise you would have to go to

11 the Congress archives in DC and try to dig it out.

12 So a lot of this stuff, fortunately, is online

13 now.

14        So if you'll turn to page 2. This is

15 another United States Congressional hearing. The

16 title of it is, "OxyContin: Its Use and Abuse."

17        Now, you are aware of what OxyContin is,

18 correct, Mr. Schoen?

19    A.   I'm not a pharmacologist, but yes. I'm

20 basically aware that it is a pain drug.

21    Q.   And you're aware that it's an

22 opioid-based pain medication?

23    A.   I am aware.

24    Q.   And I'll tell you, if you're aware or

Page 79

1 not, that it was launched in approximately 1996.

2        Does that seem to coincide with your

3 recollection?

4    A.   Yes.

5    Q.   And are you aware that -- it was created

6 by Purdue Pharma, which you know who they are,

7 correct?

8    A.   (Indicates affirmatively.)

9        MR. RICARD:  You have to say yes or no.

10    A.   Yes. I'm sorry.

11    Q.   That's all right. Again, we get into

12 that conversational tone and we forget sometimes.

13 I apologize.

14        Are you aware that the -- that multiple

15 entities have been very critical of Purdue Pharma

16 for the way it marketed OxyContin to doctors and

17 patients?

18        MR. RICARD:  Objection to form.

19    Q.   And if you're not aware --

20    A.   I'm really -- in particular, no, I'm not

21 aware of it.

22    Q.   Are you aware that they got in trouble

23 with the DEA for the way they market their

24 product?

Page 80

1        MR. RICARD:  Objection to form.

2    A.   To be -- I mean, I've heard something

3 about it. That's --

4    Q.   But you don't know the details?

5    A.   I certainly don't.

6    Q.   Fair enough. And, again, if you don't,

7 just tell me that.

8    A.   Okay.

9    Q.   That is a legitimate answer as long as

10 it's a truthful answer, okay?

11    A.   All right.

12    Q.   So this hearing is before the

13 Subcommittee on Oversight and Investigations of

14 the Committee on Energy and Commerce, House of

15 Representatives, One Hundred Seventh Congress,

16 first session, August 28, 2001.

17        So here going back a year prior to the

18 last document that we looked at, which was a GAO

19 report, this is going back to 2001, and it's the

20 abuse -- the use and abuse of OxyContin.

21        And if you will turn to page 6. It

22 says, "The use and abuse of OxyContin provides

23 quite a dilemma for us in the U.S. Congress" --

24 excuse me -- "for us in Congress and for the

Page 81

1 American public. For some, OxyContin is the angel

2 of mercy; and for others, it's the angel of

3 death."

4        Does Prescription Supply agree that if

5 used appropriately, OxyContin has its place and

6 can be a, for lack of a better analogy, angel of

7 mercy; and if used illicitly, can also bring about

8 death?

9        MR. RICARD:  Objection to form.

10    A.   Yes.

11    Q.   It says, "Today, we will hear from law

12 enforcement officials who argue that OxyContin is

13 quickly becoming the abuser's drug of choice,

14 surpassing heroin and cocaine in some

15 jurisdictions."

16        Does Prescription Supply agree and

17 recognize that as early as 2001, we were seeing

18 the opioid epidemic blossom and bloom?

19    A.   To be honest, in 2001, I don't believe I

20 was aware of that.

21    Q.   Whether you were --

22    A.   I'm aware of it now.

23    Q.   Sure. Let's go on, and then I'll ask

24 the next question.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 If you'll turn to page 8. It says,
2 "These actions, though commendable, also appear
3 long overdue. According to DEA, the number of
4 oxycodone-related deaths has increased 400 percent
5 since 1996, the same time period in which the
6 annual number of prescriptions for OxyContin has
7 risen from approximately 300,000 to almost
8 6 million."
9 We're looking at the time frame,
10 Mr. Schoen, of 1996 to 2001. Prescription Supply
11 would agree that that is an unusual increase in
12 the prescriptions for any drug going from 300,000
13 to 6 million?
14 MR. RICARD: Objection to form.
15 Q. Do you know how many times that is
16 increased --
17 A. No.
18 Q. -- or what percentage?
19 A. No.
20 Q. So I had to do the math on the
21 calculator.
22 A. Okay.
23 Q. That's a 2,000 percent increase in five
24 years.

Page 83

1 A. Mm-hmm.
2 Q. Does that cause you any concern as
3 someone in the industry knowing that this is a
4 Schedule II controlled substance?
5 A. It depends on what it's being used for,
6 doesn't it?
7 Q. Right.
8 A. When my wife broke her leg --
9 Q. Yes, sir.
10 A. -- okay, she got a prescription, okay,
11 and at that time I asked a nurse, who happened to
12 have been a neighbor of ours at one time, that was
13 there, "Why this? Why that drug?"
14 And she said, "Because there's nothing
15 else available," which could explain the rise in
16 this. I mean, it used to be when I was in the
17 Army and had my teeth pulled, they gave me Darvon
18 Compound or something.
19 Q. Sure.
20 A. And that's gone. A lot of the drugs
21 that were out there have disappeared, and that
22 would allow them to gain a certain market share.
23 I'm not defending. I'm just saying that that's --
24 Q. Sure. And you're not -- well, let me

Page 84

1 ask you.
2 You're not saying that there weren't
3 other opioid-based pain medications, because we
4 know morphine --
5 A. Yes.
6 Q. -- was around?
7 A. Yes.
8 Q. We know Lortab was around. Vicodin was
9 around.
10 A. Yeah.
11 Q. Those are all other pain medications,
12 right?
13 A. Well, yeah, there are. When I think of
14 morphine, I think of even worse than, you know ...
15 Q. It would shock you that that's not the
16 case, huh?
17 A. I am shocked that that's not the case,
18 yes. I did not know that.
19 Q. So take that increase, that
20 2,000 percent increase --
21 A. Yes.
22 Q. -- in light of the earlier sentence, a
23 400 percent increase in oxycodone-related deaths
24 during the same time frame. That's not right, is

Page 85

1 it? People shouldn't be dying from prescription
2 medication, should they?
3 MR. RICARD: Objection to form.
4 A. No.
5 Q. Okay.
6 A. But people do die from taking
7 prescription medication. Very few hopefully.
8 Q. You wouldn't expect --
9 A. But I wouldn't expect 400 percent, no.
10 Q. Right. Now, if during this time frame
11 we are mismarketing medications, during this time
12 frame if we are -- and I say "we." People in the
13 supply chain -- and I'm not picking on PSI -- are
14 shipping and not reporting suspicious orders, this
15 type of thing could be a foreseeable outcome,
16 correct?
17 MR. RICARD: Objection to form.
18 A. Yes. But these are -- you're talking
19 about 6 million prescriptions.
20 Q. That's a lot.
21 A. That's a lot.
22 Q. I mean, particularly when five years ago
23 it was only 300,000 --
24 A. Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q. -- a 2,000 percent increase?

2    A. Mm-hmm.

3    Q. Now, I agree with you there's plenty of

4 blame to go around. Doctors had to write those

5 scripts, right?

6    A. That's right.

7    Q. But we know there's bad doctors out

8 there, too, don't we?

9    A. That's right.

10    Q. Now, we also are not -- as being a

11 member of the supply chain, Prescription Supply,

12 we're not going to condone any manufacturers who

13 may be mismarketing their drugs either?

14    A. No.

15    Q. That's absolutely inappropriate,

16 correct?

17    A. Correct.

18    Q. It's absolutely detrimental to the

19 American public, correct?

20    A. Yes.

21    Q. Without question?

22    A. Without question.

23    Q. We're not going to condone any other

24 wholesale distributors who may be shrugging their

Page 87

1 duties to report and stop suspicious orders

2 either, are we?

3    A. No.

4    Q. I'm not saying you or picking on anybody

5 else here, but if it's happening, Prescription

6 Supply isn't going to stand for it?

7    A. Prescription Supply isn't going to do it

8 for sure.

9    Q. For sure. And doesn't think anybody

10 else should be able to get away with it?

11    A. That's correct.

12    Q. Okay.

13       MR. FULLER: I need 206.

14 BY MR. FULLER:

15    Q. It's another big book, but at least my

16 boxes are going to be a lot lighter going home.

17    A. I'm happy for you and the airlines.

18    Q. And you don't have to take this with

19 you?

20    A. I'm happy for you and the airlines.

21    Q. All right. This is going to be

22 Plaintiff's Exhibit Number 12.

23       - - -

24       (PSI-Schoen Exhibit 12 marked.)

Page 88

1       - - -

2    Q. Now, Mr. Schoen, this is the National

3 Center On Addiction and Substance Abuse, Cornell

4 University. You know of Cornell University, heard

5 of it at least, correct?

6    A. Yes.

7    Q. A very prestigious entity -- university?

8    A. Yes.

9    Q. And it's funded by -- well, excuse me.

10 It's "Under the Counter: The Diversion and Abuse

11 of Controlled Prescription Drugs in the U.S.," and

12 it's dated -- what date do you see there,

13 Mr. Schoen?

14    A. July '05.

15    Q. So a couple years after those other

16 documents we looked at, right?

17    A. Correct.

18    Q. And it's funded by an unrestricted grant

19 from who?

20    A. From Purdue apparently.

21    Q. Purdue Pharma LP?

22    A. Okay.

23    Q. The maker of OxyContin, right?

24    A. Yes.

Page 89

1    Q. And there's only one area I want to

2 touch on. If you go to page 9, again, Bates

3 number in the upper right-hand corner.

4    A. It happens to agree with the lower page.

5 Okay.

6    Q. Sir?

7    A. It happens to agree with the lower.

8    Q. Oh, it does. You're right. You're

9 right.

10       It says, "The bottom line: Our nation

11 is in the throws of an epidemic of controlled

12 prescription drug abuse and addiction. Today

13 15.1 million people admit abusing prescription

14 drugs, more than the combined number who admit

15 abusing cocaine, hallucinogens, and heroin

16 combined." Oh, and inhalants as well.

17       Do you see that there?

18    A. I see it.

19    Q. And, again, you may not have ever been

20 provided this report or seen this report, but PSI

21 has no reason to disagree with this report that in

22 the early 2000s, we were in the throws of a

23 prescription drug abuse and addiction epidemic,

24 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1     MR. RICARD:  Objection to form.
2  Objection to scope.
3     A.  I assume that this is accurate then,
4  yes.
5     Q.  And then here's what was most shocking
6  to me at least, and you tell me.  "Children are
7  especially at risk."
8        Do you see that?
9     A.  I see that.
10    Q.  "In 2003" -- so about that time frame
11  you were just talking about -- "2.3 million teens
12  between the ages of 12 and 17 admit abusing
13  prescription drugs in the past year.  83 percent
14  of them admitted abusing opioids."
15        Now, understanding that that was going
16  on back 15 years ago, that causes Prescription
17  Supply great concern, doesn't it?
18    A.  It does.
19    Q.  Because these are our kids, right?
20    A.  Right.
21    Q.  These are part of the people that we
22  are -- and I say "we."  Prescription Supply is
23  trying to keep safe by abiding by the Controlled
24  Substances Act?

Page 91

1     A.  Yes.
2     Q.  We shouldn't have -- would Prescription
3  Supply agree that we shouldn't have 2.3 million
4  teens, kids between the ages of 12 and 17, abusing
5  opioids in this country?
6     A.  Yes.
7     Q.  And this would be an indication that we
8  are in an epidemic even in the early 2000s,
9  correct?
10    MR. RICARD:  Objection to form.
11    A.  Yes.
12    Q.  Now, Prescription Supply is aware that
13  when you're talking about oxycodone or hydrocodone
14  or any of the other derivatives, you're dealing
15  with opioids, right?
16    A.  Yes.
17    Q.  Hydrocodone was -- I say recently.
18  What?  2014, I think rescheduled from a III to a
19  II?
20    A.  Yes.
21    Q.  That's because of the dangerous
22  propensities with that medication as well, right?
23    MR. RICARD:  Objection to form.
24    A.  Yes.

Page 92

1     Q.  Prescription Supply also recognizes
2  that -- strike that.
3        So with that information that I showed
4  you provided by the GAO, the Congressional
5  hearings, and now Cornell University, while you
6  may not have known it at the time, Prescription
7  Supply agrees that the evidence indicates that we
8  were in an opioid epidemic even in the early
9  2000s?
10    MR. RICARD:  Objection to form.
11  Objection to scope.
12    A.  Yes, based on what you've shown me.
13    Q.  And assuming that it's true?
14    A.  Assuming.
15    Q.  Because you haven't done anything to
16  independently verify this stuff?
17    A.  I have not.
18    Q.  All right.  Mr. Schoen, we're going to
19  talk now a little bit about interaction and
20  communication with the DEA.  So here's what my
21  hope is -- and counsel probably picked up on this
22  already.
23        We're flowing through a bunch of
24  different topics, subjects, most of which are set

Page 93

1  out in the 30(b) notices, the Exhibits 1 and 2
2  that we looked at earlier.  Through the
3  progression through these subject areas, we're
4  going to cover -- at least my goal is -- most of
5  the subjects set out in the 30(b).
6        There may be some that we need to go
7  back and -- that I didn't ask about that we'll
8  clean up at the end, just to get the information
9  out, but I'm just trying to do this in sort of
10  organic conversation type instead of running
11  through one after the other, which, trust me,
12  would be even more boring than this already is for
13  you.  Okay?
14    A.  Yes.
15    Q.  All right.  Now, my understanding is
16  that -- strike that.
17        PSI has had interaction with the DEA in
18  the past, correct?
19    A.  Yes.
20    Q.  As of -- shoot.  I think I saw a --
21    A.  The DEA is a regulatory body --
22    MR. RICARD:  There's no question
23  pending.
24    Q.  If you want to go ahead and start

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 talking, we all -- I'm kidding. I'm kidding.
2 Listen to the advice of your counsel.
3       Now, as recent as April, I think, of
4 '16, PSI had a meeting and a presentation done by
5 the DEA. Does that sound correct?
6    A. Yes.
7    Q. Okay. But you're correct, the
8 regulatory body, at least at the federal level, is
9 the DEA; is that right?
10    A. Yes.
11    Q. Prescription Supply also recognizes that
12 they have to comply with the board of pharmacies
13 in the respective states that they do business in,
14 particularly the state we're sitting in, the State
15 of Ohio --
16    A. Yes.
17    Q. -- correct?
18       And they may have slightly different
19 rules and regulations, some of which we saw
20 earlier today?
21    A. Yes.
22    Q. But it doesn't change the fact that
23 Prescription Supply is obligated to comply with
24 those regulations?

Page 95

1    A. Yes.
2    Q. Okay.
3       MR. FULLER: 301.
4       And, Counsel, this is the Dear Registrant
5 letter from 2006. In the production, I didn't get one
6 that was specifically to Prescription Supply --
7       MR. RICARD: Right.
8       MR. FULLER: -- so I just grabbed
9 Cardinal's, so I'm assuming that he will testify
10 that they got one.
11       MR. RICARD: Yeah. You can ask him.
12          - - -
13       (PSI-Schoen Exhibit 13 marked.)
14          - - -
15 BY MR. FULLER:
16    Q. So, Mr. Schoen, this letter is what we
17 refer to as a Dear Registrant letter. And if you
18 look at the very beginning, it says, "This letter
19 is being sent to every commercial entity in the
20 United States registered with the DEA to
21 distribute controlled substances."
22       And certainly we've established that
23 Prescription Supply would fall into that category,
24 correct?

Page 96

1    A. Correct.
2    Q. Okay. This particular letter, however,
3 is to Cardinal Health, right?
4    A. Yes.
5    Q. Not Prescription Supply?
6    A. That's correct.
7    Q. Now, I'll tell you -- and it may be
8 because it wasn't saved or it wasn't kept -- I
9 never got in discovery one that was sent to
10 Prescription Supply. I'm not faulting anybody.
11 It's just I didn't get it.
12       Do you know whether Prescription Supply
13 ever got such a letter from the DEA?
14    A. I don't know that we got it. I assume
15 we got it, but I don't know that we have it.
16    Q. So let me ask you a different question.
17       Assuming that the DEA sent one to every
18 registrant in the country in September of 2006,
19 presumptively the same letter would have been sent
20 to Prescription Supply because it was a registrant
21 as well, correct?
22    A. Correct.
23    Q. Okay. But sitting here today, you have
24 no independent recollection of actually getting

Page 97

1 this letter?
2    A. No, I don't.
3    Q. Okay. And that's fair enough, all
4 right? Like I told you before, if you don't know
5 or you don't remember, just tell me, and I don't
6 have any problem with that, okay?
7    A. Yes.
8    Q. All right. Now, we're going to go
9 through some areas of this letter and just talk
10 about them briefly.
11       So it says -- after that first sentence,
12 it says, "The purpose of this letter is to
13 reiterate the responsibilities of controlled
14 substance distribution in view of the prescription
15 drug abuse problem our nation currently faces."
16       Do you see that?
17    A. I see it.
18    Q. If we roll down to the -- under the
19 Background section --
20       MR. FULLER: Yeah. How did you know I
21 was going there? Is that highlighted on yours?
22       MS. VELDMAN: No. I was just cheating
23 looking --
24       MR. FULLER: She's good.

Page 98

BY MR. FULLER:

Q. All right. If you go down to the paragraph -- well, you have it highlighted, so I don't need to specify, but the highlighted section there says, "Distributors are, of course, one of the key components of the distribution chain. If the closed system is to function properly as Congress envisioned, distributors must be vigilant in deciding whether a proposed customer can be trusted to deliver controlled substances only for lawful purposes."

PSI agrees and accepts that responsibility as set out by the DEA in this letter, correct?

MR. RICARD: Objection to form.

A. Yes.

Q. PSI also agrees that that has been the obligation since 1971, right?

A. Yes.

Q. That PSI, along with the other registered distributors, is a key component in the distribution chain and must be, as it says here, vigilant in deciding whether to ship controlled substances, correct?

Page 99

A. Yes.

Q. And PSI takes extreme caution in ensuring that the persons that it is shipping to are the type that are not going to divert, as we discussed earlier? You even declined to take on new customers because of that concern, correct?

A. Yes.

Q. It says, "This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."

Again, Prescription Supply accepts and agrees with that statement?

A. Yes.

Q. We've already seen that written several other times in the Congressional history, as well as the Controlled Substances Act, correct?

A. Yes.

Q. That shouldn't come as a surprise to anybody?

A. No.

Q. At least nobody in your line of

Page 100

business, correct?

A. Correct.

Q. Okay. If you go to the next page, Mr. Schoen.

A. Yes.

Q. It says, "The statutory factors DEA must consider in deciding whether to revoke a distributor's registration are set forth in 21 U.S.C. 823(e). Listed first among these factors is the duty of the distributors to maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific, and industrial channels."

Prescription Supply agrees and accepts that duty and responsibility to maintain effective controls against diversion, correct?

MR. RICARD: Objection to form.

A. It does.

Q. Okay. And then it goes down, and it says, "The DEA regulations require" -- do you see that section?

A. No.

Q. Hold on. She'll get there. Yeah, that's it.

Page 101

A. All right.

Q. And this recites 21 C.F.R. 1301.74(b), and that's the suspicious order obligation that we talked about earlier, right?

A. Yes.

Q. And Prescription Supply still accepts and recognizes that that has been in place since 1971, correct?

MR. RICARD: Objection to form.

A. Yes.

Q. Then here's where it gets interesting, and here's where I want to make sure that you and I, Mr. Schoen, are on the same page.

It next says, "It bears emphasis that the foregoing reporting requirement is in addition to, and not in lieu of, the general requirement under 21 U.S.C. 823(e) that a distributor maintain effective controls against diversion."

MR. RICARD: Hang on.

MS. MONAGHAN: Objection to form.

MR. RICARD: Do you see where --

THE WITNESS: I see that, yes.

MR. FULLER: There we go.

THE WITNESS: Yes.

Page 102

1    MR. RICARD: Take a look at it.
2    BY MR. FULLER:
3    Q.  And I'll read it again, Mr. Schoen.  "It
4    bears emphasis that the foregoing reporting
5    requirement is in addition to, and not in lieu of,
6    the general requirement under 21 U.S.C. 823(e)
7    that a distributor maintain effective controls
8    against diversion."
9    And let's talk about that for one
10   second, Mr. Schoen.  What the DEA is pointing out
11   is the two separate code sections we looked at
12   earlier.  We know, and Prescription Supply agrees,
13   that it has a statutory obligation to maintain
14   effective controls against diversion, correct?
15   MR. RICARD:  Objection to form.
16   Q.  And that means put systems and practices
17   and policies in place to try to prevent diversion.
18   Does PSI agree?
19   MR. RICARD:  Same objection.
20   A.  Yes.
21   Q.  And that code section has been in full
22   force and effect since 1970 when the Controlled
23   Substances Act was passed, correct?
24   MR. RICARD:  Objection to form.

Page 103

1    A.  Yes.
2    Q.  Separate from that, separate and
3    distinct, on this side, we have the suspicious
4    order reporting requirement, which is different,
5    right?
6    A.  Yes.
7    Q.  It is a mechanism in which the wholesale
8    distributor, in this case PSI -- I'm sorry.
9    A.  Go ahead.
10   Q.  You seemed bothered there for a second.
11   A.  Well, I'm just trying to make sure that
12   I'm not misunderstanding.
13   Q.  No.  And I'm going to try to make it as
14   simple as I can because this is how --
15   A.  That's good because I need it to be
16   simple.
17   Q.  This is how I know how to do it.
18   21 C.F.R. -- so when we say "C.F.R.," we're
19   referring to the Code of Federal Regulation.
20   A.  Yes.
21   Q.  And that's a rule promulgated by the
22   DEA.
23   A.  Okay.
24   Q.  That's different than U.S.C., which is

Page 104

1    the United States Code that's actually passed by
2    the U.S. Congress.
3    A.  Okay.
4    Q.  Okay?
5    A.  Okay.
6    Q.  So we're dealing with two different
7    statutory schemes.  And, again -- and I'm doing
8    this, Mr. Schoen, so that you and I -- like I
9    mentioned earlier, we can make sure we're on the
10   same page because I want to make sure you
11   understand what you're answering so I know that
12   I'm getting -- I'm understanding what you're --
13   the answer I'm getting as well.
14   Okay.  Now, I'm just going to hold it
15   up.
16   A.  Okay.
17   Q.  So we have -- I hope you don't mind, but
18   I like changing colors for emphasis.  And you see
19   if this makes sense and whether you agree, okay?
20   So, number one, we have the U.S. code section --
21   or excuse me.  And I got that backwards.  I can't
22   write it right much less explain it right.  Jeez.
23   So, number one, the first thing we
24   looked at this morning was the U.S. code section?

Page 105

1    A.  Okay.
2    Q.  And Prescription Supply recognizes that
3    U.S. -- 21, U.S. Code 823(e) requires effective
4    controls against diversion, correct?
5    MR. RICARD:  Objection to form.
6    A.  Yes.
7    Q.  And that regulatory -- or excuse me.
8    That statutory obligation has been in place in
9    full effect since 1970 when the CSA was passed?
10   MR. RICARD:  Same objection.
11   A.  Yes.
12   Q.  In addition to that, what we saw was
13   passed in 1971 was the Code of Federal Regulation,
14   21 C.F.R. 1301.74(b), which is the suspicious
15   order reporting requirement, correct?
16   MR. RICARD:  Objection to form.
17   A.  Mm-hmm.
18   Q.  Is that a yes?
19   A.  Yes.
20   Q.  And Prescription Supply agrees that it
21   also in addition to effective controls against
22   diversion has a suspicious order reporting
23   requirement since 1971?
24   MR. RICARD:  Same objection.

Page 106

1 Q. Correct?
2 A. Yes.
3 Q. Okay. And when I say there's two
4 distinct -- and when Mr. Rannazzisi is explaining
5 in his letter, he's saying there's two distinct
6 obligations; one, you have to maintain effective
7 control to try to prevent diversion yourself.
8 And you agree with that, correct?
9 MR. RICARD: Objection to form.
10 A. Yes.
11 Q. You also have a suspicious order
12 reporting requirement in addition to that you have
13 to report suspicious orders to the DEA, correct?
14 MR. RICARD: Objection to form.
15 A. Yes.
16 Q. Okay. And if anybody wants to, I'll --
17 MS. MONAGHAN: Can we mark that as an
18 exhibit?
19 MR. FULLER: Yeah. My artwork, that
20 will be Plaintiff's 14.
21 - - -
22 (PSI-Schoen Exhibit 14 marked.)
23 - - -
24

Page 107

1 BY MR. FULLER:
2 Q. And that's where Mr. Rannazzisi who
3 was -- I forget what his actual title was. Let's
4 see if he puts it on his letter. Joseph
5 Rannazzisi who did this letter was the Deputy
6 Assistant Administrator, Office of Diversion
7 Control, in 1996.
8 A. Mm-hmm.
9 MR. RICARD: You need to respond yes or
10 no.
11 A. I'm sorry. I don't know what the -- I
12 didn't hear a question there.
13 Q. No, there wasn't. I was just stating
14 who -- what his title was.
15 So let me state it differently. If you
16 go to page 4 of the document, this document
17 indicates that it was -- it is signed off on by
18 Joseph Rannazzisi, correct?
19 A. Yes.
20 Q. And it indicates that his position is
21 Deputy Assistant Administrator of the Office of
22 Diversion Control, correct?
23 A. Yes.
24 Q. Now, you don't know whether that's right

Page 108

1 or not. That's just what it indicates on the
2 letter.
3 A. Yes.
4 Q. Now, in all fairness, you don't have any
5 reason to dispute that, do you?
6 A. No.
7 Q. Okay. Now, going back to page 2 of the
8 document. That's what Mr. Rannazzisi is saying
9 when he says, "It bears emphasis that the
10 foregoing reporting requirement is in addition to,
11 and not lieu of, the general requirement under 21
12 U.S.C. 823(e) that a distributor maintain
13 effective controls against diversion"?
14 MR. RICARD: Objection to form.
15 Q. And PSI agrees and accepts those
16 responsibilities, correct?
17 A. We do.
18 MR. RICARD: Same objection.
19 Q. Okay. Now, he goes on to explain it
20 more, and we're going to read through that just
21 for the fun of it, I guess.
22 He says, "Thus, in addition to reporting
23 all suspicious orders, a distributor has a
24 statutory responsibility to exercise due diligence

Page 109

1 to avoid filling suspicious orders that might" --
2 might -- "be diverted into other than legitimate
3 medical, scientific, and industrial channels.
4 Failure to exercise such due diligence could, as
5 circumstances warrant, provide a statutory basis
6 for revocation or suspension of a distributor's
7 registration."
8 And PSI recognizes and accepts that
9 responsibility and obligation, correct?
10 MR. RICARD: Objection to form.
11 A. Yes.
12 Q. Okay. He goes on to say, "In a similar
13 vein, given the requirement under Section
14 823(e)" --
15 MR. RICARD: Can you wait until it's up?
16 MR. FULLER: Yeah. Sorry.
17 BY MR. FULLER:
18 Q. All right. "In a similar vein, given
19 the requirement under Section 823(e) that a
20 distributor maintain effective controls against
21 diversion, a distributor may not simply rely on
22 the fact that the person placing the suspicious
23 order is a DEA registrant and turn a blind eye to
24 the suspicious circumstances."

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 Prescription Supply agrees that that is
2 the status of the law and has been since 1971,
3 correct?
4 MR. RICARD: Objection to form.
5 A. Yes.
6 Q. That just because the person you're
7 sending to is a registrant doesn't mean that you
8 can turn a blind eye when it's suspicious?
9 MR. RICARD: Same objection.
10 A. That's correct.
11 Q. That's the same thing that you guys did
12 at PSI repeatedly when those registrants wanted to
13 become a new customer and there was something
14 fishy going on, or at least you suspected
15 something, and you turned them down, right?
16 A. Yes. That's -- there was some reason
17 why we turned them down, yes.
18 Q. Sure. And, listen, I went through the
19 applications because they were provided by your
20 counsel, and a lot of the times it's like, "Look,
21 this just doesn't smell right."
22 A. That's right.
23 Q. For whatever reason --
24 A. We didn't take them off.

Page 111

1 Q. And you didn't take them off?
2 A. At least as controlled substance
3 receivers.
4 Q. And fair enough. You would agree to
5 ship these things to them?
6 A. But not controlled substances.
7 Q. But that's not what they wanted,
8 usually?
9 A. Generally, yes.
10 Q. And the reason you were doing that is
11 because you knew of the heightened obligation you
12 had and the potential for abuse and the fact that
13 these drugs are dangerous if not handled
14 correctly?
15 MR. RICARD: Objection to form.
16 A. Yes.
17 Q. And Prescription Supply took that
18 obligation very, very serious?
19 A. Yes.
20 MR. FULLER: So now I'm going -- 601.
21 BY MR. FULLER:
22 Q. So Prescription Supply is also a member
23 of the H -- or what was the HDMA, correct?
24 A. Yes.

Page 112

1 Q. Which was --
2 A. NDWA a long time ago.
3 Q. Right.
4 (Reporter clarification.)
5 A. NDWA, National Drug Wholesalers
6 Association.
7 Q. And HDMA has changed its name to HDA, I
8 think, now?
9 A. Yes.
10 Q. Okay. And not only is Prescription
11 Supply a member, but at different times -- and
12 maybe the entire time -- I'm not sure -- had
13 directors or had a director on the board.
14 A. Recently, as the number of wholesalers
15 has decreased, and it's been decreasing pretty
16 fast.
17 Q. So you made your way up the totem pole?
18 A. Yeah. Now anybody -- any member,
19 wholesaler member, has a board member.
20 Q. Oh, currently?
21 A. Currently. Now, some big wholesalers
22 have more than one board member.
23 Q. Sure, sure.
24 A. But everybody has a board member.

Page 113

1 Q. Oh, really? I didn't realize that.
2 A. Yeah, mm-hmm.
3 Q. Huh. Okay. Well, we're going to look
4 at some of that.
5 - - -
6 (PSI-Schoen Exhibit 15 marked.)
7 - - -
8 Q. Plaintiff's Exhibit 15. So there's a
9 lot of stuff on here that's irrelevant I'm not
10 going to ask you about. We'll wade through it.
11 And I'm going to go to page 12 right off
12 the bat. So page 12 is an e-mail.
13 MR. FULLER: Can you blow that up for
14 me?
15 MS. VELDMAN: Yes.
16 BY MR. FULLER:
17 Q. So if you look on the screen, there is a
18 J -- it's a Harbauer?
19 A. That's Harbauer.
20 Q. Harbauer?
21 A. Mm-hmm.
22 Q. And I'm assuming you know who that it
23 is?
24 A. My sister.

Page 114

1　Q.　Okay.　Well, there you go.　Let's hope
2　you know who she is.
3　A.　She's 89.
4　Q.　Bless her heart.
5　　　So this is an e-mail coming from
6　Brian -- or no.　This is from Robert
7　G-i-a-c-a-l-o-n-e.
8　　　Do you know how to pronounce that?
9　A.　No.
10　Q.　Okay.　Well, we'll go with Robert G.
11　And he is forwarding an e-mail -- I say that -- if
12　you read down, the subject matter is "Summary of
13　September 7th Meeting with DEA and Attachments."
14　　　Do you see that?
15　A.　All right.　Yes.
16　Q.　We're blowing it up for you.
17　A.　Mm-hmm.
18　Q.　And the attachments include a Final
19　Summary of DEA Meeting 9-7-07.　There's another
20　attachment -- there's a total of three
21　attachments.　At least that's what it says.
22　　　Do you see that there?
23　A.　Yes.　I see it says three attachments,
24　yes, I do.

Page 115

1　Q.　And then it says, "Attention RAC
2　Members."
3　　　Do you know what it means, RAC members?
4　A.　No.
5　Q.　Okay.　Either do I.　It wasn't a trick
6　question.
7　　　But then it reads, "HDMA met with the
8　DEA officials last Friday to discuss the Agency's
9　current policy position on suspicious orders.　A
10　summary highlighting the key points made during
11　the meeting are attached above for your review.
12　Three additional attachments containing a DEA
13　slide presentation on suspicious orders and the
14　DEA's Office of Diversion Control are also
15　enclosed.　Please contact me if you have any
16　questions regarding the attached materials."
17　　　So this e-mail was apparently forwarded
18　to your sister back on September 10th of 2007; is
19　that correct?
20　A.　That's what it seems to show, yes.
21　Q.　Now, have you had an opportunity to see
22　this before today?
23　A.　Not that I recall.
24　Q.　Okay.　That's fair enough.　And, again,

Page 116

1　I told you there may be some things that don't
2　look familiar.　And what I want to go to is the
3　summary, and that's on page 32 of the document, I
4　believe.
5　　　MS. VELDMAN:　31.
6　　　MR. FULLER:　One more, page 31.　There
7　you go.　We'll start with the title though, Gina.
8　BY MR. FULLER:
9　Q.　All right.　You see page 31 there,
10　Mr. Schoen?
11　A.　I do.
12　Q.　It says "Summary of the DEA-HDMA Meeting
13　on Suspicious Orders.　Meeting Date:　September 7,
14　2007."　Right?
15　A.　Yes.
16　Q.　And if we go to the key takeaways from
17　the meeting, we can see what the highlights sort
18　of were.　It says, "The DEA's policy was to expect
19　more than just reporting 'suspicious orders.'　If
20　there was a suspicious order, the distributor
21　should either stop the delivery or should evaluate
22　the customer further before delivering it."
23　　　Does PSI agree that that has been the
24　obligation as it understood it since 1971?

Page 117

1　　　MR. RICARD:　Objection to form.
2　A.　Yes.
3　Q.　Without question, correct?
4　　　MS. MONAGHAN:　Objection; form.
5　A.　Yes.
6　Q.　Okay.　This says, "Simply complying with
7　the suspicious orders regulatory requirement does
8　not mean, in the agency's view, that the
9　registrant is maintaining effective programs to
10　detect and prevent diversion."
11　　　That's what we talked about, the two
12　separate requirements, correct?
13　A.　Yes.
14　Q.　And PSI agrees that simply reporting
15　suspicious orders and following the regulation
16　doesn't mean you're still following and complying
17　with the U.S. code, correct?
18　　　MR. RICARD:　Objection to form.
19　A.　Yes.
20　Q.　Then the next key takeaway is, "DEA
21　indicated they did not have the resources to
22　inspect every pharmacy; therefore it was important
23　for the distributor to know their customers."
24　A.　Yes.

Page 118

1    Q.  Does PSI agree simply with the notion
2  that it's important for the distributor to know
3  their customers?
4    A.  Yes.
5    Q.  PSI also recognizes that -- strike that.
6      MR. FULLER:  204, Gina.
7          - - -
8      (PSI-Schoen Exhibit 16 marked.)
9          - - -
10 BY MR. FULLER:
11   Q.  And we're going to flip-flop back and
12 forth between two exhibits for a moment, only
13 because I think it's important for complete
14 understanding.
15     What counsel is going to hand you is a
16 memorandum, and it's from the U.S. Inspector
17 General, Glenn Fine.  And the subject matter is
18 "Review of Drug Enforcement Administration's
19 Investigations of the Diversion of Controlled
20 Pharmaceuticals."
21     This was done in 2002, so about five
22 years before this meeting that we were just
23 looking at, okay?
24   A.  All right.

Page 119

1    Q.  And if you'll turn to page 12.  Gina is
2  going to blow up the highlighted section for us
3  there.  And this is talking about -- and so you
4  know, Mr. Schoen, in looking at the resources that
5  the DEA had and the resources that were being
6  allocated for diversion control purposes.
7      Now, this document reads that "Diversion
8  investigators represent 10 percent, or 523, of the
9  DEA's 5,124 authorized investigator positions in
10 fiscal year 2001.  The authorized diversion
11 investigator positions were assigned as follows:
12 55 at headquarters, 455 at domestic field offices,
13 and the remaining 13 at overseas offices."
14     So out in the field around the country
15 during this time, we had 455 diversion officers.
16 That's to police all the wholesale distributors
17 and all the shipments and all the pharmacies
18 around this entire country.
19   A.  Mm-hmm.
20   Q.  You and I can agree there's no way 455
21 guys are going to be able to get that done for the
22 entire country, correct?
23     MR. RICARD:  Objection to form.
24 Objection to scope.

Page 120

1    A.  It would be very difficult to do it
2  perfectly.
3    Q.  It's like having police officers out
4  there trying to maintain and catch people
5  speeding.  If you and I are in the State of Ohio
6  and we're told there's only ten cops in the entire
7  State of Ohio that are going to police speeding,
8  we know they're not going to do a very good job,
9  right?
10     MR. RICARD:  Same objection.
11   A.  They'll only catch a certain number of
12 speeders.
13   Q.  Because they can't.
14   A.  Correct.
15   Q.  It's not possible.  Well, the point is
16 the same thing with the DEA back during this time
17 frame.  They didn't have enough field diversion
18 officers to police every pharmacy.  They're even
19 admitting that to the HDMA in 2007, right?
20     MR. RICARD:  Same objection.
21   A.  Yes.
22   Q.  That's what they say.  They said the DEA
23 indicated they did not have the resources to
24 inspect every pharmacy; therefore, it was

Page 121

1  important for the distributors --
2    A.  To know their customers.
3    Q.  Exactly.  A statutory obligation that
4  they should be doing anyway, right?
5      MR. RICARD:  Objection to form.
6    A.  Yes.
7    Q.  Certainly what PSI has done from the
8  very beginning?
9    A.  We've tried.
10   Q.  Best you can, correct?
11   A.  That's correct.
12   Q.  Not to say people don't make mistakes,
13 right?
14   A.  Hopefully not.
15   Q.  Fair enough.  Let's go to the --
16     MR. FULLER:  Gina, back to 60- whatever,
17 601, page 32 now.
18     MS. VELDMAN:  Okay.
19     THE WITNESS:  This one?
20     MR. RICARD:  This one.
21     THE WITNESS:  On page 32 now?
22     MR. RICARD:  You said 32, Mike?
23     MR. FULLER:  Yes, sir.
24

Page 122

BY MR. FULLER:

Q. Okay. So if you see the section "HDMA Questions and Assessment."

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. And I apologize, but it has to be verbal so she can write it down. I'm not trying to pick on you, Mr. Schoen. I promise.

So if you look at the second bullet point there, it says, "DEA's expectations are clearly heightened. HDMA would like to ask its members about the impact of these expectations." For example, in an indented bullet point, "Are members capable of inspecting their pharmacy customers?"

Do you see that there?

A. I see it.

Q. Prescription Supply would agree that all distributors should be investigating or inspecting their pharmacy customers anyway, right?

MR. RICARD: Objection to form.

A. I agree, but --

Q. Now, you don't know what the others are

Page 123

doing?

A. I don't know what the others are doing. I know that Prescription Supply is a $70 million house. We're very small. We have probably two or three thousand customers of which maybe 150 or so are buying controlled substances on a regular basis.

It is easier for us to control our 150 in some way. And we're not perfect, but it's easier for us to control 150 than it is for perhaps some of the bigger operations to control -- how many, I have no idea.

Q. Oh, sure. Now, let's talk about that just for a second. We're going to push back from the document for a minute.

A. Okay.

Q. No one forces anybody to get into this line of business, do they?

A. That's correct.

Q. People choose to get into this line of business as an entity in this controlled substance supply chain, right?

A. That's correct.

Q. And if you're going to take on that

Page 124

duty --

A. Yes.

Q. -- take on that obligation, with great power also comes great responsibility, correct?

A. Mm-hmm.

MS. MONAGHAN: Objection; form.

Q. Is that a yes?

A. Yes.

Q. And whether others -- no matter how large or small they want to be or choose to be, they still need to comply with the law?

MR. RICARD: Objection to form.

Q. Right?

A. Yes.

Q. And if they don't, whoever they may be, they need to be held accountable for not complying with the law --

MR. RICARD: Same objection.

Q. -- right?

A. Yes.

Q. Okay. So I understand your point, and you're saying you guys have 150 to 200 people who buy controlled substances, so your realm of entities you have to investigate is probably

Page 125

smaller than a lot of other people, right?

A. That's correct.

Q. And you have how many employees?

A. Seventy some.

Q. Others have tens of thousands of employees.

A. That's correct.

Q. They should be able to train those people, just like you train your people, to conduct these investigations? You would agree with that, correct?

MR. BUSHUR: Objection; form.

A. I certainly try.

Q. Fair enough. Fair enough.

And my only point is, just because others chose to grow larger doesn't exempt them from the requirement to know their customer --

MR. RICARD: Objection to form.

Q. -- right?

A. That's correct.

Q. Okay. Let's go down to the fourth bullet point, which I think is a great question. It says, "Do we have recommendations for the DEA as to how to approach this problem in a way that

Page 126

1 simplifies things for the wholesale distributor?"
2     Do you see that?
3     A. I see it.
4     Q. And wouldn't it make sense that the
5 trade organization and the distributors, that if
6 they could come up with a better system, that they
7 maybe propose that to the DEA?
8     A. Yes, yes.
9     Q. I mean, listen, DEA doesn't have -- or
10 the Department of Justice doesn't have the lock,
11 stock, and barrel on good ideas, right?
12     A. Correct.
13     Q. I mean, you guys are operating in the
14 industry. Maybe there are ideas that can come
15 from the industry to help deal with this situation
16 of controlled substances?
17     A. Yes.
18     Q. Do you know if that's ever been done?
19     MR. RICARD: Objection to form.
20 Objection to scope.
21     A. Do I know? I don't know that that's
22 been done. I'm sure it has been done, but I don't
23 know that it's been done.
24     Q. Right. You don't know one way or

Page 127

1 another?
2     A. I don't from personal knowledge have --
3     MR. FULLER: Now, we're going to go 303.
4 This will be Plaintiff's Exhibit 17.
5     MR. PELINI: 17, Mike?
6     MR. FULLER: Yes, sir.
7         - - -
8     (PSI-Schoen Exhibit 17 marked.)
9         - - -
10     Q. Mr. Schoen, I'm going to represent to
11 you this is going to look a little familiar
12 because it's another letter from the DEA. And if
13 you look on the second page, I think the same
14 gentleman signed it, Joe Rannazzisi, Deputy
15 Assistant Administrator, Office of Diversion
16 Control.
17     Do you see that?
18     A. I see it.
19     Q. Seems to be the same guy as last time,
20 right?
21     A. It appears.
22     Q. But this letter is dated December 27th
23 of 2007, so about a year and three or four months
24 after the first letter in September of 2006,

Page 128

1 correct?
2     A. Correct.
3     Q. Okay. Now, I'm going to go through the
4 same sort of qualifiers. This has the same
5 introduction that is being sent to every
6 registrant, manufacturer, or distributor of
7 controlled substances, which during this time
8 frame, Prescription Supply, Inc., was one of
9 those, right?
10     A. That's correct.
11     Q. And assuming that Mr. Rannazzisi is
12 correct and he sent this letter out to everybody,
13 presumptively Prescription Supply would have
14 gotten that, correct?
15     A. Yes.
16     Q. Now, however, sitting here today, I'm
17 assuming that you have not seen this letter and
18 don't ever recall receiving it?
19     A. I don't recall seeing it.
20     Q. Fair enough.
21     A. We may have received it. I don't --
22     Q. Sure. And, listen, that may have been
23 issues that you delegated to someone else within
24 the business, and that's absolutely fine, okay?

Page 129

1     So the letter starts off after that
2 introductory sentence that "The purpose of this
3 letter is to reiterate the responsibilities of
4 controlled substance manufacturers and
5 distributors to inform the DEA of suspicious
6 orders in accordance with 21 C.F.R. 1301.74(b).
7     Do you see that there?
8     A. I see it, yes.
9     Q. And he, again, is reiterating what he
10 talked about, it appears, in the September of '06
11 letter, right?
12     MR. RICARD: Objection to form.
13     A. Mm-hmm.
14     Q. We saw that the HDMA met with him in
15 April of 2007 and had a summary of those
16 conversations related to these same issues,
17 correct?
18     A. Correct.
19     Q. All right. So let's see if they have
20 anything new or different to say now. He starts
21 off with, "In addition to, and not lieu of" --
22 hold on. Give her a second to get that
23 highlighted for you.
24     "In addition to, and not in lieu of, the

Page 130

1　general requirement under 21 U.S.C. 823, that
2　manufacturers and distributors maintain effective
3　controls against diversion, DEA regulations
4　require all manufacturers and distributors to
5　report suspicious orders of controlled
6　substances."
7　　　　And I know we've been talking about this
8　ad litem, but you would agree that Prescription
9　Supply recognizes that duty and obligation,
10　correct?
11　　　　MR. RICARD:  Objection to form.
12　　A.  Yes.
13　　Q.  That Prescription Supply recognizes that
14　that's been the duty and obligation as a
15　registrant since 1971?
16　　　　MR. RICARD:  Same objection.
17　　A.  Yes.
18　　Q.  Okay.  Now, if we go down -- yep.
19　　　　The next paragraph starts off "The
20　regulation also requires that the registrant
21　inform local DEA Division Office of suspicious
22　orders when discovered by the registrant."
23　　　　Does Prescription Supply agree and
24　recognize that it has an obligation to report

Page 131

1　suspicious orders when they're first discovered?
2　　　　MR. RICARD:  Objection to form.
3　　A.  Yes.
4　　Q.  And we'll skip down a little bit to
5　"Registrants are."  There you go, right there.
6　　　　"Registrants are reminded that their
7　responsibility does not end merely with filing a
8　suspicious order report.  Registrants must conduct
9　an independent analysis of suspicious orders prior
10　to completing a sale to determine whether the
11　controlled substances are likely to be diverted
12　from legitimate channels.  Reporting an order as
13　suspicious will not absolve the registrant of
14　responsibility if the registrant knew or should
15　have known that the controlled substances were
16　being diverted."
17　　　　Prescription Supply again agrees with
18　that obligation, correct?
19　　　　MR. RICARD:  Objection to form.
20　　A.  Yes.
21　　Q.  Now, at least by the end of 2007, we've
22　known we've had the Controlled Substances Act and
23　the regulation since 1970 and '71, but at least by
24　the end of 2007, the DEA has made it abundantly

Page 132

1　clear to the industry what they expect from its
2　registrants, correct?
3　　　　MR. RICARD:  Objection to form.
4　　A.  Yes.
5　　Q.  Prescription Supply agrees that there is
6　no question what the DEA expects in fulfilling the
7　statutory and the regulatory requirement that
8　we've looked at today?
9　　A.  Yes.
10　　　　MR. RICARD:  Same objection.
11　　　　MR. FULLER:  It's 11:44.  We've been
12　going over an hour.  Do you want to stop now for
13　lunch?  Do you want to push till noon?
14　　　　Mr. Schoen, what's your druthers?
15　　　　THE WITNESS:  You know, I just want to
16　get it over with.
17　　　　MR. FULLER:  I've never heard that
18　before.
19　　　　MR. RICARD:  If now is a good spot to
20　take a break, then we could do lunch now.
21　　　　MR. FULLER:  Yeah.  I was going to jump
22　into the policies and procedures next, but that's
23　going to take a bit, so why don't we go ahead
24　and --

Page 133

1　　　　MR. RICARD:  Sure.
2　　　　THE VIDEOGRAPHER:  The time now is
3　11:43.  Going off the record.
4　　　　　　- - -
5　　　　Thereupon, at 11:43 a.m. a lunch
6　　recess was taken until 12:49 p.m.
7　　　　　　- - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  Wednesday Afternoon Session
   September 5, 2018
2         12:59 p.m.
3         - - -
4      THE VIDEOGRAPHER:  The time is now
5  12:59.  Back on the record.
6         - - -
7      (PSI-Schoen Exhibit 18 marked.)
8         - - -
9  BY MR. FULLER:
10     Q.  Mr. Schoen, we're going to pass to your
11  counsel Plaintiff's Exhibit 18.  I'm going to have
12  him take a look at it first and then pass you a
13  copy.
14         And so what you'll be looking at,
15  Mr. Schoen, is this is a document from the HDMA,
16  Healthcare Distribution Management Association.
17  We talked a little bit about them earlier, right?
18     A.  Yes.
19     Q.  And PSI is a member of that
20  organization; is that correct?
21     A.  That's correct.
22     Q.  And if you look at the title of the
23  document you have in front of you -- it's also on
24  the screen.  It's "Healthcare Distribution

Page 135

1  Management Association (HDMA) Industry Compliance
2  Guidelines."  What this appears to be -- and
3  correct me if I am wrong -- is it's guidelines put
4  out by the HDMA for its industry, which is the
5  wholesale distribution industry, right?
6     A.  That's correct.
7     Q.  All right.  And it says, "Reporting
8  Suspicious Orders and Preventing Diversion of
9  Controlled Substances."
10         Correct?
11     A.  Yes.
12     Q.  And Prescription Supply, Inc., would
13  agree that part of how we prevent diversion is by
14  reporting suspicious orders, correct?
15     A.  Yes.
16     Q.  Now, these are, for lack of a better
17  term -- we looked at the federal regulations and
18  the federal code.  These are the industry's own
19  safety rules, if you will, that the industry came
20  up with themselves, correct?
21     MR. RICARD:  Objection to form.
22     A.  Yes.
23     Q.  In regulating how they're going to deal
24  with controlled substances?

Page 136

1     MR. RICARD:  Same objection.
2     A.  Yes.
3     Q.  And you have an understanding, just like
4  with the HDMA, that in order for the guidelines to
5  come out, all the members of the HDMA have to
6  approve it, correct?
7     A.  I suppose, yeah.
8     Q.  Okay.  And then -- so in the
9  introduction -- and I'm going to skip the first
10  sentence and go to the next sentence that begins
11  with "Manufacturers."
12         It says, "Manufacturers, distributors,
13  pharmacies, and healthcare practitioners share a
14  mission and responsibility to continuously
15  monitor, protect, and enhance the safety and
16  security of this system to combat the increasing
17  sophisticated criminals who attempt to breach the
18  security of the legitimate supply chain."
19         And I'm sure PSI would agree that that
20  is the goal of the industry.
21     MR. RICARD:  Object to form.
22     A.  Yes.
23     Q.  All right.  If you go down to the third
24  paragraph on the page.  It says, "At the center of

Page 137

1  a sophisticated supply chain, distributors are
2  uniquely situated to perform due diligence in
3  order to help support the security of the
4  controlled substances they deliver to their
5  customers."
6         Does Prescription Supply, Inc., agree
7  and accept that responsibility?
8     MR. RICARD:  Object to form.
9     A.  Yes.
10     Q.  And it talks about due diligence.  That
11  would be what we were referring to earlier when we
12  talked about knowing your customers and
13  investigating potential suspicious orders and
14  things of that nature, correct?
15     A.  Yes.
16     Q.  And is that what Prescription Supply
17  does when it's operating in this realm?
18     A.  Yes.
19     Q.  It says, "Due diligence can provide a
20  greater level of assurance that those who purchase
21  controlled substances from distributors intend to
22  dispense them for legally acceptable purposes."
23         And, again, that's part of the goal of
24  having the system in place and doing due

Page 138

1 diligence, is to ensure that it's only being used
2 for legitimate means, correct?
3     MR. RICARD: Object to form.
4     A. Yes.
5     Q. "Such due diligence can reduce the
6 possibility that controlled substances within the
7 supply chain will reach locations they are not
8 intended."
9     Does Prescription Supply agree with
10 that, that doing the due diligence can help
11 prevent diversion?
12     A. Yes.
13     MR. RICARD: Object to form.
14     Q. Does Prescription Supply agree with the
15 reverse, that not doing due diligence can
16 potentially lead to diversion?
17     MR. RICARD: Object to form.
18     A. Yeah, I suppose.
19     Q. So, for example, with Prescription
20 Supply, if you had taken -- or Prescription Supply
21 had taken on some of those shady customers that we
22 had talked about who --
23     A. Customers that we didn't take on, yes.
24     Q. You don't want to call them shady. I

Page 139

1 get that. But I've read some of what they've said
2 and didn't say, and clearly they were shady. I'll
3 rephrase it.
4     A. There were reasons why we didn't take
5 them on, yes.
6     Q. I'll rephrase it. If Prescription
7 Supply had taken on those customers they didn't
8 deem desirable for whatever reason, maybe
9 documented in the file, there's a greater chance
10 that diversion would have occurred with those
11 entities?
12     A. Yes.
13     Q. And that's the reason that you declined
14 to accept those new customers?
15     A. Yes.
16     Q. Okay.
17     Go to page 4. "Know Your Customer Due
18 Diligence."
19     And this industry guideline, these safety
20 rules that the HDMA put out, addresses each one of these
21 issues, or at least some of them, that we've talked
22 about, Mr. Schoen, in order. So number I -- or I there
23 at the beginning of the page is "Know Your Customer Due
24 Diligence."

Page 140

1     Do you see that?
2     A. Yes.
3     Q. And under the introduction, it says,
4 "Before opening an account for a new customer, the
5 distributor should (i) obtain background
6 information on the customer and the customer's
7 business; (ii) review that information carefully
8 and, where appropriate, verify the information,
9 and; (iii) independently investigate the potential
10 customer."
11     Would you agree that that is the type of
12 due diligence that needs to be done before opening
13 a new customer account?
14     MR. RICARD: Objection to form.
15     A. Yes.
16     Q. Okay. B on that page deals with
17 information gathering. And we're going to skip
18 sort of down to the bullet points. Do you see
19 "The information gathering step would include"?
20 And it provides a whole laundry list there.
21     Do you see that?
22     A. I see it.
23     Q. Including credit application, background
24 questionnaires, business background, number of

Page 141

1 prescriptions filled each day, so forth and so on.
2     Are those the type of things that
3 Prescription Supply undertakes in reviewing and
4 obtaining prior to opening a new customer account?
5     A. Yes.
6     Q. Is that the type of, to your
7 knowledge -- strike that.
8     Now, let's go to page 7.
9     And, Mr. Schoen, let's talk just a
10 second. So we have this due diligence, know your
11 customer requirement which we've talked about
12 some, and we also have something that's referred
13 to as thresholds.
14     Have you ever heard of the term
15 "threshold" before?
16     A. Yes.
17     Q. So now we're going to talk a little bit
18 about that under this auspice of monitoring for
19 suspicious orders, okay? And it says "Identifying
20 Product and Customer Characteristics."
21     Now, before I read to you what is here
22 in the HDMA safety rules, let me ask you, when
23 you're looking at thresholds at PSI, do you break
24 it down by drug families?

Page 142

1    A.   Yes.
2    Q.   Okay.  So technically --
3    A.   Can I at least --
4    Q.   Absolutely.
5    A.   I think we broke it down by drug
6  families from about 2006 on.
7    Q.   Okay.
8    A.   Up until then we did each and every item
9  separately, okay?  So if they were different
10  brands or different manufacturers, we would know
11  if it was this -- if it was this item,
12  40-milligram, whatever size.  So we would have the
13  total of that.  But we didn't put them in drug
14  families until, I think, '06.
15    Q.   Okay.  So, for example, if we had --
16  prior to '06, if we had OxyContin -- which is a
17  name brand, right?
18    A.   Mm-hmm.
19    Q.   -- and we had a 40-milligram and an
20  80-milligram --
21    A.   Yes, it would be two different lines.
22    Q.   Okay.  And there would be a separate
23  threshold for each?
24    A.   Yeah -- well, yes, I guess.  Yes.

Page 143

1    Q.   Okay.
2    A.   There would be a certain -- yeah, yeah.
3    Q.   To the best of your --
4    A.   We unfortunately didn't put them
5  together at that time.
6    Q.   Right.  You did them separately?
7    A.   We did them separately, because at that
8  time, it was what we could do.
9    Q.   And you say "what you could do."  Is it
10  just because of the way the computer software was
11  or --
12    A.   It's because we didn't have -- we
13  probably could have put the 80s and 40s together
14  or whatever, but there were a lot of things that
15  we just didn't realize this was that and something
16  else.
17    Q.   Okay.
18    A.   When we got into -- we finally were able
19  to get a -- from a source, we were able to get how
20  we could put together the families.  And then as
21  soon as we were able to do that, we did put
22  together the families, which made more sense.  We
23  should have done it that way, but we just weren't
24  able to before that.

Page 144

1    Q.   Got it.  So we'll go from 2006 forward,
2  or since then, PSI has been categorizing them by
3  drug families?
4    A.   Yes.
5    Q.   Okay.  And that's what this says, I
6  think.  "Identify Product and Customer
7  Characteristics."
8         Now, let me break out the second part.
9  Does PSI break out separate thresholds for
10  different customer characteristics, say larger
11  pharmacies versus smaller pharmacies or a
12  hospital-based pharmacy versus a retail chain
13  pharmacy or so forth?
14    A.   Yes.
15    Q.   Okay.  Then these HDMA safety rules
16  read, "Separate/classify/group customers into
17  appropriate/different classes of trade.  For
18  example, retail, pharmacies, hospitals, doctors,
19  and dentists -- or dentists."
20    A.   Mm-hmm.
21    Q.   And that's what PSI did, correct?
22    A.   Yes.
23    Q.   "Separate the controlled substances, or
24  CS, the distributor sells into groups or families

Page 145

1  of drugs, i.e., all controlled items containing
2  codeine.  The following information may be useful
3  for identifying the families of drugs."
4         And then it give us a long laundry list
5  of ways of characterizing them.
6         If you turn to the next page, here's
7  where it talks about the "Develop Thresholds to
8  Identify Orders of Interest."
9         Do you see that there?
10    A.   Yes.
11    Q.   And it gives several that could be
12  considered in developing thresholds.  It says,
13  "Patterns of ordering, such as comparing the
14  present order to:  Past orders from the same
15  consumer."
16         Do you see that?
17    A.   Yes.
18    Q.   "Orders from extraordinary quantities
19  outside of normal purchasing patterns typically
20  followed by the customer or the customers within
21  the same class of trade and geographical areas,"
22  so forth and so on.
23         And then it goes on to say that
24  "Distributors are also encouraged to consider the

Page 146

1  following when developing thresholds:  Quantities
2  of product the dispenser initially indicated
3  during the 'Know Your Customer Due Diligence'
4  phase that is expected to be purchased -- that it
5  expected to purchase"?
6      A.  Mm-hmm.
7      Q.  "A minimum of six months sales history
8  and a maximum of 24 months sales history are
9  recommended."
10      And when it "sales history," it means
11  from the potential customer, correct?
12      A.  It does.
13      Q.  And you can ask the pharmacies to
14  provide you with their -- I think it's been
15  referred to as different things, but their dosage
16  history --
17      A.  That's correct.
18      Q.  -- or sales history, right?
19      A.  We can and do.
20      Q.  And are the pharmacies -- if they want
21  your business or they want you to sell to them,
22  are they usually willing to provide you with that
23  information?
24      A.  Yes.

Page 147

1      Q.  Now, if they don't, would that send up a
2  red flag?
3      A.  Yes.
4      Q.  And why is that?
5      A.  Well, I mean, if they don't want to tell
6  us what they're going to buy or what their usage
7  is, it -- I mean, I probably wouldn't be doing --
8  well, I probably -- it certainly would send up a
9  red flag.
10      Q.  Okay.  And because it causes you concern
11  because that's part of the due diligence you have
12  to do --
13      A.  That's right.
14      Q.  -- as a distributor to know your
15  customer?
16      A.  That's right.
17      Q.  And without that, you can't complete
18  your tasks, right?
19      A.  That's true.
20      Q.  Sort of like failing to report
21  suspicious orders doesn't give the DEA the
22  information they need to do their job, right?
23      A.  Right.
24          MR. RICARD:  Object to form.

Page 148

1      Q.  And Prescription Supply agrees with
2  these safety guidelines put out by the HDMA --
3      A.  Yes.
4      Q.  -- that this is what should be done?
5          MR. RICARD:  Object to form.
6      A.  Yes.
7      Q.  All right.  We're going to jump to page
8  11.  There's a section there on documentation.
9  Mr. Schoen, Prescription -- PSI would agree that
10  documentation in this area is very important,
11  correct?
12          MR. RICARD:  Object to form.
13      A.  Yes.
14      Q.  Because we need to be able to look back
15  and see and know what has transpired in the course
16  of dealing with customers.  We need to
17  substantiate the Know Your Customer investigation
18  we've done, so forth and so on, correct?
19          MR. RICARD:  Same objection.
20      A.  Yes.
21      Q.  And it says here, "All investigation
22  should be fully documented, and all records of the
23  investigation should be retained in the
24  appropriate location within the firm."

Page 149

1          Within parentheses it says "such as with
2  other records relating to the particular
3  customer."
4          Does Prescription Supply agree with
5  that --
6          MR. RICARD:  Object to form.
7      Q.  -- safety rule as stated by the HDMA?
8      A.  Yes.  We probably haven't always done it
9  properly, but yes.
10      Q.  But that's the best practice; that's the
11  safest practice?
12      A.  That would be the safest practice.
13      Q.  "At a minimum, documentation should
14  include the name, title, and other relevant
15  identification of the representative of the
16  customer contacted, dates of contact, and a full
17  description of the questions asked and requests
18  for information made by the distributor and of
19  information provided by the customer."
20          The document should -- "the
21  documentation should include a clear statement of
22  the final conclusion of the investigation,
23  including why the order investigated was or was
24  not determined to be suspicious."

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1　　　Do you see that there?

2　A.　Okay.  All right.

3　Q.　And do you agree with that, that that is

4 the proper standard to conduct yourself as a

5 registrant?

6　　　MR. RICARD:  Objection to form.

7　A.　Yes.  But I don't think we've always

8 done it.  We've always asked the questions, but I

9 don't know if we've always appropriately noted

10 them.

11　Q.　Right.  And I've looked at the discovery

12 that has been provided, and we're going to just

13 sort of put out there that 8,000-pound gorilla

14 that may be standing over my shoulder.

15　　　Prescription Supply did not report any

16 suspicious orders, did they?

17　A.　That's correct.

18　Q.　Okay.  But -- and let's continue with

19 that.  You believe that they did do the best job

20 they could investigating new clients, new

21 customers?

22　A.　Yes.

23　Q.　And as I mentioned to you earlier,

24 there's documentation throughout the files of the

Page 151

1 discovery of Prescription Supply even declining

2 potential customers --

3　A.　Yes.

4　Q.　-- because of we'll call them red flags?

5　A.　Yes.  But I don't know if we actually

6 put down why we declined them.

7　Q.　I will --

8　A.　It became obvious, but ...

9　Q.　Right.  I will represent to you that

10 there were issues of concern in some of the

11 documents I reviewed.

12　A.　Yes.

13　Q.　And it said "Ask Tom."

14　A.　Mm-hmm.

15　Q.　And then there would be a handwritten

16 note that "Tom says tell them no."

17　　　So I think on some of them, it was

18 abundantly clear what the issues were based on the

19 investigation.

20　A.　I hope so, yes.  But we didn't -- I

21 don't think we put down any specific reason.

22　Q.　And you recognize that you probably

23 should have?

24　A.　It was abundantly clear that there were

Page 152

1 questions.  I was not in a position to say there

2 was something wrong with this customer.  I just

3 didn't want to do business with them because I was

4 concerned.

5　Q.　Right.  Of potential issues dealing with

6 controlled substances?

7　A.　Potential issues.

8　Q.　With controlled substances, correct?

9　A.　Among other things, yeah.

10　Q.　Sure.

11　　　Now, we're not going to spend the rest

12 of the time going over all the -- I don't know how

13 many pages are in this document total, 15 -- 14,

14 15.  But Prescription Supply would agree, would it

15 not, with the HDMA safety rules that were

16 previously provided to it?

17　A.　Yes.

18　　　MR. RICARD:  Object to form.

19　　　MR. FULLER:  So next is going to be 404.

20 BY MR. FULLER:

21　Q.　So next, Mr. Schoen, I think we're going

22 to go to something that you probably have seen

23 before, some of your policies and procedures that

24 you guys had at PSI.

Page 153

1　　　　　- - -

2　　　(PSI-Schoen Exhibit 19 marked.)

3　　　　　- - -

4　Q.　And I'll be honest with you.  Some of

5 them I completely understood and got it.  Some I

6 didn't.  And there's some issues that I want to

7 hit real briefly and go over with you.

8　　　So what has been marked for -- or I

9 guess attached as Plaintiff's Exhibit 19, which

10 you have there, is a Prescription Supply, Inc.,

11 document; is that right?

12　A.　It is.

13　Q.　Okay.  And I think this is the first one

14 where we have a Bates number for this case, which

15 is PSI0000648, and is this document named

16 "Inventory Controls."

17　A.　Yes.

18　Q.　Okay.  And this is one of your policies

19 and procedures at Prescription Supply; is that

20 correct?

21　A.　It is.

22　Q.　Okay.  Now, it has an effective date of

23 what?

24　A.　7/30/09 apparently.

Page 154

1 Q. No. Look right above that.

2 A. I'm sorry. I keep reading it back.

3 Well, from 12/08 to --

4 Q. Look a little bit above that.

5 A. Oh, I see. June 2000. Okay.

6 Q. I'm telling you, use the screen as kind

7 of like your little cheat sheet. That's exactly

8 where I'm at.

9 So this document at least indicates that

10 it was effective as of June of 2000, correct?

11 A. Well, it's been revised, yes.

12 Q. And it's been revised, and we have the

13 revision dates there?

14 A. Yes.

15 Q. And do you believe those to be accurate?

16 A. Yes.

17 Q. To the best of your knowledge?

18 A. Yes.

19 Q. Do you believe this to be an accurate

20 copy of a document that's kept in the normal

21 course of business for Prescription Supply?

22 A. Yes.

23 Q. Okay. And I'll tell you, I'm going to

24 sort of go through that with each document, and

Page 155

1 it's just a predicate that I have to lay for legal

2 purposes, okay?

3 A. Okay.

4 Q. So don't get frustrated with me because

5 it's the same question every time, all right?

6 A. All right.

7 Q. And I inquired of counsel of this. And

8 there's some of these where I have a couple

9 different versions, maybe an older version and

10 then the newer version.

11 A. Perhaps.

12 Q. Do you know if Prescription Supply has

13 maintained copies from the original of June of

14 2000?

15 A. I don't know.

16 Q. Who would be the best person at

17 Prescription Supply to ask? Any idea?

18 A. Well, yeah. I mean the --

19 Q. And what I'm looking for, is there

20 someone that would just deal with this

21 administrative stuff that maybe --

22 A. Candy would have -- Candy Harbauer would

23 have probably been doing most of this.

24 Q. And Candy Harbauer, because she has the

Page 156

1 same last name as your sister, I'm assuming she is

2 related.

3 A. Her daughter, yes.

4 Q. Okay.

5 A. She's my niece.

6 Q. Got it. Got it.

7 A. There's a lot of family in the business.

8 Q. I saw the org chart. I agree with you.

9 A. Yes, and a lot that you don't even

10 recognize.

11 Q. Probably so. Probably so. It's truly a

12 family business. No, I get that.

13 A. Yes.

14 Q. Is Candy still employed with the

15 company?

16 A. She is.

17 Q. Okay. Great. And she would probably be

18 the best one to check with; is that right?

19 A. Yes.

20 Q. Okay. Now, this says -- this policy

21 is -- it says," Prescription Supply, Inc., will

22 monitor inventory for: Critical [sic] accounts,

23 suspicious purchases and losses, theft, or

24 otherwise missing products. "

Page 157

1 And if you go down --

2 MR. RICARD: It says "cyclical,"

3 Counsel.

4 MR. FULLER: I'm sorry. Cyclical. What

5 did I say?

6 MR. RICARD: "Critical."

7 MR. FULLER: Oh. I apologize.

8 BY MR. FULLER:

9 Q. If you go down the page -- there you go.

10 Under Responsibilities, it says, "Customer service

11 representatives and/or warehouse manager shall

12 forward all suspicious prescription product orders

13 to the director of purchasing prior to

14 fulfillment. Suspicious orders can be identified

15 as, but not limited to, those orders of unusual

16 size, orders deviating substantially from a normal

17 pattern, and orders of unusual frequency.

18 Suspicious orders may or may not be criminally

19 suspected."

20 Did I read that right?

21 A. You did.

22 Q. All right. So the way the process -- my

23 understanding of the process is the customer

24 service representative or warehouse manager would

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 pick up on a suspicious order and bring it to the
2 director of purchasing prior to shipping, correct?
3     A.  Actually, the computer stops any order
4 that would have been out of -- would be of
5 interest, okay?
6     Q.  Okay.  And when you say any order that
7 would be out of interest, do you know how the
8 computer determines what would be of interest or
9 suspicious?
10     A.  All of the -- it takes into
11 consideration everything that we've talked about
12 here.  The -- if it's over the threshold, if
13 it's -- remember that Prescription Supply in 2000
14 or -- we had a lot of accounts that were -- that
15 we were the primary of, okay?  In 2018, we have
16 relatively few accounts that we are a primary
17 supplier for --
18     Q.  Right.
19     A.  -- okay?  Things have evolved in that
20 way.
21         In 2000, we were in a position -- we had
22 actually an advantage over the big three or other
23 wholesalers, in that you could fax us a C-II blank.  We
24 could fill it from the fax -- because we used our own

Page 159

1 delivery people -- so they were our employees -- we
2 could deliver that item the same day, have that delivery
3 person, that employee, check and pick up the actual
4 physical narcotic blank, check it to make sure the
5 number was the same, and that the -- no other items had
6 been added to or subtracted on it, which was relatively
7 easy to do --
8     Q.  Sure.
9     A.  -- okay?  And bring it back to us, and
10 we would file that in our system, okay?  And we'd
11 process it.  But we had already processed the
12 drugs out to the pharmacy.
13     Q.  Based on the facts?
14     A.  Based on the facts, yes.
15     Q.  Got it.
16     A.  All right.  Because we could do that and
17 because there wasn't an electronic order
18 processing system at that time, which there is
19 now, we did an inordinate amount of C-II business,
20 okay?
21         I'm not saying we did anything wrong.
22 We didn't, okay?  But we got a far greater
23 percentage of C-II orders than our size would have
24 indicated, okay, because of our advantage.

Page 160

1     Q.  Because you could turn them around more
2 quickly?
3     A.  Because we could turn them around right
4 away.
5         What was my -- go back and give the
6 question again so I --
7     Q.  Well, we were starting to talk about how
8 the computer stops it.
9     A.  Oh, okay.  All right.  As time went on,
10 we developed a suspicious order monitoring system,
11 okay?  Actually, probably by around -- dates are a
12 bit of a problem.  But, anyway, somewhere around
13 2- -- well, in '96, we had some kind of an order.
14         We have different systems that we use to
15 check sales by customer and send off orders to --
16 or actually reports to the DEA on excessive
17 purchases or -- not excessive but out-of-line
18 purchases.
19         We continued doing that right up until
20 2013 when they asked us to stop, okay?  Now, we
21 had other suspicious order systems over --
22 evolving through that time period, but we did
23 actually report an awful lot of stuff.  The
24 problem is that they didn't have the ability to

Page 161

1 look into all these.  It was too much paperwork,
2 too much stuff, okay?
3         So we stopped sending those orders,
4 okay, those -- what we considered a suspicious
5 order -- or maybe not a suspicious order.  An
6 out-of-line order, okay?
7     Q.  Order of interest?
8     A.  Order of interest, okay?
9     Q.  Okay.
10     A.  Now, the computer does stop an order
11 before it's -- before it can be shipped, okay?
12     Q.  Yes, sir.
13     A.  Then we do -- we look at that order and
14 make the decision, and take whatever due diligence
15 is necessary, make calls to the customer, and
16 decide if we should ship it or not.  And that's
17 the way we operate.
18     Q.  So -- and let me back up.
19         You mentioned at one time you were
20 sending stuff to the DEA.
21     A.  Yes.
22     Q.  Okay.  Now, you've always been reporting
23 ARCOS data to the DEA?
24     A.  Oh, of course.

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 Q. And that hasn't stopped?
2 A. No.
3 Q. Always been there?
4 A. Yes.
5 Q. Still going on today?
6 A. Of course, yes.
7 Q. Okay. So we're not referring to ARCOS
8 data?
9 A. No, no.
10 Q. Now, you mentioned excessive order
11 reports?
12 A. Yes.
13 Q. That may be at one time what was being
14 sent to the DEA, correct?
15 A. You could say that, yes. Yes.
16 Q. Okay. Now, excessive order reports are
17 different than suspicious order reports?
18 A. That's correct.
19 Q. Okay. Do you -- during this time prior
20 to '13, do you recollect ever reporting suspicious
21 orders?
22 A. No, we never reported suspicious orders.
23 Q. Okay. And you mentioned --
24 A. Nor have we ever shipped a suspicious

Page 163

1 order.
2 Q. Okay. Now, let's break that down before
3 we move on.
4 A. Okay.
5 Q. The suspicious order requirement under
6 the C.F.R., the Code of Federal Regulation, does
7 not require you to have shipped it before you
8 reported it, right?
9 MR. RICARD: Object to form.
10 A. In fact, I believe you're not supposed
11 to ship it.
12 Q. Right. So while you mentioned you
13 didn't ship any suspicious orders, that doesn't
14 relieve PSI of its obligation to still report
15 them?
16 MR. RICARD: Object to form.
17 Q. You would agree with that, correct?
18 A. Yes.
19 Q. Okay. Now, let's take that -- let's go
20 another way. We also looked at the Ohio
21 Administrative Code, and that also requires
22 certain types of orders to be reported; is that
23 right?
24 A. Yes.

Page 164

1 Q. Did PSI ever report any suspicious order
2 to the Board of Pharmacy as required by the code?
3 MR. RICARD: Object to form.
4 A. No. But we were -- actually, we only
5 saw the State -- we saw them in '95, and we saw
6 them in '18. I believe it was '18.
7 Q. I think it may have been '17.
8 A. It could have been '17.
9 Q. Yeah.
10 A. In '17. Those are the only two times we
11 saw the State Board. I talked to State Board
12 people, but they never came into Prescription
13 Supply, okay? When they did come into
14 Prescription Supply, they asked -- they did their
15 investigation. They did ask about a number of
16 stores.
17 Q. Four of them, actually, right?
18 A. Four actually, yes. And why and how, we
19 checked in and what we did in those stores, okay?
20 And we gave them I believe in three of four
21 appropriate documentation. I believe the fourth
22 store -- in my own memory, the fourth store, they
23 wanted to know why we stopped shipping to them,
24 and it's because they stopped buying from us.

Page 165

1 Q. That was the one that was sold to CVS?
2 A. That's right.
3 Q. Yeah, I remember that.
4 A. Yes.
5 Q. Now, so you said PSI has had two
6 encounters with the Board of Pharmacy, that one
7 that we were just talking about in '17.
8 A. Yeah, way back in '95 when we opened --
9 that's when we built -- that's when we moved into
10 our new facility.
11 Q. The building you're currently in?
12 A. That's right.
13 Q. Got it. Got it.
14 Now, was that just when -- your
15 interaction with the Board of Pharmacy back in
16 '95, was that just the inspections and whatnot on
17 your building?
18 A. It was.
19 Q. Okay. Did the DEA come out and inspect
20 the building, too?
21 A. Of course.
22 Q. Now, Prescription Supply currently has,
23 like you mentioned, a computer system in place --
24 A. Correct.

Page 166

1  Q.  -- that prevents suspicious orders or
2  orders of interest, whatever you want to call
3  them, from being shipped.  It stops them from
4  before they get --
5  A.  It stops them before they're shipped,
6  yes.
7  Q.  That some sort of red flag brings --
8  A.  That's right.
9  Q.  -- it to someone's attention?
10  A.  Yes.
11  MR. RICARD:  Wait until he's finished
12  with the question.  You're doing fine.
13 BY MR. FULLER:
14  Q.  Does -- strike that.
15  When did that computer system first come
16  into place, best you can recollect?
17  MR. RICARD:  Don't guess.
18  A.  Don't guess.  I honestly can't tell you
19  that, when they became --
20  Q.  Are we talking in the last two or
21  three -- let me ask you this --
22  A.  No.
23  Q.  Was it --
24  A.  Before then.

Page 167

1  Q.  Okay.  Let me ask you specifically.  Was
2  it before or after the Board of Pharmacy came to
3  you?
4  A.  Oh, long before.
5  Q.  Long before?
6  A.  Yeah.  I just don't know if it was
7  before 2006 or -- it was at least operational in
8  2006.
9  Q.  Okay.  So that kind of time frame we're
10  talking about?
11  A.  Yes.
12  Q.  Maybe even further back?
13  A.  Yes, but I can't tell you for sure when.
14  Q.  Fair enough.  Fair enough.
15  So if we continue down on the page,
16  starting on the bottom of the page and rolling on
17  to the next.  Okay.  It says, "The IT manager
18  shall be responsible for suspicious order
19  monitoring reports and sharing concerns with the
20  DR/DR supervisor.  He/she is responsible for
21  sending all reports to the DEA and governing state
22  agencies and maintaining records for at least six
23  years or as required by law."
24  Do you see that?

Page 168

1  A.  I see that.
2  Q.  And who was the IT or is the IT manager?
3  A.  Kirk Harbauer.
4  (Reporter clarification.)
5  A.  Kirk, like in Captain Kirk.
6  Q.  Harbauer.  Is that your nephew?
7  A.  My nephew.
8  Q.  Okay.  And how long has he been the IT
9  manager?  For quite sometime?
10  A.  Quite sometime.
11  Q.  Okay.  So I'm assuming because he's IT,
12  he's working with computer systems and that's --
13  the flags would come to him; is that correct, or
14  do you know?
15  A.  No.  The flags would come to the -- into
16  the filling area --
17  Q.  Okay.
18  A.  -- okay?  Those decisions would be made
19  in the -- where the process -- I'm trying -- yes,
20  the computer person, you know, makes sure that the
21  system is functioning, okay?
22  Q.  Okay.
23  A.  But ...
24  Q.  So Kirk would be responsible for the

Page 169

1  suspicious order monitoring reports and sharing
2  those concerns with the DR or DR supervisor.  And
3  I'm not sure what a DR is.
4  A.  To be honest with you, I'm not sure what
5  a DR is.  We got into having DRs and DR
6  supervisors because we had to pass certain
7  requirements by the national board of state --
8  national board of state boards, okay?
9  Q.  Okay.
10  A.  Okay?  And they came in and required us
11  to type up thousands of pages of -- which is why
12  you have all these pages, okay?
13  Q.  Fair enough.
14  A.  Unfortunately, we probably wouldn't have
15  had them without that.
16  Q.  Now, can you tell me what a DR or DR
17  supervisor does?  Probably not a good question,
18  huh?
19  A.  That's not a good question.
20  Obviously a DR supervisor supervises the
21  DR.  I believe -- I'm not even sure who the -- if
22  I'm the DR or the DR supervisor by definition,
23  okay?
24  Q.  Does DR stand for something other than

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 doctor?

2    A.  Yeah.  It stands for something other

3 than doctor, yes.

4    Q.  You're not sure what?

5    A.  I'm not sure what.

6    Q.  Fair enough.

7        But, still, and according to this, the

8 IT manager is responsible for sending all reports

9 to the DEA and the state agencies, right?

10   A.  Right.

11   Q.  But that never got done?

12   A.  Because it never got that far, because

13 when we had an order of interest, we would do due

14 diligence on that order.  We didn't discover

15 anything that was criminally reportable.

16   Q.  Well -- so it's PSI's position that they

17 never -- well, strike that.  Let me ask it

18 differently.

19       So were there ever orders that got cut?

20   A.  Yeah.

21   Q.  Well, would -- and you cut them because

22 they were --

23   A.  Because they were -- they beat the

24 threshold.

Page 171

1    Q.  Okay.

2    A.  All right.  If a pharmacy were to beat

3 the threshold and it was October the 27th, we

4 don't backorder those orders, but we cut them.

5 And if he wanted it after the 1st or 2nd, again,

6 he could probably get it, but then he'd be working

7 on his next threshold, okay?

8    Q.  Right.  So the thresholds reset?

9    A.  That's right, which is perfectly legal

10 and perfectly reasonable.  In other words, he may

11 place an order on the 27th and we can't fill all

12 of it or part of it or any of it.  I don't know.

13 It depends on what it is.

14   Q.  Well, it depends on what the

15 threshold --

16   A.  On the other hand, it isn't unreasonable

17 to think that he wanted this product because he

18 uses it in his normal operation.  He just happened

19 to place it a day or two early.  In other words,

20 he's not buying too much, at least by our

21 definition, by what we're able to tell, by our due

22 diligence.

23   Q.  Well, and let's talk about that.  So he

24 exceeds a threshold.  And thresholds are set and

Page 172

1 determined how at Prescription Supply, Inc.?

2    A.  There's a lot of things that go into

3 thresholds, okay?

4    Q.  Okay.  Now, and I'll tell you before we

5 get started, I didn't see a policy and procedure

6 related to setting thresholds.  I saw where the

7 Board of Pharmacy asked, I think, in this area in

8 follow-up to the investigation from last year --

9    A.  Right.

10   Q.  -- "Explain to us how you set

11 thresholds."  And I didn't see a reply from PSI

12 going back.  So can you explain to the jury how

13 PSI sets thresholds?

14   A.  There are a lot of things that go into

15 setting thresholds.  Number one would be the

16 number of prescriptions the pharmacy fills per

17 day, for example, or per month or whatever.  So if

18 he's a much bigger pharmacy, he could probably

19 have a larger threshold.  Number two --

20   Q.  Sure.

21   A.  -- he gives us an estimate of what his

22 use is, okay?  We look at the number of

23 prescriptions he fills, okay, relative to the

24 usage of controlled substances that he's getting,

Page 173

1 and that has an effect on what threshold we may

2 initially set, okay?

3        Number three, things can happen.  He

4 can -- maybe he picks up a hospice, okay, and he's

5 supplying a hospice.  Well, if he's supplying a

6 hospice, he's going to use more controls than he

7 would if he didn't supply that hospice, okay?

8        For example, maybe it's no more -- maybe

9 it's no more -- not anything bigger than, gee,

10 he's going on vacation for three weeks, he doesn't

11 want his replacement pharmacist to be filling

12 C-II -- buying C-IIs.  He buys them now so that

13 they have the C-IIs in hand to process the orders

14 that they expect to have.

15       There's all kinds of reasons why you

16 look at -- and that's why you do your due

17 diligence, and that's why you have to know your

18 customer.  And, like I said, we have a relatively

19 limited number of customers, and we look at those

20 customers very closely.  And we don't take on

21 everybody.

22       And money, frankly, is not -- is not a

23 big thing.  You know, I was probably doing

24 30 percent of my sales -- 10 or 15 years ago were

Page 174

1 controlled substances. Right now it's 12 and a
2 half, and it's going to go down next year, okay?
3 It's been going down steadily. Probably only half
4 of those are what we're talking about here, okay?
5     Q.  Right.
6     A.  It was way up there because we had an
7 advantage in shipping at that time. We don't have
8 that advantage anymore. And actually
9 prescriptions have gone down for controlled
10 substances, okay? Doctors are writing fewer or
11 smaller, which I'm actually glad to hear. And,
12 therefore, the sales are going down naturally. Do
13 I need to --
14     MR. RICARD: Wait for another question.
15     Q.  No. And you're doing fine. You're more
16 than welcome to explain your answers.
17         So now we know thresholds are based on
18 the number of scripts, generally speaking, the
19 estimates provided by the potential new customer.
20 We talked earlier about getting their usage data.
21     A.  Yes. I mean, we look at other things
22 obviously. We look at the -- we check out the
23 doctors and the -- as to where their primary
24 prescriptions are being -- are coming from,

Page 175

1 particularly controls, okay?
2     Q.  Right.
3     A.  And does this doctor have any -- is
4 there a reason that he would write more controls
5 than somebody else, okay?
6     Q.  Right.
7     A.  Maybe if he's a dental surgeon, okay, he
8 might -- and he's pulling wisdom teeth all day, he
9 may write more prescriptions for pain than
10 somebody else.
11     Q.  Than a regular dentist?
12     A.  Than a regular dentist does.
13     Q.  Sure, sure. Now --
14     A.  Just for example.
15     Q.  Yes, sir. Yes, sir.
16         And correct me if I am wrong, but the
17 goal in setting these thresholds is to create an
18 upper limit for our customers?
19     A.  Mm-hmm.
20     Q.  Is that a yes?
21     A.  That's a yes.
22     Q.  Okay. And does PSI use any type of
23 multiplier to a threshold number?
24     A.  We have. But as I pointed out to you,

Page 176

1 PSI is a secondary supplier. When we were a
2 primary supplier, it was easier for us to apply
3 the multipliers that are, you know, involved in
4 that.
5     Q.  Right.
6     A.  Now we could get an order from someone
7 who is -- who places it maybe once or twice a
8 year, okay? And obviously that order just because
9 it's placed once or twice a year is out of the
10 ordinary and is a red flag, but it doesn't mean
11 there's anything wrong with that order. It's just
12 that that's how often the guy buys that from us.
13     Q.  Right. And when you're dealing as a
14 secondary provider --
15     A.  Yes.
16     Q.  -- that creates a heightened obligation
17 to be careful --
18     A.  Which is why --
19     MR. RICARD: Objection to form.
20     Q.  Go ahead.
21     A.  Which is why we do due diligence and why
22 we know our customers and why we don't have as
23 many customers as maybe somebody else will. Maybe
24 I don't have as many customers because they don't

Page 177

1 want to buy from me, okay? But --
2     Q.  It could be that, too.
3     A.  But there are customers that we don't
4 want to sell to, okay?
5     Q.  As well?
6     A.  As well.
7     Q.  Now -- and understand what I'm trying to
8 do. I'm trying to determine what else, if
9 anything, PSI considers when it's setting
10 thresholds.
11     A.  Yes.
12     Q.  And we went through some of them, and
13 you gave us some great examples, absolutely. And
14 correct me if I am wrong, but the goal is to set
15 thresholds that are reasonable for that particular
16 client?
17     A.  That's correct.
18     Q.  You may have things that change the
19 circumstances --
20     A.  Correct. That would perhaps change the
21 threshold.
22     Q.  And, therefore, we would see the due
23 diligence in the documentation supporting that
24 change, or at least we should?

Page 178

1    A.  We should.

2    Q.  Can we agree on that?

3    A.  Yes.

4    Q.  Okay.  And when you're looking at

5  changes in thresholds, you wouldn't be looking at

6  changes in thresholds for some reason that doesn't

7  necessarily affect supply or demand.  You want to

8  look for legitimate reasons for changes in

9  thresholds.

10       MR. RICARD:  Object to form.

11    Q.  Take, for example, a new pharmacy -- a

12  pharmacy down the road closed.

13    A.  That's a reason.

14    Q.  That may be a reason?

15    A.  Um-hmm.

16    Q.  You may need to look to see and see who

17  that pharmacy was providing for in servicing and

18  we still need to do our other due diligence and

19  verification, correct?

20    A.  Correct.

21    Q.  You know, maybe increasing thresholds by

22  20, 30 percent because it's St. Patrick's Day may

23  not be such a legitimate reason?

24    A.  That's correct.

Page 179

1       MS. MONAGHAN:  Objection to form.

2  BY MR. FULLER:

3    Q.  I knew they would object.

4       So there are legitimate reasons and

5  illegitimate reasons that people try to seek

6  increases in thresholds, right?

7    A.  Yes.

8    Q.  Now, the obligation on the distributor,

9  the registrant, is to sort out the legitimate from

10  the illegitimate requests doing the due diligence

11  that we talked about; is that fair?

12    A.  That's right.

13    Q.  Okay.  And that's what the regulations

14  and code require, correct?

15       MR. RICARD:  Objection to form.

16    A.  That's correct.

17    Q.  Okay.  Going to page 2 of that policy

18  and procedure.

19       MR. FULLER:  The first paragraph on that

20  page, Gina.

21  BY MR. FULLER:

22    Q.  There it reads, "The controlled

23  substance handler shall be responsible for

24  monitoring all controlled purchases in

Page 180

1  coordination with the IT manufacturer.  He/she

2  shall report any unaccounted losses or problems to

3  the DR/DR supervisor and, when delegated, to

4  appropriate authority (Northwood Police or DEA).

5  Controlled substances handler shall also document

6  all transactions and communications, holding

7  copies of paperwork as required by law for at

8  least six years."

9       So I was comparing this with the -- your

10  org chart, organizational chart, that has all the

11  people listed.  I didn't see a controlled

12  substance handler anywhere.  Who is the controlled

13  substance handler?

14    A.  Well, it's -- I've never heard of the

15  controlled substance handler either.  We're going

16  to say that we have a controlled substance

17  manager, okay?

18    Q.  Okay.

19    A.  We have two people in my cage that, you

20  know, do that.  They actually look at these orders

21  and they make those decisions.

22    Q.  Now -- and let me ask.  And this is not

23  meant to be derogatory or negative in any way, so

24  don't take it as such.  These policies and

Page 181

1  procedures as we --

2    A.  You know, the --

3       MR. RICARD:  Wait for a question.

4       THE WITNESS:  Okay.

5    Q.  And you may be going where I'm going.

6    A.  No.  You go ahead.

7    Q.  I understand there's requirements that

8  you have to have them.  It sounds like

9  Prescription Supply is such an operation that,

10  "Hey, we don't always look at these.  We know how

11  we do things.  We try to do things the right way,

12  and" -- go ahead.

13    A.  The procedures should match the -- the

14  policies should match the procedures, okay?

15    Q.  Yes, sir.

16    A.  And that is our intention.  On the other

17  hand, if you throw DR and DR manager in there and

18  maybe a name that -- controlled substance handler,

19  those are things that are thrown in because the

20  person that put them in was far more aware of what

21  requirements were for something else, okay,

22  than -- so the names may not be accurate, okay?

23    Q.  Yes, sir.

24    A.  But the policies should be accurate.

Page 182

1 Yes. I mean, if we have a shortage -- or let's
2 say we have -- let's say we have a shipment and
3 we --
4     MR. RICARD: I think you answered the
5 question.
6     THE WITNESS: Okay.
7 BY MR. FULLER:
8     Q. So we talked about this policy a bit.
9 And it talks about reporting suspicious orders.
10    A. Yes.
11    Q. And we know Prescription Supply has
12 never reported a suspicious order. And is it
13 Prescription Supply's position that's because they
14 never got a suspicious order?
15    A. We certainly never shipped a suspicious
16 order.
17    Q. Well -- and I understand that. You've
18 made that abundantly clear. But my question is a
19 little different. Is that because Prescription
20 Supply has never received --
21    A. It depends on how you define a --
22    Q. Suspicious order?
23    A. -- suspicious order. If you define it
24 the way it is in the code, we've received them,

Page 183

1 okay?
2     Q. Yes, sir.
3     A. If you define them the way the HDMA --
4 where they say "orders of interest," okay, and you
5 call those orders of interest and not suspicious
6 orders, then yes, we've never reported a
7 suspicious order because we've never gotten one,
8 okay?
9     Q. That's just because we renamed them,
10 right?
11    A. That's because we renamed them. But I'm
12 telling you that, you know, the -- they want to
13 know when we find something that is truly
14 suspicious. If we find that Joe Smith Pharmacy
15 placed an order on the 27th that would put them
16 over the threshold by a few hundred tablets, the
17 DEA doesn't want to know that. They don't need to
18 know it because it's not -- they're not going to
19 use that.
20    Q. And I get what you're saying. Now,
21 let's back up and digest what you've just given
22 us.
23        PSI agrees that if we're looking at the
24 regs and the statute and the code, that there have

Page 184

1 been suspicious orders which they failed to report
2 in the past, correct?
3     A. Yes.
4     Q. Okay. If we look at HDMA guidelines
5 now -- let's transfer. They talk about, you're
6 right, orders of interest, right?
7     A. Mm-hmm.
8     Q. Is that a yes?
9     A. Yes.
10    Q. Orders of interest are nowhere mentioned
11 in our regulatory requirements, are they?
12    A. That's correct.
13    Q. Basically what HDMA has done is tried to
14 reclassify or rename suspicious orders as orders
15 of interest?
16        MR. RICARD: Object to form.
17    A. Correct.
18    Q. Okay. But just because --
19    A. They did it. Okay. Go ahead.
20    Q. Right. If we call a duck a dog, it
21 doesn't change the fact that it's still a duck,
22 right?
23        MR. RICARD: Object to form.
24    A. Correct.

Page 185

1     Q. Okay. Let's go back to thresholds for a
2 moment.
3     A. Okay.
4     Q. Now, we've talked a little bit about how
5 thresholds are set initially. And I've seen some
6 forms, particularly with that Board of Pharmacy
7 investigation, related to threshold changes or
8 change requests.
9        Is it assuming a -- strike that.
10       When we know our customer, we should be
11 able to set a threshold and have that threshold
12 maintained, correct?
13    A. Yes.
14    Q. Now, there may be things in the real
15 world and in changes in the business that cause us
16 to have to adjust that threshold, correct?
17    A. Correct.
18    Q. But that should be the exception instead
19 of the rule, meaning that we should be able to set
20 a threshold that maintains over a period of time?
21    A. Mm-hmm.
22    Q. We shouldn't see two, three, five, six,
23 seven threshold changes within one month?
24       MR. RICARD: Object to form.

Page 186

1    A.   For one pharmacy?
2    Q.   For one pharmacy.  Correct?
3    A.   I would think not.
4    Q.   Because then either -- something is
5 wrong.  Either we didn't set our threshold right
6 at the very beginning, or maybe there's a red flag
7 or something going on, correct?
8         MR. RICARD:  Object to form.
9    A.   Mm-hmm.
10   Q.   Do you agree?
11   A.   Yes.
12   Q.   Okay.  And --
13   A.   Although I have to -- if we had two or
14 the three changes, there probably were reasons for
15 those changes.  I don't know that there were three
16 versions.
17   Q.   Yes, sir.  And if there is and there is
18 legitimate reason, then we should see that
19 documented, correct?
20   A.   Correct.
21   Q.   And just for the record -- I know you're
22 chuckling, not because you're not taking it
23 seriously --
24   A.   Not because -- no, because --

Page 187

1    Q.   -- but because the reality is maybe
2 sometimes it doesn't get documented?
3    A.   I'm afraid that's true.
4    Q.   It doesn't change the fact that it
5 should?
6    A.   No.
7    Q.   Because it makes it much more --
8    A.   On the other hand, it doesn't make it
9 criminal or illegal either.
10   Q.   Well, listen, when the IRS comes and
11 tells me I didn't document money I made, that does
12 make it criminal.
13   A.   You know, Prescription Supply had the
14 pleasure of entertaining the IRS for a six-month
15 audit in-house.
16   Q.   Oh, God bless you.
17   A.   Yes.  They left after three months, and
18 they gave us a letter of no change.
19   Q.   Well, congratulations.
20   A.   The only reason they left was because
21 other people were more interesting than we were.
22 We just weren't very interesting.
23   Q.   Well, there you go.  That's a good thing
24 when it comes to the IRS.

Page 188

1    A.   It is.
2    Q.   All right.  We've been going --
3    A.   And the same thing applies --
4         MR. RICARD:  There's --
5         THE WITNESS:  Okay.
6         MR. RICARD:  -- no question --
7         MR. FULLER:  We've been going another
8 hour.  Let's take a break.
9         MR. RICARD:  Sure.
10        THE VIDEOGRAPHER:  The time is now 2:02.
11 We're going off the record.
12        (Recess taken.)
13        THE VIDEOGRAPHER:  The time is now 2:19.
14 Back on the record.
15 BY MR. FULLER:
16   Q.   We were talking about thresholds,
17 Mr. Schoen.  Tell me -- you mentioned that back
18 when you did have a bunch of primaries, that you
19 guys used a multiplier.  Do you know what the
20 multiplier was that you used?
21   A.   No.
22   Q.   Okay.
23   A.   I can't say that we don't still use a
24 multiplier.

Page 189

1         MR. RICARD:  Wait for a question, Tom.
2         THE WITNESS:  Okay.
3 BY MR. FULLER:
4    Q.   Well, I think you were trying to
5 clarify, because I think you said earlier that you
6 didn't use a multiplier anymore, but you think you
7 might?
8    A.   I don't know.
9    Q.   Okay.  Who would know that?
10   A.   The IT people.
11   Q.   Kirk?
12   A.   Kirk.
13        MR. FULLER:  So we're going to mark for
14 identification purposes Exhibits 21 and 22 [sic].
15        Gina, it's 407 and 408.
16        MS. VELDMAN:  What was the number?
17        MR. FULLER:  407 and 408.
18        And for the record, it's PSI0000280 and
19 PSI0000274.
20        MS. VELDMAN:  Are you going to do one at
21 a time?
22        MR. FULLER:  Oh, no.  We're going to do
23 three at a time.  Are you kidding me?  We're
24 getting done.  No.  I'm kidding.

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1           - - -
2      (PSI-Schoen Exhibits 20 and 21 marked.)
3           - - -
4  BY MR. FULLER:
5      Q.  So we have two more exhibits there in
6  front of you, Mr. Schoen.
7          I'm going to deal with Bates Number 2 --
8  or 280 first, the one that has at the top "Maximum
9  Monthly Quantity Prescription Supply."
10     A.  Mm-hmm.
11     Q.  And I'll tell you, I've read through it.
12 I don't really understand what this is or what it
13 does.  Do you?
14     A.  I honestly haven't read through it
15 recently, so I don't -- I don't know that I do or
16 don't.
17     Q.  Now, there's references to maximum
18 units, medication families, and it looks like
19 somewhat of a bunch of computer stuff talking
20 about order processing system modifications.  And
21 the other document, which is 274, seems to, at
22 least from my simple perspective, be written in
23 more of an understandable English.
24         Do you have that one in front of you?

Page 191

1      A.  This one?
2      Q.  Yes, sir.
3      A.  Yeah.
4      Q.  It says, "Prescription Supply Maximum
5  Monthly Units of OLS" --
6      A.  Oh, okay.
7      Q.  -- which my understanding is --
8      A.  They're a software company.
9      Q.  -- Online Solutions.  Okay.  That's your
10 software company?
11     A.  Online Solutions.  Yes.
12     Q.  So explain to me what OLS is.
13     A.  Online Solutions.
14     Q.  Yeah, but it's a software company that
15 does what?
16     A.  That's the name.  They wrote our
17 software, our entire package.
18     Q.  Okay.
19     A.  They still are writing some.
20     Q.  And is this the software that manages
21 and sets the -- or stops the orders that come in
22 that may be above threshold and things of that
23 nature?
24     A.  It is.  As I said, suspicious order

Page 192

1  monitoring system has evolved over time.
2      Q.  Yes, sir.
3      A.  This was surely part of it and is part
4  of what's being used, but is it everything?  Other
5  changes have been made, yes.
6      Q.  Sure.  Now, I guess my question is, we
7  talked earlier about that software that prevents
8  orders above thresholds from going out now --
9      A.  Mm-hmm.
10     Q.  -- or being shipped.  Is OLS the group
11 that wrote that software?
12     A.  Some of it.
13     Q.  Okay.  And maybe some of it isn't?
14     A.  Some of it we wrote ourselves.
15     Q.  Okay.
16     A.  Some of it -- we gain software from
17 numerous entities, okay?  Online Solutions is on
18 the West Coast.  We have an East Coast provider of
19 software also for Online Solutions.  This is --
20 the West Coast is really Online Solutions.  The
21 East Coast are people that have developed software
22 for Online Solutions.  So we're getting it from --
23     Q.  Multiple sources?
24     A.  Multiple sources.

Page 193

1      Q.  Got it.  Got it.
2          So when this refers to maximum monthly
3  units, we're talking about a threshold type of
4  situation, is that correct, or do you know?
5      A.  Well, it is talking about a
6  threshold-type situation, yes.
7      Q.  Okay.
8      A.  Yes.
9      MR. FULLER:  Next is 503.
10 BY MR. FULLER:
11     Q.  Mr. Schoen, we're going to look next at
12 the -- yeah, this is going to be Plaintiff's
13 Exhibit Number 22.
14         - - -
15     (PSI-Schoen Exhibit 22 marked.)
16         - - -
17 BY MR. FULLER:
18     Q.  And have you seen --
19     MR. RICARD:  Can I just state for the
20 record that although not marked as confidential,
21 it was our intention to mark these as confidential
22 documents not to be distributed outside the scope
23 of this deposition.
24     MR. FULLER:  And we won't let the

Page 194

1 witness keep them. I'm kidding.
2 BY MR. FULLER:
3    Q.  All right. Have you seen this document
4 before?
5    A.  Well, yes.
6    Q.  Okay. And this is where the Ohio State
7 Board of Pharmacy came in and initially did a
8 visit to Prescription Supply, Inc., in May of
9 2017, this document being your response thereof,
10 and ultimately what the Board of Pharmacy said is,
11 "Why is it that Prescription Supply has not
12 reported suspicious orders in 2014, 2015, 2016,
13 and 2017?"
14       Right?
15       MR. RICARD:  Objection to form.
16    A.  Apparently, mm-hmm.
17    Q.  And Prescription Supply responded much
18 like you said and said, "Because we don't get
19 suspicious orders."
20       MR. RICARD:  Objection to form.
21    Q.  Right?
22    A.  That's the response.
23    Q.  And then BOP comes back and says, "But,
24 hey, what about these four pharmacies and what was

Page 195

1 going on with them?"
2       Right?
3       MR. RICARD:  Objection to form.
4    A.  That's correct.
5    Q.  Then you guys provided, as you mentioned
6 earlier, various responses; is that right?
7    A.  Mm-hmm, yes.
8    Q.  And the four entities -- if you go to
9 page -- I think it's page 5. Yep. That provides
10 you a listing of the four pharmacies they asked
11 about; is that correct?
12    A.  Correct.
13    Q.  A Kahler Pharmacy. Am I pronouncing
14 that right?
15    A.  Yes.
16    Q.  A Shaffer Pharmacy. Both in Toledo. A
17 Medicine Shoppe, which is in --
18    A.  Bellevue.
19    Q.  Bellevue. Which that's part of a chain,
20 is it not, or a bunch of franchises?
21    A.  Franchises, I believe.
22    Q.  Okay.
23    A.  I believe franchises.
24    Q.  And then Gibsonburg Pharmacy in

Page 196

1 Woodville.
2    A.  Correct.
3    Q.  Now, we talked a little bit earlier,
4 Gibsonburg Pharmacy in Woodville is the one that
5 eventually got sold to CVS; is that correct?
6    A.  Correct.
7    Q.  Okay. And the Board of Pharmacy had
8 questions about the other three?
9    A.  Yes.
10    Q.  And, particularly, the other three,
11 they're talking about spikes, and spikes that
12 occurred anywhere from April of '14 through
13 January of '15, at least according to this
14 document; is that fair?
15    A.  Yes.
16    Q.  Okay. And if you turn to page 60.
17    A.  60?
18    Q.  Yes, sir. Oh, no, it's not 60. Try 59.
19 I'm sorry.
20       Do you recognize this form? Have you
21 ever seen this type of form before, Mr. Schoen?
22    A.  Yes.
23    Q.  This is a form that's called -- or at
24 the top, it says "Prescription Supply, Inc., 2233

Page 197

1 Tracy Road, Northwood, Ohio  43619. And that's
2 the name and location of your business; is that
3 correct?
4    A.  That's correct.
5    Q.  And it says, "Increased purchase request
6 for controlled substances."
7       Is this what you guys used to increase
8 basically thresholds for controlled substances?
9    A.  Among other things, yes.
10    Q.  Okay. And it says, "We understand the
11 changes in usage occur. To facilitate increased
12 purchasing, please have the Owner, Business
13 Officer, or Authorized Signatory complete and
14 return this form."
15       And so this is a form that would be
16 provided to your customers to fill out and provide
17 back to PSI to indicate that they were seeking
18 some sort of increase related to controlled
19 substances?
20    A.  Correct.
21    Q.  And the form asks for a variety of
22 differing types of information. And this
23 particular one is filled out by the Medicine
24 Shoppe that was part of that Ohio Board of

Page 198

1  Pharmacy investigation; is that right?
2      A.  That's correct.
3      Q.  Okay.  Now, if you go on down the form,
4  we have questions 1 through 6 -- well, actually, 1
5  through 7.  But it doesn't look like Medicine
6  Shoppe filled out anything other than number 6.
7      A.  That's correct.
8      Q.  Now, what did they say in number 6?
9      A.  That Cardinal was unable to supply.
10     Q.  So this would have been a facility in
11 which you were a secondary source for, correct?
12     A.  Correct.
13     Q.  Presumptively then Cardinal would have
14 been the primary; and for some reason, they
15 couldn't provide them with the Oxy 30s?
16         MR. BUSHUR:  Objection; form.
17     A.  Correct.
18     Q.  At least that's what's indicated on this
19 document?
20     A.  That's what's indicated, yeah.
21     Q.  Okay.  Now, I'm assuming, sitting here
22 today, you have no idea whether that's true or
23 not?
24     A.  Well, yes, I don't know that it's true.

Page 199

1      Q.  Now, let's talk about how the system
2  worked.  So if they were a secondary customer for
3  PSI and they would have placed an order, assuming
4  that order would have been within their threshold,
5  it would get filled in the normal course, right?
6  Is that a yes?
7      A.  That's correct.
8      Q.  Okay.  What may happen, though, is
9  because they're a secondary customer, they may
10 have a very low threshold?
11     A.  That's correct.
12     Q.  So that an order will set off that
13 system, which you described to us earlier,
14 triggering this type of documentation, the
15 necessity for this type of documentation to ship
16 an order beyond that set threshold?
17     A.  Correct.
18     Q.  Okay.  So -- and I'll represent to you
19 that we do have provided through your counsel a
20 list of threshold events for all your businesses
21 or all your transactions going back, I think,
22 until 2008.
23         MR. RICARD:  Correct.
24     Q.  So being that this is in 2015, if we

Page 200

1  looked, we would see a threshold event for this
2  particular increased purchase request, or at least
3  we should, correct?
4      A.  Yes.
5      Q.  Okay.  Now, if we go to page 61, we'll
6  have another one of these forms; is that right?
7      A.  Yes.
8      Q.  Okay.  And this is for Shaffer Pharmacy,
9  correct?
10     A.  Yes.
11     Q.  That was another one of those that was
12 looked into by the Board of Pharmacy for the State
13 of Ohio, correct?
14     A.  Correct.
15     Q.  And here we have -- there's a stamp
16 which provides most of that information on those
17 first few lines.  And then we have answers to
18 numbers 1 through 7.
19         Do you see that there?
20     A.  I see it.
21     Q.  And question 1 asks "Has the pharmacy
22 prescription count increased?"
23         And the answer is?
24     A.  Yes.

Page 201

1      Q.  Okay.  Which in your line of business,
2  explain to us what that means.  It means they're
3  getting more prescriptions, right?
4      A.  That's what it means.
5      Q.  Okay.  "2.  Did the pharmacy change its
6  business activity?"
7          And the answer is?
8      A.  No.
9      Q.  "3.  Has there been an increase in
10 prescribers?"
11         And the answer is?
12     A.  Yes.
13     Q.  4, "Is the pharmacy serving additional
14 long-term care, or LTC, hospice, pain management,
15 Urgent Care?"
16         And the answer is?
17     A.  No.
18     Q.  "Name/Drug Family" is what?
19     A.  Oxycodone.
20     Q.  And then it says, "If new pain
21 management clinic/physicians/hospice/urgent care,
22 long-term care, please list each prescriber name
23 with their DEA number."
24         And it indicates whom?

Page 202

1    A.  Two doctors, I'm guessing.  They have
2  DEA numbers.
3    Q.  Correct.  Now, number 6 asks for the
4  reason for the request.  Read the reason for the
5  request to us.
6    A.  "Supplier mentioned an industry short
7  supply."  New MDs named [sic] in building -- new
8  doctors in the building.
9    Q.  And I think it says "New MDs moved in
10  the building."
11    A.  Okay.
12    Q.  Right?
13    A.  Yes.
14    Q.  And, now, it's signed by a Tom Tadsen?
15    A.  Tadsen.
16    Q.  But it's not dated, is it?
17    A.  No.
18    Q.  Now, it should be, correct?
19    A.  Yes.
20    Q.  Now, as we stated earlier, we should be
21  able to look and see a threshold increase that hit
22  during this time frame, correct?
23    A.  Yes.
24    Q.  Otherwise, if there was no threshold

Page 203

1  event, there would be no purpose or reason that we
2  would have this form, at least the way our system
3  works, correct?
4    A.  Right.
5    Q.  Okay.  So now let's go to two more pages
6  back, 63, and I think we'll see the form for the
7  third pharmacy.  Now, Tabb Enterprises, I'm
8  assuming, is a -- it indicates there is a d/b/a
9  for that Kahler -- I know I pronounced that right
10  last time.  Is it Kahler or Kahler?
11    A.  Kahler.
12    Q.  Kahler, Kahler Pharmacy.  And that's in
13  Toledo, right?
14    A.  Correct.
15    Q.  And there it asks the same questions.
16  Has the prescription count increased?  They say
17  yes.
18        Did the pharmacy change business
19  activity?  No.
20        Has there been an increase in
21  prescribers?  No.
22        Is it servicing an LTC, pain management,
23  or urgent care?  No.
24        Name and drug family?  Does it give one?

Page 204

1    A.  No.
2    Q.  But it should, right?
3    A.  Yes.
4    Q.  And then the reason.  Can you read the
5  reason for us?
6    A.  "We have seen an increase in
7  prescriptions over the past six months on the
8  average of about 110 new prescriptions monthly."
9    Q.  Now, if you and I are doing the due
10  diligence on this and looking to determine whether
11  we're going to increase this, that doesn't really
12  give us enough information, does it?
13        MR. RICARD:  Object to form.
14    A.  It says -- well, what other information
15  would you want to see?
16    Q.  Well, let's talk about that.  So it says
17  the number of people coming with prescriptions is
18  increasing, right?
19    A.  Mm-hmm.
20    Q.  Well, we don't know if those people are
21  driving up from Florida.  We don't know if they're
22  driving from West Virginia or Kentucky or anywhere
23  else.  If we're going to see a potential spike
24  that may be from diversion, we're going to see

Page 205

1  more prescriptions, aren't we?
2        MR. RICARD:  Objection to form.
3    A.  Yes.
4    Q.  So the information that we have doesn't
5  provide us anything to tell us whether it's
6  potential diversion or otherwise?
7        MR. RICARD:  Objection to form.
8    Q.  Correct?
9    A.  Yes, but we -- well, we feel we know
10  Kahler.
11    Q.  And I understand that, and that may be
12  true.  But, again, we're wanting to look at the
13  documentation we have to make sure we can
14  substantiate what we're doing, and that's the way
15  it's supposed to be done, right?
16    A.  Yes.
17    Q.  Okay.  All right.  So --
18        MR. FULLER:  Gina, can you pull up the
19  macro spreadsheet.
20        And, AJ, I need just -- oh, actually, hold on.
21  I think I -- I think we have it in the -- bring me up
22  904.
23        MS. VELDMAN:  Are you talking to me?
24        MR. FULLER:  Yes, ma'am.

Page 206

1      MS. VELDMAN:  What did you say, 94?
2      MR. FULLER:  904.  And for the record, I
3  don't know that I'm going to use it right now, but
4  I'm going to be using a macro spreadsheet in a
5  bit, and I'll attach the thumb drive as Exhibit
6  23.
7          And, Counsel, here's a copy of that for y'all.
8              - - -
9      (PSI-Schoen Exhibit 23 marked.)
10             - - -
11 BY MR. FULLER:
12     Q.  All right.  So let me tell you what I've
13 been provided and what I've done, is, Mr. Schoen,
14 I've been provided, as I mentioned to you earlier,
15 the transactional data, as well as all the
16 threshold events that your company received from
17 2008 to present, okay?
18         And what I've done and went through is
19 sort of separate them out, because they were all
20 in chronological order.  And as you know from
21 running the business, that's a whole bunch of
22 lines with a whole bunch of different pharmacies
23 with a whole bunch of different drugs.
24         So what I've separated out is anything

Page 207

1  but for oxies and hydros, two drug families which
2  we talked about earlier that you guys do
3  thresholds within since 2006, correct?
4      A.  Correct.
5      Q.  Okay.  So as you can see from on the
6  screen, this is Kahler Pharmacy, right?
7      A.  Kahler, but yes.
8      Q.  Kahler.  I'm sorry.  I keep messing that
9  up now.
10         And it starts -- the first threshold
11 event we have is in March of 2012.
12         Do you see that there?
13     A.  I do.
14     Q.  Okay.  Now, if we could slide it over to
15 the right, we'll see as we go across, at the end
16 of the columns, we have column S, which is the
17 total number of units ordered -- or units sold
18 that month, and then T is the maximum units which
19 indicates the threshold; is that right?
20     A.  Yes.
21     MR. FULLER:  And, Gina, can you get the
22 date on there as well?  Slide it over just a
23 little bit.  Can you shrink some of those down?
24     MS. VELDMAN:  Yeah.

Page 208

1      MR. FULLER:  There you go.  Great.
2  BY MR. FULLER:
3      Q.  All right.  So we see in March,
4  March 5th, you see there we have an order that the
5  total units sold of oxycodone is 6,100, and our
6  max threshold is 7,000, correct?
7      A.  Correct.
8      Q.  And when we have one of these flags,
9  that's because the next order was going to send
10 them over the limit; is that right?
11     A.  Apparently, yes.
12     Q.  Okay.  And that's on the 5th.  Then on
13 the 7th, we've now sold to Kahler 11,800, and
14 apparently back on the 5th, we increased their
15 threshold from 7- to 12,000.
16         Do you see that?
17     MR. RICARD:  Objection to form.
18     A.  Yes.  I suppose -- it's the family.
19 Okay.
20     Q.  It's the family.  So it means --
21     A.  It's a different product, but yeah.
22     Q.  Correct.  Well, it's a different dosage;
23 is that right?
24     A.  That's correct.

Page 209

1      Q.  Okay.  But still it's, I think,
2  oxycodone.  So then on the 12th, we have another
3  event there where now Kahler has ordered -- and,
4  again, our initial threshold at the beginning of
5  the month was 7,000.  Now they've ordered 15,300,
6  and we've apparently increased their threshold to
7  18,000.
8      MR. RICARD:  Object to form.
9      Q.  Do you see that there, Mr. Schoen?
10     A.  I see it.
11     Q.  Then on the 19th, another five days
12 later, of March of 2012, we've now sold them
13 20,500 and have previously increased their
14 threshold to 22,000.
15         Then on the 19th again, same day, we've
16 sold them 24,500 and increased their threshold to
17 25,000.  On the 21st of March, we've now sold them
18 25,500 and increased their threshold to 26,000.
19 The 26th of March, we've now sold them 28,400
20 oxycodone pills of varying strength, right?
21     A.  Correct.
22     Q.  And we've now raised their threshold to
23 29,000 pills.  But wait.  We're not done.
24     MR. RICARD:  Object to form.

Page 210

1    Q.   On the 30th, we've now sold them 33,000
2  pills, and we've increased their threshold to
3  33,000 pills.  That is seven threshold increases
4  increasing the threshold over 400 percent within
5  25 days.
6         MR. RICARD:  Objection to form.
7    Q.   Now, I can tell already that this
8  concerns you, doesn't it?
9    A.   It does.
10   Q.   You did not know that things like this
11 may have been going on in your company?
12        MR. RICARD:  Objection to form.
13   A.   I don't know -- I mean, what do I say?
14 No.  I mean no, huh-uh.
15   Q.   Now, let's drop down.  Because we
16 separate into two drug families oxycodone --
17   A.   And hydrocodone.
18   Q.   -- and hydrocodone.  In August of the
19 same year, on the 7th of August, we have a
20 hydrocodone threshold event, correct?
21   A.   Mm-hmm.
22   Q.   And they ordered 5,500, and already on
23 the 7th.
24        Now, you would agree with me that these

Page 211

1  threshold events -- the threshold should be set
2  and shouldn't necessarily be hit so early in a
3  month?  It's not something you would expect to
4  see, generally speaking?
5    A.   Generally.
6         MR. RICARD:  Objection to form.
7    Q.   So the threshold, while they're at 5,500
8  pills, is at 6,000.  On the 17th, ten days later,
9  they're up to 12,000 pills, and the threshold is
10 at 12,000.
11        On the 23rd, another week later, they're
12 at the 12,100 pills, and we've increased our
13 threshold to 14,000 pills.  On the 29th, the last
14 transaction of the month, they're at 15,100, and
15 we've increased their threshold to 16,000 pills.
16 We have more than doubled it within this month
17 of -- well, within this 21 days basically.
18        Does that cause you concern?
19        MR. RICARD:  Objection to form.
20   A.   I would want to look into it.
21   Q.   And we would want to see the
22 documentation as to the reasons, because just
23 looking at what's happening with the threshold and
24 the number of pills going out, it's concerning.

Page 212

1  You would agree with that?
2         MR. RICARD:  Objection to form.
3    A.   It certainly draws my interest, yes.
4    Q.   And who knows, you may go back to the
5  office either later today or tomorrow and ask for
6  someone to look into this and see if there is an
7  explanation.  And certainly if there is
8  documentation that sets out, I would absolutely
9  ask you to provide it to your counsel so he can
10 forward it to us, because, again, we're not here
11 to make accusations or anything that is
12 inaccurate.  We want to have all the information,
13 as I'm sure you do, correct?
14   A.   Correct.
15   Q.   Okay.  So this doesn't have to do
16 necessarily with a time frame when Kahler was --
17 and the Board of Pharmacy was looking in, but
18 this, too, is a concerning issue; you would agree
19 with that?
20        MR. RICARD:  Objection to form.
21   A.   It's certainly of interest, yes.
22        MR. FULLER:  Okay.  Now, let's go to --
23 we're going to need to go to the macro.
24        And, AJ, help her get to where the -- all the

Page 213

1  threshold events, and then bring it up for Shaffer
2  Pharmacy, please, unless I have it.
3         Actually, 905 I think does it.  Sorry.  I
4  should have known that.
5  BY MR. FULLER:
6    Q.   Okay.  So this is Shaffer's Pharmacy in
7  Toledo.  You're familiar that that's a client of
8  yours, right?
9    A.   Yes.
10   Q.   Okay.  These are the threshold events,
11 and I believe these are all the threshold events I
12 have for Shaffer's, which is less -- looks less
13 than Kahler, doesn't it?
14   A.   Yes.
15   Q.   Now, Shaffer's Pharmacy and the issue
16 with the Board of Pharmacy was in April of 2014.
17 If you get the date on that.  There you go.  And
18 it dealt with oxycodone.
19        So do you see a threshold event in April
20 of 2014 --
21        MR. FULLER:  I need the date on there.
22 Right there.  You're good.
23 BY MR. FULLER:
24   Q.   In April of 2014 for Shaffer's Pharmacy?

Page 214

1  A.  No.
2  Q.  We see March of '13, and then the next
3  one chronologically we see is September of '14,
4  correct?
5  A.  Right.
6  Q.  Okay.  So that begs the question,
7  doesn't it, how do we get an increased purchase
8  request if there was no event that would trigger
9  an increased purchase request?
10  MR. RICARD:  Objection to form.
11  A.  This is dated -- that's different.  I'd
12  have to --
13  Q.  Because the increased purchase request
14  form that we had that we looked in our Board of
15  Pharmacy investigation packet --
16  A.  Um-hmm.
17  Q.  Do you have that back in front of you?
18  A.  I do now.
19  Q.  It's not dated, is it?
20  A.  No.
21  Q.  Now -- and I'm not suggesting that you
22  did this, Mr. Schoen.  I'm asking PSI, because
23  you're sitting here as Prescription Supply, Inc.,
24  do we know whether someone went to Shaffer

Page 215

1  Pharmacy once the Board of Pharmacy came to do
2  their investigation and said, "Hey, we need an
3  increased purchase request from you for April of
4  2014," when the Board of Pharmacy is looking at
5  this spike."
6  MR. RICARD:  Objection to form.
7  A.  I have no idea.
8  Q.  Because there's no triggering event --
9  A.  I see that, yes.
10  Q.  -- to set off this documentation.  And
11  here's my concern.  I'm going to be very --
12  A.  It's not dated either though.
13  Q.  Right.  And that was my concern, is that
14  someone -- and, again, I have no idea who.  But it
15  appears someone could have went to Shaffer's
16  Pharmacy and asked them to do an increased
17  purchase request in 2017 once this investigation
18  got on its way?
19  MR. RICARD:  Objection to form.  Calls
20  for speculation.
21  Q.  Which you would agree would be very
22  disconcerting, wouldn't it?
23  A.  It would be disconcerting, but I
24  don't --

Page 216

1  Q.  You don't know whether it happened or
2  no?
3  A.  I -- yeah.
4  Q.  Now, we know there's no triggering
5  event, and we know the increased request form is
6  not dated, which it's supposed to be dated,
7  correct?
8  A.  Mm-hmm.
9  Q.  Is that a yes?
10  A.  Yes, that's correct.
11  Q.  And, again, I encourage you when you go
12  back, if you want to look into it, and if there's
13  anything that you can provide to counsel, I'm sure
14  they will forward it to me, and maybe we can get
15  to the bottom of it.
16  A.  I would have to go back and look at the
17  whole thing.
18  Q.  Well, and understand, you don't need to
19  write anything down.  I know you were reaching for
20  your pen, but counsel is going to have all this
21  information.  And if he needs anything from me, I
22  can point him to where it was or what we were
23  looking at, and he can get with you, okay?
24  A.  Mm-hmm.  Um --

Page 217

1  MR. RICARD:  There's no question
2  pending.
3  MR. FULLER:  Go to 506, Gina.
4  BY MR. FULLER:
5  Q.  Now, let me ask you -- and, again, we'll
6  get to the bottom of it, and we'll figure it out
7  one way or another.  If somebody was doing
8  documents in 2017 to support shipments in 2014,
9  you would agree with me that would be completely
10  inappropriate?
11  MR. RICARD:  Objection to form.
12  A.  Yes.
13  Q.  It would potentially be illegal as well?
14  A.  Yes.
15  MR. RICARD:  Objection.
16  Q.  And you would --
17  A.  Okay.
18  Q.  You wouldn't stand for that in your
19  company, would you, if you knew it was going on?
20  A.  No.
21  Q.  Okay.  And I know you want to explain,
22  but I would just suggest listen to your advice of
23  counsel and just answer the questions being asked.
24  MR. FULLER:  All right.  506.  And if

Page 218

1  you can blow up this area here (indicating).  This
2  is going to be Plaintiff's Exhibit Number 24.
3          - - -
4      (PSI-Schoen Exhibit 24 marked.)
5          - - -
6  BY MR. FULLER:
7      Q.  Now, Mr. Schoen, I think this was
8  actually an e-mail that was actually sent to you.
9      A.  Mm-hmm.
10     Q.  Is that a yes?
11     A.  Yes.
12         MR. RICARD:  You need to respond out
13 loud.
14     Q.  Take a minute.  We're going to look at
15 just the second -- I want to say paragraph, but I
16 don't even know that it's a paragraph.  This is
17 from the Board of Pharmacy, is that right, for the
18 State of Ohio, relating to the investigation that
19 they were already conducting that they started in
20 2017; is that correct?
21     A.  Yes.
22     Q.  And it's to
23 schoen@prescriptionsupply.com.  You and your
24 sister, it appears, right?

Page 219

1      A.  Yes -- well, actually -- the J?
2      Q.  Yeah.
3      A.  The J is to James.
4      Q.  Who's jaharbauer?
5      A.  Where is JA?
6      Q.  If you look on the screen.
7      A.  Oh, okay.  Oh, Jacqueline Harbauer.
8      Q.  Or did they get --
9      A.  It could be -- I mean, it's possible it
10 went to James Harbauer.  Although, that's -- I
11 don't believe that's his --
12     Q.  E-mail address?
13     A.  -- e-mail address.
14     Q.  And they may have gotten it wrong.  They
15 may have gotten it wrong.  But it does appear to
16 have your e-mail address on it?
17     A.  It does.
18     Q.  Okay.  And they say there in the second
19 paragraph, "In order for the Board of Pharmacy to
20 finalize this case, please describe how
21 Prescription Supply determines who to sell to, how
22 the monthly thresholds are set and what is done if
23 a monthly threshold is above what was determined.
24 Please use the following pharmacies as examples."

Page 220

1      And it gives you the Medicine Shoppe and
2  Shaffer, correct?
3      A.  Yes.
4      Q.  Okay.  Do you know if you guys -- and I
5  say "you guys."  Do you know if Prescription
6  Supply has responded to the Board of Pharmacy
7  pursuant to this request as of yet?
8      A.  Yes.
9      Q.  And in that response --
10     A.  No.  I can say that the agent was in the
11 building.  We may have responded there, and he may
12 have accepted that response.  I don't know.
13     Q.  Okay.
14     A.  I do remember talking to him there, and
15 that may have been -- if we don't have a written
16 one, I can't tell.
17     Q.  Okay.  Well, and I just wanted to check
18 if you knew of a written one, because this is as
19 far as I have in that process.  So what I'll do is
20 after the deposition, I'll follow up with your
21 counsel on anything else, okay?
22     A.  Yes.
23     Q.  Now, you believe that investigation to
24 be over; is that correct?

Page 221

1      A.  That's correct.
2      Q.  Okay.
3      A.  I was told it was over.
4      Q.  By whom?
5      A.  By the State.
6      Q.  Okay.
7          MR. FULLER:  All right.  Gina, if you
8  would bring up 905A for me.
9          Here, let me do a couple housekeeping things
10 real quick here.  So I'm going to do 25.  Plaintiff's
11 Exhibit 25 is going to be that spreadsheet that I showed
12 him.
13         MR. RICARD:  You already saw that one.
14         MR. FULLER:  Yeah.  It's just too hard
15 to see on the printout.  Although, we'll have a
16 printout for the record.  Here's a copy of 905A.
17         - - -
18     (PSI-Schoen Exhibits 25 through 27 marked.)
19         - - -
20 BY MR. FULLER:
21     Q.  So what we have up in front of us is
22 905A, which is now Exhibit 26.  And what I've done
23 here, Mr. Schoen, is taken just oxycodone sales
24 for a period of time.  You see that period of time

Page 222

1 being January of '08 through April of '09,
2 correct?
3     Is that a yes?
4     A.  Yes.
5     Q.  Okay.  And sort of plotted it in a bar
6 graph.  I'm better with graphs than I am just
7 looking at a bunch of numbers.  And you can see
8 that they sort of go along at a consistent clip a
9 little above and below 15,000 pills per month of
10 the oxycodone family, right?
11     A.  Correct.
12     Q.  Until about October of '08, and then
13 they drop off, but here's what my question is and
14 caused me a concern, is that in March of '09, they
15 spike to 30,000 pills.
16     Do you see that?
17     A.  I see it.
18     Q.  Which you would agree with me, or PSI
19 would agree, is a significant increase over the
20 normal --
21     A.  Yes.
22     Q.  -- past pattern?
23     MR. RICARD:  Objection to form.
24     Q.  Correct?

Page 223

1     A.  Yes.
2     Q.  We would expect to see a threshold event
3 from this type of increase, correct?
4     A.  Yes.
5     Q.  And we looked earlier --
6     MR. FULLER:  And if we can bring back up
7 905, which is Exhibit 25.
8 BY MR. FULLER:
9     Q.  We see no threshold events in March of
10 '09, do we?
11     A.  No.  I don't --
12     Q.  We don't see our first threshold --
13     MR. RICARD:  It's up on the screen.
14     THE WITNESS:  Yes, I see that.  Oh, I
15 see it, yes.
16 BY MR. FULLER:
17     Q.  We don't see our first threshold event
18 until January of 2011, actually, which would mean
19 that our threshold for some reason must have been
20 set above 30,000 pills per month --
21     MR. RICARD:  Objection; form.
22     Q.  -- for Shaffer Pharmacy, correct?
23     A.  Yes.
24     Q.  Otherwise, based on the way the system

Page 224

1 works, we would have seen a threshold event?
2     MR. RICARD:  Objection to form.
3     A.  There could be a reason for this, but
4 I'm looking and thinking there is one, but I don't
5 know.
6     Q.  Right.  And, again, like with the other
7 things that we've talked about, you can go back
8 and look at the business and see if there is some
9 sort of explanation, and please feel free to
10 provide it to your counsel, and he'll get with me
11 on it, okay?
12     A.  I can see a possibility for this one,
13 but ...
14     Q.  But we can agree that based on this
15 purchase history, this would qualify -- this
16 30,000 spike would qualify as a suspicious order,
17 correct?
18     MR. RICARD:  Objection to form.
19     A.  Maybe.
20     Q.  And it should at least be halted --
21     A.  Yeah, there should have been something
22 done.
23     Q.  It should be halted until it can be
24 investigated, and it should potentially be

Page 225

1 reported as well --
2     MR. RICARD:  Objection to form.
3     Q.  -- correct?
4     A.  I can see a possible answer to this one,
5 so I don't --
6     Q.  Okay.  Let's go --
7     A.  It may not be accurate.
8     Q.  Let's go on --
9     A.  Pure guess in this case.
10     Q.  Right.  Sitting here today, you have no
11 explanation -- any explanation would be a guess,
12 correct?
13     A.  At this point.
14     Q.  Okay.  But just based on the numbers
15 that we're seeing, we can both agree that it
16 was --
17     A.  Certainly --
18     Q.  Go ahead.
19     A.  Yes.  Yes.
20     Q.  That it should have been flagged, it
21 should have been investigated, and potentially
22 reported as a suspicious order, correct?
23     MR. RICARD:  Objection to form.  Asked
24 and answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    You can answer again.

2    A.  I'm sure it was investigated, and I -- I
3  don't know.

4    Q.  You don't know.  So just listen to my
5  question.  Let me read it back.  "That this order
6  should have been flagged, and it should have been
7  investigated, and potentially reported as a
8  suspicious order, correct?"

9      MR. RICARD:  Objection to form.  Asked
10  and answered.

11    Q.  You can answer.

12    A.  I did answer it as best I can.  I'm sure
13  it was investigated.

14    Q.  Well, that wasn't --

15    A.  The question.  I understand.

16    Q.  Yeah.  My question is, seeing this --
17  and I understand --

18    A.  All right.  The answer to that --

19      MR. RICARD:  Hang on.  Let him ask his
20  question.

21    Q.  And your answer is that you're sure it
22  was investigated is a guess at this point,
23  correct?

24      MR. RICARD:  Objection.

Page 227

1    Q.  You don't know, sitting here today,
2  whether it was investigated or not?

3    A.  I don't know.

4    Q.  It may be an educated guess based on the
5  systems you had in place, but it's still a guess?

6    A.  It is.

7    Q.  And remember we talked at the very
8  beginning, I don't want you guessing here today.

9    A.  All right.

10    Q.  Okay?  I only want to know what you know
11  or don't know.  And I'm phrasing my questions very
12  specific to allow you to be able to provide an
13  answer.

14    A.  Okay.

15    Q.  So, again, my question is that this
16  order -- this spike of 30,000, it should have been
17  flagged, it should have been halted, it should be
18  investigated and potentially reported as a
19  suspicious order?

20    A.  Yes.

21    Q.  Okay.  Now, let's go to 905B, which is
22  27, Plaintiff's Exhibit 27.  This, again, is
23  another diagram again because I deal better with
24  diagrams.  And, again, it's for Shaffer's

Page 228

1  Pharmacy, and it runs the gamut of January of '13
2  through November of '14.

3    Do you see that there, Mr. Schoen?

4    A.  I see it.

5    Q.  Okay.  And these are the sales totals
6  for oxycodone on a monthly basis, okay?

7    A.  Yeah.

8    Q.  And now again we see a pattern where --
9  and I ran the numbers, and you can take my word
10  for it, or you can double check me.

11    So from January of '13 to November of
12  '14, we have the sales data.  We have the spike up
13  to over 16,000 pills.  Now, if you look from
14  January of '13 to December of '13, so the whole
15  year of 2013, there's an average of 4,467 pills
16  per month?

17      MR. RICARD:  Objection to form.

18    Q.  4,400, okay?

19    A.  All right.

20    Q.  If you take even further, January
21  through March, we have an average of 5,126 pills
22  per month --

23      MR. RICARD:  Objection to form.

24    Q.  -- okay?

Page 229

1    A.  Okay.

2    Q.  Understanding those averages, then we
3  see a spike to over 14- and over 16,000, we would
4  expect to see some sort of threshold event; would
5  we not?

6      MR. RICARD:  Objection to form.

7    A.  Yes.

8    Q.  And based on the information that was
9  provided, we don't see any threshold events for
10  oxy until -- well, we don't see any threshold
11  events in 2013 or 2014 for oxycodone, do we?

12      MR. RICARD:  Objection to form.

13    A.  I don't know.  You know, from looking at
14  this, I don't know.

15    Q.  Well, if you look at --

16    A.  Okay.  All right.  Here we go.

17    Q.  Yes, sir.

18    So in 2013, we have a March event for
19  hydrocodone which is different, correct?

20    A.  Yes.

21    Q.  And then in '14, we have a couple of
22  events for -- what is that?  Tramadone [sic]?

23      MS. VELDMAN:  Tramadol.

24    Q.  Tramadol?

Page 230

1   A.   Mm-hmm.
2   Q.   And then caris something.  Carisoprodol,
3   which none of those are the oxy family, correct?
4   A.   Correct.
5   Q.   So, again, we see no oxy threshold
6   events when we have an increase of over four times
7   the average pills going out in one month to
8   Shaffer Pharmacy?
9       MR. RICARD:  Objection to form.
10  Q.   Does that cause you concern?
11  A.   I know we know Dave Shaffer, okay?  We
12  know Shaffer Pharmacy.  I have to -- there has to
13  be a reason, okay?  And what it is, I don't know.
14  Q.   Right.  No, no.  I understand that.
15  And, therefore, you agree that this does cause you
16  concern, seeing what we're seeing today, correct?
17      MR. RICARD:  Objection to form.
18  Mischaracterizes his answer.
19  A.   Yes.
20  Q.   Okay.  Now, again, like I did earlier, I
21  invite you, when you get back to the shop, to do
22  some due diligence, do some checking and see if
23  there's an explanation.  If there's documentation,
24  I would love to see it.  I'll be honest.  Again,

Page 231

1   we're not here to accuse people of doing things or
2   not doing things that should have or shouldn't
3   have been done unless we have all the facts.  And
4   that's what we're trying to get to, is get to all
5   the facts, and that's fair, isn't it?
6   A.   It is.  As I said, I know Dave Shaffer.
7   I just, you know ... I probably would have felt
8   comfortable with him, but ...
9   Q.   Sir?
10  A.   I know Dave Shaffer, so I would have
11  felt comfortable.  There must be a reason.
12  Q.   But we still have to do our due
13  diligence --
14  A.   Yes.
15  Q.   -- even though -- absolutely.
16      Now, I'm going to test your memory a
17  little bit.
18      You've had, at least from my review, two
19  instances in which you were delivering to entities
20  that had lost their license as pharmacies or
21  pharmacists, one in Texas in which you actually
22  assisted the DEA with, Niko Rx.
23      Does that ring a bell?
24  A.   Could be, yes.

Page 232

1   Q.   And you knew that they lost their
2   license, and you guys continued to ship for about
3   a month after that.  And then two months later,
4   the DEA actually had you ship to them in part of a
5   sting they were doing, correct?
6   A.   Mm-hmm.
7       MR. RICARD:  Objection to form.
8   Q.   Is that a yes?
9   A.   That's a yes.
10  Q.   And then you had certain ventures with
11  an Ohliger.
12  A.   Ohliger.
13  Q.   Ohliger --
14  A.   Yes.
15  Q.   -- Pharmacy?
16  A.   Yes.
17  Q.   Brings up some probably pleasant and not
18  so pleasant memories, huh?
19      MR. RICARD:  Objection to form.
20  A.   He went out of business.
21  Q.   He did.
22  A.   He owed us a lot of money.
23  Q.   He did.  And you guys actually had a
24  loan with him, correct?

Page 233

1   A.   That's correct.
2   Q.   He actually -- well, here, we'll look at
3   it.
4       You had shipped to him after he lost his
5   pharmacy license as well, correct?
6   A.   Not that I know of, no.  I never knew
7   that we shipped to Ohliger after he lost his
8   pharmacy license.  Do we have something?
9   Q.   Did you know old man Ohliger?
10  A.   Pardon?
11  Q.   Did you know Mr. Ohliger?
12  A.   I knew Mr. Ohliger.
13      MR. PELINI:  Mike, I'm real sensitive
14  about the use of the term "old man."
15      MR. FULLER:  Hey, hey, hey.  This isn't
16  a litigation to be in if you don't get your
17  feelings hurt down there.  Toughen up --
18      MR. PELINI:  All right.  I'm sorry.
19      MR. FULLER:  -- Mr. OSU.
20      MR. PELINI:  Now we have a problem.
21      MR. FULLER:  All right.  So this is
22  going to be Plaintiff's Exhibit 28.
23      And that's where I'm going, Gina.
24          - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    (PSI-Schoen Deposition Exhibit 28 marked.)
2         - - -
3    BY MR. FULLER:
4    Q.   So Plaintiff's Exhibit 28 is a document
5    from the State of Ohio State Board of Pharmacy.
6         Do you see that?
7    A.   I see it.
8    Q.   And it's the Summary Suspension/Notice
9    of Opportunity for Hearing, correct?
10   A.   Yes.
11   Q.   And it says, "You are hereby" -- and
12   it's to Thomas Ohliger, right?
13   A.   Yes.
14   Q.   Okay.  Dated October 6 of 2015.
15        "You are hereby notified, in accordance
16   with Section 119.07 of the Revised Code, the Ohio
17   State Board Pharmacy Board hereby summarily
18   suspends Thomas Ohliger's Ohio license as a
19   pharmacist, under the authority of Section
20   3719.121(B) 4729.16 of the Revised Code.
21        Do you have any idea what Mr. Ohliger
22   did?
23   A.   No.
24   Q.   Okay.  Well, let's look.  So if you go

Page 235

1    to the allegations section a little further down
2    on the page.
3         MR. FULLER:  Blow up A, B, and C, too,
4    please.
5    BY MR. FULLER:
6    Q.   It says, "You, Thomas Ohliger, are
7    engaged in conduct that provides clear and
8    convincing evidence that continuation of your
9    professional practice presents a danger of
10   immediate serious harm to others set forth in
11   Section 3719.121(B) of the ORC, to wit:  A. On
12   September 29th, 2015, you called the Board and
13   stated that you had been robbed of your keys to
14   your pharmacy, Ohliger Drug of Fairview Park, a
15   retail pharmacy licensed by the Board under
16   license number" -- it gives the number.
17        "On September 29th -- same day -- an
18   Agent and Regional Supervisor of the Board
19   responded to the pharmacy to investigate the
20   current state of security at the pharmacy and the
21   security of the dangerous drugs contained within
22   the pharmacy.
23        "c" --
24        MR. FULLER:  You're going to need to

Page 236

1    roll onto the next page, Gina.  Do C, D, and E.
2    BY MR. FULLER:
3    Q.   "c.  During the investigation [sic], you
4    struck an Agent of the Board about the body with
5    your hand."
6    A.   Now it starts coming back, yeah.
7    Q.   Now you're recalling this, huh?
8    A.   Now I'm recalling it.
9    Q.   "While a supervisor of the Board spoke
10   with police officers dispatched to the pharmacy,
11   you took the Board-issued property, a laptop,
12   without consent.  The supervisor was able to
13   complete the inspection once the property was
14   returned."
15        And "On October 5, 2015, you appeared
16   before the Cuyahoga County Court of Common Pleas
17   on case number" -- and it gives the case number --
18   "where you were indicted on seven counts of
19   illegal processing of drug documents and eight
20   counts of trafficking.  During the hearing, you
21   were referred to the court psychiatric clinic to
22   determine your competency to stand trial."
23        Does that refresh your memory at all --
24   A.   It does, yes.

Page 237

1    Q.   -- of Mr. Ohliger?
2    A.   So we sold to him --
3         MR. RICARD:  Wait until another
4    question.
5    Q.   I believe the records would indicate
6    that you sold to him throughout the month of
7    October of 2015.
8         Now, due diligence would require that we
9    stay informed of things like this with our
10   customers, correct?
11        MR. RICARD:  Objection to form.
12   A.   Yes.
13   Q.   And while I have not checked, I would
14   undoubtedly place a bet that if we looked at the
15   papers in Cleveland, we would see newspaper
16   clippings about Mr. Ohliger; wouldn't you think?
17        MR. RICARD:  Objection to form.  Calls
18   for speculation.
19   A.   But I don't see the newspapers in
20   Cleveland.
21   Q.   Well, I understand that.  I understand
22   that.  But these are the type of things --
23   A.   I'm sure -- I'm sure there were, yes.
24   Q.   But these are the type of things that we

Page 238

1 would certainly try to stay informed of, correct?
2    A.  Yes.
3    Q.  I mean, I was pretty amused when I was
4 reading it, I have to say.  You're slapping the
5 investigative agent with your hand and then steal
6 the laptop.
7       MR. FULLER:  I'll strike the commentary
8 myself.
9       We've been going for a while.  Why don't we
10 take another break.
11      MR. RICARD:  Sure.
12    A.  Oh, okay.  We closed that store for the
13 State of Ohio, okay?
14    Q.  Because of a suspension?
15    A.  Because of a suspension.  We took
16 control of the drugs, yes, okay, at the request of
17 the State.
18      MR. FULLER:  Fair enough.  We'll take a
19 quick break.
20      THE VIDEOGRAPHER:  The time is now 3:25.
21 Going off the record.
22      (Recess taken.)
23      THE VIDEOGRAPHER:  Okay.  The time is
24 now 3:39.  Back on the record.

Page 239

1 BY MR. FULLER:
2    Q.  Mr. Schoen, I was looking at the sales
3 data provided by counsel.  And as I think you
4 mentioned earlier, there's a significant dropoff
5 of control IIs at some point for Prescription
6 Supply, Inc., correct?
7    A.  Correct.
8    Q.  And the information I was looking at
9 appeared to indicate that it happened at the end
10 of '09, beginning of 2010, when Discount Drug Mart
11 left Prescription Supply for its control IIs and
12 went to Cardinal; is that right?
13      MR. RICARD:  Object to form.
14    A.  Yes.
15    Q.  Okay.  Do you know why Prescription --
16 or excuse me -- Discount Drug Mart left
17 Prescription Supply for its control IIs and went
18 to Cardinal?
19    A.  They had the cosi -- or the suspicious
20 order monitoring system up -- not suspicious
21 order.  The electronic.  The electronic C-II
22 system went up.  They no longer -- we no longer
23 had an advantage.  That's why they left us.
24    Q.  Was there also a price differential or a

Page 240

1 better --
2    A.  Well, I think they were probably --
3 yeah, I would imagine Cardinal might have been
4 cheaper.  I don't know.
5    Q.  Okay.  You're not sure either way on
6 that?
7    A.  I'm not sure what their pricing was.
8    Q.  Now, even with the electronic monitoring
9 system, even though you could still do it by
10 fax --
11    A.  Yes.  We could do it electronically,
12 too, but ...
13    Q.  Did that make them any faster than you?
14    A.  It meant that they would deliver it with
15 every -- the next day.
16    Q.  And would it --
17    A.  Just as we would have delivered the same
18 day.  That differential wasn't significant.
19    Q.  Okay.
20    A.  Okay?
21    Q.  At least that's your understanding of
22 why Discount Drug Mart went to Cardinal?
23    A.  I'm very sure that that is why.
24    Q.  And how do you know?  Did they tell you

Page 241

1 that or ...
2    A.  I honestly can't say that they told us
3 that.
4    Q.  Okay.  That's just your understanding or
5 based on the business environment?
6    A.  Right.  Yes.
7    Q.  Okay.  Fair enough.
8       But you did not have any conversation
9 with Discount Drug Mart or Cardinal about that?
10    A.  Certainly not with Cardinal.
11    Q.  All right.  I'm going to run us through
12 two more documents real quick, and then we'll turn
13 it over to your counsel in case he has any
14 questions, okay?
15    A.  Mm-hmm.
16          - - -
17    (PSI-Schoen Deposition Exhibit 29 marked.)
18          - - -
19    Q.  This is going to be Plaintiff's Exhibit
20 Number 29.
21       So I don't know if you know, Mr. Schoen,
22 but there is a thing called the Wayback Machine.
23       Have you ever heard of the Wayback
24 Machine?

Page 242

1    A.   No.
2    Q.   You can go way, way back.
3    A.   Way, way back.
4    Q.   At least on the Internet, and you can
5  pull up older websites.  What I've done is I've
6  pulled up the HDMA website for this -- you know
7  what?  I think I gave you my copy, guys.
8    A.   Do you want it back?
9    Q.   Yeah.
10       MR. RICARD:  The one with the circles on
11 it?
12       MR. FULLER:  It doesn't matter.  The
13 other one just doesn't have circles.  It will help
14 you get to it faster.
15 BY MR. FULLER:
16   Q.   So the Wayback Machine tells me that
17 from '04 to 2014, if you look at the second page,
18 Christopher Schoen --
19   A.   Has been on the board.
20   Q.   Is one of the board members, Vice
21 President - Sales, Prescription Supply, Inc.
22       And what relation is Christopher to you?
23   A.   Son.
24   Q.   Okay.  Does he still work at the

Page 243

1  business?
2    A.   Yes.
3    Q.   Is he still in sales?
4    A.   Yes.
5    Q.   Is he still a board member of the HDMA?
6    A.   Yes, mm-hmm.
7    Q.   Fair enough.
8    A.   You understand that we have -- all
9  right.
10   Q.   You see, what makes him really nervous
11 is he's not exactly sure what you're fixing to
12 say.  That makes all of us nervous when our
13 clients are going to say something we're not sure
14 what they're going to say.
15       - - -
16   (PSI-Schoen Deposition Exhibit 30 marked.)
17       - - -
18   Q.   All right.  Plaintiff's Exhibit 30.  So
19 you understand what this is -- because I told you
20 there wouldn't be any more legal documents, but
21 then I took that back, and I said there may be
22 one.  This is my one, okay?
23   A.   Yes.
24   Q.   So what this is, is it relates to the

Page 244

1  Cardinal versus the Department of Justice matter.
2       MR. FULLER:  It is 108.  Oh, excuse me.
3  107.
4  BY MR. FULLER:
5    Q.   This is part of the pleadings from that
6  matter.  And in the legal world, there is issues
7  of significant importance being considered by a
8  court.  Different organizations can ask to file
9  what's called and amicus curiae brief --
10   A.   Okay.
11   Q.   -- meaning of public interest.  And the
12 HDMA, your trade organization, did that on behalf
13 of Cardinal and related to its action involving
14 the DOJ.
15   A.   Okay.
16   Q.   I'll tell you they also did the same
17 related to that Masters Pharmaceuticals case that
18 we looked at at the beginning this morning.  I
19 didn't show you that document, but they did.
20   A.   Okay.
21   Q.   It's a service they provide, or
22 something that they do related to some legal
23 matters.  This is that document, and there's a few
24 sections that I want to show you.  I think I know

Page 245

1  what your answer is going to be, but I want to
2  take care of it for the record, okay?
3       MR. RICARD:  Mike, before you get
4  started, can I just note an objection to the
5  extent you're going to seek a legal conclusion?
6       MR. FULLER:  Sure.  Objection noted for
7  the record.
8  BY MR. FULLER:
9    Q.   And the first part I want to ask you
10 about is on the bottom of page 1 onto page 2.
11 Actually, just the bottom of page 1.
12       MR. FULLER:  Just give me the bottom of
13 page 1, Gina.
14 BY MR. FULLER:
15   Q.   And there it says -- and it's in front
16 of you on the electronic screen, Mr. Schoen.
17       It says, "HDMA's members" -- which
18 Prescription Supply is one of, correct?
19   A.   Correct.
20   Q.   -- "have not only statutory and
21 regulatory responsibilities to detect and prevent
22 diversion of controlled prescription drugs, but
23 undertake such efforts as responsible members of
24 society."

Page 246

1      Does Prescription Supply agree with that
2 statement?
3      MR. RICARD:  Objection to form.
4   A.  Yes.
5   Q.  "The public health dangers associated
6 with the diversion and abuse of controlled
7 prescription drugs have been well-recognized over
8 the years by Congress, DEA, HDMA, and its members,
9 and public health authorities."
10      PSI also agrees and accepts that
11 statement, correct?
12      MR. RICARD:  Objection to form.
13   A.  Yes.
14   Q.  PSI also agrees that it has not only a
15 regulatory and statutory duty as mentioned there,
16 but also a duty as a good public actor to protect
17 the public from these dangerous controlled
18 substances, correct?
19      MR. RICARD:  Same objection.
20   A.  Yes.
21   Q.  Basically a common law duty, if you
22 will, correct?
23      MR. RICARD:  Same objection.
24   A.  Yes.

Page 247

1   Q.  Okay.  Page 7.  Here the HDMA says, "The
2 societal costs of prescription drugs are" -- it's
3 in front of you on the electric screen, too,
4 Mr. Schoen.
5   A.  Okay.
6   Q.  So the HDMA says the societal costs of
7 prescription drugs are what?
8   A.  Huge.
9   Q.  Huge.  "The development and
10 implementation of practices and procedures to
11 detect and prevent diversion are burdens that HDMA
12 members willingly bear."
13      You agree with that, correct?
14      MR. RICARD:  Objection to form.
15   A.  Yes.
16   Q.  And if members of the HDMA do not
17 develop and implement practices and procedures to
18 detect and prevent diversion, they should be held
19 responsible for their fair share of these huge
20 societal costs, correct?
21      MR. RICARD:  Objection to form.
22   A.  Yes.
23      MR. FULLER:  I don't have anything
24 further.

Page 248

1      THE VIDEOGRAPHER:  The time is now 3:49.
2 Going off the record.
3      (Recess taken.)
4      THE VIDEOGRAPHER:  Okay.  The time is
5 now 3:58.  Back on the record.
6      MR. RICARD:  I do not have any questions
7 for Mr. Schoen.  We would just request that the
8 transcript be marked as highly confidential
9 pursuant to the protective order that governs this
10 case.
11      MR. FULLER:  Why are you all looking at
12 me?  I'm already finished.
13      Does any other defense counsel have any
14 questions?
15      MR. PELINI:  It's out of respect we're
16 looking at you.
17      THE VIDEOGRAPHER:  The time is now 3:58.
18 This concludes the deposition.  Going off the
19 record.
20      (Signature not waived.)
21      - - -
22      Thereupon, at 3:58 p.m., on Wednesday,
23 September 5, 2018, the deposition was concluded.
24      - - -

Page 249

1      CERTIFICATE
2 STATE OF OHIO      :
                      SS:
3 COUNTY OF _____:
4
5      I, THOMAS G. SCHOEN, do hereby certify that I
6 have read the foregoing transcript of my
7 cross-examination given on September 5, 2018; that
8 together with the correction page attached hereto noting
9 changes in form or substance, if any, it is true and
10 correct.
11      _____
         THOMAS G. SCHOEN
12
13      I do hereby certify that the foregoing
14 transcript of the cross-examination of THOMAS G. SCHOEN
15 was submitted to the witness for reading and signing;
16 that after he had stated to the undersigned Notary
17 Public that he had read and examined his
18 cross-examination, he signed the same in my presence on
19 the _____ day of _____, 2018.
20
      _____
21      NOTARY PUBLIC - STATE OF OHIO
22
23 My Commission Expires:
24 _____, _____.

Page 250

```
 1              CERTIFICATE
 2  STATE OF OHIO      :
                       SS:
 3  COUNTY OF FRANKLIN :
 4       I, Carol A. Kirk, a Registered Merit Reporter
    and Notary Public in and for the State of Ohio, duly
 5  commissioned and qualified, do hereby certify that the
    within-named THOMAS G. SCHOEN was by me first duly sworn
 6  to testify to the truth, the whole truth, and nothing
    but the truth in the cause aforesaid; that the
 7  deposition then given by him was by me reduced to
    stenotype in the presence of said witness; that the
 8  foregoing is a true and correct transcript of the
    deposition so given by him; that the deposition was
 9  taken at the time and place in the caption specified and
    was completed without adjournment; and that I am in no
10  way related to or employed by any attorney or party
    hereto or financially interested in the action; and I am
11  not, nor is the court reporting firm with which I am
    affiliated, under a contract as defined in Civil Rule
12  28(D).
13       IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio on
14  this 10th day of September 2018.
15
16
17
18       _____
              CAROL A. KIRK, RMR
19            NOTARY PUBLIC - STATE OF OHIO
20  My Commission Expires:  April 9, 2022.
21          - - -
22
23
24
```

Page 251

```
 1        DEPOSITION ERRATA SHEET
 2  I, THOMAS G. SCHOEN, have read the transcript
    of my deposition taken on the 5th day of September 2018,
 3  or the same has been read to me.  I request that the
    following changes be entered upon the record for the
 4  reasons so indicated.  I have signed the signature page
    and authorize you to attach the same to the original
 5  transcript.
 6  Page  Line  Correction or Change and Reason Therefor:
 7  ___  ____  _____
 8  ___  ____  _____
 9  ___  ____  _____
10  ___  ____  _____
11  ___  ____  _____
12  ___  ____  _____
13  ___  ____  _____
14  ___  ____  _____
15  ___  ____  _____
16  ___  ____  _____
17  ___  ____  _____
18  ___  ____  _____
19  ___  ____  _____
20  ___  ____  _____
21  ___  ____  _____
22  ___  ____  _____
23  ___  ____  _____
24  Date _____ Signature _____
```