```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5      ---------------------------x

 6   IN RE: NATIONAL PRESCRIPTION   ) Case No.

 7   OPIATE LITIGATION              ) 1:17-MD-2804

 8   APPLIES TO ALL CASES           ) Hon. Dan A. Polster

 9      ---------------------------x

10        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

11                 CONFIDENTIALITY REVIEW

12

13         VIDEOTAPED DEPOSITION OF BLAINE M. SNIDER

13

14                    WASHINGTON, D.C.

14

15                THURSDAY, NOVEMBER 8, 2018

15

16                       8:34 A.M.

16

17

18

19

20

21

22

23

24   Reported by: Leslie A. Todd
```

Highly Confidential - Subject to Further Confidentiality Review

| Page 2 |
|---|

1    Deposition of BLAINE M. SNIDER, held at the
2 offices of:
3
4
5       COVINGTON & BURLING, LLP
6       One City Center
7       850 10th Street, N.W.
8       Washington, DC 20001-4956
9
10
11
12
13    Pursuant to notice, before Leslie Anne Todd,
14 Court Reporter and Notary Public in and for the
15 District of Columbia, who officiated in
16 administering the oath to the witness.
17
18
19
20
21
22
23
24

| Page 3 |
|---|

1      A P P E A R A N C E S
2
3 ON BEHALF OF PLAINTIFFS:
4    BRANDON BOGLE, ESQUIRE
5    WESLEY BOWDEN, ESQUIRE
6    LEVIN PAPANTONIO THOMAS MITCHELL
7     RAFFERTY & PROCTOR, PA
8    316 S. Baylen Street, Suite 600
9    Pensacola, Florida 32502
10    (850) 435-7043
11
12 ON BEHALF OF McKESSON CORPORATION:
13    KEVIN B. COLLINS, ESQUIRE
14    WEISS NUSRATY, ESQUIRE
15    COVINGTON & BURLING, LLP
16    One CityCenter
17    850 Tenth Street, N.W.
18    Washington, D.C. 20001-4956
19    (202) 662-5598
20
21
22
23
24

| Page 4 |
|---|

1 APPEARANCES (Continued):
2
3 ON BEHALF OF DEFENDANT CVS:
4    DANIEL P. MOYLAN, ESQUIRE
5    ZUCKERMAN SPAEDER, LLP
6    100 East Pratt Street, Suite 2440
7    Baltimore, Maryland 21202-1031
8    (410) 949-1159
9
10 ON BEHALF OF DEFENDANT WALMART:
11    SARAH G. CONWAY, ESQUIRE
12    JONES DAY
13    555 South Flower Street
14    Fiftieth Floor
15    Los Angeles, California 90071-2300
16    (213) 489-3939
17
18 ON BEHALF OF DEFENDANT HBC CO.:
19    SCOTT D. LIVINGSTON, ESQUIRE
20    MARCUS & SHAPIRA, LLP
21    One Oxford Centre, 35th Floor
22    301 Grant Street
23    Pittsburgh, Pennsylvania 15219-6401
24    (412) 338-4690

| Page 5 |
|---|

1 APPEARANCES (Continued):
2 ON BEHALF OF DEFENDANT CARDINAL HEALTH:
3    MIRANDA PETERSEN, ESQUIRE
4    WILLIAMS & CONNOLLY, LLP
5    725 Twelfth Street, N.W.
6    Washington, D.C. 20005
7    (202) 434-5000
8
9 ON BEHALF OF ENDO PHARMECUTICALS, INC. and
10    ENDO HEALTH SOLUTIONS, INC.:
11    JOHN D. CELLA, ESQUIRE
12    ARNOLD & PORTER KAYE SCHOLER, LLP
13    601 Massachusetts Avenue, N.W.
14    Washington, D.C. 20001-3743
15    (202) 942-6771
16
17 ON BEHALF OF AMERISOURCEBERGEN BERGEN:
18    MOLLY Q. CAMPBELL, ESQUIRE
19    REED SMITH, LLP
20    1301 K Street, N.W.
21    Suite 1000 - East Tower
22    Washington, D.C. 20005
23    (202) 414-9173
24

Page 6

1  APPEARANCES (Continued):

2

3  ON BEHALF OF ALLERGAN FINANCE:

4      MICHAEL LeFEVOUR, ESQUIRE (Telephonically)

5      KIRKLAND & ELLIS, LLP

6      300 North LaSalle

7      Chicago, Illinois 60654

8      (312) 862-2000

9

10 ON BEHALF OF PRESCRIPTION SUPPLY, INC.:

11     ERIC J. WILLIAMS, ESQUIRE (Telephonically)

12     PELINI, CAMPBELL & WILLIAMS, LLC

13     Bretton Commons - Suite 400

14     8040 Cleveland Avenue NW

15     North Canton, Ohio 44720

16     (330) 305-6400

17

18 ALSO PRESENT:

19     RICHARD WOODS, Paralegal

20     DANIEL HOLMSTOCK, Videographer

21

22

23

24

Page 7

1          C O N T E N T S

2  EXAMINATION OF BLAINE M. SNIDER         PAGE

3      By Mr. Bogle                17, 489

4      By Mr. Collins              453, 514

5

6

7

8          E X H I B I T S

9      (Attached to transcript)

10 MCKESSON-SNIDER DEPOSITION EXHIBITS         PAGE

11 No. 1   Drug Operations Manual, Exhibit

12     P1.1555 through P1.1555.137      35

13 No. 2   E&C U.S. House of Representatives

14     Committee on Energy and Commerce,

15     Exhibit P1.264 though P1.264.9      59

16 No. 3   Letter from Drug Enforcement

17     Administration, September 27,

18     2006, Exhibit P1.1464 through

19     P1.1464.4               73

20 No. 4   Beyond Boundaries, National

21     Operations Conference 2007,

22     Exhibit P1.1830 through P1.1830.9   83

23 No. 5   E-mail re November LDMP, Exhibit

24     P1.1864 through P1.1864.3       90

Page 8

1      E X H I B I T S  C O N T I N U E D

2      (Attached to transcript)

3  MCKESSON-SNIDER DEPOSITION EXHIBITS      PAGE

4  No. 6   McKesson Operations Manual for

5      Pharma Distribution, Exhibit

6      P1.1333 through P1.1333.6       117

7  No. 7   E-mail string re CSMP contribution,

8      DCM call, Tightening up our

9      increase process, Exhibit P1.1679

10     through P1.1679.3           133

11 No. 8   McKesson's Controlled Substance

12     Monitoring Program, Regulatory

13     Affairs Training, Exhibit P1.795

14     through P1.795.51           137

15 No. 9   Document re "Understand ARCOS Data,"

16     Exhibit P1.1568 through P1.1568.2  149

17 No. 10  Letter from Hyman, Phelps &

18     McNamara to Linden Barber, Exhibit

19     P1.1829 through P1.1829.7       156

20 No. 11  McKesson CSMP "Red Flags," Exhibit

21     P1.1146 through P1.1146.8       163

22

23

24

Page 9

1      E X H I B I T S  C O N T I N U E D

2      (Attached to transcript)

3  MCKESSON-SNIDER DEPOSITION EXHIBITS      PAGE

4  No. 12  Letter from the House of

5      Representatives, Committee on

6      Energy and Commerce to John H.

7      Hammergren, dated February 15,

8      2018, Exhibit P1.44 through P1.44.14 180

9  No. 13  Documents re Mace's Pharmacy,

10     Exhibit P1.1824 through P1.1824.91  188

11 No. 14  U.S. Census Bureau 2010 Demographic

12     Profile Data, Exhibit P1.1892

13     through P1.1892.5           199

14 No. 15  Threshold Change Forms, Exhibit

15     P1.1782 through P1.1782.8       221

16 No. 16  Documents re Best Care Pharmacy,

17     Exhibit P1.1812 through P1.1812.72 229

18 No. 17  Document re Weston, West Virginia,

19     Exhibit P1.1909            232

20 No. 18  Documents re Lumberport Pharmacy,

21     Exhibit P1.1821 through P1.1821.20 267

22 No. 19  Document re Lumberport, West

23     Virginia, Exhibit P1.1908       272

24

Page 10

EXHIBITS CONTINUED

(Attached to transcript)

MCKESSON-SNIDER DEPOSITION EXHIBITS        PAGE

No. 20   Documents re Belington Pharmacy,
         Exhibit P1.1822 through P1.1822.18   286
No. 21   Press release titled Pharmacist
         Charged with Illegal Distribution
         of Painkillers, Exhibit P1.1251
         through P1.1251.2        296
No. 22   McKesson Northeast Region-Buffalo/
         New Castle, June 2014 Monthly
         Report, Exhibit P1.1794 through
         P1.1794.5        309
No. 23   E-mail string re Status of
         Threshold Change Request for
         Martella's Pharmacy (Conemaugh/
         Martella's), Exhibit P1.1900
         through P1.1900.3
No. 24   (number not used)
No. 25   (number not used)
No. 26   E-mail string re Account #861446
         Account Name Martella's Pharmacy,
         Exhibit P1.1842 through P1.1842.2   313

Page 11

EXHIBITS CONTINUED

(Attached to transcript)

MCKESSON-SNIDER DEPOSITION EXHIBITS        PAGE

No. 27   E-mail string re Status of
         Threshold Change Request for
         Martella's Pharmacy, Exhibit
         P1.1843 through P1.1843.2        319
No. 28   E-mail string re Status of
         Threshold Change Request for
         Martella's Pharmacy, Exhibit
         P1.1901 through P1.1901.2        332
No. 29   McKesson's Controlled Substance
         Monitoring Program Regulatory
         Investigative Report, Exhibit
         P1.1902 through P1.1902.5        335
No. 30   Press Release entitled Johnstown
         Pharmacist Charged in 109-Count
         Indictment with Illegally
         Creating Bogus Prescriptions and
         then Dispensing the Drugs, Exhibit
         P1.1905 through P1.1905.2        340
No. 31   Indictment in re United States of
         America v. Joseph M. Martella,
         exhibit P1.1904 through P1.1904.10  343

Page 12

EXHIBITS CONTINUED

(Attached to transcript)

MCKESSON-SNIDER DEPOSITION EXHIBITS        PAGE

No. 32   E-mail re 2014 NSC Regulatory
         Update to DC Ops, Exhibit P1.1434
         through P1.1434.30        349
No. 33   E-mail string re New Pharmacy,
         Stowe, OH, Exhibit P1.1896 through
         P1.1896.5        354
No. 34   E-mail string re Summit Pain
         Specialists, Exhibit P1.1877
         through P1.1877.2        359
No. 35   E-mail string re CSMP - Acme,
         Exhibit P1.1870 through P1.1870.4   361
No. 36   E-mail string re Acme 1/11/13
         CSMP, Exhibit P1.1874 through
         P1.1874.2        375
No. 37   Chart, Exhibit P1.1907        378
No. 38   McKesson's Controlled Substance
         Monitoring Program Regulatory
         Investigative Report, Exhibit
         P1.1899 through P1.1899.13        383

Page 13

EXHIBITS CONTINUED

(Attached to transcript)

MCKESSON-SNIDER DEPOSITION EXHIBITS        PAGE

No. 39   Akron Beacon Journal/Ohio.com
         article, Stow pain clinic closing
         after court upholds sexual
         imposition conviction against
         doctor accused of abusing patients,
         Exhibit P1.1895 through P1.1895.2   388
No. 40   Google page showing Acme Pharmacy,
         Exhibit P1.1911 through P1.1911.2   391
No. 41   Documents re Giant Eagle Pharmacy,
         Exhibit P1.1814 through P1.1814.7   394
No. 42   Documents re Giant Eagle 0217,
         Exhibit P1.1827 through P1.1827.16  402
No. 43   Documents re Giant Eagle 0357,
         Exhibit P1.1811 through P1.1811.13  406
No. 44   E-mail string re Giant Eagle CSMP
         Thresholds, Exhibit P1.1866 through
         P1.1866.14        411
No. 45   Documents re Giant Eagle 0465,
         Exhibit P1.1777 through P1.1777.24  418
No. 46   Documents re Giant Eagle 0230,
         Exhibit P1.1816 through P1.1816.5   423

Page 14

1       E X H I B I T S   C O N T I N U E D
2          (Attached to transcript)
3   MCKESSON-SNIDER DEPOSITION EXHIBITS       PAGE
4   No. 47   Documents re Giant Eagle 4030,
5           Exhibit P.1.1839 through P.1.1839.5   427
6   No. 48   Documents re Giant Eagle 0209,
7           Exhibit P.1.1817 through P.1.1817.8   431
8   No. 49   E-mail string re Pain mgt, Exhibit
9           P.1.1841 through P.1.1841.4       433
10  No. 50   E-mail string re Suspicious Order
11          Monitoring Awareness Training,
12          Exhibit P.1.1775 through P.1.1775.2   439
13  No. 51   E-mail string re Monthly Drug Usage
14          Report - March, Exhibit P.1.1876
15          through P.1.1876.2            443
16  No. 52   McKesson DEA Tri-annual checklist,
17          Bates MCK_00002614 through 00002617  459
18  No. 53   Photograph, Bates MCKMDL00649081   464
19  No. 54   Photograph, Bates MCKMDL00649080   464
20  No. 55   Photograph, Bates MCKMDL00649077   464
21  No. 56   Photograph, Bates MCKMDL00649075   464
22  No. 57   Photograph, Bates MCKMDL00649074   464
23  No. 58   Photograph, Bates MCKMDL00649073   464
24  No. 59   Photograph, Bates MCKMDL00649071

Page 15

1       E X H I B I T S   C O N T I N U E D
2          (Attached to transcript)
3   MCKESSON-SNIDER DEPOSITION EXHIBITS       PAGE
4   No. 60   Photograph, Bates MCKMDL00649076   464
5   No. 61   Photograph, Bates MCKMDL00649072   464
6   No. 62   Photograph, Bates MCKMDL00649070   464
7   No. 63   McKesson Operations Manual, DEA
8           General Policies / Requirements,
9           Bates MCKMDL00534074 through
10          00534091                     476
11  No. 64   Controlled Substance Compliance
12          Processes (CSCP), Bates
13          MCKMDL00531288 through 00531302   478
14  No. 65   McKesson Operations Manual,
15          ARCOS Reporting, Bates MCKMDL00354474
16          through 00354491             483
17  No. 66   McKesson Operations Manual,
18          ARCOS/Controlled Drug Inventory
19          Procedures, Bates MCKMDL00329091
20          through 00329111             484
21  No. 67   DEA letter to Covington & Burling,
22          dated November 4, 2014, Bates
23          MCKMDL00409453 through 00409458   493
24

Page 16

1       E X H I B I T S   C O N T I N U E D
2          (Attached to transcript)
3   MCKESSON-SNIDER DEPOSITION EXHIBITS       PAGE
4   No. 68   E-mail string re Missing HBC Tote,
5           Bates MCKMDL00598574 through
6           00598578                     497
7   No. 69   Documents re Summit County, Exhibit
8           P.1.1889 through P.1.1889.31     509
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 17

1       P R O C E E D I N G S
2          ------------------
3       THE VIDEOGRAPHER:  We are now on the
4   record.  My name is Daniel Holmstock.  I am the
5   videographer for Golkow Litigation Services.
6   Today's date is November 8, 2018, and the time on
7   the screen is 8:34 a.m.
8       This deposition is being held at the law
9   offices of Covington & Burling, LLP, at 850
10  10th Street, Northwest, in Washington, D.C., in
11  the matter of In Re: National Prescription Opiate
12  Litigation.  It is pending before the United
13  States District Court for the Northern District of
14  Ohio, Eastern Division.
15      The deponent today is Mr. Blaine Snider.
16      Counsel will be noted on the
17  stenographic record.  The court reporter is Leslie
18  Todd, who will now administer the oath.
19      BLAINE M. SNIDER,
20   and having been first duly sworn,
21   was examined and testified as follows:
22      CROSS EXAMINATION
23  BY MR. BOGLE:
24   Q   Can I get your full name, sir?

Page 18

1    A    Blaine Matthew Snider.

2    Q    And am I correct that you're currently
3  employed with McKesson?

4    A    Yes.

5    Q    Okay.  And have you ever been deposed
6  before?

7    A    No.

8    Q    Okay.  Just a few basic ground rules
9  that might help both of us here today.  I'm going
10  to be asking you some questions, and if you don't
11  understand the question I ask or don't hear it,
12  it's perfectly okay for you to ask me to repeat or
13  rephrase the question.  Okay?

14    A    Okay.

15    Q    If you need a break at any point in
16  time, just let me know or your counsel know.
17  Happy to take a break whenever you need it.  All
18  I'd ask is if I've got a question pending, that
19  you answer that question, and then we can break
20  for whenever you want.

21        And also I'm going to ask you questions,
22  you're going to provide answers.  I'd ask that we
23  try not to talk over each other.  So I'll ask my
24  question, try to give you ample opportunity to

Page 19

1  answer before I ask my next question.  Is that
2  fair?

3    A    Okay.

4    Q    Okay.  And how long have you been with
5  McKesson?

6    A    Almost 40 years.

7    Q    Okay.  Am I correct that you currently
8  hold the director of operations position at the
9  New Castle Distribution Center?

10    A    Yes.

11    Q    Okay.  How long have you held that
12  specific position?

13    A    Eighteen -- eighteen years.

14    Q    Okay.  What was your job at McKesson
15  prior to that?

16    A    I was distribution center manager in
17  Sewickley, Pennsylvania, and North Canton, Ohio.

18    Q    Okay.  How long did you have that role?

19    A    About three years.

20    Q    How about prior to that?

21    A    I was operations manager in Cincinnati,
22  Ohio, and North Canton previous to that.

23    Q    How long did you hold that position?

24    A    Oh, I can't remember now.  Eight, ten

Page 20

1  years, I guess.

2    Q    Okay.  What was your job prior to that
3  at McKesson, just the title?

4    A    I started as a supervisor almost 40
5  years ago.

6    Q    Okay.  So would it be fair to say, just
7  doing the rough math here, that you have nearly 30
8  years of experience as a distribution center
9  operations manager at McKesson?

10    A    Yes.

11    Q    Okay.  Now, McKesson itself as an entity
12  has, as I understand it, 37 distribution centers
13  around the country; is that right?

14        MR. COLLINS:  Objection to the form.

15        THE WITNESS:  I can't answer to -- it
16  sounds like you're including med-surg or something
17  else.  I know there's 28 distributions centers for
18  U.S. pharma.

19  BY MR. BOGLE:

20    Q    Okay.  And New Castle is one of those 28
21  distribution centers for U.S. pharma, correct?

22    A    Yes.

23    Q    And just so I understand, as director of
24  operations for New Castle, it would be your

Page 21

1  general responsibility to run the day-to-day
2  operations for the facility, correct?

3        MR. COLLINS:  Objection.  Form.

4        THE WITNESS:  I'm in charge of the
5  facility, yes.

6  BY MR. BOGLE:

7    Q    Right.  So it's fair to say that you're
8  the highest ranking McKesson employee at New
9  Castle that has responsibility exclusive to that
10  distribution center, right?

11        MR. COLLINS:  Objection to form.

12        THE WITNESS:  Well, I'm not sure.  I
13  have a VP/GM I report to, but I run the
14  distribution center.

15  BY MR. BOGLE:

16    Q    Who do you report to?

17    A    Brian Ferreira, the VP/GM.

18    Q    When it comes to decisions specific to
19  the operations of New Castle, would it be fair to
20  say that the buck stops with you?

21        MR. COLLINS:  Objection to form, vague.

22        THE WITNESS:  I don't think so.

23  BY MR. BOGLE:

24    Q    Okay.  Who do you think the buck stops

Page 22

1  with at New Castle?
2       MR. COLLINS:  Same objection.
3       THE WITNESS:  I don't know the buck.  I
4  know I'm in charge of the distribution center
5  operations, and I have a boss who is the VP/GM.
6  BY MR. BOGLE:
7    Q    Okay.  When you say you're responsible
8  for distribution center operations, what do you
9  think that that -- that entails?
10   A    In charge of the distribution center and
11  the employees, and the pick, pack and ship of that
12  operations.
13   Q    When you say "pick, pack and ship," what
14  does that mean?
15   A    The day-to-day filling of orders for our
16  customers out of the New Castle DC.
17   Q    Okay.  And when it comes to pills that
18  are distributed from New Castle, you would agree
19  with me that it's your ultimate responsibility to
20  make sure that those go to the proper customers
21  for the proper purpose.
22       MR. COLLINS:  Objection.  Compound,
23  form.
24       THE WITNESS:  We make sure the orders

Page 23

1  are correct, accurate, billed correctly, shipped
2  correctly, on time.
3  BY MR. BOGLE:
4    Q    And your job responsibilities also
5  include, when it comes to controlled substances,
6  making sure that the customers purchasing are
7  purchasing for a legitimate medical purpose,
8  correct?
9       MR. COLLINS:  Objection.  Form, calls
10  for a legal conclusion, lacks foundation.
11       THE WITNESS:  I can't say for the
12  customers all the time.  I can say that I follow
13  the Code of Federal Regulations.
14  BY MR. BOGLE:
15   Q    Okay.  And part of the Code of Federal
16  Regulations, when it comes to the Controlled
17  Substances Act, talks about the distributor's
18  responsibility to ensure that they're supplying
19  drugs to customers who are buying it for a
20  legitimate medical purpose, right?
21       MR. COLLINS:  Objection.  Form, asked
22  and answered --
23       THE WITNESS:  Can you repeat that?
24       MR. COLLINS:  -- calls for a legal

Page 24

1  conclusion.
2       Please let me finish my objections.
3  BY MR. BOGLE:
4    Q    When it comes to the Controlled
5  Substances Act, you understand that part of that
6  act requires that controlled substances that are
7  distributed to customers are being provided for a
8  legitimate medical purpose, correct?
9       MR. COLLINS:  Objection.  Form, calls
10  for a legal conclusion.
11       THE WITNESS:  I can't --
12       MR. COLLINS:  Foundation.
13       THE WITNESS:  I can't say a legitimate
14  medical purpose.  I don't know that phrase.  I'm
15  sorry.
16  BY MR. BOGLE:
17   Q    You've never heard that phrase?
18   A    No.
19   Q    Okay.  You're a member of management at
20  the distribution center for New Castle, right?
21   A    Yes.
22       MR. COLLINS:  Objection to form.
23  BY MR. BOGLE:
24   Q    And the distribution center management

Page 25

1  at McKesson has the full responsibility for
2  ensuring the proper distribution of controlled
3  substances, correct?
4       MR. COLLINS:  Objection to form, calls
5  for a legal conclusion, vague.
6       THE WITNESS:  Can you repeat the
7  question, please?
8       MR. BOGLE:  Can you repeat back, Court
9  Reporter?
10       (Whereupon, the requested record
11       was read.)
12       MR. COLLINS:  Same objections.
13       THE WITNESS:  I believe so, yes.
14  BY MR. BOGLE:
15   Q    Okay.  And that's a job you take
16  seriously, right?
17   A    Yes.
18   Q    Okay.  Just make sure you speak up a
19  little bit.  I'm having sometimes a little trouble
20  hearing you.
21   A    Okay.
22   Q    Is that "yes"?
23   A    Yes.
24   Q    Okay.  Your pay structure at McKesson,

Page 26

1  do you receive bonuses?
2     A   Yes.
3     Q   Okay.  How are those bonuses determined?
4  What criteria is used?
5        MR. COLLINS:  Objection to form.
6        THE WITNESS:  It's based on operational
7  performance and employee engagement.
8  BY MR. BOGLE:
9     Q   Okay.  When it comes to operational
10 performance, does that include the amount of
11 products sold by the distribution center during a
12 year?
13       MR. COLLINS:  Objection to form, vague.
14       THE WITNESS:  No.
15 BY MR. BOGLE:
16    Q   Okay.  What's included?
17    A   It would be productivity, quality,
18 on-time delivery, customer satisfaction, employee
19 engagement, as I mentioned before, and then those
20 are rounded together.
21    Q   What's included within productivity?
22       MR. COLLINS:  Objection to form.
23       THE WITNESS:  There's lines per hour, we
24 call it.

Page 27

1        THE REPORTER:  Lines?
2        THE WITNESS:  Lines per hour.  Sorry.
3  BY MR. BOGLE:
4     Q   What does "lines per hour" mean?
5     A   How many lines we do in an hour, and
6  then there's quality defects per million
7  opportunities to make sure we have an accurate
8  order, filled complete and -- and accurately.
9     Q   So is it your testimony that total
10 revenues for the distribution center play no role
11 in your bonus?
12       MR. COLLINS:  Objection to form.
13 Foundation.
14       THE WITNESS:  Correct.
15 BY MR. BOGLE:
16    Q   You would agree with me that protecting
17 the health and safety of the public is the most
18 important consideration for any distributor of
19 pharmaceutical products, correct?
20       MR. COLLINS:  Objection.  Form,
21 foundation, calls for a legal conclusion, argue --
22       MR. BOGLE:  I believe you're supposed to
23 just --
24       MR. COLLINS:  Argumentative.

Page 28

1        MR. BOGLE:  -- stick to form objections.
2  You're going beyond that considerably here.
3        MR. COLLINS:  No, my objection is
4  legitimate.  Your question wasn't.  So my
5  objection stands.  It's the form, calls for a
6  legal conclusion --
7        MR. BOGLE:  I believe the protocol calls
8  for just form objections.  Not speaking objections
9  beyond that.
10       MR. COLLINS:  We have a phone here if
11 you want to make a call to the special master.
12       MR. BOGLE:  Well, we can see if this
13 continues.  We may have to.
14       MR. COLLINS:  Listen, it's a proper
15 objection.  Your question wasn't.
16       MR. BOGLE:  I don't want to stop ten
17 minutes in.
18 BY MR. BOGLE:
19    Q   I'll ask my question again.
20       Do you believe that protecting the
21 health and safety of the public is the most
22 important consideration for a distributor of
23 pharmaceutical products?
24       MR. COLLINS:  Same objections.  Form,

Page 29

1  calls for a legal conclusion, foundation.
2        THE WITNESS:  I can't answer to all the
3  health and safety of the public.  I can answer to
4  the Code of Federal Regulations and my duties.
5  BY MR. BOGLE:
6     Q   Okay.  So do you believe that compliance
7  with the Federal Regulations is the most important
8  consideration for a distributor of pharmaceutical
9  products like McKesson?
10       MR. COLLINS:  Objection to form.
11       THE WITNESS:  I think it's a part of it.
12 BY MR. BOGLE:
13    Q   Okay.  Any more important part that you
14 can think of?
15       MR. COLLINS:  Same objections.  Form,
16 foundation.
17       THE WITNESS:  Well, people.
18 BY MR. BOGLE:
19    Q   People, what do you mean by that?
20    A   My employees.
21    Q   Okay.  What about the people that you're
22 supplying the controlled substances to ultimately,
23 the end user?
24       MR. COLLINS:  Object --

Highly Confidential - Subject to Further Confidentiality Review

Page 30

BY MR. BOGLE:

Q   Do you think you have any responsibility to those people?

MR. COLLINS: Objection. It's a mischaracterization, lacks foundation, form.

THE WITNESS: I mentioned before about on-time, accurate delivery to my customers.

BY MR. BOGLE:

Q   Okay. So you think you have any responsibility to the -- the end user, the person who's purchasing from your customer?

MR. COLLINS: Objection to form, calls for speculation.

THE WITNESS: I think I mentioned that before. Yes.

BY MR. BOGLE:

Q   Okay. And as to the ultimate purchaser, the person who's going to go to your -- to the pharmacy and purchase the drug, do you think that McKesson has a responsibility to protect the health and safety of those people?

MR. COLLINS: Same objections. Asked and answered, form.

THE WITNESS: I can't answer for all of

Page 31

McKesson. I can just answer for New Castle.

BY MR. BOGLE:

Q   Sure. Then I'll rephrase it that way. Do you think New Castle has such a responsibility?

MR. COLLINS: Same objections.

THE WITNESS: I don't -- can you repeat the question?

BY MR. BOGLE:

Q   Sure.

Do you think New Castle has a responsibility for the health and safety of the end user purchasing controlled substances distributed by McKesson?

MR. COLLINS: Objection to form.

THE WITNESS: I can't say that I can control that.

BY MR. BOGLE:

Q   Okay. I didn't ask if control. I asked if you had responsibility.

MR. COLLINS: Objection to form.

THE WITNESS: I can't be responsible for someone that purchases drugs.

BY MR. BOGLE:

Q   Okay. So you think you have no

Page 32

responsibility for ensuring that people are purchasing for legitimate medical purposes?

MR. COLLINS: Objection to form, argumentative. Calls for a legal conclusion.

THE WITNESS: I can't answer to that.

BY MR. BOGLE:

Q   You don't know?

A   I can't answer to that.

Q   Okay. When you say you can't answer that, what -- what's keeping you from answering that?

A   I don't know.

Q   Okay. Have you heard of the term "diversion" when it comes to controlled substances?

A   Yes.

Q   What does that term mean to you?

A   It's in the supply chain where the product could be diverted. Like inbound trucks that come in, sometimes those are hijacked, or in the building to make sure security is there. There's a chance for diversion there. And in the truck drivers, there's a chance for diversion there. And to make sure that that supply chain is

Page 33

intact.

Q   Okay. So you talked about ways that diversion can occur, but before we get there, what do you understand the term "diversion" to mean? When somebody diverts something when it comes to controlled substances, what does that mean to you?

A   Loss of controlled substance.

Q   Loss of product?

A   Yes.

Q   Okay. Have you ever heard the term "diversion" used to mean the use of a controlled substance for an illegitimate purpose?

A   No.

Q   Never heard of that concept?

A   No.

Q   Okay. You've talked a couple of times about compliance with Federal Regulations, and that you're familiar with the Controlled Substances Act, correct?

MR. COLLINS: Objection. Lacks foundation, calls for a legal conclusion.

THE WITNESS: Is that the Code of Federal Regulations?

BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

---

Page 34

1    Q   I'm just asking if you're familiar with
2  the Controlled Substances Act.
3    A   I'm not sure.
4    Q   You're not -- have you ever heard that
5  phrase used, Controlled Substances Act?
6    A   No.
7    Q   Never heard that?
8    A   No.
9    Q   Okay.  So is that -- have you ever read
10 any portion of that act in conjunction with your
11 responsibilities at McKesson?
12   A   I would have to see it.  I'm not sure it
13 was called the Controlled Substance Act.  I just
14 know the Code of Federal Regulations.
15   Q   Okay.  Do you have any familiarity as to
16 whether the Controlled Substances Act was -- was
17 and is designed to prevent diversion of controlled
18 substances like opioids?
19       MR. COLLINS:  Objection.  Calls for a
20 legal conclusion, form.
21       THE WITNESS:  I can't answer to that.  I
22 don't know.
23 BY MR. BOGLE:
24   Q   Are you familiar with SOP 55?  Ever

---

Page 35

1  heard of that?
2    A   No.
3    Q   Okay.  And SOP, I'm referring to
4  Standard Operating Procedure, 55.  Does that help
5  at all?
6    A   I don't call it that.
7    Q   Okay.
8    A   I'm not familiar with that.
9    Q   Okay.  I'm going to hand you what I'm
10 marking as -- it's labeled as Exhibit 1.1555,
11 being marked as Snider Exhibit 1.
12       (Snider Exhibit No. 1 was marked
13        for identification.)
14       MR. BOGLE:  There's yours, and there's
15 an extra there too.
16 BY MR. BOGLE:
17   Q   Okay.  Do you see at the top here, it
18 says "Drug Operations Manual 55/Controlled
19 Substances"?
20       Do you see that at the top?
21   A   Yes.
22   Q   Okay.  And below that it's got some
23 text.  I want to read from the very beginning
24 under A where it says "General."

---

Page 36

1        Do you see that section?
2    A   Yes.
3        MR. COLLINS:  I'm sorry.  Can you --
4        THE WITNESS:  At the top?
5  BY MR. BOGLE:
6    Q   Yes.  Correct.
7        It says below that -- well, actually,
8  before we get there, does this jog your memory at
9  all about SOP 55 within McKesson?
10       MR. COLLINS:  Objection to form.
11       THE WITNESS:  No.  We don't call it
12 that.
13 BY MR. BOGLE:
14   Q   Okay.
15   A   It's the Drug Operations Manual.
16   Q   Okay.  So you're familiar with the Drug
17 Operations Manual?
18   A   Yes.
19   Q   Okay.  So have you seen this document
20 before?
21   A   Yes.
22   Q   You have.  Okay.
23       Now, it says below "General":  "The aim
24 of the Controlled Substances Act is to prevent

---

Page 37

1  diversion of abusable substances into the illicit
2  traffic while ensuring their availability for
3  legitimate medical purposes."
4        Do you see that?
5    A   Yes.
6    Q   Do you agree with that statement?
7        MR. COLLINS:  Objection.  Form.
8        THE WITNESS:  I see it.  I agree that
9  it's there.
10 BY MR. BOGLE:
11   Q   Okay.  Do you have an understanding as
12 to whether that's a correct statement?
13   A   I can't answer --
14       MR. COLLINS:  Object -- I'm sorry,
15 please let me object.
16       Assumes facts not in evidence,
17 foundation, form.
18 BY MR. BOGLE:
19   Q   You don't know whether that's a correct
20 statement or not; is that your testimony?
21   A   I can't --
22       MR. COLLINS:  Same objections.
23       THE WITNESS:  I can't answer to that.
24 BY MR. BOGLE:

---

Page 38

1  Q   Why?  Is it because you don't know?
2       MR. COLLINS:  Objection.  Argumentative,
3  form.
4  BY MR. BOGLE:
5  Q   I'm just trying to understand why you
6  can't answer.
7  A   I don't understand the question.
8  Q   Okay.  So I read the first sentence here
9  to you, and my question was, do you think that's
10 an accurate statement as to the aim of the
11 Controlled Substances Act?
12      MR. COLLINS:  Objection.  Form,
13 foundation.
14      THE WITNESS:  I see it on there, and I
15 see -- think it's accurate on 7/2000.
16 BY MR. BOGLE:
17 Q   Okay.  Do you think that's an accurate
18 statement today as to the Controlled Substances
19 Act?
20 A   I don't know that.
21 Q   You don't know either way?
22 A   I don't know.  I can't answer to how the
23 change -- how it's changed.  It's an evolving
24 program, and this was -- the Drug Operations

Page 39

1  Manual was trained and evolved over time to meet
2  the needs and changes of the regulations.
3  Q   So looking at that paragraph, the last
4  sentence there says:  "It is extremely important
5  that McKesson employees comply fully with the
6  regulations and the following guidelines," and
7  then there is a discussion of the guidelines
8  thereafter.
9      Do you see that sentence?
10 A   Yes.
11 Q   Okay.  Do you agree that it's extremely
12 important for McKesson to comply specifically with
13 the Controlled Substances Act?
14      MR. COLLINS:  Objection.  Form,
15 foundation, calls for a legal conclusion.
16      THE WITNESS:  I agree that it's
17 extremely important that McKesson employees comply
18 fully with the regulations and the following
19 guidelines, yes.
20 BY MR. BOGLE:
21 Q   Okay.  And those regulations include the
22 Controlled Substances Act, right?
23      MR. COLLINS:  Objection.
24 Mischaracterization, form.

Page 40

1       THE WITNESS:  Yes.
2  BY MR. BOGLE:
3  Q   Do you have an understanding that
4  McKesson's responsibilities under the Controlled
5  Substances Act include having effective controls
6  against diversion?
7       MR. COLLINS:  Objection to form,
8  foundation.
9       THE WITNESS:  In my distribution center,
10 yes, we had effective controls against diversion.
11      MR. BOGLE:  Move to strike as
12 nonresponsive.
13 BY MR. BOGLE:
14 Q   That's not my question.  We'll get
15 there.  I'm asking you questions that I think is
16 before we get there.
17      My question is, do you agree that
18 McKesson's responsibilities under the Controlled
19 Substances Act include having effective controls
20 against diversion?
21      MR. COLLINS:  Objection.  The question
22 was just asked.  He just answered.  He's not here
23 as a 30(b)(6) witness, so he is not answering on
24 behalf of McKesson.

Page 41

1  BY MR. BOGLE:
2  Q   You can answer.
3  A   I can answer for my distribution center,
4  and it stands, yes.
5  Q   Okay.  Yes, that you understand that
6  your responsibilities at New Castle include having
7  effective controls against diversion, right?
8  A   Yes.
9  Q   Okay.  And part of having effective
10 controls against diversion include monitoring for
11 suspicious controlled substance orders, right?
12 A   Depends on what period and what you're
13 calling "monitoring."
14 Q   Okay.  Well, we'll start with a period.
15      What period of time do you think that
16 the responsibilities at New Castle did not include
17 monitoring for suspicious controlled substances
18 orders?
19      MR. COLLINS:  Objection.  Form.
20 Mischaracterization.
21      THE WITNESS:  I can't answer that for my
22 40 years.  I didn't always know that when I first
23 started.  So I think your question has to be more
24 specific so I can respond to it.

Page 42

BY MR. BOGLE:

Q   Okay. Well, you've been director of operations at New Castle you said for 18 years, right?

A   Yes.

Q   So let's focus on those 18 years.

A   Okay.

Q   So from 2000 to 2018, is there any point in time in that 18-year window where you believe that New Castle's responsibilities did not include monitoring for suspicious controlled substance orders?

A   No.

Q   Okay. So we can agree during that window those responsibilities existed at your facility, right?

A   What's the question, please? I'm sorry.

Q   That your responsibilities from 2000 to 2018 at New Castle included monitoring for suspicious orders, that was part of your job too, right?

A   Yes.

Q   And part of your job from 2000 to 2018 at New Castle also included reporting orders to

Page 43

the DEA that were deemed to be suspicious, right?

A   Yes.

Q   And if a suspicious order was identified during that 18-year time period, it was not supposed to be shipped, right?

MR. COLLINS: Objection. Form, legal conclusion, foundation.

THE WITNESS: Can you repeat the question?

BY MR. BOGLE:

Q   Sure.

A   Because there's different forms of the Controlled Substance Monitoring Program.

Q   Okay. Well, I'll make it as specific as possible. From 2000 to 2018 at New Castle, if you identified a suspicious order for an opioid product, you would agree with me that that order should not be shipped, right?

MR. COLLINS: Objection. Form, foundation, assumes facts not in evidence, and calls for a legal conclusion.

THE WITNESS: I can't answer that.

BY MR. BOGLE:

Q   You don't know at all?

Page 44

A   I don't know.

Q   Okay. Is that not part of your job?

MR. COLLINS: Objection. Argue --

BY MR. BOGLE:

Q   During that time period?

MR. COLLINS: Objection. Argumentative and compound. Form.

THE WITNESS: Is what not part of my job?

BY MR. BOGLE:

Q   For ensuring that suspicious orders were not shipped.

MR. COLLINS: Objection. Calls for a legal conclusion, asked and answered.

THE WITNESS: Yes, my job was to follow the regs here.

BY MR. BOGLE:

Q   Right. I'm talking about a specific portion of those, which is that suspicious orders should not be shipped.

MR. COLLINS: Object --

BY MR. BOGLE:

Q   And my question was simply, from 2000 to 2018 as director of operations for New Castle, you

Page 45

would agree with me that if you guys found a suspicious order for a controlled substance, you weren't supposed to ship it, right?

MR. COLLINS: Objection. Argumentative, assumes facts not in evidence. It's a mischaracterization of this document.

MR. BOGLE: I'm not talking about the document -- just to be clear, I'm not talking about this document.

MR. COLLINS: Oh, I'm sorry.

MR. BOGLE: I'm talking generally.

MR. COLLINS: Objection to form.

THE WITNESS: I can't answer that, no.

BY MR. BOGLE:

Q   You don't know?

A   No.

Q   Okay. So as you sit here today, if you identify a suspicious order at New Castle, do you ship it for a controlled substance?

MR. COLLINS: Objection. Calls for a hypothetical.

THE WITNESS: I can't answer that. I don't know what I'd do today. What -- I don't understand suspicious order, what you're --

Highly Confidential - Subject to Further Confidentiality Review

Page 46

BY MR. BOGLE:

2    Q    You don't --

3    A    No, you're -- you're generalizing, and I can't answer a general question about every order that we've shipped.

6    Q    I'm not asking about every order that you've shipped. I'm asking about suspicious orders.

9        Have you ever heard the term "suspicious order" as it pertains to controlled substance?

11    A    Yes.

12    Q    What do you understand that to mean?

13    A    An order that has -- over time it's evolved to what it means according to the DEA. So at first it was an order above an average or a norm. That's what I understand it -- understood it to be in the year 2000.

18    Q    Okay. And how has that understanding evolved from your perspective? What do you understand that to mean?

21        MR. COLLINS: Objection. Vague, form.

22        THE WITNESS: To report unusual or suspicious orders.

24    BY MR. BOGLE:

Page 47

1    Q    Right. And also to not ship them. Just to report them is not enough, right?

3        MR. COLLINS: Objection. Argumentative, asked and answered, calls for a legal conclusion, and it's a mischaracterization of his prior testimony.

7        THE WITNESS: No.

8    BY MR. BOGLE:

9    Q    You can answer. "No" to what?

10    A    Your question.

11    Q    Okay. So if you find a suspicious order at New Castle, you understand that at all points in time from 2000 to 2018, you weren't supposed to ship it, right?

15        MR. COLLINS: Objection. Asked and answered.

17        Do you have another line of questioning?

18        MR. BOGLE: I haven't got --

19        MR. COLLINS: This has been asked and answered multiple times.

21        MR. BOGLE: You can state a form objection. That's what you're allowed to state.

23        MR. COLLINS: Listen, I'm trying to --

24        MR. BOGLE: I'm going to ask my

Page 48

1    question. He can answer my question. There's a question pending.

3        MR. COLLINS: I'm going to finish my objection, if you don't mind.

5        Objection to form, calls for a legal conclusion, asked and answered, and mischaracterization.

8    BY MR. BOGLE:

9    Q    You can answer.

10    A    Can you repeat the question?

11    Q    Sure. From 2000 to 2018, if you identified a suspicious order at New Castle, you would agree with me that your responsibility was not to ship that order, right?

15        MR. COLLINS: Same objections. Lack of foundation, form, assumes facts not in evidence, calls for a legal conclusion.

18        THE WITNESS: I would not agree with you.

20    BY MR. BOGLE:

21    Q    Okay. So you think it's okay to ship a suspicious order once you've identified it?

23        MR. COLLINS: Objection. Argumentative.

24    BY MR. BOGLE:

Page 49

1    Q    I'm just trying to make sure I understand your testimony.

3        MR. COLLINS: Objection. Mischaracterization.

5        THE WITNESS: Can you repeat the question, please?

7    BY MR. BOGLE:

8    Q    Okay. From 2000 to 2018, was there ever a point in time that you felt it was okay to ship a suspicious order that you identified at New Castle?

12        MR. COLLINS: Objection. Form, calls for a legal conclusion, foundation.

14        THE WITNESS: It depends on the context of the program.

16    BY MR. BOGLE:

17    Q    How?

18    A    It -- it's the unusual purchase notification program. At the early stages, it was an average -- it was evolved over time. So I can't say that something was identified as -- I believe in here it was called unusual purchases, that we didn't ship it but we notified the DEA.

24    Q    Okay. And I guess I'm still not clear

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 on -- on where you stand on this point.
2     Can you identify me any point in time
3 from 2000 to 2018 where you feel that at New
4 Castle it was okay to ship an order you had
5 identified as suspicious?
6     MR. COLLINS: Objection to form, vague,
7 calls for a legal conclusion, mischaracterization,
8 and asked and answered.
9     THE WITNESS: If the format of 2000 to,
10 I believe, 2006, we identified unusual purchases
11 to the DEA, and then shipped it after notifying
12 the DEA.
13 BY MR. BOGLE:
14    Q  Okay. And starting in 2006, did you
15 continue shipping suspicious orders that you had
16 identified?
17    A  No.
18    Q  Okay. And why did that change in 2006
19 at New Castle?
20    A  We develop -- I think it was 2006 or '7,
21 we developed a new program. Because on this
22 program, 2000 to 2006, we faxed unusual purchases
23 to the DEA every day so they could look at it, and
24 we sent monthly programs to them. And in 2006 or

Page 51

1 '7, I don't remember which, the program even got
2 more robust and data driven.
3    Q  Where did you have the understanding
4 that from 2000 to 2006 it was okay to ship
5 suspicious orders that you had identified?
6     MR. COLLINS: Objection to form. Calls
7 for a legal conclusion.
8     THE WITNESS: I think you're putting
9 words into my mouth, which you're calling unusual
10 or suspicious purchases. We notified the DEA that
11 something was above the average.
12 BY MR. BOGLE:
13    Q  Well, I'm sorry, I wasn't trying to put
14 words into your mouth. I thought that's what you
15 just said.
16    A  I -- I --
17    Q  Okay. So from 2000 to 2006 -- I'll ask
18 it again to make sure we're on the same page.
19    A  Okay.
20    Q  From 2000 to 2006, if at your New Castle
21 facility you identified a suspicious order, did
22 you -- were you under the understanding it was
23 okay to ship that order?
24     MR. COLLINS: Objection to the use of

Page 52

1 the word "okay." Calls for a legal conclusion,
2 and asked and answered.
3     THE WITNESS: No.
4 BY MR. BOGLE:
5    Q  It was not okay to do that.
6    A  No.
7    Q  Okay. So -- and when it comes to due
8 diligence at the distribution center level at New
9 Castle, you understand that the distribution
10 center had the responsibility to investigate and
11 review thoroughly threshold change requests,
12 right?
13     MR. COLLINS: Objection. Form, vague,
14 time frame, calls for a legal conclusion.
15     THE WITNESS: What -- I'm sorry. What
16 was the question? What years?
17 BY MR. BOGLE:
18    Q  At all points in time, from 2000 to
19 2018, at the distribution center level --
20 actually, strike that. Let me back up.
21     Threshold change requests, that process
22 was developed starting in '07, right?
23    A  Yes.
24    Q  Okay. So let me rephrase the time

Page 53

1 period.
2     From '07 to present, at the distribution
3 center level, there was -- there was and is a
4 responsibility to thoroughly investigate and
5 review threshold change requests, right?
6     MR. COLLINS: Objection. Form, calls
7 for a legal conclusion, foundation.
8     THE WITNESS: The threshold change
9 requests were handled by -- we did the independent
10 in the distribution center from 2006 to '7, and
11 then the national accounts handled the thresholds
12 for national accounts, and sometimes we did the
13 hospitals also or long-term care.
14 BY MR. BOGLE:
15    Q  Okay. You recall my question?
16    A  Did I review thresholds was I thought
17 your question.
18    Q  Thoroughly investigate and review --
19     MR. COLLINS: Objection.
20 BY MR. BOGLE:
21    Q  -- from '07 to 2018.
22     MR. COLLINS: Objection. Form,
23 argumentative, calls for a legal conclusion,
24 foundation.

Page 54

1    THE WITNESS:  I did not thoroughly
2  investigate all, and I mentioned the national
3  accounts and some of the hospitals.
4  BY MR. BOGLE:
5    Q    Okay.  So you mentioned independent
6  pharmacies, I think, were within the distribution
7  center purview when it comes to threshold change
8  requests, right?
9    A    Yes.
10    Q    Okay.  So when I asked you about
11  thoroughly investigating and reviewing threshold
12  change requests, certainly for any pharmacy that
13  was within the DC's responsibility, you would
14  thoroughly investigate and review those, right?
15    MR. COLLINS:  Objection to form.  Calls
16  for a legal conclusion.
17    THE WITNESS:  I think you're twisting
18  it.  I said "independent," and it's kind of coming
19  out national and the hospital, and I didn't always
20  investigate those because we had national accounts
21  and hospital experts, and the DRAs did those.
22  BY MR. BOGLE:
23    Q    I'm just asking as to any accounts that
24  you were responsible for reviewing at the

Page 55

1  distribution center level, would you thoroughly
2  investigate and review those threshold change
3  requests?
4    A    Yes.
5    Q    Okay.  And you understand that was part
6  of your responsibility, right?
7    A    Yes.
8    Q    Okay.  And you understand from the New
9  Castle's perspective from 2000 to 2018 that your
10  distribution center had a responsibility not just
11  to monitor but to also prevent diversion of
12  opioids, right?
13    MR. COLLINS:  Objection.  Form.  Legal
14  conclusion.
15    THE WITNESS:  We prevented diversion of
16  all our controlled substances.
17  BY MR. BOGLE:
18    Q    You knew that was your responsibility,
19  right?
20    A    Can you repeat the question?  I --
21    Q    Right.  From 2000 to 2018, you knew at
22  all times that your distribution center had
23  responsibility for not just monitoring but also
24  preventing diversion of controlled substances,

Page 56

1  right?
2    A    Yes.
3    Q    Okay.  And you would agree that during
4  that time period, you, as a distribution center,
5  had to be proactive in carrying out that
6  responsibility, right?
7    MR. COLLINS:  Objection to the form,
8  vague, calls for a legal conclusion.
9    THE WITNESS:  I'm always trying to be
10  proactive in all the business dealings and
11  everything I do.  That's kind of a general
12  statement, but I hope I'm proactive.
13  BY MR. BOGLE:
14    Q    And you understood that's what was
15  expected of your distribution center and all
16  distribution centers by the DEA, right?
17    MR. COLLINS:  Objection.  Foundation,
18  form, vague.
19    THE WITNESS:  Well, I understand my
20  distribution center, it was based on "know your
21  customer," and -- and I did that.
22  BY MR. BOGLE:
23    Q    And the "know your customer" program is
24  part of being proactive in trying to prevent

Page 57

1  diversion, right?  Getting out there and getting
2  to know your customer, completing questionnaires
3  and knowing what activities your customer was
4  engaged in, right?
5    A    As much as possible, yes.
6    Q    And you have an understanding that
7  diversion of controlled substances, including
8  opioids, can be prevented by way of compliance
9  with the Controlled Substances Act, right?
10    MR. COLLINS:  Objection.  Form, calls
11  for a legal conclusion.
12    THE WITNESS:  I think it helps.
13  BY MR. BOGLE:
14    Q    Okay.  So would you agree that if New
15  Castle complies with the Controlled Substances
16  Act, that goes a long way in preventing diversion
17  of opioids, right?
18    MR. COLLINS:  Objection to the form,
19  vague, calls for a legal conclusion.
20    THE WITNESS:  I think it helps.
21  BY MR. BOGLE:
22    Q    Do you agree there is currently an
23  opioid epidemic in this country?
24    A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q    And do you agree that the diversion of
2  controlled substances is a cause of that epidemic?
3         MR. COLLINS:  Objection.  Calls for a
4  legal conclusion.  Foundation.
5         THE WITNESS:  You keep using the word
6  "diversion."  In the control of McKesson New
7  Castle, I believe if there were diversion, that
8  would not help the opioid crisis.
9  BY MR. BOGLE:
10    Q    All right.  And the opioid crisis that
11  we are dealing with today, do you understand was
12  caused, in part, by diversion of controlled
13  substances?
14         MR. COLLINS:  Objection.  Form, calls
15  for a legal conclusion, lack of foundation.
16         THE WITNESS:  I don't know that.
17  BY MR. BOGLE:
18    Q    You don't know.
19         Are you aware that opioid overdoses are
20  the leading cause of injury-related death in the
21  United States?
22         MR. COLLINS:  Objection.  Form.
23         THE WITNESS:  No, I'm not.
24  BY MR. BOGLE:

Page 59

1    Q    Okay.  I'm going to hand you what I'm
2  marking as Exhibit 1.264, also marked as Snider
3  Exhibit 2.
4         (Snider Exhibit No. 2 was marked
5         for identification.)
6         MR. COLLINS:  Thank you.
7  BY MR. BOGLE:
8    Q    Do you see here, to introduce the
9  document, at the top it says "E&C, U.S. House of
10  Representatives, Committee on Energy and
11  Commerce."
12         Do you see that?
13    A    Yes.
14    Q    And it's dated May 4, 2018?
15    A    Yes.
16    Q    And do you -- below that it says:
17  "Regarding hearing entitled 'Combatting the Opioid
18  Epidemic,' examining concerns about distribution
19  and diversion."
20         Do you see that?
21    A    Yes.
22    Q    Okay.  And if you go to the second page
23  of this document, the paragraph below the chart
24  that starts with "The U.S. continues."  Do you see

Page 60

1  that?
2    A    Yes.
3    Q    It says:  "The U.S. continues to
4  experience an opioid epidemic which has worsened
5  over the last two decades.  Opioid-involved
6  overdose deaths are the leading cause of injury
7  death in the U.S. and take the lives of 115
8  Americans per day."
9         Do you see that?
10    A    Yes.
11    Q    Have you ever seen or heard of that stat
12  before?
13         MR. COLLINS:  Objection.  Foundation.
14         THE WITNESS:  No.
15  BY MR. BOGLE:
16    Q    Any reason to dispute that?
17         MR. COLLINS:  Objection.  Foundation,
18  form, asked and answered.
19         THE WITNESS:  I couldn't say.
20  BY MR. BOGLE:
21    Q    Okay.  It goes on to say:  "According to
22  a recent report issued by the Centers for Disease
23  Control and Prevention, prescription or elicit
24  opioids were involved in nearly two-thirds of all

Page 61

1  drug overdose deaths in the U.S. during 2016, a
2  27.7 percent increase from 2015."
3         Do you see that?
4    A    Yes.
5    Q    And it says:  "In total, more than
6  351,000 people have died since 1999 due to an
7  opioid-involved overdose.  The crisis has become
8  so severe that the average life expectancy
9  declined in 2016 from the previous year largely
10  because of opioid overdoses."
11         Do you see that?
12    A    Yes.
13    Q    Okay.  Have you ever heard that before,
14  that the life expectancy in this country has
15  declined largely because of opioid overdoses?
16         MR. COLLINS:  Objection.  Form,
17  foundation.
18         THE WITNESS:  No.
19  BY MR. BOGLE:
20    Q    That's news to you?
21         MR. COLLINS:  Objection.  Argumentative.
22         THE WITNESS:  Yes.
23  BY MR. BOGLE:
24    Q    Let's go back to Exhibit 1 of the Drug

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 Operations Manual. Now, this manual you
2 understand was put in place in the year 2000,
3 right?
4    A   Yes.
5    Q   Okay. And it existed until 2007, when
6 the Lifestyle Drug Monitoring Program went into
7 place, right?
8    A   Yes.
9    Q   Okay. And just to finish working
10 through that calendar, the Lifestyle Drug
11 Monitoring Program existed for about a year, from
12 2007 to 2008, right?
13    A   Yes.
14    Q   Okay. In 2008, McKesson employs the
15 Controlled Substances Monitoring Program, which
16 has existed in some form from 2008 to today,
17 right?
18    A   Yes.
19    Q   Okay. When you worked at other
20 distribution centers prior to 2000, was there any
21 standard operating procedure in place for the
22 monitoring of controlled substances at McKesson?
23    A   I don't remember --
24    Q   Okay.

Page 63

1    A   -- in the North Canton or Cincinnati.
2    Q   Okay.
3    A   We thought of diversion as loss within
4 the distribution center, doctor adulteration or
5 that kind of thing.
6    Q   So prior to 2000 when you worked at
7 other distribution centers, the notion of
8 individuals abusing opioids was not something that
9 was a consideration from diversion; is that true?
10    A   Hadn't really heard much about it that I
11 knew of.
12    Q   Okay. Now, the Drug Operations Manual
13 and the portions that pertained to controlled
14 substances, it was mandatory for McKesson
15 employees, including yourself, to comply with all
16 aspects of that manual, correct?
17    A   Yes.
18    Q   Now, during the time that -- from 2000
19 to 2007, would the New Castle Distribution Center
20 receive what were called suspicious order warning
21 reports?
22    A   Yes. It was either unusual purchase
23 order reports or suspicious, I don't remember
24 which.

Page 64

1    Q   Okay. And just so we're -- we're
2 speaking the same language here, if you can go in
3 Exhibit 1 to page 0.29.
4       MR. COLLINS: I'm sorry. Can you give
5 that to me again?
6       MR. BOGLE: .29. Should be a number.
7       MR. COLLINS: Where are you reading?
8       MR. BOGLE: .29 is at the top right.
9       MR. COLLINS: Oh, at the top right.
10       MR. BOGLE: Yeah.
11 BY MR. BOGLE:
12    Q   Are you there, Mr. Snider?
13    A   I can't see it. Can someone help me get
14 that?
15       THE WITNESS: Sorry.
16       MR. COLLINS: That's all right.
17 BY MR. BOGLE:
18    Q   We're going to blow it up on the screen
19 here too as much as we can, if that helps. You
20 obviously don't have to utilize the screen, but
21 it's there if you need --
22    A   I got it. 1555.29.
23    Q   Yes, sir.
24    A   Okay.

Page 65

1    Q   So I just want to make sure we're
2 speaking the same language as far as terms, and
3 we'll talk in more detail about these in a minute.
4       But you see in the middle of the page, a
5 little past the middle, there's a letter C, and it
6 says: "Daily Controlled Substance Suspicious
7 Order Warning Report," and it's referred to as
8 DU45L500.
9    A   Yes.
10    Q   Do you see that?
11    A   Yes, I do.
12    Q   Okay. So you understand from 2000 to
13 2007, that was one of the reports that you would
14 have received at your distribution center, right?
15    A   Yes.
16    Q   Okay. And if you go to the next page,
17 letter -- letter D refers to a "Monthly Controlled
18 Substance Suspicious Purchases Report," also
19 DU45L, this time 650. Do you see that?
20    A   Yes.
21    Q   Okay. That again would be another
22 report that you would have received at your
23 distribution center during the 2000 to '07 time
24 period, right?

Page 66

1    A    Yes.

2    Q    Okay.  And do I understand correctly
3  that reports -- or strike that.

4        Do I understand correctly that orders
5  would show up as -- on these suspicious order
6  warning reports if the orders were three times the
7  value that you would see from customers in your
8  distribution center?

9        MR. COLLINS:  Objection.  Vague.

10       THE WITNESS:  I don't remember at this
11  time how many times it was, but they did -- orders
12  did show up for a certain number of above a norm.

13  BY MR. BOGLE:

14       Q    Okay.  So go back to page .29, and I'm
15  in letter c.

16       And in that first paragraph, again we
17  read the title of the report.  It says:  "When an
18  order is entered through the central system (EOE
19  or CRT), controlled substance items are extracted
20  (after passing through front end order processing)
21  and compared in a subroutine to the purchases
22  month-to-date by customer/customer average
23  purchases, average purchases by customer class and
24  product."

Page 67

1        And then it goes on and says:  "The same
2  factors that are used for the customer recap
3  variance," and it references this -- the report,
4  "are also used for the daily controlled substance
5  suspicious order warning report," and then it
6  says:  "3X monthly average for Schedule II and III
7  reportables and 8X monthly averages for IIIN to
8  Schedule V."

9        Do you see that?

10       A    Yes.

11       Q    Okay.  So, first of all, opioid
12  products have always been either Schedule II or
13  Schedule III, right?

14       A    Yes.

15       Q    Okay.  So does this refresh your
16  recollection that when it comes to the suspicious
17  order warning reports you received from 2000 to
18  2007, a customer would show up on that report if
19  they were at three times the monthly average for
20  other customers at your distribution center?

21       A    Yes.

22       Q    Okay.  And that was true for the -- for
23  the monthly report as well.  That was the same
24  criteria that was used, right?

Page 68

1    A    I would think.  I'm not sure.

2    Q    Okay.

3    A    If -- if it's in here, I would -- I
4  would agree with it.

5    Q    Well, let me ask you this:  During the
6  2000 to 2007 time period, were there any other
7  reports that you would have reviewed to determine
8  whether an order was potentially suspicious for a
9  controlled substance, other than these two reports
10  we talked about?

11       MR. COLLINS:  Objection.  Vague, form.

12       THE WITNESS:  No, not a report.  I just
13  remember the daily one.

14  BY MR. BOGLE:

15       Q    I'm sorry.  I don't think I understand.

16       A    The daily report and the monthly.

17       Q    Right, right.

18       A    And then we reported all ARCOS
19  transmissions also.

20       Q    Right.  And we'll get to that.

21       But as far as reports go, we've talked
22  about the daily and monthly suspicious order
23  reports.  Those would be the two reports you would
24  utilize from 2000 to 2007 to potentially detect

Page 69

1  suspicious orders, right?

2    A    Yes.

3    Q    Okay.  Now, when a customer showed up on
4  the suspicious order warning report from 2000 to
5  2007, it was McKesson's practice at New Castle to
6  still ship those orders, right?

7        MR. COLLINS:  Objection.  Form, asked
8  and answered.

9        THE WITNESS:  Yes.

10  BY MR. BOGLE:

11       Q    And going back to Exhibit 1, I'm at page
12  .30 now.  About two-thirds of the way down the
13  page, there's a big B that says "Reporting."  Do
14  you see that?

15       A    Yes.

16       Q    Okay.  And below that it says:  "With
17  the release of the daily controlled substance
18  suspicious order warning report, there are several
19  significant advantages to enhance our compliance
20  efforts."

21       And I'm looking -- the second paragraph
22  below that, it says:  "It does not rely on an
23  individual's judgment or knowledge to determine
24  reporting appropriateness but, rather, on

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 statistical fact."
2    Do you see that?
3    A    Is that -- I'm sorry.  I --
4    MR. COLLINS:  I don't see it.
5    THE WITNESS:  I did not see that.
6    MR. COLLINS:  Where are you?  I'm sorry.
7    THE WITNESS:  Oh, you skipped down to
8 the last paragraph in B?
9    MR. BOGLE:  Correct.
10    MR. COLLINS:  Okay.  Neither he or I
11 knew where you were quoting from.
12    THE WITNESS:  Yes, I see that.
13 BY MR. BOGLE:
14    Q    Okay.  So, and -- and what's being
15 referred to there is the suspicious order warning
16 report, the benefit of that was felt to be that if
17 you were at three times the average and you showed
18 up on the report, it would not require judgment to
19 assess whether those reports needed to be provided
20 to the DEA, right?
21    MR. COLLINS:  Objection.  Form.
22 Mischaracterization.
23    THE WITNESS:  They were sent, yes.
24 BY MR. BOGLE:

Page 71

1    Q    Okay.
2    A    The judgment was, yes, to send the
3 report.
4    Q    Okay.  And the reports were sent, but as
5 we talked about, the orders were sent as well,
6 right?
7    A    Yes.
8    Can I add something to that?
9    Q    Go ahead.
10    A    The orders sometimes were marked down
11 and not completely sent, if we felt it was
12 suspicious and we could check on that.  For
13 instance, customers may order 33 of something, and
14 it would show up on the report, and they had -- we
15 called them fat fingers, and it was just three,
16 and we knew that because we knew the customer.
17    Q    Okay.  That's a -- that's a policy
18 that's been changed, though, right?  You can't
19 modify orders --
20    A    Right.
21    Q    -- from the forms anymore, right?
22    A    Right, back then.  So we'd sign off on
23 the report and look at it, and if there were
24 errors on it, that we did mark down.

Page 72

1    Q    Okay.  So there were blocked order
2 reports provided to us in this litigation -- and
3 we can talk about it in more detail later, but I
4 want to make sure of your understanding first --
5 that tend to indicate that from New Castle, at
6 least for pharmacies in Summit and Cuyahoga
7 County, that there were no reports provided to the
8 DEA of blocked orders until August of 2013.
9    Is that your understanding?
10    MR. COLLINS:  Objection.
11    THE WITNESS:  No.
12 BY MR. BOGLE:
13    Q    Okay.  It's your understanding that you
14 provided blocked order reports to the DEA --
15    A    I --
16    Q    -- prior to that?
17    A    I don't know a blocked order report.
18 I'm sorry.
19    Q    That's how it was phrased and how it was
20 given to us.  You never heard of that term?
21    A    No.
22    Q    Okay.  When you decided not to ship an
23 order to a customer, reports were not provided to
24 the DEA along those lines until about August 2013

Page 73

1 as it pertains to New Castle's customers in Summit
2 and Cuyahoga County, right?
3    MR. COLLINS:  Objection.  Foundation.
4    THE WITNESS:  No.
5 BY MR. BOGLE:
6    Q    That's not right?
7    A    No.
8    Q    Okay.  Actually, strike that.  We'll
9 come back to that later.
10    Do you recall getting information from
11 the DEA in 2006 stating that if a suspicious order
12 was detected that it should not be shipped and
13 should be reported to the DEA?
14    MR. COLLINS:  Objection.  Form.
15    THE WITNESS:  I don't remember that,
16 2006.
17 BY MR. BOGLE:
18    Q    I'm going to hand you what I'm marking
19 as Exhibit 1.1464, also marked as Exhibit 3.
20    (Snider Exhibit No. 3 was marked
21    for identification.)
22 BY MR. BOGLE:
23    Q    This is a letter from the U.S.
24 Department of Justice, Drug Enforcement

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 Administration, September 27, 2006.

2     Do you see that?

3     A    Yes.

4     Q    Okay.  Have you ever seen this letter

5 before?

6     A    No, I haven't.

7     Q    You have not.  Okay.

8     Communications from the DEA regarding

9 your responsibilities at New Castle, do those

10 generally not make their way to you?

11     MR. COLLINS:  Objection.  Assumes facts

12 not in evidence, argumentative, foundation, form.

13     THE WITNESS:  Yes, they made their way

14 to us, and we would adopt -- adapt the manual and

15 follow the SOPs and new procedures.

16 BY MR. BOGLE:

17     Q    Okay.  But you've never seen this

18 letter?

19     A    No, I'm sorry, I don't remember seeing

20 it.

21     Q    Well, let me ask you about a couple of

22 things in here.

23     To start, it says:  "This letter is

24 being sent to every commercial entity in the

Page 75

1 United States registered with the Drug Enforcement

2 Administration to distribute controlled

3 substances.  The purpose of this letter is to

4 reiterate the responsibilities of controlled

5 substance distributors in view of the prescription

6 drug abuse problem our nation currently faces."

7     Do you see that?

8     A    Yes.

9     Q    Okay.  And then the third paragraph on

10 the first page which starts with "Distributors

11 are," do you see that sentence?  It's the second

12 sentence in that paragraph.

13     MR. COLLINS:  Third paragraph, the

14 second sentence.

15     THE WITNESS:  Oh, okay.

16 BY MR. BOGLE:

17     Q    It says:  "Distributors are of course

18 one of the key components of the distribution

19 chain.  If the closed system is to function

20 properly as Congress envisioned, distributors must

21 be vigilant in deciding whether a prospective

22 customer can be trusted to deliver controlled

23 substances only for lawful purposes."

24     Do you see that?

Page 76

1     A    Yes.

2     Q    Do you agree with that statement?

3     MR. COLLINS:  Objection.  Form.

4 Foundation.

5     THE WITNESS:  Yes.

6 BY MR. BOGLE:

7     Q    It says:  "This responsibility is

8 critical as Congress has expressly declared that

9 the illegal distribution of controlled substances

10 has a substantial and detrimental effect on the

11 health and general welfare of the American

12 people."

13     Do you see that?

14     A    Yes.

15     Q    If you go to the second page here, I'm

16 about three-quarters of the way down the page, the

17 paragraph starting with "Thus."  Do you see that?

18     A    Yes.

19     Q    It says:  "Thus, in addition to

20 reporting all suspicious orders, a distributor has

21 a statutory responsibility to exercise due

22 diligence to avoid filling suspicious orders that

23 might be diverted into other than legitimate

24 medical, scientific and industrial channels."

Page 77

1     Do you see that?

2     A    Yes.

3     Q    Okay.  But in 2006, I think we just

4 talked about the fact that when a suspicious order

5 was detected at your facility at least, it was

6 filled, right?

7     MR. COLLINS:  Objection.  Form,

8 foundation.

9     THE WITNESS:  Not always.

10 BY MR. BOGLE:

11     Q    Okay.

12     A    I testified that not always.  We would

13 cut orders down on occasion.

14     Q    When you thought they had fat fingers.

15 I think that was the term you used.

16     A    Or they -- yeah, or they made a mistake.

17     Q    Right.  But if you thought that they

18 were ordering what they were -- intended to order,

19 that order was filled, even though you're saying

20 that a suspicious order report would have been

21 provided to the DEA, right?

22     MR. COLLINS:  Objection.  Form.

23     THE WITNESS:  If the definition is off

24 of that report, three times or the eight times,

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 yes.
2 BY MR. BOGLE:
3    Q    Then it would have been filled, right?
4    A    Yes.
5    Q    Okay. And this letter from the DEA
6 indicates that you shouldn't be filling those kind
7 of prescriptions, right?
8         MR. COLLINS: Objection.
9 BY MR. BOGLE:
10    Q    If you've identified them as suspicious.
11         MR. COLLINS: Objection. Foundation,
12 compound, argumentative, calls for a legal
13 conclusion.
14         THE WITNESS: I don't see it that way.
15 BY MR. BOGLE:
16    Q    You don't think that's what that says?
17    A    No.
18    Q    Okay. And the responsibility to avoid
19 shipment of orders deemed suspicious by a
20 distributor, that policy has always been in effect
21 since the Controlled Substances Act was enacted in
22 1970, right?
23         MR. COLLINS: Objection. Form, assumes
24 multiple facts, legal conclusion.

Page 79

1         THE WITNESS: I can't say that. 1970,
2 I -- I don't know that.
3 BY MR. BOGLE:
4    Q    Well, do you think this -- this sentence
5 I read to you here about avoiding filling
6 suspicious orders was something new that was added
7 to the regulations in '06?
8         MR. COLLINS: Objection. Calls for a
9 hypothetical, speculation.
10         THE WITNESS: I don't know.
11         MR. COLLINS: Calls for a legal
12 conclusion.
13 BY MR. BOGLE:
14    Q    You don't know?
15    A    No.
16    Q    And the next paragraph down, the last
17 sentence says: "Again, to maintain effective
18 controls against diversion, as Section 823(e)
19 requires, the distributor should exercise due care
20 in confirming the legitimacy of all orders prior
21 to filling." Right?
22    A    Yes.
23    Q    Okay. And you know that's not a new
24 policy either, right?

Page 80

1         MR. COLLINS: Objection.
2 BY MR. BOGLE:
3    Q    In '06.
4         MR. COLLINS: Objection. Vague, calls
5 for a legal conclusion.
6         THE WITNESS: I don't know that.
7 BY MR. BOGLE:
8    Q    Okay. Do you have any disagreement that
9 that's what the law required in '06?
10         MR. COLLINS: Objection. Calls for
11 speculation, legal conclusion, asked and answered.
12         THE WITNESS: I have no disagreement
13 with it's -- that it's written there.
14 BY MR. BOGLE:
15    Q    Okay. And would you agree with the
16 notion that reporting a suspicious order to the
17 DEA and not filling it gives the DEA the
18 opportunity to investigate that order without
19 having the potential of getting into the public
20 for potential diversion?
21         MR. COLLINS: Objection, if that's a
22 question. Calls for a legal conclusion, it's
23 compound, it's vague.
24 BY MR. BOGLE:

Page 81

1    Q    You can answer.
2         MR. COLLINS: And it calls for
3 speculation.
4         THE WITNESS: I can't answer to that. I
5 don't know.
6 BY MR. BOGLE:
7    Q    Okay. Do you think the DEA has the same
8 ability to investigate and prevent diversion after
9 you've filled the order versus if you hadn't
10 filled it at all?
11         MR. COLLINS: Objection. Foundation,
12 argumentative, compound.
13         THE WITNESS: I know in New Castle, we
14 had a relationship with the DEA, and I talked to
15 them, they called me. At one point the DEA agent
16 in charge was my neighbor, so I knew them, and I
17 knew if there was a problem, they would let me
18 know.
19         MR. BOGLE: Move to strike as
20 nonresponsive.
21 BY MR. BOGLE:
22    Q    My -- my question simply was, if you
23 fill an order that you deem suspicious, then it
24 naturally is going to be harder to the DEA to

Page 82

1 prevent diversion from that suspicious order as
2 opposed to if you had reported it and not filled
3 it at all, right?
4     MR. COLLINS: Objection. Closing
5 argument. Assumes facts not in evidence, calls
6 for speculation, form, compound, vague.
7     THE WITNESS: I don't know that.
8 BY MR. BOGLE:
9   Q  You don't know.
10   A  No.
11   Q  Okay. Are you aware that in 2006 the
12 DEA began investigating McKesson concerning its
13 diversion practices as it pertains to controlled
14 substances?
15     MR. COLLINS: Objection. Form,
16 foundation.
17     THE WITNESS: I'm aware now. Yes.
18 BY MR. BOGLE:
19   Q  When you say "now," when did you become
20 aware of that?
21   A  I'm not sure.
22   Q  Okay. What -- what caused you to become
23 aware of that?
24   A  McKesson. My bosses.

Page 83

1   Q  Okay. Do you have any idea what year
2 even you were made aware of that?
3   A  No, I'm not sure. I can't remember.
4   Q  Okay. I'm going to hand you what I'm
5 marking as Exhibit 1.1830, Exhibit 4 to your
6 deposition.
7     (Snider Exhibit No. 4 was marked
8     for identification.)
9     MR. COLLINS: Thank you.
10 BY MR. BOGLE:
11   Q  And you see this is a PowerPoint titled
12 "Lifestyle Drugs and Internet Pharmacies" from the
13 National Operations Conference 2007. Do you see
14 that?
15   A  Yes.
16   Q  And the author is noted to be Donald
17 Walker, Senior Vice President, Distribution
18 Operations, right?
19   A  Yes.
20   Q  Are you familiar with Mr. Walker?
21   A  Yes, I am.
22   Q  And his role in this point in time in
23 2007 would be to oversee the operations of all the
24 distribution centers within U.S. pharma, right?

Page 84

1     MR. COLLINS: Objection. Foundation,
2 vague, calls for a legal conclusion.
3     THE WITNESS: Yeah, operationally.
4 BY MR. BOGLE:
5   Q  Yeah. And if you go to page .3, the
6 slide is titled "Public Health Issues," and it
7 says -- the first bullet point below that says:
8 "Abuse of prescription drugs has risen 66 percent
9 since 2000." And the third bullet point says:
10 "Opioid painkillers kill more than cocaine and
11 heroin combined."
12     Do you see that?
13   A  Yes.
14   Q  Is that a statistic you were familiar
15 with in 2007?
16     MR. COLLINS: Objection. Form.
17     THE WITNESS: I -- I was there I believe
18 at the -- his meeting.
19 BY MR. BOGLE:
20   Q  Okay. So you would have been made aware
21 of that statistic at that meeting?
22   A  Yes.
23   Q  Okay. So you were -- you were present
24 when this was actually presented, this PowerPoint

Page 85

1 deck, right?
2   A  I believe so, yes.
3   Q  Okay. Where was it presented?
4   A  At a national meeting, I believe. I
5 don't know the date -- what's the date here?
6   Q  It just says 2007, I think.
7   A  It would have to be that -- I'd have to
8 check the date, depending -- I can't remember
9 where I was.
10   Q  Okay. And if you go to .4, the next
11 slide says "DEA Focus." And under "Wholesalers,"
12 it says "DEA Expects." Do you see that?
13   A  Yes.
14   Q  And it says: "We know our customers."
15 That's the first bullet point.
16   A  Yes.
17   Q  The second bullet point is "Wholesalers
18 accountable for controlling quantities shipped."
19 Right?
20   A  Yes.
21   Q  Okay. You understand that concept to
22 mean the DEA expected you guys to not ship
23 suspicious orders, right?
24     MR. COLLINS: Objection.

Page 86

1 Mischaracterization. Form. Calls for a legal
2 conclusion.
3     THE WITNESS: Right here it talks about
4 knowing our customers. Wholesaler accountable for
5 controlling quantities, and then I remember
6 talking about the internet pharmacies.
7 BY MR. BOGLE:
8   Q  Okay. So --
9   A  Or the rogue pharmacies that were -- we
10 didn't have any of those.
11   Q  It's your understanding that leading up
12 to 2006, that McKesson was not supplying any
13 controlled substances to rogue internet
14 pharmacies?
15     MR. COLLINS: Objection. Form.
16     THE WITNESS: It was my understanding,
17 yes.
18 BY MR. BOGLE:
19   Q  Okay. Is that still your understanding?
20   A  I don't know that now, no.
21   Q  Okay. The last bullet point here under
22 "DEA Expects" says: "5,000 dose units is,
23 quote/unquote, "average." Do you see that?
24   A  Okay.

Page 87

1   Q  You see that reference there?
2   A  Yeah.
3   Q  Okay. And they're talking again about
4 controlled substances, right?
5   A  Yes.
6   Q  That's what they felt the averages were
7 at that point in time, right?
8     MR. COLLINS: Objection. Foundation.
9     THE WITNESS: Yes.
10 BY MR. BOGLE:
11   Q  Okay. And what ends up happening in
12 2007, we mentioned this briefly, is the Lifestyle
13 Drug Monitoring Program comes into place, right?
14   A  Yes.
15   Q  Okay. And that's the first time in
16 which there are actually thresholds established
17 for, for example, hydrocodone and oxycodone,
18 right?
19   A  Yes, that I can recall.
20   Q  Okay.
21   A  Except for the thresholds on the unusual
22 purchase report.
23   Q  Right. But those weren't hard and fast
24 thresholds that were the same across the board,

Page 88

1 right?
2     MR. COLLINS: Objection. Vague.
3     THE WITNESS: I'm not sure I understand.
4 BY MR. BOGLE:
5   Q  Let me rephrase it.
6     So in 2007, the Lifestyle Drug
7 Monitoring Program established
8 8,000-dose-unit-a-month thresholds for oxycodone
9 and hydrocodone, right?
10   A  Yes.
11   Q  Okay. And that's around the same point
12 in time where the DEA, at least what's being
13 conveyed here by Mr. Walker, is that 5,000 dose
14 units is average, right?
15   A  Yes.
16   Q  Okay. And again, under the Lifestyle
17 Drug Monitoring Program, if a customer exceeded
18 that 8,000 threshold in a month, their orders
19 would not be blocked; they would still be shipped,
20 right?
21     MR. COLLINS: Objection. Compound,
22 lacks foundation, form, speculative.
23     THE WITNESS: I don't remember that, if
24 they were cut off or shipped systematically. I'm

Page 89

1 sorry.
2 BY MR. BOGLE:
3   Q  Okay.
4     MR. COLLINS: Are you moving on to
5 something else?
6     MR. BOGLE: Yeah.
7     MR. COLLINS: Can we take a short break?
8 We've been going 70 minutes.
9     MR. BOGLE: That's fine.
10     THE VIDEOGRAPHER: The time is 9:42 a.m.
11 We're going off the record.
12     (Recess.)
13     THE VIDEOGRAPHER: The time is 9:55 a.m.
14 We're back on the record.
15 BY MR. BOGLE:
16   Q  Okay. Mr. Snider, just to reorient to
17 where we were at, I had asked you whether during
18 the time period that the Lifestyle Drug Monitoring
19 Program was in place, when a customer exceeded the
20 8,000 unit threshold for hydrocodone and
21 oxycodone, that those orders were not blocked
22 thereafter, correct?
23     MR. COLLINS: Objection. Vague.
24     THE WITNESS: I don't remember that.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

BY MR. BOGLE:

1  BY MR. BOGLE:
2     Q    Okay.  Now, I'm going to hand you what
3  I'm marking as 1.1864, and Exhibit 5 to your
4  deposition.
5        (Snider Exhibit No. 5 was marked
6        for identification.)
7        MR. COLLINS:  Thank you.
8  BY MR. BOGLE:
9     Q    If you look at the bottom e-mail on the
10 first page here, do you see it's an e-mail from
11 Diane Martin to several individuals that you're
12 cc'd on, right?
13    A    To Diane, copy Blaine Snider and Brian
14 Ferreira, yes.
15    Q    No, I'm looking at the bottom e-mail on
16 the first page, not the top one.
17    A    Oh.  It's from Diane Martin to Lisa,
18 Jim, John, and Alex, copy Blaine.
19    Q    Right.  And this is from December 7,
20 2007, right?
21    A    Okay.  Yes.
22    Q    You see that?
23    A    Yeah.
24    Q    And the subject is "November LDMP."  Do

Page 91

1  you see that as well?
2     A    Yes.
3     Q    Okay.  And then there's a list that
4  extends a little more than a page of customers at
5  New Castle for the month of November 2007 that had
6  exceeded their 8,000 unit threshold for
7  hydrocodone, oxycodone, and alprazolam.
8        Do you see that?
9        MR. COLLINS:  Objection.  Form.
10       THE WITNESS:  Let me take a look at it
11 here.  (Peruses document.)
12       It looks like that, yes.
13 BY MR. BOGLE:
14    Q    Okay.  And I want to look at a couple of
15 these customers so we can understand what we're
16 seeing here.
17       So if you turn to point 2, the second
18 page of the document, do you see three customers
19 down, there's Franklin Pharmacy HM?  Do you see
20 that?
21    A    Yes, I see that.
22    Q    Are you familiar with Franklin
23 Pharmacy --
24    A    Yes.

Page 92

1     Q    -- as a customer that New Castle has
2  serviced over time?
3     A    Yes.
4     Q    And there is oxycodone referenced there
5  as to Franklin Pharmacy.  Do you see that?
6     A    Yes.
7     Q    And it's noted that on November 13,
8  2007, they would have exceeded their threshold for
9  oxycodone, right?
10       MR. COLLINS:  Objection.  Foundation.
11       THE WITNESS:  If I'm -- if I'm reading
12 this correctly, number of doses at the end of the
13 month, and then 9,733, it looks like -- it looks
14 like that's what it says.
15 BY MR. BOGLE:
16    Q    Okay.  Let me walk step by step so this
17 is clear.
18       Just talking about the date first, based
19 on this column, which is the column that says
20 "Date threshold exceeded," for Franklin Pharmacy,
21 it would note on that November 13, 2007, was the
22 date that their threshold was exceeded for
23 oxycodone, right?
24    A    Yes.

Page 93

1     Q    And then the next column says "Number of
2  doses on date doses exceeded the limit," and
3  there's 97 -- 9,733 doses as of November 13, 2007,
4  right, for oxycodone?
5        MR. COLLINS:  Objection.  Foundation.
6        THE WITNESS:  Yes.
7  BY MR. BOGLE:
8     Q    Okay.  And it indicates, the next
9  column, "Number of doses at end of month."  And
10 for Franklin Pharmacy for oxycodone that month,
11 it's noted 22,250 doses provided to them by the
12 end of the month.  Right?  That's what this chart
13 indicates.
14       MR. COLLINS:  Objection.  Foundation.
15       THE WITNESS:  It looks like that.
16 BY MR. BOGLE:
17    Q    Okay.  So this would indicate as to
18 Franklin Pharmacy that in November of 2007, while
19 the LDMP was in place, they exceeded their
20 threshold, but their orders that exceeded the
21 8,000 unit threshold for oxycodone were not
22 blocked and went all the way up to 22,250 doses
23 for that month, right?
24       MR. COLLINS:  Objection.  Compound.

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 Foundation.
2         THE WITNESS:  I don't know that they
3 weren't blocked, and that a Level II could have
4 been done on that customer, which I believe was
5 done.  I'd have to check on that.
6 BY MR. BOGLE:
7    Q    Okay.  So if you look at the e-mail
8 above that from three days later, December 10,
9 2007, the first line pertains to Franklin
10 Pharmacy.  Do you see that?
11        MR. COLLINS:  Objection.  Foundation.
12        THE WITNESS:  Yes.
13 BY MR. BOGLE:
14    Q    It says:  "Franklin appeared new last
15 month for oxycodone.  The Level II review is
16 almost complete.  Blaine got Frank's signature on
17 the declaration, and I'm finishing up the survey
18 questionnaire."
19        Do you see that?
20    A    Yes.
21    Q    Okay.  So three days after the report we
22 just looked at, the Level II for Franklin was not
23 yet complete, right?
24        MR. COLLINS:  Objection.  Foundation,

Page 95

1 calls for speculation.
2 BY MR. BOGLE:
3    Q    That's what this says.
4        MR. COLLINS:  Foundation.
5        THE WITNESS:  According to Diane.
6 BY MR. BOGLE:
7    Q    It -- and that's actually according to
8 Alexandra, right?
9    A    Or Alex -- Alexandra, yes.
10    Q    Okay.  What did she do at McKesson at
11 that point in time?  What was her job?
12    A    Sales.
13    Q    Okay.  When Alexandra said something,
14 was it generally accurate?
15        MR. COLLINS:  Objection.  Calls for
16 speculation.
17 BY MR. BOGLE:
18    Q    Did you find her to be inaccurate
19 frequently in her e-mails?
20        MR. COLLINS:  Objection.  Speculation.
21        THE WITNESS:  I can't -- I can't respond
22 to her accuracy on e-mails.
23 BY MR. BOGLE:
24    Q    Well, do you have any specific reason to

Page 96

1 disagree that for Franklin Pharmacy, they exceeded
2 their threshold on November 13, 2007 for
3 oxycodone, and continued to be supplied the drug,
4 up to 22,250 doses for that month?
5        MR. COLLINS:  Objection.  Foundation.
6 Mischaracterization of prior testimony.
7        THE WITNESS:  I don't know that they
8 didn't have a Level II already done.  The DRA had
9 looked at it, and they had a new business or
10 whatever.  I don't know that here.
11        MR. BOGLE:  Move to strike as
12 nonresponsive.
13 BY MR. BOGLE:
14    Q    All I asked you at this point was, what
15 this chart indicates is that Franklin Pharmacy
16 received 22,250 doses of oxycodone after exceeding
17 their threshold on November 13, 2007, right?
18        MR. COLLINS:  Objection.  Foundation,
19 argumentative, compound.  Mischaracterizes his
20 prior answer, which was appropriate.
21        THE WITNESS:  I don't know.  It's what
22 you say is on the chart.
23 BY MR. BOGLE:
24    Q    Well, that's what the chart says, right?

Page 97

1        MR. COLLINS:  Objection.  Vague, form.
2        THE WITNESS:  I don't know that for
3 sure.
4 BY MR. BOGLE:
5    Q    You don't know that that's what the
6 chart says right here?
7        MR. COLLINS:  Objection.  Foundation.
8        THE WITNESS:  Yes.
9 BY MR. BOGLE:
10    Q    Yes, you don't know?
11    A    Yes.
12    Q    Okay.  Have you read charts like these
13 before in your job at McKesson?
14    A    Yes.
15    Q    Okay.  When you got this e-mail in
16 December 2007, did you write back and say, What is
17 this chart?  I don't know what this means?
18        MR. COLLINS:  Objection.  Calls for
19 speculation, foundation.
20        THE WITNESS:  I don't know from 2007.
21 BY MR. BOGLE:
22    Q    Okay.  Well, I can tell you I looked,
23 and I didn't see any e-mail from you that said, I
24 don't understand what this chart means, guys.  Can

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 somebody explain this to me? I didn't see an
2 e-mail like that. I'm sure if your counsel has
3 got one, they'll show it to you in his exam.
4       MR. COLLINS: You don't have to answer.
5 That's not a question.
6 BY MR. BOGLE:
7    Q  Do you have any reason to testify under
8 oath today that you sent a response saying you
9 don't understand what this chart means?
10      MR. COLLINS: Objection. Argumentative.
11      THE WITNESS: I don't know what it means
12 specifically. I see what it says.
13 BY MR. BOGLE:
14    Q  Okay.
15    A  I can't remember from 2007.
16    Q  And what it says about whether a
17 Level II had been done for Franklin, which is
18 another thing you referenced, is that it was not
19 yet complete as of three days of you receiving
20 this chart in December 2007, right?
21      MR. COLLINS: Lack of foundation as to
22 this entire inquiry. It's not been established
23 what this document means. Given that this one --
24 this witness wasn't the author of the document.

Page 99

1       MR. BOGLE: You're not -- you're making
2 speaking objections clearly now.
3       MR. COLLINS: No, this is an entirely
4 improper line of inquiry.
5       MR. BOGLE: It's not. He's on the
6 e-mail. He's saying he doesn't understand it.
7 I'm trying to figure out why he doesn't understand
8 it.
9       MR. COLLINS: Because he didn't write
10 the e-mail.
11      THE WITNESS: I don't know that it
12 wasn't done.
13 BY MR. BOGLE:
14    Q  Okay. So --
15    A  If Alex -- you mentioned Alex. I don't
16 know if she was right or not.
17    Q  Okay. So -- but do you have any
18 specific reason, as you sit here today, that when
19 she wrote her e-mail on December 10, 2007, saying
20 that the Level II review was not done yet, that
21 she was wrong?
22      MR. COLLINS: Objection. Calls for
23 speculation.
24      THE WITNESS: I don't know that.

Page 100

1 BY MR. BOGLE:
2    Q  Okay. Well, let's look at some of the
3 other pharmacies here on this chart.
4       Do you see Mace's Pharmacy on there as
5 well for oxycodone and hydrocodone?
6    A  Yes.
7    Q  Do you see for hydrocodone, it's noted
8 on this chart that they exceeded their threshold
9 on November 8, 2007, right?
10      MR. COLLINS: Objection. Lack of
11 foundation.
12      THE WITNESS: That's what it says here.
13 BY MR. BOGLE:
14    Q  Okay. And it's noted they were provided
15 28,100 doses of hydrocodone that month, right?
16      MR. COLLINS: Objection. Lack of
17 foundation, mischaracterization, assumes facts not
18 in evidence or testified to by this witness.
19      THE WITNESS: It's under "Number of
20 doses at the end of the month." I can't remember
21 if they had exceeded it.
22 BY MR. BOGLE:
23    Q  Well, we know the threshold at this
24 point in time would have been 8,000, right?

Page 101

1    A  Yes.
2    Q  Okay. And so 28,100 is more than 8,000,
3 right?
4    A  Yes.
5    Q  Okay. And we know that's how much they
6 got that month per this chart, right?
7       MR. COLLINS: Objection.
8 BY MR. BOGLE:
9    Q  "Number of doses at end of month,"
10 that's what that means, doesn't it?
11      MR. COLLINS: Objection. Lack of
12 foundation. This witness hasn't testified to
13 firsthand knowledge as to what this chart means.
14 BY MR. BOGLE:
15    Q  I'm asking you, that's what that means,
16 doesn't it?
17      MR. COLLINS: Same objection, and lack
18 of foundation.
19      THE WITNESS: I don't know that.
20 BY MR. BOGLE:
21    Q  You don't know if that's what that
22 means?
23    A  Correct.
24    Q  You have no idea what "Number of doses

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  at end of month" means?
2       MR. COLLINS: Objection. Foundation.
3       THE WITNESS: Yes. Yes.
4  BY MR. BOGLE:
5    Q   Yes what?
6    A   I don't know what that means.
7    Q   Okay. Do you have any understanding of
8  what it could possibly mean other than that's how
9  many doses they got that month?
10   A   I don't know if that means there was a
11 Level II done or --
12   Q   That's not my question, sir.
13      MR. COLLINS: He's -- I'm sorry.
14      MR. BOGLE: Not my question.
15      MR. COLLINS: The witness is entitled to
16 respond.
17      Please finish your answer, Mr. Snider.
18      THE WITNESS: I don't know that a
19 Level II was done. I don't know -- I don't have
20 the information about the account. If Mace's got
21 long-term care facilities, if they had a hospital
22 account connected to it, I don't know that.
23      MR. BOGLE: Move to strike as
24 nonresponsive.

Page 103

1  BY MR. BOGLE:
2    Q   My only question, sir, was that Mace's
3  Pharmacy for hydrocodone, based on this chart,
4  received 28,100 doses by the end of the month.
5  True or false?
6       MR. COLLINS: Objection. Assumes facts
7  not in evidence. It's certainly not testified to
8  by this witness, and this witness has clearly
9  stated he has no firsthand knowledge about the
10 chart.
11      THE WITNESS: False. I don't know that
12 for sure.
13 BY MR. BOGLE:
14   Q   Okay. Do you see Town & Country on
15 there as well, Town & Country Pharmacy?
16   A   Yes.
17   Q   It's noted per this chart that for
18 hydrocodone, they exceeded their threshold
19 November 12, 2007, right?
20      MR. COLLINS: Assumes facts not in
21 evidence, mischaracterization of the document.
22      THE WITNESS: That's what the chart
23 says.
24 BY MR. BOGLE:

Page 104

1    Q   And under the column "Number of doses at
2  end of month," it says what, sir?
3    A   8,700.
4    Q   For hydrocodone, Town & Country?
5    A   12,017.
6    Q   I think you're looking at Troutman.
7    A   Oh, I'm sorry.
8    Q   Do you see where it says 28,900 --
9    A   I -- I apologize. If you'll slow down a
10 little bit.
11      Did you say Town -- Town & Country
12 you're looking at?
13   Q   Yes, sir.
14   A   Okay. What -- what's the question
15 again?
16   Q   For the column "Number of doses at end
17 of month," what is the number for hydrocodone for
18 Town & Country Pharmacy?
19   A   28,932.
20   Q   What is the number for oxycodone for
21 Town & Country Pharmacy for that month?
22   A   15,783.
23   Q   And you don't have any reason to dispute
24 these are all customers serviced by New Castle, do

Page 105

1  you?
2    A   No.
3    Q   Okay.
4    A   I know those customers. I actually
5  visited those customers.
6    Q   Okay. And for any of these customers,
7  if McKesson at New Castle wanted to block those
8  orders, that was within your authority to do so,
9  right?
10      MR. COLLINS: Objection. Calls for
11 speculation, legal conclusion.
12      THE WITNESS: Can you repeat the
13 question, please?
14 BY MR. BOGLE:
15   Q   Sure. If you wanted to block the orders
16 for any of these pharmacies we just talked about,
17 Town & Country, Franklin's, Mace's, for the month
18 of November 2007, after they got over 8,000 doses,
19 that was within your authority as director of
20 operations to say, no more for them that month,
21 right? You're not getting any more.
22      MR. COLLINS: Objection.
23 BY MR. BOGLE:
24   Q   You could have done that, true?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  MR. COLLINS: Object --
2  THE WITNESS: I believe I did it --
3  MR. COLLINS: I'm sorry.
4  THE WITNESS: Sorry.
5  MR. COLLINS: Please let me make my
6  objection.
7  The question was compound in multiple
8  ways, and it's vague.
9  BY MR. BOGLE:
10  Q  You had authority to stop any of the
11  pharmacies we just talked about from getting more
12  than 8,000 doses in November 2007, true?
13  A  Yes.
14  Q  Okay.  Because as director of
15  operations, the license given to McKesson for New
16  Castle to distribute controlled substances is
17  ultimately your responsibility to keep, right?
18  A  Yes.
19  Q  Right?
20  A  And I knew those customers, and actually
21  visited those customers and did threshold visits.
22  MR. BOGLE: Move to strike everything
23  after "yes."
24  BY MR. BOGLE:

Page 107

1  Q  That was within your authority, true?
2  MR. COLLINS: Objection.  Asked and
3  answered.
4  THE WITNESS: Yes.
5  BY MR. BOGLE:
6  Q  Okay.  And the same is true from 2008 --
7  2000 to 2018, if at any point in time you had a
8  concern as director of operations about opioids
9  being supplied to a customer for New Castle, you
10  had the ultimate authority to say, They're not
11  getting these pills, true?
12  MR. COLLINS: Objection.  Vague.  Calls
13  for a legal conclusion.
14  THE WITNESS: No.
15  BY MR. BOGLE:
16  Q  You couldn't stand up and say, I'm
17  against this.  I don't want them getting these
18  pills.  This is my license.  I have control over
19  this distribution center?
20  MR. COLLINS: Objection.  Incomplete
21  hypothetical to a fact witness.
22  THE WITNESS: You -- you asked about
23  ultimate authority.  I'm sorry.  Can you define
24  that?

Page 108

1  BY MR. BOGLE:
2  Q  Let me ask you this:  If you had
3  concerns about controlled substances going, and
4  specifically opioids, going to a New Castle
5  customer from 2000 to 2018, it was, first of all,
6  your responsibility to raise that concern, right?
7  MR. COLLINS: Objection.  Compound.
8  Assumes facts not in evidence.
9  THE WITNESS: Yes.
10  BY MR. BOGLE:
11  Q  Okay.  You knew that was your job,
12  right?
13  A  Yes.
14  Q  Okay.  And ultimately, if you raised
15  that concern, you were in a position of management
16  at the DC when you did so, right?
17  A  Yes.
18  Q  Okay.  You're somebody that people
19  listen to, right?
20  A  I can't answer that.  I don't know.
21  Q  You don't know if people listen to you?
22  A  I'm sure they do.  Some do, some don't.
23  Q  Okay.  As to Franklin's Pharmacy, for
24  example, you never stood up and said, I don't -- I

Page 109

1  don't want these people getting more opioids from
2  my distribution center, did you?
3  A  Yes.
4  Q  You did?
5  A  Yes.
6  Q  Okay.  When was that?
7  A  I don't recall the time.
8  Q  Okay.
9  A  But, yes, Frank Manios was not able to
10  get any more opiates.
11  Q  But that wasn't at your direction, was
12  it?
13  A  Yes, it was.
14  Q  Okay.  All right.  We'll take a look at
15  that momentarily then.
16  A  Okay.
17  Q  For Mace's, you could have stood up at
18  any point in time and said, No more oxycodone or
19  hydrocodone for you, Mace's.  I think that what
20  you're doing is suspicious.  Right?  You had that
21  authority.
22  A  Yes.
23  Q  Okay.  Let's go back to Exhibit 1.1830,
24  I think it's Exhibit 4 to the deposition.  We were

Page 110

1 talking about this --
2          MR. COLLINS:  I'm sorry, hold on a
3 second.
4          MR. BOGLE:  Yeah, it's the PowerPoint
5 deck you have right next to you, the Lifestyle
6 Drug.
7 BY MR. BOGLE:
8      Q    We were talking about this a few moments
9 ago.  I want to go to page .7 in this slide deck.
10         It's noted here, the slide is titled
11 "Lifestyle Drug Monitoring Program," and it says
12 "Focus on four drugs."  Do you see that?
13     A    Yes.
14     Q    Two of those four drugs that were the
15 focus in the Lifestyle Drug Monitoring Program
16 were hydrocodone and oxycodone, right?
17     A    Yes, I believe so.
18     Q    Okay.  And the third bullet point, we
19 talked about this a little bit, established
20 threshold for excessive quantities, 8,000 dose
21 units.  Do you see that?
22     A    Yes.
23     Q    And that threshold was established for
24 all customers as it pertained to hydrocodone and

Page 111

1 oxycodone, right?
2          MR. COLLINS:  Objection.  Form, vague.
3          THE WITNESS:  Yes.
4 BY MR. BOGLE:
5      Q    Okay.  And the next bullet point says:
6 "Thorough due diligence of customers exceeding
7 threshold."  Do you see that?
8      A    Yes.
9      Q    Okay.  And that due diligence was done
10 through a sort of three-level process, right?
11     A    As I recall.
12     Q    Okay.  For example, Level I, when a
13 customer exceeded the threshold, a Level I review
14 meant you kind of -- "you" meaning the management
15 of the distribution center was responsible for
16 evaluating that customer to assess whether you
17 thought the orders were suspicious, right?
18         MR. COLLINS:  Objection.  Form.
19         THE WITNESS:  Yes.
20 BY MR. BOGLE:
21     Q    Okay.  And then if you -- it was
22 inconclusive, you went to Level II, right?
23     A    Yes.
24     Q    Okay.  And at Level II, that involved,

Page 112

1 first of all, the distribution center management,
2 including yourself, right?
3      A    Yes.
4      Q    Okay.  And that included going out and
5 visiting the customer and sometimes having a
6 questionnaire completed by them, right?
7      A    Well, Level I was the visit that I would
8 do.  Level II was usually done by a DRA and the
9 salesperson.
10     Q    Okay.  So you weren't involved in the
11 Level II reviews at all under the lifestyle drug
12 management program?
13     A    Not that I recall.
14     Q    Okay.  What about under the CSMP,
15 Level IIs?
16     A    I don't think so.
17     Q    Okay.  Just Level I is your testimony is
18 all you would have been involved in?
19     A    That's all I remember.
20     Q    Okay.  And you were also involved in
21 reviewing threshold request increases and signing
22 off on those if you felt appropriate, right?
23         MR. COLLINS:  Objection to form, to the
24 word "signing off," vague, calls for a legal

Page 113

1 conclusion.
2          THE WITNESS:  I would push it up to the
3 director of Regulatory Affairs, yes, for their
4 review.
5 BY MR. BOGLE:
6      Q    But ultimately on many of the threshold
7 requests -- strike that.
8          On the threshold request approvals, the
9 DRA, the regulatory individual, and yourself or
10 somebody you designated at your distribution
11 center, would sign off on those threshold
12 increases for anything that went out of New
13 Castle, right?
14         MR. COLLINS:  Objection to the use of
15 the term "sign off."  Form.
16         THE WITNESS:  I wanted to make clear if
17 I sign off, it's to go to the director of
18 Regulatory Affairs.  That's what "sign off" meant
19 to me.
20 BY MR. BOGLE:
21     Q    But your authority had to matter too,
22 right?  You would sign -- literally sign those
23 forms too, right?
24         MR. COLLINS:  Objection.  Form,

Page 114

1 foundation.
2        THE WITNESS:  I would sign off to
3 proceed to send it to the director of Regulatory
4 Affairs --
5 BY MR. BOGLE:
6    Q    And if --
7    A    -- and ask for their expertise.
8    Q    And if you thought that, based on your
9 expertise and review, that a threshold increase
10 was not appropriate, you would not put your
11 signature on that, would you?
12    A    Not necessarily.
13    Q    Well, would you sign threshold
14 increase -- to approve threshold increases in
15 situations where you felt that was not
16 appropriate?
17        MR. COLLINS:  Objection to the term
18 "approve."
19        THE WITNESS:  I would send it up to the
20 correct -- the director of Regulatory Affairs for
21 their expertise.
22 BY MR. BOGLE:
23    Q    Okay.  But you would actually sign these
24 forms too, right?

Page 115

1    A    Yes.
2    Q    Okay.  And so in signing that form, that
3 requires you to literally put your signature on
4 the page approving that request, right?
5        MR. COLLINS:  Objection.
6 BY MR. BOGLE:
7    Q    From your perspective.
8        MR. COLLINS:  Objection.
9 Mischaracterization.  It's been asked and
10 answered.
11        THE WITNESS:  From my perspective, it
12 was clear I was submitting it to the director of
13 Regulatory Affairs so they could review it and do
14 the proper due diligence on usually a Level II.
15 BY MR. BOGLE:
16    Q    So if we see your signature on any
17 threshold increase requests under the approval
18 section, we should not interpret that to mean that
19 you were approving anything.  Is that your
20 testimony?
21    A    I'm approving it to go to the director
22 of Regulatory Affairs for their perusal, and then
23 they have to approve -- I can't do it on my own.
24 I cannot increase a threshold.

Page 116

1    Q    But if you had concerns about a
2 threshold being increased, you certainly had the
3 authority and ability to raise that objection,
4 correct?
5    A    I would raise that objection.
6    Q    And if you had an objection, you
7 wouldn't sign the threshold increase form, would
8 you?
9    A    From -- if I knew something, that I
10 would let the director of Regulatory Affairs know.
11    Q    Right.  And you wouldn't sign a
12 threshold increase approval form if you had such
13 concerns, right?
14    A    I would not.
15    Q    Right.  Going back to the slide deck in
16 Exhibit 4, on the same page, it says "Reducing
17 orders to customers" is the next bullet point.  Do
18 you see that?
19    A    Yes.
20    Q    And that was part of establishing
21 this -- these thresholds was an effort to try to
22 reduce the overall purchases of these four
23 specific products, right?
24        MR. COLLINS:  Objection.  Calls for a

Page 117

1 legal conclusion, foundation.
2        THE WITNESS:  It was to make sure
3 they're going to the right customers.
4 BY MR. BOGLE:
5    Q    Right.  And the last reference here says
6 "Documentation and reporting to DEA."  Do you see
7 that?
8    A    Yes.
9    Q    Meaning if you've got a suspicious order
10 you've identified, you report it, correct?
11        MR. COLLINS:  Objection.  Calls for a
12 legal conclusion.  Form.
13        THE WITNESS:  Yes.
14 BY MR. BOGLE:
15    Q    Okay.  And -- strike that.
16        (Snider Exhibit No. 6 was marked
17        for identification.)
18 BY MR. BOGLE:
19    Q    I'm going to hand you -- I'm marking as
20 Exhibit 1.1333, Exhibit 6 to your deposition.
21        Do you see this is a copy of the
22 Lifestyle Drug Monitoring Program?  Do you see
23 that?
24    A    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    Q   Okay.  You've seen this document before,
2  right?
3    A   Yes, I have.
4    Q   Okay.  And this is the document you
5  would utilize when you were conducting due
6  diligence during the 2007 into 2008 time frame,
7  right?
8    A   It was the MOM -- we called it the MOM
9  or the SOPs, standard operating procedures, and it
10  was McKesson's operation manual.
11    Q   Right.  And this is what you had to
12  comply with when you were conducting due diligence
13  as it related to, for example, oxycodone and
14  hydrocodone during the '07 into '08 time frame,
15  right?
16       MR. COLLINS:  Objection to form.
17       THE WITNESS:  I believe so, yes.
18  BY MR. BOGLE:
19    Q   Okay.  And if you look at the first
20  page, in the middle, the four drugs are listed
21  there that the 8,000 unit threshold would be
22  applied to.
23       Do you see that?
24    A   Yes.

Page 119

1    Q   Okay.  So it says there above those four
2  drug listings:  "This reporting process is
3  targeting controlled substances that the DEA
4  considers lifestyle drugs.  These drugs are highly
5  abused and are commonly found in illegal internet
6  pharmacies.  Currently the controlled substances
7  being monitored by these reports are," and it
8  lists the four.
9       The first of the two is oxycodone, the
10  second is hydrocodone, correct?
11    A   Yes.
12    Q   And if you go down a little further on
13  that page, you see where it says "Daily Dosage
14  Summary Report"?
15    A   Yes.
16    Q   Okay.  It says:  "This report will
17  summarize customers who have purchased quantities
18  of all products containing the identified base
19  code in excess of the threshold for the item."
20       Do you see that?
21    A   Yes.
22    Q   Okay.  So that sentence in and of itself
23  indicates that the 8,000 unit threshold was not a
24  hard stop, meaning that in a given month a

Page 120

1  customer could order more than 8,000 without
2  having their orders blocked, right?
3       MR. COLLINS:  Objection.  Form, vague.
4       THE WITNESS:  I'm not sure.  If you
5  could rephrase that.
6  BY MR. BOGLE:
7    Q   Well, as it indicates in this sentence,
8  this Daily Dosage Summary Report was used to
9  identify customers who had already ordered more
10  than 8,000 units, right?
11    A   Yes.
12    Q   Okay.  Meaning if you've already ordered
13  more than 8,000, you've already exceeded the
14  established threshold, right?
15    A   Yes.
16    Q   And it says:  "For example, all sales
17  and credits of McKesson items containing
18  hydrocodone will be added together and reported if
19  the total doses exceed 8,000 unit.  The daily
20  report will systemically be sent via e-mail to the
21  DCM" -- what does DCM stand for?
22    A   Distribution center manager.
23    Q   And that was you; is that right?
24    A   Yes.

Page 121

1    Q   Okay.  Director of operations is another
2  way to say distribution center manager.  Those are
3  used interchangeably at McKesson, right?
4    A   Yes.
5    Q   -- "and their -- their designee, Sales
6  Management, and regulatory department.  It will be
7  the DCM's responsibility to review and act on the
8  reports according to the processes listed below."
9       Do you see that?
10    A   Yes.
11    Q   And again, that's you.  The DCM for New
12  Castle, that's you, right?
13    A   Yes.
14    Q   Okay.  And then you talked a little bit
15  before about Level I reviews.
16       Do you remember talking about that
17  generally with me?
18    A   Yes.
19    Q   Okay.  And Level I reviews will be
20  triggered when a customer exceeded this 8,000 unit
21  threshold, right?
22    A   Not necessarily.
23    Q   Okay.  What would be triggered then?
24    A   We were -- at the distribution center in

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1  New Castle, we had a goal to go through all
2  independent pharmacies and do a Level I review,
3  part of "know your customer."
4      So starting then, we would schedule all
5  the customers, sometimes prioritizing these, but
6  we would try to get a Level I review with every
7  independent customer that we serviced.
8      Q   Okay.  But my question was more specific
9  to you.  If a customer appears on this Daily
10 Dosage Summary Report as being over 8,000 units,
11 for example, for oxycodone or hydrocodone, that
12 would trigger a Level I review, right?  That was
13 the SOP?
14     MR. COLLINS:  Objection to the form.
15     THE WITNESS:  Not necessarily.
16 Sometimes we already had one.
17 BY MR. BOGLE:
18     Q   Okay.  So if you already had one and
19 they appeared on a subsequent report, you would
20 not redo the Level I review; is that your
21 testimony?
22     MR. COLLINS:  Objection.
23 Mischaracterization.
24     THE WITNESS:  I don't know specifically

Page 123

1  which customer you're talking about, but sometimes
2  we would ask for a Level II.
3  BY MR. BOGLE:
4      Q   Yeah, I'm just asking about the general
5  procedures followed at New Castle.  I'm not
6  talking about any specific customer right now.
7      A   Oh, I'm sorry, I completely
8  misunderstood your question then.
9      Q   I'm saying --
10     A   If you could start over.
11     Q   Yeah.  If a customer shows up on this
12 Daily Dosage Summary Report, while the lifestyle
13 drug management program was in place, that, under
14 the standard operating procedure here, would
15 trigger automatically a Level I review, correct?
16     MR. COLLINS:  Objection.  Form.
17     THE WITNESS:  I don't know that.  I
18 would have to read through it again.  It's been 10
19 or 12 years.
20 BY MR. BOGLE:
21     Q   As you sit here today, you don't know
22 either way.  Is that your testimony?
23     A   Yes.
24     Q   Okay.  And let's look at Level I review.

Page 124

1  It's on page .2, the next page.
2      Under 1.1, it says:  "If the customer
3  appears on a previous month's report for the same
4  item," and then it kind of gives you some -- some
5  criteria to evaluate, right?  Below that.
6      A   I'd have to look.  If I could -- could I
7  look?
8      Q   Sure.  I'm just talking about 1.1 right
9  now.
10     A   (Peruses document.)
11     Okay.  What was your question?
12     Q   Yeah.  I'm just kind of orienting you at
13 this point.  You said you wanted to look at it, so
14 I didn't really have one.  I was trying to orient
15 you to where we were at.
16     A   Okay.
17     Q   Okay.  So below that, it says:
18 "Evaluate the customer's purchases relative to the
19 past three months' purchases.  The evaluation
20 should include, but not necessarily be limited to,
21 the following criteria," and then below that there
22 are five bullet points.
23     Do you see that?
24     A   Yes, I do.

Page 125

1      Q   Okay.  Now, these five bullet points, is
2  that the criteria that you would apply in doing a
3  Level I review?
4      A   Yes, at that time.
5      Q   Were there any other criteria that you
6  applied that are not listed here?
7      A   I don't -- there were more.  Yes.
8      Q   Yeah, so what -- what other criteria
9  would you apply during this time period?
10     A   I remember looking for red flags.  If
11 there were people -- out-of-state licenses in the
12 parking lot, we would look for that.  We were
13 trained if there wasn't any signage on the
14 building, that that was a red flag.  We were asked
15 about internet pharmacies, because that was a red
16 flag that usually would push it up to Level II.
17 And we looked at just lines of pharmacies.  And
18 then we would get sales data and look at that.  I
19 believe three months of sales data.
20     Q   Okay.  And the red flags that you refer
21 to here -- actually, strike that.  We'll get to
22 that in a minute.
23     You would also have responsibility as
24 the distribution center manager or director of

Page 126

1 operations for doing site examinations and
2 interviews with the customer under the Level II
3 phase as well, right?
4    A    Not usually, no.
5    Q    You have no role in that process?
6    A    Not that I recall.
7    Q    Okay.  You're saying that's just
8 regulatory that would do that, right?
9    A    Usually regulatory, yes.
10    Q    Now, there's also a Level III identified
11 here under the Lifestyle Drug Monitoring Program.
12 And I looked during the period of time the
13 documents that were produced for customers of New
14 Castle and Level III reviews.  I could not find
15 any.
16        That's -- there were actually no
17 Level III reviews done under the Lifestyle Drug
18 Monitoring Program for New Castle customers, were
19 there?
20        MR. COLLINS:  Objection.  Assumes facts
21 not in evidence.
22        THE WITNESS:  I don't know that.
23 BY MR. BOGLE:
24    Q    Okay.  So, again, assuming that all the

Page 127

1 documents that need to be produced have been
2 produced here, me not finding any, you would agree
3 with me, is indicative of the fact that there were
4 no Level III reviews done during this time period,
5 were there?
6        MR. COLLINS:  Objection.  Assumes facts
7 not in evidence.
8        THE WITNESS:  I can't agree with that.
9 BY MR. BOGLE:
10    Q    You don't know one way or the other; is
11 that true?
12    A    I don't recall a Level III right now,
13 no.
14    Q    You can't recall as you sit here any
15 specific Level III reviews that were done, can
16 you?
17    A    What period of time, please?
18    Q    2007 to 2003 under the LDMP.
19    A    Not that I remember, no.
20    Q    Now, let's talk about for a few minutes
21 the Controlled Substances Monitoring Program.
22 That went into effect in 2008, right?
23    A    I believe so, yes.
24    Q    Okay.  And there was a separate

Page 128

1 threshold system applied under the CSMP, right,
2 different than the LDMP?
3    A    I believe so, yes.
4    Q    Okay.  And that system for existing
5 customers was based on looking at the last six
6 months of sales data for controlled substances,
7 taking the highest months of sales during that
8 period and adding 10 percent to it, and that was
9 the threshold, right?
10        MR. COLLINS:  Objection.  Form.
11        THE WITNESS:  I don't know specifically
12 about the 10 percent, but I do know it was based
13 on sales.
14 BY MR. BOGLE:
15    Q    Okay.  Any reason to disagree that that
16 was the process employed?
17        MR. COLLINS:  Objection.  The question
18 is vague.
19        THE WITNESS:  I don't know.
20 BY MR. BOGLE:
21    Q    You don't know?
22        Did you ever -- so you would have to
23 review threshold request increases.  Those came to
24 you and -- both you and the regulatory individual

Page 129

1 responsible for New Castle, right?
2    A    Yes.
3    Q    Okay.  So when you were reviewing those,
4 you had no concept of how the threshold was set to
5 begin with?
6        MR. COLLINS:  Objection.  Form,
7 argumentative.
8        THE WITNESS:  I said I don't remember.
9 I don't remember that it was 10 percent.  It
10 doesn't state that in what I remember.  I'm sorry.
11 BY MR. BOGLE:
12    Q    Let's talk about how threshold increases
13 were dealt with under the CSMP.  Let's start in
14 2008 when the program was launched.
15        From 2008 to present, in order to
16 increase a threshold, a customer had to document a
17 legitimate business reason for increasing that
18 threshold, right?
19    A    They had to give us a reason or the DRA,
20 national accounts, et cetera.
21    Q    But there was a specific requirement
22 that the business reason needed to be documented,
23 right?
24    A    It should be.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    Q   Okay.  For example, if a customer tells
2  you that their business is increasing without
3  providing any documentation to support that and to
4  support that increase is legitimate, the threshold
5  increase should not be approved, should it?
6        MR. COLLINS:  Objection.  Calls for a
7  legal conclusion and form.
8        THE WITNESS:  They would usually supply
9  data for that salesperson or the DRA to push it up
10  the line.
11  BY MR. BOGLE:
12    Q   Okay.  My question was simply that if a
13  customer doesn't provide data to support both the
14  business increases occurring and that it's
15  legitimate, then a threshold increase should not
16  be approved under the CSMP, right?
17        MR. COLLINS:  Objection.  Incomplete
18  hypothetical, form.
19        THE WITNESS:  That data wasn't always
20  supplied to me.  It would be supplied to the DRA
21  who approved.
22        MR. BOGLE:  Move to strike as
23  nonresponsive.
24  BY MR. BOGLE:

Page 131

1    Q   I'm just asking about the process.
2  So --
3    A   I'm sorry, I misunderstood.
4    Q   Yeah.  So when an increase is requested,
5  the increase needs to be documented and justified
6  with supporting documentation showing the reason
7  for the increase and that it's legitimate, right?
8        MR. COLLINS:  Objection.  Calls for a
9  legal conclusion.  Form.  Incomplete hypothetical.
10        THE WITNESS:  Can you repeat the
11  question?  I'm sorry.
12  BY MR. BOGLE:
13    Q   Sure.  Well, I'll rephrase it to help
14  you out here.
15        So if a customer under the CSMP requests
16  a threshold increase based on increased business,
17  they have to supply documentary support for that
18  request, true?
19    A   Yes, a legitimate reason for the
20  increase.
21    Q   Right.  They can't simply say, My
22  business is increasing, and you guys take their
23  word for it and increase the thresholds, right?
24  That would not be appropriate under the protocols.

Page 132

1        MR. COLLINS:  Objection to the form.
2        THE WITNESS:  I would not always know
3  what the increase was, like in national accounts,
4  but they would supply that.
5        MR. BOGLE:  Move to strike as
6  nonresponsive.
7  BY MR. BOGLE:
8    Q   So my question is simply --
9    A   I didn't understand.
10    Q   -- a customer saying, My business is
11  increasing, without any documentary support, is
12  not a legitimate reason under the CSMP to increase
13  a threshold, true?
14        MR. COLLINS:  Objection to the use of
15  the legalese, "legitimate," so it calls for a
16  legal conclusion.  Incomplete hypothetical.
17        THE WITNESS:  Can you repeat the
18  question again?  I'm sorry.
19  BY MR. BOGLE:
20    Q   Sure.  A customer saying that their
21  business is increasing, without documentary
22  support for that increase, does not provide a
23  legitimate reason to increase the threshold under
24  the CSMP, true?

Page 133

1        MR. COLLINS:  CS -- same objections.
2        THE WITNESS:  I would not -- I would not
3  provide an increase for that.
4  BY MR. BOGLE:
5    Q   Okay.  Because that would not be
6  appropriate under the Controlled Substances
7  Monitoring Program, right?
8    A   It wouldn't be my job to do that.  It
9  would be the DRA's.
10    Q   My question simply is -- I mean you have
11  an understanding of the Controlled Substances
12  Monitoring Program, right?  You sign off on
13  threshold increases, true?
14        MR. COLLINS:  Objection.  We've been
15  over this.  Asked and answered,
16  mischaracterization of his prior testimony.
17        THE WITNESS:  I send them up to the DRA
18  so they can do the due diligence, which we do.
19  BY MR. BOGLE:
20    Q   I'm going to hand you what I'm marking
21  as Exhibit 1.1679, also Exhibit 7.
22        (Snider Exhibit No. 7 was marked
23        for identification.)
24  BY MR. BOGLE:

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    Q   Are you familiar with Dave Gustin?
2    A   Yes.
3    Q   Okay.  He was in the regulatory
4 department at McKesson, right?
5    A   Yes.
6    Q   Okay.  I want to take a look at page .2
7 here, the second page.
8        MR. COLLINS: I'm sorry.  If you need to
9 take more time to review it to familiarize
10 yourself with the document, please do.
11 BY MR. BOGLE:
12   Q   There's an e-mail from Dave Gustin,
13 looking at the bottom e-mail on that page, from
14 April 15, 2011, to a big group of people.  Do you
15 see that?
16   A   I see it, yes.
17   Q   Okay.  He says there in that e-mail:
18 "My contribution to today's call centers around
19 how we, through the CSMP, will meet the
20 expectations of the program itself and, more
21 urgently, the DEA under the terms of the agreement
22 of May '08.  The expectation is that we know our
23 customer and their customers too, at least to the
24 point where we are seeing and responding to any

Page 135

1 diversion that may be taking place, if not
2 preventing it up front."
3        Do you see that?
4    A   Yes.
5    Q   Okay.  And he wrote this, by the way, in
6 an e-mail, April 15, 2011.  Do you see that?
7 That's the date of the e-mail?
8        MR. COLLINS: Objection.  Foundation.
9        THE WITNESS: Yes.
10 BY MR. BOGLE:
11   Q   Okay.  And then it goes on in the next
12 paragraph -- you see where it says "What I
13 believe" in the second sentence?
14       It says:  "What I believe needs to be
15 tightened up are the follow-up visits to our
16 accounts that have undergone significant changes
17 in their controls purchases in either volume or
18 percentage.  We also need to tighten up the
19 process regarding granting increases.  We have
20 gotten to a point where a certain percentage of
21 increase are almost automatic, and we are too
22 easily accepting of reasons like," quote/unquote,
23 "business increase for raising thresholds by small
24 amounts.  The SOP says clearly that this is not an

Page 136

1 acceptable reason unless sales data supports it."
2        Do you see that?
3    A   Yes.
4    Q   And you agree that granting threshold
5 increases based on business increases without
6 supporting data is not appropriate under the
7 Controlled Substances Monitoring Program, right?
8        MR. COLLINS: Objection.  Form,
9 incomplete hypothetical.
10       THE WITNESS: I believe exactly what
11 he's saying here.
12 BY MR. BOGLE:
13   Q   Okay.  So you agree with that statement,
14 what I just read about --
15   A   I agree that Dave said it to -- to that
16 group, yes.
17   Q   Do you think that's an accurate
18 statement?
19   A   I can't testify --
20   Q   That the SOP says clearly it's not an
21 acceptable reason for business increase unless
22 data supports it?
23   A   Yes.
24   Q   Okay.  I'm also going to hand you what

Page 137

1 I'm marking as 1.795, Exhibit 8 to your
2 deposition.
3        (Snider Exhibit No. 8 was marked
4        for identification.)
5 BY MR. BOGLE:
6    Q   So this is a PowerPoint deck titled
7 "McKesson's Controlled Substances Monitoring
8 Program," and the metadata indicates this is from
9 2015.
10       Do you see that title there?
11   A   I'm sorry, what's the date, please?
12   Q   It doesn't have one on the document.
13 I'm saying the data as provided to us indicated
14 it's 2015.
15       MR. COLLINS: Objection.  Foundation.
16       THE WITNESS: Okay.
17 BY MR. BOGLE:
18   Q   Do you see the title of the document --
19   A   Yes.
20   Q   -- "McKesson's Controlled Substances
21 Monitoring Program"?
22   A   Yes.
23   Q   Did you ever receive training materials
24 like this on the Controlled Substances Monitoring

Highly Confidential – Subject to Further Confidentiality Review

Page 138

1 Program to tell you how to implement your portions
2 of it?
3     A    We received training, yes.
4     Q    Okay.  If you go to page .37 in this
5 PowerPoint deck.  It's titled "General Principles
6 for Threshold Increases," and in the middle, there
7 is a bubble that says "Approved Threshold
8 Increases."
9         Do you see that?
10     A    Yes.
11     Q    And around it, it says "Customer
12 Generated Request."  That -- that's a general
13 principle surrounding threshold increases is that
14 they should be customer generated, right?
15         MR. COLLINS:  Objection.  Form.
16         THE WITNESS:  Okay.
17 BY MR. BOGLE:
18     Q    Is that your understanding?
19         MR. COLLINS:  Objection.
20 Mischaracterization.
21         THE WITNESS:  Okay.
22         MR. COLLINS:  Foundation.
23 BY MR. BOGLE:
24     Q    Do you understand that to be the case?

Page 139

1         MR. COLLINS:  Objection.  The question
2 is vague.
3 BY MR. BOGLE:
4     Q    Is that threshold increases should be
5 customer generated?
6     A    Yes.
7     Q    Okay.  Threshold increases should also
8 be for a legitimate business justification, right?
9         MR. COLLINS:  Objection.  Vague.
10         THE WITNESS:  Yes.
11 BY MR. BOGLE:
12     Q    Threshold increases should be made only
13 after the appropriate level of diligence, right?
14         MR. COLLINS:  Objection.  Calls for a
15 legal conclusion.
16         THE WITNESS:  Yes.
17 BY MR. BOGLE:
18     Q    And threshold increases should be well
19 documented, right?
20     A    Yes.
21     Q    Okay.  And that's been true the entire
22 time the threshold increase system has been in
23 place at McKesson, right?
24         MR. COLLINS:  Objection.

Page 140

1 BY MR. BOGLE:
2     Q    Those principles?
3         MR. COLLINS:  Objection to the form.
4         THE WITNESS:  I don't know.  I know this
5 was the -- you said, what date was this?
6 BY MR. BOGLE:
7     Q    The document is from 2015.
8     A    Yeah, I don't know if I've ever seen
9 this.  It was directed to the DRAs.
10     Q    Okay.
11     A    But we documented thresholds whenever we
12 went to it, and then after that, the thresholds
13 were only increased by the DRAs, and it was an
14 automated system.  So I couldn't do it just
15 myself.
16     Q    And that started just in the last couple
17 years, right?
18         MR. COLLINS:  Objection.  Vague.
19         THE WITNESS:  I don't remember exactly.
20 '13?
21 BY MR. BOGLE:
22     Q    It's a recent change, right?
23         MR. COLLINS:  Objection.  Vague.
24         THE WITNESS:  Well, it depends on what

Page 141

1 you call recent.  It's been a while that we've had
2 it that way.
3 BY MR. BOGLE:
4     Q    These general --
5     A    After the lifestyle drugs, then the DRA
6 automatically has to approve and get the
7 documentation.
8     Q    These general principles for threshold
9 increases that we've reviewed, the
10 well-documented, customer-generated, legitimate
11 business justification, appropriate level of
12 diligence, any of those principles that you think
13 should not have been followed since the launch of
14 the CSMP in 2008?  Any of those principles you
15 think that are not appropriate, don't matter?
16         MR. COLLINS:  Objection.  The question
17 is confusing, compound, vague.
18         THE WITNESS:  Those are the general
19 principles.
20 BY MR. BOGLE:
21     Q    Okay.  And have always been, right?
22     A    I can't answer to that.
23     Q    You don't know?
24     A    I don't know.

Page 142

1    Q   And when a threshold increase is
2 requested, there's a form that has to be
3 completed, right?
4    A   Yes.  A form or a SharePoint site.
5    Q   Okay.  And the SharePoint site, there's
6 dropboxes that you complete and documentation that
7 is attached, right?
8    A   That's what I recall.
9    Q   Okay.  And those forms or the SharePoint
10 information is supposed to be completed at the
11 time the threshold request is made, not at some
12 time thereafter, right?
13       MR. COLLINS:  Objection.  Vague.
14       THE WITNESS:  It could be after the
15 request, because they were doing the due
16 diligence.  So I can't honestly say I put one in
17 if I thought there was more due diligence to be
18 done.
19 BY MR. BOGLE:
20    Q   Okay.  But it would not be appropriate
21 to increase a threshold, supply product to a
22 customer before a threshold request increase form
23 had been completed, true?
24       MR. COLLINS:  Objection.  The question

Page 143

1 is vague.
2       THE WITNESS:  Well, from 2000 to 2006,
3 we usually reported those, but we already shipped
4 them.  I didn't get the report till afterwards.
5 After the lifestyle drugs, it was more proactive
6 in that I could get the data and send it to them
7 electronically for them to review and then
8 approve.  So it may take some time.
9 BY MR. BOGLE:
10    Q   Let me make sure that my question is
11 clear.
12       From 2008 on, under the Controlled
13 Substances Monitoring Program when a threshold
14 increase was requested, the drug should not be
15 shipped under that increased amount without a
16 form -- threshold increase form having already
17 been completed, true?
18    A   Yes.
19    Q   Okay.  You mentioned red flags from a
20 due diligence perspective a moment ago, and I want
21 to ask you something about that.  One sort of red
22 flag aspect of the McKesson system has been
23 setting the threshold number, whether it be 8,000
24 under the Lifestyle Drug Monitoring Program or

Page 144

1 based on the last six months of sales, that's been
2 a red flag -- if you go above that number, that's
3 a red flag that requires due diligence, right?
4    A   Well, we didn't call that a red flag.
5 By red flags, I meant customers that we did
6 Level I visits on.
7    Q   Okay.  But do you consider a customer
8 going over their threshold number a red flag that
9 requires due diligence?
10    A   Can you define "red flag"?
11    Q   How would you define it?  You used the
12 term earlier in the deposition.
13    A   But I used it in the context of Level I,
14 red flags to know your customer.  So when we did
15 the visit, we would make sure they met all the
16 criteria, et cetera.
17    Q   Okay.  So would you consider a customer
18 exceeding their threshold for hydrocodone or
19 oxycodone as being something that requires due
20 diligence to assess whether that was legitimate
21 for them to do so?
22       MR. COLLINS:  Objection.  Form, vague,
23 and calls for a legal conclusion.
24       THE WITNESS:  Yes, there would be some

Page 145

1 kind of due diligence.
2 BY MR. BOGLE:
3    Q   And another mechanism that's been
4 employed more recently at McKesson to assess red
5 flags for customers is looking at the percentage
6 of controlled substances a customer purchases
7 versus their overall prescription purchases,
8 right?
9    A   Yes, the DRAs do the -- some analysis.
10 There is a lot of data-driven analysis that's
11 evolved, and I know Izzy and those guys do a good
12 job of that.
13    Q   And that's not something that was done
14 until the 2014, 2015 time frame, right, doing that
15 sort of analysis?
16       MR. COLLINS:  Objection.  Vague.
17       THE WITNESS:  I don't know.  If they did
18 it in 2008 or not, I don't know -- I don't know
19 that.
20 BY MR. BOGLE:
21    Q   That's an important metric, though, to
22 look at to assess whether a customer's orders are
23 suspicious or not is to look at whether the
24 percentages of controlled substances versus

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1  overall purchases exceeds a normal level, right?
2       MR. COLLINS: Objection. Vague, calls
3  for a legal conclusion.
4       THE WITNESS: And that's what the DRAs
5  did.
6  BY MR. BOGLE:
7    Q   I'm asking whether you think that's
8  something that's useful.
9       MR. COLLINS: Objection. Asked and
10 answered, form.
11      THE WITNESS: The DRAs found it very
12 useful, I'm sure.
13 BY MR. BOGLE:
14   Q   And another mechanism that can be
15 utilized is to look at the percentage of
16 controlled substances by category, meaning what
17 percentages the oxycodone purchases are over their
18 overall prescriptions, right? You've heard of
19 that too?
20      MR. COLLINS: Objection. Form,
21 speculation, vague.
22 BY MR. BOGLE:
23   Q   You've heard of that concept?
24   A   I've heard of that.

Page 147

1    Q   Okay. And from the 2008 to 2013 time
2  frame, that's not something, to your
3  understanding, that was utilized at McKesson,
4  using those sort of percentages of controlled
5  versus overall purchases and looking at specific
6  percentages of controlled purchases for drugs,
7  right?
8       MR. COLLINS: Objection. Form, vague,
9  compound.
10      THE WITNESS: My understanding was it
11 probably was used. That's my recollection.
12 BY MR. BOGLE:
13   Q   Okay. Did you ever look at any kind of
14 data or ask for any data like that?
15   A   Yes.
16   Q   You did?
17   A   Yes.
18   Q   Okay. In the 2008 to 2013 time frame?
19   A   I can't recall specifically.
20   Q   Okay. And we looked earlier at the
21 PowerPoint slide deck from 2007 for Mr. Walker
22 where the DEA indicated that 5,000 dosage units
23 was average. Do you recall that reference for
24 controlled substances?

Page 148

1    A   No, I don't, but --
2    Q   Okay. You want to go back and look at
3  it?
4    A   Yeah.
5    Q   It's 1.1830, Exhibit 4. It's the one
6  that looks like this (indicating) on the front.
7  Yep. And so it was specifically page .4.
8       And it's under "DEA Expects," and it
9  talks about 5,000 dose units is average,
10 quote/unquote. Do you see that?
11   A   I see that.
12   Q   Okay. And at points after 2007, the
13 DEA did provide information to McKesson about
14 controlled substances averages so that McKesson
15 could utilize that in their due diligence
16 processes, right?
17      MR. COLLINS: Objection. Lack of
18 foundation, calls for speculation.
19      THE WITNESS: I'm sorry --
20      MR. COLLINS: Calls for a legal
21 conclusion.
22      THE WITNESS: I'm sorry, I don't recall
23 that. Did --
24 BY MR. BOGLE:

Page 149

1    Q   Okay. I'm going to hand you what I'm
2  marking as Exhibit 1.1568, as Exhibit 9.
3       (Snider Exhibit No. 9 was marked
4        for identification.)
5  BY MR. BOGLE:
6    Q   Okay. Do you see here this is titled
7  "Understand ARCOS Data"? Do you see that?
8    A   Yes.
9    Q   Okay. Below that, it says, and this is
10 a point later in time than the 2007 reference we
11 looked at: "According to the DEA's 2012 ARCOS
12 data, the following are a few commonly abused
13 drugs with the annual average -- averages number
14 of dosage units purchased by a retail pharmacy for
15 each of the following drugs."
16      And then you see there is hydrocodone,
17 oxycodone, methadone, morphine, hydromorphone and
18 oxymorphone.
19      Do you see those listed?
20   A   Yes.
21   Q   And then there is an annual average
22 provided for each. Do you see that?
23   A   I see the numbers, yes.
24   Q   Okay. And then there's a reference

Highly Confidential - Subject to Further Confidentiality Review

---

Page 150

1 below that says: "Diversion can occur in
2 purchases below the DEA national averages."
3        Do you see that?
4    A   I see that.
5    Q   Okay.  And if you go to the next page of
6 this document, it says: "McKesson Regional
7 Statistical Norms."  Do you see that?
8    A   Yes.
9    Q   Okay.  And I want to look at your
10 region, which is under the Northeast.  Do you see
11 that for New Castle there under Northeast?
12    A   Yes.
13    Q   And it says total prescription
14 percentage of which controlled substances should
15 be, the norm is 19 percent in your region.
16        Have you seen that number before?
17        MR. COLLINS: Objection. Lack of
18 foundation.
19        THE WITNESS: No.
20 BY MR. BOGLE:
21    Q   You've never seen that reference before?
22    A   No.
23    Q   Okay.  Then it lists out the norms for
24 various other controlled substances specifically.

---

Page 151

1 Do you see that?
2        MR. COLLINS: Objection. Lack of
3 foundation.
4        THE WITNESS: What is a norm?  I'm not
5 sure.  You'll have to help me with this.
6 BY MR. BOGLE:
7    Q   Well, the document is titled "McKesson
8 Regional Statistical Norms."  Do you see that?
9    A   Yes.
10        MR. COLLINS: Objection. There's been
11 no testimony this witness has any firsthand
12 knowledge of this document.  Lack of foundation.
13 BY MR. BOGLE:
14    Q   So for oxycodone, it says --
15        MR. COLLINS: I'm sorry.  Please let me
16 finish my objection.
17 BY MR. BOGLE:
18    Q   -- 5 percent of the total prescriptions
19 for oxycodone is a regional statistical norm for
20 your region.  Do you see that?
21        MR. COLLINS: Objection. Lack of
22 foundation.  No firsthand knowledge has been
23 established this witness has any knowledge of this
24 document.

---

Page 152

1        THE WITNESS: It says, "Percent of
2 total, plus or minus .25 percent."  I see that.
3 BY MR. BOGLE:
4    Q   Right.  And it's 5 percent listed there
5 of oxycodone.  The 5 percent of oxycodone -- 5
6 percent of the total purchases is the regional
7 norm for oxycodone in your region.  Do you see
8 that?
9        MR. COLLINS: Objection. Lack of
10 foundation.
11        THE WITNESS: I'm sorry, I don't
12 understand the regional norm that you're saying.
13 BY MR. BOGLE:
14    Q   Have they ever shown this document to
15 you?
16    A   I don't remember seeing this.
17    Q   McKesson?  Anybody?  So nobody has ever
18 talked to you about what the regional norms are
19 for your -- the region that your distribution
20 center covers --
21        MR. COLLINS: Objection --
22 BY MR. BOGLE:
23    Q   -- for these controlled substances?
24        MR. COLLINS: Objection.  The question

---

Page 153

1 is compound and argumentative.
2        THE WITNESS: No, I've never seen the
3 Northeast for all these DCs:  Boston, New Castle,
4 Rockhill, Buffalo.
5 BY MR. BOGLE:
6    Q   Okay.  You see this is an internal
7 McKesson document, right?
8        MR. COLLINS: Objection.  Lack of
9 foundation.
10 BY MR. BOGLE:
11    Q   It says "McKesson" on it.
12    A   I don't -- I don't have any knowledge.
13    Q   It's got a Bates stamp produced from
14 defense counsel for McKesson, coming from
15 McKesson's files.  Do you see that?
16        MR. COLLINS: Objection.  If you're
17 testifying to that, that's fine.  He doesn't have
18 any knowledge of that.
19 BY MR. BOGLE:
20    Q   Do you see that?
21    A   I'm sorry.  Can you --
22    Q   First of all, McKesson, you see that?
23        MR. BOGLE: Can we highlight that?
24        THE WITNESS: I think I'll testify that

---

Page 154

1 I've never seen this document before.
2 BY MR. BOGLE:
3    Q   Yeah, I'm just asking.
4        So the annual data from 2012, the ARCOS
5 data, the averages, nobody has ever told you about
6 that -- those numbers either?
7    A   I've never seen this document.
8    Q   Outside of this document, anybody ever
9 talk to you about what the averages are nationally
10 for any of these drugs?
11   A   No, not nationally.
12   Q   No. Or regionally?
13   A   No.
14       MR. COLLINS: Objection to the word
15 "regionally."
16 BY MR. BOGLE:
17   Q   When you're out there conducting reviews
18 of customers, your due diligence component of --
19 of your job, you would agree with me that
20 assessing whether the customer has significant
21 business coming from pain clinics is relevant in
22 assessing whether to increase an opioid threshold,
23 right?
24       MR. COLLINS: Objection. Form,

Page 155

1 foundation.
2        THE WITNESS: I would assess all aspects
3 of the customer.
4 BY MR. BOGLE:
5    Q   Right. And specifically, whether they
6 do substantial business with pain clinics is
7 relevant to consider whether to increase an opioid
8 threshold, right?
9    A   I'm not sure.
10   Q   You don't know whether that's a red
11 flag?
12   A   Yes, if it's over. But I've seen
13 customers supply to pain clinics and they aren't
14 over the threshold.
15   Q   Okay. So I'm talking about increasing a
16 customer's threshold. You would agree with me
17 that one thing to look for that would be a
18 potential red flag is doing substantial business
19 with a pain clinic. Right?
20       MR. COLLINS: Objection. Form, the
21 question is vague.
22       THE WITNESS: It would be a red flag
23 only if it exceeded the thresholds by large
24 amounts and they couldn't substantiate it. And it

Page 156

1 would also depend on the era that we're talking
2 about. I don't know if I -- 2000 to 2006, I
3 would -- I would necessarily know that.
4 BY MR. BOGLE:
5    Q   Okay. Well, let me hand you what I'm
6 marking as Exhibit 1.1829, Exhibit 10.
7        (Snider Exhibit No. 10 was marked
8        for identification.)
9        MR. COLLINS: Thank you.
10 BY MR. BOGLE:
11   Q   You see here this is a letter from a law
12 firm, Hyman, Phelps and McNamara, April 25, 2007.
13 Do you see that?
14   A   Yes.
15       MR. COLLINS: Objection. Lack of
16 foundation.
17 BY MR. BOGLE:
18   Q   And they're sending this to Linden
19 Barber, Associate Chief Counsel for the DEA. Do
20 you see that?
21   A   Yes.
22   Q   Okay. And if you look at this letter,
23 specifically page .3, number 5 says: "The
24 McKesson DC management or regulatory staff, where

Page 157

1 appropriate, will conduct a further review to
2 verify information provided by its customers. For
3 example, if a pharmacy claims that it is receiving
4 increased prescriptions from a pain clinic,
5 McKesson will attempt to verify such information
6 with the clinic as well as request further
7 documentation that the clinic is issuing
8 prescriptions in the course of legitimate medical
9 practice."
10       Do you see that?
11   A   Yes.
12   Q   Do you see the statement was provided to
13 the DEA in April 25, 2007?
14       MR. COLLINS: Objection.
15 BY MR. BOGLE:
16   Q   Do you see that's the date?
17       MR. COLLINS: Objection. Lack of
18 foundation. This witness hasn't testified he has
19 any knowledge of this letter, nor to establish
20 that.
21       THE WITNESS: I have no knowledge of
22 this. I can't testify -- only to what it says
23 here on the document.
24 BY MR. BOGLE:

Highly Confidential – Subject to Further Confidentiality Review

Page 158

1 Q That's where we're starting. I'm going
2 from there.
3 A Okay.
4 Q So that's what it says, right?
5 A I'm sorry, you asked me if it was
6 supplied to the DEA or to -- from the DEA. I
7 don't know that.
8 Q We know this letter was written to the
9 DEA, to Chief Counsel of the DEA. That's what it
10 says, right?
11 MR. COLLINS: Objection. You haven't
12 established that.
13 THE WITNESS: I don't know.
14 BY MR. BOGLE:
15 Q Okay. Well, let's establish that. By
16 facsimile confirmation by mail, a copy by mail,
17 "Linden Barber, Associate Chief Counsel, Diversion
18 and Regulatory Litigation Section, Drug
19 Enforcement Administration."
20 Do you see that?
21 A I see that.
22 Q Okay, thank you.
23 Now, going back to the sentence that I
24 read to you --

Page 159

1 MR. COLLINS: I'm sorry, that hasn't
2 established anything.
3 BY MR. BOGLE:
4 Q -- did anyone tell you in --
5 MR. COLLINS: I'm sorry, let me --
6 MR. BOGLE: I'm asking a question.
7 BY MR. BOGLE:
8 Q Did anyone tell you in 2007 --
9 MR. COLLINS: I'm sorry, I need -- let
10 me finish my objection, please.
11 BY MR. BOGLE:
12 Q Did anyone tell you in 2007 that part of
13 your responsibilities as DC management included
14 when a customer requested a threshold increase, to
15 assess whether they have significant business from
16 a pain clinic and to verify the legitimacy of that
17 business? Did anyone ever tell you to do that?
18 MR. COLLINS: Objection. The question
19 is compound in multiple ways. So it's vague.
20 THE WITNESS: I don't recall
21 specifically, but the director of Regulatory
22 Affairs would in fact get that information.
23 BY MR. BOGLE:
24 Q It says -- let's go back to number 5.

Page 160

1 "The McKesson DC management or regulatory staff,"
2 we'll start with that. Do you see that?
3 A Yeah, I don't know what this document
4 even is. I have to apologize.
5 Q I'm asking you a question. Okay. Just
6 listen to my question.
7 A Okay.
8 Q When McKesson DC management or
9 regulatory staff -- so DC management, that's you,
10 right?
11 MR. COLLINS: Objection. You haven't
12 established this witness has any firsthand
13 knowledge of this document.
14 MR. BOGLE: That's the whole purpose is
15 that if he doesn't, that's a big problem.
16 MR. COLLINS: The witness has already
17 testified, and you're testifying as to what the
18 contents are. Typically it goes question and
19 answer where you elicit information from a
20 witness.
21 MR. BOGLE: You're -- you're -- you're
22 not even objecting. You're just talking.
23 MR. COLLINS: No, no, because you're
24 ignoring the objection. The witness has no

Page 161

1 firsthand knowledge about the document.
2 BY MR. BOGLE:
3 Q "For example, if the pharmacy claims it
4 is receiving increased prescriptions from a pain
5 clinic, McKesson will attempt to verify such
6 information with the clinic as well as request
7 further documentation that the clinic is issuing
8 prescriptions in the course of legitimate medical
9 practice."
10 Do you see that sentence?
11 A I see it.
12 Q That's something that you and the
13 regulatory staff should have been doing when
14 assessing threshold increases for your customers,
15 true?
16 MR. COLLINS: Objection. Lack of
17 foundation, lack of establishing the witness's
18 firsthand knowledge of this document or the
19 question or the foundation for it.
20 THE WITNESS: I don't know this document
21 at all. I'm sorry.
22 BY MR. BOGLE:
23 Q Is that -- is that something that you
24 should have been doing?

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    MR. COLLINS: Objection. Form.
2    THE WITNESS: Not in 2000 to 2006, and
3  the DRAs did that, I'm sure.
4  BY MR. BOGLE:
5    Q   What about from 2007 on?
6    A   The DRAs did that.
7    Q   Okay. So nobody ever told you --
8  because DC management is also referenced here,
9  nobody ever told you you had any role in that
10  process?
11    A   I did the Level Is and I did the
12  threshold increases. It was handled by the DRA
13  whether it was approved or not. I couldn't do it
14  on my own unilater -- unilateral.
15    Q   So is it your testimony that for New
16  Castle at least after 2007, that this assessment
17  that's talked about in this sentence I read to you
18  was actually done for the New Castle customers?
19    A   As part of the SOP, I believe it was
20  done by the DRA, yes.
21    Q   Okay. Your testimony is it was done for
22  New Castle customers.
23    A   For the -- yes, by the DRA.
24    Q   Okay. Have you reviewed the Controlled

Page 163

1  Substances Monitoring Program that was -- that has
2  been in place since 2008, the various versions of
3  it?
4    MR. COLLINS: Objection. Vague.
5    THE WITNESS: Yes.
6  BY MR. BOGLE:
7    Q   Have you read the SOPs itself?
8    A   Yes.
9    Q   Okay. And you know starting in 2015 the
10  Controlled Substances Monitoring Program included
11  a specific section talking about red flags, right?
12    A   I don't recall that. If you could show
13  me, I would be more inclined to remember.
14    Q   All right.
15    MR. BOGLE: What number are we on?
16    MR. COLLINS: 11, I think.
17    (Snider Exhibit No. 11 was marked
18      for identification.)
19    MR. COLLINS: Are you okay?
20    THE WITNESS: Yeah.
21  BY MR. BOGLE:
22    Q   All right. I'm handing you Exhibit 11,
23  which is also Exhibit 1.1146. This is titled
24  "McKesson CSMP Red Flags, May 2015."

Page 164

1    Do you recall ever seeing this portion
2  of the Controlled Substances Monitoring Program?
3    A   I do recall.
4    Q   You do?
5    A   Yes.
6    Q   Okay. And I want to look at a couple of
7  aspects of this here. Under that, it says:
8  "McKesson CSMP has identified certain,"
9  quote/unquote, "red flags that are indicators or
10  areas of possible concern regarding shipments of
11  controlled substances. Additionally, the red
12  flags discussed herein are not intended to be all
13  inclusive as they can change over time depending
14  on a variety of factors, e.g., new regulations,
15  new drugs coming to market or advancements of
16  technology."
17    Do you see that?
18    A   Yes.
19    Q   In the second paragraph, the last
20  sentence, it says: "Nevertheless, it is important
21  that when red flags are identified, they are
22  reviewed to ensure appropriate due diligence."
23    Do you see that?
24    A   Yes.

Page 165

1    Q   Okay. And below that, it says: "This
2  document is designed to separate red flags into
3  two categories. The first section, apparent red
4  flags, list those that are readily identifiable."
5    Do you see that?
6    A   Yes.
7    Q   Okay. I want to look at a couple of
8  those. Section 1 says "Apparent red flags." Do
9  you see that section?
10    A   Yes.
11    Q   It says: "Below is a list of examples
12  of the more readily identifiable red flags. These
13  do not require expertise or extensive analysis in
14  order to identify them."
15    Do you see where I read that?
16    A   Yes.
17    Q   Okay. And if you go to page .3, this is
18  under the section "Responses in the customer
19  questionnaire," do you see letter M says: "The
20  pharmacy's primary business model involves filling
21  prescriptions for or dispensing directly to pain
22  clinics."
23    Do you see that?
24    A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    Q   Okay.  So that's identified as one of
2  the apparent red flags, right?
3    A   Yes.
4    Q   Okay.  And that's something, quite
5  frankly, that as we saw back in 2007, was already
6  identified as a red flag of something McKesson
7  should be concerned about, right?
8    A   Yes.  I believe it said internet
9  pharmacy on the Level I questionnaire.
10   Q   Okay.  I'm talking -- this talks about
11 pain clinics.  Do you see that, though?
12   A   Oh, yes.
13   Q   Okay.  And business with pain clinics
14 has long been identified as a potential red flag
15 at McKesson, right?
16       MR. COLLINS:  Objection.  Vague.  Form.
17       THE WITNESS:  At least that's down here,
18 yes.
19 BY MR. BOGLE:
20   Q   At least as 2007, the document we saw
21 that was sent by counsel for McKesson to the DEA
22 identified this as something that was going to be
23 investigated back in 2007, right?
24       MR. COLLINS:  Objection.  Assumes facts

Page 167

1  not in evidence.  The witness has no firsthand
2  knowledge of that letter, as we've already
3  established.
4        THE WITNESS:  I don't have any knowledge
5  of that.
6  BY MR. BOGLE:
7    Q   Do you have any reason to think that the
8  primary business model involving filling
9  prescriptions for or dispensing directly to pain
10 clinics is a red flag that could not have been
11 identified prior to 2015?
12       MR. COLLINS:  Objection.  The question
13 is compound, it's vague.
14       THE WITNESS:  I have no reason to
15 believe.
16 BY MR. BOGLE:
17   Q   Okay.  Let's look at Q.  It says:  "The
18 pharmacy's business model centers on controlled
19 substances where the pharmacy is planning to
20 expand its controlled substance business."
21       Do you see that?
22   A   Yes.
23   Q   That's a common sense red flag, right?
24 That makes logical sense.

Page 168

1        MR. COLLINS:  Objection.  Form.
2  Compound.
3        And I'm sorry, is that a question?
4        MR. BOGLE:  Yeah.
5  BY MR. BOGLE:
6    Q   Does that make common sense to you that
7  that would be a red flag?
8    A   That would be --
9        MR. COLLINS:  Objection.  Vague.
10       THE WITNESS:  That would be something I
11 would look at or the DRA would look at.
12 BY MR. BOGLE:
13   Q   Okay.  Because that's a potential red
14 flag, right?
15       MR. COLLINS:  Objection to form.
16 BY MR. BOGLE:
17   Q   Yes or no, sir?
18   A   Okay.  Yes.
19   Q   Section 2 -- I'm on page .4 now -- talks
20 about detailed red flags.  And under
21 "Nonstatistical red flags," the first is
22 geographic location.  Do you see that?
23   A   Yes.
24   Q   And it says under A there:  "The

Page 169

1  pharmacy located in a geographic area known or
2  suspecting -- suspected of having higher than
3  normal prescription drug diversion or level of
4  prescribing.  This would include areas where
5  diversion schemes are known to be centrally
6  located."
7        Do you see that?
8    A   Yes.
9    Q   Do you think that makes sense as a
10 common sense red flag?
11       MR. COLLINS:  Objection.  Vague.  Form.
12       THE WITNESS:  It would make sense to me.
13 BY MR. BOGLE:
14   Q   Okay.  Let's go to under number 2.  Do
15 you see where it says "Pharmacy's business model"
16 on that page?
17   A   Yes.
18   Q   And then on the next page, continuing
19 that section, letter D says:  "There is a pain
20 clinic located inside of or is part of the
21 pharmacy."
22       Do you see that?
23   A   Yes.
24   Q   Do you think that's a common sense red

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 flag?

2     A    It would be something to look at, yes.

3     Q    Okay.  Number 3 says: "Governmental

4 information/inquiry."  Letter A says:

5 "Inquiry/subpoena by government agency regarding

6 customer."

7         Do you see that?

8         MR. COLLINS:  Objection.  Vague.

9 BY MR. BOGLE:

10    Q    Do you -- do you agree that's a common

11 sense red flag for McKesson?

12        MR. COLLINS:  Objection.  Vague as to

13 time frame.

14        THE WITNESS:  It's something to inquire,

15 I agree with that.

16 BY MR. BOGLE:

17    Q    And that's something if you got a

18 subpoena from a governmental agency regarding your

19 customer and their dispensing of opioids back in

20 2008, that would be a red flag too, right?

21        MR. COLLINS:  Objection.  Vague.  Form.

22        THE WITNESS:  If I -- if I got the

23 subpoena?

24 BY MR. BOGLE:

Page 171

1     Q    Yeah.

2     A    Yes, that's something I would know and

3 look at.

4     Q    Okay.  Number 4 says: "Integrity

5 concerns," and specifically under E, it says:

6 "Discipline of any pharmacy employee by a state

7 licensing authority or other regulatory agency

8 within the past 10 years."

9         Do you see that?

10    A    Yeah -- yes.

11    Q    And at all times that you've been

12 director of operations at New Castle, that would

13 be a common sense red flag to be investigated,

14 right?

15        MR. COLLINS:  Objection.  Form.

16        THE WITNESS:  I remember I didn't know

17 that until the internet searches, probably 2006 or

18 '7.

19 BY MR. BOGLE:

20    Q    Okay.  So starting in 2006, 2007, to you

21 going forward, that would be a common sense red

22 flag if you saw that, that needed investigating,

23 right?

24    A    Yes.

Page 172

1     Q    And then the last couple I want to do

2 here, and then we can take a -- a break if you

3 need to.

4         Number 5 on page .6, talks about other

5 distributors.  Do you see that?

6     A    Yes.

7     Q    And A, it says: "Pharmacy purchases

8 controlled substances from other distributors."

9         Do you see that?

10    A    Yes.

11    Q    Okay.  Is that something that you would

12 investigate when evaluating a customer's opioid

13 purchases going back even to 2006 to present?

14        MR. COLLINS:  Objection.  Form.  Vague.

15        THE WITNESS:  I couldn't always

16 investigate, but it would be something I think

17 they ask on the questionnaire.  And then later on,

18 now we have software that's involved that we

19 can -- I think the DEA has provided that, that we

20 can see all of the wholesaler purchases.  So the

21 DRA can take a look at that.  I'm not privy to

22 that, but the DRAs know that information.

23 BY MR. BOGLE:

24    Q    But that's the sort of information that

Page 173

1 would be useful to know, especially when trying to

2 decide whether to increase the threshold for

3 opioids, right?

4         MR. COLLINS:  Objection to the form.

5 The question is vague, incomplete.

6         THE WITNESS:  Okay.  I'm sorry, can you

7 repeat the --

8 BY MR. BOGLE:

9     Q    Sure.

10        Whether the pharmacy purchases from

11 multiple distributors would at all times be

12 something that would be important for McKesson to

13 know when considering whether to increase a

14 threshold for opioids, for example?

15        MR. COLLINS:  Objection to the form, the

16 use of --

17 BY MR. BOGLE:

18    Q    Do they buy opioids from another

19 distributor?

20        MR. COLLINS:  Objection to the question

21 to the extent it references "at all times."

22        THE WITNESS:  I would like to know that.

23 BY MR. BOGLE:

24    Q    All right.  B says: "Other distributors

Page 174

1 have restricted or ceased selling controls to the
2 customer or potential customer in the past five
3 years."
4        Do you see that?
5    A   Yes.
6    Q   And again, from the period of time that
7 you started as director of operations in 2000 to
8 present, that's something you think is reasonable
9 for McKesson to want to know, right?
10       MR. COLLINS: Objection to the form,
11 compound, calls for a legal conclusion.
12       THE WITNESS: I'd like to know why.
13 BY MR. BOGLE:
14   Q   Okay. But you can't know why unless you
15 know if, right?
16       MR. COLLINS: Objection. The question
17 is vague.
18       THE WITNESS: That's vague to me. Can
19 you restate that, please?
20 BY MR. BOGLE:
21   Q   Yeah. You can't ask why if you don't
22 know whether it's happened, right?
23       MR. COLLINS: Same objection.
24       THE WITNESS: Okay. I'm not sure --

Page 175

1 BY MR. BOGLE:
2    Q   Do you agree with that premise?
3        MR. COLLINS: The question doesn't make
4 any sense. Objection to form.
5 BY MR. BOGLE:
6    Q   You can't ask why another distributor
7 cut off or restricted or ceased selling controls
8 to a customer unless you've asked whether that
9 actually has occurred, right?
10   A   Yes.
11   Q   Okay. And then the last one under
12 "Statistical red flags," under A, and this is what
13 we looked at a minute ago, it says: "A customer's
14 control/Rx ratio, when compared to similar
15 customers serviced by the same distribution
16 center seems unusually high. As a benchmark, DEA
17 has previously stated that an average retailer
18 pharmacy's controls/prescription ratio is
19 approximately 20 to 25 percent."
20       Do you see that?
21   A   Yes.
22   Q   I think you said earlier that's not a
23 concept that you were familiar with before today,
24 right?

Page 176

1        MR. COLLINS: Objection. Form.
2        THE WITNESS: I don't remember
3 testifying to that.
4 BY MR. BOGLE:
5    Q   Okay. We looked at the DEA document
6 where they provided these kind of averages.
7        MR. COLLINS: Objection. Lack of
8 foundation.
9        THE WITNESS: I'm not sure that I
10 testified to that.
11 BY MR. BOGLE:
12   Q   Okay. Well, is this something you're
13 familiar with prior to today?
14   A   Yes.
15   Q   Okay. And do you agree that that's a
16 reasonable red flag that requires further due
17 diligence?
18       MR. COLLINS: Objection. The question
19 is vague as to time frame.
20       THE WITNESS: Yes. I agree that when
21 that data became available, that that was a part
22 of the due diligence.
23 BY MR. BOGLE:
24   Q   Well, it's always been available.

Page 177

1 McKesson just never asked for it until the last
2 few years, right?
3        MR. COLLINS: Objection.
4 Mischaracterization.
5        THE WITNESS: I don't agree with that.
6 BY MR. BOGLE:
7    Q   Okay. So are you saying McKesson was
8 unable to, say, for example, in 2009, ask for the
9 complete dispensing data from a -- from a customer
10 and then run the numbers?
11   A   I don't know that.
12   Q   Okay. Have you ever asked a customer
13 for complete dispensing data so an analysis could
14 be done as to how much of those purchases were
15 controlled substances?
16   A   Between what years, please?
17   Q   2008 to 2013.
18   A   Have I?
19   Q   Sure.
20   A   No. That's usually the DRA.
21   Q   Have you ever seen a DRA do it during
22 that five-year time frame for a New Castle
23 customer?
24   A   What five years?

Page 178

1    Q   2008 to 2013.
2    A   Yes.
3    Q   You've seen them do this specific
4  analysis?
5    A   Yes.
6    Q   Okay.  So you know it can be done.
7    A   Yes.
8    Q   Okay.  And it's a reasonable analysis to
9  conduct, right?
10      MR. COLLINS:  Objection.  Vague, form.
11      THE WITNESS:  If you can, I think it
12  would be a good idea.
13      MR. BOGLE:  Yeah.  Let me look real
14  quick.  I think -- yeah.  We can take a break now
15  is good.
16      MR. COLLINS:  Yep.
17      THE VIDEOGRAPHER:  The time is
18  11:14 a.m.  We're going off the record.
19      (Recess.)
20      THE VIDEOGRAPHER:  The time is 11:29
21  a.m., and we're back on the record.
22  BY MR. BOGLE:
23    Q   All right.  Mr. Snider, the -- your New
24  Castle Distribution Center is in -- located in

Page 179

1  Pennsylvania, right?
2    A   Yes.
3    Q   Okay.  But you guys service customers
4  outside of the state of Pennsylvania, correct?
5    A   Yeah -- oh, yes.
6    Q   For example, you service customers in
7  Ohio, right?
8    A   Yes.
9    Q   You service customers in West Virginia,
10  right?
11    A   Yes.
12    Q   Okay.  And we talked a little bit about
13  the opioid epidemic earlier in your deposition,
14  but you understand that West Virginia is one of
15  the states that's been hit hardest by the opioid
16  epidemic, right?
17    A   Yes.
18    Q   And In fact, there have been
19  congressional investigations into McKesson's
20  conduct specific to pharmacies supplied in West
21  Virginia.
22      Do you understand that?
23      MR. COLLINS:  Objection.  Form.
24      THE WITNESS:  I don't know that.  I'm

Page 180

1  sorry.
2  BY MR. BOGLE:
3    Q   Okay.  You've never been told that?
4    A   No.
5    Q   Okay.
6      (Snider Exhibit No. 12 was marked
7      for identification.)
8  BY MR. BOGLE:
9    Q   I'm going to hand you 1.44, Exhibit 12
10  to your deposition.
11      Okay.  This is noted at the top to be
12  from the House of Representatives, Congress of the
13  United States, February 15, 2008.  Do you see
14  that?
15    A   Yes.
16    Q   Okay.  And it's a letter sent to
17  Mr. John Hammergren.  That's the CEO of McKesson,
18  right?
19      MR. COLLINS:  Objection.  Lack of
20  foundation.
21      THE WITNESS:  Yes.
22  BY MR. BOGLE:
23    Q   Do you see where it's -- he's noted to
24  be the recipient, "Dear Mr. Hammergren"?

Page 181

1    A   I would think he got it.
2      MR. COLLINS:  Objection.
3  BY MR. BOGLE:
4    Q   Do you see that this was designed to be
5  sent to him, right?
6      MR. COLLINS:  Objection.  The witness
7  has no firsthand knowledge.
8      THE WITNESS:  I don't know anything
9  about this document, so I can't answer to that.
10  BY MR. BOGLE:
11    Q   All right.  But you see it says, "Dear
12  Mr. Hammergren," right?  Do you see that on the
13  first page?
14    A   Yeah, I see that.
15    Q   You see that?
16    A   Yeah.
17    Q   Okay.  And so if you look at the first
18  page of this document, it says in the second
19  paragraph, "As part of our investigation."  Do you
20  see that?
21    A   Yes.
22    Q   It says:  "As part of our investigation,
23  the Committee wrote to you on May 8, 2017,
24  regarding your distribution practices generally,

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 and in particular with respect to West Virginia.
2 As we mentioned in the letter, the opioid epidemic
3 has been particularly devastating to West
4 Virginia. For example, in 2015, West Virginia had
5 the highest opioid overdose death rate in the
6 nation."
7        And then it goes on, the last sentence
8 in that paragraph says: "Court filings also
9 indicate that between 2007 and 2012, McKesson
10 distributed 46,179,600 doses of hydrocodone and
11 54,304,980 doses of oxycodone, meaning that
12 McKesson shipped a total of 100,484,580 doses to
13 West Virginia during this time period."
14        Have you ever seen that kind of data
15 talking about the number of hydrocodone and
16 oxycodone pills McKesson distributed to West
17 Virginia during this time frame?
18     A    No, I haven't.
19     Q    Okay. You know that a fair amount of
20 those pills that are being referenced here came
21 from your distribution center, right?
22        MR. COLLINS: Objection. Lack of
23 foundation. Lack of firsthand knowledge.
24        THE WITNESS: I don't know that.

Page 183

1 BY MR. BOGLE:
2     Q    Okay. Well, you know from 2007 to 2012
3 that -- that the New Castle Distribution Center
4 was sending hydrocodone and oxycodone to
5 pharmacies in West Virginia, right?
6     A    Yes.
7     Q    Okay. So, therefore, you must present
8 some of this number coming from New Castle, right?
9        MR. COLLINS: Objection. The question
10 is vague.
11        THE WITNESS: If I could answer that,
12 the DEA has done audits on us. We've never been
13 found to do anything wrong. New Castle has an
14 exemplary record.
15        MR. BOGLE: Move to strike as
16 nonresponsive.
17 BY MR. BOGLE:
18     Q    My question simply was, of these 100
19 million plus doses referenced here, you know that
20 a portion of those came from your distribution
21 center --
22        MR. COLLINS: Objection.
23 BY MR. BOGLE:
24     Q    -- during this time frame, correct?

Page 184

1        MR. COLLINS: The question was asked and
2 answered last -- a moment ago.
3 BY MR. BOGLE:
4     Q    Correct?
5        MR. COLLINS: Same -- same objection.
6 Asked and answered.
7        THE WITNESS: A -- a portion probably
8 did.
9 BY MR. BOGLE:
10     Q    Well, you know they did, right? From
11 2007 to 2012, you know that the New Castle
12 Distribution Center was servicing West Virginia
13 pharmacies, right? So it has to be part of this
14 number, true?
15        MR. COLLINS: Objection.
16 BY MR. BOGLE:
17     Q    You know that.
18        MR. COLLINS: Objection. The question
19 is compound three different ways. It's
20 argumentative. It's been asked and answered.
21 BY MR. BOGLE:
22     Q    You know that, don't you?
23        MR. COLLINS: Objection. Form.
24        THE WITNESS: I've never seen this

Page 185

1 document. And we do have customers in West
2 Virginia.
3 BY MR. BOGLE:
4     Q    Okay. But you know that -- okay. I
5 think the document speaks for itself.
6        Now, specifically in West Virginia,
7 Mace's is one of the pharmacies that New Castle
8 has serviced over time, right?
9     A    I believe so.
10     Q    Okay. You recall we saw Mace's Pharmacy
11 referenced in that 2007 chart which indicated them
12 exceeding their thresholds in opioids in November
13 2007. Do you recall discussing that?
14        MR. COLLINS: Objection.
15 Mischaracterization, lack of foundation, lack of
16 knowledge.
17        THE WITNESS: I do recall seeing the
18 document. I believe Mace's was on it.
19 BY MR. BOGLE:
20     Q    Okay. Now, at your distribution center
21 for the conduct that occurred prior to McKesson
22 switching over to SharePoint, you actually have
23 hard copy files for many of the pharmacies that
24 you serviced, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1      MR. COLLINS: Objection. The question
2  is vague. In multiple ways it's vague.
3      THE WITNESS: We have Level I visits
4  documented. I believe I sent that data in.
5  BY MR. BOGLE:
6    Q   As well as threshold request increases
7  prior to you guys going to SharePoint, right?
8    A   Yes.
9    Q   Okay. In addition, you've got any
10 documentation that was sent to you by the pharmacy
11 to review the Level Is or threshold request
12 increases during that time frame, right?
13     MR. COLLINS: Objection. The question
14 is vague.
15     THE WITNESS: I don't know that.
16 BY MR. BOGLE:
17   Q   Okay. Well, you keep -- you tried to
18 keep a complete file during that time frame,
19 right?
20     MR. COLLINS: Objection. The question
21 is vague.
22     THE WITNESS: What's complete?
23 BY MR. BOGLE:
24   Q   You tell me.

Page 187

1      MR. COLLINS: Wait a second.
2  BY MR. BOGLE:
3    Q   You try to keep everything that a
4  customer gives you to support any threshold
5  increase that you would have approved, right?
6      MR. COLLINS: Same objection. The
7  question is vague as to time frame. Are you
8  talking about present possession of documents?
9      THE WITNESS: E-mails or phone calls, I
10 couldn't -- I couldn't tell you.
11 BY MR. BOGLE:
12   Q   Okay. But we can agree that from the
13 time period when the CSMP was implemented in 2008
14 until you guys went to SharePoint, which I believe
15 was sometime in 2010, during that two or so year
16 window, there's hard copy files kept of due
17 diligence related documents at New Castle for your
18 customers, right?
19     MR. COLLINS: Objection. Assumes facts
20 not in evidence.
21     THE WITNESS: I don't have those files
22 anymore, no.
23 BY MR. BOGLE:
24   Q   You turned them over for this

Page 188

1  litigation, though, didn't you?
2    A   Yes.
3    Q   Okay. All right. I'm going to hand
4  you -- marking as Exhibit 13, also Exhibit 1.1824.
5      (Snider Exhibit No. 13 was marked
6      for identification.)
7  BY MR. BOGLE:
8    Q   Okay. And you see this is a document;
9  the first page entitled "Mace's Pharmacy"; do you
10 see that?
11   A   Yes.
12   Q   Okay. Thereafter, this is all provided
13 to us as one document.
14     Does this look like your file from
15 Mace's Pharmacy for 2008 to 2010?
16     MR. COLLINS: Objection.
17     THE WITNESS: I don't know all of it.
18 BY MR. BOGLE:
19   Q   You don't -- excuse me?
20   A   I don't know all of it. I haven't seen
21 it yet.
22   Q   Okay. Let's take a look at it.
23   A   I'd have to go through them.
24   Q   Okay. Let's take a look at it. First

Page 189

1  of all, if you go to page .11, do you see there's
2  a pharmacy questionnaire there dated June 4, '07?
3  Do you see that?
4    A   Yes.
5    Q   Okay. And you see you actually signed
6  off on this questionnaire. You're the third
7  signature down --
8      MR. COLLINS: Objection.
9  BY MR. BOGLE:
10   Q   -- right?
11     MR. COLLINS: Objection to the term
12 "signed off."
13 BY MR. BOGLE:
14   Q   Is that your signature, "Blaine Snider,
15 DO"?
16   A   Yes.
17   Q   Okay. So this is obviously something
18 you've seen before, right, this questionnaire for
19 this pharmacy?
20   A   Yes.
21   Q   Okay. And if you go to the next
22 page .12, number 8 on the questionnaire asks:
23 "How many prescriptions for the following products
24 does the pharmacy fill on a daily basis?"

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    And the information conveyed for
2  hydrocodone was 15 and oxycodone .41, and then
3  it's noted, "Less than half a person, OxyContin
4  only."
5    Do you see those two?
6    A    Yes.
7    Q    Okay.  And you recall that pretty
8  quickly after this questionnaire was completed in
9  June 2007, you specifically had concerns about
10 whether Mace's was diverting opioids, correct?
11   A    I don't remember.
12   Q    Okay.  Well, let's take a like at
13 page .49 in this document.
14   I'm looking at the e-mail on the bottom
15 of this page that carries over to the next page.
16 It's from you, October 9, 2007, to a Jim
17 Gavatorta, cc Brian Ferreira.
18   Do you see that?
19   A    Yes.
20   Q    Entitled "Mace's Hydrocodone."
21   A    Yes.
22   Q    Okay.  And who is -- who is Jim
23 Gavatorta?  What did he do?
24   A    He was the executive salesperson.

Page 191

1    Q    Okay.  And Brian Ferreira, I think you
2  said was vice president/general manager?
3    A    Yes.
4    Q    What sort of oversight did Brian
5  Ferreira provide for you?
6    A    He was in charge of the distribution
7  center over all the operations, my boss, and Jim
8  reported to him directly.
9    Q    Reported to him, you said?
10   A    Yeah.
11   Q    Okay.  All right.  Let's go to the next
12 page for the substance of the e-mail.
13   You say:  "Jim, let me know re Mace's.
14 Could be a good candidate for a Level II,"
15 question mark.  "They, 868673, had 10,764 doses of
16 hydrocodone in July.  In August it was 27,716,
17 possibly due to duplicate T&T orders.  The account
18 still had 26,464 doses in September.  Can you look
19 into?  This customer and Town & Country are the
20 only two retail accounts that have over 20,000
21 doses in any of the lifestyle drugs this month."
22   Do you see that?
23   A    Yes.
24   Q    Okay.  And Mace's was a -- is a pharmacy

Page 192

1  in West Virginia, right, just so we're clear?
2    A    Yes.
3    Q    Okay.  And what ended up happening
4  thereafter is another visit and another
5  questionnaire was completed in December 2007
6  related to Mace's, right?
7    MR. COLLINS:  Objection.  Lack of
8  foundation.
9  BY MR. BOGLE:
10   Q    To investigate your concerns here.
11   MR. COLLINS:  Objection.  Lack of
12 foundation.
13   THE WITNESS:  I'm sorry, I'd have to
14 look through it.
15 BY MR. BOGLE:
16   Q    Okay.
17   A    You want me to do that?
18   Q    We're going to go there.  I'm just
19 asking your recollection first.
20   But, actually, before we go there, this
21 e-mail was sent October 9, 2007, and references
22 purchases from July, August, and September of 2007
23 for hydrocodone, right?
24   MR. COLLINS:  Objection.  Form.

Page 193

1  BY MR. BOGLE:
2    Q    That's what you say.
3    A    Yeah, as part of the Level I to get a
4  three-month purchase report.
5    Q    Right.  And so at this point in time, we
6  can see that for July, August and September of
7  2007, Mace's did end up actually filling more than
8  8,000 doses for hydrocodone, right, based on your
9  e-mail here?
10   A    Okay.  (Peruses document.)
11   I see August, September.  I'm not sure
12 of July, but --
13   Q    July says 10,764 doses.
14   A    Okay.
15   Q    That's your first or your second --
16   A    Oh, yeah, I see that now.  Yep.
17   Q    Okay.  So we can agree at least for
18 those three months in 2007, per your e-mail,
19 you're saying there were more than 8,000 doses of
20 hydrocodone in those months, right?
21   A    I would say yes.
22   Q    Okay.  Let's look at --
23   A    Now, I just want to make clear that
24 trade and travel order, or the T&T, that could be

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1  a duplicate that they returned. You don't know
2  the credit. It's not in here either.
3      Q   But we do know that you don't raise that
4  concern for September, right, in your e-mail?
5  That was only as to August.
6      A   Right. Right.
7      Q   Okay. So let's go to the -- the
8  pharmacy questionnaire from December 2007, which
9  is page .60.
10     And you see here there's "Mace's
11  Pharmacy, December 10, 2007, Pharmacy
12  Questionnaire." Do you see that?
13     A   Yes.
14     Q   And again, your signature appears on
15  this page, right?
16     A   Yes.
17     Q   If we go to the next page, page .61, it
18  says in number 8, which is the same question you
19  asked a few months earlier of them: "How many
20  prescriptions for the following products does the
21  pharmacy fill on a daily basis?"
22     Do you see here they've said, 475
23  prescriptions for hydrocodone; 103 for oxycodone?
24     Right?

Page 195

1      A   Yes.
2      Q   That's what the form indicates.
3      A   Yes.
4      Q   Which is, you would agree with me, a
5  huge increase from what they told you four months
6  earlier in June 2007, right?
7      MR. COLLINS: Objection to the form.
8      THE WITNESS: I wouldn't agree that it's
9  a huge increase unless I knew what kind of
10  business they gained.
11 BY MR. BOGLE:
12     Q   Okay. But we can agree that in
13  June 2007, on page .12, they tell you 15
14  prescriptions of hydrocodone a day and .41 for
15  oxycodone. Right?
16     A   Yes, as I recall.
17     Q   And October the same year, that number
18  has risen to 475 a day for hydrocodone and 103 a
19  day for oxycodone, right? We can agree those are
20  the numbers.
21     A   Yes.
22     Q   All right. Did you investigate what was
23  causing that increase?
24     A   I don't remember.

Page 196

1      Q   Okay.
2      A   Yes, it looks like I sent it -- just
3  from what the documents show, that we did a
4  Level I, a Level II, and then sent that up to the
5  DRA for review, and they took it from there.
6      Q   Okay. My question is, in 2007, did you
7  personally investigate what was causing such a
8  significant increase over a four-month period of
9  time in hydrocodone and oxycodone prescriptions?
10     MR. COLLINS: Objection. Asked and
11  answered.
12     THE WITNESS: I don't remember.
13 BY MR. BOGLE:
14     Q   Okay. And if you do the math, for
15  example, on hydrocodone, at 475 prescriptions a
16  day with an average of 30 pills a prescription, an
17  average of 30 days, that's actually 427,500 doses
18  a month.
19     Do you want to do the math on that?
20     A   No, I don't.
21     Q   Okay. So if you guys are giving them
22  20,000 or so doses a month based on your prior
23  e-mail, how do you explain how they're prescribing
24  this much?

Page 197

1      A   I would have to go through the due
2  diligence that was done here.
3      Q   Okay.
4      A   As you can see, there's quite a bit of
5  documentation on this that we did for them. I
6  don't recall everything, but I'm sure --
7      Q   Wouldn't that raise a red flag --
8      MR. COLLINS: I'm sorry.
9  BY MR. BOGLE:
10     Q   -- that they're using other
11  distributors?
12     MR. COLLINS: I'm sorry. Please let the
13  witness finish his answer before you cut him off.
14  I've let you do that a couple of times. I'm going
15  to insist the witness answer.
16     Finish your answer.
17 BY MR. BOGLE:
18     Q   Go ahead.
19     A   I sent this up to the DRA for review.
20  You can tell that. So I don't know what their
21  result was. I don't know if we cut them off or --
22  or what right now. I would have to go through
23  this.
24     Q   Would that math indicate to you a

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 potential red flag that they're using more
2 distributors than just McKesson for hydrocodone
3 and oxycodone?
4        MR. COLLINS: Objection. Form.
5        THE WITNESS: The increase would cause
6 concern that I would push it up to the DRA.
7 BY MR. BOGLE:
8    Q    Okay. Now, Mace's -- let's take a look
9 at -- find the spot here -- the threshold change
10 request that was submitted December 16th, 2008,
11 which is .63 in this document.
12        MR. COLLINS: Any time you want to
13 review the document, go ahead.
14        THE WITNESS: Okay.
15 BY MR. BOGLE:
16    Q    Okay. You see here this is a threshold
17 change form for Mace's Pharmacy in -- hope I'm
18 pronouncing this correctly -- Philippi, West
19 Virginia.
20        Do you see that?
21    A    Yes.
22    Q    Do you know about how many people live
23 in Philippi, West Virginia?
24    A    I don't.

Page 199

1    Q    Is that something you guys would look at
2 back in 2008 when evaluating a request like this?
3    A    I can't --
4        MR. COLLINS: Object -- objection to the
5 term we -- "you would look at."
6 BY MR. BOGLE:
7    Q    Would you?
8    A    No, I don't know.
9    Q    Okay.
10    A    I can't speculate on that.
11    Q    Okay. So if, for example, the city of
12 Philippi, West Virginia, had fewer than 3,000
13 people in it around this time frame, would that
14 raise concerns to you about how much hydrocodone
15 you're giving this company -- this pharmacy?
16        MR. COLLINS: Objection. Assumes facts
17 not in evidence, lack of foundation.
18        MR. BOGLE: Let's put it into evidence.
19 Exhibit 14, 1.1892.
20        (Snider Exhibit No. 14 was marked
21        for identification.)
22 BY MR. BOGLE:
23    Q    Here is the Census Bureau data for
24 Philippi, West Virginia, from 2010. Do you see

Page 200

1 there's a total population there noted to be 2,966
2 people in 2010?
3        MR. COLLINS: Objection. Lack of
4 foundation. You haven't established this witness
5 has any knowledge of this.
6        MR. BOGLE: I think that's the problem.
7 BY MR. BOGLE:
8    Q    Do you not -- did you not know that?
9    A    I did not --
10        MR. COLLINS: Object --
11        THE WITNESS: Sorry.
12        MR. COLLINS: I'm sorry. Please let me
13 object.
14        Argumentative. Object to the theatrics.
15        THE WITNESS: I did not know there were
16 2,966 people in the Philippi -- is that the whole
17 area or is that just the town?
18 BY MR. BOGLE:
19    Q    It's the city.
20    A    Okay.
21    Q    You didn't know that.
22    A    No.
23    Q    Okay. Let's go back and look at the
24 threshold change form request from December 16,

Page 201

1 '08, for Mace's.
2        Do you see here they're requesting to
3 increase their amount 20 percent for hydrocodone,
4 and their current threshold is set at 34,000 doses
5 a month? Do you see that?
6    A    Yes.
7    Q    Okay. And the reason for change that's
8 given here, it says: "Threshold is set too low
9 for this customer. Their monthly purchases are
10 400,000 a month. We need to increase the
11 hydrocodone family amount by 6800 units."
12        Do you see that?
13    A    Yes.
14    Q    There's no other reason given here for
15 this increase, is there?
16    A    No.
17    Q    Okay. And you, in fact, signed off on
18 this increase, right, under "Approved by DCM
19 Blaine Snider, 12/16/08." That's your signature,
20 right?
21        MR. COLLINS: Objection. The question
22 is compound. I object to the term "signed off."
23 We've gone over and over this again.
24 Mischaracterization of his prior testimony.

Page 202

1  MR. BOGLE: Yeah, I'm sorry. I'll --
2  I'll withdraw the question.
3  BY MR. BOGLE:
4  Q  Do you see where it says "Approved by"
5  on that form?
6  A  Yes.
7  Q  Okay. Who's that below that that's
8  noted?
9  A  Michael Oriente. He's the director of
10 Regulatory Affairs.
11 Q  You skipped your signature, didn't you?
12 A  Oh, I thought you meant who was below my
13 name. I apologize.
14 Q  Your name is there right below "Approved
15 by," isn't it?
16 A  Yep.
17 Q  Okay. That's your signature, true?
18 A  To go up to the DRAs, that was the
19 process.
20 Q  That's your signature, true?
21 MR. COLLINS: Please let the witness
22 finish his answer.
23 THE WITNESS: It's true it was to go up
24 to the DRA. Also there's attachments in here.

Page 203

1  You don't know what that was.
2  BY MR. BOGLE:
3  Q  Oh, I looked at them. I've looked at
4  them.
5  A  Okay.
6  Q  So what's noted here is that you
7  approved these to go -- as you say, to go to
8  Mr. Oriente, right?
9  A  Yes, the --
10 Q  You didn't raise any concerns that this
11 wasn't appropriate, did you?
12 MR. COLLINS: Objection. Argumentative.
13 THE WITNESS: I'm sure I talked to him.
14 BY MR. BOGLE:
15 Q  Did -- ultimately you put your signature
16 on this line under "Approved by," right?
17 A  Yes.
18 Q  Not disagrees with. "Approved by,"
19 right?
20 A  Yes.
21 Q  Okay. So after these concerns are
22 raised by you in 2007, and the subsequent
23 questionnaire was completed in December 2007 that
24 shows a huge spike in hydrocodone and oxycodone

Page 204

1  prescriptions being written, you guys -- you and
2  Mr. Oriente actually approve an additional
3  threshold increase for hydrocodone; is that right?
4  MR. COLLINS: Objection.
5  Mischaracterization, assumes facts not in
6  evidence.
7  You're testifying to that. He has no --
8  he said he has no knowledge of this, and he needs
9  to look at the documents. So --
10 BY MR. BOGLE:
11 Q  Take a look at it. You see your
12 signature?
13 MR. COLLINS: You don't have all the
14 documents here, he just pointed out.
15 BY MR. BOGLE:
16 Q  This is the whole file.
17 A  I keep trying to tell you my signature
18 represents that it went to Michael Oriente, who
19 was the director of Regulatory Affairs, who could
20 look at all the data, make a judgment. Also he
21 could call the customer or he could check with the
22 federal regs or the State Board of Pharmacy.
23 Q  But I believe you told me earlier you
24 wouldn't put your signature on something approving

Page 205

1  a threshold increase request if you thought it was
2  inappropriate, right?
3  A  If I knew it was inappropriate, I
4  wouldn't put it on there.
5  Q  Right. Let's go to page .66 on this
6  document.
7  See this is another threshold change
8  form from January 28, '09, for Mace's, and this
9  pertains to their thresholds for oxycodone, right?
10 A  Yes.
11 Q  Okay. And you see the current threshold
12 is noted to be 13,000 at this point in time,
13 right?
14 A  I'm sorry. Yes.
15 Q  Okay. And there's an increase approved
16 here to increase their oxycodone threshold by
17 20 percent, right?
18 A  I'm sorry, I'm not seeing the 20.
19 Q  See where it says "Increase amount,
20 20 percent"?
21 A  Oh, yes.
22 Q  Okay. And then for reason for change,
23 it says: "Threshold is set too low for this
24 customer. Their monthly purchases are 400,000 a

Page 206

1 month. We need to increase the oxycodone family
2 amount by 2500 units."
3     Right, that's the reason given on this
4 form?
5     A    Yes.
6     Q    Okay. And then there's a different
7 signature on this. It says "BPM," and then
8 there's some -- a signature after that. Do you
9 know who that is?
10     A    Yes. Dale Nusser.
11     Q    I'm sorry?
12     A    Dale Nusser, my -- one of my managers.
13     Q    Okay. So Dale Nusser worked underneath
14 you at your direction, right?
15     A    Yes.
16     Q    Okay. And this indicates it was also
17 approved by Michael Oriente in Regulatory, right?
18     A    Oh, yes.
19     Q    Okay. All right. Let's go to page .80.
20     You see here this is another threshold
21 change form, December 30, 2009, for Mace's. Do
22 you see that?
23     A    Yes.
24     Q    Okay. And at this point 9143 is the

Page 207

1 code. That's for oxycodone, correct?
2     A    I don't remember. I'm sorry.
3     Q    Okay. It says -- well, first of all,
4 you see that under "Reason for requested change,"
5 it says: "Tom Dadisman, pharmacist, has requested
6 an increase of 10 percent on oxycodone due to
7 increased number of prescriptions received per
8 category from local doctors who are changing
9 patients from morphine-based items to oxycodone-
10 based items."
11     Do you see that?
12     A    Yes.
13     Q    Okay. So this would indicate that this
14 is related to oxycodone based on the --
15     A    Yes.
16     Q    -- request, right? Okay.
17     And that's the only information
18 supporting this request that's located here,
19 right?
20     MR. COLLINS: Objection. Form.
21     THE WITNESS: That I can see, yes.
22 BY MR. BOGLE:
23     Q    Okay. And if you see anything else,
24 please let me know.

Page 208

1     A    Okay.
2     Q    This is noted to be a permanent change,
3 right?
4     A    Yes.
5     Q    Increasing their threshold from 17,600
6 doses a month by 10 percent, right?
7     A    Yes.
8     Q    Okay. Submitted by you, right? That's
9 your signature. Right?
10     A    Yes.
11     Q    Okay. And also John Kuczynski of sales
12 and approved by Michael Oriente, right?
13     A    Yes.
14     Q    Okay. Do you see any evidence from
15 around this time frame in December 2009 in this
16 file that you actually got any prescription data
17 to support this?
18     A    I don't know. I'd have to go through
19 it.
20     Q    Yeah.
21     MR. BOGLE: Let's go off the record.
22 You can go through it.
23     MR. COLLINS: No, no, we're going to
24 stay on the record.

Page 209

1     MR. BOGLE: We don't need to stay on the
2 record. If he wants time to look at it, he can,
3 but don't stay on the record. There's no such
4 requirement.
5     MR. COLLINS: Well, listen, to go off
6 the record, you need an agreement. So if you want
7 to have him start leafing through documents, we're
8 staying on the record.
9     MR. BOGLE: Okay. That's fine. We'll
10 do that.
11 BY MR. BOGLE:
12     Q    You can't point me to anything that
13 shows that you requested any prescription data,
14 can you?
15     MR. COLLINS: He just asked to go
16 through documents. You want him to go through
17 documents --
18     MR. BOGLE: He's not going to blow
19 through hours of my time looking at something that
20 he should already be familiar with.
21     MR. COLLINS: Well, no, he -- this isn't
22 a 30(b)(6) deposition.
23     MR. BOGLE: Doesn't have to be.
24     MR. COLLINS: This is in his personal

Page 210

1  capacity. So, listen, if you want him to look
2  through documents, he will do it for you, but it's
3  on your time.
4        Take as much time as you want.
5        THE WITNESS: (Peruses document.)
6  BY MR. BOGLE:
7     Q   We're in December 2009.
8     A   (Peruses document.)
9        On the questionnaire on page .13, Dale
10 reviewed the scripts.
11    Q   .13?
12    A   Yes.
13    Q   So that's from June 2007, right?
14    A   Yes.
15    Q   Okay. We're talking about December
16 2009.
17    A   Oh.
18    Q   And a specific increase that they're
19 saying -- in request in December 2009.
20    A   (Peruses document.)
21    Q   All right. I've got too many documents
22 to go through. I'll strike the question and keep
23 going.
24       Let's look at page .84.

Page 211

1        You see there's another threshold change
2  request. This looks like it's done through
3  SharePoint, 10/28/2010 for oxycodone. Do you see
4  that?
5     A   Yeah, I'm not familiar with these. I
6  don't get these copies like this. This is for the
7  director of Regulatory Affairs. It says
8  "Pharmacy Regulatory Affairs."
9     Q   You guys keep these files in your
10 distribution center, though, don't you?
11    A   I do not.
12    Q   You don't?
13    A   I do not.
14    Q   Okay. That's where it's been
15 represented this came from, but okay.
16    A   It's -- it's on SharePoint.
17    Q   Okay. So supporting information, it
18 says: "Competitor down the street does not order
19 controls, which elevates their business."
20       And the request is for a permanent
21 increase due to business growth of 600 doses for
22 oxycodone for Mace's. Do you see that?
23    A   Yes.
24    Q   Okay. And it shows that, on the next

Page 212

1  page, that request was approved by Dale Nusser,
2  who I think you indicated works for you, and
3  Michael Oriente. Do you see that?
4     A   I see it was approved by Michael
5  Oriente, the director of Regulatory Affairs, and
6  the change was made.
7     Q   Do you see it says "Dale Nusser,
8  approved 10/28/2010" right above that?
9     A   By approved, Dale was one of my
10 managers. He sent it up to the director of
11 Regulatory Affairs so he could run the scripts and
12 the numbers.
13    Q   So he sent it up there 10/28/2010 at
14 3:19 p.m. Three minutes later it was approved by
15 Mr. Oriente. That's what this indicates?
16       MR. COLLINS: Objection. Lack of
17 foundation. Lack of witness's knowledge.
18       THE WITNESS: I -- it may indicate phone
19 calls, conversations and data, especially the
20 script data.
21 BY MR. BOGLE:
22    Q   What this document says is: "DC
23 approval date, Dale Nusser, 10/28/2010, 3:19,"
24 right? That's what the document says.

Page 213

1     A   That's what it says.
2        MR. COLLINS: Objection.
3  BY MR. BOGLE:
4     Q   Okay. And it says approval date for
5  Mr. Oriente, 10/28/2010, 3:22 p.m. That's what
6  the document says, right?
7     A   Yes. It's through SharePoint, so it's
8  an automated system.
9     Q   Right. But it's an automated system
10 that can keep track of time, can't it?
11    A   Yes. But it doesn't keep track of the
12 time that they did the due diligence.
13    Q   Right. Well, it shows that three
14 minutes after this was sent to Mr. Oriente --
15    A   It doesn't show --
16    Q   -- he approved it.
17    A   It doesn't show the time between what
18 Dale did and what Michael did on -- look at the
19 scripts or whatever, it does not show that.
20    Q   What it show is it was sent to
21 Mr. Oriente, and three minutes later he approved
22 it. That's what it shows.
23       MR. COLLINS: Objection.
24 Mischaracterization.

Page 214

1    MR. BOGLE: It's what the document says.
2  The document speaks for itself.
3    MR. COLLINS: Objection.
4  Mischaracterization --
5    MR. BOGLE: You can put whatever you
6  want on top if it, that's what the document says.
7    THE WITNESS: I just want to put on the
8  record that you don't know the due diligence
9  there.
10  BY MR. BOGLE:
11    Q  Right. But the due diligence that --
12  would be in this file, wouldn't it?
13    MR. COLLINS: Objection. The witness
14  has testified --
15  BY MR. BOGLE:
16    Q  And our jury can look at that and decide
17  for themselves, right?
18    A  Not necessarily. Michael --
19    Q  Okay.
20    A  Michael could have done that on the
21  internet, had the scripts. It may not -- it
22  wouldn't be in my file.
23    Q  But you don't have any idea whether he
24  actually did that, do you? You're just saying he

Page 215

1  may have.
2    A  I don't know.
3    Q  Right. What we do know is this was
4  approved, right, 10/28/2010, increasing the
5  oxycodone threshold, right?
6    A  Yes. It says, "Approved, Michael."
7    Q  And the reason for TCR, as noted on
8  page .84, is noted as business growth, right?
9    A  It says: "Competitor down the street
10  does not order controls, which elevates their
11  business." And they -- they were one of our
12  largest customers.
13    Q  Stay with me. "Reason for TCR" --
14    A  Oh, sorry.
15    Q  -- it says "Permanent business growth,"
16  right?
17    A  I was going --
18    MR. COLLINS: It says more than that.
19  I'm sorry.
20  BY MR. BOGLE:
21    Q  It should be supported by corresponding
22  sales increase.
23    A  You aren't telling the whole story.
24  Supporting information is there too.

Page 216

1    Q  For this increase?
2    A  That's important. Yes.
3    Q  That their competitor doesn't sell
4  controls, right?
5    A  Yes.
6    Q  Okay. But it says: "Business growth
7  should be supported by corresponding sales
8  increase." Right? That's what it says.
9    A  It says that also, yes.
10    Q  All right. So that should be somewhere
11  that we can locate, right, that such documentation
12  exists to support that statement, right?
13    MR. COLLINS: Objection. Assumes facts
14  not in evidence. Assumes it's reflected in
15  documents.
16  BY MR. BOGLE:
17    Q  True?
18    A  I don't know that.
19    Q  But we know it should be supported by a
20  corresponding sales increase, right?
21    A  I can't testify to what I don't know.
22    Q  Okay. But you do know, as we talked
23  about before, that when a request is made for a
24  TCR increase based on business growth, you have to

Page 217

1  have supporting documentation for that, right?
2    A  The director of Regulatory Affairs had
3  the supporting documentation, and the program
4  changed 2007 on.
5    MR. BOGLE: Move to strike as
6  nonresponsive.
7  BY MR. BOGLE:
8    Q  My question simply was, under the CSMP,
9  you must have supporting documentation to support
10  a threshold increase based on business growth,
11  true?
12    A  It depends on the era. 2000 to 2006, I
13  did not have supporting document.
14    Q  Okay. What about 10/28/2010, you should
15  have documentation to support that?
16    A  I don't necessarily have it.
17    Q  Okay. That should be in the McKesson
18  file, shouldn't it?
19    A  I don't know.
20    Q  Okay. But you do know the CSMP requires
21  that, right, documentation?
22    A  Not on my file, no.
23    Q  That's not my question, sir.
24    The CSMP requires documentation

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 supporting any change made to a threshold based on
2 business growth, right?
3       MR. COLLINS: Objection. Assumes facts
4 not in evidence.
5 BY MR. BOGLE:
6    Q   We just looked at this a few minutes
7 ago.
8       MR. COLLINS: Objection. Show it to him
9 again.
10 BY MR. BOGLE:
11   Q   You don't recall that?
12   A   I'm sorry. I don't -- you'll have to
13 repeat the question.
14   Q   My question was, to support a threshold
15 change based on business growth, supporting
16 documentation is required under the CSMP, right?
17      MR. COLLINS: Objection. Assumes --
18 BY MR. BOGLE:
19   Q   As of 10/2010?
20      MR. COLLINS: Objection. Assumes facts
21 not in evidence.
22      THE WITNESS: I don't know that that
23 wasn't provided.
24 BY MR. BOGLE:

Page 219

1    Q   Not my question, sir. That was
2 required, wasn't it?
3       MR. COLLINS: Objection. Form.
4 BY MR. BOGLE:
5    Q   Yes or no?
6       MR. COLLINS: Objection.
7 BY MR. BOGLE:
8    Q   Or you don't know?
9       MR. COLLINS: Objection to form.
10      THE WITNESS: I don't know.
11 BY MR. BOGLE:
12   Q   You don't know if that was required?
13   A   It was required for Michael maybe, but
14 not for me.
15   Q   Okay. So you -- so for Dale Nusser to
16 sign off on his portion, he didn't need any
17 documentation to support this.
18   A   Correct.
19   Q   Okay. But Michael, you understand,
20 Oriente would?
21   A   Yes.
22   Q   Okay. So in the McKesson files that
23 have been produced to us pertaining to this
24 increase, we should find some supporting

Page 220

1 documentation if the CSMP was followed, right?
2 I'm not saying in your files or whose files. It
3 should be in somebody's files.
4    A   I don't know that.
5    Q   You don't know.
6    A   I can't testify to what's in their
7 files.
8    Q   I didn't ask -- I didn't say "is it." I
9 said "should it be."
10   A   I can't --
11      MR. COLLINS: Objection. Calls for a
12 legal conclusion.
13      THE WITNESS: I can't testify. It was
14 electronic.
15 BY MR. BOGLE:
16   Q   Okay. Was there a policy at McKesson in
17 2010 to destroy evidence of due diligence review?
18      MR. COLLINS: Objection. Argumentative.
19 Object to the theatrics.
20 BY MR. BOGLE:
21   Q   There's a question.
22   A   Can you repeat the question?
23   Q   Was there a policy written or unwritten
24 at McKesson in October 2010 to destroy evidence of

Page 221

1 due diligence review?
2       MR. COLLINS: Object to the theatrics
3 and the argument.
4       THE WITNESS: No.
5 BY MR. BOGLE:
6    Q   Okay. Target, that's another -- that's
7 another large customer for McKesson over time,
8 right?
9       MR. COLLINS: Objection. Form, vague.
10      THE WITNESS: They aren't our customer
11 anymore.
12 BY MR. BOGLE:
13   Q   Okay. Back in 2008, they were, right?
14   A   I would -- I would think, yes.
15   Q   Okay. Let's take a look at Exhibit 15,
16 which is 1.1782.
17      (Snider Exhibit No. 15 was marked
18         for identification.)
19   Q   All right. This is another file that
20 was produced to us. You see it's pertaining to
21 Target No. 2231. Do you see that?
22   A   Yes.
23   Q   Okay. Let's start back at page .7.
24 There's an e-mail chain there.

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1    And do you see the e-mail at the bottom
2  of that page from Dave Gustin to Michael Bishop
3  dated September 16, 2008, titled "Could you do me
4  a favor?"  Do you see that?
5    A    Yes.
6    Q    Okay.  It says there:  "I just need a
7  TCR form you signed and dated the 30th.  I will
8  use it for the 30 percent increases I made for the
9  RNAs that day after you e-mailed me all those
10  reports."
11    Do you see that?
12    A    Yes.
13    Q    And then Mr. Bishop responds:  "This is
14  the Thanksgiving increases," question mark.
15    Do you see that?
16    A    Yes.
17    Q    Okay.  And if you follow the e-mail
18  chain to the next page, Mr. Gustin says:  "Yep,
19  11/28."
20    Do you see that?
21    A    Yes.
22    Q    Okay.  Then if you go to page .5, it's
23  another e-mail from Dave Gustin to several
24  individuals, December 17, 2008.  It says:  "All:

Page 223

1  On November 28, I was sent requests by Michael for
2  over 200 thresholds to get 30 percent increases
3  for various national accounts.  The attached TCR
4  form covers all RNA increases made that date.
5  Please sign and file."
6    Do you see that?
7    A    Yes.
8    Q    Okay.  And if you go to page .4, it's a
9  threshold change form from 11/28/08, the same day.
10  Do you see that?  It's referenced earlier by
11  Mr. Gustin.
12    A    Yes.
13    Q    And it's noted to be for various
14  controlled substances, right?
15    A    Yes.
16    Q    And a 30 percent increase.  Do you see
17  that?
18    A    Yes.
19    Q    What's the reason for the change given
20  there on the form?
21    A    Thanksgiving holiday.
22    Q    Okay.  Do -- was it a McKesson policy in
23  2008 to give permanent threshold increases based
24  on holidays?

Page 224

1    A    Yes, it was.  Sometimes the vendors --
2  like I just got a notice today, the vendors close
3  during the holidays and product is unavailable.
4  And my customers know that too, hospitals, nursing
5  homes, pharmacies.  So at that time they want to
6  make sure they get it before the pharmacy closes.
7    Q    And that's a justification to increase
8  30 percent permanently?
9    A    I believe so.  It looks like it was
10  approved.
11    Q    Okay.  So each time that a big holiday
12  would come, thereafter you get 30 more percent
13  increase permanently?
14    MR. COLLINS:  Objection.
15  BY MR. BOGLE:
16    Q    Is that what you're saying?
17    MR. COLLINS:  Objection.
18  Mischaracterization.
19    THE WITNESS:  I did not say that.
20  BY MR. BOGLE:
21    Q    Okay.  Well, you're saying the 30
22  percent increase here was justified by the fact
23  that it was a Thanksgiving holiday and that could
24  justify a permanent increase, right?

Page 225

1    MR. COLLINS:  Objection.
2  Mischaracterization.
3    THE WITNESS:  I don't know the due
4  diligence that Dave did, but he was the national
5  acts DRA and he justified it.
6  BY MR. BOGLE:
7    Q    Okay.  Well, the reason for change given
8  here is what we just read, increase due to
9  Thanksgiving holiday, 30 percent increase, right?
10    A    That's what -- did I say that?
11    Q    That's what's stated here for reason for
12  change, right?  It's what the form says.
13    A    Who -- oh, the form, yes.
14    Q    Right.
15    A    Okay.
16    Q    And under "Approved by," whose signature
17  is that?
18    A    Blaine Snider.  "B. Snider."
19    Q    That's you, right?
20    A    Yep.
21    Q    And if we go to page .2, this is another
22  threshold change form from 11/28/08 for the Target
23  store in Triadelphia, West Virginia.  Do you see
24  that?

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1  A   Yes.

2  Q   Okay.  And this is for a 30 percent

3  increase to their morphine thresholds, and under

4  "Reason for change," you would agree with me there

5  is nothing listed there, right?

6  A   Yes.

7  Q   Okay.  And again, under "Approved by,"

8  that's your signature, isn't it?

9  A   That I sent it to Regulatory, if I did.

10  Q   That's your signature, isn't it?

11  A   Yes.

12  Q   Okay.  Did you raise any questions as to

13  why there was no reason given to you here?

14  A   I don't even know that it was -- the

15  threshold was increased.

16  Q   Well, it says "Approved by."

17      MR. COLLINS:  Objection.  We've been

18  over this --

19  BY MR. BOGLE:

20  Q   Right?

21      MR. COLLINS:  -- a dozen times.

22  Objection.  Mischaracterization.

23  BY MR. BOGLE:

24  Q   Right?

Page 227

1  A   That does not mean I approved it.  I

2  cannot send a -- make a threshold change.  I can't

3  do it.

4  Q   But you didn't raise any concerns at

5  this point in time about forwarding this on to --

6  A   There's nothing on this paper --

7  Q   -- approve it, correct?

8  A   There's nothing on this paper that says

9  he approved it or raised any concerns.

10  Q   There's nothing on this paper that

11  indicates that you raised any concerns or in this

12  file that indicates that you raised any concerns

13  about this threshold change form, does it?

14  A   I don't know if it even was complied

15  with.

16      MR. BOGLE:  Okay.  Not my question, sir.

17  Move to strike as nonresponsive.

18  BY MR. BOGLE:

19  Q   There's nothing in this file that

20  indicates you raised concerns about the lack of

21  reason for threshold increase in this form, is

22  there?

23      MR. COLLINS:  Objection.  Foundation,

24  form.

Page 228

1      THE WITNESS:  I don't know that.

2  BY MR. BOGLE:

3  Q   You don't know if there's any reason

4  listed?

5  A   Correct.

6  Q   Okay.  Can you see the form?

7  A   Yes.

8  Q   Okay.  Do you see any indication on this

9  form that you disapproved this request with zero

10  information provided for a reason?

11      MR. COLLINS:  Object to the terminology,

12  "disapproved" and "approved."

13      THE WITNESS:  I dispute that there

14  was -- wasn't any evidence of that.

15  BY MR. BOGLE:

16  Q   Well, we've got the file right here.

17  This one -- this one's shorter, so this is eight

18  pages.  I'd like you to show me where in this file

19  there is specific documentary evidence showing why

20  a Target in West Virginia needed a 30 percent

21  increase on this date.

22  A   Okay.  On page .6.

23  Q   .6.  Okay.

24  A   There was an e-mail on December 17th

Page 229

1  about a -- with an attachment threshold change

2  form, that could have had the reason on it.  I

3  don't know.  It's -- it's not here.

4  Q   Okay.  This is what was produced to us.

5  Can you point to anything that was produced to us

6  in this file that indicates a reason for this

7  threshold change increase?

8      MR. COLLINS:  Objection.  Asked and

9  answered.

10      THE WITNESS:  Not to my knowledge.

11  BY MR. BOGLE:

12  Q   Okay.  Best Care Pharmacy, are you

13  familiar with them?

14  A   I -- I do know them, yes.

15  Q   It's another one of New Castle's former

16  customers in West Virginia, right?

17  A   Yes.

18  Q   Okay.  And actually, Best Care actually

19  operated multiple pharmacies in West Virginia,

20  didn't they?

21  A   As I recall.

22      (Snider Exhibit No. 16 was marked

23      for identification.)

24  BY MR. BOGLE:

Page 230

1 Q Okay. I'm going to hand you what is
2 marked as 1.1812, Exhibit 16.
3 You see here this is another document,
4 file folder document with the name "Best Care" on
5 the front.
6 Do you see that?
7 A Yes.
8 Q Okay. And if we go to page .10, do you
9 see this is your signature related to an approval
10 that a questionnaire has been completed and
11 affidavit signed for this customer, right?
12 A It's a -- I testified that it's a
13 Level I observation form.
14 Q No, .10.
15 A I testified that that's a Level I
16 observation form.
17 Q We may be on different pages.
18 Do you see what's pulled up here on the
19 screen?
20 A Yes.
21 Q Okay. That's your signature related to
22 Best Care Pharmacy, you are saying for, what, a
23 Level I observation?
24 A Yes. It says "CSMP Observation Level I

Page 231

1 Documentation Form."
2 Q On this page?
3 MR. COLLINS: Page 9.
4 THE WITNESS: Oh, I'm sorry. It's a --
5 it's a continuation of that.
6 BY MR. BOGLE:
7 Q Okay. Well, let's look at the pharmacy
8 questionnaire that follows thereafter.
9 A Okay.
10 Q You see this customer is noted to be a
11 new customer as of October 1, 2009, right?
12 A Yes.
13 Q And it's for Best Care Pharmacy in
14 Weston, West Virginia. Do you see that?
15 A Yes.
16 Q Okay. Do you know about how many people
17 lift in Weston, West Virginia?
18 A A lot more than Philippi.
19 Q Think so?
20 A Yes.
21 Q Okay. Would it surprise you that it's
22 fewer than 5,000 people?
23 A In that area?
24 Q In Weston, West Virginia.

Page 232

1 A Yes.
2 Q That would surprise you?
3 A Yes.
4 (Snider Exhibit No. 17 was marked
5 for identification.)
6 BY MR. BOGLE:
7 Q I hand you Exhibit 1.1909 marked as
8 Exhibit 17.
9 It says: "Population data for Weston,
10 West Virginia," indicated to have a population of
11 4,085 people. Do you see that?
12 MR. COLLINS: Objection. Lack of
13 foundation, lack of authentication, lack of
14 knowledge.
15 THE WITNESS: What year is this, please?
16 BY MR. BOGLE:
17 Q This is the current data.
18 MR. COLLINS: Yeah, I mean -- it's the
19 internet, it's accurate.
20 THE WITNESS: What's that?
21 MR. BOGLE: Well, I'm sure you guys are
22 going to produce census data that shows otherwise,
23 so we'll just wait to see that.
24 MR. COLLINS: I'll withdraw my

Page 233

1 objection.
2 MR. BOGLE: I would hope so.
3 MR. COLLINS: It's a lack of foundation,
4 lack of knowledge.
5 BY MR. BOGLE:
6 Q 4,085 people, right? That's what it
7 says.
8 A That's what it says right here.
9 Q Right. That's wrong; is that your
10 testimony?
11 MR. COLLINS: Objection. Lack of
12 foundation. You haven't established the witness
13 has any knowledge about this issue.
14 MR. BOGLE: Well, he said he thought it
15 was wrong.
16 THE WITNESS: I said I was surprised,
17 and I am. I'm sorry.
18 BY MR. BOGLE:
19 Q You're surprised?
20 A Yes.
21 Q Okay. All right. Let's go back to
22 Exhibit 1.1812, back on .11. See the pharmacist's
23 name there is a Matthew Genin. Do you see that?
24 A Yes.

Page 234

1    Q   Okay.  And further on in this form,
2  page .14, under "Purchasing Information," it's
3  asked what percentage of their purchases are
4  controlled substances, and they indicate 40
5  percent.  Right?
6        MR. COLLINS:  Sorry.  Where are you?
7  BY MR. BOGLE:
8    Q   Page .14 under Section IV(c).
9        Right?
10   A   Yes.
11   Q   And this was, if you look at the next
12 page, as of October 2009.  Do you see that's when
13 all this form was signed?
14   A   Yes.
15   Q   Okay.  That in and of itself would be
16 a red flag for potential diversion, right, that
17 40 percent of their purchases are controlled
18 substances?
19       MR. COLLINS:  Objection.  Form.
20       THE WITNESS:  I would have sent this up
21 to the DRA to make sure they vet it out.
22 BY MR. BOGLE:
23   Q   I'm asking your opinion, though, sir.
24 40 percent, is that a red flag to you?

Page 235

1    A   And my opinion is I definitely would
2  send this up to the DRA so they can vet it out,
3  yes.
4    Q   Because that's a concern, right, 40
5  percent?
6    A   I would send it to the DRA so they could
7  vet it out for sure.
8    Q   Because that's a concern.  40 percent of
9  their purchases being controlled substances, that
10 is a concern, a potential red flag, right?
11   A   At the time I don't remember, but I know
12 I sent it up to the DRA for vetting out.
13   Q   Okay.  My question was simply whether
14 that would be concerning to you in October 2009,
15 when you signed this form.
16   A   I don't know that --
17   Q   When you read this form, you don't know?
18   A   I don't know that when I signed that.
19   Q   Okay.
20   A   There's documentation as to why, and
21 then they do their due diligence.  That's part of
22 the process of that year also.
23   Q   But 40 percent is a high figure, right,
24 for controlled substances?

Page 236

1        MR. COLLINS:  Objection.  Asked and
2  answered.
3        THE WITNESS:  It depends on their
4  business.
5  BY MR. BOGLE:
6    Q   Okay.  That's -- that's well above the
7  norm, isn't it?
8    A   It's above the average, yes.
9    Q   Yeah.  If you go to the next page,
10 page .15, they provide more detail on their
11 controlled substance purchases.  They indicate
12 6,199 doses dispensed per month for hydrocodone.
13 Do you see that?
14   A   Yes.
15   Q   And 4,905 doses of oxycodone per month
16 is what they are telling you, right, as of this
17 time?
18   A   Yes.
19   Q   Okay.  And there's a request for
20 anything over 5,000 to provide a reason, which is
21 indicated as -- they underlined "Frequent
22 referrals from pain clinics," et cetera.  Do you
23 see that?
24   A   Yes.

Page 237

1    Q   Okay.  Again, that's a potential red
2  flag if they're getting frequent referrals from
3  pain clinics, right?  We talked about that
4  earlier.
5        MR. COLLINS:  Objection.  Form,
6  compound.
7        THE WITNESS:  That one I would do the
8  due diligence on for sure.
9  BY MR. BOGLE:
10   Q   Right.
11   A   And send it up to the director of
12 Regulatory Affairs, yes.
13   Q   And you would hope that they would vet
14 that closely, right?
15   A   Yes.
16   Q   That issue.
17       All right.  Let's go to page .43.
18       So you've got a threshold change form
19 here from -- dated October 9, 2009.  Do you see
20 that?
21   A   Yes.
22   Q   Okay.  And this is for a permanent
23 change regarding 9193, which I will represent is
24 hydrocodone.  That's y'all's code for hydrocodone.

Highly Confidential – Subject to Further Confidentiality Review

Page 238

1    Do you see that code listed there?
2    A    Where is that listed?
3    Q    "CS requested" -- 9191 is slashed
4 through and 9193 is written.
5    A    Oh, on the left. I'm sorry.
6    Q    Yeah. Do you see that?
7    A    9193, yes.
8    Q    Okay. And if you see here, the current
9 threshold at this point in time in October 2009 is
10 8,000, and they're requesting an increase by
11 12,000 additional doses.
12    Do you see that?
13    A    Sorry. It says 5,000.
14    MR. COLLINS: I'm -- I'm confused, and I
15 think the witness is too.
16 BY MR. BOGLE:
17    Q    Current threshold, 8,000. Do you see
18 that?
19    A    No, I don't see 8,000.
20    MR. COLLINS: I don't see it either.
21 BY MR. BOGLE:
22    Q    On .43. Let me check my page here.
23    All right. So, I'm sorry. Actually,
24 it's .44. My fault.

Page 239

1    A    Okay.
2    Q    All right. So this is -- let's go back
3 and make sure we're talking about the same thing.
4    October 9, 2009, threshold change form,
5 right?
6    A    Yes.
7    Q    For Best Care, right?
8    A    Yes.
9    Q    9193 is the base code entered, which
10 again I'll represent to you is hydrocodone.
11 That's how you guys code that.
12    A    Yes.
13    Q    Okay. And you see the current threshold
14 is at 8,000.
15    A    Yes.
16    Q    It's a permanent -- request for a
17 permanent increase, right?
18    A    Yes.
19    Q    Increase by 12,000 units, right?
20    A    Yes.
21    Q    And this threshold change request was
22 submitted on October 9, 2009, by you, correct?
23    A    Yes.
24    Q    Okay. And under "Reason for requested

Page 240

1 change," what's provided there?
2    A    Nothing. Just the date.
3    Q    And if we go then to the next form --
4    A    If I could say on there, also it says
5 "Question of declaration on file: Yes, dated
6 10/1/09." So someone was just in there nine days
7 before this threshold request.
8    MR. BOGLE: Move to strike as
9 nonresponsive.
10 BY MR. BOGLE:
11    Q    I asked you what was written there under
12 "Reason for requested change" section.
13    MR. COLLINS: His answer is what it is.
14 BY MR. BOGLE:
15    Q    All right. Let's go to Bates page
16 ending 4225, since my pages are wrong on this
17 document, which is bottom right, 4225.
18    It's another threshold change form,
19 October 26, 2009, for a permanent change for
20 hydrocodone for Best Care.
21    Do you see that?
22    A    Yes.
23    Q    Okay. And at this point because the
24 threshold has just been increased a couple of

Page 241

1 weeks earlier, which we just saw, now their
2 current threshold is at 20,000, right?
3    A    I don't remember when the other one was.
4    Q    Sure. We just looked at it. We can
5 look at it again.
6    A    If you can just give me the date, I
7 would be fine.
8    Q    It was October 9, 2009 is what we just
9 looked at. I can take you back to that page if
10 you want.
11    A    Okay. And this one is --
12    Q    So here you go, page -- Bates page
13 ending 4227, two pages later as the one we just
14 looked at.
15    A    Yes.
16    Q    Okay. We see hydrocodone, there's a
17 requested increase from 8 to 20.
18    A    Yes.
19    Q    Okay. Which was submitted by you that
20 day. So we're now a couple of weeks later, same
21 product, we show the threshold is 20,000, which
22 you indicated it was approved previously, right?
23    A    Yes.
24    Q    Okay. And now there's a request for an

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 additional 5,000 dosage units for hydrocodone,
2 right?
3   A   Yes.
4   Q   Okay.  And is there any specific reason
5 for the requested change given here?
6   A   It says questionnaire declaration was
7 done two weeks previously, or a week and a half.
8 And it was a new customer.
9   Q   Okay.  My question was, under "Reason
10 for requested change," what's the reason provided
11 there?
12       MR. COLLINS:  Asked and answered.
13       THE WITNESS:  Only that I referenced the
14 questionnaire and declaration on file.
15 BY MR. BOGLE:
16   Q   Right.  You don't give any specific
17 reason for the change that's being requested, do
18 you?
19       MR. COLLINS:  Objection.
20 Mischaracterization, asked and answered.
21       THE WITNESS:  Only that I would
22 reference the questionnaire.
23 BY MR. BOGLE:
24   Q   Right.  There's no documented reason why

Page 243

1 there's an increase here, especially given that
2 you've already increased it just two weeks before.
3 Right?
4       MR. COLLINS:  Objection.  It's a
5 mischaracterization of the document and his prior
6 testimony.
7       MR. BOGLE:  So I'll strike that.
8 BY MR. BOGLE:
9   Q   We can agree this was increased just two
10 weeks prior, right?
11   A   Yes.
12   Q   Okay.  And we can agree there's an
13 additional request being submitted two weeks later
14 without any additional documentation supporting
15 why they would need 5,000 more doses a month just
16 two weeks later, is there?
17       MR. COLLINS:  Objection.
18 Mischaracterization of the document and his prior
19 testimony.
20       THE WITNESS:  I would have to reference
21 the questionnaire and the visit.
22 BY MR. BOGLE:
23   Q   Right.  So -- but for the reason for
24 requested change, we can agree there is zip

Page 244

1 written there, nothing, right?
2       MR. COLLINS:  Object.  That's a
3 mischaracterization of the document and his
4 testimony.
5       THE WITNESS:  The document says:  "Refer
6 to questionnaire or -- and declaration on file
7 10/1/09."  So that was within nine days.
8 BY MR. BOGLE:
9   Q   No, this is now three weeks, and you
10 already increased it after that.
11   A   Right.
12   Q   What I'm saying, though, this whole
13 "Reason for requested change" section is supposed
14 to be completed, right?  You don't just refer to a
15 declaration.  That's the whole purpose of this,
16 right, you document your reason for the business
17 change?
18       MR. COLLINS:  Objection.
19 BY MR. BOGLE:
20   Q   You don't say "See declaration."
21       MR. COLLINS:  Objection.
22 BY MR. BOGLE:
23   Q   Right?
24       MR. COLLINS:  There's about four

Page 245

1 questions within one.  Compound, form, asked and
2 answered.
3 BY MR. BOGLE:
4   Q   Sure, I'll reask it.
5       The reason for requested change
6 is supposed to be -- there's supposed to be a
7 written reason documented as to why this change is
8 needed, right?
9   A   In totality, I would have to refer to
10 the questionnaire on file.
11       MR. BOGLE:  Move to strike as
12 nonresponsive.
13 BY MR. BOGLE:
14   Q   "Reason for requested change, be
15 specific."
16       MR. COLLINS:  If that's --
17 BY MR. BOGLE:
18   Q   That's what it says, right?
19       MR. COLLINS:  If that's a question,
20 objection.  Asked and answered.
21 BY MR. BOGLE:
22   Q   Does it say "Be specific"?
23       MR. COLLINS:  Objection.  Asked and
24 answered multiple times.

Page 246

BY MR. BOGLE:

1   Q   Does it say "Be specific"?

2   A   And I had the same response: Be
specific, and refer to the questionnaire and
declaration on file.

6   Q   Does it say, "Be specific, please refer
to questionnaire"?  Does that say that's good
enough?

9   A   It's right underneath that.

10  Q   No, you -- it says "Questionnaire or
declaration."  It just asks whether it's there.
It doesn't say that that's sufficient, does it?

13  A   It's -- it's --

14      MR. COLLINS:  Objection.  Argumentative.
I would ask you to move on to something else.

16  BY MR. BOGLE:

17  Q   So is it your testimony that your
understanding that as of 2009, you could simply
put "See questionnaire," and that was fine?

20      MR. COLLINS:  Objection.

21  BY MR. BOGLE:

22  Q   Or "See declaration," and that was --
that was justified to increase any threshold based
on that?

Page 247

1       MR. COLLINS:  Object --

2   BY MR. BOGLE:

3   Q   Is that your testimony?

4       MR. COLLINS:  Objection.  The question
is compound.  It's about three or four questions.
It's been asked and answered.

7   BY MR. BOGLE:

8   Q   Is that your testimony?

9       MR. COLLINS:  It's been asked and
answered.  It's a mischaracterization of his
testimony.

12      THE WITNESS:  No, my testimony is that I
did the due diligence and sent it up to Michael
Oriente, the director of Regulatory Affairs.

15  BY MR. BOGLE:

16  Q   You're saying you did your due diligence
because there was a questionnaire and declaration
on file, right?

19  A   Yes.  You can see quite a bit of
information on the store for Best Care, and sales
data and vetting out the store.  And I -- I'm
sorry, it was 10/26, so it was done on 10/1.

23  Q   Right.  Which we already discussed
that -- and you've already increased it --

Page 248

1   A   I did.

2   Q   -- requested increase 10/9?

3   A   And it's a new customer, yes.

4   Q   Okay.  But this is the second increase
in a month.

6   A   Yes.

7   Q   And there's -- you would agree with me,
other than saying "Questionnaire and declaration
on file, yes," there's no written justification
here provided, right?

11      MR. COLLINS:  Objection.
Mischaracterization.  It's been asked and
answered.

14      THE WITNESS:  I would agree to reference
the questionnaire and also the DRA's approval.

16  BY MR. BOGLE:

17  Q   So the questionnaire, which tells us how
much they're dispensing of controlled substances,
and the declaration that they claim they're doing
everything above board, that's good enough, right?

21      MR. COLLINS:  Objection.  Argumentative.

22  BY MR. BOGLE:

23  Q   Right?

24  A   I don't know that.

Page 249

1   Q   Okay.  Okay.  Let's take a look at Bates
page ending 4234.

3       See it's another threshold change form
for Best Care, 11/24/09, right?

5   A   Yes.

6   Q   This time the request is to increase the
oxycodone threshold from 8,000 to 12,000, right?

8   A   Yes.

9   Q   Permanently, right?

10  A   Yes.

11  Q   And the reason for change provided here
is: "Store business warrants increase to 12,000,"
right?

14  A   Yes.

15  Q   And that would have been provided by
you, that information, right?

17      MR. COLLINS:  Objection.  Form.

18      THE WITNESS:  I don't know that.

19  BY MR. BOGLE:

20  Q   Your name appears under "Approved by,"
right?

22  A   Yes.

23      MR. COLLINS:  Objection.  Asked and
answered, mischaracterization.

Highly Confidential – Subject to Further Confidentiality Review

Page 250

BY MR. BOGLE:
1  Q   That's what it says, right?
2  A   Yes.
3  Q   Okay.  And is there any other reason
4 listed for the change other than "Store business
5 warrants increase to 12,000" --
6  A   No.
7  Q   -- provided on this form?
8     MR. COLLINS:  Objection.  Objection.
9 Mischaracterization.
10 BY MR. BOGLE:
11  Q   If we go to Bates page ending 4239.
12     So this has indicated a Level I review
13 for hydrocodone from June 2010.  Do you see that?
14  A   Yes.
15  Q   And it's noted that they've omitted for
16 hydrocodone, right?
17     It says "EOM omit" under "Supporting
18 Information" -- or next to "Supporting
19 Information."
20  A   Yes.  I'm sorry, I'm not familiar with
21 these.  These are only documents the DRA has
22 knowledge of.
23  Q   What is an omit?

Page 251

1  A   It means something wasn't filled.
2  Q   Okay.  And one way in which somebody can
3 omit is because they've reached their threshold,
4 right?
5  A   Yes.
6  Q   Okay.  If you go to the next page here,
7 do you see where it says "Supporting Information"?
8     Do you see that, the next page, Bates
9 page ending 4240?
10  A   Yes.
11  Q   Okay.  "Supporting Information" says:
12 "Due to an increase in local prescriptions for
13 hydrocodone, Matt has requested we raise his
14 threshold on this item."
15     Do you see that?
16  A   Yes.
17  Q   And the reason for TCR, two below that,
18 says:  "Business growth should be supported by
19 corresponding sales increase."
20     Do you see that?
21  A   Yes.
22  Q   Okay.  And the specific request is to
23 increase the number of hydrocodone doses by 5,000
24 units, right?  5,000 doses.

Page 252

1  A   Yes.
2  Q   Okay.  And you see the next page, there
3 are approvals from Dale Nusser and Michael Oriente
4 on July 8, 2010, right?
5  A   Yes.
6  Q   Okay.  And Dale Nusser, I think we
7 talked about earlier works -- worked beneath you
8 at this point in time, right?
9  A   Yes.
10  Q   So to approve this based on business
11 growth, you would agree there should be some
12 supporting documentation somewhere to support
13 that, right, that their business has in fact grown
14 legitimately?
15  A   I don't know that.
16  Q   You don't know whether that should be
17 there?
18  A   I don't know if Mike got that or not.
19  Q   I'm asking whether it should be there.
20 I'm not asking whether it is there.
21  A   I don't know.
22  Q   You don't know whether that should be
23 there or not?
24  A   That would be up to Michael.

Page 253

1  Q   Okay.
2  A   I don't know if he had to keep that or
3 he disposed of it.  I don't know.
4  Q   You don't in fact know whether they got
5 it, do you?
6     MR. COLLINS:  Objection.  Calls for
7 speculation.
8     THE WITNESS:  I'll testify that I never
9 saw this document, and I'm not responsible for the
10 document, but it's Michael Oriente that had the
11 document.
12 BY MR. BOGLE:
13  Q   Okay.  Do you see page 4242 in this
14 document?
15     It's another threshold change request,
16 this time from July 23rd, 2010.  Do you see that?
17 The date's on the second page.
18  A   Oh, thank you.
19  Q   Do you see that date on there?
20  A   Yes.
21  Q   Okay.  And this is to increase
22 hydrocodone doses by 5,000 doses at this point in
23 time, right?
24     MR. COLLINS:  Objection.  Lack of

Page 254

1 foundation.
2      THE WITNESS: Yes.
3 BY MR. BOGLE:
4      Q   Okay.  And the reason cited is again
5 business growth, right?
6      A   It says -- if I could interject, it
7 says: "Should be supported by corresponding sales
8 increase."
9      Q   Yeah.  That's what it says, right?
10     A   Yes.
11     Q   And then "Supporting Information," it
12 says: "The account opened last October 2009.  The
13 new owner is trying to increase his business in
14 the area and reestablish the pharmacy.  He has
15 increased a number of prescriptions and requesting
16 another increase for hydrocodone.  He was already
17 given an increase of 5,000 on the 8th of this
18 month."
19     Do you see that?
20     A   Yes.
21     Q   So, again, whoever is approving this,
22 Michael Oriente or otherwise, should be requesting
23 documentation to support that increase, right?
24     MR. COLLINS: Objection.  Form.

Page 255

1      THE WITNESS: I don't know.  He may have
2 it.
3 BY MR. BOGLE:
4      Q   Should he?  Should he, right?  He
5 should.
6      MR. COLLINS: Objection.  Calls for a
7 legal conclusion.
8      THE WITNESS: He may have it.  I don't
9 know.
10 BY MR. BOGLE:
11     Q   Right.  My question is, should he?
12     MR. COLLINS: Same objection.  Calls for
13 a legal conclusion.
14     THE WITNESS: I don't know that he
15 doesn't have that.
16 BY MR. BOGLE:
17     Q   That, sir, was not my question.  I'm
18 asking should he have requested it.  I'm not
19 asking whether he did or whether he's got it or
20 what happened to it.  I'm just asking if he
21 should.
22     A   I don't know that.
23     MR. COLLINS: I'm sorry --
24 BY MR. BOGLE:

Page 256

1      Q   You don't know if he should have?
2      MR. COLLINS: Let me object.  Lack of
3 foundation, lack of firsthand knowledge, calls for
4 a legal conclusion.
5 BY MR. BOGLE:
6      Q   You see on the next page, page 4243,
7 this was approved by Michael Oriente and Duane
8 McPherson.  Do you see that?
9      A   Yes.
10     Q   Does Duane McPherson work at your
11 distribution center?
12     A   Yes.
13     Q   Okay.  Works beneath you?
14     A   Yes.
15     Q   We'll look at another one from the same
16 month for oxycodone, July 2010, which is page
17 4244.
18     Do you see they've omitted here for
19 oxycodone, July 2010?  Do you see that?
20     MR. COLLINS: Objection.  Lack of
21 foundation.  The witness hasn't testified he has
22 firsthand knowledge of this.
23     THE WITNESS: Yeah, I don't know what
24 this is.  If it doesn't respond to another

Page 257

1 threshold change request earlier, is this the same
2 one we went over?
3 BY MR. BOGLE:
4      Q   We're about to walk through that.  Just
5 bear with me.
6      A   Okay.
7      Q   What it says here is an oxycodone omit,
8 July 2010, right?
9      MR. COLLINS: Objection.  Lack of
10 foundation.  Lack of firsthand knowledge.
11     THE WITNESS: This document is new to
12 me, but that's what it says.
13 BY MR. BOGLE:
14     Q   And it notes a Level I review, right?
15     MR. COLLINS: Objection.  Lack of
16 foundation.
17     THE WITNESS: Yes, it says "Document
18 type."
19 BY MR. BOGLE:
20     Q   Yep, Level I review.  And Level I
21 reviews at this point in time in 2010 were to be
22 done by you or your designee at the distribution
23 center, right?
24     A   Or director of regular -- Regulatory

Page 258

1 Affairs, either of -- either of them.
2    Q  Okay. But there's a -- the CSMP spells
3 out involvement for the distribution center in
4 that process, right?
5    A  I can't remember 2010. I apologize. I
6 just don't know.
7    Q  You don't know. Okay.
8     Do you see here then, if you go to the
9 next page, this is again related to Best Care,
10 where they're requesting an additional threshold
11 increase for hydrocodone, right, 2,000 doses?
12     MR. COLLINS: Objection. Lack of
13 foundation, lack of firsthand knowledge.
14 BY MR. BOGLE:
15    Q  It's what the document indicates, right?
16     MR. COLLINS: Same objections.
17     THE WITNESS: I don't know if this is
18 Michael's document, but I see it.
19 BY MR. BOGLE:
20    Q  Okay.
21    A  It says, "Amount, 2,000."
22    Q  And the reason for the request is noted
23 to be business growth, should be supported by
24 corresponding sales increase, right?

Page 259

1     MR. COLLINS: Same objections. Lack of
2 foundation, lack of firsthand knowledge.
3     THE WITNESS: Yes.
4 BY MR. BOGLE:
5    Q  Okay. And then "Supporting Information"
6 says: "This account's purchases are up overall.
7 A review and site visit was done by Dale Nusser
8 and Jim Gavatorta in the fall of 2009."
9    Right?
10     MR. COLLINS: Objection. Foundation.
11     THE WITNESS: Yes.
12 BY MR. BOGLE:
13    Q  Okay. And that's the same one you
14 referred to having occurred a year earlier, right?
15 That we looked at earlier, sorry.
16     MR. COLLINS: Form.
17 BY MR. BOGLE:
18    Q  Do you recall when we started looking
19 through this document?
20    A  Yes.
21    Q  The first documentation, the first
22 questionnaire related to a site visit was from the
23 fall of 2009?
24    A  Are you referencing the Level I

Page 260

1 questionnaire?
2    Q  I'm referencing what they're talking
3 about, a review and site visit.
4     MR. COLLINS: Objection. Lack of
5 foundation.
6     THE WITNESS: By "site visit," can you
7 be more specific?
8 BY MR. BOGLE:
9    Q  I'm talking about what's in this
10 document. If you don't know, that's fine. We'll
11 keep going.
12     But if you see here, this -- this
13 threshold increase request from August 2010,
14 approved by Diane Martin and Michael Oriente,
15 right?
16     MR. COLLINS: Objection. Lack of
17 foundation.
18 BY MR. BOGLE:
19    Q  Do you see that on the next page?
20    A  That's what it says here.
21    Q  All right. Diane Martin, is that
22 someone that worked for you as well?
23    A  Yes.
24    Q  Okay. What was your oversight of the

Page 261

1 people that worked for you when they're -- they're
2 signing off and approving these sort of requests?
3 When you say you're not involved, what was your
4 oversight of people like Mr. McPherson and
5 Mrs. Martin when they're approving these?
6     MR. COLLINS: Objection. Lack of
7 foundation, form, vague, confusing.
8     THE WITNESS: I didn't testify that I
9 wasn't involved. I testified that they worked for
10 me.
11 BY MR. BOGLE:
12    Q  Mm-hmm. Yeah, I'm asking what your
13 level of oversight was in this process.
14     MR. COLLINS: Objection. Form, vague,
15 assumes facts not in evidence.
16     THE WITNESS: To make sure that they did
17 the proper procedure and SOPs for New Castle.
18 BY MR. BOGLE:
19    Q  Okay. Okay. Let's go to page -- Bates
20 page ending 4249 in this document.
21     You see here is another threshold change
22 request for oxycodone requesting a temporary
23 increase by 50. Do you see that?
24    A  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    Q   Okay.  And a reference is made back to,
2  again, the site visit from more than a year prior,
3  right, October 1, 2009?
4        MR. COLLINS:  Objection.  Lack of
5  foundation, lack of firsthand knowledge.
6        THE WITNESS:  Can you repeat that
7  question for me, please?
8  BY MR. BOGLE:
9    Q   Yeah.  They refer back to a site visit
10  from October 2009 for this request in December
11  2010, right?
12        MR. COLLINS:  Objection.  Lack of
13  foundation, lack of firsthand knowledge.
14        THE WITNESS:  It says "Temporary."  I
15  don't know if it was increased or not by this
16  document.
17  BY MR. BOGLE:
18    Q   We'll get there.  The reason for TCR
19  noted on this page is increase in scripts, right?
20    A   That's what it says, yes.
21    Q   Okay.  And the next page notes that it
22  was approved by Joel Zwick and Michael Oriente,
23  December 16, 2010.
24        Do you see that?

Page 263

1        MR. COLLINS:  Objection.  Lack of
2  foundation.
3        THE WITNESS:  Yes.  Yes, DRA.
4  BY MR. BOGLE:
5    Q   Joel Zwick is somebody that also worked
6  for you at this point in time?
7    A   Yes.  Yes.
8    Q   Okay.  The last one I want to look at
9  for Best Care is on page 40 -- Bates page 4253.
10        And you see here this is a threshold
11  change request related to oxycodone and
12  hydrocodone from January 2011.
13        Do you see that?
14    A   Yes, I do.
15    Q   Okay.  They're requesting 8,000
16  additional doses for oxycodone and 5,000
17  additional doses for hydrocodone, right?
18        MR. COLLINS:  Objection.  Foundation.
19        THE WITNESS:  Yes, but it says threshold
20  wasn't reached.
21  BY MR. BOGLE:
22    Q   Yeah, I'm just asking what request
23  they're making here.
24    A   Yes, but I don't know how much it is.

Page 264

1  I'm sorry.
2    Q   Right, but they're asking to increase
3  the amount of doses for oxycodone by 8,000 and
4  hydrocodone by 5,000, right?
5        MR. COLLINS:  Objection.  Foundation.
6  BY MR. BOGLE:
7    Q   That's what the document says, right?
8        MR. COLLINS:  Same objection.  Same
9  foundation objection.
10        THE WITNESS:  That's what the DRA's
11  document says.
12  BY MR. BOGLE:
13    Q   And "Supporting Information," it says:
14  "Best Care has a new pain clinic, Edita Milan,
15  that it services."  Do you see that?
16    A   Yes.
17    Q   Okay.  And you agree when there's a
18  reference to a pain clinic, that's something that
19  somebody needs to investigate, right?
20        MR. COLLINS:  Objection.
21  BY MR. BOGLE:
22    Q   As a potential red flag.
23        MR. COLLINS:  Objection.  Form, calls
24  for a legal conclusion.

Page 265

1        THE WITNESS:  I don't know about Eda --
2  Edita Milan, but that is something that Michael
3  would have vetted out.
4  BY MR. BOGLE:
5    Q   Okay.  Something that should be
6  investigated, right?
7    A   That I think was.
8    Q   Okay.  Do you have any proof here that
9  that was investigated?
10    A   Not with this document.  I'm not
11  familiar with this.
12    Q   Okay.  So you have no reason to
13  specifically say that Mr. Oriente vetted this
14  because you don't have any documentary support of
15  that, do you?
16        MR. COLLINS:  Objection.
17  Mischaracterization, argumentative.
18        THE WITNESS:  I can't speak to what
19  Michael did.
20  BY MR. BOGLE:
21    Q   Right.  And the reason for the TCR is:
22  "Business growth should be supported by
23  corresponding sales increase."  Right?
24        MR. COLLINS:  Objection.  Foundation.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    THE WITNESS: That's what it says there.
2  BY MR. BOGLE:
3    Q   And this was one approved January 27,
4  2011, by Diane Martin and Michael Oriente. Do you
5  see that, the next page?
6    A   Yes. Michael's director of Regulatory
7  Affairs.
8    Q   Also approved by Diane Martin, as
9  indicated on that form, right?
10   A   She evidently put it in.
11   Q   Right. Do you recall another location
12 of Best Care being in Lumberport, West Virginia?
13   MR. COLLINS: Are you -- I'm sorry.
14 We've been going 70 minutes. Is this a good time
15 to break?
16   MR. BOGLE: That's fine. I'm moving to
17 a different pharmacy. That's fine.
18   THE VIDEOGRAPHER: The time is 12:47
19 p.m. We're going off the record.
20   (Lunch recess.)
21   THE VIDEOGRAPHER: The time is
22 1:35 p.m., and we're back on the record.
23 BY MR. BOGLE:
24   Q   All right, Mr. Snider, we're back from

Page 267

1  lunch. I wanted to pick up from where we were
2  talking about before we broke.
3    So we were talking about Best Care
4  Pharmacy. You recall that generally?
5    A   Yes.
6    Q   Okay. And I want to talk to you about
7  their pharmacy in Lumberport, West Virginia. Are
8  you familiar with that pharmacy?
9    A   A little bit, yeah.
10   Q   Okay. And that's a pharmacy that New
11 Castle has serviced historically, right?
12   A   Yes. It -- I believe it -- the
13 documents show 2009, was it, it went onboard.
14   Q   Okay. Yeah. So I want to take a look
15 at some documents related to that location.
16   (Snider Exhibit No. 18 was marked
17   for identification.)
18 BY MR. BOGLE:
19   Q   I'm going to hand you Exhibit 1.1821,
20 also marked as Exhibit 18 to your deposition.
21   All right. This is another one of these
22 files, and you see the name on the outside is
23 "Lumberport."
24   Do you see that?

Page 268

1    A   Yes.
2    Q   Okay. And I want to walk through, first
3  of all, the pharmacy questionnaire when they were
4  onboarded.
5    So if you go to page .2, you see there's
6  a signature there on that page from you. Do you
7  see that?
8    A   Yes.
9    Q   Okay. Related to Lumberport Pharmacy.
10 And would this be you signing off on the pharmacy
11 questionnaire that follows?
12   A   Yes. And the affidavit was signed by
13 the pharmacist, I believe.
14   Q   Okay. So let's go to the questionnaire
15 that starts on page .3. And you see there,
16 they're noted to be a new customer going live
17 October 1, 2009. Do you see that?
18   A   Yes.
19   Q   Okay. And the pharmacist's name there
20 is a Matt Genin. Do you see that at the bottom?
21   A   Yes.
22   Q   Okay. You recognize that is the same
23 name we just saw going through the Best Care
24 Pharmacy at Weston, West Virginia. Do you recall

Page 269

1  that name?
2    A   I don't remember, but it could be.
3    Q   Okay. Well, I can show you if you want
4  to refresh on it. Let me -- give me one second to
5  find that document.
6    MR. COLLINS: I honestly don't remember
7  it, but --
8    MR. BOGLE: It's not a huge point, but I
9  decided I wanted to make it, so we're --
10   MR. COLLINS: Fine. Fair enough. It's
11 your depo.
12 BY MR. BOGLE:
13   Q   All right. So it's 1.1812, which I
14 believe was Exhibit 17 as well, the Best Care
15 document we looked at right before lunch. I think
16 it's the one you've got in your hand right there.
17   MR. COLLINS: That's 16.
18   MR. BOGLE: Oh, is it 16? Okay. Then
19 that's the one I want, 16.
20   MR. COLLINS: What page? I'm sorry.
21 BY MR. BOGLE:
22   Q   So if you go to page on this one .11.
23 It's again the pharmacy questionnaire.
24   Do you see the pharmacist's name there?

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    A    Yes.

2    Q    Do you see it's the same individual

3  we're talking about there?

4    A    Yes.  Same license.

5    Q    Yeah, same license number as well.

6  Okay.

7        So we're dealing with the same

8  pharmacist involved with this Lumberport location

9  here.  So in looking further, he's also noted on

10  .4 as the owner of the pharmacy.

11        Do you see that?

12    A    I believe the owner, it says Bob Reep.

13    Q    Are you at -- are you back on

14  Exhibit 18?  Because I'm looking at page .4.

15    A    Well, I'm not sure who's the owner.  Is

16  it Bob Reep or Matt Genin?

17    Q    Well, let's look at .4, and we can take

18  a look at that first.

19    A    Okay.

20    Q    So on .4, it says "Ownership/business

21  history," and it says "Owner's name:  Matt Genin,

22  dba," which I believe means doing business as,

23  "Best Care Pharmacy."

24        Do you see that?

Page 271

1    A    Yes.

2    Q    Okay.  And it's actually got the Weston

3  address of the Best Care Pharmacy we just looked

4  at, right?

5    A    Yes.

6    Q    And continuing further on in this

7  questionnaire, page .7, and you see here again

8  they're outlining their controlled substances

9  purchases as of October 2009, and they note 80

10  percent of the controlled substances purchases

11  were for hydrocodone.

12        Do you see that?

13    A    Yes.

14    Q    Okay.  And you would agree 80 percent of

15  their controlled substances purchases being

16  hydrocodone is a potential red flag that needs to

17  be reviewed from the perspective of diversion,

18  right?

19    A    I would agree that the director of

20  Regulatory Affairs would have to look at that.

21    Q    Okay.  It's something that should be

22  looked at.  I'm not saying -- again, I'm not

23  saying necessarily that it's you on the front

24  lines looking at that, but that should be

Page 272

1  investigated, correct?

2    A    It's something that I think the director

3  of Regulatory Affairs should look at.

4    Q    All right.  Now, Lumberport, you

5  understand that's another very small city, right?

6        MR. COLLINS:  Objection.

7  BY MR. BOGLE:

8    Q    In West Virginia.

9        MR. COLLINS:  Objection to form.

10        THE WITNESS:  I don't remember.

11  BY MR. BOGLE:

12    Q    Okay.  Have you ever been to Lumberport?

13    A    No, I don't remember being there.

14    Q    Okay.

15        (Snider Exhibit No. 19 was marked

16        for identification.)

17  BY MR. BOGLE:

18    Q    I hand you Exhibit 19.

19        Actually, let me ask you this:  If the

20  census data indicated there were fewer than a

21  thousand people living in Lumberport, would you

22  have reason to dispute that?

23        MR. COLLINS:  Again, foundation.

24        THE WITNESS:  I wouldn't know.  I'd have

Page 273

1  no reason to dispute it.

2  BY MR. BOGLE:

3    Q    Okay.  Let's just take a look real quick

4  then.  Exhibit 19, also marked as 1.1908, is what

5  I'm handing you.

6        All right.  It's another printout with

7  population and other data.  You see it's for

8  Lumberport, West Virginia?

9    A    Yes, I see.

10    Q    And this is the most current data that I

11  was able to obtain.  The population noted here for

12  Lumberport is 881 people.  Do you see that?

13    A    Yes.

14    Q    Okay.  Do you have any specific

15  knowledge that would contradict that being the

16  most current population data for Lumberport?

17        MR. COLLINS:  Objection.  Foundation.

18        THE WITNESS:  I don't have any knowledge

19  of the surrounding area of Lumberport.

20  BY MR. BOGLE:

21    Q    Okay.  All right.  So let's go back to

22  Exhibit 1.1821, and I want to specifically look at

23  .19 is the page.

24    A    Can you give me that exhibit again?

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q   It's 1.1821, the page is .19. The page
2 should look like this (indicating).
3        MR. COLLINS: He's referring to the
4 numbers at the top.
5        THE WITNESS: Oh, 1821.19, okay.
6 BY MR. BOGLE:
7    Q   Yeah.
8    A   Thank you.
9    Q   Are you at that page?
10   A   Yes.
11   Q   Okay.  And you see here this is for
12 threshold change form, October 19, 2009, for a
13 permanent threshold change.  Do you see that?
14       MR. COLLINS: Objection.  Form.
15       THE WITNESS: I don't know if it's to
16 start them.  It looks like the day we opened them.
17 BY MR. BOGLE:
18   Q   Yeah, I'm just saying the date is
19 October 19, 2009, right?
20   A   Yes.
21   Q   Okay.  And it's a threshold change form
22 requesting a permanent threshold change, right?
23   A   Yes, but I think it's the start of their
24 ownership.  I'm not sure because I'm -- we had a

Page 275

1 Level I questionnaire on that date.
2    Q   Okay.  But all I'm --
3    A   So I'm --
4    Q   Okay.  All I'm asking, though, is it's
5 indicated to be a permanent change being
6 requested, right?
7    A   Yes.
8    Q   Okay.  And this is related to 9193,
9 which I believe is hydrocodone.  Do you see that?
10   A   Yes.
11   Q   And the current threshold is noted to be
12 8,000 at this point in time, right?
13   A   Yes.
14       MR. COLLINS: Objection.
15 Mischaracterization.
16 BY MR. BOGLE:
17   Q   And there is a request to increase that,
18 to double that, to 16,000 doses per month, right?
19       MR. COLLINS: Objection.  Foundation.
20       THE WITNESS: Well, I'd have to -- oh,
21 plus -- plus 8,000.
22 BY MR. BOGLE:
23   Q   Right.
24   A   Yes.

Page 276

1    Q   They're asking to add 8,000 to the
2 existing threshold, right?
3    A   Yes.
4    Q   Okay.  So -- and it says for -- the
5 reason for the requested change -- actually,
6 strike that.
7        When it's noted to increase a threshold,
8 and we talk about by a certain number of doses, a
9 dose when it comes to hydrocodone or oxycodone is
10 a pill, right?
11   A   Usually a pill or an ounce.
12   Q   All right.  When it comes in pill form,
13 it's going to be a single pill, right?
14   A   Usually, yes.
15   Q   Okay.
16   A   That I know of.
17   Q   Okay.  And the reason noted for the
18 requested change here is:  "Brand new account.
19 Family threshold is set too low."  Do you see
20 that?
21   A   Yes.
22   Q   Okay.  And this was submitted by you on
23 October 20th, 2009, right?
24   A   Yes.

Page 277

1    Q   And in addition, from sales, Jim
2 Gavatorta; approved by Michael Oriente, right?
3    A   Yes.
4    Q   Okay.  And to establish that the
5 threshold is too low for the specific product, you
6 would need to be able to look at the prescription
7 data for hydrocodone and the overall prescription
8 data to indicate whether this is too low.
9        You agree with that, right?
10       MR. COLLINS: Objection.  Form.
11       THE WITNESS: I would not have to look
12 at that.  I'd look at the --
13       What year was this, please?
14 BY MR. BOGLE:
15   Q   October 2009.
16   A   I believe I would get the sales and the
17 director of Regulatory Affairs or the -- or Jim
18 would have gotten the script information.
19   Q   Right.  But my question simply was,
20 to -- whoever is making this determination at
21 Regulatory would need to look at how much they're
22 selling of hydrocodone and how that compares to
23 their overall prescription sales at that time,
24 right?

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    A    Yes. It says "80 percent,
2 Medicare/Medicaid." They would verify that too.
3    Q    Okay. So looking at this file,
4 though -- again, it's a fairly small file -- I did
5 not see any indication of such data being attached
6 to this form or in this file. Am I missing
7 something here?
8    A    On the questionnaire of the same day, it
9 says: "Call doctors to verify." So I don't know
10 what all due diligence was done on that. There's
11 no record of a call.
12    Q    Right. And there's also no new actual
13 documentation of their prescription sales either
14 for hydrocodone or overall sales in this packet,
15 is there?
16    A    I don't see it.
17    Q    Okay. And I want to look at the next
18 threshold change request, which is page .13. Do
19 you see here this is a threshold change request
20 that was approved July 19, 2010, by Duane
21 McPherson and Michael Oriente?
22        Do you see that --
23        MR. COLLINS: Object --
24 BY MR. BOGLE:

Page 279

1    Q    -- on page .14?
2        MR. COLLINS: Objection. Foundation.
3        THE WITNESS: I see those names on
4 there.
5 BY MR. BOGLE:
6    Q    Okay. And it's noted to be approved as
7 the approval status for both, right?
8    A    I'm not familiar with this document. It
9 went to the Pharmacy Regulatory Affairs.
10    Q    Okay.
11    A    So I wouldn't have seen this before.
12    Q    But for Mr. McPherson, it says: "DC
13 approval status, approved," right, next to it?
14    A    That's what it says.
15    Q    What the document says.
16    A    Yes.
17    Q    Same for Mr. Oriente, where it says "DRA
18 approval status," next to it, it says "Approved,"
19 right?
20    A    It says DR -- is this number 13?
21    Q    This is .14.
22    A    Sorry.
23    Q    The -- this document starts .13. I was
24 trying to give you the sense of both pages of it.

Page 280

1    A    Okay. I didn't see the second page, I'm
2 sorry. It has "DC approver, Duane" on it, and
3 "DRA, Michael Oriente" on it.
4    Q    Okay. And then going back to .13 to see
5 what request was made here, this is a request for
6 an increase for hydrocodone by 5,000 doses.
7        Do you see that?
8    A    Yes.
9    Q    And for "Supporting Information," it
10 says: "Account purchase are up overall for the
11 month due to an increase in local prescriptions."
12        Do you see that as the supporting
13 information?
14    A    I see that as under that column, yeah.
15    Q    Okay. And the reason for TCR is the
16 same one we've seen several times today, "Business
17 growth should be supported by corresponding sales
18 increase."
19        Do you see that reference?
20    A    Yes, but I don't know that isn't on the
21 original TCR or that he didn't have that. I can't
22 answer to that.
23    Q    Yeah, just -- I'm just -- right now I'm
24 just saying that's what the document says, and I'm

Page 281

1 going to get to my next question. Just bear with
2 me.
3        That's what it says, first of all.
4 That's the reason for TCR that's listed here,
5 right? "Business growth should be supported by
6 corresponding sales increase."
7    A    What's your question, please?
8    Q    That's what it says, right?
9    A    Under "Reason for TCR" --
10    Q    Yes, sir.
11    A    -- yes. Yes.
12    Q    Okay. And we just talked about -- in
13 the file that was provided here for this pharmacy,
14 there are -- there's no purchase data included
15 here, is there, documentary purchase data?
16        MR. COLLINS: Objection. Form.
17        THE WITNESS: I don't -- I don't see
18 that. I do see an attachment on October 20th from
19 Michael.
20 BY MR. BOGLE:
21    Q    Attachment of what?
22    A    It doesn't say. A Word document.
23    Q    Okay. All right. But to my -- do you
24 recall my question, though? Do you see anything

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1 that indicates an attachment here, there's actual
2 physical documentation attached here showing
3 purchase data?
4        MR. COLLINS: Objection. Form.
5        THE WITNESS: I don't see anything
6 except that Word document attachment that's not
7 attached here.
8 BY MR. BOGLE:
9    Q   Okay. And how do you know that's not
10 attached?
11   A   I don't see it.
12   Q   Okay. Do you see there's a -- on that
13 same day -- I think you're looking at page .20.
14   A   Yes.
15   Q   Okay. And that references a Lumberport
16 TCF, hydrocodone, 10/19/09, right?
17   A   I don't know.
18   Q   So the document -- that's what it says,
19 the attachment, right, that you're referring to?
20   A   Yes. Yeah.
21   Q   Okay. And you see the previous page,
22 10/19/09, I believe is the one we just looked at a
23 minute ago, same date, hydrocodone, increase
24 request?

Page 283

1        MR. COLLINS: Objection. Form.
2        THE WITNESS: I -- I --
3        MR. COLLINS: What's the question?
4        THE WITNESS: I see it.
5 BY MR. BOGLE:
6    Q   It's the same date and for the same
7 product that you're refer- -- that's being
8 referenced in the attachment there, right? And
9 the same pharmacy.
10   A   Yes, it is.
11   Q   Okay. And TCF is threshold change,
12 right, form?
13   A   Yes. That's usually what we refer to.
14   Q   All right. Let's go to next page .15 in
15 this document.
16       And on .15 and .16 is an additional
17 threshold change request for hydrocodone for an
18 additional 2,000 doses.
19       Do you see that?
20       MR. COLLINS: Objection. Foundation.
21       THE WITNESS: Yeah, this is a Pharmacy
22 Regulatory Affairs document. I didn't always see
23 these, and I didn't see this.
24 BY MR. BOGLE:

Page 284

1    Q   Okay. Do you see that there, though,
2 the request for 2,000 additional doses for
3 hydrocodone?
4        MR. COLLINS: Same objections.
5        THE WITNESS: It's what it looks like,
6 yes.
7 BY MR. BOGLE:
8    Q   And on .16, this was approved by Diane
9 Martin at your facility and Michael Oriente,
10 October 26, 2010 -- or August 26, 2010, right?
11       MR. COLLINS: Objection. Foundation.
12       THE WITNESS: That would mean Diane
13 would have sent it in to the director of
14 Regulatory Affairs.
15 BY MR. BOGLE:
16   Q   Right. But what's noted in the document
17 is approval dates, August 26, 2010, for both of
18 them, right?
19   A   I believe that's when Diane sent it in,
20 yes.
21   Q   Okay. And what's noted here, if you go
22 back to page .15 for supporting information, it
23 says: "This accounts purchases are up overall. A
24 review and visit were done by Dale Nusser and Jim

Page 285

1 Gavatorta in the fall of 2009."
2        Do you see that?
3    A   Yes.
4    Q   Okay. So that's a full year prior to
5 this request when this review was done, right?
6        MR. COLLINS: Objection. Misstates the
7 document.
8        THE WITNESS: I would think that's
9 reasonable.
10 BY MR. BOGLE:
11   Q   Okay. So the supporting information for
12 this increase in August 2010 is that there had
13 been a review and site visit nearly a year before,
14 right?
15   A   I don't know what else was included with
16 Michael's DRA due diligence.
17   Q   But that's what's indicated here for
18 supporting information on this form, right?
19   A   The form says that, yes.
20   Q   Right. And it's for a permanent
21 request, again based on "Business growth should be
22 supported by corresponding sales increase."
23 That's what's indicated on the form, right?
24       MR. COLLINS: Objection. Form.

Page 286

1    THE WITNESS: That's what it says on the
2 form. I don't know that he doesn't have that.
3 BY MR. BOGLE:
4    Q    Right. You don't know either way,
5 right?
6    A    No.
7    Q    And for Lumber -- I'm sorry, strike
8 that.
9        For Best Care, they also had a pharmacy
10 in Belington, West Virginia, right? Do you recall
11 that, servicing that pharmacy too?
12    A    Yes, I do.
13    Q    Okay. And Belington, West Virginia, do
14 you know anything about the population for that
15 city?
16    A    No, I don't. I don't. I don't think I
17 remember being there.
18    Q    Okay. Any reason to dispute they have
19 about 2,000 people in Belington, West Virginia?
20    MR. COLLINS: Objection. Foundation.
21    THE WITNESS: I wouldn't dispute that.
22 I don't know.
23        (Snider Exhibit No. 20 was marked
24        for identification.)

Page 287

1 BY MR. BOGLE:
2    Q    Okay. And I want to look at some of the
3 documentation on the Belington location. I hand
4 you Exhibit 20, also marked as Exhibit 1.1822.
5        All right. We see here, we start with
6 page .5. It's a threshold change form from
7 August 20, 2009. Do you see that?
8    A    It's a Level I documentation, yes.
9    Q    Right. You say Level I documentation.
10 I'm looking at the threshold change form. Are we
11 looking at something different?
12    A    Oh, I'm sorry. Yeah, .5?
13    Q    Yes. Yes, sir.
14    A    I apologize, I was.
15    Q    That's all right.
16        Okay. You see -- you see August 20,
17 2009, there on that one, right?
18    A    Yes.
19    Q    Where it says "Belington Prescription in
20 Belington, West Virginia."
21    A    Yes.
22    Q    Do you see that name?
23    A    Yep.
24    Q    And the current threshold noted here for

Page 288

1 them on hydrocodone is 12,000. Do you see that?
2    A    Increase amount 2,000 -- current
3 threshold, 12, yes.
4    Q    Right. And they're asking for 2,000
5 more, right?
6    A    Yes.
7    Q    Okay. And the reason for change noted
8 here is: "Increase in business, stopped buying
9 from competitor Bellco. All hydrocodone bought
10 from McKesson."
11        Do you see that as the reason noted?
12    A    I see that, yes.
13    Q    Okay. When customers tell you that
14 they've stopped buying from one of your
15 competitors, that's something you would ask for
16 them to substantiate, right, to prove that?
17    A    That's something Michael would ask to
18 substantiate that so he could get the data.
19    Q    And that -- that should be confirmed,
20 right?
21    MR. COLLINS: Objection. Form.
22    THE WITNESS: I can't answer if he did
23 or didn't.
24 BY MR. BOGLE:

Page 289

1    Q    I didn't ask you that. That should be
2 confirmed, right?
3    MR. COLLINS: Objection. Calls for a
4 legal conclusion. Form. Foundation.
5    THE WITNESS: I can't answer if he did
6 or didn't.
7 BY MR. BOGLE:
8    Q    Okay. Listen to my question.
9        That should be confirmed, right? I
10 didn't ask you whether he did confirm. I'm
11 asking, that's something that should be confirmed
12 when a customer tells you that?
13    MR. COLLINS: Objection. Calls for a
14 legal conclusion, form, foundation.
15    THE WITNESS: I answered. I can't --
16 I'm not sure if he did or didn't.
17 BY MR. BOGLE:
18    Q    Right. But should he have, from your
19 perspective?
20    A    I can't answer for him, sir.
21    Q    Okay. And this is noted as being
22 approved by both yourself and Michael Oriente on
23 August 20, 2009, right?
24    MR. COLLINS: Objection to the term

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 "approved."

2 THE WITNESS: I signed the threshold

3 change request to be put through.

4 BY MR. BOGLE:

5 Q Right. This says "Approved by," and

6 there's your name and there's Michael Oriente's

7 name, right?

8 MR. COLLINS: Objection.

9 Mischaracterization.

10 THE WITNESS: I signed it to be sent to

11 the Regulatory Affairs director.

12 BY MR. BOGLE:

13 Q And if you go to page .11.

14 MR. BOGLE: .11 and .12, can we just

15 pull those up side by side on the screen? Thanks.

16 BY MR. BOGLE:

17 Q Do you see this is a threshold change

18 request for hydrocodone for Belington approved

19 August 16, 2010? Do you see that?

20 MR. COLLINS: Objection. Foundation.

21 THE WITNESS: I didn't -- I don't know

22 this document. I'm sorry. Can you go through it

23 again?

24 BY MR. BOGLE:

Page 291

1 Q Yeah. You see on page .12, "DC approval

2 status: Approved Duane McPherson, August 16,

3 2010." Right?

4 MR. COLLINS: Objection. Foundation.

5 THE WITNESS: Yes.

6 BY MR. BOGLE:

7 Q And "DRA approval status: Approved by

8 Michael Oriente," three minutes later, "August 16,

9 2010." Right?

10 MR. COLLINS: Objection. Foundation.

11 THE WITNESS: I already testified to how

12 it works. I don't know what due diligence was

13 done before or after the call.

14 BY MR. BOGLE:

15 Q Right. I'm just asking if that's --

16 that's what is indicated here.

17 A You said three minutes.

18 Q Yeah, 10:59 to 11:02.

19 A Correct.

20 Q And then -- so going back to .11,

21 they're requesting here an increase of 4,000 doses

22 for hydrocodone, a permanent increase, right?

23 A It looks like this form says it was

24 increased.

Page 292

1 Q Right. That's what they were

2 requesting, and that's what they got, right?

3 A Well, I don't see the TCR with this, but

4 I do see this form.

5 Q Okay. And "Supporting Information"

6 says: "Belington was recently sold to Best Care

7 Pharmacy Group in May 2010. New scripts from this

8 acquisition has caused a need for an increase in

9 their hydrocodone threshold."

10 Do you see that?

11 A Yes.

12 Q Okay. And again, business growth is the

13 reason provided, right?

14 A No, it was sold.

15 Q Right. But the reason for TCR, it says:

16 "Business growth should be supported by

17 corresponding sales increase." Right?

18 MR. COLLINS: Objection. Lack of

19 foundation.

20 THE WITNESS: Yeah, supporting

21 correspondence above, yes.

22 BY MR. BOGLE:

23 Q Okay. And so, again, if there's an

24 acquisition which has caused an increased need,

Page 293

1 that's again something that would need to be

2 confirmed with documentation, right?

3 MR. COLLINS: Objection. Calls for a

4 legal conclusion.

5 THE WITNESS: I don't know. It could

6 have been done with a phone call or a check of the

7 pharmacy license or a call to the State Board of

8 Pharmacy.

9 BY MR. BOGLE:

10 Q But just the purchase itself doesn't

11 mean they need more pills, right? You would need

12 to show a business need documented beyond just the

13 purchase itself, right?

14 MR. COLLINS: Objection. Calls for a

15 legal conclusion, foundation, form.

16 THE WITNESS: I don't know what Michael

17 did to show on that.

18 BY MR. BOGLE:

19 Q Okay. All right. So let's go to

20 page .13 and .14.

21 Do you see here this is another

22 threshold change request for hydrocodone

23 requesting a temporary increase of 9,000 doses?

24 Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    A    Yes.
2    Q    This was approved by Joel Zwick and
3 Michael Oriente, November 15, 2010, right?
4    A    Joel sent it to Michael.
5    Q    The note is approving on November 15 --
6    A    Oh, I'm sorry, I correct myself.
7         Dale Nusser sent it to Michael.
8    Q    Right.  .14 indicates that Joel Zwick
9 and Michael Oriente both noted as approving this
10 on November 15, 2010, right?
11        MR. COLLINS:  Objection.  Lack of
12 foundation, lack of firsthand knowledge.
13        THE WITNESS:  Joel sent it, yes.  I
14 believe.  I don't know this form.  But it shows
15 that Joel sent it, and then above here, it says
16 "Submitter name:  Dale Nusser."
17 BY MR. BOGLE:
18    Q    And it does show it was approved, right?
19        MR. COLLINS:  Objection.  Form.
20        THE WITNESS:  The way I see it, I don't
21 see a signature, but the -- the -- Michael
22 Oriente's name is on the -- this document.
23 BY MR. BOGLE:
24    Q    And it says "Approved," right?

Page 295

1         MR. COLLINS:  Objection.  Form.
2 BY MR. BOGLE:
3    Q    On .14.
4         MR. COLLINS:  Objection.  Form.
5         THE WITNESS:  "DRA approval status:
6 Approved."
7 BY MR. BOGLE:
8    Q    Yep.  And for "Supporting Information"
9 on this one, it says:  "The customer was robbed on
10 Sunday.  All hydrocodone products were stolen
11 except for two bottles of Vicodin 5/500.  Customer
12 to send a copy of police report when received."
13        Do you see that?
14    A    Yes.
15    Q    Do you see a copy of the police report
16 here in this file?
17        MR. COLLINS:  Objection.  Foundation.
18        THE WITNESS:  I don't know that that's
19 in here.  I don't see it in what you gave me.
20 BY MR. BOGLE:
21    Q    Okay.  This is the document as produced.
22 I'm giving you what was produced to us.
23        Do you see it in this?
24    A    I didn't produce it.

Page 296

1    Q    Huh?
2    A    I didn't produce it.  I don't know.
3    Q    I'm just asking you if you see the
4 police report in this packet related to this
5 pharmacy.
6         MR. COLLINS:  Objection.  Argumentative.
7         THE WITNESS:  I don't see it in here.
8 BY MR. BOGLE:
9    Q    Okay.  Are you aware that ultimately one
10 of the owners of Best Care was prosecuted for
11 illegally diverting opioids?
12    A    I am aware that an owner of Best Care
13 was prosecuted, and we cut them off.
14    Q    Well, you're aware that there was a --
15 there was an arrest and a prosecution for one of
16 the owners of Best Care for diversion of opioid
17 products, right?
18        MR. COLLINS:  Objection.  Foundation.
19        THE WITNESS:  I was aware that he was
20 arrested.  That's all.
21        (Snider Exhibit No. 21 was marked
22        for identification.)
23 BY MR. BOGLE:
24    Q    Okay.  Let me hand you 1.1251,

Page 297

1 Exhibit 21.
2         This is a news release from the U.S.
3 Department of Justice, June 3rd, 2014, titled
4 "Pharmacist charged with illegal distribution of
5 painkillers."
6         Do you see that?
7    A    Yes.
8    Q    Have you ever seen this press release
9 related to Best Care?
10    A    No, I haven't.
11    Q    Okay.  How did you become aware of the
12 arrest then?
13    A    I don't remember.  Probably the DRA.
14    Q    Okay.  And if you look in the press
15 release, it says:  "A West Virginia pharmacist has
16 been indicted on charges that he dispensed
17 prescription painkillers outside the scope of his
18 professional practice."
19        And then it says:  "United States
20 Attorney William Ihlenfeld, II, announced that
21 Mario Blount, 51, of Bridgeport, West Virginia,
22 was arrested this morning on charges of conspiracy
23 to possess and distribute Schedule II controlled
24 substances, distribution of oxycodone and a

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1  failure to report the filling of a prescription."
2      Do you see that?
3      A    Yes.
4      Q    And it says:  "Blount, who was employed
5  by Best Care Pharmacy, is alleged to have
6  conspired with two other individuals over the last
7  three years to distribute prescription painkillers
8  for non-legitimate medical purposes."
9      Do you see that reference?
10     A    Yes.
11     Q    Okay.  And skip a paragraph, the next
12  one says:  "The Greater Harrison County Drug Task
13  Force executed search warrants in October 2013 at
14  Best Care Pharmacy locations in the West Virginia
15  towns of Bridgeport, Lumberport and Belington."
16     Do you see that?
17     A    Yes.
18     Q    And that's the three facilities we've
19  just been looking at over the last hour or so,
20  right?
21     A    Yes.
22     Q    And then the last paragraph on this page
23  says:  "Mr. Blount abused the trust of the
24  citizens of Bridgeport and the customers of Best

Page 299

1  Care Pharmacy.  These arrests serve as a warning
2  that the illicit distribution of controlled
3  substances will not be tolerated in Harrison
4  County, said Karl C. Colder, Special Agent in
5  Charge, Drug Enforcement Administration,
6  Washington, D.C. Field Division.  Over
7  approximately three years, Mr. Blount illegally
8  dispensed over 11,000 oxycodone and oxymorphone
9  pills."
10     Do you see that?
11     A    I see that, yes.
12     Q    And you know McKesson was the supplier
13  of those pills, right?
14         MR. COLLINS:  Objection.  Assumes facts
15  not in evidence, foundation.
16         THE WITNESS:  I don't know that.
17  BY MR. BOGLE:
18     Q    Well, your New Castle facility was
19  supplying Best Care with those very drugs during
20  that very time period, right?
21         MR. COLLINS:  Objection.  Argumentative,
22  assumes facts not in evidence.
23         THE WITNESS:  I don't know that.
24  BY MR. BOGLE:

Page 300

1      Q    You don't know if you were supplying
2  them?
3      A    No.
4         MR. COLLINS:  Objection.
5  BY MR. BOGLE:
6      Q    You don't know if Best Care Pharmacy was
7  a customer of yours for 2010 to 2014?
8         MR. COLLINS:  Objection.  Argumentative.
9  BY MR. BOGLE:
10     Q    I'm just asking if you know or not.
11         MR. COLLINS:  Objection.  You just asked
12  the same -- you've asked the same question two or
13  three times.
14         THE WITNESS:  I don't know.
15  BY MR. BOGLE:
16     Q    You don't know?
17     Okay.  We just saw from all three of
18  those facilities threshold change requests
19  approved for some of these very drugs covering all
20  the way up until 2011, and it's your -- that came
21  from your facility at New Castle, and it's your
22  testimony that after seeing all that, you don't
23  know if you supplied them with any oxycodone or
24  oxymorphone pills?

Page 301

1         MR. COLLINS:  Objection.  Assumes facts
2  not in evidence.  The question is compound.
3         THE WITNESS:  I don't -- I don't know
4  that.  He could have other wholesalers.  I don't
5  know that.
6  BY MR. BOGLE:
7      Q    You don't even know if he had other
8  wholesalers?
9      A    I don't remember that, no.
10     Q    Okay.
11     A    No.
12     Q    Isn't that something you would need --
13  that you would want to know?
14         MR. COLLINS:  Objection.  Calls for a
15  legal conclusion, argumentative.
16         THE WITNESS:  I would want the director
17  of Regulatory Affairs to know that.
18  BY MR. BOGLE:
19     Q    You would want him to know that.  It's
20  okay, as the guy who is responsible for making
21  sure that the New Castle isn't involved in
22  diversion, you don't care if you know that or not?
23         MR. COLLINS:  Objection.  Argumentative.
24  Object to the theatrics.

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1    THE WITNESS: Can you restate the
2  question, if you want?
3  BY MR. BOGLE:
4    Q   Well, I don't think there's anything
5  wrong with that question.
6    MR. COLLINS: Objection. It's --
7    THE WITNESS: Can you repeat it then?
8  BY MR. BOGLE:
9    Q   Yeah.
10    You don't think that as the individual
11  or director of operations for New Castle
12  responsible for making sure that facility isn't
13  involved in diversion, you don't think it's
14  important for you to know whether you were the
15  only supplier of these pills to this -- these
16  pharmacies or whether somebody else was too?
17    MR. COLLINS: Objection. Argumentative,
18  compound, object to the theatrics, asked and
19  answered.
20    THE WITNESS: I don't know.
21  BY MR. BOGLE:
22    Q   You don't know whether that's something
23  you should know?
24    A   I've already answered that. You keep

Page 303

1  asking me. I don't know. He could have had
2  another wholesaler. I don't know that. I don't
3  remember.
4    Q   But you know you were one -- that your
5  facility at New Castle certainly was one of the
6  wholesalers, right?
7    MR. COLLINS: Objection.
8  BY MR. BOGLE:
9    Q   We've seen documentary support for that.
10    MR. COLLINS: Objection. The
11  question --
12  BY MR. BOGLE:
13    Q   Right?
14    MR. COLLINS: Well, the question is now
15  compound three times.
16    THE WITNESS: I -- I answered that, yes.
17  BY MR. BOGLE:
18    Q   Yes, you were. Okay.
19    And you said this pharmacy was cut off.
20  They were cut off for about two weeks, right, Best
21  Care?
22    MR. COLLINS: Objection. Assumes facts
23  not in evidence, foundation.
24    THE WITNESS: I don't remember.

Page 304

1  BY MR. BOGLE:
2    Q   You don't remember?
3    A   No.
4    Q   Okay.
5    A   That would be the director of Regulatory
6  Affairs.
7    Q   Well, the pills come out of your
8  facility, right?
9    MR. COLLINS: Objection.
10    THE WITNESS: I don't know that. I
11  answered to that.
12  BY MR. BOGLE:
13    Q   Does -- does Regulatory Affairs run your
14  facility?
15    MR. COLLINS: Objection. Form. The
16  question is vague.
17  BY MR. BOGLE:
18    Q   I mean, do you defer all responsibility
19  for the pills that go out of New Castle to
20  Regulatory Affairs?
21    MR. COLLINS: Objection. Argumentative.
22    THE WITNESS: No.
23  BY MR. BOGLE:
24    Q   Okay. Because that's -- it's your job,

Page 305

1  right?
2    MR. COLLINS: Objection.
3    THE WITNESS: What's my job, please?
4  I'm not sure --
5  BY MR. BOGLE:
6    Q   To know what's leaving your facility and
7  to whom it's going to and whether they can be
8  trusted.
9    A   I didn't --
10    MR. COLLINS: Objection. The question
11  is compound, it's vague, calls for a legal
12  conclusion, lacks foundation.
13  BY MR. BOGLE:
14    Q   I think it's a good question, so go
15  ahead.
16    MR. COLLINS: My objections stand.
17    THE WITNESS: I stand by my record and
18  what I do at the facility.
19  BY MR. BOGLE:
20    Q   That's -- that's not my question, sir.
21    A   That's the best I can answer.
22    Q   My question is, is it your testimony
23  that your responsibilities as director of
24  operations at New Castle does not include knowing

Page 306

1 who you're selling to and what purpose they're
2 using those pills for?
3      MR. COLLINS: Objection. Argumentative,
4 compound, vague, calls for a legal conclusion.
5      THE WITNESS: Can you repeat the
6 question?
7 BY MR. BOGLE:
8    Q   Right.  Is it your testimony here today
9 that it's not your responsibility as director of
10 operations for New Castle to know who you're
11 selling to and what they're using the products for
12 that you're selling them?
13      MR. COLLINS: Objection. Calls for a
14 legal conclusion.  It's compound and it's also
15 vague.
16      THE WITNESS: The best I can answer that
17 is I know my customers, and when I don't, I make
18 sure the DRA and the VP/GM know.
19 BY MR. BOGLE:
20    Q   Okay.  So you knew -- you knew the folks
21 at Best Care then, right?
22      MR. COLLINS: Objection. Assumes facts
23 not in evidence.
24      THE WITNESS: Not personally, no.

Page 307

1 BY MR. BOGLE:
2    Q   You say it's your responsibility to know
3 the customer or the DRA knows them, so either you
4 knew them or the DRA knew them.  Who knew them?
5      MR. COLLINS: Objection. Argumentative,
6 compound.
7      THE WITNESS: I can't answer that for
8 the DRA or the VP/GM.
9 BY MR. BOGLE:
10    Q   What about you, did you know them?
11    A   I didn't --
12      MR. COLLINS: Objection. Question is
13 compound.
14      THE WITNESS: -- know them personally.
15 BY MR. BOGLE:
16    Q   Did you find them trustworthy to give
17 them all those pills?
18      MR. COLLINS: Objection.
19      THE WITNESS: I didn't know --
20      MR. COLLINS: I'm sorry.  Please let me
21 finish my objection.
22      THE WITNESS: Sorry.
23      MR. COLLINS: These questions are vague,
24 compound, argumentative.

Page 308

1 BY MR. BOGLE:
2    Q   Did you trust them to let those pills
3 out of your facility that ultimately they were --
4 one of their owners was arrested for diverting?
5      MR. COLLINS: Objection. The question
6 is vague, "them."
7      THE WITNESS: I wouldn't trust an owner
8 that was arrested for diversion, no.
9 BY MR. BOGLE:
10    Q   But you did trust that owner.
11      MR. COLLINS: Objection. Argumentative.
12 BY MR. BOGLE:
13    Q   Right?
14      MR. COLLINS: Objection. Argumentative.
15      THE WITNESS: I protest to the word
16 "trust."  I didn't know him.
17 BY MR. BOGLE:
18    Q   Okay.  Do you know anybody that did at
19 McKesson?
20    A   Yeah, Jim --
21    Q   That did know that customer?
22    A   Yeah, Jim Gavatorta did, and so did
23 Brian.
24    Q   Brian Ferreira?

Page 309

1    A   Yeah.
2    Q   Okay.  So they would be the ones to say
3 whether they were trustworthy prior to this arrest
4 being made, right?
5    A   I can't answer to that.  I just know
6 they knew them.
7    Q   Okay.  I'm going to hand you what I'm
8 marking as Exhibit 1.1794, also marked as
9 Exhibit 22.
10      (Snider Exhibit No. 22 was marked
11       for identification.)
12 BY MR. BOGLE:
13    Q   All right.  And you see this is a
14 monthly report from a Tim Foster to an Andrew
15 Moore, June 2014 monthly report.
16      Do you see that?
17      MR. COLLINS: Objection. Found--
18 BY MR. BOGLE:
19    Q   First page.
20      MR. COLLINS: Objection. Foundation.
21      THE WITNESS: It looks like it.  I'm not
22 familiar with this document.
23 BY MR. BOGLE:
24    Q   Okay.  Well, let me ask you, on page 2,

Page 310

1 I think it references something on Best Care. I
2 want to know if you knew this independent of this
3 document.
4     It says on point 2, it's the -- one,
5 two, three, four, five, six -- sixth bullet point
6 that starts with "Mario Blount." Do you see that
7 paragraph?
8     A    Yes.
9     Q    Okay. It says: "Mario Blount, partial
10 owner of the Best Care Group, was arrested in
11 early June on numerous narcotics charges, several
12 in relation to drug overdose deaths. As a result,
13 we shut off all narcotics at both Best Care
14 locations, Bridgeport and Lumberport, on Friday,
15 6/6. After a review of their dispensing and
16 surveys, we were unable to turn narcotics back on
17 because Blount was still listed as a 10 percent
18 owner. As of 6/20, Blount was bought out of the
19 group, and we were able to review them again. On
20 6/24, Drew Schwichow did site visits and will make
21 a determination from there, and from that, they
22 were turned on 6/26."
23     Do you see that?
24     A    I do.

Page 311

1     Q    Twenty days that you guys weren't
2 providing them narcotics, right?
3     MR. COLLINS: Objection. Assumes facts
4 not in evidence, lack of foundation.
5 BY MR. BOGLE:
6     Q    6/6 to 6/26, that's 20 days that you
7 guys stopped providing them narcotics, including
8 opioids, right?
9     MR. COLLINS: Objection --
10 BY MR. BOGLE:
11     Q    Based on this document.
12     MR. COLLINS: Objection. Compound,
13 argumentative, assumes facts not in evidence,
14 lacks foundation.
15     THE WITNESS: I can't say to what Tim
16 put in this document.
17 BY MR. BOGLE:
18     Q    Okay.
19     A    I don't know that.
20     Q    Do you recall ceasing sales to any of
21 these Best Care locations for more than 20 days?
22     A    I don't recall how many days we ceased
23 sales of any controls.
24     Q    Okay. And the next bullet point says:

Page 312

1 "Rich Mace, owner of Mace's Pharmacies, purchased
2 the Best Care Belington location and closed on
3 this sale on May 16th."
4     Do you see that?
5     A    Yes.
6     Q    Okay. And Mace's Pharmacy, that's
7 another one we discussed earlier and reviewed some
8 TCRs for, right? Remember talking about that
9 earlier today with me?
10     A    Yes, I do. Yes.
11     Q    Okay. Same guy, right, Mace's?
12     MR. COLLINS: Objection. Foundation.
13 BY MR. BOGLE:
14     Q    Mace's Pharmacy, do you remember talking
15 about that?
16     MR. COLLINS: What's the question?
17     THE WITNESS: I answered that "yes."
18 BY MR. BOGLE:
19     Q    Okay. Are you familiar with Martella's
20 Pharmacy in Pennsylvania?
21     A    Yes.
22     Q    And that's a pharmacy that the New
23 Castle Distribution Center has serviced over the
24 years, right?

Page 313

1     A    Yes.
2     Q    Okay. And when they were brought on as
3 a new customer in late 2010, they immediately
4 began requesting threshold increases for opioids,
5 right?
6     A    I don't recall that.
7     Q    You don't know. Okay.
8     Do you recall them in 2010 threatening
9 to go to another distributor if those increases
10 weren't approved?
11     A    No.
12     (Snider Exhibit No. 23 was marked
13     for identification.)
14 BY MR. BOGLE:
15     Q    There's Exhibit 2- --
16     Do you need to --
17     A    No.
18     Q    Exhibit 23, also marked as 1.1900.
19     MR. COLLINS: This is 23?
20     MR. BOGLE: Yeah.
21 BY MR. BOGLE:
22     Q    Okay. It's a string of e-mails here,
23 but I want to start with the threshold change
24 request e-mail, which is the last one in the

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  document on page .2.
2      Do you see it's from SharePoint,
3  October 19, 2010?
4      A   Yes.
5      Q   To Dale Nusser, cc'ing other
6  individuals, including you?
7      A   Yes.
8      Q   Okay.  And this relates to threshold
9  increases that were approved for multiple drugs,
10  including increasing the oxycodone threshold to
11  12,000 doses on this date, right?
12     A   That's what it says, yes.
13     Q   Okay.  And it says in the paragraph
14  above the three drugs that are noted to be
15  increased:  "New customer load.  Customer was
16  loaded to the lower thresholds than expected."
17      Do you see that?
18     A   Yes.
19     Q   Okay.  And so if you go up to the
20  e-mails that follow, going up from there, there's
21  an e-mail from Dale Nusser to John Kuczynski,
22  October 19, 2010 thereafter.
23      Do you see that e-mail?
24     A   Yes.

Page 315

1      Q   Okay.  There Dale says:  "John,
2  Martella's ready to go for ordering.  Michael
3  approved the TCR with no questions."
4      Do you see that?
5      A   Sorry.
6      Q   The e-mail starts on point -- the first
7  page and carries over to the second.
8      MR. COLLINS:  If you need a moment to
9  review it, why don't you review it.
10     THE WITNESS:  I'm sorry.  Where is that,
11  please?  What part of that first page?
12  BY MR. BOGLE:
13     Q   So the bottom of the first page just
14  introduces the e-mail.  The text I just read you
15  is on the top of page 2.
16     A   Oh, okay.  Yeah, I see that now.
17     Q   Okay.  Now, John Kuczynski, he's in
18  what, sales?
19     A   Yes.
20     Q   Okay.  So John responds back to Dale and
21  says:  "What about the overall thresholds?  Is he
22  adjusting everything?"
23      And the response by Dale to that on the
24  next e-mail is:  "Michael didn't say.  I will keep

Page 316

1  a close eye on them.  If they do happen to show up
2  on the 80 percent report, I will do the TCR
3  immediately, if you don't mind."
4      And then John responds:  "Waiting for an
5  item to show up at 80 percent isn't going to work.
6  They omitted on an item yesterday before the 80
7  percent report came out.  We need to adjust their
8  numbers across the board.  Please work with
9  Michael to get this issue resolved.  We can't be
10  in a reactionary mode right now with them."
11      Do you see that?
12     A   Yes.
13     Q   Okay.  This 80 percent report, that
14  references customers at this point in time in
15  2010, once they had reached a certain percentage,
16  in this instance 80 percent, there would be a
17  report sent to the folks at McKesson, which would
18  then trigger them to reach out to the customer and
19  see if they wanted to increase their thresholds,
20  right?
21      MR. COLLINS:  Objection.  Form, lack of
22  foundation, assumes facts not in evidence.
23      THE WITNESS:  No, they wouldn't -- we
24  wouldn't call that.  They would call us when it

Page 317

1  was over the threshold.
2  BY MR. BOGLE:
3      Q   So you're saying that in this time frame
4  in October 2010, McKesson would not call on
5  customers and say, Hey, you've hit your 80 percent
6  mark; do you want more?
7      MR. COLLINS:  Objection.
8  BY MR. BOGLE:
9      Q   Do you want to increase your threshold?
10     MR. COLLINS:  Objection.  Form, vague.
11     THE WITNESS:  Not that I know of, no.
12  BY MR. BOGLE:
13     Q   Okay.  Do you recall ever being copied
14  on e-mails where customers were notified that they
15  had reached 75 or 80 percent of their threshold
16  and asked whether they want to increase it?
17     A   I don't recall that, no.
18     Q   Okay.  So you don't know what this
19  80 percent report is that's being referenced here?
20     A   I didn't say that.  I do know what it
21  is.
22     Q   What's the 80 percent report then?
23     A   That they reached 80 percent of their
24  threshold.

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1     Q   Right. And that the customer will be
2 notified of that, right?
3     A   No, I already testified that that wasn't
4 the way I did it.
5     Q   And that's not how that would be done
6 for any customers of New Castle. Is that your
7 testimony?
8     A   Not that I know of, no.
9     Q   Okay.
10     A   I also wanted to add that it says here:
11 "Please attach usage report provided by customers
12 for all products as a part of the due diligence."
13     Q   Okay. But there's no report attached to
14 the document provided to us, right?
15     A   But it says it in the e-mail, so --
16     Q   It asks for it to be attached, right?
17     MR. COLLINS: Objection.
18 Mischaracterization.
19 BY MR. COLLINS:
20     Q   There's no report attached. That's all
21 I can say. I mean, I see -- I hear what you're
22 adding here.
23     A   Yeah.
24     Q   But it's not here.

Page 319

1     MR. COLLINS: Objection. It's a
2 mischaracterization of the exact language in the
3 document.
4 BY MR. BOGLE:
5     Q   Is there any usage report attached to
6 this e-mail chain?
7     A   I don't see that you have it here.
8     Q   Okay. I have what was given to me.
9     And I want to look at some further
10 information on Martella's in this request for
11 threshold increases. The threshold increase that
12 were being requested in October of 2010, you're
13 the one that ultimately approved those, right?
14     MR. COLLINS: Objection to the form.
15     THE WITNESS: No.
16 BY MR. BOGLE:
17     Q   You weren't? Okay.
18     (Snider Exhibit No. 26 was marked
19     for identification.)
20 BY MR. BOGLE:
21     Q   I hand you Exhibit 26, also marked as
22 1.1842.
23     All right. So looking -- I want to
24 start by looking at an e-mail on the first page in

Page 320

1 the middle. Do you see it's an e-mail from
2 Jennifer -- Jennifer Melvin to you and several
3 others? Do you see that, October 21, 2010?
4     A   Yes.
5     Q   And this references Martella's Pharmacy,
6 right?
7     A   Yes.
8     Q   And it says: "ServiceFirst" --
9     What is ServiceFirst?
10     A   It's a customer care center.
11     Q   Okay. Part of McKesson?
12     A   Yes.
13     Q   -- "has began calling on all of the NE
14 regions CSMP 85 to 99.99 percent threshold calls
15 this month."
16     Do you see that?
17     A   Yes.
18     Q   "Evidently, Martella's was called by the
19 sales rep last month, and then both ServiceFirst
20 and the sales rep this month, and is upset that
21 his thresholds are not where he feels they should
22 be. Today ServiceFirst called on hydrocodone, the
23 account was at 91.58 percent, so they also would
24 have received a notice on their invoice."

Page 321

1     And then it says: "ServiceFirst only
2 makes one call per month to the account. We
3 wanted you to know that the account was very
4 unhappy and threatened to pull his business from
5 McKesson. Please review and see if there's
6 anything else that may need to be looked at
7 regarding his thresholds."
8     Do you see that e-mail?
9     A   Yes.
10     Q   Okay. And so this indicates that
11 ServiceFirst and the sales rep responsible for
12 this account were certainly calling this customer
13 once -- in this instance, they reached the 85
14 percent mark, right?
15     MR. COLLINS: Objection.
16 BY MR. BOGLE:
17     Q   Of the threshold.
18     MR. COLLINS: Objection to the form.
19     THE WITNESS: I don't know if it doesn't
20 mean that they called them because they were over
21 the threshold or that they called them first, but
22 I don't recall ServiceFirst doing this.
23 BY MR. BOGLE:
24     Q   Well, you see the sentence that says:

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  "Today ServiceFirst called on the hydrocodone, the
2  account was at 91.85 percent."
3      So that indicates a call was made before
4  they had reached the threshold, right?  They're 91
5  percent.
6      MR. COLLINS:  Objection to the form.
7      THE WITNESS:  I think that's what
8  Jennifer is trying to say here.
9  BY MR. BOGLE:
10     Q   Right.  So that's news to you that those
11  kind of calls were being made before a threshold
12  was reached?
13     A   I did not remember that.
14     Q   Okay.  It's your --
15     A   Or like I say, I can't testify that they
16  weren't called because the previous month they
17  went over the threshold or that the customer
18  called them already.  I don't know that.
19     Q   What we do know here indicated from
20  Jennifer, she is saying ServiceFirst called them
21  on hydrocodone, at the very least, before the
22  threshold was reached.
23     A   For whatever reason.
24     MR. COLLINS:  Objection to the form.

Page 323

1  BY MR. BOGLE:
2      Q   All right.  And then so John Kuczynski
3  responds to that e-mail on October 22, 2010, the
4  second paragraph, he says:  "I'm meeting with
5  Martella's in about an hour, and I'm going to
6  reassure him that we are addressing this issue.
7  Please make sure every effort is made to adjust
8  their threshold levels prior to them hitting the
9  85 percent level to prevent omits or SF from
10  calling them."
11     SF being ServiceFirst, right?
12     A   I would think.
13     Q   Okay.  Do you see that reference there?
14     A   Yes.
15     Q   Okay.  And so this -- strike that.
16     So the hydrocodone increase in October
17  2010 that's being referenced here potentially, you
18  didn't approve that ultimately?
19     MR. COLLINS:  Object.
20  BY MR. BOGLE:
21     Q   Is that your testimony?
22     MR. COLLINS:  Objection to the form.
23     THE WITNESS:  No.  I -- I don't know.
24  BY MR. BOGLE:

Page 324

1      Q   You don't know?
2      A   No, I don't remember from this e-mail.
3      Q   Okay.  But you wouldn't have approved it
4  anyway, right, because you don't -- you don't
5  approve threshold increases, right?
6      A   I submit them and let the DRA, which I
7  think was Michael at the time, vet it out fully.
8      Q   But you don't approve them yourself.
9  That's been your testimony throughout this
10  deposition, right?
11     A   I submit them.
12     Q   Right.  But you don't approve them,
13  right?
14     A   I submit them.
15     Q   Okay.  Well, I'm asking you, do you
16  approve them?  Did you approve them in 2010?
17     MR. COLLINS:  Objection to the form.
18  It's vague.
19     THE WITNESS:  I submitted them.
20  BY MR. BOGLE:
21     Q   Okay.  Is there a difference in your
22  mind between submitting and approving a threshold
23  increase?
24     A   Yes.  The way you put the words, it's

Page 325

1  like I can make a threshold happen, and I'm trying
2  to testify that I cannot of and on my own put a
3  threshold through.
4      (Snider Exhibit No. 27 was marked
5      for identification.)
6  BY MR. BOGLE:
7      Q   Okay.  I'm handing you what's marked as
8  1.1843, Exhibit 27.
9      This is a continuation of the discussion
10  regarding Martella's.  And you see here the last
11  e-mail, it's another SharePoint e-mail from
12  October 25, 2010, noting that the threshold
13  increase has been approved by you and Michael
14  Oriente for five drugs, including hydrocodone and
15  methadone, right, for Martella's?
16     MR. COLLINS:  Objection to form.
17     THE WITNESS:  That's what this e-mail
18  says from SharePoint.
19  BY MR. BOGLE:
20     Q   And the hydrocodone increase was by
21  20 percent is what's indicated, right?
22     A   Yes.
23     Q   Methadone by 20 percent, right?
24     A   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    Q   Okay.  And the change type is noted to
2  be permanent.  Right?
3    A   Yes.
4    Q   And this was approved without dispensing
5  data, wasn't it?
6        MR. COLLINS:  Objection.  Assumes facts
7  not in evidence, form.
8        THE WITNESS:  I -- I disagree with that.
9  BY MR. BOGLE:
10   Q   Okay.  You see where it says "DRA
11 approval comments" at the bottom, "Completed.
12 Please secure from customer hydrocodone dispensing
13 data ASAP."  Do you see that?
14   A   I see it.
15   Q   Okay.  So you're saying he already had
16 it, but for some reason he -- Mr. Oriente wanted
17 to get it again?
18       MR. COLLINS:  Objection.  Argumentative,
19 form.
20       THE WITNESS:  I can't answer to what he
21 meant, but he -- he could have meant it was -- we
22 have the data.
23 BY MR. BOGLE:
24   Q   It could have meant he -- you had the

Page 327

1  data when he said you need to get the data.  Is
2  that your testimony?
3        MR. COLLINS:  Objection.  Form,
4  argumentative.  Calls for speculation as to what
5  this witness thought somebody other -- somebody
6  else meant when they wrote something.
7        THE WITNESS:  I can't answer to what
8  Michael meant on that e-mail.
9  BY MR. BOGLE:
10   Q   Okay.  Well, let's keep looking at this
11 e-mail chain.
12       You then say on the next e-mail,
13 October 25, 2010, at 1:52, to John Kuczynski:
14 "John, when can you get the usage?"
15       Do you see that?
16   A   Yes.
17   Q   Okay.  Then your next e-mail to John on
18 October 26 says again:  "Can you get what Michael
19 requested?  The usage was incomplete.  I believe
20 Dale said something," question mark.  "I've upped
21 them to about the highest I've ever done anyone as
22 per previous e-mails.  Will you be able to call to
23 discuss?"
24       Do you see that?

Page 328

1    A   I'm sorry, I skipped the -- I was
2  looking at the one before that.  "I met with Joel
3  Martella," you want the one above that?
4    Q   I'm reading the e-mail that you sent on
5  October 26, 2010.
6        MR. COLLINS:  Objection.  The witness is
7  confused and lost.  If you could direct him to
8  where you're --
9  BY MR. BOGLE:
10   Q   Sure.  October 26, 2010, second e-mail
11 on the page from you to John Kuczynski.  I'll read
12 it again.
13       "Can you get what Michael requested?
14 The usage was incomplete.  I believe Dale said
15 something?  I upped them to about the highest I've
16 ever done anyone as per previous e-mails."
17       That's what you said to Mr. Kuczynski,
18 right?
19   A   Yes.
20   Q   You didn't say that Michael Oriente
21 upped them; you said you upped them, right?
22   A   Yes, but I can't do that myself.  I
23 can't put a threshold through without DRA
24 approval.

Page 329

1    Q   But what you say here is that you upped
2  them, right?  And you were a little concerned
3  about that, right --
4        MR. COLLINS:  Object --
5  BY MR. BOGLE:
6    Q   -- because you didn't have the usage
7  data?
8        MR. COLLINS:  If that's a question, I
9  object.  It's compound multiple ways.  It's
10 argumentative.
11       THE WITNESS:  I asked the DRA to do his
12 due diligence, which he did.  The pharmacy had
13 trouble with the usage data, and I said it was
14 incomplete.  And I can't make it up them at any
15 point in time.  I can't do that.
16 BY MR. BOGLE:
17   Q   It was --
18   A   I can't even do it in the system.
19   Q   It was incomplete, but the threshold was
20 approved, right?
21       MR. COLLINS:  Objection.
22 BY MR. BOGLE:
23   Q   And you're still concerned the next day
24 where is the data, right?  That's what you're

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1 talking about here, isn't it?
2          MR. COLLINS: Objection. It's three
3 questions. Compound. It's argumentative. It's
4 been asked and answered.
5 BY MR. BOGLE:
6     Q   You're still looking for the data the
7 next day, aren't you?
8     A   I'm making sure the due diligence is
9 done. I don't know what Michael had.
10    Q   Well, you know that you had said that
11 you upped it, and you wanted to see the data,
12 right, because you didn't have it?
13         MR. COLLINS: Objection. The question
14 is compound again.
15 BY MR. BOGLE:
16    Q   Would you ask to see data that you had?
17    A   I didn't ask to see it.
18    Q   You didn't. You said: "Can you get
19 what Michael requested?"
20    A   Yes.
21    Q   "I upped them to about the highest I've
22 ever done anyone."
23    A   Right. That doesn't mean I did it
24 because I can't. That's the point I'm trying to

Page 331

1 make: I can't up a threshold myself.
2     Q   Okay. So that just wasn't true when you
3 said that.
4          MR. COLLINS: Objection. Argue---
5 BY MR. BOGLE:
6     Q   Right? That's a false statement?
7          MR. COLLINS: Objection. Argumentative.
8          You don't have to answer that.
9 BY MR. BOGLE:
10    Q   True?
11         Yeah, you do.
12         MR. COLLINS: No, you don't.
13 BY MR. BOGLE:
14    Q   That was a false statement when you made
15 it in the e-mail --
16         MR. COLLINS: Object.
17 BY MR. BOGLE:
18    Q   -- is that your testimony?
19         MR. COLLINS: Objection. Argumentative.
20 BY MR. BOGLE:
21    Q   You can answer it.
22         MR. COLLINS: Argumentative. Object to
23 the theatrics.
24 BY MR. BOGLE:

Page 332

1     Q   Sir, was that a false statement when you
2 made it in the e-mail?
3          MR. COLLINS: Objection. Calls for
4 speculation, argumentative.
5          THE WITNESS: No.
6 BY MR. BOGLE:
7     Q   Okay. And there were additional
8 threshold increases approved for Martella's for
9 hydrocodone after this date, right?
10         MR. COLLINS: Objection. Assumes facts
11 not in evidence. Lack of --
12 BY MR. BOGLE:
13    Q   Do you know?
14         MR. COLLINS: Lack of foundation.
15         THE WITNESS: I don't know.
16         (Snider Exhibit No. 28 was marked
17         for identification.)
18 BY MR. BOGLE:
19    Q   All right. Let's take a look at
20 Exhibit 28, 1.1901.
21         This is the following month, the first
22 e-mail at the bottom from SharePoint, November 23,
23 2010, to Joel Zwick, cc'ing several individuals,
24 including you, right?

Page 333

1     A   I'm sorry. It's from -- oh, to Joel
2 Zwick?
3     Q   Yeah.
4     A   Yeah.
5     Q   Cc'ing multiple people, including you,
6 right?
7     A   Yes.
8     Q   And this relates to a threshold change
9 for Martella's in November 2010, right?
10    A   Yes.
11    Q   Okay. And this notes that Dale Nusser
12 and Michael Oriente approving a 2,000 dose
13 increase for hydrocodone for Martella's on
14 November 23rd, right?
15         MR. COLLINS: Objection. Foundation.
16         THE WITNESS: The director of Regulatory
17 Affairs approved it. I don't see the -- the
18 record of it, but it looks like he says he
19 approved it. I'm not sure.
20 BY MR. BOGLE:
21    Q   Okay. Well, the -- okay.
22         And in the paragraph -- the second sort
23 of paragraph there notes "Change type:
24 Permanent," right?

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    A   Yes, that's right.

2    Q   And the reason again being: "Business
3 growth should be supported by corresponding sales
4 increase."

5        The same thing we've seen throughout the
6 deposition, right?

7    A   It says: "New customer still adjusting
8 thresholds to accommodate purchases. Also, there
9 are four accounts under this DEA number. The
10 number of scripts have increased for all four
11 pharmacies."

12   Q   Okay. Do you see that there?

13   A   Yes.

14   Q   Okay. Do you see any proof of their
15 purchases attached to this e-mail?

16   A   No.

17   Q   And Dale Nusser responds to this e-mail
18 to John Kuczynski saying: "John, they are
19 approved and ready to order for tomorrow."

20       Do you see that?

21   A   Yes.

22   Q   And in 2016, you actually received a
23 subpoena from the DEA for information about
24 controlled substances that McKesson -- that the

Page 335

1 New Castle center supplied to Martella's, right?

2       MR. COLLINS: Objection. Foundation.

3       THE WITNESS: I would have to see that.

4 BY MR. BOGLE:

5    Q   You don't remember that?

6       (Snider Exhibit No. 29 was marked

7       for identification.)

8 BY MR. BOGLE:

9    Q   All right. Exhibit 29, also
10 Exhibit 1.1902.

11       Okay. We see this is McKesson's
12 Controlled Substance Monitoring Program,
13 Regulatory Investigative Report dated December 15,
14 2016.

15       Do you see that?

16   A   Yes.

17   Q   Related to customer's name, Martella's
18 Pharmacy, right?

19   A   Yes.

20   Q   And in the first paragraph under
21 "Details," it says: "This report is in reference
22 to a DEA administrative subpoena received on
23 December 13, 2016, for all invoicing records for
24 Martella's Pharmacy from January 1, 2015, through

Page 336

1 November 30, 2016."

2       And then it provides the location for
3 Martella's, and it says it's currently serviced
4 out of the New Castle No. 8772 Distribution
5 Center.

6       That's the number for New Castle, right?

7    A   Yes.

8    Q   "The DEA subpoena was faxed to director
9 of operation for New Castle DC, Blaine Snyder."

10       That's you, right?

11   A   Yes. It's spelled wrong, but that's me.

12   Q   I figured there is not another Blaine
13 Snider.

14       And if you go to .3, page .3 in this
15 document, third page, there's a purchase history
16 review section in the middle, and it says:
17 "Current solver information for fiscal year '17,
18 Quarter 2, revealed that the business control
19 ratio is 21.17 percent. This is above the mean
20 for control prescriptions in the New Castle DC."

21       Do you see that?

22   A   Yes, I see it.

23   Q   So you see this is identifying a
24 potential red flag with a ratio of the number of

Page 337

1 controlled substances versus total purchases,
2 right?

3    A   I can testify that I don't know this
4 document and I've never seen this.

5    Q   Okay. So you don't know what that means
6 when he says that?

7    A   I can't speculate on that.

8    Q   Okay. Well, you did receive the
9 subpoena, you don't dispute that when it says that
10 in this document?

11   A   No, I got -- if it says I did, I'm sure
12 I got it --

13   Q   Okay.

14   A   -- and passed it on to Aaron.

15   Q   And Martella's orders were not blocked
16 for controlled substances after the subpoena was
17 received, right?

18       MR. COLLINS: Objection. Foundation.

19       THE WITNESS: I don't know.

20 BY MR. BOGLE:

21   Q   You don't know if your distribution
22 center kept giving them pills?

23   A   I don't remember when they were blocked.
24 I apologize. I just don't know.

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    Q   Okay.  You know, though, that just last
2  week the owner of Martella's was indicted on 109
3  counts of diversion of controlled substances,
4  right?
5    A   Yes, I read that.  Izzy sent that to me.
6    Q   Okay.  Sent it to you when?
7    A   Tuesday or Wednesday.
8    Q   Okay.  So you've seen that recently,
9  right?
10    A   Yes.
11    Q   Okay.  And you know that that indictment
12  pertains to controlled substances that were
13  provided to Martella's by your distribution
14  center, right?
15        MR. COLLINS:  Objection.  Lack of
16  foundation, assumes facts not in evidence.
17        THE WITNESS:  I don't know if it says
18  that.  I did not read that.
19  BY MR. BOGLE:
20    Q   Do you know, though?  I mean, when you
21  got this just a couple of days ago, did you look
22  and say, Boy, was my distribution center the one
23  giving them stuff?
24        MR. COLLINS:  Objection.  Calls for

Page 339

1  speculation.  Foundation.
2        THE WITNESS:  I read it.
3  BY MR. BOGLE:
4    Q   Okay.  But, again, you didn't follow up
5  to see if you guys were the ones supplying them?
6    A   I will say this:  It was in Izzy's hands
7  and the director of Regulatory Affairs.  We used
8  to call it a Level III.
9    Q   Okay.  But you do know as of 2016, with
10  this DEA subpoena, and going back as far as 2010
11  in the documents we looked at, during that time
12  period certainly McKesson and your distribution
13  center specifically was supplying Martella's,
14  right?
15        MR. COLLINS:  Objection.  The question
16  is vague.  Form.
17        THE WITNESS:  I don't know if we were
18  supplying all of his controls or pharmaceuticals.
19  BY MR. BOGLE:
20    Q   I didn't ask you if you were supplying
21  all.  I said that you were supplying him, right?
22    A   Some.
23    Q   He was a customer.
24        MR. COLLINS:  Objection.  Form.

Page 340

1  BY MR. BOGLE:
2    Q   He was a customer of McKesson's New
3  Castle Distribution Center --
4    A   Yes.
5    Q   -- during that time frame, right?
6        MR. COLLINS:  Objection.
7        THE WITNESS:  Yes, he was.
8        MR. COLLINS:  Objection.  The question
9  is --
10  BY MR. BOGLE:
11    Q   And as we just saw from the e-mails we
12  just -- the e-mail and the investigative report
13  from 2016, those purchases included four opioids,
14  right?
15        MR. COLLINS:  Objection.  Assumes facts
16  not in evidence.
17        THE WITNESS:  I don't know the subpoena,
18  but he did have opioid purchases.
19        (Snider Exhibit No. 30 was marked
20         for identification.)
21  BY MR. BOGLE:
22    Q   Okay.  I'm going to hand you what's
23  marked as Exhibit 30, 1.1905.
24        Do you see it's another DOJ press

Page 341

1  release from November 2nd, 2018, just a few days
2  ago.  And the title is "Johnstown pharmacist
3  charged with -- charged in 109-count indictment
4  with illegally creating bogus prescriptions and
5  then dispensing the drugs."
6        Do you see that title?
7    A   Yes, I do.
8    Q   Okay.  Thereafter it says:  "A
9  Johnstown, PA, pharmacist has been indicted by a
10  federal grand jury in Pittsburgh on charges of
11  dispensing and distributing controlled substances
12  and conspiring to distribute and dispense
13  controlled substances, by United States Attorney
14  Scott W. Brady announced today."
15        Then it says:  "The 109-count indictment
16  returned on October 30th named Joseph M. Martella,
17  53, of Johnstown, Pennsylvania."
18        Then it says:  "According to the
19  indictment presented to the court, Martella owned
20  and operated Martella's Pharmacy located on
21  Franklin Street in Johnstown.  The indictment
22  alleges that Martella, a pharmacist, conspired
23  with Dr. Peter James Ridella, who previously
24  pleaded guilty, and with an individual known as JR

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 to create and submit unlawful prescriptions for
2 oxycodone; oxycodone and acetaminophen, also known
3 as Percocet; oxymorphone, also known as Opana;
4 morphine sulfate, also known MS Contin; and
5 hydrocodone and acetaminophen, also known as
6 Vicodin, and then unlawfully dispensed those
7 controlled substances to other persons."
8      Do you see that?
9   A   I see that, yeah.
10   Q   Okay. And have you done any sort of
11 investigation in the last week as to the time
12 period covered in this indictment when these
13 alleged violations occurred?
14      MR. COLLINS: Objection. The question
15 is vague. It's compound.
16      THE WITNESS: No, I actually didn't see
17 this article, but Izzy sent me another article
18 about the newspaper.
19 BY MR. BOGLE:
20   Q   Okay. So --
21   A   And --
22   Q   I'm sorry, go ahead.
23   A   I was told by the manager, Izzy's boss,
24 to make sure I cut off Franklin Street Pharmacy,

Page 343

1 and I did. Oh, he does that. I just make sure
2 there was no will-calls or anything.
3   Q   That was after the indictment, though,
4 right?
5   A   Yes. Well, I believe so. It was, I
6 believe, Sunday or Monday. I don't remember which
7 day.
8   Q   Okay.
9      (Snider Exhibit No. 31 was marked
10      for identification.)
11 BY MR. BOGLE:
12   Q   I'm handing you Exhibit 31 to your
13 deposition, 1.1904.
14      This is the actual indictment for
15 Martella's. And if you look to the point I just
16 asked you about the covered period for this
17 conduct, on page 10, do you see the paragraph
18 starts there "From in and around"?
19      MR. COLLINS: I'm sorry. Can I have a
20 proffer as to the relevance of this? It certainly
21 doesn't involve Summit County, it doesn't involve
22 Cuyahoga County, it doesn't involve the cities of
23 Cleveland or Canton. Can I have a proffer as to
24 the relevance?

Page 344

1      MR. BOGLE: No.
2      MR. COLLINS: Okay.
3      MR. BOGLE: You're entitled to nothing
4 of the sort.
5      MR. COLLINS: Okay. Well --
6 BY MR. BOGLE:
7   Q   "From in and around April 2011 and
8 continuing thereafter to in and around June 2016
9 in the Western District of Pennsylvania, the
10 Defendant Joseph M. Martella," and it goes on to
11 repeat sort of the allegations I talked about as
12 far as the diversion of controlled substances,
13 including opioids.
14      Do you see that?
15   A   Yes, I see it.
16   Q   Okay. So the time period April 2011
17 to June 2016 -- first of all, April 2011, that's
18 just a few months after you noted in an e-mail
19 that you approved a threshold increase as high as
20 you had ever done, right?
21      MR. COLLINS: Objection.
22 BY MR. BOGLE:
23   Q   Do you remember that e-mail?
24      MR. COLLINS: Objection. The question

Page 345

1 is compound. It's actually three questions. It's
2 also vague.
3 BY MR. BOGLE:
4   Q   Do you remember the e-mail? We can pull
5 it back out.
6   A   I sent --
7   Q   I'm happy to pull it back out.
8   A   I sent a threshold. That's what I
9 testified to.
10   Q   All right. Let's pull it back out.
11      1.1843, Exhibit 27. Do you have that
12 e-mail?
13      MR. COLLINS: Can you give an exhibit
14 number?
15      MR. BOGLE: 27.
16 BY MR. BOGLE:
17   Q   Do you recall looking at this e-mail,
18 the one on the first page here, the second e-mail
19 on the page from October 26, 2010, where you tell
20 John Kuczynski: "I upped them to about the
21 highest I've ever done anyone as per previous
22 e-mails"? Do you see that?
23   A   I see this.
24   Q   And that involved threshold increases

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  for drugs including methadone and hydrocodone,
2  right?
3      MR. COLLINS: Objection. Lack of
4  foundation.
5  BY MR. BOGLE:
6      Q   That's what the form says on the second
7  page.
8      MR. COLLINS: Objection. Foundation.
9  Vague. Argumentative.
10     THE WITNESS: Yes. I see that Michael
11 approved that.
12 BY MR. BOGLE:
13     Q   Okay. You also see your e-mail where
14 you say you upped it, right?
15     A   I already discussed that. I didn't up
16 it. I sent the threshold request. I keep saying
17 that.
18     Q   Right, right.
19     Some few -- just a few months before the
20 covered period of conduct discussed in the
21 indictment we just looked at, right?
22     MR. COLLINS: Objection. Compound.
23     THE WITNESS: I don't know.
24     MR. COLLINS: Lack of foundation.

Page 347

1  BY MR. BOGLE:
2      Q   The covered period starting April 2011?
3      MR. COLLINS: I'm sorry. The question
4  is irrelevant to this litigation.
5      MR. BOGLE: I doubt that.
6  BY MR. BOGLE:
7      Q   Do you see that?
8      MR. COLLINS: I'm sorry. What's the
9  question?
10 BY MR. BOGLE:
11     Q   Back to -- back to Exhibit 1.1904,
12 Exhibit 31, covered period beginning April 2011.
13     MR. COLLINS: What's the --
14 BY MR. BOGLE:
15     Q   Just a few months after the -- you
16 granting them the biggest increase you had ever
17 done.
18     MR. COLLINS: What's the question?
19 BY MR. BOGLE:
20     Q   Do you see that?
21     MR. COLLINS: I'm sorry. That's not a
22 proper question. You need to ask a legitimate,
23 proper question.
24     MR. BOGLE: No, I'm good with that one.

Page 348

1  BY MR. BOGLE:
2      Q   Do you see that?
3      MR. COLLINS: See what?
4  BY MR. BOGLE:
5      Q   See that in the indictment? The covered
6  period was just a few months after the threshold
7  that you said you upped.
8      MR. COLLINS: Objection.
9  Mischaracterization.
10 BY MR. BOGLE:
11     Q   For hydrocodone and methadone for this
12 pharmacy.
13     MR. COLLINS: Objection. The question
14 is compound. It's also argumentative.
15     THE WITNESS: I see what it says now.
16     MR. BOGLE: I'm moving to a whole other
17 topic area. If we can take a break, and we'll
18 reload documents.
19     THE VIDEOGRAPHER: The time is 2:47 p.m.
20 We're going off the record.
21     (Recess.)
22     THE VIDEOGRAPHER: The time is 3:03 p.m.
23 We're back on the record.
24 BY MR. BOGLE:

Page 349

1      Q   All right. Mr. Snider, I want to shift
2  gears to a different topic area.
3      We talked about earlier that Ohio was
4  one of the states that customers -- that your New
5  Castle Distribution Center services, right?
6      A   Yes.
7      Q   And you know that Ohio in recent years
8  has had a high level of abuse and diversion of
9  opioids within that state, right?
10     MR. COLLINS: Objection. Form.
11 Foundation.
12     THE WITNESS: I know it's in the papers,
13 yes.
14 BY MR. BOGLE:
15     Q   Okay. And you've read those stats,
16 right?
17     A   Yes.
18     Q   On that topic.
19     MR. COLLINS: Objection. Form.
20     THE WITNESS: Yeah.
21 BY MR. BOGLE:
22     Q   Okay. I want to hand you what I'm
23 marking as Exhibit 1.1434, so Exhibit 32.
24     (Snider Exhibit No. 32 was marked

Page 350

1  for identification.)
2 BY MR. BOGLE:
3    Q   This is an e-mail from Krista Peck to a
4 large group of individuals, June 10, 2014.  Do you
5 see that?
6        MR. COLLINS:  Objection.  Foundation.
7        THE WITNESS:  Yes.  It looks --
8 BY MR. BOGLE:
9    Q   Okay.  And noted in the e-mail, it says:
10 "Attached is the regulatory presentation to the DC
11 Ops team at National Sales Conference (NSC) in
12 May."
13       Do you see that?
14   A   Yes.
15   Q   So the DC ops is DC operations,
16 distribution center operations?
17   A   Yes.
18   Q   Okay.  So that's a meeting you would
19 have attended, right?
20   A   What year is it?
21       MR. COLLINS:  Objection.
22 BY MR. BOGLE:
23   Q   2014.
24       MR. COLLINS:  Objection.  Form.

Page 351

1        THE WITNESS:  I don't know if I attended
2 that one.
3 BY MR. BOGLE:
4    Q   Okay.  Is that a meeting you generally
5 would attend?
6    A   Normally, I do.  I'm not sure, in 2014,
7 I was exempted because I believe I was -- that's
8 when I was putting up a new distribution center in
9 Delran.
10   Q   Okay.  Would you have -- if you did not
11 attend this specific session, would you generally
12 have requested the materials that were passed
13 out --
14       MR. COLLINS:  Objection.
15 BY MR. BOGLE:
16   Q   -- so you could catch up to speed?
17       MR. COLLINS:  Objection.  Form.
18       THE WITNESS:  I certainly would think
19 so, yes.
20 BY MR. BOGLE:
21   Q   Okay.  So I want to look at the -- just
22 one slide from this PowerPoint deck that was
23 presented in 2014.  If you go to page .13.
24       Do you see there is a slide titled

Page 352

1 "Current Rx Drug Diversion Trends"?  Do you see
2 that?
3    A   Yes.
4    Q   Okay.  And then it lists various states
5 and various opioid products, right?
6    A   Yes.
7    Q   Okay.  And for oxycodone, for example,
8 Ohio is ranked as number 5 for drug diversion,
9 right?
10       MR. COLLINS:  Objection.  Foundation.
11 BY MR. BOGLE:
12   Q   As of 20 -- as of 2013 is what it
13 indicates there.
14   A   That's I think what it indicates.
15   Q   Okay.  Hydrocodone -- Ohio is listed as
16 number 7 in drug diversion for hydrocodone, right?
17   A   That's what it looks like, yes.
18   Q   Hydromorphone, number 8 for Ohio, right?
19   A   Yes.
20   Q   And for oxymorphone, number 7 for the
21 state of Ohio as far as drug diversion.
22   A   Yes.  I don't know the quantification
23 for drug diversion, but I see the slide for sure.
24   Q   And then as far as the authority for

Page 353

1 this, it's noted below the chart:  "States with
2 highest pharmacy dispensing data 2012.  Source:
3 DEA Distributors Conference, October 2013."
4        Do you see that as the reference?
5    A   I see that.
6    Q   Okay.  As far as Ohio pharmacies go,
7 Acme Pharmacy was a pharmacy that you guys
8 serviced out of the New Castle Distribution
9 Center, right?
10   A   Can you say that again?
11   Q   Acme, A-C-M-E.
12   A   I'm sorry, I don't remember that.
13   Q   You don't remember Acme?
14   A   No.
15   Q   Okay.  Specifically, Acme in Summit
16 County, does that ring a bell at all?
17   A   No.  I'm sorry.
18   Q   Okay.  That's fair.  That's fine.
19       How about Summit Pain Specialists, do
20 you recall hearing them, that name?
21   A   No, I don't.
22   Q   Okay.  Were you ever made aware that in
23 2010, Summit Pain Specialists reached out to
24 McKesson for assistance in opening up its own

Highly Confidential – Subject to Further Confidentiality Review

Page 354

1 pharmacy?

2   A   No, I was not aware of that.

3   Q   Okay. I'm handing you what I'm marking

4 as Exhibit 33, 1.1896.

5       (Snider Exhibit No. 33 was marked

6       for identification.)

7 BY MR. BOGLE:

8   Q   I want to start with the e-mail that

9 starts on page .4 at the bottom, from Becky Suglio

10 to a Kim Diemand, October 18, 2010.

11      Do you see that e-mail at the very

12 bottom?

13   A   Yes.

14   Q   Okay. It says -- in the second

15 sentence, it says: "I am the administrator of

16 Summit Pain Specialists, and I'm considering

17 putting some type of pharmacy within the pain

18 center. The physicians write for approximately

19 500 scripts per day, 3,000 per week."

20      And skipping a sentence, it says: "With

21 this type of volume and professionalism and

22 respect of this practice, I am certain that a

23 pharmacy that would just serve their patients

24 would be profitable for all parties."

Page 355

1       And skipping a sentence thereafter, it

2 says: "I think this would be an opportunity for

3 McKesson to get involved in some type of

4 ownership/partnership with the physicians and

5 agree to put forth the meds until the pharmacy has

6 cash flow 45 to 60 days out. What are your

7 thoughts?"

8       Do you see that e-mail?

9   A   I see that e-mail, yeah.

10   Q   Okay. And then going up, there's a

11 response from Kim Diemand, November 2nd, 2010,

12 that copies a few more people within McKesson.

13      The second sentence she says: "This is

14 a pain clinic with five doctors that write around

15 3,000 scripts a week."

16      Do you see that?

17      MR. COLLINS: Objection. Lack of

18 foundation, lack of firsthand knowledge.

19      THE WITNESS: I see that.

20 BY MR. BOGLE:

21   Q   Okay. And then following up there,

22 there's a response from Dave Gustin that starts at

23 the bottom of .3 and carries over on November 2nd,

24 2010.

Page 356

1       He says: "How many days a week would

2 this thing operate? If you do the math, you would

3 have 600 scripts a week per doctor. That's 100 a

4 day in a six-day week and 120 per day per doctor

5 in a five-day. How much face time would each

6 patient be getting and does it pass the sniff test

7 with the BOP?"

8       What's BOP, do you know?

9   A   Board of Pharmacy, I would guess.

10   Q   Okay. "I am assuming they would be

11 getting all licenses and that it would be all

12 above board, but I'm curious as to how they handle

13 that volume and extend the right time/care to each

14 patient. I would also want to know how the DEA or

15 BOP views the potential for a built-in conflict of

16 interest by having a financial benefit for doctors

17 and/or the owner of the pain clinic implied in

18 writing more, not fewer, scripts. Do you know

19 what I mean?"

20      And he says: "We are not in a position

21 to advise the customer, but certainly they will

22 need to cross every T and dot every I."

23      Do you see that e-mail?

24      MR. COLLINS: Objection. Lack of

Page 357

1 foundation. Lack of firsthand knowledge.

2       THE WITNESS: I see the e-mail.

3 BY MR. BOGLE:

4   Q   Okay. And you would agree that a doctor

5 writing a hundred scripts a day for controlled

6 substances, that's a -- that's a high number,

7 isn't it?

8       MR. COLLINS: Objection. Vague, form,

9 calls for speculation.

10      THE WITNESS: I can't answer to this

11 e-mail what happened. I wasn't involved.

12 BY MR. BOGLE:

13   Q   I'm not asking you what happened. I'm

14 asking a hundred scripts a day for controlled

15 substances by one -- per doctor, do you think

16 that's a high number?

17   A   I'm not sure.

18   Q   You don't know. Okay.

19      And then if you go to the first page of

20 this e-mail chain, the top e-mail from John

21 Kuczynski, November 4, 2010, third paragraph he

22 says: "We are definitely going to have to do some

23 serious diligence on this. Dave's point regarding

24 the math not adding up to proper doctor/patient

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 relationship is a serious concern. Also of
2 concern, physicians owning the pharmacy may not be
3 against the law in Ohio but raises the questions
4 of conflict of interest. The more you write, the
5 more you make."
6 And it says: "One of their primary
7 offices seems to be in Cuyahoga Falls, close to
8 Klein's."
9 Klein's is a customer of New Castle as
10 well, right?
11 A Oh, Yes.
12 Q Okay. "I believe it opened within the
13 last year and has caused Klein's to request CSMP
14 threshold increases due to scripts coming from the
15 clinic."
16 Do you see that?
17 A I see that, yes.
18 Q Okay. And shortly after these
19 communications went back and forth in late 2010,
20 you were looped in to the concerns about Summit
21 Pain Specialists and their prescribing practices,
22 right?
23 MR. COLLINS: Objection.
24 BY MR. BOGLE:

Page 359

1 Q Do you recall that?
2 MR. COLLINS: Objection. Foundation.
3 THE WITNESS: No.
4 BY MR. BOGLE:
5 Q Okay.
6 (Snider Exhibit No. 34 was marked
7 for identification.)
8 BY MR. BOGLE:
9 Q Let's take a look at Exhibit 34, 1.1877.
10 First of all, we're going to start from
11 the earliest e-mail in time, but the top e-mail,
12 which includes all of the e-mails before it, do
13 you see it's from Michael Oriente to you, June 16,
14 2011, right? At the top.
15 A Yes.
16 Q Okay. Let's go back and look at the
17 e-mails that come before that. So it starts at
18 the bottom of the first page from Steve Kravec,
19 June 14, 2011. And the substance of the e-mail is
20 on the second page.
21 It says there: "I just got off the
22 phone with Dr. James Bressi and Becky Suglio from
23 Summit Pain Specialists. The bulk of the
24 conversation was over their ability to utilize

Page 360

1 Access Health for contract management, but they
2 are looking at taking their business model
3 national."
4 And the last paragraph says, to somebody
5 named Chris: "As we discussed, Dr. Bressi is
6 talking about taking his concept national and
7 asked if we had people who helped to open new
8 pharmacies. That's where I thought you would come
9 in. He wants to get his pharmacy opened and then
10 take it to his peers, whom he says represent 45
11 percent of the pain market."
12 Do you see that?
13 A Yes.
14 Q Okay. And then going up from there, the
15 next e-mail is from you forwarding that e-mail
16 below to Mr. Oriente, correct? You say "FYI."
17 A Yes.
18 Q Okay. Then he responds back to you with
19 the e-mail from June 16, 2011, that says: "Some
20 comments from patients. One not so good. His
21 brother OD'd, and the last comment says how busy
22 they are. I think we would need a closer physical
23 visit."
24 Do you see that?

Page 361

1 A Yes.
2 Q Okay. So does this jog your memory at
3 all about any discussions about Summit Pain
4 Specialists?
5 A No. I don't even know if we put them on
6 as a customer, and I don't know Kim Diemand or
7 Steve Kravec was a sales exec. I don't really
8 know him very well.
9 Q Okay. And you said Acme Pharmacy
10 doesn't ring a bell for you either, huh?
11 A No, I'm sorry.
12 Q Okay.
13 A We don't have them now, I know that.
14 Q I agree with that.
15 (Snider Exhibit No. 35 was marked
16 for identification.)
17 BY MR. BOGLE:
18 Q Well, let's take a look then at the next
19 exhibit, 1.1870, which is also Exhibit 35.
20 MR. COLLINS: What number?
21 MR. BOGLE: Exhibit 35.
22 MR. COLLINS: Thank you.
23 BY MR. BOGLE:
24 Q Okay. And you see this is an e-mail

Highly Confidential -- Subject to Further Confidentiality Review

Page 362

1  chain that pertains to Acme Pharmacy No. 30. Do
2  you see that generally?
3      A   I see "Topco" on here. It says "Acme"
4  at the top. Yes.
5      Q   Okay. So let's start with the e-mails
6  on page .2 and work our way back towards the
7  front.
8          The bottom e-mail on .2 says -- it's
9  from Denise Joslyn to Joe Lahovich, December 5,
10 2010, entitled "CSMP Acme." Do you see that?
11     A   Yes, on December 5th?
12     Q   Yep. And she says there: "Joe, I'm not
13 sure who this should be sent to. Please let me
14 know if this account needs an increase to the
15 threshold below. Please provide a business reason
16 for this request."
17         And it lists -- Acme Pharmacy No. 30,
18 oxycodone, lists their current monthly threshold
19 as 16,000. Do you see that?
20     A   I see that.
21     Q   Okay. And then the next e-mail up
22 says -- from Joe, December 5, 2012, says: "Acme
23 Pharmacy No. 30 is located in the local hospital
24 systems medical building. The local hospitals'

Page 363

1  facility is Akron General Wellness Center. Within
2  the building is a large pain management practice,
3  which the pharmacy serves its patients. Due to
4  the practice, Acme Pharmacy No. 30 dispenses a
5  large quantity of oxycodone and other pain
6  medications."
7          Do you see that reference?
8      A   I see that sentence.
9      Q   Okay. And then there's a discussion
10 with Denise Joslyn asking the pharmacy: "Based on
11 the below, how much do we need to increase?"
12         MR. COLLINS: Objection.
13 BY MR. BOGLE:
14     Q   Do you see that e-mail?
15         MR. COLLINS: Objection. Foundation.
16         THE WITNESS: I don't know what that is.
17 I don't know Denise. It says "Joe." I'm not sure
18 who this could be sent to.
19 BY MR. BOGLE:
20     Q   All right. Well, let's take a look.
21 The response from December 6, 2012, at the top of
22 the e-mail from Joe Lahovich, his e-mail is noted
23 to be Acme Stores, right? At the top of .2, the
24 top e-mail.

Page 364

1          MR. COLLINS: Objection.
2          THE WITNESS: Acmestores.com.
3          MR. COLLINS: I'm sorry. Objection.
4  BY MR. BOGLE:
5      Q   Acmestores.com, right?
6          MR. COLLINS: Objection. Form, lack of
7  foundation.
8  BY MR. BOGLE:
9      Q   Do you see that?
10     A   I see it on here, yes.
11     Q   Okay. So -- and this is who she sent
12 the initial e-mail to, so again this would
13 indicate that the thresholds at least for Acme,
14 when they were reaching a certain percentage, were
15 being sent to them. They were at 88.13 percent
16 when they were notified about their oxycodone
17 threshold, the first e-mail we looked at, right?
18         MR. COLLINS: Objection. Total lack of
19 foundation for this entire line of inquiry. Lack
20 of firsthand knowledge. You can testify to it.
21 This witness hasn't.
22         MR. BOGLE: He's on the whole -- he's
23 copied on the whole e-mail chain.
24         MR. COLLINS: You haven't established

Page 365

1  this witness has any firsthand knowledge of this.
2          MR. BOGLE: We're getting there, man.
3          MR. COLLINS: Well, establish it first
4  and then we have a foundation.
5          MR. BOGLE: Well, we'll get there.
6          THE WITNESS: I'm sorry.
7  BY MR. BOGLE:
8      Q   Okay. So my question was, the bottom
9  e-mail I looked at with you first because you --
10 you said before that customers don't get notified
11 of their thresholds prior to reaching them. Do
12 you remember that testimony?
13     A   Yes. I don't remember the context,
14 though.
15     Q   Yeah. Well, you see here the first
16 e-mail that I looked at with you from Denise
17 Joslyn to Joe Lahovich at Acme, she's literally
18 listing out his monthly threshold and telling him
19 exactly how much they've used for that month,
20 right?
21     A   I have no recollection of ever seeing
22 this e-mail.
23     Q   You see it now, don't you?
24     A   I see what Joe and Denise were talking

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1 about, yes.
2    Q   Right.  And what they're talking about
3 are the specific thresholds for Acme Pharmacy for
4 oxycodone, right?
5        MR. COLLINS:  Objection.  Lack of
6 foundation.
7 BY MR. BOGLE:
8    Q   That's what the chart says, doesn't it?
9        MR. COLLINS:  Object.
10       THE WITNESS:  I cannot testify to that.
11 BY MR. BOGLE:
12   Q   You don't know what that says?
13   A   I can't testify what it says.
14   Q   Okay.  All right.  Let's go back up
15 then, the top of this -- the top e-mail on this
16 page where Joe says:  "70,000 per oxycodone
17 products."  And he says:  "Query from No. 30
18 e-mailed.  The warehouse says my oxycodone 30
19 milligram limit is 4,000, not 8,000.  My limit is
20 16,000 total oxycodone.  Of that 4,000 can be
21 oxycodone, 30 milligrams.  I need at least 10,000
22 generic Percocet, 10/325 alone to make it a month.
23 I figure a limit of 70,000 is needed to safely get
24 through a month with all oxycodone products."

Page 367

1        Do you see that?
2    A   I see what this Joe said.  I don't know
3 him.
4    Q   Yeah.  And 70,000 doses a month for
5 oxycodone is a huge number, isn't it?
6    A   For Joe, it might be.  I don't know.  I
7 can't testify to what Joe was doing there.
8    Q   What about for the oxycodone that you
9 historically distributed from New Castle, how does
10 70,000 a month for oxycodone fit?  Is that about
11 right?  Is that normal?
12       MR. COLLINS:  Objection.  The question
13 is inherently vague.
14 BY MR. BOGLE:
15   Q   I'm asking you if 70,000 seems high to
16 you.  This is what you do every day.
17   A   I can't --
18       MR. COLLINS:  Objection to the form.
19       THE WITNESS:  I can't testify that this
20 person got 70,000.  I've never seen this e-mail
21 before.
22 BY MR. BOGLE:
23   Q   Do you think he didn't?
24   A   I don't know.

Page 368

1    Q   Okay.  Well, if you go back to
2 Exhibit 1.1568, which is Exhibit 9.  Keep that one
3 out there with the 70,000 doses.
4    A   That what, keep --
5    Q   Keep that next to you, but I want you to
6 pull this one out too, Exhibit 9.
7    A   Nine?
8    Q   Yeah.
9        MR. COLLINS:  I think they should be in
10 order.
11       THE WITNESS:  Well, kind of.
12       MR. COLLINS:  Let me get mine.
13 BY MR. BOGLE:
14   Q   You got Exhibit 9?
15   A   Yes.
16   Q   Okay.  So this was the "Understand
17 ARCOS" dated document talking about, on the first
18 page, the 2012 DEA ARCOS average numbers per
19 dosage units for various opioids, and if you look
20 at oxycodone, the annual average per the DEA in
21 2012 was 75,584 doses a year.  Do you see that?
22   A   (The witness nods.)
23   Q   Yes?
24   A   Yes.

Page 369

1    Q   Okay.  And what Acme is requesting here
2 is just about that much per month.  Right?
3        MR. COLLINS:  Objection.  Lack of
4 foundation.
5 BY MR. BOGLE:
6    Q   They're asking for 70,000 doses a month,
7 right?
8        MR. COLLINS:  Objection.  Compound, lack
9 of foundation, lack of firsthand knowledge.
10       THE WITNESS:  I'm not aware of anything
11 except this e-mail right here.  I can't testify to
12 what he's asking for or if he's a hospital or
13 anything else.  I'm not --
14 BY MR. BOGLE:
15   Q   Well, you see that it says that they're
16 a pharmacy located in a medical building that's
17 affiliated with a pain medication facility.
18 That's what it says and what we just read, right?
19       MR. COLLINS:  Objection.  Lack of
20 foundation.  You haven't established this witness
21 had any knowledge of this.
22       THE WITNESS:  I'm not even familiar if
23 we ever put this customer onboard.  I'm sorry.
24 BY MR. BOGLE:

Page 370

1    Q   Okay.  Well, you're copied on this whole
2  e-mail chain, right?
3    A   I don't remember.
4    Q   Look at the top e-mail from Denise
5  Joslyn to Michael Oriente, copying you.  Do you
6  see that?  The top e-mail of the document.
7    A   Yes.
8    Q   Okay.  And you understand that when you
9  get copied on something, you get included on the
10 whole -- you get to see the whole chain before it,
11 right?
12       MR. COLLINS:  Objection to the form.
13 BY MR. BOGLE:
14   Q   That's how e-mails work, right?
15   A   I do know how e-mails work --
16   Q   Right.
17   A   -- but I don't remember this e-mail
18 ever.
19   Q   Okay.  That's fair.
20       But my simple question to you was, since
21 you were copied on this e-mail chain, you've seen
22 this e-mail before.  Whether you read it, I don't
23 know.  But 70,000 doses a month is what Acme is
24 requesting, which is nearly the national average

Page 371

1  per year for oxycodone for pharmacies at that
2  point in time.
3        Do you see that reference at least?
4        MR. COLLINS:  Object -- the question is
5  objectionable on multiple grounds.  It assumes
6  that he read the e-mail, which is what your
7  question said.  You haven't established that.
8  Lack of foundation.  Lack of firsthand knowledge.
9  BY MR. BOGLE:
10   Q   Okay.  So do you see they were
11 requesting 70,000 doses of oxycodone a month,
12 compare -- and you compare that to the DEA
13 national average annually for pharmacies, which
14 was 75,584 a year was the average in 2012.  Do you
15 see that?
16   A   I can't testify to this.  I've never
17 seen this before.
18   Q   Okay.  Well, you're on the e-mail chain,
19 right?  You're saying you never read this e-mail
20 chain?
21   A   I don't remember reading it, no.
22   Q   Okay.  But are you saying you didn't
23 read it definitively?
24       MR. COLLINS:  Objection.  Argumentative.

Page 372

1        THE WITNESS:  I'll testify that I don't
2  remember reading it.  I don't even remember the
3  Acme.
4  BY MR. BOGLE:
5    Q   Do you typically not read e-mails
6  you're -- you're copied on?
7        MR. COLLINS:  Objection.  Argumentative.
8        THE WITNESS:  I can't say typically.
9  BY MR. BOGLE:
10   Q   Okay.  But what you can say is that what
11 they're asking for per month is just shy of the
12 average per year for pharmacies in this country in
13 2012, right?  We can agree on that.
14       MR. COLLINS:  Objection.  Assumes facts
15 not in evidence.  It hasn't even been established.
16       MR. BOGLE:  It's right here, Exhibit 9.
17 Just talked about it.
18       MR. COLLINS:  Because -- because it's in
19 a document, it's established?
20       MR. BOGLE:  Well, that's what -- I mean,
21 if you dispute that's what the DEA says, I guess
22 we can deal with that later, but --
23       MR. COLLINS:  Objection.
24 BY MR. BOGLE:

Page 373

1    Q   Do you see that in Exhibit 9?  75,584 a
2  year was the average in 2012.
3        MR. COLLINS:  Objection.  The entire
4  line of question lacks foundation.
5  BY MR. BOGLE:
6    Q   Do you see that?
7    A   Yes.
8    Q   Okay.  All right.  Well, let's see --
9  let's see what you guys did do with this.
10       So, going back to Exhibit 1.1870, I'm
11 going to the first page now, it's the second
12 e-mail in the chain down from Michael Oriente to
13 Denise Joslyn, copying you and Joe Lumpkin,
14 December 6, 2012.
15       He says:  "Denise, submit a threshold
16 change for a 25 percent increase.  A 70,000-dose
17 threshold is more than most of our customers.
18 This account will be under Joe Lumpkin out of New
19 Castle.  He will have the final say.  I will
20 approve a 25 percent for the month until Joe can
21 get there for a visit for such a threshold review.
22 We'll want the top five prescribers that are
23 writing scripts that are being filled at this
24 location and dispensing data minus any patient

Highly Confidential – Subject to Further Confidentiality Review

Page 374

1 info for the last three months for all
2 oxycodone-based products."
3      Do you see that?
4    A   I see that.
5    Q   So on an e-mail you're copied on here,
6 you can at least see that a 25 percent increase
7 was approved without any further data being
8 provided, right?
9      MR. COLLINS: Objection. Foundation.
10      THE WITNESS: I cannot answer to that.
11 BY MR. BOGLE:
12    Q   Okay.
13    A   I don't know.
14    Q   Do you see any reference to any data
15 that he's reviewed? In fact, he's asking for data
16 after he's already approved it, right?
17      MR. COLLINS: Objection. Foundation,
18 form.
19      THE WITNESS: I don't know that.
20 BY MR. BOGLE:
21    Q   Do you see any indication that he says,
22 I've reviewed data already to support this 25
23 percent increase?
24      MR. COLLINS: Objection. Calls for

Page 375

1 speculation, form, foundation.
2 BY MR. BOGLE:
3    Q   If you see it in the e-mail, feel free
4 to point it out to me.
5    A   I can't respond to that. I don't know
6 what he did.
7    Q   Right. I'm asking in the e-mail does he
8 reference that he's reviewed any data to support
9 that increase?
10    A   I don't know that.
11    Q   You don't know if the e-mail says that
12 one way or the other?
13    A   Yes.
14    Q   Okay.
15      (Snider Exhibit No. 36 was marked
16      for identification.)
17 BY MR. BOGLE:
18    Q   All right. Let's take a look at
19 Exhibit 36, 1.1874.
20      All right. Here's another series of
21 e-mails, this now from -- we're into -- from
22 December now into January.
23      It's an e-mail from Denise Joslyn again
24 to Joe Lahovich at Acme, January 11, 2013, saying:

Page 376

1 "Please let me know if we need to make any
2 changes. If you need an increase, please provide
3 a business reason."
4      Again, similar chart except this time
5 showing a monthly threshold of 35,000 for
6 oxycodone. Do you see that?
7      MR. COLLINS: Objection. Foundation.
8      THE WITNESS: I see what Denise wrote,
9 yes.
10 BY MR. BOGLE:
11    Q   Okay. And you see that in the chart,
12 right?
13    A   I see it now.
14    Q   And you see Joe's response in the e-mail
15 above says: "Please increase the threshold to
16 70,000 units for this product class. Their limit
17 was 46,000 last month. They need a limit of
18 70,000 to meet the needs of the patients of Summit
19 Pain Management Practice in the pharmacy's medical
20 building."
21      Do you see that?
22    A   Yes, I see that.
23    Q   And prior to today, do you have any
24 awareness that Summit Pain Management was actually

Page 377

1 located in the same building as Acme Pharmacy?
2    A   No.
3    Q   Were you aware that they were providing
4 almost a hundred percent of the prescriptions for
5 Acme Pharmacy that they were filling for
6 controlled substances?
7      MR. COLLINS: Objection. Form,
8 foundation.
9      THE WITNESS: No, I testified that I
10 don't remember anything about Acme Pharmacy and
11 wasn't on this e-mail.
12 BY MR. BOGLE:
13    Q   Okay. So you don't know the
14 relationship between the two entities at all. Is
15 that your testimony?
16    A   I do not remember.
17    Q   Okay. Now, the increase to 70,000 doses
18 for oxycodone in January 2013, that was approved,
19 right?
20      MR. COLLINS: Object --
21 BY MR. BOGLE:
22    Q   You know that.
23      MR. COLLINS: Objection. Assumes facts
24 not in evidence.

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1    THE WITNESS:  I do not know that.
2  BY MR. BOGLE:
3    Q   You don't know that?
4        MR. COLLINS:  Mischaracterization of his
5  prior testimony.
6  BY MR. BOGLE:
7    Q   You don't know that your distribution
8  center started shipping them out 70,000 doses a
9  month of oxycodone --
10       MR. COLLINS:  Objection.
11 BY MR. BOGLE:
12   Q   -- starting in January 2013?
13       MR. COLLINS:  Objection.  Assumes facts
14 not in evidence.  Lack of foundation.
15       THE WITNESS:  I testified that I did not
16 remember this customer.
17 BY MR. BOGLE:
18   Q   All right.  Well, what we got produced
19 to us in this case was the threshold history
20 reports for all Summit and Cuyahoga pharmacies,
21 and I'm going to hand you the one for Acme here.
22       (Snider Exhibit No. 37 was marked
23       for identification.)
24 BY MR. BOGLE:

Page 379

1    Q   It's Exhibit 37, also marked as 1.1907.
2        And you see here in the middle of this
3  chart -- do you see where I'm at, TCR 1/14/13.  Do
4  you see that date?
5    A   Yes.
6    Q   Related to oxycodone?
7    A   Yes --
8    Q   Okay.
9    A   -- I see the chart.
10   Q   You see that's the same date as the
11 e-mail we just looked at from Joe Lahovich where
12 he asks for an increase from thirty-five to
13 70,000, right?
14   A   I can't testify what this is.  I don't
15 know Joe Lahovich, and I don't know what this
16 chart is.  I'm sorry.
17   Q   Okay.  Well, let's -- let's take a look
18 at the chart and see.  I've got some questions for
19 you on it.
20   A   Okay.
21   Q   In that same column, it says "TCR
22 1/14/13, 35K to 70K.  JL 1/14/13, Topco store,
23 business growth new."
24       Do you see that?

Page 380

1    A   Yes, I do.
2    Q   Okay.  So you weren't aware that once
3  this threshold increase was approved to 70,000
4  doses for oxycodone, that your distribution center
5  started giving them about that much every month?
6        MR. COLLINS:  Objection.  Assumes facts
7  not in evidence, lack of foundation.
8        This witness has testified he has no
9  idea what this is, and you're testifying to facts
10 that aren't -- haven't been established.
11 BY MR. BOGLE:
12   Q   So you don't know when your distribution
13 center sends out 70,000 doses a month to a
14 customer for oxycodone?  That can go on without
15 you even knowing it?
16       MR. COLLINS:  Objection.  Argumentative.
17 Form.
18 BY MR. BOGLE:
19   Q   I'm a little baffled by that, sir.
20       MR. COLLINS:  Objection.  Compound,
21 form, argumentative.  Closing argument.
22       THE WITNESS:  Well, I --
23 BY MR. BOGLE:
24   Q   Is that your testimony?

Page 381

1    A   Yes, I can understand what you're
2  saying, but I don't know anything about this, and
3  it's -- plus I don't know if you have the right
4  account.  It says Topco.
5    Q   They're one of the -- in the Topco
6  Group.
7    A   Okay.
8    Q   Sir, this was provided to us.  I can
9  tell you -- if it's wrong, I guarantee you your
10 counsel will establish it's wrong.  It ain't
11 wrong.  Okay?
12       This is Acme Pharmacy.  This was
13 provided to us from your counsel coming from
14 McKesson's files.
15   A   I'm --
16       MR. COLLINS:  Objection.
17 BY MR. BOGLE:
18   Q   Okay.  So my question to you, though,
19 is -- because I just want to make sure I
20 understand this.
21       So a customer like Acme Pharmacy can get
22 70,000 doses a month of oxycodone from your
23 distribution center, and you don't even know it?
24       MR. COLLINS:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 382

BY MR. BOGLE:

1 BY MR. BOGLE:
2    Q   Is that your testimony?
3        MR. COLLINS:  Objection.  I'm sorry, let
4 me finish my objection, sir.
5        Objection.  Assumes facts not in
6 evidence.  You haven't established that.  This
7 witness has testified over and over again he has
8 no knowledge of that, and so this is just legal
9 argument that's improper at a deposition.
10 Typically lawyers ask questions, witnesses provide
11 testimony.  Not the other way around.
12       MR. BOGLE:  You're just kind of
13 complaining now.  You're not objecting.
14       MR. COLLINS:  No, no, I am objecting.  I
15 mean, this is just total argument.  It's not a
16 question.
17       MR. BOGLE:  No, it's not.  It's not
18 argument.  It is a question.
19 BY MR. BOGLE:
20    Q   Can that go on at your distribution
21 center and you not know about it?
22       MR. COLLINS:  Objection for all the
23 reasons I just stated.
24       THE WITNESS:  I don't remember this

Page 383

1 account.
2 BY MR. BOGLE:
3    Q   Right.  So it obviously can go on and
4 you not know about it, right?
5        MR. COLLINS:  Objection.
6 Mischaracterization, argumentative, form.
7 BY MR. BOGLE:
8    Q   Right?
9    A   Can you repeat the question, please?
10   Q   A customer like Acme Pharmacy can get
11 70,000 doses a month of oxycodone from your
12 distribution center and you not even know it,
13 right?
14   A   I don't remember that.
15   Q   Right, that's my point.
16   A   I don't know what this form is, and I
17 wasn't on the e-mails.  I testified to that.
18       (Snider Exhibit No. 38 was marked
19       for identification.)
20 BY MR. BOGLE:
21   Q   All right.  Let's take a look at
22 Exhibit 38, 1.1899.
23       You see here this is a regulatory
24 investigative report from March 2nd, 2015, related

Page 384

1 to Acme Fresh Markets Pharmacy No. 30.
2        Do you see that?
3    A   Yes.
4    Q   Okay.  And in the "Detail" section
5 there, the middle of that first paragraph, it
6 says:  "There is a pain management clinic, Summit
7 Pain Specialists, located within Akron General
8 Hospital medical building that the pharmacy is
9 located in."
10       Again, that's news to you today, right?
11   A   I testified I don't remember this
12 account.  I'm sorry.
13   Q   Okay.  Let's continue a few more
14 sentences down.  It says:  "The majority of the
15 prescriptions that are filled at the pharmacy are
16 being written at Summit Pain Specialists.  For the
17 period of 7/1/14 to 10/28/14, 89 percent of the
18 scripts filled by Acme 30 were from the pain
19 clinic."
20       Do you see that?
21       MR. COLLINS:  Objection.  Foundation.
22       THE WITNESS:  I see this -- this e-mail.
23 I've never seen this before.
24 BY MR. BOGLE:

Page 385

1    Q   This is a report created by Michael
2 Oriente.  That's what is indicated, right?
3        MR. COLLINS:  Objection.  Lack of
4 foundation, lack of firsthand knowledge.
5 BY MR. BOGLE:
6    Q   Where it says "By"?
7    A   It says "By" --
8        MR. COLLINS:  Objection.  Form,
9 foundation.
10 BY MR. BOGLE:
11   Q   And, you know, there were some questions
12 raised about whether you guys actually did provide
13 anything approaching 70,000 doses of oxycodone a
14 month to this Acme Pharmacy, so let's take a look
15 at that.
16       On page .3, there is a purchase history
17 review.  So for -- if you see there, for
18 oxycodone, it provides the number of doses that
19 were provided to Acme Pharmacy over a period
20 covering January 2014 to January 2015, right?
21       MR. COLLINS:  Objection.  Lack of
22 foundation, lack of firsthand knowledge.
23       THE WITNESS:  I do not know this chart.
24 I see the dates and I see the doses, but I've

Page 386

1 never seen this before.
2 BY MR. BOGLE:
3    Q   So for June 2014, they got 69,504 doses.
4 July 2014, 70,000 doses.  August 2014, 69,900
5 doses.  September 2014, 69,900 doses.  October
6 2014, 67,300 doses.  And November 2014, 67,600
7 doses of oxycodone right here.  That's what it
8 says, right?
9        MR. COLLINS:  Objection.  Form,
10 foundation, lack of firsthand knowledge.
11       THE WITNESS:  I cannot and won't testify
12 that that's what it says.  I don't know.
13 BY MR. BOGLE:
14    Q   You won't?  You can't?  You can't read
15 that?
16    A   I can read that, you know that.  I can't
17 testify that I understand that's what it is.
18    Q   Okay.  So you don't --
19    A   I've never seen this before, this
20 document.
21    Q   Okay.  So, again, your -- your
22 distribution center services this area of Ohio,
23 right?
24    A   Yes.

Page 387

1    Q   Okay.  And so 70,000 doses of oxycodone
2 can go out for multiple months or near it in 2014,
3 and you don't even know, right?
4        MR. COLLINS:  First of all, totally
5 incorrect.  Mischaracterization of his prior
6 testimony.
7        MR. BOGLE:  Well, if he knows, he can
8 certainly correct me.
9        MR. COLLINS:  I'm sorry.  Let me finish
10 my objection.  Lack of foundation.  Lack of
11 firsthand knowledge.  Mischaracterization.  Object
12 to the form.  Otherwise, it's a fine question.
13       THE WITNESS:  I don't know this account.
14 I'm sorry.  It was handled by the national
15 accounts and the director of Regulatory Affairs,
16 and they vetted it out.
17 BY MR. BOGLE:
18    Q   So if national accounts handles it, but
19 you distribute it at your facility, you're hands
20 off; is that right?
21    A   No.
22    Q   Okay.  It's still your pills coming out
23 of your facility, right?
24    A   I protect the supply chain.  I do my job

Page 388

1 on that, and it's very important to me that I do
2 that.  This was vetted out by someone else, and a
3 director of Regulatory Affairs and his boss also,
4 I see.
5    Q   Are you aware that both Summit Pain
6 Specialists and Acme No. 30 are both closed now?
7    A   I'm not aware of that.
8    Q   Not aware of that?
9        I hand you what I'm marking Exhibit 39,
10 Exhibit 1.1895.
11       (Snider Exhibit No. 39 was marked
12       for identification.)
13 BY MR. BOGLE:
14    Q   This is an article from the Akron Beacon
15 Journal/Ohio.com titled "Stow Pain Clinic closing
16 after court upholds sexual imposition conviction
17 against doctor accused of abusing patients,"
18 posted August 11, 2016.  Do you see that?
19    A   I see that, yes.
20    Q   Okay.  The first sentence says: "Summit
21 Pain Specialists in Stow is permanently closed
22 Monday after years of wrangling over a sex abuse
23 scandal involving a doctor there."
24       Do you see that?

Page 389

1    A   I see that, yes.
2    Q   The third paragraph there says: "But
3 the Ohio Supreme Court on August 3 upheld the
4 Summit County Common Pleas Court conviction a
5 former doctor James Bressi, who once co-owned the
6 business with former doctor Robert Stephen
7 Geiger."
8        Do you see that?
9    A   No.  Can you tell me where you are?
10 I -- I was under what prompted the clinic to
11 close.
12    Q   Right here, sir, if you look at my
13 finger.
14    A   I'm sorry.  You skipped around.  I
15 didn't see that.
16    Q   You want me to reread that for you?
17    A   Please.
18    Q   So you can follow along.
19    A   Please.
20    Q   That's fair.
21       The portion I read says: "But the Ohio
22 Supreme Court on August 3 upheld the Summit County
23 Common Please Court conviction of former
24 doctor James Bressi, who once co-owned the

Page 390

1 business with former doctor Robert Stephen Geiger.
2 The clinic's troubles started in 2012 when
3 patients began calling Stow police reporting they
4 had been sexually abused by Bressi inside the pain
5 clinic. Stow police took reports from
6 about 95 patients, including some in their 70s,
7 who made similar claims according to a detective's
8 court testimony."
9     Do you see that?
10    A   I see that, yes.
11    Q   And Dr. James Bressi, that's the same
12 doctor that had reached out to McKesson to begin
13 with about their assistance in opening the
14 pharmacy that ultimately became Acme Pharmacy,
15 right?
16        MR. COLLINS:  Objection to form, lack --
17 BY MR. BOGLE:
18    Q   Do you remember his name?
19    A   No.
20        MR. COLLINS:  Objection to the form,
21 lack of foundation.
22        THE WITNESS:  I don't.
23 BY MR. BOGLE:
24    Q   You don't?

Page 391

1    A   No.
2    Q   Okay.  Do you have any reason to dispute
3 that pretty quickly after Summit Pain Specialists
4 closed so did Acme 30?
5        MR. COLLINS:  Objection.  Foundation,
6 form.
7        THE WITNESS:  I do not know or remember
8 any of that.  I'm sorry.
9 BY MR. BOGLE:
10    Q   Okay.  Well, let's just close the loop
11 here.
12        (Snider Exhibit No. 40 was marked
13        for identification.)
14 BY MR. BOGLE:
15    Q   Exhibit 40, 1.1911.  I pulled this off
16 of Google before I came, pertaining to Acme
17 Pharmacy in Stow, Ohio.  Same address as we just
18 saw in the investigative report.
19        Do you see it's noted to be permanently
20 closed?
21        MR. COLLINS:  Objection.  Foundation.
22        THE WITNESS:  If you say -- I don't see
23 where it says that.  Please point to it.
24 Permanently closed, yes.

Page 392

2 BY MR. BOGLE:
3    Q   Okay.  But again, this is not a customer
4 you ever even recall dealing with at all, right?
5    A   I don't think I was in New Castle at the
6 time.  I was in Delran, New Jersey.
7    Q   You weren't in New Castle at all from
8 when you -- this account started getting serviced
9 in 2012 to 2016 when that -- it closed?
10    A   I was there in 2012, yes.
11    Q   Okay.  For what period of time were you
12 not at New Castle then?
13    A   '14 and '15 or '15, '16.  I don't
14 remember.
15    Q   Who was running New Castle while you
16 were gone?
17    A   Andrew Moore, the VP/GM.
18    Q   Andrew Moore?
19    A   Yes.
20    Q   Okay.  Did you have any communications
21 concerning New Castle during that time period that
22 you were in Delran?
23    A   Not too many.
24    Q   Okay.  There are many Giant Eagle
25 Pharmacies that -- in Summit and Cuyahoga County

Page 393

1 that New Castle supplies opioids to, correct?
2    A   Supplied.  We don't have them any
3 longer.
4    Q   Okay.  When did you stop?
5    A   About a year ago -- less than a year
6 ago.
7    Q   Okay.  Do you know why you stopped
8 providing to them out of New Castle?
9    A   They got another wholesaler.
10    Q   Okay.  Who?
11    A   Cardinal.
12    Q   Okay.  All right.  So prior to losing
13 that business, you said about a year ago, that was
14 one of the larger customers you had in Summit and
15 Cuyahoga counties, right?
16    A   Yes.
17        MR. COLLINS:  Are we done with these?
18        MR. BOGLE:  Yeah.
19 BY MR. BOGLE:
20    Q   We talked about earlier in the
21 deposition that documentation is required to
22 establish claims of business growth when you're
23 reviewing a threshold increase, right?
24    A   Yes, we did.

Page 394

1    Q   As a general principle, that's what's
2  required, right?
3    A   We talked about that, yes.
4    Q   That wasn't historically done for Giant
5  Eagle Pharmacies at Summit and Cuyahoga County,
6  though, was it?
7    A   I don't know that.  I know that was
8  handled by national accounts, and it depends on
9  the time period.  But national accounts and DRAs
10 handled Giant Eagle.
11   Q   Okay.  So if -- if the drugs were coming
12 out of your distribution center, and you believe
13 that anyone handling national accounts wasn't
14 complying with the Controlled Substances
15 Monitoring Program, you think you had an
16 obligation to say something about that?
17       MR. COLLINS:  Objection.  Calls for a
18 legal conclusion.
19       THE WITNESS:  If I knew wrongdoing was
20 happening, I would report it to McKesson or my
21 boss.
22 BY MR. BOGLE:
23   Q   All right.
24       (Snider Exhibit No. 41 was marked

Page 395

1      for identification.)
2  BY MR. BOGLE:
3    Q   We're going to look at a few of the
4  Giant Eagle stores in Summit and Cuyahoga County
5  here.  I hand you 1.1840, Exhibit 41.
6    A   Thank you.
7    Q   So it's another one of the hard copy
8  file productions.  You see it's "Giant Eagle 4009"
9  on the front page, right?
10   A   Yes.
11   Q   Okay.  And let's take a look at the
12 e-mail starting on page .4.
13       The bottom e-mail there is an e-mail
14 from Dave Gustin, May 28, 2008, to several
15 individuals, including you.
16       Do you see that?
17   A   Yes.
18   Q   Regarding New Castle CSMP Report, 75
19 percent plus, 5/28/08.
20       And Mr. Gustin there says:  "Rex, I
21 await your input.  I can bump it if you agree to a
22 small bump."
23       Do you see that there?
24   A   Yes.

Page 396

1    Q   Do you understand he's agreeing to --
2  he's talking about bumping up thresholds, right?
3        MR. COLLINS:  Objection.  Form.
4  Speculation.
5        THE WITNESS:  I don't know that, but I
6  could guess.
7  BY MR. BOGLE:
8    Q   Okay.  No, we can keep going.  I think
9  it establishes it going forward.
10       First of all -- well, hold on.  I'll
11 strike that.
12       The next e-mail is a response from Rex
13 Catton, May 28, 2008, where he says:  "Yes, please
14 bump it up."
15       What was Rex Catton's job in May 2008 at
16 McKesson?
17   A   He was vice president of national
18 accounts.
19   Q   Okay.  On the sales side or regulatory
20 side?
21   A   Sales side.
22   Q   Okay.  Then Dave Gustin responds to that
23 e-mail and says:  "The list, by the way, is a long
24 one.  I need a reason to go in and bump all

Page 397

1  these -- all those stores' thresholds.  They are
2  all purchasing at well past their historic trends
3  or they would not be on the report."
4        Do you know what report is being
5  referenced here?  The CSMP report?
6    A   I don't know the specific one.
7    Q   Okay.  And it's embedded there in the
8  title "Threshold" -- "CSMP Threshold Warning
9  Report."  Are you familiar with that report?
10   A   Yes, I am.
11   Q   What is that report?
12   A   I think it -- it prints out -- I believe
13 we discussed that, but it depends on -- when was
14 this, please?  2008?
15   Q   Right.
16   A   It would print out -- I think it was
17 when it was 85 percent or over the threshold.
18 That's what I recall.
19   Q   Okay.  All right.  And if we keep going
20 in the e-mail chain.  I'm now on page .3.
21       It's an e-mail from Diane Martin,
22 September 22nd, 2008, to Dave Gustin, copying you
23 and Rex Catton.  It says:  "Since these were
24 bumped up without a TCR in late May, what is the

Page 398

1 reason for the increase in dosages?"
2     Dave Gustin responds: "Reason: RNA
3 reasonable request for a small increase per Rex
4 Catton."
5     Do you see that?
6   A   Yes.
7   Q   Okay.  Now, I think we talked about this
8 before, but when a threshold increase is
9 requested, a form has to be completed prior to
10 that increase being approved, right?
11   A   Yes.
12   Q   Okay.  But you see here in September,
13 Diane Martin is talking about increases that were
14 made in May without a TCR.  And she's talking
15 about that in September, right?
16     MR. COLLINS:  Objection.  Lack of
17 foundation.
18     THE WITNESS:  She doesn't see there's a
19 TCR, yes.
20 BY MR. BOGLE:
21   Q   Okay.  Well, let's take a look then at
22 page .2.  And this is the threshold change form
23 that's being referenced here for Giant Eagle 4009,
24 hydrocodone.  Now, it's dated May 28, 2008.  Do

Page 399

1 you see that?
2   A   Yes.
3   Q   And the reason for the change is noted
4 "RNA reasonable request for a small increase per
5 Rex Catton."
6     Do you see that?
7   A   Yes.
8   Q   But that specific information, that
9 language specifically wasn't provided until
10 September 22nd by Dave Gustin, was it?
11     MR. COLLINS:  Objection.
12 Mischaracterization of the document, assumes facts
13 not in evidence.
14     THE WITNESS:  I don't know when that was
15 done.  I assume 5/28/08.  It also doesn't include
16 the increase amount, which is unusual.
17 BY MR. BOGLE:
18   Q   Right, I was going to get to that next.
19     But if you look back at the e-mail from
20 Dave Gustin, September 22nd, 2008, the very same
21 language we just read from the form, identical, is
22 what appears on the May 28, 2008 change form,
23 right?
24     MR. COLLINS:  Objection.

Page 400

1 Mischaracterization.
2     THE WITNESS:  Yes.  And I don't know
3 what -- retail national accounts, yes.
4 BY MR. BOGLE:
5   Q   Yeah.  And that seems consistent with
6 what Diane Martin says in September 22nd, which is
7 that this TCR was approved in May without a form,
8 right?
9   A   Yes.
10   Q   And this information was added in
11 September.
12     MR. COLLINS:  Objection.  That's a total
13 mischaracterization, assumes facts not in
14 evidence.
15 BY MR. BOGLE:
16   Q   How do you explain the very same
17 language, word for word, that first appears in a
18 September e-mail being put in there in May?
19     MR. COLLINS:  Object --
20 BY MR. BOGLE:
21   Q   How did he get that right?
22     MR. COLLINS:  Objecting to the form,
23 compound, assumes facts not in evidence.
24     THE WITNESS:  I can't explain why that

Page 401

1 was in there exactly as they repeated it, but it
2 may have been something they did before.
3 BY MR. BOGLE:
4   Q   Okay.  So you think that Diane was
5 mistaken when she said that this request was
6 actually approved in May without a TCR, right?
7   A   Yeah.  I don't know if she didn't find
8 one or she was doing an audit of them or what.
9   Q   And as you noted, the form that is
10 attached here doesn't include even an increased
11 amount, does it?
12   A   No.
13   Q   But it is noted to be approved by you,
14 right?
15   A   Yes.
16   Q   And Dave Gustin.
17   A   Yes.
18   Q   And the pharmacy at issue here is Giant
19 Eagle 4009, which is in Parma, Ohio, and you
20 understand that's in Cuyahoga County?
21   A   Yes.
22   Q   Have you ever been to that pharmacy to
23 visit there?
24   A   No, I don't think so.

Page 402

1    Q   Are you aware that there were actually
2  multiple Giant Eagles approved at this very same
3  time for threshold increases for various opioid
4  products that include the same exact language on
5  the same exact date?  Are you aware of that?
6    A   No, I'm not.
7    Q   Okay.
8        (Snider Exhibit No. 42 was marked
9        for identification.)
10 BY MR. BOGLE:
11   Q   1.1827, which is Exhibit 42.
12       We put together a compilation of these.
13 We're just going to look at a couple of them.
14       MR. COLLINS:  Do you have another copy
15 or no?
16       MR. BOGLE:  Yeah, I think I actually do.
17       MR. COLLINS:  Thank you.  42?
18       MR. BOGLE:  Yeah.
19 BY MR. BOGLE:
20   Q   So I don't want to reread all of the
21 e-mails, but you see the e-mails on page .15 and
22 .16, that's the same e-mail chain we just
23 reviewed.
24   A   It looks like the same one, yes.

Page 403

1    Q   Right.  Okay.
2        And then if you see what follow -- or
3  what's before that in this packet, there are --
4  one, two, three -- four hydrocodone threshold
5  increases from the same date with the same
6  description as for the reason for the change, all
7  without increased amounts.
8        Do you see those forms?
9    A   Let me -- can I check --
10   Q   Yeah, yeah.  I don't want you to take my
11 word for it.
12   A   Yes.  I don't know the amounts, though.
13 It's not complete.
14   Q   Right.  None of them include amounts, do
15 they?
16   A   No, they don't.
17   Q   But all of them show as approved by both
18 you and Dave Gustin, don't they?
19   A   They show me submitting it to Dave
20 Gustin, yes, national account.
21   Q   And his name appears there too under
22 "Approved by," right?
23   A   Yes.
24   Q   Okay.  All dated May 28, '08, and all go

Page 404

1  back to the same e-mail chain from September where
2  Diane Martin is telling everyone that threshold
3  change request forms weren't actually completed in
4  May, right?
5        MR. COLLINS:  Objection.
6  Mischaracterization, assumes facts not in
7  evidence.
8        THE WITNESS:  I can't testify that they
9  all did.  You have included this, but I don't have
10 the list.
11 BY MR. BOGLE:
12   Q   And they all include for the reason for
13 the change the same exact language that was first
14 introduced in the e-mail chain on September 22nd,
15 2008, correct?
16       MR. COLLINS:  Objection.  Foundation,
17 form.
18       THE WITNESS:  They include that, but
19 like I say, I don't know if it wasn't included on
20 5/28.
21 BY MR. BOGLE:
22   Q   You're supposed to list the actual
23 increased amount on the threshold --
24   A   Yes.

Page 405

1    Q   -- change request form, right?
2    A   Yes.
3    Q   Okay.  And reasonable request for a
4  small increase, is that documented proof of a
5  legitimate business reason?
6    A   I don't think that's a good enough
7  reason.  I don't know what the DRA vetted out on
8  that.
9    Q   Oh, I'm sorry.  One more thing on that
10 compilation I just gave you, and you can take
11 whatever time you need to look at this.
12       But all the pharmacies listed here,
13 we'll get there one by one, page .2, Middleburg
14 Heights, that's in Cuyahoga County, right?
15       MR. COLLINS:  Give him a second.
16       MR. BOGLE:  Sure.
17       THE WITNESS:  Yeah, I believe that's
18 south of Cleveland.
19 BY MR. BOGLE:
20   Q   Okay.  Page .6, Garfield Heights, that's
21 Cuyahoga County, right?
22   A   Yes.
23   Q   Page .10, Cuyahoga Falls, Cuyahoga
24 County as well, right?

Page 406

1    A    No.

2    Q    No?

3    A    That's Summit County.

4    Q    Summit, you're right.  You're right.
5  Fair clarification.  Thank you.  Summit County.

6         .14, this pharmacy is in Cleveland,
7  Ohio, right?

8    A    Yes, at Lorraine Road.

9    Q    Okay.  All right.  We're done with that.

10        MR. COLLINS:  When would be a good time
11 to take a break?

12        MR. BOGLE:  It's fine now.  Yeah, if he
13 needs it, that's fine.

14        THE VIDEOGRAPHER:  The time is 3:56 p.m.
15 We're going off the record.

16        (Recess.)

17        THE VIDEOGRAPHER:  The time is 4:08 p.m.
18 We're back on the record.

19 BY MR. BOGLE:

20    Q    Okay, Mr. Snider, we had stopped --
21 broken after talking about some of the Giant Eagle
22 Pharmacies, and I want to talk about a couple more
23 of those from Summit and Cuyahoga County.

24        (Snider Exhibit No. 43 was marked

Page 407

1         for identification.)

2  BY MR. BOGLE:

3    Q    I'm going to hand you what's marked as
4  1.1811, Exhibit 43.

5         Okay.  This is a file pertaining to
6  Giant Eagle 0357.  Do you see that?

7    A    Yes.

8    Q    Okay.  All right.  If you can go to
9  page .2, do you see there's a threshold change
10 form for Giant Eagle 0357 from Parma, Ohio?  Do
11 you see that?

12    A    Yes.

13    Q    That's in Cuyahoga County, right?

14    A    Yes.

15    Q    Okay.  Requested on July 17, 2008.  Do
16 you see that date?

17    A    Yes.

18    Q    And the request is for a 20 percent
19 increase of the hydrocodone thresholds for that
20 pharmacy, right?

21    A    Yes.

22    Q    Okay.  Now, the current threshold is not
23 actually noted here at all, is it?

24    A    No.

Page 408

1    Q    Okay.  And the reason for change that is
2  noted, it says:  "This store volume is up over 55
3  percent with additional scripts for hydrocodone."

4         Do you see that?

5    A    Yes.

6    Q    Okay.  And this was noted -- under
7  "Approved by," there's your signature, dated
8  7/18/08, right?

9    A    Yes.

10    Q    Okay.  In this file for this Giant Eagle
11 Pharmacy, I did not see any prescription data
12 associated with this or any other threshold change
13 for this store in this packet.  I mean, feel free
14 to look.  Do you see any -- any data, purchase
15 data that's designated?

16    A    Let me check.  (Peruses document.)

17         No, I don't see it in this packet.

18    Q    Okay.  And if you go to .5, which is
19 another threshold change form for the same store,
20 dated October 2nd, 2008, do you see that?

21    A    October 7th, was it?  Oh, I see that
22 it's 2.  Yeah, okay.

23    Q    Yeah.  Your signature is the 7th, we'll
24 get there, but the form is dated October 2nd,

Page 409

1  right?

2    A    Yes.

3    Q    Okay.  And so this is some, less than,
4  three months after the prior request for a
5  hydrocodone increase was requested and approved,
6  right?

7    A    I believe so, yes.

8    Q    Right.  Let me --

9    A    I actually remember that, yeah.

10    Q    So this again is for hydrocodone
11 requesting a 10 percent increase for this store,
12 right?

13    A    In Parma, yes.

14    Q    Right.  And again, there's no current
15 threshold listed here either, is there?

16    A    No.

17    Q    Okay.  It is noted to be a permanent
18 change request, right?  I'm right here if it
19 helps.

20    A    Yeah, thank you.  Yes.

21    Q    Okay.  And the reason for change noted
22 there is "Per Donald M. -- I don't know if it's
23 Casar or Sasar (phonetic), I'm not sure how you
24 say that, but "RPH manager, quality assurance and

Page 410

1 compliance." "Please increase due to the business
2 has increased substantially over the last few
3 months."
4      Do you see that?
5   A   Yes.
6   Q   Okay.
7   A   It's their security manager.
8   Q   All right. And so, again, for this
9 request, there's no dispensing data in this
10 packet, right?
11      MR. COLLINS: Objection.
12 Mischaracterization.
13      THE WITNESS: I wouldn't see that.
14 BY MR. BOGLE:
15   Q   Okay. Do you see that in this packet?
16   A   No. No.
17   Q   Okay. And -- well, let me ask you this:
18 For Giant Eagle specifically, and during this time
19 period, 2008 time period, for a larger pharmacy
20 like that, would you not require them to produce
21 dispensing data to support their request?
22   A   I would not.
23   Q   You would not? Okay.
24   A   No, the director of Regulatory Affairs

Page 411

1 would.
2   Q   Okay. A fair clarification.
3      Do you know if it was policy within the
4 company to request dispensing data for larger
5 pharmacies like Giant Eagle when they made
6 requests like this?
7   A   I'm not sure what year, but I know at
8 one point on the CSMP, they did ask for data.
9 Previously, on Lifestyle, I think we asked for
10 three months sales.
11   Q   Right. So either way you're asking for
12 some sort of data to support this kind of change,
13 right?
14   A   The DRA is, yes.
15   Q   All right.
16      (Snider Exhibit No. 44 was marked
17      for identification.)
18 BY MR. BOGLE:
19   Q   I'm going to hand you what's marked as
20 1.1866, Exhibit 44 to your deposition.
21      Okay. This is a series of e-mails with
22 some threshold change forms attached to them. So
23 let's start by looking at the e-mails.
24      On the bottom of the first page there,

Page 412

1 there's an e-mail from Sabrina Cook to Gregory
2 Carlson, October 22nd, 2008.
3      Do you see that?
4   A   Yes.
5   Q   She notes: "Below are stores that are
6 at least 80 percent or above their thresholds.
7 Please review and let me know if there is a
8 business reason for an increase."
9      Do you see that statement?
10   A   Yes.
11   Q   Okay. And this e-mail does include
12 various thresholds for Giant Eagle Pharmacies for
13 controlled substances including opioids, right?
14   A   I don't know what that is. It --
15   Q   Do you see where it lists monthly
16 thresholds and has numbers below?
17   A   Yes. And then it's blank where it says
18 "Threshold percent." Month-to-date accumulator, I
19 don't really know what that is.
20   Q   Yeah, I'm just asking if the monthly
21 threshold amounts were provided in this e-mail to
22 Gregory Carlson at Giant Eagle.
23      MR. COLLINS: Objection. Foundation.
24      THE WITNESS: It says Sabrina -- it

Page 413

1 says: "Below are other stores that are -- that
2 are at least 80 percent or above." I don't know
3 if Greg asked for it or not.
4 BY MR. BOGLE:
5   Q   Yeah, let me rephrase. I wasn't asking
6 if he asked for it.
7      I'm saying Sabrina Cook, that's what
8 she's giving him are the monthly thresholds for
9 these stores for opioid products and other
10 controlled substances. Correct?
11   A   She's giving him these list of stores
12 that are at least 80 percent or above.
13   Q   Right. And the monthly threshold is
14 provided for each in the chart, right?
15   A   I would guess. I'm not sure what that
16 is.
17   Q   Okay. We see where it says "Monthly
18 threshold" and there's numbers below it, right?
19   A   Yes.
20   Q   Okay. There's a response from Gregory
21 Carlson, October 22nd, 2008, saying: "We need to
22 bump stores 4078, 6537, 2108, 4075, 6523, and 6513
23 up by 20 percent due to high volume growth. These
24 are all either new stores or stores running

Page 414

1 promotions causing increased volume."
2     Do you see that?
3   A  Yes.
4   Q  And then the very top e-mail is an
5 e-mail from Bill de Gutierrez-Mahoney saying:
6 "Done. Jim, Blaine, please file for your
7 records."
8     Do you see that?
9   A  Yes.
10   Q  And Bill Mahoney was another DRA, right?
11   A  Yes.
12   Q  And if you look, the -- look at a couple
13 of these, there's actually the threshold change
14 forms attached to the e-mails here, they're being
15 discussed.
16     So, for example, on page .3, on that
17 same day, October 22, 2008, where the request is
18 made by Giant Eagle, you see a 20 percent increase
19 amount request for 9193, which is hydrocodone,
20 right?
21   A  Yes.
22   Q  Okay. And this is from Groveport, Ohio.
23 Do you know where that's at?
24   A  I think it's by the river.

Page 415

1   Q  Okay. In which county, do you know?
2   A  No, I don't.
3   Q  You don't know. Okay.
4     You see here the reason for change is
5 basically just copied from the e-mail that Gregory
6 Carlson sent. It says: "Per Gregory Carlson,
7 Director of Pharmacy Sourcing," and it gives his
8 number, "Please increase due to running promotions
9 causing increased volume." Right?
10     MR. COLLINS: Objection. Form.
11 BY MR. BOGLE:
12   Q  Is that what it states?
13   A  Can you restate that, please?
14   Q  Yeah.
15     So the reason for change noted in this
16 form is, "Per Gregory Carlson, Director of
17 Pharmacy Sourcing: Please increase due to running
18 promotions causing increased volume?"
19     That's the reason stated on the actual
20 form. Right?
21   A  Yes.
22   Q  Okay. And again, in this packet of
23 threshold change forms, there's no dispensing data
24 attached, is there?

Page 416

1     MR. COLLINS: Objection. Form.
2     THE WITNESS: And I -- what year is
3 this, please?
4 BY MR. BOGLE:
5   Q  2008.
6   A  I don't know if we asked for that in
7 2008. That was Lifestyle.
8   Q  October 2008, you think was Lifestyle?
9   A  It may have been. I don't remember.
10   Q  Okay. So if it was under the Lifestyle
11 Drug Monitoring Program, you wouldn't have asked
12 for dispensing data at all. Is that's what you're
13 saying?
14   A  I wouldn't have asked for national
15 account dispensing data at any time. That was
16 handled by the director of Regulatory Affairs and
17 Bill de Gutierrez-Mahoney. But he says he
18 attaches them, but I'm not sure if this was what
19 was attached. If it was, it wasn't completed.
20   Q  Okay. So -- yeah, and again, I'm just
21 giving you what was produced to us. This -- this
22 e-mail and attachments to the e-mail, these
23 threshold change forms, you would agree with me
24 there is no dispensing data included in here for

Page 417

1 any of these stores, right?
2   A  I don't normally get that ever.
3   Q  I'm not asking if you get it. I'm
4 asking, is it attached to this e-mail chain?
5   A  No.
6   Q  Do you see it?
7   A  I don't see it here.
8   Q  Okay. All right. And -- strike that.
9     Do you see there are multiple other --
10 actually, we'll go through a couple more.
11     There is one on .5 asking for a 20
12 percent increase for a Giant Eagle in Berea, Ohio.
13 Do you see that?
14   A  Berea.
15   Q  Berea. Okay. What county is that in?
16   A  That's Cuyahoga.
17   Q  And that's for a 20 percent increase for
18 hydrocodone, right?
19   A  Yes, that has a lot of population area.
20   Q  Okay. And again, the same reason for
21 change is provided there as was in the last
22 threshold change form, right?
23   A  Yes.
24   Q  Okay. Is there any indication here of

Page 418

1 Giant Eagle providing you, McKesson, with the
2 actual promotion they were even running that was
3 causing this increased volume?
4    A    I wouldn't know that.
5    Q    Right. I'm asking, is it -- do you see
6 that anywhere in the packet of information or the
7 e-mails?
8    A    You haven't included it in this packet.
9 I don't see anything.
10    Q    I haven't -- I have included what was
11 given to us.
12    A    Okay.
13    Q    Okay. So --
14    A    Then -- then you or us haven't included
15 that.
16    Q    Do you have any independent recollection
17 that that information was even provided for these
18 change requests?
19    A    No, I don't. I don't.
20    Q    Okay. I'm going to hand you what I'm
21 marking as 1.1777, also Exhibit 45 to your
22 deposition.
23         (Snider Exhibit No. 45 was marked
24         for identification.)

Page 419

1 BY MR. BOGLE:
2    Q    Do you see this file pertains to Giant
3 Eagle 0465? Do you see on the first page?
4    A    Yes.
5    Q    Okay. And if you look, there's some
6 threshold change requests attached here.
7         First of all, if you can go to page .10.
8 Do you see this is a threshold change request made
9 May 28, 2008, for a Giant Eagle in Brook Park,
10 Ohio?
11    A    Yes.
12    Q    Okay. And that's in Cuyahoga County,
13 right?
14    A    Yes.
15    Q    Okay. And this is another one of those
16 stores that in May 2008 had their thresholds
17 increased for hydrocodone, the reason being
18 "Reasonable request for a small increase," per Rex
19 Catton. Do you see that?
20    A    Yes. I think that's the same date.
21    Q    Yeah, it is.
22         All right. Let's go a couple of months
23 later for the same pharmacy. I'm on page .2.
24 This is a threshold change form for hydrocodone

Page 420

1 from July 31, '08, right?
2    A    What was the other one? I'm sorry, I
3 forgot.
4    Q    May 28, '08.
5    A    Thank you.
6    Q    This is July 31 on this one, '08, right?
7    A    Yes.
8    Q    Okay. Again, requesting an increase for
9 hydrocodone, this time by 5 percent, right?
10    A    Yes.
11    Q    And the noted reason for change is:
12 "Threshold adjustment is being requested due to
13 high growth rate. Please increase by 5 percent."
14         Do you see that reference?
15    A    Yes, I do.
16    Q    Okay. And this was noted -- signed by
17 you, August 1, 2008, right?
18    A    It was, yes.
19    Q    So in the packet of information for this
20 pharmacy, do you see any dispensing data that
21 would support this request?
22    A    I never see that. It's a national
23 account. They do the vetting.
24    Q    I'm asking whether you see it in this

Page 421

1 packet.
2    A    I -- no.
3    Q    Okay. So let's fast-forward to the same
4 pharmacy to October 2nd, 2008, page .13.
5         Are you there?
6    A    Yes.
7    Q    Okay. This is a threshold change
8 request dated October 2nd, 2008, for the same
9 Giant Eagle Pharmacy, right?
10    A    Yes.
11    Q    Also for hydrocodone, this time to
12 increase by 35 percent, right?
13    A    Yes.
14    Q    Okay. And the reason for the change is
15 noted per Gregory Carlson, Director of Pharmacy
16 Sourcing: "Please increase due to volume growth."
17 Right?
18    A    Yes.
19    Q    And this was sent -- signed and sent by
20 you, October 7, 2008, correct?
21    A    Yes, but sent -- I -- I don't know if I
22 sent this to Regulatory or they sent it to me.
23 I'm not sure which.
24    Q    Okay. Fair enough.

Page 422

1   Again, no dispensing data attached to
2   support the volume growth?
3   A   I -- I would not and do not see that.
4   Q   Okay.  Let's go to page .18.
5   So this is a couple of weeks later,
6   October 23rd, 2008.  There's an e-mail from
7   Sabrina Cook at the bottom of this page to Gregory
8   Carlson saying: "Below are stores that are above
9   80 percent of their thresholds.  The thresholds
10  will be reset in six business days.  Let me know
11  if there is a business reason for the increase --
12  for an increase."
13  Gregory Carlson responds the same day
14  saying: "Go ahead and bump 482, 1475 and 465 due
15  to increased volume.  I would say 20 percent for
16  each."
17  Do you see those references?
18  A   I do.
19  Q   Okay.  And if you go to page .16, you
20  see there there's the threshold change request for
21  this store that corresponds to that e-mail
22  requesting a 20 percent increase for hydrocodone,
23  right?
24  MR. COLLINS: Objection.  Foundation.

Page 423

1   THE WITNESS: Yes, it's the one that
2   says per Greg Carlson with his phone number.
3   BY MR. BOGLE:
4   Q   Right.  And this relates to the e-mail
5   we just looked at, October 23, 2008, where he
6   makes the request for multiple stores, including
7   465, to get a 20 percent increase for hydrocodone,
8   right?
9   A   I would guess that, yes.
10  Q   That's the next day, right?
11  A   Well, I would -- your answer is I would
12  guess that.
13  Q   Okay.  And it's the same reason for
14  change provided that he provides in the e-mail,
15  volume growth, right?
16  A   I'm sorry.  Per -- per Gregory Carlson:
17  "Please increase due to volume growth."  Yeah, it
18  has the phone number and everything on it too.  I
19  don't know why that's different, but...
20  Q   And that's for the same Giant Eagle
21  Pharmacy at Brook Park, Ohio, that we looked at
22  for the last few change requests, right?
23  A   Yes.
24  (Snider Exhibit No. 46 was marked

Page 424

1   for identification.)
2   BY MR. BOGLE:
3   Q   Okay.  I'm going to hand you Exhibit 46,
4   which is Exhibit 1.1816.
5   It's a file for Giant Eagle 0230.  Do
6   you see that?
7   A   Yes.
8   Q   Okay.  If you go to .2 -- actually, I'm
9   sorry, let's go to .4 first.  My apologies.
10  There is an e-mail there in the middle
11  of the page from Sabrina Cook to the same two
12  individuals at Giant Eagle on November 20, 2008,
13  saying: "Please see below for the stores that hit
14  above 80 percent of their thresholds.  If there's
15  a business reason for an increase, please let us
16  know."
17  Do you see that?  And there's a chart
18  below with Giant Eagle 488 for oxycodone, Giant
19  Eagle 230 for hydrocodone, and Giant Eagle 224 for
20  oxycodone in that chart.
21  A   Yes.
22  Q   Gregory Carlson then responds the same
23  day in the next e-mail above saying: "All need to
24  be increased by 20 percent.  These stores are all

Page 425

1   experiencing high volume.  488 have significantly
2   grown due to a remodel, and the other two are in
3   Cleveland, which is a high growth market for us."
4   Do you see that?
5   A   I see that.
6   Q   Did you have an understanding that in
7   late 2008 that Cleveland was a high growth market
8   for controlled substances for Giant Eagle?
9   MR. COLLINS: Objection.  Form.
10  THE WITNESS: No, I didn't.  I know --
11  can you rephrase that?  I apologize.
12  BY MR. BOGLE:
13  Q   Yeah.  Did you know in late 2008 that
14  Cleveland was a high growth market for Giant Eagle
15  for controlled substances?
16  A   No, not for controlled substances, but I
17  know their volume increased.  Whereas a typical
18  pharmacy might be eighty to 100,000, these guys
19  were three to 400,000 and doing multiple scripts.
20  It was a high density area.  I do know that.
21  Q   Okay.  So, in his e-mails indicated
22  here, it was a -- what they called a high growth
23  market, right?
24  A   That's what he says here.

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1    Q   All right.  And then if you see on
2  page .2, here's the threshold increase form that
3  corresponds with that request dated November 21,
4  2008, for the Giant Eagle 230 in Cleveland, Ohio.
5  Do you see that?
6    A   Yes.
7    Q   It's for a 20 percent increase for
8  hydrocodone, right?
9    A   I'm sorry, I can't -- yes.
10   Q   And again, the same reason for change
11 was given here that we've seen in the prior
12 threshold change forms, which is volume growth,
13 right?
14   A   Yes, with Greg's phone number.
15   Q   All right.  And there's no -- again, in
16 this packet of information for this pharmacy that
17 we obtained, there is no dispensing data attached,
18 is there?
19   A   I'm not privy to -- to any of that.  I
20 don't see it here at all.
21   Q   Okay.  And your signature on this
22 document appears on November 21, '08, right?
23   A   Yes.
24   Q   I'm going to hand you what I'm marking

Page 427

1  Exhibit 47, also noted as 1.1839.
2        (Snider Exhibit No. 47 was marked
3        for identification.)
4  BY MR. BOGLE:
5    Q   This information relates to Giant Eagle
6  4030.  Do you see that?
7    A   Yes.
8    Q   Okay.  And if you look here on page .4,
9  there is an e-mail at the bottom of the page from
10 Gregory Carlson to Telisca Lindsay, July 29, '09,
11 where he says: "Telisca, please increase the
12 following stores these percentages based on
13 reasons listed" --
14   A   Excuse me, hold on one second.  Could
15 you tell me where you're at?
16   Q   Yeah.
17   A   What page?
18   Q   It says .4 on the very --
19   A   Sorry.  Thank you.
20   Q   -- bottom.  Yeah.
21       Let me know when you get there, and I'll
22 reread it --
23   A   I'm there.
24   Q   -- so we'll be on the same page

Page 428

1  literally.
2    A   I'm on it.
3    Q   Okay.  So it says on this e-mail from
4  July 29, 2009, from Gregory Carlson: "Please
5  increase the following stores these percentages
6  based on reasons listed.  Thanks."
7        And you see specifically as to the store
8  this packet pertains to, Giant Eagle 4030, there's
9  a request for a 10 percent increase for oxycodone,
10 and the reason given is "volume up."  Do you see
11 that?
12   A   4030.  Yes.
13   Q   Okay.  And then if you go to the actual
14 form, which is page .2, you see here's the form
15 from July 29, 2009, for the Giant Eagle in
16 Tallmadge, Ohio.  Do you see that?
17   A   Yes.
18   Q   And that's in Summit County, right?
19   A   Yeah, I think it is.  It's on the edge.
20 I think so.
21   Q   All right.  And you see the reason given
22 here for the change is volume growth.  Do you see
23 that?
24   A   I'm sorry.

Page 429

1    Q   I'm just looking at "Reason for
2  requested change."
3    A   Oh, thank you.  Yes, I see it now.
4    Q   Okay.  And what's noted here, though, is
5  a 20 percent increase for this store for
6  oxycodone, right?
7    A   Yes.
8    Q   They only actually requested 10, though,
9  right?
10       MR. COLLINS: Objection.  Foundation.
11       THE WITNESS: Can you help me out?
12 BY MR. BOGLE:
13   Q   Yep.  So if you go back to .5, the chart
14 provided by Gregory Carlson, for Giant Eagle 4030,
15 he's asking for a 10 percent increase for
16 oxycodone.  Do you see that in the middle of the
17 chart?
18   A   It looks like it, yes.
19   Q   Okay.  But on the threshold change form
20 completed the same day and signed by you, there's
21 a 20 percent increase approved, right?  Which is
22 also signed off on by Regulatory.
23       MR. COLLINS: Objection.  Form.
24       THE WITNESS: Yes, Regulatory would have

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1 vetted it out.
2 BY MR. BOGLE:
3    Q   Right.  But you see that there is a
4 20 percent increase approved for oxycodone whereas
5 they asked for 10?
6       MR. COLLINS:  Objection.  Foundation.
7 BY MR. BOGLE:
8    Q   On the same day.
9    A   I don't know all the information that
10 went to vet that out by the director of Regulatory
11 Affairs.  I believe it was Dave Gustin.
12    Q   Okay.  But --
13    A   It doesn't say that in the e-mail.
14    Q   Yeah, but you see here that we just
15 looked at the request being made for 10 percent
16 and granted at 20 percent, right?
17       MR. COLLINS:  Objection.
18 Mischaracterization, lacks foundation.
19       THE WITNESS:  I see what they put in the
20 e-mail, yes.
21 BY MR. BOGLE:
22    Q   And you see what's in the threshold
23 change form, right?
24    A   Yes, I do.

Page 431

1    Q   Okay.  One says 10, the other says 20,
2 right?
3    A   This e-mail says 10, the other says 20.
4 I don't know what else was vetted out by Dave and
5 with the customer.
6    Q   All right.  I'm handing you what I'm
7 marking as Exhibit 1.1817, which is also marked as
8 Exhibit 48.
9       (Snider Exhibit No. 48 was marked
10       for identification.)
11 BY MR. BOGLE:
12    Q   This packet pertains to Giant Eagle
13 2029.  Do you see that on the first page?
14    A   Yes.
15    Q   Okay.  If you can go to page .7.
16 Looking at the e-mail from -- sorry, e-mail from
17 Sabrina Cook, the bottom e-mail on the page, to
18 Gregory Carlson and Donald Casar, December 19,
19 2008, where she says: "The below stores have hit
20 above 80 percent.  Please let me know if there is
21 a business reason for an increase."
22       Gregory Carlson responds the same day in
23 the e-mail above: "All the hydrocodones need to
24 be bumped by 25 percent."  It says: "All due to

Page 432

1 out-of-stock situation on the Vicodin from last
2 month filling owes.  Also bump the two with the
3 oxycodone.  4012 had a recent acquisition, so
4 their volume is way up, and 5863 is experiencing
5 greater than average growth.  Increase 4012 by
6 25 percent and 5863 by 20 percent."
7       Do you see that?
8    A   I see it.
9    Q   Okay.  And if you look, the form appears
10 on page .2.  This is the form for hydrocodone
11 related to that request, and this pharmacy is
12 located in Bedford, Ohio.  Do you see that?
13    A   Yes.
14    Q   It's another Cuyahoga County pharmacy,
15 right?
16    A   Yes.  It's where I bought my car.
17    Q   Okay.  And the request here is for the
18 25 percent increase to hydrocodone, right?
19    A   Yes.
20    Q   Which was submitted by you December 19,
21 2008, correct?
22    A   Yes.
23    Q   And again, in this packet of
24 information, no dispensing data to support the

Page 433

1 growth, right?
2       MR. COLLINS:  Objection.  Foundation.
3       THE WITNESS:  I don't know what due
4 diligence did -- they did with the RNA.
5 BY MR. BOGLE:
6    Q   I'm just asking if in the packet of
7 materials here we've got dispensing data.
8    A   I don't see it in this packet, no.
9       (Snider Exhibit No. 49 was marked
10       for identification.)
11 BY MR. BOGLE:
12    Q   All right.  I'm going to hand you
13 1.1841, which is marked as Exhibit 49.
14       Okay.  Let's start on page .2 at the
15 bottom.  Do you see an e-mail from October 29,
16 2010, from pharmacy team leader to Gregory
17 Carlson, copying Michael Chappell, at the very
18 bottom?
19    A   Yes.
20    Q   It says there: "Greg, just received our
21 order from McKess, and we did not get the Endocet
22 and Roxicet that we need desperately.  We have
23 increased our business, and with a pain management
24 specialist in town and several terminal patients,

Highly Confidential – Subject to Further Confidentiality Review

Page 434

1  we are seeing a rise in these products.  According
2  to McKesson, we are limited to 9,900 tablets, and
3  they recommend 12,000 units.  We need to get these
4  medications or lose our customers.  Can anything
5  be done?"
6      Do you see that e-mail?
7  A   Yes, I see it.
8  Q   Okay.  And then the next e-mail up in
9  the chain, there's an e-mail from Randy Heiser at
10 Giant Eagle to a Jeff Wallace saying:  "Jeff, we
11 are currently evaluating pain management as a
12 corporate business opportunity.  Looking at the
13 Cleveland marketplace to begin.  Already in
14 conversation with the Cleveland Clinic.  Please
15 give me a call this week to discuss."
16     Do you see that?
17 A   Yes.
18 Q   Did you know that around this time in
19 2010 that Giant Eagle was looking at pain
20 management clinics as a corporate business
21 opportunity?
22     MR. COLLINS:  Objection.  Foundation.
23     THE WITNESS:  I don't remember that.
24 BY MR. BOGLE:

Page 435

1  Q   Okay.
2  A   That was 2010.  I -- I do know Jeff
3  Wallace.  He was the account manager.  So I don't
4  remember this e-mail in particular.
5  Q   Well, you see, though, the next e-mail
6  up, Jeff does copy you on it.
7  A   Yes.
8  Q   So you would have seen this e-mail that
9  I just read to you, right?
10     MR. COLLINS:  Objection.  Foundation.
11     THE WITNESS:  He sends it back to me
12 just saying, "I will call Randy," yes.
13 BY MR. BOGLE:
14 Q   Right.  So this is an e-mail, the one I
15 just read to you about the pain management as
16 being a corporate business opportunity for Giant
17 Eagle, is one you would have received, right?
18     MR. COLLINS:  Objection.  Foundation.
19     THE WITNESS:  I did not receive it.  I
20 was copied --
21 BY MR. BOGLE:
22 Q   You didn't receive --
23 A   I was copied on it.
24 Q   Right.  So when you're copied on it, you

Page 436

1  get to see it, right?
2      MR. COLLINS:  Objection.  Lacks
3  foundation.
4      THE WITNESS:  Yes.  And I just -- Jeff
5  said, I'm going to call Randy on this, and so if I
6  saw that, I don't recall specifically from 2010.
7  BY MR. BOGLE:
8  Q   Okay.  So do you recall any other
9  discussions with Giant Eagle that -- about pain
10 management clinics being a business opportunity
11 for them?
12 A   No.  I try to make it clear that it's
13 regarding the national accounts, they're vetted
14 out by our national accounts folks and the
15 directors of Regulatory Affairs.  So I wouldn't
16 have had that discussion at my level, no.
17 Q   So if Giant Eagle was looking at pain
18 management clinics as a business opportunity in
19 the Cleveland market, even though that's a market
20 that you service with your distribution center,
21 you don't think you would be aware of that?
22 A   I think I would be aware that it's been
23 fully vetted by the director of Regulatory Affairs
24 and our national accounts folks.

Page 437

1  Q   So you would totally defer to them as to
2  whether that was a business opportunity that
3  McKesson should participate in.  Is that fair?
4      MR. COLLINS:  Objection.
5  Mischaracterization.  Foundation.
6      THE WITNESS:  I would defer to their
7  data and expertise, especially in the 2010 time
8  frame, yes.
9  BY MR. BOGLE:
10 Q   Okay.  But you don't recall being made
11 aware of it around that time frame, though?
12 A   No.
13 Q   Other than being copied on that e-mail.
14 A   No.  I know who Randy Heiser is and I
15 know who Jeff Wallace is.  And I -- my due
16 diligence was to send it to two Regulatory people
17 to make sure they're aware.
18 Q   Do you recall receiving correspondence
19 in late 2013 regarding the subject of enhanced
20 controlled substance monitoring by McKesson?
21 A   I do recall a change in 2013 to enhance
22 it, yes.
23 Q   And you're aware that that change was
24 prompted by renewed investigations by the

Highly Confidential – Subject to Further Confidentiality Review

Page 438

1 Department of Justice and DEA as to McKesson's
2 practices, right?
3        MR. COLLINS: Objection. Foundation.
4        THE WITNESS: I don't remember that. I
5 would have to see what the correspondence said. I
6 don't remember that.
7 BY MR. BOGLE:
8    Q   You do know that McKesson ultimately in
9 2016 paid a $150 million fine for violations of
10 the Controlled Substances Act, right?
11       MR. COLLINS: Objection. Calls for a
12 legal conclusion.
13 BY MR. BOGLE:
14   Q   Do you know whether that occurred?
15       MR. COLLINS: I'm sorry. Lack of
16 foundation. Form.
17 BY MR. BOGLE:
18   Q   Do you know that?
19   A   I heard it was a settlement with the
20 DEA.
21   Q   Okay. Do --
22   A   And that's what I was told.
23   Q   You weren't told how much?
24   A   I was told it was --

Page 439

1    Q   For how much or for what for?
2    A   I was told it was a settlement for
3 $150 million.
4    Q   Okay. But you didn't -- you never asked
5 what for?
6    A   I'm sure I did.
7    Q   Okay. Do you remember being told what
8 it was for?
9    A   Not the people that know, no.
10   Q   Okay. I'm going to hand you --
11 actually, strike that -- 1.1775, which I'm marking
12 as Exhibit 50.
13       (Snider Exhibit No. 50 was marked
14       for identification.)
15 BY MR. BOGLE:
16   Q   Okay. And do you see here on the first
17 page, there's an e-mail from 10/24/13 sent by Elie
18 Rio, the subject being "Suspicious order
19 monitoring awareness training."
20       Do you see that?
21   A   Yes.
22   Q   Okay. And if you go to the second page,
23 required attendees, there's a list there, and in
24 the second row names, you see -- you see you?

Page 440

1    A   Yes.
2    Q   Okay. Do you recall attending this
3 training?
4    A   I think it was a Webex.
5    Q   Okay.
6    A   And I don't recall specifically, but I'm
7 sure I was there.
8    Q   Okay. Pertaining to this training, it's
9 stated here: "Team" -- sent on behalf of Don
10 Walker -- "As you are aware, we are in the process
11 of implementing an enhanced suspicious order
12 monitoring program. As a pharmaceutical
13 distributor, McKesson has a responsibility to
14 ensure pharmaceutical controlled substances are
15 not diverted for nonmedical or other illegal
16 purposes. To that end, we are further enhancing
17 our controlled substances distribution policies
18 and procedures."
19       Do you see that?
20   A   Yes.
21   Q   Okay. McKesson's responsibility is to
22 ensure that controlled substances are not diverted
23 for nonmedical or other illegal purposes. You
24 understand that McKesson has had that

Page 441

1 responsibility since you've been running the
2 distribution center in New Castle in 2000, right?
3        MR. COLLINS: Objection to the form.
4        THE WITNESS: I don't know if that was
5 the language.
6 BY MR. BOGLE:
7    Q   Okay. Do you have an understanding that
8 that was the general responsibility from 2000 to
9 present?
10       MR. COLLINS: Objection to the form.
11       THE WITNESS: I know the SOPs that
12 McKesson had, and I tried to follow those.
13 BY MR. BOGLE:
14   Q   Okay. So you have no opinion one way or
15 the other whether that was McKesson's
16 responsibility from 2000 to present while you were
17 distribution center manager?
18       MR. COLLINS: Objection. Vague, form.
19       THE WITNESS: I don't know if those
20 words were used.
21 BY MR. BOGLE:
22   Q   Okay. Those words do not look familiar
23 to you?
24       MR. COLLINS: Objection. Argumentative.

Page 442

1       THE WITNESS:  I can't answer that.  I
2  don't know.
3  BY MR. BOGLE:
4     Q    Okay.  So -- but after this enhanced
5  suspicious order monitoring program was
6  implemented, your distribution center began
7  looking closer at its customers to see if any of
8  their orders were out of the ordinary, right?
9     A    I would say that the director of
10  Regulatory Affairs took that over in 2013 because
11  they could get the data, and it was more of a
12  data-driven evolving of it.  So they would get the
13  script data, and they would do the searches for
14  it.
15     Q    Okay.  You were involved in actually
16  vetting the customers as well, though, right?
17       MR. COLLINS:  Objection.  Form.
18  BY MR. BOGLE:
19     Q    In 2013.
20       MR. COLLINS:  Objection.  Form.
21       THE WITNESS:  I don't remember if we
22  still did Level I observations or the DRAs did it.
23  BY MR. BOGLE:
24     Q    Okay.  Let's take a look here then.

Page 443

1       (Snider Exhibit No. 51 was marked
2       for identification.)
3  BY MR. BOGLE:
4     Q    I hand you Exhibit 51, also marked as
5  1.1876.
6       Do you see here this is an e-mail from
7  you, April 17, 2013, to several individuals?  Do
8  you see that?
9     A    Yes.
10     Q    Titled "Monthly Drug Usage Report,
11  March."  Do you see that there?
12     A    Yes.
13     Q    And you say: "John, Alex and Kim:  We
14  are going to set up CSMP visits for all of the
15  accounts below.  This is based on Joe Lumpkin's
16  monthly reports attached.  The first column
17  represents higher than normal controls percent to
18  total purchases.  This would be ISMC over 25
19  percent.  The second column represents high
20  oxycodone purchases to control purchases.  This is
21  over 25 percent.  Based on this data, it's
22  recommended that we do CSMP visits, with usage and
23  questionnaires completed within the next 60 to 90
24  days."

Page 444

1       Do you see that?
2     A    Yes.
3     Q    Okay.  So you have familiarity and
4  experience looking at this ratio we talked about
5  before, the controls percentage versus the overall
6  percentage of prescriptions filled, right?
7     A    This data was given to me, yes.
8     Q    Right.  And you actually describe the
9  data in pretty good detail there in the e-mail I
10  just read, right?
11       MR. COLLINS:  Objection.  Vague.
12       THE WITNESS:  Joe sent this on April
13  2013, so I scheduled due diligence to get the
14  salesperson and Dale to do an observation or
15  Level I at each one of these stores.
16  BY MR. BOGLE:
17     Q    Okay.  My question was simply --
18     A    Sorry.
19     Q    -- what I just read is your recitation
20  which provides your understanding of what this
21  data actually even means, right?
22       MR. COLLINS:  Objection.  Vague.
23       THE WITNESS:  Recitation.  Please, I
24  don't -- can you rephrase that?

Page 445

1  BY MR. BOGLE:
2     Q    What I just read -- I'm trying to avoid
3  reading the whole thing to you again -- but the
4  highlighted information on the screen here for you
5  is your specific understanding of what the ratios
6  of controlled substance purchases to overall
7  prescription purchases means in addition to
8  OxyContin prescription of controls purchase data,
9  which we talked about before.
10     A    This shows, yes, that Joe Lumpkin sent
11  me information, so I scheduled within 60 days a
12  visit to all these stores.
13     Q    And your discussion specifically of your
14  understanding of what that data means, right?
15       MR. COLLINS:  Objection.  Form.
16       THE WITNESS:  I do remember most of it,
17  yes.
18  BY MR. BOGLE:
19     Q    Okay.  And I just want to look at a
20  couple of these here.
21       So there's Best Care of Bridgeport, the
22  second pharmacy listed, you see there at this
23  point in time, March 2013, their controls
24  percentage to overall prescription purchases was

Page 446

1  53.97 percent.
2      Do you see that?
3  A    Yes.
4  Q    Okay.  You know that's very high, right?
5  A    I also know I don't know how many
6  wholesalers they had or what they were buying from
7  other pharmaceuticals.  So that is higher than the
8  norm, and I would have scheduled a visit there.
9  Q    Okay.  And their -- their sales of
10  oxycodone and hydrocodone had been high for years
11  leading up to 2013.  We looked at that earlier in
12  the deposition.  You recall that, don't you?
13      MR. COLLINS:  Object -- objection.
14  Argumentative, compound, assumes facts not in
15  evidence, lack of foundation.
16      THE WITNESS:  I don't remember when we
17  required a -- you would have to refresh me on that
18  again.
19  BY MR. BOGLE:
20  Q    You don't recall looking at all the
21  pharmacy information on Best Care earlier today?
22  A    I meant I didn't require -- I didn't
23  remember when we acquired Best Care.
24  Q    Okay.

Page 447

1  A    So --
2  Q    You don't remember at all?
3  A    I don't remember what year.
4  Q    Okay.  So, now the information about
5  whether they had another distributor is
6  information that you should have been aware of at
7  this point in time, right?
8      MR. COLLINS:  Objection.
9  BY MR. BOGLE:
10  Q    In April 2013, you should have already
11  known that, right?
12      MR. COLLINS:  Objection.  That's
13  multiple questions.  It's compound.  Foundation.
14      THE WITNESS:  No, I didn't have that
15  information.
16  BY MR. BOGLE:
17  Q    You didn't ask that?
18  A    I may have --
19      MR. COLLINS:  Objection.  Vague.
20      THE WITNESS:  I may have asked that, but
21  it asks that in the Level I questionnaire, and
22  that's not attached.
23  BY MR. BOGLE:
24  Q    Okay.  So -- but for Best Care, for

Page 448

1  example, you wouldn't have already known when you
2  completed this e-mail and attached the chart
3  whether they had another distributor?
4      MR. COLLINS:  Objection to the form.
5      THE WITNESS:  No.
6  BY MR. BOGLE:
7  Q    You wouldn't know that?
8  A    No.
9  Q    If you can go back to Exhibit 9 real
10  quick.  And keep this one I'm looking at with you
11  out too, but...
12  A    Eight.
13      MR. COLLINS:  One more.  Getting warmer.
14      THE WITNESS:  10.
15      MR. COLLINS:  Getting warmer.
16      THE WITNESS:  11.  Sorry.  Where is 9?
17  It has to be behind there.  I'm sorry.  15.  I
18  don't see 9 here.  Let me look at that other --
19  BY MR. BOGLE:
20  Q    You can follow me up on the screen if
21  you want.  It doesn't matter to me.
22      MR. COLLINS:  It's got to be in this
23  stack.
24      THE WITNESS:  If it's okay with you, I

Page 449

1  will go ahead and follow it here.
2  BY MR. BOGLE:
3  Q    This is the last document I want to
4  cover with you, so I'm just trying to -- so if you
5  look -- if we can turn to the second page of the
6  document, you see here -- you remember us talking
7  earlier about this regional statistical norms
8  chart?
9  A    Yes.
10  Q    Okay.  And we talked about New Castle,
11  the controlled substances to total prescription
12  norm was 19 percent.  Do you see that in the
13  Northeast chart there?
14  A    That's not New Castle.  That's all the
15  distribution centers combined.
16  Q    Right.  That applies to all of them in
17  the Northeast.  You understand that, right?
18  A    Yes.  Yes, I understand that.
19  Q    And New Castle is included there, right?
20  A    Yes.  Yes.
21  Q    Okay.  So with a 19 percent controlled
22  substances to overall prescription purchases norm,
23  you would agree with me that Best Care of
24  Bridgeport is multiple times over that number,

Page 450

1  right, in 2013?
2      MR. COLLINS:  Objection to form,
3  foundation.
4      THE WITNESS:  Yes, that number is higher
5  than that.
6  BY MR. BOGLE:
7    Q   Right.  Significantly higher, right?
8      MR. COLLINS:  Objection.  Vague.
9      THE WITNESS:  Two-and-a-quarter times.
10 BY MR. BOGLE:
11   Q   Okay.  And the last one I want to look
12 at here is, for oxycodone for your region, 5
13 percent is noted to be the regional norm of total
14 prescriptions should be oxycodone.  That's the
15 regional norm.  Do you see that?
16     MR. COLLINS:  Objection.  Lack of
17 foundation.
18     THE WITNESS:  These numbers are not
19 guidelines for appropriate dispensing.  They are
20 simply national average derives from McKesson
21 data.  Yes, I see that.
22 BY MR. BOGLE:
23   Q   You see where it says --
24   A   Yeah.

Page 451

1    Q   -- "Diversion can occur in purchases
2  below these statistical norms"?
3    A   Yes.
4    Q   I think you missed that sentence.
5    A   Yes.
6    Q   Okay.  And then so if you look here for
7  Martella's, which is another pharmacy we just --
8  we talked about earlier.  Do you recall them?
9    A   Yes.
10   Q   Okay.  So the oxy percentage of controls
11 purchased, they have three different listings.
12 They're between 37 and 57 percent for their three
13 different DEA numbers.  Do you see that on this
14 chart from 1.1876?
15   A   Yeah, but I see -- I think the 19 refers
16 to our controls percent of Rx purchase, doesn't
17 it?  Or am I wrong on that?
18   Q   19?  I'm not sure I'm following you.
19   A   On the chart before.
20   Q   Can we go back to the other chart?
21     MR. COLLINS:  Yeah, we've got a copy of
22 it.  Hold on one second so he can see it.
23     MR. BOGLE:  We'll go back to the chart
24 either way on the screen.

Page 452

1      MR. COLLINS:  Well, here, I'm going to
2  hand it to him so he can look at it.
3      THE WITNESS:  Thank you.
4      MR. BOGLE:  Yeah, that's fine.
5      THE WITNESS:  It says 19 percent of
6  total Rx, so that refers to controls percent to Rx
7  purchase line.
8  BY MR. BOGLE:
9    Q   Right.  And for oxycodone specifically,
10 that's noted to be 5 percent.  Do you see that for
11 your region?
12   A   You said percent of total Rx, yes.
13   Q   Right.  And so that's the same sort of
14 calculations that are being run here in
15 Exhibit 1.1876, and for Martella's, for their
16 three different DEA numbers, they're coming out at
17 between 37 and 57 percent, right?
18   A   Correct.
19     MR. COLLINS:  Object to the form.
20     MR. BOGLE:  No further questions at this
21 time.
22     MR. COLLINS:  Why don't we take five
23 minutes?  I have some redirect.
24     THE VIDEOGRAPHER:  The time is 4:59 p.m.

Page 453

1  We're going off the record.
2      (Recess.)
3      THE VIDEOGRAPHER:  The time is 5:12
4  p.m., and we're back on the record.
5      REDIRECT EXAMINATION
6  BY MR. COLLINS:
7    Q   Good afternoon, Mr. Snider.
8    A   Good afternoon.
9    Q   I'm Kevin Collins.
10   A   Yes.
11   Q   Where do you currently live?
12   A   I currently live in -- south of
13 Youngstown, Ohio -- Poland, Ohio.
14   Q   Can you keep your voice up.  I know it's
15 been a long day.  One more time?
16   A   Poland, Ohio.
17   Q   Okay.  And what county is that?
18   A   It's Mahoning County.
19   Q   All right.  And where is that county
20 related to Summit and Cuyahoga counties?
21   A   It's about three or four counties over
22 east, directly east towards the PA line.
23   Q   And how long have you resided there?
24   A   Twenty -- 18 years.

| Page 454 |
|---|

1     Q    All right.  Where were you born and
2  raised?
3     A    I was born in Coshocton, Ohio, and was
4  raised in Cuyahoga Falls in Summit County.
5     Q    Where did you go to high school?
6     A    Cuyahoga Falls High School.
7     Q    What did you do after high school?
8     A    I went to Kent State University.
9     Q    And after Kent State, when did you
10  graduate?
11     A    I graduated in -- I'm sorry -- 1978.
12  Sorry.  That's a long time ago.
13     Q    Okay.  And when did you start working
14  for McKesson?
15     A    I believe '79, '80.
16     Q    Can you briefly describe the positions
17  you've held, starting from your earliest position
18  at McKesson to your current position and where --
19  where you were located.
20     A    Okay.  Sure.  Started in North Canton,
21  Ohio.  I don't remember exactly how long, but I
22  was first a trainee for a couple of months, and
23  then a night supervisor after that couple of
24  months of -- in there.  And then I did that for

| Page 455 |
|---|

1  quite a few years, and then I got promoted to
2  operations manager there, and I'm not sure what
3  year that was.  It would be on -- probably on my
4  resume, but I don't remember.
5        And then after that, we built a new
6  facility in Cincinnati, Ohio.  Fairfield, Ohio, to
7  be exact.  And I ran -- I went there as the
8  operations manager.  And I --
9     Q    What year was that?
10     A    1978.  No, '75.  I think so.
11     Q    Would it be --
12     A    No, no.  No, no.  I'm sorry.  I have the
13  wrong -- '95 or '6.  Sorry about that.
14     Q    I'm sorry.  Where did you go after that?
15     A    After Cincinnati, I went back to North
16  Canton, and then they promoted me to distribution
17  center manager over in Sewickley, Pennsylvania,
18  and after that I was promoted to manager over
19  Sewickley and North Canton.  And we had closed
20  Cincinnati, and then we closed North Canton, which
21  was in Stark County, and we combined it into New
22  Castle in 2000, and I was made the director of
23  operations there.
24     Q    So is it true that the New Castle

| Page 456 |
|---|

1  facility opened in 2000?
2     A    Yes.  May of 2000.
3     Q    And when it opened, what was your title?
4     A    I don't remember if it was DCM or DO,
5  but it was one of those, and I ran the
6  distribution center.  We got -- started it up, and
7  then I'm still there.  So I've always been in the
8  Ohio/PA market.
9     Q    What geographic territory does the New
10  Castle distribution service -- distribution center
11  service?
12     A    Our distribution center services -- if I
13  could say what towns, you might know, but on the
14  east is State College, which is the -- central PA;
15  on the north is Erie, Pennsylvania, which is the
16  north side; northwest is -- is Cleveland; and then
17  southwest would be down to the Zanesville area;
18  and then south would be -- I believe it was
19  Morgantown, Weston; and then back up to New
20  Castle.  So we're in the geographic center.
21     Q    How many employees do you manage?
22     A    About 133 right now.
23     Q    And how many employees are direct
24  reports to you?

| Page 457 |
|---|

1     A    About ten.
2     Q    In your almost 19 years of managing the
3  New Castle Distribution Center, how would you
4  describe the performance of the distribution
5  center?
6        MR. BOGLE:  Object to form, vague and
7  ambiguous.
8        THE WITNESS:  The distribution center
9  won the DC of the year seven times, and that's
10  twice as many as any other distribution center has
11  received that, and that's based on the quality and
12  the performance of the distribution center.
13  BY MR. COLLINS:
14     Q    Are there ever any internal audits
15  performed about the operations of the distribution
16  center at New Castle?
17     A    Yes.  We have four or five kinds of
18  audits.  The first kind is called a STARS audit
19  that we do internally to match our SOPs to our
20  performance.  And that's done -- right now it's
21  done by an accounting team.  But before that, all
22  those years, it was done by McKesson Regulatory
23  Affairs folks.
24        Then we have a specific --

Page 458

1    Q   I'm sorry.  Can you tell me how often
2  that's done?
3    A   Every two, two-and-a-half years.
4    Q   Okay.  And the next -- the other audit
5  you were going to describe?
6    A   Yes.  Sorry.  The next audit is the DEA
7  cyclic audit or any DEA unannounced audit.  So
8  we've had cyclic audits average two-and-a-half
9  years.  They try to do them every two years,
10 but -- so I believe there were four audits at the
11 distribution center by the DEA, and they've all
12 came out as -- a hundred percent as exemplary.  So
13 that was one of the other audits.
14       And then monthly, we did the triannual
15 report, which was a DEA SOPs.  And then also we
16 did a VAWD audit, which is the National Wholesale
17 Association.  We do that every two to five years
18 depending on our licensure.  We were one of the
19 first DCs to get VAWD accreditation.
20       So when the DEA or we do our audits, we
21 check our licensing and numerous other things, but
22 the DEA has been in there a few times, and they've
23 always had exemplary comments for New Castle and
24 our team.

Page 459

1        (Snider Exhibit No. 52 was marked
2        for identification.)
3  BY MR. COLLINS:
4    Q   I'm going to hand you what's been
5  premarked as Exhibit 52.
6        Mr. Snider, can I ask you to identify
7  what is Exhibit 52?
8    A   This is the triannual checklist in the
9  McKesson operations manual.
10   Q   And what's the purpose of this document?
11   A   It's to do a -- every -- every
12 quarter -- every four months, I'm sorry, do a
13 DA -- DEA triannual checklist, and there's a group
14 of questions to ask to make sure we're complying
15 with supply chain and SOPs.
16   Q   Has the DEA ever complained to you about
17 your operations at the New Castle Distribution
18 Center?
19       MR. BOGLE:  Object to form.
20       THE WITNESS:  No.  They've always
21 said -- I know Kurt Dittmer, who was there before.
22 Patty Robson is there right now as interim agent
23 in charge, and before that we had -- I knew Jim
24 Crawford, and all of them have given us exemplary

Page 460

1  records.
2  BY MR. COLLINS:
3    Q   Have you ever received -- or has the
4  distribution center ever received any kind of
5  minor infraction or citation from the DEA?
6        MR. BOGLE:  Object to form.
7        THE WITNESS:  Never.
8  BY MR. COLLINS:
9    Q   In terms of the New Castle Distribution
10 Center operations, on average, what's the volume
11 of the pharmaceuticals that you distribute per
12 day?
13   A   We do about 150,000 pieces a day to
14 200,000, depending on the day.
15   Q   And when you say "pieces," what do you
16 mean?  Is that -- is that a tablet or --
17   A   A bottle or pill, or even sometimes a
18 case.  It depends on the selling unit.
19   Q   150,000 pieces?
20   A   Minimum.
21   Q   And how many -- what portion of that is
22 controlled substances?
23   A   About fourteen to 15,000.  Total for
24 Class II, III, IV and V.

Page 461

1    Q   And in terms of opioids, what's the
2  percentage of the product that is moved out of the
3  distribution center each day that is an opioid?
4        MR. BOGLE:  Object to form as to time,
5  vague and ambiguous.
6        MR. COLLINS:  And I -- fair enough.  I
7  will -- Mr. Bogle's objection is well founded.
8  BY MR. COLLINS:
9    Q   Over the course of the last 20 years,
10 can you tell me how the volume of opioids, what
11 it's been relative to the rest of the product
12 that's been moved?
13       MR. BOGLE:  Object to form.
14       THE WITNESS:  Two percent.
15 BY MR. COLLINS:
16   Q   What other products besides controlled
17 substances does the distribution center
18 distribute?
19   A   We sell pharmaceuticals, legend drugs,
20 over-the-counter merchandise, some medical
21 devices, everything from syringes to -- we used to
22 sell wheelchairs and that, but we got out of that
23 business locally.  But we would sell anything you
24 would see in a pharmacy.

Page 462

1    Q   How significant in terms of the
2  resources are controlled substance to your daily
3  distribution needs?
4        MR. BOGLE:  Object to form.
5        THE WITNESS:  Currently we have about 10
6  or 12 people that do nothing but the controls.  I
7  have two clerks that do nothing but the paper 222
8  forms or sorting those out, and I have one that
9  answers the phone and balances those edits.  We
10  send an edit every day to the DEA, electronically.
11  I believe it's the Philadelphia office.
12  BY MR. COLLINS:
13    Q   Let's take an opioid that is received in
14  your distribution center, and I'd like you to
15  describe how it's received, how it's handled, how
16  it's stored, and how it's then further
17  distributed.
18        MR. BOGLE:  Objection.  Form, compound.
19        THE WITNESS:  We receive it several
20  ways.  Directly from a vendor or FedEx or what we
21  call our national redistribution center.  So I'll
22  take the national redistribution center.
23        They send a notice to us that something
24  is coming.  The minute it hits the door, it's got

Page 463

1  an electronic threshold report that I actually get
2  an e-mail or text that I have to have it in the
3  cage or the vault within one-half hour.  If that
4  doesn't happen, then the text happens to my
5  managers to go out and see what's wrong.
6        And of that, we check it in.  We open it
7  up under camera every -- every box.  And then the
8  receiver checks it in, puts it in a holding cage
9  and rolls it over, just about every hour or two
10  hours, to the cage or the vault.  And then that
11  person double-checks and opens it up under camera,
12  and then we have a record of that that keeps
13  for -- with our system now at least 60 days.  And
14  that's part of it.  Everything is double-checked
15  by at least two people.
16  BY MR. COLLINS:
17    Q   I'm going to hand you a series of
18  photographs and ask you to identify them for me.
19    A   Okay.
20    Q   They've been premarked as Exhibits 2
21  through -- 2 through 11.  So I'm going to hand you
22  each of those, and I want you to tell me -- I'll
23  hand them to you.  You can have a seat.
24        I'm sorry, 53 through 62.

Page 464

1        (Snider Exhibits No. 53 through 62
2        were marked for identification.)
3  BY MR. COLLINS:
4    Q   So I'm handing you 53.  Do you recognize
5  what's depicted in Exhibit 53?
6    A   Yes.
7    Q   What is it?
8    A   This is our control substance cage for
9  Class III, IV and V merchandise.
10    Q   And where is that perspective from?
11    A   It's from the mezzanine level looking
12  down.
13    Q   And does that fairly and accurately
14  depict the cage --
15    A   Yes.
16    Q   -- in its current state?
17    A   Yeah, the bottom right is our
18  self-closing door.  And then I'll -- which has a
19  scanner on it so we know only people can enter
20  that are accessed to that.  And there's quite a
21  bit of -- well, you don't see the security here,
22  but there's quite a bit there.
23    Q   Let me hand you what's been premarked as
24  Exhibit 54.  Can you identify what's depicted in

Page 465

1  Exhibit 54?
2    A   Yes.  That's Jeff inside the cage
3  showing our radio frequency Accumax unit that we
4  barcode scan the product so we have an accurate
5  order and -- and know what's in the tote.
6        And what he's doing is put away, and on
7  the left you see the scanner above the fire
8  extinguisher for our -- that opens the door,
9  allows you access if you have a badge that's
10  authorized.  He's been background checked.  I
11  actually know him from my North Canton days.
12        And then the middle of that is the
13  authorization list of the people that can enter
14  that area and have access.  And then if there's a
15  visitor, like my boss or whatever, it's put on the
16  restricted area, authorized personnel only log.
17  And they have to be accompanied.
18        You can see the -- up above some of the
19  cameras, et cetera.  And that door is
20  electronically self-closing.
21    Q   Does that fairly and accurately depict
22  the area that you just described?
23    A   Yes.
24    Q   I'm going to hand you what's been

Page 466

1 premarked as Exhibit 55. Describe what -- tell me
2 if you identify -- can identify what's in that
3 picture.
4    A    Yes. That's the back area of the cage.
5 There is an I-Wash station there too, but above
6 that is the motion detectors that go 360 -- well,
7 I'm sorry, 180, around, and we have those on every
8 corner. And we alarm test every month, and
9 everything is brazed bolts. There's a lot of DEA
10 regs on that.
11    Q    Let me show you what's been -- I'm going
12 to -- actually, does that fairly and accurately
13 depict the area that you just described?
14    A    Yes.
15    Q    I'm going to hand you what's been
16 premarked as Exhibit 56.
17    A    Thank you.
18    Q    Do you recognize what's depicted in
19 Exhibit 56?
20    A    Yes, I do.
21    Q    What is it?
22    A    That's our fairly new vault that we put
23 in for Class II product. This was approved by the
24 DEA, and it's a two-story vault and it's got

Page 467

1 cement panels. I don't know if they weld them or
2 whatever, but that area has secure steel doors.
3 It's a combination lock, self-closing doors. It
4 just shows you part of the supply chain that we
5 have to make sure everything is secure. So no one
6 can go in there unless they're authorized. It has
7 the same lists and card readers there.
8    Q    You -- you indicated this -- well, does
9 this fairly and accurately depict the area you
10 just described?
11    A    Yes.
12    Q    You indicated this is relatively recent.
13 What did you have there before?
14    A    We had two smaller vaults, one story, so
15 they were a little tight. And so we upgraded to
16 this, and added all kinds of security cameras and
17 motion. There's noise sensors. There's heat
18 sensors. There's everything we can do to make
19 sure that we aren't broken into.
20    Q    What's the purpose of the heat sensors?
21    A    Just to make sure if a body is on the
22 top, you can detect them. There is a space in
23 between there. That's how we test the alarm
24 system every month. And when the DEA comes, they

Page 468

1 walk through and test every -- every point.
2    Q    Let me show you what's been premarked as
3 Exhibit 57, and ask you to tell me whether you can
4 identify that.
5    A    That's just the side of the vault, and
6 it just shows you some of the conduit for the
7 security system. Up above there is one of the
8 sensors, and I think that's what that depicts
9 there.
10    Q    Does it fairly and accurately depict
11 that area you just described?
12    A    Yes.
13    Q    I want to show you -- hand you what's
14 been premarked as Exhibit 58. Ask you to identify
15 or tell me whether you can identify that.
16    A    Yeah, this is the first access door to
17 the Class II narcotic vault. It just shows the
18 steel doors and some of the product inside that
19 vault.
20    Q    Does it fairly and accurately depict the
21 area you just described?
22    A    Yes.
23    Q    What is kept in that vault?
24    A    Class II narcotic substances. And I

Page 469

1 believe the hydrocodone was put in there about '13
2 or '14, as I recall.
3    Q    And when you say '13 or '14, 2013 and
4 2014?
5    A    Yes.
6    Q    And who has access to this area?
7    A    The managers. There's a list on the day
8 gate, so you have to access that too, and they are
9 all self-closing. So there is a list of managers
10 and employees, and they're background checked
11 every year.
12    Q    In the almost 20 years that you've
13 managed this distribution center, have you ever
14 had any theft of opioids?
15    A    Yes, I have.
16    Q    When?
17    A    We had some in 2010, '10 -- '10 to '11.
18 And it was a long-term employee, and we called
19 security, the DEA, let the police know and
20 everything else, and she was terminated.
21    Q    And what was the volume of product that
22 was missing?
23    A    I -- I never found out exactly. I just
24 know we had three 106s, as I recall, for

Page 470

1 hydrocodone.
2    Q    And what are 106s?
3    A    106 is a loss form that we report to the
4 DEA, not just with our ARCOS, but we also call
5 them and talk to them about it and then send it
6 electronically.
7    Q    Let me show you what's been premarked as
8 Exhibit 59. Can you identify what's in Exhibit 59
9 for me?
10    A    Yes. This just shows the backside. So
11 you're looking at the opposite side of the vault,
12 so you get a little idea of the distance. And
13 then there's sensors on there, and these are the
14 two roll-about cages that a receiver would put
15 product in and then roll it into the vault area to
16 be double-checked under camera.
17    Q    Does this fairly and accurately depict
18 the area you just described along with these
19 cages?
20    A    Yes.
21    Q    I show you what's been premarked as
22 Exhibit 60. Ask you to identify what's depicted
23 there, if you can.
24    A    That's some of our security cameras that

Page 471

1 was -- Dale took that picture. It just shows some
2 of our -- I believe they're called 360s. I'm not
3 an expert. But these cameras would show if there
4 is any pilferage or tampering, et cetera. Also
5 shows if there's a problem with something, so I
6 would see that with these cameras, and we keep
7 that data.
8    Q    And where exactly are we looking? Is
9 this --
10    A    This is just down one aisle of the cage.
11 So you didn't see that from up top, but this is
12 one aisle in the cage probably as you came in,
13 past where Jeff was on the other picture.
14    Q    And does it fairly and accurately depict
15 the area you just described?
16    A    Yes, it does.
17    Q    I'm showing you what's been premarked as
18 Exhibit 61. Please tell me whether you can
19 identify this area for me.
20    A    This shows some of the security inside
21 the vault. So I'll just direct your attention to
22 the automation that shows a tote is sealed under
23 camera. And every controlled substance goes into
24 a security bag that's sealed under camera. So

Page 472

1 every tote has a security bag sealed to avoid
2 tampering, and then that tote is tied with a
3 plastic tote tie, here in the vault, and it's sent
4 out into the shipping areas and it's commingled,
5 so you really don't know what a controlled
6 substance is inside. So all that's scanned.
7 Also I can tell realtime every tote and every
8 piece that is scanned on my system.
9    Q    What do you mean by a tote?
10    A    That's the container for the controlled
11 substances.
12    Q    And I don't recall if I already asked
13 you, but does this fairly and accurately depict
14 the area you just described?
15    A    Yes.
16    Q    I'm showing you what's been premarked as
17 Exhibit 62. Ask you to identify what's depicted
18 in Exhibit 62.
19    A    Yeah, this is our MAXPRO camera system.
20 It's just a typical view for our security system.
21 So it's important that we have access anywhere we
22 have a laptop availability, and we have access to
23 this. There's over 130 cameras in the
24 distribution center, and we do a report out as

Page 473

1 part of our auditing for scope and purpose, and
2 then that's reviewed by the DEA.
3        So this was, I believe, Dale's laptop.
4 So there's a lot more camera footage you can tell.
5 Even the parking lot is -- is -- we have a fence
6 around the outside of the parking lot, and we have
7 badge access only, so we know who came and went,
8 and et cetera.
9    Q    Other than that one occasion I think you
10 said in 2010 where you had an employee that was
11 involved in some theft, have you ever had any
12 other type of incident at your distribution
13 center?
14    A    Yes, we had -- up in Cleveland, someone
15 approached one of the drivers with a gun, and he
16 actually yelled for them to get out, and they
17 actually did. But they asked him to open the back
18 of his truck, which is always locked, and produce
19 the totes. And he actually used to run a
20 Mini-Mart is how he did that.
21        And I know that because our delivery
22 service has worked for me for almost 40 years, and
23 it's a dedicated delivery service, and no other
24 wholesaler has that. And these guys carry

Page 474

1  scanners so they can scan the totes. We know when
2  they bring them back how many totes were
3  delivered. They call if there's an error, they
4  had ten instead of nine. So we investigate that,
5  et cetera. But the drivers have been dedicated
6  service only for McKesson totes, which I think is
7  a differentiator for us.
8      Q   Do you see any totes in this Exhibit --
9  is it 62?
10     A   Yes. That top left, you see -- I can't
11 tell if that's the bio box or the -- yeah, it is
12 the bio. There's totes lined up there that are
13 getting ready to fill orders. So they're maroon
14 totes, and they're all sealed with -- bless you --
15 they're sealed with a plastic heat strap.
16     Q   And does this fairly and accurately
17 depict the -- sort of the various views of the
18 cameras?
19     A   Yes.
20     Q   How long has the distribution center had
21 cameras?
22     A   Since our inception. And we've had four
23 iterations of the security system and updated our
24 DVRs. For instance, just last week, we updated

Page 475

1  for the WannaCry virus. I don't know what that
2  is, but they had to update so that coordinates
3  with our security.
4      And we have a separate McKesson, it's
5  called GSOC, which is a company that monitors our
6  building, and the in-and-out doors, especially on
7  the weekends, we call them before we come in to
8  make sure everything is secure, because we do --
9  there have been hostage situations with other
10 wholesalers.
11     Q   Do your employees have to be screened to
12 handle controlled substances?
13     A   Yes. They're background checked, and
14 it's a preemployment drug test.
15     Q   Are they --
16     A   Every year.
17     Q   I'm sorry. So preemployment, are they
18 given background checks every year then?
19     A   If they have access to controls, they
20 are.
21     Q   Are there standard operating procedures
22 that -- that the distribution center complies with
23 in its handling of controlled substances?
24     A   Yes. We have SOPs that we work with,

Page 476

1  and you saw it on some of the audits. The first
2  one was called the DOM or -- we call it even
3  before that Section 55, but we've always had SOPs
4  for handling of controlled substances.
5      (Snider Exhibit No. 63 was marked
6      for identification.)
7  BY MR. COLLINS:
8      Q   I'm going to hand you what's been
9  premarked as Exhibit 63. Ask you to identify that
10 for me.
11     A   This is the McKesson operations
12 manager -- I think I -- we had this before.
13     Q   And approximately what period of time
14 was this in effect?
15     A   This was -- let me see. I'm not sure.
16 I'd have to look here. Just a second. (Peruses
17 document.)
18     I'm going to guess. My memory was 2000
19 to 2006. It might have been changed after that.
20 I'm not sure.
21     Q   Do your employees undergo any kind of
22 training for handling of controlled substances?
23     A   Yeah, we do. We do SOPs, and then we
24 document the training for everything from door

Page 477

1  checks -- that they're going to have a door check
2  to the walk test every month, and that they could
3  be searched, et cetera.
4      So we also go to SOPs for the handling
5  of every controlled substance, how they have to
6  keep it under camera, and they actually have a
7  camera right above them when they fill or dispense
8  product into the security bag. So that helps us
9  to make sure the right product is in that bag.
10     Q   Does the distribution center communicate
11 with local DEA?
12     A   Yes.
13     Q   How often?
14     A   Not as much right now, but they will
15 call me. I talked to Patty Robson last week. And
16 I also used to talk to Kurt Dittmer quite a bit
17 before he retired. And I've known these folks for
18 a long time, and I would probably say at least
19 twice a month there was some contact.
20     Q   Has the DEA -- the local DEA ever given
21 you a complaint about the operation of the
22 distribution center?
23     MR. BOGLE: Object to form.
24     THE WITNESS: They've never.

Page 478

BY MR. COLLINS:

1 Q   I'm sorry?

2 A   No, they have never.

3 Q   In earlier questioning by Mr. Bogle, he
mentioned a settlement agreement with the -- the
Justice Department.  Do you recall that?

4 A   Yes.

5 Q   Do you know if the New Castle
Distribution Center was mentioned in that
settlement agreement?

6 A   I know it was not.

7       (Snider Exhibit No. 64 was marked
        for identification.)

BY MR. COLLINS:

8 Q   I'm going to show you what's been
premarked as Exhibit 64.

9       Do you recognize that document?

10 A   Yes.

11 Q   What is it?

12 A   It's the controlled substance compliance
process.

13 Q   And what's the purpose of this document?

14 A   To make sure the SOPs are followed under
the MOM or manual on the handling of controlled

Page 479

substances.  So this would be how to fill out the
daily transmission to the DEA, how to file the
ARCOS month end, how to do counts.

        We count the product every day if it
doesn't match inventory numbers, and we also count
the product every month, and twice a year we count
every piece, including Class IV through V in
there.  We just do our biannual inventory last
month.

        So it tells us how to do that.  It also
tells us how to fill out or how to properly fill
out and check a 222 form, which is what a percent
of our customers still use.  It's a three-part
form, and it tells how to do that and how to void
that.  We spend a lot of time with that.  I prefer
the electronic version called CSOS, but this
explains how to do all of that.

Q   I want to talk about the suspicious
order reporting programs you've had in place at
the New Castle Distribution Center.  Can you
describe what process you followed starting in
2000 to report suspicious orders?

        MR. BOGLE:  Object to form.  Vague and
overbroad.

Page 480

        THE WITNESS:  Yes.  Briefly, the first
part, 2000 to 2006, we would fax the DEA unusual
purchase notification log, I think is what the
full name was, DU45.  And then we would transmit a
monthly ARCOS, and we've been doing that for all
of my 40 years.  So we transmit ARCOS to the DEA.
That's every transaction, automated reporting of
control order system.  And we --

BY MR. COLLINS:

Q   I'm sorry.  How often is that done or
was that done?

A   Once a month.

Q   And the DU45s, how often were they
transmitted to the DEA?

        MR. BOGLE:  Object to form.

        THE WITNESS:  In 2000 to 2006, it was
daily.  And then we also sent it monthly, and we
put it in the audit box for the DEA, and retained
it for two years also.  So we had that data for
them to look at when they did the audit, and they
did.

BY MR. COLLINS:

Q   I want to make sure I'm clear.  So you
mentioned basically three reports, correct?

Page 481

A   Yes.

Q   The monthly ARCOS data.

A   Yes.

Q   Every transaction reported to the DEA.

A   Yes.

Q   Daily DU45.

A   Yes.

Q   Suspicious order reports faxed to the
DEA.

A   Yes.

Q   And then monthly, the same thing.

A   Monthly suspicious order reports that
were sent.  I think --

        MR. BOGLE:  Object as leading.

BY MR. COLLINS:

Q   Let me -- in terms of the timing of
filling orders versus faxing DU45s, can you
explain that, how that occurred?

A   Yeah.  The early part of the program, it
was kind of reactive.  So the order would already
get there.  Sometimes we would have it filled and
on the cross dock truck, and then we would get the
DU45 and look at that.  So we couldn't be as
proactive, so we sent it to the DEA after the

Page 482

1 order was filled.

2 And then after that, 2007 on, it was

3 more proactive was -- was the way I looked at it,

4 so that we could maybe stop and take a look at it

5 and have the DRAs in place. But during that first

6 part of the time, it was -- the data would only

7 come after we did the last pull of orders, and we

8 may have shipped it, especially if our early

9 trucks went out at midnight.

10 Q Did there ever come a time where the DEA

11 told you to stop sending these daily DU45 reports?

12 MR. BOGLE: Object to form. Hearsay.

13 THE WITNESS: Yes. They asked us to

14 stop faxing them after a little bit. Kurt Dittmer

15 called me. And I asked him to put it in writing,

16 because I knew that, and he did send me an e-mail

17 about that. He said the monthly suspicious order

18 reports were enough, and he would accept that.

19 BY MR. COLLINS:

20 Q And do you remember approximately when

21 that occurred?

22 A No, I don't. 2004, 2005. I'm not sure.

23 Q And what was his explanation?

24 A That they had enough data --

Page 483

1 MR. BOGLE: Object to form.

2 THE WITNESS: -- with the monthly

3 suspicious order reports.

4 (Snider Exhibit No. 65 was marked

5 for identification.)

6 BY MR. COLLINS:

7 Q I'm going to hand you what's been marked

8 as Exhibit 65, and ask you to identify it for me,

9 please.

10 A It's a MOM manual.

11 Q I'm sorry. Can you -- can you explain

12 that?

13 A McKesson Operation Manual from, it looks

14 like, 2013. We did an update.

15 Q What's the purpose?

16 A This changed the way we did the -- not

17 the daily ARCOS procedure, but the month end and

18 the DEA error report notices, and I believe that

19 sent it all electronic. And some of this is a

20 little bit technical, but we would send every day

21 the reports to the DEA.

22 Q When did you start doing it daily?

23 A Well, this says 2013, electronically,

24 but I'm not sure.

Page 484

1 Q When the New Castle Distribution Center

2 first became operational in 2000, did you have

3 access to customer information in terms of who

4 else was supplying them?

5 A No, I didn't.

6 MR. BOGLE: Object to form.

7 BY MR. COLLINS:

8 Q Do you have that now?

9 A The DRAs have all the access to that,

10 yes.

11 Q And when did that start?

12 A I'm -- I'm not sure if that was 2008,

13 but -- with the Lifestyle drugs, but I know that

14 the fact that they could see the wholesalers'

15 information, I think Izzy told me it was just

16 within the last few years.

17 (Snider Exhibit No. 66 was marked

18 for identification.)

19 BY MR. COLLINS:

20 Q I'm going to show you what's been now

21 premarked as Exhibit 66, and ask you to identify

22 it for me.

23 What is Exhibit 66?

24 A It looks like an update of the ARCOS

Page 485

1 manual, 2014. I'm not sure of that date, but

2 that's what it looks like. This shows how to

3 count the ARCOS.

4 Q Can you tell me how your role as a

5 manager or director of operations of a

6 distribution center has changed since the opening

7 of the distribution center over time with respect

8 to handling and monitoring of controlled

9 substances?

10 MR. BOGLE: Object to form, vague and

11 ambiguous.

12 THE WITNESS: Just some of the things

13 that I can mention. We've upgraded all the

14 security systems. We've actually changed the way

15 we do totes. We used to identify them as a

16 controlled substance and put them on the back of

17 the truck, and we stopped doing that years ago.

18 And also as far as the way we handle

19 controls, it's a lot more data driven. The

20 director of Regulatory Affairs, especially for

21 national accounts, because I wasn't always privy

22 to that data, so they had a lot of data that they

23 could see, and when they started getting the

24 script information, it was very helpful to them to

Page 486

1  make the decision on the customer.
2  BY MR. COLLINS:
3     Q   What do you mean by "script
4  information"?
5     A    That was part of the -- after the LDMP,
6  the CSMP, to get script information from the
7  customer for, I think it was, three months.
8  Without the HIPAA or the people's information,
9  just the amounts.  So it would actually say what
10 kind of doctor -- what doctor prescribes what --
11 what pills.
12    Q   You've mentioned the director of
13 Regulatory Affairs a number of times.  What's his
14 or her role?
15       MR. BOGLE:  Object to form.
16       THE WITNESS:  They're vetting out the
17 regulations and the customers that we either
18 onboard or sell to.
19 BY MR. COLLINS:
20    Q   Given your almost four decades of
21 experience with McKesson, including almost 20
22 years as the director of operations of the New
23 Castle Distribution Center, what do you think
24 about all of these allegations about McKesson

Page 487

1  fueling the opioid crisis?
2        MR. BOGLE:  Object to form.
3        THE WITNESS:  I spent most of my life in
4  Summit County.  I know Cuyahoga County.  I'm
5  probably the last Browns' fan you'll ever meet.
6  So it means a lot to me, and I would never do
7  anything willingly to create an opiate crisis.
8  I -- I feel it is terrible and I feel bad for it,
9  but I don't say that I caused it at -- at New
10 Castle.
11 BY MR. COLLINS:
12    Q   Besides your handling of distribution of
13 pharmaceuticals in a routine way, are you aware of
14 any other things that you've done as a head of
15 operations at the distribution center --
16       MR. BOGLE:  Object.
17 BY MR. COLLINS:
18    Q   -- that would impact the community?
19       MR. BOGLE:  Object to form.
20       THE WITNESS:  Yeah, I guess that's where
21 I say about some of the things we do.
22       I know in -- I think it was Summit
23 County, Stark County, there was a meningitis
24 outbreak several years ago, and one of the high

Page 488

1  school kids, one or two of them died, and so we
2  had to provide the antidote or the medicine for
3  that.  And I called in helicopters, and they
4  landed in the parking lot and they distributed to
5  the County Board of Health, I believe it was, and
6  one of the hospitals.  And that's kind of what we
7  do.
8        I also -- just recently one of my
9  managers from UPMC Pittsburgh Hospital, they had a
10 snake bite, and they must have been in central PA.
11 I'm not sure how that happened.  But we -- he
12 didn't know if the courier could get there quick
13 enough, so he grabbed it and drove it down
14 himself, and that saved the kid.
15       And then we were in McKesson Today for
16 New Castle recently for the Washington Courthouse
17 distribution center in Ohio that we provided and
18 had a life-saving medicine, and my manager drove
19 it halfway, they had someone pick it up, and it
20 saved the patient.  It was a mother who was
21 pregnant and needed this medicine to save the
22 baby, and I know that's what we did.
23       It was written up in the McKesson Today,
24 et cetera, and Bev did most of the work.  I just

Page 489

1  was standing there.  But that's the kind of thing
2  we do that I wanted to make sure I got on the
3  record.
4        MR. COLLINS:  I have no further
5  questions.  You want to switch?
6        MR. BOGLE:  Yeah, just give me a couple
7  of minutes.
8        THE VIDEOGRAPHER:  The time is 5:55 p.m.
9  We're going off the record.
10       (Recess.)
11       THE VIDEOGRAPHER:  The time is 6:02
12 p.m., and we're back on the record.
13       RECROSS-EXAMINATION
14 BY MR. BOGLE:
15    Q   All right.  Mr. Snider, I have a few
16 follow-up questions for you.
17       You made reference to opioids being
18 2 percent of the overall volume at your
19 distribution center.  Do you recall that
20 testimony?
21    A   Yes.  At one time, yes.
22    Q   Yeah, that number has not been stagnant,
23 right?  For example, when you started in 2000,
24 that number increased over time, didn't it?

Page 490

1     MR. COLLINS:  Objection.  Vague.
2     THE WITNESS:  Over time, yes, it did.
3  BY MR. BOGLE:
4     Q    Right.  So when you say that opioids
5  were 2 percent of the total volume at New Castle,
6  you're not representing to our jury that that was
7  true for the entire period of 2008 -- or 2000 to
8  present, right?
9     A    No.  I just got the data from present.
10    Q    From today?
11    A    Recently.
12    Q    Right.  So, for example, you have the
13 2018 data is what you're talking about.
14    A    Yes.
15    Q    Okay.  And it was higher than that, for
16 example, in 2010.
17    A    I don't -- I don't know that, what it
18 was.
19    Q    You don't know.  So you didn't check
20 anything other than 2018.
21    A    Correct.
22    Q    Okay.  You provided some -- some
23 testimony about -- to the effect that the DEA has
24 never had any complaints about any activities

Page 491

1  involving New Castle.  Is that right?
2     A    Yes.
3     Q    Okay.  Have you reviewed any of the DEA
4  and DOJ letters that led to the -- the $150
5  million settlement agreement?
6     A    I looked at them, yes, briefly.
7     Q    Did you just look at the settlement
8  agreement, or did you look at any of the internal
9  letters that led up to that?
10    A    I looked at the distribution centers
11 listed.
12    Q    Okay.  Did you review the letters in
13 detail beyond that?
14    A    No.
15    Q    Okay.  So, for example, if the -- some
16 of the letters from the DEA indicate that they
17 found nationwide and systemic violations regarding
18 controlled substance monitoring at McKesson,
19 that's something you were not aware of when you
20 provided that testimony, right?
21       MR. COLLINS:  Objection.  Assumes facts
22 not in evidence.  Lack of foundation.
23 BY MR. BOGLE:
24    Q    Right?

Page 492

1     A    Can you ask me -- I'm not sure what you
2  mean by --
3     Q    Sure.
4     A    -- "provided that testimony."
5     Q    You provided testimony there's been no
6  complaints about -- about New Castle from the DEA.
7     A    Yes.
8     Q    And my question to you was, did you
9  review any of these letters from the DEA to assess
10 whether they made any comments about the fact that
11 they found nationwide and systemic violations as
12 to McKesson's suspicious order monitoring
13 programs?
14       MR. COLLINS:  Object to form.
15       THE WITNESS:  I did not discuss it with
16 the DEA.
17 BY MR. BOGLE:
18    Q    No, I'm talking about in the letters.
19 Did you see that in the letters anywhere?
20       MR. COLLINS:  Objection.  I'm not
21 sure --
22 BY MR. BOGLE:
23    Q    All right.  Let's just take a look at
24 one.

Page 493

1     A    No, I didn't.
2     Q    Okay.  Let's take a look at one.
3     A    I thought you said did I review it with
4  the DEA.  That's what I heard.
5     Q    All right.  That's fine.
6       (Snider Exhibit No. 67 was marked
7       for identification.)
8  BY MR. BOGLE:
9     Q    Exhibit 67, I'm going to hand you here,
10 also marked as 1.1443.
11       This is a letter from U.S. Department of
12 Justice, Drug Enforcement Administration, dated
13 November 4, 2014.  Do you see that?
14    A    Yes, I do.
15    Q    Okay.  It's sent to a Geoffrey Hobart at
16 Covington & Burling.  Do you see that?
17    A    Yes.
18    Q    Okay.  And that's the same firm that's
19 also representing you here today, right?
20    A    Yes.
21    Q    Okay.  And if you look at this letter,
22 I'm going to page 2 in the letter.  And I'm on the
23 fourth paragraph.
24       And it says:  "In order to release all

Page 494

1 McKesson-owned DEA registrants from administrative
2 liability as you have requested, the agreed-upon
3 registration consequences must reflect not only
4 the gravity of the offenses but the nationwide
5 scope of McKesson's failure to report suspicious
6 orders and to maintain effective controls against
7 diversion."
8     Do you see that?
9     A   Yes.
10    Q   Okay.  When you looked through the DEA
11 correspondence prior to testifying today, do you
12 recall reading that statement?
13       MR. COLLINS:  Objection.  Lack of
14 foundation.  Form.
15       THE WITNESS:  No, I don't.
16 BY MR. BOGLE:
17    Q   You don't.  Okay.
18       And if you go to page 5 of the letter,
19 the first full paragraph, it says:  "As noted
20 above, the above examples are illustrative, not
21 exhaustive.  They are meant to illustrate what we
22 mean when we say that we will be driven by the
23 evidence that we could present in administrative
24 proceedings against these registrants.  We have

Page 495

1 attempted to highlight this evidence in hopes that
2 you and your client can fully understand why DEA
3 believes that the failings at McKesson were
4 system -- systemic as they were serious."
5     Do you see that?
6     A   Yes.
7     Q   Okay.  Do you recall seeing that in the
8 letter that you reviewed?
9       MR. COLLINS:  Objection.  Asked and
10 answered.
11       THE WITNESS:  No.
12 BY MR. BOGLE:
13    Q   You reviewed quite a few photos of the
14 New Castle Distribution Center.  Do you recall
15 that?
16    A   Yes.
17    Q   Okay.  Now, those photos all pertain to
18 security measures contained within your facility
19 at New Castle, right?
20    A   Yes.
21    Q   Okay.  None of those photos pertain to
22 anything that involved trying to make sure that
23 the controlled substances once they are sold get
24 into the right hands, right?

Page 496

1     A   No.  Except for the security bags and
2 the sealed totes.
3     Q   To make sure your drivers don't get
4 robbed, right?
5     A   Or to make sure that the pharmacist
6 opens it behind the pharmacy and scans the product
7 with -- to make sure it's the right stuff.
8     Q   To make sure the pharmacist doesn't get
9 robbed.
10    A   Or make sure it doesn't get pilfered.
11    Q   When you say "pilfered," what do you
12 mean?
13    A   The stuff is in a security bag from us,
14 and I just wanted to make that clear that it's
15 another layer of security that we put in there so
16 that the pharmacist has to open the bag.  It can't
17 be tampered with.
18    Q   You talked too about these -- these
19 totes that the controlled substances are carried
20 in.  Do you recall discussing that generally?
21    A   Yes.
22    Q   And I think you said something about
23 having dedicated drivers delivering these totes,
24 and that was something that you thought

Page 497

1 differentiated McKesson from other wholesalers.
2 Am I summarizing that fairly?
3    A   Yes.
4    Q   Okay.  Now, you've had at New Castle
5 problems with lost totes that carried controlled
6 substances in them, right?
7       MR. COLLINS:  Objection.  Form.
8       THE WITNESS:  No.
9 BY MR. BOGLE:
10    Q   You've never lost a tote?
11    A   I didn't say that.  We don't have a
12 problem with it.
13    Q   Okay.  Well, we talked about Giant
14 Eagle, for example, earlier, right, and you recall
15 back in 2014 losing several totes that included
16 controlled substances for deliveries to Giant
17 Eagle, right?
18    A   No, I don't.
19    Q   You don't?
20    A   Nope.
21    Q   Okay.  All right.
22       (Snider Exhibit No. 68 was marked
23       for identification.)
24 BY MR. BOGLE:

Page 498

1  Q   I'm going to hand you Exhibit 68, also
2  marked as 1.1878.
3      Looking at the e-mail on the bottom
4  of the first page, it's from a Barbara Simpson,
5  April 23rd, 2014, to several individuals,
6  including you, right?
7  A   Yes.
8  Q   Titled "Missing HBC Tote."  Do you see
9  that?
10  A   Yes.
11  Q   What is HBC?
12  A   That's not our tote.  That's a Giant
13  Eagle tote that the delivery service delivers for
14  them, and we don't handle it.  It's the -- it's
15  their warehouse.
16  Q   So you guys deliver for HBC for their
17  materials, is that what you're saying?
18  A   I don't.  The delivery service does.
19  Q   Right.  So -- so the delivery service,
20  you're saying -- your testimony is that they've
21  lost HBC's totes but not McKesson's?
22  A   I don't even know that they lost an HBC
23  tote.  It doesn't say whose fault it was.  But
24  this wasn't our tote.  It was a Giant Eagle tote.

Page 499

1  They have their own warehouse, and they have their
2  own control system, et cetera, and I'm --
3  Q   These are the same --
4  A   -- I'm not involved with it.
5  Q   Sorry.  These are the same delivery
6  drivers that deliver McKesson totes, right?
7      MR. COLLINS:  Objection.  Misrep- --
8  mischaracterization.
9      THE WITNESS:  Yes, they deliver for
10  Giant Eagle.
11  BY MR. BOGLE:
12  Q   And you're aware of the circumstance
13  back in 2014 where two totes were lost, right?
14  A   No.
15  Q   That contained controlled substances.
16  A   If you give me time to read it, I will.
17  I'm not -- it's HBC --
18  Q   Sure.  It's a one-page e-mail.  Go
19  ahead.
20  A   Sorry, there's other pages here.  Okay.
21  (Peruses document.)
22      This -- this doesn't record that the
23  delivery service lost any totes.  It's recording
24  that this -- Giant Eagle reported missing.  So

Page 500

1  their manifest wasn't correct on that.
2  Q   Okay.  It does report missing totes,
3  right?
4      MR. COLLINS:  Objection.
5  Mischaracterization of his --
6      THE WITNESS:  It does not.
7      MR. COLLINS:  -- testimony.
8  BY MR. BOGLE:
9  Q   It does not report where the totes are
10  missing?
11  A   No.
12  Q   Okay.  So when the e-mail talks about
13  missing HBC totes, they're not talking about
14  missing totes?
15  A   They're talking about missing totes, but
16  it doesn't report it.  This isn't a 106 or a lost
17  form to the DEA.
18  Q   Right.  But this whole e-mail discussion
19  is about missing totes, right?
20      MR. COLLINS:  Objection.  Lack of
21  foundation.
22      THE WITNESS:  Yes, from -- from someone
23  else.
24  BY MR. BOGLE:

Page 501

1  Q   Right.  But it's -- it's certainly these
2  delivery drivers -- either delivery drivers or HBC
3  that lost these totes.  We can agree on that,
4  right?
5  A   Yes.
6  Q   Okay.
7  A   Also there's no manifest to show that.
8  So the -- I'm sure that Greg Carlson and the Giant
9  Eagle folks reported that to the DEA, that they
10  have missing totes, or I don't even know that they
11  found them at another store or where --
12  Q   Right.  You don't know either way,
13  right?
14  A   No.
15  Q   But you do agree with me this discusses
16  missing totes?
17      MR. COLLINS:  Objection.  The question
18  is vague.
19  BY MR. BOGLE:
20  Q   Right?
21  A   Yeah.
22      MR. COLLINS:  The question is vague.
23  BY MR. BOGLE:
24  Q   Now, you talked about McKesson always

Page 502

1 having standard operating procedures for
2 controlled substances.
3         Do you recall testifying to that a few
4 minutes ago?
5     A    Yes.
6     Q    Okay.  And so I think I asked you a
7 similar question in my exam.  You have no idea
8 what was in place prior to 2000, do you?
9         MR. COLLINS:  Objection.  Vague, form.
10        THE WITNESS:  I don't recall.  There was
11 a 55 manual, Section 55.  That's what I recall.
12 BY MR. BOGLE:
13    Q    Right.  And we looked at that actually
14 at the very beginning of the exam that was dated
15 July 2000, right?
16    A    Yes.
17    Q    So you have no idea whether any standard
18 operating procedure existed prior to that manual
19 in July of 2000, do you?
20        MR. COLLINS:  Objection.  Asked and
21 answered.
22        THE WITNESS:  I know there was one in
23 '97 for sure.
24 BY MR. BOGLE:

Page 503

1     Q    There was one in '97?
2     A    Yes.  That's what I recall.
3     Q    Okay.  And how did that differ from the
4 2000 version?
5     A    I don't know.
6     Q    Okay.  What was that one titled?
7     A    Probably DOM or Operations Manual.  We
8 didn't use the word SOPs back then.
9     Q    Okay.  Have you seen any copies of that
10 SOP?  Because we've asked for all of them and we
11 didn't get anything prior to 2000.
12    A    No, I didn't.
13    Q    Okay.  Now, you said that there were
14 reports sent to the DEA, unusual order reports, I
15 think you called them, from 2000 to 2006.  Do you
16 recall that?
17    A    Yes.
18    Q    Do you have any documentary proof of
19 that at this point in time?
20    A    No.
21    Q    And you also said that at some point in
22 time, the D -- DEA agent told you on the phone
23 that he didn't want daily unusual reports anymore.
24 Do you recall that?

Page 504

1     A    Yes.
2     Q    Do you have any documentary proof of
3 that today?
4     A    I don't have the e-mail.  He actually
5 put it in writing for me.
6     Q    But you don't have that, right?
7     A    No, not from two -- whatever year that
8 was.
9     Q    So we don't have any way to verify by
10 documentation either of those statements, do we?
11        MR. COLLINS:  Objection.  It's a
12 mischaracterization.  You can ask the DEA.
13        THE WITNESS:  From Kurt Dittmer would be
14 the only way to verify that.
15 BY MR. BOGLE:
16    Q    We don't have any documentary evidence
17 that you can provide us as to providing reports
18 from 2000 to 2006, number one, right?
19    A    Number one?
20    Q    First thing.  You can't point me to any
21 documents that show that you actually did what you
22 said you did?
23    A    No, I don't have those e-mails from 2004
24 or whatever year it was.

Page 505

1     Q    And you don't -- and you don't have any
2 e-mail that you can show me or to the jury or to
3 anybody else about the DEA agent specifically
4 calling you and telling you that you didn't need
5 to provide daily reports anymore, correct?
6     A    I don't have that.
7     Q    You were asked about obtaining data from
8 other -- strike that.
9         You talked about being able to obtain
10 data regarding your customers receiving controlled
11 substances from other manufacture -- other --
12 other wholesalers.  Do you recall that?
13    A    Yes.
14    Q    And you talked about when you thought
15 that was available, and I won't go back into the
16 exact years, but you recall talking about a
17 timeline --
18    A    Yes.
19    Q    -- when you thought that was available,
20 right?
21    A    Yes.
22    Q    The bottom line is, McKesson at all
23 times was able to ask the customer for that data,
24 right?

Page 506

1    MR. COLLINS: Objection. Compound,
2  argumentative.
3    THE WITNESS: I don't know that.
4  BY MR. BOGLE:
5    Q  You don't know whether McKesson at all
6  times could ask their own customers, Listen, give
7  me all of the drugs that you're getting from all
8  the wholesalers, give me proof of that, I want to
9  see?
10    A  From 2000 on, I don't know that -- if
11  that was legally feasible.
12    Q  Legally feasible?
13    A  Yeah, I don't know --
14    Q  You've asked --
15    A  -- if we could legally give them the
16  other wholesalers' information.
17    Q  Do you recall anybody ever asking, that
18  you were aware of?
19    MR. COLLINS: Objection to form.
20    THE WITNESS: Yes.
21  BY MR. BOGLE:
22    Q  You recall somebody asking for it?
23    A  Yes.
24    Q  And somebody saying that was legally not

Page 507

1  possible?
2    A  No.
3    Q  Okay. So -- but what you do know is you
4  guys can get it today, right?
5    A  I -- yes, as he showed me.
6    Q  Any -- are you aware of any changes to
7  the laws that would allow it today that didn't
8  exist before?
9    MR. COLLINS: Objection. Calls for a
10  legal conclusion, among other things.
11    THE WITNESS: I don't know anything
12  about the laws, no, right now on that.
13  BY MR. BOGLE:
14    Q  Okay. Well, you talked about the fact
15  that you guys could get it. I'm just trying to
16  follow up on that.
17    A  It depends --
18    MR. COLLINS: I'm sorry, is that -- I'm
19  not sure that's a question.
20    MR. BOGLE: No, it's not. It's just a
21  comment.
22  BY MR. BOGLE:
23    Q  Now, you talked about blocked orders and
24  suspicious order reports generally. Do you recall

Page 508

1  that?
2    A  Yes.
3    Q  Okay. Now, the fact of the matter is
4  for Summit County, there were no blocked orders
5  from January 2006 to May 2008 for McKesson for
6  Summit County pharmacies, were there?
7    MR. COLLINS: Object to the term
8  "blocked orders." Vague. Form.
9    THE WITNESS: Can you explain "blocked
10  orders"? Unusual purchases?
11  BY MR. BOGLE:
12    Q  No, what I'm asking is, if a customer
13  from 2006 to mid-2008 from Cuyahoga County made an
14  order for a controlled substance, they got that
15  order, and those orders were not stopped or
16  blocked or ceased, right?
17    A  No -- no, they were blocked, stopped or
18  ceased.
19    Q  Okay. Well, let's take a look at Summit
20  County here.
21    This is a summary of -- on the first
22  page -- of the information that's been provided to
23  us about blocked orders from Summit County.
24  Exhibit 69.

Page 509

1    (Snider Exhibit No. 69 was marked
2    for identification.)
3  BY MR. BOGLE:
4    Q  So this is what was produced to us as
5  far as blocked orders from Summit County or
6  stopped orders.
7    Do you see on the first page -- this is
8  from January 1, 2006, on. Do you see the first
9  blocked or stopped order that appears on this
10  spreadsheet on page 2 is from June 18, 2008, for a
11  Summit County pharmacy? Do you see that?
12    A  Yes. I have no idea what this document
13  is. It doesn't even have attribution.
14    Q  This is what was provided to us when we
15  asked for evidence of stopped orders. This is
16  what was provided by McKesson.
17    A  I don't -- I don't know that.
18    Q  Okay. So you're saying this is wrong?
19    A  No.
20    MR. COLLINS: No. Objection. That's a
21  total mischaracterization of his answer. He said
22  he doesn't know what this document is.
23    THE WITNESS: I don't know anything
24  about this document.

Highly Confidential - Subject to Further Confidentiality Review

Page 510

1 BY MR. BOGLE:
2    Q   Okay. So if what was produced to us
3 supports the notion that there were no blocked
4 or stopped orders from January 1, 2006, until
5 June 17, 2008, into Summit County from McKesson,
6 do you have any reason to dispute the accuracy of
7 that finding?
8      MR. COLLINS: Objection. Assumes facts
9 not in evidence, lack of foundation.
10      THE WITNESS: Yes, I don't know.
11 BY MR. BOGLE:
12    Q   You don't know.
13    A   Correct.
14    Q   Okay. So -- and this report as well
15 indicates that the first report to the DEA of a
16 blocked order occurred August 1st, 2013, for a
17 Summit County pharmacy, and that's on page .10.
18      You see there's a "DEA reported date"
19 column there, and you see it's blank on all pages
20 leading up to .10 until you get to August 1, 2013.
21    A   I can testify --
22      MR. COLLINS: I'm sorry. I'm not sure
23 if there's a question. He's just --
24 BY MR. BOGLE:

Page 511

1    Q   Yeah, I'm introducing the information to
2 you.
3    A   Okay.
4    Q   You see there's a "DEA reported date"
5 column. The first date entry is on page 10 for a
6 blocked order that was reported to the DEA,
7 August 1st, 2013, for a Summit County pharmacy.
8 Do you see that?
9    A   I don't know what that is, and I don't
10 know -- it doesn't say blocked order. It says
11 Acme Pharmacy.
12    Q   This was represented to us by McKesson
13 this was their blocked order reports for Summit
14 County.
15      MR. COLLINS: Objection. Lack of
16 foundation what this --
17 BY MR. BOGLE:
18    Q   So you don't know what this report is
19 even about?
20      MR. COLLINS: I'm sorry, let me finish
21 my objection. Lack of foundation. You haven't
22 established this witness's knowledge as to what
23 this document --
24 BY MR. BOGLE:

Page 512

1    Q   Geez, it should, man. I mean, you don't
2 know when orders were blocked from your
3 distribution center?
4      MR. COLLINS: You don't have to answer
5 that.
6 BY MR. BOGLE:
7    Q   No, you do. You don't know that?
8      MR. COLLINS: Actually -- actually, lack
9 of foundation. You haven't established this
10 witness has any knowledge about this document. He
11 keeps telling you he doesn't know anything about
12 the document, and you keep asking him questions
13 about a document he doesn't know anything about.
14      THE WITNESS: I don't know anything
15 about this document, and you say it's a blocked
16 item document, and this cover page is on it, but
17 I've never seen this before.
18 BY MR. BOGLE:
19    Q   I put the cover page on there.
20 Everything else --
21    A   Oh --
22    Q   -- is provided to us by --
23    A   -- I did not know that.
24    Q   That's a summary of the data included in

Page 513

1 there.
2    A   If you say so, but I don't -- can't
3 testify to that.
4    Q   Okay. You have no reason to dispute the
5 accuracy of either of those statements, do you, on
6 the first page?
7      MR. COLLINS: Objection. Lack of
8 foundation.
9 BY MR. BOGLE:
10    Q   Do you?
11      MR. COLLINS: Objection. Lack of
12 foundation.
13      THE WITNESS: I don't trust what you put
14 on here.
15 BY MR. BOGLE:
16    Q   You don't trust what I put on there?
17    A   No.
18    Q   Show me where I'm wrong in the document.
19    A   I don't know the document.
20    Q   Okay. You don't have any idea, right?
21      MR. COLLINS: Objection. Argumentative.
22      MR. BOGLE: No further questions.
23      MR. COLLINS: Actually I have a couple
24 of follow-ups.

Highly Confidential - Subject to Further Confidentiality Review

Page 514

REDIRECT EXAMINATION

BY MR. COLLINS:

3   Q   Exhibit 67, can you pull it out.

4     Mr. Bogle asked you about this

5 correspondence between the DEA and Mr. Hobart.

6 Can you look through it and see if you see the

7 New Castle name mentioned anywhere in this

8 document?

9   A   I was kind of looking through that. I

10 think I saw Colorado. I didn't see New Castle

11 anywhere.

12   Q   All right, Exhibit 68, Mr. Bogle

13 questioned you about this allegedly lost tote.

14     Did McKesson ever lose any totes in

15 connection with servicing whatever customer this

16 is?

17   A   No.

18   Q   Do you have any idea what this -- what

19 is being discussed in this e-mail?

20   A   This is --

21     MR. BOGLE: Object to form.

22     THE WITNESS: This is their Giant Eagle

23 warehouse that they contracted with SSD to fill --

24 to deliver orders, and their due diligence would

Page 515

1 have been their manifest.

2     But Barb is trying to find out because

3 she's doing due diligence to make sure controls

4 don't get out on the street.

5 BY MR. BOGLE:

6   Q   Does this document reflect that McKesson

7 lost totes?

8   A   No.

9     MR. BOGLE: Object to form.

10     MR. COLLINS: No further questions.

11     MR. BOGLE: All right, we're done.

12     THE VIDEOGRAPHER: All right. The time

13 is -- sorry, anything else?

14     MR. BOGLE: No, I'm good.

15     MR. COLLINS: We're good.

16     THE VIDEOGRAPHER: Anybody on the phone

17 either?

18     I just want to make sure --

19     MR. COLLINS: I didn't even know -- was

20 there anybody participating by phone?

21     THE VIDEOGRAPHER: The time is

22 6:23 p.m., November 8, 2018.

23     Going off the record, completing the

24 videotaped deposition.

Page 516

1     (Whereupon, the deposition of

2 BLAINE M. SNIDER was concluded

3 at 6:23 p.m.)

Page 517

1   CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

2   The undersigned Certified Shorthand Reporter

3 does hereby certify:

4   That the foregoing proceeding was taken before

5 me at the time and place therein set forth, at

6 which time the witness was duly sworn; That the

7 testimony of the witness and all objections made

8 at the time of the examination were recorded

9 stenographically by me and were thereafter

10 transcribed, said transcript being a true and

11 correct copy of my shorthand notes thereof; That

12 the dismantling of the original transcript will

13 void the reporter's certificate.

14   In witness thereof, I have subscribed my name

15 this date: November 13, 2018.

16

17     _____

18     LESLIE A. TODD, CSR, RPR

19     Certificate No. 5129

20 (The foregoing certification of

21 this transcript does not apply to any

22 reproduction of the same by any means,

23 unless under the direct control and/or

24 supervision of the certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

| Page 518 |
|---|

1          INSTRUCTIONS TO WITNESS

2      Please read your deposition over carefully and

3 make any necessary corrections.  You should state

4 the reason in the appropriate space on the errata

5 sheet for any corrections that are made.

6 After doing so, please sign the errata sheet

7 and date it.

8      You are signing same subject to the changes

9 you have noted on the errata sheet, which will be

10 attached to your deposition.  It is imperative

11 that you return the original errata sheet to the

12 deposing attorney within thirty (30) days of

13 receipt of the deposition transcript by you.  If

14 you fail to do so, the deposition transcript may

15 be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

| Page 520 |
|---|

1       ACKNOWLEDGMENT OF DEPONENT

2     I,_____, do hereby

3 certify that I have read the foregoing pages, and

4 that the same is a correct transcription of the

5 answers given by me to the questions therein

6 propounded, except for the corrections or changes

7 in form or substance, if any, noted in the

8 attached Errata Sheet.

9

10 _____

11 BLAINE M. SNIDER          DATE

12

13

14 Subscribed and sworn to

15 before me this

16 _____day of_____,20___.

17 My commission expires:_____

18 _____

19 Notary Public

20

21

22

23

24

| Page 519 |
|---|

1       - - - - - -

2       E R R A T A

3       - - - - - -

4 PAGE LINE CHANGE

5 ____ ____ _____

6 REASON: _____

7 ____ ____ _____

8 REASON: _____

9 ____ ____ _____

10 REASON: _____

11 ____ ____ _____

12 REASON: _____

13 ____ ____ _____

14 REASON: _____

15 ____ ____ _____

16 REASON: _____

17 ____ ____ _____

18 REASON: _____

19 ____ ____ _____

20 REASON: _____

21 ____ ____ _____

22 REASON: _____

23 ____ ____ _____

24 REASON: _____