```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3   IN RE NATIONAL PRESCRIPTION   |   MDL No. 2804
                                   |
 4   OPIATE LITIGATION            |   Case No. 17-MD-2804
                                   |
 5   This Document Relates to:    |   Judge Dan Aaron Polster
                                   |
 6   The County of Summit, Ohio,  |
     et al., v.                    |
 7   Purdue Pharma L.P., et al.    |
     Case No. 17-op-45004          |
 8                                 |
     The County of Cuyahoga v.     |
 9   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45090          |
10                                 |
     City of Cleveland, Ohio v.    |
11   Purdue Pharma L.P., et al.    |
     Case No. 18-op-45132          |
12                                 |
13
                  Thursday, January 10, 2019
14
                        - - -
15
            HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
16
                  CONFIDENTIALITY REVIEW
17
                        - - -
18
           Videotaped deposition of SABRINA SOLIS, held
19   at Foley & Lardner LLP, One Biscayne Tower,
     2 Biscayne Boulevard, Suite 1900, Miami, Florida,
20   commencing at 10:27 a.m., on the above date,
     before Susan D. Wasilewski, Registered
21   Professional Reporter, Certified Realtime
     Reporter, Certified Realtime Captioner.
22
                        - - -
23
                 GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

```
 1    APPEARANCES:
 2    WEITZ & LUXENBERG, P.C.
      BY:  TIFFANY ELLIS, ESQUIRE
 3         PAUL NOVAK, ESQUIRE
      3011 West Grand Boulevard, Suite 2150
 4    Detroit, Michigan 48202
      (313) 800-4170
 5    tellis@weitzlux.com
      pnovak@weitzlux.com
 6    Representing the Plaintiffs
 7
 8    FOLEY & LARDNER LLP
      BY:  KATY E. KOSKI, ESQUIRE
 9    111 Huntington Avenue
      Boston, Massachusetts 02199
10    (617) 342-4000
      kkoski@foley.com
11    Representing Anda, Inc., and the witness
12
13    REED SMITH LLP
      BY:  CRISTINA CÁRDENAS, ESQUIRE
14    1001 Brickell Bay Drive, Suite 900
      Miami, Florida 33131
15    (786) 747-0207
      ccardenas@reedsmith.com
16    Representing AmerisourceBergen Corporation and
      AmerisourceBergen Drug Corporation
17
18
      ALLEGAERT BERGER & VOGEL LLP
19    BY:  CHRISTOPHER ALLEGAERT, ESQUIRE
      111 Broadway, 20th Floor
20    New York, New York 10006
      (212) 571-0550
21    callegaert@abv.com
      Representing Rochester Drug Co-op
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  NICHOLAS HODGES, ESQUIRE
 3    4655 Executive Drive, Suite 1500
      San Diego, California 92121-3134
 4    (858) 314-1200
      nhodges@jonesday.com
 5    Representing Walmart
 6
      ARNOLD & PORTER
 7    BY:  SEAN P. HENNESSY, ESQUIRE
      601 Massachusetts Avenue, NW
 8    Washington, DC 20001-3743
      (202) 942-5000
 9    sean.hennessy@arnoldporter.com
      Representing Endo Health Solutions Inc., Endo
10    Pharmaceuticals Inc., Par Pharmaceutical, Inc.,
      Par Pharmaceutical Companies, Inc.,
11    (f/k/a Par Pharmaceutical Holdings, Inc.)
12
      COVINGTON & BURLING LLP
13    BY:  ALEJANDRO BARRIENTOS, ESQUIRE
      One CityCenter, 850 Tenth Street, NW
14    Washington, DC 20001-4956
      (202) 662-6000
15    abarrientos@cov.com
      Representing McKesson Corporation
16
17    KIRKLAND & ELLIS, LLP
      BY:  TUCKER HUNTER, ESQUIRE
18    300 North LaSalle Drive
      Chicago, Illinois 60654
19    (312) 862-2000
      tucker.hunter@kirkland.com
20    Representing Allergan Finance LLC
21
      ROPES & GRAY LLP
22    BY:  SOFIA McDONALD, ESQUIRE
      1211 Avenue of the Americas
23    New York, New York 10036-8704
      (212) 596-9000
24    sofia.mcdonald@ropesgray.com
      Representing Mallinckrodt PLC, Mallinckrodt LLC,
25    and SpecGx LLC
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     ALSO PRESENT:

2        ANTHONY BARBARO, Videographer

3        MICHAEL PIGGINS, Weitz & Luxenberg

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                       - - -
 2                    I N D E X
 3                       - - -
 4  Testimony of:  SABRINA SOLIS                PAGE
 5      DIRECT EXAMINATION BY MS. ELLIS............... 11
 6
                    E X H I B I T S
 7
                 (Attached to transcript)
 8
     SABRINA SOLIS DEPOSITION EXHIBITS            PAGE
 9
    Anda - Solis   Notice of Videotaped Deposition of   13
10  Exhibit 1      Sabrina Solis
11  Anda - Solis   Résumé of Sabrina A. Solis           27
    Exhibit 2      ANDA_SOLIS_PERSONNEL_019 and 20
12
    Anda - Solis   Résumé of Sabrina A. Solis           27
13  Exhibit 3      ANDA_SOLINAS_PERSONNEL_032
                   through 34
14
    Anda - Solis   E-mail - Subject: Added: DD report  106
15  Exhibit 4      to O:drive (TPS): 66351)**No
                   controls ever**
16                 Anda_Opioids_MDL_0000453833
17  Anda - Solis   E-mail - Subject: 450176: 2 S Drug  153
    Exhibit 5      Mart
18                 Anda_Opioids_MDL_0000415442
19  Anda - Solis   E-mail - Subject: Request for       178
    Exhibit 6      Clonazepam increase new QOL Meds
20                 location
                   Anda_Opioids_MDL_000042114 through
21                 422117
22  Anda - Solis   E-mail - Subject: 825257            188
    Exhibit 7      Anda_Opioids_MDL_0000460932 and
23                 460933
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     E X H I B I T S
 2              (Attached to transcript)
 3    SABRINA SOLIS DEPOSITION EXHIBITS              PAGE
 4    Anda - Solis   E-mail - Subject: FYI Safeway    214
      Exhibit 8      (154132) -
 5                   Anda_Opioids_MDL_0000421668
                     through 421670
 6
      Anda - Solis   E-mail - Subject: Bucket         232
 7    Exhibit 9      Anda_Opioids_MDL_0000339317
 8    Anda - Solis   E-mail - Subject: Bucket         235
      Exhibit 10     Anda_Opioids_MDL_0000339315 and
 9                   339316
10    Anda - Solis   SOP #:040                         270
      Exhibit 11     Anda_Opioids_MDL_0000527936
11                   through 527938
12    Anda - Solis   SOP #:040                         278
      Exhibit 12     Anda_Opioids_MDL_0000084445
13                   through 84447
14    Anda - Solis   E-mail - Subject: Acct #389613    288
      Exhibit 13     Anda_Opioids_MDL_0000423540
15
      Anda - Solis   E-mail - Subject: Loading         293
16    Exhibit 14     Walgreens Limits
                     Anda_Opioids_MDL_0000089949
17
      Anda - Solis   E-mail - Subject: Customer        296
18    Exhibit 15     Questionnaire Meeting: Follow-Up
                     Info
19                   Anda_Opioids_MDL_0000418852
                     through 418854
20
      Anda - Solis   E-mail - Subject: Customers Not   298
21    Exhibit 16     Actively Purchasing Controls
                     Anda_Opioids_MDL_0000418832
22                   through 418834
23    Anda - Solis   E-mail - Subject: Just FYI        306
      Exhibit 17     Anda_Opioids_MDL_0000351076 and
24                   351077
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2              (Attached to transcript)
 3    SABRINA SOLIS DEPOSITION EXHIBITS              PAGE
 4    Anda - Solis    E-mail - Subject: Notes        314
      Exhibit 18      Anda_Opioids_MDL_0000350910 and
 5                    350911
 6    Anda - Solis    E-mail - Subject: Conference -  316
      Exhibit 19      Cardinal SOM Program
 7                    Anda_Opioids_MDL_0000089620
 8    Anda - Solis    E-mail - Subject: News          318
      Exhibit 20      Anda_Opioids_MDL_0000485846
 9
      Anda - Solis    E-mail - Attachments: ALL Controls  322
10    Exhibit 21      Y, CQ N (1st Meeting) MASTER
                      COMBINED.xlsx
11                    Anda_Opioids_MDL_0000850138 and
                      850139
12
      Anda - Solis    E-mail - Subject: 087298: Star   331
13    Exhibit 22      Pharmacy
                      Anda_Opioids_MDL_0000493634 and
14                    496335
15    Anda - Solis    E-mail - Subject: Order          335
      Exhibit 23      #21212859/Acct #319849 - WAKE
16                    FOREST DRUG, INC.
                      Anda_Opioids_MDL_0000493357
17                    through 493359
18    Anda - Solis    E-mail - Subject: SOMS order-    338
      Exhibit 24      803415 PRESCRIPTION CENTER
19                    PHARMACIES
                      Anda_Opioids_MDL_0000419725  and
20                    419726
21    Anda - Solis    Produced in Native Format        341
      Exhibit 25      Anda_Opioids_MDL_0000018604
22
      Anda - Solis    E-mail - Subject: Updated List of  349
23    Exhibit 26      Customers Not Eligible to Purchase
                      Controls from Anda
24                    Anda_Opioids_MDL_0000018603
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2               (Attached to transcript)

 3     SABRINA SOLIS DEPOSITION EXHIBITS              PAGE

 4   Anda - Solis    E-mail - Subject: Trends - Pills    355

     Exhibit 27      to Heroin

 5                   Anda_Opioids_MDL_0000493332

                     through 493336

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3       My name is Anthony Barbaro.  I am a videographer

 4       for Golkow Litigation Services.  Today's date is

 5       January 10th, 2019, and the time is 10:27 a.m.

 6              This video deposition is being held today in

 7       Miami, Florida, In Re:  The National Opiate

 8       Prescription Litigation, MDL Number 2804, for the

 9       United States District Court, Northern District

10       of Ohio, Eastern Division.

11              The deponent is Sabrina Solis.

12              Counsel, would you please introduce

13       yourselves for the video record?

14              MS. ELLIS:  Yes.  This is Tiffany Ellis,

15       Michael Piggins, and Paul Novak of Weitz &

16       Luxenberg on behalf of the MDL plaintiffs.

17              MS. KOSKI:  Katy Koski, Foley & Lardner in

18       Boston, on behalf of Anda, Inc., and the witness.

19              MS. CARDENAS:  Cristina Cardenas from Reed

20       Smith on behalf of AmerisourceBergen.

21              MR. ALLEGAERT:  Christopher Allegaert,

22       Allegeart Berger & Vogel, on behalf of Rochester

23       Drug Co-Op.

24              MS. ELLIS:  I think we have some people on

25       the phone.  Could they introduce themselves?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. HENNESSY:  Good morning.  This is Sean

2      Hennessy from Arnold & Porter here today on

3      behalf of the Endo and Par Pharmaceutical

4      defendants.

5              MR. BARRIENTOS:  Hello.  This is Alejandro

6      Barrientos from Covington & Burling for McKesson.

7              MR. HUNTER:  This is Tucker Hunter from

8      Kirkland & Ellis on behalf of Allergan Finance,

9      LLC.

10              MS. McDONALD:  Hello.  This is Sofia

11      McDonald at Ropes & Gray on behalf of

12      Mallinckrodt.

13              MR. HODGES:  This is Nick Hodges with Jones

14      Day for Walmart.

15              THE VIDEOGRAPHER:  The court reporter is

16      Susan Wasilewski and she will now swear in the

17      witness.

18              THE COURT REPORTER:  Would you raise your

19      right hand?

20              Do you solemnly swear or affirm the

21      testimony you're about to give will be the truth,

22      the whole truth, and nothing but the truth?

23              THE WITNESS:  Yes.

24              THE COURT REPORTER:  Thank you.

25              SABRINA SOLIS, called as a witness by the
```

Highly Confidential - Subject to Further Confidentiality Review

1    Plaintiffs, having been duly sworn, testified as

2    follows:

3                    DIRECT EXAMINATION

4    BY MS. ELLIS:

5        Q.   Good morning, Ms. Solis.  May I call you

6    Sabrina?

7        A.   Sure.

8        Q.   Will you please introduce yourself for the

9    record, please?

10       A.   I'm Sabrina Solis.

11       Q.   What is your address?

███  ███  █████████████████████████████████

███  ██████████████

14       Q.   And what do you do for a living?

15       A.   I'm the current manager for DEA compliance

16   at Anda, Inc.

17       Q.   How long have you had that position?

18       A.   I've had this current role for about

19   14 months.

20           MR. ALLEGAERT:  Could I just ask the witness

21       to try to keep your voice up a little bit?  There

22       is a noise coming off this machine, and we've got

23       a whole bunch of counsel who are on the phone.

24       Thank you.

25           MS. ELLIS:  That brings up a good time to go

```
 1        over some ground rules.

 2    BY MS. ELLIS:

 3        Q.   Have you ever had your deposition taken

 4    before?

 5        A.   No.

 6        Q.   So to make it easier for the court reporter,

 7    we'll just go over a few things.

 8             When I ask you questions, just try to wait

 9    until I finish my question before you begin to

10    answer.  Even if you think you know the answer, just

11    wait so we don't talk over each other.  Okay?

12        A.   Okay.

13        Q.   And then please use "yes" or "no" answers so

14    that she can record it.  It's being recorded both by

15    video and audio today, so that the record can pick

16    it up.  Okay?

17        A.   Uh-huh.  Yes.

18             MS. KOSKI:  She means no head nods and "ums"

19        or "ahs."

20             THE WITNESS:  Right.

21        Q.   So if I -- if we sometimes find ourselves

22    doing that anyway, I may remind you from time to

23    time.  I'm not trying to be rude.  Okay?

24        A.   Okay.

25        Q.   And similarly, I may ask you sometimes a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    question that leads you into different directions in

 2    your answers.  I want to ensure that I still get the

 3    answer to my original question, so if I direct you

 4    back, I'm not trying to be rude.  We'll come back to

 5    what you're saying.  I know you enjoy your job and

 6    you think it's important.  I want to make sure you

 7    have a chance to say everything that you want, but

 8    just don't think I'm being rude if I try to, you

 9    know, get you back to the original question.  Okay?

10        A.    Okay.

11        Q.    And then one last point:  At -- from time to

12    time your attorney may object, and unless she tells

13    you not to answer, you should go ahead and answer

14    the question.  Okay?

15        A.    Okay.

16        Q.    Do you ever work remotely?

17        A.    Yes.

18        Q.    You do?

19        A.    Yes.

20        Q.    Do you have a laptop that you work from?

21        A.    Yes, I do.

22        Q.    Where is your primary office?

23        A.    In Weston.

24              (Anda - Solis Exhibit 1 was marked for

25    identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. ELLIS:

 2        Q.   I'm going to show you what's been marked as

 3    Exhibit 1.  Have you seen this before?

 4        A.   No, I have not.

 5        Q.   This is your notice of deposition for this

 6    case.  You have not seen it?

 7        A.   I have not seen this.

 8             MS. ELLIS:  We'll just enter in the record

 9        that it's to be used for all applicable purposes

10        under the appropriate pretrial and case

11        management orders in the proceedings.

12    BY MS. ELLIS:

13        Q.   Did you do anything to prepare for today's

14    deposition?

15        A.   We had a conversation yesterday.

16        Q.   When you say "we," who is that?

17        A.   Attorney, client.

18        Q.   Your attorney, Katy, sitting next to you?

19        A.   Yes.

20        Q.   Was anybody else involved in that

21    conversation?

22        A.   No.

23        Q.   How long did it last?

24        A.   A couple of hours.

25        Q.   Did you review any documents?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    There were some e-mails.

 2      Q.    Do you remember what they were?

 3            MS. KOSKI:  Objection.

 4      Q.    You do?  You can answer.

 5            MS. KOSKI:  I'm sorry.

 6            THE WITNESS:  Yeah.

 7            MS. KOSKI:  Unless I tell you not to

 8      answer --

 9            THE WITNESS:  Okay.

10            MS. KOSKI:  -- you can answer, yeah.

11      A.    Yes, some of them I do.

12      Q.    Anything other than e-mails?

13      A.    Nothing other than e-mails.

14      Q.    Did you do any independent research besides

15   your meeting with your attorney to prepare for

16   today's deposition?

17      A.    I did not do research.

18      Q.    You said you've been in your position now

19   for about 12 months; is that right?

20      A.    Yeah, about.

21      Q.    What is your job responsibility?

22      A.    I oversee a team of, you know, analysts,

23   what I would call analysts, who review the current

24   consumer base that is either requesting access to

25   controlled substance eligibility or we are currently
```

```
 1   servicing.

 2       Q.   When you say "we," you mean Anda?

 3       A.   Anda.

 4       Q.   How many people are on your team?

 5       A.   Right now, there are -- there's five of us,

 6   including myself.

 7       Q.   Are the other four all analysts?

 8       A.   They have a variety of different titles.  So

 9   one of them is considered an auditor, and there's

10   two specialists.  The other is a clerk 3.

11       Q.   I'll ask you about what those mean in a

12   moment, but in general, can you tell me, what is the

13   role of the compliance department at Anda?

14       A.   The role of the compliance department is to

15   ensure compliance, to adhere to what is regulated,

16   and to ensure that we're doing what we need to do to

17   operate.

18       Q.   Anything else?

19       A.   I think that sums it up.

20       Q.   And who do you report to?

21       A.   Jay Spellman.

22       Q.   How long -- have you reported to Jay

23   Spellman the entire time you've been in that role?

24       A.   Yes.

25       Q.   So you said the role of the compliance
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    department is to ensure compliance, adhere to what

 2    is regulated, and to do what you need to do to

 3    operate; is that right?

 4        A.   Yes.

 5        Q.   Okay.  So let's go through those one by one.

 6    When you say "ensure compliance," what do you mean?

 7        A.   Meaning that in order to be licensed and

 8    operate, there are certain statutes or laws that you

 9    have to adhere to, to ensure compliance.

10        Q.   Compliance with those laws, right?

11        A.   With those laws.

12        Q.   Are those both federal and state?

13        A.   Yes, they are.

14        Q.   Are there any locals, local laws?

15             MS. KOSKI:  Object to form.

16             You can answer.

17        A.   I focus on the state and federal.

18        Q.   The next thing you said was to adhere to

19    what is regulated.  That ties into what you just

20    said, to ensure compliance, right?

21        A.   Yes.

22        Q.   Is there anything else that you to do to

23    adhere to what is regulated in the compliance

24    department?

25             MS. KOSKI:  Object to form.
```

1        A.    I'd like to understand the question better.

2        Q.    Well, I'm just trying to use your words to

3    understand what the compliance department does.  And

4    we'll break this down, I guess, into some specific

5    tasks, but I guess generally speaking right now, I

6    want to understand what you mean.

7        A.    Generally speaking, I mean, our job to

8    operate is to understand what is required to

9    operate.  So each day we try to maintain and do what

10   is required for us to operate.

11       Q.    So what is required for you to operate?

12       A.    I like to think of it as who licenses you,

13   whether it's state or federal.  They set certain

14   requirements, and in order for us to engage in the

15   type of business that we do, we adhere to those

16   requirements.

17       Q.    If I were to ask you what those requirements

18   are, sitting here today, could you tell me them?

19       A.    I could round and about tell you, but it

20   would be specific to what you're looking for.

21       Q.    Well, let's just start with roundabout.

22   What are the requirements that you, as a compliance

23   department and the leader of the compliance

24   department, need to adhere to ensure that Anda can

25   operate?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2      A.    I think we need to be familiar with the

 3   customers that either seek to do business with us or

 4   we have approved to do business with.  In addition,

 5   we need to be mindful of who we're selling to after

 6   our review of them.

 7      Q.    Anything else?

 8      A.    That's the round and about.

 9              MR. HENNESSY:  I apologize, I don't mean to

10       interrupt.  I'm having a hard time hearing on the

11       phone.

12      Q.    I'll just ask you to try to keep your voice

13   up.

14      A.    Okay.

15              MS. ELLIS:  And I'll try to do the same for

16       those on the phone.  Please let us know if it

17       dies down at any point.

18              THE COURT REPORTER:  Can I ask who that was?

19       This is the court reporter.

20              MR. HENNESSY:  Sure.  This is Sean Hennessy,

21       and again, I apologize for interrupting.

22              (Discussion off the record.)

23              MS. ELLIS:  Could we go off the record for a

24       second?

25              THE VIDEOGRAPHER:  Off the record at 10:38.
```

```
 1              (Recess from 10:38 a.m. until 10:40 a.m.)

 2              THE VIDEOGRAPHER:  We're now back on the

 3         video record at 10:40 a.m.

 4    BY MS. ELLIS:

 5         Q.   Before we took a break, you said you -- in

 6    order to adhere to regulations, your role in the

 7    compliance department was to be familiar with

 8    customers who seek to do business with Anda or have

 9    been approved to do business with Anda, correct?

10         A.   Correct.

11         Q.   And also be mindful of who Anda is selling

12    to after the review of those customers, right?

13         A.   Correct.

14         Q.   Anything else?

15         A.   That's the round and about.

16         Q.   And what is your understanding of what

17    requires you to do those things?

18         A.   My understanding is the different laws or

19    regulations.

20         Q.   Do you know what those laws or regulations

21    are?

22              MS. KOSKI:  Object to form.

23         A.   I would need you to be more specific because

24    there are so many.

25         Q.   Are there ones that you think are more
```

1    important than others?

2          MS. KOSKI:  Object to form.

3    A.    There are not.

4    Q.    Are there laws and regulations specific to

5    the -- specific to controlled substances that you're

6    aware of?

7    A.    Yes.

8    Q.    What are those?

9    A.    For example, understanding who you do

10   business with, and understanding meaning

11   understanding based on your review of the customer,

12   being knowledgeable of what you are selling to them.

13   Q.    Anything else?

14   A.    That's the majority of what we're doing.

15   Q.    Are you familiar with the term due

16   diligence?

17   A.    Yes.

18   Q.    What does that mean to you?

19   A.    To me, it means an overall review of the

20   customer and what we collect in order to feel that

21   we understand our customer well enough to engage in

22   business with them.

23   Q.    Are you familiar with the term "know your

24   customer"?

25   A.    I'm familiar.

```
1        Q.   What does that mean to you?

2        A.   I believe that that means that we have to

3    collect enough information to feel that we know our

4    customer, who they are, what their business looks

5    like, what they want from Anda, and ultimately where

6    the product is going.

7        Q.   So you said know your customer, who they

8    are, what their business looks like, what they want,

9    and where the product is going.  Anything else?

10            MS. KOSKI:  Object to form.

11       A.   That's a good summary.

12       Q.   Is there any other information that you

13   would include on that list of "know your customer"?

14            MS. KOSKI:  Object to form.

15       A.   I'm -- please elaborate.  Like, what we

16   review or --

17       Q.   We'll talk about what you review --

18       A.   Okay.

19       Q.   -- specifically, but generally those things.

20       A.   Generally, yes.

21       Q.   If I were to say the term "public health,"

22   what does that mean to you?

23       A.   The overall good.

24       Q.   What about safety?

25       A.   Overall safety.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    For who?

2        A.    Public.

3        Q.    Are you familiar with the name Rannazzisi

4        A.    I've heard the name.

5        Q.    In what context?

6        A.    I've just heard the name.

7        Q.    Who have you heard it from?

8        A.    I don't know who I've heard it from.  I've

9   heard the name, so I'm unfamiliar with the person.

10       Q.    Would you agree that part of the role of

11  Anda's compliance department is to ensure that the

12  company is abiding by federal and state rules?

13            MS. KOSKI:  Object to form.  Are you asking

14       her opinion?

15            MR. NOVAK:  I asked if she would agree with

16       that statement.

17       A.    I would agree that you attempt to do that at

18  all times.

19       Q.    Would you agree that that's important?

20       A.    Of course.

21       Q.    Why?

22            MS. KOSKI:  Object to form.  Are you asking

23       her opinion about why it's important to follow

24       laws?  How is -- how is that within the scope of

25       a deposition, given the special master's orders
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      about the law?
 2           MS. ELLIS:  She is the manager of
 3      compliance.  I'm asking her understanding of what
 4      the role of the compliance department is.
 5           MS. KOSKI:  That's not what you asked her.
 6      You asked her her opinion about why someone
 7      follows the law.  That's -- that's -- Special
 8      Master Cohen's order is to not ask people's
 9      opinions about the law, what it means.  I think
10      you're -- you've run afoul of that order.
11           If you want to ask her what you said in
12      response to me, her understanding of what the
13      role of the compliance department is, that's a
14      different question.
15           MS. ELLIS:  Okay.  I'll move on.
16   BY MS. ELLIS:
17      Q.   Would you agree that recordkeeping is
18   important in the -- in the compliance department of
19   Anda?
20      A.   Yes.
21      Q.   Why?
22      A.   Because it reflects the different records
23   that come into the department.
24      Q.   Why does that matter?
25      A.   Because you're keeping them to show that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    have taken in those records.
2        Q.   Would you agree that consistency in that
3    process is important?
4            MS. KOSKI:  Object to form.
5        A.   It should be important.
6        Q.   Why?
7        A.   Because being consistent, I believe, is
8    always good.
9        Q.   Why?
10       A.   Because you're wanting to do the right
11   thing.
12       Q.   What does that mean?
13       A.   So I'm not really --
14           MS. KOSKI:  Object to form.
15       A.   -- following the "why," actually.
16       Q.   Well, I'm just following up on what you
17   said.  You want to do the right thing.  What does
18   that mean to you?
19       A.   Consistency.
20           MS. KOSKI:  Object to form -- excuse me for
21   a second.
22           Object to form.  You're asking in general,
23   in the universe, what's --
24           MS. ELLIS:  I'm asking --
25           MS. KOSKI:  -- the right thing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. ELLIS:  -- for clarification on what she

 2     just testified to.

 3          MS. KOSKI:  You can answer if you understand

 4     the question.

 5  BY MS. ELLIS:

 6     Q.   You just testified a moment ago that

 7  consistency is important because you want to do the

 8  right thing.  Is that right?

 9          MS. KOSKI:  You're talking about a

10     consistency in recordkeeping --

11          MS. ELLIS:  Yes.

12          MS. KOSKI:  -- specifically?

13          You can answer that question.

14     A.   Correct.

15     Q.   And why is that important?

16     A.   Because recordkeeping is important to a

17  compliance department.

18     Q.   To ensure that federal rules are followed?

19          MS. KOSKI:  Object to form.

20     A.   Not necessarily.  It's in order to show that

21  you are collecting documents and doing appropriate

22  due diligence to the customer base that you're

23  reviewing.

24     Q.   As manager of DEA compliance, are you in

25  charge of that process for Anda?
```

```
 1      A.   I am in charge of the review of customers

 2   for controlled substances at this point in time.

 3      Q.   When you say "this point in time," what do

 4   you mean?

 5      A.   Because I've been in this role specifically

 6   since December of last year.

 7      Q.   So since December of last year, you've been

 8   in charge of that process?

 9      A.   Correct.

10           MS. KOSKI:  I don't know that it matters,

11           but I think by last year, she means 2017, not

12           2018.

13      A.   I'm sorry.  2017.

14      Q.   Thank you for that clarification.

15           (Anda - Solis Exhibit 2 was marked for

16   identification.)

17   BY MS. ELLIS:

18      Q.   I'm handing you Exhibit 2.  I apologize,

19   these came from you.  Do you recognize this?  This

20   is a résumé that came from your personnel file.

21      A.   This is very old.

22      Q.   It's marked Anda Solis Personnel 019.

23      A.   Yeah.  This is maybe nine or ten years old.

24           (Anda - Solis Exhibit 3 was marked for

25   identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. ELLIS:

 2        Q.   I'll go ahead and hand you Exhibit 3 as

 3    well.  Is this a more recent copy of your résumé

 4    from your personnel file?

 5        A.   I would say that this is maybe eight years

 6    old.

 7        Q.   So let's focus on Exhibit 2 first.  You said

 8    this one is nine to ten years old?

 9        A.   Correct.

10        Q.   Do you remember preparing this?

11        A.   I didn't even know it existed to this point.

12        Q.   Are you familiar with the information that's

13    on it?  And I'll just say, I'm not trying to trick

14    you with any of these questions.

15        A.   Yes.

16        Q.   These were in the materials that were

17    provided to us by Anda as part of your personnel

18    file.

19        A.   Yes, I'm familiar, but I just haven't seen

20    them in many years.  So I wanted to review it.

21        Q.   Have you had a chance to look it over?

22        A.   Yes.

23        Q.   At this point, it looks like you had been

24    working as a pricing assistant for Anda; is that

25    right?
```

```
1      A.    Correct.

2      Q.    When did you first start working for Anda?

3      A.    2003.

4      Q.    And what did you do in that -- or what did

5   you do when you first began your employment with

6   Anda?

7      A.    I worked in the pricing department.

8      Q.    Doing what?

9      A.    I did a bunch of different things.  I had a

10  miscellaneous sort of a role.  So I pretty much

11  assisted the people who were making the decisions on

12  pricing within the company, and I played more of an

13  analytical role in providing materials to them to

14  assign pricing.

15     Q.    You did that from 2003 until 2008?

16     A.    Yes.

17     Q.    At that point, had you received any training

18  to fulfill those responsibilities?

19           MS. KOSKI:  Object to form.

20     A.    Training to be in the pricing department?

21     Q.    Yes.

22     A.    I'm not following, like, the exact question.

23  So once I was in the role, did I receive training

24  once I was there?

25     Q.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A.    Yes.

 2    Q.    What sort of training did you receive?

 3    A.    Training on the job requirements and what I

 4  needed to do to fulfill those requirements.

 5    Q.    Had you had any formal education?  Did you

 6  go to college before that?

 7    A.    I had gone to college two years or so.

 8    Q.    What did you study?

 9    A.    At one point -- at that point in time, I had

10  studied journalism.

11    Q.    Did you have a degree then?

12    A.    I was working on that.

13    Q.    Do you have a degree now?

14    A.    Yes.

15    Q.    When did you get your degree?

16    A.    2014.

17    Q.    And what is it in?

18    A.    It's -- the major is called University

19  Without Walls, and it's a concentration on business

20  studies.

21    Q.    And where is that from?

22    A.    University of Massachusetts Amherst.

23    Q.    And that's a degree you did online?

24    A.    I completed it online.

25    Q.    So when you started working for the pricing
```

```
 1    department, you were still in school, correct?

 2        A.   I was not in school at the time, but I had

 3    already gone to college for over two years.

 4        Q.   Did you know anybody at Anda when you

 5    started working for the company?

 6        A.   Yes.

 7        Q.   Who?

 8        A.   I had an acquaintance where I worked at that

 9    time, and I had family.

10        Q.   Who was it?  Who in your family?

11        A.   A parent.

12        Q.   Mom?  Dad?

13        A.   Yes, uh-huh.

14        Q.   Which one?

15        A.   My mother.

16        Q.   What did she do?

17        A.   She was an assistant in the finance area.

18        Q.   Do you know who she was an assistant to?

19        A.   Brian Witte.

20        Q.   Is your mom still in that role?

21        A.   No, she's not.

22        Q.   Did she retire or left the company?

23        A.   She left the company.

24        Q.   When did she leave the company?

25        A.   I don't recall.  I think it was in 2016.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Was she a -- do you know if she was an

 2   assistant for Brian Witte the whole time that she

 3   was there?

 4        A.   Yes.  But she also worked with different

 5   people, but primarily, she reported to Brian Witte.

 6        Q.   Did you know anybody else at the company?

 7        A.   I just knew one person that was with the

 8   company only one year, so --

 9        Q.   You said that was an acquaintance?

10        A.   Yes.

11        Q.   And what did that person do?

12        A.   They were an assistant, and I don't even

13   recall who they were reporting to at the time.

14        Q.   Angela Boucher; is that right?

15        A.   Yes.

16        Q.   Is that your sister?

17        A.   Yes.

18        Q.   Did she work for the company?

19        A.   Yes.

20        Q.   What did she do?

21        A.   She had a variety of different roles.  She

22   worked for -- I believe it was the accounts

23   receivable department, and then she transitioned to

24   more of the contracts area.

25        Q.   Does she still work for the company?
```

```
 1      A.   No, she does not.

 2      Q.   Let's go back to Exhibit 2 for a moment.  As

 3  a pricing assistant from 2003 to 2008, you list a

 4  number of things that you did in that role; is that

 5  right?

 6      A.   Yes.

 7      Q.   You said you direct -- you were a direct

 8  contact for major brand manufacturer regarding

 9  contract price changes, new products, and new

10  customer eligibility for direct -- on direct

11  pricing.

12      A.   Correct.

13      Q.   What brand manufacturer was that?

14      A.   At that time, it was GlaxoSmithKline.

15      Q.   Were there certain products that you were

16  responsible for?

17      A.   I do not remember right now.  It was more of

18  understanding which customers were approved for

19  those products with GlaxoSmithKline.

20      Q.   Do you recall if any of those products were

21  controlled substances?

22      A.   I do not recall.

23      Q.   You also say that you were responsible for

24  maintenance of the eligibility matrix on the

25  customer, and then the item level to avoid negative
```

Highly Confidential - Subject to Further Confidentiality Review

1    margins.

2          What does that mean?

3      A.   So manufacturers determine which customers

4    they will or will not provide back-end discounts to,

5    charge-backs, rebates, PMs.

6          So for example, if a customer lives in

7    Puerto Rico, and the manufacturer has determined

8    they will not give anything on the back end to a

9    customer in Puerto Rico, if we were to allow at that

10   time a person to get a certain price assuming you

11   would be receiving something in the back end, it

12   would turn into a negative margin.  So you would

13   have to make sure that that customer is not eligible

14   for that product.

15     Q.   What is the eligibility matrix?  Is that a

16   document or a database?

17     A.   It's a -- it's a system that's maintained in

18   another department at Anda where a customer is or is

19   not eligible based on outside factors, apart from

20   compliance, that have to do with the vendor

21   relationship and customer types.

22     Q.   So when you say "another department," you

23   mean outside of compliance?

24     A.   Yes.

25     Q.   Yes?

1      A.   Yeah.  It's maintained by, I believe,

2    database management or customer maintenance.

3      Q.   You then say:  Submitted ISR requested to

4    the IS department for all system requests and

5    enhancements.

6           What does that mean?

7      A.   At that time, I would work with new

8    employees to get them set up.  And if we needed to

9    enhance something within the department, I would

10    work with IT, at that time with management

11    direction, to do whatever they wanted done.

12      Q.   What is ISR?

13      A.   That is an internal form that at that

14    time -- again, we're talking about now 11 years ago.

15    That was what we would do to request a change to the

16    system for an employee or our internal database.

17      Q.   What you say "system," what do you mean?

18      A.   System meaning e-mail or TPS specifically.

19      Q.   Any other systems?

20      A.   It's been so long.  I think those are the

21    two that we focused on.

22      Q.   Earlier in that list, you say:  Design TPS

23    enhancements which created a one-stop location to

24    review a customer's profile and pricing structure,

25    product cost, retail price, and profit margin.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Did you work with TPS the entire time you
 2    were in the contracts and pricing department?
 3              MS. KOSKI:  Object to form.
 4       A.    TPS is just the computer system.  I do not
 5    know what that statement means at this time.
 6       Q.    Okay.  Well, let's break it down.  TPS is
 7    the computer system.  What computer system?
 8       A.    That's the internal database for Anda's
 9    customers and items, products sold.
10       Q.    Do you know what TPS stands for?
11       A.    I don't know.
12       Q.    Do you remember when you first started
13    working with TPS?
14       A.    Yes, when I started working at Anda.
15       Q.    Do you recall ever being trained in TPS?
16       A.    When I took the job with Anda, we were
17    trained in TPS.
18       Q.    Who trained you?
19       A.    At the time, probably my manager.
20       Q.    What did -- what were you trained to do in
21    TPS?
22       A.    I'd have to think about the department
23    specifically.  We were looking at items, customers,
24    pricing contracts that they were eligible for, that
25    sort of thing.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Were you given a user manual or anything
 2   like that?
 3        A.   No.
 4        Q.   Throughout today's deposition, I'm going to
 5   try to be as specific as possible on our time
 6   frames.  I'm not trying to confuse you --
 7        A.   Uh-huh.
 8        Q.   -- but we'll -- when I ask you questions,
 9   we'll try to keep it isolated to that job what we're
10   talking about, and then we'll catch up to what you
11   do now.
12        A.   Uh-huh.
13        Q.   Okay?
14        A.   Uh-huh.
15        Q.   So you say "design TPS enhancements."  I
16   understand that you don't recall the full meaning of
17   what you say in this statement.  But do you know
18   what you would have meant when you said "design TPS
19   enhancements"?
20        A.   I do not recall.
21        Q.   Are you a computer programmer?
22        A.   My function usually was if something could
23   be enhanced so that it was more system friendly for
24   what we did day-to-day, I would request a change to
25   make it more user friendly for what we did.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   So day-to-day, in the pricing and contracts

2    department, what did you use TPS for?

3        A.   TPS is the heart of all of Anda's internal

4    items carried and customers carried, so we used TPS

5    for whatever it was we were working on.

6        Q.   Would it include information about

7    customers, like their biographical or geographical

8    location?

9        A.   At that time, I don't believe the focus was

10   customers.  In that department, it's the items

11   you're selling.

12       Q.   So it would include information both on

13   product as well as customers?

14       A.   I don't believe we were dealing with

15   customers at that time, other than the fact that a

16   customer may or may not be eligible for a certain

17   pricing contract.  But other than that, we didn't

18   get into anything that had to do with the customer's

19   profile.

20       Q.   Higher on Exhibit 2, in the areas of

21   strengths, you say:  Ability to assimilate large

22   amounts of data and to prioritize into cohesive and

23   actionable recommendations.

24            What do you mean by that?

25       A.   So the product catalog at Anda -- and I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   don't recall how many were at that time.  We could

 2   say thousands of items.  You would have to have the

 3   ability to analyze whatever it was that I was

 4   getting a direction to analyze, talking about a

 5   large volume of products.

 6       Q.   Do you have any formal training in data

 7   processing?

 8       A.   What does data processing mean?

 9       Q.   Well, what does it mean to you?

10       A.   I'm --

11            MS. KOSKI:  Object to form.

12       A.   I guess I'm not following the question.

13       Q.   Well, let me ask you this:  You say ability

14   to assimilate large amounts of data.  What do you

15   mean by that?

16       A.   So I guess at that time, it was working

17   through large amounts of data through Excel and

18   being able to analyze and review specifically what

19   management was targeting at the time.

20       Q.   And then you say:  Prioritize into cohesive

21   and actionable recommendations.

22            What do you mean by that?

23       A.   So in the example where you mentioned

24   negative margins, for example, you would look into

25   this information, look at what you're being asked to
```

Highly Confidential - Subject to Further Confidentiality Review

1    look at, and show this could potentially be where an

2    issue is.

3        Q.   Would you make recommendations at that time

4    to your management?

5        A.   I had no say in pricing at all.  So all I

6    was doing was reviewing current pricing and giving

7    it to them to determine what they would -- would or

8    would not do going forward with any product we were

9    selling.

10       Q.   Did you have any contact with compliance

11   matters at this point in time?

12       A.   I did not.

13       Q.   Why -- did you leave this position in 2008?

14       A.   Actually, I had a child, and so different

15   circumstances happened where I wasn't able to come

16   back.

17       Q.   Sounds like a good reason.

18       A.   Yeah.  It -- that could be debated.

19       Q.   Okay.  So what did you do after you left the

20   contracts and pricing department?

21       A.   I was just working from home with

22   acquaintances that we had, helping to translate

23   books.  This was not a job.  It was something

24   part-time where I was helping translate from Spanish

25   to English.

```
 1        Q.   Let's go to Exhibit 3 now.  Is this a more

 2   recent copy of your résumé?

 3        A.   This is -- this national account

 4   representative?

 5        Q.   Yes.

 6        A.   This is probably prior to 2011 or around

 7   that time.

 8        Q.   But it's more recent than what we went

 9   over --

10        A.   Yes.

11        Q.   -- on Exhibit 2?

12             In Exhibit 3 you say -- it says you went

13   back to Anda in 2009?

14        A.   Uh-huh.

15        Q.   As a national accounts representative?

16        A.   Yes.

17        Q.   What is a national accounts representative?

18        A.   So I would say that my background is data

19   and analytics.  And so at the time, I worked for

20   people who were on the front end.  And when I say

21   front end, they were actually engaging with the

22   customer.  They had the customer relationship, and I

23   was, like, running reports for them.

24        Q.   Why did you go back to Anda?

25        A.   I guess because I like the company.
```

```
 1      Q.   Are there certain things about the company

 2   you like?

 3      A.   Yes.

 4      Q.   What?

 5      A.   I think that it's a great company.  I think

 6   they care about their employees, and I like the

 7   business.

 8      Q.   The business of distributing drugs?

 9      A.   I like pharmaceuticals.

10      Q.   When you went back to Anda in 2009, had you

11   continued your formal education outside the company

12   at all?

13      A.   When I went back in 2009, that was the

14   intention, to continue on.  And as soon as I became

15   eligible, I did.

16      Q.   When you say you "became eligible," what do

17   you mean?

18      A.   Because the company allows you to become

19   eligible after a certain amount of time you work

20   there and I had to start all over again.

21      Q.   So the company would help you pay for your

22   education, is what you mean?

23      A.   Tuition reimbursement, yeah.

24      Q.   Let's go to the second page of Exhibit 3.

25   One of the bullet points, you say:  Cross-trained in
```

1    departmental responsibilities.

2         What does that mean?

3    A.   So, for example, there was different

4    customers that were managed through national

5    accounts, because these are -- national accounts is

6    chain business.  And there were different people

7    that worked in the department that specifically

8    worked with different chains.  So I became familiar

9    with different roles in the department.

10   Q.   So were there people that worked with chains

11   and then people that worked with independent

12   retailers?

13   A.   We had no engagement with independent

14   retailers.

15   Q.   National accounts was limited to chains?

16   A.   Yes.  Corporate sales.

17   Q.   NAM, what does that stand for?

18   A.   National account manager.

19   Q.   You said as a national accounts

20   representative, you did not work with customers

21   directly, correct?

22   A.   I did not participate in any sort of, like,

23   sale where something is being pitched, but I would

24   support the person who had pitched to the customer

25   directly.

```
 1      Q.   So what sort of -- I think you said:  Use

 2   your ability to analyze and process data to do that?

 3      A.   Uh-huh.

 4      Q.   Yes?

 5      A.   So for example, at the time, if there was a

 6   new-to-market product, and it was shipped to each

 7   store location within a chain, I would just relay

 8   back to their corporate, this shipped, this is where

 9   it shipped, this is when it arrived, sort of thing.

10      Q.   Did you do any work specific to controlled

11   substances in this role?

12      A.   Not that I recall.

13      Q.   Were you familiar at all with regulations or

14   compliance requirements related to controlled --

15   controlled substances when you were in this role?

16      A.   At that time, I wasn't a subject matter

17   expert.

18      Q.   Well, subject matter expert I understand.

19   Were you familiar?

20      A.   It wasn't my world.

21      Q.   Did you receive any training as a national

22   account representative related to controlled

23   substances that you remember?

24      A.   No, I did not.

25      Q.   You worked with TPS also in this role,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?
 2        A.    Yes.  Anyone who pretty much works at Anda
 3    deals with TPS.
 4        Q.    When you sign in -- do you sign into TPS?
 5    How does that work?
 6        A.    Yes.  You have log-on information.
 7        Q.    Do you -- are you aware of whether or not
 8    there are different profiles that people have when
 9    signing into TPS?
10        A.    I'm not aware.
11        Q.    You're not aware?
12        A.    Like, if -- please explain.
13        Q.    Well, are there different permission levels
14    that you're aware of?
15        A.    So, yes, not -- every department is only
16    approved for whatever executive management says
17    they're approved for.
18        Q.    Are you aware if -- whether TPS is something
19    that Anda developed or if it's something that they
20    purchased from somebody else?
21        A.    I'm unaware.
22        Q.    Did you receive any training related to TPS
23    when you were in your role as national accounts
24    representative?
25        A.    Department training once you're hired, yes.
```

1    Q.    Do you remember what that was?

2    A.    Sitting alongside someone and following

3    instructions on what the task was and how to do it.

4    Q.    So what did you use TPS for as a national

5    accounts representative?

6    A.    We -- we did have more, like, order entry.

7    You could see order entry.  I don't remember if we

8    could see, like, customer information, like, profile

9    information.  But again, it's been so many years.

10   Q.    Anything else?

11   A.    I don't recall.

12   Q.    You said on the second page of Exhibit 3:

13   Process mass load updates in TPS.

14         What does that mean?

15   A.    So because you're dealing with chain

16   corporate locations, and there are multiple stores

17   that fall within a corporation, we use the term

18   "mass load" when you're making changes to a large

19   group of customers.

20   Q.    What sort of changes would you be making?

21   A.    I don't recall at the time what -- what

22   exactly it was, but -- I don't know specifically

23   what I was doing.

24   Q.    How would you do a mass load update?

25   A.    So, for example, you would put whatever it

Highly Confidential - Subject to Further Confidentiality Review

```
1    is that you're wanting to change in the system into

2    a spreadsheet, which would then run through the IT

3    department, and they would change whatever it is in

4    the system.

5        Q.   So this isn't something that you would do by

6    hitting a button in TPS?

7        A.   No.

8        Q.   You would have to send it to somebody, and

9    they would do it?

10       A.   Correct.

11       Q.   On the first page you say:  Process mass

12   load files for NTM products.

13            What is NTM?

14       A.   New to market.

15       Q.   And also DEA license updates.

16            What do you mean by that?

17       A.   Because any customer who wants to be

18   on-boarded to Anda, they have to provide licensure.

19   Not every new customer who comes to Anda is

20   interested in controls, or controlled substances.

21   But if they are wanting to load their -- all of

22   their licensing at the same time, we would have to

23   set up licensing when reviewing new customers.

24       Q.   Why is that?

25       A.   Because it's part of the customer setup at
```

Highly Confidential - Subject to Further Confidentiality Review

1    Anda, that you enter licensing for a new customer.

2        Q.    How do you know that, or how did you know

3    that at that time?

4        A.    Because you're not able to sell to anyone

5    who is not licensed.

6        Q.    Was there a rule within Anda that told you

7    that or --

8              MS. KOSKI:  Object to form.

9        A.    Yes.

10             MS. KOSKI:  Sorry.  Object to form.

11             You can answer.

12       A.    Yes.

13       Q.    What -- do you know what that role was

14   called or anything like that?

15       A.    It's a system rule.  You can't sell to

16   anyone that doesn't have a license to operate.

17       Q.    And then you also say you helped with

18   opening new accounts by processing mass load files;

19   is that right?

20       A.    Yes.

21       Q.    At that time, were you familiar with

22   compliance requirements for new accounts?

23       A.    The focus at that time was that a customer

24   was licensed to operate.

25       Q.    Were you aware of any -- of Anda's due

1    diligence efforts at that point?

2    A.   I was not.

3    Q.   Were you aware of any "know your customer"

4    efforts that Anda had at that time?

5    A.   I was not.

6    Q.   Were the salespeople that you were working

7    with that were on the front end, as you said, with

8    customers using the same title, national accounts

9    representative, as you were?  Do you know?

10   A.   I believe at that time, they were called

11   national account managers, and there were a few

12   directors as well.

13   Q.   How many representatives were there at that

14   point?  Do you know?

15   A.   I don't know the number.

16   Q.   Has the company grown over the time since

17   you've been with it?

18        MS. KOSKI:  Object to form.

19   A.   I mean, we're -- how many years are you

20   talking about?

21   Q.   I mean, is the company bigger now than it

22   was when you started as a national account

23   representative in 2009?

24   A.   I don't know if it's bigger than at that

25   time.  It's bigger from maybe the time that I first

1    started.

2        Q.    From 2003?

3        A.    Probably.

4        Q.    Okay.  What makes you say that?

5        A.    Because it's a different -- it's almost --

6    how many years is that?  I'd have to do some math

7    there.  It's 20 -- 16 years.

8        Q.    Things have changed a bit?

9        A.    There's -- I don't know how to answer that

10   question.

11       Q.    Who did you report to when you were a

12   national accounts representative?

13       A.    Elizabeth Shefferman.

14       Q.    And when did you leave that position?

15       A.    2011.

16       Q.    Why did you leave that position?

17       A.    It wasn't challenging enough.

18       Q.    Okay.  What did you want to do?

19       A.    So I had returned back to school, and I had

20   more of an interest specifically in business.

21       Q.    Any particular type of business?

22       A.    Business analytics.

23       Q.    What did you do after you left that

24   position?

25       A.    I went into the compliance area.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you recall what position that was?

 2        A.   DEA compliance analyst.

 3        Q.   Did you specifically want to work in the

 4   compliance area?

 5        A.   No.

 6        Q.   Why did you go in?  Just because there was

 7   an open position?

 8        A.   I was actually referred to the position when

 9   I spoke to HR.

10        Q.   Who referred you?

11        A.   Lisa Anderson.

12        Q.   Do you know why, or did she tell you why?

13        A.   She felt that I was qualified with my work

14   history at Anda.

15        Q.   Did she give you a job description at that

16   point of what the position in compliance would be?

17        A.   It was posted online, public.

18        Q.   What was that for, what position?

19        A.   DEA compliance analyst.

20        Q.   What was your understanding of what your job

21   would be as a DEA compliance analyst?

22        A.   Being compliant with the people that you

23   sold controlled substances to.

24        Q.   Did you ultimately get that job?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    When did you start?

2        A.    I believe it was July of 2011.

3        Q.    When you started in July of 2011, did you

4    receive any training specific to compliance?

5        A.    I received training for the responsibilities

6    that I had.

7        Q.    What were your responsibilities at that

8    time?

9        A.    It was learning how to review customers that

10   you're asked to approve to engage in business with

11   or continued engaging in business with.

12       Q.    Anything else?

13       A.    That sums it up.

14       Q.    So as a DEA compliance analyst, your

15   responsibility was to review customers that you were

16   asked to engage in business with or that Anda was

17   already engaged in business with, right?

18       A.    We were not, like, for example, asked to do

19   business with someone, but if a customer wanted to

20   do business with Anda, it -- the sales department

21   would request a review.

22       Q.    Any other responsibilities that you had as a

23   DEA compliance analyst?

24       A.    That is -- that's where I started with the

25   training.
```

1      Q.    Who trained you?

2      A.    Emily Schultz.

3      Q.    How long did that training last?

4      A.    I would say that it was a good one year of

5    working through different facets of the department.

6      Q.    What did the training consist of?

7      A.    Reviewing customers, reviewing due diligence

8    provided to us by the customer, such as their

9    dispensing information questionnaire, reviewing

10   their limits.

11     Q.    Anything else?

12     A.    That's about what I recall.

13     Q.    So your training was reviewing customers,

14   which meant reviewing the due diligence provided by

15   the customer -- customer including dispensing

16   information?

17     A.    Uh-huh.

18     Q.    Yes?

19     A.    Yes.

20     Q.    And customer questionnaires?

21     A.    Yes.

22     Q.    Yes.  And then reviewing customer limits,

23   correct?

24     A.    Correct.

25     Q.    Would customer limits also be called

Highly Confidential - Subject to Further Confidentiality Review

```
 1    thresholds?

 2        A.   I don't refer to it as a threshold, but it's

 3    what we assign and what we allow a customer to

 4    purchase.

 5        Q.   When you say "we," you mean the compliance

 6    department --

 7        A.   The --

 8        Q.   -- at Anda?

 9        A.   -- compliance department, uh-huh.

10             MS. KOSKI:  That was a good example of wait

11        until she finishes just so the court reporter can

12        get the full question and answer.

13             MS. ELLIS:  Thank you.

14    BY MS. ELLIS:

15        Q.   So you said this was part of training.  Did

16    you continue to do these responsibilities after a

17    year?

18        A.   Yes.

19        Q.   What made it training, then, in the first

20    year?

21             MS. KOSKI:  Object to form.

22        A.   It was an understanding of the department

23    and what the department's responsibilities are.

24        Q.   Were there, like, webinars that you did to

25    understand these things or sessions that you
```

```
 1   participated in?

 2       A.   Yes.  We went to different sessions.

 3       Q.   Who would present at those sessions?

 4       A.   We went to a couple of Buzzeo seminars, and

 5   there was various presenters, and we went to DEA

 6   seminars specific to distributors.

 7       Q.   When you say "we," who do you mean?

 8       A.   Everyone in the department.

 9       Q.   At that time, how many people were in the

10   department?

11       A.   So when I started the position, it was

12   myself, and it was Emily Schultz and Michael

13   Cochrane specific to controlled substances.

14       Q.   Anybody else?

15       A.   Not -- not in my day-to-day.  I don't know.

16       Q.   Was your position as DEA compliance analyst

17   specific to controlled substances?

18       A.   Yes.

19       Q.   Was that the -- that was part of the

20   position that you had applied to, was a controlled

21   substances-specific position?

22       A.   It was not called controlled substances.  It

23   was a DEA compliance analyst.

24       Q.   Were there other DEA compliance analysts

25   there?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   At the -- they started shortly after I was

2   hired.

3        Q.   So who did you report to when you started in

4   2011 as a DEA compliance analyst?

5        A.   Michael Cochrane.

6        Q.   Do you know what his role was at that time?

7        A.   I believe it was executive director of

8   regulatory compliance.

9        Q.   Do you know if Emily Schultz also reported

10  to Michael Cochrane at that time?

11       A.   Yes.

12       Q.   So the three of you were the ones

13  responsible for Anda's controlled substance

14  compliance at that time?

15            MS. KOSKI:   Object to form.

16       A.   We were the three in that area of the

17  department at that time.

18       Q.   What were the other areas of the department?

19       A.   There is regulatory compliance as well.

20       Q.   What's the difference?

21       A.   Regulatory compliance is customer

22  licensing-specific, facility licensing, FDA issues.

23       Q.   So you said you went to a couple of seminars

24  as part of your training done by Buzzeo and the DEA,

25  right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.

 2       Q.   Was that within the first year that you were

 3   a DEA compliance analyst?

 4       A.   I believe so.

 5       Q.   Do you remember specifically any of those

 6   seminars, what they were?

 7       A.   They were specific to distributors.

 8       Q.   Do you remember when they were?

 9       A.   I don't recall the exact dates.

10       Q.   Do you remember where any of them were?

11       A.   They were all in Maryland, outside of DC.

12       Q.   Who -- was there anybody besides Emily,

13   Michael, and yourself that went to these seminars at

14   that time?

15       A.   As we hired more people, they attended as

16   well.

17       Q.   But initially, it was you and Emily and

18   Michael?

19       A.   Yes.

20       Q.   Did you ever go to seminars done by HGMA or

21   HGA?

22       A.   No.

23       Q.   Do you know what those acronyms stand for?

24       A.   Yes.

25       Q.   How do you know?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I know Healthcare Distribution Alliance, and

2    HGMA is just part of the industry.

3        Q.    Were any -- did you ever receive materials

4    from either of those groups as part of your

5    training?

6        A.    We follow, like, various news topics, and we

7    keep up to speed with different bulletins, yes.

8        Q.    So I want to take you back to -- let's just

9    say your first day as a DEA compliance analyst.

10   What did it look like?  What did you do?

11            MS. KOSKI:  Object to form.

12       A.    Understanding the customers, the -- what the

13   department is responsible for.

14       Q.    How would you get that understanding?

15       A.    So can you please be more specific, like, of

16   what --

17       Q.    What is -- I'm just asking day-to-day, you

18   know, I want to understand how you evolved from the

19   pricing department and the national accounts

20   management department into the compliance

21   department.

22       A.    So basically, I would say a lot of it is

23   analytics and looking at data.

24       Q.    We'll come back to your responsibilities and

25   what you did as a DEA compliance analyst in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    moment, but that brings us to a good point to ask

 2    you about some Anda systems.

 3            You've already mentioned TPS?

 4    A.    Uh-huh.

 5    Q.    Yes?

 6    A.    Yes.

 7    Q.    And that's something that you've used

 8    consistently throughout your time at Anda?

 9    A.    Yes.

10    Q.    Are you aware of any user guides that exist

11    now or at any point for using TPS?

12    A.    I am not.

13    Q.    Have you ever done any formal training,

14    besides people sitting with you at a computer

15    terminal, into how to use TPS?

16            MS. KOSKI:  Object to form.

17    Q.    Meaning have you been trained?

18    A.    That's --

19            MS. KOSKI:  Go ahead.

20    A.    The training consists of sitting down with

21    people who are showing you the responsibility in the

22    department.

23    Q.    You said earlier that almost anybody who

24    works for Anda would use TPS; is that right?

25    A.    I believe that most departments utilize TPS.
```

```
 1      Q.   Do they use it for different functions?

 2      A.   Every department has a different function.

 3      Q.   And they would use TPS accordingly?

 4      A.   Yes.

 5      Q.   Is there one particular department that

 6   controls the TPS system, that you know of?

 7           MS. KOSKI:  Object to form.

 8      A.   I believe that everything falls within the

 9   IT department if it's -- if it's a computer system

10   or software.

11      Q.   When you used TPS in the DEA -- as a DEA

12   compliance analyst, was it different than how you

13   used it in the -- as a national accounts

14   representative?

15      A.   Yes.

16      Q.   How so?

17      A.   Because your access is different, and your

18   job responsibilities are different, so you have

19   access in TPS only to what your current

20   responsibilities are.

21      Q.   So when you became a DEA compliance analyst,

22   how did your access in TPS change?

23      A.   It was very limited.

24      Q.   What do you mean?

25      A.   Meaning that it was specific to my role with
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the customer.

 2        Q.   As a customer account manager, you mean, or

 3    as a DEA compliance analyst?

 4        A.   Sorry.  Which one are you asking about?

 5        Q.   Well, my initial question was:  How did

 6    it -- how did your access in TPS change?  So you

 7    said it was limited.  Was it limited when you were

 8    an account manager or when you were in the

 9    compliance department?

10        A.   In the compliance department.

11        Q.   That's when it was limited?

12        A.   You have different access because you're

13    only using basically a customer master.

14        Q.   What do you mean, customer master?

15        A.   You're focused on the customer and their

16    eligibility to do business at Anda.

17        Q.   What is customer master?

18        A.   Like, the customer's information.

19        Q.   Is master a term for, like, a data set, or

20    is it --

21        A.   I refer to it as the customers that we do

22    business with.

23        Q.   So when you say "customer master," is that

24    everybody who's -- every customer of Anda who's

25    eligible to purchase controlled substances?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    No.

 2      Q.    What -- is it every customer of Anda at all?

 3      A.    It's every customer that has probably come

 4   through Anda and been set up at Anda as a customer.

 5      Q.    At any point in time?

 6      A.    At any point in time.

 7      Q.    Is it your understanding that TPS has

 8   historical data in it?

 9            MS. KOSKI:  Object to form.

10      A.    I -- that has to be more specific.

11      Q.    So let's talk about your time as an

12   account -- national account representative.  Could

13   you see a customer's purchase history, for example,

14   when you were in that role?

15      A.    I don't recall.

16      Q.    Could you see how a customer's activity with

17   Anda had changed over time when you were in that

18   role?

19      A.    No.

20      Q.    When you came to the compliance department,

21   could you see a customer's purchase history through

22   TPS?

23      A.    Yes.

24      Q.    Are there other things that you could see

25   when you came to the compliance department that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    could not see when you were at the national

2    account -- when you were a national account

3    representative?

4        A.   Yeah.  I stated before, every department is

5    able to see what is specific to that department.

6        Q.   So I guess I'm asking you for some specific

7    examples of what you would see in compliance that

8    you had not seen in national accounts, or vice

9    versa.

10       A.   So you would see -- you would have access to

11   the customer's licensing, whether or not they're

12   allowed controls or not.

13       Q.   You're talking about when you're in

14   compliance, right?

15       A.   Yes.

16       Q.   Okay.  Anything else?

17       A.   Anything that the -- has to do with the

18   customer's setup.

19       Q.   Such as?

20       A.   It's also maybe the controlled substances,

21   if they're allowed those items.

22       Q.   You said anything that has to do with the

23   customer's setup.  What would that be?

24       A.   So the department, again, they focus on

25   licensing.  They focus on whether or not a person is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    allowed controls or not, and they focus on, if they

 2    are allowed controls, what would they be eligible

 3    for.

 4        Q.   Are you aware of any reporting capabilities

 5    in TPS?

 6        A.   Yes.

 7        Q.   What are those?

 8             MS. KOSKI:  Object to form.

 9        A.   TPS has the -- you are able to report in

10    TPS.  And every department is different, and

11    everything that they want to do is different.

12        Q.   So let's talk about national accounts

13    representative for a moment.  Do you recall any

14    reports that you were capable of running when you

15    were a national account representative in TPS?

16        A.   Yes.

17        Q.   What were those?

18        A.   Proof of delivery reports.

19        Q.   Anything else?

20        A.   Something referred to as an invoice file.

21        Q.   Anything else?

22        A.   That's what I recall.

23        Q.   Okay.  Were those reports that you would

24    just push a button in TPS and they would run?

25        A.   No.
```

```
 1        Q.   How would you run a report?

 2        A.   You would have to say what it is that you're

 3   trying to pull.  So is it a specific customer?  Is

 4   it a specific customer type?  Is it a specific date

 5   range?  Is it a specific item?

 6        Q.   Were there ever reports, when you were a

 7   national accounts representative, that you wanted to

 8   see, but the system was not capable of?

 9        A.   No.  I mean, I wasn't so much into a variety

10   of different reporting factors.  It was whatever was

11   my job responsibility.

12        Q.   When you came to the compliance department

13   in 2011, were there certain reports that you were

14   aware TPS was capable of?

15        A.   Yes.

16        Q.   Do you recall what those were?

17        A.   There were -- I have -- I have to think

18   about that.  I'll come back with that.

19        Q.   Is there something that would help you

20   recall what reports were available at that time?

21        A.   Well, it's because it's 10 years ago, so I'm

22   trying to remember what those reports were then

23   specifically.

24        Q.   I understand it's been some time.

25        A.   Yeah.  It's --
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Is it fair to say that the system's ability

2   to -- strike that.

3           Is it fair to say that the reports that are

4   available in TPS now are different than the ones

5   that were available at that time?

6           MS. KOSKI:  Object to form.

7      A.   There are new reports created with time.

8      Q.   So there have been reports created since

9   2011 in TPS?

10     A.   Probably, yes.

11     Q.   Can you think of any off the top of your

12  head?

13     A.   No, I cannot think off the top of my head.

14     Q.   How would you know what reports the system

15  was capable of in 2011 anyway?  Was there, like, a

16  list or something that you were given?

17     A.   No.

18     Q.   How would you know what the system could do,

19  then?

20     A.   So TPS reports -- something called a query,

21  and there are different reports that were already

22  created.  So you could see a report created.

23     Q.   Do you know who was responsible for creating

24  those reports?

25     A.   Any --

1     Q.   Go ahead.

2     A.   It could be any employee who was capable of

3   creating a report in any department.

4     Q.   When you were a national account

5   representative, were you capable of creating a

6   report?

7     A.   No.

8     Q.   When you became a DEA compliance analyst,

9   were you capable of creating a report?

10     A.   Capable of authoring a report to be created.

11     Q.   What does that mean?

12     A.   So it was a little bit more complex, and so

13   I partnered with IT.  I partnered with our sales

14   reporting department.

15     Q.   Was that part of what you understood your

16   job to be as a DEA compliance analyst?

17     A.   Yes.

18     Q.   Were you told that the -- were you told

19   about any specific focuses that the compliance

20   department had at the time you became an analyst in

21   2011?

22     A.   Yes.

23     Q.   What were those?

24     A.   Knowing a customer's business, who they are,

25   what they want from Anda, whether or not we would

Highly Confidential - Subject to Further Confidentiality Review

1    choose to do business with them.

2        Q.   Were you told, when you started with

3    compliance, if the department was facing any

4    challenges?

5            MS. KOSKI:  Object to form.

6        A.   I was told that we wanted to maintain

7    standards.

8        Q.   What standards?

9        A.   Standards of knowing our customers.

10       Q.   According to what?

11           MS. KOSKI:  Object to form.

12       A.   Knowing our customers and being familiar

13   with them at all times.

14       Q.   Were you told, when you became a DEA

15   compliance analyst, whether there were specific

16   areas that the department needed to improve upon in

17   order to do that?

18           MS. KOSKI:  Object to form.

19       A.   We wanted to collect updated information on

20   everyone that we were doing business with.

21       Q.   Were you told that was part of your job

22   responsibility back in 2011?

23       A.   Yes.

24       Q.   When you say "wanted to collect updated

25   information," what do you mean?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Information in 2011, at that time.

 2        Q.    Why is that?

 3        A.    To have updated recordkeeping.

 4        Q.    Earlier you said that recordkeeping and

 5    being thorough is important, correct?

 6        A.    Correct.

 7        Q.    And that was part of what you understood

 8    your job to be, yes?

 9        A.    Yes.

10        Q.    So was it your understanding that

11    information had not been updated as well as it could

12    have been previously?

13        A.    No.

14        Q.    It had not been?

15        A.    It -- that was not pointed out to me.

16        Q.    Well, you said you wanted to collect updated

17    information.  Does -- was it your understanding that

18    there was information that was out of date?

19              MS. KOSKI:  Object to form.

20        A.    No.

21        Q.    Then what would the information you were

22    collecting be updating?

23        A.    So, for example, if you're reviewing a

24    customer, they're required to provide updated

25    information to you in order for you to conduct your
```

1    review.

2        Q.   Was that entitled a specific project of some

3    sort?

4             MS. KOSKI:   Object to form.

5        A.   So please help me understand.  Is there a

6    project that you're talking about or --

7        Q.   No.  I'm just asking you.  At the time, was

8    there a project, in 2011, that you were working on

9    that was focused on up -- collecting updated

10   information on customers?

11       A.   I did collect updated information in a

12   project, yes.  And then I also collected updated

13   information depending on the different requests that

14   came to our department.

15       Q.   So what was the -- was there a name for the

16   project that you collected updated information

17   through?

18       A.   So we collected questionnaires, and we

19   collected dispensing data.

20       Q.   Was there a name for that project?

21       A.   Not anything formal, no.

22       Q.   If I said Customer Questionnaire Project,

23   was -- does that mean anything?

24       A.   Yes.

25       Q.   What does that mean?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I mean, a project to collect questionnaires.
 2        Q.   Let's go back to TPS for a second.  You said
 3   you could author a report in TPS when you were a DEA
 4   compliance analyst; is that right?
 5        A.   Correct.
 6        Q.   So if you wanted to author a report, what
 7   would you do?
 8        A.   You would identify what you're wanting to
 9   see in the report, and then you would create a
10   report to see what you're wanting to see.
11        Q.   How would you know whether there was a
12   report that already existed that included what you
13   wanted to see?
14        A.   I wanted to create my own, so I -- at that
15   time, there was a new type of reporting, and so I
16   used that type of reporting.
17        Q.   So let's break that down.  Back in 2011, you
18   said you wanted to create your own report, right?
19        A.   Correct.
20        Q.   What kind of report did you want to create?
21        A.   It's called a Cognos report.
22        Q.   What does that mean?
23        A.   It's a different means of reporting.  It's
24   not using TPS to report.  It's just -- it's better
25   looking, and it's more efficient.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Is it a different program?

 2      A.   It's a different way of reporting.

 3      Q.   What does Cognos stand for, do you know?

 4      A.   No.

 5      Q.   And when you say it's a different way of

 6   reporting to some agency or to someone or --

 7      A.   No.  It's just -- to be honest, like, TPS is

 8   an older system, and so Cognos is just easier to

 9   look at.

10      Q.   So it's a different program?

11      A.   Correct.

12      Q.   So when you open your desktop, you would

13   have an icon for TPS, correct?

14           MS. KOSKI:  Object to form.

15      Q.   Or how would you get into TPS?

16      A.   Sign in.

17      Q.   Through, like, clicking on a computer icon

18   or sign into what, online?

19      A.   Icon.

20      Q.   If I were to hand you a laptop today, could

21   you sign into TPS?

22      A.   I'm unaware because I'm off-site, and

23   there's different security measures.  I'm not sure.

24      Q.   When you work from home, are you able to

25   access TPS?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    Yes.

 2       Q.    How do you do that?

 3       A.    Through a secured website.

 4       Q.    You sign in with your own credentials?

 5       A.    Yes.

 6       Q.    Those are specific to you at your permission

 7   level, correct?

 8       A.    Correct.

 9       Q.    And you do that through the Internet?

10       A.    Correct.

11       Q.    When you say "a secured website," do you

12   have a secured work environment that you access for

13   Anda, or is it just on your home computer, you go to

14   a web browser, and you type in a web address?

15       A.    Anda has various security measures.

16       Q.    Okay.  Well, I'm trying to understand what

17   they are.

18       A.    Yeah.

19       Q.    So when you -- say you're at home.  You're

20   working from home, and you want to access TPS.  Walk

21   me through the steps of what you would do.

22       A.    So you have to sign on to Teva-secured

23   environment, and then the Internet, and then TPS.

24       Q.    So sitting here today, if you had a laptop,

25   and you could access the Internet, you could sign
```

```
 1    into Teva's secured environment?

 2        A.   I'm unsure of that.

 3        Q.   Why are you unsure of that?

 4        A.   Because I haven't tried it.

 5        Q.   You have done it from home?

 6        A.   From home.

 7        Q.   On your own computer?

 8        A.   Yes.

 9        Q.   Have you done it from any other location

10    besides that?

11        A.   No, I have not.

12        Q.   Are you aware of your sign-in credentials

13    from Teva?

14            MS. KOSKI:  Object to the form of the

15        question.

16        Q.   Do you know what they are, sitting here

17    today?

18        A.   Sorry.  So which -- there's so many

19    sign-ons.  Which environment?

20        Q.   So if you wanted to access Teva in your home

21    computer sitting at your house, just sitting here

22    today, could you do that?

23        A.   I could attempt to get into their secured

24    website.

25        Q.   Is there something that would prevent you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    from doing that, that you're aware of?

2        A.   I have had difficulty getting into that

3    sometimes, yes.

4        Q.   Such as what?  What would cause a

5    difficulty?

6        A.   Something that I don't understand.  It has

7    to do with Teva allowing you to do it.

8        Q.   So to access TPS, once you sign into the

9    secure environment, you said you would go into a

10   website, and then you would sign into TPS?

11       A.   TPS is actually not a website, so it's just

12   signing into the application.

13       Q.   So it would be in your start menu or on your

14   desktop or something like that?

15       A.   Correct.

16       Q.   And what about Cognos, is that something

17   that you would sign into separately?

18       A.   I'm unable to access Cognos from home.

19       Q.   But whether you're at home or not --

20       A.   Uh-huh.

21       Q.   -- how would you access Cognos?

22       A.   Cognos is Internet access.

23       Q.   And you can only access that one when you're

24   onsite at Anda?

25       A.   Yes.
```

```
1        Q.    Okay.  What is CSOS?

2        A.    It's an electronic controlled substance

3    ordering.

4        Q.    Do you have access to that program?

5        A.    No, I do not.

6        Q.    Do you know who uses CSOS?

7        A.    It's various customers who have gone through

8    with the program.

9        Q.    What do you mean, "that have gone through

10   with the program"?

11       A.    Having it installed and wanting to do

12   business with Anda using CSOS.

13       Q.    So what is your understanding of what CSOS

14   does?

15       A.    It's electronic controlled substance

16   ordering.

17       Q.    So that's how customers would order

18   controlled substances from Anda?

19       A.    If they were set up to do business that way.

20       Q.    What other way would they order controlled

21   substances from Anda?

22       A.    Is there, like, a specific controlled

23   substance that you're talking about?  Like a

24   schedule or, like, CII, CIII, CIV, CV.

25       Q.    Does it make a difference?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   Why?

 3        A.   Because if they order CIIs, the only other

 4   way is, like, a 222 form, rather than electronic

 5   ordering.

 6        Q.   That's a DEA form, correct?

 7        A.   Correct.

 8        Q.   So you said Schedule IIs were a 222 form?

 9        A.   Correct, if not CSOS.

10        Q.   Are there any other ways somebody could

11   order -- an Anda customer could order a Schedule II

12   besides a 222 form or CSOS?

13        A.   I'm unaware.

14        Q.   So do you understand how -- what happens

15   once a customer puts an order in CSOS, how does

16   it -- do you ultimately see that in the compliance

17   department?

18        A.   We don't have visibility to that.

19        Q.   You don't have visibility into CSOS?

20        A.   Correct.

21        Q.   But you would have visibility into a

22   customer's order, correct?

23        A.   Correct.

24        Q.   How would -- and just -- I'll stop you.

25   Let's try not to talk over each other.  I know that
```

1    this is the part where you probably are going to

2    know the answers to my questions before I ask them.

3    But for the record to be clear, let's just try not

4    to talk over each other.

5             So let's just walk through the process.  If

6    a customer puts an order into CSOS, what is your

7    understanding of how it comes to Anda so that you

8    can review that order?

9        A.   It's ordered electronically, and should it

10   need review, if it is flagged in our system to be

11   reviewed, then we review it.

12       Q.   So is it your understanding that CSOS talks

13   to -- when I say "talk," I just mean communicates

14   with electronically in some way some Anda system or

15   program?

16            MS. KOSKI:  Object to form.

17       A.   I would assume that orders -- not specific

18   to CSOS, orders speak to the system.

19       Q.   What system would that be, TPS?

20       A.   Yes.

21       Q.   So an order -- a customer places an order

22   through CSOS that you do not have access to,

23   correct?

24       A.   Correct.

25       Q.   But you and the compliance department would

Highly Confidential - Subject to Further Confidentiality Review

1    be able to see that order at some point, right?

2        A.    If it was needing reviewed.

3        Q.    If it were flagged, per se?

4        A.    Correct.

5        Q.    And TPS is the program that would flag it?

6    Let's say back in 2011.

7        A.    Yes.

8        Q.    Now it's a Buzzeo cloud-based program?

9        A.    Correct.

10       Q.    So we'll talk about these two separate

11   periods separately.  Okay?  For the time being,

12   unless I ask you about Buzzeo, let's assume we're

13   talking about pre-Buzzeo.

14       A.    Okay.

15       Q.    So a customer places an order through CSOS,

16   and you would see it within TPS, right?

17       A.    No.

18       Q.    No.  Why --

19       A.    So --

20       Q.    -- or what would you -- what would happen?

21             MS. KOSKI:  Object to form.

22       A.    Not every order is reviewed by compliance.

23       Q.    I apologize.  If an order was flagged, you

24   would then see it in TPS?

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    What about Remedy, what is that?

2        A.    Remedy is a task management system.  It's a

3   part of our suspicious order monitoring system where

4   we take the approach of approving customers and

5   reviewing them on the front end, and we have control

6   of any requests that come from a customer to their

7   sales rep, and we review and determine whether we

8   will allow or not allow.

9        Q.    Are you aware if TPS and Remedy communicate

10  with each other electronically?

11            MS. KOSKI:  Object to form.

12       A.    I'm unaware of behind the scenes.

13       Q.    Is there any overlap between TPS and Remedy?

14       A.    Remedy is specific to customers'

15  information.  And for our purposes, again, Remedy

16  has different purposes in different departments.

17  For our purpose, it's a request-based purpose.

18       Q.    When you say "our," you mean the compliance

19  department?

20       A.    The compliance department.

21       Q.    Is that a computer program that you are able

22  to access if you're working virtually?

23       A.    Sometimes, yes.

24       Q.    Why sometimes?

25       A.    Because, as I mentioned before, sometimes

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there are hurdles with getting into different

 2    systems from home that I can't explain.

 3        Q.   So the system might be down, and it just

 4    doesn't let you sign in?

 5        A.   Yes.

 6        Q.   Or you may be having some problem with the

 7    company intranet or something like that?

 8        A.   Yes.

 9        Q.   But on a day where things are running

10    smoothly, you could sit at your home computer and

11    sign into Remedy, yes?

12        A.   Yes.

13        Q.   And you could also sign into TPS?

14        A.   Yes.

15        Q.   And you could access the same information in

16    each of those programs as you would as if you were

17    sitting at your desk at work?

18        A.   I believe so.

19        Q.   And you've done that before?

20        A.   Yes.

21        Q.   Did you use Remedy when you were a national

22    accounts representative?

23        A.   Sparingly.

24        Q.   What did you use it for?

25        A.   There were requests to open a new store
```

Highly Confidential - Subject to Further Confidentiality Review

1    within a chain, and that was all that was done.

2        Q.   When you would use Remedy to open a new

3    store within a chain, what would you do as a

4    national accounts representative?

5        A.   You were asking the company and another

6    department within the company to review customers'

7    information to create an account at Anda.  And it

8    went through numerous processes, but in national

9    accounts, you pulled the licensing and provided it

10   to other departments to load, review and load.

11       Q.   When you say "other departments," do you

12   mean compliance?

13       A.   Yes.

14       Q.   Who -- were you aware of who was working in

15   compliance at that point?

16       A.   I did not have a relationship with anyone in

17   compliance.  We sent our requests to a group e-mail

18   or a group fax machine.

19       Q.   Do you remember what that was?

20       A.   Warehouse --

21            MS. KOSKI:  Object to form.

22            Sorry.  Go ahead.

23       A.   Warehouse 20 Compliance.  It's an e-mail

24   group.

25       Q.   So what would you e-mail?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Hard copies of customers' licenses.

 2      Q.   And you said it was Warehouse 20 Compliance?

 3      A.   Yes.

 4      Q.   @Anda?

 5      A.   @Andanet.

 6      Q.   So you would e-mail hard copy of a

 7  customer's license.  Anything else?

 8      A.   That was all.

 9      Q.   When you were at national accounts, did you

10  ever help collect customer questionnaires?

11      A.   No.

12      Q.   Did you help collect dispense data?

13      A.   No.

14      Q.   Were you aware of whether new accounts -- or

15  customer questionnaires at that point were required

16  for new accounts?

17      A.   I don't recall.

18      Q.   Do you recall whether dispense data was

19  required for new accounts when you were a national

20  accounts representative?

21      A.   I don't recall.

22      Q.   Is there anything that would refresh --

23  refresh your recollection?

24      A.   We had nothing to do with controlled

25  substances at that point.  This was just opening a
```

1    customer to Anda.

2    Q.   So if a customer came in, it didn't matter

3    whether they wanted to purchase controlled

4    substances or not; you just did basic things?

5    A.   Basic.

6    Q.   Would somebody else vet, then, them for

7    controlled substances?

8    A.   If that were to happen, it would be probably

9    a manager who was in charge of the relationship.  It

10   wasn't my role.

11   Q.   It would have been one of the salespeople

12   that worked with the customer?

13   A.   Correct.

14   Q.   Were you aware, as a representative, whether

15   a customer was purchasing controls or wanted to

16   purchase controls or not?

17   A.   I was not aware of that process.

18   Q.   Okay.  So we've talked about TPS, Remedy,

19   CSOS, and Cognos.  Are there any other programs

20   that you're -- computer programs at Anda that you're

21   aware of or that you've used on a regular basis,

22   either as a national accounts representative or in

23   the compliance department?

24       MS. KOSKI:  Object to form.

25   A.   Those are most frequently used.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   You said Cognos is another program, correct?

 2        A.   It's another source of reporting.

 3        Q.   A source of reporting?

 4        A.   Uh-huh.

 5        Q.   Yes?

 6        A.   Yes.

 7        Q.   Who within Anda uses Cognos?

 8        A.   I have no idea.

 9        Q.   Did you use Cognos when you were a national

10   accounts representative?

11        A.   No, I did not.

12        Q.   Did you receive any training in Cognos at

13   any point in your time with Anda?

14        A.   Yes.

15        Q.   When?

16        A.   I don't recall the time.  There were

17   training sessions.

18        Q.   Who would have done those training sessions?

19   Do you recall?

20        A.   The sales reporting department.

21        Q.   Do you recall what sort of things they

22   trained you on?

23        A.   Report capabilities.

24        Q.   And this is when you were -- you came to the

25   compliance department?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I believe so.

 2      Q.   What sort of report capabilities do you

 3  recall being trained on through Cognos?

 4      A.   Understanding what you could pull by

 5  customer or by item.

 6      Q.   So what sort of information could you pull

 7  by customer from Cognos?

 8      A.   The training doesn't consist of them telling

 9  you what you could or could not pull.  It's what you

10  are wanting to pull.  And again, all accesses are

11  different.

12      Q.   So the training consisted of showing you how

13  you could pull things, right?

14      A.   Correct.

15      Q.   But not necessarily what it was that you

16  were able to pull?

17      A.   Correct.

18      Q.   So as a DEA compliance analyst, were you

19  able to pull things from Cognos?

20      A.   Yes.

21      Q.   What things would you pull from Cognos?

22      A.   Customer information or item information.

23      Q.   What sort of customer information?

24      A.   Specific to our department, control

25  eligibility.
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   When you say "control eligibility," is

2   that -- what does that mean?

3     A.   So if I were wanting to look and see, is

4   this customer currently allowed controls or not.

5     Q.   So if you were to pull a customer

6   information from Cognos through a report, would it

7   be as simple as a "yes" or "no"?

8          MS. KOSKI:  Object to form.

9     A.   Say -- please repeat.

10     Q.   So I guess I'm trying to understand when you

11   say the reporting capability of customer

12   information.  Like, what would that include?

13     A.   Things that we managed in our area, so if

14   you wanted to look at licensing, if you wanted to

15   look at control eligibility.

16     Q.   And so control eligibility, if you wanted to

17   look at that, what would the report include?

18     A.   It would include a "yes" or "no" flag, if

19   they are allowed controlled substances or not.

20     Q.   Anything else?

21     A.   Whatever information that you felt was

22   important to your report.

23     Q.   Have you pulled these reports before?

24     A.   Yes.

25     Q.   What sort of information have you included

1    that you felt was important?

2         A.   If they had various documents, so

3    questionnaire, dispensing data, and if I wanted to

4    see what was sold to them.

5         Q.   Anything else?

6         A.   That sums it up.

7         Q.   And you used Cognos to pull that?

8         A.   Yes.

9         Q.   And then you also said item information, you

10   could pull reports, correct?

11        A.   Yes.

12        Q.   What sort of information would you be able

13   to pull out of items?

14        A.   What was sold.

15        Q.   What was sold to a particular customer?

16        A.   Yes.

17        Q.   Would that include what was sold over a

18   period of time?

19        A.   If that's how the report was written.

20        Q.   What are ways that the report could be

21   written?

22        A.   That's however the report author wants to

23   see the information they're reporting on.

24        Q.   I understand that these questions are kind

25   of complicated, and it's hard.  Why don't I try to

1    ask you this a different way.

2          If I were a new employee coming into your

3    compliance department, and you were training me on

4    Cognos, how would you show me what I could do in

5    Cognos?

6      A.   So new employees are not in the Cognos

7    world.

8      Q.   If I were an employee who needed to access

9    Cognos whether -- at any point, I guess what would

10   my role be, is the first question?

11     A.   It would be discussing capabilities for

12   reporting based on what your training and what you

13   want to see.

14     Q.   So you said you have five employees in your

15   compliance department right now, correct?

16     A.   Including myself.

17     Q.   So yourself and then four other employees?

18     A.   Uh-huh.

19     Q.   Correct?

20     A.   Yes.

21     Q.   Which, if any, of those employees need to

22   know or are able to use Cognos?

23     A.   There is one employee.

24     Q.   Who is that?

25     A.   Latoya Laroche.

```
1      Q.   Why did Latoya need to know?

2      A.   Because she's, like, an analyst --

3      Q.   So --

4      A.   -- senior analyst.

5      Q.   If I were Latoya starting in the position

6  that she has now, and you were training me on using

7  Cognos, how would you show me what the system was

8  capable of?

9      A.   We would sit together and go through the

10 different ways to pull the report.

11     Q.   Would you give me a list of any reports that

12 are currently available?

13     A.   Maybe.

14     Q.   Where would you get that list from?

15     A.   Training, just speaking and training.

16     Q.   It's one that you could create perhaps off

17 the top of your head?

18     A.   Not off the top of my head.

19     Q.   Is it one that would be in a file that's

20 already been created?

21     A.   There's reports that have been created.

22     Q.   But do you have a list of reports that have

23 been created anywhere?

24     A.   I don't believe there's a list anywhere.

25     Q.   Are there any other programs besides TPS,
```

```
1    Remedy, CSOS, and Cognos that the compliance

2    department -- you have used in the compliance

3    department at any point in time on a regular basis?

4         MS. KOSKI:  Object to form.

5    A.   Those are the ones that are most frequently

6    used.

7    Q.   Are those -- are there others that are not

8    as frequently used?

9    A.   I can't think off the top of my head.

10   Q.   So what's the difference between Cognos and

11   TPS besides, you said, Cognos being a little bit

12   more user friendly and look -- looking differently?

13   A.   To put it in, like, easy form, it's fancier.

14   It just looks better.

15   Q.   Do you know if there is a reason why they're

16   both used?

17   A.   It was just a preference for the person

18   running the report and how they want to view the

19   data.

20   Q.   So you could -- is it your understanding

21   that the same data is in TPS as it is in Cognos?

22   A.   Correct.

23   Q.   Is it your understanding that TPS and Cognos

24   share the same information?

25   A.   Yes.
```

```
 1              MS. KOSKI:  Object to form.  Sorry.

 2       Objection to form.

 3       Q.   Do you have an understanding of how they

 4   share that information?

 5       A.   No, I do not.

 6       Q.   Is it your understanding that if you update

 7   something in Cognos, it will automatically be

 8   updated in TPS?

 9       A.   You can't update in Cognos.

10       Q.   Is it your understanding that if you update

11   something in TPS, it will automatically be updated

12   in Cognos?

13       A.   Not all the time.

14       Q.   Sometimes?

15       A.   So that's maintained by IT, and you're not

16   always able to pull, in Cognos, what is in TPS.

17       Q.   TPS includes more information?

18       A.   No.  TPS maintains its own information.

19       Q.   So let's try the other approach again.  If I

20   am Latoya, and in my --

21       A.   Uh-huh.

22       Q.   -- new role as an analyst, I need to

23   understand these programs, how would you explain the

24   difference between TPS and Cognos to me?

25       A.   I would say Cognos looks better.  And if
```

1    you're pulling information from TPS, there's a lot

2    of activity in the company, because it's the heart

3    of the company's information, that sometimes if you

4    try to run information, the report will cancel

5    itself because it's too busy, too much traffic.

6    Cognos gives you an ability to run information and

7    not have to worry about that at -- as often.

8        Q.   If I'm Latoya or somebody in her position,

9    what would you tell me to use TPS for?

10        MS. KOSKI:  Object to form.

11        A.   TPS is the internal information for the

12    customers and the items that we sell.

13        Q.   So what would you tell me to use it for

14    specific to my job?

15        A.   We review a customer's profile; we review

16    their eligibility; we review sales.

17        Q.   If I'm Latoya or somebody in her position,

18    what would you tell me to use Cognos for?

19        A.   Reporting.

20        Q.   When you access Cognos, whether you're

21    Latoya or yourself, can you make changes to

22    information in Cognos?

23        A.   Changes?

24        Q.   Well, you said previously you can't update

25    things in Cognos.  I guess I want to understand what

```
 1    you mean by that.

 2        A.   No, I cannot make any changes to information

 3    that you're reporting on.

 4        Q.   Can you make changes to, say, customer

 5    information?

 6        A.   No.

 7        Q.   So Cognos is simply a program that you pull

 8    information from, not one that you put information

 9    into?

10        A.   Correct.

11        Q.   If you want to put information in about a

12    customer, that would go into TPS?

13        A.   Correct.

14        Q.   Is there any other way that you understand

15    information goes into Cognos besides TPS?

16        A.   I believe they have information -- the

17    reporting capabilities, there is information, but

18    it's not something that I use.

19        Q.   You said you believe they have information,

20    the reporting capabilities.  What do you mean by

21    that?  It's not something you -- what do you --

22    explain that to me.

23        A.   They call it, like, a data warehouse, and

24    different departments have different needs and

25    different things that they're looking at and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting on in that -- in their data warehouse that

 2    I don't -- I'm unfamiliar with, I don't use.

 3        Q.   When you say "they," who is "they"?

 4        A.   All the other departments at Anda.

 5        Q.   So that's in Cognos?

 6        A.   Yes.

 7        Q.   Got it.  So let's go back for second.   In

 8    2011 -- we'll just spend a little bit -- and by way

 9    of background, we'll spend a little while longer on

10    reports, and then we'll probably take a break for

11    lunch --

12        A.   Uh-huh.

13        Q.   -- once we get done with this section.

14             But let's go back to 2011.  You said that

15    there was a report you wanted to create in Cognos

16    that didn't exist; is that right?

17        A.   I don't know if it existed or not.  I had a

18    preference to view the report in a different way.

19        Q.   What report was that?  Do you recall?

20        A.   The report that I wanted to view was looking

21    at a customer's profile and sales.

22        Q.   Why did you want to do that?

23        A.   Because it's part of the job

24    responsibilities within the department.

25        Q.   Do you recall the first time you wanted to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    look at that report?

 2             MS. KOSKI:  Object to form.

 3        A.   The -- the report had to be created first.

 4        Q.   The report had to be created.  Okay.

 5        A.   In that -- in that environment.

 6        Q.   Because it did not exist before?

 7        A.   In the Cognos environment.

 8        Q.   It did exist in the TPS?

 9        A.   Perhaps.

10        Q.   Was this report your idea, or was it someone

11   else's?

12        A.   It was my idea and preference to report in

13   that environment.

14        Q.   Is that the first report you remember

15   creating in Cognos?

16        A.   Yes.

17        Q.   And when did you do that, when you first

18   started?

19             MS. KOSKI:  Object to form.

20        A.   I don't recall the time frame.

21        Q.   When you first started as a DEA compliance

22   analyst, were you told by Michael Cochrane or Emily

23   Schultz that there are certain reports that you're

24   going to need to look at on a regular basis as a

25   compliance analyst?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   I was tasked with standards that Anda wanted

2    with regards to the review of our customers and how

3    I would ultimately adhere to those standards.

4      Q.   What specific standards were you tasked

5    with?

6      A.   Recordkeeping, reviewing customers for

7    eligibility, reviewing their sales, and collecting

8    the due diligence that was required to engage in

9    controlled substance business.

10      Q.   When you started as a compliance analyst --

11    or a DEA analyst in the compliance department, were

12    you given a list of, say, procedures that you were

13    to follow to do your job?

14      A.   We were familiar with the procedures in the

15    department, yes.

16      Q.   Do you recall what those were at that time?

17      A.   I don't recall what they were at the time.

18      Q.   Do you recall if they had certain names?

19      A.   No, I do not.

20      Q.   Do you recall if they were given to you

21    orally or on a piece of paper?

22      A.   I do not recall.

23      Q.   Are you familiar with the company's, Anda's,

24    standard operating procedures now --

25      A.   Now, yes.

```
 1        Q.    -- sitting here today?

 2        A.    Today, yes.

 3        Q.    Were you trained in the company's standard

 4   operating procedures when you first started as a DEA

 5   analyst?

 6        A.    I don't recall.

 7        Q.    Do you know what SOP 40 is?

 8        A.    Yes, I do.

 9        Q.    When do you first remember becoming aware of

10   SOP 40?

11        A.    So those -- the SOP is guidelines for what's

12   required of our department and our position.  So I

13   immediately became aware of the requirements and the

14   guidelines for the department.

15        Q.    How did you become aware of them?

16        A.    Training.

17        Q.    By whom?

18        A.    By Emily and Michael.

19        Q.    You said earlier your training over the

20   course of the year was learning about, you know, the

21   different ways that you needed to do your job, going

22   to some different conferences sponsored by the DEA

23   and Buzzeo.  And now you've added to that list Emily

24   and Michael would have trained you in Anda internal

25   company procedures, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Correct.

 2       Q.   Are there other things that your training

 3   consisted of in 2011 when you became a DEA

 4   compliance analyst?

 5       A.   It's not training, but we monitor news.  We

 6   monitor anything pertinent to what we do.

 7       Q.   At that time, how many people were in the

 8   compliance department?  Do you recall?

 9            MS. KOSKI:  Object to form.

10       A.   So compliance -- specifically DEA compliance

11   or regulatory compliance?

12       Q.   DEA compliance, that was you and Michael and

13   Emily.

14       A.   Yes, for a short period of time.

15       Q.   Did that change?

16       A.   Yes.

17       Q.   When?

18       A.   Within a month or so.

19       Q.   How did that change?

20       A.   There was a new hire.

21       Q.   Who was that?

22       A.   It was, I believe, Howard, and I don't

23   remember his last name.  He was there for a short

24   period of time.

25       Q.   Okay.  What was his role?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   He was brought in as the director.

 2      Q.   Did you have an understanding why they were

 3   hiring a director?

 4      A.   No, I did not.

 5      Q.   Were you told when you took the job as a

 6   compliance analyst that they would be hiring a

 7   director?

 8      A.   There was a job posted.

 9      Q.   There was a job posted, and that's how you

10   were aware of it?

11      A.   Correct.

12      Q.   Did you have a meeting with Emily and

13   Michael, when you started as a compliance analyst,

14   that talked about what was going to be happening in

15   the compliance department in the next few months?

16      A.   No.

17      Q.   Did you have any conversations about what to

18   expect in the coming months?

19      A.   No.

20      Q.   They just said:  This is your job; this is

21   what you need to do; start doing it?

22      A.   Correct.

23      Q.   You said that Howard was there for just a

24   short period of time?

25      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   How long would you say?

2      A.   I really don't know.  It was less than

3   probably three months.

4      Q.   Do you have any understanding of why it was

5   such a short period of time?

6      A.   I do not.

7      Q.   Did you report to Howard?

8      A.   No, I did not.

9      Q.   Did you interact with Howard?

10     A.   Yes.

11     Q.   In what way?

12     A.   He worked in the same department.

13     Q.   Did you have an understanding of what his

14  job was as director?

15     A.   The same as ours, same reviews and same

16  responsibilities.

17     Q.   Is that the job that you hold now?

18     A.   No.  He was a director.

19     Q.   So what would make him a director and you an

20  analyst, then?

21          MS. KOSKI:  Object to form.

22     A.   At that time?  I don't know.

23     Q.   What was your understanding of Emily's role

24  at that time?

25     A.   Emily -- I don't -- I don't recall her title
```

Highly Confidential - Subject to Further Confidentiality Review

1    at the time.

2       Q.   What was your understanding of her role?

3       A.   She was a manager.

4       Q.   So what did that mean?

5       A.   She was a manager within the compliance

6    department.

7       Q.   And what was your understanding of Michael's

8    role at that time?

9       A.   He was an executive director of the

10   compliance department.

11      Q.   Sitting here today, do you use TPS or Cognos

12   to report -- pull reports?

13      A.   I use both.

14      Q.   What sort of reports do you pull from TPS?

15           MS. KOSKI:  Object to form.

16      A.   Sales and customer information.

17      Q.   What sort of -- any -- anything else?

18      A.   That's specific to what we do.

19      Q.   So sales -- what do you mean by sales?

20      A.   Customer sales.

21      Q.   So a customer's sales history with --

22      A.   Correct.

23      Q.   -- Anda?  And then you said customer

24   information you would also pull from TPS?

25      A.   Correct.

```
 1        Q.   What would that include?

 2        A.   The customer's profile, so licensing,

 3   eligibility for controls.

 4        Q.   What would you -- what reports would you

 5   pull today from Cognos?

 6        A.   So as a report, like, author, it depends on

 7   what I needed to see.

 8        Q.   When you go into TPS, are there certain

 9   reports that are created in the system that you can

10   just hit a button and say this is the report that I

11   want?

12        A.   So nothing is, like, a button.  It's --

13   there are reports that are created, and you have to

14   go into these reports.  And even though the report

15   is created, you would have to specify what it is

16   you're wanting to pull.

17        Q.   And if I were, say, someone in Latoya's

18   position and you were to show me how to do that,

19   how -- you would sign into TPS, correct?

20        A.   Correct.

21        Q.   And you would just walk her through those

22   steps, right?

23        A.   Correct.

24        Q.   And you said, sitting here today, you're not

25   sure if you could do that or not?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Here?

 2      Q.   Yes.

 3      A.   I'm not sure.

 4      Q.   Because you're just not sure if you can

 5   access that environment?

 6      A.   Correct.

 7      Q.   But you know that you are able to access it

 8   at home?

 9      A.   Yes.

10      Q.   And then in Cognos, are there -- is a report

11   created every time, or are there certain saved

12   reports that you can just access at any point?

13           MS. KOSKI:  Object to form.

14      A.   So reports are created, but we -- we refer

15   to something as a prompt, meaning the person who is

16   pulling the report has to use prompts and specify

17   what you're pulling.

18      Q.   Okay.  So give me an example of what you

19   mean by that.

20      A.   So am I wanting to look at all active

21   customers at Anda?  I would have to specify that I'm

22   wanting to see active customers at Anda.

23      Q.   Would you specify anything else?

24      A.   It depends on the business needs of what I

25   was wanting to pull.
```

```
 1      Q.   When you mean "active customers at Anda,"

 2   what do you mean?

 3      A.   So we have customers that are now out of

 4   business.  They're not active at Anda.

 5      Q.   Active means eligible to purchase or that

 6   are actively purchasing?

 7      A.   Active meaning eligible to purchase at Anda

 8   because they are an active customer at Anda.

 9      Q.   Do you know what ARCOS is?

10      A.   Yes.

11      Q.   What is it?

12      A.   They -- it's reporting directly to the DEA

13   specific to narcotics.

14      Q.   Is it a program?

15      A.   No.

16      Q.   Is it -- is it a database?

17      A.   No.

18      Q.   Is it something that you have responsibility

19   for?

20      A.   It's the responsibility of the compliance

21   department, yes.

22      Q.   How does Anda report information to ARCOS?

23           MS. KOSKI:  Object to form.

24      Q.   If you know.

25      A.   I don't -- I'm not a part of that.
```

1     Q.   Who is a part of that?

2     A.   IT.

3     Q.   Do you under -- do you have an understanding

4  of how IT gets the information to report to ARCOS?

5     A.   I do not.  I would assume it's transactions

6  and sales.

7     Q.   Through TPS?

8     A.   Yes.

9          (Anda - Solis Exhibit 4 was marked for

10  identification.)

11  BY MS. ELLIS:

12     Q.   I'm handing you what's been marked as

13  Exhibit 4, labeled -- starting with Bates Number

14  453833.  This is an e-mail from Natashia

15  Jean-Charles to yourself, Mary Barber, and Latoya

16  Samuels, correct?

17     A.   Correct.

18     Q.   Who is -- who's Natashia?

19     A.   She no longer works with Anda.

20     Q.   Did she work with Anda at some point?

21     A.   Yes.

22     Q.   What did she do?

23     A.   She was a compliance clerk.

24     Q.   Did she -- was she in the compliance

25  department?

```
 1        A.   Yes.

 2        Q.   And what did she do?

 3        A.   At this point, looking at this e-mail, she

 4   was helping to -- the e-mail group that I mentioned,

 5   where you can submit information to the compliance

 6   department, she was helping to take in data and save

 7   it.

 8        Q.   Save it where?

 9        A.   To our records.

10        Q.   Which are saved where?

11        A.   They're saved within our O drive.

12        Q.   And that's what this e-mail, in fact, says,

13   correct?  The following DD report has been added to

14   the O drive.  Right?

15        A.   Yes.

16        Q.   And then there's a TPS number in

17   parenthesis, right?

18        A.   Yes.

19        Q.   What is that TPS number?

20        A.   That's the customer number at Anda.

21        Q.   Okay.  There's some information that's

22   highlighted below the customer information.  Do you

23   see that?

24        A.   Yes.

25        Q.   What -- is that a copy-and-paste from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    somewhere?

 2            MS. KOSKI:  Object to form.

 3        A.   This is compliance notes.

 4        Q.   Where would that come from?

 5        A.   TPS.

 6        Q.   So is this a report that you could run

 7    through TPS, is compliance notes?

 8        A.   It could be pulled.

 9        Q.   Have you been -- ever been asked to pull

10    that report?

11            MS. KOSKI:  Object to form.

12        A.   I've never been asked to pull a report.

13        Q.   Have you ever pulled that report before?

14        A.   I do not pull that report.

15        Q.   Who does?

16        A.   I could get that information with IT.

17        Q.   But it is a report you're aware TPS is

18    capable of producing?

19        A.   So it's not a report, but it's -- you

20    could -- you could request that someone report on

21    that information.

22        Q.   I guess I don't understand what the

23    difference is.  What -- can you explain that to me?

24        A.   So, like, I think of a report as being

25    something created, and there's a certain output
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    there.  There is no, like, report specifically for

 2    this, but you can ask for this information to be

 3    reported on.

 4       Q.   So you could go to IT and say, I want all of

 5    this information from any customer that has

 6    information there?

 7       A.   Correct.

 8       Q.   Have you ever done that before?

 9       A.   I have -- we -- in our department, our focus

10    is on our notes, so we look at it customer by

11    customer.

12       Q.   You wouldn't look at them as a -- as a

13    group, per se?

14       A.   It's not important to our function.

15       Q.   So, for example, using Exhibit 4, you

16    were -- you, Natashia, Mary Barber, and Latoya

17    and presumably Robert Brown were looking at Reams

18    Palace Drug, correct?

19       A.   This e-mail seems to indicate that the

20    customer provided new information to Anda.

21       Q.   Is this the sort of e-mail that you recall

22    receiving on a regular basis?

23       A.   At the time, Natashia was assisting with

24    this, because there was, like, an inbox for our

25    department where a customer is able to submit that
```

```
 1    information.  So, yes, we currently still have an

 2    inbox where we are able to take in information

 3    provided by a customer.

 4        Q.   So Natashia would get something from the

 5    inbox, right?

 6        A.   Correct.

 7        Q.   And then she would copy some of that

 8    information from the inbox?

 9        A.   She would save the information to our files.

10        Q.   And then what would she do?

11        A.   So this example that is here, she's

12    explaining that new information has been received,

13    and she's communicating that to the DEA team since

14    she was in a clerical role, and then it's -- as an

15    FYI.

16        Q.   So you know that the information has been

17    received and that she checked TPS customer notes?

18        A.   Correct.

19        Q.   Would you do anything with an e-mail like

20    this once you received it?

21             MS. KOSKI:  Object to form.

22        A.   You -- so the way it worked is if a customer

23    is requesting something from Anda, that request is

24    initiated by the customer to the sales rep, and then

25    it's passed over to the compliance department to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    review.  So sometimes information comes into the

 2    department, and we're not clear on what's being

 3    asked from the department.

 4        Q.   Let's walk through that process, and then we

 5    may be at a good point to break.

 6             So when a customer makes a request to

 7    someone in sales, what is your understanding of how

 8    they do that?

 9        A.   If a customer is an existing Anda customer,

10    and they've never been eligible for controls, they

11    may have this conversation with our sales rep.  And

12    the sales rep will tell the customer what is

13    required for review of controlled substance

14    eligibility.  And then that information is put in a

15    queue of sorts for the compliance department to

16    review the customer.

17        Q.   Would the customer use any sort of computer

18    program to communicate with the sales reps, that

19    you're aware of?

20        A.   I'm not aware of that.

21        Q.   So it would be a conversation over the phone

22    or perhaps --

23        A.   Right.

24        Q.   -- by e-mail, correct?

25        A.   Correct.
```

```
 1        Q.   And then the sales rep would communicate

 2   with the compliance department by sending things to

 3   a particular e-mail?

 4        A.   It's possible the customer could submit the

 5   information to the sales rep, and they also have the

 6   option to submit it directly to compliance by

 7   preference.

 8        Q.   How would -- is there a way that they should

 9   do it, according to Anda policy?

10        A.   No.

11        Q.   How would a customer know the compliance

12   information?  Do you talk to customers on a regular

13   basis?

14        A.   No.

15             MS. KOSKI:  Object to form.

16             Go ahead, sorry.

17        A.   No, we do not.

18        Q.   Then how would a customer just know to send

19   something directly to compliance?

20        A.   So on our questionnaire, there is a section

21   that indicates how they're able to submit

22   information to the compliance department, and the

23   questionnaire indicates different requirements that

24   are needed in order to be reviewed for a controlled

25   substance eligibility.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And the sales representatives, if we're

 2    speaking of today, they're -- they're aware of

 3    compliance requirements because if those

 4    requirements are not received, then it's not

 5    reviewed by compliance.

 6        Q.   So in 2011, what were the requirements that

 7    needed to be received to set up a new customer?

 8              MS. KOSKI:  Object to form.

 9        A.   Sorry.  So for a person who --

10        Q.   When you started in 2011 in this role, and

11    you were to receive this in --

12        A.   Uh-huh.

13        Q.   -- what sort of information would you expect

14    to see from a new customer?

15        A.   If a customer was wanting to be approved for

16    controls, they would need to provide dispensing

17    information.  They would need to have a customer

18    questionnaire on file.  It's also asked that they

19    provide policies, procedures, pictures, and anything

20    other, that they're specifically requesting to be

21    reviewed.

22        Q.   And how did you know, as a new DEA

23    compliance analyst, that that's what the customer

24    needed to submit?

25        A.   Remedy indicates what is required, and you
```

Highly Confidential - Subject to Further Confidentiality Review

1    know because that's part of your training to the

2    standards that are required to review a new customer

3    to controls.

4         Q.   So when you say "standards," what are you

5    referring to?

6         A.   Procedures, standards, requirements.

7         Q.   Is there a specific procedure?

8         A.   The procedure to -- so, sorry, if I'm

9    following, are you saying, like, is there something

10   outlined or in training?

11        Q.   Outlined, is there something outlined that

12   you would know as a reference?  Say, I'm a new DEA

13   compliance analyst.  I need to know what it takes to

14   set up a new customer.  Is there something I can go

15   to see what that list required?

16        A.   At the time, it was training, and again,

17   Remedy states those requirements.  So any time that

18   you're reviewing any task on the front end as part

19   of our suspicious order monitoring, it's required

20   that those documents are provided in order for us to

21   review it.

22        Q.   So when you say it was training, you mean

23   there wasn't, like, a procedure you could look at to

24   say this is what's required, correct?

25             MS. KOSKI:  Object to form.  You mean a

Highly Confidential - Subject to Further Confidentiality Review

```
 1        written procedure?

 2            MS. ELLIS:  Yes.

 3        A.   At the time, it was training on what are the

 4    standards and requirements.

 5        Q.   Are you aware of who had set the

 6    requirements in Remedy at that point?

 7        A.   I'm not aware.

 8        Q.   Are you aware of whether there were any

 9    written procedures that governed the requirements

10    that were in Remedy at that time?

11        A.   At that point, no.

12        Q.   You don't know, or there weren't any?

13        A.   At that point, it was not something that I

14    was aware of.

15            MS. ELLIS:  This is probably a good time for

16        a break.

17            MS. KOSKI:  Okay.  I heard noise at the

18        door.

19            THE VIDEOGRAPHER:  The time is 12:27 p.m.

20        We're going now off the record.

21          (Recess from 12:27 p.m. until 1:06 p.m.)

22            THE VIDEOGRAPHER:  The time is 1:06 p.m.

23        We're now back on the video record.

24    BY MS. ELLIS:

25        Q.   Sabrina, I'm going to direct you back to
```

1    Exhibit 4 for a moment.

2        A.    Okay.

3        Q.    So you testified prior to the break that the

4    highlighted information on this e-mail is from the

5    TPS system customer notes field, correct?

6        A.    Correct.

7        Q.    Is this typical of the information that you

8    would find in that field?

9        A.    Those notes indicate compliance reviews of

10   customers.

11       Q.    What else might those notes include?

12             MS. KOSKI:   Object to form.

13       Q.    If anything?

14       A.    It's any comment or determination upon a

15   review of a customer.

16       Q.    So when you say compliance review of

17   customers, what do you mean by that?

18       A.    Those are specifically compliance notes.

19       Q.    So a compliance review of a customer,

20   there's two examples, I guess -- or three examples

21   right here on Exhibit 4 that we can -- we can look

22   at.  A compliance note might include whether a

23   customer was approved or denied for a purchase of a

24   controlled substance, right?

25       A.    Correct.  So that first comment seems to

```
 1    indicate that the customer or sales rep initiated a

 2    request for oxycodone family, and it was denied by

 3    compliance.

 4        Q.   And the initials -- or it looks like there's

 5    a name next to the "oxy denied."  Is that right?

 6        A.   Yes.

 7        Q.   And that is -- what does that indicate to

 8    you?

 9        A.   The name of the person who entered the

10    compliance note.

11        Q.   That's Mary Barber?

12        A.   Correct.

13        Q.   Who is Mary Barber?

14        A.   She was a compliance analyst.  She's no

15    longer with Anda.

16        Q.   Did she work -- did she work under you?  Did

17    she report to you?

18        A.   No, she did not.

19        Q.   Were you in the same position?

20        A.   She was a compliance analyst, and we were in

21    the same position for a short time.

22        Q.   So your jobs would have been the same?

23        A.   Correct.

24        Q.   So your name could have just as easily been

25    there as hers?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2      A.   I could enter compliance notes.

 3      Q.   And then there's a date next to her name

 4   there on the left-hand side.  What does that

 5   indicate to you?

 6      A.   The date of the compliance note entry.

 7      Q.   And that's 1/10/13 in this case, correct?

 8      A.   Correct.

 9      Q.   And then the second line of information here

10   has a date of 1/8 -- or 11/8/12; is that right?

11      A.   Yes.

12      Q.   So the compliance notes don't just take the

13   last entry into account; it includes all previous

14   entries as well.  Is that your understanding?

15              MS. KOSKI:  Object to form.

16      A.   It should show any compliance note entered.

17      Q.   So any compliance note entered since the

18   customer had been purchasing products from Anda?

19      A.   I -- I can't answer when that capability was

20   available to compliance to make notes.  So just from

21   my experience, it should show any notes that we've

22   made.

23      Q.   When you started as a DEA compliance analyst

24   in 2011, were you able to make compliance notes?

25      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   Since you've been in the compliance

2   department, have you seen compliance notes in TPS

3   prior to -- that were dated prior to 2011?

4      A.   I believe so.

5      Q.   Do you recall the earliest or any sort of

6   date prior to 2011 that you recall seeing in a

7   compliance note field?

8      A.   I don't recall how -- how old they are.

9      Q.   And so on this line, the next over from the

10  date, 11/18 -- or 11/8/12 is EA Schultz.  Would that

11  be Emily Schultz?

12     A.   Correct.

13     Q.   And so this -- that would indicate to you

14  that she's the one that entered this compliance --

15  particular compliance note?

16     A.   Yes.

17     Q.   And this particular compliance note says:

18  No controls ever reported to the DEA.  Right?

19          MS. KOSKI:  Object to form.

20     A.   That's what it says.

21     Q.   What does that mean to you?

22     A.   So what had occurred at a certain point in

23  time is if a person was reported to the DEA, you did

24  not sell controls to them.

25     Q.   So -- and when -- and when you say person,
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you mean customer, correct?
2    A.   Correct.
3    Q.   A customer who was buying --
4    A.   Right.
5    Q.   -- controlled products from Anda.
6    A.   Uh-huh.
7    Q.   Yes?
8    A.   Yes.
9    Q.   So this is two types of information, one,
10   that this customer was reported to the DEA, right?
11   A.   Correct.
12   Q.   And then, two, that no controls should be
13   sold to that customer going forward from
14   November 8th of 2012, right?
15        MS. KOSKI:  Object to form.
16   A.   That is what the comments show.
17   Q.   Well, beyond the comments showing that, if
18   you were to later look at this customer, say, and
19   they placed an order for controlled substances, and
20   you saw that, what would that mean to you?
21        MS. KOSKI:  Object to form.
22   A.   So with the evolving times, there are
23   instances where it is possible that a customer
24   provides additional information.  It's possible that
25   you reinstate controls.  I'm not familiar with this
```

```
 1    customer.

 2        Q.   What do you mean, "with the evolving times"?

 3        A.   Meaning that today, in 2019, it is possible

 4    that you made a determination at one point in time,

 5    and with new review of the customer and a sufficient

 6    amount of time, it's possible that you could

 7    reinstate controls.  But I don't know what happened

 8    in this situation.

 9        Q.   Well, taking collectively these two entries

10    from November 8th, 2012 and January 10th, 2013, are

11    you able to understand compliance's -- Anda

12    compliance's interaction with Reams Palace Drug?

13           MS. KOSKI:  Object to form.

14        A.   No, I'm not.

15        Q.   What does this -- what do these two entries

16    say to you, sitting here today?

17        A.   In and of themselves, it looks like one

18    person said they would not sell controls at one

19    point in time, and they were reported.  And at

20    another point in time, it says that they were denied

21    a control family.

22        Q.   If you were not sitting here in a deposition

23    today, but sitting in your office and looking at

24    this from a compliance perspective, would you have

25    any reason to believe that that -- that those two
```

Highly Confidential - Subject to Further Confidentiality Review

1    things had not happened?

2         MS. KOSKI:  Object to form.

3    A.   I would have to research it further.

4    Q.   You would rely on these, though, to start

5    your research, correct?

6    A.   It would be the beginning of research.

7    Q.   And you would potentially -- potentially

8    talk to these people as part of your research?

9    A.   We don't ever speak to customers on a --

10   Q.   I'm sorry, let me rephrase.  I meant the

11   other people in the compliance department.

12   A.   I could do that, or I could research

13   recordkeeping.

14   Q.   How would you research?

15   A.   I would research recordkeeping and see what

16   we have on file, what could have been reviewed, what

17   could have been looked at.

18   Q.   Okay.  So walk me through that process.

19   When you say "research recordkeeping," what do you

20   mean by recordkeeping?

21   A.   The due diligence that is collected for a

22   customer at the time of review.

23   Q.   So you testified earlier that due diligence

24   can happen at two times:  One, when a customer

25   applies to purchase controls for the first time,

```
 1    correct?

 2       A.   Correct.

 3       Q.   And, two, if a customer would like -- has

 4    not purchased controls before and would like to

 5    purchase controls, correct?

 6       A.   Correct.

 7       Q.   And so that might be an existing customer

 8    that just wants to add a new product, right?

 9       A.   A new product family, correct.

10       Q.   Any other times that you might do due

11    diligence for a customer?

12       A.   Upon request.

13       Q.   What do you mean by "request"?

14       A.   If compliance requests it for whatever

15    reason.

16       Q.   What sort of reasons would compliance

17    request it for?

18       A.   It could be a sales rep-initiated request.

19    It could be a customer's question through their

20    sales rep.  I can't speculate, but something would

21    make us look into something further.

22       Q.   Well, I'm not asking you to speculate.  I'm

23    asking you if you can recall some examples of when

24    you might have received one of those requests from

25    the sales department and what those requests would
```

```
 1    have been.

 2        A.   So, like, in this example, if oxycodone was

 3    denied, somebody seemed to have requested it.  And

 4    if you see the previous note, you would probably be

 5    interested in understanding their current state of

 6    business, their business overall, and you would want

 7    to look into it.

 8        Q.   Okay.  So let's use this as an example.

 9    Let's assume for a moment that the entry from

10    January 10th, 2013 is not there, and you are the

11    compliance analyst that received a request from

12    Reams Palace Drug.  Okay?

13        A.   Uh-huh.  Yes.

14        Q.   Yes.  So you would receive a request through

15    the e-mail inbox that you referenced before, right?

16        A.   Requests typically come through Remedy since

17    it's a task management system.

18        Q.   So when you log into Remedy, do you -- is

19    there, like, a -- what do you see?

20        A.   It's a queue of sorts where the different

21    types of requests are entered by the sales rep for

22    our review.

23        Q.   So you log into Remedy, and you see sort of

24    a queue.  Is that a queue that's shared with you

25    alone as a compliance analyst, or is it shared with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the compliance department, and multiple analysts see

 2    the same thing?

 3        A.   Compliance analysts have access to the same

 4    queue.

 5        Q.   So is this something, as a compliance

 6    analyst, that you would do on a daily basis, log

 7    into Remedy?

 8        A.   No.

 9        Q.   When would you log into Remedy?

10        A.   So it would be the person who is -- that is

11    their core responsibility, is reviewing the pharmacy

12    sales rep requests.

13        Q.   And in this circumstance, it was Natashia?

14        A.   Natashia only took in the data that was

15    provided by the customer to the department.  It

16    looks like Mary was the analyst who reviewed the

17    oxycodone request.

18        Q.   So when you began in the compliance

19    department in 2011, was this the system that was

20    followed at that point?

21        A.   Please explain "the system" as far as --

22        Q.   Well, you said there was one person assigned

23    to review the sales rep requests that came through

24    Remedy.  Was that what was done in 2011?

25        A.   No.  In 2011 it was a shared effort.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   So what does that mean?

2      A.   That means that in 2011, Emily Schultz was

3   there, and I came into the department.  And then in

4   addition, Mary came, I believe, in in 2012, so --

5      Q.   So in 2011, if a Anda customer who had been

6   a customer, but had never purchased controls and

7   wanted to purchase controls, that customer would

8   talk to their sales rep, right?

9      A.   Correct.

10      Q.   And then that sales rep would put in a

11   request to the compliance department, right?

12      A.   Correct.

13      Q.   And they would do that using Remedy,

14   correct?

15      A.   That is what should happen, yes.

16      Q.   There are other ways that it could happen?

17      A.   It should not, no.  That should be how it

18   works, yes.

19      Q.   But were there other ways?  Whether it

20   should happen or not, did it --

21      A.   I can't answer that.  You would hope it's

22   not in an e-mail, but this is what was required at

23   the time.

24      Q.   But it could have been in an e-mail?

25      A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you ever recall it being in an e-mail?

 2        A.   There have been instances where people

 3   request something in an e-mail, but it was always

 4   asked to be entered into Remedy.

 5        Q.   So in any event, this system that -- the

 6   Anda compliance system, whether -- as it was laid

 7   out through training that you testified earlier, was

 8   that sales reps would make requests through Remedy,

 9   right?

10        A.   Correct.

11        Q.   And you don't know that that was on any sort

12   of written policy or paper anywhere, right?

13        A.   Sorry?

14        Q.   So, like, if a sales rep e-mailed you a

15   request from a customer, and you wanted them to put

16   it in Remedy instead --

17        A.   Uh-huh.

18        Q.   -- would you just tell them to put it in

19   Remedy instead, or would you say, per this policy

20   located in this place?

21        A.   It would not be a policy.  It would be a

22   compliance requirement.

23        Q.   So those weren't written down somewhere for

24   sales reps to reference?

25        A.   Other than instruction by our department and
```

Highly Confidential - Subject to Further Confidentiality Review

1    an awareness of what's required by our department.

2        Q.   That's the only way a sales rep would know?

3        A.   Right.

4        Q.   So at that point, let's assume that the

5    sales rep makes the request through Remedy, and it

6    was you and Emily Schultz.  You said it was a shared

7    responsibility to review that request, right?

8             MS. KOSKI:  Object to form.

9        A.   There was shared access to Remedy.

10       Q.   So you each had your own log-in?

11       A.   Correct.

12       Q.   But you would see the same information?

13       A.   You could see the same information.

14       Q.   So do you recall when that changed?

15       A.   Sorry.  When what part changed?

16       Q.   I guess it was when you -- when you couldn't

17   see the same information.  You didn't have shared

18   access.

19       A.   Well, the department -- anyone in the

20   department has access to log into Remedy within the

21   DEA compliance side.

22       Q.   But I think you testified earlier that at

23   some point in time, it changed, like, you

24   individually could only see certain things at some

25   point now, or you all still see the same

1    information?

2        A.    You could -- you could still all log into

3    Remedy.

4        Q.    Okay.  So a sales rep puts a request in

5    Remedy.  You and Emily log in, right?

6        A.    At this point in time?

7        Q.    Yes.

8        A.    At this point in time, I can't speak to who

9    reviewed it because Mary was in the department at

10   the time, too.  And at that point in time, Emily was

11   reporting to the DEA.  But I don't know who the

12   analyst is that indicated to report it to the DEA.

13   I don't know who -- who reviewed and made that

14   determination.

15       Q.    Based on this entry, what is your

16   understanding that Emily did?

17       A.    Reported it to the DEA, because she would do

18   that.

19       Q.    But based on what you see here, you don't

20   know what happened prior to that point?

21       A.    I don't -- I don't know who analyzed the

22   customer and made the determination to report it.

23       Q.    Okay.  Fair enough.  Let's assume that you

24   are the analyst, after November 8th of 2012, that

25   logs into Remedy and sees a request from this

```
 1    customer to order oxy.  Let's pretend for a second

 2    that January 10th, 2013 entry is not here.  Okay?

 3        A.    Uh-huh.

 4        Q.    So what would you do first?

 5        A.    Well, first you would see that they were

 6    declined or -- controls/no controls, and then you

 7    would look into their request and examine the amount

 8    of time between the requests, and make a

 9    determination based on the information you have.

10        Q.    And you said you would do that, earlier, by

11    looking at the recordkeeping, right?

12        A.    After -- if I researched, yes.

13        Q.    Okay.  So let's -- just walk me through

14    this.  We're pretending again that the Mary Barber

15    entry isn't there; that the 11/8/2012 entry is; and

16    you've received a request for an OxyContin order

17    from this customer.  What would the first thing be

18    that you would do in order to determine how to

19    respond to that request?

20        A.    I would -- we always, as a standard

21    practice, if a person is allowed -- this is not in

22    this instance.  If a person is eligible for

23    controls, a new customer eligible for controls, they

24    are not immediately eligible for oxycodone.

25              So in this instance, most likely you -- it's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      a different situation.  You would want to collect

2      dispensing information, or you would make a

3      determination based on the previous note.

4          Q.   So let's take those one at a time.  You

5      would, one, collect dispensing data, you said,

6      right?

7          A.   But the time difference is not -- is not --

8      in this situation, it's within, it looks like, three

9      months, so --

10         Q.   And why -- why is that significant to you?

11         A.   It's significant because the data is not

12     outdated.

13         Q.   When does it become outdated?  Is there a

14     certain time frame?

15         A.   It's your discretion with each customer.

16         Q.   But you think that three months is not

17     enough time?

18         A.   If we're speaking about this situation, and

19     I saw that note, I would say, yes, that's not enough

20     time.

21         Q.   Would four months be enough time?

22         A.   That note saying no controls are reported,

23     that would make me more conservative in my review of

24     that customer.

25         Q.   So would six months be enough time?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Typically, it's not common that a person who

 2   is reported is reinstated unless there is a

 3   significant amount of time, new ownership, business

 4   changes.

 5        Q.    So what is a significant amount of time?

 6   I'm just trying to understand.

 7        A.    Years.

 8        Q.    Would it be five years?

 9        A.    There is no -- there's nothing defined.

10   It's discretion with each customer that you're

11   reviewing.

12        Q.    So the period of time that would pass after

13   a customer had been denied controls is discretionary

14   based on the analyst's own discretion?

15        A.    So in this specific example, if it has been

16   reported to the DEA, you would not most likely want

17   to immediately sell to a customer that was reported

18   to the DEA unless whoever was analyzing it felt that

19   there was a significant change to the business.

20        Q.    And is there a written policy that would

21   guide that analyst as to what a significant change

22   meant?

23        A.    There's no written policy to say that.  You

24   would be looking at the due diligence and making

25   that determination.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1      Q.   So one analyst could potentially find that

2   enough time had passed; whereas a different analyst

3   would find that enough time had not passed.  Is that

4   fair?

5      A.   I -- I don't know that.  I don't know what

6   they would feel.

7      Q.   You are -- you've talked to other analysts

8   in your department, right?

9      A.   Yeah.  But in this specific situation, I

10  don't know what happened with Mary in January of

11  2013.  I don't know --

12     Q.   I'm not asking about --

13     A.   -- that, yeah.

14     Q.   -- this specific situation at this point.

15  I'm just talking generally.  Because there's no

16  written policy, you said, outlining what those

17  changes might need to be so that controls could be

18  reinstated, it's understandable, would you agree,

19  that one analyst could find enough time had passed,

20  and another analyst could find that not enough time

21  had passed?

22     A.   Most reinstatements are a bigger discussion,

23  so it's usually -- there's a lot more looked into.

24     Q.   Okay.  That's fair.  But I'm, again, asking

25  you -- and remember, I'm not trying to be difficult
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    here.  But at the beginning, I said I want to talk

 2    about those things, but first I want to ensure we

 3    get this question answered.

 4            Analysts could come to different

 5    conclusions, right?

 6       A.   Of course.

 7       Q.   So you said you would look at dispensing

 8    data.  There would be changes in the business that

 9    you would look at, such as ownership or new

10    locations or other information like that.  Right?

11       A.   So when you're reviewing a customer for

12    control eligibility, you're looking at control and

13    noncontrol ratio.

14       Q.   And what do you mean by that?

15       A.   The ratio of controlled pills dispensed in

16    relation to the nonprescription or prescription

17    drugs that are not controlled substances.

18       Q.   And what are you looking for in that ratio?

19       A.   Pills, like, the pills -- pill volume

20    dispensed.

21       Q.   So a certain percentage of pills dispensed

22    being controlled substances would raise a red flag,

23    per se?

24       A.   It's not necessarily a percentage.  It's

25    looking at the top items and top pill volume
```

```
 1   dispensed.

 2       Q.   Why is that important?

 3       A.   Because it indicates the majority of the

 4   pill volume going in and out of a pharmacy.

 5       Q.   Why is that important?

 6       A.   Because for the purposes of our department,

 7   we're reviewing someone for controlled substances.

 8       Q.   And so what would the pill volume going out

 9   of a pharmacy, if there was a higher number of

10   controls and noncontrols, indicate to you, as a

11   compliance analyst?

12       A.   It can indicate a lot of things.  So if it's

13   a special pharmacy, if it's oncology, if there's

14   different situations, it could make total sense and

15   be justified.

16            If there isn't anything that stands out as

17   an explanation or a justification, based on the type

18   of specialization a pharmacy has, then you would

19   look at it and say there's a lot of controlled

20   substances.

21       Q.   And if there were a lot of controlled

22   substances, what would that indicate to you, as a

23   compliance analyst?

24       A.   We're always looking to evaluate risk.

25       Q.   And a lot of controlled substances would
```

```
 1    indicate a higher risk?

 2        A.   Of course.

 3        Q.   Why?

 4        A.   Because we're discussing selling to a

 5    customer controlled substances.

 6        Q.   And when you say "risks," what do you mean,

 7    risks of what?

 8        A.   So we're supposed to be knowing who we're

 9    selling to, and we're supposed to be aware of who

10    we're selling to.  And we have to feel comfortable

11    with their business, so if they're wanting to apply

12    for controlled substance eligibility with us, and we

13    see that they're dispensing a lot of controlled

14    substances, we would need to understand, number one,

15    why they want to do business with Anda, number two,

16    why they have that volume.

17        Q.   And the risk that you're referring to is

18    that somehow those controlled substances would be

19    misused?

20        A.   That's always a possibility.

21        Q.   That somehow they would not go into

22    treatment as they were intended?

23        A.   That's always a possibility.

24        Q.   So you would look at the control to

25    noncontrol ratio based on the dispensing data,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right?

 2        A.   Correct.

 3        Q.   And then you said changes in business or

 4    ownership you would look at, right?

 5        A.   Yes.

 6        Q.   Anything else in the recordkeeping that you

 7    would look at if a customer had come -- if this

 8    particular customer came back to you, as a analyst,

 9    sometime after November 8th, 2012?

10        A.   If an analyst is reviewing a customer, a

11    part of what they're able to do is ask more

12    questions.

13        Q.   Of whom?

14        A.   Of the customer.

15        Q.   So you -- at this point in time, you

16    could -- you, as the analyst, could contact Reams

17    Palace and ask them questions?

18        A.   No.  You would indicate to the sales rep

19    that you're wanting to know more information.

20        Q.   So you would talk through the sales rep as a

21    middle person?

22        A.   Correct.

23        Q.   Okay.  So you would look at dispensing data.

24    You would determine whether there was a change in

25    business or ownership.  You would potentially ask
```

```
 1    questions from the sales rep.  Anything else that
 2    you would do?
 3        A.   And then research all of the documentation
 4    that we have in our possession.
 5        Q.   And so when you research the documentation,
 6    what documentation would that include?
 7        A.   Dispensing information, policies and
 8    procedures, those are the most pertinent, and the
 9    customer questionnaire.
10        Q.   And where would you find that information,
11    as a sales analyst?
12        A.   That's warehoused on the O drive.
13        Q.   Would you expect to find policies and
14    procedures, dispensing information, customer
15    questionnaire -- and I think that those were the
16    three that you said -- for every customer on -- that
17    was attempting to purchase controls?
18        A.   Those are the guidelines.
19        Q.   According to what?
20        A.   To what the department is -- it does upon
21    review of a customer.
22        Q.   And where are those guidelines located?
23        A.   The procedures.
24        Q.   That would be one of the standard operating
25    procedures?
```

```
 1      A.   Correct.

 2      Q.   Would that -- do you know which number that

 3   would be?

 4      A.   40.3.

 5      Q.   What do you mean when you say 40.3?

 6      A.   It's a version of the SOP, but I would have

 7   to see if there's other versions.

 8      Q.   What's the difference in the versions, or

 9   what would that mean to you?

10      A.   Because there's a number of different DEA

11   compliance SOPs that are out there.

12      Q.   So are there multiple versions of the same

13   SOP that could apply at the same time?

14      A.   There should not be.

15      Q.   So when you say "versions," do you mean one

16   version would replace an earlier version?

17      A.   Correct.

18      Q.   It's not as if there is one version that

19   applies to certain customers and another version

20   that applies to other customers of the same SOP

21   number?

22      A.   Not that I'm aware of.

23      Q.   Okay.  So you would -- say, after this

24   request came in to renew the controls, you would

25   look at the recordkeeping, including the due
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    diligence.  You would review the ratio of controls
 2    to noncontrols.  You would potentially ask the sales
 3    rep to ask the customer for additional information.
 4          Anything else that you would do in order to
 5    determine whether or not you would allow a customer
 6    to purchase controls?
 7    A.   That's among what we use as a guideline,
 8    yes.
 9    Q.   Is there anything else?
10    A.   I'm not thinking of anything right now.
11    Q.   After you did all of those things, what
12    would you do next?
13    A.   Make a determination.
14    Q.   A determination of whether that customer
15    should buy -- be able to -- be allowed to use
16    controls or not?
17    A.   We would make a determination on whatever
18    the request was, yes.
19    Q.   And once you made that determination, how
20    would you indicate that to the customer?
21    A.   If it came through Remedy, and it was a
22    sales rep-initiated request, what the -- what
23    happens is the sales rep communicates to the
24    customer with compliance's determination.
25    Q.   Would you record your determination
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    anywhere?

 2        A.   If there was a determination made in Remedy,

 3    it's an outcome disposition, and that is recorded.

 4        Q.   You will have to bear with me because I'm a

 5    little dense when it comes to corporate speak

 6    sometimes.  What does -- what does that mean?

 7        A.   So Remedy has something called an outcome

 8    disposition.  This is a sales-initiated request.

 9    This is what the request is, and this is

10    compliance's determination.

11        Q.   And that's what you mean by outcome

12    disposition?

13        A.   Yes.

14        Q.   So it sends it back to the sales rep?

15        A.   Correct.

16        Q.   And then the sales rep would communicate it

17    to the customer?

18        A.   Right.

19        Q.   Would you then record that information

20    anywhere so that you would know in the future that

21    you had made that decision?

22        A.   It's possible that it would be in the

23    compliance notes.

24        Q.   Why do you say it's possible?

25        A.   Because that's where -- if a note is
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    entered, that's where it's entered.

 2        Q.   Would there be occasions where it's not

 3    entered?

 4        A.   Not that I'm aware of, but it depends on the

 5    person who is making a determination to enter a note

 6    or not.

 7        Q.   You would agree that if it's not entered,

 8    that a person later looking at the account may not

 9    have the most accurate information about what had

10    happened with that account, right?

11        A.   Correct.

12        Q.   And that could be problematic in making

13    decisions about whether or not controls should be

14    allowed for purchase or not?

15             MS. KOSKI:  Object to form.

16        A.   Correct.

17        Q.   Is it your understanding that -- is it your

18    understanding that DEA compliance analysts were

19    required to enter this information into TPS for

20    those very reasons that you just said?

21             MS. KOSKI:  Object to form.

22        A.   Compliance analysts were aware that there is

23    an area for entering notes.

24        Q.   That was something you became aware of

25    during training, right?
```

```
 1        A.    Correct.

 2        Q.    But your -- it was not a requirement that

 3    they include that information?

 4        A.    It's a part of your training that it should

 5    be done.

 6        Q.    Are you aware or were you aware, when you

 7    were trained that it should be done, of any

 8    consequences if you didn't enter that information?

 9             MS. KOSKI:  Object to form.

10        A.    I'm not aware of a consequence.  Probably a

11    best practice is what you would say.

12        Q.    So at that point in time, in 2011, when you

13    started as a DEA compliance analyst, and you

14    theoretically did not enter your determination into

15    TPS, you're not aware that you were violating any

16    written policy, correct?

17             MS. KOSKI:  Object to form.

18        A.    There's no written policy about what -- a

19    comment, I don't -- I don't believe.

20        Q.    Your understanding would have been that you

21    were just violating a best practice?

22             MS. KOSKI:  Object to form.

23        A.    Correct.

24        Q.    And that wouldn't necessarily be anything

25    that you could be disciplined for?
```

```
 1              MS. KOSKI:  Object to form.

 2      A.   Correct.

 3      Q.   Did that change at any point, that it became

 4   a requirement that an analyst needed to enter

 5   information and keep track of their determinations

 6   in TPS?

 7      A.   There's multiple ways of tracking what an

 8   analyst does.  So because Remedy is a task

 9   management system with an outcome disposition, you

10   could also go in there and track an outcome.

11   Another way of tracking an outcome is using the

12   compliance notes.

13      Q.   So there's multiple ways of tracking what an

14   analyst did; is that right?  That's what you said?

15      A.   An outcome of something that was requested.

16      Q.   So let's set this Exhibit Number 4 aside for

17   a -- for a second and just think about a

18   hypothetical customer, a customer who was a customer

19   of Anda and a requisite time had passed when they

20   were eligible to purchase OxyContin.  Okay?

21              MS. KOSKI:  Object to form.

22      Q.   Do you follow the hypothetical?

23      A.   No, I'm sorry.  I missed that.

24      Q.   That's okay.  I just want to run you through

25   a hypothetical situation so that I can understand
```

Highly Confidential - Subject to Further Confidentiality Review

1    how to get an accurate picture of what compliance's

2    interaction was with that customer.  Okay?

3        A.    Okay.

4              MS. KOSKI:  Object to form.

5        Q.    So let's assume that there is a customer of

6    Anda's that has not -- that has purchased products

7    from Anda in the past.  Follow me so far?

8        A.    Yes.

9        Q.    You said earlier that a customer who has

10   purchased products is not able to purchase Anda --

11   or is not able to purchase OxyContin until a certain

12   period of time goes by; is that right?

13       A.    When a customer -- from the time that I've

14   been there, and you're doing a part of the upfront

15   review, that is correct.

16       Q.    Do you know what that period of time is?

17       A.    It's discretionary upon the person reviewing

18   the account.  Typically, we like to wait around

19   three months.

20       Q.    Why three months?

21       A.    It's something that we determined

22   internally.  One of the big asks in our department

23   is knowing why our customer wants to do business

24   with Anda.

25       Q.    Why is that important?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    It's important because you want to know why,

 2    as a secondary supplier, a customer is asking to

 3    have a relationship with your company.

 4          Q.    What difference does it make?

 5                MS. KOSKI:  Object to form.

 6          A.    I'm not following.

 7          Q.    Why does it matter why a customer wants to

 8    have a relationship with your company?

 9          A.    Because you're a secondary supplier, so you

10    can presume that in most cases, they are getting

11    supply other places as well.

12          Q.    Are there reasons that you would think are

13    bad for a customer to want to have a relationship

14    with Anda?

15          A.    It's not necessarily bad.  When you're --

16    when you're analyzing it, your job is to find out

17    why that is.

18          Q.    I understand, but I'm trying to understand

19    why that matters.

20          A.    So you -- in this specific example, if this

21    customer was only coming to Anda for oxycodone, and

22    the customer had just been turned on as an Anda

23    customer overall, you would not know at the time

24    that they only wanted oxycodone.

25          Q.    Could there be other reasons why you would
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    want to know; for example, if they had been denied
2    purchases of a product from another place that they
3    could purchase it?
4         A.   That's important information.
5         Q.   You would want to know that, right?
6         A.   You would want to know that.
7         Q.   And you would try to ask questions that
8    would help you know that, right?
9         A.   There is a possibility that you can ask
10   supplemental questions to ask that information, yes.
11        Q.   But the goal of this whole process is to
12   prevent customers, in one way, from coming to Anda
13   after they've been denied from purchasing controls
14   from other companies, right?
15        A.   Correct.
16        Q.   So the requisite amount of time to purchase
17   oxycodone, you said, was usually around three
18   months, but it's discretionary?
19        A.   Correct.
20        Q.   Is there any written policy that you're
21   aware of that guides what that time frame is or
22   should be?
23        A.   I believe that it is a part of the
24   procedures, because oxycodone review is typically a
25   separate review, apart from a new customer review.
```

```
 1       Q.   So the requisite amount of time has passed

 2   with our -- with our hypothetical customer, right?

 3   They've purchased products from Anda in the past,

 4   they now want to purchase oxy, around three months

 5   has passed and you get the request as an analyst.

 6   Okay?

 7       A.   Uh-huh.

 8       Q.   You follow me?

 9       A.   Yes.

10       Q.   You would then look at what's on file in the

11   compliance recordkeeping, right?

12       A.   Yes.

13       Q.   And that would be located where?

14       A.   So if we're talking about due diligence, the

15   due diligence would be on the O drive.

16       Q.   And then you said that there were a couple

17   of other places where you could also look to find

18   information about a customer in your research.  One

19   of those would be the customer notes in TPS, right?

20       A.   Correct.

21       Q.   And one of those would also be the customer

22   history in Remedy; is that right?

23       A.   Correct.

24       Q.   Are there other places that you would look,

25   in your research as an analyst, to determine the
```

1    history of Anda's relationship with that customer?

2        A.   That's typically where you would go to do

3    your research.

4        Q.   Would you, as an analyst, try to look at all

5    three of those places in order -- before you made a

6    decision?

7        A.   Me, as an analyst, yes, I would.

8        Q.   You would think that it's important to get a

9    complete picture of what had happened with that

10   customer at Anda in the past, right?

11       A.   Based on these notes, yes.

12       Q.   Because these notes contain vital

13   information that you need to understand to make your

14   determination?

15       A.   Correct.

16       Q.   If an analyst had made a decision on that --

17   on our hypothetical account prior to the time you

18   were reviewing it, and didn't enter that information

19   into one of those three systems, it might lead to an

20   inaccurate picture for you, as the analyst, right?

21       A.   So, like, the most important thing is the

22   due diligence, because you're looking at the

23   customer's business.  It's helpful to see previous

24   information, of course, but you're reviewing the

25   information that you have on file if you're the

 1   person reviewing it.

 2        This only helps you know what someone

 3   previously entered, but you would look at what you

 4   have on file as well.

 5   Q.   It would help you understand what you had on

 6   file and why it was there or why it wasn't there?

 7   A.   The -- if you saw this note, you would look

 8   on the O drive to see what information was collected

 9   to make that note.

10   Q.   Are there other things, besides the two

11   examples in Exhibit 4, that would be entered in the

12   customer notes, that you can think of, other types

13   of information?

14   A.   Anything could be added there that a

15   compliance analyst felt to enter upon review of a

16   customer.

17   Q.   Can you give me some examples of things that

18   you've entered in that field upon review that you

19   thought would be important?

20   A.   Typically, that's when you say -- you're --

21   upon review, something is approved or denied.

22   Q.   Anything else?

23   A.   That's usually what it's used for.

24   Q.   What about limits for a purchase of certain

25   controlled substances?

```
 1      A.    If a customer's limits went through a review

 2    process, it's ideal that a note is entered that

 3    there was a review process, and this is what the

 4    limit was changed to.

 5      Q.    Why is that ideal?

 6      A.    Because it's just a history of the review in

 7    one of these areas that it could be recorded.

 8      Q.    And so that's so an analyst, at any point,

 9    could go back and look at the account and understand

10    what had happened with it, right?

11      A.    Correct.

12      Q.    Has that always been the case, that that

13    should be what analysts should be entered in TPS

14    notes?

15      A.    Has it always been the case that analysts

16    know --

17      Q.    Should enter that information.

18      A.    It's always been the case that review notes

19    should be entered.

20      Q.    But that was just something you learned in

21    your training, right?

22      A.    Correct.

23      Q.    There's not a piece of paper that you can

24    point to that says you should enter X, Y, and Z if

25    they occur?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I don't recall right now.

 2      Q.    You don't know of one, sitting here as you

 3   are today?

 4      A.    I know that we talk about a review process,

 5   and we do talk about notes, yes.

 6      Q.    But you don't recall any place that, if a

 7   new analyst were to start tomorrow, that you could

 8   say, here, as part of this packet, this is what

 9   you're supposed to enter into TPS?

10      A.    There is a procedure that does indicate that

11   notes should be entered.

12      Q.    Generally, but not necessarily according to

13   what specific criteria those notes should be?

14      A.    It's -- the criteria is review

15   determinations.

16      Q.    Okay.  Has that -- has this process of

17   entering notes and tracking information for a

18   particular customer over time changed throughout

19   your time in the compliance department?

20      A.    Can you please help me understand?  Are

21   you -- are you saying that has it changed that they

22   should not be entered?

23      Q.    No.  Just that -- has there been more of an

24   emphasis on entering notes placed on analysts at one

25   point versus another?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    I'm not --

 2            MS. KOSKI:  Object to form.

 3      A.    I'm not aware.

 4            (Anda - Solis Exhibit 5 was marked for

 5      identification.)

 6      BY MS. ELLIS:

 7      Q.    I'm going to show you what's been marked as

 8      Exhibit 5, which is Bates numbered beginning 415442.

 9      This looks like an e-mail from you to Robert Brown

10      on July 31st, 2014.  Do you see that?

11      A.    Yes.

12      Q.    Do you recall receiving this e-mail?

13            MS. KOSKI:  Object to form.

14      A.    I don't recall the e-mail.  I'm reading it

15      now.

16      Q.    Do you recall this topic of conversation?

17      A.    It makes sense now that I'm reading it.

18      Q.    And why does it make sense?

19      A.    Because I'm following what the e-mail says.

20      Q.    And so just so the record reflects what

21      we're talking about here --

22            MS. ELLIS:  Do you want to turn this on?  I

23      can put this up here.

24      Q.    This is a conversation with yourself and

25      Robert Brown, is that right, via e-mail?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And at this point, was Robert Brown your

 3   boss?

 4      A.   Yes.

 5      Q.   What was his role?  Do you know?

 6      A.   Director.

 7      Q.   Okay.  You reported to him?

 8      A.   Yes.

 9      Q.   So at some point, you no longer reported to

10   Michael Cochrane?

11      A.   Yes.

12      Q.   Do you remember when that changed?

13      A.   When Robert Brown came on board.

14      Q.   Do you remember when that was?

15      A.   I don't recall, but I think he was with the

16   company for a discretionary amount of time before

17   they transferred the analysts under him.

18      Q.   What -- do you know why?

19      A.   I think they usually do that when there is a

20   new employee.  I don't know.

21      Q.   Just like a trial period?

22      A.   I believe so.

23      Q.   Was that after Howard, who you had mentioned

24   before, left?

25      A.   Yes.
```

```
 1      Q.   Do you know why Howard left?

 2      A.   I don't know.

 3      Q.   Do you know if he was fired?

 4      A.   Well, he was there less than a couple of

 5   months, so you would assume that was the case.

 6      Q.   Do you remember hearing any rumors about it?

 7      A.   No.

 8      Q.   Do you remember having any conversations

 9   about it?

10      A.   I don't remember.

11      Q.   Do you remember any specific priorities that

12   were in place from Anda leadership for the

13   compliance department at the time that Howard left

14   the position and Robert took over?

15           MS. KOSKI:  Object to form.

16      A.   From the time I've been in the position, the

17   priorities have been to have the appropriate

18   information and review process in place for

19   customers who engage in business for controlled

20   substances with.

21      Q.   When you became a DEA compliance analyst,

22   were you made aware of any areas of weakness that

23   they expected the compliance department to improve

24   upon?

25           MS. KOSKI:  Object to form.
```

```
 1        A.   I was made aware of the standards that the

 2    department wanted, which is collecting information

 3    on all of our customers.

 4        Q.   Were you made aware that the department had

 5    not been doing as good a job upholding or meeting

 6    those standards as Anda would have liked?

 7        A.   That was not communicated to me.

 8        Q.   Were you given specific areas of focus that

 9    you were to prioritize in your role as a DEA

10    analyst?

11        A.   Yes.  It was just what I said.  We're -- my

12    focus was collecting data on all the customers we

13    did controlled substances business with.

14        Q.   And your goal -- one of your goals, I

15    presume, would have been to do your job as best as

16    you could, right?

17        A.   Right.

18        Q.   And to ensure that you got as much customer

19    information on file as possible, right?

20        A.   Correct.

21        Q.   To ensure that analysts like yourself had as

22    much information about -- about customers and

23    potential customers as they could in order to make

24    the most accurate determinations, right?

25        A.   That was the goal.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And so in Exhibit 5, you're having a

2   conversation with Mr. Brown, who is your boss at

3   this time in 2014, and you were talking about

4   "printing screens of the orders we question from

5   order entry for our records and for the next person

6   to be made aware that a previous order was

7   questioned."

8           What does that mean?

9      A.   I don't remember why the e-mail was written

10  at the time.  I could only assume what it meant

11  today.

12     Q.   Okay.  Well, sitting here today, what does

13  it mean to you?

14     A.   It means that an order was researched and

15  that I'm suggesting a note should indicate it was

16  researched.

17     Q.   Why?

18     A.   Because it would show the history of the

19  researching of the order.

20     Q.   Isn't that something that, as you said

21  before, as an analyst you would want to understand

22  in order to make the most accurate determination,

23  right?

24     A.   It's helpful.

25     Q.   And so at this time it appears that that

```
1    wasn't always happening; is that fair?

2         A.   In this specific situation, it shows that

3    there was a review and it seems to indicate that a

4    note wasn't entered.

5         Q.   Fair enough.  But here you say:  "We should

6    be printing screens of the orders we question from

7    order..."

8              That seems to indicate that you're talking

9    more broadly than this one particular order.  Is

10   that accurate or fair?

11             MS. KOSKI:  Object to form.

12        A.   It was a suggestion.

13        Q.   I mean, it looks to me like you're making a

14   suggestion on how to improve the process for the

15   compliance department.

16        A.   That's what it's saying.

17        Q.   Okay.  And it seems like throughout the

18   course of your career at Anda, that's something

19   you've prided yourself on, is trying to make systems

20   better, and this might be an example of you trying

21   to do that, right?

22             MS. KOSKI:  Object to form.

23        A.   It's an example of where I made a suggestion

24   to improve a process.

25        Q.   Are you aware if the process changed after
```

1    you made this suggestion?

2        A.    I don't recall.

3        Q.    Is there anything that would help refresh

4    your recollection?

5        A.    No.

6        Q.    Was this something that frustrated you, do

7    you remember, at this time?

8        A.    I don't remember until I saw this e-mail.

9        Q.    The next paragraph says:  An F4 note should

10   be made when an order is researched and cleared,

11   more details on file.

12              What does that mean to you now?

13       A.    That's the same discussion as we've had all

14   morning, that we're talking about entering

15   compliance notes indicating that there was a review

16   of something.

17       Q.    So you're suggesting that this become a

18   policy, right?

19              MS. KOSKI:  Object to form.

20       A.    I'm suggesting that it could enhance things.

21       Q.    It could enhance the compliance department's

22   ability to be effective in their --

23       A.    No.  It could enhance the fact that you're

24   seeing the review was done in that area, because

25   we've mentioned before, there's a number of areas

```
 1    where you could see that a review was done.
 2        Q.   It would enhance an analyst's ability to
 3    look at information in one place?
 4        A.   Yes.
 5        Q.   In order to make an accurate determination?
 6        A.   Right.
 7        Q.   And those determinations, again, are so that
 8    Anda is compliant with state and federal laws,
 9    right?
10             MS. KOSKI:  Object to form.
11        A.   No.  So a determination does not mean
12    necessarily that you'll be compliant or not.  A
13    determination is what the analysts determine was the
14    best course of action at the time of review.
15        Q.   Well, and the best course of action is in
16    furtherance of the goal that Anda remain compliant
17    with regulatory and compliance-based goals, right?
18             MS. KOSKI:  Object to form.
19        A.   No.  I don't -- I don't think that we look
20    at that necessarily in this specific situation.  In
21    every situation when we're reviewing a customer, of
22    course, we want to be compliant in who we are
23    selling to.  But we're making a decision based on
24    the information that we reviewed for a customer,
25    whether or not we'll engage in business with them.
```

```
 1    So that doesn't necessarily mean that you would not

 2    be compliant if you were to do business or were not

 3    to do business.

 4    Q.   Well, you would agree part of being

 5    compliant with state and federal regulation is to

 6    not break those regulations, right?

 7         MS. KOSKI:  Object to form.

 8    A.   I'm not following.  Sorry.

 9         MS. KOSKI:  We're getting into the area that

10         I think is limited by Special Master Cohen's

11         order.

12         MS. ELLIS:  Well, Katy, I'm not asking her

13         opinion.  I'm asking her what the goals and her

14         responsibility are of a compliance department and

15         her particular position.  I've been pretty

16         lenient with speaking objections so far, but I --

17         MS. KOSKI:  You're violating the court's

18         order, not -- the restatement of your question is

19         different from the question that I just objected

20         to, if you look at the transcript.

21         The question you asked is:  Would you agree

22         part of being compliant with state and federal

23         regulation is to not break those regulations,

24         right?

25         Compliance with regulations is specifically
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      within the parameters of Special Master Cohen's

 2      order.  You've restated the question, in response

 3      to me, in a different way.  I'm telling you, you

 4      need to restate the question in order to be

 5      compliant with Special Master Cohen's order.

 6           MS. ELLIS:  I'll continue to ask my

 7      questions.  I don't believe it was in violation,

 8      but I'll continue on with this line.

 9           MS. KOSKI:  Okay.

10  BY MS. ELLIS:

11      Q.   Now, on the -- on the next line here you

12  say:  I've noticed that we're not doing this and

13  anyone reviewing the bucket would not know about

14  SOM's history based on notes and what's saved on the

15  drive.

16           What does that mean to you?

17      A.   What it means to me is that suspicious order

18  monitoring took place for the customer, and it

19  wasn't asked, that that review was just archived as

20  a note.

21      Q.   In TPS?

22      A.   Correct.

23      Q.   Anywhere else?

24      A.   That's probably what I was referring to.

25      Q.   When you say "saved on the drive," were you
```

```
 1    referring to the O drive?

 2    A.   Correct, in a customer's file.

 3    Q.   You said you've noticed that "we're not

 4    doing this."  What do you mean by this?

 5    A.   So the sentence is saying that suspicious

 6    order monitoring is taking place, and what is being

 7    addressed is, can we just notate that these -- the

 8    monitoring of orders is taking place.

 9    Q.   You want -- you're suggesting that the

10    compliance department adopt some sort of process so

11    that you know what has been done, right?

12    A.   What has been reviewed, yes.

13    Q.   What has been reviewed.  So you can be more

14    effective in your job?

15    A.   It seems to be related to communication

16    within the department.

17    Q.   Would you agree that communication can help

18    you be more effective in your job?

19    A.   Communication is important with a team of

20    people working together.

21    Q.   So that one person knows what the other

22    person is doing, right?

23    A.   So that you know that suspicious order

24    monitoring has taken place, yes.

25    Q.   Because if you're not communicating about
```

Highly Confidential - Subject to Further Confidentiality Review

1    it, and it's not written down for another analyst to

2    review, you can't be sure that it's taken place,

3    right?

4        A.   You can't be sure.

5        Q.   You -- and you can't assume it's taken place

6    if there is no record of it, right?

7        A.   You can't assume.

8        Q.   So this is a suggestion to help you, as an

9    analyst, understand whether or not suspicious order

10   monitoring has occurred?

11       A.   Correct.

12       Q.   Without the type of information that you're

13   suggesting here, you would not make that assumption

14   that suspicious order monitoring had occurred, would

15   you?

16           MS. KOSKI:  Object to form.

17       A.   Sorry.  I'm not following the question.  Are

18   you saying specific to this customer?

19       Q.   Not specific to this customer, just

20   generally, the type of information that you're

21   referencing here.  As an analyst, if you didn't see

22   that sort of information, you would not assume that

23   suspicious order monitoring had occurred, would you?

24       A.   Well, I know that we do monitor orders and

25   identify orders of interest, so I would assume, with

1    any customer that we have, that it's possible if

2    they're purchasing controlled substances from Anda,

3    that I know we're monitoring on the back end, as

4    well as on the front end.

5        Q.   So even without the records of the

6    monitoring, you would make the assumption that the

7    monitoring had been done?

8        A.   I would make the assumption that we have

9    something in place that monitors all customers who

10   purchase from Anda.  I would not know, based on this

11   specific e-mail, that this particular customer was

12   reviewed in that one place I was looking, which is

13   the compliance notes.

14       Q.   I wasn't asking about this specific customer

15   but I will, since you brought it up.  You -- and if

16   I understand you correctly -- just tell me because I

17   want to make sure that we're on the same page.

18            You would assume that there are systems in

19   place to do suspicious order monitoring, right?

20       A.   Correct.

21       Q.   But without the results of those systems

22   being entered in a way that you could see them, you

23   could not assume that that monitoring had occurred

24   as it relates to a specific customer, right?

25            MS. KOSKI:  Object to form.

 1     A.   No, I would not know, like, in this specific

 2     example, that that specific order was looked at.

 3     Q.   And you would want that sort of proof to

 4     ensure that a specific order was looked at, right?

 5     A.   The suggestion was that the communication

 6     would be beneficial on the team.

 7     Q.   Because it would help you ensure that the

 8     system was effective?

 9     A.   No, because it would help us -- it would

10     ensure that there was proper communication between

11     the different people working within the team.

12     Q.   Are threshold -- at the bottom of this

13     e-mail, Exhibit 5, it says:  Hydrocodone limit

14     reduced from 5,000 to 2,000 pending dispense data

15     for review.

16          Is that the sort of information that would

17     be included in TPS notes as well?

18     A.   Should.

19          MS. KOSKI:  Object to form.

20     A.   Should the analyst have made a determination

21     to enter a comment about their review, that could be

22     a comment that was entered.

23     Q.   If I could hand you a laptop right now so

24     that you could sign into your environment and look

25     up TPS, and you were to look up this customer

1   number, could you tell me if that was in the TPS

2   field?

3       A.   Sorry.  Which field, the notes?

4       Q.   The customer notes field.

5       A.   I'm not able to sign on through Teva's

6   environment here.  If I were able to do it, then I

7   would be able to check and see if that's in the

8   notes.

9       Q.   Earlier today you said you weren't sure if

10  you were able to sign on through Teva's environment

11  here.

12      A.   Right.

13      Q.   Have you tried to do that?

14      A.   I've never tried to sign on here.

15      Q.   Then how are you able to say that you're not

16  sure or you don't think that you can sign on?

17      A.   Because Teva's security is very difficult

18  and even when you work at home remotely, you can

19  have a day where you can get in.  And then you can

20  have another instance where you cannot get in.  I've

21  never tried logging in here, so I don't know if I

22  would be able to get in.

23      Q.   Okay.  Well, that's just different than what

24  you said a second ago, because this morning you said

25  you weren't sure.  A second ago you said you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    couldn't, and now you're not sure again.

 2    A.   I'm not following.

 3    Q.   Well, sitting here today, could you sign

 4    into Teva's environment, Yes or no?

 5    A.   Teva has a secured VPN environment, so I

 6    would have to see if I'm able to get into that.  If

 7    I'm able to get into that, then I should be able to

 8    get into what I'm normally eligible to get into, and

 9    that response has been consistent the whole time.

10    Q.   You don't know?

11    A.   I'm unaware if I can.

12    Q.   Okay.  I'm not trying to --

13    A.   Yeah.  No.  I mean, I'm just saying --

14    because I think that's the issue, is there is a lot

15    of security with their systems, and to be honest,

16    you don't know when you can get in or not.

17    Q.   Prior to today, were you asked to pull

18    together any information from Anda or their systems

19    responsive to discovery requests in this case?

20         MS. KOSKI:  I'm going to object to form.

21         And I'm going to instruct you not to answer

22      any communications that you had with counsel for

23      Anda.

24    Q.   I'm not asking you specifically as far as

25    what counsel has asked you to do.  I'm asking if you
```

```
 1    have -- if you have done anything personally in your

 2    job responsibilities to respond to discovery in this

 3    case.

 4         MS. KOSKI:  I'm going to object to form, and

 5      instruct you that you can answer to the extent

 6      that you're not communicating correspondence

 7      you've had between the legal department and

 8      outside counsel and yourself.

 9    A.   Yeah.  I don't feel that that can be

10    responded to.

11    Q.   You don't feel that that can be responded to

12    because everything -- because you've been instructed

13    by counsel on pulling these materials together, if

14    you've done so?

15    A.   There's attorney-client privilege, as just

16    mentioned.

17    Q.   I'm asking you -- I understand your attorney

18    just made an objection, and it's made for the

19    record.  But I'm asking you:  Were there -- are

20    there things that you have done that were not at the

21    explicit instruction of your attorney related to

22    this case?

23    A.   No.

24    Q.   Earlier you said threshold is not a term

25    that you would personally use, but you are aware
```

Highly Confidential - Subject to Further Confidentiality Review

1    that some people use it in the context of controlled

2    substances; is that right?

3        A.    Correct.

4        Q.    So what does it mean to you, sitting here

5    today, when I say threshold?

6        A.    So Anda determines what control family limit

7    is allowed to a customer upon review.

8        Q.    What is that based upon?

9            MS. KOSKI:   Object to form.  What's the

10       limit based upon, or what's her understanding of

11       the definition of limits?

12           MS. ELLIS:   Fair enough.

13       Q.    What is -- what is your definition of

14   threshold based upon?

15       A.    We don't use the term "threshold."  We use

16   the term "limit."  So a control limit is determined

17   based on a review of the customer, understanding

18   their business, understanding our position with

19   them.

20       Q.    What would you need to understand in order

21   to determine a limit?

22       A.    Anda's position with the customer.

23       Q.    Have you been involved, as a DEA analyst or

24   now as a manager, in setting customer limits?

25       A.    Yes.

```
 1       Q.   And when have you been involved in that

 2   process, since you were a DEA compliance analyst?

 3       A.   Yes.

 4       Q.   Did you continue to be involved in that

 5   process as a senior analyst?

 6       A.   Yes.

 7       Q.   And are you involved now, as the manager of

 8   the compliance department, in setting customer

 9   limits?

10       A.   Yes.

11       Q.   Okay.  So what do you look at when you set a

12   customer's limit for controlled substance purchases?

13       A.   We're reviewing the customer's dispensing

14   information, and we're considering that along with

15   the increase request.  Then we make a determination

16   on what that controlled family limit will be, based

17   on the customer's request.

18            If they ask for a specific item -- remember,

19   a limit is set on a control family.  It's not set

20   based on an item.  So if a customer is asking for a

21   particular item, we look at the dispensing

22   information, and you make a determination where you

23   would allow that customer to purchase that item from

24   you.

25       Q.   Does the type of customer -- type of
```

```
 1    customer make any difference in setting the limit?

 2        A.   Every customer has a different need from

 3    Anda, so knowing your customer would make a

 4    difference because every customer has a different

 5    need from Anda.

 6        Q.   So let's say, for example, there's a chain

 7    customer versus an independent retail customer.

 8    What difference would that make in setting a limit

 9    for a customer's ability to purchase controlled

10    substances?

11        A.   So chain customers are looked at on the

12    corporate level as a business relationship.  There's

13    more corporate oversight.  And so you collect a

14    corporate questionnaire, understanding the

15    relationship that that corporation has to Anda.

16            And usually with a corporate relationship,

17    there's a specific relationship that's not usually

18    all controlled substances.  It could be specific

19    items, specific control families.  Every situation

20    is different.

21        Q.   So you're saying it's not as important to

22    look at individual pharmacies in a corporate setting

23    as it is when you're looking at independent

24    retailers?

25            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   No, I did not say that.  I said that when

 2   you're looking at a corporate customer, you're

 3   looking at the overall relationship with that

 4   corporation.  You never are looking, oh, this store

 5   just usually decided to come to you.  And we're

 6   talking about national corporate chains.  I don't

 7   know what you're referring to.

 8             But a national corporate chain, usually the

 9   stores do business with you based on the

10   relationship with corporate.  So it's a -- it's a

11   relationship where all stores should be purchasing

12   along with the corporate relationship.

13        Q.   So you want to preserve the relationship of

14   Anda corporate to whatever that chain's corporate?

15             MS. KOSKI:  Object to form.

16        A.   No, I'm not following.

17        Q.   Well, you just said that when you're looking

18   at a corporate customer, you're looking at the

19   overall relationship with that corporation.

20        A.   Relationship meaning business needs from

21   Anda.

22        Q.   So you would look at -- let's say, for

23   example, there were a Walgreens relationship, right?

24        A.   Uh-huh.

25        Q.   And there are 100 Walgreens stores.  Okay?
```

```
 1     A.    Uh-huh.

 2     Q.    You would --

 3           MS. KOSKI:  Answer verbally.

 4     Q.    You have to say "yes" or "no."

 5     A.    Yes.  I'm sorry.

 6     Q.    You would want to make decisions based on

 7     individual orders for those Walgreens stores keeping

 8     that overall relationship in mind, right?

 9     A.    You should consider the big picture.

10     Q.    Why is that?

11     A.    Because the stores are usually purchasing

12     with the oversight and direction that corporate has

13     engaged in business with Anda to do.

14     Q.    So there's a broader base of information

15     that's available from corporate, is what you're

16     saying?

17     A.    Usually with a corporate customer -- and

18     we're speaking national corporate chains -- if there

19     is -- if Anda engages in business, there's an

20     understanding of what corporate is allowing or

21     instructing stores to purchase from Anda.

22     Q.    You would agree it's important to have

23     information for every order that comes in that might

24     be suspicious, though, right?

25           MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   In our world, there -- we order -- we do

 2   suspicious order monitoring all the way from the

 3   front end into the back end.  And so a lot of orders

 4   that hold in the suspicious order monitoring on the

 5   back end have already been prescreened on the front

 6   end.

 7       Q.   Okay.  I want to break that down a little

 8   bit, so I understand a little bit what you're

 9   saying.  When you say "all the way from the front

10   end to the back end," what -- what do you mean by

11   front end?

12       A.   In our world, suspicious order monitoring is

13   not just electronic monitoring of orders on the back

14   end.  We take a very conservative approach where a

15   customer is looked at on the front end before you

16   even determine to make that customer eligible.  And

17   if and when you do determine to make them eligible,

18   then there is another hindrance where they're

19   limited by customer limits.

20            And then after those two phases, there is

21   the third phase of the back end monitoring, where

22   you are now monitoring what they are ordering after

23   you already made them eligible to order, gave them a

24   limit of where they are allowed to order.

25       Q.   Thank you for that explanation, but I still
```

Highly Confidential - Subject to Further Confidentiality Review

1    want to break it down some more.  So let's just try

2    to answer my brief questions.

3           What you say "our world," what do you --

4    what world is that?

5       A.   From Anda, we monitor orders from the

6    upfront process of allowing eligibility to the

7    back-end process of the orders that are placed.

8       Q.   So "our" is Anda or is "our" Anda

9    compliance?

10      A.   Anda compliance.

11      Q.   So remember when I said at the beginning I'm

12   not trying to be rude.  I'm just trying to break it

13   down, and we'll get to the rest of the things that

14   you talked about.  But I want to ensure that we're

15   breaking -- that I'm getting answers to individual

16   questions.

17          So our world is Anda compliance, right?

18      A.   Correct.

19      Q.   What does the front end mean?

20      A.   We begin monitoring customers from the time

21   that we review sales-initiated requests.

22      Q.   Okay.

23      A.   So at that point in time, since the time

24   that I've been there, they will come to you and say

25   I would like to do business, this is the

Highly Confidential - Subject to Further Confidentiality Review

1   information, it's reviewed by compliance, a

2   controlled limit is decided and set.

3        And then as a third portion, the orders are

4   monitored as they are placed, should they be

5   indicated they needed an additional look at them as

6   they're placed.

7   Q.   So when you say back end, what do you mean?

8   A.   Meaning the third part of our order

9   monitoring process, which is as the orders are

10  placed.

11  Q.   You would agree that it would make it

12  difficult to do any work on the back end if you

13  didn't have information from the front end, right?

14       MS. KOSKI:  Object to form.

15  A.   It depends on the situation.  I'm not

16  familiar with an instance right now where that

17  happened.

18  Q.   But you said those things sort of go hand in

19  hand; it's a process for Anda, correct?

20  A.   Correct.

21  Q.   So you want to make sure that everything is

22  set up correctly as the relationship starts, so that

23  as the relationship continues and potentially

24  suspicious or nonsuspicious orders for controls are

25  vetted, that you have all the proper foundational

Highly Confidential - Subject to Further Confidentiality Review

1    information, right?

2        A.   Correct.

3        Q.   Because without that, you may not be able to

4    make accurate determinations, like you testified to

5    before?

6        A.   Correct.

7        Q.   And if that's not done correctly on the

8    front end, it would be difficult to do the work on

9    the back end, right?

10       A.   You wouldn't have the due diligence that you

11   could refer to.

12       Q.   And you want that due diligence because it

13   helps you understand that customer, right?

14       A.   Correct.

15       Q.   It helps you know the customer?

16       A.   Correct.

17       Q.   And that's really what the goal of your

18   department is, is to know the customer to ensure

19   you're complying with these regulations?

20       A.   Correct.

21            (Anda - Solis Exhibit 6 was marked for

22   identification.)

23   BY MS. ELLIS:

24       Q.   I'm going to hand you what's been marked as

25   Exhibit 6, Bates number beginning 422114.  This is

1    an e-mail exchange, it looks like, between yourself

2    and a number of individuals, starting on

3    October 8th, 2012, and ending on October 23rd, 2012,

4    regarding a QOL Meds location.

5          Are you familiar with QOL Meds?

6    A.   Yes, I am.

7    Q.   Is that a chain customer of Anda's?

8    A.   It's a behavioral health chain.

9    Q.   But it is a chain, right?

10   A.   Yes.

11   Q.   So this is one of those customers that you

12   just were discussing was important to have the

13   information on both the front end and the back end,

14   right?

15   A.   Correct.

16   Q.   I want to direct you to the second-to-last

17   page, and I'll put this up here on the screen for

18   you, since it's a little bit easier to see.

19         MS. KOSKI:  Can you adjust the lighting

20   under it so it --

21         MS. ELLIS:  Yeah.

22         MS. KOSKI:  That may be too much.  Somewhere

23   in the middle there.  There you go.

24         (Discussion off the record.)

25         MS. ELLIS:  Okay.  That's better.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MS. ELLIS:

 2        Q.   And, actually, we'll go to the last page of

 3    this document, Bates Number 422117.

 4             It looks like this is a request from a

 5    senior national account manager to yourself and

 6    Emily to increase Klonopin for 20,000 units for this

 7    particular location, right?

 8        A.   No.  20,000?

 9             MS. KOSKI:  The last page, if you look at

10        the screen.

11        A.   Okay.  Sorry.  Yes.

12        Q.   Yes.  And then we'll go on to the next page.

13    Emily responds that you need a questionnaire from

14    this location, right?

15        A.   Yes.  Yes.

16        Q.   And then a couple of e-mails up, it looks

17    like about a week later, Michelle, the sales rep

18    says there's orders being routed to ABC due to

19    limitation.

20             Is ABC one of Anda's competitors?

21        A.   Yes.  They're a distributor.

22        Q.   Would that be something that you would

23    consider in looking at the -- their -- the

24    location's ability to purchase controls?

25        A.   I don't think that's the reference in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    e-mail.  Just interpreting it today, I don't think
 2    that's what it's saying.
 3        Q.   What does it say to you?
 4        A.   It sounds like there may have been a supply
 5    issue with the product, and they're asking if Anda
 6    can fulfill it.
 7        Q.   Okay.  Let's look at that explanation in
 8    context of your response.  Here it says that the
 9    limit has been increased to 5,000 until you have
10    dispense data for further review of the account.
11             So does that mean you gave them a limit
12    without having that dispense data?
13        A.   This is a long-standing relationship that we
14    have with the customer, and so this is different
15    because it's a corporate relationship where we do
16    have due diligence, and we do have lots of
17    information on file for QOL as a group.
18        Q.   As a whole?
19        A.   As a whole.
20        Q.   But not for this new location?
21        A.   It seems to be that we're indicating that
22    we're wanting to further review it.  I can't tell
23    here if we ever had it on file without actually
24    referring to the files.
25        Q.   Let's go on to the next page of this
```

1    document.  It looks like Michelle responds back to



Highly Confidential - Subject to Further Confidentiality Review

7     A.   See, we're not -- we're not reviewing the

8     volume of sales in this instance.  We're reviewing

9     the volume of patients.  There is a difference in

10    this particular customer.

11    Q.   I -- maybe I'm missing something.  I don't

12    see on here anything related to patients.  Can you

13    direct me to where that is?

14    A.   Yes.  QOL, they're in the behavioral health.

15    So when she's saying that it's higher volume, it's

16    not talking about sales or dollars.  She's asking

17    for an increase in pills.

18    Q.   I understand that it's about pills, but I

19    don't see anything here about patients.  Do you have

20    the data about patients somewhere that's not

21    indicated here?

22    A.   Yes.  We do have information on QOL and who

23    they are and the whole corporate background, yes.

24    Q.   The corporate background, but not

25    necessarily this particularly new location, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.

 2      Q.   So at this point in time, because it's a new

 3   location, you wouldn't have had patient information,

 4   would you?

 5           MS. KOSKI:  Object to form.

 6      A.   The e-mail is indicating that it was a newer

 7   location.

 8      Q.   Let's just go back to that page before,

 9   because you specifically asked for the questionnaire

10   about patients.  Is that where the information would

11   be about patients, is on the customer questionnaire?

12      A.   The customer questionnaire outlines the

13   questions that you are asking related to the

14   business on the questionnaire.

15      Q.   Which would include information about

16   patients, right?

17      A.   There is nothing specific to patients, but

18   it would maybe reference specialty pharmacy.  Is

19   there anything different about this pharmacy

20   compared to all other pharmacies in a

21   specialization?

22      Q.   So you said you were able to give them a

23   5,000 limit based on information that you had about

24   the chain, right?

25      A.   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Let's look again at that second page of the
 2   e-mail here that you say:  Let's collect the 60 days
 3   of dispense data.  Also, we need the dispense data
 4   for all the other locations as well.
 5        A.   Yes.
 6        Q.   Does that indicate that maybe you didn't
 7   have the most up-to-date information when you
 8   allowed these sales?
 9        A.   Without me being able to do research on what
10   we had on file at the time, I could have been asking
11   for updated information.
12        Q.   Meaning that the information that you had
13   wasn't up-to-date enough for what you would want to
14   see?
15        A.   I would have to research, but I was asking
16   for updated information.
17        Q.   But you did approve sales to this store,
18   right?
19             MS. KOSKI:  Object to form.
20        A.   That's what the e-mail seems to say.
21        Q.   And then on the next -- first page here of
22   this e-mail, the sales national account manager
23   explains that they're going to be giving you
24   up-to-date information in batches; is that right?
25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    There's nothing from this chain that
 2   indicates that you are limiting their sales at this
 3   point until you get that sort of information, is
 4   there?
 5        A.    I can't tell that from looking at the
 6   e-mail.
 7        Q.    You would need to go back to Remedy and TPS
 8   and --
 9        A.    Yes.
10        Q.    -- the O drive?
11        A.    Yes.
12        Q.    So for chain customers at least, you said
13   that you rely on the broader information that the
14   chain gives you, right, to determine whether an
15   individual store or maybe a new location should be
16   able to get controls?
17        MS. KOSKI:   Object to form; mischaracterizes
18        testimony.
19        A.    I wouldn't use the term "broader
20   information."  I would say that you're looking at a
21   group of customers and what that group is wanting
22   from Anda in comparison to the way that you would
23   look at an independent pharmacy, who is just coming
24   to you in and of themselves.  Usually the group is
25   coming to you through the corporate ownership
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    wanting similar things.

2        Q.   That would be the front end that you were

3    talking about before, right?

4        A.   Correct.

5        Q.   So as a compliance department, you would

6    have an understanding of a chain from the

7    information that you gathered on the front end, yes?

8        A.   Yes.

9        Q.   And based on that, you may or may not have a

10   certain level of comfort with a chain in order to

11   add a new location or perhaps change the limits on

12   control purchases to a location, right?

13       A.   It helps you to know and have an

14   understanding, yes, of that customer.

15       Q.   So is it fair to say that you're willing to

16   be more flexible with some individual pharmacies

17   within a chain because of what you understand from

18   the front end?

19            MS. KOSKI:  Object to form.

20       A.   I wouldn't use the term "flexible."  I think

21   that it's the job of compliance to know the

22   customer.  In this situation, it's also the group

23   and the individual location.  So there is a

24   familiarity with the overall group.

25       Q.   And so would you be more comfortable, as a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance analyst, allowing the sale of controlled

 2    substances to some groups -- other -- versus other

 3    groups?

 4       A.   No.

 5       Q.   No, it doesn't depend?

 6       A.   No.

 7       Q.   It doesn't make any difference?

 8       A.   No.

 9       Q.   Because you want to ensure that you have the

10    most accurate information for all the groups, right?

11       A.   That's the goal.

12       Q.   Are there times that you are okay selling

13    with controls to some chains, but not to others?

14       A.   As with anything, you approve and you deny.

15            (Anda - Solis Exhibit 7 was marked for

16    identification.)

17    BY MS. ELLIS:

18       Q.   I'll hand you what's been marked as

19    Exhibit 7, beginning Bates Number 460932.  This

20    looks like an e-mail exchange between yourself, Mary

21    Barber, and James Gatto from October of 2012.  Who

22    is James Gatto?  Is it Gatto or -- how do you say

23    it?

24       A.   Gatto.

25       Q.   Gatto.  Who is that?
```

```
 1        A.   He works in our department.  He works

 2   remotely in New York.

 3        Q.   So he's able to access these programs like

 4   TPS and Remedy and the O drive from wherever it is

 5   that he is?

 6        A.   We have a broker location, which is a sales

 7   location, in New York.

 8        Q.   Is -- does he report to you?

 9        A.   Yes.

10        Q.   Now, this looks to be -- and the subject

11   line is 825257.  Is that a customer number?

12        A.   It appears like it is one.

13        Q.   What do you understand this e-mail exchange

14   to be?

15        A.   So it seems to be that they're saying they

16   don't have this information.

17        Q.   And he would be asking about this because

18   there may have been an order that he needed to

19   review and potentially approve or deny?

20        A.   That's what it says.

21        Q.   And he says there is no CQ.  CQ is customer

22   questionnaire; is that right?

23        A.   Correct.

24        Q.   And DD is what?

25        A.   Dispensing data.
```

1    Q.   And that's part of the "know your customer"

2    materials that you talked about before, right?

3    A.   Yes.

4    Q.   The type of information you base these

5    decisions on?

6    A.   Right.

7    Q.   So for this customer, there is none of this

8    information on file?

9    A.   That's not necessarily the case.  So these

10   two were most likely talking about this in 2012

11   because they weren't typically involved directly

12   with some of the chains.  So a lot of information

13   and background, rather than it being in the system

14   on a customer level, was actually filed away on a

15   corporate level.

16   Q.   It was in a different place, so that some

17   people in compliance didn't have access to it?

18   A.   No.  Everybody has access to it, but they

19   may or may not have known it was there.  I would

20   have to research it to find out.

21   Q.   Oh.

22   A.   I think he's indicating that looking at this

23   account number, he's not seeing that based on the

24   customer flags.  But I am not sure, without looking

25   at it, if they were aware or not aware if something

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was there or located for the group.

 2        Q.   So when you say "customer flags," do you

 3    mean those flags in, like, TPS and Cognos that you

 4    talked about before?

 5        A.   The flags indicating, yes, it shows that we

 6    have a customer questionnaire or, yes, we have

 7    dispensing data.  But that does not necessarily

 8    indicate that we did not have it if it was not

 9    flagged.

10        Q.   So the flag in one of those systems, like

11    TPS or Cognos, could be wrong and not reflective of

12    what you actually have in the system?

13        A.   It's possible that you could have had

14    something on the corporate level that was saved that

15    was not indicated on the individual level.

16        Q.   Okay.  I understand.  But -- so this is an

17    exchange in helping James understand how to look at

18    this better, then, right?

19        A.   I think he was asking for more of a

20    familiarity of chains, because he was not directly

21    involved with chains.  Yet he was monitoring

22    suspicious orders.  And so that's what it seems like

23    it's asking.

24        Q.   And that's really what Mary Barber's e-mail

25    to him says, is that this is a chain, right?
```

```
 1      A.   Yes.

 2      Q.   And then he asks:  Can I get a list of the

 3  chains we're okay with selling controls to, so on

 4  the nights I'm watching SOMs, I can just release the

 5  orders.

 6           Do you know if there was a list?

 7      A.   No.  He was asking for more of an

 8  understanding of the corporate chain review process.

 9      Q.   So James -- James's position was what at

10  this point?

11      A.   He's been with the company 25-plus years,

12  and he's had a number of different titles.  At this

13  point in time, in 2012, he was the manager of

14  facility services.

15           In New York we used to have a distribution

16  center.  We no longer do.  It's a broker facility.

17  Jim was kept with the company, and he transitioned

18  into a compliance role at some point prior to me

19  coming into the department.

20      Q.   You were in the compliance department in

21  2012, though, right?

22      A.   Yes.

23      Q.   So -- but he was still -- he was doing

24  things with the compliance --

25      A.   Yes.
```

```
1      Q.   -- department at this point?

2      A.   Yes.

3      Q.   And we'll try not to talk over each other

4   again.

5           The -- so would you have considered him a

6   member of your department at this point?

7      A.   Yes.

8      Q.   Even though he was the -- his official

9   title, it looks like, was manager of facilitation --

10  facilities services.

11     A.   Correct.

12     Q.   Were there other people that had titles not

13  related to compliance that you considered members of

14  your department?

15     A.   Jim.

16     Q.   Jim was sort of the outlier?

17     A.   Yes.

18     Q.   The exception.  Okay.  And so it looks like

19  Jim was doing suspicious order monitoring on a

20  fairly regular basis, right?

21     A.   At this point in time, on this e-mail, yes,

22  he's indicating he's doing it.

23     Q.   So when he says "when I'm watching the SOM

24  system," what -- what do you understand that to

25  mean?
```

Highly Confidential – Subject to Further Confidentiality Review

```
1        A.   That he's monitoring the electronic end of

2   the suspicious order monitoring.

3        Q.   So earlier, you described that as orders

4   that would have come in through Remedy that maybe

5   were flagged by the system in some way or another?

6        A.   No.

7             MS. KOSKI:  Object to form.

8        Q.   Okay.  Maybe I misunderstood.  Can you

9   explain to me what you mean by that, then?

10       A.   This is the monitoring of the orders as they

11  are placed, but we're monitoring -- monitoring

12  customers as well up front.

13       Q.   So suspicious order monitoring -- let's just

14  back up for a second, then.  SOMS --

15       A.   Uh-huh.

16       Q.   -- stands for suspicious order monitoring

17  system; is that right?

18       A.   Yes.

19       Q.   So when I say suspicious order monitoring

20  system -- let's assume that we're in 2012 -- what

21  does that mean to you?  What does that entail?

22       A.   He was reviewing the orders.

23       Q.   So you said that it's a review of the

24  orders?

25       A.   Uh-huh.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.    Yes?

2       A.    Yes.

3       Q.    And those would come through Remedy?

4             MS. KOSKI:  Object to form.

5       A.    No.

6       Q.    No?

7       A.    No.

8       Q.    Where would they come from?

9       A.    The electronic ordering system.

10      Q.    Oh, the CSOS that we talked about?

11      A.    No.

12      Q.    No?

13      A.    No.  Electronic ordering meaning what was in

14  place to detect orders of interest.

15      Q.    What program would have done that?

16      A.    We had a legacy suspicious order monitoring

17  system at this point in time, in 2012, through TPS.

18      Q.    So that was part of TPS at this point?

19      A.    Yes.

20      Q.    So the SOMS system -- or the SOM system in

21  2012 that he was watching was TPS, right?

22      A.    Correct.

23      Q.    So what did that mean, that he was watching

24  the SOM system?  Was that something that somebody in

25  compliance would do on a regular basis?
```

Highly Confidential - Subject to Further Confidentiality Review

███  ███  ████████████████████████

███  ██████████████████████████████

███  ████████████████████████

███  ███  ████████████████

███  ███  █████████████████████████

6    Q.   And so is that still the case today?

7    A.   Yes.

8    Q.   So if an order comes in, presumably it's

9    being looked at by somebody in the compliance

10   department, right?

11   A.   Correct.

12   Q.   And that was from at least 2012 on?

13   A.   Yes.

14   Q.   Was that always the case since you've been

15   in the compliance department?

16   A.   I'm not aware.  I wasn't directly involved

17   immediately in that area.

18   Q.   When did you become aware of the suspicious

19   order monitoring system process?

20   A.   I don't recall exactly.  It wasn't

21   immediately.

22   Q.   So when it was you and Michael and Emily in

23   charge of the controlled substance compliance, you

24   were not aware of the suspicious order monitoring

25   system at first?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Not immediately.

 2      Q.   How long would you say before you became

 3   aware of it?

 4      A.   I don't recall.

 5      Q.   Do you remember who made you aware of it?

 6      A.   I don't recall.

 7      Q.   Do you remember getting any training about

 8   it?

 9      A.   At the time I became aware, of course, there

10   would be training on how to review the orders, yes.

11      Q.   Do you know who did that for you?

12      A.   Most likely it was Emily Schultz.

13      Q.   Do you remember what she told you or what

14   that training consisted of?

15      A.   I don't remember what she told me.  I know

16   what it consists of today.

17      Q.   Let's stay focused back in 2012 for a

18   second, because I think with Buzzeo, it's a very

19   different --

20      A.   Uh-huh.

21      Q.   -- time today than it was then.  Is that

22   fair?

23           MS. KOSKI:  Object to form.

24      A.   They were just two different systems.

25      Q.   Different, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.    They were -- one was legacy in-house TPS and
 2    the other is a different system, cloud-based system,
 3    yes.
 4       Q.    When you say legacy, what do you mean?
 5       A.    Meaning that that was built internally
 6    through the TPS system, legacy meaning that that is
 7    no longer what is used today.
 8       Q.    Old?
 9       A.    Previous to what we're using today.
10       Q.    So in this particular circumstance, Jim --
11    Jim, I think you called him?
12       A.    Yes.
13       Q.    Do you call him Jim or James -- Jim.  Okay.
14    He was watching SOM systems so he could release the
15    orders.  Was that something you had done at this
16    point, was watch the SOM -- SOM system?
17       A.    I honestly don't recall when I became
18    involved with that.
19       Q.    Well, you're on this e-mail chain, right?
20       A.    Yes.
21       Q.    And he is addressing this both to you and
22    Mary Barber?
23       A.    Yes.
24       Q.    And you and Mary Barber had the same
25    position at this point, I think we talked about?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I was analyzing customers in the same way,

2   but I had a different position at that point.

3        Q.   What was that?

4        A.   I was a senior analyst, but we did work

5   alongside each other, yes.

6        Q.   So what was the difference between a senior

7   analyst and regular analyst?

8        A.   Reporting.

9        Q.   What do you mean?

10       A.   I was reporting, I was auditing, I was doing

11  different things.

12       Q.   You had more responsibility?

13       A.   I was working on a different set of

14  responsibilities.

15       Q.   Did you continue to do the things you did as

16  an analyst, as a senior analyst?

17       A.   I was reviewing customers, yes, but I wasn't

18  reviewing them as a sales-initiated request in

19  Remedy primary -- as my primary job.

20       Q.   You were looking at them with a different

21  lens, per se?

22       A.   No.  I was reviewing Anda's customer base in

23  the aggregate.

24       Q.   We'll come back to that in a second.

25  When --
```

```
 1              MS. KOSKI:  Do you need a break?

 2         I'm just -- sorry.  I'm just asking if she

 3         needs a break, because she's looking at me.

 4         But --

 5              THE WITNESS:  No.

 6              MS. KOSKI:  -- maybe she's just looking at

 7         the screen.  Sorry.  Maybe at 3:00 we can do a

 8         break.  Is that a good stopping point?

 9              MS. ELLIS:  Assuming that we're not in the

10         middle of a question.

11    BY MS. ELLIS:

12         Q.  So when you're watching the SOM system, you

13    don't know if you had done it at this point in two

14    thousand and -- October of 2012 or not, but you know

15    you have -- you have done it at some point, right?

16         A.  Yes.  I just don't recall when I -- when I

17    started doing it.

18         Q.  Okay.  Well, when you started doing it, what

19    did that mean, watching the system so you can

20    release the order?

21         A.  I stated earlier, he's saying that he's

22    working in the evenings, and he's monitoring orders

23    of interest in the evenings.

24         Q.  Okay.

25         A.  So --
```

```
1          Q.   So what is -- what does that mean?  Like,

2     what steps go into monitoring an order of interest,

3     whether it's in the evening or during the day?

4          A.   He's saying that if an order of interest is

5     put aside to review using the suspicious order

6     monitoring system, he wants to be more familiarized

7     with chains.  That's his ask.

8          Q.   Let's just step away from this document for

9     a second, because I understand his ask.  But what

10    I'm trying to understand is what that process looked

11    like.

12              So TPS, the legacy system that you talked

13    about --

14         A.   Uh-huh.

15         Q.   -- before, would flag an order, right?

16         A.   Uh-huh.

17         Q.   Yes?

18         A.   Yes.

19         Q.   Okay.  And that order would be flagged as

20    potentially suspicious, correct?

21         A.   An order of interest, yes.

22         Q.   An order of interest.  What's the difference

23    between order of interest and suspicious?

24         A.   Suspicious means that you've determined that

25    the order is suspicious after review.  An order of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    interest is something that you need to look into to

 2    make that determination.

 3        Q.   Where do those terms come from?

 4        A.   That's the way we refer to it.

 5        Q.   Anda?

 6        A.   Yes.

 7        Q.   Were you told -- were you trained in that

 8    manner, to differentiate between an order of

 9    interest and a suspicious order?

10        A.   No.

11        Q.   Where did you get that language from?

12        A.   Because every order that is held is

13    obviously not suspicious.

14        Q.   Okay.  Is that written down somewhere or --

15        A.   No.  It's just a fact that every order that

16    is held is not suspicious.

17        Q.   But it potentially is, and it needs to be

18    reviewed, right?

19        A.   Right.  That's why it's of interest.

20        Q.   So an order of interest is determined by

21    some automated method in TPS, right?

22        A.   Yes.

23        Q.   Do you know what that method was that

24    determined an order to be an order of interest, as

25    you call it?
```

```
 1        A.   I was not a part of the implementation or

 2   the programming of that system.

 3        Q.   Fair enough.  But do you -- do you know what

 4   it was within the system that would cause an order

 5   to be held and called of interest?

 6        A.   I'm not aware of the exact criteria that was

 7   programmed, but I believe it was looking at

 8   patterns, and it was looking at frequency and

 9   different factors.

10        Q.   Were you trained on that as a compliance

11   analyst?

12        A.   As -- the suspicious order monitoring?  At

13   the point that I did become involved, yes.

14        Q.   But sitting here today, you can't tell me

15   what would have triggered the system to put some --

16   a particular order into an order of interest

17   category?

18        A.   The system was programmed to detect anything

19   that was unusual, size, pattern, or frequency.

20        Q.   TPS was programmed in that way?

21        A.   Correct.

22        Q.   Do you know what the specifics of those

23   equations were?

24        A.   I do not because I was not a part of the

25   programming.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1     Q.   Do you know if those were written down

2  anywhere?

3     A.   I am unaware.

4     Q.   Do you know who was part of the programming?

5     A.   I believe it was Michael Cochrane.

6     Q.   Do you know when that programming was done?

7     A.   I do not know the exact time.

8     Q.   Was it done prior to you joining the

9  compliance department?

10    A.   I do not know.

11    Q.   Was it done when you joined the compliance

12 department, or was that happening as you were

13 joining?

14    A.   I wasn't a part of the suspicious order

15 monitoring immediately, so I don't know that.  I

16 knew it existed when I became involved with it.

17    Q.   And again, you don't remember when you

18 became involved?

19    A.   I don't remember.

20    Q.   Is there anything that would refresh your --

21 refresh your recollection as to when you became

22 involved in that?

23    A.   No.

24    Q.   When somebody was watching the suspicious

25 order monitoring system within TPS, would they have
```

1    to -- well, strike that.  I'll get to that question

2    in a moment.

3           What were the steps that a person watching

4    the suspicious order monitoring step -- system would

5    do at this point within TPS in order to potentially

6    release the order?

7        A.   What we do look at is the customer's sales

8    history with Anda to determine what type of a

9    customer it is with Anda.  Is this a customer that

10   is buying controls, noncontrols?  Do they come to

11   Anda specifically for certain items that were

12   indicated on the front end?  We look at due

13   diligence.

14       Q.   And you would look at those for each order

15   to determine if that order was just of interest or

16   if it was potentially suspicious?

17       A.   It's usual that you should look at what

18   information you have pertaining to that customer.

19       Q.   Usual meaning that's what's expected?

20       A.   That's what should be done when you're

21   researching something, is to research what you have.

22       Q.   So looking at this, would you expect Jim to

23   do research on each individual order that was

24   flagged as of interest in TPS?

25       A.   He's indicating that he wants to know what

```
 1    corporate chains have been reviewed by compliance,

 2    so that he's aware.

 3        Q.   I understand.

 4        A.   Yeah.

 5        Q.   But I -- what I was asking --

 6        A.   Yeah.

 7        Q.   -- was a little bit different.

 8        A.   Okay.

 9        Q.   It was:  What did you understand Jim to be

10    doing when he was looking at each of these

11    suspicious orders in the system?

12        A.   I really can't, like, answer that.  I don't

13    know what he was doing.  I just know what he was

14    asking.

15        Q.   Okay.  Let me ask it a different way.  When

16    you would look at the suspicious orders -- or orders

17    of interest, rather, held in TPS, whenever it was

18    that you became involved, would you go back and look

19    at the customer questionnaire and the sales history

20    and the dispense data and any other due diligence

21    materials that were on file before determining

22    whether to release that order or not?

23        A.   There's a number of different ways that

24    things are looked at.  Yes, that would be one

25    approach.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   What are the other ways?

2        A.   The other approach is, under the assumption

3   that a customer was already reviewed on the front

4   end and that they already went through a thorough

5   review process, they were already given very

6   conservative limits to buy, period, and then

7   understanding our secondary position, so that on the

8   third step, if an order was on hold as an order of

9   interest, you would then be looking at what they

10  ordered.

11       Q.   Okay.  So if I understand you correctly, the

12  research could be done very thoroughly on the front

13  end, right?

14       A.   Right.

15       Q.   And you said that's often the case with

16  chains because of the business relationship and

17  because there is numerous stores, right?

18       A.   It's been the case since I've been in the

19  department on the front end with any new customers

20  to controls, yes.

21       Q.   That on the front end, the initial review is

22  so thorough that you don't necessarily need to do as

23  thorough of a review on the back end for the

24  individual orders?

25       A.   I'm not indicating that.  I'm saying that
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    you've already approved that this customer can buy.

2    You've limited what they're allowed to buy, and then

3    you're then reviewing what they are buying.

4        Q.   And so you might be more lenient when it

5    comes to determining whether an order is suspicious

6    or not based on your previous approval?

7        A.   I wouldn't --

8             MS. KOSKI:  Object to form.

9             Sorry.  Go ahead.

10       A.   I wouldn't use the term "lenient."

11       Q.   What term would you use?

12       A.   I would say that there may be a familiarity

13   with the customer based on the review that you --

14   that's already taken place.

15       Q.   So you may be more comfortable with the

16   orders that are coming in and tagged by the system

17   as potentially of interest because of the

18   information that you've gathered up front?

19       A.   If there was a comfort -- assuming that

20   there was a comfort with the customer, you would --

21   unless there was something to indicate that the

22   order was suspicious and make you uncomfortable,

23   that's why we're researching it, yes.

24       Q.   So that brings us back to Exhibit 7.  Did

25   you understand the legacy TPS system as identifying
```

Highly Confidential - Subject to Further Confidentiality Review

1    potentially uncomfortable orders as -- using your

2    language?

3        A.   We had -- that system was flagging orders of

4    interest, and there could potentially be an order

5    that needed looked into as potentially being

6    suspicious, yes.

7        Q.   Are there reasons why you wouldn't look at

8    one of those orders flagged by the system as being

9    potentially suspicious?

19       Q.   So let's just back up for a second.  My

20   understanding, based on your testimony today, is

21   that within TPS, Cognos, and I think Remedy, you

22   said, a customer might be screened or flagged "yes"

23   or "no" for controls; is that right?

24       A.   The -- Remedy is not where a customer is

25   flagged.  Remedy is a task management system for

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sales reps to make a request to us.  But a customer

 2    would be flagged in TPS.

 3        Q.   So a customer would be flagged "yes" or "no"

 4    for controls in TPS, right?

 5        A.   Yes.

 6        Q.   And that flag and ability to purchase

 7    controls would be based on this initial upfront

 8    information that you've just been talking about,

 9    right?

10        A.   From the time I've been there, yes.

11        Q.   And you said you've been very comfortable

12    with the information that you've gathered up front

13    from the time that you've been there, right?

14        A.   I can't speak to a specific example going

15    back this far, but I know that we've been reviewing

16    new customers to controls with that information.

17        Q.   And based on that information, you wouldn't

18    be as concerned that a particular order was

19    suspicious because you had already done the review

20    at the front end, right?

21        A.   I wouldn't use the term "as concerned."  I

22    would say that you already had a comfort level with

23    a customer and what you had allowed, and then you

24    would need to take another look at what is pending

25    based on what you have already made available to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them.
 2        Q.   So the other look was triggered by TPS --
 3        A.   Right.
 4        Q.   -- using some sort of equation that you
 5    don't know what it was, you said before, right?
 6        A.   Right.
 7        Q.   You said it might be frequency or --
 8        A.   Size.
 9        Q.   -- size or something like that?
10        A.   Yes.
11        Q.   All right.  And then depending on your
12    comfort level with that customer, your research into
13    whether or not that order of interest should be
14    suspicious or not might look different?
15        A.   No.  So you're -- you have an awareness of
16    who you are comfortable with as a customer, and then
17    you're looking at what they are ordering for sure.
18    But it depends on what it is that they're ordering
19    that stands out as being something you need to look
20    into more, because there's already a few different
21    limitations and checks in place.
22        Q.   So would those be some of the things that
23    might cause TPS to flag an order of interest?
24        A.   Whatever was behind the scenes flagging it
25    as something that needed looked into.
```

```
 1       Q.   And then if it were flagged, you would,

 2   coming back to where we started this line of

 3   questioning, do certain research into that customer

 4   to determine if it was, in fact, potentially

 5   suspicious, right?

 6       A.   Yes.

 7       Q.   And that would include looking at the due

 8   diligence information such as customer

 9   questionnaire, right?

10       A.   It -- you could do that, yes.

11       Q.   You -- and the dispense data?

12       A.   Yes.

13       Q.   And the sales data?

14       A.   Yes.

15       Q.   And whatever customer notes might be in TPS?

16       A.   Correct.

17       Q.   And some of the other things that we've

18   talked about, you said it might look different in

19   each situation?

20       A.   Correct.

21       Q.   And this would up -- be up to an analyst to

22   decide what process that they wanted to follow for

23   each of those orders?

24       A.   Not up to the analyst to decide what process

25   they want to follow, but for the analyst to
```

```
 1    determine where the information is to do their

 2    research for each of those customers and what

 3    information is available.

 4        Q.   Okay.  So at this point, that's what Jim is

 5    asking.  He's doing that research, right?

 6        A.   He's asking for more of a familiarity with

 7    chain reviews.  He was not directly involved with

 8    the front end of chain reviews at this point in

 9    time.

10        Q.   Yet he's still reviewing the orders from

11    those chains here, right?

12        A.   He's indicating that he wants to be more

13    familiar while working from -- in the evenings on

14    the suspicious order monitoring.

15        Q.   At this point in time, are you aware of

16    whether Jim could release orders or not?

17        A.   I'm not aware.

18        Q.   His language in this e-mail would indicate

19    that he was, though; you would agree, right?

20        A.   His language is indicating that he's

21    monitoring.

22        Q.   And that he can potentially release the

23    order, right?

24        A.   Potentially, yes.

25        Q.   Do you remember any correspondence related
```

```
1    to this?

2        A.   I don't recall.

3        Q.   We'll take a break in just a second here,

4    but I want to just finish this line of questioning.

5             (Anda - Solis Exhibit 8 was marked for

6    identification.)

7    BY MS. ELLIS:

8        Q.   I'm handing you what's been marked as

9    Exhibit 8.  This is beginning Bates Number

10   Anda_Opioids_MDL_421668.  This appears to be an

11   e-mail chain starting on December 11th, 2012,

12   related to Safeway.  It looks like you are looped

13   into this chain on the 19th, about a week later.

14           Is Safeway a chain customer of Anda's that

15   you're familiar with?

16       A.   Yes.

17       Q.   And here it says that they are looking to

18   buy about four bottles of generic Percocet, but

19   they're blocked in the system.

20           So this is -- these are the limits that you

21   were talking about earlier, right?

22       A.   Correct.

23       Q.   So whatever had happened on the front end

24   with Safeway had basically led compliance to set a

25   limit of no Percocet, it appears, or something less
```

```
 1    than four bottles of Percocet, right?

 2        A.   Right.

 3        Q.   And they've come to compliance through the

 4    sales rep, as you talked about before, right?

 5        A.   Right.

 6        Q.   To request more, correct?

 7        A.   Yes.

 8        Q.   And so in this circumstance, you first

 9    approved the order, right?

10        A.   It looks like, yes, that happened.

11        Q.   But then the next thing that you say is that

12    you don't have any information on file for the

13    chain?

14        A.   Yes.

15        Q.   You've requested the information a couple of

16    times, but you don't have it?

17        A.   Right.

18        Q.   So in this case, you didn't have due

19    diligence -- or dispense data for the chain before

20    you released this order?

21        A.   No.  It seems to be indicating it may be on

22    the store level.  I don't know if -- I said I didn't

23    have any on file for the chain.

24             MS. ELLIS:  Okay.  We can take a break.

25             THE VIDEOGRAPHER:  Off the video record at
```

```
 1      2:59.

 2           (Recess from 2:59 p.m. until 3:25 p.m.)

 3           THE VIDEOGRAPHER:  The time is 3:25 p.m.

 4      We're now back on the video record.

 5  BY MS. ELLIS:

 6      Q.   A moment ago we were talking about the

 7  suspicious order monitoring system.  Do you recall?

 8      A.   Yes.

 9      Q.   And in the e-mail we just were going over,

10  Exhibit 8, there's a reference to the bucket, I

11  believe, or if I say "the bucket," what is -- what

12  does that mean to you?

13      A.   The suspicious order monitoring queue.

14      Q.   Within TPS?

15      A.   If it was in 2012, it was within TPS.

16      Q.   And is that still a term that's used at Anda

17  today, the bucket?

18      A.   Yes.

19      Q.   And so what -- if somebody were to say,

20  these orders are in the bucket, we need to deal with

21  them, what does that mean to you?

22      A.   I don't know what "deal with them" means.  I

23  would assume it's saying they need reviewed.

24      Q.   Okay.  So if an order is in the bucket, it

25  needs -- it would mean that it needs to be reviewed?
```

```
 1      A.   Yes.

 2      Q.   And the review could take on, as we talked

 3   about at length, a couple of different forms,

 4   looking at the research that Anda has on file,

 5   right?

 6      A.   Yes.

 7      Q.   Including dispense data, yes?

 8      A.   Yes.

 9      Q.   The customer questionnaire?

10      A.   Yes.

11      Q.   Potentially asking the customer more

12   questions through the sales rep, right?

13      A.   Yes.

14      Q.   And that was something that you said was

15   ideal to do in all circumstances where you look at

16   an order of interest, right?

17      A.   Yes.

18      Q.   So orders of interest are in the bucket,

19   right?

20      A.   Right.

21      Q.   So an order of interest, according to

22   compliance standards at Anda, needed to be reviewed

23   before -- so that it could be determined if it was

24   suspicious or not, right?

25      A.   Yes.
```

1      Q.   And without that review, Anda policy was not

2   to fill that order; is that right?

3      A.   Please help me understand the point of what

4   you're saying.

5      Q.   Well, just walk me through what happens when

6   something goes into the bucket.  So an order goes

7   into the bucket.

8      A.   Right.

9      Q.   What happens to that order next?

10      A.   You look at what is being ordered, what is

11   the SKU, what is the item, what is the quantity, who

12   is the customer.

13      Q.   So customer would look at the order -- or,

14   I'm sorry, compliance would look at the order,

15   right?

16      A.   Yes.

17      Q.   And then from there they would make a

18   determination to either release it, correct?

19      A.   Correct.

20      Q.   And that means that the order would be

21   filled and would be shipped, right?

22      A.   Yes.

23      Q.   Or determine that perhaps more research was

24   needed, right?

25      A.   Right.

1    Q.   In which case it would continue to be held,

2    yes?

3    A.   Yes.

4    Q.   Or potentially determine that it was

5    suspicious, right?

6    A.   Yes.

7    Q.   And that was all according to Anda

8    compliance policy, right?

9    A.   Yes.

10   Q.   In furtherance of the goals of upholding the

11   regulatory environment that Anda was operating in,

12   right?

13   A.   Those are guidelines for reviewing a

14   customer, yes.

15   Q.   Guidelines, because that's the goals of what

16   the compliance department does, as you testified to

17   before, right?

18   A.   Yes.

19   Q.   Now, how long -- it sounds like there is a

20   couple of steps that are involved in reviewing an

21   order of interest in the bucket, right?

22   A.   Yes.

23   Q.   It could take some time?

24   A.   It can.

25   Q.   What's the longest you've ever spent

Highly Confidential - Subject to Further Confidentiality Review

```
1    reviewing an order?

2         MS. KOSKI:  Object to form.

3    A.   I don't know what the longest time is that

4    I've reviewed something.

5    Q.   Have you ever spent more than three hours

6    reviewing an order?

7    A.   An order can be reviewed for three days.

8    Q.   Have you ever spent more than three days

9    reviewing an order?

10   A.   I don't recall off the top of my head.  It's

11   possible.

12   Q.   Have you ever spent more than two weeks

13   reviewing an order?

14   A.   Not that I'm aware of.

15   Q.   Have you ever spent more than a week

16   reviewing an order?

17   A.   I'm not aware of --

18   Q.   Have you ever spent more than -- do you ever

19   recall spending more than five days reviewing an

20   order?

21   A.   Not that I remember.

22   Q.   Do you remember spending more than three

23   days reviewing an order?

24   A.   If information is requested from a customer,

25   our department has to wait for the customer to
```

```
 1    respond.  So typically, as is today, if we give a

 2    customer three days to respond, usually, before we

 3    make a determination.

 4           In the past, I don't know how long it

 5    could -- would have been.

 6    Q.   So today it would be three days; is that

 7    fair?

 8    A.   They have up to three days, yes.

 9    Q.   In the past it could have been longer, but

10    you don't know for sure?

11    A.   I don't know.

12    Q.   What's the least amount of time that it

13    might take you to review an order?

14           MS. KOSKI:  Object to form.

15    A.   I don't know that.

16    Q.   Could you do it in an instant?  Can -- have

17    you ever looked at an order and just known this

18    is -- this is okay, it's not suspicious?

19           MS. KOSKI:  Object to form.

20    A.   There -- being a secondary supplier, and

21    there's so much review already up front, you can

22    look at what you've already approved and allowed,

23    and you can look at the items and the quantities,

24    and you can make a determination of what you feel

25    needs to be looked into more and could potentially
```

1    be suspicious.

2        Q.   So no matter the order, you've said a few

3    things that you look at every time.  One, you figure

4    out who the customer is, right?

5        A.   Right.

6        Q.   And you either have familiarity with that

7    customer as an analyst or you don't, right?

8        A.   Right.

9        Q.   Sorry, let's try not to talk over each

10   other.

11       A.   Sorry.

12       Q.   I know it's a long day, but we'll try to

13   stay with the rules we agreed on.

14            So you can -- you have to determine whether

15   you're familiar with that customer or not, right?

16       A.   Yes.

17       Q.   You would almost always look at what was on

18   file for that customer?

19       A.   You're also looking at the item being

20   purchased, the reason it's being held, and the

21   quantity of what they're purchasing.

22       Q.   Within TPS, when an order is viewed in the,

23   quote-unquote, bucket, does it give a reason that

24   the order is being held?

25       A.   There used to be a code, and I don't know

1    off the top of my head what that code represented,

2    but there was a hold code.

3        Q.   Were there different hold codes depending on

4    the reason that an order was held as of interest?

5        A.   It had to do with the programming that it

6    would be flagged to hold, yes.

7        Q.   So I guess by way of example, you had said a

8    couple of things earlier that an order might have

9    held of interest, although you weren't sure the

10   exact equation, that it might be a higher quantity,

11   right?

12       A.   Right.

13       Q.   Or it could be a different frequency, right?

14       A.   Yes.

15       Q.   Would that be two separate codes in TPS, or

16   would there be something you could look at in TPS

17   and the bucket to tell you which one of those two

18   things it was?

19       A.   There was -- the way it was programmed is if

20   a line item was held, there was a reason code.

21       Q.   And that -- there were multiple reasons,

22   right?

23       A.   Yes.

24       Q.   Do you know how many reasons there were?

25       A.   I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Do you know if a report could have been run

2    off of those reason codes for items that were held?

3    A.   There -- if it was in TPS, and there was a

4    reason code, I assume that that could be pulled out.

5    Q.   That could be made into a report?

6    A.   Yes.

7    Q.   Did you ever make that into a report?

8    A.   I don't recall.

9    Q.   Do you know if anybody else ever made that

10   into a report, why items were being held?

11   A.   Anything can be made into a report if it's

12   requested.

13   Q.   So if the data is in TPS, and there's a

14   separate field for it, it can be made into a report?

15   A.   Any -- any field can be reported on, yes.

16   Q.   And that can be done with a combination of

17   reports, right?

18   A.   Yes.

19   Q.   I'm sorry.  A combination of fields, not

20   reports.

21   A.   Combination of fields, yes.

22   Q.   And you do that in cooperation with IT,

23   correct?

24   A.   Yes.

25   Q.   All right.  So you weren't able to say, you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    know, that you could just release an order in an
 2    instant.  Would you say that the least amount of
 3    time it might take to review an order of interest is
 4    five minutes?
 5        A.   I think that we don't look at it as a time
 6    frame, like speeding through something.  We have a
 7    familiarity with what passes through the department,
 8    and we're focusing on -- we have a very high volume
 9    of customers, and we're looking at what is the item
10    that's flagging, what is the reason, and who is the
11    customer.
12             So, for example, in today's world, a
13    customer's first order for the first 30 days is in
14    there.  So you can tell that that is a first-time
15    order on someone that you just reviewed and you just
16    approved.
17             So I wouldn't say that anything is speedily
18    done.  It's looking at all of those factors and
19    deciding how much it needs looked into.
20        Q.   Is there a -- so you do that for every order
21    that you look at, right?
22        A.   You're -- you're looking at all of those
23    factors.
24        Q.   Is there a time frame in which you -- and I
25    guess I'll differentiate time frame here, because it
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    seems like you're differentiating between today's

 2    world, which I guess would be post-Buzzeo.  Is that

 3    fair to say?

 4        A.   Yes.

 5        Q.   And pre-Buzzeo?

 6        A.   Yes.

 7        Q.   Okay.  So in the pre-Buzzeo world, was there

 8    a time frame in which you, as in the compliance

 9    department, told customers you would review and

10    potentially release orders in or guaranteed to do

11    that in?

12        A.   I don't recall.

13        Q.   Is there anything that would help refresh

14    your recollection?

15        A.   Possibly.

16        Q.   What would that be?

17        A.   Going back into that place and time.  I

18    don't recall if we -- if we responded in a certain

19    way.  I know today it's three days.

20        Q.   But you don't -- do you remember any other

21    limit besides three days and that you gave customers

22    to tell them when they could expect to hear about an

23    order that might be flagged of interest?

24        A.   I don't recall going back that far.

25        Q.   Okay.  So anywhere between five minutes and
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    three days, it's fair to say, it might take an order

2    to be reviewed; is that fair?

3            MS. KOSKI:  Object to form.

4       A.   I really can't calculate that.  It depends

5    on -- every situation is different.

6       Q.   Okay.  I understand that.

7       A.   Yeah.

8       Q.   I'm trying to account for all of the

9    situations, then, and understand that there is a

10   variance and -- you said it's not done in an instant

11   because you have to do those steps that we just went

12   through, realizing who the customer is, right?

13      A.   Right.

14      Q.   Thinking about what you have in your own

15   head, as an analyst, about what is on file for that

16   customer, right?

17      A.   I wouldn't say it's in my own head, but I

18   would say if you have an awareness and you recently

19   reviewed them, then you know what you just reviewed,

20   yes.

21      Q.   So at the very least, those two things you

22   have to be able to recognize when you see an order

23   of interest, right?

24      A.   Yes.

25      Q.   So that takes, would you say, fair to say, a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    minute?

 2        A.   To do -- to do which part?

 3        Q.   Just that.

 4        A.   Just to look at the order and say --

 5        Q.   Yeah.

 6        A.   -- is this an order that I consider?  I

 7    think that you can make a quick deduction looking at

 8    the quantity, the customer, the item, and the reason

 9    code.

10        Q.   What's quick?

11        A.   You can say, I need to look into this

12    further, or this doesn't need looked into further.

13        Q.   So could you do that in 30 seconds?

14        A.   I don't know.

15        Q.   Could you do that in 10 seconds?

16        A.   I don't know.

17        Q.   So somewhere between zero seconds and three

18    days is what it would take you to review a potential

19    order of interest; is that fair?

20        A.   Yes.

21        Q.   Would you say it was more the exception or

22    the norm that you would look at orders that were

23    placed by customers who had just become customers of

24    Anda?

25             MS. KOSKI:  Object to form.
```

```
 1        A.    Customers that have just become customers of
 2    Anda, in today's world, always appear because
 3    they're first-time orders.
 4        Q.    What about pre-Buzzeo?
 5        A.    Pre-Buzzeo, I don't recall because I wasn't
 6    a part of that background programming.
 7        Q.    But you were reviewing orders of interest in
 8    TPS at that point.
 9        A.    It -- I think it's important to note I was
10    in that department in '11, and I left in, like, '14.
11    And I worked in another area of compliance.  And so
12    at that point in time when I was in the department,
13    I wasn't in the suspicious order monitoring very
14    often.
15        Q.    But you were doing suspicious order
16    monitoring releases at that point?
17        A.    Few and far between, yes.
18        Q.    Do you think you would have spent more time
19    reviewing particular orders, given the fact that you
20    didn't do it that frequently?
21             MS. KOSKI:  Object to form.
22        A.    Say that again.
23        Q.    You said it was few and far between.  So do
24    you think that meant you would review orders faster
25    or slower than other analysts?
```

```
 1        A.    I don't know.  I don't know where I would

 2   compare to another analyst.  I'm not sure.

 3        Q.    In the period of time between 2011 and 2014,

 4   were there any conversations within the compliance

 5   department about levels of orders that fell into the

 6   bucket and the amount of time that it took to clear

 7   them?

 8        A.    Levels and the time that it took to clear?

 9   I don't -- I don't recall.  I don't know.

10        Q.    So you don't remember whether anybody ever

11   had any concern about whether there were too many

12   orders in a bucket on a given day?

13        A.    Going back in time, there were issues with

14   items that were held in the bucket, and it was

15   different concerns with programming.  So

16   something -- for example, preallocated was holding,

17   and that -- this was a determination by whoever put

18   together the program.  And I don't know why that was

19   done.

20              And so I think why it was done was it would

21   be looked at preallocated and then when it was

22   finally confirmed.

23              What was happening, if I recall back in

24   those days, was that there was a lot that was

25   holding, and it was actually a bad NDC that was not
```

1    even active at Anda, or there was actually no

2    inventory for the orders to ever go out.

3          So there were times where you would have

4    tons and tons and tons of orders because they

5    weren't actual orders, yet they were still holding,

6    and they still needed to be cleared, so you could

7    review the orders that were legitimate.

8    Q.   So was that something that was -- happened

9    regularly, would you say?

10   A.   It did occur because it continued -- so

11   there is different issues that I'm recalling.  One

12   of them was the preallocating point.  And I don't

13   believe -- I think that the upper management made a

14   decision they wanted it to stay that way for

15   whatever they -- reason they wanted to logistically.

16         And then other than that, a bad NDC was a

17   flaw with an item that was in our system.  And I

18   know that that did occur quite often, yes, and they

19   were not real orders.

20   Q.   When you say they weren't real orders, you

21   mean because it wasn't an actual NDC --

22   A.   It could never be fulfilled.  There was

23   never any quantity or the NDC was not a real good

24   NDC with quantity on hand.

25   Q.   How would that get in the system?

```
 1        A.   Because -- it depends on who the customer

 2   is, but if a customer was -- they tried to purchase

 3   an item, and the system would suggest a substitute

 4   or something like that.  And they were directed to

 5   the substitute item, but the item was not a good

 6   item, they continued to be pushed towards that item

 7   that wasn't going to be fulfilled.

 8        (Anda - Solis Exhibit 9 was marked for

 9   identification.)

10   BY MS. ELLIS:

11        Q.   I'm handing you Exhibit 9, marked with

12   Anda_Opioid_MDL Bates Number 339317.

13        A.   Uh-huh.

14        Q.   This is an e-mail from December 9th, 2013,

15   between yourself and Latoya Samuel, who I believe is

16   also Latoya Laroche; is that right?

17        A.   Yes.

18        Q.   Okay.  And this would have been between 2011

19   and 2013 where you were reviewing these orders of

20   interest, as you call them, so that they could be

21   released, right?

22        A.   Yes.

23        Q.   And this e-mail exchange looks like it's an

24   exchange between yourself and Latoya about releasing

25   those orders, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    Yes.

2        Q.    So here, were you and Latoya in the same

3   position at this point?  Do you know?

4        A.    No, we were -- well, we were both analysts.

5   I was a senior analyst, senior analyst.

6        Q.    So you said before that your

7   responsibilities changed as a senior analyst, but it

8   appears from this e-mail that you were still doing

9   reviews of orders of interest at this point, right?

10       A.    Yes, if it was needed.

11       Q.    So in this circumstance, you were -- it

12  appears to have been needed, right?

13       A.    Yes.

14       Q.    You said to her that you'll be out of the

15  office tomorrow, just FYI, because of the Walgreens

16  orders.  Today you released 600 orders.

17       A.    Yes.

18       Q.    Now, those 600 orders all would have needed

19  to be reviewed according to the process that we

20  talked about before, right?

21       A.    Not necessarily, no.

22       Q.    Oh, no?  Why not?

23       A.    Because there are 8,500 Walgreens locations,

24  and I would have to go back into that period of time

25  in context to understand what they were buying and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    why they were buying it.

 2          But for example, in today's world, if

 3    Walgreens comes to you, and there's a particular

 4    market condition, you can see an influx of a lot of

 5    their stores coming your way for the same item.  And

 6    so if you see 900 orders for that same item, you

 7    quickly know what it's about.

 8    Q.   You can't, sitting here today, tell me what

 9    this is, though, right?

10    A.   I don't recall this particular issue with

11    Walgreens.

12    Q.   This is an issue that you said TPS might

13    be -- or is capable of producing reports related to

14    order releases, right?

15    A.   Yes.

16    Q.   So when you put in an order release, or you

17    approved an order for release, would you have put in

18    reason why you released it?

19    A.   There's a code, yes.

20    Q.   And that code would be reported and capable

21    of -- recorded, pardon me, and capable of being

22    reported as well, right?

23    A.   Yes.  That note is within the SOM system,

24    not like a compliance note, yes.

25    Q.   So there's a separate field for an order
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    being released, right?

 2        A.    Correct.

 3        Q.    And so you said you released 600 orders on

 4    December 9th, 2013, and Latoya responds back that

 5    she released about 300 later that evening; is that

 6    right?

 7        A.    Yes.

 8        Q.    Sitting here today, those numbers don't

 9    concern you, though?

10        A.    No.

11              (Anda - Solis Exhibit 10 was marked for

12    identification.)

13    BY MS. ELLIS:

14        Q.    I'm going to hand you Exhibit 10.  This is

15    Anda_Opioids page beginning 339315.  This looks to

16    be a later iteration of this e-mail.  It starts

17    where the last one left off.  You'll see right there

18    that same exchange from Monday, December 9th, 2013,

19    right?

20        A.    Right.

21        Q.    And then you go on to say that you talked to

22    Robert, and that's a scary number of 900.  Hopefully

23    something can be done about that.

24        A.    Right.

25        Q.    Do you remember talking to Robert?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.   I don't recall the situation, but if I said

2    that, it means that we were inundated for probably

3    something that was nonsensical, and it was in the

4    suspicious order monitoring system.

5         Q.   You used the word "scary."

6         A.   Right.

7         Q.   Why was that scary?

8         A.   Because the orders still had to be cleared

9    out of the system in order for us to review all

10   other orders.

11        Q.   And that was taking time, right?

12        A.   900 orders had to be released --

13        Q.   So that --

14        A.   -- whether or not they were a real order or

15   not, and I don't recall.

16        Q.   So that would take some time?

17        A.   Yes.

18        Q.   An order would need to be released

19   individually, right?

20        A.   Assuming that it was an order and not an

21   item that had no inventory or product that was not

22   legitimate, yes.

23        Q.   So what steps would you go through to

24   release an order in the system?

25        A.   You would look --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1           MS. KOSKI:  Object to form.

2           Sorry.  Go ahead.

3    A.    You would look at the customer, the code,

4    the quantity, and the item.

5    Q.    I'm sorry.  That was my mistake.  I should

6    have been more specific in my question.

7    A.    Yeah.

8    Q.    So if you had determined that an order could

9    be released, was there just, like, a field that you

10   coded the reason why you're releasing the order

11   into, or did you push a button?  What did you

12   actually do within TPS so that the order was

13   released?

14   A.    There is -- at that time, going back this

15   far, there was an area where you can select the

16   reason that you're saying it could be cleared.

17   Q.    So you would need to do that for each of the

18   900 orders, right?

19   A.    Yes.

20   Q.    And that's something that would take some

21   time, right?

22   A.    It would take time to release 900 orders,

23   yes.

24   Q.    And so this is something that concerns you

25   at that point, yes?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    The volume, yes.

 2      Q.    And Latoya agreed with you, right?

 3      A.    Yes.

 4      Q.    Do you have Google Alerts set up related to

 5   your job?

 6      A.    Sorry?

 7      Q.    Do you have Google Alerts set up related to

 8   your job?

 9      A.    Yes.

10      Q.    What are they?

11      A.    I don't -- I set this up maybe nine years

12   ago, and it's pertinent to what we do.

13      Q.    Did somebody ask you to do that?

14      A.    I believe when I was hired, yes.

15      Q.    Do you know who asked you?

16      A.    Most likely Michael Cochrane or Emily

17   Schultz.

18      Q.    Do you remember what they said about it?

19      A.    To always know what's going on in the news.

20      Q.    Why?

21      A.    Because it's relevant to what we do.

22      Q.    Why is it -- what importance would the news

23   have to do with your job in compliance?

24      A.    To be aware of the industry as a whole, to

25   be aware of what's going on with the state, with the
```

```
 1    DEA, and with customers.

 2       Q.   So you could do your job better?

 3       A.   To be aware of what's happening in the news,

 4    yes.

 5       Q.   Do you remember -- you don't remember,

 6    sitting here today, what Google Alerts you have set

 7    up?

 8       A.   I would assume that the Google Alerts are

 9    set up to identify DEA-related issues, narcotic

10    issues, control issues, doctor issues.

11       Q.   Did you ever use Google Alerts to identify

12    issues that you might want to look at from a

13    compliance perspective?

14            MS. KOSKI:  Object to form.

15            Go ahead.  Sorry.

16       A.   Yes.

17       Q.   Sitting here today, if I were to ask you to

18    pull up SOP 040.3 that you had mentioned earlier,

19    how -- where would you go to do that?

20       A.   That's -- everything that -- all of our

21    records are saved in the O drive.

22       Q.   Is there a folder or something that they're

23    saved in?

24       A.   Yes.

25       Q.   Do you know what it's called?
```

```
 1      A.    SOP.

 2      Q.    And there's a folder presumably for

 3   different SOPs?

 4      A.    Yes.

 5      Q.    Do -- does that folder include historical

 6   versions of SOPs or previous versions?

 7      A.    I believe so.

 8      Q.    Have you gone in and accessed those at any

 9   point?

10      A.    The historical?

11      Q.    Yeah.

12      A.    I have not looked at the historical.  I was

13   not part of those.

14      Q.    Have you authored an SOP yourself?

15      A.    If -- in my current role, I have only been

16   in this since December of '17, so I have not

17   authored one to date.

18      Q.    Have you been the reviewer on one?

19      A.    I have, yes.

20      Q.    What does that mean?

21      A.    Reviewing to see if there's any pertinent

22   changes that I felt needed added at the time of

23   review.

24      Q.    What is your understanding of how an SOP

25   comes to exist within Anda?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Meaning who authors it?

 2      Q.   Meaning there's some issue that the company

 3   wants to adopt a standard operating procedure for,

 4   what do they do?

 5           MS. KOSKI:  Object to form.

 6      A.   To be honest, I can't even answer that,

 7   because I haven't been a part of that end of it to

 8   this point in time.

 9      Q.   You've been a part of the SOP review

10   process, right?

11      A.   Yes.

12      Q.   You've been responsible for abiding by SOPs,

13   right?

14      A.   Yes.

15      Q.   But you have not authored it, yet, one; is

16   that right?

17      A.   Not that I recall, no.

18      Q.   Okay.  Do you -- do you have any

19   understanding of how an SOP is adopted?

20           MS. KOSKI:  Object to form.

21      A.   I understand that an SOP is adopted so that

22   you have a set of guidelines and procedures that

23   you're identifying are what should be followed.

24      Q.   Okay.  So sitting here today, say you

25   identify some sort of issue within compliance that
```

Highly Confidential - Subject to Further Confidentiality Review

1    you want your compliance team members to follow a

2    certain procedure.  What would you do in order to

3    have a procedure adopted by the company?

4        A.   If it needs to be adopted by the company, it

5    would have to be revised and added.

6        Q.   And how would you do that?

7        A.   Well, when I do do that, it would be

8    initiating the change.

9        Q.   So that's referring to an existing SOP,

10   right?

11       A.   Most likely, yes.

12       Q.   So let's use that as our first example.

13   Let's say you want to make a change to SOP 40 about

14   suspicious order monitoring, sitting here today.

15   What would the first step be that you would take in

16   order to make that change?

17       A.   Hypothetically, it would have to make sense

18   and then be identified as something that you wanted

19   to do going forward.

20       Q.   Okay.  And so you would make a draft,

21   perhaps, of that?

22       A.   Perhaps.

23       Q.   And then what would you do with that draft?

24       A.   I haven't done anything with a draft to this

25   point in time, but if you create a draft, assuming

1    that you want to make it permanent, you would

2    probably take it to different approvals to make it

3    permanent.

4         Q.   Who would need to approve it?

5         A.   Most likely it would be the heads of

6    compliance, meaning, like, a Jay Spellman today.

7         Q.   How would you know who would need to approve

8    it?

9         A.   Well, that sort of a thing, I think, should

10   be approved by multiple people, if it's going to

11   become a company standard.

12        Q.   Are you aware of any written process that

13   Anda has for the development and adoption of SOPs?

14        A.   I'm not familiar with a written process for

15   that.

16        Q.   Are you aware of any -- has anybody told you

17   of any process that Anda has for the development and

18   adoption of SOPs?

19        A.   I am not familiar with that.

20        Q.   Are you, in your current role, responsible

21   for complying with Anda SOPs?

22        A.   In my current role, we're supposed to be

23   cognizant of guidelines, yes.

24        Q.   You're supposed to follow those guidelines,

25   right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   We're supposed to be aware and try to

 2    follow, of course.

 3        Q.   Are there certain guidelines that are more

 4    important in your role now, as manager of compliance

 5    at Anda, than they were, say, when you were in

 6    purchasing?

 7             MS. KOSKI:  Object to form.

 8        A.   I don't -- I don't think anything is more or

 9    less important, but I do think that where you are

10    today versus the past is always going to be

11    different.

12        Q.   All right.  You said you were a DEA analyst

13    from 2011 until 2013; is that right?

14             MS. KOSKI:  Object to form.

15        A.   I believe it was '14 or '15.

16        Q.   Well, you became -- after -- strike that.

17             You were a DEA analyst starting in 2011?

18        A.   Yes.

19        Q.   Right?

20        A.   Uh-huh.

21        Q.   You stayed in that position for a couple

22    years, you said?

23        A.   Yes.

24        Q.   And then what happened?

25        A.   Then I transitioned to the other side of the
```

```
 1    department, which is the regulatory compliance area,

 2    which focuses on the licensing of customers, the

 3    facility licensing of every place that we operate.

 4         Q.   And is that the area that Emily Schultz is

 5    the head of?

 6         A.   Currently, yes.

 7         Q.   And was your title the same at that point?

 8         A.   The title part is very confusing, because

 9    when Teva purchased us -- and I don't remember.  I

10    think it went from a regulatory compliance manager.

11    And even though I was working on the regulatory

12    licensing side when Teva purchased us, they tried to

13    find like titles.  And so they created the title DEA

14    compliance manager, even though I was in the other

15    role.  And they did the same for Emily Schultz.

16         Q.   Meaning Emily Schultz has the same title as

17    you or she --

18         A.   She had a title of, like, a senior or -- I

19    don't know exactly what it was -- senior DEA

20    compliance manager when Teva purchased us and they

21    did the title review, even though prior to Teva

22    purchasing us, we were considered regulatory

23    compliance managers.

24         Q.   So Teva purchased Anda in what year?

25         A.   October of -- is it -- 2016, I believe.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   So prior to that, from 2011 to 2013, you

2   were a DEA compliance analyst dealing with

3   controlled substances, right?

4        A.   I believe it was '11 to maybe '15.

5        Q.   '11 to '15.  And in '15, you transferred to

6   the regulatory compliance side of things, right?

7        A.   Yes.

8        Q.   And you were there from '15 until when?

9        A.   December of 2017.

10       Q.   And then what happened in December of 2017?

11       A.   There was a restructuring of the department,

12  and so I transitioned over to the DEA compliance

13  side.

14       Q.   So back to the area where you had been

15  working up until 2015?

16       A.   Correct.

17       Q.   So you now, again, are responsible for

18  dealing with controlled substances and Anda

19  compliance with applicable rules and regulations?

20       A.   Yes.

21       Q.   And that's been since 2015, right?

22       A.   No.

23       Q.   Or '17, I'm sorry.

24       A.   Yes.

25       Q.   So from -- with the exception of 2015 to
```

```
 1    2017, your entire time in the compliance department

 2    has been dealing with controlled substances?

 3        A.    Yes.

 4        Q.    From 2015 to 2017, what was different about

 5    your job compared to 2011 to 2015, if anything?

 6        A.    Sorry.  So the time that I left the

 7    department and went into the regulatory side, I was

 8    not dealing with controlled substances any longer.

 9    I was dealing with the customers and their licensing

10    and Anda's facility licensing to operate.

11        Q.    Are you aware of whether anybody took your

12    position when you left the department?

13        A.    Nobody took my position, but, however, you

14    had Robert Brown there, who was the director of the

15    department.  Latoya -- actually, no, I stand

16    corrected.  Latoya Samuels was made a senior DEA

17    compliance analyst.  When I -- when I left the

18    department, I became a manager of regulatory

19    compliance, and so she did take my previous title.

20        Q.    Does she hold that title today?

21        A.    So with Teva purchasing us, she -- it --

22    she's doing the same thing, but they gave her

23    another name, a DEA compliance auditor.

24        Q.    And you said Mr. -- or Howard, Howard was

25    the first boss that you had, and then it was Robert
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Brown, right?

 2        A.    The first person that I reported to in that

 3    department was Michael Cochrane.  Howard was brought

 4    into the company.  I never reported under him, and

 5    then I did at some point report under Robert Brown.

 6        Q.    How long between when Howard left the

 7    company and -- do you recall how long of a time

 8    passed between when Howard left the company and

 9    Robert Brown started?

10        A.    I don't recall exactly, but it was a couple

11    of months.

12        Q.    Were you involved in any conversations about

13    the hiring of Robert Brown?

14        A.    I was not.

15        Q.    Were you aware, prior to the time that

16    Robert Brown was hired, that they were looking for

17    somebody to fulfill that position?

18        A.    The job was posted online.

19        Q.    Did you apply for it?

20        A.    No.  It's a director position.

21        Q.    Did you not feel you were qualified for

22    that?

23        A.    I was an analyst at the time.

24        Q.    Do you have any understanding of why Robert

25    Brown left the company?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    There was layoffs with Teva overall when

 2   there was financial issues with the corporation.  He

 3   left at the same time that many other people were

 4   laid off.

 5        Q.    So in 2017, you left the regulatory

 6   environment, and you went back to controlled

 7   compliance; is that right?

 8        A.    Yes.

 9        Q.    Why did you do that?

10        A.    It was a restructuring of the department,

11   and the -- Jay Spellman made the decision.

12        Q.    Was it a promotion?

13        A.    No, it was not.

14        Q.    Are you in the same position now as you were

15   in 2017 when you started?

16        A.    Yes.

17        Q.    And who do you report to now?

18        A.    Jay Spellman.

19        Q.    And does Emily Schultz now still work in

20   regulatory compliance?

21        A.    Yes.

22        Q.    Did she ever do the control side of things?

23        A.    Yes.

24        Q.    When was that?  Do you know?

25        A.    I don't know the exact years, but I would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    say that she was involved until Robert Brown came in
 2    and took over the department.
 3         Q.   Have you ever done any training of others
 4    related to compliance and controlled substances?
 5              MS. KOSKI:  Object to form.
 6         A.   What type of training?
 7         Q.   Well, if I were -- I mean, what do you --
 8    what do you think of when I say training?
 9         A.   Training in the way we review customers and
10    the type of information and, yes, the way the
11    industry works as a whole, we do those sorts of
12    things.
13         Q.   Who do you do those sorts of things for?
14         A.   There's been very few new employees, but if
15    there is a new employee, you would do something like
16    that --
17         Q.   Was that --
18         A.   -- or if they were cross-training.
19         Q.   I'm sorry.  I cut you off.
20              Was that new employees within compliance?
21         A.   Yes.
22         Q.   What about employees within other
23    departments within Anda?
24         A.   We do training related to various things we
25    need to communicate.  Yes, we do something like
```

```
 1    that.

 2         Q.    When is the first time you remember doing a

 3    training for somebody outside of compliance once you

 4    joined the compliance department?

 5         A.    There has been a lot of different sales

 6    training.  I don't recall the first time.  The type

 7    of training that has occurred is explaining what we

 8    need to review a customer, explaining what we're

 9    wanting as a guideline to review people, what's

10    expected, what's expected of communications back to

11    the customer.  That always took place, and it takes

12    place today.

13         Q.    So from 2011 on, that was taking place?

14         A.    Yes.

15         Q.    What form did that take?

16         A.    There's new hire seminars where you kind of

17    introduce the new hires to different concerns with

18    the marketplace, the industry.  You also indicate

19    what's needed by your department to review a

20    request.

21         Q.    So those were, like, day-long seminars that

22    new hires would sit through?

23         A.    They're not day-long, but maybe an hour or

24    two.

25         Q.    Would compliance present the entire hour or
```

```
1    two of those programs?

2        A.    If it was focused on compliance, yes.

3        Q.    Does every new hire receive compliance

4    training?

5        A.    Since I've been in the department in the

6    last year, we've been doing that.  We've been asking

7    to be included in those new hire sessions, yes.

8        Q.    What about prior to that?

9        A.    I know -- I can't speak to exactly what

10   happened, but I know Robert Brown did do sales

11   trainings.

12       Q.    Do you -- did you ever assist with those?

13       A.    Not with the ones that he attended when I

14   was out of the department.

15       Q.    What about prior to being out of the

16   department, prior to 2015, did you assist with

17   trainings for salespeople?

18       A.    I don't recall being directly involved with

19   the salespeople, but we did speak with, like,

20   national account managers and such.

21       Q.    Do you recall ever putting together

22   materials for the sales department or people within

23   the sales department of Anda?

24       A.    It could have been asked of me to put

25   together materials.  I don't off the top of my head
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    remember.

2       Q.    Prior to taking your position now, were

3    you -- are you aware if there were any set materials

4    that the compliance department had developed and/or

5    distributed to departments other than compliance?

6       A.    I'm sure that materials were distributed.  I

7    don't know anything off the top of my head.

8       Q.    Do you know where those would have been

9    found?

10      A.    No.

11      Q.    If I were to ask you to run a report of

12   customer limits for controlled substances

13   companywide, could you do that?

14      A.    Current, today?

15      Q.    Yes.

16      A.    You're able to see it currently where a

17   limit is at, yes.

18      Q.    Could you run a report of that?

19      A.    Yes.

20      Q.    And what -- how would you do that?

21      A.    How would you run the report?

22      Q.    Yes.

23      A.    You would have to question to see the

24   control limit for a particular customer for a

25   particular control family.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Would you use a certain program?

 2        A.   You could use any of the ones we discussed

 3   this morning.  You could use Cognos; you could use

 4   TPS.

 5        Q.   Prior to 2015, could you have done that?

 6        A.   Yes.

 7        Q.   Could you run a report of customer limits of

 8   any customer, including any customer that was

 9   eligible to buy controls?

10        A.   Yes.

11        Q.   Could you run a report of how those customer

12   limits have changed over time?

13        A.   No.  There is no historical -- well, I

14   wasn't aware.  I don't believe there is a way to do

15   historical.  We always ran reports to see where they

16   were at at the current time.

17        Q.   Would those reports be saved anywhere?

18        A.   They were not saved in any one particular

19   place.

20        Q.   If I, prior to 2015, were to ask you to run

21   a report of reasons why a customer limit had changed

22   when -- well, just that first, reasons why a

23   customer limit had changed, could you have done

24   that?

25        A.   Prior to 2015?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Yes.

 2        A.    Assuming that the request went through

 3    Remedy, you would be able to identify the request

 4    and when it changed.

 5        Q.    Could you also have identified why it

 6    changed?

 7        A.    You could identify if the customer provided

 8    that in the request, giving a reason, such as a

 9    market condition, a shortage, a backorder issue, or

10    simply because they didn't have that item before, if

11    that was entered into the Remedy opportunity, we

12    could retrieve that.

13        Q.    When you say opportunity, what do you mean?

14        A.    That's what we call a sales request for a

15    compliance review, is an opportunity.

16        Q.    Is it your understanding that when a

17    customer purchase limit changed for a particular

18    reason, that that change went on in perpetuity?

19             MS. KOSKI:   Object to form.

20        A.    Sorry?

21        Q.    So by way of an example, if a customer

22    requested an increase in their ability to purchase

23    controls and their control limit, based on one

24    particular one-time reason -- are you familiar with

25    any situations like that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   A one-time situation?

 2        Q.   Yes.

 3        A.   I'm not familiar with a one-time situation.

 4   Usually, if a customer is reviewed for an increase,

 5   it's supposed to be ongoing.  There may be an

 6   example of a one-time opportunity where the customer

 7   has a certain limit, and there's only 100 of the

 8   limit left.  And we only have a certain bottle count

 9   available, and that's their only option to purchase.

10   That's a one-time opportunity that I'm thinking of.

11        Q.   So in that circumstance, would you change

12   the limit and allow the customer to purchase more?

13        A.   If we did our research and our research

14   indicated that there was not a concern, and it could

15   be justified because that's the only option

16   available, yes.

17        Q.   There was at that point -- this is

18   pre-2015 -- nothing in the system that the limit was

19   changed and that would automatically change it back,

20   was there?

21        A.   No.

22        Q.   That limit would be increased into the

23   future as well, right?

24        A.   If it was supposed to be a permanent

25   increase.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Do you ever remember moving limits back down

2   on a customer?

3        A.   Yes.

4        Q.   Do you -- did you do that on a regular

5   basis?

6        A.   No.

7        Q.   How many times do you remember doing that?

8        A.   So, for example, if a customer needed to

9   return a product, we don't automatically re-increase

10  the limit because a product is returned.  So we

11  would maybe say, well, we'll verify that that

12  product is being picked up.  And once we verify it's

13  being picked up and returned to Anda, we will

14  increase your limit so you can place an order for

15  the correct item, that sort of a scenario.

16       Q.   From 2011 to 2015 were you responsible for

17  running any sort of reports on a regular basis?

18       A.   Yes.

19       Q.   What were they?

20       A.   Auditing sorts of reports where I was

21  collecting updated information.

22       Q.   Did they have specific names, those reports?

23       A.   They had various names.  They could be an

24  audit of particular states.  It could be audits of

25  particular control families.  It could be audits of
```

1    customers that we needed updated due diligence on,

2    questionnaires and dispensing data.

3        Q.   And how would you know at that time whether

4    to run a report or not?  Did somebody tell you?

5        A.   There was a standard that -- when I was

6    brought into the department, that was expressed to

7    me of what was wanted when I came into the

8    department, and that was one of the tasks.

9        Q.   By whom?

10       A.   Michael Cochrane and Emily Schultz.

11       Q.   And what was the standard that they

12   expressed to you at that time?

13       A.   They wanted updated information on the

14   customer base.

15       Q.   Did you ever do any analysis into shipments

16   into a particular geographic area?

17       A.   Yes.

18       Q.   When did you do that?

19       A.   During that same time period you mentioned,

20   probably '11 to '15.

21       Q.   How would do you that?

22       A.   I would select different regions for

23   different reasons and go into that region and

24   report -- report on what I was looking at, whether

25   it was sales or the customer's information.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Why would you do that?

2        A.   As a form of auditing.

3        Q.   Was that one of your main responsibilities

4   as a DEA compliance analyst?

5        A.   When I became a senior analyst, that became

6   one of my main responsibilities, yes.

7        Q.   Was auditing information?

8        A.   Yes.

9        Q.   And when you say "auditing information," I

10  guess what do you mean by that?

11       A.   I was looking at our entire customer base,

12  and I was making determinations, well, this person

13  at one point was approved for controls.  They're not

14  active -- an actively buying customer from Anda.

15  They will now become ineligible for controls because

16  they're inactive.

17            If they want to purchase from us again,

18  they're going to have to go through the Remedy

19  process.  I was looking at them and determining

20  if -- like, what it was they were buying and if

21  updated data was needed.

22       Q.   Would you do that on a regular basis?

23       A.   Yes.

24       Q.   How frequently?

25       A.   There was no specific time frame.  All of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    them I would consider, like, a project and --

 2        Q.   What are some of the projects that you

 3    remember doing when you had the senior analyst role?

 4        A.   Well, I created a lot of the reporting that

 5    I was using.

 6        Q.   What are some of the reporting that you

 7    created?

 8        A.   Just what we mentioned, like, customer

 9    information and sales transactions.

10        Q.   When you created reports to look at

11    shipments into a particular geographic location, are

12    there certain fields that you were looking at or

13    types of information that you were looking at in

14    those reports?

15        A.   I was looking, like, for volume of product

16    shipped and whether -- how updated the data was.

17        Q.   And why were you doing that?

18        A.   As a form of auditing of our customer base.

19        Q.   Do you remember on how many occasions you

20    did that?

21        A.   I did it a lot.

22        Q.   Would you say that looking at shipments into

23    a particular geographic area was something that you

24    did regularly?

25        A.   Once I got into that role, yes.
```

```
 1        Q.   When I say regularly, is that monthly?

 2        A.   Well, again, they were projects, so -- and

 3   you're looking at a very large amount of data.  So

 4   once we had either received what we needed in a

 5   project or we were ready to go to another project, I

 6   would do that.

 7        Q.   So you said earlier that Remedy is a

 8   task-based system that you used and others in the

 9   company used to keep track of tasks, right?

10        A.   That's our way of controlling sales

11   requests, because there are a lot of requests that

12   come from the sales department.  That way, honestly,

13   they don't have to come to you and request something

14   by phone or by e-mail, and it's archived in there.

15        Q.   So when you say "task," you're talking about

16   specifically orders?

17        A.   No.  Remedy is a task management system of

18   any type of a request that they are asking from

19   compliance, whether it's an increase, a new customer

20   to controls.

21        Q.   So was Remedy, like, an efficiency program

22   that you would have used, as an analyst, to keep

23   track of, say, like your to-do list for projects?

24        A.   No.

25        Q.   Did you have a program like that where you
```

1    kept track of what projects you were working on,

2    when?

3        A.    No.

4        Q.    Did you have any system on keeping track of

5    projects, when, and what their duties were?

6            MS. KOSKI:  Object to form.

7        A.    No.  I did not have a system, but there were

8    sometimes deadlines of when you would want

9    information back.

10       Q.    And what were those deadlines based upon?

11       A.    Based upon requests of information and

12   trying to ensure you got it in, or you had some sort

13   of a response.

14       Q.    To the customer or to people within Anda?

15       A.    No.  So a deadline was created because if we

16   sought that information, and the customer did not

17   reply in a certain amount of time, we created the

18   dead line so that we could make a determination to

19   commence with control substance eligibility or to

20   cut it off temporarily until we received the

21   information we needed.

22       Q.    At any point in time in your time with

23   compliance, Anda compliance, have you taken part in

24   preparing materials for submission to the DEA?

25       A.    Preparing, like, what type of materials?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    Any type of materials.

 2        A.    We've had an inspection, yes.  I

 3   participated in the inspection.

 4        Q.    What about orders or customers to be

 5   reported?

 6        A.    Every person who's in the department who is

 7   reviewing orders makes a suggestion of what needs to

 8   be reported, and then there have been people within

 9   the department that had the -- like, the

10   responsibility to pass that information over to the

11   DEA.

12        Q.    Has that been the case since you started in

13   the compliance department in 2011?

14        A.    Yes.

15        Q.    When you first started in 2011, what was

16   your understanding of your obligation to report

17   things to the DEA?

18        A.    It's not an obligation to report suspicious

19   customers; however, it was an arrangement, and they

20   have always been communicated with about all of the

21   customers that we determine suspicious during our

22   reviews of the customers.

23        Q.    Okay.  My question was a little bit

24   different.  It was:  Back in 2011, what was your

25   understanding of what you were required to report to
```

Highly Confidential - Subject to Further Confidentiality Review

1    the DEA?

2      A.   My understanding was any customer that we

3    found to be suspicious.

4      Q.   And where did you get that understanding?

5      A.   I got that understanding because we reviewed

6    customers, and we had a sort of a system where we

7    were reviewing them on the front end.  And if you

8    determined that a customer was someone you did not

9    want to engage in business with, we were notifying

10   the DEA, because we never actually allowed them to

11   purchase from us.

12     Q.   And who told you that system?

13     A.   It was something that was in place prior to

14   me even getting into the department, that our

15   department was always communicating suspicious

16   customers to the DEA.

17     Q.   It was your understanding that your

18   department was always doing that, right?

19     A.   Yes, from a certain period of time that that

20   was discussed.

21     Q.   So what was that system at that time, say,

22   in 2011 when you came in?

23     A.   If a customer was reviewed and for whatever

24   reason the data that you reviewed, you made a

25   determination that this is a customer that I will no

```
 1    longer sell to or I will not sell to, it was

 2    communicated to the DEA.

 3        Q.   Was that based on your review of TPS orders

 4    of interest?

 5        A.   It could have been.

 6        Q.   What else?

 7        A.   The overall review of the customer.

 8        Q.   And what would trigger an overall review of

 9    a customer?

10        A.   Some of it is initiated by a sales request,

11    and some of it could be auditing or new information

12    received.

13        Q.   Have you ever had, yourself, direct

14    correspondence with anybody from the DEA?

15        A.   Inspections, yes.

16        Q.   What about as it relates to suspicious order

17    monitoring?

18        A.   In an inspection, yes.

19        Q.   Do you remember when inspections occurred?

20        A.   This year -- or this past year in the end of

21    September.

22        Q.   What about prior to that?

23        A.   I don't know.  I was not a part of those.

24        Q.   Were you aware of whether specific orders

25    needed to be reported to the DEA as suspicious?
```

```
 1              MS. KOSKI:  Object to form.

 2      A.   Suspicious orders?

 3      Q.   Yes.

 4      A.   I'm not aware of a specific order.

 5      Q.   I didn't ask if you were aware of any one

 6   particular suspicious order.  I'm asking if, in

 7   2011, when you started as a DEA compliance analyst

 8   at Anda, were you aware that suspicious orders were

 9   to be reported to the DEA?

10              MS. KOSKI:  Object to form.

11      A.   I don't know if I immediately was aware, but

12   I did become aware within the next year or so, yes.

13      Q.   That suspicious orders were to be reported

14   to the DEA?

15      A.   Yes.

16      Q.   You said it was your understanding, however,

17   that the Anda system was reporting suspicious

18   customers; is that right?

19      A.   I know that Anda had always communicated

20   with the DEA about customers we would not do

21   business with.

22      Q.   But you -- at that time, were you also aware

23   that Anda was not reporting suspicious orders

24   specifically to the DEA?

25              MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I was not aware immediately of the order

 2   part of it.  As I said earlier, I wasn't immediately

 3   engaged in the suspicious order monitoring.  When I

 4   became engaged with it, I became more aware of that.

 5        Q.   How did you become aware of the order

 6   monitoring process part of it?

 7             MS. KOSKI:  Object to form; asked and

 8        answered.

 9             Go ahead.

10        A.   Different literature, conferences attended.

11        Q.   Do you remember at what point you became --

12   at what date you became involved in the order

13   monitoring process?

14        A.   I don't recall that.

15        Q.   When you started in the Anda compliance

16   department, were you aware of customer

17   questionnaires that were in existence that customers

18   had to fill out?

19        A.   Yes.

20        Q.   Were you a part of developing those customer

21   questionnaires?

22             MS. KOSKI:  Object to form.

23             Go ahead.

24        A.   I -- I don't remember if at that time I had

25   input.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   You said that you have been a part of

2    communications with the DEA related to specific

3    reviews or audits?  Is that the word that you used?

4      A.   If the -- if we determine as a result of an

5    audit where information was received or reviewed

6    that we would no longer sell to a customer or we

7    would not sell to that customer, I was aware

8    that that was -- I was a part of submitting that

9    customer to the person who at that time -- because

10   if we're going back in history, it was -- reporting

11   it to the DEA.

12     Q.   You -- so you would submit the name of a

13   customer to the person within Anda who would submit

14   it to the person at the DEA?

15     A.   Correct.

16     Q.   When is the first time you remember seeing

17   SOP 40?

18     A.   I don't remember when the first time was.

19     Q.   Earlier you said SOP 40.3 is the one that

20   you follow to deal with suspicious orders?

21         MS. KOSKI:  Object to form.

22     A.   That explains a lot of the different facets

23   of what's in the department and how areas are

24   reviewed.

25     Q.   Were you involved in any process to change

Highly Confidential - Subject to Further Confidentiality Review

```
 1    SOPs over different points in time since you've been

 2    in the compliance department?

 3        A.   No.

 4        Q.   Do you remember the first time that you were

 5    given a written copy of SOP 40?

 6        A.   I don't remember that.

 7        Q.   Do you remember SOP 40 being adopted?

 8        A.   Because I was not directly involved with the

 9    creation, I don't remember when it was adopted.

10        Q.   Do you remember what month you started in

11    the compliance department?

12        A.   I believe it was in July of '11.

13        Q.   In July of '11, you would have started?

14        A.   I believe so.

15        Q.   Were you aware of any Anda process --

16    written process for suspicious order monitoring at

17    that point?

18             MS. KOSKI:  Object to form.

19        A.   I don't -- I'm not aware of that process,

20    no.

21        Q.   Were you at that time?

22        A.   No.

23        Q.   And you, again, don't remember when you

24    became aware of it?

25        A.   Well, because I was not involved in that,
```

1    like, immediately once getting into the department.

2      Q.   Would it surprise you if I told you that

3    Anda didn't have a written SOM, written monitoring

4    process at that time?

5         MS. KOSKI:  Object to form.

6      A.   I can't tell you the emotion that I would

7    feel, but I could say I wasn't aware.

8      Q.   Would you have expected Anda to have a

9    written process at that point for suspicious order

10   monitoring?

11        MS. KOSKI:  Object to form.

12     A.   You would expect that you would have a

13   formalized procedure.

14     Q.   You would have expected that as an employee

15   of the compliance department, right?

16        MS. KOSKI:  Object to form.

17     A.   You would expect that, if someone said it

18   should have been authored as an SOP in a procedure,

19   that it would be there.

20        (Anda - Solis Exhibit 11 was marked for

21   identification.)

22   BY MS. ELLIS:

23     Q.   I'm handing you what's been marked as

24   Anda -- I'm sorry, Exhibit 11, Anda Opioids Bates

25   Number 527936.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Do you recognize this?

 2      A.    Yes.

 3      Q.    What is it?

 4      A.    SOP 40.

 5      Q.    On the last page of SOP 40, it looks like

 6      this is Version 40.01, adopted or effective April

 7      5th, 2011.

 8            Do you see that?

 9      A.    Yes.

10      Q.    And above that, you see that there is a

11      effective date of SOP 40 of 2000 -- December 2011,

12      right?

13      A.    Yes.

14      Q.    This was after you started in the DEA

15      compliance department, right?

16      A.    Yes.

17      Q.    Were you involved in the review between

18      December 2011 and April 5th, 2012, of this SOP?

19      A.    I believe that I had input into the review

20      process that we were following when looking at a

21      customer.

22      Q.    Do you -- why do you remember that?

23      A.    Looking at this.

24      Q.    What do you remember about it?

25      A.    That I had input on our review process that
```

1    we were following.

2        Q.    And where in the SOP is that review process

3    documented?

4        A.    The whole thing.  The steps that are taken

5    once an order has been flagged as an order of

6    interest.

7        Q.    So that would be here in the scope.  It says

8    what is covered or as an interest or captured using

9    historical sales information with a user-defined

10   time frame.

11            Is this the TPS criteria that we were

12   talking about before that you thought might flag an

13   order of interest?

14       A.    Yes.

15       Q.    What does user-defined time frame mean to

16   you?

17       A.    I don't know what that means.

18       Q.    Do you remember what your specific input was

19   into this process between December 2011 and April

20   2012?

21       A.    With regards to this SOP?

22       Q.    Yes.

23       A.    I had input into what we were doing at that

24   time to review customers as our procedure.

25       Q.    And what section would that input have gone

1    into?

2        A.   Two, three, four, five, six.

3        Q.   What input would you have had in Section 2,

4    refer to TPS?

5        A.   I had input into that suggestion.

6        Q.   What was it?

7        A.   That area.

8        Q.   That it be included?

9        A.   Yes.

10       Q.   And why was that important to you?

11       A.   Because there were areas of concern.

12       Q.   What does -- "areas of concern," meaning

13   what?

14       A.   Meaning when you audit the entire country

15   and you look at dispensing data from locations

16   around the whole entire country, there is areas that

17   you wanted to focus on.

18       Q.   Why?

19       A.   Because you could see particular trends or

20   patterns.

21       Q.   What would those trends or patterns indicate

22   to you?

23       A.   It would indicate that you needed to know

24   who you were selling to.

25       Q.   What about Section 3, what input did you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    have into that area?
 2         A.   I had input into suggesting that we review
 3    those things.
 4         Q.   Previously you had not been reviewing those
 5    things?
 6              MS. KOSKI:  Object to form; mischaracterizes
 7         the testimony.
 8         A.   No.
 9         Q.   Well, if you had input into saying that you
10    should be referring to those things --
11         A.   The input was what we were already doing at
12    this point in time and drawing it out.
13         Q.   And spelling out what you already were doing
14    at this point in time --
15         A.   Right.
16         Q.   -- is what you're saying?
17         A.   Yes.
18         Q.   So from this point in time, you mean from
19    July of 2011 until April 2012 would have been the
20    time that you were limited to?
21              MS. KOSKI:  Object to form.
22         A.   Sorry, I'm not following.
23         Q.   You started in compliance in July of 2011,
24    right?
25         A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   So the experience that you had with what
 2   Anda was doing would have been limited to July of
 3   2011 to April of 2012 by this point, right?
 4      A.   Yes.
 5      Q.   So less than a year?
 6      A.   Yes.
 7      Q.   So any of the suggestions that you offered
 8   at this point were based on that few months of
 9   experience?
10      A.   Yes.
11      Q.   Are there specific areas or things that you
12   remember suggesting should be in this SOP that were
13   not there before?
14      A.   I'm not aware of a version that was there
15   before.  My input at the time was to document what
16   we were doing to review customer requests.
17      Q.   So you're not aware of the version that was
18   in effect from December 2011 to April 4th, 2012?
19      A.   At that point in time, I wasn't reviewing
20   the SOP itself.  I was just suggesting points that
21   we were already utilizing while reviewing customers.
22      Q.   How were you making those suggestions?
23      A.   Based on what we were doing when we were
24   reviewing a customer request in Remedy.
25      Q.   I guess my question is a little more basic
```

Highly Confidential - Subject to Further Confidentiality Review

1    than that.

2           Was there a meeting absent this SOP with you

3    and Michael and Emily and you said this is what

4    we're doing and this is what needs to be in there?

5        A.   I don't recall going back this far that

6    there was a meeting, but I do recall being asked for

7    input on what we -- the steps we were taking while

8    reviewing.

9        Q.   Who do you recall asking you that?

10       A.   It was either Michael or Emily.

11       Q.   Do you remember when that was?

12       A.   No, I do not.

13       Q.   Do you remember if they told you why they

14   were asking for that input?

15       A.   I don't remember.

16       Q.   Do you remember specific things within this

17   SOP Version 40.01 that you suggested should be there

18   that weren't previously there?

19       A.   I'm not aware of a previous version to know

20   what was previously there.

21       Q.   Do you know how that SOP was approved, that

22   version of it, or who actually made the decision to

23   put that one into effect?

24       A.   Michael Cochrane was -- if this happened

25   when Robert was there, when it went into effect --

```
 1    what month was it?  It was --

 2        Q.   Looks like from the last page it was April

 3    of 2012.

 4        A.   So Robert may have been here at this time,

 5    but it seems that Michael's name is on here.

 6        Q.   So Michael's name being there and it saying

 7    effective April 5th, 2012, what does that mean to

 8    you?

 9        A.   Well, one states "original issue" and the

10    other one states "review."

11        Q.   So do you understand that to document the

12    history of this SOP?

13        A.   Yes.

14        Q.   So when one was reviewed, does that indicate

15    that it was voted upon?

16             MS. KOSKI:  Object to form.

17        A.   No.

18        Q.   Does that indicate that just somebody

19    approved it, Michael Cochrane in this circumstance?

20        A.   Could be, yes.

21        Q.   What else could it be?

22        A.   That seems so because it shows that he --

23    his name is there for the original issue.

24        Q.   Do you recall when an SOP such as this was

25    approved if it was published anywhere?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2       A.   I don't recall that.

 3       Q.   Do you remember or do you know how you would

 4   have become aware that that version had become

 5   approved?

 6       A.   No.

 7       Q.   Would you have become aware that the

 8   different -- that the SOP had been changed?

 9       A.   At that point in time, no.

10       Q.   In April of 2012, when you were in

11   compliance as an analyst, you would not become aware

12   that the SOP had changed?

13              MS. KOSKI:  Object to form.

14       A.   Not that I recall.

15              (Anda - Solis Exhibit 12 was marked for

16   identification.)

17   BY MS. ELLIS:

18       Q.   I'm now handing you Bates numbered page Anda

19   Opioids 84445.

20              This -- is this a document that you

21   recognize?

22       A.   Is this the same thing with different

23   reviews?

24       Q.   I'm asking you.

25       A.   It looks like that's the case.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   That this would have been a later version of

 2   SOP 40?

 3      A.   It looks like it was reviewed at a later

 4   time.

 5      Q.   What does review mean to you when -- in the

 6   context of SOPs?

 7      A.   Reviewing the procedures that are outlined

 8   as being the guidelines for the department.

 9      Q.   Are you aware if that was done on a regular

10   basis?

11      A.   I'm not aware.

12      Q.   Did you understand that to have been done on

13   a regular basis?

14      A.   At that point in time, I was not directly

15   involved with the SOPs.

16      Q.   But you were -- you still had to abide by

17   them, right?

18           MS. KOSKI:  Object to form.

19      A.   That's ideal.  Like it's a guideline, yes.

20      Q.   Was it ever the case that you did not abide

21   by the SOPs?

22      A.   I don't know.

23      Q.   Were you ever aware of any consequences of

24   not abiding by SOPs?

25      A.   I don't know.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    Have you had performance reviews in any of

2    your roles in the Anda compliance department?

3        A.    Yes.  You have one every year.

4        Q.    Are those written?

5        A.    Yes.

6        Q.    Is it your understanding that those become

7    part of your personnel file?

8        A.    I believe that has to do with your

9    employment, yes.

10       Q.    Do you remember offering input into this

11   specific version of this SOP?

12       A.    I haven't noticed a difference yet.

13       Q.    Would you have become aware of any

14   differences as they were adopted in SOPs?

15       A.    Only if the review process was different.

16       Q.    What do you mean?

17       A.    Meaning that if something was done

18   differently and it was determined that the team

19   should do it differently, then I would have been

20   aware of that.

21       Q.    How would you have become aware of that?

22       A.    I can't presume how, but I'm sure it would

23   have been communicated to me, we're going to do this

24   differently.

25       Q.    By whom?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     A.   Management.

 2     Q.   Would that be Jay Spellman?

 3     A.   No, because at this point in time it was

 4  Robert Brown.

 5     Q.   And how would he have communicated that to

 6  you?

 7     A.   If he wanted something done differently, he

 8  would tell the team that.

 9     Q.   Would he put it in writing?

10     A.   I'm not sure what he would have done.

11     Q.   Well, do you remember him ever telling you

12  to do things differently in writing?

13     A.   I mean, him being the director of the

14  department, it could be that he sent out e-mails or

15  he could have had a meeting with us in our team

16  meeting indicating that.

17     Q.   But there was no standard process by which

18  Mr. Brown would tell you to do things differently?

19          MS. KOSKI:  Object to form.

20     A.   Not that I can recall.

21     Q.   Did that frustrate you?

22     A.   What?

23     Q.   If you were told to do things differently

24  but you didn't know when to expect those sorts of

25  changes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. KOSKI:  Object to form.

2       A.   Say that again, please.

3       Q.   I'll strike that.  I'll just move on.

4            You said earlier that you occasionally would

5       take place in trainings for salespeople in Anda; is

6       that right?

7              MS. KOSKI:  Object to form.

8       A.   What time frame are we talking about?

9       Q.   From 2011 to 2015.

10      A.   I would participate in a lot of national

11      account communication, chain communication, and it

12      could be that I was invited to different sales

13      meetings, yes.

14      Q.   Why would you be invited to a sales meeting?

15      A.   Because if someone is directing the

16      department and they wanted me to be there, I would

17      go.

18      Q.   But it was at that person's invitation,

19      right?

20      A.   Correct.

21      Q.   It was never sort of part of the -- any

22      standardized process, that compliance would do

23      training for salespeople?

24             MS. KOSKI:  Object to form.

25      A.   No, that's not what I was saying.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Robert Brown, like being the director at

 2      this point in time, it's possible that he had

 3      engagement with the sales floor.

 4         Q.   Did you have direct correspondence with

 5      salespeople at that time, from 2011 to 2015?

 6         A.   Yes.

 7         Q.   On what occasions?

 8         A.   It's possible that a salesperson could

 9      e-mail.

10         Q.   Why would a salesperson e-mail you?

11         A.   For a variety of different reasons, they can

12      e-mail you.

13         Q.   Like what?

14         A.   You could request information from them,

15      from their customer, and they provide it to you or

16      they could have a question.

17         Q.   Would you ever rely on salespeople for your

18      input -- for their input into whether a customer was

19      allowed to buy controls or not?

20              MS. KOSKI:  Object to form.

21         A.   Would they sway my decision?

22         Q.   Yes.

23         A.   I don't believe that they would sway my

24      decision.  Salespeople, though, could provide

25      information that would help us understand the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacy better, if it was a specialty pharmacy or

 2    if there was something that we needed to know.

 3        Q.   Were you ever aware of any tension between

 4    the salespeople of Anda and compliance?

 5             MS. KOSKI:   Object to form.

 6        A.   Can you explain tension?

 7        Q.   Well, what do you understand tension to

 8    mean?

 9        A.   Well, compliance is considered sales

10    prevention, so I think there is like a normal

11    tension.

12        Q.   Compliance is considered sales prevention?

13    Is that what you said?

14        A.   In a lot of ways, yes.

15        Q.   Where does that understanding come from?

16        A.   Well, we are always making determinations to

17    not do business with someone or collect information

18    or we say no a lot.

19        Q.   Is that a term that you became familiar with

20    at Anda?

21        A.   That's a term that we know -- we are always

22    saying no.

23        Q.   So there's a natural tension, you think,

24    between sales and compliance?

25        A.   I don't know if there is a natural tension,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but you're -- you're not on the same team.
 2       Q.   When you say you're not on the same team, do
 3    you mean the goals are different?
 4       A.   I don't know what their goals are, but our
 5    goals are not sales.  So our goals are knowing who
 6    we're selling to and if we feel comfortable selling
 7    to them so that we can continue to operate.
 8       Q.   Do you share any goals with the sales team?
 9       A.   No.
10       Q.   No goals with the sales team?
11       A.   We don't have anything to do with sales.
12       Q.   At any time in your time with Anda
13    compliance did you become aware of salespeople that
14    were more aggressive than others in the sale of
15    controlled substance products?
16            MS. KOSKI:  Object to form.
17       A.   I don't know if it's a salesperson being
18    more aggressive with relation to controlled
19    substances.  There are salespeople that are
20    successful because of their level of -- whatever you
21    would call it, they're aggressive.
22       Q.   Well, what would you call it?
23       A.   There are salespeople that you can see how
24    they're successful because they are consistently
25    trying.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Trying to do what?

2       A.   Sell.

3       Q.   Did you come into contact with certain

4   salespeople more than others?

5       A.   I don't recall there being a person that I

6   was in contact more or less.

7       Q.   Do you recall ever having to admonish

8   anybody in sales about contacting you?

9            MS. KOSKI:  Object to form.

10      A.   We have had instances over the course of

11  time where we felt it was inappropriate for them to

12  contact us, like if we made a decision and they

13  wanted us to revisit a decision or they just wanted

14  to vent.  Those types of things, we considered

15  inappropriate contact.

16      Q.   Who is "we"?

17      A.   The compliance department.

18      Q.   Were there any written policies in place

19  that you're aware of related to sales correspondence

20  with compliance?

21      A.   Not written policies, no.

22      Q.   How would a salesperson know what their

23  responsibilities were for communicating with

24  compliance?

25           MS. KOSKI:  Object to form.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.   There were discussions with the heads of the

 2   compliance department, with the heads of the sales

 3   floor, and the department managers within the sales

 4   floor.

 5      Q.   Were any of those your primary contact as a

 6   DEA analyst?

 7           MS. KOSKI:  Object to form.

 8      A.   Sorry, I'm not following.

 9      Q.   Would you talk to salespeople directly or

10   were there certain people within sales as a

11   compliance analyst you corresponded with more

12   frequently?

13      A.   We tried to funnel requests that reached

14   compliance through their managers.  And that is why

15   the Remedy task management system was created, so

16   that there was less communication verbally or

17   through e-mail with a rep and that it was through

18   that queue.

19      Q.   Were there certain managers that you worked

20   with more frequently than others?

21      A.   When I became a senior analyst, I worked a

22   lot on corporate accounts.  And other than that, if

23   I was involved with pharmacy, we asked to be dealing

24   with management.

25      Q.   And why would you ask to be dealing with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    management?

 2       A.   So that they can funnel what was coming to

 3    us.

 4       Q.   What do you mean by funnel?

 5       A.   Is it something that compliance needs to be

 6    looking at.

 7            (Anda - Solis Exhibit 13 was marked for

 8    identification.)

 9    BY MS. ELLIS:

10       Q.   I'm handing you what's been marked as

11    Exhibit 13, Anda Opioids Bates Number 423540.  This

12    looks like an e-mail exchange from July 3rd, 2012.

13            Who is Pat Williams?

14       A.   At that point in time she was one of the

15    senior people over the sales floor.

16       Q.   Is she one of the managers that you would

17    try to funnel things to?

18       A.   Yes.

19       Q.   Do you recall this exchange?

20       A.   I don't recall the exchange, but I see the

21    e-mail.

22       Q.   Do you know who Kristina Sentence is?

23       A.   She was a sales rep at the time.

24       Q.   And you say to Patricia Williams and Wayne

25    Tischler:  "Can someone please inform Kristina
```

```
 1    Sentence that we will not be reinstating controls to

 2    the account in reference."

 3         Do you know why you would have said that?

 4    A.    I can't assume without seeing prior to this

 5    e-mail, but it sounds like the rep could have been

 6    persistent about the decision we made.  I don't know

 7    if she applied again in Remedy and asked us to

 8    review it again or I don't know -- if she e-mailed

 9    us, I don't know what transpired before the e-mail.

10    Q.    So when she would apply in Remedy, you mean

11    the sales rep would have put a customer -- a request

12    in Remedy for something to be reviewed, right?

13    A.    It could be that she did that or it could be

14    that we made a determination and then she

15    immediately submitted something for another review

16    or it could be that she sent an e-mail questioning

17    the decision.

18    Q.    And you have another section there that says

19    "internal information only."  What does that mean to

20    you?

21    A.    That you don't want these sales managers to

22    talk about this information externally.

23    Q.    Why?

24    A.    Because that was a part of our

25    decision-making process where we arrived to do
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    business with this customer.

 2        Q.   Did you tell customers when they were cut

 3    off from purchasing controls?

 4        A.   We had the sales reps tell the customers

 5    that they were cut off for controls.

 6        Q.   Would you tell them why?

 7        A.   No.

 8        Q.   Why not?

 9        A.   I don't think that they should know why we

10    made a decision or not.

11        Q.   Why not?

12        A.   Because that's compliance.

13        Q.   What does that have to do with anything?

14        A.   Why should they know why we decide not to do

15    business with them?

16            MS. KOSKI:  If you get to a natural break,

17        we've been going about two hours, I think, if we

18        wanted to take a break.

19            MS. ELLIS:  We can break.

20            MS. KOSKI:  I don't want to interrupt your

21        flow.

22            MS. ELLIS:  No, we can break.  That's fine.

23            THE VIDEOGRAPHER:  The time is 4:50 p.m.

24        We're going off the record.

25            (Recess from 4:50 p.m. until 5:05 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  The time is 5:05 p.m.
 2      We're now back on the record.
 3   BY MS. ELLIS:
 4      Q.   A moment ago you used the word preallocation
 5   in talking about chain stores.
 6              What does that mean?
 7      A.   It's not relating to chain stores.  Are you
 8   referring to the SOM system and the programming?
 9      Q.   I don't know.  I guess that's what I'm
10   asking for clarification on is what does
11   preallocation mean to you?
12      A.   It has to do with the, like, logistics in
13   the warehouse.  So if an order is flagged in SOMs as
14   an order of interest, it's possible that something
15   is ordered preallocation which means it hasn't
16   allocated to be actually picked and shipped.  And at
17   that point in time, preallocated, it was being
18   reviewed by compliance.
19              Should it have been -- had gone through --
20   past the preallocation portion, we could have seen
21   that there was no inventory on the item that was
22   appearing in the ordering bucket.
23      Q.   So it's a way of saving inventory for orders
24   that you know are going to come in?
25      A.   No.  No.  This is something that is more of
```

```
 1    a warehouse -- it was -- it was something that was

 2    related to the warehouse, and I don't know why the

 3    legacy SOMs was programmed in that way.

 4         So where items that were preallocated or

 5    orders that were preallocated were actually

 6    appearing to be reviewed by suspicious order

 7    monitoring.  Had they gone the next step past

 8    preallocation in the warehouse, it would be

 9    determined that there was no inventory or it was a

10    bad item, yet it was still appearing as if it was a

11    legitimate order in the suspicious order monitoring

12    queue.

13    Q.   So are orders set -- this is apart from the

14    topic of preallocation for a minute.

15         Are orders -- or, pardon me -- limits for

16    particular stores or customers set automatically on

17    any occasions?

18    A.   Like automatically, meaning?

19    Q.   I mean, are there certain occasions where

20    you just know that a customer's limit is going to be

21    a certain amount?

22         MS. KOSKI:  Object to form.

23    A.   It's not that you know that it's going to be

24    a certain amount, but if you're familiar -- for

25    example, with a chain customer who is coming to you
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    specifically for certain items, specifically for a

2    certain reason, and you understand that those stores

3    are coming to you for those items and that reasons,

4    after you've reviewed the group, then you know

5    what -- where you would set your limit for those

6    items should they be approved.

7            (Anda - Solis Exhibit 14 was marked for

8    identification.)

9    BY MS. ELLIS:

10       Q.   I'm handing you what's been marked as

11   Exhibit 14.

12           MS. ELLIS:  I'll represent to counsel that

13       the Bates number for some reason didn't print on

14       the bottom, but it is Anda_Opioids_MDL 711769 and

15       we will supplement the record with the court

16       reporter to ensure that they get the correct

17       version that has the Bates number on it.

18           MS. KOSKI:  711769?

19           MS. ELLIS:  Yes.

20           MS. KOSKI:  Okay.  And it's an Anda

21       obviously?

22           MS. ELLIS:  It is an Anda document, correct.

23   BY MS. ELLIS:

24       Q.   Is this a circumstance similar to the one

25   that you just mentioned where a chain's limit would
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    be set at a certain amount?

2        A.   This is an example of a customer that was

3    reviewed and we had an understanding of what they

4    were going to be utilizing Anda for, and this is a

5    discussion of where we would be setting the limits

6    after that review.
```

```
24       Q.   And 1,000 is a standard for other chains?

25       A.   Standard for other customers that are
```

1   prescreened and approved for controls, yes.

2        Q.   And that's the front end that you were

3   talking about earlier in the deposition?

4        A.   Correct.

5        Q.   What does good faith dispensing mean to you?

6        A.   I know that there was a customer who had a

7   policy or procedure that mentioned that, and it

8   wasn't anything that was ours.  That was some

9   customer, and I don't recall who the customer was.

10       Q.   What does it mean?

11       A.   I can interpret what that -- those words

12   mean, good faith dispensing.

13       Q.   What do you understand it to mean, please?

14       A.   I would assume that someone has good faith

15   that what is being dispensed is for legitimate

16   purposes.

17       Q.   Are there -- is that a term that you've

18   heard in your position at Anda?

19       A.   I've heard that, yes.

20       Q.   And has anybody explained it to you in that

21   way, the way that you just explained it?

22       A.   No.

23       Q.   At some point in your time in Anda

24   compliance, were you in charge of a program called

25   CQDD project?

```
 1      A.   Yes.  That's what we were speaking about
 2   earlier, which was auditing.
 3      Q.   And was that an ongoing project?
 4      A.   Yes.
 5      Q.   What was the goal of that project?
 6      A.   To collect updated data on our customer
 7   base.
 8      Q.   Was there a number of customers that you did
 9   not have updated data for?
10      A.   There was a number of customers that were
11   targeted as we needed updated data, yes.
12      Q.   But they were still eligible to purchase
13   controls; is that right?
14      A.   Yes.
15           (Anda - Solis Exhibit 15 was marked for
16   identification.)
17   BY MS. ELLIS:
18      Q.   I'm handing you what's been marked as
19   Exhibit 15.
20           MS. KOSKI:  You can just make a pile.  Thank
21      you.
22      Q.   And this is Anda Opioids 418852.
23           Do you recall when this project started?
24      A.   I don't recall when it started, but I know
25   that those Cognos reports were created in 2012, I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    believe.

 2         Q.   Were these reports that you created?

 3         A.   Yes.  I created them in that new reporting

 4    environment.

 5         Q.   What was the goal of this project?

 6         A.   To collect updated questionnaires and

 7    dispensing data on all of our customer base.

 8         Q.   Up until that point, had customers been

 9    allowed to purchase controls despite not having

10    updated data?

11         A.   I don't know.  If you had data on file and

12    they were reviewed and there was no indication that

13    there was anything happening with what they were

14    purchasing, that was an issue.  It's possible that

15    they continue to buy and you were just wanting to

16    review them again with newer data.

17         Q.   Was this -- how long did this project go on?

18         A.   I can only estimate that it was a couple of

19    years.

20         Q.   Were you responsible for this project and

21    the outcomes of it?

22              MS. KOSKI:  Object to form.

23    BY MS. ELLIS:

24         Q.   Who was in charge of the project?

25         A.   I would assume it's our department,
```

1    compliance, and who I reported to.

2        Q.   All right.  You don't know for sure?

3        A.   I mean it was the responsibility of the

4    department to collect updated data for our customer

5    base.

6        Q.   And what would happen if a customer -- you

7    did not have updated data for a customer?

8        A.   So because our order monitoring is many

9    facets, we would then monitor their orders.  And if

10   something stuck out to us in their ordering pattern,

11   it would also require that we collect updated data.

12            (Anda - Solis Exhibit 16 was marked for

13   identification.)

14   BY MS. ELLIS:

15       Q.   I'm handing you what's been marked as

16   Exhibit 16.  This is an e-mail from yourself to

17   Robert Brown dated July 18th, 2013.

18            Do you recognize that?

19       A.   Yes.

20       Q.   What is it?

21       A.   It's explaining the -- what we had talked

22   about earlier, if a customer was active at Anda and

23   eligible for controls but they were not an active

24   customer at Anda.  We took the approach -- actively

25   buying -- that we would remove controlled substances

Highly Confidential - Subject to Further Confidentiality Review

1    and force updated data.  Because should they want to

2    purchase controls from Anda, again, they would have

3    to go through the Remedy review process.

4        Q.   So up until this point, people had been

5    listed in Remedy as able to buy controls, right?

6            MS. KOSKI:  Object to form.

7        A.   No, because Remedy is the task management

8    system.  The customer could have been made eligible

9    for controls at Anda yet they were not buying

10   anything from Anda at that point in time that we

11   were reviewing the customer.

12       Q.   So they would have been eligible for

13   controls in TPS then?

14       A.   Correct.

15       Q.   And when -- so what that meant is when a

16   customer wanted to purchase controls, and the sales

17   rep perhaps submitted the opportunity through

18   Remedy, that the compliance would look at TPS and it

19   would say the customer was eligible, yes?

20       A.   If I'm following, because in this specific

21   situation, it wasn't specific to, like, a Remedy

22   request.  This was specific to, like, an auditing of

23   our department where we were reviewing who was

24   act -- an active customer with Anda and yet they

25   were eligible for controls.  So they were an active

Highly Confidential - Subject to Further Confidentiality Review

```
 1   customer and they had the potential to buy yet they

 2   were not actively buying from Anda at all.

 3        So what we did was removed the controlled

 4   substance eligibility from that customer so that

 5   when they came back to Anda and became an active

 6   customer, they would have to go through a new review

 7   process.

 8   Q.   So in this paragraph, you said -- and I have

 9   it highlighted right here on this copy.  I'll put it

10   up on the screen.

11        That you had customers that had not

12   purchased controls in more than six months; there

13   were a couple reviewed with another project and

14   there is no CQ or DD, so controls were removed with

15   first phase.

16        And then you said you have questionnaires

17   for many of them; however, most have never been

18   reviewed or provided DD.  Right?

19   A.   Yeah, I would have to see what the accounts

20   were I was looking at.  That's what it says.

21   Q.   So it was something that happened fairly

22   regularly that, quote, most questionnaires for some

23   accounts had not been reviewed by compliance?

24        MS. KOSKI:  Object to form; mischaracterizes

25        the document.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    This is a tricky -- there is a tricky way to
2   respond to this, because at the time we were trying
3   to figure out a way that we were able to correlate
4   data that we've received and showing that we had
5   received that data.
6        So I don't know -- I'm saying here that it
7   has never been reviewed or they've never provided
8   dispensing data.  So it could be that we didn't have
9   anything on file or it could have been that we had
10  it on file and maybe it hadn't been reviewed at that
11  period of time.
12       Q.    Why wouldn't that be in TPS?
13       MS. KOSKI:   Object to form.
14       A.    The -- the fact that we had the data?
15       Q.    Yeah.
16       A.    That was an ongoing project for us to update
17  our system with the most recent data received.
18       Q.    So when data was received, what was the
19  process of putting it into the system?
20       A.    If the data was received, like that previous
21  e-mail with the compliance clerk, we received it
22  into our department.  And then it would be saved,
23  and then a lot of the times, like I had mentioned
24  before, we weren't aware of why we were receiving
25  the information directly from the customer.
```

```
 1              So sometimes we would wait for the

 2     customer -- depending on the circumstance, the sales

 3     rep to tell us what the customer is wanting, if it

 4     was an increase, if they wanted to be reviewed for

 5     controls.

 6              So a lot of times a sales rep can have a

 7     conversation with a customer and tell the customer

 8     to submit the information to compliance.  We

 9     received something and we don't know where the

10     request originated.

11       Q.   So you don't know why you would be getting a

12     customer questionnaire from a customer?

13              MS. KOSKI:  Object to form.

14       A.   We would know why we're getting a customer

15     questionnaire, but with regards to dispensing data,

16     it could be provided to you and you may not know

17     where the request was initiated.

18       Q.   And you were cutting these customers off

19     from purchasing, as you said before, so that you

20     could trigger the submission of new data, right?

21       A.   Correct.

22       Q.   But you said that was a process that was

23     compliance concentric, correct?  It's a compliance

24     decision?

25       A.   Yes.  That was what our department was
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    doing.  It was an initiative.

2       Q.    Client compliance is in charge of

3    determining whether you can buy controls or not,

4    right?

5       A.    Yes.

6       Q.    Except here you have a list from Renee Mort.

7             Who is that?

8       A.    That's a sales rep.

9       Q.    It says right here:  Attached to that list,

10   the customers the reps would like to keep "yes" in

11   the system.

12      A.    Yeah, that's not surprising because as part

13   of this review process we were requesting data and

14   phases with deadlines.  So all of this seems to

15   indicate to me is if I were to research this

16   further, we were giving extensions sometimes, and we

17   were communicating with sales because this was very

18   large initiative of data collection, and we removed

19   a substantial amount of control eligibility.

20            So in this situation, it just indicates to

21   me that we did have communication back and forth and

22   who had asked for an extension, because maybe this

23   pharmacy needed more time to pull the data or

24   whatever the case is.

25            MS. KOSKI:  Just for the record, you have an
```

```
 1      attachment that just says it was produced in

 2      native, but you didn't include the substance of

 3      the attachment, right?  Is that what you meant to

 4      do?  It just says --

 5          MS. ELLIS:  Yes.  The attachments that are

 6      included in native format -- and we will

 7      supplement the record as we have done in previous

 8      depositions -- with the actual Excel spreadsheet,

 9      and we can send those to you afterward but

10      they're not printable.

11          MS. KOSKI:  Sure.

12          MS. ELLIS:  Because they're very large.

13          MS. KOSKI:  Yeah, I just figured you just

14      haven't shown it to her.  I just want to make

15      sure it's clear on the record she doesn't have

16      the spreadsheet attached, so she can't look at it

17      to refer to it.

18   BY MS. ELLIS:

19      Q.   You were able to provide without your

20   attorney's commentary there your explanation without

21   having looked at the spreadsheet, right?

22      A.   I'm familiar with the different processes

23   that happened during this time of auditing.

24      Q.   So you didn't need the spreadsheet to

25   provide that explanation, right?
```

```
 1       A.   It would be helpful to see what this e-mail

 2   is referring to.

 3       Q.   You know what a list of not actively

 4   purchasing controls January through June '13 is,

 5   though, right?

 6       A.   I know what would be included in the report.

 7   I don't know who the customers were.

 8       Q.   I wasn't asking you about specific

 9   customers, though, did I?

10       A.   No.

11       Q.   Right.

12            I was asking you in general, right?

13       A.   Yes.

14       Q.   Okay.  You said a moment ago that there was

15   a substantial amount of -- let me go back and read

16   it so I get it right.

17            You said you were giving an extension

18   sometimes and communicating with sales because this

19   is a very large initiative of data collection.

20            Is it fair -- is it fair to say that that

21   means that there was a fair amount of accounts

22   that -- or a large amount of accounts, to use your

23   words, that you needed up-to-date data for?

24       A.   There was a large amount of customers that

25   we were going after for various reasons to collect
```

Highly Confidential - Subject to Further Confidentiality Review

1    updated data for.  So I don't know how many of them

2    exactly didn't have data, but we were going after

3    customers for a variety of different reasons.

4        Q.   And you were collecting a substantial amount

5    of information that you did not previously have in

6    the system; is that right?

7            MS. KOSKI:  Object to form.

8        A.   That's not necessarily the case, but when we

9    were going after different segments of our customer

10   base, we were collecting and bringing in a large

11   amount of data due to that initiative.

12       Q.   Was this called the customer questionnaire

13   project?

14       A.   Yes.

15           (Anda - Solis Exhibit 17 was marked for

16   identification.)

17   BY MS. ELLIS:

18       Q.   I'm handing you what's been marked

19   Exhibit 17.  That's Anda Opioids 351076.

20           This appears to be an e-mail from yourself

21   to Latoya Samuels with background on the customer

22   questionnaire project; is that right?

23       A.   Yes.

24       Q.   And you were sending this -- why were you

25   sending this to Latoya at this point?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   We worked in the same department, and so she

 2    was aware of the ongoing project.

 3        Q.   Was there ownership of this project with any

 4    one person in your department?

 5        A.   I was primarily responsible for all of the

 6    reporting and the organization of the project, but

 7    the department was responsible for wanting the data.

 8        Q.   Where did the idea for this project come

 9    from?

10        A.   When I was brought into the department, I

11    was brought in with the expectation that I would

12    help the department with certain standards that they

13    were wanting to meet.

14        Q.   That they were wanting to meet better?

15        A.   To keep -- to do as far as it's what we

16    wanted to do.

17        Q.   So let's look at the second page of the

18    attachment on this.

19             Did you draft this attachment?

20        A.   Did I draft this?  Yes.

21        Q.   It's the customer questionnaire project,

22    right?

23        A.   Yes.

24        Q.   Originated in 2011, right?

25        A.   Yes.
```

1    Q.   So at that time it says:  9,624 customers

2    that no questionnaire yet were flagged as yes for

3    being able to purchase controls; is that right?

4    A.   Yes.

5    Q.   So it's your testimony today that that's the

6    standard that the Anda leadership wanted to keep

7    once they brought you into compliance?

8    A.   Yes.

9    Q.   They wanted to keep that large number of

10   customers as being flagged for yes yet not having

11   customer questionnaires on file?

12   A.   No, that's not what I was saying.  I'm

13   saying the department wanted to collect updated

14   questionnaires on the customer base.

15   Q.   Because at that time there were nearly

16   10,000 customers that were allowed to buy controls

17   within TPS, yet there was no customer questionnaire

18   on file for them?

19   A.   They were eligible to buy controls, but as

20   we talked about, previous to this e-mail, a lot of

21   them were not even actively buying from Anda.

22   Q.   But if a -- if they attempted to purchase a

23   control from Anda and a compliance analyst went into

24   the TPS program and looked at whether they were

25   eligible for it, they would see the flag as yes,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2       A.   Yes.

3       Q.   And that would, as we discussed before,

4    potentially shorten the time that they would take to

5    review an order for controls to be approved or not?

6            MS. KOSKI:   Object to form.

7       A.    No.  We don't ever look at the control flag

8    and make a determination that it's going to take a

9    shorter amount of time because they are flagged Y.

10   And that's why we delve into the other procedures

11   where our review process kicks in and we look at

12   what is the item the customer is ordering, who is

13   the customer, and what is the quantity they are

14   ordering.

15      Q.   That 9,624 number did not even include

16   chains, did it?

17      A.    No.

18      Q.   So there were, in fact, more than 9,624

19   customers in October of -- I guess that was in 2011

20   that were eligible for controls but there was none

21   of the -- no questionnaire on file for them?

22           MS. KOSKI:   Object to form.

23           Go ahead.

24   BY MS. ELLIS:

25      Q.   Go ahead.

```
 1        A.    Even to date, chains don't have the same

 2   sort of a questionnaire.  If it is a corporate-owned

 3   entity, they give us a corporate questionnaire.

 4        So that's just indicating a individual

 5   customer questionnaire for an individual location

 6   that requires it.  That's not to say we didn't have

 7   a folder on file with background for a chain

 8   relationship that we had.

 9        Q.    If a customer was eligible to purchase

10   controls and placed an order for controls in TPS --

11   let me ask that a different way.

12        If a customer was not eligible to purchase

13   controls but purchased or placed an order for

14   controls, that would make it an order of interest,

15   correct?

16        MS. KOSKI:  Object to form.

17        A.    They wouldn't be able to place an order if

18   they are not eligible for controls.

19        Q.    So unless the flag was yes, they would not

20   be able to place the order is what you're saying?

21        A.    Correct.

22        Q.    So this allowed customers to -- the yes flag

23   within TPS allowed the customer to be able to place

24   the order in the first place?

25        A.    They could place the order and then most --
```

1    that would go then to another process of reviewing

2    an order if it was flagged an order of interest.

3        Q.   And it would be flagged an order of interest

4    according to the things in SOP 40 that we talked

5    about before, as well as the other things that you

6    were not aware of?

7        A.   It would be flagged if -- through the

8    suspicious order monitoring system, in that

9    criteria.

10       Q.   And so presumably if there are more

11   people -- or more customers that are flagged yes for

12   controls and able to place orders for controlled

13   substances, that might lead to more orders of

14   interest being generated in the TPS program.

15            Is that fair?

16       A.   No, because just -- even though they are

17   flagged Y, that doesn't necessarily indicate that

18   should they buy from us and we didn't have data,

19   that what they would buy would stand out to us as

20   being an order of interest.

21       Q.   Then why would you want to cut them down?

22       A.   Simply because we were trying to collect

23   updated data on these customers.

24       Q.   So what you're saying is that even though

25   you didn't have the updated data, because their flag

Highly Confidential - Subject to Further Confidentiality Review

```
 1    was yes, an order would not necessarily be

 2    determined by the system to be an order of interest?

 3         A.   No.

 4              I was saying that if they were flagged Y,

 5    regardless of any information that we had on file,

 6    the order would still go through the regular process

 7    of review, and then we would still be reviewing what

 8    was consistent -- what the order consisted of.

 9         Q.   Okay.  So they were flagged yes, correct, in

10    the system, in TPS?

11         A.   That's -- yes.  That line is saying that.

12         Q.   But you had determined by this point, at

13    least in 2011, that 9,624 of those people,

14    customers, did not have questionnaires on file,

15    right?

16         A.   Yes.

17         Q.   And your testimony a moment ago was

18    regardless of what their status was with the

19    customer questionnaire, that any order placed

20    through TPS would not have necessarily been deemed

21    by the system to be an order of interest?

22         A.   Correct, because it's based on the criteria

23    that was in the programming.

24         Q.   So a customer could have a yes flag,

25    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And not have a current -- not have a

 3   customer questionnaire on file at all, right?

 4      A.   Going back in to this point in time, yes.

 5      Q.   And still place an order and have that order

 6   not be flagged by the system as an order of

 7   interest, right?

 8      A.   It's a possibility if it didn't meet the

 9   criteria of the program.

10      Q.   So unless it was one of the criteria of the

11   program that you were not familiar with earlier --

12      A.   Right.

13      Q.   -- it could still have happened, right?

14      A.   Potentially.

15      Q.   And, again, you don't know whether those

16   orders were suspicious or not without having done

17   the review, correct?

18           MS. KOSKI:  Object to form.

19      A.   I'm not following the question.

20      Q.   Well, you mentioned earlier that orders of

21   interest were different than suspicious orders,

22   correct?

23      A.   Yes.

24      Q.   So if the system did not flag it as an order

25   of interest, then an analyst would not have deemed
```

```
 1    it to be suspicious, right?

 2        A.   Correct, because there would be no review

 3    process.

 4        Q.   Right.  So if the system for some reason

 5    didn't flag the order of interest according to its

 6    criteria, then the review would never have been done

 7    for whether it was suspicious?

 8        A.   Correct.

 9        Q.   And that was the case for any of these 9,624

10    customers that did not have current customer

11    questionnaires on file up until 2011?

12        A.   That's the case, assuming that they were

13    purchasing.

14        Q.   And this project continued for a number of

15    years, didn't it?

16        A.   Yes.

17        Q.   It was an ongoing effort to collect that

18    information, right?

19        A.   Yes.

20             (Anda - Solis Exhibit 18 was marked for

21    identification.)

22    BY MS. ELLIS:

23        Q.   I'm handing you what's been marked as

24    Exhibit 18.  This is another e-mail from yourself to

25    Latoya Samuels, and the Bates Number 350910.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              It seems that you're circulating the same

 2     attachment to her again five years later.

 3              Is that fair?

 4       A.    Yes, it looks to be so.

 5       Q.    Was the project still going on at this

 6     point?

 7       A.    I don't remember why I sent this to her in

 8     2016.

 9       Q.    You would have had a reason to send it to

10     her at that point, though, wouldn't you?

11       A.    I assume so, yes.

12       Q.    Would that be because you were still trying

13     to get updated questionnaire information for

14     customers?

15       A.    Anda is always trying to get updated

16     information from our customers.

17       Q.    And sitting here today you can't say that by

18     this point in time, in October of 2016, updated

19     information had been received from all of the 9,624

20     customers that had no customer questionnaire on file

21     in 2011, right?

22              MS. KOSKI:  Object to form.

23       A.    I can't speculate.  I can pretty confidently

24     say that at that point in time we had a lot of

25     success with the project and we had received updated
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    information.

 2        Q.   But you haven't -- you don't know sitting

 3    here at this moment for how many of those?

 4        A.   Well, you remember I wasn't in that area of

 5    the department at that time, so I don't know why I

 6    forwarded it to Latoya.  I was working in

 7    regulatory, so I don't know what happened.

 8        Q.   Did you ever do a comparison of your SOM --

 9    I'm sorry, Anda's SOM processes to any of your

10    competitors' or other people in the controlled

11    substance distribution or manufacturing space?

12        A.   That wasn't something that I was involved in

13    if it happened.

14        Q.   Is it something you would take an interest

15    in if you became aware of it?

16            MS. KOSKI:  Object to form.

17        A.   I always think it's possible for the entry

18    to work together.

19            (Anda - Solis Exhibit 19 was marked for

20    identification.)

21    BY MS. ELLIS:

22        Q.   I'm handing you what's been marked as

23    Exhibit 19.  This is Anda Opioids Bates Number

24    ending in 89620.

25            This is an e-mail from you to Michael
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Cochrane, Robert Brown, and Emily Schultz on

 2    April 16th, 2013, regarding Cardinal's SOM program.

 3         Do you remember this e-mail?

 4    A.    Yes.  This was the result of -- he was a

 5    speaker at the conference.

 6    Q.    Who was?

 7    A.    Gilberto Quintero.

 8    Q.    And you were sending these notes to

 9    Mr. Cochrane, Mr. Brown, and Ms. Schultz why?

10    A.    It was notetaking from his presentation at

11    the conference.

12    Q.    Was his presentation broader than this?

13         MS. KOSKI:  Object to form.

14    A.    I assume.  He spoke for an hour, and this is

15    a couple of bullets.

16    Q.    Do you know why he would have just included

17    these bullets as opposed to anything else he might

18    have said in that hour?

19    A.    I guess I thought that they were worth

20    looking at.

21    Q.    Do you know why you would have thought that

22    they were worth looking at?

23    A.    I don't know why at that point in time.

24    Q.    At this point in time, do you recall any

25    internal meetings related to Anda's SOM process and
```

```
 1    potential changes to it?

 2         MS. KOSKI:  Object to form.

 3    A.   Our department is always looking for ways of

 4    enhancing processes.

 5    Q.   You don't remember specifically at this

 6    point any conversations related to changing the SOM

 7    process?

 8         MS. KOSKI:  Object to form.

 9    A.   I know that there was always discussions

10    about enhancing.  I don't know when they took place.

11         (Anda - Solis Exhibit 20 was marked for

12    identification.)

13    BY MS. ELLIS:

14    Q.   I'm handing you what's been marked as

15    Exhibit 20.  This is Anda Bates Number 485846.  This

16    is an e-mail that you sent to Jay Spellman, Emily

17    Schultz, Johnny Kincaide, Latoya Samuels, and James

18    Gatto on June 15th, 2017.

19         This is -- it looks like you're forwarding

20    some news on to them; is that right?

21    A.   Yes.

22    Q.   Is this something that you have done

23    throughout your time in the Anda compliance

24    department?

25    A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Why would you forward news along to these

 2   other folks in your department?

 3      A.   We discussed this earlier today, that we

 4   monitor news events pertinent to the industry.

 5      Q.   And in this particular article, the second

 6   one mentioned is related to McKesson and SOMs.  It

 7   seems you pulled out a portion of the article

 8   talking about McKesson's monitoring program, right?

 9      A.   Yes.

10      Q.   And there it describes assigning customers a

11   monthly threshold for controlled substances, and it

12   says it was geared more towards reporting suspicious

13   customers than isolated suspicious orders, right?

14      A.   Yes.

15      Q.   Is that your -- is that your understanding,

16   that that's what Anda's system was also doing at

17   that point?

18      A.   No.

19      Q.   You testified earlier that Anda was

20   providing historically suspicious customer names to

21   the DEA and not suspicious orders; isn't that right?

22      A.   Yes.

23      Q.   And so that's different than what this says,

24   recording suspicious customers rather than isolated

25   suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.
 2      A.   You're asking me to -- if -- or you're
 3   insinuating that the reason I copied and pasted this
 4   was because I believed that to be true about Anda.
 5   And so I'm saying that that's not necessarily true.
 6              I'm saying that when you're in the space
 7   that we're in, there is so much emphasis on
 8   suspicious order monitoring.  And when you are in
 9   our world, you are doing so much monitoring of
10   customers.
11              And like I said, the three-phased approach
12   are looking at customers, you're determining the
13   limits that they are allowed to have, and you're
14   looking at the orders that are leaving the building.
15   So this was just something specific to our industry
16   and the world we're living in.
17      Q.   You would agree that at least in 2017 you
18   were aware that there was an obligation to report
19   the specific orders to the DEA and not just
20   customers, right?
21              MS. KOSKI:  Object to form.
22      A.   Yes, I know that there was an ask to report
23   orders.
24      Q.   And you knew that that was an ask previous
25   in time to that point, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And you know that Anda had not been doing

3    that, correct?

4           MS. KOSKI:  Object to form.

5      A.   I don't know --

6           MS. KOSKI:  Time period.

7      A.   -- the specifics of what took place all

8    throughout the period of time.  I know that we were

9    always in communication with the DEA about our

10   customer reviews.

11     Q.   You were on e-mails that were sent to the

12   DEA with suspicious customers, right?

13     A.   Yes.  Oh, no.  I would, at that point in

14   time, submit customers to be reported.  I don't

15   believe at this period in time I was the one that

16   was communicating and doing the reporting.

17     Q.   But you were at least cc'd or on the e-mails

18   throughout your period or throughout your time in

19   the Anda compliance department on e-mails that were

20   sent to the DEA, right?

21     A.   There was a period of time where I was not

22   cc'd on the communication.  Today, I am.

23     Q.   There was a period of time up until 2017

24   where you were cc'd on the communication, right?

25     A.   There is a possibility that I was, but there

```
 1    is also -- I don't know the date ranges.  There was

 2    a time period where I was not cc'd on it.

 3            (Anda - Solis Exhibit 21 was marked for

 4    identification.)

 5    BY MS. ELLIS:

 6      Q.   I'm handing you what's been marked as Anda

 7    Exhibit 21, and this is an e-mail from yourself to

 8    Christine Leon-Laurent, and entitled:  All Controls

 9    Y Customer Questionnaire No Master Combined.

10            You say:  "For meeting."

11            Do you have any recollection of what this --

12    what this is?

13      A.   I can assume that -- Christine worked in the

14    corporate chain area and that I was asking her to

15    help coordinate data that we were wanting to

16    collect.

17      Q.   And was this part of the customer

18    questionnaire project?

19      A.   Yes.

20      Q.   We're going to go ahead and switch and show

21    you the attachment to that.  It's been produced

22    in -- the page saver has been produced in paper

23    format here for the record, but we will also

24    distribute it to defense counsel as well as the --

25    as well as Golkow for the record.
```

Highly Confidential - Subject to Further Confidentiality Review

1          And what we have pulled up on this screen

2     I'll represent is what's been produced in native

3     format as Anda_Opioids_MDL 850139, the subsequent

4     Bates number from the e-mail that we just referenced

5     as attached as Exhibit 21.

6          Is this the spreadsheet that is attached to

7     that e-mail that you sent to Christine?

8     A.   I don't -- I don't know what was attached

9     but if you're saying that this is the attachment,

10    yes.

11    Q.   Does it look like this is what a list of

12    that sort would look like?

13    A.   Yes.

14    Q.   So what is this spreadsheet or what is your

15    understanding of what an "all controls yes CQ no"

16    spreadsheet is?

17    A.   You're showing who you are wanting to

18    collect a questionnaire from.

19    Q.   So these would be the customers that had

20    their ability to purchase controls flagged as yes in

21    TPS, correct?

22    A.   Correct.

23    Q.   And had the customer -- and Anda did not

24    have a customer questionnaire on file for them,

25    correct?

```
 1       A.   That can be interpreted a number of

 2   different ways.

 3            So it could be that the individual count

 4   showed a no.  And when you are dealing with these

 5   sort of chain locations, we could have had data on

 6   the O drive related to this customer yet the

 7   customer was not flagged.  Either way, we were

 8   wanting to collect data, new data, and flag these

 9   customers.

10       Q.   So is it fair to say in 2012 there was not

11   one place that you could go to determine if you had

12   up-to-date due diligence information on a customer

13   before making a determination of whether you should

14   allow them to buy controls?

15       A.   I'm sorry.  So could the information that we

16   collected be in more than one place?

17       Q.   Yes.

18       A.   Yes.

19       Q.   And it wasn't an easy way to determine

20   whether the information was up-to-date?

21       A.   They were saved in different places,

22   depending on the customer or group, yes.

23       Q.   Is it fair to say that this was an attempt

24   to put safeguards in place to prevent the

25   fulfillment of suspicious orders?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I don't think that this was necessarily

 2   related to -- directly related to the fulfillment of

 3   suspicious orders.  I believe that this was more

 4   targeting us collecting new information on our

 5   customers to know our customers.

 6        Q.   And it's your understanding, per your

 7   testimony earlier today, that that's one of the

 8   requirements of federal law, that you know your

 9   customers, right?

10             MS. KOSKI:  Object to form; mischaracterize

11        her testimony.

12        A.   It's one of the asks, yes.

13        Q.   It's one of the asks and it's one of the

14   responsibilities of Anda's compliance department,

15   right?

16        A.   Yes.

17        Q.   If we could just sort this spreadsheet here,

18   I think you can hit the filter button there at the

19   top.  And pardon me as I roll over.

20             Can we scroll over to the right there in the

21   spreadsheet.

22             So in column AV, that's the customer

23   questionnaire received, let's go ahead and filter

24   that.  Select "no" and take the blank off.

25             And then customers controls in column AD,
```

```
 1    filter that to say "yes," it is.  And can we tell

 2    how many people are on this spreadsheet at this

 3    point?

 4         MS. ELLIS:  I'm going to take a minute here

 5      to take a quick break.  And we'll probably wrap

 6      up after the next break, but I just want to get a

 7      couple of things organized first.

 8         MS. KOSKI:  Okay.

 9         THE VIDEOGRAPHER:  The time is 5:50 p.m.

10    We're going off the record.

11         (Recess from 5:50 p.m. until 6:04 p.m.)

12         THE VIDEOGRAPHER:  The time is 6:04 p.m.

13    We're now back on the record.

14    BY MS. ELLIS:

15    Q.   A moment ago I was asking you about the

16    spreadsheet 850139.  Was that the spreadsheet from

17    where you would have derived the number of customers

18    that had control flags on but did not have customer

19    questionnaires on file?

20         MS. KOSKI:  Object to form.

21    A.   That was based on a report on the -- what

22    the flags indicated in the customer master at that

23    time.

24    Q.   So that's the customer questionnaire info

25    sheet that you sent to Latoya twice that we talked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    about a minute ago?  It would have been based on a
 2    report like that?
 3          MS. KOSKI:  Object to form.
 4    A.    I'm not following.  The flags that the
 5    questionnaire flagged with Y or no and the
 6    dispensing data flagged Y or no would be based on a
 7    report that we were pulling based on what the flag
 8    indicated.
 9    Q.    So is that different -- a report was not the
10    spreadsheet that we were looking at a moment ago?
11    A.    No.  That spreadsheet is a report.
12    Q.    It is a report?
13    A.    Yes.
14    Q.    So is that a report from where you would get
15    this 9,624 number that we're looking at here?
16    A.    That report was specific to a segment of our
17    business.  That report was specific to the chain
18    area, and this seems to be a reflection of the
19    entire business trade class.  But you would use a
20    similar report.
21    Q.    Similar to the one that we just looked at?
22    A.    Yes.
23    Q.    And you would pull it in the same way, just
24    with different numbers -- or different fields?  I'm
25    sorry.
```

Highly Confidential – Subject to Further Confidentiality Review

1    A.    We could pull it with whatever criteria we

2    wanted to use.

3    Q.    Throughout your time in the compliance

4    department, were you -- how were you made aware of

5    what was being reported to the DEA at what time?

6          MS. KOSKI:  Object to form.

7    Q.    If at all.

8    A.    I'm not following how I was made aware.  I

9    know that it was -- if an analyst reviewed a

10   customer at any point in time and we determined that

11   we would not sell to them or we would discontinue

12   selling to them, we notified the DEA.

13   Q.    And sometimes you were on that list and

14   sometimes you were not, right?

15   A.    There was a period of time that I was not on

16   the list.  I am today.

17   Q.    There was a period of time when you were on

18   the list, right?

19   A.    Yes.

20   Q.    Have you seen the list before?

21   A.    That we report to the DEA?

22   Q.    Yes?

23   A.    Yes.

24   Q.    Do you know where that list was in the Anda

25   systems?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2       A.   Not at all times during the time I've worked

 3    at Anda.  I do today, yes.

 4       Q.   Is it your understanding that up until 2017

 5    it was a running spreadsheet that included all

 6    customers that had been reported at any point in

 7    time between, say, 2011 to 2017?

 8       A.   Yes.

 9       Q.   And that that same spreadsheet would be sent

10    over and over to the DEA, just with additional

11    information, right?

12       A.   Yes.

13       Q.   So if you were to look at the last version

14    of the spreadsheet, you could see all reports that

15    had been made prior to that point to the DEA on that

16    spreadsheet, right?

17       A.   Up to a certain time frame today, yes.

18       Q.   And that process, of course, changed when

19    Buzzeo came into effect; is that right?

20              MS. KOSKI:  Object to form.

21       A.   No.  We still notified the DEA with a

22    similar spreadsheet.

23       Q.   But it's a different spreadsheet?  It

24    changed at some point?

25       A.   It changes with updates, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Would you recognize that spreadsheet if I

 2   showed it to you?

 3        A.   Yes.

 4        Q.   Would you say -- is it fair to say that

 5   there was some confusion in the compliance

 6   department about who was to be reported or what

 7   customers were to be reported to the DEA at what

 8   point in time?

 9             MS. KOSKI:  Object to form.

10        A.   I wouldn't use the word confusion.  I think

11   that there has been discussions about who should be

12   reported.

13        Q.   Would you agree that it has not been

14   consistent throughout your time in the compliance

15   department about who was report -- or what customers

16   were reported at what time?

17             MS. KOSKI:  Object to form.

18        A.   I don't know if it's consistency because

19   it's due to who is reviewing the customer and what

20   they determine should be reported.

21             So, for example, if you're reviewing a

22   customer and you deny them controls at this period

23   of time because you don't have enough information to

24   make a conclusion, would you notify the DEA that

25   you're not selling to them just because you wanted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    more time, or are you going to notify the DEA of

 2    someone that as of this moment you would not sell

 3    to?

 4            That's the type of conversations we've had.

 5            (Anda - Solis Exhibit 22 was marked for

 6    identification.)

 7    BY MS. ELLIS:

 8       Q.   I'm handing you what's been marked as

 9    Exhibit 22.

10            Is that right?

11            MS. ELLIS:  Is that right?

12            MS. KOSKI:  Yes.

13       A.   Yes.

14       Q.   Thank you.

15            Anda Bates Number 493634.  This is an e-mail

16    from Robert Brown to yourself and Tasha Campbell as

17    well as some others in the compliance department; is

18    that right?

19       A.   Yes.

20       Q.   Is this one of those discussions that just

21    referenced about when a customer is to be reported

22    versus not?

23       A.   Yes.  This is another example of what would

24    be discussed.

25       Q.   And so in this situation you're asking
```

1    Mr. Brown, who was your boss at this point in

2    November of 2013; is that right?

3        A.   Correct.

4        Q.   You're asking him:  So you're on the same

5    page going forward, do we report this order?

6             Right?

7        A.   I think what I'm asking is at what point in

8    time would an order that is being reviewed be

9    determined as suspicious, yes.

10       Q.   And so it's fair to say that on November

11   5th, 2013, you were not clear on what a suspicious

12   order was?

13            MS. KOSKI:  Object to form.

14       A.   No, that's not correct.

15            In our world, when you're reviewing an order

16   and you're asking for more information from a

17   customer, if an order is held based on a lot of

18   different criteria and you want information and the

19   customer doesn't respond in enough time, you may

20   have to cancel the order because the customer hasn't

21   responded.

22            But that doesn't necessarily indicate that

23   it was suspicious altogether.  It could be that the

24   order was held, an analyst determined they wanted to

25   get updated data, the customer didn't respond in

```
 1    time.

 2         Q.   And so would that order be reported as

 3    suspicious or not?

 4         A.   Currently, today, it would be, yes.

 5         Q.   At that point would it have been?

 6         A.   I think I was asking for clarification here.

 7         Q.   Did this e-mail give you clarification as to

 8    whether that order would be reported or not?

 9         A.   Yes.  I think he was making clear to my

10    question, and he was along the lines of what I was

11    saying.  He was saying that it can be reported if we

12    inquire and we get data and we do determine it is

13    suspicious after review; or, number two, we don't

14    get data and we find the order in and of itself

15    suspicious without the data we're requesting.

16         Q.   So the answer would be yes, you would report

17    an order at that point as suspicious?

18         A.   Yes, if we find the order to be suspicious.

19              In our world, everything that holds to us is

20    not suspicious.  There is a lot of things that hold.

21    If we look at what is held and we say this is

22    suspicious, we would report it.

23         Q.   So what you're saying is at this point in

24    time, in 2013, an order could be held because it was

25    flagged by TPS according to SOM 40 and the criteria
```

1    that you said you weren't really completely familiar

2    with before, right?

3        A.   The programming aspect of it I was not

4    involved in, yes.

5        Q.   So an order could be held by TPS, right?

6        A.   Yes.

7        Q.   You could ask the customer for more

8    information and they could not give it to you?

9        A.   In our time frame, yes.

10       Q.   And you would not have necessarily reported

11   it to the DEA at that point?

12       A.   It's a possibility.

13       Q.   And so is it fair to say that it depended at

14   that point on the judgment of the analyst or whoever

15   was making the report to the DEA?

16       A.   It depends on what the customer was

17   ordering.  So if a customer is ordering something

18   for the first time and in today's world they are

19   ordering Viberzi for irritable bowel and they are

20   getting 100 pills of that, it's going to flag

21   because they haven't ordered that product.

22            Whether or not we would consider that

23   suspicious, I don't know if we would, and if we

24   looked at that order and said it's time to get

25   updated data, we might use that order as an

Highly Confidential - Subject to Further Confidentiality Review

1    opportunity to get updated data because it was

2    something we were reviewing.

3        Q.   Was it your understanding but still at this

4    point that suspicious orders particularly were not

5    being reported, only suspicious customers?

6         MS. KOSKI:  Object to form.

7        A.   I was aware that we were reporting

8    suspicious orders to the DEA -- or customers, yes.

9        Q.   Just to be clear for the record, you were

10   aware in 2013 that suspicious customers were being

11   reported to the DEA but not suspicious orders?

12       A.   I was aware that I was suggesting to report

13   customers that I had reviewed, yes.

14       Q.   You were suggesting customers to be

15   reported, correct?

16       A.   Yes.

17       Q.   But not specific orders?

18       A.   I don't know if I was.  There was another

19   e-mail somewhere else that I thought I had asked for

20   clarification, so -- and someone had said I'm going

21   to report this.  I don't know.  I'd have to see an

22   example.

23         (Anda - Solis Exhibit 23 was marked for

24   identification.)

25   BY MS. ELLIS:

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   I'm handing you what's been marked as

 2   Exhibit 23, and this is Bates Number Anda Opioids

 3   493357.  This seems to be an e-mail exchange between

 4   yourself and Isaac Pizaro and some others in the

 5   compliance department regarding Wake Forest Drug; is

 6   that right?

 7        A.   Yes.

 8        Q.   Who is Isaac Pizaro?

 9        A.   I believe he was a sales rep.

10        Q.   And here you say that this came through with

11   the suspicious orders, data was received, and

12   controls were removed, right?

13        A.   Yes.

14        Q.   So at this point in time, November 5th,

15   2013, this is about a week after the last e-mail

16   that we just discussed.

17             Was it your understanding that this order

18   would have been reported to the DEA?

19        A.   That's what the e-mail is indicating.  Emily

20   used to be the person who reported to the DEA.

21        Q.   So you thought the order was going to be

22   reported, right?

23        A.   Yes.

24        Q.   And what Emily says here:  Anytime there is

25   an order associated with a customer we cut, please
```

```
 1    supply cut in the e-mail so I can report it as a

 2    suspicious order.

 3          Right?

 4    A.    Yes.

 5    Q.    Did you have any reason to believe that the

 6    orders themselves were not being reported?

 7          MS. KOSKI:  Object to form.

 8    A.    I think that in the area of business that we

 9    do, we're scrutinizing customers on the front end,

10    we're setting conservative limits, and we're looking

11    for ways to report because when you're not even

12    allowing a customer to purchase from you based on

13    your front-end review, you're not leaving room for a

14    suspicious order.

15    Q.    I'll ask my question again.  And I do

16    appreciate that explanation, and I have some

17    questions about it.

18          But my question was:  Do you have any -- did

19    you have any reason at this point to believe that

20    the orders themselves were not being reported?

21          MS. KOSKI:  Object to form.

22    A.    This e-mail doesn't indicate that I had a

23    reason to believe that.  I was communicating with

24    the person as an analyst who was reporting to the

25    DEA that this should be reported.
```

1      Q.   So as an analyst, you thought this should be

2    reported to the DEA?

3      A.   Correct.

4      Q.   You weren't doing the reports at this point?

5      A.   Emily was the person communicating directly

6    with the DEA.

7           (Anda - Solis Exhibit 24 was marked for

8    identification.)

9    BY MS. ELLIS:

10     Q.   I'm handing you what's been marked as

11   Exhibit 24.  This is Anda Bates Number 419725.  This

12   is an e-mail from yourself to Robert Brown on April

13   25th, 2013 that -- do you recall this?

14     A.   No, I don't recall.  I'm reading through it.

15     Q.   Take a moment.

16     A.   Okay.

17     Q.   And here, this was an order that had been

18   placed; is that fair?

19     A.   Yes.

20     Q.   That you're debating whether you will be

21   deleting the order or you would be fulfilling it,

22   correct?

23          MS. KOSKI:  Object to form.

24     A.   Correct.

25     Q.   Do you recall what happened with this order?

```
 1      A.   I don't recall what happened.

 2      Q.   If you had a computer in front of you today

 3   and you were able to access your system, would you

 4   know where to go to look?

 5      A.   If I had the order number, I could find out

 6   what happened to that order, yes.

 7      Q.   And how would you do that?

 8      A.   I would have to know the order number, but

 9   yes, I could locate what happened if I knew that.

10      Q.   This number in front of Prescription Center

11   Pharmacies there, what number is that?

12      A.   Their customer number.

13      Q.   Is that not their customer DEA number?

14      A.   No.  That's the Anda customer number.

15      Q.   Is the Anda customer number the most

16   consistent number that you would use to look at a

17   customer?

18           MS. KOSKI:  Object to form.

19      A.   There's a number of different ways to

20   identify a customer, but we use the customer number

21   primarily.

22      Q.   So after sending an e-mail like this to

23   Mr. Brown, what was your understanding of what would

24   happen next when it came to reporting a suspicious

25   customer or order to the DEA?
```

```
 1              MS. KOSKI:  Object to form.

 2       A.   So what this is indicating is that this is a

 3    large customer, which doesn't mean anything, but it

 4    means that most likely their control percentages

 5    with Anda were pretty good and that their control to

 6    noncontrol ratio at Anda was pretty good.  And we're

 7    seeing an increase of ordering with those items.

 8    And if it's a large volume customer, that doesn't

 9    necessarily indicate that anything is wrong.

10              And what we're saying is this appeared, I

11    reviewed it, and I believe that updated data is

12    needed.  Because we have their order history and

13    because this customer is most likely in balance,

14    control to noncontrol ratio -- that's what we say

15    when we say large customer -- do we cancel this as

16    suspicious or do we ask for updated data.

17       Q.   And your inclination at this point was to

18    not fill the order; is that fair?

19       A.   My inclination was that I wanted to ask for

20    updated data after seeing the order, yes, because of

21    the age of the data.

22       Q.   But sitting here today you don't know if you

23    were able to do that?

24       A.   Today, I don't know if this order was

25    released.  I don't recall.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              (Anda - Solis Exhibit 25 was marked for

 2     identification.)

 3     BY MS. ELLIS:

 4        Q.   All right.  I'm handing you what's been

 5     marked as Exhibit 25, and this is a native format

 6     document that we're going to pull up on the screen

 7     in just a moment.  And we will also produce to

 8     defense counsel and the court reporting service.

 9              This is Bates Number Anda_Opioids_MDL 18604,

10     and this is -- if you can look at it on the computer

11     monitor in front of you.

12              Can you see that?

13        A.   Yes.

14        Q.   Is this the spreadsheet that we -- you

15     mentioned before was a cumulative spreadsheet that

16     was sent to the DEA?

17        A.   Yeah.  It's a version of a spreadsheet that

18     has been sent to the DEA.

19        Q.   On this version, it looks like there are

20     four tabs on it, correct?

21        A.   Yes.

22        Q.   There is customer cutoff, controls denied,

23     controls reinstated, and suspicious orders, right?

24        A.   Correct.

25        Q.   Let's go ahead and look at the suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    order tab, please.

 2            On this tab, the first suspicious order date

 3    in Row 2 seems to be 5/27/15; is that right?

 4        A.    Yeah, that's what the spreadsheet says.

 5        Q.    If you could just scroll down a little bit,

 6    it looks like there is five orders on that tab,

 7    correct?

 8        A.    Correct.

 9        Q.    And the last one is dated 7/19/16, correct?

10        A.    On this version, yes.

11        Q.    And that span -- those suspicious orders

12    span a period of time, I guess, from 5/27/15 to

13    7/19/16, which would be about 17 -- I guess 14

14    months, right?

15        A.    Yes.

16        Q.    Is it your understanding that orders were

17    not specifically being reported on a tab prior to

18    this 5/27/15 date?

19        A.    It's my understanding, if we go through the

20    other tabs and find out how many were denied and cut

21    off, that they could have quite possibly fallen into

22    a similar category.

23        Q.    Okay.  Well, let's go ahead and look at the

24    other tabs.  Let's start with customer cutoff and

25    let's just scroll across from Column A over.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              The first column is the date, right?
2      A.    Right.
3      Q.    Anda account is the second one, correct?
4      A.    Yes.
5      Q.    And the third column is additional accounts
6   number.
7              What is that?
8      A.    We used to have a separate account number
9   for our New York distribution facility.  That's not
10  something we use anymore.
11     Q.    The next one is the customer's DEA number,
12  right?
13     A.    Yes.
14     Q.    The customer name is in Column E?
15     A.    Yes.
16     Q.    Customer address in Column F, right?
17     A.    Yes.
18     Q.    Column G is the city of the customer,
19  correct?
20     A.    Yes.
21     Q.    Column H is the state of the customer?
22     A.    Yes.
23     Q.    And then Column I is Anda comments, right?
24     A.    Right.
25     Q.    Nowhere on that tab is there a place for a
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    specific order number, is there?

2    A.   No.

3    Q.   Let's go ahead and look at the controls

4    denied tab on the next sheet and again scroll

5    through those columns at the top.

6         They include date, Anda account, additional

7    account number, customer's DEA, name, address, city,

8    state, and then Anda comments.

9         The same categories as the previous tab,

10   right?

11   A.   Yes.

12   Q.   And nowhere on that tab is there an area for

13   an order number, is there?

14   A.   No.

15   Q.   And then we'll look at controls reinstated.

16   There is the same columns again across the top,

17   right?  Account, additional account information, DEA

18   number, name, address, city, state, and Anda

19   comments, right?

20   A.   Yes.

21   Q.   So nowhere on that controls reinstated tab

22   is there anyplace for an order number to be

23   specified, is there?

24   A.   Correct, unless it was entered in comments.

25   Q.   So unless it was entered in comments, that's
```

Highly Confidential - Subject to Further Confidentiality Review

1    your impression that those -- the order number would

2    not have been specified in this sheet sent to the

3    DEA, right?

4         A.   Correct.

5         Q.   And it's your understanding that this

6    spreadsheet was cumulative in time and included all

7    things that were reported to the DEA up to a certain

8    point in time, right?

9         A.   Yes.

10        Q.   Let's go to the customer cutoff tab and

11   scroll down to column -- let's go ahead and sort

12   Column A by date, if we can, and we'll sort oldest

13   to newest, if you could scroll up to the top.

14             So it looks like 10/6 of '10 is the first

15   customer cutoff that's reported there?

16        A.   On this spreadsheet.  But accounts were

17   reported to the DEA previous to that in other ways.

18        Q.   But you were not involved in that process,

19   right?

20        A.   I was not involved in that.

21        Q.   So you have no personal knowledge of that?

22        A.   I have knowledge that they were reported

23   because they were reported when accounts were cut

24   off, but this spreadsheet was adopted in 2010.

25        Q.   But you weren't involved in that process?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.

 2      Q.   Right?

 3           In fact, even after 2011, when you started

 4    in compliance, you were not involved, right?

 5           MS. KOSKI:  Object to form.

 6      A.   I did not report directly to the DEA, but I

 7    was involved with suggesting who should be reported

 8    to the DEA.

 9      Q.   So were you considered the owner of this

10    document?

11      A.   No.

12           MS. KOSKI:  Object to form.

13    BY MS. ELLIS:

14      Q.   Who would have been considered the owner of

15    this document?

16      A.   There -- there was no owner of the document

17    because all of the team members had input into what

18    was added to the document.

19           So, for example, when you mentioned the

20    amount of suspicious orders, if a customer is cut

21    off, that indicates that there was a review of some

22    sort that was triggered in some way, if it was an

23    audit, if it was an order, whatever it was.  And at

24    that point, due diligence was conducted and the

25    customer was cut off.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Let's scroll down, I think, to Row

 2   Number 892.

 3             MS. KOSKI:   892?

 4             MS. ELLIS:   Yes.

 5   BY MS. ELLIS:

 6        Q.   It looks like there is one out of place

 7   there, but the last one on this spreadsheet is

 8   November 16th, 2016, right?

 9        A.   The last date?

10        Q.   Yes.

11        A.   Ours is the 14th of --

12        Q.   The last one seems to be out of place, but

13   subsequently chronologically, November 16th, 2016?

14        A.   Yes.

15        Q.   Yes.  Let's go to the controls denied tab.

16   And again, sort this by Column A, oldest to newest,

17   and scroll down to the bottom.

18             It looks like chronologically there at the

19   bottom the last date on this is 6/20/17, right?

20        A.   Yes.

21        Q.   And then when we look at the controls

22   reinstated tab, there's no date in this field,

23   right?

24        A.   I don't see a date.

25        Q.   Okay.  So this is a spreadsheet that you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    testified you are familiar with, right?

 2         A.   Yes, I'm familiar.   This is an older

 3    version, yes.

 4         Q.   An older version than what?

 5         A.   Than what we use today.

 6         Q.   But this is what was used up to a certain

 7    point in time, right?

 8         A.   Yes.

 9         Q.   Do you know when they stopped using this

10    version?

11         A.   I think that this is going back further in

12    time, and the version we have today records from one

13    point to another, not quite going back that far.

14         Q.   Do you know when this spreadsheet stopped

15    being used?

16         A.   No.   It's still used today.   We just don't

17    have all of the -- those same historic entries are

18    not continuing to be sent to the DEA.

19         Q.   You've just taken those historic entries

20    off?

21         A.   Up to a certain time frame, yes.

22         Q.   When was that decision made, do you know?

23         A.   I don't know.   It was prior to me being

24    where I am today.

25         Q.   Do you know who made that decision?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   I do not.

 2      Q.   Do you know why that decision was made?

 3      A.   I do not.  Probably, if I had to guess, it's

 4   because there's a lot of entries that are older.

 5      Q.   If I told you that this was from June 23rd,

 6   2017, does that seem like about the time that this

 7   would have been still in use?

 8           MS. KOSKI:  The spreadsheet that's marked?

 9           MS. ELLIS:  Yes.

10           MS. KOSKI:  Because that's the date of it?

11           MS. ELLIS:  Yes, that's the date according

12       to the documents produced in relativity by the

13       defendant.

14      A.   It's possible, yes.

15           (Anda - Solis Exhibit 26 was marked for

16   identification.)

17   BY MS. ELLIS:

18      Q.   I'll hand you Exhibit 26.  This is a -- this

19   is actually the e-mail it was attached to.  And I

20   realize you're not on this e-mail, but I'm just

21   going to offer it as an exhibit for purposes of

22   dating this spreadsheet.

23           This is Exhibit Number 26, Bates Number

24   18603, and this is an e-mail from Jay Spellman to

25   the DOJ with the attached Anda customers to be
```

1    reported document, June 2017.

2         Is it your understanding this is the

3    spreadsheet that would have been reported along with

4    an e-mail like this?

5    A.   If this was the version at that time, yes.

6    Q.   And you were on these e-mails sometimes but

7    not at other times?

8    A.   There was a certain point of time when I

9    became added again.  I came back into the department

10   in December of '17, so I would have to see when I

11   started to be added again.

12   Q.   You were previously -- you were previously

13   on them?

14        MS. KOSKI:  Object to form.

15   A.   I don't recall.  I know that I am today.  I

16   know that it existed, but I was never a part of

17   reporting directly.  I don't know if I was copied.

18   Q.   So you don't remember?

19   A.   I don't remember.

20   Q.   But you have no reason to believe that this

21   spreadsheet is inaccurate, though, that was reported

22   to the DEA, right?

23   A.   I have no reason to believe that, no.

24   Q.   You have no reason to believe that it didn't

25   include everybody that had been reported to the DEA

Highly Confidential - Subject to Further Confidentiality Review

1    at that point in time, right?

2         MS. KOSKI:  Object to form.

3    A.   No, I'm not saying that because I know that

4    other customers previous to this were reported in

5    some way, shape, or form, but as of that time frame

6    that this started to be used, that's when we used

7    the spreadsheet form.

8    Q.   So you have no reason to believe that there

9    are customers besides those within the 2010 to 2017

10   dates that we looked at on the spreadsheets that

11   were reported to the DEA that wouldn't be on this?

12   A.   No, well -- the spreadsheet -- it's

13   possible.  There is a possibility that they were

14   reported in another way.  There were various things

15   reported.  But if we were using specifically the

16   spreadsheet in that time frame, it should be on

17   there.

18   Q.   Is there anyplace I would go besides a

19   spreadsheet like this to understand who would be

20   reported to the DEA between 2010 and 2017?

21   A.   Not that I'm aware of.  I believe that from

22   this time frame, you will see that.

23   Q.   Are there other places besides this that I

24   could pull that information from?

25   A.   Not --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2        A.   Not that I'm aware of.

 3        Q.   You testified earlier that within the

 4   compliance -- or within the -- pardon me, the notes

 5   field of TPS that it would include the customer

 6   reported to the DEA, right?

 7        A.   If a person did make that entry, yes, it

 8   would be found there.

 9        Q.   So is it possible that it could be made in

10   the notes field but not on this spreadsheet?

11        A.   There's always a possibility for error.

12        Q.   So there is not one place that we could look

13   to determine whether a customer had been reported in

14   that time frame without checking all of those

15   places, right?

16        A.   You could assume that there is a possibility

17   for error, but it should be on the spreadsheet.

18        Q.   Why don't you go to the first tab again,

19   please, and I'll direct you back to the previous

20   exhibit, which was Prescription Center Pharmacies.

21              MS. ELLIS:  Could you do a search for that?

22   BY MS. ELLIS:

23        Q.   Now, the exhibit prior to this was

24   Prescription Center Pharmacies from April 25th,

25   2013, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   And in that exhibit, as we discussed, there

3   was an order, right?

4      A.   Yes.

5      Q.   And there was a question of the order,

6   whether the order should be released or deleted,

7   right?

8      A.   Yes.

9      Q.   It's fair to say that this order and this

10   customer is not on this spreadsheet, right?

11        MS. KOSKI:   Object to form.

12      A.   I cannot say that without researching the

13   whole transaction and the order number.

14      Q.   You can't say based on the search that we

15   just did on the screen in front of you that that

16   customer is not on the spreadsheet?

17      A.   In the tab that you're in, customer cutoff,

18   they are not located there.

19        MS. ELLIS:   Let's go ahead and go to the

20     next one and do that search again.

21   BY MS. ELLIS:

22      Q.   Is it fair to say that you're not on the

23   controls denied tab either?

24      A.   Yes.  That's for an up-front review of a new

25   customer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. ELLIS:  Let's go ahead to the control

 2       reinstated tab and do the search there.

 3    BY MS. ELLIS:

 4       Q.   Is it fair to say they're not located there?

 5       A.   Yes.

 6            MS. ELLIS:  Let's go ahead to the suspicious

 7       order tab there and do a search.

 8    BY MS. ELLIS:

 9       Q.   Is it fair to say that they are not located

10    there either?

11       A.   Yes.

12            MS. ELLIS:  I just want to take a quick

13       break.

14            THE VIDEOGRAPHER:  Off the record at 6:42.

15            (Recess from 6:42 p.m. until 6:46 p.m.)

16            THE VIDEOGRAPHER:  The time is 6:46 p.m.

17       We're now back on the record.

18    BY MS. ELLIS:

19       Q.   Can you go back to Exhibit 1, Sabrina,

20    please.

21            Is it fair to say you did nothing to prepare

22    to access your TPS or Remedy accounts from this

23    deposition here today?

24            MS. KOSKI:  Object to form.

25       A.   I'm not understanding the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Did you do anything prior to coming to

 2   today's deposition so that you could access TPS or

 3   Remedy from the deposition today?

 4        A.   No.  I don't know, other than working.  I

 5   don't understand.

 6        Q.   You didn't bring a laptop with you?

 7        A.   No.

 8        Q.   You didn't make sure that you had the

 9   website address that you could go to so you could

10   log into the system?

11        A.   I don't have that with me, no.

12        Q.   You didn't bring anything like that with

13   you, right?

14        A.   No.

15        Q.   Do you see in the deposition notice where it

16   says that you're requested to produce access to

17   Anda's Turning Point system and Remedy system there?

18        A.   As mentioned, when you first gave it to me,

19   it was my first time seeing it.

20        Q.   But you do see that that's there now, right?

21        A.   Yes.

22             (Anda - Solis Exhibit 27 was marked for

23   identification.)

24   BY MS. ELLIS:

25        Q.   Let me hand you what's been marked as
```

```
 1      Exhibit 27.  This is Anda Bates Number 493332.  This

 2      is an article that you sent on May 13th, 2013 to

 3      members of the compliance team.

 4           Is that accurate?

 5      A.   Yes.

 6      Q.   And this is one of the articles that you

 7      mentioned before you would send around because it

 8      would help inform you in your job duties?

 9      A.   Yes.

10      Q.   And the subject of this article is Pills to

11      Heroin South Florida, right?

12      A.   Correct.

13      Q.   You also say here that you saw the same in a

14      documentary on TV about new trends with drugs,

15      right?

16      A.   New York Trends, yes.

17      Q.   New York Trends.

18           So you're essentially saying what they're

19      talking about in South Florida, you also saw in a

20      documentary about New York, right?

21      A.   Correct.

22      Q.   Let's go ahead to the article itself.  This

23      is an article from May 11th, 2013 from the Miami

24      Herald.

25           And would you agree that the point of this
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    article is discussing people who were hooked on

 2    oxycodone becoming addicted to heroin afterwards?

 3          MS. KOSKI:  Object to form;

 4       mischaracterize -- to the extent it characterizes

 5       the document, it speaks for itself.

 6    BY MS. ELLIS:

 7       Q.  Go ahead and take a moment to review that

 8    article, and why don't you tell me what it's about?

 9          This is an article you read at the time,

10    right?

11       A.  Yes.

12       Q.  You thought it was important to your

13    compliance team to send around?

14       A.  I think it's important for us to stay up to

15    date with anything that has to do with controlled

16    substances in the news.

17       Q.  So was it based -- your understanding based

18    on this article that an oxycodone addiction could

19    lead to heroin use?

20       A.  It is indicating that people were getting

21    away from pills for something that's cheaper.

22       Q.  So an oxycodone addiction could lead to

23    heroin abuse?

24       A.  It's possible.

25       Q.  And that's part of why you sent it to your
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    compliance team?

 2      A.    Yes.

 3            MS. ELLIS:  I have no further questions.

 4            MS. KOSKI:  Good news.  I don't have any

 5    questions.  This is Katy.

 6            Anyone in the room have further questions?

 7            Anyone on the phone have any questions for

 8    the witness?

 9            Hearing none, we're adjourned.

10            THE VIDEOGRAPHER:  The time is 6:51 p.m.

11    This marks the end of the deposition.

12            (Whereupon, the deposition concluded at

13    6:51 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2         I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of SABRINA

 6    SOLIS was duly taken on Thursday, January 10, 2019,

 7    at 10:27 a.m. before me.

 8         The said SABRINA SOLIS was duly sworn by me

 9    according to law to tell the truth, the whole truth

10    and nothing but the truth and thereupon did testify

11    as set forth in the above transcript of testimony.

12    The testimony was taken down stenographically by me.

13    I do further certify that the above deposition is

14    full, complete, and a true record of all the

15    testimony given by the said witness, and that a

16    review of the transcript was requested.

17

18    _____

19    Susan D. Wasilewski, RPR, CRR, CCP

20    (The foregoing certification of this transcript does

21    not apply to any reproduction of the same by any

22    means, unless under the direct control and/or

23    supervision of the certifying reporter.)

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5     and make any necessary corrections.  You should

 6     state the reason in the appropriate space on the

 7     errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10     and date it.  It will be attached to your

11     deposition.

12

13          It is imperative that you return the

14     original errata sheet to the deposing attorney

15     within thirty (30) days of receipt of the deposition

16     transcript by you.  If you fail to do so, the

17     deposition transcript may be deemed to be accurate

18     and may be used in court.

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -

 2                   E R R A T A

 3                    - - - - - -

 4    PAGE    LINE    CHANGE

 5    ____    ____    _____

 6       REASON: _____

 7    ____    ____    _____

 8       REASON: _____

 9    ____    ____    _____

10       REASON: _____

11    ____    ____    _____

12       REASON: _____

13    ____    ____    _____

14       REASON: _____

15    ____    ____    _____

16       REASON: _____

17    ____    ____    _____

18       REASON: _____

19    ____    ____    _____

20       REASON: _____

21    ____    ____    _____

22       REASON: _____

23    ____    ____    _____

24       REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I, _____, do hereby

4     acknowledge that I have read the foregoing pages, 1

5     through 362, and that the same is a correct

6     transcription of the answers given by me to the

7     questions therein propounded, except for the

8     corrections or changes in form or substance, if any,

9     noted in the attached Errata Sheet.

10

11

12    _____      _____

13    SABRINA SOLIS                                   DATE

14

15

16

17

18    Subscribed and sworn to before me this

19    _____ day of _____, 20___.

20    My Commission expires: _____

21

22    _____

      Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                          LAWYER'S NOTES

 2    PAGE      LINE

 3    _____     _____    _____

 4    _____     _____    _____

 5    _____     _____    _____

 6    _____     _____    _____

 7    _____     _____    _____

 8    _____     _____    _____

 9    _____     _____    _____

10    _____     _____    _____

11    _____     _____    _____

12    _____     _____    _____

13    _____     _____    _____

14    _____     _____    _____

15    _____     _____    _____

16    _____     _____    _____

17    _____     _____    _____

18    _____     _____    _____

19    _____     _____    _____

20    _____     _____    _____

21    _____     _____    _____

22    _____     _____    _____

23    _____     _____    _____

24    _____     _____    _____

25
```