1                 UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION
3

     IN RE: NATIONAL          )
4    PRESCRIPTION             )   MDL No. 2804
     OPIATE LITIGATION        )
5    _____ )   Case No.
                              )   1:17-MD-2804
6                             )
     THIS DOCUMENT RELATES )      Hon. Dan A.
7    TO ALL CASES             )   Polster
8

                TUESDAY, OCTOBER 16, 2018
9

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                     - - -
12             Videotaped deposition of Eric
13   Stahmann, held at the offices of BARTLIT BECK
14   HERMAN PALENCHAR & SCOTT LLP, 54 West
15   Hubbard, Suite 300, Chicago, Illinois,
16   commencing at 9:05 a.m., on the above date,
17   before Carrie A. Campbell, Registered
18   Diplomate Reporter, Certified Realtime
19   Reporter, Illinois, California & Texas
20   Certified Shorthand Reporter, Missouri &
21   Kansas Certified Court Reporter.
22                     - - -
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY PROCTOR, P.A.
BY: PETER MOUGEY, ESQUIRE
 pmougey@levinlaw.com
 PAGE POERSCHKE, ESQUIRE
 ppoerschke@levinlaw.com
 LAURA DUNNING, ESQUIRE
 ldunning@levinlaw.com
 JEFF GADDY, ESQUIRE
 jgaddy@levinlaw.com
316 South Baylen Street
Pensacola, Florida 32502
(850) 435-7000

NAPOLI SHKOLNIK, PLLC
BY: HUNTER J. SHKOLNIK, ESQUIRE
 hunter@napolilaw.com
 SAL BADALA, ESQUIRE
 (VIA TELECONFERENCE)
360 Lexington Avenue, 11th Floor
New York, New York 10017
(212) 397-1000
Counsel for Plaintiffs

WILLIAMS & CONNOLLY LLP
BY: COLLEEN MCNAMARA, ESQUIRE
 cmcnamara@wc.com
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5331
Counsel for Cardinal Health, Inc.

REED SMITH LLP
BY: STEVEN BORANIAN, ESQUIRE
 sboranian@reedsmith.com
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
Counsel for AmerisourceBergen

Page 3

BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
BY: KASPAR STOFFELMAYR, ESQUIRE
 kaspar.stoffelmayr@bartlit-beck.com
 KATE SWIFT, ESQUIRE
 kswift@bartlit-beck.com
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4400
and
BY: ALEX J. HARRIS, ESQUIRE
 alex.harris@bartlit-beck.com
 (VIA TELECONFERENCE)
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
(303) 592-3100
Counsel for Walgreens

JONES DAY
BY: TINA M. TABACCHI, ESQUIRE
 tmtabacchi@jonesday.com
77 West Wacker
Chicago, Illinois 60601-1692
(312) 782-3939
Counsel for Walmart

PELINI, CAMPBELL & WILLIAMS LLC
BY: PAUL B. RICARD, ESQUIRE
 pbricard@pelini-law.com
8040 Cleveland Avenue NW, Suite 400
North Canton, Ohio 44720
(330) 305-6400
Counsel for Prescription Supply,
Inc.

ZUCKERMAN SPAEDER LLP
BY: ANTHONY M. RUIZ, ESQUIRE
 aruiz@zuckerman.com
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
(202) 778-1800
Counsel for CVS Indiana, LLC, and
CVS RX Services, Inc.

Page 4

MARCUS & SHAPIRA LLP
BY: ROBERT M. BARNES, ESQUIRE
 rbarnes@marcus-shapira.com
 (VIA TELECONFERENCE)
301 Grant Street, 35th Floor
Pittsburgh, Pennsylvania 15219-6401
(412) 338-4690
Counsel for HBC

KIRKLAND & ELLIS, LLP
BY: PRATIK GHOSH, ESQUIRE
 pratik.ghosh@kirkland.com
300 North LaSalle
Chicago, Illinois 60654
(312) 862-3671
Counsel for Allergan Finance, LLC

VIDEOGRAPHER:
 MICHAEL NEWELL,
 Golkow Litigation Services

TRIAL TECHNICIAN:
 COREY SMITH,
 Golkow Litigation Services

 – – –

Page 5

INDEX

 PAGE
APPEARANCES...................................... 2
EXAMINATIONS
 BY MR. MOUGEY............................... 9
 BY MR. STOFFELMAYR....................... 387
 BY MR. MOUGEY............................. 414

 EXHIBITS
No. Description Page
Walgreens Eric Stahmann LinkedIn 10
Stahmann 1 curriculum vitae

Walgreens Walgreens Central Pharmacy 53
Stahmann 2 Operations-Pharmaceutical
 Integrity org chart,
 WAGMDL00289186 -
 WAGMDL00289188

Walgreens Masters Pharmaceutical, Inc. 78
Stahmann 3 Vs. Drug Enforcement
 Administration opinion

Walgreens "OxyContin: Its use and 109
Stahmann 4 abuse: Hearing before the
 Subcommittee on Oversight
 and Investigations of the
 Committee on Energy and
 Commerce, House of
 Representatives, One Hundred
 Seventh Congress, first
 session, August 28, 2001

Walgreens US Department of Justice 129
Stahmann 5 June 12, 2012 letter to
 registrant,
 ABDCMDL00269683 -
 ABDCMDL00269693

Highly Confidential - Subject to Further Confidentiality Review

1 Walgreens    Settlement and Memorandum of    172
2 Stahmann 6    Agreement,
   P-WAG-0001
3 Walgreens    E-mail(s),    222
   Stahmann 7    WAG00000950 - WAG00001012
4
   Walgreens    Staff Pharmacist Bonus    263
5 Stahmann 8    Program,
   WAG00000007 - WAG00000008
6
   Walgreens    E-mail(s),    281
7 Stahmann 9    WAGMDL00183798 -
   WAGMDL00183800;
8    WAGMDL00205379 -
   WAGMDL00208716
9
   Walgreens    StoreNet screenshot with    337
10 Stahmann 10    handwritten notes,
   WAG00001912 - WAG00001913
11
   Walgreens    Handling Suspicious Orders    342
12 Stahmann 11    and Loss of Controlled
   Drugs,
13    WAG00000028
14 Walgreens    Handling Suspicious Drug    345
   Stahmann 12    Orders,
15    WAG00000027
16 Walgreens    Opioid Shipments to    361
   Stahmann 13    BW4673554 by Distributor,
17    P-WAG-1272
18
   (Exhibits attached to the deposition.)
19
20
21
22
23
24
25

1    VIDEOGRAPHER: We are now on
2 the record. My name is Michael
3 Newell. I am a videographer for
4 Golkow Litigation Services.
5    Today's date is October 16,
6 2018. The time is 9:05 a.m.
7    This video deposition is being
8 held in Chicago, Illinois, in the
9 matter of In Re: National
10 Prescription Opiate Litigation for the
11 Northern District of Ohio.
12    The deponent is Eric Stahmann.
13    Will counsel please identify
14 themselves for the record?
15    MR. MOUGEY: Peter Mougey for
16 the plaintiffs.
17    MS. POERSCHKE: Page Poerschke
18 for the plaintiffs.
19    MS. DUNNING: Laura Dunning for
20 the plaintiffs.
21    MR. SHKOLNIK: Hunter Shkolnik
22 for the plaintiffs.
23    MR. GADDY: Jeff Gaddy for the
24 plaintiffs.
25    MR. GHOSH: Pratik Ghosh for

1 the Allergan defendants.
2    MR. BORANIAN: Steven Boranian
3 for defendant AmerisourceBergen.
4    MR. RICARD: Paul Ricard,
5 Prescription Supply, Inc.
6    MS. MCNAMARA: Colleen
7 McNamara, Cardinal Health.
8    MS. TABACCHI: Tina Tabacchi,
9 defendant Walmart.
10    MS. SWIFT: Kate Swift for
11 Walgreens.
12    MR. STOFFELMAYR: Kaspar
13 Stoffelmayr for Walgreens.
14    VIDEOGRAPHER: The court
15 reporter is Carrie Campbell, who will
16 now swear in the witness.
17    MR. STOFFELMAYR: Is there
18 someone in the room who should be
19 identified?
20    MR. MOUGEY: Corey, would you
21 mind just introducing yourself?
22    MR. SMITH: Oh, yeah, I'm the
23 trial tech. I'm just also present.
24    MR. STOFFELMAYR: I just didn't
25 know. Thanks.

1    MR. MOUGEY: If we could get
2 who is on the phone, that would be
3 fantastic.
4    MR. HARRIS: Alex Harris for
5 Walgreens.
6    MR. BARNES: Robert Barnes for
7 HBC.
8    MR. BADALA: Sal Badala,
9 plaintiffs.
10    MR. RUIZ: Anthony Ruiz for
11 CVS.
12
13    ERIC STAHMANN,
14 of lawful age, having been first duly sworn
15 to tell the truth, the whole truth and
16 nothing but the truth, deposes and says on
17 behalf of the Plaintiffs, as follows:
18
19    DIRECT EXAMINATION
20 QUESTIONS BY MR. MOUGEY:
21    Q.    Good morning, Mr. Stahmann.
22 I'm Peter Mougey.
23    Am I pronouncing your last name
24 correctly?
25    A.    Stahmann.

Page 10

1  Q.  Stahmann.
2  A.  Yes.
3      (Walgreens-Stahmann Exhibit 1
4  marked for identification.)
5  QUESTIONS BY MR. MOUGEY:
6  Q.  I'm going to hand you what we
7  are marking as Stahmann 1.
8      I believe this is your résumé
9  or CV that you had on LinkedIn, correct, sir?
10  A.  Yes.
11  Q.  And you've obviously seen this
12  before, correct?
13  A.  Correct.
14  Q.  You drafted this?
15  A.  I did.
16  Q.  Posted it on social media
17  through LinkedIn?
18  A.  Yes.
19  Q.  And you reviewed it, and to
20  the -- it's accurate, correct, sir?
21  A.  Yes.
22  Q.  And you understand when you're
23  posting something such as your CV or résumé
24  online, that you've taken pretty good care to
25  walk through your experience and areas of

Page 11

1  responsibility to accurately reflect those on
2  this CV, correct, sir?
3  A.  Correct.
4  Q.  And have you had an opportunity
5  to review this document for your deposition
6  today?
7  A.  Briefly, yes.
8  Q.  Okay.  If we could, start on
9  page 3 of 3 under Education.
10      You finished your master's
11  degree in 2002, correct?
12  A.  Correct.
13  Q.  Here in Chicago, Loyola of
14  Chicago, correct?
15  A.  Yes.
16  Q.  And a master's degree in
17  criminal justice, law background, correct,
18  sir?
19  A.  Correct.
20  Q.  And then -- with an undergrad
21  in biology, correct, sir?
22  A.  That's correct.
23  Q.  And then after, sir, there's a
24  period that's missing from 2002 to 2006.  You
25  were in law enforcement for at least a period

Page 12

1  of that time?
2  A.  That is correct.
3  Q.  And would you give me some
4  background on what your law enforcement
5  experience was?
6  A.  Sure.  I worked briefly --
7  total law enforcement career was under five
8  years.  I worked for the DuPage County
9  Sheriff's Office for two and a half, three
10  years, and then I transferred to Glendale
11  Heights Police Department.
12  Q.  And what was your capacity with
13  the -- with both police departments?
14  A.  DuPage County I worked in the
15  jail and the corrections facility, and then I
16  transferred to Glendale Heights as patrol.
17  Q.  Walk me through your
18  responsibility on patrol.  What was your --
19  what was the scope of your responsibilities?
20  A.  Patrol was basically --
21  responsibilities was average police officer,
22  respond to calls that are given to us, patrol
23  the streets, community service.  Just normal
24  police officer duties.
25  Q.  All right.  And the jail?

Page 13

1  A.  Jail was to secure the inmates
2  in the jail, make sure that everybody was
3  safe, everybody was cooperating, everybody
4  was following the regulations inside the
5  jail.
6  Q.  So kind of a corrections
7  officer, so to speak?
8  A.  Correct.
9  Q.  And those five years in those
10  two roles, were those after your graduate
11  degree and before Walgreens?
12  A.  Yes.
13  Q.  Did you work your way through
14  school with either the police department or
15  jail?
16  A.  No.
17  Q.  So after you left the county --
18  I'm sorry, after you left your role as a
19  police officer, you went to work with
20  Walgreens?
21  A.  Correct.
22  Q.  And you went to work with
23  Walgreens in June of 2006 with a title of
24  senior analyst investigator, correct?
25  A.  That is not correct.  I

Page 14

1 actually started off as a pharmacy tech for
2 Walgreens.
3     Q.    And how long were you a
4 pharmacy tech with Walgreens?
5     A.    Close to nine months to ten
6 months.
7     Q.    And then you went into your
8 senior analyst investigator role?
9     A.    I actually went -- briefly, for
10 under a year, I started off in finance.  I
11 worked for a loyalty card called a
12 Prescription Savings Club card which offered
13 discounts to members -- customers that did
14 not have insurance.
15     Q.    So in June of 2006, you
16 transferred into a new role with senior
17 analyst investigator, correct?
18     A.    June of 2006 is when I started
19 my career at Walgreens as a pharmacy tech.
20     Q.    When did you begin your role as
21 senior analyst investigator?
22     A.    I don't know the exact date,
23 but it was probably 2007, 2008.
24     Q.    All right.  So the entry under
25 senior analyst investigator beginning in June

Page 15

1 of 2006 is inaccurate?
2     A.    The start date is inaccurate,
3 yes.
4     Q.    So it was more 2007, 2008?
5     A.    Correct.
6     Q.    And then in your role as a
7 senior analyst investigator, on your CV, it's
8 blank, correct, sir?
9     A.    I'm sorry, say that again.
10     Q.    It's blank under your
11 description under senior analyst
12 investigator?
13     A.    It is blank, yes.
14     Q.    Would you please walk me
15 through what the scope of your
16 responsibilities were as a senior analyst
17 investigator at Walgreens?
18     A.    Sure.
19          So I was working for what was
20 known as loss prevention.  It's asset
21 protection now.  I ran reports for the asset
22 protection department to help identify
23 employee pilferage for controlled substances
24 in the pharmacy.  I mostly ran queries for
25 the field leadership to help them with their

Page 16

1 investigations of diversion.
2     Q.    Walk me through what the kind
3 of suite of different reports you had
4 available to you as an analyst at Walgreens.
5     A.    Any and all prescription data.
6 So the queries we were able to pull
7 basically -- we can pull any type of
8 prescription data related to when a
9 prescription was filled, when it was entered.
10          We also looked at exception
11 reporting that -- the reports were
12 automatically or automated for Walgreens.  We
13 provided those exception reports to the
14 field.
15          We also -- I also provided
16 ancillary reports to those exception
17 reporting to help investigators either
18 pulling video or providing them with
19 instances of time for when prescriptions were
20 being filled so they can identify employee
21 pilferage or pilferage.
22     Q.    Walk me through, under the
23 automated exception reports and the ancillary
24 reports, kind of specifically what type of
25 information you had available to query or

Page 17

1 pull?
2     A.    So the ancillary reports -- the
3 exception reports, I'll start there.  The
4 exception reports, there was a dashboard
5 called the LPX RX, and it was basically a KPI
6 or a metric where field leadership had access
7 to where they -- the exception reports showed
8 prescription -- or not prescriptions, showed
9 movements where it could identify
10 opportunities where there could be diversion
11 or loss in the pharmacy.
12          So it populated negative
13 adjustments, so adjustments made by the
14 pharmacy staff, negatively adjusting their
15 on-hand count, and those were the exception
16 reports on the LPX RX report.  And then I
17 provided ancillary reports to show, for that
18 particular medication, if a prescription was
19 being filled during a time frame.  If there
20 wasn't, we have video of someone going to the
21 shelf, touching that medication.  That could
22 be an indicator of employee pilferage or
23 theft.
24     Q.    Those reports were targeted or
25 aimed at identifying employee theft or

Page 18

1 employee adjustments that were -- indicated
2 there were thefts in the department?
3     A.    Correct.
4     Q.    And were not targeted to
5 identifying diversion at the pharmacy level
6 in Walgreens' role as a distributor, correct?
7         MR. STOFFELMAYR:  Objection to
8     the form.
9         THE WITNESS:  Correct.  They
10    were -- they were only reports for
11    employee pilferage.  It was to
12    identify losses in the pharmacy.
13        MR. STOFFELMAYR:  Just make
14    sure before you answer, give me a
15    chance to chime in if I want to.
16    Okay?
17 QUESTIONS BY MR. MOUGEY:
18    Q.    Any other exception reports
19 than the employee pilferage that you just
20 walked me through?
21    A.    There are other reports, yes.
22    Q.    Walk me through what other
23 reports were available to you in your role as
24 a senior analyst investigator.
25    A.    Available to -- other reports

Page 19

1 available to me were negatively adjusted
2 versus overbuy reports.
3     Q.    Explain what that is.
4     A.    So in SIMS, which is the
5 inventory management system our pharmacies
6 use, there are reports that indicate if a
7 pharmacy is buying or receiving controlled
8 substances or any type of medication more
9 than they're selling with negative
10 adjustments.
11    Q.    Anything other than the
12 negative adjustment report and the employee
13 pilferage reports you just walked me through?
14    A.    There were reports called
15 13-week or 15-week {sic} movement reports.
16 Those basically just showed if a particular
17 item -- the movement during that specified 13
18 or 52-week movement.  So it was sales,
19 receipts, claims.
20    Q.    Other than the three kind of
21 broader areas you identified, employee
22 pilfering, negative adjustments and 13-week,
23 15-week, anything else that you can identify
24 in the suite of reports available to you as a
25 senior analyst at Walgreens?

Page 20

1     A.    There were probably others, but
2 I can't recall offhand.
3     Q.    Any types of reports
4 identifying suspicious orders or orders of
5 any size or frequency that were red flagged?
6     A.    There were reports that were
7 run for suspicious orders and orders of
8 interest.
9     Q.    And when you say "That were
10 run," were they not automated?
11    A.    They were automated.
12    Q.    And explain to me what data was
13 pulled in those reports identifying red flags
14 or suspicious orders.
15        MR. STOFFELMAYR:  Objection to
16    the form.  Foundation.
17        THE WITNESS:  So I never
18    actually pulled -- I never actually
19    provided -- put the data inside the
20    reports.  They were automated, so the
21    orders that were in these reports were
22    only orders of interest based off of
23    what the DEA's general description of
24    a suspicious order was.
25

Page 21

1 QUESTIONS BY MR. MOUGEY:
2     Q.    Explain to me what your
3 understanding of what the DEA's description
4 of an order of interest was.
5         MR. STOFFELMAYR:  Objection to
6     form.  Foundation.
7         THE WITNESS:  I only know what
8     the -- my understanding of -- my
9     interpretation of it, and my
10    interpretation may not be what legal's
11    representation or interpretation is.
12 QUESTIONS BY MR. MOUGEY:
13    Q.    Sure.  And that's what I
14 understand.
15        I'm asking you today in your
16 role as a senior analyst at Walgreens, do you
17 have an understanding of what the DEA's
18 definition of an order of interest was?
19        MR. STOFFELMAYR:  Same
20    objection.
21        THE WITNESS:  My role today, I
22    do.
23        Back then, I did not.
24 QUESTIONS BY MR. MOUGEY:
25    Q.    What is your understanding

Page 22

1 today of the DEA's definition of an order of
2 interest?
3    A.    From my understanding, it's any
4 order of an unusual size, frequency or
5 deviates from normal movement.
6    Q.    And when between 2006 when you
7 began at Walgreens until today did you
8 develop an understanding of what the DEA's
9 definition of order of interest was?
10    A.    When I took my role as a
11 manager for pharmaceutical integrity.
12    Q.    If you'd, please, sir, turn to
13 page 2 of 3 of your CV.
14        Under the section Walgreens,
15 six years, nine months, project manager,
16 pharmacy loss prevention --
17        MR. MOUGEY:  Corey, could you
18 pull this up, please?
19 QUESTIONS BY MR. MOUGEY:
20    Q.    And you held that role
21 approximately six years and nine months,
22 correct, sir?
23    A.    Correct.
24    Q.    And the title on your CV,
25 project manager, pharmacy loss prevention,

Page 23

1 correct?
2    A.    Yes.
3    Q.    Beginning in June of 2012 to
4 February of 2013, correct?
5    A.    I don't remember exactly, but
6 that sounds correct.
7    Q.    All right.  Let's walk through
8 some of these bullets.  The first
9 bullet that --
10        MR. STOFFELMAYR:  I'm sorry,
11    did you say he was a project manager
12    for six years?  Because that's --
13        THE WITNESS:  Yeah, I was not a
14    project manager for six years.  I was
15    with Walgreens for six years at that
16    time.
17        MR. STOFFELMAYR:  You see what
18    I mean?  He was a project manager for
19    however many months, but that up there
20    is the whole time he was at Walgreens.
21        MR. MOUGEY:  Sure, I appreciate
22    that.
23        MR. STOFFELMAYR:  You see what
24    I mean?
25 QUESTIONS BY MR. MOUGEY:

Page 24

1    Q.    Project manager at pharmacy
2 at -- pharmacy loss prevention from June
3 of 2012 to February of '13, correct?
4    A.    That's about right.
5    Q.    And you had been at Walgreens
6 at the end of that tenure as project manager
7 six years and nine months, correct?
8    A.    Correct.
9    Q.    And let's walk through some of
10 the bullets under your role as project
11 manager.
12        Very first bullet, "Compile and
13 interpret data for internal pharmacy theft
14 cases and for statistical purposes to monitor
15 diversion," correct, sir?
16    A.    That's correct.
17    Q.    Would you please explain what
18 your understanding of what diversion is in
19 the pharmacy context?
20    A.    Diversion can be a multiple of
21 things. So basically any loss out of the
22 pharmacy, so whether it's customer diversion,
23 employee diversion; it can mean a lot of
24 different things.
25    Q.    How about diversion in the

Page 25

1 supply chain that opiates or pills are used
2 for illegal purposes at the practitioner
3 level?
4    A.    I don't know how we would be
5 able to capture diversion from that
6 standpoint.
7    Q.    Walk me through what --
8 statistical purposes to monitor diversion,
9 explain to me what you mean by that mean.
10    A.    So statistical purposes, so
11 to -- the reports we ran -- or I ran provided
12 data outside of what those automated
13 exception reports were.
14        So to monitor diversion, if
15 there were continuous negative adjustments
16 happening at a pharmacy, it would help to
17 determine whether or not there's -- something
18 internally is happening, either procedurally
19 where stores aren't posting orders correctly
20 or just something incorrectly happening at
21 the store level that could cause these
22 negative adjustments.
23        Part of my job was to help
24 those field leaders determine whether or not
25 there's actual loss happening or diversion

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 happening at the pharmacy or if there's
2 something operationally that's happening at
3 the pharmacy that needs to be corrected.
4     Q.    So definition of diversion as a
5 project manager at Walgreens was -- continue
6 to be the employee pilfering and manual
7 adjustments, et cetera, at the pharmacy
8 level, correct, sir?
9     A.    Correct.
10        MR. STOFFELMAYR: Objection to
11     the form.  Give me a second.
12 QUESTIONS BY MR. MOUGEY:
13     Q.    Go to the fourth bullet,
14 "Intimate work with statistical software and
15 databases, including, but not limited to,
16 Access, Excel, Oracle, WebSDL, IC Plus, SIMS,
17 EDW, Mobius and Business Objects."
18        Do you see that, sir?
19     A.    I do.
20     Q.    And explain to me what Mobius
21 is.
22     A.    My understanding, it is an
23 application that houses reports.
24     Q.    And what kind of reports?
25     A.    The reports that were in there

Page 27

1 were from human resources, basically any
2 report that was in there - human resources,
3 employee relations, employee background
4 information.  They had a whole bunch of
5 different reports in there.
6     Q.    Did you say Mobius in the
7 context of diversion?
8     A.    I did not.
9     Q.    Did you store reports in Mobius
10 in the context of diversion?
11     A.    I did not.
12     Q.    Did anyone at Walmart {sic}
13 that you're aware of store reports regarding
14 diversion on Mobius?
15        MR. STOFFELMAYR: I think you
16     mean Walgreens.
17        MR. MOUGEY: Did I say Walmart?
18     Yeah.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    Did you -- were you aware of
21 any reports being stored in Mobius regarding
22 diversion?
23     A.    I am not aware.
24     Q.    So you never pulled any reports
25 out of Mobius having to do with diversion

Page 28

1 while at Walgreens?
2     A.    Not to diversion, no.
3     Q.    Any reports pulled out of
4 Mobius while you were at Walgreens in the
5 context of orders of interest or suspicious
6 reports?
7     A.    Yes.
8     Q.    All right.  Now, when I just
9 asked you the question of whether or not you
10 had pulled any reports out of Mobius while at
11 Walgreens regarding diversion, you answered
12 no.  And I asked in the context of interest
13 of orders or suspicious reports, you answered
14 yes.
15        Tell me what the difference is
16 in your mind.
17     A.    Orders of interest or
18 suspicious orders don't necessarily mean
19 diversion or theft.
20     Q.    They are potential -- the
21 reports are a means or mechanism to identify
22 red flags or potential areas of interest,
23 correct, sir?
24     A.    Which reports?
25     Q.    Any reports.

Page 29

1        MR. STOFFELMAYR: Objection to
2     the form.
3        Go ahead.
4        THE WITNESS: The report -- the
5     reports in Mobius that I pulled were
6     only for orders of interest or
7     suspicious orders.
8 QUESTIONS BY MR. MOUGEY:
9     Q.    And did you not use those
10 reports out of Mobius to identify potential
11 areas of diversion?
12     A.    I did not.
13     Q.    What specific reports did you
14 pull out of Mobius at Walgreens?
15     A.    The only report that I pulled
16 were the orders of interest and suspicious
17 orders report.
18     Q.    All right.  And what is
19 captured in those reports?
20     A.    Orders that -- based off of
21 those generic DEA identification of what a
22 suspicious order is, orders that were orders
23 of interest based off of those generic
24 descriptions for the DEA suspicious orders.
25     Q.    You understand in databases

Page 30

1  that there's fields with specific information
2  in them, correct?
3      A.    I do.
4      Q.    And in your intimate work with
5  statistical software and databases, you
6  understand that those fields can be --
7  specific fields can be pulled and reports run
8  to turn data into information, correct, sir?
9          MR. STOFFELMAYR:  Objection to
10     the form.
11         THE WITNESS:  Can you rephrase
12     that for me, please?
13 QUESTIONS BY MR. MOUGEY:
14     Q.    There's a ton of transactional
15 data at Walgreens on a day-to-day basis
16 regarding opiates, correct, sir?
17     A.    There is.
18     Q.    There's a significant amount of
19 data at Walgreens with pharmaceutical
20 transactions in general, correct, sir?
21     A.    Correct.
22     Q.    And the reports were used to
23 pull specific fields to assist Walgreens to
24 identify areas of potential diversion,
25 correct, sir?

Page 31

1      A.    Correct.
2      Q.    And you understand that those
3  reports pulled specific fields of data to
4  assist Walgreens in its job to identify
5  suspicious orders, correct, sir?
6      A.    Correct.
7      Q.    And, sir, would you please
8  explain to me what fields, what information
9  was pulled to populate a report to assist
10 Walgreens with identifying suspicious orders?
11         MR. STOFFELMAYR:  Objection to
12     the form.  Foundation.
13         THE WITNESS:  So I do not know
14     what was actually populated in those
15     Mobius reports.  I just pulled them,
16     burned them on a CD and sent them off
17     to the individual DEA local offices
18     and to our distribution centers.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    So you performed no analysis on
21 any of those reports?
22     A.    That is correct.
23     Q.    You have no earthly idea what
24 was in the reports?
25         MR. STOFFELMAYR:  Objection to

Page 32

1      the form.
2          THE WITNESS:  I don't remember
3      exactly what our -- what was in those
4      reports.
5  QUESTIONS BY MR. MOUGEY:
6      Q.    Do you remember generally what
7  was in those reports?
8      A.    Generally, yes.
9      Q.    What generally was in those
10 reports?
11     A.    Orders of interest and
12 potential suspicious orders.
13     Q.    Define for me what an order of
14 interest was or a potential suspicious order.
15         MR. STOFFELMAYR:  Objection to
16     the form.  Foundation.
17         THE WITNESS:  So I don't -- my
18     definition of an order of interest is
19     an order that could potentially be --
20     based off those -- DEA definition of
21     what's a suspicious order, an order of
22     interest could lead to an order of
23     interest based off of our -- or a
24     suspicious order based off of the DEA
25     definition.

Page 33

1  QUESTIONS BY MR. MOUGEY:
2      Q.    How frequently were you pulling
3  those reports off of Mobius and forwarding
4  them to the DEA?
5      A.    On a monthly basis.
6      Q.    Were you aware if anyone at
7  Walgreens was reviewing those reports that
8  were sent to the DEA?
9      A.    I don't know if anybody from
10 Walgreens were reviewing those reports.
11     Q.    Did anybody come back to you
12 and ask you for additional information on any
13 of those reports from Walgreens?
14     A.    Personally, no.
15     Q.    Did anybody send you an e-mail
16 or ask for any additional information on any
17 of those reports from Walgreens?
18     A.    No.
19     Q.    Okay.  Let's continue down to
20 the paragraph that begins with, "Facilitate
21 activities."
22         Do you see where I am?
23     A.    Yes.
24     Q.    "Facilitate activities and
25 projects for HCLP team leads and analysts,

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 proactively support loss prevention manager
2 investigations across the country with data
3 requests."
4         Let's stop right there.  Okay?
5         So part of your role as project
6 manager at Walgreens was to pull data
7 requests for project managers across the
8 country, correct?
9     A.    Correct.
10    Q.    Your role was not limited to
11 any geographical space or region as a project
12 manager, correct?
13    A.    At that time, no.
14    Q.    And you continue on in that
15 sentence, it says, "In content expert advice
16 as it pertains to compliance, fraud, waste
17 and abuse with the Walgreens family of
18 companies."
19        Sir, what expert advice were
20 you providing to Walgreens as it pertains to
21 compliance, fraud, waste and abuse with the
22 Walgreens family of companies?
23    A.    The advice I was providing were
24 for the field leadership.  If they were
25 investigating suspected losses at their

Page 35

1 pharmacy, I was able to provide my expertise
2 as a pharmacy tech to explain the workflow of
3 how a prescription is entered, filled and
4 what that looks like in keystrokes.
5        So if there's anything that
6 diverts from those average keystrokes, I can
7 identify those and bring those to the
8 attention of the local field leadership, who
9 would then perform their either interview or
10 investigation to a specific employee.
11    Q.    Okay.  Let me go back to the
12 suspicious order reports or the order of
13 interest reports that you were forwarding to
14 the DEA.
15        What -- what years did you --
16 did you pull those reports?
17    A.    I can't recall exactly when.
18    Q.    Just generally, what years did
19 you pull those reports?
20    A.    It was when I was working in --
21 towards the later end of my career in loss
22 prevention.  So probably 2011, 2012.
23    Q.    Have you had an opportunity to
24 review what period of time Walgreens sent
25 those reports to the DEA outside of when that

Page 36

1 was your area of responsibility?
2    A.    I did not, no.
3    Q.    Was there anyone else that you
4 were aware of that was also sending the
5 reports for suspicious orders or orders of
6 interest to the DEA?
7    A.    Yes.
8    Q.    And who else was that?
9    A.    At the time it was my
10 manager/supervisor, Marcie Ranick.
11    Q.    And how did you -- is it
12 Ranick?
13    A.    Ranick.
14    Q.    How did you and Ms. Ranick
15 divide responsibilities over who sent the
16 orders of interest or suspicious orders to
17 the DEA?
18    A.    She did it for a period of time
19 before I was in loss prevention, asset
20 protection, and then towards the end of my
21 career, she kind of delegated that role or
22 that responsibility to me.
23    Q.    All right.  The next bullet on
24 your CV, "Serve as the subject matter expert
25 on all systems, applications and initiatives

Page 37

1 related to the inventory movement and
2 associated functions that can cause and/or
3 monitor pharmacy health/" -- I'm sorry,
4 "pharmacy/health care shrink.  Examples would
5 include, but are not limited to, point of
6 sale systems, inventory management, cash
7 management, prescription monitoring and
8 processing, internal theft, DEA requirements,
9 corporate programs, regulatory issues and
10 operation policies," correct, sir?
11    A.    That's what it states here,
12 yes.
13    Q.    And for the second time on the
14 second page of your CV, you have used the
15 word "expert" to describe your areas of
16 responsibility, correct, sir?
17    A.    For those applications, yes.
18    Q.    And one of those applications
19 included the DEA requirements, correct, sir?
20    A.    That is correct.
21    Q.    And, sir, what was your
22 understanding of what the DEA requirements
23 were during your tenure at Walgreens in
24 relation to the prescription of opiate,
25 Schedule II or Schedule III?

Page 38

1        MR. STOFFELMAYR:  Objection to
2    the form.
3        THE WITNESS:  I can't recall
4    specifically what those requirements
5    were at that particular time.
6    QUESTIONS BY MR. MOUGEY:
7        Q.    I'm assuming that while you
8    were at Walgreens, you received significant
9    training regarding your areas of
10   responsibility, but more specifically the DEA
11   requirements regarding Schedule II and
12   Schedule III narcotics?
13       A.    I was not.
14       Q.    You were not trained on what
15   the DEA requirements were on Schedule II and
16   Schedule III requirements?
17       A.    I was not.
18       Q.    And what study or academic
19   background do you have that you would
20   indicate that you had subject matter
21   expertise on DEA requirements?
22       A.    I have not had any education or
23   background regarding those.
24       Q.    The last bullet point on this
25   page, "Serves as a subject matter expert on

Page 39

1    all systems."
2            Sitting here today, is that an
3    accurate and truthful statement regarding
4    your areas of expertise at Walgreens?
5        A.    In my role, yes, at the time.
6        Q.    In your role as understanding
7    and having an expertise as far as the DEA
8    requirements, is that a truthful statement,
9    sir?
10       A.    It is a truthful statement for
11   my role in loss prevention, asset protection.
12       Q.    And is it a truthful statement,
13   sir, that you have subject matter expertise
14   on regulatory issues and operation policies?
15       A.    As my role in asset protection,
16   loss prevention, yes.
17       Q.    Is it also a truthful or
18   accurate statement, sir, that you have
19   subject matter expertise on Walgreens'
20   corporate programs?
21       A.    Those pertain to my role in
22   loss prevention, asset protection, yes.
23       Q.    And, sir, is it also a truthful
24   or accurate statement that you have subject
25   matter expertise regarding prescription

Page 40

1    monitoring and processing?
2        A.    Yes, in my role that pertains
3    to loss prevention and asset protection.
4        Q.    And in your role as loss
5    prevention and asset protection, you had
6    day-to-day responsibilities regarding
7    Schedule II and Schedule III opiates,
8    correct, sir?
9        A.    Those were part of my daily
10   responsibilities, yes.
11       Q.    If you turn to the first page
12   of your CV.  Beginning in February of 2013,
13   you were promoted to manager of
14   pharmaceutical integrity, correct, sir?
15       A.    That is correct.
16       Q.    Do you have an understanding of
17   why or when the pharmaceutical integrity
18   group at Walgreens was created?
19       A.    I do.
20       Q.    And why is that?
21       A.    It was part of the settlement
22   agreement with the DEA on the memorandum of
23   agreement.
24       Q.    And when were you informed that
25   the pharmaceutical integrity group was being

Page 41

1    created as a result of the MOA, memorandum of
2    agreement?
3        A.    When was I informed?
4        Q.    Yes, sir.
5        A.    I was informed when I joined
6    the team.
7        Q.    All right.  So let's walk
8    through your areas of responsibility as
9    manager of the pharmaceutical integrity -- is
10   it a department?  Group?  What would you
11   refer to it as?
12       A.    Department.
13       Q.    So your first bullet,
14   "Responsible for managing, creating and
15   managing controlled substance dispensing,
16   monitoring and reporting programs," correct,
17   sir?
18       A.    That is correct.
19       Q.    Would you please explain what
20   you mean by the first bullet?
21       A.    So our team manages the
22   monitoring of controlled substances that are
23   going into the pharmacies and out of the
24   pharmacies.  So we have an application called
25   a CSO KPI that handles that for our team.  It

Page 42

1 automatically populates an application with
2 what the store receives and what they
3 dispense.
4      Q.    Was that system in place prior
5 to the creation of the pharmaceutical
6 integrity department?
7      A.    I do not believe it was.
8      Q.    The second bullet, "Develops,
9 recommends and implements programs,
10 procedures and techniques which will identify
11 and minimize loss of company assets and
12 ensure the safety, compliance and security of
13 the ordering and dispensing of controlled
14 substances," correct, sir?
15           Did I read that right?
16      A.    That's correct.
17      Q.    Would you please explain what
18 you mean by the second bullet?
19      A.    Our team was instrumental in
20 developing our policies and procedures
21 revolving around good faith dispensing and
22 target drug, good faith dispensing policies.
23      Q.    Were the good faith dispensing
24 policies in place prior to the implementation
25 of the pharmaceutical integrity department?

Page 43

1      A.    It was not.  Well, those
2 specific policies and procedures were not in
3 place, but we did have policies regarding
4 good faith dispensing.
5      Q.    Would you agree with me, sir,
6 that the policies in place at the
7 implementation of the pharmacy --
8 pharmaceutical integrity department were
9 significantly more robust prior to -- I'm
10 sorry, after the MOA with the DEA?
11      A.    They were more robust.
12      Q.    Sir, the third bullet,
13 "Responsible for investigating/reporting
14 potential violations of law, regulations or
15 company policy applicable to controlled
16 substances to the appropriate business
17 centers, units and director of pharmaceutical
18 integrity," correct, sir?
19           MR. STOFFELMAYR:  Sorry, where
20 are you?  The third bullet?
21           MR. MOUGEY:  The -- yes.
22           MR. STOFFELMAYR:  I'm sorry,
23 okay.
24 QUESTIONS BY MR. MOUGEY:
25      Q.    Third bullet, did I read that

Page 44

1 correctly?
2      A.    That's correct.  That's what it
3 states here.
4      Q.    Please explain to me what you
5 mean by that third bullet?
6      A.    So a part of what our team's
7 responsibilities were to make sure that
8 individual state laws are being followed
9 regarding pick up and dispensing of
10 controlled substances.
11      Q.    When you say "pick up and
12 dispensing of controlled substances," what do
13 you mean?
14      A.    So certain states require
15 identification of patients that are picking
16 up their controlled substance medications and
17 that we had to record those IDs.
18      Q.    The fourth bullet, "Recommend
19 and implements programs designed to enhance
20 and improve the ordering and dispensing of
21 controlled substances, i.e., process and
22 policy initiative, ensures companywide
23 awareness and adequate understanding of the
24 functions and responsibilities of the
25 pharmaceutical distribution and dispensing

Page 45

1 integrity group," correct?
2      A.    That's what it states here,
3 correct.
4      Q.    Explain to me that last
5 sentence in that bullet, "ensures companywide
6 awareness and adequate understanding of the
7 functions and responsibilities of the
8 pharmaceutical distribution."
9           What does that mean, sir?
10      A.    So we made sure that our
11 pharmacy is aware of the procedure to get
12 additional controlled substances into their
13 pharmacies as well as other prescription
14 medications.  We made them aware that we
15 implemented two applications, that if they
16 needed additional controlled substances
17 outside of what the system auto-suggested,
18 that there was a process in place that they
19 had to follow in order to get those
20 additional medications.
21      Q.    So if they exceeded their
22 threshold, that was the policy or procedure,
23 to order additional Schedule II or
24 Schedule III narcotics?
25      A.    It was for any Schedule II

Page 46

1 through V, and we had two separate types
2 of -- we had a tolerance limit and a ceiling
3 limit.
4    Q.   And, sir, was part of your role
5 that you were recommending specific programs
6 to ensure there was companywide awareness and
7 adequate understanding of the
8 responsibilities of the pharmacy --
9 pharmaceutical distribution?
10    A.   Yes.
11    Q.   Next bullet, "Develops and
12 maintains an interactive and collaborative
13 working relationship," and it identifies the
14 DEA, "to drive industry-leading solutions to
15 pharmaceutical diversion," correct, sir?
16    A.   Correct.
17    Q.   And what exactly did you do,
18 sir, that you and Walgreens were driving
19 industry-leading solutions to pharmaceutical
20 diversion?
21    A.   So Walgreens has implemented
22 two programs: One is the safe medication
23 disposal program, which allows customers to
24 dispose of unwanted or unused medications at
25 no cost to them. We have 1,088 locations

Page 47

1 across the chain where any medication can be
2 disposed of into a kiosk. Those medications
3 are then sent off to one of our hazardous
4 waste haulers, destruction facility where
5 they are incinerated.
6        The other program is our
7 naloxone program where naloxone is a -- is a
8 medication that reverts the effects of opioid
9 overdose, and it's a lifesaving medication
10 that we have now available without a
11 prescription.
12    Q.   Now, the second program is not
13 a program that is a solution to
14 pharmaceutical diversion, correct, sir?
15    A.   Correct.
16    Q.   And the first program that you
17 mentioned, the, I'll call it, takeback or
18 that -- people turning in unwanted or unused
19 Schedule II, Schedule III narcotic
20 prescriptions, correct, sir?
21    A.   It's any type of medication.
22    Q.   So when you say "unwanted,
23 unused," that people had in their homes that
24 they hadn't taken the entire prescription,
25 correct?

Page 48

1    A.   That's correct.
2    Q.   And you would agree that that
3 is a potential area of diversion, correct,
4 sir?
5    A.   It could lead to diversion,
6 correct.
7    Q.   Yes, sir.
8        And you would agree with me
9 that the -- that the volume of Schedule II
10 and Schedule III narcotics prescribed to
11 people and then remain unused in their homes
12 was a potential area of diversion, correct,
13 sir?
14    A.   I can agree to that.
15    Q.   Next bullet, you "collaborate
16 with other departments in order to meet the
17 needs of the department and the company's
18 objective," correct?
19    A.   Correct.
20    Q.   What other departments?
21        You give some examples here:
22 Legal, government affairs, logistics, loss
23 prevention, IT.
24        Any other department that you
25 collaborated with in your role as manager of

Page 49

1 pharmaceutical integrity?
2    A.   Those are the main ones. We
3 also collaborated with the operations team,
4 which basically -- any type of program that
5 touches the stores, they have to get
6 involvement with just to make sure they land
7 or they're launched correctly in those
8 stores.
9    Q.   The next bullet, "Collaborate
10 all levels of management concerning required
11 compliance and audit reviews and initiatives
12 to ensure adherence to federal, state and
13 local laws and regulations," correct, sir?
14    A.   That's correct.
15    Q.   Next bullet, "Coordinates
16 unique investigations involving controlled
17 substance ordering and dispensing, which may
18 involve highly sensitive and/or extremely
19 confidential information," correct, sir?
20    A.   That is correct.
21    Q.   Would you please explain to me
22 what you mean by that second to last bullet
23 on page 1 of 3?
24    A.   High sensitive or extremely
25 confidential information deals with HIPAA

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  information. So we're able to view patient
2  and profile information, prescription
3  history. We have to treat it as highly
4  sensitive in regards to HIPAA.
5      Q.   Yes, sir.
6           But the first part of that
7  sentence, "coordinates unique investigations
8  involving controlled substance ordering and
9  dispensing," what did you mean by that, sir?
10     A.   So for investigations regarding
11 ordering, dispensing, kind of as -- reverting
12 back to those reports, the exception reports,
13 the store is ordering more than they're
14 selling, and there's negative adjustments.
15          It kind of -- it flags on an
16 exception report, so we help coordinate by
17 providing data in terms of orders that are
18 coming in, sales history for the
19 investigators, and we provide any additional
20 information that can help the investigators
21 determine loss of controlled substances.
22     Q.   And when you say "reverting
23 back to the exception reports," those were
24 the -- the employee pilfering reports
25 internally at the store, correct, sir?

Page 51

1      A.   Correct. They were available
2  on a -- it's called StoreNet. It's a
3  public-facing for our stores, a web page.
4      Q.   All right. So those unique
5  investigations you're referring to include,
6  for example, the employee pilfering report,
7  the negative adjustments report, the 13-,
8  15-week reports you mentioned earlier?
9      A.   13- and 52-week.
10     Q.   13- and 52-week. Thank you.
11          And were there additional
12 reports under your unique investigations
13 involving controlled substance ordering and
14 dispensing that you're referring to here in
15 the second to last bullet on page 1 of 3 of
16 your CV?
17     A.   Not that I can recall at this
18 time.
19     Q.   Would you explain to me
20 again -- and I'm sorry if you've already done
21 this -- but what the 13-week, 52-week report
22 was?
23     A.   So it's basically a snapshot of
24 that -- for a particular pharmacy, a snapshot
25 of either 13- or 52-week movement of what

Page 52

1  they received, product, and what they sold,
2  and any claims for any product that was
3  damaged in transit or damaged at the
4  pharmacy, those would be considered claims.
5      Q.   Okay. What was the goal or
6  objective of running that 13-week, 52-week
7  report? What were you looking for?
8      A.   So those reports basically
9  provided another means for identifying
10 possible losses that are coming out of a
11 pharmacy. So those reports will show what a
12 store received, what they sold, and if it
13 doesn't match up with the prescription sales
14 history, if there's negative adjustments, we
15 can see that that sort of potentially has a
16 leak of medications.
17     Q.   And I think you referred to
18 that internally at Walgreens in loss
19 prevention as shrinkage, correct?
20     A.   Correct.
21     Q.   Meaning that -- where there are
22 Schedule II or Schedule III narcotics that
23 were disappearing internally at Walgreens,
24 correct?
25     A.   Those were some of the

Page 53

1  medications on there.
2      Q.   Yes, sir.
3           The last bullet on page 1 of 3,
4  "Develops innovative programs to identify and
5  analyze areas that address drug diversion and
6  regulatory compliance," correct, sir?
7      A.   That is correct.
8      Q.   And the last bullet, "Develops
9  appropriate metrics to identify suspicious
10 controlled substance acquisition, inventory
11 or utilization," correct, sir?
12     A.   Correct.
13     Q.   I would like you to keep that
14 handy, and we'll come back to it.
15          I hand you what we're going to
16 mark as Stahmann 2.
17          (Walgreens-Stahmann Exhibit 2
18          marked for identification.)
19 QUESTIONS BY MR. MOUGEY:
20     Q.   Have you seen this document
21 before, Mr. Stahmann?
22     A.   I have not seen this particular
23 one, no.
24     Q.   If you turn to the last page,
25 in the bottom right-hand corner, it has a

Page 54

1 date, April 2, 2013, correct?
2     A.    Correct.
3     Q.    And you see the org chart
4 directly above that, correct, sir?
5     A.    I do.
6     Q.    And you see your name under
7 Tasha Polster, director of pharmaceutical
8 integrity, correct?
9     A.    Correct.
10     Q.    And that was your role as
11 manager, correct, sir?
12     A.    Yes, I was manager at that
13 time.
14     Q.    And so you directly reported to
15 the director, Ms. Polster, of the
16 pharmaceutical integrity department, correct,
17 sir?
18     A.    Correct.
19     Q.    And was there a division of
20 duties between you and the other managers on
21 this organizational structure?
22     A.    There were.
23     Q.    And please explain to me what
24 the division of duties were between you,
25 Ms. Daugherty, Mr. Dymon and Mr. Bratton?

Page 55

1     A.    So at that time we all had the
2 same duties, but we had different areas of
3 responsibilities, so different areas would be
4 part of the country for orders.
5     Q.    And in addition to being
6 divided in different parts of the country,
7 did you-all have areas of expertise that you
8 helped on regarding specific initiatives?
9     A.    Yes.
10     Q.    And please explain to me what
11 those different areas of expertise were.
12     A.    So Patricia and Chris were both
13 pharmacists, so they provided insight
14 regarding their pharmacist's background.  Ed
15 Bratton, his expertise or skill, was running
16 data queries, creating reports, and my
17 expertise was in loss prevention, asset
18 protection.
19     Q.    Now, you -- your geographic
20 area in the pharmaceutical integrity group
21 was the West, correct, sir?
22     A.    That is correct.
23     Q.    And so each of these --
24 Ms. Daugherty, Mr. Dymon and Mr. Bratton also
25 had regions as well, correct?

Page 56

1     A.    That is correct.
2     Q.    And so explain to me how these
3 areas of expertise, between the pharmacist,
4 the data queries and loss prevention -- how
5 did you-all divide those up on top of the
6 geographical responsibilities you had?
7     A.    So those were kind of
8 cross-trained, so even though Patty and Chris
9 had pharmacist's backgrounds, they provided
10 insight in things throughout the country.
11         So if a policy was being
12 implemented, they provided their
13 pharmaceutical -- pharmacist's background.
14 So there -- if it was something that was
15 touching all of the chain or company, we all
16 would provide insight to it.  So if it's
17 something that touched all of the chain or
18 company, it wasn't just specific to our areas
19 of region.
20     Q.    Now, if I use the word
21 "constituents," does that make sense to you?
22     A.    Yes.
23     Q.    What does that mean to you,
24 constituents?
25     A.    From my understanding,

Page 57

1 constituents would be -- maybe I have the
2 definition wrong.  Actually, I really don't
3 know the exact definition.
4     Q.    How about the people you serve?
5     A.    Okay.
6     Q.    The people -- so when you were
7 a police officer with the -- with the city,
8 and you were literally out on the beat
9 driving the car, making sure that people were
10 following the rules and laws, who would
11 you -- what was your understanding of who
12 your constituents were, people --
13     A.    The people that I served, so it
14 would be the community.
15     Q.    The community at large,
16 correct?
17     A.    Correct.
18     Q.    And I'm assuming that's a
19 position that you took very seriously,
20 correct?
21     A.    Yes.
22     Q.    And your day-to-day
23 responsibilities meant taking care of and
24 protecting people at large, correct?
25     A.    Yes.

Page 58

¹ Q. And you followed up on
² information and leads that were given to you
³ to ensure the people you served were safe,
⁴ correct?
⁵ A. Correct.
⁶ Q. And that was a tremendously
⁷ important job that you filled for a few
⁸ years, correct, sir?
⁹ A. Yes.
¹⁰ Q. And your area of expertise when
¹¹ you transitioned into Walgreens -- you also
¹² had a position of trust at Walgreens,
¹³ correct, sir?
¹⁴ A. Correct.
¹⁵ Q. And you capitalized on your
¹⁶ background and your academic background at
¹⁷ Walgreens, correct?
¹⁸ A. Yes.
¹⁹ Q. Now, you also had constituents,
²⁰ or people, that you served in your job at
²¹ Walgreens, correct?
²² A. Correct.
²³ Q. And sitting here today in your
²⁴ role as pharmaceutical integrity and your
²⁵ role as project manager and loss prevention

Page 59

¹ and as a senior analyst investigator, who
² were the -- your constituents or the people
³ that you served?
⁴ MR. STOFFELMAYR: Objection to
⁵ the form.
⁶ THE WITNESS: Yeah, it's too
⁷ broad of a statement. We -- we served
⁸ a lot of people, so I can't really
⁹ answer that directly.
¹⁰ QUESTIONS BY MR. MOUGEY:
¹¹ Q. All right. Let's break them
¹² down one by one.
¹³ A. Yeah.
¹⁴ Q. Let's start off in your role as
¹⁵ project manager in the pharmacy loss
¹⁶ prevention.
¹⁷ Who were the people you served?
¹⁸ Who was -- who were your constituents?
¹⁹ MR. STOFFELMAYR: Objection to
²⁰ the form.
²¹ THE WITNESS: Again, it spanned
²² over quite a few different areas, so I
²³ couldn't say specifically who the
²⁴ constituents were.
²⁵

Page 60

¹ QUESTIONS BY MR. MOUGEY:
² Q. Well, generally, tell me who --
³ the different areas, who were the people you
⁴ were serving? Who were the people that were
⁵ your constituents in your role as project
⁶ manager in pharmacy loss prevention?
⁷ MR. STOFFELMAYR: Objection to
⁸ the form.
⁹ THE WITNESS: Again, yeah, I
¹⁰ can't say specifically who we served,
¹¹ because it just covered such a broad
¹² area.
¹³ QUESTIONS BY MR. MOUGEY:
¹⁴ Q. Well, I'm not asking you
¹⁵ specifically. I'm asking you generally.
¹⁶ Generally, in your role as a
¹⁷ project manager, pharmacy loss prevention at
¹⁸ Walgreens, who were you serving? Whose
¹⁹ interest were you protecting?
²⁰ A. Both Walgreens and the
²¹ customers.
²² Q. And you were protecting
²³ Walgreens in loss prevention to minimize or
²⁴ alleviate shrinkage, correct?
²⁵ A. At the time I was helping our

Page 61

¹ field leaders with their investigations
² regarding shrink.
³ Q. And explain to me what part of
⁴ your role as a project manager in pharmacy
⁵ loss prevention at Walgreens was to protect
⁶ customers or patients.
⁷ MR. STOFFELMAYR: Objection to
⁸ the form.
⁹ THE WITNESS: I can't say
¹⁰ specifically. I don't -- I don't
¹¹ recall exactly.
¹² QUESTIONS BY MR. MOUGEY:
¹³ Q. All right. When you mentioned
¹⁴ customers earlier as part of those people you
¹⁵ were working to protect, who did you mean by
¹⁶ customer? Who was the customer?
¹⁷ A. Customers could mean the actual
¹⁸ individual or patients that come to
¹⁹ Walgreens. Customers could be other
²⁰ businesses within Walgreens -- other
²¹ departments within Walgreens, sorry, and
²² other businesses that work with Walgreens.
²³ Q. So I'm not talking about
²⁴ businesses within Walgreens or divisions
²⁵ within Walgreens, and I'm not talking about

Page 62

1 other businesses. Let's talk about --
2 specifically about patients or customers.
3          What part of your job as
4 project manager in pharmacy loss prevention
5 was designed to protect patients or customers
6 of the pharmacy?
7          MR. STOFFELMAYR: Objection to
8     the form.
9          THE WITNESS: Yeah, I can't --
10    I don't recall specifically what
11    aspects of my job at the time would
12    impact customers or help with the
13    constituents.
14 QUESTIONS BY MR. MOUGEY:
15    Q.    Let's break them down one by
16 one.
17          Patients: What part of your
18 job generally in your role as project manager
19 of pharmacy loss prevention was designed to
20 protect patients?
21          MR. STOFFELMAYR: Objection to
22    the form.
23          THE WITNESS: Yeah. Like I
24    said, I can't recall exactly what
25    parts of my job touched the individual

Page 63

1     customers.
2 QUESTIONS BY MR. MOUGEY:
3    Q.    All right. You keep using the
4 word "exactly" or "specifically." I'm not
5 asking you exactly or I'm not asking you
6 specifically.
7          I'm asking you generally what
8 part of your job as project manager in
9 pharmacy loss prevention was designed to
10 protect patients?
11          MR. STOFFELMAYR: Objection to
12    the form.
13          THE WITNESS: I can't recall.
14 QUESTIONS BY MR. MOUGEY:
15    Q.    What part of your job
16 specific -- I'm sorry. What part of your job
17 generally as manager of pharmaceutical
18 integrity was designed to protect patients?
19          MR. STOFFELMAYR: Objection to
20    the form.
21          THE WITNESS: So as -- in
22    pharmaceutical integrity, we make sure
23    that patients are getting medications
24    for legitimate medical purposes.
25

Page 64

1 QUESTIONS BY MR. MOUGEY:
2    Q.    And that was a new role for you
3 beginning in February of 2013?
4    A.    Correct.
5    Q.    Do you have an understanding
6 sitting here today what department or group
7 within Walgreens was responsible for
8 protecting patients by ensuring they're
9 getting medication for legitimate medical
10 purposes?
11    A.    Prior to my role in asset --
12 pharmaceutical integrity? No, I cannot
13 recall.
14    Q.    You don't recall any general
15 group or division within Walgreens whose job
16 it was to ensure that patients were getting
17 medications for legitimate medical purposes
18 prior to February of 2013?
19          MR. STOFFELMAYR: Objection to
20    the form.
21          THE WITNESS: I cannot recall.
22    I'm not saying that there wasn't. I
23    just can't recall.
24 QUESTIONS BY MR. MOUGEY:
25    Q.    The document that you have in

Page 65

1 front of you, Stahmann 2, on the org chart,
2 on the third page of this document, has --
3 each region or each manager has business --
4 two business analysts that are reporting to
5 the manager, correct, sir?
6    A.    That's what it states here, but
7 that is not correct today.
8    Q.    What is not -- what was not --
9 was it correct at the time in April of 2013?
10    A.    It was not.
11    Q.    All right. What was incorrect
12 about it?
13    A.    So at the time we each had one
14 business analyst that reported to us.
15    Q.    Would you explain to me or are
16 you familiar with what the role of business
17 analysts were at the time in April of 2013,
18 correct?
19    A.    Correct.
20    Q.    And you were familiar with the
21 role of the business analyst from the
22 inception of the pharmaceutical integrity
23 unit, correct, sir?
24    A.    Only -- I joined pharmaceutical
25 integrity after it was created, so my

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 understanding of the role of the business
2 analyst started as -- when I took a manager
3 position for RX integrity.
4     Q.    And what is your understanding
5 of what the business analyst's scope of
6 responsibilities were in the pharmaceutical
7 integrity department?
8     A.    So they would help provide
9 reports for either requests that came in from
10 outside agencies like the DEA, State Boards
11 of Pharmacy.  They would provide reports for
12 audits, investigations, if an outside agency
13 was investigating a particular prescriber for
14 a particular patient.
15         We also provided reports for
16 other departments inside Walgreens if they
17 were unable to pull that data themselves.
18     Q.    Were there reports that were
19 automated that the business analysts were
20 responsible for pulling on a regular basis?
21     A.    There were some, yes.
22     Q.    All right.  And what were
23 those?
24     A.    I can't recall exactly which
25 ones -- or I can't recall all of them, but

Page 67

1 there were reports for -- we have an internal
2 reporting where it indicates the amount of
3 sales of controlled substances, receipts of
4 controlled substances, those are all
5 automated reports.
6     Q.    If you turn to the second page
7 of this document, your picture in the upper
8 left-hand corner, Eric Stahmann.
9         "Eric is a certified pharmacy
10 technician, earned a bachelor's degree in
11 biology and a master's degree in criminal
12 justice from Loyola University in 2002.  He's
13 been with Walgreens for over six years, most
14 recently in health care loss prevention,
15 where he investigated fraud, waste and abuse
16 cases."
17         Is that accurate, sir?
18     A.    Yes.
19     Q.    "Prior to starting his career
20 at Walgreens, Eric spent time as a law
21 enforcement officer."
22         And that's correct?
23     A.    That is correct.
24     Q.    "He's currently the
25 pharmaceutical integrity manager for the

Page 68

1 western division," correct?
2     A.    That is correct.
3     Q.    Would you differentiate your
4 role in pharmaceutical integrity from your
5 previous experience at Walgreens in any way?
6     A.    So my role in pharmaceutical
7 integrity was different than any other role
8 is -- well, it was different than asset
9 protection, loss prevention.  Just based off
10 of the reports I was pulling in loss
11 prevention, I was providing ancillary reports
12 for the field leaders to help them with their
13 investigations.
14         Here in pharmaceutical --
15 pharmaceutical integrity, it was more
16 surrounding policies, procedures around
17 controlled substances.
18     Q.    So from your initial employment
19 at Walgreens, beginning in approximately June
20 of 2006 until you left your role as a senior
21 analyst investigator in 2012, would you
22 describe that function as protecting patients
23 of Walgreens?
24         MR. STOFFELMAYR:  Objection to
25 the form.

Page 69

1         THE WITNESS:  Yeah.  I can't --
2 it was probably a benefit of the job
3 or a subsequent {sic} of the job, but
4 it wasn't our primary responsibility.
5 QUESTIONS BY MR. MOUGEY:
6     Q.    When you say it was a benefit
7 of the job or a part of the job, what
8 specifically about that -- your job as a
9 senior analyst investigator was designed to
10 protect patients?
11         MR. STOFFELMAYR:  Objection to
12 the form.
13         THE WITNESS:  So some of the
14 policies and procedures we put in
15 place were to help customers and to
16 help our pharmacists help those
17 customers, so I think that's part of
18 how we impacted customers.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    What policies and procedures
21 did you put in place in your role as a senior
22 analyst investigator that were designed to
23 help patients?
24         MR. STOFFELMAYR:  Objection to
25 the form.

Page 70

1  THE WITNESS: I don't recall
2  implementing any -- specifically
3  myself implementing any policies and
4  procedures in loss prevention.
5  MR. STOFFELMAYR: We're coming
6  up on an hour, when you get to a good
7  spot.
8  QUESTIONS BY MR. MOUGEY:
9  Q.  If you go to the --
10  MR. MOUGEY: Ask a couple more?
11  MR. STOFFELMAYR: Sure.
12  QUESTIONS BY MR. MOUGEY:
13  Q.  -- to the org chart on
14  Stahmann 2, has the org structure changed in
15  any way in pharmaceutical integrity since
16  the -- since this doc was published in
17  April 2, 2013?
18  A.  Yes.
19  Q.  And how has it changed now?
20  A.  Judy Rooney is no longer with
21  the company. Chris Dymon has taken another
22  role with the company.
23  Q.  Otherwise, the organizational
24  structure has stayed the same?
25  A.  Except for the business analyst

Page 71

1  portion, there are additions and subtractions
2  out of this org chart.
3  Q.  What is the scope of the
4  responsibility of this group over the last
5  three to four years?
6  A.  It remains the same: Basically
7  monitor controlled substances, provide
8  policies and procedures to help our
9  pharmacists identify red flags where
10  prescriptions may not be being prescribed for
11  a legitimate medical purpose, and then also
12  to provide data for subsequent audits or
13  requests from outside agencies.
14  MR. MOUGEY: It's a good
15  stopping point.
16  VIDEOGRAPHER: We're going off
17  the record at 10:05.
18  (Off the record at 10:05
19  a.m.)
20  MR. SHKOLNIK: Just for the
21  record, yesterday we asked for the
22  courtesy of being provided or being
23  directed to the location, if it wasn't
24  provided, of a document entitled
25  "Settlement and Memorandum of

Page 72

1  Agreement" between the DEA and
2  Walgreens.
3  I inquired of counsel if our
4  request was even considered, and it
5  appears that it was not. And we would
6  just ask the courtesy that the copy be
7  provided to us so that we can use it
8  today, and that's important to put
9  that on the record. I can -- and I
10  can see you're working very hard,
11  taking notes, and it would be nice for
12  you to simply just send us a copy of
13  the document, rather than just reject
14  it.
15  MR. STOFFELMAYR: That's
16  totally incorrect. Let's go ahead.
17  MR. SHKOLNIK: It's incorrect?
18  MR. STOFFELMAYR: Totally
19  incorrect.
20  MR. SHKOLNIK: Oh, okay.
21  MR. MOUGEY: Kaspar, which part
22  is incorrect?
23  MR. STOFFELMAYR: That he asked
24  for the copy of the document at
25  3:00 p.m., never said he needed it for

Page 73

1  the deposition today. The implication
2  is insulting.
3  MR. MOUGEY: Do you-all believe
4  that a copy of the signed MOA has been
5  produced, that we have it, that we're
6  missing it? Have you seen a copy?
7  MR. STOFFELMAYR: I couldn't
8  possibly know the answer to that
9  question. I have not reviewed the
10  whole --
11  MR. MOUGEY: The 2013
12  settlement agreement with an
13  $80 million payment, you don't know if
14  you have a signed copy or not?
15  MR. STOFFELMAYR: I do not. I
16  don't know if we have a signed copy,
17  if it exists.
18  MR. MOUGEY: Kate, you don't
19  know if you have a copy?
20  MS. SWIFT: I don't.
21  MR. MOUGEY: You don't know if
22  you have a signed copy?
23  MS. SWIFT: I don't.
24  VIDEOGRAPHER: Back on the
25  record at 10:31.

Highly Confidential - Subject to Further Confidentiality Review

Page 74

QUESTIONS BY MR. MOUGEY:
Q.    Mr. Stahmann, before we leave Exhibits 1 and 2, on Exhibit 2, the business analyst we were discussing before the break.
Do you see that on the organizational structure?
A.    Yes.
Q.    And the first several years at Walgreens you were an analyst, correct?
A.    I was an analyst for a couple of years at Walgreens, correct.
Q.    Would you please describe the difference between the function and duties of the business analyst in the pharmaceutical integrity unit and your role as an analyst during your first few years at Walgreens?
A.    So my role as an analyst for asset protection, loss prevention differs than the role for these business analysts and pharmaceutical integrity based on the type of reports they pull, the type of reports they run, and also who that information is being provided to.
Q.    Let's do one at a time.
So in your role as an analyst,

Page 75

who were the reports provided to?
A.    They were provided internally to field leadership.
Q.    Do you have any understanding of whether or not field leadership was forwarding any of those reports to the DEA?
A.    I am unaware.  I do not know.
Q.    Do you have any understanding of whether or not anyone within Walgreens was forwarding any of the reports you were pulling to the DEA?
A.    I do not know.
Q.    Let's go back to the business analyst in the pharmaceutical integrity department.
Do you have an understanding of whether any of the reports that were being pulled were sent to the DEA?
A.    I am aware.
Q.    And which reports were being forwarded to the DEA out of the pharmaceutical integrity unit?
A.    The reports that I can recollect or recall are reports that were actually requested by the DEA in regards to

Page 76

either an audit or an investigation.
Q.    And those were not reports on a periodic basis; those were specific detailed reports requested by the DEA?
A.    That is correct.
Q.    And what kind of reports were -- did the DEA request?
A.    It could -- pertaining to any type of investigation, so reports regarding prescriber history, what prescriptions were sold by -- what prescriptions that Walgreens sold were written from or by a particular prescriber.  Sometimes they asked for specific patient profiles.  They asked for other various types of documents, blueprints of the pharmacy, basically anything that they were authorized to request in terms of Walgreens pharmacies.
Q.    Explain in a little more detail what the -- what type of information the DEA wanted regarding patient history.
A.    So from my understanding, if they were investigating a patient or if they needed patient information, we would pull all of the -- based on the requested date range,

Page 77

we would pull the information regarding what a patient filled at a Walgreens and where at and what time.
Q.    What time period did Walgreens have the ability to pull that customer, patient-specific information?
A.    When you mean frame, can you kind of elaborate on that time frame?
Q.    In your tenure at Walgreens from 2006 until today, do you have an understanding of when Walgreens had the ability to pull specific patient prescription history?
A.    From my understanding, we've always had that capability.
Q.    Was Walgreens able to red flag specific patient history in their prescriptions of Schedule II and III narcotics?
MR. STOFFELMAYR:  Objection to the form.
THE WITNESS:  So there was a way to red flag prescriptions, but it was not part of an automated system.  We were reliant on the actual

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1 pharmacists.
2 QUESTIONS BY MR. MOUGEY:
3     Q.    Were there any automated
4 reports regarding suspicious orders that were
5 forwarded to the DEA during your tenure at
6 pharmaceutical integrity?
7         MR. STOFFELMAYR: Objection to
8     the form.  Foundation.
9         THE WITNESS:  I don't know if
10     anybody in Walgreens forwarded any
11     reports to the DEA when I was in RX
12     integrity because it was not part of
13     my function then.
14 QUESTIONS BY MR. MOUGEY:
15     Q.    Were you aware of anyone within
16 pharmaceutical integrity forwarding automated
17 reports to the DEA?
18     A.    Automated reports?  No, I'm
19 not -- I can't -- I don't think or can't
20 recall if any reports -- automated reports
21 were sent to the DEA.
22         (Walgreens-Stahmann Exhibit 3
23     marked for identification.)
24 QUESTIONS BY MR. MOUGEY:
25     Q.    Now, Mr. Stahmann, you

Page 79

1 understand during your tenure at Walgreens
2 that there were specific regulations in place
3 regarding Schedule II and Schedule III
4 narcotics, correct, sir?
5     A.    I am aware that there are
6 regulations regarding C-II and C-III
7 narcotics.
8     Q.    And you are aware during your
9 tenure at Walgreens that there are several
10 different areas of information that would
11 help define or -- the parameters around those
12 rules and regulations around Schedule II and
13 Schedule III narcotics, correct?
14     A.    Correct.
15     Q.    And some of that information
16 would be statutes that were applicable to
17 Schedule II and Schedule III narcotics,
18 correct?
19         MR. STOFFELMAYR: Objection to
20     the form.
21         THE WITNESS:  I know there are
22     statutes, but I don't know
23     specifically what those individual
24     statutes are, especially for
25     individual states.

Page 80

1 QUESTIONS BY MR. MOUGEY:
2     Q.    And you understand that there's
3 both state statutes or state code and federal
4 code governing the distribution of
5 Schedule II and Schedule III narcotics,
6 correct?
7     A.    I am aware, yes.
8     Q.    And you understand that there
9 are both state and federal codes that
10 regulate dispensing of Schedule II and
11 Schedule III narcotics, correct?
12     A.    I am aware, yes.
13     Q.    And you're aware, sir, that
14 there is additional information that assists
15 companies like Walgreens with providing
16 additional parameters to the codes governing
17 dispensing and distribution of Schedule II
18 and III narcotics, correct?
19         MR. STOFFELMAYR: Objection to
20     the form.
21         THE WITNESS:  I don't know
22     specifically or I don't know outside
23     agencies, if they provide additional
24     information.
25

Page 81

1 QUESTIONS BY MR. MOUGEY:
2     Q.    Generally speaking, you're
3 aware that there are other guidelines or
4 parameters governing Schedule II and III
5 distribution and dispensing, correct?
6         MR. STOFFELMAYR: Objection to
7     the form.
8         THE WITNESS:  I don't know if
9     there are or not.
10 QUESTIONS BY MR. MOUGEY:
11     Q.    Are you aware that there are
12 regs that govern Schedule II and Schedule III
13 distribution?
14     A.    Yes.
15     Q.    Are you aware that there's regs
16 governing Schedule II and Schedule III
17 dispensing?
18     A.    Yes.
19     Q.    Are you aware that there's
20 manuals at Walgreens that govern policies and
21 procedures regarding Schedule II and III
22 distribution?
23     A.    I am aware that there are
24 policies and procedures regarding dispensing
25 of C-IIs and C-IIIs.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1     Q.    And are you aware of, sir, that
2  there are polices and procedures at Walgreens
3  that govern distribution of schedule -- C-II
4  and C-III?
5     A.    I am aware, yes.
6     Q.    And, sir, are you aware that
7  there are industry guidelines from industry
8  organizations that govern the distribution of
9  Schedule II and Schedule III distribution?
10     MR. STOFFELMAYR: Objection to
11  the form.
12     THE WITNESS: I don't know if
13  there are individual standards
14  regarding those governances.
15  QUESTIONS BY MR. MOUGEY:
16     Q.    Are you aware, sir, that there
17  are court interpretations of the code and
18  regs governing Schedule II and III
19  distribution?
20     A.    I am aware that there are
21  interpretations, yes.
22     Q.    Are you aware that there are
23  court interpretations of the code and regs
24  governing Schedule II and Schedule III
25  dispensing?

Page 83

1     A.    Yes.
2     Q.    And, sir, what I've put in
3  front of you as Stahmann 3 is one of the
4  interpretations regarding Schedule II and
5  Schedule III narcotics.  It's Masters
6  Pharmaceutical.
7     Sir, have you ever seen this
8  decision or this document?
9     A.    I have not.
10     Q.    And have you ever seen
11  reference to the Masters Pharmaceutical
12  decision in any internal documents at
13  Walgreens?
14     A.    I do not recall, no.
15     Q.    Have you ever seen reference to
16  this document in any of your dealings with
17  the DEA regarding Schedule II and Schedule
18  III distribution?
19     A.    I cannot recall.
20     Q.    All right.  If you would, sir,
21  turn to --
22     MR. STOFFELMAYR: Do you have
23  two of these?
24     THE WITNESS: Oh, yes, I have
25  them.

Page 84

1     MR. STOFFELMAYR: You want the
2  one with the orange sticker.
3  QUESTIONS BY MR. MOUGEY:
4     Q.    If you would turn, sir, to the
5  fourth page in a bottom right-hand
6  corner that has a number 2, begins with
7  "whereas here."
8     It's the last paragraph on the
9  right-hand side.
10     MR. STOFFELMAYR: The fourth
11  page are you saying?
12     MR. MOUGEY: The fourth page.
13  Mine doesn't have pages on them.  The
14  print doesn't have a page.
15     MR. STOFFELMAYR: So this is
16  double-sided.  You mean this side, the
17  fourth actual page?
18     MR. MOUGEY: The fourth piece
19  of paper, yes.
20     MR. STOFFELMAYR: Number 2?
21     MR. MOUGEY: Number 2.
22     MR. STOFFELMAYR: Do you mind
23  if I look at yours because I'm not
24  sure what we're looking for?
25     MR. MOUGEY: Sure.  Bottom

Page 85

1  right-hand side.  That last paragraph,
2  right-hand side.
3     MR. STOFFELMAYR: Oh, the
4  headnote.  This is not page 4 of ours,
5  but it says "whereas here."
6     Do you see that?
7     THE WITNESS: Yes.
8  QUESTIONS BY MR. MOUGEY:
9     Q.    Headnote 2, bottom right-hand
10  side that begins with "whereas here."
11     Do you see that?
12     A.    I do see that.
13     Q.    Take a minute, if you would,
14  and just read that paragraph, Mr. Stahmann,
15  that continues into the next page.
16     A.    I read it.
17     Q.    Have you ever seen any language
18  during your tenure at Walgreens -- anything
19  similar to the paragraph you just reviewed
20  under headnote 2?
21     MR. STOFFELMAYR: Objection to
22  the form.
23     THE WITNESS: I cannot recall
24  if I've seen this specifically
25  somewhere else.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  QUESTIONS BY MR. MOUGEY:
2      Q.    You understand that Walgreens
3  has a license from the federal government to
4  distribute Schedule II and Schedule III
5  narcotics, correct?
6      A.    We used to, correct.
7      Q.    Yes, sir.
8          Up until 2014, Walgreens was
9  licensed by the federal government to
10 distribute Schedule II and Schedule III
11 narcotics, correct?
12         MR. STOFFELMAYR:  Objection to
13     the form.
14         THE WITNESS:  I can't recall
15     exactly up to what point, but I do
16     know now that we do not distribute
17     controlled substances.
18 QUESTIONS BY MR. MOUGEY:
19     Q.    Yes, sir.
20         But up until the point where
21 you did not continue to distribute controlled
22 substances, Walgreens had a license from the
23 federal government to distribute Schedule II
24 and Schedule III narcotics, correct?
25     A.    That is correct.

Page 87

1      Q.    And you understand with -- that
2  license from the federal government to
3  distribute Schedule II and Schedule III comes
4  with significant responsibilities, correct,
5  sir?
6      A.    Correct.
7      Q.    And if we look at the federal
8  court interpretation of the reg and code
9  governing the distribution of Schedule II and
10 Schedule III, this paragraph begins, "The
11 administrator considers the first factor:
12 The maintenance of effective controls against
13 the diversion of controlled substances.  The
14 administrator must determine whether the
15 registrant complied with the DEA securities
16 requirement, and the security requirement at
17 the heart of this case mandates that
18 distributors design and operate a system to
19 identify suspicious orders of controlled
20 substances and report those orders to DEA,
21 the reporting requirement."
22         Did I read that accurately,
23 sir?
24     A.    Yes.
25     Q.    And, sir, you would agree based

Page 88

1  on your tenure and experience and expertise
2  at Walgreens that Walgreens had a reporting
3  requirement of suspicious orders to the DEA,
4  correct, sir?
5          MR. STOFFELMAYR:  I'm going to
6      object to that form and lack of
7      foundation, asking him to interpret a
8      legal document he's never seen.
9          THE WITNESS:  Yeah, I can't
10     really answer that accurately because
11     I don't know what Walgreens has done
12     throughout their history of the
13     company.
14 QUESTIONS BY MR. MOUGEY:
15     Q.    And what I asked you was a
16 little different.
17         What I asked you was:  During
18 your tenure at Walgreens, do you have an
19 understanding that Walgreens had a reporting
20 requirement of suspicious orders to the DEA?
21         MR. STOFFELMAYR:  Objection to
22     the lack of form.  Foundation.  Again,
23     asking for a legal conclusion from a
24     lay witness.
25         THE WITNESS:  I do now know

Page 89

1      that we had a requirement, but
2      throughout my entire tenure, no, I
3      cannot say that I knew of that
4      requirement or what that requirement
5      was.
6  QUESTIONS BY MR. MOUGEY:
7      Q.    Yet your tenure at Walgreens
8  included the scope and realm of diversion for
9  almost 12 years, correct, sir?
10         MR. STOFFELMAYR:  Objection to
11     the form.
12         THE WITNESS:  Diversion can
13     mean a lot of different things.  My
14     involvement with diversion helped -- I
15     provided information to field leaders
16     to help investigate diversion.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    And one of the major components
19 of your responsibility during your entire
20 tenure at Walgreens was the area of
21 diversion, correct, sir?
22         MR. STOFFELMAYR:  Objection to
23     the form.
24         THE WITNESS:  I wouldn't say
25     major.  It was a part of my job

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  duties.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    One of your significant job
4  duties at Walgreens during your entire
5  tenure, from 2006 until today, included
6  diversion, correct, sir?
7          MR. STOFFELMAYR:  Objection to
8      the form.
9          THE WITNESS:  I consider all of
10      my duties significant, so I wouldn't
11      say that is one significant.  So it's
12      a part of my duty, but I wouldn't say
13      it is a significant part of my duties.
14  QUESTIONS BY MR. MOUGEY:
15      Q.    And, sir, at what point in time
16  did you become aware in your responsibilities
17  managing diversion issues, the Schedule II
18  and Schedule III narcotics, that there was a
19  reporting requirement?
20          MR. STOFFELMAYR:  Objection to
21      the form.  Lack of foundation.
22          THE WITNESS:  I did not know
23      what the requirement was, but I did
24      know that we had a requirement when I
25      was in -- a manager for pharmaceutical

Page 91

1  integrity.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    So until February of 2013, you
4  did not have any understanding that there was
5  a reporting requirement to the DEA of
6  suspicious orders?
7          MR. STOFFELMAYR:  Objection to
8      the form.
9          THE WITNESS:  That is correct.
10      I did not know that there was a
11      reporting requirement or if one
12      existed.
13  QUESTIONS BY MR. MOUGEY:
14      Q.    Draw your attention to the --
15  the next sentence that begins with "the
16  security requirement."
17          Do you see that, sir?
18      A.    I do.
19      Q.    "The security requirement is at
20  the heart of this case, mandates distributors
21  design and operate a system to identify
22  suspicious orders of controlled substances
23  and report those to the DEA."
24          That's the reporting
25  requirement, correct, sir?

Page 92

1          MR. STOFFELMAYR:  Objection to
2      the form.
3          THE WITNESS:  I do not know if
4      that is the requirement that is
5      referenced in this document.
6  QUESTIONS BY MR. MOUGEY:
7      Q.    Are you aware of any systems at
8  Walgreens up and to February of '13, when the
9  pharmaceutical integrity department was
10  organized, that Walgreens had a system to
11  identify suspicious orders of controlled
12  substances?
13          MR. STOFFELMAYR:  Objection to
14      the form.  Lack of foundation.
15          THE WITNESS:  I am aware that
16      we had a system to identify controlled
17      substance orders that were suspicious
18      or of interest, but I do not know if
19      that met the requirement.
20  QUESTIONS BY MR. MOUGEY:
21      Q.    Let me redo that question
22  because I asked you in February of '13, when
23  pharmaceutical integrity was organized.
24          Up and to when you began with
25  pharmaceutical integrity, do you have an

Page 93

1  understanding of whether or not Walgreens had
2  a system to identify suspicious orders of
3  controlled substances?
4          MR. STOFFELMAYR:  Objection to
5      the form.  Lack of foundation.
6          THE WITNESS:  There was a
7      system in place, but I cannot speak on
8      behalf of Walgreens what that complete
9      system was or if any other part of
10      that system fell outside of my
11      responsibilities.
12  QUESTIONS BY MR. MOUGEY:
13      Q.    And I'm not asking you to speak
14  on behalf of Walgreens.  And I'm not asking
15  you to -- I want to know what exactly you
16  knew.
17          What exactly did you know
18  during your tenure at Walgreens until you
19  joined the pharmaceutical integrity
20  department about Walgreens' system to
21  identify suspicious orders of controlled
22  substances?
23      A.    I did not have any awareness of
24  a system to identify controlled substances.
25  The reports that I pulled and provided to the

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1 DEA, I knew that they had suspicious orders,
2 orders of interest on them, but I was not
3 fully aware of that how that system works.
4     Q.    During the time that you were
5 pulling any suspicious order reports, did
6 anyone from Walgreens ever ask you to pull
7 any additional information or to drill down
8 on any of those reports?
9     A.    No.
10    Q.    The next section, "The
11 reporting requirement is a relatively modest
12 one.  It requires only that a distributor
13 provide basic information about certain
14 orders to DEA so that DEA investigators in
15 the field can aggregate reports from every
16 point along the legally regulated supply
17 chain and use those information to ferret out
18 potentially illegal activity."
19         Do you see that, sir?
20    A.    I do.
21    Q.    Do you have an understanding up
22 until the point when you joined the
23 pharmaceutical integrity department of
24 whether or not the DEA was using the
25 information provided by Walgreens to ferret

Page 95

1 out potential illegal activity?
2     A.    I do not know what the DEA was
3 doing with those reports.  I do remember at
4 one time they told us to stop sending those
5 reports because they didn't really want to
6 get inundated with them.
7     Q.    And do you have an
8 understanding or recollection when that was
9 that the DEA asked you to stop sending the
10 reports you were sending?
11    A.    It was towards the end of my
12 tenure at the asset protection, loss
13 prevention.
14    Q.    So at the end of 2012?
15    A.    Around that time.  And it was
16 just individual DEA offices.  It wasn't the
17 DEA in general.  I don't remember
18 specifically who those offices were.
19    Q.    Who specifically did you send
20 the reports to that you're referencing?
21    A.    I can't recall each individual
22 agency, but it was all of the local DEA
23 offices and then also to our DCs, or
24 distribution centers, throughout the country.
25    Q.    Did the DEA explain when it

Page 96

1 contacted you about why they wanted you to
2 stop sending the reports?
3     A.    They didn't contact me
4 directly, but, no, they did not provide an
5 explanation to me.
6     Q.    Do you know who they contacted?
7     A.    I believe it was either my
8 boss's boss or one of the VPs in asset
9 protection.
10    Q.    Do you have an understanding of
11 what was in those reports that you were
12 pulling?
13    A.    I do have an understanding.
14    Q.    And what was in those reports
15 that you were pulling that were being
16 forwarded to the DEA?
17    A.    Inside those reports were
18 orders that were either deemed as suspicious
19 or of interest based off of some algorithm,
20 mathematical formula, which I can't begin to
21 comprehend.
22    Q.    The mathematical or the
23 algorithm that you can't begin to comprehend
24 was in place prior to '13?
25    A.    Yes.

Page 97

1     Q.    You don't have any
2 understanding of what that algorithm or model
3 was prior to 2013?
4     A.    I don't know what the
5 mathematical formula was, no.
6     Q.    Even more narrow.
7         Prior to the creation of the
8 pharmaceutical integrity unit, do you have
9 any understanding of what the formula or
10 algorithm was to identify suspicious order
11 reports?
12    A.    I do not.
13    Q.    How do you know that you
14 couldn't begin to understand it?
15    A.    The reason why I said that,
16 because I know the person who created that
17 algorithm, and he has a doctorate in
18 mathematics.
19    Q.    And when did he create it?
20    A.    I don't know.
21    Q.    And who was that person?
22    A.    It's -- the name escapes me at
23 this time.  I'll think of it in a couple
24 minutes, I'm sure.
25    Q.    And that was in 2012, 2013,

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 correct, sir?
2      MR. STOFFELMAYR: Objection to
3 the form.
4      THE WITNESS: I don't recall
5      exactly when that formula was --
6 QUESTIONS BY MR. MOUGEY:
7      Q.  I'm not asking you exactly.
8 I'm giving you a two-year window.
9      The algorithm that you're
10 referencing was created in 2012, 2013,
11 correct, sir?
12      MR. STOFFELMAYR: Objection to
13 the form.
14      THE WITNESS: I have no idea
15      when it was created.
16 QUESTIONS BY MR. MOUGEY:
17      Q.  Do you have an understanding of
18 whether or not that algorithm or formula
19 changed over time at Walgreens?
20      A.  I have an understanding that it
21 changed, and the name is Wayne Bancroft.
22      MR. STOFFELMAYR: Wayne
23 Bancroft was the Ph.D. --
24      THE WITNESS: Ph.D.
25      MR. STOFFELMAYR: -- you

Page 99

1      referred to earlier?
2      THE WITNESS: Correct. Sorry.
3      MR. STOFFELMAYR: Part of your
4      answer to that?
5      THE WITNESS: Correct.
6 QUESTIONS BY MR. MOUGEY:
7      Q.  Do you have any idea of what
8 happened within Walgreens after the
9 suspicious order was sent to the DEA?
10      A.  I do not know what happened.
11      Q.  Do you have any idea of whether
12 or not anyone within Walgreens used that
13 suspicious order report for any further due
14 diligence?
15      A.  I do not know.
16      Q.  Did you forward that report to
17 anyone at Walgreens, the same report that you
18 sent to the DEA?
19      A.  Yes.
20      Q.  Who did you send that report
21 to?
22      A.  To the DCs, or distribution
23 centers.
24      Q.  Okay. And in -- so from 2006
25 to when you started until pharmaceutical

Page 100

1 integrity department was created, do you have
2 an understanding of where those suspicious
3 order reports were sent?
4      A.  Not through that full period,
5 but only during my time frame of when I
6 worked in asset protection, loss prevention.
7      Q.  Which wasn't until 2012,
8 correct?
9      A.  Sounds about right, correct.
10      Q.  So you have no understanding of
11 whether or not the reporting requirement we
12 just went through was filled from 2006 when
13 you began at Walgreens until you -- until you
14 joined the loss prevention group in June of
15 '12 as a manager?
16      MR. STOFFELMAYR: Objection to
17 the form.
18      THE WITNESS: I do not know if
19      that report existed prior to my role
20      in loss prevention.
21 QUESTIONS BY MR. MOUGEY:
22      Q.  Did you send the report to
23 someone specific at the distribution centers?
24      A.  I don't recall if it went to a
25 specific person.

Page 101

1      Q.  Do you recall what e-mail
2 address you sent it to?
3      A.  They were actually mailed.
4 They were burned on a CD and actually mailed.
5      Q.  Let's continue with Stahmann 3.
6      "Once a distributor has
7 reported a suspicious order, it must make one
8 of two choices: Decline to ship the order,
9 or conduct some due diligence, and if it is
10 not able to determine that the order is not
11 likely to be diverted into illegal channels,
12 ship the order, the shipping requirement."
13      Do you see that, sir?
14      A.  I see that.
15      MR. STOFFELMAYR: I think you
16 misread it unintentionally. You
17 inserted an extra "not."
18      MR. MOUGEY: Let me do it
19 again.
20 QUESTIONS BY MR. MOUGEY:
21      Q.  "Once a distributor has
22 reported a suspicious order, it must make one
23 of two choices: Decline to ship the order or
24 conduct some due diligence."
25      Let me stop there.

Page 102

1 Do you agree that I got that
2 right?
3 A. Yes.
4 Q. All right. So the two choices
5 once the suspicious order is identified:
6 Ship or perform due diligence, correct, sir?
7 MR. STOFFELMAYR: Objection to
8 the form. Lack of foundation. Asking
9 a witness to interpret the document.
10 THE WITNESS: Yeah, I don't
11 know -- I can't speak to the
12 interpretation of what needs to be
13 done or the actions taken. It's
14 beyond my role or was my role.
15 MR. MOUGEY: Kaspar, I would
16 appreciate it if you'd just limit your
17 objections at this point to just
18 "objection to form." That's plenty to
19 preserve it. I don't -- limit any
20 speaking objections.
21 MR. STOFFELMAYR: All right.
22 Well, I won't make an objection, but I
23 think it is unfair to ask a lay
24 witness to interpret a court decision
25 and interpret regulations.

Page 103

1 MR. MOUGEY: I appreciate that.
2 You've said that twice and --
3 MR. STOFFELMAYR: But he's
4 already told you this is outside his
5 field and something he wasn't trained
6 on.
7 MR. MOUGEY: Yes, sir, and
8 that's about the third time you've had
9 a speaking objection, and it's amazing
10 because exactly what you say, Kaspar,
11 is then repeated by the witness. So
12 let me finish --
13 MR. STOFFELMAYR: That wasn't
14 an objection. You told me I was
15 objecting. I'm not objecting --
16 MR. MOUGEY: I'm specifically
17 asking that the only thing you say
18 today is "objection to the form."
19 That's it. You know, you've been
20 doing this a lot longer than I have,
21 that preserves whatever objection you
22 have.
23 Your speaking objection is
24 getting repeated by the witness. I
25 want to hear what he has to say, not

Page 104

1 what you have to say.
2 MR. STOFFELMAYR: Okay. I'm
3 speaking to you now. I'm not
4 objecting. I'm asking you to ask him
5 fair questions.
6 QUESTIONS BY MR. MOUGEY:
7 Q. Sir, do you have any personal
8 knowledge during your tenure at Walgreens, up
9 until the point when you began in the
10 pharmaceutical integrity department, whether
11 or not there was any due diligence conducted
12 on suspicious orders?
13 A. I have no knowledge.
14 Q. Did anyone ever -- at Walgreens
15 ever come back to you on the due diligence --
16 I'm sorry, on the suspicious order reports
17 that you were burning on CDs and ask you to
18 perform any due diligence on any of those
19 orders?
20 A. They did not come to me, no.
21 Q. Do you know if anyone at
22 Walgreens came to anyone in your group and
23 asked you to perform any due diligence on any
24 of those suspicious orders?
25 A. I don't know if they ever came

Page 105

1 to anybody at Walgreens.
2 Q. So during your tenure up until
3 pharmaceutical integrity department, you have
4 no independent recollection of anyone
5 performing any due diligence on any of the
6 reports that you generated regarding
7 suspicious orders?
8 A. Not saying it didn't happen,
9 but I am unaware that they were asking or if
10 they asked.
11 Q. Yes, sir.
12 And during your entire career,
13 diversion was your area of expertise,
14 correct, sir?
15 MR. STOFFELMAYR: Objection to
16 the form.
17 THE WITNESS: Diversion means a
18 lot of different things, could be
19 interpreted a lot of different ways,
20 depending on who you ask.
21 QUESTIONS BY MR. MOUGEY:
22 Q. Is there a diversion group,
23 other than yours, from '06 until 2012 that
24 was responsible for performing due diligence
25 on suspicious orders?

Page 106

1      MR. STOFFELMAYR:  Objection.
2   Form.  Lack of foundation.
3      THE WITNESS:  I am -- I do not
4   know if there are other departments
5   that conducted investigations on
6   diversion outside of mine.
7 QUESTIONS BY MR. MOUGEY:
8      Q.    How many different suspicious
9 order reports do you believe you forwarded to
10 the DEA during your tenure at Walgreens?
11      A.    I can't recall exactly how
12 many.
13      Q.    Well, how long were you
14 responsible for sending -- burning them on
15 CDs and sending them to the DEA?
16      A.    Ever since I took that -- or
17 was delegated that role from my supervisor
18 until I left asset protection.  Again, I
19 don't know exactly when that role was
20 delegated to me.
21      Q.    So a period of two years?
22      A.    Again, I can't say exactly
23 when.  I don't know.  We can assume, but,
24 yeah, I don't know exactly how long it was.
25      Q.    And no one ever came back to

Page 107

1 you or asked you any questions about
2 performing any additional due diligence on
3 those suspicious orders?
4      A.    No, no one from the DEA came
5 back to me and asked.
6      Q.    Or from internally at
7 Walgreens, anyone ask you to perform any due
8 diligence on those suspicious orders?
9      A.    Not to me directly, no.
10      Q.    And during your entire tenure,
11 up until the pharmaceutical integrity
12 department was formed, you're not aware of
13 any group specifically within Walgreens
14 responsible for performing due diligence on
15 suspicious orders?
16      A.    I am not aware, no.
17      Q.    And, sir, you have an
18 understanding sitting here in -- when you --
19 I'm sorry.
20         You have an understanding when
21 you began at Walgreens, in 2006 up until 2012
22 when the pharmaceutical integrity department
23 was formed, that there was an opiate epidemic
24 in the US?
25      A.    No, I was not.

Page 108

1      Q.    You had no earthly idea from
2 2006 until 2012 that there was an opiate
3 epidemic?
4      MR. STOFFELMAYR:  Objection to
5   the form.
6      THE WITNESS:  No, I was not.
7 QUESTIONS BY MR. MOUGEY:
8      Q.    No one from Walgreens ever
9 provided any training to you explaining that
10 dozens and dozens of people were dying every
11 day from Schedule II and Schedule III
12 narcotic overdoses --
13      MR. STOFFELMAYR:  Objection to
14   the form.
15 QUESTIONS BY MR. MOUGEY:
16      Q.    -- from 2006 to 2012?
17      A.    You're asking if I received
18 training on that?  No.
19      Q.    Did you receive any information
20 from Walgreens that opiates were rapidly
21 becoming the largest cause of death in kids
22 18 to 25 years old?
23      MR. STOFFELMAYR:  Objection to
24   the form.
25      THE WITNESS:  No, I was not

Page 109

1 made aware.
2      (Walgreens-Stahmann Exhibit 4
3   marked for identification.)
4 QUESTIONS BY MR. MOUGEY:
5      Q.    I've handed you what I've
6 marked as Stahmann 3, and at the very top of
7 the page, "OxyContin:  Its use and abuse.
8 Hearing before the Subcommittee on Oversight,
9 Investigation, the Committee on Energy and
10 Commerce, House of Representatives, 107th
11 Congress, First session, August 28, 2001."
12         Sir, OxyContin was one of the
13 Schedule II narcotics distributed and
14 dispensed by Walgreens, correct, sir?
15      MR. STOFFELMAYR:  Objection to
16   the form.
17      THE WITNESS:  That's not
18   entirely true.  We did dispense
19   OxyContin, and at one time we were a
20   distributor.
21 QUESTIONS BY MR. MOUGEY:
22      Q.    Yes, sir.
23         For a long period of time -- or
24 from 2006 up until 2012, 2013, Walgreens
25 distributed Schedule II narcotics such as

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 OxyContin, correct?
2    A.    I don't know the exact time
3 frame.
4    Q.    I'm not asking you this for the
5 exact time frame.
6         Generally speaking, you're
7 aware for several years during your tenure at
8 Walgreens that it was distributing OxyContin?
9    A.    At one time we were
10 distributing OxyContin, yes.
11    Q.    And, sir, when you began in
12 2006, up and to pharmaceutical integrity
13 department was created, were you aware that
14 there were ongoing hearings before
15 subcommittees in Congress on the abuse of
16 OxyContin?
17    A.    I was not.
18    Q.    Sir, would you please -- in the
19 upper right-hand corner, Mr. Stahmann,
20 there's page numbers and a date.  Would you
21 please turn to page 6 titled "OxyContin, its
22 use and abuse"?
23         And let me direct your
24 attention to the paragraph that begins in the
25 middle of the page with "the use and abuse of

Page 111

1 OxyContin."
2         Do you see that, sir?
3         MR. STOFFELMAYR:  Sorry, did
4 you say page 6 or page 1?
5         MR. MOUGEY:  At the very top
6 hand -- right-hand corner, 006.
7         MR. STOFFELMAYR:  Oh, those
8 numbers.  Okay.
9         THE WITNESS:  So, yes, I do see
10 that.
11 QUESTIONS BY MR. MOUGEY:
12    Q.    All right.  "The use and abuse
13 of OxyContin provides quite a dilemma for us
14 in Congress and for the American public.  For
15 some, OxyContin is the angel of mercy; for
16 others, it is the angel of death."
17         Sir, are you aware that in
18 subcommittee hearings in front of Congress,
19 OxyContin, that Walgreens distributed, was
20 being referred to as the angel of death?
21         MR. STOFFELMAYR:  Objection to
22 the form.
23         THE WITNESS:  I was not made
24 aware, and Walgreens only distributed
25 OxyContin during a certain time

Page 112

1 period.
2 QUESTIONS BY MR. MOUGEY:
3    Q.    The last sentence of that
4 paragraph, sir, references OxyContin as a
5 highly addictive drug.
6         Were you aware from 2006 until
7 2012 that OxyContin was highly addictive?
8    A.    During that entire time frame?
9 No.
10    Q.    When did you become aware,
11 between 2006 and your initiation into the
12 pharmaceutical integrity department, that
13 OxyContin was highly addictive?
14    A.    I probably came more aware
15 during my -- end of my tenure with loss
16 prevention.
17    Q.    And do you see in the paragraph
18 below, "Today we will hear from law
19 enforcement officials who argue that
20 OxyContin is quickly becoming the abuser's
21 drug of choice, surpassing heroin and cocaine
22 in some jurisdictions"?
23         Do you see that, sir?
24    A.    I do see that.
25    Q.    Were you aware that one of the

Page 113

1 drugs being distributed by Walgreens,
2 Schedule II, OxyContin, was becoming the drug
3 of choice for drug dealers?
4         MR. STOFFELMAYR:  Objection to
5 the form.
6         THE WITNESS:  I was not aware.
7 QUESTIONS BY MR. MOUGEY:
8    Q.    Continue on that page.  Bottom
9 paragraph, "Today's hearing is the logical
10 extension of this subcommittee's ongoing
11 investigation into prescription drug abuse
12 throughout the United States.  My staff and I
13 have met on numerous occasions with the DEA,
14 the FDA and Purdue Pharma in order to
15 investigate the trends of OxyContin abuse and
16 diversion and {sic} well as to explore
17 potential solutions."
18         Do you see that, sir?
19    A.    I do.
20    Q.    Do you see the use of the word
21 "diversion"?
22    A.    I do see diversion, yes.
23    Q.    Did you have an understanding
24 from 2006 and 2012 that subcommittees in
25 Congress were concerned about the diversion

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  of Schedule II narcotics such as OxyContin?
2      A.    Yes.
3      Q.    And when did you become aware
4  that there were subcommittee hearings on the
5  diversion of Schedule II drugs such as
6  OxyContin?
7      A.    During my time or current time
8  with pharmaceutical integrity.
9      Q.    Okay.  That -- up until
10  pharmaceutical integrity, were you aware that
11  Senate -- I'm sorry, Congress was conducting
12  hearings on Schedule II narcotics such as
13  OxyContin and the problems associated with
14  diversion?
15      A.    No, not previous to my tenure
16  at RX integrity.
17      Q.    Next paragraph.  "Sadly,
18  prescription drug bruise is a growing
19  national problem."
20          Sir, were you aware from 2006
21  to pharmaceutical integrity -- when you
22  started with that department, that drug abuse
23  -- prescription drug abuse was a growing
24  national problem?
25      A.    No.

Page 115

1      Q.    "According to the National
2  Institute on Drug Abuse, as recently as 1999,
3  more than 9 million Americans, age 12 and
4  older, reported that they used prescription
5  drugs at least that year for nonmedical
6  reasons."
7          Do you see that, sir?
8      A.    I do.
9      Q.    Were you aware that this was a
10  growing trend, including kids years 12 and
11  older?
12          MR. STOFFELMAYR:  Objection to
13      the form.
14          THE WITNESS:  I was not aware
15      during my time in asset protection.
16  QUESTIONS BY MR. MOUGEY:
17      Q.    Or at any point up until
18  pharmaceutical integrity department, were you
19  aware about the growing trend of prescription
20  drug abuse?
21      A.    No.
22      Q.    Sir, if you would, please turn
23  to page 11 in the upper right-hand corner,
24  the section that's titled or begins with
25  "Testimony of Terrance W. Woodworth."

Page 116

1          Do you see that, sir?
2          MR. STOFFELMAYR:  It's the
3      little page 11?  Yeah, right there.
4      The little number on there.
5          THE WITNESS:  I see it.
6  QUESTIONS BY MR. MOUGEY:
7      Q.    And you see Mr. Woodworth is
8  the deputy director, Office of Diversion
9  Control, Drug Enforcement Administration.
10          Do you see that, sir?
11      A.    I do see that.
12      Q.    Were you aware that the DEA had
13  an Office of Diversion Control participating
14  in investigations regarding Schedule II drugs
15  such as OxyContin?
16      A.    I do now, yes.
17      Q.    And when you say you do now,
18  when did you become aware that there was a
19  DEA Department of Diversion Control?
20      A.    During my tenure or current
21  position with pharmaceutical integrity.
22      Q.    If you go to the bottom of that
23  page that begins with "during the last two
24  years."
25          Do you see where I am?  Last

Page 117

1  paragraph.
2      A.    Yes.
3      Q.    "During the last two years, DEA
4  has noticed a dramatic increase in the
5  illicit availability and abuse of OxyContin,"
6  correct, sir?
7      A.    I do see that.
8      Q.    And, sir, you were charged with
9  investigating internally at Walgreens
10  shrinkage, correct, sir?
11      A.    I was -- yes, that was part of
12  -- one of my responsibilities was to help
13  facilitate the investigation of shrink.
14      Q.    Was the -- part of your
15  responsibilities, did you have an
16  understanding that OxyContin was highly
17  sought after and was a target of illicit drug
18  dealers?
19      A.    During my time at asset
20  protection, no.
21      Q.    Was there no sense of urgency
22  or no highlight from Walgreens that OxyContin
23  should be paid special attention to in your
24  analysis of drugs being stolen?
25          MR. STOFFELMAYR:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  the form.  Foundation.
2      THE WITNESS:  I cannot speak
3  what Walgreens felt as -- what sense
4  of urgency it would have for certain
5  medications.
6  QUESTIONS BY MR. MOUGEY:
7      Q.    Did anybody ever come to you
8  when you were in loss prevention and say,
9  "There is a national opiate epidemic with
10  Schedule II OxyContin.  I need you to pay
11  special attention to diversion issues with
12  regard to Schedule II narcotics"?
13      A.    Not to me specifically, no.
14      Q.    To you generally, did that
15  message ever get relayed to you, e-mail,
16  training, modules, Internet, anything?
17      A.    I was asked to pull data
18  regarding OxyContin and oxycodone and other
19  C-II medications, but I was never directly
20  contacted stating that this was a growing
21  epidemic.
22      Q.    I wasn't asking if you were
23  directly contacted.
24          Did anybody in any training
25  during your entire tenure at Walgreens up

Page 119

1  until the point where you began with the
2  pharmaceutical integrity department ever tell
3  you to put a spotlight on Schedule II
4  narcotics such as OxyContin because it was a
5  drug dealers' drug of choice?
6      A.    No.
7      Q.    That last paragraph, "During
8  the last two years, DEA has noted a dramatic
9  increase in the illicit availability and
10  abuse of OxyContin."
11          Do you see that, sir?
12      A.    Yes.
13      Q.    You were not aware of that fact
14  until you began with pharmaceutical integrity
15  group, department?
16          MR. STOFFELMAYR:  Objection to
17  the form.
18          THE WITNESS:  I was not aware
19  of that fact, no.
20  QUESTIONS BY MR. MOUGEY:
21      Q.    So up until 2012, you were not
22  aware that there was a dramatic increase in
23  the illicit availability of OxyContin?
24          MR. STOFFELMAYR:  Objection to
25  the form.

Page 120

1      THE WITNESS:  That's correct.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    "As early as 1999, the DEA
4  assisted the State of Maine in the
5  investigation of an organized ring of
6  individuals who used forged, stolen and
7  altered prescriptions to divert thousands of
8  dosage units of OxyContin to abusers."
9          Sir, were you aware that one of
10  the means of diversion -- one of the holes
11  for diversion was that individuals were using
12  forged, stolen and altered prescriptions to
13  get their hands on OxyContin?
14      A.    If you're asking if I was ever
15  aware --
16      Q.    Up until pharmaceutical
17  integrity department in 2012.
18      A.    I was aware that there were
19  people that were using forged prescriptions,
20  yes.
21      Q.    When did you become aware of
22  that, sir?
23      A.    During my tenure at asset
24  protection.
25      Q.    Sir, if you turn to page -- the

Page 121

1  small page number 15, the upper right-hand
2  side.
3          Were you aware that part of the
4  hearings in front of the subcommittee -- I
5  direct your attention to the third full
6  sentence, "The abuse of the brand name
7  painkiller, OxyContin, is rising on a
8  tremendous scale."
9          Were you aware of that 2006 to
10  2012?
11      A.    No.
12      Q.    "Placing people who are unaware
13  of its lethal potential in danger."
14          Sir, you were aware that
15  OxyContin could be lethal?
16      A.    Yes, it did -- it could be
17  lethal.
18      Q.    And were you aware that the
19  general public did not have knowledge that
20  taking OxyContin could be lethal?
21          MR. STOFFELMAYR:  Objection to
22  the form.
23          THE WITNESS:  I can't speak on
24  behalf of the general public.
25

Page 122

1 QUESTIONS BY MR. MOUGEY:
2    Q.   If you go to the bottom of that
3 page, sir, the second to the last sentence
4 that begins with "and a phenomenon."
5         Are you there with me?
6    A.   I'm there.
7    Q.   "And a phenomenon we called
8 doctor shopping."
9         Are you aware of what doctor
10 shopping is, sir?
11    A.   I am.
12    Q.   And doctor shopping is when
13 individuals will go from doctor to doctor to
14 doctor faking injuries or pain trying to
15 secure prescriptions?
16    A.   That's my understanding of what
17 doctor shopping is, yes.
18    Q.   And once they received a
19 prescription, they would then fill with a
20 Schedule II or Schedule III narcotic,
21 correct, sir?
22    A.   It could be any prescription,
23 but, yes, they can.
24    Q.   Yes, sir.
25         And then it would be sold on

Page 123

1 the street for a higher value, correct, sir?
2         MR. STOFFELMAYR:  Objection to
3 the form.
4         THE WITNESS:  I have no idea
5 what is done with prescriptions after
6 they leave Walgreens.
7         MR. STOFFELMAYR:  The question
8 wasn't about Walgreens.
9         THE WITNESS:  Oh.
10 QUESTIONS BY MR. MOUGEY:
11    Q.   Yes, sir, but the issue that I
12 had was the doctor shopping.  That's what we
13 were talking about, right?
14         Were you aware that one of the
15 mechanisms -- one of the means for diversion
16 was through doctor shopping?
17    A.   It is one of the means of
18 diversion, yes.
19    Q.   And do you have any
20 understanding of any metrics or analytics
21 that Walgreens used from when you began in
22 2006 up until 2012 to analyze or identify
23 individuals involved with doctor shopping?
24    A.   There was no way we can analyze
25 doctor shopping, but we did have a system

Page 124

1 that indicated early refills or identical
2 therapy.
3    Q.   And by identical therapy, does
4 that include repeat prescriptions to the same
5 individuals over and over again?
6    A.   That is part of it, yes.
7    Q.   And there were significant
8 holes in Walgreens' systems to identify
9 specific individuals that repeatedly came
10 back to fill prescriptions, correct?
11         MR. STOFFELMAYR:  Objection to
12 the form.
13         THE WITNESS:  I have no idea if
14 there were any holes in the system.
15 QUESTIONS BY MR. MOUGEY:
16    Q.   Sir, were you aware in --
17 beginning in 2001 up until 2006 that there
18 were repeated investigations into the opiate
19 epidemic by Congress?
20    A.   I was not.
21    Q.   Were you aware that offices
22 like the GAO, the Government Accountability
23 Office, was filing reports to the
24 subcommittee regarding opiates and the abuse
25 of prescription drugs?

Page 125

1    A.   Prior to that time frame, I
2 was -- no, I was not aware.
3    Q.   Were you aware that the
4 Inspector General was filing reports to
5 Congress identifying problems with diversion
6 and Schedule II and III narcotics?
7    A.   Prior to that time, I was not
8 aware.
9    Q.   Were you aware, sir, that the
10 OxyContin and schedule -- other Schedule II
11 narcotics were repeatedly being investigated
12 in Congress on almost an annual basis about
13 the ongoing epidemic?
14         MR. STOFFELMAYR:  Objection to
15 the form.
16         THE WITNESS:  Prior to that
17 time, no, I was not aware.
18 QUESTIONS BY MR. MOUGEY:
19    Q.   When you keep saying "that
20 time," what time are you referencing?
21    A.   You were referencing or you had
22 stated prior -- prior to my time at asset
23 protection or RX integrity.  That's the time
24 frame I was referencing.
25    Q.   In your tenure in law

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  enforcement, did you investigate specific
2  crimes that were reported in your community?
3      A.    No.
4      Q.    And as part of your tenure as a
5  law enforcement officer, you conducted
6  observation or surveillance to ensure your
7  constituents' safety?
8      A.    Yes.
9      Q.    And what are some of the tools
10  that you used to help keep people safe when
11  you were a police officer?
12      A.    Conducting community awareness
13  events, just walking through the community,
14  talking with individuals, just putting out a
15  presence and awareness.
16      Q.    Awareness is paramount to law
17  enforcement, correct, sir?
18      A.    It's important, yes.
19      Q.    And you would expect if there
20  were problems in your community, as a law
21  enforcement officer, that the senior officers
22  would make you aware of that, correct?
23      A.    I can assume that, yes.
24      Q.    Yes, sir.
25          Because when you're out on the

Page 127

1  street trying to keep people safe, you would
2  expect that you are armed with information to
3  do your job, correct, sir?
4      A.    Correct.
5      Q.    And as a law enforcement
6  officer, information is vital, correct, sir?
7      A.    It is.
8      Q.    And without the information,
9  things that might become obvious to you in
10  your job as a police officer might otherwise
11  escape your analysis if you didn't know it
12  was a problem, correct?
13          MR. STOFFELMAYR:  Objection to
14      the form.
15          THE WITNESS:  It's possible.
16  QUESTIONS BY MR. MOUGEY:
17      Q.    Information helps you spot
18  problems, right?
19      A.    It is a means to help spot a
20  problem, yes.
21      Q.    And information, when -- you
22  would agree with me while you were at
23  Walgreens in -- your role as a diversion
24  expert was also important, correct?
25          MR. STOFFELMAYR:  Objection to

Page 128

1      the form.
2          THE WITNESS:  I can't agree
3      with that entire statement.
4  QUESTIONS BY MR. MOUGEY:
5      Q.    Yes, sir.
6          You would agree with me that
7  information in your roles at Walgreens was an
8  important component of your job, correct,
9  sir?
10      A.    Yes, information -- correct
11  information or accurate information is an
12  important role of any job.
13      Q.    And you would expect that
14  senior management at Walgreens would pass
15  along information to you that would help your
16  job in diversion at Walgreens, correct, sir?
17          MR. STOFFELMAYR:  Objection to
18      the form.
19          THE WITNESS:  I cannot speak to
20      what senior leadership or executives
21      pass -- what they deem as important
22      information to pass down.
23  QUESTIONS BY MR. MOUGEY:
24      Q.    I'm not asking what -- what
25  leadership or executives -- what they deem

Page 129

1  important.
2          What I'm asking you is what you
3  would deem important, that you would expect
4  information that was helpful to you in your
5  job as diversion at Walgreens, that senior
6  management would pass that along to you,
7  correct, sir?
8      A.    Information that I deem
9  important, I would like, but that's not
10  necessarily the same information that they
11  would deem important.
12          (Walgreens-Stahmann Exhibit 5
13      marked for identification.)
14  QUESTIONS BY MR. MOUGEY:
15      Q.    I hand what you I've marked as
16  Stahmann Exhibit 5.  I'm going to ask you
17  about specific parts of this letter.  It's a
18  letter -- it's a package.
19          Let's just walk through what I
20  have in front of you.  Okay, sir?
21      A.    Okay.
22      Q.    So on the first page, Stahmann
23  Exhibit 5, is a letter that's stamped
24  June 12, 2012.
25          Do you see that, sir?

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.    I do see that stamp.

2    Q.    And if you would just turn the

3 page, it appears to be another correspondence

4 from the US Department of Justice, DEA, dated

5 December 27, 2007.

6         Do you see that, sir?

7    A.    I do.

8    Q.    And if you turn the page again,

9 there appears to be another piece of

10 correspondence dated February 7, 2007.

11        Do you see that?

12   A.    I do.

13   Q.    And one more time, turn two

14 pages, onto what's Bates numbered 691. You

15 see that there is another piece of

16 correspondence from the US Department of

17 Justice, DEA, dated September 27, 2006,

18 correct, sir?

19   A.    I do see that.

20   Q.    All right. So let's start back

21 on the very first page, June 12, 2012, US

22 Department of Justice.

23        And, sir, you have an

24 understanding who the Department of Justice

25 is, correct, sir?

Page 131

1    A.    Yes, I do.

2    Q.    And US Department of Justice is

3 over the DEA, correct, sir?

4    A.    Correct.

5    Q.    And it's -- this letter is

6 addressed as, "Dear Registrant: This letter

7 is being sent to every entity in the United

8 States who is registered with the Drug

9 Enforcement Administration, DEA, to

10 manufacture or distributing controlled

11 substances."

12        Do you see that, sir?

13   A.    I do.

14   Q.    All right. And, sir, have you

15 seen this letter before?

16   A.    I have.

17   Q.    And did you see it in

18 preparation for your testimony today?

19   A.    Yes.

20   Q.    Have you seen this letter other

21 than in preparation for your testimony today?

22   A.    I have not.

23   Q.    If you go to the next

24 paragraph, "On September 27, 2006, DEA sent a

25 letter to this registrant community

Page 132

1 expressing concerns regarding drug abuse in

2 the United States and highlighted the

3 responsibilities of manufacturers and

4 distributors to be vigilant in the

5 distribution of controlled substances."

6         Do you see that sentence, sir?

7    A.    I do.

8    Q.    And Walgreens is in the

9 business of distributing controlled

10 substances, correct, sir?

11   A.    At one point in time, yes.

12   Q.    Yes, sir.

13        At the point in time that this

14 letter went out, June 12, 2012, Walgreens was

15 in the business of distributing controlled

16 substances, correct, sir?

17   A.    I believe so, yes.

18   Q.    And the paragraph goes on, "To

19 assist manufacturers and distributors, DEA

20 listed circumstances that might be indicative

21 of diversion."

22        Correct, sir?

23   A.    I do see that.

24   Q.    "On December 27, 2007, DEA

25 issued another letter which reiterated the

Page 133

1 responsibilities of controlled substance

2 manufacturers and distributors to inform DEA

3 of suspicious orders in connection with 21

4 CFR Section 1301.74(b)."

5         Correct, sir?

6         MR. STOFFELMAYR: Objection to

7 the form.

8         THE WITNESS: I see that

9 written here, yes.

10 QUESTIONS BY MR. MOUGEY:

11   Q.    "Although DEA's September 2006

12 letter included a list of factors that might

13 indicate diversion, DEA wants to stress that

14 this was not a comprehensive list of all

15 possible indications of diversion."

16        Correct?

17        MR. STOFFELMAYR: Objection to

18 the form.

19        THE WITNESS: I see that

20 written here.

21 QUESTIONS BY MR. MOUGEY:

22   Q.    Yes, sir.

23        And you see in that paragraph

24 that the DEA has now used the word

25 "diversion" on at least two to three

Page 134

1  different instances, correct, sir?
2      A.   I do see that.
3      Q.   Does there appear to be any
4  confusion from the DEA about what diversion
5  is?
6      A.   I don't see where they define
7  diversion in this letter.
8      Q.   "Although DE" -- I'm going to
9  continue, sir.
10      "Although DEA's September 2006
11  letter included a list of factors that might
12  indicate diversion, DEA wants to stress that
13  this was not a comprehensive list of all
14  possible indications of diversion," correct,
15  sir?
16      MR. STOFFELMAYR:  Objection to
17  form.
18      THE WITNESS:  I do see that,
19  but I do -- I was never -- I never
20  received or seen the letter that
21  they're referencing in 2006.
22  QUESTIONS BY MR. MOUGEY:
23      Q.   "The DEA encouraged registrants
24  to take an integrated approach.  This point
25  was emphasized in the December 2007 letter,

Page 135

1  and DEA once again is bringing it to your
2  attention."
3      Do you see that, sir?
4      A.   I do see that.
5      Q.   Sir, did you have any
6  understanding during any tenure at Walgreens
7  about how large or how many controlled
8  substances that it was putting into the
9  stream of commerce?
10      A.   At some point in my tenure,
11  yes.
12      Q.   Billions of Schedule II and
13  Schedule III narcotics over a period of years
14  into the US in total, correct, sir?
15      MR. STOFFELMAYR:  Objection to
16  form.
17      THE WITNESS:  I do not know the
18  exact total.
19  QUESTIONS BY MR. MOUGEY:
20      Q.   Do you have any understanding
21  that Walgreens was responsible for 15,
22  16 percent of every Schedule II and III
23  narcotic distributed in the US from 2006 to
24  2014?
25      MR. STOFFELMAYR:  Objection to

Page 136

1  the form.
2      THE WITNESS:  I do not know if
3  that's accurate or not.
4  QUESTIONS BY MR. MOUGEY:
5      Q.   Do you have any idea of just
6  how large Walgreens' part was in the
7  distribution of Schedule II and III narcotics
8  from '06 to '13, '14?
9      A.   I do not know the scope.
10      Q.   Go to the last paragraph on
11  this page, "registrants who rely on rigid
12  formulas to identify whether an order is
13  suspicious may fail to detect suspicious
14  orders."
15      Do you see that, sir?
16      A.   I do.
17      Q.   "For example, the system might
18  not identify suspicious orders placed by a
19  pharmacy if that pharmacy placed unusually
20  large orders from the beginning of its
21  relationship."
22      Do you see that, sir?
23      MR. STOFFELMAYR:  Objection to
24  the form.
25      THE WITNESS:  I see those words

Page 137

1  written here, yes.
2  QUESTIONS BY MR. MOUGEY:
3      Q.   Let's stop there.
4      So do you have any idea of
5  whether Walgreens had a formula to identify
6  whether an order is suspicious prior to the
7  DEA's mandate that Walgreens create
8  pharmaceutical integrity?
9      MR. STOFFELMAYR:  Objection to
10  the form.
11      THE WITNESS:  I am aware that
12  there was a way to identify suspicious
13  orders for those reports that I had --
14  was burning on CDs.
15  QUESTIONS BY MR. MOUGEY:
16      Q.   Do you have any idea what the
17  formula was?
18      A.   I do not.
19      Q.   Do you have any idea whether it
20  was a rigid formula?
21      A.   I do not.
22      Q.   Your job was just to burn CDs
23  and send them off?
24      A.   That is correct.
25      Q.   Walgreens is in the business of

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 hiring folks with master's degrees from
2 Loyola of Chicago to burn CDs and to send
3 them off with no -- no analysis?
4      A.    Yes, sir.
5           MR. STOFFELMAYR:  Objection to
6 the form.
7 QUESTIONS BY MR. MOUGEY:
8      Q.    And your job -- your job title
9 was senior analyst, and you did no analyzing
10 of these reports that you sent off?
11          MR. STOFFELMAYR:  Objection to
12 the form.
13          THE WITNESS:  That was not part
14 of my responsibility.
15 QUESTIONS BY MR. MOUGEY:
16     Q.    Yet that was your title,
17 correct, sir?
18          MR. STOFFELMAYR:  Objection to
19 the form.
20          THE WITNESS:  That was -- my
21 title was analyst, but that was not
22 part of my responsibility, to analyze
23 or investigate those orders on the
24 reports that I was sending out.
25

Page 139

1 QUESTIONS BY MR. MOUGEY:
2      Q.    So you analyzed other segments
3 of your job responsibility, just not the
4 suspicious order reports you were sending off
5 monthly, correct, sir?
6      A.    That is correct.
7      Q.    And as part of your job as an
8 investigator, you did not perform any
9 analysis on any suspicious orders, correct,
10 sir?
11     A.    That is correct.
12     Q.    To the point where you don't
13 even know what the formula was for
14 identifying suspicious orders, correct, sir?
15     A.    Correct, I do not know that
16 formula.
17     Q.    All the while, an opiate
18 epidemic is raging in our country, and no one
19 is asking the senior analyst to provide or
20 perform any analysis, correct?
21          MR. STOFFELMAYR:  Objection to
22 the form.
23          THE WITNESS:  That's -- yeah, I
24 don't know that -- the answer to that
25 question.

Page 140

1 QUESTIONS BY MR. MOUGEY:
2      Q.    You don't know whether anybody
3 was asking you as a senior analyst to provide
4 any analysis of suspicious orders?
5      A.    I am -- yes, I am aware that
6 nobody was asking me specifically to perform
7 additional analysis.
8      Q.    You were just burning CDs?
9           MR. STOFFELMAYR:  Objection to
10 the form.  It's like the 18th time --
11          THE WITNESS:  Yes.
12 QUESTIONS BY MR. MOUGEY:
13     Q.    You were just burning CDs?
14          MR. STOFFELMAYR:  You don't
15 need to be embarrassed about burning
16 CDs.
17          THE WITNESS:  I'm not at all.
18          No.  That's exactly part of my
19 responsibility is burn that CD.
20 QUESTIONS BY MR. MOUGEY:
21     Q.    If you would, sir, please turn
22 all the way back to September 27, 2006,
23 correct -- or September 27, 2006?
24     A.    All right.  Yep, I'm there.
25     Q.    And you were employed at

Page 141

1 Walgreens in September 27, 2006, correct,
2 sir?
3      A.    Correct.
4      Q.    "Dear Sir or Madam:  This
5 letter is being sent to every commercial
6 entity in the United States registered with
7 the Drug Enforcement Administration to
8 distribute controlled substances," correct,
9 sir?
10     A.    I do see that.
11     Q.    And you agree with me that that
12 was Walgreens at that point in time, correct,
13 sir?
14     A.    Yes.
15     Q.    Under background, "As each of
16 you is undoubtedly aware, the abuse,
17 non-medical use of controlled prescription
18 drugs is a serious and growing health problem
19 in this country."
20          Do you see that, sir?
21     A.    Yes.
22     Q.    But no one from Walgreens ever
23 told you in your capacity as an investigator
24 that there was a serious and growing health
25 problem in the country, correct, sir?

Page 142

1    A.    Correct.
2    Q.    Go to the next paragraph, "The
3  CSA" --
4        Sir, you understand that stands
5  for Controlled Substance Act?
6    A.    I do.
7    Q.    -- "was designed by Congress to
8  combat diversion by providing for a closed
9  system of drug distribution."
10       Let's stop there.
11       Do you understand what closed
12  system of drug distribution is?
13   A.    No.  I don't know exactly what
14  that means.  It can be interpreted many
15  different ways.
16   Q.    Well, I'm not asking you
17  exactly or specifically.
18       Do you have a general
19  understanding of what closed system means
20  under the CSA?
21   A.    Very vague, general
22  understanding, yes.
23   Q.    What's your vague, general
24  understanding of what a closed system under
25  the CSA means?

Page 143

1    A.    My vague understanding is that
2  we need to record controlled substances that
3  are being shipped to stores, sales of those
4  medications, and keep inventory of those
5  medications so we can identify any shrink.
6    Q.    Any shrink.  So your scope of
7  the closed system is to make sure that
8  Schedule II and III narcotics weren't
9  disappearing out of the pharmacies?
10   A.    Correct.
11   Q.    And this sentence goes on, "In
12  which all legitimate handlers of controlled
13  substances must obtain a DEA registration; as
14  a condition of maintaining such registration,
15  must take reasonable steps to ensure that
16  their registration is not being utilized as a
17  source of diversion."
18       Do you see that, sir?
19   A.    I do.
20   Q.    Were you aware, once you
21  started Walgreens, that as a member of this
22  closed system, Walgreens must take reasonable
23  steps to ensure their registration is not
24  being utilized as a source of diversion?
25       MR. STOFFELMAYR:  Objection to

Page 144

1  the form and foundation.
2        THE WITNESS:  I was aware at
3  some point in my tenure with
4  Walgreens, but not during the time
5  that this letter was sent out.
6  QUESTIONS BY MR. MOUGEY:
7    Q.    Or not until several years
8  thereafter, correct, sir?
9    A.    That is correct.
10   Q.    The letter goes on,
11  "Distributors are, of course, one of the key
12  components of the distributor chain."
13       Sir, were you aware your first
14  several years at Walgreens that a distributor
15  was a key component of the distributor chain?
16       MR. STOFFELMAYR:  Objection to
17  the form.
18       THE WITNESS:  I was not aware.
19  QUESTIONS BY MR. MOUGEY:
20   Q.    Were you aware, sir, as this
21  next sentence indicates that, "distributors
22  are, of course, one of the" -- I'm sorry, I
23  read the same sentence.
24       The next sentence, "If the
25  closed system is to function properly as

Page 145

1  one -- as Congress envisioned, distributors
2  must be vigilant."
3        Correct, sir?
4    A.    I do see that.
5        MR. STOFFELMAYR:  Objection to
6  the form.
7        THE WITNESS:  Sorry.  I'm
8  sorry.
9  QUESTIONS BY MR. MOUGEY:
10   Q.    "And Walgreens must be vigilant
11  in deciding whether a prospective customer
12  can be trusted to deliver controlled
13  substances only for -- only for lawful
14  purposes," correct, sir?
15       MR. STOFFELMAYR:  Objection to
16  the form.
17       THE WITNESS:  I see that
18  written here, but I don't know what
19  the vigilance was being -- or what due
20  diligence was being performed.
21  QUESTIONS BY MR. MOUGEY:
22   Q.    At Walgreens, correct, sir?
23   A.    Correct.
24   Q.    DEA goes on, and it says, "This
25  responsibility" --

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    And you see, sir, that it's
2  referencing the distributor's responsibility,
3  correct, sir?
4    A.    I do see that.
5    Q.    -- "is critical as Congress has
6  expressly declared that the illegal
7  distribution of controlled substances has a
8  substantial and detrimental effect on the
9  health and general welfare of the American
10 people."
11    Do you see that, sir?
12    A.    I do.
13    Q.    Do you agree with that
14 sentence, sir, that distributors of
15 controlled substances have a substantial and
16 detrimental effect on the health and general
17 welfare of the American people?
18    MR. STOFFELMAYR:  Objection to
19 the form.  I think that --
20    THE WITNESS:  Yeah, you left --
21 the illegal distribution, yes.  I
22 agree that illegal distribution of
23 controlled substances has a
24 substantial and detrimental effect on
25 health.

Page 147

1  QUESTIONS BY MR. MOUGEY:
2    Q.    And that Walgreens must be
3  vigilant in ferreting out potential diversion
4  in the supply chain, correct, sir?
5    MR. STOFFELMAYR:  Objection to
6  the form.
7    THE WITNESS:  It states here
8  that a distributor must be vigilant.
9  I can't state whether Walgreens -- on
10 behalf of Walgreens if we -- our due
11 diligence in maintaining the
12 vigilance.
13    MR. STOFFELMAYR:  Can we go off
14 the record for one second?
15    MR. MOUGEY:  Sure.
16    MR. STOFFELMAYR:  Just to talk
17 about lunch.  So it's 11:40.
18    VIDEOGRAPHER:  We're going off
19 the record at 11:39.
20  (Off the record at 11:39 a.m.)
21    VIDEOGRAPHER:  We're back on
22 the record at 11:40.
23 QUESTIONS BY MR. MOUGEY:
24    Q.    If you would, sir, please turn
25 to the second page of this letter, the third

Page 148

1  paragraph in, that begins with, "The
2  statutory factors."
3    Let me know when you're there.
4    A.    I'm there.
5    Q.    "The statutory factors DEA must
6  consider in deciding whether to revoke a
7  distribute's registration are set forth in 21
8  USC 823(e)."
9    Do you see that, sir?
10    A.    Yes.
11    Q.    Listed first among these
12 factors, "the duty of distributors to
13 maintain effective controls against
14 diversions of controlled substances into
15 other than legitimate medical, scientific and
16 industrial channels."
17    Do you see that, sir?
18    A.    Yes.
19    Q.    And you understand, sir, that
20 that was the duty that Walgreens was charged
21 with from the DEA, correct, sir?
22    MR. STOFFELMAYR:  Objection to
23 the form.  Foundation.
24    THE WITNESS:  I do not know
25 what Walgreens was charged with or

Page 149

1  asked to do from a DEA's perspective.
2  QUESTIONS BY MR. MOUGEY:
3    Q.    Sir, in 2006 until 2012, did
4  you have any understanding of what Walgreens'
5  duties were under the CSA?
6    A.    No.
7    Q.    No idea?
8    A.    No.
9    Q.    So if we continue with this
10 letter, sir, "The DEA regulations require all
11 distributors to report suspicious orders of
12 controlled substances.  Specifically the
13 regulations state in 21 CFR 1301.74(b)."
14    You didn't know what Walgreens
15 was required to do or not required to do?
16    MR. STOFFELMAYR:  Objection to
17 the form.
18    THE WITNESS:  At the time this
19 letter was sent out, no.
20 QUESTIONS BY MR. MOUGEY:
21    Q.    At any point in time up until
22 2012, you didn't know what Walgreens'
23 responsibilities were under the CSA, correct?
24    A.    Up until 2012, correct.
25    Q.    Did you even understand

Page 150

1 generally, in your capacity at Walgreens of
2 one of the diversion guys, what Walgreens'
3 responsibilities were?
4        MR. STOFFELMAYR: Objection to
5    the form.
6        THE WITNESS: I wouldn't title
7    myself as one of the diversion guys,
8    but, no, I was not aware.
9 QUESTIONS BY MR. MOUGEY:
10    Q.    Yet you used the word
11 "diversion" repeatedly in your CV, correct,
12 sir?
13    A.    I used the word "diversion" to
14 identify what types of responsibilities and
15 reports I ran to help identify diversion.
16    Q.    Then the next paragraph, the
17 blocked quote, "The registrant shall design
18 and operate a system."
19        You weren't aware of whether or
20 not the system that you were using to burn
21 CDs was part of a requirement for -- from the
22 DEA, correct, sir?
23    A.    I was not aware.
24    Q.    And the next paragraph, sir, I
25 assume then it's also safe to conclude that

Page 151

1 you were not aware that in addition to
2 reporting suspicious orders, that a
3 distributor has a statutory responsibility to
4 exercise due diligence to avoid filling
5 suspicious orders that might be diverted into
6 other legitimate, medical, scientific and
7 industrial channels, correct, sir?
8        MR. STOFFELMAYR: Objection to
9    the form.
10        THE WITNESS: Prior to my time
11    with RX integrity, no, I was not
12    aware.
13 QUESTIONS BY MR. MOUGEY:
14    Q.    And you're not aware from 2006,
15 continuing into pharmaceutical integrity,
16 that anyone at Walgreens was responsible for
17 performing due diligence on suspicious
18 orders?
19        MR. STOFFELMAYR: Objection to
20    the form.
21        THE WITNESS: I think you added
22    through my time in RX integrity. I
23    was aware in RX integrity that there
24    was due diligence ran, but not prior
25    to.

Page 152

1 QUESTIONS BY MR. MOUGEY:
2    Q.    So you're not aware from 2006,
3 when you began at Walgreens, up and to the
4 point when you began at pharmaceutical
5 integrity department, that anyone at
6 Walgreens was responsible for performing due
7 diligence on suspicious orders?
8        MR. STOFFELMAYR: Objection to
9    the form.
10        THE WITNESS: I do not know who
11    was responsible for those duties.
12 QUESTIONS BY MR. MOUGEY:
13    Q.    You don't know who was
14 responsible for the duties, and you don't
15 know whether anyone was even fulfilling those
16 duties, correct, sir?
17        MR. STOFFELMAYR: Objection to
18    the form.
19        THE WITNESS: I do not know if
20    those duties were being performed or
21    by who.
22 QUESTIONS BY MR. MOUGEY:
23    Q.    Right.
24        You have no idea of any
25 department or individuals who were performing

Page 153

1 due diligence on suspicious orders, correct,
2 sir, up until pharmaceutical integrity
3 department was formed in 2012?
4        MR. STOFFELMAYR: Objection to
5    the form.
6        THE WITNESS: Not saying that
7    they weren't being performed. I just
8    don't know who was performing those
9    duties.
10 QUESTIONS BY MR. MOUGEY:
11    Q.    Yes, sir, and I just want to
12 make sure we're clear. I'm not asking you
13 whether or not they were performed.
14        What I'm asking you is: Do you
15 know any individuals or any departments that
16 was responsible for performing due diligence
17 on suspicious orders before they were shipped
18 up and the time when you began with
19 pharmaceutical integrity?
20    A.    Performing due diligence on
21 those orders, I do not know of anyone
22 specifically, no.
23    Q.    You keep throwing in the word
24 specifically. I'm not asking you John Smith
25 in Dubuque, Iowa.

Page 154

1    What I'm asking you is:  Do you
2  -- generally are you aware of any individuals
3  or departments within Walgreens that was
4  tasked with performing due diligence on
5  suspicious orders before they were shipped?
6       MR. STOFFELMAYR:  Object to the
7    form, the little speech.  You asked
8    him for individuals.  I don't think
9    it's fair to dress him down for saying
10   he couldn't give you the names of
11   individuals, but go ahead and answer
12   that question.
13      THE WITNESS:  Again, I don't
14   know specifically or -- individually
15   or who were performing due diligence
16   on those reports.  When I sent those
17   reports out, if due diligence was
18   being done, I was unaware of it.
19 QUESTIONS BY MR. MOUGEY:
20   Q.   Generally, do you have any
21 general knowledge of a department who was
22 responsible for performing due diligence on
23 suspicious orders before they were shipped?
24      MR. STOFFELMAYR:  Objection to
25   the form.

Page 155

1       THE WITNESS:  I cannot speak to
2    that.  I know part of the
3    responsibilities of our distribution
4    centers -- that was part of their
5    responsibilities, but, again, I cannot
6    speak to whether or not that was being
7    performed.
8  QUESTIONS BY MR. MOUGEY:
9    Q.   So the answer to my question
10 is, no, you are not aware of any departments
11 that were responsible for performing due
12 diligence on suspicious orders before they
13 were shipped?
14      MR. STOFFELMAYR:  Objection to
15   the form.
16      THE WITNESS:  There could have
17   been due diligence done.  I just don't
18   know who was performing that due
19   diligence.
20 QUESTIONS BY MR. MOUGEY:
21   Q.   I'm not asking you if it could
22 or maybe could have.  I'm asking you:
23 Sitting here today, do you have any general
24 knowledge that any department was responsible
25 for performing due diligence on suspicious

Page 156

1  orders before they were shipped?
2       MR. STOFFELMAYR:  Objection to
3    the form.
4       THE WITNESS:  So to answer
5    that, then, yes, I am aware that
6    there -- it was part of their
7    responsibilities, but I don't know if
8    it was actually being performed.
9  QUESTIONS BY MR. MOUGEY:
10   Q.   It was part of the
11 responsibilities of which department?
12   A.   It was actually the individual
13 distribution centers.
14   Q.   So the distribution centers --
15 you believe, it was their responsibility to
16 perform due diligence on suspicious orders
17 before they were shipped?
18   A.   That was my understanding, yes.
19   Q.   Sir, when did you become aware
20 that the distribution centers were
21 responsible for performing due diligence on
22 suspicious orders before they were shipped?
23   A.   When I was in pharmaceutical
24 integrity.
25   Q.   So you have no individual -- no

Page 157

1  personalized knowledge of which departments
2  were supposed to perform due diligence on
3  orders before they were shipped until you
4  began in pharmaceutical integrity?
5    A.   Correct.
6    Q.   Do you have any understanding
7  that there was due diligence performed on
8  suspicious orders prior to being shipped
9  before the pharmaceutical integrity
10 department was formed?
11      MR. STOFFELMAYR:  Objection to
12   the form.
13      THE WITNESS:  Are you asking me
14   if I was aware that due diligence was
15   being performed?
16 QUESTIONS BY MR. MOUGEY:
17   Q.   Do you have -- yes, sir.
18   A.   I am unaware if any due
19 diligence was being performed.
20   Q.   So what I want to try and do is
21 separate out the time period when the DEA and
22 the Department of Justice required that
23 Walgreens form the pharmaceutical integrity
24 department.
25      Okay?

Highly Confidential – Subject to Further Confidentiality Review

Page 158

1  A.  Okay.

2  Q.  Were you aware of any

3  department that was performing due diligence

4  on suspicious orders before they were

5  shipped?

6  A.  No.

7  Q.  Now, let's start with the

8  pharmaceutical integrity when you said that

9  the distribution centers were tasked with

10  performing due diligence on suspicious orders

11  before they were shipped.

12  How did you become aware of

13  that information? Who told you?

14  A.  It was discussed in our

15  department from my supervisor and among the

16  other managers regarding the DEA MOA. It was

17  part of the discussion of the duties that

18  were being performed or responsibilities for

19  each department.

20  Q.  And do you have an

21  understanding of what the scope of

22  distribution center's responsibility was with

23  performing due diligence on suspicious orders

24  before they were shipped?

25  A.  No, I do not know the scope.

Page 159

1  Q.  So, sir, you would agree with

2  me that if Walgreens was not performing due

3  diligence on suspicious orders before they

4  were shipped, that it was violating the

5  Controlled Substance Act?

6  MR. STOFFELMAYR: Objection to

7  the form. Lack of foundation.

8  THE WITNESS: Yeah, I can't

9  speak to regulations. I'm not -- I'm

10  obviously not a lawyer, so I don't

11  know what Walgreens' responsibilities

12  were in regards to the Controlled

13  Substances Act.

14  QUESTIONS BY MR. MOUGEY:

15  Q.  I understand you're not a

16  lawyer, but what I'm asking you: In your

17  tenure at Walgreens from 2006 all the way up

18  to the beginning of pharmaceutical integrity,

19  did you have an understanding that if

20  Walgreens was not performing due diligence on

21  suspicious orders, that it was violating the

22  CSA?

23  MR. STOFFELMAYR: Objection to

24  the form. Lack of foundation.

25  THE WITNESS: No, I did not

Page 160

1  have knowledge of what those

2  regulations were or if Walgreens was

3  in compliance with those regulations.

4  QUESTIONS BY MR. MOUGEY:

5  Q.  But you would agree with me

6  that as early as 2006, the DEA was

7  communicating to registrants that it had to

8  perform due diligence on suspicious orders,

9  correct, sir?

10  MR. STOFFELMAYR: Objection to

11  the form.

12  THE WITNESS: According to the

13  information you provided me, I am

14  aware, but during the time frame, I

15  was not aware that we were being --

16  QUESTIONS BY MR. MOUGEY:

17  Q.  Yes, sir.

18  But sitting here today you can

19  see that the DEA is telling the registrants

20  like Walgreens it has to perform due

21  diligence on suspicious orders, correct, sir?

22  MR. STOFFELMAYR: Objection to

23  the form.

24  THE WITNESS: I do see that in

25  the documents you showed me, but I

Page 161

1  don't know who was informed on the

2  Walgreens side.

3  QUESTIONS BY MR. MOUGEY:

4  Q.  And if Walgreens was not

5  performing due diligence on suspicious orders

6  up to the creation of pharmaceutical

7  integrity, it was violating the CSA, correct,

8  sir?

9  MR. STOFFELMAYR: Objection to

10  the form. Lack of foundation.

11  THE WITNESS: I can't speak to

12  that.

13  QUESTIONS BY MR. MOUGEY:

14  Q.  Well, let's read the paragraph

15  together. Okay?

16  It says, "Thus, in addition to

17  reporting all suspicious orders, a

18  distributor has a statutory responsibility to

19  exercise due diligence to avoid filling

20  suspicious orders."

21  You see that, right?

22  A.  Yes.

23  Q.  So as of 2006, according to

24  this letter, you don't have any problem

25  understanding, as a Walgreens employee, that

Page 162

1 a distributor has a statutory responsibility
2 to exercise due diligence to avoid filling
3 suspicious orders, correct?
4          MR. STOFFELMAYR:  Objection to
5 the form.  Lack of foundation.
6          THE WITNESS:  I do not know
7 what a distributor has -- what
8 responsibilities a distributor has in
9 terms of these federal regulations.
10 QUESTIONS BY MR. MOUGEY:
11     Q.    I understand, but sitting here
12 today looking at this letter for the first
13 time, it's as of September 2006, the DEA is
14 telling Walgreens, "You have a responsibility
15 to exercise due diligence to avoid filling
16 suspicious orders."  That's unequivocal,
17 correct?
18          MR. STOFFELMAYR:  Objection to
19 the form.
20          THE WITNESS:  I see that today,
21 but again, I don't know what those
22 responsibilities are on behalf of
23 Walgreens as a distributor.
24 QUESTIONS BY MR. MOUGEY:
25     Q.    But that sentence is not

Page 163

1 confusing, convoluted, hard to understand in
2 any shape, form or fashion, correct, sir?
3          Due diligence on suspicious
4 orders to avoid filling illegitimate
5 prescriptions, correct, sir?
6          MR. STOFFELMAYR:  Objection to
7 the form.  That's not what it says.
8          THE WITNESS:  Yeah, it says --
9          MR. MOUGEY:  Mr. Kaspar, I'm
10 not going to ask you again, you
11 understand?  It's the fifth, sixth,
12 seventh, eighth time.
13          MR. STOFFELMAYR:  I thought you
14 were making a mistake.
15          MR. MOUGEY:  No, I appreciate
16 that.  I'll live with my mistakes.  I
17 don't need any more conversations on
18 the record, underneath your breath,
19 because exactly what Mr. Stahmann says
20 is exactly what -- he's just parroting
21 whatever you say.
22          Now, I've been patient.  You've
23 probably done speaking objections 20,
24 25 times --
25          MR. STOFFELMAYR:  It wasn't a

Page 164

1 speaking objection.
2          MR. MOUGEY:  It certainly was.
3          MR. STOFFELMAYR:  I am
4 correcting you.
5          MR. MOUGEY:  I don't need to be
6 corrected.
7          MR. STOFFELMAYR:  You say
8 you're reading the text, and you read
9 the first half of the sentence, and
10 you rewrite the second half of the
11 sentence.  That's not fair.
12          If you're doing that on
13 purpose --
14          MR. MOUGEY:  And you have
15 plenty time down the road to object,
16 correct?
17          MR. STOFFELMAYR:  Well --
18          MR. MOUGEY:  I don't need --
19          MR. STOFFELMAYR:  -- we're
20 going to be here a long time cleaning
21 up if you're going to misread every
22 document you show him.
23          MR. MOUGEY:  I appreciate your
24 concern about how long we're going to
25 be here.  We have parameters on how

Page 165

1 long we can be here.  If that's how I
2 want to spend my time, great, but I
3 don't want to spend my time asking you
4 not to continue with your speaking
5 objections.  Are we on the same page?
6          MR. STOFFELMAYR:  I'm going to
7 ask you to stop misreading documents.
8          MR. MOUGEY:  I appreciate that,
9 and I'm going to --
10          MR. STOFFELMAYR:  Can I ask you
11 that?
12          MR. MOUGEY:  This is the fifth
13 or sixth time I've asked you to stop
14 with the speaking objections.
15          MR. STOFFELMAYR:  It wasn't an
16 objection.  I'm correcting you.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    There's not any confusion in
19 this paragraph, sir, that a distributor has a
20 statutory responsibility to exercise due
21 diligence to avoid filling suspicious orders,
22 correct?
23          MR. STOFFELMAYR:  Objection to
24 the form.
25          THE WITNESS:  According to this

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1     document, there is a statutory
2 responsibility for a distributor to
3 exercise due diligence.
4 QUESTIONS BY MR. MOUGEY:
5     Q.    So the letter we just went
6 through is dated September 27, 2006. If you
7 look backwards, you see that almost the exact
8 same letter was sent on February 7, 2007,
9 correct, sir?
10     A.    I don't know if it's the same
11 exact letter. I didn't read through both of
12 them.
13     Q.    Take a minute and look through
14 them.
15     A.    Seems to be additional
16 information in the February 7, 2007 document
17 or letter.
18     Q.    You turn to the next page,
19 December 27, 2007, another letter from the US
20 Department of Justice, DEA to registrants
21 under the CSA, correct?
22     A.    It's from Joseph Rannazzisi. I
23 don't know if that's -- specifically if he
24 represents the DEA.
25     Q.    Do you see his title, deputy

Page 167

1 assistant administrator, Office of Diversion
2 Control?
3     A.    I do see that.
4     Q.    And if you turn to the first
5 page of this document, December 27, 2007, the
6 third paragraph down, "This regulation also
7 requires that the registrant inform the local
8 DEA diversion -- division office of
9 suspicious orders when discovered by the
10 registrant."
11     Do you see that, sir?
12     A.    I do see that.
13     Q.    And you see that "when
14 discovered" is underlined, correct, sir?
15     A.    That is underlined, yes.
16     Q.    So as of December 27, 2007, it
17 was crystal clear that the DEA wanted
18 Walgreens to report suspicious orders as they
19 were discovered, correct, sir?
20     MR. STOFFELMAYR: Objection to
21 the form. Foundation.
22     THE WITNESS: According to
23 Mr. Rannazzisi, the -- that could be
24 his interpretation of those regs, yes.
25     (Discussion off the record.)

Page 168

1 QUESTIONS BY MR. MOUGEY:
2     Q.    Let's go back to the very first
3 page, June 12, 2012. There is -- there are a
4 series of letters coming from the DEA
5 reminding registrants of their duties and
6 obligation under the CSA, correct, sir?
7     A.    Yes.
8     Q.    And up and to the point when
9 you began in pharmaceutical integrity, no one
10 ever came to you and relayed what the DEA
11 expectations were, correct, with regard to
12 suspicious orders?
13     A.    No.
14     Q.    No one ever came to you from
15 Walgreens and gave you any of the information
16 about the requirement that -- that Walgreens
17 perform due diligence on suspicious orders
18 prior to your time in pharmaceutical
19 integrity department, correct, sir?
20     MR. STOFFELMAYR: Objection to
21 the form.
22     THE WITNESS: During my time.
23 No one came to me and relayed this
24 information to me.
25     MR. MOUGEY: This is a good

Page 169

1 time to take a break for lunch. Thank
2 you.
3     VIDEOGRAPHER: We're going off
4 the record at 11:58.
5     (Off the record at 11:58 a.m.)
6     VIDEOGRAPHER: We're back on
7 the record at 1:05.
8 QUESTIONS BY MR. MOUGEY:
9     Q.    Mr. Stahmann, at any point in
10 time were you aware that pharmacy customers
11 were arrested on Walgreens property regarding
12 Class II and III narcotics?
13     A.    Yes.
14     Q.    Were you aware that pharmacists
15 were concerned for their safety when walking
16 to their cars after work from a Walgreens
17 Pharmacy?
18     A.    No.
19     Q.    Were you aware that pharmacists
20 expressed their concern about growing
21 prescriptions for oxy 30s?
22     A.    At some point I was made aware,
23 yes.
24     Q.    And when you say "at some
25 point," when did you become aware?

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1       A.      Pharmaceutical integrity.
2       Q.      And you've mentioned
3   pharmaceutical integrity a few times.
4   Pharmaceutical integrity is the department
5   that was created by direction of the DEA
6   after an imposed an $80 million fine,
7   correct, sir?
8           MR. STOFFELMAYR:  Objection to
9       the form.
10          THE WITNESS:  Actually, I think
11      it was a settlement, but I don't know
12      exactly why the RX integrity
13      department was created.  I do know
14      that it was part of the settlement
15      with the DEA.
16  QUESTIONS BY MR. MOUGEY:
17      Q.      And that settlement resulted in
18  substantial fines from the DFA {sic},
19  correct?
20          MR. STOFFELMAYR:  Objection to
21      the form.
22          THE WITNESS:  Again, there were
23      not fines.  I think it was a
24      settlement, and the -- yeah, the
25      approximate dollar amount was

Page 171

1   $80 million.
2   QUESTIONS BY MR. MOUGEY:
3       Q.      And you're aware, sir, that
4   that substantial settlement amount at the
5   point that agreement was reached with the DEA
6   was the largest in the history of the DEA
7   regarding a distributor, correct, sir?
8       A.      I did not know that, no.
9       Q.      When you said that you were
10  aware that customers were arrested in -- on
11  Walgreens property, did you become aware of
12  that in your role as part of the
13  pharmaceutical integrity department?
14      A.      I did learn about some
15  instances when I was in loss prevention.
16      Q.      Did you -- when you were with
17  part of loss prevention?
18      A.      Correct.
19      Q.      Were you aware that pharmacists
20  were questioning how the -- strike that.
21          Were you aware that corporate
22  Walgreens was questioning how specific
23  Walgreens pharmacies stored so many bottles
24  of Class II and III narcotics as they were
25  ordering?

Page 172

1           MR. STOFFELMAYR:  Objection to
2       the form.
3           THE WITNESS:  I was not aware
4       of what Walgreens knew.
5           (Discussion off the record.)
6           (Walgreens-Stahmann Exhibit 6
7       marked for identification.)
8   QUESTIONS BY MR. MOUGEY:
9       Q.      I just put in front of you what
10  we've premarked as Stahmann 6, which the
11  first page of this document is titled
12  "Settlement and Memorandum of Agreement,"
13  correct, sir?
14      A.      That is correct.
15      Q.      Now, are you familiar with this
16  document?
17      A.      Yes.
18      Q.      And did you review it in
19  preparation for your testimony today?
20      A.      I did.
21      Q.      Did you also review it at about
22  the same time that Walgreens reached the
23  agreement with the DEA?
24      A.      It was a little bit after that
25  time, during my role in pharmaceutical

Page 173

1   integrity.
2       Q.      So pharmaceutical integrity you
3   started on or about in February of 2013,
4   correct?
5       A.      Correct.  I think I officially
6   transitioned over there in April of 2013.
7       Q.      In the bottom right-hand corner
8   you have page numbers on this document, so
9   let's start off with the very beginning
10  titled "Settlement and Memorandum of
11  Agreement," correct?
12      A.      Yes.
13      Q.      And the memorandum of agreement
14  is entered into by and between the United
15  States Department of Justice, United States
16  Drug Enforcement Administration, and
17  Walgreens.
18          Do you see that there, sir?
19      A.      I do.
20      Q.      And then on the first page
21  there is another section titled "Procedural
22  Background."
23          Correct?
24      A.      I do see that.
25      Q.      And you are familiar that this

Page 174

1 memorandum of agreement, or MOA, encompasses
2 several different orders to show cause issued
3 by the DEA, correct, sir?
4     A.    I am not aware of that. I
5 don't know specifically what orders to show
6 cause were listed in here.
7     Q.    All right. And maybe not
8 specifically, but generally, did you have an
9 understanding that this MOA was a culmination
10 of several different orders to show cause?
11     A.    Yes.
12     Q.    So if we started off with
13 paragraph 1 on page 1 of this document,
14 "Walgreens owns or operates distribution
15 centers," and that's one of Walgreens' role
16 under -- roles under the CSA with regard to
17 Schedule II and III, correct, sir?
18     A.    At one time it was, yes.
19     Q.    And under paragraph 2,
20 "Walgreens owns and operates or has
21 previously owned or operated pharmacies that
22 are or were registered with the DEA's
23 retail/chain pharmacies to handle Schedule II
24 through V controlled substances under the
25 CSA," correct?

Page 175

1     A.    I do see that, yes.
2     Q.    And that is what the DEA and
3 Walgreens are referring to as a pharmacy or
4 collectively pharmacies, correct, sir?
5     A.    I don't know if that's
6 specifically what Walgreens and the DEA is
7 referring to, but that is written here.
8     Q.    All right. On -- underneath
9 paragraph 3 on April 7, 2011, Walgreens
10 entered into a settlement agreement and
11 administrative memorandum of agreement with
12 the DEA, correct?
13     A.    Correct.
14     Q.    And it says "see Appendix A."
15     A.    Yep.
16     Q.    And then just take a minute --
17 well, let's look at 4. 4 is, "Walgreens
18 Jupiter Distribution Center is registered
19 with the DEA as a distributor of Schedule II
20 through IV controlled substances," correct?
21     A.    They were at one time, yes.
22     Q.    Yes, sir.
23         And that was one of three
24 distribution centers at this point in time
25 that distributed Schedule II narcotics,

Page 176

1 correct, sir?
2     A.    I don't recall how many of our
3 distribution centers distributed C-II
4 through Vs at that time.
5     Q.    And I'm asking specifically
6 about C -- just C-IIs.
7     A.    Again, I don't know which
8 specific distribution centers of Walgreens
9 distributed C-IIs at the time.
10     Q.    Do you have an understanding
11 that it was less than five distribution
12 centers that were distributing C-IIs like
13 OxyContin?
14     A.    I believe it was under -- it
15 was less than five, yes.
16     Q.    It was less than five.
17         So are you -- do you have any
18 understanding of whether Perrysburg is
19 another distribution center that was licensed
20 to distribute Class II narcotics?
21     A.    They were. They were at one
22 time.
23     Q.    And another was -- Tempe,
24 Arizona, was licensed to distribute Class II,
25 correct?

Page 177

1     A.    They were at one time, yes.
2     Q.    Can you think of any others
3 other than those three that were licensed or
4 approved to distribute Class II?
5     A.    I don't know for certain if
6 they were, but I can name other distribution
7 centers.
8     Q.    Number 5, "On September 13,
9 2012, the DEA by its administrator, Michele
10 Leonhart, issued an order to show cause and
11 immediate suspension of regulation to Jupiter
12 Distribution."
13         Do you see that, sir?
14     A.    I do see that.
15     Q.    And that's Jupiter as a
16 distribution center, correct, sir?
17     A.    I believe that's what they're
18 referring to, yes.
19     Q.    And as you look at paragraph 6,
20 "On November 6, 2012, the DEA, but its deputy
21 assistant administrator, Joseph H.
22 Rannazzisi, issued three OTSC" --
23         You understand that that's
24 order to show cause?
25     A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.    -- "to Walgreens Pharmacy," and
2 it lists the numbers 3629, 12028 -- I'm
3 sorry, the first one is 03629.  The second
4 one is 07 -- 04727, and 06997 as part of that
5 order to show cause, correct?
6    A.    I do see that.
7    Q.    Paragraph 7 on the second page
8 also references on February 4, 2013, that
9 Mr. Rannazzisi also issued an order to show
10 cause for retail pharmacy 03836, correct?
11    A.    I do see that.
12    Q.    So that's the fourth Walgreens
13 Pharmacy so far included in the orders to
14 show cause, correct, sir?
15    A.    That's what it appears, yes.
16    Q.    Number 8 is February 11, 2013,
17 Mr. Rannazzisi issued another order to show
18 cause for retail pharmacy 04391, correct?
19    A.    Yes.
20    Q.    And under paragraph 9 on
21 February 19, 2013, Mr. Rannazzisi issued
22 another order to show cause on another
23 Walgreens Pharmacy, 03099, correct, sir?
24    A.    That is correct.
25    Q.    And each of those paragraphs

Page 179

1 that we just went through, paragraph 6
2 through 9, all reference Exhibit 3 for the
3 orders to show cause, correct, sir?
4    A.    Yes.
5        MR. STOFFELMAYR:  Exhibit C?
6        MR. MOUGEY:  I'm sorry?
7        MR. STOFFELMAYR:  C?
8        MR. MOUGEY:  C?
9        MR. STOFFELMAYR:  I thought you
10 said 3.
11        MS. SWIFT:  You did.
12 QUESTIONS BY MR. MOUGEY:
13    Q.    Exhibit 6 through 9 all
14 reference Exhibit C as the order to show
15 cause on those various Walgreens pharmacies,
16 correct, sir?
17    A.    Yes, Appendix C.
18    Q.    All right.  And just keep your
19 finger there.  I'm going to come back to that
20 section.  I want you to turn, sir, to page 11
21 of this document.
22        Do you see the title on that
23 page, "Addendum:  Prospective compliance"?
24    A.    I do.
25    Q.    And prospective meaning looking

Page 180

1 forward, correct, sir?
2    A.    That's my understanding of that
3 word, yeah.
4    Q.    So during the course this
5 morning of your testimony, you have
6 referenced several times the Walgreens
7 pharmaceutical integrity department, correct,
8 sir?
9    A.    Yes.
10    Q.    And as we look on page 11 under
11 the title "Addendum:  Prospective
12 compliance," we see under A1, "Walgreens will
13 maintain the department of pharmaceutical
14 integrity composed of personnel with
15 pharmacy-related training and managerial
16 personnel who shall be trained in relevant
17 diversion-related issues."  I'll stop there.
18        Did I read that correctly?
19    A.    You did.
20    Q.    So as part of this substantial
21 settlement agreement with Walgreens,
22 Walgreens was required by the DEA to maintain
23 the department of pharmaceutical integrity,
24 correct, sir?
25        MR. STOFFELMAYR:  Objection to

Page 181

1 the form.
2        THE WITNESS:  Under these
3 rules, I don't know if that was part
4 of why the department of
5 pharmaceutical integrity was created
6 or why -- or if it needed to be
7 maintained, so I can't speak directly
8 to that.  I can speak to --
9 QUESTIONS BY MR. MOUGEY:
10    Q.    Well, let's look at the intro
11 paragraph preceding the discussion about
12 pharmaceutical integrity.
13        It says, "The parties agree
14 that Walgreens will maintain the following
15 specific compliance measures for the duration
16 of this agreement.  To the extent any
17 compliance measures identified below are not
18 yet in place, Walgreens commits to implement
19 such measures within the time frame specified
20 therein."
21        Correct?
22    A.    Correct, that's what -- that's
23 what it says.
24    Q.    And you see in the paragraph
25 A1, second sentence, it says, "Within one

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  month of the effective date of this
2  agreement, Walgreens will identify a
3  dedicated contact point for DEA within the
4  department of pharmaceutical integrity to
5  facilitate Walgreens' responses to DEA
6  requests for information and documents,"
7  correct, sir?
8      A.    That's correct.
9      Q.    If you would, sir, please turn
10 to page 15 of this document, which is
11 Appendix A, referencing the memorandum of
12 agreement regarding the Jupiter store,
13 correct? I'm sorry, the Jupiter Distribution
14 Center.
15         No, I'm sorry, I got -- I'm
16 incorrect.
17         Exhibit A references the
18 settlement and release agreement with the DEA
19 regarding a San Diego pharmacy, number 06094.
20         Do you see that, sir?
21     A.    I do see that, yes.
22     Q.    And under background, you see
23 on September 30, 2009, the deputy assistant
24 administrator, Office of Diversion Control,
25 DEA, issued an order to show cause proposing

Page 183

1  to revoke DEA's certificate of registration
2  on Walgreens store 06094, correct, sir?
3      A.    That's what it says, yes.
4      Q.    In the paragraph below, the
5  OTSC -- the order to show cause -- alleged
6  that Walgreens, and you see there's
7  numbers, 1, 2, 3.
8         Do you see that, sir?
9      A.    Yes.
10     Q.    The first one is, "Dispense
11 controlled substances to individuals based on
12 purported prescriptions issued by physicians
13 who are not licensed to practice medicine in
14 California."
15         Do you see that, sir?
16     A.    Yes.
17     Q.    And number 2, "Dispense
18 controlled substances to individuals located
19 in California based on Internet prescriptions
20 issued by physicians for other than a
21 legitimate medical purpose and/or outside the
22 usual course of professional practice in
23 violation of federal and state law."
24         Do you see that, sir?
25     A.    I do.

Page 184

1      Q.    And number 3 is, "Dispensing
2  controlled substances to individuals that
3  Walgreens 06094 knew or should have known
4  were diverting the controlled substances."
5         Do you see that, sir?
6      A.    I do see that.
7      Q.    So before the lunch break, you
8  and I just went through a series of DEA
9  letters that began in 2006, correct?
10     A.    Yes.
11     Q.    And those letters continued
12 until 2012, and I think we looked at four
13 individual and distinct letters reminding
14 distributor of their duties, correct?
15     A.    Correct.
16     Q.    And as of, according to this
17 document, September 30, 2009, right in the
18 middle of those letters reminding
19 distributors of their duties, the Walgreens
20 received an order to show cause from the DEA,
21 correct, sir?
22     A.    For a particular store, yes,
23 that's correct.
24     Q.    Yes, sir.
25         So were you aware that

Page 185

1  Walgreens received an order to show cause
2  regarding this Walgreens Pharmacy before
3  Walgreens initiated the pharmaceutical
4  integrity department?
5      A.    I was not aware.
6      Q.    Were you aware after you joined
7  the pharmaceutical integrity department of
8  this order to show cause?
9      A.    Yes.
10     Q.    And explain to me how you
11 became aware of this order to show cause that
12 was received by Walgreens in
13 September 30th -- or on September 30th of
14 2009?
15     A.    So after I joined the
16 pharmaceutical integrity team part of our
17 analysis to help develop policies and
18 procedures, we looked at these orders to show
19 cause to help develop policies and
20 procedures.
21     Q.    Walgreens, corporate Walgreens,
22 should have been aware of these problem areas
23 with diversion beginning on September 30th of
24 2009, correct?
25         MR. STOFFELMAYR: Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    form.
2        THE WITNESS:  I cannot speak
3    whether or not Walgreens as a whole
4    should have been made aware.
5    QUESTIONS BY MR. MOUGEY:
6        Q.    Let's continue with the
7    paragraph that begins with, "The OTSC
8    alleged," and go to the sentence that begins
9    with, "In addition to the allegations
10   raised."
11       Do you see that?
12       A.    I do.
13       Q.    "In addition to the allegations
14   raised in the OTSC, DEA's investigation also
15   reveals that Walgreens O6094 was allegedly
16   refilling prescriptions for controlled
17   substances too early and had allegedly filled
18   several prescriptions that were issued using
19   expired DEA registration numbers."
20       Do you see that, sir?
21       A.    I do see that.
22       Q.    And these are all examples of
23   diversion, correct, sir?
24       MR. STOFFELMAYR:  Objection to
25   form.

Page 187

1        THE WITNESS:  Not necessarily.
2    Diversion is very, very vague and
3    broad.  It can mean a whole bunch of
4    different things.  This doesn't
5    necessarily lead to diversion.
6    QUESTIONS BY MR. MOUGEY:
7        Q.    Sir, you would agree with me
8    that these examples are all issues identified
9    by the DEA that would -- could lead to
10   potential diversion, correct, sir?
11       A.    It is possible, yes.
12       Q.    These were red flag diversion
13   areas brought to the attention of Walgreens
14   in 2009 by the DEA, correct, sir?
15       MR. STOFFELMAYR:  Objection to
16   the form.
17       THE WITNESS:  I do not know if
18   they were brought to Walgreens'
19   attention in 2009.
20   QUESTIONS BY MR. MOUGEY:
21       Q.    Sir, you've expressed some
22   confusion with what exactly diversion is, but
23   you used the word "diversion" repeatedly
24   through your CV, correct, sir?
25       A.    Correct.

Page 188

1        MR. STOFFELMAYR:  Objection to
2    form.  Give me a chance to --
3        THE WITNESS:  Sorry.
4    QUESTIONS BY MR. MOUGEY:
5        Q.    And, in fact, sir, under your
6    definition of your job description as a
7    project manager of pharmacy loss prevention,
8    "compile and interpret data for internal
9    pharmacy theft cases and for statistical
10   purposes to monitor diversion," correct, sir?
11       A.    Correct.
12       Q.    You didn't think it was
13   important at that point in time to provide
14   any definition for what diversion meant,
15   correct?
16       MR. STOFFELMAYR:  Objection to
17   the form.
18       THE WITNESS:  Diversion at that
19   time in my role and responsibility
20   focused solely on employee diversion.
21   QUESTIONS BY MR. MOUGEY:
22       Q.    Yes, sir.
23       And you didn't think you had to
24   define that in your CV for the world to see
25   that you posted on LinkedIn of what the

Page 189

1    definition of diversion was, correct?
2        A.    I did not, no.
3        Q.    Yes, sir.
4        And if you look on the first
5    page of your CV, you use the word "diversion"
6    in relation to your position as manager of
7    pharmaceutical integrity department on
8    several different instances, correct, sir?
9        A.    I do.
10       Q.    And, for example, the very
11   first bullet point -- I'm sorry, the very
12   last bullet point, "develops innovative
13   programs to identify and analyze areas that
14   address drug diversion and regulatory
15   compliance."
16       Do you see that on the last
17   bullet?
18       A.    I do see that.
19       Q.    And you thought it was crystal
20   clear in that description what drug diversion
21   meant, correct, sir?
22       A.    To me when I wrote these words,
23   yes.
24       Q.    Yes, sir.
25       That you developed innovative

Page 190

1 programs to identify and analyze areas that
2 address drug diversions and regulatory
3 compliance, correct, sir?
4     A.    That's what I wrote, yes.
5     Q.    And if you go back to page 15
6 of the administrative memorandum of
7 agreement, the second to last paragraph --
8 the last sentence of that paragraph beginning
9 with "moreover, the parties."
10        Do you see where I am?
11    A.    Yes.
12    Q.    "Moreover, the parties believe
13 that the continued cooperation between the
14 parties to reduce the potential for diversion
15 is in the public interest, and entering into
16 this agreement will ensure nationwide
17 compliance by Walgreens with respect to its
18 pharmacy operations."
19        Sir, do you see that?
20    A.    I do.
21    Q.    And if you turn to page 21 of
22 this document, the order to show cause and
23 the resulting memorandum of agreement was
24 entered into in 2011, correct, sir?
25    A.    I do see that's when it was

Page 191

1 signed.
2     Q.    Yes, sir.
3         March of 2011, it's signed by
4 Walgreens and April of 2011 signed by the
5 DEA, correct, sir?
6     A.    That is correct.
7     Q.    Now, if you would turn to
8 page 16 of the memorandum of agreement of the
9 San Diego store, under obligations of
10 Walgreens, Walgreens assured the DEA when it
11 signed this document that "it would maintain
12 a compliance program to detect and prevent
13 diversion of controlled substances as
14 required under the Controlled Substances Act
15 and applicable DEA regulations."
16        Do you see that, sir?
17    A.    You said assures. I think it
18 says Walgreens agrees to maintain.
19    Q.    Yes, sir.
20        But the question I asked:  Was
21 it assured?  By signing this agreement
22 Walgreens told the DEA it was going to
23 maintain a compliance program to detect and
24 prevent diversion of controlled substances as
25 required under the Controlled Substances Act,

Page 192

1 correct, sir?
2     A.    The person who signed this had
3 agreed to that.  I cannot say on behalf of
4 Walgreens that's what we agreed or assured to
5 do.
6     Q.    The plain reading of this
7 agreement, sir, is that Walgreens assured the
8 DEA that it was going to comply with the
9 requirements of the CSA and the applicable
10 DEA regs, correct, sir?
11    A.    It says Walgreens maintains a
12 compliance program.  I don't know if it -- it
13 doesn't specifically say or it doesn't say
14 verbatim that it assures that we would be in
15 compliance under the CSA.
16    Q.    Well, by signing something, you
17 understand that that's an agreement or a
18 contract, correct, sir?
19    A.    I do.
20    Q.    And by signing something, you
21 understand and agree that when you sign it,
22 you're assuring the other party that, Hey,
23 I'm going to take care of my obligations as
24 agreed to in this agreement, correct, sir?
25    A.    I can assume that when that

Page 193

1 person signed that, that's what was under
2 their thought process, but, again, I cannot
3 speculate.
4     Q.    And when you sign something,
5 that's what you mean.  Personally,
6 Mr. Stahmann, when you sign something, you're
7 assuring the other party that you're going to
8 fulfill your obligations in that agreement,
9 correct, sir?
10    A.    Personally, yes.
11    Q.    And the same paragraph goes on,
12 "This program shall include procedures to
13 identify the common signs associated with the
14 diversion of controlled substances including,
15 but not limited to, doctor shopping and
16 requests for early refills."
17        Do you see that, sir?
18    A.    I do.
19    Q.    And you see in paragraph B that
20 "Walgreens shall implement a system to notify
21 local DEA office within two business days of
22 a refusal to fill a prescription for
23 controlled substances where such refusal is
24 based on the Walgreens' pharmacist's
25 determination that the prescription was

Page 194

1 forged, altered or issued other than for a
2 legitimate medical purpose."
3          Correct, sir?
4     A.   I do see that.
5     Q.   And, sir, that immediate
6 notification to the DEA -- you can understand
7 as a former law enforcement officer why the
8 timeliness of that notification is important,
9 correct, sir?
10    A.   Of course, yes.
11    Q.   You can't wait for weeks or
12 months to go by with reporting that
13 information to law enforcement because that
14 opportunity to enforce the regulations or
15 laws is often lost with the passage of time,
16 correct?
17          MR. STOFFELMAYR:  Objection to
18     form.  Foundation.
19          THE WITNESS:  I can't say
20     exactly why the DEA needed those --
21     that information on a timely basis or
22     within two business days.
23 QUESTIONS BY MR. MOUGEY:
24    Q.   Well, let's just say your own
25 experience with law enforcement that you've

Page 195

1 now brought into Walgreens, you would agree
2 with that, correct?
3     A.   In a very general, broad sense,
4 yes.
5     Q.   Yes, sir.
6          And when we were looking at the
7 organizational chart earlier in the day, and
8 I asked all of the managers' areas of
9 expertise -- do you remember that line of
10 questioning?
11    A.   I do.
12    Q.   And you said two of them were
13 pharmacists, correct?
14    A.   Yes.
15    Q.   And one, I think it was
16 Mr. Bratton, was the -- he was kind of the
17 database guru, correct?
18    A.   Correct.
19    Q.   You were the loss prevention
20 guy, right?
21    A.   I worked in loss prevention.  I
22 was not the loss prevention guy.
23    Q.   But despite the geographic
24 areas of division of responsibility, your
25 area of expertise was loss prevention,

Page 196

1 correct?
2     A.   Correct.
3     Q.   And that loss prevention, you
4 would understand that timeliness of
5 information in your role at Walgreens is
6 important, correct?
7     A.   In my role, yes.
8     Q.   Yes, sir.
9          And under paragraph C,
10 "Walgreens shall implement and maintain
11 policies and procedures to ensure that
12 prescriptions for controlled substances are
13 only dispensed to authorized individuals
14 pursuant to federal and state laws and regs."
15          Correct?
16    A.   I do see that.
17    Q.   Let's go back to the first page
18 of this memorandum of agreement.  I would
19 like you to look down at paragraphs 4 and 5,
20 and those discuss the Jupiter Distribution
21 Center.
22          Correct, sir?
23    A.   They do.
24    Q.   Now, sir, were you aware that
25 the Jupiter Distribution Center had been

Page 197

1 padlocked by the DEA at this point in time?
2     A.   I was not.
3     Q.   Were you aware that the DEA had
4 locked the building based on its conclusions
5 that Walgreens continually violated its
6 obligations under the CSA?
7          MR. STOFFELMAYR:  Objection to
8     the form.
9          Go ahead.
10          THE WITNESS:  Sorry.  I was not
11     aware until after I was part of
12     pharmaceutical integrity team.
13 QUESTIONS BY MR. MOUGEY:
14    Q.   When you say you were not
15 aware, you were not aware that the DEA locked
16 the distribution center in Jupiter, Florida,
17 so Walgreens could not enter?
18          MR. STOFFELMAYR:  Objection to
19     the form.
20          THE WITNESS:  That's correct.
21     I was not aware until after I joined
22     the pharmaceutical integrity team.
23 QUESTIONS BY MR. MOUGEY:
24    Q.   And after you joined the
25 pharmaceutical integrity treatment discussed

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 in this memorandum of agreement as part of
2 this substantial fine, what were you told by
3 Walgreens about the Jupiter center being
4 locked by the DEA?
5         MR. STOFFELMAYR: Mr. Stahmann,
6     the question is fine. I just want to
7     caution you, and I don't know if this
8     is the case, but if any of what you
9     were told you were told by lawyers for
10    the company or people passing on
11    information from lawyers to the
12    company, don't go into that. We can
13    sort that out.
14        Go ahead and answer the
15    question with that caveat.
16        THE WITNESS: So I was told by
17    my supervisor why the DEA came and
18    closed down the Jupiter Distribution
19    Center.
20 QUESTIONS BY MR. MOUGEY:
21    Q.   And what was that explanation?
22    A.   That they had some concerns
23 about our distribution or dispensing of
24 controlled substances.
25    Q.   And were you told that it was

Page 199

1 closed down, or were you told that it was put
2 under lock and key by the DEA excluding
3 Walgreens from their own distribution center?
4    A.   I don't recall the exact words
5 that were used.
6    Q.   Any description, closed down
7 versus that it was locked up by the DEA. Was
8 anybody -- did anybody explain that to you
9 from Walgreens?
10       MR. STOFFELMAYR: Objection to
11    the form.
12       THE WITNESS: Again, yeah. No,
13    I don't remember the specific words
14    that were used.
15 QUESTIONS BY MR. MOUGEY:
16    Q.   And I'm not asking you if you
17 remember the specific words.
18       Did anybody from Walgreens tell
19 you that the Jupiter Distribution Center had
20 been locked up by the DEA?
21    A.   Not in so many words, but, yes.
22    Q.   Sir, please turn to page 23, if
23 you aren't there already.
24       It's titled "Order to Show
25 Cause and Immediate Suspension of

Page 200

1 Registration."
2    A.   I see it.
3    Q.   It's titled "Order to Show
4 Cause and Immediate Suspension of
5 Registration."
6       Do you see that?
7    A.   I do.
8    Q.   And under Notice, "It's hereby
9 given to inform Walgreen Corporation of the
10 immediate suspensions of Drug Enforcement
11 Administration certificate of registration,"
12 provides a number, "pursuant to US Code,
13 because such registration constitutes an
14 imminent danger to the public health and
15 safety."
16       Do you see that, sir?
17    A.   I do.
18    Q.   Were you aware that the DEA had
19 concluded that the Jupiter Distribution
20 Center constituted an imminent danger to
21 public health and safety?
22    A.   At some point in my time with
23 pharmaceutical integrity, yes, I was made
24 aware.
25    Q.   And you understand that as part

Page 201

1 of this order to show cause and immediate
2 suspension, that the DEA was suspending the
3 Jupiter Distribution Center's license to
4 distribute controlled substances, correct?
5    A.   Yes, I was made aware.
6    Q.   And under paragraph 1, DEA
7 explains that "Walgreens operates more than
8 7,800 Walgreens retail pharmacies in the
9 United States," correct, sir?
10   A.   I don't recall how many at the
11 time. I know we're -- that that number has
12 changed.
13   Q.   Do you understand -- well,
14 let's put it this way. There's several
15 thousand Walgreens across the country,
16 correct, sir?
17   A.   That is correct.
18   Q.   Do you understand what the word
19 "systemic" means?
20   A.   I do.
21   Q.   What does the word "systemic"
22 mean?
23   A.   Pertaining to a system.
24   Q.   Meaning that the entire system
25 has problems; it's a systemic problem,

Page 202

1 correct, sir?
2         MR. STOFFELMAYR: Objection to
3 the form.
4         THE WITNESS: According to the
5     definition of systemic, I don't know
6     if that is what is mentioned here or
7     the context -- the context of what is
8     mentioned here.
9 QUESTIONS BY MR. MOUGEY:
10     Q.    Did anyone at Walgreens as part
11 of the pharmaceutical integrity department
12 advise you that there were systemic problems
13 according to the DEA and with Walgreens'
14 system?
15     A.    No.
16     Q.    At any point in time ever in
17 pharmaceutical -- your experience in
18 pharmaceutical integrity department, did
19 anyone advise you the DEA believed there were
20 systemic problems with Walgreens' performance
21 and obligations under the CSA?
22     A.    No.
23     Q.    Sir, if you turn to page 11.
24         MR. MOUGEY: I'm sorry. I said
25     11, I meant 33. I apologize, page 33.

Page 203

1         MR. STOFFELMAYR: 3 as in the
2     small numbers in the lower right?
3         MR. MOUGEY: The small numbers,
4     yes.
5 QUESTIONS BY MR. MOUGEY:
6     Q.    Under paragraph 23, on page 33,
7 "Voluntarily -- voluntary dispensing
8 restrictions enacted either in anticipation
9 of or in reaction to regulatory action do not
10 indicate to me that respondent and its parent
11 company have recognized and adequately
12 reformed the systemic shortcomings discussed
13 herein."
14         Do you see that, sir?
15     A.    I do.
16     Q.    Don't you think that if the DEA
17 believed there were systemic shortcomings
18 with Walgreens, that as a manager in the
19 pharmaceutical integrity department you would
20 have been advised of that fact?
21         MR. STOFFELMAYR: Objection to
22     the form.
23         THE WITNESS: I do not know
24     what the DEA was thinking.
25

Page 204

1 QUESTIONS BY MR. MOUGEY:
2     Q.    As part of your job description
3 where you are designing and implementing new
4 policies and procedures to avoid diversion,
5 don't you think it would have been important
6 for you to understand the belief --
7 understand that DEA believed there were
8 systemic shortcomings with Walgreens' system?
9     A.    That is valuable information,
10 yes.
11     Q.    If you would, sir, please turn
12 back to page 23 and 24, and let me direct
13 your attention to paragraph 2. "Since at
14 least 2009" --
15         Do you see that, sir?
16     A.    I do.
17     Q.    -- "The State of Florida has
18 been the epicenter of a notorious,
19 well-documented epidemic of prescription drug
20 abuse.
21         Yet, sir, you weren't aware of
22 the epidemic of opiate drug abuse until you
23 began in the pharmaceutical integrity
24 department, correct, sir?
25     A.    That is correct.

Page 205

1     Q.    "In July of 2011, the Florida
2 Surgeon General declared a public health
3 emergency based on the prescription pill
4 epidemic which resulted in an average of
5 seven overdose deaths per day in Florida."
6         Do you see that, sir?
7     A.    I do.
8     Q.    Yet you weren't advised by
9 Walgreens management of the opiate epidemic
10 in the State of Florida before you started
11 the pharmaceutical integrity department,
12 correct, sir?
13     A.    Correct.
14     Q.    Now, sir, do you have any
15 understanding of whether or not there was a
16 problem with pills, Schedule II and III
17 narcotics, being diverted out of Florida
18 pharmacies into other states?
19     A.    I am not aware, no, or was not
20 aware.
21     Q.    Even sitting here today, were
22 you aware that Schedule II and III narcotics
23 were being diverted from Florida pharmacies
24 into other states?
25         MR. STOFFELMAYR: Objection to

Page 206

1  the form.
2      THE WITNESS: Can you define
3  diversion for me, your definition of
4  diversion?
5  QUESTIONS BY MR. MOUGEY:
6      Q.    You want me to define diversion
7  for you?
8      A.    Because it can mean so many
9  different things. That's why I'm asking.
10     Q.    Pills that are not ending up in
11 a legitimate home and out into the stream of
12 commerce. Did -- that pills were being
13 diverted from legitimate patients into the
14 hands of kids, that were being diverted into
15 the hands of drug dealers and making their
16 way into other states.
17     MR. STOFFELMAYR: Objection to
18 the form.
19     THE WITNESS: So are you asking
20 me if I was aware that that was
21 happening?
22 QUESTIONS BY MR. MOUGEY:
23     Q.    Yes, sir.
24     A.    Yes, I was aware that people
25 were using opioid medications not for their

Page 207

1  intended use.
2      Q.    And not just for -- not just
3  for their intended use, but were you aware
4  that Florida was the epicenter of a notorious
5  well-documented epidemic of description drug
6  abuse, and those pills were migrating to
7  other states?
8      A.    I was made aware of that during
9  my time in pharmaceutical integrity.
10     Q.    So not until 2013?
11     A.    Correct.
12     Q.    And, sir, what were you told by
13 Walgreens about the migration of pills from
14 Florida pharmacies into other states?
15     A.    We were made aware of some of
16 the drug-seeking behavior of some of the
17 patients and how -- some of the techniques
18 that they use to obtain prescriptions not for
19 a legitimate medical purpose and made aware
20 of some prescribers that were not writing
21 prescriptions for legitimate medical purpose.
22     Q.    So at that point in time, in
23 2013, did you make a study or analyze the
24 systems set in place at Walgreens to minimize
25 or avoid the diversion of Schedule II and III

Page 208

1  narcotics?
2      MR. STOFFELMAYR: Objection to
3  the form.
4      THE WITNESS: I personally did
5  not, no.
6  QUESTIONS BY MR. MOUGEY:
7      Q.    You never went back and looked
8  prior to '13 what Walgreens was doing prior
9  to the agreed-upon creation of the
10 pharmaceutical integrity department?
11     A.    That was not part of my role,
12 so, no, I did not.
13     Q.    Did you ask anybody, Well, what
14 were we doing before the pharmaceutical
15 integrity department was created by agreement
16 between the DEA and Walgreens?
17     A.    I did not.
18     Q.    You never went back and looked
19 at the systems in place to avoid diversion
20 prior to you starting in the pharmaceutical
21 integrity department?
22     MR. STOFFELMAYR: Objection to
23 the form.
24     Go ahead.
25     THE WITNESS: That was not part

Page 209

1  of my role, no.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    Have you ever looked through
4  this document that I have in front of you and
5  identified the discussion about the migration
6  of pills from Florida pharmacies to other
7  states?
8      A.    No.
9      Q.    Are you aware of how big a
10 problem it was in Florida that pills were
11 migrating from Florida pharmacies to other
12 states?
13     A.    I was not aware of the size of
14 the problem, no.
15     Q.    If you would, sir, please turn
16 to page 41, and it says, "Summary of
17 testimony." It's the Deputy Assistant
18 Administrator, Joseph Rannazzisi, says he's
19 from the DEA.
20     Do you see that, sir?
21     A.    Yes.
22     Q.    And, sir, this is a submission
23 from the government's prehearing statement.
24     Do you see that, sir?
25     A.    I do.

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1    Q.    And do you know who
2  Mr. Rannazzisi is?
3    A.    Just according to what he puts
4  under his title, so I get -- yes.
5    Q.    Let's look at the last sentence
6  of the second paragraph.  It says, "Each year
7  roughly 5.1 million people abuse narcotic
8  pain relievers in the United States."
9          Do you see that, sir?
10   A.    I do.
11   Q.    And, sir, you've heard the
12 saying that a chain is only as strong as its
13 weakest link, correct, sir?
14   A.    I have heard that.
15   Q.    So meaning that if the strength
16 of the chain is only going to be able to
17 handle the pressure as the weakest link in
18 the chain, correct?
19   A.    I have heard that, yes.
20   Q.    So if there's a hole or a soft
21 spot in the Walgreens pharmacies, the
22 diversion efforts are only as good as the
23 softest or weakest distribution --
24 pharmacies, correct, sir?
25         MR. STOFFELMAYR:  Objection to

Page 211

1     form.  Foundation.
2          THE WITNESS:  I don't -- I
3     don't know how you can make that
4     assumption.
5  QUESTIONS BY MR. MOUGEY:
6     Q.    Yes, sir.
7          Because you think that's a
8  reach?  You think that I'm just speculating
9  that the -- that the pharmacy -- that
10 Walmart -- I'm sorry, Walgreens Pharmacy is
11 only as strong as its weakest pharmacy?
12    A.    Yeah, again, I cannot agree to
13 that assumption.
14    Q.    Yes, sir.
15         Am I speculating -- do you
16 think I'm speculating when I'm making that
17 statement?
18         MR. STOFFELMAYR:  Objection to
19    the form.
20         THE WITNESS:  I don't know what
21    you're intending.
22 QUESTIONS BY MR. MOUGEY:
23    Q.    Paragraph, "Beginning in late
24 2008 and continuing to the present, there's
25 been a significant rise in the number of

Page 212

1  rogue pain clinics whose complicit doctors
2  were initially permitted to dispense millions
3  of dosage units of oxycodone and other abused
4  drugs directly from the clinics."
5          Did I read that correctly?
6     A.    You did.
7     Q.    And Mr. Rannazzisi goes on to
8  testify that, "Florida is the epicenter for
9  these illegal pain clinics."
10         Do you see that, sir?
11    A.    Yes.
12    Q.    "DEA state and local law
13 enforcement investigations reveal that
14 thousands of drug seekers flocked these
15 Florida-based pain clinics to obtain their
16 supply of oxycodone."
17         Do you see that, sir?
18    A.    I do.
19    Q.    And if you go on to the next --
20 sir, turn to page 128.
21    A.    128?
22    Q.    128, which is in Appendix C,
23 and this is a summary of the testimony of
24 Ms. Langston, diversion program manager in
25 the Miami field division.

Page 213

1          Do you see that, sir?
2     A.    I do.
3     Q.    And on the bottom of page 128,
4  "Ms. Langston will testify to DEA findings
5  that Walgreens 03629 has dispensed controlled
6  substances to customers residing in numerous
7  states and commonwealths outside of Florida."
8          Do you see that, sir?
9     A.    I do.
10    Q.    "She will testify that
11 Walgreens 03629's dispensing to out-of-state
12 customers is particularly problematic when
13 one considers information developed by DEA
14 that is a result of long-standing
15 prescription monitoring programs in Kentucky
16 and Ohio, and with the increased difficulty
17 in obtaining controlled substances from
18 licensed physicians in these jurisdictions,
19 many individuals have found creative ways to
20 circumvent state prescription monitoring
21 programs."
22         Do you see that, sir?
23    A.    Yes.
24    Q.    Did you have an understanding
25 during your tenure at Walgreens that addicts

Page 214

1 were seeking pills in states that did not
2 have monitoring programs mandated by the
3 states?
4     A.    Yes.
5     Q.    And they go on in page 129, "As
6 a result of the restricted access to
7 controlled substances in their states, many
8 individuals from Ohio, Kentucky and other
9 states have traveled by the carloads to pain
10 clinics located in Florida to obtain
11 prescriptions for oxycodone."
12         Do you see that, sir?
13         MR. STOFFELMAYR:  Objection to
14     form.
15         THE WITNESS:  I do see that
16     here.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    So it's impossible to simply
19 say, Well, this is a Florida problem,
20 confined to Florida, because it was crystal
21 clear that pills were migrating to other
22 states from the weakest pharmacies, correct,
23 sir?
24         MR. STOFFELMAYR:  Objection to
25     the form.  Foundation.

Page 215

1         THE WITNESS:  Yeah.  I can't
2     speculate that or agree with that
3     statement.
4 QUESTIONS BY MR. MOUGEY:
5     Q.    You understand that as of
6 January 9, 2013, the date of this summary of
7 testimony, that the DEA was relaying that
8 they had uncovered evidence that pills were
9 migrating to other states for addicts
10 traveling by the carloads, correct, sir?
11         MR. STOFFELMAYR:  Objection to
12     the form.
13         THE WITNESS:  I do see that,
14     that that's what they're implying,
15     yes.
16 QUESTIONS BY MR. MOUGEY:
17     Q.    And, sir, you understand that
18 that is why the CSA required that due
19 diligence was performed on suspicious orders
20 before they were shipped, correct, sir?
21         MR. STOFFELMAYR:  Objection to
22     form.  Foundation.
23         THE WITNESS:  I don't know the
24     definition or interpretation of the
25     regs or the CSA.

Page 216

1 QUESTIONS BY MR. MOUGEY:
2     Q.    Yes, sir, I understand that.
3         Do you understand, though, sir,
4 that -- that part of the diversion issue in
5 Florida was carloads of addicts traveling to
6 pharmacies that were dispensing Schedule II
7 and Schedule III narcotics?
8         MR. STOFFELMAYR:  Objection to
9     the form.
10         THE WITNESS:  I understand now
11     that that was one of the problems,
12     yes.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    Yes, sir.
15         And during your time at
16 Walgreens, did you ever perform any analysis
17 to try to identify suspicious orders that
18 would point to red flags with addicts coming
19 from out of town by the carloads?
20     A.    I personally did not, no.
21     Q.    Do you know of anyone that was
22 performing any analysis of all of the data
23 maintained by Walgreens to identify
24 suspicious orders from addicts traveling from
25 foreign states to secure Schedule II and

Page 217

1 Schedule III narcotics in Florida pharmacies?
2     A.    I do not know how the data
3 would be able to identify an addict versus
4 someone who is a snowbird.
5     Q.    Well, wouldn't it be relatively
6 easy to look at Walgreens' prescription data
7 to identify out of state customers?
8     A.    It is.
9     Q.    It would be relatively simple,
10 wouldn't it?
11     A.    It is.
12     Q.    It would be relatively simple
13 to have a data pull with the ages of those
14 customers, correct?
15     A.    That can be done, yes.
16     Q.    And it would also be relatively
17 simple to pull the doctors that wrote the
18 prescriptions for these potential red flags,
19 correct, sir?
20     A.    It is easy to pull prescriber
21 information, yeah.
22     Q.    So if you had a number of pill
23 seekers coming from a foreign jurisdiction,
24 they'd have to present their driver's license
25 at Walgreens, correct, sir?

Page 218

1    A.    They do now, yes.
2    Q.    And they would have to present
3 a prescription, correct, sir?
4    A.    They do, yes.
5    Q.    And so a simple data pull for
6 pill seekers with out-of-state licenses
7 issued by physicians within, say, 30 miles of
8 a Walgreens might be a red flag of a
9 suspicious order, right?
10        MR. STOFFELMAYR:  Objection to
11   the form.  Foundation.
12        THE WITNESS:  It could be a
13   potential red flag.  Not every one of
14   those instances or situations they
15   describe would automatically indicate
16   a drug seeker.
17 QUESTIONS BY MR. MOUGEY:
18   Q.    Exactly.
19        And that's the point of a red
20 flag, right?  A red flag is a place to look
21 to see if there's a potential problem, right?
22        MR. STOFFELMAYR:  Objection to
23   the form.
24        THE WITNESS:  A red flag is
25   something that would indicate special

Page 219

1 attention, yes.
2 QUESTIONS BY MR. MOUGEY:
3    Q.    Yes, sir.
4        And your pharmacists are a
5 combination of men, women, varying ages,
6 correct?
7    A.    I would assume so, yes.
8    Q.    And you can understand that a
9 pharmacist that's issuing a prescription to a
10 pill seeker who is concerned with his or her
11 safety -- that might impact her decision
12 whether or not to fill that prescription,
13 correct?
14   A.    I can't speak on behalf of what
15 a pharmacist would do during their roles as a
16 pharmacist.
17   Q.    But that's part of your job,
18 isn't it, is -- putting together policies and
19 procedures, you don't put the burden on a
20 115, 120-pound female or male working behind
21 the counter to not issue the prescription to
22 the -- to the pill seeker, correct?
23        MR. STOFFELMAYR:  Objection to
24   the form.
25        THE WITNESS:  I don't believe

Page 220

1 we put the burden on them.  We provide
2 them with tools and resources that
3 they can use or lean on to use their
4 professional judgment to determine if
5 red flags are resolvable.
6        And if the red flags are not
7 resolvable, they have the right to
8 refuse the prescription based on
9 information provided by the prescriber
10 and/or patient.
11 QUESTIONS BY MR. MOUGEY:
12   Q.    Was there a hotline available
13 for pharmacists to call that they could
14 anonymously report their concerns about
15 walking to the car at the end of the night?
16   A.    Yes, I believe there was.
17   Q.    "This trouble" -- and I go on
18 in this paragraph.  "This troublesome" --
19 and, sir, when was that hotline created?
20   A.    I do not know.
21   Q.    Was it created before the
22 pharmaceutical integrity department was
23 agreed to be created from the DEA and
24 Walgreens?
25   A.    I don't know when that hotline

Page 221

1 was created.
2    Q.    "This troublesome trend is
3 particularly acute in the Appalachian region
4 where individuals return to the region with
5 drugs dispensed or prescribed by physicians
6 working at Florida clinics."
7        Did I read that accurately,
8 sir?
9    A.    Yes.
10   Q.    "Because of the easy
11 availability of drugs from these cash-only
12 clinics, drug-seeking individuals in the
13 Appalachian region have obtained these drugs
14 and abuse or sell them on the streets to --
15 both to support drug habits and finance later
16 car trips to Florida."
17        Do you see that, sir?
18   A.    I do.
19   Q.    "The financing of these trips
20 include the costs charged by the clinics for
21 doctor visits and for drugs dispensed by the
22 clinics."
23        Do you see that, sir?
24   A.    I do.
25   Q.    Do you have any idea how much

Page 222

1 revenue some of these doctor shopping groups
2 were -- were generating on an annual basis?
3    A.   No idea.
4    Q.   No idea.
5       (Walgreens-Stahmann Exhibit 7
6    marked for identification.)
7 QUESTIONS BY MR. MOUGEY:
8    Q.   Hand you what I've marked as
9 Stahmann 7.
10    A.   7?
11    Q.   Stahmann 7.
12       Do me a favor, don't put away
13 the Stahmann 6.  Just keep it in front of
14 you.
15       Stahmann 7, just look at the
16 first page, and you recognize the names of
17 the e-mails on this first page as Walgreens
18 employees, correct, sir?
19    A.   Yes.
20    Q.   Markets 3 and 28, what does
21 that reference, sir?  Do you see that at the
22 top of the page?
23    A.   Those are -- markets are
24 individual -- are identified by individual
25 numbers stating where in the region of the

Page 223

1 country they are.
2    Q.   Do you know where those are off
3 the top of your head, markets 3 and 28?
4    A.   Not off the top of my head.
5    Q.   Okay.  And if you would turn to
6 the second page, it says, "Market 3, pharmacy
7 meeting."
8    A.   I do see that.
9    Q.   On the bottom right-hand corner
10 of this document are WAG, and then there's a
11 series of numbers, if you could turn to 996.
12 And you see there's a badge in the left-hand
13 corner of Bates numbered 996 that says
14 "Sheriff's Office, Sarasota County."
15       Do you see that?
16    A.   I do see that.
17    Q.   It says, "How much money is in
18 doctor shopping?"
19       Do you see that, sir?
20    A.   I do.
21    Q.   And it says, "Office visit, the
22 cost is $250," right?
23    A.   According to this, yes.
24    Q.   "Pills received, 180, cost at
25 pharmacy, $270."

Page 224

1       Do you see that, sir?
2    A.   I do.
3    Q.   So the total outlay is $520,
4 correct, according to the Sarasota Sheriff's
5 Office, correct?
6    A.   Yes.  If they supplied that
7 information, then, yes.
8    Q.   Yes, sir.
9       And the price of 30-milligram
10 OxyContin on the street is about $15 a pill.
11 Do you see that, sir?
12    A.   I do.
13    Q.   Times 180 pills, it's $2,700,
14 correct?
15    A.   Sounds about right, yes.
16    Q.   And then profit is $2,100 a
17 month, correct?
18    A.   I do see that.
19    Q.   Now -- and it says there's
20 more.  Do you see that on the bottom?
21    A.   I do.
22    Q.   Flip to the next page.  You see
23 at the bottom where it says -- and I'm on
24 Bates number 997.
25       At the bottom it says, "This is

Page 225

1 big business."
2       Do you see that, sir?
3    A.   I do see that.
4    Q.   And it says, "How much money is
5 in doctor shopping?"
6       And the monthly profit we just
7 pulled from the previous page, $2,180,
8 correct?
9    A.   I do see that.
10    Q.   And if there's a 21-person
11 shopping ring, that's $21,800 a month,
12 correct?
13    A.   A 10-person shopping ring, yes.
14    Q.   Yes, sir.
15       Or 10 times 2,180 for $21,800,
16 correct?
17    A.   Yes.
18    Q.   And you go to four doctor
19 offices per month, that's $87,200, correct?
20    A.   That's what it says.
21    Q.   That's just one a week, right?
22 Just one a week per person amounts to $87,200
23 for a 10-person ring, correct?
24    A.   That's what it states, yes.
25    Q.   Times 12 months is $1,046,400,

Page 226

1 correct?
2    A.   That's what it states, yes.
3    Q.   Did anybody at Walgreens ever
4 come to you and give you a similar
5 explanation about doctor shopping being big
6 business?
7    A.   Ever?  Yes.  Someone -- not in
8 these terms, but, yes, I was made aware that
9 doctor shopping is -- is big business.
10   Q.   After the pharmaceutical
11 integrity department was created by agreement
12 from the DEA and Walgreens in the 2013 MOA,
13 correct?
14   A.   Correct.
15   Q.   Now, let's go back to Stahmann
16 6 --
17        MR. STOFFELMAYR:  I don't know
18 if it's your accent, but it's
19 Stahmann, not straw man.
20        MR. MOUGEY:  Thank you.  I have
21 an accent?
22        MR. STOFFELMAYR:  I didn't
23 notice, but she told me.
24 QUESTIONS BY MR. MOUGEY:
25   Q.   Sir, if you turn to page 130,

Page 227

1 Mr. Stahmann.
2    A.   I'm sorry, you said 130?
3    Q.   Yes, sir.
4        And under 3, "DEA Task Force
5 Officer Janet Pascalli proposed testimony."
6        Do you see that that, sir?
7    A.   I do.
8    Q.   And as you go into the next
9 page, it says, "Walgreens 03629, because of
10 the ease with which they could get
11 combination controlled substance
12 prescriptions filled, she will further
13 testify that PCSO received additional
14 information that Walgreens 03629 became a
15 favorite location with traffickers of
16 prescription drugs, and some of these
17 individuals would travel great distances to
18 fill questionable prescriptions, primarily
19 for oxycodone."
20        Do you see that, sir?
21        MR. STOFFELMAYR:  Objection to
22 the form.
23        THE WITNESS:  I do see that
24 written here, yes.
25

Page 228

1 QUESTIONS BY MR. MOUGEY:
2    Q.   Yes, sir.
3        And in all of your time with
4 the monitoring diversion for Walgreens, were
5 you ever specifically tasked to identify
6 suspicious orders from patients from out of
7 state?
8    A.   You said suspicious orders, so,
9 no --
10   Q.   No, fair enough.  You're right.
11 Let me do it another way.
12        During all of your time with
13 monitoring diversion for Walgreens, were you
14 ever -- were you ever specifically tasked to
15 identify patients with suspicious
16 prescriptions from out-of-state residents?
17   A.   I was not.
18   Q.   And if you look at page 135,
19 "Division Investigator Peter Flagg's proposed
20 testimony," that on the last paragraph of
21 page 135, he relays that "Walgreens 03629
22 dispensed to customers who resided in 26
23 states and our commonwealths including the
24 Appalachian regions of Kentucky, Ohio and
25 Tennessee."

Page 229

1        Do you see that, sir?
2    A.   I do.
3        MR. STOFFELMAYR:  When you get
4 to a good point, I need a break.
5        MR. MOUGEY:  Sure.  I think
6 it's a good point.
7        MR. STOFFELMAYR:  Okay.
8        VIDEOGRAPHER:  We're going off
9 the record at 2:03.
10   (Off the record at 2:03 p.m.)
11       VIDEOGRAPHER:  We're back on
12 the record at 2:17.
13 QUESTIONS BY MR. MOUGEY:
14   Q.   Mr. Stahmann, when you
15 transitioned to your new role with the
16 pharmaceutical integrity department, did you
17 take that opportunity to go meet with anyone
18 at Walgreens who had been performing due
19 diligence on suspicious orders in the past?
20   A.   No.
21   Q.   So you testified earlier that
22 you believe the distribution centers possibly
23 were performing due diligence on suspicious
24 orders.
25       I take it you didn't go and

Page 230

1 talk to anyone in the distribution centers?
2     A.    Correct.
3     Q.    Did you ask anyone at Walgreens
4 to pull all of the historical due diligence
5 files on suspicious reports so you could
6 analyze those?
7     A.    No.
8     Q.    Is there someone that you are
9 aware of at Walgreens that you could go to
10 and say, "Would you help me gather all of
11 these due diligence files and that will give
12 us some direction on how to do a better job
13 going forward?"
14     A.    Not one particular point of
15 contact.  It would probably have to be a
16 collaborative effort.
17     Q.    All right.  And who would
18 those -- that group of people be that would
19 be a collaborative effort?
20     A.    So I would probably reach out
21 to the loss prevention, asset security
22 department.  Probably reach out to the
23 individual SAIL coordinators for the
24 distribution centers as well as legal -- our
25 legal team as well.

Page 231

1     Q.    Now, was your legal team
2 involved in the compliance for suspicious
3 orders?
4         MR. STOFFELMAYR:  Just answer
5     that question yes or no.
6         THE WITNESS:  Yes.
7 QUESTIONS BY MR. MOUGEY:
8     Q.    And so they fill the compliance
9 function at Walgreens with ensuring that the
10 specific code regulations were followed by
11 Walgreens?
12     A.    Yes.
13     Q.    Do you know if anyone in the
14 pharmaceutical integrity department went and
15 interviewed those responsible for performing
16 due diligence on suspicious reports and
17 gathered that information for the
18 pharmaceutical integrity department?
19     A.    I am not aware of anybody from
20 pharmaceutical integrity that interviewed
21 anybody.
22     Q.    Did you see any evidence when
23 you transitioned to pharmaceutical integrity
24 department that anyone had gathered prior
25 reports or data that had been performed on

Page 232

1 suspicious reports?
2     A.    No.
3     Q.    Have you seen any evidence
4 whatsoever that there was any due diligence
5 performed on any suspicious reports prior to
6 the pharmaceutical integrity team department
7 being created?
8     A.    I personally did not.
9     Q.    Did you see any assimilation or
10 tables or spreadsheets of any evidence that
11 any due diligence had been done on any
12 suspicious reports prior to Walgreens and the
13 DEA agreeing that a pharmaceutical integrity
14 department would be created?
15         MR. STOFFELMAYR:  Objection to
16     the form.
17         THE WITNESS:  I personally did
18     not see any reports, but I do not
19     know -- I'm not saying they couldn't
20     have been taking place.
21 QUESTIONS BY MR. MOUGEY:
22     Q.    Did you hear anyone discussing
23 an accumulation of any due diligence on
24 suspicious order reports once the
25 pharmaceutical integrity department was

Page 233

1 created by agreement with the DEA and
2 Walgreens?
3     A.    I do not.
4     Q.    Now, you mentioned kind of a --
5 I think you said an accumulation of three
6 different groups that you put together to try
7 to gather that information on suspicious --
8 on due diligence on suspicious orders,
9 correct?
10         MR. STOFFELMAYR:  Objection to
11     form.
12         THE WITNESS:  I did mention
13     three departments that I would
14     personally reach out to, but I don't
15     know if that would be an all-inclusive
16     list.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    But one of those departments
19 was the loss prevention department, correct?
20     A.    Correct.
21     Q.    And that's you, isn't it?
22         MR. STOFFELMAYR:  Objection to
23     form.
24         THE WITNESS:  That is not me,
25     no.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  QUESTIONS BY MR. MOUGEY:
2      Q.    That was the department you
3  came from, right?
4      A.    I was part of that department
5  at one time, yes.
6      Q.    Yes, sir.
7            But before the pharmaceutical
8  integrity department, you were with loss
9  prevention, correct?
10     A.    I was, yes.
11     Q.    For six years, right?
12     A.    Approximately, yes.
13     Q.    Would you consider yourself to
14 be fairly attuned with the inner working of
15 the loss prevention department?
16     A.    Yes.
17     Q.    I mean, you were promoted out
18 of loss prevention into pharmaceutical
19 integrity, correct?
20     A.    Correct.
21     Q.    Your scope of responsibility
22 increased in the pharmaceutical integrity
23 department, correct?
24     A.    Different scope, but, yes.
25     Q.    Yes, sir.

Page 235

1            And your pay increased at that
2  point, correct?
3      A.    Correct.
4      Q.    And so you were clearly well
5  thought of within loss prevention, correct?
6      A.    I can't say what other people
7  think of me.  I have no idea what --
8      Q.    You had positive annual
9  reviews, did you not?
10     A.    I did.
11     Q.    And those were positive,
12 correct?
13     A.    They were.
14     Q.    And you were well-informed
15 about the inner workings of your loss
16 prevention department, correct?
17     A.    From my perspective, yes.
18     Q.    Yes, sir.
19            And you kept apprised of the --
20 kind of the different scope or areas of
21 responsibility in loss prevention, correct?
22     A.    Correct.
23     Q.    Can you point me to anyone
24 within loss prevention that had done any work
25 on due diligence for suspicious orders?

Page 236

1      A.    I cannot.
2      Q.    Can you point me to anyone
3  specifically in the -- I can't read my own
4  writing -- the SAIL?
5      A.    It's a -- yeah, SAIL
6  coordinator.  It's an acronym.
7      Q.    A SAIL coordinator.
8            Can you point me to anyone in
9  that group or department that had done any
10 due diligence work on suspicious orders?
11     A.    Not to my knowledge, no.
12     Q.    Can you point me to anyone on
13 the legal team in their compliance function
14 that had done any work on suspicious
15 orders -- on the due diligence for suspicious
16 orders?
17     A.    Not to my knowledge.
18           MR. STOFFELMAYR:  Just slow
19     down a little bit, give me a second.
20     Sorry it doesn't happen, but every
21     time he says "legal," my antenna goes
22     up, so I just want to make sure I have
23     a chance.
24 QUESTIONS BY MR. MOUGEY:
25     Q.    I think it's -- Stahmann 6, the

Page 237

1  bound report.  Okay.  Stahmann 6, would you
2  mind going to page 24, sir?  And we're back
3  in Exhibit B.
4            Okay.  Paragraph 4 on
5  page number 24.
6            Do you see that, sir?
7      A.    I do.
8      Q.    "Since 2009 Walgreens' Jupiter,
9  Florida, distribution center has been the
10 single largest distributor of oxycodone
11 products in Florida."
12           Do you see that, sir?
13     A.    I do see that.
14     Q.    "At about the same time, the
15 abuse of -- abuse of prescription drugs
16 became an epidemic in Florida, Walgreens
17 Florida retail pharmacies supplied by
18 Respondent commanded an increasingly large
19 percentage of the state's growing oxycodone
20 business," correct, sir?
21           MR. STOFFELMAYR:  Objection to
22     the form.
23           THE WITNESS:  I see that that
24     is what is written here, but I'm not
25     agreeing with that statement.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1  QUESTIONS BY MR. MOUGEY:
2      Q.    Do you agree with -- you don't
3  agree with those first three sentences in
4  paragraph 4?
5      A.    I'm reading them.  Yeah, I
6  cannot say that I agree with them because I
7  don't have the data behind it to back that
8  up.
9      Q.    You've been sitting here today,
10 you've never looked to see where the holes
11 were in possible diversion areas in Florida
12 in the Walgreens pharmacies?
13         MR. STOFFELMAYR:  Objection to
14         form.
15         THE WITNESS:  Again, we're
16         diversion, so with my role in loss
17         prevention, I did not look at
18         diversion outside of employee
19         pilferage.
20 QUESTIONS BY MR. MOUGEY:
21     Q.    Well, I'm a little confused, so
22 I need your help.
23         So you were with loss
24 prevention for about six years, right?
25     A.    Yes.

Page 239

1      Q.    And I just asked you about who
2  you would talk to about going and pulling
3  historical due diligence files for suspicious
4  reports, and one of three groups you gave me
5  was loss prevention, right?
6      A.    Yes.
7      Q.    And -- but yet when I asked you
8  about did you have this backup data, you
9  said, "Well, I was with loss prevention,"
10 correct?
11         MR. STOFFELMAYR:  Objection to
12         form.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    Correct?
15     A.    I was with loss prevention,
16 yes.
17     Q.    Okay.  Well, who in loss
18 prevention, what group or department within
19 loss prevention, would know anything about
20 potential weak links in Walgreens' pharmacy
21 system in the State of Florida?
22     A.    I can't speak to who, but I
23 would -- would have to lead to or -- it would
24 mostly be the field leadership or the
25 leadership in the loss prevention department.

Page 240

1  So the field leadership in Florida for --
2  speaking directly or specifically about
3  Florida.
4      Q.    Who specifically would that be
5  in field leadership?
6      A.    So there are loss prevention
7  managers and loss prevention directors who
8  oversee loss prevention responsibilities in
9  those markets or areas.
10     Q.    All right.  And who -- so that
11 would be two different people?
12     A.    It could be two different
13 people, yes.
14     Q.    Okay.  And you're saying that
15 it would be important for us to talk to those
16 people because they might have information
17 about the due diligence performed on
18 suspicious orders?
19         MR. STOFFELMAYR:  Objection to
20         form.  Foundation.
21         THE WITNESS:  I don't know what
22         information that they would have, but
23         it would be good to get their insight
24         of things that are happening on the
25         ground versus what we know at

Page 241

1  corporate.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    Now, how many of those -- what
4  would you call them, field what?
5      A.    They're field leaders, so at
6  the time they're loss prevention managers and
7  loss prevention directors; now they're asset
8  protection managers and asset protection
9  managers.
10     Q.    Okay.  So -- and this is a dumb
11 way to say it, but how many fields are there?
12         How many of those people are
13 there around the country?
14     A.    I don't know offhand.  I don't
15 know the number.
16     Q.    Just schwag it for me.  Are
17 there five?  Are there 20?  Are there one for
18 every state?  Are there 50?
19     A.    There are multiple --
20         MR. STOFFELMAYR:  If you know
21         what the word "schwag" means.
22         THE WITNESS:  I don't know the
23         exact number.  They're in the -- I
24         know we have more than 50 markets, 54
25         markets, so one person per market for

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1 a manager --
2 QUESTIONS BY MR. MOUGEY:
3     Q.    Maybe two?
4     A.    Yeah.
5     Q.    So you're talking maybe 50, 75,
6 even possibly a hundred people that may have
7 specific information about suspicious orders
8 and the due diligence provided or performed
9 on those orders, right?
10     A.    They would possibly have some
11 knowledge, yes.
12     Q.    And it would be your
13 recommendation that we should probably talk
14 to them to -- to find out how -- what kind of
15 information they had on due diligence on
16 suspicious orders, right?
17         MR. STOFFELMAYR:  Objection to
18     form.  Lack of foundation.
19         THE WITNESS:  It would be my
20     personal recommendation.
21 QUESTIONS BY MR. MOUGEY:
22     Q.    All right.  I'm still on
23 paragraph 4, second sentence, "At about the
24 same time as the abuse of prescription drugs
25 became an epidemic in Florida, Walgreens'

Page 243

1 Florida retail pharmacies supplied by
2 Respondent commanded an increasingly large
3 percentage of the state's growing oxycodone
4 business."
5         All right.  Went through that
6 sentence before.
7         The next sentence, "In 2010,
8 only three Walgreens retail pharmacies were
9 in the top hundred purchasers of oxycodone
10 within Florida.  In 2011, 38 Walgreens
11 pharmacies made the top 100 and six were in
12 the top ten."
13         Do you see that, sir?
14     A.    I do.
15     Q.    Now, any of the metrics or
16 reports that you were running during your
17 tenure at Walgreens in 2010, in 2011, would
18 you have spotted the rapid increase in
19 oxycodone prescriptions from Walgreens
20 pharmacies in any of those reports?
21     A.    Yes.
22     Q.    And which reports are those?
23     A.    Any type of movement report or
24 sales report or reports that documented
25 receipts of shipments being delivered to

Page 244

1 stores.
2     Q.    So when you say "a movement
3 report," how often is a movement report?
4     A.    They can be pulled at any
5 specific time.  It can be for that day.  It
6 could be for the past hour.  It could be --
7 it's similar to those 15-week -- or 13-week
8 and 52-week movement reports.
9     Q.    Okay.  So that's -- assuming 52
10 weeks obviously is a year.
11         Is that as far as back as you
12 can go running a report?
13     A.    No.
14     Q.    So how far back can you go
15 running a report?
16     A.    As far back as our electronic
17 data warehouse stores that information.
18     Q.    And do you know how far that
19 is?
20     A.    I don't.  I know there's a
21 legal requirement of how long that data is
22 supposed to be maintained, but I don't recall
23 how long that is.
24     Q.    All right.  And were you
25 running month-to-month, year-to-year reports

Page 245

1 to see trends around the country?
2     A.    I personally was not, no.
3     Q.    Was anyone that you're aware of
4 running month-to-month, year-to-year reports
5 to see trends around the country?
6     A.    During my time in loss
7 prevention, no.
8     Q.    You weren't -- were you aware
9 of anyone within Walgreens tracking or
10 monitoring month-to-month or year-to-year
11 trends for Schedule II and Schedule III?
12     A.    I am not aware, no.
13     Q.    So while you're saying the data
14 is there, there was no automated report that
15 would spot or red flag about rapidly
16 increasing trends in specific areas or
17 regions?
18         MR. STOFFELMAYR:  Objection to
19     the form.  Foundation.
20         THE WITNESS:  So I am aware
21     there that are reports that flagged
22     orders because we did have an order
23     monitoring system in place, but I
24     don't -- and those reports were
25     automatically generated, but I don't

Page 246

1    know who was reviewing those.
2    QUESTIONS BY MR. MOUGEY:
3        Q.    Those are the ones, excuse me,
4    that you were burning off on a CD and mailing
5    to the distribution centers and the DEA?
6        A.    Those were some of the reports,
7    correct, yes.
8        Q.    But you don't know if anybody
9    was reviewing those, correct?
10       A.    Correct.
11       Q.    The last sentence of
12   paragraph 4 says, "Through May 2012, 44
13   Walgreens pharmacies earned the top 100
14   oxycodone purchasers, all of them supplied by
15   Respondent."
16           Do you see that, sir?
17       A.    I do.
18       Q.    Were you aware at this point in
19   time in 2012 that 44 of the 100 pharmacy --
20   top 100 pharmacies in the State of Florida
21   for oxycodone were Walgreens?
22       A.    Not at that time, no.
23       Q.    Did you become aware of that at
24   a later point in time?
25       A.    Yes.

Page 247

1        Q.    Did you contact -- now, we went
2    through all of the folks you could have
3    communicated with before.
4            Did you call the field division
5    and contact anyone in the field division
6    about what had caused the rapid increase in
7    '11 and '12?
8        A.    Well, I am or was or am aware
9    of what may have caused that. The pain
10   clinics closed down due to state law in
11   Florida that prohibited clinics from
12   dispensing oxycodone in their clinics. So
13   the business went to -- potentially could
14   have went to other pharmacies.
15       Q.    Right.
16           And that was a -- that was a
17   well-known fact that the pill mills -- the
18   dispensing side had been shut down in efforts
19   by regulators, correct?
20       MR. STOFFELMAYR:  Objection to
21   the form.
22       THE WITNESS:  I don't know if
23   that was in response to the regulation
24   or why those pill mills were closed
25   down.

Page 248

1    QUESTIONS BY MR. MOUGEY:
2        Q.    Sir, if you turn to page 25,
3    the next page of this document, paragraph 7,
4    that begins with, "DEA's investigation of
5    Respondent also revealed that Walgreens
6    failed to detect and report suspicious orders
7    by its pharmacy customers -- customers in
8    violation of 21 CFR Section 1301.74B."
9            Do you see that, sir?
10       A.    I do.
11       Q.    And you see that the rest of
12   that paragraph cites to the requirement that
13   Walgreens design and operate a system to
14   disclose the suspicious orders, right, sir?
15       A.    I do see that.
16       Q.    And you see that it cites back
17   to a Southwood Pharmacy case as the source
18   for that requirement, correct, sir?
19       MR. STOFFELMAYR:  Objection to
20   the form.
21       THE WITNESS:  I see that
22   written here.  I don't know the
23   details behind that.
24   QUESTIONS BY MR. MOUGEY:
25       Q.    Now, sir, the suspicious order

Page 249

1    reports that you said that you were burning
2    onto CDs and sending out, are you aware of
3    whether or not those orders were shipped or
4    held by Walgreens?
5        A.    I am not aware if they were
6    shipped or if any particular order was
7    stopped.
8        Q.    Because you would agree with
9    me, sir, based on the criteria that we've
10   reviewed today, the regulations we've
11   reviewed today, that if Walgreens were to
12   have shipped those suspicious orders without
13   performing any due diligence, that would be a
14   violation of the applicable regs, correct,
15   sir?
16       MR. STOFFELMAYR:  Objection to
17   the form. Lack of foundation.
18       THE WITNESS:  Can you point me
19   to where you're referring back to that
20   in the document, please?
21   QUESTIONS BY MR. MOUGEY:
22       Q.    The due diligence requirements
23   that we went through earlier in the DEA
24   letters, that due diligence be performed --
25   remember on the Masters case we went through

Page 250

1 earlier and looked at the shipping
2 requirement, that you either not ship or you
3 ship, two choices, when there's a suspicious
4 order?
5          Remember that, sir?
6      A.    I do remember that document.
7      Q.    And that ship or not ship, and
8 the only way to ship is to perform due
9 diligence on those suspicious orders that
10 were flagged, right?
11          MR. STOFFELMAYR:  Objection to
12      the form.  Lack of foundation.
13          THE WITNESS:  Yeah, that's what
14      you're stating to me, but I don't know
15      if that's -- if you can point me back
16      to that reg, I can take a look, but I
17      don't know if that was a true
18      statement.
19 QUESTIONS BY MR. MOUGEY:
20      Q.    You don't know if what I just
21 said was a true statement?
22      A.    Yeah, if you can please point
23 me back to that reg, I can take a look.
24      Q.    Well, now, you've been now in
25 pharmaceutical integrity for -- since 2013.

Page 251

1 That's five years.  You were in charge of
2 diversion and loss prevention for another six
3 years.  So, I mean, what are we talking here?
4 We're talking -- the math, we're talking 10,
5 11 years, a good part of that, is when
6 Walgreens was distributing Schedule II and
7 Schedule III.
8          You're not aware of whether or
9 not Walgreens was required to perform due
10 diligence before it shipped?
11          THE WITNESS:  I --
12          MR. STOFFELMAYR:  Excuse me.
13      Objection to the form.  Lack of
14      foundation and the paragraph-long
15      windup.
16          THE WITNESS:  I am aware now
17      that it was part of our requirement,
18      but not during when I was in loss
19      prevention.
20 QUESTIONS BY MR. MOUGEY:
21      Q.    Great, so we don't need to go
22 back and look at that reg.
23          You know that Walgreens was
24 required to perform due diligence before it
25 shipped suspicious orders.  So the logical

Page 252

1 conclusion to that statement is:  If
2 Walgreens shipped suspicious orders without
3 performing due diligence, that would violate
4 the applicable regs, correct, sir?
5          MR. STOFFELMAYR:  Objection to
6      the form.  Lack of foundation.
7          THE WITNESS:  I can't speak to
8      the regs and if Walgreens was in
9      compliance with the regs.
10 QUESTIONS BY MR. MOUGEY:
11      Q.    Well, you understand that in
12 your job as managing diversion, you have to
13 understand industry standards, correct?
14          MR. STOFFELMAYR:  Objection to
15      the form.
16          THE WITNESS:  I was not a
17      manager of diversion.
18 QUESTIONS BY MR. MOUGEY:
19      Q.    You understand, sir, that in
20 your role, managerial role, at Walgreens,
21 which the scope of your responsibility was
22 diversion, that there are industry standards,
23 correct?
24          MR. STOFFELMAYR:  Objection to
25      the form.

Page 253

1          THE WITNESS:  I am aware that
2      there are industry standards, yes.
3 QUESTIONS BY MR. MOUGEY:
4      Q.    Yes, sir.
5          And are you aware that pursuant
6 to industry standards, that Walgreens was
7 required to perform due diligence on
8 suspicious orders before they shipped?
9      A.    I am aware of that now, yes.
10      Q.    And you understand that if
11 Walgreens did not perform due diligence on
12 the suspicious orders, that it would violate
13 those industry standards, correct?
14          MR. STOFFELMAYR:  Objection to
15      the form.  Foundation.
16          THE WITNESS:  Only if Walgreens
17      did not perform due diligence.  I
18      don't know if due diligence was being
19      performed.
20 QUESTIONS BY MR. MOUGEY:
21      Q.    So the answer to my question
22 is, yes, if Walgreens did not perform due
23 diligence on suspicious orders and shipped
24 them regardless, that would violate the
25 applicable industry standards, correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 　　　MR. STOFFELMAYR: Objection to
2 the form. Foundation.
3 　　　THE WITNESS: If, yes.
4 QUESTIONS BY MR. MOUGEY:
5 　Q. Let's go back to the beginning
6 of this document. Page 2 under "Stipulation
7 and Agreement."
8 　　　And you understand what
9 stipulation and agreement means, right?
10 　A. Yes.
11 　Q. What does stipulation and
12 agreement mean to you?
13 　A. Stipulation and agreement, the
14 parties agree to the statements that are
15 written in this document.
16 　Q. Now, if you go to the second
17 paragraph under "Stipulation and Agreement"
18 on page 2, it says "Walgreens acknowledges."
19 　　　Do you see that, sir?
20 　A. Yes.
21 　Q. "That suspicious order
22 reporting for distribution to certain
23 pharmacies did not meet the standards
24 identified by DEA in three letters from DEA's
25 Deputy Assistant Administrator, Office of

Page 255

1 Diversion Control sent to every registered
2 manufacturer and distributor, including
3 Walgreens, on September 27, 2006; February 7,
4 2007; and December 27, 2007."
5 　　　Sir, do you agree based on your
6 experience at Walgreens that that is an
7 accurate statement?
8 　　　MR. STOFFELMAYR: Objection to
9 the form. Foundation.
10 　　　THE WITNESS: I cannot speak to
11 　the agreement that was made here. I
12 　was not part of that agreement or part
13 　of that acknowledgement.
14 QUESTIONS BY MR. MOUGEY:
15 　Q. But, sir, you were a manager of
16 the pharmaceutical integrity department that
17 was created as a result of this agreement,
18 and it's part of your job to understand the
19 contents of this agreement, is it not?
20 　A. That is not one of my roles,
21 no.
22 　Q. Your role is not to understand
23 the -- this is kind of -- let me strike that.
24 　　　This is a MOU -- I mean, MOA
25 that we're walking through now is a good

Page 256

1 roadmap for you when you began as manager of
2 the pharmaceutical integrity department in
3 2013, correct?
4 　　　MR. STOFFELMAYR: Objection to
5 　the form.
6 　　　THE WITNESS: It was not.
7 QUESTIONS BY MR. MOUGEY:
8 　Q. It was not a good roadmap?
9 　A. It was not a roadmap that we
10 used to develop policies and procedures or to
11 evolve policies and procedures.
12 　Q. So the DEA had been
13 investigating, at least pursuant to the
14 agreement that we've seen so far, based on
15 the order to show cause in San Diego since
16 2009, and had uncovered numerous weak links
17 in the system, correct, sir?
18 　　　MR. STOFFELMAYR: Objection to
19 　the form.
20 　　　THE WITNESS: I can't agree to
21 　that, no.
22 QUESTIONS BY MR. MOUGEY:
23 　Q. Sir, we've looked through this
24 document for the last hour and a half, hour,
25 you haven't seen numerous examples of weak

Page 257

1 links in Walgreens' distribution and
2 dispensing system?
3 　　　MR. STOFFELMAYR: Same
4 　objection.
5 　　　THE WITNESS: Again, no, I
6 　can't agree to that.
7 QUESTIONS BY MR. MOUGEY:
8 　Q. You don't -- you haven't seen
9 any weak links in Walgreens' distrubution
10 system?
11 　　　MR. STOFFELMAYR: Same
12 　objection.
13 　　　THE WITNESS: I don't agree to
14 　that term "weak links."
15 QUESTIONS BY MR. MOUGEY:
16 　Q. You haven't seen any weak links
17 in Walgreens' dispensing practices in this
18 memorandum of agreement?
19 　　　MR. STOFFELMAYR: Same
20 　objection.
21 　　　THE WITNESS: I don't agree to
22 　that term "weak links."
23 QUESTIONS BY MR. MOUGEY:
24 　Q. What about the "weak links" do
25 you not like?

Page 258

1     A.   It signifies that there was --
2     Q.   Problems?
3        MR. STOFFELMAYR: Objection to
4 the form. Let me answer.
5        THE WITNESS: It signifies that
6 there were areas of opportunity or
7 you're basically saying that Walgreens
8 was at fault.
9 QUESTIONS BY MR. MOUGEY:
10     Q.   Areas of opportunity for
11 Walgreens to do a better job, right?
12     A.   Areas of improvement, yes.
13     Q.   Yes, sir.
14        There were problems in
15 Walgreens' distribution and dispensing
16 practices, correct?
17     A.   I can't agree to that.
18     Q.   And this document identifies
19 numerous areas for Walgreens to do a better
20 job, right?
21     A.   It provides guidance, yes.
22     Q.   Yes, sir.
23        But the pharmaceutical
24 integrity group did not use this memorandum
25 of agreement as a roadmap to put together

Page 259

1 policies and procedures going forward,
2 correct?
3     A.   Correct, not as a roadmap.
4     Q.   On page 2 of this document,
5 "Furthermore, Walgreens acknowledges that
6 certain Walgreens retail pharmacies did on
7 some occasions dispense controlled substances
8 in a manner not fully consistent with its
9 compliance obligations under the CSA."
10        Correct, sir?
11     A.   I do see that.
12     Q.   Is that an accurate statement?
13        MR. STOFFELMAYR: Objection to
14 the form. Foundation.
15        THE WITNESS: I don't know if
16 that's an accurate statement or not.
17 QUESTIONS BY MR. MOUGEY:
18     Q.   And when you took over as
19 manager of the pharmaceutical integrity
20 department, you didn't go back and ferret out
21 whether these were accurate statements or
22 not?
23     A.   Correct.
24     Q.   You knew at this point, sir, in
25 2013 that approaching 200,000 people were

Page 260

1 dying a year from Schedule II and
2 Schedule III overdoses?
3     A.   Around that time, yes, I was
4 aware.
5     Q.   You understand in about this
6 time that Walgreens is dispensing
7 approximately one out of every six Schedule
8 II and Schedule III pill across the country,
9 correct, sir?
10        MR. STOFFELMAYR: Objection to
11 the form.
12        THE WITNESS: I don't know
13 exactly what the total is or what the
14 percentage is.
15 QUESTIONS BY MR. MOUGEY:
16     Q.   Does one out of six sound out
17 of line?
18     A.   Again, I have no idea what --
19     Q.   Wouldn't that be something
20 important to know, to go back and figure out
21 if Walgreens is a material part of the
22 overall distribution and dispensing system in
23 the United States?
24        MR. STOFFELMAYR: Objection to
25 the form.

Page 261

1        THE WITNESS: At a certain time
2 Walgreens was in distribution. They
3 are no longer in distribution, but I
4 can't speak to whether or not it was
5 important to go back in time.
6 QUESTIONS BY MR. MOUGEY:
7     Q.   And why is it that Walgreens is
8 no longer in the distribution system after --
9 distribution business after the Jupiter store
10 was padlocked by the DEA?
11        MR. STOFFELMAYR: Objection to
12 the form. Foundation.
13        THE WITNESS: I don't know
14 what -- why that decision was made by
15 Walgreens.
16 QUESTIONS BY MR. MOUGEY:
17     Q.   No one ever communicated to
18 you?
19     A.   No.
20     Q.   Now, were there any conflicts
21 of interest with the pharmacists in refusing
22 to fill prescriptions for pill seekers?
23        MR. STOFFELMAYR: Objection to
24 the form.
25        THE WITNESS: When you say

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1    "conflict of interest," conflict of
2    interest with who or what?
3 QUESTIONS BY MR. MOUGEY:
4    Q.   Conflict -- you understand what
5 a conflict of interest is, right?
6    A.   I do.
7    Q.   And it's a -- a conflict of
8 interest may be a financial conflict of
9 interest, correct?
10    A.   It could be a conflict, but --
11    Q.   Yes, sir.
12      Did the pharmacist have a
13 financial conflict of interest when refusing
14 to fill prescriptions for Schedule II and III
15 narcotics for pill seekers?
16    A.   Not that I'm aware of.
17    Q.   No one has ever brought that to
18 your attention, that there was a potential
19 conflict of interest for pharmacists if they
20 refused to fill a prescription for a
21 Schedule II or III narcotic for a pill
22 seeker?
23      MR. STOFFELMAYR: Objection to
24    the form.
25      THE WITNESS: I was not aware.

Page 263

1    It was actually the pharmacist's duty
2    to not fill a prescription that
3    they're not comfortable filling.
4 QUESTIONS BY MR. MOUGEY:
5    Q.   You were not aware that it was
6 the pharmacist's duty not to fill a
7 prescription that they weren't comfortable
8 filling?
9    A.   No, I'm sorry, I may have
10 misspoke. I -- it's only -- it's the
11 pharmacist who can only refuse a prescription
12 that they're not comfortable filling, so I
13 was -- I am aware of that.
14    Q.   Okay. So were you ever aware
15 that there was a financial conflict of
16 interest for a pharmacist if they refused to
17 fill a Schedule II or III narcotic from a
18 pill seeker?
19    A.   I'm not aware of a financial
20 conflict of interest.
21    (Walgreens-Stahmann Exhibit 8
22    marked for identification.)
23 QUESTIONS BY MR. MOUGEY:
24    Q.   I hand you what -- Stahmann 8.
25      Sir, were you aware that

Page 264

1 pharmacists were bonused based on the number
2 of prescriptions they wrote?
3    A.   At some point of time, yes.
4    Q.   And you would understand or
5 agree with me, sir, that that is a conflict
6 of interest for a pharmacist when deciding
7 whether or not to fill a Schedule II or III
8 prescription for a pill seeker, correct?
9      MR. STOFFELMAYR: Objection to
10    the form.
11      THE WITNESS: So this policy
12    has changed over time, but this is
13    not -- so currently pharmacists are
14    not -- the sales of controlled
15    substances are not part of a
16    pharmacist's bonus.
17 QUESTIONS BY MR. MOUGEY:
18    Q.   Yes, sir.
19      And do you know why that policy
20 stopped?
21    A.   I do not.
22    Q.   All right. Without putting 8
23 away, let's go back to the bound 6 and turn
24 to page 12. Now, page 12 is part of the
25 prospective compliance for Walgreens.

Page 265

1      Do you see that on page 11,
2 sir?
3    A.   I do see that.
4    Q.   Meaning as a result of this
5 substantial fine from the DEA and as a result
6 of these multiple investigations, Walgreens
7 is agreeing to certain conduct prospectively,
8 going forward.
9      Do you see that, sir?
10      MR. STOFFELMAYR: Objection to
11    the form.
12      THE WITNESS: Walgreens was not
13    fined. It was a settlement.
14 QUESTIONS BY MR. MOUGEY:
15    Q.   Yes, sir.
16      You can tell yourself that.
17 It's $80 million, right?
18    A.   A settlement.
19    Q.   $80 million that Walgreens paid
20 over a period of several years when you were
21 a material participant in the diversion team,
22 correct, sir?
23      MR. STOFFELMAYR: Now, you're
24    just arguing with him. Do you want to
25    ask a question?

Page 266

1  QUESTIONS BY MR. MOUGEY:
2      Q.    Sir, please answer my question.
3          $80 million that Walgreens paid
4  over a period -- covering a period of time of
5  several years when you were a material
6  participant in the diversion team, correct,
7  sir?
8          MR. STOFFELMAYR:  Objection to
9      the form.
10         THE WITNESS:  Yeah, I don't
11     think I would call myself a
12     material -- a material part of the
13     diversion team.
14  QUESTIONS BY MR. MOUGEY:
15     Q.    Yes, sir.
16         But when we looked at this --
17  your CV this morning when we first started
18  off, under "Project Manager, Pharmacy Loss
19  Prevention," you used the word "expert" --
20  "subject matter expert" on two different
21  occasions, correct, sir?
22     A.    Correct.
23     Q.    So this $80 million fine was
24  paid by Walgreens at a time when you were the
25  "subject matter expert on all systems,

Page 267

1  applications and initiatives related to
2  inventory movement and associated functions
3  that can cause or monitor pharmacy health
4  care shrink, examples would include, but are
5  not limited to, point-of-sale systems,
6  inventory management, cash management,
7  prescription monitoring and processing,
8  internal theft, DEA requirements, corporate
9  programs, regulatory issues, and operation
10  policies," correct, sir?
11         MR. STOFFELMAYR:  Objection to
12     the form.
13         THE WITNESS:  Again, you keep
14     using the term "fine."  I don't see
15     anywhere where we were fined.  It was
16     a settlement, and I was one of many
17     people that had expertise in the loss
18     prevention department.
19  QUESTIONS BY MR. MOUGEY:
20     Q.    $80 million was paid by
21  Walgreens during a period of time that you
22  were the subject matter expert on
23  prescription monitoring and processing and
24  DEA requirements, correct?
25         MR. STOFFELMAYR:  Objection to

Page 268

1      the form.
2          THE WITNESS:  I was one of many
3      that had that type of expertise.
4  QUESTIONS BY MR. MOUGEY:
5      Q.    You were one of many people
6  that was the subject matter expert on all
7  systems covering prescription monitoring and
8  processing, DEA requirements, making
9  decisions at Walgreens and the DEA, and
10  Walgreens paid an $80 million settlement,
11  correct, sir?
12         MR. STOFFELMAYR:  Objection to
13     the form.
14         THE WITNESS:  I don't agree
15     with that statement.
16  QUESTIONS BY MR. MOUGEY:
17     Q.    What part of that statement do
18  you not agree with?
19     A.    I was not the maker of the DEA
20  requirements or had the ability to make sure
21  Walgreens was following what the DEA
22  regulations were, requirements were.
23     Q.    You would agree with me that
24  Walgreens paid an $80 million settlement
25  covering a period of time when you were the

Page 269

1  subject matter expert on prescription
2  monitoring and processing and DEA
3  requirements, correct, sir?
4          MR. STOFFELMAYR:  Objection to
5      the form.
6          THE WITNESS:  I agree, I was
7      one of the many subject matter experts
8      in loss prevention during that time
9      period, yes.
10  QUESTIONS BY MR. MOUGEY:
11     Q.    So the answer to my question,
12  sir, that Walgreens paid an $80 million
13  settlement covering a period of time when you
14  were the subject matter expert on
15  prescription monitoring and processing and
16  DEA requirements, the answer to that question
17  is yes, correct?
18         MR. STOFFELMAYR:  Objection to
19     the form.
20         THE WITNESS:  I am not agreeing
21     that I was the subject matter expert.
22  QUESTIONS BY MR. MOUGEY:
23     Q.    You would agree with me that
24  you were a subject matter expert on
25  prescription monitoring and processing and

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1  DEA requirements at a period in time when
2  Walgreens agreed to pay an $80 million
3  settlement to the DEA, correct, sir?
4          MR. STOFFELMAYR: Objection to
5  form.
6          THE WITNESS: I am agreeing
7  that I was a subject matter expert
8  during that time, but I believe
9  this -- in 2000 -- I believe this
10  settlement came after I was part of
11  loss prevention.
12  QUESTIONS BY MR. MOUGEY:
13      Q.   As a matter of months.
14          But the settlement agreement
15  paying -- agreeing to pay $80 million covered
16  a period of time when you were the subject
17  matter expert on prescription monitoring and
18  processing and DEA requirements, correct,
19  sir?
20          MR. STOFFELMAYR: Objection to
21  the form.
22          THE WITNESS: I was a subject
23  matter expert, one of many, again, in
24  part of Walgreens. So the fine did
25  come out during that time period when

Page 271

1      I was a subject matter expert.
2  QUESTIONS BY MR. MOUGEY:
3      Q.   Thank you.
4          And you'll agree with me, sir,
5  on page 12 of Stahmann 6, that beginning in
6  2014 Walgreens will exclude any accounting
7  for controlled substance prescriptions
8  dispensed by a particular pharmacy from bonus
9  computations for pharmacists and pharmacy
10  technicians at the pharmacy, correct, sir?
11      A.   I do see that.
12      Q.   And the document I just put in
13  front of you, sir, Stahmann 5, is an example
14  of the bonus calculation for pharmacists at
15  Walgreens, correct, sir?
16      A.   I believe that's what it is,
17  yes. I don't know if it's the current one --
18  but it is --
19      Q.   It's one of them, correct, sir?
20      A.   It's one of them.
21      Q.   And you can see based on Bates
22  number WAG08, that pharmacists were bonused
23  based on the number of prescriptions they
24  wrote, correct, sir?
25      A.   That they filled, at a --

Page 272

1  during a certain amount of time.
2      Q.   Yes, sir. And exactly right.
4          You would agree with me, sir,
5  that Stahmann 8, Bates number 007 and 008,
6  pharmacists at Walgreens were bonused based
7  on the amount of prescriptions they filled,
8  correct, sir?
9      A.   Total amount of prescriptions
10  they filled, yes.
11      Q.   Yes, sir.
12          And you would agree with me
13  that when the pharmacist was making a
14  decision whether or not to fill a
15  prescription of Schedule II and III narcotics
16  for a pill seeker, that this was a financial
17  conflict of interest?
18          MR. STOFFELMAYR: Objection to
19  the form. Foundation.
20          THE WITNESS: I can't speak on
21  behalf of the pharmacists if the
22  decision whether or not to fill a
23  prescription was based off their
24  financial conflict of interests.
25

Page 273

1  QUESTIONS BY MR. MOUGEY:
2      Q.   And I'm not asking you to
3  provide testimony based on what pharmacies
4  thought -- pharmacists thought.
5          As the manager of
6  pharmaceutical integrity and the project
7  manager, do you believe that it was a
8  conflict of interest for pharmacists to be
9  bonused on the number of scripts they filled
10  for Schedule II and III narcotics?
11          MR. STOFFELMAYR: Objection to
12  the form.
13          THE WITNESS: I can't possibly
14  be able to validate whether or not
15  pharmacists felt filling or refusing
16  prescriptions, if there was any
17  financial motive behind it.
18  QUESTIONS BY MR. MOUGEY:
19      Q.   Do pharmacists get paid if they
20  don't fill a Schedule II and III narcotic
21  prescription?
22      A.   Yes.
23      Q.   Do they get bonused as much if
24  they refuse to fill a number of Schedule II
25  and III -- Schedule II and III narcotic

Page 274

1 prescriptions as if they don't?
2     A.    They do not get paid as much.
3     Q.    And underneath -- do you see
4 the overview section on the first page?
5     A.    Yes.
6     Q.    Do you agree with the statement
7 that the best evidence of a well-run pharmacy
8 is the increase in prescriptions from
9 pharmacy sales, which are the result of not
10 only price, promotion, location and product,
11 but also customer service, employee
12 development, leadership and innovative ideas?
13     MR. STOFFELMAYR: Objection to
14   form. Foundation.
15     THE WITNESS: Are you asking me
16   if I agree with that statement?
17 QUESTIONS BY MR. MOUGEY:
18     Q.    Yes, sir.
19     MR. STOFFELMAYR: Same
20   objections.
21     THE WITNESS: I do not agree
22   with that statement. They're leaving
23   out customer safety.
24 QUESTIONS BY MR. MOUGEY:
25     Q.    But you agree that the -- you

Page 275

1 don't have a problem with the best evidence
2 of a well-run pharmacy is the increase in
3 prescriptions?
4     A.    I do have an issue with that,
5 yes.
6     Q.    That's not the best evidence of
7 a well-run pharmacy, is it?
8     A.    It is not.
9     Q.    And quite frankly, increase in
10 prescriptions should not even be a metric in
11 a well-run pharmacy, correct, sir?
12     MR. STOFFELMAYR: Objection to
13   the form. Foundation.
14     THE WITNESS: I don't know what
15   the best evidence for a well-run
16   pharmacy is.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    But what I asked you, sir, is
19 that an increase in prescriptions should not
20 even be a metric in a well-run pharmacy,
21 correct, sir?
22     MR. STOFFELMAYR: Objection to
23   form. Foundation.
24     THE WITNESS: I don't know what
25   metrics should be used to identify a

Page 276

1 well-run pharmacy.
2 QUESTIONS BY MR. MOUGEY:
3     Q.    Your job was to identify red
4 flags in pharmacies, correct, sir?
5     MR. STOFFELMAYR: Objection to
6   the form. Foundation.
7     THE WITNESS: It was not.
8     MR. STOFFELMAYR: Give me a
9   chance, sorry.
10 QUESTIONS BY MR. MOUGEY:
11     Q.    Your job was not to identify
12 potential red flags in pharmacies?
13     A.    It was not, no. We helped
14 pharmacists identify red flags.
15     Q.    Well, if you're going to help a
16 pharmacist identify red flags, your job is to
17 identify them to provide them to the
18 pharmacists, correct, sir?
19     MR. STOFFELMAYR: Objection to
20   the form.
21     THE WITNESS: No.
22 QUESTIONS BY MR. MOUGEY:
23     Q.    Go to page 13 in paragraph 2,
24 the sentence that begins with, "Walgreens
25 agrees not to ship."

Page 277

1     Do you see that, sir?
2     About three-quarters of the way
3 down the page on the right-hand side?
4     A.    Yes.
5     Q.    "Walgreens agrees not to ship
6 any order of interest or suspicious order in
7 whole or in part and until Walgreens resolves
8 the reasons that caused it to designate an
9 order as an order of interest or a suspicious
10 order," correct, sir?
11     A.    I do see that, yes.
12     Q.    Do you have any reason to
13 believe that Walgreens was not shipping an
14 order of interest or a suspicious order in
15 2012?
16     MR. STOFFELMAYR: Objection to
17   the form.
18     THE WITNESS: I don't know what
19   Walgreens was doing in 2012. I know
20   we started to get out of the
21   distribution business at that time
22   period.
23 QUESTIONS BY MR. MOUGEY:
24     Q.    Bear with me one second,
25 Mr. Stahmann. I'm sorry, I got -- all right.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1 If you would, sir, please turn to page 77. I
2 apologize. I just missed -- now I figured
3 out what I did. If you can go back to the --
4          MR. STOFFELMAYR: Sorry, what
5 page?
6          MR. MOUGEY: Page 26.
7 QUESTIONS BY MR. MOUGEY:
8     Q.    All right. Paragraph 9 on
9 page 26, begins with "Respondent's practice"?
10    A.    I'm there.
11    Q.    Okay. "Respondent's practice
12 with regard to suspicious order reporting was
13 to send to the local DEA field office a
14 monthly report labeled 'suspicious controlled
15 drug orders.'"
16          Do you see that, sir?
17    A.    Yes.
18    Q.    Do you have reason to believe
19 that the suspicious controlled drug orders
20 were the reports that you were burning on a
21 CD and sending out?
22    A.    Yes, I believe that's what this
23 is referring to.
24    Q.    Those were the reports you were
25 sending out?

Page 279

1     A.    Yes.
2     Q.    And how do you know those were
3 the reports you were sending out?
4     A.    Because the title of the
5 reports were labeled "suspicious controlled
6 substance orders," I believe.
7     Q.    Okay. Now, do you know if you
8 have access to those historical order reports
9 that you sent to the DEA?
10    A.    Access to those reports now?
11    Q.    Yes, sir.
12    A.    I do not know if we have
13 access. I know we were -- we can produce one
14 of the reports, but I do not know historical
15 access or if they're automatically purged
16 during a certain time frame.
17    Q.    Do you -- are you aware in 2017
18 of whether or not you could pull those
19 suspicious order reports that you were
20 sending to the DEA?
21    A.    In 2017, I believe we were
22 unable to pull those reports.
23    Q.    You were unable to pull those
24 reports?
25          Did you --

Page 280

1     A.    During a certain time frame,
2 yes.
3     Q.    Did you store those reports
4 anywhere that you had access to them or any
5 sampling of those reports?
6     A.    I may have had some stored in
7 my e-mail.
8     Q.    Some stored in your e-mail?
9     A.    Yes.
10    Q.    Do you -- how far back does
11 your -- do you not delete e-mails?
12    A.    It cannot, no. Part of my
13 e-mails are on legal hold.
14    Q.    Do you know how long they have
15 been on legal hold?
16    A.    Various times. There's been
17 gaps, but probably ever since I started in
18 loss prevention, there's been periods on and
19 off of being on legal hold.
20    Q.    So you started in loss
21 prevention in 2012?
22    A.    That sounds about right, yes.
23    Q.    Okay. So in 2012, was it your
24 practice that as you pulled and sent those
25 suspicious order reports to store them

Page 281

1 anywhere?
2     A.    No, because they were -- since
3 they were burned on a CD, the only storage of
4 those were on that Mobius application.
5     Q.    Okay. And do you have an
6 understanding of what period of time is still
7 on the Mobius application as far as the
8 suspicious order reports?
9     A.    I do not know.
10    Q.    Do you have an estimate of what
11 period in time?
12    A.    I don't. I don't know if or
13 when they're purged or if there's an
14 automatic purging time frame.
15          (Walgreens-Stahmann Exhibit 9
16          marked for identification.)
17 QUESTIONS BY MR. MOUGEY:
18    Q.    I'll hand you what I've -- I'll
19 mark as Stahmann Exhibit 9.
20          Do you see this is an e-mail
21 from yourself to yourself?
22          Do you see that?
23    A.    I do.
24    Q.    And the subject is "CD
25 orders-2."

Page 282

1    A.    I see that.
2    Q.    What does that mean?
3    A.    I can't recall why -- what that
4 subject means.
5    Q.    All right.  And the date of
6 this e-mail is August 16, 2017, correct?
7    A.    That is correct.
8    Q.    And if you would flip the page,
9 does this appear to be the suspicious order
10 report that you were responsible for pulling,
11 burning on a CD and sending to the DEA, along
12 with the distribution centers?
13    A.    This does appear to be one of
14 those reports, yes.
15    Q.    Okay.  Was it -- are there
16 different kinds of reports, or was this the
17 suspicious controlled drug orders that DEA
18 mentions in page 26 of Stahmann 6?
19    A.    I believe this is one of the
20 reports.  There may have been a -- there
21 may -- the reports may have been broken down
22 by area so we would know who to send to.
23    Q.    All right.  You see in the
24 bottom left-hand side of this page where it
25 says, "Report available in Mobius."

Page 283

1    A.    Yes.
2    Q.    And did you in August of 2017
3 go on Mobius and pull this report?
4    A.    No.
5    Q.    All right.  Where do you think
6 you found this report?
7    A.    To be complete -- I can't say
8 for certain, but I think I pulled this from
9 an e-mail that I may have sent out in
10 preparation or for -- due to a legal ask.
11 They asked if I could --
12         MR. STOFFELMAYR:  Stop.
13    Don't -- don't get into what anyone
14    asked you legally.
15 QUESTIONS BY MR. MOUGEY:
16    Q.    Why did you send it to
17 yourself?
18    A.    I think that was the only way
19 that I can get that data.
20    Q.    Where was the data when you
21 pulled it?
22    A.    It was stored -- I don't
23 remember, but the data resides in Mobius.
24    Q.    Right.
25         So you had to access Mobius to

Page 284

1 pull the data, correct?
2    A.    At one time, yes.
3    Q.    And I'm talking about in August
4 of 2017.  Did you have to access Mobius to
5 pull the data?
6    A.    No, because I was unable to.
7    Q.    Okay.  So but you tried?
8    A.    We definitely looked into it,
9 yes.
10    Q.    All right.  So where do you
11 believe that you found this report?
12    A.    I can't recall exactly how.
13    Q.    And you didn't store these
14 reports as you sent them or keep them in a
15 file or anything along those lines?
16    A.    No, they were just burned on a
17 CD, so it's possible that I had a copy of a
18 CD and then e-mailed me that -- the data from
19 the CD.
20    Q.    Who e-mailed you the data from
21 the CD?
22    A.    I could have e-mailed myself,
23 so just -- I don't know exactly, but that's
24 how I'm envisioning this could have went.
25    Q.    And I'm sorry if I'm being slow

Page 285

1 here, but -- so you found this report, you
2 believe, in an old e-mail?
3         MR. STOFFELMAYR:  Objection to
4    the form.
5         THE WITNESS:  I believe I found
6    the report on an old CD and then
7    transferred the file to myself via
8    e-mail.
9 QUESTIONS BY MR. MOUGEY:
10    Q.    Okay.  So you had no practice
11 of filing or storing the CDs as you burned
12 them and sent them to the DEA?
13    A.    No.
14    Q.    If you ever wanted to go back
15 and look at historical suspicious orders, how
16 would you do it?
17         MR. STOFFELMAYR:  Objection to
18    the form.
19         THE WITNESS:  At the time, you
20    can -- we could have went back in
21    Mobius to look at the data that was
22    currently stored or not purged in
23    Mobius.
24 QUESTIONS BY MR. MOUGEY:
25    Q.    Okay.  So up to what point in

Page 286

1  time could you access Mobius and pull
2  historical suspicious controlled drug orders?
3      A.    Personally, it was up until the
4  time that I left asset protection.  My access
5  was once I transferred to
6  pharmaceutical integrity.
7      Q.    So you're not saying that the
8  reports were purged, but you just didn't have
9  any access?
10     A.    I personally did not have
11 access, no.
12     Q.    Now, help me to understand
13 that, because you went to and moved to the
14 pharmaceutical integrity department that was
15 responsible for overseeing diversion.
16         Why would you not have access
17 to the platform with the suspicious order
18 reports?
19         MR. STOFFELMAYR:  Objection to
20     the form.  Foundation.
21         THE WITNESS:  When I
22     transferred to RX integrity, we were
23     not reporting suspicious orders via
24     those CDs and Mobius.
25

Page 287

1  QUESTIONS BY MR. MOUGEY:
2      Q.    But if you wanted historical
3  data to go back and look at patterns, would
4  that not have been helpful?
5      A.    Our team did not look at the
6  historical suspicious orders.
7      Q.    Walk me through a couple
8  samples of -- what I've done here is this is
9  an approximately 25,000-page report.
10         Okay?
11         So is that consistent with your
12 recollection of what you were burning onto a
13 CD and sending to the DEA once a month?
14     A.    To be honest, I cannot
15 recollect how large the files were or
16 page-wise.  I just basically burned the data
17 on a CD and sent it off.  I didn't dive into
18 each individual report or CD, so I don't know
19 if this is a --
20     Q.    Did you even look at it?
21     A.    I would look at it briefly, but
22 just to see if the data transferred to the
23 CD, but that's about the extent.
24     Q.    But in order to know if it
25 transferred to the CD, wouldn't you have to

Page 288

1  look at it?  Do I have three pages or 3,000
2  pages or 18?
3         You had no -- you didn't look
4  at it for any content or what was -- what was
5  in the report?
6      A.    I did not look at the content.
7  I may have looked to see -- if only three
8  pages transferred to the CD, then I knew
9  there was something wrong with the data.
10     Q.    What was the scope of
11 nationally where you were pulling these
12 suspicious order reports from?
13     A.    What do you mean by "scope"?
14     Q.    I mean, did you -- was it for
15 every state?  Every region?
16     A.    They were for the chain length.
17 It was for all of Walgreens.
18     Q.    The entire Walgreens?
19     A.    Correct.
20     Q.    And where would you send them?
21 What DEA would you send them to?
22     A.    We would send them to all the
23 local DEA offices that had their office
24 listings on the DEA web page and then also to
25 our individual distribution centers.

Page 289

1      Q.    All right.  So you would send
2  the entire country suspicious controlled drug
3  orders to every DEA field office?
4      A.    That is correct.
5      Q.    And now, let's go back to
6  page 26 of Stahmann 6.
7         Okay?
8         It says, "Respondent's practice
9  with" -- I'm sorry.
10         MR. STOFFELMAYR:  Give me a
11     second.
12         MR. MOUGEY:  Yeah, my bad.
13         MR. STOFFELMAYR:  Got it.  Are
14     you there?
15         MR. MOUGEY:  Are you there?
16         THE WITNESS:  Yep.  Okay.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    Page 626, paragraph 9,
19 "Respondent's practice with regard to
20 suspicious order reporting was to send to the
21 local DEA field office a monthly report
22 labeled 'Suspicious Drug Controlled Orders.'
23 Two reports were provided:  One for
24 suspicious orders of Schedule II drugs;
25 another for suspicious orders of drugs in

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1 Schedules III and V. These reports were
2 transmitted on respondent's behalf from
3 Walgreens corporate headquarters in
4 Deerfield, Illinois."
5        So you think for the period of
6 time that you were responsible, that's you
7 sending those out?
8        A.    Yes.
9        Q.    And respondent's suspicious
10 order report for December 2011 appears to
11 include suspicious orders placed by its
12 customers for the past six months, okay?
13        But you don't have any
14 recollection of what time scope you were
15 pulling the suspicious control orders,
16 correct?
17            MR. STOFFELMAYR: Objection to
18 form.
19            THE WITNESS: I was only tasked
20 to pull the reports monthly, so I do
21 not know how much information was
22 contained on those reports.
23 QUESTIONS BY MR. MOUGEY:
24        Q.    The report for just suspicious
25 orders of Schedule II drugs is 1,712 pages.

Page 291

1        Do you see that?
2        A.    I do.
3        Q.    That's a lot of pages with a
4 lot of suspicious orders, right?
5            MR. STOFFELMAYR: Objection to
6 form.
7            THE WITNESS: It's a lot of
8 pages. I don't know if each one of
9 those orders is a, quote/unquote,
10 suspicious order.
11 QUESTIONS BY MR. MOUGEY:
12        Q.    And sitting here today, you
13 don't know what the formula was for
14 identifying suspicious orders, do you?
15        A.    That is correct.
16        Q.    Now, you recall our going
17 through the DEA letters earlier that a rigid
18 formula is not really helpful with
19 identifying suspicious orders, correct?
20            MR. STOFFELMAYR: Objection to
21 form. Foundation.
22            THE WITNESS: I don't recall
23 those exact words being used.
24 QUESTIONS BY MR. MOUGEY:
25        Q.    If you'd go back to the DEA

Page 292

1 letters, tell me what exhibit number that is.
2 I think it's 5, Stahmann 5.
3        A.    Got it.
4        Q.    Got it?
5        A.    Yep.
6        Q.    Okay. Look at the paragraph
7 that begins with "registrants" and the very
8 last paragraph of Stahmann 5 dated June 12,
9 2012.
10        A.    I see that.
11        Q.    "Registrants who rely on rigid
12 formulas to identify whether an order is
13 suspicious may fail to detect suspicious
14 orders," right?
15        A.    I do see that.
16        Q.    "For example, this system might
17 not identify suspicious orders placed by a
18 pharmacy if that pharmacy placed unusually
19 large orders from the beginning."
20        That makes sense, right?
21            MR. STOFFELMAYR: Objection to
22 the form.
23            THE WITNESS: I don't know if
24 that makes sense in the context it's
25 used because that doesn't necessarily

Page 293

1 mean that because a pharmacy placed
2 large orders that are suspicious or
3 that since they were placing large
4 orders from the beginning we weren't
5 able to detect suspicious orders.
6 QUESTIONS BY MR. MOUGEY:
7        Q.    Well, it's not categorical, but
8 the point of this process with suspicious
9 order reporting was to identify red flags,
10 right?
11            MR. STOFFELMAYR: Objection to
12 the form.
13            THE WITNESS: The purpose of
14 the suspicious order report is to
15 report based off of a formula orders
16 of interest that could lead to
17 suspicious orders.
18 QUESTIONS BY MR. MOUGEY:
19        Q.    And then perform due diligence
20 on those orders before they were shipped as
21 we went through earlier, correct?
22            MR. STOFFELMAYR: Objection to
23 form.
24            THE WITNESS: Due diligence was
25 performed, to my knowledge, don't know

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  by who, on those orders, yes.
2  QUESTIONS BY MR. MOUGEY:
3      Q.    And prior to being shipped,
4  correct?
5          MR. STOFFELMAYR:  Objection to
6  form.  Foundation.
7          THE WITNESS:  I don't know if
8      that's actually what -- I don't know
9      who was responsible for that type
10     of --
11 QUESTIONS BY MR. MOUGEY:
12     Q.    And I'm not asking you who was
13 responsible.  What I'm asking is what the
14 requirement was, and the due diligence was
15 performed prior to the shipment being
16 actually -- the order being shipped, correct?
17         MR. STOFFELMAYR:  Objection to
18 form.  Foundation.
19         THE WITNESS:  I believe that's
20     what the requirements stated, but that
21     was not part of my expertise as to
22     interpret regulations.
23 QUESTIONS BY MR. MOUGEY:
24     Q.    All right.  Let's go back to
25 Stahmann 6, and middle of the page, the

Page 295

1  sentence underneath paragraph 9 on the
2  right-hand side says, "The reports are based
3  on a formula that assigns an average monthly
4  order for a particular drug" --
5          MR. STOFFELMAYR:  You better
6      give him a second.  He's still on --
7          THE WITNESS:  What page are you
8      on, I'm sorry?
9  QUESTIONS BY MR. MOUGEY:
10     Q.    I'm sorry.  Page 26.
11     A.    26.
12     Q.    Paragraph 9.
13     A.    Got it.  Okay.
14     Q.    "The reports are based on a
15 formula that assigns an average monthly order
16 for a particular drug which is then
17 multiplied by a DEA factor, which is always
18 three regardless of the drug or the average
19 order amount, resulting in a trigger amount
20 above which orders for the month are reported
21 as suspicious, along with a listing of all
22 orders placed for the particular drug by the
23 reported pharmacy for the month in which the
24 trigger amount was exceeded."
25         Do you see that?

Page 296

1      A.    I do see that.
2      Q.    Now, Stahmann 8, the report
3  that you e-mailed yourself on August 16,
4  2017, you would flip to Bates number 380?
5      A.    Exhibit 9, I think --
6      Q.    Is it 9?
7      A.    Yeah.
8      Q.    Stahmann 9, if you go to Bates
9  number 380, top of that page is titled "Sales
10 District 277."
11     A.    Yes.
12         MR. STOFFELMAYR:  I'm sorry,
13     give me a second to catch up.  It's
14     380 at the bottom?
15         Okay.  I got it figured out
16     now.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    And the store address is 6410
19 Broadway Avenue, Cleveland, Ohio.
20         Do you see that?
21     A.    I do see that.
22     Q.    And then you can see below, you
23 see the NDC number?
24     A.    I do.
25     Q.    What's the NDC number mean?

Page 297

1      A.    It is an identifying number.
2  It's a national -- I forgot what the acronym
3  means, but it's basically a way to identify a
4  certain product.
5      Q.    And --
6      A.    It's national drug code.
7      Q.    And you can see below or
8  adjacent to that, 6, which is the oxycodone,
9  6 times 3 is 18.
10         Do you see that?
11     A.    I see that.
12     Q.    But as you were shipping these
13 reports on CDs to the DEA, you didn't know
14 what the multiplier DEA factor was, correct?
15         MR. STOFFELMAYR:  Objection to
16     the form.
17         THE WITNESS:  I did not know
18     what the DEA factor meant, and I did
19     not dive deeply into these reports
20     when I sent them.
21 QUESTIONS BY MR. MOUGEY:
22     Q.    I mean, I'm not asking you to
23 deeply dive.  You didn't even know that they
24 were multiplied by 3 and what the criteria
25 was for the thresholds, correct?

Page 298

1    A.    Correct, I did not.
2    Q.    Okay.  So below that, you see
3  the date ordered, 6/29, 6/22, 6/15, 6/8, 6/1.
4         Do you see that?
5    A.    I do.
6    Q.    And the quantity, 7, 4, 3, 5,
7  9, right?
8    A.    Yes.
9    Q.    So how would you determine --
10  how would one determine how many dosage units
11  are in each of those quantities?
12    A.    Via the NDC on the top, it says
13  plus 500.  That's the number of dosage units
14  per bottle.
15    Q.    Did you not have access to the
16  NDC codes to import those into your database
17  to identify how many pills those are?
18    A.    We did have that information.
19    Q.    You did?
20    A.    Yes.
21    Q.    Do you understand or know
22  whether the DEA had the NDC codes imported
23  into ARCOS so it could tell how many dosage
24  units were part of that quantity?
25    A.    I don't know if the DEA had

Page 299

1  that information.
2    Q.    Would you think that would be
3  helpful to provide the number of dosage units
4  in your report to the DEA?
5         MR. STOFFELMAYR:  Objection to
6    the form.  Foundation.
7         THE WITNESS:  I don't know if
8    that would be helpful or not.  I don't
9    know if that would be helpful or not
10    to them.
11  QUESTIONS BY MR. MOUGEY:
12    Q.    Go back to your experience as
13  law enforcement.  Wouldn't you want to know
14  if that's -- I mean, is that seven bottles of
15  three pills or seven bottles of 80 pills?
16  Wouldn't you want to know?
17    A.    Yes, and it states here on the
18  report how many dosage units are in the
19  bottle.
20    Q.    Where do you see that?
21    A.    Right next to oxycodone 5/325
22  tab, Watson brand, plus 500, that's the
23  dosage units.
24    Q.    Where do you see that?
25    A.    Right under average order, "DEA

Page 300

1  factor equals trigger, oxycodone APAP 5 to 25
2  tab Wats, 500."
3    Q.    And which of the dosage units?
4    A.    Plus 500 is the dosage units
5  for that bottle.  So there's 500 tablets in
6  that particular bottle.  So 7 times 500 is
7  3,500.
8    Q.    So we could do 500 times
9  28 bottles or whatever the -- however the
10  shipment mechanism is?
11    A.    That is correct, to get that
12  dosage units for that particular drug.
13    Q.    Okay.  So that's 500 times 20
14  is 10,000, so what is that 14,000 oxycodone
15  for that pharmacy in Cleveland in 2010?
16    A.    Yeah, if that math is correct.
17  I didn't calculate that really quick, but,
18  yeah.
19    Q.    All right.  And do you see the
20  155 percent, correct?
21    A.    I do see that.
22    Q.    And what is that 155 percent?
23    A.    I have no idea.
24         MR. STOFFELMAYR:  We're due for
25    a break soon when you get to a moment.

Page 301

1  QUESTIONS BY MR. MOUGEY:
2    Q.    Let's go back to Stahmann 6,
3  paragraph 9.  It says, "The reports" -- you
4  see on the right-hand side, which begins with
5  "the," paragraph 9, in the middle of the
6  page?
7    A.    Yes.
8    Q.    "The reports are based on a
9  formula that assigns an average monthly order
10  for a particular drug which is then
11  multiplied by a DEA factor, which is always
12  3, regardless of the drug or the average
13  order amount."
14         Do you see that?
15    A.    I do.
16    Q.    And that's resulting in a
17  trigger amount, correct?
18    A.    That's what it states here,
19  yes.
20    Q.    "Anything above that trigger
21  amount is reported as suspicious."
22         Do you see that?
23    A.    I do see that.
24    Q.    "Along with the listing of all
25  orders placed for the particular drug by the

Page 302

1 reported pharmacy for the month in which the
2 trigger amount was exceeded"?
3      A.    I do see that.
4      Q.    "This report from the Jupiter
5 distribution center covers pharmacies in
6 multiple states in Puerto Rico, yet the
7 average order and the trigger amount is the
8 same for a particular drug regardless of the
9 pharmacy's location, the population it serves
10 or the number of other pharmacies in the
11 area."
12          Do you see that?
13     A.    I do.
14     Q.    Paragraph 10, as it made clear
15 in 21 CFR 1301, and it's Southwood, in
16 December 27, 2007 letter to distributors from
17 the Deputy Assistant Administrator for the
18 Office of Diversion Control, "Suspicious
19 orders are to be reported as discovered."
20          Do you see that, sir?
21     A.    I do see that.
22     Q.    "Not in a collection of monthly
23 completed transactions," right?
24     A.    I do see that.
25     Q.    And you were aware, at least

Page 303

1 until the point in time when you left loss
2 prevention and were sending these reports to
3 the DEA as of 2012, you were still sending
4 out a collection of monthly completed
5 transactions, correct, sir?
6          MR. STOFFELMAYR:  Objection to
7      the form.
8          THE WITNESS:  I was sending out
9      reports on a monthly basis.  Again, I
10     do not know what the contents of those
11     reports were.
12 QUESTIONS BY MR. MOUGEY:
13     Q.    You don't know whether they
14 were completed or not?
15     A.    I do not.
16         MR. MOUGEY:  I'm fine with
17     taking a break now.
18         MR. STOFFELMAYR:  Great.
19         VIDEOGRAPHER:  Going off the
20     record at 3:25.
21  (Off the record at 3:25 p.m.)
22         VIDEOGRAPHER:  We're back on
23     the record at 3:42.
24 QUESTIONS BY MR. MOUGEY:
25     Q.    Mr. Stahmann, the report that I

Page 304

1 have in front of you as exhibit -- Stahmann
2 Exhibit 9, do you remember what format that
3 was in?
4      A.    What do you mean by format?
5      Q.    I mean Excel, PDF.
6      A.    I don't recall, no.
7      Q.    Do you remember how you
8 trans -- how you send it -- how you sent it
9 to the DEA on a CD?
10     A.    I don't recall the file
11 extension type, no.
12     Q.    Can we tell by looking at the
13 attachment?  It's a zip file.
14     A.    A zip, correct, but it looks
15 like it's plain text or ASCII text.
16     Q.    Would you have changed the text
17 when you pulled it out of your e-mail, or
18 would it have probably more than likely been
19 the same as how sent it to the DEA?
20     A.    I did not format in any way, so
21 what I pulled would be how it was sent to the
22 DEA.
23     Q.    Okay.  And earlier you
24 mentioned that you sent this report also to
25 the distribution centers, the DCs, right?

Page 305

1      A.    That is correct.
2      Q.    Did you have a person in
3 particular at the DCs you sent them to or a
4 title that you sent them to?  Who would you
5 send them to?
6      A.    It was the C-II or SAIL
7 coordinator, S-A-I-L coordinator.  They were
8 not addressed to someone in particular just
9 because people changed in those positions or
10 roles.
11     Q.    And that was every distribution
12 center?
13     A.    Yes.
14     Q.    Okay.  And do you remember just
15 roughly, I'm sure they changed over time, but
16 how many distribution centers that Walgreens
17 had?
18     A.    I don't know the exact number,
19 but it was more than five.
20     Q.    Okay.  And Schedule II and
21 Schedule III, more than ten?
22     A.    I don't know.  I can't recall
23 exactly how many.
24     Q.    Okay.  But if we were to
25 inquire further about the type and amount of

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  due diligence performed on these suspicious
2  orders in this report, we would need to -- to
3  talk to each of the SAIL coordinators,
4  correct?
5        MR. STOFFELMAYR:  Objection to
6  the form.  Foundation.
7        THE WITNESS:  I would recommend
8  that you start there.  I don't know if
9  they are the individual people that
10 performed the due diligence.
11 QUESTIONS BY MR. MOUGEY:
12    Q.    Yes, sir.
13        But that would be a good place
14 to start, right?
15    A.    In my opinion, yes.
16    Q.    Okay.  Now, did you -- when you
17 said -- is that different, the C-II function
18 manager?
19    A.    I don't know what a C-II
20 function manager is.
21    Q.    Okay.  Now, you mentioned
22 earlier that the DEA asked that these reports
23 to stop being sent?
24    A.    Yes.
25    Q.    Who told you that?

Page 307

1     A.    My boss, Marcie Ranick, at the
2  time.
3     Q.    Marcie?
4     A.    Ranick, R-a-n-i-c-k.
5     Q.    Okay.  And when was Ms. Ranick
6  your boss?
7     A.    When I was in loss prevention,
8  asset protection, throughout my term there.
9     Q.    So from '07 to '12?
10    A.    Through '13.  So a little bit
11 over five years, so let's say 2008, 2009 to
12 '13.
13    Q.    All right.  Did Ms. Ranick give
14 you a reason why the DEA asked?
15    A.    I don't recall the specific
16 reason she said.
17    Q.    Do you remember what time frame
18 that was?
19    A.    No.
20    Q.    I mean, do you have a general
21 understanding of the time frame?
22    A.    I don't.
23    Q.    So did you stop sending them?
24    A.    No.
25    Q.    You just kept sending them?

Page 308

1     A.    Yes.
2     Q.    Did -- or did the DEA ask that
3  you stop sending them across the board, all
4  information, stop sending them at all,
5  nothing?
6     A.    They didn't request or they
7  didn't tell me specifically to stop sending
8  them, so I don't know which field offices
9  specifically said don't send those to me.
10    Q.    Do you know which field offices
11 it was that told Ms. Ranick to stop sending
12 them?
13    A.    I don't.
14    Q.    Did -- do you know how many
15 field offices there were with the DEA?
16    A.    At the time, no, I can't recall
17 the number.
18    Q.    More than 20?
19    A.    Yes.
20    Q.    So let me get this straight.
21 You sent the, let's just say, the DEA field
22 office in San Francisco a CD that contained
23 the suspicious reports for Topeka, Kansas.
24    A.    I don't recall or I don't know
25 what information were on the reports.  I do

Page 309

1  know that we sent the individual field
2  offices those reports.
3     Q.    For the entire country?
4     A.    Again, I don't recall what were
5  actually in the reports since I didn't dive
6  into them.
7     Q.    Right.
8        But you -- I thought what you
9  said earlier is that you -- you pulled
10 the entire report for the entire country and
11 you sent that -- you burned it on a CD and
12 then you sent it to every DEA field office?
13    A.    So the reports auto-generated
14 with data and populated with data, so I don't
15 know what formulas or logic that was used to
16 populate that data, but, yes, I sent -- I
17 literally took the file burner and a CD and
18 sent it out to district offices.
19    Q.    Who put the CD in an envelope?
20    A.    Most -- for my time, it was me.
21    Q.    Okay.  So you put the label on
22 the envelope, you took it down to the mail
23 center, they stamped it, and it went out the
24 door, right?
25    A.    Yeah.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  Q.   So do you recall that you were
2  trying to match up CDs with specific
3  envelopes, or did everybody get the same CD?
4       A.   I believe everyone got the same
5  CD.
6       Q.   So potentially the suspicious
7  order reports, if they were generated in
8  Topeka, Kansas, went to the DEA field office
9  in San Francisco, right?
10      A.   There was information in -- for
11 each DEA office, there could potentially have
12 been information that did not pertain to
13 their district office.
14      Q.   And your recollection is -- is
15 that the format that is consistent with the
16 report in front of us in Stahmann 9 was
17 consistent with what you sent the DEA on a
18 regular basis?
19      A.   Yes, from my understanding.
20      Q.   Okay.  Now, I believe your CV
21 said that you had intimate knowledge, and it
22 listed several different databases and --
23 like Excel and Access and so forth, correct?
24      A.   It does list that, yes.
25      Q.   So you're fairly tech savvy?

Page 311

1       A.   Not anymore, but I was at one
2  time when these systems did -- did exist.  A
3  lot of these don't exist anymore.
4       Q.   But as of the time that you put
5  together this CD, you said you had intimate
6  work with statistical software and databases,
7  including, but not limited to, Access, Excel,
8  Oracle, WebSDL, IC Plus, SIMS, EDW, Mobius
9  and Business Objects, right?
10      A.   Correct, at that time, yes.
11      Q.   Right.  Yet you chose to send
12 this in a text file, correct?
13      A.   I did not choose that.  That
14 was the format the file was populated in
15 Mobius, so I just burned the file and sent it
16 off on a CD not modifying the information on
17 there at all.
18      Q.   Now, as somebody that's fairly
19 tech savvy, as yourself, or at least at that
20 point in time, it would be very helpful to
21 organize the data, wouldn't it?
22           MR. STOFFELMAYR:  Objection to
23      the form.  Foundation.
24           THE WITNESS:  The DEA never
25      specified how they wanted that

Page 312

1       information sent to them or --
2  QUESTIONS BY MR. MOUGEY:
3       Q.   So you just sent them the whole
4  country in a text file?
5       A.   That's -- yes, that's the file
6  that I sent them.
7       Q.   Based on what we now understand
8  to be a rigid formula, correct?
9           MR. STOFFELMAYR:  Objection to
10      the form.  Foundation.
11           THE WITNESS:  I don't know what
12      that formula --
13 QUESTIONS BY MR. MOUGEY:
14      Q.   Sitting here today you don't
15 even know what the formula is?
16      A.   That is correct.
17      Q.   All right.  So when you were
18 analyzing data as a role with the manager
19 with the pharmaceutical integrity department,
20 do you routinely export data out of Walgreens
21 databases in text format?
22      A.   I do not.
23      Q.   Yeah.  You typically put it in
24 some sort of a spreadsheet or a database,
25 right?

Page 313

1       A.   I don't do the data pulls
2  anymore as a pharmacy manager.
3       Q.   Sure.
4           But once somebody in the IT
5  department does, correct?
6       A.   Our analysts do pull data and
7  provide it in Excel format.
8       Q.   If somebody sent you a
9  1,700-page report in a text file, you would
10 send it back to them as a manager and say,
11 "Give it to me in a file that I can actually
12 use," right?
13           MR. STOFFELMAYR:  Objection to
14      the form.  Foundation.
15           THE WITNESS:  Only if I needed
16      the data in a specific format.
17 QUESTIONS BY MR. MOUGEY:
18      Q.   Sure.
19      A.   I would.
20      Q.   And that's part of the -- your
21 law enforcement background.  You would want
22 to be able to sort the data and look at it
23 and -- and analyze the data, right?
24      A.   That would be useful, yes.
25      Q.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    And it's very difficult to
2 analyze data in a text file, is it not?
3    A.    It can be done, but it's a
4 little -- it's a heavy lift.
5    Q.    Yes.
6    Now, Stahmann 9 is your -- your
7 understanding, these are shipped orders,
8 correct?
9    MR. STOFFELMAYR:  Objection to
10 the form.  Foundation.
11    THE WITNESS:  Yeah, I cannot
12 confirm whether or not these orders
13 actually shipped or were received by
14 the store.
15 QUESTIONS BY MR. MOUGEY:
16    Q.    So but you could go back at any
17 point in time and figure out whether these
18 orders were, in fact, shipped, correct?
19    A.    Yes.
20    Q.    And you would just match up
21 with the orders versus with what was shipped,
22 correct?
23    A.    That can be done, yes.
24    Q.    So someone at Walgreens even
25 today could go back and match up orders with

Page 315

1 shipments and determine whether or not there
2 were orders that weren't shipped, correct?
3    MR. STOFFELMAYR:  Objection to
4 the form.  Foundation.
5    THE WITNESS:  Only for a
6 specific time period.
7 QUESTIONS BY MR. MOUGEY:
8    Q.    And what time period would that
9 be?
10    A.    For as long as our EDW
11 warehouse houses that data or stores that
12 data.
13    Q.    Do you have any time frame what
14 that would be?
15    A.    I do not.
16    Q.    Do you recall in any of your
17 tenure at Walgreens where anyone came to you
18 and said would you be able to compare the
19 orders versus shipments to see if any orders
20 were not shipped?
21    A.    During my tenure at Walgreens,
22 yes.
23    Q.    And who was it that -- that
24 came and asked you to compare orders versus
25 shipments?

Page 316

1    A.    So currently with
2 pharmaceutical integrity, our business
3 analysts, if there is a loss that is being
4 reported to the DEA, they have to go back to
5 see if there's an operational issue of an
6 order not being posted, so they'll look to
7 see if our distributor -- what they shipped
8 to the store and what the store actually
9 posed just to make sure they match up.
10    Q.    To make sure nothing went
11 missing en route, essentially?
12    A.    In transit, correct.
13    Q.    Right.
14    So going back from '06 to --
15 prior to pharmaceutical integrity department,
16 was it at any point in time part of your job
17 to match up orders with shipments to
18 determine what, in fact, wasn't being
19 shipped?
20    A.    It was not.
21    Q.    Okay.  Do you recall any
22 reports whatsoever identifying what orders
23 weren't shipped?
24    A.    No.
25    Q.    Do you recall any part of any

Page 317

1 discussion or meeting that there was an
2 ongoing report of orders that weren't
3 shipped?
4    A.    I do not recall, no.
5    Q.    And if we wanted to figure out
6 if, in fact, any of these orders in the
7 suspicious controlled drug orders were not
8 shipped, is that possible to do today?
9    A.    Depending on the time frame, it
10 is possible.
11    Q.    How far back would you be able
12 to discern whether or not these orders were
13 actually shipped?
14    A.    Again, as long -- there's two
15 ways, so as long as our current EDW, or
16 enterprise data warehouse, stores the data
17 and also any paper copies that the pharmacy
18 may have at their pharmacy.
19    Q.    All right.  Who would be the
20 people to talk to?
21    A.    In our team, it would be Ed
22 Bratton.
23    Q.    Okay.  Now, let's go down to
24 paragraph 10 on page 26 of Stahmann 6, and
25 hold that.  We're going to come back to

Page 318

1  the -- to Stahmann 9 with the suspicious
2  controlled drug orders in a minute.
3      Okay?
4  A.   Okay.
5      MR. STOFFELMAYR:  What page are
6  you on?
7      MR. MOUGEY:  I'm on page 26.
8      THE WITNESS:  26.
9  QUESTIONS BY MR. MOUGEY:
10     Q.   If you see under paragraph 10,
11 about three-quarters of the way down,
12 left-hand side, it says, "No order identified
13 as suspicious should be filled until an
14 assessment of the order's legitimacy is
15 concluded."
16     Correct?
17 A.   I do see that.
18     Q.   And, sir, sitting here today,
19 you have no recollection of any order not
20 being shipped until the legitimacy of that
21 order was concluded, correct?
22     MR. STOFFELMAYR:  Objection to
23 the form.
24     THE WITNESS:  I do not have any
25 knowledge of any due diligence

Page 319

1      regarding orders, suspicious orders,
2      or who -- whose role or responsibility
3      that was.
4  QUESTIONS BY MR. MOUGEY:
5      Q.   Or more importantly, you don't
6  have any knowledge out of the millions and
7  millions and millions of Schedule II and III
8  narcotics in the middle of a raging opiate
9  epidemic that those orders were not shipped
10 until due diligence?  You have no knowledge
11 of one order that you could point me to
12 saying that it wasn't shipped because due
13 diligence wasn't performed?
14     MR. STOFFELMAYR:  Objection to
15     form.  Foundation.
16     THE WITNESS:  During that time
17     frame, I was not aware who the
18     individual or people were conducting
19     their due diligence about suspicious
20     orders.
21 QUESTIONS BY MR. MOUGEY:
22     Q.   So the answer to my question
23 is, yes, I can't point you to one single
24 order out of millions and millions of
25 Schedule II and Schedule III opiate orders

Page 320

1  that were not shipped because due diligence
2  wasn't performed, correct?
3      MR. STOFFELMAYR:  Objection to
4      form.
5      THE WITNESS:  I can point you
6      to a department, but I don't know
7      individuals who were actually
8      performing that task.
9  QUESTIONS BY MR. MOUGEY:
10     Q.   And which department would you
11 point me to?
12 A.   It was those individual DC SAIL
13 coordinators.
14     Q.   The next sentence in
15 paragraph 10 on page 26 of Stahmann 9 says,
16 "As such, respondent's reports consisting of
17 nothing more than an aggregate of completed
18 transactions did not comply with the
19 requirement to report suspicious orders as
20 discovered despite the title attached to
21 these reports."
22     Do you see that, sir?
23 A.   I do.
24     Q.   And, sir, you don't have any
25 information, sitting here today, that that

Page 321

1  last sentence of paragraph 10 on page 26 of
2  Stahmann 6 was inaccurate, correct?
3  A.   I do not have any information
4  in front of me today regarding that
5  statement.
6      Q.   Well, just not in front of you
7  today, but you have no information at any
8  point in time that the last sentence of
9  Stahmann 6, paragraph 10, says, "That the
10 report that you sent out is nothing more than
11 an aggregate of completed transactions that
12 did not comply with the requirement to report
13 suspicious orders as discovered despite the
14 title Respondent attached to these reports."
15 You have no information that that's an
16 inaccurate statement, correct, sir?
17     MR. STOFFELMAYR:  Objection to
18     the form.
19     THE WITNESS:  I don't have any
20     information that that is an incorrect
21     statement, no.
22 QUESTIONS BY MR. MOUGEY:
23     Q.   Sir, if you turn to page 27,
24 the paragraph 11, the next page, last
25 sentence of that paragraph, "Respondent has

Page 322

1 been unable to provide any files related to
2 any effort to adequately verify the
3 legitimacy of any particular order it shipped
4 to its customer stores."
5          Do you see that, sir?
6     A.    I do.
7     Q.    Do you have any information
8 sitting here today of where we can find the,
9 quote/unquote, due diligence files on any of
10 the suspicious orders?
11          MR. STOFFELMAYR:  Objection to
12     the form.
13          THE WITNESS:  I -- I don't know
14     where to -- where any of that
15     information would be able to be found.
16 QUESTIONS BY MR. MOUGEY:
17     Q.    And if you had -- if we had to
18 look, you would suggest that we go to the
19 distribution center management?
20     A.    That would be my personal --
21 yeah, my personal view, that would be my --
22 the first place to start.
23     Q.    Do you have kids?
24     A.    Not yet.
25     Q.    All right.  My kids are old,

Page 323

1 but we used to look at this book.  It used to
2 drive me nuts.  It's called -- name is
3 Finding Waldo or Nemo or something, and you
4 would have to look at this picture and find
5 this guy in this book, and that's kind of
6 what we feel like right now where we're
7 having to try to find within the Walgreens
8 corporate structure the answer to a lot of
9 this.
10          So you're telling me -- is it
11 Nemo or Waldo?
12          MS. POERSCHKE:  Waldo.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    Waldo.
15          So if Walgreens is the finding
16 Waldo book and we're looking for Waldo, if
17 we're trying to figure out where the due
18 diligence files on the suspicious orders, we
19 should go to the distribution centers and ask
20 them?
21          MR. STOFFELMAYR:  Objection to
22     the form.  And if you understand, go
23     for it.  I don't know what Waldo has
24     to do with anything.
25

Page 324

1 QUESTIONS BY MR. MOUGEY:
2     Q.    It's because you're not
3 looking.
4          So if you -- if you're looking
5 for Waldo and that's the due diligence files,
6 do we go to the -- do we go to the
7 distribution centers?
8          MR. STOFFELMAYR:  I'm going to
9     move to strike that weird little
10     speech, and go ahead and answer the
11     question if you remember what it is.
12          THE WITNESS:  Yes, I -- in my
13     personal belief, I would recommend
14     starting with the distribution centers
15     to find those due diligence documents
16     or reports.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    All right.  Who do the
19 distribution centers -- what was the title
20 of those -- that you told us just -- to look
21 for them?
22     A.    The SAIL coordinators.
23     Q.    Who do they report to?
24     A.    I do not know.
25     Q.    Are there -- are there

Page 325

1 organizational charts at Walgreens that -- I
2 mean, if you wanted to know as manager of
3 pharmaceutical integrity, where do you go to
4 find out, say, who the SAIL coordinators'
5 bosses are?
6     A.    There are --
7          MR. STOFFELMAYR:  Excuse me.
8     Objection to the form.
9          THE WITNESS:  There are
10     organizational charts available at
11     Walgreens, but I don't know if that
12     covers the distribution centers.
13     Obviously, now a lot of those
14     distribution centers -- a lot of them
15     have been closed, so there's no way to
16     go back and look.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    If you go back to Stahmann 9,
19 which is the report, and go to Bates
20 number 5394.  Now, let's do some -- it's
21 getting late in the day so let's do some
22 rough math for a minute.  Okay?  Let's try to
23 make it as easy as we can.
24          So the formula that identifies
25 suspicious orders that Walgreens is using as

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1  indicated here in the -- Stahmann 6 was a
2  multiple of 3.  Are we on the same page that
3  that's what Stahmann 6 indicates?  The DEA
4  formula was a multiple of 3?
5      A.    That's what it states there,
6  but, again, I don't know what that factor or
7  that formula involved.
8      Q.    Sure, and that's why I said
9  let's assume that that's -- that's accurate.
10  Okay?
11      And we can see it on Stahmann 6
12  that that's what appears to be used, correct,
13  the multiple of 3?
14      MR. STOFFELMAYR:  Objection to
15  form.
16      THE WITNESS:  It states that in
17  the document.  I don't know if that's
18  exactly how that -- the calculation on
19  these reports was used.
20  QUESTIONS BY MR. MOUGEY:
21      Q.    Well, let's just -- we're on
22  Bates number 5934, bottom of the page,
23  Suboxone is 12, times 3 is 36.
24      Do you see that?
25      A.    I do see that.

Page 327

1      Q.    Okay.  That appears to be a
2  multiple of 3, right?
3      A.    It does.
4      Q.    And then below that, "Date
5  ordered, 5/26, 5/21, 5/19, 5/14, 5/12, 5/7."
6      Do you see that?
7      A.    I do.
8      Q.    Do you see how they have
9  quantities right next to it?
10      A.    Yes.
11      Q.    And those are totaled with 43,
12  right?
13      A.    Correct.
14      Q.    Do you see the 119.44 percent?
15      A.    I do see that.
16      Q.    So if you were to compare 36
17  and 43, 43 appears to be 119 percent of 36
18  roughly, correct?
19      A.    I do see that.
20      Q.    So it appears, at least based
21  on the report in front of us that you pulled
22  out of your e-mail box, that the DEA factor,
23  at least in this report, was a multiple of 3,
24  correct?
25      MR. STOFFELMAYR:  Objection to

Page 328

1      the form.
2      THE WITNESS:  Based on all
3      those assumptions, yes.
4  QUESTIONS BY MR. MOUGEY:
5      Q.    Yes.  So let's do some rough
6  math for a second.
7      So if a pharmacy had 10,000
8  oxycodone orders per month and the month when
9  you were pulling this report it had 29,999
10  orders that month, it wouldn't be flagged as
11  a suspicious order, right?
12      MR. STOFFELMAYR:  Objection to
13      the form.  Foundation.
14      THE WITNESS:  Again, I don't
15      know what the formula -- formula was
16      used to flag orders of interest or
17      suspicion, so I can't say that based
18      on that assumption those orders would
19      appear or not appear on this report.
20  QUESTIONS BY MR. MOUGEY:
21      Q.    Well, do you see, can you flip
22  through the report and see if you see
23  anything else other than a multiple of 3?
24      A.    It will take me a while.
25      Q.    Yeah, take your time.  Why

Page 329

1  don't you flip through there and see if you
2  see anything different than a multiple of 3
3  on this sheet of paper.
4      A.    So far that appears to be the
5  case, yes.
6      Q.    All right.  Now, based on your
7  experience in the pharmaceutical --
8      MR. STOFFELMAYR:  He's still
9      looking.
10      MR. MOUGEY:  Oh, I'm sorry.
11      THE WITNESS:  Yes, they all
12      appear to be multiples of 3.
13  QUESTIONS BY MR. MOUGEY:
14      Q.    Okay.  So let's just do some
15  rough math.  All right.  It's late, so help
16  me make sure I've got this right.
17      But if in January of a given
18  year, Schedule II, OxyContin, highly
19  addictive, high probability for misuse,
20  there's 10,000 orders, dosage units, right?
21      A.    Okay.
22      Q.    And then the next month, if
23  there was 29,900, that wouldn't appear as a
24  suspicious order under the 3 multiple that
25  we're looking at in this report given to the

Page 330

1 DEA, right?
2         MR. STOFFELMAYR: Objection to
3 the form. Lack of foundation.
4         MR. MOUGEY: What's the
5 objection there, Kaspar?
6         MR. STOFFELMAYR: Completely
7 misstated how the test works. It's an
8 average -- it's a base average order,
9 not the January -- January order
10 doesn't control February order.
11        MR. MOUGEY: The base average
12 order --
13        MR. STOFFELMAYR: The average
14 order is not tied to the particular
15 store.
16 QUESTIONS BY MR. MOUGEY:
17     Q.    The base average order is
18 10,000?
19     A.    So if you're asking if that
20 particular order would be flagged --
21     Q.    Base average order of 10,000,
22 that's where we're going to start. Okay?
23     A.    Base average order of 10,000,
24 okay. And the next month there was
25     Q.    And the next month there was

Page 331

1 29,900, based on the multiple of 3 formula
2 used to generate the suspicious order report,
3 would that order be flagged?
4         MR. STOFFELMAYR: Objection to
5 the form. Foundation.
6         THE WITNESS: Each individual
7 month or order, I believe has its own
8 mathematical logic behind it, so I --
9 again, I don't know enough about that
10 mathematical formula, logic, to say
11 whether or not that order would be
12 flagged based on the quantity.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    If it wasn't 3 times the base
15 order amount, it wouldn't be flagged, right?
16        MR. STOFFELMAYR: Objection to
17 form. Lack of foundation.
18        THE WITNESS: I can't say that
19 for certain.
20 QUESTIONS BY MR. MOUGEY:
21     Q.    Who knows how this works?
22        MR. STOFFELMAYR: Objection to
23 the form. Foundation.
24        THE WITNESS: Which -- which
25 part of this?

Page 332

1 QUESTIONS BY MR. MOUGEY:
2     Q.    The formula, the 3 -- the
3 multiple of 3?
4     A.    It would be that individual who
5 created that formula.
6     Q.    And who would that be?
7     A.    That would be that Wayne
8 Bancroft individual.
9     Q.    You think Wayne Bancroft
10 created this formula?
11    A.    He did.
12    Q.    So according to the DEA on
13 page 26 in the paragraph 9, "The reports are
14 based on a formula that assigns an average
15 monthly order for a particular drug which is
16 then multiplied by a DEA factor."
17        Do you see that?
18    A.    I do see that.
19    Q.    So do you have an understanding
20 of what the average monthly order used for
21 the base to apply the DEA factor of 3?
22    A.    I do not.
23    Q.    You don't know?
24    A.    Nope.
25    Q.    You understand, and you would

Page 333

1 agree with me, that over a period of about
2 six months, every month the base average
3 order would compound to a significant number
4 potentially without creating a suspicious
5 order report, right?
6         MR. STOFFELMAYR: Objection to
7 the form. Excuse me.
8         THE WITNESS: I can't agree
9 with that. I don't know what would --
10 what logic is used to flag or to
11 populate that report with a suspicious
12 order or order of interest.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    Well, how do you know this
15 formula works?
16        So when you went into
17 pharmaceutical integrity department, you were
18 promoted with a higher salary and a new title
19 and you said, "I'm charged with complying
20 with the DEA MOU reached by Walgreens."
21        Did you believe that the order
22 in place at the time was working?
23        MR. STOFFELMAYR: Objection to
24 the form. Foundation.
25        THE WITNESS: So this formula

Page 334

1 was not used when I was part of
2 pharmaceutical integrity.
3 QUESTIONS BY MR. MOUGEY:
4     Q.    So Walgreens abandoned this
5 formula and came up with a new formula under
6 pharmaceutical integrity, correct?
7        MR. STOFFELMAYR:  Objection to
8 the form.
9        THE WITNESS:  When I was in
10 pharmaceutical integrity, this formula
11 wasn't used because Walgreens wasn't
12 part of distributing controlled
13 substances.  We had a different
14 application to identify orders of
15 interest.
16        Sorry, let me rephrase.  We
17 were beginning to get out of the
18 distribution business.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    You didn't get out of the
21 distribution business in total until 2014,
22 correct?
23     A.    I believe that's the very --
24 around the time where the very last order
25 came out of the distribution center.

Page 335

1     Q.    And as of early 2013, Walgreens
2 was still shipping Schedule IIs, correct?
3     A.    I don't know exactly.  A
4 minimal amount.
5     Q.    Are you aware of whether or not
6 Walgreens in 2012 was sending suspicious
7 order reports to the DEA?
8     A.    2012, I was aware because I was
9 still sending those reports out.
10     Q.    You were still sending those
11 reports out in 2012?
12     A.    Up and to when I transferred
13 over to pharmaceutical integrity, yes.
14     Q.    And do you have a specific
15 recollection of when that was?
16     A.    Up until early 2013, I
17 officially transitioned over in April
18 of 2013, so up and through that time.
19     Q.    So you believe all the way
20 through 2012 suspicious order reports were
21 being sent?
22     A.    Yes.
23     Q.    Sir, would you turn to
24 paragraph 13 on page 27 of Stahmann 6?
25     A.    I'm there.

Page 336

1     Q.    It says, "According to
2 documents received from Walgreens corporate
3 headquarters on April 2, 2012, Walgreens
4 revised its suspicious order policy but made
5 the policy retroactively effective to
6 January 1, 2012."
7        Do you see that, sir?
8     A.    I do.
9     Q.    Have I read that accurately?
10     A.    You have.
11     Q.    "The policy states in pertinent
12 part that effective calendar year 2012, the
13 controlled substance monitoring ordering and
14 prevention system prevents suspicious
15 controlled drugs from being shipped to the
16 stores in calendar year 2012 because of the
17 program mentioned.  Suspicious controlled
18 drugs reports are no longer generated as
19 their shipment is prevented by the system."
20        Do you see that, sir?
21     A.    I do.
22     Q.    Is that consistent with your
23 recollection of Walgreens policy in 2012?
24     A.    That is my recollection.
25     Q.    That in 2012, there were not

Page 337

1 any suspicious orders being sent to the DEA?
2     A.    My recollection is that I was
3 still burning CDs up and through to that
4 point, but I don't know if those reports were
5 populated with anything.
6        (Walgreens-Stahmann Exhibit 10
7 marked for identification.)
8 QUESTIONS BY MR. MOUGEY:
9     Q.    Okay.  So let me hand you
10 Stahmann 10.  Corey, it's P-WAG5012.
11        Just take a minute and read
12 that one.  While you're reading it, is that
13 your handwriting?
14     A.    It is not.
15     Q.    Do you know whose handwriting
16 it is?
17     A.    No, I do not.
18     Q.    All right.  I'm sorry to
19 interrupt.  Keep reading.  Let me know when
20 you're done.
21     A.    Okay.
22     Q.    All right.  I'm having trouble
23 making all of this out, but it appears, it
24 says, in the handwriting, first sentence,
25 "End effective calendar year 2012 the" -- can

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1 you make out what that next word is?
2     A.    Used title.
3         MR. STOFFELMAYR:  Oh, I thought
4 it said kettle.
5     THE WITNESS:  Could be kettle.
6         MR. STOFFELMAYR:  Your kettle,
7 used title.
8 QUESTIONS BY MR. MOUGEY:
9     Q.    "Prevent suspicious control
10 drugs from being shipped to the stores."
11         Do you see that?
12     A.    I do.
13     Q.    So according to this note, that
14 any suspicious controlled drugs just weren't
15 shipped, right?
16         MR. STOFFELMAYR:  Objection to
17 the form.
18         THE WITNESS:  I don't know
19 if -- I can't speak to whether or not
20 suspicious orders were being shipped
21 or not.  That wasn't part of my
22 responsibility back then.
23 QUESTIONS BY MR. MOUGEY:
24     Q.    In calendar 2012, because of
25 the program mentioned, suspicious controlled

Page 339

1 drug reports were no longer generated as
2 their shipment as {sic} prevented by the
3 system, right?
4     A.    I do see that written here,
5 yes.
6     Q.    So it's possible that you were
7 pulling and burning these reports on a CD in
8 2012 and they were empty?
9     A.    Yes.
10     Q.    So when you say you weren't
11 making a deep dive into these reports, is it
12 actually accurate that you weren't really
13 even looking at them?
14         MR. STOFFELMAYR:  Objection to
15 form.
16         THE WITNESS:  I can't recall
17 whether or not which reports I looked
18 into or dove into.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    And you see the part in the
21 circle underneath the text box that says,
22 "Stops reports from being made."
23         Correct?
24     A.    That's what it states here.
25     Q.    Do you believe if Walgreens'

Page 340

1 system prevents suspicious reports -- I'm
2 sorry, suspicious orders from being shipped,
3 that that complies with the DEA regs to
4 notify it of red flags or potential problems?
5         MR. STOFFELMAYR:  Objection to
6 the form.  Foundation.
7         THE WITNESS:  I can't speak to
8 whether or not Walgreens was in
9 compliance to regulations as that
10 wasn't part of my job to determine if
11 Walgreens was compliant with
12 regulations.
13 QUESTIONS BY MR. MOUGEY:
14     Q.    I know that's been your stock
15 answer all day long about that it's not part
16 of your job.  Anything about regulations, you
17 didn't know.  That wasn't part of your gig.
18 I mean, you've -- in 2013 were the manager
19 for an entire region of ensuring that DEA
20 requirements were met.  A subject matter
21 expert on DEA requirements.
22         You don't know whether a system
23 stopping from suspicious orders being sent
24 and, therefore, not reported complies with
25 the CSA requirements?

Page 341

1         MR. STOFFELMAYR:  Okay.  I'm
2     going to object and ask you to stop
3     arguing with the witness.  And
4     multiple objections to form.
5 QUESTIONS BY MR. MOUGEY:
6     Q.    Are you -- are you the subject
7 matter -- are you one of the subject matter
8 experts on all systems, applications and
9 initiatives related to inventory movement,
10 prescription monitoring and processing and
11 DEA requirements at Walgreens?
12         MR. STOFFELMAYR:  Objection to
13 the form.
14         THE WITNESS:  I was -- I am one
15 of the subject matter experts, but I
16 cannot speak to whether or not our
17 systems were compliant to DEA or
18 federal regulations.
19 QUESTIONS BY MR. MOUGEY:
20     Q.    Who do you think was
21 responsible for ensuring that the
22 prescription monitoring and processing,
23 applications, inventory movement, all
24 systems, would be responsible for ensuring
25 they complied with DEA codes and regs?

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1     A.   I would have to assume that it
2 was our compliance and legal teams.
3     Q.   So the compliance and the legal
4 teams were responsible for ensuring that the
5 DEA -- the Controlled Substance Act and the
6 regs thereunder were complied with?
7     A.   Correct.
8     (Walgreens-Stahmann Exhibit 11
9 marked for identification.)
10 QUESTIONS BY MR. MOUGEY:
11     Q.   Let me hand you what I've
12 marked as Stahmann 11.
13     This document is titled
14 "Handling Suspicious Drugs Orders."
15     Do you see that?
16     A.   "Handling Suspicious Orders,"
17 yes.
18     Q.   Yes, sir.
19     "Effective calendar year 2012,
20 the controlled substance order monitoring and
21 prevention system prevents suspicious
22 controlled drugs from being shipped to the
23 stores."
24     Do you see that, sir?
25     A.   Yes.

Page 343

1     Q.   "In calendar year 2012, because
2 of the program mentioned, suspicious
3 controlled drug reports are no longer
4 generated as their shipment is prevented by
5 the system," correct, sir?
6     A.   I do see that, yes.
7     Q.   "The logistics and planning
8 department sends the suspicious controlled
9 drug order reports to all distribution
10 centers," correct?
11     MR. STOFFELMAYR: Where are you
12 reading?
13 QUESTIONS BY MR. MOUGEY:
14     Q.   "The logistics and planning
15 department sends the suspicious controlled
16 drug orders to all distribution centers."
17     Do you see that sentence?
18     A.   I'm looking --
19     MR. STOFFELMAYR: I'm not
20 trying to be dense, but I honestly
21 don't see.
22     THE WITNESS: I don't. I don't
23 know if this is an older version.
24 That is not on this one.
25     MR. STOFFELMAYR: Exhibit 11 is

Page 344

1 different than what's on the screen.
2     MR. MOUGEY: There's two of
3 them that are almost exactly alike.
4 All right. Let me stick with the one
5 you have in front of you.
6 QUESTIONS BY MR. MOUGEY:
7     Q.   "The administration manager
8 must complete the report of theft of {sic}
9 loss controlled substances, DEA Form 106,
10 when any of the following circumstances
11 occur," correct?
12     A.   That's what it states here,
13 yes.
14     Q.   All right. So it lists DEA
15 Form 106, which is a theft of controlled
16 substances, correct?
17     A.   Yes.
18     Q.   A substantial loss, correct?
19     A.   Yes.
20     Q.   And all in transit losses are
21 thefts, correct?
22     A.   Correct.
23     Q.   Those are the shrinkage
24 instances or examples that we discussed
25 earlier this morning, correct?

Page 345

1     A.   Yes.
2     Q.   Okay. And that's what's sent
3 to the DEA, correct?
4     A.   That is what we are reported --
5 required to report for any types of loss of
6 controlled substances.
7     (Walgreens-Stahmann Exhibit 12
8 marked for identification.)
9 QUESTIONS BY MR. MOUGEY:
10     Q.   Let me hand you what I've
11 marked as Stahmann 12 titled "Handling
12 Suspicious Drug Orders."
13     "Effective calendar year 2012,
14 the controlled substance order monitoring and
15 prevention systems prevents suspicious
16 controlled drugs from being shipped to the
17 stores in calendar year 2012. Because of the
18 program mentioned, suspicious controlled drug
19 reports are no longer generated as their
20 shipment is prevented by the system."
21     Do you see that, sir?
22     A.   Yes.
23     Q.   Okay. And that sounds very
24 similar to the handwritten note we looked at
25 in two previous exhibits, correct?

Page 346

1  A.  Yes, it's very similar.
2  Q.  And the handling suspicious
3  drug orders, Walgreens' internal document
4  goes on to "the logistics and planning
5  department sends the suspicious control drug
6  ordering report to all distribution centers,"
7  right?
8  A.  That's what it says.
9  Q.  Not to the DEA, correct?
10  A.  I honestly do not know who the
11  logistics and planning department is.  I do
12  not recall that department during my time at
13  Walgreens.
14  Q.  Now, let's go back to
15  Stahmann 6, which is the big binder,
16  paragraph 13.
17  MR. STOFFELMAYR:  What page?
18  MR. MOUGEY:  Page 27.
19  QUESTIONS BY MR. MOUGEY:
20  Q.  It begins with "According to
21  documents," right?
22  We started to read this
23  earlier.
24  A.  Yes.
25  Q.  It says, "The policy states in

Page 347

1  pertinent part that effective calendar year
2  2012," and that's the statement we just read,
3  correct?
4  A.  Yes.
5  Q.  The paragraph goes on, "In
6  calendar year 2012, because of the program
7  mentioned, suspicious controlled drug reports
8  are no longer generated as their shipment is
9  prevented by the system," which is the same
10  sentence we just went through in the
11  Walgreens document, correct?
12  A.  Yes.
13  Q.  On page 28 of Stahmann 6,
14  paragraph 14, "This policy ignores the fact
15  that the reporting requirement of 21 CFR
16  Section 1301.74 B applies to orders, not
17  shipments."
18  Do you see that, sir?
19  A.  I do.
20  Q.  "A suspicious order placed by a
21  customer pharmacy is made no less suspicious
22  by application of a system designed to reduce
23  or eliminate such orders prior to shipping."
24  Do you see that, sir?
25  A.  I do.

Page 348

1  Q.  Do you agree with that
2  statement?
3  MR. STOFFELMAYR:  Objection to
4  the form.  Foundation.
5  THE WITNESS:  Based on how that
6  is written here, that can be
7  interpreted a different way.
8  QUESTIONS BY MR. MOUGEY:
9  Q.  The DEA wants to know -- go
10  back to the document we looked at this
11  morning, ferreting out potential illegal
12  activity.  They want to know about suspicious
13  orders, right?  They want to know what
14  potential problems are, correct?
15  MR. STOFFELMAYR:  Objection to
16  the form.
17  THE WITNESS:  I can't speak to
18  what the DEA is looking for in terms
19  of orders or what they're asking for
20  to investigate.
21  QUESTIONS BY MR. MOUGEY:
22  Q.  Sir, as a project manager in
23  pharmacy loss prevention, you are the subject
24  matter expert on DEA requirements.  You're
25  not aware that the DEA wants to know about

Page 349

1  suspicious orders; they want the information
2  to ferret out potential problems, correct?
3  MR. STOFFELMAYR:  Objection to
4  the form.  Foundation.
5  THE WITNESS:  Again, I can't
6  speak to what the DEA wants or what
7  their intentions are with these
8  reports.
9  QUESTIONS BY MR. MOUGEY:
10  Q.  Well, how are you the subject
11  matter expert on DEA requirements, including
12  prescription monitoring and processing, but
13  today, sitting here, you don't know whether
14  it's important that the DEA has information
15  regarding suspicious shipments?
16  MR. STOFFELMAYR:  Objection to
17  the form.
18  THE WITNESS:  I do not know if
19  the DEA -- or what information the
20  DEA -- the DEA has regarding
21  suspicious orders or shipments.
22  QUESTIONS BY MR. MOUGEY:
23  Q.  So in paragraph 15,
24  "Respondent's local DEA field office with the
25  Miami field division has not received a

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1 suspicious order report for any orders placed
2 in 2012," correct, sir?
3     A.    I do see that.
4     Q.    "Despite the fact that
5 Respondent has received and shipped multiple
6 orders that" -- "this year, using the
7 criteria Walgreens employed in 2011, would
8 have exceeded the trigger amount previously
9 used to report these sales."
10         Do you see that, sir?
11    A.    I do.
12    Q.    And, sir, this is at the same
13 exact time that a number of pill mills were
14 shut down in the state of Florida, correct,
15 sir?
16         MR. STOFFELMAYR:  Objection to
17    the form.
18         THE WITNESS:  It was around
19    that time, but I don't know when
20    specific pill mills were shut down.
21 QUESTIONS BY MR. MOUGEY:
22    Q.    And you're aware, sir, that
23 Walgreens Schedule II and Schedule III
24 dispensing went up dramatically in 2011 and
25 2012, correct?

Page 351

1         MR. STOFFELMAYR:  Objection to
2    the form.  Foundation.
3         THE WITNESS:  I can't tell you
4    where or how much of an increase of
5    prescription -- any type of
6    prescription sales increased anywhere
7    in the country.
8 QUESTIONS BY MR. MOUGEY:
9    Q.    Sir, would you please turn to
10 page number 33 of Stahmann 6 and go to
11 paragraph 23.
12         After reviewing this document
13 now, which is a -- 343 pages of orders,
14 proffered testimony from the DEA, settlement
15 agreements, let's go back to where we started
16 this morning.
17         Paragraph 23, "Voluntary
18 dispensing restrictions enacted either in
19 anticipation of or in reaction to regulatory
20 action do not indicate to me that Respondent
21 and its parent company have recognized and
22 adequately reformed the systemic shortcomings
23 discussed therein," correct, sir?
24         MR. STOFFELMAYR:  I'm going to
25    object to the form and the windup

Page 352

1 paragraph.
2         Go ahead and answer the
3    question he asked again.
4         THE WITNESS:  I don't agree to
5    that statement.  I do see that's
6    written here, but again, I don't know
7    who is making that claim or if that's
8    an accurate statement or not.
9 QUESTIONS BY MR. MOUGEY:
10    Q.    And as a result of DEA's belief
11 of the systemic shortcomings, it padlocked
12 the Jupiter distribution center, correct,
13 sir?
14         MR. STOFFELMAYR:  Objection to
15    the form.  Foundation.
16         THE WITNESS:  Again, I don't
17    know the reasoning why the DEA shut
18    down the Jupiter distribution center.
19 QUESTIONS BY MR. MOUGEY:
20    Q.    Was the DEA also looking at the
21 Perrysburg distribution center?
22    A.    I have no idea if the DEA was
23 looking at the Perrysburg distribution
24 center.
25    Q.    Would you be surprised to know

Page 353

1 if the DEA had sent a subpoena to the
2 Perrysburg distribution center in early 2012?
3    A.    It wouldn't be shocking, no.
4    Q.    I'm sorry?
5    A.    It would not be shocking.
6    Q.    Why would it not be shocking?
7    A.    In my current role, we're
8 regular -- regularly contacted by the DEA
9 with subpoenas.
10    Q.    That paragraph continues, "On
11 the contrary when a company undertakes to
12 survey its stores for regulatory compliance,
13 then selectively edits that survey for the
14 explicit purpose of avoiding evidence of its
15 own noncompliance as Walgreens apparently did
16 in May of 2011, claims of ineffective
17 remedial measures have less credibility."
18         Sir, what do you think about
19 the tone of that last sentence in the DEA
20 about Walgreens' compliance with CSA
21 regulations?
22         MR. STOFFELMAYR:  Objection to
23    the form.
24 QUESTIONS BY MR. MOUGEY:
25    Q.    Does it give you pause for

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 concern?
2          MR. STOFFELMAYR:  Objection to
3 the form.
4          THE WITNESS:  I can't speak to
5 the tone of the DEA when whoever wrote
6 this wrote this.  I mean, it's very
7 difficult for me to judge tone based
8 on words that are in -- in here.
9 QUESTIONS BY MR. MOUGEY:
10     Q.    It's difficult for you to gauge
11 tone based on words; is that your testimony?
12          MR. STOFFELMAYR:  Objection to
13 the form.
14          THE WITNESS:  In this
15 particular context, yes.
16 QUESTIONS BY MR. MOUGEY:
17     Q.    It goes on.  It says, "I gave
18 significant weight to the fact that Walgreens
19 appears to have deliberately structured
20 certain of its anti-diversion measures to
21 avoid learning about and/or documenting
22 evidence consistent with diversion."
23          Do you see that, sir?
24     A.    I do.
25     Q.    "At best, I regard this as a

Page 355

1 deliberate indifference on Walgreens' part as
2 to its obligations as a DEA registrant."
3          Do you see that, sir?
4     A.    I do.
5     Q.    Does any of those last few
6 sentences give you pause for concern about
7 DEA's conclusion regarding DEA's
8 shortcomings, fulfilling its regulatory
9 obligations?
10          MR. STOFFELMAYR:  Objection to
11 the form.
12          THE WITNESS:  I can't speak to
13 the -- what the DEA or whoever wrote
14 this, the individual that wrote this,
15 their intent or tone on how they wrote
16 this or why they wrote that.
17 QUESTIONS BY MR. MOUGEY:
18     Q.    Excuse me, Mr. Stahmann, just
19 one second.  Stahmann 6, page 7, 4B.  Let me
20 know when you get there.
21     A.    I am there.
22     Q.    Okay.  "Within five business
23 days of the effective date of this agreement,
24 DEA agrees to unlock the controlled substance
25 storage area at Walgreens Jupiter and make

Page 356

1 its contents available to Walgreens for any
2 lawful transfer or reverse distribution of
3 this inventory contained therein to an
4 appropriate DEA registrant."
5          Do you see that?
6     A.    Yes.
7     Q.    What does -- do you have an
8 understanding of what "reverse distribution
9 of inventory contained therein" mean?
10     A.    Yes.
11     Q.    What does that mean,
12 Mr. Stahmann?
13     A.    Reverse distribution would be
14 send it back to the manufacturers that the
15 product came from.
16     Q.    The DEA is saying that we'll
17 take off the padlock, but Walgreens is not
18 going to sell Schedule II and Schedule III
19 narcotics in that distribution center.  They
20 need to send them back to the manufacturer,
21 correct, sir?
22          MR. STOFFELMAYR:  Objection to
23 the form.  Foundation.
24          THE WITNESS:  I don't know if
25 that's what they mean by that.  It can

Page 357

1 be inferred, but lawful transfer can
2 mean transfer to other pharmacies or
3 other distribution centers as well.
4 QUESTIONS BY MR. MOUGEY:
5     Q.    A reverse distribution of the
6 inventory contained therein can mean send
7 back to other pharmacies?
8     A.    Lawful transfer could mean
9 that.
10     Q.    Yes, sir.
11          But DEA was not allowed --
12 going to allow Walgreens to distribute
13 Schedule II and III narcotics out of its
14 Jupiter distribution center.
15          MR. STOFFELMAYR:  Objection to
16 the form.
17          THE WITNESS:  I don't know what
18 the DEA would allow or not allow
19 Walgreens to distribute out of the
20 distribution centers.
21 QUESTIONS BY MR. MOUGEY:
22     Q.    Sir, this is at a point in time
23 when you are manager of the pharmacy
24 integrity department for Walgreens, correct,
25 sir?

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    A.   This took place before -- this
2  memorandum of agreement was signed before I
3  transferred over to pharmaceutical integrity.
4    Q.   How do you know, looking at
5  this document, when it was signed?
6    A.   I believe the memorandum --
7  from my recollection, the memorandum of
8  agreement was in place before I transferred
9  to Walgreens pharmaceutical integrity.
10   Q.   It happened almost on top of
11 it, did it not, Mr. Stahmann?
12        You started in Walgreens
13 pharmaceutical integrity department in early
14 2013, and this document was also executed in
15 early 2013, correct?
16        MR. STOFFELMAYR:  Objection to
17 form.
18        THE WITNESS:  I don't recall
19 when this document was executed or
20 signed.  I only recall when I was made
21 aware of this document, which was
22 around the time -- this document
23 existed -- I was part of
24 pharmaceutical integrity when I made
25 aware -- when I was made aware of this

Page 359

1  document.
2  QUESTIONS BY MR. MOUGEY:
3    Q.   How long after you started with
4  the pharmaceutical integrity department were
5  you made aware of this document?
6    A.   A few months.
7    Q.   Did you live in Deerfield when
8  you began with the pharmaceutical integrity
9  department?
10   A.   I did not.
11   Q.   Where did you live?
12   A.   At that time I was living in
13 Chicago.
14   Q.   And how far is Deerfield from
15 Chicago?
16   A.   I don't know miles.  The drive,
17 depending on traffic, an hour and a half,
18 hour and 15 minutes.
19   Q.   Do you have any understanding
20 of whether Walgreens' decision to get out of
21 the distribution business in 2013 and 2014
22 was because of the regulatory settlement with
23 the DEA?
24        MR. STOFFELMAYR:  Objection to
25 form.

Page 360

1        THE WITNESS:  I do not know who
2  made the decision or why the decision
3  was made.
4  QUESTIONS BY MR. MOUGEY:
5    Q.   What I asked was a little
6  different.
7        Did you have any understanding
8  of whether or not Walgreens' decision to get
9  out of distribution business in 2013 and 2004
10 {sic} was related to the settlement with the
11 DEA as we've been through here the last
12 couple of hours?
13        MR. STOFFELMAYR:  Objection to
14 the form.
15        THE WITNESS:  Again, I don't
16 know if it was related specifically or
17 solely on the memorandum of agreement.
18 QUESTIONS BY MR. MOUGEY:
19   Q.   Do you have any understanding
20 of whether the Jupiter distribution center
21 was responsible for shipping Schedule II and
22 III narcotics into Ohio?
23   A.   I am unaware.  I do not know.
24   Q.   Do you have any idea of who
25 supplied the pharmacies in Ohio with

Page 361

1  Schedule II and Schedule III narcotics?
2    A.   I believe it was Perrysburg.
3        (Walgreens-Stahmann Exhibit 13
4    marked for identification.)
5  QUESTIONS BY MR. MOUGEY:
6    Q.   I'll hand you what I've
7  marked -- I hand you what I'm marking as
8  Stahmann 13.
9        What I've put in front of you,
10 Mr. Stahmann, is a report generated out of
11 the ARCOS database.
12        All right, sir?
13   A.   Okay.
14   Q.   And the data was exported into
15 an Excel spreadsheet.  All right?
16        If you would, on Stahmann 13,
17 do you see the Walgreens, which are
18 highlighted for you, on Pearl Road in
19 Cleveland?
20   A.   I do see that.
21   Q.   All right.  So do you have any
22 independent knowledge --
23        MR. STOFFELMAYR:  You know
24 what, sorry, can we take a timeout for
25 a second?  I don't think he signed the

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  ARCOS protective order, so if this is
2  data you guys generated out of the
3  ARCOS database that includes
4  information other than about
5  Walgreens, I don't know where that --
6  I don't want to be associated with
7  messing with the DEA on this.
8     I'm going to turn this over
9  until we figure this out. I'm sorry.
10    MR. MOUGEY: Well, let's just
11 grab a -- if you're worried about it,
12 let's grab a protective order and sign
13 it.
14    MR. STOFFELMAYR: Well, I'm
15 not -- I mean, he's in the business
16 function. I mean, I can't speak for
17 anybody else, but the rule has been
18 that business people in business
19 functions aren't supposed to know
20 competitors' information.
21    MS. SWIFT: And that's under
22 the regular protective order you --
23 but, yeah.
24    MR. STOFFELMAYR: Is there a
25 way to ask him questions you want to

Page 363

1  about Walgreens without showing him
2  all the information about all the
3  other pharmacies out here?
4     MR. MOUGEY: Sure. Let's pull
5  off the front page. Take off the
6  front page of Stahmann 9 {sic}, and
7  the first page should be 19 of -- 19
8  of 414.
9     Yeah, I'm sorry. Did we go --
10 did we go off, or are we still on?
11    MR. STOFFELMAYR: Okay. So
12 Exhibit 13 is the same document minus
13 the first page?
14    MR. MOUGEY: Right. Which
15 only -- from here on out only
16 contains -- only contains Walgreens
17 data.
18 QUESTIONS BY MR. MOUGEY:
19    Q.  I will represent to you --
20 well, that the Walgreens pharmacy, you have
21 two of them that we're about ready to go
22 through, are the -- two of the largest six
23 dispensers in Cuyahoga.
24    Okay?
25    A.  Okay.

Page 364

1     Q.  So what I want you to see or
2  help me walk through here is you see the
3  company -- let's start off in the upper
4  left-hand corner.
5     You see the address, Walgreens
6  Company, 5400 Pearl Road, right?
7     A.  I see that.
8     Q.  Parma, Ohio, okay, which is in
9  Cleveland, in Cuyahoga County.
10    Underneath "Company" in the
11 left-hand column, you see "Cardinal Health"
12 and "Walgreens"?
13    A.  I do.
14    Q.  And underneath the state and
15 ZIP, you see "Cardinal Health-West Virginia"
16 and "Walgreens" with Florida 3378 {sic} and
17 Ohio 43551.
18    Right?
19    A.  I do.
20    Q.  Do you recognize the Walgreens,
21 Florida 33478 as the Jupiter distribution
22 center?
23    MR. STOFFELMAYR: Objection to
24 the form. Lack of foundation.
25    THE WITNESS: I don't based off

Page 365

1  of just that ZIP code if that is
2  referring to the Jupiter distribution
3  center.
4  QUESTIONS BY MR. MOUGEY:
5     Q.  All right. Oxycodone, you see
6  a total between Cardinal and Walgreens of
7  168,200 dosage units, correct?
8     A.  I do see that number, yes.
9     MR. STOFFELMAYR: Objection.
10 Objection to lack of foundation.
11 QUESTIONS BY MR. MOUGEY:
12    Q.  And Walgreens out of Florida,
13 163,200, correct?
14    MR. STOFFELMAYR: Same
15 objection.
16    THE WITNESS: I see that number
17 here, yes.
18 QUESTIONS BY MR. MOUGEY:
19    Q.  And that's oxycodone, correct?
20    A.  Yes, I see that number written.
21    Q.  According to what -- the
22 spreadsheet I put in front of you, correct,
23 sir?
24    A.  Yes.
25    Q.  And you see it's 2006, correct,

Page 366

1  sir?
2     A.    I do see that.
3     Q.    And do you see going down the
4  page, 2006, 2007, 2008, 2009, 2010, correct?
5     A.    I do see that.
6     Q.    And do you see the dosage units
7  going into Walgreens on 5400 Pearl Road going
8  from 168,000 to 199,000 in one calendar year,
9  2007?
10          MR. STOFFELMAYR:  Lack of
11    foundation.  Objection.
12          THE WITNESS:  I see that number
13    increased from 168 to 199 based on
14    this report, yes.
15  QUESTIONS BY MR. MOUGEY:
16    Q.    Yes, sir.
17          And that's approximately 31,000
18  dosage units, correct, sir?
19          MR. STOFFELMAYR:  Objection.
20    Lack of foundation.
21  QUESTIONS BY MR. MOUGEY:
22    Q.    Difference between the 168 and
23  the 199, right?
24    A.    Approximately, yes.
25    Q.    Yes, sir.

Page 367

1          And that's a little short of
2  20 percent increase, correct?  Calendar year
3  2006 to 2007, correct?
4     A.    It's about right, yes.
5     Q.    And in 2008, the number of
6  OxyContin dosage -- the oxycodone dosage
7  units goes from 199 to 242, correct?
8          MR. STOFFELMAYR:  Objection.
9    Lack of foundation.
10          THE WITNESS:  I see that number
11    written here.
12  QUESTIONS BY MR. MOUGEY:
13    Q.    Yes, sir.
14          And from 2006 to 2009,
15  according to the report I've put in front of
16  you, the numbers increased by approximately
17  80,000 dosage units, correct, sir?
18    A.    I do see that.
19    Q.    And if you go to 2009, the
20  number of dosage units according to this
21  report of oxycodone goes to 299,000, correct,
22  sir?
23          MR. STOFFELMAYR:  Object to
24    lack of foundation.
25          THE WITNESS:  According to this

Page 368

1  report, yes.
2  QUESTIONS BY MR. MOUGEY:
3     Q.    An increase from 2006, just
4  three years before, of 131,000 dosage units,
5  correct, sir?
6     A.    That is the increase that is
7  depicted here.
8     Q.    Yes, sir.
9          And that's approximately an
10  80 percent increase from 2006 to 2009,
11  according to this report, correct, sir?
12    A.    According to this report, yes.
13    Q.    And you can see that, at least
14  according to this report, that the -- under
15  state ZIP, the distributor changes from
16  Florida to Ohio, correct, sir, under the
17  Walgreens, correct?
18          MR. STOFFELMAYR:  Object to
19    lack of foundation.
20  QUESTIONS BY MR. MOUGEY:
21    Q.    According to this report?
22    A.    According to this report, but I
23  don't know if that's true or not.  I don't
24  have time frames of when it switched from
25  Florida to Ohio.

Page 369

1     Q.    Yes, sir.
2          And oxycodone at the bottom of
3  this page in 2010 increases to 361,000
4  according to this report, correct, sir?
5          MR. STOFFELMAYR:  Object to
6    lack of foundation.
7          THE WITNESS:  According to this
8    report, yes.
9  QUESTIONS BY MR. MOUGEY:
10    Q.    It's approximately 110,
11  115 percent increase from the year 2006 to
12  2010 of dosage units dispensed through
13  Walgreens on 5400 Pearl Road, correct, sir?
14          MR. STOFFELMAYR:  Same
15    objection.
16          THE WITNESS:  That's what it
17    states, but it does not give the
18    reasoning behind why the percentage
19    increased.
20  QUESTIONS BY MR. MOUGEY:
21    Q.    Yes, sir.
22          Would this in your role as
23  Walgreens in either loss prevention, business
24  analyst, senior analyst, pharmaceutical
25  integrity department, would an increase as

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1  indicated on this report from 168,000 dosage
2  units in '06 increasing year to year to year
3  until 361,200 in 2010, would that give you
4  pause for a concern?
5       MR. STOFFELMAYR:  Objection to
6  the form.  Lack of foundation.
7       THE WITNESS:  It would give me
8  a pause of concern if there were no
9  reasoning of why that increase
10 occurred.  There could be from just --
11 off the top of my head, a handful of
12 reasons why that increase would be
13 legitimate.
14 QUESTIONS BY MR. MOUGEY:
15      Q.    Yes, sir.
16           And would it, in your mind,
17 these increases, these annual increases,
18 caused the local distribution center to
19 perform some due diligence as to why the
20 increases year to year to year, correct, sir?
21      MR. STOFFELMAYR:  Objection to
22 the form.  Lack of foundation.
23      THE WITNESS:  I can't speak on
24 behalf of the distribution center
25 whether or not they felt that these

Page 371

1  increases would lead to or would be
2  required to perform due diligence.
3  QUESTIONS BY MR. MOUGEY:
4       Q.    Okay.  But what I'm asking is
5  you sitting here today, in all the various
6  roles that you've spent now at Walgreens over
7  approximately 12 years, would these
8  year-to-year increases of oxycodone dosage
9  units, 168,000 to 199,000 to 242,000, to
10 299,000 to 110 percent increase in a matter
11 of a few years to 361,000, cause you to want
12 to perform some due diligence or ask some
13 questions about the increase?
14      MR. STOFFELMAYR:  Objection to
15 the form.  Lack of foundation.
16      THE WITNESS:  If you're asking
17 for my particular advice on this, just
18 looking at this report, there's a lot
19 of things that I would question, like
20 on MME percentile from the state, it's
21 actually showing a decrease going down
22 from year to year.  So even though the
23 orders are going up, the percentage of
24 Walgreens medications -- the
25 percentage is lowering based on the

Page 372

1  state percentage on this report.
2       So there's a lot of questions
3  that I would have to ask to determine
4  why those orders are going up, and it
5  wouldn't necessarily mean that these
6  orders are suspicious.  There could be
7  businesses that closed down.  We could
8  have obtained buyouts or file buys
9  from other pharmacies or chains, just,
10 for instance, Happy Harry's or other
11 buyouts of pharmacy chains that we
12 acquired throughout the -- this time
13 frame.
14 QUESTIONS BY MR. MOUGEY:
15      Q.    Sure.  That would act as a
16 catalyst for you to ask questions, correct,
17 sir?
18           All of those issues you just
19 raised would be questions that you would ask
20 when looking at these numbers and increases
21 year to year, correct, sir?
22      MR. STOFFELMAYR:  Objection to
23 the form.  Lack of foundation.
24      THE WITNESS:  Personally, I can
25 say that, yes, I would ask questions.

Page 373

1  However, I can't speak on behalf of
2  the team that -- that's performed the
3  due diligence, what their take on this
4  report would be.
5  QUESTIONS BY MR. MOUGEY:
6       Q.    Yes, sir.
7            And if they did ask questions
8  and they did document their resolution of
9  their concerns, you would expect that to be
10 saved in a file in the distribution centers,
11 correct, sir?
12      MR. STOFFELMAYR:  Objection to
13 the form.  Foundation.
14      THE WITNESS:  I don't know how
15 they conducted their due diligence, if
16 there were conversations over the
17 phone or just in-person meetings.  I
18 have no idea how they performed their
19 due diligence.
20 QUESTIONS BY MR. MOUGEY:
21      Q.    Now, when you were in law
22 enforcement and you were out questioning
23 witnesses or doing surveillance, would you
24 make notes of your conversations?
25      A.    Not all the time, no.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1  Q.   And would you -- when you did
2  make notes of those conversations, would you
3  go back and look at those notes at a later
4  point?
5  A.   Possibly, yes.
6  Q.   Because when you're going to
7  review the file at maybe months down the
8  road, you want to go refresh your memory
9  about what you asked maybe months before,
10 correct?
11 A.   Personally, yes.
12 Q.   Yes, sir.
13      And it's good business practice
14 for witness interviews, any documentation,
15 mental notes, impressions, whatever questions
16 you answered in law enforcement, to make a
17 record of that, correct, sir?
18      MR. STOFFELMAYR:  Objection to
19 the form.  Foundation.
20      THE WITNESS:  I can't speak on
21 what good business practices are.  I
22 can just tell you what I did as a law
23 enforcement officer.
24 QUESTIONS BY MR. MOUGEY:
25 Q.   When you were in law

Page 375

1  enforcement and you filled out an arrest
2  report, that contained information that you
3  wrote down, correct?
4  A.   At times, yes.
5  Q.   Yes, sir.
6      And it was stored and kept in a
7  file for review at a later point, correct,
8  sir?
9  A.   Correct.
10 Q.   And at any point in time at
11 Walgreens when you were with pharmaceutical
12 integrity, have you asked anyone to go back
13 and look at due diligence files so you could
14 see what questions were -- were asked with
15 increasing dispensing?
16 A.   I did not because it was not
17 part of my job functions.
18 Q.   Was it part of anyone's job
19 functions as you were helping develop the
20 pharmaceutical integrity department to go
21 back and look at due diligence files and
22 answer questions that may pop up looking at
23 year-to-year or month-to-month dispensing
24 increases?
25 A.   I don't know if it was

Page 376

1  anybody's responsibility.
2  Q.   Sir, do you believe that one
3  metric to use when asking questions about
4  month-to-month or year-to-year increases in
5  dosage units is the percentage of Schedule II
6  and III narcotics of an overall dispensing
7  practice in a pharmacy?
8  A.   Can you restate that for me?
9  Q.   Sure.
10 A.   I was confused by the question.
11 Q.   So isn't it important to
12 understand a combination of Schedule II and
13 III, the percentage of the total dispensing
14 in that pharmacy?
15 A.   It is important based on that
16 pharmacy's business, yes.
17 Q.   Yes.
18      And do you, based on your
19 experience, have an understanding of what an
20 appropriate range is of Schedule II and
21 Schedule III percentages of an overall
22 pharmacy's dispensing practice?
23 A.   I do not know that there is a
24 standard range just because certain
25 pharmacies based on where they're located

Page 377

1  could have an increase of certain types of
2  medications.  So if it's located next to a
3  hospital, a trauma unit or a specialty site,
4  they may have an increase of certain
5  medications based on a store of similar size
6  in a different part of the country.
7  Q.   Yes, sir.
8      But part of the job of spotting
9  red flags, part of the responsibilities of
10 Walgreens to identify suspicious orders, that
11 metric would potentially be helpful, could it
12 not?
13      MR. STOFFELMAYR:  Objection to
14 the form.
15      THE WITNESS:  It is one metric
16 that could provide insight, but not --
17 it's not solely used as a red flag.
18 QUESTIONS BY MR. MOUGEY:
19 Q.   Well, I wasn't asked if it was
20 the sole use, but it is a useful metric when
21 determining if a pharmacy is out of balance
22 with having a disproportionately high
23 dispensing rate of Schedule II and
24 Schedule IIIs, correct?
25      MR. STOFFELMAYR:  Objection to

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1  the form.
2       THE WITNESS: I don't know of a
3  standard of what percentage is within
4  bounds as you stated, so I don't know
5  if -- if 20 percent, 60 percent,
6  80 percent is out of bounds because
7  there's no standard.
8  QUESTIONS BY MR. MOUGEY:
9       Q.    So in all your years at
10 Walgreens, have you ever seen a metric
11 employed to spot red flags or as a catalyst
12 for additional questions of a
13 disproportionally high Schedule II and
14 Schedule III dispensing ring?
15      A.    Throughout my career at
16 Walgreens, we have used that metric, but it
17 is not a sole -- it's not solely used.
18 There's other information that we gather.  So
19 if they have a, quote/unquote, high
20 percentage, we'll have to look at the
21 geographical location or the -- the
22 clientele, the customer base, of that
23 particular pharmacy.
24      Q.    And based on your experience of
25 using that metric, what did Walgreens use to

Page 379

1  analyze whether or not a Schedule II and
2  Schedule III dispensing rate was abnormally
3  high?
4       A.    I don't know if we had a
5  standard to determine whether or not a
6  particular store is high.  We did compare
7  them to other stores of similar size, of
8  similar geographical location, but I know we
9  tried not to compare a store of similar size
10 that was close to a trauma unit or 24-hour
11 next to a hospital of a similar size to a
12 store that is not 24-hour and not near a
13 hospital.
14      Q.    Doesn't 80 percent of the US
15 population live within a five-minute drive to
16 Walgreens?
17      A.    I have no idea if that's
18 correct.
19      Q.    Is that on Walgreens website
20 right now, if we were to pull it up, that a
21 ridiculously high number of the US population
22 lives within a very short drive of Walgreens?
23      A.    It's possible.  I have no idea
24 if that's correct.
25      Q.    Wouldn't it be useful to run a

Page 380

1  metric to understand if a Schedule II and III
2  dispensing at one Walgreens is 15, 16, 17,
3  18, 19, 20 percent versus an average of
4  Walgreens of 4 or 5 percent?
5       MR. STOFFELMAYR:  Objection to
6  the form.
7       THE WITNESS:  Again, I don't
8  want to say that we use -- that metric
9  is an important indicator or a red
10 flag for a particular pharmacy.
11 That's not -- that's not a true
12 statement.
13 QUESTIONS BY MR. MOUGEY:
14      Q.    Is it one of the metric used to
15 identify potential problem pharmacies within
16 Walgreens' system?
17      A.    It is a metric.  It is not --
18 it is a metric that is used, but it's not to
19 help identify, quote/unquote, problem
20 pharmacies within Walgreens.
21      Q.    What is it used for?
22      A.    To help identify or -- well,
23 it's used for currently with our controlled
24 substance order monitoring, if a pharmacy is
25 next to a hospital, they'll have a higher

Page 381

1  percentage of controls going into that store,
2  so we'll use that metric to set ceiling
3  limits and tolerance limits for that
4  particular store or particular stores in the
5  area.
6       Q.    What further questions do you
7  ask when it's next to a trauma center or an
8  oncology center of that Walgreens pharmacy?
9       A.    So we make sure that those
10 prescriptions are from those individual
11 hospitals and that they're written from
12 doctors in that scope.  So if -- just an
13 example, if an optometrist is writing for
14 opioid prescriptions and they're coming in at
15 wee hours of the evening, we would probably
16 question those prescriptions --
17      Q.    And --
18      A.    -- or ask the pharmacist to
19 question those prescriptions.
20      Q.    And as you ask those questions
21 and you pull the data and you get your
22 questions answered as part of the
23 pharmaceutical integrity department, where do
24 you store that information?
25      A.    A lot of it is conversations.

Page 382

1  Sometimes it's through e-mail, but a lot of
2  it is just a one-on-one conversation with the
3  pharmacist or the particular area leader,
4  district manager or health care supervisor.
5     Q.   So the pharmaceutical integrity
6  department doesn't actually go and verify
7  what percentage might be coming from an
8  oncology center or an emergency room; it's
9  just verbal conversations with the
10 pharmacist?
11    A.   A majority of it is verbal
12 conversation and we do pull data, but it's
13 not to identify prescribers of a particular
14 scope of practice.
15    Q.   If a -- if a Schedule II and
16 Schedule III has a disproportionate high
17 percentage of prescriptions at a particular
18 pharmacy, you might go and ask the pharmacist
19 to -- for some answers, correct?
20    A.   That is correct.
21    Q.   And if the answer is that "we
22 are next door to an oncology clinic,"
23 Walgreens has the ability to go and verify
24 if, in fact, the prescriptions that are
25 driving the abnormally high percentage rate

Page 383

1  are coming from that oncology center,
2  correct?
3     A.   We have the ability after the
4  prescriptions have been filled and sold to go
5  back and retroactively look at those types of
6  prescriptions, yes.
7     Q.   Yes, sir.
8         And that's not new technology.
9  Walgreens, since you started in 2006, has
10 always had the ability to go back and verify
11 if the percentage of those prescriptions
12 that's driving the abnormally high
13 Schedule II and Schedule III are coming from
14 that oncology center, correct?
15    A.   We do have that ability, yes.
16    Q.   Yes, sir.
17        But that's never been part of
18 the practice at Walgreens, to go back and
19 pull and verify on a regular basis what's
20 driving the high percentage of Schedule IIs
21 and IIIs at a particular pharmacy, correct?
22    MR. STOFFELMAYR:  Objection to
23 the form.  Foundation.
24    THE WITNESS:  Throughout
25 Walgreens, I can't speak, but as part

Page 384

1  of pharmaceutical integrity, we do
2  pull data regarding prescribers and
3  their activity or prescribing habits
4  during a specified period of time.
5  QUESTIONS BY MR. MOUGEY:
6     Q.   Yes, sir.  The question I asked
7  was a little bit different.
8         I said but the practice at
9  Walgreens, the practice meaning that the
10 requirement to go back and pull what's
11 driving the high percentage, to verify what
12 the pharmacist has said, is not an automatic
13 part of the due diligence, correct?
14    MR. STOFFELMAYR:  Objection to
15 the form.  Foundation.
16    THE WITNESS:  It is not part of
17 my specific responsibilities, but I
18 can't speak on behalf of Walgreens as
19 a whole.
20 QUESTIONS BY MR. MOUGEY:
21    Q.   And now as part of the manager
22 of the western division, you have a pretty
23 good understanding or feel of what went on
24 around the country in 2012 and '13, correct?
25    A.   I do have an understanding,

Page 385

1  yes.
2     Q.   And have you seen any evidence
3  that Walgreens would verify verbal answers
4  from a pharmacist about why their specific
5  pharmacy has abnormally high percentages of
6  Schedule II and Schedule III narcotics?
7     A.   So if I'm understanding
8  correctly, we do have policies and procedures
9  in place to help pharmacists, if they see an
10 influx of controlled substance prescriptions.
11 We do have policies and procedures in place
12 for pharmacists to reach out to our team with
13 any concerns that they may have with --
14 regarding to individual prescribers or
15 individual patients or individual
16 prescriptions.
17    Q.   All right.  That's not what I
18 asked, though.  I understand you said you
19 have policies and procedures in place to help
20 pharmacists if they see an influx of
21 controlled substance prescriptions, and they
22 can reach out to you.
23        What I'm asking is:  As the
24 pharmaceutical integrity department, have you
25 seen any evidence at Walgreens that it is

Page 386

1 verifying pharmacists' response by pulling
2 the number of prescriptions supporting that
3 the high percentage of Schedule II and
4 Schedule III is attributable to, example, for
5 that oncology clinic?
6         MR. STOFFELMAYR:  Objection to
7     the form.
8         THE WITNESS:  So if you're
9     asking me if part of my responsibility
10    is to pull that data, no, that is not
11    part of my responsibilities.
12 QUESTIONS BY MR. MOUGEY:
13    Q.    Instead, that the response or
14 the answer of the pharmacist is -- is taken
15 at face value, correct?
16        MR. STOFFELMAYR:  Objection to
17    the form.
18        THE WITNESS:  Not always, no.
19        MR. MOUGEY:  I'll tell you
20    what, if we can have a few minutes, I
21    can -- might have a little bit more,
22    but I don't know how much more I have.
23    Not too much, I think.
24        MR. STOFFELMAYR:  All right.
25    We're overdue, probably, I think.

Page 387

1         VIDEOGRAPHER:  We're going off
2     the record at 5:03.
3      (Off the record at 5:03 p.m.)
4         VIDEOGRAPHER:  We're back on
5     the record at 5:26.
6         CROSS-EXAMINATION
7 QUESTIONS BY MR. STOFFELMAYR:
8     Q.    All right.  Good evening,
9 Mr. Stahmann.  How are you holding up?
10    A.    I'm good.
11    Q.    We've been here since 9, and
12 it's 5:30 now, correct?
13    A.    Yes.
14    Q.    All right.  Why don't you just
15 start at the beginning.  Why don't you tell
16 us your full name?
17    A.    My name is Eric Stahmann.
18    Q.    Okay.  And tell us about your
19 education.
20    A.    I went to the Loyola University
21 in, I believe it was, 2006, graduated with an
22 undergraduate degree in biology, and then I
23 pursued a master's degree in criminal justice
24 and received that in 2002.
25    Q.    Where do you live?

Page 388

1     A.    I currently live in Naperville,
2 which is a suburb south -- suburb southwest
3 of Chicago.
4     Q.    Okay.  Do you have a family?
5     A.    I do have a wife who is
6 expecting our first child.
7     Q.    Let me ask you to look at what
8 was marked before Exhibit 4 to your
9 deposition.
10        Do you have that?
11    A.    I do.
12    Q.    And do you recall answering
13 some questions about Exhibit 4, which is a
14 hearing report from a House subcommittee,
15 correct?
16    A.    Yes.
17    Q.    What was the date of this
18 subcommittee hearing you were asked questions
19 about?
20    A.    According to this document, it
21 was August 28, 2001.
22    Q.    And what were you doing in
23 August of 2001?
24    A.    I was a student at Loyola
25 University.

Page 389

1     Q.    I'll ask you to flip to --
2 actually, let's put that aside.
3         When did you come to Walgreens
4 again?
5     A.    It was June of 2006.
6     Q.    And before you came to
7 Walgreens, you said you were a police
8 officer?
9     A.    That is correct.
10    Q.    How long did you do that work?
11    A.    It was under five years.
12    Q.    When you came to Walgreens in
13 2006, what was your first job?
14    A.    I was a pharmacy technician.
15    Q.    What does a pharmacy technician
16 do?
17    A.    So some of their basic
18 functions are when patients come and drop off
19 their medications or prescriptions, we would
20 enter the data into our system, get their
21 medications ready to be filled, fill the
22 prescription, get it ready for the pharmacist
23 to do product review, product verification,
24 and verify that the medication, the SID code
25 or the directions on the prescription, were

Page 390

1 accurate. I actually did inventory tests
2 where I would make sure that prescriptions or
3 medications -- I'm sorry, make sure that the
4 medications were in the rightful spot in the
5 inventory in the pharmacy.
6     Q.    Can a pharmacy technician at
7 Walgreens ever fill a prescription without
8 the pharmacist's approval?
9     A.    No.
10     Q.    And then at some point after
11 that, you answered a lot of questions about
12 time you spent as an analyst in loss
13 prevention, correct?
14     A.    Yes.
15     Q.    And briefly, what were your
16 responsibilities as an analyst in loss
17 prevention?
18     A.    My -- one of my main
19 responsibilities was to help provide
20 ancillary reports to our asset protection
21 field leaders, asset protection managers,
22 asset protection directors, ancillary reports
23 to help identify employee theft.
24     Q.    How many people were working in
25 loss prevention or asset protection at

Page 391

1 Walgreens when you were in that function?
2     A.    I can't give you an exact
3 number, but there were hundreds.
4     Q.    Did your job cross all of the
5 functions that asset protection and loss
6 prevention were working on?
7     A.    No.
8     Q.    When -- in your asset
9 protection or loss prevention job, are those
10 synonyms, just at different points in time?
11     A.    Yes.
12     Q.    Okay. In your asset protection
13 or loss prevention job, when you were working
14 on diversion issues, what kind of diversion
15 were you focused on?
16     A.    They were employee theft of
17 pharmaceuticals.
18     Q.    You were -- you were asked some
19 questions suggesting that you weren't doing a
20 very good job because you sent suspicious
21 order reports to DEA as text files.
22         Do you recall that?
23     A.    I do.
24     Q.    Did anyone ever tell you that
25 DEA had asked for the suspicious order

Page 392

1 reports in a different format?
2     A.    No.
3     Q.    If someone had asked you to
4 generate suspicious order reports in a
5 different format other than text files, would
6 you have been able to do so?
7     A.    Yes.
8     Q.    And if someone had come to you
9 and said, "DEA wants these suspicious order
10 reports in the Excel format or a different
11 format," is that something you could have
12 done?
13     A.    Depending on the format, yes.
14     Q.    Were you ever personally
15 involved in communications with the DEA about
16 what they expected or wanted from Walgreens
17 for suspicious order reports?
18     A.    Not directly, no.
19     Q.    Were there other people at the
20 company, as far as you know, who were in
21 direct communication with DEA about what they
22 expected or wanted from Walgreens on
23 suspicious order reporting?
24     A.    Yes.
25     Q.    Were you ever a manager in the

Page 393

1 loss prevention function?
2     A.    No.
3     Q.    Let's take a look at -- hold on
4 one second. Let's take a look at Exhibit 9
5 to your deposition. That is the e-mail that
6 you sent yourself, and attached to it is part
7 of a set of suspicious order reports from
8 your earlier testimony.
9     A.    I see that, yes.
10     Q.    And flip to the page with the
11 small number 394 in the bottom right.
12     A.    Okay.
13     Q.    And do you see there's some
14 information about some orders in the bottom
15 half of that page regarding a drug called
16 Suboxone?
17     A.    I do.
18     Q.    Do you remember being asked
19 some questions about these orders?
20     A.    Yes.
21     Q.    Do you have any understanding
22 of what Suboxone is used for?
23     A.    I do.
24     Q.    What is that?
25     A.    It is to help wean people off,

Page 394

1 or it's used to help people get off of opioid
2 addiction.
3     Q.    All right.  Let's look at
4 Exhibit 6 to your deposition.  That was the
5 big, bound exhibit.
6     A.    Got it.
7     Q.    And let me ask you to go to
8 page 7, using the small numbers in the lower
9 right.
10    A.    Okay.
11    Q.    And do you recall being asked
12 some questions about paragraph 4B that says,
13 "Within five business days"?
14    A.    I do.
15    Q.    It says, "Within five business
16 days of the effective date of this agreement,
17 DEA agrees to unlock the controlled
18 substances storage area at Walgreens
19 Jupiter."
20        Do you see that?
21    A.    Yes.
22    Q.    So is this an agreement to take
23 a padlock off the front door of the
24 distribution center, or is this the
25 controlled substances cage?

Page 395

1     A.    Just the controlled substances
2 cage.
3     Q.    And that's typical in a large
4 distribution center, that controlled
5 substances are stored separately in a locked
6 cage, correct?
7     A.    It's required by law, yes.
8     Q.    And it says that "DEA will make
9 the contents available to Walgreens for any
10 lawful transfer or reverse distribution of
11 the inventory contained therein to an
12 appropriate DEA registrant."
13        Do you see that?
14    A.    Yes.
15    Q.    You were asked some questions
16 about reverse distribution.
17        Do you remember that?
18    A.    Yes.
19    Q.    Were you asked any questions
20 about lawful transfer?
21    A.    I was.
22    Q.    And, in fact, did Walgreens or
23 was Walgreens permitted by DEA to send these
24 controlled substances to other Walgreens
25 distribution centers?

Page 396

1     A.    As a lawful transfer, yes.
2     Q.    Okay.  Let's talk for a few
3 minutes about your current job.
4        When did you move again to
5 pharmaceutical integrity?
6     A.    It was around April of 2013.
7     Q.    And your current job is as a
8 manager there, correct?
9     A.    Correct.
10    Q.    How many managers are there
11 today in pharmaceutical integrity?
12    A.    There are three total.
13    Q.    And you have a boss who sits on
14 top of the managers?
15    A.    Yes.
16    Q.    In your entire time at
17 pharmaceutical integrity since you joined,
18 have you ever had any responsibilities with
19 respect to controlled substances distribution
20 as opposed to dispensing?
21    A.    No.
22    Q.    What does pharmaceutical
23 integrity do?
24    A.    They have a lot of different,
25 various roles.  One of the main roles or one

Page 397

1 of the roles we do is controlled substance
2 order monitoring.  The monitoring is done by
3 applications or systems that we have put in
4 place to identify orders that either exceed
5 tolerance, which is the limit set, or exceeds
6 ceiling -- or a ceiling limit.  There are two
7 separate limits.  So if an order violates any
8 of those tolerance or ceiling limits, the
9 order is actually cut and not sent to the --
10 to be processed to be ordered.
11    Q.    Let's take -- take that in
12 small bites maybe.
13    A.    Sure.
14    Q.    Let me ask you first, come back
15 to one thing that came up earlier today.
16        You said your responsibility
17 was for the western states, correct?
18    A.    Correct.
19    Q.    Does that include the state of
20 Ohio?
21    A.    It does not.
22    Q.    You were also asked some
23 questions, it sounded like, trying to
24 embarrass you or make you feel bad, about
25 whether you were conversant with the details

Page 398

1  of Controlled Substances Act or DEA
2  regulations and what training you had
3  received on that.
4         Since you've been at Walgreens,
5  have you received any training on the
6  company's own policies and procedures?
7     A.    Yes.
8     Q.    And are the compliance and
9  legal functions involved in developing
10 policies and procedures at Walgreens?
11    A.    Yes, they are.
12    Q.    And did you tell us earlier
13 that the compliance and legal functions are
14 the ones who are responsible for making sure
15 that the company's policies and procedures
16 keep it in compliance with the law?
17    A.    That is correct.
18    Q.    You said a minute ago that one
19 of the functions of pharmaceutical integrity
20 is to help monitor controlled substances at
21 Walgreens, but did you also say that
22 Walgreens is no longer involved in the
23 distribution of controlled substances?
24    A.    That is correct.
25    Q.    So what sort of controlled

Page 399

1  substance monitoring are you talking about?
2     A.    So it's any type of order that
3  is sent to the individual pharmacy by our
4  current distributors as well as sales of --
5  prescription sales for those individual
6  stores, and we also look at some of the
7  exception reports like individual adjustments
8  made at those pharmacies on their inventory.
9     Q.    Okay.  And did you refer to a
10 tool to help you monitor controlled
11 substances?
12    A.    I did.
13    Q.    What's the name of that tool?
14    A.    We have two tools.  One tool is
15 called the CSO KPI, which is controlled
16 substance ordering KPI and the other is a
17 ceiling limits tool.  The ceiling limits tool
18 is accessible by the pharmacy staff.  The CSO
19 KPI tool is only accessible internally.
20    Q.    If a pharmacy -- a Walgreens
21 pharmacy wants to order a prescription opioid
22 medication from the distributor, do they call
23 or e-mail or go directly to the distributor,
24 or how does that work?
25    A.    They cannot.

Page 400

1         So if the store pharmacy
2  personnel, mostly the pharmacists, needs
3  additional controlled substance outside of
4  the suggested system order, they have the
5  ability to use the ceiling limit tool, as I
6  mentioned, enter into the identification
7  number, WIC, UPC, NDC, of that particular
8  medication, enter in the desired quantity.
9  That tool is realtime.  It tells whether or
10 not that desired quantity is above or below a
11 tolerance limit.  If it's above a tolerance
12 limit, it will reject the request and force
13 them to submit another form, which is a
14 controlled substance override form, which
15 then gets sent to our team in that form.  It
16 has the drug information.  It has a freeform
17 text box where the pharmacy personnel has to
18 enter information as to why they are
19 requesting that additional product.  When
20 they submit it, it actually gets sent to
21 their district manager who has to review and
22 approve it before our team is able to review,
23 approve, and/or reject.
24    Q.    Okay.  I want to break that
25 down into a couple smaller bites.

Page 401

1     A.    Sure.
2     Q.    The first part of my question
3  was the pharmacy manager -- well, let me take
4  a step back.
5         The inventory management system
6  will suggest an order, is that what you said?
7     A.    It does.
8     Q.    And if the pharmacy manager
9  thinks the suggested order is too small, does
10 that pharmacy manager go directly to your
11 distributor to get more of the product, or
12 does he go to a corporate office, or how does
13 he do it?
14    A.    So they have to actually use
15 those tools or those -- follow the policy and
16 procedures to request that, but they cannot
17 go directly to our distributor and ask for
18 that information.  All of that information is
19 funneled through our team, all those
20 requests.
21    Q.    And your team is at the
22 corporate offices in Deerfield, Illinois?
23    A.    That is correct.
24    Q.    You referred to a couple
25 different kind of limits.

Page 402

1  What's a tolerance limit?
2      A.    A tolerance limit is a limit
3  set on a particular item for a particular
4  order.  So a tolerance limit -- basically, a
5  particular drug can only be ordered, let's
6  say, the quantity of three, just throwing a
7  number out there, for a particular order.
8      Q.    And what about a ceiling limit,
9  what's that?
10     A.    A ceiling limit is another type
11 of limit that's set for a particular item,
12 and it's based on a rolling six-week
13 movement.  So if a store is near their
14 ceiling during a rolling six-week period,
15 they're not allowed to order above their
16 ceiling until the rolling time period falls
17 off.
18     Q.    How are these limits set?
19     A.    They're set systematically, but
20 there is a formula that is involved in the
21 setting of those limits.  They compare
22 peer-to-peer stores.  The tolerance limits
23 are also based on their historical
24 prescription movements, sales, receipts, as
25 well as certain aspects of that pharmacy and

Page 403

1  their geographic location.
2      Q.    Is -- are these limits the same
3  for every Walgreens store across the county
4  or in a region?
5      A.    They are not.
6      Q.    Are they different for each
7  store?
8      A.    They are.
9      Q.    If a Walgreens store or
10 Walgreens pharmacy manager wants to order
11 more than these tools will allow the pharmacy
12 to order, explain just in simple terms what
13 the manager has to do.
14     A.    There --
15     Q.    Whether it's the tolerance
16 limit or the ceiling limit for that matter?
17     A.    So there are a couple of
18 measures that they have to take.  So they
19 have to first use the ceiling limits tool.
20 If the tool rejects the request right there,
21 they have to then use a controlled substance
22 override form.  That form then gets reviewed
23 and approved by the district manager, which
24 comes to us.  We review and approve it.  If
25 they're requesting product outside their

Page 404

1  ceiling limit or puts them above their
2  ceiling limit, we have the ability to
3  temporarily increase their ceiling to allow
4  that order to come in based on a lot of
5  different factors.
6          So just, for example, the
7  hurricane kind of wiped out some of the
8  inventory at certain pharmacies in South
9  Carolina, so they had to replenish their
10 inventory.  Obviously those orders would have
11 put them above their rolling six-week
12 ceiling, so we temporarily increased their
13 ceiling to allow them to receive product to
14 get replenished.
15     Q.    When a pharmacy manager comes
16 to your team and wants -- wants an order
17 above what the limits are -- the allowed
18 limits, is that automatically allowed?
19     A.    It is not automatically
20 allowed.
21     Q.    If a manager comes to you and
22 says, "Yeah, I need more prescription opioids
23 because we just got so much business, a ton
24 of customers," will you take their word for
25 it?  Is that good enough?

Page 405

1      A.    That's not adequate, no.
2      Q.    What else would you want to
3  know?
4      A.    We would need to know what is
5  driving or what is increasing those sales, so
6  if there's a competitor that closed in the
7  area or if they've taken over -- acquired a
8  local business or a local pharmacy in the
9  area, if a clinic or a hospital opened up in
10 the area or something that is driving those
11 sales, we need to know that.  And it's not
12 just controlled substance orders that are
13 increasing.  We look at their overall
14 prescription dispensing.  So it can't be just
15 controls that are increasing.  We have to see
16 increases in other prescriptions such as
17 antibiotics and things like that, maintenance
18 medications.
19     Q.    It was suggested earlier that
20 whatever the pharmacist says, you just take
21 their word for it and don't do any kind of,
22 you know, don't check behind that.
23          Do you think that's a fair
24 characterization?
25          MR. MOUGEY:  Object to the

Page 406

1   form.
2   QUESTIONS BY MR. STOFFELMAYR:
3       Q.    Do you think that's a fair
4   characterization?
5       A.    I do not.
6       Q.    Why not?
7       A.    It's not true, so we don't
8   basically -- we don't take the word of the
9   pharmacist. We ask -- we have to use some
10  other type of data to kind of back the word
11  of what they're saying or what they're
12  putting in their statements.
13      Q.    You've referred a couple of
14  times of course -- over the course of the day
15  to target drug or good faith dispensing
16  policies.
17          Could you tell us at just a
18  high level what that means?
19      A.    Sure.
20          So our team, the pharmaceutical
21  integrity team, created these policies and
22  procedures with legal's guidance as well to
23  help pharmacists identify red flags of
24  prescriptions that they're receiving to make
25  sure that the -- not only that the

Page 407

1   prescription is for a legitimate medical
2   purpose, but also that the prescriber is
3   writing the medication within their scope and
4   also for legitimate medical purpose, and to
5   help kind of identify or bring awareness
6   around red flags around both the patient --
7   well, three things: The patient, prescriber,
8   and the prescription, and we provide the
9   store with a checklist so every time they're
10  presented with an opioid prescription, they
11  have to complete this checklist to make sure
12  that they're doing their due diligence
13  regarding good faith dispensing.
14      Q.    How do you communicate all of
15  that to your pharmacists?
16      A.    Yearly, the pharmacists are
17  given a training module, which they have to
18  go through every year, that refreshes them on
19  the good faith dispensing and target drug
20  dispensing policies.
21      Q.    If a customer shows up at a
22  Walgreens store with a prescription and the
23  pharmacist isn't comfortable filling it, is
24  the pharmacist required to fill the
25  prescription anyway?

Page 408

1       A.    No.
2       Q.    What does Walgreens expect of a
3   pharmacist who is not comfortable filling a
4   prescription?
5       A.    We expect the pharmacist to
6   refuse to fill the prescription.
7       Q.    And if the patient or the
8   patient's doctor becomes upset, who is
9   Walgreens going to back up?
10      A.    The pharmacist making the
11  decision.
12      Q.    Again, does Walgreens
13  communicate this to its pharmacists?
14      A.    Yes.
15      Q.    How is that?
16      A.    Through that training and also
17  through various communications, e-mails, if
18  they do any type of reach-out or
19  correspondence with our team as well.
20      Q.    Is your team at pharmaceutical
21  integrity involved in any compliance checks
22  for controlled substances at the pharmacies?
23      A.    Yes.
24      Q.    Tell us about that.
25      A.    So there are quarterly

Page 409

1   compliance walks. Basically they're walks
2   that either the district manager or health
3   care supervisor do on a quarterly basis.
4   They would visit a store. They're given a
5   list of -- just throwing a number, 30 to 35
6   questions, pertaining to a lot of different
7   policies and procedures within Walgreens
8   pertaining to their pharmacy. The district
9   manager or health care supervisor makes sure
10  that the pharmacist or pharmacy staff is
11  aware and knowledgeable of those policies and
12  procedures, and also to make sure that
13  they're checking to see if prescriptions have
14  the -- just, for example, the target drug
15  good faith dispensing checklists attached to
16  the prescriptions, make sure it's completely
17  filled out and also if there are any
18  refusals, prescription refusals, in a folder
19  that we have asked the pharmacist to keep.
20      Q.    In your years at Walgreens,
21  have you ever heard anyone suggest that there
22  are pharmacists filling prescriptions they're
23  not comfortable with because they thought
24  their bonus would be a little bigger at the
25  end of the year?

Page 410

1    A.    No.
2    Q.    Would that be consistent with a
3  pharmacist's professional obligations?
4    A.    Can you rephrase that?  I'm
5  sorry.
6    Q.    Sure.
7         If a pharmacist was
8  uncomfortable with a prescription but filled
9  it anyway because they thought their bonus
10  would be a little bigger at the end of the
11  year, in your experience as pharmacy tech and
12  in the field, would that be okay given a
13  pharmacist's professional obligations and
14  license requirements?
15    A.    No.  They're more concerned
16  with customer safety.
17    Q.    You made a couple comments
18  earlier today.  I would like to give you a
19  chance to elaborate a little bit about -- I
20  think you called them kiosks at Walgreens
21  stores.
22         Can you describe what you mean
23  by a kiosk?
24    A.    Sure.
25         So Walgreens has implemented a

Page 411

1  program called a safe medication disposal
2  program.  This program basically allows
3  customers to, free of charge, dispense -- or
4  dispose of their medications that are unused
5  or unwanted at 1,000 -- currently 1,088
6  locations across the chains at these kiosks.
7  And it basically looks like a mailbox, for
8  lack of a better description, and these
9  kiosks are available anytime the pharmacy is
10  open free of charge for the customers.
11    Q.    So if I have, say, extra
12  OxyContin pills left over from a prescription
13  and they're sitting in my medicine cabinet
14  and I'm worried about my teenage son's
15  friends getting ahold of those, I can take
16  them to a Walgreens and dispose of them?
17         MR. MOUGEY:  Object to the
18  form.
19         THE WITNESS:  Yes, with no
20  questions asked.
21  QUESTIONS BY MR. STOFFELMAYR:
22    Q.    You said there were, I think, a
23  bit over a thousand.
24         Are you done installing these
25  kiosks?

Page 412

1    A.    We are not.  Our goal is to get
2  to 1,500 nationwide, and there's also
3  discussions about expanding the program to
4  other states as well and also implement a
5  disposal option for non-kiosk stores.
6    Q.    Who pays for these kiosks?
7    A.    Walgreens.
8    Q.    If I go to a pharmacy, a
9  Walgreens or another pharmacy, with my extra
10  OxyContin pills, can't I just hand them back
11  to the pharmacist?
12    A.    No.  It's illegal for a
13  pharmacist to accept those medications.
14    Q.    When these kiosks fill up, do
15  you throw the pills in a dumpster behind the
16  store, or what happens?
17    A.    No, there's actually a
18  procedure in place.  Under federal
19  regulations and compliance, we are -- we have
20  partnered with a hazardous waste hauler where
21  they come and remove the contents of the
22  kiosks and ship them off to their destruction
23  facility where they're incinerated.
24    Q.    And who pays for all of that?
25    A.    Walgreens.

Page 413

1    Q.    You also said a few words
2  earlier about naloxone.  Tell us again, what
3  is naloxone.
4    A.    Naloxone is the lifesaving
5  medication that reverses the effects of
6  someone who is going through opioid overdose.
7    Q.    Is that a prescription
8  medication?
9    A.    It is.
10    Q.    Is it available at Walgreens
11  only with a doctor's prescription?
12    A.    It is not.  Walgreens has
13  worked with various state pharmacy boards and
14  other agencies to help get that medication
15  available without prescription.
16    Q.    How many Walgreens stores can
17  you go to to get naloxone?
18    A.    Every single one.
19    Q.    And will the pharmacist
20  question you about why you're buying naloxone
21  if you come in to buy it?
22    A.    No.
23         MR. STOFFELMAYR:  Go off the
24  record for one second.
25         VIDEOGRAPHER:  Going off the

Page 414

1    record at 5:51.
2       (Off the record at 5:51 p.m.)
3       VIDEOGRAPHER:  Back on the
4    record at 5:51.
5       MR. STOFFELMAYR:  All right.
6    Mr. Stahmann, it's almost six o'clock.
7    Thank you very much for your day.
8       MR. MOUGEY:  I have a couple of
9    quick follow-ups.
10      Can you hear me from here?
11      MS. SWIFT:  I just got a note
12   from somebody on the phone that they
13   can't hear anything.
14      REDIRECT EXAMINATION
15   QUESTIONS BY MR. MOUGEY:
16      Q.   Is -- naloxone, is Walgreens
17   distributing for free?
18      A.   We are dispensing it -- it is
19   not for free.  It's dependent on the
20   individual's insurance coverage.
21      Q.   So people that need naloxone
22   are paying for the naloxone, correct?
23      A.   There is a cost associated,
24   yes.
25      Q.   Yes, sir.

Page 415

1       And Walgreens is profiting from
2    the naloxone sales, correct?
3       MR. STOFFELMAYR:  Objection to
4    form.  Foundation.
5       THE WITNESS:  I don't -- I
6    don't know the contractual agreement
7    with what a reimbursement rate is for
8    naloxone.
9    QUESTIONS BY MR. MOUGEY:
10      Q.   So you're not suggesting that
11   people that need naloxone, that Walgreens is
12   supplying for free to those in need, correct?
13      A.   No, I'm not saying that.
14      Q.   Okay.  You went through a
15   series of reports.
16      Everything that you've just
17   spent the last 20 minutes describing on the
18   reports, CSO, ceiling limits and I think
19   there was a third, is -- were created and
20   implemented after the pharmaceutical
21   integrity department was implemented in 2013,
22   correct?
23      MR. STOFFELMAYR:  Objection to
24   the form.
25      THE WITNESS:  Not correct.  I

Page 416

1    believe some part of the CSO KPI was
2    in development prior to me coming over
3    to pharmaceutical integrity.
4    QUESTIONS BY MR. MOUGEY:
5       Q.   In development, but not
6    implemented, correct?
7       A.   I don't know exactly when that
8    application went into production.
9       Q.   So all of these -- these tools
10   that you were just discussing were created
11   after the settlement with the DEA, which, at
12   the time, was a record-setting amount,
13   correct, sir?
14      MR. STOFFELMAYR:  Objection to
15   the lack of foundation.
16      THE WITNESS:  I don't know when
17   exactly the CSO KPI tool was
18   implemented.  I don't know if it was
19   before or after the settlement.
20   QUESTIONS BY MR. MOUGEY:
21      Q.   The mailboxes you described for
22   dropping off unused drugs, correct?
23      A.   Yes.
24      Q.   You said there's approximately
25   a thousand?

Page 417

1       A.   Thousand 88.
2       Q.   When did those start being
3    installed at Walgreens?
4       A.   We launched in March of 2016.
5       Q.   Yes, sir.
6       Just here in the last couple of
7    years, correct, sir?
8       A.   After the regulations, the DEA
9    allowed pharmacies to collect medications,
10   yes.
11      MR. MOUGEY:  Yes, sir.  No
12   further questions.
13      MR. STOFFELMAYR:  We're done.
14      VIDEOGRAPHER:  We're going off
15   the record at 5:54 p.m.
16   (Deposition concluded at 5:54 p.m.)
17      _ _ _ _ _ _ _
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

Page 418

CERTIFICATE

I, CARRIE A. CAMPBELL, Registered Diplomate Reporter, Certified Realtime Reporter and Certified Shorthand Reporter, do hereby certify that prior to the commencement of the examination, Eric Stahmann was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
CARRIE A, CAMPBELL,
NCRA Registered Diplomate Reporter
Certified Realtime Reporter
California Certified Shorthand
Reporter #13921
Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter
#084-004229
Texas Certified Shorthand Reporter #9328
Kansas Certified Court Reporter #1715
Notary Public
Dated:  October 19, 2018

Page 419

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.  You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you.  If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 420

ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
Eric Stahmann            DATE

Subscribed and sworn to before me this _____ day of _____, 20 _____.
My commission expires: _____

Notary Public

Page 421

_ _ _ _ _ _ _
ERRATA
_ _ _ _ _ _ _

PAGE  LINE  CHANGE/REASON
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____
_____  ____  _____

Page 422

– – – – – – –

**LAWYER'S NOTES**

– – – – – – –

PAGE   LINE

| | | |
|---|---|---|
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |
| ___ | ___ | _____ |