Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE NORTHERN DISTRICT OF OHIO

 3                     EASTERN DIVISION

 4

 5   ---------------------------x

 6   IN RE: NATIONAL PRESCRIPTION ) MDL No. 2804

 7   LITIGATION                   ) Case No. 17-md-2804

 8   This document relates to:    ) Hon. Dan A. Polster

 9   All Cases                    )

10   ---------------------------x

11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12                CONFIDENTIALITY REVIEW

13      VIDEOTAPED DEPOSITION OF TINA STEFFANIE-OAK

14                 YORK, PENNSYLVANIA

15               MONDAY, MARCH 11, 2019

16                     9:34 A.M.

17

18

19

20

21

22

23

24   Reported by: Leslie A. Todd
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1    Deposition of TINA STEFFANIE-OAK, held at
2    the offices of:
3
4
5
6
7            BARLEY SNYDER
8            100 East Market Street
9            York, Pennsylvania 17401
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1    APPEARANCES (Continued):
2
3    ON BEHALF OF WALMART CORPORATION:
4        PAIGE E. ZIELINSKI, ESQUIRE (Telephonically)
5        JONES DAY
6        555 California Street, 26th Floor
7        San Francisco, California 94104
8        (415) 875-5788
9
10   ON BEHALF OF McKESSON CORPORATION:
11       ALEJANDRO BARRIENTOS, ESQUIRE (Telephonically)
12       COVINGTON & BURLING, LLP
13       850 10th Street, Northwest
14       Washington, DC 20001
15       (202) 662-6000
16
17   ON BEHALF OF HBC SERVICES:
18       PAUL M. MANNIX, ESQUIRE (Telephonically)
19       MARCUS & SHAPIRA, LLP
20       One Oxford Centre, 35th Floor
21       Pittsburgh, Pennsylvania 15219
22       (412) 471-3490
23
24

Page 3

1         A P P E A R A N C E S
2
3    ON BEHALF OF PLAINTIFFS:
4        DONALD A. MIGLIORI, ESQUIRE
5        MOTLEY RICE, LLC
6        28 Bridgeside Boulevard
7        Mount Pleasant, South Carolina 29464
8        (843) 216-9000
9
10   ON BEHALF OF HENRY SCHEIN, INC.:
11       LAUREN MORGAN FINCHER, ESQUIRE
12       JOHN P. MCDONALD, ESQUIRE
13       LOCKE LORD LLP
14       600 Congress Avenue, Suite 2200
15       Austin, Texas 78701
16       (512) 305-4700
17
18   ON BEHALF OF THE WITNESS:
19       JUSTIN A. TOMEVI, ESQUIRE
20       BARLEY SNYDER
21       100 East Market Street
22       York, Pennsylvania 17401
23       (717) 852-4977
24

Page 5

1    APPEARANCES (Continued):
2
3    ON BEHALF OF AMERISOURCEBERGEN DRUG CORPORATION:
4        SYLVIA WINSTON NICHOLS, ESQUIRE (Telephonically)
5        JACKSON KELLY, PLLC
6        150 Clay Street
7        Suite 500
8        Morgantown, West Virginia 26501
9        (304) 284-4138
10
11   ALSO PRESENT:
12       CHRIS RITONA (Videographer)
13
14
15
16
17
18
19
20
21
22
23
24

Page 6

# C O N T E N T S

EXAMINATION OF TINA STEFFANIE-OAK          PAGE

By Mr. Migliori                    12


# E X H I B I T S

(Attached to transcript)

STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE

No. 1    Plaintiffs' Amended Notice of Oral
Videotaped Deposition of Tina
Steffanie-Oak as Fact Witness for
Defendant Henry Schein          14

No. 2    Henry Schein personnel file for
Tina Steffanie-Oak, Bates
HSI-MDL-00642956 to 00642995      21

No. 3    Henry Schein Inc. Export Compliance
Program, Corporate Procedural
Manual HSI-MDL-00170080 to
00170108              27

No. 4    2012 Performance Appraisal for
Tina Steffanie-Oak, Bates
HSI-MDL-00643039 to 00643043      38

No. 5    E-mail re Need 3 embers, Bates
HSI-MDL-00552881 to 00552883      68

Page 7

E X H I B I T S (Continued)

(Attached to transcript)

STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE

No. 6    Henry Schein Regulatory affairs,
October 2017 Report, Regulatory
Affairs - Sergio Tejeda, Bates
HSI-MDL-00569496          86

No. 7    Industry Compliance Guidelines,
Healthcare Distribution Management
Association (HDMA) Industry
Compliance Guidelines: Reporting
Suspicious Orders and Preventing
Diversion of Controlled Substances,
Bates HSI-MDL-00063613 to 0063627    91

No. 8    Schein SOM Procedural Review,
Prepared for Henry Schein, Bates
HSI-MDL-00404369 to 00404373      107

No. 9    Interoffice Memorandum dated
February 14, 2014, Subject: Meeting
Minutes from our February 11, 2014
Review of the SOM audit findings,
Bates HSI-MDL-00622219 to 00622224  119

Page 8

E X H I B I T S (Continued)

(Attached to transcript)

STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE

No. 10   Interoffice Memorandum dated
December 23, 2013, Subject:
Regulatory Internal Assessment of
our DEA Suspicious Order
Monitoring/Know Your Customer
Systems and Procedures,
Bates HSI-MDL-00622244 to 00622250
and 00621989 to 00621996      122

No. 11   PowerPoint presentation entitled
"Individual Opportunity/Issue,"
Presented by Tina Steffanie-Oak,
Bates HSI-MDL-00072607      133

No. 12   2013 Performance Appraisal for
Tina Steffanie-Oak, Bates HSI-MDL-
00643069 to 00643073      150

No. 13   DEA Compliance Update, May 12, 2014,
Bates HSI-MDL-00602191 to 00602193  159

No. 14   2014 Performance Appraisal for Tina
Steffanie-Oak, Bates HSI-MDL-00643077
to 00643082              167

Page 9

E X H I B I T S (Continued)

(Attached to transcript)

STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS    PAGE

No. 15   E-mail re JDE 2316982 Frank Spendel -
do not notify DEA, Bates HSI-MDL-
0003834              173

No. 16   Code of Federal Regulations, Title 21
Food and Drugs, Chapter II. Drug
Enforcement Administration,
Department of Justice, Part 1301.
Registration of Manufacturers,
Distributors, and Dispensers of
Controlled Substances, Security
Requirements          182

No. 17   Henry Schein Inc. Follow Up Action
Report (FUAR) - Suspicious Order
Monitoring, May 19, 2014, Bates
HSI-MDL-00623318 to 00623325      186

No. 18   2015 Performance Appraisal for Tina
Steffanie-Oak, Bates HSI-MDL-
00643092 to 00643097          194

No. 19   Customer Service Imaging, Bates
HSI-MDL-00001198 to 00001210    197

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1      E X H I B I T S (Continued)

2      (Attached to transcript)

3 STEFFANIE-OAK-HENRY SCHEIN, INC. EXHIBITS   PAGE

4 No. 20   E-mail string re Charles P.

5      Virden - JDE 692579, Bates

6      HSI-MDL-00581110 to 00581111    227

7 No. 21   E-mail re Conduct Expectation -

8      2nd Verbal Warning, Bates HSI-MDL-

9      00643112 to 00643113    234

10 No. 22   Exit Interview, Bates HSI-MDL-

11      00643108 to 00643109    236

12 No. 23   Letter of Resignation, Bates

13      HSI-MDL-00643121    239

14

15

16

17

18

19

20

21

22

23

24

Page 11

1      P R O C E E D I N G S

2      -------------------

3      THE VIDEOGRAPHER: We are now on the

4 record. My name is Chris Ritona. I'm the

5 videographer with Golkow Litigation Services.

6 Today's date is March 11, 2019, and the time is

7 approximately 9:34 a.m.

8      This video deposition is being held at

9 Barley Snyder, 100 East Market Street, York, PA,

10 in the matter of National Prescription Opiate

11 Litigation, MDL No. 2804, Case No. 17-md-2804, for

12 the court of -- for the United States District

13 Court, Northern District of Ohio, Eastern

14 Division.

15      The deponent today is Tina

16 Steffanie-Oak.

17      And will all counsel please identify

18 themselves for the record.

19      MR. MIGLIORI: Good morning. Donald

20 Migliori from Motley Rice on behalf of the

21 plaintiff.

22      MR. TOMEVI: Justin Tomevi from Barley

23 Snyder on behalf of the witness.

24      MS. FINCHER: Lauren Fincher from Locke

Page 12

1 Lord on behalf of Henry Schein.

2      MS. McDONALD: John McDonald from Locke

3 Lord on behalf of Henry Schein.

4      THE VIDEOGRAPHER: The court reporter

5 today is Leslie Todd, and she will now please

6 swear in the witness.

7      MR. BARRIENTOS: I'm sorry, you have

8 counsel on the phone.

9      THE VIDEOGRAPHER: Oh, my apologies. Go

10 ahead.

11      MR. BARRIENTOS: This is Alejandro

12 Barrientos from Covington & Burling for McKesson.

13      MR. MANNIX: Paul Mannix with Marcus &

14 Shapira for HBC Services.

15      MS. WINSTON: Sylvia Winston for

16 AmerisourceBergen Drug Corporation from Jackson

17 Kelly.

18      THE VIDEOGRAPHER: Anyone else? Okay.

19      TINA STEFFANIE-OAK,

20   and having been first duly sworn,

21   was examined and testified as follows:

22      EXAMINATION

23 BY MR. MIGLIORI:

24   Q   Good morning.

Page 13

1   A   Good morning.

2   Q   My name is Don Migliori. I will be

3 asking you questions today.

4      I think we're situated in a way where we

5 should be able to hear each other pretty well, but

6 if you don't hear me or if you don't understand my

7 question, just let me know --

8   A   Okay.

9   Q   -- and I'll rephrase.

10      Have you ever had your deposition taken

11 before?

12   A   No.

13   Q   Okay. The most important rule for you

14 is the court reporter is taking both of our words

15 down. So it's critically important to not speak

16 until I'm finished, and I'll do the same for you.

17   A   Okay.

18   Q   It will also give your counsel an

19 opportunity to interpose an objection if necessary

20 and give you instruction if necessary.

21      But if you answer my question, I'll

22 assume you've understood it. Okay?

23   A   Yes.

24   Q   Okay. The other helpful tip is that

Page 14

1  gestures are not easily recorded, so I'll just ask
2  you to verbally respond.  If it's yes, please say
3  "yes"; no, "no," and then the like.
4       Do you have any questions before we get
5  started?
6     A   No.
7       (Steffanie-Oak Exhibit No. 1 was
8       marked for identification.)
9  BY MR. MIGLIORI:
10    Q   Okay.  Let me show you what's been
11 marked as Exhibit 1.  This is just the notice for
12 today.  The copy I give you will be the one with
13 the blue sticker.
14    A   Okay.
15    Q   And then I'll pass out copies to other
16 folks.
17      You understand you're here today in
18 litigation that's pending in the Northern District
19 of Ohio?
20    A   Yes.
21    Q   Okay.  And we're going to primarily be
22 speaking about your time working at Henry Schein.
23      When were you received -- or when did
24 you receive notice of this deposition?

Page 15

1     A   January.  This January.
2     Q   Okay.  And who contacted you about that?
3     A   I first was contacted by Sergio Tejeda
4  of Henry Schein to let me know that there was a
5  chance that I may be called for a deposition, and
6  had given Henry Schein counsel my phone number to
7  contact me, and then Margie Hahn reached out to me
8  in January.
9     Q   Okay.  And did you talk substantively
10 with Mr. Tejeda about your testimony?
11    A   No.
12    Q   And then you said Margie contacted you
13 later?
14    A   Correct.
15    Q   And when you spoke with Margie, was
16 anything substantive discussed about your
17 testimony?
18    A   No.
19    Q   When was the first time you met with any
20 counsel to talk about the substance of your
21 testimony?
22    A   Yesterday.
23    Q   And who did you speak with?
24    A   I spoke with my attorney, Justin, and

Page 16

1  then also counsel from Locke Lord, John and
2  Lauren.
3     Q   How long did you meet yesterday?
4     A   Five hours.
5     Q   And what did you review?  Generally
6  speaking.
7     A   Just some documentation.
8     Q   Was the documentation provided to you to
9  review?
10    A   Yes.
11    Q   Did you bring anything with you to
12 review?
13    A   No.
14    Q   Did you review any testimony of prior
15 witnesses?
16    A   No.
17    Q   You didn't read any transcripts --
18    A   No.
19    Q   -- or any -- did you speak to any other
20 people at Henry Schein about your testimony today?
21    A   No.
22    Q   Other than the five hours you spent
23 yesterday and the documents that you reviewed, did
24 you do any other preparation for today?

Page 17

1     A   No.
2     Q   You're here represented by counsel,
3  correct?
4     A   Correct.
5     Q   And how did you retain counsel?
6     A   Through Henry Schein.
7     Q   Okay.  So you had no prior relationship
8  with your counsel before this deposition?
9     A   Correct.
10    Q   And I assume Henry Schein is paying for
11 your counsel to be here?
12    A   Correct.
13    Q   Okay.  Let's start by having you again,
14 could you please tell the jury your full name and
15 where you reside.
16    A   Sure.  Tina Steffanie-Oak, and I reside
17 in Mount Wolf, Pennsylvania.
18    Q   Who is your employer?
19    A   Integra Life Sciences.
20    Q   And what's your job?
21    A   International Regulatory Affairs
22 manager.
23    Q   Generally speaking, what does that mean?
24    A   I work for a medical device firm, so I

Page 18

1  assist with product registrations to market
2  products in countries outside the U.S.
3     Q   In your current position, do you do any
4  work with pharmaceuticals?
5     A   No.
6     Q   And you started this job when?  When did
7  you start this job?
8     A   At Henry Schein?
9     Q   No, this job here.
10    A   This particular job?
11    Q   Yeah.
12    A   2012.  March 2012.
13    Q   And you --
14       MR. McDONALD:  Well, let me just tell
15  you, Don, I think she --
16       MR. MIGLIORI:  Yeah, I think she'd
17  have -- yeah.
18  BY MR. MIGLIORI:
19    Q   When did -- when did you start your job
20  with your current employer?
21    A   Oh, I'm sorry.  With my current employer
22  was November 17, 2016.
23    Q   And was that immediately after you
24  resigned from Henry Schein?

Page 19

1     A   Yes, it was.
2     Q   Now, you started at Henry Schein in
3  2004?
4     A   Correct.
5     Q   All right.  So we'll spend most of today
6  talking about from 2004, November of 2004 to
7  November of 2016.
8        But before we get to that, tell me about
9  your educational background.
10    A   I have a bachelor's in business
11  management.
12    Q   From where?
13    A   From Dowling College.
14    Q   And when did you graduate?
15    A   1998, May.
16    Q   Okay.  And what was your first
17  employment after that?
18    A   I was -- well, I went to school in the
19  evening, night, so I was employed.
20    Q   And where were you working?
21    A   Olympus America.
22    Q   What were you doing at Olympus?
23    A   I was an associate manager for a medical
24  device company.

Page 20

1     Q   And what did --
2     A   Regulatory affairs.
3     Q   I'm sorry.  And what did that entail?
4     A   510(k) submissions, again, related to
5  product approvals in the U.S.; assisting with FDA
6  inspections; writing procedures; approving
7  labeling.
8     Q   And at that time all of your work was
9  with medical devices?
10    A   Correct.
11    Q   Prior to joining Schein, had you done
12  any work in the area of pharmaceuticals?
13    A   No.
14    Q   How long did you have the job at
15  Olympus?
16    A   Almost seven years.
17    Q   How did you transition from Olympus to
18  Henry Schein?
19    A   Olympus announced that they were going
20  to be moving their headquarters from Long Island,
21  New York, to Pennsylvania, and at that point in
22  time I wasn't open to relocation.  I wanted to
23  stay on Long Island.  So I searched for open
24  employment, and I received the position at Henry

Page 21

1  Schein.
2        (Steffanie-Oak Exhibit No. 2 was
3        marked for identification.)
4  BY MR. MIGLIORI:
5     Q   All right.  Let me show you
6  Exhibit No. 2.  This was provided to me as your
7  employment file or -- and I'm not going to ask you
8  a lot of questions about it, but there are -- just
9  to get some background.
10       If you look on the bottom right corner
11  of these pages, you'll see that there's something
12  called a Bates number, and I'll generally refer to
13  the last three numbers.
14       So it says 971 on the page that I'm
15  looking at.  So if you look --
16    A   Oh, I'm sorry.  Yes.
17    Q   Okay, we're on the same page?  Okay.
18       Is this your application for employment
19  at Schein?
20    A   Yes.
21    Q   And this is dated October 8th, 2004.
22  Does that sound to be around the time that you
23  applied for this position?
24    A   Yes.

Page 22

1    Q    It says "Employment desired," it says
2    "Senior RA Analyst."  Is that correct, on the
3    bottom?
4    A    Correct.
5    Q    What is a senior RA analyst?
6    A    It's not a managerial position so I did
7    not have staff reporting to me, so it was a
8    professional level position.
9    Q    And what were your responsibilities in
10   that position?
11   A    At Henry Schein at that time?
12   Q    Yes, mm-hmm.
13   A    Okay.
14   Q    Well, what -- what is it that you
15   believed you were applying for, what position?
16   A    At the point in time that I actually
17   applied, there wasn't an open job description.  I
18   knew someone who had handed in my resume.  So at
19   that point in time there were -- based on my
20   qualifications and an acquisition that they were
21   dealing with, my skill set was something that they
22   were looking for.  So 510(k) submissions again,
23   helping them understand those.
24   Q    Who was the person that you knew there?

Page 23

1    A    I didn't know him directly.  It was
2    through a colleague at Olympus.  Amit Raksit.
3    Q    And so you applied for this position,
4    and it looks like in your application you
5    reference a couple other earlier employments.
6    From '93 to '98 --
7    A    Yes.
8    Q    -- does it say Qosina?
9    A    Correct.
10   Q    What is that?
11   A    They were a medical component
12   distributor.
13   Q    And what did you do for them?
14   A    I was their quality assurance manager.
15   Q    And those are medical devices?
16   A    Medical components, yes.
17   Q    Were they covered by FDA medical device
18   regulations, as you understand them?
19   A    No.
20   Q    All right.  And what kind of components?
21   What did they go to?
22   A    A lot of components were for the IV
23   sets.
24   Q    Okay.  Again, no pharmaceutical

Page 24

1    background in that position, correct?
2    A    Yes.  Correct.
3    Q    And before that, from 1988 to '93, it
4    says Lanner.  Is that right?
5    A    Langer.
6    Q    Langer.  And what did you do at Langer
7    from '88 to '93?
8    A    I started off as an administrative
9    assistant, and then I was promoted into a -- an
10   associate quality role.  They were also a medical
11   company, and at the time that I was promoted, they
12   were introducing some products that were FDA
13   regulated at that time.
14   Q    Okay.  Again, nothing at Langer that was
15   related to pharmaceuticals, correct?
16   A    Correct.
17   Q    And so it's fair to say that in your
18   employment history prior to joining Henry Schein,
19   you had no experience or background relative to
20   pharmaceuticals or specifically controlled
21   substances, correct?
22   A    Correct.
23   Q    The position that you were hired into --
24   let's see.  I think I'm -- well, let me ask you

Page 25

1    this.  If you turn to the page that's got the
2    Bates numbers 973.  Do you see that?
3    A    Yes.
4    Q    Is this the curriculum vitae that you
5    submitted to Henry Schein when you first applied?
6    A    Yes.
7    Q    And to the best of your recollection,
8    this would describe your work history leading up
9    to that application?
10   A    Yes.
11   Q    And it includes Olympus, Qosina and the
12   Langer Biomechanics Group, correct?
13   A    Yes.
14   Q    All right.  There's a page that ends in
15   976.  Are you on that page?
16   A    Yes, I am.
17   Q    Okay.  This is dated October 18th, 2004,
18   and it appears to be an offer letter for
19   employment at Henry Schein.
20        Does that document look familiar to you?
21   A    Yes.
22   Q    And these are the terms under which you
23   were employed or hired by Henry Schein in October
24   2004?

Page 26

1    A   Yes.
2    Q   And you were to begin work, as I
3 understand from the rest of your file, on the
4 first paragraph of this, effective November 1st,
5 2004, reporting to Maurizio Romano, quality
6 assurance manager?
7    A   Correct.
8    Q   And again, this letter generally
9 describes your offer and the expectations and
10 responsibilities as you understood them when you
11 signed on to hire at Henry Schein, right?
12   A   Correct.
13   Q   It's signed by Joanne Gianninoto, human
14 resource specialist.  And on the last page ending
15 in 978, that is your signature dated October 21st,
16 2004, correct?
17   A   Yes.
18   Q   All right.  So you hire in at Schein
19 effective November 1st, 2004, and your background
20 at this point is in medical devices, correct?
21   A   Correct.
22   Q   And you are to then report to
23 Mr. Romano, correct?
24   A   Correct.

Page 27

1        (Steffanie-Oak Exhibit No. 3 was
2        marked for identification.)
3 BY MR. MIGLIORI:
4    Q   Exhibit 3, I'm just going to have you
5 look at.  It's entitled "Henry Schein Export
6 Compliance Program Corporate Procedural Manual."
7 I'll tell you it's dated July 10th, 2007, so this
8 is a little less than three years after you're
9 hired.
10       I want to show you an organizational
11 chart that's on page 083.  Just take a second to
12 familiarize yourself with that.
13   A   (Peruses document.)
14   Q   Okay?
15   A   Yes.
16   Q   All right.  Is this the flowchart that
17 would have been also applicable once you hired in?
18 That is, would this be true as of November of
19 2004?
20       MS. FINCHER:  Object to form.
21 BY MR. MIGLIORI:
22   Q   In terms of your role, not everybody
23 else's role.
24   A   Yes.

Page 28

1    Q   Okay.  So here it says "The Regulatory
2 Affairs Organizational Chart."  The Corporate
3 Compliance and Security Services, L. David.
4        Was L. David there when you hired on?
5    A   Yes.
6    Q   And he was -- was he then the senior
7 vice president and chief compliance officer?
8    A   Yes.
9    Q   Did Mr. DiBello report to him at that
10 point, do you know?
11   A   Yes.
12   Q   And underneath Mr. DiBello, there are
13 five different areas.  One is called Regulatory
14 Affairs, and you mentioned Sergio Tejeda earlier
15 -- earlier.
16       You were at that point, 2004 through
17 2007, were not part of that part of Henry Schein,
18 correct?  You were not in Regulatory Affairs,
19 correct?
20   A   Correct.
21   Q   Now, you were under a caption or heading
22 called "Quality Assurance" with Maurizio Romano as
23 quality manager, and then it lists you as a
24 corporate quality assurance senior regulatory

Page 29

1 specialist.  Is that your title?
2    A   Correct.
3    Q   And what did that -- what did that
4 entail for you?
5    A   I was involved in acquisitions for
6 medical device companies, so I would do due
7 diligence.  I also would perform audits of
8 suppliers and internal -- Henry Schein sites or
9 subsidiaries.  I was responsible for labeling
10 approval of corporate branded products, and I also
11 was responsible for supplier approvals.
12   Q   These were all for medical devices,
13 correct?
14   A   Some of the suppliers may have sold
15 pharmaceuticals, so it could have been a
16 combination, and supplier approvals.
17   Q   Okay.  What would your roles have been,
18 if any, with those suppliers as they related to
19 controlled substances?  If you had any.
20   A   I did not have any as far as controlled
21 substances.  Only Rx pharmaceuticals.
22   Q   Okay.  So it's fair to say that from
23 2004, at least through this date, 2007, you were
24 not in any way involved with DEA compliance,

Page 30

1 suspicious order monitoring or anything like that,
2 correct?
3     A   Correct.
4     Q   And this position you held for how long?
5     A   That was held until March of 2012.
6     Q   Okay.  So I have about ten different
7 appraisals in front of me here that I can avoid
8 with this one question.  I'm giving you incentive.
9     A   Okay.
10     Q   It's fair to say that from 2004 through
11 2012, all of your responsibilities were outside
12 the realm of controlled substances, correct?
13     A   Up until 2012, correct.
14     Q   Okay.  And your role at Henry Schein was
15 more directly related to or consistent with the
16 prior work you had been doing at Olympus in terms
17 of FDA regulatory applications, compliance, things
18 like that, correct?
19     A   Correct.
20     Q   At this point, through 2012, you had not
21 dealt with the DEA at all, correct?
22     A   Correct.
23     Q   And you had not dealt with any
24 Controlled Substances Act requirements, correct?

Page 31

1     A   Correct.
2     Q   And your role at Henry Schein in quality
3 assurance was distinct from the role of those that
4 reported to Sergio Tejeda in Regulatory Affairs,
5 correct?
6     A   Correct.
7     Q   All right.  In 2012, you transitioned
8 over to a position in Regulatory Affairs, correct?
9     A   Correct.
10     Q   Tell me about how that came about.
11     A   I was offered a promotion from Mike
12 DiBello and Sergio Tejeda.  So they approached me
13 about this position.
14     Q   Okay.  And what did they approach you --
15 what did they tell you?
16     A   I had been with the company for a number
17 of years, so there had been previous discussions
18 that I did want some advancement within the
19 company.  So when they approached me about this
20 position, you know, they indicated that I was a
21 loyal employee, they felt that this was something
22 that I could handle, and they explained what the
23 position was.
24     Q   Did they explain it to be?

Page 32

1     A   Being responsible for DEA compliance.
2     Q   All aspects of DEA compliance or a
3 particular area?
4     A   Basically for the Henry Schein
5 distribution centers, the sites that distributed
6 controlled substances.
7     Q   And how would you go about dealing with
8 DEA compliance for the distribution centers?  How
9 did they explain it to you?  Did they tell you it
10 involved travel?  Did they tell you it involved
11 meeting with the DEA?  What -- what more
12 specifically can you remember, if anything?
13     A   They did indicate that some travel would
14 be involved.  They did mention about customer site
15 visits, that I would be involved in those.
16     Q   What did they tell you, if anything,
17 about the recently implemented Suspicious Order
18 Monitoring Program?
19     A   During that conversation, that didn't
20 come up.
21     Q   At that -- during that conversation, did
22 they talk to you at all about the "Know Your
23 Customer" due diligence project that was then
24 ongoing?

Page 33

1     A   I don't recall.
2     Q   Were you asked at any point in that
3 initial conversation or before you took the
4 position to take over the catchup project for the
5 due diligence files for existing controlled
6 substance customers?
7        MS. FINCHER:  Object to the form.
8 BY MR. MIGLIORI:
9     Q   Go ahead.
10     A   During the conversation when they
11 offered the position, correct?  Was that the
12 question?
13     Q   Initially, yes.
14     A   No.
15     Q   When did they first ask you to assume a
16 position, if they did, where you would be
17 responsible for the due diligence project?
18     A   Can I ask for clarification?  So
19 specific to --
20     Q   Controlled substances.
21     A   Just generally the responsibility.
22     Q   Yes.
23     A   So due to the fact that I didn't have
24 prior experience in this area, it was something

Page 34

1 that I had to be trained into. So it wasn't an
2 immediate takeover of that responsibility.
3    Q   Okay.
4    A   So I probably -- at the point that I
5 became more heavily involved in it would have been
6 the summer of 2012. So around the August --
7    Q   Okay.
8    A   -- time frame.
9    Q   So who is it that trained you on due
10 diligence?
11    A   Multiple sources.
12    Q   And who are they?
13    A   Internally through Henry Schein, I
14 shadowed with Mike DiBello, Sergio Tejeda, Craig
15 Schiavo.
16       We also worked with external
17 consultants, Pharma Compliance, and Buzzeo,
18 Cegedim. I also attended multiple outside
19 industry conferences that were available. So I
20 attended HDMA, the Cegedim PDMA conference that
21 they hold. If there were any DEA conferences that
22 were being held, I also attended those. And then
23 we -- I also joined NADDI, but I'm not sure if it
24 was in that exact time frame.

Page 35

1    Q   Okay. So I understand there were
2 essentially three sources of training. There was
3 internal training, primarily with Mr. DiBello and
4 Mr. Tejeda. There was some training with third-
5 party vendors, including Buzzeo. And then you
6 went to some conferences, including the Buzzeo
7 conferences, HDMA, potentially DEA.
8       Is that generally --
9       MS. FINCHER: Object to form.
10 BY MR. MIGLIORI:
11    Q   -- what you testified to was the sources
12 of -- of information?
13    A   Yes.
14    Q   Do you believe you did all of that in
15 2012 or is this over time? Was this sort of on
16 the job?
17    A   It was continual.
18    Q   Okay. But it started in 2012.
19    A   Correct.
20    Q   And who was performing the due diligence
21 task, if anybody, when you were first introduced
22 to that responsibility?
23       MS. FINCHER: Object to the form.
24       THE WITNESS: I -- I will need you to be

Page 36

1 more specific.
2 BY MR. MIGLIORI:
3    Q   Was it -- was there somebody else
4 primarily responsible for the due diligence
5 project when you first were asked to move over to
6 Regulatory Affairs?
7       MS. FINCHER: Object to form.
8       THE WITNESS: I guess I wouldn't
9 consider it a project. The process itself starts
10 with the department, our Verifications department
11 in Henry Schein. And then also Regulatory Affairs
12 would be involved in that process.
13 BY MR. MIGLIORI:
14    Q   Okay. Maybe I -- that's a fair point.
15 Let me approach it this way.
16       You realize that by 2012 that Henry
17 Schein had come to the realization that they had a
18 lack of due diligence, both for onboarding new
19 customers and for existing customers, correct?
20    A   No.
21    Q   There was a deficiency.
22       MS. FINCHER: Object to the form.
23       THE WITNESS: No.
24 BY MR. MIGLIORI:

Page 37

1    Q   Okay. You -- you were not told of any
2 deficiency at Henry Schein in terms of the
3 completeness of due diligence files for your
4 customers in 2012?
5    A   No.
6    Q   All right. So no one shared with you
7 any of the third-party audits about the lack of
8 completeness with new customer questionnaires and
9 due diligence?
10       MS. FINCHER: Object to the form.
11       THE WITNESS: Not that I recall.
12 BY MR. MIGLIORI:
13    Q   All right. And nobody shared with you
14 any of the reactions to the HDMA guidances
15 relative to due diligence?
16       MS. FINCHER: Object to the form.
17       THE WITNESS: Yes, they did, as far as
18 the guidance that HDMA was giving to the industry
19 and understanding the need for the process, but it
20 was more putting more resources into the process.
21 BY MR. MIGLIORI:
22    Q   Okay. And -- and was that what you
23 understood your role to be, was to be additional
24 resources into the process?

Page 38

1  A   Yes.
2      (Steffanie-Oak Exhibit No. 4 was
3      marked for identification.)
4  BY MR. MIGLIORI:
5      Q   Let's look at your -- I just gave you
6  Exhibit No. 4.  This is your 2012 performance
7  appraisal.
8      Do you recognize that to be you?
9      A   Yes.
10     Q   Okay.  Let me ask you to turn to the
11 second page in particular.
12     Now, by the end of 2012, you have now
13 moved over to Regulatory Affairs, correct?
14     A   Correct.
15     Q   And this is the first time that you're
16 dealing with controlled substances in any job
17 description, correct?
18     A   Correct.
19     Q   How did you educate yourself on what
20 the -- the law is?
21     A   I read the CFR.
22     Q   Okay.  So you know what the -- you then
23 learned in this position what the Controlled
24 Substances Act required of a distributor?

Page 39

1      A   Correct.
2      Q   And you understand that under the
3  statute and the regulations, the distributors are
4  referred to as DEA registrants?
5      A   Correct.
6      Q   And part of the obligations of the
7  registrants then and today is to design and
8  operate a system for the detection of suspicious
9  orders, correct?
10     A   Correct.
11     MS. FINCHER:  Object to form.
12 BY MR. MIGLIORI:
13     Q   And a component part of that obligation
14 is an ongoing obligation to know your customer and
15 perform due diligence, correct?
16     A   Correct.
17     MS. FINCHER:  Object to the form.
18 BY MR. MIGLIORI:
19     Q   And that due diligence starts with
20 bringing a new client on board into the company,
21 correct?  A new customer, correct?
22     A   Correct.
23     Q   And as of 2012, nobody shared with you
24 any third-party observation that the only due

Page 40

1  diligence being performed at Henry Schein for a
2  new customer was just verifying a DEA license?
3      MS. FINCHER:  Object to form.
4      THE WITNESS:  No.
5  BY MR. MIGLIORI:
6      Q   If that were true, is that something you
7  would have liked to have seen?
8      A   Yeah --
9      MS. FINCHER:  Object to the form.
10     THE WITNESS:  Yes.
11 BY MR. MIGLIORI:
12     Q   All right.  Let's look at your comments.
13 It says:  "Tina had a very challenging but
14 successful year.  She transitioned into the
15 Regulatory operations team and took over
16 responsibilities for the company's DEA
17 compliance."
18     Is that a true statement?
19     A   Yes.
20     Q   So this is at this point the first time
21 you've ever dealt with DEA compliance, correct?
22     A   Correct.
23     Q   "Tina's promotion to supervisor of
24 Regulatory operations was complicated in that one

Page 41

1  of her team members was out on medical leave and
2  the other left the company just a few months after
3  Tina taking over.  She has really done a great job
4  adjusting to the situation and putting together a
5  new team."
6      Do you recall who the new team was that
7  you put together?
8      A   Yes.
9      Q   Who was that?
10     A   Ken Romeo.  Glenn Lonnquist.
11     Q   Anyone else?
12     A   Not at that time.
13     Q   Okay.  And were these new hires or did
14 you pull them over from other areas?
15     A   They were new hires.
16     Q   And did you interview them?
17     A   Yes.
18     Q   "Regardless of these complications, Tina
19 was able to manage and maintain the DEA 'Know Your
20 Customer' process backlog to a minimum."
21     You realize that as of 2012, that Schein
22 had a backlog in its "Know Your Customer" due
23 diligence.
24     MS. FINCHER:  Object to the form.

Page 42

1 BY MR. MIGLIORI:
2    Q   Correct?
3    A   Correct.
4    Q   And so, "Tina has demonstrated to be a
5 good manager and successfully completed/managed
6 the following major projects/initiatives: One,
7 took over DEA compliance management
8 responsibilities and hired two Regulatory
9 specialists for her team."
10    We just discussed that.
11    "Two, established herself as a
12 Regulatory contact with the Verifications and
13 Operations team for the DEA issues."
14    So at this point, did you become the
15 contact person for folks in the Verifications
16 department?
17    A   Yes.
18    Q   And at that time was Shaun Abreu the
19 head of the Verifications department?
20    A   He was -- he wasn't the head of the
21 department, but he was -- he was in the
22 department, yes. He was my contact.
23    Q   Okay. Who was the head of the
24 department?

Page 43

1    MS. FINCHER: Object to the form.
2    THE WITNESS: It would be Bill Brandt,
3 because that's who he would have reported into
4 eventually.
5 BY MR. MIGLIORI:
6    Q   Okay. But your contact with
7 Verifications was Shaun, correct?
8    A   Correct.
9    Q   You developed new and enhanced existent
10 policies and procedures related to the HSI
11 Suspicious Order Monitoring System and "Know Your
12 Customer" function.
13    What new -- let's start with new. What
14 new policies and procedures did you bring to Henry
15 Schein's Suspicious Order Monitoring System and
16 "Know Your Customer" function?
17    MS. FINCHER: Object to the form.
18    THE WITNESS: It was related to the
19 "Know Your Customer" due diligence process. So
20 there were enhancements to the questionnaires that
21 we would use to send to the customers, the "Know
22 Your Customer" form. Also developing audit
23 checklists that we would use during site --
24 customer site visits.

Page 44

1 BY MR. MIGLIORI:
2    Q   Okay. Anything else you can think of?
3    A   I don't recall.
4    Q   Do you recall if in 2012 there was a
5 standard operating procedure in place for new
6 customer due diligence?
7    A   I -- yes.
8    Q   Yes, you recall or, yes, there was?
9    A   Yes, I recall.
10    Q   And what -- what's the answer?
11    A   Yes.
12    Q   Okay. And did you do anything to
13 enhance or change that in 2012?
14    A   I -- I don't recall specifically, other
15 than the "Know Your Customer" forms themselves.
16    Q   Okay. Did you update the standard
17 operating procedures with the new form
18 information?
19    A   I believe that would have been under
20 Shaun.
21    Q   Okay. You didn't do it, to your
22 recollection?
23    A   No.
24    Q   It says you also performed a significant

Page 45

1 number of customer due diligence assessments
2 visits.
3    Do you know how many you would have done
4 between August and December of 2012?
5    A   No, I don't recall.
6    Q   Do you know how you prioritized which
7 customer visits for due diligence you undertook?
8    A   As an overall, not just myself you
9 mean --
10    Q   Yeah.
11    A   -- correct?
12    Q   Well, that's fine.
13    A   Yeah, I -- I'm sorry.
14    Q   Do you recall the question?
15    A   Yeah, I recall the question. I had to
16 reprioritize the site -- the site visits.
17 Basically if it -- new -- new customers, it was
18 based on territory, where the customers were
19 located. At that point in time they would be
20 assigned based off of that.
21    Q   Did you prioritize based on volume of
22 business?
23    MS. FINCHER: Object to the form.
24    THE WITNESS: That would be one

Page 46

1 criteria, yes.
2 BY MR. MIGLIORI:
3    Q  Did you prioritize based on risk of
4 diversion?
5    A  Yes.
6    Q  And how did you assess that?
7    A  Through review of the "Know Your
8 Customer" due diligence information that had been
9 prepared.
10    Q  What if there hadn't been any due
11 diligence information in the file?
12    A  I don't recall a situation where we
13 didn't have any.
14    Q  Well, okay. You don't recall looking at
15 any files in 2012 where there were no -- there was
16 no due diligence in the file other than
17 verification of registration?
18      MS. FINCHER: Object to the form.
19      THE WITNESS: In relation to a planned
20 site visit, no.
21 BY MR. MIGLIORI:
22    Q  Okay. So you did not, in prioritizing
23 planned site visits in 2012, look for those places
24 for which you had no due diligence.

Page 47

1      MS. FINCHER: Object to the form.
2 BY MR. MIGLIORI:
3    Q  In the file. Correct?
4      MS. FINCHER: Object to the form.
5      THE WITNESS: In order to set up the
6 site visit, we would've had to have had some
7 information to review and make a determination.
8 BY MR. MIGLIORI:
9    Q  You will agree with me at this point
10 there were files that had insufficient information
11 for you to make those decisions as of 2012,
12 correct?
13      MS. FINCHER: Object to the form.
14      THE WITNESS: I would say no. Because
15 we made the decision to do a site visit, so we
16 would have had some information to base that
17 decision off of.
18 BY MR. MIGLIORI:
19    Q  I'm not limiting it to the site visits,
20 though. I'm saying as of 2012, among the thirty,
21 40,000 customers, whatever the number is, you were
22 then aware that there were files that had little
23 or no information in the files for due diligence,
24 correct?

Page 48

1      MS. FINCHER: Object to the form.
2      THE WITNESS: Correct.
3 BY MR. MIGLIORI:
4    Q  All right. The last point here in 2012,
5 it says: "Conducted DEA-focused audits and
6 trainings in Henry Schein's and subsidiaries'
7 facilities."
8      Who developed the DEA-focused audits?
9    A  I don't recall specifically.
10    Q  So these were audits that were already
11 in place that you just joined in on, or are these
12 audits that you came up with? If you recall.
13    A  I'm sorry, I misunderstood the first
14 question.
15    Q  Sure. It says conduct the focused
16 audits. Were these --
17    A  Oh, okay.
18    Q  -- new types of audits, or were these
19 ongoing or regular occurring audits that you then
20 joined when you joined this department?
21    A  They were ongoing audits that were
22 performed by other employees until I came into the
23 role.
24    Q  Okay. And then it says you conducted

Page 49

1 trainings. What kind of trainings did you conduct
2 in 2012 on DEA audits?
3    A  I performed mock DEA audits at our
4 distribution centers.
5    Q  Do you know which distribution centers
6 service Ohio?
7    A  Denver, Pennsylvania can service it.
8 All Schedule IIs had only come out of the
9 Indianapolis facility, but technically any of the
10 distribution centers other than Schedule IIs could
11 ship into Ohio based on availability of the
12 product.
13    Q  All controlled substances, including
14 opioid narcotics, came out of the Indianapolis
15 distribution center?
16    A  All Schedule IIs.
17    Q  Right. And that includes OxyContin,
18 oxycodone, hydrocodone, correct?
19    A  As of now, correct. In 2012,
20 hydrocodone wasn't a Class II.
21    Q  Where did the Class IIIs come out of in
22 2012, which distribution center?
23    A  All of them.
24    Q  Do you know which would have supplied

Page 50

1 Ohio?

2 A Based on territory, I would say that the
3 Denver, Pennsylvania distribution center would
4 have been the closest.

5 Q Okay. Is that generally the preference
6 in the -- in the Schein system that the closest
7 distributing -- distribution center fill those
8 orders if they had the supply?

9 A Correct.

10 Q So more likely than not for the
11 northern -- for the Cleveland, Cuyahoga, Summit
12 County areas of Ohio, hydrocodone, until it was
13 reclassified as a Schedule II drug in 2014,
14 hydrocodone would have been most likely shipped
15 out of the Denver, Pennsylvania distribution
16 center, correct?

17 A Correct.

18 MS. FINCHER: Object to the form.

19 BY MR. MIGLIORI:

20 Q All right. In these trainings, did you
21 have any materials, any training materials,
22 handouts, booklets? Was there something that you
23 used to train?

24 A There would have been something, yes.

Page 51

1 Q And do you recall what it was called?

2 A Not at this time in 2012.

3 Q Was it a paper handout, was it online,
4 do you know?

5 A It -- we had an audit checklist that we
6 would work off of. I -- I don't recall handing
7 out anything specifically after the audits.

8 Q What -- what kinds of things were on the
9 audit -- audit checklist?

10 A It basically was set up to follow the
11 requirements under the CFR. So it would talk
12 about receipts of controlled substances, inventory
13 records that are required to be kept, shipment
14 records that are required to be kept,
15 reconciliation of inventory.

16 Q What, if anything, did the checklist
17 have relative to due diligence and due diligence
18 files?

19 A It did ask whether or not there was a
20 system in place, and whether or not there was due
21 diligence --

22 Q Okay.

23 A -- available.

24 Q Did it have specifics about new

Page 52

1 customers?

2 A Not that I recall, no.

3 Q Did it have any components that talked
4 about background checks of new customers?

5 A No, because these audits were being done
6 at the distribution center, and that process was
7 not handled at the -- at that level. So no.

8 Q Okay. So the due diligence components
9 were handled by the Verifications department and
10 not at the distribution centers; is that correct?

11 MS. FINCHER: Object to form.

12 THE WITNESS: Verifications in the
13 corporate office managed the due diligence
14 process.

15 BY MR. MIGLIORI:

16 Q Okay. Distribution centers did not,
17 correct?

18 A They did not manage the process,
19 correct.

20 Q They helped execute it, implement the --
21 the shipment -- would it ship directly from the
22 distribution center to the physicians?

23 A Yes.

24 Q Was there a process at the distribution

Page 53

1 center -- let's stick to Indianapolis and
2 controlled substances. Was there a process at the
3 Indianapolis distribution center to check the due
4 diligence file before shipment?

5 MS. FINCHER: Object to form.

6 Q In 2012?

7 A I -- I don't know.

8 Q Would the distribution center in
9 Indianapolis have access to the due diligence file
10 prior to shipment in filling a physician's order?

11 MS. FINCHER: Object to the form. Lack
12 of foundation.

13 THE WITNESS: I don't know. I wasn't
14 involved directly in that part of it.

15 BY MR. MIGLIORI:

16 Q If that existed, that wasn't part of the
17 training that you did at the distribution centers
18 for DEA audits?

19 MS. FINCHER: Object to the form.

20 THE WITNESS: Correct. I -- I did not
21 do training specifically myself at Indianapolis.
22 So no, I wasn't part.

23 BY MR. MIGLIORI:

24 Q What about for hydrocodone, was there

Page 54

1 any special process that you can recall in your
2 training that's referred to in your performance
3 evaluation relative to hydrocodone and
4 controlled -- and Schedule III drugs?
5    A   I'm sorry. Can you rephrase the
6 beginning?
7    Q   Sure.
8    A   I don't know what the question exactly
9 was.
10    Q   Do you recall in your training that's
11 referenced in this document, Exhibit No. 4, in
12 this training that you would give, if there was
13 anything specific to hydrocodone and Schedule III
14 drugs?
15    A   What we would speak to the -- the team
16 about is what drugs we knew were being abused and
17 that were potentially to be diverted. So that was
18 part of the discussion.
19    Q   Which drugs did you tell the team were
20 being abused and potentially diverted?
21    A   Opioids. And also some other, Xanax
22 and --
23    Q   Did that include hydrocodone?
24    A   Yes.

Page 55

1    Q   And what was the training -- what more
2 specifically, if you can recall, was that
3 training? Did you just tell them which drugs they
4 were? Did you tell them anything else in
5 particular?
6    A   Just reemphasizing security of those
7 drugs, making sure that the processes were always
8 being followed. That's all that I recall.
9    Q   Okay. Was there a particular paperwork
10 or reporting requirements that were specific to
11 the distribution centers in this training?
12        MS. FINCHER: Object to the form.
13        THE WITNESS: It was a mock audit or
14 internal audit. So, again, we had a checklist
15 that we would use, so that was filled out, and
16 then a report would be generated if there were any
17 potential issues, and to document that the audit
18 took place.
19 BY MR. MIGLIORI:
20    Q   Did that audit involve anything to do
21 with ARCOS data? Or ARCOS reporting requirements?
22    A   Yes.
23    Q   And what do you recall?
24    A   Confirmation that ARCOS was being

Page 56

1 reported.
2    Q   Okay. What about suspicious orders, did
3 anything come out of that audit training relative
4 to suspicious order reporting?
5    A   I don't recall at that time in 2012
6 specifically.
7    Q   Okay. What about reporting to states
8 for those states that had reporting requirements?
9 Was there anything in that training?
10    A   No, not for the distribution centers
11 because they were not involved in that process.
12    Q   Who handled the state reporting process
13 in 2012?
14        MS. FINCHER: Object to the form.
15 BY MR. MIGLIORI:
16    Q   If you know.
17    A   It would have been between Regulatory
18 and Verifications.
19    Q   This has come up a few times. What does
20 that mean, it would be between Verifications and
21 Regulatory, specific to state reporting
22 requirements?
23    A   At that point in time, some reports may
24 have been run by Verifications for certain states,

Page 57

1 and other states may have been run for -- by
2 Regulatory.
3    Q   Do you know in 2012 who was supposed to
4 be running Ohio's state reporting requirements?
5    A   No.
6    Q   Do you know at any point after that 2012
7 who was supposed to be running Ohio's reporting
8 requirements?
9        MS. FINCHER: Object to the form.
10        THE WITNESS: I know that eventually all
11 the state reporting came under regulatory's
12 responsibility.
13 BY MR. MIGLIORI:
14    Q   Did you have any responsibilities with
15 respect to state reporting requirements?
16    A   Not directly, no.
17    Q   How were you indirectly involved?
18    A   I don't remember what year it was. It
19 wasn't for the first couple of years that I was in
20 the position. Once it transferred under
21 Regulatory, I had a staff member that was
22 responsible for running the reports.
23    Q   And did that staff member report
24 directly to you?

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1  A  Yes.
2  Q  Did you become aware that for almost a
3  two-year period of time, that Henry Schein had not
4  been reporting at all to the Ohio Board of
5  Pharmacy?
6     MS. FINCHER:  Object to the form.
7     THE WITNESS:  No.
8  BY MR. MIGLIORI:
9  Q  But that responsibility at some point
10 fell on your staff member, correct?
11 A  Correct.
12 Q  Do you know what years?
13 A  No.
14 Q  And ultimately you reported throughout
15 this period of time to Sergio Tejeda?
16 A  Correct.
17 Q  Did you have -- beginning in 2012 going
18 through 2016, did you have regular meetings about
19 DEA compliance with your Regulatory team?
20 A  Yes.
21 Q  When did those start?  Were they ongoing
22 when you got there or did they begin sometime
23 after?
24 A  They were ongoing as part of training,

Page 59

1  bringing on the new hires, and also meeting
2  internally.
3  Q  And how often did you meet?
4  A  With my staff, it was at least once a
5  week.
6  Q  Were there minutes to those meetings?
7  A  No.
8  Q  Did you report out your meetings to
9  anybody above you?
10 A  Not -- no, not the specific ones.  I may
11 have had conversations with Sergio as far as the,
12 you know, training of each of the new hires, kind
13 of where they were at.
14 Q  From 2012 to 2016, did you have regular
15 meetings with those above you, with Sergio, with
16 Mr. DiBello, Mr. Peacock?
17    MS. FINCHER:  Object to the form.
18    THE WITNESS:  I would -- yes.  Mike
19 DiBello wasn't there then.  But also for
20 Verifications, we were in contact on a daily
21 basis, so we also had scheduled meetings but it
22 was a constant communication.
23 BY MR. MIGLIORI:
24 Q  Okay.  I'm focusing right now

Page 60

1  specifically, though, with regularly scheduled
2  meetings, that is, a weekly meeting, a monthly
3  meeting, a quarterly meeting.
4     Did you have any kind of organizational
5  meeting or regular reporting meeting with your
6  supervisors, whether or not it included
7  Verifications?
8  A  No.
9  Q  Okay.  And that was through 2016?
10 A  Correct.
11 Q  Were you ever part of a team of -- of
12 specific people within Regulatory to -- well,
13 strike that.
14    There's a reference in your appraisal to
15 conducting audits.  Was there an audit team?  In
16 2012, let's start there.
17 A  In reference to these conducted DEA-
18 focused audits?
19 Q  Yeah.
20 A  As far as the internal sites that were
21 done at -- for Henry Schein, it would have been my
22 team, once they were trained.  So it would have
23 been myself, Ken and Glenn.
24 Q  Okay.

Page 61

1  A  And Sergio if we needed him.
2  Q  Was there anybody between 2012 and 2016
3  added to that team?
4  A  Yes.
5  Q  Who was that?
6  A  Beverly Butcher.
7  Q  Okay.  And what was her title?
8  A  Senior Regulatory specialist.
9  Q  Okay.  And who -- anyone else?
10 A  I'm just trying to remember the year.
11 So Liam Schauer.
12 Q  Okay.  Anyone else you can think of?
13 A  Pete Schmidt.  He was not a new hire,
14 but he was moved into my team.
15 Q  Okay.  How often were these audits done?
16 A  The mock audits were done once a year.
17 Q  And were you the project leader for the
18 mock audits?
19 A  I would say no.  I mean, each -- each of
20 my staff was -- they were at a distribution center
21 or the corporate office, so they were responsible
22 for that site.  I was a project leader as far as
23 making sure they got completed.
24 Q  Okay.  So you didn't actually actively

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1 participate yourself in all of the audits. You
2 coordinated them. Is that a fair statement?
3     A  Yes.
4     Q  All right. Did you actively participate
5 in any yourself?
6     A  Yes.
7     Q  Was that throughout the entire period or
8 mostly in the beginning or --
9     A  The entire period.
10     Q  All right. And what would your specific
11 role be in audits?
12     A  So I was based in the Denver,
13 Pennsylvania facility, so I would conduct a mock
14 audit once a year.
15     Q  Okay. And that's where the hydrocodone
16 would have come into Ohio?
17     MS. FINCHER: Object to the form.
18     THE WITNESS: Correct. Up until it was
19 reclassed.
20 BY MR. MIGLIORI:
21     Q  Okay. And so you had those
22 responsibilities from 2012 to 2014, when it was
23 reclassed, correct?
24     A  Yes.

Page 63

1     Q  Did you find -- in your audits, did you
2 find any observations of -- of DEA risks of
3 enforcement relative to hydrocodone?
4     A  No.
5     MS. FINCHER: Object to the form.
6 BY MR. MIGLIORI:
7     Q  You did not?
8     A  No.
9     Q  If you had found any observations or
10 risks for DEA enforcement, would that end up in a
11 checklist, a memorandum, or report?
12     A  Yes.
13     MS. FINCHER: Objection to the form.
14 BY MR. MIGLIORI:
15     Q  And what would that report be called?
16     A  An audit report.
17     Q  Okay. And so for every distribution
18 center, if I were to look, there should be an
19 audit report once a year from somebody within your
20 team, correct?
21     A  Correct.
22     Q  And that's true for Denver,
23 Pennsylvania. That's also true for the
24 Indianapolis distribution center, correct?

Page 64

1     A  Excuse me. I can't say if it was done
2 every year for Indianapolis because I wasn't
3 directly --
4     Q  Okay.
5     A  -- involved then.
6     Q  Did those reports get electronically
7 uploaded into the system?
8     A  The -- yeah, a scanned PDF was saved to
9 a folder.
10     Q  And what was that folder called, if you
11 recall?
12     A  I don't remember.
13     Q  And was that in the JDE system?
14     A  No.
15     Q  Where did those reports go?
16     A  In a folder on a -- a shared folder.
17 There again, they were PDF scanned, so...
18     Q  If somebody else wanted to review them,
19 where would they go on their computer?
20     A  It would have been on a shared
21 Regulatory drive.
22     Q  Okay. Was that accessed only by folks
23 in the Regulatory team?
24     A  Yes.

Page 65

1     Q  All right. So Sergio Tejeda, the entire
2 time you were in Regulatory, was your immediate
3 supervisor, correct -- or was one of your
4 supervisors, correct?
5     A  Yes.
6     Q  Your first report was to Mr. Romano?
7     A  Not under this role, no.
8     Q  Not under this role. Oh, Mr. Romano was
9 under your -- your medical device role?
10     A  Correct.
11     Q  So when you switched over, your
12 immediate report was to Sergio Tejeda, correct?
13     A  Yes.
14     Q  In 2012, correct?
15     A  Correct.
16     Q  All right. And so Mr. Tejeda would have
17 access to all of these annual audits of the
18 distribution centers, correct?
19     A  Correct.
20     MS. FINCHER: Object to the form.
21 BY MR. MIGLIORI:
22     Q  And do you know whether there was a
23 document retention policy relative to those audit
24 reports?

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    MS. FINCHER: Object to the form.
2    THE WITNESS: Yes.
3 BY MR. MIGLIORI:
4    Q    What is that?
5    A    I don't recall what -- how many years,
6 but there was a policy.
7    Q    Okay. Did you review any of those
8 audits in preparation for today?
9    A    No.
10    Q    Counsel didn't bring any of those
11 with -- with them to show you yesterday?
12    A    No.
13    MR. MIGLIORI: Why don't we take a
14 break. It's been an hour.
15    MS. FINCHER: Sure.
16    THE VIDEOGRAPHER: 10:33, we are off the
17 record.
18    (Recess.)
19    THE VIDEOGRAPHER: 10:45, and we are on
20 the video record.
21 BY MR. MIGLIORI:
22    Q    So the last point on this Exhibit 4 I
23 wanted to ask you about was this DEA "Know Your
24 Customer" process backlog.

Page 67

1    How much of a backlog did you realize in
2 2012 had developed at Henry Schein?
3    MS. FINCHER: Object to the form.
4    THE WITNESS: I'm sorry. How much of a
5 backlog?
6 BY MR. MIGLIORI:
7    Q    Yeah. Do you recall?
8    A    This -- I recall specifically what this
9 is referring to.
10    Q    Okay. What was that?
11    A    Basically what this was referring to was
12 as new customer due diligence was being put
13 together, it had to be reviewed by Regulatory.
14 Because we at that point in time had lost some of
15 the staff, it was just taking longer because it
16 was less people to review it. So it wasn't a
17 significant backlog. It was just if we had more
18 staff, it would have been reviewed quicker.
19    Q    You don't recall actually quantifying
20 that backlog?
21    MS. FINCHER: Object to the form.
22    THE WITNESS: I don't recall
23 specifically here, no. I just remember it was not
24 significant.

Page 68

1 BY MR. MIGLIORI:
2    Q    Not significant.
3    MR. MIGLIORI: Just give me one second.
4 I'm sorry. Not off the record -- I'm just -- just
5 bear with me.
6    (Steffanie-Oak Exhibit No. 5 was
7    marked for identification.)
8 BY MR. MIGLIORI:
9    Q    Let me show you Exhibit 5.
10    The highlights on my copy are mine, not
11 yours, okay? That's just to point you.
12    This is an August 6, 2013 e-mail --
13    A    Mm-hmm.
14    Q    -- between Sergio Tejeda and Jeff
15 Peacock. And Sergio Tejeda is your direct
16 supervisor, correct?
17    A    Correct.
18    Q    And at this time Jeff Peacock is in
19 Mr. DiBello's role?
20    A    Correct.
21    Q    So Sergio Tejeda reports to Jeff
22 Peacock, correct?
23    A    Correct.
24    Q    Have you seen this e-mail before?

Page 69

1    A    No. No.
2    Q    Let me show you -- so if you go to the
3 first page -- the last page. So e-mails, as we go
4 through this, read back to front --
5    A    Mm-hmm.
6    Q    -- because they're a string.
7    There is an e-mail from Jeff Peacock to
8 several people, including you.
9    A    Mm-hmm.
10    Q    And it says: "Could you each please
11 send me three topics that you feel are risks which
12 Henry Schein faces in our compliance, regulatory
13 and quality worlds? It can be related to your own
14 area or someone else's. Please send them in rank
15 order, most risk to least."
16    Do you remember receiving that e-mail?
17    A    Yes.
18    Q    Okay. And did you submit something?
19    A    Yes.
20    Q    And what did you submit?
21    A    I submitted something to Sergio.
22    Q    And what do you recall the risk being?
23    Well, let me say it this way: The first
24 two pages of this are Sergio responding to Jeff

Page 70

1 Peacock. Did you contribute to this list?
2     A   Yes.
3     Q   All right. Let's go through them. It
4 says: "Jeff, here are the areas that I think
5 represent the highest regulatory risk for the
6 company at this point."
7         And this would be highest to lowest,
8 correct?
9         MS. FINCHER: Object to the form.
10 BY MR. MIGLIORI:
11    Q   Based on the instructions?
12    A   Yes.
13    Q   "Number one, DEA customer due diligence.
14 I have to agree with Tina that this is the area of
15 most risk. A couple of additional pieces to
16 consider on this issue. Approximate number of new
17 accounts opened in a daily basis is 150."
18        Was that generally true in 2013 that you
19 were bringing on 150 new customers a day?
20    A   It sounds accurate, yes.
21    Q   And that would include customers who are
22 ordering controlled substances?
23        MS. FINCHER: Object to the form.
24        THE WITNESS: It would include, but

Page 71

1 not -- it's not 150 total, correct.
2 BY MR. MIGLIORI:
3     Q   Do you know what percentage of the daily
4 customers were -- were intending to order
5 controlled substances?
6     A   Only from reading this e-mail.
7 Otherwise, I don't recall.
8     Q   It says: "From those" --
9     A   For --
10    Q   -- "from to those, an approximate 4 to
11 5 percent will place an order for controlled
12 substances. Using the 4 percent, that equates to
13 1560 new accounts ordering controlled substances
14 each year."
15        Is that data that you provided to
16 Sergio?
17    A   No.
18    Q   Is that data consistent with your
19 recollection around this time, 2013?
20    A   Yes.
21        MS. FINCHER: Object to the form.
22 BY MR. MIGLIORI:
23    Q   And these customers that you're talking
24 about are primarily individual physicians,

Page 72

1 correct?
2         MS. FINCHER: Object to the form.
3         THE WITNESS: No.
4 BY MR. MIGLIORI:
5     Q   What percentage of Schein customers
6 were -- were individual physicians or individual
7 practices as opposed to dispensaries?
8         MS. FINCHER: Object to the form.
9 Foundation.
10        THE WITNESS: I wouldn't know the
11 percentage, but I wasn't referring to
12 dispensaries. I -- I'm not sure what you mean by
13 that.
14 BY MR. MIGLIORI:
15    Q   Okay. Well, let me ask you maybe a
16 little differently. Of the 1560 new accounts
17 ordering substances -- controlled substances each
18 year, how many of those are individual physicians
19 or private practices, what percentage?
20        MS. FINCHER: Object to the form.
21 Foundation.
22        THE WITNESS: I don't know.
23 BY MR. MIGLIORI:
24    Q   You would agree with me that Henry

Page 73

1 Schein's general business model was not to be a
2 supplier to pharmacies as much as directly to
3 physicians and their practices, correct?
4     A   Correct.
5     Q   And of the 1500, you have no idea how
6 many are physicians and their practices?
7     A   No.
8     Q   Are they the vast majority of them?
9         MS. FINCHER: Object to the form.
10        THE WITNESS: I'm not -- I'm not sure.
11 It's -- you're saying individual doctors, like
12 you're saying one --
13 BY MR. MIGLIORI:
14    Q   Or their practices.
15    A   Yes. I would say yes.
16    Q   Okay. So let me make sure it's clear.
17        The vast -- it's -- of the 1560 new
18 accounts that Henry Schein was onboarding each
19 year that were intending to order controlled
20 substances, the vast majority of those were
21 individual physicians or private practices,
22 correct?
23        MS. FINCHER: Object to the form.
24        THE WITNESS: Correct.

Page 74

BY MR. MIGLIORI:

Q   All right. "Tina based her analysis on 2012 numbers."

Does that change your recollection about whether you did this analysis?

A   I did an analysis, but it was in 2013.

Q   Well, but on 2012 numbers, correct?

A   Correct.

Q   "I learned from a recent conversation with Shaun Abreu, Verifications manager, that the number of active accounts ordering controlled substance products is now closer to 40,000, and that we have completed due diligence for about 13,000 accounts."

Were you aware of that information from Shaun Abreu?

A   At that point --

MS. FINCHER:  Object to the form.

THE WITNESS:  -- in time, yes.

BY MR. MIGLIORI:

Q   Okay. "So, therefore, the gap is now approximately 27,000 accounts."

Do you recall that being based on 2012 numbers, the number of accounts that had no due

Page 75

diligence or completed due diligence?

A   I recall based off of reading this e-mail.

Q   Okay. So going back to my earlier question when you said there was a small amount of backlog, will you agree with me that 27,000 out of 40,000 customers is not a small amount of due diligence backlog?

MS. FINCHER:  Object to the form.

THE WITNESS:  Yes.

BY MR. MIGLIORI:

Q   All right. "Based on year-to-date records, we can expect Regulatory Affairs to process 400 to 450 due diligence files each year."

Was that a statistic or a projection that you put together?

MS. FINCHER:  Object to the form.

THE WITNESS:  I don't recall. I may -- I'm sure I had input, but I'm not sure if I'm the only one that reviewed that.

BY MR. MIGLIORI:

Q   Okay. Let me explore that a little bit. If you're bringing on 1560 new accounts ordering controlled substances each year, of those, are --

Page 76

is it only a fraction of those getting due diligence files updated?

MS. FINCHER:  Object to the form.

THE WITNESS:  Can you repeat that again?

BY MR. MIGLIORI:

Q   Sure. I'm trying to understand of the 400 to 450 files this year, is that the backlog project or is that new -- new customers?

MS. FINCHER:  Object to the form.

THE WITNESS:  It -- it would include both.

BY MR. MIGLIORI:

Q   Okay. So we can agree that by the end of 2012, when you had your appraisal that we -- your -- your work appraisal that we looked at, Exhibit No. 4, at the end of that year, based on the statistics that you gave to Sergio Tejeda, there were approximately 27,000 accounts or customers in the Henry Schein system that did not have complete due diligence.

MS. FINCHER:  Object --

BY MR. MIGLIORI:

Q   Correct?

MS. FINCHER:  Object to the form.

Page 77

Mischaracterizes the document.

THE WITNESS:  Correct, but I still stand by what I said in 2012, I was not aware of that information.

BY MR. MIGLIORI:

Q   That's fine.

A   Okay.

Q   And maybe you weren't aware of it. That's fine.

A   Okay.

Q   But as you're providing this statistical information --

A   Mm-hmm.

Q   -- in August of 2013 to your supervisor --

A   Yes.

Q   -- it turned out to be true that in 2012, of the 40,000 customers of Henry Schein, 27,000 of them did not have completed due diligence in their files, correct?

MS. FINCHER:  Object to the form. Mischaracterizes the document.

BY MR. MIGLIORI:

Q   Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1   A   Correct.
2   Q   All right.  And you were bringing on 150
3  new customers or new accounts each day at that
4  period of time, correct?
5   A   No.
6   Q   Well, I'm going back up to the --
7  approximate number of new accounts open in a daily
8  basis is 150.  Correct?
9   A   Correct.
10   Q   All right.  So you're bringing on 150
11  new customers every day, but the projection for
12  completing due diligence was 400 or 450 per year,
13  correct?
14   A   Per year, correct.
15   Q   So in one week, in seven days, you'd
16  have just over a thousand new customers coming on.
17  Correct?
18       MS. FINCHER:  Object to the form.
19       THE WITNESS:  Correct.
20  BY MR. MIGLIORI:
21   Q   But in that entire year, only less than
22  half of them -- due diligence would be completed
23  for less than half of what was actually onboarded
24  in a single week, correct?

Page 79

1   A   No.
2       MS. FINCHER:  Object to the form.
3  BY MR. MIGLIORI:
4   Q   Help me understand.
5   A   Regulatory was not responsible for
6  reviewing every single account.
7   Q   Okay.
8   A   So the first process and who owned the
9  process initially was Verifications.  So there was
10  only maybe a percentage of those accounts where
11  they felt needed a secondary review.
12   Q   Okay.
13   A   That would come to Regulatory.
14   Q   All right.  Well, let's keep reading
15  then, because this is the Verifications side.  It
16  says:  "According to Shaun Abreu" -- from
17  Verifications, correct?  He's from Verifications,
18  correct?
19   A   Yes.
20   Q   -- "they resolve/complete approximately
21  200 due diligence files per week or 10,400 a year,
22  a combined effort of 10,800 to 10,900 accounts.
23  If we take the current gap plus estimated new
24  account volume for three years, we have an

Page 80

1  approximate 32,000 accounts to be reviewed.
2  Therefore, we are looking at three to four years
3  to become current/fully compliant with DEA due
4  diligence."
5       Was that information that you projected?
6       MS. FINCHER:  Object to the form.
7       THE WITNESS:  I had involvement in the
8  input, yes.
9  BY MR. MIGLIORI:
10   Q   All right.  So as we sit here right now,
11  in 2012, at the end of 2012 based on this data,
12  given the number of new clients coming on board,
13  the percentage of those that were intending to
14  order controlled substances and the number of
15  accounts that were not complete in their due
16  diligence, it was projected as of August 6, 2013,
17  that Henry Schein would not be compliant with
18  DEA's due diligence requirements until 2016 or
19  2017, correct?
20       MS. FINCHER:  Object to the form.
21  Foundation.
22       THE WITNESS:  With the current resources
23  at that time, that's correct.
24  BY MR. MIGLIORI:

Page 81

1   Q   Okay.  At some point, did you accelerate
2  that process so it would be a quicker resolution
3  to be DEA compliant relative to due diligence and
4  "Know Your Customer"?
5   A   Yes.
6   Q   When did you bring on new people to --
7  to become compliant with DEA's due diligence?
8       MS. FINCHER:  Object to the form.
9       THE WITNESS:  I brought on one more
10  staff member.  That was Beverly Butcher in 2014.
11       And then I know that Shaun's team grew.
12  I can't say specifically how many, but I know that
13  there was a significant increase in his staffing,
14  because, again, they are the ones that are the
15  front end of the process.
16  BY MR. MIGLIORI:
17   Q   Okay.  And you left in November of 2016?
18   A   Yes.
19   Q   As of the time you left in November of
20  2016, was Henry Schein caught up in the backlog of
21  due diligence?
22   A   Yes.
23   Q   When did that happen?
24   A   I can't -- I don't recall the exact

Page 82

1  date, but there were certain actions that were put
2  in place to ensure that that happened quicker than
3  the time frame that's discussed here.
4      Q   Okay.  But you don't know if it happened
5  just before you left or 2015 --
6      A   It was at least a year before I left,
7  but I don't know the specific date.
8      Q   All right.  So it's fair to say that
9  whatever that date is, based on your information
10 that you provided to Sergio Tejeda, Henry Schein
11 was not compliant with DEA due diligence until
12 that date, correct?
13         MS. FINCHER:  Object to the form.
14         THE WITNESS:  No.  Not correct.
15 BY MR. MIGLIORI:
16     Q   Let me word -- use exact words.
17         "We are looking at three to four years
18 to become current/fully compliant with DEA due
19 diligence."
20         That was Mr. Tejeda's words, correct?
21         MS. FINCHER:  Object to the form.
22         THE WITNESS:  Correct, based on the
23 current resources and the process.
24 BY MR. MIGLIORI:

Page 83

1      Q   Right.  So when additional resources
2  were put together and processes were put in place,
3  that projection was shortened to sometime you
4  think a year prior to your departure in 2016?
5      A   It was sooner than that based off of the
6  actions that were taken.  So when we look at that
7  overall number of accounts, that was looking back
8  at previous history of when they ordered
9  controlled substances.  So a large percentage of
10 those accounts may not have ordered again.
11         There were actions that were put in
12 place to make sure that if those customers that
13 did not have due diligence were to order, that the
14 order would pend.  So the DEA was removed from the
15 account.  So if they were to place an order, that
16 we did take the necessary steps to do due
17 diligence.  So it's not that they just left those
18 accounts there for two or three years allowing
19 them to continue to order.
20     Q   I appreciate that.  That wasn't my
21 question.
22         My question was simply, there was a
23 certain point at which this backlog project, this
24 backlog process caught up.  Correct?

Page 84

1      A   Correct.
2      Q   And you're telling me that it happened
3  sometime before this projection in this exhibit,
4  that is before 2016, 2017, correct?
5      A   Correct.
6      Q   All right.  So instead of taking three
7  to four years for Henry Schein to become current
8  and fully compliant with DEA due diligence, it
9  took some time less than that, correct?
10     A   Correct.
11         MS. FINCHER:  Object to the form.
12 BY MR. MIGLIORI:
13     Q   But you're saying that it was probably a
14 year or more before your departure, correct?
15     A   I'm going to say no.
16     Q   When would it have been?  I'm just
17 trying to find out the time frame.
18     A   Yeah, it -- it would have been shortly
19 after this was issued, because, again, they
20 removed the DEA numbers from those accounts to
21 prevent them from continually -- being able to
22 continue to order without due diligence.
23     Q   I'm not asking about the ordering.  I'm
24 asking about the files being compliant with DEA

Page 85

1  due diligence.  I'm only asking about the files
2  being complete.  Okay?  I'm not asking about
3  placing orders.
4          You'll agree with me that the files were
5  not updated completely and the backlog resolved
6  until -- and up until your departure from the
7  company, correct?
8          MS. FINCHER:  Object to the form, asked
9  and answered.
10         You can answer again.
11 BY MR. MIGLIORI:
12     Q   Can you answer the question?
13         MS. FINCHER:  Do you need him to repeat
14 it?
15         THE WITNESS:  Yes, please.
16 BY MR. MIGLIORI:
17     Q   Will you agree with me that the
18 backup -- the backlog and due diligence at Henry
19 Schein was not resolved completely even at the
20 time of your departure?
21     A   No.
22         MS. FINCHER:  Object to the form.
23 BY MR. MIGLIORI:
24     Q   When do you think the backlog was

Page 86

1 resolved?

2    A   It was at least a year or more before I

3 left.

4    Q   All right.  So it's your testimony right

5 now that at least a year or more before November

6 of 2016, Henry Schein became current and fully

7 compliant with the DEA due diligence requirements.

8 Is that a fair statement?

9        MS. FINCHER:  Object to the form.

10       THE WITNESS:  Based on my recollection,

11 I would say yes.

12       (Steffanie-Oak Exhibit No. 6 was

13       marked for identification.)

14 BY MR. MIGLIORI:

15    Q   Let me show you Exhibit 6.

16       Exhibit 6 is a PowerPoint produced to us

17 called the "Henry Schein Regulatory Affairs,

18 October 17 Report, Regulatory Affairs, Sergio

19 Tejeda."

20       By this point you've left the company,

21 correct?

22    A   Correct.

23    Q   I'm going to direct you to page 7 of the

24 PowerPoint.

Page 87

1       Page 7 is a chart of the Regulatory

2 Affairs SOM and due diligence review increases.

3 Do you see that?

4    A   Mm-hmm.  Yes.

5    Q   And you'll see that through 2017, there

6 is -- from 2012 when you start through 2017, every

7 year there is an increase in the number of due

8 diligence reviews and site visits, or let's stick

9 with due diligence reviews.

10       Do you see that?

11       MS. FINCHER:  Object to the form.

12       THE WITNESS:  Yes.

13 BY MR. MIGLIORI:

14    Q   On the next page -- I'm sorry, on

15 page -- it doesn't have a number suddenly all of a

16 sudden.

17       So on page 10, it would be --

18    A   Is it that one?  Okay.

19    Q   It says "Projects, Activities, Francis

20 O'Regan."  Do you see that?

21    A   Where?  I'm sorry.

22    Q   In the title.

23    A   Oh, yes.  Yes.

24    Q   Under "Due Diligence," it says:

Page 88

1 "Working on standardization and enhancement of the

2 due diligence file review process and creating a

3 standard operating procedure to memorialize a

4 process."

5       Were you --

6    A   No, I don't see that.  Where's that?

7    Q   It's --

8    A   This one?  Oh.  (Peruses document.)

9 Okay.

10    Q   What was Frank -- Francis O'Regan's

11 position, if you know?

12    A   I don't know him.

13    Q   You don't know him.

14    A   No.

15    Q   Did he show up after you?

16    A   I'm guessing, yes.

17    Q   Okay.  So do you see -- first of all,

18 did you know that there was a need for

19 standardization and enhancement of due diligence

20 file review process and the standard operating

21 procedure as of the time you left in November of

22 2016?

23       MS. FINCHER:  Object to the form.

24       THE WITNESS:  No.

Page 89

1 BY MR. MIGLIORI:

2    Q   And going back to page 7, you'll agree

3 with me that the volume of due diligence reviews

4 did not stop as of the end of 2016 when you left

5 the company?

6       MS. FINCHER:  Object to the form.

7 Foundation.

8       THE WITNESS:  No, because we bring on

9 new customers every day.

10 BY MR. MIGLIORI:

11    Q   All right.

12    A   So it would not stop.

13    Q   And it continued to grow exponentially?

14    A   Correct.

15       MS. FINCHER:  Object to the form.

16 BY MR. MIGLIORI:

17    Q   All right.  So as of the end of 2012,

18 going back to Exhibit 5, the gap of existing

19 customers was 27,000 without complete due

20 diligence, and the going forward projection of new

21 customers ordering controlled substances was just

22 over 1500 a year, correct?

23       MS. FINCHER:  Object to the form.  Are

24 you asking what this document says?

Page 90

1    MR. MIGLIORI: I'm asking if that's her
2 recollection of the data.
3 BY MR. MIGLIORI:
4    Q   Correct?
5    MS. FINCHER: Object to the form.
6    THE WITNESS: There's a hundred -- yes.
7 1560 new accounts added per year.
8 BY MR. MIGLIORI:
9    Q   Did that number change in the subsequent
10 years, '13, '14, '15 or '16, to your knowledge?
11    A   I would say yes, because they were
12 continuing to -- the business would grow and the
13 market would grow, so, yes, it would.
14    Q   So your general recollection is that
15 more than 1560 new accounts came on board from
16 2012 through 2016 for those physicians and
17 practices wanting to order controlled substances,
18 correct?
19    A   Correct.
20    Q   Now, the -- in 2012 when you started,
21 you said that one of the things you did was go to
22 HDMA conferences.
23    A   They have one a year, so yes.
24    Q   Okay. Do you recall going to one in

Page 91

1 2012?
2    A   Yes.
3    Q   And what, if anything, do you recall
4 learning at that conference as it related to due
5 diligence?
6    A   I know that there was a presentation
7 related to "Know Your Customer," suspicious order
8 monitoring.
9    Q   Were you ever provided the HDMA guidance
10 about due diligence?
11    MS. FINCHER: Object to the form.
12    (Steffanie-Oak Exhibit No. 7 was
13    marked for identification.)
14 BY MR. MIGLIORI:
15    Q   Exhibit No. 7.
16    A   Yes.
17    Q   And what do you recall the expectations
18 to be by the trade association for distributors
19 relative to "Know Your Customer"?
20    MS. FINCHER: Object to the form.
21    THE WITNESS: That you were responsible
22 to know your customer.
23 BY MR. MIGLIORI:
24    Q   Did that involve more than verification

Page 92

1 of registration?
2    A   Yes.
3    Q   If you turn to the -- just the first
4 page of the document, you'll see it's a 2008
5 Healthcare Distribution Management Association
6 Industry Compliance Guideline.
7    There's a reference here in the front
8 page of this, it says that -- that -- that "These
9 guidelines have been prepared in recognition of a
10 growing problem of misuse and diversion of
11 controlled substances and the critical role of
12 each member of the supply chain in helping to
13 enhance security."
14    Did you understand when you first
15 started working with controlled substances in 2012
16 that there was a growing, if not very grown,
17 problem of misuse and diversion of controlled
18 substances?
19    A   Yes.
20    MS. FINCHER: Object to the form.
21 Foundation.
22    I'll just note here that the document
23 predated her time at Schein relative to controlled
24 substances.

Page 93

1    MR. MIGLIORI: I want to make sure I
2 understand that. You said that 2008 was before
3 Schein was working with controlled substances?
4    MS. FINCHER: Before her role at
5 Schein --
6    MR. MIGLIORI: Okay.
7    MS. FINCHER: -- working with controlled
8 substances.
9 BY MR. MIGLIORI:
10    Q   You said you educated yourself when you
11 got there in 2012, right, about controlled
12 substances?
13    A   Yes.
14    Q   And one of the sources of that education
15 was the HDMA?
16    A   Yes.
17    Q   And this would -- did you -- were you
18 provided this guidance, do you recall?
19    A   I don't -- I don't recall specifically.
20 I know I've seen it over time, but I don't
21 remember if it was then.
22    Q   Okay. It says: "At the center of a
23 sophisticated supply chain, distributors are
24 uniquely situated to perform the due diligence in

Page 94

1  order to help support the security of the
2  controlled substances they deliver to their
3  customers."
4        Is that part of what you learned in your
5  training, that distributors were in a unique
6  position to perform due diligence?
7     A   I don't know about the "unique" part,
8  but I understood that that was a requirement.
9     Q   Okay.  And you understand that the
10 purpose of due diligence is that: "Such due
11 diligence can reduce the possibility that
12 controlled substances within the supply chain will
13 reach locations they are not intended to reach."
14       That was one of the purposes of due
15 diligence, correct?
16    A   Correct.
17    Q   And then for guidance, if you turn to
18 the page that ends in 616, the very first category
19 is also about "Know Your Customer" due diligence.
20       Do you recall ever seeing this in your
21 work on the due diligence backlog at Henry Schein?
22    A   Yes.
23    Q   And the types of information that they
24 recommend, the Distributors Trade Association

Page 95

1  recommends under Part b, it says:  "All
2  information requested by a distributor should be
3  provided by the owner of the potential customer,
4  the pharmacist in charge, or in the case of a
5  non-pharmacy customer, an equivalent designee."
6        Who would -- generally speaking, Henry
7  Schein would fall more into the category of a
8  distributor with non-pharmacy customers, correct?
9     A   Correct.
10    Q   It says:  "Each completed application,
11 questionnaire or other document providing
12 information requested by the distributor from the
13 potential customer should be signed by the
14 potential customer's owner, pharmacist in charge
15 or equivalent designee."  Saying:  "I declare
16 under penalty of perjury that the foregoing is
17 true and correct, executed on this date."
18       Do you recall that kind of guidance from
19 the HDMA?
20    A   I don't recall specifically.
21    Q   Did Henry Schein ever require that much
22 due diligence, that the person sign under the
23 penalties of perjury?
24       MS. FINCHER:  Object to the form.

Page 96

1        THE WITNESS:  It required that the owner
2  or the person responsible were to sign the
3  documents.
4  BY MR. MIGLIORI:
5     Q   Does the questionnaire for Henry Schein
6  actually require that it be under the penalties of
7  perjury?
8     A   I don't recall specifically.
9     Q   The types of information suggested for
10 Henry Schein customers based on the HDMA guidance
11 provide potential customer with a credit
12 application.
13       Did you require a credit application for
14 your new customers?
15       MS. FINCHER:  Object to the form.
16       THE WITNESS:  Not in my role, but I'm --
17 under the account setup, I -- I know they went
18 through a credit application.
19 BY MR. MIGLIORI:
20    Q   Okay.  "A background questionnaire
21 requesting the following information:  Business
22 background, customer base, average number of
23 prescriptions filled each day."
24       Is this information -- this type of

Page 97

1  information the types of information that you were
2  trained should be in a due diligence file for each
3  of the Henry Schein customers?
4        MS. FINCHER:  Object to the form.
5        THE WITNESS:  Yes.
6  BY MR. MIGLIORI:
7     Q   And isn't it true that from 2012 to
8  2016, Henry Schein's compliance with this was a
9  one-page questionnaire?
10       MS. FINCHER:  Object to the form.
11       THE WITNESS:  No.
12 BY MR. MIGLIORI:
13    Q   How did Henry Schein obtain this
14 information --
15       MS. FINCHER:  Object to the form.
16 BY MR. MIGLIORI:
17    Q   -- that -- or information like this when
18 you got there in 2012?
19    A   In 2012, there was -- it was at least a
20 two-page questionnaire in 2012, and then after
21 that there were additional questionnaires that
22 were developed based off of the practice type that
23 the account would fill out.
24       And then as part of the whole overall

Page 98

1  due diligence process, we also -- there was a
2  licensure background check for state level DEA.
3  There was also an address verification check to
4  make sure it appeared to be a legitimate address,
5  a legitimate practice office.
6       A Google search. If there was a website
7  for the account, we would look at that.
8  Healthgrades was used to look at different reviews
9  of the physician. You know, any information that
10  was available on the internet.
11     Q  You would agree with me that all those
12  sources of information are important to understand
13  and know your customer, correct?
14     A  Correct.
15     Q  And when they had 27,000 cases that did
16  not have full and complete due diligence, some
17  aspect of that information was missing in those
18  27,000 due diligence files, correct?
19        MS. FINCHER: Object to the form.
20        THE WITNESS: Correct.
21  BY MR. MIGLIORI:
22     Q  And if you look at the last page of this
23  guidance -- or it says "Additional
24  Recommendations." It's going to be the page that

Page 99

1  ends in 626. Let's see if I got this right.
2        It says under "SOPs": "It is
3  recommended that to implement these industry
4  compliance guidelines, specific written company
5  SOPs be developed and maintained."
6        Did you ever do that, develop SOPs for
7  due diligence?
8     A  I don't recall actually developing one.
9  I was definitely involved in revising and changing
10  existing procedures.
11     Q  Did they get implemented?
12     A  Yes.
13     Q  Were they relative to due diligence?
14     A  Yes.
15     Q  So if they happened between 2012 and
16  2016, you would have had some input relative to
17  due diligence?
18     A  Yes.
19     Q  Did you have any roles from 2012 to 2016
20  relative to the setting of thresholds in the
21  Suspicious Order Monitoring Systems?
22     A  No.
23     Q  Did you have any roles at all with
24  respect to the Suspicious Order Monitoring Systems

Page 100

1  themselves? And -- and I'm distinguishing that
2  from the "Know Your Customer" due diligence.
3     A  I would say yes.
4     Q  What roles did you have with SOMS?
5     A  I think overall it was a joint role
6  between Verifications and Regulatory to make sure
7  that the system was working, there was an adequate
8  system, and that we were meeting the requirements.
9     Q  Well, specifically, what would your role
10  be in that?
11     A  It's understanding different pends that
12  we had set up, making sure we were pending orders
13  for different reasons. It's -- if there were new
14  drugs that were becoming -- we were learning on
15  the marketplace that being diverted, making
16  sure that we were looking at those drugs. Do an
17  internal auditing of the system to make sure that
18  it was working as it was expected to work.
19     Q  But you didn't yourself get involved
20  with setting the algorithms, correct?
21     A  Correct. No.
22     Q  And the assumptions for those
23  algorithms, that wasn't part of your
24  responsibility, correct?

Page 101

1     A  Correct.
2     Q  Is it fair to say that in the world of
3  DEA compliance from 2012 to 2016, your primary
4  responsibilities were in the area of "Know Your
5  Customer" due diligence and -- and distribution
6  center audits?
7        MS. FINCHER: Object to the form.
8        THE WITNESS: Yes.
9  BY MR. MIGLIORI:
10     Q  If you look at the page 623. It's
11  page 11 of 15. I -- I brought you back too far.
12        It's a section called "Documentation."
13  It says: "All investigations should be fully
14  documented, and all records of the investigation
15  should be retained in an appropriate location
16  within the firm such as with other records
17  relating to the particular customer."
18        Was that something that you were taught
19  and trained in 2012?
20     A  Yes.
21     Q  And was it the belief at Henry Schein
22  that if you were to perform due diligence,
23  everything had to be documented?
24     A  Yes.

Page 102

1    MS. FINCHER: Object to the form.
2  BY MR. MIGLIORI:
3    Q    And that a lack of documentation was
4  evidence of not being fully compliant --
5    MS. FINCHER: Object to the form.
6  BY MR. MIGLIORI:
7    Q    -- with DEA due diligence?
8    MS. FINCHER: Sorry, Don. Object to the
9  form.
10    THE WITNESS: Yes.
11  BY MR. MIGLIORI:
12    Q    It says: "At a minimum, documentation
13  should include the names, titles and other
14  relevant identification of the representative or
15  the customer contacted -- example: The physician
16  in charge or pharmacist in charge -- dates of
17  contact, and a full description of questions asked
18  and requests for information made by the
19  distributor, and of information provided by the
20  customer."
21    You would agree with me that, in your
22  review of the due diligence files at Henry Schein,
23  that those were all important elements or fields
24  of information to be recorded, correct?

Page 103

1    MS. FINCHER: Object to the form.
2    THE WITNESS: Correct.
3  BY MR. MIGLIORI:
4    Q    And that failure to record that type of
5  information would amount to being an incomplete
6  due diligence file, correct?
7    MS. FINCHER: Object to the form.
8    THE WITNESS: Correct.
9  BY MR. MIGLIORI:
10    Q    "The documentation should include a
11  clear statement of the final conclusion of the
12  investigation, including why the order
13  investigated was or was not determined to be
14  suspicious."
15    You would agree with me that at least
16  when you got there in 2012, you were trained that
17  suspicious orders that were investigated, their
18  outcome needed to not only be determined but
19  documented in the due diligence files at Henry
20  Schein, correct?
21    MS. FINCHER: Object to the form.
22    THE WITNESS: Correct.
23  BY MR. MIGLIORI:
24    Q    You mentioned the word "pend" earlier.

Page 104

1  You'll agree with me earlier that a pended order
2  in the Henry Schein system was an order that
3  somehow triggered or tripped a concern about an
4  order deviating in size, frequency or pattern from
5  prior orders of that customer?
6    MS. FINCHER: Object to the form.
7    THE WITNESS: No.
8  BY MR. MIGLIORI:
9    Q    How is that wrong?
10    A    Any new customer would automatically
11  pend, and so it would be their first order.
12    Q    Okay. So I'll increase the definition.
13  Any new customer is pended until they are cleared,
14  correct?
15    A    Correct.
16    Q    So in order to clear a new customer,
17  it's essential in the Henry Schein system to
18  perform due diligence, correct?
19    A    Correct.
20    Q    And it's essential to document that due
21  diligence, correct?
22    MS. FINCHER: Object to the form.
23    THE WITNESS: Correct.
24  BY MR. MIGLIORI:

Page 105

1    Q    And a new customer, would the due
2  diligence include criminal background checks?
3    MS. FINCHER: Object to the form.
4    THE WITNESS: No.
5  BY MR. MIGLIORI:
6    Q    In new customers, would due diligence
7  include prior convictions for drug-related
8  offenses?
9    MS. FINCHER: Object to the form.
10  Foundation.
11    Are you asking, Don, about her role in
12  Regulatory or Verifications or --
13    MR. MIGLIORI: Due diligence.
14    THE WITNESS: The license would be
15  checked. There was a check on the license. There
16  was no criminal background.
17  BY MR. MIGLIORI:
18    Q    Well, you've seen -- have you ever seen
19  the letters from the DEA about not relying on the
20  mere existence of a registration as due diligence?
21    A    Yes.
22    Q    All right. So I'll go back to the
23  original question.
24    In the onboarding of a new client at

Page 106

1 Henry Schein from 2012 to 2016, in the due
2 diligence for that pended new customer, was there
3 a process by which to verify that that customer
4 did not have any prior drug-related criminal
5 offenses?
6 A   If that offense affected their medical
7 license, yes.
8 Q   So the only way at Henry Schein to
9 determine whether or not somebody had a prior
10 drug-related criminal conviction would be if the
11 medical license were suspended?
12     MS. FINCHER:  Object to the form.
13     THE WITNESS:  Correct.
14 BY MR. MIGLIORI:
15 Q   There was no independent review of a new
16 onboarded customer of whether or not that doctor
17 or practice had any convictions for drug-related
18 offenses, other than verifying the medical
19 license?
20     MS. FINCHER:  Object to the form.
21 BY MR. MIGLIORI:
22 Q   Correct?
23 A   Correct.
24 Q   The last sentence of this documentation

Page 107

1 paragraph says: "Copies of any written
2 information provided by the customer should also
3 be retained as part of the documentation of the
4 investigation."
5     So for a new customer that came on
6 board, if they provided any dispensing history or
7 any other documentation from their practice, that
8 should be in the file, correct?
9 A   Correct.
10 Q   All right.  So if I were to take a file
11 of a customer of Henry Schein, that information --
12 that is, all the information relied upon and all
13 the conclusions from that information about the
14 new customer, the pended new customer, should
15 actually be in the file to be compliant with the
16 DEA regulations, correct?
17     MS. FINCHER:  Object to the form.
18     THE WITNESS:  Correct.
19     (Steffanie-Oak Exhibit No. 8 was
20     marked for identification.)
21 BY MR. MIGLIORI:
22 Q   I show you exhibit -- Exhibit 8.
23     You said one of the companies that you
24 educated yourself on DEA regulatory compliance was

Page 108

1 the Cegedim Dendrite Company, correct?
2 A   Correct.
3 Q   Cegedite -- Cegedim actually performed
4 external third-party audits of your -- of Henry
5 Schein's suspicious order monitoring and due
6 diligence files, correct?
7     MS. FINCHER:  Object to the form.
8 Foundation.
9     THE WITNESS:  Prior to me coming into
10 the position, yes.
11 BY MR. MIGLIORI:
12 Q   Okay.  They didn't do any while you were
13 there?
14 A   No.  No audits, no.
15 Q   But they did help you train to
16 understand the DEA requirements, correct?
17 A   It was an industry conference that I had
18 gone to, yes.
19 Q   Okay.  Had you, when you took this
20 position, done anything to educate yourself on the
21 prior audits of Cegedim?
22 A   I don't recall being aware.  In this --
23 Q   All right.  This document is dated
24 December 16, 2009.  It's called the "Cegedim

Page 109

1 Dendrite Compliance Solutions Draft, Schein S1
2 Procedural Review."
3     And it says: "Background.  The guidance
4 provided directly through the regulations was
5 further amplified in correspondence delivered by
6 the Drug Enforcement Administration (DEA) in
7 December of 2007."
8     Did you ever see that DEA Dear
9 Registrant letter of December 2007?
10 A   Do you have a copy of it so I can look
11 at it or --
12 Q   I -- I do.  Just do you recall it
13 offhand?  I can show it to you.
14 A   I know there was a DEA letter that I was
15 aware of.  I just don't remember the specific
16 date.
17 Q   Okay.  It says: "In this correspondence
18 the DEA establishes expectations that registrants
19 will actively investigate prospective customers
20 and aggressively investigate orders pending to
21 filling them."
22     Do you see that?
23 A   Mm-hmm.
24 Q   Did you understand that to be the --

Page 110

1 your general recollection of what those letters
2 concerned?
3        MS. FINCHER: Object to the form.
4 BY MR. MIGLIORI:
5    Q   Is that consistent?
6    A   By aggressively and all that, yes, I
7 understood what the requirements were per the CFR.
8    Q   Okay. So Cegedim's conclusions and
9 recommendations, if you turn to page 4 of the
10 document, include a section called "New Accounts."
11 Do you see it?
12   A   Mm-hmm.
13   Q   "New accounts are opened without
14 sufficient due diligence, investigations/
15 inquiries."
16       Were you aware that Cegedim had found
17 that Henry Schein's new accounts were being opened
18 without sufficient due diligence, investigations
19 and inquiries when you took the job in 2012?
20   A   No.
21       MS. FINCHER: Object to the form,
22 foundation.
23 BY MR. MIGLIORI:
24   Q   "For the most part, new accounts are

Page 111

1 opened based upon a verification of the customer's
2 DEA number, which is not considered adequate by
3 the DEA."
4        Were you aware that the -- the new
5 customers were being onboarded, at least as of
6 2009, with simple verification of DEA registration
7 only?
8    A   No.
9        MS. FINCHER: Object to the form,
10 foundation.
11 BY MR. MIGLIORI:
12   Q   You would agree with me that that's not
13 sufficient based on your training and knowledge,
14 correct?
15       MS. FINCHER: Object to the form.
16       THE WITNESS: Correct.
17 BY MR. MIGLIORI:
18   Q   "Correspondence regarding the
19 prospective customer's previous history of using
20 controlled substances, office practice rules, and
21 general practice expectations should be completed
22 prior to opening the new account."
23       You would agree that that's what needs
24 to happen before opening a new account, correct --

Page 112

1        MS. FINCHER: Object --
2 BY MR. MIGLIORI:
3    Q   -- at a minimum?
4        MS. FINCHER: Object to the form.
5        THE WITNESS: Correct.
6 BY MR. MIGLIORI:
7    Q   And it says: "A compliance agreement
8 form should be developed and included in the new
9 account opening process."
10       Did you in fact develop a compliance
11 agreement during your four years in Regulatory?
12   A   Yes, we did.
13   Q   Were you part of that process of
14 developing it?
15   A   I don't recall if it was there or if I
16 had just modified it.
17   Q   Okay. "The use of the MedPro inquiry
18 should be expanded for all controlled substance
19 accounts, and not just a limited number of states
20 that require this background check."
21       Are you familiar with the MedPro
22 inquiry?
23   A   Somewhat, yes.
24   Q   And -- and what was it?

Page 113

1    A   That is the computer database that
2 Verifications would use to access the doctor's
3 license. They could see if they were licensed in
4 other states too, see if there were any actions
5 against the license or if it was, you know, in
6 good standing.
7    Q   So if a physician went into MedPro --
8 I'm sorry. Strike that.
9        If Henry Schein went into MedPro and saw
10 that a physician's license had been suspended and
11 then reinstated, that information would be in
12 MedPro, correct?
13       MS. FINCHER: Object to the form.
14       THE WITNESS: It -- yes, it should be in
15 MedPro.
16 BY MR. MIGLIORI:
17   Q   And the basis for the suspension should
18 also be in MedPro, correct?
19       MS. FINCHER: Object to the form,
20 foundation.
21       THE WITNESS: Yes.
22 BY MR. MIGLIORI:
23   Q   And if that information were relied upon
24 by Henry Schein, that would be in your due

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  diligence file, correct?
2      A   Correct.
3      Q   And as of this time, at least in 2009,
4  it appears from this document that MedPro was only
5  being used in the states that required it for
6  background checks.
7          MS. FINCHER:  Object --
8  BY MR. MIGLIORI:
9      Q   Was that true --
10     A   I don't --
11     Q   -- when you got there in 2012?
12     A   No.
13         MS. FINCHER:  Object to the form.
14  BY MR. MIGLIORI:
15     Q   It says:  "Henry Schein has conducted
16  some on-site investigation for prospective
17  customers.  However, the criteria for the level of
18  due diligence has not been documented in any SOP
19  or memorandum."
20         By the time you got there in 2012, was
21  there a standard operating procedure or memorandum
22  that documented how on site -- or what the
23  criteria would be for due diligence for new
24  customers?

Page 115

1      A   Yes.
2      Q   Do you know when between 2009 and 2012
3  that happened?
4          MS. FINCHER:  Object to the form.
5          THE WITNESS:  No.
6  BY MR. MIGLIORI:
7      Q   You would agree with me that in order
8  for there to be a criteria for due diligence, that
9  it would have to be included in a standard
10  operating procedure of the company, correct?
11         MS. FINCHER:  Object to the form.
12         THE WITNESS:  It would need to be
13  documented.
14  BY MR. MIGLIORI:
15     Q   And that's where it would be documented,
16  correct, in the SOPs?
17         MS. FINCHER:  Object to the form,
18  foundation.
19         THE WITNESS:  Yes.  Yes.
20  BY MR. MIGLIORI:
21     Q   Okay.  Another conclusion of Dendrite
22  was that:  "Lower level staff is actively involved
23  in clearing pended orders.  Pended orders should
24  be cleared by a management official."

Page 116

1          Were you aware of that issue coming into
2  the Regulatory Affairs position in 2012?
3          MS. FINCHER:  Object to the form.
4          THE WITNESS:  No, and I'm not clear what
5  the context was of the pended order.
6  BY MR. MIGLIORI:
7      Q   You would agree with me that even when
8  you got there in 2012, it was one of the
9  observations that non-medically trained people
10  were clearing pended orders in the Verifications
11  department, correct?
12         MS. FINCHER:  Object to the form.
13         THE WITNESS:  That's correct, but there
14  was never a requirement for them to be medically
15  trained.
16  BY MR. MIGLIORI:
17     Q   Well, wasn't it true that your own
18  internal auditing that you participated in reached
19  a conclusion at the end of 2013 that the folks
20  that are clearing orders at that level need better
21  training?
22         MS. FINCHER:  Object to the form.
23         THE WITNESS:  We needed to continually
24  improve and provide additional training as

Page 117

1  information became available.  I will agree to
2  that, yes.
3  BY MR. MIGLIORI:
4      Q   And will you agree that your auditing
5  group also found that there needed to be more
6  communication with Regulatory Affairs in clearing
7  those orders and not just having it be done by
8  staff at the Verifications level?
9          MS. FINCHER:  Object to the form.
10         THE WITNESS:  I didn't really a hundred
11  percent agree with that finding, so I have to say
12  no.
13  BY MR. MIGLIORI:
14     Q   Okay.  Well, let me break it down.
15         You will agree with me that was the
16  finding of that committee -- of that audit,
17  correct?
18     A   That was the finding of one individual,
19  yes, I'll agree.
20     Q   Well, the audit is signed by all of you,
21  correct?
22         MS. FINCHER:  Object to the form.
23         THE WITNESS:  No.
24  BY MR. MIGLIORI:

Page 118

1    Q    All right. I will show it to you. You
2  will agree with me that your auditing team reached
3  the conclusion that low level staff were
4  insufficiently trained and were making too many
5  decisions without Regulatory input relative to
6  clearing pended orders, correct?
7    A    No.
8        MS. FINCHER: Object to the form. Asked
9  and answered.
10 BY MR. MIGLIORI:
11   Q    All right. We'll get to it in a second.
12       Do you agree with this observation in
13 2009 of Cegedim that: "The responsibilities of
14 the customer service department, the Verifications
15 department and the Regulatory department appear to
16 be poorly defined and reliant, to some extent,
17 upon the judgment of individual employees
18 regarding what types of situations should be
19 referred to management for approval or forwarded
20 to Regulatory for investigation"?
21       First of all, were you aware that that
22 was Cegedim's observation and recommendation in
23 2009?
24       MS. FINCHER: Object to the form,

Page 119

1  foundation.
2        THE WITNESS: No.
3  BY MR. MIGLIORI:
4    Q    And when you got there in 2012, did you
5  share that concern?
6        MS. FINCHER: Object to the form.
7        THE WITNESS: No. I wasn't -- I've
8  never seen this before, so no.
9  BY MR. MIGLIORI:
10   Q    You did in fact participate in your own
11 audits where members of your team concluded
12 similarly, correct?
13       MS. FINCHER: Object to the form.
14 BY MR. MIGLIORI:
15   Q    Do you recall that?
16   A    Not how you're wording it. I know that
17 there was a finding about additional training
18 being needed or recommended. So I can agree to
19 that, yes. I'd like to see the report if I can.
20   Q    Sure. I'll give it to you right now.
21       (Steffanie-Oak Exhibit No. 9 was
22       marked for identification.)
23 BY MR. MIGLIORI:
24   Q    This is Exhibit 9. This is one of the

Page 120

1  iterations of a report that is -- it says from
2  you, and to the attendees L. David, Jeff Peacock,
3  Mullens, David, Tejeda, Brandt, Matalon, Abreu and
4  Romeo, dated February 14, 2014.
5        Do you recall writing this?
6    A    I recall completing the minutes to the
7  meeting. I don't -- yes, I didn't -- these are
8  minutes from a meeting.
9    Q    All right. So you -- you compiled these
10 minutes, correct?
11   A    Correct.
12   Q    And these minutes are from a meeting
13 that related to certain findings of the SOM audit
14 team, which included you, correct?
15       MS. FINCHER: Object to the form.
16       THE WITNESS: The audit was done -- from
17 my recollection, was done by Ken Romeo, who was --
18 who reported to me.
19 BY MR. MIGLIORI:
20   Q    Okay. And so when Mr. Peacock testified
21 in this case that you were part of a team with
22 Mr. Romeo and with Sergio Tejeda, would that have
23 been accurate relative to SOM auditing?
24       MS. FINCHER: Object to the form.

Page 121

1        THE WITNESS: We had been involved in
2  other audits. This particular -- let me see if
3  this was the particular one that he had done on
4  his own.
5  BY MR. MIGLIORI:
6    Q    You -- you think Mr. Romeo did this on
7  his own?
8    A    Yes.
9    Q    And you -- you reported this out to
10 everyone. Did you report it as only being
11 Mr. Romeo's?
12   A    Well, the original audit report should
13 be from him. This is just meetings -- we held a
14 meeting to review the audit report and have
15 discussions, so I just documented the minutes.
16   Q    Okay. Well, let's go through the
17 findings.
18   A    Okay.
19   Q    Somebody at Henry Schein found, number
20 one, the current computerized Suspicious Order
21 Monitoring System is dated and that the risk level
22 is high.
23       That was one of the findings you
24 reported, correct?

Page 122

1    MS. FINCHER:  Object to the form.
2  Mischaracterizes the document.
3    THE WITNESS:  I didn't report that, no.
4  It's in the -- this is -- I added minutes within
5  his report.  So, is that what you're asking?
6  BY MR. MIGLIORI:
7    Q   Maybe that's the question, but --
8    A   Okay.  Okay.
9    Q   -- I can actually -- it's helpful to me
10  if that's the distinction you're making.  I can go
11  to the very original one and see if it -- let's
12  see.
13    (Steffanie-Oak Exhibit No. 10 was
14    marked for identification.)
15  BY MR. MIGLIORI:
16    Q   I show you Exhibit 10.
17    A   (Peruses document.)
18    Q   If this helps you, Exhibit 10 is
19  December 2013, so it's a couple of months earlier,
20  and this is written from Ken Romeo.
21    Do you see that?
22    A   Yes.
23    Q   To Jeff Peacock, who was your superior,
24  correct -- your supervisor, correct?

Page 123

1    MS. FINCHER:  Object to the form.
2  BY MR. MIGLIORI:
3    Q   At this point.
4    A   No.  I report to Sergio, and Sergio
5  reports to Jeff.  I mean ultimately I reported to
6  Jeff.
7    Q   Okay.  Fair enough.  I'm sorry.  I'm
8  sorry.
9    But -- but he took Mr. DiBello's
10  position at this point, correct?
11    A   Yes.
12    Q   All right.  And it's the Regulatory
13  internal assessment of our DEA suspicious order
14  monitoring, "Know Your Customer" systems and
15  procedures.  Do you see that?
16    A   Yes.
17    Q   And then it says:  "On December 2nd and
18  3rd, 2013, Ken Romeo, Tina Steffanie-Oak and
19  Sergio Tejeda were on site in the Melville, New
20  York, to complete a DEA compliance assessment of
21  Henry Schein's SOM, 'Know Your Customer' systems
22  and procedures."
23    Does that refresh your recollection of
24  who was doing the compliance assessment?

Page 124

1    A   I know we had meetings about the, yes,
2  audit itself.  I don't remember actually carrying
3  out audit functions of this, but --
4    Q   Okay.
5    A   -- based off what Ken had done at his
6  site, what he had looked at, he had reviewed the
7  information with me and Sergio.
8    Q   Okay.
9    A   But I don't recall taking -- actually
10  doing the audit myself.
11    Q   All right.  But at least as it
12  represents here --
13    A   Mm-hmm.
14    Q   -- from the 2nd to the 3rd of 2013, you,
15  Ken and Sergio were on site in Melville to
16  complete the DEA compliance assessment, correct?
17    A   Correct.
18    Q   You have no reason to think that's
19  not --
20    A   No.
21    Q   -- true?  Okay.
22    And the purpose of it, the report
23  summarizes the findings of the Regulatory
24  assessment of our suspicious order monitoring,

Page 125

1  "Know Your Customer" internal process and
2  procedures, as well as the computer programs
3  utilized by our Suspicious Order Monitoring
4  System.
5    So you agree with me, at least in the
6  way it's presented, this was a report of the three
7  of you, correct?
8    A   Yes.
9    MS. FINCHER:  Object to the form.
10  BY MR. MIGLIORI:
11    Q   All right.  We can go and we'll see the
12  same language that we just found.
13    The findings of -- from three of you
14  says:  "Current computerized Suspicious Order
15  Monitoring System is dated, and that risk level is
16  high."
17    That was one of the findings, correct?
18    MS. FINCHER:  Object to the form.  She's
19  already testified that she wasn't involved in the
20  audit itself.
21    MR. MIGLIORI:  Just form is enough.
22    THE WITNESS:  Yes.  This is what it
23  says, yes.
24  BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    Q   And it says, "Risk level is high," and
2 when that -- in terms of risk level high, that's
3 for DEA enforcement, correct?
4        MS. FINCHER:  Objection.
5 BY MR. MIGLIORI:
6    Q   When you -- when you measure risk in
7 this kind of report, the risk that you're
8 measuring is whether or not this is subject to DEA
9 enforcement, correct?
10        MS. FINCHER:  Object to the form.
11        THE WITNESS:  No.  So the "high" here
12 did not mean that we weren't compliant at the
13 time.  Is that --
14 BY MR. MIGLIORI:
15    Q   I'm asking --
16    A   So it would not -- it would not have led
17 to any type of an enforcement action.
18    Q   Okay.  When the document talks about
19 risk, if you go to the first page.
20    A   Mm-hmm.
21    Q   It says:  "This assessment is a result
22 of a cooperative effort of both Regulatory and
23 Verifications teams who took into account, one,
24 the identification of controlled substances and/or

Page 127

1 specific combinations of controlled substances
2 that might potentially place Schein in a high risk
3 category of distributor -- as a distributor of
4 controlled substances for DEA regulatory actions."
5        Would you agree with me that the risk
6 that you're measuring is whether or not you're
7 putting Schein in a high risk category as a
8 distributor of controlled substances for DEA
9 regulatory action?  That's the risk you're
10 measuring, correct?
11        MS. FINCHER:  Object to the form.  Asked
12 and answered.
13        THE WITNESS:  Based on how it's worded
14 in here, I agree, yes.
15 BY MR. MIGLIORI:
16    Q   Okay.  Now, we've gone over a lot of
17 these findings with other people.  I just want to
18 talk to you about on page 3.
19        It says:  "Individual account thresholds
20 for controlled substance purchases may be adjusted
21 by Verifications without regulatory and/or
22 appropriate medical guidance, which could result
23 in appropriate product release."  And the risk
24 here again is high.

Page 128

1        And it says:  "A, decision makers in the
2 Verifications department lack the medical training
3 and qualifications to release controlled
4 substances without regulatory/medical guidance in
5 some instances."
6        Was that one of the findings that your
7 group had in this particular audit in December of
8 2013?
9        MS. FINCHER:  Object to the form.
10        THE WITNESS:  Yes.
11 BY MR. MIGLIORI:
12    Q   You say:  "In fairness, they are doing
13 the best they can with the limited training that
14 they have received, and many of our Verifications
15 colleagues are new to the particular position of
16 decision makers."
17        So you're identifying that it's a
18 problem, but they're trying.
19        MS. FINCHER:  Object to --
20 BY MR. MIGLIORI:
21    Q   Fair enough?
22        MS. FINCHER:  Object to the form.
23 Again, she's already testified she's not the one
24 who drafted these portions.

Page 129

1        MR. MIGLIORI:  Please just limit to
2 form.
3        THE WITNESS:  I wouldn't refer to it
4 as --
5        MR. MIGLIORI:  That's coaching.  We just
6 got Cohen involved with these, okay?  I'm not a
7 guy that usually cares, but that's way too much.
8        MS. FINCHER:  I'll do what I need to do
9 to protect the record.
10        MR. MIGLIORI:  And we'll call Cohen if
11 we have to.  He gave a number of eight words at
12 most.  If you have form -- form, if you want to
13 say "asked and answered," that's fine.  Please no
14 coaching.
15        MS. FINCHER:  I'll continue to do what I
16 need to do to protect the record.
17        MR. MIGLIORI:  And then we'll call
18 Cohen.  All right?
19        MR. McDONALD:  Don, just ask the
20 question.
21        MR. MIGLIORI:  No, no, I just -- I want
22 some acknowledgment.  I appreciate what you're
23 doing, but it's coaching.
24        MS. FINCHER:  I -- I respectfully

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 disagree with you.

2 BY MR. MIGLIORI:

3    Q   So one of the opportunities that your

4 group found was "To provide Verifications

5 personnel with additional medical and dental

6 training geared towards a recognition of common

7 drug utilization and prescribing habits of

8 clinical physicians, dentists and institutional

9 accounts."

10      One of the -- the opportunities or

11 recommendations from your group was to come out

12 and say, We should train them better. Correct?

13      MS. FINCHER: Object to the form.

14      THE WITNESS: Yes. To provide

15 additional training would be beneficial, yes.

16 BY MR. MIGLIORI:

17    Q   All right. I'm not going to make you go

18 through all of them because, again, we've done

19 this with a bunch of other people.

20      And so the overall recommendations on

21 page 7, in the short term, enhanced communications

22 with the Verifications department.

23      Did you believe at the end of 2013 that

24 it was important that Regulatory and Verifications

Page 131

1 have better interaction?

2    A   Yes.

3    Q   At the end of 2013, another

4 recommendation was to provide additional medical

5 training to Verification medical -- Verifications

6 decision makers.

7      That was one of your conclusions and

8 recommendations, correct?

9      MS. FINCHER: Object to the form.

10      THE WITNESS: Yes.

11 BY MR. MIGLIORI:

12    Q   And the third was to provide additional

13 training relative to account due diligence

14 techniques.

15      That is, you recommended at the end of

16 this two-day assessment that more training was

17 needed for account due diligence techniques,

18 correct?

19      MS. FINCHER: Object to the form.

20      THE WITNESS: I'm not sure specifically

21 what that one referred to. I'm not sure if that

22 was -- I'm sorry. I can't find where is -- what

23 page was it on?

24 BY MR. MIGLIORI:

Page 132

1    Q   Sure. I'll find it in a minute.

2      If you go to No. 6 -- I'm sorry, I

3 didn't --

4    A   246?

5    Q   -- I didn't show it to you. Number 6 on

6 page 5, paragraph 6.

7    A   Paragraph 6. Okay.

8    Q   It says: "Additional justification

9 letters should be reviewed by management." It

10 says the risk level there is low.

11      And it says: "The potential additional

12 justification letters allow medical specialists

13 input into the decision-making process, and

14 mitigates the long-term risk for Schein and better

15 compliance with our obligations to the Code of

16 Federal Regulations and the DEA."

17      Do you see that?

18    A   Yes.

19    Q   All right. And so that is a technique

20 for better due diligence, correct?

21    A   Okay. Yes. Yes.

22    Q   So we don't need to go back to this

23 original one since I think they're the same.

24      MS. FINCHER: Don, I'll just point out

Page 133

1 it's almost noon. So I'm not sure when you wanted

2 to take a lunch break.

3      MR. MIGLIORI: Why don't we go off the

4 record for a second and talk about that.

5      THE VIDEOGRAPHER: 11:55. We're off the

6 video record.

7      (Lunch recess.)

8      THE VIDEOGRAPHER: 12:29, we're on the

9 video record.

10      (Steffanie-Oak Exhibit No. 11 was

11      marked for identification.)

12 BY MR. MIGLIORI:

13    Q   Okay. I'll show you Exhibit 11.

14      Exhibit 11 has a date of November 27,

15 2013. It's a PowerPoint presentation with -- that

16 bears your name on it. It says "Individual

17 Opportunity/Issue, Presented by Tina

18 Steffanie-Oak."

19      Did you review this in preparation for

20 today?

21    A   I do remember seeing it yesterday.

22    Q   Okay. And is this something you

23 prepared?

24    A   Yes.

Page 134

1  Q   Okay.  On the second page, it says
2  "Opportunity/Issue."  It says:  "Are we in
3  substantial compliance with DEA SOM/Know Your
4  Customer regulations?"
5      And the first bulleted item says:  "We
6  do not have Know Your Customer Due Diligence for
7  approximately 60 percent of our customers.
8  Remaining 40 percent has varying degrees of due
9  diligence (files are not consistent)."
10      First of all, are those your words?
11  A   Yes.
12  Q   And the 60 percent represents files that
13  have no due diligence, correct?
14      MS. FINCHER:  Object to the form.
15      THE WITNESS:  I don't recall
16  specifically if some files may have had something.
17  I can't say with certainty.
18  BY MR. MIGLIORI:
19  Q   Okay.  The second part says:  "Remaining
20  40 percent has varying degrees of due diligence."
21      So at least in the 40 percent, there is
22  some information.  It doesn't say it all, correct?
23  A   Based -- based on improvements that we
24  made to the process, we had added different types

Page 135

1  of documents, so that's where the consistency
2  comes from.  So what the requirements were as of
3  that day, they may not have had or been in that
4  same format that was required.
5  Q   Okay.  Well, there's a lot of "mays" in
6  -- I want to -- I want to understand, first of
7  all, what you know, and then -- or can recall, and
8  then we'll get into what might explain some
9  things.
10      You'll agree with me that, at least for
11  this PowerPoint presentation that Henry Schein
12  produced to us, it says that:  "We," Henry Schein,
13  "do not have Know Your Customer Due Diligence for
14  approximately 60 percent of our customers."
15      That's a statement that you wrote,
16  correct?
17  A   Correct.
18  Q   All right.  And then on the remaining
19  40 percent, there were varying degrees of due
20  diligence, the files were not consistent.
21      Those were your words, correct?
22  A   Correct.
23  Q   You would agree that incomplete files,
24  whatever percentage that may be, is noncompliance

Page 136

1  with DEA regulations, correct?
2      MS. FINCHER:  Object to the form.
3      THE WITNESS:  No.
4  BY MR. MIGLIORI:
5  Q   You would agree that if a file had no
6  information on it for a customer, that would be
7  noncompliance with DEA regulations, correct?
8      MS. FINCHER:  Object to the form.
9      THE WITNESS:  Correct.
10  BY MR. MIGLIORI:
11  Q   All right.  It says:  "What we do
12  not" -- what -- "So what we do know from other
13  Distributor DEA Civil Actions and recent DEA-
14  sponsored conferences:  The fact that the customer
15  has a 'Valid DEA Registration' is not enough due
16  diligence to 'Know Your Customer.'"
17      So the emphasis on "not enough," that is
18  your emphasis, correct?
19  A   From what I recall putting this
20  together, I did take a lot of this information
21  directly out of the presentation that was
22  prepared.  So I can't say for certainty that that
23  was my emphasis.  I believe that's what I took out
24  of the presentation.

Page 137

1  Q   But -- but you would certainly agree
2  that only relying on a DEA registration is not
3  compliance with DEA due diligence requirements,
4  correct?
5  A   Correct.
6  Q   Under "Opportunity/issues, continued,"
7  there are some statements.  It says:  "Statements
8  made by James Arnold, Unit Chief, Regulatory Unit,
9  DEA headquarters, at industry conference regarding
10  suspicious order monitoring."
11      Did you attend that particular
12  conference?
13  A   Yes.
14  Q   And you recall Unit Chief James Arnold
15  giving these examples?
16  A   Yes.
17  Q   All right.  And so you would have culled
18  these examples for this presentation.  That is,
19  these are what you heard and observed from the
20  conference?
21  A   This is what I took out of his
22  presentation, correct, and I heard him, yes.
23  Q   Okay.  So one of the things that you
24  took from James Arnold's presentation was, "Do

Page 138

1  what you are supposed to do and we won't have a
2  problem."
3      What did that mean?
4      MS. FINCHER: Object to the form.
5  BY MR. MIGLIORI:
6    Q  To your understanding.
7    A  At the time I felt as though they
8  weren't giving us enough information.  I mean, "Do
9  what you're supposed to do."  We were there as
10 industry advisors, What are our obligations?  What
11 are -- how -- how do we go about implementing this
12 in a compliant way?  So to me it had no meaning.
13 I kind of -- to me it came across as arrogant,
14 quite honestly.
15   Q  Okay.  You understand under the CF --
16 CSA and the DEA regulations, the obligation to
17 design a system was that of the supplier, that of
18 Henry Schein, correct?
19   A  Yes.
20     MS. FINCHER: Object to the form.
21 BY MR. MIGLIORI:
22   Q  And you understand that under the
23 regulations, that DEA headquarters and field
24 offices were not allowed to tell you whether your

Page 139

1  system was compliant, correct?
2      MS. FINCHER: Object to the form.
3      THE WITNESS: Correct.
4  BY MR. MIGLIORI:
5    Q  All right.  It says: "All you need to
6  do is identify and report.  It's that simple."
7      Was that one of the things you took out
8  of his presentation?
9    A  Yes.
10   Q  And you understand that the importance
11 of identifying suspicious orders and reporting
12 them was towards the end of preventing misuse,
13 abuse and diversion?
14   A  Yes.
15   Q  "Legitimate medical need is key."
16     Do you understand that to mean that --
17 that part of the closed system and the
18 distributor's obligations under the closed system
19 to prevent diversion was so that folks who
20 actually needed controlled substances wouldn't be
21 interfered with getting them?
22     MS. FINCHER: Object to the form.
23     THE WITNESS: Yes.
24 BY MR. MIGLIORI:

Page 140

1    Q  "Volume will tell you a lot about the
2  customer."
3      You'll agree that -- that large volumes
4  of orders of controlled substances is a red flag
5  for potential suspicious orders, correct?
6      MS. FINCHER: Object to the form.
7      THE WITNESS: Generally speaking, yes.
8  BY MR. MIGLIORI:
9    Q  You understood that Mr. Arnold was
10 telling suppliers, distributors, "you should know
11 what is suspicious more than DEA would know
12 because you see the numbers and deal with the
13 customers every day."
14     Was that one of the message -- messages
15 that Mr. Arnold was trying to deliver to companies
16 like Henry Schein?
17   A  Yes, that was the message.
18   Q  It says: "Unacceptable excuses for
19 failure to report a suspicious order, according to
20 DEA, included, 'They had a valid DEA
21 registration.'"
22     We've already accepted that just having
23 a valid DEA registration is not due diligence,
24 correct?

Page 141

1    A  Correct.
2    Q  "We are only a link, one link in the
3  supply chain."
4      Claiming that you are only one part of
5  the supply chain is not a sufficient excuse for
6  not reporting suspicious orders, correct?
7      MS. FINCHER: Object to the form.
8      THE WITNESS: That was the statement
9  that the -- made by the DEA.  Not knowing where
10 other drugs are coming from is problematic to a
11 distributor, because if you're selling only one
12 bottle, and they're getting 500 from someone else,
13 your bottle of 100 is not going to appear
14 suspicious.  So...
15 BY MR. MIGLIORI:
16   Q  And one of the recommendations that your
17 audit team actually came up with was that you
18 actually request prescribing histories of your new
19 customers for that purpose, right?
20     MS. FINCHER: Object to the form.
21     THE WITNESS: Yes.  Not always provided,
22 though, it wasn't.
23 BY MR. MIGLIORI:
24   Q  Fair enough.

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1      But you understood the importance that
2  whatever you're providing, that is, whatever Henry
3  Schein was providing to a customer for controlled
4  substances, could actually be indicative of an
5  even bigger concern because that customer could
6  also be ordering from other suppliers, correct?
7      A   Yes.
8          MS. FINCHER:  Object to the form.
9  BY MR. MIGLIORI:
10     Q   And that -- that was known to you at the
11 time, right?
12         MS. FINCHER:  Object to the form.
13         THE WITNESS:  Yes.
14 BY MR. MIGLIORI:
15     Q   And part of knowing your customer is
16 understanding and appreciating the prescribing
17 habits of that customer, correct?
18     A   Correct.
19     Q   Mr. Arnold also said:  "It wasn't
20 acceptable to say that we," Henry Schein, "can't
21 look at every customer order."
22         Did you appreciate that in 2013 that --
23 that it wasn't acceptable to simply say, It's too
24 much work to look at all of our customers' orders?

Page 143

1          MS. FINCHER:  Object to the form.
2          THE WITNESS:  Yes.  These are comments I
3  guess they've heard from industry, not from me, so
4  I -- yeah.
5  BY MR. MIGLIORI:
6      Q   And they're quoted.
7      A   Yes, yes.
8      Q   I'm not saying you said this.
9      A   Yes.
10     Q   But you took from his presentation that
11 the DEA expected of suppliers that they not use as
12 an excuse --
13     A   Right.
14     Q   -- that there's no way they could look
15 at every one of their customers' orders.  You
16 understood that, correct?
17     A   Yes.
18     Q   All right.  DEA was also telling
19 distributors that it wasn't an acceptable excuse
20 to say that, We are not responsible for what a
21 customer does with the drugs.
22         That's not an acceptable excuse for
23 misuse, abuse or diversion, correct?
24         MS. FINCHER:  Object to the form.

Page 144

1          THE WITNESS:  Yes.
2  BY MR. MIGLIORI:
3      Q   And then the last example that you put
4  down from his presentation, Mr. Arnold's
5  presentation, was that:  "DEA would not find it to
6  be an acceptable excuse to say, As a distributor,
7  I'm not a doctor or pharmacist."
8          That's what they said in this
9  presentation, correct?
10     A   Yes.
11     Q   That is, you just -- it's not sufficient
12 to just blame the doctor or pharmacist for
13 diversion, correct?
14         MS. FINCHER:  Object to the form.
15         THE WITNESS:  I don't think that's how
16 it was interpreted.  I think it was saying, As a
17 distributor, we're not a doctor or pharmacist to
18 understand how the drugs are going to be used.
19 BY MR. MIGLIORI:
20     Q   Right.
21     A   Not to point to the doctor and say it's
22 the doctor's responsibility.
23     Q   Right.  Okay.  Fair enough.
24         Then you put together a slide that says

Page 145

1  "Potential Risks to Henry Schein."  And you raise
2  the question:  "How vulnerable are we to potential
3  DEA Regulatory action by not having complete due
4  diligence on all customers purchasing controlled
5  substances?"
6          So you -- you raise the question of --
7  of vulnerability because the due diligence files
8  are incomplete, correct?
9      A   Correct.
10     Q   And then your bullet point is that:
11 "DEA has stated:  One, a pattern of drugs being
12 distributed to practitioners or pharmacies who are
13 diverting demonstrates a lack of effective
14 controls against diversion by the distributor."
15         So you at least recognized from this
16 presentation of Mr. Arnold that diversion in the
17 field is actually evidence of a lack of effective
18 controls by the distributor.  Correct?
19         MS. FINCHER:  Object to the form.
20         THE WITNESS:  Yes.
21         MS. FINCHER:  Mischaracterizes the
22 document.
23 BY MR. MIGLIORI:
24     Q   Go ahead.

Page 146

1     A  Yes, I understood that that's how they
2 interpreted it, yes.
3     Q  "The distributor registration could be
4 revoked under public interest grounds."
5     And you understood that one of the
6 consequences of diversion is that Henry Schein
7 could lose its DEA registration, correct?
8     A  Yes.
9     MS. FINCHER:  Object to form.
10 BY MR. MIGLIORI:
11     Q  You also put from this presentation
12 that: "Any distributor who is selling drugs that
13 are being dispensed outside the course of
14 professional practice must stop immediately."
15     So that is one of the takeaways from
16 Mr. Arnold's presentation, correct?
17     A  Yes.
18     Q  So in your -- in your supply chain when
19 you're dispensing to a physician, and you learn
20 that that physician is self-medicating, under this
21 observation, it's clear that the DEA's expectation
22 is that Henry Schein stop sending controlled
23 substances to that physician immediately, correct?
24     MS. FINCHER:  Object to the form.

Page 147

1     THE WITNESS:  I'm not -- I mean, we
2 didn't ship to someone who indicated they were
3 self-medicating, so --
4 BY MR. MIGLIORI:
5     Q  Yes.  Let me -- let me explain what --
6 it's a hypothetical.
7     A  Okay.
8     Q  Okay.  So if a physician is self-
9 medicating, and it comes to the attention of Henry
10 Schein, under this observation that you've made
11 here from Mr. Arnold's presentation, it's clear
12 that the DEA expects that Henry Schein stop all
13 orders being shipped to that physician who is
14 using them outside the course of the intended use.
15 Correct?
16     MS. FINCHER:  Object to the form.
17     THE WITNESS:  Correct.  Excuse me.
18 BY MR. MIGLIORI:
19     Q  Between the objection and the cough, I
20 just want to make sure --
21     A  I'm sorry.  Yes.
22     Q  -- that's -- that's correct.
23     A  Yes, it is.
24     Q  Okay.  And then finally you write, as a

Page 148

1 potential Regulatory action, your third bullet
2 point says: "DEA cannot guarantee that past
3 failure to maintain effective controls against
4 diversion will not result in actions against the
5 distributor."
6     Did you understand coming out of this
7 presentation by Mr. Arnold that the past failures
8 to prevent diversion in Henry Schein, to the
9 extent that they existed, continued to be risk of
10 future DEA enforcement?
11     MS. FINCHER:  Object to the form.
12     THE WITNESS:  Yes.
13 BY MR. MIGLIORI:
14     Q  Okay.  And then you list the different
15 types of DEA actions.  You write a letter of
16 admonition and immediate suspicion order,
17 memorandum of agreement, administrative hearing,
18 surrender for cause, order to show cause,
19 revocation of registration and fines.
20     Did you pull those types of DEA actions
21 out of the presentation?
22     A  Yes.
23     Q  And so those are the types of actions
24 that the DEA could take for failing -- for Henry

Page 149

1 Schein's potential failure to comply with DEA
2 regulations for controlled substances, correct?
3     A  I'm sorry, can you repeat that?
4     Q  Yeah.  So these -- these potential
5 actions are the potential ramifications if Henry
6 Schein were to be found to have been noncompliant
7 with DEA regulations, correct?
8     A  Correct.
9     MS. FINCHER:  Object to the form.
10 BY MR. MIGLIORI:
11     Q  And that would include failures to
12 maintain proper due diligence, correct,
13 potentially?
14     A  Potentially, yes.
15     Q  So, again, this is dated November 27th,
16 2013.  One of the solutions you posit is:
17 "Develop and execute a plan to obtain due
18 diligence on all active customers purchasing
19 controlled substances within a reasonable time
20 frame."
21     We discussed the 27,000 customer
22 backlog.  Do you recall in November of 2013 the
23 need to develop and execute a plan to catch up on
24 those customer files that did not have due

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1  diligence?
2      A   Yes.
3      Q   And the last point says:  "Additional
4  Regulatory resources are needed to prepare, review
5  and complete customer due diligence."
6          Was that the need to hire more people in
7  order to catch up on the backlog?
8      A   Yes, additional resources were needed,
9  correct, to complete the due diligence.  Yes.
10     Q   And so that's going into the beginning
11 of 2014.  That is, the need to come up with this
12 plan, to execute on it, and to get Schein in
13 compliance with its due diligence requirements,
14 and that's the state of affairs as of the end of
15 2013, correct?
16         MS. FINCHER:  Object to the form.
17         THE WITNESS:  2014, you said, right?
18 Was it '14 or '13."
19 BY MR. MIGLIORI:
20     Q   The end of 2013 was that document.
21     A   Okay.  Yes.
22         (Steffanie-Oak Exhibit No. 12 was
23         marked for identification.)
24 BY MR. MIGLIORI:

Page 151

1      Q   All right.  I'm going to show you,
2  hopefully quickly, Exhibit 12.  This is your 2013
3  performance report.
4      A   Oh, sorry.
5      Q   Do you recognize this to be your
6  performance report from 2013?
7      A   Yes.
8      Q   All right.  I'm just going to, again,
9  bring you to this box on the top of the second
10 page.  There are a couple of things here that I
11 wanted to follow up with you on.
12         So your -- was it Sergio Tejeda that
13 provided your performance appraisals?
14     A   Yes.
15     Q   It said you had another full year of
16 challenges, but one that you managed to the end in
17 a positive way.  "Tina shows she is a strong
18 manager and successfully completed/managed the
19 following major goals/projects."
20         And I wanted to bring you to -- well,
21 let's do the first one.
22         It says: "Partnered with IS."  That's
23 the information systems department, correct?
24     A   Correct.

Page 152

1      Q   What's PDM?
2      A   Product -- product data management.
3      Q   Okay.  And IM and marketing.  What's
4  IM?
5      A   Oh, God.
6      Q   Information management?  It's okay if
7  you don't remember.
8      A   Yeah, I don't remember.  Sorry.
9      Q   All right.  "To address List 1 chemical
10 recordkeeping issues identified in the DEA letter
11 of admonition issued to our Indy distribution
12 center."
13         First of all, what is a List 1 chemical
14 recordkeeping issue?
15     A   I don't recall specifically what the
16 issue was.  So List 1 chemicals, they had iodine.
17 Excuse me.  We also had pseudoephedrine and
18 ephedrine, but they were actually regulated under
19 our controlled substance license and not the
20 List 1 chemical.  So it was only iodine that we
21 had.
22     Q   Are you familiar with what's called
23 Ingredient Limit Reports?
24     A   Vaguely.  I know we didn't have to file

Page 153

1  any.
2      Q   And that follows my question, did you
3  file any to your knowledge?
4      A   No.
5      Q   All right.  List 1 chemical
6  recordkeeping, as you understand it represented
7  here, is not related to controlled substances?
8      A   This specific issue was -- no, it was
9  related only to List 1 chemical.  It wasn't -- I
10 don't remember specifically what the reporting
11 issue was, but it was only for the List 1.  It did
12 not impact controlled substances.
13     Q   Okay.  And so -- but the Indy
14 distribution center is the only center that had
15 controlled substances, correct?
16     A   No.  I'm sorry.  They all had controlled
17 substances, and they all had List 1 -- they all
18 had iodine, so like povidone basically.
19     Q   So I want to make sure I understand
20 because I think you said to me before that for
21 Ohio anyway, controlled substances would have --
22 or Schedule II drugs would have come out of Indy
23 only.
24     A   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Q   All right.  Your understanding of this
2    List 1 chemical recordkeeping issue that caused
3    the DEA to write a letter of admonition, that had
4    nothing to do with the Indianapolis's --
5    Indianapolis control -- distribution center's
6    controlled substances, correct?
7    A   Correct.
8    Q   All right.  So it said:  "Continued to
9    coach and work closely with her team to continue
10   to develop and educate them on DEA requirements."
11       So you continued to train and -- and
12   develop your own team on those issues, correct?
13   A   Correct.
14   Q   "Attended several industry conferences
15   to ensure they keep up to date on the DEA's area
16   of focus and new trends."
17       So you stayed current with industry
18   conferences, correct?
19   A   Correct.
20   Q   It says:  "Conducted a 1 -- conducted
21   103 DEA customer site visits and completed over
22   500 due diligence reviews."
23       So that was your contribution to the
24   backlog process, correct?

Page 155

1        MS. FINCHER:  Object to the form.
2        THE WITNESS:  It could be current
3    customers and accounts that they were collecting
4    due diligence from, just for accounts that needed
5    to be escalated to Regulatory for a second review.
6    BY MR. MIGLIORI:
7    Q   Okay.  So for you to get a review -- to
8    do a review, it would have been something that
9    Verifications has said, We need to escalate this
10   up to Regulatory, correct?
11   A   Correct.
12   Q   All right.  And then it says:  "Provided
13   DEA suspicious order monitoring and 'Know Your
14   Customer' related training to our sales team by
15   participating in several medical regional sales
16   meetings and developing content for an online
17   training module that will be rolled out by the
18   second quarter of 2014."
19       Tell me what you did with the sales
20   force at Henry Schein.
21   A   There was one specific sales meeting
22   where Shaun and I did a presentation to the
23   medical sales reps -- excuse me -- explaining what
24   this sort of monitoring was, "Know Your Customer"

Page 156

1    process, explain what it is, why we do it, and how
2    they need to help educate their customers as well
3    on what information that we need.
4        Then there was a second show again for
5    the medical sales where we had a table set up,
6    where we would share our "Know Your Customer"
7    forms and speak one on one with the sales reps to,
8    again, educate them on the process and why we're
9    doing what we're doing, and why it's so important.
10   Q   Did the sales force have any role in
11   your suspicious order monitoring/"Know Your
12   Customer" process at this time?
13   A   Only as far as just educating the
14   customer on the forms that they're going to need
15   to fill out and why we need their cooperation in
16   providing the data that we're asking for.
17   Q   It would be inappropriate for a
18   salesperson to tell customers how to fill out the
19   form, correct?
20       MS. FINCHER:  Object to the form.
21       THE WITNESS:  Correct.
22   BY MR. MIGLIORI:
23   Q   And that is, and to provide answers that
24   would generate the least amount of scrutiny,

Page 157

1    correct?
2        MS. FINCHER:  Object to the form.
3        THE WITNESS:  Correct.
4    BY MR. MIGLIORI:
5    Q   And -- and what kind of training
6    materials had you used for the sales teams?  Was
7    it -- it says "online training module."  Where --
8    where was that housed?
9    A   It was -- I can't remember the name of
10   the computer system.  It was -- it's a -- it's an
11   online training software that all the sales reps
12   have access to, so they use it for multiple types
13   of medical type training.
14       So my team, we created a specific
15   module, again to explain what "Know Your Customer"
16   is, why we do it, why it's important, how to help
17   educate the customer, and why they need to
18   cooperate.  You know, we showed some -- some of
19   the previous companies that had been fined to try
20   to show the importance of what could happen if we
21   don't, you know, comply with the --
22   Q   Was the prior exhibit, No. 11, part of
23   that module?  Is that one of the things that you
24   would have shown the sales force?

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1    A   Exhibit 11?
2    Q   Your PowerPoint presentation.
3    A   No.
4    Q   Okay.  Was -- was that online module
5  something that continued -- you continued to use
6  right through the time of your resignation?
7    A   Yes.
8    Q   And you don't know what system that that
9  module was housed on?
10   A   I -- I can't remember the name of it.
11   Q   The --
12   A   It was controlled through the medical
13 education team.
14   Q   And it was content that you put together
15 for "Know Your Customer" obligations for the
16 benefit of the sales force at Henry Schein?
17   A   Correct.
18   Q   And we've had a lot of testimony about
19 JD Edwards.  I think it was called JD Edwards --
20   A   Mm-hmm, yes.
21   Q   -- platform.  Would it have been housed
22 there?
23   A   No.
24   Q   Was it something that they could print

Page 159

1  out if they needed to print it out as a resource?
2    A   No.  No.
3        (Steffanie-Oak Exhibit No. 13 was
4        marked for identification.)
5  BY MR. MIGLIORI:
6    Q   Exhibit 13 is called the "DEA Compliance
7  Updated -- Compliance Update" dated May 12th,
8  2014.  It's issued by Kathy Reid, and you're
9  listed as one of the attendees.
10       Who's Kathy Reid at this point?
11   A   She was a Regulatory specialist that
12 reported to me.
13   Q   Okay.  So it's a "First meeting of DEA
14 team for ongoing monthly meetings to provide
15 updates and discuss issues, constraints, what we
16 should be reporting, how to measure, how to
17 report."
18       Do you recall in May of 2014 starting a
19 monthly meeting for updates and issues among your
20 team in Regulatory?
21   A   Yes.
22   Q   And were minutes taken of these monthly
23 meetings?
24   A   Most likely, yes.  Kathy Reid was

Page 160

1  responsible for minutes.
2    Q   Okay.  And so is she still there, to
3  your knowledge?
4    A   Yes.
5    Q   And so she would have maintained the
6  minutes and would have reported -- like this
7  document, would have reported the various issues
8  discussed, correct?
9    A   I believe so, yes.
10   Q   All right.  Under "Training" -- well, it
11 says: "Tina and Ken recently conducted a thorough
12 audit.  System improvements were initiated
13 involving reprogramming additional costs.  We need
14 to define metrics to meet company Regulatory team
15 goals.  Provide monthly reporting to senior
16 management."
17       So did -- did you and Ken Romeo work
18 together to come up with sort of a metric for
19 regular reporting out to senior management?
20   A   I don't remember -- I don't recall
21 specifically what this statement refers to.  I'm
22 not sure if there's something further down in the
23 body of the --
24   Q   Well, we can look through it.  But

Page 161

1  you -- you -- at least according to this document,
2  you began a process where your group would be
3  reporting out on a monthly basis to your senior
4  management, correct?
5    A   Yes.
6        MS. FINCHER:  Object to the form.
7  BY MR. MIGLIORI:
8    Q   Under "Training," it says:  "Ken has
9  been listed as the primary for developing
10 professional training materials for the DEA team,
11 Regulatory team, Verifications new team members.
12 It was suggested that Verifications provide a
13 recommendation versus just sending accounts over
14 for Regulatory review."
15       Do you recall there being a process by
16 which it was recommended that Verifications
17 actually make a recommendation about whether to
18 release a pended order before passing to
19 regular-- before escalating it to Regulatory?
20       MS. FINCHER:  Object to the form,
21 mischaracterizes the testimony.
22       THE WITNESS:  I'm sorry, your
23 question -- it doesn't have -- that's not the
24 meaning of this statement, so...

Page 162

BY MR. MIGLIORI:

Q   Oh, it's not?

A   It's not, no.

Q   So what does it mean?

A   So when an account was escalated from Verifications to Regulatory for -- for a request to review, in the past Verifications would provide an e-mail with -- not necessarily giving their recommendation on -- or a write-up of the account.

So what we did was we instituted a similar process that Regulatory had where they had a report form that they filled out and kind of summarized all the information, and then indicated in there we're -- we're giving it over to Regulatory for these reasons.  It was more like a summary for Regulatory so that we didn't have to go trying to dig through and figure out why did it came to us.  What was the concern?  Why are you sending it to us?  So that's what that meant there.

Q   Okay.  So if you go to the next page in the first full paragraph, it talks about:  "It was discussed that although Verifications provides background information for the S1 reviews

Page 163

forwarded to Regulatory, 90 percent of the final reviews contained additional information from Regulatory, the additional research, phone interviews with doctors and/or facilities and site visits when necessary."

Was that type of due diligence that -- the responsibility of Regulatory?  That is, the phone interviews, additional internet research, site visits, is that in part the nature of escalating it to Regulatory?

A   Well, I don't agree that -- I don't agree that 90 percent of them that came had that much additional information.  As far as conducting phone interviews, that was typically the responsibility of Regulatory to do that.

Q   Okay.  And then it says that there's a dramatic difference between Regulatory review and Verifications.  It says:  "Ken reviews from the MD level."

Was Ken a physician?

A   He was a -- he had a medical license but hadn't practiced.

Q   Okay.  To your knowledge, is that the only one -- the only person in Verifications or

Page 164

Regulatory that had a medical license?

A   Yes.

Q   "It's also noted that Regulatory due diligence report may be viewed by the DEA if they investigate the account.  Currently Regulatory only receives 20 percent of pended orders for further review.  Verification reviews the other 80 percent to determine if the system pended orders unnecessarily or a physician is self-medicating.  Restriction letters are sent by them."

So is that consistent with your recollection that 80 percent of the due diligence was handled at the Verifications level?

MS. FINCHER:  Object to the form.

THE WITNESS:  Correct, because new customers would pend, so that was a large amount of the pends were new customers.  So they were able to review those.

Additionally, if there was an existing account and they ordered a new active ingredient, that order would pend.  So it may not be suspicious.  It may be a drug that's commonly used within that practice, but they had not yet

Page 165

purchased it from us.  So that would pend.  So based off of the information that they had, they were able to clear those orders without escalating it to Regulatory.

BY MR. MIGLIORI:

Q   So about 80 percent of the pended orders were managed or cleared or otherwise handled by Verifications, 20 percent was handled by your department.  Correct?

A   Correct.

Q   And the only MD was in Regulatory, not in Verifications, correct?

A   Correct.

Q   And what does it mean if a physician is self-medicating, restriction letters are sent by them?

A   Henry Schein had a policy that if the doctor indicated on their "Know Your Customer" form that they were ordering the drugs for their own use, we would restrict them.  So those accounts did not have to go to Regulatory to -- for us to agree that they were self-medicating.

So Verifications had the authority to go ahead and restrict those accounts based off of the

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1  information provided by the doctors.
2     Q   And in that context, does "restrict"
3  mean they got nothing, no controlled substances
4  after that or --
5     A   Correct.
6     Q   Go ahead.
7     A   Correct.
8     Q   Okay.  And you would agree with me that
9  a physician self-medicating is on its face a
10 suspicious order, correct?
11       MS. FINCHER:  Object to the form.
12       THE WITNESS:  I would say that, in many
13 cases, what we ended up finding out was that the
14 doctor had a valid prescription from his own
15 doctor, and he was just thinking that he could
16 just fill it out of his own supply.
17 BY MR. MIGLIORI:
18    Q   Would that --
19    A   So --
20    Q   Sorry, I didn't mean to interrupt you.
21    A   That's okay.
22    Q   Would that be enough to release the
23 prescription, if he had a valid --
24    A   No, it wouldn't.  We would explain to

Page 167

1  them that they're acting as a pharmacy, and
2  they're not licensed as a pharmacy.  And we found
3  a lot of doctors didn't realize that they couldn't
4  do that, because it's not like they were writing
5  their own prescription and taking the drugs.
6     Q   So if a doctor were deemed or determined
7  to be self-medicating, and a restriction letter
8  went out, would a suspicious order be reported to
9  the DEA field office or headquarters?
10    A   If there was an open order at the time,
11 it would be reported as suspicious, correct.
12    Q   Okay.  And failure to report a
13 suspicious order if there was an open order at the
14 time would be noncompliant with the DEA
15 regulations as you understood them, correct?
16       MS. FINCHER:  Object to the form.
17       THE WITNESS:  If -- yes, if there was an
18 open order and it was deemed to be suspicious,
19 yes.
20       (Steffanie-Oak Exhibit No. 14 was
21       marked for identification.)
22 BY MR. MIGLIORI:
23    Q   Okay.  We'll quickly do your '14
24 appraisal, just to get a couple more little

Page 168

1  projects.
2       2014, it's Exhibit No. 14.  It's your
3  performance appraisal.  Again, it's by Sergio
4  Tejeda on the second page.
5       And it talks about how -- "Tina has
6  developed a strong DEA compliance team, and is now
7  recognized in the company as a source for
8  information on DEA matters."
9       So from the end of 2012 to the end of
10 2014, in those two years, would you agree with
11 Mr. Tejeda's observation at this point in time,
12 the end of 2014, that you are the source of
13 information on DEA matters?
14       MS. FINCHER:  Object to the form.
15       THE WITNESS:  Yes.  And this is in the
16 context again for distribution center compliance,
17 correct.
18 BY MR. MIGLIORI:
19    Q   And more so --
20    A   Working with sites.
21    Q   I'm sorry.  I didn't mean to interrupt.
22    A   That's okay.
23    Q   And more so on the side of due diligence
24 than on suspicious order monitoring for that

Page 169

1  component of compliance, correct?
2     A   Correct.
3     Q   It says:  "She continues to develop
4  positive relationships with Verifications,
5  Operations, Sales, IT and Marketing teams, as well
6  as our JVs."
7       That's joint ventures, correct?
8     A   Correct.
9     Q   "She also built important relationships
10 with regulators and other industry players, which
11 allow her to go to the source on matters affecting
12 the company and stay on top of new requirements.
13 Tina had a great year and successfully completed/
14 managed the following programs."
15       It says:  "Successful implementation of
16 the tramadol and hydrocodone federal
17 rescheduling."
18       Did you change over all of Henry
19 Schein's handling of tramadol and hydrocodone as
20 controlled -- Schedule II controlled substances?
21    A   Hydrocodone was a Schedule II.  Tramadol
22 was an Rx that went to a schedule, but it wasn't a
23 II, I don't think.
24    Q   Okay.

Page 170

1    A   I think it might have been a III.  So I
2  was part of a project team.
3    Q   Okay.  It says: "Developed and
4  implemented a medical-based training program for
5  the Regulatory and Verifications teams."
6        So is this the medical training that
7  your group found to be needed in the SOM/Know Your
8  Customer internal audits?
9        MS. FINCHER:  Object to the form.
10        THE WITNESS:  I'm sorry.  I can't
11  remember if it was the same year as -- as the
12  audit.
13  BY MR. MIGLIORI:
14    Q   It was December of 2013 that the audit
15  came out, and this is a '14 audit.  Remember it
16  was December 2nd and 3rd of 2013?
17    A   It may have been part of it, because
18  this was also a larger base training that was
19  rolled out to the entire Regulatory team --
20    Q   Okay.
21    A   -- not just the DEA group.  So it was a
22  combination.
23    Q   Was that online as well?
24    A   No.  This was a presentation, personal

Page 171

1  presentation by Ken.
2    Q   Were they PowerPoints?
3    A   Yeah, I believe so, yes.
4    Q   So they should exist somewhere.  Did you
5  use those through 2016 when you left the company?
6    A   No.  These -- again, they were done by
7  Ken, so they were -- there was -- some of the
8  content was very medical driven, so -- and he was
9  a very visual person, so sometimes it would just
10  be a picture --
11    Q   Okay.
12    A   -- and he would speak to the picture.
13  So a lot of it afterwards, it -- it wasn't
14  something I could do or reuse or --
15    Q   Got you.  So as the only person with a
16  medical license, he gave a medical-based
17  presentation?
18    A   (The witness nods.)
19    Q   But here it says that you at least
20  helped to develop and implement that.
21    A   Yes.
22    Q   Okay.  It says: "Implemented the DEA
23  SOM/Know Your Customer FSC training module."
24        What's that?

Page 172

1    A   That's the online module we were talking
2  about earlier, so it's the field sales
3  consultants.
4    Q   Okay.  So -- so it was at least here in
5  2014 that was implemented?
6    A   Yes.
7    Q   "He developed the DEA Controlled
8  Substances Act suspicious order monitoring/Know
9  Your Customer training module."
10        Is that the same or is that something
11  different?
12    A   I don't --
13    Q   This one seems to add the Controlled
14  Substances Act as a component.
15    A   Mm-hmm.  I don't recall specifically
16  what -- what that was.
17    Q   When it says "training module," does
18  that suggest that it's an online-based training?
19    A   Typically, yes.
20    Q   And would that be housed in the same
21  place with your other trainings that we discussed
22  so far, whatever electronic format, platform that
23  is?
24    A   Most likely, but I -- I'm not -- I'm not

Page 173

1  sure.  Because I -- I think there were two
2  different training modules they used, one for
3  sales and one internal.  So I'm not --
4    Q   Was that --
5    A   I'm sorry.  I don't -- I don't recall.
6    Q   Okay.  Was that module in effect when
7  you left in 2015?
8        MS. FINCHER:  Object to the form.
9        THE WITNESS:  The sales training module
10  was.  I remember that.  I don't recall what this
11  other --
12  BY MR. MIGLIORI:
13    Q   Okay.
14    A   Because here it's saying something was
15  developed.  So I -- I'm not sure if it was ever
16  implemented or not.
17        (Steffanie-Oak Exhibit No. 15 was
18        marked for identification.)
19  BY MR. MIGLIORI:
20    Q   This is Exhibit No. 15.
21        Again, the highlights are my notes, not
22  yours.
23        This is an e-mail exchange, February of
24  2015.  It talks about -- it's an exchange between

Page 174

1  you at the bottom and others. And asks that
2  Dr. Spendal -- do you recall Dr. Spendal?
3      A   No.
4      Q   It says: "Bev Butcher, senior
5  Regulatory specialist, DEA compliance, in the
6  Indianapolis, Indiana" --
7          I assume that that's the controlled
8  substances Schedule II distribution center?
9      A   It has all schedules.
10     Q   Okay.
11     A   But it is the only one for IIs.
12     Q   So this is talking about how Dr. Spendal
13 is restricted from the controlled substances, and
14 the report has been placed on the M-drive.
15         First of all, what report would that be?
16     A   Her site visit report.
17     Q   Okay. So Bev would have done a site
18 visit herself or somebody under her?
19     A   She did it.
20     Q   Okay. And the M-drive is what?
21     A   That's the shared Regulatory -- well,
22 the M-drive is a shared drive within the company,
23 and then there are folders that each department
24 will use on the shared drive.

Page 175

1      Q   Is that where you would have kept your
2  PowerPoint presentations and your trainings?
3      A   Possibly.
4      Q   So were you --
5      A   Or --
6      Q   I'm sorry.
7      A   Sorry. I can't say for sure that they
8  all would have been copied onto the shared drive.
9  Some may be on someone's C-drive.
10     Q   Would monthly minutes of those
11 Regulatory meetings be shared on that M-drive too?
12         MS. FINCHER: Object to the form.
13         THE WITNESS: I'm not sure --
14 BY MR. MIGLIORI:
15     Q   Okay.
16     A   -- whether -- where Kathy kept them.
17     Q   So then you write back and say: "He,"
18 referring to Dr. Spendal, "has a current open
19 order and will need to be reported to the DEA.
20 Thanks."
21         And so with a pended order -- is pended
22 order the same in this context as a current open
23 field order, meaning --
24     A   In this --

Page 176

1      Q   -- unfilled order?
2      A   -- context, yes.
3      Q   Okay. So presumably, once she did the
4  site visit and she determined that he should be
5  restricted, you indicated that the open order
6  should not be filled and that he would need to be
7  reported to the DEA, correct? That's --
8      A   That's what -- yes, that's what I
9  stated.
10     Q   Okay. And then if you go up to the top,
11 you, I guess, learned from Shaun that: "The
12 Verifications department," not Regulatory,
13 "accidentally released his hydrocodone order on
14 February 23rd. Please do not send a suspicious
15 order letter to the DEA. Thank you" -- or
16 "thanks."
17         Do you recall giving instruction to
18 Kathleen Reid not to send out a suspicious order
19 letter to the DEA?
20     A   I -- I don't recall other than looking
21 at this -- this e-mail.
22     Q   Is there -- what possible explanation
23 would there be for you not to send a suspicious
24 order letter to the DEA for an accidentally

Page 177

1  released hydrocodone?
2      A   I have to answer hypothetically without
3  being able to see the complete due diligence file,
4  because I'm not sure if the initial recommendation
5  was to hold all orders until the site visit was
6  completed or was the initial communication to have
7  the site agreement signed.
8      Q   Okay.
9      A   So I don't -- without --
10     Q   Well, for now, I want to ask just what
11 your memory is.
12         MR. McDONALD: Well, let her finish,
13 please.
14         THE WITNESS: Sorry, now I've lost my
15 train of thought.
16 BY MR. MIGLIORI:
17     Q   I'm sorry, I didn't mean to do that.
18         You were debating between the
19 hypothetical, I think the word was, and I was just
20 simply saying first I'd like to know what your
21 recall is, if you remember this.
22     A   I don't remember specifically. I can
23 just say speaking on what the policy was, there
24 were situations where we would conduct site

Page 178

1  visits, and depending on the reason for the site
2  visit, we may continue to ship until the site
3  visit -- as long as the doctor agreed to the site
4  visit.
5      Q   Okay.
6      A   So I'm not sure, without seeing here
7  what the initial concerns were, what the findings
8  were at the site visit, what the amount he was
9  looking to order -- there are varying
10 circumstances that would lead me to --
11     Q   Okay.  Well, let me -- let me just go
12 through it and just -- and then I will ask you a
13 question.
14         Based on the chronology of this, on
15 February 27th at 12:47 p.m., Beverly Butcher, who
16 reported to you, told you that she did a site
17 visit of Dr. Spendal, and she restricted his
18 ability to purchase controlled substances.
19         Three minutes later, you responded by
20 saying: "He has a current open order and will
21 need to be reported to the DEA."  Correct?
22     A   Correct.
23     Q   And then one hour after that, you found
24 out from Shaun that the "Verifications

Page 179

1  accidentally released his hydrocodone order on
2  2/23.  Please do not send a suspicious order
3  letter to the DEA."
4         That -- that's the chronology, correct?
5      A   Mm-hmm, yes.
6      Q   All right.  You would agree with me that
7  it would not be compliant to withhold a suspicious
8  order report solely because it was accidentally
9  shipped by the Verifications department, correct?
10         MS. FINCHER:  Object to the form.
11         THE WITNESS:  I can't agree to that,
12 because, again, I don't know what the
13 circumstances were.  The order was released prior
14 to her determining that it may have been
15 suspicious.  Right.  The order went out on the
16 23rd, and she did the site visit on the 27th.
17         And again, with this particular account
18 or any other account, the reason for the site
19 visit may -- may not have been that there was
20 really something that we thought they may be
21 diverting.  So if it was an existing customer, we
22 may have said, Okay, if you agree to the site
23 visit, we're going to continue to ship as long as
24 you're ordering within size, frequency and

Page 180

1  pattern.
2         So there could have been -- at the point
3  she did the site visit or from when we said they
4  have to have a site visit to when we did it, they
5  were allowed to continue to order, those orders
6  were going out.  So it may not have been a
7  situation where we truly said it was suspicious.
8  We may have been shipping.
9         So I can't agree with the statement that
10 you made because I don't know the circumstances
11 within which this occurred.
12 BY MR. MIGLIORI:
13     Q   Let's see what we can agree to.
14         You will agree with me that within the
15 one hour between you saying, Report this to the
16 DEA and don't report this to the DEA, you don't
17 make reference to any of those other potential
18 factors, correct?
19     A   Correct, in the e-mail I do not, but I'm
20 not sure if there were attachments.
21     Q   No, this -- this is how I got it, so I'm
22 not holding anything back.
23     A   Mm-hmm.
24     Q   You'd also agree with me that the

Page 181

1  accidentally released order before the site visit
2  does not in any way change your obligation after
3  the site visit to report it as a suspicious order,
4  correct?
5         MS. FINCHER:  Object to the form.
6         THE WITNESS:  According to the
7  regulations, if there was an open order at the
8  point that it was deemed suspicious, we need to
9  report it.  So the order was shipped prior to us
10 deeming that it as suspicious, so at that point in
11 time, there was nothing to report.
12 BY MR. MIGLIORI:
13     Q   Well, the order says -- isn't it the
14 regulation that you are required to report a
15 suspicious order when discovered?  Isn't that the
16 operative language?
17         MS. FINCHER:  Object to the form.
18         THE WITNESS:  Since it was discovered on
19 the 27th, there was no order to discover.  I mean,
20 that's -- that's my interpretation of it.
21 BY MR. MIGLIORI:
22     Q   Let -- I'll ask my question, and then
23 I'll do the follow-up.
24     A   Okay.

Page 182

1    Q   Doesn't the regulation say -- and at
2 this point you're, in the company, the person to
3 go to for DEA matters.
4        Doesn't the regulation say that Henry
5 Schein is obligated to report a suspicious order
6 when discovered?  Isn't that what the reg says?
7        MS. FINCHER:  Object to the form.
8 BY MR. MIGLIORI:
9    Q   If you need me to show it to you, I will
10 be happy to.
11   A   I -- I can't say for sure.  I don't --
12 I've been out of this for two-and-a-half years, so
13 I don't remember the -- if you want to show it to
14 me again.
15   Q   I will.
16       (Steffanie-Oak Exhibit No. 16 was
17        marked for identification.)
18 BY MR. MIGLIORI:
19   Q   Exhibit 16.
20       Do you recognize this as a portion of
21 the CFR related to controlled substances?
22   A   Yes.
23   Q   It says:  "The registrant shall design
24 and operate a system to disclose to the registrant

Page 183

1 suspicious orders of controlled substances.  The
2 registrant shall inform the field office of the
3 administration in this area of suspicious orders
4 when discovered by the registrant."
5        You'll agree with me that the obligation
6 of the registrant is to report suspicious orders
7 when discovered.  Correct?
8    A   That's the wording, yes.
9    Q   All right.  At least if this e-mail is
10 accurate, you will agree with me that your first
11 reaction at 12:50 was that once it was discovered
12 that this was to be a restricted account, we will
13 need -- it was your view that it needed to be
14 reported to the DEA, correct?
15   A   Correct.
16       MS. FINCHER:  Object to the form.
17 BY MR. MIGLIORI:
18   Q   All right.  At least the way this is
19 worded, the decision was made -- or the
20 recommendation was made by you not to report it
21 because it had already gone out the door, correct?
22   A   Correct.  I -- that's what it looks
23 like, yes, I said to not report it, correct.  I
24 don't know all the circumstances again behind it.

Page 184

1 Only reading that, yes.
2    Q   And so -- and only reading that, and
3 that's all I have to look at.
4    A   Mm-hmm.
5    Q   And only reading that, you would agree
6 with me that whether or not the order was filled,
7 once a distributor discovers that an order is
8 suspicious, the regulation has, again shown here
9 in Exhibit 16, is that at that moment of
10 discovery, that when the order needs to be
11 reported to DEA, correct?
12       MS. FINCHER:  Object to the form.  Asked
13 and answered.
14       THE WITNESS:  I still -- I have to say
15 no.  The way that I viewed it was that if there
16 was an open order.  If we reported a customer as
17 suspicious and there was an order, we only
18 reported that one order.  We didn't report -- does
19 that make everything else suspicious that we
20 shipped then?  Because we never reported that to
21 the DEA.
22 BY MR. MIGLIORI:
23   Q   In looking at the provision that I put
24 up here, Exhibit 16, in anywhere in this provision

Page 185

1 does it say, Unless you've already shipped the
2 suspicious order?
3        MS. FINCHER:  Object to the form.
4        THE WITNESS:  I still look at it that
5 the order at the point that it was released had
6 not been deemed suspicious.
7 BY MR. MIGLIORI:
8    Q   I understand that.  I'm not talking
9 about the shipment.  I'm talking about the
10 reporting requirement.  You understand that there
11 is a shipping requirement and a reporting
12 requirement.  Those are independent requirements,
13 correct?
14       MS. FINCHER:  Object to the form.
15       THE WITNESS:  I still feel at that point
16 in time there was nothing to report.  I don't know
17 how -- that's all I can say.  I don't know how
18 many --
19 BY MR. MIGLIORI:
20   Q   That's fine.  My question is simple,
21 though.
22       You will agree with me that nothing in
23 this provision says that you don't have to report
24 it if you've already shipped a suspicious order.

Page 186

1 That's not what the regulation says, correct?
2        MS. FINCHER: Object to the form. Asked
3 and answered.
4        THE WITNESS: It doesn't mention
5 anything about shipping, correct.
6        MR. MIGLIORI: I'm going to keep my
7 promise to you of 2:00-ish.
8        (Steffanie-Oak Exhibit No. 17 was
9        marked for identification.)
10 BY MR. MIGLIORI:
11     Q    17. Let me show you Exhibit No. 17.
12        This is a document called "Henry Schein
13 Inc. Follow-Up Action Report, Suspicious Order
14 Monitoring, Privileged Information, May 19, 2014."
15        Have you seen this document before?
16     A    It doesn't look familiar to me at this
17 point.
18     Q    All right. I just want to ask you,
19 some of these entries here, do you see where it
20 says "TSO" in the column here under "Responsible
21 TSO"?
22     A    Yes.
23     Q    Okay. Have you seen these follow-up
24 reports in this format before?

Page 187

1     A    I don't recall seeing this format
2 before, no.
3     Q    Okay. So under "Recommendations," it
4 says a couple of things here. It says -- the
5 first is: "Observation. Current Suspicious Order
6 Monitoring System appears to utilize a regression
7 formulated statistical mode."
8        And then it gives a recommendation next
9 to it: "The real issue lies in the fact that our
10 SOM system provides us with only a mirror image."
11        Do you see that there is a -- an
12 observation, a recommendation, and then somebody
13 assigned to it?
14     A    So this is the same audit report that we
15 looked at earlier.
16     Q    Okay.
17     A    I -- I do -- I believe that this --
18 there's an internal audit department within Henry
19 Schein, and I think --
20     Q    Got you.
21     A    -- outside of Regulatory, I think that
22 this is their format. So it's the same audit that
23 we did.
24     Q    So this would be the computer system

Page 188

1 printout of what was in the exhibits that we
2 referred to earlier where, on December 2nd and
3 3rd, you and Ken went out to the Melville plant
4 and did an assessment or the Melville facility.
5     A    Correct. When Regulatory issues a
6 report, it's in a memo format.
7     Q    Okay. All right. So -- and so this is
8 just a follow-up document, correct?
9        MS. FINCHER: Object to the form,
10 foundation.
11 BY MR. MIGLIORI:
12     Q    And let -- and I think this may prove
13 the point. I just want to make sure I know what
14 it is before we move on from that.
15     A    It -- there's an internal audit within
16 reg -- I'm sorry, within Henry Schein, they were
17 required to audit certain areas of the company.
18     Q    Right.
19     A    And they used this audit, I guess, to
20 fulfill that requirement, and this is their form.
21 So they were just following to make sure that
22 whatever findings were there, that they were aware
23 of them, and --
24     Q    Okay. So if you look at the second

Page 189

1 page, this -- this makes sense, because it even
2 has the same subparagraphs, I think.
3        It says: "Decision makers in
4 Verifications department need additional medical-
5 related training and qualifications to release
6 controlled substance orders without Regulatory
7 medical guidance in some instances."
8        That's -- that's the same observation we
9 saw earlier?
10     A    Correct. So it's not a second audit.
11     Q    Got you.
12     A    It's the exact audit that was done.
13     Q    It's just in a different format.
14     A    Correct.
15     Q    Here it gives a certain recommendation,
16 which is the same. It says, provide the medical
17 training, and it lists the people to follow up.
18        So here it has Ken Romeo --
19        Who's SA?
20     A    Shaun Abreu.
21     Q    -- Shaun Abreu, and you are the
22 follow-up people for that process?
23     A    Correct.
24     Q    And then it says that you had completed

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  for Verifications and Regulatory this additional
2  training in August of 2014.
3      Am I reading it correctly?
4  A   Yes.
5  Q   All right.  That's helpful.  Thank you.
6      Great, great, great, great.  That
7  solves -- saves some time.
8      Let me see if this is -- because I don't
9  remember this recommendation.  If you go to
10  page 5.
11      So this was an observation:  "Current
12  SOM SOPs allowed for existing customers of three
13  times pend release."
14      But in the observation, it says:  "If
15  the diversion of controlled substances is taking
16  place, the corresponding entity or DEA might hold
17  Schein responsible for a lack of due diligence in
18  our internal controls by releasing a controlled
19  substance without documented due diligence.
20  Though it was the finding of the assessment that
21  our current decision makers and underwriting teams
22  have used good sense in this area and that this
23  event may not have occurred in the past, we are
24  vulnerable, nonetheless."

Page 191

1      I don't recall that observation being
2  made before.  Do you remember that observation?
3      MS. FINCHER:  Object to the form,
4  foundation.
5  BY MR. MIGLIORI:
6  Q   Because I don't recall it in the other
7  document.
8  A   I don't remember it, other than looking
9  at it here, no.
10  Q   Okay.  So here you'll agree, though,
11  that DEA might hold Schein responsible for a lack
12  of due diligence in its internal controls by
13  releasing controlled substances without a
14  documented due diligence.  That is a risk to the
15  company, correct?
16      MS. FINCHER:  Object to the form.
17      THE WITNESS:  Correct.
18  BY MR. MIGLIORI:
19  Q   And for that, it says, as a
20  recommendation, to actually have -- the due
21  diligence documents provided to Schein should be
22  signed under the penalty of perjury.
23      Do you know if that ever got
24  implemented?

Page 192

1  A   I do believe it did.
2  Q   Okay.  And you're one of the people
3  responsible for that.  And it says here that that
4  was completed on October 20th of 2014.
5      Do you believe that that's when it was
6  added to the due diligence letter?
7  A   Yes.
8  Q   Okay.  "Tina to review the language with
9  Legal to understand the industry standard."
10      And then under the second component, it
11  lists you as responsible for -- "Verifications
12  will work with Information Services to establish
13  reporting to identify customers who have purchased
14  high risk AI" --
15      What's AI?
16  A   Active ingredient.
17  Q   -- "active ingredient and have pended
18  SOMs.  Verifications will proactively work with
19  these customers to acquire the necessary due
20  diligence."
21      Do you recall that being implemented?
22  A   Yes.
23  Q   And was that a -- and after this in --
24  after May of 2014?

Page 193

1  A   Is that the date of the audit report?
2  Q   Yeah, it's on the top of that same page
3  on the top left corner.
4  A   Oh.
5      MS. FINCHER:  Object to the form.
6  BY MR. MIGLIORI:
7  Q   It says, "Verifications will work with
8  IS."
9  A   I don't remember the exact date because
10  they put this in a format months -- months after
11  we did the audit.  So...
12  Q   Right.  Well, if you look above with the
13  orders, it said "completed."  On this one it says
14  "Tentative."  "Will continue to support
15  recommended" --
16  A   Okay.
17  Q   So that's not yet completed, right?
18      MS. FINCHER:  Object to the form.
19  BY MR. MIGLIORI:
20  Q   As you read this.
21  A   As I read this, yes.
22  Q   Yeah.  It also says:  "Verifications is
23  working with a summer intern to review these
24  customers, and will work on quantifying the number

Page 194

1  of customers requiring due diligence."
2       As of May of 2014, were you still in the
3  process of trying to understand the number of
4  files that were not complete for purposes of DEA
5  due diligence?
6     A   I don't recall specifically.  But,
7  again, this is where we had initially removed the
8  DEA from all those customers, so they could not
9  continue to order or ship anything.
10    Q   Okay.  Go to page 7, please.
11      So -- so as you see it, this is sort of
12 an internal tracking system for the internal audit
13 observations and recommendations.  Is that a way
14 for me to look at this document?
15    A   Yes.
16    Q   Okay.  Thanks.
17      (Steffanie-Oak Exhibit No. 18 was
18      marked for identification.)
19 BY MR. MIGLIORI:
20    Q   Exhibit 18.  This is your last completed
21 appraisal.  I'm only going to ask you about one
22 issue on this one.
23    A   Thanks.  Oh.
24    Q   This is your 2015 appraisal.  If you go

Page 195

1  to the second page, there's a reference to how
2  you -- on the fourth bullet point, it says:  "You
3  worked closely with Cardinal and partnered with
4  Verifications to ensure that 'Know Your Customer'
5  due diligence was completed on customers who would
6  be purchasing controlled substances and to make
7  sure this was completed by the go live integration
8  due date."
9     A   Oh, sorry.  The last one.  I couldn't
10 follow where you were.  Sorry.
11      (Peruses document.)  Yes.  Okay.
12    Q   Tell me, is this Cardinal Health?
13    A   Yes.
14    Q   A competitor, a supplier, distributor?
15    A   There was an acquisition by Henry Schein
16 of the Ambulatory Surgery Center accounts --
17    Q   Okay.
18    A   -- by Henry Schein.
19    Q   Okay.  So Henry Schein purchased a
20 portion of Cardinal Health's distribution business
21 as it related to ambulatory care centers?
22    A   Correct.
23    Q   And was that nationwide?
24      MS. FINCHER:  Object to the form.

Page 196

1       THE WITNESS:  I believe, as you asked,
2  yeah, I -- I don't recall the exact contractual
3  territories.  But --
4  BY MR. MIGLIORI:
5     Q   But based on your recollection, at least
6  it would have included Ohio?
7     A   Yes.
8     Q   Okay.  And then it says that you
9  partnered with Verifications to ensure that "Know
10 Your Customer" due diligence was completed on
11 customers who would be purchasing controlled
12 substances.
13      And so these would be the Cardinal
14 customers that had come over now through this
15 acquisition to Schein?
16    A   Correct.
17    Q   And "make sure that this was completed
18 by the go-live integration due date."  So go-live
19 integration would be the total integration of this
20 division of Cardinal into Henry Schein?
21    A   Correct.
22      MS. FINCHER:  Object to the form.
23 BY MR. MIGLIORI:
24    Q   Okay.  I didn't know about any of that.

Page 197

1  Very helpful.
2       (Steffanie-Oak Exhibit No. 19 was
3       marked for identification.)
4  BY MR. MIGLIORI:
5     Q   I am going to ask you about a document
6  that we talked about a lot so far in this
7  litigation.  It's Exhibit No. 19.
8       I just want you to identify some
9  documents for me.
10      This is the due diligence file for one
11 of Henry Schein's customers.  It's a doctor in
12 Summit County, Ohio, or -- yeah, it's a doctor in
13 the northern district of Ohio named Brian Heim.
14 This is Exhibit No. 19.  And this was provided to
15 us as the entire due diligence file for Dr. Heim.
16      So let's start on the first page.  So
17 when you did your review of the due diligence
18 files as the person working on -- particularly on
19 that part of the DEA compliance for Henry Schein,
20 this would be information that you would go online
21 and pull up, correct?  This is an online printout,
22 isn't it?
23      MS. FINCHER:  Object to the form.
24      THE WITNESS:  No, we would not.

Page 198

BY MR. MIGLIORI:

Q   Okay.

A   This looks to be a printout from perhaps JD Edwards --

Q   Okay.

A   -- that Verifications would enter notes in.  So this is not how I -- when I was in the role, how we would receive --

Q   Okay.

A   -- the information.

Q   Okay.  I'm going to represent to you this was presented to us as the entire file for this one customer.

A   Mm-hmm.

Q   Okay.  So this -- this -- this looks like a JE Edwards inventory of the file of some sort or a docketing?  Is that a good word?

A   Yeah, it looks like notes from -- I can't tell with the abbreviation specifically what it's referring to.

Q   Did you work in this format at all?

A   No.

Q   Okay.  Let's see if we can at least understand some of it.

Page 199

It says, "On June 3rd, 2011, W/MP," and it says, "L number 35."

Do you know what that means, what that --

A   No, I --

MS. FINCHER:  Object to the form, foundation.

THE WITNESS:  -- I don't.

BY MR. MIGLIORI:

Q   Okay.  Is there -- do you know these initials, BMIL?

A   No.

Q   You will see the top is "S.Abreu."

A   Yeah, that's the only one I recognize.

Q   Okay.  So you don't -- so those were all folks within the Verifications team, correct?

A   Yes.

Q   Is there anything on this first page of Exhibit No. 19 that looks like it is Regulatory?

A   I'm not --

Q   Is related to Regulatory?

A   I can't tell because I don't know what the abbreviations are.

Q   Okay.

Page 200

A   Yeah.

Q   All right.  But nothing is jumping out in terms of initials or names or anything like that?

A   No.

Q   There's a -- another notes page here.  It's an approval to purchase testosterone.  And the next page is a printout -- it just says: "Responsible party:  Brian Heim."

On the next page that ends in Bates 201, it says: "Effective date:  August 17, 2011.  Heim approved for controls."

Is that something that is potentially done at the Verifications level in the -- at this time when you --

MS. FINCHER:  Object to the form.

THE WITNESS:  I wasn't involved back then, so I can't say.  This is 2000 -- what is this?

BY MR. MIGLIORI:

Q   This is '11.

A   Okay.  And I didn't really work in this system, so I'm not sure what the -- the notes --

Q   Okay.  My question is not so much about

Page 201

the system as much as did the Verifications department -- as of the time you got to -- got to Regulatory in 2012, did the Verifications department have the authority to approve somebody for controls without Regulatory?

A   I would have to say yes, because that's the process even while I was in the role.

Q   Okay.  So this "Heim approved for controls," just by looking at this, we don't know if that's Verifications and/or Regulatory; we can't -- we can't tell --

A   If Regulatory was involved in the review?

Q   Right.

A   Correct.

Q   Okay.  Let's see what else is in the file.  It says: "CAT3 responsible party:  Brian Heim, MD."

Do you know what "CAT3 responsible party" means?

A   No.

Q   Okay.  There's another page that says: "Solo, Heim."  Do you know what that means?

A   It may refer to solo practitioner, but

Page 202

1 I'm not sure.
2 Q Okay. And did -- as of the time you got
3 into Regulatory, did Verifications approve solo
4 practitioners for controlled substances?
5 A They could --
6 Q As a general matter.
7 A -- yes. Yes.
8 Q Okay. The next page, it says:
9 "8/23/12. As per Shaun to EML."
10 Do you recognize those initials, EML?
11 A No.
12 Q "The doctor, a new quest sent," and then
13 it has a number. Is that an order number? Is
14 that --
15 A It looks like a phone number probably.
16 Q Okay. "New question sent." Okay.
17 Then "August 24th, received completed
18 questionnaire, placed in bin to be approved."
19 Do you know what questionnaire?
20 A They're referring to the KYC, the "Know
21 Your Customer" questionnaire.
22 Q Okay. So is this the initial onboarding
23 questionnaire?
24 A I don't --

Page 203

1 MS. FINCHER: Object to the form,
2 foundation.
3 THE WITNESS: -- know if it's the
4 initial one or --
5 THE REPORTER: Excuse me.
6 MR. MIGLIORI: Sorry, it's just the
7 way --
8 THE WITNESS: Oh.
9 MS. FINCHER: Object to the form,
10 foundation.
11 BY MR. MIGLIORI:
12 Q Go ahead.
13 A I don't know if that was the first one
14 that was sent.
15 Q Well, which questionnaires exist as of
16 this point in time?
17 MS. FINCHER: Object to the form.
18 THE WITNESS: There was a "Know Your
19 Customer" questionnaire when I came into the role.
20 So...
21 BY MR. MIGLIORI:
22 Q Okay. And then this FDU 6376, does that
23 mean anything to you?
24 A I think it's someone's initials and

Page 204

1 their extension, but I don't know.
2 Q Okay. "8/25, gave to Shaun, TH."
3 So the -- the questionnaire came in to
4 be approved, and it was given to Shaun, 8/25.
5 And then the next page is a form. Can
6 you tell me -- this is dated by fax, August 24th,
7 2012.
8 A Mm-hmm.
9 Q Which is the same date on the prior page
10 as the received completed questionnaire.
11 A Yeah.
12 Q So what -- what is this questionnaire?
13 At what stage of the process is this
14 questionnaire?
15 MS. FINCHER: Object to the form.
16 THE WITNESS: This is the beginning of
17 the --
18 BY MR. MIGLIORI:
19 Q Okay.
20 A -- the first form that we would -- well,
21 not that -- we may have had a prior form, but this
22 is the form that we would send out to gather the
23 initial information.
24 Q So this would be the new client

Page 205

1 onboarding questionnaire that would go out to
2 clients -- to new customers, correct?
3 A New customers, correct. And then over
4 time, I don't remember the specific time period,
5 but we would resend out to get updated
6 information.
7 So the -- one account would -- would
8 receive it multiple occasions, depending on the --
9 the time that they would continue ordering with
10 Henry Schein.
11 Q Okay. But the form, as we're looking at
12 it now, is at least consistent with, in 2012, the
13 forms that would go out initially to a new
14 customer, correct?
15 A Yes.
16 Q All right. And it may, as you said, go
17 out before or again, if necessary, for some other
18 due diligence, correct?
19 A Correct.
20 Q Now, if we look back on the -- the date
21 of the entry that says "Approved for controls," it
22 says: "Effective date: August 17th, 2011."
23 Is it possible that this doctor was
24 approved for ordering controlled substances a year

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1 before this form would come back?
2          MS. FINCHER: Object to the form, and
3 also mischaracterizes the document.
4          THE WITNESS: I'm not sure what this
5 date refers to, if it's the date that the entry
6 was put in or -- normally they put the date on the
7 line like you saw. So I would be speculating.
8 BY MR. MIGLIORI:
9     Q   Okay. And that's why I'm asking is it
10 possible. I'm not asking --
11    A   Yeah.
12    Q   -- for the truth of it. I'm asking at
13 this point in time when you got to Regulatory,
14 were there folks -- were there new customers who
15 were approved for controlled substances without a
16 questionnaire in the file?
17         MS. FINCHER: Object to the form.
18 BY MR. MIGLIORI:
19    Q   Wasn't that one of the observations you
20 found when you looked at the 40,000 customers?
21         MS. FINCHER: Object to the form.
22         THE WITNESS: Yes, there may have been
23 customers that did not have it. Correct.
24 BY MR. MIGLIORI:

Page 207

1     Q   And so it is possible anyway that this
2 particular doctor was approved for controlled
3 substances a year before this "Know Your
4 Customer" due diligence form got in the file,
5 correct?
6          MS. FINCHER: Object to the form.
7          THE WITNESS: Yes, it's possible.
8 BY MR. MIGLIORI:
9     Q   Okay. And then if we go through the
10 questionnaire, it does ask is it a solo practice
11 or not. And what kind of practice: Family
12 practice. The address listed, it says: "Home or
13 office?"
14         Why is that important, home or office?
15    A   Well, basically we're looking at it to
16 make sure it's a legitimate medical office. If
17 someone says -- and I'm sorry, I have to put my
18 hat back on -- if someone says it's a home, we
19 want to have some type of verification that they
20 actually have an office in their home that we can,
21 you know, verify that it appears to be a
22 legitimate practice.
23    Q   So would you do a phone call and/or site
24 visit?

Page 208

1     A   We would initially do like Google
2 Earth --
3     Q   Okay.
4     A   -- shots and -- yes.
5     Q   The number of patients who pay with cash
6 or check, why is that important?
7     A   With the pill mills and things, I think
8 it was more relevant. Nowadays with the change of
9 insurance and things, people probably pay more in
10 cash, so I -- but that was -- that was the premise
11 of trying to understand how many patients are they
12 treating that has insurance versus uninsured.
13    Q   And was it a potential red flag that
14 there were -- there were a high volume of patients
15 that paid just in cash without insurance?
16    A   Potentially, yes, red flag, yes.
17    Q   Okay. And so as you go through this
18 form, these are just answers and information that
19 the doctors are providing to Henry Schein in a
20 questionnaire, correct?
21    A   Correct.
22    Q   There's nothing in the process at Henry
23 Schein in 2012 -- or from 2012 to 2015 to
24 automatically verify any of this information,

Page 209

1 correct?
2          MS. FINCHER: Object to the form.
3          THE WITNESS: So -- something in the
4 process to automatically verify it? How --
5 BY MR. MIGLIORI:
6     Q   Well, that's fair. That's not a good
7 question.
8          Let me say it this way: Unless
9 something jumps out of this page as being
10 extraordinary, these answers are accepted on their
11 face, correct?
12    A   Correct.
13    Q   And when they talk about "the percentage
14 of your practice that patients leave your office
15 with controlled substances," that -- that's
16 representations that you're -- you're trusting a
17 physician on -- on the face of this document for
18 accuracy, correct?
19         MS. FINCHER: Object to the form.
20         THE WITNESS: Correct.
21 BY MR. MIGLIORI:
22    Q   And at least here in this document, if
23 you go on to the next page, it does talk about
24 types of drugs intended to order, and then there's

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  a signature.

2  There is no "under the penalty of

3  perjury" type line here yet as of 2012, correct?

4  A   Correct.

5  Q   That's something that you put in place,

6  I think we said in October of 2014, correct?

7  A   Correct.

8  Q   All right.  So if this is -- these two

9  pages -- and you corrected me before

10  appropriately, that it's not one page, it's two

11  pages -- these are the two pages of the due

12  diligence that Henry Schein was attempting to go

13  back and make sure all 40,000 customers had,

14  correct, at least this?

15  MS. FINCHER:  Object to the form.

16  BY MR. MIGLIORI:

17  Q   Correct?

18  A   Not all -- I'm sorry.  We're -- 40,000,

19  I don't remember --

20  Q   Let me just --

21  A   That wasn't -- was not the number.  I

22  don't think it was that many customers.  Sorry.

23  Q   Well, initially I showed you a document

24  that said there were 40,000 customers, and 27,000

Page 211

1  had no information.  Do you remember that?

2  A   Yeah, so the 27,000 sounds more right

3  than 40.

4  Q   Okay.  So when you were looking at those

5  files to say things were deficient, this was one

6  of the things that was missing in those files,

7  correct?

8  MS. FINCHER:  Object to the form.

9  THE WITNESS:  Yes, potentially.  Some of

10  them, yes.

11  BY MR. MIGLIORI:

12  Q   So part of the backlog process was to

13  get this updated, make sure that all the -- all

14  the customers, all 40,000 and ongoing, had due

15  diligence letters in their files.  That was an

16  important component of Henry Schein's due

17  diligence program, correct?

18  MS. FINCHER:  Object to the form.

19  THE WITNESS:  So we -- we did not

20  require all 40,000 to have the form.  So it's an

21  important distinction, as I mentioned multiple

22  times, where we removed the DEA number from the

23  account to prevent them from ordering.  Because a

24  large majority of that population never ordered

Page 212

1  again.  And, you know, even going out proactively,

2  they had no intention of ordering, so they

3  wouldn't fill the form out.

4  BY MR. MIGLIORI:

5  Q   Correct.

6  A   So that's why the number came down

7  significantly.

8  Q   So --

9  A   So...

10  Q   -- of the active customers that -- that

11  were making orders, this had to be in the file,

12  correct?

13  A   Correct.

14  Q   Some orders never got that far because

15  you never activated the accounts.

16  A   Correct.

17  Q   All right.  Fair enough.

18  After those two pages in the file, there

19  seems to be a Ohio License Center printout.  Is

20  that a verification of license?  Is that something

21  you would see in a due diligence file?

22  MS. FINCHER:  Object to the form.

23  THE WITNESS:  This could be something,

24  yeah, that Verifications would run this.  So, yes,

Page 213

1  it could.  I'm not familiar myself with this one.

2  BY MR. MIGLIORI:

3  Q   All right.  This was with the Ohio.

4  And then there is another letter here.

5  It looks like a similar letter, or is this the

6  same?  It looks a little different.

7  A   No.  So then this is from 2011.  That's

8  why I said earlier I couldn't say if that was the

9  first time it was sent --

10  Q   Right.

11  A   -- because it looks -- they did have a

12  previous one.

13  Q   Okay.  So this would be the first letter

14  that goes out, right?  August 17 --

15  A   I don't know if it's the first one, but

16  it's -- yes, another one that went out.

17  Q   The forms changed a little bit in format

18  anyway, right?

19  A   Mm-hmm.

20  Q   This one is the one-page letter,

21  correct?

22  A   Yes.

23  Q   All right.  And then another license

24  verification form for the Ohio center.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    And then we talked about MedPro. Do you
2 recall that?
3    A  Yes.
4    Q  This would be the MedPro printout for
5 Dr. Heim, correct?
6       MS. FINCHER: Object to the form,
7 foundation.
8 BY MR. MIGLIORI:
9    Q  If you -- if you -- if you know what
10 they look like.
11    A  Yes.
12    Q  Okay. So this only reports his --
13 what's SLN information? Do you know what that
14 stands for?
15    A  No. Oh, wait, I'm sorry. Is it state
16 license number?
17    Q  Okay. All right. It says under
18 "Disciplinary Action," do you see it says, "Yes"?
19    A  Yes, I do.
20    Q  Does that mean that this was a positive
21 finding for prior disciplinary action?
22    A  I believe so, yes.
23    Q  Do you know if there is any -- when you
24 see that at Henry Schein, is there active effort

Page 215

1 to try to figure out what that prior disciplinary
2 action was?
3    A  While I was in the role, yes, we would
4 attempt to get a copy of what the disciplinary
5 action was.
6    Q  Okay. And if that disciplinary action
7 demonstrated a prior history of conviction for
8 drug trafficking, is that something you would want
9 to know?
10    A  Yes.
11    Q  If it demonstrates a prior history for
12 loss of medical license, is that something you
13 would want to know?
14    A  Yes.
15    Q  And would that immediately pend or keep
16 pended this potential new customer?
17       MS. FINCHER: Object to the form.
18 BY MR. MIGLIORI:
19    Q  If there was a prior conviction for drug
20 trafficking?
21    A  The order would be pended, yes.
22 Initially that would be why we would do the
23 review. But, correct, that would be a reason not
24 to. To continue to hold until you can do the

Page 216

1 review.
2    Q  If there were further investigation,
3 would that investigation be in this due diligence
4 file?
5       MS. FINCHER: Object to the form.
6       THE WITNESS: Yes.
7 BY MR. MIGLIORI:
8    Q  And is there any experience that you've
9 had of doing further investigation and finding out
10 that in fact the potential new customer was in
11 fact convicted of drug trafficking?
12    A  Not that I'm aware of, no.
13    Q  And if somebody had been previously
14 convicted of drug trafficking, is that enough in
15 the Henry Schein system to restrict that customer
16 or terminate that customer?
17       MS. FINCHER: Object to the form.
18       THE WITNESS: It -- it would depend on
19 the circumstances, I think. I mean, we would need
20 to look at it. I can't -- I mean, what -- is that
21 like selling a joint? Is that drug trafficking?
22 I don't know. I mean, I'm not sure.
23 BY MR. MIGLIORI:
24    Q  Bear with me for one second.

Page 217

1    Would a prior guilty plea to 24 felony
2 counts of theft of drugs and 21 felony counts of
3 illegal possession of drug documents be an issue
4 you would want to know about in your due diligence
5 of a physician?
6       MS. FINCHER: Object to the form.
7       THE WITNESS: Yes, I would want to know.
8 BY MR. MIGLIORI:
9    Q  Is there any set of facts that you can
10 think of as you sit here today that a new customer
11 of Henry Schein would be approved for controlled
12 substances with a history of a guilty plea for 24
13 felony counts of theft of drugs and 21 felony
14 counts of illegal processing of drug documents?
15       MS. FINCHER: Object to the form.
16 Improper hypothetical.
17 BY MR. MIGLIORI:
18    Q  Can you think of any?
19       MS. FINCHER: Same objection.
20       THE WITNESS: No.
21 BY MR. MIGLIORI:
22    Q  If you go to -- that seems to be the
23 last page.
24    So is it fair to say that, at least when

Page 218

1 you were training your Regulatory people and your
2 training of Verifications people, if there were
3 further investigation of this particular doctor,
4 consistent with your training from 2012 to 2016,
5 would be that whatever that additional
6 investigation or justification would be for this
7 doctor, it would have to be put in the doc- -- in
8 the due diligence file, correct?
9         MS. FINCHER: Object to the form.
10        THE WITNESS: If we're able to access
11 it. So there are cases where it says, "Yes," and
12 we may not be able to access it and reach out to
13 the state, and sometimes they won't release it.
14        So sometimes there's a link directly to
15 it. I know there have been -- I can think of at
16 least one other time where we tried to get copies
17 and weren't able to get it, and maybe due to the
18 length of time that has passed because the system
19 only holds a certain -- they only go back so far.
20        But if it's available, I know when I was
21 in the role, we did the best to make sure that we
22 can get a copy of it and review it.
23 BY MR. MIGLIORI:
24    Q   If you inquired of the Ohio Board of

Page 219

1 Pharmacy or the State Medical Board of Ohio about
2 prior disciplinary actions, would that notation of
3 inquiry be in the file?
4    A   Yes.
5         MS. FINCHER: Object to the form.
6 BY MR. MIGLIORI:
7    Q   And if they provided you with any
8 information, would that be in the file?
9    A   Yes.
10   Q   And did Henry Schein do anything to look
11 in the criminal justice system to see whether or
12 not its new customers had been convicted or
13 indicted on drug-related offenses --
14        MS. FINCHER: Object to the form.
15 BY MR. MIGLIORI:
16   Q   -- in performing its due diligence?
17        MS. FINCHER: Object to the form.
18        THE WITNESS: As I mentioned earlier,
19 they only did a -- we only did a license
20 verification. If the charge had an impact to the
21 medical license, even if they were on probation
22 for something, if that was in the system, we would
23 review it.
24 BY MR. MIGLIORI:

Page 220

1    Q   Okay. And so if it's not in that due
2 diligence file I just showed you, Exhibit 19, then
3 it -- then it -- and it was obtained, then at
4 least that file would not be compliant with the
5 due diligence obligations, correct?
6         MS. FINCHER: Object to the form.
7         THE WITNESS: With this particular one,
8 both states -- from Ohio say there's no formal
9 action, and then MedPro says, "Disciplinary
10 action, yes."
11        So I can't tell if there was something
12 to click -- click on, if there was actually
13 something there to get. So it looks like there is
14 a discrepancy even in the data.
15 BY MR. MIGLIORI:
16   Q   Dr. Heim --
17   A   On both of the Ohio, it says "No act- --
18 "formal actions exist."
19   Q   And the MedPro data says there was
20 disciplinary --
21   A   It says, "Yes."
22   Q   Do you see anything in that file that
23 shows investigation into that reference that there
24 was disciplinary action?

Page 221

1         MS. FINCHER: Object to the form.
2         THE WITNESS: Not in what you gave me,
3 no.
4 BY MR. MIGLIORI:
5    Q   Do you see anything in that file that
6 says that Dr. Heim in 1998 pleaded guilty to over
7 40 drug-related felonies?
8         MS. FINCHER: Object to the form.
9         THE WITNESS: No, not in here.
10 BY MR. MIGLIORI:
11   Q   Do you see anything in that file that
12 says that doctor -- that Henry Schein provided the
13 DEA, before releasing the last controlled
14 substance order to him, evidence to help support
15 an indictment of him again in 2012?
16        MR. TOMEVI: Object to the form.
17        THE WITNESS: I only see here that we
18 did notify the DEA, and the DEA said to continue.
19 Right. "Will notify the" --
20 BY MR. MIGLIORI:
21   Q   What's the date on that?
22   A   "Will continue to notify DEA if he
23 orders."
24   Q   What's the date on that?

Page 222

1   A   Eight -- well, there's an effective
2 date, 8/30/12.
3   Q   Okay.  And you know that as of 8/30/12,
4 the DEA had already indicted him again?
5       MS. FINCHER:  Object to the form.
6       THE WITNESS:  I didn't --
7 BY MR. MIGLIORI:
8   Q   Is there anything in the document that
9 shows that?
10      MS. FINCHER:  Object to the form,
11 foundation.
12      THE WITNESS:  No.
13 BY MR. MIGLIORI:
14  Q   If it -- if the DEA contacted Henry
15 Schein and said, We're investigating one of your
16 customers, please send us information, is that
17 inquiry alone something that should be in the due
18 diligence file?
19      MS. FINCHER:  Object to the form.
20      THE WITNESS:  It's part of the customer
21 file, but it --
22 BY MR. MIGLIORI:
23  Q   Let me be more specific.
24      If the DEA contacts Henry Schein and

Page 223

1 says, We believe that your customer has ordered
2 unusually large volumes of controlled substances,
3 please provide us your supply transactions, is
4 that something that at Henry Schein should show up
5 in the due diligence file?
6       MS. FINCHER:  Object to the form.
7 Improper hypothetical, assumes facts not in
8 evidence.
9       THE WITNESS:  I've never seen a request
10 like that from the DEA where they actually stated
11 that, but we would get requests all the time for
12 sales data, and it would be part of the customer
13 file, but it didn't -- it doesn't get matched up
14 to the questionnaire, I guess is what I'm saying.
15 Overall, it's additional information that's stored
16 in the system, it's reviewed, but it's not
17 attached with this.  So you wouldn't get it
18 with -- it's in the system.
19 BY MR. MIGLIORI:
20  Q   It's in -- in what system?
21  A   They'll scan it into JDE, but it's not
22 part of -- this file at the time that it's
23 produced, it's scanned in, so you can't keep
24 adding to a scan.  There may be multiple documents

Page 224

1 over the course of time in the system.
2   Q   So this --
3   A   So it's reviewed and saved.  Just --
4   Q   What -- I'm sorry.  What's been produced
5 to you is -- produced to us as the due -- as the
6 file, the due diligence file for that doctor.
7       And my question very simply is, if the
8 DEA informs Henry Schein that it is investigating
9 for criminal purposes one of your customers, would
10 you as the DEA person at Henry Schein expect that
11 information to go into the due diligence file or
12 somewhere else?
13      MS. FINCHER:  Object to the form.
14 Improper hypothetical, assumes facts not in
15 evidence.
16      THE WITNESS:  I would expect it to go
17 into the system and be notified of the concern.
18 BY MR. MIGLIORI:
19  Q   If a doctor puts in an order, does
20 Verifications have to go through multiple
21 different files to find out whether or not to pend
22 it?
23      MS. FINCHER:  Object to the form.
24      THE WITNESS:  There's different scanned

Page 225

1 attachments in the system, but they're named a
2 certain way so that when they open them, they know
3 what they are.
4 BY MR. MIGLIORI:
5   Q   And so DEA inquiries, other than the one
6 you referenced on August 30th, 2012, would not
7 automatically go into a due diligence file?
8       MS. FINCHER:  Object to the form.
9       THE WITNESS:  I guess I look at it
10 different, but it's in -- it's in the customer
11 file.  I guess if everything is in there, you're
12 referring to it as a due diligence file, then it's
13 there.  I'm looking at it as an initial packet
14 that they get when they first approve a customer,
15 and it's a snapshot in time of what was looked at.
16 BY MR. MIGLIORI:
17  Q   Let me --
18  A   And then there may be additional things
19 that come in.
20  Q   Maybe that's a disconnect.
21      I want you to assume that Exhibit 19,
22 the document in front of you, that is, the
23 customer file, that's what was produced to us from
24 Henry Schein about this doctor.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    A   Okay.

2    Q   If that's how it's been produced to us,

3 would you expect a DEA inquiry and request for

4 transactional information about a doctor to be

5 somewhere in that customer file?

6       MS. FINCHER: Object to the form.

7       THE WITNESS: No, if it wasn't

8 specifically requested, and you're only asking for

9 the KYC customer file, then no, it may not have

10 been pulled.

11 BY MR. MIGLIORI:

12    Q   No, I'm asking for actual orders, number

13 of pills sold.

14       MS. FINCHER: Object to the form.

15       THE WITNESS: I'm misunderstanding.

16       MS. FINCHER: You want to reask the

17 question again?

18       THE WITNESS: Yeah, please reask it.

19 BY MR. MIGLIORI:

20    Q   If the DEA calls up Henry Schein and

21 says, We are investigating one of your customers,

22 and we need to know how many pills were sold to

23 this guy over the past X number of months, does

24 your due diligence system do anything to try to

Page 227

1 make sure that that information is documented in

2 the customer file?

3    A   Yes.

4       MS. FINCHER: Object to the form.

5       THE WITNESS: Yes.

6 BY MR. MIGLIORI:

7    Q   All right. So that kind of inquiry from

8 DEA should be somewhere in the customer file,

9 wherever it is.

10    A   Correct.

11    Q   Okay. That's all I was asking. Thank

12 you.

13       (Steffanie-Oak Exhibit No. 20 was

14       marked for identification.)

15 BY MR. MIGLIORI:

16    Q   I'll show you Exhibit 20, and then I've

17 got one more after this.

18       Now, you said you hired Glenn Linnquist,

19 right?

20    A   I was one of the people. I interviewed

21 him, yes.

22    Q   So he was hired on to be sort of the

23 backup help for the -- the due diligence project,

24 correct?

Page 228

1    A   That's one of the things that he did,

2 but that wasn't the sole reason why he was hired.

3    Q   Right. But when we talked about him

4 earlier, he was one of the -- that was one of the

5 first things you did is you hired him and another,

6 correct?

7    A   I -- when I came into the role, I lost

8 the two people that were going to be reporting to

9 me, so Glenn was one of the ones that replaced the

10 two I already had.

11    Q   All right. So Glenn writes to you on

12 January 21st, 2016, this is Exhibit No. 20, he

13 says: "Tina, attached is a completed due

14 diligence form for Charles Virden," and it gives

15 JDE.

16       So the due diligence form, would that be

17 the initial form, do you know?

18       MS. FINCHER: Object to the form.

19 BY MR. MIGLIORI:

20    Q   Or is it too --

21    A   I don't know.

22    Q   -- not specific enough?

23    A   I don't know. I would have to see the

24 file. Because, again, customers, they don't just

Page 229

1 stick with one form. As time goes on, we get a

2 new form.

3    Q   Okay.

4    A   And also, again, because it's coming to

5 Regulatory, we're kind of given that package of

6 information from Verifications.

7    Q   Got you. This is all that's attached.

8 That's why I'm asking --

9    A   Yeah.

10    Q   -- because I don't -- I don't know

11 either.

12    A   Yeah.

13    Q   Okay. You write back and say: "Can you

14 do the visit?"

15       So based on that exchange, is it fair to

16 say that there's something about Charles Virden

17 that's causing a need for escalating for

18 Regulatory to do a site visit?

19       MS. FINCHER: Object to the form.

20       THE WITNESS: Not necessarily, because

21 we also had it set up that there were certain

22 account types that we automatically required site

23 visits on. So as pain clinics started to change,

24 we saw a shift in the market. Weight clinics,

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1 testosterone clinics, methadone clinics, there
2 were just certain types that we said, Okay, we
3 want to go in and have a site visit, kind of right
4 off the bat. So it could be that. I can't tell
5 from here.
6 BY MR. MIGLIORI:
7    Q   Well, let's see if this helps.
8    A   Okay.
9    Q   So Ken Romeo writes to you, and copies
10 Glenn, and says: "As an aside on Dr. Virden, he
11 is an artist with a scalpel. That's why the heavy
12 out of state. Though truly a genius in
13 reconstruction, I'll bet his records aren't up to
14 par with DEA. I guess we'll see. Thanks for the
15 honest opinion, Glenn. Because of the personal
16 knowledge, I would have been more lenient. As for
17 doing the SV, sure."
18    A   Site visit?
19    Q   "Site visit, sure. Why not? We all go
20 to accounts multiple times."
21      So let's start with "out of state." Is
22 one of the reasonable assumptions from this
23 document is that Glenn found that there were a lot
24 of out-of-state plates, license plates for

Page 231

1 patients at Dr. Virden's office?
2      MS. FINCHER: Object to the form,
3 foundation.
4      THE WITNESS: No.
5 BY MR. MIGLIORI:
6    Q   What would that mean?
7    A   No. So he hasn't even done the site
8 visit yet, so he has received the packet, the due
9 diligence packet from Verifications, and he's
10 doing a review of the "Know Your Customer" form
11 that we looked at earlier. And one of the
12 questions on there is, Do you treat out-of-state
13 patients?
14    Q   Got you. So this is just based on the
15 doctor's representation.
16    A   Mm-hmm.
17    Q   Correct? Okay.
18      And then it says: "Because of the
19 personal knowledge, I would have been more
20 lenient."
21      That certainly wouldn't be appropriate
22 to be more lenient on a doctor because of a
23 personal relationship, right?
24      MS. FINCHER: Object to the form.

Page 232

1 Mischaracterizes the document.
2      THE WITNESS: The way that I interpreted
3 this is Ken knew him as a physician. So he was
4 familiar with his practice, and he's meaning that
5 he had personal knowledge of the practice. That
6 he's a well-known -- what do you call it? -- maybe
7 a plastic surgeon.
8 BY MR. MIGLIORI:
9    Q   Right.
10    A   That's what he's referring to. And I
11 don't know what the write-up is. I would have to
12 see the file.
13    Q   So maybe it's just poor -- poor wording.
14    A   Correct.
15    Q   But you would never ever have anybody in
16 your department be more lenient applying the law
17 because of personal knowledge, correct?
18    A   Absolutely not.
19      MS. FINCHER: Object to the form.
20 BY MR. MIGLIORI:
21    Q   The reference here or the inference here
22 that you're drawing is that he actually knew this
23 customer well, so, therefore, under the actual
24 law, he would have said this is a person that's

Page 233

1 compliant or not a suspicious -- a potential
2 suspicious ordering doctor.
3      MS. FINCHER: Object to the form.
4 BY MR. MIGLIORI:
5    Q   Correct?
6      MS. FINCHER: Mischaracterizes the
7 document, foundation.
8      THE WITNESS: Correct, that was my
9 understanding, knowing the both of them, yes.
10 BY MR. MIGLIORI:
11    Q   All right. Ken certainly wouldn't say,
12 Go easier on my doctors.
13    A   No, not at all.
14    Q   But up on top he says -- who is KK?
15    A   It was his -- I don't remember exactly.
16 He would call him KK, and Ken would call him
17 Tonto. I don't --
18    Q   Okay. KK, I don't want to touch that.
19      "KK said he could not do this guy's due
20 diligence review because he knew him. So what do
21 you -- what do you make of this?"
22      So here at least Ken is saying, I
23 shouldn't do his review because he is actually
24 personal to me.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1  A  Mm-hmm.
2  Q  Is that an appropriate response?
3  A  Yes, it is.
4  Q  All right.  But Ken Romeo was somebody
5  that you had trouble with as a supervisor,
6  correct?
7  A  I did have difficulties at some point,
8  yes.
9  Q  And you actually had to give him
10  multiple warnings about his conduct and his
11  behavior, correct?
12  A  Yes.
13  Q  And he -- you found him to be
14  condescending and rude and inappropriate in the
15  office environment?
16  A  At times, yes.
17  Q  And you wrote him up for that, correct?
18  A  Yes.
19  Q  And I'm not going to ask you much about
20  it, but this is that write-up, correct?  This is
21  at least the --
22     MR. McDONALD:  Show it to her first.
23     (Steffanie-Oak Exhibit No. 21 was
24     marked for identification.)

Page 235

1  BY MR. MIGLIORI:
2  Q  This is Exhibit 21.
3     This is the second write-up of a verbal
4  warning that you gave to Ken.
5  A  Yes.
6  Q  And again, this was April 15th, 2016, so
7  it's less than a year before you leave the
8  company, correct?
9  A  Correct.
10  Q  And you cite different reasons, but you
11  actually yourself had a bad run-in with him on a
12  phone call, and that was consistent with what
13  other people were reporting to you, correct?
14  A  Correct.
15  Q  Did he stay at the company after you
16  left?
17  A  No, he left prior to me.
18  Q  Okay.  And did he leave on his own terms
19  or was he terminated?
20  A  He left on his own terms.
21  Q  And you also had an issue with Jeff
22  Peacock, correct?
23  A  I wouldn't describe it as an issue.
24     MS. FINCHER:  Object to the form.

Page 236

1     THE WITNESS:  I think we just have
2  different managerial styles.
3  BY MR. MIGLIORI:
4  Q  In your exit interview, you did report
5  that you thought he should be replaced, right?
6  A  I don't recall --
7  Q  He said --
8  A  -- ever saying that he should be
9  replaced.
10     (Steffanie-Oak Exhibit No. 22 was
11     marked for identification.)
12  BY MR. MIGLIORI:
13  Q  I'm sorry.  This is Exhibit No. 22.
14  A  I wish I had that authority, but no.
15  Q  Well, you didn't use the word "replace,"
16  but let's see.
17     So this is your exit interview dated --
18  A  11/10.
19  Q  -- 11/10 of '16, and your last day was
20  11/11 of '16.
21     It said -- it's hard to read.  This is
22  how I got it, unfortunately.  But -- sure.
23     Talking about Jeff Peacock, you say:
24  "Someone in his position should not be allowed to

Page 237

1  act as he does.  Jeff acts unprofessionally.
2  Seems to go out of his way to make you look bad in
3  front of others.  Has made comments to others
4  about the members.  Pits people against each
5  other."
6     Those -- is this your handwriting, by
7  the way?
8  A  No.
9     MS. FINCHER:  Object to the form.
10  BY MR. MIGLIORI:
11  Q  Okay.  Is that what you related in your
12  exit interview to HR?
13  A  Yes.
14  Q  And what change should be made.  You
15  say: "Change in leadership with department.
16  Jeff: Jeff curses, yells at people.  No tolerance
17  for yelling."
18     You believed Jeff should not have the
19  position of leadership in your department as of
20  the time you left, correct?
21     MS. FINCHER:  Object to the form.
22  Mischaracterizes the document.
23     THE WITNESS:  I think they were asking
24  me what would it kind of take for me to stay, and

Page 238

1   I was saying I couldn't stay if I continued to
2   report to him. I don't know if I necessarily was
3   saying that he should leave.
4   BY MR. MIGLIORI:
5       Q   Well, they say: "What suggestions or
6   comments do you have that would make Henry Schein
7   a better place to work?" "Change Jeff to someone
8   who embraces our culture."
9           Is that something you would have said?
10      A   No.
11          (Peruses document.) Oh, I think maybe
12  having him change so that he -- not -- not remove
13  him. That's not what I meant.
14      Q   Okay. But at least here it was reported
15  twice that you said change in leadership with
16  department, change Jeff to someone else.
17          MS. FINCHER: Object to the form.
18  BY MR. MIGLIORI:
19      Q   That's what the form says.
20          MS. FINCHER: Mischaracterizes the
21  document.
22  BY MR. MIGLIORI:
23      Q   Correct? Am I reading it correctly?
24          MS. FINCHER: Object to the form.

Page 239

1           THE WITNESS: I guess the point I was
2   making is that I -- yeah, I couldn't continue -- I
3   didn't wish to continue working under him.
4   BY MR. MIGLIORI:
5       Q   And is that -- is this who you gave the
6   report to is this June Woz, is that the HR
7   representative?
8       A   Wolf.
9       Q   Wolf. Okay. Do you recall giving that
10  exit interview?
11      A   Yes.
12          (Steffanie-Oak Exhibit No. 23 was
13          marked for identification.)
14  BY MR. MIGLIORI:
15      Q   And then Exhibit No. 23 is your
16  resignation letter.
17          Is it fair to say that Jeff Peacock was
18  a -- a reason why you decided to retire -- or
19  resign?
20          MS. FINCHER: Object to the form.
21          THE WITNESS: It was a contributing
22  factor.
23  BY MR. MIGLIORI:
24      Q   And did you already at this point, as of

Page 240

1   the time of this letter, October 27, 2016, where
2   you're giving your resignation with an effective
3   last day of November 11th, 2016, did you already
4   have a position in a new job?
5       A   Yes.
6       Q   And that's the job you currently hold
7   now?
8       A   Correct.
9       Q   Do you know what the due diligence
10  retention -- file retention, document retention
11  policy is?
12      A   I don't remember it.
13      Q   Do you know if there is one for due
14  diligence?
15      A   Yes.
16          MS. FINCHER: Object to the form.
17  BY MR. MIGLIORI:
18      Q   And did you have any -- do you have any,
19  as you sit here today, any specific recollection
20  of dealing with any issues or DEA compliance
21  issues in the state of Ohio?
22      A   No.
23      Q   Do you ever remember having any direct
24  dealings with any of the DEA field offices in

Page 241

1   Ohio?
2       A   Not that I can recall, no.
3       Q   Did you have any roles with respect to
4   suspicious order reporting either to the DEA field
5   office for Ohio or for the state reporting
6   requirements in Ohio?
7       A   As I mentioned earlier, later on in my
8   role, one of the people that reported to me was
9   responsible for the reporting.
10      Q   Right.
11      A   But I didn't really get directly
12  involved in that.
13      Q   Okay. And who -- remind me again, I'm
14  sorry, who was that person?
15      A   Pete Schmidt.
16      Q   Schmidt. Okay.
17          And you had -- as you sit here today,
18  you have no recollection of any failure to report
19  to the State of Ohio for any period of time while
20  you were in Regulatory, correct?
21      A   The only thing I'm aware of, and I don't
22  remember all the specifics, for the state
23  reporting, I thought that at one point in time
24  they found an error with a report, that it wasn't

Page 242

1  pulling in all controls, that it was limited to
2  certain drugs, and then when they discovered that,
3  they corrected it.  But that wasn't under my
4  responsibility.  I just remember hearing about it.
5      Q   Okay.  And so have you reviewed or read
6  Sergio Tejeda's letter to the Ohio Board of
7  Pharmacy about failing to report to Ohio under the
8  required state law?
9          MS. FINCHER:  Object to the form.
10         THE WITNESS:  I don't recall reading the
11 whole letter, no.
12 BY MR. MIGLIORI:
13     Q   Okay.  Are you -- if this case is tried
14 in the fall of this year, in October or November,
15 are you available to testify as a fact witness?
16     A   No.  Can I say no?
17     Q   Have you been asked to be available to
18 testify as a fact witness?
19     A   No.
20         MR. MIGLIORI:  Okay.  I appreciate your
21 time.  Thank you so much.
22         THE WITNESS:  Thank you.
23         MS. FINCHER:  Pass the witness now?
24         MR. MIGLIORI:  Yes.

Page 243

1          MS. FINCHER:  We'll reserve our
2  questions.
3          MR. MIGLIORI:  Thank you very much.
4          THE VIDEOGRAPHER:  2:24, we're off the
5  video record.  This concludes the video
6  deposition.
7          (Whereupon, the deposition of
8          TINA STEFFANIE-OAK was concluded
9          at 2:24 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 244

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10 transcribed, said transcript being a true and
11 correct copy of my shorthand notes thereof; That
12 the dismantling of the original transcript will
13 void the reporter's certificate.
14     In witness thereof, I have subscribed my name
15 this date:  March 14, 2019.
16
17         _____
18         LESLIE A. TODD, CSR, RPR
19         Certificate No. 5129
20 (The foregoing certification of
21 this transcript does not apply to any
22 reproduction of the same by any means,
23 unless under the direct control and/or
24 supervision of the certifying reporter.)

Page 245

1      INSTRUCTIONS TO WITNESS
2      Please read your deposition over carefully and
3  make any necessary corrections. You should state
4  the reason in the appropriate space on the errata
5  sheet for any corrections that are made.
6  After doing so, please sign the errata sheet
7  and date it.
8      You are signing same subject to the changes
9  you have noted on the errata sheet, which will be
10 attached to your deposition.  It is imperative
11 that you return the original errata sheet to the
12 deposing attorney within thirty (30) days of
13 receipt of the deposition transcript by you. If
14 you fail to do so, the deposition transcript may
15 be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 246

```
1        ------
2        E R R A T A
3        ------
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON: _____
7  ____ ____ _____
8  REASON: _____
9  ____ ____ _____
10 REASON: _____
11 ____ ____ _____
12 REASON: _____
13 ____ ____ _____
14 REASON: _____
15 ____ ____ _____
16 REASON: _____
17 ____ ____ _____
18 REASON: _____
19 ____ ____ _____
20 REASON: _____
21 ____ ____ _____
22 REASON: _____
23 ____ ____ _____
24 REASON: _____
```

Page 247

```
1        ACKNOWLEDGMENT OF DEPONENT
2     I,_____, do hereby
3  certify that I have read the foregoing pages, and
4  that the same is a correct transcription of the
5  answers given by me to the questions therein
6  propounded, except for the corrections or changes
7  in form or substance, if any, noted in the
8  attached Errata Sheet.
9
10 _____
11 TINA STEFFANIE-OAK            DATE
12
13
14 Subscribed and sworn to
15 before me this
16 _____day of_____,20___.
17 My commission expires:_____
18 _____
19 Notary Public
20
21
22
23
24
```