Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

February 15, 2019

- - -

Videotaped deposition of GEORGE STEVENSON, taken pursuant to notice, was held at the offices of McCarter & English, LLP, 1600 Market Street, Philadelphia, Pennsylvania, beginning at 9:11 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

## Page 2

1  APPEARANCES:
2
    SEEGER WEISS, LLP
3  BY:  JENNIFER SCULLION, ESQ.
         KSENIYA LEZHNEV, ESQ.
4  77 Water Street, 8th Floor
    New York, New York 10005
5  (212) 584-0780
    Jscullion@seegerweiss.com
6  klezhnev@seegerweiss.com
7  Representing the Plaintiffs
8  BRANSTETTER, STRANCH & JENNINGS, PLLC
    BY:  JOE P. LENISKI, JR., ESQ.
9  223 Rosa L. Parks Avenue, Suite 200
    Nashville, Tennessee 37203
10  (615) 254-8801
    Joeyl@bsjfirm.com
11  Representing the TN Plaintiffs
12
    McCARTER & ENGLISH, LLP
13  BY:  AMY M. VANNI, ESQ.
    1600 Market Street, Suite 3900
14  Philadelphia, Pennsylvania 19103
    (215) 979-3848
15  avanni@mccarter.com
16      - and -
17  McCARTER & ENGLISH, LLP
    BY:  HAYLEY J. REESE, ESQ.
18  Renaissance Centre
    405 N. King Street, 8th Floor
19  Wilmington, Delaware 19801
    (302) 227-6308
20  hreese@mccarter.com
    Representing the Defendants, Endo Health
21  Solutions; Endo Pharmaceuticals, Inc.;
    Par Pharmaceutical Companies, Inc. f/k/a
22  Par Pharmaceutical Holdings, Inc. and the
    Witness
23
24

## Page 3

1  APPEARANCES:  (Cont'd.)
2
    PIETRAGALLO GORDON ALFANO BOSICK &
3  RASPANTI, LLP
    BY:  ASHLEY KENNY, ESQ.
4  1818 Market Street, Suite 3402
    Philadelphia, Pennsylvania 19103
5  (215) 320-6200
    Ak@pietragallo.com
6  Representing the Defendant, Cardinal
    Health
7
8
    TELEPHONIC/STREAMING APPEARANCES:
9
10  JONES DAY
    BY:  EDWARD M. CARTER, ESQ.
11  325 John H. McConnell Boulevard
    Columbus, Ohio 43215
12  (614) 281-3906
    Emcarter@jonesday.com
13  Representing the Defendant, Walmart
14
    COVINGTON & BURLING, LLP
15  BY:  JOSEPH HYKAN, ESQ.
         AMBER CHARLES, ESQ.
16  850 Tenth Street, NW
    Suite 586N
17  Washington, D.C. 20001
    (202) 662-5769
18  jhykan@cov.com
    acharles@cov.com
19  Representing the Defendant, McKesson
    Corporation
20
21  JACKSON KELLY, PLLC
    BY:  SANDRA K. ZERRUSEN, ESQ.
22  50 South Main Street, Suite 201
    Akron, Ohio 44308
23  (330) 252-9060
    Skzerrusen@jacksonkelly.com
24  Representing the Defendant, AmerisourceBergen

## Page 4

1  TELEPHONIC/STREAMING APPEARANCES:
    (Cont'd.)
2
3
    ROPES & GRAY, LLP
4  BY:  SEAN B. KENNEDY, ESQ.
    800 Boylston Street
5  Boston, Massachusetts 02199
    (617) 951-7234
6  sean.kennedy@ropesgray.com
    Representing the Defendant, Mallinckrodt
7
8  ULMER BERNE, LLP
    BY:  SANDRA MILLER BENOIT, ESQ.
9  65 East State Street
    Columbus, OH 43215
10  (614) 229-0016
    sbenoit@ulmer.com
11  Representing the Defendant, Teva
    Pharmaceuticals, Inc. Cephalon Inc,
12  Watson Laboratories, Actavis LLC, Actavis
    Pharma, Inc.
13
14
15
16
17
18
19
20
21
22
23
24

## Page 5

1  ALSO PRESENT:
2
    Carolyn Johnson
3  (Paralegal - Seeger Weiss)
4  Sandra Di Iorio, Esq.
    (Endo)
5
6
7  VIDEOTAPE TECHNICIAN:
8  Bill Geigert
9
    LITIGATION TECHNICIAN
10
    Bradley Smith
11
12
13
14
15
16
17
18
19
20
21
22
23
24

2  (Pages 2 to 5)

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                    - - -
 2                I N D E X
 3                    - - -
 4
 5
          Testimony of:
 6
              GEORGE STEVENSON
 7
 8        By Ms. Scullion         21
 9        By Ms. Vanni            527
10
11
12                    - - -
13              E X H I B I T S
14                    - - -
15
16        NO.      DESCRIPTION        PAGE
17        Endo
          Stevenson-1  Curriculum Vitae    21
18              George R. Stevenson
19        Endo
          Stevenson-2  Subpoena to Testify  37
20
          Endo
21        Stevenson-3  GeneriCo Board of   68
              Directors
22
23
24
```

Page 7

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5        NO.      DESCRIPTION        PAGE
 6        Endo
          Stevenson-4  E-mail, 1/25/07    81
 7              Subject, Stevenson
                2006 Performance
 8              Appraisal
                Endo 2006 Performance
 9              Management
                ENDO-OPIOID_MDL-
10              00860303-11
11        Endo
          Stevenson-5  E-mail Thread     107
12              3/8/07
                Subject, Opana
13              On Hand Quantities at
                McKesson (QVL)
14              ENDO-OPIOID_MDL-
                05554625-28
15
16        Stevenson-6  Trade Organization   113
                Memberships
17              OpCom 4/28/04
                ENDO-OPIOID_MDL-
18              04137718
19        Endo
          Stevenson-7  Form 10-K       160
20              Endo Pharmaceuticals
                Holdings
21
          Endo
22        Stevenson-8  Endo Pharmaceuticals  176
                Company Overview
23              April 2004
                ENDO-OPIOID_MDL-
24              04137944
```

Page 8

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5        NO.      DESCRIPTION        PAGE
 6        Endo
          Stevenson-9  E-mail Thread     200
 7              1/24/07
                Subject, Percocet
 8              Price Increase Effective
                2/1/07 Approved by EPC
 9              ENDO-OPIOID_MDL-
                03571186-92
10
          Endo
11        Stevenson-10 Percocet Quarterly   203
                Business Review
12              Fourth Quarter 2002
                ENDO-OPIOID_MDL-
13              04910731
14        Endo
          Stevenson-11 (Skipped)
15
          Endo
16        Stevenson-12 GAO, OxyContin     247
                Abuse and Diversion
17              And Efforts to Address
                The Problem
18              ENDO-OPIOID_MDL-
                03256655-17
19
          Endo
20        Stevenson-13 E-mail Thread     260
                9/8/03
21              Subject, EN3218
                Quota Request and
22              Risk Management Questions
                ENDO-OPIOID_MDL-
23              03002818-19
24
```

Page 9

```
 1                    - - -
 2           E X H I B I T S  (Cont'd.)
 3                    - - -
 4
 5        NO.      DESCRIPTION        PAGE
 6        Endo
          Stevenson-14 E-mail Thread     274
 7              9/29/03
                Subject, Final DEA
 8              Presentation
                Endo Pharmaceuticals
 9              Meeting with Drug
                Enforcement Administration
10              9/30/03
                ENDO-OPIOID_MDL-
11              03005612
12        Endo
          Stevenson-15 Risk Management Plan  284
13              For Opioid Analgesics
                Oxycodone ER
14              1/15/04
                ENDO-OPIOID_MDL-
15              04137306-413
16        Endo
          Stevenson-16 Risk Management Plan  286
17              For Opioid Analgesics
                Oxycodone ER
18              2/19/04
                ENDO-OPIOID_MDL-
19              01500831-36
20
          Endo
21        Stevenson-17 Endo Pharmaceuticals  297
                To Continue to Market
22              Its Bioequivalent
                Version of OxyContin
23
24
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

## Page 10

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo Stevenson-18 | Form 10-K Fiscal Year Ended 12/31/06 | 302 |
| Endo Stevenson-19 | Corporate Reputation Management Cohn & Wolfe Healthcare 5/14/04 ENDO-OPIOID_MDL-04137791 | 308 |
| Endo Stevenson-20 | E-mail Thread 8/20/03 Subject, Risk Management Plan Submission ENDO-OPIOID_MDL-01709808-18 | 313 |
| Endo Stevenson-21 | You Want a Description of Hell? OxyContin's 12-Hour Problem | 321 |
| Endo Stevenson-22 | Endo Health Solutions Supplemental Objections and Responses Preliminary Statement | 326 |

## Page 11

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo Stevenson-23 | Drug Abuse, Current Concepts and Research | 334 |
| Endo Stevenson-24 | E-mail Thread 3/6/08 Subject, Opana ENDO-OPIOID_MDL-06175127-29 | 338 |
| Endo Stevenson-25 | Letter, 7/10/00 To McCormick from Patterson RE, IND 56,919 Numorphan ENDO-OPIOID_MDL-00156150-51 | 346 |
| Endo Stevenson-26 | E-mail Thread 10/20/06 Subject, Project Pizza ENDO-OPIOID_MDL-00856825-31 | 351 |
| Endo Stevenson-27 | E-mail Thread 10/27/06 Subject, Project Pizza Update ENDO-OPIOID_MDL-02230226-28 | 364 |

## Page 12

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo Stevenson-28 | E-mail Thread 4/5/06 Subject, Examples ENDO-OPIOID_MDL-03924784 | 378 |
| Endo Stevenson-29 | Endo Contribution Margin Report ENDO-OPIOID_MDL-00000008 | 397 |
| Endo Stevenson-30 | E-mail Thread 5/3/06 Subject, New NCPA Pharmacist Research Study ENDO-OPIOID_MDL-00877265-66 | 411 |
| Endo Stevenson-31 | E-mail Thread 2/12/04 Subject, Urgent Re Opioid Education Materials ENDO-OPIOID_MDL-02255008-09 | 417 |

## Page 13

E X H I B I T S  (Cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Endo Stevenson-32 | E-mail Thread 3/23/04 Subject, Pharmacist Educational Initiative Update ENDO-OPIOID_MDL-02255384-88 | 426 |
| Endo Stevenson-33 | E-mail Thread 5/21/04 Subject, Opioid Patient Brochure Production Ready ENDO-OPIOID_MDL-02255803-12 | 427 |
| Endo Stevenson-34 | E-mail Thread 7/1/03 Subject, Agency Contact Report, Oxymorphone ER and IR ENDO-OPIOID_MDL-01716696-97 | 463 |
| Endo Stevenson-35 | E-mail Thread 7/14/03 Subject, Action Plan To Prevent Diversion ENDO-OPIOID_MDL-01692316-21 | 469 |

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Endo
     Stevenson-36 Memo, 4/1/04      476
7              Cohn & Wolfe
               Subject, Proactive
8              Media Relations
               Review & Recommendations
9              ENDO-OPIOID_MDL-
               04137641-42
10
     Endo
11   Stevenson-37 E-mail Thread     480
               4/7/04
12             Subject, Kentucky
               State Programs and
13             OxyContin Abuse
               ENDO-OPIOID_MDL-
14             03256784-86
15   Endo
     Stevenson-38 E-mail Thread     489
16             4/23/04
               Subject, E-mailing
17             8494968
               ENDO-OPIOID_MDL-
18             03389105-07
19   Endo
     Stevenson-39 E-mail Thread     495
20             4/28/04
               Subject, Actiq Abuse
21             In PA
               ENDO-OPIOID_MDL-
22             02843461-62
23
24

Page 16

1            - - -
2      DEPOSITION SUPPORT INDEX
3            - - -
4
5    Direction to Witness Not to Answer
6    PAGE   LINE
     None.
7
8    Request for Production of Documents
9    PAGE   LINE
     None.
10
11   Stipulations
12   PAGE   LINE
     None.
13
     Questions Marked
14
     PAGE   LINE
15   None.
16
17
18
19
20
21
22
23
24

Page 15

1            - - -
2      E X H I B I T S  (Cont'd.)
3            - - -
4
5    NO.      DESCRIPTION      PAGE
6    Endo
     Stevenson-40 E-mail Thread     500
7              5/21/04
               EN3218 Preparedness
8              Next Steps
               ENDO-OPIOID_MDL-
9              02843475-80
10   Endo
     Stevenson-41 E-mail Thread     510
11             5/22/07
               Subject, FDA News Drug
12             Daily Bulletin
               ENDO-OPIOID_MDL-
13             05554689-93
14   Endo
     Stevenson-42 COLT Staff Minutes   516
15             5/24/07
               ENDO-OPIOID_MDL-
16             01915705-06
17   Endo
     Stevenson-43 McKesson 867     520
18             Opana Data Aug
               To Present 11/3/06 xls
19             ENDO-OPIOID_MDL-04139984
20
21
22
23
24

Page 17

1            - - -
2          MS. VANNI:  This is Amy
3    Vanni, I represent Endo and the
4    witness.  We learned today that
5    Ms. Scullion previously
6    represented Apothecon, a division
7    of BMS, and more particularly,
8    represented or participated in
9    representing Mr. Stevenson, our
10   deponent today, at a deposition
11   involving an unrelated drug,
12   related to his employment at
13   Apothecon.
14         We're allowing the
15   deposition to move forward, but
16   ask that in the course of the
17   deposition, that Ms. Scullion met
18   with Mr. Stevenson, that she not
19   use any confidential information
20   that she may have obtained from
21   him during her representation here
22   today.
23         MS. SCULLION:  And as I
24   explained off the record

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1  previously, I did represent, as an
2  associate at a prior law firm,
3  Apothecon.  And I do recall
4  Mr. Stevenson, meeting him in the
5  course of that.  I don't recall
6  representing you personally during
7  a deposition.  But I'm -- I'm just
8  saying I don't recall.
9       As Ms. Vanni explained, the
10  representation with respect to
11  Apothecon did not concern any
12  opioid product, did not concern
13  any pain product; the product at
14  issue there was a generic warfarin
15  sodium product.  And the nature of
16  the lawsuit was an antitrust
17  action.  And again I was an
18  associate, that was at Solomon,
19  Zauderer, Ellenhorn, Frischer &
20  Sharp.
21       And I have no intention
22  whatsoever of using any
23  confidential information I
24  obtained during the course of that

Page 19

1  representation for today's
2  deposition.
3       MS. VANNI:  Thank you.
4       MS. SCULLION:  Just to be
5  clear, my understanding that the
6  statement has been made on the
7  record, but that there's no
8  intention of trying to strike the
9  testimony or deem the deposition
10  in any way unusable based on that
11  prior unrelated representation.
12       MS. VANNI:  That's based on
13  your representation that you will
14  not use any confidential
15  information, that's true.
16       MS. SCULLION:  Okay.  If at
17  any point today there's any
18  concern that I am, I would ask
19  that that be made vocal, so I know
20  and we can resolve it.
21       So, again, I don't want to
22  waste the witness's time, my time,
23  the deposition time, if there's
24  going to be any concern about the

Page 20

1  testimony.
2       MS. VANNI:  Agreed.
3       MS. SCULLION:  Okay.  Great.
4  Thanks.  I appreciate that.
5       THE VIDEOGRAPHER:  Good
6  morning.  We are now on the
7  record.
8       My name is Bill Geigert, I'm
9  a videographer for Golkow
10  Litigation Services.
11       Today's date is February 15,
12  2019.  And the time is 9:11 a.m.
13       This video deposition is
14  being held in Philadelphia,
15  Pennsylvania, in the matter of
16  National Prescription.
17       The deponent is George
18  Stevenson.
19       Counsel will be noted on the
20  stenographic record.
21       The court reporter is
22  Michelle Gray and she will now
23  swear in the witness.
24                - - -

Page 21

1       ... GEORGE STEVENSON,
2  having been first duly sworn, was
3  examined and testified as follows:
4                - - -
5            EXAMINATION
6                - - -
7  BY MS. SCULLION:
8       Q.   Good morning, Mr. Stevenson,
9  I introduced myself to you briefly off
10  the record.  And again, as you know, we
11  met before, my name is Jennifer Scullion.
12       A.   Good morning, Jennifer.
13  Nice to see you.
14       Q.   Very nice to see you as
15  well.
16       Mr. Stevenson, I'm going to
17  hand you what's been marked as Exhibit
18  Number 1.
19       (Document marked for
20       identification as Exhibit
21       Endo-Stevenson-1.)
22  BY MS. SCULLION:
23       Q.   Mr. Stevenson, Exhibit
24  Number 1 was handed to us just before the

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    deposition began today.  Can you identify
2    Exhibit Number 1 please?
3        A.   It's my CV.
4        Q.   Okay.  So this is a copy of
5    your current CV?
6        A.   Yes.
7        Q.   And this is something you
8    drafted yourself?
9        A.   Yes.
10       Q.   And to the best of your
11   knowledge, it's accurate and complete?
12       A.   Yes, yes.
13       Q.   We're going to get into some
14   of the preliminaries, but just as a
15   reminder in a deposition, if you can let
16   me finish my questions, and then you
17   begin your answers.  The primary reason
18   for that is that Michelle, our court
19   reporter, will otherwise not be able to
20   take down both of our statements.
21           Does that make sense?
22       A.   Thanks -- thanks for
23   reminding me.
24           Sorry, Michelle.

Page 23

1        Q.   Terrific.  Okay.
2            Mr. Stevenson, have you been
3    deposed before?
4        A.   Any.
5        Q.   Approximately how many
6    times?
7        A.   Let me see, probably -- let
8    me see, there was -- somewhere in the
9    neighborhood of five or six.
10       Q.   Have you ever been deposed
11   before with respect to any opioid
12   products?
13       A.   No.
14       Q.   Okay.  Have you ever been
15   deposed before with respect to any
16   controlled substances?
17       A.   No.
18       Q.   Have you been deposed at all
19   with respect to any work you did with
20   Endo?
21       A.   No.
22       Q.   All right.  Can you tell me
23   just very generally, as best you can
24   recall, the nature of the proceedings in

Page 24

1    which you were deposed before?
2        A.   There was -- I don't
3    remember the year.  There was an AWP
4    pricing case that I gave a deposition
5    for.
6        Q.   Which -- which employer was
7    that in connection with?
8        A.   It was -- it was in
9    conjunction with Geneva, which became
10   Sandoz, and Bristol-Myers Squibb,
11   Apothecon also rep -- was represented
12   there because some of it referred to
13   them.  So it was like a dual deposition
14   where both were there.
15       Q.   Okay.
16       A.   And then before that I gave
17   several depositions with respect to
18   warfarin sodium in the case with BMS and
19   their Apothecon subsidiary versus Barr
20   Laboratories.  And before that I gave a
21   deposition in a private matter.
22       Q.   And putting aside
23   depositions, have you ever testified in
24   court in connection with your employment

Page 25

1    with Endo?
2        A.   No.
3        Q.   Have you given any -- any
4    sworn testimony of any kind in writing
5    with respect to your work at Endo?
6        A.   No.
7        Q.   All right.  And just to
8    be -- really make sure, did you ever
9    testify before the New York Attorney
10   General, New York Attorney General with
11   respect to your work for Endo?
12       A.   No.
13       Q.   Are you represented by
14   counsel today?
15       A.   Yes, I am.
16       Q.   Who is that?
17       A.   McCarter English, Amy Vanni.
18       Q.   Fantastic.  Okay.  And let's
19   just go over some of the basics for
20   deposition.
21           As I said, I'm going to be
22   asking you questions.  And I'm going to
23   ask you to answer and answer orally.  Is
24   that all right?

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1      A.   That's fine.
2      Q.   Okay.  So we can't have
3   shaking of heads and mm-hmms and
4   unh-unhs.  Do you understand that?
5      A.   I do.
6      Q.   Terrific.  And as we
7   discussed, we need to try and avoid
8   talking over each other.  Okay?
9      A.   I will.
10      Q.   Thank you.  And from time to
11   time, Ms. Vanni may have objections.
12   Unless she instructs you not to answer
13   and you choose to follow that
14   instruction, you're going to need to
15   answer the question despite any
16   objection.  Do you understand that?
17      A.   I do.
18      Q.   Terrific.  And is there any
19   reason that you can't give your best
20   testimony today?  For example, are you
21   taking any medications that might
22   interfere with your cognitive skills
23   today?
24      A.   No.

Page 27

1      Q.   Okay.  If at any point
2   today, you don't understand a question
3   that I ask, would you please let me know
4   that?
5      A.   Be glad to.
6      Q.   Terrific.  Thank you very
7   much.  Did you do anything to prepare for
8   today's deposition?
9      A.   I met with -- I met with
10   Ms. Vanni, yes.
11      Q.   And when was that?
12      A.   Over several days in the
13   last couple of weeks.
14      Q.   You say several days.  Was
15   it more than two days?
16      A.   It might have been.  I don't
17   know.  It depends on how you define a
18   day.
19      Q.   On how many different days,
20   putting aside how -- length of day, on
21   how many different occasions did you meet
22   with Ms. Vanni?
23      A.   I think a total of three
24   days.

Page 28

1      Q.   And that was over the last
2   week or more than a week?
3      A.   Somewhere in the
4   neighborhood of the last two weeks.
5      Q.   Okay.  Was there anyone else
6   present at the meetings you had with
7   Ms. Vanni?
8      A.   Yes.  And then you want
9   to -- Sandra was there and --
10      MS. REESE:  Kelly Reese.
11   BY MS. SCULLION:
12      Q.   Fantastic.  Okay.  Was there
13   anyone else other than counsel?
14      A.   There was -- no, there
15   was -- other than counsel, no.
16      Q.   Okay.  Was anyone joined by
17   phone other than counsel?
18      A.   No one joined by phone, no.
19      Q.   Okay.  And did you review
20   documents in the course of your
21   preparation for today's deposition?
22      A.   I did.
23      Q.   Did any of those documents
24   refresh your recollection about any of

Page 29

1   the events that took place when you were
2   employed with Endo?
3      A.   I would say honestly
4   vaguely.  I didn't have some -- I didn't
5   have some, you know, burst of memory that
6   it all of the sudden jolted my brain that
7   says, oh, yeah, absolutely that's crystal
8   clear now.  I mean, I -- it came back a
9   little bit.  But remember we're going
10   back -- you know, I left Endo in -- in
11   August of 2007, so it's -- you know, it
12   was already going -- it's 11 and a half
13   years.  It's going on 12 years.
14      Q.   I understand.
15      A.   So a lot of the -- I started
16   in '03.  So if you add those years in,
17   you're looking at, you know, close to
18   16 years.
19      Q.   Understood.  You said that
20   your recollection may have been refreshed
21   even just vaguely on some things.  Can
22   you tell me what kinds of things you have
23   a little bit more recollection on having
24   prepared?

8  (Pages 26 to 29)

Page 30

1    A.   I don't have any -- I can't
2  give you specific examples.  Just in
3  general terms, you know, I saw documents
4  that, you know, some dealt with the
5  brand.  I had nothing to do with the
6  brand.  So I was -- our focus was -- my
7  focus was on generics.
8    Q.   You say you have nothing to
9  do with the brand -- I apologize.  Did
10 you finish?
11   A.   I think so, yes.
12   Q.   I apologize.  I think I
13 started to talk over you.  You said you
14 had nothing to do with the brand.  The
15 brand there, are you referring to Opana?
16   A.   Well, just brands in
17 general.  Brands -- Endo had the brand --
18 Endo's brand division or group, which
19 was, you know, 95 percent of the company,
20 maybe more, had, you know, opioids and
21 non-opioids.  But they were the brand.
22 And I didn't have anything to do with
23 that activity.  So the brands were the
24 brands.  And they did their things.

Page 31

1  Completely different business in
2  generics.  It's completely different
3  models, completely different everything.
4    Q.   Okay.  We'll look a few -- a
5  few documents later, because I think
6  we've seen some involvement that you had
7  with some of the branded products.  We'll
8  look at that a little bit later.
9         In terms of preparing for
10 the deposition, did you yourself go back
11 and look at any documents on your own
12 outside of what Ms. Vanni or counsel may
13 have shown to you?
14   A.   I don't have any documents
15 of my own.  So there was nothing to
16 review.
17   Q.   Okay.  You don't keep any
18 diaries or journals that you would have
19 gone back to look at, or did you go back
20 to look at?
21   A.   I don't -- I didn't -- no, I
22 don't have any of those journals or
23 diaries.  Notebooks I left at Endo.  When
24 I left, I left.  You know, I had boxes of

Page 32

1  personal photographs and things of my
2  wife and kids and left.
3    Q.   Okay.  Terrific.  Did you
4  speak with anyone else other than counsel
5  in preparation for the deposition about
6  the work that you did with Endo?
7    A.   No.
8    Q.   Since you left Endo, have
9  you been in touch with any of your former
10 colleagues?
11   A.   No.  You know, they -- I'm a
12 big believer in antitrust.  And, you
13 know, we -- you know, I never -- as a
14 matter of fact I saw some yesterday when
15 I was there.  And I haven't seen them in,
16 you know, 12 years, whatever it's been
17 since I left.  So, no, other than I would
18 wave to them at a convention or
19 something, you know, we didn't have any
20 conversations.
21   Q.   You didn't have any ongoing
22 personal relationship with anybody?
23   A.   No.
24   Q.   And you said that you saw

Page 33

1  some folks yesterday.  So in the course
2  of going for preparation for the
3  deposition, you saw other folks from
4  Endo?
5    A.   As I was leaving.  You know,
6  as I was leaving, I got to spend five or
7  10 minutes with former colleagues that
8  were in the -- whatever department
9  they're in now, at the time they were in
10 the finance department.  "Hi, how are
11 you?  You know, how are you doing?  You
12 look great."  That kind of stuff.
13   Q.   Got it.  Who were those
14 folks that you said hi to?
15   A.   They would have been Mary Jo
16 Magrone and it was -- the other one was
17 Jody Travis.
18   Q.   And you said you recall them
19 from your time at Endo; is that right?
20   A.   Yeah, they were there when I
21 left.
22   Q.   And they're -- were they in
23 the finance department when you were
24 there?

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1      A.   Yeah, they were in the
2   finance department.
3      Q.   Okay.  Got it.  Anyone else
4   that you -- that you said hello to at
5   Endo?
6      A.   Guy Donatiello, but he's
7   part of their legal counsel team.  He was
8   the -- he was the IP lawyer then.  He's
9   still the IP lawyer.
10     Q.   Got it.
11     A.   Not that that's a bad thing.
12     Q.   It's not a bad thing at all.
13         Okay.  At some point, I
14  assume you were contacted to inform you
15  that you were going to be deposed in this
16  case.  Before you were contacted about
17  the deposition, had you heard about this
18  case?
19     A.   Vaguely, whatever I heard in
20  the press, that you know -- to be honest,
21  not very much.
22     Q.   Okay.  What do you recall
23  hearing about it?
24         MS. VANNI:  Object to form.

Page 35

1          THE WITNESS:  Just the
2     various -- the various government
3     entities were pursuing, you know,
4     different pharmaceutical
5     companies.  More or less, that's
6     just it, you know.
7   BY MS. SCULLION:
8      Q.   Okay.  And what's your
9   understanding of what the governmental
10  entities are pursuing the companies for?
11     A.   I didn't really pay that
12  much attention to it.  I'm not involved
13  with opioids.  You know, when I was
14  Kremers Urban, I wasn't involved in
15  opioids.  Controlled drugs, yes, but not
16  opioid.
17         So, you know, I didn't -- I
18  don't believe most of the stuff that I
19  read in the press anyway.  So I didn't
20  really -- I didn't really focus on it.
21     Q.   Do you have -- do you have
22  an understanding that the case at its
23  core involves allegations concerning the
24  opioid epidemic in this country?

Page 36

1          MS. VANNI:  Object to form.
2          THE WITNESS:  I understand
3     based on -- based on our meeting
4     with counsel, yes.
5          MS. VANNI:  I just want
6     to -- I just want to remind you.
7     Don't disclose anything that we
8     personally discussed.
9          THE WITNESS:  Yeah, yeah,
10    yeah, yeah.
11  BY MS. SCULLION:
12     Q.   Okay.  Outside of this
13  litigation, are you generally familiar
14  with the fact that there's an opioid
15  epidemic in the country?
16         MS. VANNI:  Object to form.
17         THE WITNESS:  Only what I've
18    heard on TV that there's a problem
19    with opioids.
20         MS. SCULLION:  Okay.  Can I
21    have the subpoena, please.
22  BY MS. SCULLION:
23     Q.   Mr. Stevenson, were you
24  provided a copy of the subpoena that was

Page 37

1   served in this case for your deposition
2   and documents?
3      A.   I -- yes, I was -- I was
4   shown a copy, yes.  Mm-hmm.
5      Q.   Okay.
6          (Document marked for
7     identification as Exhibit
8     Endo-Stevenson-2.)
9   BY MS. SCULLION:
10     Q.   Let me hand you what's been
11  marked as Exhibit Number 2.  Exhibit
12  Number 2, Mr. Stevenson, is a copy of the
13  subpoena to testify at deposition in a
14  civil action.  It's addressed to you,
15  care of Arnold & Porter Kaye Scholer.  Do
16  you understand that Arnold & Porter Kaye
17  Scholer is also counsel for Endo in this
18  case?
19     A.   Yes.
20     Q.   Okay.  Terrific.  And is
21  the -- did you see the subpoena before
22  today's deposition?
23     A.   Yes.
24     Q.   All right.  And you

10  (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  understand that in addition to asking for
2  your testimony, it asks for documents?
3       A.   What kind of documents?
4       Q.   Sure.  Sorry.  Let's go
5  to -- on the very first page of
6  Exhibit 2, you see where it says in
7  italics on the left-hand side
8  "production"?
9       A.   Yes.
10      Q.   And it says, "You or your
11  representative must produce the
12  documents, electronically-stored
13  information, or objects identified in
14  Attachment A prior to the date of the
15  deposition but no later than February 10,
16  2019."
17           Do you see that?
18      A.   Yes.
19      Q.   Okay.  And if you turn back
20  in Exhibit 2 to what's labeled at the top
21  Attachment A.
22      A.   Yes.
23      Q.   And then you'll see that
24  page, and then really the next page under

Page 39

1  Roman Numeral II, documents requested,
2  there's five categories of documents.
3           The question is just, did
4  you search for documents that might be
5  responsive to the subpoena?
6       A.   I never had a personal
7  e-mail.  I only got one when I stopped
8  working at Kremers Urban as the president
9  and CEO.  I never had one before that.
10  So whatever was on my e-mail was at Endo.
11  I left it there.  And they have it all.
12  So I never stored -- for that very
13  reason.  I didn't want to have documents
14  at home.
15      Q.   Okay.
16      A.   I don't have any documents
17  to search for.
18      Q.   Terrific.  And then at the
19  bottom of that same page, it asks for
20  tangible things, Roman Numeral III,
21  tangible things.
22      A.   Yes.
23      Q.   The question here is, did
24  you have any samples of promotional

Page 40

1  materials or educational materials from
2  Endo at home?
3       A.   No.
4       Q.   Okay.
5       A.   Because first of all, in
6  generics, we don't do promotion.
7  Generics is a different business.
8  That's -- the brand business does
9  promotion.
10           And we didn't have any
11  educational -- that's what the brand
12  does.  They had educational material when
13  they called on physicians or whatever
14  they have in their -- you know, in their
15  arsenal when they visited physicians.
16  But in generics we didn't have that.  You
17  know, it's generics.  It's more of a
18  shoestring operation from a cost
19  standpoint, pricing standpoint.  So all
20  those things which are very expensive
21  would not be in the generics business.
22      Q.   And again, do you recall
23  though that with respect to the generic
24  OxyContin product that Endo did sell for

Page 41

1  a period of time, there were certain
2  educational materials that were created
3  and distributed?
4       A.   There -- there, you know, my
5  recollection is there was or there could
6  have been.  But I wouldn't have been
7  involved in that.  That was -- you know,
8  and Endo was very segregated by function.
9  So pharmacovigilance and the operational
10  people and the medical people, they all
11  did that kind of stuff.  And as a matter
12  of fact by rule, you don't want any
13  commercial people in that.  You want it
14  all to be on scientific basis.  That's
15  the way most Pharma companies, and
16  companies set it up.
17           So the commercial people,
18  which I was considered more on the
19  commercial side, aren't involved in -- in
20  any of that.  So there could have been
21  educational things developed at the time.
22  It's a long time ago.  Yes, I was
23  involved in oxycodone ER, which is the
24  generic name for OxyContin.  But I did

11 (Pages 38 to 41)

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1    not, you know, draft any of that.  That
2    was all done, if it was done, was done by
3    other people in the company that had --
4    it was based on their scientific
5    expertise, MDs, et cetera, that were
6    involved in that.
7         Q.   So you referred to a rule to
8    separate out the commercial and
9    educational aspects --
10        A.   There -- yeah.
11        Q.   Sorry.  Can you explain
12   what -- what rule you are referring to?
13            MS. VANNI:  Object to form.
14            THE WITNESS:  Well, you
15        know, it's not so much of a rule.
16        Let's say it was a policy where,
17        you know, they wanted -- the
18        company wanted, and most companies
19        want this, they want the
20        commercial people to stay away
21        from scientific endeavors.  Okay.
22        So whether it's a risk management
23        program or whether it's
24        educational materials, it's very

Page 43

1    specific and it's based on the
2    label of the product, it's a --
3    this is -- FDA is a very
4    complicated, you know, process.
5    And -- and the FDA, when they
6    approve your product, your product
7    is approved based -- and a label
8    is approved.  Effectively when you
9    get the product approved, the
10   label for use is approved.
11            And based on that,
12        educational materials are
13        developed based on that label.
14        And they wanted -- and Endo was
15        not an exception.  Other companies
16        have done it as well.  That
17        information, they wanted the
18        scientific people, MDs,
19        pharmacovigilance people, to work
20        on those kinds of products.  And
21        if there was educational materials
22        developed, that's who would have
23        done it.
24   BY MS. SCULLION:

Page 44

1         Q.   Okay.  And just to make sure
2    we are on the same page, when you talk
3    about educational materials, would that
4    include unbranded educational materials?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  That's why I
7        don't recall that it would have
8        been -- normally on -- if they did
9        it, it might have been for what's
10       called a CE program, you know, or
11       something like that.
12            It's also done -- again, the
13       CE program and who writes that is
14       separate from commercial because
15       it's based on the science of the
16       product.  We may have done some of
17       that, I just don't recall.
18   BY MS. SCULLION:
19        Q.   Okay.  And what's your
20   understanding of why there was the policy
21   to separate the commercial from the
22   educational and science aspects as you
23   were just discussing?
24        A.   It's normally done in order

Page 45

1    that the information presented is based
2    on the science without influence from the
3    commercial people.  So if you -- not that
4    I would have influenced them.  But just
5    as a policy or an approach, most
6    companies don't want to have any
7    association where commercial is involved
8    in -- in, you know, that kind of
9    activity.  Because, you know, the feeling
10   is that somehow it taints the product and
11   makes it more of a commercial slant.
12            So most, most companies, and
13   Endo was no exception, have, and I've
14   seen it described as a firewall between
15   the commercial people and the scientific
16   people with respect to what you are
17   discussing.
18        Q.   And again, your
19   understanding is that firewall is because
20   you don't want to taint the educational
21   materials with a commercial slant?
22        A.   Right.
23            MS. VANNI:  Object to form.
24            THE WITNESS:  Not that that

12  (Pages 42 to 45)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    would happen, but, you know, the
2    idea is if they are not involved,
3    there's no -- there's no
4    possibility of that happening.
5    BY MS. SCULLION:
6        Q.    Got it.  Okay.
7              All right.  You mentioned
8    that you left Endo in August of 2007.
9    And just to be sure, do you have any
10   current financial connections with Endo
11   or Par?
12       A.    No.
13       Q.    All right.  Do you hold any
14   stock in either company?
15       A.    No.
16       Q.    Okay.  Are you being paid
17   for your time in connection with this
18   deposition at all?
19       A.    No.  I tried, but no.
20       Q.    Good for you.
21       A.    But I'll take -- I'll
22   definitely take a donation if you want to
23   make one.
24       Q.    Well, do you have an

Page 47

1    expectation of being paid in connection
2    with your testimony?
3        A.    No.  In all seriousness, no.
4        Q.    Okay.  And I -- I heard what
5    you said, but just so we're clear on the
6    record.  You have no expectation of
7    anyone making a donation to anyone on --
8    on your behalf --
9        A.    No.
10       Q.    -- in connection with the
11   deposition?
12       A.    I'm not expecting any
13   remuneration from anybody.
14       Q.    Okay.  Okay.  That has come
15   up in recent cases.  That's why I asked
16   the question.  Not in this case.
17             MS. SCULLION:  Sandra is
18   looking at me like what is she
19   talking about.
20             MS. VANNI:  Yeah.
21   BY MS. SCULLION:
22       Q.    ████████████████████



Page 48

1    ████████████████████
     ████████████████████
     ████████████████████
     ████████████████████
     ████████████████████
     ████████████████████
     ████████████████████
     ████████████████████
15       Q.    Okay.  And -- and by
16   definition, they're also not in any
17   opioids, correct?
18       A.    No.  No opioids.
19       Q.    All right.  Okay.  Do you
20   currently have any positions in any
21   industry groups other than being a member
22   of any industry group?
23       A.    Nope.
24       Q.    Are you -- are you currently

Page 49

1    personally a member of any industry
2    groups?
3        A.    No.  I get an e-mail
4    everyday about the generic industry.  I
5    still get it from the -- the successor to
6    GPhA, it's now called Association of
7    Accessible Medicines.  I still get my
8    daily brief or whatever it's called.  But
9    just, you know, that's it.
10       Q.    Is that still called The
11   Pink Sheet?
12       A.    No.  They have -- they have
13   an update on everything in the
14   pharmaceutical business or generic
15   business and...
16       Q.    Okay.  Let's go back to
17   Exhibit Number 1, your CV.
18       A.    Sure.
19       Q.    And as we go through today,
20   just, it will help to keep a pile of
21   exhibits.  Because we might come back to
22   them.
23       A.    Okay.
24       Q.    Just to give you the

Page 50

```
 1    heads-up there.
 2           So just -- just starting
 3    back on the last page of Exhibit 1,
 4    you -- you, it looks like, were born and
 5    raised in Philly?
 6       A.  No. Actually I was born in
 7    Haddington, Scotland, but --
 8       Q.  Okay.
 9       A.  -- I was six weeks old when
10    I came over. My parents came over.
11       Q.  Terrific. And then you were
12    raised here?
13       A.  Yeah, I grew up in Northeast
14    Philadelphia.
15       Q.  Okay. And you -- then you
16    went to St. Joe's?
17       A.  Yes.
18       Q.  And on to Drexel, right?
19       A.  Yeah.
20       Q.  All right. I also see that
21    you, for a period -- good period of time,
22    you were an associate professor at Drexel
23    for economics and marketing; is that
24    right?
```

Page 51

```
 1       A.  15 years, yeah.
 2       Q.  Terrific. And did you
 3    include teaching there on pharmaceutical
 4    marketing?
 5       A.  No, no, no. I taught
 6    economics. I taught undergraduate --
 7    well, the marketing was related into a
 8    couple economics courses. It wasn't a
 9    direct marketing course.
10       Q.  Okay.
11       A.  It was mostly microeconomics
12    and macroeconomics, and then some
13    international business courses which were
14    more marketing oriented so that's why I
15    wrote that.
16       Q.  Terrific. Okay. And then
17    just looking back at your employment
18    history, you start off at ASTM, right,
19    for a period?
20       A.  Correct.
21       Q.  You went onto SUN Company?
22       A.  Right.
23       Q.  Neither of those positions
24    obviously involved any -- any opioid
```

Page 52

```
 1    products, right?
 2       A.  No opioids, no.
 3       Q.  Okay. And then you went to
 4    United Research Laboratories, right?
 5       A.  Correct.
 6       Q.  It says you were group
 7    manager for contracts, marketing, and
 8    pricing. Did -- did that position have
 9    anything to do with any opioid products?
10       A.  We may have had a C-V or
11    C-IV drug. But, you know, it's a long
12    time ago. I don't remember.
13       Q.  Okay.
14       A.  It was -- we didn't have
15    C-II.
16       Q.  And just so we're all clear,
17    C-II, C-IV, C-V, these are references to
18    the schedules under the federal
19    Controlled Substances Act, correct?
20       A.  Right, yes.
21       Q.  And C-II, that is a fairly
22    restricted category that's scheduled,
23    correct?
24       A.  Very restricted.
```

Page 53

```
 1       Q.  Okay. And we're going to
 2    talk about them more, but some of the
 3    products that you were involved with at
 4    Endo were -- were C-II products, correct?
 5       A.  Correct.
 6       Q.  So Endocet was a C-II
 7    product, correct?
 8       A.  Correct.
 9       Q.  Sorry. Morphine sulfate
10    extended-release was a C-II, correct?
11       A.  Correct.
12       Q.  Generic oxycodone ER was a
13    C-II, correct?
14       A.  Correct.
15       Q.  Okay. And then we -- we
16    said Endocet, Endo was also selling
17    Percocet at the time you were working
18    with them?
19       A.  That was the brand.
20       Q.  Right.
21       A.  Okay.
22       Q.  That was a brand. That was
23    a C-II, correct?
24       A.  Yes.
```

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1     Q.   All right.  And that was the
2  brand equivalent of Endocet, right?
3     A.   Well, actually Endocet was
4  the generic equivalent of Percocet.
5  That's --
6     Q.   Well put.  Okay.
7        And -- and each of those,
8  they were an oxycodone APAP combo
9  product; is that right?
10    A.   Oxycodone IR was
11 acetaminophen, or APAP combo product,
12 yeah.
13    Q.   Right.  Thank you.
14    A.   For -- with respect to
15 Endocet.
16    Q.   Understood.
17    A.   And Percocet.
18    Q.   Right.
19    A.   Percocet was -- was the
20 brand name for the generic chemical
21 entity.
22    Q.   Right.  And then I mentioned
23 earlier Opana.  You recall that while you
24 were employed with Endo, it sold two

Page 55

1  products, one called Opana, and another
2  one called Opana ER?
3     A.   I had nothing -- yeah, I --
4  they were selling it, but I had nothing
5  to do with that.
6     Q.   Okay.  And I'm just -- if
7  you can just answer the questions as I
8  ask them.  I -- if you don't have
9  anything to do with it, you'll let me
10 know.  But I'm just making sure you
11 recall that they sold those products.
12    A.   Yes.  Yeah.
13    Q.   Okay.
14    A.   So the -- the answer, to be
15 clear, they sold the products --
16    Q.   Right.
17    A.   -- that was the brand
18 people.
19    Q.   Right.
20    A.   I didn't have anything to do
21 with generics.
22    Q.   Okay.
23    A.   So it wasn't a generic
24 product.

Page 56

1     Q.   Okay.  And -- but you recall
2  that Opana and Opana ER were also C-II
3  products?
4     A.   Yes.
5     Q.   Okay.  Okay.  So sorry.
6        So after your position at
7  United Research Labs, you then joined
8  Apothecon, which was a division of
9  Bristol-Myers Squibb, correct?
10    A.   Yeah.  Mm-hmm.
11    Q.   All right.  And you were
12 there from 1996 to 2000, correct?
13    A.   Correct.
14    Q.   And your time there did not
15 involve any controlled substances,
16 correct?
17    A.   No controlled substances.
18    Q.   Okay.  And then moving ahead
19 to Page 2 of your CV.
20    A.   Excuse me.  Can I go back?
21    Q.   Yes, go ahead.  Absolutely.
22    A.   You -- controlled substances
23 or opioids?
24    Q.   Let's just start with --

Page 57

1  let's talk about opioids.  Any opioids
2  at -- at Apothecon?
3     A.   No.  For the record, they
4  did have a controlled substance which was
5  methylplenidate which is a C-II, but it's
6  for attention deficit.
7     Q.   Thank you very much.  I
8  appreciate that.
9        And then you joined, after
10 Apothecon, you joined Sandoz, correct?
11    A.   Yes.
12    Q.   All right.  And at Sandoz
13 did you have responsibility for any
14 opioid products?
15    A.   No.  I have to think about
16 it.  Excuse me, I have to think about it
17 for one moment.
18    Q.   Sure.
19    A.   I would say no.
20    Q.   Okay.  If at any -- if at
21 some point today, it occurs to you, will
22 you just let me know?
23    A.   Be glad to.
24    Q.   Okay.  Thanks a lot.

15 (Pages 54 to 57)

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1      And then -- and then after
2  Sandoz, you joined Endo Pharmaceuticals.
3  And that was in 2003, correct?
4      A.   That's correct.
5      Q.   All right.  And you stayed
6  with Endo, you said, August 2007, right?
7      A.   Correct.
8      Q.   And were you vice president
9  generics business and trade affairs for
10  that entire period?
11      A.   No.  I was the vice -- I was
12  vice president of generics for the entire
13  period.  The trade affairs was the last,
14  I would say, nine months or so, ten
15  months.  They had, like, a little
16  reorganization at the time.  At the time
17  when I arrived at Endo -- and this is
18  just for the record, but, you know, when
19  I arrived at Endo, they had a director of
20  corporate accounts.  And they -- under
21  corporate accounts, they had managed care
22  accounts, which, you know, for people who
23  don't know who they are, they're the
24  Aetnas, CIGNAs and United Healthcares and

Page 59

1  Blue Cross Blue Shields kind of accounts.
2  They're called managed care.
3      And then they had what's
4  called the trade accounts, which are the
5  wholesalers, AmerisourceBergen, McKesson,
6  those kind of accounts, plus the chains,
7  the CVS, Walgreens, Rite Aids of the
8  world.  And they had that all under
9  corporate accounts.
10      When the director of
11  corporate accounts left, which I believe,
12  from my recollection, is sometime in late
13  2006, to pursue another opportunity, the
14  feeling at the time was to segregate the
15  retail accounts from the managed care
16  accounts because they wanted to have more
17  of a focus on managed care.  And they
18  thought the retail accounts were a
19  distraction to managed care for the
20  individuals involved.  So because of my
21  knowledge and experience in retail
22  accounts, they asked me to have those
23  three people report to me.
24      So for the last -- from,

Page 60

1  let's say, November or somewhere in that
2  time frame of '06 until the time I left,
3  I then had trade affairs.
4      Q.   Okay.  And you've used the
5  terms trade and retail.  Those refer to
6  the same thing, and that is the chains?
7      A.   Chains and wholesalers,
8  yeah.
9      Q.   Okay.
10      A.   They're commonly called the
11  trade.
12      Q.   Okay.  And so you -- so I
13  just want to make sure I understand.  So
14  the trade/retail would include, as you
15  said, wholesalers like AmerisourceBergen,
16  correct?
17      A.   Correct.
18      Q.   McKesson?
19      A.   Correct.
20      Q.   Cardinal Health?
21      A.   Cardinal Health.
22      Q.   All right.  Would it also
23  include the national chains such as Rite
24  Aid?

Page 61

1      A.   Yes.
2      Q.   Walgreens?
3      A.   Yes.
4      Q.   Walmart?
5      A.   Yes.
6      Q.   Okay.  So now I think I have
7  an understanding of what we are talking
8  about.
9      A.   And all that's commonly
10  called, for ease of -- for those of us in
11  the business, the trade.
12      Q.   Fantastic.  Okay.
13      And before taking on the
14  responsibilities for -- formally as --
15  for trade affairs, had you had experience
16  working with the trade in the past, I
17  think you said?
18      A.   Yes.
19      Q.   Okay.  All right.  How did
20  you come to join Endo in 2003?
21      A.   I was recruited.
22      Q.   Who recruited you?
23      A.   Oh, I don't remember.  It
24  was a recruiting firm in Philadelphia.

16  (Pages 58 to 61)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1      Q.   Okay.  It wasn't anyone
2  specific at Endo that recruited you?
3      A.   No.
4      Q.   Did you know anyone at Endo
5  before you joined?
6      A.   I might have known them from
7  being in the business.  You know, I
8  may -- oh, yeah, they are at Endo.  No, I
9  didn't have any personal relationship
10  with anybody.
11      Q.   Okay.  When you -- when you
12  did join Endo, did was there anyone
13  specific within Endo who hired you?
14      A.   The decision was made by
15  Peter Lankau, who was the CEO of the
16  company.
17      Q.   Okay.  When you joined Endo,
18  was Carol Ammon still with the company?
19      A.   Yes, actually, I misspoke.
20  Carol Ammon was the president and CEO,
21  and Peter was the VP of business
22  operations.  But Carol was phasing out,
23  and Peter was going to become the new
24  CEO.  So I said he was the CEO of the

Page 63

1  company.  He was responsible the
2  hiring -- for my hiring into the company.
3      Q.   Okay.  Carol Ammon, she was
4  one of the cofounders of Endo; is that
5  right?
6      A.   Yes.
7      Q.   Right.  Had you -- did you
8  meet with her personally when you worked
9  at Endo?
10      A.   Oh, yes.  Yes.  I went
11  through the interview process with her.
12      Q.   Fair to say Ms. Ammon was
13  very knowledgeable about her business?
14      MS. VANNI:  Objection to
15  form.
16      THE WITNESS:  She was very
17  knowledgeable, yes.
18  BY MS. SCULLION:
19      Q.   She was, to your knowledge,
20  pretty involved in the strategies that
21  helped get Endo off the ground?
22      MS. VANNI:  Object to form.
23      THE WITNESS:  I would say
24  she was knowledgeable in the

Page 64

1  strategies, yeah.
2  BY MS. SCULLION:
3      Q.   And you said you left Endo
4  in August of 2007.  Why did you leave
5  Endo?
6      A.   The opportunity to become
7  the president and CEO of Kremers Urban
8  Pharmaceuticals.
9      Q.   Were you asked to leave
10  Endo?
11      A.   No.
12      Q.   Did anyone suggest that you
13  leave Endo?
14      A.   No.  Came, I think, as a
15  complete shock that I left.
16      Q.   And as you said, then you
17  went straight from Endo to Kremers Urban,
18  correct?
19      A.   Right.  They were a
20  subsidiary of UCB, which is a
21  Brussels-based biotech.  We were the
22  generic division of the United States.
23      Q.   And you stayed with Kremers
24  Urban for about 11 years, through 2016.

Page 65

1  I'm sorry, nine years to 2016.
2      A.   Yes.
3      Q.   Bad math.  Sorry about that.
4      A.   That's all right.  It's
5  okay.  You're forgiven.
6      Q.   Thank you.  And you were
7  president and CEO there, as you said,
8  correct?
9      A.   Correct.
10      Q.   Did Kremers Urban
11  Pharmaceuticals, while you were president
12  and CEO, sell any opioid products?
13      A.   No.
14      Q.   And did it have any
15  relationship with Endo during that
16  period?
17      A.   No.
18      Q.   With Par?
19      A.   No.
20      Q.   And then you left Kremers
21  Urban -- I'm sorry, when did you leave
22  Kremers Urban?  It says 2016.  But when?
23      A.   ███████████████████

17  (Pages 62 to 65)



Page 66

Page 67

17    A.   No opioids.
18    Q.   Is it working on any opioid
19 products, without specifying?
20    A.   No, they're not.
21    Q.   All right.
22       MS. SCULLION:  Could I have
23 Tab 62, please.
24       (Document marked for

Page 68

1       identification as Exhibit
2       Endo-Stevenson-3.)
3 BY MS. SCULLION:
4    Q.   I want to hand you what's
5 been marked as Exhibit Number 3.
6    A.   Okay.
7    Q.   And, Mr. Stevenson, do you
8 see Exhibit Number 3 is, I'll represent
9 to you it's a printout from GeneriCo's
10 website.  It's a description of the board
11 of directors.  Have you seen this before?
12    A.   Probably.  Not in printed
13 form.  But yes.
14    Q.   All right.  You see at the
15 bottom of the first page, the heading,
16 board of directors, and on the left-hand
17 side, that's you, George R. Stevenson,
18 chairman of the board, correct?
19    A.   That's me, yes.
20    Q.   All right.  And then there's
21 a brief bio under your name that starts
22 at the bottom of the first page, and it
23 continues onto the next page.  I just
24 want to confirm that you agree with

Page 69

1 what's stated in the bio here.
2       It says in the second
3 sentence, "Mr. Stevenson brings deep
4 generic and brand pharmaceutical
5 experience to the GeneriCo board and is a
6 seasoned and successful executive with
7 over 20 years of leadership in this
8 dynamic marketplace."
9       That's an accurate
10 characterization of you, correct?
11    A.   Yes.  I understand the brand
12 business, yes.  So yeah, I would say yes,
13 that's -- that's accurate.
14    Q.   If you'll go a little
15 further down the bio sort of summarizes
16 your work experience.  If you go towards
17 the bottom of the bio.  It says, "As vice
18 president of Endo generic products,
19 George was charged with full
20 responsibility for the generics business
21 including strategy, account management,
22 marketing, and the identification and
23 development of new products."
24       Is that also an accurate

Page 70

1    description of your time at Endo?
2        A.   Yes.
3        Q.   Can you just explain to me,
4    when it refers here to marketing in the
5    generics business, what did that mean,
6    when you were at Endo?
7        A.   It doesn't mean -- there's a
8    difference -- what it means is that it
9    mostly deals with the pricing and getting
10   business into accounts.  It's not what
11   normally is referred to as marketing like
12   on the brand side where there's
13   promotion.  There's no promotional in
14   generics because you're competing against
15   yourself.  There's normally no more than
16   one.  So there's no sense in promotion.
17   There's no sales -- there's no sales, you
18   know, paraphernalia that's given out.
19   There's no representation to doctors.
20           On the brand side, they have
21   thousands or hundreds or whatever number
22   of sales reps that are calling
23   physicians.  On generics, we had three
24   national account executives.

Page 71

1           So marketing and generics is
2    completely different than what is
3    normally involved in the brand; however,
4    the marketing is, make sure people know
5    you have the product, that you're coming
6    with the product.  And it's more getting
7    the product placed in the trade accounts,
8    as we described them earlier.
9           Essentially in generics,
10   that's what marketing is.
11       Q.   Okay.  So if I understand
12   you correctly, on the brand side, there's
13   marketing that takes the form of sales
14   representatives, for example, going out
15   to detail healthcare providers about the
16   product, correct?
17       A.   Correct.
18       Q.   Okay.  And they might be
19   using specific promotional materials in
20   the course of doing that?
21       A.   Yeah.  They would use
22   specific promotional materials, which are
23   very strictly controlled.  Where the
24   scientific people, we talked about

Page 72

1    earlier, helped develop those, or
2    developed those, based on the
3    FDA-approved label, okay, so -- otherwise
4    they can get in big trouble.
5           So you can only promote
6    what's on the label.  You cannot promote
7    anything other than what's on the label.
8        Q.   Right.
9        A.   So that's what they do.
10   Yes.
11       Q.   All right.  And just to make
12   sure we are on the same page on promoting
13   according to the label.  I mean, I've
14   heard the phrase that the label defines
15   the product, is that something you've
16   heard?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Yeah.
19   BY MS. SCULLION:
20       Q.   Yeah?
21       A.   I would say some people use
22   that phrase, yeah.
23       Q.   Okay.  And -- and it's very
24   clear that a company cannot promote its

Page 73

1    product inconsistent with what's in the
2    label approved by the FDA, correct?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  Yes.
5    BY MS. SCULLION:
6        Q.   Okay.  To do that is called
7    off-label marketing, correct?
8        A.   Yes.
9        Q.   It's unlawful, correct?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  Yes.
12   BY MS. SCULLION:
13       Q.   Would you agree that it's
14   also unethical?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  It's a
17   judgment call.  I guess so.  I --
18   I don't know.  I wasn't involved
19   in it.
20   BY MS. SCULLION:
21       Q.   Okay.
22       A.   So, you know, in every
23   Pharma company I worked at, they went to
24   great lengths, okay.  I was part of the

19 (Pages 70 to 73)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1  brand Pharma company in Bristol-Myers
2  Squibb, in Sandoz -- Geneva Sandoz was
3  part of Novartis, at Endo, wherever it
4  was, the brand company went to great
5  lengths and spent tremendous amounts of
6  money to make sure that the sales reps
7  promoted according to the label.
8          And anybody who went off
9  that script was -- was severely punished,
10  including -- up to and including
11  termination.
12      Q.   Okay.
13      A.   And actually went to great
14  lengths, I know at Endo, in monitoring
15  that kind of activity to make sure that
16  did not occur.  Because Endo, in the big
17  scheme of things, was not that big a
18  company and they couldn't -- they didn't
19  want to have any issues along the lines
20  you described.
21          So most pharmaceutical
22  companies take the same approach.  They
23  go to great lengths to ensure that that
24  off-label promotion does not happen.

Page 75

1      Q.   Okay.  Now, as you said,
2  when you were at Endo, you were not
3  personally professionally involved in the
4  sales and promotion of the branded
5  products, correct?
6      A.   Correct.
7      Q.   Okay.  So then, that was
8  describing the marketing for branded.
9  Then you were explaining to me what
10  marketing means on the generic side.
11          To make sure I understand,
12  that involves marketing to the trade
13  accounts in order to, to what, to be
14  stocked by them, to placed by them?  What
15  are you marketing them for?
16      A.   Yeah.  You know, we -- yeah,
17  that they know we have the product,
18  that -- that we're always searching for
19  opportunities to get product, you know,
20  does somebody need product, do they not
21  like their current supplier.  You know,
22  under CDA we would tell them about future
23  products.  I don't know if we did that at
24  Endo, but, you know, I'd done that

Page 76

1  before.  When I was at Kremers, we did
2  that where, you know, under a CDA, a
3  large account, we would tell them this is
4  what we're working on in the pipeline, to
5  get their reaction, is that something
6  they'd be interested in.  And also to let
7  them know it was coming, you know, so
8  that they -- that's the kind of
9  marketing.
10          We did some reminder ads in
11  journals which were, you know, they were
12  very expensive.  In the case of Endo, I
13  remember they -- you know, they called
14  them three-piece, three-piece entities
15  because of all the different things that
16  had to go into the ads because they
17  were -- it was -- it was an opioid, which
18  was standard.  So we didn't run that many
19  of them, because it was -- it was
20  expensive.  You know, 30-, 40,000.  In
21  the generics business that's -- that's a
22  lot of money.  The ad budget is not
23  that -- normally not that high.
24          So, yeah, that's the kind

Page 77

1  of, you know, pricing, you know, we
2  talked about pricing and how we can, you
3  know, work something involving getting --
4  with our product to make sure that if we
5  were challenged by our competition, you
6  know, how we could retain the business
7  and -- and customer relations, customer
8  interaction.  That was -- in generic,
9  more or less, that's what marketing is.
10      Q.   Okay.  And I'm sorry, you
11  mentioned a CDA.  Is that like a
12  confidentiality agreement?
13      A.   Confidentiality, yeah.
14      Q.   Great, thanks.  And I think
15  you were explaining to me that in terms
16  of getting and retaining the trade
17  business, that one of the important
18  things you were focused on was the
19  relationship with that trade customer,
20  correct?
21          MS. VANNI:  Object to form.
22          THE WITNESS:  Yes.
23  BY MS. SCULLION:
24      Q.   And that -- that was true

20  (Pages 74 to 77)

Page 78

1    while you were at Endo?
2        A.    It's been true before Endo
3    and after Endo and at Endo.
4        Q.    Okay.  And is -- was part of
5    the relationship providing educational
6    materials that could be used for example,
7    at pharmacies?
8        A.    No.
9        Q.    Okay.  Did --
10           MS. SCULLION:  I thought the
11       door was opening, it's not.
12   BY MS. SCULLION:
13       Q.    Did -- did Endo -- strike
14   that.  We'll look at some of the
15   documents in a bit.
16           MS. SCULLION:  Can I have
17       Tabs 26 and 27, please.
18   BY MS. SCULLION:
19       Q.    I want to go back and talk
20   more about your -- your role at Endo and
21   what it entailed.  Hopefully I'm not
22   going to knock the computer out with my
23   binder here.
24           Okay.

Page 79

1            MS. SCULLION:  Why don't you
2        mark 27 and then 26.
3    BY MS. SCULLION:
4        Q.    So I think you were
5    explaining to me that you didn't have
6    promotional responsibility for any of the
7    brand products.  But you were involved in
8    helping get Opana, for example, stocked
9    in the trade accounts, correct?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  This -- the
12       role of the national account
13       executives that visit the trade
14       accounts, their -- their role on
15       the brand side is to make sure the
16       account is stocked.  That's all
17       they do.  They make sure their
18       account is stocked with the
19       product.  Because if you don't
20       have the product in the account,
21       you can't sell it.  And so their
22       job -- that's all the national
23       account executives do on the brand
24       side, is they make sure the

Page 80

1        product is stocked.
2    BY MS. SCULLION:
3        Q.    And -- I'm sorry.
4        A.    So there was no promotional
5    activity by the national account
6    executives to anybody.
7        Q.    But you -- but you had
8    responsibility for the national account
9    executives getting Opana, and Opana ER to
10   be clear, stocked in the trade accounts,
11   correct?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  To be honest,
14       getting them stocked when they --
15       I don't know if I had assumed
16       the -- I don't remember from the
17       time when I took over trade
18       affairs, whether or not Opana had
19       launched or didn't launch.  I
20       don't remember that.
21           So if it -- if it hadn't
22       launched, then yes.  If not, then
23       I just took over the role of
24       supervising them.

Page 81

1    BY MS. SCULLION:
2        Q.    Okay.
3        A.    And it wasn't -- their role
4    in the brand side was, if I had to divide
5    their time, their time was generics.
6    They were there to work on generics.
7            The brand -- their brand
8    role was a de minimus kind of role.  It
9    wasn't that significant, other than the
10   stocking.
11       Q.    Okay.
12           (Document marked for
13       identification as Exhibit
14       Endo-Stevenson-4.)
15   BY MS. SCULLION:
16       Q.    Let me show you what's been
17   marked as Exhibit 4.  And we may be out
18   of order here, but we'll get to it in
19   terms of exhibit numbers.
20           MS. SCULLION:  Is it good?
21       Okay.
22   BY MS. SCULLION:
23       Q.    Mr. Stevenson, I've handed
24   you Exhibit 4.  And for the record, the

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  Bates number is ENDO-OPIOID_MDL-00860303.
2      And just so you know, I'm
3  just reading the small numbers in the
4  bottom right corner for the record, so
5  people on the phone can follow.
6      Mr. Stevenson, do you
7  recognize Exhibit Number 4?
8      A.  Well, it's my 2006
9  performance appraisal.
10      Q.  Right.  And it's -- this is
11  an e-mail from you to David Kerr
12  attaching your 2006 performance
13  appraisal, correct?
14      A.  Yes.
15      Q.  Okay.  And who was Mr. Kerr
16  when you sent this e-mail, what was his
17  position?
18      A.  He was the vice president of
19  business operations I believe.
20      Q.  He was your boss
21  effectively?
22      A.  Yes, he was my boss.
23      Q.  And let's turn to the actual
24  performance appraisal itself, which

Page 83

1  begins in the attachment at 860304.  I
2  just want to page back through this.  If
3  you turn back through the document.  If
4  you go to Page 6, in the lower right-hand
5  corner?
6      A.  Page 6.  Yes.
7      Q.  And before I ask you about
8  the particulars on this page, am I
9  correct in understanding, this is
10  something you would have -- you would
11  have filled out in terms of saying to
12  Mr. Kerr, here was my objective and here
13  is how I explain how I have or haven't
14  achieved that particular objective this
15  year; is that right?
16      A.  Yes, that's -- yeah.  You
17  know, for clarity normally the employee,
18  at my level, would complete what I
19  thought.  And he would, you know, have a
20  meeting and we would see if there was
21  some agreement with what he thought with
22  what I wrote, et cetera, and then it'd be
23  finalized, yes.
24      Q.  Okay.  So I'm on Page 6.

Page 84

1  And looking in the left-hand column,
2  lists a number of objectives for the
3  year.  And let's go down to the third
4  row.  Do you see it says successfully
5  launched products?
6      A.  Yes.
7      Q.  And it identifies this as a
8  corporate objective.  And the corporate
9  objective there was "achieve
10  $17.5 million in Opana and Opana ER net
11  factory sales in 2006," correct?
12      A.  Correct.
13      Q.  All right.  And then you've
14  indicated on the right-hand side that
15  that was achieved.  And, in fact, it was
16  about, approximately $18.8 million in net
17  factory sales, correct?
18      A.  Yes.  What's -- that's
19  what's there, that's correct.
20      Q.  Okay.  And then the next row
21  down, successfully launched products,
22  Corporate Objective 1.
23      Now here it says, "Manage
24  Project Pizza to achieve documented

Page 85

1  stocking of Opana and Opana ER in
2  12,000" -- it looks like it's supposed to
3  say pharmacies.  Do you see that?
4      A.  Yes.  Yes.
5      Q.  And then on the
6  right-hand -- oh sorry.  Go over to the
7  right on that same row, do you see in
8  terms of describing fulfillment of the
9  objective it says, "Managed Project Pizza
10  team and documented Opana and Opana ER
11  stocked in 12,100 pharmacies as of
12  12/31/06."
13      Do you see that?
14      A.  Yes.
15      Q.  Do you recall Project Pizza?
16      A.  Not really.  I mean it
17  was -- not really.
18      Q.  Okay.  Do you recall though
19  that there was a project that you oversaw
20  to document stocking of Opana and Opana
21  ER in about 12,000 pharmacies as of -- as
22  of 2006?
23      MS. VANNI:  Object to form.
24      THE WITNESS:  To be honest,

22 (Pages 82 to 85)

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    I didn't.  No, I saw some
2    documentation in the last day or
3    so.  But I -- I really don't
4    recall any details about it, you
5    know.
6  BY MS. SCULLION:
7       Q.   Fair enough.  You have no
8  reason to doubt the accuracy of what you
9  wrote here in this performance appraisal,
10 correct?
11      A.   No, I don't.  There's no
12 reason to doubt it, no.
13      Q.   And this description of an
14 effort to document stocking of Opana and
15 Opana ER in 12,000 pharmacies, that's
16 consistent with what you just explained
17 to me about one of the roles of -- that
18 you had at Endo, correct?
19           MS. VANNI:  Object to form.
20           THE WITNESS:  It was a role
21      I had in the last ten months or so
22      before I left, yes.  It was
23      overseeing the stocking portion of
24      the brand business that the

Page 87

1    national account executives were
2    responsible for.
3  BY MS. SCULLION:
4       Q.   Okay.  Now, let's just stay
5  in the document -- same document for a
6  moment.  If you'll go up to Page 5.
7  Looking at the top of Page -- yeah, Page
8  5 -- excuse me -- the first row.
9            It says, "The objective is
10 increase Endo penetration and
11 entrenchment in key strategic accounts."
12           Do you see that?
13      A.   Yes.
14      Q.   And then under that it says,
15 "Actively participate in NACDS, HDMA and
16 GPhA in leadership position."
17           Did I read that correctly?
18      A.   Yes.
19      Q.   And then -- let's stick on
20 that for a minute.  What is NACDS?
21      A.   National Association of
22 chain drug stores.
23      Q.   Okay.  That was an industry
24 group for the trade?

Page 88

1       A.   It's an industry group for
2  the chains.  And they have two meetings
3  per year, which suppliers, which -- you
4  know, whoever the pharmaceutical company
5  is, attends.  And it can be both for the
6  pharmacy end and for the non-pharmacy
7  end.  It's a pretty big -- they're pretty
8  big meetings every -- twice a year.
9  Once -- one in the spring, one is coming
10 up in April/May, and one in the summer.
11      Q.   Got it.  And that was listed
12 here, the "Actively participate in
13 NACDS," was listed as increasing Endo
14 penetration and entrenchment in key
15 strategic accounts.  How would actively
16 participating in NACDS serve that goal?
17      A.   By attending those meetings
18 and meeting with customers, and, you
19 know, showing the flag.  We used to take
20 a booth and have a booth.  And most
21 companies take a booth, and then the
22 customers come to your booth.  And you
23 have a discussion.  You show the flag.
24 You are actively participating.

Page 89

1            It's expensive.  There was
2  always somebody that would say, you know,
3  was it really worth it and that kind of
4  stuff.  So when I -- you know, that was a
5  goal when we established objective that,
6  you know, my belief was, from a generic
7  perspective, if you're not there, if your
8  absence is missed, you'll be -- that will
9  be noticed.  If everybody in the business
10 is there, and you're not there, that's a
11 problem.
12           So when I wrote this, you
13 know, to go back, generics in Endo
14 Pharmaceuticals was a very small portion
15 of their business compared to their brand
16 business.
17           So to go to have a booth at
18 NACDS, it's expensive.  To have people to
19 go to NACDS is expensive.  There's always
20 someone questioning, you know, since
21 generics was a small part of the
22 business, was it worth it.
23           So when I wrote the
24 objective, it was designed to say, if you

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  want to be -- have a player in generics
2  and entrench yourself as a generic
3  player, then you have to participate in
4  these groups.
5      Q.  So for someone who's not as
6  familiar with the generic industry as
7  obviously you are, why would being at a
8  meeting like NACDS be important to the
9  generic business as opposed to simply
10  competing based on price?  Why would that
11  be important?
12      A.  Well, first of all, you
13  don't just compete based on price.
14  That's not what you want.  When you
15  compete, you know, you compete based on
16  how well you supply the product, how
17  responsible your customer service is.
18          These big accounts are busy.
19  You know, they don't sit around all day
20  saying, gee whiz, it's 9:30 and Endo
21  hasn't called me yet.  That's not what
22  happens.  They're extremely busy.
23          Supply is a big issue for
24  them, especially on big products,

Page 91

1  whatever the product might be, opiate or
2  non-opiate, doesn't make any difference.
3  If they have a fast-moving product or a
4  big product and someone can't supply it,
5  it's a very big problem.
6          I use the example in
7  Seymour, Indiana, was where -- when I was
8  at KU, where our manufacturing
9  headquarters was located.
10      Q.  Sorry, and KU is Kremers
11  Urban?
12      A.  Kremers Urban.
13      Q.  Thank you.
14      A.  A town of 50,000.  On one
15  corner is a CVS, and right across is a
16  Walgreens.  So there's a lot of
17  competition.  And if you can't supply,
18  that's going to get -- you're going to
19  get noticed.  So we don't just compete on
20  price.  You don't want to just compete on
21  price.  You want to compete on other
22  things.
23          And that's part of, you
24  know, what -- if you want to call it

Page 92

1  marketing in generics, the overall, you
2  know, your image, the overall ability to
3  service the account.  That's more of the
4  marketing approach.
5          So by going to an NACDS, if
6  you're not there, you're going to be
7  missed, because they're going to know you
8  are not there.  Just you notice who's not
9  there.  If somebody is not there, you
10  will notice it if you're in the business.
11          So it was important to go to
12  NACDS.  It was important to go to HDMA.
13  And it was obviously important to go to
14  GPhA.
15      Q.  Okay.  And we'll come to
16  those --
17      A.  Yeah, I understand.
18      Q.  -- organizations in a -- in
19  a minute.  But so if I understand you
20  correctly, in terms of not just competing
21  on price, but competing, you said, based
22  on your ability to service the accounts?
23      A.  Multiple factors.
24      Q.  Okay.  And so would speed of

Page 93

1  customer service of processing orders be
2  an important factor?
3      A.  Yes.
4      Q.  And an ability to just be
5  responsive to orders as they come in,
6  that would be an important factor?
7      A.  Yes.  Yes.
8      Q.  Okay.
9      A.  That's -- yeah.
10      Q.  Fair to say customers really
11  don't want to hear that when they place
12  an order, there's a problem with you
13  processing their order, right?
14          MS. VANNI:  Object to form.
15          THE WITNESS:  Correct.  Most
16      customers, I don't remember or
17      don't recall what it was at that
18      time.  But today, it's a
19      requirement that you service
20      98 percent of their purchase
21      orders.
22  BY MS. SCULLION:
23      Q.  I'm sorry.  What does that
24  mean?

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1          A.    Number of lines in a PO, a
2     purchase order -- I'm sorry I used -- a
3     purchase order comes in with a number of
4     lines.  So the definition of a backorder
5     percentage, 98 percent is based on number
6     of lines ordered based on number of lines
7     filled.
8          Q.    And if you don't meet that
9     98 percent, what happens?
10         A.    They'll send you a bill.
11    You have to pay the difference.  Today --
12    again, I don't remember what it is back
13    in that time.  But some accounts, I
14    think, had already started -- it was a
15    big issue, supply.  It was one thing to
16    differentiate.
17              But to finish my sentence,
18    if you don't supply, then they will send
19    you a bill for your price versus the next
20    lowest price generic.  That's usually
21    what happens.
22              And it's an order for you to
23    be open and honest about how soon you can
24    supply, because if you want to pay them,

Page 95

1     great.  They'll keep the spot for you
2     open until you can supply again.
3              But it's designed to be
4     financially painful so that if you can't
5     supply, that you'll say I can't supply
6     and give up the business.  And then once
7     you give it up, you won't get it back.
8              So it's designed that
9     they're not out of product, because they
10    have a lot of pharmacies, a lot of
11    stocking, a lot of issues and they don't
12    want to have an issue with being out of
13    stock.  Being out of stock is the worst
14    thing you can do.
15              So part of how we
16    differentiate ourselves wherever I have
17    worked is we've been able to supply 95,
18    98 percent.  Okay.
19              Now, over time, it used to
20    be 95, if I recall correctly, and, you
21    know, they have become more aggressive
22    now, and it moved more to 98 percent.  So
23    they give you very little leeway for
24    error.

Page 96

1          Q.    Okay.  And I think you said,
2     do you recall whether the 95 percent
3     level was in place when you were at Endo?
4          A.    I don't recall.
5          Q.    Okay.
6          A.    But it's possible.
7          Q.    Okay.  But putting aside the
8     95, 98 percent, do you recall though when
9     you were at Endo and in part working with
10    the trade accounts, that there still was
11    a focus in the trade accounts on the
12    level of customer service that was being
13    provided?
14         A.    Yes.
15         Q.    Okay.  That was -- and
16    again, regardless of whether there's a
17    95 percent threshold or not, still at
18    that time when you were with Endo, the
19    trade accounts didn't want to have
20    hassles, for lack of a better word, with
21    their orders, right?
22         A.    Correct.
23         Q.    They wanted their orders to
24    be taken and processed, right?

Page 97

1          A.    Correct.
2          Q.    No questions asked?
3              MS. VANNI:  Object to form.
4              THE WITNESS:  Well, that's
5     what their expectation was.
6     BY MS. SCULLION:
7          Q.    Right.
8          A.    Endo, as most companies do,
9     we had it at Kremers Urban even though we
10    were not involved in C-IIs, we monitored
11    their orders.  At Kremers, we monitored
12    orders to make sure they were in line
13    with what historical demand has been.
14              And that's pretty common in
15    companies to do that.  It has nothing to
16    do with opioids necessarily.  Opioids is
17    more important because of the nature of
18    opioid products.  But even if it's not an
19    opioid, it's going to be monitored.  So
20    that somebody doesn't buy more product
21    than -- than the historical demand.  It
22    will raise a flag so you can go back and
23    inquire what happened.
24         Q.    Now --

25 (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1      A.   And opioids, it's even more
2  important.  So Endo had what the accounts
3  expected was no hassles.  But if Endo had
4  order monitoring, suspicious order
5  monitoring, just the nature of the beast
6  of opioids, they had that -- they had
7  that process in place, as companies do,
8  for all -- for products.
9      Q.   Are you aware if Endo, in
10  the time that you were there, ever
11  turning -- turning back any orders from
12  the trade on any of its opioid
13  accounts --
14      A.   I --
15      Q.   Sorry.
16          -- for suspicious orders?
17          MS. VANNI:  Object to form.
18          THE WITNESS:  I don't recall
19      any of that.  You know, I don't
20      recall that happening.
21  BY MS. SCULLION:
22      Q.   Okay.
23      A.   If that had happened, I
24  wouldn't have objected to it.

Page 99

1      Q.   But you don't recall it ever
2  happening?
3      A.   No.
4          MS. VANNI:  Object to form.
5          THE WITNESS:  Could have
6      happened.  They had -- that was a
7      separate branch.  The way Endo was
8      set up was they were segregated.
9      So the people in customer service
10      serviced the brand and generics.
11      The people in supply chain handled
12      generic -- brand and generics.
13      People in manufacturing and
14      operations handled brands and
15      generics.
16          It was segregated into
17      levels of expertise.
18          And so, just like we talked
19      about earlier on scientific people
20      looking at promotional material,
21      it was very segregated as to what
22      people's experience and the way it
23      was set up at Endo was that -- to
24      avoid duplication of efforts.

Page 100

1          So rather than having two
2      people doing the same thing only
3      one for brand and one for
4      generics, it was all put into one
5      department.  And they did both
6      brand and generics.
7          So it could have happened,
8      and I wouldn't have necessarily
9      heard about it.
10  BY MS. SCULLION:
11      Q.   Okay.  To the best of your
12  understanding, though, who was handling
13  any suspicious order monitoring for
14  opioids when you were at Endo, which
15  department?
16      A.   I don't remember the exact
17  department.  It was probably, I'm going
18  to say, supply chain.  But I don't
19  remember exactly.
20      Q.   Okay.  Do you remember a
21  woman named Lisa Walker?
22      A.   Yes.
23      Q.   Was Lisa Walker handling
24  suspicious order monitoring?

Page 101

1      A.   I don't know what she was
2  handling specifically.  But it wouldn't
3  surprise me that she was involved in
4  that.  I don't know if she was the
5  person.  She had a department.  So it was
6  more than just Lisa Walker in her
7  department.
8      Q.   But fair to say, the
9  suspicious order monitoring, whatever it
10  was, and whoever was doing it, was not
11  your area of expertise, correct?
12      A.   I wasn't involved in
13  suspicious order monitoring.
14      Q.   Okay.  All right.  Going
15  back to Exhibit 4, same page.  We were
16  just talking about the NACDS and some
17  aspects of that.  It also mentions in
18  this first row, "Actively participate in
19  HDMA."
20          What was HDMA?
21      A.   HDMA was -- I forget what
22  the H stands for, but distributors.  It
23  was basically the trade association for
24  the wholesalers.

26  (Pages 98 to 101)

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1      Q.   Okay.  So NACDS was for the
2   retail chains, and HDMA was for the
3   wholesalers?
4      A.   Yes.
5      Q.   Okay.  And was the
6   importance of having active participation
7   at HDMA similar to what you described for
8   NACDS?
9      A.   Yes, it -- it declined over
10   time because everybody went to the NACDS
11   meeting.  So the HDMA meeting was nice to
12   go there, but it wasn't as crucial.  It
13   was -- we had to go to support the
14   whole -- our wholesale customers.  It was
15   a different type of meeting than NACDS.
16   So we did meet with the wholesalers while
17   we were there.  And obviously -- but it
18   wasn't as big or large as NACDS.
19      Q.   Okay.  And similar to what
20   you described in terms of the
21   relationship with the retail chains, was
22   it also important to have that good
23   customer service relationship with the
24   wholesalers?

Page 103

1      A.   Yes.
2      Q.   And then the same row in
3   Exhibit 4 then refers to the GPhA.  Is
4   that the Generic Pharmaceutical
5   Association?
6      A.   Yes.  Now they are known as
7   Association For Accessible Medicines,
8   AAM, or AM.
9      Q.   Okay.  And why did you --
10   why was it important that Endo actively
11   participate in that association?
12      A.   Well, that association was
13   on the cutting edge of -- of representing
14   the generic industry in various meetings.
15   And, you know -- but if for -- they had a
16   meeting, two meetings a year, they would
17   have different speakers come in.  One
18   year they had the secretary of the -- the
19   health and human service secretary come.
20   They've had people from -- normally they
21   have the FDA commissioner would come.  So
22   it was -- it was an informative meeting.
23      They had people there from
24   Wall Street talking about, you know,

Page 104

1   talking about how Wall Street perceives
2   the generic business.
3      They had people from IMS
4   that would go through IMS data of -- you
5   know, talking about the industry from an
6   IMS standpoint.  IMS is -- you know, they
7   have all the data for sales and revenue
8   and stuff like that.  And, you know, it
9   was an informational meeting.  And the
10   organization itself represented the
11   generic industry in -- to the outside
12   world, you know.
13      Q.   Okay.  And just, if we
14   could, it says here that "the goal was
15   actively participate in these three
16   organizations."
17      It says, "In leadership
18   position."  Do you see that?
19      A.   Yep.
20      Q.   Did Endo, while you were
21   there, take any leadership positions in
22   any of those organizations?
23      A.   In NACDS, in -- you have --
24   to take a leadership position, you have

Page 105

1   to be a chain, so we weren't a chain.
2      Q.   Okay.
3      A.   In HDMA you have to be a
4   wholesaler distributor, and we weren't a
5   wholesaler distributor.
6      In GPhA, I don't -- I didn't
7   take a leadership position.  That was the
8   goal, but if I had a chance -- I did join
9   the board of directors later on after I
10   left Endo, but not when I was at Endo.
11      Q.   Okay.  And then if we can go
12   over to the right-hand side of that same
13   row where you then describe the extent to
14   which you've met this goal.  It says, you
15   wrote, "Endo firmly entrenched as
16   important niche generic specialty Pharma
17   company that brings value to customer
18   through competitive offers, 100 percent
19   supply, and industry knowledge."
20      Do you see that?
21      A.   Yeah.
22      Q.   And that was an accurate
23   description of what Endo had achieved as
24   of the date of this document, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.   We -- we supplied
2  100 percent of all legitimate orders,
3  yeah.
4    Q.   Okay.  And -- and it says
5  that you have, at this point, actively
6  participated in NACDS, HDMA, and GPhA?
7    A.   Yeah, we did actively
8  participate.
9    Q.   Okay.  Great.
10    MS. SCULLION:  Oh, actually,
11  you know, right now is actually we
12  can take a quick break.  I mean
13  it's probably almost an hour,
14  right?  Yeah, let's take a quick
15  break.
16    THE VIDEOGRAPHER:  Off the
17  record, 10:19.
18    (Short break.)
19    THE VIDEOGRAPHER:  We are
20  back on the record at 10:32.
21    MS. SCULLION:  Can I have
22  Tab 29.
23    (Document marked for
24  identification as Exhibit

Page 107

1    Endo-Stevenson-5.)
2  BY MS. SCULLION:
3    Q.   I'm going to hand you what's
4  been marked as Exhibit Number 5.
5  Exhibit 5 for the record is Bates-stamped
6  ENDO-OPIOID_MDL-05554625.
7    Mr. Stevenson, do you see
8  Exhibit Number 5 is a series of e-mails
9  from March 2007, the last few of which
10  you are on the chain?
11    Do you see that?
12    A.   Yes.
13    Q.   Okay.  I'd like to draw your
14  attention on the very first page of
15  Exhibit 5 to the middle of the page.  Do
16  you see an e-mail from Lisa Walker to
17  Kayla Kelnhofer and yourself?
18    A.   Yes.
19    Q.   All right.  And I think you
20  identified Ms. Walker as someone you
21  recall being, I think, part of the supply
22  chain group; is that right?
23    A.   Yes.
24    Q.   All right.  Does she also

Page 108

1  handle customer service?
2    A.   Yes, she was involved --
3  yeah.  Yes, all that.  Yes.
4    Q.   Okay.  Do you recall who
5  Ms. Kelnhofer was?
6    A.   Yes.  She was the national
7  account executive that handled McKesson.
8    Q.   Okay.  And the subject of
9  the e-mail from Ms. Walker is "Opana
10  on-hand quantities at McKesson."  It says
11  "(QVL)."  Do you have an understanding of
12  what that refers to?
13    A.   I don't -- I don't know what
14  QVL means.
15    Q.   How about Opana on-hand
16  quantities?
17    A.   Opana on-hand quantities
18  would be the amount of Opana on hand at
19  McKesson DCs.
20    Q.   Okay.  And then let's look
21  at Ms. Walker's e-mail.  She's responding
22  to a chain.  She says, "Thanks, Kayla.  I
23  will run the Opana information for
24  McKesson tomorrow so we have it at HDMA."

Page 109

1    Do you see that?
2    A.   Yes.
3    MS. SCULLION:  Bless you.
4  BY MS. SCULLION:
5    Q.   And is Ms. Walker talking
6  about getting information concerning
7  Opana ready for an HDMA meeting that was
8  to be attended?
9    MS. VANNI:  Object to form.
10    THE WITNESS:  Yes.  It
11  appears that way, yes.
12  BY MS. SCULLION:
13    Q.   Okay.  Do you recall
14  Ms. Walker attending HDMA meetings?
15    A.   I don't remember all the
16  people that attended.  I don't remember
17  who attended.  I think she attended, but
18  I don't really remember.
19    Q.   Okay.  How about
20  Ms. Kelnhofer?
21    A.   Ms. Kelnhofer would have
22  attended.  She reported to me.  At that
23  time in '07, you know, I was in my final
24  five months with the company.  But, yes,

28  (Pages 106 to 109)

Page 110

1    at that time she reported to me.  She was
2    one of the national account executives,
3    who I testified earlier to was
4    responsible for stocking.
5         Q.    Okay.  And let's go then up
6    to the top of the first page, which is
7    your response e-mail.  You say -- this is
8    to David Kerr, your boss, correct?
9         A.    Yes.
10        Q.    And you say to Mr. Kerr,
11   "FYI, Kayla is keeping up the pressure to
12   increase stocking at forward DCs."
13        Do you see that?
14        A.    Yes.
15        Q.    And does that refer to
16   increasing stocking of Opana at
17   McKesson's distribution centers?
18        A.    Yes.
19        MR. HYKAN:  Object to form.
20   BY MS. SCULLION:
21        Q.    And you then go on to say,
22   "This will be a topic for her at next
23   week's HDMA meeting."
24        Do you see that?

Page 111

1         A.    Yes.
2         Q.    And by that, did you mean
3    that this is an area she was going to be
4    prepared to discuss with McKesson at the
5    HDMA meeting?
6         A.    It appears that way, yes.
7         Q.    Okay.  Do you have any
8    understanding of why you were looking to
9    keep up the pressure to increase stocking
10   at McKesson's forward DCs as of
11   March 2007, stocking of Opana?
12        MS. VANNI:  Object to form.
13        THE WITNESS:  I don't have
14   any specific knowledge.  McKesson
15   had a -- what they call a depot in
16   Memphis.  And then from that depot
17   they supplied all their forward
18   DCs.  And sometimes on a new
19   product launch there could have
20   been a delay -- whether there was
21   a delay here, I don't know -- of
22   getting the product out to the
23   forward DCs.
24        And because opioids require

Page 112

1    a vault, we -- not every -- not
2    every chain we sold to had a
3    vault.  Like, for example, CVS
4    didn't have a vault.  Rite Aid
5    didn't have a vault.  So they
6    relied on the wholesaler.
7         So in order to get the
8    stocking adequate to meet demand,
9    we had to make sure that it
10   wasn't -- it wasn't just important
11   to be in the case of McKesson, as
12   an example, in their depot, it
13   also had to be in their forward
14   DCs across the country.
15        So what this appears to
16   be -- what this appears to be
17   referring to is how do we ensure
18   that the product is not only in
19   the Depot, but also out in the --
20   in the forward DCs in order to
21   service the pharmacies that will
22   be receiving prescriptions from a
23   doctor for Opana.
24        Again, national account

Page 113

1    executives are focused on
2    stocking.  So that's what this is
3    referring to.
4    BY MS. SCULLION:
5         Q.    And just to make sure I
6    understand, forward DCs are distribution
7    centers that are -- were McKesson had
8    around the country that its hub sent
9    materials out to, right?
10        A.    Correct.
11        Q.    Okay.  Terrific.  Okay.  And
12   then --
13        MS. SCULLION:  Can I have
14   Tab 60, please.
15        (Document marked for
16   identification as Exhibit
17   Endo-Stevenson-6.)
18   BY MS. SCULLION:
19        Q.    Mr. Stevenson, I'm going to
20   hand you what's been marked as Exhibit
21   Number 6.
22        A.    Okay.
23        Q.    And Exhibit Number 6, let me
24   just orient you to the document a little

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1     bit.  On the first page of Exhibit 6
2     is -- you see at the top it says document
3     metadata.  This is a document produced
4     from the document system we used to store
5     all the documents that Endo and other
6     parties have produced to us in the
7     litigation.  And this is indicating the
8     metadata, electronic metadata associated
9     with the document.
10          And from time to time today,
11    I might be showing you these metadata
12    pages to help you understand what the
13    document is.
14          If you look on this first
15    page of Exhibit 6, under the first box,
16    do you see document identification, that
17    first box at the top?
18        A.   Yes.
19        Q.   Okay.  And if you'll go down
20    to the bottom of that box, you'll see a
21    line that says custodian.  Do you see
22    that?
23        A.   Yes.
24        Q.   And it says your name there.

Page 115

1     Do you see that?
2         A.   Yes.
3         Q.   And just so you understand,
4     that's an indication that, according to
5     the metadata produced with the document
6     in this litigation, the document came
7     from your custodial file at -- at Endo.
8     So I'm just pointing it out to you so you
9     have some understanding.
10        A.   Okay.  Thank you.
11        Q.   Okay?  Great.
12             MS. VANNI:  So then to be
13    clear, Counsel, can I ask a
14    question?
15             MS. SCULLION:  Sure.
16             MS. VANNI:  This information
17    on this first page, document
18    metadata --
19             MS. SCULLION:  Yeah.
20             MS. VANNI:  -- this is
21    information that's stored in your
22    system though?
23             MS. SCULLION:  It is stored
24    in our system.  It is based on the

Page 116

1     metadata that is provided in
2     accordance with the ESI protocol.
3     So the metadata itself is what was
4     coming from Endo in the
5     production.
6             MS. VANNI:  Okay.
7             MS. SCULLION:  Okay?  Thank
8     you.
9             MS. VANNI:  Thank you.
10            MS. SCULLION:  Sure.
11    BY MS. SCULLION:
12        Q.   If we go then to the
13    substance of the exhibit itself, you turn
14    to the second page of Exhibit 6.  And you
15    see this is a PowerPoint entitled Trade
16    Organization Memberships?
17        A.   Yes.
18        Q.   And it says at the bottom
19    here, OpCom 4/28/04.  Do you remember
20    what OpCom was at Endo in April of 2004?
21        A.   It was the operations
22    committee of the company.  Some people
23    would call it the executive committee.
24    It was the operations committee of the

Page 117

1     company.
2         Q.   Were you ever a member of
3     the OpCom?
4         A.   No.
5         Q.   Okay.  And let's turn
6     through the exhibit.  Next page.  Page 2
7     of the PowerPoint identifies two trade
8     organizations.  One is PhRMA.  And the
9     second is the Generic Pharmaceutical
10    Association.  Do you see that?
11        A.   Yes.
12        Q.   And the Generic
13    Pharmaceutical Association, that's the
14    one that we were just discussing a few
15    minutes ago, correct?
16        A.   Correct.
17        Q.   All right.  Apologies.
18             Are you familiar with --
19    with PhRMA as well as the Generic
20    Pharmaceutical Association?
21        A.   How do you define familiar?
22        Q.   Have you been involved with
23    PhRMA yourself?
24        A.   No.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1   Q.   Okay.
2   A.   It's a -- it's a brand.
3   It's the brand -- trade association for
4   the brand PhRMA industry.
5   Q.   Okay.  Then do you recall
6   any discussions at Endo about whether
7   Endo should be a member of PhRMA when you
8   were there?
9   A.   Yes, I do.
10   Q.   So let's look at that.  If
11   you'll turn to page 12 of --
12   A.   Can I just offer one
13   additional comment?
14   Q.   Sure.
15   A.   I sat in meetings where
16   PhRMA was discussed.  I wasn't involved
17   in the decision or any representation of
18   whether Endo should join PhRMA or not.  I
19   just want to be clear about that.
20   Q.   You were in the meetings
21   though, where it was discussed?
22   A.   Well, this meeting it was
23   discussed.  That's the point of this
24   meeting obviously.

Page 119

1   Q.   All right.  And you think
2   this was a meeting you would have
3   attended?
4   A.   Well, it had GPhA, so I
5   would have been there.  If I remember
6   this meeting correctly, it was discussing
7   the -- the benefits belonging to a
8   member.  Endo had two businesses, the
9   brand business, generics business.  Do I
10   belong -- should the brand business Endo
11   belong to PhRMA to support its brand
12   business, and should it belong to GPhA to
13   support its generics business.  So that's
14   what this is about.
15   Q.   Okay.  Fair enough.  So
16   let's go to page 12 of the PowerPoint.
17   If you look in the lower right-hand
18   corner you'll see the page numbers.
19   A.   Yep.  Okay.
20   Q.   Make sure we are literally
21   on the same page.  The top of the page
22   says critical issues, right?
23   A.   Yes.
24   Q.   All right.  And the bullet

Page 120

1   point here says, "Our industry is among
2   the most heavily regulated in the U.S.,
3   and what happens in Washington matters a
4   lot."
5   Do you see that?
6   A.   Yes.
7   Q.   And then the next bullet
8   point under that says, "Having access to
9   the knowledge and influence of PhRMA can
10   support us to sustaining and growing the
11   business."
12   Did I read that correctly?
13   A.   Yes.
14   Q.   And was that, what's written
15   there, was that generally a topic that
16   was discussed at Endo when you were
17   there?
18   MS. VANNI:  Object to form.
19   THE WITNESS:  This PhRMA is
20   the brand business.
21   BY MS. SCULLION:
22   Q.   Right.
23   A.   Okay.  So I'm not -- I
24   wasn't involved with PhRMA.  So you can

Page 121

1   ask me all the questions you want about
2   PhRMA, but, you know, I -- this is not my
3   area.  This was directed from the brand
4   people to the leadership of the company,
5   whether Endo should belong to PhRMA.
6   Q.   Understood.
7   A.   Okay.
8   Q.   But just to -- just to make
9   sure though, do you recall discussions
10   about Endo being interested in
11   potentially being a member of PhRMA,
12   because having access to the knowledge
13   and influence of PhRMA can support Endo
14   in sustaining and growing the business?
15   A.   Well, I would have heard it
16   at this meeting if it came up, yeah.  So
17   I mean it came up.  PhRMA is -- is
18   designed to support the brand PhRMA
19   industry and their members in PhRMA.
20   That's what they do.
21   Q.   And -- and it does that, as
22   this document indicates, in part, by
23   access to knowledge, correct?
24   A.   Yeah, I didn't write this.

31  (Pages 118 to 121)

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1    I assume that's right.
2       Q.    Okay.
3       A.    Again, I'm not focused on
4    PhRMA.  I don't know what they did or
5    didn't do --
6       Q.    Sure.
7       A.    -- directly because I
8    wouldn't have been involved in PhRMA.
9       Q.    And just to the extent that
10   you do know, is it accurate that one of
11   the things that would be -- that Endo is
12   interested in was the influence of PhRMA
13   supporting Endo in sustaining and growing
14   its business?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  If they had
17       joined, if they had joined, yes.
18   BY MS. SCULLION:
19       Q.    Okay.  And then, on the --
20   staying on the same page, next bullet
21   point it says, "The industry is under
22   fire by politicians and the press."
23       Did I read that correctly?
24       A.    Yes.

Page 123

1       Q.    And then it discusses in
2    terms of PhRMA, "PhRMA is working on a
3    series of initiatives to help turn around
4    negative perceptions of the industry."
5       Do you see that?
6       A.    Yes.
7       Q.    And -- and again,
8    understanding that it wasn't your
9    particular focus, but were you aware that
10   Endo had an interest in potentially
11   joining PhRMA because of PhRMA's
12   initiatives to help turn around negative
13   perceptions of the industry?
14       MS. VANNI:  Object to form.
15       THE WITNESS:  If Endo was
16       going to join PhRMA, I don't think
17       that was the sole reason.  There
18       would have been multiple reasons
19       to have -- belong to PhRMA, as
20       PhRMA is effectively the lobbying
21       organization for the brand PhRMA
22       industry.  So any negative or
23       positive perceptions, whatever
24       exist, PhRMA would be involved.

Page 124

1    They are involved in -- that's
2    what their members want from them.
3    They are the trade association for
4    the PhRMA brand business.
5    BY MS. SCULLION:
6       Q.    Okay.  And -- and so as you
7    said, there could have been multiple
8    reasons Endo was interested in
9    potentially joining PhRMA, but one of
10   those would have been PhRMA's work
11   helping to turn around negative
12   perceptions of the industry, right?
13       MS. VANNI:  Object to form.
14       THE WITNESS:  To the extent
15       they existed.  I have no idea what
16       existed at the time, so --
17   BY MS. SCULLION:
18       Q.    In terms of negative
19   perceptions?
20       A.    Yes.
21       Q.    Thank you.  Got it.
22       If you look then to Page 14
23   of the presentation.  It's entitled at
24   the top, What PhRMA Can Do For Endo.

Page 125

1       Do you see that?
2       A.    Yes.
3       Q.    As you were just
4    referencing, the very first bullet point
5    here is, "Lobby important bills in
6    Congress and state legislatures,"
7    correct?
8       A.    Yes.  That's what they do.
9       Q.    Okay.  And then the next is,
10   "Present industry view to FDA" -- that's
11   the Food and Drug Administration,
12   correct?
13       A.    Correct.
14       Q.    "NIH" -- National Institute
15   of Health, correct?
16       A.    Correct.
17       Q.    CMS is?
18       A.    Center for Medicare, I think
19   Services.  I think it's Center For -- I
20   get lost in the alphabet.
21       Q.    Okay.
22       A.    But I think that's what it
23   is, Center For Medicare Services.
24       Q.    Okay.  And that's another --

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1     again, to the extent of your
2     understanding, that's another thing that
3     PhRMA could do for a brand company like
4     Endo, right?
5         MS. VANNI:  Object to form.
6         THE WITNESS:  Well, it's not
7     just for Endo.  For any brand
8     pharmaceutical company.
9     BY MS. SCULLION:
10        Q.   Who was a member?
11        A.   Who was a member.
12        Q.   Okay.
13        A.   Should they decide to join.
14        Q.   Understood.
15            And the third bullet says,
16    "Interact with professional associations
17    on key issues."
18            Do you see that?
19        A.   Yes.
20        Q.   What are professional
21    associations referred to here?  What does
22    that mean?
23            MS. VANNI:  Object to form.
24            THE WITNESS:  I don't -- I

Page 127

1     don't know what all the
2     professional associations would
3     be.  American Medical Association.
4     People -- American whatever, okay.
5     So that -- that's what a -- that's
6     whatever professional association
7     is, that is involved in the
8     pharmaceutical healthcare
9     business.
10    BY MS. SCULLION:
11        Q.   Did you -- medical
12    associations?
13        A.   I have no idea.  You know, I
14    have no idea what it would have been.
15        Q.   Okay.  Now, let's go to
16    Page 17 of the presentation.
17        A.   Okay.
18        Q.   Now, this is -- begins part
19    of the presentation that does concern
20    Generic Pharmaceutical Association.
21            Do you see that?
22        A.   Yes.  But for the record,
23    Endo, to my knowledge when I was there
24    never joined PhRMA.

Page 128

1         Q.   So again on Page 17, we're
2     talking about the Generic Pharmaceutical
3     Association.  Do you see that?
4         A.   Yes.  Yes.
5         Q.   All right.  And you said you
6     are familiar with Generic Pharmaceutical
7     Association, right?
8         A.   Yes.
9         Q.   All right.  And I apologize,
10    we may have -- I might have asked this
11    before, have you ever held any office,
12    official position within G Pharma?
13        A.   Yes, but not while at Endo.
14        Q.   What position did you hold?
15        A.   I was on the board of
16    directors.
17        Q.   And when was that?  Is it --
18    is it in your -- probably on your CV?
19        A.   No, it's not on -- not on
20    there.  I don't believe.
21        Q.   Okay.
22        A.   I -- I'm going to say 2010
23    to 2012 or '13 -- some -- I don't know.
24    It was two, two -- two, two-year terms if

Page 129

1     I remember right.
2         Q.   And that was while you were
3     with -- with Kremers Urban?
4         A.   Correct.
5         Q.   So you are pretty familiar
6     with -- with the organization?
7         A.   Yes.
8         Q.   All right.  And so the first
9     bullet point here, it -- the first bullet
10    point here says, in terms of the mission
11    of the Generic Pharmaceutical
12    Association, "Promote the common
13    interests of its members and the general
14    welfare of the pharmaceutical industry."
15            Is that an accurate
16    statement of one part of the Generic
17    Pharmaceutical Association's mission?
18            MS. VANNI:  Object to form.
19            THE WITNESS:  Yes.
20    BY MS. SCULLION:
21        Q.   And when it says common
22    interests of its members, that refers to
23    the common interests that the various
24    generic pharmaceutical manufacturers

33 (Pages 126 to 129)

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    would have?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  It refers to
4    the common interests of making
5    sure that the generic industry
6    voice was heard.  The PhRMA voice
7    was much stronger because they had
8    more money.  Their lobbying
9    efforts were much stronger.  The
10   brand PhRMA companies were trying
11   to prevent brands from going
12   generic.
13        So they were -- there was a
14   lot of lobbying with respect to
15   that, how to find loopholes in
16   Hatch-Waxman, which is the law
17   that governs the generic
18   pharmaceutical business in the
19   United States.
20        It had to do with FDA rules
21   that were coming up to make sure
22   they're -- you know, understand
23   them.  These were all common
24   interests that were, you know,

Page 131

1    every company shared on a broad
2    basis.  So -- and how do we get
3    our message out to the politicians
4    who, you had a lot of -- a lot of
5    money from lobbying by PhRMA.  And
6    because of their -- their size and
7    their -- the money available
8    compared to the generic business,
9    which was much smaller, the
10   generic association was much
11   smaller, you know, what is the
12   common interest of how we
13   communicate the benefits of
14   generics to the public.
15   BY MS. SCULLION:
16        Q.   Got it.  Let's go to the
17   next page where it discusses the members.
18        A.   Yep.
19        Q.   And it says the three types
20   of membership, the first being
21   manufacturer.  That would be a
22   manufacturer like Endo if Endo had
23   joined, right?
24        A.   We did join GPhA.

Page 132

1         Q.   You did join?  Okay.  Thank
2    you.
3         A.   But not PhRMA, just for the
4    record.
5         Q.   And then bulk supplier, that
6    would be the suppliers of the API?
7         A.   That would be the supplier
8    of -- the API suppliers, yes.
9         Q.   Okay.  And then on the
10   associates that we have generic
11   distributor.  Is a generic distributor
12   just a distributor of generics?
13        A.   Yeah.  That would be -- that
14   would be like an ANDA, there's a company
15   that all they do is distribute -- you
16   know, they don't -- they're a generic
17   distributor.  There may be others.  I
18   don't know.  I'm not familiar with all of
19   them.
20        Q.   Is there a distinction
21   between a generic distributor and -- and
22   distributors in general.  So for example,
23   you mentioned ANDA.  Is there a
24   difference between ANDA and McKesson?

Page 133

1         A.   Yes.
2         Q.   Okay.  Can you explain what
3    that is?
4         A.   Well, the central difference
5    is that a sole distributor cannot do
6    chargebacks, and the wholesaler can.  So
7    that's the effect -- I mean, that's the
8    way I describe it.  So, you know, there
9    could be other differences, but, you
10   know, that's the way I think of it.  I
11   could be wrong, but that's the way I
12   think of it.
13        Q.   And so if I understand
14   correctly, when it says generic
15   distributors, that refers to what you're
16   calling a sole distributor?
17        A.   Correct.
18        Q.   And ANDA is one such example
19   of a sole distributor?
20        A.   At the time, yes.
21        Q.   All right.  You also
22   mentioned chargebacks.  You have some
23   familiarity with chargebacks, correct?
24        A.   Yes.

34  (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1       Q.   All right.  We'll talk about
2   that a little bit later.  I just want to
3   make sure I understood that.
4            The next bullet point here
5   is CRO.  What's a CRO?
6       A.   Contract research
7   organization.
8       Q.   And what is that?
9       A.   Somebody that would do
10  pivotal -- pilot and pivotal biostudies.
11  You know, I don't know -- I don't
12  remember if they all exist anymore.  But
13  if you want to do a pilot biostudy or
14  pivotal biostudy you have to go to
15  somebody who can do that work.  And you
16  would -- you would they are called
17  contract research organizations.
18      Q.   Okay.  Consultants I think
19  is self-explanatory.  Pharm brokers is
20  the last one.  What is that?
21      A.   Pharm broker would be
22  somebody that tries to put two companies
23  together that has a need for -- you know,
24  you have a product of -- in a particular

Page 135

1   therapeutic area, and I have a need for
2   that product.  They hear.  They try to
3   put us together.  So these were associate
4   members that they allowed to participate.
5       Q.   Okay.  And then let's just
6   go to the next page, 19, which discusses
7   privileges of full membership.  You said
8   Endo did become a member of GPhArma
9   (sic).  Did it become a full member?
10      A.   Yes.
11      Q.   Okay.  And so endo enjoyed
12  the privileges listed here?
13          MS. VANNI:  Object to form.
14          THE WITNESS:  Yes, if we
15      choose to take advantage.
16      Basically, my membership was going
17      to the meetings, period, at that
18      point in time.
19  BY MS. SCULLION:
20      Q.   Okay.  First bullet point
21  discusses participation in key industry
22  committees affecting areas such as
23  regulatory and logistics.
24          Did Endo participate in any

Page 136

1   key industry committees?
2       A.   No.
3       Q.   And I think you explained
4   Endo did not become a member of the board
5   of GPhArma (sic) while you were there?
6       A.   No.
7       Q.   Okay.  If you'll go to Page
8   21 of the presentation.  And that's
9   entitled, "Why is membership in both
10  organizations important?"
11          Are we on the same page?
12      A.   Yep.
13      Q.   Terrific.  And it says,
14  "Endo has both significant brand and
15  generic business."
16          And that was true, correct?
17      A.   Yes.
18      Q.   It says, "Strategic vision
19  is to expand both brands and generics,"
20  correct?
21      A.   Correct.
22      Q.   And as of April of 2004 when
23  this presentation was put together, that
24  was true, correct?

Page 137

1       A.   Yes.
2       Q.   And why was membership in
3   GPhArma (sic), how did that many relate
4   to this strategic vision to expand --
5   let's just take the generics business for
6   Endo?
7       A.   Who is GPhArma (sic)?
8       Q.   I'm sorry, Generic
9   Pharmaceutical Association?
10      A.   Okay.  I'm sorry.  Can you
11  repeat the question?
12      Q.   Why was membership in the
13  Generic Pharmaceutical Association
14  important, as it says here, to the
15  strategic vision to expand the generic
16  business for Endo?
17      A.   In order to make sure that
18  we were aware of all the different
19  activities affecting the generic industry
20  as a whole.  Not just in Endo, but, you
21  know, normally at a GPhA meeting, as I
22  said before, you had the FDA commissioner
23  come.  You had the head of OGD, which is
24  the Office of Generic Drugs, come.  You

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    have had the secretary of HHS come.  You
2    know, you had a lot of people that came
3    with information and made presentations.
4         So it was an informational
5    kind of meeting.  And that information,
6    it was important to hear that firsthand.
7    And that's why -- you know, that's why it
8    was important to belong.
9         Q.  Did those meetings also give
10   members the opportunity to interact with
11   some of the officials that you just
12   described?
13        MS. VANNI:  Object to form.
14   BY MS. SCULLION:
15        Q.  To speak to them?
16        A.  Yeah.  I mean, we could
17   shake their hand and talk to them if we
18   wanted to.
19        Q.  Okay.  Was that important to
20   helping Endo's strategic vision to expand
21   the generic business?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  It was -- it
24        wasn't that significant.  You're

Page 139

1    not going to talk to the FDA
2    commissioner for very long other
3    than, "Hi, how are you."  So, no,
4    that was -- it was more to hear
5    what they had to say, what their
6    vision was about where the FDA was
7    going with respect to inspections
8    and different things that they
9    were involved in.
10        The big issue was the length
11   of time for approval, was a big
12   issue.  They would always address
13   that.  And there was a lot of
14   people that would ask questions
15   about when is the FDA going to
16   speed up generic approval.  So
17   things like that.
18        So it was more to hear what
19   their position was.  The audience
20   members could ask questions, and
21   that was -- if you call that
22   interaction, you know, that's the
23   only really interaction other than
24   say, "Hi, how are you?"

Page 140

1    BY MS. SCULLION:
2         Q.  Got it.  Now, but as an
3    organization, the Generic Pharmaceutical
4    Association, was it also the idea that
5    the organization could effectively lobby
6    the FDA and other government officials
7    with respect to the interests of the
8    generic industry, some of which you just
9    described?
10        MS. VANNI:  Object to form.
11        THE WITNESS:  I disagree --
12        I disagree with the word
13        "lobbying."  You don't --
14   BY MS. SCULLION:
15        Q.  How would you describe --
16        A.  -- lobby the FDA.
17        Q.  Sure.  How would you --
18        A.  You can --
19        Q.  -- describe it then?
20        A.  You can interact with the
21   FDA and ask them -- give them your point
22   of view.  And they can either agree with
23   your point of view or say I completely,
24   totally disagree.  And then they tell you

Page 141

1    what to do.  And basically you either do
2    it or you don't get your product
3    approved.
4         Q.  Okay.  I wasn't speaking of
5    any particular product though.  But was
6    one of the roles of the Generic
7    Pharmaceutical Association to interact
8    with -- let's just start with the FDA, to
9    try to advance the interests of the
10   generic industry as a whole --
11        MS. VANNI:  Objection.
12   BY MS. SCULLION:
13        Q.  -- not to any particular
14   product?
15        MS. VANNI:  Object to form.
16        THE WITNESS:  I don't agree
17   with the word "advance."  I don't
18   know what's meant by the word
19   "advance."  The -- purpose of
20   the GPhA was to represent its
21   interest to the members.  A big
22   issue was, and until recently when
23   the user fee concept got up and
24   running to a greater degree, there

36  (Pages 138 to 141)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    was a great deal of time required
2    to get a generic approved.
3        So you would spend a lot of
4    money on the science and then have
5    to wait for it to be filed at the
6    FDA. And it could take two or
7    three years before you would get
8    approval. The feeling was that
9    should be faster. So that was a
10   big issue.
11   BY MS. SCULLION:
12       Q.   Okay.
13       A.   So those kinds of things.
14   The common interests, the common
15   interests is product approvals with the
16   FDA and then interacting with the
17   government where possible to advance the
18   idea of generics, knowing we were much
19   financially outgunned by the pharma
20   industry.
21       Q.   Understood. Let's go to the
22   next page, 22. This page is headed
23   "Value of Membership in PhRMA and GPhA."
24       Do you see that?

Page 143

1        A.   Yes.
2        Q.   Okay. And again, just
3    focusing on the right-hand column which
4    gives checkmarks for the various points
5    for GPhA. I just want to confirm that
6    you agree that as of April 2004, each of
7    these was a value of membership of the
8    GPhA.
9        The first is, "Advocacy of
10   strategic issues affecting Endo,"
11   correct?
12       A.   By the GPhA, yes.
13       Q.   Okay. The next is, "CI
14   opportunities." Is that competitive
15   intelligence opportunities?
16       A.   Yes.
17       Q.   And you agree that was a
18   value of membership in GPhA?
19       A.   Yeah. You could hear
20   things --
21       Q.   Right.
22       A.   -- that was affecting the
23   business.
24       Q.   Okay. And the next bullet

Page 144

1    point, "Access of influential policy
2    makers and legislators."
3        Do you agree that was a
4    value of membership in the GPhA?
5        A.   Yes. Hearing their
6    presentations, as I testified to, yes.
7        Q.   Okay. The next bullet
8    point, "Ability to influence legislation
9    and rulemaking affecting Endo."
10       You agree that was a value
11   of membership in the GPhA?
12       A.   It was, but I don't recall
13   we ever used that.
14       Q.   Okay. And then the last
15   bullet point is, "Opportunity for
16   business."
17       Was that also a value of
18   membership in the GPhA?
19       A.   It was a small benefit.
20   There might have been a business
21   development opportunity that you might
22   hear about by going. There might have
23   been, maybe you can meet with the CRO you
24   didn't know the capacity to do a

Page 145

1    scientific study, things like that.
2        Q.   Okay. You can put the
3    exhibit to the side for just a moment.
4        MS. SCULLION: Can I get Tab
5    19 and Tab 75.
6    BY MS. SCULLION:
7        Q.   When you joined Endo in
8    2003, Endo was already selling certain
9    prescription opioids, correct?
10       A.   Yes.
11       Q.   And the principal one was --
12   was Percocet, right?
13       MS. VANNI: Object to form.
14       THE WITNESS: It all depends
15   on how you define principal. It
16   would depend on the revenue.
17   Another big product at the time
18   that was increasing was Lidoderm.
19   BY MS. SCULLION:
20       Q.   I just want to focus in on
21   the prescription opioids. Lidoderm was
22   not an opioid, correct?
23       A.   Correct.
24       Q.   All right. Percocet was an

Page 146

1    opioid, we said, right?
2        A.   It was a brand opioid, yes.
3        Q.   Right.  And there was also
4    Endocet, right?
5        A.   Yes.
6        Q.   Was Endo already selling
7    Endocet when you joined?
8        A.   Yes.
9        Q.   Okay.  And I just want to
10   make sure I understand, Endocet was a
11   generic equivalent to the branded product
12   Percocet, correct?
13       A.   Yes.
14       Q.   Were there other generic
15   equivalents to Percocet on the market at
16   the same time as Endocet, that were sold
17   by other companies other than Endo?
18       A.   Yes.
19       Q.   Why did Endo have both
20   Percocet and Endocet, why was it selling
21   a generic version of its own product?
22       MS. VANNI:  Object to form.
23       THE WITNESS:  Well, the
24       reason is that there was a generic

Page 147

1    competitor.  And they had a
2    generic business.  So you can
3    either let the money all go to
4    your competitor and -- or you can
5    participate in the generic market.
6        The brand business, once it
7    goes generic, is going to be
8    converted.  So the brand
9    doesn't -- there's not two -- you
10   know, I call it a pie.  Okay.  So
11   once there's -- once there is a
12   generic competitor to Percocet,
13   Percocet sales are going to
14   decline.
15       And normally the erosion
16   factor -- 47, 48 states have
17   automatic generic substitutional
18   rules.  So when you walk into a
19   pharmacy, unless the doctor writes
20   "dispense as written" or "brand
21   medically necessary," if the
22   generic is available, you are
23   going to get the generic.  So they
24   write the brand on the script.

Page 148

1        They don't know if a generic
2    exists or not.  And they -- some
3    patients say, hey, I don't want
4    the generic.  So they don't know
5    if exists or not, they write
6    "dispense as written," or "brand
7    medically necessary."  You go into
8    the pharmacy, and if a generic's
9    available, unless that's written
10   at the bottom of the script by the
11   physician, you will automatically
12   get, by law, in 47, 48 states, I
13   forget the exact number, you will
14   get the generic.
15       So the Percocet brand
16   business was going to decline and
17   it was going to be replaced, the
18   volume of Percocet was going to
19   convert, if you look at it as a
20   flavor of a pie, the Percocet
21   flavor was going to convert to the
22   generic flavor.  Okay.  So the pie
23   stays the same, but the flavor
24   changes.

Page 149

1        So rather than see their
2    brand business reduced and
3    declined before my time, they --
4    they launched the Endocet generic,
5    which was the same as the brand
6    Percocet by -- it was AB-rated.
7    And as a result of that, they were
8    able to participate in the generic
9    market and minimize the financial
10   impact of the loss of revenue for
11   brand Percocet.
12   BY MS. SCULLION:
13       Q.   Okay.  And AB-rated, just to
14   make it clear, means pharmaceutically
15   equivalent batch?
16       A.   Yes.  Bioequivalent.
17       Q.   Thank you.
18       And so if I understand
19   correctly, by having both Endocet and
20   Percocet available, Endo was hedging
21   against the decline in its branded
22   Percocet share of the market and
23   replacing at least some of that with
24   Endocet?

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1           MS. VANNI: Object to form.
2           THE WITNESS: I don't know
3    if I would use the word hedging.
4    It's -- it's participating, it's
5    offsetting.
6    BY MS. SCULLION:
7           Q.   Fair enough. Okay. So it
8    wouldn't -- it wouldn't have as much of a
9    decline in its overall sales of an
10   oxycodone APAP product, because some
11   would now be Endocet instead of Percocet?
12          A.   Right.
13          Q.   Okay. And you explained
14   that there were other generic versions of
15   Percocet on the market at the same time
16   as Endocet. Was there any advantage to
17   Endo in having the trademarked name
18   Endocet for its generic version?
19          A.   No, none at all. That was
20   done before I got there.
21          Q.   Okay. And so in terms of
22   competing with the other generic versions
23   of Percocet that were on the market, how
24   did Endo compete?

Page 151

1           MS. VANNI: Object to form.
2           THE WITNESS: How --
3    BY MS. SCULLION:
4           Q.   Sorry. How did Endocet --
5    how did Endocet compete with the other
6    generic versions on the market?
7           MS. VANNI: Object to the
8    form.
9           THE WITNESS: What do you
10   mean by how -- compete? How do
11   you mean? I'm sorry, I don't
12   understand.
13   BY MS. SCULLION:
14          Q.   Sure. That's okay. I think
15   you explained earlier that there -- the
16   national account executives interacted
17   with the wholesalers or the trade to get
18   the product stocked. Did Endo -- did
19   Endo's national account executives
20   effectively compete with national account
21   executives from other manufacturers to
22   get Endocet stocked as the generic
23   version of Percocet instead of one of the
24   others?

Page 152

1           A.   I think we're mixing the
2    brand business and the generic business.
3    The brand business focused on stocking.
4    That's all they do.
5           Q.   Got it.
6           A.   They have nothing to do with
7    price. They have nothing to do with
8    anything but stocking, period. That's
9    why 9 -- maybe that's 5, 8 percent of
10   their time is involved with the brand on
11   stocking.
12          Once the brand is stocked,
13   basically it's just maintenance. Okay.
14   On the generic side it's more
15   complicated. So I think to answer your
16   question, how we competed was we had to
17   have a competitive price. We had to
18   supply, do all the -- you know, the -- do
19   all the necessary customer service things
20   from supply, interaction with the
21   account. And that's what the national
22   account executives would do.
23          Normally in the big
24   accounts, it also took -- I was involved

Page 153

1    more in the generic side because I had in
2    many cases, if not all cases, a personal
3    relationship with these folks going back
4    from my, already by that time, many years
5    of experience in the generic business.
6    Now, most of them had -- hadn't changed.
7    And so Endo was perceived when I got
8    there as a smaller generic company,
9    basically a little niche player focused
10   in at that time in -- mostly in control
11   drugs. Over time we tried to change that
12   before I left where we tried to expand
13   the vision for Endo and get involved in
14   other non-opioid drugs. But at the time,
15   that was how Endo was perceived, and we
16   were able to compete because we supplied
17   product. We had good customer service.
18   We interacted well with -- with the
19   customer. We were responsive. All those
20   things that you need to do to get
21   business in the generic market.
22          Q.   Okay.
23          A.   We were open and
24   transparent. We didn't play games.

39 (Pages 150 to 153)

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  These things may not sound important.
2  But to a large account, they are very
3  important.
4       Q.   And I'm trying to ask the
5  question I was asking a little more
6  clearly I hope.
7       A wholesaler like McKesson,
8  would it be distributing more than one
9  generic version of Percocet or it would
10  just choose one?
11      A.   Well, McKesson -- any
12  wholesaler is going to carry multiple
13  labels.  What's in -- what they are
14  carrying in -- in their DCs is normally
15  in response to the contracts that are
16  loaded for that product for a respective
17  account.
18      So there's -- you know,
19  we -- on the opioid market, you had -- we
20  had customers who we shipped to,
21  DA-approved facilities --
22      Q.   DEA?
23      A.   Yeah, they're all -- you
24  can't --

Page 155

1       Q.   I just --
2       A.   I'm sorry, DEA-approved
3  facilities, licensed facilities.  And
4  then we also went to the customer's
5  customer, which were the chains and
6  customers that did not have a vault.
7       So in the case -- in the
8  case of McKesson, they -- I have no idea
9  how many labels they carried of the same
10  product, but we were not the only label
11  they carried in the warehouse.  Might
12  have been great if they had been, but
13  that's not the way they work.  Not -- or
14  in fairness, for the record, neither does
15  Cardinal or AmerisourceBergen.
16      Q.   Okay.  What determined
17  ultimately whether a prescription for
18  oxycodone APAP got filled with -- if it
19  got filled with a generic, whether it got
20  filled with Endocet versus another
21  generic version?  That's what I'm trying
22  to understand.
23      How -- how is it determined
24  what pill actually went to the patient?

Page 156

1       MS. VANNI:  Object to form.
2       THE WITNESS:  It starts with
3  the doctor.  The doctor -- a
4  DEA-licensed physician writes a
5  prescription.  The patient takes
6  that to a pharmacy.  CVS, Rite
7  Aid, Walgreens, whoever, you know,
8  wherever -- it could be an
9  independent pharmacy.
10  BY MS. SCULLION:
11      Q.   Let's start with one of the
12  chains.
13      A.   Okay.  So --
14      Q.   CVS.
15      A.   CVS.  Takes it to a CVS.
16  CVS fills that product.  Okay.  They --
17  normally in the pharmacies they have a
18  safe or a secure drawer for controlled
19  drugs, whether it's opioid -- if it's a
20  C-II -- not all C-II are opioids.  They
21  have it in what's called a safe or a C-II
22  drawer that's under lock and key.
23      And if you ripple that
24  effect, then because they don't have a

Page 157

1  vault, they then have a designated,
2  what's called -- the official name is
3  prime vendor or wholesaler that they have
4  a contract loaded with to supply that
5  particular pharmacy.
6       So, then that wholesaler has
7  those products in the DC, and they ship
8  the product to the chain or to the
9  pharmacy direct.
10      Q.   Can we -- let's -- let's
11  stick with CVS, okay.  So if CVS, if a
12  CVS pharmacy was going to fill a
13  prescription with a generic version of
14  Percocet.
15      A.   Yes.
16      Q.   Would that -- would the CVS
17  pharmacy have only one generic version of
18  Percocet on hand to -- to fill that
19  prescription?
20      MS. VANNI:  Object to form.
21      THE WITNESS:  Yes.
22  BY MS. SCULLION:
23      Q.   Okay.  How -- how was it
24  determined which of the various generic

40  (Pages 154 to 157)

Page 158

1    versions CVS was using?
2         Did Endo have a relationship
3    with CVS that said you're going to use
4    Endocet, for example?
5         A.   Well, we never say we're
6    going to use it.  We are honored to have
7    their business if we were fortunate to
8    get their business.
9         Q.   Understood.  Okay.  Fine.
10   But would there be exclusive -- you'd be
11   the exclusive supplier?
12        A.   At the time.  Now they're --
13   they don't do exclusive anymore, because
14   they are so big.  But at the time you
15   were exclusive, yes.
16        Q.   Okay.  And did Endo compete
17   with other generic manufacturers of these
18   oxycodone APAP drugs, compete to get the
19   exclusives with different chains?
20        MS. VANNI:  Object to form.
21        THE WITNESS:  Yes.
22   BY MS. SCULLION:
23        Q.   How, and what was the
24   competing based on for that contract?

Page 159

1         A.   What I testified a moment
2    ago, it was based on, you have to have a
3    competitive price, how you did business,
4    all the customer service, all that, okay.
5         Q.   Okay.  And so the price that
6    CVS was paying was determined based on
7    the contract between Endo and CVS; is
8    that right?
9         A.   Yeah, I don't know that I
10   would call it a contract.  But yes, it
11   was -- it was an agreement on the price.
12        Q.   Okay.  A price agreement.
13   Fair enough?
14        A.   Yeah, among other things.
15   There might have been also involved --
16   well, in the case of opioids it wouldn't
17   be effective because they didn't buy
18   direct.  But under a non-opioid, it would
19   also involve cash terms or prompt payment
20   terms and things like that.  So there
21   might have been other, you know, things
22   like that that might have been involved.
23        If there was a rebate
24   associated with it, what was the rebate

Page 160

1    at the time.  Things like that.  It
2    wasn't just about price.  You don't want
3    to just compete on price.
4         Q.   Okay.  Understood.  Okay.
5         MS. SCULLION:  I apologize.
6    Can I have Tab 49?
7    BY MS. SCULLION:
8         Q.   So we were talking about
9    the -- sorry about that -- the opioid
10   products that Endo was selling when you
11   joined.  We talked about Percocet,
12   Endocet --
13        A.   You know, what -- oh, in
14   Endo as a whole or the generic division?
15        Q.   Endo as a whole.  Endo as a
16   whole.  I mean, you were familiar with
17   Endo was selling Percocet at the time
18   that it was selling Endocet, right?
19        A.   Yes.  I was familiar with
20   it.
21        (Document marked for
22        identification as Exhibit
23        Endo-Stevenson-7.)
24   BY MS. SCULLION:

Page 161

1         Q.   Let me hand you what's been
2    marked as Exhibit Number 7.  And Exhibit
3    Number 7 is a copy of Endo's Form 10-K
4    for the fiscal year-ending December 31,
5    2004.
6         And Mr. Stevenson, if you
7    can turn to the second page of the
8    exhibit, you'll see the cover page that
9    shows it's the 10-K.
10        A.   Yep.
11        Q.   Do you see that?
12        A.   I see it.  Yes, I do.
13        Q.   I just want to use this.  If
14   we go back to page -- Page 10.  It's a
15   little hard to find it in the printout.
16   If you look at page numbers at the bottom
17   of the page, you'll see Page 9 on the
18   left side.
19        A.   Yes.
20        Q.   The next page is Page 10.
21        A.   Yes.
22        Q.   And looking at the top of
23   Page 10, looking at the chart that lists
24   a number of products.

Page 162

1    Do you see that?
2    A.   Yes.
3    Q.   And I thought this would be
4    a useful place to remind us of what Endo
5    was selling.  Now, this is as of fiscal
6    year 2004, granted.  But we see second
7    from the top, Percocet, right?
8    A.   Yes.
9    Q.   And again, that's -- it says
10   oxycodone/acetaminophen, right?
11   A.   Yes.
12   Q.   Next one is Percodan, and
13   that's oxycodone/aspirin, right?
14   A.   Yes.
15   Q.   Okay.  And going down four
16   more, we see Endocet, and there we see
17   oxycodone/acetaminophen again, right?
18   A.   Yes.
19   Q.   Next one is morphine sulfate
20   ER?
21   A.   Yes.
22   Q.   You see that?  And that's
23   morphine sulfate, right?
24   A.   Yes.

Page 163

1    Q.   And that's an
2    extended-release version?
3    A.   Yes.
4    Q.   Do you recall that's the
5    generic equivalent to Purdue's MS Contin?
6    A.   Yes.
7    Q.   All right.  Next is -- we
8    see oxymorphone ER.  Do you see -- and it
9    says oxymorphone hydrochloride.  Now, as
10   of the date of this 10-K, it says it only
11   had an approvable letter.
12       Do you see that?
13   A.   Yes.
14   Q.   And the next one is
15   oxymorphone IR.  And again, only has an
16   approvable letter at this time.
17       Do you see that?
18   A.   Yes.
19   Q.   Do you recall those are the
20   products that became Opana ER and Opana?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  Yes.
23   BY MS. SCULLION:
24   Q.   Okay.  Going down to the end

Page 164

1    of the list, you see oxycodone ER and you
2    see in terms of active ingredients there
3    it lists oxycodone?
4    A.   Yes.
5    Q.   And again, at the time of
6    this 10-K, it lists as being approved
7    subject to ongoing litigation.
8        Do you see that?
9    A.   Yes.
10   Q.   And that refers to Endo's,
11   at this time, proposed -- sorry -- at
12   this time approved but not yet launched
13   generic version of OxyContin, right?
14   A.   Yes.
15   Q.   And I just want to draw your
16   attention to the active ingredients for
17   Percocet and for the oxycodone ER.  They
18   both contain oxycodone, correct?
19   A.   Yes.
20   Q.   But the oxycodone ER is pure
21   oxycodone, not a mixture with
22   acetaminophen or aspirin, right?
23       MS. VANNI:  Object to form.
24       THE WITNESS:  It's not a

Page 165

1    combination drug.
2    BY MS. SCULLION:
3    Q.   Okay.  If you will go to the
4    next page of Exhibit -- is it 7?  Is that
5    right?  Sorry, I didn't write down
6    numbers.
7        If you go to the next page
8    of Exhibit 7, you see at the top, a
9    discussion of Percocet.  And Endo states
10   here, "We consider Percocet to be a gold
11   standard of pain management."
12       Do you see that?
13   A.   Yes.
14   Q.   And that was true, right?
15   That was a true statement?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  I can only
18   testify to that Percocet was
19   widely used, even by dentists.  If
20   you have a toothache and they give
21   you a Percocet, it's probably
22   5/325.  So does that mean it's a
23   gold standard?  I don't know how
24   they define gold standard.

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    I wasn't there when they
2  wrote this, or if I was, I wasn't
3  involved in it.
4  BY MS. SCULLION:
5    Q.  Okay.  No dispute.  That's
6  how Endo described Percocet in its 10-K
7  filed with the SEC?
8    A.  That's how Endo described
9  it, yeah.
10    Q.  Right.  And it goes on, just
11  to remind ourselves of the history,
12  explains that Endocet -- I'm sorry --
13  Percocet was launched in 1976, correct?
14    A.  That's what it says.
15    Q.  And that was approved for
16  the treatment of moderate to moderately
17  severe pain, right?
18    A.  Yes.
19    Q.  And then it explains that
20  Percocet has faced generic competition
21  for nearly 20 years.  Do you see -- and
22  that was right?  That was accurate,
23  correct?
24    MS. VANNI:  Object to form.

Page 167

1    THE WITNESS:  I assume.
2  BY MS. SCULLION:
3    Q.  Okay.  Then it says, "In
4  2004, according to the IMS national
5  prescription audit, approximately
6  17.9 million new prescriptions for this
7  combination of oxycodone HCl and
8  acetaminophen were written for the brand
9  name Percocet."
10    Did I read that correctly?
11    A.  Yes.
12    Q.  Okay.  So what Endo is
13  saying is that nearly 20 years into
14  generic competition, doctors are still
15  writing it as Percocet brand name in
16  large part, right?
17    MS. VANNI:  Object to form.
18    THE WITNESS:  Yes.  But
19    doctors, for the record, write the
20    brand name on the script, even if
21    the generic exists.
22  BY MS. SCULLION:
23    Q.  Right.  And then through
24  generic substitution rules or laws, it

Page 168

1  may be substituted with a generic version
2  at the pharmacy, right?
3    A.  By law, it has to be
4  substituted.
5    Q.  In the states that you
6  referred to?
7    A.  Well, 47 or 48 out of 50,
8  unless the brand -- writes "brand
9  medically necessary" or "dispense is
10  written."
11    Q.  Okay.  And the reference
12  here to IMS national prescription audit,
13  you also referred to IMS earlier today.
14  Can you explain what IMS was?
15    A.  IMS was -- I don't know what
16  the letters stand for anymore.  But
17  basically they were -- they gathered data
18  from stores, prescription data, and --
19  which was units, they could break it down
20  into -- down to extended-release, or they
21  could break it down into tablets and
22  capsules, you know, if you have to.
23    Q.  I think you've lost your
24  microphone.  There you go.

Page 169

1    A.  They can break it down into
2  tablets and capsules if they had to.  And
3  that data became, you know, widely used
4  by both the brand and the pharmaceutical
5  industry to understand how their product
6  was doing with respect to sales and
7  demand.
8    Q.  Did you use IMS data when
9  you were with Endo?
10    A.  IMS (sic) contracted to buy
11  IMS data.  You buy -- the pharmaceutical
12  companies buy the data.
13    Q.  I'm sorry.  I think you said
14  IMS.  You meant to say Endo contracted to
15  buy --
16    A.  Well, contracted is maybe
17  not the right -- Endo purchased IMS data.
18    Q.  Okay.  And did you use the
19  IMS data that Endo purchased when you
20  were with Endo?
21    A.  Endo had a -- yeah, Endo --
22  the forecasting group used the IMS data.
23    Q.  Did you from time to time
24  look at the IMS data as part of your

43  (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    responsibilities?
2         A.   Probably did.
3         Q.   Okay.  And as you said, the
4    IMS data would -- could be broken down
5    into, as -- units as small as the actual
6    tablets right?
7         A.   Tablets or capsules, yeah.
8         Q.   So you could purchase data
9    that would tell you the number of tablets
10   or capsules being sold in any given zip
11   code for example, right?
12        MS. VANNI:  Object to form.
13        THE WITNESS:  I don't know
14   about zip code.  I never saw any
15   data going to zip code.
16   BY MS. SCULLION:
17        Q.   Okay.  What's the geographic
18   region -- smallest geographic region you
19   recall that you looked at?
20        A.   United States of America.
21        Q.   You looked at the entire --
22        A.   Yeah.
23        Q.   Okay.  That was for your
24   generic business?

Page 171

1         A.   Generics don't care about
2    states, to be honest.  There's no
3    reflection on the states.
4         Q.   Okay.
5         A.   It's -- remember, we sell to
6    national accounts.
7         Q.   Got it?
8         A.   So they have their business
9    nationally.  CVS, AmerisourceBergen,
10   McKesson, Cardinal, they sell nationally.
11   They don't sell just to Pennsylvania and
12   New Jersey.  The brand business focuses
13   on -- regions are divided that way.  But
14   generics is not -- is the United States,
15   the whole United States.
16        Q.   Got it.
17        A.   I never saw data by zip
18   code.
19        Q.   Okay.
20        A.   And I don't even know that
21   Endo had it that small.
22        Q.   You just don't know one way
23   or the other?
24        A.   I know on generics I never

Page 172

1    saw any zip code data.
2         Q.   But you don't know what the
3    brand side saw?
4         A.   I don't know -- the brand
5    side as far as I knew mostly focused --
6    the brand companies that I'm familiar
7    with focused on scripts.  Okay.  So --
8    and every company that I worked in that
9    had a brand, which were -- you know,
10   whether it be BMS or Novartis or
11   whomever, they focus on TRx's and new
12   Rx's.  That was the --
13        Q.   And that's prescription
14   levels, right?
15        A.   That's prescription level.
16   The generics focused on tablets and
17   capsules.
18        Q.   Got it.  Let's go to the
19   next page of Exhibit 7.  And going down
20   to the last third of the page where it
21   says "generic products."
22        Do you see that?
23        A.   Yes.
24        Q.   Looking in the second

Page 173

1    paragraph, it says, "Our generic
2    portfolio is currently comprised of
3    products that cover a range of
4    indications, most of which are focused in
5    pain management."
6         I think you described that
7    earlier, that most of Endo's generics, at
8    least as of 2004, were focused in pain
9    management, correct?
10        A.   Yes.
11        MS. VANNI:  I'm sorry,
12   Counsel.  Where are you?
13        MS. SCULLION:  I'm sorry.
14   So we're on page 11.
15        MS. VANNI:  Okay.  Thank
16   you.
17        MS. SCULLION:  The top says
18   table of contents.
19        MS. VANNI:  Okay.  Got it.
20        MS. SCULLION:  And then you
21   see where it says "generic
22   products"?
23        MS. VANNI:  Yeah.
24        MS. SCULLION:  That's where

44  (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    we are.  Okay.  So we're in the
2    second paragraph.
3    BY MS. SCULLION:
4        Q.    The next sentence goes on to
5    say, "One of our generic products is
6    morphine sulfate extended-release
7    tablets, which accounted for 10 percent
8    of our total net sales in 2004."
9          Did I read that correctly?
10       A.    Yes.
11       Q.    So that was a significant
12   product, it was 10 percent of total net
13   sales, right?
14         MS. VANNI:  Object to form.
15         THE WITNESS:  If they put it
16       in the 10-K, again, I don't know
17       if I was here at the time or not.
18       I guess I was.  It was 2004.
19         Yeah, it was -- it was -- I
20       guess you could call it
21       significant.
22   BY MS. SCULLION:
23       Q.    Okay.  And then it says, "In
24   addition, we have a generic oxycodone

Page 175

1    hydrochloride and acetaminophen product,
2    Endocet, which accounted for 19 percent
3    of our total net sales in 2004."
4          Do you see that?
5        A.    Yes.
6        Q.    And again, that would be a
7    significant -- that was a significant
8    product then, 19 percent of net sales,
9    right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  I guess I'm
12       struggling with what "significant"
13       means.  It all depends on how you
14       define "significant."
15   BY MS. SCULLION:
16       Q.    Okay.  Then we'll just stick
17   with the numbers.  It was almost --
18   Endocet was almost 20 percent of total
19   net sales for Endo in 2004, right?
20       A.    Yes.
21       Q.    All right.  So combined,
22   these two generic opioids were almost a
23   third, it's 29 percent of net sales,
24   right?

Page 176

1        A.    Yes.
2        Q.    Okay.
3        A.    Are we done with the 10-K?
4        Q.    For now, but do hold onto
5    it, because I think we're going to come
6    back to it for other questions later.
7          (Document marked for
8          identification as Exhibit
9          Endo-Stevenson-8.)
10   BY MS. SCULLION:
11       Q.    Okay.  Mr. Stevenson, I'm
12   going to hand you what's been marked as
13   Exhibit Number 8.
14       A.    Okay.
15       Q.    And Exhibit Number 8, again
16   is -- we have the metadata page as the
17   first page.  And again you can see in
18   that top box under document
19   identification, the last line custodian,
20   that it says your name?
21       A.    Yeah, yes.
22       Q.    Just so I can orient you
23   where this is coming from.
24         The Bates number for the

Page 177

1    record is ENDO-OPIOID_MDL-04137944.
2          If you go to the first page
3    of -- of the PowerPoint.  Do you see it's
4    entitled Endo Pharmaceuticals Company
5    Overview?  And it's in April of 2004.  Do
6    you see that?
7        A.    Yes.
8        Q.    Okay.  Going to Page 2 of
9    the PowerPoint, it lists management and
10   senior staff.
11       A.    Yes.
12       Q.    And at the bottom under
13   commercial senior management, you see
14   yourself listed there, second from the
15   bottom on the left?
16       A.    Yes.
17       Q.    All right.  And let's go to
18   Page 8 of the presentation.
19       A.    Okay.
20       Q.    And the presentation says,
21   "Pain Market:  A large and attractive
22   opportunity."
23         Do you see that?
24       A.    Yes.

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1          Q.   And -- and that was true as
2     of April 2004, correct, that the pain
3     market was a large and attractive
4     opportunity?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  I don't know
7     how you define large.  It was
8     obviously an attractive -- it was
9     an attractive opportunity because
10    not many people could make pain
11    medications.  There were many
12    people in this country that take
13    pain medication.  And, therefore,
14    it was attractive from that
15    standpoint.
16    BY MS. SCULLION:
17         Q.   And it was also attractive
18    just from a revenue standpoint, right?  I
19    mean, if you look on the left-hand side
20    you see U.S. prescription pain market,
21    $16.5 billion, right?
22         MS. VANNI:  Object to form.
23         THE WITNESS:  Well, I see
24    that was the entire U.S. pain

Page 179

1     market.
2     BY MS. SCULLION:
3          Q.   Right.
4          A.   Yes.
5          Q.   And do you see then,
6     under -- in the pie chart underneath, it
7     explains that of that, the opioid share
8     of that market was $5.6 billion, right?
9          A.   Yes.  For the U.S.
10         Q.   Right.  So that was -- that
11    was also an attractive -- that made an
12    attractive opportunity, correct?
13         MS. VANNI:  Object to form.
14         THE WITNESS:  Yeah.  It
15    could be, yeah.
16    BY MS. SCULLION:
17         Q.   Yeah.  And it says right
18    above the pie chart, do you see
19    five-year -- the five-year CAGR?
20         A.   Yes.
21         Q.   And that's compounded annual
22    growth rate, CAGR, right?
23         A.   Yes.
24         Q.   And the non-opioid market is

Page 180

1     saying there's a 13 percent 5-year CAGR,
2     right?
3          A.   Yes.
4          Q.   That's a pretty healthy
5     CAGR, right?
6          MS. VANNI:  Form.
7          THE WITNESS:  Yes.
8     BY MS. SCULLION:
9          Q.   It's attractive in itself,
10    right?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  I would say
13    so.
14    BY MS. SCULLION:
15         Q.   And the opioid CAGR is
16    24 percent, so it's substantially even
17    greater than the general nonopioid
18    market, right?
19         A.   Apparently it's based on the
20    data I see here, yes.
21         Q.   Okay.  So that makes an even
22    more attractive opportunity, correct?
23         MS. VANNI:  Object to form.
24         THE WITNESS:  I don't know

Page 181

1     how you define attractive.  You
2     know, I -- there's many things
3     that go into being attractive or
4     not attractive, so...
5     BY MS. SCULLION:
6          Q.   Well, in this -- but in this
7     presentation from Endo in April 2004,
8     what is identified on this page as large
9     and attractive opportunity is this
10    $16.5 billion U.S. pain -- prescription
11    pain market, right?
12         A.   Well, this talks about
13    revenue.  It doesn't talk about
14    profitability, so...
15         Q.   Fair enough.
16         A.   The way I think of
17    attractiveness is profitability, not --
18    not what the overall size of the market
19    is.
20         Q.   Okay.  So -- but Endo
21    identified the overall size of the market
22    as one aspect of what made the pain
23    market a large and attractive
24    opportunity, right?

46 (Pages 178 to 181)

Page 182

1      A.   According to what I see
2  here --
3      Q.   Yeah.
4      A.   -- Endo took data that was
5  published at the time in 11/03 at the
6  bottom of the slide, it says, "Data is
7  through MAT 11/03," and the source is
8  IMS. But IM -- this is IMS data that
9  they showed. It doesn't talk about
10 profitability.
11     Q.   Right. So regardless of
12 profitability, what's identified here on
13 the page entitled a large and attractive
14 opportunity, is just the overall revenue
15 and the CAGRs, right?
16     A.   I think it's a large
17 potential opportunity, but I don't know
18 if it's attractive or not. It would
19 depend on the profitability of the
20 product.
21     Q.   Okay. Let's go to Page 18.
22 The same exhibit. And you see it's
23 discussing the Percocet franchise?
24     A.   Yep.

Page 183

1      Q.   Okay. And again it reviews
2  some of the information that we saw in
3  the 10-K that Percocet was launched in
4  1976, right?
5      A.   Yes.
6      Q.   Identifies as a gold
7  standard again in pain management, right?
8      A.   That's what it says.
9      Q.   All right. And then the
10 last bullet point on the page says,
11 "Active lifecycle management program to
12 address market needs."
13          Do you see that?
14     A.   Yes.
15     Q.   And just for the moment, if
16 you go to the next page, Page 19, you see
17 the heading Percocet Lifecycle Management
18 Strategy and the chart underneath there?
19     A.   Yes.
20     Q.   Were you familiar with, just
21 generally, Endo's Percocet lifecycle
22 management strategy in your role as
23 overseeing Endo sales of Endocet?
24     A.   I was familiar with it by

Page 184

1  sitting in meetings. It had nothing to
2  do with the generic business.
3      Q.   Okay. But you were -- but
4  you were familiar with the lifecycle
5  management strategy from meetings, right?
6      A.   Yes.
7      Q.   Okay. And can you just
8  explain just generally what a lifecycle
9  management strategy means?
10     A.   In general terms it's how --
11 it has nothing to do with opioids or
12 non-opioids. It has to do with extending
13 the life of the brand.
14     Q.   And with respect to
15 Percocet, on page 19, let's go to
16 Page 19. Just on the left-hand side, it
17 starts off with the column for fourth
18 quarter 1999, showing -- I'm not sure if
19 they are TRx's -- well, the -- column
20 refers to Percocet 5-milligram, correct?
21 In the -- do you see the key at the
22 bottom of the chart?
23     A.   Yes. The dark blue is
24 Percocet 5-milligram, right.

Page 185

1      Q.   Okay. And then we see in
2  the next couple of columns, we see light
3  blue coming into the chart and it
4  indicates that's from launch of a few new
5  strengths of Percocet, right?
6      A.   Yeah. They were officially
7  called variants.
8      Q.   Okay. Got it. So the
9  Percocet variants are launched. And you
10 see that in the Percocet variants, the
11 maximum strength was a 10/650?
12     A.   Yes.
13     Q.   And that refers to
14 10 milligrams of oxycodone versus 650 of
15 the APAP, right?
16          MS. VANNI: Object to form.
17          THE WITNESS: Yes.
18          10 milligrams of the oxycodone IR.
19 Yes.
20 BY MS. SCULLION:
21     Q.   Okay. So when the variants
22 were launched, the maximum strength for
23 Percocet in terms of the oxycodone went
24 from 5 milligrams to 10 milligrams of the

Page 186

1    Oxycodone portion, right?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  Appears to,
4    yes.
5    BY MS. SCULLION:
6         Q.   Right.  So -- and then --
7         A.   Although from this chart, if
8    I read it right, I'm not sure when -- the
9    generic Percocet also had a -- some of
10   the -- there was also a Percocet 10/325,
11   and that already apparently, according to
12   this chart, had generic competition not
13   clear to me.
14        Q.   Yeah.  Let me -- let me see
15   if I can walk you through it then.
16        So we have the variants
17   being launched, right, in, it looks like
18   Q2 2000, correct?
19        A.   I don't know when they were
20   launched.  I started in May of 2003.
21        Q.   Please look at -- if you
22   look on the chart in the circle it says
23   the 7.5/500, 10/650, and 2.5/325 launch,
24   and it points to Q2 2000, right?

Page 187

1         A.   I don't know if that -- just
2    because the circle is there, I don't -- I
3    don't take that necessarily as fact of
4    launch.  Because my recollection is
5    seeing this, the 2.5 launch later when I
6    was there.  So I don't know that I can
7    testify that it launched when it shows
8    here.
9         Q.   Okay.  But then, as you
10   were -- I think you were explaining
11   though, Percocet, as new variants were
12   launched, then generic versions of those
13   variants eventually also were launched,
14   right?
15        A.   Right.
16        Q.   And so, if you look at this
17   chart with the various launches
18   indicated -- strike that.
19        Okay.  Now you said you
20   recall when you were with Endo, the 2.5
21   variant launching to the best of your
22   recollection?
23        A.   Yeah, to my recollection it
24   was not there when I started.

Page 188

1         Q.   Okay.  But it had -- it
2    launched while you were, is your
3    recollection?
4         A.   Yeah, and it failed.  I
5    don't think it lasted very long.
6         Q.   Okay.  Was it actively
7    promoted by the sales force, do you
8    recall?
9         MS. VANNI:  Object to form.
10        THE WITNESS:  My
11   recollection is they tried to
12   launch the product on the brand
13   side that would mean promotion.
14   But there didn't seem to be much
15   of a demand for it because it
16   didn't provide much relief.
17   BY MS. SCULLION:
18        Q.   Okay.
19        A.   But that's just my
20   recollection.  I know it was not there --
21   I don't recall it being there when I
22   started.  Somehow I recall it coming
23   after I started.
24        Q.   Okay.

Page 189

1         A.   That's why I said I don't --
2    I can't testify to what's in that circle
3    is accurate, because it's not my
4    recollection.
5         Q.   Okay.  And I think as you
6    explained though, when you -- when you
7    joined, Endo was also selling Endocet,
8    correct?
9         A.   Yes.
10        Q.   Was there -- was there
11   any -- any competition between -- in your
12   view, between Endo's sales of Percocet,
13   the branded version, and Endocet the
14   generic version, were those two things
15   inconsistent?
16        MS. VANNI:  Object to form.
17        THE WITNESS:  No.  Because
18   as we -- Endo only sold the
19   generic when there was another
20   generic competitor.
21   BY MS. SCULLION:
22        Q.   Let's go to Page 21 of
23   Exhibit 8.  Sorry, Exhibit 8.  This
24   describes Endo's generic product

48  (Pages 186 to 189)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    strategy.  Do you see that?
2        A.   Yes.
3        Q.   It explains there was a
4    selective focus.  The first area of focus
5    was niche therapeutic areas, correct?
6        A.   Yes.
7        Q.   Next it says, "Difficult to
8    develop generics."
9            Do you see that?
10       A.   Yes.
11       Q.   And was that accurate that
12   Endo was focused on difficult to develop
13   generics?
14           MS. VANNI:  Object to form.
15           THE WITNESS:  That was part
16   of what I recommended as a
17   strategy to Endo at the time, to
18   focus on more difficult to do
19   generics, whether it be opioids or
20   non-opioids.
21           MS. SCULLION:  Okay.  Can I
22   have Tab 18.
23   BY MS. SCULLION:
24       Q.   As part of the generic

Page 191

1    strategy that you recommended, were you
2    also recommending that Endo focus on
3    generics where there were certain
4    barriers to entry?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  Well,
7    difficult to do generics, that is
8    the barrier.  They're
9    scientifically more difficult to
10   do and, therefore, they have
11   greater financial viability.
12   BY MS. SCULLION:
13       Q.   Okay.  And actually, if we
14   go to the next page, staying on the same
15   exhibit, Page 22, where it discusses
16   generic oxycodone ER.  The last bullet
17   point there, you say "anticipate limited
18   competition subject to exclusivity period
19   due to high barriers to entry for
20   controlled-release Schedule II products."
21           Is that what you're talking
22   about in terms of a difficult to
23   manufacture --
24       A.   Yes.

Page 192

1        Q.   -- as having a high barrier
2    to entry?
3        A.   And it's also more cost --
4    it's more costly to manufacture, and that
5    was the reason that I mentioned earlier
6    about the profitability is important,
7    what makes the product significant, as
8    the manufacture of C-II is much more
9    difficult than manufacturing a
10   noncontrolled drug.
11           So opioids are a controlled
12   drug.  So it's much more difficult.
13   There are certain -- DEA has very, very,
14   very strict rules involving opioid
15   products.
16       Q.   And why were you
17   recommending that Endo focus on generic
18   products that had barriers to entry?
19       A.   In order to have a
20   financially viable business.
21       Q.   I mean, other generic
22   manufacturers manufacture generics that
23   don't have barriers to entry, correct?
24           MS. VANNI:  Object to form.

Page 193

1            THE WITNESS:  Other
2    manufacturers, mostly foreign
3    manufacturers, specifically from
4    India or in the immediate release
5    product, the prices are depressed
6    because there may be eight, nine,
7    ten players for a particular
8    product.  So the product doesn't
9    have much value.
10           Plus the companies in India
11   are vertically integrated.  So
12   it's impossible to, you know, have
13   a long-term ratable, predictable
14   level of profitability.
15           And products like
16   extended-release products, whether
17   they're control drugs or
18   noncontrolled drugs are more
19   difficult to do, more difficult
20   and not everybody can do them.
21           Plus the cost of, A,
22   manufacturing them; B, shipping
23   them; C, monitoring them is much,
24   much more costly because it

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1    involves additional people.
2         To manufacture a controlled
3    drug requires two people in the
4    room.  You know, you can't have a
5    drug felony conviction and handle
6    a C-II.
7         You have to restrict on a
8    card access basis to the vault
9    where two people have to access
10   the vault.
11        So there's -- the costs in
12   many cases are double because you
13   have to have two people involved
14   in the process of handling C-IIs.
15        So not everybody wants that.
16   Some companies' strategy is, hey,
17   I just want to have as many
18   products on the market as I can.
19   And if you're a foreign supplier
20   like companies in India, where you
21   have API facilities -- besides
22   they cannot participate in C-II
23   drugs they're -- or controlled
24   drugs of any kind, because control

Page 195

1    drugs require you to make the API,
2    source the API from the United
3    States and only sell the product
4    in the United States.
5         So from a variety of
6    standpoints, not many people can
7    do it.  Plus, the FDA
8    historically -- I don't know if
9    they've changed.  But historically
10   they didn't approve that many
11   generic suppliers of controlled
12   drugs, whether it be opioids or
13   non-opioids.
14        That -- whether that's
15   changed today I don't know.  But
16   at the time, there was a feeling
17   that there weren't that many
18   players, and they wouldn't approve
19   as many.  Okay.  They didn't want
20   to have nine or ten players in
21   opioid drugs or controlled drugs,
22   not just opioids, controlled
23   drugs.
24        So for those reasons,

Page 196

1    controlled drugs was an attractive
2    financial area to be in to meet
3    the pain -- and there was an unmet
4    need in pain management.  There's
5    many people in this country that
6    suffer from pain.
7         And that's what drugs like
8    Endo sold, both brand and generic,
9    were designed to meet, pain
10   management needs of the public.
11   BY MS. SCULLION:
12        Q.   Okay.  But I think you just
13   said, some of the things that made
14   generic opioids, C-II products,
15   attractive were some of the various
16   barriers to entry that you were just
17   identifying.
18        So let me just make sure I
19   understood some of those.  One of them
20   that I think you identified is somewhat
21   unique to the controlled substances.  And
22   that is, there is a prohibition on
23   foreign manufacturers manufacturing a
24   generic opioid and importing it into the

Page 197

1    U.S., correct?
2         A.   Yes.  Both from API and
3    finished dosage.
4         Q.   Okay.  So that's already
5    taking out, as you said, some of the
6    vertically integrated, more
7    commodity-type manufacturers from India,
8    correct?
9              MS. VANNI:  Object to form.
10             THE WITNESS:  Correct.
11   BY MS. SCULLION:
12        Q.   Okay.  They wouldn't be
13   there to compete?
14             MS. VANNI:  Object to form.
15             THE WITNESS:  They wouldn't
16   be there to compete unless they
17   had a U.S. business.
18   BY MS. SCULLION:
19        Q.   Right.  Okay.  And then I
20   think you said you also understood that,
21   I forget if you said the DEA or FDA was
22   not interested in having eight or nine or
23   ten manufacturers of generic opioids --
24   of any generic opioids?

50  (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1     A.  Or controlled drugs.
2     Q.  Okay.  They wanted to limit
3  the number of --
4     A.  That was the feeling.  I
5  don't know if they ever had a stated, you
6  know, policy or anything like that.  But
7  that was kind of the feeling.
8     Q.  Okay.  And what was your
9  understanding about why -- why that
10 feeling is just --
11    A.  I -- that was just the way
12 it was.  I don't know that I had a
13 feeling.
14    Q.  Okay.  Did you understand
15 why the DEA maybe would have wanted to
16 restrict the number of manufacturers of
17 controlled substances?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  I don't know
20    why.  I don't know why.
21 BY MS. SCULLION:
22    Q.  But in terms of the barriers
23 to entry.  You also said just within
24 controlled substances, the

Page 199

1  extended-release products were harder to
2  make, right?
3     A.  They are more variable.
4     Q.  Okay.  And you said that
5  that -- those entail greater costs.  Did
6  they also, though, provide, in your view,
7  the opportunity for a greater profit
8  margin than a commodity opioid, for
9  example?
10       MS. VANNI:  Object to form.
11       THE WITNESS:  Well, assuming
12    you can attain your share target
13    in the large accounts -- and
14    there's no guarantee of that --
15 BY MS. SCULLION:
16    Q.  Right.
17    A.  Then it was -- it was a
18 higher -- it would be a higher
19 profitability on average than a commodity
20 product.
21    Q.  Okay.  I want to come back
22 to Percocet.
23       MS. SCULLION:  Can I have
24    Tab 27.

Page 200

1        (Document marked for
2     identification as Exhibit
3     Endo-Stevenson-9.)
4  BY MS. SCULLION:
5     Q.  I'm going to hand you what's
6  been marked as Exhibit Number 9.
7        MS. VANNI:  Thank you.
8        MS. SCULLION:  Sure.
9  BY MS. SCULLION:
10    Q.  And Exhibit Number 9 is
11 Bates-stamped ENDO-OPIOID_MDL-03571186.
12 Do you recognize Exhibit Number 9,
13 Mr. Stevenson?
14    A.  How do you define recognize?
15    Q.  Let's try this.  Do you see
16 that at the top of Exhibit Number 9 is an
17 e-mail from yourself to David Kerr again?
18    A.  Yes.
19    Q.  Okay.  And this is in
20 January of 2007, right?
21    A.  Yes.
22    Q.  And by this point, I think
23 you explained, you had taken on the
24 additional responsibilities with respect

Page 201

1  to the trade group; is that right?
2     A.  Yes.
3     Q.  Okay.  And this e-mail
4  concerns Percocet price increase
5  effective February 1st, 2007; is that
6  right?
7     A.  Apparently, yes.
8     Q.  Okay.  If we can put that
9  aside for the moment.
10       MS. SCULLION:  Tab 61.
11 BY MS. SCULLION:
12    Q.  Mr. Stevenson -- I'm sorry.
13 Were you reading something?
14    A.  No, not really.
15    Q.  Okay.  If you are reading
16 anything, I'm going to need to ask you
17 what you're reading --
18    A.  Okay.  No, I wasn't reading
19 anything.
20    Q.  -- because I need to know
21 what you're looking at while we're in
22 looking -- while we're in the deposition.
23    A.  I wasn't reading anything.
24    Q.  Okay.  So we talked about

51 (Pages 198 to 201)

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    when you joined Endo, Endo was selling
2    both Percocet and Endocet.
3         Were you -- even though you
4    weren't responsible for the Percocet
5    branded promotion, were you familiar
6    though with what the strategies were that
7    Endo was using to market the branded
8    version of Percocet?
9         MS. VANNI:  Object to form.
10        THE WITNESS:  Only thing I
11   really knew was that they were --
12   excuse me, they were promoting the
13   Percocet like any other brand
14   would -- like they promoted
15   Lidoderm and non-opioids that they
16   had in their portfolio.  And
17   that's really all I knew.  I
18   didn't get involved in the
19   day-to-day Percocet discussion.
20   They had a whole brand section
21   that handled all that.
22   BY MS. SCULLION:
23   Q.   Okay.
24        (Document marked for

Page 203

1    identification as Exhibit
2    Endo-Stevenson-10.)
3    BY MS. SCULLION:
4    Q.   I'm going to hand you what's
5    been marked as Exhibit 10.
6         Exhibit 10 is Bates-stamped
7    ENDO-OPIOID_MDL-04910731.
8         And if you'll turn to the
9    first page of the PowerPoint, you see
10   it's Endo Pharmaceuticals Percocet.  And
11   it's the quarterly business review of the
12   fourth quarter 2002, correct?
13   A.   Correct.
14   Q.   Okay.  And let's turn to, if
15   you look in the upper right-hand corner
16   we have some numbers that say E 513?
17   A.   Yes.
18   Q.   It makes it a little bit
19   easier --
20   A.   Okay.
21   Q.   -- to navigate.
22        I apologize.  I lost my
23   page.  Hold on one second.
24        Right.  If you can go to

Page 204

1    page E 513.8.
2    A.   .8.
3    Q.   Upper right-hand corner.
4    A.   Okay.
5    Q.   And you see Percocet
6    dispensed tablet trends?
7    A.   Yes.
8    Q.   And here, there is two
9    bullet points that talk about volumes
10   of -- sorry.  Talk about the dispensed
11   tablets for Percocet 7.5/325, and 10/325.
12        You referred earlier to data
13   on tablets being sold.  And you recall
14   using that tablet information on the
15   generic side, right?
16        MS. VANNI:  Object to form.
17        THE WITNESS:  I recall what?
18   BY MS. SCULLION:
19   Q.   I'm sorry, you said -- you
20   said IMS had tablet data available on the
21   generic side, right?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  They had
24        tablet and capsule data available

Page 205

1    for the products, yes.
2    BY MS. SCULLION:
3    Q.   Okay.  And this -- does this
4    indicate that there is also tablet data
5    available to some extent on the branded
6    side?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  Yes.  They
9    would have tablet data for --
10   the -- IMS didn't distinguish
11   between brand and generics.
12   They -- they had data for product
13   in the trade.
14   BY MS. SCULLION:
15   Q.   Okay.
16   A.   Being sold in -- into -- in
17   the United States.
18   Q.   Right.  And if you look at
19   the next page, you do see that in the
20   bottom left-hand corner it references IMS
21   MPA December 2002 --
22   A.   Yes.
23   Q.   -- in this chart actual
24   versus planned tablets, right?

52  (Pages 202 to 205)

Page 206

1      A.   Yes.  For the record, I was
2  not there in December of 2002.
3      Q.   Understood.  If you go to
4  page E 513.15.
5          And this is discussing
6  forward-looking Percocet key strategies.
7  Do you see that?
8      A.   I see it.  Yeah.
9      Q.   Okay.  And so when you
10  joined Endo in 2003, were you familiar
11  with a strategy as it lists in Point 1,
12  here, to expand and accelerate usage of
13  Percocet 7.5/325 and 10/325 into the
14  overall Oxycodone market during the
15  period of exclusivity?
16      A.   I wasn't familiar with the
17  specific strategy.  I wasn't involved in
18  Percocet.  My job at Endo was to grow the
19  generics business, period.
20      Q.   Right.
21      A.   And, you know, could I --
22  could I have heard about it?  That wasn't
23  my focus.  So I -- I don't recall what
24  the exact strategies were, other than

Page 207

1  what I testified a moment ago, the basic
2  strategy was to promote Percocet to
3  physicians.  That was part of what Endo
4  did.
5      Q.   Now, this bullet point
6  Number 1 speaks to the period of
7  exclusivity.  Do you know what that
8  refers to in relation to the Percocet 7.5
9  and 10?
10      A.   It would refer to the time
11  the brand patent exclusivity was
12  exclusive because of the patent.  When
13  the patent expires it would be considered
14  a loss of exclusivity.
15      Q.   Okay.  At the end of -- of
16  any exclusivity period for a particular
17  variant for Percocet, then Endocet would
18  come in to -- to launch, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  That was the
21      plan.  That was never a guarantee.
22  BY MS. SCULLION:
23      Q.   Okay.
24      A.   But that was -- that was the

Page 208

1  kind of thinking.  But it was never --
2  never the guarantee.
3  BY MS. SCULLION:
4      Q.   Okay.  So would you have
5  been paying attention to when the
6  exclusivity for various -- for the
7  variant on Percocet was going to expire?
8          MS. VANNI:  Object to form.
9          THE WITNESS:  Yes.
10  BY MS. SCULLION:
11      Q.   Okay.  And then the next
12  bullet point speaks to "Creating a
13  transitional platform to Percocet 5/325
14  and 20/325, to provide optimal impact on
15  current line and to maximize high
16  strength launch."
17          Do you see that?
18      A.   Yes.  Yes.
19      Q.   And again, in terms of just
20  understanding the launch of different
21  variants of Percocet and exclusivity,
22  were you familiar with a plan to
23  potentially launch these strengths of --
24  these variants of Percocet, 15 and 20?

Page 209

1          MS. VANNI:  Object to form.
2          THE WITNESS:  No, I never
3      saw anything about those two
4      strengths.
5  BY MS. SCULLION:
6      Q.   Okay.  Now, if we go to
7  Page E 513.22.
8          And this discusses the
9  strategy, "Expand usage in adopters."  Do
10  you see that?
11      A.   Yes.
12      Q.   And here it lists that "the
13  key issue was accelerate Percocet usage
14  in additional acute and chronic pain
15  types."
16          Do you see that?
17      A.   Yes.
18      Q.   And were you familiar with a
19  strategy at Endo starting at the end of
20  2002, carrying into when you began, to
21  accelerate Percocet usage into additional
22  acute and chronic pain types?
23          MS. VANNI:  Object to form.
24          THE WITNESS:  No.  As I've

53 (Pages 206 to 209)

Highly Confidential - Subject to Further Confidentiality Review

Page 210

```
 1        already testified, my basic
 2     knowledge was, of the brand side
 3     of the business, is they had
 4     products that they promoted.  I
 5     was focused on the generic side.
 6     That was consuming a lot of my
 7     time when I got there.
 8          So that's what I -- that's
 9     what I did.
10          This is the Percocet.  These
11     slides, for the record, are all
12     about the brand.
13  BY MS. SCULLION:
14     Q.    And did any of the -- the
15     brand strategy in terms of promotion of
16     Percocet variants while you were selling
17     Endocet, did that at all impact your
18     sales of Endocet, the strategies used to
19     sell Percocet?
20          MS. VANNI:  Object to form.
21          THE WITNESS:  When the
22     product was going to go generic,
23     the promotion stopped.  You don't
24     promote a product that's
```

Page 211

```
 1     genericized.
 2  BY MS. SCULLION:
 3     Q.    Right.
 4     A.    So to answer your question,
 5  Endo did not -- no longer promote it to
 6  my recollection, because it wouldn't have
 7  made any financial sense a brand that's
 8  gone generic.  So you -- the expense
 9  doesn't warrant that.
10          So once a product has gone
11  generic, there's no more promotion.  Then
12  the only promotion was done was on the
13  variants that had no -- that didn't have
14  generic competition.
15  BY MS. SCULLION:
16     Q.    Right.  That -- that's a
17  question.  The promotion that was
18  happening for the variants that didn't
19  have generic competition, did that impact
20  your sales of the variants that did have
21  generic competition?
22          MS. VANNI:  Object to form.
23          THE WITNESS:  No.
24  BY MS. SCULLION:
```

Page 212

```
 1     Q.    Okay.  Did it hurt your
 2  sales of the variants that did have
 3  generic competition?
 4          MS. VANNI:  Object to form.
 5          THE WITNESS:  No.
 6  BY MS. SCULLION:
 7     Q.    Okay.
 8          MS. SCULLION:  Can I have
 9     Tab 48.
10  BY MS. SCULLION:
11     Q.    Mr. Stevenson, I think we
12  were -- just the exhibits that we were
13  looking at, we saw that over the years
14  Endo launched, as you said, different
15  variants of -- of Percocet, right?
16     A.    Correct.
17     Q.    And as those variants became
18  genericized, then filled in with Endocet,
19  correct?
20          MS. VANNI:  Object to form.
21          THE WITNESS:  If it was
22     Percocet, yes.
23  BY MS. SCULLION:
24     Q.    Okay.  And Endo did that --
```

Page 213

```
 1  hold on a second.
 2          MS. SCULLION:  Leave it,
 3     it's fine.
 4  BY MS. SCULLION:
 5     Q.    Endo did that knowing that
 6  there had been a history of abuse of --
 7  of Percocet, right?
 8          MS. VANNI:  Object to form.
 9          THE WITNESS:  Not to my
10     knowledge.
11  BY MS. SCULLION:
12     Q.    You were not ware of --
13  aware of any history of abuse of Percocet
14  when you were selling Endocet?
15     A.    No, I -- no.  First of all,
16  I wasn't -- for the record I wasn't
17  involved with selling Percocet.  For the
18  record.
19     Q.    Sure.
20     A.    I was involved with the
21  generics, which do not involve promotion
22  to physicians that are -- we are
23  converting the brand business that exists
24  to generic form.
```

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1    As I said earlier there's a
2  pie -- there's a brand flavor that
3  converts.  Part of that pie converts over
4  time to the -- well, converts immediately
5  to the generic flavor.  The amount it
6  converts increases over time.
7    Q.    So the -- as you say, the
8  brand, and the brand promotion, creates
9  the pie, correct?
10    MS. VANNI:  Object to form.
11    Misstates his testimony.
12    THE WITNESS:  The brand
13    promotion creates the pie based on
14    the doctor writing the
15    prescription.
16  BY MS. SCULLION:
17    Q.    Right.
18    A.    It all starts with the
19  doctor.
20    Q.    Well, if the -- if Endo is
21  not promoting the product though, would
22  doctors be writing as -- as many
23  prescriptions as they were?
24    MS. VANNI:  Object to form.

Page 215

1    THE WITNESS:  I have no
2    idea.
3  BY MS. SCULLION:
4    Q.    Okay.  In your experience,
5  when a -- when a brand stops promoting a
6  product, do your prescription levels
7  change?
8    A.    They can, yeah.
9    Q.    What's -- what's been your
10  experience with that?
11    A.    Mixed.  Sometimes the
12  product -- I've seen products like
13  Prilosec, which is for GERD, even though
14  promotion has stopped a long time ago, it
15  rises for a variety of factors.  Doctors
16  recommend that over other more newer
17  medicines.  It's hard to quantify what
18  happens on every product in the United
19  States.
20    I've seen -- as I said, I've
21  seen products that have long since
22  stopped promotion increase because
23  doctors, many -- in some cases prefer
24  older products to newer products.  You

Page 216

1  know, it -- again, it's up to the
2  physician.  It all starts with the
3  DEA-licensed physician.
4    Q.    Right.  Now, but safe to
5  say, though, that Endo thought it was
6  worth its while to invest money in hiring
7  sales reps, right?
8    MS. VANNI:  Object to form.
9    THE WITNESS:  Yes.
10  BY MS. SCULLION:
11    Q.    Endo hired sales reps,
12  right?
13    A.    Yes, they hired sales reps.
14    Q.    And hundreds of them, right?
15    A.    I don't know how many they
16  had exactly.
17    Q.    Okay.  They had sales reps
18  around the country, right?
19    A.    Correct.
20    Q.    And it paid those sales reps
21  to go and visit the doctors, right?
22    A.    Yes.  They got their message
23  out that they had the product to meet
24  pain management requirements.  That's

Page 217

1  correct.
2    Q.    Right.  And again, safe to
3  say Endo thought it was worth its while
4  in creating promotional materials for its
5  branded products, right?
6    MS. VANNI:  Object to form.
7    THE WITNESS:  Based on the
8    label that the FDA approved, yes.
9  BY MS. SCULLION:
10    Q.    But it spent money creating
11  materials beyond just the label, right?
12  It didn't just hand the doctors the
13  labels.  It created brochures, right?
14    A.    Yes, they did, yeah.
15    Q.    Right.
16    A.    They had marketing brochures
17  that was based on --
18    Q.    Okay.
19    A.    -- the FDA-approved label,
20  yes.
21    Q.    And fair to say Endo thought
22  it was worth it's while creating speaker
23  programs using doctors, right?
24    MS. VANNI:  Object to form.

55 (Pages 214 to 217)

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1          THE WITNESS:  Well, I don't
2     know all the -- again, that was
3     the brand business.  I don't know
4     all the programs that they had at
5     the time, because that was not my
6     focus.  I couldn't -- I couldn't
7     resuscitate -- or I'm sorry,
8     reconstruct all of the programs
9     that they might have had doing
10    brand marketing.
11 BY MS. SCULLION:
12    Q.    But safe to say Endo -- Endo
13    spent money on sales and promotion of
14    it's branded product, correct?
15         MS. VANNI:  Object to form.
16         THE WITNESS:  Yes, they did.
17 BY MS. SCULLION:
18    Q.    Okay.  And in doing so,
19    generated, as you say, the prescriptions
20    written by doctors, right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Based on their
23    promotional material, the doctors
24    felt that the product that Endo

Page 219

1     was selling was meeting a pain
2     management need of the patient.
3     That's what doctors do.  They
4     write prescription that meets the
5     need, the medical need of the
6     patient.  If they're in pain,
7     they -- pain management product is
8     what's required for pain.  That's
9     up to the doctor what they write.
10 BY MS. SCULLION:
11    Q.    And -- I'm sorry.
12    A.    So that's up to the
13    physician.  They write the prescription.
14    Q.    And the results of that are
15    measured, as you said, by looking at the
16    number of -- the prescription levels,
17    right?
18    A.    That's -- yes, you can look
19    at TRx's and new Rx's, yes.
20    Q.    Okay.  And so the branded
21    promotion results in a pie that consists
22    of a level of TRx's, right?
23    A.    Correct.
24         MS. VANNI:  Object to form.

Page 220

1 BY MS. SCULLION:
2     Q.    And then I think as you were
3 explaining then, when the product is
4 genericized because of loss of patent
5 exclusivity, the generic can come in and,
6 I think you said, change some of the
7 flavor or parts of the pie to generic?
8     A.    I'm just trying to describe
9 in layman's terms --
10    Q.    Yes.
11    A.    -- how it works.
12    Q.    Right.
13    A.    We don't double the pie.
14 Okay.  The pie stays the same.  As a
15 matter of fact, the DEA controls the size
16 of the pie.  Endo doesn't control the
17 size of the pie.  It all depends, on a
18 control drug it has to deal with quota.
19 Whatever the DEA awards on quota is what
20 you can sell.  And you can't sell one
21 milligram more than whatever the DEA's
22 quota allows you to sell.  So that's why
23 you have to be very careful of what you
24 ship and make sure that it's within

Page 221

1 demand, because if for some reason
2 somebody bought -- your quota would be
3 exhausted.  And once your quota is
4 exhausted for the year, unless somebody
5 loses business, unless you can justify to
6 the DEA why you need more quota, they
7 won't give it to you.
8          They are not going to say,
9 "Oh, gee whiz, Endo.  Yeah, we feel sorry
10 for you.  We're going to give you more
11 quota."  This is your quota for the year.
12 This is what you can sell for that year.
13 Every year, you have to go back and ask
14 for more quota.
15    Q.    Understood.  Were you
16 involved in Endo efforts to secure DEA
17 quota for its controlled products?
18    A.    How do you define
19 "involved"?
20    Q.    At all?
21    A.    I didn't involve myself
22 going to the FDA.  I was involved in the
23 discussions about quota, when we could
24 get quota, how much quota we had, what

56  (Pages 218 to 221)

Page 222

1  our restrictions were, to make sure, as I
2  just said -- I didn't want to over -- we
3  didn't want to take on business for
4  whatever reason. And so we're talking
5  about the generic side. If somebody
6  couldn't supply -- and let's suppose an
7  account we didn't have, a large account
8  came to us, their volumes are fairly
9  large, depends what -- that kind of
10  product would not be, for lack of a
11  better phrase, just hanging around, you
12  know, doing nothing.
13       So at the end of the day, we
14  would have to, we have to stay within the
15  quota. So if somebody said we want to
16  switch to you and we were taking it from
17  competitor A, at that point in time we
18  would have to go to the DEA and say,
19  "Competitor A is losing its business.
20  It's coming to us." And then we would
21  have to ask for an increase in quota.
22       Until we got an increase in
23  quota, we could not take that business
24  on, because it would drain our quota

Page 223

1  down, and then our existing customers, we
2  would be out of product.
3       So it would negatively
4  impact our entire business if we were to
5  do that.
6            This was -- the quota issue
7  was something -- you can't -- if you --
8  if you violate the DEA regulations they
9  can shut you down. So we were very, as
10  anybody selling control drugs -- and post
11  my -- post my Endo experience, we sold
12  control drugs. You make sure that you
13  are in absolute compliance with the DEA,
14  because they can shut your whole
15  operation down in a matter of minutes if
16  they have to.
17       Q.  And that's particularly
18  important for the opioid category of
19  controlled substances, right?
20       A.  It's important in any
21  category involving controlled substances.
22       Q.  And the point of the
23  controlled substance is that it's a
24  closed system, as you say, right? The

Page 224

1  DEA determines the quota of the active
2  ingredient, the active pharmaceutical
3  ingredient, right?
4       A.  Yes.
5       Q.  That can be used. And that
6  is the actual opioid molecule, right?
7       A.  Yes.
8       Q.  And then all throughout the
9  chain from manufacturer to distribution
10  through -- all the way out to delivery to
11  the pharmacy, it's strictly controlled,
12  right?
13            MS. VANNI:  Object to form.
14            THE WITNESS:  Yes.
15  BY MS. SCULLION:
16       Q.  And that's for good reason,
17  right? Because these are opioids that
18  are inherently risky products, right?
19            MS. VANNI:  Object to form.
20            THE WITNESS:  All control
21       drugs are inherently risky
22       products, yes.
23  BY MS. SCULLION:
24       Q.  Okay. And opioids in

Page 225

1  particular, you're aware had inherent
2  risks of addiction, right?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  I don't know
5       how you define inherent risks. So
6       I -- that --
7  BY MS. SCULLION:
8       Q.  What was your understanding
9  of what the risks were for opioids that
10  led them to be categorized as Schedule II
11  drugs?
12       A.  If somebody chose to misuse
13  them and not follow direction on that
14  they were given by their physician or the
15  direction that was indicated on a -- on a
16  bottle received at the pharmacy, then if
17  they chose to abuse that product, then
18  that could be -- or any control drug
19  that's abused. Could be methylplenidate
20  extended-release, which is used for
21  attention deficit. You can misuse that,
22  just like you can misuse acetaminophen
23  today. If you take too much
24  acetaminophen, you can have liver

57 (Pages 222 to 225)

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1    disease.
2        So any drug can be -- if you
3    don't follow the exact direction that
4    you're provided by your physician,
5    pharmacist, it can result in an adverse
6    event.
7        Q.   Sure.  But acetaminophen is
8    not a Schedule II drug, right?
9        A.   No.  But you're still dead
10   if you take it the wrong way.
11       Q.   Okay.  But the federal
12   government has decided that certain drugs
13   that have risks that are so severe that
14   they're putting them into Schedule II,
15   right?
16       A.   Yes.
17           MS. VANNI:  Object to form.
18   BY MS. SCULLION:
19       Q.   And the risks for opioids,
20   putting aside the word "inherent," the
21   risks include, as you said, there's a
22   risk for abuse, right?
23       A.   Yes.
24       Q.   Risk of misuse?

Page 227

1        A.   Sure.
2        Q.   Risk of addiction?
3        A.   Sure.
4        Q.   Risk of withdrawal symptoms,
5    right?
6        A.   I don't know about the
7    withdrawal symptoms, but yes.
8        Q.   Okay.  Are you familiar at
9    all with the phenomenon withdrawal in
10   association with the use of opioids?
11       A.   No.
12       Q.   Never heard about or got any
13   training on that?
14       A.   No.  Again, this was
15   generics.  So --
16       Q.   Okay.  Just asking the
17   question.
18           And there's also a risk of
19   diversion for opioids, correct?
20       A.   There's a risk of diversion
21   on any product.
22       Q.   But there was a risk of
23   diversion for opioids, right?
24       A.   Sure.  On any product,

Page 228

1    including opioids.
2        Q.   Okay.  So again, it was --
3    and the DEA put opioids as well as other
4    controlled substances, but put opioids
5    into this category of Schedule II, which
6    is second-highest category of
7    control, correct?
8           MS. VANNI:  Object to form.
9           THE WITNESS:  Yes.
10   BY MS. SCULLION:
11       Q.   Okay.  Now let's go back
12   though.  We were talking about the pie
13   concept of brand and generic.  Okay.  I
14   just want to get back to that.
15       A.   Okay.
16       Q.   We got a little sidetracked
17   on the DEA quotas?
18       A.   But it's related to that
19   pie --
20       Q.   Understood.
21       A.   -- because they control how
22   big that pie is.
23       Q.   Well, let me ask you about
24   that.  So the DEA can control the maximum

Page 229

1    amount that you could make the pie,
2    right?
3        A.   They control what you can
4    sell based on your quota.
5        Q.   Right.  The maximum you can
6    sell, right?
7        A.   Yes.
8        Q.   They don't -- but they
9    don't -- but you can sell less than the
10   maximum if you wanted to, right?
11           MS. VANNI:  Object to form.
12   BY MS. SCULLION:
13       Q.   At any time given point?
14       A.   Sure, you could, or --
15       Q.   Sure.
16       A.   -- if your sales failed,
17   yeah, you could.
18       Q.   And in fact, any company
19   like Endo could choose to stop selling an
20   opioid drug if the company determined
21   that it was too risky, right?
22           MS. VANNI:  Object to form.
23   BY MS. SCULLION:
24       Q.   It has that -- it has that

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1  ability?
2       MS. VANNI:  Object to form.
3       THE WITNESS:  If they want
4  to leave an unmet need in pain
5  management, sure, they can do
6  that.  But there's patients out
7  there that need -- I don't agree
8  with the characterization of the
9  inquiry -- inquiry of the
10  questioning.
11       It implies that somehow Endo
12  was doing something nefarious.
13  No, Endo was selling an
14  FDA-approved product that was
15  shipped to a DEA-licensed facility
16  that was -- where a -- and a
17  prescription was written --
18  fill -- written by a DEA licensed
19  lawyer (sic), to meet the patients
20  pain management requirement.
21       Okay.  Not everybody that
22  took an opioid, whether it's an
23  Endo product or a non-Endo product
24  is an addict.  That's what the

Page 231

1  implication is.  There are many
2  people in this country that need
3  pain management.
4       My dad died for two weeks
5  with cancer pain.  He took
6  morphine.  If he'd have had that
7  pain 51 years ago, he'd have been
8  screaming in pain for two weeks.
9       Those kind of people like my
10  dad who was on morphine for two
11  weeks because he had incurable
12  cancer, without those C-IIs,
13  opioids, he would have been
14  screaming in pain for the last two
15  weeks.
16       So it's not correct to imply
17  that everybody that sold opioid
18  drugs was somehow selling them to
19  addicts.  We sold them to
20  DEA-licensed facilities.  They
21  were an FDA-approved product.
22  They went through the FDA approval
23  process.
24       We -- we monitored those

Page 232

1  orders.  And so if you've ever
2  seen somebody in pain and you've
3  seen their response to medications
4  like pain management products, you
5  would realize they meet a great
6  need, that if not there, it would
7  go unfulfilled and the quality of
8  life of these people would be
9  unbearable.
10  BY MS. SCULLION:
11      Q.   So first, I'm sorry for your
12  loss.
13      A.   It's a long time ago.
14      Q.   But --
15      A.   But it's just --
16      Q.   It's still -- it's still a
17  loss, and I am sorry for that.  I'm not
18  disagreeing with you that -- and I'm not
19  implying that every prescription for an
20  opioid is improper.
21       I'm just asking about the
22  fact that there is a risk within opioids,
23  there are certain risks that we
24  identified, right?

Page 233

1      A.   Yeah.  And my -- my point
2  is -- and you know, I don't mean to be
3  argumentative.  So please forgive me if it
4  comes across.  There's a risk of every
5  drug sold in the United States of
6  America.  If you watch any consumer ad,
7  you see all the caveats at the end.
8  That's for a reason.
9       And some of them actually
10  say, including death.
11      Q.   Right.
12      A.   So there's a risk.  If you
13  misuse -- a drug is a chemical substance.
14  If you misuse that chemical substance,
15  whether it's an opioid or non-opioid, you
16  can have an adverse event that will not
17  result in a good outcome.
18      Q.   All right.  Understood.
19       MS. VANNI:  Whenever you are
20  at a logical stopping place, I
21  think lunch is here.  We've been
22  going almost two hours I think.
23       MS. SCULLION:  Yeah, this is
24  fine.  This is actually a fine

59 (Pages 230 to 233)

Page 234

1 place to stop.
2 MS. VANNI: Yeah? You're
3 sure?
4 MS. SCULLION: Yeah.
5 THE VIDEOGRAPHER: Off the
6 record, 12:15.
7 - - -
8 (Lunch break.)
9 - - -
10 THE VIDEOGRAPHER: We are
11 back on the record at 1 o'clock.
12 - - -
13 EXAMINATION
14 - - -
15 BY MS. SCULLION:
16 Q. Welcome back, Mr. Stevenson.
17 You understand that you're still under
18 oath?
19 A. I do.
20 Q. Good. Thank you. I want to
21 focus now on the generic oxycodone
22 extended-release product, generic
23 OxyContin.
24 A. Okay.

Page 235

1 Q. Do you recall that product?
2 A. Yes.
3 Q. Okay. And that was a
4 product that you had responsibility for,
5 correct?
6 A. Yes.
7 Q. Okay. And OxyContin was a
8 product that Purdue originally had
9 developed and sold, correct?
10 A. It was -- yeah, it was a
11 brand product that was marketed by Purdue
12 Pharma.
13 Q. Okay. Do you recall that in
14 2004, the market for the oxycodone
15 extended-release product was about
16 $1.9 billion?
17 A. I don't recall that specific
18 a number from almost 15 years ago, no.
19 Q. Okay. I actually should say
20 at 1.8 billion. If you look quickly back
21 at Exhibit 7.
22 A. Okay.
23 Q. Exhibit 7, again this is the
24 10-K. If you'll turn to page -- Page 13,

Page 236

1 which is again easier to find if you see
2 the left hand page, it'd be Page 12, and
3 the next one is 13.
4 A. Yes. Mm-hmm.
5 Q. And at the top, it says,
6 "Table of contents." In the middle of
7 the page, do you see it says "oxycodone"
8 in italics?
9 A. Yes.
10 Q. Oxycodone ER, I should say.
11 A. Yes.
12 Q. Okay. And in here it says,
13 "We've also developed an extended-release
14 oxycodone, an AB-rated generic version of
15 OxyContin, a product of the Purdue
16 Frederick company, according to IMS
17 retail provider prospective data,
18 OxyContin generated U.S. sales of
19 approximately $1.8 billion in 2004."
20 Did I read that correctly?
21 A. Yes. $1.8 billion in 2004.
22 Yes.
23 Q. Okay. And Purdue claimed
24 that it had patents that covered the --

Page 237

1 covered OxyContin, right?
2 A. Yeah.
3 Q. And as part of its generic
4 strategy, Endo decided to try to get a
5 part of the OxyContin market, right?
6 MS. VANNI: Object to form.
7 THE WITNESS: It tried --
8 it -- it wanted to have a generic
9 version of OxyContin to
10 participate in that market by
11 converting the brand to the
12 generic, yes.
13 BY MS. SCULLION:
14 Q. Okay. And -- and, in fact,
15 in order to do so, Endo had to do more
16 than just develop its own oxycodone
17 extended-release product. It had to
18 actually challenge Purdue's patents,
19 right?
20 A. Yes.
21 Q. It had to submit what's
22 called a Paragraph IV challenge to
23 produce patents, right?
24 A. Yes. Paragraph IV under the

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Hatch-Waxman law that governs generic --
2    generics in the United States.
3        Q.   Okay.  And then when Endo
4    did that, let me see if it says it
5    here -- strike that.
6        If you look back, right
7    where you're looking at Exhibit 7 again.
8    It explains that "Endo has received final
9    approval from the FDA for bioequivalent
10   versions of the 10 milligram,
11   20 milligram, 40 milligram, 80-milligram
12   strengths of OxyContin."
13       Do you see that?
14       A.   I just saw it a moment ago.
15   Yes.
16       Q.   Okay.  And Endo was first to
17   file a Paragraph IV challenge to Purdue's
18   patents on three out of four of those
19   strengths, right?
20       A.   Yes, the 10, the 20, and the
21   40-milligram.  Yes.
22       Q.   And what is the significance
23   of Endo being the first to file
24   Paragraph IV challenges to those

Page 239

1    strengths?
2        MS. VANNI:  Object to form.
3        THE WITNESS:  It would allow
4    you to launch the product.
5    Originally it was designed to
6    give -- it was designed under the
7    Hatch-Waxman law as a reward to
8    the generic filer, whether it was
9    an opioid drug or non-opioid drug,
10   that you would get six months of
11   market exclusivity before other
12   competitors could launch the
13   product.
14       However, a new concept
15   developed that became known in
16   the -- in the business as
17   authorized generics, where the
18   brand company could, after the
19   litigation was resolved, could
20   enter the market through what's
21   called as -- an authorized generic
22   by having their generic version of
23   the brand marketed by a generic --
24   a generic player.

Page 240

1    BY MS. SCULLION:
2        Q.   Okay.  When Endo challenged
3    Purdue's patents and was first to file,
4    did Endo regard that as a valuable
5    opportunity for Endo?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  Well, I was
8    not there when they filed the
9    product.
10   BY MS. SCULLION:
11       Q.   At the time you joined, Endo
12   was still challenging the patents,
13   correct?
14       A.   Yes.
15       Q.   And did Endo, when you
16   joined, did it regard the first to file
17   exclusivity possibility as a valuable
18   possibility?
19       MS. VANNI:  Object to form.
20       THE WITNESS:  It was -- it
21   was -- it was -- it was still
22   deemed to be a worthwhile
23   opportunity.
24   BY MS. SCULLION:

Page 241

1        Q.   And what were the advantages
2    to Endo, if Endo did get exclusivity as a
3    result of being the first to file?
4        A.   Well, if you had
5    exclusivity, but, you know, for the
6    record IVAX was -- they became the
7    authorized generic for Purdue Pharma, so
8    we were not exclusive.
9        But during the exclusivity
10   period or -- generic pricing is
11   determined by the amount of competitors.
12   So it could be -- it could be a
13   profitable product because of -- you
14   have -- you could have potentially a
15   higher price, therefore, higher profits.
16       It could also -- if it was
17   significant product, also help your
18   business, you know, that you were a
19   player.  It would help your -- you were a
20   niche player in the generic market, that
21   we were no longer this little, you know,
22   generic company anymore, because we -- I
23   think I had articulated or testified
24   earlier that, you know, we were looking

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    at expanding our business beyond the --
2    the C-II products or controlled drugs
3    products that we had, the opioid products
4    we had.
5          So it -- it reinforced the
6    image or story that generic -- that Endo
7    was -- was there for the long-term.
8    Because we would be able to have a
9    significant product get through the FDA
10   approval process, and get through the
11   legal gauntlet, only enhanced Endo's
12   image with the trade that, you know,
13   they -- they are a longer term player.
14        Q.   Okay.  You mentioned that
15   one of the potential values for
16   exclusivity would be the opportunity to
17   charge a higher price than if there were
18   multiple generic competitors, correct?
19        A.   Yes.
20        Q.   Okay.  Did the possibility
21   of not having multiple generic
22   competitors, was that also an advantage
23   in terms of getting the exclusive
24   arrangements with the retail pharmacies

Page 244

1          MS. VANNI:  Object to form.
2          THE WITNESS:  Not
3    necessarily.
4          You know, they -- my
5    experience has been that those
6    people that are expecting approval
7    start agitating pretty quickly
8    after the exclusivity period
9    begins to make sure that people
10   know they are coming in a couple
11   months.
12         Number 2, you can't possibly
13   supply everybody when you have
14   more competition, because all
15   you're going to do is destroy your
16   profitability.  They have nowhere
17   to go but just to take the price
18   down.  So at that point in time it
19   becomes a market share game, how
20   much market share do you want.  Or
21   more -- how much -- how much do
22   you want, and then how much do you
23   actually get.  It may not be the
24   same thing.

Page 243

1    we talked about earlier.
2          MS. VANNI:  Object to form.
3          THE WITNESS:  I'm not sure I
4    understand the question.
5    BY MS. SCULLION:
6          Q.   Do you recall we talked
7    about with like -- an example was CVS
8    would carry one generic at any time?
9          A.   Well, if you're the only
10   generic then they were going to carry
11   your product.  It was --
12         Q.   Right.
13         A.   -- perhaps, you know, there
14   was never over the larger count a lay-up,
15   as you call it.
16         Q.   Right.
17         A.   But all things being equal,
18   they would carry your product.
19         Q.   Okay.  And would it be an
20   advantage to the first generic on the
21   market to already be in -- in -- sorry,
22   be in place with the retail chains in the
23   event that another generic launched,
24   would that be a slight advantage?

Page 245

1          So there's -- it doesn't
2    follow that because you were
3    exclusive for some period of time,
4    although we were not exclusive,
5    because IVAX had the authorized
6    generic.  But if you were
7    exclusive, it does not follow that
8    that gives you an automatic
9    advantage in the post-exclusivity
10   period.
11   BY MS. SCULLION:
12         Q.   Right.  Thanks.  That helps.
13         So understanding that
14   you're -- you're not a lawyer, you are
15   aware that Endo did put a great deal of
16   effort into litigating the challenge to
17   produce patents, correct?
18         MS. VANNI:  Object to form.
19         THE WITNESS:  Yeah.  They --
20   they put a great deal of effort.
21   They went through the lower court
22   case and the appellate court case.
23   BY MS. SCULLION:
24         Q.   Okay.  And now, by the time

62  (Pages 242 to 245)

Page 246

```
1      Endo was challenging Purdue's patents and
2      (looking to participate in the oxycodone
3      extended-release market, there was
4      substantial information concerning abuse
5      of OxyContin, correct?
6             MS. VANNI:  Object to form.
7             THE WITNESS:  I think I
8         would categorize it as abuse of
9         the use of a particular drug.
10        Perhaps, you know, there was stuff
11        in the press about abuse of the
12        use of the drug.
13     BY MS. SCULLION:
14        Q.   Okay.  Well, putting aside
15     the press -- and there were a number of
16     reports, correct, around abuse of
17     OxyContin?
18        A.   Abuse of the use of it, yes.
19        Q.   Abuse of the use, right,
20     including in Pennsylvania and the
21     Philadelphia area, right?
22            MS. VANNI:  Object to form.
23            THE WITNESS:  I have no idea
24        where they are.
```

Page 247

```
1      BY MS. SCULLION:
2         Q.   Okay.
3         A.   I mean it wasn't something
4      that I followed, to be honest.  It was
5      something, you might have read about it,
6      yes, okay, heard about in the news or
7      whatever.  But it wasn't something that I
8      really focused on to be honest.
9         Q.   So then in addition to the
10     media reports that you say you weren't
11     looking at, you are aware though that the
12     GAO, the United States General Accounting
13     Office, did issue a report in
14     December 2003 concerning OxyContin abuse
15     and diversion?
16            MS. VANNI:  Object to form.
17            THE WITNESS:  No, I'm not
18        aware of that.
19     BY MS. SCULLION:
20        Q.   You are not familiar at all
21     with the GAO issuing this report?
22        A.   No.
23            MS. SCULLION:  Let me just
24        show it to you, just to make sure.
```

Page 248

```
1         Okay?  Thank you.
2             (Document marked for
3         identification as Exhibit
4         Endo-Stevenson-12.)
5      BY MS. SCULLION:
6         Q.   Let me show you what's been
7      marked as Exhibit 12.
8         A.   Are we done with the 10-K?
9         Q.   For the moment, yeah.
10        A.   Okay.
11        Q.   And Exhibit 12, for the
12     record, is Bates-stamped
13     ENDO-OPIOID_MDL-03256655.
14            Mr. Stevenson, do you see
15     that Exhibit 12 states on its cover
16     that's a December 2003 GAO report and
17     entitled Prescription Drugs, OxyContin
18     Abuse and Diversion and Efforts to
19     Address the Problem?
20        A.   Yes.
21        Q.   If you could just skim over
22     it just to tell me if you have any
23     recollection of ever having read the
24     report or any part of it?
```

Page 249

```
1         A.   No, I've never seen it
2      before.
3         Q.   Did you ever hear anyone
4      discuss the GAO report?
5         A.   No.
6         Q.   Let's -- let's go to Page 9
7      of the report.  If you'll look on the
8      bottom of the page, you'll see the page
9      numbers.
10        A.   Oh, 9.  Okay.
11        Q.   Yeah.
12        A.   I thought you were going to
13     test my Roman numeral skills.
14        Q.   I'm sure you would do better
15     than me.  We already saw my math skills
16     are not great.
17        A.   Okay.  Page 9.
18        Q.   You got it.  And, again, to
19     make sure we're on the same page, in the
20     middle of that page is a paragraph that
21     begins "OxyContin sales and prescriptions
22     grew rapidly."
23            Are we on the same page?
24        A.   Yes, yes.
```

63 (Pages 246 to 249)

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1    Q.   Okay.  So the sentence there
2  says, "OxyContin sales and prescriptions
3  grew rapidly following its market
4  introduction in 1996."
5       And a little further down in
6  the paragraph states, "In both 2001 and
7  2002, oxy sales exceeded $1 billion and
8  prescriptions were over 7 million."
9       Do you see that?
10   A.   I see that's what it says,
11  yes.
12   Q.   Is that consistent with
13  your -- your general understanding of the
14  growth of OxyContin during that time
15  period?
16       MS. VANNI:  Object to form.
17       THE WITNESS:  I -- I
18       wouldn't have followed it that
19       way.  We would have followed it
20       based on -- we would have modeled
21       things off of tablets and capsules
22       and, you know, what the -- this is
23       not -- first of all, I wasn't here
24       at the time.  I was still at

Page 251

1       Geneva Sandoz at the time.
2  BY MS. SCULLION:
3    Q.   To be clear, this is
4  December of 2003.
5    A.   No, you were referring to
6  the paragraph here about --
7    Q.   Oh, thank you very much.
8    A.   -- 2001 and 2002 --
9    Q.   Yes.  Correct?
10   A.   -- I was not there.
11   Q.   Correct.  Fair enough.
12       But you have no reason to
13  doubt the accuracy of what the GAO was
14  reporting, right?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  No reason for
17       me to doubt it.
18  BY MS. SCULLION:
19   Q.   The next paragraph refers
20  to, I think, something that you were also
21  discussing, which is media reports of
22  OxyContin abuse and diversion began to
23  surface in 2000.
24       Is that consistent with what

Page 252

1  you recall in terms of what you were
2  referring to as media reports of abuse of
3  the use of OxyContin?
4    A.   I don't remember the year.
5  But, you know, I just remember media
6  reports.  When it occurred, I don't know
7  when I first picked up on it.
8    Q.   Okay.  And it goes onto
9  explain that, "These media" -- "These
10  reports first appeared in rural areas of
11  some states, generally in the Appalachian
12  region."  Do you see that?
13   A.   Yes.
14   Q.   Do you recall that
15  Appalachia in particular had a lot of
16  reports of OxyContin abuse -- abuse and
17  diversion?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  No, I don't
20       recall that.
21  BY MS. SCULLION:
22   Q.   Okay.  And then it says in
23  the next sentence, "Rural communities in
24  Maine, Kentucky, Ohio, Pennsylvania,

Page 253

1  Virginia, and West Virginia were
2  reportedly being devastated by the abuse
3  and diversion of OxyContin."
4       Do you see that?
5    A.   Yes.
6    Q.   In the early 2000s, were you
7  living in Pennsylvania?
8    A.   Yes.
9    Q.   Do you recall there being
10  reports about rural communities within
11  Pennsylvania being devastated by the
12  abuse and diversion of OxyContin?
13   A.   Not -- not really.  I mean,
14  I -- as I testified, I just recall, you
15  know, general media -- media accounts.
16  Where -- I don't -- I can't recall any
17  specific location.
18   Q.   Okay.  But you have no
19  reason to doubt that, again, the accuracy
20  of what the GAO is reporting in terms of
21  rural communities in these states,
22  including Ohio, Pennsylvania, West
23  Virginia, reportedly being devastated?
24       MS. VANNI:  Object to form,

64  (Pages 250 to 253)

Highly Confidential - Subject to Further Confidentiality Review

Page 254

```
1    foundation.
2         THE WITNESS:  I have no --
3    no reason to doubt that's what's
4    being written there.
5    BY MS. SCULLION:
6         Q.   Okay.  And if we go onto the
7    next page, 10, the paragraph continues.
8    And just going down, third line from the
9    top.  The sentence that begins, or
10   states, "Pain patients, teens, and
11   recreational drug users who had abused
12   OxyContin reportedly entered drug
13   treatment centers sweating and vomiting
14   with withdrawal."
15        Did I read that correctly?
16        A.   Yes.
17        Q.   And so this is talking about
18   not only recreational drug users -- those
19   would be people using it for nonmedical
20   purposes, right?  A recreational drug
21   user is a person using it for nonmedical
22   purposes, right?
23        A.   Are you asking me to testify
24   that's written here?  I'm sorry.
```

Page 255

```
1         Q.   No, I'm asking -- I'm just
2    asking just your understanding of the
3    phrase "recreational drug users."  That
4    would refer to nonmedical users, right?
5         A.   I guess.  I assume.  I guess
6    you can interpret it that way.
7         Q.   Okay.  And the GAO explains
8    that, in addition to recreational drug
9    users, there also were pain patients who
10   were reportedly entering drug treatment
11   centers, correct?  That's what the GAO is
12   reporting?
13        MS. VANNI:  Object to form.
14        THE WITNESS:  Where is that
15   located?
16   BY MS. SCULLION:
17        Q.   The sentence says pain
18   patients.
19        A.   Pain patients.
20        Q.   "Pain patients, teens, and
21   recreational drug users."
22        A.   Okay.
23        Q.   Do you see that?
24        MS. VANNI:  She's referring
```

Page 256

```
1    to right here.
2         THE WITNESS:  Yeah, I know.
3    I see that.  But the last
4    question, I'm trying to find where
5    it's --
6    BY MS. SCULLION:
7         Q.   Sure.  So as long as we are
8    on the same page, let me start again.
9         So the GAO is reporting
10   that, in addition to recreational drug
11   users, there also were pain patients who
12   were reportedly entering drug treatment
13   centers sweating and vomiting from
14   withdrawal?
15        A.   Oh, and recreation -- "who
16   had abused OxyContin reportedly entered
17   drug treatment centers sweating and
18   vomiting from withdrawal."
19        Yes, that's what it says.
20        Q.   Okay.
21        A.   I'm not sure.  Did I answer
22   your question?
23        Q.   Yes.  That's what it says.
24   That's what GAO is reporting.  And pain
```

Page 257

```
1    patients, those would be people under
2    medical supervision, right?  They're a
3    patient?
4         MS. VANNI:  Object to form.
5         THE WITNESS:  Pain patients
6    would be somebody under a
7    physician's care, yes.
8    BY MS. SCULLION:
9         Q.   And next sentence discusses
10   reports concerning West Virginia.
11        The next sentence says, "The
12   media also reported on deaths due to
13   OxyContin."
14        Do you see that?
15        A.   Yes.
16        Q.   And that was also true,
17   right, that their media was report that
18   go there were deaths from OxyContin?
19        MS. VANNI:  Objection.
20        THE WITNESS:  I don't --
21   again, I wasn't following it that
22   closely.  You know, there was --
23   there was always a potential for
24   abuse on a -- on any drug.
```

65 (Pages 254 to 257)

Page 258

BY MS. SCULLION:
Q.    Okay.  Let's go down then to the next paragraph.  Looking at the very last sentence of the next paragraph, which states, "The most recent data available from DEA show that as of February 2002, the agency had verified 146 deaths nationally involving OxyContin in 2000 and 2001."
Do you see that?
A.    Yes.
Q.    And you have no reason to doubt the accuracy, again, of what GAO is reporting there, right?
A.    No.
MS. VANNI:  Object to form.
THE WITNESS:  No doubt.  No reason to doubt.
BY MS. SCULLION:
Q.    Before you joined Endo, had you ever -- had any of the products that you've been involved in, any of the pharmaceutical products you had been involved in, had death rates of that

Page 259

level, 146 deaths in two years?
MS. VANNI:  Object to form.
THE WITNESS:  I have no idea.
BY MS. SCULLION:
Q.    The same year that the GAO issued the report that we were just looking at, Exhibit 12.
The DEA came to Endo and expressed some concerns it had about Endo's potential launch of generic OxyContin, correct?
MS. VANNI:  Object to form.
THE WITNESS:  When?  I'm sorry.  When was this?
BY MS. SCULLION:
Q.    The same year, 2003.
A.    I'm not sure if the DEA came to Endo.  We weren't summoned or anything like that.  I think there was a -- what I remember there was some discussion with the DEA by phone.  And there was -- either they invited.  You know, you don't just march into the DEA.  And there was a

Page 260

meeting agreed to, I remember, sometime in 2003 in order to -- for the DEA to better understand what our intention was with oxycodone ER.
They didn't really understand generics.  Most people don't.  They don't understand how generic conversion works.  So it was a mutually agreed-upon meeting that we were thrilled to have, and they were thrilled to have with us as well.
MS. SCULLION:  Can I have Tab 1 and Tab 54, please.
(Document marked for identification as Exhibit Endo-Stevenson-13.)
BY MS. SCULLION:
Q.    Mr. Stevenson, I'm going to hand you what's been marked as Exhibit 13.
A.    Okay.
Q.    And Exhibit 13 is Bates-stamped ENDO-OPIOID_MDL-03002818.
And, Mr. Stevenson, do you

Page 261

recognize Exhibit 13 as a series of e-mails in September of 2003 that involved you as well as others at Endo?
A.    Yes.
Q.    Okay.  Let's go to the last page of Exhibit 13.
A.    Is that the back page?
Q.    It is.  And this is the page at the very top, has an e-mail from Dan Carbery, dated September 5th, 2003, 6:35 p.m.
A.    Yes.
Q.    Okay.  And it's addressed to yourself and to MaryAlice Raudenbush, correct?
A.    Yes.
Q.    And who was Dan Carbery at that time?  What was his position?
A.    I think he was VP of operations.
Q.    Okay.  And Ms. Raudenbush, who was she?
A.    She was the head of regulatory affairs.

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1      Q.   There's cc'd on here, Jill
2   Connell.
3      A.   Connell.
4      Q.   Connell.  Thank you.  I keep
5   doing that.  Jill Connell.  Do you recall
6   Ms. Connell's position?
7      A.   She worked for Dan Carbery.
8   I don't remember her exact title.
9      Q.   Okay.  And Sue Tolen, do you
10  remember who she was?
11     A.   No.
12     Q.   And the subject is "EN3218
13  quota request and risk management
14  questions."
15          Do you see that?
16     A.   Yes.
17     Q.   And EN3218, that's -- that
18  was Endo internal code number at the time
19  for generic OxyContin, correct?
20     A.   For oxycodone ER, yes.
21     Q.   Okay.  And then in his
22  e-mail, the first sentence, Mr. Carbery
23  states, "Endo has been asked by the DEA
24  to meet with the quota and diversion

Page 263

1   group on September 22nd or 23 to discuss
2   our 'marketing and risk management plan'
3   for oxy ER."
4          Do you see that?
5      A.   Yes.
6      Q.   So as Mr. Carbery -- you
7   have no reason to doubt the accuracy of
8   what Mr. Carbery was stating in his
9   e-mail, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  Well, I
12     have -- I have no reason to doubt.
13     But I need to point out that
14     "marketing" is in quotation.
15     "Marketing and risk management
16     plan" is in quotations.  So again,
17     marketing for oxycodone ER is not
18     traditional marketing used for the
19     brand, just so -- for the record.
20  BY MS. SCULLION:
21     Q.   Sure.  And we'll -- we'll
22  talk about that in a -- in a bit.  We
23  talked about it some more before.  But I
24  wanted to point out, so Mr. Carbery is

Page 264

1   reporting that the DEA asked for a
2   meeting, correct?
3      A.   Well, I can't tell you his
4   choice of words.  My understanding -- I
5   can testify, my understanding is that we
6   were not -- we were not summoned by the
7   FDA.
8      Q.   The DEA?
9      A.   We were -- we were not
10  summoned by the FDA.  My understanding
11  there was a conference call.  During that
12  conference call, they may have said, "Hey
13  can you guys -- you know, would you" --
14  you know, we wanted -- we were seeking
15  the opportunity to have a direct dialogue
16  with them.
17         So his -- I can't speak for
18  his choice of words.  But I just want to
19  make clear for the record, we were not
20  summoned to go there.
21     Q.   I'm not suggesting you were
22  summoned.
23     A.   Okay.  Okay.
24     Q.   I'm just saying, he's

Page 265

1   reporting that Endo was asked by the DEA
2   to meet.  And as you said, in the next
3   sentence, he says -- it refers to a
4   teleconference that was held to clarify
5   what the general questions are.
6          So if I understand what he's
7   saying, DEA asked for a meeting, and then
8   there was a teleconference to say, "Yeah,
9   what would you like to talk about?"
10  Right?
11         MS. VANNI:  Object to form.
12         THE WITNESS:  My
13     understanding is we were both
14     seeking a meeting.  I can't speak
15     for how he phrased it.  But we
16     were thrilled to have a meeting
17     with them.  I mean, that's my
18     understanding.
19         MS. SCULLION:  Counsel, if
20     there are any records indicating
21     that Endo asked for the meeting
22     with DEA, we have not seen those.
23         THE WITNESS:  I'm not sure
24     that we asked for the meeting.

Golkow Litigation Services - 877.370.DEPS

Page 266

1    Just to be clear, there was a --
2    my understanding is there was a
3    teleconference.  My recollection
4    is there was a -- there was a call
5    of some kind.  I didn't
6    participate in the call.
7        At that meeting, the idea of
8    a meeting -- at that -- in that
9    teleconference, the idea of a
10   meeting came up.
11       And -- but the point is we
12   were not officially summoned by
13   the DEA, you know, to be here, be
14   at a certain place.
15   BY MS. SCULLION:
16       Q.   Okay.
17       A.   I can't speak to how -- I
18   don't know that we asked for the meeting.
19   I think we were hoping we would have a
20   meeting.  Who asked for what, I can't
21   testify.  I know we were not summoned to
22   go down there as -- summoned or else.
23       It was a meeting where they
24   wanted to understand about the generic

Page 267

1    business, how -- how oxycodone would be
2    with respect to OxyContin.  And we wanted
3    to have -- we were thrilled at the
4    opportunity to go down there and explain
5    it to them, to try and alleviate any --
6    any concerns or issues that they might
7    have.  To make sure their understanding
8    was correct and not subject to somebody
9    else's, you know, interpretation.
10       Q.   Understood.  So regardless
11   of how the meeting came about --
12       A.   Okay.
13       Q.   -- Mr. Carbery goes on in
14   his next sentence, if you'll take a look,
15   to say that "they said we won't get quota
16   approval until we meet with them."
17       Do you see that?  It's the
18   next paragraph, first sentence.
19       "However, they said we won't
20   get quota approval until we meet with
21   them."
22       A.   Yeah, I see that.
23       Q.   Okay.  And the quota
24   approval there, that's referring to again

Page 268

1    DEA's approval for a quota for the opioid
2    to be used to manufacture the generic
3    oxycodone ER product, right?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  It's a quota
6    for the API, yes.
7    BY MS. SCULLION:
8        Q.   Yeah.  Okay.
9        Now if you go to the first
10   page of Exhibit 13.  Now looking at an
11   e-mail, follow-up e-mail from Jill
12   Connell to you.
13       A.   Yeah.
14       Q.   And she says, "It's a
15   follow-up to the telephone conversation
16   with the DEA," right?
17       A.   Yeah.
18       Q.   And she says, "DEA is
19   questioning our choice of Prozac as a
20   comparison for our rate of conversion.
21   They suggested we use MS Contin generic
22   conversion rate."
23       Do you see that?
24       A.   Yes.

Page 269

1        Q.   And the discussion of rate
2    of conversion and generic conversion
3    rate, what is that, just what is that
4    concept, what's it referring to?
5        A.   Well, whenever a generic
6    comes into the marketplace, because 47 or
7    48 states have automatic substitution of
8    the generic for the brand, it's referring
9    to the rate of conversion from the brand
10   product to generic product.  So the brand
11   product declines.  The generic product,
12   you know, takes some of that pie, as we
13   talked about earlier.  But the pie
14   remains the same.
15       Q.   Okay.  And that rate at
16   which the pie changes could be very
17   quick, could be a little slower, right?
18       A.   Normally on opioids is
19   slower.
20       Q.   And why is that?
21       A.   You know, the anecdotal
22   evidence was that some patients want to
23   remain on the -- on the brand because
24   they know it works.  They are -- they

68 (Pages 266 to 269)

Page 270

1    have pain is a fear factor, that if I go
2    to generic it won't work as well and then
3    I'm going to be in pain and I have to go
4    through -- I have to get the physician to
5    write a new script for the generic.  And
6    then, you know, it becomes more -- well,
7    some people used to call it the hassle
8    factor.
9         You know, so the generic --
10   like on Prozac, the conversion rate from
11   the brand Prozac to the generic
12   fluoxetine?  Very fast.
13        Q.   Okay.
14        A.   And on MS Contin and other
15   opioids, it was a slower decline.
16   Eventually it erodes.  But the rate of
17   erosion can be slower for opioids than
18   for non-opioids.
19        Q.   Okay.  And so if I
20   understand this correctly, Endo at least
21   initially was presenting to DEA Prozac as
22   a model of a conversion rate that might
23   apply to generic OxyContin, that's what
24   this e-mail is indicating, right?

Page 271

1         A.   It was showing them -- it
2    was implying that that could be the case,
3    yes.
4         Q.   Right.  And so that would
5    then be, as you said, a fairly rapid
6    conversion rate, correct?
7         A.   Right.  So the brand would
8    go away and be replaced by the generic.
9         Q.   Right.  And if it was a
10   rapid conversion rate, that -- that would
11   mean that the anticipated volume of sales
12   for the generic version would be higher
13   than if there were a slower conversion
14   rate?
15        A.   Yes.
16        Q.   Okay.  And -- okay.
17        And I think, as you said
18   earlier, if the anticipated demand for an
19   opioid were -- the anticipated demand
20   impacts the -- the DEA quota.
21        MS. VANNI:  Object to form.
22        THE WITNESS:  In order to
23   get quota you have to demonstrate
24   to the DEA that you have business.

Page 272

1         You don't just get quota.
2         As I said earlier, you don't
3    walk into the FDA and say, oh, by
4    the way, I'm launching a -- you
5    know, an opioid product -- or any
6    controlled drug for that matter.
7    Because they -- DEA regulates --
8    actually they regulate all
9    pharmaceuticals, but quotas are
10   established with control drugs.
11        So whether it's an opioid or
12   another control drug, you have to
13   get quota from the FDA in order to
14   manufacture the product.  If you
15   exceed that quota in any calendar
16   year, okay you're done, unless you
17   can show that you gained business
18   from your competition.  They lost
19   the business, you gained the
20   business, they'll give you more
21   quota.  But reluctantly.  And
22   normally not as much as you want.
23   BY MS. SCULLION:
24        Q.   Okay.  And so in -- in

Page 273

1    discussing the -- the quota for generic
2    oxycodone ER for Endo, DEA was
3    questioning whether, in fact, the model
4    of a Prozac rapid conversion was maybe
5    overestimating the amount of demand you
6    might need, right?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  They were --
9    yeah, they -- they had looked at,
10   I think, at an MS Contin
11   conversion rate.  It was -- it was
12   shorter, but the technology -- the
13   technology today is light years
14   what it was then.  And that was
15   light years from what it was when
16   Oxy -- when MS ER was launched, MS
17   Contin.  The technology was
18   increasing all the time to convert
19   the brand to generic, so yes.
20   BY MS. SCULLION:
21        Q.   Okay.  Understand.  But
22   that's -- that's what DEA was saying, was
23   we're not sure that it will convert as
24   quickly as Prozac.  And -- and then you

69 (Pages 270 to 273)

Page 274

1    had a discussion, correct?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  Yes.
4    BY MS. SCULLION:
5         Q.    Okay.
6         MS. SCULLION:  Do we have
7    Tab 54?  Thank you.
8    BY MS. SCULLION:
9         Q.    And you were part of those
10   discussions with the DEA, correct, not
11   the teleconference, but the subsequent
12   discussion?
13        A.    I was at the -- I was at the
14   meeting with the DEA, yes.
15        Q.    Okay.  Let me hand you --
16   are you okay?
17        A.    Yeah, I'm fine.
18        (Document marked for
19        identification as Exhibit
20        Endo-Stevenson-14.)
21   BY MS. SCULLION:
22        Q.    Let me hand you what's been
23   marked as Exhibit 14.
24        A.    Having bifocals are not --

Page 275

1    they're not everything that they're
2    cracked up to be.
3         Q.    I have tried them, they did
4    not work for me.
5         So Exhibit 14 is
6    Bates-stamped ENDO-OPIOID_MDL-03005612.
7         And, Mr. Stevenson, do you
8    see that Exhibit 14 starts with an e-mail
9    from Sue Tolen to Dan Carbery, yourself,
10   Bob Barto, and Jill Connell?
11        A.    Yes.
12        Q.    Okay.  And the subject
13   matter here is final DEA presentation,
14   right?
15        A.    Yes.
16        Q.    And Miss Tolen indicates
17   that she's passing on to the group the
18   final DEA presentation incorporating
19   corrections, correct?
20        A.    Yes.
21        Q.    All right.  So then let's
22   turn to the document itself, which is
23   another PowerPoint presentation.  You see
24   the title page says it's Endo

Page 276

1    Pharmaceuticals' meeting with Drug
2    Enforcement Administration, September 30,
3    2003, correct?
4         A.    Yes.
5         Q.    And then the next page, the
6    meeting overview?
7         A.    Yes.
8         Q.    As you indicated, it lists
9    yourself as well as Mr. Carbery,
10   Miss Connell, Mr. Barto, and Miss Tolen
11   in the meeting overview, correct?
12        A.    Correct.
13        Q.    To the best of your
14   recollection they all attended, right?
15        A.    Yes.
16        Q.    Okay.  And then the next
17   page of the presentation begins with
18   slides.  It looks like it indicated that
19   you would present with respect to the
20   EN3218 marketing plan; is that right?
21        A.    Yes.
22        Q.    Okay.  And the first slide,
23   background generics versus brand.  This
24   generally talks about the concept of --

Page 277

1    of AB-rating that we discussed earlier,
2    correct?
3         A.    Yes.
4         Q.    All right.  And going to the
5    next slide.  Again, discusses the concept
6    you talked about before about
7    substitution of an AB-rated product for
8    the brand, correct?
9         A.    Yes.
10        Q.    And then the next -- the
11   second bullet point says, "Endo customers
12   for generics are retailers and
13   wholesalers and not physicians," correct?
14        A.    Yes, yes.
15        Q.    Okay.  And that's the
16   concept we talked about earlier, right,
17   that the generic does not get marketed to
18   physicians, but there is some sales
19   effort directed by the national account
20   executives to the retailers and
21   wholesalers, correct?
22        MS. VANNI:  Object to form.
23        THE WITNESS:  Yes.
24   BY MS. SCULLION:

70  (Pages 274 to 277)

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1      Q.   All right.  Okay.  Going to
2  Page 6 of the presentation which
3  discusses generic conversion of brands.
4  This is discussing the concept again of
5  the pie that was created by the brand,
6  then being converted over time in part to
7  generic?
8      A.   Yes.
9      Q.   Okay.  And if you'll go to
10  the third bullet point down which
11  discusses recent ABA -- AB, sorry,
12  AB-rated generic conversion of equivalent
13  brand approaching 90 percent within
14  30 days, correct?
15      A.   Yes.
16      Q.   And you discuss the Prozac
17  example.  And one of the things that you
18  note here is "market efficiency over" --
19  "overcame expected brand loyalty."  Did I
20  read that correctly?
21      A.   Yes.
22      Q.   What did you mean there by
23  brand loyalty?
24      A.   I launched generic name or

Page 279

1  the generic name fluoxetine for another
2  company.  And at the time, we were
3  exclusive on the 10-milligram capsules,
4  and at the time there was a lot of buzz
5  in the industry that Prozac would
6  remain -- the patients would remain more
7  loyal to the brand Prozac than -- than
8  have -- than take a generic.  And that's
9  proved not to be the case.
10      Q.   Okay.  And you were
11  presenting your viewpoint to the DEA that
12  a Prozac model was more applicable for,
13  in your view, for generic oxycodone than,
14  as you said, the older MS Contin
15  conversion model, right?
16      MS. VANNI:  Object to form.
17      THE WITNESS:  We were
18  presenting the Prozac model as a
19  basis for -- my recollection is
20  for our quota request that we
21  would not run out of quota in
22  order to convert -- as I said,
23  without the quota, you can't sell
24  the product.  You run out of

Page 280

1  product.
2      And there was a concern that
3  if you -- if the market converts
4  the way we think it would convert,
5  which would be closer to the
6  Prozac model because of, even
7  then, more advanced technology, if
8  the DEA didn't give enough quota,
9  that we wouldn't have enough
10  product -- we would run out of
11  product, and now we would have
12  customer obligations that we
13  couldn't fulfill.  We'd have to go
14  through the quota process with the
15  DEA, which is not something that
16  happens overnight.
17      So we were showing them an
18  example of how generics can
19  convert --
20  BY MS. SCULLION:
21      Q.   Right.
22      A.   And how quickly they can
23  convert so they would be aware of that.
24      Q.   And do you recall, was the

Page 281

1  DEA persuaded by your presentation that
2  the -- a faster model of generic
3  conversion should be used to support the
4  quota for generic oxycodone?
5      MS. VANNI:  Object to form.
6      THE WITNESS:  I don't know
7  how you define persuaded.  I would
8  say that -- I would say that we
9  received adequate quota to meet
10  our share -- our share attainment
11  goal.
12  BY MS. SCULLION:
13      Q.   And do you -- was that
14  adequate quota based on something more
15  like the Prozac conversion rate or the MS
16  Contin conversion rate?
17      A.   You know, I don't recall.
18  Basically, we went down there.  We had a
19  meeting with the FDA.  It went into
20  whatever deliberations they engaged in.
21  They come back and tell you here it is.
22  Here's your answer.
23      Q.   Okay.
24      A.   And that's what I remember.

71  (Pages 278 to 281)

Page 282

1      Q.   You said -- you said the
2   FDA.  Do you mean the DEA?
3      A.   I'm sorry, the DEA.  I
4   apologize.
5      Q.   Okay.
6      A.   DEA.
7      Q.   That's okay.
8      A.   DEA.
9      Q.   That's all right.  I
10  understood.  I just wanted to be sure
11  that I understood you correctly.
12     A.   And thank you for correcting
13  me.
14     Q.   Sure.  Sure.  Now, the next
15  part of the presentation concerns the
16  Endo risk management plan.  It's on Page
17  8.  Do you see that?
18     A.   Yes.
19     Q.   And that was presented by
20  Mr. Barto, correct?
21     A.   Yes.  We
22  compartmentalized -- we compartmentalized
23  the presentation based on our areas of
24  expertise.  And that's the way it was

Page 283

1   organized.
2      Q.   Okay.  As VP for generics
3   with oversight of Endo's generic
4   oxycodone ER product, were you at least
5   familiar with the basic contours of
6   Endo's risk management plan for that
7   product?
8      A.   I don't know how you mean --
9   excuse me, how you mean contours?
10        MS. VANNI:  Objection.
11        THE WITNESS:  Basically what
12  happened in Endo, if I remember
13  correctly, there was, like, a
14  scientific kind of committee that
15  was setup by management.  In
16  addition to doing, you know, the
17  brand marketing stuff and all the
18  things that we had discussed
19  earlier, they would have been
20  involved in the risk management
21  thing.
22        So it was compartmental.
23  Again, take the commercial people
24  out of it.  It was designed to be

Page 284

1   what was required to meet the FDA
2   and DEA -- any regulatory
3   criteria, keep the commercial --
4   have a firewall so the commercial
5   people couldn't -- not that I
6   would have, but couldn't influence
7   any kind of risk management plan.
8   It was designed to be based on the
9   science of the product and what
10  was required by the regulatory
11  authorities, whether it be at FDA
12  or DEA, whoever the regulatory
13  authority was.  In this case it
14  was the DEA we were meeting with.
15  BY MS. SCULLION:
16     Q.   Did you ever have the chance
17  to review the risk management plan for
18  oxycodone?
19     A.   I'm sure I got a copy of it.
20        MS. SCULLION:  Do we have
21  that, the risk management, the
22  clean one?
23        Sorry, one second.
24        (Document marked for

Page 285

1   identification as Exhibit
2   Endo-Stevenson-15.)
3   BY MS. SCULLION:
4      Q.   Mr. Stevenson, let me hand
5   you what's been marked as Exhibit 15.
6      A.   Thank you.
7      Q.   Again, Exhibit 15, we've
8   started with a metadata page so you can
9   see at the top again in the document
10  identification box under custodian, you
11  are listed there.
12     A.   Oh, yeah, I'm sure it was in
13  my file.
14     Q.   Okay.  And I'll acknowledge
15  at the bottom of the page, I think
16  there's some -- maybe some --
17        MS. VANNI:  Wite-Out.
18  BY MS. SCULLION:
19     Q.   -- Wite-Out.  It is just a
20  remnant of, I think, Kseniya having
21  e-mailed the information, which we're
22  happy to show you.  And the body of the
23  document itself, which begins at
24  ENDO-OPIOID_MDL-04137306.

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1      Do you see this is a risk
2   management plan for opioid analgesics
3   focused on oxycodone ER?
4      A.   Yes.
5      Q.   And it's a red-line.  It's a
6   marked-up, right?
7      A.   Yes.
8      Q.   Okay.  But at least based on
9   the metadata, you would have at least
10  seen this markup, right?
11     A.   Yeah.
12         MS. VANNI:  Object to form.
13         THE WITNESS:  I already
14     testified.  I already testified to
15     that.
16  BY MS. SCULLION:
17     Q.   Yep.  I just want to be able
18  to show it to you there.
19         MS. SCULLION:  And then the
20     actual clean version?  It's a
21     little easier to read.  All right.
22     (Document marked for
23     identification as Exhibit
24     Endo-Stevenson-16.)

Page 287

1   BY MS. SCULLION:
2      Q.   Let me hand you what's been
3   marked as Exhibit 16.  Exhibit 16 is
4   Bates-stamped ENDO-OPIOID_MDL-01500831,
5   and this is a clean copy --
6   non-marked-up -- a clean copy of the risk
7   management plan for opioid analgesics,
8   focused on oxycodone ER.
9      Do you see that?
10     A.   Yes.
11     Q.   Okay.  If you'll go to
12  page -- again, we've marked these in the
13  upper right-hand corner with E0778
14  number.  If you go to Page E0778.5 in the
15  upper right-hand corner.
16     A.   Yes.
17     Q.   Looking at the first full
18  paragraph there.  It says, "Thus, Endo's
19  RMP is tailored to fit the needs of a
20  generic drug that will protect against
21  improper use, abuse, and diversion."
22     Do you see that?
23     A.   Yes.
24     Q.   And the first element listed

Page 288

1   there is product labeling, correct?
2      A.   Yes.
3      Q.   Okay.  And the second is,
4   "Strong educational initiatives in place
5   and planned regarding the proper
6   prescribing and clinical use of opioid
7   analgesics as a class (though not
8   specific to oxycodone ER generic.  These
9   educational initiatives can be considered
10  a component of the RMP since they will
11  have a direct impact on appropriate use
12  of the drug)."
13     Do you see that?
14     A.   Yes.
15     Q.   And is that consistent with
16  your understanding that the -- Endo had
17  in place and was putting in place general
18  educational initiatives concerning opioid
19  analgesics as a class?
20     A.   Yes.  Many of them are
21  outlined in the document, in the DEA
22  presentation that we just covered a
23  moment ago.
24     Q.   Right.

Page 289

1      A.   Pages and pages of them.
2      Q.   Yep.  You are ahead of me
3   there.  Is it also correct -- is it your
4   understanding that those educational
5   initiatives concern the proper
6   prescribing and clinical use of opioid
7   analgesics?
8      A.   Proper prescribing?
9      Q.   I'm just reading what's
10  written here in the risk management plan.
11     A.   Yes, yes, yes.
12     Q.   Okay.  The proper
13  prescribing --
14     A.   Yes.
15     Q.   -- and clinical use of
16  opioid analgesics?
17     A.   Yes, yeah.
18     Q.   That's what these
19  educational initiatives were about,
20  right?
21         MS. VANNI:  Object to form.
22         THE WITNESS:  Yes.  In --
23     yes.
24  BY MS. SCULLION:

73 (Pages 286 to 289)

Page 290

1    Q.   And as you indicated, the
2  next couple pages then lay out these
3  educational initiatives.  Let's go to
4  Page E778.6.
5    A.   Okay.
6    Q.   And I'm looking at the
7  Section 3.1.1, "Patient and family
8  brochure, 'Understanding your pain:
9  Taking oral opioid analgesics.'"
10       Do you see that?
11   A.   Yes.
12   Q.   This describes a brochure
13 developed by Russell Portenoy, Chris
14 Pasero and Margo McCaffery.
15       Do you see that?
16   A.   Yes.
17   Q.   Do you know any of those
18 individuals?
19   A.   No.
20   Q.   Okay.  And it indicates that
21 the brochure was developed by -- via an
22 unrestricted educational grant; is that
23 right?
24   A.   Yes.

Page 291

1    Q.   Do you recall Ms. Kitlinski,
2  Linda Kitlinski administering those
3  grants for Endo when you were there?
4    A.   The name sounds familiar.  I
5  don't know.  But I don't know what her --
6  I can't recall what her exact role or
7  title was.
8    Q.   Okay.  And as indicated
9  here, this was -- what's described is a
10 brochure that was intended to be
11 presented to patients, patient brochure,
12 right?
13   A.   Yes, and pharmacist.
14   Q.   Okay.  Correct.  Was also
15 presented to pharmacists -- it says
16 pharmacists for their patients.
17   A.   Right.  But it was
18 physicians and pharmacists for their
19 patients, yes.
20   Q.   If you'll go to Page E778.8?
21   A.   Okay.
22   Q.   I just want to draw your
23 attention to Section 3.2.1.  That's
24 labeled, "National Initiative on Pain

Page 292

1  Control (NIPC)."
2        Do you see that?
3    A.   Yes.
4    Q.   Do you recall the National
5  Initiative on Pain Control?
6    A.   Endo had multiple programs.
7  You know, I don't remember each one.
8  Other people handled that, was in their
9  area of expertise.  And it was scientifically
10 driven.  And the commercial people were
11 out of it.  So I -- you know, I don't
12 recall each individual program they had.
13 I know they had educational programs.
14   Q.   Okay.  You've said a few
15 times -- I think we actually began the
16 deposition talking about this concept.
17 When you say the commercial people were
18 out of it --
19   A.   Excluded from -- excluded
20 from discussions, because, as I testified
21 earlier, in most cases, they want the
22 experts in the field, in this case, this
23 is scientific material, the people
24 involved were on the side -- I think Endo

Page 293

1  had a scientific affairs committee of
2  some kind.  And most of the people on
3  there, a lot of them were MDs.  And that
4  was their background.  And that's who the
5  executive management of the company
6  wanted working on these.  And they didn't
7  want so-called commercial people to get
8  involved with it.
9        The commercial people could
10 look at it.  Perhaps offer their input.
11 I had none.  You know, these were written
12 by the experts in this area, regulatory
13 and pharmacovigilance, et cetera, and you
14 know, this is what -- there was no reason
15 for the commercial people to get
16 involved.
17       So that's the way it was set
18 up.
19   Q.   Okay.  As you say, the
20 commercial people weren't to have any
21 input into the substance of these
22 initiatives, right?
23       MS. VANNI:  Object to form.
24       THE WITNESS:  It wasn't --

74  (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    was -- it was designed to, here it
2    is kind of thing.  Here is the
3    plan.
4    BY MS. SCULLION:
5        Q.   Right.  But the question
6    is -- and -- but the policy was that the
7    commercial people weren't supposed to
8    have any input into --
9        A.   No, no --
10       Q.   -- the educational
11   initiatives, right?
12           MS. VANNI:  Let her finish
13   her question.
14           THE WITNESS:  No, no input.
15           MS. SCULLION:  Thank you.
16   BY MS. SCULLION:
17       Q.   And just following through
18   on the national initiative on pain
19   control.  It's described here as "a CME
20   accredited educational program solely
21   supported by Endo Pharmaceuticals."
22           Do you see that?  The very
23   first sentence?
24       A.   Yes.

Page 295

1        Q.   Okay.  Let's put aside the
2    risk management plan for the moment.  I
3    want to go back and now just talk about
4    generic oxycodone and Endo's plans around
5    that product.
6            We looked at the GAO report.
7    You don't recall seeing it, right?
8        A.   Correct.
9        Q.   Okay.  But fair to say that
10   despite the GAO report and despite some
11   of the media reports that you generally
12   referenced that discussed problems
13   associated with OxyContin, that Endo did
14   go ahead and eventually launch its
15   generic oxycodone ER product, right?
16           MS. VANNI:  Object to form.
17           THE WITNESS:  We launched a
18   product that was approved by the
19   FDA.
20   BY MS. SCULLION:
21       Q.   Right.  And Endo launched
22   that product after it had won the patent
23   case initially on appeal, correct?
24       A.   Correct.

Page 296

1        Q.   All right.  But then while
2    the product was -- was out in the
3    marketplace, there was a reversal, right,
4    at the federal circuit?
5        A.   We went on appeal.  I don't
6    know what the vote was, two to one, three
7    to zero.  But then Purdue did not give
8    up.  They went and asked for an en banc
9    appellate court ruling for the entire
10   appeals court to rule and they -- the
11   appellate court did not overturn the
12   case.  They remanded it back to the lower
13   court.
14           And my -- my recollection is
15   that they had a -- they -- if I remember
16   correctly, they wanted to find out -- the
17   lower court had to find out the state of
18   mind of the formulator or somebody at
19   Purdue at the time.  And it became -- it
20   was pretty nebulous.  So the decision was
21   made to enter into a settlement to
22   withdraw the product and all the generic
23   players, ourselves included, negotiated
24   an exit from the market with Purdue

Page 297

1    Pharma.
2        Q.   Let's take this -- going to
3    take it one step at a time.
4            MS. SCULLION:  Can I have
5    Tab 47.
6            (Document marked for
7    identification as Exhibit
8    Endo-Stevenson-17.)
9    BY MS. SCULLION:
10       Q.   So let me hand you what's
11   been marked as Exhibit 17.  And
12   Exhibit 17 is a press release from Endo
13   dated February 6, 2006.  And it's
14   entitled Endo Pharmaceuticals to continue
15   to market its bioequivalent version of
16   OxyContin, correct?
17       A.   Yes.
18       Q.   And this explains that as of
19   February 6, 2006, in the first line it
20   says, "Endo Pharmaceuticals today
21   announced that its wholly owned
22   subsidiary, Endo Pharmaceuticals, Inc.,
23   will continue its commercial sales in its
24   bioequivalent version of OxyContin at

75  (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    this time."
2         Did I read that correctly?
3         A.   Yes.
4         Q.   And the paragraph then goes
5    to explain that Endo is continuing its
6    commercial sales of OxyContin -- sorry,
7    of its bioequivalent version of
8    OxyContin, even though -- look in the
9    last line of the paragraph -- the federal
10   circuit issued a new opinion on
11   February 1, 2006, as you said, that
12   remanded the case to the District Court
13   for further consideration, correct?
14        MS. VANNI:  Object to form.
15        THE WITNESS:  Yes.
16   BY MS. SCULLION:
17        Q.   So fair to say that as of
18   February 6, 2006, Endo was now marketing
19   its generic version of OxyContin --
20   OxyContin at risk?
21        MS. VANNI:  Object to form.
22   BY MS. SCULLION:
23        Q.   Right?
24        A.   That's not my understanding,

Page 299

1    but I'm not a lawyer.
2         Q.   Okay.  Well, let's go --
3    have you ever heard someone talking about
4    launching a product, a generic product at
5    risk?
6         A.   I'm sorry, could you restate
7    that?
8         Q.   Sure.  Have you ever heard
9    anyone talk about the concept of --
10        A.   Yeah, I'm familiar with the
11   concept of launching at risk, yes.
12        Q.   Not asking you for a legal
13   opinion.  From your understanding as a
14   professional in the generic drug
15   industry, what does that mean, to launch
16   at risk?
17        A.   Well, launching at risk,
18   this -- this was an unusual case that no
19   one -- I had never encountered anything
20   like this.  Normally -- but to answer
21   your question, an at-risk launch means
22   that you launch the product with only the
23   District Court's opinion.  So if the
24   District Court said -- if the District

Page 300

1    Court said you didn't infringe or
2    whatever the ruling was that was in your
3    favor, you were then able legally to
4    launch the product.  The risk was you
5    could be overturned on appeal.
6         Q.   Right.
7         A.   This case was different.  We
8    won on the lower court, we won on appeal,
9    and then this was remanded back.
10        So at the time, management
11   decided that we did not have to withdraw
12   the product.  However, it was not stated
13   in the press release, I don't believe, I
14   haven't read it all, is that we had
15   entered into negotiations with Purdue
16   Pharma to have an orderly exit from the
17   market.
18        Q.   Well, let's -- let's take it
19   one step at a time.
20        So as you said there was a
21   remand as of February 1, 2006, back to
22   the District Court.  And if you go down
23   two more paragraphs, it says, "In the
24   event that there is a final

Page 301

1    non-appealable judgment that produced
2    patents that are valid and enforceable,
3    Endo could face substantial liability for
4    patent infringement and be obligated to
5    pay Purdue damages in an amount to be
6    determined by the District Court,"
7    correct?
8         A.   Yes.
9         Q.   Okay.  So, these -- and this
10   press release, I'll submit to you, does
11   not actually discuss any ongoing
12   discussions at that point with Purdue.
13        So let me ask you this
14   question.  So given the possibility as it
15   says of facing substantial liability, if,
16   on remand there were a judgment that
17   produced patents were valid and
18   enforceable, is it fair to say that at
19   this point Endo was continuing to market
20   and now marketing at risk?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  You know, I'm
23   not a lawyer so I don't know how
24   it would be categorized.

76 (Pages 298 to 301)

Page 302

1    We were given -- my
2  recollection is, when this came
3  out, the feeling was we would,
4  what I was told at the highest
5  levels of the company is that we
6  could -- they were engaged in
7  discussions with Purdue Pharma.
8  If those discussions had not gone
9  well, would we have exited, I
10  don't know.  That is a what-if,
11  it's speculation.
12    What I do know is that we
13  didn't have to -- the feeling was
14  there was a risk to the company by
15  pulling the market, the product
16  off the market right away.  And
17  that wasn't desirable to do that.
18  At the same time we also knew we
19  had this issue to deal with.  And
20  so, my recollection is that that
21  led to discussions with Purdue
22  Pharma that led to us being able
23  to continue to market the product
24  until December 31, 2006.

Page 303

1    MS. SCULLION:  Okay.  Let's
2  go to Tab 63.
3    (Document marked for
4  identification as Exhibit
5  Endo-Stevenson-18.)
6  BY MS. SCULLION:
7    Q.  Let me hand you what's been
8  marked as Exhibit 18.
9    Exhibit 18 is a copy of Endo
10  Pharmaceuticals 10-K for the fiscal year
11  ended December 31, 2006.
12    MS. SCULLION:  18, right?
13  BY MS. SCULLION:
14    Q.  And, Mr. Stevenson, let me
15  take you to Page 15 of the 10-K.
16    A.  Okay.
17    Q.  And under the heading,
18  Generic Products, the second paragraph
19  again discusses the -- you're not on the
20  page, hold on.  I'll wait till you are
21  there.
22    A.  Okay.  I'm there.
23    Q.  Okay.  Second paragraph
24  under generics product discusses again

Page 304

1  the litigation between Endo and Purdue
2  concerning the patents, right?
3    A.  Yes.
4    Q.  Now, this 10-K states,
5  second sentence from the bottom of that
6  same paragraph, "On August 28, 2006, we
7  executed a settlement agreement with
8  Purdue pursuant to which we continued to
9  selling" -- sorry.  "Continued selling
10  our oxycodone extended-release products
11  until December 31, 2006."
12    Did I read that correctly?
13    A.  Yes.
14    Q.  So, now -- and, again, this
15  is the 10-K filed with -- with the SEC,
16  right?
17    A.  Yes.
18    Q.  One would expect Endo to be
19  completely accurate in its discussion of
20  when it actually entered into a
21  settlement agreement with Purdue, right?
22    A.  Yeah.  I'm -- I can tell you
23  that it's on or about that time that's
24  when it -- I remember it was during NACDS

Page 305

1  when the settlement was done.  So yes,
2  mm-hmm.
3    Q.  Okay.  But we saw that,
4  the -- earlier, the press release that
5  was Exhibit 17 was from February of 2006,
6  right?
7    A.  Yes.
8    Q.  So fair to say that between
9  February 2006 and August 28, 2006, Endo
10  was, in fact, selling this oxycodone
11  extended-release product at risk, because
12  it didn't yet have a settlement agreement
13  signed, right?
14    MS. VANNI:  Object to form.
15    THE WITNESS:  Yeah, I can't
16  testify they were selling at risk.
17  Because my understanding was
18  that -- that there was still a
19  long way to go in the legal
20  proceedings.
21    So they had already
22  initiated I believe -- I don't
23  know when they started discussions
24  with Purdue.  I would think it

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    started pretty quickly.  And, you
2    know, those discussions took a
3    long time to come to fruition.
4    There were certain things we
5    wanted and -- in that.  And so it
6    didn't happen overnight.
7    BY MS. SCULLION:
8        Q.   Right.  Fair to say, though,
9    until the settlement agreement is signed,
10   you don't know that you have a deal
11   right?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  You don't have
14       a deal until it's signed, no.
15   BY MS. SCULLION:
16       Q.   Right.  And according to the
17   10-K, it wasn't signed until August 28th,
18   right?
19       A.   Correct.
20       Q.   Okay.  And again, as you
21   say, then Endo discontinued sale as of
22   December 31st, 2006, right?
23       A.   Correct.
24       Q.   And that was because of the

Page 307

1    settlement agreement, right?
2        A.   Correct.
3        Q.   That wasn't for any safety
4    reasons, right?
5           MS. VANNI:  Object to form.
6           THE WITNESS:  Correct.
7    BY MS. SCULLION:
8        Q.   Endo didn't decide this drug
9    is too risky, we are taking it off the
10   market, right?
11          MS. VANNI:  Object to form.
12          THE WITNESS:  Correct.
13   BY MS. SCULLION:
14       Q.   Okay.  As we discussed
15   earlier, there was a fair amount of media
16   attention with respect to, to use your
17   phrase, abuse of the use of OxyContin in
18   the early 2000s, right?
19          MS. VANNI:  Object to form.
20          THE WITNESS:  Yes, you know,
21      I assume it was early 2000s.  It
22      was a long time ago.
23   BY MS. SCULLION:
24       Q.   Okay.  And Endo engaged a

Page 308

1    media relations firm to help it get out
2    ahead of any potential issues with
3    respect to its generic version of
4    OxyContin, right?
5           MS. VANNI:  Object to form.
6           THE WITNESS:  They may have.
7    BY MS. SCULLION:
8        Q.   Okay.  Well, let's take a
9    look at that.
10          MS. SCULLION:  Can I have
11      Tab 66, please.  Let's not use
12      that one then.
13          Let me have tab 68, please.
14          (Document marked for
15      identification as Exhibit
16      Endo-Stevenson-19.)
17   BY MS. SCULLION:
18       Q.   I'll hand you what's been
19   marked as Exhibit 19.
20          MS. VANNI:  Thank you.
21   BY MS. SCULLION:
22       Q.   And Exhibit 19, again, we
23   have the metadata on the front to show
24   that this was coming from your custodial

Page 309

1    file.  And then if you turn to the first
2    page of the exhibit, you see it's a
3    presentation by Cohn & Wolfe Healthcare
4    dated May 14th, 2004, the subject of
5    which is corporate reputation management?
6        A.   Yes.
7        Q.   Do you recall Cohn & Wolfe
8    Healthcare being engaged by Endo to
9    assist it with public relation issues?
10       A.   No, I do not recall.
11       Q.   Okay.  You have no reason to
12   doubt that Cohn & Wolfe Healthcare was in
13   fact engaged, though, right?
14       A.   Well, yeah, I guess my point
15   is I, the generic side of the business,
16   did not hire them.
17       Q.   Okay.  This concerns -- if
18   we go to the next page, the agenda
19   states, "Preserving and enhancing Endo's
20   reputation, 3218 launch and beyond."
21          Do you see that?
22       A.   Yes.
23       Q.   3218 launch, that was the
24   launch of generic -- the generic

78  (Pages 306 to 309)

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1    oxycodone ER product, right?
2        A.   Yes.
3        Q.   Okay.  So this did, in fact,
4    concerned you to the extent that it
5    concerned that product, right?
6        MS. VANNI:  Object to form.
7        THE WITNESS:  It concerned a
8        product.  My only testimony is I
9        did not hire them.
10   BY MS. SCULLION:
11       Q.   Got it.  But again, this
12   document comes from your file.  Fair to
13   say that you would have attended this
14   presentation?
15       MS. VANNI:  Object to form.
16       THE WITNESS:  Could be.
17       Don't remember it.  But could be.
18   BY MS. SCULLION:
19       Q.   Okay.  All right.  If you go
20   to, this is a little bit tough.  There is
21   no page numbers.  Turn the page, the
22   fourth -- I apologize.  I think it's
23   fourth page.  It says, "Endo, rough seas
24   ahead"?

Page 311

1        Do you see that?
2        A.   Yes.
3        MS. SCULLION:  Let me make
4        sure trial tech will be able to
5        find it.  Thank you.  Sorry, I
6        don't have any page numbers.
7    BY MS. SCULLION:
8        Q.   So "Endo, rough seas ahead,"
9    and the first thing listed are some
10   upcoming milestones, first of which is
11   the 3218 launch.  That's your generic
12   oxycodone, right?
13       A.   Yes.
14       Q.   Then the fentanyl patch
15   launch, was that a generic fentanyl patch
16   that Endo was considering at that point?
17       A.   We were considering it, but
18   we dropped it.
19       Q.   Okay.  And then 3202 launch,
20   that's a reference to the Opana and
21   Opana -- I'm sorry, Opana IR and Opana
22   ER, right?
23       A.   I'm not familiar with what
24   3202 is.  Don't know what that is.

Page 312

1        Q.   Okay.  We'll see if we can
2    find a document to refresh your
3    recollection on that.  But in the
4    meantime, the next bullet point discusses
5    Purdue litigation and disruptive guerilla
6    tactics.  And it says, "Talk to George to
7    get examples of guerilla tactics."
8        Is that you?  Talk to you
9    about the guerilla tactics?
10       A.   Yes.
11       Q.   What were the guerilla
12   tactics?
13       A.   The concern was that -- if I
14   remember correctly, in -- you know, in
15   general terms, that Purdue would threaten
16   customers for buying a generic.  More or
17   less that's what it was.
18       Q.   And then the next bullet
19   point says, "Anti-abuse policy and
20   programs gain attention."
21       Do you see that?
22       A.   Yes.
23       Q.   And there's a reference to
24   national support for state anti-abuse

Page 313

1    programs.  The first bullet under that
2    says, "AG Pappert warns of OxyContin
3    generic in our backyard."
4        Do you see that?
5        A.   Yes.
6        Q.   And that's a reference to
7    Pennsylvania State Attorney General at
8    the time, Jerry Pappert, right?
9        A.   If you say so.
10       Q.   I did check and he was the
11   attorney general at the time.
12       A.   It's always good to learn
13   something new every day.
14       Q.   I say that.
15       Do you recall Pennsylvania
16   Attorney General warning about concerns
17   of oxy -- generic OxyContin?
18       A.   No.
19       Q.   All right.  And then two
20   more bullet points down, again references
21   a GAO report that raises interest in and
22   scrutiny of risk management plan
23   implementation.
24       Do you see that?

79  (Pages 310 to 313)

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    A.  Yes.
2        (Document marked for
3    identification as Exhibit
4    Endo-Stevenson-20.)
5    BY MS. SCULLION:
6        Q.  Let me quickly show you
7    Exhibit 20, only to help you -- to help
8    you understand the 3202.  Exhibit 20 is
9    ENDO-OPIOID_MDL-01709708.  And this is an
10   e-mail from Mr. Barto to a variety of
11   folks.  And you are cc'd.
12       Do you see that?
13       A.  Yes.  It looks to me like
14   most of the people on this list were vice
15   presidents, not all perhaps, but yeah.
16       Q.  And Mr. Barto writes, "The
17   attached submission regarding elements of
18   the EN3202/03 risk management plan was
19   made to the FDA yesterday."
20       Do you see that?
21       A.  Yes.
22       Q.  And then if you turn to the
23   next page, you can see in the subject
24   matter line of the letter, Mr. Barto

Page 315

1    referencing, it says oxymorphone
2    extended-release tablets and oxymorphone
3    immediate release tablets.
4        Do you see that?
5        A.  Yes.
6        Q.  Okay.  Showing you that,
7    just so you have some reference for what
8    EN3202 and 03 is, as referring to the
9    oxymorphone ER and IR?
10       A.  Okay.
11       Q.  Okay.
12       A.  That's probably why I didn't
13   recognize it, because it's a brand
14   product.
15       Q.  Understood.
16       Okay.  So going back to
17   Exhibit 19.  There is a page a couple
18   pages back that's headed "Situation for
19   Launching 3218" at the top.
20       Okay.
21       Q.  Do you see that?
22       A.  Yeah.
23       Q.  And what's identified here
24   is a situation for launching.  Again,

Page 316

1    this is the generic oxycodone product.
2    The first element -- sorry, the first
3    item listed in the situations is, "Opioid
4    category synonymous with abuse."
5        Do you see that?
6        A.  Yes.
7        Q.  And that was a concern
8    Endo -- that was something that Endo was
9    concerned about at the time, right, there
10   was an opioid category that was kind of
11   synonymous with abuse?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  Well, I can't
14       testify to that.  This was written
15       by some marketing firm.  And that
16       was what they wrote down on a
17       piece of paper.  That doesn't mean
18       that Endo agreed with it.
19   BY MS. SCULLION:
20       Q.  Were you concerned that the
21   opioid category was becoming synonymous
22   with abuse?
23       A.  To be honest, no, because I
24   saw it as helping people relieve their

Page 317

1    pain, pain management.
2        Q.  Did you think that concerns
3    about abuse of opioids at that time were
4    overstated?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  I didn't think
7        they were overstated or
8        understated.
9    BY MS. SCULLION:
10       Q.  Okay.  All right.  Let's go
11   to the case study section, which begins
12   on the next page.  If you can turn back,
13   the first case study concerns Monsanto.
14   The next says Purdue Pharma.  The third
15   case study here is Endo.
16       Do you have that one?
17       A.  Yes.
18       Q.  All right.  And what's
19   described here is -- in the first bullet
20   point is, "AG Pappert issues press
21   release on April 22nd, warning of new
22   wave of abuse from generic OxyContin."
23       Did I read that correctly?
24       A.  Yes.

80  (Pages 314 to 317)

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1      Q.   And then it indicates that,
2   "An AP article was released at 3:40
3   focused on concerns of the Attorney
4   General," correct?
5      A.   Yes, that's what it says.
6      Q.   All right.  Then it
7   indicates that at 3:45, five minutes
8   later, Endo coordinates an interview with
9   Dr. Galer and AP reporter.
10     Do you see that?
11     A.   Yes.
12     Q.   And Dr. Galer, that was
13  Dr. Brad Galer, right?
14     A.   Yes.
15     Q.   And who was he at Endo at
16  the time?
17     A.   I don't remember his exact
18  title, but he was involved in the science
19  side of the business.
20     Q.   Okay.  The science side of
21  the business is -- five minutes after
22  release of an article that's discussing
23  concerns from the Attorney General, State
24  of Pennsylvania, the science side of Endo

Page 319

1   is on the phone with an AP reporter.
2   That's what this is indicating, right?
3      MS. VANNI:  Object to form.
4      THE WITNESS:  That's what it
5      indicates.  I don't know if that
6      happened.  I have no way of
7      knowing.
8   BY MS. SCULLION:
9      Q.   Then we see, at 4:38, so
10  less than an hour after the first AP
11  article, a second AP article now is
12  released.  And it's described as having
13  a, quote, "balanced messages."
14     Do you see that, closed
15  quote?
16     A.   Yes.
17     Q.   And the first balanced
18  message indicated for the second AP
19  article is, "OxyContin has been a godsend
20  to patients suffering from severe,
21  long-lasting pain."
22     Did I read that correctly?
23     A.   Yes.
24     MS. SCULLION:  Can I have

Page 320

1   Tab 77.
2   BY MS. SCULLION:
3      Q.   Now, you are aware that for
4   some people, OxyContin was not a godsend,
5   right?
6      MS. VANNI:  Object to form.
7      THE WITNESS:  I'm aware of
8      what I testified to earlier, that
9      there was abuse -- some of --
10     there was abuse of OxyContin by
11     some.  But that they were in the
12     overwhelmingly vast minority
13     compared to the number of people
14     that took, in this case OxyContin
15     to manage their pain.
16  BY MS. SCULLION:
17     Q.   You are aware, are you not,
18  that for some people who took OxyContin
19  under a physician's direction, not
20  abusing it, but under direction, that
21  they described OxyContin as hell.  You
22  are aware of that, right?
23     MS. VANNI:  Object to form
24     and foundation.

Page 321

1      THE WITNESS:  No, I'm not
2      aware of that.
3   BY MS. SCULLION:
4      Q.   Okay.
5      (Document marked for
6      identification as Exhibit
7      Endo-Stevenson-21.)
8   BY MS. SCULLION:
9      Q.   Let me show you Exhibit 21.
10     And Exhibit 21 is a copy of
11  a May 5, 2016 article from the LA Times.
12  And it's titled "You want a description
13  of hell:  OxyContin's 12-hour problem."
14     Do you see that?
15     A.   Yes.
16     Q.   Did you read this article
17  when it came out?
18     A.   No.  It was -- in May, May
19  5, 2016, I was in my noncompete phase.
20     Q.   Okay.  Your -- I won't ask
21  you to read it now since you haven't read
22  it before.  But fair to say that, at
23  least according to this article, certain
24  patients described OxyContin as -- as

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1    hell and not a godsend, right?
2         MS. VANNI:  Object to form.
3         THE WITNESS:  Well, yeah, I
4    just -- for the record, I think
5    it's pure speculation to know
6    whether they abused a product or
7    didn't abuse a product, whether
8    they took an opioid like
9    OxyContin, drank alcohol, or -- or
10   did other nefarious things that
11   were contra to the indication on
12   the label.
13        So the title could be
14   misleading.  I don't know what
15   caused their hell, the 12 hours of
16   hell, just for the record.
17   BY MS. SCULLION:
18        Q.   Now, going back to
19   Exhibit 19.
20        A.   19.
21        Q.   Yep.
22        A.   Be good at numbers.
23        Q.   I'm getting better.
24             Same page we were just on,

Page 323

1    which discusses the AP article that came
2    out, second AP article after Endo
3    coordinated an interview between
4    Dr. Galer and the AP reporter.
5         The third bullet point with
6    respect to balanced messages in that
7    article says, "The company, Endo, plans
8    to monitor for prescription data for
9    signs of abuse and tell doctors that the
10   medication should not be overprescribed."
11        Do you see that?
12        A.   Yes.
13        Q.   Now, I think you've
14   mentioned and testified to rather a
15   number of times, with respect to generic
16   oxycodone ER, Endo wasn't going to be
17   telling doctors anything, right?  Endo is
18   not directly communicating with
19   physicians concerning that generic
20   product, right?
21             MS. VANNI:  Object to form.
22             THE WITNESS:  They were not
23   promoting it.  I do not know if
24   they sent out informational

Page 324

1    material to doctors.  That I don't
2    recall.
3    BY MS. SCULLION:
4         Q.   Did you ever see any
5    informational materials that went out
6    directly to doctors concerning --
7         A.   I don't recall --
8         Q.   Sorry.
9              -- concerning generic
10   oxycodone ER?
11        A.   I don't recall any.
12        Q.   Do you recall seeing any
13   "Dear Doctor" letters concerning generic
14   oxycodone ER that told the doctors
15   that -- that that medication should not
16   be overprescribed?
17        A.   I don't recall any.
18        Q.   Okay.  And turn the page --
19        A.   But I -- can I -- I do want
20   to stipulate though, it says --
21        Q.   I'm so sorry, I apologize,
22   Mr. Stevenson.  Your counsel will have
23   the opportunity to ask you questions, and
24   I'm certain that she will.  So I'm trying

Page 325

1    to move on to the next part of this
2    document.  Sorry.
3              The recommendations section
4    on -- starts with communications
5    imperatives.  Do you see that?
6         A.   Yes.
7         Q.   And do you see that one of
8    the communications imperatives identified
9    a must have as part of a crisis
10   preparedness program is, looking at the
11   third bullet point, "A strategy to
12   neutralize critics/activists."
13        Do you see that?
14        A.   Yes.
15        Q.   Those are pretty strong
16   words, right, neutralize?
17             MS. VANNI:  Object to form.
18             THE WITNESS:  I didn't write
19   them.  They were written by a PR
20   firm.
21   BY MS. SCULLION:
22        Q.   Well -- just to make sure we
23   are on the same page.  This was, in fact,
24   a PR firm that Endo hired.  But I -- I

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    will show you.  I know you said you don't
2    remember.  Let me show you, so you know
3    the basis on which we are saying that.
4    You don't have to take my word for it.
5            (Document marked for
6            identification as Exhibit
7            Endo-Stevenson-22.)
8    BY MS. SCULLION:
9        Q.  Let me show you what's been
10   marked as Exhibit 22.
11           And Exhibit 22 is a copy of
12   Endo Health Solutions Inc. and Endo
13   Pharmaceutical Inc.'s -- excuse me, Endo
14   Pharmaceuticals Inc.'s supplemental
15   objections and responses to plaintiffs'
16   second set of interrogatories numbers --
17   and I'm not going to read the series of
18   numbers.
19           If you'll go to Page 35.
20       A.  Can I just ask a question?
21       Q.  Absolutely.
22       A.  What -- what is the date of
23   this document?
24       Q.  Sure.  The date of this

Page 327

1    document is November 15, 2018.
2        A.  2018, okay.
3        Q.  Correct.  If you'll go to
4    Page 34.
5        A.  34.
6        Q.  And I'm looking at
7    Interrogatory Number 31.
8        A.  34, okay.
9        Q.  Okay.  And this is an
10   interrogatory, you can see, that asks
11   Endo to identify all vendors, including
12   but not limited to, public relations
13   firms you have retained for purposes
14   relating to opioids.  And it -- it asks
15   for certain details.
16           And on the next page, 35,
17   you see listed under vendor, Cohn &
18   Wolfe.  It says, "/GCI Health."  And it
19   identifies the purpose for hiring that
20   vendor as marketing and promotional
21   materials, public relations.
22           Do you see that?
23       A.  Yes.
24       Q.  Okay.  So let's go back

Page 328

1    to --
2        A.  But Cohn & Wolfe did not do
3    any marketing or promotional materials
4    for the generic business, just for --
5        Q.  That's fine.
6        A.  For the record.
7        Q.  That's fine.
8            Here, here we're looking in
9    Exhibit 19 at what is more traditionally
10   called public relations.
11       A.  Yes.
12       Q.  Okay.  So let's -- we were
13   on the page communications imperatives.
14       A.  Yes.
15       Q.  And the strategy to
16   neutralize critics/activists, right?
17       A.  Yes.
18       Q.  Just getting us back to
19   where we are.
20           Now, again, what's written
21   here is to neutralize the critics and
22   activists.  It doesn't say for example,
23   engage in a thoughtful debate, right?
24           MS. VANNI:  Object to form.

Page 329

1            THE WITNESS:  I had no way
2    of controlling what somebody
3    writes in a PowerPoint
4    presentation who worked for
5    another firm.
6    BY MS. SCULLION:
7        Q.  Just asking.  It doesn't say
8    that, right, it doesn't say engage in a
9    thoughtful debate, right?
10           MS. VANNI:  Object to form.
11           THE WITNESS:  No, it says
12   neutralize, as we've already said
13   five times.
14   BY MS. SCULLION:
15       Q.  It doesn't say give
16   considered attention to the concerns of a
17   community devastated by the opioid
18   epidemic, it doesn't say that, right?
19           MS. VANNI:  Objection to
20   form.
21           THE WITNESS:  No, it doesn't
22   say that.
23   BY MS. SCULLION:
24       Q.  Says neutralize the critics

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1    and -- and activists, right?
2         A.   Yes, that's what it says.
3         Q.   Right.  And common
4    understanding of the term "neutralize"
5    means to stop something from being
6    effective, right?
7              MS. VANNI:  Object to form.
8              THE WITNESS:  I don't know
9         how the -- what the intent of the
10        meaning was in the PowerPoint
11        presentation, since I didn't write
12        it.
13   BY MS. SCULLION:
14        Q.   That's -- that's an
15   understanding of what the -- the term
16   "neutralize" does mean:  Stop something
17   from being effective?
18             MS. VANNI:  Object to form.
19             THE WITNESS:  One could have
20        numerous, numerous definitions.
21        Who knows what was in the state of
22        mind of the individual who wrote
23        it.
24   BY MS. SCULLION:

Page 331

1         Q.   Well, the one thing we do
2    know is they -- they wrote that there
3    must -- the must have was a strategy to
4    neutralize critics and activists.  That's
5    what they did write, right?
6              MS. VANNI:  Object to form.
7              THE WITNESS:  That's what
8         they wrote, yes.
9    BY MS. SCULLION:
10        Q.   Okay.  And then if you'll go
11   two more pages in.  This is part of the
12   presentation of options for media
13   strategy for the 3218 launch.
14             Do you see that?
15        A.   What does it say at the top?
16        Q.   Media strategy for 3218
17   launch, three options?
18        A.   Media -- media launch tab,
19   do you reckon that is what it is?
20             MS. VANNI:  It's not up on
21        the screen.
22   BY MS. SCULLION:
23        Q.   Oh.  That's the one.  Media
24   strategy for 3218 launch, three options.

Page 332

1    I probably told you to go back too far.
2    I apologize.
3         A.   Okay.  Let's start over
4    again.
5         Q.   Yeah.
6         A.   Oh, is that it?
7         Q.   That's it.  Thank you.  I
8    apologize, we don't have page numbers.
9         A.   That's all right.  No
10   problem.  My mistake.
11        Q.   This section is talking
12   about three options for a media strategy.
13   And again, this is for the launch of
14   generic oxycodone ER product, right?
15        A.   Yes.
16        Q.   Okay.  And then if you go to
17   the next page, in discussing the pros and
18   cons of one option, which is to conduct
19   top tier briefings, do you see under the
20   cons section, fourth bullet point down
21   is, "Endo 'blues' story emerges."
22             Do you see that?
23        A.   Yes.
24        Q.   And if you go to the next

Page 333

1    page, which is discussing another
2    potential media strategy option.  Again,
3    under the cons we see listed, "Endo
4    'blues' story emerges."
5              Do you see that?
6         A.   Yes.
7         Q.   And same thing on the last
8    potential strategy under the cons, "Endo
9    'blues' story emerges."
10             Do you see that?
11        A.   Yes.
12        Q.   And that was a reference to
13   the history of abuse of the oxymorphone
14   pills in the '60s and '70s, right?
15             MS. VANNI:  Objection,
16        foundation.
17             THE WITNESS:  I have no
18        knowledge what it is.  I've never
19        heard of it before.
20   BY MS. SCULLION:
21        Q.   You never heard anyone talk
22   about a prior version of oxymorphone
23   being called "the blues"?
24        A.   No.  I have never heard that

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    before.
2         Q.   Okay.
3             MS. SCULLION:  Can I have
4    tab -- Tab 74 and 72.
5             (Document marked for
6    identification as Exhibit
7    Endo-Stevenson-23.)
8    BY MS. SCULLION:
9         Q.   Let me first hand you what's
10   been marked Exhibit 23.
11            Exhibit 23 is an excerpt
12   from a book called "Drug Abuse:  Current
13   concerns and research."
14        A.   What is the date of this
15   document?
16        Q.   If you'll turn to the second
17   page of the exhibit, you can see that
18   this was a book that was copyrighted in
19   1972.
20        A.   Okay.  Thank you.
21        Q.   And again I don't
22   have all the page numbers, so it's a
23   little bit hard to direct you.  But,
24   yeah, in the upper right-hand corner we

Page 335

1    have numbers E137.  Do you see those
2    numbers?
3         A.   I'm sorry, I don't see them.
4    Do you see them?
5             MS. VANNI:  Where is it?
6    I'm sorry.
7             MS. SCULLION:  Sure.  You
8    have these -- upper right-hand
9    corner.
10            THE WITNESS:  I have to get
11   through the --
12            MS. SCULLION:  You have
13   these little numbers that say
14   E137.
15            THE WITNESS:  Oh, at the
16   back.  I see.
17            MS. SCULLION:  Yeah.
18            THE WITNESS:  Okay.  Sorry.
19   BY MS. SCULLION:
20        Q.   Sure.  And so --
21        A.   I'm sorry.  What is the
22   page?
23        Q.   E137.1.
24        A.   Yeah.

Page 336

1         Q.   And this is indicated to be
2    Chapter 35 of this book.  And it is
3    entitled "Oxymorphone Abuse Among
4    Narcotic Addicts."
5             Do you see that?
6         A.   Yes.
7         Q.   And it discusses in the
8    first line, "Numorphan (oxymorphone), a
9    narcotic analgesic developed and first
10   marketed by Endo Laboratories in 1966 has
11   become a drug abuse" -- "a drug of abuse
12   among a sizable segment of the narcotic
13   addict population."
14            Do you see that?
15        A.   Yes.
16        Q.   Okay.  And I think we
17   discussed earlier, oxymorphone was the
18   opioid Endo used in the Opana IR and ER
19   products, right?
20            MS. VANNI:  Object to form.
21            THE WITNESS:  It was a brand
22   product, which I had no
23   involvement.
24   BY MS. SCULLION:

Page 337

1         Q.   I'm just asking the -- you
2    understand that was the same opioid,
3    right?
4             MS. VANNI:  Object to form,
5    foundation.
6             THE WITNESS:  To be honest,
7    you know, I haven't done -- what
8    the derivative is or what was the
9    predecessor of it, I really don't
10   know.  It wasn't my focus.
11   BY MS. SCULLION:
12        Q.   Sure.  We saw earlier in the
13   10-K though that oxymorphone was listed
14   as one of the products that Endo was
15   marketing during your time there?
16        A.   Oh, yeah.  They were
17   marketing several products when I was
18   there.
19        Q.   Okay.  And then if you look
20   under the heading "Background," you'll
21   see in the second paragraph, it says, "On
22   the street Numorphan can be identified by
23   its various subculture names Numorphine,
24   Blue Morphine, Blue Morphan, or Blues."

85  (Pages 334 to 337)

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1         Do you see that?
2      A.   Yes.
3      Q.   If you go to the next page.
4   E137.2, under the heading "The Prevalence
5   of Numorphan Abuse," do you see it says,
6   "The abuse of Numorphan appears to be
7   rather widespread geographically.
8   Without any systematic attempt to gather
9   case histories, we have discovered
10  Numorphan addicts in Florida, Kentucky,
11  Pennsylvania, and New York."
12        Do you see that?
13     A.   Yes.
14        MS. SCULLION:  Let's look at
15     Tab 72.
16        (Document marked for
17        identification as Exhibit
18        Endo-Stevenson-24.)
19  BY MS. SCULLION:
20     Q.   I'll show you what's been
21  marked as Exhibit 24 is
22  Bates-stamped ENDO-OPIOID_MDL-06775127.
23        MS. VANNI:  Just note my
24     objection to the extent that this

Page 339

1         postdates his employment.
2         MS. SCULLION:  Understood.
3   BY MS. SCULLION:
4      Q.   If you go down to the bottom
5   of the first page of Exhibit 24.  I just
6   want to direct your attention to the
7   e-mail.  It's from Robert Reder to a
8   variety of folks.  And it is dated
9   March 6, 2008.
10        Do you see that?
11     A.   Yes.
12     Q.   Okay.  And let's turn to the
13  next page.  You'll see that Dr. Reder is
14  forwarding an item from the New York
15  press entitled "Opana:  A Brief History."
16        Do you see that?
17     A.   Yeah.  Yes.
18     Q.   And just for orientation,
19  the first paragraph states, "Opana, a
20  powerful painkiller that went on the
21  market less than two years ago, is twice
22  as strong as OxyContin with a potential
23  for addiction that rivals the
24  prescription drug that has ravaged the

Page 340

1   lives of thousands of abusers."
2         Do you see that?
3      A.   I see that's what it says.
4      Q.   Okay.  And you were aware
5   that Opana was twice as strong as
6   OxyContin, right?
7         MS. VANNI:  Object to form
8   foundation.
9         THE WITNESS:  No, I was not
10  aware of that.
11  BY MS. SCULLION:
12     Q.   Any reason to doubt the
13  accuracy of that?
14        MS. VANNI:  Objection.
15        THE WITNESS:  I have no idea
16  who Mr. Elzweig is.  I have no --
17  I have no knowledge of what he
18  based his article on.  So I do not
19  know that it was twice as large,
20  one third as large or less.  I
21  have no -- again, as I testified
22  before, whether it's -- what is
23  this drug called?  Numorphan or
24  oxy -- oxymorphone, that's a brand

Page 341

1   product, not a generic.
2         So my involvement was only
3   in the stocking of the product
4   once I took over trade affairs in
5   late '06.  I had no other
6   involvement with the product.  I
7   didn't follow the product.  I
8   wasn't involved in strategic
9   discussions about the product, how
10  the product was promoted or
11  anything else involving the
12  product.
13        You know, I may have gotten
14  copies of documents because I was
15  at the VP level.  What did I do?
16  I put it in my file.  Okay, great.
17  They sent me a document.  It has
18  to go somewhere.  So I put it in
19  my folder.
20        But I was not involved with
21  these brand products whether it
22  was Percocet, oxymorphone ER,
23  Numorphan.
24        MS. VANNI:  And just for the

86 (Pages 338 to 341)

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1    record, I just want to note that
2    you missed my objection, on the
3    "any reason to doubt" question.
4    BY MS. SCULLION:
5        Q.   But we did see earlier in
6    your performance evaluation that you were
7    involved with Opana, at least to the
8    extent of, as you said, facilitating
9    the --
10       A.   Stocking.
11       Q.   -- relationships with the
12   trade on stocking, right?
13       A.   Stocking, yes.  I agree.
14       Q.   Right.  And that was -- and
15   that was an important part of the launch
16   of Opana ER, right, getting that stocked?
17           MS. VANNI:  Object to form.
18           THE WITNESS:  Well, you have
19       to have it stocked, yes.
20   BY MS. SCULLION:
21       Q.   Right.  And when you were
22   helping get that drug stocked, are you
23   telling me that you were not aware that
24   Opana -- that oxymorphone had a history

Page 343

1    of abuse in the 1960s and '70s under the
2    name Blues?
3            MS. VANNI:  Object to form.
4            THE WITNESS:  I was not
5        aware of that.  I've never heard
6        of that before.
7    BY MS. SCULLION:
8        Q.   Okay.  And just, again, to
9    draw your attention in Exhibit 24 to the
10   last paragraph of the article.
11       A.   Oh, 24.  That's this one?
12       Q.   That's the article, right.
13       A.   The last paragraph?
14       Q.   Right.  Which explains,
15   "This isn't the first time that
16   oxymorphone hydrochloride has been
17   available in tablet form.  Until it was
18   taken off the market in the 1970s, it was
19   available in 10-milligram tablets under
20   the brand name Numorphan."
21           Did I read that correctly?
22       A.   Yes.
23       Q.   Okay.  And it goes on to
24   say, "That was the drug referred to as

Page 344

1    'Blues' in the 1989 Gus Van Sant film,
2    Drugstore Cowboy, about a family of
3    traveling drug addicts set in the early
4    1970s."
5            Did I read that correctly?
6        A.   Yes.
7        Q.   Mr. Stevenson, so sitting
8    here today, you're telling me that during
9    the time that you were helping Endo get
10   oxymorphone tablets stocked out in the
11   retail drug chains, no one made you aware
12   of this history of abuse of that opioid,
13   right?
14           MS. VANNI:  Objection.
15           THE WITNESS:  I was not
16       aware of -- I was not aware of
17       anything involving Numorphan.
18       That never came up during my
19       tenure there.
20   BY MS. SCULLION:
21       Q.   Okay.  Fair to say that in
22   terms of the relationships that you were
23   discussing are important to develop with
24   the trade, that you never informed anyone

Page 345

1    in your trade relationships that
2    oxymorphone, in fact, had a history of
3    abuse in the 1960s and '70s, right?
4            MS. VANNI:  Objection.
5            THE WITNESS:  We were
6        stocking an FDA-approved product.
7        The FDA approved a product, and
8        what -- and what the goal was, was
9        to make sure that the product was
10       stocked.  That was, while an
11       important aspect of the product
12       launch, it was not a significant
13       activity for myself.  It was
14       basically in the hands of three
15       national account executives who
16       reported to me at the time.  And
17       that was our only involvement with
18       oxymorphone.
19   BY MS. SCULLION:
20       Q.   Understood.  The question is
21   just, factually, I assume from your prior
22   answers that it's fair to say that when
23   your national account executives were
24   interacting with the trade to get Opana

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1  and Opana ER stocked, as part of the
2  launch, they were not telling the trade
3  that that opioid had a history of abuse
4  in the 1960s or '70's?  Just factually
5  that didn't happen?
6          MS. VANNI:  Objection.
7          THE WITNESS:  They would not
8      be telling them that.
9          (Document marked for
10     identification as Exhibit
11     Endo-Stevenson-25.)
12 BY MS. SCULLION:
13     Q.   Let me hand you what's been
14 marked -- sorry.  Do I have an extra copy
15 of this?  Yeah, I do.
16         Let me hand you what's been
17 marked as Exhibit 25.
18         MS. VANNI:  Thank you.
19 BY MS. SCULLION:
20     Q.   Exhibit 25 is Bates-stamped
21 ENDO-OPIOID_MDL-00156150.
22         And, Mr. Stevenson, have you
23 seen Exhibit 25 before?
24     A.   No.

Page 347

1      Q.   Okay.  And you can see it's
2  a letter on Endo letterhead dated
3  July 10th, 2000.  And it's addressed to
4  Dr. Cynthia McCormick at the Division of
5  an Anesthetic, Critical Care, and
6  Addiction Drug Products at the FDA.
7          Do you see that?
8      A.   Yes.
9      Q.   Okay.  And the reference,
10 the Re line is to "Numorphan
11 controlled-release tablet correspondence
12 to provide additional information."
13         Do you see that?
14     A.   Yes.
15     Q.   And do you recall we just
16 looked in that article in Exhibit 24,
17 that discussed the fact that oxymorphone
18 had previously been sold under the name
19 Numorphan?
20         MS. VANNI:  Objection.
21     Foundation.
22         THE WITNESS:  Yes.
23 BY MS. SCULLION:
24     Q.   Okay.  Now, July -- as of

Page 348

1  July 10, 2000, the Endo Pharmaceuticals
2  entity referred to here, that's the Endo
3  Pharmaceuticals entity that you
4  eventually did go to work for, right?
5      A.   Yes.  But not in 2000.  I
6  was not there.
7      Q.   Understood.  This is -- this
8  is the -- what we call the modern Endo
9  entity, right?
10         MS. VANNI:  Object to form.
11         THE WITNESS:  I only know it
12     as Endo Pharmaceuticals.
13 BY MS. SCULLION:
14     Q.   Okay.  And if you'll go down
15 to the third bullet point on the first
16 page of this letter, there is a
17 discussion that, "On October 18, 1971,
18 Endo referenced a Federal Register notice
19 in which FDA classified Numorphan tablets
20 and injection as effective."
21         Do you see that?
22     A.   Yes.
23     Q.   That's an indication that at
24 least as of that time, the FDA had

Page 349

1  classified Numorphan tablets as
2  effective, right?
3          MS. VANNI:  Object to form.
4      Foundation.
5          THE WITNESS:  Yes.
6  BY MS. SCULLION:
7      Q.   And then it goes on to say,
8  "In this notice FDA requested a
9  supplement for revised labeling and a
10 supplement for updating information and
11 adequate data to show the bioavailability
12 of the drug when administered other than
13 by intravenous route."
14         Did I read that correctly?
15     A.   Yes.
16     Q.   And then it explains though
17 that in this October 18, 1971 letter,
18 Endo indicated that a supplement for the
19 tablets was not being submitted -- go to
20 the next page -- because production and
21 distribution of this drug was being
22 suspended as of May 1st, 1971.
23         Do you see that?
24     A.   Yes.

88  (Pages 346 to 349)

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1      Q.   Okay.  Were you aware that
2   despite the FDA having classified the
3   Numorphan tablets as effective, the
4   entity that was Endo in 1971 had decided
5   to suspend production and distribution of
6   the drug?
7           MS. VANNI:  Objection to
8   foundation.
9           THE WITNESS:  No, I was not
10  aware.  For the record, I'm not
11  aware of anything that happened on
12  Numorphan.
13  BY MS. SCULLION:
14     Q.   All right.  And so then
15  again, fair to say that you weren't
16  aware -- you didn't tell any of the --
17  any your trade -- trade connections about
18  that history, right?
19          MS. VANNI:  Objection.
20          THE WITNESS:  No.  I was
21  unaware of it, so how could I tell
22  them if I was unaware of it?
23  BY MS. SCULLION:
24     Q.   Exactly.  And none of your

Page 351

1   national account executives informed the
2   trade when they were stocking Opana or
3   Opana ER about this history with respect
4   to Numorphan, right?
5           MS. VANNI:  Objection.
6   Asked and answered.
7           THE WITNESS:  Not to my
8   knowledge.
9           MS. SCULLION:  Okay.  We've
10  been going for a while.  This is a
11  good time for a quick break.
12          THE VIDEOGRAPHER:  Off the
13  record, 2:40.
14          (Short break.)
15          THE VIDEOGRAPHER:  We are
16  back on the record at 2:58.
17  BY MS. SCULLION:
18     Q.   Welcome back, Mr. Stevenson.
19  You understand that you're still under
20  oath?
21     A.   Yes, I do.
22          (Document marked for
23  identification as Exhibit
24  Endo-Stevenson-26.)

Page 352

1   BY MS. SCULLION:
2      Q.   Let me hand you what has
3   been marked as Exhibit 26.  Exhibit 26 is
4   Bates-stamped ENDO-OPIOID_MDL-00856825.
5           And Mr. Stevenson, do you
6   see this is an e-mail from you to
7   Mr. Kerr on October 20th, 2006, subject
8   matter "Project Pizza"?
9      A.   Yes.
10     Q.   If you recall, we saw that
11  term, Project Pizza, earlier today.
12          By any chance, have you had
13  any recollection about what Project Pizza
14  meant?
15     A.   To be honest, I'm just --
16  I'm gathering it had to do something with
17  Opana ER stocking.
18     Q.   Okay.  Fair enough.  So you
19  explained to Mr. Kerr in the first page
20  of Exhibit 26, "Pursuant to our meeting,
21  attached is Opana ER sold to our direct
22  buying accounts launch year-to-date.  It
23  is in dollars, and on Monday someone will
24  get an assignment to put into bottles.

Page 353

1   But I believe it tells the story of lack
2   of pull-through."
3           Did I read that correctly?
4      A.   Yes.
5      Q.   Okay.  And then you go on,
6   in the third sentence -- fourth sentence
7   discussed, "Also included is data taken
8   from Cardinal and Kinray," it says, "567,
9   which shows sales out by product and is
10  provided under their DSAs."
11          Do you see that?
12     A.   Yes.
13     Q.   I just want to make sure I
14  understand what it was that you were
15  talking about here.  Let's start with
16  DSAs.  Those are distributor service
17  agreements?
18     A.   Distribution service
19  agreements.
20     Q.   Distribution service
21  agreements.  What's a distribution
22  service agreement?
23     A.   It was an agreement -- in
24  layman's terms it was an agreement

Page 354

1  between the respective wholesaler, and in
2  this case Endo. They were widely used by
3  pharmaceutical companies. In this case,
4  it was the distributor -- I mean, it was
5  a wholesaler in question, and it
6  established fees that the wholesaler
7  negotiated a fee that they received in
8  return for their services.
9        It also limited the amount
10 of quantity that they could stock. You
11 know, they had to -- they had to have a
12 minimum and a maximum. So no less than
13 30, no more than 45, that kind of thing.
14 I don't remember what the exact numbers
15 were.
16       But it was designed to -- it
17 was designed as an outgrowth of what
18 happened in a court case involving
19 stuffing the channel. There was a -- I
20 don't know all the companies involved.
21 But there was a stuffing-the-channel
22 case. And there's a fine line between
23 having products, enough on hand to
24 fulfill demand, and what is was called

Page 355

1  stuffing the channel.
2        And so there's a -- you're
3  not allowed to manage income. It's
4  against the, you know, SEC law. There's
5  a rule against that law or whatever. I'm
6  not a lawyer. But there was a --
7        And so as a result of that,
8  when the dust settled, the wholesalers
9  were concerned that they were providing
10 services for no compensation, and the
11 pharmaceutical companies, whether it be
12 Endo or anybody else, recognized, okay,
13 they did provide a value, and they
14 negotiated respectively with each
15 wholesaler what the fee was. It was
16 normally a couple percent -- you know,
17 percent.
18    Q.   Okay. So that was a lot.
19 That's helpful. Let me just make sure I
20 understand the various pieces of that.
21 Let's start with the last point. You
22 said that the fee negotiated was normally
23 a couple percent. Is that percent of the
24 product sales?

Page 356

1    A.   As I recall, yes. It didn't
2  apply -- to be clear, it only -- it did
3  not apply to generics. It was just for
4  brands.
5    Q.   Fair enough. And that's
6  what we're talking about here, was the
7  relationship with the wholesalers with
8  respect to Opana ER, branded product?
9    A.   Yes.
10   Q.   And -- and you were
11 explaining that the reason that, let's
12 take Endo in this case, was paying a fee
13 under these distribution service
14 agreements, was in recognition of certain
15 services provided by the distributors.
16 Do I understand correctly?
17   A.   By the wholesalers, yes.
18   Q.   Wholesalers, thank you. Is
19 wholesalers different from distributor or
20 just better term?
21   A.   Distributor has a different
22 meaning to me.
23   Q.   Fair enough.
24   A.   I understand why people call

Page 357

1  them distributor. To me a distributor is
2  different than a wholesaler.
3    Q.   We'll call them wholesalers.
4  Thank you. Even though it's called
5  distribution services agreement, it's a
6  wholesaler?
7    A.   Yeah, it was the --
8  wholesaler was providing distribution
9  services.
10   Q.   And what did those
11 distribution services entail?
12       Can you give me an example,
13 and explain what they were?
14   A.   Well, they would stock the
15 product. They would, you know, ship the
16 product out. They would provide data.
17 You know, I think 567s -- I don't recall
18 exact, they were sales out data. You
19 know, that was interesting data to have.
20 You know, what -- what did they sell out
21 of there. Again, it enabled you to
22 monitor product, because if you sold 100
23 bottles and they shipped out 90, okay,
24 that meant, you know, if they ordered you

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1    could use that as your order monitoring.
2    It was very -- you know, especially for a
3    control drug, you could -- it enabled you
4    to better monitor what inventory they had
5    on hand and what they were shipping out.
6    You can see who they shipped it to with
7    respect to a large account.  You know,
8    that -- that kind of data.
9          So they provided that
10   service.  They provided, you know, it
11   was -- the big product, the big thing was
12   stocking in all of their DCs.  So it was
13   called DC balancing.  So if you send 100
14   bottles to a DC, you know, in Michigan
15   somewhere and you had ten other DCs out
16   of product, that was -- that was not
17   conducive to consider stocking.
18         So part of the agreement was
19   they would have their -- they would have
20   their -- your product in all of their
21   DCs, in adequate quantities that they
22   could meet demand.
23     Q.   The e-mail references --
24   references -- excuse me, I'm losing my

Page 359

1    tongue.
2          The e-mail references 567s.
3      A.   Right.
4      Q.   You discussed that in your
5    testimony.
6          Is 567 sometimes called the
7    867 data?
8      A.   It could have been.  That's
9    why I said the 567.  It could be 867.
10   But it's sales out.
11     Q.   It's sales out.  Okay.
12         Have you worked, whether
13   it's 567 or 867, had you worked with that
14   kind of sales out data before you joined
15   Endo?
16     A.   No, because it was
17   relatively new during that time frame
18   that these things became popular.
19     Q.   Got it.  Okay.  But that
20   data was provided to Endo under DSA, to
21   the extent that the DSA called for it,
22   right?
23     A.   Yes.  Whatever was in the --
24   yes, mm-hmm, yes.

Page 360

1      Q.   And Endo could negotiate or
2    tried to negotiate to get that sales out
3    data included as part of a DSA if it
4    wanted to, right?
5          MS. VANNI:  Object to form.
6          THE WITNESS:  It was part of
7    the negotiation.  It was something
8    that was -- that they could
9    provide.
10         And before a DSA, they would
11   charge for that.
12   BY MS. SCULLION:
13     Q.   Okay.
14     A.   And -- but as far as the
15   DSA, it was agreement, an overall
16   agreement on minimal inventories, maximum
17   inventories.  It was designed to prevent
18   spec buying.  Had benefits to both sides,
19   and one of the benefits to a company like
20   Endo, was that you could get sales out
21   data.
22     Q.   Okay.  And I think you
23   explained though that even if it hadn't
24   been provided for in the DSA, Endo could

Page 361

1    have gotten that sales out data from a
2    wholesaler by paying for it, right?
3      A.   Yeah.
4          MS. VANNI:  Object to form.
5    BY MS. SCULLION:
6      Q.   Okay.
7      A.   With the caveat that they
8    normally wanted an exorbitant price, so
9    nobody wanted to pay for it.
10     Q.   Okay.  So -- so then it was
11   then negotiated as at least part of some
12   of the DSA's, right?
13     A.   Yeah.
14     Q.   Is that right?
15     A.   Yes.
16     Q.   Okay.  Thanks.
17         Okay.  And I just want to
18   quick -- take a quick look at the data
19   itself that you're referencing.
20         Go to the next page of
21   Exhibit 26.  It's a little bit hard to
22   read.  I think it's somehow cut off in
23   the way that it's printed out here.
24     A.   Which -- which page?  I'm

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    sorry.
2         Q.    The next page of Exhibit 26.
3    So the first --
4         A.    Oh, okay.
5         Q.    -- chart or data run, I
6    should say.  And it says -- it has
7    handwritten at the top, Opana ER
8    5-milligram?
9         A.    Yes.
10        Q.    Do you have that?
11        A.    Yeah.
12        Q.    Okay.  I just want to make
13   sure I understand the best I can here.
14             The first column, again it's
15   slightly cut off, appears to be sold to
16   party; is that right?
17        A.    Yes.
18        Q.    Okay.  And then under -- in
19   that column it's listing the names of the
20   entities to which the wholesaler has sold
21   the product in question, right?
22        A.    No.  These are the -- these
23   are the wholesalers.
24        Q.    Oh.  Okay.  That's why I was

Page 363

1    a little confused.  I thought it said
2    sold to party.  Maybe that won't work.
3    Let's see.  Okay.
4             But here we have listed by
5    month, as you said, this is the dollar
6    amounts of sales to these wholesalers,
7    right?
8         A.    Yes.  It appears to be.
9         Q.    Okay.  And you indicate in
10   your e-mail that you would be getting
11   that information in -- in bottles, I
12   think you anticipated within the next
13   couple days.  You said, "By Monday, we'd
14   get that information in bottles," right?
15        A.    Yes -- well, no, it says
16   here, "On Monday someone will get the
17   assignment to put it into bottles."
18        Q.    Thank you.  That's right.
19   Okay.
20        A.    That's what I -- I have to
21   review it again.  I...
22        Q.    Thank you.  Okay.
23             Let's go to Tab 23.  You can
24   put this one aside for now.

Page 364

1         A.    23?  Oh.
2         Q.    No, no.  I have Tab 23.  I'm
3    going to get it to you.  It's a lot of
4    numbers.
5             (Document marked for
6             identification as Exhibit
7             Endo-Stevenson-27.)
8    BY MS. SCULLION:
9         Q.    I'll hand you what's been
10   marked as Exhibit 27.  And Exhibit 27 is
11   Bates-stamped ENDO-OPIOID_MDL-02230226.
12             And, Mr. Stevenson, do you
13   recognize Exhibit 27 as a series of
14   e-mails from you to various folks in late
15   October 2006?
16        A.    Yes.
17        Q.    All right.  Let's start on
18   the next to last page of the exhibit.  At
19   the bottom it says -- 227 is the last
20   three digits of the number.
21        A.    Yes.
22        Q.    Okay.  And let's start
23   with -- with your e-mail at the bottom of
24   the page, which again is from you to

Page 365

1    Mr. Kerr and it's cc'd to Mark Baglin.
2             Do you recall his position
3    at the time?
4         A.    No, I don't.
5         Q.    And again, this is
6    concerning Project Pizza, right?
7         A.    Yes.
8         Q.    All right.  And you're
9    explaining to Mr. Kerr that you and
10   Mr. Baglin had met to -- as a follow-up
11   to discussion with Mr. Kerr the day
12   before to further brainstorm Project
13   Pizza deliverables.  And then you explain
14   what those are.
15             Do you see that?
16        A.    Yes.
17        Q.    Let's just go to the first
18   bullet point which says, "'Mine'
19   wholesaler supplied DSA data on sales out
20   to help independently verify retail store
21   stocking."
22             Did I read that correctly?
23        A.    Yes.
24        Q.    And that's referring to what

92  (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review

Page 366

```
1    we were just talking about before, in
2    terms of looking at the sales out data
3    from wholesalers to understand what, in
4    fact, had been supplied to the retail
5    stores one level more down the chain,
6    right?
7         A.  Yeah.  The customer's
8    customer, yeah.
9         Q.  Okay.
10        A.  In most cases.  Those are de
11   novo.
12        Q.  And then you go on in the
13   next sentence to say, "We receive this
14   data every week, but" -- it says, "do use
15   it for this purpose (Endo fault)."
16        Does it look like you mean
17   to say we receive this data every week,
18   but do not use it for this purpose?
19        A.  Yes, I believe so.
20        Q.  Okay.  But to the best of
21   your understanding, Endo did, in fact,
22   receive this sales out data every week at
23   least as of October 2006, correct?
24        A.  Yes.
```

Page 367

```
1         Q.  All right.  Okay.  Then
2    let's go up to the next e-mail which
3    starts on the first page of Exhibit 27.
4    Okay.
5         And now you are giving
6    everyone an update on the Project Pizza,
7    correct?
8         A.  Yes.
9         Q.  All right.  And you explain
10   the key takeaways from a recent meeting
11   that you and Amy Romero and David Kerr
12   had were, first, the goal was 12,000
13   retail pharmacies stocked by year-end; is
14   that right?
15        A.  Yes.  That's what it says.
16        Q.  Okay.  And 17.5 million in
17   net factory sales by year-end; is that
18   right?
19        A.  Yes.
20        Q.  Okay.  And you then go on to
21   state, "If we" -- "if we achieve the
22   12,000 stocked pharmacies we obviously
23   will achieve 17.5 million."  And that's
24   just because, in order to stock the
```

Page 368

```
1    pharmacies, obviously you have to have
2    made the sales to the wholesalers, right?
3         A.  Yes.
4         Q.  Okay.  So that's --
5         A.  Or -- or a vaulted chain.
6         Q.  Or a vaulted chain, thank
7    you.
8         Okay.  And if you go down to
9    the fourth bullet point just to help
10   clarify the whole 567/867 issue.  You
11   say, "As a result, Mark Baglin and I met
12   this morning to further brainstorm.  We
13   agreed to begin with data based on
14   quantitative facts that have attribution,
15   i.e., 867 data."
16        Is that -- and then you go
17   on again in the last sentence to talk
18   about using 867 data.
19        Does that confirm that, in
20   fact, you're referring to 867 data in
21   that first e-mail we looked at, not 567?
22        A.  Yes.
23        Q.  Okay.
24        A.  Yes.  It was a typo.
```

Page 369

```
1         Q.  And towards the end of that
2    bullet point, you do say, "So using the
3    867s and input from chains obtained via
4    the NAEs, we will establish a baseline
5    early next week."
6         Do you see that?
7         A.  Yes.
8         Q.  We talked about the 867
9    input.  What was the input from chains
10   obtained from the NAE?
11        A.  It would be, what this is
12   referring to -- well, to answer your
13   question specifically it would be input
14   from the vaulted chains who do not -- did
15   not have 867s.  So what he was trying to
16   establish, on a total market basis, you
17   know, where are we with stock.  He was
18   getting pressure to Opana -- as I
19   remember.  You know, I don't remember
20   much about this stuff.  But it was -- the
21   Project Pizza was a fancy word for -- you
22   know, they gave it a code name in order
23   to have adequate stocking of Opana.
24        And why -- so that's why the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1  feeling was, reading this, that leading
2  up to these e-mails, that it was not
3  stocking, and the pull-through was not
4  sufficient. So -- or below par, I mean
5  below expectation.
6      So we had this focus, you
7  know, to have better stocking.
8      Q.  Understood.  And you
9  explained sales-out data would show you
10 the customer's customers of the
11 wholesaler, right --
12     A.  Yes.
13     Q.  -- what the stocking was; is
14 that right?
15     A.  Yes.
16     Q.  And then with respect to the
17 vaulted chains.  Was the idea that the
18 NAEs, the national account executives,
19 would get similar information about what
20 the level of stocking was at the
21 individual stores within the vaulted
22 chains?
23     A.  If they could.  You know,
24 the chains may not have agreed to provide

Page 371

1  it to them.
2      Q.  Okay.  But they were going
3  to make an effort to do that, right?
4      A.  Yes.
5      Q.  Okay.
6      MS. SCULLION:  And can we
7  take -- can we go off the record
8  really quickly?
9      THE VIDEOGRAPHER:  Off the
10 record.  3:15.
11     (Short break.)
12     THE VIDEOGRAPHER:  We are
13 back on the record at 3:19.
14 BY MS. SCULLION:
15     Q.  Sorry for that brief
16 interruption.
17     Mr. Stevenson, staying on
18 Exhibit 27, I'd like to bring your
19 attention to the last paragraph at the
20 bottom of the first page where you're
21 talking about the 867 and other data --
22 information, rather.  And you say, "If it
23 shows, we are at 6,000 stores stocked
24 when W-G factored into the equation.  We

Page 372

1  will probably run a promotion focused on
2  the retail pull-through from the
3  wholesaler."
4      Do you see that?
5      A.  Yes.
6      Q.  Let me try and break that
7  down and make sure I understand.  First
8  of all, the WG there refers to Walgreens;
9  is that right?
10     A.  I believe so, yes.
11     Q.  Okay.  And do I understand
12 correctly that you're saying if the data
13 winds up showing that that's 6,000 stores
14 stocked, even when Walgreens is accounted
15 for, we will probably run a promotion,
16 that that's what Endo -- you were
17 proposing to do, is if the data showed
18 that level of stocking, you would run a
19 promotion, right?
20     MS. VANNI:  Object to form.
21     THE WITNESS:  We would run a
22 promotion, not to physicians, but
23 to -- from the wholesaler, we
24 would support one from the

Page 373

1  wholesaler to the retailer, which
2  would consist of making sure they
3  knew it was available.
4      If you read further on in
5  the e-mail, you know, there was
6  demand generation program that
7  marketing was creating and sales
8  was executing.
9  BY MS. SCULLION:
10     Q.  Yeah.
11     A.  So in order for those
12 programs to be successful, they had to be
13 stocking at the retail pharmacy.  So
14 that's what this is all about.
15     Q.  So let's make sure that we
16 are on the same page.  You're referring
17 on the second page of Exhibit 27 at the
18 top, the last sentence of that carryover
19 paragraph that says, "The overriding
20 strategic goal is to have the pharmacies
21 stocked, so as to take advantage of the
22 demand generation programs marketing is
23 creating and sales is executing."
24     A.  Correct.

94  (Pages 370 to 373)

Page 374

1    Q.   That's what you are
2  referring to?
3    A.   Yeah.
4    Q.   Just again to put it in
5  layman's terms, your goal was to get the
6  product into the pharmacies stocked,
7  right, so that as prescriptions are
8  coming in from the demand generation
9  programs, they can be filled?
10   A.   Correct.
11       MS. VANNI:  Object to form.
12  BY MS. SCULLION:
13   Q.   Let's stay in that same
14  paragraph, same page.  You say at the
15  very top there that, "Endo is prepared to
16  trade price to gain volume and get on the
17  launch trajectory."
18       Do you see that?
19   A.   Yes.
20   Q.   What did that mean?
21   A.   I don't know specifically
22  what the discussion was at that time.
23  You know, normally brands were -- might
24  have been, if there was a -- well, I

Page 375

1  don't know.  I don't know.  It would be
2  speculation what it is.  I don't remember
3  what it is.
4    Q.   Fair enough.  I want to go
5  back to the beginning of that paragraph,
6  on the first page, where you talked about
7  possibly the running of promotion to
8  focus on retail pull-through from the
9  wholesaler?
10   A.   Yes.
11   Q.   You were starting to explain
12  what that was.  Can you just explain to
13  me, again, in layman's terms what that
14  kind of promotion would have looked like?
15   A.   You know, it was pretty
16  simple.  We would have probably paid for
17  announcements that the product's
18  available down to the retail.  It's
19  pretty simple basic stuff.  You know,
20  it's here.
21       It could have been there was
22  mail order.  You know, you can send
23  notice through the mail.  There's PDQ or
24  PharmAlert or whatever that went out to

Page 376

1  umpteen pharmacies.  Again, it was to get
2  the word out that the product was there
3  and that -- the promotion was not what
4  you would think of promotion in the
5  normal sense.  It was -- it was designed
6  to promote the fact that scripts were
7  coming.
8    Q.   Okay.  And that was to
9  encourage the pharmacies to stock?
10   A.   Yeah.  To stock the product.
11   Q.   Okay.
12   A.   To have pull-through.
13   Q.   And I think -- and correct
14  me if I got this wrong.  I think you
15  mentioned that the promotion could be
16  done, as you said, either directly, you
17  said, from Endo, through a direct mail or
18  PDQ, right?  That's one way to do it?
19   A.   Yeah, that's one way.
20   Q.   Did you also say that the
21  promotion could be done through the
22  wholesaler?
23   A.   I don't recall the
24  different, you know, components involved.

Page 377

1  It's a long time ago.  I mean, I don't
2  know.  Normally we would have -- we would
3  have paid for it.  So I don't know who
4  would have done it.  Okay.
5    Q.   From time to time, did Endo
6  run promotions through the wholesalers to
7  the retailers?
8    A.   Very -- it wasn't common.
9  Okay.  This was a new product launch, and
10  they wanted to make sure the product was
11  stocked.
12   Q.   That was -- that was
13  important to make the launch successful,
14  right?
15   A.   Yes.  Stocking is important
16  to making the launch successful.
17   Q.   I think we -- okay.
18       And just one more piece of
19  terminology, again, for those who are not
20  familiar with the pharmaceutical
21  industry.  Can you explain what you meant
22  by pull-through?
23   A.   Pull-through is a term we --
24  term used to refer of pulling from the

Page 378

1   wholesaler distribution centers to the
2   respective pharmacies. So the product is
3   pulled from the wholesaler through to the
4   pharmacies, where the product is
5   dispensed and adjudicated at the point of
6   sale.
7       Q.   Okay.
8           MS. SCULLION: Can I have
9   Tab 9, please.
10          (Document marked for
11  identification as Exhibit
12  Endo-Stevenson-28.)
13  BY MS. SCULLION:
14      Q.   I'll hand you what's been
15  marked as Exhibit Number 28. And
16  Exhibit 28 is Bates-stamped
17  ENDO-OPIOID_MDL-03924784. And do you see
18  that Exhibit 28 begins with an e-mail,
19  again, from you to David Kerr, and this
20  time it's dated April of 2006?
21      A.   Yes.
22      Q.   And you state, "Attached is
23  P&L for oxycodone ER at McKesson."
24      A.   Yes.

Page 379

1       Q.   Is that right?
2       A.   Yes.
3       Q.   Okay. And again, oxycodone
4   ER, that was a generic version of
5   OxyContin, right?
6       A.   Yes.
7       Q.   Okay. A product that you
8   actually had P&L responsibility for,
9   right?
10      A.   Yes.
11      Q.   Okay. And let's go to
12  this -- first page of the actual exhibit
13  is entitled "McKesson Summary." Are you
14  on that?
15      A.   Yes.
16      Q.   Okay. And I'll ask you to
17  help me walk through and understand some
18  of the pieces in this summary, to make
19  sure I understand it.
20          So it says at the top,
21  McKesson financial value to Endo. I'm
22  looking at this -- this first box here.
23          Where it says account value.
24  There's an amount listed for -- nothing

Page 380

1   for November 2005, but then
2   December 2005, an amount for 2006, and a
3   total.
4           What does account value
5   refer to?
6       A.   It would be net sales, I
7   think.
8       Q.   Okay. Next line says
9   corporate rebate. What's the corporate
10  rebate?
11      A.   It was a standard rebate
12  that they would have received that was,
13  you know, for -- for -- it was just a
14  rebate program that we had.
15      Q.   Did -- it says corporate
16  rebate. Did some customers get it and
17  other customers did not?
18      A.   Every -- I think every
19  generic customer got a corporate rebate.
20      Q.   Okay. Is there any reason
21  that it's just not built into the price
22  and lowering the price?
23          MS. VANNI: Object to form.
24          THE WITNESS: It was

Page 381

1   designed to show what the net
2   sales were before any rebates. So
3   we -- we broke out anything after
4   net sales that -- on -- on how to
5   get down to the bottom line, in
6   this case net revenue.
7           So rather than say it's all
8   in net sales, someone is going to
9   ask the question, well, how much
10  is a rebate.
11          So rather than -- you know,
12  we broke it out for ease of -- so
13  every -- you know, all the
14  components were known.
15  BY MS. SCULLION:
16      Q.   Okay. And let's -- again,
17  let's just make sure we are talking the
18  same language. What is your
19  understanding of how net sales were
20  determined, when you talked about net
21  sales there?
22      A.   Well, net sales --
23      Q.   Net of what?
24      A.   Yeah, net sales, you start

Highly Confidential - Subject to Further Confidentiality Review

Page 382

1    off with gross sales and you work down to
2    net sales.
3         Q.   But net of what?  They
4    weren't net of rebates.  They were net of
5    what?
6         A.   No, no.  Net sales would
7    be -- net sales would be -- you know,
8    that's why I'm -- I don't really --
9    account value could be gross sales for
10   all -- I mean, the idea -- normally these
11   things are the things that would come
12   out of -- down -- so I'm sorry.  I didn't
13   see net revenue.
14        So these are gross --
15   account value I think would be gross
16   sales.
17        Q.   Okay.
18        A.   And then gross sales you
19   have these deductions, okay, to --
20   starting off there with corporate rebate.
21        Q.   Okay.  And you explained
22   what that was.  What was PSR?
23        A.   Product specific rebate.
24        Q.   And just, can you explain

Page 383

1    what that was?
2         A.   On some products we had a
3    product specific rebate when they -- you
4    know, for stocking -- for -- for having
5    us in their -- in their program.
6         Q.   And would that vary from
7    product to product?
8         A.   It could.
9         Q.   Okay.  And then you have,
10   the next line is stocking allowance.  Can
11   you just explain again for someone who is
12   not familiar with the industry what that
13   would be?
14        A.   Normally when you launch a
15   product you give the customer a stocking
16   allowance.  If they bring in so much
17   product, they get a stocking allowance
18   for the expense of bringing it in and
19   distributing it to the DCs.  That's why,
20   you know, it's important that you pay a
21   stocking allowance, you want to make sure
22   your product's out and to the forward
23   DCs, so...
24        Q.   Okay.  And it's only

Page 384

1    associated though, to the initial
2    stocking then?
3         A.   Yes.
4         Q.   Okay.  Next one says off
5    invoice.  What's that?
6         A.   We may -- it may have been
7    in order to get the McKesson business
8    that we gave some percentage off their
9    original invoice, which would have been
10   at WAC.
11        Q.   And just so you -- can you
12   explain what WAC is?
13        A.   Wholesale acquisition cost.
14        Q.   Okay.  So that would be an
15   additional discount --
16        A.   Yes.
17        Q.   -- in addition to the
18   rebate, and the product specific rebate,
19   then there could be another specific
20   negotiated discount off of invoice per --
21   is it per wholesaler you negotiated?
22        A.   Yes.  And it's for the
23   launch.  So it goes -- it's just stocking
24   allowance and off invoice is associated

Page 385

1    with the launch only.
2         Q.   Okay.  And then next line
3    says, "Sales out rebate equals six
4    months' units."
5         Can you explain that?
6         A.   We had a program that if
7    they achieved -- you know, if they
8    achieved so much in sales out, which was
9    normally, again, a function of -- it was
10   a way to make sure their forward DCs were
11   stocked, that they would get an
12   additional -- additional performance
13   rebate based on sales out.
14        Q.   Okay.  And then the -- and
15   that -- that sales out rebate here was
16   $9 million for 2006 it says.  Do you see
17   that?
18        A.   Yes.
19        Q.   And do you have any
20   understanding of how that $9 million
21   relates to six months' units?  It says
22   six months' units.  I'm trying to
23   understand.
24        A.   It would be six months'

Page 386

1    units times -- times their net price,
2    and, you know, that's -- that's what it
3    was.  I don't know what their net price
4    was.  But it would be -- that's why it
5    says equal to six months of units.
6        Q.   Okay.  Okay.  So you -- I
7    mean, are you effectively giving them six
8    months worth of units for free --
9        A.   No, no, no.
10       Q.   -- or just -- just at the
11   net price?
12       A.   No.  To be clear, we
13   didn't -- we didn't do free goods.
14       Q.   Okay.
15       A.   All right.  We -- when they
16   bought -- when they -- the stick when
17   they bought we -- we established based on
18   their forecast of demand what six months
19   of units were.
20       Q.   Right.
21       A.   And when they attained that,
22   we gave them a rebate.
23       Q.   Okay.  But it wasn't a
24   rebate for the entire price, right?

Page 387

1        A.   It wasn't a rebate for what?
2    I'm sorry.
3        Q.   The entire price for those
4    six months' units.
5        A.   I'm sorry, I don't follow
6    the question.
7        Q.   That's okay.  I'm asking,
8    the sales out rebate, that did -- did
9    that equal the actual cost to them for
10   those six months' units?
11       A.   No.  Their cost would have
12   been at WAC.  It would have been based
13   on -- my recollection is it would have
14   been based on net price.
15       Q.   Okay.  Got it.
16           And then the next line is
17   returns, Medicaid, and cash discount.  Do
18   you see that?
19       A.   Yes.
20       Q.   And that's just -- and
21   returns is, again, it's accounting for
22   actual returns, I assume, right?
23       A.   It would have been -- it
24   would have been a charge to the P&L.

Page 388

1    We -- everybody does it the same way.
2    You normally take a charge to the P&L
3    based on what your historic rate is of
4    returns.  It's normally 1 1/2 percent,
5    2 percent, whatever it may be that you're
6    experiencing, and you just take a charge
7    to the P&L to cover for any -- any
8    returns so there's no surprises.
9        Q.   Okay.  And what's the
10   reference to Medicaid there?
11       A.   Medicaid is the charge that
12   you pay Medicare rebates.  Medicare
13   rebates get put in there, it's another
14   charge that you pay.  Generics paid I
15   think at the time 11 percent, you know,
16   is my recollection.
17           So that's a charge that you
18   pay because it's a charge to the P&L.
19       Q.   Okay.  And that's -- when
20   you say it's a charge you pay, you are
21   paying it to McKesson?
22       A.   No, no, no.  We're --
23       Q.   You're paying it to the
24   government?

Page 389

1        A.   -- we're paying it to the
2    government.
3        Q.   Okay.  Okay.
4        A.   But it's based on products
5    sold to McKesson.
6        Q.   Understood.  I'm just trying
7    to make sure I understand how it all
8    flows together.
9            And then cash discount is, I
10   assume, just a discount for payments in
11   cash?
12       A.   It's prompt payment terms.
13       Q.   Okay.  Got it.
14           Now, you explained in -- in
15   a prior exhibit that the marketing and
16   sales departments had this demand
17   generating -- these demand-generating
18   programs.  We looked at that in your
19   earlier e-mail, right?
20       A.   On the brand side.
21       Q.   Right.  Got it.  Okay.
22           So on the generic side
23   though, there's still going to be
24   prescriptions coming into the pharmacies

98 (Pages 386 to 389)

Page 390

1  served by McKesson, correct?
2       MS. VANNI:  Object to form.
3       THE WITNESS:  Yes.
4  BY MS. SCULLION:
5       Q.   Okay.  And as part of its
6  relationship with the pharmacies,
7  McKesson has responsibility to try and
8  ensure those pharmacies can service their
9  patients, right?
10      MS. VANNI:  Object to form.
11      THE WITNESS:  I can't speak
12  for McKesson.
13  BY MS. SCULLION:
14      Q.   Okay.  I'm just trying to
15  understand why Endo would need to pay any
16  monies to McKesson to, I think you
17  explained, try to make sure that the
18  stock was getting out to the McKesson
19  DCs.  Isn't that just something McKesson
20  would do as part of its business?
21      MS. VANNI:  Object to the
22  form.
23      THE WITNESS:  No.  They --
24  BY MS. SCULLION:

Page 391

1       Q.   Why not?
2       A.   Because if you -- you know,
3  this was part of a competitive package,
4  and we were not exclusive.  There was an
5  authorized generic that we competed
6  against, IVAX, who had the Purdue Pharma
7  product as a generic.  And so we had to
8  have a competitive offer.  And so,
9  basically, what this is about is, in
10  order to get the McKesson business, we
11  had to have a competitive offer and these
12  were the components, to gain that -- to
13  gain that business.
14      Q.   Got it.  Okay.
15      A.   And you can see now, you
16  know, what this is designed to show if I
17  look across here, this is -- this is
18  asking for new price authorization and I
19  had a certain authority, current VP
20  authorization level, that was me.  And it
21  was -- and SVP authorization level.  So
22  the price was declining.  That's why I'm
23  ask -- we need to have new levels,
24  because we're -- obviously there's some

Page 392

1  competitive issue ongoing against our
2  McKesson business that we had to respond
3  to.
4       Q.   Okay.  And that's one of the
5  things I wanted to turn to.  If you look
6  at the next page of the exhibit, which
7  has some of the, I think, backup detail
8  to your summary on the first page we've
9  been looking at.
10      I'm just going down to the
11  second box that says proposed pricing and
12  rebates.  Do you see that?
13      A.   Yes.
14      Q.   Okay.  And in the third
15  column from the left, it says contract
16  price.  Do you see that?
17      A.   Yes.
18      Q.   And just, can you explain to
19  me, when it says contract price, who is
20  the contract between?  Who are the two
21  parties?
22      A.   Endo and McKesson.
23      Q.   Okay.  And I think you are
24  explaining to me that one of the things

Page 393

1  that you were doing was you had to meet a
2  competitive pricing offer with respect to
3  McKesson for oxycodone, at least at this
4  time?
5       A.   It appears that way.
6       Q.   Okay.  Let's go back to your
7  summary page in this exhibit.
8       A.   Which --
9       Q.   The McKesson summary.
10      A.   Yes.
11      Q.   So, again, the first box at
12  the top is summarizing the McKesson
13  financial value to Endo.  This is your
14  attempt to summarize what the value is to
15  Endo of this relationship as proposed,
16  right?
17      MS. VANNI:  Objection.
18      THE WITNESS:  Yes.
19  BY MS. SCULLION:
20      Q.   Okay.  And if you go over to
21  the right-hand side of that box under
22  total, you are explaining that the
23  account value total for those periods was
24  a little over $34 million, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 394

1      A.   On gross.
2      Q.   Right.
3      A.   On -- on gross, yeah.
4      Q.   That was the account value.
5   After the various rebates and allowances,
6   et cetera, the net revenue to Endo would
7   be 11.4 -- about $11.4 million, right?
8      A.   Almost 11.5.  But yeah.
9      Q.   Okay.  So pretty substantial
10  decrease off of the gross, right?
11     A.   Yep.  Yes.
12     Q.   Okay.  And then the gross
13  profit listed underneath would be just
14  over $6 million, right?
15     A.   Yes.
16     Q.   But still the gross profit
17  percentage was 53 percent, right?
18     A.   Yes.
19     Q.   Okay.  All right.  And then
20  at the bottom of the page, you do the
21  opposite analysis looking at the
22  financial value of this proposed
23  relationship to McKesson, right?
24     A.   Yes, our estimate.

Page 395

1      Q.   Okay.  And the estimate of
2   the total value to McKesson for this same
3   period, the period in which gross profit
4   to Endo was going to be a little over
5   $6 million.  The value to McKesson was
6   going to be almost $20 million, right?
7      A.   Yes, because our price was
8   declining as you can see in the middle
9   section here.  Our level, what we were
10  anticipating was to have to go to a lower
11  price.  And, therefore, you know, we had
12  paid these -- these different rebates, et
13  cetera, out, the stocking, et cetera,
14  out.
15          So the pricing was -- it was
16  showing that while it still made sense
17  from a profitability standpoint for us,
18  you know, management wanted to see, okay,
19  what was -- what has McKesson received
20  from us.
21          So obviously as the price
22  declines, you know, that number is going
23  to increase, because you're going to take
24  in less revenue, but you paid out these

Page 396

1   launch incentives.
2      Q.   Right.  So, and I think as
3   you're pointing out, Endo is paying a
4   substantial amount in connection with the
5   launch, in this case, of generic
6   OxyContin, right?
7          MS. VANNI:  Object to form.
8          THE WITNESS:  That's what
9          was required in the competitive
10         environment.
11  BY MS. SCULLION:
12     Q.   Okay.  And so much so that
13  the value to McKesson, estimated value to
14  McKesson, of this proposed relationship
15  was more than three times the estimated
16  gross profit to Endo of this
17  relationship?
18     A.   Well, just to be clear, all
19  we could speak to is the amount of money
20  we gave McKesson through rebates and
21  discounts, et cetera.  It was in no
22  way -- in no way seeks to imply or
23  implies what the actual financial value
24  to McKesson is in their internal P&L.

Page 397

1   There's no way for us to know that.
2      Q.   Okay.  Okay.
3          MS. SCULLION:  Can I have
4          Tab 52, please.  Make sure we have
5          the same document.  Because these
6          can get a little bit tricky.
7          (Document marked for
8          identification as Exhibit
9          Endo-Stevenson-29.)
10  BY MS. SCULLION:
11     Q.   I'll hand you what's been
12  marked as Exhibit Number 29.
13         And, Mr. Stevenson, if
14  you'll turn to the second page of
15  Exhibit 29, you'll see at the top, that
16  it's entitled "Endo Contribution Margin
17  Report - Period."
18         Do you see that?
19     A.   Yes.
20     Q.   Now, I'll represent to you
21  that this is a format of this data that
22  was produced to us by Endo in this
23  litigation in response to our request for
24  financial reporting from Endo.

Page 398

1         And I just want to draw your
2  attention to this first page.  You'll see
3  on the product line, indicates that
4  it's -- Endocet is the product, right?
5         A.   Yes.
6         Q.   Okay.  And then we see a
7  number of lines in the chart.  It starts
8  with the gross revenues and then goes
9  through a number of the line items that
10  we discussed when we were looking at the
11  McKesson summary.
12         Do you see that?
13         A.   Yes.
14         Q.   But there's -- there's a new
15  line item in here that we haven't
16  discussed in detail yet.  We referred to
17  it earlier.  That's the chargebacks.  Do
18  you see that the fourth line down under
19  revenue?
20         A.   Yes.
21         Q.   It says chargebacks.  Can
22  you explain what chargebacks were in this
23  context for -- context for Endocet?
24         A.   Well, it's the same concept

Page 399

1  for any product, whether it's an opioid
2  or not.  It's the difference between the
3  WAC, the wholesale acquisition cost, and
4  the contract price --
5         Q.   Okay.
6         A.   -- for the number of bottles
7  sold through their -- whatever the
8  respective wholesaler's program was to
9  the independent pharmacists.
10         Q.   Okay.
11         A.   Or whatever -- not only -- I
12  shouldn't say independent pharmacists.
13  Whatever -- whoever they sold out to, if
14  the contract was loaded, there was a
15  contract price.  The WAC was the WAC.
16  And the respective contract price was
17  whatever the respective contract price
18  was for Contract 1, 2, 3, 4, 5.  And then
19  there was another -- another pharmacy
20  chain or whatever might have been
21  Contract 1, 2, 3, 4, 5, 6, however it was
22  numbered.
23         And every -- every
24  respective contract had a price.  That

Page 400

1  was their contract price.  And so if the
2  WAC was $80, and the contract price was
3  $40.  There would be a $40 chargeback
4  submitted to Endo to -- for the number --
5  for the number of bottles sold -- sold to
6  that contract number.
7         Q.   Okay.  Again, let me see if
8  I can just break that down to make sure I
9  actually understand how that all worked,
10  because it was a lot.  It was very
11  helpful.  But so, again, the WAC is the
12  wholesale acquisition cost, right?
13         A.   Yes.
14         Q.   And that's the price across
15  the board, the same WAC across the board
16  that Endo sets for a product, right?
17         A.   Yes.
18         Q.   Okay.  And then the contract
19  price you referred to, in the context of
20  a product like Endocet, would that be the
21  contract between Endo and -- let's start
22  with the retail pharmacy chain?
23         A.   It wouldn't be to the retail
24  pharmacy chain.  It would be to the

Page 401

1  wholesaler.  The chargeback goes to the
2  wholesaler, not to the --
3         Q.   The contract price is the
4  price that the wholesaler has contracted
5  for?
6         A.   No.  No.  It's the price
7  that Endo has with the respective chain
8  or wholesaler program.
9         Q.   Okay.
10         A.   So McKesson had One Stop, or
11  whatever it was called in those days.
12  ABC had a different program.  Cardinal
13  had -- I forget, Generic Alliance.  I
14  forget all the names now.
15         And they -- if a contract
16  was loaded for those programs, it was
17  given a unique number.  And its price was
18  loaded.  The wholesaler bought it at WAC.
19  And they sent you a chargeback for the
20  number of bottles sold --
21         Q.   Through that program?
22         A.   -- through that program
23  based on what the WAC price was minus
24  what the contract price.  That was called

Page 402

1 the chargeback.
2 Q. Okay. And when they were
3 calculating the chargeback, that had to
4 be based on that wholesaler's sales
5 through that particular program under
6 that contract price, right?
7 A. Number.
8 Q. Okay. And did Endo get data
9 telling it how those chargebacks were
10 calculated? In other words, to see which
11 sales through the program justified the
12 chargeback that the wholesaler was asking
13 for?
14 MS. VANNI: Object to form.
15 THE WITNESS: Endo got
16 chargeback data that was
17 primarily -- matter of fact, as
18 far as I know, exclusively used
19 for financial verification.
20 That's who -- that's what
21 chargeback data was for, to
22 validate claims.
23 BY MS. SCULLION:
24 Q. Right. And let me make

Page 403

1 sure. The chargeback data that Endo got,
2 it wouldn't just be a summary of the
3 chargeback. It would be actually, like
4 you said, a validation of all the sales
5 from the wholesaler out that justified
6 that chargeback?
7 A. Yes.
8 Q. Okay. So would that be
9 another piece of data that Endo had about
10 its customers' customers?
11 MS. VANNI: Object to form.
12 THE WITNESS: Yes, it would
13 be another data point, yes.
14 BY MS. SCULLION:
15 Q. Okay. And you said that was
16 used in finance to verify the claims,
17 right?
18 MS. VANNI: Objection.
19 THE WITNESS: It was
20 especially used to validate claims
21 for customers' customers. So if
22 there was -- there's a line on
23 here called "price equalization,"
24 for example, which refers to --

Page 404

1 which is a shelf stock.
2 So the price declines in the
3 market, and they have 100 bottles
4 on the shelf, they want to have
5 the bottles on the shelf be the
6 same price as their new price.
7 Okay. And as a result of
8 that you would get a claim for
9 that, and they would say, "We had
10 900 bottles on the shelf when the
11 price change went into affect."
12 And if it's a direct account, you
13 can validate that because you know
14 from what you shipped them.
15 So if it's a chain with a
16 vault, you can validate that. If
17 it's a chain or customer without a
18 vault and they make that claim, to
19 pass an audit which is always
20 important to do, and verify that
21 the claim was a legitimate claim,
22 finance would use chargeback data
23 to validate the claim.
24 BY MS. SCULLION:

Page 405

1 Q. Okay. Thank you. If you
2 can turn a few pages back -- let's see.
3 One, two, three, four, five, six, seven.
4 There's a page that lists the product at
5 the top at Numorphan.
6 A. Numorphan, okay.
7 MS. VANNI: Sorry, Counsel,
8 what page was that?
9 MS. SCULLION: Well, it
10 doesn't have page numbers.
11 THE WITNESS: You have to
12 find it.
13 MS. SCULLION: It's about
14 seven pages back.
15 THE WITNESS: Okay, yeah.
16 MS. SCULLION: They are
17 hopefully in alphabetical order.
18 THE WITNESS: It's there.
19 MS. VANNI: Gotcha.
20 BY MS. SCULLION:
21 Q. Okay. You are on the -- on
22 the page that has the product listed as
23 Numorphan?
24 A. Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 406

1     Q.   Okay.  And you see that for
2  this fiscal year, it's 2006, it does
3  indicate that year-to-date there were
4  392,000, a little bit more, in sales of
5  Numorphan during that year?
6     A.   That's what it shows, yeah.
7     Q.   Okay.  And again you recall
8  that we saw the name Numorphan come up in
9  the article about oxymorphone abuse,
10  correct?
11          MS. VANNI:  Object to form.
12          THE WITNESS:  Yes, I recall
13     the article.
14  BY MS. SCULLION:
15     Q.   Okay.  Do you have any
16  understanding about what Numorphan
17  product is referred to in this
18  contribution margin report?
19     A.   I have no idea.
20     Q.   Okay.  Let's go -- turn
21  another page back and you'll see at the
22  top, the product Opana ER.
23     A.   I see Opana.  Is there
24  supposed to be an Opana ER?

Page 407

1     Q.   Yeah.  If you go to the next
2  page, you'll see an Opana ER.
3     A.   Okay.
4     Q.   All right.  And here it's
5  just representing that the stub last five
6  months of 2006 for Opana ER.  Do you see
7  that?
8     A.   Yes.
9     Q.   Okay.  And here, I just want
10  to ask you about a few more of the -- of
11  the lines indicated on the left-hand
12  side.  We talked about a lot of them.
13          You mentioned price
14  equalization.  The next line is sales
15  promotions.  What was sales promotions?
16     A.   I don't know.  I wasn't
17  involved with Opana or Opana ER, other
18  than stocking.  That's my only
19  involvement.
20     Q.   You know what, fair enough.
21  Let's go -- let's go to the next page
22  then, which is oxycodone.
23     A.   And I assume this is
24  oxycodone ER; is that correct?

Page 408

1     Q.   I will tell you in this set
2  it's the only oxycodone page there is.
3  So that's my understanding.
4     A.   Okay.
5     Q.   Okay.  So again, let's look
6  down the line for price -- sorry, for
7  sales promotions.  And you'll see, just
8  for Period 1, 2.6 million, a little bit
9  more.  Do you see that?
10     A.   Yes.
11     Q.   What was sales promotions?
12     A.   I'm sure it was -- you know,
13  had to do with stocking.
14     Q.   So that would be --
15     A.   That's the only promotion
16  that we would ever -- you know, they put
17  it into a convenient P&L line.  But
18  that's only -- we didn't promote to
19  doctors.  So generics do not promote to
20  physicians, ever.
21     Q.   Just going down a few more
22  lines.  There's a reference to
23  distribution fees?
24     A.   Yes.

Page 409

1     Q.   And are -- are those the
2  percentage fees under the distributor --
3  distributor services agreement we talked
4  about earlier?
5     A.   I -- I'm assuming.  You
6  know, I'm assuming that's what it is.  I
7  don't know -- I don't know what -- I
8  haven't seen these P&Ls before, so...
9     Q.   Okay.  And then two more
10  lines down underneath that is an
11  administration fee.  Do you see that?
12     A.   Yes.
13     Q.   What was administration fee
14  separate from distribution fee?
15     A.   You know, I don't recall the
16  specifics.  It was some customers or
17  wholesaler -- whoever it was, they had --
18  they called it an admin fee?  I don't
19  remember what it was all for.  It was
20  just another fee, another charge, you
21  know, cost of doing business on the
22  account.
23     Q.   From your perspective it's
24  another thing you had to compete on for

Page 410

1    the account?
2        A.   Well --
3        MS. VANNI:  Object to form.
4        THE WITNESS:  Yes.  It's
5    another thing that we had to -- at
6    the end of the day you had to get
7    to a net price.  Okay.  So we
8    listed these things out in order
9    to make sure all the different
10   deductions were accounted for in
11   order that we get to a net price.
12   When we know the net price then we
13   know we can calculate our
14   profitability.  So when you take
15   all the deducts out and you get to
16   a net price, and you take off your
17   cost of goods, you now can
18   determine your profitability.
19   BY MS. SCULLION:
20       Q.   Okay.  So from your
21   perspective it didn't really much matter
22   which of the deducts it went into, as
23   long as, in the end, you got to a net
24   price that you can make a deal on?

Page 411

1        MS. VANNI:  Object to form.
2        THE WITNESS:  As long as we
3    got to net price that was
4    profitable and attractive to the
5    company.  And if it wasn't
6    attractive to the company, we
7    would have walked away.
8    BY MS. SCULLION:
9        Q.   Sure.  Understood.  But
10   again -- again, you get to a net price
11   that you would be willing to make a deal
12   on?
13       A.   Yes.
14       Q.   Okay.
15       MS. SCULLION:  Can I have
16   Tab 11, please.
17   BY MS. SCULLION:
18       Q.   You can put that aside.
19   Thank you very much.
20       (Document marked for
21       identification as Exhibit
22       Endo-Stevenson-30.)
23   BY MS. SCULLION:
24       Q.   I'll hand you what's been

Page 412

1    marked Exhibit 30.  And Exhibit 30 is
2    Bates-stamped ENDO-OPIOID_MDL-00877265.
3        Mr. Stevenson, drawing your
4    attention to the bottom e-mail.  It's
5    from a Chris Cresswell to you, Ron
6    Wickline, and Mark Gossett in May of
7    2006.  Do you see that?
8        A.   Yes.
9        Q.   And the subject is new NCPA
10   pharmacist research study.  "Are you
11   leveraging the pharmacist to grow your
12   marketplace."
13       Did I read that correctly?
14       A.   Yes.
15       MS. VANNI:  Market share.
16   BY MS. SCULLION:
17       Q.   Sorry.
18       A.   Market share, I'm sorry.
19       Q.   Market share.  I didn't read
20   it correctly.
21       "Are you leveraging the
22   pharmacist to grow your market share?"
23       What was NCPA?
24       A.   National -- it was basically

Page 413

1    the independent pharmacy trade
2    association.  They are equivalent of
3    NACDS.  And I forget what the letters
4    stand for.
5        Q.   Okay.
6        A.   National Community
7    Pharmacists Association.  I knew it would
8    come to me.
9        Q.   And did you know
10   Mr. Cresswell?
11       A.   No.
12       Q.   Okay.
13       A.   Not that I recall.  I mean I
14   could have met him.
15       Q.   Now, in his e-mail
16   Mr. Cresswell is outlining a few products
17   and services, research programs, and
18   in -- in his last paragraph what he calls
19   tools.
20       What's your understanding
21   of -- of what it is that Mr. Cresswell
22   was describing to you just generally?
23       A.   This was a long time ago.  I
24   don't really -- I mean, I don't know what

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1    it is. I don't remember what it is. It
2    was, you know, a national -- you know,
3    the NCPA was always -- you know, was
4    interested in trying to -- they had
5    programs that they designed for
6    independent pharmacists. And they were
7    looking for people that wanted to
8    participate. It was in my -- I just sent
9    it off to them as another, are you
10   interested in this, FYI, are you
11   interested in this, something we may want
12   to consider. That's -- that's what I see
13   here.
14        Q.   And so I think you are
15   talking to the -- the top e-mail where
16   you're passing along to Mr. Wickline and
17   Mr. Gossett, correct?
18        A.   Yes.
19        Q.   And as you say, you say,
20   "NCPA serves independent pharmacists. We
21   should evaluate which of these programs
22   we find appealing for oxymorphone
23   launch," correct?
24        A.   Yes.

Page 415

1         Q.   And so why would Endo even
2    potentially find a program offered by
3    NCPA for independent pharmacists
4    appealing to the oxymorphone launch?
5    What would the purpose be in such a
6    program?
7         MS. VANNI:  Object to form.
8         THE WITNESS:  In reading the
9    second, the bottom e-mail, it
10   talks about tutorial. It -- a
11   pharmacist education solution:
12        So what this would be, would
13   be part of the education program.
14   And what NCPA is offering is a --
15   appears to be a program for new
16   launches of how to educate the
17   pharmacists about the product.
18   That kind of thing is what I'm
19   reading here.
20   BY MS. SCULLION:
21        Q.   And how would educating a
22   pharmacist about the product, why would
23   that be important as part of a launch for
24   a product like oxymorphone?

Page 416

1         MS. VANNI:  Object to form.
2         THE WITNESS:  It would be
3    important just so the -- if, you
4    know, in this case it was an
5    opioid, so that it was coming out
6    and whatever the education program
7    is, it could have been a
8    noncontrolled drug. You know, any
9    time you had a product launch,
10   they wanted to say how they could
11   help you, and of course there was
12   a fee associated with that.
13        So that's why -- you know,
14   it should have said up above, if
15   any of these programs we find
16   appealing. Because there's a cost
17   associated with that. And
18   eventually somebody in sales, and
19   above, Mark Gossett was my boss at
20   the time, he would have to decide
21   whether or not they were
22   interested in spending the money
23   or found these programs
24   attractive.

Page 417

1         Most of the time, to my
2    knowledge, my recollection is they
3    didn't. You know, they didn't
4    engage in this.
5    BY MS. SCULLION:
6         Q.   Okay. Do you recall whether
7    Endo, in fact, engaged in such a
8    program --
9         A.   I don't recall.
10        Q.   -- for oxymorphone?
11        A.   I don't recall.
12        Q.   Fair enough.
13        MS. SCULLION:  Can I have
14   Tabs 2 and 4, please.
15        (Document marked for
16   identification as Exhibit
17   Endo-Stevenson-31.)
18   BY MS. SCULLION:
19        Q.   Let me hand you what's been
20   marked as Exhibit 31. And Exhibit 31 is
21   Bates-stamped ENDO-OPIOID_MDL-02255008.
22        And, Mr. Stevenson, do you
23   see that Exhibit 31 is a series of
24   e-mails between yourself and

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    Miss Kitlinski in February of 2004?
2        A.   Yeah -- yes.
3        Q.   Okay.  Again, let's start at
4    the back of the exhibit with -- beginning
5    at the chain of the e-mails.  And the
6    subject matter of her e-mail is urgent
7    regarding opioid education materials,
8    correct?
9        A.   Yes.
10       Q.   Okay.  And she says to you
11   she wants to "follow up on the opioid
12   education initiatives we discussed a few
13   weeks ago."  She goes on to explain, "I
14   know this is a high priority."  And that
15   she can't sign any CE agreements until
16   the budget has been approved.
17           Do you see that?
18       A.   Which paragraph are we in?
19       Q.   I was just reading the first
20   two paragraphs of her e-mail.
21       A.   Oh.  Oh, yes.  I'm sorry,
22   yes.
23       Q.   That's okay.
24       A.   Yes.

Page 419

1        Q.   Do you see that?  Okay.  And
2    CE agreements, those are continuing
3    education agreements, right?
4        A.   Yes.
5        Q.   Okay.  And then let's go up
6    to the -- your response e-mail.  It
7    actually begins at the very bottom of the
8    first page, but the text is at the top of
9    this --
10       A.   Okay.
11       Q.   -- second page.  And you are
12   addressing this to Steven?
13       A.   Andrzejewski.
14       Q.   Andrzejewski.
15           You say, "Steve, when we did
16   the original 2004 budget, as you
17   requested, 500,000 to be budgeted for
18   promotion."  Do you see that?
19       A.   Yes.
20       Q.   That was a promotion budget
21   for generic OxyContin, right?
22       A.   It was -- again, not to
23   physicians.  It was designed, as it says
24   there, a large part of this money was

Page 420

1    designed for CE programs.  And the rest
2    would have been for reminder ads and
3    things like that.
4        Q.   Okay.
5        A.   In this case, also for --
6    I'm guessing for mailers, in addition
7    to -- that the product was available.
8    Most of it was for CE programs which were
9    very expensive.
10       Q.   Okay.  And so just again to
11   break that down.  There was a budget for
12   promotion, and in your mind a large part
13   of that was -- of that budget was for CE
14   programs, right?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  Correct.
17   BY MS. SCULLION:
18       Q.   And then in addition, I
19   think you said there could have been
20   some -- some mailers and some ads, right?
21       A.   There could have been, yeah.
22   The problem with -- the problem with
23   the -- having a -- the problem with a
24   mailer for -- for an opioid drug is that

Page 421

1    there's so much information that it's not
2    a simple one page.  It's multiple pages.
3    And of course you get charged for every
4    page in the mailer.
5            So, you know, what could be
6    10,000 for one page can very quickly
7    balloon up to a big number, you know.
8        Q.   Okay.
9        A.   So that doesn't mean -- I
10   don't recall if we did it or not.  I'd
11   like to point out this was part of the
12   problem in this case.  This was 2004.  We
13   didn't get approval for the product until
14   June of, I think, '05.  Part of it was
15   the, you know, the estimation as to when
16   we were going to get approval.  We didn't
17   want to spend the money before we had --
18   we wanted to make sure we had a good
19   feeling that we were going to get
20   approval, not only approval but through
21   the legal process --
22       Q.   The patent litigation?
23       A.   -- approval post legal --
24   the patent litigation.  It was unclear

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1  when that was going to end.  So
2  obviously, these folks that are
3  identified, U.S. Pharmacists, PharmAlert,
4  PDQ, you know, they're pushing for
5  business all the time.
6       Q.   Understood.  And then, as
7  you said, a large part of the promotion
8  budget was set aside for CE programs, it
9  says, to support 3218.  That's the
10  generic oxy, right?
11       A.   That's generic -- that's
12  oxycodone ER, yes.
13       Q.   Okay.  And then -- and then
14  you go onto explain in the next paragraph
15  that, "Part of our RMP for 3218 calls for
16  a pharmacist education program."
17       Do you see that?
18       A.   Yes.
19       Q.   And the RMP there, that's
20  referring to the risk management plan,
21  right?
22       A.   Yes.
23       Q.   And so -- okay.  You then,
24  as you say, explained that from a

Page 423

1  budgetary standpoint you can't support
2  individualized customer CE programs, such
3  as the one for Walmart, one for CVS, et
4  cetera, right?
5       MS. VANNI:  Object to form.
6       THE WITNESS:  Correct.  And
7       it talks about Endo's policy calls
8       for CE programs to be run by our
9       clinical folks, which I testified
10       to earlier.
11  BY MS. SCULLION:
12       Q.   Understood.  And in that
13  same paragraph, that you're looking at
14  right now you explain that -- in the last
15  two sentences, the CE programs themselves
16  are not about 3218, but rather narcotic
17  analgesics.
18       Did I read that correctly?
19       A.   Yes.
20       Q.   So if I understand, you were
21  trying to say, look, these CE programs
22  even though they can be paid for by the
23  promotion budget for generic oxy, they're
24  really about narcotic analgesics more

Page 424

1  generally; is that right?
2       MS. VANNI:  Object to form.
3       THE WITNESS:  Yes, it was
4       not about -- normally these people
5       did not run -- they did not want
6       to view themselves in U.S.
7       Pharmacists as a promotional tool
8       for your product.
9  BY MS. SCULLION:
10       Q.   Okay.
11       A.   They were more than happy to
12  have a -- run a CE on an overall topic,
13  like narcotic analgesics.  And so yes, I
14  would say that's accurate.
15       Q.   Okay.  Now let's go to the
16  first page of Exhibit 31.
17  Mr. Andrzejewski agrees with you in terms
18  of your approach to the budget and use of
19  the funds, right?
20       A.   Yes.  Apparent -- yes.
21       Q.   Okay.  And Ms. Kitlinski
22  then responds to all -- to both of you in
23  her e-mail above saying, "Steve, George,
24  many thanks for the prompt reply.  I

Page 425

1  think your proposed path forward is the
2  right way to go."
3       Do you see that?
4       A.   Yes.
5       Q.   Okay.  She talks about
6  needing to discuss prioritization of the
7  initiatives.
8       And in her last paragraph,
9  she says, "My suggestion would be to move
10  forward with developing one program now
11  and initiate the others once launch
12  decision is made."
13       Do you see that?
14       A.   Yes.
15       Q.   And she explains, "George,
16  this would allow us to utilize a portion
17  of the budget for the opioid analgesic
18  brochure that was also included in your
19  presentation to the DEA."
20       Did I read that correctly?
21       A.   Yes.
22       Q.   Okay.  And you recall that
23  we looked at the RMP for generic
24  oxycodone and the reference to a patient

Highly Confidential - Subject to Further Confidentiality Review

Page 426

1    education brochure?  Do you recall that?
2        A.  Yes.
3        Q.   Okay.  And if you go up to
4    then your e-mail back, you're basically
5    agreeing with Ms. Kitlinski's suggested
6    approach, right?
7        A.  Yes.
8        Q.   Okay.  Great.
9            MS. SCULLION:  Can I have
10   Tab 4, please.
11           (Document marked for
12       identification as Exhibit
13       Endo-Stevenson-32.)
14   BY MS. SCULLION:
15       Q.   I'll hand you what's been
16   marked as Exhibit 32.  Exhibit 32 is
17   Bates-stamped ENDO-OPIOID_MDL-02255384.
18           And Mr. Stevenson, do you
19   recognize Exhibit 32 as a series of
20   e-mails concerning pharmacist educational
21   initiative in March of 2004?
22       A.  That's what it says.
23       Q.   Okay.  Let's go to --
24   actually, I apologize.  We don't need to

Page 427

1    do that one.  That's okay.  I apologize.
2            MS. SCULLION:  I think I
3        have the wrong document there,
4        because my numbers are not
5        matching up.
6    BY MS. SCULLION:
7        Q.   You know what?  You can put
8    this exhibit aside.  We may or may not
9    come back to it.
10           MS. SCULLION:  Don't worry
11       about it.  We'll move on.  That's
12       all right.
13       Can I have Tab 69, please.
14       Before we even start, do you
15       want to take a quick break?  Take
16       a quick break and come back in.
17           THE VIDEOGRAPHER:  Off the
18       record, 4:11.
19           (Short break.)
20           THE VIDEOGRAPHER:  We are
21       back on the record at 4:25.
22           (Document marked for
23       identification as Exhibit
24       Endo-Stevenson-33.)

Page 428

1    BY MS. SCULLION:
2        Q.   Welcome back, Mr. Stevenson.
3            Let me hand you what's been
4    marked as Exhibit 33.  And Exhibit 33 is
5    Bates-stamped ENDO-OPIOID_MDL-02255803.
6            Mr. Stevenson, do you
7    recognize -- sorry, do you see that
8    Exhibit 33 is an e-mail from Carey Aron
9    to yourself and a few other folks in May
10   of 2004?
11       A.  Yes.
12       Q.   And the subject matter here
13   is opioid patient brochure - production
14   ready.  Do you see that?
15       A.  Yes.
16       Q.   All right.  And at the
17   bottom of the e-mail you'll see Carey
18   Aron is identified as the associate
19   director of clinical development
20   education and scientific affairs.
21           Do you see that?
22       A.  For Endo.
23       Q.  Yes.
24       A.  Yes.

Page 429

1        Q.   Just giving you some
2    orientation here.  Let me go back to the
3    body of the e-mail.  I apologize.  Is
4    Carey man or woman?  Do you remember?
5        A.   I beg your pardon?  Could
6    you say that again?
7        Q.   Do you remember if Carey was
8    a man or woman?
9        A.   To be honest, I don't.
10       Q.   We're going to go with
11   mister just for no reason.  Mr. Aron
12   says, "I'm happy to inform you that the
13   final version of the opioid patient
14   brochure ('Understanding your pain:
15   Taking oral opioid analgesics') is now
16   fully PMRB approved and ready for
17   production (PDF of final version
18   attached)."
19           Do you see that?
20       A.   Yes.
21       Q.   Okay.  And you recall again
22   the reference in the risk management plan
23   that we looked at earlier to this opioid
24   patient brochure?

108 (Pages 426 to 429)

Highly Confidential - Subject to Further Confidentiality Review

Page 430

1    A.   Yes.
2    Q.   Okay.  And then if you go
3  down to the next paragraph -- sorry, next
4  paragraph, Mr. Aron is asking for certain
5  information from you, Debbie Travers and
6  others in order to make appropriate
7  decisions regarding the initial print run
8  for the brochure, correct?
9    A.   Yes.  It appears that way,
10  yes.
11    Q.   Okay.  And the first bullet
12  point discusses the budget for the
13  brochures, and then there's a couple
14  sub-bullets under that.  The first one is
15  addressed to you.  "George, as above
16  relative to 3218."  And that's the
17  generic oxycodone again, right?
18    A.   Yes.
19    Q.   And then it goes on in the
20  next paragraph.  "As above relative to
21  EN3202/03."  And you'll recall that we
22  saw those numbers refer to Opana IR and
23  ER, right?
24    A.   Yes, and Deb Travers and

Page 431

1  Jerry McLaughlin were brand marketing.
2    Q.   Okay.  So this was a patient
3  brochure that was contemplated to be used
4  in association with both the generic
5  oxycodone product and the branded
6  oxymorphone products, right?
7    A.   It was available as a tool,
8  as I understand it.
9    Q.   Okay.  And then this is a
10  brochure that, again, was designed
11  specifically to be distributed to
12  patients, correct?
13      MS. VANNI:  Object to form.
14      THE WITNESS:  I don't know.
15  I don't know who it was designed
16  to be distributed.  I don't recall
17  who -- who the audience was.
18  BY MS. SCULLION:
19    Q.   Yeah, it's described as the
20  opioid patient brochure, correct?
21    A.   Yes, yes, yes.  But I'm not
22  sure that it was -- yes, patient
23  brochure, yes.
24    Q.   Okay.  So it's designed to

Page 432

1  go to patients, right?
2    A.   I believe so.
3    Q.   Okay.  And let's look at the
4  actual brochure itself.  Go to Page 5804
5  in the lower right-hand corner.  You see
6  the cover for "Understanding your pain:
7  Taking oral opioid analgesics," right?
8    A.   Yes.
9    Q.   All right.  And if you go to
10  Page 5806 in the lower right-hand corner
11  of the brochure, looking in the
12  right-hand column under the heading,
13  "What should I know about opioids and
14  addiction?"
15      Do you see that?
16    A.   Yes.
17    Q.   Okay.  And then the text
18  describes statements about what addiction
19  allegedly is and isn't, correct?
20    A.   Yes.
21      MS. VANNI:  Object to form.
22  BY MS. SCULLION:
23    Q.   The third sentence in that
24  section states, "Addiction is a chronic

Page 433

1  brain disease that can occur in some
2  people exposed to certain substances such
3  as alcohol, cocaine, and opioids."
4      Did I read that correctly?
5    A.   You did.
6    Q.   Is that consistent with your
7  understanding that addiction is in fact a
8  chronic brain disease?
9    A.   I'm not an expert.  I'm
10  not -- I'm not a doctor.  So I would
11  not -- I could not testify as to what it
12  is.
13    Q.   Okay.  But fair to say that
14  addiction, though, is a medical
15  condition, right?
16      MS. VANNI:  Object to form.
17      THE WITNESS:  It's -- it's a
18  condition -- yes, it's -- I --
19  yeah, you can say a medical
20  condition.
21  BY MS. SCULLION:
22    Q.   I mean, as you said, you
23  don't feel comfortable speaking to it
24  because you're not a medical doctor,

109 (Pages 430 to 433)

Page 434

1  right?
2      A.   Right, exactly.
3      Q.   So it's something that a
4  medical doctor should be speaking to,
5  correct?
6      A.   Correct.
7      Q.   All right.  Not something an
8  average person could diagnose?
9          MS. VANNI:  Object to form.
10          THE WITNESS:  I don't
11      think -- I don't think addiction
12      was designed to be -- that
13      somebody could -- that somebody
14      could diagnose it.  It was -- I
15      think what it's saying here,
16      addiction is a chronic brain
17      disease, et cetera, that as you
18      read it, as trying to find what it
19      is.
20          And then it goes on to say,
21      as I'm sure you'll cover, what
22      it's not.
23  BY MS. SCULLION:
24      Q.   Right.  And I'm just asking,

Page 435

1  you know, putting aside what the brochure
2  is saying right there, though, your
3  understanding, though, addiction is not
4  something that an average person should
5  be trying to diagnose themselves, right?
6          MS. VANNI:  Object to form.
7          THE WITNESS:  Average -- I
8      don't -- I can't answer that, what
9      the average person should be
10      diagnosing or not diagnosing.
11  BY MS. SCULLION:
12      Q.   Well, as you say, it is a
13  medical condition.  You typically would
14  go to a doctor to diagnose a medical
15  condition, right?
16      A.   Yes.  You would go to a
17  doctor to diagnose a medical condition.
18      Q.   Okay.  And we've seen in the
19  risk management plan, in fact, there's a
20  whole field of medicine that specializes
21  in addiction, correct?
22      A.   I don't know if I would say
23  specializes in addiction, but I guess you
24  could say that.

Page 436

1      Q.   Well, the risk management
2  plan that we looked at refers to, among
3  the various societies, the American
4  Society For Addiction Medicine.  You've
5  heard of them?
6      A.   Not -- you know, I'm not
7  familiar with them, but yes, okay.
8      Q.   Okay.  And then let's go see
9  what the brochure then actually tells
10  patients.  The next page, if you go to
11  the next page of the brochure, you see in
12  the top left-hand corner it asks the
13  question, "How can I be sure I'm not
14  addicted?"
15      A.   Yeah.
16      Q.   Do you see that?
17      A.   Yeah.
18      Q.   And the first bullet point
19  under that talks about, again, what
20  addiction allegedly means in terms of
21  whether a pain has gone away.
22          Do you see that?
23      A.   Yes.
24          MS. VANNI:  Object to form.

Page 437

1  BY MS. SCULLION:
2      Q.   And the next bullet point
3  after this question, "How can I be sure
4  I'm not addicted?"
5          Can you read for the jury
6  what the brochure states in answer to
7  that question?
8      A.   The first bullet?
9      Q.   Second bullet point?
10      A.   "Ask yourself: Would I want
11  to take this medicine if my pain went
12  away?  If you answer no, you are taking
13  opioids for the right reasons, to relieve
14  your pain and improve your function.  You
15  are not addicted."
16      Q.   Right.  Now, again, the
17  brochure says that after asking the
18  question, "how can I be sure I'm not
19  addicted?"  Right?
20      A.   That's what it says, yes.
21      Q.   It doesn't say, "What are
22  signs of addictions?"  Right?
23          MS. VANNI:  Object to form.
24          THE WITNESS:  No, not in

Highly Confidential - Subject to Further Confidentiality Review

Page 438

1     that particular page.  But if I go
2   back to 806, it describes what
3   addiction is not.
4   BY MS. SCULLION:
5     Q.   Right.
6     A.   And there's a whole
7   paragraph that describes what addiction
8   is not.
9         So it does in the brochure
10  address as a way for the patient to
11  identify if, you know, they have some
12  signs of addiction in order that if it
13  was -- they felt they were addicted, it
14  was designed to be able to go back to a
15  medical doctor.
16    Q.   Well, that's not what it
17  does on this page though, right?  On this
18  page, it doesn't say, you know, "Go to
19  your doctor to be sure whether you are
20  addicted," right?
21        MS. VANNI:  Object to form.
22        THE WITNESS:  No, it doesn't
23    say that on that page.
24  BY MS. SCULLION:

Page 439

1     Q.   No.  It says --
2     A.   But it does on 06.
3     Q.   Okay.  We'll get back to 06.
4   But on this page, it's saying to a
5   patient, "How can I be sure I'm not
6   addicted?"  And what it's telling the
7   patient is ask yourself this question,
8   right?
9     A.   Yeah.  Well, that's -- I
10  mean, yes.  Yes, that's correct.
11    Q.   Okay.  I think you referred
12  earlier to television ads for drug
13  products.  Do you remember referring to
14  that earlier, right?
15    A.   Yes, absolutely.
16    Q.   And, you know, in all those
17  TV ads, right, you see TV ads for drug
18  products, we hear that the tagline, "Ask
19  your doctor" -- right -- "if X is right
20  for you."  That's typically what we hear,
21  right?
22        MS. VANNI:  Object to the
23    form.
24        THE WITNESS:  Yes, I would

Page 440

1     say that's probably typical, yeah.
2   BY MS. SCULLION:
3     Q.   Okay.  But in this brochure,
4   it's going to patients about pretty
5   serious topic about opioid use and
6   addiction, it doesn't say here, "Ask your
7   doctor if you're addicted," right?
8         MS. VANNI:  Object to form.
9         THE WITNESS:  It implies,
10    certainly on 06, you should ask
11    your doctor.  It says
12    specifically, "Your doctor will
13    avoid stopping your medication
14    suddenly."  It goes on, et cetera.
15    It applies that you have
16    interaction with a physician.
17  BY MS. SCULLION:
18    Q.   I understand.  We'll come
19  back to 06.  I'm happy to talk about 06.
20  But on this page, this is talking about
21  the critical question that some patients
22  would have, "How can I be sure I'm not
23  addicted?"  That's the question this page
24  is addressing, right?

Page 441

1     A.   Yes.  It's designed -- yes,
2   it is, yes.
3     Q.   Right.  And what it's
4   suggesting to patients is they should
5   self-diagnose --
6         MS. VANNI:  Objection.
7   BY MS. SCULLION:
8     Q.   -- by asking themselves this
9   question.
10        MS. VANNI:  Object to form.
11        THE WITNESS:  I don't agree
12    with the characterization of your
13    question.  So --
14  BY MS. SCULLION:
15    Q.   Well, it does say, in
16  response to, "How can I be sure I'm not
17  addicted?"  The response is, "Ask
18  yourself this question," right?
19    A.   Well, that's just -- that's
20  what it says.
21    Q.   Right.  Now, you understand
22  that if someone were addicted, that's a
23  condition that could impact, among other
24  things, their willingness to be honest

111  (Pages 438 to 441)

Highly Confidential - Subject to Further Confidentiality Review

Page 442

1    with themselves about their condition,
2    right?
3            MS. VANNI:  Objection.
4    Foundation.
5            THE WITNESS:  I can't answer
6    what everybody is going to think
7    or not think.  So, I mean, that's
8    just not -- I can't testify to
9    that.
10   BY MS. SCULLION:
11       Q.   I mean, I think just from
12   your common experience as a human being
13   in the world, I mean, addicts often have
14   a hard time admitting to themselves that
15   they are addicted, correct?
16           MS. VANNI:  Objection.
17           THE WITNESS:  This brochure
18   and the paragraph you're referring
19   to is trying to give the patient a
20   question in case they believe they
21   have an issue.
22           If you're taking, as it says
23   here, would I take -- would I
24   want -- would I want to take this

Page 443

1    medicine if my pain went away.  If
2    you answer no, you are taking the
3    opioid for the right reasons, to
4    relieve your pain and improve your
5    function.  That's what opioids do.
6    Pain management, quality of life.
7    That's what they do.  Obviously if
8    you're -- if you -- obviously if
9    you are taking this, if the pain
10   does go away, that means that, you
11   know, you may have a problem and
12   need to go take a -- see a doctor.
13           Whether or not the person is
14   willing to step forward is -- is
15   up to the individual.
16   BY MS. SCULLION:
17       Q.   That's right.  It's up to
18   them whether they would answer that
19   question, that's posed here, whether they
20   would answer it honestly to themselves,
21   right?
22       A.   Endo can't, or any company
23   cannot have any control over that.
24       Q.   Right.  So as you say, there

Page 444

1    can be good reasons to -- to be taking
2    opioids, right, for -- for pain
3    management, right?
4        A.   For pain management.
5        Q.   Right.  But this part of
6    this brochure is addressed to one of the
7    risks that is inherent in opioid
8    products, and that is the risk of
9    addiction, right?
10       A.   Risk of addiction, yes.
11       Q.   And that's a -- that's a
12   serious important topic, right?
13       A.   Of course it's a serious
14   important topic, yes.
15       Q.   And -- and patients, by
16   definition, would have been concerned to
17   understand how they could be sure whether
18   they were addicted to the opioids, right?
19           MS. VANNI:  Object to form.
20           THE WITNESS:  Could you
21   restate that, please?
22   BY MS. SCULLION:
23       Q.   Sure.  I mean, this brochure
24   is asking this question for a reason,

Page 445

1    because it thinks patients would want to
2    look at this issue and be able to
3    understand what -- how they would know if
4    they are addicted or not, right?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  It's designed
7    to have a -- yes.  It would be an
8    indication if they had a -- if
9    they -- if they were addicted or
10   not.  If they are -- if they are
11   taking the opioid for other than
12   pain relief, that would be an
13   indication that they probably
14   should see a medic -- that they
15   should see a medical doctor.
16   BY MS. SCULLION:
17       Q.   Okay.  But right here on
18   this page, it doesn't say if you have any
19   of the signs of addiction, go ask your
20   doctor to be sure, that's not what it
21   says, right, we agreed on that?
22           MS. VANNI:  Object to form.
23           THE WITNESS:  It doesn't say
24   that on this page, no.

112  (Pages 442 to 445)

Page 446

BY MS. SCULLION:
Q.   Right.  And so looking at this page and reading this page on this brochure on this important topic of addiction, a patient could understand that what they should be doing is asking themselves this question.  And if they answer it no, then they can be sure they are not addicted.
MS. VANNI:  Objection.
BY MS. SCULLION:
Q.   Right?
A.   If they answer it no and they still have pain, yes, that's correct.
Q.   Well, but no, it just -- it just says if they answer it no.
A.   "If you answer no you are taking opioids for the right reason.  It's designed as a simple" -- "it's designed as a simple way for the patient to check whether or not they believe they have a problem or not.  If they are taking the opioids for pain management,

Page 447

then they are taking it for the right reason.  If they are not taking it for pain management or quality of life," as it says there, or to be clear, not quality of life.  "To relieve your pain and improve your function," then if -- if that's why -- if they are taking it for other than that, then -- then it indicates that you have a problem.  And it implies you should go see obviously a medical professional.
Q.   Right.  But it's asking the patient to make that self-assessment, right?
MS. VANNI:  Object to form.
BY MS. SCULLION:
Q.   About why they are taking the opioids?
A.   Well, we talked a moment ago about human beings.  Most human beings are going to -- if I read that I would say a-ha, if that's my case I would say -- I would now be able to tell pretty clearly using common sense whether I had

Page 448

an addiction problem or not.
Q.   And it doesn't talk about what level of pain, right?
I mean pain has different levels, right?
A.   There's different levels of pain.  But that -- that's determined by the physician when he prescribes the product.
Q.   Agreed.  A physician should determine the medication based on the level of pain, right?
A.   Well, of course.
Q.   And -- but this is not asking -- saying that.  This is saying to the patient individually, you determine if you are still taking it for pain.  That pain could be far lower than what a physician would agree is appropriate to use opioids for --
MS. VANNI:  Objection.  Misstates the document.
THE WITNESS:  No, I -- I disagree with that.

Page 449

MS. VANNI:  Asked and answered.
THE WITNESS:  This is saying to somebody who is under the care of a doctor who is being prescribed an opioid product by a doctor, that if they are taking that, and they have some concern that they are addicted to the product, if they have pain, then -- and -- I want to read it correctly.
If they have pain and their functions are improved by the opioid product that the doctor has prescribed, that doesn't mean they are addicted.  That's what it's saying.
BY MS. SCULLION:
Q.   Okay.  Now, you were -- you were looking at Page 06 before.  And I think you were looking under the column "What should I know about opioids and addiction?"

113  (Pages 446 to 449)

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1          Is that right?
2     A.   Correct.
3          Q.   And you pointed to, in the
4    second paragraph, the sentence, "Your
5    doctor will avoid stopping your
6    medications suddenly by slowing
7    reduce" -- "slowly reducing the
8    medication" -- let me start again.
9    Sorry.
10          "Your doctor will avoid
11   stopping your medication suddenly by
12   slowly reducing the amount of opioid you
13   take before the medicine is completely
14   stopped."
15          Did I read that correctly?
16     A.   Yes.
17          Q.   And nothing in that sentence
18   says, if you have concerns that you may
19   be addicted, ask your doctor to be sure;
20   that's not what it says, right?
21          MS. VANNI:  Object to form.
22          THE WITNESS:  No, but it
23     certainly implies that you're
24     talking to a doctor.

Page 452

1          THE WITNESS:  If you're
2    taking any kind of medication,
3    opioid or non-opioid, you are
4    getting that medication through an
5    interaction with a physician.  And
6    if you're on pain management
7    medication, you would be under the
8    care of a -- of a medical doctor
9    in order to get that pain
10   management prescription.  So it
11   implies that you are interacting
12   with a physician.
13          So this was written by the
14   clinical people.  I didn't write
15   this.  This was written by the
16   science people of the company.
17   That's who wrote this document.
18          But it -- obviously it goes
19   to the patient, but it's just
20   designed to make them aware
21   this -- these are some signs to be
22   aware of in case -- you know, so
23   they are educated that they should
24   be aware of when they -- what

Page 451

1    BY MS. SCULLION:
2          Q.   Understood.  This is going
3    to patients, right?
4     A.   Yes.
5          Q.   Right.  But again, as we saw
6    on the page, it actually asks about how
7    can I be sure I'm not addicted.  The one
8    thing it doesn't say is ask your doctor,
9    right?
10          MS. VANNI:  Object to form.
11    Asked and answered.
12          THE WITNESS:  If you are
13     taking an opioid medication, it
14     has to be prescribed by a medical
15     doctor.
16   BY MS. SCULLION:
17          Q.   Correct.  But going back to
18   Page 07, the next page, in answer to the
19   question, "How can I be sure I'm not
20   addicted," the one thing that doesn't say
21   there is ask your doctor if you want to
22   sure if you're addicted.
23          MS. VANNI:  Objection.
24     Asked and answered.

Page 453

1    addiction -- what addiction is not
2    and if they are taking pain
3    medication or thinking to
4    themselves, gee whiz, I'm still
5    taking pain medication, am I
6    addicted.  If the answer is no,
7    you are taking opioids -- you're
8    taking -- right -- opioids for the
9    right -- to relieve your pain and
10   improve your function.
11          So it -- it obviously
12   implies you're interacting with a
13   doctor because you couldn't get
14   the prescription to begin with.
15          MS. SCULLION:  I'm going to
16     move to strike the response there
17     as nonresponsive.
18   BY MS. SCULLION:
19          Q.   Mr. Stevenson, I'm just
20   asking though, factually, in response to
21   the question, "How can I be sure I'm not
22   addicted," the one thing that's not
23   stated in this response that the patient
24   would be reading is ask your doctor to be

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1    sure whether you're not addicted?
2         MS. VANNI:  Objection.
3    BY MS. SCULLION:
4         Q.   It doesn't say that
5    factually.
6         MS. VANNI:  Object to form.
7    Asked and answered.
8         THE WITNESS:  No, we've
9    already -- already testified to
10   that.
11   BY MS. SCULLION:
12        Q.   Okay.
13        A.   But it -- but I also want to
14   be clear in the characterization of my
15   answer, it implies interaction with a
16   doctor.  You are implying.  That's why I
17   disagree with the characterization of the
18   line of inquiry that somehow the patient
19   is taking opioids outside the -- outside
20   the prescription of a medical doctor.
21        MS. SCULLION:  So I'm going
22   to move to strike everything after
23   that I've already testified to
24   that.

Page 455

1    BY MS. SCULLION:
2         Q.   And, Mr. Stevenson, I
3    understand you didn't write the brochure.
4    I understand that.  Do you agree though
5    it would be important to be as clear as
6    possible with patients about an issue
7    such as how they could be sure about
8    whether they were addicted to opioids?
9         A.   Clarity is always good.
10        Q.   Okay.
11        MS. SCULLION:  I have no
12   further questions for you today.
13   Thank you for your time.
14        THE WITNESS:  Okay.
15        MS. SCULLION:  I think we're
16   going to take a quick break and my
17   colleague from Tennessee will be
18   asking some questions.
19        THE WITNESS:  Okay.
20        THE VIDEOGRAPHER:  Off the
21   record, 4:48.
22        (Short break.)
23        THE VIDEOGRAPHER:  We are
24   back on the record at 4:55.

Page 456

1         - - -
2         EXAMINATION
3         - - -
4    BY MR. LENISKI:
5         Q.   Good afternoon,
6    Mr. Stevenson.  My name is Joe Leniski.
7    We were introduced earlier.  I'm from the
8    State of Tennessee, and I represent
9    plaintiffs in the State of Tennessee.
10   I'm going to follow up with some
11   questions for you today.
12        How are you feeling?  Okay?
13        A.   I'm feeling great.
14        MR. LENISKI:  We have a
15   standing objection, the Tennessee
16   plaintiffs do, to these
17   depositions, which I'll adopt
18   here, due to a number of different
19   issues, lack of notice, lack of
20   document production, because
21   different civil rules of procedure
22   apply in Tennessee.
23        And I will adopt that
24   objection, as I have in other

Page 457

1    depositions.  And nonetheless, in
2    the spirit of cooperating with the
3    MDL and under the protocol
4    established by that court, we're
5    here today to ask questions.
6         If there's no response,
7    I'll --
8         MS. VANNI:  No objection.
9         MR. LENISKI:  -- continue.
10        MS. VANNI:  So noted.
11        MR. LENISKI:  Thank you.
12   BY MR. LENISKI:
13        Q.   Before your deposition,
14   Mr. Stevenson, we asked Endo's lawyers if
15   you had any knowledge that was specific
16   to the State of Tennessee.  And they
17   responded that your responsibilities
18   while you were at Endo were national in
19   scope and not particular to Tennessee,
20   and that you didn't -- effectively, you
21   didn't have any Tennessee-specific
22   knowledge that you gained while you were
23   at Endo.
24        Do you agree with that

Highly Confidential - Subject to Further Confidentiality Review

Page 458

1    statement?
2        A.   Absolutely true.
3        Q.   Okay.  So, for example,
4    during your tenure at Endo, while you may
5    not have had specific knowledge, did you
6    know that Endo did sell its opioid
7    products in the State of Tennessee?
8        A.   Endo sold their products
9    nationally, so including Tennessee.
10       Q.   Okay.  What did you know
11   about opioid abuse rates in Tennessee
12   during your time at Endo?
13       A.   Nothing.
14       Q.   While employed at Endo, did
15   you have any understanding of the level
16   of opioid use in Tennessee relative to
17   other states?
18       A.   No.
19       Q.   While employed at Endo, did
20   you have any understanding of the level
21   of opioid abuse in Tennessee relative to
22   other states?
23       A.   No.
24       Q.   While employed at Endo, did

Page 459

1    you know that opioid abuse rates -- or
2    have any understanding that opioid abuse
3    rates were higher in Tennessee than
4    almost anywhere else in the country?
5            MS. VANNI:  Object to form.
6            THE WITNESS:  No.
7    BY MR. LENISKI:
8        Q.   Now, most of my clients are
9    district attorneys in the State of
10   Tennessee.  They represent districts in a
11   part of Tennessee that we refer to as
12   Appalachia.  Have you heard of Appalachia
13   before?
14       A.   Yes.
15       Q.   Okay.  And do you have a
16   general understanding that parts of
17   Tennessee are located in Appalachia?
18       A.   I always thought Appalachia
19   was located in Tennessee.  But yes.
20       Q.   Certainly is.  I think it's
21   a wider region.  Do you understand other
22   states would also be included in the
23   region known as Appalachia?
24       A.   I guess so, if I think about

Page 460

1    it now, yes.
2        Q.   And basically it's just a
3    range of -- is a range of -- the region,
4    rather, around the Appalachian Mountains.
5        A.   Okay.
6        Q.   Did you gain any -- while
7    you were employed at Endo, did you gain
8    any understanding about opioid use in
9    Appalachia?
10       A.   No.
11       Q.   Did you learn anything
12   during your time at Endo of opioid abuse
13   rates in Appalachia relative to other
14   areas of the country?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  No.
17   BY MR. LENISKI:
18       Q.   Okay.  So you did not have
19   any understanding while you were at Endo
20   that the level of opioid abuse in
21   Appalachia was relatively higher than
22   other parts of the country?
23           MS. VANNI:  Object to form.
24           THE WITNESS:  No.  I had no

Page 461

1            knowledge of that.
2    BY MR. LENISKI:
3        Q.   Okay.  I also represent
4    individual infants and toddlers in
5    Tennessee who were born afflicted with
6    neonatal abstinence syndrome, or what's
7    called NAS, because their mothers abused
8    opioids while pregnant.  Have you ever
9    heard of neonatal abstinence syndrome?
10       A.   No.
11       Q.   Okay.  Did you ever hear the
12   term "epidemic" used to describe opioid
13   use in this country while you were
14   employed at Endo?
15           MS. VANNI:  Object to form.
16           THE WITNESS:  I'm not sure
17   when I heard -- when I was at Endo
18   I heard the word "epidemic."  I
19   can't -- I can't testify that.
20   I've heard it recently in the
21   news.  But I would say when I was
22   at Endo, I can't recall that.
23   BY MR. LENISKI:
24       Q.   Okay.  So was the term

Highly Confidential - Subject to Further Confidentiality Review

---

Page 462

1  "opioid epidemic" ever used, to your
2  knowledge, at Endo while you were
3  employed there?
4        MS. VANNI:  Object to form.
5        THE WITNESS:  To my
6  knowledge, no.
7  BY MR. LENISKI:
8     Q.   Did you ever hear the term
9  "epidemic" to describe Opana use in this
10  country while you were employed at Endo?
11     A.   No.
12     Q.   Do you recall being asked
13  questions early today about the 2003
14  meetings between Endo and the DEA and FDA
15  with respect to oxymorphone ER and IR?
16        MS. VANNI:  Objection.
17        THE WITNESS:  I was not
18  at -- I wasn't at a DEA involving
19  oxymorphone IR and ER.
20  BY MR. LENISKI:
21     Q.   I'm sorry.  I think you were
22  asked questions about MDL counsel about
23  generic OxyContin that Opana -- or that
24  Endo was launching in 2003.  Do you

---

Page 463

1  recall that?
2     A.   We were hoping to launch in
3  2003.  We launched it in June of '05.
4     Q.   Okay.  Did you have any
5  involvement or any responsibilities
6  relative to Endo's launch of oxymorphone
7  ER or IR around that time frame of 2003?
8     A.   No.
9        (Document marked for
10  identification as Exhibit
11  Endo-Stevenson-34.)
12  BY MR. LENISKI:
13     Q.   There's copies there for
14  your attorney.
15     A.   Oh, sorry.
16        MS. VANNI:  You don't need
17  to apologize.
18  BY MR. LENISKI:
19     Q.   I handed the witness a
20  document that we've identified as
21  Exhibit 34 to his deposition.  This is
22  ENDO-OPIOID_MDL-01716696.
23        MS. VANNI:  Is this one
24  page, Counsel?

---

Page 464

1        MR. LENISKI:  It's one page.
2  It's double-sided.
3        MS. VANNI:  I think you just
4  had an extra copy.  Thank you.
5  BY MR. LENISKI:
6     Q.   I've handed you Exhibit 34,
7  which is a series of e-mails that are
8  dated between June 30, 2003, and
9  July 1st, 2003.  The very first e-mail on
10  the chain, which is on the second page of
11  Exhibit 34, is from Bob Barto.  And it's
12  subject "Agency contact report,
13  oxymorphone ER and IR."
14        Do you see that?
15     A.   Which one is it?  Where is
16  Bob Barto?  Oh, yeah, there -- sorry.
17  Yeah.  Okay.
18     Q.   Did you find that?
19     A.   Yes.
20     Q.   And who is Bob Barto?
21     A.   I don't know exactly.  Based
22  on the documents that I've seen, he was
23  involved in regulatory affairs.
24     Q.   His e-mail reads, "Please

---

Page 465

1  see attached agency contact report
2  regarding oxymorphone ER and IR trade
3  name submission and risk management
4  plan."
5        Did I read that correctly?
6     A.   Yes.
7     Q.   The e-mail directly above
8  that is from Debbie Travers to Scott
9  Shively.  And Miss Travers, who was
10  copied on or a recipient of Mr. Barto's
11  e-mail below is forwarding this e-mail to
12  Scott Shively.  And who was Scott
13  Shively?
14     A.   He was the vice president of
15  brand marketing.
16     Q.   Okay.  So you were on the
17  generic side at Endo and he was on the
18  brand side; is that correct?
19     A.   Yes.
20     Q.   Okay.
21     A.   I was copied on here as a
22  convenience.  I wasn't involved in the
23  product, but...
24     Q.   Well, you are jumping ahead

---

Highly Confidential - Subject to Further Confidentiality Review

Page 466

1    a little bit.  We'll get there, but
2    there's an e-mail from Ms. Travers to
3    Mr. Shively.  And she says, "Here it is.
4    They claim that our risk management plan
5    is not enough.  But were nice enough to
6    point us in the right direction."
7         Did I read that correctly?
8         A.   Yes.
9         Q.   Okay.  And then Mr. Shively
10   writes back -- or actually he actually
11   sends an e-mail to both Debbie Travers
12   and then a number of individuals
13   including MaryAlice Raudenbush.
14        A.   Yes.
15        Q.   Raudenbush -- later on
16   June 30, 2003.  Do you see that e-mail?
17        A.   Yes, I do.
18        Q.   And he says, "MaryAlice,
19   'really deficient' with regard to our
20   risk management plan does not sound very
21   good.  It seems we have a lot of work to
22   do."
23        Did I read that correctly?
24        A.   Yes.

Page 467

1         Q.   Okay.  Miss Raudenbush
2    writes back to Mr. Shively, also on
3    July 1st, 2003, correct?
4         A.   Yes.
5         Q.   And she says, "Scott, FDA
6    indicated that we have the right elements
7    but these are 'soft.'  Our plan as
8    currently presented is quite vague and
9    lacks direction.  It appears we also need
10   to address diversion from multiple
11   angles, i.e., tracking prescriptions by
12   region, trends, et cetera, as well as the
13   actual distribution of our products from
14   Memphis."
15        Did I read that correctly?
16        A.   Yes.
17        Q.   Okay.  And then Mr. Shively
18   in the final e-mail on this exhibit
19   responds to MaryAlice Raudenbush, and he
20   copies you and a number of other
21   individuals.
22        He writes, "MaryAlice,
23   thanks, that helps a bit.  My big concern
24   all along has been that we would be asked

Page 468

1    to 'track' prescriptions/patients.
2    Depending on what this translates to it
3    can be very laborious and very expensive
4    (a patient registry is the extreme case).
5    If it is just regional, that is
6    manageable, i.e., looking for 'macro
7    trends' and areas for concern."
8         Did I read that correctly?
9         A.   Yes.
10        Q.   Do you recall receiving that
11   e-mail?
12        A.   No.
13        Q.   Do you know why you were
14   copied on the e-mail from Mr. Shively?
15        A.   Because he brought up at the
16   last sentence, "We have to do the same
17   for 3218," which would be oxycodone ER.
18   So he was just asking a question whether
19   or not this would now be required.
20        Q.   Okay.  And --
21        A.   He was filling me in on
22   that, I guess so I would be aware of it.
23        Q.   Okay.  Do you recall
24   responding to Mr. Shively --

Page 469

1         A.   I don't.
2         Q.   -- about his question --
3         A.   No.
4         Q.   -- in this e-mail?
5         A.   No.
6         Q.   Okay.  And do you remember
7    what the answer was whether the same
8    would be required for the -- for Endo's
9    generic launch of OxyContin to track
10   prescriptions in patients?
11        A.   I don't remember.
12        Q.   Did you have any
13   responsibilities with respect to
14   implementing any system for tracking
15   prescriptions or patients for either
16   oxymorphone ER and IR or what's numbered
17   here as 3218 which is the generic
18   OxyContin?
19        A.   No.  Just as I testified to
20   numerous times today, oxymorphone ER and
21   IR was a brand.  I was not involved with
22   the brand other than for stocking of the
23   product in late '06 and into '07.
24        Q.   Okay.

118 (Pages 466 to 469)

Highly Confidential - Subject to Further Confidentiality Review

Page 470

1    (Document marked for
2    identification as Exhibit
3    Endo-Stevenson-35.)
4    BY MR. LENISKI:
5    Q.   I'm handing the witness
6    what's been identified as Exhibit 35 to
7    his deposition.  This is
8    ENDO-OPIOID_MDL-01692316.
9        Mr. Stevenson, would you
10   agree this is an e-mail from Sue Tolen to
11   a number of individuals including
12   yourself dated July 14, 2003?
13   A.   Yes.
14   Q.   And the title of this e-mail
15   is action plan to prevent diversion,
16   correct?
17   A.   Diversion abuse of
18   OxyContin, yes.
19   Q.   Well, that is -- the subject
20   of the e-mail is action plan to prevent
21   diversion.
22   A.   Oh, excuse me.  Subject.
23   Q.   Right?
24   A.   Yes, the subject, yes, is

Page 471

1    action plan to prevent diversion.  Yes.
2    Q.   And then there is an
3    attachment to this e-mail from Miss Tolen
4    which is titled action plan to prevent
5    the diversion and abuse of OxyContin,
6    correct?
7    A.   Yes.
8    Q.   Okay.  And who was Sue
9    Tolen?
10   A.   I don't know.  I don't
11   remember.
12   Q.   Okay.  She writes, "Team,
13   attached is the action plan to prevent
14   the diversion and abuse of OxyContin from
15   the DEA website, mentioned at today's
16   meeting."
17       Did I read that correctly?
18   A.   Yes.
19   Q.   Okay.  Now, do you know what
20   kind of meeting would have been -- that
21   Miss Tolen would have been referring to
22   that occurred in this time frame of
23   July 2003 to which you would have been a
24   participant?

Page 472

1    A.   I don't recall being a
2    participant in any meeting about this.
3    Q.   Okay.  Do you recall getting
4    this e-mail?
5    A.   No, I don't recall getting
6    the e-mail either.
7    Q.   Okay.  If you look at the
8    attachment which starts on the second
9    page of Exhibit 35?
10   A.   Yes.
11   Q.   There is a document titled
12   "Drugs and Chemicals of Concern:  Action
13   plan to prevent the diversion and abuse
14   of OxyContin," correct?
15   A.   Yes.
16   Q.   Third paragraph down it
17   reads, "Reports of a diversion and abuse
18   of OxyContin are currently concentrated
19   in rural areas of the Eastern United
20   States.  However, DEA's Office of
21   Diversion Control has identified this
22   activity as a growing problem throughout
23   the nation.  It has been described by
24   some local law enforcement officials as a

Page 473

1    national epidemic in the making."
2        Did I read that correctly?
3    A.   Yes.
4    Q.   Okay.  Do you recall reading
5    this article or this attachment when you
6    received it in 2003?
7        MS. VANNI:  Object to form.
8        THE WITNESS:  No.
9    BY MR. LENISKI:
10   Q.   Do you recall discussing the
11   contents of this attachment to this
12   e-mail in Exhibit 35 with any of the
13   individuals listed on the e-mail?
14   A.   No.
15   Q.   Do you recall if you did
16   anything at all with the information that
17   Miss Tolen forwarded you that we see in
18   Exhibit 35?
19   A.   No.
20   Q.   While employed at Endo was
21   it your practice to circulate news
22   articles about Endo's products to your
23   coworkers at Endo?
24   A.   No.  I wouldn't say it's a

119  (Pages 470 to 473)

Highly Confidential - Subject to Further Confidentiality Review

Page 474

1    practice, no.
2        Q.   Okay.  Do you recall doing
3    just that, circulating news reports from
4    the internet or other sources to your
5    colleagues at Endo while you were
6    employed there?
7        A.   I have no recollection.
8        Q.   Okay.  Were reports in the
9    news and elsewhere about -- about abuse
10   of Endo's products occurring in the
11   country relevant to your work at Endo?
12       A.   I'm sorry, could you restate
13   that, please?
14       Q.   Were reports in the news and
15   elsewhere about the abuse of Endo's
16   products occurring in the country
17   relevant to your work at Endo?
18       MS. VANNI:  Object to form.
19       THE WITNESS:  I never saw
20       any article about the abuse of an
21       Endo product.
22   BY MR. LENISKI:
23       Q.   Were reports in the news and
24   elsewhere about the abuse of opioids

Page 475

1    generally occurring in the country
2    relevant to your work at Endo?
3        MS. VANNI:  Object to form.
4        THE WITNESS:  How do you
5        define relevant?
6    BY MR. LENISKI:
7        Q.   Well, is it information that
8    you either did use or would have used in
9    performing your job duties at Endo?
10       A.   No.
11       Q.   Okay.  You were asked some
12   questions earlier today about an entity
13   known as Cohn & Wolfe.  Do you recall
14   that?
15       A.   Yes.
16       Q.   Do you remember when
17   approximately Endo retained Cohn &
18   Wolfe's services?
19       A.   No.  I have no idea.
20       Q.   Okay.  Were you involved in
21   retaining Cohn & Wolfe to work with Endo?
22       A.   No.
23       Q.   Did you participate in
24   meetings with Cohn & Wolfe employees with

Page 476

1    respect to whatever work they were
2    performing for Endo?
3        A.   I may have sat in a
4    presentation that they made, a Cohn &
5    Wolfe presentation, I may have sat in a
6    meeting.  But I wasn't involved in
7    anything else that Cohn & Wolfe did.
8        Q.   Okay.  So to your knowledge,
9    were you involved in the retention of
10   Cohn & Wolfe to perform services on
11   behalf of Endo?
12       MS. VANNI:  Objection.
13       Asked and answered.
14       THE WITNESS:  No, I was not
15       involved.
16   BY MR. LENISKI:
17       Q.   I've handed you what we've
18   marked as Exhibit 36.  This is
19   ENDO-OPIOID_MDL-04137641.  Do you
20   recognize this document?
21       A.   No.
22       (Document marked for
23       identification as Exhibit
24       Endo-Stevenson-36.)

Page 477

1    BY MR. LENISKI:
2        Q.   And I'll represent to you
3    this is something that was located in
4    your custodial file.
5        Do you know why you would
6    have had this document in your custodial
7    file?
8        A.   Somebody sent it to me,
9    because, you know, I was at the VP level
10   and -- and Endo people kept the VP level
11   informed.  So I just got a copy of it.
12       Q.   Okay.  This is an April 1st,
13   2004, dated document.  Letterhead says
14   it's from Cohn & Wolfe Healthcare, to
15   Scott Shively from Patty Leitch.  Do you
16   recognize that name?
17       A.   No.
18       Q.   And this is regarding
19   proactive media relations review and
20   recommendations.
21       First paragraph reads, "As
22   we've had several conversations over the
23   past few months regarding the merits of a
24   media outreach in support of Endo

120  (Pages 474 to 477)

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1    corporate and program milestones, we've
2    undertaken a review of the objectives and
3    intent of proactive media relations to
4    provide you with the below
5    recommendations."
6            Did I read that correctly?
7        A.  Yes.
8        Q.  It continues, "We've taken
9    into account our recent experience with
10   top tier medical and health policy news
11   media, the current media environment, and
12   feedback from you and your colleagues
13   regarding the legal, regulatory, and
14   investor sensitivity surrounding EN3218
15   launch and EN3202 and 03 approval."
16           Did I read that correctly?
17       A.  Yes.
18       Q.  There's a reference here to
19   feedback from Endo personnel being
20   received by Cohn & Wolfe.  Do you recall
21   being -- or having any communications
22   with Cohn & Wolfe that predated the date
23   of this memo, April 1st, 2004?
24       A.  I've never had any

Page 479

1    conversations or feed -- any interaction
2    with Cohn & Wolfe.
3        Q.  Okay.  And there's reference
4    here to EN3218.  Again, as we said
5    earlier that was generic OxyContin that
6    Endo was trying to market, correct?
7        A.  Oxycodone ER, yes.
8        Q.  And then EN3203/03, was that
9    oxymorphone ER and IR?
10       A.  Yes.
11       Q.  Okay.  Do you recall having
12   any involvement in any proactive media
13   outreach concerning either the launch of
14   generic OxyContin or the launch of
15   oxymorphone ER and IR?
16       A.  Yeah, I wasn't involved
17   in -- if there was any done, I wasn't --
18   I don't believe there was anything really
19   done on 3218.  I wasn't involved in it.
20   I don't have any recollection of it.
21       Q.  Okay.
22       A.  I can't speak to the 3202
23   and 03 because that was a brand product,
24   and I wasn't responsible for that.

Page 480

1        Q.  Okay.  Do you have any
2    knowledge as you sit here today as to why
3    Endo retained Cohn & Wolfe Healthcare to
4    perform proactive media relations on its
5    behalf surrounding the launch of generic
6    OxyContin?
7        A.  I don't have any -- any idea
8    what the underlying basis of it was.
9        Q.  Do you recall receiving
10   communications from Cohn & Wolfe,
11   subsequent to this date of April 1st,
12   2004, concerning reports of OxyContin
13   abuse?
14       A.  No.  I have no recollection
15   of that.
16           (Document marked for
17            identification as Exhibit
18            Endo-Stevenson-37.)
19   BY MR. LENISKI:
20       Q.  I've handed you what's been
21   marked as Exhibit 37 to your deposition.
22   This is ENDO-OPIOID_MDL-03256784.
23           Three e-mails down on the
24   first page, there's an e-mail from

Page 481

1    WendyLu@nyc.CohnWolfe.com on April 6,
2    2004, including a number of individuals
3    including yourself, correct?
4        A.  Yes.
5        Q.  And the subject of this
6    e-mail is "Kentucky state programs and
7    OxyContin abuse," correct?
8        A.  Yes.
9        Q.  And she writes, "Bill,
10   Scott, George, Deb, and Jerry:  We wanted
11   to briefly provide you with perspective
12   on today's news regarding the crackdown
13   on OxyContin trafficking in Kentucky.
14   Aggressive state monitoring programs and
15   enforcement tactics levied against both
16   drug abusers and dealers in Kentucky
17   indicate that the state's leaders rate
18   curbing prescription painkiller abuse as
19   a high priority."
20           Have I read that correctly?
21       A.  Yes.
22       Q.  And do you know, are you the
23   George that she is referring to in her
24   subject line?

121  (Pages 478 to 481)

Page 482

1    A.   Yes.
2    Q.   Okay.  Do you know Wendy Lu?
3    A.   No.
4    Q.   Do you have recall ever
5    meeting Wendy Lu?
6    A.   I have no recollection of
7    ever meeting her.
8    Q.   If you flip over, the e-mail
9    continues on the top of the next page.
10   It says, "We recommend keeping close tabs
11   on regulatory and enforcement activity
12   surrounding the issue in Kentucky and
13   beyond."  And signed regards, "C&W Endo
14   team."
15        Did I read that correctly?
16   A.   Yes.
17   Q.   There's a -- the e-mail
18   continues.  And it's forwarding an
19   Associated Press article titled "Kentucky
20   Authorities Crack Down on OxyContin."
21        Did you see that?
22   A.   Yes.
23   Q.   It's April 6, 2004.  And it
24   reads Hazard, Kentucky byline.

Page 483

1    "Authorities in eastern Kentucky began
2    arresting more than 200 suspected drug
3    dealers Tuesday in the state's biggest
4    crackdown yet on OxyContin, the powerful
5    prescription painkiller blamed for scores
6    of deaths."
7         Did I read that correctly?
8    A.   Yes.
9    Q.   And then lower down in that
10   same e-mail there's a quote.  "'I'm
11   afraid we're going to see a resurgence in
12   its use with the lower-priced generic
13   form,' Smoot said."
14        Did I read that correctly?
15   A.   Yes.
16   Q.   And it says, "Authorities
17   blame abuse of OxyContin for scores of
18   overdose deaths in Appalachian region and
19   beyond."
20        Did I read that correctly?
21   A.   Yes.
22   Q.   And on the top of the next
23   page, it reads, "OxyContin is also blamed
24   for a rise in crime across the region."

Page 484

1         Did I read that correctly?
2    A.   Yes.
3    Q.   Do you recall reading the
4    article that Ms. Lu forwarded to you and
5    others at Endo about this time of
6    April 6, 2004?
7    A.   No recollection.
8    Q.   In her e-mail where she
9    asks -- or where she stated, "We
10   recommend" -- Cohn & Wolfe recommends --
11   "keeping close tabs on regulatory and
12   enforcement activity surrounding this
13   issue in Kentucky and beyond," was
14   that something -- was that a -- was that
15   a recommendation that you took any action
16   in response to?
17        MS. VANNI:  Object to form.
18        THE WITNESS:  No.  No, I'm
19   trying to find it.  I lost it
20   where --
21        MS. VANNI:  The next page.
22        THE WITNESS:  Yeah.
23   Regulatory was monitored by the
24   regulatory people.  As I testified

Page 485

1    to earlier, Endo had different
2    departments that did different
3    things.  It was very
4    compartmentalized.
5         So the other fact is --
6    about this is we didn't launch the
7    product until June of '05.
8         This was in the middle of
9    the litigation.
10        So, you know, there was an
11   ongoing business we were running.
12   This was far off.  It was involved
13   in litigation.  I'm not sure the
14   appellate court.  We knew there
15   was going to be, I believe, by
16   this time -- I don't know the
17   exact dates.  But in 2004 it was
18   unlikely that there was going to
19   be the -- the legal obstacles were
20   going to be overcome.
21        So the focus was not really
22   on oxycodone ER at this time,
23   because we were not in the
24   position to market the product any

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1    time soon.  When I say market,
2    sell the product.
3    BY MR. LENISKI:
4        Q.   You don't have any reason to
5    believe that Endo did not retain or
6    wasn't paying Cohn & Wolfe to perform any
7    analysis of media surrounding opioids or
8    OxyContin specifically around this time
9    of April 2004, do you?
10       MS. VANNI:  Object to form.
11       THE WITNESS:  No.  I don't
12   have any -- I don't -- I'm
13   assuming they did.
14   BY MR. LENISKI:
15       Q.   So even though Endo had not
16   yet launched its generic product, as you
17   just testified to, it was still paying
18   someone to monitor reports such as this
19   regarding OxyContin and send it along to
20   a number of individuals at Endo including
21   yourself, correct?
22       MS. VANNI:  Object to form.
23       THE WITNESS:  Yes.  But my
24   point -- maybe it wasn't -- my

Page 487

1    point was -- I should have made
2    the point clearer.  Cohn & Wolfe
3    was hired by Endo, and Endo was
4    98 percent brand.  And Cohn &
5    Wolfe was not brought in for
6    oxycodone ER.  Oxycodone would
7    have been brought in for the 3202
8    and 03, because -- I don't
9    remember all the dates, but
10   their -- I think it said earlier
11   in a document, approval.  So their
12   launch was more imminent, much
13   more imminent than oxycodone ER,
14   which everybody knew was still far
15   off in the distance, given the
16   legal hurdles or the legal
17   process -- I shouldn't -- however
18   you want to describe it, the legal
19   process that was ongoing.
20       It was -- at that point in
21   time, there was no end at the
22   light of the tunnel that somebody
23   could say, you know, we're going
24   to be able to launch it fairly

Page 488

1    quickly.
2    BY MR. LENISKI:
3        Q.   So where do you -- what's
4    the basis of your statement that Cohn &
5    Wolfe was brought in for the 3202 and 03,
6    which ended up being Opana, correct?
7        A.   Yes.
8        Q.   What is the basis of your
9    statement that they -- that Cohn & Wolfe
10   was retained by Endo with regard to Opana
11   versus any generic product that Endo was
12   seeking to market?
13       A.   Because I believe -- I
14   believe -- I believe Opana -- Opana was
15   discussed earlier in a document around
16   this time frame for approval, so that was
17   a more imminent activity than oxycodone
18   ER, which, you know, we knew was off in
19   the distance.
20       Q.   Okay.  Do you recall taking
21   any actions with regard to what we see in
22   Exhibit 37, the information forwarded to
23   Endo by Lucy Lu (sic) at Cohn & Wolfe?
24       MS. VANNI:  Objection.

Page 489

1        THE WITNESS:  No, I don't,
2    no.  I have no recollection.
3    BY MR. LENISKI:
4        Q.   Okay.  Do you recall any
5    discussions at Endo about the information
6    Ms. Lu forwarded in Exhibit 37?
7        A.   I have no recollection.
8            (Document marked for
9        identification as Exhibit
10       Endo-Stevenson-38.)
11   BY MR. LENISKI:
12       Q.   I handed the witness what we
13   identified as Exhibit 38.  It's
14   ENDO-OPIOID_MDL-03389105.
15       Mr. Stevenson, I've handed
16   you Exhibit 38.  It is a series of
17   e-mails attaching a -- what looks to be a
18   news report.  First e-mail in the
19   sequence is from an individual named --
20   at the very bottom of the first page,
21   Peter Lankau, L-A-N-K-A-U, to Scott
22   Shively, yourself, and Mr. Andrzejewski
23   dated April 23rd, 2004, correct?
24       A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 490

1    Q.   Who is Peter Lankau?
2    A.   He was -- he was the
3  president.  He might have been the CEO by
4  this time.  I don't remember the exact
5  day he became the CEO.  He became the CEO
6  when Carol Ammon retired.
7    Q.   Okay.  And he's forwarding
8  an article to you and others.  And his
9  comments, which are at top of the second
10  page, says, "Do we have Cohn & Wolfe on
11  standby for this?  Where are we on media
12  readiness for when we launch?"
13    Did I read that correctly?
14    A.   Yes.
15    Q.   Okay.  And the article that
16  he forwarded to you and others is titled
17  "Attorney General Sees New Wave of Abuse
18  in Generic OxyContin," correct?
19    A.   Yes.
20    Q.   The byline says
21  Philadelphia.  "Pennsylvania's Attorney
22  General says he has concerns that the
23  planned introduction of cheaper generic
24  versions of the painkiller OxyContin will

Page 491

1  lead to a surge in abuse of the drug."
2    Did I read that correctly?
3    A.   Yes.
4    Q.   And then the article goes on
5  under the third page, second -- third
6  full paragraph.  "Two companies, Teva
7  Pharmaceuticals and Endo Pharmaceuticals,
8  were given FDA approval to sell the
9  generic drugs on the condition that they
10  also include abuse warnings and operated
11  a risk management program designed to
12  limit the possibility of illegal use."
13    Did I read that correctly?
14    A.   Yes.
15    Q.   Okay.  So do you recall
16  receiving the e-mail from Mr. -- no, it's
17  not that name -- Lankau on or about this
18  time, April 23, 2004?
19    A.   I don't recall.
20    Q.   Okay.  Do you recall
21  responding to this e-mail in any form or
22  fashion that you received from
23  Mr. Lankau?
24    A.   I didn't -- I don't recall.

Page 492

1    Q.   Okay.  So clearly Mr. Lankau
2  is sending this article to you because it
3  has to do with the impending launch of
4  generic OxyContin, correct?
5    MS. VANNI:  Object to form.
6  BY MR. LENISKI:
7    Q.   Is that a fair reading of
8  Mr. Lankau's e-mail?
9    MS. VANNI:  Object to form.
10    THE WITNESS:  I would say
11  yes.
12  BY MR. LENISKI:
13    Q.   Okay.  And his question, "Do
14  we have Cohn & Wolfe on stand-by for
15  this," did you understand what he was
16  talking about?
17    A.   I understand now, having
18  seen the documents, that Cohn & Wolfe was
19  primarily used by the brand -- I never
20  hired Cohn & Wolfe.  So the work they did
21  for Endo was 99 percent, maybe
22  100 percent for the brand side.  And so I
23  think what he's asking is here, he's
24  asking Scott Shively and -- because it

Page 493

1  was a brand function.  It was in his
2  budget, do we have them on stand-by for
3  this.  That's what he's asking.
4    So I don't have any
5  recollection of the document.  I never
6  responded to it, because I didn't involve
7  myself with Cohn & Wolfe.
8    Q.   So is your testimony then
9  that you had no responsibilities with
10  respect to what Mr. Lankau calls in his
11  e-mail, media readiness, for when Endo
12  was launching generic OxyContin?
13    MS. VANNI:  Object to form.
14    THE WITNESS:  Yeah, I -- I
15  don't have any -- I didn't have
16  any responsibility for hiring Cohn
17  & Wolfe.  So he's asking Scott
18  Shively who, I'm guessing -- I
19  shouldn't guess, but I'm assuming
20  that -- you know, I'm confident
21  Cohn & Wolfe was in his budget.  I
22  didn't have any -- I didn't pay
23  Cohn & Wolfe any kind of fee.  It
24  was never charged to me.

124 (Pages 490 to 493)

Highly Confidential - Subject to Further Confidentiality Review

Page 494

1    BY MR. LENISKI:
2         Q.   Okay.  In the e-mail
3    responding to Mr. Lankau, Scott Shively
4    writes to you and others, also on
5    April 23, 2004, in the last line of his
6    e-mail he writes, "I'd like to suggest
7    that Bill, George, and I have C&W put
8    together their plan and proposal ASAP and
9    review with you so we can agree to take
10   appropriate actions.  We'll speak with
11   them right away about this."
12        Did I read that correctly?
13        A.   Where is that?  Yes.  Yes.
14        Q.   Okay.  Do you recall being
15   involved in any discussions between
16   yourself, Mr. Newbould, and Scott Shively
17   with getting a proposal from Cohn &
18   Wolfe?
19        A.   I don't recall any -- any
20   meeting.
21        Q.   Okay.
22        A.   It could have happened.  I
23   just don't recall.
24        Q.   All right.  And above

Page 495

1    there's another e-mail from -- also from
2    Mr. Shively, and the last line in his
3    e-mail is, "Bill, we should have a brief
4    telecom on this with C&W, you, me, and
5    George.  I'll ask Dani to set up."
6         Did I read that correctly?
7         A.   Yes.
8         Q.   Do you recall partaking in
9    any telecon with Cohn & Wolfe?
10        A.   I don't have any
11   recollection of that.
12        Q.   Okay.
13        (Document marked for
14        identification as Exhibit
15        Endo-Stevenson-39.)
16   BY MR. LENISKI:
17        Q.   I've handed you Exhibit 39,
18   which is ENDO-OPIOID_MDL-02843461.
19   It's an e-mail from Patty
20   Leitch to a number of individuals,
21   including yourself, dated April 28, 2004.
22   The subject is Actiq abuse in
23   Pennsylvania.
24        Have I represented that

Page 496

1    correctly?
2         A.   Yes.
3         Q.   Okay.  And do you know who
4    Patty Leitch was?
5         A.   No, I don't remember off the
6    top of my head.
7         Q.   Okay.  She writes, "In case
8    you have not seen this yet, please see
9    article below about Actiq abuse that
10   quotes a spokesperson for Attorney
11   General Pappert."
12        Did I read that correctly?
13        A.   Yes.
14        Q.   And then the last line of
15   her e-mail states, "As part of the 3218
16   issue management plan, we need to decide
17   how we will respond to media inquiries on
18   reports of abuse and diversion.  We can
19   put this on the agenda for Monday's
20   meeting."
21        Did I read that correctly?
22        A.   Yes.
23        Q.   Do you know what Ms. Leitch
24   is referring to when she says the 328 --

Page 497

1    3218 issues management plan?
2         A.   I'm sorry, could you restate
3    that please?
4         Q.   Ms. Leitch refers here to
5    the 3218 issues management plan.
6         A.   Yes.
7         Q.   My question is, do you know
8    what she's talking about?
9         A.   No, I don't -- I don't know
10   what she's talking about.
11        Q.   Okay.  And she references
12   the "need to decide how to respond to
13   media inquiries on reports of abuse and
14   diversion."
15        Do you have any recollection
16   about what she is referring to there?
17        A.   No.  No recollection.
18        Q.   And what is Actiq?
19        A.   Actiq -- excuse me.  Actiq
20   was the brand name for what was called
21   the lollypop -- it was a fentanyl
22   lollypop.  We at one time considered
23   working on it, but we were unable to
24   overcome the science because the

Highly Confidential - Subject to Further Confidentiality Review

Page 498

1  machinery that Cephalon used, if I recall
2  correctly, was proprietary and we
3  couldn't overcome the patent so we
4  dropped it.
5      But it was -- it's used for
6  people with, I think it says here,
7  with -- in the paragraph of the article,
8  it talks about "designed to speed relief
9  to cancer patients, because it goes, it
10 is a lollypop in your mouth." And we --
11 we had looked at working on it because it
12 was very difficult to do scientifically,
13 but we couldn't overcome the patent
14 because of the proprietary nature of the
15 machines as I recall. It had something
16 to do with that. And so we dropped the
17 product from our development program.
18     Q.  Okay.  So Actiq was
19 manufactured by another manufacturer,
20 correct, not Endo?
21     A.  Actiq was a brand of
22 Cephalon, I believe.
23     Q.  Okay.  In the article below,
24 that is forwarded by Ms. Leitch, about

Page 499

1  three paragraphs down, there is a quote
2  starting -- that starts, "we are starting
3  to see it emerge."
4      Do you see that?
5      A.  Yes.
6      Q.  And the quote is -- full
7  quote there in the article is, "We're
8  starting to see it emerge as a drug that
9  is, as we call it, diverted, which is a
10 legally prescribed drug being used
11 illegally, said Kevin Harley, spokesman
12 for state Attorney General Jerry Pappert.
13     "It is a drug that is easily
14 administered or taken by somebody who
15 might be afraid to either take a pill,
16 snort or inject a needle in their arm."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  Okay.  Now, do you recall
20 receiving this e-mail and article from
21 Ms. Leitch about this time?
22     A.  I -- no, I don't recall.
23     Q.  Okay.  Do you recall being a
24 party to any discussions or meetings with

Page 500

1  respect to the information Ms. Leitch
2  forwarded to yourself and others at Endo
3  about this time?
4      A.  About -- about -- about
5  Actiq, no.  We're not -- we weren't
6  involved with Actiq.  We had decided not
7  to work on Actiq.
8      Q.  Okay.  Have you ever heard
9  the term "crisis binder"?
10     A.  No.
11         (Document marked for
12     identification as Exhibit
13     Endo-Stevenson-40.)
14 BY MR. LENISKI:
15     Q.  I've handed the witness what
16 we've marked as Exhibit 40.  This is an
17 e-mail -- it's a few e-mails.  First one
18 is -- the top of the first page is from
19 Patty Leitch to you, Mr. Stevenson, and
20 others, dated May 21, 2004.  Subject is
21 EN3218 preparedness next steps.
22     Did I read that correctly?
23     A.  Yes.
24     Q.  Okay.  And Ms. Leitch states

Page 501

1  in her e-mail, "Scott, George, and Bill.
2  Just wanted to follow up on last Friday's
3  meeting to confirm our recommended next
4  step to finalize the EN3218 crisis binder
5  as we are waiting approval of the
6  product."
7      Did I read that correctly?
8      A.  Yes.
9      Q.  Okay.  Does reading that
10 refresh your recollection about what a
11 crisis binder was?
12     A.  No, I don't -- I don't -- I
13 don't remember -- I don't remember a
14 crisis binder.
15     Q.  Okay.  Does reading what Ms.
16 Leitch wrote about a follow-up on last
17 Friday's meeting to confirm recommended
18 next step to finalize the crisis binder
19 refresh your recollection about being in
20 meetings with any individuals from Cohn &
21 Wolfe?
22     A.  No, it doesn't.  As I
23 testified a moment ago, in May of 2004,
24 it was virtually a certain -- a certainty

Highly Confidential - Subject to Further Confidentiality Review

Page 502

1  that we weren't going to -- we weren't
2  going to get approval for the product. I
3  believe the appellate court case had
4  already been held and I think it was
5  the -- the appellate -- the appearance
6  before the appellate court on the -- on
7  the lower court verdict had transpired
8  and we were in the waiting period. And
9  the waiting period was, I remember very
10  explicitly, was going to be 15 or
11  18 months. You know, so we got approval
12  in June of '05, and in June of '05, you
13  can go back 15 months obviously, it's
14  with -- in '04, May of -- in this case,
15  May of '04. We weren't -- I wasn't
16  expecting, based on what I had heard, we
17  were going to get out of the legal woods,
18  out of the -- complete the legal process.
19  And so, you know, people may have sent me
20  information and documents. But, you
21  know, for me, okay, great. But at the
22  end of the day, it wasn't a focal point
23  at the moment because I knew it was still
24  a ways off if we won at the appellate

Page 503

1  court level.
2  Q.  Ms. Leitch continues in her
3  e-mail, "I'm sure you've seen the broad
4  news pick-up of the Kentucky area
5  diversion of generic OxyContin. See
6  below."
7  Did I read that correctly?
8  A.  Yes.
9  Q.  Okay. And she does
10  forward -- she forwards a series of
11  articles, but I'll turn your attention to
12  what's on Page 4 of this exhibit. There
13  is an article, "Police seeing generic" --
14  "generic OxyContin on street."
15  A.  Yes. Okay.
16  Q.  Did you find that?
17  A.  Yes.
18  Q.  And that's an article from
19  the Associated Press on May 21, 2004,
20  correct?
21  A.  Yes.
22  Q.  And byline is Pikeville,
23  Kentucky. "The generic form of the
24  powerful painkiller OxyContin already is

Page 504

1  for sale on the black market in
2  Appalachia, even though it's not yet
3  available in all pharmacies."
4  Did I read that correctly?
5  A.  Yes.
6  Q.  Okay. Do you recall seeing
7  this article about the time that
8  Ms. Leitch sent the e-mail?
9  A.  Could have.
10  Q.  Do you recall discussing the
11  article with anybody at Endo?
12  A.  Could have. It wasn't -- we
13  weren't selling it. So from my
14  perspective, it wasn't an Endo product.
15  That, I know. We didn't sell the product
16  in May of '04 -- or, yeah, May of '04.
17  We were not selling -- we did not sell
18  oxycodone ER until we got FDA approval,
19  and FDA normally doesn't approve the
20  product -- give final approval until the
21  legal process is completed. As a matter
22  of fact, in most cases when I -- you
23  know, post-Endo when I've had a
24  settlement with a brand company, as you

Page 505

1  guys probably know better than anybody,
2  you have to file that settlement with the
3  court, and it becomes a court order.
4  And until -- when you get
5  that court order, you have to send that
6  to the FDA because you can't assume that
7  they keep up with all this stuff.
8  So you send it to the FDA.
9  When they -- when it's clear to them that
10  the legal process is complete, that's
11  when they give you approval. So this was
12  not Endo product.
13  Q.  And thank you for that
14  clarification. My question, though, was
15  whether you recall discussing the
16  information from the article forwarded
17  from Ms. Leitch in this exhibit with
18  anyone at Endo?
19  A.  No.
20  Q.  Okay. Did you -- but
21  according to the article from Ms. Leitch,
22  Endo does have information that, even
23  though it's not selling its own generic
24  product, the generic form of OxyContin is

127 (Pages 502 to 505)

Highly Confidential - Subject to Further Confidentiality Review

Page 506

1    already for sale on the black market in
2    Appalachia, correct?
3              MS. VANNI:  Object to form.
4              THE WITNESS:  Yes.  But what
5        she doesn't say, whether it was
6        FDA approved.
7    BY MR. LENISKI:
8        Q.   Okay.  Do you see the last
9    line of the article that she forwarded.
10   There's a quote from a Kentucky state
11   police detective Eddie Crum.  It's on
12   Page 5.
13       A.   Oh, sorry.  Yep.
14       Q.   Mr. Crum states, "'We knew
15   when the FDA approved generic OxyContin
16   that it would end up in the region,'
17   Engle said.  'But we didn't think it
18   would be here before the pharmacies got
19   it.'"
20           Did I read that correctly?
21       A.   Yes.
22       Q.   Okay.  Do you know if you
23   forwarded Ms. Leitch's e-mail to anyone
24   at Endo?

Page 507

1        A.   No, I don't -- I don't
2    recall.  I doubt I would have.
3        Q.   Was it your practice to file
4    away or otherwise save articles such as
5    this media report from Ms. Leitch
6    concerning generic OxyContin as part of
7    your job responsibilities?
8              MS. VANNI:  Object to form.
9              THE WITNESS:  I don't think
10       I would call it -- you know, I got
11       e-mails and whatever given to me,
12       and I filed them away.
13   BY MR. LENISKI:
14       Q.   When you say you filed them
15   away, what do you mean by that?
16       A.   Well, it was either on my
17   e-mail, on my -- you know, whatever the
18   computer electronically, or it could have
19   been in a folder.  You know, somebody
20   goes to a meeting, and they hand --
21   sorry -- they hand you a document, you go
22   back to your office, you put it in a
23   folder.  Or I gave it to my assistant,
24   put it in a -- you know, like you have

Page 508

1    manila folder.  Put it in a manila
2    folder, put it in my filing cabinet.
3        Q.   Did you have any folders on
4    your e-mail program where media reports
5    like the one we see from Mrs. Leitch in
6    Exhibit 40 were saved, to your knowledge?
7        A.   No, I don't have any
8    knowledge.  We're going back, you know,
9    12 years.
10       Q.   Sure.  Do you recall ever
11   giving a direction that such media
12   reports were supposed to be filed in a
13   particular way, either electronically or
14   in paper or otherwise?
15       A.   No.
16       Q.   Okay.  Are you aware how
17   much Endo paid Cohn & Wolfe for their
18   services?
19       A.   No.
20       Q.   So you had no -- did you
21   have any role whatsoever in determining
22   what compensation Endo would pay to
23   Cohn & Wolfe for their services?
24             MS. VANNI:  Objection.

Page 509

1              THE WITNESS:  As I testified
2        already several times I wasn't
3        involved in Cohn & Wolfe.  I have
4        no idea -- you can put a knife in
5        my throat, I couldn't tell you
6        what Endo paid them.
7    BY MR. LENISKI:
8        Q.   I won't do that today.
9        A.   Okay.
10             MS. VANNI:  Today.
11   BY MR. LENISKI:
12       Q.   Do you know how long Endo
13   utilized Cohn & Wolfe's services?
14       A.   No.
15       Q.   Did you independently
16   monitor news reports about opioids after
17   the date of, for example, Exhibit 40,
18   which is May of 2004?
19       A.   No.
20       Q.   I'm going to show you a
21   document, which unfortunately, for some
22   reason, I don't have copies of.  But it's
23   a document which is Bates-stamped
24   ENDO-OPIOID_MDL-05554689.

128  (Pages 506 to 509)

Page 510

1          MR. LENISKI:  Can I ask that
2     it be put on your screen?
3          MS. VANNI:  You don't have a
4     copy for him?
5          MR. LENISKI:  I don't.
6          THE WITNESS:  I'll read
7     through my bifocals.
8          MR. LENISKI:  Has it been
9     pulled up?  Okay.  I'm going to
10    ask that that be entered as
11    Exhibit 41 to your deposition --
12         (Document marked for
13    identification as Exhibit
14    Endo-Stevenson-41.)
15         MR. LENISKI:  -- even though
16    we don't have a paper copy of it.
17    BY MR. LENISKI:
18         Q.   This is an e-mail from
19    yourself to David Kerr dated May 22,
20    2007, correct?
21         A.   Yes.
22         Q.   And you are forwarding
23    what's called FDA News Drug Daily
24    Bulletin, correct?

Page 511

1          A.   Yes.
2          Q.   Who is David Kerr?
3          A.   He was the vice president of
4     business operations, who was my immediate
5     boss.
6          Q.   Okay.  And did he oversee
7     both generic and branded business at
8     Endo?
9          A.   Yes.
10         Q.   Okay.  You write to Mr. Kerr
11    on this occasion, "FYI, please note first
12    article on OxyContin.  Could have an
13    impact on Opana."
14         Did I read that correctly?
15         A.   Yes.
16         Q.   And then you forward the FDA
17    Drug -- I'm sorry, FDA News Drug Daily
18    Bulletin.  And the very first item under
19    the header, "Lawmakers ask FDA to
20    reclassify OxyContin following guilty
21    pleas."
22         Do you see that?
23         A.   Yes.
24         Q.   That reads, "Two republican

Page 512

1     lawmakers sent a letter to FDA
2     commissioner Andrew von Eschenbach asking
3     the agency to reclassify OxyContin after
4     the drug's manufacturers pleaded guilty
5     to misbranding the product."
6          Did I read that correctly?
7          A.   Yes.
8          Q.   And then two paragraphs down
9     starts, "Purdue Pharma, which
10    manufactures OxyContin, and three current
11    and former company executives recently
12    pleaded guilty to mislabeling the drug
13    and will pay more than $634 million in
14    fines.  The company had promoted the drug
15    as less addictive, less subject to abuse,
16    and less likely to cause withdrawal
17    symptoms than other painkillers."
18         Read that correctly?
19         A.   Yes.
20         Q.   And the very next paragraph
21    reads, "The company 'ruthlessly marketed'
22    the drug to individuals in areas with
23    less access to medical information and
24    higher levels of disability, such as

Page 513

1     Virginia and Kentucky, the lawmakers said
2     in the letter.
3          "One quarter of all overdose
4     deaths from OxyContin in 2002 happened in
5     eastern Kentucky, which includes Rogers'
6     district, the lawmaker noted in a
7     separate statement."
8          Did I read that correctly?
9          A.   Yes.
10         Q.   Okay.  Do you recall sending
11    this e-mail to Mr. Kerr?
12         A.   No.
13         Q.   Okay.  When you wrote to
14    Mr. Kerr that this article about Purdue
15    paying -- pleading guilty to mislabeling
16    and paying a very large multi-million
17    dollar fine, when you said, "This could
18    have an impact on Opana," what were you
19    saying to Mr. Kerr?
20         A.   I was -- FYI, just be aware
21    of it.  That's what I was saying.
22         Q.   What was the impact on Opana
23    that you expected or anticipated from
24    such a report?

129 (Pages 510 to 513)

Highly Confidential - Subject to Further Confidentiality Review

Page 514

1    A.   The top sentence, where it
2  talks about reclassifying the drug.
3  That's what I was referring to.
4    Q.   And what do you mean by
5  that?
6    A.   My point was if they
7  reclassified OxyContin, you know -- I
8  wasn't involved in Opana, but, you know,
9  this stuff was up for him since he
10  supervised the brand business to see if
11  they would -- you know, if there was
12  going to be a move afoot to reclassify
13  Opana.  That was the whole point.
14    Q.   And can you tell the jury
15  what you mean by reclassify?
16    A.   I don't -- I mean, I guess
17  what they mean by reclassify is to -- is
18  to take it up to the next level and call
19  it a Class I.  You know, after -- the
20  only class left after Class II is a Class
21  I.
22    Q.   And what would be the impact
23  of reclassifying an opioid as a Class I
24  narcotic?

Page 515

1    MS. VANNI:  Object to form.
2    THE WITNESS:  I don't know
3  all the specific differences
4  between Class II and Class I since
5  we didn't carry Class Is.  But
6  it's more restrictive.  How
7  restrictive, I don't know.
8  BY MR. LENISKI:
9    Q.   Okay.  All right.  Was there
10  any other reason why you forwarded this
11  e-mail to Mr. Kerr on this occasion?
12    A.   No.
13    Q.   And according to what the
14  article -- I'm sorry -- the news report
15  from the FDA that you forwarded to
16  Mr. Kerr, there continued to be problems
17  with abuse and diversion in the region
18  around Kentucky, correct?
19    A.   According to the FDA
20  bulletin, yes.
21    Q.   I'm done with that.
22    Do you know what COLT Staff
23  was at Endo?
24    A.   I'm sorry.  What?  Say that

Page 516

1  again.
2    Q.   COLT, C-O-L-T, staff was at
3  Endo?
4    A.   No.
5    Q.   This is the last document I
6  have I don't have a copy of.  But I'm
7  going to ask that
8  ENDO-OPIOID_MDL-01915705, please, be
9  shown.
10    (Document marked for
11    identification as Exhibit
12    Endo-Stevenson-42.)
13  BY MR. LENISKI:
14    Q.   This is -- we'll have it
15  identified as Exhibit 42.  The document
16  at the top reads "COLT staff minutes,
17  Thursday, May 24, 2007," correct?
18    A.   This was the -- now I -- now
19  I -- I thought it was a product.  I'm
20  sorry.  When you say COLT staff, I was
21  thinking about a product.  COLT I believe
22  was the commercial something leadership
23  team.  And I don't know -- I forget what
24  the O stands for.  Maybe it's commercial

Page 517

1  and operational leadership team.  I don't
2  remember.  That's what it was referring
3  to.
4    Q.   Okay.  And you were part of
5  the COLT staff, correct?
6    A.   Yes, I was part of the
7  commercial leadership team, yes.
8    Q.   Okay.  And how long had you
9  been a member of that leadership team?
10    A.   My recollection is from the
11  time that I arrived at Endo as a vice
12  president.  I think all the vice
13  presidents were a member of it, if I
14  remember right.
15    Q.   How frequently did the
16  commercial leadership team meet?
17    A.   I have -- I don't remember.
18    Q.   Do you recall the purpose
19  for commercial leadership -- leadership
20  team meetings?
21    A.   It was more -- you know, it
22  was more like, you know, a staff meeting.
23    Q.   Okay.  This particular set
24  of minutes from May 24, 2007, do you see

130 (Pages 514 to 517)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 518

1    Item Number 2, sales update?
2        A.   Yes.
3        Q.   And third item down, there's
4    a bullet that reads, "Opana surge program
5    update."
6        A.   Yes.
7        Q.   Do you see that?
8            Do you recall what that was?
9        A.   No.  Opana was a brand.  I
10   wasn't involved in the brand.  I've said
11   that, you know, numerous times.  I've
12   testified to that numerous times.  I have
13   no idea.  What -- I wasn't involved in
14   Opana in any way other than the stocking
15   of the product in -- from -- in '07, late
16   '06, '07, until I left the company.
17       Q.   Okay.  And so is it fair
18   then to say that at these commercial
19   leadership team meetings there were
20   presentations made by both leadership in
21   the branded portion of the company as
22   well as the generic portion of the
23   company?
24       A.   Yes.  The leadership team

Page 519

1    was comprised of brand and -- and myself.
2    I was the only generic VP.  So it was
3    just myself and the other people, yeah.
4        Q.   Okay.  In other words,
5    generic side of the business was not
6    walled off from the branded side.  There
7    were joint meetings where the leadership
8    such as yourself and the other
9    individuals listed in this exhibit met
10   and talked about all aspects of Endo
11   Pharmaceutical's business, correct?
12           MS. VANNI:  Object to form.
13           THE WITNESS:  Correct.  But
14       my point is I didn't focus on what
15       they were saying since I wasn't
16       involved in it.
17   BY MR. LENISKI:
18       Q.   That's fair enough.  Okay.
19   I'm done with that.
20           Do you recall being asked
21   questions this morning, or I should say
22   this afternoon, about what was called 867
23   data?
24       A.   867 data, yes, I do.

Page 520

1        Q.   Okay.  And that was data
2    that -- correct, that Endo received from
3    wholesalers and distributors about those
4    wholesalers and distributors' customers
5    who received Endo product?
6        A.   Yes.  Sales out, yes.
7        Q.   Okay.
8            (Document marked for
9        identification as Exhibit
10       Stevenson-43.)
11   BY MR. LENISKI:
12       Q.   Was it -- was it part of
13   your job responsibilities to receive and
14   review 867 data received from Endo's
15   wholesale and distributor customers?
16       A.   No, I -- I didn't review it
17   or receive it.
18       Q.   I've handed the witness
19   what's been identified as Exhibit 43 to
20   this deposition.
21           This is -- this is a native
22   file, I'll represent.  Bates-stamped
23   ENDO-OPIOID_MDL-04139984.  The file name
24   on this document is McKesson 867 Opana

Page 521

1    data August to present, 11-3-06.xls.
2            And the original custodian
3    on this, on Exhibit 43, is you, George
4    Stevenson.
5        A.   That's what it says.
6    Someone gave it to me.  But I wasn't
7    responsible for assembling it.
8        Q.   And that's fair.
9        A.   And it deals with Opana.  So
10   it depends -- when was this?  '06?  Okay.
11   I would have been involved in stocking.
12   Maybe that's why I received it.  But I
13   wasn't -- other than stocking I wasn't
14   involved with Opana.
15       Q.   Well, and that's my question
16   is, what aspect of Opana stocking were
17   you involved with?
18       A.   I was overseeing the
19   national account executives in their role
20   and interaction with the trade accounts
21   as we just testified earlier, to ensure
22   that the product was adequately stocked
23   in order to meet prescription needs when
24   the prescription arrived in the pharmacy

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    for adjudication.
2        Q.   Okay.  So even though Opana
3    was a branded product, you would still
4    have that responsibility, correct?
5        MS. VANNI:  Object to form.
6        THE WITNESS:  For stocking.
7    Just for stocking.
8    BY MR. LENISKI:
9        Q.   Okay.  And was that true for
10   both Opana and Opana ER?
11       A.   I don't remember if Opana ER
12   had launched by that time.  I don't -- I
13   don't remember.
14       Q.   Okay.  And I'll also
15   represent that Exhibit 43 originally
16   contained a lot of information.  We only
17   included the Tennessee-specific 867 data
18   that was in the original spreadsheet.
19   And so that's what you see on Page 2 and
20   3 of this document.  Okay?
21       A.   Okay.
22       Q.   If you look at the document,
23   I just want to understand what we're
24   looking at here.

Page 523

1        The first column is an
2    invoice date, correct?
3        A.   Yes.
4        Q.   And then what's the fill DC
5    ID?
6        A.   I have no idea.
7        Q.   Okay.  And then sales
8    quantity.  What does that number
9    indicate?
10       A.   A bottle.
11       Q.   One bottle?
12       A.   Yes.
13       Q.   Okay.  And there's a
14   customer account ID, correct?
15       A.   Yes.
16       Q.   And was that customer
17   account ID assigned to this particular
18   customer from the wholesaler or
19   distributor from whom the 867 data was
20   received?
21       A.   I believe so, but I'm not --
22   I don't believe it was an Endo customer
23   ID number.  Would have -- this was sales
24   out from the wholesalers.  So I'm --

Page 524

1    I'm -- I would believe it was a
2    customer -- wholesaler customer ID
3    number.
4        Q.   Okay.  Then there's a
5    customer account name, which is the name
6    of the particular -- and here it's a --
7    appears to be a pharmacy, correct,
8    Crescent Center Drugs?
9        A.   I have no idea who they are.
10   I'm assuming it's a pharmacy.  Could
11   be -- it could be a medical center.
12       Q.   Okay.  And then there's the
13   address, city and state and zip code for
14   this particular customer, correct?
15       A.   Yes.
16       Q.   And what is the EM item
17   number column, what is that?
18       A.   I don't know.
19       Q.   And the sale description,
20   that is the -- what was in the bottle
21   that was sold for that particular
22   customer, correct?
23       A.   Yes.
24       Q.   And then so the first line

Page 525

1    would be Opana ER tablets 5-milligram
2    strength, 100 count, correct?
3        A.   Correct.
4        Q.   And then the NDC number is
5    what?
6        A.   The NDC number for Opana ER.
7    Yes, it would be the Opana ER NDC number.
8        Q.   Okay.  Now you said you
9    didn't -- it's not your recollection that
10   you routinely analyzed this data; is
11   that, correct?
12       A.   I didn't analyze, so it was
13   my testimony I never analyzed this data.
14       Q.   Okay.  And when -- who would
15   you receive this data from?
16       A.   I don't recall who gave this
17   to me.  I have no idea.
18       Q.   Do you have any idea why you
19   would have been included or copied on the
20   receipt of such information?
21       MS. VANNI:  Object to form.
22       THE WITNESS:  I think -- I
23   think I testified earlier that
24   there was a focus on stocking.

132  (Pages 522 to 525)

Highly Confidential - Subject to Further Confidentiality Review

1      That it wasn't up to -- it wasn't
2   up to the level that management
3   wanted.  Somebody may have given
4   me one of these.  You know, it's a
5   lot of information.  Doesn't
6   really -- you know, from my
7   standpoint, it doesn't -- someone
8   has to go through them and analyze
9   it by wholesaler DC.  It's not
10  something I was doing or the
11  national account executives were
12  doing.  It was somebody in
13  operations doing it.
14  BY MR. LENISKI:
15      Q.   Okay.  Was it your practice
16  to forward such information to anyone in
17  particular at Endo, 867 data?
18      A.   No.  No.
19      Q.   Was it your practice to file
20  or otherwise store 867 data?
21      A.   I don't know what you mean
22  by practice.  Obviously some document
23  ended up in my file.  But, you know, I --
24  I mean the volume here was pretty

1   significant because the previous -- one
2   of the previous exhibits focused on
3   McKesson.  I'm guessing, since this goes
4   through McKesson, that there was a --
5   that this was related to that.  But I
6   don't know.  You know, I have no idea.
7   It's just -- it's just a sheet with data
8   and it has a cover sheet on it.  So I'm
9   not familiar with the document.
10      Q.   Okay.
11          MR. LENISKI:  I don't have
12  any more questions at this time.
13          THE WITNESS:  Okay.
14          MS. VANNI:  Take a
15  five-minute break.
16          THE VIDEOGRAPHER:  Going off
17  the record at 5:59.
18          (Short break.)
19          THE VIDEOGRAPHER:  We are
20  back on the record at 6:15.
21              - - -
22          EXAMINATION
23              - - -
24  BY MS. VANNI:

1      Q.   Good evening, Mr. Stevenson.
2      A.   Good evening.
3      Q.   It's been a long day.  Are
4   you okay?
5      A.   Oh, I'm fine.
6      Q.   I just have a few questions
7   for you.
8          I want to direct your
9   attention to an exhibit that Ms. Scullion
10  marked during your cross-examination.
11  It's Plaintiffs' Exhibit 33.  Do you have
12  that in front of you?
13      A.   Yes.
14      Q.   You were asked a series of
15  questions about this document.  Do you
16  recall that line of questioning?
17      A.   Yes.
18      Q.   And in particular, if I can
19  direct your attention to MDL
20  ENDO-OPIOID_MDL-02255807.
21      A.   Yes.
22      Q.   The paragraph beginning "how
23  can I be sure I'm not addicted."  Do you
24  see that?

1      A.   Yes.
2      Q.   Do you recall being asked a
3   series of questions by Miss Scullion
4   about this particular part of the
5   document?
6      A.   Yes.
7      Q.   And I believe counsel asked
8   you that one thing that is not stated
9   here that the patient would be reading is
10  to ask your doctor to be sure you're not
11  addicted.  Do you recall that line of
12  questioning?
13      A.   Yes, yes.
14      Q.   I want to direct your
15  attention to the first page of that
16  document if you could.
17          And it's, for the record,
18  ENDO-OPIOID_MDL-02255805.
19          Could you read the first
20  paragraph that's in bold there?
21      A.   "The information contained
22  in this brochure does not take the place
23  of talking with your healthcare provider
24  about your pain and your pain

Highly Confidential - Subject to Further Confidentiality Review

Page 530

1    medications."
2       Q.   Thank you.
3            MS. VANNI:  I have no
4    further questions for you,
5    Mr. Stevenson.
6            THE VIDEOGRAPHER:  Going off
7    the record at 6:16.
8            MS. SCULLION:  So I have no
9    questions for the witness.
10           We did skip Exhibit Number
11   11.  That's inadvertent.  It was
12   not used.
13           MS. VANNI:  Thank you.
14           THE VIDEOGRAPHER:  That
15   concludes the deposition.  The
16   time is 6:17.
17           (Excused.)
18           (Deposition concluded at
19   approximately 6:17 p.m.)
20
21
22
23
24

Page 532

1            INSTRUCTIONS TO WITNESS
2
3            Please read your deposition
4    over carefully and make any necessary
5    corrections.  You should state the reason
6    in the appropriate space on the errata
7    sheet for any corrections that are made.
8            After doing so, please sign
9    the errata sheet and date it.
10           You are signing same subject
11   to the changes you have noted on the
12   errata sheet, which will be attached to
13   your deposition.
14           It is imperative that you
15   return the original errata sheet to the
16   deposing attorney within thirty (30) days
17   of receipt of the deposition transcript
18   by you.  If you fail to do so, the
19   deposition transcript may be deemed to be
20   accurate and may be used in court.
21
22
23
24

Page 531

1
2            CERTIFICATE
3
4
5            I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
             It was requested before
8    completion of the deposition that the
     witness, GEORGE STEVENSON, have the
9    opportunity to read and sign the
     deposition transcript.
10
11
12   _____
     MICHELLE L. GRAY,
13   A Registered Professional
     Reporter, Certified Shorthand
14   Reporter, Certified Realtime
     Reporter and Notary Public
15   Dated:  February 20, 2019
16
17
18           (The foregoing certification
19   of this transcript does not apply to any
20   reproduction of the same by any means,
21   unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 533

1            - - - - - -
             E R R A T A
2            - - - - - -
3
4    PAGE LINE  CHANGE
5    ___ ____ _____
6    REASON: _____
7    ___ ____ _____
8    REASON: _____
9    ___ ____ _____
10   REASON: _____
11   ___ ____ _____
12   REASON: _____
13   ___ ____ _____
14   REASON: _____
15   ___ ____ _____
16   REASON: _____
17   ___ ____ _____
18   REASON: _____
19   ___ ____ _____
20   REASON: _____
21   ___ ____ _____
22   REASON: _____
23   ___ ____ _____
24   REASON: _____

134 (Pages 530 to 533)

Highly Confidential - Subject to Further Confidentiality Review

Page 534

1
2      ACKNOWLEDGMENT OF DEPONENT
3
4         I,_____, do
5      hereby certify that I have read the
6      foregoing pages, 1 - 535, and that the
7      same is a correct transcription of the
8      answers given by me to the questions
9      therein propounded, except for the
10     corrections or changes in form or
11     substance, if any, noted in the attached
12     Errata Sheet.
13
14
15     _____
16     GEORGE STEVENSON           DATE
17
18
19     Subscribed and sworn
       to before me this
20     _____ day of _____, 20____.
21     My commission expires:_____
22
       _____
23     Notary Public
24

Page 535

1         LAWYER'S NOTES
2      PAGE  LINE
3      ____ ____ _____
4      ____ ____ _____
5      ____ ____ _____
6      ____ ____ _____
7      ____ ____ _____
8      ____ ____ _____
9      ____ ____ _____
10     ____ ____ _____
11     ____ ____ _____
12     ____ ____ _____
13     ____ ____ _____
14     ____ ____ _____
15     ____ ____ _____
16     ____ ____ _____
17     ____ ____ _____
18     ____ ____ _____
19     ____ ____ _____
20     ____ ____ _____
21     ____ ____ _____
22     ____ ____ _____
23     ____ ____ _____
24     ____ ____ _____