Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3

    IN RE: NATIONAL          )
 4  PRESCRIPTION             )   MDL No. 2804
    OPIATE LITIGATION        )
 5  _____  )   Case No.
                             )   1:17-MD-2804
 6                           )
    THIS DOCUMENT RELATES     )   Hon. Dan A.
 7  TO ALL CASES             )   Polster
 8

              FRIDAY, JANUARY 4, 2019
 9

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10             CONFIDENTIALITY REVIEW
11                    - - -
12          Videotaped deposition of Ramona
13  Sullins, held at the offices of JONES DAY, 77
14  West Wacker Drive, Chicago, Illinois,
15  commencing at 7:31 a.m., on the above date,
16  before Carrie A. Campbell, Registered
17  Diplomate Reporter, Certified Realtime
18  Reporter, Illinois, California & Texas
19  Certified Shorthand Reporter, Missouri &
20  Kansas Certified Court Reporter.
21                    - - -
              GOLKOW LITIGATION SERVICES
22       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1
 2        A P P E A R A N C E S :
 3  CARELLA, BYRNE, CECCHI, OSTEIN,
    BRODY & AGNELLO, P.C.
 4  BY:  ZACHARY S. BOWER
         zbower@carellabyrne.com
 5       DAVID GILFILLAN
         dgilfillan@carellabyrne.com
 6       MICHAEL INNIS
         (VIA TELECONFERENCE)
 7  5 Becker Farm Road
    Roseland, New Jersey 07068
 8  (973) 994-1700
 9  Counsel for Plaintiffs
10
11  WILLIAMS & CONNOLLY LLP
    BY:  JOSEPH BUSHUR
12       jbushur@wc.com
         (VIA TELECONFERENCE)
13  725 Twelfth Street, N.W.
    Washington, DC 20005
14  (202) 434-5331
15  Counsel for Cardinal Health, Inc.
16  TABET DIVITO ROTHSTEIN
    BY:  KYLE A. COOPER
17       kcooper@tdrlawfirm.com
18  209 South LaSalle Street, 7th Floor
    Chicago, Illinois 60604
19  (312) 762-9495
20  Counsel for McKesson Corporation
21  JONES DAY
    BY:  TARA FUMERTON
22       tfumerton@jonesday.com
23       JOANNE CACERES
         jcaceres@jonesday.com
24  77 West Wacker
    Chicago, Illinois 60601-1692
25  (312) 782-3939
    Counsel for Walmart
```

Page 3

```
 1  MARCUS & SHAPIRA LLP
    BY:  DARLENE M. NOWAK
 2       nowak@Marcus-Shapira.com
         (VIA TELECONFERENCE)
 3  301 Grant Street, 35th Floor
    Pittsburgh, Pennsylvania 15219-6401
 4  (412) 338-4690
 5  Counsel for HBC
 6
    ARNOLD & PORTER
 7  BY:  SETH WIENER
         Seth.Wiener@arnoldporter.com
 8       (VIA TELECONFERENCE)
 9  601 Massachusetts Avenue, NW
    Washington, DC 20001-3743
10  (202) 942-5000
    Counsel for Endo Pharmaceuticals
11  Inc., and Endo Health Solutions Inc.
12
    JACKSON KELLY PLLC
13  BY:  SYLVIA WINSTON NICHOLS
         sylvia.winston@jacksonkelly.com
14       (VIA TELECONFERENCE)
15  150 Clay Street, Suite 500
    Morgantown, West Virginia 26501
16  (304) 284-4138
17  Counsel for AmerisourceBergen
18  ALSO PRESENT:
    WALMART LEGAL
19  BY:  PAUL D. MORRIS
         Paul.Morris@walmartlegal.com
20  702 Southwest 8th Street, MS #0215
    Bentonville, Arkansas 72716-0215
21  (479) 204-9118
    In-house Counsel for Walmart
22
23  VIDEOGRAPHER:
24     Stephan Hoog,
25     Golkow Litigation Services
         - - -
```

Page 4

```
 1                 INDEX
 2                           PAGE
 3  APPEARANCES................................  2
 4  EXAMINATIONS
 5    BY MR. BOWER.............................  9
 6
 7             EXHIBITS
 8  No.     Description          Page
 9  Walmart    E-mail(s),                 75
    Sullins 1  WMT_MDL_000009183 -
10             WMT_MDL_000009185
11  Walmart    E-mail(s),                 93
    Sullins 2  WMT_MDL_000009319 -
12             WMT_MDL_000009320
13  Walmart    E-mail(s),                106
    Sullins 3  WMT_MDL_000009321 -
14             WMT_MDL_000009323
15  Walmart    E-mail(s),                129
    Sullins 4  WMT_MDL_000049760 -
16             WMT_MDL_000049761
17  Walmart    E-mail(s),                158
    Sullins 5  WMT_MDL_000010215
18
    Walmart    E-mail(s),                180
19  Sullins 6  WMT_MDL_000017581 -
             WMT_MDL_000017582
20
    Walmart    E-mail(s),                212
21  Sullins 7  WMT_MDL_000009834 -
             WMT_MDL_000009837
22
    Walmart    E-mail(s),                220
23  Sullins 8  WMT_MDL_000009224 -
             WMT_MDL_000009232
24
25
```

Page 5

```
 1  Walmart    E-mail(s),                235
    Sullins 9  WMT_MDL_000010287 -
 2             WMT_MDL_000010288
 3  Walmart    E-mail(s),                239
    Sullins 10 WMT_MDL_000017502 -
 4             WMT_MDL_000017503
 5  Walmart    E-mail(s),                248
    Sullins 11 WMT_MDL_000047871
 6
 7  Walmart    E-mail(s),                255
    Sullins 12 WMT_MDL_000016232 -
 8             WMT_MDL_000016234
 9  Walmart    E-mail(s),                260
    Sullins 13 WMT_MDL_000047753 -
10             WMT_MDL_000047788
11  Walmart    E-mail(s),                274
    Sullins 14 WMT_MDL_000009267
12  Walmart    E-mail(s),                284
    Sullins 15 WMT_MDL_000016554 -
13             WMT_MDL_000016558
14  Walmart    E-mail(s),                288
    Sullins 16 WMT_MDL_000011626 -
15             WMT_MDL_000011629
16  Walmart    E-mail(s),                320
    Sullins 17 WMT_MDL_000003683
17
18  Walmart    E-mail(s),                325
    Sullins 18 WMT_MDL_000022799 -
19             WMT_MDL_000022805
20  Walmart    E-mail(s),                331
    Sullins 19 WMT_MDL_000028014 -
21             WMT_MDL_000028015
22  Walmart    E-mail(s),                337
    Sullins 20 WMT_MDL_000009161 -
23             WMT_MDL_000009162
24  Walmart    E-mail(s),                345
    Sullins 21 WMT_MDL_000017458 -
25             WMT_MDL_000017459
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1  Walmart    E-mail(s),
   Sullins 22  WMT_MDL_000017434 -
2            WMT_MDL_000017435
3  Walmart    E-mail(s),
   Sullins 23  WMT_MDL_000002717
4
   Walmart    E-mail(s),
5  Sullins 24  WMT_MDL_000007345
6    (Exhibits attached to the deposition.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        VIDEOGRAPHER:  We are now on
2  the record.
3        My name is Stephan Hoog.  I'm
4  the videographer for Golkow Litigation
5  Services.
6        The date today is January 4,
7  2019.  The time is 7:31 a.m., as
8  indicated on the video screen.
9        This video deposition is being
10  held in Chicago, Illinois, in the
11  matter of In Re: National Prescription
12  Opiate Litigation for the US District
13  Court, Northern District of Ohio.
14        The deponent is Ramona Sullins.
15        Will counsel please introduce
16  themselves for the video record.
17        MR. BOWER:  Good morning.  Zach
18  Bower, Carella Byrne, on behalf of
19  plaintiffs.
20        MR. GILFILLAN:  David
21  Gilfillan, Carella Byrne, on behalf of
22  plaintiffs.
23        MR. COOPER:  Kyle Cooper from
24  Tabet DiVito Rothstein on behalf of
25  McKesson Corporation.

Page 8

1        MR. MORRIS:  Paul Morris from
2  Walmart legal department.
3        MS. CACERES:  Joanne Caceres
4  from Jones Day on behalf of Walmart.
5        MS. FUMERTON:  Tara Fumerton
6  from Jones Day on behalf of Walmart
7  and the witness.
8        VIDEOGRAPHER:  The folks on the
9  phone?
10        MR. BUSHUR:  Joseph Bushur of
11  Williams & Connolly on behalf of
12  Cardinal Health.
13        MS. NOWAK:  Darlene Nowak,
14  Marcus & Shapira, on behalf of HBC
15  Services.
16        MR. WIENER:  Seth Wiener of
17  Arnold & Porter Kay Scholer on behalf
18  of Endo Health Solutions, Inc., Endo
19  Pharmaceuticals, Inc., Par
20  Pharmaceutical, Inc., and Par
21  Pharmaceutical Companies, Inc.
22        VIDEOGRAPHER:  The court
23  reporter today is Carrie Campbell.
24        Can you please swear in the
25  witness?

Page 9

1        RAMONA SULLINS,
2  of lawful age, having been first duly sworn
3  to tell the truth, the whole truth and
4  nothing but the truth, deposes and says on
5  behalf of the Plaintiffs, as follows:
6
7        VIDEOGRAPHER:  Please proceed.
8
9        DIRECT EXAMINATION
10  QUESTIONS BY MR. BOWER:
11      Q.   Good morning, Ms. Sullins.  How
12  are you today?
13      A.   Doing good, thank you.
14      Q.   Have you ever given a
15  deposition before?
16      A.   No.
17      Q.   So I'm sure your attorney
18  informed you of kind of the ground rules for
19  today, but we'll go over a few of the
20  important ones, okay, and let me know if you
21  don't understand any.
22        Okay?
23      A.   Okay.
24      Q.   The first and probably most
25  important is just to let me finish my

Page 10

1 questions and allow your attorney a chance to
2 object to any question before you answer.
3        Okay?
4     A.    Okay.
5     Q.    And also, I'd ask that if you
6 don't understand any question today, you ask
7 me to rephrase the question or let me know
8 that you don't understand before answering.
9        Do you understand that?
10    A.    I do understand that.
11    Q.    Okay.  So if you do answer a
12 question, I will assume that you did
13 understand the question.
14        Okay?
15    A.    Okay.
16    Q.    And also, please, if the answer
17 calls for a yes or no, provide the answer
18 verbally without shaking your head or nodding
19 your head so the court reporter can take down
20 your answer.
21        Okay?
22    A.    Okay.
23    Q.    Is there any reason that you
24 cannot testify truthfully today?
25    A.    No.

Page 11

1     Q.    Are you taking any medication
2 that would prevent you from testifying
3 truthfully today?
4     A.    No.
5     Q.    Have you ever provided any
6 statements under oath on behalf of Walmart?
7     A.    No.
8     Q.    Never provided a declaration or
9 anything like that?
10    A.    No.
11    Q.    When did you first learn you
12 would be giving a deposition in this case?
13    A.    I don't recall the actual date.
14    Q.    Do you recall the approximate
15 date?
16    A.    No.  Whenever I got the -- the
17 notice in the e-mail.
18    Q.    You got an e-mail from someone
19 at Walmart?
20    A.    Yes.
21    Q.    Okay.  Who sent you that
22 e-mail?
23    A.    I believe it was Carl.
24    Q.    Okay.  And how did you prepare
25 for today's deposition?

Page 12

1     A.    I met with our counsel.
2     Q.    Okay.  When was the first time
3 you met with your counsel?
4     A.    It was back in November when
5 the original deposition was scheduled.
6     Q.    Okay.  And when did that
7 meeting take place?  Do you recall
8 approximately -- strike that.
9     A.    Before -- before Thanksgiving.
10    Q.    And your deposition in this
11 case was rescheduled, correct?
12    A.    Correct.
13    Q.    Okay.  Do you recall
14 approximately how long before that initial
15 deposition was scheduled you first met with
16 counsel?
17    A.    The one time I met with counsel
18 was in November.
19    Q.    November.
20        About how many days before the
21 initial deposition was scheduled did that
22 meeting take place?
23    A.    I don't recall.  It might have
24 been a week.
25    Q.    Okay.  And approximately how

Page 13

1 long was that meeting?
2     A.    About four hours.
3     Q.    Had you scheduled an additional
4 meeting with counsel to prepare for that
5 initial deposition date?
6        MS. FUMERTON:  Objection.
7 Form.
8        THE WITNESS:  There was a
9 meeting scheduled for the deposition.
10 QUESTIONS BY MR. BOWER:
11    Q.    What about anything else prior
12 to the deposition?
13        Was there a meeting that you
14 all had planned to have prior to the
15 deposition?
16    A.    No, just the prep.
17    Q.    When was that prep to occur?
18    A.    The four hours.
19    Q.    So that prep had already
20 occurred; is that correct?
21    A.    That's correct.
22    Q.    Okay.  So you had not planned
23 to meet with your counsel the day before that
24 deposition; is that correct?
25    A.    I believe there was.  I don't

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  recall.
2     Q.   You believe there was a meeting
3  scheduled, but you're not sure?
4     A.   That's correct.
5     Q.   Okay.  Since that initial
6  four-hour meeting, have you done anything
7  else to prepare for today's deposition?
8     A.   Just met with them yesterday.
9     Q.   Okay.  And how long was that
10 meeting?
11    A.   Approximately seven, eight
12 hours.
13    Q.   And who did you meet with?
14    A.   Tara.
15    Q.   Anyone else?
16    A.   Joanne was there.  Paul was
17 there.
18    Q.   Anyone else?
19    A.   I don't know her name.  I think
20 her name's Tina.
21    Q.   Do you remember whether they
22 were counsel for Walmart or outside counsel?
23    A.   They were part of Jones Day.
24    Q.   Jones Day.
25        Was there anyone on the phone?

Page 15

1     A.   I don't know anybody that
2  chimed in.
3     Q.   Was there a phone call open?
4     A.   There was.
5     Q.   Okay.  Do you know who was on,
6  listening in to that phone?
7     A.   No, I don't.
8     Q.   Do you know why there was a
9  phone open?
10        MS. FUMERTON:  Objection to the
11    extent that you're starting to get
12    into conversations with counsel.  But
13    to the extent she can answer
14    otherwise, that's fine.
15        THE WITNESS:  To -- it was our
16    counsel, Walmart.
17 QUESTIONS BY MR. BOWER:
18    Q.   There was in-house counsel from
19 Walmart on the phone?
20    A.   Yes.
21    Q.   That's your understanding?
22    A.   That was my understanding.
23    Q.   Okay.  That meeting took place
24 in Chicago?
25    A.   Yes.  It happened yesterday.

Page 16

1     Q.   Did you review documents during
2  that meeting?
3     A.   We did.
4     Q.   Did you review documents that
5  refreshed your recollection for the testimony
6  you will provide today?
7     A.   No.
8     Q.   What was the purpose of
9  reviewing documents?
10        MS. FUMERTON:  Objection to the
11    extent that she has -- her
12    understanding from reviewing documents
13    is based on communications with
14    counsel, so I'll instruct her not to
15    answer that question unless she can
16    answer it without revealing
17    attorney-client communications.
18 QUESTIONS BY MR. BOWER:
19    Q.   Can you answer the question?
20    A.   No.
21    Q.   Okay.  Have you ever been asked
22 to provide counsel with documents for this
23 case?
24    A.   Not that I recall.
25    Q.   Has anyone asked you whether

Page 17

1  you have documents that might be relevant to
2  this case?
3        MS. FUMERTON:  Again, I object
4    to the question to the extent that
5    you're asking her about questions --
6    communications with counsel, and I'm
7    going to instruct her not to answer
8    that question.
9        MR. BOWER:  Well, that
10    question -- that question she can
11    answer.  It's a yes or no question.
12 QUESTIONS BY MR. BOWER:
13    Q.   The question is this:  Have you
14 been asked to provide documents that may be
15 responsive to this case?
16        MS. FUMERTON:  Well, you're
17    asking may be responsive to this case.
18    You're not getting to the
19    communications with counsel.
20        You should have asked, which I
21    think you already did, "Have you been
22    asked to produced documents in
23    connection with the case?"  That's a
24    yes or no question, which she can
25    answer.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1      THE WITNESS:  No.
2  QUESTIONS BY MR. BOWER:
3      Q.    Have you ever spoken with
4  anyone at Walmart about this case?
5      A.    No.
6      MS. FUMERTON:  Again, just give
7  me a second to object.
8      To the extent it's outside of
9  communications with counsel in
10 preparation for the deposition.
11     THE WITNESS:  No.
12 QUESTIONS BY MR. BOWER:
13     Q.    Okay.  Are you aware of whether
14 other Walmart employees have given testimony
15 in this case?
16     A.    Can you repeat the question?
17     MR. BOWER:  Can you just read
18 it?
19     (Court Reporter read back
20 question.)
21     MS. FUMERTON:  And again, I'm
22 going to object to the question to the
23 extent that you're asking about any
24 communications with counsel.
25     But to the extent that she has

Page 19

1  knowledge outside of those
2  communications, she can answer the
3  question.
4      THE WITNESS:  No.
5  QUESTIONS BY MR. BOWER:
6      Q.    Is your answer affected by
7  communications with counsel and your
8  counsel's instructions not to answer
9  concerning those communications?
10     MR. BOWER:  It's a yes or no
11 question.  She's allowed to answer
12 whether she had knowledge of other
13 folks giving testimony.  That's not a
14 privileged correspondence.  There's no
15 legal advice being provided.
16     So I'll ask it again.
17 QUESTIONS BY MR. BOWER:
18     Q.    Are you aware of whether other
19 Walmart employees have provided testimony in
20 this case?
21     MS. FUMERTON:  I disagree with
22 your assertion of the law.  I object
23 to the question to the extent that it
24 would invade communications with
25 counsel.

Page 20

1      To the extent that she's, for
2  example, talked to other folks at
3  Walmart about whether or not they've
4  given deposition testimony, I think
5  that's fair game, but I do not agree
6  with you that you can ask her
7  questions about communications with
8  counsel.
9      Just because it's a yes or no
10 question does not mean that it does
11 not invade privilege.
12     But to the extent you can
13 answer the question outside of
14 communications with counsel, please go
15 ahead.
16     THE WITNESS:  No.
17 QUESTIONS BY MR. BOWER:
18     Q.    Well, I'll ask it more
19 directly.  Did counsel tell you who's been
20 deposed in this case?
21     MS. FUMERTON:  Again, I
22 instruct you not to answer that
23 question on the basis of
24 attorney-client privilege.
25

Page 21

1  QUESTIONS BY MR. BOWER:
2      Q.    Are you going to follow those
3  instructions and not answer the question?
4      A.    I'm going to follow the
5  instructions.
6      Q.    Do you know whether the
7  documents you reviewed in preparation for
8  your deposition were produced in this case?
9      MS. FUMERTON:  I -- to the
10 extent that you're asking about
11 specific documents that she reviewed
12 with counsel, I think it's
13 inappropriate for you to ask her to
14 identify those documents.
15 QUESTIONS BY MR. BOWER:
16     Q.    I'm not asking -- just to be
17 clear, I'm not asking her to identify
18 document.  I'm just asking whether you know
19 the documents that you acknowledge you
20 reviewed were produced to plaintiffs in this
21 case.
22     A.    I have no idea.
23     Q.    What is Jabber?
24     A.    That's an in-house
25 communication.

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1    Q.    And how often would you use it?
2    A.    Ten times daily?  I don't -- I
3  can't quantify that.
4    Q.    When did you -- when would it
5  start -- strike that.
6        Do you recall when
7  approximately you started using Jabber to
8  communicate with other Walmart employees?
9    A.    No.
10   Q.    Has it been available for
11 communications your entire time at Walmart?
12   A.    No.
13   Q.    When did it start becoming
14 available?
15   A.    I don't recall.
16   Q.    Do you recall approximately
17 when?
18   A.    No, I don't recall
19 approximately when.
20   Q.    Do you recall the year?
21   A.    No.
22   Q.    Why would you communicate via
23 Jabber versus e-mail?
24   A.    If it was a quick question
25 about work.

Page 23

1    Q.    It was quicker than e-mail,
2  correct?
3    A.    Yes.
4    Q.    More convenient, correct?
5    A.    Yes.
6    Q.    Okay.  Are you aware of any
7  Walmart policies and procedures regarding
8  preserving communications on Jabber?
9    A.    No, I'm not aware of any.
10   Q.    What is your understanding as
11 to whether those communications are preserved
12 or maintained?
13       MS. FUMERTON:  Objection to
14 form.
15       THE WITNESS:  I have no idea.
16 QUESTIONS BY MR. BOWER:
17   Q.    Do you know whether they're
18 deleted immediately?
19   A.    I don't know.
20   Q.    Have you spoken -- strike that.
21       Have you used Jabber to
22 communicate regarding Walmart's SOM program?
23   A.    Not that I'm aware of.
24   Q.    Never?
25   A.    I can't recollect that.  I

Page 24

1  don't know.
2    Q.    Well, I'm just trying to
3  understand what you -- what your answer is.
4        Is it that you're not aware of
5  any, you don't believe it happened, or that
6  you simply don't recall?
7    A.    I simply don't recall.
8    Q.    Is it possible it could have
9  happened?
10   A.    I can't recall.
11   Q.    Well, you testified a few
12 minutes ago that you believe you used it
13 daily, correct?
14   A.    Correct.
15   Q.    So why is it that you believe
16 you may not have used it to communicate
17 regarding Walmart's SOM program?
18   A.    Because the -- I mean,
19 that's -- I don't know if I used it for that.
20 I mean, I used it for something other than
21 that.  I know I used it for questions about
22 the operation, operational questions.
23   Q.    Would those include questions
24 about the operation of the Walmart SOM
25 program?

Page 25

1        MS. FUMERTON:  Objection to
2  form.
3        THE WITNESS:  I don't recall.
4  QUESTIONS BY MR. BOWER:
5    Q.    It could have happened; you
6  just don't recall.  Is that correct?
7    A.    I don't recall.
8    Q.    When you say -- I just want the
9  record to be clear.  When you say you don't
10 recall, are you saying you don't recall it
11 ever happening, or are you saying I don't
12 recall whether it happened or not?
13       MS. FUMERTON:  Objection to
14 form.
15       THE WITNESS:  I don't recall
16 whether it happened or not.
17 QUESTIONS BY MR. BOWER:
18   Q.    Okay.  What would you use
19 Jabber to communicate about on a daily basis?
20       MS. FUMERTON:  Objection.
21 Form.
22       THE WITNESS:  Questions about
23 the operation or, hey, can you attend
24 this meeting, I'm on another call,
25 stuff like that.

Page 26

1  QUESTIONS BY MR. BOWER:
2      Q.    Anything else that you can
3  recall today?
4      A.    No.
5      Q.    Who would you communicate --
6  strike that.
7           With who would you communicate
8  on Jabber?
9      A.    Multiple people in Walmart.
10     Q.    Okay.  Can you provide us the
11  names of those folks?
12          MS. FUMERTON:  Objection.
13  Form.
14          THE WITNESS:  Some were team
15          members.  Some were in replenishment.
16          Different -- just different groups
17          that I would communicate with.
18  QUESTIONS BY MR. BOWER:
19     Q.    Do you recall their names as
20  you sit here today?
21     A.    Yeah.  Theresa Alford, Shawn
22  Robinson.  Then there was Flynn.  I don't
23  recall his last name.  He was in ISD.  I
24  mean, there was -- there was quite a bit of
25  people that I would communicate.

Page 27

1      Q.    Other than Theresa, Shawn and
2  Flynn, anyone that you can recall as you sit
3  here today?
4      A.    Jonathan Leonard.  I can't
5  think of all of them.
6      Q.    Kristy Spruell?
7      A.    She's not there.  I don't know
8  if Jabber was available when she was there.
9      Q.    Jimmie Sherl?
10     A.    Again, he's no longer with the
11  company, and I don't know if he was there
12  when Jabber was -- existed.
13     Q.    Well, I thought you testified
14  before you weren't sure of when Jabber
15  existed, so does -- are you now recalling
16  when it was available?
17     A.    No.
18          MS. FUMERTON:  Objection.
19  Objection.  Form.
20  QUESTIONS BY MR. BOWER:
21     Q.    All right.  So just -- when you
22  say you don't believe that it was available
23  when, for example, Ms. Spruell was there,
24  what do you mean by that?
25     A.    I don't -- I don't know if it

Page 28

1  was available when she was there.
2      Q.    When was she there?
3      A.    I don't recall the actual time.
4  I don't recall when she left.
5      Q.    Okay.  So you don't recall when
6  she was there, and you also don't recall when
7  Jabber was available, but your testimony
8  today is that you don't believe she was
9  available when Jabber was also available; is
10  that correct?
11          MS. FUMERTON:  Objection.
12  Form.
13          THE WITNESS:  No, what I'm
14          saying is I don't know when she was
15          there, what time frame she was there,
16          and I don't know if Jabber existed.
17  QUESTIONS BY MR. BOWER:
18     Q.    When did you first begin
19  working at Walmart?
20     A.    1988.
21     Q.    Can you briefly describe for us
22  your educational background after high
23  school?
24     A.    I took a couple of non-credited
25  courses.

Page 29

1      Q.    When did you graduate high
2  school?
3      A.    1987.
4      Q.    So you went to work for Walmart
5  after graduating high school; is that
6  correct?
7      A.    Correct.
8      Q.    What was your first job at
9  Walmart?
10     A.    I was an order filler.
11     Q.    And where was -- where were you
12  located at that time?
13     A.    Plainview, Texas.
14     Q.    And how long did you -- strike
15  that.
16          What was your next job at
17  Walmart after an order filler?
18     A.    I loaded trailers.
19     Q.    What do you mean by "loaded
20  trailers"?
21     A.    I physically loaded
22  televisions, dog food, paint, into a trailer,
23  floor-loaded it.
24     Q.    Was that at a Walmart
25  distribution center?

Page 30

1 A. Yes.
2 Q. Which distribution center was
3 that?
4 A. 6012.
5 Q. And where is that distribution
6 center located?
7 A. Plainview, Texas.
8 Q. And just briefly can you
9 describe what you did as an order filler?
10 A. I filled orders for the store.
11 Q. What do you mean by you "filled
12 orders for the store"?
13 Can you describe that with more
14 specificity?
15 A. So I filled like makeup, yarn,
16 tools; placed those in a box and shipped
17 them.
18 Q. Were those online orders?
19 A. No.
20 Q. Where were the orders coming
21 from?
22 A. The stores that were aligned to
23 that distribution center.
24 Q. Okay. So you're also -- the
25 role you described of filling orders was also

Page 31

1 at the distribution center; is that correct?
2 A. That's correct.
3 Q. Okay. And then what was the
4 next position you held at Walmart?
5 A. I went into quality assurance.
6 Q. Okay. And approximately what
7 time period was that?
8 A. 1990.
9 Q. And where were you located at
10 that time?
11 A. Plainview, Texas.
12 Q. And how long did you hold that
13 role in quality assurance?
14 A. I don't recall how long I held
15 the role.
16 Q. Approximately how long?
17 A. Maybe two years.
18 Q. And just generally speaking,
19 what were your duties and responsibilities in
20 quality assurance?
21 A. Inventory control, cycling the
22 inventory, problem solving with freight that
23 didn't have a home. Mostly just inventory
24 related.
25 Q. And were there any specific

Page 32

1 products or areas of the business you were
2 responsible for?
3 A. Not -- not at that time.
4 Q. Was this at the same DC?
5 A. Yes.
6 Q. Who did you report to at this
7 time?
8 A. I don't recall.
9 Q. And you held that role for
10 approximately two years, until approximately
11 1992?
12 A. Yes.
13 Q. What was your next role at
14 Walmart?
15 A. I was a supervisor.
16 Q. What did you supervise?
17 A. The associates in the order
18 filling area.
19 Q. How long did you hold that
20 role?
21 A. Until approximately 1995.
22 Q. And then what role did you take
23 on in 1995?
24 A. I was a manager trainee.
25 Q. And what does that mean?

Page 33

1 A. I was in the processes of
2 learning how to run a department.
3 Q. Does Walmart have specific
4 training for its prospective managers?
5 A. It did at that time.
6 Q. And you were chosen to
7 participate in that training, correct?
8 A. Correct.
9 Q. That was in 1995,
10 approximately?
11 A. Approximately.
12 Q. And where did that training
13 take place?
14 A. Palestine, Texas.
15 Q. And what type of training
16 occurred?
17 A. Leadership training.
18 Q. Anything else?
19 A. Manpower, forecasting,
20 administrative.
21 Q. What do you mean when you
22 say -- strike that.
23 Can you describe what
24 leadership training is?
25 A. So it would have been like how

Highly Confidential - Subject to Further Confidentiality Review

---

Page 34

1 do you handle, you know, your interviewing
2 skills; how do you, you know, write different
3 disciplinary things. I'm trying to think
4 what else was in there.
5    Q.    And I realize this is going
6 back a ways. I'm just trying to get a
7 general sense of what you were --
8    A.    That was --
9    Q.    That's fine.
10         And then do you have any
11 recollection with respect to what kind of the
12 other areas were, the manpower, forecasting,
13 administrative, what just generally those
14 involved?
15    A.    Just knowing how to read the --
16 the associates' attendance, how to forecast,
17 you know, based on the volume coming in, how
18 many people do you need, how long is it going
19 to take to do the work. That was the
20 manpower forecasting.
21    Q.    And how long did the training
22 last?
23    A.    I believe it was -- I want to
24 say six weeks. I don't recall how long the
25 training was.

---

Page 35

1    Q.    Okay. And then after you
2 received this training, did you take a
3 different position at Walmart?
4    A.    Then I had an area to run.
5    Q.    Okay. And what area was that?
6    A.    The marking room.
7    Q.    Can you describe what the
8 marking room is?
9    A.    So it was when goods came in to
10 Walmart, they weren't ticketed, so we would
11 ticket those -- that merchandise, and the
12 majority of it was apparel and shoes.
13    Q.    And what do you mean by
14 "ticketed"?
15    A.    Showed the price tags on them.
16    Q.    Was this position also at the
17 DC?
18    A.    Yes.
19    Q.    And these were products that
20 were sold to Walmart by manufacturers or
21 suppliers?
22    A.    Yes.
23    Q.    And how long did you have that
24 role?
25    A.    Maybe a year.

---

Page 36

1    Q.    So until approximately 1996 at
2 some point you switched again?
3    A.    Yes.
4    Q.    Okay. What was your next role?
5    A.    I was a QA manager. QA,
6 quality assurance.
7    Q.    Can you just describe for us
8 very briefly what that means?
9    A.    So it's the inventory, so on
10 the -- you would have responsibility for all
11 the inventory and the associates that
12 reported up through that process.
13    Q.    How long did you have that
14 role, approximately?
15    A.    Maybe about six or seven
16 months.
17    Q.    And then you switched again; is
18 that correct?
19    A.    I moved.
20    Q.    Oh, you moved where you lived;
21 is that --
22    A.    Yes.
23    Q.    And where did you move?
24    A.    To Loveland, Colorado.
25    Q.    Did you continue to work for

---

Page 37

1 Walmart in Loveland, Colorado?
2    A.    Yes.
3    Q.    Okay. What did you do there?
4    A.    I'm sorry?
5    Q.    What did you do in Loveland?
6 I'm sorry.
7    A.    So I was an area manager as
8 well.
9    Q.    And how long did you have that
10 role in Loveland, approximately?
11    A.    I lived in -- so I got there in
12 May of '96, and I left in April of '97.
13    Q.    You left Loveland in April
14 of '97; is that correct?
15    A.    That's correct.
16    Q.    Okay. And where did you go at
17 that point?
18    A.    I went to Hope Mills, North
19 Carolina.
20    Q.    Was that move a result of a
21 change in Walmart jobs?
22    A.    No. It was distribution as
23 well.
24    Q.    Okay. That move was for
25 personal reasons not related to your

---

Page 38

1 employment at Walmart; is that correct?
2    A.    That's correct.
3    Q.    So now you're in North
4 Carolina, still working for Walmart on the
5 distribution side, correct?
6    A.    Correct.
7    Q.    Was that also a distribution
8 center in North Carolina?
9    A.    Yes.
10    Q.    And are you still a manager, an
11 area manager, there?
12    A.    Yes.
13    Q.    Okay.  And what was the next
14 role you had at Walmart?
15    A.    So then I transferred back to
16 Plainview, Texas, in October of '97, and I
17 had an area manager position there as well.
18    Q.    And then how long did you hold
19 that position back in Texas?
20    A.    Until 2004.
21    Q.    And what change occurred in
22 2004?
23    A.    I moved to Bentonville,
24 Arkansas.
25    Q.    And then what position did

Page 39

1 you -- strike that.
2        Did you change positions at
3 that point?
4    A.    I did.
5    Q.    Okay.  And what was your new
6 position?
7    A.    I worked in merchandise
8 support.
9    Q.    Is that at a DC in Bentonville?
10    A.    No, that was in the home
11 office.  That was in the logistics building.
12    Q.    And can you just describe
13 generally what your duties and
14 responsibilities were for that role in
15 merchandise support?
16    A.    So I had responsibility for all
17 of the apparel and shoes and the flow of
18 those -- that product from supplier to
19 distribution center.
20    Q.    And is that for all of the
21 Walmarts in the world?
22    A.    In all the US apparel DCs.
23    Q.    So you were responsible for
24 getting the apparel to the DCs; is that
25 correct?

Page 40

1    A.    I worked with -- I was a
2 liaison between merchandising and logistics.
3    Q.    And what sort of things would
4 you do on a day-to-day basis?
5    A.    I would meet with the buyers to
6 find out when they were flowing product into
7 the distribution centers and determine when
8 those were going to hit.  Because with
9 apparel it's seasonal, so there was four
10 seasons that you had to flow through; so you
11 have, you know, the winter season, you -- it
12 was a certain specific time frame.  If there
13 was inventory left in the distribution
14 center, that you partnered with them to try
15 to flow that into the stores.
16    Q.    During this time period, was
17 there a database or any other electronic
18 system that Walmart used to manage its
19 inventory?
20        MS. FUMERTON:  Objection.
21 Form.
22 QUESTIONS BY MR. BOWER:
23    Q.    I'll strike that.
24        How did Walmart manage its
25 inventory in 2004?

Page 41

1        MS. FUMERTON:  Objection.
2 Form.
3        THE WITNESS:  So it was through
4 their host mainframe system.
5 QUESTIONS BY MR. BOWER:
6    Q.    So did you say host mainframe
7 or closed mainframe?
8    A.    Host.
9    Q.    Does that system go by any
10 other name?
11    A.    I -- I don't -- I don't know.
12    Q.    Did you receive at that point
13 any -- or strike that.
14        At any point did you receive
15 specific training with respect to merchandise
16 inventory management?
17    A.    I did.
18    Q.    Okay.  When was that?
19    A.    When I came in 2004.
20    Q.    Did that training occur in
21 Bentonville?
22    A.    Yes.
23    Q.    And how long did you hold that
24 position?
25    A.    Till 2008.

Page 42

1 Q. And then what was the change in
2 2008?
3 A. I moved over to the pharmacy.
4 Q. And what was your title in
5 2008?
6 A. I was senior manager on the
7 pharmacy team.
8 Q. Was that your title in 2008,
9 senior manager in the pharmacy team?
10 A. I don't know what it said.
11 Q. What were your duties and
12 responsibilities in connection with that
13 role?
14 A. So I had responsibility to
15 bring in a system because they were filling
16 orders with pen and paper, and just
17 day-to-day operational questions that would
18 come up.
19 Q. Were you assigned -- strike
20 that.
21 Was that position at the home
22 office?
23 A. Yes, but it was still under
24 logistics.
25 Q. What do you mean by that, by

Page 43

1 the statement that it was still under
2 logistics?
3 A. It is under the division of
4 logistics.
5 Q. Was that division at the home
6 office?
7 A. Yes.
8 Q. When you say that you were --
9 one of your duties was to bring in a system
10 because they were currently filling orders
11 with pen and paper, what do you mean by that?
12 A. So they would get a document
13 for orders, and they would go fill those
14 store orders based on the paper document.
15 Q. So who would get the document?
16 A. So the distribution center
17 would, and they would pass those documents
18 out to the order fillers.
19 Q. At that point in 2008, had you
20 received any training specific to pharmacy?
21 A. I did. I went to the
22 distribution centers.
23 Q. So at some point in or about
24 2008 you traveled to the distribution
25 centers; is that correct?

Page 44

1 A. That's correct.
2 Q. And the purpose of that travel
3 was to learn about the ordering and the
4 filling of those orders for pharmacy
5 products; is that correct?
6 MS. FUMERTON: Objection.
7 Form.
8 QUESTIONS BY MR. BOWER:
9 Q. Well, strike that.
10 What was the purpose of your
11 visits to the distribution centers?
12 A. To learn how they were filling
13 orders, how we could take their process and
14 make it into a -- to bring in a system that
15 could help with that process.
16 Q. And at that point how many
17 distribution centers were filling orders for
18 pharmacies?
19 A. Six.
20 Q. And at that time, how many
21 distribution centers were filling orders for
22 prescription II products? Strike that.
23 At that time, how many
24 distribution centers were filling orders for
25 Schedule II products?

Page 45

1 A. One distribution center.
2 Q. And what center is that?
3 A. 6045.
4 Q. And what about for Schedule III
5 products?
6 A. The other five distribution
7 centers.
8 Q. Do you recall at that time
9 which other distribution centers were
10 distributing hydrocodone?
11 A. That would have been the five
12 distribution centers.
13 Q. And this is around 2008,
14 correct?
15 A. That's correct.
16 Q. Okay. During this time period,
17 did you receive any training regarding
18 Walmart's obligations to monitor orders for
19 Schedule II products?
20 A. It was part of the training
21 that I sat through with -- at the
22 distribution center. I don't recall
23 specifically what was -- what we talked
24 about.
25 Q. Well, do you recall generally

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1  what Walmart's obligations were at that time?
2          MS. FUMERTON: Objection.
3  Form.
4  QUESTIONS BY MR. BOWER:
5      Q.   Strike that.
6          Do you recall generally what
7  Walmart's obligations were at that time
8  regarding monitoring of orders for
9  Schedule II narcotics?
10     A.   No, I don't.
11     Q.   At some point did you become
12 aware of Walmart's obligations to monitor
13 orders for Schedule II narcotics?
14     A.   I did.
15     Q.   And when did you become aware
16 of that?
17     A.   I don't recall the year.
18     Q.   Do you recall approximately
19 when?
20     A.   No.
21     Q.   Do you recall how you became
22 aware of Walmart's obligations to monitor
23 orders for Schedule II narcotics?
24     A.   No.  No, not -- no.
25     Q.   So I just want to make sure

Page 47

1  that the record is clear.  So you don't
2  recall either how you became aware or when
3  you became aware of Walmart's obligations to
4  monitor orders of Schedule II narcotics; is
5  that correct?
6          MS. FUMERTON: Objection.
7  Form.
8          THE WITNESS: I don't recall.
9  QUESTIONS BY MR. BOWER:
10     Q.   And what about Walmart's
11 obligations to monitor orders of Schedule III
12 narcotics, do you know whether they have any
13 such obligations?
14         MS. FUMERTON: Objection.
15 Form.
16 QUESTIONS BY MR. BOWER:
17     Q.   I'll strike that.
18         Do you know whether Walmart has
19 any obligations to monitor orders of
20 Schedule III narcotics?
21         MS. FUMERTON: Objection.
22 Form.
23         THE WITNESS: Ask the question
24 again.
25

Page 48

1  QUESTIONS BY MR. BOWER:
2      Q.   Sure.
3          Do you know whether Walmart, as
4  a distributor, has any obligations to monitor
5  orders placed by its pharmacies for
6  Schedule III narcotics?
7          MS. FUMERTON: Objection.
8  Form.
9          Can we get a time period?
10         MR. BOWER: At any point.
11         MS. FUMERTON: Okay.
12         MR. BOWER: Just a question.
13         MS. FUMERTON: It's a question
14 with a false premise, though.  That's
15 the problem.  You're talking about as
16 a distributor, and as you know,
17 Walmart no longer distributes
18 controlled substances.
19         MR. BOWER: Okay.
20 QUESTIONS BY MR. BOWER:
21     Q.   Do you know whether Walmart --
22         MS. FUMERTON: You said
23 "Walmart, as a distributor."  That's
24 why I'm asking, why the question is
25 flawed.

Page 49

1          MR. BOWER: Okay.  I'll
2  rephrase the question.  I think you
3  understood it, but I'll rephrase.
4  QUESTIONS BY MR. BOWER:
5      Q.   Do you know whether Walmart at
6  any point had any obligation to monitor
7  orders for Schedule II narcotics that were
8  placed by its pharmacy to its distribution
9  centers?
10     A.   Yes.
11     Q.   Okay.  What is your
12 understanding of those obligations?
13     A.   I don't have an understanding
14 of it.  I know that there was policies or
15 procedures related to that.  That wasn't part
16 of my responsibility.
17     Q.   Has it ever been part of your
18 responsibility?
19     A.   No.  No.
20     Q.   Have you ever had any role
21 since you started working at Walmart in
22 connection with Walmart's suspicious order
23 monitoring program?
24         MS. FUMERTON: Objection.
25 Form.

Page 50

1 THE WITNESS: I was part of the
2 rollout of that system.
3 QUESTIONS BY MR. BOWER:
4 Q. And when did that occur?
5 A. I don't recall.
6 Q. Approximately?
7 A. The Reddwerks threshold, I
8 believe, was 2010, 2011.
9 Q. And we'll look at some
10 documents in a bit. Maybe that'll help you
11 refresh your recollection. I'm just trying
12 to get a general sense of when you say
13 "rollout of that system," are you referring
14 to the over 20 reports or something else?
15 A. No, that would have -- I don't
16 know if that was during the same time.
17 Q. Okay. So when you say "rollout
18 of that system," what system are you
19 referring to?
20 A. The thresholds.
21 Q. What do you mean by --
22 A. Order alert.
23 Q. What do you mean by thresholds?
24 Order alerts?
25 A. That's what the project was

Page 51

1 called.
2 Q. What project are you referring
3 to?
4 A. So the rollout of Reddwerks
5 order alert.
6 Q. And you believe that occurred
7 sometime in 2010; is that correct?
8 A. '10 or '11. I don't recall.
9 Q. Before that rollout occurred,
10 did Walmart have a monitoring program in
11 place?
12 A. Yes.
13 Q. And what was that program?
14 A. I believe it was a 405 report,
15 and they monitored orders as they came in.
16 Q. Okay. And what do you mean
17 by -- when you say "they monitored orders as
18 they came in," what does that mean?
19 A. So the distribution center did
20 and the associates did.
21 Q. Are the associates at the
22 distribution center?
23 A. Yes.
24 Q. Okay. Anyone other than the
25 associates at the distribution center that

Page 52

1 would monitor orders?
2 MS. FUMERTON: Objection.
3 Form.
4 QUESTIONS BY MR. BOWER:
5 Q. And I'm just trying -- just so
6 the record is clear, I'm just trying to
7 understand your answer.
8 You said "the distribution
9 center did and the associates did." Are
10 those two different things in your mind?
11 A. They're all at the distribution
12 center.
13 Q. And what were the associates
14 doing prior to the rollout of Reddwerks?
15 A. So my understanding is that
16 they would -- they would let their manager
17 know if they saw an order that was out of the
18 ordinary.
19 Q. What do you mean by "out of the
20 ordinary"?
21 A. Like, for example, ReliOn
22 insulin, we had orders that would -- where
23 the pharmacy would think that they were
24 ordering ten vials of insulin, and they
25 actually ordered a hundred of them because

Page 53

1 they were in packs of ten. So those would be
2 examples of what they would bring to their
3 attention.
4 Q. And in fact, Walmart had an
5 automatic cut for those instant orders,
6 correct?
7 MS. FUMERTON: Objection.
8 Form.
9 Go ahead.
10 THE WITNESS: For the what now?
11 QUESTIONS BY MR. BOWER:
12 Q. For those insulin orders that
13 you just -- the example that you just
14 provided, Walmart actually had an automatic
15 cut for those orders, didn't they?
16 MS. FUMERTON: Objection.
17 Form.
18 THE WITNESS: It was a manual
19 cut; it wasn't automatic.
20 QUESTIONS BY MR. BOWER:
21 Q. A manual cut that was
22 automatically applied to insulin orders,
23 correct?
24 MS. FUMERTON: Objection.
25 Form.

Page 54

1    THE WITNESS:  They would call
2 the store to inform them that they had
3 placed -- if they really wanted a
4 hundred because, I mean, the
5 refrigerator didn't hold a hundred.
6 QUESTIONS BY MR. BOWER:
7    Q.    Right.
8        And that was specific to
9 insulin, correct?
10    A.    That's correct.
11    Q.    Okay.  What about with respect
12 to Schedule II narcotics, what were the DCs
13 doing in 2008?
14        MS. FUMERTON:  Objection.
15 Form.
16        THE WITNESS:  My understanding
17 is they would do the same thing with
18 that.
19 QUESTIONS BY MR. BOWER:
20    Q.    And where does that
21 understanding come from?
22    A.    Just from when I was training
23 in 2008, when I was out at the DCs training.
24    Q.    Okay.  So what specifically did
25 you learn in connection with your training

Page 55

1 that the DCs were doing for Schedule II
2 narcotics?
3        MS. FUMERTON:  Objection.
4 Form.
5        THE WITNESS:  So again, they
6 would look at that paper and let their
7 supervisor or manager know that this
8 appears to be out of the ordinary or
9 unusual.
10 QUESTIONS BY MR. BOWER:
11    Q.    And at that point -- and we're
12 talking 2008, correct?
13    A.    Yes.
14    Q.    At that point, how was DC 6045
15 receiving orders?  They were paper, correct?
16    A.    So those would come in
17 electronically.  They're printed on paper.
18    Q.    They would come in
19 electronically once a day?
20    A.    That's correct.
21    Q.    And then they would print it on
22 paper at the DC?
23    A.    That's correct.
24    Q.    And then what would happen to
25 those papers?

Page 56

1    A.    Well, first they would print
2 the 222 form, sign those, and then that and
3 the paper order would be put together in a
4 packet, and the associates would fill orders
5 based on that paper order.
6    Q.    And was it the practice for the
7 orders to be filled and shipped the same day
8 they came in?
9    A.    Yes.
10    Q.    And approximately how many
11 orders came in to DC 6045 on a daily basis
12 during this time period?
13    A.    I don't recall how many orders
14 came in.
15    Q.    Would it have been in the
16 hundreds of orders?  Could it have been in
17 the hundreds of orders per day?
18    A.    Well, they filled store
19 order -- store only got an order once a week
20 of C-IIs.  So if you divide it up, however
21 many stores we had at the time, that's how
22 many orders they would -- processed, four
23 days a week.
24    Q.    That's fine.
25        You said four days a week?

Page 57

1    A.    Yes.
2    Q.    So, for example, if there were
3 4,000 stores, approximately a thousand orders
4 a day, correct?
5    A.    Potentially.
6    Q.    And just so the record's clear,
7 you mentioned a couple reports.  I just want
8 to go through just what those reports are.
9        What is a 222?
10    A.    It's a DEA 222 form to move
11 C-II drugs.
12    Q.    Okay.  And what is a 405
13 report?
14    A.    So it was a report that the
15 distribution used.  I don't know what they --
16 I don't know what all it had on there.  I
17 know that they used it.
18    Q.    And how do you know that they
19 used it?
20    A.    Because when it didn't generate
21 one month, they pinged me to help them get it
22 generated.
23    Q.    Do you know why they pinged you
24 to help get them generated?
25    A.    Because of the systems

Page 58

1 background that I had.
2    Q.    And what systems backgrounds do
3 you have?
4    A.    It was mainly knowing how the
5 orders would come in, some of the jobs that
6 were run for certain reports. So I would
7 partner with maybe my -- I had contacts over
8 in the IT department, so they would ask me to
9 ping somebody over in IT to let them know
10 that a report didn't run.
11    Q.    And I just want to put a time
12 frame on that answer.
13    What time frame would you ping
14 folks in IT to run a report?
15    MS. FUMERTON: Objection.
16    Form.
17    THE WITNESS: That happened to
18    be one incident. I don't know when it
19    occurred.
20 QUESTIONS BY MR. BOWER:
21    Q.    Okay. Other than the 405
22 reports and the DC associates reviewing the
23 orders, prior to the role of Reddwerks, was
24 Walmart doing anything else to review orders
25 for Schedule II narcotics?

Page 59

1    MS. FUMERTON: Objection.
2    Form.
3    THE WITNESS: I don't know.
4 QUESTIONS BY MR. BOWER:
5    Q.    Anything else you're aware
6 of that was being done?
7    MS. FUMERTON: Objection.
8    Form.
9    THE WITNESS: I don't know.
10 QUESTIONS BY MR. BOWER:
11    Q.    Well, you visited DC 6045 in
12 2008, correct?
13    A.    I did.
14    Q.    Okay. At that point did you
15 see anything else being done in connection
16 with reviewing orders placed by the
17 pharmacies for Schedule II narcotics?
18    MS. FUMERTON: Objection.
19    Form.
20    THE WITNESS: Not that I
21    recall.
22 QUESTIONS BY MR. BOWER:
23    Q.    Okay. And did someone at DC
24 6045 tell you that they would have the
25 associates review the orders on a daily

Page 60

1 basis?
2    A.    That was part of the training
3 that -- when I was learning how to -- they
4 filled orders. They told me and so did the
5 associates.
6    Q.    Okay. So who told you that?
7    A.    I don't recall the manager that
8 would have said it.
9    Q.    Was it the manager at 6045 or
10 your manager for the training?
11    A.    No, it was the managers that
12 were supervisors at 6045.
13    Q.    Mike Mullin?
14    A.    He was a general manager. I
15 don't know.
16    Q.    Okay. Do you know who had
17 responsibility at 6045 for making sure the
18 associates would review the orders for
19 Schedule II narcotics?
20    A.    I don't know.
21    Q.    Are you aware of any instance
22 where the associates flagged an order for
23 Schedule II narcotics as potentially
24 suspicious?
25    MS. FUMERTON: Objection.

Page 61

1    Form.
2    THE WITNESS: I don't know.
3 QUESTIONS BY MR. BOWER:
4    Q.    Was that part of your training?
5    A.    I spent a day there. I --
6 doing the order filling process. That day we
7 didn't. I don't know of anything else that
8 would have been done.
9    Q.    What about since that day?
10    MS. FUMERTON: Objection.
11    Form.
12    THE WITNESS: I don't know. It
13    wouldn't have been anything that would
14    have come to me.
15 QUESTIONS BY MR. BOWER:
16    Q.    So in 2008 you're tagged with
17 responsibility to bring in a system to kind
18 of move beyond this printout and paper
19 system, correct?
20    A.    Correct.
21    Q.    Okay. And what did you do in
22 connection with those responsibilities?
23    A.    I looked at multiple order
24 filling vendors. I brought those vendors to
25 my boss at the time, and then they made a

Case: 1:17-md-02804-DAP Doc #: 3027-27 Filed: 12/19/19 17 of 101. PageID #: 472432

Page 62

1 decision on which vendor to go with.
2     Q.    And who was your boss at the
3 time?
4     A.    So in 2008 it was Molly Mason.
5     Q.    And which vendor did you end up
6 going with?
7     A.    Reddwerks.
8     Q.    And do you recall why you chose
9 Reddwerks?
10     A.    They had -- they were the only
11 vendor that had a continuous light.
12     Q.    And what do you mean by a
13 continuous light?
14     A.    So the bar in front of the
15 product, it was all lights versus just one
16 light.
17     Q.    And was that something that was
18 important to Walmart?
19     A.    It was important, yes.
20     Q.    And why is that?
21     A.    So that you wouldn't have to
22 have openings if the product -- for that
23 location, the size changed, you wouldn't have
24 to go get maintenance to cut you another
25 plate to move the light over.  So then you

Page 63

1 could dedicate light space for that product,
2 and if that product moved somewhere else in a
3 different bay, then -- running a smaller
4 product, then you didn't have to, again, cut
5 the plate and change the backing of it.
6     Q.    Did Walmart's decision to go
7 with Reddwerks impact the ordering process
8 for Schedule II narcotics?
9     MS. FUMERTON:  Objection.
10 Form.
11     THE WITNESS:  No.
12 QUESTIONS BY MR. BOWER:
13     Q.    Those orders still came in to
14 6045, correct?
15     A.    Correct.
16     Q.    They were still printed out on
17 paper on a daily basis?
18     A.    They printed the 222 form.
19     Q.    Okay.  Well, let's go back then
20 to before you went with Reddwerks.
21     A.    Uh-huh.
22     Q.    How was Walmart filling orders
23 for Schedule II products at 6045?
24     MS. FUMERTON:  Objection.
25 Form.

Page 64

1     MR. BOWER:  What's the nature
2 of that objection?
3     MS. FUMERTON:  It's an
4 incredibly broad and vague question.
5 QUESTIONS BY MR. BOWER:
6     Q.    Okay.  You can answer.
7     A.    So in 2008, they printed the
8 222 forms, and they printed the paper orders.
9     Q.    And what would they do with
10 those paper orders that they printed?
11     A.    They would fill the order from
12 the paper.
13     Q.    Did that process change after
14 Walmart adopted the Reddwerks system?
15     A.    The -- I don't know how to
16 answer that because it's -- the fill process
17 still was the same.  I was still getting
18 order at the DC.  I'd still sign my 222,
19 just -- I don't print paper.  It goes to a
20 light.
21     Q.    Okay.  You mentioned the light
22 term a couple times.
23     What do you mean by "light"?
24     It may not be familiar to some
25 of us that aren't in the industry.

Page 65

1     A.    So it truly is a bar of lights,
2 and the light will light up with the quantity
3 that you need to pick for that product.
4     Q.    So there's an associate
5 assigned to each product; is that correct?
6     A.    There's an associate
7 assigned...
8     MS. FUMERTON:  Go ahead.
9 Sorry.  I was going to give an
10 objection.  Go ahead.
11     THE WITNESS:  There's an
12 associate assigned multiple products.
13 QUESTIONS BY MR. BOWER:
14     Q.    And the light informs the
15 associate of how much of that product is
16 necessary for a particular order; is that
17 correct?
18     A.    That's correct.
19     Q.    And how does the light do that?
20     A.    It's the same thing that went
21 to the paper that goes to the light.
22     Q.    Is the light a screen?
23     A.    Is the light a screen?
24     Q.    Yeah.
25     How does the light convey that

Page 66

1 information to an associate?  Is it a number
2 on a screen?  Is it --
3      A.     Yes, it's a number on a screen.
4      Q.     And does that number on the
5 screen reflect a product number?
6           MS. FUMERTON:  Objection.
7 Form.
8 QUESTIONS BY MR. BOWER:
9      Q.     All right.  I'll strike that.
10          The associate's assigned more
11 than one product, correct?
12     A.     Correct.
13     Q.     How does the associate know how
14 many of each product to fill?
15     A.     There's just -- the light in
16 front of that product tells them.  So there's
17 a screen there that says "pick one" or
18 whatever.
19     Q.     Okay.  And that process applied
20 to order filling at 6045 for Schedule II
21 products; is that correct?
22     A.     It occurred for all buildings.
23     Q.     And when was that process
24 implemented at 6045?
25     A.     I don't know exactly when it

Page 67

1 was implemented in 6045, but we started the
2 project in 2009.
3      Q.     Do you know whether the
4 implementation of Reddwerks impacted
5 Walmart's suspicious order monitoring program
6 at all?
7           MS. FUMERTON:  Objection.
8 Form.
9           THE WITNESS:  I have no idea.
10 QUESTIONS BY MR. BOWER:
11     Q.     You don't know one way or the
12 other, correct?
13     A.     I have no idea.
14          MS. FUMERTON:  Zach, we've been
15 going for about an hour.  Would it be
16 okay --
17          MR. BOWER:  Can we just have a
18 few minutes just to round out her
19 employment history and then we'll --
20          MS. FUMERTON:  Sure.
21          MR. BOWER:  I just wanted -- so
22 we can switch topics after the break.
23 QUESTIONS BY MR. BOWER:
24     Q.     So you held this position
25 beginning in 2008 where you were senior

Page 68

1 manager for the pharmacy team.
2          How long did you hold that
3 position?
4      A.     That's what I currently do.
5      Q.     You still have that -- what's
6 your current title?
7      A.     Senior manager, department
8 supply chain.  We just changed it from
9 logistics to supply chain.
10          MR. BOWER:  It might take a
11 little longer to go through subsequent
12 duties and responsibilities, so why
13 don't we take a break and we can
14 finish up after.
15          MS. FUMERTON:  Okay.
16          VIDEOGRAPHER:  Going off the
17 record at 8:33 a.m.
18      (Off the record at 8:33 a.m.)
19          VIDEOGRAPHER:  We're back on
20 the record at 8:47 a.m.
21 QUESTIONS BY MR. BOWER:
22     Q.     Okay.  I just want to finish
23 up, hopefully fairly briefly, your roles at
24 Walmart.
25          So from 2008 to the present,

Page 69

1 you've had the same title, essentially; is
2 that correct?
3      A.     That's correct.
4      Q.     Okay.  Other than the system
5 implementation of Reddwerks that we've
6 discussed, what have your other duties and
7 responsibilities been since 2008 in that
8 title?
9      A.     So it's mostly been systems,
10 system enhancements, the rollout of CSOS,
11 some other day-to-day stuff that comes up.
12     Q.     Other than the rollout of CSOS,
13 which stands for controlled substance
14 ordering system -- is that correct?
15     A.     That's correct.
16     Q.     What other systems enhancements
17 did you work on?
18     A.     So we did the order level
19 alerts for Reddwerks.  And then we did an
20 enhancement to that later on.
21     Q.     And do you have any
22 understanding as to why Walmart imposed an
23 order level alert for Reddwerks?
24          MS. FUMERTON:  Objection.
25 Form.

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  QUESTIONS BY MR. BOWER:
2      Q.    Well, strike that.
3            You said you did -- in your
4  words, you did the order level work for
5  Reddwerks.
6            What is that?
7      A.    So that was the threshold
8  process that was put in.
9      Q.    Do you have any understanding
10 as to why that was put in?
11           MS. FUMERTON:  Objection.
12 Form.
13           Go ahead.
14           THE WITNESS:  No, just -- I was
15     just asked to run the project.
16 QUESTIONS BY MR. BOWER:
17     Q.    As you sit here today, you have
18 no recollection as to why this project was
19 needed; is that correct?
20           MS. FUMERTON:  Objection.
21 Form.
22           THE WITNESS:  That's correct.
23 QUESTIONS BY MR. BOWER:
24     Q.    Do you recall approximately
25 when that -- the order level alerts for

Page 71

1  Reddwerks was rolled out?
2      A.    I believe 2010, 2011.
3      Q.    And what about the enhancement
4  that you mentioned, what does that refer to?
5      A.    So we added different screens
6  on the Reddwerks system.
7      Q.    Did you have any understanding
8  as to what the reason for the different
9  screens was?
10           MS. FUMERTON:  Objection to
11 form.
12           MR. BOWER:  What's the nature
13 of that objection?
14           MS. FUMERTON:  Because it can
15     be -- again, it's vague and ambiguous,
16     but the reason why, because referring
17     to two different things:  why it was
18     implemented in the first place, or why
19     the different screens existed and what
20     the functionality was.
21 QUESTIONS BY MR. BOWER:
22     Q.    Okay.  Why was the different
23 screens implemented in the first place?
24     A.    Different visibility to that
25 order alert.

Page 72

1      Q.    And what different visibility
2  was provided by the new screens?
3      A.    From what I recall, it showed
4  what was ordered, what was the threshold and
5  what the weekly amount shipped.  And that
6  wasn't available.  Or it was available, but
7  you had to go dig through it, so this just
8  put it all on one screen.
9      Q.    Were those new or different
10 screens part of the ordering process for
11 Schedule II products?
12           MS. FUMERTON:  Objection to
13 form.
14           THE WITNESS:  I'm not sure I
15     understand your question.
16 QUESTIONS BY MR. BOWER:
17     Q.    Well, you mentioned that
18 enhancement occurred, right, to Reddwerks?
19     A.    Yes.
20     Q.    Right?
21           Did that enhancement impact the
22 ordering, or the review of the ordering, for
23 Schedule II products?
24           MS. FUMERTON:  Objection.
25 Form.

Page 73

1            THE WITNESS:  They were part of
2      the rollout with all the other DCs.
3  QUESTIONS BY MR. BOWER:
4      Q.    Okay.  But I thought you
5  testified earlier that Schedule II products
6  could only be ordered once a week, correct?
7      A.    That's correct.
8      Q.    Okay.  So why would Walmart
9  need an enhancement to view the prior orders
10 for that week for Schedule II products?
11           MS. FUMERTON:  Objection.
12 Form.
13           THE WITNESS:  I mean, it was
14     just to level set all the buildings.
15     The code needed to be the same for
16     all.
17 QUESTIONS BY MR. BOWER:
18     Q.    But for practical purposes,
19 because Schedule II products were ordered
20 once a week, it wouldn't have impacted the
21 information on those screens, correct?
22     A.    I don't know.  I mean...
23     Q.    Well, you know that Schedule II
24 products can only be ordered once a week,
25 correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    A.    That's correct.
2    Q.    So what additional information
3 could have been provided with respect to
4 those orders once the enhancement occurred?
5         MS. FUMERTON:  Objection.
6    Form.
7         THE WITNESS:  They still had a
8    threshold, so it still would alert if
9    it was beyond that threshold.
10 QUESTIONS BY MR. BOWER:
11   Q.    Okay.  Was the threshold
12 available prior to that enhancement?
13        MS. FUMERTON:  Objection.
14   Form.
15        THE WITNESS:  Yes.
16 QUESTIONS BY MR. BOWER:
17   Q.    So did the enhancement impact
18 the threshold?
19   A.    No.
20   Q.    Did the enhancement impact how
21 the alerts for any threshold -- strike that.
22        Did the -- did the enhancement
23 impact how threshold alerts were conveyed to
24 the DC?
25        MS. FUMERTON:  Objection.

Page 75

1    Form.
2         THE WITNESS:  Not that I'm
3    aware of.  I don't know.
4         (Walmart-Sullins Exhibit 1
5    marked for identification.)
6 QUESTIONS BY MR. BOWER:
7    Q.    I'm going to show you some
8 documents, and maybe it will help you refresh
9 your recollection.
10        Okay?
11   A.    Okay.
12   Q.    Okay.  You've been handed
13 what's been marked as Exhibit 1.  This is --
14 take a moment to review it.
15        While you're reviewing it, I'll
16 note that this is an e-mail from Tim Harris
17 to Nick Tallman, yourself, Theresa Alford,
18 Donna Auldridge and Donald Silvia, Junior,
19 dated 8/1/2011, and the Bates number is
20 ending in 9183.  And it includes the
21 attachments going through 9185.  Or
22 attachment, rather.
23        So just take a moment to review
24 that.  Let me know when you're done.  I just
25 have a -- my initial questions will be

Page 76

1 whether this refreshes your recollection that
2 the systems you were working on related
3 suspicious order monitoring as noted in the
4 title of the attachment.
5    A.    I don't recall the e-mail.
6         MS. FUMERTON:  And once you're
7    done, just for the documents, it's
8    probably best to let him know that
9    you're done reviewing the document and
10   he can ask his questions.
11        THE WITNESS:  Okay.
12        MR. BOWER:  Thanks.
13        THE WITNESS:  I'm finished.
14 QUESTIONS BY MR. BOWER:
15   Q.    Okay.  If you see the e-mail,
16 the first e-mail there in that chain from
17 Mr. Beam to Tim Harris, do you see that one?
18   A.    Yes.
19   Q.    He writes, "I know that Ramona,
20 Jim and crew were working on a data system to
21 meeting the new regulatory requirements."
22        Do you see that?
23   A.    Yes.
24   Q.    Was that an accurate statement
25 in August of 2011?

Page 77

1    A.    I don't know that we were
2 working on those -- the threshold process
3 with Reddwerks.
4    Q.    And was that process a data
5 system designed to meet new regulatory
6 requirements?
7    A.    I know that it was -- I don't
8 know that there was a new regulatory
9 requirement.  I know that what I was asked to
10 do was to partner with Reddwerks and have
11 them put together a threshold process.
12   Q.    Okay.  So -- but certainly when
13 you received this e-mail, you must have
14 realized that -- the reasons for that, right?
15        MS. FUMERTON:  Objection.
16   Form.
17 QUESTIONS BY MR. BOWER:
18   Q.    I mean, he's stating here
19 that -- the data system to meet the new
20 requirements.
21        Do you see that?
22   A.    I see it.
23   Q.    So when you would receive this
24 e-mail, wouldn't have you then learned of the
25 reasons for the Reddwerks project?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    MS. FUMERTON: Objection.
2  Form.
3    THE WITNESS: I don't recall if
4  this was before or after we started
5  the project.
6  QUESTIONS BY MR. BOWER:
7    Q.   Okay. But my question to you,
8  though, is whether, when you received this
9  e-mail, wouldn't that have informed you the
10  reasons for the project?
11    MS. FUMERTON: Objection.
12  Form.
13    THE WITNESS: Again, I don't
14  know if I received this e-mail prior
15  to the Reddwerks changes that we were
16  in the process of doing.
17  QUESTIONS BY MR. BOWER:
18    Q.   And I'm just -- sorry. My
19  question is a little bit different, though.
20  Okay?
21    My question is: When you
22  received this e-mail, would this e-mail not
23  have informed you the reasons that you were
24  implementing the Reddwerks projects, whether
25  it was complete yet or not?

Page 79

1    MS. FUMERTON: Objection.
2  Form.
3    THE WITNESS: Again, I don't
4  know if I would have received this
5  e-mail prior to us doing the Reddwerks
6  enhancement.
7  QUESTIONS BY MR. BOWER:
8    Q.   Okay. Well, let's say you
9  received this e-mail after you did these
10  enhancements, okay?
11    A.   Okay.
12    Q.   Would this e-mail then have
13  informed you whether or not the enhancements
14  were designed to meet new regulatory
15  requirements?
16    A.   No, because I don't know what
17  they were. It wasn't anything that I was --
18  I mean, it wasn't part of my job
19  responsibilities.
20    It was my job responsibility to
21  partner with Reddwerks and get the threshold
22  process implemented.
23    Q.   And what specifically were you
24  instructed to get implemented with respect to
25  the threshold process? What does that mean?

Page 80

1    A.   So the -- to put in a system to
2  alert orders that were beyond that threshold,
3  whatever that was determined.
4    Q.   And who told you that was --
5  that needed to be done?
6    A.   Tim Harris.
7    Q.   In this e-mail?
8    Is this what he's telling you
9  needs to be done, or some other communication
10  that he told you needed to be done?
11    MS. FUMERTON: Objection.
12  Form.
13    THE WITNESS: It would have
14  been outside of -- I would think it
15  would have been in a communication one
16  on one, you know.
17  QUESTIONS BY MR. BOWER:
18    Q.   All right. So we're in August,
19  right, 2011, right? Mr. Harris sends you
20  this e-mail saying that "Ramona, Jim and crew
21  were working on a data system to meeting the
22  new regulatory requirements."
23    Is your testimony as you sit
24  here today that you didn't know why you were
25  working on a new system?

Page 81

1    MS. FUMERTON: Objection.
2  Form. Misstates the document.
3    THE WITNESS: Yes.
4  QUESTIONS BY MR. BOWER:
5    Q.   And who's Jim, do you know,
6  referenced in this e-mail?
7    A.   I don't know.
8    Q.   Well, there's two people
9  mentioned by name: you and Jim. You're
10  saying you don't know who Jim is?
11    A.   There was a Jim on our team,
12  but there was also other Jims in the area.
13    Q.   What do you mean by "in the
14  area"?
15    A.   In the health and wellness
16  area.
17    Q.   Well, were any other Jims
18  working on a data system to meeting the new
19  regulatory requirements?
20    A.   I don't know. I -- I mean, I
21  was asked to do that. I don't know if Jim
22  was, too.
23    Q.   Did you work with a Jim in
24  context with that assignment?
25    A.   No, I did not.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.   Okay.  Did you work with any
2  others in your crew on that assignment?
3    A.   I worked with compliance, and
4  there was a Jim in compliance.  I don't know
5  if that's who he's referring to.
6    Q.   Did you ever ask him, "Hey,
7  Tim, who are you referring to?  I don't
8  understand your e-mail"?
9       MS. FUMERTON:  Objection.
10  Form.  Misstates the document.
11       THE WITNESS:  I don't recall.
12  QUESTIONS BY MR. BOWER:
13    Q.   Okay.  Any other names of the
14  crew members that you can recall?
15    A.   No, because it would have
16  been -- I don't know who would have been in
17  ISD or anything like that that I would have
18  worked with to help with the system portion
19  of it.
20    Q.   What do you mean by "the system
21  portion of it"?
22    A.   Well, it was an enhancement to
23  the system.
24    Q.   And as you sit here today, how
25  do you know this was referring to the

Page 83

1  enhancement and not the initial threshold
2  process?
3       MS. FUMERTON:  Objection.
4  Form.
5       THE WITNESS:  So I'm talking
6  about the threshold process.
7  QUESTIONS BY MR. BOWER:
8    Q.   Okay.  Well, you mentioned --
9  and I just want to make sure -- sorry, I'll
10  let you finish.
11    A.   No, go ahead.
12    Q.   I just want to be clear,
13  because before you mentioned two different
14  things, right, the initial creation of the
15  order level alerts and then the enhancement?
16    A.   Yes.
17    Q.   Is it your understanding that
18  this e-mail refers to that initial creation
19  of the alerts or the enhancement?
20    A.   The initial creation of the
21  alerts.
22    Q.   Was that a fairly large project
23  for you at that time?
24    A.   Yes.
25    Q.   Okay.  But as you sit here

Page 84

1  today, you don't know who you worked with on
2  it; is that correct?
3    A.   I know who I worked with in
4  ISD.  I don't recall who I worked with
5  because there was multiple people in
6  compliance that were involved.
7    Q.   Okay.  What does ISD stand for?
8    A.   Information systems --
9    Q.   Okay.  And who --
10    A.   -- department.
11    Q.   And who did you work with at
12  ISD?
13    A.   With Donald Silvia.
14    Q.   Anyone else?
15    A.   There was other people there.
16  I don't recall who they were.
17    Q.   And what specifically did you
18  do in connection with creating the order
19  level alerts?
20    A.   So we would partner with
21  Reddwerks to look at what requirements were
22  needed from compliance.  Compliance would --
23  you know, pretty much told us how they wanted
24  the process to work.  We then conveyed those
25  requirements to Reddwerks.

Page 85

1    Q.   Do you recall what compliance
2  told you with respect to how they wanted the
3  process to work?
4    A.   I don't recall because it was
5  part of the requirements, so I don't recall
6  specifically.
7    Q.   Do you recall anything about
8  what compliance told you they needed?
9    A.   For it to alert orders based on
10  the threshold.
11    Q.   Okay.  And do you recall
12  whether this was specific to Schedule II
13  products or whether it was broader than that?
14    A.   It was all products.
15    Q.   Was it limited to pharmacy
16  products?
17    A.   It was all pharmacy.  It was in
18  the pharmacy distribution centers, yes.
19    Q.   Did they include products that
20  were not prescription drugs?
21    A.   Yes.
22    Q.   Can you give us an example of
23  something that would have been included that
24  wasn't a prescription drug?
25    A.   The ReliOn insulin strips.

Page 86

1  Q.  Okay.  Anything else that
2  wasn't a prescription drug that would have
3  been included in this project?
4  A.  There was some supplies that
5  were -- that we would ship to the stores.
6  There was hearing aids.
7  Q.  So this -- sorry, I didn't know
8  if --
9  A.  It's okay.
10  Q.  So this order level alert
11  project had a fairly significant impact on
12  the pharmacy ordering; would you agree with
13  that?
14      MS. FUMERTON:  Objection.
15  Form.
16      THE WITNESS:  I wouldn't agree
17  with that.
18  QUESTIONS BY MR. BOWER:
19  Q.  And why not?
20  A.  It wouldn't have impacted the
21  orders.
22  Q.  Okay.  Would it have impacted
23  the ordering process?
24  A.  No.
25  Q.  Okay.  What impact would it

Page 87

1  have had, if any, on the pharmacies?
2  A.  I don't know of any impact that
3  it would have had.
4  Q.  So do you have any
5  understanding as to what the reasons that
6  these thresholds were being implemented?
7  A.  Ask that again.
8  Q.  Sure.
9      Do you have any understanding
10  as to why these thresholds were being
11  implemented?
12  A.  No.
13  Q.  You just were asked to do it,
14  correct?
15  A.  Correct.
16  Q.  So you did it, right?
17  A.  Yes.
18  Q.  Okay.  So let's look at the
19  attachment then to this Exhibit 1.
20      Do you see it says, "A SOMLink
21  solution"?
22  A.  Yes.
23  Q.  And do you see the title of the
24  attachment in the e-mail says "suspicious
25  order monitoring"?

Page 88

1  A.  Yes.
2  Q.  Do you see that?
3      Do you know what suspicious
4  order monitoring is?
5  A.  Yes.
6  Q.  And what's your understanding
7  as to what suspicious order monitoring is?
8  A.  Monitoring orders coming into
9  the distribution center.
10  Q.  And would that -- strike that.
11      Based on your understanding,
12  would that include orders of any kind of
13  product?
14  A.  Yes.
15  Q.  Including nonprescription
16  products?
17  A.  Yes.
18  Q.  Okay.  And why was Walmart --
19  strike that.
20      What's your basis for that
21  understanding?
22  A.  Just that it affected all
23  product.  We were asked to do it for all the
24  product, not specific.
25  Q.  Well, do you see in the

Page 89

1  attachment here it references DEA compliance?
2      MS. FUMERTON:  Can you point to
3  specifically where you're looking?
4  QUESTIONS BY MR. BOWER:
5  Q.  Sure.
6      It says, "The statistical
7  defensible analysis provided by SOMLink is a
8  must for DEA compliance, VAWD accreditation
9  and HDMA membership."
10      Do you see that in the last
11  sentence of the second paragraph?
12  A.  Yes, I see that.
13  Q.  Do you know what DEA compliance
14  refers to?
15  A.  No.
16  Q.  Do you have any understanding
17  that Walmart has an obligation to monitor for
18  suspicious orders of Schedule II products?
19  A.  Yes, I do understand that they
20  have an obligation.
21  Q.  Okay.  Do you have any
22  understanding that that obligation may have
23  been related to your threshold work in
24  Reddwerks?
25  A.  At the time I didn't put those

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 together.
2    Q.    At the time it was your
3 understanding that the Reddwerks project was
4 simply -- strike that.
5        What was your understanding of
6 why the Reddwerks project was needed during
7 this time period?
8    A.    During 2010?
9    Q.    Yeah. 2011.
10   A.    I'm sorry. That we needed to
11 put in a threshold order level alert into the
12 system. That was my understanding.
13   Q.    But you didn't have any
14 understanding as to why that system was
15 needed, correct?
16   A.    Correct.
17   Q.    And indeed that system wasn't
18 limited to Schedule II products, correct?
19   A.    Correct.
20   Q.    And it wasn't limited to
21 Schedule III products, correct?
22   A.    Correct.
23   Q.    It applied to all -- strike
24 that.
25        It applied to all prescription

Page 91

1 products, correct?
2    A.    It applied to all products.
3    Q.    When did the rollout of the
4 C-S-O-S, CSOS, occur?
5    A.    I think we did a pilot in 2012,
6 at the end of 2012.
7    Q.    Was the CSOS specific to 6045?
8    A.    Yes.
9    Q.    Do you recall when it was
10 actually put in practice in 6045?
11   A.    2000 -- I'm guessing 2013 if we
12 did it at the end of 2012.
13   Q.    While you were working on CSOS,
14 did you have any understanding as to why
15 Walmart was implementing that process?
16   A.    To go away from the paper 222
17 forms.
18   Q.    And did you have any further
19 understanding as to why Walmart wanted to go
20 away from the paper 222s?
21   A.    No. We had -- we had old
22 computers that were running the system and
23 old dot matrix printers that were obsolete,
24 and we couldn't find replacements for those,
25 so that was a part of the initiative to move

Page 92

1 to the electronic CSOS.
2    Q.    And at some point did you
3 become aware that Walmart -- Walmart
4 Distribution Center 6045 was running daily
5 over 20 reports?
6    A.    I did become aware of it. I
7 was -- may have been copied on a couple of
8 e-mails on that, yeah.
9    Q.    Sorry. You said you were
10 copied on a couple of e-mails; is that
11 correct?
12   A.    I don't know how many. I
13 believe I was -- I had one e-mail or
14 something.
15   Q.    Well, weren't you, in fact, the
16 person to inform the folks at DC 6045 of the
17 new process?
18       MS. FUMERTON: Objection.
19   Form.
20       THE WITNESS: I don't recall.
21 QUESTIONS BY MR. BOWER:
22   Q.    You don't recall one way or the
23 other; is that correct?
24   A.    I don't recall informing them.
25   Q.    Do you recall having meetings

Page 93

1 about the process?
2    A.    No.
3    Q.    Do you recall discussing the
4 process with Bart?
5    A.    No.
6        (Walmart-Sullins Exhibit 2
7    marked for identification.)
8 QUESTIONS BY MR. BOWER:
9    Q.    Okay. You've been handed
10 what's been marked as Exhibit 2 to today's
11 deposition. It's an e-mail -- short e-mail
12 chain to yourself and others in July of 2012.
13       Let me know when you've had a
14 chance to review it.
15   A.    Okay. Okay.
16   Q.    Does this refresh your
17 recollection regarding your role in rolling
18 out this process at 6045?
19   A.    It does.
20   Q.    Okay. And what was your role?
21   A.    To inform them to put the -- to
22 let them know that there was going to be a 20
23 limit on the oxy 30.
24   Q.    And why were you the one that
25 was supposed to inform them of that?

Page 94

1    A.    Because I had to send an e-mail
2 to Reddwerks, and I had owned that
3 relationship with Reddwerks.
4    Q.    Okay.  Did you also own the
5 relationship with the DC team?
6    A.    I was one of, you know, three
7 that owned that relationship as well.
8    Q.    All right.  And indeed, your
9 e-mail says "DC team, we," affecting
10 inclusion of yourself, correct?
11        I mean, it's your words, right?
12 You say, "DC team, we," right?
13    A.    Right.
14    Q.    Right?
15        "We have been asked to limit
16 the quantity of Item 3880693, oxycodone 30."
17        Do you see that?
18    A.    I do.
19    Q.    Okay.  Did you have at that
20 time any understanding as to why that was
21 occurring?
22    A.    No.
23    Q.    Did it matter to you?
24    A.    No, I was just asked to do it.
25    Q.    And who asked you to do it?

Page 95

1    A.    From this e-mail, it looks like
2 Brandon.
3    Q.    Well, let's look at that
4 e-mail, all right?
5        Brandon writes, "Ramona, as we
6 discussed today," correct?
7    A.    Right.
8    Q.    "And based on Bart's data,"
9 right?
10        Do you know what data he's
11 referring to?
12    A.    No, I don't.
13    Q.    Do you know who Bart is?
14    A.    Bart was in replenishment.
15    Q.    Do you know what data he
16 provided?
17    A.    No, I don't know what data he
18 provided.  I don't recall it.
19    Q.    And Brandon goes on to write,
20 he says, "After two weeks, we will then visit
21 on what our next step of drugs to focus on
22 will be."
23        Do you see that?
24    A.    I see that.
25    Q.    Do you and him visit on "what

Page 96

1 our next step of drugs" we'll focus on will
2 be?
3    A.    I don't recall.
4    Q.    Do you recall -- strike that.
5        All right.  Are you aware the
6 country is undergoing an opioid epidemic?
7    A.    I am aware of that.
8    Q.    When did you become aware of
9 that?
10    A.    I don't know exactly when.
11 I've seen it in the news.
12    Q.    Did you ever discuss it at
13 work?
14    A.    No.
15    Q.    No?
16        Didn't concern you at all that
17 you had a role in limiting one of the most
18 highly abused drugs in the country?
19        MS. FUMERTON:  Objection.
20 Form.
21        THE WITNESS:  Ask your question
22 again.
23 QUESTIONS BY MR. BOWER:
24    Q.    Did it concern you at all that
25 you played a role in limiting the ordering by

Page 97

1 Walmart pharmacies of one of the highest
2 abused drugs in the country?
3        MS. FUMERTON:  Objection.
4 Form.
5        THE WITNESS:  Was I concerned?
6 QUESTIONS BY MR. BOWER:
7    Q.    Yeah.
8    A.    No, I was asked to do
9 something.
10    Q.    Okay.  Are you aware that
11 oxy 30 was being -- strike that.
12        Are you aware that orders of
13 oxy 30 were being limited because of its
14 potential for abuse?
15        MS. FUMERTON:  Objection.
16 Form.
17        THE WITNESS:  No, I had no
18 knowledge of why.
19 QUESTIONS BY MR. BOWER:
20    Q.    Did it matter to you from your
21 perspective?
22        MS. FUMERTON:  Objection.
23 Form.
24        THE WITNESS:  I was asked to do
25 a job.

Page 98

¹ QUESTIONS BY MR. BOWER:
² Q. And so let's get into more of
³ what job you were asked to do.
⁴ Okay?
⁵ A. Okay.
⁶ Q. Your first e-mail here, the
⁷ bottom says, "Brandon, came looking for you
⁸ to discuss the queries I had ran on the items
⁹ listed below."
¹⁰ Why were you running those
¹¹ queries?
¹² A. I was asked to run those.
¹³ Q. And who asked you to run those?
¹⁴ A. Tim Harris.
¹⁵ Q. Tim Harris.
¹⁶ And what queries did he ask you
¹⁷ to run?
¹⁸ A. To run data on multiple items.
¹⁹ Q. Do you have any idea why you
²⁰ were running on the -- a query for the
²¹ Item 3880910?
²² A. No, I was just asked to run it.
²³ Q. Did you ever ask why?
²⁴ A. No.
²⁵ Q. What -- where did you run these

Page 99

¹ queries?
² A. In Teradata.
³ Q. And what's Teradata?
⁴ A. So it's a place where all, to
⁵ my understanding, data lives for, in this
⁶ case, shipment.
⁷ Q. What do you mean by "shipment"?
⁸ A. Ships to the store.
⁹ Q. Who would you have e-mailed at
¹⁰ Reddwerks to make the appropriate change to
¹¹ the order level alert parameter screen?
¹² A. It would have been a support
¹³ call to --
¹⁴ Q. Well, it says "I will be
¹⁵ sending Reddwerks an e-mail."
¹⁶ Do you see that?
¹⁷ A. Yes.
¹⁸ Q. So that statement is not
¹⁹ correct?
²⁰ A. So it's a support e-mail
²¹ address.
²² Q. Oh, okay.
²³ Do you recall what that e-mail
²⁴ address is?
²⁵ A. It used to be

Page 100

¹ support@Reddwerks.com.
² Q. And after you sent that e-mail,
³ how long would it have taken for this change
⁴ to be made?
⁵ A. An overnight change.
⁶ Q. Do you recall what the prior
⁷ order level alert was for oxy 30?
⁸ A. I don't recall.
⁹ Q. And then in your e-mail you
¹⁰ write, "If we receive calls from the stores
¹¹ asking for additional oxy 30 product, please
¹² direct them to the regional."
¹³ Why did you write that?
¹⁴ A. Because we had stores that
¹⁵ would call the distribution center to be
¹⁶ added for an additional day of shipment.
¹⁷ Q. I understand that stores could
¹⁸ call, but why are you directing them to the
¹⁹ regional?
²⁰ A. To the store's regional.
²¹ Q. Why are you providing that
²² instruction?
²³ A. I don't recall, other than
²⁴ that's what we would do.
²⁵ Q. How did you know that that was

Page 101

¹ the appropriate thing to do?
² A. I don't know. I mean, that's
³ what we did with stores, is direct them to
⁴ who their boss was.
⁵ Q. So by the regional -- the
⁶ regional would be referring to the store's
⁷ boss?
⁸ A. Yes.
⁹ Q. And then you next write, "Also,
¹⁰ we will need to keep track of the stores
¹¹ calling in to the DC or submitting a web form
¹² for additional oxycodone 30 product."
¹³ Do you see that?
¹⁴ A. Yes.
¹⁵ Q. Why did you write that?
¹⁶ A. I really don't know, other than
¹⁷ to keep track of who was calling in so that
¹⁸ we could report that back to their regional.
¹⁹ Q. But you didn't know why there
²⁰ was a specific emphasis on oxy 30; is that
²¹ correct?
²² A. That's correct.
²³ Q. And you never asked anybody why
²⁴ oxy 30, correct?
²⁵ A. No, I did not.

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  Q.   Did you ever become aware that
2  oxy 30 was a highly abused drug?
3      A.   No, I did not.
4      Q.   Did you ever see the e-mails
5  that noted -- that noted that oxy 30 was a
6  highly abused drug?
7      A.   Not that I recall.
8      Q.   Did you ever have any follow-up
9  meetings with Brandon to discuss the next set
10 of drugs to focus on?
11     A.   I don't recall if we did.
12     Q.   Do you recall adding additional
13 order alert levels to other drugs?
14     A.   I don't recall.
15     Q.   Do you recall further
16 follow-ups with Mr. Sherl regarding putting
17 together a daily spreadsheet?
18     A.   I don't recall that.
19     Q.   Who was Susanne Hiland?
20     A.   Susanne Hiland?
21     Q.   Hiland, yeah, sorry.
22     A.   She was in compliance.
23     Q.   Do you work with her?
24     A.   Yeah, on like CSOS I did.
25     Q.   What about on this issue, on

Page 103

1  this oxy 30 issue?
2      A.   I don't know if I did or
3  didn't.
4      Q.   No recollection?
5      A.   No.
6      Q.   Do you recall running reports
7  and looking at what orders were cut?
8      A.   No, I don't recall that.
9      Q.   Do you recall being provided
10 with reports on what orders were cut?
11     A.   No, I don't recall that.
12     Q.   Do you recall anything else
13 about your role in cutting orders?
14         MS. FUMERTON:  Objection.
15     Form.
16 QUESTIONS BY MR. BOWER:
17     Q.   And just so I'm clear, my
18 question is very broad.  I'm asking you do
19 you recall anything else about your role in
20 cutting -- cutting orders?
21         MS. FUMERTON:  Objection.
22     Form.
23         THE WITNESS:  Cut orders for
24     insulin, we cut orders for test
25     strips.

Page 104

1  QUESTIONS BY MR. BOWER:
2      Q.   You cut orders for insulin.  We
3  talked about that.
4          What are test strips?
5      A.   The ReliOn test strips for --
6  diabetic test strips.
7      Q.   Do you recall why you cut
8  orders for those test strips?
9      A.   Again, it was similar to the
10 ReliOn insulin, that they would misorder
11 product.
12     Q.   Right.
13         It was because they came in
14 packs of ten, correct, and folks simply
15 wouldn't realize that and order ten times the
16 amount necessary, right?
17     A.   Yes.
18     Q.   So there were specific reasons
19 for those order cuts, right?
20     A.   Yes.
21     Q.   Based on the size of the
22 packaging, right?
23         MS. FUMERTON:  Objection.
24     Form.
25         THE WITNESS:  It was after we

Page 105

1      would contact the store and let them
2      know.  DCs would contact the stores.
3  QUESTIONS BY MR. BOWER:
4      Q.   Right.
5          And they would cut because the
6  packages came in ten, correct?
7          MS. FUMERTON:  Objection.
8      Form.
9          THE WITNESS:  Not necessarily.
10     They would cut based on what they
11     needed.
12 QUESTIONS BY MR. BOWER:
13     Q.   Well, those two products were
14 frequently ordered in multiples of ten, so
15 they had to be cut because the orders were
16 too large; isn't that right?
17         MS. FUMERTON:  Objection.
18     Form.
19         THE WITNESS:  At certain times,
20     yes.
21 QUESTIONS BY MR. BOWER:
22     Q.   So other than those two
23 products and oxy 30, any other products that
24 you had involvement in cutting orders for?
25         MS. FUMERTON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Form.
2         THE WITNESS:  Not that I
3    recall.
4    QUESTIONS BY MR. BOWER:
5         Q.    And you know why those two
6    orders were cut, right, but you don't know
7    why oxy 30 orders were cut?
8         A.    No, I don't know.
9         Q.    You never asked?
10        A.    I did not.
11        Q.    Didn't concern you?
12             MS. FUMERTON:  Objection.
13        Form.
14             THE WITNESS:  I did what they
15        were asking me to do.
16             (Walmart-Sullins Exhibit 3
17        marked for identification.)
18   QUESTIONS BY MR. BOWER:
19        Q.    Okay.  You've been handed
20   what's been marked as Exhibit 3, which is
21   another e-mail from yourself, right, to
22   Mr. Sherl --
23        A.    Uh-huh.
24        Q.    -- cc'ing others, right?
25        A.    Yes.

Page 107

1         Q.    And this is, in fact, the same
2    day as the prior e-mail, right?
3         A.    Yes.
4         Q.    All right.  This is 8:42 at
5    night, right?
6         A.    Yes.
7         Q.    Any recollection as to why
8    you're e-mailing Jimmie at 8:42 at night
9    referencing a phone conversation?
10             MS. FUMERTON:  I don't know if
11        she's had a chance to review the
12        document yet.
13             MR. BOWER:  Okay.  Sure, it's
14        just a short e-mail, but, sure.
15             THE WITNESS:  Okay.
16   QUESTIONS BY MR. BOWER:
17        Q.    Have you had a chance to review
18   it?
19        A.    Yes.
20        Q.    Okay.  Any recollection as to
21   why you're e-mailing Jimmie at 8:42 at night
22   referencing a phone conversation?
23        A.    No, I don't recall what I was
24   e-mailing at 8:42.
25        Q.    Did you typically work that

Page 108

1    late?
2         A.    I would take my laptop home to
3    get e-mail done.
4         Q.    Do you typically work that
5    late?
6         A.    On some occasions, yes.
7         Q.    What time do you usually come
8    to the office?
9         A.    I'm usually there by 7.
10        Q.    And you're referencing your
11   phone conversation with Jimmie, correct?
12        A.    Yes, that's what it says here.
13        Q.    You're saying, "Please put
14   together a daily spreadsheet with the
15   essential information needed to report any
16   stores that order more than 20 bottles of
17   oxycodone 30."
18             Do you see that?
19        A.    Yes.
20        Q.    Do you have any recollection as
21   to why you provided that instruction to
22   Mr. Sherl?
23        A.    Because of the e-mail he had
24   sent.  It was in e-mail format.
25        Q.    And why -- what was the problem

Page 109

1    with the e-mail format?
2         A.    Just cleaner if it's on a
3    spreadsheet.
4         Q.    Cleaner for whom?
5         A.    For the audience that's going
6    to see it.
7         Q.    And who was going to see it?
8         A.    In this case it was myself.
9         Q.    So why did you want a cleaner
10   spreadsheet?
11        A.    Just to be able to read it
12   better.
13        Q.    What would you do with it?
14        A.    Forward it on.
15        Q.    Why would you receive it?
16        A.    Because I was asked to put the
17   information together.
18        Q.    What information were you asked
19   to put together?
20        A.    The 28 -- the oxy 30 that was
21   being cut to 20.
22        Q.    Someone asked you to put that
23   information together; is that your testimony?
24        A.    No, my testimony -- no.  I was
25   asked to tell them to do it, and they were

Page 110

1 providing me the information, so then I would
2 forward it on. I was a funnel. And then --
3 so I'd asked him to put it in a spreadsheet.
4 Q. Did you receive these reports
5 on a daily basis?
6 A. I'm sorry, say that again?
7 MR. BOWER: Can you just read
8 that back?
9 (Court Reporter read back
10 question.)
11 THE WITNESS: I did for a
12 period of time.
13 QUESTIONS BY MR. BOWER:
14 Q. For what time period?
15 A. I don't know. I don't recall.
16 Q. Approximately what time period?
17 A. I don't -- I really don't know.
18 Q. But certainly as of this date
19 you would have started receiving them,
20 correct?
21 A. Correct.
22 Q. Okay. Do you recall
23 approximately when you would have stopped
24 receiving them?
25 A. No, it was -- I don't know.

Page 111

1 Q. A few months? A few years?
2 Somewhere in the middle?
3 A. No. If I'm guessing, it would
4 be less than a month.
5 Q. Okay. Do you recall who -- why
6 you stopped receiving them?
7 A. Because my portion of the work
8 was complete.
9 Q. And what -- from your
10 perspective, what was your portion of the
11 work? What does that mean?
12 A. So I was asked to get with
13 Reddwerks and put a threshold of 20, partner
14 with the DC to let them know to provide that
15 report, and then I would forward that on.
16 And then I asked him to put it in a
17 spreadsheet.
18 Q. Then who -- you mentioned
19 before you were a funnel.
20 Who would you send those
21 spreadsheets to?
22 A. It looks like Susanne Hiland
23 or -- and Brandon Worth.
24 Q. Who told you to send them to
25 those folks?

Page 112

1 A. I don't recall who did.
2 Q. How'd you know where to send
3 them?
4 A. I'm sure I was told at that
5 time, but I don't recall who did it.
6 Q. And as you sit here today, you
7 have no understanding as to why you were
8 sending them to those two individuals; is
9 that correct?
10 MS. FUMERTON: Objection.
11 Form.
12 THE WITNESS: That's correct.
13 QUESTIONS BY MR. BOWER:
14 Q. So let's go back then to
15 Mr. Sherl's e-mail to yourself and Mr. Mullin
16 and then cc'ing Mr. Abernathy and Ms. Miller.
17 Do you see that?
18 A. Yes.
19 Q. And that's on the morning of
20 July 23rd, right, 9:33 a.m.?
21 MS. FUMERTON: I think we're
22 not caught up with you. He's
23 looking --
24 MR. BOWER: Oh, sorry. The
25 first one, the first string in the

Page 113

1 e-mail. Sorry about that.
2 THE WITNESS: Okay. Yes.
3 QUESTIONS BY MR. BOWER:
4 Q. So I just have a couple of
5 questions on this.
6 Why is Mr. Sherl sending this
7 information to you?
8 Right? The e-mail is a
9 breakdown of the C-II orders, right?
10 A. Yes.
11 Q. Did you ask him to send that to
12 you?
13 A. I don't recall if I did or
14 didn't.
15 Q. Okay. So you see one of the
16 things he mentioned is Store 1935.
17 Do you see that?
18 A. Yes.
19 Q. It says Store 1935 in
20 Johnstown, PA, had two items over 20: oxy
21 30, 41 bottles.
22 Do you see that?
23 A. Yes.
24 Q. And oxycodone ACL 15,
25 23 bottles.

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    Do you see that?
2    A.    Yes.
3    Q.    Okay.  Was there -- do you
4 recall any discussion about monitoring C-II
5 orders for products other than oxy 30?
6    A.    I don't recall.
7    Q.    Do you have any idea why
8 Mr. Sherl is sending you this information?
9    A.    No.
10    Q.    Well, there's only -- he's
11 sending it to you and Mr. Mullin, right?
12    A.    Yes.
13    Q.    All right.  Walmart's got more
14 than 4,000 pharmacies, right?
15    A.    Yes.
16    Q.    Lots of people involved at home
17 office in this?
18    MS. FUMERTON:  Objection.
19 Form.
20 QUESTIONS BY MR. BOWER:
21    Q.    Correct?
22    A.    I don't know --
23    Q.    Well --
24    A.    -- who all was involved.
25    Q.    Well, why is he sending it to

Page 115

1 you?
2    MS. FUMERTON:  Objection.
3 Form.  Asked and answered.
4    THE WITNESS:  I don't recall.
5 I mean, other than I sent him the
6 e-mail.
7 QUESTIONS BY MR. BOWER:
8    Q.    Why are you informing Susanne
9 and Brandon which orders the DC cut?
10    A.    I don't recall why.  I -- I
11 don't recall why.
12    Q.    And this e-mail doesn't refresh
13 your recollection?
14    A.    No, it does not.
15    Q.    You still don't recall anything
16 about this; is that correct?
17    A.    That's correct.
18    Q.    Okay.  So do you know whether
19 you also asked Reddwerks to change alerts for
20 other C-II items?
21    MS. FUMERTON:  Objection.
22 Form.
23    THE WITNESS:  I don't recall if
24 I did.
25 QUESTIONS BY MR. BOWER:

Page 116

1    Q.    It could have happened; you
2 just don't recall.  Right?
3    A.    It could have happened; I don't
4 recall.
5    Q.    In fact, it appears to be what
6 Mr. Sherl is looking at, right, breakdown of
7 all C-II orders, correct?
8    That's what it says, right?
9 "The following is a breakdown of these C-II
10 orders," right?
11    He's not limiting it to oxy 30,
12 is he?
13    A.    I don't know what he was -- I
14 don't know what he put in here other than
15 what's here.
16    Q.    Well, is this limited to oxy
17 30?
18    A.    I don't know.
19    Q.    Well, let's look at it, right?
20    Let's look at another store,
21 store 2555.  You following me?
22    A.    Yes.
23    Q.    Going halfway down, had two
24 items over 20, right?  One of which was oxy
25 30, right, and one of which was oxy 15.

Page 117

1    Do you see that?
2    A.    Yes.
3    Q.    So it appears here that he was
4 looking at other C-II items other than oxy
5 30.  Would you agree with that?
6    A.    Yes.
7    Q.    All right.  So at some point
8 Walmart was concerned with any order of any
9 C-II item over 20; is that correct?
10    MS. FUMERTON:  Objection.
11 Form.
12    THE WITNESS:  I don't know.
13 QUESTIONS BY MR. BOWER:
14    Q.    Well, it's what Mr. Sherl was
15 looking at here, isn't it?
16    A.    I don't know what he was
17 looking at other than he put stores and
18 quantities down for different products.
19    Q.    And he notes, for example, at
20 the bottom, "interesting note on 2029."
21    That references the store
22 number, right, 2029?
23    MS. FUMERTON:  2929 or 2029?
24 QUESTIONS BY MR. BOWER:
25    Q.    I'm sorry, 2929, the bottom of

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 the last one there, the last bullet point.
2 "Interesting note on 2929"?
3     A.    Okay.  I see what you're
4 saying.
5     Q.    He writes, "Interesting note on
6 2929 is that their order number has increased
7 every week for the month of July."
8         Do you see that?
9     A.    I see that.
10     Q.    None of this concerned you at
11 the time you received it; is that your
12 testimony?
13     A.    I'm sorry, say that again?
14     Q.    Did any of this concern you at
15 the time you received it?
16         MS. FUMERTON:  Objection.
17 Form.
18         THE WITNESS:  I don't recall.
19 QUESTIONS BY MR. BOWER:
20     Q.    Do you recall being concerned
21 that store 2555, for example, was a 2555
22 volume store, 495,000 for the month of June?
23     A.    Repeat your question?
24         MR. BOWER:  Can you just read
25 it?

Page 119

1         (Court Reporter read back
2     question.)
3         THE WITNESS:  So I don't know
4     what the -- I don't know what 495
5     references, if it's total -- total
6     drugs or just a specific item.
7 QUESTIONS BY MR. BOWER:
8     Q.    What do you mean by that?
9     A.    Because he's referencing a 405
10 report.
11     Q.    Right.
12     A.    The 405 report, I don't know if
13 the 405 report was multiple items or one
14 specific item.
15     Q.    Well, his reference is June, SD
16 405-1, number 25 in oxy 30 and number 16 in
17 oxy 15, right?
18     A.    Right.
19     Q.    What does that mean?
20     A.    To just reading the note here
21 is that it would be the number 25 store for
22 oxy 30 and the number 16 store for oxy 15.
23     Q.    And that's the rank of the
24 store out of all Walmart pharmacies in the
25 entire country?

Page 120

1     A.    I believe so.
2     Q.    There's more than 4,000, right?
3     A.    I don't know how many there
4 were at the time.
5     Q.    Approximately?
6     A.    I don't know.
7     Q.    Okay.  So, again, you didn't
8 have any concerns that one store might be in
9 the top 25 for both products?
10     A.    It wasn't --
11     Q.    It wasn't part of your
12 responsibilities, right?
13     A.    No.
14     Q.    So it didn't matter to you,
15 right?
16         MS. FUMERTON:  Objection.
17 Form.
18 QUESTIONS BY MR. BOWER:
19     Q.    Well, did it matter or not?
20         MS. FUMERTON:  Objection.
21 Form.
22         THE WITNESS:  It was not part
23 of my responsibility.
24 QUESTIONS BY MR. BOWER:
25     Q.    Were you aware in July of 2012

Page 121

1 that oxycodone was creating an opioid
2 epidemic in this country?
3         MS. FUMERTON:  Objection.
4 Form.
5         THE WITNESS:  I was not aware.
6 QUESTIONS BY MR. BOWER:
7     Q.    Hadn't seen any news reports on
8 it prior to this time period?
9     A.    I don't recall.
10     Q.    Do you recall attending
11 meetings discussing these reports?
12     A.    No.
13     Q.    You don't recall attending a
14 single meeting discussing these over 20
15 reports?  Is that your testimony?
16     A.    Yes, that's my testimony.
17     Q.    What's the reason you don't
18 recall anything else about these reports?
19         MS. FUMERTON:  Objection.
20 Form.
21         MR. BOWER:  I'll strike that.
22 QUESTIONS BY MR. BOWER:
23     Q.    Do you recall anything else
24 about these reports?
25     A.    No.

Page 122

1    Q.   Is there any reason for that?
2         MS. FUMERTON:  Objection to
3    form.
4         THE WITNESS:  No.
5    QUESTIONS BY MR. BOWER:
6    Q.   What were your day-to-day
7    responsibilities in July of 2012?
8    A.   System enhancements.
9    Q.   Anything else?
10   A.   Inventory management.  Any
11   problems with systems that came up.
12   Q.   Okay.  Let's break those down a
13   bit more.
14        What specifically were you
15   doing for systems enhancement in July
16   of 2012?
17   A.   Working on the CSOS.
18   Q.   Anything else?
19   A.   There was a project called
20   weight in motion and ORMD applicator.
21   Q.   What is weight in motion?
22        MS. FUMERTON:  Objection.
23   Form.
24   QUESTIONS BY MR. BOWER:
25   Q.   Well, you referred to a project

Page 123

1    called weight in motion.  I'm just asking
2    you:  What is it?
3         MS. FUMERTON:  I think there
4    was a mistranslation.
5         MR. BOWER:  Okay.
6         MS. FUMERTON:  I'm sure she can
7    clarify.
8         MR. BOWER:  Okay.
9         THE WITNESS:  So weight in
10   motion?
11   QUESTIONS BY MR. BOWER:
12   Q.   Weight in motion?
13   A.   Weight.
14   Q.   What is that project?
15   A.   So that was the cubing of all
16   product, and then there was a tolerance that
17   we would set into the system.  So let's say
18   that it was 2 pounds.  So as the box was
19   order filled and came across the weights, it
20   would divert that to a nonshipping lane for
21   someone to go through and check every product
22   to see if there was a mispick or something
23   wasn't picked correctly.
24   Q.   Was that in connection with
25   your duties in inventory management or is

Page 124

1    that something different?
2    A.   No, that was part of the system
3    enhancements.
4    Q.   Okay.  So what were you doing
5    for inventory management in July of 2012?
6    A.   I don't recall if we had
7    installed a system called GRT into the DCs to
8    key in their -- their cycle counts of
9    inventory.
10   Q.   So do you recall anything that
11   you actually were doing in inventory
12   management in 2012?
13        You said you don't recall
14   whether you were doing that.
15   A.   I don't --
16   Q.   Do you recall doing anything in
17   inventory management in July of 2012?
18        MS. FUMERTON:  Objection.
19   Form.  Misstates the testimony.
20   QUESTIONS BY MR. BOWER:
21   Q.   I'll just ask it again.
22        What were you doing with
23   respect to inventory management in July
24   of 2012?
25        MS. FUMERTON:  Objection.

Page 125

1    Asked and answered.
2         THE WITNESS:  I mean, I don't
3    know.  I don't know if that project
4    was during that time as well.  I -- I
5    don't know.
6    QUESTIONS BY MR. BOWER:
7    Q.   Okay.  What about -- you
8    mentioned also problem suppliers, I believe.
9    What were you doing with respect to that in
10   July of 2012?
11   A.   I didn't say problems with
12   suppliers.
13   Q.   Okay.  So other than system
14   enhancement and inventory management, what
15   were your other duties and responsibilities
16   in July of 2012?
17   A.   That was the majority of it.
18   Q.   So what did you spend your days
19   doing?  What was a typical day in July
20   of 2012?
21   A.   Working on those projects.
22   Q.   Working on --
23   A.   CSOS and --
24   Q.   Sorry.
25   A.   -- weight in motion, ORMD

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 applicator.
2      Q.     Sorry, is it RMD applicator?
3      A.     ORMD.
4      Q.     Approximately what percentage
5 of your time was spent on each of those three
6 projects?
7      A.     Quite a bit of my time.
8      Q.     How much of your time was spent
9 on CSOS?
10      A.     I would say that was about
11 70 percent of my time.
12      Q.     That was a big project for you?
13      A.     It was a big project.
14      Q.     And how long did that project
15 last?
16      A.     About two years.
17      Q.     Why did it take so long?
18      A.     Because of the system coding
19 that had to occur, the integration that had
20 to occur with multiple systems.
21      Q.     What systems did integration
22 have to work with?
23      A.     I don't know all the systems,
24 but I know some. I had to work with our
25 mainframe system. I had to work with our --

Page 127

1 the store's ConnectSys system. Had to work
2 with our EDI system. I had to partner with
3 McKesson to send them files. So multiple,
4 multiple applications there.
5      Q.     And before you mentioned -- I
6 meant to follow up on and didn't -- a
7 database called Teradata; is that correct?
8      A.     Uh-huh.
9      Q.     What information is available
10 in Teradata?
11      MS. FUMERTON: Objection.
12 Form.
13      THE WITNESS: There's -- I know
14 what I used it for. I know that
15 there's other uses of it.
16 QUESTIONS BY MR. BOWER:
17      Q.     Okay. What did you use it for?
18      A.     To pull invoices, to look at
19 purchase orders coming inbound to the DC.
20      Q.     Anything else that you used it
21 for?
22      A.     No, that was all.
23      Q.     And how -- do you know how far
24 back you could pull invoices from?
25      A.     I don't know how far back you

Page 128

1 can go.
2      Q.     What's the farthest you've
3 gone?
4      A.     A year.
5      Q.     And what about purchase orders;
6 how far back have you gone?
7      A.     90 days.
8      Q.     Do you know whether the
9 information on Teradata is backed up by
10 Walmart?
11      A.     I don't know.
12      Q.     Do you know who would know the
13 answer to that question?
14      A.     I don't know.
15      Q.     None of your IT partners would
16 know that?
17      A.     I don't know if they would or
18 they wouldn't.
19      MS. FUMERTON: Is this a good
20 transition point? Because we've been
21 going about an hour and 20 minutes
22 now.
23      MR. BOWER: Sure, we can take a
24 break. I don't know what your
25 schedule is, but if we keep taking

Page 129

1 15-minute breaks an hour, we're not
2 going to be done by 4, so...
3      MS. FUMERTON: Well, it wasn't
4 15 minutes last time, I checked. But
5 in any event, we'll keep the breaks
6 short, and we'll keep lunch short,
7 too.
8      MR. BOWER: Okay.
9      VIDEOGRAPHER: Going off the
10 record. It's 9:54 a.m.
11      (Off the record at 9:54 a.m.)
12      VIDEOGRAPHER: We're back on
13 the record at 10:07 a.m.
14      (Walmart-Sullins Exhibit 4
15 marked for identification.)
16 QUESTIONS BY MR. BOWER:
17      Q.     Okay. Ms. Sullins, we're back
18 on the record.
19      Let me hand you what's been
20 marked as Exhibit 4. This is an e-mail from
21 Theresa Alford to Tim Harris and yourself on
22 July 26th. Take a moment to review it.
23      And this is only a few days
24 after the Exhibit 3 that we just looked at.
25      A.     Okay. Okay.

Page 130

1    Q.   Okay.  This e-mail you received
2  approximately three days prior to the last
3  e-mail, correct, Exhibit 3?
4         MS. FUMERTON:  Three days
5  after?
6         MR. BOWER:  What's that?
7         THE WITNESS:  After?
8  QUESTIONS BY MR. BOWER:
9    Q.   Three days after, right?
10        MS. FUMERTON:  Yeah, you said
11  prior.
12  QUESTIONS BY MR. BOWER:
13   Q.   Oh, sorry.
14        Exhibit 3 is was three days
15  prior to this, right?
16   A.   Yes.
17   Q.   Okay.  This is another e-mail
18  about the oxy 30 orders, right?
19   A.   I think it's an e-mail with
20  multiple changes.
21   Q.   Okay.  Let's go through those
22  changes.
23        What changes do you see?
24   A.   It says, "market director MD
25  review and follow-up on all C-II exceptions.

Page 131

1  Revision" --
2    Q.   So I just wanted -- for the
3  record, you're looking at the second bullet
4  point in the e-mail from Ms. Hiland?
5    A.   Yes.
6    Q.   And it says, "MD review and
7  follow up on all C-II order exceptions,"
8  right?
9    A.   Yes.
10   Q.   And "cc to practice compliance
11  regional and divisional," right?
12   A.   Yes.
13   Q.   What does MD refer to?
14   A.   Market director.
15   Q.   Do you know who held this
16  position at that time?
17   A.   There would have been multiple
18  market directors.
19   Q.   Okay.  Who would they have
20  been; do you know?
21   A.   I don't know.
22   Q.   And what is -- do you see it
23  mentions a C-II order exception?
24        What does that refer to?
25        And I'll just note that the

Page 132

1  bullet point above that says, "implementation
2  of C-II order exception review."
3         Do you see that?
4    A.   I do see that, yeah.
5    Q.   And under that it has two
6  things, right?  "Blocks orders of more 20
7  bottles of oxy 30," right?
8    A.   Yes.
9    Q.   And "alerts AP of all
10  pharmacies ordering more than 20 bottles of
11  any item for follow-up," right?
12   A.   Yes.
13   Q.   So those are the two things for
14  the C-II order exception review, right?
15   A.   Yes.
16   Q.   And then the MD is to review
17  and follow up on those two things?
18   A.   Yes.
19   Q.   All right.  And was it your
20  role -- strike that.
21        Was your only role in this
22  process to create that capability within
23  Reddwerks?
24   A.   I didn't create this.  I
25  created -- I helped with the threshold

Page 133

1  process.
2    Q.   Right.
3         And was one of the processes
4  you helped with the blocking orders of more
5  than 20 bottles of oxy 30?  Right?
6    A.   Yes.  When I sent the e-mail.
7    Q.   Right.
8         And was one of the other things
9  that you or someone on your team did was
10  alert AP of all pharmacies ordering more than
11  20 bottles of any item for follow-up?
12   A.   AP was at the DC.
13   Q.   Okay.  So was there a system
14  put in place to alert the AP of all
15  pharmacies ordering more than 20 bottles of
16  any item for follow-up?
17   A.   So I don't understand the
18  question, because AP is at the DC.
19   Q.   Okay.  So are you saying the DC
20  itself was supposed to review any item over
21  20 --
22   A.   Correct.
23   Q.   -- without -- let me just --
24  I'll strike that and I'll ask -- I'll strike
25  that.  I should have -- I paused, and that's

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1  my fault.
2      So is it your testimony that
3  the DC itself was to perform this review of
4  orders more than 20 bottles outside of the
5  Reddwerks system?
6      A.    So the way that I read this is
7  that AP -- that there was a report being
8  initiated by the asset protection department,
9  or the manager, so he was alerting all the
10  other AP associates.
11      I don't know.  I mean, that's
12  how I read this.
13      Q.    Okay.  And so those alerts were
14  occurring, but it didn't require you to
15  change anything in Reddwerks; is that
16  correct?
17      A.    I don't know if I did or
18  didn't.
19      Q.    Okay.  Could you have created
20  an alert in Reddwerks for orders over 20 for
21  other C-II items?
22      A.    I would have had to send an
23  e-mail to Reddwerks support.
24      Q.    Right.
25      But you could have done that if

Page 135

1  it was requested, right?
2      A.    Yes, I could have done that.
3      Q.    Reddwerks had the capability to
4  do that, correct?
5      A.    They were the only ones.
6      Q.    And the e-mail that's forwarded
7  to you that's written by Ms. Hiland, she
8  writes, "For our call this afternoon:  The
9  outline of the program."
10      Do you know what program she's
11  referring to?
12      A.    No.
13      Q.    Do you know whether it's
14  Walmart's suspicious order monitoring
15  program?
16      A.    I don't know.
17      Q.    Did you attend this meeting?
18      A.    I don't recall.
19      Q.    You could have attended it; you
20  just don't recall.  Is that correct?
21      A.    I don't recall attending it.
22      Q.    Okay.  If you see Theresa -- is
23  it Alford?  Alford?
24      A.    Alford.
25      Q.    -- Alford's e-mail to

Page 136

1  Mr. Harris and yourself.
2      The first question on that
3  e-mail is, was Mr. Harris your boss at the
4  time?
5      A.    Yes.
6      Q.    Okay.  And do you know who he
7  reported to during this time period?
8      A.    I think it was David Wright.
9  Dave Wright.
10      Q.    Okay.  And did you report to
11  anyone else other than Mr. Harris?
12      A.    No.
13      Q.    He notes in his e-mail to --
14  sorry.  Ms. Alford notes in her e-mail to
15  Mr. Harris and yourself that "the DC will
16  continue to cut any order over 20 for oxy 30.
17  If a web form or emergency order that is
18  called for in this item is over 20, the DC
19  will also cut.  The DC will forward that
20  information to us, and we will inform the
21  teams involved at the home office."
22      Do you see that?
23      A.    I see that.
24      Q.    Okay.  Were you involved in
25  that process personally?

Page 137

1      A.    I don't recall.
2      Q.    Well, there's only three people
3  on this e-mail, right?
4      A.    Right.
5      Q.    Right.
6      Do you recall involving people
7  at the home office in this process?
8      A.    No.
9      Q.    Do you recall the DC forwarding
10  any of this information to you?
11      MS. FUMERTON:  Objection.
12  Form.
13      THE WITNESS:  I don't.
14  QUESTIONS BY MR. BOWER:
15      Q.    It could be that Walmart never
16  implemented this process, right?
17      MS. FUMERTON:  Objection.
18  Form.
19  QUESTIONS BY MR. BOWER:
20      Q.    You don't know one way or the
21  other; isn't that correct?
22      MS. FUMERTON:  Objection.
23  Form.
24      MR. BOWER:  I'll strike it.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 QUESTIONS BY MR. BOWER:
2    Q.    Do you know whether Walmart
3 ever implemented the process outlined here?
4    A.    I don't know.
5    Q.    It could be possible they never
6 actually implemented this process, right?
7         MS. FUMERTON:  Objection.
8    Form.
9         THE WITNESS:  I don't know.
10 QUESTIONS BY MR. BOWER:
11    Q.    You don't recall making the
12 change in Reddwerks other than the oxy 30
13 reports, right?
14         MS. FUMERTON:  Objection.
15    Form.
16         THE WITNESS:  I don't recall.
17 QUESTIONS BY MR. BOWER:
18    Q.    You don't recall making that
19 change at Reddwerks, right?
20         MS. FUMERTON:  Objection.
21    Form.
22         THE WITNESS:  I don't recall.
23 QUESTIONS BY MR. BOWER:
24    Q.    Could be that change was never
25 made, right?

Page 139

1         MS. FUMERTON:  Objection.
2    Form.
3         THE WITNESS:  I don't recall.
4 QUESTIONS BY MR. BOWER:
5    Q.    Okay.  Could be that Walmart
6 outlined a process here they never actually
7 implemented; isn't that correct?
8         MS. FUMERTON:  Objection.
9    Form.
10         THE WITNESS:  I don't know.
11 QUESTIONS BY MR. BOWER:
12    Q.    And you don't know one way or
13 the other, right?
14    A.    Right.
15    Q.    It appears to me here that
16 Walmart is designing a process where AP of
17 all pharmacy ordering -- where alerts are
18 created, right, for AP of all pharmacies
19 ordering more than 20 bottles, right?  That's
20 the intention here?
21         MS. FUMERTON:  Objection.
22    Form.
23 QUESTIONS BY MR. BOWER:
24    Q.    Well, that's what it says,
25 right?  It says, "Implementation of C-II

Page 140

1 order access and review."
2         Do you see that?
3    A.    I see that.
4    Q.    And then the second bullet
5 point says, "Alert AP all pharmacies ordering
6 more than 20 bottles," right?
7    A.    Yes.
8    Q.    And this was to be part of the
9 program as reflected in Ms. Hiland's e-mail,
10 right?
11         MS. FUMERTON:  Objection.
12    Form.
13         THE WITNESS:  Ask your
14    question.
15 QUESTIONS BY MR. BOWER:
16    Q.    That's what Ms. Hiland writes,
17 right?  "The outline of the program and
18 changes include," right?
19    A.    That's what she writes, yes.
20    Q.    So these were part of the
21 program, right?
22         MS. FUMERTON:  Objection.
23    Form.
24 QUESTIONS BY MR. BOWER:
25    Q.    According to Ms. Hiland, on

Page 141

1 Wednesday, July 25, 2012, these bullet points
2 were intended to be part of the program,
3 correct?
4    A.    Yes.
5    Q.    But we don't know whether
6 Walmart ever instituted that program, do we?
7         MS. FUMERTON:  Objection.
8    Form.
9         THE WITNESS:  I was not privy
10    to that, so...
11 QUESTIONS BY MR. BOWER:
12    Q.    Do you have knowledge or
13 recollection of ever asking Reddwerks to
14 create an alert for an order of more than
15 20 bottles of C-II items?
16         MS. FUMERTON:  Objection.
17    Form.
18         THE WITNESS:  I don't recall.
19 QUESTIONS BY MR. BOWER:
20    Q.    And you would have been the
21 person at Walmart with that responsibility,
22 correct?
23    A.    Anybody could have e-mailed
24 that support hotline.
25    Q.    Well, I thought you testified

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 before that you were the contact for that
2 support; isn't that correct?
3          MS. FUMERTON: Objection.
4 Form.
5 QUESTIONS BY MR. BOWER:
6     Q.    I'll strike that.
7          Who was the contact at Walmart
8 with Reddwerks?
9          MS. FUMERTON: Objection.
10 Form.
11          THE WITNESS: So for system
12 enhancements, I was.
13 QUESTIONS BY MR. BOWER:
14     Q.    Okay.  So --
15     A.    But the DCs could directly call
16 or send an e-mail to that support line.
17     Q.    Do you know whether they ever
18 did?
19     A.    I don't know.
20     Q.    Is that information -- strike
21 that.
22          If a DC had done that, someone
23 at the DC had done that, would you have been
24 notified of the change?
25     A.    No.

Page 143

1     Q.    Who would have been notified of
2 that change?
3          MS. FUMERTON: Objection.
4 Form.
5          THE WITNESS: I don't know.
6 QUESTIONS BY MR. BOWER:
7     Q.    And how would someone at the DC
8 have known who to e-mail?
9     A.    Because when they had system
10 issues, they would e-mail that same.
11     Q.    And what kind of system issues
12 would they have?
13     A.    If the server was down where
14 the orders would come in at, the lights
15 didn't work, that's typically what they would
16 see.
17     Q.    So is it your testimony that
18 anyone at the DC had the capability to e-mail
19 or contact Reddwerks to change an order
20 threshold alert?
21          MS. FUMERTON: Objection.
22 Form.
23          THE WITNESS: I don't know if
24 they did or didn't.  I know that they
25 had access to that e-mail.

Page 144

1 QUESTIONS BY MR. BOWER:
2     Q.    My question is:  Did anyone at
3 Walmart have that responsibility, or was it
4 simply anyone could do it?
5          MS. FUMERTON: Objection.
6 Form.
7          THE WITNESS: I don't know.
8 QUESTIONS BY MR. BOWER:
9     Q.    Right.
10          You asked -- you asked
11 Reddwerks to create the oxy 30 alert, right?
12     A.    I don't know if I did or
13 didn't.
14     Q.    Well, let's go back to
15 Exhibit 2.
16     A.    Okay.
17     Q.    Okay?  Because I think we
18 covered this, but I guess we have to go over
19 it again.
20     A.    Okay.
21     Q.    Okay?
22          Exhibit 2 is an e-mail from
23 yourself to the DC team, right?
24     A.    Yes.
25     Q.    And in that e-mail you state,

Page 145

1 "I will be sending Reddwerks on e-mail to
2 make the appropriate change to the order
3 level alert parameter screen."
4          Do you see that?
5     A.    Yes.
6     Q.    And why did you do that?
7     A.    Because I was asked to.
8     Q.    Why didn't Mr. Harris do it?
9          MS. FUMERTON: Objection.
10 Form.
11          THE WITNESS: I don't know.
12 QUESTIONS BY MR. BOWER:
13     Q.    He asked you to do it, right?
14     A.    Yes.
15     Q.    Right?
16          Why didn't Mr. Sherl do it?
17     A.    I don't know.
18     Q.    Could Mr. Sherl have done it?
19     A.    He could have.
20     Q.    So Walmart would have allowed
21 Mr. Sherl or anyone else at the DC to contact
22 Reddwerks directly to change order
23 thresholds?
24          MS. FUMERTON: Objection.
25 Form.

Page 146

1    THE WITNESS: Yes.
2 QUESTIONS BY MR. BOWER:
3    Q.    Did Walmart have any policies
4 and procedures preventing any of its
5 associates or any of its employees from
6 contacting Reddwerks directly to change order
7 thresholds?
8    MS. FUMERTON: Objection.
9    Form.
10 QUESTIONS BY MR. BOWER:
11    Q.    I'll strike that.
12    Are you aware of any policies
13 and procedures at Walmart that would prevent
14 anyone from contacting Reddwerks directly to
15 change order thresholds for C-II items?
16    MS. FUMERTON: Objection.
17    Form.
18    THE WITNESS: I'm not -- I'm
19    not aware of any policies or
20    procedures for that specific...
21 QUESTIONS BY MR. BOWER:
22    Q.    So to the best of your
23 knowledge then, anyone could have e-mailed
24 Reddwerks to change any thresholds for C-II
25 items at any time, right?

Page 147

1    MS. FUMERTON: Objection.
2    Form.
3    THE WITNESS: They would have
4    been a member of management, yes.
5 QUESTIONS BY MR. BOWER:
6    Q.    How do you know it would have
7 been a member of management?
8    A.    They would be the ones that
9 would e-mail Reddwerks if the system was
10 down.
11    Q.    Well, what about the change of
12 order threshold? Couldn't anyone e-mail
13 Reddwerks?
14    A.    Not that I'm aware of.
15    Q.    What would be preventing them
16 from doing so?
17    MS. FUMERTON: Objection.
18    Form.
19    THE WITNESS: I don't know.
20 QUESTIONS BY MR. BOWER:
21    Q.    Was there anything that you're
22 aware of at Walmart that would prevent anyone
23 from e-mailing Reddwerks to change an order
24 threshold for a C-II item?
25    MS. FUMERTON: Objection.

Page 148

1    Form.
2    THE WITNESS: No.
3 QUESTIONS BY MR. BOWER:
4    Q.    In your dealings with
5 Reddwerks, did you ever discuss with them
6 that other folks shouldn't be able to change
7 the thresholds for C-II items?
8    MS. FUMERTON: Objection.
9    Form.
10    THE WITNESS: I don't recall
11    that.
12 QUESTIONS BY MR. BOWER:
13    Q.    So if an hourly associate at DC
14 6045 e-mailed Reddwerks to change a C-II
15 threshold, nothing would have prevented that,
16 correct?
17    MS. FUMERTON: Objection.
18    Form. Misstates prior testimony.
19 QUESTIONS BY MR. BOWER:
20    Q.    I'll strike that.
21    Would anything have prevented
22 an hourly associate at DC 6045 from e-mailing
23 Reddwerks and changing a threshold for a C-II
24 item?
25    A.    They could have e-mailed, but

Page 149

1 it wouldn't necessarily mean that they would
2 have done it.
3    Q.    And who wouldn't have done it?
4    A.    Reddwerks.
5    Q.    Why not?
6    A.    Because if it wasn't a contact
7 that they were familiar with, they wouldn't
8 have done it.
9    Q.    And why not?
10    A.    I don't know.
11    Q.    And how do you know that?
12    A.    Just the relationship I had
13 with them.
14    Q.    So based on your relationship
15 with Reddwerks, they wouldn't have changed an
16 order threshold for a C-II item if it didn't
17 come from someone they were familiar with; is
18 that correct?
19    A.    That's correct.
20    Q.    And who were they familiar with
21 other than yourself?
22    A.    Some of the DC managers.
23    Q.    And who were those?
24    A.    Jimmie, Jeff, Stephanie, Arlin,
25 Shawn. I'm trying to think of others in the

Page 150

1 other buildings. Some of the managers that
2 were already left, Jan.
3      Q.    And all of these folks had the
4 ability to e-mail Reddwerks directly to
5 change a C-II threshold; is that your
6 testimony?
7           MS. FUMERTON: Objection.
8      Form.
9           THE WITNESS: Not a C-II.
10 QUESTIONS BY MR. BOWER:
11      Q.    Okay. Who were the folks that
12 would have been capable of changing a C-II
13 threshold?
14      A.    Jimmie and Jeff, that
15 management staff there.
16      Q.    Anyone other than Jimmie and
17 Jeff?
18      A.    Whoever else was there. Mike.
19      Q.    Anyone else?
20      A.    Not that I can think of.
21      Q.    So if Jimmie or Jeff or Mike or
22 yourself never e-mailed Reddwerks to create
23 the order alerts for more than 20 bottles of
24 a C-II, was it done?
25           MS. FUMERTON: Objection.

Page 151

1      Form.
2 QUESTIONS BY MR. BOWER:
3      Q.    I want you to assume that
4 neither you, Jimmie, Jeff or Mike asked
5 Reddwerks to create those alerts for C-II
6 items of over 20.
7           Okay?
8      A.    You want me to assume that?
9      Q.    Yes. Because we don't have any
10 records that that occurred.
11           So that should be your
12 assumption. Okay?
13           MS. FUMERTON: Objection.
14      Form. And I object to the --
15 QUESTIONS BY MR. BOWER:
16      Q.    You can answer.
17           MS. FUMERTON: -- testimony of
18      counsel.
19           THE WITNESS: No. No, they
20      could have called as well.
21 QUESTIONS BY MR. BOWER:
22      Q.    So is it your testimony that
23 Mr. Sherl could have called Reddwerks to
24 change an order alert for a C-II item?
25      A.    Yes.

Page 152

1      Q.    And Walmart had nothing to
2 prevent that; is that correct?
3           Walmart had no policies in
4 place to prevent such an action, correct?
5           MS. FUMERTON: Objection.
6      Form.
7           THE WITNESS: I don't recall
8      that we had a policy for that.
9 QUESTIONS BY MR. BOWER:
10      Q.    Do you have any reason as you
11 sit here today to expect that even though you
12 were the one to create the oxy 30 alert, it
13 would have been someone else to do the over
14 20 alert?
15           MS. FUMERTON: Objection.
16      Form.
17           THE WITNESS: Ask your question
18      again?
19 QUESTIONS BY MR. BOWER:
20      Q.    Sure, I'll rephrase.
21           Going back to Exhibit 4, right,
22 we see "alert AP of all pharmacies ordering
23 more than 20 bottles," right --
24      A.    Yes.
25      Q.    -- going back to that bullet

Page 153

1 point?
2           I'm just trying to understand,
3 based on your experience and your
4 relationship with Reddwerks, whether that
5 alert was ever created.
6      A.    For all others?
7      Q.    Yes.
8           This is in relation to the
9 implementation of the C-II order exception
10 review, right? This is for C-II items,
11 right?
12      A.    Yes.
13      Q.    Okay. So I'm just trying to
14 understand, based on your relationship with
15 Reddwerks and the fact that you are the one
16 who notified them of the oxy 30 threshold,
17 was the alert for more than 20 bottles ever
18 created in Reddwerks?
19           MS. FUMERTON: Objection.
20      Form.
21           THE WITNESS: For the oxy 30?
22      Yes.
23 QUESTIONS BY MR. BOWER:
24      Q.    No, for the other C-II items.
25      A.    I don't know.

Page 154

1  Q.   And if you don't know, who
2  would know the answer to that question?
3  A.   I don't know.
4  Q.   Did you ever attend any
5  meetings with the DEA?
6  A.   I've attended when they've come
7  to the D -- some DCs if I were -- if I was
8  already there.
9  Q.   Did you ever attend any
10 meetings where the abuse of oxy was
11 discussed?
12 A.   No.
13 Q.   Did you ever attend any
14 meetings where the abuse of opioids was
15 discussed?
16 A.   No.
17 Q.   Did you ever attend any
18 meetings where diversion of opioid products
19 was discussed?
20 A.   No.
21 Q.   Are you involved in any way
22 with any NACDS?
23 A.   I attended some NACDS
24 conferences for serialization.
25 Q.   And what is serialization?

Page 155

1  A.   So it's the track and trace of
2  product, pharmaceutical products.
3  Q.   What do you mean by track and
4  trace?  What does that mean?
5  A.   So it's -- it's a law that was
6  passed in 2013, and it's called a Drug Supply
7  Chain Security Act.  It's an iterated law, so
8  the first phase of that law is to track
9  product from the manufacturer.  So once it's
10 introduced into commerce, the manufacturers
11 have a responsibility to provide transaction
12 history, transaction data -- or excuse me,
13 transaction information and transaction
14 statement.
15     So the first phase was rolled
16 out in 2015, and then there's other deadlines
17 that have to be met.  So in 2018 they have to
18 affix a 2D barcode to product, and in 2019
19 they -- wholesalers can only accept product
20 that is -- they have an invoice for.
21     And then in 2020, the
22 pharmacies can only accept product that has
23 the 2D barcode affixed to it.  And then in
24 2023 they do full-blown serialization, which
25 is you have to be able to have -- to know

Page 156

1  where a specific bottle has been in order to
2  move it to.
3  Q.   Other than this work on
4  serialization, have you been on other
5  communications with NACDS?
6  A.   No, just serialization.
7  Q.   When did you start being
8  included on NACDS communications?
9  A.   For serialization, I believe
10 it's like 2010.
11 Q.   My question isn't limited to
12 serialization.  So I'm just asking more
13 generally:  When did you start being included
14 on any NACDS communications?
15 A.   2010.  I don't know.
16 Q.   And is it your testimony that
17 every communication you've been a part of
18 with NACDS relates to serialization issue?
19 A.   Yes.
20 Q.   What is KNAPP, K-N-A-P-P?
21 A.   KNAPP.  It's an order-filling
22 system.
23 Q.   Did Walmart ever use that
24 system?
25 A.   Yes.

Page 157

1  Q.   When did it begin using that
2  system?
3  A.   So it was before my time that I
4  came to the team.  Then I believe it was
5  installed at warehouse 6001 in 2004, 2005.
6  Q.   Was it only installed at that
7  warehouse?
8  A.   Yes.
9  Q.   Is there any -- based on your
10 experience, is there any reason why it was
11 only used at that warehouse?
12 A.   I have no idea.
13 Q.   Do you know whether it ever
14 stopped being used at that warehouse?
15 A.   It's still being used.
16 Q.   So is it in addition to the
17 Reddwerks system?
18 A.   Yes.
19 Q.   Can you just describe very
20 generally, to the best of your knowledge, how
21 that KNAPP system differs from Reddwerks?
22 A.   It's an A-frame base system.
23 Q.   And what do you mean by that?
24 A.   So they have channels where
25 they put the product into.  Then as an order

Page 158

1 is scanned -- so the box has a barcode with
2 store order -- with the store number. So as
3 it scans it, it dispenses -- kind of like a
4 Pez dispenser, upside down -- dispenses that
5 product onto a belt. So each store has like
6 six feet of that belt, and then it takes it
7 and puts it into the box.
8     Q.    And that system was never in
9 place at 6045; is that correct?
10    A.    That's correct.
11        (Walmart-Sullins Exhibit 5
12    marked for identification.)
13 QUESTIONS BY MR. BOWER:
14    Q.    Okay. You've been handed
15 what's marked as Exhibit 5, which is another
16 e-mail regarding at least in part the C-II
17 item level alerts. This is a few days after
18 Exhibit 4.
19        Just take a moment -- it's just
20 a one-page e-mail -- and let me know when
21 you've finished reviewing it.
22    A.    Okay. Okay.
23    Q.    Okay. Who is Bryan Boudreaux?
24 Boudreaux?
25    A.    Boudreaux?

Page 159

1    Q.    Boudreaux?
2    A.    He's the -- he was Tim's boss.
3    Q.    Okay.
4    A.    He's the VP.
5    Q.    And he writes to Bryan, "Here's
6 is the weekly recap to the health and
7 wellness network."
8        Do you see that?
9    A.    Yes.
10    Q.    What does that refer to, the
11 health and wellness network?
12    A.    So it's all the distribution
13 centers.
14    Q.    And only included on here
15 are -- the e-mail from Nick are Mr. Harris,
16 Mr. Boudreaux, yourself and Karla Hayes, and
17 then cc Theresa Alford, correct?
18    A.    Yes.
19    Q.    So other than the folks on this
20 e-mail, was there anyone involved in the
21 health and wellness network?
22        MS. FUMERTON: Objection.
23    Form.
24        THE WITNESS: So this is a
25    recap of the week.

Page 160

1 QUESTIONS BY MR. BOWER:
2    Q.    Uh-huh.
3    A.    So there would be others that
4 would be involved.
5    Q.    Who else would be involved?
6        MS. FUMERTON: Objection.
7    Form.
8        THE WITNESS: In the recap?
9 QUESTIONS BY MR. BOWER:
10    Q.    No, in the health and wellness
11 network. I'm just trying to understand what
12 that means.
13    A.    So it's the distribution
14 centers plus the optical center.
15    Q.    Okay. So why are you included
16 on this e-mail?
17    A.    Because it's a recap of the
18 week, of what was done.
19    Q.    But why are you included on it?
20    A.    Because I'm part of that team.
21    Q.    Part of the health and wellness
22 team?
23    A.    Yes.
24    Q.    And what was your role on that
25 team?

Page 161

1    A.    So it was -- I'm a senior
2 manager on the health and wellness logistics
3 team.
4    Q.    Okay. So what role did you
5 play?
6    A.    What was --
7    Q.    During this time period,
8 July 2012.
9    A.    I was a senior manager on the
10 health and wellness logistics team.
11    Q.    Okay.
12    A.    So I had system enhancements
13 responsibility and day-to-day
14 responsibilities.
15    Q.    Other than system enhancements,
16 what were your day-to-day responsibilities?
17    A.    Just questions that came up
18 such as, this purchase order is canceled; can
19 you help fix it? We're having an issue with
20 this screen; can you take a look at it?
21 Those -- that was some of the stuff I did. I
22 did other system projects.
23    Q.    What about the project here
24 noted at bullet point 2 where it says, "DC
25 6045, C-II, continues to work on a solution

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 for the C-II item alerts that can be --
2 can/could be requested by the DEA."
3          Did you work on that solution?
4     A.   No.
5     Q.   Who worked on that solution?
6     A.   I don't know.
7     Q.   Well, there's only a few folks
8 here, right?
9          I'm trying to understand some
10 facts about how Walmart worked.  Okay?
11          So is it your testimony that
12 you don't know who would have worked on that
13 solution?
14     A.   That is my testimony.  I don't
15 know who would have worked on it.
16     Q.   But it wasn't you?
17     A.   No, it was not me.
18     Q.   Was it Mr. Harris?
19     A.   I don't know.
20     Q.   Other than you, who worked on
21 system enhancements?
22     A.   So I would partner with other
23 ISD people.
24     Q.   Okay.  Let me rephrase the
25 question.

Page 163

1          Other than you, who within the
2 health and wellness network would work on
3 system enhancements?
4     A.   So I did the logistics.  There
5 was a different team that did the stores.
6     Q.   What do you mean by
7 "logistics"?  Are you referring to the --
8     A.   Just the distribution centers.
9     Q.   The distribution centers?
10     A.   Yes.
11     Q.   All right.  So it appears here
12 that distribution center 6045 is working on a
13 solution to level alerts.
14          I understand that wasn't you?
15     A.   That was not me.
16     Q.   Why would that not have been
17 you?  Wouldn't that have been your core
18 responsibility?
19          MS. FUMERTON:  Objection.
20 Form.
21          THE WITNESS:  I don't know what
22 this is referring to because it's not
23 a system.
24 QUESTIONS BY MR. BOWER:
25     Q.   I thought level alerts refers

Page 164

1 to Reddwerks system that you had a major role
2 in choosing and implementing.  Isn't that
3 correct?
4          MS. FUMERTON:  Objection.
5 Form.
6          THE WITNESS:  So the initial
7 portion of that, yes.  The rollout of
8 the threshold files and then the
9 enhancement to that, yes, that would
10 have been me.
11          But I don't know what this
12 is -- this isn't -- I don't know what
13 this is referring to.
14 QUESTIONS BY MR. BOWER:
15     Q.   Well, it says what it's
16 referring to, doesn't it?  It says, "DC 6045,
17 C-II, continues to work on a solution for the
18 C-II item level alerts," right?
19     A.   Right.
20     Q.   That refers to the oxy 30
21 alert, right?
22          MS. FUMERTON:  Objection.
23 Form.  Lack of foundation.
24 QUESTIONS BY MR. BOWER:
25     Q.   Well, do you know whether that

Page 165

1 refers to the oxy 30 alerts that you helped
2 create?
3     A.   I don't know if it's referring
4 to that.
5     Q.   Well, who would know?
6          If you were the person at the
7 health and wellness who was responsible for
8 system enhancements and you don't know, who
9 would?
10          MS. FUMERTON:  Objection.
11 Form.
12          THE WITNESS:  I mean, I don't
13 know.  I mean, it could have been
14 anybody that's on this or somebody
15 that was on this that was working with
16 somebody else.  I don't know.
17 QUESTIONS BY MR. BOWER:
18     Q.   Who would know the answer to
19 that question?
20          MS. FUMERTON:  Objection.
21 Form.  Asked and answered.
22          THE WITNESS:  I don't know.
23 QUESTIONS BY MR. BOWER:
24     Q.   The next sentence in that
25 bullet point says, "Any unusual orders on oxy

Page 166

1 items are being elevated to the home
2 office/regulatory affairs/store operations
3 and H and W diversion team."
4      Do you see that?
5      A.   Yes.
6      Q.   Do you know what that refers
7 to?
8      A.   No.  I mean, I'd be speculating
9 what that refers to.
10      Q.   Well, what is your -- based on
11 your experience working at Walmart in the
12 systems operations for ten-plus years, what
13 would be your guess?
14      A.   That would have been the report
15 that he was putting together.
16      Q.   The over 20 report for C-II,
17 right?
18      A.   Correct.
19      Q.   I'm not trying to play -- I'm
20 just trying to get some information.  Okay?
21      So do you know -- so we talked
22 about folks at the home office who might have
23 received those reports, right?
24      A.   (Witness nods head.)
25      Q.   Are you familiar with anyone at

Page 167

1 regulatory affairs who would have received
2 those reports?
3      A.   I believe Susanne Hilander
4 {sic} was in regulatory compliance at that
5 time.
6      Q.   Okay.  And then what about
7 stores operations; do you know what that
8 refers to?
9      A.   That would have been the market
10 directors, and I believe Brandon was in store
11 operations at that time.
12      Q.   And those folks have oversight
13 over the pharmacies, correct?
14      A.   Correct.
15      Q.   Okay.  And then about the H and
16 W and diversion team?
17      Do you see that?
18      A.   Yes.
19      Q.   Do you know what that refers
20 to?
21      A.   There's another team that's
22 part of compliance that's called the
23 diversion team.
24      Q.   And that's health and wellness,
25 correct?

Page 168

1      A.   Correct.
2      Q.   You were a member of the health
3 and wellness team, right?
4      MS. FUMERTON:  Objection.
5 Form.
6      THE WITNESS:  Not -- only in
7 logistics.
8 QUESTIONS BY MR. BOWER:
9      Q.   Okay.  Do you know who during
10 this time period was on the health and
11 wellness diversion team?
12      A.   I believe Greg Beam was.
13      Q.   Did you ever work with Greg?
14      A.   He was the individual that sent
15 that note to Tim.
16      Q.   Right.
17      So, yes, you've worked with
18 Greg on occasion; is that correct?
19      A.   Yes.
20      Q.   Other than the note we've
21 already saw, do you have any recollection --
22 or we saw today, do you have any recollection
23 of working with Greg?
24      A.   Yes.
25      Q.   And what did you work with him

Page 169

1 on?
2      A.   On pulling some reports for --
3 for orders -- like correctional invoices.  So
4 his team did diversion, and I would work with
5 them to -- to understand what it is that they
6 were needing from the DC.
7      Q.   Why would he come to you for
8 those sorts of issues?
9      A.   Because of -- knowing that I
10 knew how the order came in and the fact that
11 I have a systems background.
12      Q.   Can we just talk about that for
13 a moment?  Because it sounds like a lot of
14 your responsibilities did deal with systems.
15      What type of background did you
16 have?
17      A.   It was more of on-the-job
18 experiences for whatever system was running.
19      Q.   And those were limited to your
20 experiences at Walmart, correct?
21      A.   Yes.
22      Q.   Did you ever receive any
23 specific training with respect to systems,
24 databases, things like that?
25      A.   Some training at DC level, and

Page 170

1 then a little bit of training when we were --
2 Matt came to the home office for Teradata
3 queries and stuff like that.
4     Q.    Were you specifically trained
5 in how to run Teradata queries?
6     A.    Only for the invoice table and
7 the PO table.
8     Q.    And what specifically were you
9 trained to do?
10        How were you instructed to run
11 those queries?
12     A.    So it was just if I wanted to
13 look at what a store was invoiced for, I
14 could use a query that somebody built and run
15 it. Or if I wanted to look at purchase
16 orders, past purchase orders, that came into
17 the DC, somebody else had built a query, so
18 they'd share it.
19     Q.    So you wouldn't be the one to
20 build the query; is that correct?
21     A.    No.
22     Q.    And who would build those
23 queries for the Teradata system?
24     A.    Multiple people.
25     Q.    Who were some of the people you

Page 171

1 would have contacted to do that work?
2     A.    I would have contacted somebody
3 in ISD.
4     Q.    Do you recall any of those
5 folks' names?
6     A.    Flynn would be one of those. I
7 don't know what Flynn's last name is.
8        Sometimes I would just e-mail a
9 distribution list of people.
10     Q.    Flynn at e-t-t-i-e-n-n-e?
11     A.    Yes.
12     Q.    What about Kie Boyett; is he at
13 Walmart? K-i-e, B-o-y-e-t-t?
14     A.    He was. I don't know if he
15 still is.
16     Q.    Would he have been one of the
17 persons you would contact to run -- to create
18 those queries?
19     A.    I don't know that I would use
20 him for that.
21     Q.    Primarily you would use Flynn?
22     A.    Primarily.
23     Q.    Okay. What about P-r-a-b-h-u,
24 and then his last name is M-u-t-h-a-i-y-a-n?
25 Does that name ring a bell?

Page 172

1     A.    No.
2     Q.    Maybe possibly at Reddwerks?
3     A.    No, I don't know.
4     Q.    Okay. Lynn Cress, C-r-e-s-s?
5     A.    Yes.
6     Q.    Who is Lynn Cress?
7     A.    He worked in logistics systems.
8     Q.    At Walmart?
9     A.    Uh-huh.
10     Q.    Do you know why you be
11 e-mailing Lynn about 405 reports?
12     A.    That was probably when they
13 didn't trigger to run or something.
14     Q.    And then I know I asked you
15 this already; I just want to confirm your
16 testimony.
17        Do you ever recall meeting with
18 the DEA?
19     A.    No, I don't recall meeting with
20 them.
21     Q.    Do you ever recall explaining
22 to the DEA issues with ARCOS?
23     A.    Yes.
24     Q.    Okay. So would you like to
25 change your testimony?

Page 173

1        MS. FUMERTON: Objection.
2 Form. It's -- I -- there's no
3 testimony to change, but go ahead.
4        THE WITNESS: I didn't recall
5 meeting with them.
6 QUESTIONS BY MR. BOWER:
7     Q.    Do you recall now meeting with
8 them?
9     A.    Now that you brought up the
10 ARCOS errors, yes.
11     Q.    So other than me bringing up a
12 specific example, your answer would be that
13 you do not recall, right?
14        MS. FUMERTON: Objection.
15 Misstates the prior testimony.
16        THE WITNESS: That's correct.
17        MR. BOWER: We can take a
18 break.
19        VIDEOGRAPHER: Going off the
20 record at 10:54 a.m.
21     (Off the record at 10:54 a.m.)
22        VIDEOGRAPHER: We're back on
23 the record at 11:06 a.m.
24 QUESTIONS BY MR. BOWER:
25     Q.    Okay. We're back on the

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  record.  I just wanted to talk a minute,
2  ma'am, about the oath that you've taken
3  today.
4          Okay?
5      A.    Yes.
6      Q.    You understand the nature of
7  that oath?
8      A.    Yes.
9      Q.    You understand that your
10 obligation is to tell the whole truth and
11 nothing but the truth?  Do you understand
12 that?
13     A.    Yes.
14     Q.    So, for example, when you say
15 you don't remember, you have to have a basis
16 for that statement.
17         Do you understand that?
18         MS. FUMERTON:  Objection to the
19     instruction and the question.
20         THE WITNESS:  I understand
21     that.
22 QUESTIONS BY MR. BOWER:
23     Q.    And so, for example, when I
24 asked you multiple times about whether you
25 met with the DEA, your immediate response was

Page 175

1  that, no, you didn't recall anything, right?
2          MS. FUMERTON:  Objection to the
3      form and misstates the testimony,
4      because you asked the question, she
5      went back to look, and she
6      specifically said that she met with
7      the DEA when they came to do
8      inspections at the DC facilities on
9      occasion.
10         So you're misstating her --
11     yes, it is absolutely what she said.
12         MR. BOWER:  I appreciate your
13     speaking objection, but I would also
14     ask that you refrain from those in the
15     future.
16         MS. FUMERTON:  Well, I would
17     ask that you refrain from
18     mischaracterizing the witness'
19     testimony.
20         MR. BOWER:  There's a reason
21     that you're only allowed for speaking
22     objections.  I would just ask you to
23     abide by that obligation.
24         MS. FUMERTON:  You also have an
25     obligation not to misrepresent the

Page 176

1  record.
2          MR. BOWER:  And that's why
3  you're free to make an objection.
4  Right?
5          So you're free to make your
6  objections, but I would appreciate if
7  you didn't have speaking objections.
8          MS. FUMERTON:  You're the one
9  that's keeping talking right now.
10 QUESTIONS BY MR. BOWER:
11     Q.    Ma'am, I asked you, "Do you
12 ever recall meeting with the DEA?" and your
13 answer was, "No, I don't recall meeting with
14 them."
15         Do you recall that testimony?
16     A.    I do now.
17     Q.    Is that testimony accurate?
18     A.    No, I misspoke.
19     Q.    Okay.  How many times have you
20 met with the DEA?
21     A.    I don't know exactly how many
22 times.  I was present at some of the
23 inspections at the DC.  I recall that meeting
24 that you informed me about with the ARCOS
25 errors, and I did speak to the DEA ARCOS

Page 177

1  office.
2      Q.    Do you know what ARCOS is?
3      A.    Yes.
4      Q.    What is ARCOS?
5      A.    Sales and purchases.
6      Q.    Do you know whether Walmart
7  reports information to the DEA?
8      A.    Yes.
9      Q.    Do you know how Walmart reports
10 that information?
11     A.    They report it monthly.
12     Q.    And who creates the reports?
13     A.    It's created through a job in
14 the system, so it's an automatic report that
15 gets put on a server.  We take that data and
16 upload it into the DEA's website.
17     Q.    And who has the responsibility
18 at Walmart to physically do the uploading of
19 the data?
20     A.    There was an individual on our
21 team that did that.
22     Q.    And what was that individual's
23 name?
24     A.    It was -- when I started on the
25 team, it was Brenda Glenn.  Then it was Sarah

Page 178

1  Eisler. And it was Kelsey Clark.
2      Q.    And at some point, Walmart
3  became aware that the information that was
4  being provided to the DEA was inaccurate; is
5  that correct?
6          MS. FUMERTON: Objection.
7  Form. No foundation.
8          THE WITNESS: It wasn't
9  inaccurate. It was missing some data.
10 QUESTIONS BY MR. BOWER:
11     Q.    What's the difference between
12 inaccurate and missing data in your mind?
13     A.    Well, the information that was
14 provided, the quantities and who it was
15 shipped to, was correct. It was -- the CSOS
16 order ID was missing.
17     Q.    So is information -- or data
18 that's missing information accurate?
19         MS. FUMERTON: Objection.
20 Form.
21         THE WITNESS: The data was
22 correct. It was the missing
23 information.
24 QUESTIONS BY MR. BOWER:
25     Q.    So I just want to be clear so

Page 179

1  that I understand what your testimony is.
2          Is it your testimony that the
3  data that was being provided was correct but
4  that it wasn't complete?
5      A.    It was not complete.
6      Q.    What does DVP stand for?
7      A.    DVP? Divisional vice
8  president.
9      Q.    Did you attend those meetings?
10         MS. FUMERTON: Objection.
11 Form.
12 QUESTIONS BY MR. BOWER:
13     Q.    Did you attend -- I'll strike
14 that.
15         Did you attend DVP meetings?
16     A.    I attended some meetings. I
17 didn't stay for the entire time.
18     Q.    What was the reason for your
19 attendance at DVP meetings?
20     A.    To provide an update for the
21 previous week's workload.
22     Q.    And what would you provide an
23 update on? What types of things?
24     A.    So where our, like, pier
25 processing was, did we have any late arrivals

Page 180

1  to the stores due to storms or systems, if we
2  had significant downtime at the distribution
3  center, if it was either mechanical or
4  system.
5      Q.    Are you done?
6      A.    Yeah.
7      Q.    Okay. Did you ever provide
8  updates on issues related to Walmart's
9  suspicious order monitoring policy in any
10 way?
11         MS. FUMERTON: Objection.
12 Form.
13         THE WITNESS: I did not.
14         (Walmart-Sullins Exhibit 6
15 marked for identification.)
16 QUESTIONS BY MR. BOWER:
17     Q.    Okay. You've been handed
18 what's been marked as Exhibit 6. Take a
19 moment. It's an e-mail with the attachment.
20 The e-mail is from Mr. Tallman to Timothy
21 Harris, yourself and Theresa Alford.
22     A.    Yes.
23     Q.    Okay?
24         And I have some questions on
25 the PowerPoint slides, the first of which is,

Page 181

1  who puts these together?
2          But take your time to review it
3  and then -- before answering the question.
4  It looks like there's maybe two copies of the
5  document --
6          MS. FUMERTON: I was just
7  trying to figure out if that was
8  supposed to be the case, or was it --
9          MR. BOWER: I don't think so,
10 but I think they're also identical, so
11 I don't know if it's...
12         MS. FUMERTON: It looks like
13 from the attachments --
14         MR. BOWER: There's only one,
15 right?
16         MS. FUMERTON: This should be
17 only one.
18         MR. BOWER: Yeah. So we can
19 either pull it out or --
20         MS. FUMERTON: Why don't we
21 pull it out.
22         MR. BOWER: -- investigate.
23 Yeah. Okay.
24         MS. FUMERTON: At a break,
25 we'll just double-check. We'll do a

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  comparison.
2      MR. BOWER: Yes, that's --
3  either way is fine. I don't have any
4  questions on the second one anyways
5  because that would have been my
6  assumption, so...
7      And we can remove yours at the
8  break --
9      MS. FUMERTON: Okay.
10     MR. BOWER: -- so we don't have
11 to worry about it now.
12 QUESTIONS BY MR. BOWER:
13     Q.   So I just want to know, it's
14 some general questions about these slides and
15 whether you were at least partially
16 responsible for preparing them.
17     A.   I don't recall preparing them.
18     Q.   Okay. Do you know who did
19 prepare them?
20     A.   It would have been Nick
21 Tallman.
22     Q.   What was his role at this time;
23 do you know?
24     A.   He was the same as I was. I
25 was a senior manager; he was a senior

Page 183

1  manager.
2      Q.   Did he have different
3  responsibilities than you?
4      A.   Yes.
5      Q.   What were his responsibilities?
6      A.   More strategic initiatives. He
7  reviewed the P&Ls. He did some day-to-day
8  stuff as well. He also did some flow
9  processes.
10     Q.   What P&Ls did he review?
11     A.   All the distribution centers.
12     Q.   Each distribution center had
13 its own P&L?
14     A.   Yes.
15     Q.   How often would he review
16 those; if you know?
17     A.   I don't know how often. I know
18 that we had a P&L maybe once a month.
19     Q.   Would he discuss the
20 distribution P&Ls at those meetings?
21     A.   Yes.
22     Q.   What types of things would he
23 discuss, just generally?
24     A.   What the total expenses were
25 and what our units per hour was, cost per

Page 184

1  pick shipped.
2      Q.   So Walmart monitored all that
3  data; is that correct?
4      A.   We did, yes.
5      Q.   And for what reason did he
6  review those P&Ls?
7      MS. FUMERTON: Objection.
8  Form.
9      THE WITNESS: I don't know. It
10 was just part of the business.
11 QUESTIONS BY MR. BOWER:
12     Q.   Was it to make sure that they
13 were profitable?
14     MS. FUMERTON: Object to form.
15 QUESTIONS BY MR. BOWER:
16     Q.   Well, you attended these
17 meetings where they were discussed, right?
18     A.   Attended some of them, yes.
19     Q.   All right. Did Mr. Tallman
20 ever discuss the profitability of the DCs?
21     A.   No, he just talked about the
22 expenses and the percents to sales.
23     Q.   Sorry. You said percent to
24 sales?
25     A.   Yes.

Page 185

1      Q.   What does that mean?
2      A.   So it's some calculation of
3  what the sales were and total expenses,
4  divided by total expenses.
5      Q.   And how does a DC have sales?
6      A.   So it's not really a sale, it's
7  just a -- an accounting, so it's based on
8  what the cost is of the drug.
9      Q.   And what is your understanding
10 as to why Mr. Tallman review these P&Ls?
11     A.   To look at what our expenses
12 were.
13     Q.   And why was that important to
14 the health and wellness folks?
15     A.   Because you would want to
16 reduce your expenses.
17     Q.   And why do you want to do that?
18     A.   Because -- for profit in the
19 company.
20     Q.   Okay. And was that part of the
21 role of health and wellness, was to reduce
22 the expenses at the DCs?
23     A.   That was some of the role, yes.
24     Q.   And how would you go about
25 doing that?

Page 186

1    A.    Implementing systems to help
2  that process.  Keeping our maintenance on
3  conveyors up to date so that it didn't cause
4  downtime that you were sitting there.
5  Maintaining any -- you know, a preventive
6  maintenance on the equipment.
7    Q.    Do you recall anything that was
8  done at DC 6045 to reduce expenses?
9    A.    No, I don't recall anything
10  specific that we did to reduce expenses.
11    Q.    And did the health and wellness
12  group have its own P&L?
13      MS. FUMERTON:  Objection.
14  Form.
15      THE WITNESS:  It's a broad
16  question.  I don't -- I'm not sure I
17  understand what you're asking.
18  QUESTIONS BY MR. BOWER:
19    Q.    Well, did the folks on your
20  team, Mr. Tallman, Mr. Harris, yourself,
21  Ms. Alford, have their own kind of P&L
22  statements they looked at to determine
23  whether they were successful in increasing
24  profitability?
25      MS. FUMERTON:  Objection.

Page 187

1  Form.
2      THE WITNESS:  No, it was the
3  DCs' P&L.
4  QUESTIONS BY MR. BOWER:
5    Q.    But I'm just -- I'm just
6  trying to understand why this was part of
7  the -- your role at health and wellness and
8  Mr. Tallman's role.  Why was this being
9  discussed?
10    A.    It was part of business.  I
11  mean, we discussed that with all the DCs.
12    Q.    Okay.  Was part of your --
13  strike that.
14      Was the success of your team at
15  health and wellness in part determined by the
16  profitability of the DCs?
17      MS. FUMERTON:  Objection.
18  Form.  Lack of foundation.
19  QUESTIONS BY MR. BOWER:
20    Q.    In other words, in your annual
21  reviews, did the folks look at whether the
22  DCs were profitable?
23      MS. FUMERTON:  Objection.
24  Form.
25      THE WITNESS:  The P&L

Page 188

1  information was on there, but it was
2  for all DCs.  It wasn't for a specific
3  DC or anything like that.  It was
4  overall.
5  QUESTIONS BY MR. BOWER:
6    Q.    Right.
7      And the overall performance
8  would impact your review, correct?
9      MS. FUMERTON:  Objection.
10  Form.
11      THE WITNESS:  No, I don't
12  believe it would.
13  QUESTIONS BY MR. BOWER:
14    Q.    You don't believe that the
15  profitability, overall profitability, of the
16  DCs, impacted your reviews?
17      MS. FUMERTON:  Objection.  Form
18  and lack of foundation.
19      THE WITNESS:  No.
20  QUESTIONS BY MR. BOWER:
21    Q.    What did impact your reviews?
22    A.    Not -- not doing a project or
23  not completing a project in time.  That's
24  what would impact my review.
25    Q.    Anything else?

Page 189

1    A.    If we had violations at DC
2  level, which we never did have violations
3  when the DEA inspection or state Boards of
4  Pharmacy came through.  So that would impact
5  it.
6    Q.    Anything else?
7    A.    There was other categories on
8  there.  I don't know all of them.
9    Q.    Going back to Exhibit 6, turn
10  your attention to page 2 of the PowerPoint.
11      See where it says on the top,
12  "RX supply chain controlled substance
13  monitoring"?
14      Do you see that?
15    A.    Yes.
16    Q.    Do you see -- do you know what
17  all of these statements here refer to?
18      For example, "Cardinal Health
19  settles drug distribution case."  Do you know
20  what that refers to?
21    A.    No.
22    Q.    No?
23      What about the last one,
24  "McKesson to pay 13 million for failure to
25  report suspicious drug activity"?  Do you

Page 190

1 know what that refers to?
2     A.   Suspicious drugs.
3     Q.   Do you know what that refers
4 to?
5     A.   No.
6     Q.   Do you know whether that refers
7 to the distribution of opioid products?
8     A.   I don't know.
9     Q.   Do you know whether the one
10 above that, where it notes "DEA serves a
11 suspension order on Walgreens distribution
12 center in Jupiter, Florida," do you know what
13 that refers to?
14     A.   No.
15     Q.   Do you know what any of these
16 refer to?
17     A.   No, I didn't read any of these.
18     Q.   So Nick sends this to
19 Mr. Harris, yourself and Ms. Alford, right?
20 And you didn't read it?
21     A.   Well, I -- I don't recall
22 reading it, but I'm reading it now.
23     Q.   You don't recall asking, hey,
24 Nick, what are all of these about?
25     A.   No, I don't recall doing that.

Page 191

1     Q.   Why wouldn't you have done
2 that?  Wouldn't you have been curious as to
3 why these were there?
4         MS. FUMERTON:  Objection.
5     Form.
6         THE WITNESS:  It's information
7     pulled from the websites.
8 QUESTIONS BY MR. BOWER:
9     Q.   Well, why is he including this
10 information on this PowerPoint?
11         MS. FUMERTON:  Objection.
12     Form.
13         THE WITNESS:  I don't know.
14 QUESTIONS BY MR. BOWER:
15     Q.   Didn't affect what you were
16 doing, so it didn't matter, right?
17     A.   It was not part of my
18 responsibility, no.
19     Q.   Okay.  Anything on here part of
20 your responsibility?
21         MS. FUMERTON:  Objection.
22     Form.
23         Are you talking entire
24     presentation?
25

Page 192

1 QUESTIONS BY MR. BOWER:
2     Q.   Anything in this PowerPoint
3 part of your responsibility?
4     A.   I can look.
5     Q.   I mean, this is a PowerPoint
6 put together by your team, right?
7         MS. FUMERTON:  Well, you asked
8     a question, so she needs to look.
9         MR. BOWER:  Well, I'll strike
10     that question.
11 QUESTIONS BY MR. BOWER:
12     Q.   This is a PowerPoint put
13 together by your team, right?
14         MS. FUMERTON:  Objection.
15     Form.
16         THE WITNESS:  The team I was
17     on, yes.
18 QUESTIONS BY MR. BOWER:
19     Q.   Right.  And there's how many on
20 this team?
21     A.   There appears to be one, two,
22 three, four people on that team, right?
23         MS. FUMERTON:  Objection.
24     Form.
25         THE WITNESS:  There was more,

Page 193

1 but --
2 QUESTIONS BY MR. BOWER:
3     Q.   It was sent to four people,
4 right?
5     A.   Yes.
6     Q.   For review prior to the
7 meeting, right?
8         MS. FUMERTON:  Objection.
9     Form.
10         THE WITNESS:  Say that again?
11 QUESTIONS BY MR. BOWER:
12     Q.   They were sent to the team,
13 right?
14         MS. FUMERTON:  Objection.
15     Form.
16 QUESTIONS BY MR. BOWER:
17     Q.   They were sent to the four
18 people on this e-mail, correct?
19         MS. FUMERTON:  Objection.
20     Form.
21         What is the "they" you're
22     referring to?
23         MR. BOWER:  These slides.  The
24     slides in the PowerPoint we're looking
25     at were sent to the people on the

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 e-mail.
2 QUESTIONS BY MR. BOWER:
3  Q.  Is that correct?
4  A.  Yes.
5      MS. FUMERTON:  Objection.
6  Form.
7      MR. BOWER:  Are you objecting
8  that the slides on this e-mail were
9  sent to the people on the e-mail?
10      MS. FUMERTON:  I'm objecting
11 because you continuously do not listen
12 to her answers and misrepresent the
13 testimony, because she said that there
14 were other people involved in the
15 team, and then you keep trying to
16 reduce it to a smaller number.
17      MR. BOWER:  I don't reduce it.
18 QUESTIONS BY MR. BOWER:
19  Q.  I'm saying these slides were
20 sent to these four people; is that correct?
21  A.  Yes.
22  Q.  Do you have any idea why
23 these -- only these four people received
24 these slides in this e-mail?
25      MS. FUMERTON:  Objection.

Page 195

1  Form.  Lack of foundation.
2      MR. BOWER:  I'll strike it.
3 QUESTIONS BY MR. BOWER:
4  Q.  Do you have any idea why the
5 other team members weren't included on this
6 e-mail?
7  A.  No, I do not.
8  Q.  Okay.  Do you have any reason
9 to believe that you were included on this
10 e-mail because you had some responsibility in
11 connection with these slides?
12  A.  No.
13  Q.  So is it your testimony today
14 that despite your inclusion on this e-mail
15 and receiving these slides before the DVP
16 meeting, you had no responsibility in
17 connection with any of these projects?
18      MS. FUMERTON:  Objection.
19 Form.  And I object to what you're
20 asking because you're going back to
21 the original question that you asked.
22      And she said, "Let me look to
23 see if I had any responsibility," and
24 you said you were going to withdraw
25 that question, and then you came back

Page 196

1 and insisted that she answer the
2 question.
3      So if you want her to answer
4 whether she had responsibility for
5 anything in the slides, you need to
6 allow her time to review the slides.
7      MR. BOWER:  I would ask, again,
8 for no speaking objections.
9      MS. FUMERTON:  And I am going
10 to again ask you to stop
11 misrepresenting her testimony and the
12 record.
13      Are you objecting to letting
14 her have time to review the slides?
15      MR. BOWER:  I never did.
16      MS. FUMERTON:  Yes, you did.
17      MR. BOWER:  I just asked the
18 question.
19      MS. FUMERTON:  You withdrew the
20 question.
21      MR. BOWER:  I withdrew the
22 question.
23      MS. FUMERTON:  And now you
24 asked again.
25      MR. BOWER:  Now -- let me clear

Page 197

1 up the record, because now you've made
2 a long record that's inaccurate, which
3 is frequent in this case.
4      I withdrew the question.  I
5 asked some foundational questions and
6 then asked the question again, at
7 which point you interjected your long
8 speaking objection which is
9 inappropriate.
10 QUESTIONS BY MR. BOWER:
11  Q.  So I'll ask again.  And I've
12 given you plenty of time today to review
13 every document.  All I'm asking you is, did
14 you have any responsibility in connection
15 with anything represented in these slides?
16      MS. FUMERTON:  And you can take
17 the time to review the slides.
18      MR. BOWER:  And while she's
19 reviewing, I would appreciate if we
20 could end the speaking objections
21 because it's getting out of hand.
22      MS. FUMERTON:  It's not getting
23 out -- and, Zach, again, you cannot
24 withdraw when she says, "Give me a
25 minute to review," and you say, "I'll

Page 198

1 withdraw the question," then come back
2 and ask. You have to give her time to
3 review the slides.
4        MR. BOWER: I never didn't give
5 her time.
6        MS. FUMERTON: I'm not going to
7 let you railroad her into questions
8 that are unfair.
9        MR. BOWER: Look, it's pretty
10 clear that your speaking objections
11 are strategic, so if they keep going,
12 we're going to have to find some
13 relief because it's inappropriate.
14        MS. FUMERTON: Is your
15 misrepresenting the record strategic?
16        MR. BOWER: I am not. I
17 withdrew a question. I asked
18 foundational questions then asked the
19 question again.
20        MS. FUMERTON: All I'm asking
21 is for time to review the document.
22        MR. BOWER: Then that should be
23 the nature of your statement, not a
24 long colloquy.
25        THE WITNESS: There was stuff

Page 199

1 in here that I was responsible for.
2 QUESTIONS BY MR. BOWER:
3        Q.    Okay. Let's talk about that.
4        What in here were you
5 responsible for?
6        A.    Some system solutions.
7        Q.    What page are you on?
8        A.    I'm on page 4.
9        Q.    Okay. And what specifically
10 are you looking at? The dash system
11 solution? That one?
12        A.    On the system solution.
13        Q.    Okay.
14        A.    So...
15        Q.    And that notes "develop a
16 proactive order limitation system."
17        Do you see that?
18        A.    Yes.
19        Q.    Did Walmart ever do that?
20        A.    Yes.
21        Q.    Okay. What -- what that
22 system called?
23        A.    Buzzeo, I believe.
24        Q.    So this refers to Buzzeo; is
25 that correct?

Page 200

1        A.    So it refers to --
2        Q.    I'll strike that. That was a
3 poor question.
4        At the time, Walmart didn't use
5 Buzzeo; is that correct?
6        A.    That's correct.
7        Q.    So this refers to what would
8 later become the Buzzeo project?
9        A.    Correct.
10        Q.    Okay. Were you responsible for
11 that project?
12        A.    I was initially brought in, and
13 then I was not responsible because it didn't
14 affect the distribution center. Buzzeo was
15 prior to the order dropping to the
16 distribution center.
17        Q.    Okay. So is it your testimony
18 that you were not responsible for the rollout
19 of Buzzeo at 6045?
20        A.    That's correct.
21        Q.    Did you have any role in that
22 rollout?
23        A.    Not in the rollout.
24        Q.    What was your role, if any?
25        A.    It was when it -- when it

Page 201

1 initially rolled out, there was a bug with
2 it, and so they had to take that out and fix
3 the bug. And so I was brought in to look at
4 why the system did what it did, so I provided
5 some -- some insight into that.
6        Q.    Well, wasn't it, in fact, your
7 decision to take it out and fix the bug?
8 Wasn't that your decision?
9        MS. FUMERTON: Objection.
10 Form.
11        THE WITNESS: I don't recall.
12 QUESTIONS BY MR. BOWER:
13        Q.    Okay. Other than your
14 reference to Buzzeo here, do you know why you
15 were looking to develop a proactive order
16 limitation system?
17        A.    It wasn't necessarily me. It
18 was -- I was partnering with compliance.
19        Q.    Okay. Do you know why Walmart
20 wanted to develop a proactive order
21 limitation system?
22        MS. FUMERTON: Objection.
23 Form.
24        THE WITNESS: No, I don't know.
25

Page 202

1  QUESTIONS BY MR. BOWER:
2      Q.    It didn't affect your
3  responsibility so you didn't ask, right?
4      A.    I didn't ask.
5      Q.    Do you think it could possibly
6  be related to the second page of this
7  PowerPoint, all these headlines here?
8          MS. FUMERTON: Objection.
9      Form.
10         THE WITNESS: Possibly.
11  QUESTIONS BY MR. BOWER:
12     Q.    Well, as you sit here today,
13  what is your understanding as to why these
14  headlines are here?
15         MS. FUMERTON: Objection.
16     Form.
17         THE WITNESS: For monitoring.
18  QUESTIONS BY MR. BOWER:
19     Q.    What specifically about
20  monitoring?
21     A.    Controlled substances.
22     Q.    Specifically opioids, correct?
23         MS. FUMERTON: Objection.
24     Form.
25  QUESTIONS BY MR. BOWER:

Page 203

1      Q.    Do you have that understanding?
2      A.    No. Controlled substances.
3      Q.    Okay. Were you aware in 2013
4  that the country was in the middle of an
5  opioid crisis?
6      A.    I don't know when I became
7  aware of it.
8      Q.    Do you recall being aware of it
9  at this time?
10     A.    No, I don't recall that.
11     Q.    Do you see -- so you're --
12  going back to page 4, which you directed to
13  us as having some responsibility for, do you
14  see the second dash? It says, "Provide
15  internal alerts for increasing volumes on key
16  items."
17         Do you see that?
18     A.    Yes.
19     Q.    Did you ever ask what those key
20  items were?
21     A.    No.
22     Q.    Well, you knew at this time
23  that Walmart was focusing on oxy 30, right?
24     A.    Yeah, in 2012.
25     Q.    Right.

Page 204

1      one of the key items referenced here?
2      Do you know whether that was
3      A.    I don't know.
4      Q.    Do you know whether other oxy
5  products were key items referenced here?
6      A.    I don't know.
7      Q.    What is a controlled drug
8  report? Do you know what that refers to?
9          The third dash there says,
10  "Identify controlled drug report
11  requirements." What does that mean?
12     A.    I don't know what that means.
13     Q.    Well, you have testified that
14  you were responsible for this systematic
15  solution, right?
16         You don't know what the third
17  dash refers to?
18         MS. FUMERTON: Objection.
19     Form. Misstates prior testimony.
20         THE WITNESS: I don't know what
21     it refers to.
22  QUESTIONS BY MR. BOWER:
23     Q.    Do you know what the data in
24  that sentence refers to?
25     A.    No.

Page 205

1      Q.    Do you know what data you would
2  have used or had access to in connection with
3  this development of the solution?
4      A.    The sales data.
5      Q.    And where would you have --
6  where would that data have been maintained?
7      A.    In Teradata.
8      Q.    And what was the solution for?
9  It says, "this is my solution," but
10  "solution" suggests to me there's a problem.
11         Do you know what the solution
12  was supposed to address?
13     A.    I don't know that it was a
14  problem. It was a change in the process.
15     Q.    Do you know why a change was
16  needed or desired by Walmart?
17         MS. FUMERTON: Objection.
18     Form.
19         THE WITNESS: No, we just -- we
20     change systems as they evolve, as new
21     stuff comes into the processes.
22  QUESTIONS BY MR. BOWER:
23     Q.    Well, what new stuff was coming
24  into the processes?
25     A.    I'm not talking about

Page 206

1 specifically this. I'm talking about broad,
2 like CSOS. I mean, it wasn't something that
3 we brought in. It was to replace what we
4 were currently doing.
5     Q.    Right.
6           And I think you explained --
7 sorry, go ahead.
8     A.    And pick the light. It was to
9 replace what we were currently doing. So it
10 was just systems that became available, and
11 we evolved to those.
12    Q.    And I think for each of those
13 situations you just described, the CSOS issue
14 and the pick a light, you were able to
15 identify why those changes were made.
16          Do you have any idea why this
17 change was being made?
18          MS. FUMERTON: Objection.
19 Form.
20          THE WITNESS: No, I don't.
21 QUESTIONS BY MR. BOWER:
22    Q.    Did you ever ask, "Why do we
23 need a solution?"
24    A.    I don't recall asking.
25    Q.    Well, how is it that you went

Page 207

1 about providing a solution to something you
2 didn't know what you were trying to solve?
3          MS. FUMERTON: Objection.
4 Form.
5 QUESTIONS BY MR. BOWER:
6     Q.    Well, I'll strike that.
7           What did you do to develop a
8 solution?
9     A.    I didn't develop a solution. I
10 went and attended meetings that people asked
11 for a solution.
12    Q.    And what did people ask?
13    A.    They wanted -- like when we
14 enhanced Reddwerks, they wanted visibility to
15 the orders that were coming in and what
16 was -- what the threshold was and what was
17 being held and where it alerted and then what
18 the weekly quantity was.
19    Q.    And at any of these meetings
20 did they ever say why they wanted this
21 information?
22          MS. FUMERTON: Objection.
23 Form.
24          THE WITNESS: I didn't ask.
25

Page 208

1 QUESTIONS BY MR. BOWER:
2     Q.    But -- and in your answer you
3 mentioned, like, we wanted the enhanced
4 Reddwerks. But this is not the enhanced
5 Reddwerks, right, this is something
6 different?
7           MS. FUMERTON: Objection.
8 Form.
9 QUESTIONS BY MR. BOWER:
10    Q.    I'll ask it a different way
11 then.
12          Does this systematic solution
13 refer to enhanced Reddwerks?
14    A.    I believe it is, but I'm not
15 sure.
16    Q.    Okay. Because earlier you
17 mentioned Buzzeo.
18    A.    I mentioned Buzzeo as well,
19 yes. I don't know if it was Buzzeo or if it
20 was the system enhancements.
21    Q.    Okay. Could it have been both?
22    A.    It could have been. I don't
23 know.
24    Q.    In other words, both the
25 Reddwerks enhancement and Buzzeo could have

Page 209

1 been systematic solutions to addressing these
2 issues, correct?
3     A.    It could have been.
4     Q.    Okay. Do you know what the
5 system was at this time in January of 2013?
6     A.    It was Reddwerks.
7     Q.    And what was specifically with
8 respect to order limitation was happening at
9 Reddwerks at this time?
10    A.    Thresholds.
11    Q.    Thresholds for which products?
12    A.    For all products.
13    Q.    And what does that mean when
14 you say "thresholds"?
15    A.    There was a limit set on items.
16    Q.    On all items?
17    A.    On all items.
18    Q.    And what were those limits?
19    A.    I don't know that specifically.
20    Q.    Do you recall whether it being
21 50?
22    A.    I do recall it being somewhat
23 50.
24    Q.    Do you recall automatic cuts to
25 50 of all items?

Page 210

1   MS. FUMERTON: Objection.
2   Form.
3   QUESTIONS BY MR. BOWER:
4   Q.   I'll strike it.
5   Do you know whether Walmart
6   instituted a policy of automatically cutting
7   orders to 50 for all items?
8   A.   I don't recall.  I don't
9   recall.
10   MR. BOWER: I'm not sure what
11   time it is.  Do you want to keep going
12   or do you want to do --
13   MS. FUMERTON: No, this is a
14   good time to stop for lunch.  I just
15   wanted to be mindful because we do
16   have the 4:00 cutoff.
17   MR. BOWER: Well, I mean --
18   MS. FUMERTON: You took the
19   other break after we had just taken a
20   30-minute break, so --
21   MR. BOWER: I took a
22   five-minute break.  I'm allowed to
23   take a five-minute break.
24   MS. FUMERTON: I'm not saying
25   you're not, but I'm just saying --

Page 211

1   MR. BOWER: We will be done
2   when we're done.  I'm not agreeing to
3   less than my time on the record.
4   MS. FUMERTON: Well, then let's
5   just take -- we'll take a short
6   lunch --
7   MR. BOWER: That's fine.
8   MS. FUMERTON: -- and --
9   MR. BOWER: You can take a
10   five-minute lunch if you want.
11   MS. FUMERTON: We had this
12   conversation --
13   MR. BOWER: We did, and
14   that's --
15   MS. FUMERTON: -- before the
16   scheduling.
17   MR. BOWER: -- why I said
18   before we were taking three 15-breaks
19   this morning.
20   MS. FUMERTON: We did not take
21   a 15-minute break, but the record will
22   show what we took.
23   MR. BOWER: They both were like
24   14 minutes.
25   MS. FUMERTON: No, they were

Page 212

1   not.
2   VIDEOGRAPHER: Going off the
3   record at 11:41 a.m.
4   (Off the record at 11:41 a.m.)
5   VIDEOGRAPHER: We're back on
6   the record at 12:06 p.m.
7   (Walmart-Sullins Exhibit 7
8   marked for identification.)
9   QUESTIONS BY MR. BOWER:
10   Q.   Okay.  We're back on the
11   record.
12   Do you understand that you're
13   still under oath?
14   A.   Yes.
15   Q.   You've been handed what's
16   marked as Exhibit 7, an e-mail from Kristy
17   Spruell to yourself, Ms. Alford, Donna
18   Auldridge and Nick Tallman, September 2013.
19   Just take a moment and review
20   it.  It's simply an e-mail and attachment.
21   A.   Okay.  Okay.
22   Q.   Okay.  Who is Kristy Spruell?
23   A.   She was a team member on the
24   team.
25   Q.   Okay.  What team is that?

Page 213

1   A.   She was originally in
2   compliance and then worked with our team on
3   the monitoring of controlled substances.
4   Q.   And what role did your team
5   have in the monitoring of controlled
6   substances?
7   A.   So it would have been the -- my
8   role would have been the system enhancements.
9   Q.   What about the other folks on
10   your team; did they have other roles?
11   A.   I don't know.
12   Q.   You don't know what roles, if
13   any, the other folks on your team had in
14   connection with controlled substance
15   monitoring; is that correct?
16   A.   That's correct.
17   Q.   And just -- I think the record
18   this morning wasn't clear.
19   When you say "team," what do
20   you mean?
21   A.   The people on the health and
22   wellness logistics team.
23   Q.   Okay.  And who were those
24   people in 2013?
25   A.   It would have been Nick

Page 214

1 Tallman, Theresa Alford. I believe Sarah
2 Eisler, Tim Harris. Donna was not on the
3 actual team, but she had a dotted line there.
4 Joan Mersher. I think that was it.
5     Q.    Okay. I appreciate that.
6 Thank you.
7         So your role would have been
8 the system enhancements portions for any --
9 anything related to monitoring for controlled
10 substances; is that correct?
11     A.    For any system changes, yes.
12     Q.    Okay. So is that the reason
13 that Ms. Spruell was sending this document to
14 you?
15         MS. FUMERTON: Objection.
16 Form.
17 QUESTIONS BY MR. BOWER:
18     Q.    I'll strike that then.
19         What is your understanding as
20 to why Ms. Spruell is sending this document
21 titled "Controlled Substance Distribution
22 Monitoring Program" to you?
23     A.    What she was working on.
24     Q.    I understand that may have been
25 what she was working on. My question,

Page 215

1 though, to you is, why is she sending it to
2 you?
3     A.    I don't know why she sent it to
4 the -- to the operational team.
5     Q.    She sent it to four people,
6 right?
7     A.    Yes.
8     Q.    You're the first person listed
9 on there, right?
10     A.    Yes, I'm the first person
11 listed on there.
12     Q.    And as you sit here today, you
13 have no understanding as to why she would
14 have sent this to you; is that correct?
15     A.    That's correct.
16     Q.    Okay. Do you recall, other
17 than seeing this document today, ever seeing
18 this document before?
19     A.    Yeah, I've seen it before.
20     Q.    When have you seen it?
21     A.    Back in 2013.
22     Q.    Oh, you recall receiving this
23 e-mail from Ms. Spruell in 2013?
24     A.    I don't recall receiving the
25 e-mail --

Page 216

1     Q.    Okay.
2     A.    -- but I recall seeing this
3 information.
4     Q.    Okay. And you note it
5 refers -- do you see where it refers to
6 "every order of interest"?
7         Do you see it starts --
8     A.    Oh, at the beginning?
9     Q.    Yeah.
10         And it goes through and talks
11 about what Walmart must do for every order of
12 interest, correct?
13     A.    Yes.
14     Q.    Did you have any role in that
15 process?
16     A.    No.
17     Q.    Did you have any role in -- if
18 you go to number 4, do you see it says, "4 B,
19 all investigation records must be stored on a
20 server"?
21         Do you see that, that they
22 "must be stored on a server"?
23     A.    Yes.
24     Q.    Did you have any role in that?
25     A.    No.

Page 217

1     Q.    Do you know who would have
2 ensured that those records were stored on a
3 server?
4     A.    Kristy would have done that.
5     Q.    And what's your basis for that
6 statement?
7     A.    Because it was the program she
8 put together.
9     Q.    So it was your understanding
10 that Kristy put together this program; is
11 that correct?
12     A.    That's correct.
13     Q.    Okay. Is it your understanding
14 this program had been in place as of this
15 date?
16     A.    There was some program prior to
17 that date, which was the order alerts through
18 Reddwerks.
19     Q.    Is it your understanding that
20 this program changed that program?
21     A.    No.
22     Q.    Okay. Is it your understanding
23 this program added to that program?
24     A.    Yes.
25     Q.    Okay. It added requirements to

Page 218

1 that program, for example?
2    A.    Correct.
3    Q.    Okay.  Did it change the way
4 that order alerts were identified?
5       MS. FUMERTON:  Objection.
6 Form.
7 QUESTIONS BY MR. BOWER:
8    Q.    So I'll strike that.
9       Did this program reflected in
10 Exhibit 7 change the way Walmart identified
11 orders of interest for Control II substances?
12    A.    I don't know.
13    Q.    Do you know who would know that
14 answer?
15    A.    No, I mean, other than Kristy.
16    Q.    Okay.  Because this note at the
17 top says, "Every order of interest will be
18 properly and thoroughly investigated."
19       Do you see that?
20    A.    Yes.
21    Q.    So was it your understanding
22 that this investigation and evaluation
23 requirement was applying to the system
24 already in place?
25    A.    Yes.

Page 219

1    Q.    Do you know what server would
2 have been referred to in 4?
3    A.    No, not -- I wouldn't know what
4 server it would specifically refer to.
5    Q.    Did Walmart have a dedicated
6 server for this type of information during
7 this time period?
8    A.    I don't know.
9    Q.    Has Walmart ever had a
10 dedicated server space for preserving
11 investigations of orders of interest?
12    A.    I know that they started to key
13 those into Archer.
14    Q.    Well, that didn't occur until
15 well after this time period; isn't that
16 correct?
17    A.    I don't know when that
18 occurred.
19    Q.    So other than keying
20 information into Archer, do you know whether
21 Walmart has ever had a dedicated server space
22 for preserving investigations of orders of
23 interest?
24    A.    I don't know that.
25    Q.    Do you know who would know

Page 220

1 that?
2    A.    Maybe somebody in ISD.
3    Q.    I mean, you were the systems --
4 you were the -- kind of the liaison between
5 health and wellness and ISD, right?
6    A.    On enhancements, yes.
7    Q.    But not on preserving
8 information?
9    A.    No.
10    Q.    Who would have had that role?
11    A.    Kristy would have asked for
12 that space.
13    Q.    We talked this morning for some
14 time about the alerts over 20 reports.
15       Do you recall that?
16    A.    Yes.
17    Q.    Do you recall ever being
18 involved in thresholds of a certain
19 percentage above a four-week average?
20    A.    No, I don't recall that.
21       (Walmart-Sullins Exhibit 8
22 marked for identification.)
23 QUESTIONS BY MR. BOWER:
24    Q.    Okay.  You've been handed
25 what's been marked as Exhibit 8, which is an

Page 221

1 e-mail to -- to Reas Macken, M-a-c-k-e-n,
2 cc'ing herself from Miranda Gan, and then her
3 response to you and Miranda.
4       Just take a moment and review
5 this.
6    A.    Okay.
7    Q.    I just -- my first question
8 will be whether this refreshes your
9 recollection as to my previous question
10 regarding threshold percentages.  Rather,
11 threshold based on percentages.
12    A.    Let me just --
13    Q.    Sure, yeah, please take your
14 time.
15       I know you're looking at the
16 attachment.  I don't want to cut you off at
17 all, but I'm not going to be asking questions
18 on kind of the labeling portion.
19    A.    Okay.
20    Q.    My questions will be focused
21 kind of starting on the order level alerts
22 page.
23    A.    Okay.
24    Q.    So if that helps you at all.
25       And that Bates number ends in

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1  9230. That's the first one.
2      A.    Okay.
3      Q.    Okay? So I appreciate you
4  taking the time to review this.
5          This is more within your
6  bailiwick, right? This is what you did,
7  right?
8      A.    Yes.
9      Q.    So I wanted to then start on
10 the first page, which is the e-mail from
11 Miranda to -- is it Reas?
12     A.    Reas.
13     Q.    -- Reas and yourself.
14          Does this -- and Miranda
15 writes, "Walmart's health and wellness
16 division is working on a monitoring program
17 for suspicious orders." And then she asks a
18 series of questions.
19          Does this document that's
20 attached to this e-mail reflect what Walmart
21 was doing at the time or what Walmart was
22 going to do in the future?
23     A.    So the attached document is
24 what we implemented in 2011.
25     Q.    Okay. So, for example, in

Page 223

1  2011, Walmart implemented those order level
2  alerts reflected on page 9230?
3      A.    Yes.
4      Q.    Okay. Okay. That's helpful.
5          And then going back to the
6  cover of the e-mail, the question from
7  Miranda to Reas is, "Do we have the option to
8  turn off the threshold at 30 percent but
9  leave the orders over 50 on?"
10         What does that refer to?
11     A.    So there were some items that
12 had a hard limit of 50, and then there were
13 some items that were the 30 percent
14 threshold.
15     Q.    And how would you determine
16 whether an item was -- which item -- strike
17 that.
18         How would you determine which
19 bucket an item fit into, whether it was an
20 over 50 or over 30 percent? Because that's
21 the source of my confusion.
22         MR. BOWER: And I know this is
23     a long question, so you can feel free
24     to object.
25 QUESTIONS BY MR. BOWER:

Page 224

1      Q.    I'm just trying to understand
2  how kind of the logic used to flag items in
3  1 -- do you see that on that page? -- relates
4  to what you just said. Right? Because it
5  appears to me that there's three options,
6  right?
7          And so I'll strike that
8  question and we'll start from there.
9          If you look at 1, right, on
10 that page, on the page ending in 9230 --
11     A.    Yes.
12     Q.    You with me?
13         It says, "detailed steps and
14 action," right?
15         One, "logic used to flag an
16 item. The logic that is used to flag an item
17 is as follows." And then A is, "any order
18 that is over 50 items is flagged, regardless
19 of percent of the four-week average."
20         Was that what was occurring
21 since 2011?
22     A.    Yes. To some items.
23     Q.    Okay. But that's -- and
24 that's -- why do you say "to some items"?
25         Because it says -- this says

Page 225

1  "any order." It doesn't say to "some"
2  orders; it says "any" order.
3      A.    Because it was based on
4  items -- it was that flagged item. So it's
5  that specific SKU for that -- in that order.
6      Q.    I understand what you mean.
7          Okay. So not any order, but
8  any item of over 50 was flagged
9  automatically?
10     A.    Yes.
11     Q.    Any SKU of over 50 would flag?
12     A.    That was the logic, yes.
13     Q.    Well, that's -- that was the
14 logic, wasn't it?
15     A.    I know. But for that specific
16 item, if that was the logic, then, yes.
17     Q.    Were there some -- what do you
18 mean by "item"? What's an item?
19     A.    So it would be an NDC, a
20 specific NDC.
21     Q.    Okay. Were there any NDCs for
22 which an order of over 50 would not be
23 flagged?
24     A.    If it had the other logic in
25 it.

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 Q. But those logics are all orders
2 under 50, correct?
3 A. Or if it had a different
4 threshold.
5 Q. But that's not reflected here,
6 is it?
7 The statement you just said, if
8 it had a different threshold, is not
9 reflected in this document, is it?
10 A. Not in this document it's not.
11 Q. So why do you say that an
12 item -- strike that.
13 Why is it your testimony that
14 an order of over 50 for a particular item may
15 not have been flagged?
16 MS. FUMERTON: Objection.
17 Form.
18 THE WITNESS: Can you repeat
19 that?
20 QUESTIONS BY MR. BOWER:
21 Q. Sure. Okay. Let's talk about
22 1 A again, right? 1 A says -- and I'll try
23 to rephrase if that was a poor question.
24 1 A says, "Any order that is
25 over 50 items is flagged," right? What does

Page 227

1 that mean?
2 A. So it's based on individual
3 items. So if the order quantity for an item
4 is over 50, it would flag.
5 Q. Is that true for all items?
6 A. No, it's not true for all
7 items.
8 Q. And what's your basis for that
9 statement?
10 A. Because of the oxy 30 that we
11 changed to 20.
12 Q. Other than for oxy 30, is that
13 statement true for all items?
14 A. I can't say that it is because
15 I don't know based on individual items. I
16 can't say that they were all at 50.
17 Q. Well, but this is the
18 Reddwerks -- right? This is what Reddwerks
19 was doing. This document reflects the
20 Reddwerks settings, correct?
21 A. Right. But you're ask --
22 MS. FUMERTON: Objection.
23 Form.
24 THE WITNESS: But what you're
25 asking me is, are all items set at 50.

Page 228

1 I don't know that, because I
2 know that there was some that were set
3 at 20.
4 QUESTIONS BY MR. BOWER:
5 Q. Okay.
6 A. But I don't know if they were
7 all set at 50.
8 Q. Other than oxy 30, are you
9 aware of any other item that was set at 20?
10 A. I'm not aware of it. I don't
11 know.
12 Q. Okay. Other than oxy 30, are
13 you aware of any other items that were
14 flagged for an amount other than 50?
15 A. I don't know.
16 Q. Do you have any reason to
17 believe that C-II products would have had a
18 different threshold than 50?
19 A. I don't know.
20 Q. And then for -- going on to B,
21 "Any order between 0 and ten items will not
22 be flagged, regardless of percent of
23 four-week average."
24 Do you see that?
25 A. Yes.

Page 229

1 Q. That was also in place since
2 2011?
3 A. Yes.
4 Q. Same for C?
5 MS. FUMERTON: Objection.
6 Form.
7 QUESTIONS BY MR. BOWER:
8 Q. Was the lot -- I'll strike
9 that.
10 Was the logic identified in 1 C
11 in place since 2011?
12 MS. FUMERTON: Objection.
13 Form.
14 THE WITNESS: Yes, that was --
15 that was in place.
16 QUESTIONS BY MR. BOWER:
17 Q. So going down then to 2 B, do
18 you see below that chart there?
19 A. Uh-huh.
20 Q. By the way, what's this chart?
21 What is this an excerpt from,
22 or what's this a picture of?
23 A. It's a picture of the screen
24 inside of Reddwerks.
25 Q. And then it has the four-week

Page 230

1  average there. Do you see that?
2          Kind of hard to make out, but
3  it has -- I believe it has -- the columns are
4  customer, item, description, batch, order,
5  and that next one is kind of hard to read.
6  Then four-week average, current threshold,
7  adjusted four-week average, and then percent
8  above four-week average.
9      A.   Yes.
10     Q.   Do you see that?
11         Are there any other columns
12 available in Reddwerks other than these?
13         MS. FUMERTON:  Objection.
14     Form.  Time frame.  I mean, this --
15         MR. BOWER:  I know, but I'm
16     just trying -- I know, but what -- I
17     understand, but I'm trying to cut to
18     the chase in light of...
19 QUESTIONS BY MR. BOWER:
20     Q.   Okay.  During this time period,
21 were there any other columns available in
22 Reddwerks other than the ones reflected here?
23     A.   I don't know, because if there
24 were, there would be a scroll bar at the
25 bottom, and they only take a snippet of it.

Page 231

1      Q.   Well, are you familiar with any
2  other columns that have ever been available
3  in Reddwerks?
4      A.   Yes.
5      Q.   What are those columns?
6      A.   Order quantities, shipped
7  quantities.  I know there's others; I just
8  can't recall them all.
9      Q.   Okay.  Appreciate that.
10         So then going back to my
11 initial question on 2 B there it says, "Cut
12 any quantity that is above 50 to an
13 appropriate number using the cut quantity
14 action under the actions column."
15         Had that parameter been in
16 place since 2011?
17         MS. FUMERTON:  Objection.
18     Form.
19 QUESTIONS BY MR. BOWER:
20     Q.   Well, how would you describe
21 what's happening in 2 B?
22     A.   So it's -- it's a -- it's an
23 action that you can do inside of the -- that
24 link there under the action column.
25     Q.   Okay.  And did that action in

Page 232

1  4 B have to occur before the order was able
2  to be shipped?
3      A.   Yes.
4      Q.   Going back to the -- I'm just
5  going to ask a couple more questions on that
6  page.
7          Did this -- this order level
8  alert logic and steps we've been talking
9  about, did that apply to all DCs?
10     A.   All DCs.
11     Q.   Okay.
12     A.   All items.
13     Q.   Including 6045, correct?
14     A.   Yes.
15     Q.   What is the historical items
16 data tab in CSOS?
17     A.   That is the history of orders
18 that were shipped, signed and shipped.
19     Q.   When did that functionality
20 roll out to 6045?
21     A.   CSOS, we started the pilot in
22 2012, the end of the year.  So I think it was
23 like December of 2012.
24     Q.   So sometime probably early
25 2013, 6045 had that visibility; would that be

Page 233

1  accurate?
2      A.   Visibility to what?
3      Q.   To use the historical items
4  data tab to review orders.
5      A.   There was no history there till
6  after.
7      Q.   Okay.  So what information is
8  reflected in the historical items data tab?
9  In other words, what do you mean by history?
10     A.   So because we had started in
11 2012, it was -- there was nothing there from
12 the previous shipments.
13     Q.   In other words, you didn't
14 upload any data to CSOS when it was rolled
15 out?
16     A.   No, there was no data to
17 upload.  It was all paper 222 forms.
18     Q.   Okay.  So if someone was using
19 the CSOS system to track unusual orders, how
20 would it go about doing so?
21     A.   I don't know.
22     Q.   It would have been difficult,
23 right, without having the order history,
24 correct?
25         MS. FUMERTON:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1   Sorry.  Objection.  Form.
2       THE WITNESS:  I -- I don't
3   know.  I mean, there wasn't any in
4   2012 there.
5   QUESTIONS BY MR. BOWER:
6       Q.    Right.
7           I mean, you couldn't look for,
8   for example, an unusual ordering pattern if
9   you couldn't see any ordering history, right?
10      A.    Not in CSOS.  In a different
11  system you could.
12      Q.    What system would you use to
13  look for unusual pattern?
14      A.    The other Reddwerks system.
15  There were two Reddwerks systems in 6045.
16      Q.    There was the C -- CSOS was a
17  Reddwerks system?
18      A.    Yes.
19      Q.    Okay.  And what was the other
20  system called?
21      A.    The other Reddwerks system.
22      Q.    Didn't have a separate name or
23  anything --
24      A.    No.
25      Q.    -- just Reddwerks?

Page 235

1       A.    No, it was just the order --
2   the order fulfillment system.  Then you had
3   CSOS.
4       Q.    Okay.  Sorry, I'm just looking
5   over a couple of things to confirm -- thank
6   you for that.
7           (Walmart-Sullins Exhibit 9
8       marked for identification.)
9   QUESTIONS BY MR. BOWER:
10      Q.    Okay.  You've been handed
11  what's marked as Exhibit 9.  It's an e-mail
12  from Ms. Spruell to yourself with a one-page
13  attachment.  Just take a moment and review
14  it.
15      A.    Okay.  Okay.
16      Q.    Okay.  Going back to my
17  question from a couple documents ago, what is
18  your understanding of why Ms. Spruell was
19  sending this now only to yourself?
20      A.    I don't know, other than to
21  look at the flow, how the order runs.
22      Q.    And would it be important for
23  your job responsibilities to know of the flow
24  that's reflected in the exhibit?
25      MS. FUMERTON:  Objection.

Page 236

1   Form.
2       THE WITNESS:  Can you ask your
3   question again?  I'm sorry.
4   QUESTIONS BY MR. BOWER:
5       Q.    Oh, sure.  Please.
6       A.    Can you ask your question
7   again?
8       Q.    Oh, sorry.  I thought you said,
9   can I ask a question.
10          Sorry about that.
11          So I'm just wondering whether
12  this reporting flow chart would have had any
13  relationship with your duties and
14  responsibilities.
15          Just generally speaking, I can
16  tell you that there's -- Ms. Spruell is
17  sending you a lot of these flowcharts.  I'm
18  just trying to understand why.
19      A.    Well, I think just to know how
20  the product flows from a systems perspective.
21      Q.    All right.  So let's just talk
22  about that then.
23          From a systems perspective,
24  what does this flow chart mean to you?
25      A.    That the order comes in to the

Page 237

1   DC, there's an alert for over 20, there's --
2   there is an alert for over 50 report, and
3   then there's a 405 and 402 report.
4       Q.    So can we talk about -- did you
5   have any familiarity with the 405 and 402
6   reports?
7           Sorry, strike that.
8           Did you have any familiarity
9   with the 405 reports?  I guess there's 1 and
10  2.
11      A.    Yes.  So I knew that they
12  existed and when they broke -- when the job
13  broke, that I got the e-mail from the DC to
14  ask for them to have that job run.
15      Q.    Okay.  So someone from the DC
16  contacted you with issues regarding the
17  reports at some point, correct?
18      A.    Correct.
19      Q.    What did you do when you
20  received those communications?
21      A.    I would send that on to someone
22  in ISD to take a look at it.
23      Q.    Are you familiar with the
24  position drug diversion coordinator?
25      A.    No.

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1    Q.    Have you ever heard that term?
2    A.    No.
3    Q.    You're not aware of whether
4  anyone at Walmart held that position or that
5  title?
6    A.    No, I'm not aware of it.
7    Q.    Bottom right of that -- of the
8  attachment there references McKesson --
9  McKesson omit report and AmerisourceBergen
10  report.
11         Do you know what that refers
12  to?
13    A.    No.
14    Q.    Do you know whether this over
15  20 report reflected here took into account
16  orders that were directed to McKesson?
17        MR. COOPER:  Object to form.
18        THE WITNESS:  No, it did not
19    include those.
20  QUESTIONS BY MR. BOWER:
21    Q.    Did you ever receive any
22  communication from anyone at Walmart that
23  Walmart should look at all oxy products
24  together instead of the products on an NDC
25  level?

Page 239

1    A.    I don't recall that.
2    Q.    Do you recall ever having that
3  discussion with anybody?
4    A.    No.
5    Q.    Who is Lucas Jackson?
6    A.    I don't know.
7        (Walmart-Sullins Exhibit 10
8    marked for identification.)
9  QUESTIONS BY MR. BOWER:
10    Q.    Okay.  You've been handed
11  what's marked as Exhibit 10, an e-mail from
12  Ms. Auldridge to Ms. Spruell and yourself
13  forwarding an e-mail from Mr. Jackson in
14  July of 2015.  So take a moment and review
15  the e-mail and the attachment.
16    A.    Okay.  Okay.
17    Q.    Okay.  Does reviewing this
18  document refresh your recollection as to who
19  Lucas Jackson may be?
20    A.    No.
21    Q.    Okay.  Do you, as you sit here
22  today, recall receiving this e-mail?
23    A.    I don't recall receiving it.
24    Q.    Do you have any understanding
25  why Donna Auldridge may have sent this to you

Page 240

1  and Kristy Spruell?
2    A.    No, other than -- no, not
3  really.  I don't -- I don't.
4    Q.    Okay.  Well, in Mr. Jackson's
5  e-mail to Ms. Auldridge, he notes that he was
6  working on this "after we talked last week."
7        Do you see that?
8    A.    Yes.
9    Q.    And he appears to be suggesting
10  "a more accurate depiction of store ordering
11  than what we are getting with the over 20
12  report."
13        Do you see that?
14    A.    I see that.
15    Q.    Right?
16        And his solution would be to
17  look at all oxy products ordered by a store,
18  right?
19    A.    Yes.
20    Q.    Was that -- did Walmart have
21  that capability from a system standpoint?
22    A.    We did not.
23    Q.    And why not?  Why couldn't
24  Reddwerks have been configured in that
25  manner?

Page 241

1        MS. FUMERTON:  Objection.
2    Form.
3  QUESTIONS BY MR. BOWER:
4    Q.    Strike that.
5        Could Reddwerks have been
6  configured to look at all oxy products
7  together?
8    A.    I don't know because I can't
9  speak for them.  It would be something of a
10  code change.
11    Q.    So you never followed up on
12  this e-mail; is that correct?
13    A.    No, because it wasn't addressed
14  to me.
15    Q.    Well, Donna sent you an e-mail,
16  correct?
17        MS. FUMERTON:  Objection.
18    Form.
19        THE WITNESS:  It was addressed
20    to Kristy.
21  QUESTIONS BY MR. BOWER:
22    Q.    Kristy.  It was cc'd -- you
23  were cc'd on it.
24        So it's your testimony that
25  because you were cc'd on it, it wasn't

Page 242

1 addressed to you; is that correct?
2     A.    That's correct.
3     Q.    Did you ever follow up with
4 Kristy on this?
5     A.    I don't recall.
6     Q.    Did you ever ask anybody about,
7 hey, maybe we should look at all oxy products
8 together?
9     A.    I don't recall.  I don't
10 recall.
11     Q.    It could have happened; you
12 just don't recall?
13     A.    Yes, it could have happened.  I
14 don't recall.
15     Q.    As you sit here today, does it
16 concern you that Walmart never looked at oxy
17 products together?
18         MS. FUMERTON:  Objection.
19     Form.  Lack of foundation.
20 QUESTIONS BY MR. BOWER:
21     Q.    Well, in light of what you know
22 about the opioid crisis today, right, and the
23 damage it's causing across the country, does
24 it concern you that Walmart never did this?
25         MS. FUMERTON:  Objection.

Page 243

1     Form.  Lack of foundation.
2         THE WITNESS:  I don't know
3     whether they did or did not.
4 QUESTIONS BY MR. BOWER:
5     Q.    Do you know whether Walmart
6 ever considered all oxy products together in
7 identifying orders of interest?
8     A.    Yes, they did that with Buzzeo.
9     Q.    They did that with Buzzeo.
10         When did that start?
11     A.    2016.
12     Q.    So is it your understanding
13 that Buzzeo combined all orders of certain
14 products together when determining certain
15 thresholds, for example?
16     A.    That was my understanding of
17 Buzzeo.
18     Q.    Maybe we should take a step
19 back then and just talk about Buzzeo for a
20 moment.
21         Up until Buzzeo was rolled
22 out -- and my questions now are directed to
23 6045.
24         Okay?
25     A.    Okay.

Page 244

1     Q.    Up until Buzzeo was rolled out
2 to 6045, was the Reddwerks protocol that
3 we've already seen today in place until that
4 time?
5     A.    Yes.
6         MS. FUMERTON:  Objection.
7     Form.
8         THE WITNESS:  Yes.
9 QUESTIONS BY MR. BOWER:
10     Q.    Okay.  And your counsel
11 objected, so I need to clean up that question
12 because it's an important one.
13         Was the Reddwerks -- let's just
14 strike that.  I'll turn to the exhibit.
15         All right.  Going back to
16 Exhibit 8.  Was the -- we talked for some
17 time about the order level alerts on
18 Exhibit 8.
19         Do you recall that, on the page
20 ending in 30?  Do you recall that discussion?
21     A.    Yes, I do recall.
22     Q.    Were these logic items, or
23 logic used to flag items, in place at 6045
24 until the rollout of Buzzeo?
25     A.    No, there was an enhancement to

Page 245

1 that.
2     Q.    And when did that enhancement
3 occur?  Approximately.
4     A.    I don't know.  I want to say
5 2014.  I don't know.
6     Q.    Okay.  I don't want you to
7 guess.  Maybe we'll look at another document
8 later that reflects that.
9         But in order to save some time,
10 do you recall what changes were made with
11 respect to how items were flagged in
12 connection with that enhancement?
13     A.    There was still a threshold.
14     Q.    And were the thresholds changed
15 in connection with that enhancement?
16     A.    Yes.
17     Q.    Do you recall how they were
18 changed?
19     A.    They were changed by
20 compliance.
21     Q.    Okay.  Do you recall what that
22 change was?
23     A.    No, they -- I don't know what
24 the change was other than they -- each item
25 had its own threshold.

Page 246

1    Q.   Do you recall whether each
2  store also had its own threshold?
3    A.   It was a store/item
4  combination.
5    Q.   Was it a numeric threshold or
6  was it percentage-based threshold, if you
7  recall?
8    A.   I believe it was a numeric
9  threshold.
10    Q.   Is it your understanding that
11  Walmart used a numeric threshold, at least
12  until the time Buzzeo was rolled out, at
13  6045?
14    A.   Yes.
15    Q.   Let me go back then to
16  Exhibit 10 for a moment.  So we can close
17  that one out.
18    A.   Okay.
19    Q.   Do you disagree with
20  Mr. Jackson's statement that it would be a
21  more accurate depiction of store ordering to
22  look at all oxy products together?
23    MS. FUMERTON:  Objection.
24  Form.
25    THE WITNESS:  I don't have

Page 247

1    enough knowledge about it.
2  QUESTIONS BY MR. BOWER:
3    Q.   What other information would
4  you need to answer that question?
5    A.   Because I don't know what all
6  it would include.  I don't know.
7    Q.   Well, he's telling you, right?
8  Here he says, "I think this would be a more
9  accurate depiction of store ordering than
10  what we are getting with the over 20 report.
11  This looks at all oxy products ordered by the
12  store."
13    Do you think that he was
14  correct in making that statement?
15    MS. FUMERTON:  Objection.
16  Form.
17    THE WITNESS:  That's -- that's
18    out of my -- what I -- what I know and
19    did at Walmart and do at Walmart.
20  QUESTIONS BY MR. BOWER:
21    Q.   I'm just asking you as you sit
22  here today, with your knowledge of Walmart's
23  ordering process, of the opioid crisis, all
24  of that information:  Do you think this
25  statement by Mr. Jackson is accurate?

Page 248

1    MS. FUMERTON:  Objection.
2  Form.
3    THE WITNESS:  I can't answer
4    that.  I don't know because it's --
5    it's not part of what my job
6    responsibilities were, to look at
7    that.
8    (Walmart-Sullins Exhibit 11
9    marked for identification.)
10  QUESTIONS BY MR. BOWER:
11    Q.   Okay.  You've been handed
12  what's been marked as Exhibit 11.  It's just
13  a short e-mail from Ms. Spruell again to
14  yourself, Nick Tallman and Theresa Alford,
15  cc'ing Tim Harris.
16    Do you see that?
17    A.   Yes.
18    Q.   Okay.  And there are some
19  redactions here.  These were Walmart
20  redactions, just for the record.
21    Okay.  So let me know when
22  you've finished completing the document.  I
23  just have a few questions.
24    Okay?
25    A.   Okay.  Okay.

Page 249

1    Q.   Okay.  So during this time
2  period -- we're now in July 2014, correct?
3    A.   Uh-huh.
4    Q.   The Reddwerks flagged items
5  protocol that we discussed earlier is still
6  in place, correct?
7    MS. FUMERTON:  Objection.
8  Form.
9    THE WITNESS:  The 2011?
10  QUESTIONS BY MR. BOWER:
11    Q.   Yes.
12    A.   Yes.
13    Q.   Okay.  So what system upgrades
14  were being discussed here?
15    You see that -- "We continue to
16  work to implement system upgrades to provide
17  support for systematic solution."
18    Do you see that?
19    A.   Yes.
20    Q.   Do you have any idea what
21  system upgrades are being referred to?
22    Is this, for example, the
23  Reddwerks enhancement?
24    A.   Yes.
25    Q.   So up until this time, the

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1 Reddwerks enhancement hasn't rolled out yet,
2 correct?
3     A.    That's correct.
4     Q.    Okay.  Do you know -- again, we
5 see the word "solution," right, "systematic
6 solution"?
7         Do you know what that refers
8 to?
9     A.    No.
10    Q.    Okay.  Number one says, "They
11 don't understand why we can't continue to cut
12 orders."
13        Do you see that?
14    A.    Yes.
15    Q.    Did you have an understanding
16 what that meant at this time?
17    A.    No, I don't.
18    Q.    Did Walmart at some point stop
19 cutting orders?
20        MS. FUMERTON:  Objection.
21        Form.
22        THE WITNESS:  I don't recall.
23 QUESTIONS BY MR. BOWER:
24    Q.    Well, would a decision to cut
25 an order be reflected in Reddwerks?

Page 251

1     A.    Yes.
2     Q.    Would the parameters in
3 Reddwerks need to be changed -- strike that.
4         Would the settings -- strike
5 that.
6         Would any settings in Reddwerks
7 need to be changed if Walmart changed its
8 policy to stop cutting orders?
9         MS. FUMERTON:  Objection.
10        Form.
11        THE WITNESS:  Let me make sure
12    I understood what you just said.
13        Are you asking if we had to
14    make a change inside of Reddwerks for
15    us not -- to stop cutting orders?
16 QUESTIONS BY MR. BOWER:
17    Q.    Yes.
18    A.    Yes, we would have had to make
19 the change.
20    Q.    Do you recall making that
21 change or anyone making that change?
22    A.    No.
23    Q.    Were the concerns reflected, I
24 guess in 2?  Do you see that, holding an
25 order, that type of discussion?  Do you see

Page 252

1 that in 2 there?
2     A.    Uh-huh.
3     Q.    Where they would like to see a
4 process where all orders are dropped to fill,
5 but any order that includes a product order
6 that was submitted to the HO is
7 questionable -- as a questionable order would
8 be held in a separate area.
9         Do you see that?
10    A.    Yes.
11    Q.    Was that ever implemented in
12 Reddwerks?
13    A.    Yes.
14    Q.    Okay.  When was that change
15 made?
16    A.    That was part of the
17 enhancement.
18    Q.    Okay.  So as of this date, that
19 hadn't been made yet?
20    A.    No.
21    Q.    Did Walmart incur any costs in
22 connection with that Reddwerks enhancement?
23    A.    Yes.
24    Q.    Okay.  Did Walmart have to get
25 approval for incurring those costs?

Page 253

1         MS. FUMERTON:  Objection.
2         Form.
3 QUESTIONS BY MR. BOWER:
4     Q.    Strike that.
5         Who -- I'll ask it a different
6 way.
7         Does your team, the health and
8 wellness team, at this time period have a
9 budget?
10    A.    For system enhancement?
11    Q.    Yes.
12    A.    We did.
13    Q.    Okay.  Did the enhancements to
14 Reddwerks come from that budget?
15    A.    Not that I'm aware of.
16    Q.    Who would have funded within
17 the Walmart structure the system enhancements
18 at Reddwerks?
19        MS. FUMERTON:  Objection.
20        Form.
21 QUESTIONS BY MR. BOWER:
22    Q.    In other words, whose budget
23 would have paid for those enhancements?
24    A.    Compliance.
25    Q.    Do you know who would have had

Highly Confidential - Subject to Further Confidentiality Review

---

Page 254

1  to approve those payments at compliance?
2      A.    I don't know.
3      Q.    Okay.  Who would know the
4  answer to that question?  Ms. Spruell?
5      A.    Yes.
6      Q.    Potentially Ms. Hiland?
7      A.    I don't know.  Potentially.
8      Q.    There are -- and I'm trying to
9  skip over some documents here, but there's
10  some references to the interim sum process.
11         Are you familiar with that?
12     A.    Yes.
13     Q.    Would that be the Reddwerks
14  enhancement or something different?
15     A.    Something different.
16     Q.    Okay.  What is the interim sum
17  process?
18     A.    That would have been prior to
19  the enhancement.
20     Q.    Would that be applicable to
21  6045?
22     A.    Yes.
23     Q.    Okay.  What was that process,
24  from a systems perspective at least?
25     A.    There was nothing inside the

---

Page 255

1  system that we did differently.  It was --
2  it's a manual process.
3      Q.    Okay.  Can you just describe
4  generally what that process was then?
5      A.    I don't recall what that
6  process was.
7      Q.    But it didn't change anything
8  from your perspective within Reddwerks?
9      A.    Not in the system, no.
10        (Walmart-Sullins Exhibit 12
11        marked for identification.)
12  QUESTIONS BY MR. BOWER:
13     Q.    Okay.  You've been handed
14  what's been marked as Exhibit 12.
15     A.    Uh-huh.
16     Q.    I don't particularly need to
17  spend too much time on this, certainly spend
18  your time reviewing it.
19         It reflects that you were in
20  attendance at the meeting, you'll see in the
21  last page.  But I'm mainly concerned with how
22  this relates to our discussion regarding the
23  alert levels.  And particularly -- I'm not
24  trying to cut you off; I just want to show
25  you where I am so that you can review.

---

Page 256

1      A.    Okay.
2      Q.    If you see in the meeting
3  minutes on this -- kind of the first page of
4  the attachment, it has "alert level
5  requirement" in the first bullet point.  And
6  then if you go down a little bit, it has --
7  it states that "thresholds will be translated
8  from pill count to bottle count."
9         And I'm just trying to
10  understand how that relates to our earlier
11  discussion about -- which I believe was
12  50 bottles, with the thresholds tied to
13  50 bottles.  Okay?
14         So with that in mind, take your
15  time reviewing that.
16     A.    Okay.
17     Q.    Okay.  I just want to clarify a
18  few things and make sure I'm reading this
19  document the correct way.
20         Okay?
21     A.    Okay.
22     Q.    In that bullet point I
23  mentioned where it says, "Thresholds will be
24  translated from pill count to bottle count,"
25  did that change the way that Reddwerks was

---

Page 257

1  flagging items for review?
2      A.    They were always -- they were
3  always flagging items at bottle count.
4      Q.    Okay.  That's why -- so when it
5  says they will be translated from pill count
6  to bottle count, that's simply an additional
7  piece of information that Reddwerks will be
8  providing?
9      A.    No.  The -- the original ask
10  was for it to be in pill count, and
11  Reddwerks, since we weren't getting -- we
12  weren't sending them the pills, asked to
13  change that to bottle count.
14     Q.    Well, then why does it say
15  "thresholds will be translated from pill
16  count to bottle count"?  What does that mean?
17     A.    I don't know if the threshold
18  file that was sent to them was a pill count.
19     Q.    Okay.  So are you referring to
20  the threshold file that was sent from Walmart
21  to Reddwerks?
22     A.    Correct.
23     Q.    Okay.  So at some point Walmart
24  sent Reddwerks a threshold file?
25     A.    To upload, yes.

---

Page 258

1  Q.   Who would have sent that?
2  A.   The compliance team.
3  Q.   Would those files be sent
4 anytime a threshold was changed?
5  A.   Yes.
6  Q.   Going down another bullet point
7 there, kind of the clear bullet point, it
8 says, "The DCs will be access to their
9 respective servers."
10     Do you see that?
11  A.   Yes.
12  Q.   Did each DC have a dedicated
13 server?
14  A.   I don't know.
15  Q.   Well, who -- if you don't know
16 the answer to that question, who would know?
17  A.   Someone in ISD.
18  Q.   So a couple -- I'm just trying
19 to get some of this terminology down as well.
20     A couple of bullet points down
21 it says, "The week-to-date quantities will be
22 compared to thresholds as they exist in the
23 DB to trigger alerts."
24     Do you see that?
25  A.   Yes.

Page 259

1  Q.   What does the DB refer to?  The
2 database?
3  A.   The database.
4  Q.   Does that refer to the
5 Reddwerks database or is there some other
6 database?
7  A.   Reading this, I would -- I
8 would say that would be the Reddwerks
9 database.
10  Q.   Do you know whether Reddwerks
11 has -- well, strike that.
12     Would Walmart also have had to
13 send Reddwerks a file for these default
14 thresholds in the next bullet point?
15  A.   To change that threshold, yes.
16  Q.   So I'm trying to move ahead a
17 little bit.  There's a few documents
18 referencing that you're -- e-mail that you're
19 on, discussions regarding rolling out of
20 certain things at the DCs.  I believe it's
21 the Reddwerks enhancement, and the reference
22 is to board of directors commitments, time
23 commitments.
24     Do you recall that?
25  A.   I don't.

Page 260

1     MR. BOWER:  Okay.  So we've
2 been going about an hour.  We'll take
3 a break.  I'll pull out those
4 documents.  We'll have to go through
5 them.  Okay?
6     MS. FUMERTON:  Okay.
7     VIDEOGRAPHER:  Going off the
8 record at 1:13 p.m.
9     (Off the record at 1:13 p.m.)
10     VIDEOGRAPHER:  We're back on
11 the record at 1:30.
12     (Walmart-Sullins Exhibit 13
13 marked for identification.)
14 QUESTIONS BY MR. BOWER:
15  Q.   Okay.  I'm going to hand you
16 what's been marked as Exhibit 13.  It's a
17 rather long document, so take a few minutes
18 and look at it.
19     MS. FUMERTON:  Zach, did you
20 correct the other document during the
21 break?
22     MR. BOWER:  No, I did not.
23     MS. FUMERTON:  That's fine.  As
24 long as we just do it by the end of
25 the day.

Page 261

1     MR. BOWER:  Yeah.
2 QUESTIONS BY MR. BOWER:
3  Q.   I just have -- so you can keep
4 in mind as you review it -- a few questions
5 on the e-mail, and then I'll focus on a few
6 pages of the attachment.
7  A.   Okay.
8  Q.   Page 18 -- principally page 17
9 and 18.
10     MS. FUMERTON:  Feel free to
11 orient yourself to the whole document.
12     MR. BOWER:  Yeah, please do.  I
13 just wanted to -- some of the stuff is
14 kind of irrelevant to this case, so...
15     THE WITNESS:  You said 17 and
16 18?
17 QUESTIONS BY MR. BOWER:
18  Q.   Yes, of the attachment.  You
19 see they're numbered kind of in the bottom
20 left.
21     Are you looking at the Bates
22 number or the --
23  A.   Oh, I was looking at the
24 PowerPoint number.  So the Bates number?
25  Q.   Yeah.  17, the one that has a

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  central fill data retention on the top.
2      A.    Yes.
3      Q.    And then 18 has suspicious
4  order identification monitoring and
5  reporting.
6          Do you see that?
7      A.    Yes.
8      Q.    So those two pages.
9          But like your counsel said,
10  take your time and review it.  I'll have some
11  questions on that e-mail as well.
12      A.    Okay.  Okay.
13      Q.    Okay.  So this is -- the first
14  e-mail is an e-mail from yourself to -- who
15  is RJ Hermans, H-a-r-m-a-n-s {sic}?
16      A.    He was our logistics system
17  project manager.
18      Q.    Okay.  Who did he report to?
19      A.    I believe it was Brian Wagner.
20      Q.    Okay.  And what about Casey
21  Campbell, C-a-m-p-b-e-l-l?
22      A.    He was in compliance.
23      Q.    Do you know whether he reported
24  to Susanne Hiland?
25      A.    I don't know.

Page 263

1      Q.    Do you know why he's including
2  you on his e-mail circulating the compliance
3  focus area deck?
4      A.    I had to present RX
5  serialization.
6      Q.    Is that related to your role
7  with NACDS that we discussed earlier?
8      A.    That was for us to implement
9  the Drug Supply Chain Security Act.
10      Q.    So is it your testimony that
11  you didn't have any involvement in the -- for
12  example, the data retention system referenced
13  on page 17 of the PowerPoint?
14      A.    No, I did not.
15      Q.    Okay.  Who would have had that
16  responsibility?
17      A.    I don't know.  That's related
18  to central fill.
19      Q.    Okay.  And what do you mean
20  by -- what is central fill?
21      A.    It's a location that fills
22  prescriptions for the store.
23      Q.    Can you be more specific?
24      A.    So in some states you can send
25  a prescription to a central fill location to

Page 264

1  be filled by the pharmacist there, and that
2  prescription then gets sent back to that
3  store for the customer to pick it up.
4      Q.    So in those circumstances does
5  a -- strike that.
6          In that scenario you just
7  described, who is sending the prescription?
8      A.    The store is.
9      Q.    So the store sends the
10  prescription to a central location, and the
11  central location returns a filled
12  prescription?
13      A.    Yes.
14      Q.    Do you know whether that
15  occurred in Ohio?
16      A.    I don't know.
17      Q.    Do you know who would know
18  that?
19      A.    Someone in compliance.
20      Q.    And turning to the next page
21  then, page 18, this is -- appears to be a
22  timeline for suspicious order identification
23  monitoring and reporting.
24          Do you see that?
25      A.    Yes.

Page 265

1      Q.    During this time period, you
2  did have involvement in some of these
3  projects, correct?
4      A.    I had involvement in this
5  project, yes.
6      Q.    Okay.  Do you know what -- if
7  you see there it says, "Board deliverable
8  date, 7/31/2015"?
9          Do you see that kind of towards
10  the top?  It has certain points on the
11  timeline.  Do you see that?
12      A.    I'm not --
13      Q.    So if you look at the top
14  right, you see the timeline?
15      A.    This timeline?
16      Q.    Yes.
17      A.    Okay.
18      Q.    And then kind of -- towards the
19  right-hand column towards the bottom, it has
20  a board deliverable date of 7/31/2015.
21          Do you see that?
22      A.    Yes.
23      Q.    Do you know what that refers
24  to?
25      A.    No.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.    Do you know whether the -- a
2  Walmart board or a committee of a Walmart
3  board set a timeline for installation for the
4  SOM rollout reflected here?
5    A.    I don't know.
6    Q.    Do you know what else that
7  could refer to?
8    A.    No, I don't know.
9    Q.    If I told you it referred to
10 the Walmart board, would you have any reason
11 to believe that's an inaccurate statement?
12       MS. FUMERTON:  Objection.
13   Form.
14       THE WITNESS:  I wouldn't know
15   because I don't know who that would
16   be.
17 QUESTIONS BY MR. BOWER:
18   Q.    Are you familiar with any other
19 team or group or any other type of similar
20 organization within Walmart that would be
21 referred to as "the board"?
22       MS. FUMERTON:  Objection.
23   Form.
24       THE WITNESS:  No.
25

Page 267

1  QUESTIONS BY MR. BOWER:
2    Q.    So I just want to go then down
3  to the key deliverables in the bottom left
4  there.
5    A.    Uh-huh.
6    Q.    Do you know what -- the fourth
7  bullet point says, "Include vendor data and
8  order level limits."
9        Do you know what that means?
10   A.    No.
11   Q.    Do you know what "vendor data"
12 refers to?
13   A.    No.
14   Q.    Well, this is a project you
15 were involved with, correct?
16   A.    I was involved with the
17 implementation of it, yes.
18   Q.    All right.  And the
19 implementation included providing certain
20 data to Reddwerks, correct?
21       MS. FUMERTON:  Objection.
22   Form.
23       THE WITNESS:  Yes, from the
24   compliance team.
25

Page 268

1  QUESTIONS BY MR. BOWER:
2    Q.    Right.
3        And do you know what data the
4  compliance team provided?
5    A.    No.
6    Q.    Okay.  You weren't involved in
7  that side of the project?
8    A.    No.
9    Q.    Okay.  What about the next
10 bullet point, "proactive tracking of order
11 and industry trends"?
12       Do you see that?
13   A.    Yes.
14   Q.    Do you know when Walmart
15 started tracking industry trends?
16   A.    No, I don't know.
17   Q.    Do you know who would have been
18 responsible for that?
19       Would it also have been on the
20 compliance side?
21       MS. FUMERTON:  Objection.
22 Form.
23       Go ahead.
24       THE WITNESS:  I would assume it
25   would be the compliance team.

Page 269

1  QUESTIONS BY MR. BOWER:
2    Q.    So anything on here that you
3  had involvement with?
4        MS. FUMERTON:  And you're
5    referring just to this page?
6        MR. BOWER:  Yes, this page,
7    sorry.
8        THE WITNESS:  The rollout.
9  QUESTIONS BY MR. BOWER:
10   Q.    Okay.  And just so we're all on
11 the same page, where are you looking?
12   A.    Where it says "current week."
13   Q.    Okay.
14   A.    "Plan to roll out a patch to DC
15 6028."
16   Q.    Okay.  What was being rolled
17 out?  Was this the enhanced Reddwerks at this
18 time period or something else?
19   A.    It was our -- the enhancement
20 had already been rolled out.  It was just
21 bugs that were being fixed.
22   Q.    Okay.  So do you know what --
23 under that sort of section where there's
24 current week and prior week, it references
25 "timelines for development to correct

Page 270

1  inventory visibility."
2  What does that refer to?
3  A.  I don't know.
4  Q.  Do you know what inventory
5  visibility is?
6  A.  Not the way that it's
7  referenced here.
8  Q.  Okay.  Well, how do you -- or
9  in what way are you familiar with that term?
10  A.  There is certain screens inside
11  the host system that shows inventory for each
12  DC by item.
13  Q.  By "item," do you mean NDC
14  number?
15  A.  Yes.
16  Q.  And what do you mean by "host
17  system"?  What does that refer to?
18  A.  So it's the -- it's a -- a
19  Walmart mainframe system that shows a
20  multitude of things where inventory resides.
21  Q.  Okay.  What else does it show?
22  A.  Purchase orders.
23  Q.  Do you know how -- for what
24  time period it maintains purchase orders?
25  A.  No, they all have different

Page 271

1  rules on purchase orders.
2  Q.  What is the longest -- strike
3  that.
4  Let's say someone needed to
5  look back as far as possible for purchase
6  orders.
7  Where would they go?
8  MS. FUMERTON:  Objection.
9  Form.
10  QUESTIONS BY MR. BOWER:
11  Q.  I'll strike that.
12  Let's say someone wanted to
13  look back as far as they could go for
14  purchase orders for C-IIs, okay?  Where would
15  they go?
16  MS. FUMERTON:  Objection.
17  Form.
18  QUESTIONS BY MR. BOWER:
19  Q.  And I'm talking now about any
20  time period.
21  MS. FUMERTON:  My objection is
22  actually different.  It's to the use
23  of the term "purchase order."  I just
24  want to make sure you're not talk --
25  MR. BOWER:  That's fine.  I'm

Page 272

1  just using however you -- whatever you
2  meant purchase order, that's what I
3  mean.
4  THE WITNESS:  So purchase order
5  is inbound to the C-II facility from
6  the supplier.
7  QUESTIONS BY MR. BOWER:
8  Q.  Okay.
9  A.  That would be inside of
10  Teradata.
11  Q.  And how far back would that go?
12  A.  I don't know.
13  Q.  Okay.  And I think I asked this
14  already, but just to be sure, do you know
15  whether the information in Teradata is backed
16  up anywhere?
17  A.  I don't know.
18  Q.  Do you know whether it is
19  routinely deleted?
20  A.  I don't know.
21  Q.  So I'm just going back to the
22  timeline then.  The installations, you see it
23  has certain DCs.  For example, 6045
24  installation is other -- with references to
25  updates.

Page 273

1  Do you see that?  For example,
2  it has 6028 update and then 6024 -- 6045
3  installation.
4  A.  Yes.
5  Q.  What's the difference between
6  those two things?
7  A.  It was already installed in
8  6028, so they were doing updates to the bugs
9  that we were finding.
10  Q.  Okay.  But it hadn't yet been
11  installed in 6045, right?
12  A.  So it was installed in 6045,
13  and then we took it out.
14  Q.  This is the -- sorry.  I'll let
15  you finish, sorry.
16  A.  We took the -- we reverted back
17  to the threshold process because of CSOS.
18  Q.  And why is that?
19  A.  It wasn't -- when the order was
20  held for review, it didn't assign that order
21  a new CSOS order ID.
22  Q.  Okay.  So the CSOS and the
23  enhanced Reddwerks weren't working together?
24  A.  They were not.
25  (Walmart-Sullins Exhibit 14

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1   marked for identification.)
2   QUESTIONS BY MR. BOWER:
3      Q.   Okay.  Okay.  You've been
4   handed what's been marked as Exhibit 14.
5   This is going back a little bit in time,
6   so...
7          It's just a one-page e-mail,
8   but take a moment and let me know when you've
9   had a chance to review it.
10     A.   Okay.
11     Q.   Okay.  So I just have a couple
12  questions.
13         Did you work with Brian Wagner?
14     A.   Yes.
15     Q.   Okay.  What was his role?
16     A.   So RJ Hermans reported to Brian
17  Wagner, and they were both over on the
18  systems -- logistics systems team.
19     Q.   Okay.  So he writes to a bunch
20  of folks, including yourself, or cc'ing you,
21  referring to the next generation of
22  suspicious order monitoring.
23         Do you see that?
24     A.   Uh-huh.
25     Q.   Is he referring to enhanced

Page 275

1   Reddwerks, or is this the initial kind of RFI
2   for Buzzeo?
3      A.    It is the whole Buzzeo process
4   to look for something else.
5      Q.    Okay.  And were you part of
6   that process?
7      A.    I was initially.
8      Q.    All right.  Okay.  And for how
9   long were you part of that process?
10     A.    I don't know how long I was in
11  it.  It was just through the -- through the
12  process of looking at what data might be
13  needed for that.
14     Q.    Were you involved in providing
15  data to Buzzeo in connection with
16  implementing the new system?
17     A.    No.
18     Q.    Okay.  Do you know who provided
19  that data to Buzzeo?
20     A.    I don't know.
21     Q.    He references a
22  cross-functional team here.  Do you see that,
23  second paragraph?
24     A.    Yes.
25     Q.    Do you know -- were you on that

Page 276

1   team at some point?
2      A.    Initially I was, and then
3   because it -- it never would be sent to the
4   DC, I was removed from that team.
5      Q.    Is that because --
6      A.    Or that project.
7      Q.    Sorry, I didn't mean to
8   interrupt you.
9          And is that because the Buzzeo
10  would work before the order got to the DC?
11     A.    Yes.
12     Q.    Okay.  And that would occur at
13  the home office, correct?
14     A.    Yes.
15     Q.    Okay.  Who were the other
16  members of the cross-functional team while
17  you were on it?
18     A.    Miranda, Brian Barker, Brian
19  Wagner.  I don't know who it was from the
20  replenishment team.  I think there was David
21  Hernon.
22     Q.    Okay.  David was part of the
23  replenishment team?
24     A.    I think he was.  I don't
25  recall.

Page 277

1      Q.    I appreciate that.
2          And then what was the -- kind
3   of the -- was there any timeline you all were
4   under -- working under to roll out this --
5   the next generation of the suspicious order
6   monitoring program?
7      A.    I don't recall a timeline in
8   the beginning.
9      Q.    Do you ever recall a timeline?
10     A.    No.
11     Q.    It was just as fast as possible
12  or something else?
13     A.    I don't know.  I mean, I
14  wasn't -- I was in it for the very beginning,
15  and when they realized we were going to
16  install that prior to it dropping to the DC,
17  I wasn't included in any -- in the work
18  group.
19     Q.    At some point, though, you
20  became involved again, correct?
21     A.    When it was installed.
22     Q.    And why did you become involved
23  once it was installed?
24     A.    Because of the orders that were
25  being deleted, the augmented orders.

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1    Q.    We'll talk about that in a
2    minute.  I just want to -- have a couple more
3    questions on this document.
4         Okay?
5    A.    Okay.
6    Q.    Did you have an understanding
7    when you were on the team initially, at
8    least, what the framework referred to meant?
9    A.    That we wanted to install that
10   prior to the order dropping to the DC.
11   Q.    Did you have any understanding
12   or any discussions -- strike that.
13        Were there any discussions as
14   to why Walmart was pursuing the next
15   generation of suspicious order monitoring?
16        MS. FUMERTON:  Objection.
17        Form.
18        THE WITNESS:  No, we were
19   pursuing it from a DC perspective
20   because the current process deducted
21   the inventory, whether you shipped the
22   product or not.
23   QUESTIONS BY MR. BOWER:
24   Q.    Is that the only reason?
25        MS. FUMERTON:  Objection.

Page 279

1    Form.
2         THE WITNESS:  I don't know.  I
3    don't know that that was the only
4    reason.
5    QUESTIONS BY MR. BOWER:
6    Q.    Are you aware of any others?
7    A.    No.
8    Q.    When you say the current
9    process deducted the inventory whether you
10   shipped the product or not, what do you mean?
11   A.    So the Reddwerks process, the
12   enhancement process, would -- because an
13   order came into the DC, the system
14   automatically deducts that from inventory.
15   So on the screen if it says that you were
16   going to -- you had a hundred and then you
17   had an order for ten, it would reflect 90 in
18   the system and on some reports, but you
19   hadn't yet shipped a bottle of it.  So it was
20   always reflecting end-of-day potential
21   process.
22   Q.    And how would the rollout of --
23   is it Buzzeo or Buzzeo?  Buzzeo?
24   A.    I've heard it as Buzzeo.
25   Q.    Okay.  How would the rollout of

Page 280

1    Buzzeo address that problem?
2    A.    That would have been upstream,
3    so that would have been prior to the order
4    ever dropping to the DC.  The review would be
5    done.
6    Q.    So it was your understanding
7    that the review would be complete before the
8    order ever hit the DC, correct?
9    A.    Yes.
10   Q.    Do you know, in fact, that's --
11   whether that's what happened?
12   A.    After the install?
13   Q.    Yes.
14   A.    Yes.
15   Q.    That's your understanding?
16   A.    That's my understanding.
17   Q.    What's your basis for that?
18   A.    From the augmented orders that
19   were being deleted.
20   Q.    What does it mean when you say
21   an augmented order is "deleted"?
22   A.    So an augmented order is a
23   process within the replenishment system that
24   looks at the need of a product at store level
25   based on sales history.  There's some

Page 281

1    algorithm that it does.  I don't know what
2    it -- what that algorithm is.
3         So then that process -- I don't
4    know the timing of it, but it's -- it was
5    being performed later in the day than when
6    Buzzeo was grabbing all the orders.  So
7    then because Buzzeo didn't grab all those
8    orders, it deleted all those augmented picks.
9    Q.    You said it deleted all those
10   augmented picks?
11   A.    Yes.
12   Q.    Who would know what the
13   algorithm was?  Who would be responsible for
14   that?
15   A.    The replenishment systems.
16   Q.    All right.  Is it your
17   testimony that the replenishment systems
18   folks were responsible for the Buzzeo
19   algorithm?
20        MS. FUMERTON:  Objection.
21        Form.
22        THE WITNESS:  That's not what
23   you asked.
24   QUESTIONS BY MR. BOWER:
25   Q.    Okay.  Can you clarify that,

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1  what you mean?
2      A.    You asked --
3      Q.    I asked who would know, right?
4      A.    You asked who would know what
5  that --
6      Q.    The algorithm --
7      A.    The algorithm for the augmented
8  picks.
9      Q.    Right.
10     A.    And I said replenishment
11 systems.
12     Q.    Okay.  Well, then maybe --
13 maybe -- you're right, that's a poor
14 question.
15         What do you mean by algorithm
16 for augmented picks?
17     A.    So it's looking at POS -- past
18 POS sales, so what am I selling, and trying
19 to take that and predict what I may need at
20 store level.
21     Q.    Okay.  So those were algorithms
22 directed at store-level demand?
23     A.    Yes.
24         MS. FUMERTON:  Objection.
25 Form.

Page 283

1  QUESTIONS BY MR. BOWER:
2      Q.    The algorithms you referred to
3  were not algorithms that were used for
4  suspicious order monitoring; is that correct?
5      A.    That's correct.
6      Q.    Are you aware of whether there
7  were algorithms for suspicious order
8  monitoring?
9          MS. FUMERTON:  Objection.
10 Form.
11         THE WITNESS:  I was not aware.
12 I don't know.
13 QUESTIONS BY MR. BOWER:
14     Q.    Are you aware of whether the
15 rollout of Buzzeo had any impact on Walmart's
16 suspicious order monitoring program for
17 C-IIs?
18         MS. FUMERTON:  Objection.
19 Form.
20         THE WITNESS:  I wouldn't have
21 any knowledge of that.
22 QUESTIONS BY MR. BOWER:
23     Q.    While we're pulling this next
24 document, just a couple more names that I
25 haven't seen much but you may be familiar

Page 284

1  with.
2          David Bonds, B-o-n-d-s?
3      A.    Yes.
4      Q.    What was his role?
5      A.    He was in maintenance.  He was
6  our maintenance operations manager.
7      Q.    Maintenance of what?
8      A.    The conveyors, the lifts, any
9  structural work done to the building.
10     Q.    So maintenance of physical
11 structure at the DCs?
12     A.    Uh-huh.
13         (Walmart-Sullins Exhibit 15
14 marked for identification.)
15 QUESTIONS BY MR. BOWER:
16     Q.    Okay.  You've been handed
17 what's been marked as Exhibit 15.
18     A.    Uh-huh.
19     Q.    An e-mail from RJ Hermans to
20 yourself and a bunch of other folks.
21         Do you need a moment to review
22 that document?
23     A.    Yes, please.  Okay.
24     Q.    Okay.  I just wanted to talk
25 generally here about the time frame around

Page 285

1  this time period.
2          The e-mail from RJ mentioned
3  "high-level updates, SOM-OLA install
4  completed at 6045."
5          Do you see that?
6      A.    Yes.
7      Q.    Do you know what that refers
8  to?
9      A.    The enhancements.
10     Q.    This is still the enhancement
11 then?
12     A.    Yes.
13     Q.    The Reddwerks enhancement?
14     A.    Yes.
15     Q.    Okay.  Was this the reinstall
16 after the bugs were fixed or is this the
17 initial install?
18     A.    No, this was the reinstall.
19     Q.    After this reinstall, did
20 everything operate smoothly with respect to
21 the way the enhancement worked at 6045?
22         MS. FUMERTON:  Objection.
23 Form.
24         THE WITNESS:  I don't recall if
25 there was issues or not.

Page 286

1  QUESTIONS BY MR. BOWER:
2      Q.   Do you recall any specific
3  issues as you sit here today?
4      A.   No.
5      Q.   Do you know -- so if you turn
6  to page 1 in the attachment --
7      A.   Uh-huh.
8      Q.   -- on the bottom there the
9  bullet point says, "Reddwerks SOM."
10         Do you see that?
11     A.   Yes.
12     Q.   All right.  It says, "Changing
13 order level alert logic in Reddwerks' picking
14 system to fully utilized enhanced store item
15 order level to flag suspended reports on
16 suspicious orders."
17         Do you know what that refers
18 to?
19     A.   So that was the enhancement.
20     Q.   That one bullet point reflects
21 the enhancement to Reddwerks?
22         MS. FUMERTON:  Objection.
23     Form.
24 QUESTIONS BY MR. BOWER:
25     Q.   I'm just trying to understand

Page 287

1  what you mean by "that was the enhancement."
2      A.   It's a summary of what his
3  report is.
4      Q.   Is it -- this report, you mean,
5  or something else?
6      A.   No, it's a summary of all his
7  projects.  These are all projects that he's
8  reporting on.
9      Q.   Okay.  So these are all RJ's
10 projects?
11     A.   These are all our projects in
12 the distribution center, yes.
13     Q.   Okay.  And this is a summary of
14 what was done for the Reddwerks enhancement?
15     A.   Right.
16     Q.   What is the -- what does the
17 enhanced store item order level refer to?
18     A.   I can't remember what it's
19 referring to.
20     Q.   Well, can we just then, just so
21 that I'm clear, I guess -- maybe I'm confused
22 now.  But what -- the first part of this
23 says, "changing order level alert logic."
24         What does that mean?
25     A.   So the original threshold, if

Page 288

1  an order was held for review, it would hold
2  the entire store order.
3         This change would only hold the
4  item that was flagged for review.
5      Q.   Okay.  And just so the record
6  is clear, when you say "the entire store
7  order," that would include the order for
8  other products, or other items, correct?
9      A.   Yes.
10     Q.   So now it's being changed to
11 only hold the order for that specific item,
12 correct?
13     A.   The item that was alerted, yes.
14         (Walmart-Sullins Exhibit 16
15         marked for identification.)
16 QUESTIONS BY MR. BOWER:
17     Q.   You've been handed what's been
18 marked as Exhibit 16.  It's an e-mail from
19 yourself attaching an old, I believe, over 20
20 report.
21         I don't have too many questions
22 on the attachment, just maybe a few general
23 questions.  My questions are focused mainly
24 on the e-mails.
25     A.   Okay.

Page 289

1      Q.   That's all.
2      A.   Okay.
3      Q.   Okay.  First, where did you get
4  this old report from?
5      A.   The old report?
6      Q.   Uh-huh.
7      A.   The -- I kept it.
8      Q.   This is an e-mail -- an e-mail
9  that you sent in 2017, right?
10     A.   Right.
11     Q.   Okay.  And so where did you --
12 where did you keep it?
13     A.   In my e-mail.
14     Q.   Okay.  Do you have any other
15 reports in your e-mails?
16     A.   I'm sure there is.  I don't
17 know what they are.
18     Q.   Has anyone asked for them --
19 strike that.
20         Has anyone asked you to produce
21 them in connection with this case?
22     A.   No.
23     Q.   Does the -- does the exhibit
24 reflect one report?
25         MS. FUMERTON:  Let me just give

Page 290

1 some clarification because there's
2 actually sort of two e-mails and
3 then --
4 MR. BOWER: Why don't we not
5 have testimony from counsel on the
6 record. If we need to clarify it off
7 record, we can do it, but...
8 MS. FUMERTON: Well, okay.
9 Well, I didn't question -- I object to
10 the question then because I think it's
11 unclear.
12 THE WITNESS: What was your
13 question?
14 QUESTIONS BY MR. BOWER:
15 Q. Does the report that you're
16 sending, is it one report?
17 Your e-mail reflects --
18 states -- actually your e-mail states,
19 "Attached is an old report," suggesting it's
20 your own report. But if you look at the
21 report itself, it has various dates on it.
22 Do you see the first page,
23 7/30/2012 in the top left?
24 A. Right.
25 Q. And the second page, 7/31/2012.

Page 291

1 Third page is 8/3/2012.
2 A. It was --
3 Q. And 8/6, right? And then 8/7,
4 and then 8/8, and then 8/2, and then 8/6
5 again, 8/14 and 8/15.
6 So I'm just trying to
7 understand what exactly it is that you
8 forwarded on to Chad and Jeff and Nick.
9 A. It was one report with multiple
10 tabs.
11 Q. Can you explain to us why one
12 report would have multiple tabs with
13 different dates?
14 A. That's how it was created by
15 the DC.
16 Q. Weren't those reports created
17 on a daily basis?
18 A. Yes.
19 Q. So why would one report have
20 multiple tabs from -- stretching more than --
21 over more than two weeks?
22 MS. FUMERTON: Objection.
23 Form.
24 THE WITNESS: I don't know.
25

Page 292

1 QUESTIONS BY MR. BOWER:
2 Q. If you look at the reports
3 themselves, if you look at, for example, the
4 report dated 8/3/2012.
5 Do you see that one?
6 A. Yes.
7 Q. You note in the comment section
8 it says, "Two previous orders this week total
9 20. Today's McKesson's order will be cut."
10 Do you see that?
11 A. Yes.
12 Q. Do you know why someone at
13 Walmart would have been cutting an order for
14 McKesson?
15 MR. COOPER: Objection.
16 Foundation.
17 MS. FUMERTON: Objection.
18 Form.
19 QUESTIONS BY MR. BOWER:
20 Q. Well, let me lay the foundation
21 then since that's apparently an objection.
22 You received this e-mail in
23 2012 at the time it was created, this report,
24 right? It looks like on Bates number 11628.
25 Do you see that?

Page 293

1 A. Yes.
2 Q. Jimmie Sherl sent it to
3 yourself, Mike Mullin, Theresa Alford, cc'ing
4 Sharon Morton, Jeff Abernathy and Teresa
5 Miller, right?
6 A. Yes.
7 Q. So when you received this
8 report in 2012, was it your understanding
9 that Walmart was cutting orders that were
10 placed by the pharmacies to McKesson?
11 MS. FUMERTON: Objection.
12 Form.
13 THE WITNESS: I was not aware.
14 QUESTIONS BY MR. BOWER:
15 Q. Do you know whether that's
16 consistent with Walmart's policies?
17 MS. FUMERTON: Objection.
18 Form.
19 THE WITNESS: I don't know.
20 QUESTIONS BY MR. BOWER:
21 Q. Well, let me ask you this then.
22 Do you know who would have been providing
23 those comments?
24 A. The distribution center.
25 Q. And that would have been

Page 294

1 Mr. Sherl, correct?
2     A.    It could have been Mr. Sherl.
3 It could have been Jeff.  It could have been
4 Mike.  It could have been Sharon or Teresa.
5 I don't know who put the spreadsheet together
6 by date.
7     Q.    But it's your understanding
8 these spreadsheets were put together on a
9 daily basis, correct?
10     A.    That was my understanding.
11     Q.    Do you know, for example, if
12 you look to the -- look at the report on
13 7/30/2012.  They have a column quantity and
14 then a shipped quantity.
15         Do you see that?  Just looking
16 at the first one there.
17     A.    Yes.
18     Q.    Those are all oxy 30s that were
19 cut to 20, correct?
20     A.    Yes.
21     Q.    Okay.  Do you know whether
22 those were reported to the DEA?
23     A.    I don't know.
24     Q.    Do you know whether anyone else
25 received these reports other than the folks

Page 295

1 on this e-mail?
2     A.    I don't know.
3     Q.    Did you send this report to
4 anybody when you received it?
5     A.    I don't recall.
6     Q.    Do you know whether Walmart
7 would have been required to report those cuts
8 to the DEA?
9     A.    I don't know.
10     Q.    Did you ever ask anybody?
11     A.    No.
12     Q.    And then if you look at the
13 other products, right, there's Endocet 10,
14 oxycodone 15, some other oxy products.
15 There's a quantity, but the shipped quantity
16 for those is empty.
17         Do you see that?
18     A.    I see that.
19     Q.    Does that mean that those
20 orders were shipped with the quantity
21 reflected in the QTY column?
22         MS. FUMERTON:  Objection.
23     Form.
24         THE WITNESS:  I don't know.
25

Page 296

1 QUESTIONS BY MR. BOWER:
2     Q.    Well, what's your understanding
3 as to whether, for example, the order in
4 Mount Pleasant, South Carolina, for 28 of
5 oxycodone 15s, whether that order was -- for
6 20 was shipped?
7     A.    I wouldn't -- I don't know
8 based off of this.
9     Q.    What else would you need to
10 know to know whether the order was shipped?
11     A.    To see what was invoiced.
12     Q.    And where would you look to get
13 that information?
14     A.    On Teradata.
15     Q.    So going back now to the
16 e-mail, Chad's -- I'm sorry, Jeff's writing
17 to Chad and cc'ing -- look at the e-mail on
18 the bottom of that page -- cc'ing yourself
19 and Nick.
20         Do you see that?
21     A.    Yes.
22     Q.    It says, "West Virginia called
23 follow-up."  Or "WV called follow-up."
24         Do you see that?
25     A.    Yes.

Page 297

1     Q.    Do you know what that refers
2 to?
3     A.    What WV stands for?
4     Q.    Yeah.
5     A.    I would assume West Virginia.
6     Q.    This is -- this occurred in
7 2017, right?
8     A.    Yes.
9     Q.    Did you have a discussion with
10 Chad about oxy 30 in 2017?
11         MS. FUMERTON:  Objection to
12     form.
13         THE WITNESS:  I don't recall.
14 QUESTIONS BY MR. BOWER:
15     Q.    Well, do you see he notes that
16 "Ramona thought this was done because of
17 concerns being raised by Florida and WV"?
18         Do you see that?
19     A.    I see that.
20     Q.    Do you recall conveying that
21 information to Chad?
22     A.    No, I don't recall that.
23     Q.    So it could have been the case
24 that folks were raising concerns about oxy 30
25 in Florida and West Virginia which required

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1 Walmart to impose cuts, right?
2         MS. FUMERTON: Objection.
3 Form.
4         THE WITNESS: I don't know.
5 QUESTIONS BY MR. BOWER:
6     Q.    Well, Chad writes, "Before the
7 SOM program, there was an issue with
8 oxycodone 30 MG in which Kristy S. had 6045
9 cut all orders over 20 bottles of oxy 30 to
10 20 bottles."
11        Do you see that?
12    A.    From Jeff, yes, to Chad.
13    Q.    And then he writes, "Ramona
14 thought this was done because of concerns
15 being raised by Florida and West Virginia."
16        Do you see that?
17    A.    I see that.
18    Q.    And that refers to you,
19 correct?
20    A.    Yes.
21    Q.    Okay. But as you sit here
22 today, you don't have any recollection of
23 this conversation?
24    A.    I do not.
25    Q.    And you don't have any

Page 299

1 recollection as to why Walmart decided to cut
2 oxy 30 orders, do you?
3     A.    I do not.
4         MS. FUMERTON: Objection.
5 Form.
6         Just give me a second. Go
7 ahead.
8         THE WITNESS: I do not.
9 QUESTIONS BY MR. BOWER:
10    Q.    So it could have been that at
11 some point you became aware of diversion
12 occurring in Florida and West Virginia,
13 correct?
14        MS. FUMERTON: Objection.
15 Form. Lack of foundation.
16 QUESTIONS BY MR. BOWER:
17    Q.    Well, you just don't recall,
18 right?
19        MS. FUMERTON: Objection.
20 Form.
21 QUESTIONS BY MR. BOWER:
22    Q.    Could have happened?
23        MS. FUMERTON: Objection to the
24 three questions that have been asked.
25 She hasn't -- if I make an objection,

Page 300

1 she can answer if you're not restating
2 your question.
3         And if you are restating your
4 question, I object to the third
5 question and the supplement.
6         THE WITNESS: I don't recall.
7 QUESTIONS BY MR. BOWER:
8     Q.    You don't recall one way or the
9 other, correct?
10    A.    I don't recall.
11    Q.    So it could have been the case
12 that at some point you became aware that
13 Walmart was having diversion concerns in West
14 Virginia and Florida, correct?
15        MS. FUMERTON: Objection.
16 Form.
17        THE WITNESS: I do not recall.
18 QUESTIONS BY MR. BOWER:
19    Q.    Do you have any reason to doubt
20 that you -- that Chad is -- strike that.
21        Do you have any reason to doubt
22 that Chad is accurately reflecting the
23 conversation he had with you in this e-mail?
24        MS. FUMERTON: Objection.
25 Form. Misstates the document.

Page 301

1         THE WITNESS: The document
2 is -- or the e-mail is from Jeff.
3 QUESTIONS BY MR. BOWER:
4     Q.    Oh, excuse me. Okay.
5         So he's writing to Chad, right?
6     A.    Yes.
7     Q.    And he's writing, "Chad, I
8 talked to Nick and Ramona about the call we
9 were on today. Here are some thoughts we
10 had."
11        Do you see that?
12    A.    I see that.
13    Q.    And then he goes on to say,
14 "Ramona thought this was done," "this" being
15 the decision to cut oxy 30s to 20, right?
16    A.    Yes.
17    Q.    That that was done because of
18 concerns being raised by Florida and West
19 Virginia.
20        Do you see that?
21    A.    I see that.
22    Q.    Do you have any reason to doubt
23 that Jeff's statement is incorrect regarding
24 what you told him?
25        MS. FUMERTON: Objection. Form

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  and lack of foundation.
2      THE WITNESS: He was talking to
3  both of us, Nick and myself. I don't
4  know -- I don't recall.
5  QUESTIONS BY MR. BOWER:
6    Q.  He's stating there that Ramona
7  thought this was done. He's stating there
8  that you told him that one of the reasons
9  that oxy 30 was being cut was because of
10  concerns being raised by Florida and West
11  Virginia, isn't he?
12      MS. FUMERTON: Objection.
13  Form.
14      THE WITNESS: That -- that's
15  what he's stating. I don't recall the
16  conversation.
17  QUESTIONS BY MR. BOWER:
18    Q.  Well, do you have any reason to
19  doubt the veracity of the statement?
20      MS. FUMERTON: Objection.
21  Form.
22  QUESTIONS BY MR. BOWER:
23    Q.  As you sit here -- I'll strike
24  that.
25      As you sit here today, do you

Page 303

1  have any reason to doubt that the statement
2  here by Jeff is inaccurate?
3    A.  Well, the fact that he's
4  talking to two of us, that makes me doubt it.
5    Q.  And why is that?
6    A.  Because I don't recall the
7  conversation.
8    Q.  So is it your testimony that
9  you doubt it because as you sit here today
10  you don't recall it? Is that correct?
11    A.  That's correct.
12    Q.  And you think Jeff was making
13  it up?
14      MS. FUMERTON: Objection.
15  Form.
16      THE WITNESS: I don't know what
17  Jeff was doing.
18  QUESTIONS BY MR. BOWER:
19    Q.  Well, either his statement here
20  is accurate or it's inaccurate, right?
21      MS. FUMERTON: Objection.
22  Form.
23      THE WITNESS: I just do not
24  recall the conversation.
25

Page 304

1  QUESTIONS BY MR. BOWER:
2    Q.  Do you have any idea, either
3  today or back in 2017, why Jeff would make
4  this up?
5      MS. FUMERTON: Objection.
6  Form. Lack of foundation.
7      THE WITNESS: I do not recall
8  the conversation.
9      MR. BOWER: Can you read back
10  my -- I move to strike that answer.
11  Can you just read back the previous
12  question?
13      (Court Reporter read back
14  question.)
15      MS. FUMERTON: Objection.
16  Form. Lack of foundation again.
17      THE WITNESS: No, I do not.
18  QUESTIONS BY MR. BOWER:
19    Q.  Jeff isn't asking a question
20  here, is he?
21      MS. FUMERTON: Objection.
22  Form.
23      THE WITNESS: I don't see a
24  question.
25

Page 305

1  QUESTIONS BY MR. BOWER:
2    Q.  In fact, right, he's making a
3  statement, and the statement is, "Ramona
4  thought this was done because of concerns
5  being raised by Florida and West Virginia."
6      That's his statement, correct?
7    A.  That's his statement.
8    Q.  And you are calling that
9  statement into question today; is that
10  correct?
11      MS. FUMERTON: Objection.
12  Form. Misstates prior testimony.
13      THE WITNESS: I'm saying I
14  don't recall the conversation.
15  QUESTIONS BY MR. BOWER:
16    Q.  Are you saying as you sit here
17  today that you did not think that the
18  decision to cut oxy 30 to 20 bottles was
19  being done because of concerns being raised
20  by Florida and West Virginia?
21      MS. FUMERTON: Objection.
22  Form.
23      THE WITNESS: I'm saying I
24  don't recall the conversation.
25

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1  QUESTIONS BY MR. BOWER:
2      Q.    And I understand you don't
3  recall the conversation, but you also have
4  testified that you don't believe that Jeff
5  accurately reflected the conversation,
6  correct?
7          MS. FUMERTON:  Objection.
8      Form.  Misstates prior testimony.
9          MR. BOWER:  Okay.  So let me
10     ask that question then.
11 QUESTIONS BY MR. BOWER:
12     Q.    Do you believe that Jeff's
13 e-mail accurately reflects the conversation
14 you had with him?
15     A.    I don't recall the
16 conversation.  I can't say yes or no to that
17 question.
18     Q.    Well, do you have -- and that's
19 what I'm trying to get at, as to why you're
20 doubting it.
21         Do you have any reason to doubt
22 that Jeff would convey a conversation that
23 you had in a way that was inaccurate?
24         MS. FUMERTON:  Objection.
25

Page 307

1  QUESTIONS BY MR. BOWER:
2      Q.    I'll strike that.
3          Do you have any reason to
4  believe that Jeff would describe a
5  conversation you had had with him the same
6  day in an inaccurate way?
7          MS. FUMERTON:  Objection.
8      Form.  Lack of foundation.
9          THE WITNESS:  I just do not
10     recall the conversation.  I can't
11     answer that question yes or no.
12 QUESTIONS BY MR. BOWER:
13     Q.    And I understand you don't
14 recall it, but Jeff wrote this e-mail the
15 same day the conversation allegedly occurred,
16 correct?
17         MS. FUMERTON:  Objection.  Form
18     and lack of foundation.
19         THE WITNESS:  Yes.
20 QUESTIONS BY MR. BOWER:
21     Q.    And as you sit here today, you
22 don't recall the conversation, correct?
23     A.    I do not recall the
24 conversation.
25     Q.    But Jeff wrote about that

Page 308

1  conversation the same day it occurred,
2  correct?
3          MS. FUMERTON:  Objection.
4      Form.  Lack of foundation.
5  QUESTIONS BY MR. BOWER:
6      Q.    Well, let's just read it then.
7  Jeff is writing to Chad.  "Chad, I talked to
8  Nick and Ramona about the call we were on
9  today."
10         Do you see that?
11     A.    Yes.
12     Q.    Does that suggest to you that
13 Jeff is writing this e-mail about a
14 conversation he had with you on the same day?
15         MS. FUMERTON:  Objection.
16     Form.
17         THE WITNESS:  Yes.
18 QUESTIONS BY MR. BOWER:
19     Q.    He goes on to write, "Here are
20 some thoughts we had," correct?
21     A.    Yes, that's what it states.
22     Q.    "And one of those thoughts that
23 we had," he notes, "is that Ramona thought
24 this was done because of concerns being
25 raised by Florida and West Virginia," right?

Page 309

1  That's what he states?
2      A.    That's what he states.
3      Q.    And he's making that statement
4  on the same day that the conversation
5  occurred, correct?
6          MS. FUMERTON:  Objection.
7      Form.  Lack of foundation.
8          THE WITNESS:  He's making the
9      statement.
10 QUESTIONS BY MR. BOWER:
11     Q.    And I understand that you --
12 your testimony is that you don't recall
13 making the statement.  But as you sit here
14 today, my question is, do you have any reason
15 to doubt that Jeff accurately reflected a
16 conversation he had with you?
17         MS. FUMERTON:  Objection.  Form
18     and lack of foundation and asked and
19     answered.
20         THE WITNESS:  I do not know.
21 QUESTIONS BY MR. BOWER:
22     Q.    And what is it that you don't
23 know?
24     A.    Whether or not he made the
25 statement correctly or incorrectly.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 Q. As you sit here today, do you
2 have any reason to believe -- to believe that
3 his statement reflecting a conversation he
4 had with you is inaccurate?
5 MS. FUMERTON: Objection.
6 Form. Lack of foundation. This has
7 been asked numerous times.
8 THE WITNESS: I do not recall.
9 QUESTIONS BY MR. BOWER:
10 Q. I'm not asking you to recall
11 the statement. I'm asking you again -- and I
12 understand there's going to be an objection,
13 but you haven't answered the question.
14 As you sit here today, do you
15 have any reason to believe that Jeff would
16 reflect a conversation he had with you in an
17 inaccurate way?
18 MS. FUMERTON: Objection.
19 Form. Lack of foundation. Misstates
20 the testimony, and I disagree with
21 your characterization.
22 MR. BOWER: All right. Let me
23 strike it. Let me get at it a
24 different way.
25

Page 311

1 QUESTIONS BY MR. BOWER:
2 Q. Jeff makes the statement in his
3 e-mail that "Ramona thought this was done
4 because of concerns being raised by Florida
5 and West Virginia," right? That's what Jeff
6 writes?
7 A. That's what Jeff writes.
8 Q. Do you doubt that that
9 statement is accurate?
10 MS. FUMERTON: Objection.
11 Form. Asked and answered.
12 THE WITNESS: With the people
13 present there, I don't know. I don't
14 know who made the statement.
15 QUESTIONS BY MR. BOWER:
16 Q. So is that a yes, you do doubt
17 that you told that information to Jeff?
18 MS. FUMERTON: Objection.
19 Form. Asked and answered.
20 THE WITNESS: Because I don't
21 recall the statement, I don't know.
22 QUESTIONS BY MR. BOWER:
23 Q. And, look, I don't think this
24 is difficult. I understand that you don't
25 recall making the statement, but you're

Page 312

1 questioning the statement as it's written and
2 saying it's not accurate.
3 And I'm asking you why you
4 believe it's not an accurate statement.
5 MS. FUMERTON: Objection. Form
6 and misstates her testimony.
7 I've been giving a lot of
8 leeway for you to go at this many
9 ways, as I understand you have that,
10 but at some point it becomes harassing
11 if you keep asking the same question
12 and misstating the testimony every
13 time.
14 MR. BOWER: She's not answering
15 the question. So let me just try it
16 one more time --
17 MS. FUMERTON: I disagree.
18 MR. BOWER: -- and then we'll
19 just ask to read back the question.
20 Okay.
21 QUESTIONS BY MR. BOWER:
22 Q. Jeff writes in an e-mail to
23 Chad, yourself and Nick on March 30, 2017,
24 correct?
25 A. Correct.

Page 313

1 Q. Sends an e-mail.
2 In that e-mail he states that
3 "before the SOM program, there was an issue
4 with oxycodone 30 MG in which Kristy S. had
5 6045 cut all orders over 20 bottles of oxy 30
6 to 20 bottles."
7 Do you see that?
8 A. I see that.
9 Q. And do you have any reason to
10 doubt that statement?
11 A. I do because Kristy didn't send
12 the e-mail. I did.
13 Q. And who ordered you to send the
14 e-mail?
15 MS. FUMERTON: Objection.
16 Form.
17 THE WITNESS: I don't recall.
18 QUESTIONS BY MR. BOWER:
19 Q. Did you decide -- was it your
20 decision to cut all oxy orders over
21 20 bottles to 20?
22 A. No. As I stated before, it
23 was -- I was directed to send that
24 information to -- to the DCs.
25 Q. Right.

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1    It doesn't say that Kristy
2 directed the DCs.  It says Kristy made the
3 decision, right?  Kristy had 6045 cut all
4 orders.
5        MS. FUMERTON:  Objection.
6 Form.  Misstates this document.
7 QUESTIONS BY MR. BOWER:
8    Q.    Well, that's what it says,
9 right?  "Kristy S. had 6045 cut all orders,"
10 right?
11    A.    But Kristy didn't ask them to
12 do that.
13    Q.    Oh.  Is that what it says?
14        MS. FUMERTON:  Objection.
15 Form.
16 QUESTIONS BY MR. BOWER:
17    Q.    It suggests that Kristy made
18 the decision, doesn't it?
19        MS. FUMERTON:  Objection.
20 Form.  Misstates the document.  Lack
21 of foundation and asked and answered.
22        THE WITNESS:  That's not how I
23 read it.
24 QUESTIONS BY MR. BOWER:
25    Q.    How do you read it?

Page 315

1    A.    To me, he spoke to Kristy as
2 well.
3    Q.    Where does he say he spoke to
4 Kristy?
5    A.    It doesn't say that.  That's --
6 I'm just saying that how I read it is he
7 spoke to Kristy, and Kristy directed the DCs
8 to cut that.
9        But the e-mail didn't come from
10 Kristy.  The e-mail came from me.
11    Q.    So it was you that directed the
12 DCs to cut oxy 30 to 20?
13    A.    Based off of what I was told to
14 send to the DCs.
15    Q.    And was it you that made the
16 decision to --
17    A.    No.
18    Q.    Who made that decision?
19    A.    I don't know.
20    Q.    Okay.  So the decision was
21 made, and you carried out the decision,
22 correct?
23    A.    Yes.
24    Q.    Kristy S. could have made the
25 decision, correct?

Page 316

1    A.    I don't know if she was on the
2 team or if she was still in compliance or
3 what.  I do not know.
4    Q.    But either way it wasn't you,
5 right?
6    A.    It was not me.
7    Q.    It wasn't part of your
8 responsibility, right, to decide to cut
9 orders of oxy 30, right?
10    A.    That's correct.
11    Q.    The next sentence of the e-mail
12 says, "Ramona thought that this" --
13        And "this" refers to the cuts
14 of oxy 30, right?
15        MS. FUMERTON:  Objection.
16 Form.  Lack of foundation.
17 QUESTIONS BY MR. BOWER:
18    Q.    What do you believe that "this"
19 refers to?
20    A.    The oxy 30.
21    Q.    Okay.  So "Ramona believes that
22 this decision to cut oxy 30 was done because
23 of concerns being raised by Florida and West
24 Virginia."
25        Right?  That's the intent of

Page 317

1 the statement that he's making, correct?
2        MS. FUMERTON:  Objection.
3 Form.  Lack of foundation.
4        THE WITNESS:  That's what the
5 statement says.
6 QUESTIONS BY MR. BOWER:
7    Q.    Okay.  Is that an accurate
8 statement?
9        MS. FUMERTON:  Objection.
10 Asked and answered.
11        THE WITNESS:  I don't recall
12 it.
13        MS. FUMERTON:  Lack of
14 foundation.
15        MR. BOWER:  Can you read
16 back -- I move to strike that answer.
17 Can you please read back the question?
18        MS. FUMERTON:  Zach, it's
19 fundamentally unfair, if somebody's
20 repeatedly telling you they don't
21 recall something, whether or not it's
22 an accurate statement.
23        She's answered that seven ways
24 from Sunday as to she does not
25 recall --

Page 318

1     MR. BOWER: The question isn't
2  whether --
3     MS. FUMERTON: -- the
4  conversation. You asked whether or
5  not it's accurate.
6     MR. BOWER: I would appreciate
7  the speaking objections to end, okay?
8  It's not -- and just to be clear, my
9  question isn't whether you recall the
10  statement. The question is whether
11  the statement is an accurate
12  statement.
13     MS. FUMERTON: Objection. Form
14  and lack of foundation.
15     THE WITNESS: I can't answer
16  that yes or no because I don't recall
17  the conversation.
18  QUESTIONS BY MR. BOWER:
19     Q.    Okay. So then my follow-up
20  question in trying to understand why you're
21  hesitant to believe or agree that the
22  statement is accurate is, is there anything
23  that you can tell us today as to why you are
24  calling into question or refusing to
25  acknowledge that this statement is accurate?

Page 319

1     MS. FUMERTON: Objection. Form
2  and lack of foundation.
3  QUESTIONS BY MR. BOWER:
4     Q.    Why can't we just agree that
5  this is an accurate statement? You don't
6  recall it, but, yeah, I probably made it.
7     Why are you doubting
8  Mr. Abernathy's statement?
9     MS. FUMERTON: Objection.
10  Form.
11  QUESTIONS BY MR. BOWER:
12     Q.    And I'll strike that. I'll ask
13  a question.
14     Do you doubt the accuracy of
15  the statement written by Jeff Abernathy in
16  this e-mail dated March 30, 2017?
17     MS. FUMERTON: Objection.
18  Form. Lack of foundation, and asked
19  and answered 20 times.
20     THE WITNESS: I can't answer
21  that because I don't recall the
22  conversation.
23  QUESTIONS BY MR. BOWER:
24     Q.    Okay. So I just want to make
25  sure I understand your answer.

Page 320

1     So as you sit here today, you
2  can't tell me whether you doubt the accuracy
3  of this statement; is that correct?
4     A.    That's correct.
5     MS. FUMERTON: We've been going
6  about an hour. Can we take a -- if
7  you're moving on.
8     MR. BOWER: Sure. Okay.
9     MS. FUMERTON: It will be a
10  short break. I just need to use the
11  restroom.
12     VIDEOGRAPHER: Going off the
13  record at 2:35 p.m.
14  (Off the record at 2:35 p.m.)
15     VIDEOGRAPHER: We're back on
16  the record at 2:48 p.m.
17  (Walmart-Sullins Exhibit 17
18  marked for identification.)
19  QUESTIONS BY MR. BOWER:
20     Q.    Back on the record, Exhibit 17.
21  This is just a short e-mail
22  from Dena McClamroch --
23     A.    Yes.
24     Q.    It's M-c-C-l-a-m-r-o-c-h.
25     -- to yourself.

Page 321

1     Just take a second and review.
2  I just have very few questions on this one.
3     A.    Okay.
4     Q.    Okay. So can you just
5  explain -- well, first, did you make requests
6  to Reddwerks to make these changes?
7     A.    I believe we did.
8     Q.    Okay. And do you believe that
9  the changes were made?
10     A.    Not to all.
11     Q.    Okay. So can we just go
12  through which ones were made and which ones
13  weren't then?
14     A.    Yes.
15     Q.    Three-digit threshold. First,
16  what does that mean?
17     A.    So for -- like for insulin, if
18  they ordered a hundred, there's only a place
19  for two digits.
20     Q.    So the request was to enlarge
21  that for places for three digits, correct?
22     A.    Correct.
23     Q.    And was that change made?
24     A.    No.
25     Q.    And why not, if you know?

Page 322

1    A.    I don't recall.
2    Q.    But you do recall requesting
3 it?
4    A.    It was part of the SOW, I
5 believe.
6    Q.    Okay.  SOW, you're referring to
7 statement of work?
8    A.    Yes.
9    Q.    BOD fixed/revised to ensure
10 that weekly quantities reset properly.
11        Was that change made?
12    A.    I believe so.
13    Q.    Were there issues with the
14 quantities being reset each week prior to
15 that change being made?
16        MS. FUMERTON:  Objection.
17    Form.
18 QUESTIONS BY MR. BOWER:
19    Q.    I'll strike that.
20        Were you aware of any issues
21 regarding quantities resetting properly prior
22 to the change being made?
23        MS. FUMERTON:  Objection.
24    Form.
25        THE WITNESS:  I don't recall.

Page 323

1 QUESTIONS BY MR. BOWER:
2    Q.    Indicator for orders sent to
3 practice compliance.
4        What does that refer to?
5    A.    So when an order was held, they
6 wanted to be able to see which one was sent
7 to practice compliance for additional review.
8    Q.    Okay.  And when you say "when
9 an order was held," do you mean when an order
10 was triggered by one of the thresholds or
11 something else?
12    A.    When an order was triggered by
13 a threshold.
14    Q.    Okay.  And what about if an
15 order was triggered by the threshold and
16 cleared at the DC?
17    A.    They would not -- it would not
18 come to the home office for review.
19    Q.    Okay.  So an indicator for that
20 order wouldn't be necessary, correct?
21    A.    No.
22    Q.    Okay.  Do you recall the
23 indicator for orders in practice compliance
24 change being made?
25    A.    I believe it was.

Page 324

1    Q.    Okay.  Number 4, "ability to
2 identify stores on SOM remediation."
3        Was that change made?
4    A.    I don't know.
5    Q.    Do you know what SOM
6 remediation refers to?
7    A.    No.
8    Q.    Number 5, "ability to select
9 all and the HO action needed, review flagged
10 order screen."
11        What does that mean?
12    A.    I'm unsure what that means.
13    Q.    Okay.  Do you know whether that
14 change was made?
15    A.    I don't know.
16    Q.    Okay.  And then the last one,
17 "all screens related to SOM exportable to
18 Excel."
19        Do you see that?
20    A.    Yes.
21    Q.    Was that change made?
22    A.    I do not recall.  I don't know
23 if that was changed -- if that change was
24 made.
25    Q.    And do you recall whether at

Page 325

1 any point the screens related to SOM were
2 exportable to Excel?
3    A.    I think some screens were.
4    Q.    What about all screens?
5    A.    I don't know if all screens
6 were.
7    Q.    And this certainly suggests
8 that at least prior to 1/25/2016, all screens
9 related to SOM were not exportable to Excel.
10        Would you agree with that?
11    A.    Yes.
12    Q.    So at some point did you become
13 involved by a request for certain records
14 from the State of Ohio?
15    A.    Yes.
16    Q.    Okay.  And can you just tell us
17 just at a high level what your involvement
18 was and what the request was?
19    A.    So my involvement was to ask
20 for ISD to pull those records.  Then I sent
21 that over to compliance for them to submit.
22        (Walmart-Sullins Exhibit 18
23    marked for identification.)
24        MS. FUMERTON:  We're on 18?
25        MR. BOWER:  We are on 18, yes.

Page 326

1  QUESTIONS BY MR. BOWER:
2      Q.    So I'm handing you Exhibit 18.
3  I just have a few questions on this in light
4  of the fact that -- if you'll note, the
5  e-mail from Chad to yourself is redacted, and
6  that redaction was by Walmart.
7      I obviously can't ask you
8  questions on what Chad asked you to do.  I
9  would like to, but we have to resolve that at
10 a later issue.
11     Do you recall Chad sending you
12 advice from counsel in this communication?
13     A.    Can I read through it?
14     Q.    Sure.  Yeah.  Please take your
15 time.
16     A.    Okay.
17     Q.    And do you recall Chad sending
18 you advice from counsel in this first e-mail
19 on 2/24/2016?
20     A.    I do not recall.
21     Q.    Did Chad's e-mail to you on
22 2/24/2016 reflect legal advice?
23     A.    I do not recall.
24     Q.    Do you recall what Chad asked
25 you to do?

Page 327

1      Just yes or no.  Do you recall
2  what Chad asked you to do, if anything?
3      A.    No, I do not.
4      Q.    Do you recall receiving this
5  e-mail from Chad?
6      A.    I do not recall receiving this
7  e-mail from Chad.
8      Q.    But you recall generally
9  this -- this event occurring, correct?
10     A.    Yes.
11     Q.    Okay.  And by "this event," I
12 mean the Ohio's -- Ohio's request for certain
13 information.
14     A.    Yes.
15     Q.    Okay.  And so if you look kind
16 of down in the e-mail -- you are initially
17 included on one of the e-mails, the e-mail
18 from Arlin Horst.
19     Who is that?  Arlin, A-r-l-i-n,
20 H-o-r-s-t?
21     A.    He is a operations manager at
22 DC 6046.
23     Q.    Okay.  And for some reason he
24 adds you to the e-mail string.
25     Do you have any idea why?

Page 328

1      A.    No.
2      Q.    Did you respond to him, saying,
3  "hey, I can get this information"?
4      A.    I don't recall.
5      Q.    Do you recall seeing the e-mail
6  from him seeking the information?
7      A.    No, I do not recall that.
8      Q.    All right.  Do you recall who
9  asked you to get the information?
10     A.    No, I don't.
11     Q.    Do you recall who you asked at
12 ISD to pull the information?
13     A.    It could have been a group of
14 people.  I don't recall who I sent it to.
15     Q.    Okay.  So let's look then at
16 what information is actually being requested,
17 okay, which is kind of the last three pages
18 of that exhibit.
19     A.    Uh-huh.
20     Q.    And let's just look at 6045, I
21 guess, because it's all very similar, which
22 is the second one at Bates ending in 22804.
23     Do you see that?
24     A.    Yes.
25     Q.    Okay.  So here we have a letter

Page 329

1  from the State of Ohio Board of Pharmacy,
2  correct?
3      A.    Yes.
4      Q.    Directed to Walmart Pharmacy
5  Warehouse 6045, correct?
6      A.    Yes.
7      Q.    And the letter is dated
8  2/25/2016, right?
9      A.    Yes.
10     Q.    So -- and they're looking
11 for -- they write -- strike that.
12     They write in their letter,
13 "Please advise dates of quantities of all
14 transactions, parentheses, purchases,
15 returns, credits, et cetera, close
16 parentheses, of all controlled substances to
17 any and all locations within the state of
18 Ohio purchased from your company for the
19 period 10/27/2011 through present day."
20     Do you see that?
21     A.    I see that.
22     Q.    Was that information available
23 to Walmart as of 2/25/2016?
24     A.    I don't know how far back the
25 data went.

Highly Confidential – Subject to Further Confidentiality Review

Page 330

1    Q.    That's my question to you.
2         As you sit here today, you
3    don't know whether you complied with this
4    request?
5         MS. FUMERTON:  Objection.
6    Form.
7         THE WITNESS:  I don't know if
8    we could pull data as far back as
9    2011.
10   QUESTIONS BY MR. BOWER:
11   Q.    Before -- before I hand you the
12   next exhibit, where would you -- what are the
13   available data sources where you could look
14   for this information?
15   A.    It would be in Teradata.
16   Q.    Anywhere else?
17   A.    I don't know if it existed
18   anywhere else.
19   Q.    Do you recall asking everyone?
20   Strike that.
21        When you received this request,
22   do you recall asking anyone whether Walmart
23   could comply with the request?
24   A.    I don't recall that.
25   Q.    Do you recall having any

Page 331

1    concerns about Walmart's ability to pull data
2    going back to 10/27/2011?
3    A.    I don't recall that.
4         (Walmart-Sullins Exhibit 19
5    marked for identification.)
6    QUESTIONS BY MR. BOWER:
7    Q.    You've been handed what's been
8    marked as Exhibit 19.
9         Do you see that?
10   A.    Yes.
11   Q.    Okay.  Take a moment to review
12   it. I'm just trying to get to the bottom of
13   whether Walmart complied with this request
14   and whether it was able to, in fact, go back
15   to 2011 and gather that information.
16        Okay?
17        And just so that you're aware,
18   this was produced as an Excel.  We just
19   pulled the first kind of page of it.
20   A.    Okay.
21   Q.    Because as you might imagine, a
22   lengthy document.
23   A.    Okay.
24   Q.    Okay.  Does this refresh your
25   recollection of whether Walmart was able to

Page 332

1    go back to the requested time period in 2011
2    and provide the data requested by the State
3    of Ohio Board of Pharmacy?
4    A.    Yes, I see the date's on here.
5    Q.    And where are you looking, just
6    so the record can reflect what you're looking
7    at?
8    A.    I'm looking at the spreadsheet,
9    and the date on there is 10/27/2011.
10   Q.    So it indeed appears that
11   Walmart could go back and get the requested
12   information, correct?
13   A.    Correct.
14   Q.    And does this spreadsheet, to
15   you, appear to be one that was pulled from
16   the Teradata source that you mentioned?
17   A.    It would appear.
18   Q.    Okay.  And why do you say that?
19        What are you looking at to draw
20   the conclusion?
21   A.    Only because that's the only
22   place I know that the data existed.
23   Q.    Okay.  Fair enough.
24        So nothing on this document
25   itself suggests it to you.  Just simply your

Page 333

1    experience with the data, correct?
2    A.    Correct.
3    Q.    Okay.  I just have then some --
4    a couple questions on the columns.  Okay?
5         The first column A says, "6045
6    DEA."
7         Do you see that?
8    A.    Yes.
9    Q.    Are the numbers below that --
10   what do those reflect?
11   A.    The DEA number for the DC.
12   Q.    Okay.  So those would all be
13   the same, correct, throughout this
14   entire spreadsheet, right?
15   A.    Yes.
16   Q.    Okay.  And then the sale
17   purchase reflects that it was a sale from the
18   DC?
19   A.    Yes.
20   Q.    Correct?
21        The NDC would reflect the
22   individual product, right?
23   A.    Yes.
24   Q.    Okay.  The quantity would be in
25   bottles, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    A.    Yes.
2    Q.    What does the purchaser DEA
3 reflect?
4    A.    The store number, the store DEA
5 number.
6    Q.    So that would be the individual
7 pharmacy's DEA number within Ohio, correct?
8    A.    Yes.
9    Q.    Okay.  What about the next
10 column, 222/CSOS ID?
11    A.    So that would be either the 222
12 form number or the CSOS order ID.
13    Q.    And does that information
14 depend on the time period that the order was
15 placed?
16    A.    Yes.
17    Q.    Because at some point they
18 moved from 222s to the CSOS, right?
19    A.    Yes.
20    Q.    Are those IDs unique to an
21 order?
22    A.    To a form.  If it's a 222.
23        If it's a CSOS order ID, it
24 would be -- because the 222 form only has
25 room for ten items.

Page 335

1    Q.    Okay.
2    A.    And so a CSOS order ID would be
3 the entire order.
4    Q.    And then the date, I think, is
5 self-explanatory, right?
6    A.    Yes.
7    Q.    And is that the date the order
8 is placed or the date the order is filled?
9    A.    The date the order is shipped
10 and filled.
11    Q.    I see the state.  Again,
12 self-explanatory.
13        And then the store, do you know
14 what that reflects?
15    A.    The store number.
16    Q.    Is that different than the
17 purchaser DEA?
18    A.    It should be one in the same.
19    Q.    And the description is
20 self-explanatory, right?
21    A.    Yes.
22    Q.    Okay.  And then I note that --
23 so if you go back to the prior exhibit,
24 you'll see that the State of Ohio is
25 requesting dates and quantity of all

Page 336

1 transactions, and then in parentheses they
2 have purchases, returns, credits, et cetera.
3        Do you see that?
4    A.    Yes.
5    Q.    Was Walmart able to provide
6 information regarding returns?
7    A.    We didn't do returns to the
8 C-II facility.
9    Q.    Okay.  What about credits?
10    A.    I don't know what a credit
11 would be.
12    Q.    So is it your understanding
13 that Walmart didn't provide any information
14 related to credits in connection with this
15 response?
16        MS. FUMERTON:  Objection.  Form
17    and lack of foundation.
18        THE WITNESS:  I don't know what
19    a credit is, so I don't know -- I
20    can't answer whether we did or didn't.
21 QUESTIONS BY MR. BOWER:
22    Q.    Okay.  Do you have any
23 understanding why Sarah Eisler -- there's her
24 name.  It's E-i-s-l-e-r.
25        She's Mr. Ducote's assistant,

Page 337

1 correct?
2    A.    She's an associate on the team.
3    Q.    What's that?
4    A.    She's an associate on the team.
5    Q.    Okay.  Her -- I note that her
6 signature says "Sarah Eisler, administrative
7 assistant to Chad Ducote."
8        What does that mean?
9    A.    So she had some administrative
10 duties.
11    Q.    So she kind of played a dual
12 role on the team?
13    A.    Yes.
14    Q.    Do you have any idea why she's
15 cc'ing you on the response to the Ohio board
16 of governor -- board of pharmacies?
17    A.    No.
18    Q.    Were you surprised to be
19 included in this e-mail?
20    A.    No.
21        (Walmart-Sullins Exhibit 20
22    marked for identification.)
23 QUESTIONS BY MR. BOWER:
24    Q.    Okay.  You've been handed
25 what's been marked as Exhibit 20.  It's just

Page 338

1 another response to the Ohio board of
2 governors {sic} with a different time frame
3 for the data.
4        So I just have a few questions
5 regarding kind of the different format of the
6 attachment.
7        A.    Okay.
8        Q.    So take a look.  I just -- the
9 principal question is whether this data may
10 have come from a different source.
11        Do you know whether it did?
12        A.    I don't know whether it did.
13        Q.    Is it your understanding this
14 data would have also come from the Teradata
15 location?
16        A.    Yes.
17        Q.    Okay.  Do you have -- do you
18 see -- if you compare -- if you compare the
19 prior spreadsheet to this one, this has
20 different columns, for example, strength,
21 which I don't think appears in the other one.
22 Certainly correct me if I missed something.
23        A.    Yes, I see that.
24        Q.    Okay.  Do you have an
25 understanding as to why there's a difference

Page 339

1 in the data being provided?
2        A.    No.
3        MS. FUMERTON:  Objection.
4 Form. Lack of foundation.  Sorry.
5        THE WITNESS:  No, I don't.
6 QUESTIONS BY MR. BOWER:
7        Q.    Well, you were the one who
8 requested the data from ISD, correct?
9        A.    Yes, I sent the initial
10 request.
11        Q.    And did they send the results
12 of that request to you?
13        A.    No, they put those on a server
14 because it was too big to send via e-mail.
15        Q.    And how did they notify you
16 that the data was then available?
17        A.    Either by phone call or an
18 e-mail.
19        Q.    Okay.  And then how did you
20 convey that that was available to Ms. Eisler?
21        A.    I may have walked up to her
22 desk and told her that it was available.
23        Q.    And how would she have known
24 where to get it?
25        A.    Because it was on the same

Page 340

1 tables that we would use for ARCOS reporting.
2        Q.    Well, can you just describe
3 what you mean by tables?
4        A.    Not table.  The server.  Sorry.
5        Q.    What server is that?  Does it
6 have a name?
7        A.    It does, but I don't know what
8 the name is.
9        Q.    Is it a dedicated ARCOS server?
10        A.    No, it's a HONS number.
11        Q.    Did you have the capability of
12 pulling the data yourself?
13        A.    No.
14        Q.    You didn't have access to the
15 Teradata database?
16        A.    I have access to some tables.
17 Not all things.
18        Q.    Did you have access to the
19 tables -- what do you mean by -- strike that.
20        What do you mean by tables?
21        A.    Like an invoice table, a
22 purchase order table.
23        Q.    Did you have access to this
24 information reflected on the attachment to
25 Exhibit 20?

Page 341

1        MS. FUMERTON:  Objection.
2 Form.
3        THE WITNESS:  No, I don't
4 believe so.
5 QUESTIONS BY MR. BOWER:
6        Q.    Do you know why that was?
7        A.    No.
8        Q.    Okay.  Were you ever -- well,
9 strike that.  Let's finish up this one.
10        Do you know whether the
11 strength column is a column that exists in
12 the Teradata database?
13        A.    It does.
14        Q.    Are there other columns that
15 you're aware of that aren't on the exhibit
16 to -- the exhibit to Exhibit 20?
17        A.    I'm not sure I understood your
18 question.
19        Q.    Strike that, and I'll rephrase
20 it.
21        You would agree with me,
22 wouldn't you, that exhibit to Exhibit 20 has
23 different information than the exhibit to
24 Exhibit 19, correct?
25        A.    Yes.

Page 342

1   Q.   Okay.  Other than this strength
2  column that is not on exhibit to Exhibit 19,
3  are there any other columns or sources of
4  information that are not reflected on these
5  exhibits that relate to the purchase or sale
6  of C-II products?
7        MS. FUMERTON:  Objection.
8        Form.
9        THE WITNESS:  There's other --
10       there's other information that you can
11       add to the report.
12  QUESTIONS BY MR. BOWER:
13   Q.   And what information is that?
14   A.   Let me look at it.  Store name,
15  store city and state, vendor name, vendor
16  number.
17   Q.   Do you know how the data in
18  this Teradata database is populated?
19   A.   No, I do not.
20   Q.   Do you know where it comes
21  from?
22   A.   No.
23   Q.   Do you know whether it comes
24  directly from the DCs?
25   A.   I would say, yes, some of that

Page 343

1  data comes from the DC.
2   Q.   Where else could it come from?
3  In other words, what are the other sources of
4  data at Walmart that could populate the
5  Teradata database?
6   A.   From a supplier, purchases from
7  a supplier.  Store data.
8   Q.   Are you familiar with a
9  database or other system called Retail Link?
10   A.   Yes.
11   Q.   And what is Retail Link?
12   A.   It is a web-based system that
13  suppliers use to pull their own data, that
14  they have access to it.
15   Q.   Did you have access to it?
16   A.   I did have access to it.
17   Q.   Did you ever actually access
18  it?
19   A.   Yes.
20   Q.   For what purpose?
21   A.   It also has information about
22  the JLN numbers for each DC or store.  It had
23  alignment information by store.  It had
24  information about which store had a optical
25  center in it.  Just various information that

Page 344

1  was in it.
2   Q.   Do you know how the information
3  in Retail Link was populated?
4   A.   I do not know.
5   Q.   Okay.  What does -- what do you
6  mean by alignment information by store?  What
7  does that mean?
8   A.   So stores aligned for general
9  merchandise.  It's -- so which DC services
10  that store for general merchandise, which DC
11  services that store for groceries, fresh,
12  which DC services that store for
13  pharmaceuticals.
14   Q.   Does Retail Link have pricing
15  information?
16        MS. FUMERTON:  Objection.
17        Form.
18  QUESTIONS BY MR. BOWER:
19   Q.   If you know.
20   A.   I don't know.
21   Q.   Did there come a time when
22  you -- strike that.
23        Did there come a time when
24  Mr. Hermans was the main contact for
25  Reddwerks?

Page 345

1   A.   Yes, he took -- he took that
2  ownership of that relationship.
3   Q.   And when was that
4  approximately?
5   A.   I don't recall when he came on
6  to that system change.
7   Q.   And do you recall why that
8  change was made?
9   A.   They wanted to run projects
10  through that team, and I -- and I did the --
11  I would bring the requests for projects to
12  RJ, and then he would submit those to
13  Reddwerks for -- to get a statement of -- a
14  scope of work.
15   Q.   And I'm sorry, what team was he
16  on?
17   A.   He was on the logistics systems
18  team.
19        (Walmart-Sullins Exhibit 21
20        marked for identification.)
21  QUESTIONS BY MR. BOWER:
22   Q.   Okay.  You've been handed
23  what's been marked as Exhibit 21.  I just
24  have a few questions regarding this e-mail
25  string.

Page 346

1    A.    Okay.
2    Q.    Okay.  Can you just explain
3 generally what's going on here?
4    A.    I think it was some of the
5 changes that were requested by Dena.
6    Q.    And you were surprised at the
7 cost of those changes, correct?
8    A.    Yes.
9    Q.    And did you say "WOW" in all
10 caps?  "110K to make changes to some
11 screens"?  Right?
12    A.    Yes, that's what I said.
13    Q.    Why were you surprised at the
14 cost?
15    A.    Because I didn't understand why
16 it would take that amount to move -- like,
17 for instance, to go from two digits to three
18 digits.
19    Q.    Why did you care?
20        MS. FUMERTON:  Objection.
21    Form.
22        THE WITNESS:  It sounded like a
23    simple code to me.  I --
24 QUESTIONS BY MR. BOWER:
25    Q.    But did it matter to you how

Page 347

1 much Walmart was paying for changes to
2 enhance its SOM program?
3        MS. FUMERTON:  Objection.
4    Form.
5        THE WITNESS:  I'm sorry, ask
6    that again.
7 QUESTIONS BY MR. BOWER:
8    Q.    Well, these -- this -- if you
9 notice the e-mail from Heather Carol to RJ at
10 the bottom of that first page, right, it
11 says, "Please find attached the statement of
12 work for the SOM enhancements."
13        Do you see that?
14    A.    Yes.
15    Q.    So why did it matter to you how
16 much Walmart would have to pay for SOM
17 enhancements?
18        MS. FUMERTON:  Objection.
19    Form.
20        THE WITNESS:  It was the items
21    that Dena had brought up.
22 QUESTIONS BY MR. BOWER:
23    Q.    So this change was for those
24 items we discussed earlier?
25    A.    Yes.

Page 348

1    Q.    Okay.  And this was a lot of
2 money for those changes, in your mind?
3    A.    For how I understood the
4 changes.
5    Q.    And can you explain to me
6 why -- why it would be -- seem unusual to
7 you?
8    A.    Again, because I thought just
9 adding an extra digit didn't seem like it
10 would take much coding time.
11    Q.    Well, we went through a series
12 of five changes, right, that were -- that
13 Walmart had requested?
14    A.    Right.
15    Q.    Right.
16        So could this be for all five
17 of those changes?
18    A.    Not knowing what all the
19 changes that were included in the SOW.
20    Q.    Right.  We would need actually
21 to see the SOW, right?
22    A.    Right.
23    Q.    And would the cost, the 110,000
24 cost, impact whether Walmart went ahead with
25 those changes?

Page 349

1        MS. FUMERTON:  Objection.
2    Form.
3        THE WITNESS:  No.
4 QUESTIONS BY MR. BOWER:
5    Q.    Why not?
6    A.    I still would like to get it at
7 a lower cost.
8    Q.    Well, what if that was the
9 cost; would Walmart approve those changes?
10        MS. FUMERTON:  Objection.
11    Form.
12        THE WITNESS:  Yes, they would
13    approve those changes.
14 QUESTIONS BY MR. BOWER:
15    Q.    Were those changes, in fact,
16 made?
17    A.    I know some were.  I don't know
18 what all were made.
19    Q.    Well, you testified earlier
20 that some were not, right?
21        MS. FUMERTON:  Objection.
22    Form.
23        THE WITNESS:  I did testify to
24    that earlier.
25

Page 350

QUESTIONS BY MR. BOWER:
Q. And isn't it the case that some changes weren't made because Walmart deemed the cost to be too high?
MS. FUMERTON: Objection. Form. Lack of foundation.
THE WITNESS: Not that I recall.
QUESTIONS BY MR. BOWER:
Q. Well, do you know whether Walmart decided not to pursue some SOM enhancements due to the high cost?
MS. FUMERTON: Objection. Form.
THE WITNESS: Not that I recall.
QUESTIONS BY MR. BOWER:
Q. Do you know whether it occurred or not?
MS. FUMERTON: Objection. Form. Asked and answered.
THE WITNESS: I do not recall that.
QUESTIONS BY MR. BOWER:
Q. What is it that you don't

Page 351

recall specifically?
A. Whether or not we didn't make changes to a system.
Q. Right.
So it could be the case that Walmart decided not to pursue changes due to the high cost; isn't that correct?
MS. FUMERTON: Objection. Form. Lack of foundation.
THE WITNESS: That is not correct.
QUESTIONS BY MR. BOWER:
Q. And what's your basis for that statement?
A. Because of the changes that we made for other systems and the cost for those.
Q. Well, for each of the changes, Walmart had to make a business decision of whether the change was worth it, didn't it?
MS. FUMERTON: Objection. Form. Lack of foundation.
THE WITNESS: I don't know that it was a business decision. Some of those were compliance and made the

Page 352

changes.
(Walmart-Sullins Exhibit 22 marked for identification.)
QUESTIONS BY MR. BOWER:
Q. You've been handed what's been marked as Exhibit 22, which is an e-mail four days later regarding Reddwerks' enhancements. Please take a moment to review that document.
A. Okay. Okay.
Q. Okay. This e-mail is four days after exhibit -- prior exhibit, Exhibit 21?
A. No.
Q. I'm sorry, you're right. My mistake. A month and four days.
Right?
A. Yes.
Q. And does this relate to the enhancements referenced in Exhibit 22, or are these different enhancements?
MS. FUMERTON: Zach, I think you misspoke on the exhibit.
MR. BOWER: I think you're right.
QUESTIONS BY MR. BOWER:
Q. So the enhancements referenced

Page 353

in Exhibit 22 -- I'll strike that.
Are the enhancements referenced in Exhibit 22 different than the enhancements referenced in Exhibit 21?
A. I do not know if they are different.
Q. So, for example, if you look at the e-mail from RJ to yourself on August 29th at 4:32, he -- number 5, "SOM enhancements - three requirements sent to Reddwerks. Awaiting business decision as cost is extremely high."
Do you see that?
A. I see that.
Q. So before when I asked you whether Walmart had to make a business decision regarding SOM enhancements, you took issue with "make a business decision," right?
MS. FUMERTON: Objection. Form.
QUESTIONS BY MR. BOWER:
Q. Do you recall having issue with my choice of words?
MS. FUMERTON: Objection. Form.

Page 354

1      THE WITNESS:  Do I recall
2  having an issue with --
3  QUESTIONS BY MR. BOWER:
4     Q.   An issue with my -- my question
5  regarding whether Walmart makes a business
6  decision in deciding whether to go forward
7  with SOM enhancements.
8      MS. FUMERTON:  Objection.
9  Form.
10     THE WITNESS:  I'm not
11  understanding your question.
12  QUESTIONS BY MR. BOWER:
13    Q.   All right.  I'll ask it a
14  different way.
15     Does Walmart make a business
16  decision when deciding whether to pursue
17  enhancements to its SOM program?
18     MS. FUMERTON:  Objection.
19  Form.
20     THE WITNESS:  No, it's a
21  compliance issue.
22  QUESTIONS BY MR. BOWER:
23    Q.   All right.  So when RJ is
24  writing that he's "awaiting business decision
25  as cost is extremely high," what does he

Page 355

1  mean?
2      MS. FUMERTON:  Objection.
3  Form.
4  QUESTIONS BY MR. BOWER:
5    Q.   Well, you're the only one on
6  the e-mail, right, other than RJ, right?
7    A.   Yes.
8    Q.   And he's updating you to
9  confirm that you agree with the priority
10  list, right?
11    A.   Yes.
12    Q.   And you confirm that you -- you
13  state, "RJ, I agree with the priority list,"
14  right?
15    A.   I do.
16    Q.   So what was your understanding
17  of what he meant when he said "awaiting a
18  business decision as cost is extremely high"?
19    A.   Someone in compliance was going
20  to make that decision.
21    Q.   Whether compliance was going to
22  make that business decision; is that correct?
23     MS. FUMERTON:  Objection.
24  Form.
25     THE WITNESS:  Yes.

Page 356

1  QUESTIONS BY MR. BOWER:
2    Q.   That's not what he said,
3  though, is it?
4    A.   That's not what he said.
5    Q.   And then at the bottom he
6  further explains, I think, himself when he
7  says, "Really the question becomes how much
8  money do we want to spend on SOM
9  enhancements, and do we want to budget money
10  for it to work on next year or pay for some
11  of it this year somehow?"
12     Do you see that?
13    A.   I see that.
14    Q.   Why is he -- why is he
15  concerned about spending money on SOM
16  enhancements?
17     MS. FUMERTON:  Objection.
18  Form.  Lack of foundation.
19     THE WITNESS:  I don't know why
20  he's concerned about that.
21  QUESTIONS BY MR. BOWER:
22    Q.   Well, he's -- no one else he's
23  sending this e-mail to, right?
24    A.   I don't know.  I mean, he's
25  sending it to me.  I don't know if he sent it

Page 357

1  to somebody else as well.
2    Q.   There's no one else on here,
3  right?
4    A.   Not on this particular e-mail,
5  no.
6    Q.   I mean, we can at least agree
7  on that, right?
8    A.   Yes.
9    Q.   Okay.  And you're agreeing with
10  him, right?  You're agreeing with his
11  priority list?
12    A.   With the list that he's got
13  there, yes.
14    Q.   Right.
15     And that list is further
16  explained where he says 1 and 2 on his list
17  are really not debatable, right?
18     MS. FUMERTON:  Objection.
19  Form.
20  QUESTIONS BY MR. BOWER:
21    Q.   Do you see that?
22     He says, "1 and 2 are really
23  not debatable.  Number 2 has to complete or
24  nearly complete by the end of the year to
25  avoid service support penalties and

Highly Confidential – Subject to Further Confidentiality Review

Page 358

1  end-of-life harbor issues," right?
2      He's referring to 1 and 2 on
3  this list, isn't he?
4      A.    Yes.
5      Q.    Okay.  And then he goes on to
6  say, after discussing 1 and 2, "Really the
7  question becomes how much money do we want to
8  spend on SOM enhancements," right?
9      A.    Yes.
10     Q.    And the only SOM enhancements
11  referenced on his list are number 5, aren't
12  they?
13         MS. FUMERTON:  Objection.
14     Form.
15         THE WITNESS:  Yes.
16  QUESTIONS BY MR. BOWER:
17     Q.    And he puts that as a number 5
18  priority out of six things, right?
19     A.    Yes.
20     Q.    And you're agreeing with that
21  priority list, correct?
22     A.    Yes.
23     Q.    So you're agreeing that these
24  other things are more important than SOM
25  enhancements, correct?

Page 359

1         MS. FUMERTON:  Objection.
2     Form.
3         THE WITNESS:  I'm agreeing with
4     the list, yes.
5  QUESTIONS BY MR. BOWER:
6     Q.    And in that list, that list
7  reflects that 1 through 4 are more important
8  priorities than the SOM enhancements,
9  correct?
10         MS. FUMERTON:  Objection.
11     Form.  Misstates the document.
12  QUESTIONS BY MR. BOWER:
13     Q.    Well, this is -- 1 through 6 is
14  a priority list, correct?
15     A.    Yes.
16     Q.    Right?
17         And number 5 is the SOM
18  enhancements, correct?
19     A.    Yes.
20     Q.    And you agree with that
21  priority list, correct?
22     A.    Yes, I do.
23     Q.    Approximately how long after
24  this did Buzzeo roll out?
25     A.    It rolled out in August.

Page 360

1     Q.    August of 2016?
2     A.    Yes.
3     Q.    At 6045?
4     A.    Yes, at all buildings.
5     Q.    And before we go to the next
6  exhibit, you must have been aware in 2016
7  that the nation was in an opioid crisis,
8  weren't you?
9         MS. FUMERTON:  Objection.
10     Form.
11         THE WITNESS:  That the nation
12     was?
13  QUESTIONS BY MR. BOWER:
14     Q.    Was in the middle of an opioid
15  epidemic, a crisis.
16         MS. FUMERTON:  Objection.
17     Form.
18         THE WITNESS:  I don't know
19     when -- when I learned of that from
20     the news, but --
21  QUESTIONS BY MR. BOWER:
22     Q.    Do you disagree that the nation
23  was in the middle of an opioid crisis in
24  2016?
25         MS. FUMERTON:  Objection.

Page 361

1     Form.
2         THE WITNESS:  I don't know when
3     I learned of that from the news.
4         (Walmart-Sullins Exhibit 23
5     marked for identification.)
6  QUESTIONS BY MR. BOWER:
7     Q.    Okay.  So you've been handed
8  what's been marked as Exhibit 23, and I'm
9  just trying to nail the timeline down for
10  Buzzeo.
11         And I think that you just
12  testified a minute ago that it rolled out in
13  2016, so I just want to try to nail down the
14  timeline in light of Exhibit 23.
15     A.    Okay.
16     Q.    Okay.  So my first question:
17  Were you aware that this exhibit, an e-mail,
18  refreshes your recollection of when Buzzeo
19  rolled out at 6045?
20         MS. FUMERTON:  Have you had a
21     chance to review it, too.
22  QUESTIONS BY MR. BOWER:
23     Q.    Yes, please do.  I just wanted
24  to kind of frame your thoughts as you were
25  looking at it.

Page 362

1    A.    Okay.

2    Q.    Okay.  Does this refresh your
3 recollection as to when the Buzzeo rolled out
4 at 6045?

5    A.    It does now.

6    Q.    Okay.  And so based on that, I
7 guess, refreshment, when did Buzzeo finally
8 roll out at 6045?

9         MS. FUMERTON:  Objection.
10 Form.

11 QUESTIONS BY MR. BOWER:

12    Q.    Well, I'll strike that then.

13         When did Walmart roll out
14 Buzzeo at 6045?

15    A.    I believe it was in November of
16 that year then.

17    Q.    In November of 2017, correct?

18    A.    Correct.

19    Q.    And so the previous exhibit
20 where Walmart is prioritizing SOM
21 enhancements, five out of six, still another
22 almost year and a half until Buzzeo rolls out
23 to 6045, right?

24    A.    Yes.

25    Q.    And if you see here on

Page 363

1 Exhibit 23, I guess the end of that first
2 paragraph, "The decision was made to turn off
3 Buzzeo by Ramona."

4         Do you see that?

5    A.    Yeah, it says "by Ramona and
6 I."

7    Q.    And it says, "and I support
8 her," right?

9    A.    Yes.

10    Q.    So Nick was supporting you in
11 that decision, right?

12    A.    Yes.

13    Q.    But it was your decision,
14 right?

15    A.    With support from compliance.

16    Q.    And what factors led you to
17 make that decision?

18    A.    Because of the bug of the
19 augmented picks.

20    Q.    Did you consider anything else
21 in making that decision?

22    A.    Not that I can think of.

23    Q.    For example, did you consider
24 whether Buzzeo provided improved SOM
25 enhancements over Reddwerks?

Page 364

1    A.    Well, it wasn't considering all
2 the orders because it was deleting orders.

3    Q.    Which orders was it deleting?

4    A.    The augmented picks.

5    Q.    And how long had Buzzeo been
6 deleting augmented picks at 6045?

7    A.    When they turned it on that
8 day.

9    Q.    Okay.  So it was one day?

10    A.    Yes.

11    Q.    Okay.  And do you see where
12 Nick writes, "We will move forward tomorrow
13 utilizing the Reddwerks SOM program until
14 opportunities in Buzzeo are corrected"?

15         Do you see that?

16    A.    I see that.

17    Q.    So was Buzzeo going to take
18 over the SOM program from Reddwerks?

19    A.    Yes.

20    Q.    Any understanding as to why it
21 didn't roll out for another three to four
22 months at 6045?

23         MS. FUMERTON:  Objection.
24 Form.  Misstates testimony.

25

Page 365

1 QUESTIONS BY MR. BOWER:

2    Q.    Well, strike that then.

3         How long after this was Buzzeo
4 finally implemented at 6045?

5    A.    In November.

6    Q.    So approximately three months
7 later, correct?

8    A.    Yes.

9    Q.    And approximately almost a year
10 and a half after Walmart had deprioritized
11 its SOM enhancements, correct?

12         MS. FUMERTON:  Objection.
13 Form.  Misstates the document.

14         THE WITNESS:  After those
15 enhancements that Dena brought up.

16 QUESTIONS BY MR. BOWER:

17    Q.    After the priority list that
18 you agreed with, right?

19    A.    Yes.

20    Q.    Was there any urgency on
21 Walmart's part to get Buzzeo up and running
22 at 6045?

23         MS. FUMERTON:  Objection.
24 Form.

25         THE WITNESS:  I was not privy

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  to those conversations.
2  QUESTIONS BY MR. BOWER:
3      Q.    Did any of those -- any of
4  those SOM issues impact your decision to turn
5  off Buzzeo at 6045?
6          MS. FUMERTON:  Objection.
7  Form.  Lack of foundation.
8          THE WITNESS:  Ask your question
9  again?  Sorry.  I didn't understand
10  it.
11  QUESTIONS BY MR. BOWER:
12     Q.    Did you consider Walmart's
13  suspicious order monitoring program in your
14  decision to turn off Buzzeo at 6045?
15         MS. FUMERTON:  Objection.
16  Form.
17         THE WITNESS:  We had a backup.
18  QUESTIONS BY MR. BOWER:
19     Q.    Was it your understanding that
20  that backup system was similar to the Buzzeo
21  system?
22         MS. FUMERTON:  Objection.
23  Form.
24         THE WITNESS:  I didn't know how
25  Buzzeo worked.

Page 367

1  QUESTIONS BY MR. BOWER:
2      Q.    So you didn't know whether
3  turning off the Buzzeo would impact Walmart's
4  SOM program, did you?
5          MS. FUMERTON:  Objection.
6  Form.
7          THE WITNESS:  It was not
8  considering those picks, those
9  augmented picks.
10  QUESTIONS BY MR. BOWER:
11     Q.    So my question is a little bit
12  different, okay?
13         I'm just trying to get at
14  what -- whether you considered Walmart's SOM
15  program in connection with your decision to
16  turn off Buzzeo at 6045.
17         MS. FUMERTON:  Objection.
18  Form.
19         THE WITNESS:  I partnered with
20  compliance when we made the decision.
21  QUESTIONS BY MR. BOWER:
22     Q.    Who did you partner with at
23  compliance?
24     A.    With Miranda.
25     Q.    And how did you partner with

Page 368

1  her?
2      A.    I called her.
3      Q.    And what did you say to her?
4      A.    I told her what the issue was.
5      Q.    And what did you convey as
6  being the issue to her?
7      A.    The augmented picks.
8      Q.    And what did she say to you?
9      A.    I don't recall what she said.
10     Q.    Do you recall her agreeing with
11  your decision to turn it off at 6045?
12     A.    I'm sure that was part of the
13  conversation.
14     Q.    Do you recall the conversation?
15     A.    I don't recall all of the
16  conversation.  I recall calling her about the
17  issue.
18     Q.    Why did you call her?
19     A.    She was in compliance.
20     Q.    But why did you call her
21  specifically?
22     A.    It was her project.
23     Q.    Buzzeo was her project?
24     A.    Yes.
25     Q.    And why did you -- at this

Page 369

1  point, this is August 9, 2017, right?
2      A.    Yes.
3      Q.    When did you get back involved
4  in the Buzzeo project?
5      A.    It was that day.
6      Q.    That day?
7      A.    Yes.
8      Q.    Someone called you in and said,
9  "Hey, we got a problem"?
10         MS. FUMERTON:  Objection.
11  Form.
12  QUESTIONS BY MR. BOWER:
13     Q.    Well, strike that.
14         Then how did you become
15  involved that day?
16     A.    Someone from ISD called me.
17     Q.    And what did they tell you?
18     A.    They wanted us to look at the
19  orders that were sent to 6020 -- or 6045.
20     Q.    Did you attend meetings --
21  strike that.
22         Did you attend SOM review
23  meetings?
24     A.    Yes.
25     Q.    And what was the reason you

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 attended those meetings?
2     A.    In Chad Ducote's absence.
3     Q.    In Mr. Ducote's absence, you
4 would attend and perform the same duties as
5 him?
6           MS. FUMERTON: Objection.
7     Form.
8           THE WITNESS: Yes.
9 QUESTIONS BY MR. BOWER:
10    Q.    So you were involved in
11 decisions of whether to cut orders of
12 controlled substances; is that correct?
13          MS. FUMERTON: Objection.
14    Form.
15          THE WITNESS: With compliance.
16 QUESTIONS BY MR. BOWER:
17    Q.    Did you ever receive any
18 training in suspicious order monitoring?
19          MS. FUMERTON: Objection.
20    Form.  Asked and answered.
21          THE WITNESS: I don't recall.
22 QUESTIONS BY MR. BOWER:
23    Q.    Do you recall ever receiving
24 training in the opioid epidemic?
25          MS. FUMERTON: Objection.

Page 371

1     Form.
2           THE WITNESS: I don't recall.
3 QUESTIONS BY MR. BOWER:
4     Q.    Do you ever recall receiving
5 training in diversion?
6           MS. FUMERTON: Objection.
7     Form.
8           THE WITNESS: No, I don't
9     recall.
10 QUESTIONS BY MR. BOWER:
11    Q.    What qualifications did you
12 have to decide whether an order for
13 controlled substances would be cut?
14          MS. FUMERTON: Objection.
15    Form.
16          THE WITNESS: I don't -- I
17    don't know.
18 QUESTIONS BY MR. BOWER:
19    Q.    What criteria did you use in
20 evaluating orders for controlled substances?
21    A.    It was what compliance would
22 bring to us.
23    Q.    Can you explain what you mean
24 by "what compliance would bring to us"?
25    A.    What they had -- the data that

Page 372

1 they had pulled.
2     Q.    They would bring that data to
3 the meetings?
4     A.    Yes.
5     Q.    And what would you do with the
6 data?
7           MS. FUMERTON: Objection.
8     Form.
9           THE WITNESS: They would
10    provide the information, and I would
11    always ask them what they -- what
12    their decision -- what their -- what
13    they would recommend us do and follow
14    that lead.
15 QUESTIONS BY MR. BOWER:
16    Q.    Wasn't your role at those
17 meetings to provide your own opinion as to
18 whether an order should be cut?
19    A.    With their recommendation.
20    Q.    What criteria did you use to
21 determine whether an order should be cut?
22          MS. FUMERTON: Objection.
23    Form.
24          THE WITNESS: Whatever their
25    recommendation was.

Page 373

1 QUESTIONS BY MR. BOWER:
2     Q.    Other than their
3 recommendation, did you have any other
4 criteria that you considered?
5     A.    I asked questions.  I don't
6 recall what questions I would ask.
7     Q.    Did they come to the meetings
8 with the recommendations already made, or
9 were there discussions prior to the
10 recommendations being made?
11          MS. FUMERTON: Objection.
12    Form.
13          THE WITNESS: There were
14    discussions as we were walking through
15    the data.
16 QUESTIONS BY MR. BOWER:
17    Q.    What type of things would you
18 discuss?
19    A.    Whatever the data had.  I mean,
20 said.
21    Q.    Okay.  Give us an example.
22          MS. FUMERTON: Objection.
23    Form.
24          THE WITNESS: I can't recall
25    what some of that data was.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1 QUESTIONS BY MR. BOWER:
2    Q.    Do you recall any discussions
3 regarding this issue?
4         I mean, you attended several
5 meetings, right?
6         Well, strike that.
7         You attended several meetings
8 in connection with the SOM review process,
9 correct?
10        MS. FUMERTON:  Objection.
11 Form.
12        THE WITNESS:  I attended some
13 meetings.
14 QUESTIONS BY MR. BOWER:
15    Q.    How many would you say you
16 attended?
17    A.    I don't know.
18    Q.    Approximately.  More than 50?
19    A.    No.
20    Q.    More than 25?
21    A.    I don't know.  I do not know.
22    Q.    How long did the meetings last?
23    A.    It depended on how many stores
24 were being reviewed.
25    Q.    And did you receive any

Page 375

1 information before the meeting started?
2    A.    No.
3    Q.    Who attended the meetings?
4    A.    Miranda Gan -- I mean, Miranda
5 Johnson.  Roxy did.
6    Q.    Anyone else that you can
7 recall?
8    A.    I can't recall anybody else.
9    Q.    Were notes kept at the
10 meetings?
11    A.    I do not recall that.
12    Q.    You do not recall anyone taking
13 notes at the meeting; is that correct?
14    A.    That's correct.
15    Q.    Do you know whether Walmart was
16 required to document its decisions of whether
17 to cut an order that had been flagged as an
18 order of interest?
19        MS. FUMERTON:  Objection.
20 Form.
21        THE WITNESS:  Can you repeat
22 that question?
23        MR. BOWER:  Can you read that
24 back, please?
25        (Court Reporter read back

Page 376

1 question.)
2        THE WITNESS:  Yes, they were
3 documenting that.
4 QUESTIONS BY MR. BOWER:
5    Q.    And who was documenting it?
6    A.    The pharmacy -- that team that
7 Dena was on.  It was called the pharmacy
8 monitoring team.
9    Q.    Were they at those meetings?
10    A.    No.
11    Q.    So no one was documenting the
12 discussions at the meetings; is that correct?
13        MS. FUMERTON:  Objection.
14 Form.
15        THE WITNESS:  I do not know if
16 somebody was.
17        MS. FUMERTON:  Zach, I think
18 you have like two or three minutes.  I
19 don't know if we can get a -- want to
20 go off the record for a second to get
21 a check on the time?
22        VIDEOGRAPHER:  Going off the
23 record at 3:51 p.m.
24    (Off the record at 3:51 p.m.)
25        VIDEOGRAPHER:  We're back on

Page 377

1 the record at 3:58 p.m.
2 QUESTIONS BY MR. BOWER:
3    Q.    Ms. Sullins, I just have a few
4 more questions, closing up some questions
5 from this morning.
6         Do you recall I asked you
7 whether you were included on NACDS
8 communications?
9    A.    I do recall you asking that
10 question.
11    Q.    And in fact, you were on
12 communications regarding a various number of
13 issues, correct?
14        MS. FUMERTON:  Objection.
15 Form.
16        THE WITNESS:  I don't recall
17 that.
18 QUESTIONS BY MR. BOWER:
19    Q.    You don't recall ever receiving
20 communications from NACDS regarding
21 hydrocodone reclassification?
22    A.    I don't recall it.
23    Q.    Do you recall being part of the
24 NACDS working group?
25    A.    Yes, for serialization I was.

Page 378

1    Q.    What about for anything else?
2          Did that group deal with
3    anything else other than serialization?
4          MS. FUMERTON:  Objection.
5    Form.
6          THE WITNESS:  I didn't attend
7    anything other than serialization.
8    QUESTIONS BY MR. BOWER:
9    Q.    What do you mean by "attend
10   anything"?
11   A.    I didn't attend a meeting with
12   NACDS other than serialization.
13   Q.    Were you on e-mails discussing
14   the impact of the reclassification of
15   hydrocodone to Walmart?
16   A.    I don't know if I was.
17   Q.    Do you recall receiving those
18   e-mails?
19   A.    I do not recall that.
20   Q.    Did you ever attend HDMA
21   meetings?
22   A.    I did.
23   Q.    And what was the purpose of
24   attending those meetings?
25   A.    For serialization.

Page 379

1    Q.    What year did that start?
2    A.    I don't know.  Maybe 2012,
3    2013.  I don't know.
4    Q.    And is it your testimony today
5    the only reason you attended the HDMA
6    meetings was for serialization issues?
7    A.    Yes.
8    Q.    Did you attend the HDMA
9    distribution management conference?
10   A.    No.
11         MS. FUMERTON:  Objection.
12   Form.
13         THE WITNESS:  No.
14   QUESTIONS BY MR. BOWER:
15   Q.    Did you attend the HDMA
16   distribution manager conference in 2011?
17   A.    No.
18   Q.    Would you be surprised if
19   you're on their attendees list for 2011 as
20   attending?
21   A.    I would be surprised.
22   Q.    It's your testimony you never
23   attended such a meeting; is that correct?
24   A.    Yes.
25   Q.    And is -- what does PDFUA stand

Page 380

1    for?
2    A.    PD --
3    Q.    -- FUA, in connection with
4    NACDS communications.
5          MS. FUMERTON:  Objection.
6    Form.
7          THE WITNESS:  I don't know.
8    QUESTIONS BY MR. BOWER:
9    Q.    Would that be related to
10   serialization?
11   A.    It could be.
12   Q.    I think it is.  I'm not trying
13   to trick you or anything.  I'm just trying to
14   understand -- unfortunately, I can't show you
15   these documents because they're marked
16   confidential, but I'm just trying to get your
17   understanding of your involvement.
18         Anyone else from Walmart
19   included on the NACDS communications?
20         MS. FUMERTON:  Objection.
21   Form.
22         THE WITNESS:  I believe there
23   is some other Walmart associates that
24   are included in that.
25

Page 381

1    QUESTIONS BY MR. BOWER:
2    Q.    Were you -- and I may have
3    asked this, but I'm going to ask it again.
4          Were you a member of the NACDS
5    supply chain working group?
6    A.    Yes.
7    Q.    And what was the purpose of
8    your membership in that group?
9    A.    For serialization.
10   Q.    Anything else?
11   A.    No.
12   Q.    That group didn't deal with the
13   reclassification of hydrocodone?
14         MS. FUMERTON:  Objection.
15   Form.  Lack of foundation.
16   QUESTIONS BY MR. BOWER:
17   Q.    Is it your testimony as you sit
18   here today that you don't ever recall
19   receiving any communications from NACDS
20   regarding the reclassification of
21   hydrocodone?
22   A.    That's correct.
23         (Walmart-Sullins Exhibit 24
24   marked for identification.)
25

Page 382

1  QUESTIONS BY MR. BOWER:
2      Q.   Exhibit 24.  Okay.  You've been
3  handed what's been marked as Exhibit 24.
4  It's just a one-page e-mail, and it's
5  forwarded to you by Chad Ducote dated
6  August 9, 2017.
7          Just take a moment.  I just
8  have a few questions on this e-mail.
9      A.   Okay.
10     Q.   Do you recall receiving this
11 e-mail from Chad?
12     A.   I didn't recall.  I do not
13 recall.
14     Q.   Is it a fair statement then
15 that you didn't have the same concerns as him
16 about the algorithm kicking off too many
17 false positives?
18         MS. FUMERTON:  Objection.
19 Form.  Lack of foundation.
20         THE WITNESS:  Can you repeat
21 your question?
22         MR. BOWER:  Sure.
23         Can you just read back that
24 question, please?
25         (Court Reporter read back

Page 383

1  question.)
2          THE WITNESS:  I wasn't -- I
3  wasn't getting the data, so I can't
4  say that I was or was not.
5  QUESTIONS BY MR. BOWER:
6      Q.   Well, he forwards this e-mail
7  to you, right?
8      A.   Yes, he sent it to three of us.
9      Q.   And he says, "It is often my
10 opinion" -- referring to the algorithm,
11 right -- "in kicking off too many alerts that
12 are false positives."
13         Do you see that?
14     A.   I see that.
15     Q.   Okay.  So when you received
16 this e-mail, it didn't impact what you were
17 doing, right?
18     A.   It did not.
19     Q.   And you never followed up on
20 it?
21     A.   No.
22     Q.   Never talked to anyone about
23 the Buzzeo algorithm?
24     A.   No.
25     Q.   It didn't concern you at all?

Page 384

1          MS. FUMERTON:  Objection.
2  Form.
3          THE WITNESS:  It was not in my
4  job responsibilities.
5          MR. BOWER:  All right.  I have
6  nothing further.
7          MS. FUMERTON:  Okay.  Can we go
8  off the record for a second?
9          VIDEOGRAPHER:  Going off the
10 record at 4:05 p.m.
11  (Off the record at 4:05 p.m.)
12         VIDEOGRAPHER:  We're back on
13 the record at 4:07 p.m.
14         CROSS-EXAMINATION
15 QUESTIONS BY MS. FUMERTON:
16     Q.   Good afternoon, Ms. Sullins.  I
17 just have a couple of questions to follow up
18 on some of the questions that Mr. Bower asked
19 you earlier.
20     A.   Okay.
21     Q.   Do you recall when Mr. Bower
22 was asking you questions this morning about
23 the P&L reports that you may have reviewed in
24 some meetings?
25     A.   Yes.

Page 385

1      Q.   And just to orient us, I
2  believe you said that those P&L reports were
3  for each distribution center; is that
4  correct?
5      A.   That's correct.
6      Q.   And if you could describe the
7  P&L reports some more.  For example,
8  specifically my question is did the P&L
9  reports have line items for specific drugs?
10         MR. BOWER:  Objection to form.
11         THE WITNESS:  No, they did not.
12 QUESTIONS BY MS. FUMERTON:
13     Q.   Did they have line items for
14 specific categories of drugs?
15     A.   No, they did not.
16     Q.   Was it -- if you can just
17 describe then -- and I don't want to put
18 words in your mouth.
19         So was it just a P&L rolled up
20 of all of the products that were being
21 distributed from the distribution center?
22         MR. BOWER:  Objection.  Form.
23         THE WITNESS:  It was -- yes, it
24 was all items.
25

Page 386

1 QUESTIONS BY MS. FUMERTON:
2    Q.    And so if I want to know what a
3 particular P&L report was for opioids, for
4 example, would I be able to find that out
5 from that report?
6          MR. BOWER: Objection to form.
7          THE WITNESS: No, you would
8 not.
9 QUESTIONS BY MS. FUMERTON:
10    Q.    I think you also mentioned with
11 respect to the P&L reports that one piece of
12 information on the report was expenses; is
13 that right?
14    A.    Yes, that's correct.
15    Q.    Can you please just describe
16 what type of expenses would be reflected
17 there?
18          MR. BOWER: Objection to form.
19          If you have the reports, it
20    might be helpful to show her because
21    she testified she doesn't recall
22    what's on there.
23 QUESTIONS BY MS. FUMERTON:
24    Q.    Go ahead and answer the
25 question.

Page 387

1    A.    There would be expenses of
2 wages, overtime, utilities, rent,
3 depreciation and some other categories.  I
4 don't know now.
5    Q.    And then I think you also
6 testified -- and again, if I get the record
7 wrong, the record will say what it says --
8 that there was either a sale amount or a cost
9 of the drug; is that correct?
10          On the P&L report, that there
11 were the costs of the drug for -- or the
12 product from the DC to the pharmacy; is that
13 right?
14    A.    It would be all the costs.
15    Q.    Okay.  And that's what I was
16 trying to get at.  I was just trying to
17 understand what cost was there, because I
18 think you might have used the term "sale"
19 before.
20          But what you were referring to
21 is the sale from the DC to the pharmacy,
22 correct?
23          MR. BOWER: Objection to form.
24          THE WITNESS: That's correct.
25

Page 388

1 QUESTIONS BY MS. FUMERTON:
2    Q.    And I think you also mentioned
3 that that was an accounting function.  And
4 can you explain what you meant by that?
5    A.    It's all done in the
6 background.  They knew that that accounting
7 in the background, it's not anything that
8 is -- that comes directly to the DC.
9    Q.    So is the pharmacy transferring
10 money to the DC when it places an order or
11 its invoice for a drug?
12          MR. BOWER: Objection to form.
13    Foundation.
14          THE WITNESS: No, it's not.
15 QUESTIONS BY MS. FUMERTON:
16    Q.    Would it be accurate to
17 describe the rolled-up cost that you're
18 referring to as an internal allocation of all
19 of the product costs from the DC to the
20 pharmacy?
21          MR. BOWER: Objection.  Form.
22          THE WITNESS: Yes.
23 QUESTIONS BY MS. FUMERTON:
24    Q.    And I asked you to get
25 Exhibits 20 and 19 out in front of you.

Page 389

1    A.    Yes.
2    Q.    Do you see those?
3    A.    Yes.
4    Q.    And I just want to make sure
5 that the testimony is clear on -- with
6 respect to these exhibits.
7          With respect to Exhibit 19, you
8 were asked a series of questions about the
9 attachment, which is an excerpt of an Excel
10 spreadsheet, correct?
11    A.    Yes.
12    Q.    Did you pull this spreadsheet?
13    A.    No, I did not.
14    Q.    Do you know where this
15 spreadsheet was pulled from?
16          MR. BOWER: Objection to form.
17          THE WITNESS: I do not.
18 QUESTIONS BY MS. FUMERTON:
19    Q.    And I'm just going to ask the
20 same set of questions with respect to
21 Exhibit 20.
22          That also is an e-mail with an
23 attachment with a -- appears to be some sort
24 of spreadsheet, correct?
25    A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1  Q.   Did you pull the information
2 that is attached to Exhibit 20?
3  A.   No, I did not.
4  Q.   Do you know where it was pulled
5 from?
6  A.   I do not know.
7      MS. FUMERTON:  I have no
8 further questions.
9      MR. BOWER:  I just have a
10 couple of follow-ups.  Do you want to
11 switch back?
12      MS. FUMERTON:  Let's go off the
13 record.  Your rules.
14      VIDEOGRAPHER:  Going off the
15 record at 4:12 p.m.
16  (Off the record at 4:12 p.m.)
17      VIDEOGRAPHER:  We're back on
18 the record at 4:13 p.m.
19      REDIRECT EXAMINATION
20 QUESTIONS BY MR. BOWER:
21  Q.   I think we're almost done,
22 Ms. Sullins.  I just have a couple of
23 follow-up questions regarding what
24 Ms. Fumerton just asked you regarding the P&L
25 statements from the DCs.

Page 391

1      Okay?
2  A.   Yes.
3  Q.   Okay.  Are you able, as you sit
4 here today, to recall all the information
5 that's on those statements?
6  A.   No.
7  Q.   Would you need to see those
8 statements in order to testify as to all of
9 the information that's on them?
10  A.   Yes.
11  Q.   Indeed, earlier today you
12 mentioned, for example, some things that
13 Ms. Fumerton did not suggest:  the pick rate,
14 right, or the cost per pick?
15  A.   The cost per pick shipped?
16  Q.   Yeah.  That's on there, right?
17  A.   It's not on the P&L.  It's -- I
18 don't know if it's on the P&L.
19  Q.   You would need to see the P&L
20 in order to answer that question, right?
21  A.   I would need to -- I would
22 need -- because I think that that was added
23 afterwards.  I don't know if it's part of the
24 P&L.
25  Q.   But it was part of your

Page 392

1 discussion in connection with the P&L,
2 correct?
3  A.   Yes.
4  Q.   And then you simply don't know
5 whether it's part of the P&L; isn't that
6 true?
7  A.   I do not know.
8  Q.   Because we don't have them,
9 right?
10      We don't have them today,
11 right?
12      MS. FUMERTON:  Objection.
13 Form.
14 QUESTIONS BY MR. BOWER:
15  Q.   Have we seen the P&Ls today?
16  A.   We have not.
17  Q.   Okay.  Without those P&Ls you
18 cannot testify as to all the information on
19 them; is that correct?
20  A.   That's correct.
21      MR. BOWER:  I have nothing
22 further.
23      MS. FUMERTON:  Okay.  I
24 literally have like two questions just
25 to follow up on what you said.  Are we

Page 393

1 really going to switch?
2      MR. BOWER:  Yeah.
3      MS. FUMERTON:  Okay.  Can we go
4 off the record?
5      VIDEOGRAPHER:  Going off the
6 record at 4:15 p.m.
7  (Off the record at 4:15 p.m.)
8      VIDEOGRAPHER:  We're back on
9 the record at 4:15 p.m.
10      RECROSS-EXAMINATION
11 QUESTIONS BY MS. FUMERTON:
12  Q.   Ms. Sullins, just a couple
13 quick questions.
14      Mr. Bower just asked you about
15 the cost per pick shipped.
16      Do you recall --
17  A.   Yes.
18  Q.   -- those questions?
19      Can you please describe what
20 that is?
21  A.   It is the total expenses
22 divided by the total sales, and that gets you
23 the cost per pick shipped.
24  Q.   And is that calculated on a
25 drug level?

Highly Confidential - Subject to Further Confidentiality Review

| Page 394 |
| --- |

1    A.    No.

2    Q.    So that's, again, calculated

3  for all of the expenses at the DC?

4    A.    Yes.

5    Q.    Divided by all of the orders

6  for all drugs for that DC?

7    A.    Yes.

8       MS. FUMERTON:  I have no

9  further questions.

10       MR. BOWER:  I have nothing

11  further.

12       VIDEOGRAPHER:  Going off the

13  record at 4:16 p.m.

14       This concludes the videotaped

15  deposition of Ramona Sullins.

16  (Deposition concluded at 4:16 p.m.)

17       _ _ _ _ _ _ _

18

19

20

21

22

23

24

25

| Page 396 |
| --- |

1       INSTRUCTIONS TO WITNESS

2

3       Please read your deposition over

4  carefully and make any necessary corrections.

5  You should state the reason in the

6  appropriate space on the errata sheet for any

7  corrections that are made.

8       After doing so, please sign the

9  errata sheet and date it.  You are signing

10  same subject to the changes you have noted on

11  the errata sheet, which will be attached to

12  your deposition.

13       It is imperative that you return

14  the original errata sheet to the deposing

15  attorney within thirty (30) days of receipt

16  of the deposition transcript by you.  If you

17  fail to do so, the deposition transcript may

18  be deemed to be accurate and may be used in

19  court.

20

21

22

23

24

25

| Page 395 |
| --- |

1

2       CERTIFICATE

3       I, CARRIE A. CAMPBELL, Registered
Diplomate Reporter, Certified Realtime

4  Reporter and Certified Shorthand Reporter, do
hereby certify that prior to the commencement

5  of the examination, Ramona Sullins was duly
sworn by me to testify to the truth, the

6  whole truth and nothing but the truth.

7       I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the

8  testimony as taken stenographically by and
before me at the time, place and on the date

9  hereinbefore set forth, to the best of my
ability.

10

11       I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney

12  nor counsel of any of the parties to this
action, and that I am neither a relative nor

13  employee of such attorney or counsel, and
that I am not financially interested in the

14  action.

15

16

17       _____
CARRIE A. CAMPBELL,

18  NCRA Registered Diplomate Reporter
Certified Realtime Reporter

19  California Certified Shorthand
Reporter #13921

20  Missouri Certified Court Reporter #859
Illinois Certified Shorthand Reporter

21  #084-004229
Texas Certified Shorthand Reporter #9328

22  Kansas Certified Court Reporter #1715
Notary Public

23  Dated:  January 8, 2019

24

25

| Page 397 |
| --- |

1       ACKNOWLEDGMENT OF DEPONENT

2

3

4       I,_____, do
hereby certify that I have read the foregoing

5  pages and that the same is a correct
transcription of the answers given by me to

6  the questions therein propounded, except for
the corrections or changes in form or
substance, if any, noted in the attached
Errata Sheet.

7

8

9

10

11

12  _____

     Ramona Sullins          DATE

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

Page 398

1      _ _ _ _ _ _ _
              ERRATA
2      _ _ _ _ _ _ _
3    PAGE  LINE  CHANGE/REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25

Page 399

1      _ _ _ _ _ _ _
            LAWYER'S NOTES
2      _ _ _ _ _ _ _
3    PAGE  LINE
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25