Highly Confidential - Subject to Further Confidentiality Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -   -   -
 5
    IN RE:  NATIONAL      :   HON. DAN A.
 6  PRESCRIPTION OPIATE   :   POLSTER
    LITIGATION            :
 7                        :
    APPLIES TO ALL CASES  :   NO.
 8                        :   1:17-MD-2804
                          :
 9

10          - HIGHLY CONFIDENTIAL -

    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      -   -   -
12
                   April 2, 2019
13
                      -   -   -
14

15          Videotaped deposition of
    SERGIO TEJEDA taken pursuant to notice,
16  was held at the offices of Locke Lord,
    LLP, 200 Vesey Street, New York, New
17  York, beginning at 9:01 a.m., on the
    above date, before Michelle L. Gray, a
18  Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
19  Realtime Reporter, and Notary Public.
20                      -   -   -
21
           GOLKOW LITIGATION SERVICES
22       877.370.3377 ph| 917.591.5672
                deps@golkow.com
23

24
```

Page 2

APPEARANCES:

MOTLEY RICE, LLC
BY: DONALD A. MIGLIORI, ESQ.
JOHN C. DUANE, ESQ.
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
(843) 216-9000
dmigliori@motleyrice.com
jduane@motleyrice.com
Representing the Plaintiffs

LOCKE LORD, LLP
BY: JOHN P. McDONALD, ESQ.
2200 Ross Avenue
Suite 2800
Dallas, Texas 75201
(214) 740.8758
jpmcdonald@lockelord.com
Representing Henry Schein, Inc. and the
Witness

WILLIAMS & CONNOLLY, LLP
BY: KATELYN ADAMS, ESQ.
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5148
Kadams@wc.com
Representing the Defendant, Cardinal
Health

COVINGTON & BURLING, LLP
BY: MEGAN A. CROWLEY, ESQ.
850 Tenth Street, NW, Suite 586N
Washington, D.C. 20001
(202) 662-5516
mcrowley@cov.com
Representing the Defendant, McKesson
Corporation

Page 3

APPEARANCES: (Cont'd.)

MARCUS & SHAPIRA, LLP
BY: JOSHUA A. KOBRIN, ESQ.
One Oxford Centre, 35th Floor
Pittsburgh, Pennsylvania 15219
(412) 338-3990
kobrin@marcus-shapira.com
Representing the Defendant, HBC
Service Company

TELEPHONIC/STREAMING APPEARANCES:

JACKSON KELLY, PLLC
BY: SYLVIA WINSTON NICHOLS, ESQ.
150 Clay Street, Suite 500
Morgantown, WV 26501
(304) 284-4138
Sylvia.winston@jacksonkelly.com
Representing the Defendant,
AmerisourceBergen

VIDEOTAPE TECHNICIAN:
David Lane

ALSO PRESENT:

Marjorie Han, Esq.
(Henry Schein, Inc.)

Page 4

- - -
I N D E X
- - -

Testimony of:

SERGIO TEJEDA

By Mr. Migliori          11

- - -
E X H I B I T S
- - -

NO.          DESCRIPTION          PAGE
Henry Schein
Tejeda-1     Notice of Deposition  30

Henry Schein
Tejeda-2     Resumé of Sergio      31
             Tejeda

Henry Schein
Tejeda-3     Henry Schein          48
             Appoints New Director
             Of Compliance

Page 5

- - -
E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
Henry Schein
Tejeda-4     PDMA Record           75
             Retention Policy
             1/30/02
             HSI-MDL-00092255-70

Henry Schein
Tejeda-5     Due Diligence         116
             Documents
             Schein Summit
             County Customers
             Opioid Orders
             2001-2008
             HSI-MDL-00648726

Henry Schein
Tejeda-6     Customer Service      125
             Imaging
             Harper, Jr. Adolph
             HSI-MDL-00000983-84

Henry Schein
Tejeda-7     Due Diligence         142
             Documents
             Schein Summit County
             Customers
             Opioid Post January 2009
             HSI-MDL-00648726

Henry Schein
Tejeda-8     Customer Service      149
             Imaging
             Heim, Brian
             HSI-MDL-00001198-210

Page 6

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
Henry Schein
Tejeda-9    Letter, 11/9/12        158
            To Droz from
            Tejeda
            HSI-MDL-00397293-94
Henry Schein
Tejeda-10   E-mail Thread         180
            7/11/12
            Subject, Brian Heim
            HSI-MDL-00648727
Henry Schein
Tejeda-11   DEA/Prof Licence      186
            Maintenance
            HSI-MDL-00648813
Henry Schein
Tejeda-12   Cegedim Dendrite      207
            New Account Issues
            Involving Controlled
            Substances
            HSI-MDL-00231217-18
Henry Schein
Tejeda-13   E-mail, 8/6/13        223
            Subject, Need 3
            Embers
            HSI-MDL-00552881-83
Henry Schein
Tejeda-14   Individual            228
            Opportunity/Issue
            Presented by
            Tina Steffanie-Oak
            (No Bates)

Page 8

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
Henry Schein
Tejeda-20   E-mail Thread         300
            11/6/13
            Subject, December
            Audit Basis
            HSI-MDL-00622264-67

Henry Schein
Tejeda-21   Projects - Tejeda     315
            Slide

Henry Schein
Tejeda-22   21 CFR 1301.74(b)     321
Henry Schein
Tejeda-23   US DEA Letter         335
            12/27/07
            HSI-MDL-00404079-80

Page 7

E X H I B I T S (Cont'd.)
- - -

NO.          DESCRIPTION          PAGE
Henry Schein
Tejeda-15   Cegedim Draft         230
            Schein SOM Procedural
            Review
            21 CFR 1301.74(b)
            HSI-MDL-00404369-73
Henry Schein
Tejeda-16   E-mail, 3/5/11        242
            Subject, Draft DEA
            Presentation
            HSI-MDL-00007351-52
Henry Schein
Tejeda-17   Due-Diligence         250
            Documents
            Schein Summit County
            Customers
            Canceled Orders
            HSI-MDL-00648726
Henry Schein
Tejeda-18   E-mail Thread         261
            2/6/08
            Subject, HDMA
            Meeting
            HSI-MDL-00376363-64
Henry Schein
Tejeda-19   HDMA Industry         279
            Compliance Guidelines
            HSI-MDL-00063613

Page 9

DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
PAGE   LINE
None.

Request for Production of Documents
PAGE   LINE
None.

Stipulations
PAGE   LINE
None.

Questions Marked
PAGE   LINE
None.

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1           - - -
2       THE VIDEOGRAPHER:  We're now
3   on the record.  My name is David
4   Lane, videographer for Golkow
5   Litigation Services.
6       Today's date is April 2nd,
7   2019.  Our time is 9:01 a.m.
8       This deposition is taking
9   place in New York, New York, in
10  the matter of National
11  Prescription Opiate Litigation.
12      Our deponent today is Sergio
13  Tejeda.
14      Counsel will be noted on the
15  stenographic record.
16      Our court reporter today is
17  Michelle Gray and will now swear
18  in our witness.
19          - - -
20  ... SERGIO TEJEDA, having
21  been first duly sworn, was
22  examined and testified as follows:
23          - - -
24      THE VIDEOGRAPHER: Please

Page 11

1   begin.
2           - - -
3       EXAMINATION
4           - - -
5   BY MR. MIGLIORI:
6       Q.   Good morning.
7       A.   Good morning.
8       Q.   My name is Don Migliori.  I
9   represent some of the plaintiffs in this
10  litigation, and I'll be asking you some
11  questions this morning.
12      My voice is a little weak
13  today.  If you can't understand my
14  question or can't hear it, I'll ask you
15  to let me know.  Okay?
16      A.   Okay.
17      Q.   Have you ever had your
18  deposition taken before?
19      A.   No.
20      Q.   So I'll be asking you some
21  questions.  The court reporter will be
22  taking down your answers.
23      A.   Okay.
24      Q.   I ask that you wait for my

Page 12

1   question to be complete before you
2   answer.  Also, to give a little bit of
3   time so that your counsel can make an
4   objection, if necessary.
5       I'll ask that also your
6   answers be verbal; that is, gestures, or
7   sounds are hard to type, so if you can
8   say "yes" or "no" as appropriate, I'd
9   appreciate it.  And if you have any
10  questions or want to take a break, just
11  let me know and we'll do so.
12      Do you have any questions
13  before we get started?
14      A.   No.
15      Q.   Okay.  If you answer my
16  question, I'm going to assume that you've
17  understood it.  Is that understandable?
18      A.   Yes, it is.
19      Q.   Okay.  Could you tell the
20  jury your name and your address?
21      A.   My name is Sergio Tejeda.
22  My address is 93 Edgewood Road, Port
23  Washington, New York 11050.
24      Q.   I'm going to ask you to keep

Page 13

1   your voice up too.  We're both
2   struggling.  Just so the court reporter
3   can hear you.  Okay?
4       A.   Okay.
5       Q.   What's your current position
6   and employer?
7       A.   I'm the director of
8   regulatory affairs for Henry Schein
9   Incorporated.
10      Q.   And how long have you held
11  that position?
12      A.   About four years with the
13  same title.
14      Q.   Going back to 2015?
15      A.   Yes.
16      Q.   And what was the title
17  before that?
18      A.   Director of regulatory for
19  North America.
20      Q.   How long did you hold that
21  title?
22      A.   About three years.
23      Q.   Going back to 2012?
24      A.   More or less.

Page 14

1    Q.   Okay.  What, if anything,
2  was a change in your responsibilities
3  between those two positions?
4    A.   I am focused on domestic
5  compliance at this point.
6    Q.   Okay.  We're going to get
7  into some of the specifics of all of
8  that.  Before we get started with that,
9  when did you first learn about this
10 deposition?
11   A.   When did I first learn?
12 Sometime last year.
13   Q.   And did you meet with
14 counsel in preparation for this
15 deposition?
16   A.   Yes.
17   Q.   Do you recall the first time
18 that you met with counsel?
19   A.   I think it was late
20 February.
21   Q.   February?
22   A.   Late February.
23   Q.   And who did you meet with?
24   A.   I met with the local team

Page 15

1  and our inhouse attorneys.
2    Q.   Did you meet in Melville, or
3  did you meet at the -- or did you meet
4  here in the office?
5    A.   First meeting was here.
6    Q.   Do you recall how long you
7  met?
8    A.   Maybe four hours.
9    Q.   Did you review documents at
10 that time?
11   A.   Yeah, we reviewed some
12 documents.
13   Q.   Did you review any testimony
14 of other witnesses in this case?
15   A.   No.
16   Q.   Have you ever reviewed any
17 testimony of other witnesses in this
18 case?
19   A.   No.
20   Q.   The documents that you
21 reviewed in that first meeting, were they
22 documents that you brought with you to
23 the meeting or were they provided to you
24 by counsel?

Page 16

1    A.   They were provided by
2  counsel.
3    Q.   Did you meet again with
4  counsel in preparation for today?
5    A.   Yes.
6    Q.   How many more times?
7    A.   Three.
8    Q.   And were those meetings also
9  here or were they in other places?
10   A.   In Melville once, we had
11 teleconference once, and here once.
12   Q.   When was the meeting in
13 Melville?
14   A.   So I don't remember the
15 exact date, sorry.
16   Q.   Was it the second meeting
17 you had?
18   A.   It was the second meeting,
19 yes.
20   Q.   Do you know how long that
21 meeting last -- lasted?
22   A.   About six, seven hours.
23   Q.   Did you review documents at
24 that meeting?

Page 17

1    A.   Yes.
2    Q.   Were they documents that you
3  had in Melville?  That is, were they
4  kept -- were you the -- did you bring
5  those documents with you to the meeting?
6    A.   I brought some documents.
7    Q.   And do you recall what kinds
8  of documents you brought with you,
9  yourself, to the meeting?
10   A.   Material that we had
11 reviewed the first meeting.
12   Q.   Okay.  Anything that you got
13 out of your own files that had not been
14 provided to you by counsel?
15   A.   No.
16   Q.   Were you asked to gather any
17 documents that weren't part of what the
18 counsel showed you?
19   A.   No.
20   Q.   Did you prepare -- at any
21 point were you asked to set aside
22 documents in your own control in order to
23 comply with any discovery requests in
24 this case?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1   A.   Do you mean prior to the
2 preparation?
3   Q.   Yeah.
4   A.   Yes.
5   Q.   And did you provide all
6 those documents that you had in your
7 control?
8   A.   Yeah.
9   Q.   Relative to this case?
10   A.   Yes.
11   Q.   And since that initial
12 production, did you go back and get any
13 more documents or look for more
14 documents?
15   A.   I don't think so.
16   Q.   Did you review any
17 transactional records of controlled
18 substances for your testimony in this
19 case?
20   A.   Not for my testimony.
21 For -- as a matter of my -- the nature of
22 my work, I do.
23   Q.   Okay.  And I'm not talking
24 about generally in the course of your own

Page 19

1 business.  I'm asking relative to the
2 issues in this case, relative to Ohio or
3 Summit County, Ohio.  Did you review any
4 transactional records in preparation for
5 your testimony?
6   A.   Not transactional records.
7 We produced some reports.
8   Q.   Were you helpful in
9 producing those reports?
10   A.   It was a collab -- an effort
11 between my team and the verifications
12 department.
13       MR. McDONALD:  He said
14       collaborative effort.
15       THE WITNESS:  Sorry.
16 BY MR. MIGLIORI:
17   Q.   Which reports did your team
18 and the verifications team gather
19 together?
20   A.   Sales reports.  Any due
21 diligence that we may have.
22   Q.   What about pended order
23 reports?  Did you review anything like
24 that?

Page 20

1   A.   No.
2   Q.   Did you help produce any
3 reports relevant to canceled orders?
4   A.   My team did.
5   Q.   What is a canceled order?
6   A.   Canceled order is an order
7 that has been placed and either the
8 customer or Henry Schein, somebody at
9 Henry Schein has canceled.
10   Q.   Okay.  When it's canceled by
11 Henry Schein, what are their bases to
12 cancel an order?
13   A.   Many different types of
14 reasons.
15   Q.   Is there a canceled order
16 for an order that's considered
17 suspicious?
18   A.   So an order can be deemed
19 suspicious and can be canceled by the
20 customer.
21   Q.   Okay.  My question is a
22 little more particular to these reports
23 that you gathered.  Did you prepare a
24 canceled order report with the

Page 21

1 verifications team?
2   A.   No.
3   Q.   Any other reports that you
4 or your team prepared for this
5 litigation, to your knowledge?
6   A.   Training.  We produced SOPs.
7   Q.   What kind of training
8 documents did you gather?
9   A.   Training materials, some
10 training records.
11   Q.   And describe the training
12 records in particular.  Are they the
13 actual manuals for training, are they
14 scores or grades for success in training?
15 What kind of records did you pull
16 together?
17   A.   May have been just pieces of
18 PowerPoint presentations, or forms that
19 they were completed after a training has
20 completed.  The employees record their
21 name and sign.
22   Q.   Were any of these employees
23 sales employees?
24   A.   No.  It was mainly

Page 22

1 verifications and/or regulatory.
2     Q.    Verifications and what?
3     A.    And/or regulatory.
4     Q.    All right.  Do you know when
5 the training records started, what years
6 they started from what you gathered?
7     A.    I don't remember.
8     Q.    You said standard operating
9 procedures, were you part of the
10 collection of the SOPs, or your team?
11     A.    They were collected by
12 verifications, and some were collected by
13 my team.
14     Q.    Did you review those in
15 preparation for today at any point?
16     A.    I remember looking at one or
17 two.
18     Q.    Okay.  Were the same people
19 at the Melville meeting that were at the
20 initial meeting here at Locke Lord?
21     A.    No.
22     Q.    Who else was there?
23     A.    Somebody was missing, and I
24 apologize if I don't remember his name.

Page 23

1 I think it was somebody from the Locke
2 Lord team.
3     Q.    Okay.  Did you ever speak
4 with Shaun Abreu about your testimony?
5     A.    About?
6     Q.    About this litigation?
7     A.    So about being deposed or
8 the --
9     Q.    Any aspect of this --
10     A.    -- in particular from --
11     Q.    Any aspect of this
12 litigation?
13     A.    The only thing has been that
14 we know that we both were deposed or
15 being deposed.
16     Q.    Okay.  Did you ask him about
17 his deposition?
18     A.    No.
19     Q.    Did you ask anybody about
20 testimony they've given in this case?
21     A.    No.
22     Q.    Did you talk to Mr. Peacock?
23     A.    Every day.
24     Q.    Did you talk about this

Page 24

1 litigation?
2     A.    Just on the matter that I
3 was being deposed.
4     Q.    Okay.  You didn't talk about
5 the substance of his testimony?
6     A.    No.
7     Q.    Did you talk to Tina -- let
8 me get this -- Tina Steffanie-Oak at any
9 point about this litigation?
10     A.    I haven't talked to Tina in
11 months.
12     Q.    Okay.  Have you talked to
13 her since she left the company?
14     A.    Yes.
15     Q.    Did you talk to her about
16 this litigation?
17     A.    Only when -- last year when
18 we were talking about her being deposed.
19     Q.    Okay.  And you haven't
20 talked to her since her deposition about
21 her testimony?
22     A.    No, I haven't.
23     Q.    Okay.  When you had your
24 teleconference, did you continue to

Page 25

1 review documents in preparation for
2 today?
3     A.    Yes.
4     Q.    Were there any new documents
5 presented to you?
6     A.    I think so.
7     Q.    Any new testimony described
8 to you at any point?
9     A.    No testimony.
10     Q.    Were the same people
11 involved in that meeting?
12     A.    It was -- yes.
13     Q.    Okay.  That is, counsel
14 inhouse from Henry Schein and counsel
15 from Locke Lord?
16     A.    Yes, that's correct.
17     Q.    Was it Mr. McDonald or was
18 it Mr. Jones or both?
19     A.    No, it was Mr. Jones and
20 also Lauren, I don't remember her last
21 name.
22     Q.    That's fine.  It's not a
23 quiz.
24         How long did the

Highly Confidential – Subject to Further Confidentiality Review

Page 26

1 teleconference last?
2     A.   Teleconference last six
3 hours.
4     Q.   And during that six hours,
5 no testimony was described to you?
6     A.   No, no testimony.
7     Q.   And that was the third of
8 your four meetings?
9     A.   Yes, sir.
10     Q.   And then you had one more
11 meeting here at this law office?
12     A.   Yes, sir.
13     Q.   And was that yesterday?
14     A.   Yesterday.
15     Q.   And how long was that
16 meeting?
17     A.   It started at around nine
18 and finished around four.
19     Q.   Okay.  So about seven hours?
20     A.   About seven hours.
21     Q.   So if my math is correct,
22 you spent somewhere between 20 and
23 25 hours preparing for today?
24     A.   Between that.

Page 27

1     Q.   In the meeting yesterday,
2 did you see any documents that were new
3 that you hadn't seen before?
4     A.   I think I saw a couple, yes.
5     Q.   And the documents that
6 you're looking at generally, were they
7 documents relating to suspicious order
8 monitoring systems?
9     A.   The process, yes, and
10 relating to the suspicious order
11 monitoring.
12     Q.   Did you review any documents
13 specific to Ohio or Summit County, Ohio?
14     A.   No.
15     Q.   Did you review any answers
16 to interrogatories that Henry Schein
17 prepared in this -- in this litigation?
18     A.   I'm sorry, say that again.
19     Q.   Did you review any written
20 responses, sworn statements, that your
21 company prepared for this litigation?
22     A.   No.
23     Q.   Do you know whether or not a
24 single suspicious order has ever been

Page 28

1 reported in the state of Ohio or in
2 some -- for Summit County transactions
3 ever?
4     A.   I don't know.
5     Q.   Do you know whether or not
6 any pended orders were ever discovered
7 for Summit County, Ohio, or anywhere
8 within the state of Ohio?
9         MR. McDONALD:  Object to the
10 form.
11         THE WITNESS:  What?
12         MR. McDONALD:  Go ahead.
13 Answer if you know.
14         THE WITNESS:  Okay.  Sorry,
15     by knowing, you mean a specific
16     or -- because we know that we were
17     doing it -- we were more like --
18     more than likely reported to Ohio.
19 BY MR. MIGLIORI:
20     Q.   Well, I'm not asking about
21 reporting to Ohio, the state of Ohio,
22 I'll get to that separately.  Right now
23 I'm talking about, and I'll be clear I
24 guess, to the DEA field office.

Page 29

1         Did you report any pended
2 orders to the DEA field office for Summit
3 County or within the state of Ohio at any
4 point while you were at Henry Schein to
5 your knowledge?
6     A.   I don't remember.
7     Q.   And in the 25 hours that you
8 prepared for today, you didn't do
9 anything to familiarize yourself with
10 Summit County, Ohio, the county where
11 Henry Schein has been sued?
12     A.   We really didn't talk
13 about --
14         MR. McDONALD:  Don't --
15     don't disclose the specifics of
16     what we discussed.  Just answer
17     his question.
18 BY MR. MIGLIORI:
19     Q.   I'm just asking whether you
20 familiarized yourself with anything from
21 Summit County, Ohio, relevant to
22 suspicious orders, pended orders, any
23 activity, transactional activity that
24 would rise to the level of a pended or

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1 suspicious order?
2      A.   No.
3      Q.   I'm going to hand you
4 documents throughout the day.  It's a
5 tough reach but...
6           (Document marked for
7      identification as Exhibit
8      Henry Schein-Tejeda-1.)
9 BY MR. MIGLIORI:
10     Q.   This is today's notice of
11 deposition for the record.
12          And you have seen this,
13 haven't you?
14     A.   Yes.
15     Q.   This tells you to come here
16 today.  Did you bring any documents with
17 you today?
18     A.   Not related to the -- to
19 this.
20     Q.   No?  Okay.  I've been
21 provided with what appears to be a
22 curriculum vitae.  I'm not sure when this
23 was prepared.
24          (Document marked for

Page 31

1      identification as Exhibit
2      Henry Schein-Tejeda-2.)
3 BY MR. MIGLIORI:
4      Q.   If you can take a couple
5 seconds, I marked it as Exhibit 2.
6           Could you look at this and
7 let me know when you think this may have
8 been prepared?
9      A.   I think this was prepared
10 sometime last year.
11     Q.   For what purpose?
12     A.   I wanted to update it, to
13 update my resumé.
14     Q.   Okay.  Was it -- were you
15 asked to prepare this by counsel?
16     A.   No.
17     Q.   Do you recall when you
18 provided it to counsel?
19     A.   I don't.
20     Q.   Did you have any help in
21 preparing this document?
22     A.   No.  Not unless my wife read
23 it and give me comments.
24     Q.   Those are the best critics.

Page 32

1      A.   Yes.
2      Q.   Let's start at the last
3 page.
4      A.   Okay.
5      Q.   It says that you attended
6 law school at the Universidad Raphael
7 Landívar in Guatemala, Central America.
8           Is that correct?
9      A.   Yes, sir.
10     Q.   And it has the date of 1986.
11 Did you -- what kind of degree did you
12 get in 1986?
13     A.   So, I close curriculum, I
14 didn't graduate.
15     Q.   Okay.  Was that a school --
16 was that a full law school program to
17 become a lawyer or was there another
18 program within the university that you
19 were attending?
20     A.   It was a full law school to
21 become a lawyer.
22     Q.   Okay.  So you did not
23 complete law school?
24     A.   No.

Page 33

1      Q.   After law school it lists as
2 your next educational background, Adelphi
3 University on Long Island, New York,
4 bachelor of arts degree in 1996.
5      A.   Yes.
6      Q.   Is that a degree that you
7 obtained?
8      A.   Yes, sir.
9      Q.   And that's in -- it was in
10 criminal justice?
11     A.   Yes, sir.
12     Q.   When did you move from
13 Guatemala to the United States?
14     A.   1989.
15     Q.   From 1986 to 1999, it has,
16 on the third page, different professional
17 experiences.  It looks like at least from
18 '86 to '88, it says that you were a
19 junior associate.  What does that mean?
20 At the Barrios and Comparini Law Firm in
21 Guatemala.
22     A.   Yes.  So that means that I
23 was in the senior stages of my law school
24 education, and they started to give me

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  work of -- more as an attorney as opposed
2  to a paralegal.
3      Q.   But you were not a lawyer,
4  correct?
5      A.   No, I wasn't.
6      Q.   Before that, from 1980 to
7  1988 or during that same period of time
8  you are also listed as a paralegal,
9  correct?
10     A.   Yes.
11     Q.   At any point during that
12 professional experience, did you have any
13 role or relationship to any kind of
14 pharmaceutical litigation?
15     A.   Not litigation.  My role was
16 more, on that end, drug registration, you
17 know, intellectual property, things like
18 that.
19     Q.   You left Barrios and
20 Comparini and went to Tres Torres, S.A.,
21 in Guatemala from '88 to '90.  It says
22 collections manager.  Is that what it
23 sounds like?  Did you work for a firm
24 that did collections?

Page 35

1      A.   So this was a software
2  company, and they hired me to run their
3  collections department, yes.
4      Q.   So, again, you were not a
5  lawyer; you were either a paralegal or a
6  manager of sorts, correct?
7      A.   A manager.
8      Q.   All right.  So in 1990, it's
9  the first entry we have here for Henry
10 Schein Inc., Port Washington, New York.
11 What caused you to move to Port
12 Washington, New York?
13     A.   My wife is a dentist.  And
14 she was offered a program in NYU that was
15 to make us take the transition to move to
16 the United States.
17     Q.   Okay.  And from 1990 to
18 1993, it says that you were a customer
19 returns representative.  Tell me about
20 that position at Henry Schein.
21     A.   So this was a position where
22 I received and processed returns from
23 Henry Schein customers.
24     Q.   And what kind of products

Page 36

1  are we talking about?
2      A.   Drugs, medical devices,
3  supplies, paper goods, vitamins.
4      Q.   And in 1993 you moved from a
5  customer returns representative to a
6  customer returns department
7  return-to-vendor coordinator.  You did
8  that for two years.  What change in
9  responsibilities did you have at Henry
10 Schein?
11     A.   Since I was working with our
12 suppliers and business partners in
13 coordinating returns of product to -- to
14 them based on their policies and our
15 needs.
16     Q.   I assume at this point
17 through 1995 -- from 1990 to 1995 you had
18 no responsibilities relative to
19 controlled substances, correct?
20     A.   As far as processing the
21 returns and processing paperwork to
22 return controlled substances, or dispose
23 of it, that was my role with controlled
24 substances.

Page 37

1      Q.   You had no issue -- no
2  responsibilities relative to compliance
3  issues or training or oversight with
4  regulatory affairs, correct?
5      A.   No.
6      Q.   No you didn't or --
7      A.   I didn't.  I didn't.
8      Q.   All right.  You started in
9  1995 as a customer -- supervisor,
10 customer returns department.  So did you
11 just work your way up to the top of the
12 chain in customer returns?
13     A.   Yes, I guess you can say
14 that.
15     Q.   So at this point now,
16 instead of being a representative, you're
17 now managing 40 associates and
18 coordinators?
19     A.   Yes, sir.
20     Q.   And again, to the extent it
21 related to controlled substances, it
22 would just be the return and processing
23 of returned controlled substances from
24 Henry Schein customers, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    A.   So at that point I started
2  to get more involved in policy issues,
3  SOPs, working with the verifications
4  teams, understanding the controlled
5  substance operations, and obviously
6  because of the returns, what to do with
7  the inventories, what to do with special
8  outgoings and things like that.
9    Q.   Okay.  How did you learn
10 about all those things?
11   A.   So my manager was also a
12 manager of the person that was doing
13 controlled substance monitoring, I can
14 say.
15   Q.   Who was that?
16   A.   Janet Nalbeaiko.  Or I'm
17 sorry, my manager or the person that was
18 doing -- that was focusing on
19 verifications?
20   Q.   Well, I was referring to the
21 person that you were referring to.  So I
22 think you said that you learned from
23 somebody who was your manager.  I was
24 trying to figure out who that person was.

Page 39

1    A.   So my manager, his name was
2  Bob Carlson.  He was also the manager for
3  Janet, who was more involved in the
4  controlled substance management.
5    Q.   Okay.  And how did they
6  teach you about issues relating to
7  policies, standard operating procedures,
8  and controlled substance compliance?
9    A.   So work -- on the work
10 education, and I also started to become
11 responsible of the processes and
12 procedures for the department.
13   Q.   How?  How did you learn
14 about it?  Who taught you?  Did you have
15 training materials?
16   A.   Do I have training
17 materials?
18   Q.   Were you provided training
19 materials?
20   A.   I don't remember.
21   Q.   Did you go to any classes to
22 learn about the Controlled Substances
23 Act?
24      MR. McDONALD:  You are

Page 40

1  talking about at that point in
2  time?
3      MR. MIGLIORI:  Yeah.
4  BY MR. MIGLIORI:
5    Q.   As you're starting to learn
6  about policies and standard operating
7  procedures.
8    A.   I don't remember.
9    Q.   Is it fair to say that
10 whatever you were starting to learn about
11 DEA compliance, you were learning on the
12 job?
13   A.   And -- yes, and by working
14 with -- with Janet and Rob -- Bob.  Yes.
15   Q.   At this point do you recall
16 doing any returns or issues relating to
17 compliance with returns for Schedule II
18 drugs?
19   A.   When you say doing any
20 returns, what do you mean?
21   Q.   We're still talking about a
22 period of time when you're in the returns
23 department, 1995 to 1998.  You were the
24 supervisor of customer returns.  And I'm

Page 41

1  asking you, in that role did you have any
2  direct involvement with Schedule II
3  controlled substances, other than the
4  returns being processed from your
5  customers?
6    A.   Other than the returns being
7  processed from our customers, the
8  security of the drugs, making sure that
9  they went to the proper inventory, that
10 they were recorded appropriately, and
11 that if we needed to return anything to
12 the supplier, we were going to do it
13 according to our processes and their
14 policies.  Some, maybe investigations on
15 inventories, things like that.
16   Q.   So of all the different
17 products that were coming into the
18 returns department from 1995 to 1998,
19 what percentage were controlled
20 substances?
21   A.   Very little.
22   Q.   Is it fair to say that most
23 of your work in the returns department
24 related to medical devices and other

Page 42

1 non-controlled-substance products sold by
2 Henry Schein?
3     A.   You mean as far as -- yes.
4     Q.   In 1998, you moved over to a
5 position called regulatory affairs
6 specialist/recall coordinators.
7          Tell me about that position.
8 What kind of work were you doing there?
9     A.   So that's where I started to
10 do more -- I became part of the, at that
11 point, the regulatory affairs team.  And
12 my first assignment was to be regulatory
13 coordinator.  I also worked with
14 licensure issues, with quality
15 complaints, with adverse events.
16    Q.   And again, it's fair to say
17 that the recalls that you're talking
18 about during this period of time, only a
19 small percentage of those related to
20 controlled substances, correct?
21    A.   Yes.
22    Q.   And were there any recalls
23 of controlled substances from '98 to 2002
24 that you can recall?

Page 43

1     A.   Wow.  I can't recall any
2 specific.
3     Q.   Okay.  If you go to Page 2,
4 you moved over to just supervisor of
5 regulatory affairs.  How did your job
6 responsibilities change at that point?
7     A.   Now I was responsible for
8 managing the team and to -- on a
9 day-to-day workload, as well as special
10 projects, and getting more into
11 developing, bonuses, SOPs.
12    Q.   Okay.  And the work here is
13 still across all product lines at Henry
14 Schein, correct?
15    A.   Yes.
16    Q.   And a small percentage of
17 that product line that you oversaw was
18 controlled substances, correct?
19    A.   As far as my
20 responsibilities it was more than what it
21 used to be.
22    Q.   My question to you is
23 simply:  Was it a small percentage of
24 your time working with controlled

Page 44

1 substances from 2002 to 2006?
2     A.   What would you consider
3 small percentage?
4     Q.   You tell me.
5         MR. McDONALD:  Object to the
6 form.
7 BY MR. MIGLIORI:
8     Q.   Was it a --
9     A.   So --
10    Q.   -- half your job, was it a
11 fraction of your job, did you spend any
12 time doing it?
13    A.   About 25 percent.
14    Q.   Related to controlled
15 substances?
16    A.   Mm-hmm.  Yes.
17    Q.   Were you --
18        MR. McDONALD:  You've got to
19 say yes.
20 BY MR. MIGLIORI:
21    Q.   And were you involved with
22 the suspicious order monitoring programs,
23 if any, at Schein during this period of
24 time?

Page 45

1     A.   Yes, as super -- one of the
2 persons on the team was responsible for
3 DEA compliance, they were -- she was more
4 close to it.  But as her supervisor, I
5 was involved.
6     Q.   Who was that person in 2002
7 to 2006 that was directly involved with
8 DEA compliance?
9     A.   Nancy Fariello.
10    Q.   And is Nancy still with the
11 company?
12    A.   No.
13    Q.   And she reported to you?
14    A.   Yes.
15    Q.   Okay.  In 2006 you move over
16 to manager of regulatory affairs.  What
17 is the difference between a supervisor
18 and a manager of regulatory affairs?
19    A.   So we didn't have a manager
20 position back in 2002.  As a result of
21 the growth of the department there was
22 more responsibility and that give place
23 to the manager position.
24    Q.   It says in this description,

Page 46

1 as manager of regulatory affairs, that
2 "you were responsible to ensure general
3 compliance with federal and state
4 regulations applicable to the
5 distribution of drugs and medical
6 devices, including the coordination of
7 product recalls."
8        Did that include controlled
9 substances?
10    A.   Yes, it did.
11    Q.   Did -- was that still being
12 held -- managed by Ms., I think you said
13 Fariello?
14    A.   I don't remember at what
15 point she left the company.
16    Q.   Okay.  Did somebody replace
17 her in that role?
18    A.   Yes.
19    Q.   Who?
20    A.   Craig Schiavo.
21    Q.   Okay.  And Craig continued
22 to work under you for several years,
23 correct?
24    A.   Yes, he did.

Page 47

1    Q.   And his position was more
2 directly related to DEA compliance?
3    A.   He did evolve into that,
4 yes.
5    Q.   Okay.  So you were also
6 responsible for hazardous material
7 handling, OSHA, environmental
8 regulations, as well as managing the
9 completion of a wide variety of
10 regulatory projects.
11        Is it fair to say that DEA
12 compliance was not your primary focus at
13 this point, from 2006 to 2010?
14    A.   Was not the only focus.
15    Q.   Henry Schein has several
16 divisions during this period of time,
17 correct?
18    A.   Business units?
19    Q.   Yes.
20    A.   Yes.
21    Q.   All right.  And you were
22 director of regulatory affairs for the
23 various business units domestically,
24 correct?

Page 48

1    A.   Yes.
2        (Document marked for
3        identification as Exhibit
4        Henry Schein-Tejeda-3.)
5 BY MR. MIGLIORI:
6    Q.   Let me show you Exhibit 3.
7 It is a document we found online that
8 describes -- it's -- it's dated June 7,
9 2010.  It says, "Henry Schein appoints
10 new director of compliance.  6.5 billion,
11 Henry Schein, a Melville, New York-based
12 distributor of healthcare products and
13 services to office-based practitioners,
14 has promoted Sergio Tejeda to director of
15 regulatory operations and compliance."
16        It says -- do you -- do you
17 recall this promotion?
18    A.   Yes.
19    Q.   Was this about the period of
20 time when this happened, about 2010?
21    A.   The promotion to director,
22 yes.
23    Q.   Okay.  It says, "Tejeda
24 joined Henry Schein in 1990 and spent his

Page 49

1 first eight years at the company as a
2 returns supervisor.  In 2006 he was
3 promoted to regulatory affairs manager
4 and assumed responsibility of the
5 regulatory affairs team at GIV, General
6 Injectables and Vaccines, a Henry Schein
7 company."
8        In 2006, was your promotion
9 to the GIV division of Henry Schein?
10    A.   GIV was a subsidiary of
11 Henry Schein and their regulatory team
12 did report to me.  I think that was 2007,
13 but...
14    Q.   So in 2010, was your
15 responsibility as director of compliance
16 limited to the general injectables and
17 vaccines division?
18    A.   No.  That was in addition to
19 the Henry Schein regulatory compliance.
20    Q.   Okay.  So did the GIV have
21 controlled substances?
22    A.   Yes.
23    Q.   And were the suspicious
24 order monitoring systems in place at GIV

Page 50

1 that were in place throughout the rest of
2 Henry Schein?
3         MR. McDONALD: Object to the
4     form.
5 BY MR. MIGLIORI:
6     Q.   At this time?
7         MR. McDONALD: Object to the
8     form.
9         Go ahead. You can answer if
10     you understand.
11         THE WITNESS: They weren't
12     the same. They were similar.
13 BY MR. MIGLIORI:
14     Q.   Wasn't it true that GIV was
15 lagging behind Henry Schein in terms of
16 suspicious order monitoring compliance?
17         MR. McDONALD: Object to the
18     form.
19 BY MR. MIGLIORI:
20     Q.   In 2010?
21         MR. McDONALD: Object to the
22     form.
23         THE WITNESS: As far as our
24     best practices, they had some

Page 51

1     opportunities.
2 BY MR. MIGLIORI:
3     Q.   They had some opportunities
4 to improve?
5     A.   Yes.
6     Q.   So on the first page of your
7 CV going back to Exhibit Number 2. This
8 position is described here as director of
9 regulatory operations and compliance 2010
10 to 2013.
11         Are we talking about the
12 same position?
13     A.   The same position as -- as
14 the document?
15     Q.   As -- as the press release?
16     A.   Yes.
17     Q.   And again, this is across
18 all Henry Schein business units, correct?
19         MR. McDONALD: Object to the
20     form.
21 BY MR. MIGLIORI:
22     Q.   Domestically?
23         MR. McDONALD: Same
24     objection.

Page 52

1         THE WITNESS: Domestically.
2 BY MR. MIGLIORI:
3     Q.   Okay. So it involved --
4 what were the other business units that
5 you were responsible for at this time?
6     A.   Dental, medical, vet.
7     Q.   Vet?
8     A.   Veterinary medicine.
9     Q.   Okay. Okay. And it makes
10 reference here to the FDA, DEA, and
11 HAZMAT compliance.
12         Do you see that?
13     A.   Yes.
14     Q.   So -- and it also has
15 oversight of the Canadian regulatory team
16 on the second page, right?
17     A.   Yes.
18     Q.   Who was the person that was
19 more directly involved under you at this
20 point for DEA compliance relative to
21 controlled substances, was that Craig
22 Schiavo?
23         MR. McDONALD: Object to the
24     form. Vague as to time.

Page 53

1         THE WITNESS: Should I
2 respond?
3         MR. McDONALD: If you
4 understand the question, Sergio,
5 then you should answer the
6 question unless I tell you not to.
7         THE WITNESS: Okay.
8         So I -- I think at the
9 beginning of that period, Craig
10 Schiavo was focused on that. We
11 added resources to that function
12 over time.
13 BY MR. MIGLIORI:
14     Q.   Okay. In 2010, Henry
15 Schein -- at the beginning of 2010, Henry
16 Schein implemented a new suspicious order
17 monitoring system, correct?
18         MR. McDONALD: Object to the
19     form.
20         THE WITNESS: The enhanced
21     suspicious order monitoring
22     system, my recollection is that it
23     was implemented in 2009.
24 BY MR. MIGLIORI:

Page 54

1    Q.   At the end of 2009, in
2 October, November of 2009, correct?
3    A.   I don't remember the exact
4 time. But I think it was earlier than
5 that.
6    Q.   Okay. Well, I'll show you
7 some documents.
8       But that program, was that
9 as of 2010 when you took this position of
10 director of regulatory operations and
11 compliance, were you then responsible
12 overall for the implementation and
13 execution of that suspicious order
14 monitoring program as it related to
15 controlled substances?
16    A.   From the regulatory side, I
17 was responsible for the development and
18 implementation of the system, yes.
19    Q.   Okay. And you're
20 distinguishing that from the
21 verifications side?
22    A.   We had several project
23 managers.
24    Q.   Okay. And my question was,

Page 55

1 was the verifications department also
2 involved with the execution of that
3 enhanced suspicious order monitoring
4 system?
5    A.   Yes.
6    Q.   And the person there that
7 was most responsible in verifications,
8 was that Shaun Abreu during this period
9 of time?
10    A.   You know, I don't remember
11 exactly when Shaun joined the team. But
12 if you're asking between 2008 and 2009, I
13 don't remember that he was the
14 verifications manager at that point.
15    Q.   I'm asking from 2010 going
16 forward, now that the enhanced monitoring
17 program has been implemented, who else
18 outside of regulatory was responsible for
19 its oversight and management?
20    A.   Okay. Yes, the
21 verifications manager and their
22 management team.
23    Q.   Okay. And do you recall if
24 that was Shaun Abreu at the time?

Page 56

1    A.   Again, I don't remember at
2 what point Shaun joined as manager.
3    Q.   In 2010, beginning of 2010,
4 what percentage of the responsibilities
5 with the enhanced suspicious order
6 monitoring program were the
7 responsibility of regulatory, and what
8 percentage was the responsibility of
9 verifications, if you can estimate?
10       MR. McDONALD: Object to the
11 form.
12       THE WITNESS: As far as
13    reviewing the orders that have
14    pended in the system,
15    verifications was the first line.
16    And a percentage of that came to
17    regulatory.
18 BY MR. MIGLIORI:
19    Q.   Okay. Do you know what
20 percentage came to regulatory?
21    A.   Approximately, I mean, but
22 I'm not sure.
23    Q.   Okay. What approximately?
24       MR. McDONALD: Object to the

Page 57

1    form.
2       Go ahead.
3       THE WITNESS: Around 12,
4    15 percent.
5 BY MR. MIGLIORI:
6    Q.   Came to regulatory?
7    A.   Came to regulatory, yes.
8    Q.   So beginning in 2010 and
9 going forward to today, is it still true
10 that 85 to 88 percent of the review of
11 suspicious orders at Henry Schein are
12 handled at the verifications stage
13 without regulatory involvement?
14       MR. McDONALD: Object to the
15    form.
16 BY MR. MIGLIORI:
17    Q.   The regulatory department's
18 involvement?
19       MR. McDONALD: Same
20    objection.
21       THE WITNESS: Around that
22    percentage.
23 BY MR. MIGLIORI:
24    Q.   And today, is that

Page 58

1 department managed and overseen by Shaun
2 Abreu?
3     A.   Shaun Abreu, yes.
4     Q.   Okay.  In 2013, it's the
5 last entry here on your resumé.  It says
6 director of regulatory affairs.  Is that
7 the current position that you hold now,
8 or is this the one that switched in 2015?
9     A.   Director of regulatory
10 affairs is what I currently hold.
11     Q.   Okay.  I don't see the
12 distinction that you made earlier for me
13 about North America versus domestic.
14     A.   So I'm no longer responsible
15 for the Canadian regulatory team.
16     Q.   Okay.  Is that what dropped
17 out from this description in your
18 curriculum vitae around 2015, the
19 oversight of Canadian affairs?
20     A.   Well, based on this, it
21 dropped down in 2013.
22     Q.   Okay.  So the position that
23 you hold today, based on this resumé that
24 you prepared last year, the position that

Page 59

1 you hold today is the one described here
2 as director of regulatory affairs, 2013
3 to the present?
4     A.   Has changed a little bit.
5     Q.   In any way that was
6 significant or related to controlled
7 substances?
8     A.   To controlled substances, we
9 are now responsible for licensure, so we
10 are responsible to maintain controlled
11 substance licenses for the company.  And
12 we are responsible for item initiation.
13     Q.   I'm sorry.  For what
14 initiation?
15     A.   Item initiation, item
16 creation, to make sure that all items
17 have the correct regulatory attributes in
18 the system, so as it pertains to
19 controlled substances, yes.
20         And I have less involvement
21 in the quality side, but that's probably
22 not relative to controlled substances.
23     Q.   Do you continue to be
24 responsible for retuning and enhancing

Page 60

1 the company's suspicious order monitoring
2 systems?
3     A.   Yes.
4     Q.   Do you continue to be
5 responsible for the "know your customer"
6 obligations of the DEA?
7     A.   Yes.
8     Q.   And the due diligence
9 program at Henry Schein, are you still
10 responsible for that?
11     A.   Know your customers, the
12 diligence program, yes.
13     Q.   And is that entirely within
14 regulatory affairs, or is that shared
15 with verifications?
16     A.   That is shared with
17 verifications.
18     Q.   Same percentages with
19 responsibility, 85 to 88 percent?
20         MR. McDONALD:  Object to the
21     form.
22         THE WITNESS:  Yeah, around
23     that.
24 BY MR. MIGLIORI:

Page 61

1     Q.   Okay.  It says that you
2 helped to formalize the "know your
3 customer" site visit program for
4 different types of accounts.
5         Were you involved in the
6 "know your customer" site visit program
7 that Tina Steffanie-Oak and others were
8 involved in?
9     A.   Yes, I was.
10     Q.   Did they have to report to
11 you their progress in the "know your
12 customer" project to complete the due
13 diligence --
14     A.   Yes.
15     Q.   -- files?
16     A.   I'm sorry.  Yes.
17     Q.   Okay.  And it says here that
18 one of your major accomplishments during
19 this period of time, 2013 to the present,
20 was compliance awareness manual and
21 inspection preparedness guidelines for
22 Henry Schein operations.  Did you prepare
23 a manual?
24     A.   My team did.

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1  Q.   Did you approve it?
2  A.   Yes.
3  Q.   Did you review it in
4  preparation for today?
5  A.   Did I review it in
6  preparation for today?
7  Q.   In any of the 25 hours of
8  review?
9       MR. McDONALD:  Object to the
10      form.
11      THE WITNESS:  No.  That
12      wasn't one of the documents as I
13      remember reviewing.
14 BY MR. MIGLIORI:
15 Q.   Do you know where that
16 document is today?
17 A.   The current version of which
18 one?  The compliance --
19 Q.   The compliance -- I'm sorry,
20 the compliance awareness manual and
21 inspection preparedness guidelines for
22 Henry Schein operations.
23 A.   It's two different
24 documents.

Page 63

1  Q.   Okay.  Do you know where
2  they are?  Where would you go to look for
3  them right now if you had to go get them?
4  A.   Our document management
5  system.
6  Q.   Is that the JDW -- JEW, JWE?
7  A.   No.  No, it's not that one.
8  Q.   What is it?
9  A.   It is called PowerDMS.
10 Q.   Okay.
11 A.   It's a specific document
12 control system.
13 Q.   Okay.  What kind of
14 documents are kept there, like training
15 manuals?
16 A.   SOPs, training manuals, work
17 instructions, records related to those
18 documents.
19 Q.   Is due diligence kept there?
20 A.   Due diligence?
21 Q.   Yeah.
22 A.   No.  For due diligence we
23 have a different system.
24 Q.   Okay.  I'll get into that in

Page 64

1  a moment.
2       And so the compliance
3  awareness manual, what kind of manual --
4  what kind of topics were covered in that?
5  A.   The compliance awareness
6  manual is meant to be a tool for Henry
7  Schein operations, Henry Schein
8  facilities so it covers awareness for our
9  regulatory responsibilities with many
10 different agencies, many different
11 regulations.  We cover DEA compliance, we
12 cover FDA compliance.  EPA, OSHA.  We
13 cover state law.
14 Q.   So would the Ohio suspicious
15 order reporting requirements be in there?
16 A.   That is -- the answer is no,
17 because that document is meant to be
18 awareness for the operations team.  So
19 Ohio compliance is covered in a different
20 SOP.
21 Q.   Okay.  Did you review that
22 SOP in preparation for today, for the
23 Ohio compliance?
24 A.   No.

Page 65

1  Q.   If you were to go look for
2  that today, would that be in the PowerDMS
3  system that you talked about --
4  A.   Yes.
5  Q.   -- with the other SOPs?
6       Did you help create the
7  compliance awareness manual?
8  A.   Like I said, we -- we
9  discussed the plan, what should cover,
10 then my team developed it.  We went
11 through several revisions and then we
12 implemented.
13 Q.   Did -- was that also true
14 for the inspection preparedness
15 guidelines?
16 A.   Yes.
17 Q.   And I assume that includes
18 DEA inspections of distribution centers
19 as well?
20 A.   Yes, it does include DEA
21 inspections.
22 Q.   And then it says, "DEA/FDA
23 compliance education for fields" --
24 "field sales consultants."

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1    Were you involved with that
2 compliance education?
3    A.   What was that, I'm sorry?
4    Q.   I'm sorry, the second to
5 last bullet point.  If you look on the
6 screen in front of you I can point to it.
7    A.   Okay.
8    Q.   "DEA and FDA compliance
9 education for field sales consultants."
10    A.   Yes, sir.
11    Q.   All right.  So tell me about
12 that.  What kind of education program did
13 you put together for your field sales
14 consultants?
15    A.   Okay.  So we have done a
16 couple of different things.  We have
17 attended regional sales meetings, and
18 prepare material to train them on the
19 obligations of the company, their
20 responsibility, what we need to do.
21    We have, when we do attend
22 regional meetings, there is -- the field
23 sales consultants spend some time with us
24 in either by group or one-to-one basis.

Page 67

1 We provide the explanation, they ask
2 questions.  They tell us what their
3 concerns may be.  Then we develop a
4 program that we use to train them via
5 phone and web conference.  And that was
6 delivered as well in groups, so we had
7 several meetings, so several sessions on
8 that.  That was in -- in partnership with
9 Bill Brandt the director of verifications
10 at that point.
11    We also have developed
12 online education models so our field
13 sales consultants now, when they join the
14 company, they are required to go through
15 this online training, and then I forget
16 how often they need to take refresher.
17    But those have been some of
18 the things that we have done.  We have
19 also meet with field sales consultants
20 groups in our distribution centers.  And
21 provide some training that way.
22    Q.   The online training that you
23 discuss, when did that first get
24 implemented?

Page 68

1    A.   Last year.
2    Q.   And that includes DEA
3 compliance --
4    A.   Yes.
5    Q.   -- for the sales force.
6    A.   Sorry, yes.
7    Q.   And why is it important to
8 educate the sales force on DEA
9 compliance?
10    MR. McDONALD:  Objection.
11 BY MR. MIGLIORI:
12    Q.   What role, if any, do they
13 play in DEA compliance at Henry Schein?
14    MR. McDONALD:  Object to the
15 form.
16    THE WITNESS:  It is
17 important to us that everybody
18 knows what the requirements that
19 the company need to comply are.
20 Everybody plays a role.
21    We have very good
22 relationship with our customers,
23 especially the field sales
24 consultants.  They visit our

Page 69

1 practitioners' offices on a daily
2 basis.  So they need to understand
3 what they can, what they cannot
4 do.  They need to understand it in
5 order to -- for them to be able to
6 do their work, better service our
7 customer without putting the
8 company at any risk or...
9 BY MR. MIGLIORI:
10    Q.   Are they involved in the due
11 diligence process either for a new
12 customer that they onboard or for
13 existing companies -- customers?
14    MR. McDONALD:  Object to the
15 form.  Go ahead.
16    THE WITNESS:  Not really.
17 We -- we are developing a program
18 that somebody from operations or
19 an FSC may carry a laptop or
20 something to the customer office,
21 and we will be on the other side
22 of the -- of the line, and they
23 will be able to interact with the
24 customer by showing documents,

Page 70

1 assisting to show us what the
2 facility is, things like that.
3 But the -- the review will be
4 conducted by somebody in
5 regulatory.
6 BY MR. MIGLIORI:
7 Q. Okay. This is something
8 you're developing now that's not yet
9 implemented?
10 A. Yeah. We have tested a
11 couple of times.
12 Q. So it's essentially a
13 virtual site visit, that is, it's
14 through -- through laptop interaction of
15 some sort?
16 A. Essential, yes. Virtual
17 site visit.
18 Q. Does the sales force, are
19 they trained in this either online or
20 written or regional sales meeting
21 trainings, are they trained to identify
22 red flags or potential suspicious issues
23 relating to controlled substances, is
24 that part of the training?

Page 71

1 A. Yes. We cover red flags, we
2 cover potential signs of issues.
3 Q. So before the online
4 training, was there written training
5 material that you would hand out at these
6 regional sales meetings on issues like
7 red flags, things for sales force to
8 watch out for?
9 A. Yes. Usually what we did is
10 we had a laptop on the table. We can
11 have the PowerPoint presentation there.
12 And we have printouts of the
13 presentation. Then that evolved into an
14 electronic flash drive that they can
15 carry with them. They were complaining
16 that they had too much paper, they don't
17 want to carry anything.
18 Q. How often did you have these
19 regional sales meetings where you would
20 educate the sales force on DEA
21 compliance?
22 A. So it used to be more often.
23 Now it's probably once, twice a year.
24 Q. Okay. And did they go back

Page 72

1 before 2013 when you took this
2 position --
3 A. I --
4 Q. -- that is, the regulatory
5 training and education of sales
6 force-type meetings, do you recall them
7 happening before 2013?
8 A. Yes.
9 Q. How far back, to your
10 recollection, were those types of
11 training sessions or -- or presentations
12 made to the sales force, to your best
13 recollection?
14 A. 2010, maybe.
15 Q. So, since the launch of the
16 enhanced suspicious order monitoring
17 system maybe, that you incorporated
18 training of sales force in the DEA
19 compliance training program, does that
20 seem to coincide with your recollection?
21 A. Yeah, it is a separate
22 program, yes.
23 Q. Okay. And are those written
24 materials or presentations, things that

Page 73

1 are on the thumb drives, is that
2 something that you still use today?
3 A. PowerPoint changed. I mean,
4 the materials change. They evolve, you
5 know.
6 Q. If you were to go to look
7 for them, either historically what you
8 were using in 2011 or up to today, would
9 they also be in the PowerDMS system?
10 A. PowerDMS wasn't in place in
11 2011. I would think it would be a
12 combination of hard copies or somewhere
13 in somebody's computer. I don't know how
14 much we have retained.
15 Q. Sure. And we'll take a
16 break in a second. I just want to know,
17 was there a title to this kind of
18 training manual or these kind of
19 presentations for the sales force? Is
20 there some way that you referred to those
21 types of education and training materials
22 for the sales team?
23 MR. McDONALD: Object to the
24 form.

Page 74

BY MR. MIGLIORI:

Q. Was it called regional sales training? Was it called anything that you can particularly remember if you were to say, I need to go grab the education materials for the sales force?

A. No, not really.

Q. Okay. Who would you ask in your department for the latest version of it?

A. The latest version?

Q. Yeah. If you said I want to read it this afternoon, ask so and so to go get it for me. Who would be that person?

A. Liam Schauer would be one.

Q. What position is Liam Schauer in?

A. He's a senior regulatory specialist.

Q. Okay. And is your team responsible for updating it, verifying its accuracy, making changes and modifications to it?

Page 75

A. Yes.

MR. MIGLIORI: Why don't we take a break here.

THE VIDEOGRAPHER: Going off the record 10:15 a.m.

(Short break.)

THE VIDEOGRAPHER: Back on record at 10:27 a.m.

BY MR. MIGLIORI:

Q. Okay. Mr. Tejeda, here is Exhibit Number 4.

(Document marked for identification as Exhibit Henry Schein-Tejeda-4.)

BY MR. MIGLIORI:

Q. This is a standard operating procedure that bears your name on top. It's dated, as I read this, original issue January 30th, 2002. It says prepared by Sergio Tejeda, revised March 14, 2003. So first of all, is this you that prepared this?

A. Yes, along with Frank

Page 76

Pesale.

Q. And by looking at it, would you have prepared the original issue, or is the way this is prepared, this would say that you prepared the revision in March of 2003? How do I read this document?

A. It is -- would be prepared in collaboration with Frank. At this point, Frank will have more of a role of doing the revision, and I will have more of a role of reviewing and approving. But, you know, we worked close together.

Q. I guess my question is a little more basic. In looking at the document, can you tell whether you were involved with the original issue or are you only necessarily here involved in preparing the revision? And can you tell from looking at the document? And if you don't know, that's fine too.

A. I don't remember.

Q. All right. On the front page it says, "The purpose of this policy

Page 77

is to comply with the PDMA record retention requirements and to standardize Henry Schein's record retention procedures." What is PDMA?

A. Prescription Drug Marketing Act.

Q. Okay. And it gives some definitions, and it lists different acronyms. ICT is the inventory control ticket, et cetera.

And then on the right side it has WCS, the warehouse control system. What is that system?

A. So it's -- it's a warehouse management system. It's an operations management system.

Q. Does it cover all the distribution centers?

A. At this point we had two. WCS and WMS were both warehouse management systems.

Q. And they were -- in 2003, they were online?

Page 78

1    A.   Online.
2    Q.   And everybody -- what kind
3  of information relative to controlled
4  substances would have been stored there,
5  if any?
6    A.   The receipt, storage,
7  location moves, pick, pack.
8    Q.   What is pick, pack?
9    A.   I'm sorry.  When we get an
10 order then our distribution centers have
11 a print room.  So the print room will
12 print a batch record, which will cover
13 several invoices, several shipments.  So
14 pickers are assigned batches.  And then
15 they go to the locations of the products,
16 and they pick the product, they put it in
17 a tote or box that is specified for that
18 order.
19       In the case of controlled
20 substances, either the box will travel
21 into the drug room, or if it's only a
22 controlled substance, then the whole
23 order, the batch will go directly to the
24 drug room to be completed.

Page 79

1    Q.   So these systems are
2  designed to track the intake and the
3  movement of controlled substances within
4  the distribution center?
5       MR. McDONALD:  Object to the
6    form.
7  BY MR. MIGLIORI:
8    Q.   That is, the people and the
9  places where the controlled substances
10 are being moved while they're in the
11 position -- distribution center?
12       MR. McDONALD:  Object to the
13   form.
14       THE WITNESS:  Well, I will
15   say that at a very big level they
16   are much more complex.  But again,
17   big picture, it will be inventory
18   control and things like that.
19 BY MR. MIGLIORI:
20   Q.   So would every order, for
21 example, from the state of Ohio be
22 recorded somewhere in the warehouse
23 control system and/or the warehouse
24 maintenance system?

Page 80

1    A.   The warehouse management
2  system.  At the point of the order being
3  processed, yes.
4    Q.   And processed means from the
5  distribution center out the door?
6    A.   Yes.
7    Q.   Okay.  And those records
8  are -- are searchable by zip code or by
9  region?  How are they managed, if you
10 know?
11   A.   The records that are in the
12 system, they may be searchable by account
13 number.  They may be searchable by
14 invoice number.  They may be searchable
15 by item code.
16   Q.   What about -- so by a
17 physician or a practitioner?
18   A.   Account, yes -- by the
19 account number, yes.
20   Q.   And what kind of information
21 is in the JD Edwards system as it relates
22 solely to controlled substances?
23       MR. McDONALD:  Object to the
24   form.

Page 81

1       THE WITNESS:  So to my
2    understanding, JD is the sales
3    management -- the transaction
4    management system.  So it will be
5    the transaction side.
6  BY MR. MIGLIORI:
7    Q.   Now, are the transactions
8  different from the distribution records
9  from the warehouse control system?  Are
10 they two separate databases of
11 transactions?
12   A.   So JDE, it's a different
13 system than WCS.
14   Q.   And but each would record a
15 portion at least of the order and
16 processing of each transaction, correct?
17   A.   That is my understanding.
18   Q.   So if I have a record or a
19 field for a Dr. Smith in Summit County,
20 Ohio, for placing an order, I'd be able
21 to find that order both in the warehouse
22 control system or the warehouse
23 management system, as well as in the JD
24 Edwards system?

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  MR. McDONALD: Object to the
2  form.
3  BY MR. MIGLIORI:
4  Q.  Correct?
5  MR. McDONALD: Object to the
6  form.
7  THE WITNESS: At the time
8  that the order has been -- that's
9  being processed and through the
10  recordkeeping time.
11  BY MR. MIGLIORI:
12  Q.  Where would the pended
13  orders be stored?  What system would
14  pended orders show up in?
15  A.  I'm not sure if it's a
16  different system.
17  Q.  Okay.  Where would an order
18  pend?  Would an order -- would it pend at
19  the warehouse control system?  Or would
20  it pend at the transactional level in the
21  JD Edwards system?  In other words, where
22  would the actual trigger occur?
23  A.  Would pend -- would be
24  pended by the suspicious order monitoring

Page 83

1  system.  My point was, I'm not sure where
2  that SOM resides and what part of the
3  software.
4  Q.  Okay.  Let me see if I can
5  walk through an example.  So a doctor
6  places an order.  Does the doctor in --
7  let's say in 2010, does the doctor place
8  that order online?
9  MR. McDONALD: Object to the
10  form.
11  THE WITNESS: So there were
12  many different ways for a doctor
13  to place an order.
14  BY MR. MIGLIORI:
15  Q.  Okay.  At what point does
16  that order hit the warehouse control
17  system?  Immediately or after it's been
18  reviewed by the suspicious order
19  monitoring system?
20  MR. McDONALD: Object to the
21  form.
22  THE WITNESS: After it has
23  been reviewed by not only the
24  suspicious order management

Page 84

1  system, but any other systems that
2  look at the order.
3  BY MR. MIGLIORI:
4  Q.  Okay.  So if an order gets
5  to the warehouse control system, it has
6  already passed through the suspicious
7  order monitoring system?
8  A.  Yes.
9  Q.  What about the JD Edwards
10  system, those transaction records?  For
11  it to show up in the JD Edwards system,
12  would it already have passed through the
13  suspicious order monitoring process?
14  MR. McDONALD: Object to the
15  form.
16  THE WITNESS: I'm sorry, I
17  was a little distracted.  Could
18  you repeat?
19  BY MR. MIGLIORI:
20  Q.  Sure.
21  So the transactional records
22  for that same order that we just
23  discussed, a doctor in Summit County
24  making an order in 2010, will that order

Page 85

1  pass through the suspicious order
2  monitoring system before it gets to the
3  JD Edwards system or after?
4  MR. McDONALD: Object to the
5  form.
6  THE WITNESS: Again, I
7  don't -- I'm -- I don't know where
8  the SOM resided.  It's different
9  than JDE, or within JDE or within
10  a different system.
11  BY MR. MIGLIORI:
12  Q.  Okay.  All right.  I'll get
13  back to those types of reports in a
14  second.
15  So as I understand, if you
16  turn to Page 2 of this document.  The
17  revision history lists the different
18  changes to this standard operating
19  procedure, correct, that's what this page
20  does?
21  A.  Yes.
22  Q.  And the Revision 3 that's
23  being documented here revises the record
24  retention contact guide section of

Page 86

1 proceeded to eliminate specific primary
2 and secondary contact names.
3        So this is a revision of an
4 existing records retention policy,
5 correct?
6        A.   Yes.  Revision of
7 Revision 2.
8        Q.   It seems to be Revision 3,
9 but I -- maybe I'm reading it wrong.
10       MR. McDONALD:  He says it's
11    a -- he said it's a revision of
12    Revision 2.
13 BY MR. MIGLIORI:
14       Q.   Oh, okay.  It's a revision
15 of Revision 2.  Gotcha.  Thank you.
16       The original, January 30,
17 2002, that's the original policy,
18 correct?
19       A.   Yes.
20       Q.   By reading that date, does
21 that mean that the record retention
22 policy that's referred to in this
23 standard operation -- operating procedure
24 was first documented on January 30, 2002?

Page 87

1        A.   That is correct.
2        Q.   All right.  I want to bring
3 your attention to -- so if you look at
4 the Bates page that ends in 266?
5        A.   266.
6        Q.   It's actually Page 6 of the
7 standard operating procedure.
8        A.   Okay.
9        Q.   It says, "For regulatory
10 affairs, the primary contact would be the
11 regulatory affairs supervisor."  And then
12 it says records, and it lists a bunch of
13 different records for regulatory affairs.
14       It says product distribution
15 history.  Is the regulatory affairs
16 department responsible for the product
17 distribution history, including
18 controlled substances?
19       A.   At that point it was
20 responsible to produce that information.
21       Q.   And to retain it under this
22 policy, correct?
23       MR. McDONALD:  Object to the
24    form.

Page 88

1        THE WITNESS:  I'm not sure
2    that that's the case.
3 BY MR. MIGLIORI:
4        Q.   Well, this is the document
5 retention policy of Henry Schein,
6 correct?
7        A.   Correct.
8        Q.   And this section lists the
9 different departments and the records
10 that they maintain, correct?  Am I
11 misreading this?
12       A.   The records that we will be
13 responsible to produce, I don't know that
14 we will be responsible to maintain the
15 system.
16       Q.   Well, if you look at the --
17 if you look at the top of Page 262 or
18 page -- I think -- it's hard to tell what
19 it says here.
20       It says, "Record retention
21 slash contact reference guide."
22       MR. McDONALD:  He's not with
23    you, Don.
24       There you go.

Page 89

1        THE WITNESS:  Okay.
2 BY MR. MIGLIORI:
3        Q.   This section is the record
4 retention, not record produced section.
5        Do you see that?
6        A.   Record retention contact
7 reference.
8        Q.   And -- and going back to
9 regulatory affairs, under the record
10 retention it says, "The record of
11 regulatory affairs includes product
12 distribution history."
13       That's what you signed off
14 on in March of 2003, correct?
15       MR. McDONALD:  Object to the
16    form.
17 BY MR. MIGLIORI:
18       Q.   It's your signature on the
19 front of this document, correct?
20       A.   My signature, yes.
21       Q.   Okay.  So let's start
22 with -- I'm reading that correctly,
23 right?  This is a record of the
24 regulatory affairs department, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 A. It is a record that the
2 regulatory affairs department will be
3 responsible to produce.
4 Q. To produce to whom?
5 A. Well, we will go to whatever
6 system, whatever process we had --
7 somebody will request it. Then we will
8 go to the system. We will type a query
9 or whatever was the procedure.
10 Q. Okay.
11 A. And then get a report, and
12 that's your record.
13 Q. Are you responsible for
14 making sure that it's maintained and
15 secure within your department?
16 A. Again, it is maintained in
17 the system. So we have IT security, IT
18 management that are responsible to make
19 sure that everything is the -- is in the
20 system is kept correctly and secure.
21 Q. Okay. And the regulatory
22 affairs department, part of the record
23 would be customer purchasing history for
24 controlled substances only. That was

Page 91

1 maintained or the responsibility of the
2 regulatory affairs department to produce,
3 correct?
4 MR. McDONALD: Object to the
5 form.
6 THE WITNESS: Yes.
7 BY MR. MIGLIORI:
8 Q. All right. So is that still
9 true today?
10 A. No.
11 Q. Who is responsible for that
12 today?
13 A. So if somebody requests a
14 customer purchase history, I would go to
15 verifications to input the request.
16 Q. Was an SOP revised to say
17 that's a verifications function then, to
18 your knowledge?
19 This is a 2003 document.
20 A. Yeah, I'm -- I think there
21 were more than one revisions after this
22 one.
23 Q. That's not my question. Was
24 that revised to say that you are no

Page 92

1 longer responsible for customer purchase
2 history for controlled substances only in
3 the regulatory affairs department, was
4 that moved in an SOP to your knowledge?
5 A. I don't know.
6 Q. It says that the regulatory
7 affairs department would be required to
8 produce product recall information?
9 A. That is correct.
10 Q. Regulatory affairs would be
11 required to produce government inquiries,
12 is that true?
13 A. At that point, it was.
14 Q. Did that change?
15 A. That process has changed.
16 Q. When?
17 A. I don't remember when.
18 Q. To whom? Who is now
19 responsible to produce government
20 inquiries?
21 A. Now it is an effort between
22 verifications, regulatory with copy to
23 legal.
24 Q. What about DEA inquiries

Page 93

1 into doctor prescribing habits, would
2 that be considered a government inquiry?
3 A. Yes.
4 Q. Or DOJ inquiry into
5 suspicious transactions that appear
6 either in ARCOS or in the Ohio reporting
7 system, would that be a government
8 inquiry?
9 A. Yes.
10 Q. And where would that be
11 documented in the system today?
12 A. Where the -- the inquiry or
13 the response or?
14 Q. Yes. The inquiry or the
15 response.
16 MR. McDONALD: Well --
17 BY MR. MIGLIORI:
18 Q. Whatever is referred to here
19 as the record of government inquiries.
20 Whatever that means to Henry Schein?
21 MR. McDONALD: Object to the
22 form.
23 THE WITNESS: I'm not sure.
24 BY MR. MIGLIORI:

Highly Confidential – Subject to Further Confidentiality Review

Page 94

1  Q.  Is that in JD Edwards?
2      MR. McDONALD:  Object to the
3  form.  If you know tell him, but
4  don't guess.
5      THE WITNESS:  I don't know.
6  BY MR. MIGLIORI:
7  Q.  Okay.  That's --
8      MR. McDONALD:  And, Sergio,
9  this is true throughout.  If you
10 tell him an answer, he's going to
11 assume that's true and that's
12 actual factual.  If you don't
13 know, then tell him that you don't
14 know.  He doesn't want you to
15 guess.
16     MR. MIGLIORI:  That's a
17 substantial -- I'll accept it.
18     MR. McDONALD:  You don't
19 want him to guess.  You don't want
20 him to guess, do you?
21     MR. MIGLIORI:  And I asked
22 him in the beginning.
23     MR. McDONALD:  Right.
24     MR. MIGLIORI:  But I don't

Page 95

1  need a --
2      MR. McDONALD:  And he was --
3  he was --
4      MR. MIGLIORI:  I don't
5  need --
6      MR. McDONALD:  --
7  hesitating.
8      MR. MIGLIORI:  You know what
9  I'm saying.
10     MR. McDONALD:  You and I
11 both know that he was hesitating
12 and about to guess.
13     MR. MIGLIORI:  And I agree
14 with the instruction.  And we can
15 stipulate that it doesn't have to
16 be made again.  Fair?
17     MR. McDONALD:  Unless I feel
18 like he's about ready to guess
19 again.
20     MR. MIGLIORI:  Just try not
21 to coach.  We've had plenty of
22 issues with that.
23     MR. McDONALD:  You and I
24 haven't had very many issues at

Page 96

1  all.
2      MR. MIGLIORI:  We haven't.
3  That's why I'm smiling.
4  BY MR. MIGLIORI:
5  Q.  You don't know where the
6  government inquiries would be recorded
7  and documented in the system, correct?
8  A.  I'm not sure what the office
9  of record is for that documentation.
10 Q.  One of the beauties of this
11 document is you signed it, and you wrote
12 it.  So I'm just trying to understand
13 what you understand this to mean.  There
14 is a government inquiries record referred
15 to in an SOP that you literally signed
16 off on.
17     And I'm trying to
18 understand, one, what is a government
19 inquiry as it relates to controlled
20 substances, and two, where would you find
21 it?
22 A.  Okay.
23 Q.  So let's start with the
24 first part.  The government inquiries, as

Page 97

1  it relates to controlled substances.
2  What would those be, to your knowledge?
3  A.  It would be a subpoena for
4  records.
5  Q.  Okay.  And would that
6  include transactional records that the
7  DEA or DOJ might request of a particular
8  physician?
9  A.  Yes.
10 Q.  And would it be the practice
11 of Henry Schein to maintain that
12 subpoena?
13 A.  Yes.
14 Q.  If there were a letter from
15 a DEA field office or the DOJ asking for
16 information voluntarily, would you
17 maintain that letter as well?
18     MR. McDONALD:  Object to the
19 form.
20     THE WITNESS:  At the point
21 of this SOP being written,
22 regulatory would have.
23 BY MR. MIGLIORI:
24 Q.  Okay.  And you said at some

Page 98

1  point, that may have changed to
2  verifications?
3      A.   I said at some point it was
4  changed, that the process includes
5  verifications, regulatory, with copy to
6  legal.
7      Q.   Okay.  And so at some point
8  it's not maintained just by regulatory,
9  but three different departments would
10  have that record somewhere --
11      MR. McDONALD:  Objection.
12  BY MR. MIGLIORI:
13      Q.   -- or access to that record
14  somewhere, correct?
15      MR. McDONALD:  Object to the
16      form.
17      THE WITNESS:  I didn't say
18      that.  I said that the effort to
19      put that information together will
20      be shared.  I said I don't really
21      know where that record is
22      maintained, what is the office of
23      record for that record for right
24      now.

Page 99

1  BY MR. MIGLIORI:
2      Q.   All right.  And we don't
3  have to talk about the other ones.
4      If you go to the previous
5  page, verifications has a list of records
6  in your SOP here.  And in verifications,
7  222 forms are the responsibility of the
8  verifications department in 2003,
9  correct, return forms?
10      A.   Yes.
11      Q.   In fact, that was one of --
12  that was your job title at this point in
13  time, correct, returns?
14      A.   No.  I wasn't in returns at
15  that point.
16      Q.   In 2003?
17      A.   I was in regulatory affairs
18  in 2003.
19      Q.   Okay.  But this was your
20  department before that, correct?  You
21  would have handled 222 forms when you
22  were in the returns department?
23      A.   For returns only.  Yes.
24      Q.   Yeah.  So did you fill out

Page 100

1  222 forms?
2      A.   No.
3      Q.   And the sales and return or
4  the 222 forms, did they apply to
5  controlled substances?
6      A.   The 222 forms required for
7  Schedule II controlled substances.
8      Q.   Okay.  And so at least at
9  this time in 2003, that was the
10  responsibility of the verification
11  department to produce, if requested,
12  correct?
13      A.   Correct.
14      Q.   Did it remain the
15  verifications' responsibility through
16  till today?
17      A.   Yes.
18      Q.   How about suspicious
19  monitoring monthly reports?  Are those
20  maintained by the verifications
21  department in 2003, or did they -- were
22  they the department responsible for
23  producing them?
24      A.   They were the primary

Page 101

1  responsible for producing them.
2      Q.   Do they -- is that still
3  true today?
4      MR. McDONALD:  Objection.
5      THE WITNESS:  We don't --
6      Sorry.  We don't produce
7      those reports anymore.
8  BY MR. MIGLIORI:
9      Q.   Did the monthly reports stop
10  after the 2017 master's decision or some
11  time before that, or was that the 2010
12  enhancement?
13      MR. McDONALD:  Object to the
14      form.
15      THE WITNESS:  I don't
16      remember when it stopped.
17  BY MR. MIGLIORI:
18      Q.   After the monthly
19  reporting -- and so there was a period of
20  time at Henry Schein where suspicious
21  orders were gathered and reported on a
22  monthly basis to the DEA field office,
23  correct?
24      MR. McDONALD:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1   form.
2       THE WITNESS:  Do you mean
3   the report of orders pended and
4   not released?
5   BY MR. MIGLIORI:
6       Q.   I'm actually -- actually
7   just using your words in your document.
8   There was a period of time when
9   suspicious monitoring monthly reports --
10      A.   Yes.
11      Q.   -- were submitted to the DEA
12  field office on a monthly basis, correct?
13      A.   Correct.
14      Q.   Not when the suspicious
15  orders were discovered, correct?
16      A.   Correct.
17      Q.   And that was changed as a
18  result of Buzzeo consulting with Henry
19  Schein and coming up with an -- I think
20  you referred to it as an enhanced
21  suspicious order monitoring program that
22  was implemented sometime in 2009,
23  correct?
24      MR. McDONALD:  Object to the

Page 103

1   form.
2       THE WITNESS:  I'm sorry.
3   The question was kind of long,
4   so --
5   BY MR. MIGLIORI:
6       Q.   This change in this monthly
7   reporting occurred as a result of Buzzeo
8   consulting and advising you that it was
9   noncompliant to report to the DEA on a
10  monthly basis suspicious orders, correct?
11      MR. McDONALD:  Object to the
12  form.
13      THE WITNESS:  I don't
14  remember when we discontinued the
15  report.
16  BY MR. MIGLIORI:
17      Q.   Do you know if it was before
18  2009?
19      A.   I don't remember.
20      Q.   Okay.  But you understand
21  that that process of monthly reporting
22  was at some point terminated because it
23  was noncompliant with DEA regulations on
24  suspicious order monitoring, correct?

Page 104

1       MR. McDONALD:  Object to the
2   form.
3       THE WITNESS:  No.  I don't
4   remember the process not being
5   compliant with the DEA
6   requirements.
7   BY MR. MIGLIORI:
8       Q.   So as you sit here today as
9   the director of regulatory affairs, you
10  cannot recall whether or not it was ever
11  acceptable to report suspicious orders on
12  a monthly basis and not when discovered?
13      MR. McDONALD:  Object to the
14  form.
15      THE WITNESS:  For a period
16  of time it was industry-based
17  practices and the DEA did accept
18  that.
19  BY MR. MIGLIORI:
20      Q.   The -- the DEA accepted
21  that.
22      Did a DEA person tell you
23  that that was acceptable ever?
24      A.   Not personally.

Page 105

1       Q.   No?
2       A.   But as a matter of fact, we
3   just got a communication maybe less than
4   two months ago of some -- one local
5   office requesting that type of
6   information.
7       Q.   Okay.  Did you get the 2007
8   letters from Joe Rannazzisi, did you see
9   those letters from the DEA in 2007 when
10  they -- when they arrived in 2006 and
11  2007?
12      A.   The 2006 letter and the
13  December 2007 letter.
14      Q.   Did you understand those
15  letters when you received them?
16      A.   We did review the letters.
17      Q.   I didn't ask if you reviewed
18  them.  Did you understand them?
19      A.   Yes.
20      Q.   Okay.  Did you change your
21  monthly suspicious monitoring reporting
22  to a system where you now reported pended
23  or suspicious orders at the time you
24  discovered them instead of on a monthly

Page 106

1  basis?
2       MR. McDONALD:  Object to the
3  form.
4       THE WITNESS:  You mean based
5  on --
6  BY MR. MIGLIORI:
7    Q.   No, at any point.  Did you
8  change that system?
9    A.   Yes.
10   Q.   Is the verifications
11 department responsible for producing
12 licensing information for all of your
13 customers?
14   A.   They are responsible for
15 maintaining and verifying the licensure
16 information for our customers.
17   Q.   Okay.  Including DEA
18 registration?
19   A.   Including DEA registrations.
20   Q.   Is the verifications
21 department responsible for producing
22 documents relating to the DEA NTIS tape?
23   A.   The DEA NTIS tape is part of
24 our verifications system.  It is a

Page 107

1  service that we use.
2    Q.   Right.  You -- and you --
3  and you download from that service for
4  each customer, correct?
5    A.   Yes.
6    Q.   It's part of verifications,
7  right?
8    A.   Yes.
9    Q.   And those records are the
10 responsibility of verifications
11 department to produce, correct?
12   A.   Correct.
13   Q.   The customer licenses and
14 DEA microfilm, that was required to be
15 produced as a record of the verifications
16 department, correct?
17   A.   Correct.
18   Q.   And that contained
19 information about -- including customer
20 due diligence, correct?
21   A.   Microfilm?
22   Q.   This -- this particular DEA
23 microfilm reference, what is it?
24   A.   I'm not sure.

Page 108

1    Q.   Do you -- are you familiar
2  with any microfilm storage of documents
3  and information or records maintained by
4  Henry Schein?
5       MR. McDONALD:  Object to the
6  form.
7       You mean currently?
8       THE WITNESS:  We no --
9       MR. MIGLIORI:  At any time.
10 For controlled substances.
11      THE WITNESS:  We no longer
12 have microfilm.
13 BY MR. MIGLIORI:
14   Q.   Were you involved in any
15 decisions to purge microfilm records?
16   A.   No.
17   Q.   Are you familiar with any
18 point in time when Henry Schein decided
19 to purge microfilm records?
20   A.   No.
21   Q.   The ARCOS reporting, was
22 that a record that was supposed to be
23 maintained and produced by the
24 verifications department?

Page 109

1       MR. McDONALD:  Object to the
2  form.
3  BY MR. MIGLIORI:
4    Q.   In 2003?
5       MR. McDONALD:  Object to the
6  form.
7       THE WITNESS:  So the ARCOS
8  report is produced by the
9  verifications department based on
10 the system information.
11 BY MR. MIGLIORI:
12   Q.   And is that still true
13 today?
14   A.   Yes.
15   Q.   Go to the last pages.
16      MR. McDONALD:  Which page?
17      MR. MIGLIORI:  It ends in
18 269.
19 BY MR. MIGLIORI:
20   Q.   It says verification
21 department, and it lists the various
22 records we just went through?
23   A.   Okay.
24   Q.   And then there's the

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 retention in years next to each one of
2 those items. So for the 222 forms, sales
3 and returns, it says, "Control drug point
4 person verification five-year retention
5 file copy."
6        What does file copy mean
7 under retrieval?
8     A.   Hardcopy.
9     Q.   So -- so at this point,
10 those 222 forms were maintained as hard
11 copies?
12    A.   Yes.
13    Q.   Is there a file room for
14 those hard copies? Where would you go
15 for those hard copies?
16    A.   I will go to the
17 verifications department.
18    Q.   Okay. And are they still
19 maintained in hardcopy?
20       MR. McDONALD: Well, can --
21 I'd like to clarify the record.
22 You said so at this point. Did
23 you mean today or did you mean at
24 the time of this document?

Page 111

1        MR. MIGLIORI: Well, first I
2 said at this point, and now I said
3 I said still today.
4        MR. McDONALD: Okay. I just
5 want to be sure that when he
6 answered at this point, he
7 meant -- he understood you to say
8 at the time this document was
9 prepared.
10       That's how you were
11 answering the question. I just
12 want it to be clear.
13       MR. MIGLIORI: Sure.
14       THE WITNESS: Right, so
15 at -- at the time this document
16 was produced, the 222 forms,
17 verifications was responsible to
18 produce them to maintaining.
19 That's --
20 BY MR. MIGLIORI:
21    Q.   My question is today, are
22 222 forms maintained as hard copies to
23 your knowledge?
24    A.   To my knowledge I think it

Page 112

1 is a combination of. We have implemented
2 a controlled substance ordering system.
3 So some customers may still order using
4 222 forms. Some customers order using
5 CSOS.
6     Q.   And those are maintained by
7 the verifications department today?
8     A.   The 222 forms?
9     Q.   Yes.
10    A.   Yes.
11    Q.   Okay. Does verifications
12 still maintain the -- the current
13 suspicious monitoring reporting, not the
14 monthly, but the current reporting
15 system?
16    A.   The current reporting system
17 is shared. Verifications will report
18 some suspicious orders, regulatory will
19 report some others.
20    Q.   Based on what?
21    A.   Based on who did the review.
22 Based on what type of restriction it
23 wants.
24    Q.   Is it fair to say that the

Page 113

1 percentage of review would be what we
2 discussed earlier, that -- that -- about
3 85 to 88 percent of the suspicious
4 reporting is managed at the verifications
5 level and the balance, 12 to 15 percent,
6 is managed at the regulatory affairs
7 department level?
8     A.   You mean that verifications,
9 when it comes to regulatory, is about
10 15 percent of the volume, yes.
11    Q.   Okay. On the last page it
12 talks about the document retention and
13 regulatory affairs. And it says that the
14 product distribution history is in the
15 JDE system and it's to be maintained for
16 ten years.
17       Do you see that?
18    A.   I see that.
19    Q.   And that's for controlled
20 substances as well, correct?
21    A.   That was mainly for recall,
22 product recall purposes.
23    Q.   Okay. The next one says,
24 "Customer purchase history for controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 substances only, has controlled purchases
2 by DEA number (report), WCS" -- that's
3 the warehouse control system -- "for ten
4 years."
5        That's how long the record
6 retention program was for customer
7 purchase history in 2003?
8        A.   That is correct.
9        Q.   Is that still the record
10 retention policy?
11       A.   Record retention policy
12 right now for controlled substances,
13 because of the Drug Quality and Security
14 Act has been revised.
15       Q.   And what is it now?
16       A.   Six years.
17       Q.   And when did that change?
18       A.   I don't remember.
19       Q.   And the basis for that was
20 which statute?
21       A.   Drug Quality and Security
22 Act.
23       Q.   And so did it reduce from
24 ten to six as a result of that act?

Page 115

1        A.   So I know that today, that
2 is the record retention.  I don't know
3 when this changed.
4        Q.   Okay.  If there is
5 litigation, is that handled or is that
6 dealt with in the Schein document
7 retention program relative to this type
8 of purchase history?
9            MR. McDONALD:  Object to the
10           form.
11           THE WITNESS:  I'm sorry.  I
12           don't understand the question.
13 BY MR. MIGLIORI:
14       Q.   Sure.  Have you been asked
15 not to purge or destroy any records
16 relevant to customer purchase history
17 during the pendency of this litigation?
18       A.   Yes.
19       Q.   And that would include these
20 types of documents here, correct, the
21 controlled purchases by DEA number of
22 Schein customers, correct?
23       A.   Well, that will include
24 whatever was in my possession or on my

Page 116

1 records.
2        Q.   Okay.  And do you know when
3 that order was implemented relative to
4 this type of information for controlled
5 substances?
6            MR. McDONALD:  You mean the
7            litigation document hold?
8            MR. MIGLIORI:  Mm-hmm.
9            MR. McDONALD:  You just said
10           order.  He looked puzzled by what
11           you meant by that.
12           THE WITNESS:  Yeah, the
13           document hold, I don't remember
14           exactly.
15 BY MR. MIGLIORI:
16       Q.   If you were to go right now
17 and go look at the orders in Ohio of
18 controlled substances, where would you
19 go?
20       A.   Well, I could ask
21 verifications to run a report.
22           (Document marked for
23           identification as Exhibit
24           Henry Schein-Tejeda-5.)

Page 117

1 BY MR. MIGLIORI:
2        Q.   I'm going to show you
3 Exhibit 5.  Does that look like a report
4 that you might get out of verifications?
5        A.   Yes.
6        Q.   It doesn't come out --
7 strike that.
8            This has a title that's been
9 added for purposes of this litigation.
10 Do you see that on top, Schein Summit
11 County customers?
12       A.   Yes.
13       Q.   And it has opioid orders
14 from 2001 to 2008.
15           Do you see that?
16       A.   Yes.
17       Q.   Who would put that
18 information on top of an Excel
19 spreadsheet like this?
20           MR. McDONALD:  Object to the
21           form.
22 BY MR. MIGLIORI:
23       Q.   Do you know?
24       A.   Whoever was responsible to

Page 118

1 prepare this report.
2     Q.    What does this report
3 demonstrate?  Take Line 1 and walk me
4 through it.
5         Is this a -- is this a
6 purchase history?  Is this a product
7 distribution history?  Is this one of the
8 documents that comes out of the warehouse
9 control system?  Or does it come out of
10 the JD Edwards system?  Tell me what you
11 can tell me from looking at this
12 Exhibit 5.
13         MR. McDONALD:  Object to the
14     form.  Lack of foundation.
15         MR. MIGLIORI:  I'll
16     stipulate that there's a lack of
17     foundation.  That's why I'm trying
18     to figure out what the heck this
19     thing says.
20         MR. McDONALD:  Well, and
21     with all due respect, Don, I don't
22     think he's the guy to do it.
23         MR. MIGLIORI:  Well, I just
24     got it this weekend.  So I don't

Page 119

1 have any more depositions to find
2 out.
3         MR. McDONALD:  Well, you
4     know, Don, as I have told your
5     colleagues, if there's some issue
6     with documents that were recently
7     produced that's --
8         MR. MIGLIORI:  We'll get to
9     it.
10         MR. McDONALD:  I know.  Let
11     me finish because I want it clear
12     on the record.  If there is some
13     issue with documents that we
14     recently produced and the person
15     that knows the most about it or
16     can explain to you has already
17     been deposed, we're happy to have
18     a conversation with you to
19     facilitate that process.
20         MR. MIGLIORI:  I appreciate
21     the offer.  I want to understand,
22     since he is responsible for this
23     type of information or the
24     production of this type of

Page 120

1     information, I want to understand
2     what his recollection or knowledge
3     is of it.  And he can limit it,
4     obviously, to what he knows.
5 BY MR. MIGLIORI:
6     Q.    But if you look at
7 Exhibit 5, Mr. Tejeda, what is this, as
8 best you can tell as director of
9 regulatory affairs at Henry Schein?
10     A.    It's a report that was
11 produced as a request of information for
12 this litigation.
13     Q.    So as I'm looking at this
14 Exhibit 5, this is not a document that's
15 kept in this form, correct?  This is a
16 query in a report of things that were
17 particularly asked for.  Is that a fair
18 statement?
19     A.    That is my understanding.
20     Q.    Okay.  And so somebody came
21 up with parameters of what to put into
22 this Excel spreadsheet, and these are the
23 different fields that were requested,
24 correct?

Page 121

1     A.    Yes.
2     Q.    And can you tell by looking
3 at this where these fields come from;
4 that is, which system this reporting
5 comes out of?
6         MR. McDONALD:  Again, object
7     to the form.  Lack of foundation.
8         THE WITNESS:  I can't.
9 BY MR. MIGLIORI:
10     Q.    Okay.  And if you were to
11 ask for the opioid orders from 2001 to
12 2008 as director of regulatory affairs,
13 who would you ask for this information
14 from?  Who is required to produce it
15 under the Henry Schein retention program?
16         MR. McDONALD:  Object to the
17     form.  Assumes facts not in
18     evidence.
19         THE WITNESS:  I would define
20     the parameters as far as what type
21     of information were you looking
22     for, and I think I will ask the
23     verifications team for the report.
24 BY MR. MIGLIORI:

Page 122

1  Q.  Now, it says opioid orders.
2  And so as you go through it, it seems
3  like most of these are self --
4  self-explanatory.  But I can't tell how
5  this is organized; that is, the dates
6  aren't chronological.
7      Can you tell, in the
8  ordinary course of business, looking at a
9  sheet like this, how this may have been
10  organized?
11      MR. McDONALD:  You mean how
12  it's sorted?
13      MR. MIGLIORI:  Yeah.
14  BY MR. MIGLIORI:
15  Q.  I mean, the order dates are
16  not chronological.  The ordering
17  physicians are not -- repeat themselves.
18  So I'm just trying -- again, it seems
19  like the most -- it seems to be organized
20  in part by practitioner.  But I'm just
21  trying to get a sense of how you would
22  read this.
23  A.  I would read that it seems
24  to be organized by practitioner by

Page 123

1  account.
2  Q.  Okay.  And so did you review
3  this in preparation for today?
4  A.  No, I didn't.
5  Q.  Were you advised who would
6  request the certain fields of information
7  to be gathered and printed into this?
8  Were you part of that process or know who
9  was part of that process?
10  A.  I think the request came
11  from legal.
12  Q.  Okay.  And did it -- was it
13  Shaun Abreu or his department that would
14  have put this together?
15      MR. McDONALD:  Object to the
16  form.
17      THE WITNESS:  I am not sure
18  who put it together.
19  BY MR. MIGLIORI:
20  Q.  Okay.  Let's take another
21  example.  If you go to Page 11 and 12.
22  You see there are multiple references to
23  Adolph Harper, Junior.
24      Do you see that?

Page 124

1  A.  Multiple references to the
2  name of the account or --
3  Q.  It says under mailing, but
4  it has a name.
5  A.  Okay.  Okay.
6  Q.  Do you see where I am?
7  A.  Adolph.
8  Q.  Harper Junior.
9  A.  Okay.
10  Q.  And then it's got orders
11  that range from 2000 -- best I can tell,
12  2004 to 2008 over the next several pages.
13  2003.  I see one entry of
14  2003.
15  A.  Yes.
16  Q.  Do you know who Dr. Harper
17  is?
18  A.  I don't.
19  Q.  Did you do anything to
20  educate yourself on the amount of volume
21  Dr. -- any of the doctors in Summit
22  County ordered in preparation for today?
23  A.  No, I didn't.
24  Q.  Were you aware that

Page 125

1  Dr. Harper was the third largest by
2  dosage unit -- I'm sorry, by -- by -- he
3  was the largest by dosage unit customer
4  of Henry Schein in Summit County?
5      MR. McDONALD:  Object to the
6  form.
7      THE WITNESS:  No, I can't
8  say he was.
9  BY MR. MIGLIORI:
10  Q.  Have you -- the due
11  diligence file for Henry Schein, is that
12  something that you maintain in your
13  department or you were responsible for
14  producing today?
15  A.  Again, it depends on if
16  regulatory conducted that due diligence,
17  yes.  And if it was conducted by
18  verifications, then verifications will
19  produce it.
20      (Document marked for
21      identification as Exhibit
22      Henry Schein-Tejeda-6.)
23  BY MR. MIGLIORI:
24  Q.  I just handed you Exhibit

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1 Number 6.
2    A.   Yeah.
3    Q.   This is Dr. Harper's -- this
4 is all I have for Dr. Harper's due
5 diligence.  It's a printout of the screen
6 shot of the due diligence file.  That's
7 all that's been produced to me.
8    A.   Okay.
9    Q.   I'm representing that to
10 you.
11       MR. McDONALD:  Well, I'll
12    represent to you that we told you
13    guys that we produced initial
14    screen shots for all these
15    customers last week.
16       MR. MIGLIORI:  Right.
17    And -- and you've produced to me
18    due diligence folders of due
19    diligence files or supported due
20    diligence files months ago.
21       MR. McDONALD:  Right.
22       MR. MIGLIORI:  To date, all
23    I have for Harper is this.  That's
24    all I'm representing.

Page 127

1       MR. McDONALD:  And there
2    wasn't an additional screen shot
3    on Friday.
4       MR. MIGLIORI:  This is
5    Friday's.
6       MR. McDONALD:  Okay.
7       MR. MIGLIORI:  The only
8    reason I'm doing this is because
9    I'm -- I'm trying to understand
10    what I got.
11 BY MR. MIGLIORI:
12    Q.   And if you look at this
13 Exhibit 6, this is the screen shot of
14 Dr. Harper's due diligence file.  Are you
15 familiar with the system where you can go
16 look at this inventory?
17       MR. McDONALD:  Well, Don, I
18    hate to interrupt you, but based
19    on the Bates number, I find it
20    hard to believe that this was
21    Friday.  Because it's 983.
22       MR. MIGLIORI:  I will stand
23    corrected if that's true.  This is
24    what I have.  This is all I have

Page 128

1 for Harper on due diligence.
2       MR. McDONALD:  Okay.
3       MR. MIGLIORI:  Do you have
4    the rest in there?
5 BY MR. MIGLIORI:
6    Q.   I want you to, while he's
7 looking, to verify my comment.
8       This screen shot may have
9 been produced to me earlier.  This is
10 literally the entire file that I have for
11 Adolph Harper on due diligence.
12       If we go through this screen
13 shot -- you are familiar with this screen
14 on the system, correct?
15    A.   Not really.
16    Q.   Not really?  Sort of?
17    A.   I know about the screen, but
18 I don't work on it.
19    Q.   All right.  Well, you know
20 some of the initials of some of the
21 people that work for you, correct?
22    A.   That work for me, yes.
23    Q.   Yeah.
24    A.   Yes, I do know.

Page 129

1    Q.   Do you know some of the
2 initials for people in the verifications
3 department, correct?
4    A.   For some.
5    Q.   Okay.  If you look at the
6 second page, there are initials entered
7 by C-U-R-Q-U-I.
8       Do you know who that
9 references in 2002?
10    A.   I'm sorry, I don't.
11    Q.   How about above that,
12 Y. Mason?  Do you know anybody named
13 Y. Mason?
14    A.   No.
15    Q.   On the first page, GS
16 Stewart.  Is that familiar to you?
17    A.   No, I'm sorry.
18    Q.   Siebel, are you familiar
19 with that name?
20    A.   I'm sorry.  No.
21    Q.   M-D-O-N-O-2.  Do you know
22 who that might be?
23    A.   No.
24    Q.   Kunick, K-U-N-I-C-K?

Page 130

1    A.   No.  I -- I wouldn't tell --
2 I couldn't tell you who that identifies.
3    Q.   N-M-A-L-N-O.  Do you know
4 who that might be?
5    A.   No.
6    Q.   D. Marin.  Do you know who
7 that might be referencing?
8    A.   No.
9    Q.   How about D-B-L-A?
10    A.   No.
11    Q.   D. Hagan.  Do you know who
12 that is?
13    A.   No.
14    Q.   T-H-A-R-R-2?
15    A.   I don't know what -- who
16 that would identify.
17    Q.   And how about R-S-W-A-I-M?
18 Do you know who that might reference?
19    A.   No.
20    Q.   So you see that this is a --
21 you understand from your knowledge of the
22 system that this is a computer printout
23 referencing certain due diligence steps
24 related to this particular doctor,

Page 131

1 correct, you understand that much?
2    A.   I understand that this is a
3 printout of customer service part of the
4 system that records some changes that
5 were made in the system or some notes.
6    Q.   Okay.  Each one of these
7 notes should have a document associated
8 with it, correct, in the system?
9       MR. McDONALD:  Object to the
10    form.
11       THE WITNESS:  I don't know.
12 BY MR. MIGLIORI:
13    Q.   As director of regulatory
14 affairs, do you have any knowledge
15 whatsoever of how you maintain your due
16 diligence files?
17    A.   Absolutely.
18    Q.   So tell me how you maintain
19 them for a doctor like Dr. Harper, given
20 that in this litigation, this is what I
21 have to go by?
22    A.   So I couldn't tell you about
23 specifics on Dr. Harper.  But if your
24 question is what -- how our system works

Page 132

1 and how we maintain it, I can answer
2 that.
3    Q.   Well, right now I want to
4 know what you can tell me, if anything,
5 about Dr. Harper.  This is the --
6    A.   I have no specifics for
7 Dr. Harper.
8    Q.   You can't read any of these
9 abbreviations and tell me that "letter on
10 file pain meds," you don't know what that
11 reference is?
12    A.   I will be guessing.
13    Q.   I don't want you to guess.
14       W/IV S/A X10.  That means
15 nothing to you?
16    A.   I know that the W is with.
17 The I is image.  I don't recall what V
18 is.
19    Q.   Okay.  Is there a document
20 that's associated with that?
21    A.   I don't know.
22    Q.   What is a T-D-D-D letter?  I
23 may have said too many Ds.
24    A.   TDDD is an acronym for

Page 133

1 terminal drug distributor -- or dangerous
2 drug distributor.
3    Q.   What does that mean?
4    A.   It's a license -- specific
5 license issued by Ohio.
6    Q.   For what?
7    A.   For practitioners that
8 handle controlled substances, if I
9 remember correctly.
10    Q.   And is there a particular
11 right or privilege that goes along with
12 that Ohio distinction?
13    A.   They implemented that
14 program to provide additional ordering
15 privilege to practitioners, yes.
16    Q.   For what purpose?
17    A.   I will answer your question.
18       May I ask you, the spelling
19 of my right -- my last name is
20 T-E-J-E-D-A.
21       MR. MIGLIORI:  You can make
22    fun of the very kind woman who has
23    been very patiently taking all of
24    your words down.  I didn't do it.

Page 134

1    I apologize. But we will fix
2    that.
3        THE WITNESS: Okay. Thank
4    you. I'm sorry, can you repeat
5    your question?
6  BY MR. MIGLIORI:
7    Q.   Is there a particular right
8  or privilege that goes along with the
9  Ohio distinction of TDDD?
10       MR. McDONALD: Object to the
11   form.
12 BY MR. MIGLIORI:
13   Q.   What's the purpose of that
14 privilege?
15       MR. McDONALD: Object to
16   form.
17       THE WITNESS: I will have to
18   go back to the file to review all
19   the ins and out of the regulation.
20 BY MR. MIGLIORI:
21   Q.   If you were to read through
22 Exhibit Number 6 and go through any line
23 of Dr. Harper, you'd be able to find out
24 an order number, correct? If you just

Page 135

1  take the categories on top. I'm now back
2  on Exhibit 6.
3        MR. McDONALD: Oh,
4    different. He's on this one.
5        THE WITNESS: Exhibit 5?
6  BY MR. MIGLIORI:
7    Q.   Is it five?
8    A.   Yes.
9    Q.   I'm sorry. I apologize.
10 Five.
11       So there's an order number?
12       MR. McDONALD: Why don't you
13   get him to the page again.
14 BY MR. MIGLIORI:
15   Q.   Pick any -- Dr. Harper. You
16 can do Page 13.
17       MR. McDONALD: He's on page
18   one is why I said that.
19       THE WITNESS: Page 12,
20   right?
21 BY MR. MIGLIORI:
22   Q.   12 or 13. Either one.
23   A.   Okay.
24   Q.   So this will give you the

Page 136

1  order number, correct?
2    A.   Correct.
3    Q.   What does SO stand for?
4    A.   Sales order.
5    Q.   What is a line reference?
6    A.   I don't know.
7    Q.   Do you know what item number
8  reference is?
9    A.   It's the SKU for the
10 specific product.
11   Q.   Okay. There's a ship
12 number. Is there a separate tracking
13 number for shipment? What is ship?
14   A.   Ship number is the ship to
15 location.
16   Q.   So that's specific to this
17 doctor?
18   A.   That is specific to that
19 doctor.
20   Q.   And the bill is the same
21 number, and not specific to this doctor?
22   A.   The ship is where we're
23 shipping. The bill is where we send the
24 invoices.

Page 137

1    Q.   Okay. The drug order class
2  of the controlled schedule?
3    A.   The schedule.
4    Q.   How is that different from
5  the current item master drug class?
6    A.   So the current item master
7  drug class is Schedule II because
8  hydrocodone was rescheduled sometime ago.
9    Q.   So this distinction would be
10 at the time of this order, it was a
11 Schedule III. But currently it's a
12 Schedule II. Is that --
13   A.   Yes. At the time of
14 printing that report, the current would
15 be a Schedule II.
16   Q.   Gotcha. What is a Julian
17 order date?
18   A.   I'm not sure.
19   Q.   Order date and year, that's
20 self-explanatory. Do you know what AT
21 stands for?
22   A.   No. Sorry.
23   Q.   It's the doctor, the
24 doctor's address, and then it has the

Page 138

1 doctor's zip code and then there's a
2 number for a distribution center.
3          Do you know which
4 distribution center this is on Page 13
5 that's referenced in all of these orders?
6     A.   On Page 13?
7     Q.   Yep.  I assume it's true
8 throughout.  But I'm only looking on Page
9 13 now.  The distribution center --
10    A.   So the distribution center,
11 there was a couple of them, right?
12    Q.   I just see the ones that end
13 in 002.
14    A.   002.
15    Q.   Is that Indianapolis?
16    A.   Indicating Indianapolis.
17    Q.   The quantity shipped is the
18 amount of orders shipped?
19    A.   Quantity shipped will be the
20 amount of selling units.
21    Q.   Okay.  What is UOM?
22    A.   Unit of measure.
23    Q.   And what does BT stand for?
24    A.   Bottle.

Page 139

1     Q.   Bottle.  And then the size
2 would be the number of milligrams per
3 bottle?
4          MR. McDONALD:  Object to the
5     form.
6 BY MR. MIGLIORI:
7     Q.   Is that -- what is the
8 500/BT on the first line of Page 13 for
9 hydrocodone?
10    A.   That would indicate --
11    Q.   Dosage?
12    A.   -- the selling unit size.
13    Q.   So -- which is what for
14 500/BT?
15    A.   500 per bottle.
16    Q.   500 what?
17    A.   In this case tablets.
18    Q.   500 hydrocodone tablets of a
19 strength of 7.5 codeine and
20 750 milligrams --
21    A.   Correct.
22    Q.   -- hydrocodone?
23         MR. McDONALD:  Object to the
24    form.

Page 140

1 BY MR. MIGLIORI:
2     Q.   Or of oxy?
3          MR. McDONALD:  Object to the
4     form.
5          THE WITNESS:  So you are
6     looking at Page 3, right?
7 BY MR. MIGLIORI:
8     Q.   13.
9          MR. McDONALD:  13.
10         THE WITNESS:  I mean 13.
11 BY MR. MIGLIORI:
12    Q.   I'm looking at the very last
13 column under strength?
14    A.   Page 13, okay.
15    Q.   All the way at the end.
16 Strength, when it says
17 7.5/750 milligrams, when you combine the
18 last two columns it's 500 pills of that
19 dosage strength, correct, for that
20 particular order?
21    A.   For -- yes, for hydrocodone,
22 yes.
23    Q.   Times two bottles, correct?
24    A.   Depending what it says in

Page 141

1 the quantity shipped.
2     Q.   Right.  On the first line.
3 So in this particular order, there were
4 two separate orders of 500 pills at the
5 strength 7.5/750, correct?
6          MR. McDONALD:  Object to the
7     form.
8          THE WITNESS:  I'm sorry,
9     what particular order?  I thought
10    we were under purchase in general?
11 BY MR. MIGLIORI:
12    Q.   Page 13.  Page 13.  Stay on
13 the top line.
14    A.   Okay.  Top line.
15    Q.   Just go to the last two
16 columns --
17    A.   Okay.
18    Q.   -- last four columns.  There
19 were two bottles of 500 pills in
20 each bottle at the strength of
21 7.5/750 milligrams, correct?
22    A.   That's my understanding.
23    Q.   All right.  Exhibit 7 is
24 what we received earlier of 2009 to

Page 142

1  present.
2         (Document marked for
3     identification as Exhibit
4     Henry Schein-Tejeda-7.)
5     THE WITNESS:  Thank you.
6  BY MR. MIGLIORI:
7     Q.   If you look on the top of
8  these two documents, it says, "Due
9  diligence documents."  Transactional
10 records are not due diligence, are they,
11 in Schein's system?
12    A.   Transactional documents are
13 not due diligence.
14    Q.   You -- you would -- you
15 would agree with me that Exhibit 7 that
16 we're looking at and Exhibit 5 that we
17 were looking at, these are summaries of
18 transactional information, correct?
19 These are opioid orders, the first from
20 2001 to 2008, the second post January of
21 2009.  These are transactional records,
22 correct?
23    A.   The way I read it.
24    Q.   And so these aren't due

Page 143

1  diligence documents the way the title
2  reads, correct?
3         MR. McDONALD:  Object to the
4     form.
5         THE WITNESS:  Yeah, I
6     don't -- I don't think these are
7     due diligence documents.
8  BY MR. MIGLIORI:
9     Q.   Okay.  And so you'll see
10 that the information is organized the
11 same for Exhibit Number 7.  And again,
12 there are a couple more entries on Page 2
13 for Dr. Harper.
14        Here he got a total of nine
15 more bottles, 500 pills in each bottle,
16 of the same dosage that we just discussed
17 7.5/750 milligrams.
18        Do you see that?
19    A.   Yes, I see it.
20    Q.   And were you aware that he
21 was, by dosage, the largest customer of
22 Henry Schein in Summit County?
23    A.   Right now?
24    Q.   Ever.

Page 144

1     A.   At the time?
2     Q.   Were you ever made aware of
3  that?
4     A.   No.
5     Q.   And I showed you Exhibit 6,
6  which I believe was the printout of his
7  due diligence file, or at least the
8  inventory of the computer screen shots of
9  his due diligence file.  Is there
10 anything on there that pops out at you to
11 suggest that he might be the largest
12 customer of Henry Schein in Summit County
13 based on dosage units?
14    A.   Do you want me to go over
15 the whole report to see who is the
16 largest?  Oh.
17    Q.   No, I'm asking you whether
18 by looking at this particular due
19 diligence printout, if there's anything
20 that pops out at you.
21        You can see it's the
22 verifications group that produced this
23 document.
24        But I'm asking, by looking

Page 145

1  at it as director of regulatory affairs,
2  whether anything pops out at you that
3  this is a large volume customer of Henry
4  Schein or --
5         MR. McDONALD:  Object to the
6     form.
7         THE WITNESS:  Again, we
8     don't work with this.
9  BY MR. MIGLIORI:
10    Q.   I'm sorry, I didn't hear
11 you.
12    A.   So no, we don't work with
13 this.
14    Q.   Okay.  So if there were
15 government inquiries about this doctor in
16 2010, would those records be the
17 verifications department or the
18 regulatory department's obligation to
19 produce?
20        MR. McDONALD:  Object to the
21     form.
22        THE WITNESS:  I don't
23     remember.
24 BY MR. MIGLIORI:

Page 146

1    Q.   Would it be a joint
2  responsibility by 2010?
3    A.   I'm sorry?
4    Q.   Would it be a joint
5  responsibility by 2010?
6    A.   I know it is a joint
7  responsibility now.
8    Q.   It is now?
9    A.   Yes.
10    Q.   So that -- those documents
11  would exist somewhere still if the --
12  there was such an inquiry?
13    A.   Dr. Harper, if it was
14  inquiry when?
15    Q.   In 2010?  Would you still
16  have those records?
17    A.   I don't know.  But if I go
18  by the record retention, I wouldn't think
19  so.
20    Q.   Were you aware of the fact
21  that Dr. Harper was sentenced to ten
22  years in prison for illegal
23  prescription --
24    A.   No.

Page 147

1    Q.   -- of opioids and controlled
2  substances?
3    A.   No.
4    Q.   Were you aware that
5  prosecutors connect him to eight deaths
6  of opioid-addicted users?
7    A.   No.
8    Q.   The second largest volume by
9  dosage in this county is a Dr. Name Brian
10  Heim.  Are you familiar with Dr. Heim?
11    A.   No.  I have heard the name,
12  but not familiar with his file.
13    Q.   Have you ever seen any
14  documentation of the DOJ and the DEA
15  asking Henry Schein for his transactional
16  information?
17    A.   I may have seen a copy of
18  it.
19    Q.   What's that?
20    A.   I may have seen a copy of
21  it.
22    Q.   What did you see to your
23  recollection?
24    A.   A copy of a request.

Page 148

1    Q.   From whom?
2    A.   I think it was DEA.
3    Q.   And what do you recall the
4  document requesting?
5    A.   Records of -- transaction
6  records I think.
7    Q.   And were you involved --
8  did -- did you receive that request --
9  did you see that request at the time?
10    A.   No.
11    Q.   Did you receive it in
12  preparation for today, did you look at it
13  in preparation for today?
14    A.   I think I saw it in one of
15  the meetings.
16    Q.   One of the meetings with
17  counsel to prepare for today's
18  deposition?
19    A.   Mm-hmm.
20    Q.   Yes?
21    A.   Yes.
22    Q.   Where would that request in
23  2012 be documented, that is, which
24  department would be required under the

Page 149

1  document retention policy to produce that
2  document?  Verifications, regulatory,
3  legal or some combination of them?
4    A.   I don't know.
5    Q.   Do you recall the date of
6  the document that you saw where DEA
7  requested this information?
8    A.   No.
9    Q.   Did your counsel share
10  Exhibit Number 8, the due diligence file
11  produced to us of Dr. Heim.
12          (Document marked for
13      identification as Exhibit
14      Henry Schein-Tejeda-8.)
15          MR. McDONALD:  And there was
16      a supplementation to Dr. Heim
17      produced to you last week.
18          MR. MIGLIORI:  Did we get
19      that?
20          MR. DUANE:  It was noted in
21      relativity to Sunday at 7:00 p.m.
22      --
23          MR. McDONALD:  I think it
24      was produced to you early last

Page 150

1 week.
2     MR. MIGLIORI:  No, Friday
3 was the production.
4     MR. McDONALD:  Well, we
5 produced stuff to you on Tuesday
6 as well.
7     MR. MIGLIORI:  And you think
8 you produced that to us on
9 Tuesday?
10     MR. McDONALD:  I can find
11 out, Don.
12     MR. MIGLIORI:  No, I --
13     MR. McDONALD:  And we
14 specifically identified for you
15 what we produced.  So --
16     MR. MIGLIORI:  No.  Whoa,
17 whoa, whoa, whoa.  Let's be
18 careful.  Let's be careful.
19     I'm perfectly happy with you
20 creating a record, but you didn't
21 specifically show me, identify and
22 direct me to any due diligence of
23 Dr. Heim.
24     MR. McDONALD:  We told you

Page 151

1 that -- well, I can go back and
2 look at the communications with
3 you.  But I talked to your
4 colleague last week.
5     MR. MIGLIORI:  I know you
6 did.
7     MR. McDONALD:  And I told
8 him on the phone exactly what we
9 had produced, including the
10 additional screen shots --
11     MR. MIGLIORI:  Right.
12     MR. McDONALD:  -- for all of
13 them, which you specifically had,
14 an additional production.  You got
15 further documentation from my
16 colleague, Scott Jones, in an
17 e-mail to you guys, telling you
18 that there had been additional
19 screen shot of Dr. Heim that
20 identified the inquiry from DOJ or
21 whoever it came from, the
22 government entity, because I don't
23 know off the top of my head right
24 now who it came from, as well as

Page 152

1 we produced to you the supporting
2 documentation of the government
3 inquiry.
4     MR. MIGLIORI:  I don't --
5     MR. McDONALD:  That was sent
6 to you in an e-mail telling you
7 exactly what we had done.
8     MR. MIGLIORI:  That e-mail
9 did not say any of that
10 information about Dr. Heim.
11     MR. McDONALD:  Yeah, it did.
12     MR. MIGLIORI:  No, it
13 didn't.  I actually just reviewed
14 it.  And I have my -- my counsel
15 here for the sole purpose --
16     MR. McDONALD:  Well, I
17 will -- I will tell you that I was
18 on the phone and I told him that.
19     MR. MIGLIORI:  Well, he is
20 here, and I'll let him explain the
21 position that he --
22     Do you have that?
23     MR. DUANE:  I think I've got
24 it now.  He just sent it to me.

Page 153

1     MR. MIGLIORI:  And this is?
2     MR. McDONALD:  There is the
3 additional screen shot for
4 Dr. Heim, and there is the
5 additional due diligence
6 documentation for Dr. Heim.
7     MR. MIGLIORI:  Can you tell
8 when this was produced?
9     MR. DUANE:  I'll check.
10     MR. McDONALD:  And, Don, I
11 told your -- I told your
12 colleagues this, that -- that
13 this -- hang on.  That this was
14 brought to our attention as a
15 result of your inquiry from Tina
16 Steffanie-Oak where she said that
17 this isn't -- she wasn't familiar
18 with this file, there should have
19 been something else in the file if
20 there was, in fact, an inquiry
21 from DEA or DOJ.
22     And so we went and looked,
23 and said we must be
24 miscommunicating what we're asking

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  for. And we found this additional
2  screen shot, as well as the DOJ
3  inquiries, and we produced them to
4  you.
5      But it's a verifications
6  issues, Don. And -- and let me be
7  clear. As I told you before, if
8  there's some -- you can ask --
9      MR. MIGLIORI: I appreciate
10  it.
11      MR. McDONALD: Hang on. You
12  can ask him all the questions you
13  want, but if he doesn't know about
14  it and you need to ask Mr. Grey or
15  somebody else, I'll open his
16  deposition for a short period of
17  time to ask about it, we're happy
18  to accomplish that.
19      There was certainly no
20  intention on our part not to
21  produce this stuff.
22      MR. MIGLIORI: I'm not -- I
23  have never in the seven
24  depositions I've done, I have

Page 155

1  never accused you of anything
2  untoward. I'm trying to get to
3  the bottom of this. And I can
4  tell you that this was never
5  referenced directly or brought to
6  my attention, and to my knowledge
7  to my law partner's attention,
8  that this screen shot particularly
9  to Heim existed.
10      I know that I saw the
11  general reference to additional
12  screen shots which was contained
13  in several other screen shots.
14      This is the first time I'm
15  seeing a screen shot. And I'm
16  looking at it through the database
17  right now.
18      MR. McDONALD: Okay.
19      MR. MIGLIORI: So that's --
20  that's my side of the story.
21  BY MR. MIGLIORI:
22      Q. You did review -- the letter
23  from DEA to Henry Schein about Dr. Heim?
24      A. I remember seeing it.

Page 156

1      Q. But your recollection of
2  that is only from preparation for today,
3  not that you were involved with the
4  inquiry back in 2012, correct?
5      A. I don't remember.
6      Q. Did anyone point out to you
7  in showing you this information that
8  Dr. Heim was in fact the second largest
9  customer of Henry Schein in Summit
10  County, Ohio?
11      A. Not in that context.
12      Q. And are you aware that
13  Dr. Heim is also in federal prison as a
14  result of convictions on drug-related
15  charges including -- specifically
16  including controlled substances?
17      A. I wasn't aware.
18      Q. Are you aware that
19  Dr. Heim's conviction was actually
20  premised on the information about Henry
21  Schein's transactions with Dr. Heim?
22      MR. McDONALD: Object to the
23  form. Assumes facts not in
24  evidence.

Page 157

1      THE WITNESS: I wasn't
2  aware.
3  BY MR. MIGLIORI:
4      Q. In Ohio, in Summit County,
5  the two largest customers of Henry Schein
6  today sit in federal prison, and you
7  haven't looked to see anything about them
8  or Henry Schein's involvement with them
9  as customers?
10      MR. McDONALD: Object to the
11  form.
12      THE WITNESS: I'm sorry,
13  what -- what are you -- what are
14  you -- what is your question?
15  BY MR. MIGLIORI:
16      Q. As you spent 25 hours
17  preparing for this deposition, I'm asking
18  you whether you did anything yourself
19  within the regulatory affairs department
20  or the verifications department or legal
21  department to familiarize yourself with
22  the two largest customers of Henry Schein
23  in Summit County, Ohio, where this
24  lawsuit is being prosecuted to

Page 158

1 familiarize yourself with Henry Schein's
2 involvement with these two doctors who
3 now sit in federal prison?
4        MR. McDONALD:  Object to the
5 form.
6        You can answer that question
7 yes or no.
8        THE WITNESS:  Nothing on
9 Dr. Harper, and just like I said,
10 so the document from Dr. Heim.
11        MR. MIGLIORI:  This is the
12 last document and we'll take a
13 break.
14        (Document marked for
15 identification as Exhibit
16 Henry Schein-Tejeda-9.)
17 BY MR. MIGLIORI:
18    Q.   Did you see this document in
19 your preparation for today, the letter
20 that you wrote to the field office of DEA
21 about the reporting --
22    A.   This was in --
23    Q.   Let me finish.  I'm sorry.
24    A.   Okay.

Page 159

1    Q.   Did you review this document
2 in preparation for today, which was your
3 letter to Danna Droz of the Ohio State
4 Board of Pharmacy regarding Schein
5 reporting practices in the state of Ohio?
6    A.   I did review this slide.
7    Q.   It's a November 9, 2012,
8 letter, which is over your name, correct?
9    A.   Correct.
10    Q.   This version that I have is
11 not signed.  Did you believe that in fact
12 you sent this to the Ohio Board of
13 Pharmacy?
14    A.   The letter was sent to the
15 Ohio Board of Pharmacy.
16    Q.   And in this letter you tell
17 the Ohio Board of Pharmacy in November of
18 2012 that Henry Schein was writing for --
19 quote, "The purpose of this letter is to
20 notify the Ohio Board of Pharmacy of an
21 issue that was recently discovered while
22 conducting a routine internal review of
23 operations.  During the course of our
24 internal review, we realized that Henry

Page 160

1 Schein Incorporated has been
2 underreporting sales of controlled
3 substances to Ohio Board of Pharmacy as
4 required by the state's prescription
5 monitoring program (PMP)."
6        Do you recall sending that
7 letter to the Ohio Board of Pharmacy?
8    A.   Yes.
9    Q.   And do you recall the
10 realization that Henry Schein had been
11 underreporting controlled substances as
12 to Ohio as required by Ohio law?
13    A.   Yes.
14    Q.   Who was the person that
15 discovered this?
16    A.   It was one of our regulatory
17 specialists.
18    Q.   Who was that?
19    A.   I don't remember exactly who
20 it was.  I can tell you who I think it
21 was.
22    Q.   What's your best educated
23 guess?
24        MR. McDONALD:  Object to the

Page 161

1 form.
2        Go ahead.
3        THE WITNESS:  Peter Schmidt.
4 BY MR. MIGLIORI:
5    Q.   Who?
6    A.   Peter Schmidt.
7    Q.   And did Peter Schmidt -- is
8 he the one that discovered that the
9 reports that you had been sending to Ohio
10 for sales of products that contained
11 tramadol and carisoprodol didn't -- but
12 did not include any other controlled
13 substances, is he the one that made that
14 realization?
15        MR. McDONALD:  Object to the
16 form.
17        THE WITNESS:  So one of our
18 specialists brought it up to our
19 attention.
20 BY MR. MIGLIORI:
21    Q.   And how many controlled
22 substances were missing from the list of
23 what was required in 2012?
24    A.   I can't tell you that.

Page 162

1      Q.   Is it dozens?
2      A.   I don't know.
3      Q.   Do you know how many -- how
4 significant in numbers the underreporting
5 was as of November of 2012?
6      A.   I don't remember.
7      Q.   Isn't it true that this
8 underreporting continued for two years
9 before it was discovered?
10      A.   I'm sorry. Say that again?
11      Q.   Isn't it true that this
12 underreporting of controlled substances
13 to the Ohio State Board of Pharmacy had
14 been going on for two years?
15      A.   I'm not sure about the time
16 frame, if it's in the letter.
17      Q.   I'll show you. On the third
18 paragraph, it says, "Please be reassured
19 that there was never any intent to avoid
20 or circumvent the company's obligation
21 under Ohio state law, and as an act of
22 good faith, Henry Schein is providing all
23 controlled substances sales information
24 which was mistakenly omitted for the

Page 163

1 previous two years. See enclosures."
2      A.   Okay.
3      Q.   Isn't it true that Henry
4 Schein, for two years, underreported the
5 sale of controlled substances within the
6 state of Ohio, from at least 2010 to
7 2012?
8        MR. McDONALD: Object to the
9     form.
10        THE WITNESS: So I don't
11     know if it was two years that we
12     underreported. I know that we
13     were providing two years of
14     information.
15 BY MR. MIGLIORI:
16      Q.   Your letter says,
17 unequivocally, "Information which was
18 mistakenly omitted for the previous two
19 years."
20        Those are your words,
21 correct?
22      A.   Those are my words.
23      Q.   That would include Summit
24 County, Ohio, my client, correct?

Page 164

1      A.   The state of Ohio.
2      Q.   So at this point in 2010,
3 the oxycodone would have been a
4 controlled substance that would not be
5 reported here, correct?
6      A.   From what the letter says,
7 we only were reporting a couple of drugs.
8      Q.   Hydrocodone would not have
9 been reported, correct?
10      A.   According to the letter.
11      Q.   And you understand that in
12 Ohio, hydrocodone was almost 99 percent
13 of the orders filled from 2006 to 2014 in
14 Summit County? Were you aware of that?
15        MR. McDONALD: Object to the
16     form.
17 BY MR. MIGLIORI:
18      Q.   From Henry Schein?
19        MR. McDONALD: Object to the
20     form.
21 BY MR. MIGLIORI:
22      Q.   Were you aware of that?
23      A.   No, sir, I wasn't.
24      Q.   Were you aware that

Page 165

1 Dr. Heim, who was convicted of drug
2 trafficking, had received over 11,000
3 dosage units of hydrocodone from Henry
4 Schein leading up to his conviction?
5        MR. McDONALD: Object to the
6     form.
7        THE WITNESS: I wasn't
8     aware.
9 BY MR. MIGLIORI:
10      Q.   And that the inquiry that
11 you saw from the DEA about Dr. Heim, that
12 was dated in July of 2012, correct?
13      A.   I don't remember.
14      Q.   I can only show you by a
15 computer screen.
16        MR. MIGLIORI: Can you pull
17     that back up?
18        Maybe it will refresh your
19     recollection.
20        THE WITNESS: Okay.
21 BY MR. MIGLIORI:
22      Q.   I -- I can show it to you
23 here so we can all see it. And then I
24 can give this to you if you'd like. This

Page 166

1  is -- forgive me for having to do it this
2  way.
3          Is this what you saw as a --
4      A.   The note?
5      Q.   -- screen shot?
6      A.   The note?
7      Q.   And what I'm looking at here
8  is -- there is an 11 -- 7/11/12, "Please
9  contact Shaun to notify DEA if a control
10 is ordered."
11         Do you see that?
12     A.   Yes.
13     Q.   It says, "Deleted account."
14 Do you know what that means?
15     A.   Deleted account will mean
16 that the account is not longer current in
17 our system.
18     Q.   You don't know when it was
19 deleted, do you?
20     A.   No.
21     Q.   So you'll see here that
22 these -- this -- if -- if the date of
23 inquiry is in -- is in -- let's see --
24 July of 2012, if I'm reading this

Page 167

1  correctly, you would agree with me that
2  based on your letter to the Ohio board on
3  November 9, 2012, Exhibit Number 9, that
4  none of those 11,500 hydrocodone orders
5  to Dr. Heim would have been reported to
6  the Ohio Board of Pharmacy based on your
7  letter, correct?
8          MR. McDONALD:  Object to the
9      form.
10         THE WITNESS:  So is the
11     record showing that we were in
12     communication with the DEA and
13     this is a record to the board of
14     pharmacy?  I'm just confused how
15     you can -- and what --
16 BY MR. MIGLIORI:
17     Q.   I -- I can show you several
18 different ways.  We can start with the
19 exhibit, I believe it's Exhibit 8.
20         But if you look at the Henry
21 Schein transactional records from post
22 January 2009 and you turn to Page 3.
23     A.   Okay.
24     Q.   You see all of these orders

Page 168

1  for Dr. Heim?
2      A.   Yes.
3      Q.   And you see these are all
4  hydrocodone orders?
5      A.   Yes.
6      Q.   For Dr. Heim?
7      A.   Mm-hmm, yes.
8      Q.   And these are all in the
9  transactional records of Henry Schein,
10 correct?
11     A.   That is correct.
12     Q.   And they say he is
13 getting -- according to this chart, he is
14 getting, on the first line of his, one
15 bottle of 500 pills, at
16 10/500 milligrams.  And goes down the
17 list.  Then he increases to two bottles
18 of 500 pills at 10/500 milligrams.
19         You see all of those
20 entries, correct?
21     A.   Yes.
22     Q.   These are records maintained
23 by Henry Schein, correct?
24     A.   That is correct.

Page 169

1      Q.   And those records were also
2  reported to ARCOS, the federal DEA,
3  correct?
4      A.   Yes, they were.
5      Q.   And the DEA, by looking at
6  those very same records, contacted Henry
7  Schein and said to Henry Schein, there's
8  something unusual about this doctor's
9  ordering, correct?
10         MR. McDONALD:  Object to the
11     form.
12         THE WITNESS:  I don't know.
13         MR. McDONALD:  Form and
14     foundation.  Mischaracterizes the
15     evidence.
16 BY MR. MIGLIORI:
17     Q.   Do you recall the inquiry
18 about the transactional records from DEA
19 that you read?
20     A.   No.
21     Q.   You don't recall the
22 substance of it?
23     A.   No.
24     Q.   When the DEA contacted Henry

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 Schein, was the DEA -- did Henry Schein
2 have an appreciation that the DEA, when
3 they asked for transactional record, is
4 looking for suspicious order practices,
5 would that be a reasonable assumption at
6 Henry Schein?
7 　　　MR. McDONALD:  Object to the
8 　　form.
9 　　　THE WITNESS:  Not really.
10 　　Henry Schein has had a very good
11 　　relationship with all the local
12 　　DEA offices and also the
13 　　Washington office.  The fact that
14 　　they asked for records doesn't
15 　　necessarily mean that they're
16 　　looking for something on the
17 　　customer.
18 BY MR. MIGLIORI:
19 　　Q.   In that month, he was
20 indicted in August, based on the
21 transactional records Henry Schein
22 provided.  Were you aware of that?
23 　　　MR. McDONALD:  Object to the
24 　　form.

Page 171

1 　　　THE WITNESS:  No, I wasn't.
2 BY MR. MIGLIORI:
3 　　Q.   In August of 2012, these
4 records that you have here, in this
5 exhibit that we're looking at, were
6 never, ever reported to the Ohio Board of
7 Pharmacy as required by Ohio law,
8 correct?
9 　　A.   They were reported at the
10 time of this letter.
11 　　Q.   Right.  They weren't
12 reported until November of 2012 with two
13 years of unreported transactions,
14 correct?
15 　　A.   Again, I don't know -- I
16 cannot tell you the time frame of the
17 underreporting.
18 　　Q.   You -- you write it out and
19 you put a number in.  It says,
20 "Mistakenly omitted for the previous two
21 years, see enclosures."
22 　　　Did you ever look at these
23 enclosures when you reviewed this
24 document?

Page 172

1 　　A.   I would have.
2 　　Q.   When you prepared for this
3 deposition and you saw this Exhibit
4 Number 9, where you wrote to the Ohio
5 Board of Pharmacy and said we have
6 mistakenly omitted two years of
7 controlled substance reporting to you,
8 did it have attached to it the enclosures
9 that's referenced in your letter to the
10 board of pharmacy?
11 　　A.   Did I have the enclosures?
12 No, I didn't read the enclosures.
13 　　Q.   Those two years of -- of
14 omitted reporting to the Ohio Board of
15 Pharmacy, do you know if they still exist
16 somewhere at Henry Schein?
17 　　A.   I don't know.  But, however,
18 I think my point is that we are offering
19 two years of records to the board.
20 　　Q.   Which --
21 　　A.   I don't think we're
22 necessarily saying that we omitted two
23 years of records.
24 　　Q.   Let's go through it

Page 173

1 together.  Because the jury can actually
2 see this as we print it.  So I -- I don't
3 want there to be any confusion.  Or if
4 I've mistaken, you can show me how I'm
5 mistaken.
6 　　　Do you see where I am where
7 it says in the third paragraph, please?
8 　　A.   Right.
9 　　Q.   And we'll read this
10 altogether for the jury's benefit.
11 　　　"Please be reassured that
12 there was never any intent to avoid or
13 circumvent the company's obligation under
14 Ohio state law, and as an act of good
15 faith, Henry Schein Incorporated is
16 providing all controlled substance sales
17 information which was mistakenly omitted
18 for the previous two years, see
19 enclosures."
20 　　　Those are your words,
21 correct?
22 　　A.   Correct.
23 　　Q.   You haven't seen the
24 enclosures in preparation for today,

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1 correct, just this letter?
2     A.   Correct.
3     Q.   But at least based on this
4 letter, you provided two years of
5 mistakenly omitted reporting to the Ohio
6 Board of Pharmacy, correct?
7     A.   So we provided two years of
8 information.  I can see -- you can read
9 it that way.  I can read it a little
10 different too.
11    Q.   Did I read it properly?
12        MR. McDONALD:  Object to the
13    form.
14 BY MR. MIGLIORI:
15    Q.   Did I read it properly?
16 Whatever the information is, did I read
17 it properly?
18    A.   I think the fact that I can
19 say over here is that the information
20 that we produced at this time was two
21 years of information.
22    Q.   Okay.  Those are -- those
23 are some of the words of the sentence.
24 If you put them all together, it

Page 175

1 references, "All controlled substance
2 sales information which was mistakenly
3 omitted."
4        That's what you provided,
5 for the previous two years?
6     A.   Right.
7     Q.   You provided all of the
8 controlled substance sales information
9 which was mistakenly omitted for the
10 previous two years.
11        Do you see that?
12    A.   I see that.
13    Q.   Those are your words?
14    A.   Those are my words.
15    Q.   And that would include,
16 because it's November 2012, all of the
17 hydrocodone that Dr. Heim ordered from
18 Henry Schein, which led to his conviction
19 in federal court, in this federal court
20 in Ohio, correct?
21        MR. McDONALD:  Object to the
22    form.
23        THE WITNESS:  That would
24    include all the information of

Page 176

1 controlled substances that was
2 distributed to Ohio customers for
3 the prior two years.
4 BY MR. MIGLIORI:
5     Q.   And in these prior two
6 years, as we just saw, hydrocodone was
7 the order -- the only thing that Dr. Heim
8 ordered from Henry Schein in Summit
9 County, correct?
10        MR. McDONALD:  Object to the
11    form.
12        You've totally
13 mischaracterized this record.
14        MR. MIGLIORI:  I have your
15 objection.
16        MR. McDONALD:  It only --
17 only as to controlled substance.
18 Be careful.
19        MR. MIGLIORI:  This is a
20 controlled substance letter.
21        MR. McDONALD:  Correct.  But
22 you're saying that is all we sold
23 to him.  I don't know if we sold
24 him all other kinds of stuff.

Page 177

1        MR. MIGLIORI:  With all due
2 respect, that is all I have.  And
3 it's all you -- it's what you've
4 given me.  So everything that
5 Dr. Heim --
6        MR. McDONALD:  This is -- if
7 you want to ask him if that's all
8 the controlled substances that we
9 sold to him, that's fine.  But
10 there's no evidence that that's
11 all we sold to him.
12        MR. MIGLIORI:  All right.
13 In fact that's the only evidence,
14 because that's what you've
15 provided me.
16        MR. McDONALD:  You only
17 asked for evidence of controlled
18 substance.
19        MR. MIGLIORI:  Listen, we
20 don't need to debate this.  We
21 don't need to -- I get to ask the
22 questions.  And if you have a
23 problem, you state your objection.
24        MR. McDONALD:  You do.

Page 178

BY MR. MIGLIORI:

Q. In this exhibit of Dr. Heim's transactions as we've gone through, they are all related to hydrocodone tablets, correct?

A. The report?

Q. Take as much time as you want to look at it.

A. What report are you looking at?

MR. McDONALD: The exhibit.

BY MR. MIGLIORI:

Q. The opioid orders post January 2009.

MR. McDONALD: Tell him what exhibit, Don.

MR. MIGLIORI: He's going to have to tell me because he's got it.

BY MR. MIGLIORI:

Q. What number is that exhibit?

A. That is Tejeda Number 7.

Q. Exhibit Number 7, if you start on Page 3, and you look at all of

Page 179

the Brian Heim orders listed there, every one of them on Page 3 and Page 4, is hydrocodone tablets, correct?

A. Yes.

Q. If you go to the order date, every one of them is in 2011 or 2012, correct?

A. Yes.

Q. And they are all before November 9, 2012, correct?

A. That is correct.

Q. And in your letter to Danna Droz from the Ohio State Board of Pharmacy, you specifically inform the Board of Pharmacy in November of 2012 that you did not report any hydrocodone orders from Summit County from -- for the prior two years from November of 2012, correct?

A. I didn't specifically mention hydrocodone in my letter.

Q. You specifically referenced that it was not the two controlled substances that you did report, correct?

Page 180

You only reported two controlled substances in those two years.

A. Right.

Q. And neither were hydrocodone, correct?

A. Correct.

Q. So every single pill that you sold to Dr. Heim in Summit County in 2011 and 2012 went unreported to the Ohio Board of Pharmacy, correct?

MR. McDONALD: Object to the form.

THE WITNESS: Up to this point, yes.

MR. MIGLIORI: Thank you. I want to take a break.

THE VIDEOGRAPHER: Going off the record at 12:04 p.m.

- - -

(Lunch break.)

- - -

THE VIDEOGRAPHER: Back on the record at 12:49 p.m.

(Document marked for

Page 181

identification as Exhibit Henry Schein-Tejeda-10.)

BY MR. MIGLIORI:

Q. Let me show you Exhibit 10. You had mentioned prior to the break that you had seen an inquiry from DEA about Dr. Heim. And I want to show you Exhibit 10. Is this what you looked at? Is this the inquiry that you were referring to?

A. Yes.

Q. So Scott Brinks from the Drug Enforcement Administration in Cleveland wrote to a Melodie Steele. Who is Melodie Steele to your knowledge?

A. Melodie Steele was a production manager for the Indianapolis distribution center.

Q. So she was at the distribution center itself, correct?

A. Yes, she was.

Q. And so the DEA writes to her and says, "Could you please send me all purchase invoices for controlled

Page 182

1  substances purchased by Dr. Brian Heim
2  from January 1st, 2011, through to the
3  present. Could you also flag your system
4  to give me a call if he places another
5  order for controlled substances."
6       And then it leaves a phone
7  number.
8       And based on that e-mail,
9  would it be reasonable for Henry Schein
10 to appreciate the fact that the DEA had a
11 concern about his ordering practices for
12 controlled substances?
13      MR. McDONALD: Object to the
14      form.
15      THE WITNESS: So based on
16      the e-mail, it would be reasonable
17      to say that we provided the
18      records that they requested and
19      that if any communication followed
20      up as requested.
21 BY MR. MIGLIORI:
22      Q.   And so if an order came in
23 after this date in your system, would you
24 expect that order to be filled?

Page 183

1       MR. McDONALD: Object to
2       form.
3       Go ahead.
4       THE WITNESS: I would expect
5       a communication to go back to
6       Mr. Brinks.
7  BY MR. MIGLIORI:
8       Q.   Okay. My question was,
9  would you expect an order for a
10 controlled substance after July 5, 2012,
11 to be filled?
12      MR. McDONALD: Object to the
13      form. Asked and answered.
14      THE WITNESS: I cannot
15      answer that because it depends on
16      what the communication with the
17      DEA was.
18      THE REPORTER: Counsel on
19      the phone have asked that you
20      speak up.
21 BY MR. MIGLIORI:
22      Q.   The next e-mail up is again
23 Scott Brinks writing to Melodie. This is
24 now six days later saying, "Mrs. Steele,

Page 184

1  could you please update me on the status
2  of the below request? Thanks for your
3  help."
4       Did you see any
5  communications in your review of
6  documents in preparation for today where
7  Ms. Steele ever responded to this initial
8  request of the DEA to provide controlled
9  substance purchase records for Dr. Heim?
10      A.   Did I see anything besides
11 this e-mail as far as what was provided
12 to the DEA?
13      Q.   Correct. Did you see any
14 other response from Ms. Steele to Scott
15 Brinks of the DEA asking for information
16 on Dr. Heim?
17      A.   No.
18      Q.   Okay. If you go to the
19 first e-mail in the chain, she doesn't
20 ever, based on this string of e-mails,
21 ever respond to the DEA. She writes to
22 Shaun Abreu, Donna Tomaselli and Craig
23 Schiavo and asks, can somebody contact
24 him.

Page 185

1       Do you see that?
2       A.   I see that.
3       Q.   Which department is Donna
4  Tomaselli in?
5       A.   Verifications.
6       Q.   And Craig Schiavo is in
7  regulatory, correct, at this time?
8       A.   Yes, sir.
9       Q.   He reported to you, correct?
10      A.   Yes, sir.
11      Q.   So other than these three
12 e-mails from the DEA, or two from the DEA
13 asking for information about Dr. Heim,
14 have you seen any other correspondence
15 between the DEA and Henry Schein about
16 Dr. Heim and his controlled substance
17 purchase history?
18      A.   Not that I recall.
19      Q.   Did you say not that I
20 recall?
21      A.   Not that I recall.
22      Q.   Do you know who ended up
23 contacting the DEA in response to this
24 inquiry about Dr. Heim?

Page 186

1    A.   No.

2    Q.   Put up on the screen off the
3 computer at the break I printed out the
4 screen shot counsel was referring to in
5 his very concise objection.

6        MR. McDONALD:  Thank you.

7        (Document marked for
8        identification as Exhibit
9        Henry Schein-Tejeda-11.)

10 BY MR. MIGLIORI:

11    Q.   This is Exhibit 11.  This is
12 a screen shot related to Dr. Heim that we
13 received over the -- sometime over the
14 past week.

15        Did you review this in
16 preparation for today?

17    A.   I remember seeing this
18 screen shot.

19    Q.   Do you know which system
20 this is printed off of?

21        It actually has on the title
22 "DEA/Proof License Maintenance."

23        Do you know which database
24 that is?

Page 187

1    A.   It's something used by the
2 verifications team.

3    Q.   Okay.  Is that separate and
4 apart, to your knowledge, from the due
5 diligence printout that I showed you
6 earlier?

7        I'll put it back on the
8 screen.  I don't remember the exhibit
9 number but...

10        Is that a separate system
11 from the customer service imaging
12 database?

13    A.   Again, I don't use the
14 system so I couldn't tell you.

15    Q.   Okay.  And here there is a
16 reference on Exhibit 11, which says,
17 "Please contact Shaun to notify DEA if a
18 control is ordered."  And it's dated
19 July 11, 2012.

20        Do you see that notation?

21    A.   Yes, sir.

22    Q.   Who would have access to
23 that notation?

24        Would that be in the

Page 188

1 warehouse system, would that be in the
2 JD Edwards system?  What -- how would
3 this trigger the DEA?

4    A.   So that -- that note would
5 be placed by Shaun or somebody in his
6 team, somebody in the verifications team.

7    Q.   And by what process would an
8 order prompt contacting Shaun?  If
9 Dr. Heim placed an order, how would it
10 prompt somebody to contact Shaun based on
11 that note, how does that work?

12    A.   I'm not sure what process
13 they put in place at the time.  It could
14 simply just regard the license number
15 from the system.

16    Q.   Okay.  Do you know if that
17 was done here?

18    A.   I don't know.

19    Q.   If you go back to the due
20 diligence file for Dr. Heim, you'll see
21 that a month and a half later, the due
22 diligence file -- Shaun directed that a
23 new questionnaire be sent to Dr. Heim on
24 August 23, 2012, a month after the DEA

Page 189

1 made this inquiry.

2        Do you see that?

3    A.   Yes.

4    Q.   The next day that
5 questionnaire was completed and placed in
6 a bin to be approved.

7        Do you see that?

8    A.   Yes.

9    Q.   And then that was given to
10 Shaun.

11        Do you know what action was
12 taken at that point in August of 2012 on
13 whether or not to approve Dr. Heim for
14 any further controlled substances?

15    A.   I wouldn't know just by
16 looking at this document.

17    Q.   The last page of this due
18 diligence file has a reference to
19 something called MedPro.

20        Do you see that?

21    A.   Yes, sir.

22    Q.   Are you familiar with
23 MedPro?

24    A.   I'm familiar with what it

Page 190

1 is.
2 Q. What do you understand it to
3 be?
4 A. MedPro is the third party
5 service that we contract with to verify
6 license information.
7 Q. And this is done at the
8 onboarding, that is, bringing on of a new
9 customer at Schein?
10 A. This is a live process,
11 because we refresh the data.
12 Q. You'll notice that the date
13 of the MedPro search is June 3, 2011.
14 Do you see that?
15 A. Yes.
16 Q. Going back to the
17 transactional records of Dr. Heim, the
18 first order processed for hydrocodone is
19 dated August 17, 2011. It's on page --
20 A. I'm sorry, which one of the
21 two are you --
22 Q. It's Page 3 of that one
23 there which is exhibit -- what's the
24 number on that, Exhibit 7 --

Page 191

1 A. 7, okay.
2 Q. Yeah. Page 3.
3 A. Okay.
4 Q. The first order is -- order
5 date is August 17, 2011.
6 Do you see that?
7 A. Yes.
8 Q. And it's to fill an order
9 for controlled substances, correct, for
10 hydrocodone, correct?
11 A. This order was for -- for
12 hydrocodone, correct.
13 Q. And the way that this
14 information has been organized in this
15 spreadsheet, it's one bottle, 500 doses
16 of 10/500 milligrams, correct?
17 A. 500 tabs, yes.
18 Q. And that would have been
19 filled based on the way this information
20 is presented, correct?
21 A. Based on how the report is
22 presented, yes.
23 Q. And then all of these
24 subsequent orders on the -- throughout

Page 192

1 the rest of the Page 3, going onto
2 Page 4, are the hydrocodone controlled
3 substance orders that were filled,
4 correct?
5 A. Correct.
6 Q. And when you go back to
7 Exhibit 11 that I was showing you under
8 MedPro, when the search was run in June,
9 before the very first order to Dr. Heim
10 was filled, under the MedPro category of
11 disciplinary action it says yes.
12 Do you see that?
13 A. Yes.
14 Q. Where would the follow-up to
15 that disciplinary action be stored in
16 Henry Schein?
17 A. Today?
18 Q. Today or in 2011 when this
19 was done.
20 A. Today's process would be for
21 our teams to review it, and then it will
22 be stored either on their SOM system or
23 on our SOM software.
24 Q. Is it random which system

Page 193

1 it's on, or is it on both systems?
2 When you say or, what does
3 that mean?
4 A. Today's process, it depends
5 on who conducted the review. If
6 regulatory conducted the review, it will
7 be housed in a system called FileMarker,
8 which is what we have implemented and
9 customized to be our software that we use
10 for due diligence files.
11 Q. That's separate and apart
12 from verifications system?
13 A. Verifications was integrated
14 to that system late last year. So there
15 are still some separation of records.
16 Q. 2011, where would
17 disciplinary action -- strike that.
18 You would agree with me that
19 if a MedPro inquiry in 2011 generated a
20 positive answer for disciplinary action,
21 that under Henry Schein's "know your
22 customer" due diligence system, that that
23 would require follow-up, correct?
24 MR. McDONALD: Object to the

Page 194

```
1    form.
2         THE WITNESS:  Under Henry
3    Schein's due diligence process,
4    there would be follow-up.
5    BY MR. MIGLIORI:
6    Q.   Yes?
7    A.   That would be followed up.
8    Q.   And that information would
9    be followed up in the first instance by
10   verifications or by regulatory?
11   A.   By the department that is
12   conducting the due diligence.  So if this
13   was conducted by verifications, it will
14   be verifications.
15   Q.   Okay.  For a new client,
16   would that be verifications?
17   A.   For a new account, that most
18   likely will be verifications.
19   Q.   And it's important in a
20   follow-up like this, especially if you're
21   going to go ahead and ship controlled
22   substances to this doctor, that the file
23   be documented that the follow-up has
24   occurred, correct?
```

Page 195

```
1         MR. McDONALD:  Object to the
2    form.
3         THE WITNESS:  Yes.
4    BY MR. MIGLIORI:
5    Q.   Are you aware that this
6    doctor in the 1990s was convicted of more
7    than 20 drug trafficking charges, felony
8    charges?
9         MR. McDONALD:  Object to the
10   form.
11        THE WITNESS:  No, I wasn't.
12   BY MR. MIGLIORI:
13   Q.   Were you aware that this
14   doctor had lost his license to practice
15   medicine for a period of time --
16        MR. McDONALD:  Objection.
17   BY MR. MIGLIORI:
18   Q.   -- because of that drug
19   trafficking charge?
20        MR. McDONALD:  Object to the
21   form.
22        THE WITNESS:  This indicates
23   that the doctor had a license.
24   BY MR. MIGLIORI:
```

Page 196

```
1    Q.   I'm asking you, were you
2    aware that this doctor lost his license
3    for a period of time as a result of drug
4    trafficking charges?
5    A.   No, I wasn't.
6    Q.   I'm going to ask you to
7    assume that this doctor was convicted of
8    felony drug trafficking charges and lost
9    his license for a period of time to
10   practice medicine.  Is that something, in
11   the Henry Schein due diligence "know your
12   customer" system that Henry Schein would
13   want to know about before filling the
14   first prescription or order of controlled
15   substances?
16   A.   Our process is that we
17   collect as much information as we can on
18   the -- during the due diligence process.
19   Q.   My question to you is a
20   little more basic.  At Henry Schein in
21   2011, would you want to know if a new
22   customer of yours had a prior felony
23   conviction for more than 20 counts of
24   drug trafficking and lost his medical
```

Page 197

```
1    license as a result of that in years
2    prior?  Would you want to know that in
3    your "know your customer" obligations to
4    the DEA?
5         MR. McDONALD:  Object to the
6    form.
7         THE WITNESS:  I don't
8    remember how in depth the process
9    was at that point.  If your
10   question is just if me personally
11   would like to know, again, we
12   always strive to know as much --
13   to get as much information of any
14   account as we could.
15   BY MR. MIGLIORI:
16   Q.   I'm asking, as the director
17   of regulatory affairs, whether or not
18   your system -- whether you would expect
19   your system to follow up on a MedPro
20   disciplinary action that turned out to be
21   more than 20 felony convictions for drug
22   trafficking?  Is that what you would
23   expect of your system to produce?
24        MR. McDONALD:  Object to the
```

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1     form.
2         THE WITNESS:  Second, I'm
3 not trying to be difficult here,
4 but the system has been enabled,
5 and we always look for continuous
6 improvement.  I can't tell you
7 what -- how in depth or what the
8 expectation was from the system at
9 that time.
10 BY MR. MIGLIORI:
11     Q.  You could not tell me
12 whether or not Henry Schein would want to
13 know whether one of its customers was
14 convicted of drug trafficking charges?
15         MR. McDONALD:  Object to
16     form.
17 BY MR. MIGLIORI:
18     Q.  As director of regulatory
19 affairs for the company?
20         MR. McDONALD:  Object to the
21     form.
22         Don, you're just arguing him
23     and asking the same question over
24     and over.

Page 199

1         MR. MIGLIORI:  You get about
2     five words.  That's enough.
3         MR. McDONALD:  Well, you're
4     being abusive.
5         MR. MIGLIORI:  John --
6         MR. McDONALD:  You know you
7     are.
8         MR. MIGLIORI:  No.  In the
9     face of questions, I can follow up
10     on.  Please stop.
11         MR. McDONALD:  You know why
12     I'm interrupting you.
13         MR. MIGLIORI:  I know --
14     just stop.
15 BY MR. MIGLIORI:
16     Q.  You want her to read back
17 the question?
18         MR. McDONALD:  Yes, please.
19         (Whereupon, the court
20     reporter read back the requested
21     portion of testimony.)
22         MR. McDONALD:  Object to
23     form.
24         THE WITNESS:  As director of

Page 200

1 regulatory affairs, I believe I
2 already answered your question.
3 We would strive to get as much
4 information as we could from every
5 account.
6 BY MR. MIGLIORI:
7     Q.  As director of regulatory
8 affairs, if you found out that a new
9 potential customer had more than 20
10 convictions, felony convictions for drug
11 trafficking, and you were asked to review
12 it at regulatory affairs as to whether or
13 not that is an appropriate customer of
14 Henry Schein in 2011, what would you have
15 concluded?
16         MR. McDONALD:  Objection to
17     form.  Improper hypothetical.
18         THE WITNESS:  I would have
19     to review the file to be able to
20     answer your question.
21 BY MR. MIGLIORI:
22     Q.  So there are some doctors
23 with more than 20 felony convictions for
24 drug trafficking charges that would be an

Page 201

1 appropriate customer for Henry Schein for
2 the ordering of controlled substances?
3         MR. McDONALD:  Object to the
4     form.
5         THE WITNESS:  I didn't say
6     that.
7 BY MR. MIGLIORI:
8     Q.  That's what I'm trying to
9 find out.
10     A.  I'm saying that I would have
11 to review the file in order to be able
12 for answer -- to give you a -- for answer
13 on what the review was.
14     Q.  Okay.  And I'm telling you
15 that the file says that this customer
16 that you have not yet filled a single
17 controlled substance order for, that this
18 customer previously had more than 20
19 felony convictions for drug trafficking
20 charges.  And I'm asking you as the
21 director of regulatory affairs whether or
22 not that is a customer that Henry Schein
23 would have wanted in June -- in June of
24 2011?

Page 202

1       MR. McDONALD: Object to the
2   form.
3       THE WITNESS: Do you have
4   the file?
5   BY MR. MIGLIORI:
6       Q. Yeah. You have the file.
7   That's the entire file. You're looking
8   at it right now. The MedPro inquiry is
9   the only entry related to the
10  disciplinary action that I'm asking you
11  about.
12      A. You said that the file says
13  that the doctor was convicted for more
14  than 20 felonies.
15      Q. No. The federal judge that
16  we're in front of in this case said that.
17      A. Oh, I'm sorry. I
18  misunderstood.
19      So what was your question
20  again?
21      Q. At Henry Schein, would you
22  want as a customer somebody that in your
23  due diligence you found out had been
24  previously convicted of more than 20

Page 203

1   felony counts of drug trafficking
2   charges? Is that a customer Henry Schein
3   would want for its controlled substances
4   business?
5       MR. McDONALD: Object to the
6   form.
7       THE WITNESS: The proposed
8   action of approving or
9   disapproving an account is based
10  on the review of the totality of
11  circumstances, not on one or two
12  factors.
13      Also including issues as of,
14  okay, if the doctor had issues
15  with his license or was convicted
16  of anything, so did he get his
17  license back, why did he get his
18  license back. Was it any review
19  of the medical board, how did the
20  DEA give the license back to the
21  customer.
22      So we are not there to make
23  a judgment on the doctor or
24  practicing medicine. We're there

Page 204

1   just to look at a set of issues
2   and -- and facts and make a
3   determination on what we see.
4       If -- if there is any issues
5   with the character of the doctor,
6   I think the DEA and board of
7   pharmacy are -- are the most --
8   the bodies in the best position to
9   make a judgment on that.
10  BY MR. MIGLIORI:
11      Q. So it's -- you just -- I
12  believe you just told me that it's not
13  your position to pass judgment on the
14  customer?
15      MR. McDONALD: Object to the
16  form. Mischaracterizes testimony.
17  BY MR. MIGLIORI:
18      Q. Isn't that the purpose of
19  "know your customer"?
20      A. Our mission is to put all
21  the information that we can together to
22  make a recommendation as far as the
23  company servicing that account or not.
24      Q. All that information you

Page 205

1   just referenced, what were the
2   circumstances around the convictions,
3   what did the board of pharmacy decide,
4   what did they -- that's all part of "know
5   your customer," correct?
6       A. Today it is.
7       Q. And all of that information
8   would be in your due diligence file,
9   before you took a person with a noted
10  disciplinary action history, you would
11  want all of that information, put it in
12  the file and make a judgment, correct?
13      MR. McDONALD: Object to the
14  form.
15      THE WITNESS: We will -- all
16  the information that we collect
17  will be in the due diligence file
18  today.
19  BY MR. MIGLIORI:
20      Q. All right. And so, that due
21  diligence file would have to have an
22  explanation that would be sufficient
23  enough for Henry Schein to say that a
24  person with more than 20 felony

Page 206

1 convictions for drug trafficking, that
2 explanation would have to be sufficient
3 and documented in the file for you to
4 give that doctor an order of controlled
5 substances, correct?
6    A.   Yes.
7    Q.   And if it's not in the file,
8 isn't it true, it doesn't exist?
9        MR. McDONALD:  Object to the
10    form.
11 BY MR. MIGLIORI:
12    Q.   Isn't it true in the
13 regulatory world of regulatory affairs
14 and compliance, that that which is not
15 documented doesn't exist?
16        MR. McDONALD:  Object to the
17    form.
18        THE WITNESS:  That is to
19    say, that is not necessarily the
20    truth.
21 BY MR. MIGLIORI:
22    Q.   Have you seen anything in
23 any of your review of this case or what
24 was provided to you this week on

Page 207

1 Dr. Heim, where any follow-up or inquiry
2 about his felony convictions was
3 undertaken, did you see anything?
4    A.   Again, I didn't review the
5 file in completeness.
6    Q.   In fact, Henry Schein
7 doesn't do background checks, criminal
8 background checks, even today, on new
9 customers, correct?
10    A.   Are we supposed to?
11    Q.   My question to you is you
12 don't do it as of today, correct?
13    A.   Background checks on
14 customers, as a general rule, no.
15        (Document marked for
16    identification as Exhibit
17    Henry Schein-Tejeda-12.)
18 BY MR. MIGLIORI:
19    Q.   Okay.  Let me show you
20 Exhibit 12.  You had lots of interaction
21 with a company called Cegedim Dendrite,
22 correct, over the several decades that
23 you would have been at Henry Schein,
24 correct?

Page 208

1    A.   Yes, sir.
2    Q.   They are a consultant to
3 Henry Schein, correct?
4    A.   Yes, sir, they have been.
5    Q.   And this Exhibit 12 is one
6 of the Cegedim reports that Henry Schein
7 commissioned, correct?
8        I can tell you from the
9 metadata that the date of this document
10 is January 28, 2008.
11    A.   2008, okay.
12    Q.   So this -- you would have
13 been in regulatory affairs at this point,
14 correct?
15    A.   Correct.
16    Q.   And it says in the
17 discussion this is -- Cegedim consulting
18 to you, to your company:
19        "As a part of Henry Schein's
20 revised suspicious order monitoring
21 system, all new accounts which handle
22 controlled substances will be the subject
23 of a due diligence inquiry."
24        Did you understand in 2008

Page 209

1 to that -- be the new targeted goal?
2    A.   I know you're reading.  I'm
3 just trying to see --
4    Q.   Take your time.
5    A.   -- where you -- where --
6 what the --
7    Q.   I'm reading fright from the
8 first sentence right now.
9    A.   Okay.
10    Q.   "During the due diligence
11 inquiry, the new account holder will be
12 interviewed by Schein staff over the
13 telephone to determine whether the new
14 account appears to be qualified to handle
15 controlled substances."
16        That was another point that
17 Cegedim was recommending to Henry Schein,
18 correct, in 2008?
19    A.   Correct.
20    Q.   "Information acquired during
21 the interview may include obvious
22 information such as licenses and
23 registrations."
24        That's a normal function of

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1 the verifications department, correct?
2    A.   Correct.
3    Q.   "Additional personal
4 information such as dates of birth,
5 social security numbers, this information
6 will be used for public record
7 inquiries."
8      That's another
9 recommendation of Cegedim, correct?
10    A.   That is correct.
11    Q.   And then what controlled
12 substances a customer anticipates
13 ordering including quantities.  That was
14 a reasonable suggestion of Cegedim in
15 2008 for new customers, correct?
16    A.   That was a suggestion of
17 Cegedim.
18    Q.   "After the interview, the
19 customer should be provided with a
20 document with information pertaining to
21 controlled substances which addresses
22 basic legal issue" -- "issues such as
23 legitimate medical use."
24      Do you know if you ever

Page 211

1 implemented that recommendation of
2 Cegedim, that once you bring out a new
3 customer of Henry Schein, you give them
4 some kind of documentation of appropriate
5 legitimate medical use for controlled
6 substances?
7    A.   Yeah.  They complete a
8 questionnaire.
9    Q.   Like, this --
10    A.   And they are -- they are
11 asked about it.
12    Q.   This says you would give
13 them a basic legal issues document once
14 you brought them onboard.  Did you ever
15 start doing that?
16      MR. McDONALD:  Object to the
17    form.
18      THE WITNESS:  I'm not sure
19    what is your understanding of
20    basic legal issues.
21 BY MR. MIGLIORI:
22    Q.   Well, this is -- my -- my
23 understanding doesn't matter.  This is
24 between you and your consultant.

Page 212

1    A.   Okay.  So -- so then, my
2 understanding of this is that they were
3 asking us to implement a document that we
4 asked the customer to provide with some
5 information that will allow us to make a
6 determination on the potential use of the
7 drugs.
8    Q.   The customer should be
9 provided with a document with information
10 pertaining to controlled substances.  Did
11 you provide a document to your customers
12 with information pertaining to controlled
13 substances?
14    A.   We have a welcome package
15 that we provide to the customers.  It
16 contains several pieces that refer to
17 controlled substances.
18    Q.   It might be advisable to
19 have a signed document from the client
20 acknowledging his or her receipt and
21 understanding of the information.  Do you
22 make them sign for it, that welcome
23 package?
24    A.   Yes.

Page 213

1    Q.   A background investigation
2 should be conducted to determine whether
3 there are convictions or regulatory
4 actions in the client's past that may
5 affect their suitability for ordering
6 controlled substances.
7      Do you recall in 2008
8 Cegedim advising you that you should do
9 criminal background checks of your new
10 customers?
11    A.   I don't recall the
12 conversation in 2008.  I don't think that
13 this says that we need to do background
14 checks on customers.  We need to do
15 background investigations, which is what
16 we implemented.
17    Q.   "A background investigation
18 should be conducted to determine whether
19 there are convictions."
20      Do you know what convictions
21 are?
22    A.   Yes, sir.
23    Q.   They're criminal, right?
24    A.   Right.

Page 214

1  Q.  All right.  So you don't
2  know if this recommendation refers to
3  doing background investigation of
4  convictions?
5  A.  Background investigation is
6  not necessarily background checks.
7  Q.  All right.  Take the word
8  "checks" out.  Did you ever implement the
9  system at Henry Schein from January of
10  2008 to present where you, Henry Schein,
11  do background investigations to determine
12  whether there are convictions of your
13  customers' or clients' pasts that may
14  affect their suitability?
15  A.  We do an in-depth review of
16  any documents that are publicly
17  available.
18  Q.  Okay.  Well, you see that
19  one of the things is to provide the birth
20  date and social security numbers to
21  perform public record inquiries.
22  Do you see that?
23  A.  Yeah, we don't -- we don't
24  ask for social security numbers.

Page 215

1  Q.  So you didn't follow that
2  recommendation of Cegedim?
3  A.  That might be something that
4  we either disagree or we found that it
5  wasn't really a suitable recommendation.
6  Q.  So you don't get social
7  security background information?
8  A.  No.
9  Q.  And so you don't do
10  background checks either, correct?
11  MR. McDONALD:  Object to the
12  form.
13  BY MR. MIGLIORI:
14  Q.  Isn't that what you just
15  told me?
16  A.  Yeah.
17  MR. McDONALD:  Object to the
18  form.
19  THE WITNESS:  I -- that's
20  what I said.
21  BY MR. MIGLIORI:
22  Q.  All right.  And you'll agree
23  with me that Cegedim is recommending in
24  2008 that background investigations for

Page 216

1  criminal convictions be conducted of each
2  new client?
3  A.  I agree to that, and I also
4  said that we implemented that.
5  Q.  You did?
6  A.  Yes.
7  Q.  Show me where in Brian
8  Heim's entire file you see an indication
9  of criminal background checks?
10  A.  I don't know if I have the
11  entire file in front of me.
12  Q.  I can represent to you you
13  do, because this is all I have.  This is
14  what was provided to me.  This is my
15  chance to ask you about it.  So this is
16  all I have.  I'll give you as much time
17  as you want.
18  A.  Okay.
19  Q.  You can even count it
20  against my time.
21  A.  I'm sorry?
22  Q.  You can take as much time as
23  you'd like.
24  MR. McDONALD:  Well, for the

Page 217

1  record, that is not the entire
2  file.  There's the other screen
3  shot as well as the information
4  that we produced to you about the
5  DEA inquiry.
6  MR. MIGLIORI:  Those are
7  both in front of you.
8  One is -- all three of those
9  documents are in front of him.
10  MR. McDONALD:  No, they're
11  not.
12  MR. MIGLIORI:  What?
13  MR. McDONALD:  No, they're
14  not.
15  MR. MIGLIORI:  I just gave
16  him the DEA inquiry, the screen
17  shot.  They're Exhibits 11 and 12.
18  MR. McDONALD:  There's more
19  to the DEA inquiry than that one
20  e-mail that you cited.
21  MR. MIGLIORI:  Maybe that's
22  in tomorrow's production.
23  MR. McDONALD:  No, Don.  You
24  know, I'll tell you the Bates

Page 218

1  numbers if you want.
2      MR. MIGLIORI:  I would love
3  it.
4      MR. McDONALD:  Sure.
5      MR. MIGLIORI:  You can't be
6  shocked at my frustration with
7  getting a production in April on
8  this.  You can't be.  And I
9  haven't given you any gripe about
10  it.  But don't act exasperated.
11     MR. McDONALD:  I am not
12  exasperated.  I had a conversation
13  with your colleague --
14     MR. MIGLIORI:  It doesn't
15  matter.  It was produced in April.
16     MR. McDONALD:  And you know
17  why?
18     MR. MIGLIORI:  It was
19  requested in August.  It's been
20  four days.
21     MR. McDONALD:  648727 to
22  648728.
23     MR. MIGLIORI:  Is that a
24  criminal background check?

Page 219

1      MR. McDONALD:  I don't think
2  there's a criminal background
3  check in there.  But that's the
4  rest of the DEA file.  You guys
5  have it.
6  BY MR. MIGLIORI:
7      Q.   Do you see any reference in
8  the exhibit that you have or in anything
9  that you were shown yesterday about
10  Dr. Heim to a criminal background check,
11  including the documents produced to us
12  last week that you reviewed?
13     A.   I don't see any notes under
14  review of the information provided by
15  Dr. Heim.
16     Q.   So in 2008 when Cegedim
17  recommended background investigations to
18  determine whether there are convictions
19  that may affect the suitability for
20  ordering controlled substances, at least
21  in Dr. Heim's case, that was not done
22  based on the records we have in front of
23  us, correct?
24     A.   Based on what I have in

Page 220

1  front of me, I cannot say if it was done
2  or not.
3      Q.   There's no evidence of it in
4  any of the documents that you've seen
5  today or yesterday in preparation,
6  correct?
7      A.   There's no evidence that it
8  was done.  I would suggest that there is
9  no evidence that it wasn't done either.
10     Q.   Well, is that how the Henry
11  Schein due diligence system works?
12     A.   No, sir.
13     Q.   The absence of evidence is
14  sufficient to go ahead and fill orders of
15  controlled substances to doctors with
16  felony convictions?
17     A.   No, sir.  The Henry Schein
18  due diligence files are very complete and
19  inclusive of any write-up of the
20  recommendation of whoever review the
21  file.
22     Q.   But Henry Schein due
23  diligence records were not complete in
24  2011, were they, sir?

Page 221

1      A.   It has been a work in
2  progress.  There has been a process, that
3  as we learn, we have implemented best
4  practices.  There has been something that
5  we would have hoped that we'd get some
6  guidance from the DEA to see what needed
7  to be done and what needed to be
8  implemented.
9      Q.   Are you saying that it is
10  the DEA that failed to get due diligence
11  on 60 percent of the 40,000 customers
12  that you had in 2013?  Is that the DEA's
13  fault?
14     MR. McDONALD:  Object to the
15  form.
16     THE WITNESS:  I'm saying
17  that the DEA failed to provide
18  proper instructions to industry on
19  how to -- what the expectations
20  were and how to perform due
21  diligence.
22  BY MR. MIGLIORI:
23     Q.   You didn't, in 2013, have
24  compliance with your own due diligence

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 system, correct?
2     A.  Say that again.
3       MR. McDONALD:  Object to
4 form.
5 BY MR. MIGLIORI:
6     Q.  Tiffany Steffanie-Oak
7 reported to you in 2013, that 60 percent
8 of your customers had no due diligence,
9 and the other 40 percent had varying
10 degrees of due diligence in their files,
11 based on Henry Schein's "know your
12 customer" system, correct?
13     A.  Again, I already told you
14 that it was a process.  It was over
15 20,000 customers that needed to be worked
16 on, and it took some time to get there.
17     Q.  Maybe you can answer my
18 question.  My question to you was, more
19 than 60 percent of your customers in 2013
20 had no due diligence in their files based
21 on the due diligence system that Henry
22 Schein had in place, correct?
23     A.  I couldn't tell you what we
24 had, what we had in file in 2013.  I can

Page 223

1 tell you that on or about 2015, we make
2 sure that all the customers that were
3 ordering controlled substances would have
4 a due diligence file.
5     Q.  Your due diligence was
6 finally complete by 2015?
7     A.  Our due diligence process
8 was close to the fact that if a customer
9 ordered a controlled substance, they
10 will -- and they didn't have a due
11 diligence file, they will be required to
12 provide information so we can build a due
13 diligence file.
14       (Document marked for
15       identification as Exhibit
16       Henry Schein-Tejeda-13.)
17 BY MR. MIGLIORI:
18     Q.  Exhibit 13.  This is your
19 e-mail to Jeff Peacock, correct?
20     A.  Okay.
21     Q.  Jeff Peacock is your boss,
22 correct?
23     A.  Yes, sir.
24     Q.  This is August of 2013,

Page 224

1 correct?
2     A.  August of 2013, yes.
3     Q.  Bullet point Number 1.  All
4 right, let me start with the top.
5       "Jeff, here are the areas
6 that I think represent the highest
7 regulatory risk for the company at this
8 point, August of 2013."
9       Do you recall writing this?
10     A.  I don't.
11     Q.  "One, DEA customer due
12 diligence.  I have to agree with Tina
13 that this is the area of most risk.  A
14 couple of additional pieces to consider
15 on this issue."
16       Do you remember customer due
17 diligence being a highest degree of risk
18 with respect to DEA compliance?
19     A.  I remembered something that
20 we were always on our top priority to
21 complete.
22     Q.  Right.  And approximately
23 number -- "Approximate number of new
24 accounts opened in a daily basis is 150.

Page 225

1 From to those, an appropriate 4 to
2 5 percent will place an order for
3 controlled substances.  Using the
4 4 percent that equates to 1,560 new
5 accounts ordering controlled substances
6 each year."
7       Do you recall performing
8 that analysis?
9     A.  I don't recall, but I
10 certainly did.
11     Q.  "Tina based her analysis on
12 2012 numbers.  I learned from a recent
13 conversation with Shaun Abreu,
14 verifications manager, that the number of
15 active accounts ordering controlled
16 substances products is now closer to
17 40,000 and that we have completed due
18 diligence for about 13,000 accounts."
19       Do you recall that 27,000
20 accounts, as of the writing of this
21 document in August of 2013, had no due
22 diligence in them?
23     A.  They didn't have a complete
24 due diligence file, yeah.

Page 226

1    Q.   27,000 accounts for
2  customers that were expected to order
3  controlled substance had no due
4  diligence, correct?
5    A.   Correct.
6    Q.   And based on the estimates
7  then, you didn't expect to be caught up
8  in this process for another three years,
9  correct?
10   A.   That's what it says, yes.
11   Q.   Do you think you may have
12 gotten it done in 2015, instead of 2016,
13 correct?
14   A.   Yeah, the -- the completion
15 of due diligence file for all accounts
16 was done around that time.  However, we
17 put the process in place to ensure that
18 if an account doesn't have a due
19 diligence on file and places an order,
20 then we will be required to complete one.
21   Q.   But that --
22   A.   That was on or about 2015.
23   Q.   Let's explore that.
24         So there are -- through

Page 227

1  2013, there are 27,000 doctors and
2  prescriber -- and -- and facilities
3  ordering controlled substances from Henry
4  Schein without the due diligence required
5  from DEA to know your customer, correct?
6         MR. McDONALD:  Object to the
7    form.
8         THE WITNESS:  Without the
9    complete due diligence file.
10 BY MR. MIGLIORI:
11   Q.   No.  The 27,000 represents
12 those that had no due diligence.  The
13 13,000 represents due diligence of
14 varying degrees, correct?
15         MR. McDONALD:  Object to
16   form.
17 BY MR. MIGLIORI:
18   Q.   Do you remember that from
19 Tina?
20         MR. McDONALD:  Object to the
21   form.
22 BY MR. MIGLIORI:
23   Q.   Do you remember Tina telling
24 you that?

Page 228

1    A.   I -- listen, it's in
2  writing.  However, I cannot remember the
3  conversations around it.
4    Q.   I'll show you her
5  presentation.  This is Exhibit 14.
6         (Document marked for
7    identification as Exhibit
8    Henry Schein-Tejeda-14.)
9  BY MR. MIGLIORI:
10   Q.   Exhibit 14, this is Tina
11 Steffanie-Oak.  She reported to you,
12 correct?
13   A.   Yes, she did.
14   Q.   And this is dated November
15 of 2013.  So this is actually after your
16 e-mail here.
17   A.   Okay.
18   Q.   If you turn to the second
19 page of it.
20   A.   Okay.
21   Q.   "Opportunity/issue.  Are we
22 in substantial compliance with DEA
23 suspicious order monitoring 'know your
24 customer' regulations?

Page 229

1         "Answer:  We do not have
2  'know your customer' due diligence for
3  approximately 60 percent of our
4  customers.  Remaining 40 percent has
5  varying degrees of due diligence, (files
6  are not consistent)."
7         Do you recall her telling
8  you that?
9    A.   I vaguely recall this
10 presentation.
11   Q.   And what we know from other
12 distributor DEA civil actions and recent
13 DEA sponsored conferences, the fact that
14 a customer has a valid DEA registration
15 is not enough due diligence to know your
16 customer.
17         You appreciated that in
18 2013, correct?
19   A.   Correct.
20   Q.   You appreciated that in
21 2008, correct?
22   A.   Correct.
23   Q.   In fact, in 2008 you had
24 another Dendrite review of your systems.

Page 230

1     It's the last document, of
2  course.  Exhibit Number 15.
3     (Document marked for
4     identification as Exhibit
5     Henry Schein-Tejeda-15.)
6  BY MR. MIGLIORI:
7     Q.  This one is dated
8  December 16, 2009.
9     A.  Okay.
10    Q.  This is a Schein suspicious
11 order monitoring procedural review.
12    At this point you are in
13 regulatory affairs, correct?
14    A.  This was dated 2009, yes.
15    Q.  And if you go to conclusions
16 on Page 4 of the document, these are my
17 highlights on the screen.
18    A.  Okay.
19    Q.  And if you look at the big
20 box here, Cegedim, under its conclusions
21 in 2009 says, "New accounts are opened
22 without sufficient due diligence
23 investigations or inquiries.  For the
24 most part, new accounts are opened based

Page 231

1  upon a verification of the customer's DEA
2  number which is not considered adequate
3  by the DEA."
4     You appreciated that in
5  2009, correct?
6     A.  Yes.
7     Q.  And Cegedim was telling you
8  that what you were doing was not
9  sufficient for DEA compliance, correct?
10    A.  Cegedim was giving their
11 recommendation for best practices.
12    Q.  And that included that what
13 you were doing was noncompliant with DEA
14 expectations on know your customer,
15 correct?
16    MR. McDONALD:  Object to the
17    form.
18    THE WITNESS:  So that will
19    be their opinion and their
20    interpretation.  We were --
21    absolutely took that very
22    seriously and immediately
23    implemented processes to make sure
24    that by risk -- risk review, we

Page 232

1  completed due diligence files for
2  all the accounts that we have.
3  BY MR. MIGLIORI:
4     Q.  This report and
5  recommendation is dated December 16,
6  2009.
7     A.  Okay.
8     Q.  You said you promptly
9  responded to this recommendation?
10    A.  Yes, we did.
11    Q.  In 2013, according to your
12 employee, 60 percent of those files had
13 nothing in them for due diligence,
14 correct?
15    A.  Correct.
16    Q.  Is that prompt response to
17 the new onboarding due diligence "know
18 your customer" process at Henry Schein?
19    MR. McDONALD:  Object to the
20    form.
21    THE WITNESS:  Yeah.  We set
22    processes to look at the accounts
23    based on risk level.  We
24    prioritize it that way.  We

Page 233

1  prioritize new accounts.
2     So if you are telling me you
3  are expecting me to say from this
4  day till tomorrow, we wouldn't be
5  expected to have due diligence
6  accounts for every customer, well,
7  that's a little unrealistic.
8  BY MR. MIGLIORI:
9     Q.  You were told in 2009 that
10 what you were doing to open a new account
11 for due diligence did not comply with DEA
12 regulations, correct?
13    A.  Correct.
14    Q.  In 2013, Tina told you that
15 60 percent of your files had no due
16 diligence, correct?
17    A.  Correct.
18    Q.  2013, you wrote to your
19 boss, Jeff Peacock, and you said 27,000
20 of our files have no due diligence,
21 correct?  Files that are expected
22 controlled substance ordering
23 practitioners, correct?
24    MR. McDONALD:  Object to

Page 234

1 form. Mischaracterizes the
2 document.
3 MR. MIGLIORI: It's on the
4 screen right here.
5 BY MR. MIGLIORI:
6 Q. You write to Jeff Peacock,
7 in August of 2013, and you say that you
8 learned from these conversations that the
9 number of active accounts ordering
10 controlled substance products is now
11 closer to 40,000 and that we have
12 completed due diligence for about 13,000;
13 therefore, the gap is now 27,000
14 accounts.
15 A. That's what is written, yes.
16 Q. So this is now four years
17 after the Cegedim recommendation and
18 notification to Henry Schein that you
19 aren't doing proper due diligence for new
20 customers, correct?
21 MR. McDONALD: Object to the
22 form.
23 THE WITNESS: Like I said,
24 we were working on completing all

Page 235

1 these files for all these tens of
2 thousands of customers, and we
3 were doing it in a very organized
4 fashion to make sure that we limit
5 any risk, or minimize any risk,
6 and we in fact completed that
7 before -- you know, like, two
8 years after that. So to me, if 47
9 thousand accounts were still left
10 as a gap at this point, we did
11 complete 27,000 accounts in about
12 two years.
13 BY MR. MIGLIORI:
14 Q. So by 2015, all of your
15 files were finally compliant with DEA
16 regulations and due diligence, correct?
17 A. By 2015, we have closed the
18 gap. We have closed the gap in a way
19 that if we had any account that didn't
20 have any due diligence file, we wouldn't
21 ship any controlled substance to that
22 account until the due diligence file was
23 completed.
24 Q. Where does it say that? You

Page 236

1 show me in any document that you've seen
2 over the 26 hours of preparation that
3 these 27,000 client -- customers of yours
4 didn't get controlled substances?
5 MR. McDONALD: Object to the
6 form. Don't argue with him, okay?
7 MR. MIGLIORI: I'm not.
8 MR. McDONALD: Yeah, you
9 are.
10 MR. MIGLIORI: No, I'm
11 asking him a question. Where are
12 the --
13 MR. McDONALD: Come on, Don.
14 Really. Ask a question.
15 BY MR. MIGLIORI:
16 Q. Where's a -- where's a
17 document that shows that these 27,000
18 customers were put on a pended or
19 suspended status?
20 MR. McDONALD: Object to the
21 form.
22 BY MR. MIGLIORI:
23 Q. Where is that?
24 MR. McDONALD: Object to the

Page 237

1 form.
2 It's not his job to produce
3 documents to you.
4 BY MR. MIGLIORI:
5 Q. Go ahead. Have you seen a
6 document like that?
7 A. Yes.
8 Q. You're going to testify
9 under oath -- and you understand the
10 significance of being under oath, right?
11 A. Right.
12 Q. You're going to testify
13 under oath that these 27,000 customers of
14 Henry Schein were not given any
15 controlled substances until their files
16 were caught up?
17 A. That's not what I'm saying.
18 That's totally not what I'm saying.
19 I'm saying that by 2015, we
20 have closed the gap. And that's what I'm
21 saying I have seen documentation on that.
22 Q. Is that --
23 A. I have e-mail correspondence
24 or e-mail correspondence that exists on

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 that.
2    Q.   Okay.  As of 2015, the gap
3 was closed and those customers now had
4 what was sufficient due diligence in
5 their files based on DEA expectations or
6 compliance, correct?
7    A.   They did have due diligence
8 files based on DEA -- our interpretation
9 of DEA expectations, because DEA never
10 provided any instruction on what was the
11 due diligence file to have.
12    Q.   Cegedim did.  In 2009,
13 Cegedim, in this exhibit that I'm showing
14 you, Exhibit Number 15, told you what you
15 needed in every file, correct?
16       MR. McDONALD:  Object to the
17    form.
18 BY MR. MIGLIORI:
19    Q.   Not DEA, Cegedim, correct?
20       MR. McDONALD:  Object to the
21    form.
22       THE WITNESS:  We did
23    communicate --
24 BY MR. MIGLIORI:

Page 239

1    Q.   Just answer my question, and
2 I'll give you all the opportunity to
3 elaborate.
4       My question to you is, in
5 2009, Cegedim told you what you needed to
6 do to be compliant with DEA, and that was
7 more than just verifying DEA
8 registration, correct?
9       MR. McDONALD:  Objection.
10 BY MR. MIGLIORI:
11    Q.   That's what Exhibit 15
12 shows, correct?
13       MR. McDONALD:  Object to the
14    form.
15       THE WITNESS:  Where does it
16    say that?
17 BY MR. MIGLIORI:
18    Q.   I can read it to you again
19 if you'd like.
20    A.   Yeah.
21    Q.   "New accounts are opened
22 without sufficient due diligence
23 investigations/inquiries."
24       In December of 2009, Cegedim

Page 240

1 told Henry Schein that, correct?
2    A.   Yes.
3    Q.   "For the most part, new
4 accounts are opened based upon a
5 verification of the customer's DEA
6 number, which is not considered adequate
7 by the DEA."
8       Cegedim in December of 2009
9 told Henry Schein that, correct?
10    A.   They did write in the memo,
11 yes.
12    Q.   "Correspondence regarding
13 the prospective customer's previous
14 history of using controlled substances,
15 office practice rules, general practice
16 expectations should be completed prior to
17 opening a new account."
18       Cegedim in December of 2009
19 told Henry Schein that, correct?
20    A.   Correct.
21    Q.   "A compliance agreement form
22 should be developed and included in the
23 new account opening process."
24       Cegedim told Henry Schein

Page 241

1 they should do that, correct?
2    A.   Correct.
3    Q.   "The use of MedPro inquiries
4 should be expanded for all controlled
5 substance accounts and not for the
6 limited number of states that require the
7 check."
8       Cegedim was telling Henry
9 Schein that that MedPro inquiry that we
10 just saw in Dr. Heim's file, should be
11 used across the entire company, not just
12 where required by certain states,
13 correct?
14       MR. McDONALD:  Object to the
15    form.
16       THE WITNESS:  We always use
17    it.  Yeah, correct.
18 BY MR. MIGLIORI:
19    Q.   This is 2009.  They're
20 telling you what DEA's expectations are
21 clearly and you paid -- Henry Schein paid
22 for this consultancy, correct?
23    A.   And we implemented that.
24    Q.   Henry Schein paid for this

Page 242

1 information from Cegedim, correct?
2     A.   Yes.
3     Q.   And you implemented it and
4 you got around to finishing it in 2015,
5 correct?
6     A.   Correct.
7     Q.   But by August and November
8 of 2013, you were only 40 percent, not
9 even quite 40 percent of the way there,
10 correct?
11     A.   Correct.
12     Q.   Now I've made a mess.
13          (Document marked for
14 identification as Exhibit
15 Henry Schein-Tejeda-16.)
16 BY MR. MIGLIORI:
17     Q.   This is Exhibit 16.
18 Exhibit 16 is an e-mail from Craig
19 Schiavo.  You said that he worked for
20 you, correct?
21     A.   Yes, he did.
22     Q.   And it's to you and to
23 Michael DiBello.  Michael DiBello
24 preceded Jeff Peacock, correct?

Page 243

1     A.   That is correct.
2     Q.   He was your boss at this
3 time?
4     A.   That's correct.
5     Q.   And Craig sent to you by
6 e-mail this PowerPoint presentation.
7 It's called "Draft SOM System."  And this
8 is again dated March 5th of 2011.
9          Do you see that?
10     A.   I'm sorry.
11     Q.   It's on the -- it's on the
12 e-mail.  March 5, 2011.
13     A.   March 5, 2011.  Okay.
14     Q.   Do you recall getting this?
15     A.   I don't.
16     Q.   Okay.  Do you recall
17 reviewing this in preparation for today?
18     A.   I don't remember reviewing
19 it in preparation for this meeting.
20     Q.   So I'm going to direct your
21 attention to the page.  There's no
22 numbers on this so I apologize, but...
23     A.   Okay.
24     Q.   New account setup, system

Page 244

1 enhancement in process.  It's about
2 halfway through.
3          This is the in-process
4 system with respect to customer
5 questionnaire for every customer ordering
6 controlled substances.
7          Do you see that?
8     A.   Yes.
9     Q.   So part of this new account
10 setup was to, in fact -- this is now two
11 years later -- implement what Cegedim has
12 been saying, that you should be getting
13 due diligence of every new customer for
14 the file, correct?
15          MR. McDONALD:  Object to the
16     form.
17          THE WITNESS:  Are you saying
18     that we are implementing it at
19     this point?
20 BY MR. MIGLIORI:
21     Q.   I'm not saying anything.
22 I'm reading the document.  I don't -- I
23 don't -- I don't know.
24          It says, "New account setup,

Page 245

1 customer questionnaire for every customer
2 ordering controlled substances.
3 Information such as license and
4 registrations, phone number, address,
5 practice type, what controlled
6 substances."
7          That's part of the new
8 account setup as of -- as drafted in this
9 proposal in March of 2011.
10          Do you see that?
11          MR. McDONALD:  Object to the
12     form.
13          THE WITNESS:  Yes.  So
14     again, the -- the process in how
15     we get the information changed
16     throughout the year.
17          So over here, and I see that
18     we are now asking for a
19     questionnaire for every customer
20     ordering controlled substances.
21 BY MR. MIGLIORI:
22     Q.   That's what was going to
23 be -- and if you turn two more pages
24 down.  That process, it's under "Standard

Page 246

1  Operating Procedures/Policies."
2        One more page.  It's on the
3  screen if you want to see what it looks
4  like.
5        "This new account setup, (to
6  be implemented in 2011)."
7     A.  Mm-hmm.
8     Q.  You agree with me that's
9  more than two years after Cegedim
10  recommended it in Exhibit Number 15,
11  correct?
12        MR. McDONALD:  Object to the
13  form.
14        THE WITNESS:  It is stating
15  what, I'm sorry?
16  BY MR. MIGLIORI:
17     Q.  This new account setup with
18  the -- getting out the new questionnaires
19  for due diligence, that was recommended
20  in 2009 by Cegedim.
21        In March of 2011, your
22  presentation shows that that's something
23  that was going to be implemented in 2011,
24  correct?

Page 247

1     A.  Sending each customer our
2  due diligence questionnaire.
3     Q.  Right.
4     A.  I'm making a difference
5  here.  Because I don't know if your
6  records show that we had a due diligence
7  questionnaire prior to that.
8     Q.  Yeah.
9     A.  Okay.
10     Q.  Do you see this, the new
11  to-be-implemented system?  Do you recall
12  implementing the new system of sending
13  customer due diligence questionnaires for
14  new customers beginning in 2011?
15        MR. McDONALD:  Object to the
16  form.
17        THE WITNESS:  Again, what it
18  says is sending each customer our
19  due diligence questionnaire.
20  BY MR. MIGLIORI:
21     Q.  Right.  To be implemented in
22  2011.
23     A.  Right.
24     Q.  That's what it says,

Page 248

1  correct?
2        MR. McDONALD:  Object to the
3  form.
4        THE WITNESS:  Which could --
5        MR. McDONALD:  Go ahead.
6        THE WITNESS:  Which is a
7  modification of this process.  But
8  that doesn't mean that
9  questionnaires didn't exist prior
10  to that.
11  BY MR. MIGLIORI:
12     Q.  Okay.  Two years after this
13  document, 60 percent of your files have
14  no due diligence, correct?
15        MR. McDONALD:  Object to the
16  form.
17        THE WITNESS:  What was the
18  date?
19  BY MR. MIGLIORI:
20     Q.  2011, March of 2011.
21     A.  I just said that that
22  presentation was 2013, so...
23     Q.  You already -- you had an
24  August 2013 e-mail saying that 27,000

Page 249

1  files didn't have due diligence, correct,
2  two years later?
3     A.  Correct.
4     Q.  Now, I'll try to --
5        MR. McDONALD:  Are you done
6  with this?
7        MR. MIGLIORI:  Yeah.
8  BY MR. MIGLIORI:
9     Q.  I asked you a question
10  earlier about something --
11        MR. McDONALD:  Hang on --
12  hold on a second.  I'm just trying
13  to put this exhibit back
14  together --
15        MR. MIGLIORI:  Sorry.
16        MR. McDONALD:  -- that was
17  paper-clipped before it gets lost.
18        Thanks.  Go ahead.
19  BY MR. MIGLIORI:
20     Q.  I asked you some questions
21  about transaction reports.  I'm going to
22  show you something now that is produced
23  in the same format, but I just want to
24  understand, see if you understand what

Page 250

1 this may be, so I can better understand
2 it.
3        (Document marked for
4        identification as Exhibit
5        Henry Schein-Tejeda-17.)
6 BY MR. MIGLIORI:
7        Q.   This is Exhibit Number 17.
8 And again it says, "Due diligence
9 documents, Henry Schein" -- I'm sorry,
10 "Schein Summit County customers canceled
11 orders."
12        Like the previous
13 spreadsheets, this is a report generated
14 upon request, correct?  That is, this
15 isn't maintained in the ordinary course
16 of business like this, correct?
17        A.   Yes.  And I just want to
18 clarify.  You are telling me that this is
19 a different report than the ones that --
20        Q.   Yeah.
21        A.   -- we already saw.  Okay.
22        Q.   Correct.  This one says
23 canceled orders on top.  But it has
24 otherwise the exact same title as the

Page 251

1 prior.
2        A.   Okay.
3        Q.   Do you see that?
4        A.   Yes, I see that.
5        Q.   So I assume, based on
6 looking at this, that this isn't
7 maintained at Henry Schein in this form,
8 correct?
9        A.   Correct.
10        Q.   Somebody said, I need you to
11 get me these 15, 20 fields of information
12 and import them into a spreadsheet.
13 That's how this would be generated,
14 correct?
15        A.   Yes, sir.
16        Q.   And do you know from which
17 database this would be generated?
18        A.   No, not exactly.
19        Q.   Okay.  The -- is there
20 something in the ordinary course of
21 business that you know as the canceled
22 orders report?
23        A.   The canceled order report?
24        Q.   That's not a term you're

Page 252

1 familiar with, is it?
2        A.   No.
3        Q.   Okay.  And so I just want to
4 again try to understand the columns.
5        There's an order number.  It
6 says type.  What is a CM versus an SO for
7 type?
8        A.   So it's -- it's a comment to
9 what we use.  It would mean credit memo.
10        Q.   Credit memo?
11        A.   Mm-hmm.
12        Q.   What does that mean, like a
13 chargeback?
14        A.   Like a credit to the
15 customer, if it was a return.
16        Q.   Oh I see.  Okay.
17        The line, what did we say
18 that was?
19        A.   I'm sorry?
20        Q.   What is line, the third
21 column?
22        A.   Oh, line, that's one that I
23 really can't tell you what --
24        Q.   Okay.

Page 253

1        A.   -- what it was.
2        Q.   Item, is that a base code?
3 What -- what's the item number?
4        A.   The -- the S-K-U.
5        Q.   S-K-U?
6        Description.  And the
7 shipping number and the billing number.
8        A.   Right.
9        Q.   So it seems like the
10 exact -- for the most part, the exact
11 same columns as the transactional report,
12 except it's got an additional column
13 called "Pend."
14        Do you see that, on the very
15 last column?
16        A.   Yes.
17        Q.   So is it fair to say that
18 somebody said run that report but add the
19 column of pend, is that what you would
20 interpret -- imagine this report being
21 generated --
22        MR. McDONALD:  Objection.
23 BY MR. MIGLIORI:
24        Q.   -- based on your knowledge

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1  of the databases and the record
2  retention?
3      MR. McDONALD:  Object to the
4  form.  If you know, tell him, but
5  don't guess.
6  BY MR. MIGLIORI:
7      Q.   We can go back to the other
8  charts too.  I mean, I think the columns
9  are all exactly the same, except some --
10 except there's an added column of "pend."
11     MR. McDONALD:  There's --
12     MR. MIGLIORI:  Hmm?
13     MR. McDONALD:  P is on one
14 of them too.
15     MR. MIGLIORI:  It is?  I
16 appreciate that.
17 BY MR. MIGLIORI:
18     Q.   So going back to the prior
19 chart, I think this one is seven.
20     A.   Which one?
21     Q.   Seven.  The post 2009.
22     MR. McDONALD:  That's it.
23 BY MR. MIGLIORI:
24     Q.   Is that right?

Page 255

1      When we were talking about
2  Dr. Shein -- Dr. Heim, three of his
3  orders were pended but released.
4      Do you see that?
5      MR. McDONALD:  Well, and let
6  me state for the record, as we've
7  told you, the company is not
8  verifying the reliability of this
9  information.
10     MR. MIGLIORI:  Yeah.  We
11 have other testimony from Shaun
12 Abreu that they found pended
13 orders.
14 BY MR. MIGLIORI:
15     Q.   And it may be unreliable to
16 your company, this information, but this
17 is the only information I have of your
18 company.  So maybe you can help me
19 understand it.
20     A.   Okay.
21     Q.   Three of these orders,
22 according to Exhibit 7, based on the
23 information that your company provided to
24 me, were pended orders of Dr. Schein.

Page 256

1      MR. McDONALD:  Dr. Heim.
2  BY MR. MIGLIORI:
3      Q.   Dr. Heim, but all of them
4  were actually filled.  And Shaun Abreu
5  testified to that earlier in the
6  litigation.
7      So the P there, as I
8  understand it, is for pended, right?  Is
9  that how you understand it?
10     MR. McDONALD:  If you know,
11 tell him.
12     THE WITNESS:  I don't know.
13 I will be assuming.
14 BY MR. MIGLIORI:
15     Q.   Okay.  Well, the column is
16 called pend and the only letter in any of
17 the columns is P.  So is it a reasonable
18 assumption that those were pended orders?
19     A.   Again, I will be assuming
20 that that's what it is.
21     Q.   Okay.  Well, if we go back
22 to the exhibit that I just showed you,
23 Exhibit Number 17, these are so-called
24 canceled orders.  And some of them have a

Page 257

1  P next to them, not many.  But there are
2  some.
3      If you go to page that ends
4  in 726.
5      MR. McDONALD:  They're all
6  726, Don?
7      MR. MIGLIORI:  What?
8      MR. McDONALD:  They're all
9  726.
10     MR. MIGLIORI:  Oh, are they?
11     MR. McDONALD:  It's an
12 electronic file.
13 BY MR. MIGLIORI:
14     Q.   All right.  If you go to one
15 of the ones that's 726, towards the end,
16 about four pages towards the end.
17     A.   Number 20.
18     Q.   No, actually Page 19.
19 There's a different number.
20     A.   Okay.
21     MR. McDONALD:  19.  Page
22 726.
23 BY MR. MIGLIORI:
24     Q.   Page 19.  Do you see the P's

Page 258

1 there?
2    A.   Yes, sir.
3    Q.   So those would be pended
4 orders for those particular doctors.  And
5 I think one is lorazepam.  One is
6 testosterone.
7        Do you see that?  Is --
8    A.   Testosterone.  Lorazepam.
9 Yes.
10   Q.   Are these all controlled
11 substance?
12   A.   Yes, they're all controlled
13 substances.
14   Q.   They are not Schedule II
15 substances, right?  Lorazepam and
16 testosterone?
17   A.   Lorazepam is Schedule IV.
18 Testosterone is a Schedule III.
19   Q.   Okay.  Is there any way in
20 looking at this spreadsheet -- you would
21 agree with me, again, that this isn't
22 a -- these aren't due diligence
23 documents, that that's just a
24 mislabeling, correct?

Page 259

1    A.   This is just a report.
2        MR. McDONALD:  Objection to
3    form.
4 BY MR. MIGLIORI:
5    Q.   Just a report.
6        And it's not a typical
7 business report that you would get
8 regularly in the course of business,
9 right, this is something called canceled
10 orders that isn't a part of your standard
11 operating procedures, correct?
12   A.   This report is not part of
13 our -- okay.
14   Q.   Is there anything in looking
15 at this report of canceled orders that
16 denotes to you that the order was
17 canceled at the customer's request versus
18 by some process of due diligence?
19   A.   Not on this report, not to
20 me.  But again, there are a couple of
21 columns that I don't really know what the
22 information is about.
23   Q.   Okay.  And that would be
24 like the line code and things like that?

Page 260

1    A.   Line and AT.
2    Q.   What was the other one?  AT?
3    A.   AT.  Yeah.
4    Q.   You have no idea what AT
5 stands for?
6    A.   No.  I'm sorry.
7    Q.   AT did exist in the
8 transactional reports, Exhibit 7.
9        And UOM, did I ask you what
10 that stands for?
11   A.   Yeah.  That one I understand
12 to be unit of measure.
13   Q.   Okay.  Unit of measure.  Oh,
14 that's right.
15        So with this list of
16 canceled orders, you have -- you have no
17 way of telling me, as you sit here today,
18 why any one of these orders may have been
19 canceled, correct?
20   A.   Not -- no, I couldn't tell
21 you.
22   Q.   And based on your review of
23 this, this isn't limited to opioids or
24 Schedule II drugs.  This is all

Page 261

1 controlled substances of all schedules,
2 correct?  Maybe not Schedule I.  But this
3 isn't limited to Schedule II drugs,
4 correct?
5    A.   Schedule II to V.
6    Q.   Okay.  Clear as mud.
7        MR. McDONALD:  I'll let that
8    go.  We've been going about an
9    hour and 20 when you get to a
10   point.
11       MR. MIGLIORI:  I think this
12   could very reasonably be the end.
13   Let me -- this stack.  So why
14   don't we take a break and I'll
15   make sure.
16       THE VIDEOGRAPHER:  Going off
17   the record at 2:06 p.m.
18       (Short break.)
19       THE VIDEOGRAPHER:  Back on
20   the record at 2:22 p.m.
21 BY MR. MIGLIORI:
22   Q.   I want to show you
23 Exhibit 18.
24       (Document marked for

Page 262

1    identification as Exhibit
2    Henry Schein-Tejeda-18.)
3 BY MR. MIGLIORI:
4    Q.   This is an e-mail which you
5 sent to your then-supervisor Michael
6 DiBello, regarding -- this is February of
7 2008.  And it's regarding an HDMA
8 meeting.
9        What is the HDMA, or what
10 was it then?
11    A.   Healthcare Distribution
12 Management Association, I believe it
13 stands for.
14    Q.   I notice in your curriculum
15 vitae and some other places, that you
16 were -- you yourself were fairly involved
17 with the HDMA as a representative of
18 Henry Schein; is that correct?
19    A.   Yes, sir.
20    Q.   Do you recall how often you
21 attended HDMA meetings or conferences?
22    A.   In person, maybe twice a
23 year.  Conference calls, maybe another
24 few times a year.

Page 263

1    Q.   Okay.  And does that go back
2 to 2006 or two thousand -- whenever you
3 moved over to regulatory?  When did you
4 first start getting involved with the
5 HDMA?
6    A.   I think it might have been
7 around that time.
8    Q.   Around 2006?
9    A.   Around 2006, yeah.
10    Q.   Did you serve on any
11 committees for the HDMA?
12    A.   As a participant, yes.
13    Q.   Which committees?
14    A.   Regulatory affairs
15 committee, which now my team actually
16 participates in now, and I guess very --
17 the more infrequent there is a policy --
18 a public policy committee that we
19 participate probably once every so often.
20 Not even every year.
21    Q.   Do you remember any
22 interactions with the HDMA where the DEA
23 was presenting or giving best practice
24 presentations?

Page 264

1    A.   Yes.
2    Q.   Do you recall who from the
3 DEA that you've seen present to HDMA?
4    A.   So the -- the most recent
5 one, his name is Keith Brown, I think
6 deputy administrator.
7    Q.   Okay.
8    A.   And he was actually very
9 friendly to the industry.  He just stated
10 that -- that they don't like the reports
11 that they receive everyday with -- that
12 our computer system sends everyday.  That
13 they much rather prefer for us to
14 complete our due diligence and then send
15 the report.
16        And he also stated that the
17 final rule that we have been waiting for
18 years may actually be something that is
19 material, is here.
20    Q.   Okay.  A friend of industry,
21 is that what you called him?
22    A.   He was --
23        MR. McDONALD:  Object to
24    form.

Page 265

1 BY MR. MIGLIORI:
2    Q.   Go ahead.
3    A.   He said that -- that they --
4 they understand that they have to do
5 better in customer service, whatever that
6 means.
7    Q.   Customer service as in the
8 distributors are the customer in that
9 context, right?
10    A.   The audience was
11 manufacturers and distributors.
12    Q.   Okay.  Do you recall any
13 presentations by a guy named Kyle Wright
14 from headquarters in the distributor
15 initiative?
16    A.   Not really.  I mean I have
17 spoken with many people in DEA.
18    Q.   Do you recall ever meeting
19 with the DEA on behalf of Henry Schein
20 for what was called a distributor
21 initiative?
22    A.   Yes.
23    Q.   Were you part of that
24 meeting?

Page 266

1   A.   Yes, sir.

2   Q.   Do you recall when it was?

3   A.   It was in 2009.

4   Q.   And who -- was -- was that
5 the, to your knowledge, the first meeting
6 with DEA for the DEA initiative program?

7   A.   To my knowledge, that was
8 the only meeting.

9   Q.   Okay.  Who else was there
10 from Schein?

11   A.   I believe it was Len David.
12 Mike DiBello, Craig Schiavo and myself.

13   Q.   And do you recall seeing a
14 presentation about internet pharmacies
15 and suspicious order monitoring?

16   A.   They did have material.  I
17 don't really recall what it was about.  I
18 do recall that they have prepared some
19 material based on our ARCOS reporting.

20   Q.   Okay.  That was my next
21 question.  So did they present to you
22 some of your own reporting data from
23 ARCOS that they thought was exemplary or
24 illustrative of certain ordering trends?

Page 267

1   A.   Yeah, I think the way they
2 characterize it, they wanted to review
3 some customer orders with us.

4   Q.   And do you recall what those
5 orders showed, or they -- they believed
6 they showed?

7   A.   I think it was information
8 out of our ARCOS report.  So it would
9 have identified the customer, their DEA
10 registration and transaction information.

11   Q.   And isn't it true that the
12 purpose of showing you those particular
13 examples was to show you where they
14 believed that there was irregular
15 ordering patterns for that particular
16 surgeon that they thought were
17 appropriate for follow-up?

18   MR. McDONALD:  Object to the
19 form.

20   THE WITNESS:  So, I
21 apologize.  I don't really
22 remember what did they say about
23 this orders.

24   I do remember that they were

Page 268

1 happy that we actually meet about
2 these customers and we have taken
3 care of any due diligence issues
4 that we had with those accounts.

5 BY MR. MIGLIORI:

6   Q.   Okay.  So as you recall, the
7 DEA wanted to show you some information
8 from your ARCOS data that raised issues
9 or questions for them.  And you were able
10 to report back to them that you had
11 actually addressed those issues already.

12   Is that what you generally
13 recall?

14   A.   Yes.

15   Q.   All right.  Do you recall
16 anything else from that distributor
17 initiative meeting?

18   A.   I recall that the -- the
19 main person traveled from Washington.
20 Then it was the -- a couple of ranking
21 officers from the local office.  I recall
22 that he said that that meeting was in
23 good faith, that they were talking
24 with -- with the industry players and

Page 269

1 they were trying to discuss issues on
2 distribution of controlled substances.
3 And I -- I think that the conversation
4 was cordial.

5   We did -- also we did have a
6 PowerPoint presentation that we shared
7 with them at that point as far as who
8 Henry Schein was and what our focus is.
9 You know, we service office-based
10 practitioners, we don't service
11 pharmacies.  We -- we tend to be -- we
12 are aimed to be a one-stop shop for
13 office-based practitioners.  We service
14 from the pen that they use in their
15 office to the x-ray machine.  And, you
16 know, each comments about the controlled
17 substances being a very teeny-tiny piece
18 of our operation.

19   Well, I mean, and also kind
20 of the relationship that we had with our
21 customers, the mission that we had with
22 our customers, things like that.

23   Q.   And so that interaction
24 was -- was broad-based about your role

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1 though, as a distributor of controlled
2 substances, correct?
3     A.   Well --
4     Q.   That is, you were there,
5 although you said it was a teeny piece of
6 your business, you were there for the
7 controlled substances and the DEA
8 regulations governing controlled
9 substances, correct?
10     A.   Yes, that is correct.
11     Q.   All right.
12         Exhibit Number 18 in front
13 of you makes reference to the DEA coming
14 to the HDMA to talk about best practices
15 as it relates to distribution of
16 controlled substances.
17         Do you recall writing this
18 e-mail?
19         While you are reading it,
20 for the record I'll just say what it is.
21 It's an e-mail from you to Michael
22 DiBello on Wednesday, February 6, 2008,
23 regarding an HDMA meeting.
24         Do you either recall writing

Page 271

1 this e-mail or the meeting itself?
2     A.   I vaguely, very vaguely
3 recall the meeting.
4     Q.   Okay.  Do you remember where
5 this meeting was?
6     A.   All of our meetings in
7 person with HDMA, they -- I think this
8 time, I think that it was -- it was in
9 Washington DC.
10     Q.   Okay.  So you wrote to Mike,
11 and you showed him a response that you
12 wrote to Jim.  Who -- who is Jim?
13     A.   So Jim Owens was the most
14 responsible person for the verifications
15 team at that point.
16     Q.   Okay.  Was he replaced by
17 Shaun Abreu at some point?
18     A.   No.  Actually he has been
19 replaced by Bill Brandt.
20     Q.   Okay.  So -- so this would
21 be a position underneath Shaun Abreu's --
22 above Shaun Abreu's position?
23     A.   Yes.
24     Q.   Okay.  So you wrote to Jim

Page 272

1 in verifications.  You said, "As you
2 know, this was a meeting facilitated by
3 the HDMA to discuss a proposal to the DEA
4 on best practices for distribution of
5 controlled drugs which will be accepted
6 and observed industrywide.  The goal is
7 to come up with something that will
8 satisfy the DEA officials to get their
9 buying into that industry is addressing
10 their concerns and no additional actions
11 against the wholesalers is necessary."
12         Do you remember trying to
13 facilitate or -- or effectuate a meeting
14 with the DEA through the HDMA to try to
15 get an understanding of how much you
16 needed to do to be compliant with DEA
17 regulations on controlled substances?
18     A.   Yeah, I think our -- our
19 goal in participating in all these
20 meetings was to gain a further
21 understanding on what best practices were
22 and to see if we can get any
23 interpretation on what the expectation
24 was from the DEA.

Page 273

1         Obviously the issue for us
2 always was that our business model has
3 been so different than other wholesale
4 distributors.  We -- we did service the
5 office-based practitioner.  We don't
6 service pharmacies or other distributors.
7     Q.   These recommendations for
8 best practices to the DEA though, they
9 were actually being made by the HDMA in
10 this meeting for industrywide
11 understanding of best practices, correct?
12     A.   That was the goal, to come
13 up with industrywide best practices.
14     Q.   And one of the HDMA, that is
15 the distributor's trade association,
16 recommendations, was to do an on-site
17 visit for all new accounts industrywide
18 for the due diligence requirements,
19 correct, that was one of the HDMA's
20 proposals?
21     A.   That was in this e-mail?
22         MR. McDONALD:  Take a
23     look --
24 BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 274

1    Q.   If you look at Item
2  Number 1, I'll read it and then we can
3  talk about it.
4         Number 1, due diligence on
5  new accounts.  "The proposal was that
6  companies will need to perform an on-site
7  review of every new account before they
8  could open -- be open for controlled
9  substances.  Obviously, most of the
10  companies represented in the meeting have
11  a different business model than Henry
12  Schein.  Most of them service pharmacies
13  and retailers or regionals which don't do
14  much volume.
15         "We argued that with the
16  amount of new accounts that Henry Schein
17  opens daily, it will be virtually
18  impossible to visit all of them and
19  proposed to have different levels of
20  review for different types of customers
21  with the office-based practitioners being
22  in the low risk end and, therefore,
23  subject to lesser level of review."
24         Do you recall making that

Page 275

1  argument to the DEA at this
2  HDMA-sponsored meeting?
3    A.   I don't think we were making
4  an argument to the DEA.
5    Q.   I'm trying not to use my
6  words.  Your words are, "We argued that
7  the amount of new accounts Henry
8  Schein" -- "accounts Henry Schein
9  Incorporated opens daily, it will be
10  virtually impossible to visit all of
11  them."
12    A.   Yeah.  So that was an
13  internal association discussion.
14    Q.   Well, this was a meeting,
15  though, facilitated by the HDMA with the
16  DEA, correct?
17         MR. McDONALD:  Object to the
18    form.  Mischaracterizes the
19    document.
20  BY MR. MIGLIORI:
21    Q.   If I'm wrong --
22    A.   I -- I don't think so.
23    Q.   Okay.  So internally you're
24  discussing what a good industrywide

Page 276

1  practice would be among other
2  manufacturers and distributors, other DEA
3  registrants.  And you are arguing to the
4  trade group that you're different than
5  most of those because of your type of
6  customer, correct?
7    A.   Yeah.  Part of the
8  discussion was understanding, again,
9  different business models, because the
10  focus seemed to be on pharmacists most
11  than anything else.
12    Q.   Do you believe that your
13  customers are low risk for diversion?
14    A.   I believe that most
15  practitioners, the vast majority of them,
16  are trying to do the right thing, they
17  are not somebody that is going to divert
18  drugs.
19    Q.   My question is, based on the
20  wording here, do you believe that you had
21  a different or a lower standard that you
22  had to comply with in terms of your
23  obligations to the DEA because your
24  customers were doctors, veterinarians,

Page 277

1  and dentists?
2    A.   I think the tough process
3  was that, because our customers were
4  practitioners, the volume of what they
5  order is much lower than what a pharmacy
6  will order.  And they will order all
7  different type of supplies as opposed to
8  just controlled substances.  And you
9  know, as opposed for the distributors,
10  that they ship maybe even pallet size of
11  shipments, our shipments are several, but
12  one or two pieces of -- of the product.
13    Q.   Between 2006 and 2014, Henry
14  Schein distributed more than 1.2 million
15  doses of opioids into the state of Ohio.
16  Do you believe that because your
17  customers were practitioners primarily,
18  that you had a lower or lesser obligation
19  to prevent diversion than other
20  distributors?
21         MR. McDONALD:  Object to the
22    form.
23         THE WITNESS:  No.  We never
24    said that we had a lesser

Page 278

¹ obligation.
²      Our point was that our
³ business model was different and
⁴ that we couldn't treat our
⁵ customers as pharmacists.
⁶ BY MR. MIGLIORI:
⁷      Q.   And ultimately -- well, the
⁸ next recommendation for best practices at
⁹ this meeting in 2008, in February of
¹⁰ 2008, was holding of orders over the
¹¹ threshold. "The HDMA is proposing that
¹² when an order pends for review, it should
¹³ be held until the investigations of the
¹⁴ account is completed. This should not be
¹⁵ an issue most of the time, but in some
¹⁶ cases the investigation might take some
¹⁷ time and may create issues with the
¹⁸ customer."
¹⁹      Did you have a problem with
²⁰ the industry wanting to hold all pended
²¹ orders?
²²      A.   Not at all. That was our --
²³ our common practice. I think I was
²⁴ highlighting that issue because Jim

Page 279

¹ Mullins was also the head of customer
² service. So he's always concerned with
³ the customer experience.
⁴      Q.   "The position of the HDMA
⁵ accepted by the members that any proposal
⁶ to the DEA needs to be a substantial
⁷ change to current practices and that it
⁸ will represent additional cost and
⁹ resources."
¹⁰      Did Henry Schein sign onto
¹¹ that? Was that accepted by Henry Schein?
¹²      MR. McDONALD: Object to the
¹³ form.
¹⁴      THE WITNESS: Henry Schein
¹⁵ has implemented significant
¹⁶ enhancements to processes,
¹⁷ procedures, policies, systems.
¹⁸ BY MR. MIGLIORI:
¹⁹      Q.   Okay. At the end of that
²⁰ year, as part of the HDMA, there was in
²¹ fact a guidance issued for the
²² distribution of controlled substances,
²³ correct?
²⁴      A.   I don't remember.

Page 280

¹      (Document marked for
² identification as Exhibit
³ Henry Schein-Tejeda-19.)
⁴ BY MR. MIGLIORI:
⁵      Q.   Let me show you Exhibit 19.
⁶ Exhibit 19 is the HDMA industry
⁷ compliance guidelines, reporting
⁸ suspicious orders and preventing
⁹ diversion of controlled substances.
¹⁰      Do you recall this guidance
¹¹ being reported out that same year that
¹² you had this meeting in the prior
¹³ exhibit?
¹⁴      A.   I'm sorry. I couldn't tell
¹⁵ you the actual timing of this document.
¹⁶      Q.   I can tell you. It's
¹⁷ November 13th of 2008.
¹⁸      A.   Okay.
¹⁹      Q.   Okay. So you had a meeting
²⁰ in February of 2008 that you reported to
²¹ Jim and to Michael DiBello. And then
²² later that year, this guidance came out.
²³      Do you recall participating
²⁴ in either the preparation of or the

Page 281

¹ ratification of this guidance, you
² yourself?
³      A.   Yes.
⁴      Q.   Okay. And was there a point
⁵ at which this was passed around and each
⁶ company had to acknowledge or approve the
⁷ guidance or vote?
⁸      A.   I don't remember formal
⁹ vote. I think it was more a process of
¹⁰ several meetings, discussions, and then
¹¹ coming up with a couple of drafts or
¹² several drafts, and then coming up to the
¹³ final document.
¹⁴      Q.   Okay. And did Henry Schein
¹⁵ sign on to this final document? Did it
¹⁶ approve of this document?
¹⁷      A.   I think Henry Schein made a
¹⁸ commitment to do as much as we can to
¹⁹ comply with this document.
²⁰      Q.   Okay. So to the best of
²¹ your recollection, there was nothing that
²² Henry Schein objected to in this document
²³ as you sit here today?
²⁴      MR. McDONALD: Object to the

Page 282

1  form.
2      Go ahead.
3  BY MR. MIGLIORI:
4      Q.  Go ahead.
5      A.  So again, the distribution
6  industry is very complex and there is no
7  one way to look at all the participants
8  the same way that one formula will fit
9  all.  So it might have been parts of the
10  document that we didn't find were
11  relevant or we couldn't implement.
12      Q.  Okay.  But in that sense,
13  it's a guidance.  It's not a --
14      A.  It's a guidance.
15      Q.  And so depending on your
16  company, you adapted to what would be
17  best and appropriate for your company,
18  correct?
19      A.  Yeah, I think that was.
20      Q.  So as far as Henry Schein
21  was concerned in 2008 when this was
22  issued, this was acceptable to Henry
23  Schein as a guidance with all of those
24  limitations that you've stated, correct?

Page 283

1      A.  I think so.
2      Q.  Yes?
3      A.  Yes.
4      Q.  One of the statements here
5  on the front page is, "At the center of
6  the sophisticated supply chain,
7  distributors are uniquely situated to
8  perform the due diligence in order to
9  help support the security of the
10  controlled substances they deliver to
11  their customers."
12      Did you agree with that
13  statement, that the distributors are
14  uniquely situated to perform due
15  diligence to support the security of
16  controlled substances?
17      A.  I don't remember discussing
18  that statement.
19      Q.  As you sit here today, does
20  that statement sound like a reasonable
21  statement that you would agree to?
22      A.  We are in a situation to
23  perform due diligence, yes.
24      Q.  Okay.  And because Henry

Page 284

1  Schein actually does not have a pharmacy
2  between it and the practitioner, would
3  you say that Henry Schein has a
4  particularly unique opportunity to
5  understand its customer because of the
6  direct relationship with the prescriber
7  that it has?
8      A.  We do have a close
9  relationship with our customers, yes.
10      Q.  And you have a particularly
11  unique positioning to perform the due
12  diligence because of your direct
13  relationship with those practitioners,
14  correct?
15      MR. McDONALD:  Object to the
16  form.
17      THE WITNESS:  Yes, and it
18  has to do with also understanding
19  the level of due diligence based
20  on the review of each account.
21  BY MR. MIGLIORI:
22      Q.  Correct.  And if you turn to
23  Page 4 of 15 in the guidance, there's a
24  whole section here on knowing your

Page 285

1  customer and due diligence.  And it goes
2  through the different types of data that
3  should be collected.
4      Do you recall being part of
5  the process of coming up with these
6  guidances on knowing your customer?
7      A.  I remember the conversation
8  in general, I mean.
9      Q.  It talks about doing the
10  background questionnaires and asking for
11  certain types of information for new
12  clients, right?
13      A.  Right.
14      Q.  And it -- it talks about, on
15  the next page, the types of prescribing
16  expectations and the -- particularly,
17  "Identification of physicians in other
18  treatment centers that are potential
19  customers' most frequent prescribers or
20  highest purchasing doctors."
21      Do you recall that being a
22  guidance that you all thought
23  appropriate?
24      A.  I'm sorry.  Could you point

Highly Confidential - Subject to Further Confidentiality Review

Page 286

1 to me where --
2     Q.   Sure.  The very last bullet
3 point on Page 2.  "Identification of
4 physicians and other treatment centers
5 that are the potential customers' most
6 frequent prescribers or highest
7 purchasing doctors."
8         Did you think that was a
9 reasonable guidance in the onboarding of
10 new customers and the ongoing "know your
11 customer" obligations, to keep track of
12 the most frequent and highest purchasing
13 doctors are?
14     A.   Again --
15     MR. McDONALD:  Object to the
16 form.
17     Go ahead.
18     THE WITNESS:  This is one of
19 the things that probably didn't
20 fit in our world, because we -- we
21 don't sell to pharmacies.  So the
22 companies that were selling to
23 pharmacies, they were looking at
24 prescriber information.  We were

Page 287

1     really looking more at
2     administration during the course
3     of practice.
4 BY MR. MIGLIORI:
5     Q.   So as a company that sells
6 directly to the physicians and the
7 veterinarians and the dentists, you
8 didn't have as a component part of your
9 due diligence and know your customer a
10 sensitivity to who the highest purchasing
11 doctors were, or most frequent purchasing
12 doctors were?
13     A.   Purchasing doctors from
14 Henry Schein, we did, yes.
15     Q.   And that's what it says
16 here, highest purchasing doctors.
17         That's a reasonable thing to
18 have in the guidance, right, a
19 sensitivity in your "know your customer"
20 obligations to the highest purchasing
21 doctors?
22     A.   Yes, highest purchasing
23 doctors, absolutely.  Yes, we did.
24     Q.   So in a community like Ohio

Page 288

1 or Summit County, understanding who the
2 highest prescribers are would be a
3 reasonable thing to do in terms of
4 knowing your customer and satisfying your
5 due diligence obligations, correct?
6     MR. McDONALD:  Object to the
7 form.
8     THE WITNESS:  So our
9 suspicious order monitoring system
10 is based on two different sides.
11 So the way we look at our
12 customers is based on the market,
13 meaning medical, dental, or vet,
14 and then their specialty.
15     Then at some point it was
16 the practice type, then it changed
17 to the practice size.
18     So we don't specifically
19 look at Ohio customer or Alaska
20 customer.  We look at medical
21 doctors within this specialty
22 within this practice type within
23 this practice size, and we group
24 them.

Page 289

1     The other piece, another
2     part of the SOM is to look at the
3     account purchasing behavior
4     itself.
5 BY MR. MIGLIORI:
6     Q.   So in Henry Schein's
7 suspicious order monitoring system, it
8 never factored in the demographics of the
9 community where the pills were going?
10     A.   We did, and we have done
11 that more on a ad hoc basis that when we
12 are notified or we learn that there is
13 specific trend of something being used in
14 a specific part of the country, then,
15 yes, we do add to our system either a
16 combination of drugs or geographic
17 location that may be an issue with a
18 specific drug.
19     Q.   And in fact, after Dendrite
20 initially consulted with you, it was
21 pointed out that it was necessary for
22 Schein to develop a system to monitor
23 frequency and pattern in order to comply
24 with DEA expectations, correct?

Page 290

1 MR. McDONALD: Object to the
2 form.
3 THE WITNESS: So we enhanced
4 our computer system to include
5 those elements. Previous to that
6 enhancement we relied on our DSMs
7 that have close contact with the
8 customers and they get to learn --
9 to know them to, you know,
10 identify or try to identify any
11 potential issues with any orders.
12 BY MR. MIGLIORI:
13 Q. Did that transition happen
14 around 2009 with the implementation of
15 the enhanced SOM system?
16 A. The enhanced SOM system was
17 implemented in 2009. Our sales
18 personnel, our customer service
19 personnel, our telesales personnel, they
20 always -- they keep being, like, an
21 additional resource to identify any
22 potential issues.
23 Q. But when Henry Schein was
24 only monitoring for size of orders, and

Page 291

1 not yet frequency or pattern before 2009,
2 Henry Schein was relying on the sales
3 representatives to identify issues of
4 deviation in frequency and pattern. Is
5 that a fair statement?
6 MR. McDONALD: Hold on.
7 Object to the form. Go ahead.
8 THE WITNESS: Not only on
9 the sales personnel, on the
10 personnel that will have contact
11 with the customers.
12 BY MR. MIGLIORI:
13 Q. Who else would that be,
14 besides the sales rep?
15 A. Customer service.
16 Q. Okay.
17 A. So.
18 Q. Customer service is a phone
19 call, correct?
20 A. Well, customer service could
21 be one phone call. It could be a
22 dedicated customer service to an account.
23 Q. And they work in concert
24 with the sales representatives, correct?

Page 292

1 A. No. Not necessarily. They
2 are -- so telesales would be different
3 from field sales and will be different
4 from customer service and will be
5 different from customer support.
6 Q. Okay. And so prior to 2009,
7 the suspicious order monitoring system at
8 Henry Schein relied on the customer
9 service and sales force to identify and
10 bring attention to deviations in
11 frequency and pattern, and afterwards
12 when the suspicious order monitoring
13 system picked up frequency and pattern,
14 those sales force and customer service
15 representatives continued to service or
16 continued to monitor?
17 A. They always have.
18 Q. All right. So prior to
19 2009, deviations in frequency of
20 pattern -- strike that.
21 Prior to 2009, deviations
22 for frequency and pattern were primarily
23 detected through the sales force and
24 customer service representatives,

Page 293

1 correct?
2 A. Yes, sir.
3 Q. After 2009 and after Buzzeo
4 made recommendations to changing the
5 actual suspicious order monitoring
6 system, there was a computer or an
7 automated algorithm for picking up
8 variations in -- variations or deviations
9 in frequency and pattern, correct?
10 A. Yes.
11 MR. McDONALD: Object to the
12 form.
13 BY MR. MIGLIORI:
14 Q. The document in front of
15 you, the HDMA document, Number 19, the --
16 references that it's a best practice,
17 good guidance for distributors to
18 identify physicians in other treatment
19 centers of highest purchasing doctors.
20 As of 2008, was that something that you
21 agreed was a good best practice?
22 A. You're pointing to the last
23 paragraph, right?
24 Q. This one here, yeah.

Page 294

1    A.   Okay.  (Reading to himself
2  quietly.)
3        Yeah, as far as the data
4  from our customers, yes.
5    Q.   Other people have talked
6  about this document, so I won't go
7  through all of it.  I just want to ask
8  you about Page 11, a section called
9  "Documentation."
10       I want to ask you if you
11  agree whether or not this was also in
12  2008 best practices for distributors.
13  Under documentation, it says, "All
14  investigations should be fully
15  documented, and all records of
16  investigation should be retained in an
17  appropriate location within the firm,
18  such as with other records relating to
19  the particular customer."
20       As of 2008, did you
21  appreciate that as a best practice for
22  distributors of controlled substances?
23    A.   Let me ask a clarification
24  question right here.

Page 295

1        So the way I am reading this
2  is all investigations conducted by the
3  company should be fully documented.  If
4  that's the question, yes.
5    Q.   Okay.  It says -- again, the
6  HDMA guidance says, "At a minimum,
7  documentation should include the names,
8  titles and other relevant identification
9  of the representative of the customer
10  contacted.  For example, the pharmacist
11  in charge, the dates of contact and a
12  full description of the questions asked
13  and the requests for information made by
14  the distributor and of information
15  provided to the customer."
16       Would you agree as of 2008
17  that part of the "know your customer" due
18  diligence investigation, best practice
19  would be to document those types of
20  details about the investigation at a
21  minimum?
22       MR. McDONALD:  Object to the
23  form.
24       THE WITNESS:  So if we did

Page 296

1  an outbound call or conducted a
2  due diligence site visit to an
3  account, yes, absolutely.
4        When the customer provided
5  information from us, the customer
6  will provide us that information.
7  BY MR. MIGLIORI:
8    Q.   Okay.  So if an order is
9  pended and it required interaction with
10  the customer, you would agree that
11  these -- this type of information, who
12  you spoke with, and when, and what issues
13  were discussed, those are all issues that
14  would be appropriate to document in the
15  file?
16    A.   Yes.
17    Q.   And preferably in a place
18  where the other records relating to that
19  customer would be, correct?
20    A.   Correct.
21    Q.   "The document should include
22  a clear statement of the final conclusion
23  of the investigation, including why the
24  order investigated was or was not

Page 297

1  determined to be suspicious."
2        Did Henry Schein maintain a
3  decision tree of questionable orders that
4  were -- are ultimately deemed or not
5  deemed to be suspicious?
6        MR. McDONALD:  Object to the
7  form.
8        THE WITNESS:  So Henry
9  Schein have SOPs as guidance
10  documents.  We have obtained
11  information from the DEA from our
12  consultants.  And most recently
13  document some of those areas as
14  far as to be a reference to ensure
15  consistency.  And we do document
16  our review in a -- what we call a
17  due diligence report.
18  BY MR. MIGLIORI:
19    Q.   Okay.  And when did those
20  reports start?  When did you implement
21  that SOP?
22    A.   I want to say 2008.
23    Q.   2008?
24    A.   Mm-hmm.

Page 298

1    Q.   So every pended order that
2  had a decision, it was a standard
3  operating procedure as of 2008 for every
4  cleared or canceled pended order, that
5  there would be a statement in the due
6  diligence file about who was contacted,
7  what was discussed, and what the -- a
8  clear statement of the final conclusion
9  of the investigation, that should be in
10 every pended order investigation based on
11 the standard operating procedures of
12 Henry Schein from 2008 to present?
13    A.   That should be in the
14 account file if we conducted due
15 diligence on that account.
16    Q.   Failure for that to be in an
17 account would be a violation of the
18 standard operating procedures at Henry
19 Schein from 2008 to present, correct?
20    MR. McDONALD:  Object to the
21 form.
22    THE WITNESS:  If somebody
23 was conducting due diligence and
24 didn't document it correctly,

Page 299

1    yeah, it was either a mistake
2  or...
3  BY MR. MIGLIORI:
4    Q.   It violated the companies
5  standard operating procedures, correct?
6    A.   Right.
7    Q.   And it would be inconsistent
8  with the HDMA guidance of 2008 based on
9  this paragraph, correct?
10    A.   Correct.
11    Q.   And this also says that that
12 statement should be signed and dated by
13 the reviewer.
14    Does Henry Schein require in
15 its standard operating procedures as of
16 2008 a signed statement of its
17 investigation of suspicious orders by the
18 reviewer?
19    MR. McDONALD:  Object to the
20 form.
21    THE WITNESS:  I believe so.
22 BY MR. MIGLIORI:
23    Q.   Failure to sign a statement
24 about that would be a violation of Henry

Page 300

1  Schein's standard operating procedures
2  for -- for investigation of suspicious
3  orders as of 2008 to present, correct?
4    MR. McDONALD:  Object to the
5  form.
6    THE WITNESS:  I mean as far
7  as process, yes.
8  BY MR. MIGLIORI:
9    Q.   I've got two more documents
10 and then we'll be done.
11    (Document marked for
12 identification as Exhibit
13 Henry Schein-Tejeda-20.)
14 BY MR. MIGLIORI:
15    Q.   Did Ken Romeo work for you?
16    A.   Yes.
17    Q.   Do you recall Ken Romeo in
18 2013 writing to you about the Melville
19 audit by a company called PCG?
20    A.   I'm trying to remember who
21 PCG was.
22    Q.   You don't recall the -- the
23 Melville audit?
24    A.   Well, it's been so long,

Page 301

1  I -- a lot of things have happened, so...
2    Q.   Sure.
3    A.   I cannot tell you I can.
4    Q.   Do you remember Ken Romeo
5  referring to you as "Padrino"?
6    A.   Yes.
7    Q.   Is that a nickname he came
8  up with?
9    A.   Yes.  He was a character.
10    Q.   And he called Tina
11 Steffanie-Oak "Giovani Padrino"?
12    A.   That one I didn't -- I don't
13 think she -- he used that often.
14    Q.   He called himself Dr. Fredo
15 at the end of this.  Did you see that?
16    A.   Dr. Fredo?
17    Q.   Yeah.  He signs it, "Thanks,
18 Dr. Fredo."
19    A.   Oh yeah.
20    Q.   What was Ken -- Ken Romeo
21 had a medical degree, correct?
22    A.   Yes, sir.
23    Q.   In fact, he was the only
24 medical doctor within the regulatory or

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1 verifications department from the time he
2 was hired even to date, correct?
3    A.   Yes, sir.
4    Q.   And it was sometimes
5 observed that his knowledge of medicine
6 was useful and indicated to make some
7 judgment calls about whether to deem a
8 pended order suspicious, correct?
9    A.   Yeah, we thought it was a
10 good idea to get somebody with that
11 background to help us grow our system,
12 to -- to help us build up our process,
13 bring a different perspective to how we
14 look at the accounts and our reviews.
15    Q.   And the Cegedim consultants
16 actually said that one of the concerns
17 about verifications doing so many of the
18 clearing of shipments for pended orders,
19 was the lack of medical training, do you
20 recall that?
21    A.   Not exactly.
22    Q.   You don't remember any --
23 I'm hoping I don't have to pull this out.
24 You don't remember any audits in 2013 of

Page 303

1 Cegedim saying that the verifications
2 team does not have any medical training,
3 and it would be beneficial to give them
4 more medical training because of the
5 amount of work that they do on reviewing
6 pended orders?
7       MR. McDONALD:  Object to the
8    form.
9 BY MR. MIGLIORI:
10    Q.   You don't remember anything
11 like that?
12       MR. McDONALD:  Object to
13    form.
14       THE WITNESS:  So I do
15    remember that we always wanted
16    to -- for somebody to do -- to
17    look at our system, to look at our
18    processes as far as the -- do
19    audits on what we are doing to
20    make sure that we understood and
21    if there were -- if there were any
22    opportunities, we -- we work on
23    that.
24       As far as the specific one

Page 304

1 that you're referring, I'm sorry,
2    I don't remember.
3 BY MR. MIGLIORI:
4    Q.   I've got plenty of other
5 people that talk about it.  But did you
6 consider Ken Romeo to be a good employee?
7       MR. McDONALD:  Object to the
8    form.
9       THE WITNESS:  I did consider
10    Ken Romeo to have very good
11    background knowledge and to bring
12    a lot to the table.  He did have a
13    little bit of personality issues.
14 BY MR. MIGLIORI:
15    Q.   And Tina Steffanie-Oak
16 addressed those directly with you, in
17 some of her e-mails, correct?
18    A.   I believe so.  Yes.
19    Q.   But from a DEA compliance
20 standpoint, he was a good employee?
21    A.   From the process and how to
22 do reviews, he was a good employee.  Also
23 conducting training for departments like
24 verifications, for other members of

Page 305

1 regulatory, to give that added
2 perspective.
3    Q.   And he -- but he worked
4 under you, he worked in your department,
5 in regulatory affairs, correct?
6    A.   He reported to Tina, who
7 reported to me.
8    Q.   Okay.  Here, in November of
9 2013, he talks to you about this audit
10 from PCG.  And he says, "It is my opinion
11 that the prior DEA SOM," or suspicious
12 order monitoring, "compliance audit
13 conducted of our internal systems and
14 controls by PCG failed to produce audit
15 results that were meaningful or useful to
16 Schein by any definition of the words."
17       Do you recall him expressing
18 that concern?
19    A.   Not really.  I'm sorry.
20    Q.   He says, "I do not know the
21 history of the Buzzeo audit and know even
22 less about how the initial thresholds
23 were calculated, but it had to have been
24 done by somebody with a medical

Page 306

background.  The PCG audit potentially failed to consider," and then he lists several factors.

First factor is, "Inherent audit risk, identifying controlled substances and/or specific combination of controlled substances that place us in a high risk category as a distributor.  An analysis of our top 50 accounts that is not statistically based to allow for both confidence level and confidence interval outside of a single drug class or account is ludicrous.  Our attorneys will not have a counterargument to DEA."

Did you agree with Ken Romeo's observation that there needed to be that type of analysis of the top 50 accounts?

A.  I'm sorry.  I'm not even understanding at that point.

But I can tell you that we did do an analysis based on priorities, and one of the priorities was the top purchasers.

Page 307

Q.  Okay.  And by top purchasers, you mean volumewise, correct?

A.  And volumewise, yes.

Q.  And when you measured that, did you do that by dosage units?  Did you do it by MME?  Do you recall how you -- how you determined the top users, whether it be top 50 or some other number?

A.  So it was done based on active ingredient volume.

Q.  Okay.  Is that still how you do it today?

A.  Yes.  We do conduct -- our current program, although we have complete due diligence file for everybody, we do conduct reviews of specific segments, like we run Virginia customers, for example.  We identify the top purchasers in Virginia for specific products.  It could be testosterone.  It could be hydrocodone.  It could be something else.  But that's -- yeah, that's the type of product review that we do at this point.

Page 308

Q.  Okay.  So you can pick a state and, by ingredient, active ingredient, identify the top volume purchasers?

A.  Yes.

Q.  And how long have you been doing that process?

A.  I believe we started that in 2017.

Q.  Okay.  Do you do that state by state now?

A.  We do that state by state.

Q.  And who analyzes it?  Who is responsible for that analysis?

A.  It is a collaboration between verifications and regulatory.

Q.  Number 3 it says, "Computer system errors, coding and regulatory linkage to verifications.  I get acid reflux when I observe this.  Here is a small technical issue.  Pending site visits do not appear in the Henry Schein notes in verifications.  Can someone explain this disconnect?"

Page 309

Do you recall him expressing his concern that the communication and interface between the verifications system and the regulatory affairs system was problematic?

A.  Not exactly.  But I'm getting the feeling that this was when he was fairly new and didn't have a full understanding.

Q.  Did you have a recollection of Buzzeo or Cegedim actually expressing that one of its observations about Henry Schein was that there was no clear delineation between the responsibilities of the verification department and the regulatory affairs department, and that's something that needed to be addressed based on Cegedim's review?

A.  Vaguely.

Q.  Do you know if this was ever addressed?  Was the interface between verifications and regulatory affairs improved after 2013 in any meaningful way or memorialized in any SOP that was

Page 310

1 developed?
2    A.   There are SOPs that talk
3 about the responsibilities for
4 verifications and responsibilities for
5 regulatory.  And there have been some
6 communications as far as that.
7    Q.   Do you know when those
8 occurred?
9    A.   I think it has been an
10 ongoing process.  It has been more than
11 once.
12    Q.   Number 7 says, "DEA hot
13 button, current street trends and/or
14 known drug combinations of interest to
15 DEA.  Self-explanatory, and using our top
16 dollar volume accounts, single audit
17 parameter is ridiculous.  We need to be
18 able to drill down to the accounts that
19 have real potential to do damage to
20 Schein."
21        Do you recall him expressing
22 this concern about this methodology?
23    A.   Not really.
24    Q.   The last one, "Medical

Page 311

1 scientific data known to DEA on global
2 basis and areas of enforcement that have
3 never been looked at by Schein.
4 Self-explanatory."
5        Do you recall him making
6 that kind of observation about Henry
7 Schein's suspicious order monitoring
8 system?
9    A.   No, sir.  I'm sorry.
10    Q.   So he goes on, on the last
11 page, to say that he's done a revised
12 audit format that he's proposing, and
13 he's attached the letter that he sent to
14 Shaun.  And he says, "To be honest, guys,
15 I have no idea what the heck I'm going to
16 find.  But it's better if I find it and
17 then discuss it with you so that changes
18 could be made to our SOM system in the
19 future rather than DEA showing up with
20 five investigators trying to pop holes in
21 us."
22        Do you recall him expressing
23 a desire to institute a new audit format
24 in 2013?

Page 312

1    A.   Well, the other -- the audit
2 format has been revised a couple of
3 times.  Again, I don't remember the
4 specific.  But we do look for room for
5 improvement on our questionnaires or in
6 our audit formats and our audit
7 checklists for distribution centers or
8 other facilities.
9    Q.   Do you know if you made any
10 specific changes as a result of this
11 particular observation or letter or
12 e-mail from Ken Romeo?
13    A.   I cannot tell you specific
14 to this document, but I can tell you that
15 working with Ken, we did get to some
16 opportunities, and we worked on
17 improvements to our process.
18    Q.   He writes -- he attaches his
19 letter, and on the bottom he asks very
20 specific information.
21        And I'm assuming, when he
22 says Hi US, that this is his letter to
23 Shaun Abreu that he references, that
24 says, "Along with the U, I'll need three

Page 313

1 other pieces of data:  Total sales for
2 each drug in the U, sales by dollar
3 volume of controlled product for each
4 account, and sales as a percentage of
5 business with Schein.  Ha-ha, I know you
6 get the last two."
7        Is that a metric or an
8 algorithm that you regularly ran, those
9 total sales, sales by dollar volume, and
10 percentage of business?
11    A.   We have used the sales by
12 dollar value and percentage of business.
13 We have used as sales by active
14 ingredient volume and percentage of total
15 sales.  These are tools that we have
16 used.
17    Q.   As a result of this proposed
18 format, was a new audit ever done to your
19 knowledge of Melville?  Did he ever issue
20 a report using his proposal?
21    A.   He did do -- I think he did
22 an audit in -- of Melville.  And then the
23 subsequent year Tina did an audit of the
24 program as well.  And as well, as you

Page 314

1  know, we also hire outside consultants to
2  do an audit for our program as well.
3      Q.   Do you recall though a
4  specific publication of -- of an audit
5  performed by Ken Romeo?
6      A.   The report?
7      Q.   Yeah.  For -- well, that he
8  was speaking of there, do you recall a --
9  a report that issued, that he -- did he
10  do an audit of his own based on the
11  proposal he had made?
12      A.   So, yeah, for -- on any
13  internal audit that we do, we do issue a
14  report.
15      Q.   I'm asking whether you know
16  that there was one done there.
17      A.   Again, I'm trying to answer
18  your question, but I think if you ask
19  me --
20      Q.   If you don't remember --
21      A.   -- the specifics, I -- I
22  don't remember.
23      Q.   I only have this one sheet
24  of paper.  I don't have copies of this.

Page 315

1  Let me put it on the screen.  I'll mark
2  it and we can get copies afterwards.
3  This is exhibit --
4          MR. McDONALD:  Do you want
5      to take two minutes and make a
6      copy?
7          MR. MIGLIORI:  It's -- I can
8      give it to him.  I don't even need
9      to look at it.  I'd rather finish
10     actually.  If that's all right.
11     You both can look at it.
12         (Document marked for
13     identification as Exhibit
14     Henry Schein-Tejeda-21.)
15  BY MR. MIGLIORI:
16     Q.   It's one page of a
17  PowerPoint presentation called "DEA SOM
18  Due Diligence Activity."  And it's
19  actually dated October of 2017.
20         You can take the whole
21  stack, but I'm only going to ask you
22  about the project's Tejeda sheet, which
23  I've marked as Exhibit 21.
24     A.   Okay.

Page 316

1      Q.   Are you familiar with that?
2      A.   I'm familiar with the
3  document.  This is our monthly report to
4  our management team.
5      Q.   Okay.  When did these
6  monthly reports begin, do you recall?
7      A.   In different formats, but I
8  think they had been there since -- since
9  I got supervisor position in regulatory.
10     Q.   Okay.  So they go back to
11  2003, '4, '5, '6?
12     A.   2002.
13     Q.   And you would have presented
14  this to Mr. Peacock or DiBello?
15     A.   I would have sent it --
16  again different formats.
17     Q.   Right.
18     A.   I would have sent it to Mike
19  or Jeff, and then they will, you know,
20  summarize everybody's report and send it
21  up the chain.
22     Q.   Okay.  Can I put that on the
23  screen just to -- and we can read it
24  together and --

Page 317

1          MR. McDONALD:  You said you
2      didn't need it.
3          MR. MIGLIORI:  Well, it's
4      actually recording it, so...
5          It would be helpful for the
6      folks listening to see it.
7  BY MR. MIGLIORI:
8      Q.   It says, "The Masters Pharma
9  decision on June 30th, the United States
10  District Court" -- "Circuit Court of
11  Appeals for the District of Columbia
12  decided the Masters Pharmaceuticals
13  versus DEA case."
14         Do you recall that case?
15     A.   Yes, sir.
16     Q.   And this is a project that
17  you were, I guess, responsible for
18  reporting on?
19         "The case has direct bearing
20  on wholesale" -- "wholesale distributors
21  and our obligation as DEA registrants to
22  prevent diversion."
23         That's what you understood
24  this case to be, correct, a case that

Page 318

1 dealt with -- that had a bearing on
2 wholesale distributors' obligations as
3 DEA registrants to prevent diversion?
4     A.   Yes, sir.
5     Q.   "As a result of the Masters
6 decision, distributors must review the
7 way we evaluate and process orders of
8 controlled substances to assure
9 compliance with the new interpretation of
10 articulate" -- "articulated in Masters."
11         That's what you were now
12 recommending to Henry Schein the company,
13 is that they had to look at how you had
14 been doing things with respect to the
15 shipping of pended orders, correct?
16     A.   That was --
17         MR. McDONALD:  Object to
18     form.  Go ahead.
19         THE WITNESS:  I'm sorry.
20     That was more the reporting
21     of suspicious orders.
22 BY MR. MIGLIORI:
23     Q.   Well, the reporting in
24 the -- okay.  And what's highlighted

Page 319

1 here, it says, "Based on the decision,
2 there is consensus that when a suspicious
3 order monitoring system designed to
4 evaluate orders based on frequency,
5 volume or pattern flags an order, that
6 order is suspicious and must be reported
7 to the DEA."
8         Is that the takeaway that --
9 that you were reporting to Henry Schein
10 of the -- of the import of the Masters
11 decision?
12     A.   Yeah, the Masters decision
13 actually clarified that.
14     Q.   Okay.  What it clarified was
15 that what you were calling pended orders
16 that whole time, Masters clarified to be,
17 in fact, suspicious orders, correct?
18         MR. McDONALD:  Object to the
19     form.
20 BY MR. MIGLIORI:
21     Q.   That was a clarification?
22     A.   Yeah, that was our read of
23 the -- of the opinion from the judge.
24     Q.   So if, in fact, your system

Page 320

1 flagged an order because of a deviation
2 based on frequency, volume, or pattern,
3 that the order, in all caps, is
4 suspicious and must be reported to the
5 DEA at that time, correct?
6     A.   Yes, that's what the -- the
7 judge interpretation was.
8     Q.   It's also what the
9 Controlled Substances Act says, doesn't
10 it?
11         MR. McDONALD:  Object to the
12     form.
13         THE WITNESS:  The Controlled
14     Substances Act?
15 BY MR. MIGLIORI:
16     Q.   Have you ever read the
17 Controlled Substances Act?
18     A.   Could you help me with what
19 section you are referring to?
20     Q.   I'm referring to the section
21 that says suspicious orders include.  Do
22 you recall that section?
23     A.   From the C.F.R.?
24     Q.   Yes.

Page 321

1     A.   I remember reading the
2 section.
3     Q.   Okay.  Well, I'll help you.
4 I'm not under oath so I get to mark one
5 more document.
6     A.   Okay.
7         MR. MIGLIORI:  Exhibit 22.
8     (Document marked for
9     identification as Exhibit
10     Henry Schein-Tejeda-22.)
11 BY MR. MIGLIORI:
12     Q.   This one I can give you a
13 copy of.
14         This is Exhibit 22.  You
15 understand that as the director of
16 regulatory affairs that this is the --
17 this is one of the governing provisions
18 of the Controlled Substances Act that
19 relates to controlled substances, right?
20     A.   Yes, sir.
21     Q.   It says, "The registrant
22 shall design and operate a system to
23 disclose to the registrant suspicious
24 orders of controlled substances.  The

Page 322

1 registrant shall inform the field
2 division of the office of the
3 administration in his area of suspicious
4 orders when discovered bring the
5 registrant.
6         "Suspicious orders include
7 orders of unusual size, orders deviating
8 substantially from a normal pattern, and
9 orders of unusual frequency."
10        That's the definition in the
11 C.F.R., correct?
12     A.   Yes, sir.
13     Q.   All right.  And Masters,
14 while it says here it's a new
15 interpretation, Masters, as you report
16 here, says that "based on the decision,
17 there is consensus that when a suspicious
18 order monitoring system designed to
19 evaluate orders based on frequency,
20 volume or pattern flags an order that
21 is" -- "that order is suspicious and must
22 be reported to the DEA."
23        That's no different from the
24 language of the C.F.R., correct?

Page 323

1         MR. McDONALD:  Object to the
2     form.
3         Surely you are not going to
4     argue with him about this at this
5     hour.
6         MR. MIGLIORI:  I'm not
7     arguing.  Did I -- did I raise my
8     voice?
9         MR. McDONALD:  Yeah.  Come
10    on, Don, ask your question.
11        MR. MIGLIORI:  I did.
12        MR. McDONALD:  Object to the
13    form.
14 BY MR. MIGLIORI:
15     Q.   Thank you.  Now, you can
16 answer it.  That's the same language --
17     A.   It is -- it is in your
18 interpretation.  It is a new document
19 clarifying what the judge interpreted as
20 what the regulation was saying.  Up to
21 this point, even the DEA accepted that
22 what we were doing was compliant.
23     Q.   The DEA has already
24 testified to that in this case.  So I

Page 324

1 won't ask you what the DEA thinks or
2 doesn't think.  Okay?
3     A.   Well, some letter from the
4 DEA --
5     Q.   There's a process --
6         MR. McDONALD:  Hang on.  Let
7     him talk.
8 BY MR. MIGLIORI:
9     Q.   There's a process for us to
10 talk to the DEA.  I'm talking to you.
11 This is my last moment to speak with you
12 before we go to trial, if we go to trial.
13 Okay?
14     A.   Okay.
15     Q.   My question to you is very
16 simple.  This decision said that a system
17 that's designed to evaluate orders based
18 on frequency, volume, or pattern that
19 flags an order for a deviation in those,
20 is suspicious, right?
21     A.   And that was in your
22 interpretation.
23     Q.   And when you compare it to
24 the actual language of the statute of the

Page 325

1 C.F.R. like the judge did in the Masters
2 case, you'll agree that the definition of
3 the C.F.R., in the C.F.R., that you as
4 director of regulatory affairs are
5 responsible for at Henry Schein, you'll
6 agree with me at least that the C.F.R.
7 defines a suspicious order as an order of
8 unusual size, deviating substantially
9 from normal pattern and unusual
10 frequency.  That's what the C.F.R. says,
11 right?
12        MR. McDONALD:  Object to the
13    form.
14        THE WITNESS:  It defines
15    what the suspicious order is;
16    however, it doesn't define when
17    you need to report it.
18 BY MR. MIGLIORI:
19     Q.   Okay.  It does say, "when
20 discovered by the registrant" in the
21 C.F.R., correct?
22     A.   And we were doing that.
23     Q.   Okay.  So it does define
24 when it has to be reported in the C.F.R.,

Page 326

1 and it does define what is a suspicious
2 order in the C.F.R. That's your
3 understanding as director of regulatory
4 affairs at Henry Schein, correct?
5         MR. McDONALD: Object to the
6     form.
7         THE WITNESS: And I'm also
8     telling you that based on
9     consultant opinions, based on
10     discussions with DEA, they told us
11     that what we were doing, the
12     practice that we were doing was
13     accepted according to the
14     interpretation at the time. There
15     were even conferences that we
16     attended that the DEA, maybe not
17     the person that you are talking
18     with, had said that there were two
19     accepted different methods to
20     report controlled substance.
21         And even in this last
22     conference, not to -- not a month
23     ago, the DEA actually came out and
24     said that they don't want to see

Page 327

1     all these letters spit out from
2     our computer systems, but they
3     want to learn when we actually
4     have deemed the order to be
5     suspicious.
6         MR. MIGLIORI: I'm going to
7     move to strike. Way beyond my
8     question.
9 BY MR. MIGLIORI:
10     Q.   My question is very simple,
11 and I promise when we're done with this,
12 we're done.
13     A.   Okay.
14     Q.   The C.F.R. has in it a clear
15 statement of when a suspicious order
16 needs to be reported, correct?
17         MR. McDONALD: Object to the
18     form.
19         THE WITNESS: When
20     discovered.
21 BY MR. MIGLIORI:
22     Q.   Correct. So when a
23 suspicious order is discovered, it's your
24 understanding as director of regulatory

Page 328

1 at -- at Henry Schein, that when
2 discovered, a suspicious order needs to
3 be reported to the field office of the
4 DEA. There's no confusion about that,
5 correct?
6         MR. McDONALD: Object to
7     form.
8         THE WITNESS: Correct, and
9     we were doing that.
10 BY MR. MIGLIORI:
11     Q.   Okay. The C.F.R. also says
12 that a suspicious order includes orders
13 of unusual size, deviating substantially
14 from a normal pattern, and orders of
15 unusual frequency. That's in the C.F.R.
16 going back to 1971, correct?
17     A.   I don't know the date,
18 but --
19     Q.   It's right here --
20     A.   -- it is in the C.F.R.
21     Q.   Okay. And that's always
22 been the governing provision in the
23 C.F.R. as long as you've been at Henry
24 Schein, correct?

Page 329

1     A.   Correct.
2     Q.   All right. And in the
3 Masters decision, the court concluded
4 that a system that's designed to flag
5 based on volume, frequency or pattern,
6 when it flags an order, that is when the
7 order is deemed suspicious, and
8 therefore, under the C.F.R., it must be
9 reported then, when discovered, to the
10 DEA, correct? That's holding of the case
11 as you understood it and reported to your
12 boss in 2017, correct?
13     A.   Which wasn't clear until
14 that time.
15     Q.   Okay. But it's clear now.
16 As you -- at the time that you wrote this
17 presentation, you understood that to be
18 what was required, correct?
19         MR. McDONALD: Object to the
20     form.
21         THE WITNESS: We understood
22     that that was the required coming
23     from the Masters decision, and we
24     were moving to implement it.

Page 330

BY MR. MIGLIORI:

Q. All right. And prior to the Masters decision, that is not what Henry Schein was doing, correct? That is, prior to the Masters decision, prior to June 30th of 2017, Henry Schein was not reporting any flagged order that had a deviation of size, frequency, or pattern in the Henry Schein suspicious order monitoring program, they were not reporting it to the DEA's field office, correct?

MR. McDONALD: Object to the form.

THE WITNESS: Prior to Masters decision, we were complying with the regulation -- with the regulation by notifying the DEA, by reporting to the DEA, orders that were deemed suspicious, which were an accepted practice.

BY MR. MIGLIORI:

Q. Not my question. My

Page 331

question to you is, prior to the Masters decision in June of 2017, Henry Schein did not deem an order that was a deviation in frequency, volume, or pattern a suspicious order and report it to the DEA when discovered, correct?

MR. McDONALD: Object to the form.

THE WITNESS: We didn't report orders that were flagged by our system until we deem it suspicious.

BY MR. MIGLIORI:

Q. So Henry Schein, prior to the Masters decision would pend an order that was a deviation of frequency, volume, or pattern and not report it to the DEA unless and until it later determined it to be suspicious, correct?

A. Which was what was compliant with the regulation.

Q. No. My question to you, is that correct? Is that what you did?

A. We would pend an order,

Page 332

review it. If deemed suspicious, we would report it immediately.

Q. And the Masters Pharmaceutical was doing the same thing, and as a result of this decision, lost its license to distribute controlled substances, correct?

MR. McDONALD: Object to the form.

I don't think he can answer that question.

BY MR. MIGLIORI:

Q. Do you know?

MR. McDONALD: If you know, tell him.

MR. MIGLIORI: He wrote this page here.

THE WITNESS: I don't know what Masters was doing.

BY MR. MIGLIORI:

Q. And you know that the Rannazzisi letters that we talked about earlier specifically said that you cannot rely upon any statements of the DEA as a

Page 333

basis for compliance with the requirements of the C.F.R., correct?

MR. McDONALD: Object to the form.

BY MR. MIGLIORI:

Q. Were you aware of that?

MR. McDONALD: Object to the form.

THE WITNESS: I think he actually said any previous statements.

BY MR. MIGLIORI:

Q. What he says was he's going to reiterate what the rules are, and that he -- you're not able -- I'll show it to you if you'd like. But you're not --

MR. McDONALD: The document -- Don, the document speaks for itself. It says what it says.

MR. MIGLIORI: Well, I want to know what his understanding of the document is.

BY MR. MIGLIORI:

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1    Q.  You understood back in 2007
2 that it was not appropriate at Henry
3 Schein to rely on a DEA statement that
4 you were in compliance or not in
5 compliance with the DEA's obligations
6 under the Controlled Substances Act,
7 correct, you understood that, didn't you?
8       MR. McDONALD:  Object to the
9    form.
10    THE WITNESS:  I don't know
11    how to answer that question.  If
12    we weren't able to go to the DEA
13    to look for guidance and interpret
14    what -- and take what they told us
15    as guidance, then...
16 BY MR. MIGLIORI:
17    Q.  Do you recall the letters?
18    A.  I do recall --
19    Q.  Do you --
20    A.  -- a letter from 2006 and a
21 letter from 2007.
22    Q.  And do you recall the
23 statement in the letters about whether or
24 not the -- it's -- it's considered

Page 335

1 compliant for you to rely on a statement
2 made by a DEA person about whether your
3 system was appropriate?
4       MR. McDONALD:  Object to the
5    form.
6    THE WITNESS:  I don't recall
7    the specific language in the
8    letters.
9    (Document marked for
10    identification as Exhibit
11    Henry Schein-Tejeda-23.)
12 BY MR. MIGLIORI:
13    Q.  Here is the December 27,
14 2007 letter.  You were in regulatory at
15 this date, correct?
16    A.  Yes, sir, I was.
17    Q.  This is Henry Schein's
18 version of this letter.  And it's Exhibit
19 Number 23.  Henry Schein.
20      This letter is being sent to
21 every entity in the United States
22 registered with the Drug Enforcement
23 Agency to manufacture or distribute
24 controlled substances.  The purpose of

Page 336

1 this letter is to reiterate the
2 responsibilities of controlled substance
3 manufacturers and distributors to inform
4 DEA of suspicious orders in accordance
5 with 21 C.F.R. 1301.74(b).  We just
6 looked at that.
7      It says, "In addition to,
8 and not in lieu of, the general
9 requirement under 21 U.S.C. 823, that
10 manufacturers should maintain effective
11 controls" -- and it goes through the
12 design and operations further.
13      Do you see that?
14    A.  Give me a minute to read it.
15 Okay.
16    Q.  The regulation clearly
17 indicates that it is the sole
18 responsibility of the registrant to
19 design and operate such a system.
20 Accordingly, DEA does not approve or
21 otherwise endorse any specific system for
22 reporting suspicious orders.
23      Do you recall that
24 statement?

Page 337

1    A.  Yes.
2    Q.  And is that -- was that
3 understood by Henry Schein in December of
4 2007?
5       MR. McDONALD:  Object to the
6    form.
7    THE WITNESS:  Yeah, that was
8    understood and it was also kind of
9    confusing why they needed to
10    clarify that.
11 BY MR. MIGLIORI:
12    Q.  Because -- well, we can ask
13 them why they believe they needed to do
14 it.
15      My question to you is
16 simply, you as a person at this point in
17 regulatory affairs, in a -- a supervising
18 person in regulatory affairs, you
19 understood, at Henry Schein, that the DEA
20 did not and could not approve or
21 otherwise endorse your system for
22 reporting suspicious orders.  You
23 understood that, correct?
24    A.  Yeah, we had a couple of

Page 338

1 conversations with consultants and DEA
2 and we came to that conclusion. They
3 didn't want to provide guidance on what
4 can be acceptable.
5     Q.    And you appreciated that as
6 of December 2007?
7     A.    After we have those -- those
8 conversations, a little bit after 2000 --
9 December 2007.
10    Q.    And as was written directly
11 to you by Joseph Rannazzisi, the deputy
12 assistant administrator of the office of
13 diversion control at DEA, you received
14 this document in 2000 --
15    A.    I didn't personally. It was
16 sent to one of our distribution centers.
17    Q.    And you were aware of this?
18    A.    I received a copy
19 afterwards.
20    Q.    Sometime in this time?
21    A.    Sometime around that.
22        MR. MIGLIORI: Okay. All
23 right. That's all I have. Thank
24 you very much for your time.

Page 339

1        Actually, wait. This is
2 just housekeeping.
3        THE WITNESS: Okay.
4 BY MR. MIGLIORI:
5     Q.    I received a personnel file
6 of yours Monday? Sunday? Friday, a file
7 on Friday and it got uploaded so that I
8 could look at it Sunday night. So --
9     A.    Okay.
10    Q.    -- this is purely
11 housekeeping, because I'm not sure.
12        But I have an evaluation for
13 you for year-end 2001 through 2004. And
14 then I have an evaluation for you for
15 year-end 2009 through 2017. And I have
16 nothing during the years of the -- from
17 2005 through 2009.
18        Did you review any of your
19 own personnel files in preparation for
20 today, and did you see any files related
21 to those years?
22    A.    I did review some of my
23 performance appraisals. I cannot tell
24 you what years I reviewed or if -- what

Page 340

1 was missing.
2     Q.    Well, of interest to me were
3 the years where the Buzzeo suspicious
4 order monitoring program was being
5 implemented -- developed and implemented,
6 and those are the years that are not
7 here. And so, I'm not suggesting
8 anything nefarious, I was just curious if
9 I just missed it because I only got it
10 literally 24 hours ago.
11        Did you see performance
12 appraisal reports for those years?
13    A.    Absolutely, yes.
14    Q.    All right. So they exist
15 somewhere?
16    A.    Yes.
17    Q.    All right. Well, we'll --
18 we'll --
19        MR. McDONALD: Well, hang
20 on.
21        MR. MIGLIORI: -- we'll look
22 for them and see if I missed them.
23 I didn't see them.
24        MR. McDONALD: I -- I don't

Page 341

1 think he's saying that he saw them
2 in preparation for the deposition.
3 He's seen them at some point in
4 life.
5 BY MR. MIGLIORI:
6     Q.    Is that -- is that what
7 you're saying? Is it -- did your counsel
8 remind you that that's what you're
9 saying?
10    A.    Well, that's what I
11 understood your question was.
12    Q.    So in preparation for today,
13 in the 25 hours of preparation, did you
14 see any performance appraisal forms for
15 those years 2005 through 2009?
16    A.    And again, I'm sorry for the
17 misunderstanding --
18    Q.    No.
19    A.    -- but I thought I had
20 answered that question. I did see
21 performance evaluations. I couldn't tell
22 you if it was complete or what years were
23 missing.
24    Q.    You saw them in -- in recent

Page 342

1  weeks?
2      A.   Yeah.  I saw the -- some of
3  the performance evaluations.
4      Q.   Okay.
5      MR. MIGLIORI:  Well, we'll
6  continue to look.  I -- I doubt
7  it's going to raise any issue that
8  I'll need to follow up on.  But I
9  just wanted it to be clear or see
10  if you had an explanation to why
11  there would be a gap of five years
12  in your -- in your record.
13      THE WITNESS:  No.  No, I'm
14  sorry.  Actually I am sure it was
15  a good review, because that's when
16  I was promoted.
17      MR. MIGLIORI:  All of your
18  reviews are -- are very good.  And
19  I was just curious.
20      That's all I have.  I
21  appreciate your time.
22      THE WITNESS:  All right,
23  sir.  Thank you.  I appreciate it.
24      THE VIDEOGRAPHER:  This ends

Page 343

1  today's deposition.  We're going
2  off the record at 3:48 p.m.
3      (Excused.)
4      (Deposition concluded at
5  approximately 3:51 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 344

1
2      CERTIFICATE
3
4
5      I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6  deposition is a true record of the
testimony given by the witness.
7
      It was requested before
8  completion of the deposition that the
witness, SERGIO TEJEDA, have the
9  opportunity to read and sign the
deposition transcript.
10
11
12
_____
MICHELLE L. GRAY,
13  A Registered Professional
Reporter, Certified Shorthand
14  Reporter, Certified Realtime
Reporter and Notary Public
15  Dated:  April 5, 2019
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

Page 345

1      INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10      You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14      It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 346

```
 1        - - - - - -
           E R R A T A
 2        - - - - - -

 3

 4  PAGE  LINE  CHANGE

 5  ____  ____  _____

 6    REASON: _____

 7                _____

 8    REASON: _____

 9                _____

10    REASON: _____

11                _____

12    REASON: _____

13                _____

14    REASON: _____

15                _____

16    REASON: _____

17                _____

18    REASON: _____

19                _____

20    REASON: _____

21                _____

22    REASON: _____

23  ____  ____  _____

24    REASON: _____
```

Page 348

```
 1           LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
```

Page 347

```
 1

 2      ACKNOWLEDGMENT OF DEPONENT

 3

 4        I,_____, do

 5  hereby certify that I have read the

 6  foregoing pages, 1 - 348, and that the

 7  same is a correct transcription of the

 8  answers given by me to the questions

 9  therein propounded, except for the

10  corrections or changes in form or

11  substance, if any, noted in the attached

12  Errata Sheet.

13

14

15  _____

16  SERGIO TEJEDA              DATE

17

18

19  Subscribed and sworn
    to before me this

20  _____ day of _____, 20____.

21  My commission expires:_____

22

    _____

23  Notary Public

24
```