```
1              THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3                      -  -  -
4    IN RE:  NATIONAL    :
     PRESCRIPTION OPIATE :    MDL NO. 2804
5    LITIGATION          :
     -----------------------------------------
6                        :    CASE NO.
     THIS DOCUMENT       :    1:17-MD-2804
7    RELATES TO ALL CASES:    Hon. Dan A. Polster
8                      -  -  -
9           Wednesday, November 28, 2018
10                     -  -  -
11      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
13                     -  -  -
14          Videotaped deposition of JOSEPH
15    TOMKIEWICZ, taken pursuant to notice, was held
16    at Golkow Litigation Services, One Liberty
17    Place, 1650 Market Street, Suite 5150,
18    Philadelphia, Pennsylvania 19103, beginning at
19    9:58 a.m., on the above date, before Lisa V.
20    Feissner, RDR, CRR, Notary Public.
21
22                     -  -  -
23          GOLKOW LITIGATION SERVICES
          877.370.3377 ph | 917.591.5672 fax
24               deps@golkow.com
```

```
 1    APPEARANCES:
 2    BARON & BUDD, P.C.
      BY: MARK PIFKO, ESQUIRE
 3    BY: STERLING CLUFF, ESQUIRE
      15910 Ventura Boulevard
 4    Suite 1600
      Encino, California 91436
 5    (818) 839-2333
      mpifko@baronbudd.com
 6    scluff@baronbudd.com
      -- Representing the MDL Plaintiffs
 7
 8    BARON & BUDD, P.C.
      BY: WILLIAM G. POWERS, ESQUIRE
 9    (via teleconference / live stream)
      600 New Hampshire Avenue NW
10    Suite 10-A
      Washington, DC 20037
11    (202) 333-4562
      wpowers@baronbudd.com
12    -- Representing the MDL Plaintiffs
13
      WAGSTAFF & CARTMELL, LLP
14    BY: THOMAS P. CARTMELL, ESQUIRE
      BY: ANDREW N. FAES, ESQUIRE
15    4740 Grand Avenue
      Suite 300
16    Kansas City, Missouri 64112
      (816) 701-1100
17    tcartmell@wcllp.com
      afaes@wcllp.com
18    -- Representing the MDL Plaintiffs
19
      SKIKOS, CRAWFORD, SKIKOS & JOSEPH, LLP
20    BY: MARK G. CRAWFORD, ESQUIRE
      BY: UZAIR SALEEM, ESQUIRE
21    One Sansome Street
      Suite 2830
22    San Francisco, California 94104
      (415) 546-7300
23    mcrawford@skikos.com
      usaleem@skikos.com
24    -- Representing the MDL Plaintiffs
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    APPEARANCES:  (Continued)
 2       ROBBINS GELLER RUDMAN & DOWD, LLP
         BY: ANDREA FIORE, ESQUIRE
 3       655 West Broadway
         Suite 1900
 4       San Diego, California 92101
         (619) 231-1058
 5       andrea.fiore@gmail.com
         -- Representing Plaintiffs
 6
 7       BRANSTETTER, STRANCH & JENNINGS, PLLC
         BY: BENJAMIN A. GASTEL, ESQUIRE
 8       223 Rosa L. Parks Avenue
         Suite 200
 9       Nashville, Tennessee 37203
         (615) 254-8801
10       beng@bsjfirm.com
         -- Representing the Plaintiffs in the
11          Dunaway and Staubus Tennessee
            State Court actions
12
13       WILLIAMS & CONNOLLY, LLP
         BY: MIRANDA PETERSEN, ESQUIRE
14       725 Twelfth Street, N.W.
         Washington, DC 20005
15       (202) 434-5000
         mpetersen@wc.com
16       -- Representing the Cardinal Health
            Defendants
17
18       JONES DAY
         BY: SARAH G. CONWAY, ESQUIRE
19       555 South Flower Street
         Fiftieth Floor
20       Los Angeles, California 90071-2300
         (213) 489-3939
21       sgconway@jonesday.com
         -- Representing the Walmart Defendants
22
23
24
```

```
 1   APPEARANCES:  (Continued)
 2      MORGAN LEWIS & BOCKIUS, LLP
        BY: ADAM M. HAMMOUD, ESQUIRE
 3      BY: RICHARD G. SHEPHARD, JR., ESQUIRE
        1701 Market Street
 4      Philadelphia, Pennsylvania 19103
        (215) 963-5000
 5      adam.hammoud@morganlewis.com
        richard.shephard@morganlewis.com
 6      -- Representing the Teva Defendants
 7
        REED SMITH LLP
 8      BY: ROBERT A. NICHOLAS, ESQUIRE
        BY: JEFFREY R. MELTON, ESQUIRE
 9         and
        BY: SHANNON E. McCLURE, ESQUIRE
10      (via teleconference / live stream)
        BY: ANNE E. ROLLINS, ESQUIRE
11      (via teleconference / live stream)
        1717 Arch Street
12      Suite 3100
        Philadelphia, Pennsylvania 19103
13      (215) 851-8100
        rnicholas@reedsmith.com
14      jmelton@reedsmith.com
        smcclure@reedsmith.com
15      arollins@reedsmith.com
        -- Representing the AmerisourceBergen
16         Defendants
17
        COVINGTON & BURLING LLP
18      BY: MARINA DALIA-HUNT, ESQUIRE
        3000 El Camino Real
19      10th Floor
        Palo Alto, California 94306-2112
20      (650) 632-4700
        mdaliahunt@cov.com
21      -- Representing the Defendant
           McKesson Corporation
22
23
24
```

```
 1   APPEARANCES:  (Continued)
 2      ALLEGAERT BERGER & VOGEL LLP
        BY: CHRISTOPHER ALLEGAERT, ESQUIRE
 3      111 Broadway
        20th Floor
 4      New York, New York 10006
        (212) 571-0550
 5      callegaert@abv.com
        -- Representing Rochester Drug
 6         Cooperative, Inc.
 7

     ALSO PRESENT:
 8

        Christopher J. Casalenuovo, Esquire
 9      -- In-house counsel, AmerisourceBergen
10      David Lane, Videographer
11      Zach Hone, Trial Technician
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      -  -  -
 2                   I N D E X
 3                      -  -  -
 4    Testimony of:   JOSEPH TOMKIEWICZ
 5       By Mr. Pifko                    15
         By Mr. Cartmell                 134
 6       By Mr. Gastel                   459
         By Mr. Hammoud                  502
 7
                         -  -  -
 8
                    E X H I B I T S
 9
                         -  -  -
10    TEVA-TOMKIEWICZ
      EXHIBIT NO.      DESCRIPTION                    PAGE
11
      001     E-mail chain, top e-mail from
12            Tomkiewicz to rxnews@listserve.com,
              Sent: 9/16/2010,
13            Subject: Re: [RxNews] Oxy's
              CAH_MDL2804_00855083 - 00855084
14
      002     E-mail chain, top e-mail from
15            Hazewski to Breitmayer et al.,
              Sent: Thu, 29 Sep 2011
16            Subject: FW: Oxycodone Allocation
              ABDCMDL00280711 - 00280712
17
      003     PowerPoint slide deck titled
18            DEA Compliance Organization
              March 18, 2014
19            TEVA_MDL_01464603
20    004     Letter from Rannazzisi, U.S.
              Department of Justice
21            dated February 7, 2007
              TEVA_MDL_A_01039159 - 01039162
22    005     PowerPoint slide deck titled
              Suspicious Order Monitoring,
23            Joseph Tomkiewicz, Diversion
              Operations Manager, 2014
24            TEVA_MDL_A_02923616
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -
 2              E X H I B I T S
                   (cont'd)
 3
                     -  -  -
 4  TEVA-TOMKIEWICZ
    EXHIBIT NO.    DESCRIPTION                PAGE
 5
    006      SOP-8277: Suspicious Order
 6           Monitoring - DEA Order Holds
             TEVA_MDL_A_02660892 - 02660899
 7
    007      SOP-8278: Suspicious Order
 8           Monitoring - Do Not Ship List
             TEVA_MDL_A_01061094 - 01061098
 9
    008      SOP-8279: Suspicious Order
10           Monitoring - Customer Due Diligence
             TEVA_MDL_A_02660918 - 02660924
11
    009      SOP-8280: Suspicious Order
12           Monitoring - Customer Site Visits
             TEVA_MDL_A_02660932 - 02660936
13
    010      SOP-8489: Suspicious Order
14           Monitoring - DEA Order Holds -
             Locations Other Than New Britain,
15           PA and North Wales, PA
             TEVA_MDL_A_03160173 - 02160175
16
    011      E-mail from Benkert to Tomkiewicz
17           Sent: 1/7/2014, Subject: SOM Documents
             TEVA_MDL_A_03478588
18
    012      Letter from Buzzeo to McGinn
19           dated September 25, 2012
             TEVA_MDL_A_01060005 - 01060012
20
    013      Teva Pharmaceuticals North America
21           Order Management, DEF OPS
             Enhancements, Functional Design
22           Specification
             TEVA_MDL_A_03479111 - 03479127
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                         -  -  -
 2                    E X H I B I T S
                         (cont'd)
 3
                          -  -  -
 4   TEVA-TOMKIEWICZ
     EXHIBIT NO.      DESCRIPTION                    PAGE
 5
     014      E-mail chain, top e-mail from
 6            McGinn to Edwards et al., Sent:
              8/19/15, Subject: FW: Global
 7            Internal Audit: DEA - Final Report
              TEVA_MDL_A_02475564 - 02475585
 8
     015      PowerPoint slide deck, SOM and
 9            Current Cases, Joseph Tomkiewicz,
              DEA Compliance Manager, 2017
10
     016      SOP-8277: Suspicious Order
11            Monitoring - DEA Order Holds,
              Revision Number 01
12            TEVA_MDL_A_01158453 - 01158462
13   017      E-mail chain, top e-mail from
              Shanahan to Baeder,
14            Sent: 10/16/2015, Subject: RE:
              PO# 1031374 for the OXYCODONE product.
15            TEVA_MDL_A_02063729 - 02063733
16   018      E-mail from Tomkiewicz to
              Everingham Sent: 3/2/2018,
17            Subject: PowerPoint, with
              Attachment: 2017 Joe Tomkiewicz
18            PDMA Conference - v2.pptx
              TEVA_MDL_A_02480387
19
     019      E-mail chain, top e-mail from
20            McGinn to Tomkiewicz, Sent: Friday,
              October 16, 2015, Subject: RE: PO#
21            1031374 for the OXYCODONE product
              TEVA_MDL_A_01056272 - 01056278
22
     020      E-mail chain, top e-mail from
23            McGinn to Shanahan, Sent:
              10/16/2015, Subject: FW: PO# 1031374
24            for the OXYCODONE product
```

```
 1                        -  -  -
 2                   E X H I B I T S
                         (cont'd)
 3
                          -  -  -
 4   TEVA-TOMKIEWICZ
     EXHIBIT NO.    DESCRIPTION              PAGE
 5
     021     Document, top line: 10:10 call
 6           returning Jen King's call
             TEVA_MDL_A_02063728
 7
     022     E-mail chain, top e-mail from
 8           Tomkiewicz to McGinn,
             Sent: 10/28/2015, Subject: RE:
 9           Publix Anda weekly call
             TEVA_MDL_A_01462200 - 01462203
10
     023     Document, top line: [10/30/2015
11           12:10 PM] Marianne Geiger:
             TEVA_MDL_A_01056182
12
     024     Letter from Tomkiewicz to
13           DEA/Spears dated December 1, 2014,
             Re: Suspicious Order Report
14           TEVA_MDL_A_02342525
15   025     Internal Memorandum To: McGinn,
             From: Tomkiewicz, Date: November 21,
16           2014, Subject: Richie Pharmacal
             APAP/Codeine Orders
17           (Bates illegible)
18   026     Letter from Tomkiewicz to
             DEA/Spears dated June 25, 2015,
19           Re: Suspicious Order Report
             TEVA_MDL_A_02063701
20
     027     Letter from Tomkiewicz to Richie
21           Pharmacal dated January 22, 2016
             TEVA_MDL_A_01046053
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                      -   -   -

2              DEPOSITION SUPPORT INDEX

3                      -   -   -

4    Direction to Witness Not to Answer
     Page Line      Page Line      Page Line
5    46    12

6

     Request for Production of Documents
7    Page Line      Page Line      Page Line
     (None)

8

9    Stipulations
     Page Line      Page Line      Page Line
10   11    2

11

     Question Marked
12   Page Line      Page Line      Page Line
     (None)

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    -  -  -

 2             (It is hereby stipulated and agreed

 3        by and among counsel that sealing,

 4        filing and certification are waived; and

 5        that all objections, except as to the

 6        form of the question, will be reserved

 7        until the time of trial.)

 8                    -  -  -

 9             VIDEO OPERATOR:  We're now on the

10        record.  My name is David Lane,

11        videographer for Golkow Litigation

12        Services.  Today's date is November

13        28th, 2018.  Our time is 9:58 a.m.

14             This deposition is taking place in

15        Philadelphia, Pennsylvania in the matter

16        of National Prescription Opiate

17        Litigation, MDL.  Our deponent today is

18        Joseph Tomkiewicz.

19             Counsel will be noted on the

20        stenographic record.  The court reporter

21        today is Lisa Feissner, who will now

22        swear in the witness.

23             (The witness was placed under

24        oath.)
```

1      MR. PIFKO:  Good morning.  My name

2      is Mark Pifko -- oh, sorry, I forgot.

3      Counsel for one of the state court cases

4      wanted to say something.

5      MR. GASTEL:  My name is Ben Gastel

6      from Branstetter, Stranch & Jennings in

7      Nashville, Tennessee representing the

8      plaintiffs in the Dunaway versus Purdue

9      case in Cumberland County State Court,

10     Tennessee, and the Staubus versus Purdue

11     case in Sullivan County, Tennessee.

12     Those were cross-noticed by Teva today

13     to this -- in this deposition.

14         Pursuant to the order entered by

15     Judge Polster in MDL 2804, Teva was

16     required to perform a number of

17     important tasks by specific deadlines

18     with regard to all cross-notice parties.

19     The Tennessee plaintiffs object that

20     Tennessee -- that Teva has flagrantly

21     ignored their duties pursuant to Judge

22     Polster's order.  Specifically, Teva was

23     required to produce Mr. Tomkiewicz's

24     complete and total custodial file by

```
1        November 14th, 14 days in advance of
2        this noticed deposition.  The
3        plaintiffs -- the discovery vendor did
4        not receive any discovery from Teva in a
5        timely manner and was not able to begin
6        ingesting Teva data until Wednesday,
7        November 21st, just seven days before
8        this deposition.  The complete file to
9        the Tennessee plaintiffs was not fully
10       ingested for review until November 24th.
11            14 days before this deposition,
12       Teva was also required to inform the
13       Tennessee plaintiffs whether
14       Mr. Tomkiewicz has personal knowledge of
15       state-specific issues, including
16       possibly state-specific documents in the
17       custodian file.  Teva stated that
18       Mr. Tomkiewicz has no Tennessee-specific
19       knowledge.  The Tennessee plaintiffs
20       believe that this statement is patently
21       untrue, and at best, intentionally
22       misleading.
23            By failing to abide by those
24       crucial protocol, Teva has prejudiced
```

 1          the Tennessee plaintiffs' ability to

 2          prepare for this deposition today.

 3          Furthermore, the Tennessee claims at

 4          issue are different and require

 5          different elements and require different

 6          discovery areas of inquiry than the MDL.

 7          Also, the Tennessee Rules of Civil

 8          Procedure do not place any time

 9          restrictions on the length of these

10          depositions.

11               The Tennessee plaintiffs also

12          requested two hours to depose

13          Mr. Tomkiewicz in addition to MDL's

14          deposition time as required by the order

15          from Judge Polster.  Teva has not

16          responded to this request.

17               For each of these reasons, the

18          Tennessee plaintiffs object to this

19          deposition going forward today in these

20          Tennessee cases and reserve the right to

21          redepose Mr. Tomkiewicz if necessary.

22               Thank you, Mark.

23               MR. HAMMOUD:  We note the objection

24          for the record, but we would follow up

Highly Confidential - Subject to Further Confidentiality Review

```
 1          and say we did not receive any notice

 2          that the Tennessee counsel would need

 3          two additional hours for deposition as

 4          required by the protocol, and that would

 5          be our objection.

 6              MR. PIFKO:  Does anyone else want

 7          to state any objections before we start?

 8              JOSEPH TOMKIEWICZ,

 9  having been first duly sworn, was examined and

10  testified as follows:

11                  EXAMINATION

12  BY MR. PIFKO:

13      Q.   All right.  My name is Mark Pifko.

14  I represent the plaintiffs in the MDL.  Can

15  you -- let's start by, can you please state and

16  spell your name for the record?

17      A.   Sure.  Joseph Tomkiewicz,

18  J-O-S-E-P-H, T-O-M-K-I-E-W-I-C-Z.

19      Q.   Have you ever had your deposition

20  taken before?

21      A.   Yes.

22      Q.   Okay.  How long ago was your

23  deposition last taken?

24      A.   Two or three years ago.
```

1        Q.    What was that in connection with?

2        A.    West Virginia, in conjunction with

3    AmerisourceBergen.

4              (Reporter interruption.)

5        Q.    The West Virginia Attorney General

6    sued AmerisourceBergen, correct?

7        A.    As far as I know, yes, correct.

8        Q.    Okay.  And you were deposed in

9    connection with that litigation?

10       A.    Yes.

11       Q.    Have you been deposed any other

12   times?

13       A.    Yes.

14       Q.    When was the last time before the

15   West Virginia AG situation?

16       A.    It was in the early 2000s.

17       Q.    And what was that concern?

18       A.    That was concerning a pharmacy in

19   the state of Hawaii over returned and reuse of

20   medications.

21       Q.    Did you work for one of the parties

22   involved in that litigation?

23       A.    Yes.

24       Q.    Who was your employer at that time?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    PharMerica.

2        Q.    Any other times you've been

3   deposed?

4        A.    No.

5        Q.    I assume that in preparing for this

6   deposition, you were -- went over the ground

7   rules, but I'll just go over a couple of high

8   points so that we're all on the same page here.

9             Let's make sure we don't talk over

10  each other.  You know, you can see there's a

11  lot of people in the room, people want to have

12  objections.  The court reporter can only write

13  down what one person is saying at a time.  So

14  if two people are talking at once, it makes it

15  hard for us to get a clear record, okay?

16       A.    Mm-hmm.

17       Q.    And then the other thing is we need

18  to make sure we get an audible verbal response

19  from you to the questions.

20       A.    Oh, yes.

21       Q.    So again, she can't -- if you shake

22  your head like you would in a normal

23  conversation, she can't write that down.  So

24  that makes it also difficult, okay?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   Last thing, as far as that kind of

3   issue, please be sure to say yes or no if

4   you're trying to answer a yes-or-no question,

5   rather than shaking your head or shrugging your

6   shoulders or something like that because,

7   again, she can't understand that, and then if

8   you say uh-huh or huh-uh, it reads almost the

9   same.  So try to state clearly if you're saying

10  yes or no instead of uh-huh or huh-uh, okay?

11     A.   Yes.

12     Q.   And then last thing, you understand

13  that you're under oath, right?

14     A.   Yes, I do.

15     Q.   Okay.  Your testimony here is under

16  penalty of perjury.  You understand that?

17     A.   Yes, I do.

18     Q.   Is there any reason why you believe

19  this deposition shouldn't go forward?

20     A.   No.

21     Q.   Are you undergoing any treatment or

22  taking any medication that would impair your

23  ability to tell the truth?

24     A.   No.

1      Q.   Are you undergoing any treatment or

2   taking any medication that would impair your

3   memory?

4      A.   No.

5      Q.   All right.  You joined

6   AmerisourceBergen in approximately 2008; is

7   that correct?

8      A.   I actually had two stints with

9   AmerisourceBergen.  As a corporate

10  investigator, I joined them in 2008.

11     Q.   Okay.  And you worked for them at

12  some point before that?

13     A.   Yes.

14     Q.   When was that?

15     A.   That was approximately 1999 to

16  somewhere around early 2002.

17     Q.   When you worked for

18  AmerisourceBergen in 1999 to 2002, what did you

19  do?

20     A.   I was a regulatory affairs

21  specialist.

22     Q.   Where were you physically located

23  at that time?

24     A.   I was in Tampa, Florida and

1    Chicago, Illinois.

2          Q.    Tampa first and then Chicago?

3          A.    Yes.

4          Q.    What was the time period roughly

5    that you were in Tampa for AmerisourceBergen?

6          A.    I was in Tampa until June of 2001.

7          Q.    There was a merger between the

8    Bergen corporation and Amerisource, correct?

9          A.    Yes.

10         Q.    Who did you work for in 1999?

11         A.    Bergen Brunswig.

12         Q.    Who did you report to when you

13   worked for the Bergen Brunswig corporation?

14         A.    I reported to Sharon Hartman, and

15   then I reported to Julianne Hom, H-O-M.

16         Q.    And your title was regulatory

17   affairs specialist?

18         A.    Yes.

19         Q.    What's your highest level of

20   education?

21         A.    I completed several years of

22   college but did not graduate.

23         Q.    Where did you go to high school?

24         A.    I went to high school in Laona,

Highly Confidential - Subject to Further Confidentiality Review

1    Wisconsin.

2         Q.   Where you attended college, was

3    that all at the same place?

4         A.   No.  I attended two different

5    colleges.

6         Q.   Okay.  Where was the first place

7    you attended college?

8         A.   First one was in Kansas City,

9    Missouri.

10        Q.   What school did you attend?

11        A.   Well, it was the Missouri Institute

12   of Technology and then became a DeVry location.

13        Q.   It became DeVry while you were

14   there or after?

15        A.   Yes, while I was there.

16        Q.   Okay.  What were you studying

17   there?

18        A.   Electronic -- electrical

19   engineering.

20        Q.   What were the years that you were

21   there?

22        A.   I was there from '84 to early '86.

23        Q.   And then you attended college

24   somewhere else as well?

Highly Confidential - Subject to Further Confidentiality Review

```
1           A.    Yes.

2           Q.    Where was that?

3           A.    Wisconsin-Milwaukee.

4           Q.    And what were the years that you

5   were there?

6           A.    '87 to '90.

7           Q.    What did you study there?

8           A.    English.

9           Q.    But you didn't finish there?

10          A.    Correct.

11          Q.    Okay.  And what did you do in 1990?

12          A.    In terms of --

13          Q.    You got a job somewhere?

14          A.    Well, I had a job, but I -- I was

15  also playing in a band, and we had a record and

16  a music video.

17          Q.    So in 1999 -- prior to 1999, where

18  were you working?

19          A.    I worked for PharMerica.

20          Q.    Okay.  What was the time period

21  that you worked for PharMerica?

22          A.    Well, PharMerica became PharMerica

23  in '96.  Before that, part of it was known as

24  Pharmacy Corporation of America.  I started
```

Highly Confidential - Subject to Further Confidentiality Review

1    with Pharmacy Corporation of America in '87.

2         Q.   What were you doing for them then?

3         A.   I started as an IT technician and

4    became a pharmacy technician, and then I was

5    transferred to the corporate office, where I

6    was a contract administrator and negotiated

7    generics purchasing contracts.

8         Q.   How long did you work -- so then

9    you worked for PharMerica, in various

10   iterations of it, from 1987 to 1999?

11        A.   Correct.

12        Q.   Did you have any involvement in

13   regulatory affairs at the PharMerica

14   corporation?

15        A.   Yes, I did.

16        Q.   Okay.  When did you start having

17   responsibilities that included regulatory

18   affairs?

19        A.   That was while I was with Bergen

20   Brunswig.  Bergen Brunswig had purchased

21   PharMerica.

22        Q.   Oh, okay.  So what I'm trying to

23   get at was, when was the first time that you

24   had a job where your responsibilities included

Highly Confidential - Subject to Further Confidentiality Review

1    regulatory affairs?

2         A.   That would have been '99, when I

3    started with Bergen Brunswig.

4         Q.   So Bergen bought the PharMerica

5    corporation?

6         A.   Correct.

7         Q.   Okay.  Did your job change at that

8    time, or --

9         A.   Well, yes -- well, not at the time

10   of the purchase, but it was shortly after the

11   purchase that I moved to the regulatory affairs

12   department.

13        Q.   Okay.  Did you have to physically

14   move cities as well?

15        A.   No.

16        Q.   Okay.  So your jobs at the

17   PharMerica corporation were in Tampa?

18        A.   Correct -- not all of them.  I had

19   started in Milwaukee in an actual pharmacy,

20   where I was an IT technician and then a

21   pharmacy technician.

22             And then when I moved to the

23   corporate headquarters, which at the time was

24   in Boulder, Colorado, that's when I was a

1  contract administrator and negotiated

2  purchasing contracts.

3          In '96, the headquarters moved to

4  Tampa, Florida, and I moved to Tampa, Florida

5  at that time.

6      Q.    Okay.  So when the Bergen Brunswig

7  Corporation bought PharMerica, sometime after

8  that, you transitioned into a regulatory

9  affairs role, correct?

10     A.    Correct, correct.

11     Q.    Did you receive any special

12  training to transition into the regulatory

13  affairs role?

14     A.    There was ongoing training.  There

15  was peer training.  There was training that was

16  conducted by -- because we reported into the

17  legal department, training conducted by the

18  attorneys of the company.

19     Q.    What was your specific

20  responsibility when you first became a

21  regulatory affairs specialist?

22     A.    I was responsible for performing

23  on-site regulatory audits of pharmacies that

24  were owned by Bergen Brunswig, which were

1    primarily PharMerica locations, but there were

2    also what were called Stadtlanders.  That was

3    another specialty pharmacy group that Bergen

4    owned at that time, and so conducted audits at

5    those sites as well.

6         Q.   I want to take a second to talk

7    about your preparation for this deposition.

8    Did you meet with attorneys to prepare for this

9    deposition?

10        A.   Yes.

11        Q.   Did you meet with AmerisourceBergen

12   attorneys to prepare for this deposition?

13        A.   Yes.

14        Q.   You currently are employed by Teva;

15   is that correct?

16        A.   Correct.

17        Q.   Did Teva tell you you had to meet

18   with AmerisourceBergen attorneys?

19        A.   No.

20        Q.   When did you first make contact

21   with AmerisourceBergen attorneys?

22        A.   I don't remember the exact date.

23   It was maybe a couple weeks ago.

24        Q.   Was that contact made directly, or

1    did that come through someone at Teva?

2         A.    I don't remember.

3         Q.    When you met with

4    AmerisourceBergen -- well, okay.  So the first

5    time that you interacted with someone

6    representing AmerisourceBergen, was that on the

7    phone or in person?

8         A.    I don't think it was a phone call.

9    I don't think I had a phone call.

10        Q.    Were there attorneys from Teva

11   present at that meeting?

12        A.    No.

13        Q.    So it was just you and

14   AmerisourceBergen attorneys?

15        A.    Correct.  The attorneys

16   representing me and an AmerisourceBergen

17   attorney.

18        Q.    Well, let's just make it easy.  Can

19   you recall the names of anyone who was at that

20   meeting?

21        A.    Bob, who is with Reed Smith --

22   Jeff?  Jason?

23             MR. NICHOLAS:  You got it.  Jeff.

24             THE WITNESS:  And then Chris from

```
 1              AmerisourceBergen.

 2    BY MR. PIFKO:

 3         Q.    Chris, the in-house attorney for

 4    AmerisourceBergen?

 5         A.    Correct.

 6         Q.    Okay.  Bob, who is sitting next to

 7    you?

 8         A.    Yes.

 9         Q.    Okay.  Jeff, who is down the table?

10         A.    Yes.

11         Q.    Just, again, we're stating things

12    for the record so that --

13         A.    Yes.

14         Q.    They can't see the gestures that

15    you're making.

16         A.    Oh, sorry.

17         Q.    Anyone else that was there that you

18    can think of?

19         A.    No.

20         Q.    Okay.  Where did that meeting

21    occur?

22         A.    That occurred at Reed Smith's

23    office.

24         Q.    About how long was that meeting?
```

1        A.    About four hours.

2        Q.    Did you have to get time off from

3    Teva to participate in that meeting?

4        A.    No.  There was no vacation time

5    taken for that meeting at all.

6        Q.    Was that during your normal working

7    hours, or was it after work?

8        A.    Normal working hours.

9        Q.    Okay.  But Teva let you not attend

10   work to go to this meeting?

11       A.    Yes.

12       Q.    Okay.  Did you have to tell anyone

13   at Teva that you were going to go to this

14   meeting?

15       A.    Oh, my boss was aware.

16       Q.    Okay.  And you said that you needed

17   to not be at your job so you could meet with

18   AmerisourceBergen attorneys?

19       A.    Yes.

20       Q.    And they said that was okay?

21       A.    Yes.

22       Q.    Did they show you any documents

23   when you were at that meeting?

24       A.    Yes.

1    Q.   E-mails and things?

2    A.   Yes.

3    Q.   Okay.  Did they should you any

4  documents that refreshed your recollection

5  about past events?

6    A.   Some, yes.

7    Q.   Can you recall what any of those

8  were?

9    A.   Yes.

10    Q.   Can you describe them?

11    A.   Oh, sure.  There were some e-mails,

12  printouts of e-mails.  Mostly, printouts of

13  e-mails.

14    Q.   The e-mails that refreshed your

15  recollection about past events, do you remember

16  what they were about?

17    A.   Oh, yes.

18    Q.   Can you tell me?

19    A.   Oh, sure.  There was one about a

20  pain clinic in Ohio that I had visited and had

21  done an on-site investigation.

22    Q.   What was the name of that pain

23  clinic?

24    A.   Summit Pain Clinic.

1    Q.    What was the e-mail about that you

2  reviewed?

3    A.    I can't remember specifically.

4    Q.    There was a problem with this pain

5  clinic in Ohio?

6    A.    A problem?  Not a problem, per se.

7    Q.    You visited it.  What was the

8  purpose of your visit?

9    A.    I visited it because of the volume

10  of oxycodone being purchased by the pain clinic

11  had appeared to be that it could be something

12  that could be unusual.

13    Q.    Do you remember the approximate

14  time period of that visit?

15    A.    Not specifically.

16    Q.    But the e-mail you reviewed would

17  have the dates on it?

18    A.    Yes.

19    Q.    Okay.  Any other e-mails that you

20  reviewed in that meeting that refreshed your

21  recollection about past events?

22    A.    Actually, nothing specific that I

23  can remember specifically like Summit.

24    Q.    Okay.  Did you meet with

Highly Confidential - Subject to Further Confidentiality Review

1    AmerisourceBergen attorneys on any other

2    occasions other than that meeting?

3              A.    No.

4              Q.    You weren't obligated to meet with

5    them by anyone?

6              A.    I was not obligated to meet with

7    them.

8              Q.    You still have loyalty to

9    AmerisourceBergen Corporation?

10             A.    What do you mean by "loyalty"?

11             Q.    Well, why did you take time off

12   your job and meet with people if you didn't

13   have to do it?

14             A.    Sometimes you do things that -- not

15   because you have to but because you're asked

16   to.

17             Q.    Who asked you to?

18             A.    Would have been -- well, I'm

19   guessing it was AmerisourceBergen, but I can't

20   remember exactly who posed the question to me.

21             Q.    But when they asked you, you were

22   willing to do so even though you didn't have

23   to?

24             A.    Oh, sure.

1    Q.   Why was that?

2    A.   Because I felt like my testimony

3    was needed.

4    Q.   What I'm trying to get at is, why

5    did you feel like you needed to meet with

6    Amerisource people to prepare for the

7    testimony?

8         MR. NICHOLAS:  I'll object at this

9         point as asked and answered several

10        times already.

11        Go ahead.

12        THE WITNESS:  Because there may

13        have been some things needed to review

14        prior that may refresh my memory about

15        some events.

16   BY MR. PIFKO:

17   Q.   Do you understand yourself to be

18   represented here today by AmerisourceBergen

19   attorneys?

20   A.   I understand myself to be

21   represented by Bob and Jeff, who are not

22   AmerisourceBergen attorneys.

23   Q.   Okay.  But you understand they're

24   outside counsel for AmerisourceBergen in this

Highly Confidential - Subject to Further Confidentiality Review

1   litigation?

2           A.   Yes.

3           Q.   Okay.  Did you spend any other time

4   reviewing AmerisourceBergen documents aside

5   from the meeting that you had with counsel?

6           A.   No.

7           Q.   Did you do anything else to prepare

8   for the deposition --

9           A.   No.

10          Q.   -- as far as AmerisourceBergen

11  goes?

12          A.   As far as AmerisourceBergen, no.

13          Q.   Did you like working at

14  AmerisourceBergen Corporation?

15          A.   Yes.

16          Q.   Did you feel like they treated you

17  fairly?

18          A.   Yes.

19          Q.   Where is your current address?

20          A.   Quakertown, Pennsylvania.

21          Q.   Did you ever live in New Jersey?

22          A.   No.

23          Q.   How long have you been at the

24  Quakertown, Pennsylvania location where you

1    live?

2            A.    11 months.

3            Q.    Where did you live before that?

4            A.    Furlong, Pennsylvania.

5            Q.    How long did you live there?

6            A.    About four years.

7            Q.    Where were you living in 2013?

8            A.    2013, I was living in Aurora,

9    Illinois.

10           Q.    You were working for

11   AmerisourceBergen at that time?

12           A.    Correct.



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review







Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review





20      A.    No, I don't recall anything with

21  Publix.

22      Q.    Did you talk to any other

23  AmerisourceBergen company -- customers about

24  the investigation?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I don't recall.

2          Q.    You left AmerisourceBergen while --

3    shortly after this -- DEA first contacted you,

4    correct?

5          A.    Correct.

6          Q.    Did this investigation have

7    anything to do with your departure?

8          A.    No.

9          Q.    What was the basis for your

10   departing the company?

11         A.    I was recruited by Teva.

12         Q.    Did anyone at AmerisourceBergen

13   tell you that you were violating company

14   policies at any point?

15         A.    Not that I recall.

16         Q.    No one ever said that you had to

17   leave the company because you were not

18   complying with diversion control policies?

19         A.    No.

20               MR. PIFKO:  I want to take a short

21         break.

22               MR. NICHOLAS:  Okay.

23               VIDEO OPERATOR:  Going off the

24         record.  The time is 10:45 a.m.

```
 1              (Recess from 10:45 a.m. until

 2        10:54 a.m.)

 3              VIDEO OPERATOR:  Back on the record

 4        at 10:54 a.m.

 5   BY MR. PIFKO:

 6        Q.   You knew, in connection with your

 7   role at AmerisourceBergen, that certain

 8   narcotic pills were subject to abuse by people,

 9   correct?

10        A.   Oh, yes.

11        Q.   When did you first become aware of

12   that information?

13        A.   That would have been back when I

14   first started in pharmacy in '87.

15        Q.   Okay.  And --

16        A.   Or even before that, just --

17        Q.   Well, let's -- let's move forward a

18   little bit.  You knew that oxy 15 and oxy 30s

19   were pills that were particularly abused by

20   people, correct?

21              MR. NICHOLAS:  Object to the form.

22              THE WITNESS:  Yes.

23   BY MR. PIFKO:

24        Q.   When did you first learn that
```

1    information?

2              MR. NICHOLAS:  Same objection.

3              Go ahead.

4              THE WITNESS:  And I don't recall

5         specifically.

6    BY MR. PIFKO:

7         Q.   In 2008 you knew that, though,

8    correct?

9              MR. NICHOLAS:  Same objection.

10             Go ahead.

11             THE WITNESS:  Yeah, I would have.

12   BY MR. PIFKO:

13        Q.   You participated in listservs where

14   people shared information about abuse, correct?

15        A.   Yes.

16        Q.   And that was a regular part of your

17   job to follow that kind of information?

18        A.   Yes.

19        Q.   And you also knew that people who

20   had trouble with addiction issues would try to

21   circumvent the timed-release mechanisms on

22   pills, correct?

23             MR. NICHOLAS:  Object to the form.

24             THE WITNESS:  Yes.

1    BY MR. PIFKO:

2        Q.   And so you knew that certain

3    immediate-release pills were preferred by

4    people who had addiction problems, correct?

5                MR. NICHOLAS:  Same objection.

6                THE WITNESS:  Yes.

7    BY MR. PIFKO:

8        Q.   And then you were aware of whether

9    certain timed-release pills were more or less

10   easy to circumvent?

11               MR. NICHOLAS:  Object to the form.

12               THE WITNESS:  Not in 2008.

13   BY MR. PIFKO:

14       Q.   Okay.  When did you first learn

15   about that?

16       A.   That would be around the time that

17   Purdue Frederick reformulated their OxyContin.

18       Q.   Okay.  When was that?

19       A.   I can't remember specifically.

20       Q.   Around 2012?

21       A.   It could have been, yes.

22       Q.   And so you knew that

23   immediate-release pills, in particular oxy 15

24   and oxy 30, were more prone to diversion,

```
 1    correct?

 2              MR. NICHOLAS:  Object to the form.

 3              THE WITNESS:  Potentially more

 4         prone to diversion, yes.

 5    BY MR. PIFKO:

 6         Q.    At AmerisourceBergen, one of the

 7    ways you communicate is by e-mail, correct?

 8         A.    Correct.

 9         Q.    But AmerisourceBergen also has an

10    instant messaging system, correct?

11         A.    Correct.

12         Q.    And you used that regularly to

13    communicate with your colleagues at

14    AmerisourceBergen?

15         A.    Occasionally.

16         Q.    You said you had a little bit of an

17    IT background earlier?

18         A.    Yes.

19         Q.    Do you know -- I want to understand

20    the functionality of the instant messaging

21    system.  So when you log on to your computer at

22    AmerisourceBergen, it would log you on to this

23    messaging system as well?

24         A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.  And you could click on any

2   employee's name and a box would pop up and you

3   could send messages back and forth to them?

4      A.   I could, yes.

5      Q.   To your knowledge, when was the

6   first time AmerisourceBergen had that system?

7      A.   Oh, I don't recall.

8      Q.   The whole time you were there?

9      A.   May have.

10      Q.   And they definitely had it when you

11   left the company, correct?

12      A.   Yes.

13      Q.   To your knowledge, all the

14   employees that you interacted with would use

15   that from time to time?

16           MR. NICHOLAS:  Object to the form,

17        and foundation.

18           THE WITNESS:  I don't recall if all

19        would use it.

20   BY MR. PIFKO:

21      Q.   Okay.  But you used it to

22   communicate with people?

23      A.   Sometimes, yes.

24      Q.   About issues in your job?

1      A.    Could have.

2      Q.    Going back to this U.S. attorney

investigation, did you communicate with anyone

about the U.S. attorney investigation on your

Teva e-mail?

6      A.    I don't recall.

7      Q.    You weren't able to access your

AmerisourceBergen e-mails after you left the

company, correct?

10     A.    That's correct.

11     Q.    So it's impossible that, to the

extent that you were having discussions about

meetings with the U.S. attorney or DEA agents,

that any of those would have occurred -- to the

extent they were after you worked for

AmerisourceBergen, they couldn't have been on

your AmerisourceBergen account, correct?

18     A.    That would be correct.

19     Q.    Do you have a personal e-mail

account?

21     A.    Yes.

22     Q.    Is that the same account you've had

for some time?

24     A.    No.

1          Q.    Back at that time in 2014, do you

2     remember what personal e-mail account you had?

3          A.    Yes.

4          Q.    What was that, like Gmail or

5     Hotmail or --

6          A.    Oh, no, it was actually a domain

7     that my wife owned.

8          Q.    Okay.  What was the name of it?

9          A.    Well, the e-mail address was

10    Joe@marvindog.com.

11         Q.    Was that your wife's business or

12    just a personal thing she set up?

13         A.    That was her business.

14         Q.    The server was under her control?

15         A.    Well, it was a -- the actual

16    physical server was not under her control.

17         Q.    Like through some service she

18    hired?

19         A.    Yes.

20         Q.    Does she still have that domain?

21         A.    No.

22         Q.    When did she stop maintaining that

23    domain?

24         A.    That domain went away maybe a year

1    and a half, two years ago.

2         Q.   Did you ever use that e-mail

3    address to communicate with anyone from

4    AmerisourceBergen?

5         A.   I could have.

6         Q.   During the time that you worked for

7    AmerisourceBergen?

8         A.   No.

9         Q.   Okay.  But after you worked for

10   AmerisourceBergen, you might have used it to

11   communicate with people?

12        A.   Could have, yes.

13        Q.   Did you -- do you have any specific

14   memories of specific people from

15   AmerisourceBergen that you communicated with

16   after you left the company?

17        A.   No.

18        Q.   Who were the people in 2013 when

19   you left the company that you worked closest

20   with?

21        A.   From AmerisourceBergen?

22        Q.   Yeah.

23             MR. NICHOLAS:  Object to the form.

24             Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  So it would be Ed
 2         Hazewski, Kevin Kreutzer --
 3              (Reporter interruption.)
 4              THE WITNESS:  Ed Hazewski, Liz
 5         Garcia, Eric Martin, Marcelino
 6         Guerreiro, Kevin Kreutzer.
 7    BY MR. PIFKO:
 8         Q.   Do you think you would have
 9    communicated with any of them on your personal
10    e-mail after you left the company?
11         A.   I don't recall anything specific.
12         Q.   If you communicated with someone,
13    it would have -- would it -- it would have been
14    those people, though?
15         A.   Probably, yes.
16         Q.   Ed, was he your boss at the time?
17         A.   Yes.
```





Highly Confidential - Subject to Further Confidentiality Review

6          Q.    Did you tell anyone at Teva when

7    you were starting the job that you were

8    being -- having discussions with the U.S.

9    attorney and the DEA?

10         A.    Yes.

11         Q.    Who did you tell?

12         A.    My boss, my supervisor.

13         Q.    You told the person who hired you

14   or you were interviewing with?

15         A.    Yes.

16         Q.    So you told them that before they

17   hired you?

18         A.    I don't recall.

19         Q.    Okay.  Who was the -- the name of

20   the -- your boss at that time?

21         A.    Colleen McGinn.

22         Q.    Okay.  So let's -- well, let's back

23   up for a second.  At some point you moved from

24   Tampa to Pennsylvania for AmerisourceBergen?

1          A.    No.  To Chicago.

2          Q.    Okay, to Chicago.  You mentioned

3    Mr. Kreutzer as someone who you interacted with

4    at AmerisourceBergen?

5          A.    Correct.

6          Q.    Did you know that he also worked at

7    Teva?

8          A.    Yes.

9          Q.    Okay.  And you -- he reported to

10   the same person at that time?

11         A.    To Colleen?

12         Q.    Yeah.

13         A.    Yes.

14         Q.    Was he part of how you made the

15   introduction with the company?

16         A.    No.

17         Q.    When did you have a -- discussions

18   with Mr. Kreutzer about the fact that he worked

19   for Teva?

20              MR. NICHOLAS:  Object to the form.

21              THE WITNESS:  That would have been

22         when I gave notice to AmerisourceBergen

23         that I was leaving AmerisourceBergen.

24   BY MR. PIFKO:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And he said, oh, I worked

2    there, too?

3    A.   Oh, well, I knew that he had worked

4    there.

5    Q.   Oh, okay.  Oh, and so you went and

6    talked to him and said, I'm joining -- I'm

7    doing --

8    A.   Yes.

9    Q.   Okay.  Did he tell you what he did

10   for them?

11   A.   Didn't have any specific

12   conversations that I remember.

13   Q.   Did he work in diversion control?

14   A.   It was my position that I'm

15   currently in that he was in.

16   Q.   Okay.  Did you understand that you

17   were replacing him?

18   A.   Yes.

19   Q.   Did he tell you that he was

20   terminated from Teva?

21   A.   I don't recall a specific

22   conversation.  But I did know that he was

23   terminated.

24   Q.   What was the basis for how you knew

Highly Confidential - Subject to Further Confidentiality Review

1    he was terminated?

2              MR. NICHOLAS:  Object to the form.

3              Go ahead.

4              THE WITNESS:  He had called Ed at

5         AmerisourceBergen essentially looking

6         for a job.

7    BY MR. PIFKO:

8         Q.   And he told Ed he had been

9    terminated and he needed work?

10             MR. NICHOLAS:  Object to the form.

11             THE WITNESS:  And I don't know

12        that.

13   BY MR. PIFKO:

14        Q.   Okay.  But you know that he

15   communicated that he was terminated in that

16   discussion?

17             MR. NICHOLAS:  Same objection.

18             THE WITNESS:  And that's correct.

19   BY MR. PIFKO:

20        Q.   And how did you know that?

21        A.   Ed told me.

22        Q.   Was there concern about hiring him

23   because he had been terminated?

24             MR. NICHOLAS:  Object to the form.

1                    THE WITNESS:  I don't remember.

2    BY MR. PIFKO:

3         Q.    Did you have any understanding

4    about why he was terminated?

5         A.    I don't recall.

6         Q.    So let's back up.  Let's talk about

7    your -- so you said in -- you became a

8    regulatory affairs specialist in 1999?

9         A.    Correct.

10        Q.    Okay.  And that involved auditing

11   of facilities?

12        A.    Correct.

13        Q.    After the -- you said you had that

14   position from 1999 to 2002, correct?

15        A.    With Bergen Brunswig, and then the

16   position moved -- well, the whole department

17   moved back to PharMerica.

18        Q.    Okay.  But at that time PharMerica

19   was owned by AmerisourceBergen corporation?

20        A.    Correct.

21        Q.    And so then you worked for

22   PharMerica from 2002 to 2008?

23        A.    Correct.

24        Q.    And what was your job there?

1      A.    It was the same position,

2   regulatory affairs specialist.

3      Q.    And you were doing audits there?

4      A.    Correct.

5      Q.    And then in 2008, you moved over to

6   AmerisourceBergen corporation?

7      A.    Correct.

8      Q.    And your job was a corporate

9   investigator?

10     A.    Correct.

11     Q.    What was your -- what were your

12  responsibilities at that time?

13     A.    As corporate investigator?

14     Q.    Yeah.

15     A.    Performing new customer due

16  diligence and reviewing orders for suspicious

17  order monitoring.

18     Q.    Had you ever conducted new customer

19  due diligence before having that job?

20     A.    No.

21     Q.    That was your first time doing

22  that?

23     A.    Correct.

24     Q.    And then you also were responsible

1    for reviewing orders for suspicious order

2    monitoring, you said?

3         A.    Correct.

4         Q.    Had you ever done that before?

5         A.    No.

6         Q.    Were you aware that

7    AmerisourceBergen had an enforcement action

8    taken against it by the DEA in 2007?

9         A.    I don't remember any specifics

10   around it.  I do remember an action, but I

11   don't know any of the specifics around it.

12        Q.    When you took on this corporate

13   investigator role, that wasn't part of the

14   discussion?

15        A.    Correct.  Not that I recall.

16        Q.    Okay.  So let's talk about -- well,

17   how long did you have that role as -- the title

18   of corporate investigator?

19        A.    That was until -- it was sometime

20   in -- at the end of 2012, I believe.

21        Q.    And then what job did you take on

22   at that point?

23        A.    Diversion program manager.

24        Q.    You held that from 2012 to the time

```
1    you left?

2           A.    Correct.

3           Q.    When you were a corporate

4    investigator from 2008 to 2012, who did you

5    report to?

6           A.    Ed Hazewski.

7           Q.    And where were you physically

8    located?  In Illinois?

9           A.    I was in Illinois, yes.

10          Q.    How many people were in the office

11   there with you?

12          A.    In Illinois?  I don't recall.

13          Q.    Were there other members of the

14   diversion control team in Illinois with you?

15          A.    No.

16          Q.    You were the only one?

17          A.    Correct.

18          Q.    The other people in the office, did

19   you have any understanding of what they did in

20   that office?

21          A.    In the office where I was

22   physically located?

23          Q.    Yeah.

24          A.    A general understanding, yes.
```

1        Q.    What did you understand that they

2   did?

3        A.    It was general duties related to

4   the distribution center.

5        Q.    Okay.  So it was specific to that

6   specific distribution center?

7        A.    Correct.

8        Q.    Your office was in the distribution

9   center?

10       A.    Correct.

11       Q.    But your responsibilities were not

12  limited to that distribution center?

13       A.    Correct.

14       Q.    They -- you had national

15  responsibilities?

16       A.    Correct.

17       Q.    Did you understand there to be a

18  specific reason why you were located there?

19       A.    Because I lived there.

20       Q.    Okay.

21       A.    Yeah.

22       Q.    That was your preference?

23       A.    Yes, that was my preference.

24       Q.    So you'd never performed new

1    customer due diligence before, you said.  How

2    did you get trained to perform that function?

3            A.    It was on-the-job training.

4            Q.    Who trained you?

5            A.    Ed Hazewski, and I think Kevin

6    Kreutzer may have as well.

7            Q.    They were both working there when

8    you joined the company in 2008?

9            A.    Yes.

10           Q.    So let's talk about performing the

11   new customer due diligence.  Did they have that

12   Form 590 at the time when you joined?

13           A.    Yes.

14           Q.    Okay.  What specifically were you

15   doing with respect to new customer due

16   diligence?

17           A.    Well, reviewing the form, reviewing

18   the information that was presented on the form,

19   looking for proper licensure, reviewing the

20   information on the form, conducting searches

21   looking for any adverse information on the

22   potential customer.

23           Q.    When you say "adverse information,"

24   what do you mean?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    That could be information based on,

2  you know, discipline on their license, or it

3  could be, for example, their phone number

4  showing up on a website somewhere that might

5  indicate that some sort of diversion activity

6  could possibly be occurring.

7      Q.    Did you understand where the Form

8  590s came from that you were looking at?

9      A.    What do you mean, where it came

10  from?

11      Q.    So you'd get piles of Form 590s to

12  look at, correct?

13      A.    Well, a couple a week, sure.  Yeah.

14  I don't know if I'd say "piles."

15      Q.    Okay.  How did you receive them,

16  hard copy or by e-mail?

17      A.    Generally via e-mail.

18      Q.    Okay.  So they would e-mail them to

19  you, and that's how you would know that you

20  were going to review those?

21      A.    Correct.  There was an e-mail box

22  for different regions, and the forms would be

23  e-mailed to those regional e-mail boxes that --

24  several investigators had access to all those

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail boxes.

2         Q.   Were you responsible for a specific

3    e-mail box?

4         A.   For a specific region, yes.

5         Q.   Okay.  What was your region?

6         A.   I do remember having the East Coast

7    for a while, but it moved around a bit.

8         Q.   So there were changes in the

9    regions that you were responsible for?

10         A.   Correct, correct.

11         Q.   At various points you had

12    responsibility for regions all over the

13    country?

14         A.   Correct, different regions.

15         Q.   About -- do you recall how

16    frequently you changed regions?

17         A.   I don't recall.  Although I had at

18    one point been taken off of being responsible

19    for a region and I more did sort of at-large

20    investigations, new customer due diligence

21    investigations.

22         Q.   Approximately what time period was

23    that?

24         A.   I don't remember.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    So did you understand that sales

2    representatives would send these forms to these

3    e-mail addresses?

4    A.    Yes.

5    Q.    Did you ever call the sales reps to

6    ask them questions?

7    A.    I don't recall any specifically,

8    but I'm sure I did at some point.

9    Q.    Did you ever call the customers

10   directly to ask them questions?

11   A.    No.

12   Q.    Were you prohibited from doing

13   that?

14   A.    No.

15   Q.    Is it AmerisourceBergen's policy

16   for you to first direct inquiries to the

17   salespeople?

18   A.    It may have been.

19   Q.    So you don't remember contacting

20   any customers?

21   A.    From the 590 process, I don't

22   recall any.

23   Q.    But you do recall discussing them

24   with salespeople from time to time?

1        A.    No specifics, but I do recall

2   discussing with salespeople, yes.

3        Q.    So you were focused on looking if

4   the customer's license was up to date?

5        A.    That was one of the pieces of

6   information, correct.

7        Q.    And then you said you did some

8   Internet research about the pharmacy to see if

9   you could see any issues of concern there?

10        A.    Correct.

11        Q.    Were there specific websites that

12   you looked at?

13        A.    Nothing specific other than I used

14   Google a lot.

15        Q.    Were there websites that discussed

16   the diversion that you would look at?

17        A.    Yes.

18        Q.    Do you remember the names of any of

19   those?

20        A.    Bluelight.

21        Q.    Bluelight?

22        A.    Yes.

23        Q.    Do you remember how that was

24   spelled?

1       A.    Common spelling,

2    B-L-U-E-L-I-G-H-T-dot-R-U at the time.  It was

3    a Russian-based site.

4       Q.    Okay.  And that was a site where

5    people who were looking for illegal pills

6    could -- would go and have discussions?

7       A.    Not just pills.  Many different

8    drugs.  But yes.

9       Q.    And so you would look on that site

10   to see if a pharmacy was mentioned?

11      A.    I never saw a pharmacy on that

12   site, but -- mostly they talked about trends.

13      Q.    What kind of trends do you remember

14   being discussed?

15      A.    I do remember discussion of abusers

16   trying to crack Purdue's time-release mechanism

17   when they reformulated OxyContin.

18      Q.    And you remember also discussions

19   about the types of pills that people who were

20   addicted preferred?

21      A.    Yes.

22      Q.    And so you would -- how often would

23   you visit that website?

24      A.    I couldn't say.  Hard to recall.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Regularly?

2    A.    It was fairly regularly, yes.

3    Q.    Like once a week?

4    A.    Maybe once a week, yes.

5    Q.    Okay.  And did you report

6  information that you learned on that website

7  back up to your boss?

8    A.    I'm sure I did.

9    Q.    Did you write memos or summaries of

10  it, or just send e-mails?

11    A.    It probably would have been

12  e-mails.

13    Q.    And those would have been sent to

14  Ed?

15    A.    Ed and other investigators.

16    Q.    Was there like a distribution list

17  for investigators that you would use?

18    A.    Not that I recall.

19    Q.    Okay.  You'd just have to write all

20  their names in there --

21    A.    Yeah.

22    Q.    -- on your own?  Any other websites

23  that you looked at?

24    A.    Erowid.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What's that?

2    A.    It's a similar type, E-R-O-W-I-D, I

3  believe.  And that may have been a .org, but I

4  don't recall specifically.

5    Q.    And you looked at that regularly as

6  well?

7    A.    That one less regularly.

8    Q.    What type of information did you

9  get from Erowid?

10    A.    It was similar information.

11    Q.    Both of those websites, you looked

12  at them the entire time from 2008 to 2012 when

13  you were an investigator?

14    A.    Yes.

15         MR. HAMMOUD:  Object to the form.

16         Go ahead.

17  BY MR. PIFKO:

18    Q.    And how about later when you were a

19  diversion program manager?

20    A.    Yes.

21    Q.    So you looked at those websites the

22  entire time that you worked for

23  AmerisourceBergen?

24         MR. HAMMOUD:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1              Go ahead.

2              THE WITNESS:  I don't recall when I

3         started looking at those.  But through

4         the end of my employment there, I did.

5    BY MR. PIFKO:

6         Q.   How did you learn about those

7    websites?

8         A.   I don't recall.

9         Q.   Any other sites?

10        A.   Nothing specific I can think of.

11        Q.   Did you look for information about

12   specific pharmacies on Erowid?

13        A.   Erowid was more about illicit

14   drugs.  So there was very little discussion

15   about pills.

16        Q.   But there was some discussion of

17   pills on that website?

18             MR. NICHOLAS:  Object to the form.

19             THE WITNESS:  I do believe there

20        was some.

21   BY MR. PIFKO:

22        Q.   So you looked at licensing

23   information, you looked on those websites when

24   you got the Form 590s.  What else did you look

1    at?  Googling, you said.

2         A.   May have used various secretaries

3    of state's websites looking at ownership.

4         Q.   What was the purpose of looking at

5    ownership?

6         A.   Well, to see if, you know,

7    potentially there is hidden ownership where,

8    you know, there -- where the 590 may not have

9    accurate information on who really owns a

10   pharmacy.

11        Q.   The Form 590 provided information

12   about top prescribers from the pharmacy?

13        A.   It could.

14        Q.   Okay.  Not in all cases?

15        A.   Not in all cases.

16        Q.   If they provided information about

17   that, would you look them up?

18        A.   Yes.

19        Q.   And was it an every occasion where

20   there was top prescribers you would look them

21   up or just from time to time?

22        A.   Oh, it -- from what I recall, every

23   instance where there was a prescriber listed, I

24   would look up the prescriber.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And what would you look up

2    the prescribers for?

3    A.    Verifying their DEA registration,

4    look for their state license, look for any

5    discipline that they may have.  I'd also look

6    for them to see if there's any chatter about

7    them, you know, essentially Googling, you know,

8    their name, maybe their office number, just to

9    see if I can find chatter somewhere on the

10    Internet about them.

11    Q.    How about the product mix that the

12    pharmacy was purchasing, their purchase

13    history, did you look at that?

14    A.    Not in all cases.

15    Q.    Okay.  In some cases?

16    A.    In some cases, yes.

17    Q.    What were circumstances where you'd

18    look at their prescribing or purchasing

19    patterns?

20    A.    Where if they were looking for a

21    large number of controlled substances.

22    Q.    Why was that something you'd be

23    interested in?

24    A.    As far as the mix of products that

1    they were buying?  To -- you know, looking for

2    anything that may indicate that they're only

3    looking for one specific controlled substance,

4    which could be an issue.

5        Q.    Why would that be an issue?

6        A.    Because that could indicate that

7    they're only dispensing, you know, one product

8    that they're looking to dispense, which could

9    indicate that there is something wrong with the

10   pharmacy.

11       Q.    So if they're only buying opioids,

12   for example, or buying a high ratio of opioids,

13   that could be a sign that the pharmacy is

14   engaged in diversion, correct?

15       A.    Not necessarily.

16       Q.    But it could be a sign, though?

17       A.    Oh, it would be something to look

18   at.

19       Q.    That would be a red flag?

20       A.    It could be, yes.

21       Q.    So then when you looked at these

22   Form 590s, did you -- you get one in, you do

23   this investigation, then is there a summary or

24   a report or something that you do with that

1   afterwards?

2        A.   There would be a summary and either

3   an approval or denial message that would go

4   out.

5        Q.   Okay.  And that's an approval or

6   denial of whether the -- AmerisourceBergen is

7   going to do business with them?

8        A.   I can't recall if it was fully

9   doing business with them or if it was just for

10  controlled substances.  I can't recall if it

11  was, you know, for all business or just

12  controlled substances.

13       Q.   So it's either they're approved to

14  generally do business with them or they're

15  approved to buy controlled substances from

16  AmerisourceBergen?

17       A.   Well, I can't recall.

18       Q.   But those are possible things

19  that --

20       A.   Those could be possible --

21            MR. NICHOLAS:  Object to the form.

22            (Reporter interruption.)

23            MR. NICHOLAS:  Yeah, just let him

24       finish his question before you answer,

1    and give me one second in case I want to

2    object to the question.

3            (Reporter interruption.)

4            THE WITNESS:  Yes, it could be

5    possible.

6  BY MR. PIFKO:

7       Q.   Any other outcomes of your

8  investigation?

9            MR. NICHOLAS:  Object to the form.

10           THE WITNESS:  I don't recall that.

11  BY MR. PIFKO:

12       Q.   Did you ever look at Form 590s for

13  existing customers?

14       A.   Occasionally.

15       Q.   Under what circumstances would you

16  look at a Form 590 for an existing customer?

17       A.   If we felt we needed to get updated

18  information about a customer.

19       Q.   Do you understand circumstances

20  that would lead AmerisourceBergen to want to

21  get updated information for a company -- or a

22  customer?

23       A.   Oh, if they had increased in

24  controlled substance purchases, we may ask for

1    an updated 590 for a customer, depending upon

2    how old the 590 was.

3         Q.   Is there like a threshold that

4    would deem it to be old?

5         A.   Not that I recall.

6         Q.   Do you remember ever evaluating

7    what time period, like, you would think of was

8    the -- would make it old enough to need

9    updating?

10             MR. NICHOLAS:  Object to the form.

11             THE WITNESS:  And I don't recall.

12   BY MR. PIFKO:

13        Q.   Was the review process they did

14   with an existing customer the same as what

15   you'd do with a new customer?

16        A.   I don't recall specifically, but I

17   believe it was.

18        Q.   Did that happen less frequently?

19        A.   That's hard to say.  I can't recall

20   the frequency.

21        Q.   So you feel like you were looking

22   at new customers and existing customers

23   relatively equally?

24        A.   No, I don't believe it was

1    relatively equally.  It was, you know, more

2    that we were looking at new customers.  But I

3    don't recall the exact frequency.

4         Q.   If you made a recommendation to

5    reject doing business with a customer, was

6    there someone else who had final approval, or

7    was that the end of the decision?

8         A.   Well, from what I recall, I believe

9    when I was an investigator, Ed had final

10   approval.  But I don't ever recall anyone being

11   overridden of a recommendation of a denial.

12        Q.   How would you communicate those

13   recommendations?

14        A.   Via e-mail, from -- I believe.

15        Q.   Did you ever use the instant

16   messaging system?

17        A.   To -- for approval or denial?

18        Q.   Right.

19        A.   Not that I ever recall.

20        Q.   Did you ever use the instant

21   messaging system to discuss questions or

22   concerns about the Form 590s?

23        A.   I don't recall.

24        Q.   But you could have?

Highly Confidential - Subject to Further Confidentiality Review

1              MR. NICHOLAS:  Object to the form.

2              THE WITNESS:  It's possible, but --

3       it's possible.

4    BY MR. PIFKO:

5       Q.    When you communicated with sales

6    representatives about Form 590s, did you do

7    that by e-mail?

8       A.    Generally that would have been done

9    via e-mail.

10      Q.    Okay.  Did you do that by instant

11   messaging?

12      A.    I don't ever recall instant

13   messaging a sales rep.

14      Q.    Okay.  Did you talk to them on the

15   phone?

16      A.    I may have.  I know I have had

17   conversations with sales reps via the phone.

18      Q.    The process we've been talking

19   about, about reviewing the Form 590s, that was

20   the same during the entire time that you had

21   the responsibility for reviewing them?

22      A.    I believe so.

23      Q.    Then you said you also had a job of

24   reviewing orders for the suspicious order

1    monitoring program, correct?

2         A.    Correct.

3         Q.    That was at the same time as you

4    were reviewing the Form 590s?

5         A.    Correct.

6         Q.    So let's talk about that process.

7    What was the mechanism by which you would get

8    an order to review?

9         A.    Oh, the actual sort of computer

10   system mechanism?

11        Q.    Yeah, like -- what I'm trying to

12   get at is, I'm you, I'm sitting in a chair or

13   however, I'm going -- I'm looking at paper,

14   like how does the process work?

15        A.    The system we had up front, I don't

16   recall exactly how it looked or how we got the

17   information.  I do recall that roughly every

18   hour there would be orders that would be pended

19   for review.  And -- but as far as how the

20   mechanism actually worked, I don't remember

21   that.

22        Q.    Did you have to go to a different

23   location to perform that function for your job?

24        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    You did that from your same desk

2    where you'd do all your other work?

3          A.    Correct.

4          Q.    So you'd get some sort of e-mail,

5    or did you have to log on to another kind of

6    system to access the order reviews?

7          A.    It would have been logging on to

8    another system.

9          Q.    Do you remember the name of that

10   system?

11         A.    I believe it was called Metastorm.

12         Q.    And was that the same system the

13   entire time that you reviewed suspicious --

14   potentially suspicious orders?

15         A.    No.

16         Q.    What were the various iterations?

17         A.    The other system would have been

18   SAP.

19         Q.    Okay.  Metastorm was first?

20         A.    Correct.

21         Q.    And then SAP was after?

22         A.    Correct.

23         Q.    And they instituted that

24   sometime -- the SAP system around 2012?

1          A.    I don't remember specifically when.

2          Q.    So you'd log on to that system and

3    there would be some orders in the queue that

4    you needed to review?

5          A.    I believe so, yes.

6          Q.    And do you have an understanding

7    about how those orders were placed into the

8    queue?

9          A.    It was a threshold-based system

10   where a total of a cumulative amount for the

11   month would have reached that threshold, and

12   then orders above that would be pended for

13   further review.

14         Q.    So you understand that people at

15   the distribution center could override the

16   thresholds and send an order out?

17             MR. NICHOLAS:  Object to the form.

18             Go ahead.

19             THE WITNESS:  Override a threshold?

20   That means something different, yeah.

21   BY MR. PIFKO:

22         Q.    Or override the hold, and despite

23   the orders exceeding the threshold, they could

24   say, it should be shipped?

1        A.    Oh, correct.

2        Q.    Okay.  Or they could also send it

3   up to you or someone on your team for review?

4        A.    Correct.

5        Q.    So you'd get these orders.  What do

6   you see in the order?

7        A.    I don't remember specifically what

8   information I could see on the order.

9        Q.    It would tell you the customer?

10       A.    I'm sure it did, yeah.

11       Q.    The order quantity?

12       A.    I'm sure.

13       Q.    The type of substance being

14  ordered?

15       A.    I'm sure, with NDC number, yes.

16       Q.    The threshold?

17       A.    I don't remember if it showed the

18  threshold or not.

19       Q.    So when you reviewed the order,

20  what were you looking for?

21       A.    Well, I would review the customer's

22  previous history, look to see if this was

23  something that appeared normal for that

24  customer, and what we knew about the customer,

Highly Confidential - Subject to Further Confidentiality Review

1    may have reviewed a 590 occasionally, a number

2    of different various monthly reports that we

3    could have reviewed.

4         Q.   About how long does the review

5    process for an order take?

6         A.   It depends.  It could take just a

7    couple of minutes, or depending upon the

8    information that we were reviewing, it could

9    take a couple of hours.  Sometimes it could be

10   the next day or the day after.

11        Q.   What was the volume of orders you

12   reviewed per day?

13        A.   Oh, I don't recall specifically.

14        Q.   Hundreds?

15        A.   It could, towards the end of a

16   month, yes.

17        Q.   Thousands?

18        A.   Couldn't say.

19        Q.   In a typical day, how much time did

20   you spend reviewing orders versus reviewing

21   Form 590s?

22        A.   Oh.  It would depend upon how many

23   590s there were to review.  But it -- it

24   depends.  It's hard to say.  I really can't

Highly Confidential - Subject to Further Confidentiality Review

1    recall a time breakdown.

2         Q.   Who trained you on how to review

3    the orders?

4         A.   That would have been Ed Hazewski,

5    Kevin Kreutzer.  Dave Breitmayer may have, but

6    I don't recall if he showed me at all.

7         Q.   Was there a manual or any

8    documentation that you had to tell you what the

9    process was?

10        A.   I don't recall.

11        Q.   So when you reviewed an order, what

12   was the potential outcomes of your review?

13        A.   Well, it could approve the order;

14   it could reject the order.

15        Q.   If you rejected the order, what

16   would happen?

17        A.   Well, it depends upon the type of

18   rejection.  If something was something that was

19   an order error, for example, we could just

20   reject the order, cancel it.  But if it was

21   something that we wanted to be reported as

22   suspicious, then -- and I don't know how that

23   process worked, but I do know that there was an

24   electronic report that was sent to the head

Highly Confidential - Subject to Further Confidentiality Review

1    office in D.C.

2         Q.    So part of your process was to

3    decide whether an order was suspicious and

4    should be reported to the DEA?

5         A.    Correct.

6         Q.    How did you -- what attributes of

7    an order would you look at to make that

8    determination?

9         A.    Well, looking not just at the order

10   but also looking at, you know, who the customer

11   is, what we know about the customer, what we

12   know about the customer's business.

13        Q.    Where would you look to look at

14   that?

15        A.    Well, we could look at the 590.  We

16   had a number of monthly reports that we

17   reviewed.

18        Q.    What were the names of the monthly

19   reports you reviewed?

20        A.    I don't recall the names of them.

21        Q.    What type of information was in the

22   monthly reports?

23        A.    Historical purchase data.

24        Q.    Oh, so it would be a monthly report

Highly Confidential - Subject to Further Confidentiality Review

1    specific to that customer?

2         A.   Well, it was specific to groups of

3    controlled substances, reports showing their

4    overall business.  Typically, that was it.



Highly Confidential - Subject to Further Confidentiality Review

7       Q.     Was there a process or official

8   policy about what you were supposed to do if

9   someone was high on that list?

10      A.     Not that I recall.

11      Q.     Did you ever -- were you ever asked

12  to review specific customers as a basis of

13  their being high on the -- as a result of their

14  being high on that list?

15      A.     As a result of being on it?  Not

16  that specific.

17      Q.     How often did you generate that

18  report?

19      A.     Monthly.

20      Q.     And who did you send it to?

21      A.     To the department, other

22  investigators.

23      Q.     In 2013, you were part of

24  discussions to change thresholds for oxy 30.

Highly Confidential - Subject to Further Confidentiality Review

1    Do you recall that?

2         A.    Yes, I do.

3         Q.    Okay.  What was the reason for

4    that?

5         A.    To lower thresholds for oxy 30, to

6    review more orders for oxy 30, to limit more

7    customers in their oxy 30 purchases.

8         Q.    And why did you want to do that at

9    that time?

10        A.    To -- well, to limit exposure to

11   the company.

12        Q.    What kind of exposure?

13        A.    Potential regulatory exposure.

14        Q.    And why would high oxy 30

15   thresholds put the company at risk of

16   regulatory exposure?

17             MR. NICHOLAS:  Object to the form.

18             THE WITNESS:  No, I wouldn't say

19        that.

20   BY MR. PIFKO:

21        Q.    Okay.  How would you say it?

22             MR. NICHOLAS:  Object to the form.

23             Go ahead.

24             THE WITNESS:  I would say more that

Highly Confidential - Subject to Further Confidentiality Review

1              the total volume was something that

2              could give an indication that the

3              company didn't care about oxy 30 sales,

4              which wasn't true.

5                   And so because many of these

6              pharmacies have been around for quite a

7              long time with valid licenses, valid DEA

8              registrations, and that simply reporting

9              an order as suspicious didn't seem to

10             give the appearance that anyone from DEA

11             was looking at these pharmacies --

12                  It was, essentially, an idea that

13             we thought it could be more incumbent

14             upon us to take the DEA's

15             responsibilities than to rely on the DEA

16             to merely review suspicious order

17             reports.

18     BY MR. PIFKO:

19             Q.   And why was that?

20                  MR. NICHOLAS:  Object to the form.

21                  THE WITNESS:  Because I'd never

22             seen an action taken based on a

23             suspicious order reported.

24     BY MR. PIFKO:

1    Q.    Was there an event or anything that

2    occurred that led to the discussions to lower

3    these thresholds?

4    A.    Indirectly.

5    Q.    What was that?

6    A.    Me becoming diversion program

7    manager.

8    Q.    Okay.  So when you became diversion

9    program manager, that was something that was of

10   concern to you?

11   A.    That was something I thought we

12   should do, yes.

13   Q.    What was the process by which you

14   undertook to lower these thresholds?

15   A.    I don't recall specifically.

16   Q.    And then these thresholds would be

17   on top of -- well, they were just part of the

18   customer's regular thresholds?

19        MR. NICHOLAS:  Object to the form.

20        THE WITNESS:  Yeah, because -- not

21        on top of, because oxy 30 was viewed

22        separately than all other oxycodones.

23   BY MR. PIFKO:

24   Q.    I guess that's -- that's kind of a

Highly Confidential - Subject to Further Confidentiality Review

1  bad question.  So okay.  Let's back up.

2          AmerisourceBergen's suspicious

3  order monitoring system evaluated drug

4  families, correct?

5          A.    Correct.

6          Q.    And what's a drug family?

7          A.    That would just be a group of

8  similar products; for example, oxycodone,

9  although oxy 30 later was separated as its own.

10  Hydrocodone was its own.  Alprazolam, for

11  example, was on its own -- well, no, I think

12  that was -- alprazolam wasn't.  It was in

13  conjunction with other benzodiazepines, I

14  think, from what I recall.

15          Q.    So at some point, oxy 30 was

16  separated out from the oxycodone family,

17  correct?

18          A.    Yes.

19          Q.    Was that in conjunction with this

20  exercise when you took over diversion control?

21          A.    It may have been.

22          Q.    And so at that point, oxy 30 had

23  its own threshold that was separate and apart

24  from the oxycodone threshold?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Correct.

2          Q.    Under that system, would oxy 30

3    also count towards the oxycodone threshold?

4          A.    No.

5          Q.    Okay.  So the oxycodone threshold

6    at that point was everything but oxy 30?

7          A.    Correct, from what I recall.

8          Q.    And then once you established those

9    thresholds, the order review process was the

10   same as it would have been for other types of

11   products that exceeded a threshold?

12         A.    Correct.

13         Q.    What was the basis for calculating

14   the thresholds?

15         A.    I don't remember.

16         Q.    You are aware that

17   AmerisourceBergen had a methodology where it

18   calculated thresholds by multiplying the

19   average by 300 percent?

20             MR. NICHOLAS:  Object to the form.

21             THE WITNESS:  I do know that the

22         DEA recommended a 300 percent threshold

23         of historical purchases.

24   BY MR. PIFKO:

1    Q.   That 300 percent of historical

2    purchases was a way that AmerisourceBergen

3    calculated thresholds?

4              MR. NICHOLAS:  Object to the form.

5              THE WITNESS:  From what I recall,

6         AmerisourceBergen followed that DEA

7         recommendation.

8    BY MR. PIFKO:

9    Q.   Was that 300 percent of average

10   used with the oxy 30 thresholds?

11   A.   I don't recall.

12   Q.   When you say it was recommended by

13   the DEA, what's your basis for that

14   understanding?

15   A.   Documentation from the DEA

16   specifically calling out 300 percent.

17   Q.   What documentation are you

18   referring to?

19   A.   I don't recall, but they had it

20   available on their website.  I don't recall if

21   it's the deadiversion.gov website or the U.S.

22   DOJ website, but it was available via their

23   website.

24   Q.   In 2013, AmerisourceBergen took on

1    business from Walgreens that it didn't have

2    before, correct?

3         A.    Correct.

4         Q.    Were you part of that transition

5    process?

6         A.    Yes, I was.

7         Q.    There was something called the

8    Walgreens C-II playbook or something like that.

9    Have you heard of that before?

10             MR. NICHOLAS:  Object to the form.

11             THE WITNESS:  And I don't recall

12        that.

13   BY MR. PIFKO:

14        Q.    Okay.  Do you remember there being

15   something about some sort of playbook about the

16   process for transitioning Walgreens accounts to

17   AmerisourceBergen?

18        A.    I don't recall.

19        Q.    But you were part of the team that

20   helped transition Walgreens accounts to

21   AmerisourceBergen?

22        A.    Correct.

23        Q.    Who else worked on that team?

24        A.    I don't recall specifically.  It

1    may have been the entire department, CSRA

2    department.  It may have been only certain

3    people within the CSRA department, but I don't

4    remember specifically who.

5         Q.   Do you recall that there were

6    meetings with Walgreens, your counterparts at

7    Walgreens, who were responsible for diversion

8    control?

9         A.   Yes.

10        Q.   Do you remember the names of any of

11   those people?

12        A.   Tasha Polster.

13        Q.   Anyone else?

14        A.   Don't recall any other names.

15        Q.   Did you ever meet with Tasha

16   Polster?

17        A.   Yes.

18        Q.   She came to your offices?

19        A.   She came to my office once.

20        Q.   Okay.  What happened in that

21   meeting?

22        A.   I don't recall.

23        Q.   Did you give her a tour of your

24   distribution facility?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    I don't recall, but I'm sure I did.

2        Q.    Did you discuss with her how

3   AmerisourceBergen's order monitoring program

4   functioned?

5        A.    I don't recall specifics.

6        Q.    How about generally?

7        A.    I don't even recall generally.

8        Q.    Do you recall explaining to her

9   what the due diligence process was at

10  AmerisourceBergen?

11       A.    I may have.

12       Q.    Do you recall discussing Form 590s

13  with her?

14       A.    I don't recall that.

15       Q.    Do you recall about when that

16  meeting occurred?

17       A.    I think it was warm outside.

18       Q.    Sometime in 2013?

19       A.    It could have been.  I'm sure it

20  was, but I don't recall when.

21       Q.    Which facility did she visit?

22  Where were you at the time?  In Illinois?

23       A.    Correct.

24       Q.    What was the name of that facility?

1    A.    Romeoville.

2    Q.    Do you recall that it was

3  AmerisourceBergen's practice to share

4  thresholds for the Walgreens stores with them?

5         MR. NICHOLAS:  Object to the form.

6         THE WITNESS:  I don't recall that.

7  BY MR. PIFKO:

8    Q.    Are you aware that that occurred?

9         MR. NICHOLAS:  Object to the form.

10         THE WITNESS:  I don't recall that.

11  BY MR. PIFKO:

12    Q.    At that time, you were still

13  reporting to Mr. Hazewski?

14    A.    Correct.

15    Q.    Do you recall having regular

16  meetings with the Walgreens diversion control

17  team?

18    A.    I was included in a couple

19  meetings, but as far as regular, I don't think

20  there were enough to say that it was regular.

21    Q.    Okay.  When did those meetings

22  start?

23    A.    Don't recall.

24    Q.    Was it before or after

1    AmerisourceBergen began servicing the

2    Walgreens?

3         A.   I do think there may have been one

4    before, but I can't recall specific.

5         Q.   Okay.  And those would have been in

6    2013?

7         A.   Could have been, but I don't

8    recall.

9         Q.   Do you recall Walgreens having a

10   specialized Form 590?

11        A.   I don't recall.

12        Q.   Do you recall discussions about

13   Cardinal Health servicing some of the Walgreens

14   stores prior to AmerisourceBergen servicing

15   them?

16        A.   I don't recall.

17        Q.   Do you recall discussions about

18   some of the Walgreens pharmacies that

19   AmerisourceBergen was going to be servicing

20   were accounts that Cardinal Health couldn't

21   service anymore?

22        A.   Don't recall.

23             MR. PIFKO:  All right.  Let's take

24        a short break.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEO OPERATOR:  Going off the
 2         record, 11:50 a.m.
 3              (Recess from 11:50 a.m. until
 4         12:10 p.m.)
 5              VIDEO OPERATOR:  Back on the
 6         record.  The time is 12:10 p.m.
 7              (Exhibit Teva-Tomkiewicz-001 marked
 8         for identification and attached to the
 9         transcript.)
10    BY MR. PIFKO:
11         Q.   Handing you what's marked as
12    Exhibit 1.
13              For the record, it's a document
14    Bates labeled from Cardinal's production,
15    CAH_MDL2804_00855083 through 84.
16              MR. NICHOLAS:  This having been
17         produced by Cardinal, has --
18              MR. PIFKO:  It's from him, so
19         it's -- it's from him.
20              MR. NICHOLAS:  Okay.
21    BY MR. PIFKO:
22         Q.   You can take as much time as you
23    want to read it, but I just had some quick
24    questions that are more about some of the
```

1    format of the e-mail than the actual substance

2    of it.

3              It mentions --

4              MR. NICHOLAS:  Take your time and

5         read the document.

6    BY MR. PIFKO:

7         Q.   I just wanted to ask you, it

8    mentions, RxNews listserv.  Can you tell me

9    what that is?

10        A.   That's a listserv for NADDI.

11        Q.   Okay.  Do you know who else

12   receives e-mails from that?

13        A.   No, I don't.

14        Q.   Okay.  And so this e-mail is from

15   you to the listserv?

16        A.   Correct.

17        Q.   So from time to time, you would

18   post things that you were aware of to that

19   listserv?

20        A.   Very rarely.

21        Q.   Okay.  Then the substance here, do

22   you know where this is from?  You can take a

23   minute --

24             MR. NICHOLAS:  I'm going to ask

1          that he now be permitted to read this

2          thing if you're going to ask him

3          questions about it.

4                THE WITNESS:  Well, actually, I'm

5          good with this.  Yeah, I --

6                MR. NICHOLAS:  Are you sure?

7                THE WITNESS:  Oh, yeah, I remember

8          this.  Yeah.

9                MR. NICHOLAS:  Okay.

10               THE WITNESS:  Certainly.  This was

11         from Bluelight.

12    BY MR. PIFKO:

13         Q.   Okay.  And so from time to time,

14    you could get information like this, and you

15    could share it with other people?

16         A.   Correct.  That's what we discussed

17    earlier about using Bluelight as a reference

18    for abusers and abuser trends.

19         Q.   When you shared this kind of

20    information with other people in

21    AmerisourceBergen, you'd send them an e-mail,

22    too, or were they on the listserv?

23         A.   For internal AmerisourceBergen, I

24    would use internal AmerisourceBergen.

1    Q.   Okay.

2    A.   Again, posting to this listserv was

3  very rare.  I think there may have been one

4  other time where I posted something to it.

5    Q.   But you received other postings

6  from it?

7    A.   Yes.

8    Q.   Are people from the other big three

9  distributors on it as well?

10    A.   Don't know.

11    Q.   You don't know from posting?  You

12  don't remember seeing postings from any of

13  them?

14    A.   Don't recall.

15    Q.   Were you a member of NADDI?

16    A.   Yes.

17    Q.   Did you get e-mails from other

18  NADDI members besides this?

19    A.   I don't recall any outside of the

20  listserv.

21    Q.   Do you know who Jack Crowley is?

22    A.   Jack Crowley, was he with Purdue?

23    Q.   Yeah.

24    A.   As you can tell by my hesitancy, I

1    don't think I've spoken with him in a long

2    time, if I've ever spoken with him.

3         Q.   Okay.  But you knew who he was,

4    that you knew he was from Purdue?

5         A.   Yeah, I believe so.

6         Q.   Would he e-mail from time to time

7    on NADDI issues?

8         A.   I don't recall.  I don't recall.

9         Q.   Do you have a recollection of how

10   you knew who he was, he was with Purdue?

11        A.   No, I don't.

12        Q.   Okay.  Have you ever spoken to him?

13        A.   I think I may have spoken to him

14   once.

15        Q.   When was that?

16        A.   Don't recall.

17        Q.   At a conference?

18        A.   Phone call.

19        Q.   Okay.  Do you know what you spoke

20   to him about?

21        A.   Don't recall specifically.

22        Q.   How about generally?

23        A.   Generally, I think it was about a

24   pharmacy but can't recall.

1    Q.   He called you to provide some

2    information about a pharmacy he was concerned

3    about?

4             MR. NICHOLAS:  Object to the form.

5             Go ahead.

6             THE WITNESS:  That would be no.  He

7        was looking for information on a

8        pharmacy.

9    BY MR. PIFKO:

10   Q.   Okay.  Did you go to any NADDI

11   conferences?

12   A.   Yes.

13   Q.   How often did you go to those?

14   A.   It was infrequent.  Last one I

15   think was, like, 2009.

16   Q.   Prior to that, did you go

17   regularly?

18   A.   Not regularly, no.

19   Q.   There were other members of the

20   pharmaceutical industry at these conferences?

21   A.   A few.  Mostly, it was law

22   enforcement.

23   Q.   Okay.  Do you remember any other

24   people and companies that participated in those

1    meetings?

2        A.    I do remember one back -- it was

3    sometime around the year 2000, where a medical

4    affairs person -- medical doctor from Purdue

5    attended.

6        Q.    Anyone else?

7        A.    No other one that I can recall.

8        Q.    Do you remember anything about what

9    that medical doctor from Purdue communicated

10   about at the conference?

11       A.    I can remember the communication he

12   got.

13       Q.    What was that?

14       A.    It was from beat law enforcement

15   officers, and they -- he got a lot of people

16   yelling at him.

17       Q.    That was in 2010, you said?

18       A.    No, no.  This was sometime around

19   2000, 2001.

20       Q.    Oh, okay.

21       A.    Yeah.

22       Q.    Do you remember that person's name?

23       A.    No.

24       Q.    You just remember they were upset

Highly Confidential - Subject to Further Confidentiality Review

1    with him?

2            A.    Oh, yes.

3            Q.    How come?

4            A.    Over OxyContin abuse.

5            Q.    You remember OxyContin abuse being

6    an issue back in 2001?

7            A.    Yes, approximately 2001.

8            Q.    What was the issue that you were

9    aware of?

10                MR. NICHOLAS:  Object to the form.

11                THE WITNESS:  Just that abusers

12          liked OxyContin.

13   BY MR. PIFKO:

14           Q.    How did you come to learn that?

15                MR. NICHOLAS:  Same objection.

16                THE WITNESS:  I don't recall

17          specifically.

18   BY MR. PIFKO:

19           Q.    So you basically remember this

20   person being heckled at the conference, kind

21   of?

22           A.    Yes.

23           Q.    Do you remember anyone else who was

24   there?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    No, I sure don't.

2            (Exhibit Teva-Tomkiewicz-002 marked

3      for identification and attached to the

4      transcript.)

5  BY MR. PIFKO:

6      Q.    All right.  I'm handing you what's

7  marked as Exhibit 2.

8            For the record, it's a two-page

9  document Bates labeled ABDCMDL00280711 and 12.

10            Take your time to review it.

11      A.    (Reviewing documents.)

12            Okay, I'm good.

13      Q.    Do you remember the discussion in

14  this e-mail?

15      A.    No, I don't.

16      Q.    Ed Hazewski sends it to some

17  people.  Those are all people in the diversion

18  control department?

19      A.    Correct.

20      Q.    He says, FYI regarding OX and HY

21  allocations.  Do you see that?

22      A.    Yes.

23      Q.    That's oxy and hydrocodone?

24      A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What's an allocation?

2    A.    An allocation, that would be a

3    limitation that a manufacturer places on a

4    distributor.

5    Q.    Okay.  What's your understanding of

6    why they placed those limitations?

7    A.    Because the products were in short

8    supply.

9    Q.    Okay.  Because there's a quota from

10   the federal government about how much can be

11   produced?

12        MR. NICHOLAS:  Object to the form.

13        THE WITNESS:  That's what it

14   appears to me.

15   BY MR. PIFKO:

16   Q.    You see here towards the bottom of

17   the page, there's an e-mail from Tara Rasch?

18   A.    Yes.

19   Q.    Do you know who she is?

20   A.    No.

21   Q.    It says here she's director of

22   generic prescription replenishment at

23   AmerisourceBergen Drug Company.

24        Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    Okay.  Is that an area of the

3    company you have any familiarity with?

4          A.    I don't recall ever having a

5    conversation with anyone with -- in that

6    department.

7          Q.    She says here -- among other things

8    in her e-mail, she says, We are hearing reasons

9    for the issues ranging from the DEA has lowered

10   the quota amounts to try to reduce abuse of

11   pain medications.

12               Do you see that?

13         A.    Yes.

14         Q.    Do you recall any discussions about

15   DEA lowering quotas to address abuse issues?

16               MR. NICHOLAS:  Object to the form.

17               THE WITNESS:  And that's going to

18         be no.

19   BY MR. PIFKO:

20         Q.    At the top here, it says, from

21   Steve Mays, I have also heard from my sources

22   that DEA is using quotas as a "tool" in their

23   so-called "manufacturer initiative" to force

24   manufacturers to implement wholesaler due

1    diligence and diversion control programs like

2    we have to.

3              Do you see that?

4         A.    Yes.

5         Q.    Do you have an understanding about

6    what he's talking about there?

7         A.    Not specifically, no.

8         Q.    How about generally?

9         A.    Generally, I have a general idea

10   what he's talking about.

11        Q.    What's that?

12        A.    That he has heard from people that

13   DEA is using quota to force manufacturers to

14   have a -- well, a due diligence and diversion

15   control program.

16        Q.    When he says, like we do, was that

17   your understanding, that manufacturers didn't

18   have diversion control programs prior to this

19   time?

20             MR. NICHOLAS:  Object to the

21        conform.

22             THE WITNESS:  I have no knowledge

23        of that.

24   BY MR. PIFKO:

1    Q.   Do you have an understanding about

2  how DEA was using quotas as that kind of tool?

3         MR. NICHOLAS:  Object to the form.

4         THE WITNESS:  And I have no

5         knowledge of that.

6  BY MR. PIFKO:

7    Q.   If you go to the second page here,

8  they're talking about specific allocations in

9  this chart.  Are you familiar with this kind of

10  data?

11    A.   No.

12    Q.   No?

13         Do you have an understanding about

14  why Ed would have been sharing allocation

15  information with you?

16         MR. NICHOLAS:  Object to the form.

17         THE WITNESS:  Don't recall.

18  BY MR. PIFKO:

19    Q.   Were allocations pertinent to your

20  role as a diversion control person?

21    A.   Not that I recall.

22         MR. PIFKO:  All right.  Well, I

23         think I'm done with my questioning for

24         you.  Some other people are going to ask

1          you some questions.

2                    VIDEO OPERATOR:  Going off the

3          record.  The time is 12:23 p.m.

4                    (Recess from 12:23 p.m. until

5          12:56 p.m.)

6                    VIDEO OPERATOR:  We're back on

7          record.  The time is 12:56 p.m.

8                         EXAMINATION

9     BY MR. CARTMELL:

10          Q.   Good afternoon, Mr. Tomkiewicz.  My

11     name is Tom Cartmell.  How are you today?

12          A.   Just fine.

13          Q.   I represent the Teva defendants in

14     this case, and I'm going to be asking you some

15     follow-up questions now about your time working

16     for Teva.  Do you understand that?

17                    MR. HAMMOUD:  Objection.  I think

18          you said you represent the Teva

19          defendants.

20                    MR. CARTMELL:  Oh, start over.

21          Start over.

22                    MR. HAMMOUD:  Making sure we're

23          clear on the record.

24                    MR. CARTMELL:  You do.

Highly Confidential - Subject to Further Confidentiality Review

1           Take that all back.  Start over.

2    BY MR. CARTMELL:

3         Q.    Mr. Tomkiewicz, I represent the

4    plaintiffs in this case, and I'm here today to

5    take your deposition about your time working at

6    Teva.  Do you understand that?

7         A.    Yes.

8         Q.    Okay.  You've been doing a great

9    job testifying so far today, and just so you

10   know, you're still under oath.  Do you

11   understand that?

12        A.    Yes.

13        Q.    And I want to make sure we're

14   communicating.  So if I ever ask you a question

15   you don't understand, go ahead and feel free to

16   interrupt me.  I'll restate it or rephrase it

17   so that we can make sure we're communicating.

18   Okay?

19        A.    Okay.

20        Q.    Okay.  Now, you're here today with,

21   I think on your left side, two Teva attorneys.

22   Is that right?

23        A.    Who also represent me.

24        Q.    Okay.  Those are your lawyers in

1    this litigation; is that correct?

2          A.    Correct.

3          Q.    And then earlier, you were being

4    asked questions about your time prior to

5    working at Teva at a wholesale distributor

6    called AmerisourceBergen; is that correct?

7          A.    Correct.

8          Q.    And you were represented at that

9    time by a lawyer from AmerisourceBergen; is

10   that correct?

11         A.    Right.  But representing me

12   personally, yes.

13         Q.    Okay.  So today you have three

14   lawyers here representing you; is that fair?

15         A.    Four.

16         Q.    Four?  I'm sorry.  Okay.  I missed

17   one.  So you have a lot of lawyers here today.

18         A.    Yes, yes.

19         Q.    Okay.  Now, the four lawyers that

20   are here today and have been representing you

21   in this case, can you estimate for me how much

22   time you have spent with them prior to today

23   preparing for your deposition in this case?

24         A.    Certainly.  For AmerisourceBergen,

1    it was about four hours.  For Teva, it was

2    maybe six hours.

3         Q.   Okay.  So a total of ten hours with

4    the lawyers preparing for your testimony today;

5    is that right?

6         A.   That's about correct, yes.

7         Q.   Okay.  And I take it, during those

8    prep sessions with your lawyers, you were

9    reviewing documents; is that fair?

10        A.   Reviewed some documents, yes.

11        Q.   Okay.  Did you maintain those

12   documents in your possession?

13        A.   No, not in my possession.

14        Q.   Okay.  Do you remember specifically

15   any of the documents related to your time at

16   Teva that you reviewed?

17        A.   I can't think of any specific.

18   Sorry.

19        Q.   So as you sit here today -- strike

20   that.

21             When were these meetings for ten

22   hours with the four lawyers?

23        A.   With Teva, it was yesterday.  With

24   AmerisourceBergen, it was Monday.

1      Q.    Okay.  And so I take it yesterday,

2  you reviewed some documents?

3      A.    Reviewed some documents.

4      Q.    And Monday, two days ago, I take it

5  you reviewed documents; is that correct?

6      A.    Yes.

7      Q.    But is your testimony that today,

8  as you sit here today, you can't remember a

9  single document you reviewed?

10     A.    For Teva?  I can't remember which

11  ones they were.  If I saw them again, I'd

12  probably recognize them.  But yeah.

13     Q.    Nothing?

14     A.    I can't.  Sorry.

15     Q.    Blank slate?

16     A.    Pretty much, yes.

17     Q.    Well, maybe I'll refresh your

18  recollection on some things as we go through

19  some documents.  Okay?

20          Now, I want to ask you about and go

21  over your prior employment before coming to

22  work with Teva.  But I don't want to put words

23  in your mouth, so if I ever mischaracterize

24  something, then go ahead and interrupt me, and

```
 1    I'll restate it.
 2              But it sounds like, from your
 3    testimony --
 4              Oh, and you have given a
 5    deposition, as you said, in another case
 6    involving opioids, a case that was brought by
 7    the State of West Virginia; is that right?
 8         A.   That is correct.
 9         Q.   And that was a deposition that you
10    gave -- was it a couple years ago, maybe?
11         A.   A couple years ago, yes.
12         Q.   All right.  And you were a witness
13    in that who was testifying on behalf of
14    AmerisourceBergen; is that right?
15         A.   That is correct.
16         Q.   Okay.  So you understand this
17    process, I take it.
18         A.   Yes.
19         Q.   Okay.  Now, if I understand from
20    reading that deposition and hearing your
21    testimony today, it sounds like you started
22    working in the area of diversion control or DEA
23    compliance in 2008.  Is that right?
24         A.   Specifically to DEA compliance,
```

Highly Confidential - Subject to Further Confidentiality Review

1    yes.

2         Q.   Okay.  And that was at a company

3    called AmerisourceBergen, right?

4         A.   Correct.

5         Q.   And AmerisourceBergen is an

6    extremely large wholesale distributor in the

7    United States; is that correct?

8              MR. HAMMOUD:  Object to the form.

9              THE WITNESS:  That's a fair

10             assessment.

11   BY MR. CARTMELL:

12        Q.   Okay.  And I say "extremely large"

13   because it's a multi-billion-dollar company.

14   Correct?

15             MR. NICHOLAS:  Object to the form.

16             MR. HAMMOUD:  Object to the form.

17             THE WITNESS:  They're a

18             multi-billion-dollar company, yes.

19   BY MR. CARTMELL:

20        Q.   Okay.  That employer for you,

21   AmerisourceBergen, was a company that, when you

22   were working there, was actually a distributor

23   of opioid narcotic drugs; is that correct?

24        A.   That was part of their business,

Highly Confidential - Subject to Further Confidentiality Review

1  yes.

2      Q.   Okay.  And I take it you know, from

3  your experience in the industry, that

4  AmerisourceBergen was one of the largest

5  wholesale distributors of opioid narcotic

6  drugs.  Is that fair?

7          MR. HAMMOUD:  Object to the form.

8          THE WITNESS:  That's a fair

9      assessment, yes.

10 BY MR. CARTMELL:

11     Q.   Okay.  So you worked there from

12 2008 in, I think you said, diversion control,

13 correct?

14     A.   Well, for the corporate security

15 and regulatory affairs department.

16     Q.   Okay.  And from 2008 until the time

17 you left AmerisourceBergen.  Was that in the

18 end of 2013?

19     A.   Correct, end of 2013.

20     Q.   So you worked there for about five

21 and a half years?

22     A.   I'll do the math.

23     Q.   Maybe it was four and a half years.

24     A.   Four and a half, yeah.

1      Q.   Okay.  Sorry about that.

2      A.   A little less than four and a half.

3      Q.   Okay.  And at all times during that

4  period, meaning 2008 to the end of 2013, part

5  of your job involved diversion control or DEA

6  compliance with opioids, correct?

7      A.   Correct.

8      Q.   In other words, you were somebody

9  who was working there who was trying to make

10  sure that AmerisourceBergen was complying with

11  the laws in the United States related to the

12  sale and distribution of these high-risk opioid

13  drugs, correct?

14           MR. HAMMOUD:  Object to the form.

15      Calls for a legal conclusion.

16           THE WITNESS:  It's a fair

17      assessment.

18  BY MR. CARTMELL:

19      Q.   Okay.  And there are laws that

20  apply to somebody like a distributor,

21  AmerisourceBergen, or a manufacturer and seller

22  of these high-risk opioid narcotics, correct?

23      A.   That is correct.

24      Q.   Okay.  And we'll talk about those

1    in a minute.

2              But is it true that at some point

3    during 2008 through 2013, you were promoted by

4    AmerisourceBergen to be the manager of the

5    diversion department?

6         A.   Of the diversion control program,

7    yes.

8         Q.   And it sound like, from your

9    testimony, you were in that position for a

10   little over a year.  Is that right?

11        A.   Yes, that is correct.

12        Q.   Okay.  And during that time that

13   you were managing the department that was

14   charged with the responsibility of making sure

15   that AmerisourceBergen was in compliance with

16   the laws of the United States for the sale of

17   these high-risk opioids -- you've talked about

18   how the processes were -- the systems were in

19   place at that time, correct?

20             MR. NICHOLAS:  Object to the form.

21             MR. HAMMOUD:  Object.

22             THE WITNESS:  That's a fair

23        assessment.

24   BY MR. CARTMELL:

1          Q.    Okay.  And we'll talk a little bit

2     more about that, but I want to understand

3     something.

4               Is it true that you started work at

5     Teva in January of 2014?

6          A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review



17   BY MR. CARTMELL:

18        Q.   Okay.  Was there a time when Teva,

19   as a company, actually first started to recruit

20   you to come work at Teva?

21             MR. HAMMOUD:  Object to the form.

22             THE WITNESS:  Yes, they recruited

23        me to work there.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    In other words, they reached out to

2   you and said that they were interested in you

3   interviewing and potentially coming to work at

4   Teva?

5        A.    Yes.

6        Q.    And was that Colleen McGinn?

7        A.    It wasn't Colleen who reached out

8   to me.

9        Q.    Who was it?

10       A.    It was an outside recruiting firm.

11       Q.    Okay.  Now, do you think that was a

12  time before you actually had the Drug

13  Enforcement agents knock on your door?

14       A.    Don't recall.  Don't recall.

15       Q.    Could it have been before that that

16  you were actually in active recruitment by

17  Teva?

18            MR. HAMMOUD:  Objection to the

19       form.

20            THE WITNESS:  I don't recall.

21  BY MR. CARTMELL:

22       Q.    Okay.  Could be; you just don't

23  remember?

24       A.    Exactly.  I don't recall.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    And let me make sure I understand

██   ████      ████████████████████████████

██   █████████████████████████████████████

██   ███████████████████████████████████████████

██   █████████████████████████████████████████████

██   ████████████████████████████████████████

██   ███████████

██           ██████████████    ██████████████

██           ██████████████    ███████████████████

██           ██████████████    ███████████████

11   BY MR. CARTMELL:

12        Q.    So it's possible that you didn't

13   even tell Teva.  Is that fair?

14        A.    It's possible.

15        Q.    Isn't that something that you think

16   Teva actually would like to know before hiring

17   you to become their new manager related to

18   diversion control of their opioids?

19             MR. HAMMOUD:  Object to the form.

20             THE WITNESS:  And I don't think

21        it's relevant.

22   BY MR. CARTMELL:

23        Q.    You don't think that's relevant?

24        A.    No.

1     Q.    Okay.  Now, ultimately, when -- let

2   me ask you, did you have to go to Teva and

3   interview with some people?

4     A.    Yes.

5     Q.    Who did you interview with?

6     A.    With Colleen McGinn and Mike

7   Edwards, and I think there was an HR person as

8   well.

9     Q.    And I suspect since you started in

10   early January of 2014, you likely would have

11   gotten the job in 2013, maybe the end, around

12   the holidays or something?

13     A.    Correct.

14     Q.    Okay.  And so let's talk a little

15   bit about your time now at Teva.  And what was

16   the position that you were hired for?

17     A.    For my current position as DEA

18   compliance manager in charge of the suspicious

19   order monitoring program.

20     Q.    Okay.  The department is called DEA

21   compliance; is that right?

22     A.    Correct.

23     Q.    And that was a department that had

24   been in existence prior to the time they hired

1    you; is that right?

2         A.    Correct.

3              MR. HAMMOUD:  Object to the form.

4    BY MR. CARTMELL:

5         Q.    Oh, one other thing I wanted to ask

6    you about.  You had been working in DEA

7    compliance since 2008 or for approximately six

8    years before you started, correct?

9         A.    Specifically DEA compliance, yes.

10        Q.    And one of the individuals who

11   trained you to become a DEA compliance expert,

12   so to speak -- would you agree that you became,

13   over time, a DEA compliance expert?

14             MR. HAMMOUD:  Object to the form.

15             THE WITNESS:  I would hope so.

16   BY MR. CARTMELL:

17        Q.    Okay.  But one of the people who

18   first trained you in that job so that you could

19   become an expert on DEA compliance was a guy

20   named -- did you say Kevin Kreutzer?

21        A.    Kevin Kreutzer, yes.

22        Q.    Okay.  And he worked at

23   AmerisourceBergen with you during that time

24   that he was training you; is that right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Correct.

2          Q.    And was he in management there?

3          A.    No.

4          Q.    Okay.  But he was a superior to

5    you?

6          A.    A superior?  The same position.

7          Q.    Okay.  At any rate, it turns out

8    that Kevin Kreutzer, who had actually trained

9    you, had gone to work at Teva before you went

10   to Teva; is that right?

11         A.    That is correct.

12         Q.    And I think you might have this

13   memory from talking to him, but isn't it true

14   that Mr. Kreutzer only worked at Teva for a

15   short period of time?

16         A.    That is correct.

17         Q.    Was it less than a year?

18         A.    I believe it was less than a year,

19   yes.

20         Q.    And Mr. Kreutzer, I think, was

21   hired to be the manager of the suspicious

22   orders and the monitoring program in the DEA

23   compliance department at Teva; is that right?

24               MR. HAMMOUD:  Object to the form.

```
 1                 THE WITNESS:  That is correct.
 2    BY MR. CARTMELL:
 3        Q.   Okay.  So your former colleague who
 4    had trained you went to Teva, and then was
 5    fired from Teva as the manager of the
 6    suspicious order monitoring program in the DEA
 7    compliance department prior to the time that
 8    you went there; is that right?
 9                 MR. HAMMOUD:  Object to the form.
10         Assumes facts not in evidence.
11                 THE WITNESS:  That's what I
12         understand.
13    BY MR. CARTMELL:
14        Q.   Okay.  And then he comes back to
15    AmerisourceBergen before you leave; is that
16    right?
17        A.   That is correct.
18        Q.   And then is it true, then, that
19    Teva reached out to you after that to try to
20    fill the spot that Mr. Kreutzer had been
21    terminated from?
22        A.   That is correct.
23                 MR. HAMMOUD:  Object to the form.
24    BY MR. CARTMELL:
```

1     Q.   Okay.  And that, again, was to be

2  the manager of the suspicious order monitoring

3  program in the DEA compliance department at

4  Teva; is that right?

5     A.   That is correct.

6     Q.   Okay.  All right.  So in January of

7  2014, when you say you were a part of the DEA

8  compliance department, how big was that

9  department at Teva?

10          MR. HAMMOUD:  Object to the form.

11          THE WITNESS:  In terms of how many

12       people we had at the time?

13  BY MR. CARTMELL:

14     Q.   Yes, sir.

15     A.   Oh, all total, there may have been

16  a dozen, 15.

17          (Exhibit Teva-Tomkiewicz-003 marked

18       for identification and attached to the

19       transcript.)

20  BY MR. CARTMELL:

21     Q.   I'm going to hand you what's been

22  marked as Exhibit 3.  And I just have a few

23  questions about this.

24          MR. HAMMOUD:  Tom, do you have a

1    Bates number for this?

2          MR. FAES:  It is 01464603, starting

3    with TEVA_MDL_.

4  BY MR. CARTMELL:

5          Q.   Mr. Tomkiewicz, I will represent to

6  you that Exhibit 3 is a PowerPoint presentation

7  that was produced to us in this lawsuit by

8  Teva, and it's titled DEA Compliance

9  Organization, with a date of March 18th, 2014.

10          Do you see that?

11          A.   Yes.

12          Q.   And I take it that this is a type

13  of slide deck or PowerPoint presentation that

14  would routinely be presented to employees of

15  the DEA compliance department at Teva; is that

16  fair?

17          MR. HAMMOUD:  Object to the form.

18          THE WITNESS:  And that's fair.

19  BY MR. CARTMELL:

20          Q.   Okay.  And March 18, 2014, this is

21  shortly after the time you started working at

22  Teva; is that right?

23          A.   That's correct.

24          Q.   And I want to refer you to the

1  second page of this that talks about the

2  current DEA compliance organization.  And this

3  just has an organizational chart, just to give

4  the jury some reference, of where you were

5  working when you started to go to work at Teva.

6  And as you see, Colleen McGinn looks like she

7  was the director of that department; is that

8  right?

9        A.   Correct.

10       Q.   Okay.  So she would have been, I

11  take it, your boss, so to speak?

12       A.   Correct.

13       Q.   Okay.  And then there's -- I

14  counted.  There's -- it looks like there's 16

15  employees on this org chart.  Is that your

16  understanding as how big the DEA compliance

17  department was?

18       A.   Correct.  That's what I said,

19  thinking it was about 12 to 15, yes.

20       Q.   Okay.  And you're here, you'll see

21  Joe Tomkiewicz, and it calls you the SOM

22  manager.  What does that stand for?

23       A.   Suspicious order monitoring.

24       Q.   Okay.  And that's an -- NW means

1   New Wales; is that right?

2        A.   North Wales.

3        Q.   I'm sorry, North Wales.  That's the

4   location or the office where you were working;

5   is that right?

6        A.   Correct.

7        Q.   Okay.  And tell us what suspicious

8   order monitoring manager entailed, or what was

9   that position that you filled at that time?

10       A.   Well, it was developing new

11  policies for the department, for suspicious

12  order monitoring, encompassing everything that

13  a suspicious order monitoring what I felt

14  should encompass, which encompasses new

15  customer due diligence, ongoing due diligence

16  of customers, monitoring of orders, and we

17  also -- one of the things that I did was worked

18  to create a new computer algorithm to assist in

19  identifying orders that may be suspicious.

20       Q.   Okay, thank you.  And we'll talk a

21  little bit more in detail about that.

22            But is it fair to say that at this

23  time in 2014 when you went to work for Teva

24  that Teva was a very large pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1    company?

2            A.    That's a fair assessment.

3                    MR. HAMMOUD:  Object to form.

4        Sorry.

5    BY MR. CARTMELL:

6            Q.    A multi-billion-dollar corporation.

7    Is that fair?

8            A.    That's fair.

9            Q.    Okay.  And the DEA compliance

10   department was in existence in part because

11   Teva, as a manufacturer and seller of

12   pharmaceuticals or drugs, was selling, among

13   other things, high-risk opioid narcotics; is

14   that right?

15                   MR. HAMMOUD:  Object to the form.

16                   THE WITNESS:  Well, not quite.  I

17           don't think you can say "high risk"

18           because really any controlled substance

19           has a risk of addiction.  That's why

20           they're controlled.

21   BY MR. CARTMELL:

22           Q.    Okay.  And the only reason I use

23   "high risk" is we'll see there's a presentation

24   that you gave that you used that word, okay?

1    So you would agree with me that opioids are

2    high risk, correct?

3              MR. HAMMOUD:  Object to the form.

4    BY MR. CARTMELL:

5        Q.    Let me restate it.  Would you agree

6    with me, though, that opioids are high risk for

7    diversion or abuse?

8              MR. HAMMOUD:  Object to the form.

9              THE WITNESS:  Insomuch as they are

10         any controlled substance, yes, I would

11         agree with that.

12   BY MR. CARTMELL:

13       Q.    Okay.  So when I say "high-risk

14   opioid narcotics," can we agree that I'm

15   referring to high risk in a sense of they're

16   high risk for diversion and abuse by

17   individuals?

18             MR. HAMMOUD:  Object to the form.

19             THE WITNESS:  And I wouldn't agree

20         with that.  I would categorize high risk

21         in the way that I have historically used

22         it to mean the specific opioid products

23         that abusers really actively seek out.

24   BY MR. CARTMELL:

1      Q.   Okay.  Meaning some opioids are

2  more high risk than others; fair to say?

3      A.   Well, again, any opioid, any

4  controlled substance is at risk of diversion

5  and is at risk of abuse, which is explicitly

6  why they are a controlled substance.  But there

7  are certain products that abusers will seek

8  out.

9      Q.   Okay.  And those are the ones that

10  you would call high risk?

11      A.   That's -- those are ones that

12  generally historically that I've called high

13  risk, yes.

14      Q.   Okay.  So let me rephrase my

15  question just -- and I'll take that phrase out

16  of there so it's not confusing.

17      A.   Yeah.

18      Q.   And I hope you're okay with it.

19  But is it fair to say that when you were hired

20  at Teva, there was a DEA compliance department

21  or organization in place because Teva had

22  chosen to manufacture and sell and distribute

23  opioid narcotic drugs?  Fair to say?

24           MR. HAMMOUD:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I would say that's
 2        fair.
 3   BY MR. CARTMELL:
 4        Q.   Okay.  And it's called the DEA
 5   compliance department, which stands for Drug
 6   Enforcement Agency, right?
 7        A.   I thought it was Administration.
 8        Q.   Oh, sorry.  Let me start over.
 9             It's called the DEA compliance
10   department because it's -- it stands for what,
11   DEA?
12        A.   I believe it's Drug Enforcement
13   Administration.
14        Q.   Okay.  And there are laws that the
15   Drug Enforcement Administration has been told
16   by Congress they have the authority and the
17   responsibility to enforce related to the sale
18   and marketing -- or excuse me, related to the
19   distribution and sales of opioid narcotic
20   drugs, right?
21              MR. HAMMOUD:  Object to the form.
22              THE WITNESS:  And I got lost in the
23        question.
24   BY MR. CARTMELL:
```

1          Q.   Let me strike it.  It was a

2    confusing question.

3               It's called the Drug Enforcement

4    Agency compliance department --

5          A.   Administration, I believe.

6          Q.   Or Administration.

7               -- because the DEA is charged with

8    the duty and responsibility to enforce the laws

9    related to the sale and distribution of opioid

10   drug narcotics, correct?

11              MR. HAMMOUD:  Object to the form,

12         calls for a legal conclusion.

13              THE WITNESS:  Yeah, and the naming

14         of the department is something that --

15         because really I don't think that we're

16         limited to strictly DEA, and I wouldn't

17         want to be limited to strictly DEA.

18         There may be some other things that, you

19         know, I may observe, and I'm not going

20         to limit it to strictly DEA issues.

21              But, you know, generally the

22         primary responsibility is related to

23         DEA-related issues.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  And primarily your

2  responsibilities as the suspicious order

3  monitoring manager, was that mostly related or

4  entirely related to the distribution of

5  opioids?

6           MR. HAMMOUD:  Object to the form.

7           THE WITNESS:  No, not to -- not

8      limited to opioids.

9  BY MR. CARTMELL:

10    Q.   Would it also include nonopioid

11  narcotics?

12    A.   Well, nonopioid controlled

13  substances, because there are controlled

14  substances that are not opioids, not narcotics.

15    Q.   Okay.  When you were hired by Teva

16  in January of 2014 to be the suspicious order

17  monitoring manager, was that a new position

18  created for you?

19           MR. HAMMOUD:  Object to the form,

20      lacks foundation.

21           THE WITNESS:  That Teva created for

22      me?

23  BY MR. CARTMELL:

24    Q.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    No.

2    Q.    But there wasn't a suspicious order

3    monitoring manager in place prior to the time

4    you arrived; is that fair?

5         MR. HAMMOUD:  Object to the form.

6         THE WITNESS:  Not at the exact

7         moment because it was Kevin Kreutzer.

8    BY MR. CARTMELL:

9    Q.    And Kevin Kreutzer had been

10   terminated?

11   A.    That was my understanding, yes.

12   Q.    Do you remember how long that

13   period of time was that that position was

14   unfilled?

15   A.    No, I sure don't.

16   Q.    If you'd go to the next page,

17   page 3, it looks like there is a proposed DEA

18   compliance organization, and I guess I was

19   going to ask you, at this time were they

20   reorganizing the department; do you remember?

21   A.    I don't remember.

22   Q.    The only thing I saw here as far as

23   changes was it looks like Gail Martin was moved

24   down to CS specialist under Tim Hilden and she

Highly Confidential - Subject to Further Confidentiality Review

1   had previously been up by Colleen McGinn, and

2   then Eric Schmidt was moved under Pat Shields

3   as the import/export specialist.  Is that fair

4   to say?

5        A.   That's fair to say, yes.

6        Q.   Okay.  But this change to the

7   organizational structure, that wouldn't affect

8   you; is that correct?

9        A.   No, that -- I don't believe that

10  affected me at all.

11       Q.   And were you the only suspicious

12  order manager at Teva at the time you were

13  hired?

14       A.   Yes.

15       Q.   And was there ever another, and to

16  this day has there ever been another,

17  suspicious order manager at Teva while you've

18  been there?

19       A.   No.

20       Q.   Okay.  A few questions about you

21  being hired real quick, and one is, I take it

22  you have a personnel file at Teva?

23       A.   I'm sure I do.  Never seen it.

24       Q.   Are you reviewed periodically or on

Highly Confidential - Subject to Further Confidentiality Review

1   an annual basis?

2          A.    Yes.

3          Q.    Okay.  Is part of your compensation

4   bonuses?

5          A.    Yes.

6          Q.    And what is your bonus based on?

7                MR. HAMMOUD:  Object to the form.

8                THE WITNESS:  It's based on my

9          performance review and profitability of

10         the company.

11  BY MR. CARTMELL:

12         Q.    In other words, part of your bonus

13  is based on the amount of profits the company

14  has?

15         A.    Correct.

16         Q.    And that has to do with the amount

17  of opioid -- or excuse me, all drugs that are

18  sold by the company, correct?

19         A.    Correct, all drugs.

20         Q.    And opioids included, correct?

21         A.    Can be, yes.

22         Q.    So there is an incentive-based

23  system at Teva today, and has been at all times

24  while you've been there, that incentivizes

Highly Confidential - Subject to Further Confidentiality Review

```
1    people by giving bonuses based on the amount of
2    drugs the company sells, including opioid
3    narcotics, correct?
4              MR. HAMMOUD:  Object to the form.
5              THE WITNESS:  Well, not
6         necessarily.  Because I would say
7         that -- I know that there have been some
8         SKUs, opioids that the company has lost
9         money on.  And so if we were to sell
10        fewer of those, it would improve
11        profitability.
12   BY MR. CARTMELL:
13        Q.   I understand.  But on a global
14   basis, thinking about the amount of profits
15   being tied to the amount of sales the company
16   has, that's your understanding, correct?
17        A.   That is correct, yeah.
18        Q.   That opioids, like all of the other
19   products, drugs, pharmaceuticals that are sold
20   by Teva, the more that is sold, at least of the
21   profitable products, the more bonus its
22   employees will receive, correct?
23             MR. HAMMOUD:  Object to the form.
24             THE WITNESS:  Potentially.
```

1     Potentially.  I don't know the formula.

2  BY MR. CARTMELL:

3     Q.   Okay.  And actually, that reminds

4  me to ask you, do you know how profitable the

5  opioid narcotics are to the company?

6     A.   No, I don't.

7          MR. HAMMOUD:  Object to the form.

8  BY MR. CARTMELL:

9     Q.   Have you ever seen anything there

10  in the materials or documents that states that

11  the sale of opioids are 85 percent profitable

12  to the company?

13     A.   I've never seen anything like that.

14     Q.   Okay.  Now, we're going to talk

15  more about the law related to the sales and

16  distribution of opioid narcotics, but first I

17  want to ask you, personally to you, do you

18  believe that this country is in the middle of

19  an opioid epidemic?

20          MR. HAMMOUD:  Object to the form.

21          THE WITNESS:  Based on overdose

22       death rates that I see, I can say that

23       it's perfectly consistent with that,

24       yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. CARTMELL:
2         Q.   Okay.  And how long do you think
3    this country has been in an opioid overdose and
4    death-related epidemic?
5         A.   That's a tough question.  And I
6    don't really think it's a fair question because
7    it's using the term "epidemic," and we can see
8    through -- overdose death rates over the last
9    couple of years have climbed pretty
10   dramatically.  But is it fair to say -- you
11   know, where is the cut-off of when you start
12   calling something an epidemic?  And I'm not
13   diminishing that there's an issue, because I do
14   believe very strongly that there's an issue, as
15   you've seen through my work, but, you know,
16   using the term "epidemic," it's -- is an unfair
17   statement.
18        Q.   Okay.  You called it an issue; is
19   that right?
20        A.   Oh, it's a very serious issue, yes.
21        Q.   Well, tell us, then, just how long
22   you think this very serious issue related to
23   opioid overdoses and deaths has gone on in
24   America.
```

```
 1                    MR. HAMMOUD:  Object to the form.

 2                    THE WITNESS:  Yeah, and again,

 3             we're getting into semantics about when

 4             someone considers something a serious

 5             issue.  I think something is a serious

 6             issue if I think any of my product is

 7             ending up in the street.

 8    BY MR. CARTMELL:

 9             Q.    Okay.  And that's been going on for

10    more than ten years; is that right?

11             A.    Decades.  Decades.

12             Q.    And we'll talk about --

13             A.    Pre-dating the Controlled

14    Substances Act.

15             Q.    Okay.  You're talking about before

16    1970?

17             A.    Oh, yes.

18             Q.    Okay.  Now, as far as this opioid

19    epidemic, has that affected your community?

20                    MR. HAMMOUD:  Object to the form.

21                    THE WITNESS:  My wife's best friend

22             growing up is an opioid addict, yes.

23    BY MR. CARTMELL:

24             Q.    So I take it, and I was going to
```

Highly Confidential - Subject to Further Confidentiality Review

1  ask you, it's also affected your family; is

2  that fair to say?

3          A.   My family:

4               MR. HAMMOUD:  Object to the form.

5               THE WITNESS:  I don't know anyone

6          in my family who is a -- has an issue

7          with opioids.

8  BY MR. CARTMELL:

9          Q.   But you have good friends?

10         A.   Oh, yeah, my -- like I said, my

11 wife's best friend growing up.

12         Q.   Okay.  Would you agree with me that

13 the abuse and addiction of both prescription

14 and nonprescription opioids is a serious

15 problem?

16         A.   Well, of course.

17         Q.   And it affects the health, social,

18 and economic welfare of all individuals,

19 communities, and companies?

20              MR. HAMMOUD:  Object to the form.

21              THE WITNESS:  I would say that's a

22         fair assessment.

23 BY MR. CARTMELL:

24         Q.   And you mentioned that opioid

Highly Confidential - Subject to Further Confidentiality Review

1   deaths continue to rise; is that right?

2          A.    That is correct.

3          Q.    And in part that's because opioids

4   continue to be diverted and abused, correct?

5                MR. HAMMOUD:  Object to the form.

6                THE WITNESS:  The rates that I've

7          seen involving prescription opioids have

8          appeared to be relatively flat over the

9          last several years.

10  BY MR. CARTMELL:

11         Q.    Staying at the same level, is that

12  what you mean?

13         A.    Correct, correct.

14         Q.    In other words, you're not saying

15  that it's going down --

16         A.    Correct.

17         Q.    -- you're just saying that it's

18  been flat?

19         A.    Correct.  And I'm not saying it's

20  not an issue either.

21         Q.    You're saying it's a serious issue,

22  aren't you?

23         A.    Oh, it's a very serious issue, yes.

24         Q.    Would you agree, and I think you

Highly Confidential - Subject to Further Confidentiality Review

1  said this, that the opioid epidemic is

2  worsening?

3          MR. HAMMOUD:  Object to the form,

4      mischaracterizes prior testimony.

5          THE WITNESS:  Yeah, it -- in terms

6      of what I see with heroin and illicit

7      fentanyl -- and that's fentanyl that's

8      not produced for medical purposes -- I

9      see pretty dramatic increases in those

10      products.

11  BY MR. CARTMELL:

12      Q.   And would you agree with me that

13  the opioid epidemic must be addressed in part

14  through the manufacturers --

15          MR. HAMMOUD:  Objection.

16  BY MR. CARTMELL:

17      Q.   -- of the opioids?

18      A.   Well, I think my program has been

19  part of helping to solve the problem.

20      Q.   Right.  In other words, you would

21  agree with me that in order to solve this

22  problem, the manufacturers -- and I'm not

23  eliminating any others -- but are a part of

24  that solution and have responsibility to do

Highly Confidential - Subject to Further Confidentiality Review

1   their duty to try to limit the amount of

2   diverted opioids.  Would you agree with that?

3              MR. HAMMOUD:  Object to the form.

4              THE WITNESS:  Oh, from -- yeah, we

5          have a different responsibility to help

6          prevent diversion.

7   BY MR. CARTMELL:

8          Q.   Okay.  Let's talk about

9   specifically what the law says that duty and

10  responsibility is for manufacturers of opioids.

11  I talked about this a little bit, but let me

12  start from the beginning, if I can, because I

13  want to make this very clear to the jurors, and

14  understandable.

15             Is it true that the sale of opioid

16  narcotic drugs is regulated by the law in

17  America?

18         A.   That's fair.

19             MR. HAMMOUD:  Object to the form.

20  BY MR. CARTMELL:

21         Q.   And for opioid narcotic drugs like

22  the ones that Teva sells and distributes, those

23  are called controlled substances; is that

24  right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. HAMMOUD:  Object to the form.

 2              THE WITNESS:  That is correct.

 3    BY MR. CARTMELL:

 4         Q.   Okay.  And what does it mean for a

 5    drug or a pharmaceutical like the opioids

 6    produced by Teva and sold by Teva, what does it

 7    mean to be a controlled substance?

 8         A.   From my understanding, it is that

 9    it's a -- that the manufacture, sale,

10    distribution of the products are controlled

11    federally by the federal government and that --

12    and as part of what's called the closed

13    distribution system.

14         Q.   Okay.  And I think you mentioned

15    this, but Congress actually passed what's

16    called the Controlled Substances Act that

17    governs and regulates the sale of opioid

18    narcotics and controlled substances?

19              MR. HAMMOUD:  Object to the form.

20              THE WITNESS:  Correct.

21    BY MR. CARTMELL:

22         Q.   Okay.  And I think you mentioned

23    this, too, but the Controlled Substances Act

24    went into effect in 1970; is that right?
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     That's correct.

2          Q.     Okay.   I want to actually hand you

3    Exhibit 4 in this case and ask you a few

4    questions about this document.

5               (Exhibit Teva-Tomkiewicz-004 marked

6               for identification and attached to the

7               transcript.)

8    BY MR. CARTMELL:

9          Q.     This was a document that was

10   produced in this litigation by Teva from their

11   internal files, and I just have a few questions

12   about this letter for you.

13              This is a letter dated --

14              MR. HAMMOUD:   Can you give him a

15              second to read the document.

16   BY MR. CARTMELL:

17         Q.     Mr. Tomkiewicz, have you seen this

18   letter before?

19         A.     Yes, I have.

20         Q.     In other words, you're familiar

21   with this letter based on your experience in

22   the industry related to diversion control of

23   opioid narcotics?

24         A.     Yes, I've seen it and have a copy

1    of it.

2          Q.    Okay.  Now, I think actually we

3    found this letter in your file.  But as you see

4    here, this is from the U.S. Department of

5    Justice Drug Enforcement Administration.

6          Do you see that?

7          A.    Yes.

8          Q.    And we talked -- you kept calling

9    it the administration; I kept calling it the

10   agency.  I apologize.

11         A.    Administration, yeah.

12         Q.    But this is the entity that is --

13         A.    I've been wrong before.

14         Q.    Don't worry.  I am all the time.

15   But this is the entity that is charged with the

16   duty to enforce the act, the Controlled

17   Substances Act, correct?

18         A.    My understanding, yes.

19         Q.    Okay.  And I want to go through a

20   few things here.  The date of this is actually

21   February 7th of 2007.

22         Do you see that?

23         A.    Yes.

24         Q.    So that's actually over ten years

Highly Confidential - Subject to Further Confidentiality Review

1    ago, correct?

2         A.   Correct.

3         Q.   And this is a letter from, if you

4    look at the last page, somebody named Joseph

5    Rannazzisi.

6              Do you see that?

7         A.   Yes.

8         Q.   Okay.  And that's a name that

9    you're familiar with, right?

10        A.   Yes.

11        Q.   And is it true that this letter and

12   maybe some of the additional letters from

13   Mr. Rannazzisi have become well-known to

14   manufacturers and distributors of opioid

15   narcotics?  Is that fair?

16             MR. HAMMOUD:  Object to the form.

17             THE WITNESS:  I would say that that

18        is fair, yeah.

19   BY MR. CARTMELL:

20        Q.   Okay.  Now, you weren't working at

21   Teva at this time, but let me go through this

22   and ask you some questions about it.  But first

23   it states, Dear sir or madam, this letter is

24   being sent to every commercial entity in the

1    United States registered with the Drug

2    Enforcement Administration to distribute

3    controlled substances.

4              Now, let me ask you, is it true

5    that a pharmaceutical company like Teva or a

6    distributor like AmerisourceBergen, they have

7    to register with the DEA in order to be allowed

8    to sell or distribute opioid narcotics?

9              MR. HAMMOUD:  Object to the form.

10             THE WITNESS:  Or manufacture.

11   BY MR. CARTMELL:

12        Q.   Or manufacture?

13        A.   Correct.

14        Q.   Okay.  It states, The purpose of

15   this letter is to reiterate the responsibility

16   of controlled substance distributors in view of

17   the prescription drug abuse problem our nation

18   currently faces.

19             Do you see that?

20        A.   Yes.

21        Q.   And we've already talked about

22   that, but clearly back in 2007, at that point

23   already our nation was faced with an opioid

24   addiction and abuse problem, correct?

1           MR. HAMMOUD:  Object to the form,

2      lacks foundation.

3           THE WITNESS:  Well, I'd say that's

4      a fair assessment.

5  BY MR. CARTMELL:

6      Q.   Okay.  And then it states, As each

7  of you is undoubtedly aware, the abuse or

8  nonmedical use of controlled prescription drugs

9  is a serious and growing health problem in this

10  country.

11           And we've talked about that, and

12  you agree with that, correct?

13      A.   Oh, yes.

14      Q.   The next paragraph states, The

15  CSA -- and that would be the Controlled

16  Substances Act, right?

17      A.   My understanding, yes.

18      Q.   -- was designed by Congress to

19  combat diversion by providing for a closed

20  system of drug distribution in which all

21  legitimate handlers of controlled substances

22  must obtain a DEA registration, and as a

23  condition of maintaining such registration,

24  must take reasonable steps to ensure that their

Highly Confidential - Subject to Further Confidentiality Review

1    registration is not being utilized as a source

2    of diversion.

3              Do you see that?

4         A.   Yes.

5         Q.   Distributors are, of course, one of

6    the key components of the distribution chain.

7    If the closed system is to function properly as

8    Congress envisioned, distributors must be

9    vigilant in deciding whether a prospective

10   customer can be trusted to deliver controlled

11   substances only for lawful purposes.  This

12   responsibility is critical as Congress has

13   expressly declared that the illegal

14   distribution of controlled substances has a

15   substantial and detrimental effect on the

16   health and welfare of the American people.

17             Do you see that?

18        A.   Yes.

19        Q.   And what this is talking about is

20   that distributors of these drugs and

21   manufacturers of these drugs that are selling

22   these opioid narcotic drugs have a

23   responsibility to try to do everything they can

24   to prevent the diversion of the drugs they are

1  manufacturing, selling, and distributing,

2  correct?

3            MR. HAMMOUD:  Object to the form.

4            THE WITNESS:  Well, I think, you

5        know, doing everything we can, I think

6        that's a fair assessment.

7  BY MR. CARTMELL:

8        Q.   Okay.  And then if you go to the

9  next page, I want to talk to you about the

10  second paragraph.  Here's where it talks

11  specifically about manufacturers like Teva.

12            In the second sentence it says,

13  Moreover, all registrants -- manufacturers,

14  distributors, pharmacies, and practitioners --

15  share responsibility for maintaining

16  appropriate safeguards against diversion.

17  Nonetheless, given the extent of prescription

18  drug abuse in the United States, along with the

19  dangerous and potentially lethal consequences

20  of such abuse, even just one distributor that

21  uses its DEA registration to facilitate

22  diversion can cause enormous harm.

23            Do you agree with that?

24        A.   Yes.

1          Q.    Okay.

2                Accordingly, the DEA will use its

3    authority to revoke or suspend registrations in

4    appropriate cases.

5                Do you see that?

6          A.    Yes.

7          Q.    And that's a fact, right, that DEA,

8    as the enforcer of the law, the Controlled

9    Substances Act, if they find that a

10   manufacturer of opioids or a seller or

11   distributor of opioids is allowing diversion or

12   ignoring diversion, or not taking on their duty

13   to try to prevent diversion and abuse of these

14   drugs, the DEA can take away the registration

15   from that company.  Is that fair?

16         A.    They have --

17               MR. HAMMOUD:  Object to the form.

18               THE WITNESS:  I believe they have

19         that ability, yes.

20   BY MR. CARTMELL:

21         Q.    And taking away a company's reg --

22   DEA registration is a really big deal.  Would

23   you agree with that?

24         A.    Oh, I would agree with that, yes.

1    Q.   Because if the registration for the

2    company, a company like Teva, is taken away by

3    the DEA, then that company no longer has the

4    ability to sell or distribute these opioid

5    narcotic drugs.  Is that fair?

6    A.   Or manufacture.

7    Q.   Or manufacture them, right?

8    A.   Correct.

9    Q.   The next paragraph, if you look at

10   the second sentence, states, Listed first among

11   these factors is the duty of distributors to

12   maintain effective controls against diversion

13   of controlled substances into other than

14   legitimate medical, scientific, and industrial

15   channels.

16       Do you see that?

17   A.   Yes.

18   Q.   And does that mean there is a duty

19   by distributors and manufacturers of these

20   opioids, and sellers of these opioid narcotic

21   drugs, that they have to have controls in place

22   in their organization to help prevent the

23   diversion and abuse of these drugs?  Is that

24   what that means?

```
 1                    MR. HAMMOUD:  Object to the form.

 2                    MR. NICHOLAS:  Object to form.

 3                    THE WITNESS:  And I would say

 4           that's a fair assessment.

 5   BY MR. CARTMELL:

 6           Q.   Okay.  If you go down to the next

 7   paragraph, it states, The DEA regulations

 8   require all distributors to report suspicious

 9   orders of controlled substances.

10                    Do you see that?

11           A.   Yes.

12           Q.   Now, you talked about you were

13   actually hired by Teva to be the manager of the

14   suspicious order monitoring; is that right?

15           A.   Of the suspicious order monitoring

16   program, yes.

17           Q.   And when we talk about suspicious

18   orders related to opioids, what are we talking

19   about?

20           A.   We're talking about orders that may

21   be of an unusual size, pattern, or frequency.

22           Q.   Okay.  And I think it says this

23   here.  Let's talk about it.

24                    The registration -- or excuse me.
```

Highly Confidential - Subject to Further Confidentiality Review

1  The registrant shall design and operate a

2  system to disclose to the registrant suspicious

3  orders of controlled substances.

4          Would you agree with me that it's

5  the duty of Teva and all manufacturers and

6  sellers and distributors of these opioids to

7  design a system so that they can, to the best

8  of their ability, have suspicious orders

9  identified?

10          MR. HAMMOUD:  Object to the form.

11          THE WITNESS:  I would say that's a

12      fair assessment, yes.

13  BY MR. CARTMELL:

14      Q.   It then states that the registrant

15  shall inform the field division office of the

16  administration in his area of suspicious orders

17  when discovered by the registrant.

18          Do you see that?

19      A.   Yes.

20      Q.   And "the registrant" is talking

21  about -- in your case Teva would be the

22  registrant because they have a DEA

23  registration, right?

24      A.   Correct.

1    Q.    So Teva, according to the law

2  that's been in place since the 1970s, has had,

3  one, the duty to design a system that's

4  effective in helping them to identify the

5  diversion of opioids, correct?

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  Controlled

8         substances, yes.

9  BY MR. CARTMELL:

10    Q.    Including opioids, right?

11    A.    Correct.

12    Q.    And also they've got to operate a

13  system that's effective in disclosing

14  suspicious orders that come to them for these

15  opioids, correct?

16    A.    Correct.

17    Q.    Okay.  And that's been going on --

18  that's been the duty of companies like Teva and

19  distributors of opioids, that duty has existed

20  since the 1970s, correct?

21              MR. HAMMOUD:  Object to the form.

22              THE WITNESS:  I'm not certain when

23         the reg came into effect, but I'll take

24         your word as an attorney.

1    BY MR. CARTMELL:

2         Q.   Well, you know that that -- and I

3    don't mean to put words in your mouth, but I

4    take it from your experience, you know that

5    this duty that we've been talking about, to

6    have a suspicious order monitoring system, one

7    that is effective, that duty has been in effect

8    since before the 1990s.  Fair enough?

9         A.   Oh, that's fair.

10        Q.   If you go a couple paragraphs down,

11   it says, Thus, in addition to reporting all

12   suspicious orders, a distributor has a

13   statutory responsibility to exercise due

14   diligence to avoid filling suspicious orders

15   that might be diverted into

16   other-than-legitimate medical, scientific, and

17   industrial channels.

18        Do you see that?

19        A.   Yes.

20        Q.   And that's the law, right?

21        MR. HAMMOUD:  Object to the form,

22        calls for a legal conclusion.

23        THE WITNESS:  And that's my

24        understanding.

1    BY MR. CARTMELL:

2         Q.   I should say that's your

3    understanding of the law as a suspicious order

4    monitoring manager at Teva.  Is that fair?

5         A.   That is a fair assessment, yes.

6         Q.   In other words, your understanding

7    as the manager at Teva since 2014 has been that

8    if your company determines that there are

9    suspicious orders for opioid narcotic drugs

10   that has come to your company, you have the

11   duty to report that to the DEA, correct?

12              MR. HAMMOUD:  Object to the form.

13              THE WITNESS:  That is correct.

14   BY MR. CARTMELL:

15        Q.   And is it true that you also have

16   the duty -- when your company determines that

17   one of your customers has a suspicious order,

18   you have the duty to, in fact, stop that order

19   from being shipped so that it won't likely be

20   diverted out in the community?

21              MR. HAMMOUD:  Object to the form,

22         calls for a legal conclusion.

23              THE WITNESS:  Yeah, I haven't heard

24         that there's a regulatory requirement to

1          stop it, but I will say that I don't

2          ship anything that we have determined to

3          be suspicious.

4     BY MR. CARTMELL:

5          Q.   In other words, would you agree

6     with me that the most prudent practice and the

7     most responsible practice would be that if a

8     company like Teva and its manager like you

9     determines that orders are suspicious for these

10    opioids that are narcotics and that you know

11    can be diverted and abused so readily, the best

12    practice and the most responsible practice

13    would be not to ship those orders?  Do you

14    agree with that?

15              MR. HAMMOUD:  Object to the form.

16              THE WITNESS:  I would agree to

17         that.

18    BY MR. CARTMELL:

19         Q.   Okay.  It then states, In a similar

20    vein, given the requirement under Section

21    823(e) that a distributor maintain effective

22    controls against diversion, a distributor may

23    not simply rely on the fact that the person

24    placing the suspicious order is a DEA

1    registrant and turn a blind eye to the

2    suspicious circumstances.

3              Do you see that?

4         A.   Yes.

5         Q.   In other words, that means that a

6    company like Teva, if you have an order for

7    opioids that you think may be suspicious and

8    could likely be diverted or abused out in the

9    communities, you can't turn a blind eye and

10   just say, well, I'll go ahead and ship it

11   because the person who made the order is

12   registered with the DEA.  You can't do that,

13   right?

14             MR. HAMMOUD:  Object to the form.

15             THE WITNESS:  And I would say that

16        yes, that is correct.

17   BY MR. CARTMELL:

18        Q.   And just on the -- I don't want to

19   go through them, but if you turn the page,

20   Mr. Tomkiewicz, you'll see that there are

21   actually some hints by the DEA here that were

22   given to distributors and manufacturers of

23   these opioids as far as some things that might

24   be a clue that an order might be suspicious or

1    may be ultimately diverted.

2            Do you see that?

3        A.    Yes.

4        Q.    You can see that they give

5    circumstances that might be indicative of

6    diversion, right?

7        A.    Correct.

8        Q.    And you're very familiar with those

9    circumstances, I take it?

10       A.    Yes, I'm familiar with them.

11       Q.    And you take those circumstances or

12   these hints that are given by the DEA into

13   consideration as the manager that is monitoring

14   suspicious orders.  Is that fair to say?

15       A.    These specifically, when I'm

16   reviewing -- when we're reviewing things that

17   might be suspicious, I wouldn't say we refer

18   back to this document, but they're often

19   included in, you know, how we review.

20       Q.    Okay.  In other words, you're

21   saying, I don't get the document out, but these

22   are some of the things we look for when we're

23   looking for a suspicious order of opioid

24   narcotic drugs, right?

1          A.    Or any controlled substance, yes.

2          Q.    Okay.  Now, if you go back to the

3    first page, this letter, which is often

4    referred to as the Rannazzisi letter, was --

5    well, let me ask you if you agree with me.

6               This letter that was sent from the

7    Drug Enforcement Administration to all of the

8    manufacturers and sellers and distributors of

9    opioids, including the high-risk opioids that

10   are narcotics and easily diverted, this was

11   sort of a reminder to these manufacturers,

12   sellers, and distributors of the

13   responsibilities and duties they had to help

14   prevent diversions of opioids.  Would you agree

15   with that?

16              MR. HAMMOUD:  Object to the form.

17              THE WITNESS:  And I would not agree

18        with the assessment in your question

19        that certain high-risk, at least as I

20        define them, are easily diverted.  I --

21   BY MR. CARTMELL:

22        Q.    Okay, well, let me restate --

23        A.    -- I would --

24        Q.    Fair enough.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yeah, I would reject that.

2          Q.    Fair enough.  Let me restate the

3    question.

4              Would you agree with me that this

5    letter that's often referred to as the

6    Rannazzisi letter was the Drug Enforcement

7    Agency sending a letter to manufacturers,

8    distributors, sellers of opioid narcotic drugs

9    as sort of a reminder and reiterating the

10   duties and responsibilities that they had to

11   try to prevent the diversion of opioid narcotic

12   drugs?  Fair enough?

13              MR. HAMMOUD:  Object to the form.

14              THE WITNESS:  And I would say

15        that's a fair assessment.

16   BY MR. CARTMELL:

17        Q.    Okay.  Do you know, as you sit here

18   today, when it was that Teva first started

19   selling or distributing opioids?

20        A.    No, I don't.

21        Q.    Do you have any clue?

22              MR. HAMMOUD:  Objection, asked and

23        answered.

24              THE WITNESS:  I have no idea.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. CARTMELL:

2      Q.   Okay.  It should be noted, though,

3  I think, that when you arrived at Teva in 2014,

4  at that point I take it you know that they were

5  selling lots of different Class II opioid

6  products.  Is that fair?

7          MR. HAMMOUD:  Object to the form,

8      lacks foundation.

9          THE WITNESS:  And -- sorry, but I

10     don't like the term "lots."  I like

11     using numbers.

12 BY MR. CARTMELL:

13     Q.   Well, I counted, from the documents

14 I received, that today, Teva is selling, I

15 believe, 18 or 19 Class II opioid narcotic

16 drugs.  Is that consistent with your

17 understanding?

18     A.   That could be consistent, yes.

19     Q.   And I said "lots."  But when you

20 arrived in 2014, is it fair to say that Teva

21 was selling a number of different opioid --

22 Class II opioid narcotic drugs?  Fair to say?

23          MR. HAMMOUD:  Object to the form.

24          THE WITNESS:  I would say that's

1        fair to say.

2   BY MR. CARTMELL:

3        Q.   And fair to say that Teva sells and

4   distributes millions of prescriptions for

5   opioid narcotic drugs?  Fair?

6                MR. HAMMOUD:  Object to the form.

7                THE WITNESS:  We don't dispense

8           prescriptions.

9   BY MR. CARTMELL:

10       Q.   Bad question.  Thank you for

11  correcting that.

12               Is it fair to say that Teva sells

13  and distributes millions and millions of opioid

14  narcotic drug pills per year?

15               MR. HAMMOUD:  Object to the form.

16               THE WITNESS:  I haven't looked at

17          the specific number of dosage units, but

18          I'm sure it's in the millions.  But

19          beyond that, I couldn't say millions and

20          millions.  And to say -- we've sold a

21          good number of them.

22  BY MR. CARTMELL:

23       Q.   And I think I've seen data that

24  suggests that today, or since 2016, Teva has

Highly Confidential - Subject to Further Confidentiality Review

1   been, as far as the sales of opioid drugs,

2   about at the 9 to 10 percent of the sales are

3   of Teva opioid products.  Is that consistent

4   with your understanding?

5              MR. HAMMOUD:  Object to the form,

6         lacks foundation.

7              THE WITNESS:  I don't know that

8         offhand.

9   BY MR. CARTMELL:

10             Q.   But you agree that Teva is one of

11  the larger sellers and distributors of opioid

12  narcotic drugs in America, correct?

13             A.   I would say that's a fair

14  assessment, yes.

15             Q.   And those are all things that, when

16  you came to Teva, some of the things that you

17  looked into, I take it, and learned as you

18  started in your job as the new suspicious order

19  manager; is that right?

20             A.   Right.  Well, looking at the -- you

21  know, which specific products we were selling,

22  which, of course, was a different mix when I

23  started from what is currently being sold.

24             Q.   We talked about the law, the

Highly Confidential - Subject to Further Confidentiality Review

1   Controlled Substances Act, and the DEA

2   enforcement of a law related to the sales of

3   opioids in America.  And is it true that the

4   DEA has actually left the responsibility to the

5   manufacturers and sellers and distributors of

6   opioids to design, internally, systems to help

7   prevent opioid diversion?

8           MR. HAMMOUD:  Objection to the

9       form.

10          THE WITNESS:  Could you ask that

11      again?  I got lost in the question.

12  BY MR. CARTMELL:

13      Q.   Sure.  Is it true that the DEA has

14  left the responsibility or relies on the

15  manufacturers and distributors and sellers of

16  opioid narcotic drugs in America to develop the

17  systems to help divert -- their internal

18  systems to help divert opioids -- help to

19  prevent the diversion of opioids?

20      A.   So are --

21          MR. HAMMOUD:  Same objection.

22          THE WITNESS:  Yeah, are you saying

23      that the DEA has sort of left the

24      manufacturers on their own to develop

1          their own system to detect potential

2          diversion?

3   BY MR. CARTMELL:

4          Q.   Let me restate the question to make

5   it more clear.

6               As we saw from the Controlled

7   Substances Act, it requires manufacturers like

8   Teva to develop internal systems that will

9   help, for one thing, identify suspicious orders

10  of opioids, right?

11         A.   Correct.

12         Q.   It also said in the Controlled

13  Substances Act that manufacturers like Teva who

14  sell opioids have to design systems internally

15  to help prevent the diversion of opioids,

16  correct?

17              MR. HAMMOUD:  Object to the form.

18              THE WITNESS:  Of any controlled

19         substance.

20  BY MR. CARTMELL:

21         Q.   Including opioids, right?

22         A.   Yes.

23         Q.   And is it true that the DEA

24  actually relies on Teva and the individual

1    manufacturers and sellers and distributors of

2    opioids to, in fact, develop those systems and

3    make sure they have effective systems in place

4    and monitoring programs in place so that they

5    can help divert the -- or help prevent the

6    diversion of opioids?

7              MR. HAMMOUD:  Same objection.

8              THE WITNESS:  And I wouldn't say --

9         I couldn't say that the DEA relies on

10        manufacturers and distributors for that.

11        Because when it comes to suspicious

12        order monitoring, they really haven't

13        given any feedback.

14   BY MR. CARTMELL:

15        Q.   Okay.  But you know from the

16   Controlled Substances Act that you have to have

17   systems in place --

18        A.   Correct.

19        Q.   -- right?  And the DEA does not

20   develop those systems for you, correct?

21        A.   The DEA has not developed our

22   system, no.

23        Q.   Okay.  And so you are left as a

24   manufacturer, meaning Teva, of these opioids to

Highly Confidential - Subject to Further Confidentiality Review

1    develop those systems yourself, correct?

2           A.    Correct.

3           Q.    And the DEA does rely on each of

4    the companies like Teva to develop those

5    systems to help prevent opioid diversion,

6    correct?

7                    MR. HAMMOUD:  Object to the form.

8                    THE WITNESS:  Well, and again, I

9           can't say that the DEA relies on because

10          I don't know what the DEA is doing on

11          their end.  So in terms of, you know,

12          saying that the DEA relies on, you know,

13          manufacturers or distributors or even

14          down to pharmacies or practitioners, I

15          can't say that.

16   BY MR. CARTMELL:

17          Q.    Okay.  One of the things, though,

18   that companies like Teva, as we discussed, are

19   interested in is maximizing the sales of their

20   prescription drugs like opioids, including

21   opioids, correct?

22                   MR. HAMMOUD:  Object to the form,

23          lacks foundation.

24                   THE WITNESS:  Maximizing?  I think

1    that's a horrible word for it.  No

2    offense, but...

3  BY MR. CARTMELL:

4    Q.    How would you describe it?

5    A.    Companies want to increase

6  profitability.  That's the reason why people

7  are in business.

8    Q.    Mr. Tomkiewicz, the DEA, as we saw,

9  has told Teva and companies like Teva who sell

10  and distribute opioids to set up systems that

11  will identify suspicious orders of opioids,

12  correct?

13    A.    Correct.

14    Q.    And they've asked those companies

15  to take it upon themselves to provide the

16  resources and actual processes to put in

17  effective types of monitoring programs to find

18  suspicious orders, correct?

19         MR. HAMMOUD:  Object to the form.

20         THE WITNESS:  I would say that's a

21    fair assessment.

22  BY MR. CARTMELL:

23    Q.    And these same companies that the

24  DEA has asked to set up these systems so that

Highly Confidential - Subject to Further Confidentiality Review

1   they can find these suspicious orders are

2   companies like Teva who, as you said, are

3   interested in maximizing their profits,

4   correct?

5        A.   I never said that.

6             MR. HAMMOUD:  Objection,

7        mischaracterizes his testimony.

8             THE WITNESS:  In fact, I

9        categorically denied the word

10       "maximize."

11  BY MR. CARTMELL:

12       Q.   How did you describe it?  I'll use

13  your words.

14       A.   I said that any company wants to

15  increase profits.  That's why you're in

16  business.

17       Q.   So these companies that the DEA has

18  asked to set up these systems to help prevent

19  the diversion of opioids are the same companies

20  that want to increase their profits, correct?

21       A.   I think that's a goal of business.

22       Q.   And part of increasing profits, as

23  we've discussed, is potentially, or can be,

24  increasing their sales, correct?

1     A.    Correct.

2     Q.    So they're asking companies that

3   want to increase their sales and increase their

4   profits to set up systems that could, if they

5   find suspicious orders, decrease their sales,

6   correct?

7              MR. HAMMOUD:  Object to the form.

8              THE WITNESS:  Well, and that's --

9         that is correct.  I would say that's a

10        fair assessment.

11  BY MR. CARTMELL:

12    Q.    So these same companies that

13  they're saying that we want you to identify

14  these orders that are suspicious, and we want

15  you to make sure that they are stopped so

16  they're not diverted, are the same companies

17  that want to increase sales and increase

18  profits over time, correct?

19    A.    Well, it's going to be difficult to

20  increase sales if you don't have a DEA

21  registration.

22    Q.    I understand that, but my point is

23  simply that there is an inherent conflict in

24  that system, correct?

Highly Confidential - Subject to Further Confidentiality Review

 1         A.   Well, that's what I'm saying.

 2    There isn't an inherent conflict.

 3         Q.   You don't believe that's a conflict

 4    or sort of, so to speak, the fox guarding the

 5    hen house?

 6         A.   No.

 7              MR. HAMMOUD:  Object to the form.

 8              MR. CARTMELL:  How long have we

 9         been going?

10              MR. HAMMOUD:  About an hour and

11         three minutes.

12              MR. CARTMELL:  Do you want to take

13         a quick break?

14              THE WITNESS:  A break sounds good.

15              MR. CARTMELL:  Like ten minutes?

16              VIDEO OPERATOR:  Going off the

17         record, 2 p.m.

18              (Recess from 2:03 p.m. until

19         2:15 p.m.)

20              VIDEO OPERATOR:  Back on record at

21         2:15 p.m.

22    BY MR. CARTMELL:

23         Q.   Mr. Tomkiewicz, we're back on the

24    record.  Are you ready to proceed?

1     A.   Yes, I am.

2     Q.   I want to ask you a few more

3  questions about Exhibit 3.  I think it's in

4  front of you.  And this was the PowerPoint

5  presentation from March of 2014, which was just

6  a few months after you arrived at the company

7  to start working, correct?

8     A.   Correct.

9     Q.   And if we look at page 3, as we

10 discussed, there was a proposed DEA compliance

11 organization, and as we discussed, there was a

12 small restructuring or a few people moving

13 around, according to this proposed

14 organization; is that correct?

15    A.   Correct.

16    Q.   And did that small restructuring

17 occur at that time; do you know?

18    A.   I believe it did.

19    Q.   Okay.  And if you look at where you

20 are, Joe Tomkiewicz, it states under you, you

21 had one individual reporting to you, Matt

22 Benkert; is that right?

23    A.   That's correct.

24    Q.   And his position was -- it

1  indicates he's an investigator; is that right?

2       A.   Correct.

3       Q.   So does that mean that he would be

4  somebody who would actually be involved in

5  investigating the suspicious orders?

6       A.   Potential suspicious orders.

7       Q.   Okay.

8       A.   Investigating orders to determine

9  if they're suspicious.

10      Q.   I got you.  Okay.  And we'll talk

11 about that process more, but I think what

12 you're talking about is orders would be

13 sometimes flagged or pulled aside or pended

14 after going through the computer system or the

15 algorithm, and then there would be an

16 investigation of that to see if it was

17 suspicious or not, correct?

18      A.   Correct.

19      Q.   Okay.  Now, how many actually of

20 the 16 employees in this organization or this

21 department were actually involved in the

22 investigation of suspicious orders or pended

23 orders?

24      A.   Oh, of pended orders?  It was

1    primarily -- primarily Matt and myself.

2         Q.   Okay.  So of the 16 individuals

3    indicated in the organization as of March of

4    2014, it sounds like what you were saying is

5    you and your direct -- well, the person who was

6    directly under you, Matt, were the two that

7    would actually take on the job of investigating

8    whether or not orders from customers for

9    opioids were suspicious or not.  Is that fair?

10        A.   That is fair.

11        Q.   Okay.  And if you go to the next

12   page of this PowerPoint, it talks about

13   predictions, and then it states, Controlled

14   substances - Teva, 13 sites with DEA

15   registrations.

16             Do you see that?

17        A.   Yes.

18        Q.   What does that mean?

19        A.   13 locations, each with an

20   individual DEA registration.

21        Q.   Okay.  And so you had 13 different

22   sites that were distributing opioids or

23   narcotics and were DEA registered; is that

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   No.

 2               MR. HAMMOUD:  Object to the form.

 3               THE WITNESS:  No, that's not

 4          correct.

 5   BY MR. CARTMELL:

 6          Q.   Okay.  Well, 13 -- strike that.

 7               It also states that you have a

 8   total of 44 DEA registrations.

 9               Do you see that?

10          A.   Yes.

11          Q.   Okay.  And so you had 16 people

12   that were in charge of what, with respect to

13   the DEA registrations?  Was it to make sure

14   they were in compliance?

15               MR. HAMMOUD:  Object to the form.

16               THE WITNESS:  Well, it depends upon

17          the person and their specific

18          responsibilities and their location.

19   BY MR. CARTMELL:

20          Q.   Okay.  As far as your DEA

21   compliance group, is it true that those 16

22   employees were located in lots of different

23   locations?

24          A.   In different locations, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Was Colleen McGinn in the

2  same location as you?

3      A.    No.

4      Q.    Okay.  And where was she located?

5      A.    I believe she's in the Frazer

6  location.

7      Q.    Okay.  But there wasn't one

8  centralized location for all of the DEA control

9  employees; they were spread out among the

10  different offices, correct?

11          MR. HAMMOUD:  Object to the form.

12          THE WITNESS:  Correct.

13  BY MR. CARTMELL:

14     Q.    Is that correct?

15     A.    That's -- is correct.

16     Q.    It says, CS -- that stands for

17  controlled substances, correct?

18     A.    Yes.

19     Q.    -- represent X percent of Teva

20  sales.  What does that mean?

21     A.    I don't know specific.  I can make

22  a conjecture.

23     Q.    Okay.

24     A.    That this is a draft.

1    Q.    Okay.  Do you know, though, what

2    percent of controlled substances was as far as

3    the sales of Teva at that time?

4    A.    No, I don't.

5    Q.    And then it says, DEA compliance

6    imperative.

7         What's your understanding of what

8    that means?

9    A.    Don't know.

10   Q.    Okay.  If you'd turn the page,

11   under predictions, it states -- and actually I

12   want to go to page 6.  It states, DEA culture

13   change.

14        Do you see that?

15   A.    Yes.

16   Q.    Was there a feeling inside the

17   company at that time that there had been a

18   culture change in the DEA related to the

19   enforcement of opioid diversion?

20        MR. HAMMOUD:  Object to the form.

21        THE WITNESS:  I don't remember

22        specific conversations about a culture

23        change, although, you know, I can say

24        from my own experience that I believe

1     that it seemed like there was.

2  BY MR. CARTMELL:

3     Q.   Okay.  So the fact that this

4  PowerPoint presentation that's being given in

5  March of 2014 mentions a DEA culture change,

6  that was consistent with your feeling about

7  that time.  Is that fair?

8     A.   That's a fair assessment.

9     Q.   And was that feeling that you had

10  that the DEA -- the culture within the DEA was

11  changing and they were increasing or ramping up

12  their enforcement, was that a feeling

13  particularly related to manufacturers like

14  Teva?

15          MR. HAMMOUD:  Object to the form,

16          lacks foundation.

17          THE WITNESS:  That's hard to say

18          from, you know -- you know, what we may

19          have thought their focus was.  I

20          couldn't say one way or another.

21  BY MR. CARTMELL:

22     Q.   At any rate, it states here that

23  there was an increase in regulatory actions.

24          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Yes.

2          Q.    And it mentions that there were

3    record-setting fines by the DEA in 2013.

4                Do you see that?

5          A.    Yes.

6          Q.    And that's consistent with your

7    memory?

8          A.    Yes.

9          Q.    In other words, around this time in

10   2013, the DEA was fining, as sort of a

11   sanction, companies like manufacturers and

12   sellers and distributors of opioids, correct?

13         A.    Correct.

14         Q.    And they were doing that at a

15   record-setting pace, correct?

16         A.    What it seemed, yes.

17         Q.    Okay.  And then there was also

18   actions being taken by the DEA to revoke the

19   registrations, as is indicated here, correct?

20         A.    Yes.

21         Q.    Okay.  The next page talks about

22   DEA compliance, and it states that expertise

23   related to DEA compliance is only gained

24   through experience, and it typically takes

Highly Confidential - Subject to Further Confidentiality Review

1    three to five years to obtain competency.

2              Do you see that?

3        A.    Yes.

4        Q.    What does that mean?

5        A.    I couldn't say because I --

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  I didn't write it.

8    BY MR. CARTMELL:

9        Q.    Okay.  Who gave this; do you know?

10       A.    Don't know.  Like I said, I think

11   it's a draft.

12       Q.    Are you guessing that this was a

13   PowerPoint presentation that was ultimately

14   given by Colleen McGinn?

15       A.    It may have been.

16       Q.    Okay.  And then it talks about an

17   investment in developing staff and that

18   retention is critical.

19             Was it the company's focus at that

20   time to try to hire more DEA compliance

21   employees because there was a change in culture

22   at the DEA and they were enforcing more

23   actions?

24             MR. HAMMOUD:  Object to the form,

1          calls for speculation.

2                THE WITNESS:  Yeah, and I don't

3          remember any discussion about that.

4    BY MR. CARTMELL:

5          Q.   Okay.  Once you became employed in

6    early 2014 by Teva as the manager of the

7    suspicious order monitoring program, did you

8    learn how many customers it was that Teva had

9    ordering opioid narcotics?

10         A.   Well, ordering controlled

11   substances.

12         Q.   How many, approximately, customers

13   did Teva have at that time?

14         A.    In terms of ship-to locations,

15   which would be individual registrant

16   locations -- so like, for example, if I'm

17   saying AmerisourceBergen -- I'm not saying

18   AmerisourceBergen is one, but it's going to

19   be -- each of their distribution centers is

20   going to be separate.  It was around 200

21   locations.

22         Q.   So 200 as you would classify as

23   customers, approximately, at that time?

24                MR. HAMMOUD:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  And again, not

 2         customers but locations where we would

 3         ship, registrants.

 4    BY MR. CARTMELL:

 5         Q.   I understand.  But are you talking

 6    about 200 separate locations that orders would

 7    come in from, approximately?

 8         A.   Correct, correct.

 9         Q.   And when you started at Teva as the

10    manager of the suspicious order monitoring

11    program, approximately how many orders would

12    Teva receive for these opioid narcotic drugs on

13    a monthly basis; do you know?

14         A.   Offhand, I don't know.

15         Q.   Do you have any idea?

16         A.   Oh, I couldn't speculate.

17         Q.   We may look at some documents that

18    talk about that later.

19              Okay.  So let's go back in time and

20    put this in perspective.  But January of 2014,

21    you come to Teva with experience, having been a

22    manager of suspicious order monitoring and

23    diversion control of opioids from your days at

24    AmerisourceBergen, correct?
```

1          A.    Correct.

2                MR. HAMMOUD:  Object to the form.

3    BY MR. CARTMELL:

4          Q.    And as a part of that, I think you

5    mentioned previously in your testimony earlier

6    that there was a program at AmerisourceBergen

7    that was in place to try to identify suspicious

8    orders of opioids, correct?

9          A.    Controlled substances.

10         Q.    Including opioids, correct?

11         A.    Correct, correct.

12         Q.    And you understand in this case

13   we're just talking about Class II opioids?

14         A.    What do you mean, in this case?

15               MR. HAMMOUD:  Object to the form.

16   BY MR. CARTMELL:

17         Q.    Did you have an understanding that

18   in this lawsuit, in this case against Teva,

19   that we are focusing on or the subject of that

20   is the sales and marketing and distribution of

21   Class II opioids?

22               MR. HAMMOUD:  Object to the form.

23               THE WITNESS:  I've heard that.  But

24         from my perspective, I look at all

1          controlled substances.

2     BY MR. CARTMELL:

3          Q.   I understand.  But when I talk

4     about the sale and distribution of opioids, I'm

5     talking about the opioids that we're referring

6     to in this case.  And I just want to make sure

7     you understand that.

8          A.   Okay.  And I just want it to be

9     clear that when I talk about suspicious order

10    monitoring, I'm not talking strictly about

11    opioids; I'm talking about all controlled

12    substances.

13         Q.   I understand.

14         A.   And certain noncontrolleds.

15         Q.   Okay.  So you come to Teva with

16    this experience of actually working in a system

17    that had been set up to satisfy the Controlled

18    Substances Act as far as a suspicious order

19    monitoring program, correct?

20              MR. HAMMOUD:  Object to the form,

21         calls for a legal conclusion.

22              THE WITNESS:  Correct.

23    BY MR. CARTMELL:

24         Q.   And when you got to Teva, I take it

1  you had to become familiar with whether or not

2  they had a suspicious order monitoring program

3  already in place, correct?

4        A.    No.   I had to work -- because there

5  was a suspicious order monitoring program in

6  place, but one of the things that I was tasked

7  with in coming in was improving the system.

8        Q.   Okay.  Let me follow up on that.

9        A.   Yeah.

10       Q.    Is it fair to say then, when you

11 were being recruited by Teva and interviewing

12 with them, the individuals that you talked to,

13 including Colleen McGinn, told you that they

14 were going to bring you in as someone with

15 expertise related to suspicious order

16 monitoring?

17       A.   Yes.

18       Q.   Okay.  And that they were going to

19 bring you to Teva as -- with that expertise in

20 hopes that you could help them improve their

21 suspicious order monitoring program?

22       A.   Yes.

23       Q.   Okay.  And make it more robust, for

24 example?

1          A.    Well, that would be an improvement.

2               MR. HAMMOUD:  Object to the form.

3     BY MR. CARTMELL:

4          Q.    One way to say that's an

5     improvement, correct?

6          A.    Yeah.  Yeah, that's a fair

7     assessment.

8          Q.    Okay.  And with the hopes that you

9     could bring your expertise from your work at

10    AmerisourceBergen to not only improve the

11    program but to make sure that it was in

12    compliance with the DEA, fair?

13         A.    Well, that's a -- sort of a root

14    function of it, yes.

15         Q.    So yes, right?

16         A.    Yes, to ensure compliance.

17         Q.    Okay.  And so when you got there,

18    though, you said there was a program.

19    Obviously you had to do your investigation to

20    determine, for example, what Teva had been

21    doing with respect to suspicious order

22    monitoring, for example, as far as due

23    diligence, for example, correct?

24         A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1        Q.   You had to determine how and when

2   or whether they were actually identifying

3   suspicious orders of opioids from their

4   customers, correct?

5             MR. HAMMOUD:  Object to the form.

6             THE WITNESS:  Well, yeah, and I

7        don't think that that's a fair

8        assessment because the -- because they

9        did have a system to help -- sorry, I

10       stutter.  They did have a system in

11       order to detect suspicious orders of

12       controlled substances.  So it -- and the

13       idea was that it was going to be

14       replaced with something new.  And there

15       were other programs that were looked at,

16       commercial programs, but when I came in,

17       I decided that we should go with a

18       program of my own design.

19   BY MR. CARTMELL:

20       Q.   Great.  I'll follow up on that

21   then.  That's a lot of information.  But let me

22   know if I'm correct in this statement, based on

23   my review of the documents.

24             When you were hired, you were asked

Highly Confidential - Subject to Further Confidentiality Review

1    to come in and to make changes to their

2    suspicious order monitoring program, correct?

3           A.    Correct.

4           Q.    Okay.  And over the next year and a

5    half when you came over and became the manager

6    of the suspicious order monitoring program,

7    you, in fact, did make multiple changes to the

8    program, correct?

9           A.    Correct.

10          Q.    All changes that you thought made

11   the program better, correct?

12          A.    Correct.

13          Q.    And more in compliance with the

14   DEA, correct?

15               MR. HAMMOUD:  Objection, calls for

16          a legal conclusion.

17               THE WITNESS:  No, no, that's not a

18          fair assessment.

19   BY MR. CARTMELL:

20          Q.    Okay.  Well, let me -- let me --

21   let's go through this and we'll talk about

22   that.

23               When you were at AmerisourceBergen,

24   were you involved there in drafting their

Highly Confidential - Subject to Further Confidentiality Review

1    standard operating procedures for their

2    suspicious order monitoring program?

3         A.    No.

4         Q.    Okay.  They existed, it's just that

5    you were not involved in drafting those, fair?

6         A.    Correct.

7         Q.    And those were standard operating

8    procedures that governed the actual suspicious

9    order monitoring program, correct?

10        A.    I would like to say that they

11   describe the process.

12        Q.    Okay.  But they were --

13        A.    Not necessarily govern but describe

14   the process.

15        Q.    I understand.  If somebody were to

16   ask AmerisourceBergen, did you have standard

17   operating procedures that would tell how the

18   process worked or how it was supposed to work,

19   there were those policies in effect, correct?

20        A.    I would say that's fair, yes.

21        Q.    Okay.  You mentioned previously

22   that you were also involved in the due

23   diligence that was being done at

24   AmerisourceBergen when they were trying to

Highly Confidential - Subject to Further Confidentiality Review

1   identify whether or not orders that came into

2   AmerisourceBergen for opioids were potentially

3   suspicious, correct?

4        A.   I got lost in the question.  Sorry.

5        Q.   Let me start over.  You've also

6   testified earlier that you were involved in due

7   diligence at AmerisourceBergen related to

8   whether or not certain orders that

9   AmerisourceBergen would receive were

10  suspicious, correct?

11       A.   Well, due diligence implies

12  customer due diligence.  So as far as due

13  diligence in reviewing a suspicious order, I

14  just want to clarify that that language isn't

15  typically used in the review of an order that

16  is held for manual investigation.  There may be

17  due diligence performed as part of an

18  investigation, but not necessarily.

19       Q.   My fault.  Let me try to clarify

20  that.  A suspicious order monitoring program

21  has lots of different facets to the program,

22  correct?

23       A.   Correct.

24       Q.   In other words, one that is

Highly Confidential - Subject to Further Confidentiality Review

1    effective and one that you believe is

2    appropriate, correct?

3            A.    One?

4                  MR. HAMMOUD:  Object to the form.

5    BY MR. CARTMELL:

6            Q.    Let me strike it.  A program that

7    you believe -- for suspicious order monitoring

8    that you believe is appropriate and in

9    compliance with the DEA has multiple facets to

10   the program, correct?

11                 MR. HAMMOUD:  Object to the form,

12         calls for a legal conclusion.

13                 THE WITNESS:  It could be a fair

14         assessment.

15   BY MR. CARTMELL:

16           Q.    Okay.  In other words, it's not

17   just the new orders coming in, going through a

18   program on the computer, an algorithm, that's

19   not the only facet or part of the program,

20   correct?

21           A.    That is correct.

22           Q.    Another facet of an appropriate

23   DEA-compliant suspicious order monitoring

24   program would include due diligence, for

Highly Confidential - Subject to Further Confidentiality Review

```
 1   example, on new clients?

 2          A.    Yes.

 3          Q.    And also would include due

 4   diligence once you have pended orders that

 5   potentially are suspicious, due diligence to

 6   determine whether or not those orders are, in

 7   fact, suspicious, correct?

 8                MR. HAMMOUD:  Object to the form.

 9                THE WITNESS:  And again, I wouldn't

10          call it due diligence.  I would call it

11          an investigation.

12   BY MR. CARTMELL:

13          Q.    Okay.  I see.  But all of those

14   things you were doing at AmerisourceBergen

15   before you came over to Teva, correct?

16                MR. HAMMOUD:  Object to the form.

17                THE WITNESS:  Correct.

18   BY MR. CARTMELL:

19          Q.    Okay.  I saw your deposition

20   previously in the West Virginia Attorney

21   General case against AmerisourceBergen and I

22   believe you testified that you had experience

23   before you came to Teva from AmerisourceBergen

24   with reporting suspicious orders of opioids to
```

1    the DEA, correct?

2         A.    That is correct.

3         Q.    In other words, while you were at

4    AmerisourceBergen, I think you testified in

5    your deposition that you had been involved in

6    investigating and reporting hundreds of

7    suspicious orders per month to the DEA,

8    correct?

9         A.    Correct.

10        Q.    So fair to say, and I just want to

11   make it clear, prior to coming to Teva, you

12   had, as the manager and investigator over the

13   years at that company, been involved in

14   reporting hundreds of suspicious orders to the

15   DEA, fair?

16        A.    That is correct.

17        Q.    Okay.  And I take it you also had

18   experience from your time as manager at

19   AmerisourceBergen or investigator there with

20   actually finding suspicious orders for opioids

21   from customers and actually stopping the

22   shipment of those opioid narcotic drugs.  Is

23   that fair?

24            MR. HAMMOUD:  Object to the form.

```
1              THE WITNESS:  Well, if something
2         was identified as suspicious, the order
3         should be stopped.
4    BY MR. CARTMELL:
5         Q.   And that's the policy, right?
6         A.   Correct.
7         Q.   Or was?
8         A.   Correct, correct.
9         Q.   Now, let's talk about Teva's
10   suspicious order monitoring program.  Would you
11   agree with me that before you showed up to Teva
12   in 2014, Teva was substantially out of
13   compliance when it came to monitoring and
14   reporting suspicious orders from customers of
15   high-risk opioid narcotics?
16             MR. HAMMOUD:  Object to the form,
17        calls for a legal conclusion.
18             THE WITNESS:  And that would be no.
19   BY MR. CARTMELL:
20        Q.   Okay.  Let's talk about -- strike
21   that.
22             Would you agree with me that the
23   suspicious order monitoring program at Teva,
24   when you started as the manager in 2014, was
```

Highly Confidential - Subject to Further Confidentiality Review

1  deficient in some respects?

2          MR. HAMMOUD:  Object to the form,

3      calls for a legal conclusion.

4          THE WITNESS:  I would say no.

5  BY MR. CARTMELL:

6      Q.   You talked about making

7  improvements to the program and changes to the

8  program.

9          When you arrived at Teva in 2014 as

10  the new manager of the suspicious order

11  monitoring program, were there any standardized

12  or standard operating procedures for the

13  program in effect?

14      A.   There were procedures, just not

15  written.

16      Q.   Let me see if I understand you.

17  There were oral understandings of ways that the

18  program would work, but there was nothing in

19  writing?

20      A.   There was -- there were no formal

21  standard operating procedures.

22      Q.   Okay.  So let me restate the

23  question just to make sure for the record we're

24  clear.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   When you arrived at Teva in 2014 as
 2      the new manager of the standard -- or excuse
 3      me -- the suspicious order monitoring program,
 4      is it true that there were no formal standard
 5      operating procedures for the program in place?
 6            A.    I would say -- I wouldn't say
 7      formal.  I would say there were no written.
 8            Q.    Okay.  Were you surprised?
 9            A.    No.
10            Q.    Had you ever worked anyplace before
11      that had a suspicious order monitoring program
12      that didn't have formal written standard
13      policies?
14            A.    Well, I only worked with suspicious
15      order monitoring at two places.
16            Q.    And the place you had worked
17      before, as we discussed, had those, correct?
18            A.    Right.
19            Q.    And would you agree with me that if
20      an audit had been done of Teva when you arrived
21      to audit the suspicious order monitoring
22      program that there would have been a finding of
23      out of compliance by Teva without standard
24      operating procedures for the suspicious order
```

Highly Confidential - Subject to Further Confidentiality Review

1   monitoring program?

2           MR. HAMMOUD:  Objection to the

3       form.  Calls for a legal conclusion.

4           THE WITNESS:  Well, in terms of

5       that question, that would be

6       speculation, and I would say probably.

7   BY MR. CARTMELL:

8       Q.   Okay.  Just so it's clear, you

9   agree with me that when you arrived when there

10  were no standard operating procedures in the

11  suspicious order monitoring program at Teva,

12  your belief would have been that if an audit

13  would have been done by the DEA, the company

14  would have been found to be noncompliant at

15  that point.  Fair?

16          MR. HAMMOUD:  Same objection.

17          THE WITNESS:  No.  No, I wouldn't

18      say that that's fair.

19  BY MR. CARTMELL:

20      Q.   "Out of compliance," didn't you

21  just say that?

22      A.   No, I didn't say "out of

23  compliance."

24      Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1      MR. HAMMOUD:  Objection.

2      Mischaracterizes the prior testimony.

3  BY MR. CARTMELL:

4      Q.   Mr. Tomkiewicz, I just asked you a

5  question:  Would you agree with me that if an

6  audit had been done of Teva when you arrived to

7  audit the suspicious order monitoring program,

8  that there would have been a finding of out of

9  compliance by Teva without standard operating

10 procedures for the suspicious order monitoring

11 program?

12      There was an objection, and your

13 answer was:  Well, in terms of that question,

14 that would be speculation, and I would say

15 probably.

16      Correct?  Was that your testimony

17 at that time?

18      A.   So I didn't say that it was out of

19 compliance.  I said it could be considered

20 probably.

21      Q.   In other words, rather than saying

22 for certain that it would have been out of

23 compliance, your belief is that it probably

24 would have been considered out of compliance?

1              MR. HAMMOUD:  Objection.  Calls for

2         a legal conclusion.

3              THE WITNESS:  It could have been.

4         It could have been.

5    BY MR. CARTMELL:

6         Q.    Actually, you said "probably,"

7    correct?

8         A.    Let me clarify that to "could have

9    been."

10        Q.    Okay.  At any rate, when you showed

11   up to Teva, one of the first things that you

12   decided needed to be done to improve the

13   suspicious order monitoring program at Teva as

14   a manager of that program was to draft and

15   develop written standardized operating

16   procedures for the program, correct?

17        A.    Written standardized procedures,

18   yes.

19        Q.    Okay.  And why was it that you

20   thought those standardized operating procedures

21   were necessary?

22             MR. HAMMOUD:  Objection.

23        Mischaracterizes his prior testimony.

24   BY MR. CARTMELL:

1    Q.   Go ahead.

2    A.   Because I felt that the process

3 should be written down.

4    Q.   Okay.  Why is that the most prudent

5 way to go with respect to the procedures for a

6 suspicious order monitoring program?

7         MR. HAMMOUD:  Objection to the

8         form.

9         THE WITNESS:  Yeah, I don't think

10        that that's limited to a suspicious

11        order monitoring program.  If you have a

12        formal procedure in something, you

13        should write it down.

14 BY MR. CARTMELL:

15    Q.   Is that so that the people who are

16 responsible and have duties to work within that

17 program have a place where they can go and know

18 for certain what is supposed to transpire, what

19 their duties are?

20    A.   That's not been my experience.

21        MR. FAES:  This is

22        TEVA_MDL_A_02923616.

23        MR. HAMMOUD:  Just for the record,

24        was that marked confidential as of the

1          produced slip sheet, or was it --

2                   MR. FAES:  I'd have to check on

3          that.

4                   (Exhibit Teva-Tomkiewicz-005 marked

5          for identification and attached to the

6          transcript.)

7     BY MR. CARTMELL:

8          Q.   Mr. Tomkiewicz, I've handed you

9     what's been marked as Exhibit 5.  And so you

10    know, this is a PowerPoint presentation that

11    was produced to us in this litigation by Teva,

12    and it actually comes from your files.

13                  Do you recognize this?

14         A.   Yes.

15         Q.   I want to ask you a few questions

16    about this.  But as you see, the title of your

17    presentation is Suspicious Order Monitoring,

18    correct?

19         A.   Correct.

20         Q.   And the date of this is in 2014.

21                  Do you see that?

22         A.   Yes.

23         Q.   Is your belief or memory that

24    shortly after you became the manager of the

Highly Confidential - Subject to Further Confidentiality Review

1   department related to suspicious order

2   monitoring of opioids or Class II narcotics

3   that you gave this presentation?

4        A.   Yes.

5        MR. HAMMOUD:  Object to the form.

6   BY MR. CARTMELL:

7        Q.   Okay.  And did you give this

8   presentation to the entire department, all 16

9   of the individuals -- or 15 others in the

10  department?

11       A.   Yeah, that is correct --

12       Q.   Okay.

13       A.   -- as well as customer service --

14       Q.   Okay.

15       A.   -- a number of customer service

16  people.

17       Q.   Now, customer service, we'll talk

18  about this more a little bit later, but the

19  customer service department is separate from

20  the DEA compliance department; is that correct?

21       A.   Correct.

22       Q.   Okay.  And is the customer service

23  department made up of individuals who are in

24  sales?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I don't know how they're actually

2    structured, you know, what part of sales or if

3    they're considered sales.  I don't know that.

4         Q.    But I take it you do know that

5    customer service representatives are the ones

6    who typically will have contact related to

7    orders and sales of the medications.  Is that

8    fair?

9         A.    That is fair, yes.

10        Q.    Okay.  You're just saying you don't

11   know whether or not their department

12   specifically falls under sales or marketing or

13   whatever department, correct?

14        A.    That is correct.  That is correct.

15        Q.    All right.  So if you look at your

16   presentation, I want to ask you a few questions

17   about this.

18             And if you'd go to page 4, the

19   title of this slide is What Happens If You

20   Screw Up?

21             Do you see that?

22        A.    Yes.

23        Q.    And then on this, I guess there are

24   the names of lots -- or several distributors --

1    there's a couple pharmacies as well -- who are

2    distributors of opioid medications; is that

3    right?

4         A.    Correct.  And other medication,

5    yes.

6         Q.    Okay.  And when you said, "What

7    Happens If You Screw Up," what did you mean?

8         A.    I talked about that -- fines that

9    these companies had been paying and actions

10   taken against them.

11        Q.    And was -- were the fines and

12   actions taken against them fines that were put

13   in place and actions taken by the Drug

14   Enforcement Administration?

15        A.    That is correct.

16        Q.    Okay.  And the claims being that

17   these organizations, including

18   AmerisourceBergen, had violated the Controlled

19   Substance Act in some way?

20             MR. NICHOLAS:  Object to the form.

21             THE WITNESS:  And that had a

22        settlement, although AmerisourceBergen

23        did not have a settlement.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I understand.

2         But the claim was that there had

3    been violations of the Controlled Substance

4    Act by these --

5              MR. NICHOLAS:  Object to the form.

6              MR. HAMMOUD:  Object to the form.

7              THE WITNESS:  No.

8              MR. CARTMELL:  Can I -- just let

9         me --

10             MR. NICHOLAS:  Sorry.

11   BY MR. CARTMELL:

12   Q.    -- the claims in these actions that

13   the Drug Enforcement Administration had brought

14   were that there were violations of the

15   Controlled Substances Act?

16             MR. NICHOLAS:  Object to the form.

17             THE WITNESS:  All I can speak to is

18        the amount of settlement, the amount of

19        fines that four of these had paid.

20   BY MR. CARTMELL:

█  ▆        █      ██      █████

█  ██████████████████████████████████████

█  ███████████████████████████████████

█  ███████████████████████████

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



22        Q.    Okay.  Now, if you turn to page 37,

23   this slide is titled What's Next? and asks the

24   question, What does the future hold?

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.    Yes.

3     Q.    And you created this slide?

4     A.    Mm-hmm.

5     Q.    Incidentally, this presentation

6  that you created was in the course and scope of

7  your employment at Teva, correct?

8     A.    Yes.

9     Q.    Okay.  And you maintained it in

10  your files for that purpose; is that fair?

11     A.    Well, yeah.

12     Q.    Okay.  You say, What does the

13  future hold?  And the first thing you mention

14  here is, SOPs, or standard operating

15  procedures, correct?

16     A.    Yes.

17     Q.    That's what we talked about, is

18  when you came in, because the system or the

19  process at Teva at that time didn't have any

20  written standard operating procedures, one of

21  the first things you intended to do was put

22  those it would effect in writing, correct?

23     A.    To write them.

24     Q.    Okay.  And, in fact, I think you

1  did that --

2  　　　　A.　Because there were already

3  procedures in effect, just not written down.

4  　　　　Q.　Right.　There was nowhere where

5  somebody could go and see written standard

6  operating procedures related to what needed to

7  be done in that program, correct?

8  　　　　　　　MR. HAMMOUD:　Object to the form.

9  　　　　　　　THE WITNESS:　Well, written --

10  　　　　there were no written SOPs.

11  BY MR. CARTMELL:

12  　　　　Q.　Okay.　And, in fact, I'm going to

13  hand you --

14  　　　　　　　In fact, actually, you were

15  involved thereafter or shortly thereafter in

16  helping to write those; is that right?

17  　　　　A.　Yes, that is correct.

18  　　　　Q.　And I think the records reflect --

19  and I'll hand you those -- that in August of

20  2014, those standard operating procedures that

21  applied to the suspicious order monitoring

22  program were put into effect.　Is that

23  consistent with your memory?

24  　　　　　　　MR. HAMMOUD:　Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Well, the written

2       formal procedures were introduced into

3       the system.  Those were descriptions of

4       the process that was already in place.

5           MR. CARTMELL:  Object and move to

6       strike the last part of your answer.

7   BY MR. CARTMELL:

8       Q.   If you can, just answer my question

9   for the record.

10           And, in fact, in August of 2014, at

11   that time, for the first time, formal written

12   standard operating policies for the suspicious

13   order monitoring system were put into effect,

14   correct?

15           MR. HAMMOUD:  Object to the form.

16   BY MR. CARTMELL:

17       Q.   Is that correct?

18       A.   I would say written procedures were

19   put into place.

20       Q.   Okay.

21       A.   Not the procedures were put into

22   place.  Just that the formal were entered into

23   the system.

24           (Exhibits Teva-Tomkiewicz-006

Highly Confidential - Subject to Further Confidentiality Review

 1          through Teva-Tomkiewicz-008 marked for

 2          identification and attached to the

 3          transcript.)

 4   BY MR. CARTMELL:

 5          Q.   I'm going to hand you what's been

 6   marked as Exhibit 6 and 7 and 8.  And I really

 7   don't have any questions for you at this time

 8   about these policies.

 9               And we'll show the jury, for

10   example, policy 8277, which is the policy

11   titled Suspicious Order Monitoring - DEA Order

12   Holds.

13               Do you see that?

14          A.   Yes.

15          Q.   And this was one of the policies

16   that you helped draft; is that right?

17          A.   Right.

18          Q.   If you go to the last page, this

19   one that we found in your documents is

20   unsigned.  But is your memory that, in fact,

21   this -- oh, I'm sorry.  Let's go to the last

22   page.  Strike that.

23               And, in fact, if you look at page 7

24   of 8, there is a signature here that this

1    policy was put into effect.  Is that Colleen

2    McGinn's signature?

3          A.    Yes.

4          Q.    And the date of the policy being

5    effective is August 1st, 2014; is that right?

6          A.    Correct.

7          Q.    Okay.  We don't need to go through

8    all of these policies, but just for the record,

9    is that your understanding, that those policies

10   were all put into effect at that time?

11               MR. HAMMOUD:  Object to the form.

12               THE WITNESS:  Formalized into

13          effect.

14               (Exhibits Teva-Tomkiewicz-009 and

15          Teva-Tomkiewicz-010 marked for

16          identification and attached to the

17          transcript.)

18   BY MR. CARTMELL:

19         Q.    I'm also going to hand you exhibits

20   9 and 10, which are also suspicious order

21   monitoring standard operating procedures.

22               Do you see that?

23               And you were also involved in

24   writing those and putting those into effect in

Highly Confidential - Subject to Further Confidentiality Review

1    August of 2014, correct?

2          A.    Yes, that is correct.

3          Q.    So is it fair to say, sir, that

4    Teva had a suspicious order monitoring program

5    since before you were there for several years

6    but never had written standard operating

7    procedures for that program?

8          A.    I would say that's a fair

9    assessment.

10         Q.    Another part or facet to the

11   suspicious order monitoring program that you

12   had at AmerisourceBergen was a computer

13   algorithm; is that correct?

14         A.    Yes.

15         Q.    And when you got to Teva, did Teva

16   also have a computer algorithm to aid in the

17   process of identifying potentially suspicious

18   orders for opioids?

19         A.    Yes.

20         Q.    Now, I think, from my review of the

21   documents, the computer algorithm that was in

22   place when you showed up to Teva in 2014 was

23   called the SORDS system.  Is that right?

24         A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And that's all capitals S-O-R-D-S;

2    is that right?

3          A.    Yes.

4          Q.    And I think -- is it true that that

5    stands for Suspicious ORDerS?

6          A.    That was my understanding.

7          Q.    Okay.  And you've mentioned this

8    previously, but part of when -- strike that.

9                When you were hired, one of the

10   things you discussed doing to improve Teva's

11   suspicious order monitoring program was

12   updating the computer algorithm that would

13   assist with identifying potentially suspicious

14   orders, correct?

15         A.    That is correct.

16         Q.    Okay.  I take it you felt like it

17   was outdated at that time.

18               MR. HAMMOUD:  Object to the form.

19               THE WITNESS:  No.

20   BY MR. CARTMELL:

21         Q.    At any rate, you thought that there

22   was an improved algorithm that you could put in

23   place that would be better.  Fair enough?

24               MR. HAMMOUD:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  That I could do

2      something better.

3 BY MR. CARTMELL:

4      Q.   Okay.  And before we talk about

5 that system that you put in place, the SORDS

6 system that was in place at Teva when you

7 arrived, was that a system that Teva actually

8 designed and developed; do you know?

9      A.   That's my understanding.

10      Q.   Okay.  And the only reason I ask

11 is, there was a merger -- or an acquisition, I

12 think, is a better way to say it, of Teva --

13 Teva acquired a company called Cephalon.  Are

14 you familiar with that?

15      A.   Yes.

16      Q.   Okay.  Do you know whether or not

17 Teva was the company who designed or developed

18 the SORDS computer algorithm to identify

19 suspicious orders for opioids or whether

20 Cephalon did that?

21           MR. HAMMOUD:  Object to the form.

22           THE WITNESS:  I'm not certain when

23      it was done, whether it was before or

24      after the acquisition of Cephalon,

1          because that was before my time.

2    BY MR. CARTMELL:

3          Q.   Okay.  So you're not certain

4    whether that was Cephalon's program or Teva's

5    program?

6          A.   I'm not certain.

7          Q.   Okay.  And do you have any idea how

8    long that system had been in effect prior to

9    the time you arrived?

10         A.   No.

11         Q.   Once you -- strike that.

12              Tell us what the SORDS system did

13   or what that system was designed to do --

14              MR. HAMMOUD:  Object to the form.

15   BY MR. CARTMELL:

16         Q.   -- the one that was in effect when

17   you arrived.

18         A.   Well, it was designed to assist in

19   detecting suspicious orders.

20         Q.   Okay.  And how would that system

21   work?

22         A.   The system worked on a -- looked at

23   a customer's history and did a certain

24   calculation based on the customer's history to

 1    flag an order for additional investigation.

 2         Q.   Okay.  After you arrived in 2014 at

 3    Teva, did you come to know that, actually, Teva

 4    had hired an outside consultant to do an

 5    evaluation or assessment of their suspicious

 6    order monitoring program?

 7         A.   Yes.

 8              MR. HAMMOUD:  Object to the form.

 9    Lacks foundation.

10              THE WITNESS:  Yes.

11   BY MR. CARTMELL:

12         Q.   How was it that you learned that?

13         A.   I was told during my interview that

14    this group was brought in.

15              (Exhibits Teva-Tomkiewicz-011 and

16              Teva-Tomkiewicz-012 marked for

17              identification and attached to the

18              transcript.)

19   BY MR. CARTMELL:

20         Q.   I'm handing you, sir, Exhibits 11

21    and 12, and I will represent to you that these

22    were documents that were produced to the

23    plaintiffs in this litigation by Teva from

24    their internal files.  Okay?

1          And the first document, which is

2   Exhibit -- is it 12?

3          A.   12, yes.

4          Q.   I'm sorry.  The first document I

5   want to ask you about is Exhibit 11.

6          A.   Oh, okay.

7          Q.   Exhibit 11 is a e-mail from Matthew

8   Benkert to you.  Do you see that?

9          A.   Yes.

10         Q.   And this is in 2014?

11         A.   Correct.

12         Q.   And it states that the attachment

13  is --

14         Well, there's several, I believe,

15  attachments.  Do you see that?

16         A.   Yes.

17         Q.   Do you know if one of the

18  attachments to this was the report from the

19  outside consultant who Teva hired to do an

20  assessment of their suspicious order monitoring

21  program?

22         MR. HAMMOUD:  Object to the form.

23         THE WITNESS:  And I believe it's --

24         Exhibit 12 is one of these listed as

1           Cegedim Teva SOM Review, I believe.

2    BY MR. CARTMELL:

3           Q.    Okay.  So at any rate, it looks

4    like, from this e-mail, that as part of the

5    attachments to this e-mail in Exhibit 11 was

6    the report which is sometimes referred to as

7    the Buzzeo report; is that right?

8                 MR. HAMMOUD:  Object to the form.

9                 THE WITNESS:  I can't recall

10          references to a Buzzeo report, so I --

11          but I've seen this, yes, obviously.

12   BY MR. CARTMELL:

13          Q.    Okay.  I believe that this report

14   that is signed by Ronald Buzzeo was in your

15   custodial file that was produced to us in this

16   litigation.  Is that consistent with your

17   understanding?

18          A.    Oh, yes.  I'm certain that, yeah, I

19   have this filed.

20          Q.    Okay.  And was your understanding

21   that Teva hired Mr. Buzzeo and others to check

22   into their suspicious order monitoring program

23   in 2012?

24          A.    Yes.

```
 1              MR. HAMMOUD:  Object to the form.

 2      Lacks foundation.

 3  BY MR. CARTMELL:

 4      Q.    You can answer.

 5      A.    So yes, yes.

 6      Q.    And at that time, is it true that

 7  one of the things that Ronald Buzzeo and his

 8  team from --

 9              Is it Cegedim?

10      A.    Cegedim.

11      Q.    Is Cegedim a consulting company?

12      A.    Yes.  They're part of IMS/IQVIA

13  now.

14      Q.    Okay.  And one of the things that

15  they were asked to consult with Teva about was

16  the adequacy of their suspicious order

17  monitoring program, correct?

18      A.    Well, looking for improvements.

19      Q.    And to give recommendations about

20  areas that they thought needed improvements,

21  fair?

22      A.    And sell their system.

23      Q.    Pardon me?

24      A.    And sell their system.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  Are you familiar with

2  Mr. Buzzeo?

3    A.   Yes.  I've met him several times.

4    Q.   Okay.  And he has expertise related

5  to suspicious order monitoring systems,

6  correct?

7         MR. HAMMOUD:  Object to the form.

8         THE WITNESS:  I would agree to

9    that.

10 BY MR. CARTMELL:

11   Q.   And, in fact, he's a frequent

12 speaker on diversion control and suspicious

13 order monitoring programs; is that right?

14   A.   Yes.

15   Q.   Okay.  Have you been to his

16 programs that he speaks at?

17   A.   I've been to a couple, yes.

18   Q.   I want to ask you some questions

19 about this.  This is dated September 25th,

20 2012.  And it's a letter from Mr. Buzzeo, the

21 consultant, to Colleen McGinn; is that right?

22   A.   Yes.

23   Q.   If you'd go to the --

24   A.   Well, actually, I'd like to read

1    through it to refamiliarize myself with it

2    because it's been a few years since I've read

3    it.

4         Q.   Okay.

5         A.   (Reviewing documents.)

6         Q.   I'm not going to ask you anything

7    about the last couple of pages.

8         A.   Okay.  I'm almost done.

9              (Reviewing documents.)

10             I think I'm good.

11        Q.   Mr. Tomkiewicz, Exhibit 12, as we

12   stated, is from September of 2012, and it's a

13   letter from the outside consultant, Ronald

14   Buzzeo, to the director of the DEA compliance

15   department and your boss, Colleen McGinn,

16   correct?

17        A.   Correct.

18        Q.   And if you see, it states, Dear

19   Ms. McGinn:  Enclosed is our report regarding

20   Teva Pharmaceutical's suspicious order

21   monitoring system.

22        A.   Yes.

23        Q.   As noted in the report, Teva has a

24   rudimentary SOM system with a process for

1    opening new accounts and pending orders

2    pursuant to calculations performed by a

3    computer program known as SORDS, Suspicious

4    ORDerS.

5              Do you see that?

6         A.   Yes.

7         Q.   And we were talking about that

8    computer program that Teva was using when you

9    came as the manager of the department or

10   suspicious order monitoring manager at that

11   time, correct?

12        A.   Well, in this -- and I wasn't sure

13   what the date was, but it talked about the

14   SORDS 2 improvement that was done, which was

15   done sometime after this.

16        Q.   And we'll talk about that.

17        A.   Yeah.

18        Q.   First, let me ask you -- we'll get

19   there.

20        A.   Yeah.

21        Q.   Let me ask you this question.  One

22   of the things that the outside expert

23   consultant, Ronald Buzzeo, looked at in Teva's

24   suspicious order monitoring program was the

1    computer program SORDS, I and II, correct?

2        A.    Correct.

3        Q.    Okay.  And if you turn to page 3 of

4    the report, the outside expert consultant,

5    Mr. Buzzeo, entered a finding or provided a

6    finding to them.

7             It states, As noted previously,

8    Teva uses a computer model known as Suspicious

9    ORDerS, SORDS, to evaluate customer orders

10   electronically for suspicious order

11   characteristics.

12            Do you see that?

13       A.    Yes.

14       Q.    Okay.  And you now know, based on

15   your review of this document, that the outside

16   expert consultant found multiple deficiencies

17   in the SORDS 1 and 2 computer systems, correct?

18       A.    No.

19            MR. HAMMOUD:  Object to the form.

20            THE WITNESS:  Yeah, I wouldn't say

21            "deficiencies."  I would say, you know,

22            avenues for improvement.

23   BY MR. CARTMELL:

24       Q.    Okay.  Well, I'm using Mr. Buzzeo's

1    words.  And if you turn the page to page 4, he

2    talks about, in the second paragraph,

3    additional deficiencies.

4              Do you see that?

5         A.   Mm-hmm.

6         Q.   So it is true, isn't it, that

7    Mr. Buzzeo, at least according to him, the

8    outside consultant, the expert who reviewed

9    their system, found several deficiencies in the

10   SORDS 1 and 2 programs, correct?

11        A.   I would say he used the term

12   "deficiencies."

13        Q.   Okay.  If you look at the last

14   sentence on the previous page, page 3, under

15   his Finding, it states, According to customer

16   service manager Marianne Geiger, the system --

17   referring to SORDS pends less than ten orders a

18   week.

19             Do you see that?

20        A.   Yes.

21        Q.   And so in 2012, at the time that

22   this system, the SORDS system, was being

23   reviewed by the outside expert consultant of

24   all the orders from customers for opioids that

Highly Confidential - Subject to Further Confidentiality Review

1   Teva was getting, their system in place at that

2   time was only flagging or pending, it sound

3   like, ten orders a week.

4               Do you see that?

5        A.   Yes.

6        Q.   And you know from your experience

7   in the industry and talking about this

8   procedure to groups and societies and things

9   like that, that your system, for example, at

10  AmerisourceBergen, was flagging or pending

11  hundreds of potentially suspicious orders a

12  week, correct?

13       A.   True.  But you can't compare the

14  two systems.

15       Q.   Okay.  And we'll talk more about

16  that.

17              It states, In June of 2012, Teva

18  initiated a SORDS improvement project.

19              And at that time, they were working

20  on SORDS 2.

21              Do you see that?

22       A.   Yes.

23       Q.   And at this time, SORDS 2 was not

24  in place.  It had not yet been transferred from

Highly Confidential - Subject to Further Confidentiality Review

1    SORDS 1 to SORDS 2, correct?

2         A.   That's what it appears, yes.

3         Q.   Okay.  So we know as of 2012, they

4    hadn't even updated SORDS 1, correct?

5         A.   Correct.  That's what it appears.

6         Q.   Okay.  Do you know when it was that

7    they transferred from SORDS 1 to SORDS 2?

8         A.   No.

9         Q.   Okay.  But at any rate, this

10   outside expert consultant looked at both

11   SORDS 1 and 2 and found multiple deficiencies

12   with both, correct?

13        A.   I would say he used the word

14   "deficiency."

15        Q.   Okay.  It states, SORDS 2 is an

16   improvement over SORDS 1.  Orders are

17   individually evaluated.  Also, orders are

18   normalized for package size.  However, the

19   orders are not normalized across different NDC

20   numbers.

21             And is one of the things that you

22   did when you came in is, you changed and

23   updated the system to include NDC numbers?

24             MR. HAMMOUD:  Object to the form.

1          THE WITNESS:  To include NDC

2     numbers?

3  BY MR. CARTMELL:

4          Q.    Yeah.

5          A.    No.  That's not a -- that's not a

6  correct statement with the way the program

7  works.

8          Q.    Okay.

9                This means, for example, that a

10  customer could order frequent smaller amounts

11  of hydrocodone in three or four different

12  products and avoid a violation of the three

13  standard deviation rule.

14                Do you see that?

15          A.    That's on -- which page was that

16  on?

17          Q.    It's on the bottom of page 3.

18          A.    Bottom of page 3.

19                Yes.

20          Q.    Okay.  And so hydrocodone, it was

21  talking about.  That's an opioid; is that

22  correct?

23          A.    Correct.

24          Q.    Okay.  And one that Teva was

Highly Confidential - Subject to Further Confidentiality Review

1   selling?

2           MR. HAMMOUD:  Object to the form.

3       Lacks foundation.

4           THE WITNESS:  I believe so.

5   BY MR. CARTMELL:

6       Q.   Okay.  And so the point was here

7   that this system at the time, SORDS, was not

8   sensitive enough to necessarily catch an opioid

9   suspicious order, correct?

10          MR. HAMMOUD:  Object to the form.

11          THE WITNESS:  Yeah, I wouldn't be

12      able to speculate in that manner.

13  BY MR. CARTMELL:

14      Q.   You don't know; is that fair?

15      A.   No, I don't know.

16      Q.   Okay.  It then states on the next

17  page, page 4, on the second paragraph,

18  Additional deficiencies were also noted during

19  the review process.  Three standard deviations

20  in particular are insufficient to identify

21  orders that may be suspicious.  Three

22  deviations in particular -- excuse me.  Three

23  standard deviations will only identify three

24  out of 1,000 orders.

1          Do you see that?

2     A.    Yes.

3     Q.    And would you agree with that

4  statement, that a system set up that had a

5  threshold of three standard deviations would

6  not be sufficient to necessarily catch

7  suspicious orders of opioids?

8          MR. HAMMOUD:  Object to the form.

9     Mischaracterizes the document.

10         THE WITNESS:  I wouldn't say that.

11 BY MR. CARTMELL:

12    Q.    Do you know for sure?

13    A.    I would say that I don't like any

14 calculation that's based on three standard

15 deviations that -- that differs from sort of a

16 mass standard of two standard deviations.  But,

17 also, you have to look at, you know, two

18 standard deviations from what?

19    Q.    Okay.  But the system based on

20 three standard deviations, as you just said,

21 you don't like that type of system, correct?

22    A.    I don't like that math.

23    Q.    Okay.

24    A.    Yeah.  I wouldn't say I don't like

1   that system.  I don't like the math.

2          Q.   Is part of the reason you don't

3   like it, though, because it might not be strict

4   enough necessarily to catch some suspicious

5   orders?

6          A.   Well, it depends.

7               MR. HAMMOUD:  Object to the form.

8   BY MR. CARTMELL:

9          Q.   It just depends?

10          A.   It depends, yeah.

11          Q.   Okay.

12          A.   It depends upon, you know, two,

13   three standard deviations from what?  What is

14   the underlying math behind it?

15          Q.   Okay.

16          A.   If I don't know the underlying math

17   behind it, I can't say one way or another.

18          Q.   Okay.  So it might or might not

19   catch suspicious orders, correct?

20               MR. HAMMOUD:  Object to the form.

21               THE WITNESS:  Any system, really,

22          might not catch a suspicious order.

23   BY MR. CARTMELL:

24          Q.   Okay.

Highly Confidential - Subject to Further Confidentiality Review

1          The system further fails to

2   identify frequency or pattern, two items

3   specifically contained in the legal definition

4   of a suspicious order.

5          Do you see that?

6     A.   Yes.

7     Q.   And would you agree with me that an

8   adequate system for identifying suspicious

9   orders needs to actually identify abnormal

10   frequencies of orders or abnormal patterns of

11   opioid orders?

12     A.   Not the way that this is written,

13   because he's talking about the computer system.

14   The overall system should, but I don't believe

15   that it's appropriate for a computer algorithm

16   to look for frequency or pattern or size.

17     Q.   Do you think a computer algorithm

18   can identify abnormal frequency orders of

19   opioids?

20     A.   I think it would be very, very

21   difficult.  I haven't seen one yet.

22     Q.   Now, did you ever talk to

23   Mr. Buzzeo about his findings of deficiencies

24   in the SORDS system?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No.  I never talked with Ron about

2    this particular document.

3        Q.    Now, even though the outside expert

4    consultant believed that their system in place

5    had several deficiencies, that SORDS system or

6    SORDS 2 system --

7        A.    SORDS 2.

8        Q.    -- stayed in place until the middle

9    of the year in 2015, correct?

10       A.    March 1st, 2015.

11       Q.    Okay.  So it was two and a half

12   years longer, after the outside consultant told

13   the company that there were deficiencies in

14   their algorithm or their system to try to

15   identify suspicious orders of opioids -- it was

16   two and a half years until they instituted what

17   you have described as a better system, correct?

18       A.    Well, I hope my system is better.

19       Q.    More -- an improved system,

20   correct?

21       A.    I'd say an improved system.

22       Q.    A more robust system, correct?

23             MR. HAMMOUD:  Object to the form.

24             THE WITNESS:  I would hope so.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2         Q.   Okay.  And, in fact, if you go back

3    to, sir, Exhibit 678 --

4         A.   Is that the PowerPoint?

5         Q.   Yes.

6         A.   Okay.

7         Q.   We were talking about your

8    PowerPoint and What's Next? when you came in in

9    2014, at page 37.

10             And not only did you put in place

11   written standard operating procedures for the

12   program, but you also updated SORDS, correct?

13        A.   That that was in the future, yes.

14        Q.   Okay.  And from this time in 2014,

15   is it fair to say that it was about a year and

16   three months until you were able to do that?

17        A.   Until the updated algorithm was in

18   place, yes.

19             MR. CARTMELL:  Okay.  677, please.

20             (Exhibit Teva-Tomkiewicz-013 marked

21        for identification and attached to the

22        transcript.)

23   BY MR. CARTMELL:

24        Q.   I'm going to hand you what's been

1  marked as Exhibit 13.  Sir, Exhibit 13 is a

2  document that was produced to us in this

3  litigation from Teva's internal files, and it's

4  titled Order Management, DEF OPS Enhancements

5  Functional Design Specification.

6           Do you see that?

7       A.   Yes.

8       Q.   Now, the system that you ended up

9  putting in place for suspicious order

10 monitoring was called DEF OPS; is that correct?

11      A.   Correct.

12      Q.   And that stands for what?

13      A.   Defensible Order Pending System.

14      Q.   What do you mean, Defensible Order

15 Pending System?  What do you mean by

16 "defensible," I guess, is what I'm asking.

17      A.   That we hoped that it would

18 withstand scrutiny.

19      Q.   Withstand scrutiny by the DEA?

20      A.   Anyone.

21      Q.   Any outside agency that might be

22 doing an audit?

23      A.   Anyone.

24           MR. HAMMOUD:  Object to the form.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2         Q.    Including the DEA?

3         A.    Including.

4         Q.    Okay.  Well, who else would

5    potentially scrutinize your suspicious order

6    monitoring system?

7         A.    Well, National Association of

8    Boards of Pharmacy.

9         Q.    Anybody else?

10        A.    Potentially, a state -- well, state

11   boards of pharmacy.

12        Q.    Okay.  So you wanted a system put

13   in place that would be defensible if there was

14   an audit by those State pharmacy organizations

15   or the DEA, correct?

16        A.    I'd say that would make them happy.

17        Q.    Okay.  And defensible in that they

18   would feel like you were doing an adequate job

19   of suspicious order monitoring, correct?

20             MR. HAMMOUD:  Object to the form.

21             THE WITNESS:  And it's hard to put

22        too much emphasis on the word

23        "defensible," because it was mostly

24        chosen because it sounded good with

Highly Confidential - Subject to Further Confidentiality Review

1          Order Pending System.  It just made a

2          good-sounding name.

3     BY MR. CARTMELL:

4          Q.    But your words were, you wanted

5     something that was defensible if there was

6     scrutiny on the program, correct?

7          A.    Yes --

8               MR. HAMMOUD:  Object to the form.

9               THE WITNESS:  -- that looked good

10         and made agencies happy.

11    BY MR. CARTMELL:

12         Q.    Okay.  This is a document that you

13    reviewed and approved, I take it; is that

14    correct?

15         A.    Correct.

16         Q.    And if you look at page 3 of 17,

17    specifically, you're indicated on the document,

18    you'll see there, as one of the individuals who

19    reviewed and approved this document.

20         A.    Yes.

21         Q.    Do you see that?

22         A.    Yes.

23         Q.    I have very few questions about

24    this, but I want to talk briefly about this

Highly Confidential - Subject to Further Confidentiality Review

1    Summary.  Did you actually write this document?

2         A.   No.  No, I did not write this

3    document.

4         Q.   If you look at 1.0 Summary, there's

5    a discussion --

6         A.   On what page?

7         Q.   On page 5 of 17.

8              Near the bottom of the first

9    paragraph, it states, DEA registration, record

10   keeping, and suspicious order reporting

11   requirements apply to importers, exporters,

12   manufacturers, distributors, and certain

13   retailers of 41 listed chemicals.

14             Do you see that?

15        A.   Yes.

16        Q.   And that's a statement that you

17   agree with, I take it, that those DEA

18   requirements apply to manufacturers like Teva,

19   correct?

20        A.   I'd say that's a fair assessment.

21        Q.   Through a combination of industry

22   outreach and voluntary compliance measures, DEA

23   strives to control chemical diversion in

24   partnership with industry and the public.

1        Do you see that?

2        A.    Yes.

3        Q.    And when it refers to "industry,"

4   that's talking about the pharmaceutical

5   manufacturers, the wholesale distributors, the

6   pharmacies, and all those entities that are in

7   the distribution chain of the opioid narcotics,

8   correct?

9        A.    I would agree with that, yes.

10       Q.    Next paragraph states, Original

11  SORDS design evaluated individual order

12  line/item quantity for each ship to against

13  three upper control limits with a designated

14  value of order UCL --

15            That means "upper control limit,"

16  right?

17       A.    Yes.

18       Q.    -- monthly UCL, and quarterly UCL.

19  If any calculated order line/item and ship to

20  exceeded one of three upper control limits,

21  then the order line would be placed on DEA

22  excessive usage hold.

23            Do you see that?

24       A.    Yes.

1          Q.   This original design was too

2     granular and difficult to manage, and

3     therefore, a new project was floated to

4     redesign the tool.

5               Do you see that?

6          A.   Yes.

7          Q.   And that's talking about what we

8     have discussed, that when you came in, part of

9     your job was to update the system, update

10    SORDS, and come up with a better, new design

11    for the suspicious order monitoring program,

12    including the computer algorithm, right?

13               MR. HAMMOUD:  Object to the form.

14               THE WITNESS:  And correct, to

15          improve the program.

16    BY MR. CARTMELL:

17          Q.   The purpose of this document is to

18    develop new enhancements outlined hereinafter

19    to the original SORDS 1 and II systems,

20    hereinafter referred to as DEF OPS.  This new

21    suspicious order monitoring tool will be more

22    robust.

23               Do you see that --

24          A.   Yes.

1       Q.    -- in operational efficiencies and

2    proactively monitoring customer order patterns

3    when placing orders for control and some

4    noncontrolled substances.

5            Do you see that?

6       A.    Yes.

7       Q.    And you agree with that, I take it?

8       A.    It's a fair assessment, yes.

9       Q.    Okay.  How did the new DEF OPS

10   computer algorithm that you helped design and

11   develop and put in place at Teva -- how did

12   that make the program better or improved and

13   more robust?

14      A.    Well, I think it improved what I

15   call the signal-to-noise ratio.  And that's

16   orders that were pended for investigation that

17   really didn't need to be pended for

18   investigation.

19           And so it provided orders that were

20   more -- that had, you know, higher likelihood

21   of possibly being suspicious or ones that had

22   more specific red flags about them.

23      Q.    Okay.  And do you know -- I think

24   there's documents discussing this, but -- the

1    number of items or orders that were pended or

2    flagged by SORDS 1 and II, at least as of 2012,

3    I should say, was indicated in Buzzeo's report

4    to be approximately ten a week?

5           Do you remember that?

6      A.   For SORDS 1, yes.

7      Q.   Yes.

8           And do you know how many orders

9    were pended per SORDS 2?

10     A.   Offhand, no.

11     Q.   Okay.  Do you know whether or not

12   your new program that was put in place called

13   DEF OPS ended up flagging or pending more or

14   less than SORDS 2?

15     A.   It seems to be not a whole lot

16   different in terms of numbers of orders pended,

17   but I'd have to go take a look specifically to

18   see, you know, the ultimate numbers.

19          But, of course, I'm looking now,

20   and we have, you know, additional controlled

21   substances that we're reviewing currently.

22          At the time, the number of orders

23   being reviewed, I believe, went down, but the

24   number of manual -- deeper investigations went

Highly Confidential - Subject to Further Confidentiality Review

1    up.

2         Q.    Okay.  We'll talk about that.  But

3    there's documents that describe that, correct?

4         A.    Oh, I'm sure there are.

5         Q.    Okay.  And is your testimony that

6    when DEF OPS went into play, it was flagging

7    less than SORDS 2, or do you know?

8         A.    I can't remember specifically.

9         Q.    You don't know one way or the

10   other?

11        A.    As I sit here, I don't know one way

12   or the other, yeah.

13        Q.    Okay.  I also want to ask you about

14   the due diligence, as you described, that Teva

15   had been doing related to suspicious order

16   monitoring prior to the time you became the

17   manager at Teva.  Okay?

18        A.    Okay.

19        Q.    Do you, as you sit here today,

20   recall to what extent Teva was doing due

21   diligence on new clients or new customers?

22        A.    Well, when I came in, it was my

23   understanding that there hadn't been a new

24   customer approved or even brought on in years.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    How many years?

2      A.    Don't know how many years.  It was

3   described as, in years.

4      Q.    So your testimony is that there was

5   no need for any due diligence related to new

6   clients at Teva prior to 2014 because for

7   years, there hadn't been any new clients?

8           MR. HAMMOUD:  Object to the form.

9           THE WITNESS:  Well, that's how it

10          was described to me.

11   BY MR. CARTMELL:

12     Q.    Who told you that?

13     A.    I can't remember who.  May have

14   been Matt.  May have been Marianne.

15     Q.    Okay.  I want to ask you a little

16   bit more about the report from Mr. Buzzeo.

17          Sir, if you can go to page 1 of

18   Mr. Buzzeo's report related to the suspicious

19   order monitoring program at Teva, the bottom

20   paragraph, the first sentence states, New

21   accounts are opened infrequently, and there is

22   minimal due diligence.

23          Do you see that?

24     A.    Correct.  Correct, yes.

1    Q.   But you were told that they had not

2    had new accounts or customers in years?

3    A.   That's what I believe, I was told

4    something similar to that, when I came aboard.

5    Q.   Okay.  What would you have

6    expected, based on your experience and

7    expertise in suspicious order monitoring

8    programs, for Teva to do as far as due

9    diligence when it had a new customer account?

10   A.   What would I have expected them to

11   have done prior to me joining Teva?  I don't

12   recall seeing any file on a new customer.

13   Q.   I'm asking, based on your

14   experience.  Because this report reflects that

15   Mr. Buzzeo and his team were told that there

16   were new accounts, but they were infrequent,

17   correct?

18   A.   Yes, infrequent --

19   Q.   Okay.  So --

20   A.   -- which I don't believe is

21   inconsistent with what I was told when I came

22   aboard.

23   Q.   Okay.  So when they had a new

24   customer, as far as due diligence, to have a

Highly Confidential - Subject to Further Confidentiality Review

1   sufficient, robust suspicious order monitoring

2   program, what due diligence would you have

3   expected them to do when they had new accounts?

4            MR. HAMMOUD:  Object to the form.

5            THE WITNESS:  Well, again, I can't

6         do any sort of conjecture on it because

7         I had never seen a new customer due

8         diligence file when I came on board.  So

9         I can't say, you know, what they had

10        been doing or whether it was effective.

11        I can't say that.

12  BY MR. CARTMELL:

13        Q.   If you go to page 2, Findings and

14  Recommendations, the outside consultant,

15  Mr. Buzzeo, states, Teva has approximately 200

16  active accounts.

17            Do you see that?

18        A.   Yes.

19        Q.   And that's consistent with what you

20  testified to previously, correct?

21        A.   Correct.

22        Q.   Okay.  And then the second

23  paragraph states, The current process for

24  conducting due diligence on new and existing

1    accounts consists of checking the NTIS database

2    to determine whether customers are adequately

3    registered with the DEA and performing

4    business/credit inquiries.

5            Do you see that?

6       A.   Yes.

7       Q.   Okay.  So based on this report, you

can see that prior to you arriving, or in 2012,

if they had a new account, all they would do is

check to see if it -- if that individual

customer was registered with the DEA and then

look to see -- at their credit report.

13           That's what that says, correct?

14           MR. HAMMOUD:  Object to the form.

15           THE WITNESS:  No.  Business

16       inquiries in addition to credit

17       inquiries.

18   BY MR. CARTMELL:

19       Q.   What do you interpret "business

inquiries" to --

21       A.   Oh, I can't interpret that.  It

could be adequate, could not be adequate.  I

don't have enough information to say.

24       Q.    It states, Currently, there are no

1  site reviews, and no additional information is

2  collected.

3          Do you see that?

4     A.   Yes.

5     Q.   And Mr. Buzzeo felt like that was

6  not an appropriate -- or that was a deficient

7  system related to due diligence, correct?

8          MR. HAMMOUD:  Object to the form.

9          THE WITNESS:  Well, Ron Buzzeo felt

10         that that was Ron Buzzeo's opinion.

11 BY MR. CARTMELL:

12    Q.   Okay.  And would you agree with

13 that opinion?

14    A.   I don't have enough information to

15 form an opinion.

16    Q.   It states, The amount of initial

17 due diligence information should be expanded to

18 include at a minimum the following items for

19 existing and potential customers:  Initial

20 client screening with a questionnaire, to be

21 followed with an on-site visit and a more

22 detailed questionnaire, to solicit detailed

23 information regarding customers' individual SOM

24 programs and assurances to safeguard against

Highly Confidential - Subject to Further Confidentiality Review

1    the diversion of controlled substances.

2           Do you see that?

3       A.   Yes.

4       Q.   Okay.  And you mentioned

5    previously, I think, that due diligence on new

6    clients and even on existing clients is

7    important or an important part of the

8    process --

9       A.   Oh, yes.

10      Q.   -- to determine whether or not

11   orders that are coming from them that had been

12   flagged may be suspicious orders, correct?

13          MR. HAMMOUD:  Object to the form.

14          THE WITNESS:  I would say that

15          that's a correct assessment.

16   BY MR. CARTMELL:

17      Q.   And as you believed when you came

18   to Teva and from your experience -- part of the

19   things you were doing is, you were doing

20   Internet searches, for example, correct?

21      A.   Correct.

22      Q.   And from time to time, based on

23   your testimony in the West Virginia case, you

24   were doing on-site visits, correct?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    All of those things were important

3    for you, as a suspicious order monitoring

4    manager and investigator, to help you

5    determine, in fact, whether these orders coming

6    from pharmacies or other customers were, in

7    fact, suspicious, correct?

8        A.    Correct.

9        Q.    And based on Mr. Buzzeo's report,

10   Teva wasn't doing any of that before you got

11   there, correct?

12            MR. HAMMOUD:  Object to the form.

13            THE WITNESS:  Like I said, I hadn't

14        seen the results of any new customer due

15        diligence.  I don't know if this was

16        speaking hypothetically, what they would

17        do, or what they had been doing.  I

18        can't tell that from this.

19   BY MR. CARTMELL:

20       Q.    Do you think that this is actually

21   talking hypothetically?

22       A.    I said it could be.

23       Q.    Well, it states what their actual

24   process is, doesn't it?

Highly Confidential - Subject to Further Confidentiality Review

1     A.    Well, like I said, I haven't seen

2     the results of their process anywhere.

3     Q.    Okay.  But I take it when you got

4     there, to improve and better their suspicious

5     order monitoring program at Teva, you made sure

6     that they were doing increasing amounts of due

7     diligence, correct?

8     A.    That is correct.

9     Q.    You made sure that they were doing,

10    like Mr. Buzzeo said, much more due diligence

11    for new customers or existing customers,

12    correct?

13          MR. HAMMOUD:  Object to the form.

14          THE WITNESS:  We had increased due

15          diligence, yes.

16    BY MR. CARTMELL:

17    Q.    And it was your brief that that was

18    important so that you could try to find out,

19    these suspicious orders, whether or not there

20    was a likelihood of diversion of these opioids?

21    A.    Well, it's to know the customer

22    better.

23    Q.    And why is it important to know the

24    customer better?

1        A.    To determine whether an order that

2    may be flagged, you know, could be suspicious;

3    is this part of their --

4        Q.    Go ahead.  I'm sorry.

5        A.    Yeah.

6              -- is this part of their normal

7    business?  Because something that could look

8    suspicious for one customer might be different

9    from another customer.

10             And one thing that's important to

11   remember is that, you know, with the on-site

12   visits at AmerisourceBergen, that's at the

13   pharmacy level.  Teva doesn't sell to

14   pharmacies.

15       Q.    Let me follow up on what you said.

16             But, actually, go back, if you

17   would, sir, to Exhibit 678, which was --

18             MR. FAES:  He means 5.

19             MR. CARTMELL:  Strike that.  Strike

20        that.  Let me start over.

21   BY MR. CARTMELL:

22       Q.    Sir, go back, if you would, to

23   Exhibit 5, which is your PowerPoint that you

24   gave in 2014 to the team at Teva under What's

Highly Confidential - Subject to Further Confidentiality Review

1    Next?

2             We've talked about that you, when

3    you came in, actually put in place standard

4    operating procedures that were not in place

5    when you got there --

6             A.    Are you on page 37?

7             Q.    -- correct?

8             MR. HAMMOUD:  I'm sorry.  He's

9        looking for the page.  Can you repeat

10       the question?

11   BY MR. CARTMELL:

12            Q.    We've talked about that you put in

13   place standard operating procedures in writing,

14   formalized those, that were not in place when

15   you got there, correct?

16            A.    No.  There were procedures in

17   place.  They were just not written down.

18            Q.    Right.

19            So if somebody wanted to find out

20   what the procedures are, they'd have to go to

21   somebody and ask them what the procedures are,

22   correct?

23            A.    Yes.

24            Q.    And hope that they included

Highly Confidential - Subject to Further Confidentiality Review

1    everything about the procedure and didn't

2    forget anything, correct?

3            A.    Well, correct, sure.

4            Q.    Much better policy to have it in

5    writing, correct?

6            A.    Oh, yes.

7                  MR. HAMMOUD:  Object to the form.

8    BY MR. CARTMELL:

9            Q.    We talked about you also updated

10   and revamped and improved the computer system

11   that was in place and made it more robust,

12   correct?

13           A.    I would hope so.

14           Q.    We -- also here under What's Next?

15   What Does the Future Hold?, you talk about

16   Customer Road Show --

17                 You see that?

18           A.    Yes.

19           Q.    -- and Customer Risk Evaluation.

20                 Do you see that?

21           A.    Yes.

22           Q.    And those are things that you were

23   doing to increase the actual due diligence in

24   your department, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2         Q.    And those things were important,

3    you thought -- in other words, going actually

4    to see and visit customers and sending out

5    questionnaires, risk evaluation questionnaires,

6    for example -- so that you could do your best

7    to determine whether or not there was

8    suspicious orders for these opioid narcotics,

9    correct?

10              MR. HAMMOUD:  Object to the form.

11              THE WITNESS:  No, that's not

12        correct.

13   BY MR. CARTMELL:

14        Q.    How was I wrong?

15        A.    Well, because we don't do

16   questionnaires, because, again, we're not

17   dealing with pharmacies.  So a

18   one-size-fits-all questionnaire is

19   inappropriate.

20        Q.    Go ahead.

21        A.    Additionally, doing a customer road

22   show, while we have had face-to-face meetings

23   with some customers, doing a full road show,

24   meeting every customer face to face, not

Highly Confidential - Subject to Further Confidentiality Review

1   something that, ultimately, I determined was

2   either necessary or would improve the program.

3        Q.   So the customer road show that you

4   refer to here, that has to do with actually

5   gaining due diligence on your customers; is

6   that correct?

7        A.   No.   That was more doing just

8   face-to-face meetings with customers to put a

9   face to names.

10       Q.   Does it have anything to do with

11  know your customer better?

12       A.   It could.   But, ultimately, I

13  determined that it wasn't something that was

14  going to improve the program in any meaningful

15  way.

16       Q.   So how did you -- or what did you

17  do at Teva to better their program and -- to

18  allow Teva to know their customer better?

19       A.   Well, most of the customers are

20  long-term customers, and we know them very well

21  anyway.

22       Q.   Did you do anything to improve that

23  aspect of due diligence?

24       A.   Of knowing who the current

Highly Confidential - Subject to Further Confidentiality Review

1   customers were?

2        Q.   Yes.

3        A.   Well, other than talking to them --

4   and, again, because it's a relatively small

5   industry, I know knew a lot of people anyway.

6   And at various conferences, you see a lot of

7   the same people, and so we know who they are.

8        Q.   You also mention here on your slide

9   that the future held training, correct?

10        A.   Correct.

11        Q.   And is it your understanding, based

12   on your knowledge of what was going on at Teva

13   as far as their suspicious order monitoring

14   program, that there was no real training going

15   on before you arrived?

16             MR. HAMMOUD:  Object to the form.

17             THE WITNESS:  And I would say no,

18        that's not correct.

19   BY MR. CARTMELL:

20        Q.   Were you coming in, though, and

21   trying to enhance and improve and more

22   frequently train the members that were within

23   the department?

24        A.   No.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Did you increase at all the amount

2    of training that was provided to the

3    individuals in the department?

4               MR. HAMMOUD:  Object to the form.

5               THE WITNESS:  Within the

6          department?  No.  Training isn't --

7          well, training of the department isn't

8          something normally that I do, other than

9          when we have department meetings and

10         sort of status updates of suspicious

11         order monitoring is done.

12   BY MR. CARTMELL:

13         Q.    Do you know whether or not Teva was

14   training customer service representatives who

15   were involved in suspicious order monitoring

16   prior to the time you arrived?

17         A.    That, I don't know.

18         Q.    Did you, when you got there,

19   though, make sure that the suspicious order

20   monitoring program included training of the

21   customer service representatives who were

22   involved?

23         A.    Yes.

24         Q.    And did you see that as an

Highly Confidential - Subject to Further Confidentiality Review

1    improvement of the program?

2         A.   Yes.

3              MR. HAMMOUD:  About ready for a

4         break?

5              MR. CARTMELL:  What's that?  Break?

6         Let's do it.

7              VIDEO OPERATOR:  Going off the

8         record, 3:43.

9              (Recess from 3:43 p.m. until

10        4:00 p.m.)

11             VIDEO OPERATOR:  Back on record.

12        The time is 4:00 p.m.

13   BY MR. CARTMELL:

14        Q.   Mr. Tomkiewicz, we're back on the

15   record.  Are you ready to proceed?

16        A.   I'm ready.

17        Q.   Okay.  So we were talking about

18   before the break all of the things that you did

19   when you came to Teva to try to improve the

20   suspicious order monitoring program that they

21   had in place, correct?

22        A.   Correct.

23        Q.   And we went through, as you noted

24   in your PowerPoint that you presented to the

Highly Confidential - Subject to Further Confidentiality Review

1    team, the things that you said you were going

2    to do in the future, things like standard

3    operating procedures, increasing customer due

4    diligence, update the SORDS program, customer

5    risk evaluations, training, customer road show,

6    all those things, correct?

7         A.    Correct.

8         Q.    And the goal for you was to improve

9    the program so that you could help the DEA by

10   identifying suspicious orders of opioids and

11   try to stop those orders that you believed were

12   likely to be diverted out in the communities,

13   correct?

14        A.    That were --

15             MR. HAMMOUD:  Object to the form.

16             THE WITNESS:  Well, that were

17        suspicious.  And not just the DEA, but

18        help to improve society.

19   BY MR. CARTMELL:

20        Q.    Right.

21        A.    Yeah.

22        Q.    That's a good point.  I mean, you

23   want to have a very robust, very good

24   suspicious orders monitoring program in place

Highly Confidential - Subject to Further Confidentiality Review

1    at Teva because you want to help society by

2    getting as many opioids off the streets that

3    are going to be diverted, correct?

4              MR. HAMMOUD:  Object to the form.

5              THE WITNESS:  And not just

6         preventing products from getting out of

7         the legitimate supply channels, but also

8         ensuring that the products are going to

9         the right people.

10   BY MR. CARTMELL:

11        Q.   Right.

12             And the goal, though, of a very

13   effective, robust suspicious order monitoring

14   program is to identify suspicious orders,

15   correct?

16        A.   That's one facet of it, yes.

17        Q.   And then when you identify those,

18   you can do your investigation, all the things

19   you need to do, to determine whether or not you

20   need to stop that order, right?

21        A.   And report it as suspicious if we

22   stop it, yes.

23        Q.   Right.  And report it to the DEA.

24   That's the other thing you need to do, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    Now, when you got to Teva, did you

3    learn that, in fact, their system of suspicious

4    order monitoring was simply not working?

5    A.    No, I wouldn't say that.

6    Q.    Well, as you stated, the whole goal

7    of the program was to identify suspicious

8    orders, correct?

9    A.    Correct.

10   Q.    And did you know or learn when you

11   got to Teva that even though they had been

12   selling opioids for years, they had not

13   identified one suspicious order in their

14   monitoring program?

15        UNIDENTIFIED SPEAKER:  I don't

16        believe that's correct.

17        MR. HAMMOUD:  Object to the form.

18        THE WITNESS:  And I don't believe

19        that's correct.  I believe there was at

20        least one order reported as suspicious.

21   BY MR. CARTMELL:

22   Q.    So your belief is that their

23   suspicious ordering program that was in place

24   before you got there and that should have been

1    in place since the time they began selling and

2    distributing opioids --

3              Right?

4              MR. HAMMOUD:  Object to the form.

5              THE WITNESS:  Well, correct.

6    BY MR. CARTMELL:

7         Q.   Correct.  Because we know the law

8    requires that, correct?

9         A.   Correct.

10             MR. HAMMOUD:  Object to the form.

11   BY MR. CARTMELL:

12        Q.   Your understanding is that you

13   believe that that suspicious order monitoring

14   program had identified one suspicious order in

15   those several years?

16        A.   Correct.

17        Q.   And you believe that that is an

18   effective, robust suspicious order monitoring

19   program?

20        A.   Could have been.

21        Q.   Do you believe it was, when it

22   identified solely one suspicious order over

23   eight years that they've been selling opioids?

24        A.   I think that that is consistent

Highly Confidential - Subject to Further Confidentiality Review

1    with the industry.

2        Q.   Let's go back, if you would, to

3    Exhibit 12.

4            We've been looking at what the

5    outside expert consultant said about Teva's

6    suspicious order monitoring program when it was

7    reviewed in 2012, and I want to ask you about a

8    statement on the front page, first paragraph at

9    the bottom.

10           It states, Orders are also

11   investigated by staff prior --

12       A.   Wait.   First page?

13       Q.   Oh, I'm sorry.   On the cover page,

14   the letter.

15       A.   Cover page.

16       Q.   Sir, I want to ask you about the

17   cover letter from Mr. Buzzeo, the outside

18   consultant, who looked at, in 2012, Teva's

19   suspicious order monitoring program and

20   evaluated that.

21           If you look at the end of the first

22   paragraph, it states, Teva has never identified

23   a suspicious order, and thus, no orders have

24   ever been reported to the DEA.

1          Do you see that?

2     A.   Correct.

3     Q.   So we know that as of September of

4  2012, several years after Teva had begun

5  selling opioid narcotics, they had never

6  reported -- or never identified a suspicious

7  order and never reported any to the DEA,

8  correct?

9     A.   Correct.

10          MR. HAMMOUD:  Object to the form.

11  BY MR. CARTMELL:

12     Q.   And if you turn the page to page 2,

13  it states, at the top of paragraph -- the first

14  paragraph, Teva has never reported any

15  suspicious order to the DEA, and there is no

16  program to review downstream distribution of

17  Teva products.

18          Do you see that?

19     A.   Yes.

20     Q.   Okay.  Now, you came from

21  AmerisourceBergen, and you testified that you

22  had been involved in reporting hundreds a

23  month, correct?

24     A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    At AmerisourceBergen, a distributor

2    of opioid narcotics, when you worked there as

3    the manager and investigator, your company was

4    reporting hundreds of suspicious orders of

5    opioid narcotics a month; is that fair?

6    A.    Correct.

7    Q.    But when you came to Teva, they had

8    never reported one, correct?

9         MR. HAMMOUD:  Objection.  Object to

10        the form.

11        THE WITNESS:  No.  I believe they

12        reported one.

13   BY MR. CARTMELL:

14   Q.    When was the one reported?

15   A.    I believe it was in 2013, but it

16   was before -- after this and before I started.

17   Q.    So even though you had reported

18   hundreds in your job as suspicious order

19   monitoring manager or investigator at

20   AmerisourceBergen and Teva, to your knowledge,

21   had only reported one in the eight years since

22   they had been selling and distributing opioids,

23   you believe Teva's suspicious order monitoring

24   program was working?

Highly Confidential - Subject to Further Confidentiality Review

1       A.    I believe so.

2       Q.    Now, did you know, from your

3  conversations or the documents that you've

4  reviewed in this case, that, in fact, Teva

5  never even started making reports of suspicious

6  orders until 2013?

7            MR. HAMMOUD:  Object to the form.

8            THE WITNESS:  I'm unaware of that.

9  BY MR. CARTMELL:

10      Q.    Is it fair to say, based on your

11 expertise as a suspicious order monitoring

12 manager and programs, that Teva had suspicious

13 orders or orders from customers that were

14 diverted prior to 2013?

15           MR. HAMMOUD:  Objection.

16 BY MR. CARTMELL:

17      Q.    Do you agree with that?

18           MR. HAMMOUD:  Object to the form.

19      Lacks foundation.

20           THE WITNESS:  Well, I'm certain

21      that product was being diverted.

22 BY MR. CARTMELL:

23      Q.    Okay.  So your point is not that

24 they didn't have suspicious orders that were

1   being diverted; they simply didn't have a

2   system in place that was able to identify

3   those, correct?

4           A.   No, not at all.

5                MR. HAMMOUD:  Object to the form.

6   BY MR. CARTMELL:

7           Q.   When you were developing and

8   improving the suspicious order monitoring

9   program at Teva after 2014 and throughout 2015,

10  did you ever hire any outside consults or

11  experts to help you?

12          A.   No.

13               (Exhibit Teva-Tomkiewicz-014 marked

14          for identification and attached to the

15          transcript.)

16  BY MR. CARTMELL:

17          Q.   I'm going to hand you what's been

18  marked as Exhibit 14.  And I'll represent to

19  you, sir, that Exhibit 14 is a document that

20  was produced to the plaintiffs in this

21  litigation by Teva from their internal files.

22  Okay?

23          A.   Mm-hmm.

24          Q.   If you look at the first page of

Highly Confidential - Subject to Further Confidentiality Review

1  Exhibit 14, there's an e-mail, you'll see,

2  from --

3              Is it Itai?

4       A.    Itai.

5       Q.    -- Itai Rigbi to several

6  individuals, including your boss, Colleen

7  McGinn.

8              Do you see that?

9       A.    Yes.

10      Q.    And this is in August of 2015,

11  correct?

12      A.    Yes.

13      Q.    And at this time, you had been at

14  the company for, essentially, a year and eight

15  months?

16      A.    Yes.

17      Q.    It states, Dear all, Attached

18  please find the final audit report of the

19  Teva's DEA department.

20              Do you see that?

21      A.    Yes.

22      Q.    Okay.  And so it looks like in

23  2015, after you'd been there for a year and

24  eight months, there was actually an internal

1    audit done by Teva of the department that you

2    were in; is that correct?

3           A.    Correct.

4           Q.    Okay.  And that's the DEA, as he

5    says, Drug Enforcement Administration,

6    department, correct?

7           A.    Correct.

8           Q.    All right.  And then it states

9    above, from Colleen McGinn to you and others on

10   August 19th, Attached is Itai's final report.

11          A.    Yes.

12          Q.    Sorry about that.

13                Do you see that?

14          A.    Yes.

15          Q.    So this is a report, I believe,

16   that was in your custodial file and was

17   produced.  You've seen this internal audit

18   report before today; is that correct?

19          A.    Yes, although I haven't reviewed it

20   in several years.

21          Q.    Were you involved in this internal

22   audit that was done at Teva in August of 2015?

23          A.    Yes, I was part of it.

24          Q.    And you were one of the individuals

Highly Confidential - Subject to Further Confidentiality Review

1    that was interviewed, correct?

2           A.   Yes.

3           Q.   And other individuals from your

4    department were interviewed as well; is that

5    right?

6           A.   Yes.

7           Q.   And tell me if I'm wrong, but this

8    individual, Mr. Rigbi --

9                Is that right?

10          A.   Yes, yes.  Mr. Rigbi, yes.

11          Q.   -- Mr. Rigbi actually worked for

12   the parent organization; is that correct?

13          A.   Well, Teva Pharmaceuticals in

14   Israel, yes.

15          Q.   In Israel?

16          A.   Yes.

17          Q.   Okay.  And so I take it that

18   Mr. Rigbi came from Israel over with a team to

19   perform this audit of your department.

20          A.   No.

21          Q.   Did he come just himself?

22          A.   Just himself.

23          Q.   Okay.  And why was this internal

24   audit done; do you know?

1        A.    I can't remember the exact

2   circumstances.  I believe it was something to

3   do with our Forest plant.

4        Q.    What does that mean?

5        A.    That there was an issue with our

6   Forest plant, and in -- and in Israel, they

7   felt that they needed to do an audit of our DEA

8   compliance program.

9        Q.    Okay.  If you turn to -- actually,

10  it's page 4.  There's a section titled The DEA

11  Department.

12           Do you see that?

13       A.    Page 4?

14           MR. HAMMOUD:  I'm sorry.  What's

15       the Bates number?

16           MR. CARTMELL:  Last three digits,

17       567.

18  BY MR. CARTMELL:

19       Q.    It states, The DEA department is

20  responsible for handling all controlled

21  substances across U.S. pharma and R&D sites,

22  compliance with DEA agency regulations, and for

23  traceability of controlled substances to ensure

24  no diversions.

Highly Confidential - Subject to Further Confidentiality Review

1        Do you see that?

2        A.    Yes.

3        Q.    And that's an accurate statement of

4   the responsibility of the DEA department,

5   correct?

6        A.    I wouldn't say fully.  I wouldn't

7   say fully.

8        Q.    What would you disagree with in

9   that regard?

10       A.    Ensuring no diversions.  We try to

11  minimize diversion as much as we can trace,

12  but -- and I wish there were the ability to

13  prevent all diversion, but unfortunately, at

14  the manufacturer level, that's just not

15  possible.

16       Q.    Your responsibility and duty as a

17  manufacturer who is selling opioids is to do

18  your very best to try to prevent that, correct?

19       A.    Correct.

20       Q.    In total, 412 controlled substance

21  products are registered in all U.S. sites.

22            Do you see that?

23       A.    Yes.

24       Q.    So what does that mean?

1      A.   That would be 412 different SKUs

2  that are registered across all sites.  And

3  that's not just products for sale, but that's

4  also products that -- in process, in the

5  manufacturing process.

6      Q.   Okay.  So I'm trying to understand.

7  Does that mean that there are 412 controlled

8  substance products that Teva was selling as of

9  this time in 2015?

10      A.   No.  No.  It just means that within

11  the system, there are 412 products that are

12  handled.  And it could -- and some of those are

13  in-process products that are never for sale to

14  the public but are moved between site and site.

15  And so they're in the system with a number, but

16  they're not products that are for sale.

17      Q.   Would the vast majority of that 412

18  likely be products for sale?

19          MR. HAMMOUD:  Object to the form.

20  BY MR. CARTMELL:

21      Q.   Or do you know?

22      A.   I don't know.

23      Q.   Okay.  Next bullet point states,

24  The department has 17 members who oversee the

Highly Confidential - Subject to Further Confidentiality Review

```
1   DEA compliance functions and processes for
2   Teva's registered facilities and maintain the
3   relationship with the DEA agency.
4            Do you see that?
5       A.   Yes.
6       Q.   The second-to-last -- I want to ask
7   you about the second-to-last bullet point.  It
8   says, The 17 team members are based in seven
9   different locations.
10           Is that correct?  That's the way it
11  was?
12      A.   Seems correct, yes.
13      Q.   Okay.  The team is responsible for
14  DEA activities in 11 pharma and R&D sites in
15  the U.S.
16           Do you see that?
17      A.   Yes.
18      Q.   On the next page, it states, Every
19  of the 11 sites has a dedicated DEA manager who
20  belongs to the DEA department and is
21  responsible for daily DEA activities at the
22  sites.  Some are responsible for several small
23  sites.
24           Is that correct?
```

1    A.    Yes.

2    Q.    And so that gives the jury some

3    idea of how the individuals in your

4    department -- and there are now 17 as of

5    2015 -- are spread out among seven different

6    sites, correct?

7    A.    Correct.

8    Q.    Okay.  I want to ask you about the

9    findings of this internal audit.  And,

10   specifically, if you go to the page -- the last

11   three Bates numbers are 575.

12         Risk Management, do you see that?

13   A.    Oh, yes.

14   Q.    Now, this is an internal audit of

15   your department, the department that you are

16   the manager of suspicious order monitoring in,

17   and the findings of Mr. Rigbi, based on his

18   audit of your department, correct?

19   A.    Correct.

20   Q.    And one of the findings has to do

21   with the risk management in that department,

22   correct?

23   A.    Correct.

24   Q.    It states, The overall risk of the

Highly Confidential - Subject to Further Confidentiality Review

1  DEA operation is in noncompliance with DEA

2  requirements.

3          Do you see that?

4      A.   Yes.

5      Q.   So although you came on as a

6  manager to help with compliance at the DEA

7  specifically related to suspicious order

8  monitoring, as of 18 months after you got

9  there, according to your own internal audit,

10 your department was still not in compliance

11 with the DEA, correct?

12     A.   No.  That's not what that says.

13     Q.   Let me repeat what it says.

14          The overall risk of the DEA

15 operation is in noncompliance with DEA

16 requirements.

17          Do you see that?

18     A.   Yes.

19     Q.   Okay.  It then states, This can

20 lead to anything from issuing "letter of

21 admonition" up to withdrawal of the sites'

22 registrations.

23          Do you see that?

24     A.   Yes, that is correct.

1     Q.    Okay.  Now, we talked earlier, but

2   one of the sanctions that the DEA can do if

3   you're not in compliance with the DEA is, they

4   can pull your registration, correct?

5     A.    Oh, yes.

6     Q.    And that's what that's referring

7   to, correct?

8     A.    That is correct.

9     Q.    It states, Various risks (security,

10  quota, suspicious monitoring, import/export,

11  and handling of documentations) are handled at

12  differing levels of performance, but not in an

13  overall methodological and orderly way.

14          Do you see that?

15    A.    Yes.

16    Q.    This was Teva's own internal audit

17  of the department, correct?

18    A.    Correct.

19    Q.    And one of the areas that it found

20  to be deficient and not operating in an overall

21  methodological and orderly way was the

22  suspicious monitoring operation that you were

23  manager of, correct?

24    A.    No.  I don't read that that way.

1        Q.    It includes suspicious monitoring,

2   correct?

3        A.    He's listing all the duties of the

4   DEA compliance department.

5        Q.    And suspicious monitoring is the

6   one that you were manager of, correct?

7        A.    Correct, am manager of.

8        Q.    And were at the time, in 2015,

9   correct?

10       A.    Correct.

11       Q.    And it states all those areas --

12  those risks and those areas are handled at

13  different levels of performance but not in an

14  overall methodological and orderly way.

15            Do you see that?

16       A.    Yes.

17       Q.    It then states, There is no

18  organized overall risk management process, no

19  centralized and orderly list of DEA risks, and

20  no orderly heat-map of the risks that the DEA

21  department deals with.

22            Do you see that?

23       A.    Yes.

24       Q.    And do you agree with those

Highly Confidential - Subject to Further Confidentiality Review

1    findings by Mr. Rigbi?

2         A.   Not as you're characterizing them.

3         Q.   Well, I'm not trying to

4    characterize them.  I'm reading his words on

5    the paper.

6         A.   Well, certainly.  And what you're

7    saying isn't what I understand the meaning of

8    this to mean.

9         Q.   I'm actually not attributing

10   anything, other than I'm reading what he says.

11            Do you agree with what he says?

12        A.   I agree with what he says but not

13   how you're characterizing it.

14        Q.   Okay.  At any rate, this document

15   states that the DEA operation is in

16   noncompliance with DEA requirements, correct?

17        A.   No, that is not correct.

18            MR. HAMMOUD:  Objection.

19            THE WITNESS:  That is absolutely

20       untrue and not correct.

21   BY MR. CARTMELL:

22        Q.   The overall risk of the DEA

23   operation is in noncompliance with DEA

24   requirements.

Highly Confidential - Subject to Further Confidentiality Review

1        Do you see that?

2        A.    Let me clarify to how I read this,

3    that a risk in a DEA operation is in

4    noncompliance.  It's not saying that the DEA

5    operation of Teva is in noncompliance.

6        Q.    It says, The DEA operation is in

7    noncompliance with DEA requirements.

8        A.    Risk is in noncompliance.  And that

9    is an obvious opening statement, Risk is in

10   noncompliance.

11       Q.    Okay.  That portion of the DEA

12   operation, the risk portion of it, is in

13   noncompliance; is that what you're saying?

14       A.    I'm saying risk of any DEA

15   operation is in noncompliance.

16       Q.    Okay.  Do you agree with me that at

17   that point, this was a finding internally by

18   your own company, Teva, related to the DEA

19   department that you were in?

20       A.    Saying that we were generally in

21   noncompliance?

22       Q.    Yes.

23       A.    No.  I reject that.

24       Q.    Okay.  This is listed under

1  category as High.  Do you see that?

2          A.    Yes.

3          Q.    One of the things that the auditor

4  internally at Teva was asked to do was to

5  determine the level of risk, the category of

6  risk that this finding was, correct?

7          A.    Certainly, yes.

8          Q.    If you go to the last page of

9  Exhibit 12 -- excuse me -- Exhibit 14, there's

10  Definitions of Risk Rankings.

11              Do you see that?

12          A.    Certainly.

13          Q.    And we know that this was

14  categorized as High, which means, This is a

15  serious internal control or risk management

16  issue that if not mitigated may, with a high

17  degree of certainty, lead to:  Substantial

18  losses; serious violation of corporate

19  strategies, policies or values --

20              Right?

21          A.    Correct.

22          Q.    -- serious reputation damage, such

23  as negative publicity in national or

24  international media --

1          Right?

2     A.    Correct.

3     Q.    -- significant adverse regulatory

4  impact, such as loss of operating licenses or

5  material fines, right?

6     A.    Certainly.

7     Q.    As a high-risk issue, immediate

8  management attention is required.  The finding

9  is reported to the audit committee quarterly.

10         Do you see that?

11    A.    Certainly.

12    Q.    And so for how long was the risk

13  portion of the DEA operation in noncompliance

14  with DEA requirements; do you know?

15         MR. HAMMOUD:  Object to the form.

16         THE WITNESS:  Yeah, that -- the --

17         again, he's not saying that the DEA

18         department is in substantial

19         noncompliance.  That's not what he's

20         saying.  Additionally, the risk of being

21         in noncompliance is a high risk level.

22  BY MR. CARTMELL:

23    Q.    Okay.  And this observation by the

24  internal auditor was found to be high risk,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?

 2              MR. HAMMOUD:  Objection.  Asked and

 3         answered.

 4              THE WITNESS:  Yeah, that's been

 5         asked and answered.  It's -- I'm not

 6         saying that there's a finding -- that

 7         he's finding high risk.  It's the

 8         potential of being in noncompliance that

 9         is high risk.

10    BY MR. CARTMELL:

11         Q.   Sir, we just read what the

12    potential risks are related to this finding,

13    correct?

14         A.   Exactly.

15         Q.   And it's high, and it's serious,

16    correct?

17              MR. HAMMOUD:  Objection.  Asked and

18         answered.

19              THE WITNESS:  Mm-hmm.

20    BY MR. CARTMELL:

21         Q.   Isn't that correct?

22         A.   I've answered that.  Yes.

23         Q.   Okay.  They also had a finding

24    related to the suspicious order monitoring; is
```

1   that correct?

2          A.    Certainly.  Where is that?

3          Q.    That's at page -- the last three,

4   Bates 581.

5          A.    581.

6          Q.    Suspicious Order Monitoring.  It

7   states, In order to identify anomalous sales

8   activity, an overall process of reviewing all

9   sales orders is conducted by the DEF OPS.

10              Right?

11         A.    Yeah.

12              Actually, it's probably easier if I

13  just read it and --

14         Q.    That's okay.  I want to read it for

15  the jury, and then I'll follow up and ask you

16  questions.  Okay?

17              MR. HAMMOUD:  Can you give him a

18         second to read it --

19              THE WITNESS:  Yeah.

20              MR. CARTMELL:  Oh, I'm sorry.

21              MR. HAMMOUD:  -- for himself?

22  BY MR. CARTMELL:

23         Q.    Oh, I'm sorry.  I thought you meant

24  you'd rather me not read it.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    Oh, no, no.  You can -- yeah.

2          Q.    Go right ahead.

3                THE WITNESS:  I just want to read

4          it first, yeah.

5                (Reviewing documents.)

6                Okay, I'm good.

7    BY MR. CARTMELL:

8          Q.    So the internal audit, one of the

9    things that was done was to take a look at your

10   suspicious order monitoring program that was in

11   place, correct?

12         A.    Correct.

13         Q.    And to assess whether or not that

14   was putting your company, Teva, at risk,

15   correct?

16         A.    Correct.

17         Q.    Okay.  And so Mr. Rigbi came in and

18   had interviews with you and, I think, Colleen

19   McGinn and several other individuals within

20   your department, correct?

21         A.    Correct.

22         Q.    It states, In order to identify

23   anomalous sales activity, an overall process of

24   reviewing all sales orders is conducted by the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   DEF OPS.

 2           Do you see that?

 3       A.   Yes.

 4       Q.   Now, that is the computer algorithm

 5   system that was put in place primarily because

 6   of you when you came to be the manager,

 7   correct?

 8       A.   Correct.

 9       Q.   And that was what you thought was

10   an improvement, more robust system to try to

11   help find suspicious orders, correct?

12       A.   Correct.

13       Q.   Okay.  If you go down a little bit,

14   it says, DEF OPS sifts through approximately

15   10,000 monthly order line items --

16           Do you see that?

17       A.   Yes.

18       Q.   -- and automatically releases

19   approximately 95 percent of the orders that fit

20   a customer's normal ordering pattern.

21           Do you see that?

22       A.   Yes.

23       Q.   And that's, I take it, consistent

24   with your memory of DEF OPS at this time, in
```

1    2015.

2          A.   It's worded not the best, but Itai

3    is not a native English speaker.

4          Q.   Okay.  And I want to make a point

5    or ask a question here.

6               We saw from Mr. Buzzeo's report

7    about the SORDS previous computer algorithm,

8    and it made a statement that at that time,

9    SORDS, in 2012, was only pending or flagging --

10   what was it? -- 10 orders a week?

11              MR. HAMMOUD:  Objection.  Asked and

12         answered.

13              THE WITNESS:  Correct.

14   BY MR. CARTMELL:

15         Q.   That would be 40 a month, wouldn't

16   it?

17              MR. HAMMOUD:  Objection.

18              THE WITNESS:  I've never seen the

19         numbers, but I won't dispute it.

20   BY MR. CARTMELL:

21         Q.   Right.  And all I was doing was

22   simple math --

23         A.   Yeah.

24         Q.   -- that if it's 10 a week that are

1    being flagged as potentially suspicious and

2    there's four weeks in a month, then you have 40

3    a month.  Correct?

4         A.    Which is why I'm not disputing that

5    at all.

6         Q.    Okay.  So SORDS, up until 2012,

7    according to the documents, was pending or

8    flagging approximately 40 a month, and your new

9    system, DEF OPS, is flagging approximately

10   10,000 a month?

11        A.    No, not flagging.  Approximately

12   10,000 order lines were going through the

13   system, and about 5 percent of those were being

14   flagged for manual investigation.

15        Q.    Okay.  I apologize.  I used the

16   wrong figure to do the math.

17        A.    I do that all the time.

18        Q.    That's all right.

19              So of the 10,000 monthly orders

20   that are coming through, approximately 95 of

21   those just sail through the system, and they're

22   not pended or flagged, correct?

23        A.    Correct.

24              MR. HAMMOUD:  Objection.

1    BY MR. CARTMELL:

2        Q.    The 5 percent -- the remaining

3    5 percent of the orders that did not pass that

4    are pended or flagged, correct?

5        A.    Correct.

6        Q.    And 5 percent, I think, of 10,000

7    is -- what? -- 500?

8        A.    Yes.

9            MR. HAMMOUD:    Object to the form.

10   BY MR. CARTMELL:

11       Q.    Okay.    And so of note is that when

12   we talked previously about the SORDS algorithm

13   that was in place in 2012, it was noted by the

14   consultant expert that SORDS, that algorithm,

15   was only flagging or pending approximately 10

16   orders a week, correct?

17       A.    Correct again.

18       Q.    And if my math is right, that would

19   be approximately 40 pended or flagged orders a

20   month, correct?

21       A.    Correct.

22            MR. HAMMOUD:    Objection.    Asked and

23       answered.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   And your new system, DEF OPS, if

2    this is correct, was pending or flagging

3    approximately 500 a month, correct?

4               MR. HAMMOUD:  Objection.  Asked and

5          answered multiple times.

6               THE WITNESS:  Multiple times, yes.

7    BY MR. CARTMELL:

8          Q.   Okay.  And so we know that DEF OPS,

9    when compared to SORDS, or SORDS 1 at least,

10   was flagging or pending a lot more potentially

11   suspicious orders than had been done at Teva

12   previously, correct?

13              MR. HAMMOUD:  Objection.  Object to

14        the form.

15              THE WITNESS:  That is correct.

16   BY MR. CARTMELL:

17        Q.   And is that some evidence to you,

18   as you've said, that this was a better system

19   that you put in place for the suspicious order

20   monitoring algorithm?

21              MR. HAMMOUD:  Object to the form.

22              THE WITNESS:  I would hope.  I

23        would hope.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  It then states, The 5

2    percent are manually checked and placed on hold

3    until they will be rechecked by trained team

4    members of suspicious order monitoring, and

5    then the release is enabled.

6            Right?

7        A.    Correct.

8        Q.    Okay.  And just so the jury

9    understands, that means 10,000 orders are

10   coming through; 5 percent, or 500 of those,

11   typically, on average, are going to be flagged

12   as potentially suspicious.

13           Those are put on hold, and then you

14   and your one other individual in your

15   department who reports to you would further

16   investigate those to decide whether or not to

17   release the hold and let the opioids ship or

18   whether or not they were suspicious and --

19       A.    Well, controlled substance,

20   because --

21           MR. HAMMOUD:  Object to the form.

22           THE WITNESS:  And, again to

23       clarify, this is all controlled

24       substances, not just opioids.

1    BY MR. CARTMELL:

2          Q.    Okay.  So the 5 percent, or 500,

3    you and one other individual would investigate

4    those controlled substances to determine

5    whether or not those should be held and not

6    actually shipped to the customer because

7    they're suspicious, right?

8          A.    Correct.

9          Q.    Okay.  It then states, The SOM unit

10   investigates approximately 15 customers a

11   month.

12               Do you see that?

13         A.    Yes.

14         Q.    And that would be the investigation

15   done by you and one other individual; is that

16   right?

17         A.    Well, that would be an inquiry to

18   the customer, which could be through customer

19   service.

20         Q.    Okay.  Explain what you mean by

21   that.  In other words, if you have an order

22   that is being held because it's potentially

23   suspicious of these 500, if there's going to be

24   a discussion with the actual customer, Teva's

1    customer, was the policy at Teva that the

2    customer service individual was the one who

3    would have that contact with the client?

4           A.    The initial contact, yes.

5           Q.    Okay.  And that individual from

6    customer service, as we discussed, is somebody

7    who is involved in discussing sales with the

8    clients, correct?

9           A.    Correct.

10          Q.    It then says, From a total share of

11   delayed orders, only a small quantity are

12   delayed for more than one day (approximately 25

13   orders a month).

14                Do you see that?

15          A.    Yes.

16          Q.    So of the 500 orders that might, on

17   average, be held and flagged as potentially

18   suspicious, about 25 of those are held longer

19   than one day; is that right?

20          A.    Correct.  At the time, I'm sure

21   that's an accurate number.

22          Q.    So you're completing all your

23   investigations on almost all of those 500,

24   approximately 475 of them, within one day?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.    Yes.

 2              Q.    And many of those, I've seen from

 3    the documents, they're only held as potentially

 4    suspicious and then released within a matter of

 5    minutes, correct?

 6                    MR. HAMMOUD:  Object to the form.

 7                    THE WITNESS:  Can be.

 8    BY MR. CARTMELL:

 9              Q.    In fact, that's a large number of

10    them, correct?

11              A.    Oh, yes, mm-hmm.

12              Q.    And then those final 25, of those,

13    within the last year, there had only been two

14    that were found to be suspicious orders,

15    correct?

16              A.    That is correct.

17              Q.    Okay.  And this is in 2015,

18    correct?

19              A.    Correct.

20              Q.    So if my math is right, you're

21    going to have in a single year 120,000 orders

22    for opioids, correct?

23              A.    No.

24                    MR. HAMMOUD:  Objection.
```

```
 1   BY MR. CARTMELL:

 2        Q.   120,000 line orders; is that right?

 3             MR. HAMMOUD:  Object to the form.

 4        Mischaracterizes prior testimony.

 5             THE WITNESS:  Controlled

 6        substances.

 7   BY MR. CARTMELL:

 8        Q.   I'm sorry.  Let me start over.  I'm

 9   dense.

10             If my math is right, then based on

11   this, your department is going to have 120,000

12   orders of controlled substances, including

13   opioids, in a year, correct?

14        A.   Yes.

15        Q.   And of those in a year, do you

16   believe, on average, the number of those that

17   are found to be suspicious is two?

18        A.   Yes.

19        Q.   It then states, The manual testing

20   process for the segment of suspicious orders

21   and the release of approximately 5 percent of

22   them is conducted by one person who has the

23   authority to change the status of the orders

24   from hold to release.
```

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2         A.   Yes.

3         Q.   So if I understand that correctly,

4    does that mean that there is only one person in

5    the department that, after the investigations

6    of those orders that are thought to be

7    potentially suspicious, can make the decision

8    on whether or not to release those and ship the

9    orders of opioids or controlled substances or

10   decide that they're suspicious and stop that

11   shipment?

12              MR. HAMMOUD:  Object to the form.

13              THE WITNESS:  Yes, it can be.

14   BY MR. CARTMELL:

15        Q.   Well, it is just one person at this

16   time, right?

17        A.   Well, in terms of a deeper

18   investigation into a controlled substance, it

19   involves multiple people.

20        Q.   But I'm not asking about the

21   investigation.  I'm asking about the ultimate

22   decision on whether or not to ship the

23   controlled substances, including opioids.

24              That decision on who will make the

1  decision either release the opioids into the

2  community, even though they were tagged

3  originally as potentially suspicious, or hold

4  those and not ship those, that -- at this time,

5  in 2015, that decision rested with one

6  individual, correct?

7         MR. HAMMOUD:  Object to the form.

8     Asked and answered.

9  BY MR. CARTMELL:

10    Q.   The final decision.

11    A.   Yeah, and are you saying that for

12  all orders that we investigated, that only one

13  person was making the decision?

14    Q.   No.  I'm talking about the decision

15  related -- whether or not to hold or release.

16    A.   The ultimate decision?

17    Q.   The ultimate decision.

18    A.   No, that's not one person.  There's

19  one person clicking a button.

20    Q.   It says, Granting exclusive

21  authority to a single person to release a

22  suspicious order constitutes a risk for

23  mistakes.

24         Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2           Q.   And it states that only one person

3      who -- had the authority to change the status

4      of the orders from hold to release.

5           Do you see that?

6           A.   Yes.

7           Q.   And is that true?  In 2015, there

8      was only one person who could change the status

9      of these potentially suspicious orders from

10     hold to release?

11          MR. HAMMOUD:  Objection.  Asked and

12          answered.

13          THE WITNESS:  And that's the

14          procedure in 2018 as well.

15     BY MR. CARTMELL:

16          Q.   Okay.  Do you agree with the

17     internal audit that says, Granting the

18     exclusive authority to a single person to

19     release a suspicious order constitutes a risk

20     for mistakes?

21          A.   No.

22          Q.   You disagree with this audit?

23          A.   I disagree with -- yeah, I disagree

24     with this audit.

1    Q.   And this was your department that

2  was being criticized here, correct?

3    A.   Yes, yes.

4    Q.   You take a lot of pride in your

5  department, I take it.

6            THE WITNESS:  Well, I hope so.

7            MR. HAMMOUD:  Objection to the

8       form.

9            THE WITNESS:  Well, I hope so.

10  BY MR. CARTMELL:

11    Q.   This identifies the potential risk,

12  if you look at the next column, False approval

13  and release of suspicious sales orders.

14            Do you see that?

15    A.   Yes.

16    Q.   And, again, that's talking about

17  the potential that there are suspicious orders

18  that Teva, as a company, is missing and going

19  ahead and releasing those into the community,

20  correct?

21    A.   No.

22            MR. HAMMOUD:  Object to the form.

23            THE WITNESS:  No.

24  BY MR. CARTMELL:

1    Q.   This risk -- let me restate it.

2         This risk, where it says, False

3    approval and release of suspicious sales

4    orders, what does that mean to you?

5         A.   I can tell you what my conversation

6    with Itai was.

7         Q.   Really, what I want to hear is

8    what -- Mr. Rigbi's statement, where he says,

9    False approval and release of suspicious sales

10   orders -- is the risk associated with this

11   finding of your department.

12        A.   And what he was talking about was

13   the final click of the button to release, that

14   he wanted two people there to witness the click

15   of the final button.

16        Q.   Your testimony is that there could

17   be false -- mistakes, he was saying, if only

18   one person was pushing a button that went from

19   hold to release on an order?

20        MR. HAMMOUD:  Object to the form.

21        Asked and answered.

22        THE WITNESS:  That's exactly what

23        I'm saying.

24   BY MR. CARTMELL:

1    Q.    And he, Mr. Rigbi, when he did the

2    internal audit, categorized this risk as

3    moderate; is that correct?

4    A.    Correct.

5    Q.    If you look at the last page,

6    there's a description of what a moderate risk

7    is; is that correct?

8    A.    Yes.

9    Q.    And it states, This is an internal

10   control or risk management issue that could

11   lead to financial losses; loss of controls

12   within the organizational entity or process

13   being audited; reputation damage, such as

14   negative publicity or local or regional media;

15   adverse regulatory impact, such as public

16   sanctions or immaterial fines, adverse

17   regulatory -- or excuse me.

18           It then states, As a moderate risk

19   issue, timely management attention is

20   warranted.  The finding should be reported to

21   the audit committee as necessary.

22           Do you see that?

23   A.    Yes.

24   Q.    And do you agree that this was a

1    moderate risk, as defined here, this finding

2    about the suspicious order monitoring program?

3         A.    No.

4         Q.    You disagree with Mr. Rigbi's

5    findings, correct?

6         A.    With the finding as written here,

7    yes.  And I'm trying to find where that was.

8         Q.    Why was it that even though the

9    internal audit found this to be a moderate risk

10   and that could lead to the false approval and

11   release of suspicious sales orders by only

12   having one individual who was pushing that

13   button, as you say -- why is it that you

14   decided not to have additional individuals, as

15   suggested, to be involved in that process?

16        A.    Well, they are involved in the

17   process.  I'm talking the actual physical

18   clicking of the button.  That's what this was

19   discussing.

20        Q.    I understand.

21             Why is it that even though the

22   internal found that that could be a risk of

23   you-all going ahead and missing a suspicious

24   order or sending out a suspicious order that

1    should be held -- why is it that you decided

2    not to adopt the recommendation and change the

3    practice?

4              MR. HAMMOUD:  Object to the form.

5              THE WITNESS:  We felt it was

6         unnecessary, that there wasn't a risk of

7         accidentally shipping a suspicious order

8         through the process of one person

9         clicking the button.

10   BY MR. CARTMELL:

11        Q.   Has there been any additional

12   audits or follow-up audits of your department,

13   the DEA department, since this 2015 internal

14   audit?

15        A.   Our legal department instituted an

16   audit that's under -- that's privileged.

17        Q.   When did that start?

18        A.   That was last month, I believe, or

19   the month before.

20        Q.   Have you received the results of

21   that audit?

22        A.   Yes.

23        Q.   Was that audit done in anticipation

24   of any sort of DEA investigation?

Highly Confidential - Subject to Further Confidentiality Review

```
1            A.   No.

2                 MR. HAMMOUD:  Objection to the

3            form.

4    BY MR. CARTMELL:

5            Q.   Do you know why that audit was

6    done?

7                 MR. HAMMOUD:  Objection to the

8            form.

9                 THE WITNESS:  Because since this

10           internal audit, there was no audit of

11           the program done.

12   BY MR. CARTMELL:

13           Q.   Why was it that the next audit that

14   was done was done by the legal department?

15                MR. HAMMOUD:  Objection to the

16           form.

17                THE WITNESS:  You have to ask the

18           legal department.

19   BY MR. CARTMELL:

20           Q.   Was the process of the audit that

21   was undertaken by the legal department the same

22   process that Mr. Rigbi undertook?

23                MR. HAMMOUD:  Objection to the

24           form.
```

```
 1              THE WITNESS:  No.
 2   BY MR. CARTMELL:
 3        Q.    What was the difference?
 4        A.    It was much more extensive.
 5        Q.    Okay.  And has the result of that
 6   actually come out yet?
 7        A.    Yes.
 8        Q.    Okay.  When did they come out?
 9        A.    That was a couple weeks ago.
10        Q.    Was the audit at the request of
11   legal?
12        A.    Yes.
13        Q.    Okay.  And who was involved in that
14   audit, other than the lawyers for the company?
15        A.    Me, Colleen McGinn, Matt Benkert, I
16   think Tim Aleman, and Sarah Everingham.
17        Q.    Now, this 2015 internal audit that
18   we just went through that had the findings --
19   high risk findings related to the DEA
20   department and the moderate risk findings
21   related to the suspicious order monitoring
22   program, this was internal in nature, and these
23   findings were not provided to the DEA, correct?
24        A.    Not that I know of.
```

1    Q.    Okay.  It's your understanding that

2    this was a confidential internal audit?

3    A.    I would assume.

4    (Exhibit Teva-Tomkiewicz-015 marked

5    for identification and attached to the

6    transcript.)

7    BY MR. CARTMELL:

8    Q.    I'm handing you what has been

9    marked as Exhibit 15.  And I'll represent to

10   you, sir, that this was a PowerPoint

11   presentation that was produced to the

12   plaintiffs in this lawsuit by Teva from their

13   internal files.  Okay?

14   A.    Yes.

15   Q.    And it looks like this is a

16   PowerPoint presentation that you gave in 2017.

17   Is that right?

18   A.    Yes.

19   Q.    This was created by you, correct?

20   A.    Yes.

21   Q.    And kept by you in the course of --

22   ordinary course of your employment at Teva?

23   A.    Yes.

24   Q.    Okay.  Who did you give this

Highly Confidential - Subject to Further Confidentiality Review

1    presentation to?

2         A.    To our internal DEA compliance

3    team.

4         Q.    Would that be all of the 16 or 17

5    employees that you have in that department?

6         A.    I think the number is less now, but

7    yes, it would be the entire DEA compliance

8    team.

9         Q.    Has the number of DEA compliance

10   employees at Teva decreased recently?

11             MR. HAMMOUD:  Object to the form.

12             THE WITNESS:  Yes.

13   BY MR. CARTMELL:

14        Q.    How so?

15        A.    We had an overall reduction in head

16   count, and we lost some people.

17        Q.    When did that occur?

18        A.    Oh, maybe a year ago, close to a

19   year ago, approximately.

20        Q.    Sometime in 2017?

21        A.    It could have been, yes.

22        Q.    And how many people from the DEA

23   compliance department actually were lost in

24   that downsizing?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I think it may have been two or

2    three.

3         Q.    So is your best guess, as you sit

4    here today, that the size of the DEA compliance

5    department is now somewhere around 12 or 13 or

6    14?

7         A.    No.  I don't know how many people,

8    because we had increased.  Then we lost people.

9         Q.    What's your best guess?

10        A.    Could be about the same.  Maybe 14,

11   maybe 15, maybe 16.

12        Q.    Okay.  If you turn to page --

13   strike that.

14             This presentation you gave is in

15   2017; is that right?

16        A.    Yes.

17        Q.    Do you remember when approximately

18   in 2017?

19        A.    I think it was towards the end of

20   2017.

21        Q.    If you turn to the internal page,

22   the very next page, which is the first page of

23   your presentation, it states, SOM, suspicious

24   order monitoring.  And then you have a graph

1    that you provide.  It's titled Overdose Deaths

2    Involving Opioids, United States, 2000-2015.

3              Do you see that?

4         A.   Yes.

5         Q.   Okay.  And if I'm reading this

6    correctly, the very top line, titled Any

7    Opioid, is a line that shows a rapidly

8    increasing number of overdose deaths in the

9    United States between 2000 and 2015 from all

10   opioids, whether prescription or not, correct?

11        A.   I would say an increasing line,

12   yes.

13        Q.   Okay.  And then the second line

14   increases -- I don't want to put words in your

15   mouth, but -- pretty substantially from 2000

16   through 2011, goes down a little bit in '12 and

17   seems to be increasing a little after that.  Is

18   that right?

19        A.   I would say that it appears more

20   flat.  There does show a slight increase

21   between 2013 and 2015, but that's still down

22   from 2011.

23        Q.   Okay.  And that line would indicate

24   the opioids that are prescribed opioids like

Highly Confidential - Subject to Further Confidentiality Review

1  some of the opioids that Teva sells and

2  contributes distributes, correct?

3           MR. HAMMOUD:  Object to the form.

4           THE WITNESS:  Certainly.  That's a

5       fair assessment.

6  BY MR. CARTMELL:

7       Q.   Why is it that you present that

8  slide to your team?

9       A.   Because I want them to be aware of

10  the risks of not having a good program.

11      Q.   "The risks," are you saying the

12  risks associated with not having a good

13  suspicious order monitoring program?

14      A.   Correct, not being vigilant in what

15  we do, not being effective in what we do.

16  Certainly.

17      Q.   And what do you mean by that?  In

18  other words, are you saying to them that if

19  we're not vigilant, we can contribute to,

20  actually, the number of deaths that occur --

21      A.   That's exactly what I'm saying.

22           MR. HAMMOUD:  Object to the form.

23  BY MR. CARTMELL:

24      Q.   Go ahead.

1          A.    That's exactly what I'm saying.

2          Q.    Okay.  So you're trying to impress

3    on your team that's involved in suspicious

4    order monitoring that you have to be very

5    diligent and do the very best you can to

6    identify all suspicious orders and investigate

7    those and not let those orders get to the

8    streets, fair?

9               MR. HAMMOUD:  Object to the form.

10              THE WITNESS:  It's an odd way of

11         saying it.

12              But generally, what I'm saying is

13         that this is how important I take this

14         business and what I'm doing and -- in

15         identifying things that are suspicious,

16         identifying customers that are

17         suspicious.

18              Because if I'm not vigilant and I

19         don't stand up strong for what I do

20         within the company, people are going to

21         die.

22              And, additionally, if I have an

23         ineffective program, one that goes the

24         other way wrong, then I have people with

Highly Confidential - Subject to Further Confidentiality Review

1          cancer, people in hospice, who are

2          sitting in pain.

3     BY MR. CARTMELL:

4          Q.   And I mentioned the opioids being

5     shipped by your company and others getting to

6     the streets, but it's not just getting to the

7     streets.  It's actually, if you miss suspicious

8     orders that are diverted ultimately, it's

9     getting to actual patients, correct?

10              MR. HAMMOUD:  Object to the form.

11    BY MR. CARTMELL:

12         Q.   Addicted patients.

13         A.   Addicted patients?

14              MR. HAMMOUD:  Object to the form.

15    BY MR. CARTMELL:

16         Q.   Let me strike that and restate it.

17              I mentioned that one of the risks

18    is that if you don't have a really effective

19    and good suspicious order monitoring program in

20    place -- that one risk of that is that you'll

21    miss suspicious orders, and the opioids will be

22    shipped and get to the streets.

23              Do you remember me saying that?

24              MR. HAMMOUD:  Object to the form

1           again.

2                   THE WITNESS:  Oh, I don't remember

3           you saying that, but that's a fair

4           assessment of missing a suspicious

5           order.

6    BY MR. CARTMELL:

7           Q.    And what I was saying was just

8    clarifying that -- and maybe it's not well said

9    and an odd way to say it, as you said, but --

10   the risk is also not only getting to the

11   streets, but the risk is that it gets to --

12   from diverters to addicted patients, correct?

13                  MR. HAMMOUD:  Object to the form.

14                  THE WITNESS:  Getting from -- I'm

15          not sure what you mean by an "addicted

16          patient," "from a diverter to an

17          addicted patient."  I'm not --

18   BY MR. CARTMELL:

19          Q.    You don't know what that means?

20          A.    I have no clue.

21          Q.    Okay.  Well, you know, from your

22   research and investigation that you did at Teva

23   and you did before that at AmerisourceBergen,

24   that all over the United States, for several

Highly Confidential - Subject to Further Confidentiality Review

1   years now, opioids that have been shipped from

2   manufacturers and distributors have ended up in

3   pharmacies that have then filled prescriptions

4   of those opioids to patients who are addicted

5   to opioids, correct?

6           MR. HAMMOUD:  Objection to the

7       form.  Vague.

8           THE WITNESS:  Oh, I'm certain.

9   BY MR. CARTMELL:

10      Q.   Okay.  And you also know from your

11  experience that if that happens from time to

12  time, as you showed in the chart on the

13  previous page and that is being shown the to

14  the jury, those addicted patients can overdose?

15          MR. HAMMOUD:  Object to the form.

16          THE WITNESS:  Any patient can

17      overdose.

18  BY MR. CARTMELL:

19      Q.   Okay.  That's my --

20      A.   Not just addicted.  Any patient can

21  overdose.

22      Q.   That's my only point.  We can move

23  on.

24          If you turn to the next page, this

Highly Confidential - Subject to Further Confidentiality Review

1    is your slide prepared by you in 2017, and this

2    actually has the suspicious orders that Teva

3    had reported to the DEA since you arrived as

4    the manager of the suspicious order monitoring

5    program; is that correct?

6            A.    Correct.

7            Q.    And so we know that the first year

8    that you were there --

9                  And this -- the first year was

10   during a time that you were working on sort of

11   revamping and improving the process, correct?

12           A.    Correct.

13           Q.    You were putting in place --

14           A.    Well, I shouldn't limit it, because

15   I always want to continuously improve.

16           Q.    Right.

17                 But you were new at that point and,

18   as you discussed, that's the time when you had

19   said when you were being hired -- and they told

20   you they were going to let you improve and make

21   it a better, more robust suspicious order

22   monitoring program, correct?

23                 MR. HAMMOUD:  Objection to the

24           form.  Mischaracterizes prior testimony.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2         Q.    You can answer.

3         A.    I would say I was brought in to

4    improve the program.

5         Q.    Okay.  And so during that year,

6    2014, your company, Teva, reported one

7    suspicious order; is that correct?

8         A.    Correct.

9         Q.    Okay.  During 2015, your company

10   reported four, correct?

11        A.    Correct.

12        Q.    And, again, we know that during

13   these years, Teva was getting thousands and

14   thousands -- over a hundred thousand orders for

15   controlled substances, correct?

16        A.    Correct.

17        Q.    Okay.  And then in 2016, the year

18   after the audit we just talked about, the

19   internal audit, the suspicious order monitoring

20   program at Teva didn't report a single

21   suspicious order, correct?

22        A.    Correct.

23        Q.    If we just look at those three

24   years -- strike that.

1    And we know, from what you've seen

2    previously as we've talked today, that in 2012

3    and before, they had not reported a single

4    suspicious order to the DEA, correct?

5        A.    That's correct.

6        Q.    And you said there was one in 2013,

7    correct?

8        A.    I believe so, yes.

9        Q.    So if we add that up from 2012 to

10   2016 -- and we'll talk about '17 in a minute --

11   that's one, two, three, four -- five years and

12   six suspicious orders over those five years,

13   correct?

14       A.    Correct.

15       Q.    And we know from the internal

16   audit, if the numbers are accurate, that --

17   120,000 orders a year.  So if we do that

18   multiplication times five, that's 600,000

19   orders, correct?

20       A.    Certainly.

21       Q.    And out of that 600,000 orders

22   during the five years from 2012 to 2016, there

23   were only six of those that were found to be

24   suspicious by your company, correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    That's true even though you came

3 from AmerisourceBergen, where you were

4 reporting hundreds of suspicious orders

5 monthly, correct?

6    A.    That is correct.

7    Q.    Okay.  And then in 2017, you report

8 that your company had reported 18 suspicious

9 orders so far; is that right?

10    A.    That is correct.

11    Q.    And, again, you don't recall

12 specifically when during the year this was

13 done; is that right?

14    A.    Correct.  It was towards the end of

15 the year.

16    Q.    Okay.  And so there was a definite

17 uptick in the numbers of suspicious orders that

18 you had found at that point?

19    A.    Correct.

20    MR. HAMMOUD:  Object to the form.

21 BY MR. CARTMELL:

22    Q.    Okay.  And what is your

23 understanding of why, all of a sudden, in that

24 one year, you had found three times as many

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious orders as you had found in the prior

2    five years at Teva?

3        A.    Well, a couple reasons.  One, seen

4    a pattern in drug abuse had shifted.  There

5    were some additional products that abusers were

6    seeking out, one of which is a noncontrolled

7    substance called gabapentin.  Which, when we

8    saw suspicious orders for that product, we

9    still reported them as suspicious, and so

10   they're in that 18 number.

11            We also had some customers --

12   potential new customers due to bringing on some

13   additional business that we terminated and

14   reported their orders as suspicious.

15            And those particular customers, by

16   the way, are still licensed in the states in

17   which they do business, and they're still

18   registered with the DEA.  But we felt that they

19   were not of a good risk for Teva to do business

20   with, so we terminated their ability to

21   purchase controlled substances for them.

22            Some of those customers had placed

23   orders after the termination, attempted to

24   place orders for those products, and we

Highly Confidential - Subject to Further Confidentiality Review

1    reported those as suspicious as well.

2          Additionally, there was a couple

3    potential new customers that tried coming on

4    board and placing orders before being approved

5    that, ultimately, we denied them, and we

6    reported those orders as suspicious as well.

7          Q.    Okay.  Of these 18 suspicious

8    orders that you reported to the DEA in 2017,

9    did you ship the actual opioids out in any of

10   those?

11              MR. HAMMOUD:  Object to the form.

12              THE WITNESS:  And not just opioids

13         but other controlled substances and one

14         noncontrolled substance.  And we did not

15         ship any of those.

16   BY MR. CARTMELL:

17         Q.    How many of the 18 reports dealt

18   with opioid -- suspicious opioid orders?

19         A.    Couldn't tell you offhand.

20   Couldn't tell you offhand.

21         Q.    Do you have any idea?

22         A.    I know there were some in there,

23   but I couldn't tell you offhand.

24         Q.    Can you guesstimate?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    No, I can't guesstimate.

2              MR. HAMMOUD:  Objection.  Asked and

3        answered.

4   BY MR. CARTMELL:

5        Q.    There's documents that would tell

6   us that, correct?

7        A.    You have the reports, yeah.

8        Q.    There would be reports from the

9   DEF OPS system?

10       A.    No.  The actual copies of the

11  reports that I've sent to the local office.

12       Q.    Oh, you're talking about the

13  reports that you actually sent to --

14       A.    DEA.

15       Q.    -- the local Philadelphia --

16       A.    Yes.

17       Q.    -- DEA administration office?

18       A.    Yes.

19       Q.    Okay.  And are those -- a copy of

20  those reports kept at Teva in your files?

21       A.    Yes.

22       Q.    Okay.  Any of the 18 controlled

23  substance reports that you made to the DEA in

24  2017, was the product actually shipped in any

Highly Confidential - Subject to Further Confidentiality Review

1    of those, or was it held in all of those?

2              MR. HAMMOUD:  Objection.  Asked and

3         answered.  And then objection to the

4         form.

5              THE WITNESS:  Didn't ship any of

6         them.

7    BY MR. CARTMELL:

8         Q.   Okay.  What were the names of the

9    customers that you say in 2017 were new and

10   that you reported to the DEA?

11        A.   EMED, DV Medical, Associated

12   Pharmacies, Inc., and I believe Rochester Drug

13   Corporation -- or Co-op.  Not Corporation.

14   Co-op.  I believe those are they.

15        Q.   And is it true that of those 18

16   reports that you made in 2017, 12 of those

17   reports made to the DEA were reports on

18   Rochester Drugs?

19        A.   Could have been.  Could have been.

20        Q.   And did any of the other reports

21   that you made in '17 -- were there multiple

22   reports for a single customer?

23        A.   Could have been.  Could have been.

24        Q.   Do you remember who it was that you

1  reported to the DEA, which customers it was, in

2  2015?

3          A.    In 2015, I want to say Osborne

4  Drugs and, possibly, Richie Pharmacal.

5          Q.    What was the reason for those

6  reports?

7          A.    Felt the orders were suspicious.

8          Q.    What were the drugs involved?

9          A.    Don't remember.

10          Q.    Were they opioids; do you know?

11          A.    Don't remember.

12          MR. HAMMOUD:  Objection.

13  BY MR. CARTMELL:

14          Q.    If you go to the next page of your

15  2017 presentation to your team, there's what's

16  listed as a Red Flags, and it gives the Jones

17  Total Health Care Pharmacy and SND Health Care

18  Decision and Order.  Tell us about that.

19          A.    This was a piece that I used to

20  explain how if we have red flags on one of our

21  orders, I won't -- our department won't allow

22  it to be shipped until any red flags are

23  satisfied.

24          Q.    Any and all red flags?

1        A.    Any and all.

2        Q.    I want to ask you about that.

3    That's the policy that you're talking about for

4    DEA holds at Teva; is that true?

5        A.    Correct.

6              (Exhibit Teva-Tomkiewicz-016 marked

7              for identification and attached to the

8              transcript.)

9    BY MR. CARTMELL:

10       Q.    I'm going to hand you what's been

11   marked as Exhibit 16, which is a 2018 standard

12   operating procedure for Suspicious Order

13   Monitoring - DEA Order Holds.

14             You're familiar with that policy, I

15   take it.

16       A.    Yes.

17       Q.    And if you wouldn't mind turning to

18   page 3 of 8.

19             This talks about the process in

20   place as far as holding orders of controlled

21   substances like opioids and other controlled

22   substances as of 2018, I believe.

23             This is a 2018 policy.  Do you see

24   that?

1       A.    Yes.

2       Q.    Okay.  And I don't think the policy

3  has ever changed between the time you arrived

4  in 2014 and this policy.  Has it?

5       A.    Not substantially.

6       Q.    Okay.

7       A.    I believe all the changes that I

8  made for 2016 were just clarifying wording.

9       Q.    Okay.  If you go to page 3 of 8, it

10  states at 6.2.2, If the order is not consistent

11  with the customer's previous order history and

12  there is not a previous explanation from the

13  customer, the DEA compliance team will notify

14  customer service to contact the customer for

15  clarification about the quantity ordered.

16            Do you see that?

17       A.    Yes.

18       Q.    And we talked about that.  Customer

19  service, again, is a different department than

20  your DEA compliance department, correct?

21       A.    Correct.

22       Q.    And those individuals in that

23  department are usually involved in dealing with

24  the customers from a sales standpoint, correct?

1    A.    That is correct.

2    Q.    They provide the sales services to

3  the clients or the customers, correct?

4    A.    I don't know exactly what services

5  they provide, but I won't dispute that.

6    Q.    Okay.  It then says, Customer

7  service will contact the customer to request

8  the reason for the increase/change in ordering

9  pattern.

10    Do you see that?

11    A.    Yes.

12    Q.    And that's the policy, that if

13  there's going to be contact with a customer,

14  it's not going to be a DEA compliance

15  individual who is going to make that contact

16  with the customer; it's going to be somebody

17  from the customer service sales department who

18  does that, correct?

19    A.    Correct.

20    MR. HAMMOUD:  Object to the form.

21  BY MR. CARTMELL:

22    Q.    Is that correct?

23    A.    That is correct.

24    Q.    And it says, Questions posed by

Highly Confidential - Subject to Further Confidentiality Review

1    customer service to the customer will be

2    open-ended.

3            Do you see that?

4    A.    Yes.

5    Q.    Why is that?

6    A.    Because we don't want to lead the

7    customer as far as what a potential answer

8    should be.

9    Q.    Right.  Because if you lead them or

10   give any indication of what they should say

11   that's appropriate to have the order released,

12   then your program is not going to work, right?

13   A.    That's a fair assessment.

14   Q.    It then says, Customer service then

15   forwards that information on to the DEA

16   compliance team for review.

17           Right?

18   A.    Correct.

19   Q.    And if a customer does not

20   satisfactorily respond to the inquiry, the

21   appropriate sales associate will be contacted

22   and instructed to obtain an explanation from

23   the customer.

24           Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2      Q.    So now you're talking to -- strike

3  that.

4            At this point, we've got an order

5  from a customer that's being held because it's

6  potentially suspicious, right?

7      A.    Correct.

8      Q.    And you're asking your customer

9  service people, who usually deal with them on

10  sales, to get a reason to see whether or not

11  it's an adequate reason to release the order,

12  correct?

13      A.    Correct.

14            MR. HAMMOUD:  Objection to the

15        form.  Asked and answered.

16  BY MR. CARTMELL:

17      Q.    Correct?

18      A.    Correct.

19      Q.    If they don't give an adequate

20  answer to the customer service person, then you

21  send another person in to the customer that's

22  from sales, correct?

23      A.    Correct.

24      Q.    Why doesn't the DEA compliance

1  individuals who have the most knowledge about

2  what diversion of opioids is -- why don't they

3  actually contact the client?

4           MR. HAMMOUD:  Objection to the

5           form.

6           THE WITNESS:  Well, because if we

7           were to notify the customer at first

8           contact that there is a DEA compliance

9           issue with their order, that -- if they

10          were, say, an unscrupulous customer --

11          And I'm not saying that any of my

12          customers are unscrupulous, because I'd

13          like to say that they are -- from what I

14          see, they're generally all above board.

15          -- that it -- an unscrupulous

16          person could then reverse-engineer the

17          orders and say, Oh, well, I've been

18          ordering this much, and it's -- and it

19          flagged their system.  So next time, I'm

20          going to change my ordering pattern,

21          reduce my orders in order to try to get

22          other orders through; may look for an

23          additional supplier to supplement, you

24          know, that particular product in order

1          to get more product.

2              By flagging them that the DEA

3          department is looking at them, that

4          could be something that could alter

5          someone's pattern if someone were

6          behaving in a nefarious manner.

7      BY MR. CARTMELL:

8          Q.   Isn't it true, sir, that one of the

9      reasons why salespeople are the ones who

10     contact the customers to try to get information

11     about whether or not the order is suspicious

12     because the salespeople do not want to upset

13     the client and risk losing the sale?

14             MR. HAMMOUD:  Object to the form.

15     BY MR. CARTMELL:

16         Q.   Isn't that one of the reasons?

17             MR. HAMMOUD:  Calls for

18         speculation.

19             THE WITNESS:  Well, that could be a

20         definite reason as well, that notifying

21         a customer that a DEA investigation into

22         their practices --

23             And if it's something that --

24         which, on the most part, we get, you

1          know, answers that, you know, satisfy,

2          you know, the red flag that we have

3          raised with the product.

4     BY MR. CARTMELL:

5          Q.    Now, once an order is being held,

6     it's not very difficult to get that hold

7     cleared, is it?

8          A.    It depends.

9          Q.    Look up 6.3, Clearing an Order from

10    Hold, DEA Compliance; An order may be released

11    in Oracle for fulfillment if it meets one or

12    more of the following criteria.

13          So it just has to meet one of these

14    criteria, right?

15          A.    Potentially.

16          Q.    It states, The order is within

17    previous purchasing history trends.  The order

18    has not exceeded all usual and customary

19    trends.

20          Do you see that?

21          A.    Yeah.

22          Q.    Total orders received are not more

23    than 10 percent over their usual and customary

24    limits.  The customer provides a reasonable

Highly Confidential - Subject to Further Confidentiality Review

1    explanation for the increase in orders.

2              Do you see that?

3         A.   Yep.

4         Q.   So all the customer has to do is

5    provide to the salespeople a reasonable

6    explanation, correct?

7         A.   Yes.

8         Q.   And then the catch-all here for

9    clearing an order is, Any other relevant data.

10             Do you see that?

11        A.   That is correct.

12        Q.   Okay.  So anything that's relevant

13   or determined to be relevant by the company is

14   a reason for clearing an order that had been

15   flagged for being suspicious, correct?

16        A.   As long as it's a reasonable

17   explanation and makes sense with what we know

18   about the customer, certainly.

19        Q.   Let's talk a little bit more about

20   your 2017 PowerPoint presentation.  And if you

21   turn to page 6, this is a slide having to deal

22   with recent cases.

23             And Mallinckrodt is a manufacturer

24   of opioids; is that correct?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Correct.

2    Q.    This is a slide that states,

3  Mallinckrodt agreed to pay record 35 million

4  settlement for failure to report suspicious

5  orders of pharmaceutical drugs and for

6  recordkeeping violations.

7         Do you see that?

8    A.    Yes.

9    Q.    What's the reason why you are

10  presenting this to your DEA compliance team?

11    A.    Because one of the requirements

12  that Mallinckrodt had in this settlement was

13  that they review chargeback data for -- to do a

14  retrospective analysis to look for potential

15  suspicious orders and report those, if needed.

16  And so that's what I was discussing with this

17  slide.

18    Q.    Is this, again, presented to your

19  team, in part, because you want to reiterate

20  the importance of having a very tight

21  suspicious order monitoring program?

22    A.    That's a very fair assessment.

23    Q.    If you turn the page, Active

24  Matters, you present to your team the Current

1    Affairs; Senator Claire McCaskill on the opioid

2    epidemic:  pharma.

3              Quote -- it states, pharma --

4              Meaning pharmaceutical companies,

5    right?

6         A.   Correct.

7         Q.   -- ought to begin looking over

8    their shoulder.

9              Do you see that?

10        A.   Yes.

11        Q.   And then down below the picture, it

12   says, Senator Claire McCaskill says it's time

13   for pharmaceutical companies to start worrying

14   about their role in causing the opioid

15   epidemic, the deadliest drug overdose crisis in

16   U.S.

17             Do you see that?

18        A.   Yes.

19        Q.   And why do you present this to your

20   team?  Is it for the same reason?

21        A.   For the same reason, that and she

22   also wrote an op-ed in the USA Today

23   specifically calling out Teva for what she

24   claimed was that we weren't cooperating with

Highly Confidential - Subject to Further Confidentiality Review

1    her requests for data.

2         Q.    And that was because Senator

3    McCaskill actually sent a request to Teva's

4    attorneys asking for specific data to try to

5    determine whether or not they were complying

6    with the Controlled Substances Act and with the

7    rules relating to suspicious order monitoring,

8    and the lawyers for Teva refused to provide any

9    of those documents, correct?

10              MR. HAMMOUD:  Object to the form.

11              I'd also instruct the witness not

12         to reveal any privileged communications

13         between him and his lawyers.

14              THE WITNESS:  Again, that's

15         conversations with my attorneys, and I'm

16         not going to discuss conversations I had

17         with Teva attorneys.

18   BY MR. CARTMELL:

19         Q.    Well, you've seen the letter from

20   Teva's attorneys to Senator McCaskill, haven't

21   you?

22         A.    No.

23         Q.    You never saw those?

24         A.    No.  I --

1    Q.   The Foley letters?

2    A.   No, I haven't seen them.

3    Q.   Okay.  Your next slide, Active

4  Matters, Current Affairs; Attorneys general

5  from 41 states hit back against opioid-pumping

6  big pharma firms.

7         Do you see that?

8    A.   Yep.

9    Q.   Now, all of these cases that you

10  present to your team, like the cases the

11  attorney generals have brought against the

12  pharmaceutical companies and the other cases,

13  reflect that the DEA, the federal government,

14  is starting to sort of crack down against the

15  pharmaceutical companies related to whether or

16  not they are reporting suspicious orders; is

17  that fair?

18         MR. HAMMOUD:  Objection to the

19      form.

20         THE WITNESS:  Crack down?  You mean

21      that they previously weren't enforcing

22      those regulations?

23  BY MR. CARTMELL:

24    Q.   Well, as we saw in the previous

1   PowerPoint presentation from your department

2   that was in your file, there was thought to be

3   a change in the enforcement by the DEA,

4   correct?

5        A.   Well, there seemed to be a change

6   in attitude.  I don't know about enforcement.

7   Is that what you're suggesting, that the DEA

8   wasn't enforcing their regulations?

9        Q.   I'm suggesting that the DEA at some

10  point started to ramp up their enforcement

11  against pharmaceutical companies.  Is that

12  consistent with your belief?

13       A.   From what I've specifically seen, I

14  really haven't seen a change in enforcement.

15  I've seen enforcement, but in terms of --

16  because there's not, you know, that many, you

17  know, manufacturers of opioids.

18            You know, one -- you know, one data

19  point against, you know, Mallinckrodt is, you

20  know, that's a 100 percent increase in

21  enforcement against manufacturers.

22            So is that something that is

23  reflective of an increase of enforcement?

24  That, I don't know.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    If you turn to the next page, you

2    present to your team in Current Affairs, Meet

3    60 Minutes' DEA Whistleblower.

4                Do you see that?

5          A.    Yes.

6          Q.    It states, Why has the country's

7    opioid problem become a national emergency?   A

8    high-ranking whistleblower from the DEA

9    explains how the drug industry -- and

10   Congress -- fueled an epidemic.

11               Do you see that?

12         A.    Yes.

13         Q.    Why do you present that to your

14   team?

15         A.    Because that was, you know, part of

16   current affairs and the view of opioid

17   manufacturers in the news media.

18         Q.    It's true, though, you're trying to

19   reiterate and impress on your team the

20   importance of making sure that they are

21   following the law, correct?

22         A.    Oh, overall, yes.

23         Q.    And finding suspicious orders and

24   reporting them to the DEA, correct?

Highly Confidential - Subject to Further Confidentiality Review

1         A.    That's part of it, yes.

2         Q.    Okay.  And at that time, in 2017,

3    after looking at hundreds of thousands of

4    orders, before 2017, the company had only

5    reported five ever?

6         A.    That's correct.  That's correct.

7         Q.    I've got to ask you about your last

8    slide.  I've noticed from your documents that

9    this is your last slide on multiple

10   presentations that you've given.

11        A.    Yes.

12        Q.    And if I'm reading it correctly, it

13   says, Don't worry, Everything is going to be

14   amazing.  And then it --

15        A.    That's exactly -- yes.

16        Q.    It's got a bunch of, like -- I'm

17   guessing those are opioid pills --

18        A.    No.

19        Q.    -- Teva opioid pills.

20             MR. HAMMOUD:  Objection to the

21        form.

22             THE WITNESS:  No, they're not

23        opioids.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    So I was wrong?  Those aren't

2     opioid pills?

3          A.    No, they're not opioids.

4          Q.    What are those?

5          A.    It's clonazepam.

6          Q.    And what is that?

7          A.    It's an anti-anxiety medication.

8          Q.    So what do you present -- or what

9     do you mean by this slide that you present

10    multiple times to your team?

11         A.    Oh, that I -- well, it's two

12    things, because if you notice, a lot of the

13    photographs that I've used in presentations

14    have been a lot of pictures of pills and some

15    illicit drugs.

16              And they're all taken from a single

17    thread on Reddit in about a 15-minute search

18    called, What drugs are you doing this weekend?

19    And these were pictures taken by what appeared

20    to be abusers of pills.

21              And some of them look very nice, in

22    very nice pictures, and I like to use them to

23    show, to demonstrate that our product is ending

24    up at the street and that we must be vigilant.

Highly Confidential - Subject to Further Confidentiality Review

 1                 But we believe we have a very good

 2    program in place and that when we identify a

 3    suspicious order, we take action, when

 4    appropriate, against the customer and terminate

 5    the customer, all of whom are still registered

 6    by DEA and still shipping opioids, by the way,

 7    but I don't believe that they're appropriate

 8    for Teva to do business with.

 9                 So I believe our program is good.

10    That's what I'm saying here.

11         Q.    How many reports of suspicious

12    orders have you made to the DEA in 2018?

13         A.    Oh, I think it's close to 50.

14         Q.    50.

15                 And who are the customers that you

16    reported in 2018?

17         A.    In 2018, I've reported Kroger.

18    I've reported Rochester Drug.  I've reported a

19    company called R&S Sales.  I have reported

20    McKesson.

21                 And some of these orders aren't

22    orders that were even identified by the DEF OPS

23    system that we've found through other pieces.

24         Q.    Documents that we have been

1    provided by Teva in this lawsuit from their

2    internal files suggest that in 2018, you have

3    made one, two, three, four, five, six, seven,

4    eight, nine -- ten suspicious order reports to

5    the DEA on Rochester Drug.  Does that seem

6    right to you?

7           A.   Yes, that sounds about right.

8           Q.   Okay.  But you made these orders,

9    actually, after you already knew that there was

10   an ongoing investigation related to Rochester

11   Drug, didn't you?

12          MR. HAMMOUD:  Objection to the

13          form.

14          THE WITNESS:  No.  We -- I had

15          terminated sales of controlled

16          substances to them before we learned

17          that there was an investigation into

18          them.

19   BY MR. CARTMELL:

20          Q.   But in 2018, when you terminated

21   those sales, you already knew of that

22   investigation, didn't you?

23          A.   No.  No.  I had terminated sales

24   before -- it was before we learned of the

1  investigation into them.

2          Q.   So your testimony under oath is

3  that all of the reports you made on Rochester

4  to the DEA based on their suspicious orders

5  came after --

6          A.   No.

7          Q.   Excuse me.

8               -- came before you learned of an

9  investigation into that entity?

10         A.   Oh, no.  That's not what I'm saying

11 at all.

12         Q.   Okay.  I think you just told me a

13 minute ago that you made all those reports --

14         A.   No, that's not --

15         Q.   -- before you knew.

16         A.   No, that's not what I said.  I said

17 I stopped selling them controlled substances

18 before I knew.

19         Q.   Okay.  So what you're saying -- I

20 guess I misunderstood you.  What you're saying

21 is, every order thereafter, you would not allow

22 to go through?

23         A.   Correct, correct.

24         Q.   I got you.

Highly Confidential - Subject to Further Confidentiality Review

1           But when you stopped selling them,

2    at that point in time, you did not know about

3    the investigation into their sales --

4           A.    Exactly.

5           Q.    -- of opioids?

6           A.    Exactly.

7           MR. HAMMOUD:  Are we about at a

8    good place for a break?

9           MR. CARTMELL:  We've been going for

10   an hour probably?

11          MR. HAMMOUD:  A little over an

12   hour, yeah.

13          MR. CARTMELL:  How far are we in?

14          VIDEO OPERATOR:  5:50.  We've been

15   going for an hour and 22 minutes.

16          MR. CARTMELL:  Yeah, let's take a

17   break.

18          MR. HAMMOUD:  Okay.  Thanks.

19          VIDEO OPERATOR:  Going off the

20   record, 5:22.

21          (Recess from 5:22 p.m. until

22   5:38 p.m.)

23          VIDEO OPERATOR:  Back on the record

24   at 5:38 p.m.

1    BY MR. CARTMELL:

2         Q.    Mr. Tomkiewicz, we're back on the

3    record.  Are you ready to proceed?

4         A.    I am ready.

5         Q.    Okay.  So I want to go back to

6    Exhibit 5.  I forgot to ask you something about

7    that at page 37.

8              And we talked about this slide that

9    you created in 2014 for the things you were

10   going to do in the future for the program --

11   suspicious order monitoring program at Teva.

12             The last thing that we didn't talk

13   about was chargeback data.  Do you see that?

14        A.    Yes.

15        Q.    Okay.  So first of all, do you know

16   whether or not Teva was actually using

17   chargeback data to try to help them identify

18   suspicious orders prior to 2014, when you

19   started there?

20        A.    I don't believe they were, but I

21   don't know for certain.

22        Q.    Okay.  Now, chargeback data, I

23   believe the DEA has said, is an advisable

24   resource to use in order to try to identify

1    suspicious orders; is that correct?

2         A.   That's my understanding, yes.

3         Q.   Okay.  And Teva, before the time

4    you got there, had chargeback data that they

5    could have used to try to help them identify

6    suspicious orders, correct?

7         A.   That's correct.

8         Q.   But they chose not to do that; is

9    that right?

10             MR. HAMMOUD:  Objection.  Object to

11        the form.

12             THE WITNESS:  Yeah, I don't know.

13   BY MR. CARTMELL:

14        Q.   But let me ask you this.  When you

15   were at AmerisourceBergen and managing that

16   suspicious order monitoring program, did your

17   program include a review of chargeback data to

18   try to help you or assist you in identifying

19   suspicious orders?

20        A.   Oh, not at all.

21        Q.   You didn't use it?

22        A.   Not at all, because --

23             And your question says that you

24   don't understand what chargeback data is.

1          Q.    My question says to you that I

2    don't understand what chargeback data is?

3          A.    Yes.

4          Q.    Exactly right.

5          A.    Would you like me to explain it?

6          Q.    Yes.

7          A.    Okay.  Chargeback data.  What a

8    chargeback is, is when, say, my company,

9    Teva -- sorry for hitting the microphone --

10   when my company, Teva, contracts with either a

11   pharmacy, a hospital, a buying group that

12   represents pharmacies and we grant a contract

13   price on a product to, you know, that group,

14   that entity, then for a wholesaler who buys at

15   wholesale acquisition cost who services those

16   pharmacies with whom we have the contract, that

17   wholesaler, say, AmerisourceBergen, will

18   provide that product at the contract cost to

19   the pharmacy, the hospital, the entity, the

20   hospice, whomever, and then charge back the

21   difference back to Teva.

22          And then that contract price in the

23   data that comes back will have information on

24   the customer, the product, the quantity,

1    information supporting that this product went

2    to this customer for that customer.

3              Now, what that doesn't include are

4    customers who don't have contracts, customers

5    who buy from wholesalers who buy at contract

6    price who aren't buying at wholesale

7    acquisition cost.  It's not going to include

8    distributors are who are, say, owned by a large

9    retail chain.

10             And so from the wholesaler's

11   standpoint, when I was at AmerisourceBergen,

12   there was no need to review chargeback data

13   because we saw everything that we sold to the

14   customer.

15             Now, on the Teva side, we can

16   see -- you know, AmerisourceBergen, for

17   example, we can see where they sold our product

18   at contract price to their customers.  But if a

19   customer isn't buying on contract price, we

20   don't see that.

21        Q.   I understand.

22             Really, what you're saying is, my

23   question was a dumb one, because it wouldn't

24   apply to wholesale distributors; they wouldn't

1    use that; they don't need to use that data.

2         A.   Well, and I wouldn't use the

3    prejudicial term "dumb."

4         Q.   Okay.

5         A.   But maybe ignorant, but --

6         Q.   No, I do understand a little bit

7    about it, but that makes sense.

8         A.   Yeah.

9         Q.   So at any rate, when you arrived at

10   Teva in 2014, one of the other improvements to

11   the suspicious order monitoring program was

12   that you were going to have Teva start to

13   utilize the chargeback data to try to aid and

14   assist in identifying suspicious orders,

15   correct?

16              MR. HAMMOUD:  Object to the form.

17         Mischaracterizes prior testimony.

18              THE WITNESS:  I will say that's a

19         fair assessment, correct.

20   BY MR. CARTMELL:

21         Q.   Okay.  And is there other data that

22   you believed that Teva should be using but they

23   weren't other than chargeback data to try to

24   assist with this?

1    And there's something called 867

2    data; is that right?

3        A.    Yes, there's 867 data.

4        Q.    And did you start Teva into using

5    that type of data as well to try to identify

6    suspicious orders?

7        A.    I have started using 867 data, yes.

8        Q.    When was that started by the

9    company?

10       A.    I think that was in 2017 that I

11   started using that.

12       Q.    And has that also assisted Teva in

13   identifying suspicious orders?

14       A.    Not only suspicious orders but

15   suspicious customers of our customers.

16       Q.    And that's a good point.

17       A.    Yes.

18       Q.    What you just said is, by using

19   data like chargeback data and 867 data, your

20   company, Teva, can actually look downstream

21   from your customers at your customers'

22   customers, right?

23           MR. HAMMOUD:  Objection to the

24           form.  Mischaracterizes prior testimony.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Well, it assists in
 2         our investigations, yes.
 3    BY MR. CARTMELL:
 4         Q.   Right.
 5              And I'm saying it assists in your
 6    investigation of not only looking at whether
 7    your customers are potentially asking for
 8    suspicious orders, but it also can assist you
 9    in looking downstream from your customer to
10    their customers to see whether or not they are
11    potentially violating the law, correct?
12              MR. HAMMOUD:  Objection to the
13         form.
14              Go ahead.
15              THE WITNESS:  I wouldn't say
16         "violating the law."  Just looking for
17         patterns.
18    BY MR. CARTMELL:
19         Q.   I understand.
20              But if you do look at that data and
21    you find out that one of your
22    customer's customers, for example -- let's use
23    an example.
24              Teva has customers like
```

1   AmerisourceBergen, correct?

2       A.   Mm-hmm.

3       Q.   A large wholesale distributor, as

4   we said, who distributes opioid narcotics all

5   over the United States, correct?

6       A.   Correct.

7       Q.   If Teva is looking at a potentially

8   suspicious order from AmerisourceBergen, for

9   example, and they do some investigation into

10  that and they find from that investigation --

11          For example, the top ten customers

12  of AmerisourceBergen, they might look into who

13  those people are, correct?

14      A.   Correct.

15      Q.   If you found out -- for example, if

16  AmerisourceBergen gave their top ten pharmacies

17  that they were selling to and during your

18  investigation, you found out that there were

19  suspicious things about those orders, that

20  would be investigation that I would categorize

21  as downstream investigation to your customer's

22  customer.  Correct?

23          MR. NICHOLAS:  Object to the form.

24  BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Correct?

2    A.   I would say that's a fair

3 assessment, yes.

4    Q.   Okay.  And if during that

5 investigation, you identify pharmacies who, it

6 looks like to you, are suspicious for diverting

7 opioids or violating the law or doctors who, it

8 looks suspicious to you, potentially are

9 diverting opioids or violating the law, you, as

10 Teva, have a duty to report that, correct?

11            MR. HAMMOUD:  Objection to the

12       form.  Calls for a legal conclusion.

13            THE WITNESS:  Well, a couple points

14       of clarification.

15            I don't see prescribers with that

16       data, the 867 data level or at the

17       chargeback data.  So unfortunately, I

18       don't see prescribers.

19            But I do see pharmacies, and if I

20       do see something that I would classify

21       as a suspicious order at that point --

22            For example, if I were to see an

23       invoice from a wholesaler to a pharmacy

24       that I would consider suspicious, I have

1        reported orders like that, that it's not

2        my order, but it's my customer's order

3        to a pharmacy.

4    BY MR. CARTMELL:

5        Q.    Your customer's customer?

6        A.    My customer's customer, yes.

7        Q.    And you have a duty, just like with

8    your customers, to report that if you believe

9    that is suspicious, correct?

10        MR. HAMMOUD:  Objection to the

11        form.  Calls for a legal conclusion,

12        asked and answered.

13        THE WITNESS:  I would say I have a

14        duty to report suspicious orders.

15    BY MR. CARTMELL:

16        Q.    Okay.  Including if it's your

17    customer's customer, correct?

18        MR. HAMMOUD:  Objection.  Asked and

19        answered, calls for a legal conclusion.

20        THE WITNESS:  And if I see a

21        suspicious order at my customer's

22        customer level, I will report it, and I

23        have reported it.

24    BY MR. CARTMELL:

1    Q.   And that's because it's your duty,

2  you believe, correct?

3         MR. HAMMOUD:  Objection.  Asked and

4         answered multiple times, calls for a

5         legal conclusion.

6  BY MR. CARTMELL:

7    Q.   You can answer.

8    A.   I have a duty to report suspicious

9  orders.

10   Q.   Okay.  Now, we talked a little bit

11 about the policy at Teva that you helped to

12 draft and put into effect in 2014 related to

13 suspicious order monitoring and, specifically,

14 holding of the orders to investigate and decide

15 whether or not they're suspicious and should be

16 shipped.  We talked some about that.  Do you

17 recall that?

18   A.   Yes.

19   Q.   Okay.  As we know from the policy

20 that you put into effect at -- into writing at

21 Teva, that policy includes not only members of

22 the DEA compliance section that you work in,

23 but also members of parts of the company that

24 have sales as a part of their duties, correct?

1    A.    And I'm sorry.  I think I know

2  where you're going, but I got lost in the

3  question.  Sorry.

4    Q.    And we also talked about from the

5  policy -- and we can pull it up if you want,

6  but it's the policy related to DEA order holds.

7  We talked about that.

8         People within the organization

9  outside of the DEA compliance section that have

10  duties or their jobs at Teva are sales in

11  nature, like customer service people and sales

12  reps, they're also involved in your procedure

13  there at Teva, right?

14    A.    Correct.

15    Q.    Okay.  Those people, as we've

16  discussed, are people that, you know, as a part

17  of their duties are trying to sell and make

18  profits from the sales for the company,

19  correct?

20    A.    That's a fair assessment.

21    Q.    Okay.  And are you aware that those

22  individuals who are involved in your suspicious

23  order monitoring program are also bonused,

24  potentially, based on the amount of sales of

1    the company?

2          A.    I'd say that's possibly a fair

3    assessment, but I have no knowledge of, you

4    know, specific bonus structure.

5          Q.    Okay.  But you know from your

6    experience that those individuals who are

7    involved in the process that are the sales-type

8    people, those people sometimes are reluctant,

9    let's say, to agree to hold suspicious orders,

10   fair?

11         A.    No.  Good Lord, no.

12         Q.    You've never seen that?

13         A.    Reluctant to hold a suspicious

14   order?

15         Q.    Right.

16         A.    No.

17         Q.    Have there been times in your

18   experience where the sales force people who

19   you're dealing with with customers related to

20   potentially suspicious orders have at times

21   been reluctant to want to actually hold that

22   order?

23         A.    At the customer service level?

24         Q.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          A.    I can think of a couple times

2     offhand where there has been a little bit of

3     pushback.

4               But I will say there's never been a

5     time that I've either been, you know,

6     overridden on a hold or I've changed my mind

7     based on just a salesperson or anyone with a

8     sales function saying, Oh, we need to ship

9     this; it's a new product.

10              If I'm not comfortable, if I have

11    red flags, it doesn't ship.

12         Q.   Okay.  But my question is, simply,

13    there are times when you do get pushback from

14    the salespeople who want to ship the order and

15    get the sales of the opioids?  There are times

16    when you have that pressure from the

17    salespeople, correct?

18              MR. HAMMOUD:  Objection to the

19         form.

20              THE WITNESS:  Certainly, I've had

21         that happen a couple of times.  Sure.

22    BY MR. CARTMELL:

23         Q.   Okay.  And, in fact, I think you've

24    given speeches over time related to the

Highly Confidential - Subject to Further Confidentiality Review

1  conflicts that exist in a suspicious order

2  monitoring program when you have people that

3  want to sell as many opioids as possible in

4  conjunction with a program of the people who

5  are trying to do their jobs and locate and stop

6  the orders of suspicious opioids.  Correct?

7          A.    I wouldn't characterize it that

8  way.

9                (Exhibit Teva-Tomkiewicz-018 marked

10         for identification and attached to the

11         transcript.)

12  BY MR. CARTMELL:

13         Q.    Okay.  Let me hand you what's been

14  marked as Exhibit 18.  I've handed you Exhibit

15  18, which I will represent to you is an e-mail

16  and attached PowerPoint presentation from the

17  internal files at Teva that were produced to us

18  in this case.  Okay?

19                And I believe, you'll see from the

20  cover page or the e-mail, this is a PowerPoint

21  presentation related to a 2017 presentation you

22  gave at a PDMA conference.  Is that right?

23         A.    That is correct.

24         Q.    What does PDMA stand for?

1    A.    Prescription Drug Marketing Act.

2    Q.    Okay.  Is the PDMA a society that

3  you're a member of, or what is it?

4    A.    It's a group, primarily, that deals

5  with the marketing of not controlled

6  substances -- that's, actually, a small part of

7  it -- but direct marketing to physicians.

8    Q.    Okay.  And I take it that your

9  company, Teva, actually encourages you to speak

10  at events or speak to groups like this.  Is

11  that fair?

12    MR. HAMMOUD:  Objection to the

13    form.

14    THE WITNESS:  It encourages,

15    allows; in some cases, not allow.  But

16    yes, I've spoken at a number of

17    conferences.  Sure.

18  BY MR. CARTMELL:

19    Q.    What other conferences?

20    A.    I spoke at Buzzeo conference.  I

21  spoke again this year at the PDMA Sharing

22  Conference.

23    Q.    You said "Buzzeo conference."

24  We've talked about Ronald Buzzeo, the

1    consultant; is that correct?

2         A.   Yes.

3         Q.   And he has an annual conference?

4         A.   Yes.  IMS/IQVIA has an annual

5    conference.

6         Q.   Okay.  And have you spoken at that

7    conference more than once?

8         A.   Just once.

9         Q.   Okay.  The title of this

10   presentation that you were giving in October of

11   2017 is, DEA:  Selling and Promoting High Risk

12   Drugs.

13        A.   Yes.

14        Q.   When you refer to "high-risk

15   drugs," what are you referring to?

16        A.   Any controlled substance.

17        Q.   Okay.  And I think previously I

18   used the term "high-risk drugs," I think, and I

19   think you told me at that time that when you

20   use "high-risk drugs," you're only referring to

21   a certain category of drugs that are easily

22   diverted.

23        A.   Exactly.

24        Q.   Okay.  But when I just asked you

Highly Confidential - Subject to Further Confidentiality Review

1  what you mean by "high-risk drugs," you're

2  talking here about any controlled substance,

3  correct?

4          A.   Right, because of the audience.

5          Q.   Okay.  And so what you're talking

6  about here is, though, primarily opioids,

7  correct?

8                MR. HAMMOUD:  Objection to the

9          form.

10               THE WITNESS:  No.  Any controlled

11         substance.

12  BY MR. CARTMELL:

13         Q.   Okay.  Well, if you turn the page

14  to page 2 of your presentation, again, you have

15  presented as your number one slide a slide that

16  deals with opioid addiction, correct, and

17  overdose?

18         A.   Correct.

19         Q.   Okay.  So is it fair to say that a

20  good portion of your talk is focused on the

21  opioid epidemic in America?

22               MR. HAMMOUD:  Objection to the

23         form.

24               Sorry.  Go ahead.

1          THE WITNESS:  I would say a part of

2          it is talking about opioid epidemic,

3          yes.

4   BY MR. CARTMELL:

5          Q.   Okay.  Now, if you turn to

6   slide 20, you created this slide; is that

7   correct?

8          A.   Yes.

9          Q.   This slide, DEA:  Selling and

10  Promoting High Risk Drugs, it states, Managing

11  Conflicts.  And you identify three conflicts

12  here, correct?

13         A.   Potential conflicts, yes.

14         Q.   Okay.  Well, it says, Managing

15  Conflicts, not potential conflicts, correct?

16         A.   Certainly.

17         Q.   Okay.  And the three conflicts or

18  potential conflicts that you identify here, the

19  first is customers, right?

20         A.   Correct.

21         Q.   And there's -- a conflict between

22  what you're doing as a suspicious order

23  monitoring manager with customers is that

24  customers want the opioids they ordered, right?

1          MR. HAMMOUD:  Objection to the

2       form.

3          THE WITNESS:  And I wouldn't

4       categorize it as strictly opioids.

5       Customers have an expectation, based on

6       a patient need, of certain products and

7       certain volumes.

8  BY MR. CARTMELL:

9       Q.   Right.  And that's a conflict with

10 customers that -- in your position, as a

11 manager of the suspicious order monitoring

12 program at Teva, that's one of the conflicts

13 you have to manage, correct?

14      A.   Where do you see the conflict?

15 Because I'm not understanding where you're

16 seeing the conflict.

17      Q.   Well, I guess I probably should ask

18 you, because this is your slide that you

19 stated, Managing Conflicts, and you identified

20 customers.

21      A.   Yes.

22      Q.   So, apparently, when you created

23 this slide and presented it to lots of people

24 in the industry --

Highly Confidential - Subject to Further Confidentiality Review

1          The pharmaceutical industry, I take

2     it?

3          A.    Yes.

4               MR. HAMMOUD:  Objection to the

5          form.

6     BY MR. CARTMELL:

7          Q.    Apparently, when you presented this

8     slide, you thought there may be a potential, at

9     least, conflict here with customers, correct?

10         A.    Well, potentially a conflict with a

11    customer, yes.

12         Q.    Okay.  Another potential conflict

13    that you identified has to do with customer

14    service, correct?

15         A.    Yes.

16         Q.    Okay.  And we know, from talking

17    about your policies at Teva, customer service

18    is a department at Teva, right?

19         A.    Yes.

20         Q.    Customer service is directly

21    involved in the process of trying to identify

22    suspicious orders at Teva, correct?

23               MR. HAMMOUD:  Objection to the

24          form, mischaracterizes prior testimony.

```
 1                    THE WITNESS:  And I will say yes,
 2           I'll accept that assessment.
 3    BY MR. CARTMELL:
 4           Q.   Okay.  And you identify it here as
 5    another potential conflict, and I'm guessing
 6    your conflict that you're identifying is that
 7    customer service people who deal with sales of
 8    opioids and part of their job is to sell as
 9    many opioids as they can potentially can put
10    pressure on you and create a conflict for you.
11                    MR. HAMMOUD:  Objection to the
12           form.
13                    THE WITNESS:  Yeah, and I
14           completely reject that question as far
15           as people wanting to sell as many
16           opioids as they can.  I categorically
17           reject that assessment of what Teva does
18           in any capacity.
19    BY MR. CARTMELL:
20           Q.   Well, they potentially get paid
21    based on selling as many opioids as possible,
22    sir; isn't that correct?
23                    MR. HAMMOUD:  Objection to the
24           form.
```

1          THE WITNESS:  And we can also lose

2          our registration as well, and then

3          you're not selling any opioids or any

4          controlled substance and probably having

5          a very hard time maintaining or staying

6          in business.

7     BY MR. CARTMELL:

8          Q.   But isn't that the conflict, that

9     you have a company -- from a sales perspective,

10    individuals who are trying to maintain

11    customers, increase profits, make the sales of

12    the opioids, versus your job, which is to make

13    sure you don't lose your registration by

14    violating the Controlled Substances Act?  Isn't

15    that the conflict you're talking about?

16         MR. HAMMOUD:  Object to the form.

17         THE WITNESS:  No.  And that's

18         minimizing the role of suspicious order

19         monitoring in terms of just strictly

20         looking to maintain a registration.

21    BY MR. CARTMELL:

22         Q.   What's the conflict that you're

23    talking about managing related to customer

24    service?

1       A.    Interpersonal conflict as far as

2   the lack of education of the importance of a

3   good suspicious order monitoring program and

4   why a suspicious order monitoring program is

5   needed.

6       Q.    You're saying that customer service

7   employees typically are not trained or don't

8   understand the importance of why a suspicious

9   order monitoring program is needed?

10      A.    No.

11            MR. HAMMOUD:  Objection to the

12            form.  Mischaracterizes the prior

13            testimony.

14            THE WITNESS:  Yeah, that's not what

15            I said at all.  There is importance of

16            training.

17  BY MR. CARTMELL:

18      Q.    What did you say?  Say it again,

19  please.

20      A.    I said there is an importance of

21  training --

22      Q.    No, no, no, no.  I don't mean to

23  interrupt you.

24            What is the conflict related to

1   customer service that you need to manage that

2   you are presenting here?

3          A.   Oh, it's --

4          Q.   What's the conflict?

5          A.   It's an interpersonal -- it's a

6   potential for interpersonal conflict if you

7   don't educate these groups for either the

8   importance of either a suspicious order

9   monitoring program, anti-diversion efforts, or

10  you know, the -- well, the importance of, you

11  know, education in this staff.

12         Q.   Education to the customer service

13  people, right?

14         A.   To customer service people, to

15  sales, and to customers.

16         Q.   Okay.  And if you don't educate

17  them properly and these people don't understand

18  the importance of the suspicious order

19  monitoring program, then what is the conflict

20  that is created?

21         A.   That they don't understand what a

22  suspicious order monitoring program is doing.

23         Q.   And what's the conflict that's

24  created because of that?  Is it because they

1    try to then pressure you and push you into

2    releasing suspicious orders --

3              MR. HAMMOUD:  Objection to the

4         form.

5    BY MR. CARTMELL:

6         Q.   -- if they really don't understand

7    it well enough?

8              MR. HAMMOUD:  Objection to the

9         form.

10             THE WITNESS:  Well, that could be a

11        potential.  That could be a potential.

12   BY MR. CARTMELL:

13        Q.   Okay.  So that's one type of

14   conflict you're talking about you may need to

15   manage?

16        A.   Correct.

17        Q.   Okay.  And then you say, finally,

18   that you need to manage a conflict related to

19   sales.

20        A.   Mm-hmm.

21        Q.   Is that the same type of issue?

22        A.   Exactly.

23        Q.   Because the salespeople,

24   potentially, if they're not properly educated

1  and really don't understand the importance of

2  your suspicious order monitoring program, they

3  might create a conflict with you because they

4  might pressure you and push you to release

5  sales that you otherwise shouldn't, correct?

6       A.   Well, and I wouldn't characterize

7  the question that way, because, again, I

8  haven't released anything that I'm not

9  comfortable with, and I haven't -- and, you

10  know, no salesperson, no customer service

11  person, or -- and no customer has ever badgered

12  or cajoled me into releasing something where I

13  still thought there was a red flag.

14       Q.   Okay.  What you're saying is that,

15  though, the conflict is, if you don't educate

16  the salespeople and they don't know or

17  understand how important a suspicious order

18  monitoring program is, they might pressure you;

19  they might, you know, try to lean on you to get

20  rid of the hold.

21            But what you're saying is that if

22  they do that to you, then you're not going to

23  succumb to that pressure, correct?

24            MR. HAMMOUD:  Objection to the

1          form.  Asked and answered.

2     BY MR. CARTMELL:

3          Q.    Is that correct?

4          A.    Oh, that is correct.

5          Q.    Okay.  All right.  But those are

6     potential conflicts that you speak about and

7     that you manage in your job at Teva as the head

8     of the suspicious order monitoring program,

9     correct?

10         A.    Correct.

11         Q.    Would you agree with me that you've

12    experienced times when the customer service

13    individuals have been reluctant to stop an

14    order for opioid sales?

15         A.    I can't think of a time when

16    customer service has been reluctant to hold

17    something.

18         Q.    Would you agree with me that

19    because reporting a customer can lead to the

20    company losing the customer, that can

21    potentially lead to a loss of profits?

22              MR. HAMMOUD:  Objection to the

23         form.

24              THE WITNESS:  That reporting a

1          customer could lead to loss of profits?

2     BY MR. CARTMELL:

3          Q.    Yes.

4          A.    I haven't seen that.

5          Q.    Well, if you report a customer, you

6     may lose a customer, right?

7          A.    Depends upon the customer, because

8     I've reported customers that part of reporting

9     the suspicious order have also terminated that

10    customer from purchasing controlled substances.

11    So, you know, in that case, it doesn't matter

12    to me that we're losing some potential profits

13    in cutting off a customer.

14         Q.    Right.

15               But that's the case, though.  When

16    you terminate a customer and you don't ship an

17    order, you potentially are losing sales and

18    profits, correct?

19         A.    Oh, exactly.

20         Q.    Let me ask you this.  You

21    mentioned -- I have a list.  You mentioned who

22    the pharmacies or customers are that Teva,

23    through you, has reported to the DEA in the

24    last three or four years.

Highly Confidential - Subject to Further Confidentiality Review

1          Have you ever reported Publix, the

2   pharmacies at Publix, to the DEA?

3          A.   I can't recall specifically.

4          Q.   Okay.  Do you remember a time when,

5   actually, Publix was making orders for opioids

6   and you found those orders to be suspicious,

7   they were initially tagged, you did an

8   investigation into those orders, you found

9   those orders to be suspicious for a host of

10  reasons, and one of the higher-ups in the sales

11  department berated you worse than you've ever

12  been berated before?

13          MR. HAMMOUD:  Objection to the

14      form.

15          THE WITNESS:  Never saw a

16      suspicious order in relation to that.

17  BY MR. CARTMELL:

18          Q.   That's not my question.

19          Do you remember a time, though,

20  when you were berated worse than you'd ever

21  been before during an investigation of

22  suspicious orders and orders that you found to

23  be -- to have suspicious aspects to them, and

24  then you were berated by a higher-up in sales

Highly Confidential - Subject to Further Confidentiality Review

1    to try to release those orders?

2              MR. HAMMOUD:  Objection to the

3         form.  Asked and answered.

4    BY MR. CARTMELL:

5         Q.   Do you remember that?

6         A.   You have some mischaracterizations

7    there, several of them.

8              One, I do believe that I recall the

9    incident that you're discussing.  One -- the

10   being berated worse than I ever have, I've been

11   berated pretty badly.  This was probably not

12   even in the top ten, although for Teva, it was

13   probably the worst.

14             This was one where I had held some

15   orders for further review, and the higher-ups,

16   as you talked about, were very upset that I was

17   holding these orders.

18        Q.   Right.

19             And, ultimately, did you, in fact,

20   release those orders?

21        A.   After a thorough investigation,

22   including me discussing the issue with Publix.

23        Q.   Okay.  I want to talk about that,

24   and there's been some documents and e-mails

1    produced in this case that I want to go through

2    with you.  This may be pretty tedious, but I

3    only want -- there's very limited things from

4    the e-mails that I want to ask you about.  But

5    I want to go through these.

6                    (Exhibit Teva-Tomkiewicz-017 marked

7              for identification and attached to the

8              transcript.)

9    BY MR. CARTMELL:

10        Q.   And I'll start with giving you

11   Exhibit 17, which is an e-mail chain that was

12   produced from the internal files of Teva in

13   this lawsuit.

14                    Now, before --

15                    MR. HAMMOUD:  Have you had a chance

16             to read it?

17                    THE WITNESS:  I'm good with it.

18   BY MR. CARTMELL:

19        Q.   Okay.  Before I ask you questions

20   about this, I kind of want to set the scene for

21   the jury.  In October of 2015, there was a time

22   when your department received several orders

23   from Publix, correct?

24        A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And Publix, I think as some people

2     know, is a grocery chain that has lots of

3     stores in Florida, for example, correct?

4          A.    Correct.

5          Q.    But in these Publix grocery chains

6     they also have pharmacies; is that right?

7          A.    Correct.

8          Q.    Okay.  And at this time in October

9     of 2015, Publix pharmacies had actually been an

10    existing customer for Teva, correct?

11         A.    Correct.

12         Q.    Okay.  And you had a history with

13    Publix ordering opioid narcotics, correct?

14         A.    Well, controlled substances in

15    general, yes.

16         Q.    Including opioids, correct?

17         A.    Including opioids, yes.

18         Q.    And the story we're about to tell

19    has to do with them ordering opioid narcotics,

20    correct?

21         A.    Correct.

22         Q.    High-risk opioid narcotics --

23               MR. HAMMOUD:  Objection to the

24         form.

1    BY MR. CARTMELL:

2         Q.    -- correct?

3         A.    Not at the high risk of what I

4    talked about at the beginning of products that

5    are highly sought by abusers.

6         Q.    Well, OxyContin 30 milligrams is

7    definitely a product that's high risk and

8    sought by abusers, correct?

9              MR. HAMMOUD:  Objection to form.

10             THE WITNESS:  No, no.  Oxycodone,

11             30-milligram.  OxyContin is an

12             extended-relief product that has a

13             mechanism to help prevent an abuser from

14             crushing up and getting the -- a full,

15             immediate release.  So there's a

16             difference in the product.

17   BY MR. CARTMELL:

18        Q.    Is oxycodone 30 milligrams one of

19   the types of products that is sought after by

20   abusers?

21        A.    Yes.

22        Q.    Okay.  And --

23        A.    Immediate release.

24        Q.    Okay.  And we're talking about that

1    in this case with Publix, aren't we?

2          A.    No.

3          Q.    Okay.  The drugs that were being

4    sought by Publix, the opioids that were being

5    ordered by Publix, were they of the type

6    that -- and actual dosage that are sought by

7    abusers?

8          A.    Not of a dosage form that are

9    highly sought by abusers anymore.

10         Q.    Okay.  But at this time in 2015?

11         A.    No.

12         Q.    Okay.  We'll get to that.  So the

13   story starts, I think, if you look at the end

14   of the e-mail string, and we'll go back to

15   front, that somebody named Daniel Baker sends

16   an e-mail to Dawn Ward that says, Can you tell

17   me if this product is going to be warehoused in

18   Ohio, please?

19              Do you see that?

20         A.    Yes.

21         Q.    And Dawn Ward says, Hi Dan.  Yes,

22   this order is to be shipped and warehoused in

23   Ohio.  I've attached a copy of the order that

24   has the shipping address.

1    Now, if you go -- if you go forward

2    and to the next e-mail from Dan Baker to Dawn

3    Ward -- and your understanding is that Dan

4    Baker is in the DEA -- is on the DEA team; is

5    that correct?

6        A.    No, that's not correct.

7        Q.    Oh, is he in sales?

8        A.    He's a customer service rep -- was

9    a customer service rep.

10       Q.    Okay.  Strike that.  Dan Baker, who

11   sends this e-mail on October 15th, is he a

12   customer service sales rep?

13       A.    A customer service rep.

14       Q.    Okay.  It says, Dawn, our DEA team

15   is asking for the following; we need the

16   following from Publix: A list of their top 10

17   stores by oxycodone tablet volume, a breakdown

18   by SKU of their oxycodone ER and IR, and a list

19   of the top 5 prescribers, including DEA number,

20   at each of the 10 locations.

21       Do you see that?

22       A.    Yes.

23       Q.    So at this point it looks like --

24   tell me if I'm wrong -- that your department

Highly Confidential - Subject to Further Confidentiality Review

1  has flagged these Publix orders as potentially

2  suspicious.  Is that fair?

3        A.    Correct.

4        Q.    Okay.  And these orders were for

5  oxycodone, an opioid, correct?

6        A.    Correct.

7        Q.    If you go moving forward, on

8  Friday, October 16th, Jocelyn Baker has an

9  e-mail to Dan Baker.  And Jocelyn Baker is the

10  director of national accounts and sales.  Did

11  you know that?

12        A.    Yes.

13        Q.    So she's a salesperson, right?

14        A.    Yes.

15        Q.    She says -- and this goes -- e-mail

16  goes to Dan Baker, but it also -- now at this

17  point you've been added to the e-mail, correct?

18        A.    That I've been added to the e-mail.

19        Q.    Jocelyn Baker's e-mail to Dan Baker

20  and to several others --

21        A.    Oh, yes.

22        Q.    -- including you?

23        A.    Yes.

24        Q.    Okay.  And she actually addresses

Highly Confidential - Subject to Further Confidentiality Review

1  you, and she says, Joe, Publix is an

2  established customer who sells some of our

3  other controls.

4              Meaning controlled substances,

5  right?

6      A.    Correct.

7      Q.    Is this really required?  Also,

8  will you require this from my other 2

9  retailers?

10             It then says, This was not

11 presented to them in advance and may put this

12 award at risk.

13             Do you see that?

14     A.    Yep.

15     Q.    Meaning if you do this and you

16 investigate and want information from Publix

17 about these -- a list of their top 10 stores

18 and data like that, it could put the sale at

19 risk, correct?

20     A.    That's what I understand her to

21 mean.

22     Q.    Again, they are an established

23 customer selling controls.  Please advice.

24             So this is a salesperson telling

1    you, do we really have to hold this order,

2    because it could put the sale at risk, right?

3         A.   Correct.

4         Q.   Now, if you go to the next page,

5    you respond to that e-mail on October 16th,

6    2015 to Jocelyn, who's in sales, and you say,

7    Jocelyn, there are several red flags with this.

8    One, this is high-strength oxycodone ultimately

9    going to Florida, a well-established hotspot

10   for oxycodone abuse in the United States.

11          And I take it that Florida is -- at

12   that time, at least, you know, based on your

13   experience, that's a hotspot as far as

14   oxycodone abuse, correct?

15        A.   Correct.

16        Q.   Okay.  And you're telling her

17   that's a red flag, that this may be a

18   suspicious order, correct?

19        A.   Correct.

20        Q.   Number two, the total quantities in

21   the Publix forecast put them significantly

22   above their peers as far as size and class of

23   trade are concerned.

24          What you mean there -- tell me if

1    I'm wrong, but it sounds like what you mean

2    there is that the total quantities in their

3    forecast is well above what other pharmacies

4    are ordering; is that correct?

5         A.   It's significantly above.

6         Q.   Okay.  And is it a matter of

7    magnitude, standard deviations?  How big?  I

8    mean, is it a lot bigger?

9         A.   I don't recall specifically.

10        Q.   Okay.  That's fine.

11        A.   I don't recall specifically.

12        Q.   You then say, three -- another red

13   flag -- the breakdown by strength, with an

14   emphasis on 40-milligram, does not appear to be

15   normal for a retail pharmacy.  I would expect

16   the breakdown to be closer to that of Thrifty

17   White, where the emphasis is on lower

18   strengths.

19             Do you see that?

20        A.   Yes.

21        Q.   Tell me if I'm wrong, but what

22   you're saying there is, sometimes you have to

23   look at the actual strength that they're

24   ordering, and if they're ordering lots of the

Highly Confidential - Subject to Further Confidentiality Review

1    higher strengths, sometimes that can be a red

2    flag that there might be something fishy going

3    on.

4           A.    Yeah, and actually, the

5    40-milligram isn't the top strength.  It's the

6    second strength.

7           Q.    But what you're saying here is that

8    this strength and the breakdown is a red flag

9    to you potentially, right?

10          A.    Yes, uh-huh.

11          Q.    All right.  You then say -- I've

12   skipped a couple paragraphs, but it then says,

13   As far as Publix being an established customer,

14   please remember that Cardinal, McKesson,

15   Walgreens, and CVS are also established

16   customers, all of whom had serious DEA

17   penalties due to the handling of oxycodone in

18   the state of Florida.

19          Am I right that what you mean there

20   is, look, you can't just say because somebody

21   is an established customer that they're not

22   diverting drugs, right?

23          A.    Correct.

24          Q.    Because all of these others that

1    you established, these other customers,

2    Cardinal, which is a huge wholesale

3    distributor, right?

4         A.    Yes.

5              MR. HAMMOUD:  Objection to the

6         form.

7    BY MR. CARTMELL:

8         Q.    McKesson, which is another

9    billion-dollar wholesale distributor of

10   opioids, correct?

11             MR. HAMMOUD:  Objection to the

12        form.

13             THE WITNESS:  Correct.

14   BY MR. CARTMELL:

15        Q.    Walgreens and CVS, which are among

16   the largest pharmacies in America, right?

17             MR. HAMMOUD:  Objection to the

18        form.

19   BY MR. CARTMELL:

20        Q.    Is that right?

21             Those are established customers of

22   Teva too, but they have all been investigated

23   and had problems related to their suspicious

24   order monitoring, is that right, or diverting

Highly Confidential - Subject to Further Confidentiality Review

1    drugs?

2         A.    Probably a combination in there.  I

3    can't speak to the specifics without actually

4    reviewing it.

5         Q.    Okay.  And then if you turn to the

6    next page, there's an e-mail at the bottom of

7    the page from Karin Shanahan, and she's

8    actually above your boss, Colleen McGinn,

9    correct?

10        A.    She was.

11        Q.    So higher-ups are now starting to

12   get --

13        A.    Oh, yes.

14        Q.    -- involved in this battle, aren't

15   they?

16        A.    Oh, yes.

17        Q.    Okay.  And she writes back to

18   Christine Baeder, who is one of the higher-ups

19   in sales, and says, Christine, I understand you

20   have some concerns regarding our suspicious

21   order monitoring program.  As you know, our

22   suspicious order monitoring program is designed

23   to ensure that Teva is not subjected to

24   penalties up to and including rescinding our

1    DEA licenses.

2            Do you see that?

3        A.    Yep.

4        Q.    That's what we were just talking

5    about, right?

6        A.    Oh, exactly.

7        Q.    And if somebody like Christine

8    Baeder is not properly educated on the

9    importance, that can kind of build this

10   pressure and potential conflict that we talked

11   about, correct?

12       A.    Oh, certainly.

13       Q.    And then if you go to the first

14   page of this e-mail string -- we're still on

15   October 16th -- Christine Baeder responds --

16   she's the higher-up from sales -- to Karin, and

17   says, Karin, thank you for reaching out.  I'm

18   happy to discuss.  My concern was about the

19   statement that Publix is diverting product.  I

20   think our new launches where we do not have

21   established history to compare to, we need a

22   more collaborative approach to ensure that we

23   are making responsible decisions.

24            And then below in the next

1  paragraph it says, Oxy is not higher than

2  market share on other noncontrolled products.

3         What does that mean?

4         A.   She was referring to IMS data.

5         Q.   Okay.  What she's saying, though,

6  is she's saying, look, I disagree that oxy is a

7  red flag.

8         A.   No.  She's saying that she

9  disagrees that Publix's levels of purchases of

10 oxycodone were a red flag.

11        Q.   Okay.  Because she's saying -- why

12 is she disagreeing with that?

13        A.   Because she --

14             MR. HAMMOUD:  Objection to the

15        form.

16             THE WITNESS:  They had IMS data

17        indicating that this was -- that these

18        products were typical of what they had

19        been purchasing previously.

20 BY MR. CARTMELL:

21        Q.   Okay.  So what we've got now is

22 we've got a battle between sales and DEA

23 related to these Publix orders, correct?

24        A.   I wouldn't call it a battle.

1           MR. HAMMOUD:  Objection to the

2      form.

3  BY MR. CARTMELL:

4      Q.   Okay.  Well, let's continue.  I'm

5  going to hand you Exhibit 19.

6           (Exhibit Teva-Tomkiewicz-019 marked

7      for identification and attached to the

8      transcript.)

9  BY MR. CARTMELL:

10     Q.   Exhibit 19 is another e-mail string

11  that was produced to us in this, and I want to

12  ask you a few questions about this.  On this

13  one, I'm just ask -- I want to ask you

14  questions on the first page because I think

15  we've covered the ones on the previous pages.

16  And I apologize for that, but when -- the way

17  these are produced to us, you know, we don't

18  get them all in one long screen -- string.

19     A.   Threading of e-mails can be

20  difficult, yes.

21     Q.   So we're still on Friday, and you

22  see at the bottom Colleen McGinn says to you,

23  Do you want to reach out to Publix directly or

24  do you want customer service to reach out?

Highly Confidential - Subject to Further Confidentiality Review

1          And then up above, you respond to

2     Colleen, who is your boss, and you say, I'm

3     always more than happy to be the one to contact

4     the customer directly - less chance of a

5     translation error that way.

6          Right?

7     A.   Correct.

8     Q.   But we know from your policy that

9     typically it was going to be customer service

10    who had the interaction with the client, the

11    customer, correct?

12          MR. HAMMOUD:  Objection to the

13          form.

14          THE WITNESS:  Well, for certain

15          investigations, but -- because this one

16          was escalated a bit.

17    BY MR. CARTMELL:

18    Q.   Okay.  Because there was pushback,

19    you might get involved and talk to the customer

20    in that situation?

21    A.   Correct, correct.

22    Q.   And then Colleen responds to you

23    again at the top and says, FYI, Christine

24    preferred they contact Publix to get the

1  information.

2              Okay?  And she says the reason for

3  that is because she wanted to ensure that the

4  customer relationship was intact, right?

5         A.   Yes.

6         Q.   And we talked about that.  A lot of

7  times these salespeople don't want the DEA

8  department to contact their customers because

9  they want to make sure that the relationship

10 stays intact, correct?

11             A.   And that's a fair assessment.

12             Q.   Okay.  All right.

13             (Exhibit Teva-Tomkiewicz-020 marked

14             for identification and attached to the

15             transcript.)

16 BY MR. CARTMELL:

17             Q.   So let me hand you Exhibit 848 --

18 excuse me.  Let me hand you Exhibit 20.  We're

19 continuing on, and on this one, I have covered

20 everything below the first e-mail.  So I'm just

21 asking you about the first e-mail at the top.

22 This is an e-mail from Colleen McGinn to Karin

23 Shanahan.  And Karin Shanahan is who?

24             A.   Karin Shanahan was Colleen's boss.

1    And if you --

2            MR. HAMMOUD:  Just give him one

3        second.

4            THE WITNESS:  Yeah, one second

5        because I'm trying -- because of

6        threading, I'm trying to place where

7        this e-mail was placed in conjunction

8        with these other e-mails.

9            So this is earlier in the day.

10       And -- okay, I'm good with where it is.

11   BY MR. CARTMELL:

12       Q.    Okay.  And this is an e-mail from

13   Colleen to Karin.  So now you've got your boss

14   who is going above her -- to her boss and

15   informing her boss that there is an issue

16   related to some orders, correct?

17       A.    Correct.

18       Q.    She says, Karin, we have an issue

19   with an order Publix placed for oxycodone.  The

20   order was held in the system for further

21   investigation because it's off the charts in

22   comparison to other customers of the same size.

23           Right?

24       A.    Correct.  That's what it says.

1    Q.   And that's what you're talking

2  about.  This is an order that you found,

3  actually, and you told Colleen it was off the

4  charts, right?

5    A.   No, I did not say "off the charts."

6         MR. HAMMOUD:  Objection to the

7    form.

8  BY MR. CARTMELL:

9    Q.   Okay.  But at any rate, Colleen at

10 that point interpreted that this order or these

11 orders from Publix were off the charts.  That's

12 what she said, correct?

13   A.   I would say that's hyperbole.

14   Q.   Okay.  Two paragraphs down.

15        Apparently Christine Baeder berated

16 him today for making accusations of "criminal

17 activity" by the customer.  In Joe's words, he

18 hasn't received verbal abuse like that in

19 years.

20   A.   Yeah.

21   Q.   That's your boss saying that you

22 said that, right?

23   A.   Yeah.  Uh-huh.

24   Q.   Do you think you probably said

1    that?

2            A.    Oh, I'm sure I probably did, yeah.

3            Q.    Okay.  And you think that's true,

4    that when this higher-up, Christine Baeder from

5    sales, talked to you, she berated you and gave

6    you verbal abuse like you hadn't had in years?

7            A.    Yes.

8            Q.    Is that fair?

9            A.    Oh, yes.

10           Q.    Christine is demanding that the

11   order be released.

12                 This is what we're talking about,

13   the conflict, right, that salespeople want to

14   release these orders sometimes, right?

15                 MR. HAMMOUD:  Objection to form.

16                 THE WITNESS:  Correct.

17   BY MR. CARTMELL:

18           Q.    And wants a meeting with you today

19   or Monday at the latest.  I'm not very happy

20   about my people being verbally abused for doing

21   their job, and bullying them into releasing an

22   order, it's a slippery slope.

23                 You see that?

24           A.    Yep.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.   And you feel the same way, I

2    suspect?

3          A.   Oh, yes.  Yeah.

4          Q.   Okay.  Let's go to the next

5    exhibit.

6               (Exhibit Teva-Tomkiewicz-021 marked

7               for identification and attached to the

8               transcript.)

9    BY MR. CARTMELL:

10         Q.   Let's go to the next exhibit,

11   Exhibit 21.  Now, this looks a little

12   different.  This is not, in fact, an e-mail.

13   Is this a text?

14         A.   No.  These were my notes as

15   Christine was yelling at me.

16         Q.   Okay.  Okay.  So what was happening

17   was, you were on a phone call with Christine

18   Baeder?

19         A.   She called me, yes.

20         Q.   And Christine Baeder, she's a vice

21   president in the company, isn't she?

22         A.   Correct.

23         Q.   I mean, she's way up there, isn't

24   she?

1    A.    Well, she's a vice president, yeah.

2    Q.    Okay.  There's a 10:10 call, and

3 it's about the Publix issue that we've been

4 talking about and those potentially suspicious

5 orders, right?

6    A.    Yes.

7    Q.    Okay.  And it says -- I want to go

8 down a little bit.

9         It says, Christine Baeder; berated,

10 unprofessional; didn't want to hear anything I

11 said.

12        Right?

13    A.    Correct.

14    Q.    She said that asking for data was

15 accusing the customer of doing illegal

16 activity.

17        And let me ask you that.  Were you

18 actually accusing Publix of criminal activity

19 at that point?

20    A.    Not at all.

21    Q.    Okay.  So she misinterpreted what

22 you were saying, right?

23    A.    Yes.

24    Q.    I offered to meet with the

1   customer.  Christine said that under no

2   circumstance would that happen.

3             Is that right?

4       A.    That's what she said.

5       Q.    Okay.  Again, a salesperson who

6   doesn't want to risk losing the client,

7   correct?

8       A.    Correct, correct.

9       Q.    Christine said that I report to

10  TGO.

11            Who's TGO?

12      A.    Teva generic operations.

13      Q.    And that's who you report to?

14      A.    Not anymore.

15      Q.    Okay.  You did at the time?

16      A.    Yes.

17      Q.    Okay.

18            And Teva generic operations was

19  informed, so there was no need to inform DEA

20  compliance of the launch.

21            That's what she said, right?

22      A.    That's what she told me.

23      Q.    Christine said Publix has

24  0.8 percent overall market share and we (Teva)

1    are trying to capture generic oxycodone market

2    share.

3              Her point there is that Publix is

4    potentially a very big or is a very big

5    customer, right?

6         A.   Yes.

7         Q.   With lots of sales, right?

8         A.   Correct.

9         Q.   And she didn't want to lose that --

10   those sales or that profit, correct?

11             MR. HAMMOUD:  Object to the form.

12             THE WITNESS:  I'm going to say

13        that's a fair assessment.

14             (Exhibit Teva-Tomkiewicz-022 marked

15        for identification and attached to the

16        transcript.)

17   BY MR. CARTMELL:

18        Q.   Let me hand you Exhibit 22.  Again,

19   this is another e-mail produced to us in this

20   lawsuit that deals with this story we're

21   talking about related to held potentially

22   suspicious orders from one of your customers,

23   Publix?

24        A.   Correct.

1        Q.    And here I only need to ask you

2    questions about the top e-mail because we've

3    covered everything below it.

4        A.    No, we haven't covered everything

5    below it.

6        Q.    We haven't?

7        A.    No.  That's results of my review.

8        Q.    Oh, we're going to cover that.

9    We're going to cover that.  Okay.  I apologize

10    for that.  But that's coming in a later

11    exhibit, okay?  Okay.

12            So this is an e-mail from you to

13    Colleen McGinn.  Now we're up to October 28th,

14    so we're almost two weeks later, correct?

15        A.    Correct.  And the orders are still

16    held.

17        Q.    And you're still holding the orders

18    from Publix.

19            You state, Colleen -- to your boss,

20    Colleen -- based on previous investigations, I

21    think it is highly likely that at a corporate

22    level, Publix is not aware of these issues.  We

23    should schedule a face-to-face meeting with the

24    relevant Publix stakeholders to discuss their

1    ongoing prescriber due diligence and related

2    diversion control efforts.

3           You say, I am comfortable releasing

4    the product we currently have on hold, provided

5    Publix agrees not to distribute our oxycodone

6    products to these nine locations.

7           That's meaning the locations that

8    you had investigated; is that correct?

9        A.    Correct.  That is correct.

10   Actually, there were ten locations but nine

11   that I wanted restricted.

12       Q.    Okay.  There were ten actual

13   pharmacies at Publix that were making orders

14   and you wanted nine of them restricted?

15       A.    Correct.

16       Q.    Okay.  I made a mistake.  I want to

17   now go down to and look at the e-mail below

18   that that this was in response to, okay?

19       A.    Okay.

20       Q.    Okay.  So this is again almost two

21   weeks later and you've still held these Publix

22   orders.

23       A.    Well, in a -- I have to give an

24   addition.  We were also holding orders for --

1    all orders for Anda as well.

2         Q.   Okay.  And Anda is a distributor

3    that would provide them to Publix; is that

4    correct?

5         A.   Correct.  They were holding -- at

6    the time, they called it a virtual vault.  And

7    so they would manage the orders for them.  And

8    so the product would be shipped to Anda on

9    behalf of Publix.  And so we were holding not

10   only Publix orders that were to go through

11   Anda, but we were also holding all other Anda

12   orders as well.

13        Q.   Okay.  And the reason you were

14   holding, though, the Anda orders was because

15   your understanding was Anda was going to

16   distribute those to Publix, correct?

17             MR. HAMMOUD:  Objection to the

18        form.

19             THE WITNESS:  That -- on not all of

20        it, but that some of the product shipped

21        to Anda could be delivered to Publix.

22   BY MR. CARTMELL:

23        Q.   Okay.  Now, after you had held

24   these orders, you did an investigation of these

1    orders to try to determine whether or not they

2    were suspicious, correct?

3         A.   Well, it wasn't really an

4    investigation into the order itself.  It was an

5    investigation into the overall oxycodone

6    business at these ten locations.

7         Q.   Let me restate it.  The orders were

8    held by -- was it DEF OPS at this time?

9         A.   No.  Well, it -- they would have

10   been held by DEF OPS, but I was aware that the

11   orders were coming prior to them hitting DEF

12   OPS.

13        Q.   Okay.  But your understanding is

14   that the computer algorithm, the new one -- the

15   updated one and improved computer algorithm

16   called DEF OPS actually flagged or pended these

17   orders from Publix, correct?

18        A.   For all customers who were ordering

19   this product.

20        Q.   Okay.  And after the orders were

21   flagged and pended and you knew about them, you

22   then, as the manager of the suspicious order

23   monitoring program, went and did an

24   investigation into -- more of an investigation

1    into, frankly, your customers' customers,

2    right?

3         A.   Correct, the downstream pharmacies,

4    yes.

5         Q.   And part of the reason you did that

6    is because, as we said in prior e-mails, you

7    said there were red flags that made you want to

8    investigate further, correct?

9         A.   Correct.

10        Q.   Things like the dosage or the

11   breakdown of how they were ordering the

12   oxycodone, right?

13             MR. HAMMOUD:  Objection to the

14        form, asked and answered.

15             THE WITNESS:  Yeah, the -- you

16        know, the breakdown of strength on the

17        forecast.

18   BY MR. CARTMELL:

19        Q.   Right.  And also the fact that this

20   was in Florida, a place where you knew this

21   type of drug was sought after by abusers,

22   correct?

23        A.   Well --

24             MR. HAMMOUD:  Objection, asked and

1      answered.

2           THE WITNESS:  Yeah, and Florida

3      wouldn't have been the only reason to

4      hold the product.

5  BY MR. CARTMELL:

6      Q.    It's just one red flag, right?

7      A.    It was just another red flag.

8      Q.    These red flags are what led you to

9  go further and do more investigation, correct?

10     A.    That red flag wouldn't have been

11 one to make me go further down the line.

12     Q.    What made you go further down the

13 line and do actual research into the customer's

14 customer?

15     A.    That was going to be the --

16 primarily the strength mix of what they were

17 looking for, that it was hyped [sic] to the

18 40-milligram product, that that was the top

19 strength that they were looking for.

20     Q.    And because you saw that they were

21 ordering so much of this 40-milligram, or one

22 of the higher strengths, you wanted to see

23 where these drugs were actually going from

24 Publix?

1          A.    Well, and not the volume of it but

2     the ratio of the 40-milligram compared to the

3     20-milligram, the 10-milligram, the

4     80-milligram, that the 40 was the top one.  And

5     I felt that was unusual and warranted

6     investigation.

7          Q.    Okay.  And then you went to work

8     and you actually did -- like you said earlier,

9     I think, you got online and you did some

10    Google-type searches and things like that, did

11    you not?

12         A.    Well, did some Google searches,

13    looked at the -- you know, verified licenses of

14    prescribers, looked for -- you know,

15    essentially telling the story of who the

16    prescribers are of these products.  And not

17    necessarily the products that we were intending

18    to sell to Publix but actually the

19    immediate-release product that was another

20    company's product.  So what I was investigating

21    wasn't our product, it was another company's

22    product.

23         Q.    Okay.  Let's see what your

24    investigation found.  And you say that and

1   summarize that in your e-mail below of

2   Wednesday, October 28th, to Colleen McGinn,

3   your boss, correct?

4        A.   Correct.  Because this primarily

5   involves another company's product, yes.

6        Q.   Okay.  And you say, On October 27,

7   2015, I received data concerning oxycodone

8   usage at Publix Super Market, Inc.  The data

9   comprised of total dosage units dispensed of

10  all oxycodone tablet SKUs for the month of

11  September 2015 for their top ten locations,

12  along with a list of the top five oxycodone

13  prescribers for each location.  The following

14  is an analysis of that data.

15           Right?

16       A.   Correct.

17       Q.   Okay.  And you had asked Publix,

18  right -- you had asked the salespeople to go to

19  Publix and get information relating to their

20  top ten locations, along with their top

21  prescribers, correct?

22       A.   Correct.

23       Q.   And Publix -- the salespeople were

24  able to get that data so that you could look at

Highly Confidential - Subject to Further Confidentiality Review

1    that data and analyze it to try to determine

2    whether or not there was suspicious orders

3    going on, right?

4          A.    No, not suspicious orders.

5          Q.    Suspicious activity?

6                MR. HAMMOUD:  Objection to the

7          form.

8                THE WITNESS:  Potentially

9          suspicious activity.

10   BY MR. CARTMELL:

11         Q.    Okay.  You state, There were ten

12   locations listed.  All stores are located in

13   the state of Florida.  Location 3210 is located

14   on the campus of Moffitt Cancer Center.

15                So that means one of the pharmacies

16   that Publix was on -- or one of the pharmacies

17   was on a cancer center premises?

18         A.    Correct.

19         Q.    All 3210-listed physicians are

20   associated with MCC; oxycodone products and

21   quantities at 3210 appear to be consistent with

22   a large oncology practice.  The balance of the

23   retail locations are typical retail, located

24   inside grocery stores.

1           Right?

2           A.    Correct.

3           Q.    Oxycodone IR 30-milligram data was

4    examined due to its status as a highly

5    sought-after product among abusers and due to

6    its limited use in retail pharmacy.

7           Why were you using oxycodone IR

8    30-milligram data?

9           A.    Because the -- going back to that

10   ratio of strengths for the extended-release

11   product, because again, the product that we

12   were launching was an extended-release product,

13   was not an immediate-release product,

14   suggested, based on my experience, that there

15   were issues in the pharmacy with oxycodone

16   30-milligram immediate release.

17          Q.    "Issues" meaning what?

18          A.    Meaning that the -- filling for

19   prescribers who may have significant discipline

20   and may have lax prescribing habits.

21          Q.    There may be some sort of fishy or

22   suspicious things going on?

23          A.    Diversion, correct.

24          MR. HAMMOUD:  Objection to the

1           form.

2       BY MR. CARTMELL:

3           Q.    Diversion?

4           A.    Potential diversion, yes.

5           Q.    Okay.  So what you found when you

6       looked at that data was that -- well, you

7       summarize it below --

8           A.    Oh, yes.

9           Q.    -- and I'll read it.

10          At each location, with the

11      exception of 0537 -- and there you list out all

12      this information --

13          A.    Yes.

14          Q.    -- their percentages -- oxycodone

15      IR 30, the highest strength immediate-release

16      oxycodone available, was the top oxycodone

17      product dispensed.  By contrast, at the cancer

18      center, the top oxycodone product dispensed was

19      IR 5 milligrams.

20          And so you can see at these

21      locations you looked at, they were dispensing

22      one of the higher milligrams when compared to a

23      cancer center, correct?

24          A.    Exactly.

1        Q.    And that's suspicious to you,

2   correct?

3               MR. HAMMOUD:  Objection to the

4          form.

5               THE WITNESS:  And that is something

6          that I find consistent with diversionary

7          activity.

8   BY MR. CARTMELL:

9        Q.    Okay.  You state that for Dr. Ralph

10  Page -- strike that.

11              Then you also did inquiries into

12  the top prescribers, meaning doctors, at the

13  nine Publix stores uncovered -- or -- and you

14  uncovered some information, correct?

15       A.    Correct.

16       Q.    I'm going to ask that question

17  again.  Then you also did some further research

18  into the top doctors or prescribers at the nine

19  stores and uncovered some information about

20  those prescribers, correct?

21       A.    Correct.

22       Q.    Okay.  And you actually list those

23  out.  For example, Dr. Ralph Page, you looked

24  into him in Melbourne, Florida, and you found

Highly Confidential - Subject to Further Confidentiality Review

1    that he was operating a cash-only pain clinic

2    business.

3            A.    Yes.

4            Q.    140 up front, but he holds no pain

5    clinic license as required by the state,

6    correct?

7            A.    Correct.

8            Q.    That sounds pretty suspicious,

9    right?

10           A.    Yes.

11                 MR. HAMMOUD:  Objection to the

12           form.

13   BY MR. CARTMELL:

14           Q.    Suspicious for diversionary

15   activity, correct?

16           A.    Could be.

17                 MR. HAMMOUD:  Objection to the

18           form.

19   BY MR. CARTMELL:

20           Q.    You looked into Dr. Mahmoud

21   El-Tobgui and you found that he's an OB/GN

22   operating a pain clinic.  It's again a

23   cash-only pain clinic, correct?

24           A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And you know from your experience

2    that that can be a red flag, correct?

3    A.    Correct.

4    Q.    You looked at Dr. Velleff.  He was

5    disciplined for abandoning a previous practice;

6    "carloads" of out-of-state patients in his

7    clinic getting prescriptions, correct?

8    A.    Correct.

9    Q.    And you know that that is a

10   potential red flag of a pill mill type of

11   situation, correct?

12   A.    Correct.

13   Q.    Pill mill -- this is significant

14   anecdotal evidence of pill mill activity with

15   his practice, is what you said, correct?

16   A.    Correct.

17   Q.    You looked at Dr. -- skipping

18   down -- Dr. Scott Hardoon.  He had a 600 cash

19   fee to enroll as a pain patient, and his

20   license -- strike that.

21         Another red flag, correct?

22   A.    Correct.

23   Q.    There is significant anecdotal

24   evidence that former pain patients belonging to

Highly Confidential - Subject to Further Confidentiality Review

1  Dr. J. Gayden (whose license was relinquished

2  due to overprescribing controlled substances

3  and trading prescriptions for sex with underage

4  patients) are now patients at this doctor's

5  clinic, correct?

6        A.   Correct.

7        Q.   Again, fishy, suspicious-type

8  behavior that could be associated with

9  diversionary activity, correct?

10            MR. HAMMOUD:  Objection to the

11        form.

12            THE WITNESS:  I would say it's

13        consistent with something that could be

14        a diversionary activity, exactly.

15  BY MR. CARTMELL:

16        Q.   Dr. Kevin Sheahan, you found that

17  his pain clinic practice is located in Atlanta,

18  which is 628 miles from this pharmacy, correct?

19        A.   Correct.

20        Q.   That's a red flag, isn't it?

21        A.   I would say that's a red flag.

22        Q.   Because when doctors are

23  prescribing pain -- opioid pain prescriptions

24  and people are driving 628 miles to pick them

Highly Confidential - Subject to Further Confidentiality Review

1   up, that's a red flag that there may be some

2   diversionary tactics or abuse going on,

3   correct?

4           A.   Oh, yeah.   Mm-hmm.

5           Q.   No question, right?

6                MR. HAMMOUD:   Objection to the

7           form.

8                THE WITNESS:   I would say that's a

9           fair assessment, yeah.

10  BY MR. CARTMELL:

11          Q.   Okay.   Then you looked at

12  Dr. Michael Mozzetti.

13               He runs an urgent care clinic that

14  anecdotally doesn't take urgent care or

15  emergency patients.   This is significant

16  anecdotal evidence of pill mill activity.

17               Correct?

18          A.   "There is," not "this is."

19          Q.   "There is."

20          A.   Yeah.

21          Q.   Okay.   So another doctor that you

22  looked into that's using these Publix

23  pharmacies, there's all kinds of red flags

24  showing and suspicion showing that there may be

1    diversionary activity going on, correct?

2         A.    Correct.

3         Q.    You then -- if you go down to

4    Dr. Naglaa Abdel-Al, his practice is 78.3 miles

5    from the pharmacy.

6         A.    Her practice.

7         Q.    Excuse me.  Her practice is either

8    78.3 miles or 40.8 miles (according to the

9    Florida license) from the store.  And she was

10   disciplined in Arizona for abandoning an

11   anesthetized patient in order to inject/abuse a

12   sedative, resulting in her overdose.

13        You found that too?

14        A.    Oh, yes.

15        Q.    And then finally, Dr. McGaha, her

16   office appears to be 116 miles from the Publix

17   store where the opioids are being picked up?

18        A.    Correct.

19        Q.    All of this points to --

20        MR. HAMMOUD:  Objection to the

21   form.  Sorry.

22        MR. CARTMELL:  I didn't even ask

23   the question yet.

24   BY MR. CARTMELL:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   This data -- all of this data that
2  you were finding in your Internet searches and
3  the other websites that you were going to
4  showed that your customers' customers, these
5  doctors, looked like they may be diverting
6  opioids, correct?
7      A.   So why the hell do they still have
8  a license and are still registered with the
9  DEA?
10      Q.   Right.
11      A.   That's what I want to know, why
12  they continued to be licensed after being
13  disciplined in this manner, opening these sorts
14  of businesses, and it's up to me to go and
15  identify it.
16      Q.   Right.  And then you say that these
17  are huge red flags.
18           So this battle between you and
19  sales continues, correct?
20      A.   No.  This was pretty much the end
21  of the battle, as you call it.
22           (Exhibit Teva-Tomkiewicz-023 marked
23           for identification and attached to the
24           transcript.)

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2         Q.    Well, let me hand you Exhibit 23.

3              MR. HAMMOUD:  Can you tell us where

4         we are in time?

5              VIDEO OPERATOR:  Three and a half

6         minutes left.

7              MR. CARTMELL:  How much?

8              MR. HAMMOUD:  Three and a half

9         minutes.

10             MR. CARTMELL:  Okay.  I'll try to

11        talk fast.

12   BY MR. CARTMELL:

13        Q.    Exhibit 23, this is another text

14   message, or is this IM messaging that you had?

15        A.    Yes.  This is an IM.  Uh-huh.

16   10/30.  Okay, so that's a couple days after

17   this.  Okay, I'm good.

18        Q.    A couple days after, you've done

19   your research and you see these red flags and

20   suspicious activity, and you decide that you're

21   still willing to release a portion of these

22   opioids that were going to go to Publix.

23        A.    Now --

24        Q.    Is that true?  First of all, answer

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2         A.   Oh, for the opioids we had on hold?

3         Q.   Yes.

4         A.   Yes.  Yes.

5         Q.   In other words, you're still

6    talking to the sales side of the company, and

7    they're pressuring you to release these holds,

8    and at this point you had actually said that

9    you would be willing to release these opioids,

10   or a portion of these opioids, if you could

11   have an in-face, face-to-face visit with the

12   company, correct?

13        A.   To have a meeting with the company,

14   yes.  And it's important to note that these

15   prescribers weren't prescribing the product in

16   question that we had on hold, that they were

17   prescribing oxycodone 30-milligram immediate

18   release.

19        Q.   Okay.  Right.  But these are

20   doctors who are actually shopping at and get --

21   and writing prescriptions to the pharmacies

22   that you have said --

23        A.   That I don't want my product going

24   to until we have a conversation with them --

1    Q.    Right.

2    A.    -- and discuss their program,

3    correct.

4    Q.    Right.  Because these doctors are

5    using those pharmacies, right, and you know

6    that at this point, correct?

7    A.    Yes.

8    Q.    Okay.  And you've already flagged

9    them because you've said there were red flags

10   that showed it may be suspicious, correct?

11           MR. HAMMOUD:  Objection to the

12       form.

13   BY MR. CARTMELL:

14   Q.    Is that correct?

15   A.    That our orders may be suspicious?

16   Q.    Yeah.  You flagged them because

17   there were red flags.

18   A.    Oh, yes.  And red flags not

19   specifically with the order but with what I

20   thought was Publix' own system.

21   Q.    You say here, We can't have any of

22   the product going to Publix until we okay it,

23   the data was that bad.

24   A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   And ultimately, sir, is it true

2   that, in fact, you didn't report any of these

3   Publix pharmacies, did you?

4       A.   I didn't see any specific orders of

5   ours that were being filled by these

6   physicians.  Again, these physicians [sic] were

7   for a different product, for oxycodone

8   30-milligram immediate release, which was not

9   our product.

10      Q.   Is your testimony that if you find

11  suspicious activity that you say is that bad,

12  is clear in your mind, that even -- just

13  because it's not your product, you don't have

14  to report it to the DEA?

15          MR. HAMMOUD:  Objection to the

16          form.

17  BY MR. CARTMELL:

18      Q.   Is that your testimony?

19          MR. HAMMOUD:  Calls for a legal

20          conclusion.

21          THE WITNESS:  If I had seen an

22          order, I would have reported it for

23          those products.  But I did not see an

24          order for oxycodone 30-milligram

1          immediate release because we did not

2          have that product at that time.

3    BY MR. CARTMELL:

4          Q.   So I want the jury to be clear

5    about this.  Even though you did this

6    investigation and found all of this data that

7    you found to be truly indicative and bad of

8    diversionary activity, and you knew doctors

9    were using those pharmacies for that purpose of

10   getting opioids, you released the product

11   because you said, that wasn't our product, so

12   we don't have to report it.  Correct?

13              MR. HAMMOUD:  Objection to the

14         form.

15              THE WITNESS:  And again, I did not

16         see anything suspicious specifically to

17         our product, to our orders.

18   BY MR. CARTMELL:

19         Q.   And so because it wasn't --

20         A.   So there was nothing to report.

21         Q.   -- your product, you didn't report

22   anything, did you?

23              MR. HAMMOUD:  Objection to the

24         form.

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. CARTMELL:
2          Q.    Did you?
3          A.    I didn't see any orders.  I had no
4    orders to report.
5          Q.    Publix ordered from your company --
6                MR. HAMMOUD:  Tom, time is up.
7                MR. CARTMELL:  Hold on.
8                MR. HAMMOUD:  I'll give you the
9          professional courtesy of one more
10         question, but that's it.
11   BY MR. CARTMELL:
12         Q.    Publix ordered from your pharmacy
13   generic 30 milligrams oxycodone, correct?
14         A.    Wrong.
15         Q.    What did they order from you?
16               MR. HAMMOUD:  That's it.  Time is
17         up.
18               THE WITNESS:  Time's up.
19               MR. CARTMELL:  I've got like three
20         questions.
21               MR. HAMMOUD:  Okay.  I'll give you
22         three questions.
23               THE WITNESS:  Extended-release
24         oxycodone.
```

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. CARTMELL:

2          Q.    So these Publix pharmacies were

3    ordering opioids from your company, correct?

4          A.    Correct.

5          Q.    Those orders were flagged as

6    suspicious, and then you detailed to sales red

7    flags related to those orders, didn't you?

8          A.    Wrong.

9                MR. HAMMOUD:  Objection to the

10         form.

11               THE WITNESS:  Wrong.  They were not

12         flagged as suspicious.

13   BY MR. CARTMELL:

14         Q.    They were flagged as potentially

15   suspicious, correct?

16               MR. HAMMOUD:  Objection to the

17         form.

18               THE WITNESS:  I would say that

19         there was something that -- as I

20         previously said, that they were

21         indicative of things that I felt could

22         be deficient with Publix' program.

23   BY MR. CARTMELL:

24         Q.    Potentially suspicious, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MR. HAMMOUD:  Tom -- objection to
 2       the form.  Move to strike the question.
 3            THE WITNESS:  Any controlled
 4       substance order is potentially
 5       suspicious.
 6            MR. CARTMELL:  That's all I have.
 7       Thanks.
 8            VIDEO OPERATOR:  Going off the
 9       record, 6:49 p.m.
10            (Recess from 6:49 p.m. until
11       6:53 p.m.)
12            VIDEO OPERATOR:  Back on record at
13       6:53 p.m.
14                 EXAMINATION
15  BY MR. GASTEL:
16       Q.   Mr. Tomkiewicz, my name is Ben
17  Gastel, and I represent plaintiffs in cases
18  that are pending in Tennessee.  So everyone I
19  represent is located in the state of Tennessee.
20            Have you ever been to the state of
21  Tennessee?
22       A.   Yes, I have.
23       Q.   Have you ever been there for work?
24       A.   Yes, I have.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you ever done a site visit to

2    a customer of Teva's in Tennessee?

3    A.    No.

4    Q.    Do you recall what your business

5    was in Tennessee when you went there for work?

6    A.    Oh, certainly.  Back when I was

7    with PharMerica, and probably Bergen Brunswig,

8    you know, as we talked about earlier in the

9    day, we had pharmacies, owned pharmacies,

10   nursing home pharmacies that I audited.  And

11   then additionally when I was with

12   AmerisourceBergen, I had -- did some customer

13   site visits.

14   Q.    Is that all of the travel that you

15   did to Tennessee with regard to work-related

16   travel?

17   A.    Let's see.  I also attended a NADDI

18   conference in Gatlinburg.

19   Q.    Anything else you can remember?

20   Was that while you were with Teva?

21   A.    For NADDI?

22   Q.    Yes.

23   A.    Well, that's not the reason, that

24   I'm with Teva, as part of NADDI.  And that was

1   years ago.  That was early 2000s.

2          Q.   Got it.  We've talked a lot about

3   diversion today.  What, in your mind, is a

4   diverted prescription opioid?

5          A.   You mean the specific product?

6          Q.   No, no, no, I mean just generally

7   when we talk about diversion.

8          A.   What is diversion?

9          Q.   What is diversion, in your mind?

10         A.    In my mind, diversion is anything

11  that -- well, in the -- from the controlled

12  substance standpoint -- sorry, I do stutter --

13  from a controlled substance standpoint, that

14  would be anything that is -- where the product

15  is moved outside of the closed system of

16  distribution until it gets to the ultimate end

17  customer.

18              Now, there is also contract

19  diversion, which is not necessarily controlled

20  substances, but that would be moving product

21  outside of a class of trade to a different

22  class of trade, a preferentially priced

23  product.

24         Q.   And why is it important that

1  controlled substances, and specifically

2  opioids, stay within the closed system of

3  distribution?

4       A.    Now, are you talking from just a

5  philosophical standpoint?

6       Q.    I'm talking about your

7  understanding of why that's important.

8       A.    Well, and again, you know, that

9  becomes a philosophical question, you know, not

10  just a regulatory question, because that --

11  from my personal standpoint, you know,

12  that's -- well, a couple reasons.  With

13  controlled substances, it's to help keep

14  product in legitimate supply channels and to

15  keep them away from abusers.  From a contract

16  diversion standpoint, the primary risk there is

17  inflating costs to hospitals through gray

18  marketing of a short supply product.

19       Q.    And when you say "legitimate supply

20  channels," do you mean the legal supply

21  channels?

22       A.    Correct.  Correct.

23       Q.    I think that we saw a slide or we

24  saw a document earlier where you described

1    Florida as a hotspot for opioid abuse.  Do you

2    recall that?

3           A.    For oxycodone.

4           Q.    Are you aware that Appalachia is

5    also a hotspot for opioid abuse?

6           A.    Oh, yes.

7           Q.    Have you ever heard of the

8    Appalachia High Intensity Drug Trafficking

9    Area?

10          A.    I'm not familiar with that term.

11          Q.    Are you aware that much of east

12   Tennessee falls in or lies adjacent to this

13   Appalachian corridor?

14          A.    Yes.

15          Q.    Does Teva treat orders that are

16   going to that area any differently than orders

17   going anywhere else?

18               MR. HAMMOUD:  Objection to the

19          form.

20               THE WITNESS:  And I can't think of

21          any -- well, from the -- well, I would

22          be hard-pressed to say that we take into

23          account any geographical areas as far as

24          the scrutiny of our system because

1          generally people are people, and whether

2          the person is in Appalachia or the

3          person is in the Pacific Northwest or

4          the northeast of the country, pain is

5          going to be pain.  And so from a

6          geographic area -- well, in terms of our

7          system, we treat all geographic areas

8          the same.

9            So if we find something that is in

10         one geographic area, you know, with the

11         way that we do our peer comparisons,

12         we're comparing, you know, a customer

13         who may be servicing, you know, a lot of

14         pharmacies in the Appalachian area,

15         they're going to be compared to other

16         geographic areas.  So if, you know,

17         they're elevated compared to a different

18         geographic area, that is going to be

19         something that is more likely to be

20         further investigated.

21   BY MR. GASTEL:

22         Q.   But is that something that's built

23   in automatically to your algorithm?

24         A.   Yes, I built that into the

1    algorithm.

2         Q.   You've talked a little bit today

3    about, again, how prescription opioid diversion

4    and abuse is a very serious issue.  I want to

5    drill down a little bit more on what you mean

6    by that.

7              Would you agree that it's a public

8    health concern whenever prescription opioids

9    are diverted and consumed for nonmedical

10   purposes?

11             MR. HAMMOUD:  Object to the form.

12             THE WITNESS:  I would say that's a

13        very fair assessment.  Um-hmm.

14   BY MR. GASTEL:

15        Q.   Would you agree that it's a public

16   health concern whenever prescription opioids

17   are consumed for nonmedical purposes?

18             MR. HAMMOUD:  Object to the form.

19             THE WITNESS:  And I would say

20        that's a fair assessment.

21   BY MR. GASTEL:

22        Q.   In your mind, what are the

23   nonmedical reasons why a person would consume a

24   prescription opioid?

Highly Confidential - Subject to Further Confidentiality Review

1        A.    To get high.

2        Q.    Any other reasons?

3        A.    I have anecdotally heard of pain

4   patients who have, you know, been terminated

5   from pain clinics who are still trying to seek

6   pain relief.  But in terms of diversion, I

7   can -- anything that goes outside of the

8   legitimate channel, I consider that the same

9   as -- you know, from my perspective, as a

10  patient getting high.  I'm not going to do an

11  allowance just because I think that, you know,

12  this might be a legitimate pain patient getting

13  product from an illicit channel.  I don't buy

14  it.

15       Q.    Would you agree that prescription

16  opioids are consumed for nonmedical purposes

17  throughout the United States?

18            MR. HAMMOUD:  Object to the form.

19            THE WITNESS:  I would say that's

20       probably a fair assessment, a very fair

21       assessment.

22  BY MR. GASTEL:

23       Q.    Would you say that that's also true

24  in the state of Tennessee?

1          A.    I wouldn't exclude them.

2          Q.    Would you agree that ensuring

3    prescription opioids are not consumed for

4    nonmedical purposes is an important public

5    health concern?

6          A.    I would say that's a fair

7    assessment.

8          Q.    Would you agree that some consumers

9    of prescription opioids obtain those opioids

10   via illegal diversion for nonmedical purposes?

11         A.    I'm sorry, could you repeat that

12   one?

13         Q.    Sure.  Would you agree that some

14   consumers of prescription opioids obtain those

15   opioids via illegal diversion for nonmedical

16   purposes?

17         A.    Oh, yes.

18         Q.    And that happens throughout the

19   country, right?

20         A.    That's a fair assessment.

21         Q.    And that's been happening

22   throughout the state of Tennessee for a long

23   time too, correct?

24         A.    I would say that's a fair

Highly Confidential - Subject to Further Confidentiality Review

1    assessment.

2         Q.   And you talked a lot today about

3    how sometimes -- and I think the description

4    you used is, your product ends up on the

5    street.  Do you recall some of that testimony?

6         A.   Oh, yes.

7         Q.   When you say "your product," you

8    really mean Teva-produced prescription opioids,

9    right?

10        A.   I mean Teva-produced controlled

11   substances.

12        Q.   But that would include

13   Teva-produced prescription opioids, right?

14        A.   Well, the photographs that I've

15   seen, I haven't seen our opioids on them.  I

16   didn't see any of our opioids.  They were

17   benzodiazepines, primarily.

18        Q.   Well, I understand that you might

19   not have seen photographs of it, but you would

20   agree with me that that includes Teva-produced

21   prescription opioids, right?

22        A.   Oh, I'm certain that that's

23   happened, yes.

24        Q.   And so would you agree with me that

Highly Confidential - Subject to Further Confidentiality Review

1    despite Teva's efforts, the prescription

2    opioids that it produces have been placed in

3    diverted channels to consumers for use for

4    nonmedical purposes?

5              MR. HAMMOUD:  Object to the form.

6              THE WITNESS:  Yeah, and I'm not

7         certain what you mean, despite our

8         efforts.

9    BY MR. GASTEL:

10        Q.   Well, I'll just ask, would you

11   agree with me that the prescription opioids

12   that Teva produces have been diverted to

13   consumers for nonmedical purposes?

14        A.   Oh, yes.

15        Q.   And that happens throughout the

16   country, right?

17        A.   I'm certain that it has.

18        Q.   And it's certainly been happening

19   in Tennessee for quite some time, right?

20             MR. HAMMOUD:  Object to the form.

21             THE WITNESS:  Well, I can't say

22        that for certain for -- for the term

23        "quite some time."

24   BY MR. GASTEL:

1         Q.    Well, since, let's say, at least

2    2014?

3         A.    I can't even say 2014.  And that's

4    because of the type of opioids that we had at

5    that time from 2014, 2015, 2016.  Generally the

6    opioids that we had weren't opioids that were

7    highly sought after by abusers.

8         Q.    Well, I understand that they might

9    not be highly sought after by abusers, but they

10   were undoubtedly diverted into channels for

11   consumers to use for nonmedical purposes, even

12   though they might not be the most sought-after

13   ones; is that fair to say?

14              MR. HAMMOUD:  Object to the form.

15              THE WITNESS:  I would say it's

16         definitely possible, yeah.

17   BY MR. GASTEL:

18        Q.    We've seen a lot of data today

19   about your suspicious order monitoring program.

20   Do you have an opinion as to what percentage of

21   prescription opioid orders that were made --

22   well, strike that.

23              Do you believe that Teva's

24   suspicious order monitoring program correctly

1    flagged and stopped every order of prescription

2    opioids that was intended to be consumed for

3    nonmedical purposes?

4              MR. HAMMOUD:  Object to the form.

5              THE WITNESS:  That -- I can't

6         determine that.

7    BY MR. GASTEL:

8         Q.   Is that the goal of the suspicious

9    order monitoring program?

10             MR. HAMMOUD:  Object to the form.

11             THE WITNESS:  The goal of the

12        suspicious order monitoring program is

13        that it -- it's actually multifold.

14        It's to identify suspicious orders, it's

15        to maintain effective controls against

16        diversion.  And that's probably the

17        biggest one that I'm looking at is

18        working to prevent diversion.

19   BY MR. GASTEL:

20        Q.   Do you have any understanding of

21   opioid prescription rates in the state of

22   Tennessee?

23        A.   Prescription rates?  No.

24        Q.   Do you have -- have you ever

Highly Confidential - Subject to Further Confidentiality Review

1    reviewed a document published by the Tennessee

2    Department of Health on Tennessee's opioid

3    crisis?

4         A.   I may have, but I don't recall

5    specifically.

6         Q.   Are you aware that in -- as of

7    2013, 2014, the Tennessee Department of Health

8    estimated that there were 221,000 adults in

9    Tennessee using prescription pain relievers for

10   nonmedical purposes?

11        A.   I haven't heard that number.

12        Q.   Would you be surprised if that was

13   true?

14        A.   No.

15        Q.   Are you aware that in 2015, doctors

16   in Tennessee wrote more than 7.8 million opioid

17   prescriptions in the state of Tennessee?

18        A.   So why did Tennessee license them?

19   Why don't they revoke the license?

20        Q.   Well, I mean, we'll maybe ask the

21   Department of Health one day.  But are you

22   aware --

23        A.   That would be nice.

24        Q.   -- that that is the number of

Highly Confidential - Subject to Further Confidentiality Review

1    opioid prescriptions in the state of

2    Tennessee --

3            MR. HAMMOUD:  Object to the form.

4    BY MR. GASTEL:

5        Q.    -- in 2015?

6            MR. HAMMOUD:  Sorry.  Object to the

7        form.

8            THE WITNESS:  I'm not aware.

9    BY MR. GASTEL:

10       Q.    I think that we kind of covered

11   this a little bit earlier, but I want to make

12   sure that it's on the record that -- in your

13   mind, what is a suspicious order for

14   prescription opioids?

15           MR. HAMMOUD:  Object to the form.

16           THE WITNESS:  A suspicious order

17       for opioids is going to be a suspicious

18       order for really anything that I

19       monitor.  It's going to be something

20       that is going to be of an unusual size,

21       pattern, or frequency where I can't --

22       where unusual becomes something where

23       there's a red flag that I can't explain.

24       If I have a -- if I see a legitimate use

Highly Confidential - Subject to Further Confidentiality Review

1          for this product, a legitimate need for

2          the product, generally those sorts of

3          things are going to satisfy a red flag.

4          But in terms of opioids, you know, then

5          I'm looking at things like hospice and

6          cancer care, like in the last document

7          that I reviewed with the previous

8          attorney.

9     BY MR. GASTEL:

10         Q.    So we saw some statistics about

11    your suspicious order monitoring program today

12    that showed that it reviews approximately

13    10,000 order lines each month?

14         A.    At that time, correct.

15         Q.    What is an order line?  And how is

16    it different from an order, if at all?

17         A.    Oh, well, an order line -- well, an

18    order may comprise of a number of different

19    products.  You know, if we're talking

20    oxycodone, oxycodone 10-milligram, oxycodone

21    extended release 20-milligram, each of those

22    are going to be separate order lines within a

23    single order.

24         Q.    And so you're tracking each one of

1    those line items in the order.  Is that what

2    you're saying?

3              MR. HAMMOUD:  Object to the form.

4              THE WITNESS:  Correct.  We're

5         looking at each line of an order.

6    BY MR. GASTEL:

7         Q.   Does your current version of the

8    algorithm incorporate any chargeback data?

9         A.   Within the algorithm?  No.

10        Q.   And the algorithm uses historical

11   purchasing data as a baseline to determine

12   whether or not an order is suspicious?

13             MR. HAMMOUD:  Object to the form.

14             THE WITNESS:  No.  It uses

15        historical data into -- to develop

16        statistical norms for customers across

17        like sciences and like business types.

18   BY MR. GASTEL:

19        Q.   Does it use the entire historical

20   data that Teva has on a given customer, or does

21   it -- just flagging orders, say, for the last

22   12 months, 14 months, 16 months?

23        A.   Well, the historical data used to

24   develop the model is from the previous 12

```
 1    months.
 2         Q.    How does that work?
 3              MR. HAMMOUD:  Object to the form.
 4              THE WITNESS:  In terms of how we're
 5         looking at the previous 12 months or how
 6         the algorithm looks at the previous 12
 7         months?
 8    BY MR. GASTEL:
 9         Q.    Yeah, like how does it -- I mean, I
10    assume that it's a computer-based system and
11    it's a software-based system.
12         A.    Correct.
13         Q.    So is it told to look at a given
14    customer's orders just for the last 12 months?
15         A.    No.  We have numbers that are built
16    into it that are compiled from historical
17    purchases, looking at not just the specific
18    customer but looking at the customer's peer
19    group by business type and by relative size.
20    And so we group customers into essentially
21    these pockets where we can develop a -- what we
22    consider to be a statistical norm for this
23    group of customers.  In that way, you know,
24    we're comparing a customer, say, in Tennessee
```

1    with a like customer across the country.  So

2    if, for example, you know, something in

3    Appalachia is showing as being elevated

4    compared to the rest of the country, that's

5    going to be something that's going to be more

6    likely to be investigated into that customer in

7    Appalachia.  Does that help?

8         Q.    Yeah.  Does the algorithm

9    incorporate information from Quintiles?

10        A.    Quintiles?  Well, Quintiles is now

11   called IQVIA, a part of IMS, and no, it

12   doesn't.

13        Q.    Do you have access to IMS data?

14        A.    I don't have access to IMS data,

15   but I do have access to EDI 867 data, which is

16   very similar.

17        Q.    And you might have answered this

18   question earlier, but when did the algorithm

19   start incorporating the 867 data?

20        A.    Well, the algorithm actually

21   doesn't incorporate the 867 data.  Our

22   suspicious order monitoring program as a whole

23   incorporates reviewing 867 data.

24        Q.    So at what point is the 867 data

1    reviewed?

2          A.   Well, there's a couple different

3    facets in the way we review it.  One would be

4    specific to an investigation where we're

5    looking at a customer's order where, instead of

6    going to the customer and asking for data, it's

7    much quicker for us to go and look at the 867

8    data on that customer to find where a product

9    is ultimately -- you know, at what pharmacy the

10   product is being dispensed from.  The other is

11   doing a prospective review of different

12   controlled substances and finding just

13   nationally what pharmacies are purchasing these

14   products.

15         Q.   And we saw the document earlier

16   that in 2015 there were 10,000 order lines

17   watched every month, and then approximately 25

18   of those per month got held back for longer

19   than a day.  Do you remember that document?

20         A.   Correct.

21         Q.   Is that statistic accurate?

22         A.   At the time, I believe it was, yes.

23         Q.   And then we saw in 2015 this slide

24   in your PowerPoint deck that showed that you

Highly Confidential - Subject to Further Confidentiality Review

1    had made four suspicious ordering reports to

2    the DEA.  Do you recall that slide?

3            A.    Correct.

4                  MR. HAMMOUD:  Objection to the

5            form.

6    BY MR. GASTEL:

7            Q.    Is that statistic correct?

8            A.    Yes, I believe it's correct.

9            Q.    So you hold -- in 2015, just using

10   these stats, you've held approximately 300

11   orders back for longer than a day.  Is that

12   fair?

13           A.    Correct.

14           Q.    You've reported four orders to the

15   DEA?

16           A.    Correct.

17           Q.    And those were never fulfilled,

18   correct?

19           A.    If they were reported as

20   suspicious, they were not filled.

21           Q.    What happens to the other roughly

22   296 orders?  Are those all sent to the customer

23   after the investigation?

24           A.    Most of them would have been sent.

Highly Confidential - Subject to Further Confidentiality Review

1    If they were not sent, it would have been for

2    some other reason other than the suspicious

3    order monitoring program.  But those were ones

4    where all the red flags were cleared.

5         Q.   So is it safe to say that the only

6    orders that you did not fulfill in 2015 were

7    the four that were reported to the DEA?

8              MR. HAMMOUD:  Object to the form.

9    BY MR. GASTEL:

10        Q.   For suspicious order monitoring

11   activity.

12        A.   Oh, I would say that's probably

13   correct.

14        Q.   So in 2013, when you had one

15   suspicious order report to the DEA, that was

16   the only order held back and not fulfilled for

17   suspicious order monitoring activity?

18             MR. HAMMOUD:  Object to the form,

19        calls for speculation.

20             THE WITNESS:  Yes, because I wasn't

21        in -- I wasn't there in 2013.  So I can

22        assume that it was not shipped but don't

23        know for certain.

24   BY MR. GASTEL:

1    Q.   Sure.  What about in 2014 when you

2  were there with the one order that was reported

3  to the DEA, was that the only order that wasn't

4  fulfilled due to suspicious order monitoring

5  activity?

6    A.   That is correct.

7    Q.   And then in 2017 when you had the

8  18 reports, were those the only orders that you

9  did not fulfill due to suspicious order

10  monitoring activity?

11    MR. HAMMOUD:  Object to the form.

12    THE WITNESS:  And I'm going to say

13    correct.  And also, one -- a point of

14    clarification on the suspicious order

15    reports that I have reported.  Because I

16    have reported things through review of

17    867 data, which would be orders that we

18    did not fill but that some of our

19    customers may have filled, those,

20    because they weren't our orders that I

21    reported, that they were, you know,

22    someone else's orders that I saw were

23    suspicious and reported, those were

24    things that were filled but that Teva

1          did not have control over determining

2          whether those were to be filled or not.

3     BY MR. GASTEL:

4          Q.    In 2016, was Teva still processing

5     approximately 10,000 order lines per month?

6          A.    Could have been.

7          MR. HAMMOUD:  Object to the form.

8     BY MR. GASTEL:

9          Q.    Would it have been more or less?

10         MR. HAMMOUD:  Same objection.

11         THE WITNESS:  Yeah, I'd have to go

12         and look to be certain.

13    BY MR. GASTEL:

14         Q.    And how would you find that out?

15         A.    Oh, I'd have to go into the system

16    and pull historic order reports and compile an

17    analysis of how many orders were reviewed, how

18    many lines were reviewed.

19         Q.    For the 300 -- again, going back to

20    that 2015 data, for the 300 orders that were

21    flagged, investigated for longer than a day,

22    and then eventually not reported to the DEA but

23    then filled, presumably, are those tracked in

24    any Teva document?

1     A.    They would be.  You know, we can

2   see how long a review of an order was.

3     Q.    And is the result of the review

4   tracked anywhere in the system?

5     A.    The result of the review of the

6   order, or reviewing for how long an order sat

7   on hold?

8     Q.    Both.

9     A.    Both.  Well, one, we don't track --

10  we have the ability to, but I don't do any

11  metrics based on how long we hold an order,

12  because generally, if we're holding an order, I

13  don't really care about any customer service

14  issues based on holding it, and I don't want to

15  look like I'm caring about customer service

16  issues based on holding an order.  So the time

17  that we spend holding an order, you know, for a

18  day, two days, weeks, because it can be weeks

19  sometimes, that doesn't matter to me.  What

20  matters to me is the results of the

21  investigation and determining if this is a

22  product where we can't resolve a red flag and

23  it has to be reported as suspicious.

24          On the other side -- and I'm sorry,

Highly Confidential - Subject to Further Confidentiality Review

1  what was the other half of that?

2          Q.   Well, I presume that there's an

3  investigation that's going on at that point --

4          A.   Correct.

5          Q.   -- with regard to the order.  So is

6  the result of the investigation --

7          A.   Oh, the result.

8          Q.   -- the reason why it's released,

9  tracked anywhere?

10          A.   Yes, that is maintained.

11          Q.   And how is it maintained?

12          A.   Well, a couple places.  For the

13  specific order line, there will be a release

14  code and a free text piece that's maintained on

15  why a specific order line is held, or released.

16  Then additionally, if it's something where

17  we've gone to the customer, we maintain that

18  information, the -- you know, any materials

19  that we've gathered through that investigation

20  is maintained within the customer's file.

21          Q.   We've seen several examples today

22  of you, specifically, asking Teva customers for

23  information on their customers.

24          A.   Correct.

1     Q.    Do you recall ever having a

2   customer refuse that request?

3     A.    Oh, yes.

4     Q.    What do you do when a customer

5   refuses that request?

6     A.    We cease all sales of controlled

7   substances, gabapentin, and List I chemicals

8   until they comply.

9     Q.    And then how many customers has

10   that happened with, approximately?

11     A.    Not very many.  In the past year, I

12   can think of one offhand who refused to provide

13   that information.

14     Q.    And then you stopped fulfilling

15   orders?

16     A.    Correct.

17     Q.    And then did the customer

18   ultimately give it and then you started redoing

19   it --

20     A.    Yes.

21     Q.    -- or refilling orders?

22     A.    Yes, exactly.

23     Q.    Do you ever recall an instance

24   where the customer refused to provide the

1    information about its customers, you then

2    ceased filling orders, and then the customer

3    just simply never came back?

4         A.   Yes.

5              MR. HAMMOUD:  Objection to the

6         form.

7    BY MR. GASTEL:

8         Q.   And what customer do you recall

9    that happening with?

10        A.   Henry Schein.

11        Q.   And when did that happen?

12        A.   I'm trying to think when

13   specifically that happened.  That may have been

14   in the last year as well, which would make two

15   customers.  That could have been the end of

16   2017, beginning of 2018.

17        Q.   Any other customers where you can

18   recall that happened to?

19        A.   Well, again, there was one other

20   customer this year that that happened to, but

21   they ultimately provided the information pretty

22   quickly.

23        Q.   Any other customers, then, other

24   than the two you've mentioned?

Highly Confidential - Subject to Further Confidentiality Review

 1          A.   Oh, yeah, there was one other that

 2    didn't want to provide information, and we

 3    ceased sales of controlled substances.

 4          Q.   You mentioned Richie Pharmacal

 5    earlier today?

 6          A.   Yes.

 7          Q.   Pharmacal?  I don't know if I'm

 8    saying that right?

 9          A.   Richie Pharmacal, yes.

10          Q.   I want to -- do you recall -- why

11    does that customer stick out in your mind?

12               MR. HAMMOUD:  Objection to the

13          form.

14               THE WITNESS:  They were the

15          suspicious order report -- the first

16          suspicious order report that I reported,

17          I believe, and we also terminated their

18          ability to order controlled substances

19          at that time.

20               (Exhibit Teva-Tomkiewicz-024 marked

21          for identification and attached to the

22          transcript.)

23    BY MR. GASTEL:

24          Q.   I'm going to show you Exhibit 24.

1  Do you recall this document.

2       A.   Oh, yes.

3       Q.   This is the suspicious order report

4  that you sent to the Drug Enforcement

5  Administration, correct?

6       A.   Correct.

7       Q.   The document that we have is not

8  signed, but is this what you actually sent to

9  the DEA?

10      A.   Oh, they would have received a

11 signed copy.

12      Q.   I understand.  But it would have

13 been this letter, correct?

14      A.   Oh, yes.

15      Q.   And this relates to orders that

16 were attempted to be placed by Richie Pharmacal

17 in October 2014, correct?

18      A.   Correct.

19      Q.   And Richie Pharmacal is actually

20 located in Glasgow, Kentucky.

21      A.   Correct.

22      Q.   Do you know where Glasgow, Kentucky

23 is?

24      A.   I've been there, but that -- I

1    can't remember specifically because I've been

2    to lots of places in Kentucky.

3            Q.    Did you do a site visit to Richie

4    Pharmacal?

5            A.    No.

6            Q.    Why have you been to Glasgow,

7    Kentucky then?

8            A.    When I worked for PharMerica, we

9    had a long-term care pharmacy in Glasgow and I

10   visited them.

11           Q.    Got it.

12           A.    Audited them.

13           Q.    Would you have flown or driven to

14   that?

15           A.    I would have flown there.

16           Q.    Do you recall if you flew into the

17   Nashville International Airport for that?

18           A.    I don't remember which airport.

19           Q.    The reason why I ask is that

20   Glasgow, Kentucky is actually very close to the

21   state of Tennessee, and probably the closest

22   regional airport to it is actually in

23   Nashville.

24                 So I want to ask some questions

Highly Confidential - Subject to Further Confidentiality Review

1    about Richie Pharmacal.

2              (Exhibit Teva-Tomkiewicz-025 marked

3         for identification and attached to the

4         transcript.)

5    BY MR. GASTEL:

6         Q.   I'm going to show you another

7    exhibit, we'll mark it as Exhibit 25.  This is

8    an internal memo that Colleen McGinn sent to

9    you on November 21st, 2014.

10        A.   Oh, I sent it to Colleen.

11        Q.   Oh, I'm sorry.  And this, I assume,

12   was based on an investigation that you did

13   based on what would eventually be reported as

14   the Richie Pharmacal suspicious orders,

15   correct?

16        A.   Correct.

17        Q.   And you'll see that he had --

18   Richie Pharmacal has, I assume, provided you

19   some information about its customers.  Is that

20   fair to say?

21        A.   Correct.

22        Q.   And then you did an investigation

23   on its customers, correct?

24        A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    I want to direct your attention to

2  the last page of this exhibit.  Do you see the

3  reference to Dr. Trent Cross in Oneida,

4  Tennessee?

5    A.    Yes.

6    Q.    And it says in the first bullet

7  point, In the last six months, Richie sold

8  Dr. Cross 56,000 tablets of hydrocodone.

9    A.    Yes.

10    Q.    And in 2014, was Teva making

11  hydrocodone?

12    A.    No.  That was someone else's

13  hydrocodone.  Well, we did have a hydrocodone

14  with ibuprofen product, but we discontinued it

15  around this time.  I think before this.

16    Q.    And you sort of identify some other

17  interesting factors about Dr. Cross, including

18  that 69 percent of Richie's hydrocodone sales

19  to Dr. Cross were 10 milligrams, correct?

20    A.    Correct.

21    Q.    And then it says that he maintains

22  two offices, a Way-Less Weight Loss Clinic and

23  a Cross Medical Clinic?

24    A.    Correct.

1    Q.   Why was that something that you

2  wanted to put in your report, if you recall?

3    A.   It seems unusual that a doctor

4  dealing with hydrocodone, the top strength of

5  hydrocodone, also operates a weight loss

6  clinic.  It doesn't seem to be consistent with

7  his practice.

8    Q.   And then do you see how it says,

9  Anecdotally appears to be a cash-only business?

10    A.   Yes.

11    Q.   Do you recall how you came to that

12  conclusion?

13    A.   Oh, well, that's through anecdotal

14  reports on the Internet, patients chattering

15  about the doctor and about how much they have

16  to pay to get in to see the doctor.  If you're

17  going to see the doctor, you know, be prepared

18  because it's going to be this much money.

19  Those sorts of things.

20    Q.   And then you have the anecdotal

21  comments down here.  Where did you find those?

22    A.   Well, they're actually listed.

23  Vitals.com, topics.com, a lot of topics.com.

24    Q.   And the reason why you put this in

1    your memo is that I assume that you believe

2    that these were red flags for diversion

3    activity going on at Dr. Cross's medical

4    practice?

5            A.    Oh, yes.

6            Q.    Are you aware of whether or not

7    Dr. Cross ultimately lost his medical license?

8            A.    That I don't know.

9            Q.    Did you report any of the -- of

10   this related to Dr. Cross to the DEA?

11           A.    Yes, I did.

12           Q.    And do you know when you did that?

13           A.    It would have been around this

14   time.  And it was actually an unusual

15   situation, which is why I remember it, in which

16   it was one of the two times the DEA actually

17   contacted me about a suspicious order report.

18   And so someone from I think the Louisville

19   office had called me up -- and I have his name

20   somewhere, but, you know, it's a few years ago,

21   so I can't quite remember it -- and he asked

22   about details about Richie and why we cut them

23   off, and so I gave him the details, and I said,

24   you know, I have a whole file full of notes and

Highly Confidential - Subject to Further Confidentiality Review

1   things, send me a subpoena and I'll send you

2   all my notes.  So he sent me a subpoena and I

3   sent him all this stuff.

4            (Exhibit Teva-Tomkiewicz-026 marked

5        for identification and attached to the

6        transcript.)

7   BY MR. GASTEL:

8        Q.   And I'm going to show you another

9   exhibit which is Exhibit 26.

10       A.   Does he still have his license?

11       Q.   I believe it's been suspended,

12  but -- for a variety of reasons.

13       A.   That's actually a good thing.

14       Q.   This is another suspicious order

15  report that you sent to the DEA, correct?

16       A.   Correct.

17       Q.   Once again detailing Richie

18  Pharmacal, correct?

19       A.   Correct.

20       Q.   So between your original report to

21  the DEA in December of 2014 and this report in

22  December of 2015, do you know if Teva filled

23  any orders for Richie Pharmacal?

24       A.   No controlled substance orders.

1     Q.   And then why did you have a second

2    report related to Richie Pharmacal then?

3     A.   Well, because they placed an order

4    for these products.

5     Q.   And what made it suspicious, in

6    your mind?

7     A.   Well, actually, two things.  The

8    first is that they're not allowed to receive

9    controlled substances from Teva.  So the act of

10   placing an order in itself is suspicious.  And

11   then the nature of the order I found highly

12   suspicious.

13        The -- if you notice, there's two

14   different dates, 6-23 and 6-24.  The order on

15   6-23 for a small amount of a product called

16   estazolam.  Estazolam isn't a highly abused

17   product.  I don't know how other manufacturers

18   of estazolam view it, but that -- it's often

19   considered a very little abuse potential.  It's

20   a Schedule IV, so it's, you know, farther down

21   on the schedule.  But what it appeared to me in

22   a -- and I held that without reporting it on

23   that day because my suspicion said this was a

24   test order and they're going to try to order

1  something else following up, just to see if

2  they get it through.

3            And the next day, orders came

4  through for buprenorphine with naloxone.  And

5  so that helped to reinforce my suspicion that

6  that first one was a test order just to see if

7  they could place the order.

8            (Exhibit Teva-Tomkiewicz-027 marked

9       for identification and attached to the

10      transcript.)

11 BY MR. GASTEL:

12      Q.   I'm going to show you Exhibit 27.

13 And this is a letter that you ultimately sent

14 to Richie Pharmacal, correct?

15      A.   Correct.

16      Q.   It says, In response to your recent

17 request, please be advised that Teva

18 Pharmaceuticals has decided to discontinue

19 sales of controlled substances to Richie

20 Pharmacal.

21      A.   Correct.

22      Q.   And this letter is dated

23 January 22nd, 2016.

24      A.   Correct.

1    Q.   So prior to that, how did you

2  communicate to Richie Pharmacal that you were

3  not going to fill controlled substances orders

4  for them?

5    A.   We did have phone calls with

6  Richie.

7    Q.   And what prompted this letter of

8  January 22nd, 2016?

9    A.   They kept asking, what can we do to

10 get back in your good graces, essentially.  I'm

11 not saying that was the exact words they were

12 using.  But that -- they kept placing calls to

13 different people within the company, you know,

14 what can we do to get turned back on, what can

15 we do to get turned back on.  And I said,

16 there's nothing really you can do.

17   Q.   Did you alert any of your other

18 customers not to send Teva product to Richie

19 Pharmacal?

20   A.   No.

21   Q.   I want to talk a little bit

22 specifically about some other parties specific

23 to the Tennessee action.

24         Have you ever heard of

```
 1    Dr. Abdelrahman Mohamed?

 2         A.    That one is not ringing a bell.

 3         Q.    What about Timothy Gowder?

 4         A.    Timothy Gowder?  Not ringing a bell

 5    either.

 6         Q.    What about Gary Arlan Moore?

 7         A.    That one's ringing a bell, but I

 8    couldn't give you any details on it.

 9         Q.    Why do you think that that sounds

10    familiar?

11         A.    It just sounds familiar to me.

12         Q.    What about David Florence?

13         A.    That one is not ringing a bell.

14         Q.    Mark Murphy?

15         A.    Mark Murphy.  I know a Mark Murphy,

16    but he's not a physician in Tennessee.  Former

17    DEA.

18         Q.    Ed White?

19         A.    Ed White?  That one's not ringing a

20    bell.

21         Q.    What about Pam White?

22         A.    Pam White?  Nah.

23         Q.    Are you aware of medical

24    professionals in Tennessee being arrested for
```

1  prescribing prescription opioids for nonmedical

2  reasons?

3      A.   Yes.

4      Q.   Do you recall any specific instance

5  of medical professionals being arrested in

6  Tennessee for that?

7      A.   Yes.

8      Q.   Do you remember specifically any

9  names of such people?

10     A.   I do remember a couple names.

11  Well, I can remember one name offhand.

12     Q.   What name do you remember?

13     A.   Councill Rudolph.

14     Q.   Do you know what part of Tennessee

15  Councill Rudolph practiced in?

16     A.   I don't remember specifically.

17     Q.   Are you aware of whether medical

18  professionals in Tennessee have been convicted

19  for prescribing prescription opioids for

20  nonmedical reasons?

21     A.   Oh, unfortunately, I know that

22  Councill Rudolph was not convicted, but that --

23  I can't think of any offhand.

24     Q.   Would it surprise you that that has

1  happened?

2      A.   He's been convicted now?

3      Q.   No, no, no --

4      A.   Oh.

5      Q.   -- that a medical professional in

6  Tennessee has been convicted for prescribing

7  prescription opioids for nonmedical reasons.

8      A.   Oh, would I be surprised that a

9  medical professional has been convicted?

10      Q.   Yeah.

11      A.   No, I wouldn't be surprised at all.

12      Q.   Have you ever heard of Boatwright

13  Drugs?

14      A.   No, that one's not ringing a bell.

15      Q.   What about Super Drugs?

16      A.   Super Drugs?  Not ringing a bell

17  either.

18      Q.   Nashville Pharmacy Services?

19      A.   A slight bell.

20      Q.   What about North Alabama Pain

21  Services?

22      A.   That one is not ringing a bell.

23      Q.   Lynnville Family Medical Clinic?

24      A.   That name is familiar.

1      Q.   What do you recall about it?

2      A.   I can't think of anything specific

3  other than I think I might have taken a look at

4  them at some point, but I can't remember

5  anything specific.

6      Q.   Tennessee Pain Institute in Hixson,

7  Tennessee?

8      A.   Institute -- that one's not ringing

9  a bell.

10      Q.   Hamblen Neuroscience Center in

11  Hamblen, Tennessee?

12      A.   No.

13      Q.   What about Center Pointe in

14  Kingsport, Tennessee?

15           (Reporter interruption.)

16  BY MR. GASTEL:

17      Q.   What about Center Pointe in

18  Kingsport, Tennessee?

19      A.   That one is not ringing a bell

20  either.  Those sound like medical practices.

21           MR. GASTEL:  Subject to the

22           objection that I lodged earlier today, I

23           have no further questions for you

24           tonight.

1           VIDEO OPERATOR:  Going off the

2      record, the time is 7:34 p.m.

3           (A discussion was held off the

4      record.)

5           VIDEO OPERATOR:  We're back on the

6      record at 7:35 p.m.

7                    EXAMINATION

8  BY MR. HAMMOUD:

9      Q.   Mr. Tomkiewicz, thank you for your

10  time today.  I just have a couple, brief

11  questions on redirect.

12           Are you aware of any suspicious

13  orders that Teva has received and released?

14      A.   No.

15      Q.   Are you aware of any suspicious

16  orders that Teva has received and not reported

17  to the DEA?

18      A.   No.

19           MR. HAMMOUD:  Thank you.  No

20      further questions.

21           MR. CARTMELL:  I don't have

22      anything further.

23           VIDEO OPERATOR:  This ends today's

24      deposition.  We're going off the record.

Highly Confidential - Subject to Further Confidentiality Review

1           The time is 7:36 p.m.

2                         -   -   -

3               (Off the record at 7:36 p.m.)

4                         -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

1              C E R T I F I C A T E

2

3         I, Lisa V. Feissner, RDR, CRR, CLR,

4    Notary Public, certify that the foregoing is a

5    true and accurate transcript of the deposition

6    of said witness, who was first duly sworn by me

7    on the date and place hereinbefore set forth.

8

9         I further certify that I am neither

10   attorney nor counsel for, nor related to or

11   employed by, any of the parties to the action

12   in which this deposition was taken, and

13   further, that I am not a relative or employee

14   of any attorney or counsel employed in this

15   action, nor am I financially interested in this

16   case.

17

18

19        Lisa V. Feissner, RDR, CRR, CLR
         Notary Public
20       Dated: December 2, 2018

21

22        (The foregoing certification of this
     transcript does not apply to any reproduction
23   of the same by any means, unless under the
     direct control and/or supervision of the
24   certifying reporter.)

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the appropriate

 6   column on the errata sheet for any change made.

 7          After doing so, please sign the errata

 8   sheet and date it.

 9          You are signing it subject to the

10   changes you have noted on the errata sheet,

11   which will be attached to your deposition.  You

12   must sign in the space provided.  The witness

13   need not be a notary public.  Any competent

14   adult may witness your signature.

15          It is imperative that you return the

16   original errata sheet to the deposing attorney

17   within thirty (30) days of receipt of the

18   deposition transcript by you.  If you fail to

19   do so, the deposition may be deemed to be

20   accurate and may be used in court.

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1
   WITNESS NAME:      JOSEPH TOMKIEWICZ

   DEPOSITION DATE:   NOVEMBER 28, 2018

2

3                         ERRATA

4  PAGE LINE  CHANGE                    REASON

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  ACKNOWLEDGMENT OF DEPONENT

 2

 3           I hereby acknowledge that I have read

 4      the foregoing deposition, pages 1 - 503, dated

 5      November 28, 2018, and that the same is a true

 6      and correct transcription of the answers given

 7      by me to the questions propounded, except for

 8      the changes, if any, noted on the attached

 9      Errata.

10

11

12      SIGNATURE:

                   JOSEPH TOMKIEWICZ

13

14      DATE:

15

16

17

18      WITNESSED BY:

19

20      DATE:

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

1

LAWYER'S NOTES

2    PAGE   LINE

3    _____  _____   _____

4    _____  _____   _____

5    _____  _____   _____

6    _____  _____   _____

7    _____  _____   _____

8    _____  _____   _____

9    _____  _____   _____

10   _____  _____   _____

11   _____  _____   _____

12   _____  _____   _____

13   _____  _____   _____

14   _____  _____   _____

15   _____  _____   _____

16   _____  _____   _____

17   _____  _____   _____

18   _____  _____   _____

19   _____  _____   _____

20   _____  _____   _____

21   _____  _____   _____

22   _____  _____   _____

23   _____  _____   _____

24   _____  _____   _____