Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3    IN RE:  NATIONAL        :   MDL No. 2804
      PRESCRIPTION OPIATE     :
 4    LITIGATION              :   Case No. 17-md-2804
      APPLIES TO ALL CASES    :   Hon. Dan A. Polster
 5                            :
                              :
 6
 7                     HIGHLY CONFIDENTIAL
 8       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
10                         - - - -
11                   DECEMBER 18, 2018
12                         - - - -
13      VIDEOTAPED DEPOSITION OF EUGENE TOMMASI,
14    taken pursuant to notice, was held at Marcus &
15    Shapira, One Oxford Center, 35th Floor, Pittsburgh,
16    Pennsylvania 15219, by and before Ann Medis,
17    Registered Professional Reporter and Notary Public in
18    and for the Commonwealth of Pennsylvania, on Tuesday,
19    December 18, 2018, commencing at 9:00 a.m.
20                         - - - -
21              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
22                    deps@golkow.com
23
24
25
```

Page 2

```
 1           A P P E A R A N C E S
 2   On behalf of Plaintiffs
 3       WAGSTAFF & CARTMELL, LLP
         BY:  TYLER W. HUDSON, ESQUIRE
 4            ERIC D. BARTON, ESQUIRE
         4740 Grand Avenue, Suite 300
 5       Kansas City, Missouri  64112
         816.701.1100
 6       thudson@wcllp.com
         ebarton@wcllp.com
 7
     On behalf of Defendant AmerisourceBergen Drug
 8   Corporation
 9       JACKSON KELLY, PLLC
         BY:  SYLVIA WINSTON NICHOLS, ESQUIRE
10       150 Clay Street, Suite 500
         P.O. Box 619
11       Morgantown, West Virginia  26501
         304.284.4138
12       sylvia.winston@jacksonkelly.com
13   On behalf of Defendant Cardinal Health, Inc.
14       PIETRAGALLO GORDON ALFANO BOSICK &
         RASPANTI, LLP
15       BY:  ADAM J. TRAGONE, ESQUIRE
         One Oxford Centre, 38th Floor
16       301 Grant Street
         Pittsburgh, Pennsylvania  15219
17       412.263.2000
         ajt@piegragallo.com
18
     On behalf of Defendants Endo Pharmaceuticals, Endo
19   Health Solutions and Par Pharmaceuticals
20       (By phone/Livestream)
         ARNOLD & PORTER KAYE SCHOLER LLP
21       BY:  ERICA GUTHRIE, ESQUIRE
         601 Massachusetts Avenue, NW
22       Washington, DC  20001-37453
         202.942.5743
23       erica.guthrie@arnoldporter.com
24
25
```

Page 3

```
 1       A P P E A R A N C E S  (Continued)
 2   On behalf of Defendant HBC Service Company
 3       MARCUS & SHAPIRA, LLP
         BY:  ROBERT M. BARNES, ESQUIRE
 4       One Oxford Centre, 35th Floor
         Pittsburgh, Pennsylvania  15219
 5       412.471.3490
         rbarnes@marcus-shapira.com
 6
     On behalf of Defendant Mallinckrodt
 7
         (By phone/Livestream)
 8       ROPES & GRAY, LLP
         BY:  SARA E. BERINHOUT, ESQUIRE
 9            FEIFEI (ANDREA) REN, ESQUIRE
         Prudential Tower
10       800 Boylston Street
         Boston, Massachusetts  02199-3600
11       617.951.7330
         sara.berinhout@ropesgray.com
12       andrea.ren@ropesgray.com
13   On behalf of Defendant McKesson Corporation
14       COVINGTON & BURLING, LLP
         BY:  RAJ PAUL, ESQUIRE
15       One CityCenter
         850 Tenth Street, NW
16       Washington, DC  20001-4956
         202.662.5807
17       rpaul@cov.com
18   On behalf of Defendant Walmart
19       (By phone/Livestream)
         JONES DAY, LLP
20       BY:  PATRICIA OCHMAN, ESQUIRE
         North Point
21       901 Lakeside Avenue
         Cleveland, Ohio  44114-1190
22       216.586.3939
         pochman@jonesday.com
23
     Also present
24
         Chris Ratano, videographer
25
```

Page 4

```
 1               * I N D E X *
 2   EUGENE TOMMASI                    PAGE
 3     EXAMINATION BY MR. HUDSON         6, 50, 55
       EXAMINATION BY MR. BARTON         39
 4     EXAMINATION BY MR. BARNES         48, 54
 5
 6       * INDEX OF HBC-TOMMASI EXHIBITS *
 7   NO.           DESCRIPTION          PAGE
     Exhibit 1   Invitation to the presentation of   32
 8       Giant Eagle Pharmacy Year 2015 AOP/
         Business Plan, 6/24/14
 9       HBC_MDL00034114 - 00034149
10   Exhibit 2   Email, 3/20/18, from L. Kolas to   36
         G. Chunderlik, subject: Rhodes-
11       Distributor Questionnaire and
         Supporting Docs, attaching Rhodes
12       questionnaire, GE SOM Program,
         GE Officers and Directors List
13       HBC_MDL00030616 - 00030622
14              - - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            P R O C E E D I N G S
 2              - - - -
 3       THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Chris Ratano.  I'm a
 5   videographer for Golkow Litigation Services.
 6   Today's date is December 18, 2018, and the time is
 7   approximately 9:00.  This video deposition is
 8   being held in Pittsburgh, PA at Marcus & Shapira,
 9   LLP, One Oxford Centre, 35th Floor, in the matter
10   of National Prescription Opiate Litigation,
11   MDL No. 2804, Case No. 17-md-2804, United States
12   District Court, Northern District of Ohio, Eastern
13   Division.
14       The deponent today is Gene Tommasi.
15       Will counsel please identify themselves for
16   the record.
17       MR. HUDSON:  Ty Hudson of Wagstaff &
18   Cartmell for plaintiffs.
19       MR. BARTON:  Eric Barton of Wagstaff &
20   Cartmell for plaintiffs.
21       MR. TRAGONE:  Adam Tragone, Pietragallo,
22   for Cardinal Health.
23       MS. WINSTON:  Sylvia Winston from
24   Jackson Kelly for AmerisourceBergen.
25       MR. HUDSON:  Robert Barnes for HBC,
```

Highly Confidential - Subject to Further Confidentiality Review

Page 6

1 Marcus & Shapira.
2     THE VIDEOGRAPHER: The court reporter
3 today is Ann Medis, and she will now please swear
4 in the witness.
5     EUGENE TOMMASI,
6 having been first duly sworn, was examined
7     and testified as follows:
8     EXAMINATION
9 BY MR. HUDSON:
10   Q. Good morning, sir. Could you please
11 state your name for the record.
12   A. Yes. It's Eugene Tommasi.
13   Q. And, Mr. Tommasi, do you reside here in
14 the Pittsburgh area?
15   A. I do.
16   Q. And are you currently the executive vice
17 president and chief supply chain and development
18 officer for Giant Eagle?
19   A. I'm not.
20   Q. What is your current role at Giant
21 Eagle?
22   A. I'm retired.
23   Q. And when did you retire?
24   A. June 30 of 2018.
25   Q. Prior to retiring, were you the

Page 7

1 executive officer for supply chain and development
2 at Giant Eagle?
3   A. Yes.
4   Q. And have you had your deposition taken
5 before?
6   A. I might have. I don't recall.
7   Q. Before we get going, let's just make
8 sure then that we are on the same page about how a
9 deposition works.
10   I'm going to be asking you questions, and
11 then you will be answering. And from time to
12 time, counsel may object. But unless your counsel
13 instructs you to answer -- not to answer the
14 question, I would ask you to answer the questions
15 you were asked.
16   Is that fair?
17   A. Sounds fair.
18   Q. You do understand that you're under oath
19 as if we were in a courtroom in front of a judge
20 and a jury?
21   A. Yes.
22   Q. If I ask a question and you answer, I'm
23 going to assume that you understood my question
24 unless you ask me to clarify.
25   Is that fair?

Page 8

1   A. It depends.
2   Q. Well, let me put it to you this way.
3 If you don't understand my question, will you
4 let me know so I can kind of make sure I clarify
5 it so we're on the same page?
6   A. Will do.
7   Q. You're doing a good job of this, but, if
8 you can, give audible answers for the court
9 reporter. She can't pick up on head shakes or
10 things like that, so if you can do that.
11   And then, lastly, if you need to take a break
12 at all, just let me know, and we can go off the
13 record.
14   A. Okay.
15   Q. What did you do to prepare for today's
16 deposition?
17   A. Very little.
18   Q. Were you shown any documents?
19   A. Yeah. I saw some documents, yes.
20   Q. Did any of those refresh your
21 recollection?
22   A. Not really.
23   Q. Approximately how long did you spend
24 preparing for today?
25   A. A couple hours.

Page 9

1   Q. Have you read the complaint that was
2 filed in this case?
3   A. I have not.
4   Q. Were you aware of the lawsuit prior to
5 being contacted about this deposition?
6   A. I was not.
7   Q. Let me shift gears, then, to just ask
8 you about your education.
9   You've got a bachelor of science in economics
10 from Allegheny College?
11   A. Correct.
12   Q. And you began working at Giant Eagle in
13 about 1992?
14   A. Correct.
15   Q. What did you do after graduating from
16 college, but before you started working at Giant
17 Eagle?
18   A. I worked for a food wholesaler.
19   Q. What was the name of that food
20 wholesaler?
21   A. Peter J. Schmitt.
22   Q. How long did you work there?
23   A. From '82 until I went to work for Giant
24 Eagle in '92. Nine and a half years.
25   Q. And at Giant Eagle in 1992, did you

Page 10

1 start as the director of distribution?
2   A.  Yes.
3   Q.  And what were your roles and
4 responsibilities in that position?
5   A.  I was responsible for our frozen food
6 facility in Youngstown, Ohio, and a cigarette and
7 candy facility in West Newton, Ohio.
8   Q.  And then, in 1996, were you promoted to
9 the VP of retail development store planning?
10  A.  Correct.
11  Q.  And what were your roles and
12 responsibilities in that position?
13  A.  I was responsible for independent
14 retailing and store planning.
15  Q.  Did you have a specific region or was
16 it --
17  A.  For the company.
18  Q.  -- across the entire company?
19  A.  Yeah.
20  Q.  And then, in 2005, were you promoted to
21 senior vice president of retail operations?
22  A.  That's correct.
23  Q.  And tell me about your roles and
24 responsibilities as a senior vice president of
25 retail operations.

Page 11

1   A.  I was responsible for the retail
2 operations of the Giant Eagle corporate and
3 independent stores.
4   Q.  And by "retail operations," does that
5 mean the supermarkets and convenience store
6 locations?
7   A.  At that time we didn't have convenience
8 store locations.  But I had, basically, just the
9 operations for the supermarket.
10  Q.  And, again, that was across the entire
11 company?
12  A.  Yes, sir.
13  Q.  At some point did Giant Eagle decide to
14 form a company called HBC Services Company?
15  A.  Yes.
16  Q.  Were you involved at all in the decision
17 to form that company?
18  A.  No.
19  Q.  Were you aware at the time that HBC
20 Service Company was an entity that was created
21 separate from Giant Eagle?
22      MR. BARNES:  Object to form.
23  I don't know if he knows whether it was
24 legal -- you mean a legal entity?
25      MR. HUDSON:  You can object.

Page 12

1      MR. BARNES:  Object to form.
2      THE WITNESS:  I'm not sure what you
3 mean.
4 BY MR. HUDSON:
5   Q.  I mean, were you aware that Giant Eagle
6 had formed a different company called HBC Service
7 Corporation -- Service Company?
8      MR. BARNES:  Same objection.
9      THE WITNESS:  Yeah.  I was aware that we
10 formed an HBC company.
11 BY MR. HUDSON:
12  Q.  And do you know when that company was
13 formed?
14  A.  I don't recall the time, no.
15  Q.  Do you know why that company was formed?
16  A.  I don't have a specific why.
17  Q.  Do you have an understanding of what
18 operations -- or what the role was for HBC
19 Services Company?  In other words, why was the
20 company formed?
21  A.  They delivered goods to our stores.
22  Q.  Was HBC Service Company formed to be a
23 distributor?
24  A.  A wholesale -- yeah.  They were a
25 warehouse delivering goods to our stores.

Page 13

1   Q.  And prior to the formation of HBC
2 Service Company, who was the wholesaler delivering
3 goods to the stores?
4   A.  I can't remember the name of the
5 company.  I think there might have been a couple
6 different wholesalers.
7   I wasn't in the wholesale end of the
8 business.  I was in the retail end.
9      MR. BARNES:  Just for clarification, are
10 we talking about grocery goods generally or
11 controlled substances, or both?
12      MR. HUDSON:  I don't think there's a
13 pending question.
14      MR. BARNES:  Well, I'm going to object.
15  Make sure you're clear about that.
16 BY MR. HUDSON:
17  Q.  So prior to HBC Service Company being
18 formed, was Giant Eagle in the business of acting
19 as a wholesaler at all?
20  A.  Yeah.  We were a wholesaler for
21 supermarket goods.
22  Q.  In conjunction with HBC Service Company
23 being formed, was there a warehouse that was built
24 in Washington, Pennsylvania?
25  A.  I don't believe there was a warehouse

Page 14

1  built.
2     Q.  In conjunction with HBC Service Company
3  being formed, did they begin operating in a
4  warehouse in Washington, Pennsylvania?
5     A.  Yes.
6     Q.  Did HBC Service Company have employees?
7     A.  Yes.
8     Q.  Were all of those employees located at
9  the warehouse in Washington, Pennsylvania?
10    A.  I don't know that.
11    Q.  Do you have any knowledge about HBC
12 Service Company's role as a distributor of
13 opioids?
14    A.  I do not.
15    Q.  Do you have any knowledge of what
16 products HBC acted as a distributor for?
17       MR. BARNES:  Again, grocery versus
18 controlled substances, are you asking him to make
19 that clarification?
20       MR. HUDSON:  No.
21       MR. BARNES:  Then I'm going to ask you
22 to make that clarification.
23       THE WITNESS:  I didn't know of all the
24 products that were there.
25

Page 15

1  BY MR. HUDSON:
2     Q.  In your role on the retail side of the
3  business, what interaction did you have with HBC
4  Service Company?
5     A.  None.
6     Q.  Do you know how many employees HBC
7  Service Company had?
8     A.  I don't.
9     Q.  Do you know who was the warehouse
10 supervisor at the HBC Service warehouse?
11    A.  No, I don't.
12    Q.  Do you know any of the employees at the
13 HBC Service warehouse who filled orders for
14 prescription drugs?
15    A.  I didn't.
16    Q.  Do you know whether HBC Service Company
17 obtained a license to act as a distributor of
18 controlled substances?
19    A.  No, I don't.
20    Q.  Do you know whether or not HBC Service
21 Company continues to have operations today?
22    A.  I believe they do for grocery and candy
23 products.
24    Q.  Do you know whether at some point HBC
25 Service Company stopped acting as a distributor of

Page 16

1  prescription drugs or controlled substances?
2     A.  I'm sorry.  Did you say when?
3     Q.  Yes.
4     A.  I don't.
5     Q.  Is it your understanding that at some
6  point HBC Service Company did stop acting as a
7  distributor for prescription drugs and controlled
8  substances?
9     A.  I don't know what controlled substances
10 they distributed.
11    Q.  Do you have any knowledge about the --
12 and I want to focus in now on the dates between
13 2009 and early 2016.
14    It's my understanding that between 2009 and
15 early 2016, HBC Service Company acted as a
16 distributor of opioids.
17    Do you know whether that's true or not?
18       MR. BARNES:  Object to form.
19       THE WITNESS:  I would have to -- I
20 don't -- I believe they distributed to Giant
21 Eagles.
22 BY MR. HUDSON:
23    Q.  Do you have any knowledge about how the
24 physical supply chain worked in terms of the --
25 you know, the process of the prescription drugs

Page 17

1  went from the manufacturer to the wholesaler or
2  distributor to the retail pharmacies?
3     A.  Not really, no.
4     Q.  Do you have any knowledge about the
5  relationship between Giant Eagle and McKesson or
6  Anda?
7     A.  I do not.
8     Q.  Do you have any knowledge about the
9  different FDA schedules for controlled substances,
10 in other own words, Schedule I, Schedule II,
11 Schedule III, Schedule IV, Schedule V?
12    A.  I know there -- I don't know what they
13 are or what the drugs are.  I've heard those
14 schedules before.
15    Q.  How did you hear those schedules or when
16 did you hear those schedules?
17    A.  Jeez, it's just sort of like -- I can't
18 tell you exactly where or how, but, you know, it's
19 just...
20    Q.  Being in the business at some point
21 along the way?
22    A.  I've heard about schedule, yeah.
23    Q.  How about the topic of opioids in
24 general, is that something -- have you heard the
25 phrase "the opioid crisis"?

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1 A. Oh, yes. I've heard it.
2 Q. And when did you first hear that?
3 A. Gosh. I mean, I -- it's all over the
4 news all the time. So I can't give you an exact
5 date.
6 Q. How about -- is that something that
7 you've heard of for years?
8 A. Years? I think over the past two or
9 three.
10 Q. In connection with your roles at Giant
11 Eagle, did you hear the phrase "the opioid
12 crisis"?
13 A. No.
14 Q. In your roles at Giant Eagle, were there
15 any discussions at the executive level about the
16 opioid crisis?
17 A. Not that I remember.
18 Q. Since -- tell me about from January of
19 2012 until your retirement. You were an executive
20 vice president at Giant Eagle; is that right?
21 A. Yes.
22 Q. Just describe for me, if you could, the
23 chain of command or the corporate hierarchy within
24 the company during that time period.
25     In other words, you're an executive vice

Page 19

1 president. Just describe for me -- were there
2 other executive vice presidents? Who did you
3 report to?
4 A. I reported to the president of the
5 company. And I believe at that time there might
6 have been one or two other executive VPs;
7 definitely one.
8 Q. What was the title of the other
9 executive VP?
10 A. Executive vice president of
11 merchandising and marketing.
12 Q. When you shifted roles from executive
13 vice president of retail operations to executive
14 vice president of chief supply chain, did your
15 roles expand?
16 A. They just changed. That was basically
17 in my last year of working at Giant Eagle. I was
18 scheduled to retire, so we moved other people into
19 the retail operations.
20     I took over that part of the business from a
21 standpoint mainly because of the real estate end
22 of the business and the, what we called,
23 independent Giant Eagle stores. And the fellow
24 that ran the warehouses reported up through me on
25 an interim period.

Page 20

1 I was preparing for retirement during that
2 phase of my career.
3 Q. During the time period when you were the
4 senior vice president of retail operations, were
5 you involved in any discussions about controls
6 that would be put in place at the retail stores to
7 address the diversion of prescription drugs?
8 A. Controls put in place at the retail? I
9 would say minimal. I mean, I was more in the
10 operations end of the business. It wasn't the
11 pharmacy end of the business. It was the -- you
12 know, the front ends, the stores, the groceries,
13 the meat, the produce.
14 Q. As the senior VP of retail operations,
15 were there other executives at Giant Eagle who
16 reported to you that were responsible for the
17 pharmacy?
18 A. There was a senior VP of pharmacy. He
19 did not report to me. And then there was a vice
20 president of pharmacy operations. He reported to
21 me for a short period of time while we were
22 looking for a new senior VP of pharmacy.
23 Q. Was there any -- at the time that you
24 were involved in the retail operations for Giant
25 Eagle, was there any coordination, to your

Page 21

1 knowledge, between the retail store operations and
2 other divisions of Giant Eagle about putting
3 controls in place to avoid the diversion of
4 prescription drugs?
5 A. Not -- not that I -- not that I know of.
6 But, I mean, I'm -- yes.
7 Q. Who was the senior vice president of
8 pharmacy?
9 A. There were at that time Randy Heiser.
10 Q. When you say -- just so the record is
11 clear, when you say "at that time," what time are
12 we talking about?
13 A. The times that you were talking about.
14 I think it was 2012 is when you were talking about
15 that.
16 Q. And then at some point did that change?
17 A. Yes.
18 Q. When did that occur?
19 A. I don't know the date exactly.
20 Q. Tell me what you do know.
21 A. I'm retired. What I do now?
22 Q. No. Sorry. Tell me what you do -- what
23 you do know. Sorry.
24     I was saying, at some point the VP of
25 pharmacy role changed. And I was saying, tell me

Page 22

1 what you know.
2   A.  Well, there was a senior VP.  There's --
3 and there was always a senior VP, basically, in
4 charge.  Randy Heiser was there during my tenure.
5 Randy Heiser, Brett Merrell and Mark Doerr.  And
6 now there's a new fellow in place.
7   They basically had overall responsibility of
8 pharmacy operation -- whole pharmacy
9 merchandising.
10   Q.  Would the VP -- senior VP of pharmacy be
11 responsible for overseeing controls at the retail
12 level to avoid the diversion of prescription
13 drugs?
14   A.  I would assume he would be responsible
15 for all things pharmacy.
16   Q.  In your role, did you have any
17 coordination with them regarding policies or
18 controls at the pharmacy?
19   A.  No.  They basically set the policies and
20 controls.  They were two separate operations.
21   Q.  In your role, did you have any interface
22 with the procurement team for prescription drugs?
23   A.  No.
24   Q.  Do you have any knowledge about the
25 contracts between Giant Eagle and drug

Page 23

1 manufacturers to purchase prescription drugs?
2   A.  No specific knowledge.
3   Q.  Do you know which particular
4 manufacturers Giant Eagle directly purchased from
5 in terms of prescription drugs?
6   A.  Jeez, I imagine there's a lot.
7   Q.  But in terms of the specifics, that
8 wasn't something that you --
9   A.  I don't know what specific drug was
10 purchased from what specific supplier.
11   Q.  Do you have any knowledge about the
12 relationship between Giant Eagle and McKesson or
13 Anda?
14   A.  Do I have any knowledge about the
15 relationship?
16   Q.  Yes.
17   A.  I know there was one.
18   Q.  Anything more specific than that?
19   A.  No.  Sorry.
20   Q.  You can only testify about what you
21 know.
22   Do you know whether or not there was ever an
23 effort within Giant Eagle or HBC to target pain
24 management as a corporate business opportunity?
25   A.  No.

Page 24

1   Q.  Do you have any knowledge about the
2 Giant Eagle corporate goals for pharmacies in
3 terms of how to drive revenue?
4   A.  Not really.
5   Q.  Do you have any knowledge about the
6 federal laws and regulations that govern
7 distributors of opioids?
8   A.  I don't have any specific knowledge of
9 that, no.
10   Q.  Do you have any general knowledge of
11 that?
12   A.  I'm just aware that there probably are
13 some.
14   Q.  Do you have any knowledge of what
15 distributors of controlled substances are required
16 to do under the federal laws and regulations?
17   A.  I don't have any specific knowledge of
18 that, no.
19   Q.  Do you have any general knowledge of
20 that?
21   A.  Again, I'm just assuming there is
22 regulations.
23   Q.  Do you know whether or not HBC designed
24 and operated a system to identify suspicious
25 orders of controlled substances?

Page 25

1   A.  I don't know whether they designed a
2 system.
3   Q.  Do you know whether or not Giant Eagle
4 or HBC operated a system to identify suspicious
5 orders of controlled substances?
6   A.  I believe I -- I've heard that, yes.
7   Q.  And how did you hear that?
8   MR. BARNES:  I want to just caution you,
9 anything outside the context of attorney/client
10 privilege.  You should limit your answer to things
11 that did not involve discussions with Giant
12 Eagle's attorneys.
13   If you can't answer it, say "I can't answer
14 it."
15   THE WITNESS:  I can't be specific.  I
16 don't...
17 BY MR. HUDSON:
18   Q.  Other than any conversations or
19 communications you had with Giant Eagle attorneys,
20 do you have any knowledge about Giant Eagle or
21 HBC's operation of a system to identify suspicious
22 orders of controlled substances?
23   A.  I don't have any specific knowledge.
24   Q.  Again, do you have general knowledge?
25   A.  Well, very limited.

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1     Q.  Could you just -- if you could -- and,
2 again, apart from any knowledge you gained from
3 communications with attorneys, could you tell me
4 what limited knowledge you have?
5     A.  That there's a system.
6     Q.  How did you learn there was a system?
7         MR. BARNES:  Same instruction.
8         THE WITNESS:  I mean, I don't know. I
9 mean, I can't give you an exact.
10 BY MR. HUDSON:
11     Q.  To your knowledge, what did the system
12 consist of?
13     A.  I don't know that -- I don't really know
14 what the system consisted of.
15     Q.  Who was involved in operating the
16 system?
17     A.  I don't know that either.
18     Q.  What was the objective of the system?
19     A.  I'm trying to -- I really don't know.
20     Q.  Do you know whether the system was
21 successful or unsuccessful?
22     A.  I don't.
23     Q.  Do you know how the system operated?
24     A.  No. I...
25     I do not, I should say. I didn't answer.

Page 27

1     Q.  Do you have any knowledge about any
2 investigations by Giant Eagle or HBC to address
3 suspicious orders of controlled substances?
4     A.  I don't.
5     Q.  Do you know whether or not Giant Eagle
6 or HBC engaged in any investigations of suspicious
7 orders of controlled substances?
8     A.  That I'm aware of, no.
9     Q.  Do you have any knowledge of the volume
10 of opioids shipped by HBC into retail pharmacies
11 in Summit County, Ohio?
12         MR. BARNES:  Same instruction. Outside
13 the context of anything you might have learned
14 with Giant Eagle's lawyers.
15         THE WITNESS:  No. I don't have any
16 knowledge.
17 BY MR. HUDSON:
18     Q.  Do you have any knowledge of the volume
19 of opioids shipped by HBC or Giant Eagle just in
20 general?
21     A.  I do not.
22     Q.  Do you know whether Giant Eagle or HBC
23 ever stopped a shipment of opioids because it was
24 suspected that there would be -- suspected of
25 diversion?

Page 28

1     A.  I don't.
2     Q.  Do you know whether or not Giant Eagle
3 or HBC ever reported any orders to the DEA as
4 suspicious orders of opioids?
5         MR. BARNES:  Same instruction.
6         THE WITNESS:  I do not.
7 BY MR. HUDSON:
8     Q.  Do you have any knowledge of any
9 corporate controls that existed at Giant Eagle or
10 HBC to reduce the diversion of opioids?
11     A.  No, I don't.
12     Q.  Do you have any knowledge of any store
13 controls at the pharmacy operations level that
14 were aimed at reducing the diversion of opioids?
15     A.  No, not that I could think of.
16     Q.  Do you have any knowledge of any of the
17 warehouse controls put in place by Giant Eagle or
18 HBC to reduce the diversion of opioids?
19     A.  I don't have any specific knowledge.
20     Q.  Do you have any general knowledge?
21     A.  I don't have anything specific. I mean,
22 I'm just assuming if there was laws that needed to
23 be followed, that we followed them. But I -- you
24 know, I don't -- I don't know what the -- what the
25 systems were or anything like that.

Page 29

1     Q.  Do you have any facts that you can point
2 to that would support your assumption that Giant
3 Eagle or HBC was following the law?
4     A.  I know that Giant Eagle, as a company,
5 follows the laws. I know that that's we do.
6 That's my statement.
7     Q.  Is there anything more specific you can
8 say about your knowledge of efforts by Giant Eagle
9 or HBC to follow the laws that specifically apply
10 to the distribution of opioids?
11     A.  No. I have nothing to...
12     Q.  Do you have any knowledge of any reports
13 that were sent by HBC or Giant Eagle to the DEA?
14     A.  I do not.
15     Q.  Let me hand you what I'm marking as
16 Tommasi Exhibit 1. If you could take a minute and
17 look at that.
18         MR. HUDSON:  For the record, Tommasi
19 Exhibit 1 is a multi-page document that's
20 Bates-labeled HBC_MDL00032530 through 534.
21         MR. BARNES:  Ty, before you go any
22 further, we're going to object to the use of this
23 document. I think it was intended to be a
24 privileged document and should not have been
25 produced.

Page 30

1     MR. HUDSON: I'll take this back then.
2 I don't think I need to mark it as an exhibit
3 then.
4     MR. BARNES: I'm just taking down the
5 Bates numbers. I'll double-check that at a break.
6     MR. HUDSON: I know you sent us several
7 documents. I apologize if this was on the list.
8     MR. BARNES: The claw-back, you mean?
9     MR. HUDSON: Yes.
10 BY MR. HUDSON:
11   Q. Mr. Tommasi, do you know George
12 Chunderlik?
13   A. I know George.
14   Q. Is he an attorney?
15   A. I don't believe so.
16   Q. How about Joe Millward, do you know him?
17   A. I do know Joe.
18   Q. Is he an attorney?
19   A. I don't believe so.
20   Q. How about Darin Goodwiler?
21   A. Yes.
22   Q. He's an attorney?
23   A. No, not that I know of.
24   Q. Greg Carlson, he's not an attorney;
25 right?

Page 31

1   A. Correct. Not that I know of.
2   Q. And Debbie Krasnow, is she an attorney?
3 Do you know who she is?
4   A. Yeah. I know who she is.
5   Q. Is she in compliance?
6   A. I don't -- she's in the pharmacy -- on
7 the pharmacy team. I don't know what her specific
8 role is.
9   Q. How about Dominic Bertucci?
10   A. I know him, yes.
11   Q. He's not an attorney; right?
12   A. No.
13   Q. Robbi Robinson?
14   A. Yes. She's an attorney.
15   Q. She is an attorney?
16   A. I do know that.
17   Q. Do you know if she's in compliance?
18   A. In compliance with what?
19   Q. The compliance department.
20   A. I don't know for sure.
21   Q. How about Justin Zimmerman?
22   A. Justin Zimmerman? I do know Justin. He
23 may be an attorney. I'm not positive though.
24   Q. How about Mary Gibson?
25   A. Yes.

Page 32

1   Q. Do you know her?
2   A. Yes.
3   Q. Is she an attorney?
4   A. You know, I think she may be an
5 attorney.
6   Q. And Mike Bianco?
7   A. Yes.
8   Q. Is he an attorney?
9   A. I do not believe he's an attorney.
10   Q. And did you ever attend compliance
11 meetings?
12   A. I don't recall attending a compliance
13 meeting.
14   Q. In your role, did you have any interface
15 with the compliance department on any issues
16 relating to prescription drugs?
17   A. No.
18     MR. HUDSON: For the record, we've
19 withdrawn the exhibit that was initially marked as
20 Exhibit 1.
21     (HBC-Tommasi Exhibit 1 was marked.)
22 BY MR. HUDSON:
23   Q. And so now I'm going to hand you,
24 Mr. Tommasi, what's now been marked as Tommasi
25 Exhibit 1.

Page 33

1 For the record, as you take a look, that
2 Tommasi Exhibit 1 is a multi-page document that's
3 Bates-labeled HBC_MDL00034114 through 34149.
4 Do you recognize this document, Mr. Tommasi?
5   A. Yes.
6   Q. And is this an annual operating plan for
7 Giant Eagle?
8   A. I don't think it's for Giant Eagle. It
9 looks like it's for pharmacy.
10   Q. And so this would be the operating plan
11 specific to the pharmacy division of Giant Eagle?
12   A. I don't know if it's the actual plan.
13 It's a presentation.
14   Q. And tell me, if you could, do you have a
15 recollection of this -- of attending a
16 presentation where this business plan was
17 discussed?
18   A. Specifically to this business plan, I
19 can't be sure. It was a long time ago.
20   Q. Were you involved in any of the business
21 planning for the pharmacy department?
22   A. Not -- no.
23   Q. Why were you copied on the distribution
24 list for this business plan?
25   A. Because I'm copied on a lot of -- you

Page 34

1 know, in general, the same reason a lot of these
2 other people were copied.
3    Q.  Do you know whether you ever read this
4 business plan?
5    A.  If it was given to me, I would say I
6 read it.
7    Q.  Did you have any involvement in trying
8 to define the role of pharmacy within Giant Eagle?
9    A.  No.
10   Q.  If we turn to the document that's got
11 the Bates label that's ending 124 on the bottom
12 right -- it's the HBC number.
13   A.  124?
14   Q.  Yes, sir.
15   A.  Page 10?
16   Q.  Yep, exactly.
17       There, it says, "Within Giant Eagle pharmacy
18 is critical to our success."
19       Do you see that?
20   A.  Yes.
21   Q.  Was that your understanding, that
22 pharmacy was critical to Giant Eagle's success?
23   A.  I mean, I'm not going to use the word
24 "critical."
25   Q.  Were there efforts within Giant Eagle to

Page 35

1 try to increase the number of scripts written by
2 the pharmacy?
3    A.  The efforts of the -- my recollection is
4 to grow the pharmacy business through service.
5    Q.  If we turn to page 11 of this
6 presentation, it says, No. 3, "Fiscal Year '15
7 Strategic Priorities."
8       Do you see that?
9    A.  Yes, sir.
10   Q.  And then if you turn to the next page,
11 do you see there, "Deliver the Pharmacy Vision"?
12   A.  Yes, sir.
13   Q.  And then down below, under "Vision,"
14 it's got "Objective"?
15   A.  Yes.
16   Q.  It says, "Drive scripts and trips."
17       Do you know what that means?
18   A.  Yeah.  Drive prescriptions -- scripts
19 and trips to the store.
20   Q.  So the idea would be to increase the
21 number of prescriptions being written by Giant
22 Eagle pharmacies because that would increase the
23 number of trips that people would make to Giant
24 Eagle stores?
25   A.  Giant Eagle pharmacies don't write

Page 36

1 scripts.
2    Q.  I'm sorry.  Filling scripts.
3    A.  I think that's what we do.  We fill
4 scripts.
5    Q.  So how would -- how would a pharmacy
6 that fills prescriptions drive prescriptions?
7    A.  Offer better service.  Limit like wait
8 time standing in line.  Offer better service to
9 the customers.  Give them adequate attention to
10 their needs.
11   Q.  And then any other ways that you would
12 drive scripts?
13   A.  That's...
14   Q.  Were you involved in anything more
15 specific in the strategy or planning for the
16 pharmacy department of Giant Eagle?
17   A.  No, sir.
18       (HBC-Tommasi Exhibit 2 was marked.)
19 BY MR. HUDSON:
20   Q.  I'll hand you what we've marked as
21 Tommasi Exhibit 2.
22       Tommasi Exhibit 2 is Bates-labeled
23 HBC_MDL00030616 through 622.
24       And I will direct your attention,
25 Mr. Tommasi, to the back, the last page of this

Page 37

1 document.
2       Do you see there under "Officers and
3 Directors List," you're listed as one of the
4 officers?
5    A.  Yes, sir.
6    Q.  Did you have -- in your role at Giant
7 Eagle, did you have any involvement with the
8 relationships between drug manufacturers and Giant
9 Eagle or HBC?
10   A.  No, not at all.
11   Q.  Have you ever seen Exhibit 2 before
12 today.
13   A.  No.  That's why I was looking at it.
14       MR. HUDSON:  Let's just take a
15 five-minute break.  We'll go off the record.
16       THE VIDEOGRAPHER:  9:44.  We are off the
17 video record.
18       (Recess from 9:44 a.m. to 9:57 a.m.)
19       THE VIDEOGRAPHER:  9:57.  We are on the
20 video record.
21       MR. BARNES:  Ty, before you start, I do
22 want to confirm.
23       I confirmed during the break that Exhibit 1
24 is a privileged document.  It was intended to
25 be -- it has already been the subject of a

Page 38

1 claw-back and/or will be the subject of a
2 claw-back.
3      MR. HUDSON:  Okay.  And just for the
4 record, we've withdrawn that.  So it's not
5 Exhibit 1.
6      MR. BARNES:  Okay.
7      MR. HUDSON:  So it's been withdrawn and
8 wasn't used.
9      MR. BARNES:  Thank you.
10 BY MR. HUDSON:
11    Q.  Mr. Tommasi, do you have any knowledge
12 about hydrocodone combination products?
13    A.  I don't.
14    Q.  Do you have any knowledge about
15 profitability of the pharmacy as it relates to
16 Giant Eagle's overall profitability?
17    A.  I don't.
18    Q.  Do you have any knowledge about any of
19 the opioids that were sold by Giant Eagle?
20    A.  I don't.
21      MR. BARNES:  Object to the form of the
22 question.
23    I think you know, Tyler, there's only one
24 opioid at issue in this case that was distributed
25 by HBC.

Page 39

1      MR. HUDSON:  I don't have any further
2 questions.
3      MR. BARTON:  I have just a few.
4           EXAMINATION
5 BY MR. BARTON:
6    Q.  Mr. Tommasi, Eric Barton, also from
7 Wagstaff & Cartmell.  Just a few questions on
8 behalf of plaintiffs.
9    I want to go back to the organizational chart
10 that Mr. Hudson asked you some questions about
11 your role in the company during certain time
12 periods.
13    So starting with when you were senior VP of
14 retail operations, which I think I understood you
15 to say you took on that role in about 2005; is
16 that correct?
17    A.  I don't have the chart in front of me.
18 I can't remember exactly the date.
19    Q.  I'm only asking for your best
20 recollection.
21    A.  Yeah.  Okay.
22    Q.  I realize 2005 probably feels like, you
23 know, 1995.
24    A.  That's fair.
25    Q.  To some of us it's hard to remember.

Page 40

1    But starting when you were senior VP of
2 retail operations, at that point in time, is it
3 your recollection that there would have also been
4 or was also a senior VP of pharmacy?
5    A.  Yes.
6    Q.  And you later became executive vice
7 president of retail operations; correct?
8    A.  Right.
9    Q.  And do you recall about when that
10 occurred?
11    A.  2014.
12    Q.  At that time was there also an executive
13 vice president of pharmacy?
14    A.  Not an executive vice president, but a
15 senior vice president.
16    Q.  Is there now an executive vice president
17 of pharmacy?
18    A.  I'm not sure if it's senior VP or
19 executive VP.
20    Q.  When you were made executive vice
21 president of retail operations, I think you said
22 the senior VP of pharmacy did not report to you?
23    A.  That's correct.
24    Q.  So at that point in time retail
25 operations within your company was really defined

Page 41

1 as the grocery side of the business, the
2 non-pharmacy side?
3    A.  Yeah.  Retail operations during the
4 whole tenure is typically defined that way, yes.
5    Q.  As executive vice president of retail
6 operations, were the revenues and profits of the
7 pharmacy side of the business, were they relevant
8 to you as executive VP of retail operations?
9    A.  Explain "relevant" to me.
10    Q.  That's fine.  Were you -- did you
11 receive reports that provided the economic
12 results, revenues and profits of the pharmacy side
13 of the stores?
14    A.  I see multiple reports on all parts of
15 the business as far as sales and profits.
16    Q.  So you regularly received reports of the
17 performance of the stores, I assume; correct?
18    A.  Of the stores, correct.
19    Q.  And those reports included both the
20 grocery side and the pharmacy side?
21    A.  Yes, they would.
22    Q.  As an executive vice president, did your
23 compensation include any kind of bonuses or
24 incentives based on performances of the stores?
25    A.  Yeah.  Of the -- based on the

Page 42

1 performance of the total company.
2     Q.  And the total company would include the
3 performance of all of the stores owned by the
4 company; correct?
5     A.  Yes.
6     Q.  And so the profitability, for instance,
7 of the pharmacy side of the business was a factor
8 in your compensation in some degree; correct?
9     A.  In -- in the bonuses, yes.
10    Q.  Over time -- and I want to -- well, let
11 me go back now because I've been asking these
12 questions about when you were executive vice
13 president.
14    Was the same true -- in terms of having bonus
15 compensation, was that true when you were a senior
16 vice president of retail operations?
17    A.  I had bonus compensation when I was a
18 senior VP, yes.
19    Q.  Was that also based on the performance
20 of the company as a whole?
21    A.  Yes.
22    Q.  I'm sure this may vary from store to
23 store, so I won't ask you on a store level, I want
24 to ask on a company level.
25    On a company level, from 2005 forward -- and

Page 43

1 I'm asking just -- I'm asking this just in
2 ballpark terms, not specifically right now.
3     In ballpark terms, how did the profits of the
4 company from the retail operations compare to the
5 profits of the company from pharmacy operations?
6         MR. BARNES:  Object to form.  Lack of
7 relevance.
8         THE WITNESS:  I mean, I don't -- I
9 couldn't -- I can't remember the comparisons.
10 BY MR. BARTON:
11    Q.  Impossible for you to say over time how
12 they compared at all?
13    A.  Yeah.  I mean, I wouldn't want to say
14 something that's not factual and I don't have any
15 of the numbers in front of me, so I don't -- I
16 can't...
17    Q.  Year to year, that's something the
18 company obviously tracked; correct?
19    A.  Yes.
20    Q.  And so every -- and how did you track
21 those numbers at the executive officer level?
22    Did you look at those reports on a monthly
23 basis?  A quarterly basis?
24    A.  I looked at the reports on a monthly
25 basis.

Page 44

1     Q.  And you looked at them for the company
2 as a whole --
3     A.  In total.
4     Q.  -- all of the stores?
5     A.  Yes.  In total, yes.
6     Q.  Did you look at them at any level other
7 than as the company as a whole?
8     In other words, are there regions or
9 territories that you would focus on specifically?
10    A.  There were different regions, yes, but
11 it all rolled up into the total.
12    Everybody -- so there were individual P & Ls
13 and there were total P & Ls.  I focused on the
14 bigger picture.  I have other folks under me that
15 focused on the -- on the rest.
16    Q.  So during the time then that you -- from
17 the time that you were senior VP of retail
18 operations forward, so really from 2005-ish
19 forward to the time you retire, do you recall
20 there being any company strategies that focused
21 specifically on increasing the profitability of
22 the pharmacy side of the business?
23    A.  In general, I think there are strategies
24 in growing our overall business, not just
25 pharmacy.

Page 45

1     Q.  Just describe kind of where strategy
2 meetings took place within the company for growing
3 the overall business of the company.
4     Did that -- did that happen -- did those
5 meetings happen on a monthly basis?  On a
6 quarterly basis?  Annual basis?
7     A.  Well, it depends.  I'm sure there were
8 people that had meetings on planning service
9 level, and so on and so forth, throughout the
10 company on a monthly basis.
11    We basically would sit down and take a look
12 at where we're standing as far as what our
13 potential growth is in the market -- and I'm
14 speaking more of a retail operations growth -- and
15 what cost savings ideas we can put together.
16    I mean, and -- you know, we used to look at
17 that two or three times a year, set the course and
18 move forward.
19    And, you know, depending on what's going on
20 with competition or whatnot, you know, define how
21 to guide the ship to best grow sales.  And I'm
22 talking in supermarket sales.
23    Q.  Did you have any regular meetings --
24 again, whether they were monthly, quarterly, or
25 annual.

Page 46

1  Did you have any regular meetings with the
2 senior VP of pharmacy?
3  A. Me personally?
4  Q. Yes.
5  A. No, not one-on-one.
6  Q. Well, and I don't mean to limit it to
7 one-on-one.
8  Did you have any -- did you have any meetings
9 of senior VPs where you would get together
10 specifically to review and discuss the business?
11  A. Yes.
12  Q. And just what was the -- how did those
13 occur? Was that --
14  A. They were scheduled.
15  Q. And they would occur at company
16 headquarters?
17  A. Yes, sir.
18  Q. Was that a monthly occurrence or --
19  A. It would happen -- it was scheduled
20 weekly. It would happen probably 30 weeks a year.
21  Q. And these weekly scheduled meetings
22 you're referring to, who typically attended these
23 meetings?
24  A. The executive team.
25  Q. And who do you consider to -- who

Page 47

1 consisted of the executive team during this time
2 period by title?
3  A. Well, it was -- it floated. There was
4 certain VPs, certain senior VPs, the president,
5 CEO, executive VPs.
6  Q. And did these meetings have printed
7 agendas and minutes?
8  A. They didn't have minutes. There used to
9 be -- we would call LOB presentations. You know,
10 here's where we're going with turkeys this year.
11 Here's how we're planning the holiday sales. You
12 know, the Steelers are in the playoffs. We're
13 going to bring in all kind of T-shirts and such.
14  I'm serious. It got to that type of
15 discussion, which -- and, you know, we'd have
16 overall review of the business. We didn't review
17 the business every week because you really
18 couldn't. But we'd have typically a P & L meeting
19 every six weeks.
20  Q. Was that pattern fairly consistent
21 during the time you were in senior management?
22  A. Yeah. Yes.
23  MR. BARTON: No further questions.
24  THE VIDEOGRAPHER: Anyone else?
25  MR. BARNES: I just have a couple

Page 48

1 questions.
2  EXAMINATION
3 BY MR. BARNES:
4  Q. Mr. Tommasi, you were asked a few
5 questions just a couple minutes ago about business
6 meetings, and pharmacy meetings, and pharmacy
7 profitability, and how it related to the stores
8 generally.
9  Do you recall those?
10  A. Yes.
11  Q. Do you recall any approach or strategy
12 by Giant Eagle to increase sales of opioids at any
13 time in any part of the company?
14  A. No.
15  Q. Were any executives or pharmacists or
16 employees ever bonused or incentivized to increase
17 the sale of opioids in any way, shape, or form?
18  A. No.
19  Q. You were asked a few questions about the
20 membership of the so-called pharmacy regulatory
21 review committee.
22  Do you remember those questions? Who was
23 George Chunderlik, et cetera?
24  Do you remember that?
25  A. Yeah. I think a few minutes ago.

Page 49

1  Q. Right. Ty Hudson asked you those
2 questions.
3  A. Yes.
4  Q. What was the purpose of that committee?
5  A. Well, you know, I think there were
6 multiple lawyers and business people on there.
7 And it was a legal compliance-type committee.
8  Q. Was it designed to look at the company's
9 compliance with laws and regulations that affected
10 the business in any way?
11  A. Yeah. It was a legal compliance
12 committee.
13  Q. Was outside counsel also on that
14 committee?
15  A. Actually, yeah. I actually got -- you
16 know, I actually know -- sorry. Steve Zubrow was
17 the outside counsel who has passed away. That's
18 why I stumbled there a little bit.
19  He led the committee.
20  Q. And as part of those committee meetings,
21 was legal advice sought and obtained by the
22 company from its internal and outside lawyers?
23  A. Yeah. Best of my knowledge, yes.
24  Q. You were asked some questions about,
25 while you were senior VP of retail operations,

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1 what some of the controls were at the pharmacy
2 level -- overall controls with respect to
3 dispensing controlled substances.
4     Do you recall those questions?
5     A.  Vaguely.
6     Q.  Do you know one way or the other what
7 the controls were or weren't, or you just have no
8 knowledge about them generally?
9     A.  I don't have any, generally, knowledge
10 about them.
11     Q.  Was that below your pay grade, so to
12 speak?
13     A.  Well, I wouldn't say it that way, but
14 other folks were responsible for that, yes.
15         MR. BARNES:  Okay.  I have nothing
16 further.
17             RE-EXAMINATION
18 BY MR. HUDSON:
19     Q.  Mr. Tommasi, I've just got a couple of
20 follow-up questions.
21     You were asked whether there were specific
22 efforts by Giant Eagle to increase the sale of
23 opioids, right, and you said no?
24     A.  Yes.
25     Q.  But you do agree, in Cleveland and in

Page 51

1 Summit County and in Cuyahoga County, Giant Eagle
2 did fill lots of prescriptions for opioids; right?
3     A.  I don't know specifically.
4     Q.  There were millions of dosage units of
5 opioids that were filled by Giant Eagle in Summit
6 County, Cuyahoga County, and Cleveland; correct?
7     A.  I don't know that.
8     Q.  In terms of your bonus, if those
9 prescriptions were filled and the company made
10 money from those sales, that would increase your
11 bonus; right?
12     A.  I mean, that's kind of -- if we made
13 money from anything that we did, legally --
14     Q.  Correct.
15     A.  -- yeah, I mean, it increases the
16 profitability of the company, that would affect my
17 bonus.
18     Q.  Right.  And if you stopped shipments of
19 opioids to Giant Eagle stores, then those
20 shipments would not be prescriptions that would be
21 filled; correct?
22     A.  I guess.  I don't know.  I don't know.
23 I mean --
24     Q.  Well, in other words, at the distributor
25 level, if HBC Service Company stops opioids from

Page 52

1 being shipped to Giant Eagle retail pharmacies,
2 then that means that there's going to be less
3 opioids available to the Giant Eagle retail
4 pharmacies; correct?
5     A.  Either that or they'd get them from
6 somewhere else.
7     Q.  Right.  But if HBC stopped those
8 shipments, at least those shipments that were
9 stopped would not have then be sent to Giant Eagle
10 pharmacies; correct?
11     A.  If they stopped shipments, you're saying
12 we wouldn't go out and try to get shipments
13 somewhere else?
14     Q.  Well, if you -- if HBC Service Company
15 stopped shipments of opioids to Giant Eagle retail
16 pharmacies because there was a suspicion of
17 diversion -- right?
18     A.  I don't know that there's any suspicion
19 of diversion here.
20     Q.  Right.  I'm saying --
21     A.  You're not saying that.  You're saying
22 if they closed their doors, they wouldn't be
23 shipping to the pharmacies.
24     Q.  I'm saying if HBC Service Company
25 stopped the shipment of opioids to Giant Eagle

Page 53

1 retail pharmacies, then that would reduce the
2 drugs or opioids available to those Giant Eagle
3 pharmacies; correct?
4     A.  From that supplier, yes.
5     Q.  Right.  Right.  And that would
6 potentially have an impact on the revenue of Giant
7 Eagle pharmacy; right?
8         MR. BARNES:  Object to the form.  You're
9 asking him to speculate.
10         THE WITNESS:  Yeah.  I mean, I don't
11 know.  I don't know how much we sold.  I don't --
12 I just don't know.
13 BY MR. HUDSON:
14     Q.  I'm -- my point is simply that
15 there's -- there is a connection between the sale
16 of opioids and bonuses that you received in the
17 sense that you were bonused on the overall
18 performance of the company; right?
19     A.  I was bonused on the overall performance
20 of the company.
21     Q.  Right.  And one source of revenue for
22 the company was the pharmacy's efforts to fill
23 prescriptions; right?
24     A.  To fill prescriptions.
25     Q.  Right.

Page 54

1  A. Yes.
2  Q. And one of the types of prescriptions
3 filled were opioids.
4  A. I'm assuming.
5  Q. And, in particular, in Cleveland and in
6 Summit County and in Cuyahoga County, there were
7 millions of units of opioids shipped into those
8 counties by HBC Services Company.
9  A. I don't know that. I'm sorry. I don't
10 know that -- I don't know that.
11      MR. HUDSON: I don't have any further
12 questions.
13      MR. BARNES: I have a follow-up question
14 or two.
15          RE-EXAMINATION
16 BY MR. BARNES:
17  Q. These millions of units that have been
18 represented to you were allegedly shipped into
19 these counties, what happened to those millions of
20 units of opioids, assuming that that's an accurate
21 representation?
22  What happened to those pills?
23  A. I'm assuming there were prescriptions
24 written by doctors that were given to patients.
25  Q. And would stopping a shipment of

Page 55

1 Schedule III controlled substances to any
2 particular store on any particular day have any
3 effect on anybody's bonus, to your knowledge?
4  A. On any particular day? No. I don't
5 think so.
6      MR. BARNES: Nothing further.
7          RE-EXAMINATION (Continued)
8 BY MR. HUDSON:
9  Q. How do you know that?
10  A. Well, I don't think it's -- it's not
11 relevant. On any particular day a stopment [sic]
12 of a shipment, the overall effect is negligent.
13  Q. Well, if the shipment was -- if HBC
14 Service Company stopped a shipment of opioids from
15 going to one of the Giant Eagle retail pharmacies
16 because there was a -- because there was suspicion
17 of diversion, meaning that it would be diverted
18 for illegal purposes, wouldn't that mean, overall,
19 there would be a decrease in the pills that were
20 going to be available to be prescribed at that
21 Giant Eagle pharmacy?
22      MR. BARNES: Object to form. Calls for
23 speculation.
24      THE WITNESS: Yeah. I'm not sure
25 what -- I don't know. I mean, we may have

Page 56

1 inventory on hand that we could fill it with. I'm
2 not sure.
3 BY MR. HUDSON:
4  Q. Is it your testimony that if HBC Service
5 Company had stopped shipments for suspected
6 diversion, that that would have had no impact at
7 all on Giant Eagle's bottom line?
8      MR. BARNES: Object to form. Calls for
9 speculation.
10  Go ahead.
11      THE WITNESS: I would have to know how
12 much, you know, if it's one pill, if it's -- I
13 don't know. I mean, it's all what-if. I can't
14 answer that. I'm sorry.
15      MR. HUDSON: I don't have any further
16 questions.
17      MR. BARNES: Nothing further. Thank
18 you.
19      THE VIDEOGRAPHER: 10:22. We are off
20 the video record. This concludes the video
21 deposition of Gene Tommasi.
22      (Whereupon, at 10:22 a.m., the taking of
23 the instant deposition ceased.)
24
25

Page 57

1 COMMONWEALTH OF PENNSYLVANIA )
2 COUNTY OF ALLEGHENY        )  SS:
3         C E R T I F I C A T E
4     I, Ann Medis, Registered Professional
5 Reporter, Certified Livenote Reporter and Notary
6 Public within and for the Commonwealth of
7 Pennsylvania, do hereby certify:
8     That EUGENE TOMMASI, the witness whose
9 deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true
11 record of the testimony given by such witness.
12     I further certify the inspection,
13 reading and signing of said deposition were not
14 waived by counsel for the respective parties and
15 by the witness.
16     I further certify that I am not related
17 to any of the parties to this action by blood or
18 marriage and that I am in no way interested in the
19 outcome of this matter.
20     IN WITNESS WHEREOF, I have hereunto set
21 my hand this 21st day of December, 2018.
22
                    _____
23                         Notary Public
24
25

Page 58

1      INSTRUCTIONS TO WITNESS
2
3         Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8         After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14        It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you.  If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.
21
22
23
24

Page 59

1         - - - - - -
        E R R A T A
2         - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____ ____ _____
6    REASON: _____
7  ____ ____ _____
8    REASON: _____
9  ____ ____ _____
10   REASON: _____
11 ____ ____ _____
12   REASON: _____
13 ____ ____ _____
14   REASON: _____
15 ____ ____ _____
16   REASON: _____
17 ____ ____ _____
18   REASON: _____
19 ____ ____ _____
20   REASON: _____
21 ____ ____ _____
22   REASON: _____
23 ____ ____ _____
24   REASON: _____

Page 60

1
2       ACKNOWLEDGMENT OF DEPONENT
3
4       I,_____, do
5  hereby certify that I have read the
6  foregoing pages, and that the same is
7  a correct transcription of the answers
8  given by me to the questions therein
9  propounded, except for the corrections or
10 changes in form or substance, if any,
11 noted in the attached Errata Sheet.
12
13
14 _____
15  EUGENE TOMMASI             DATE
16
17
18 Subscribed and sworn
   to before me this
19 _____ day of _____, 20____.
20 My commission expires:_____
21
   _____
22 Notary Public
23
24