```
 1              IN THE UNITED STATES DISTRICT COURT

               FOR THE NORTHERN DISTRICT OF OHIO

 2                      EASTERN DIVISION

 3    IN RE:  NATIONAL        :  MDL No. 2804

      PRESCRIPTION OPIATE     :

 4    LITIGATION              :  Case No. 17-md-2804

                              :

 5    APPLIES TO ALL CASES    :  Judge Dan Aaron Polster

                              :

 6                            :

 7

 8                  HIGHLY CONFIDENTIAL

 9       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10

11                     - - - -

12                  DECEMBER 13, 2018

13                     - - - -

14    VIDEOTAPED DEPOSITION OF HBC SERVICE COMPANY'S

15         DESIGNATED 30(B)(6) REPRESENTATIVE,

16                  JAMES TSIPAKIS,

17    taken pursuant to notice, was held at Marcus & Shapira,

18    One Oxford Center, 35th Floor, Pittsburgh, Pennsylvania

19    15219, by and before Ann Medis, Registered Professional

20    Reporter and Notary Public in and for the Commonwealth

21    of Pennsylvania, on Thursday, December 13, 2018,

22    commencing at 9:09 a.m.

23                     - - - -

24             GOLKOW LITIGATION SERVICES

          877.370.3377 phone | 917.591.5672 fax

25                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of Plaintiffs
 3     LEVIN PAPANTONIO THOMAS MITCHELL
       RAFFERTY PROCTOR, P.A.
 4     BY: JEFF R. GADDY, ESQUIRE
       316 South Baylen Street, Suite 600
 5     Pensacola, Florida 32502
       800.277.1193
 6     jgaddy@levinlaw.com
 7  WAGSTAFF & CARTMELL, LLP
       BY: TOM ROTTINGHAUS, ESQUIRE
 8     AND THOMAS SIDLINGER, ESQUIRE
       4740 Grand Avenue, Suite 300
 9     Kansas City, Missouri 64112
       816.701.1100
10     trottinghaus@wcllp.com
       tsidlinger@wcllp.com
11
12  On behalf of Defendant AmerisourceBergen Drug
    Corporation
13
       REED SMITH, LLP
14     BY: BRIAN T. HIMMEL, ESQUIRE
       Reed Smith Centre
15     225 Fifth Avenue
       Pittsburgh, Pennsylvania 15222
16     412.288.3131
       bhimmel@reedsmith.com
17
18  On behalf of Defendant Cardinal Health, Inc.
19  WILLIAMS & CONNOLLY LLP
       BY: COLLEEN MCNAMARA, ESQUIRE
20     725 Twelfth Street, NW
       Washington, DC 20005
21     202.434.5013
       cmcnamars@wc.com
22
23
24
25
```

Page 3

```
 1     A P P E A R A N C E S (Continued)
 2  On behalf of Defendants Endo Pharmaceuticals, Endo
    Health Solutions and Par Pharmaceuticals
 3
       (By phone/Livestream)
 4     ARNOLD & PORTER KAYE SCHOLER LLP
       BY: DAVID KOUBA, ESQUIRE
 5     601 Massachusetts Avenue, NW
       Washington, DC 20001-37453
 6     202.942.5743
       david.kouba@arnoldporter.com
 7
 8  On behalf of Defendant HBC Service Company
 9     MARCUS & SHAPIRA, LLP
       BY: THOMAS M. BARNES, ESQUIRE
10     AND JOSHUA A. KOBRIN, ESQUIRE
       AND DANIEL B. MULLEN, ESQUIRE
11     (Video stream and realtime)
       One Oxford Centre, 35th Floor
12     Pittsburgh, Pennsylvania 15219
       412.471.3490
13     rbarnes@marcus-shapira.com
       kobrin@marcus-shapira.com
14     mullen@marcus-shapira.com
15
    On behalf of Defendant McKesson Corporation
16
       COVINGTON & BURLING, LLP
17     BY: EMILY KVESELIS, ESQUIRE
       One CityCenter
18     850 Tenth Street, NW
       Washington, DC 20001-4956
19     202.662.5807
       ekveselis@cov.com
20
21  Also present
22     Chris Ratano, videographer
23
24
25
```

Page 4

```
 1              * I N D E X *
 2  THOMAS TSIPAKIS                    PAGE
 3    EXAMINATION BY MR. GADDY         8, 297
      EXAMINATION BY MR. ROTTINGHAUS      233
 4    EXAMINATION BY MR. MR. BARNES   269, 309
 5    * INDEX OF HBC-TSIPAKIS EXHIBITS *
 6  NO.     DESCRIPTION              PAGE
    Exhibit 1  First Notice of Deposition    10
 7    Pursuant to Rule 30(b)(6) and
      Document Request Pursuant to
 8    Rule 30(b)(2) and Rule 34 to
      Defendant HBC Service Company
 9    P-HBC-0001 - 0001.10
10  Exhibit 2  Second Notice of Deposition   13
      Pursuant to Rule 30(b)(6) and
11    Document Request Pursuant to
      Rule 30(b)(2) and Rule 34 to
12    Defendant HBC Service Company
      P-HBC-0002 - 0002.14
13
14  Exhibit 3  Letter, 10/15/18, J. Kobrin to  15
      Liaison Counsel for Plaintiffs
15    and Defendants regarding topics
      deponent has been designated for
16    in First and Second Notice
      P-HBC-0009 - 0009.2
17  Exhibit 4  HBC Service Company's Responses  16
18    to Plaintiffs' (First) Set of
      Combined Discovery Responses
19    P-HBC-0011 - 0011.20
20  Exhibit 5  Legislative history leading up to  27
      the Controlled Substance Act
21    MCK 30b6_06 - 001 - 102
22  Exhibit 6  21 U.S.C. Section 823         34
      P-GEN-0085 - 0085.6
23  Exhibit 7  DEA Drug Fact Sheet for      43
      Hydrocodone
24    P-GEN-0086 - 0086.2
25
```

Page 5

```
 1    * INDEX OF HBC-TSIPAKIS EXHIBITS (Continued) *
 2  NO.      DESCRIPTION             PAGE
    Exhibit 8  GAO Report "Prescription Drugs   49
 3    State Monitoring Programs Provide
      Useful Tool to Reduce Diversion,"
 4    May 2002
      P.1076 - 1076.27
 5
    Exhibit 9  CFR Regulation 1301.74, Security   54
 6    Requirements
      P.1.47 - 1.47.2
 7
    Exhibit 10  Press release "Cardinal Health,   60
 8    Incorporated agrees to pay $34
      million to settle claims that it
 9    failed to report suspicious sales of
      widely abused controlled substances,"
10    10/2/08
      P.1.48.1 - 1.48.2
11
    Exhibit 11  Reuters article "AmerisouceBergen  64
12    gets DEA distribution halt order,"
      4/24/07
13    P-GEN-0091
14  Exhibit 12  Giant Eagle Inventory Control -   75
      Suspicious Order Policy
15    P-HBC-0012 - 0012.16
16  Exhibit 13  Letter, 6/12/12, to registered  122
      manufacturers and distributors
17    to controlled substances, re
      suspicious orders
18    ABDCMDL00269683 - 00269694
19  Exhibit 14  Giant Eagle threshold report   138
      P-HBC-1032
20
    Exhibit 15  HBC Dosage Unit Distribution to  180
21    Cuyahoga County, Summit County, and
      all of Ohio
22    P-HBC0015
23  Exhibit 16  Emails re Daily HBC Suspicious   183
      Orders
24    P-HBC-0013 - 0013.41
25
```

Page 6

```
 1    * INDEX OF HBC-TSIPAKIS EXHIBITS (Continued) *
 2   NO.        DESCRIPTION            PAGE
     Exhibit 17  Email, 12/5/13, from J. Millward to  196
 3       A. Mollica, et al., subject: 2401
         HBC_MDL032815 - 0032816
 4
     Exhibit 18  Email chain, 8/20/15, from G.       199
 5       Carlson to J. Jenson, et al.,
         subject: FW: Thrifty White Notes
 6       HBC_MDL00069566 - 00069571
 7   Exhibit 19  Email, 11/16/15, from J. Millward  205
         to P. Raub, et al., subject: SOM
 8       and Controlled drug monitoring
         HBC_MDL000049996
 9
     Exhibit 20  Email chain, 3/29/16, from A.      210
10       Zakin to G. Chunderlik, et al.,
         subject: RE: Giant Eagle / Buzzeo
11       PDMA: SOM Services Proposal
         HBC_MDL00028498 - 00028500
12
     Exhibit 21  Email, 8/16, from J. Cornwell to   216
13       P. Raub, et al., subject:  Emailing:
         Order_Item_Blocking_5-Dec_13.docx,
14       SuspiciousReporting.sql
         HBC_MDL00086642 - 00086644
15
     Exhibit 22  Email, 11/21/16, from P. Raub to   219
16       M. Doerr, et al., subject: RE:
         Suspicious Order Monitoring (SOM)
17       HBC-MDL00046220 - 00046228
18   Exhibit 23  Email chain, 1/10/14, from T.      240
         Roahrig to J. Millward, subject: RE:
19       Daily HBC Suspicious Purchasing
         Report - 01/09/14
20       HBC_MDL00039223
21   Exhibit 24  20140130_Daily_HBC_Controls        242
         P-HBC-1055; 1054; I059; I052; 1053
22
     Exhibit 25  Letter, 4/28/14, to DEA, Re:       259
23       Pharmacy Profession Comments to
         DEA Notice of Proposed Rulemaking
24       on the Rescheduling of Hydrocodone
         Combination Products from Schedule
25       III to Schedule II
```

Page 7

```
 1          P R O C E E D I N G S
 2              - - - -
 3      THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Chris Ratano.  Today's date is
 5   December 13, 2018, and the time is approximately
 6   9:09 a.m.
 7      This video deposition is being held in
 8   Pittsburgh, PA at Marcus & Shapira, LLP, One
 9   Oxford Centre, 35th Floor, in the matter of
10   National Prescription Opioid Litigation, MDL No.
11   2804, Case No. 17-md-2804.
12      The deponent today is James Tsipakis.  All
13   counsel will be noted upon the stenographic
14   record.
15      The court reporter today, Ann Medis, will
16   please swear in the witness.
17          JAMES TSIPAKIS,
18      having been first duly sworn, was examined
19          and testified as follows:
20      THE VIDEOGRAPHER:  You May proceed.
21      MR. GADDY:  Can we have all counsel who
22   is present identify themselves.
23      This is Jeff Gaddy for plaintiffs.
24      MR. ROTTINGHAUS:  Tom Rottinghaus for
25   plaintiffs.
```

Page 8

```
 1      MR. SIDLINGER:  Along with Thomas
 2   Sidlinger for plaintiffs.
 3      MS. KVESELIS:  Emily Kveselis from
 4   Covington for McKesson.
 5      MS. MCNAMARA:  Colleen McNamara,
 6   Williams & Connolly, for Cardinal Health.
 7      MR. HIMMEL:  Brian Himmel from Reed
 8   Smith for AmerisourceBergen Drug Corporation.
 9      MR. KOBRIN:  Josh Kobrin with Marcus &
10   Shapira for HBC Services Company.
11      MR. BARNES:  Robert Barnes, Marcus &
12   Shapira, HBC Service Company.
13          EXAMINATION
14   BY MR. GADDY:
15      Q.  Good morning.  State your name, please.
16      A.  James Tsipakis.
17      Q.  And, Mr. Tsipakis, who do you work for?
18      A.  Giant Eagle.
19      Q.  And what's your position with Giant
20   Eagle?
21      A.  Head of pharmacy for Giant Eagle.
22      Q.  Okay.  Do you understand that you're
23   here to testify today on behalf of HBC?
24      A.  I do.
25      Q.  And do you understand that you've been
```

Page 9

```
 1   designated by HBC as a 30(b)(6) witness to testify
 2   on behalf of the company HBC?
 3      A.  I do.
 4      Q.  So you understand the answers that you
 5   give today will not be Jim Tsipakis's answers, but
 6   they will be HBC's answers?
 7      A.  I do.
 8      Q.  Now, you mentioned you're employed by
 9   Giant Eagle; correct?
10      A.  Yes.
11      Q.  Explain to me your understanding of the
12   relationship between Giant Eagle and HBC.
13      A.  Giant Eagle, as a company, owns HBC.
14      Q.  So HBC is a division of Giant Eagle?
15      A.  I'm not sure of the legal entities.  I
16   know Giant Eagle, as a company, owns HBC.
17      Q.  So the -- HBC and Giant Eagle are not
18   competitors.
19      A.  Giant Eagle owns HBC.  It's -- it's one
20   of our company assets.
21      Q.  How long has Giant Eagle owned HBC?
22      A.  I'm not exactly sure.
23      Q.  Is HBC still in business?
24      A.  HBC is still operating, yes.
25      Q.  Does HBC still distribute products to
```

Page 10

1 Giant Eagle's pharmacies -- or, excuse me, Giant
2 Eagle stores?
3     A.  Yes.
4     Q.  Does HBC still distribute any narcotics
5 to Giant Eagle stores?
6     A.  It does not.
7     Q.  So not even noncontrolled narcotics?
8     A.  Prescription drugs, no.
9     Q.  Does it distribute over-the-counter
10 drugs to Giant Eagle stores?
11     A.  Yes.
12     Q.  I'm going to show you what's marked as
13 HBC 1.
14         (HBC-Tsipakis Exhibit 1 was marked.)
15 BY MR. GADDY:
16     Q.  I'll ask you if you recognize that
17 document.
18     This is the first notice of deposition.  Have
19 you seen this before?
20     A.  Yes.
21     Q.  And have you had the opportunity to
22 review this?
23     A.  Parts of it, yes.
24     Q.  If you turn to the -- do you see in the
25 upper right-hand corner, as you turn the pages,

Page 11

1 there's going to be .2, .3, .4, as you go through
2 the page numbers.
3     Do you see that?
4     A.  Yes.
5     Q.  If you turn to .2.  And down at the
6 bottom of the bottom there's a heading that says
7 "Duty to Prepare."
8     Do you see that?
9     A.  Yes.
10     Q.  It says, "The testimony elicited in the
11 deposition represents HBC's knowledge, not the
12 individual deponent's knowledge."
13     Do you see that?
14     A.  Yes.
15     Q.  And that's consistent with your
16 understanding?
17     A.  Yes.
18     Q.  It goes on down to say that "HBC must
19 conduct a thorough investigation in response to
20 deposition notice and must prepare a witness to
21 testify to all matters known or reasonably
22 available to the organization."
23     Do you see that?
24     A.  Yes.
25     Q.  It then says that "If HBC designee is

Page 12

1 not knowledgeable about the matters specified in
2 the deposition notice, it must, nonetheless,
3 prepare such designee to give knowledgeable,
4 binding answers."
5     Do you see that?
6     A.  Yes.
7     Q.  How long have you been with Giant Eagle?
8     A.  Since late October 2017.
9     Q.  Do you understand that this deposition
10 notice will cover activity going back to 2006?
11     A.  Yes.
12     Q.  And have you taken steps to prepare to
13 be able to answer questions about HBC's conduct
14 going back to 2006?
15     A.  Yes.
16     Q.  What did you do to prepare?
17     A.  Met with Giant Eagle's internal and
18 external counsel.  Spoke to employees within our
19 organization.  Looked through documents, and did a
20 diligence.
21     Q.  Let me ask you this.
22     When did you first find out you were going to
23 be the designee to testify here?
24     A.  Roughly, about four weeks ago.
25     Q.  And in the last four weeks, how much

Page 13

1 time would you say you spent preparing for this
2 deposition?
3     A.  Forty to 50 hours.
4     Q.  If you would turn towards, for me,
5 please to .6.
6     Do you see at the top of the page it says,
7 "Subject Matters for Testimony"?
8     A.  Yes.
9     Q.  And are you prepared to give testimony
10 today on behalf of HBC on the topics listed there
11 all the way through N on the next page?
12     A.  Yes.
13     Q.  And for each of these topics, are you
14 prepared to give testimony going back to 2006?
15     A.  Yes.
16     Q.  I'm going to show you what I'll mark as
17 Exhibit No. 2 to your deposition here today.
18         (HBC-Tsipakis Exhibit 2 was marked.)
19 BY MR. GADDY:
20     Q.  Tell me if you recognize this document,
21 if you had an opportunity to review it before.
22     It is the second 30(b)(6) notice.
23     A.  I'm sorry.  Your question is?
24     Q.  Have you seen this before and had the
25 opportunity to review it?

Page 14

1    A.   Parts of it, yes.
2    Q.   And I'll represent to you it has the
3 same obligations as far as requiring you to
4 prepare to provide responsive answers for the
5 relevant time period, which is back to 2006.
6    Did you do that for the topics that you're
7 going to testify about as it relates to this
8 notice as well?
9    A.   Is there specific areas that you'd like
10 to point me to that -- as you did on the previous
11 document?
12    Q.   Well, sure.  If you turn to page 8,
13 Topic 6, 7, and 8, are you prepared to testify on
14 those today?
15    A.   Yes.
16    Q.   And if you turn to page 9, on Topic 12,
17 are you prepared to testify on that today?
18    A.   Yes.
19    Q.   And then on page 10, Topics 17, 18, and
20 20, 21, and 22, are you prepared to testify on
21 those today?
22    A.   Yes.
23    Q.   And the 40 to 50 hours that you told me
24 you spent preparing earlier, was that -- did that
25 also include the time you spent preparing to

Page 15

1 testify on these topics?
2    A.   Yes.
3    MR. BARNES:  Jeff, I'll note for the
4 record that he's prepared to testify on these
5 topics as may have been amended by the special
6 master.
7    MR. GADDY:  I'm also going to mark, for
8 the record, Exhibit No. 3.
9    (HBC-Tsipakis Exhibit 3 was marked.)
10 BY MR. GADDY:
11    Q.   I don't know if you had the opportunity
12 to see this before.
13    Is that familiar to you?
14    A.   No.
15    Q.   I won't ask you any questions about it,
16 Mr. Tsipakis.
17    You told me a few minutes ago that HBC no
18 longer distributes any prescription drugs to Giant
19 Eagle.
20    That's correct?
21    A.   Yes.
22    Q.   At some period of time, did HBC have a
23 license to distribute Schedules III, IV, and V
24 controlled substances?
25    A.   Yes.

Page 16

1    Q.   What period of time?
2    A.   From -- my recollection is from 2009,
3 late 2009, through early 2016.
4    Q.   Are you telling me the time period that
5 they actually distributed hydrocodone products or
6 the period for which they had a license?
7    Do you understand the difference?
8    A.   Yes, sir.
9    HBC received a license to distribute earlier
10 in 2009, but did not begin distributing products
11 until late 2009.
12    Then it continued to supply product until it
13 was shut down -- till that portion was shut down
14 in 2016.
15    Q.   So the license was obtained by HBC prior
16 to 2009; correct?
17    A.   My understanding is the license for HBC
18 was obtained in early 2009.
19    Q.   Let me see if I can refresh your
20 recollection.
21    I'm going to show you what's been marked as
22 Exhibit 4 to your deposition.
23    (HBC-Tsipakis Exhibit 4 was marked.)
24 BY MR. GADDY:
25    Q.   This is HBC's responses to the first set

Page 17

1 of combined discovery responses.
2    Have you seen this document before?
3    A.   Sure.
4    Q.   And this is HBC 11 for our internal
5 reference number.
6    A.   It looks somewhat familiar, yes.
7    Q.   Did you have any -- provide any
8 assistance in preparing the responses to these?
9    A.   May I glance through them to --
10    Q.   Of course.
11    A.   Looking through this, I don't recognize
12 any specific areas that I would have -- at least
13 from the surface, the quick read that I did, I
14 don't see specific areas that I would have added
15 to this.
16    Q.   Do you know whether or not you helped
17 gather any documents that would have been
18 responsive to either this or any of the other
19 discovery requests in the case?
20    Have you ever helped the attorneys gather
21 documents or collect documents?
22    A.   Can you help me?  Can you repeat the
23 question?
24    Q.   Sure.  So in this litigation, HBC has
25 produced documents to us.

Page 18

1    Have you ever assisted with that in any way?
2    A.  I assisted in the form of allowing and
3  making sure that employees and folks that would
4  have information were available for whatever was
5  needed to gather the information for this case.
6    Q.  So you -- would it be fair to say you
7  acted as the liaison to different employees as
8  opposed to you personally gathering documents?
9    A.  I assisted -- being newer to the
10 company, there wasn't a lot of documents and
11 information that I had.
12    So certainly it was folks related to, within
13 the organization, that had different knowledge
14 needed.  And, as I said, we made sure that people
15 were available, information that was needed was
16 made available to -- to our attorneys and
17 certainly the folks helping prepare for the case.
18    Q.  If you would, turn to page 8 of that.
19    And I was asking you earlier about the dates
20 that HBC had a license to distribute controlled
21 substances.
22    Do you recall that?
23    A.  Yes.
24    Q.  And you agree that to have a license to
25 distribute controlled substances, you have to be

Page 19

1  registered with the DEA?
2    A.  Yes.
3    Q.  If you look there in the middle of the
4  page it says that -- the question that's being
5  asked there is, "Please produce each of your
6  suspicious order monitoring system policies and
7  procedures since January 1, 2006."
8    Do you see that?
9    A.  Yes.
10    Q.  And I'll represent to you that this
11 first paragraph here is a series of -- series of
12 objections.
13    I'm going to take you about halfway down the
14 paragraph.  On the right side of the page there's
15 a sentence that starts, "HBC also..."
16    A.  "HBC also..."
17    Q.  Are you with me?
18    A.  Yes.
19    Q.  It says, "HBC also objects to the time
20 period of since January 1, 2006 as overly broad,
21 unduly burdensome, not proportional, not
22 relevant."
23    And it goes on to say, "HBC, which did not
24 provide services as a licensed distributor of
25 controlled substances until 2007."

Page 20

1    Do you see that?
2    A.  I do.
3    Q.  Does that refresh your recollection that
4  HBC was -- actually was licensed by the DEA as a
5  registrant back in 2007?
6    And then if you continue to read, it says,
7  "They did not distribute any Schedule III opioids
8  until November of 2009."
9    A.  I do see that.
10    Q.  Do you know which month in 2007 HBC
11 became licensed by the DEA?
12    A.  I do not.
13    MR. BARNES:  Jeff, if it makes things
14 easier, that answer is going to be amended to
15 2009, because we have since learned that it was
16 2009.
17    MR. GADDY:  Okay.  When did you find
18 that out?
19    MR. BARNES:  During his prep.
20    MR. GADDY:  And you're telling me now in
21 the middle of the deposition?
22    MR. BARNES:  Well, I'm telling you --
23 I'm obviously telling you now.
24    MR. GADDY:  I mean, how long have you
25 known that?

Page 21

1    MR. BARNES:  Probably about 48 hours.
2    MR. GADDY:  I got an email from Josh
3 last night and had a call with Josh two days ago.
4    It's fairly significant, don't you think?
5    MR. KOBRIN:  They never represented that
6 they distributed before 2009, so that probably
7 never came up and I never thought it was going to
8 be pertinent to this deposition.
9    It doesn't change any of our distribution
10 activities.
11    MR. GADDY:  Is there anything else you
12 all are going to be amending, before we keep
13 going, about any of these responses?
14    MR. BARNES:  Not that I can think of
15 right now.  If something comes to mind, I'll let
16 you know.
17    MR. GADDY:  Okay.  About 30 minutes ago
18 Josh gave me a new suspicious order that was
19 reported in 2013.
20    Are there any more suspicious orders?
21    MR. BARNES:  Yeah.  That was for a
22 Control III, which is irrelevant to the case.  We
23 thought we would give it to you anyway since you
24 wanted -- you seem to be interested in suspicious
25 orders.

Page 22

1    Are you complaining that you're getting a
2  suspicious order or don't you want the IIIs at
3  all?
4      MR. GADDY:  I'm complaining that I'm
5  getting it the morning of the deposition when
6  discovery has been going on for five or six
7  months.
8    I'm asking if there's any more, that you're
9  aware of, that haven't been given.
10      MR. BARNES:  If we find any more
11  irrelevant documents, we'll get them to you as
12  fast as we can.
13      MR. KOBRIN:  Just for the record, I
14  emailed you last night.  I told you that we
15  discovered it and I would have copies for you this
16  morning.  And we gave you those copies.
17      MR. GADDY:  I'm just asking if there's
18  anything else.
19      MR. KOBRIN:  Not to our knowledge at
20  this time.
21  BY MR. GADDY:
22    Q.  Mr. Tsipakis, what's your understanding
23  of the time period in which HBC did, in fact,
24  distribute Schedules III, IV, and V controlled
25  substances?

Page 23

1    A.  From late 2009 to early 2016.
2    Q.  And to what businesses or entities did
3  HBC distribute controlled substances?
4    A.  To our own stores, Giant Eagle
5  pharmacies.
6    Q.  Did HBC distribute to any other
7  businesses, pharmacies, hospitals, physicians,
8  other than Giant Eagle stores?
9    A.  No.
10    Q.  During the time period that HBC
11  distributed Schedule III controlled substances,
12  would it be accurate to say that opioids, and,
13  more specifically, hydrocodone combination
14  products was one of the drugs that HBC
15  distributed?
16    A.  HBC only distributed hydrocodone
17  products as a Schedule III.  Once it was
18  reclassed, they no longer distributed those
19  products.
20    Q.  So the answer is, yes, from 2009 until
21  200-- or, excuse me, until hydrocodone was
22  reclassified, HBC did distribute hydrocodone
23  combination products?
24    A.  From -- potentially from '09 through the
25  reclass, yes.

Page 24

1    Q.  Were there any Schedule III drugs that
2  HBC refused to distribute?
3      MR. BARNES:  Objection.  Relevance.
4  Discovery master has held Schedule IIIs to be
5  irrelevant.
6      MR. GADDY:  You made your objection.
7  You made your objection, Bob.
8    The witness can answer the question.
9      THE WITNESS:  Can you repeat the
10  question, please?
11  BY MR. GADDY:
12    Q.  Sure.  Are there any Schedule III drugs
13  that HBC refused to distribute?
14      MR. BARNES:  Objection.
15      THE WITNESS:  When you say "refused," I
16  don't understand.
17  BY MR. GADDY:
18    Q.  Sure.  Were there any Schedule III drugs
19  that HBC decided these drugs are addictive,
20  they're subject to abuse, we're not going to
21  distribute those drugs?
22      MR. BARNES:  Same objection.
23      THE WITNESS:  The product mix was based
24  on many factors.  There was no -- there was no --
25  there was no block on products, as any business

Page 25

1  decides what products to carry in the warehouse or
2  not.
3    So I guess I'm still not understanding your
4  question specifically.
5  BY MR. GADDY:
6    Q.  Okay.  I think it's fairly simple.
7    I'm asking whether or not HBC made a decision
8  to not distribute any particular drug that they
9  were licensed and had the ability to distribute.
10    A.  Okay.  I understand now.
11    No.
12    Q.  Can you give me some examples of the
13  types of hydrocodone combination products that HBC
14  would have distributed?
15    A.  Hydrocodone-containing products.
16  Generic Vicodin products.  Certainly cough syrups
17  that had hydrocodone in it.  Different
18  formulations and different generic names,
19  et cetera.  Those types of products.
20    Q.  And Vicodin is a product that's a
21  combination of hydrocodone and acetaminophen?
22    A.  Correct.
23    Q.  Also Lortab, the same type of product?
24    A.  Yes.
25    Q.  Norco I think is the type of product?

Page 26

1    A.  Yes.
2    Q.  And those are all types of drugs that
3  HBC would have distributed from 2009 until 2014
4  when the schedules changed.
5    A.  Yes.
6    Q.  Now, do you have an understanding of
7  HBC's responsibilities under the Controlled
8  Substance Act?
9    A.  I do, yes.
10    Q.  Is that something that you have in the
11  normal course of your job duties or is that
12  something that you had to prepare for today?
13    A.  Specifically to HBC, it's as a
14  registrant, so it has a duty to uphold all of the
15  laws that it's governed by, yes.
16    Q.  My question was a little bit different.
17    Did you have an understanding of those laws
18  and regulations in the course of your own position
19  with Giant Eagle or is that something that you had
20  to prepare for today?
21    And let me kind of explain what I'm asking.
22    You would agree that there's different rules
23  and regulations for pharmacies than there are for
24  distributors; correct?
25    A.  Yes.

Page 27

1    Q.  And your position with Giant Eagle,
2  would it be fair to say, more relates to the
3  pharmacy side?
4    A.  My current position?
5    Q.  Yes.
6    A.  I'm responsible for the total pharmacy
7  operations.
8    Q.  Does that include the distribution of
9  Schedule II, III narcotics?
10    A.  I don't directly oversee the warehouse.
11  But certainly I have -- I'm a stakeholder within
12  the total company.
13    As an officer of the company, it -- I have an
14  obligation for all portions of the company,
15  including distribution, although I don't
16  day-to-day oversee that.
17    Q.  So did you have to prepare to be able to
18  testify today about HBC's responsibilities under
19  the Controlled Substance Act as it relates to its
20  role as a distributor?
21    A.  Yes.
22    Q.  I'm going to show you PGent 40, which
23  I'm going to mark as Exhibit No. 5.
24        (HBC-Tsipakis Exhibit 5 was marked.)
25

Page 28

1  BY MR. GADDY:
2    Q.  And I'll represent to you this is the
3  legislative history leading up to the -- what's
4  commonly referred to as the Controlled Substance
5  Act.
6    Do you know if you've ever seen this document
7  before?
8    A.  Vaguely familiar.
9    Q.  Is HBC familiar and have an
10  understanding of the Controlled Substance Act?
11    A.  Yes.
12    Q.  If you turn to -- the numbering system
13  is a little bit different on this one.  You'll
14  have a dash.  And I'm on page -002, the second
15  page of the document.
16    Are you with me?
17    A.  Yes, sir.
18    Q.  If you go down about two-thirds,
19  three-fourths of the way down the page, there's a
20  section that says "Principal Purpose of this
21  Bill."
22    Do you see that?
23    A.  I'm sorry.  Where?  The second page?
24    Q.  Let me actually -- let me start at the
25  very top first.

Page 29

1    A.  Okay.
2    Q.  At the very top of the page, see it's
3  got the HR, it's got the bill number, and then
4  below that it shows the session of Congress 1970?
5    A.  Yes.
6    Q.  Do you see that?
7    Does HBC understand that there's a Controlled
8  Substance Act which has been in effect since 1970?
9    A.  Yes.
10    Q.  Now, if you go down about three-fourths
11  of the way down the page, we get to a section, the
12  title is "Principal Purpose" of the bill.
13    A.  I see that.
14    Q.  And do you see there, it says, "This
15  legislation is designed to deal in a comprehensive
16  fashion with the growing menace of drug abuse in
17  the United States through providing authority for
18  increased efforts in drug abuse prevention and
19  rehabilitation of users, through providing more
20  effective means for law enforcement aspects of
21  drug abuse prevention and control, and by
22  providing for an overall balanced scheme of
23  criminal penalties for offenses involving drugs."
24    Do you see that?
25    A.  Yes.

Page 30

1  Q.  Is that consistent with HBC's
2  understanding of the purposes of the Controlled
3  Substance Act?
4  A.  Yes.
5  Q.  If you would turn for me, please, to
6  -005.
7  And there -- at the top of the page you see
8  Title 2, Control and Enforcement?
9  Do you see that?
10  A.  Yes.
11  Q.  It says, "This bill provides for control
12  by the Justice Department of problems related to
13  drug abuse through registration of manufacturers,
14  wholesalers, retailers, and all others in the
15  legitimate distribution chain."
16  Do you see that?
17  A.  Yes.
18  Q.  And for our purposes here today, you
19  agree that HBC would be a wholesaler?
20  A.  Yes.
21  Q.  It goes on to say, "And it makes
22  transactions outside the legitimate distribution
23  chain illegal."
24  Do you see that?
25  A.  Yes.

Page 31

1  Q.  What does that mean to HBC?
2  MR. BARNES:  I'm going to object to the
3  extent you're asking him to interpret the
4  Controlled Substances Act.
5  He's not a lawyer.  And it's outside the
6  scope of the special master's ruling.
7  THE WITNESS:  These aren't my words.
8  But certainly, from reading it, it would tell me
9  closed system, and certainly setting up the
10  framework of the interaction between the
11  government and manufacturers, wholesalers,
12  retailers.
13  BY MR. GADDY:
14  Q.  Is HBC familiar with the concept of a
15  closed system of distribution?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  A closed system that has adequate
19  controls to prevent diversion and theft, and
20  making sure drugs are only -- prescription drugs
21  are -- are in that closed system, and not -- and
22  not ever outside of the system.
23  Q.  And why is that important?
24  A.  To prevent diversion and theft.
25  Q.  Why is it important to prevent diversion

Page 32

1  and theft?
2  A.  I think it's obvious.  To make sure
3  medications and the drugs are going to the
4  intended users, intended...
5  Q.  Turn to page -008 for me, please.
6  The second full paragraph starts, "The bill
7  is designed..."
8  Do you see that?
9  A.  Yes.
10  Q.  It says, "The bill is designed to
11  improve the administration and regulation of
12  manufacturing, distribution, and dispensing of
13  controlled substances by providing for a closed
14  system of drug distribution for legitimate
15  handlers of such drugs."
16  Do you see that?
17  A.  Yes.
18  Q.  It says, "Such a closed system should
19  significantly reduce the widespread diversion of
20  these drugs out of legitimate channels into the
21  illicit market."
22  Is that consistent with your understanding of
23  the purpose of the Controlled Substance Act?
24  MR. BARNES:  Same objection.  Asking him
25  to interpret the Controlled Substances Act.

Page 33

1  You're asking for a legal interpretation.
2  MR. GADDY:  Bob, all you got to do is
3  object.  I don't need to hear his objections --
4  your objections coming from him.
5  MR. BARNES:  Well, you may not need to
6  hear it, but whoever is going to rule on it is
7  going to hear it.
8  MR. GADDY:  You preserve your record by
9  objecting.
10  MR. BARNES:  Yeah.  And I'm going to put
11  the full record.
12  You're asking him to interpret the Controlled
13  Substances Act, which the special master has said
14  it's outside the purview of what you should be
15  asking.
16  THE WITNESS:  Could you repeat your
17  question, please?
18  BY MR. GADDY:
19  Q.  Sure.  It says, "Such a closed system
20  should significantly reduce the widespread
21  diversion of these drugs out of legitimate
22  channels into the illicit market."
23  Do you see that?
24  A.  Yes.
25  Q.  Is that consistent with HBC's

Page 34

1 understanding of the purpose of the Controlled
2 Substances Act?
3      MR. BARNES:  Same objection.
4 Go ahead and answer.
5      THE WITNESS:  As I read it here, it's to
6 keep drug distribution safe and secure and prevent
7 diversion and theft in a closed system.
8 BY MR. GADDY:
9    Q.  My question is a little bit different.
10 Is that HBC's understanding?
11    A.  For what I just said, yes.  That's our
12 understanding, to have prescription drugs go to
13 legitimate -- where they need to go.
14    Q.  I'm going to show you what I'm going to
15 mark as Exhibit No. 6.
16      (HBC-Tsipakis Exhibit 6 was marked.)
17      MR. GADDY:  This is -- P-GEN-85 is our
18 internal number.
19 BY MR. GADDY:
20    Q.  This is 21 USC Section 823.
21 Are you familiar with this code?
22    A.  It's vaguely familiar.
23    Q.  And you testified earlier that in order
24 to distribute any controlled substances, HBC had
25 to be registered by the DEA; correct?

Page 35

1    A.  Correct.
2    Q.  And you can start at the first page
3 there.  Two-thirds down the page on the left side,
4 we have the registration requirement; correct?
5    A.  The 823 heading?
6    Q.  Correct.
7    A.  Correct.
8    Q.  And then it goes on.  And the first one
9 that it talks about is manufacturers of controlled
10 substances.  And they have to register, too;
11 correct?
12    A.  Yes.
13    Q.  If you turn the page for me, please, and
14 go to subsection (e).
15    A.  Yes.
16    Q.  There you see the distributors of
17 Schedule III, IV, and V controlled substances also
18 have to register with the DEA; is that correct?
19    A.  Correct.
20    Q.  It says, "The attorney general shall
21 register an applicant to distribute controlled
22 substances in Schedules III, IV, or V unless he
23 determines that the issuance of such registration
24 is inconsistent with the public interest."
25    Do you see that?

Page 36

1    A.  Yes.
2    Q.  And then they list the factors to
3 determine.
4    And the first factor is "The maintenance of
5 effective controls against diversion of particular
6 controlled substances into other than legitimate
7 medical, scientific, and industrial channels."
8    Do you see that?
9    A.  Yes.
10    Q.  You agree that HBC was required to
11 maintain effective controls against diversion of
12 controlled substances even if they were only
13 distributing III, IV, or V substances.
14      MR. BARNES:  Objection.
15 BY MR. GADDY:
16    Q.  Correct?
17      MR. BARNES:  Same objection as prior.
18      THE WITNESS:  Yes.
19 BY MR. GADDY:
20    Q.  HBC didn't think that they weren't
21 required to have controls against diversion in
22 place because they were only distributing IIIs,
23 IVs, and Vs, did they?
24    A.  No.
25    Q.  Explain for me, please, from a wholesale

Page 37

1 distributor perspective as far as infrastructure,
2 security, logistics, are there different
3 requirements if you're distributing III, IV, and V
4 scheduled drugs versus Schedule II?
5    A.  The requirements are commensurate on the
6 drugs that you're distributing.
7    In our case, we're distributing to our own
8 stores in a closed system.  So the controls -- I
9 guess the controls -- I mean, the obligations
10 are the obligations we follow.
11    So can you specifically word your question?
12    Q.  Sure.  Maybe that was confusing.
13    I'm asking if logistically, from an
14 infrastructure, as far as security requirements or
15 vault requirements as it relates to the DEA, are
16 the requirements different for a distributor who
17 is distributing Schedule II drugs versus a
18 distributor who is distributing III, IVs, and V.
19    A.  Thank you for the clarification.  I
20 understand the question.
21    Yes, there is.  Schedule IIs versus III
22 through V, there is a difference.
23    Q.  Can you generally describe those
24 differences for me?
25    A.  The differences, typically, the

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1  Schedule IIs are in a vault or a more -- the
2  security requirements are different.  There's
3  tighter controls and tighter requirements needed
4  for Schedule II drugs.
5      Q.  You mentioned a vault.  Are there any
6  others that you're aware of?
7      A.  Certainly, there's a whole host of them,
8  yes.  But HBC never distributed Schedule II drugs.
9      Q.  You mentioned the vault.  Are there any
10  other additional requirements or controls that are
11  in place for Schedule IIs as opposed to
12  Schedule IIIs?
13          MR. BARNES:  You mean generally or at
14  HBC?
15          MR. GADDY:  Generally in the
16  regulations.
17          THE WITNESS:  Yes.
18  BY MR. GADDY:
19      Q.  Do you know any of them?
20      Are you able to tell us any other than the
21  vault?
22      A.  I didn't prepare for those.
23      Q.  So no?
24      A.  No.
25      Q.  Now, even though HBC did not distribute

Page 39

1  Schedule II drugs to Giant Eagle stores, Giant
2  Eagle pharmacies have dispensed Schedule II drugs
3  going back to 2006; correct?
4      A.  Dispensed, yes; correct.
5      Q.  And they would receive their Schedule II
6  drugs from wholesalers other than HBC?
7      A.  Yes.
8      Q.  They received Schedule II drugs from
9  McKesson?
10      A.  Yes.
11      Q.  From Anda?
12      A.  Yes.
13      Q.  Are there any other distributors that
14  supplied Giant Eagle pharmacies with Schedule II
15  drugs going back to 2006 that you're aware of?
16      A.  No.
17      Q.  You mentioned just a moment ago that HBC
18  was only distributing to Giant Eagle stores.  I
19  think you said only to their own stores.
20      Is that how you said it?
21      A.  Correct.
22      Q.  So from your perspective, HBC and Giant
23  Eagle are the same -- are one in the same?
24          MR. BARNES:  You mean legally?
25      If you're asking for a legal statement for

Page 40

1  what the entity structures are, he hasn't been
2  produced to respond to that.
3  BY MR. GADDY:
4      Q.  You can answer the question.
5      A.  Giant Eagle owns HBC.  HBC is part of
6  Giant Eagle, so...
7      Q.  Even though HBC is only shipping to the
8  store that owns it, to Giant Eagle, you agree
9  they're still required to follow the federal law,
10  federal regulations as it relates to the
11  Controlled Substance Act?
12      A.  Of course, yes.
13      Q.  I want to go back to No. 5, which was
14  the Controlled Substance Act.
15      Flip for me, please, to page 034.  Do you see
16  there, under Section 2, where it says, "The
17  illegal importation, manufacture, distribution,
18  and possession, and improper use of controlled
19  substances have a substantial detrimental effect
20  on the public's health and general welfare."
21      Do you see that?
22      A.  Yes.
23      Q.  Does HBC agree with that?
24          MR. BARNES:  Objection.  Same objection.
25  Asking for a legal interpretation.

Page 41

1          THE WITNESS:  As I read it, illegal
2  importation, stressing illegal, yes, I would
3  agree.
4  BY MR. GADDY:
5      Q.  Well, let me ask you:  Forgetting that
6  this language is in the Controlled Substance Act,
7  does HBC agree with the statement that the illegal
8  distribution, possession, and improper use of
9  controlled substances has a substantial
10  detrimental effect on the public's health and
11  welfare?
12          MR. BARNES:  Same objection.  Beyond the
13  scope of Special Master Cohen's ruling.
14          THE WITNESS:  Yes.
15  BY MR. GADDY:
16      Q.  Does HBC agree that as a distributor, as
17  one of the links in the closed system of
18  distribution, that HBC plays a critical role in
19  preventing the diversion of controlled substances?
20          MR. BARNES:  Same objection.
21          THE WITNESS:  We have an obligation to
22  make sure diversion doesn't happen, sure.
23  BY MR. GADDY:
24      Q.  Sure.  But you agree that HBC plays a
25  critical role in that process.

Page 42

1    A.  We have an obligation and a role to make
2  sure the controlled substances that we distribute
3  stay in the closed system and get to the intended
4  recipient, yes.
5    Q.  And that they not get to people who were
6  not the intended recipients; correct?
7    A.  Yes.
8    Q.  Do you agree that it was no secret that
9  drugs, opioids such as hydrocodone combination
10  products, have a great potential for abuse?
11    A.  All drugs, if they're not used
12  appropriately, can have a detrimental effect.
13  But, certainly, hydrocodone products, if they're
14  abused, can have detrimental effects, sure.
15    Q.  HBC had an understanding that
16  hydrocodone products were addictive before they
17  started distributing those drugs back in 2009;
18  correct?
19    A.  As the -- HBC understands there's
20  different classes of drugs, Schedule II being the
21  most addictive other than Schedule I, and then the
22  further down the schedule, less addictive.
23    But, yes.  Generally, yes.
24    Q.  So HBC had an understanding that
25  hydrocodone combination products, like the ones we

Page 43

1  talked about earlier, whether it's Vicodin or
2  Lortabs, or anything that hydrocodone is combined
3  with, HBC had an understanding, even before they
4  began to distribute those drugs, that those drugs
5  were addictive and subject to abuse.
6    A.  If they're misused, yes.
7    Q.  And you would agree that HBC has always
8  had that knowledge and understanding?
9    MR. BARNES:  Objection.
10    You, yourself, said this goes back to 2006,
11  and they didn't begin distributing until 2009.
12  BY MR. GADDY:
13    Q.  Go ahead.
14    A.  I think it's public knowledge,
15  certainly.  HBC -- it's public knowledge certainly
16  that they can be addictive, sure.
17    Q.  And that has been even before HBC
18  started distributing these drugs?
19    A.  Sure.
20    Q.  I'm done with that one.
21    I'm going to show you page N86, which I'm
22  going to mark as No. 7, I believe.
23    (HBC-Tsipakis Exhibit 7 was marked.)
24  BY MR. GADDY:
25    Q.  Do you recognize this type of document?

Page 44

1    A.  It's vaguely familiar.
2    Q.  Up in the upper left-hand corner, do you
3  see the seal, DEA seal?
4    A.  Yes.
5    Q.  And you consider the DEA to be a
6  trustworthy source for information about
7  controlled substances?
8    A.  Sure, yes.
9    Q.  And you recognize this to be a drug fact
10  sheet for the drug hydrocodone?
11    A.  Yes.
12    Q.  And you would agree the DEA is a
13  trustworthy source about which drugs are diverted
14  or abused more than other drugs?
15    A.  Sure, yes.
16    Q.  You see at the bottom of the page it
17  says this is from the Drug Enforcement
18  Administration and then has the DEA website there
19  at the bottom of the page.  Do you see that?
20    A.  Yes.
21    Q.  Let's go to the very top part, the
22  overview.  Do you see where it says, "Hydrocodone
23  is the most frequently prescribed opioid in the
24  United States and is associated with more drug
25  abuse and diversion than any other licit or

Page 45

1  illicit opioid."
2    Do you see that?
3    A.  Yes.
4    Q.  And was that HBC's understanding as
5  well?
6    MR. BARNES:  Can we get a timeframe for
7  both this document and your question?
8    MR. GADDY:  Sure.  We'll get there.
9    THE WITNESS:  So your question was
10  whether HBC knew the fact that it's the most
11  frequently prescribed opioid and whether it's the
12  one that's mostly abused?
13  BY MR. GADDY:
14    Q.  Correct.
15    A.  The exact fact of which ranks one or
16  two, et cetera, HBC understood that it's certainly
17  a drug that has had abuse certainly and it's high
18  on that list.  Exactly whether it's number one,
19  number two, I can't answer whether we had that
20  position or not.
21    Q.  Let's address the bottom of this.  If
22  you go to the second page -- I don't think the
23  document has a date on it, but if you go to the
24  second page, do you see there's the heading Legal
25  Status in the United States?

Page 46

1    A.  Yes.
2    Q.  You see in the first line it says,
3  "Hydrocodone is a Schedule II narcotic that is
4  marketed in a multi-ingredient Schedule III
5  product."
6    Do you see that?
7    A.  Yes.
8    Q.  So that tells us that this document
9  certainly predates the scheduling change; correct?
10    A.  Well, if it says hydrocodone is a
11  Schedule II, that would mean that this would be
12  post-October 2014; right?
13    Q.  Well, pure hydrocodone has always been
14  Schedule II; right?  It's the hydrocodone
15  combination products that was III.  Do you agree
16  with that?
17    A.  Yes.
18    Q.  Does HBC have that understanding, that
19  pure hydrocodone has always been a Schedule II
20  narcotic?
21    A.  Yes.
22    Q.  Where it says that multi-ingredient
23  products such as hydrocodone and acetaminophen
24  would be a Schedule III product; correct?
25    A.  Yes.

Page 47

1    Q.  So from this sentence, we know that this
2  document predates the scheduling change; correct?
3    A.  Yes.  Thank you.
4    Q.  Let's go back to the first page.  Again,
5  that first sentence says, "Hydrocodone is the most
6  frequently prescribed opioid in the United States
7  and is associated with more drug abuse and
8  diversion than any other licit or illicit opioid."
9    Do you see that?
10    A.  I do.
11    Q.  HBC from '09 to 2014 distributed
12  hydrocodone combination products; correct?
13    A.  Yes.
14    Q.  And did HBC have an understanding that
15  hydrocodone was associated with more drug abuse
16  and diversion than any other opioid?
17    MR. BARNES:  Is the question what HBC
18  distributed, hydrocodone combination products, or
19  are you talking about hydrocodone as a Schedule
20  II?
21    MR. GADDY:  I think my question was
22  clear.
23    THE WITNESS:  Just to make sure I have
24  it right, hydrocodone-containing products, so
25  Schedule III; correct?

Page 48

1  BY MR. GADDY:
2    Q.  Yes.
3    A.  So generally, yes.
4    Q.  HBC had that understanding?
5    A.  Yes.
6    Q.  If you keep going down in that first
7  paragraph, it says, "Its analgesic potency is
8  similar to morphine."
9    Did HBC have that understanding?
10    A.  Where it says "looks like"?  I'm sorry.
11  Where are you at?
12    Q.  I skipped a sentence.  You can look up
13  on the screen, too.  He's got it highlighted for
14  you.
15    A.  Oh, thank you.
16    Q.  I told you that before we started.
17    A.  Thank you.  Yes, I see that.
18    Q.  And you actually have one here in front
19  of you, too.
20    A.  I'm sorry.  Thank you.
21    Q.  That even might be more helpful.
22    A.  That's much helpful.  Thank you.
23    Q.  And HBC always had that understanding
24  that the properties of hydrocodone is similar to
25  morphine; correct?

Page 49

1    A.  It's not exactly morphine, but it's
2  similar, yes.
3    Q.  I'm going to skip another sentence.
4  Then it says, "There are numerous brand and
5  generic hydrocodone products marketed in the
6  United States.  All are combination products.  The
7  most frequently prescribed combination product is
8  hydrocodone and acetaminophen," it says, "for
9  example, Vicodin, Lorcet and Lortab."
10    And those are some of the ones we talked
11  about earlier that HBC distributed; correct?
12    A.  Correct.
13    Q.  It says, "Other examples of combination
14  products include those containing aspirin,
15  ibuprofen and antihistamines."
16    Do you see that?
17    A.  Yes.
18    Q.  Again, those would have been the types
19  of Schedule III narcotics that HBC distributed to
20  Giant Eagle pharmacies; correct?
21    A.  Correct.
22    Q.  We talked a little bit about dates.  I'm
23  going to show you what I'm going to mark as
24  Exhibit No. 8.
25    (HBC-Tsipakis Exhibit 8 was marked.)

Page 50

1    MR. GADDY: This is going to be P-GEN-55
2 internally.
3 BY MR. GADDY:
4    Q.  And if you look at the very first page,
5 do you see this is a report from the U.S. General
6 Accounting Office?
7    A.  Yes.
8    Q.  And if you read just below there, it's a
9 report to the Subcommittee on Oversight and
10 Investigations Committee on Energy and Commerce,
11 House of Representatives. Do you see that?
12    A.  Yes.
13    Q.  You recognize this as being a report to
14 Congress?
15    A.  Yes.
16    Q.  And over on the left-hand side of the
17 page, do you see the date of May 2002?
18    A.  Yes.
19    Q.  So this was a full little over seven
20 years before HBC began distributing hydrocodone
21 products; correct?
22    A.  Yes.
23    Q.  And the title of the report is
24 Prescription Drugs, and it looks like it's going
25 to spend most of its time talking about monitoring

Page 51

1 programs.
2    Do you see that?
3    A.  Yes.
4    Q.  And if you turn to .3, do you see it
5 starts with the date of May 17, 2002?
6    A.  Yes.
7    Q.  And then it starts in the body of the
8 letter, it says, "The increasing diversion of
9 prescription drugs for illegal use is a disturbing
10 trend in the nation's battle against drug abuse.
11 Prescription drug diversion is the channeling of
12 illicit pharmaceuticals for illegal purposes or
13 abuse."
14    Do you see that?
15    A.  Yes.
16    Q.  Do you know if HBC was aware of this
17 document when it began distributing hydrocodone
18 combination products in 2009?
19    A.  I do not.
20    Q.  They certainly could have been aware of
21 it if they wanted to; correct?
22    A.  I suppose, yes.
23    Q.  It goes on to say --
24    MR. BARNES: Object. Don't speculate.
25 If you know, you know.

Page 52

1    THE WITNESS: I don't know. I don't
2 know whether they were aware of it.
3    MR. GADDY: Bob, if you want to make an
4 objection, make an objection. Please don't tell
5 the witness how to answer the question. I want
6 his answers.
7    MR. BARNES: If you continue asking him
8 questions outside the agreed scope and
9 timeframe -- this is a 2002 document. HBC didn't
10 begin distributing --
11    MR. GADDY: Bob, if you want to have a
12 conversation off the record during a break, we can
13 do that.
14    MR. BARNES: Can you explain why you're
15 asking about a 2002 document?
16 BY MR. GADDY:
17    Q.  Mr. Tsipakis, it goes on to say, "It can
18 involve activities such as doctor shopping by
19 individuals who visit numerous physicians to
20 obtain multiple prescriptions, illegal sales of
21 prescription drugs by physicians or pharmacists
22 and prescription forgery."
23    Do you see that?
24    A.  Yes.
25    Q.  Are those the types of -- is HBC aware

Page 53

1 that those are the types of issues that can lead
2 to diversion?
3    A.  Sure, yes.
4    Q.  It goes on to say, "The most frequently
5 diverted prescription drugs are those that are
6 prone to abuse, addiction and dependence, such as
7 hydrocodone, the active ingredient in Lortab and
8 many other drugs."
9    Do you see that?
10    A.  Yes.
11    Q.  It then goes on to mention several
12 others, but the first one it mentioned was
13 hydrocodone. And then it specifically referenced
14 a hydrocodone combination product; correct?
15    A.  Correct.
16    Q.  So was HBC aware going all the way back
17 to 2002, that hydrocodone products such as Lortab,
18 Vicodin that you mentioned earlier were some of
19 the most frequently diverted prescription drugs?
20    MR. BARNES: Object to form.
21    THE WITNESS: I think it was public
22 knowledge that those drugs were part of a drug
23 abuse problem and certainly being diverted.
24 BY MR. GADDY:
25    Q.  And that was public knowledge and

Page 54

1 knowledge to HBC prior to when they got into the
2 business of distributing these drugs in 2009;
3 correct?
4     MR. BARNES:  Object to form.
5     THE WITNESS:  I can't -- I can't
6 speculate on what HBC knew or didn't know, but...
7 BY MR. GADDY:
8     Q.  Well, you agree it was public knowledge
9 though?
10     A.  Yes.
11     Q.  Now, as a registrant under the
12 Controlled Substance Act, HBC is aware that there
13 are certain federal regulations that they must
14 comply with; true?
15     A.  Yes.
16     Q.  And those regulations apply whether or
17 not you're a distributor of Schedule II drugs or
18 whether or not you're only a distributor of
19 Schedules III, IV and V drugs; correct?
20     A.  Correct.
21     Q.  I'm going to show you what I'll mark as
22 Exhibit No. 9.
23     (HBC-Tsipakis Exhibit 9 was marked.)
24 BY MR. GADDY:
25     Q.  This is -- you recognize this as being a

Page 55

1 document from the DEA website?  I think you see
2 the seal up in the top left corner.
3     A.  Yes.
4     Q.  And do you recognize that what we're
5 looking at here comes from Title 21 of the Code of
6 Federal Regulations and is Regulation 1301.74?
7     Do you see that?
8     A.  Yes.
9     Q.  Is this a regulation that HBC is
10 familiar with?
11     A.  Yes.
12     Q.  Is this a regulation that HBC
13 understands that it must comply with as a
14 distributor of controlled substances?
15     A.  Yes; one of many, but, yes, this
16 particular one, yes.
17     Q.  And if you start in subsection (a), this
18 regulation says, "Before distributing a controlled
19 substance to any person who the registrant does
20 not know to be registered to possess the
21 controlled substance, the registrant shall make a
22 good faith inquiry..."
23     Do you see where I am there?
24     A.  Yes.
25     Q.  This really wasn't incredibly applicable

Page 56

1 to HBC because they were only distributing to
2 Giant Eagle pharmacies; correct?
3     A.  Correct.
4     Q.  And obviously, HBC knew that all the
5 Giant Eagle pharmacies were registered; correct?
6     A.  Yes.
7     Q.  If we go on to the next paragraph, it
8 says, "The registrant shall design and operate a
9 system to disclose to the registrant suspicious
10 orders of controlled substances."
11     Do you see that?
12     A.  Yes.
13     Q.  "The registrant shall inform the field
14 division office of the Administration in his area
15 of suspicious orders when discovered by the
16 registrant.  Suspicious orders include orders of
17 unusual size, orders deviating substantially from
18 a normal pattern, and orders of unusual
19 frequency."
20     Do you see that?
21     A.  Yes.
22     Q.  And did HBC have an understanding that
23 prior to distributing any Schedule III narcotics
24 or Schedule IV narcotics or Schedule V narcotics,
25 that they had an obligation to design and operate

Page 57

1 such a system that would disclose suspicious
2 orders?
3     A.  Yes.
4     Q.  And you agree that if HBC were to not
5 design and operate such a system, they would be in
6 violation of this regulation?
7     MR. BARNES:  Object to form.
8     THE WITNESS:  This is part of the
9 security requirements, but certainly this is one
10 component of the total -- the controlled substance
11 security provision to be deemed compliant.  So
12 this is part of the overall security measures that
13 you need to have, but yes.
14 BY MR. GADDY:
15     Q.  So if they did design and operate a
16 system to detect suspicious orders, they would be
17 violating this regulation?
18     MR. BARNES:  Object to the form.
19     THE WITNESS:  They needed to have a
20 system to disclose suspicious orders, yes, but it
21 needs to be in concert with the other requirements
22 as well.
23 BY MR. GADDY:
24     Q.  But if they didn't have a system to
25 detect suspicious orders, they would be in

Page 58

1 violation; correct?
2      MR. BARNES:  Object to form.
3      THE WITNESS:  They need to have a system
4 to disclose suspicious orders, yes.
5 BY MR. GADDY:
6    Q.  And if they don't, they'd be in
7 violation; correct?
8      MR. BARNES:  Object to form.
9      THE WITNESS:  Potentially be in
10 violation, yes.
11 BY MR. GADDY:
12    Q.  How could they not have a system -- what
13 do you mean by "potentially"?  How could they not
14 have a system and not be in violation?
15    A.  My understanding is you've given me one
16 subsection of the security provision, and I
17 believe the security provision has the registrant
18 has different obligations within it.
19    This particular piece that you're showing me
20 is one of them, but it's one factor of the total.
21 Your system needs to have a provision to disclose
22 suspicious orders to the registrant, yes.
23    Q.  And if you don't have a system that
24 discloses suspicious orders to the registrant, you
25 would be violation of this regulation; correct?

Page 59

1      MR. BARNES:  Object to form.
2      THE WITNESS:  Potentially, yes.
3 BY MR. GADDY:
4    Q.  The word "potentially" is what I'm not
5 understanding.  How could you not have a system
6 that discloses suspicious orders but still be in
7 compliance with this?
8      MR. BARNES:  Same objection.  You're
9 asking him to interpret a regulation.
10      MR. GADDY:  You made your objection.
11      THE WITNESS:  You're asking me to broad
12 brush a statement that is a section of code.  This
13 code has multiple provisions within it, and the
14 suspicious order portion is one piece of it.
15    I'm sorry if I'm not understanding your
16 question.
17 BY MR. GADDY:
18    Q.  We certainly agree that HBC had an
19 obligation to design a system, operate a system
20 that would disclose to the registrant, HBC,
21 suspicious orders of controlled substances;
22 correct?
23    A.  Yes.
24    Q.  That obligation was in place whether
25 we're talking about Schedule II controlled

Page 60

1 substances or whether we're talking about Schedule
2 III controlled substances; correct?
3    A.  Correct.
4    Q.  And HBC was aware of that back in 2009?
5    A.  Yes.
6    Q.  And was HBC aware back in 2009 that DEA
7 was actively enforcing this regulation?
8    A.  HBC was generally aware that the DEA was
9 enforcing all of it.  I don't know its specific
10 enforcement activities, but I would imagine they
11 were enforcing all their provisions.
12    Q.  I'll show you what I'm going to mark as
13 Exhibit No. 10.
14      MR. GADDY:  It's PGent 75 internally.
15      (HBC-Tsipakis Exhibit 10 was marked.)
16 BY MR. GADDY:
17    Q.  This is a document, if you see in the
18 upper left-hand page, from the United States
19 Attorney's Office out of Colorado.  Do you see
20 that?
21    A.  Yes.
22    Q.  And it looks like a press release that
23 was posted on their website or something to that
24 effect.  Do you see that?
25    A.  Yes.

Page 61

1    Q.  You see under the black box there, it's
2 got the date of October 2, 2008.  Do you see that?
3    A.  Yes.
4    Q.  And this was prior to HBC distributing
5 any hydrocodone combination products; correct?
6    A.  Yes.
7    Q.  The heading there says "Cardinal Health
8 Incorporated agrees to pay $34 million to settle
9 claims that it failed to report suspicious sales
10 of widely abused controlled substances."
11    Do you see that?
12    A.  Yes.
13    Q.  Was HBC aware of this settlement prior
14 to it beginning to distribute controlled
15 substances?
16    A.  I don't know.
17    Q.  It says in the first paragraph,
18 "Cardinal Health, Inc., one of the nation's
19 largest distributor of pharmaceutical drugs, has
20 agreed to settle allegations that it violated
21 federal reporting provisions relating to its
22 handling of certain controlled substances
23 regulated by the DEA.  Under the agreement between
24 the company and seven U.S. Attorney offices,
25 Cardinal Health agreed to pay 34 million in civil

Page 62

1 penalties for alleged violations of its
2 obligations under the Controlled Substance Act."
3    Do you see that?
4    A.  Yes.
5    Q.  In the next paragraph it goes to say,
6 "Cardinal Health, which operates 27 DEA registered
7 distribution facilities, failed to report to DEA
8 suspicious orders of hydrocodone that it then
9 distributed to pharmacies that filled illegitimate
10 prescriptions originating from rogue internet
11 pharmacy websites."
12    Do you see that?
13    A.  Yes.
14    Q.  Was HBC aware that in 2008, the DEA was
15 investigating and pursuing violation of the
16 regulation we just went over as it related to
17 distributors failing to report suspicious orders
18 of hydrocodone?
19    MR. BARNES:  Object to form.  Jeff, I'm
20 also going to ask you:  What topic are you on?
21 You're asking him about a Cardinal Health
22 settlement agreement.  He's not been produced to
23 talk about anything related to Cardinal.
24 BY MR. GADDY:
25    Q.  You can answer the question.

Page 63

1    MR. BARNES:  Objection.  Outside the
2 scope of the 30(b)(6) topics.
3    THE WITNESS:  I'm not sure if HBC was
4 aware of the settlement or not.
5 BY MR. GADDY:
6    Q.  If you skip down to the bottom of the
7 page, in the second to last paragraph, it says,
8 "Hydrocodone is the generic name..."
9    Do you see that?
10    A.  I'm sorry.  Where are you at?
11    Q.  At the very bottom of the page.
12    A.  Yes.  I see it.  Thank you.
13    Q.  It says, "Hydrocodone is the generic
14 name of a prescription painkiller that is
15 classified under federal narcotics law as a
16 Schedule III controlled substance."
17    Do you see that?
18    A.  Yes.
19    Q.  Then in the next paragraph, it says,
20 "Hydrocodone is the most commonly diverted and
21 abused controlled pharmaceutical in the United
22 States."
23    Do you see that?
24    A.  Yes.
25    Q.  When HBC set about to design and operate

Page 64

1 a system to disclose suspicious orders for their
2 hydrocodone products, which would have been
3 scheduled as III under the Controlled Substance
4 Act, did HBC take into account the fact that
5 hydrocodone was the most commonly diverted and
6 abused pharmaceutical in the United States?
7    MR. BARNES:  Object to form.
8    THE WITNESS:  HBC -- HBC when setting up
9 to distribute controlled substances did their due
10 diligence and set up their system to follow the
11 law.
12 BY MR. GADDY:
13    Q.  Did they take into account that they
14 were going to be distributing a drug which is the
15 most commonly diverted and abused controlled
16 pharmaceutical in the United States?
17    Did they take that into account when they set
18 up their system to disclose suspicious orders?
19    MR. BARNES:  Object to form.
20    THE WITNESS:  I don't know.
21 BY MR. GADDY:
22    Q.  I'm going to show you what I'll mark as
23 Exhibit No. 11.
24    (HBC-Tsipakis Exhibit 11 was marked.)
25

Page 65

1 BY MR. GADDY:
2    Q.  I'll represent to you this is a Reuters
3 article from April 2007.  Do you see the date
4 there above the title?
5    A.  Yes.
6    Q.  The title is "AmerisouceBergen gets DEA
7 distribution halt order."  Do you see that?
8    A.  Yes.
9    Q.  It goes on to say in the first paragraph
10 there that, "The U.S. Drug Enforcement
11 Administration has temporarily suspended its
12 Orlando, Florida distribution center's license to
13 distribute DEA controlled substances and listed
14 chemicals," talking about AmerisouceBergen.
15    Do you see that?
16    A.  Yes.
17    Q.  It goes on to say, "The DEA asserts that
18 AmerisouceBergen did not maintain effective
19 controls against diversion of controlled
20 substances, specifically hydrocodone."
21    Do you see that?
22    A.  Yes.
23    Q.  Did HBC take into account this
24 information that we've now seen with Cardinal
25 Health and now with AmerisouceBergen that the DEA

Page 66

1 was investigating and sanctioning distributors for
2 not having systems that disclosed orders of
3 controlled substances?
4     Did HBC take that into account when designing
5 and operating their system that they put in place
6 prior to 2009?
7         MR. BARNES: Object to form. Outside
8 the scope of the 30(b)(6) topics.
9         THE WITNESS: I can't tell you --
10        MR. KOBRIN: I'll object to form, not
11 related to the scope of topics.
12 BY MR. GADDY:
13    Q. Go ahead.
14    A. I can't tell you if HBC had this in mind
15 or not.
16        MR. BARNES: Jeff, this says page 1 of
17 10. Are the other nine pages, are they deleted?
18        MR. GADDY: This is the end of the
19 article. The other nine pages were other
20 articles.
21 BY MR. GADDY:
22    Q. I want to go back to those combined
23 discovery responses. I think that was No. 4. Did
24 you find it?
25    A. Yes.

Page 67

1    Q. And if you would, turn for me again
2 please back to page 2. We already looked at that
3 question earlier this morning.
4        MR. GADDY: This is HBC 11 internally.
5 BY MR. GADDY:
6    Q. And you recall we looked at this
7 earlier. We're on .8. Did I say 2? I meant .8.
8 That's where question 2 is.
9    A. Okay.
10    Q. It says, "Please produce each of your
11 suspicious order monitoring system policies and
12 procedures since January 1, 2006 and identify the
13 Bates stamp range for each and please identify the
14 effective dates that each was in force and
15 effect."
16    Do you see that?
17    A. Yes.
18    Q. And if you turn to the next page, .9.
19    A. Yes.
20    Q. I'm going to start with the first full
21 paragraph on the page. Are you with me?
22    A. Starts "Subject to"?
23    Q. Correct. We got it up on the board
24 there.
25    A. Oh, yeah. Thank you.

Page 68

1    Q. It goes on to say towards the end of
2 that first line, it says, "HBC responds that
3 though it distributes Schedule III opioids that
4 were reclassified as Schedule II in 2014, it only
5 distributed such opioids during the period that
6 they were classified as Schedule III opioids."
7    Do you see that?
8    A. Yes.
9    Q. As far as having a system -- as far as
10 the requirement that HBC have a system to disclose
11 suspicious orders, that's irrelevant, correct,
12 whether they were II or III at the time they were
13 distributed?
14    A. Correct.
15    Q. It then goes on to say, "And it has not
16 sold or distributed products to any pharmacies
17 other than Giant Eagle pharmacies."
18    Do you see that?
19    A. Yes.
20    Q. And, again, as far as the requirement
21 that HBC design and operate a system that
22 discloses suspicious orders, that's also
23 irrelevant; correct?
24    A. Yes.
25    Q. It then goes on, and there are five hash

Page 69

1 marks down below where certain -- it looks like it
2 gives a Bates range, and then it describes a date
3 range for a policy that it's directing us to.
4    Do you see that?
5    A. Yes.
6    Q. Did you have anything to do with pulling
7 these policies and procedures that are identified
8 here?
9    A. Physically gathering them, is that your
10 question?
11    Q. Yeah.
12    A. I didn't specifically gather them, no.
13    Q. Did you point anybody in the direction
14 of where to find these?
15    A. Certainly we got the right subject
16 matter experts to point them in the direction,
17 yes.
18    Q. And if you look through here, this
19 identifies policies and procedures first beginning
20 in -- in the first hash mark, there's one that
21 says they're updating an 8/1/14 policy.
22    Do you see that in the first hash mark?
23    A. Yes. I see that.
24    Q. And as you go through the list or the
25 first one has another policy that's in place from

Page 70

1  '15 to '16. The second hash mark talks about a
2  policy that went into place in February of 2016.
3  The third hash mark talks about a policy around
4  the time period of February 2017. The fourth hash
5  mark again is around February 2017, and the fifth
6  hash mark is the same time period, February 2017.
7      Do you see that?
8      A. Yes.
9      Q. And that's it. There's nothing on the
10  next page; right?
11      A. Correct.
12      Q. From 2006 until August 1st of 2014, did
13  HBC have any written suspicious order monitoring
14  policy or procedure?
15          MR. BARNES: Object to form.
16          THE WITNESS: HBC had various written
17  and unwritten policies in that process, in that
18  timeframe.
19  BY MR. GADDY:
20      Q. Where are those?
21      A. Specifically, I believe the written ones
22  would have been produced. Is that what you're
23  asking me? I'm sorry.
24      Q. Let me make sure I'm being clear. You
25  agree with me that what's identified here are

Page 71

1  policies beginning -- the earliest policy
2  identified here is 8/1/14. Do you see that?
3      A. It's pointing to a policy revision on
4  8/1/14.
5      Q. So what it says there is that there was
6  a policy from April '15 to February '16; right?
7      A. Yes.
8      Q. And in parentheses it says that that's
9  Version 2, and it's updating what presumably was
10  Version 1 on 8/1/14. Do you see that?
11      A. I see what's written there, yes.
12      Q. So this is identifying -- the earliest
13  policy identified here is August 1, 2014. Do you
14  see that?
15      A. Version 2 updating on 8/1/14, yes.
16      Q. So my question to you, and if I said
17  this wrong the last time, I'm sorry, but I'm
18  asking whether or not HBC had any written
19  suspicious order monitoring program, policy or
20  procedure from 2006 until July 31, 2014.
21          MR. BARNES: Object to form.
22          THE WITNESS: Written policies? You're
23  asking specific written policies?
24  BY MR. GADDY:
25      Q. Correct.

Page 72

1      A. I don't know.
2      Q. In the 40 to 50 hours that you spent
3  preparing to testify today on one of the topics
4  being your past and present suspicious order
5  monitoring systems program policy and procedures,
6  you don't know whether or not HBC ever had a
7  written suspicious order monitoring policy or
8  procedure prior to July 31, 2014?
9      A. I can't with certainty tell you they did
10  or they didn't. That's what I'm telling you.
11      Q. That's fair. We talked earlier about
12  you had a duty to prepare for the deposition
13  today; correct?
14      A. Yes.
15      Q. You took that duty seriously?
16      A. Absolutely.
17      Q. You made a good faith effort to be able
18  to come in here and be prepared to testify and be
19  prepared to answer all the questions that you were
20  supposed to be prepared to answer; correct?
21      A. Of course.
22      Q. And you spent 40 to 50 hours getting
23  ready for this?
24      A. Yes.
25      Q. You talked to different subject matter

Page 73

1  experts within Giant Eagle or HBC about the topics
2  that you needed to testify on today?
3      A. Yes.
4      Q. And as a result of that preparation, you
5  don't know whether or not HBC ever had a written
6  suspicious order monitoring policy or procedure in
7  place from 2006 through July 31, 2014; is that
8  correct?
9          MR. BARNES: Object to form. Asked and
10  answered about three times.
11      Go ahead.
12          THE WITNESS: I couldn't find whether
13  there was or there wasn't written policies. For
14  that timeframe that you're asking me, I'll answer
15  it again, I don't know.
16  BY MR. GADDY:
17      Q. When did HBC begin distributing Schedule
18  III controlled substances?
19      A. HBC began distributing Schedule III in
20  late 2009.
21      Q. And when did HBC stop distributing
22  Schedule III controlled substances? Let me back
23  up and reask that.
24      When did HBC stop distributing hydrocodone
25  combination products that were rescheduled to

Page 74

1 Schedule II?
2    A.  The effective date of when hydrocodone
3 was rescheduled from class III to class II, which
4 I believe was around October of 2014.
5    Q.  So HBC distributed hydrocodone
6 combination products from November 2009 through
7 approximately October 2014; correct?
8    A.  Correct.
9    Q.  And the first written suspicious order
10 monitoring policy or procedure that HBC is aware
11 of went into effect August 1, 2014; correct?
12    A.  I'll answer again that those are the
13 policies we were able -- I was able to find.  I
14 don't know if there was or there wasn't, but...
15    Q.  As far as you know, as far as HBC knows,
16 the first suspicious order monitoring policy or
17 procedure that they had was August 1, 2014?
18    A.  Again, the first one that I'm able to
19 produce written was August 2014.
20    Q.  But it's more than that.  It's the first
21 one you know about that's written; correct?
22    A.  It's the first written policy.  It
23 doesn't mean there wasn't others.  I don't know.
24    Q.  It's the first written policy that you
25 know about?

Page 75

1    A.  Yes.
2       MR. GADDY:  This might be a good time to
3 take a break.
4       THE VIDEOGRAPHER:  10:32.  We are off
5 the video record.
6       (Recess from 10:32 a.m. to 10:48 a.m.)
7       THE VIDEOGRAPHER:  10:48.  We're on the
8 video record.
9       (HBC-Tsipakis Exhibit 12 was marked.)
10 BY MR. GADDY:
11    Q.  Mr. Tsipakis, I'm going to hand you what
12 I've marked as Exhibit No. 12.  I'll represent to
13 you -- if you want to pull back out No. 4, which
14 was the combined discovery responses, I'll
15 represent to you what I've done is compiled all
16 the documents that were listed in those five hash
17 marks.
18    A.  I'm sorry.  I'm pulling back Exhibit 4?
19    Q.  Sure.  If you want to check me, what
20 I've done is I've compiled -- do you remember in
21 the response to No. 2 there were the five dashes
22 that listed different ranges of documents that
23 were written about those policies?
24    A.  Yes.
25    Q.  What I've done here is compiled those

Page 76

1 into just one exhibit so we can look at them all
2 at the same time in No. 12.  Do you see that?
3    A.  Yes.
4    Q.  And as you flip through, you'll see that
5 I just put a blue piece of paper between the
6 different documents so we can kind of tell when
7 one ends and one begins.  Do you see that?
8    A.  Yes.
9    Q.  So the first document we see here is
10 entitled Inventory Control Suspicious Order
11 Policy.  Do you see that?
12    A.  Yes.
13    Q.  And it actually has a Giant Eagle header
14 on it, not an HBC; do you see that?
15    A.  Yes.
16    Q.  Can you explain why it would have a
17 Giant Eagle header on it as opposed to HBC at this
18 time?
19    A.  I cannot.
20    Q.  Would it be uncommon for HBC to rely on
21 documents generated by or policies generated by
22 Giant Eagle?
23    A.  It's the same corporation, if that's
24 what you're...
25    Q.  So it's not unusual or surprising to you

Page 77

1 this has got Giant Eagle letterhead and it's
2 related to distribution?
3    A.  Oh, no.
4    Q.  Again, we see on the left side that the
5 effective date, so I guess the first time the
6 policy went into place, was August 1, 2014.  Do
7 you see that?
8    A.  Yes.
9    Q.  If we go to the right-hand column, we
10 see this is Version 2?
11    A.  Yes.
12    Q.  Do you see that?  And the revision date
13 that relates to this document is April 9, 2015.
14 Do you see that?
15    A.  Yes.
16    Q.  And the purpose of this policy was to
17 identify, investigate, record and report
18 suspicious pharmaceutical product orders; correct?
19    A.  Yes.
20    Q.  And other than the first version of this
21 policy that would have come out August 1, 2014,
22 you're not aware of any earlier written policy
23 other than the one that we're looking at here?
24    A.  I could not find any earlier policy,
25 written policy.

Page 78

1    Q.   And the policy it identifies here, it
2  says, "Identify individuals from Giant Eagle
3  sourcing, pharmacy compliance and HBC team members
4  must review pharmacy customer orders and order
5  trends on a regular and for-cause basis to
6  identify suspicious drug orders."
7    Do you see that?
8    A.   Yes.
9    Q.   It goes on to say, "Suspicious orders
10  are blocked and reported to the appropriate
11  regulatory authority within the specified time
12  range."
13    Do you see that?
14    A.   Yes.
15    Q.   Then in the procedures below, under the
16  second bullet point, it lists the criteria that
17  are used to determine whether or not an order is
18  suspicious.
19    Do you see that?
20    A.   Yes.
21    Q.   The first thing that it lists is
22  purchases over a threshold?
23    A.   Yes.
24    Q.   And then it talks about orders of
25  unusual quantities or size compared to a

Page 79

1  customer's order history.  Do you see that?
2    A.   Yes.
3    Q.   Next one is unique patterns of orders
4  that differ from similar customers?
5    A.   Yes.
6    Q.   And the next is orders outside of the
7  normal pharmacy customer ordering process;
8  correct?
9    A.   Yes.
10    Q.   Again, this is a policy that this
11  revision date is April 9, 2015; correct?
12    A.   That's what it says, yes.
13    Q.   I'm going to flip to the next one, which
14  is .4.
15    A.   The next?
16    Q.   It should be .4 at the top, top
17  right-hand corner.
18    A.   Yeah, I see it.
19    MR. GADDY:  Still on 812 internally.
20  BY MR. GADDY:
21    Q.   Do you see here of the top it looks like
22  the same doc and policy, Giant Eagle inventory
23  control suspicious order policy.  Do you see that?
24    A.   Yes.
25    Q.   If we look at the effective date, it's

Page 80

1  the same policy as before, same effective date of
2  8/1/14.  Do you see that?
3    A.   Yes.
4    Q.   And if you look over there, this is now
5  the third version of the policy.  This is updating
6  what we just looked at; right?
7    A.   Yes.
8    Q.   And the date of this update is
9  February 26, 2016.  Do you see that?
10    A.   Yes.
11    Q.   As far as I could tell, the only
12  substantive update here is under scope where it
13  talks about who the policy applies to, and this is
14  the first time we see the acronym GERXDC.
15    Do you see that?
16    A.   Yes.
17    Q.   What does that mean?
18    A.   It's the Giant Eagle RX DC.
19    Q.   DC for distribution center?
20    A.   Yes.
21    Q.   So is this entity a Giant Eagle entity?
22    A.   It's owned by Giant Eagle, yes.
23    Q.   And is this entity licensed to
24  distribute Schedule II, III, IV and V narcotics?
25    A.   Yes.

Page 81

1    Q.   And does it, in fact, distribute
2  Schedules II, III, IV and V narcotics to Giant
3  Eagle pharmacies?
4    A.   Yes.
5    Q.   And is this timeframe, February of 2016,
6  approximately when that facility went online?
7    A.   Yes.
8    Q.   Would this also be the time period that
9  HBC stopped distributing prescription medication
10  to Giant Eagle pharmacies?
11    A.   Yes.
12    Q.   And that's why if we look at who this
13  applies to, we don't see anybody from HBC anymore?
14    A.   Yes.
15    Q.   Go to -- I'm on .7 of the same document.
16  And this looks like a slightly different policy.
17  Again, this is a Giant Eagle document.  Do you see
18  that?
19    A.   Yes.
20    Q.   And the title listed is Order Monitoring
21  System Policy.  Do you see that?
22    A.   Yes.
23    Q.   And the effective date is February 2,
24  2017; is that correct?
25    A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1    Q.  And if you look up in the top right-hand
2  column, this is the first version of this policy
3  that's existed; correct?
4    A.  Yes.
5    Q.  And you're not aware of any order
6  monitoring system policy and any written order
7  monitoring system policy that Giant Eagle or HBC
8  ever had prior to February 2, 2017, are you?
9    A.  I could not find any other written
10  policy, no.
11      MR. BARNES:  Jeff, do you mean other
12  than this one otherwise attached that we've
13  already gone over?
14      MR. GADDY:  Sure.  Well, my question was
15  order monitoring system policy.  I think the other
16  one was suspicious order policy.  Two different
17  iterations.
18      MR. BARNES:   well, you'll get into the
19  substance.
20  BY MR. GADDY:
21    Q.  If you look under Scope, it says, "This
22  procedure applies to the Giant Eagle order
23  monitoring system team."
24    Do you see that?
25    A.  Yes.

Page 83

1    Q.  Are you familiar with that team?
2    A.  Yes.
3    Q.  And this team that was established in
4  this 2017 policy, describe for us what that team
5  is.
6    A.  I'm going to take a minute to read the
7  scope if that's okay.
8    Q.  Sure.
9    A.  Okay.  It's a cross-functional team that
10  involves all the different constituents listed
11  there that help monitor our drug orders.
12    Q.  Do you have any involvement on that
13  team?
14    A.  Yes.
15    Q.  Which of these roles do you serve in?
16    A.  Can you describe what you mean by
17  "serve"?  So all these areas report ultimately up
18  to me.
19    Q.  So you have direct reports that are
20  directly involved in this?
21    A.  Yes, sir.
22    Q.  So as we get down into the procedure of
23  this policy, does this get into some of the
24  details on some of the different datapoints that
25  are used in this February 2, 2017 policy to

Page 84

1  identify whether or not orders of controlled
2  substances are suspicious?
3    A.  Yes.
4    Q.  And if you see under the third bullet
5  point, it says that the OMS -- and OMS stands for
6  order monitoring system?
7    A.  Um-hum.  Yes.
8    Q.  It says, "OMS uses algorithms to
9  identify controlled substance orders that require
10  investigation and documentation before releasing
11  the order for distribution."
12    Do you see that?
13    A.  Yes.
14    Q.  Then it goes down, and it gives some
15  indicators that are taken into account, such as
16  the pharmacy location, the chemical involved, the
17  generic product indicator, NDC, and order of
18  patterns.  Do you see that?
19    A.  Yes.
20    Q.  And then in the next bullet point, it
21  talks about the different levels of review that
22  this February 2, 2017 policy put into place.
23    Do you see that?
24    A.  Yes.
25    Q.  It talks about reviewing the order,

Page 85

1  potentially blocking the order, logging the order
2  into an investigation log.  Do you see all that?
3    A.  Yes.
4    Q.  If you go down to -- there's a series
5  of -- I guess about a quarter of the way down the
6  page, it talks about the approver level review
7  process includes notification the store exceeded
8  its threshold.  Do you see where I am?
9    A.  Yes.
10    Q.  And then it goes on to say what the
11  approver would review.  And it lists below there
12  different factors that an approver would look at.
13    Do you see that?
14    A.  Yes.
15    Q.  And it talks about the -- I'm on .8.
16  I'm sorry.  I'm in the middle of the page there
17  with the series of about seven bullet points.  You
18  see it indicates the geographical prescription
19  provider mapping, geographical patient mapping,
20  pharmacy district leader consultation.
21    Do you see that list of factors there?
22    A.  Yes.
23    Q.  And those are all factors that were put
24  in place in this February 2, 2017 order monitoring
25  policy; correct?

Page 86

1    A.  Pursuant to this policy.  But these are
2  things we've been doing all along.  This was the
3  creation of a threshold -- an addition of a
4  threshold screen onto our process.
5    Q.  So explain to me the geographical
6  prescription provider mapping.  What does that
7  mean?
8    A.  So how I understand it is basically
9  looking at where the prescription -- so the
10  prescriber, where is the prescriber located and
11  then where our pharmacy is located.
12    Q.  And the patient mapping, same concept,
13  where is the patient versus where is the pharmacy?
14    A.  Yes, sir, and the physician, provider.
15    Q.  The next bullet point, pharmacy district
16  leader consultation, explain what that means.
17    A.  So the pharmacy district leader is our
18  district manager and any conversations or
19  investigative information they would have had
20  consulting with the store.
21    Q.  The next one talks about store threshold
22  increase request form.  Do you see that?
23    A.  Yes.
24    Q.  Tell me what that means.
25    A.  So there's instances where there's

Page 87

1  legitimate needs to increase the threshold, and
2  there would be a request made.  This is the
3  attempt to put everything in writing.  And
4  certainly if a request was needed, it would be
5  sent in, and it would be looked at.
6    Q.  Is that talking about an increase to the
7  threshold from a Giant Eagle distribution facility
8  or an outside distributor such as McKesson or
9  Anda?
10    A.  It entails both.  Specifically this
11  one -- both follow a similar process, but this one
12  here is predominantly our internal.
13    Q.  The next factor listed is payment type
14  analysis, cash versus managed care.  What does
15  that mean?
16    A.  So whether the prescription is paid for
17  by an insurance or a patient pay, direct patient
18  pay.
19    Q.  And that's something -- that's some
20  analysis that went into place with this
21  February 2, 2017 policy?
22    A.  This is encapsulating, yes.  These were
23  always factors that -- the lens that they were
24  looking at for many years, but this is
25  establishing in written form documenting those,

Page 88

1  yes.
2    Q.  When you say these were factors that
3  were instituted for many years, you're not saying
4  that there was ever a policy, a written policy in
5  place to look at whether or not the percentages of
6  controlled substances paid for in cash versus with
7  coverage; correct?
8    A.  What I'm saying is the things that are
9  listed here are not absolute that they only
10  started happening on the date that's listed on
11  this policy.  Our pharmacists as well as our
12  corporate folks had information whether
13  prescriptions were paid for cash or third party.
14  That's what I'm saying.
15    Q.  Are you making a representation, are you
16  testifying that information as far as whether it
17  was cash or third-party payer, that that was
18  information that HBC was always using in their
19  suspicious order monitoring program?
20    A.  No.  I'm pointing out that what's listed
21  here, it's not an absolute that these things only
22  started happening on the date listed on this
23  policy.
24    Q.  You said that the pharmacies have always
25  had access to that type of information as far as

Page 89

1  cash versus third-party payer.
2    A.  Of course, yes.
3    Q.  That's something the pharmacies had
4  access to going back to before 2009 when HBC first
5  started distributing Schedule III substances;
6  correct?
7    A.  I think it's obvious that a pharmacist
8  would know a customer whether they pay cash or if
9  it's run through insurance, sure.
10    Q.  And that's the type of information that
11  HBC could get from the Giant Eagle pharmacies;
12  correct?
13    A.  If necessary, yes.
14    Q.  And the pharmacy would also have
15  information about the provider that wrote any
16  prescriptions; correct?
17    A.  Pharmacists would have information from
18  the provider, yeah.
19    Q.  They would have information about the
20  address and the residence of the patient?
21    A.  The patient would tell us their address,
22  sure.
23    Q.  The pharmacy would have information
24  about the percentages of controlled substances
25  that they dispense versus the percentages of

Page 90

1 noncontrolled substances they dispense?
2     A.  Could they get that?  Yes, yes.
3     Q.  And that's all information that Giant
4 Eagle pharmacies have always had available to them
5 and that HBC could have always had available to it
6 going back to the time that they first began
7 distributing controlled substances?
8     A.  Yes.  Certainly in our system, the
9 pharmacists play a key role in their professional
10 judgment filling legitimate prescriptions, yes.
11 Those are all factors.
12     Q.  The very last bullet point on this page
13 says, "The OMS review committee consists of the
14 following team members."
15     Do you see that?
16     A.  Yes.
17     Q.  And then it lists some of the same
18 divisions that we talked about earlier and you
19 have some direct reports that are within those?
20     A.  Yes.
21     Q.  The last one listed is legal counsel.
22 Do you see that?
23     A.  Yes.
24     Q.  Is there any particular person, any
25 particular legal counsel who is involved in the

Page 91

1 suspicious order monitoring program?
2     A.  Sure.  Our internal counsel and then
3 where needed, external counsel.
4     Q.  What's the -- first of all, how many
5 internal counsel?
6     A.  Two to three internal lawyers.
7     Q.  And can you tell me their names?
8     A.  Robbi Robinson and Loreen Wiechelt.
9     Q.  And are those legal counsel often
10 involved in compliance issues as it relates to the
11 suspicious order monitoring program?
12     A.  They're involved in all areas of
13 compliance, yes.
14     Q.  And do they answer questions from you or
15 from your direct reports involved in this process
16 as it relates to HBC or Giant Eagle's obligations
17 with the Controlled Substance Act?
18         MR. BARNES:  I'm going to object to the
19 extent it's calling for privileged information.
20     You can answer.
21 BY MR. GADDY:
22     Q.  I'm just asking for "yes" or "no."  I'm
23 not asking about the substance of any
24 conversations right now.  I'm asking whether or
25 not those legal counsel ever ask questions about

Page 92

1 compliance obligations under the Controlled
2 Substance Act for HBC or Giant Eagle.
3         MR. BARNES:  Same objection.
4         THE WITNESS:  Legal counsel is counsel
5 in multiple areas of the business.  Certainly this
6 is one of them, sure.
7 BY MR. GADDY:
8     Q.  Compliance with the Controlled Substance
9 Act and compliance with the regulation we looked
10 at earlier regarding having a suspicious order
11 monitoring program would be some of the areas that
12 are discussed with the two legal counsel that you
13 just mentioned?
14     A.  Sure, in addition to the normal pharmacy
15 practice and everything else, sure.
16     Q.  If you turn to the -- go to .11.
17     A.  Yes.
18     Q.  This document didn't have a date on it,
19 but the written responses we looked at there in
20 No. 4 represented that this was a February 2017ish
21 document.  Is that consistent with your
22 understanding?
23     A.  Forms of this document was floating in
24 the organization well before that.  So this might
25 have been -- I can't tell you -- without a date I

Page 93

1 can't tell you if this was updated or when it was
2 updated or not.  But this type of information was
3 issued well before '17.
4     Q.  You've already told me you don't know
5 whether or not there was any written suspicious
6 order monitoring policy prior to August 1st of
7 2014; correct?
8     A.  That I could find, yes.
9     Q.  If you turn to -- it's going to be .15.
10 This is the flowchart that frankly is not very
11 legible.  But you see at the top of the page that
12 this is a status of the monitoring procedure as of
13 October 17, 2016?
14     A.  Yes.  This is a flow diagram from IT
15 enhancements within the system, but it outlines
16 how the process works.
17     Q.  But the date on the document is
18 October 2016; correct?
19     A.  10/17/16, yes.
20     Q.  HBC at that point hadn't distributed
21 hydrocodone combination products for two years;
22 correct?
23     A.  Yes, correct.
24     Q.  So this document would have been in
25 place as it relates to the Giant Eagle RX

Page 94

1  distribution center; correct?
2      A.  Yes.  Yes.
3      Q.  So you've told me that you're unaware of
4  any written suspicious order monitoring policy
5  that HBC had from 2009 till August 1, 2014.
6      Did HBC have a system prior to August 2014
7  that was designed and operated to disclose
8  suspicious orders of controlled substances?
9      A.  Yes.
10     Q.  And can you describe that system for me,
11 please?
12     A.  Sure.  The system in our situation is a
13 captive warehouse.  We had tight controls over our
14 inventory, our controlled substance inventory, our
15 procedures and our controls at our warehouse
16 operation, and also at our pharmacies, the
17 pharmacy operation.
18     Q.  Let me be more specific.  Other than
19 inventory controls, what were the controls that
20 would allow HBC to identify an order as
21 suspicious?
22     A.  So the warehouse, in addition to its
23 physical security and controls, would also have
24 audits that it did, daily audits, monthly audits.
25 It understands the patterns of shipments to our

Page 95

1  locations, and it could identify deviations from
2  those patterns.
3      Q.  How frequently were audits performed?
4      A.  Daily.
5      Q.  What was the purpose of an audit?
6      A.  To ensure the safety and security of the
7  drug product.  And, again, in that closed system
8  we talked about earlier, to make sure the product
9  was not diverted and going to its intended
10 recipient.
11     Q.  Your testimony is that from
12 November 2009 until the end of Octoberish of 2014,
13 that HBC performed daily audits of the warehouse?
14     A.  Daily audits of the counts in the
15 warehouse, yes.
16     Q.  And the purpose of the counts in the
17 warehouse was to make sure that everything that
18 was supposed to be in the warehouse was actually
19 there?
20     A.  Um-hum, yes.
21     Q.  You also mentioned that the warehouse
22 was aware of ordering patterns I think is how you
23 said it from the Giant Eagle pharmacies?
24     A.  Um-hum.
25     Q.  Yes?

Page 96

1      A.  Yes.  Sorry, yes.
2      Q.  Who at the warehouse was aware of the
3  ordering patterns?
4      A.  So the warehouse had a superintendent of
5  the warehouse.  There was specialized, highly
6  trained individuals that worked the controlled
7  substance cage that were the same folks that
8  picked the orders day in and day out.
9      Q.  From 2009 until October 2014, was there
10 one superintendent of the warehouse, or were there
11 multiple?
12     A.  I believe there was one.
13     Q.  And who was that?
14     A.  Walter Durr.
15     Q.  So you said below Walter, there would
16 have been I think what you referred to as pickers?
17     A.  Folks who would fulfill the orders, yes.
18     Q.  In laymen's terms, can you describe to
19 me what a picker does?
20     A.  Sure.  An order comes in.  And for
21 whatever product they need to get, they go to the
22 shelf, the particular shelf in the warehouse, and
23 they pick the order.
24     Q.  Is it as simple as walking to a shelf
25 and there's a bottle of pills on the shelf, and

Page 97

1  they pick up the bottle?  Break it down for me,
2  please.
3      A.  There's a system certainly that there's
4  an order well that generates what each store needs
5  or has requested.  And then there's assistance, a
6  device that they -- I don't know the exact name
7  for it, but there's certainly a warehouse
8  management system that they use.  And it's
9  different slotting in the warehouse and they know
10 which slot to go to and how many to pick.
11     Q.  And then what?  They drop it in the tote
12 and put it on a truck?
13     A.  Yes.
14     Q.  And approximately -- let me back up.
15     How many different warehouses did HBC have
16 that were responsible for distributing Schedule
17 III narcotics?
18     A.  There's only one warehouse.
19     Q.  And what's the address for that
20 warehouse, for HBC's warehouse?
21     A.  I can't give you the exact -- I don't
22 know the exact address.
23     Q.  You know do the name of the road?
24     A.  No.
25     Q.  Approximately how many pickers would

Page 98

1 have been working under Walter Durr in the
2 warehouse?
3    A.  My understanding is three to four.
4    Q.  And do you know if it was the same three
5 or four people during the lifetime of HBC serving
6 as a distributor of hydrocodone combination
7 products?
8    A.  I don't know if it was the same all the
9 way throughout.
10    Q.  Who were those people?
11    A.  I don't know their names.
12    Q.  Are any of them still that?
13    A.  The warehouse is no longer there
14 anymore, so no.
15    Q.  Did any of those people transfer over to
16 the Giant Eagle RX distribution center?
17    A.  I don't know.
18    Q.  Anybody else who -- I think my original
19 question was who would have been aware these
20 patterns of shipments, and you told me Mr. Durr.
21 Then you told me the pickers as well as; correct?
22    Anybody else that would have been aware of
23 the patterns of shipments to Giant Eagle
24 pharmacies?
25    A.  From the warehouse is your question?

Page 99

1    Q.  This is all getting back to
2 identification of suspicious orders.  So my
3 question is:  From HBC who had that obligation to
4 identify suspicious orders?  And I think you've
5 identified Mr. Durr and these pickers.  But if I'm
6 missing somebody, I want you to tell me.
7    A.  So in our suspicious orders would have
8 been identified certainly from the warehouse,
9 certainly folks in corporate that were -- from the
10 procurement team buying into the warehouse.  They
11 would know if there's any spike in pattern of
12 product being demanded to be shipped to the
13 warehouse, et cetera.
14    It's not just the warehouse.  It's also the
15 folks that do the procurement of these products as
16 well would identify any deviation.  If all of a
17 sudden they're buying X and now they're being
18 asked to buy Y, they would identify that.
19    Q.  Was there any written list of items that
20 these people in procurement or people like
21 Mr. Durr, the superintendent of the warehouse,
22 were supposed to be on the lookout for?
23    A.  Not that I could find.
24    Q.  Was there any report that was generated
25 on a daily, weekly, monthly, yearly basis,

Page 100

1 quarterly basis that Mr. Durr or these procurement
2 people could look at to evaluate the pattern of
3 orders?
4    A.  I'm sorry.  Can you ask that again?
5    Q.  What I'm asking about is whether or not
6 there was any report that was generated daily or
7 weekly or monthly or quarterly or annually that
8 was kind of on a set basis distributed to anybody,
9 whether it's Mr. Durr, whether it's these people
10 from procurement, whether it's the pickers, to
11 where they can have an opportunity to look at and
12 review the pattern of orders going to each of the
13 different pharmacies?
14    A.  Not that I could find specifically, but
15 certainly from the procurement side, et cetera,
16 there's reports of what they're buying and
17 selling, sure.
18    Q.  Explain to me what you mean by the
19 procurement side.
20    A.  So from the procurement side, the folks
21 in the warehouse don't do purchasing.  There's a
22 group that does purchasing.  So those folks that
23 do purchasing would absolutely know what's being
24 bought and what's being sold.
25    Q.  And who were those folks from 2009

Page 101

1 through 2014?
2    A.  The specific people I don't know.
3    Q.  Are any of them still with the company?
4    A.  I don't know the folks that were
5 involved.
6    Q.  Was there a list that these folks in the
7 procurement or purchasing office had to be on the
8 lookout for as far as trends or spikes or anything
9 like that that they should flag and bring to
10 somebody's attention?
11    A.  So you're asking if there was a specific
12 list that I know of?
13    Q.  Sure.
14    A.  Not that I know of that I was able to
15 find.
16    Q.  Are you aware of -- let me back up and
17 ask you this:  Who did you talk to within HBC or
18 Giant Eagle to find out about this policy that was
19 in place from 2009 through July 2014?
20    A.  The policy or the system?  I'm sorry.
21    Q.  Sorry.  You're right.  There's not a
22 policy.  The system.
23    A.  So in the investigative piece, the
24 diligence, Walter was one of the folks that was
25 discussed about what happened during this

Page 102

1  timeframe.  Also, folks from corporate, from our
2  operations folks, pharmacy operations as well as
3  the warehouse operations.
4      Q.  Let me stop you for a second.  Walter,
5  is he still with the company?
6      A.  Yes.
7      Q.  And what's he do now?
8      A.  His exact duties I don't know, but it's
9  something in distribution.
10      Q.  And did you personally speak with him?
11      A.  I did not.
12      Q.  How did you go about obtaining his
13  knowledge base to talk about his role in the
14  suspicious order system?
15      A.  I reviewed his written conversations
16  with our attorneys and other folks within our
17  company.
18      Q.  You mentioned Mr. Durr.  You said you
19  talked to some folks from corporate to find out
20  about what was going on from '09 to 2014.  Who did
21  you talk to from corporate?
22      A.  Greg Carlson, which is one of our
23  operations folks.  Also had responsibility for
24  procurement at the time.
25      Q.  So he was a procurement guy between --

Page 103

1      A.  Operations and procurement, yes.
2      Q.  And he did that -- he served in that
3  role between '09 and '14?
4      A.  The exact times I'm not sure, but
5  somewhere in there.
6      Q.  Somewhere in there?
7      A.  Yes.
8      Q.  Who else other than Greg Carlson?
9      A.  That was it.
10      Q.  Was Walter able to tell you and through
11  the notes that you reviewed -- let me back up.
12      Did you specifically talk with Greg?
13      A.  I did not.
14      Q.  Same thing there where you just reviewed
15  some notes?
16      A.  Yes.
17      Q.  Through these notes that you happened to
18  review from Walter and from Greg when you were
19  doing your diligence I think you said earlier to
20  prepare to testify here today, did they talk to
21  you about any training that they attended about
22  suspicious order monitoring and different red
23  flags to be on the lookout for?
24      A.  They didn't specifically read anything
25  on training, but certainly through the documents

Page 104

1  that were presented, they were aware of the drugs
2  and the things that they should look for.
3      Q.  You agree that the regulation says that
4  HBC must design and operate a system; correct?
5      A.  Yes.
6      Q.  What is that system?
7      A.  Sure.  As I mentioned earlier, it's an
8  integrated system between operations, the
9  warehouse and our pharmacies.
10      Q.  Is there anything else you can tell me
11  about this system other than what you just said?
12      A.  As far as what specific -- can you be a
13  little more -- as far as the system, it's an
14  integrated approach between -- for us, we're a
15  self distributing -- we're a self distributing
16  distributor.  So we own the stores.  We own the
17  warehouse.  We own everything in between.
18      We're very different than a McKesson or a
19  Cardinal or a traditional distributor.  We have
20  line of sight from the time products are delivered
21  to our warehouse all the way to when they're
22  dispensed to customers, patients.
23      Q.  What I'm hearing from you is that your
24  system was the superintendent, the pickers and the
25  procurement folks knew what to look for --

Page 105

1      A.  As well as the stores.  As well as the
2  stores.
3      Q.  Let me finish.  What I'm hearing from
4  you is that your system, HBC's system that was
5  mandated by these federal regulations was that the
6  distribution center superintendent, the pickers in
7  the distribution center, the corporate procurement
8  officers and the pharmacies knew what to look for
9  and looked for it?
10      MR. BARNES:  Object to the form of the
11  question.
12  BY MR. GADDY:
13      Q.  Is that your answer as to what HBC's
14  system was from 2009 to 2014?
15      MR. BARNES:  Same objection.
16      THE WITNESS:  I'm telling you it was an
17  integrated systems where the stores were filling
18  legitimate prescriptions which created demand to
19  our warehouse that was fulfilled to those stores.
20  BY MR. GADDY:
21      Q.  If I'm being unclear -- I'm trying to
22  make sure I'm understanding your answer.  As far
23  as the order -- excuse me -- as far as the system
24  to detect any suspicious orders that come from the
25  stores, what I'm hearing you say is that the

Page 106

1 system was that the superintendent, the pickers,
2 the procurement folks who would be the only ones
3 with HBC, right, that we just talked about?
4     A.  HBC specific, yes.
5     Q.  So the pickers, the superintendent and
6 the procurement folks knew what to look for and
7 looked for it.  Is that the system that HBC
8 operated to detect suspicious orders?
9     A.  The system also included the frontline
10 scrutiny and professional judgment of the
11 pharmacist filling prescriptions as well together
12 as one whole system, yes.
13     Q.  But otherwise, that's the system?
14     A.  That's the system.  And then over time,
15 the system was continually improved upon which
16 later added the thresholds and some IT
17 enhancements, et cetera, yes.
18     Q.  But when the first hydrocodone pills
19 started rolling out the door in 2009, the system
20 was that the superintendents, the pickers and the
21 procurement officers knew what to look for and
22 looked for it?
23     MR. BARNES:  I'm going to object.  You
24 keep misstating what he said in his prior answer.
25     MR. GADDY:  Bob, if you want to object,

Page 107

1 you can object.
2     MR. BARNES:  I am.
3     MR. GADDY:  Well, limit it to that you
4 don't get to put words --
5     MR. BARNES:  Be fair with your question.
6 He told you about an integrated system about five
7 times now, and every time you ask him another
8 question, you leave out a piece of it.
9 BY MR. GADDY:
10     Q.  You can answer the question.
11     A.  As I stated, the system was an
12 integrated system.  Again, we're in a unique
13 situation.  We're distributing to our own stores.
14 We know our stores.  We know they're -- we have
15 line of sight on every prescription that comes
16 through our doors that we fill, and we fulfill
17 orders to those stores.
18     And we have chain of custody of product all
19 the way from the warehouse to our stores,
20 ultimately to the patients.  So what I'm telling
21 you is our system was integrated between store
22 controls, warehouse controls and corporate
23 controls.
24     Q.  You agree that the duties and
25 regulations that apply to the stores, the

Page 108

1 pharmacies, are different than the regulations and
2 duties that apply to the distributor; correct?
3     MR. BARNES:  Object to form.
4     THE WITNESS:  They have different
5 duties, but they have a duty as well to have the
6 safety and security of controlled substances as
7 does our warehouse.
8 BY MR. GADDY:
9     Q.  Sure, but pharmacies -- do pharmacies
10 have a duty to detect suspicious orders?
11     A.  By definition, pharmacists' duty are to
12 fill legitimate prescriptions from legitimate
13 prescribers which would then necessitate orders
14 that are fulfilled from our warehouse.
15     Q.  You keep using the word "integrated."
16 Tell me what you mean by that.
17     A.  It's an integrated system that if you
18 think about it again, the stores are doing their
19 due diligence, making sure they're filling
20 legitimate prescriptions for legitimate needs,
21 right, that generate orders to our warehouse, and
22 we fulfill those orders.
23     So again, we have folks from the warehouse
24 monitoring and having controls, physical controls
25 as well as the controls we discussed.  You have

Page 109

1 the folks on the procurement side with their
2 controls and the pieces that they're buying into
3 the warehouse and selling out of the warehouse, as
4 well as the folks in the store.  So that is the
5 system.
6     Q.  Did HBC provide any training to Mr. Durr
7 or the pickers that worked underneath him as far
8 as HBC's obligations under the Controlled
9 Substance Act?
10     A.  That I don't know.
11     Q.  Did HBC provide any training or
12 education to the procurement officers with
13 corporate I think you referred to it as on HBC's
14 obligations under the Controlled Substance Act?
15     A.  I don't know.
16     Q.  Do you know whether or not there was any
17 list -- you keep kind of saying that these
18 different people in these different roles knew
19 what to look out for.
20     Was there any list of those things that they
21 should be looking out for?
22     A.  There's no list that I could find, but I
23 think you established early on in the testimony
24 that these drugs were commonly known as drugs of
25 interest and certainly drugs that we needed to

Page 110

1  keep an eye on.
2      Q.  From the education that you did to
3  prepare to testify here today, do you know of
4  anything that Mr. Durr or Mr. Carlson or any of
5  these pickers, do you know anything that they were
6  looking for, any datapoints that they were looking
7  at between '09 and 2014 to determine whether or
8  not an order was suspicious?
9      A.  I didn't find any specific written
10 documents of what they were looking for or not
11 looking for.
12     Q.  Do you have any idea of what they would
13 have been looking for?
14     A.  They would have been looking for any
15 patterns that deviated from the norm.  Certainly
16 again, as I mentioned, we know our stores.  We're
17 selling product to our stores pursuant to
18 legitimate prescriptions.  And they'd be looking
19 for anything that's out of the norm.
20     Q.  How do you know that they were looking
21 for anything out of the norm.  How do you have
22 that knowledge?
23     A.  Because as part of the diligence,
24 looking at their responses and what they had
25 discussed, that was clearly ascertained from the

Page 111

1  conversation.
2      Q.  So you understand that what Mr. Durr,
3  the pickers and the folks in corporate were
4  looking for was any orders or any patterns that
5  deviated from the norm?
6      A.  That were suspicious, that looked
7  suspicious, yes.
8      Q.  Anything else?
9      A.  From what I can delineate and see, they
10 were looking for those things, yes.
11     Q.  What information -- let me back up.  I'm
12 going to ask you some questions about the pickers
13 in particular.
14     Is their sole job function to receive orders
15 and pick the orders and fill the totes and load
16 the trucks?  Is that their sole -- is that their
17 primary function?
18     A.  Primary functions, yes.
19     Q.  And would it be fair to say that they
20 spend most of their day in a warehouse receiving
21 orders, locating product, putting it into a tote
22 and facilitating it getting on a truck so it can
23 go a store?
24     A.  And maintaining the security of that
25 product along the way, yes.

Page 112

1      Q.  What information, reports, data is
2  available to those pickers to allow them to
3  identify patterns that deviate from the norm?
4      A.  I did not find any particular reports or
5  any specific things that they were looking for.
6      Q.  With Mr. Durr, the superintendent, can
7  you kind of generally describe for me what his job
8  duties were on a daily basis?
9      A.  His responsibilities would be the
10 security and controls of running our pharmacy
11 warehouse.
12     Q.  And that pharmacy warehouse included not
13 only the Schedule III hydrocodone combination
14 products that we've been talking about today, but
15 it also included a variety of other prescription
16 medication; correct?
17     A.  Nonscheduled, is that what you're
18 asking?
19     Q.  Sure.
20     A.  Yes.
21     Q.  It also included Schedule IVs and
22 Schedule Vs; correct?
23     A.  Correct.
24     Q.  It included Schedule IIIs that are not
25 hydrocodone combination products; correct?

Page 113

1      A.  Yes.
2      Q.  It also included I think, as you just
3  said, noncontrolled substances such as blood
4  pressure medicine, acne medication, birth control.
5  All those types of things would be included;
6  correct?
7      A.  Yes.
8      Q.  And all those things are under the
9  purview of Mr. Durr; correct?
10     A.  Yes.
11     Q.  Are you aware of any data, reports or
12 information that Mr. Durr had available to him to
13 assist him in identifying any patterns of Schedule
14 III drug orders, specifically HCPs, that would
15 have deviated from the norm?
16     A.  Through this process I did not find
17 any -- you keep asking me reports.  I did not find
18 any reports that he'd be looking at.  But, again,
19 as part of this integrated process, he would be
20 working with our operations folks.  The operation
21 folks oversee the stores.  So it's a closed
22 system.  So there's a negative feedback loop
23 within that system.
24     Q.  And I'm not trying to ask a question
25 that I already know the answer to.  I'm just

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 trying to be inclusive when I say data, report
2 information --
3     A.  Sure.  And I'm trying to do my best to
4 answer what it is you're looking for.
5     Q.  I understand.  But I didn't want you to
6 get focused on the word reports.  You're not aware
7 of any information, data that Mr. Durr had
8 available to him to assist him with identifying
9 patterns that deviated from the norm?
10    A.  What I'm saying is I don't have -- other
11 than written documents, I don't have -- I'm not
12 privy to the conversations and the pieces and the
13 things that he did as part of running his
14 warehouse.
15    Q.  When you got information from Mr. Durr,
16 he didn't say, I had this report to review or I
17 had this dataset that I got sent to me on a
18 regular basis.  He didn't say anything like that?
19    A.  I didn't read any of that, no.
20    Q.  I'm going to ask you the same questions
21 as it relates to Mr. Carlson and the other folks
22 that would have been in procurement.
23    Are you aware of any data, information,
24 reports that they had available to them to assist
25 them in identifying any patterns of HCPs ordering

Page 115

1 that would have deviated from the norm?
2     A.  Certainly the folks in corporate would
3 have information on what's being purchased by our
4 stores and certainly feedback from the operations
5 team that oversee these stores.  But through this
6 process, I didn't have any specific reports or
7 documented -- I go back to reports because we're
8 not privy to the conversations and to how they did
9 their job or didn't do their job on a day-to-day
10 basis from what I could read.
11    Q.  I understand.  What I hear you to be
12 saying is the information you got from
13 Mr. Carlson, who was one of the procurement folks
14 during this timeframe, was that he didn't inform
15 you of any data, reports or information that he
16 was provided on a regular basis for him to review
17 orders to see whether or not there was a pattern
18 that deviated from the norm?
19    MR. BARNES:  You mean other than what
20 he's testified to?
21    MR. GADDY:  I asked the question.
22    MR. BARNES:  Object to form.  Asked and
23 answered.
24    THE WITNESS:  What I'm saying is through
25 what I reviewed from Mr. Carlson, I couldn't

Page 116

1 ascertain what he used or didn't use to do this
2 job.
3 BY MR. GADDY:
4     Q.  There was no paper identified, no
5 report, no Excel spreadsheet, nothing like that
6 that was identified by Mr. Carlson, Mr. Durr or
7 any information you received from the pickers, no
8 documents that were identified that were reviewed
9 to assist with this process; correct?
10    A.  Specifically, again, our system
11 continued to be improved and changed over time.
12 And there were certainly procedures that were
13 buttressed and improved over time.  But certainly
14 through what I read, there was nothing on a report
15 or, to your point, Excel spreadsheet that I did
16 glean.  It doesn't mean there wasn't any.  It
17 wasn't in what I had read.
18    Q.  You spent 40 to 50 hours preparing for
19 today; correct?
20    A.  Yes, sir.
21    Q.  You made every effort to get all the
22 information you could; correct?
23    A.  Yes.
24    Q.  You mentioned that the system had
25 improvements over time.

Page 117

1     A.  Yes.
2     Q.  I think you said that at some point in
3 time, there was a threshold program implemented?
4     A.  Yes.
5     Q.  When did HBC first start utilizing a
6 threshold program?
7     A.  A threshold program with some IT
8 enhancements were put into place roughly in 2013.
9     Q.  Do you know what month in 2013 or season
10 even?
11    A.  I don't recall exactly in 2013.
12    Q.  And were thresholds set for every
13 prescription drug or just controlled substances?
14    A.  Controlled substances.
15    Q.  And that included Schedule III
16 controlled substances?
17    A.  Yes.
18    Q.  How were thresholds established?  Let me
19 back up before you answer that.  I'm making an
20 assumption that threshold is a monthly ordering
21 threshold.  Am I wrong on that?
22    A.  So the threshold established was using
23 diligence that was ascertained at the time from
24 DEA that a 3X threshold to be established, a
25 monthly threshold, to your point, using 12 months

Page 118

1 of trailing data, 3X the average for that month.
2    Q.  Let me say it back to you to make sure I
3 understand it.  This threshold program which was
4 first begun in 2013 set a threshold at 3 times the
5 average amount of that substance that was
6 distributed over the last 12 months?
7    A.  So 3X the company average for that
8 chemical.  So it was at the GPI level.  So the
9 chemical would include all the drugs having that
10 chemical in it, 3X using 12 months of trailing
11 data, 3X the company average for that chemical,
12 that product.
13    Q.  So you explained two things there.
14 First of all, it was based on the chemical?
15    A.  GPI level, yes.
16    Q.  Does that mean that Lortab and Vicodin
17 don't get different thresholds.  They're all under
18 the same threshold?
19    A.  It's all lumped together as one
20 threshold.
21    Q.  Because that's the same combination of
22 hydrocodone and acetaminophen?
23    A.  It's looking at the active ingredient,
24 yes.
25    Q.  As far as how the threshold is set, if

Page 119

1 HBC had sold a hundred HCP products over a month
2 for the last 12 months, the threshold for the next
3 month would have been 300; is that fair?
4    A.  Well, the threshold was -- yes.  Let me
5 just play that back.  So it would be 3X again at
6 the GPI level of that GPI using the 12 months
7 worth of data, yes.
8    Q.  So months 1 through 12 Giant Eagle
9 pharmacies had ordered 100 hydrocodone combination
10 products?
11    A.  All included.
12    Q.  Correct.  Then in month 13 the threshold
13 would be 300?
14    A.  Well, it uses the average of the 12
15 months of data.  When the new month comes on, the
16 furthest out drops off.  It's a rolling 12 months
17 worth of data, yes.
18    Q.  But I have that math right, in month 13,
19 the threshold would be 300 because the prior 12
20 months, the average was 100?
21    A.  But again, it uses the last 12 months.
22 So assuming that it was a hundred all those
23 months, it would be 3X which would be 300, yes.
24    Q.  You said it was a rolling system.  So at
25 the 13th month, instead of HBC distributing a

Page 120

1 hundred HCPs and it distributed 200, the threshold
2 for the 14th month would be different.  It would
3 not be the same 300 because that last month would
4 have affected the average; correct?
5    A.  Each datapoint adds to the average.  And
6 certainly the reason for that is there's
7 seasonality in our business as well where products
8 change over time, yes.  The demand for products
9 change over time.
10    Q.  When you say seasonality, do you mean
11 different times of years or do you mean --
12    A.  Yes.  Different times of year, cough and
13 cold season versus summer months, yes.
14    Q.  Is there a hydrocodone combination
15 product season?
16    A.  Well, certainly hydrocodone products in
17 cough syrups, it is more prevalent during cough
18 and cold season than it is during summer months.
19    Q.  I think I heard you mention that HBC
20 received guidance from the DEA that a 3 times
21 average was an appropriate threshold.
22    A.  What I said is during the due diligence
23 to set the threshold, information was derived from
24 the DEA published websites on a 3X threshold that
25 they used for list chemicals, and that's where our

Page 121

1 3X number was derived from.
2    Q.  You're talking about the chemical
3 handler's manual?
4    A.  From what I -- to prepare for this, it
5 was based on written DEA inference on a website or
6 a manual, I'm not sure where it was derived from,
7 but the DEA itself was establishing a 3X
8 threshold, and the team adopted that rationale.
9    Q.  Are you testifying that the DEA had
10 suggested a 3X threshold for opioids?
11    A.  I'm testifying that the HBC warehouse
12 and the team involved found data that pointed to a
13 3X threshold tier, and that's what they adopted.
14    Q.  But for opioids.  That's my question.
15 Are you testifying that HBC had information from
16 the DEA that they were approving or ratifying or
17 blessing, whatever verb you want to use, a 3X
18 threshold in 2013 for opioids?
19    A.  No.  That is not what I'm saying.
20    Q.  Then help me understand.
21    A.  What I'm saying is in the diligence to
22 set the threshold, Giant Eagle inferred from
23 information that they gleaned from the website, a
24 manual, whatever it was, that established a 3X
25 threshold is where they want -- the DEA was -- the

Page 122

1 DEA over the years has not been clear about what
2 their expectations were of any threshold.
3    So it left each registrant to set whatever
4 parameters and controls that they deemed
5 appropriate.  So our team used whatever they could
6 find that was reasonably available and reasonable
7 to set our thresholds.
8    Q.  The DEA never told HBC that a three
9 times average was appropriate; correct?
10    A.  Directly, no, never.
11    Q.  Did DEA indirectly tell HBC that a three
12 times average was appropriate?
13    A.  What I'm saying is the HBC set its
14 threshold based on information that it gleaned
15 from a DEA -- just like you showed me earlier, a
16 page from the DEA website.  There was information
17 that they used from DEA and inferred to use a 3X
18 threshold.
19    HBC set the threshold, but it wasn't just
20 some arbitrary number they picked.  There was
21 information they used to get to a 3X threshold.
22    Q.  I'll show you what I'll mark as No. 13.
23    (HBC-Tsipakis Exhibit 13 was marked.)
24 BY MR. GADDY:
25    Q.  I'm showing you a June 2, 2012 letter

Page 123

1 from Joe Rannazzisi with the DEA.  Do you see
2 that?
3    A.  Yes.
4    Q.  Have you ever seen this before?
5    A.  Yes.
6    Q.  Did you have the opportunity to review
7 this document in preparing for your deposition
8 today?
9    A.  Not all of it.
10    Q.  I'll represent to you and you can flip
11 through it and we'll look through some of this,
12 but it's a 2012 letter, and attached to that
13 letter were earlier letters, two from 2007 and one
14 from 2006.
15    Do you see that?
16    A.  Yes.
17    Q.  And are you aware that HBC received this
18 letter?
19    MR. BARNES:  Just the one on top or all
20 of them?
21    MR. GADDY:  The one at the top with the
22 attachments.
23    THE WITNESS:  I'm not aware of whether
24 HBC received these letters or not.  As a matter of
25 common sense, we weren't registered in 2007.  So I

Page 124

1 would assume that we wouldn't have gotten that
2 since we weren't a registrant, and this states
3 that it went to the registrants.
4    The only one, and I don't know if we did or
5 did not receive it, would have been this one from
6 2012.
7 BY MR. GADDY:
8    Q.  This one in 2012 was before HBC
9 instituted its threshold policy at three times
10 average; correct?
11    A.  Yes.
12    Q.  And it says -- in the first line, it
13 says, "This letter is being sent to every entity
14 in the United States who is registered with the
15 Drug Enforcement Administration to manufacture or
16 distribute controlled substances."
17    Do you see that?
18    A.  Yes.
19    Q.  In June 2012, was HBC such a registrant?
20    A.  Yes.
21    Q.  "This letter is to remind controlled
22 substance manufacturers and distributors of their
23 responsibilities to inform the DEA of suspicious
24 orders in accordance with 21 CFR 1301.748."
25    Do you see that?

Page 125

1    A.  Yes.
2    Q.  In the very next paragraph, it says, "On
3 September 27, 2006, DEA sent a letter to its
4 registrant community expressing concerns regarding
5 drug abuse in the United States and highlighting
6 the responsibility of manufacturers and
7 distributors to be vigilant in the distribution of
8 controlled substances."
9    Do you see that?
10    A.  Yes.
11    Q.  Did HBC ever seek to obtain that 2006
12 letter from DEA?
13    A.  I don't know.
14    Q.  They were certainly informed about it;
15 correct?
16    A.  Again, I'm not sure if they did or did
17 not receive this June 2012 letter.  So I don't
18 know.
19    Q.  Well, it says it was sent to every
20 entity who was registered with the DEA.
21    And you agreed to distribute controlled
22 substances, and you agree that HBC was registered
23 with the DEA to distribute controlled substances
24 in June 2012; correct?
25    A.  Correct.

Page 126

1    Q.  Do you know whether or not HBC ever
2  tried to obtain or did obtain the September 2006
3  DEA letter?
4    A.  I do not.
5    Q.  But you see that if they received this
6  letter, as it's indicated that they would have,
7  they would have been aware of that letter;
8  correct?
9       MR. BARNES:  Object to the form.
10      THE WITNESS:  If you're asking me a
11  hypothetical if they received this letter in '12,
12  would they be aware of a letter from '06 to '07,
13  yes.
14  BY MR. GADDY:
15    Q.  Did HBC ever request and review any of
16  those letters that you're aware of?
17    A.  I don't know.
18    Q.  If you read down further in that
19  paragraph, there's a sentence that starts,
20  "Although DEA's September 2006 letter..."
21    Do you see that?  It's about halfway down the
22  paragraph.
23    A.  Yes.  I see it now.
24    Q.  It says, "Although DEA's September 2006
25  letter included a list of factors that might

Page 127

1  indicate diversion, DEA wants to stress this was
2  not a comprehensive list of all possible
3  indications of diversion.  DEA encourages the
4  registrant to take an integrated approach.  This
5  point was emphasized in the December 2007 letter,
6  and DEA is once again bringing it to your
7  attention."
8    Do you see that?
9    A.  Yes.
10    Q.  It goes on in the next paragraph to talk
11  about the code and the regulation that we looked
12  at earlier today.  It says, "Under federal law,
13  all manufacturers and distributors are required to
14  maintain effective controls against diversion."
15    Do you see that?
16    A.  Yes.
17    Q.  It says, "The DEA regulations require
18  all manufacturers and distributers to report
19  suspicious orders of controlled substances."
20    Do you see that?
21    A.  Yes.
22    Q.  It says, "The registrant shall design
23  and operate a system to disclose to the registrant
24  suspicious orders of controlled substances.  This
25  regulation clearly places the responsibility on

Page 128

1  the registrant to design and operate the system."
2    Do you see that?
3    A.  Yes.
4    Q.  And was HBC aware of that obligation
5  going back to 2009 when they first started
6  distributing hydrocodone combination products?
7    A.  Yes.
8    Q.  If you go down to the bottom paragraph,
9  do you see where it says, "Registrants who rely on
10  rigid formulas to identify whether an order
11  suspicious may fail to detect suspicious orders."
12    Do you see that?
13    A.  Yes.
14    Q.  It says, "For example, this system might
15  not identify suspicious orders being placed by a
16  pharmacy if that pharmacy placed unusually large
17  orders from the beginning of its relationship with
18  the supplier."
19    Do you see that?
20    A.  Yes.
21    Q.  Would you agree with me that HBC's
22  threshold program that was instituted in 2013 was
23  a rigid formula?
24    A.  No, I do not.
25    Q.  Why not?

Page 129

1    A.  Because in our situation, as I testified
2  earlier, we have line of sight on our stores,
3  warehouse, everything involved.  So this is one
4  component.
5    The threshold formula was one component of a
6  total system to identify and detect suspicious
7  orders.
8    Q.  The other components of those systems
9  were superintendent of the warehouse, the pickers
10  and the procurement individuals knowing what to
11  look for as it relates to patterns that deviate
12  from the norm?
13      MR. BARNES:  Object to form.
14    Go ahead.
15      THE WITNESS:  As well as the stores.  So
16  if you follow -- if the stores are filling
17  prescriptions, legitimate prescriptions pursuant
18  to valid prescriptions, they generate demand for
19  those prescriptions to our warehouse that fulfills
20  them.
21    So in our closed system, we wouldn't expect
22  suspicious orders because they're pursuant to
23  legitimate valid prescriptions.
24  BY MR. GADDY:
25    Q.  So let me get back to the threshold

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1 report. Those are established sometime in 2013;
2 correct?
3    A. Correct.
4    Q. How often would a report kind of
5 updating HBC on those thresholds be generated?
6    A. So a report would generate daily. That
7 would be reviewed daily.
8    Q. So the first of the month would be the
9 first report for that month; correct?
10    A. Yes.
11    Q. And on the first of the month, describe
12 for me what that report is going to look at. Is
13 it going to be a list of every pharmacy and every
14 controlled drug and how many orders have been
15 made, or is it only going to identify orders that
16 are approaching or over the threshold?
17    A. The daily report would identify orders
18 of interest that we would like to investigate
19 further.
20    Q. Was the threshold based on dosage units
21 or MME or something else?
22    A. The threshold was based on the GPI level
23 of -- the exact parameters of the formula and how
24 the threshold worked. I know it relies on
25 threshold of the 3X that we established and using

Page 131

1 the GPI portion of the drug.
2    As far as MME, dosage units, by using GPI --
3 it's the amount of the chemical in question that
4 it's tracking. The exact way it works and flags,
5 I don't have the intricacies of that.
6    Q. So you said that the threshold report
7 would identify I think what you called orders of
8 interest; correct?
9    A. Correct.
10    Q. Is there any written policy and
11 procedure anywhere at any time that Giant Eagle
12 has or had, HBC has or had that uses the term
13 order of interest?
14    A. Can you define at any time? What's the
15 timeframe that you're describing?
16    Q. From 2006 until today.
17    A. Do we have a document or a report; is
18 that right?
19    Q. Do you have a document, a policy, a
20 procedure of anything that uses the term order of
21 interest?
22    A. So I'm trying to -- I don't know.
23    Q. I'll represent to you that 90 seconds
24 ago was the first time I've heard the phrase order
25 of interest as it relates to HBC. I want to make

Page 132

1 sure I'm not missing a policy or a procedure or a
2 definition page or an appendix that would tell me
3 what order of interest means to HBC or Giant
4 Eagle. Am I or am I not missing something?
5    A. No. You're not missing. There's
6 reports and things that the misnomer of things
7 that are classified as suspicious. Our orders are
8 not classified as suspicious until after an
9 investigation happens.
10    So certainly our reports in its infancy when
11 they were created mention suspicious report,
12 suspicious order. That's not what it means that
13 those reports -- the fact that something shows up
14 on that report does not mean it's suspicious until
15 we've cleared it or not. And if not, we would
16 report it.
17    Q. When did that phrase orders of interest
18 come about within HBC or Giant Eagle?
19    A. I think looking at things through the
20 2018 lens versus things that happened in the past,
21 at some point along the way, there was an
22 inference of the way these reports were labeled or
23 even internal communications were labeled were not
24 what they intended.
25    So our team started using orders of interest

Page 133

1 later. The exact time I can't tell you.
2    Q. That would be more recent?
3    A. More recent, yes.
4    Q. So what you had was you had documents
5 and memos and reports that discuss suspicious
6 orders. And more recently you have changed that
7 terminology to orders of interest; is that
8 accurate?
9    A. What I'm saying is there's things
10 labeled as suspicious orders, but it's really
11 meant and intended for orders of interest.
12    Q. So what you used to call suspicious
13 orders you now call orders of interest?
14    A. I'd have to see the specific
15 circumstance on what document and what piece, but
16 certainly on the reports, I can tell you there's
17 reports that say suspicious order report. The
18 mere fact that a store or a product is on that
19 report does not mean it's suspicious. It's
20 intended that's something for us to investigate
21 and look at and then either clear or report.
22    That's the designation I'm trying to
23 testify -- to put in my testimony. Did I answer
24 your question?
25    Q. I think you did. What I was getting at

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 is what you previously called suspicious order
2 reports, you would now change that terminology and
3 call them order of interest reports. That's what
4 you would do them now?
5     A.   If I could go back and redo them all,
6 yes, for no other reason other than they don't
7 designate what the intended purpose was.
8     Q.   It would accurate to say that -- let me
9 back up. Let's get back to these threshold
10 reports.
11     You said that they're generated daily. When
12 they're generated, do they contain information for
13 any Giant Eagle pharmacy?
14     A.   All pharmacies, yes.
15     Q.   And if it's the first day of the month
16 and either no orders have been placed yet or no
17 orders that have triggered a threshold, have gone
18 above the threshold have yet been placed on the
19 first day of the month, would there still be a
20 report generate that says nothing, or would there
21 be no report at all?
22     A.   My understanding, the report would
23 flag -- it runs every day, but whether it's a null
24 report or whether it lists -- I don't -- I don't
25 recall. But it definitely runs every day and any

Page 135

1 store that day would hit threshold or flag as an
2 order that we needed to investigate would show up,
3 yes.
4     Q.   And any order that showed up on that
5 list exceeded the three-month average for the
6 prior year?
7     A.   The three-month chain average, yes.
8     Q.   Was the threshold set store by store, or
9 was it chain-wide?
10     A.   Initially it was set as the chain
11 average, and then later on it was improved on, per
12 store improved just based on continuing -- through
13 this process we continued to look at better ways
14 of looking at things, et cetera. It was improved
15 to look at each store's individual -- store by
16 store.
17     Q.   When did that change happen?
18     A.   2017.
19     Q.   So from 2013 through 2017, it was a
20 chain-wide Giant Eagle-wide threshold average?
21     A.   Looking at our stores in totality as a
22 chain and then applying that threshold, the chain
23 average, to each location, yes.
24     Q.   So whether the Giant Eagle location was
25 in downtown Cleveland or a more rural location in

Page 136

1 Summit County, those two pharmacies would have the
2 exact same threshold for a particular product?
3     A.   Yes. And as I mentioned, the threshold
4 was one component of the total system that we
5 used, but yes.
6     Q.   Were these orders that showed up on the
7 threshold report, did they show up before or after
8 the order had been shipped to the pharmacy?
9     A.   It would have been -- I believe it would
10 have been either in process of shipping or having
11 been shipped.
12     Q.   The order wasn't blocked, it wasn't
13 stopped; correct?
14     A.   The order wasn't blocked. However, in
15 our unique circumstance, the orders are going to
16 our own stores. If there's a reason for us to
17 intercept that order, quarantine that order, send
18 in loss prevention to pick up that order, we have
19 the ability to do that where a traditional
20 wholesaler does not.
21     Q.   You keep talking about how you
22 distribute to your own stores and saying that
23 that's it makes unique. You've said that several
24 times now; right?
25     A.   My testimony is not that we have any

Page 137

1 different obligations under the law. What I'm
2 saying is we have different things at our disposal
3 that other traditional wholesalers do not.
4     Q.   Well, you understand that a store like
5 Walgreens has a distribution facility that
6 distributes to itself?
7     A.   Sure.
8     Q.   CVS has a distribution facility that
9 distributes to itself?
10     A.   Yes.
11     Q.   Rite-Aid has a distribution facility
12 that distributes to itself?
13     A.   Yes.
14     Q.   Discount Drug Mart has a distribution
15 center that distributes to itself?
16     A.   Yes.
17     Q.   This is not a rare unique feature that's
18 unique to HBC or Giant Eagle, is it?
19     A.   That's your opinion. To us that's a
20 difference than -- I guess I don't understand your
21 question.
22     Q.   I guess my point is just because you
23 distribute to your own pharmacies doesn't mean
24 you're not obligated to abide by the federal laws
25 and regulations that all wholesale distributors

Page 138

1  are subject to; correct?
2      A.  I never said that we operated nor
3  followed the law any differently with our
4  responsibilities.
5      Q.  I'm on No. 14.  I'm going to show you
6  HBC 1032 which we're going to mark as Exhibit
7  No. 14 for today's deposition.
8      Is this an example of one of the threshold
9  reports that we've been talking about?
10     (HBC-Tsipakis Exhibit 14 was marked.)
11     THE WITNESS:  In this format, I'm having
12 trouble figuring out what this is.
13 BY MR. GADDY:
14     Q.  I'm giving it to you how it was given to
15 me.  I was hoping you could kind of explain some
16 of it to me.
17     Do you recognize this as being one of the
18 threshold reports that we've been talking about?
19     A.  I'm having difficulty.  I'm trying to
20 understand what I'm looking at.
21     Q.  Let's see if we can walk through it a
22 little bit.  It looks like it was maybe a
23 spreadsheet.  It looks like the left-hand column
24 is the pharmacy number?
25     A.  Yes.

Page 139

1      Q.  Those numbers going down underneath
2  there, do those correspond with different Giant
3  Eagle stores?
4      A.  It appears so, yes.
5      Q.  I want to skip the vendor for a minute.
6  But the next one indicates month key, and it looks
7  like October of 2016 is the date of this report?
8      A.  Yes.
9      Q.  I couldn't see any way from this report
10 to determine when in October this report was run,
11 whether it was run on the 1st or the 15th or the
12 31st.  Do you know if there's a way to determine
13 that?
14     A.  Based on what I'm looking at, I agree.
15 I can't tell.
16     Q.  The next column says, I guess, it's GPI
17 10?
18     A.  Yes.
19     Q.  Can you explain what that is?
20     A.  Sure.  The GPI is the GPI class of the
21 drug.  I don't know which GPI -- this one, based
22 on what I'm reading here, I'm assuming this is
23 oxycodone, the GPI 10 for oxycodone.
24     Q.  And you were just talking about the top
25 one on the list?

Page 140

1      A.  Yes.
2      Q.  And the next one says it looks like the
3  Total Shipped Quantity.  Do you see that?
4      A.  Yes.
5      Q.  And it lists the total shipped quantity
6  as 4500.  And the next column says Threshold
7  Quantity.  Do you see that?
8      A.  Yes.
9      Q.  And the threshold was 4200, so less than
10 the 4500; correct?
11     A.  From what I'm reading, yes.
12     Q.  And then at the next column, it has the
13 Product Name?
14     A.  Yes.
15     Q.  And then, finally, the column on the
16 right is the Schedule Number, and oxycodone
17 obviously is a Schedule II drug; correct?
18     A.  Yes.
19     Q.  Are you expecting there to be any
20 additional information on one of these threshold
21 reports?
22     A.  Again, I haven't seen this in this
23 format.  I'm sorry.  I just really don't know what
24 I'm looking at here.  I know that on the report
25 that the team would generate, it looked different

Page 141

1  than this output.  I read the columns with you
2  here, but I just don't know.
3      Q.  Again, obviously, I don't work for Giant
4  Eagle or HBC, never have.  I've never seen one of
5  your internally-generated threshold reports.  This
6  is what was produced to us, and I was given a lot
7  of these.  So I'm trying to figure out if there's
8  something else I should be looking at and there's
9  something else that maybe should be provided that
10 can give me a better understanding of the
11 threshold reports.
12     We just went through the information that's
13 included on what I was provided.  Is there any
14 additional information on the reports that you're
15 used to looking at?
16     A.  I don't know any other information.
17 Again I'd be speculating.  It shows stores which I
18 recognize store numbers.  It's showing total
19 shipped, threshold quantity, product name and
20 everything we just discussed.  As far as how this
21 report was used and what native format it is -- I
22 do know things were things provided to you in
23 native format because some things were in the
24 system and they had do screenshots.
25     I honestly can't tell you exactly what this

Page 142

1 is or how this was being used.
2     Q. But if you were to go back to your
3 office and asked to see the threshold report for
4 October 2016, do you think that that report would
5 have any additional information than what I have
6 right here in front of me?
7     A. I don't believe so.
8     Q. A couple questions about this. Number
9 one, you see the column, fourth column over is
10 Total Shipped Quantity; correct?
11     A. Yes.
12     Q. So you agree that even though the
13 quantity that was ordered exceeded the threshold
14 just for that first one, 4500 is over the 4200
15 threshold, that that quantity was shipped to the
16 store?
17     A. Again, I'm just going by what's on this
18 page. I don't know whether it was shipped or not.
19 I'm reading it like you.
20     Q. And it says it was shipped.
21     A. I'm reading that it says -- the title is
22 ETL Shipped Quantity, and it says 4500.
23     Q. And we know that this threshold -- first
24 off, we can look down and we see the first seven
25 or so entries are all for the same product;

Page 143

1 correct?
2     A. Correct.
3     Q. And if we go to the far left-hand
4 column, we see that that's for seven or eight
5 different Giant Eagle stores; correct?
6     A. Yes.
7     Q. So all of these are Giant Eagle stores
8 that have exceeded their threshold for oxycodone
9 at whatever point in October this report was run;
10 correct?
11     A. Assuming we're looking at this right,
12 that this is what their published threshold
13 quantity was in that column, I'm following you.
14     Q. And we know that that threshold that was
15 set here in 2016, again the threshold was
16 identical for all these different pharmacies
17 regardless of where that pharmacy was located,
18 what that pharmacy's average sales were, what
19 their customer traffic were, the threshold was the
20 same for all of them; correct?
21     A. We went through how the threshold was
22 set earlier, yes. And then looking at this
23 report, a lot of the same numbers are in that
24 column.
25     Q. Well, just looking at the first drug,

Page 144

1 the Oxydo, the threshold for every pharmacy is
2 4213.83; correct?
3     A. I'm sorry. Where are you at?
4     Q. The first seven entries, the
5 threshold --
6     A. Oh, 4213?
7     Q. Yeah.
8     A. Yeah, 4213.83.
9     Q. So even in October of 2016, the
10 thresholds were uniform across the entire chain of
11 Giant Eagle pharmacies?
12     A. Yes, it appears to be based on what I'm
13 reading here.
14     Q. And the last thing I had a question
15 about was the vendor is indicated as HBC. Do you
16 see that?
17     A. Yes.
18     Q. And the schedule, as you can see for the
19 Oxydo out to the right, is Schedule II; correct?
20     A. Yes.
21     Q. Did HBC ever have a license to
22 distribute Schedule II?
23     A. It never had a license nor did it ever
24 distribute Schedule IIs.
25     Q. Do you know why HBC is listed there?

Page 145

1     A. I do not know why it's listed there.
2 I'm sure it's an IT thing, from a coding, but...
3     Q. I mean, in October of 2016, wouldn't
4 prescriptions to Giant Eagle be coming from the
5 new Giant Eagle RX distribution center?
6     A. As we established in 2016, all of the
7 drugs would be coming from the new distribution
8 center which did have a license for Schedule IIs.
9     Q. So you don't know why it says HBC here?
10     A. I do not.
11     Q. Go down about halfway through the page
12 and if you look to the right, it's probably the
13 easiest to find where I am, it starts saying
14 Co-Gesic. Do you see that?
15     A. Yes.
16     Q. And do you have an understanding of what
17 Co-Gesic is?
18     A. No.
19     Q. Do you have an understanding that it's
20 an oxycodone combination product?
21     A. I don't know what -- these are all
22 different generics, and they're all different
23 naming conventions. Based on this report, it's a
24 Schedule II. If you're asking me do I know what
25 Co-Gesic is exactly, I don't.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    Q.   You don't have an understanding that
2  Co-Gesic is a hydrocodone combination product?
3    A.   Without looking it up, I don't.
4    Q.   And the fact that it's a Schedule II
5  doesn't really mean much because this is after the
6  rescheduling happened in '14; correct?
7    A.   Correct.
8    Q.   So then what we're seeing for the rest
9  of this page here, for the entire second page and
10  then for the first third of the third page are
11  incidences where orders from Giant Eagle
12  pharmacies for Co-Gesic, which I'm going to
13  represent to you is a hydrocodone combination
14  product, are exceeding the threshold, which is
15  three times the monthly average for the last year.
16  Do you see that?
17    A.   I'm seeing what's on this page.  As far
18  as what their exact thresholds are, again, it's
19  listed as that on the top of the page.  It would
20  appear as such, but without being able to validate
21  what I'm looking at or how I'm looking at this, I
22  can't answer with certainty.
23    Q.   Well, according to what HBC has provided
24  us in this litigation, the threshold for this
25  hydrocodone combination product in October of 2010

Page 147

1  was -- let's just round up and say 5000.
2    A.   I'm sorry.  Where are you?
3    Q.   I'm on the threshold for the Co-Gesic.
4    A.   Which page?
5    Q.   You can look at any of them.  It's on
6  every single one.
7    So to make the numbers easier, if we round
8  up, the threshold was about 5000; correct?
9    A.   Yes.
10    Q.   So the threshold being 5000 means that
11  the 12-month, the one-year monthly average was
12  around 1800?
13    A.   I'm sorry.  Say that again, please.
14    Q.   Sure.  If the threshold is about 5000
15  for this hydrocodone combination product, that
16  would mean that the 12-month monthly average was
17  around 1800, 1900?
18    A.   The way I look at this threshold
19  quantity, I'm having difficulty just understanding
20  is it for the month, is it for the year, is it for
21  the week?  I understand what it says there.
22    Q.   Well, you testified earlier that the
23  quantity is set on a monthly basis; right?
24    A.   Yes.
25    Q.   So what we're seeing here is a monthly

Page 148

1  quantity for this particular hydrocodone
2  combination product?
3    A.   I know what the threshold is set at.  I
4  don't know his report, what it's pulling and how
5  it's pulling it.  Again, I'm making an assumption,
6  and I don't want to make assumptions.
7    Q.   Well, let's do this then.  If this 4895
8  is the monthly threshold that's been set for
9  Co-Gesic, that would mean that the average monthly
10  order for the past year for that drug had been
11  about 1900.  Do you agree with that?
12    A.   Well, it's 12 months worth of data.
13  Wouldn't the monthly average -- I'm not following
14  you.  The monthly average is 4900 or 5000.
15    Q.   That's three times the monthly average;
16  right?
17    A.   Okay.
18    Q.   You have to divide it by three.  My math
19  is wrong.  It's around 1750 would be the monthly
20  average, right, because the threshold is the
21  monthly average times three; correct?
22    A.   My understanding is the chain's average,
23  monthly average times three.
24    Q.   Correct?
25    A.   Yes.

Page 149

1    Q.   So that would mean that the monthly
2  average for Co-Gesic for the last year had been,
3  and again my math is horrible, but it's going to
4  be around 1700, 1750, somewhere in there.  Do you
5  agree with that?  If you divide 5000 by three, you
6  get something in that range?
7    A.   Say it one more time, please.
8    Q.   The threshold is the monthly average
9  times three; correct?
10    A.   Chain average, yes.
11    Q.   So if we did 5000 divided by three, we
12  get approximately 1700.  Do you agree with that
13  roughly?
14    A.   Yes.
15    Q.   So the monthly average for the last year
16  for this hydrocodone combination product was
17  approximately 1700; correct?
18    A.   The way you describe it, yes.
19    Q.   But what we're seeing here is a list
20  of -- I don't know if you can kind of take a
21  schlag at how many different stores we're looking
22  at here that are on this list for being over the
23  threshold on this particular hydrocodone
24  combination product?
25    A.   I'm sorry.  I didn't follow your

Page 150

1 question.
2    Q.  I'm asking if you can tell me about how
3 many different stores we're seeing here who are
4 over their threshold for hydrocodone combination
5 product.  I think I counted 37 on the first page.
6 Then we have the entire second page and then about
7 half of the third page; correct?
8    A.  Yes.
9    Q.  So roughly 80, 90, a hundred stores, do
10 you agree with that?
11    A.  Yes.
12    Q.  And all of these stores are exceeding
13 not only the monthly average, but three times the
14 monthly average for this particular hydrocodone
15 combination product; is that correct?
16    A.  Again, I know what we just went through.
17 I know the headings we went through.  I just want
18 to understand that threshold quantity.  Is that
19 the divide three, or is it times three?  I don't
20 know what I'm looking at there.  Before I answer
21 your question, I'd like to understand more about
22 the --
23    Q.  Well, Mr. Tsipakis, I'm accepting your
24 representation that the threshold that's
25 established is the average for the last year times

Page 151

1 three.
2    A.  That's how the threshold was set, yes.
3    Q.  And then a report is produced of any
4 stores that have orders that exceed that
5 threshold; correct?
6    A.  Where I'm having difficulty is this is a
7 format in a report that I'm not familiar with, and
8 you're asking me to testify with certainty that I
9 know what I'm looking at.
10    I'm happy to look at it further.  I'm happy
11 at a break to clarify it.  I'm not trying to dodge
12 your question.  I just don't understand what I'm
13 looking at.
14    Q.  Well, let's just keep looking at this
15 and I'll just ask you a couple of questions, and
16 we'll go on the assumptions that this report is
17 what it should be, which is what you testified to,
18 that the threshold is three times the monthly
19 average.  Okay?
20    A.  Yes.
21    Q.  So we're both going to make that
22 assumption for the rest of this testimony.  Okay?
23    If you look at the first page, oh, about 10
24 or 12 down in the Co-Gesic list, you see where
25 there's a quantity shipped of 18,500.  Do you see

Page 152

1 that?  I think it was store 60.
2    A.  Yes.
3    Q.  So we know that that's more than three
4 times over the threshold; correct?
5    MR. BARNES:  Object to form.
6    THE WITNESS:  That's three times the
7 4895 listed there, yes.
8 BY MR. GADDY:
9    Q.  It's more than three times the
10 threshold; right?
11    MR. BARNES:  Object to form.
12    THE WITNESS:  Again, you're trying to
13 tell me that -- you're trying to -- again, as I
14 mentioned, until I understand what these pieces
15 are, I can't honestly tell you if it's three times
16 its threshold.  Is this report is something
17 different than I think it is?
18    Like I said, I'm happy to clarify that.
19 Based on what you're asking me, there's a number
20 4895 that's listed under the threshold quantity,
21 and the other one is shipped.
22    MR. BARNES:  I think we need to take a
23 lunch break.
24    THE VIDEOGRAPHER:  12:29.  We're off the
25 video record.

Page 153

1    (Recess from 12:29 p.m. to 1:33 p.m.)
2    THE VIDEOGRAPHER:  1:33.  We're on the
3 video record.
4 BY MR. GADDY:
5    Q.  Mr. Tsipakis, I want to go back to
6 No. 14 and see if we can finish up with that
7 document we were looking at before lunch.  Do you
8 have that document before you?
9    A.  Yes, sir.
10    Q.  I think that what we had determined or
11 what we agreed to proceed on the assumption that
12 the threshold quantity listed here under the title
13 Threshold Quantity was equal to three times the
14 monthly average for the previous year; correct?
15    A.  For the chain; correct.
16    Q.  And so with doing some rough math, what
17 we determined was that this particular drug,
18 Co-Gesic, which I'm representing to you is a
19 hydrocodone combination product, if you divide the
20 threshold by three, you get approximately 1700,
21 which would have been the monthly average for the
22 previous 12 months; correct?
23    A.  Correct, for the chain.
24    Q.  For the entire chain; correct?
25    A.  Correct.

Page 154

1  Q. How many pharmacies in the entire chain?
2  A. Over 200.
3  Q. And what we also determined is that
4  approximately 80 to 100 pharmacies are listed on
5  this threshold report as exceeding that threshold
6  in October of 2016; correct?
7  A. On this report, yes.
8  Q. And some of them, if we look at about
9  the middle of the screen there, you see there's I
10 think store 60, the total shipped quantity in
11 October of 2016 is 18,500. Do you see that,
12 18,500?
13 A. Yes.
14 Q. And I think we agreed that that's more
15 than three times over the threshold; correct?
16 A. For the chain, yes.
17 Q. But that would also be over ten times
18 higher than the monthly average for the last 12
19 months; correct?
20 A. I'm sorry. Say that again, please.
21 Q. Sure. We identified that the monthly
22 average for the last 12 months would have been
23 1700; right?
24 A. Correct.
25 Q. So this 18,500 that this particular

Page 155

1  pharmacy received during October of 2016 is over
2  ten times the monthly average for the chain for
3  the past 12 months; correct?
4  A. That is correct, but that is one of the
5  our busiest stores. So the chain average takes
6  our busiest stores and our slow stores, our less
7  volume stores, and puts it together in an average.
8  So stores on this list will be definitely over the
9  average based on volume.
10 Q. Because when HBC or Giant Eagle sets
11 their thresholds, they do it chainwide. They
12 don't take into account differences between
13 stores; correct?
14 A. For this report at this particular time,
15 yes.
16 Q. And if we go two entries down for it
17 looks like store 71, we similarly see that that
18 store is over ten times the monthly average for
19 the last 12 months. Do you see that?
20 A. Yes.
21 Q. And if we go down about 15 or so
22 entries, we see I believe it's store 1405 which
23 had 21,500 units shipped to it in October of 2016.
24 Do you see that?
25 A. Yes.

Page 156

1  Q. And you agree that this is more than
2  four times -- excuse me -- this would be more than
3  four times over the threshold; correct?
4  A. The chain-wide threshold, yes.
5  Q. And again, more than ten times over the
6  monthly store average for the last 12 months?
7  A. For the chain, yes.
8  Q. And I'm not going to go through every
9  single one of them, but if you flip through the
10 next page, you see several additional stores that
11 are more than two times, several that are more
12 than three times the threshold that Giant Eagle
13 and/or HBC had set for this particular hydrocodone
14 combination product.
15 A. Correct.
16 Q. Now, was there any type of -- and again,
17 this is October 2016. So this is after HBC
18 stopped distributing Schedule III drugs; right?
19 A. Correct.
20 Q. What they had been distributing has now
21 been reclassified as Schedule II; correct?
22 A. For hydrocodone containing products,
23 yes.
24 Q. Thank you. Was there any type of policy
25 in place about what would happen with anything

Page 157

1  that popped on this report?
2  A. There was an expectation on the
3  procedure -- and just for a matter of context, do
4  you know the date of this report?
5  Q. What date it was generated?
6  A. Yes.
7  Q. I believe I saw a cover sheet during the
8  break that said it was October 31st of '16.
9  A. Thank you. So the expectation on the
10 procedure would be any store that shows up on this
11 report, an investigation would be conducted.
12 Q. Would it be fair to characterize this
13 report as a tool that was utilized by Giant Eagle
14 or HBC to investigate potential suspicious orders?
15 A. One tool, but yes.
16 Q. And you said there was an expectation
17 that there would be an investigation; correct?
18 A. Yes.
19 Q. Is there an expectation that there would
20 be an investigation into every single one of these
21 controlled substances where the drugs have already
22 been shipped exceeded the threshold?
23 A. Yes. However some of them -- you just
24 mentioned this report was dated the 31st. So it
25 compounds. Each day compounds from the month. So

Page 158

1  if they've already cleared a store earlier in the
2  month for whatever reason, then they wouldn't
3  reinvestigate it. But every line item would be
4  investigated and cleared.
5      Q. So they didn't wait until the end of the
6  month to start doing their research; correct?
7      A. Well, this generates every day. So if
8  something already showed up -- store 71 showed up
9  on the 15th of the month, and they already cleared
10 it, it would still show up on the report of the
11 31st.
12     Q. Who within Giant Eagle or HBC was
13 responsible, and if it's not a who, what
14 department was responsible for investigating each
15 of these?
16     A. The analytics -- the procurement
17 department, procurement department.
18     Q. And if I'm remembering your testimony
19 correctly, these reports began being generated in
20 2013; correct?
21     A. 2013; correct.
22     Q. If I already asked you this, I'm sorry,
23 but do you remember when in 2013, if it was early,
24 mid, late?
25     A. I don't recall.

Page 159

1      Q. Was its always the procurement
2  department who was in charge of investigating
3  these?
4      A. The procurement department in
5  conjunction with the compliance department.
6      Q. And where does loss prevention fall in
7  here? Is loss prevention within either of those
8  departments?
9      A. Well, they're a stakeholder. So
10 certainly it's the procurement department, the
11 compliance department, and then the loss
12 prevention department is included in that. So if
13 we need to send them out for an investigation, we
14 need them to go retrieve a product, they're
15 certainly a stakeholder, yes.
16     Q. And we looked at some policies and
17 procedures earlier, and I think the earliest one
18 that we had was a 2015 policy, but it referred
19 back to an earlier version that was in August of
20 2014. Do you remember that?
21     A. Yes.
22     Q. And there were a couple of other
23 policies that predated 2014. Do you recall that?
24     A. Correct.
25     Q. And would it be accurate to say that

Page 160

1  those policies describe the actions that should
2  have taken place in response to each of these
3  orders popping on this report?
4      A. I think they describe components of it
5  or general expectations of it, but the exact
6  pieces, I don't know that it would spell out the
7  exact procedures.
8      Q. Is any -- I use the word investigation.
9  Are these investigations into each of these line
10 items, are they documented?
11     A. There is different forms of -- some are,
12 yes.
13     Q. Are all of them documented?
14     A. I don't know if all of them are
15 documented.
16     Q. Is there any policy or procedure that
17 requires any Giant Eagle or HBC employee to issue
18 any type of written report or memorandum or even
19 just a note indicating, for example, the first one
20 listed here, that they looked into this order of
21 Oxydo from store 71 and then issued their
22 determination that it is or is not something that
23 needs to be looked at further?
24     Is there any requirement that any type of
25 report like that be generated?

Page 161

1      A. I haven't found anything that
2  specifically calls out that something needs to be
3  written down or documented or -- certainly there's
4  an expectation to investigate every one.
5      Q. And I'm not asking you to point me to a
6  piece of paper as we're sitting here right now
7  today, but if I was to ask you can you justify why
8  this order for store 71 of Oxydo, which is a CII,
9  was shipped over threshold and that it wasn't
10 clawed back or it wasn't reported to the DEA,
11 would you have the ability to go and give me an
12 answer to what was done to approve that?
13     A. Let me make sure I understand your
14 question. Can you repeat it one more time,
15 please.
16     Q. Sure. Essentially, what I'm trying to
17 figure out is whether or not HBC or Giant Eagle
18 maintains any type of due diligence files.
19     For example, this order for store 71 for this
20 controlled II substance pops on this report, if
21 you wanted to go back now two years after the fact
22 and see what did we do to justify and clear that
23 order, is that possible?
24     A. I don't know.
25     Q. As you sit here today, is there any

Page 162

1 requirement or procedure in place to do any
2 maintaining or logging of any type of due
3 diligence or investigatory type efforts to clear
4 or justify orders that were received that may be
5 over thresholds or may be otherwise indicative of
6 diversion?
7     A.  Yes.  Over time more systems were
8 developed and abilities, yes.
9     Q.  When did Giant Eagle or HBC put in place
10 a system that required employees to log or
11 maintain files that explained why particular
12 orders were cleared or not cleared?
13     A.  I can say from the diligence I had in
14 early 2017, a system was developed where
15 investigative notes and information could be
16 entered regarding orders that we wanted to look
17 at, orders of interest.
18     Q.  Prior to early 2017, HBC nor Giant Eagle
19 had any system that was dedicated to maintain
20 notes, reports or memos that would explain or
21 justify why particular orders were cleared or not
22 cleared?
23     A.  We didn't have a repository if that's
24 what you're asking.  There were certainly
25 definitive emails to the field, emails to the

Page 163

1 warehouse, things of sorts that clearly show a
2 diligence of trying to run the ground on why an
3 order happened or what triggered, sure.
4     Q.  Can you say that that's the case for
5 every order that ever popped up on one of these
6 reports?
7     A.  I can say after reviewing and talking to
8 associates involved and folks that do report to
9 me, that every order that pops up of interest is
10 investigated and either cleared or not.
11     Q.  But you can't tell me as you sit here
12 today whether or not there's any documentation to
13 prove or disprove whether or not any or all of
14 those investigations actually happened?
15     A.  I can tell you that I don't know that I
16 have specific for each line item on -- well, from
17 2017 on, I can tell you we have a repository that
18 was built.  Prior to that, I cannot.
19     Q.  That's probably the easiest way to do
20 this.  Prior to early 2017, Giant Eagle nor HBC
21 had any repository or location, whether it's
22 physical or digital, to maintain any type of due
23 diligence reports or efforts; correct?
24     A.  There was no central repository.
25 Certainly if there was folders or emails or things

Page 164

1 that were kept -- I've seen some of them, so
2 definitely I know they exist.
3     Q.  So fair to say that these orders that
4 popped on these threshold reports that started
5 coming out back in 2013 would lead Giant Eagle or
6 HBC to start to do some type of due diligence; is
7 that correct?
8     A.  Yes.
9     Q.  From 2009 until 2013, when HBC was
10 distributing hydrocodone combination products,
11 what would lead to HBC doing any type of due
12 diligence on any of the orders that were received
13 from the stores?
14     A.  Certainly from as moved on, we improved
15 the processes and continued to add capabilities.
16 Your specific timeframe is what again, please?
17     Q.  2009 until the threshold reports started
18 being generated in 2013.
19     A.  So in addition to other controls, one of
20 the mechanisms we would use is the integrated
21 approach I mentioned earlier to disclose
22 suspicious orders to us, which would prompt
23 investigation, similar diligence, no difference in
24 diligence, and running to ground whether an order
25 of interest was suspicious or not.

Page 165

1     Q.  And that integrated approach would
2 involve the superintendent of the warehouse, the
3 pickers at the warehouse and the procurement folks
4 from HBC's side; correct?
5     A.  And the stores, yes.
6     Q.  Store is not HBC, is it?
7     A.  The store is not HBC, but it's all part
8 of the same company, same system.  It's part of
9 our system.
10     Q.  But it's HBC who has the responsibility
11 to design and operate a system that detects
12 suspicious orders; correct?
13     A.  Correct.
14     Q.  Can you tell me between -- we can look
15 at that report, and we can -- assuming that in
16 October of 2016 Giant Eagle followed their
17 policies in place, if we estimate that there's 200
18 entries on that report, we could say that there
19 were 200 separate investigations done, due
20 diligence type investigations done in
21 October 2016; would that be fair?
22     A.  I can tell you just by looking at some
23 of them and understanding the report better, we
24 have stores that are filling 6000 prescription as
25 week that are averaged against stores that are

Page 166

1  doing 300 a week. So obviously, if you're doing
2  as a chain-wide average, you're going to have a
3  ton of false positives, which is predominantly a
4  lot of these orders on these reports.
5     Q. Well, isn't that a reason why having a
6  chain-wide average isn't a very good idea?
7     A. Again, it's our attempt to have a system
8  in place. We're not just relying on a threshold.
9  We're relying on a total system of the threshold
10 being one of those controls.
11    Q. Well, if you're relying on a system that
12 uses an average and you have some stores that do
13 300 scripts a week and some stores that do 6000
14 scripts a week, you would agree with me that
15 average probably isn't very helpful?
16    A. I would agree with you it's probably
17 flawed and it could be done better, which is why
18 our second version of our threshold system was
19 improved.
20    Q. How long did Giant Eagle and HBC utilize
21 this flawed version of the threshold report that
22 used a chain-wide average, from 2013 until when?
23    A. To be clear, I didn't say this report
24 was flawed. I said the methodology of averages
25 could lead to a false positive, which is what a

Page 167

1  lot of these reports -- lot of these orders on
2  these reports are.
3     Q. How long did Giant Eagle and HBC use
4  this report?
5     A. As I think was established earlier in
6  testimony, this report started somewhere around
7  2013.
8     Q. I'm sorry. Until when? Tell me if I'm
9  wrong, but I think you said that you no longer use
10 a chain-wide average and now use a store average.
11    A. Correct.
12    Q. As we sit here today in 2018.
13    A. Correct.
14    Q. When did you stop using the chain-wide
15 average that you indicated is somewhat of a flawed
16 methodology that can produce false positives?
17    A. It can produce false positives. Till
18 2017. We changed, early 2017.
19    Q. So if we were to look at the life of
20 HBC's and Giant Eagle's threshold program, from
21 2009 to 2013, there was no threshold program.
22 From 2013 to 2017, there was a threshold program
23 based on a chain-wide average. And from 2017
24 through present, there's a threshold program
25 that's based on individual stores' metrics setting

Page 168

1  the threshold?
2     A. Correct.
3     Q. From 2009 to 2013, what would cause HBC
4  to perform a due diligence investigation? What
5  about their system, what flags within the system
6  would cause HBC to perform a due diligence
7  investigation?
8        MR. BARNES: Object to form. Asked and
9  answered.
10       Go ahead.
11       THE WITNESS: So as we established
12 earlier, we know what products are coming into our
13 warehouse, what products are going out to our
14 stores. Any pattern that would show -- our
15 procurement team as well as the warehouse team, if
16 they saw a spike in orders or a deviation of sorts
17 from that, they would see that, and they would
18 recognize that.
19 BY MR. GADDY:
20    Q. From 2009 to 2013, are you able to
21 identify for me any orders of hydrocodone
22 combination products that due diligence was ever
23 performed on?
24    A. I'm sorry. Ask that once more, please.
25    Q. From 2009 until 2013, are you able to

Page 169

1  identify for me any orders for hydrocodone
2  combination products that due diligence was ever
3  performed on?
4     A. I believe there is, but -- when you
5  say -- so orders, obviously orders were placed
6  from 2009 to 2013. I can see emails,
7  investigative emails going back and forth on
8  questions on orders or product movement,
9  et cetera. So I did see that through my
10 diligence. I'm sorry. I'm trying to understand
11 your exact...
12    Q. I'm trying to determine whether or not
13 from 2009 to 2013 you can identify for me any
14 orders on which due diligence was performed by
15 HBC.
16    A. I don't know.
17    Q. Is there a software vendor that HBC or
18 Giant Eagle utilizes for these threshold reports?
19    A. No.
20    Q. It's all internal?
21    A. Yes.
22    Q. This threshold system that was utilized
23 beginning in 2013, was it developed -- was it
24 developed and designed specifically to monitor for
25 suspicious orders of controlled substances?

Page 170

1    A.  It was developed to continue to improve
2  our suspicious order monitoring system, not to
3  replace anything that was done previous.  It was
4  basically just to continue to improve upon it
5  using system-generated cues, et cetera.
6    Q.  We can go back to the document if we
7  need to, but I'm going back to the regulation, the
8  1301.74(b), which is the regulation that requires
9  the registrants to design and operate a system to
10  disclose suspicious orders.
11    Do you recall that regulation also obligates
12  the registrant, in this case HBC, to inform the
13  DEA of suspicious orders when they're discovered?
14    A.  Yes.
15    Q.  And that's the case whether we're
16  talking about Schedule II drugs or whether we're
17  talking about Schedule III drugs; correct?
18    A.  Correct.
19    Q.  Do you understand that the pharmacies
20  are not supposed to receive suspicious orders of
21  drugs?
22       MR. BARNES:  Object to form.
23       THE WITNESS:  Can you clarify?  I don't
24  follow your -- what is your question?
25

Page 171

1  BY MR. GADDY:
2    Q.  Does HBC agree that orders are not
3  supposed to be shipped to the pharmacies until
4  they have been deemed not suspicious?
5       MR. BARNES:  Object to form.
6    You can answer.
7       THE WITNESS:  Again, in our system,
8  since we have line of sight from the warehouse all
9  the way out to the dispensing level, our
10  pharmacists are filling prescriptions pursuant to
11  legitimate prescriptions, which then generate
12  orders, and we ship those orders to the
13  pharmacies.
14  BY MR. GADDY:
15    Q.  My question is more about timing of the
16  shipping.  So we looked at some of these threshold
17  or we looked at one of these threshold reports.
18  And the reports indicate on their face that orders
19  of pills that exceeded the threshold were shipped
20  to the stores that were in excess of the
21  threshold.  And you told me that after the reports
22  are generated, they're looked at, and then some
23  level of investigation is done; is that correct?
24    A.  Correct.
25    Q.  You agree with me that any investigation

Page 172

1  that was being done by Giant Eagle or HBC is
2  happening after the orders have been shipped;
3  correct?
4    A.  Perhaps, yes, perhaps.
5    Q.  Well, that's what the forms indicate;
6  correct?
7    A.  Well, some of them -- obviously looking
8  at some of these -- you mentioned this report is
9  on the 31st of the month.  So if you look at some
10  of these, as I testified earlier, some of these
11  would have already been cleared and some of them
12  you could already tell that there would be a false
13  positive.
14    So some of them you would have known -- you
15  would have known that -- you would have cleared
16  them early is what I'm trying to say knowing that
17  they were a false positive.
18    Q.  But by the time the procurement folks
19  see this report, the pills have already been
20  shipped; correct?
21    A.  They may have.  The report -- the report
22  generates early in the morning.  Stores don't
23  receive their orders till after they open.  So
24  they would have been shipped, but not received in
25  some cases, in transit.

Page 173

1    Q.  Break that down for me.  You state the
2  reports are generated early in the morning.  What
3  does that mean?
4    A.  I'm not sure of the exact time, but
5  certainly before our pharmacies open for business.
6    Q.  What time do your pharmacies open for
7  business?
8    A.  Some open at 9:00.  Some open at
9  8:00 generally.
10    Q.  Let me just ask it this way.  Did HBC or
11  Giant Eagle have any policy in place that any
12  orders that popped on the threshold report were
13  not shipped until they've been cleared?
14    A.  Not that I could find a policy.
15    Q.  They're still operating under the
16  threshold policy today.  Today are these orders
17  shipped or are they blocked merely because they
18  come up on the report, or are they shipped and
19  then the diligence is performed?
20    A.  So in our experience, having looked at
21  reports having looked at thresholds, we generated
22  very few suspicious orders over the timeframe that
23  we've been operating.  So I guess I'm trying to
24  understand.
25    In our environment, we're able to intercept,

Page 174

1 retrieve, quarantine product all the way up to the
2 time it gets to the store, after it lands at the
3 store, when in transit with the truck. So we're
4 able to intercept -- the change of title never
5 happens. Giant Eagle owns the product. Giant
6 Eagle ships the product. Giant Eagle receives the
7 product at the stores. So I guess I'm just trying
8 to follow your question.
9    Q.  Frankly, I'm trying to following your
10 answer. Because I said they're shipped before the
11 investigation happened, and your answer was, well,
12 the reports are generated early in the morning and
13 the pharmacies don't open until 8:00 or 9:00, so
14 maybe they haven't gotten there yet.
15    So my question is whether or not the orders
16 are shipped, whether or not there's a policy or a
17 rule, a procedure, that requires the orders to not
18 be shipped until somebody from procurement looks
19 at it and says, oh, that's a false positive, oh,
20 there's a justification for that.
21    Is there a policy, procedure or rule in place
22 that does such?
23    A.  No.
24    Q.  You mentioned just a few minutes ago
25 that I guess because you're shipping to your own

Page 175

1 stores, I think the phrase you used was the title
2 never changes.
3    So what I'm asking about, are you aware of
4 instances where you've had to turn the truck
5 around and bring it back to the distribution
6 center because there's pills didn't need to go to
7 that store?
8    A.  In our history, we've only had very few
9 suspicious orders, so we haven't had an instance
10 where we needed to grab an order back.
11    Q.  You mentioned that you could go to a
12 store or quarantine an order at a store. Has
13 there ever been an instance that you're aware of
14 where HBC or Giant Eagle has had to call the store
15 and tell them, don't open that tote, put that to
16 the side, we got to come, get it back from you
17 because that order shouldn't have been shipped?
18    A.  We haven't, but we've had instances
19 where we've shut off stores in the cases we've had
20 on our suspicious orders, shutting off stores from
21 being able to order any more product, either from
22 us or from our other wholesaler, our commercial
23 wholesaler. So steps quickly can be put into
24 place.
25    Q.  And I'm going to ask you about the

Page 176

1 history of suspicious order reports in just a
2 second. So we'll get into that into a little bit
3 of detail. You don't remember any times where you
4 had to turn a truck around, don't remember any
5 times where you had to call a pharmacy and ask
6 them to put a tote to the side and not open it;
7 that hasn't happened?
8    A.  Not that I've seen in what I've looked
9 at.
10    Q.  So every time that orders have been
11 flagged or popped on this threshold report going
12 back to 2013, they've always been shipped, and
13 they've never been brought back?
14    A.  As far as I can tell, no.
15    Q.  From 2013 till we sit here today, every
16 order that's ever popped on HBC's or Giant Eagle's
17 threshold report as being over threshold has
18 always been shipped, has never been reported to
19 the DEA and has never been brought back?
20    MR. BARNES:  Wait a minute. Object to
21 form.
22 BY MR. GADDY:
23    Q.  Is that correct?
24    MR. BARNES:  This is one report with a
25 hundred --

Page 177

1    MR. GADDY:  That's all I'm asking. I'm
2 asking him the question, not you.
3    MR. BARNES:  Don't trick him.
4    THE WITNESS:  Can you ask the question
5 again, please?
6 BY MR. GADDY:
7    Q.  2013 through today, have there ever been
8 any controlled substances that have been flagged
9 on this report that have not been shipped to the
10 stores?
11    MR. BARNES:  Object to form.
12    THE WITNESS:  The orders that have been
13 flagged on this report were received by the
14 stores, is that your question?
15 BY MR. GADDY:
16    Q.  I think you answered my question.
17    So every report -- every entry that's flagged
18 here on this report was sent to the stores;
19 correct?
20    A.  Every entry on these stores, none of
21 them were flagged as suspicious. They were all
22 investigated and cleared.
23    Q.  And that's fine if that's what the
24 answer is. I'm just trying to make sure that's
25 clear.

Page 178

1    A.  That is the answer.  I'm telling you
2  what happens.
3    Q.  Going back to 2013, as we sit here
4  today, every item that's showing up on this report
5  has been investigated and cleared?
6    A.  Yes.
7    Q.  From 2009 until 2014 -- here I'm only
8  asking about HBC; I'm not asking about the new
9  Giant Eagle distribution center -- do you have any
10 understanding of how many orders for hydrocodone
11 combination products HBC received from Giant Eagle
12 pharmacies?
13   A.  I'm sorry.  One more time.  2009 to
14 2014?
15   Q.  Sure.  I'm only asking about HBC.  I'm
16 not asking about the Giant Eagle facility.
17    Do you have an understanding as to how many
18 orders for hydrocodone combination products HBC
19 received from Giant Eagle pharmacies?
20   A.  How many orders HBC -- I'm sorry.  I'm
21 just trying to follow.  How many orders HBC
22 received?
23   Q.  Correct.
24   A.  From Giant Eagle pharmacies?
25   Q.  Correct.

Page 179

1    A.  You're talking about returns?  I'm
2  sorry.  I'm not following the question.
3    Q.  When I say order, I mean the pharmacy
4  submitting an order, hey, we need X number of
5  pills.
6    Do you have any idea -- and maybe I should
7  ask it this way -- do you have any idea of the
8  number of dosage units that HBC distributed to
9  Giant Eagle pharmacies of hydrocodone combination
10 products from '09 to '14?
11   A.  I do not.
12   Q.  Do you have any idea of how many doses
13 of hydrocodone combination products HBC
14 distributed to Ohio from '09 to '14?
15   A.  I do not.
16   Q.  Are you familiar with the concept of
17 ARCOS database?
18   A.  Yes.
19   Q.  Are you familiar with the fact that HBC
20 and now Giant Eagle has an obligation to report
21 its distribution of controlled substances to the
22 DEA and then it gets entered into this database
23 they call ARCOS?
24    MR. BARNES:  Object to form.
25    THE WITNESS:  Yes.

Page 180

1  BY MR. GADDY:
2    Q.  And that ARCOS tracks the delivery of
3  the pills from HBC to the Giant Eagle pharmacies?
4    A.  Yes.
5    (HBC-Tsipakis Exhibit 15 was marked.)
6  BY MR. GADDY:
7    Q.  I'll show you what I'll mark as
8  Exhibit 15.  I'll represent to you that this is a
9  spreadsheet, pretty basic one that we put together
10 from the ARCOS database.
11    Do you see at the top it says HBC Dosage Unit
12 Distribution to Cuyahoga, Summit and all those in
13 Ohio.  Do you see that?
14   A.  Yes.
15   Q.  And then below that it's got four drug
16 family, but the only one that would be relevant to
17 HBC is hydrocodone; correct?
18   A.  From HBC, yes.
19   Q.  Then it goes down under Cuyahoga County.
20 You see in the chart here the first time we have
21 any distribution from HBC is in 2009; correct?
22   A.  Correct.
23   Q.  And that's consistent with what you told
24 us about when HBC distributed these drugs?
25   A.  Yes.

Page 181

1    Q.  And we see over the time period for
2  which we have ARCOS data, which coincidentally is
3  going to be the time period, is going to
4  encapsulate all the time period that HBC
5  distributed, that HBC distributed over 10 million
6  dosage units of hydrocodone combination products
7  to Cuyahoga County.  Do you see that?
8    A.  Yes.
9    Q.  And from 2009 to 2014, zero of those
10 orders of hydrocodone combination products into
11 Cuyahoga County were deemed to be suspicious by
12 HBC; is that correct?
13   A.  There was a suspicious order in 2013.
14 I'm not sure if it was a PA store or Ohio.
15 Actually, I think it was PA.  So yes, that's
16 correct.
17   Q.  Then we see Summit County right below
18 from it.  '09 to '14, 8.8 million dosage units of
19 hydrocodone combination products were shipped into
20 Summit County during that six-year time period;
21 correct?
22    MR. BARNES:  Object to form.
23    THE WITNESS:  Yes.
24 BY MR. GADDY:
25   Q.  And HBC determined that zero of those

Page 182

1 orders were deemed to be suspicious; is that
2 correct?
3     A.  We didn't have any suspicious orders.
4 We didn't have any suspicious orders in that
5 timeframe.
6     Q.  And then very bottom column there, from
7 2009 until 2014 --
8         MR. BARNES:  I'm going to object this
9 portion in the chart.  It's not part of the case.
10 BY MR. GADDY:
11    Q.  Do you see the bottom part of it --
12        MR. BARNES:  Don't answer any questions
13 relating to the entire state.
14        MR. GADDY:  You're instructing the
15 witness not to answer?
16        MR. BARNES:  The special master has
17 ordered that only two counties in Ohio are at
18 issue in the case.  Why are you violating that
19 discovery order?
20        MR. GADDY:  I'm just asking a question.
21        MR. BARNES:  And I'm objecting.
22        MR. GADDY:  Are you instructing him not
23 to answer the question?
24        MR. BARNES:  Yes.
25

Page 183

1 BY MR. GADDY:
2     Q.  You mentioned just a second ago that
3 there was a suspicious order reported in 2013.
4 Was that into Cuyahoga or Summit counties?
5     A.  It was not.
6     Q.  Was it into the state of Ohio?
7     A.  It was not.
8     Q.  Was it for a hydrocodone combination
9 product?
10    A.  It was not.
11    Q.  From 2009 to 2014, did HBC ever report
12 as suspicious any orders for hydrocodone
13 combination products?
14    A.  As a Schedule III while it was
15 classified a Schedule III, no.  In general, no,
16 but it was Schedule III during that time.
17    Q.  And never once during that time period
18 did HBC ever report any orders of that product as
19 being suspicious?
20    A.  That's correct.
21    Q.  I'll show you what I'll mark as
22 Exhibit 16.
23        (HBC-Tsipakis Exhibit 16 was marked.)
24 BY MR. GADDY:
25    Q.  I'll represent to you -- if you recall

Page 184

1 at the beginning of the day, we looked at those
2 combined discovery responses.  And let's grab
3 those again real quick, if you don't mind -- this
4 is No. 4 -- just so we can kind of match this all
5 together.  I'm sorry.  HBC 11.
6     Do you have that?
7     A.  Yes.
8     Q.  If you turn to .10 on that document.
9     A.  .10?
10    Q.  Yes.  Page 10, sorry, up in the top
11 right-hand corner.
12    A.  .10, okay.
13    Q.  Do you see the question here is asked:
14 "Please identify and describe each suspicious
15 order your suspicious order monitoring system
16 identified since January 1, 2006 and produce all
17 documents related to it."
18    Do you see that?
19    A.  Yes.
20    Q.  And I'll represent to you we got a
21 paragraph of objections.  And if you turn the
22 page, about halfway down the page on the
23 right-hand side, there's a sentence that starts
24 "HBC, however..."  Are you with me?
25    A.  I'm sorry.  I'm just trying to find on

Page 185

1 there -- HBC, however, I have it.
2     Q.  It says, "HBC, however, did identify and
3 report a suspicious order for a Schedule III
4 opioid.  That report identifies a suspicious order
5 for buprenorphine" -- did I say that right?
6     A.  Yes.
7     Q.  -- "containing products that HBC
8 identified as suspicious on January 20, 2016 and
9 reported it to the DEA on January 21, 2016."
10    Do you see that?
11    A.  Yes.
12    Q.  In your preparation to testify today,
13 did you become familiar with that suspicious order
14 that HBC and/or Giant Eagle reported in January of
15 2016?
16    A.  Yes.
17    Q.  And you understand that that was -- this
18 was two years after HBC stopped distributing
19 controlled substances; correct?
20    A.  I'm sorry.  Ask that question again.
21    Q.  This suspicious order that's reported in
22 January of 2016, this is -- and I said two years
23 because it's approximately two years after HBC
24 stopped distributing hydrocodone combination
25 products.

Page 186

1    A.  Okay.  I misread you.  Two years after
2   hydrocodone products because it was reclassified
3   as Schedule II, yes.
4    Q.  This drug that was shipped -- excuse
5   me -- this drug that was reported as suspicious in
6   January of '16, was that shipped by HBC or was
7   that shipped by the new Giant Eagle facility?
8    A.  I believe it was shipped by HBC.
9    Q.  But it was not a hydrocodone combination
10  product?
11   A.  That's correct.
12   Q.  And if you see down here at the bottom
13  of the answer, there's a bunch of Bates ranges
14  listed for documents; correct?
15   A.  Yes.
16   Q.  Go back to No. 16, if you don't mind.
17   A.  16?
18   Q.  It's the one right in front of you
19  there.  And I'll represent to you I've done here
20  the same thing I did with the last response that
21  we looked at where I combined all those Bates
22  numbers into one document so we can just look at
23  them all at one time.  Does that make sense?
24   A.  Yes.
25   Q.  And I did the same thing again where I

Page 187

1   threw a blue piece of paper between the different
2   documents so we can keep track of what's what;
3   correct?
4    A.  Yes.
5    Q.  So if we look at the very first page
6   here, at the top we see an email from Joseph
7   Millward, January 21st of 2016; correct?
8    A.  Yes.
9    Q.  And the subject of this email is DEA
10  Notification of Suspicious Order?
11   A.  Yes.
12   Q.  And it says, "Team, attached is the
13  written notification of the suspicious order for
14  store 0054.  We are required to notify the DEA
15  when we determine that an order for controlled
16  substances is suspicious.  This complies with 21
17  CFR 1301.74(b).
18   Do you see that?
19   A.  Yes.
20   Q.  So HBC was certainly aware of their
21  obligations under the federal regulations?
22   A.  Yes.
23   Q.  And if we flip the page, we, in fact,
24  see the suspicious order notification that I
25  believe was faxed to the DEA; correct?

Page 188

1    A.  I don't know how it was delivered, but
2   it was delivered to the DEA.
3    Q.  And it's got the date of 1/21/16, Dear
4   agent in charge.  It says, "HBC Service
5   Company" -- it gives its resignation number --
6   "has identified a suspicious order for
7   buprenorphine containing products from Giant Eagle
8   Pharmacy 54."  It gives its registration number.
9   "The order was determined to be suspicious on
10  1/20/16."
11   Do you see that?
12   A.  Yes.
13   Q.  If you turn the page one more time, it
14  looks like we have -- it looks to me like we have
15  a confirmation fax page.
16   A.  Okay.
17   Q.  Does that look like what that is to you?
18   A.  Yes.
19   Q.  So no doubt that HBC knew its
20  obligations under the regulations; correct?
21   A.  Yes.
22   Q.  No doubt that HBC knew how to report a
23  suspicious order because we see them do it here;
24  correct?
25   A.  Yes.

Page 189

1    Q.  They knew how to get the order into the
2   hands of the DEA; correct?
3    A.  To get the -- to report the order, yes.
4    Q.  And I'll represent to you that several
5   of these emails are built on each other.  So I'll
6   try to go back a little bit and we'll cover
7   several at a time.  So I'm going to go to the
8   document which starts on .9, but it's an email
9   chain, so I'm going to go to the back, which is
10  .11.
11   A.  I'm sorry.  You're on?
12   Q.  13.11 at the top.  You have the right
13  exhibit, Exhibit 16.
14   A.  13.11.  Okay.  Thank you.
15   Q.  Do you see down at the bottom we see the
16  initial communication is from January 15, 2016.
17  The subject is Daily HBC Suspicious Purchasing
18  Report.  Do you see that?
19   A.  Yes.
20   Q.  And would it be fair to say this is one
21  of those threshold type reports that we spent an
22  hour or so looking at earlier today?
23   A.  Is this what's listed in 13.12?
24   Q.  I think it is attached, yes.
25   A.  Let me just take a look at it.  It looks

Page 190

1 the same, yes.
2    Q.   If you then go to .10, the previous
3 page, so we're going forward in the email chain,
4 you get an email from Joe Millward; correct?
5    A.   Yes.
6    Q.   And he writes this email to Darren
7 Evans.  Who is Darren Evans?
8    A.   He's one of the pharmacy district
9 leaders for Giant Eagle.
10   Q.   He covers an area in Pennsylvania which
11 is where I think this report came out of?
12   A.   Yes.
13   Q.   It says, "Darren, Store 54 and to a
14 lesser extent 2402 are increasing in buprenorphine
15 products on a daily basis.  Jason was able to pull
16 together some data.  This is potentially
17 concerning.  The store did not exceed the purchase
18 threshold last month.  This is a new trend at the
19 Somerset stores."
20     Do you see that?
21   A.   Yes.
22   Q.   And then he goes in and asks Darren to
23 do some investigation; correct?
24   A.   I'll just read a little bit.  Yes.
25   Q.   And these types of investigations, these

Page 191

1 are some of the things that were laid out in the
2 policies that we saw that Giant Eagle adopted in
3 2015 and -- I'm sorry -- 2014 and then 2015;
4 correct?
5    A.   Yes, but I will tell you these type of
6 inquiries would be happening all along as far as
7 from talking to investigative folks and the folks
8 that were involved.  It would not be uncommon for
9 something to trigger and then someone from
10 corporate or the warehouse talking to the field.
11 So that's what you're seeing here.
12   Q.   Well, are you aware of any investigation
13 such as this that happened at any time from 2009
14 to 2014?
15   A.   As far as written ones that I could find
16 in preparation?
17   Q.   Correct.
18   A.   I didn't have any I could find.
19   Q.   If you go to .20 of this same document,
20 we see an email from Jason Mullen.  Do you see
21 that?
22   A.   Yes.
23   Q.   Who is Jason Mullen and what does he do?
24   A.   Jason was one of the folks that worked
25 on the compliance team.

Page 192

1    Q.   And do you know what his position was?
2    A.   His exact title I'm not sure of, but he
3 was on the compliance team that helped out looking
4 at orders and things of interest.
5    Q.   My understanding is he was only with the
6 company from 2015 to 2016.
7      Do you know who filled his role before and/or
8 after him?
9    A.   I don't know who filled it before.
10 After it would have been George Chunderlik, who is
11 also copied on this or who this was sent.
12   Q.   How long has George Chunderlik been in a
13 compliance position for HBC?
14   A.   I don't know the exact number of years.
15   Q.   Can you estimate it?  Is it more than
16 10, more than 20?
17   A.   I believe it would be somewhere about
18 five years, three to five years.
19   Q.   Who was the longest serving person with
20 compliance duties as it relates to HBC or Giant
21 Eagle?
22   A.   I don't know.
23   Q.   Do you know of anybody who's been
24 serving in a compliance function with HBC or Giant
25 Eagle longer than George Chunderlik.

Page 193

1    A.   I don't know exactly.
2    Q.   We see going back to .20, this email
3 here from Jason, the top paragraph says, "I
4 apologize for the lengthy email.  Below is some
5 analysis."
6      So we're on the same page, because I kind of
7 got sidetracked, but this is the analysis that
8 he's doing into this potential suspicious order;
9 correct?
10   A.   Is it okay if I read it?
11   Q.   Yeah, yeah.
12   A.   Okay.  I've read it.  Can you repeat
13 your question?
14   Q.   My question was:  You agree this is an
15 email containing some analysis that he did on this
16 potential suspicious order?
17   A.   Yes.
18   Q.   And he also says, "The attached is a
19 spreadsheet."  It goes into a little bit more
20 detail.  Then he starts giving some notes about
21 what he found when he looked into these orders
22 coming out of the store; correct?
23   A.   Yes.
24   Q.   And several things that he looked at
25 were the number of different prescribers that were

Page 194

1 issuing prescriptions for the drug in question;
2 correct?
3     A. Yes.
4     Q. He looked at the distance between the
5 pharmacy and the provider; correct?
6     A. Yes.
7     Q. He looked at the distance between the
8 patient residence and the pharmacy; correct?
9     A. Yes.
10     Q. He looked at the distance between the
11 patient residence and the doctor; correct?
12     A. Yes.
13     Q. He looked at -- I think if you turn the
14 page, he looked at how many were cash, paying in
15 cash versus how many were paying through a third
16 party; correct?
17     A. Yes.
18     Q. He also looked at how many were combo
19 therapy. My assumption is that means got multiple
20 prescriptions, or do you know?
21     A. I'm not sure what he means, but that's
22 what it says.
23     Q. Again, all of these different factors
24 are indicators that we saw identified in those
25 2014 and 2015 policies that we looked at this

Page 195

1 morning that were put out by Giant Eagle; correct?
2     A. Yes.
3     Q. If you flip to .39, you see the response
4 to Jason's email from Joe Millward; correct?
5     A. Yes.
6     Q. Tell me what Joe Millward's role is.
7     A. I believe he was the senior manager of
8 compliance.
9     Q. And his response to Jason based on this
10 page and a half or so email that we looked at -- I
11 think it had some attachments, some charts he put
12 together -- Joe says, "Excellent work on the
13 spreadsheet, Darren. This will be powerful to
14 share with the store teams."
15     Do you see that?
16     A. Yes.
17     Q. Do you agree that this level of
18 investigation and due diligence that Jason did
19 here in January of 2016, you weren't able to find
20 any evidence that anything like this was done by
21 HBC between 2009 and 2014; is that correct?
22     MR. BARNES: Object to form.
23     THE WITNESS: I mean, there's clearly
24 communications, emails of inquiry, but I just
25 don't -- as far as when you say level of

Page 196

1 investigation, I mean, there was investigations
2 done. What's the specific question?
3 BY MR. GADDY:
4     Q. Did you see anything from 2009 to 2014,
5 any type of level of detail of investigation that
6 we see here in Jason's 2016 email? Did you see
7 anything like that when you looked back or did
8 your research from 2009 to 2014 when HBC was
9 distributing hydrocodone combination products?
10     MR. BARNES: Object to form.
11     THE WITNESS: I did not, not that I
12 could find.
13 BY MR. GADDY:
14     Q. I'm going to show you what I'll mark as
15 17. I don't have this to put up on the screen.
16 This is what I just got this morning, so I only
17 have the one copy.
18     (HBC-Tsipakis Exhibit 17 was marked.)
19 BY MR. GADDY:
20     Q. I'm going to hand it to you in just a
21 second. I'm going to represent to you this is a
22 December 5, 2013 email from Joe Millward to
23 several individuals, including Greg Carlson who
24 you mentioned earlier, and the subject is --
25     MR. GADDY: Can I swap and give him the

Page 197

1 one that's in evidence?
2     MR. BARNES: Sure.
3 BY MR. GADDY:
4     Q. So I've handed you No. 17 now. Do you
5 see that's a December 5, 2013 email from Joe
6 Millward, the subject being 2401?
7     A. Joe Millward, yes. That's who -- yeah,
8 Joe Millward.
9     Q. And what we just went through was a
10 suspicious order that was identified by HBC in
11 January of 2016. That's what we just went through
12 a minute ago; correct?
13     A. Sorry. Let me just read it. I'm sorry.
14 Your question was now that I had a chance to read
15 it?
16     Q. That's fine. I was actually asking
17 about the last one.
18     The last suspicious order that we looked at
19 was one that was reported by HBC for January 2016;
20 correct?
21     A. Correct.
22     Q. This is a separate suspicious order that
23 is being investigated by HBC; correct?
24     A. '16. Yes. I was just trying to
25 ascertain -- I know we had a suspicious order in

Page 198

1  2013. Yeah, this is what you're showing me.
2      Q.  And if you turn the page -- maybe I
3  should have started on the back page.
4      It says, "HBC team, can you please be sure
5  pharmacy 2401 does not receive this particular
6  item," which is buprenorphine, "until further
7  notice.  Their ordering of the product has been
8  flagged as suspicious and are being reported to
9  the DEA."
10     Do you see that?
11     A.  Yes.
12     Q.  I probably should have started there.
13     A.  Yeah, that made it a lot clearer.  Thank
14 you.
15     Q.  Is buprenorphine an oxycodone
16 combination product?
17     A.  I don't know.
18     Q.  Has it ever been a Schedule II drug?
19     A.  No.
20     Q.  From 2009 when HBC first began
21 distributing controlled substances until the
22 present, so all the way through HBC's lifetime and
23 now through the Giant Eagle RX distribution
24 center, how many suspicious orders have been
25 reported to the DEA?

Page 199

1      MR. BARNES:  I'm going to object.  With
2  respect to the discovery cut-off, we're not going
3  to the present obviously.  We've indicated in our
4  discovery responses that we're filing a June 1,
5  2018 discovery cut-off.  So we would object to any
6  questions beyond that date generally.
7      THE WITNESS:  To answer your question,
8  up until the date of June 1st of 2018, two, two
9  orders.
10 BY MR. GADDY:
11     Q.  How many -- of those suspicious orders
12 that were reported, how many of those two orders
13 were for hydrocodone combination products?
14     A.  Zero.
15     (HBC-Tsipakis Exhibit 18 was marked.)
16 BY MR. GADDY:
17     Q.  I'm going to show what I'll mark as
18 Exhibit 18.
19     MR. GADDY:  It's HBC 1005 internally.
20 BY MR. GADDY:
21     Q.  And if you would start for me, please,
22 at the beginning of the email chain on page 2.
23     A.  .2?
24     Q.  Correct.  It starts about halfway down
25 the page with an email from Robert McClune.  Do

Page 200

1  you see that?
2      A.  Yes.
3      Q.  The subject of the email is Thrifty
4  White Notes.  It says, "Team, I wanted to send a
5  note out regarding our trip to Thrifty White
6  yesterday in conjunction with the planned
7  warehouse move vault and refrigeration."
8      Do you see that?
9      A.  Yes.
10     Q.  What is Thrifty White?
11     A.  Thrifty White is another regional
12 pharmacy chain.
13     Q.  Is it white or right?
14     A.  White, Thrifty White.
15     Q.  What was the purpose in HBC and Giant
16 Eagle employees taking a visit to Thrifty White?
17     Let me ask you this:  Are you aware
18 independently without reviewing the email?
19     A.  No.
20     Q.  I'll withdraw the question.
21     So it says the team went to Thrifty White
22 yesterday.  Then it says in the next paragraph,
23 "Please chime into this email string with your
24 Thrifty White notes.  Do not worry about
25 duplication.  Just bring them."

Page 201

1      Do you see that?
2      A.  Yes.
3      Q.  And then if you look at the bottom of
4  that page and flip to the next page, you just kind
5  of see a set of bullet points, and there's a
6  heading in that about Thrifty White notes.  Do you
7  see that?
8      A.  Yes.
9      Q.  And if we flip through back to the first
10 page of the document, do you see the response from
11 Joe Millward who I think you said was head of the
12 compliance department?
13     A.  Yes.
14     Q.  And he writes, "Here are my notes."  And
15 the title of his notes are Thrifty White Visit
16 Notes 8/19/2015.  Are you with me?
17     Note number one is, "Keep engaged with the
18 DEA through all steps of the process."
19     Do you see that?
20     A.  Yes are.
21     Q.  His second note that he writes is, "It
22 is critical to have a robust suspicious order
23 monitoring program."
24     Do you see that?
25     A.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    Q.  Would you agree that from 2009 to 2014,
2  HBC did not have a robust suspicious order
3  monitoring program?
4      MR. BARNES:  Object to form.
5      THE WITNESS:  I do not.
6  BY MR. GADDY:
7    Q.  The next sentence says, "Relying on
8  thresholds is not good enough for the DEA."
9    Do you see that?
10    A.  Yes.
11    Q.  From '09 through '13, HBC didn't even
12  have thresholds; correct?
13    A.  Correct.
14    Q.  But you still believed that the
15  suspicious order monitoring program that HBC had
16  from '09 to '13 was robust?
17    A.  Yes.
18    Q.  It then goes on to say, "They have a
19  process to review the orders before they are
20  filled by the distribution center."
21    Do you see that?
22    A.  Yes.
23    Q.  And, in fact, that's opposite to HBC and
24  Giant Eagle's system where the orders are filled
25  and then reviewed afterwards; correct?

Page 203

1    A.  An investigation -- there could be
2  situations where investigation is happening while
3  orders are in transit for delivery, yes.
4    Q.  So HBC and Giant Eagle did not have a
5  program to review the orders before they're
6  filled?
7      MR. BARNES:  Object to form.
8      THE WITNESS:  Giant Eagle had a process.
9  Some of the investigative work would not have been
10  before the order was shipped.
11  BY MR. GADDY:
12    Q.  Then number three says that -- Thrifty
13  White, is that a standalone wholesale distributor,
14  or is that a distributor and a pharmacy?
15    A.  It's a pharmacy.
16    Q.  I went through a list earlier of other
17  folks that distribute to themselves.  Thrifty
18  White would fall under this bucket as well,
19  correct, of pharmacies that distribute to
20  themselves?
21    A.  Yes.
22    Q.  Number three says, "Thrifty White has
23  instituted guardrails for dispensing of controlled
24  substances."
25    And then down below it, if you go down,

Page 204

1  there's an (a) and (b) and then there's a little
2  lower case (i), and it gives some examples of
3  flags.  Do you see that?
4    A.  Yes.
5    Q.  And it talks about this cash versus
6  insurance, something we talked about a little
7  already; correct?
8    A.  Yes.
9    Q.  It talks about geographical relationship
10  of the prescriber and patient to the pharmacy?
11    A.  Yes.
12    Q.  Talks about combo drugs or a combination
13  of controls being dispensed.  Do you see that?
14    A.  Yes.
15    Q.  Again, these are all factors that we
16  ultimately end up seeing in a Giant Eagle policy
17  that comes out in 2015; correct?
18    A.  Components of this, yes.
19      MR. BARNES:  Jeff, if you're at a good
20  break, we've been going about an hour and 15
21  minutes.
22      MR. GADDY:  Yeah.  That's fine.
23      THE VIDEOGRAPHER:  2:43.  We're off the
24  video record.
25      (Recess from 2:43 p.m. to 3:05 p.m.)

Page 205

1      THE VIDEOGRAPHER:  3:05.  We're on the
2  video record.
3  BY MR. GADDY:
4    Q.  Mr. Tsipakis, I'm going to hand you HBC
5  1009, which I've marked, I believe, a Exhibit 19.
6      (HBC-Tsipakis Exhibit 19 was marked.)
7  BY MR. GADDY:
8    Q.  Do you see this is a November 2015 email
9  from Joseph Millward?
10    A.  Yes.
11    Q.  And do you see the subject of the email
12  is SOMS:  Suspicious order monitoring and
13  controlled drug monitoring.  Do you see that?
14    A.  Yes.
15    Q.  And he's writing to Phillip Raub, John
16  Hutten and Roger Wolfe.  Do you know what
17  department those folks are in and what they do?
18    A.  I know who Phil Raub is, but I don't
19  know what department these folks are in.
20    Q.  Who is Phil Raub and what does he do?
21    A.  I know what he does today.  I don't know
22  what he did at this time.
23    Q.  What's he do today?
24    A.  Today he works on our inventory team.
25    Q.  Is he more of an IT computer-type

Page 206

1　person?
2　　A.　Yes.
3　　Q.　And would it be accurate to say that one
4　of his functions is designing or implementing
5　technology or reports?　Does that make sense to
6　you?
7　　A.　That doesn't exactly line up with what
8　he does, no.
9　　Q.　Describe what he does.
10　　A.　He basically makes sure -- he's a
11　liaison between like our McKesson, McKesson
12　account rep and other manufacturers' delivery
13　orders.　Again, just to be clear, you're talking
14　about what he does today; correct?
15　　Q.　Yeah.
16　　A.　So when we have late orders from
17　McKesson or Cardinal, he'll follow up on those,
18　stores, say they didn't get an order from the
19　wholesaler, those kind of things.　Inventory
20　control would be a better way to say it.
21　　Q.　Let's go back to this document.　He
22　says, "Phil, John and Roger, on Friday George and
23　I participated in a conference call with Purdue
24　Pharma, maker of top self controlled substances
25　such as Oxycontin and Hyslinga ER, to discuss

Page 207

1　their SOM process."
2　　Do you see that?
3　　A.　Yes.
4　　Q.　It says, "In addition to thresholds,
5　they purchase IMS data and look at the percentages
6　of their meds as part of all prescriptions filled
7　and the percentages that were filled as cash as
8　opposed to third parties."
9　　Do you see that?
10　　A.　Yes.
11　　Q.　He goes on there to say, "Kayla created
12　a similar report a couple years ago.　I'd like to
13　incorporate something similar into our suspicious
14　order monitoring and controlled substance
15　monitoring processes."
16　　Do you see that?
17　　A.　Yes.
18　　Q.　So in this November 15, 2012 email, Joe
19　Millward, who I think you told us earlier was the
20　head of the compliance division, is asking to
21　incorporate looking at percentages of cash versus
22　percentage of scripts paid for by third parties
23　into the suspicious order monitoring program?
24　　A.　I can see that he's inquiring about it,
25　yes.

Page 208

1　　Q.　He goes down in the next paragraph to
2　say, "It would be necessary to break dispensing
3　down to the following examples:　On weekly,
4　monthly, quarterly and year-to-date timelines.
5　　And then he gives some examples of what type
6　of information he would like to see HBC or Giant
7　Eagle start gathering to issue these types of
8　reports; correct?
9　　A.　Yes.
10　　Q.　And it includes I think in the first
11　instance there -- it says the total number of
12　prescriptions and the total number of -- and the
13　percentage of controlled substance prescriptions;
14　correct?
15　　A.　Yes.
16　　Q.　And it talks about trying to figure out
17　the percentage in cash versus the percentage with
18　the discount card versus the percentage with
19　insurance; correct?
20　　A.　Yes.
21　　Q.　Then in the next line, he talks about
22　trying to determine the number and percentage of
23　total prescriptions and controlled substances of
24　what he calls there at the end his target
25　chemicals, which would be oxycocodone, hydrocodone

Page 209

1　and Suboxone; correct?
2　　A.　Correct.
3　　Q.　This process of him wanting to be able
4　to see reports on a weekly, monthly, quarterly and
5　year-to-date basis is something that he's asking
6　these folks to look into implementing here in
7　November of 2015; correct?
8　　A.　He's inquiring about them, yes.　As far
9　as what exactly he's trying to do, I can't -- I
10　can speculate, but it's one email.　Certainly,
11　he's asking for more data.
12　　Q.　Sure.　But you saw in the first
13　paragraph where he said that he wanted to
14　incorporate this factor and these types of things
15　into HBC's or Giant Eagle's suspicious order
16　monitoring program; correct?
17　　A.　Sure.
18　　Q.　He's wanting to do that in November of
19　2015; correct?
20　　A.　He's inquiring about it in
21　November 2015, and this is a standard of trying to
22　improve the process and look deeper on things,
23　sure.
24　　Q.　And he's looking to add that layer, the
25　percentage of cash versus third party, in November

Highly Confidential - Subject to Further Confidentiality Review

Page 210

1  of '15?
2      A.  Yes.
3      Q.  I'm going to show you what I will mark
4  as Exhibit No. 20.
5      (HBC-Tsipakis Exhibit 20 was marked.)
6      MR. GADDY:  This is HBC 1023, which
7  we're marking as Exhibit 20.
8  BY MR. GADDY:
9      Q.  And if we look at the first page, do you
10 recognize this to be an email from Adam Zakin in
11 March of 2016?
12     A.  Yes.
13     Q.  You can go ahead and turn to the back
14 page so we can get to the earliest email in the
15 chain.
16     Do you see it says, "Hello, Joseph and
17 George.  As a follow-up to our discussions, I have
18 attached our SOM solution proposal for your
19 review.  Once you've had a chance to review this
20 internally, we would welcome an opportunity to
21 talk through our two SOM options and answer any
22 questions you have."
23     Do you see that?
24     A.  Yes.
25     Q.  And it's from Gary at Buzzeo.  Do you

Page 211

1  see that?
2      A.  Yes.
3      Q.  Do you know what Buzzeo is?
4      A.  Yes.
5      Q.  What is that?
6      A.  Buzzeo is the compliance arm of IQVIA.
7  They purchased Buzzeo years back.  I'm familiar
8  with them.
9      Q.  Do you know what the purpose of
10 Buzzeo -- what service it is that they provide?
11     A.  Consultant services that they provide.
12     Q.  And what he's indicating here I think as
13 we'll see as we go through, he wants to talk to
14 Joe Millward and George Chunderlik regarding
15 suspicious order monitoring programs; correct?
16     A.  Yeah.  He's a salesmen trying to pitch a
17 solution or a consultant or consulting engagement,
18 sure.
19     Q.  If we go back to the first page and we
20 go two-thirds of the way down, you see an email
21 from George Chunderlik.
22     A.  First page?
23     Q.  Yes, about two-thirds of the way down.
24 Are you with me, George Chunderlik on March 24,
25 2016?

Page 212

1      A.  Um-hum.
2      Q.  And he says, "Hi, Adam and Bob.  I think
3  it would be" -- and to be clear -- never mind.
4      He's writing to Bob McClune and Adam Zakin;
5  correct?
6      A.  Yes.
7      Q.  Tell me who they are and what they do
8  within HBC or Giant Eagle.
9      A.  At the time of this email; correct?
10     Q.  Sure.
11     A.  So at the time of this email, Adam is
12 senior director of administration, which includes
13 the procurement team.  Bob works for Adam
14 basically on the procurement and analytics team.
15     Q.  Are they both still with the company?
16     A.  Yes.
17     Q.  George says, "I think it would be
18 worthwhile to talk to these guys about their SOM
19 program.  I'm curious to see their products.  I'm
20 going to set something up for us and include Jason
21 unless you have any objections."
22     Do you see that?
23     A.  Yes.
24     Q.  If you go back up to the top of the
25 page, you see Adam's response; correct?

Page 213

1      A.  Yes.
2      Q.  He says, "We saw this.  We're not there.
3  At the end of day, the only thing it did that our
4  current system would not do was stop the orders
5  physically if there was a threshold."
6      Do you see that?
7      A.  Yes.
8      Q.  So in March of 2016, HBC or Giant Eagle,
9  their current system would not physically stop the
10 orders that rose above the threshold; correct?
11     A.  Correct.
12     Q.  This outfit was selling a product that
13 would have stopped the orders that were identified
14 as being above the threshold prior to them being
15 shipped to the store, correct, at least according
16 to George and Adam?
17     A.  I don't know what they were -- what they
18 looked at, what was presented.  So I can't
19 speculate what it does or doesn't do.
20     Q.  That's what Adam is representing they
21 did; correct?  He says, "The only thing it did
22 that our current system would not do was stop the
23 orders physically if there was a threshold."
24     A.  That's what it says here and he
25 represented here, yes.

Page 214

1    Q.  It says, "Also, it would benchmark
2   against other retailer" and goes on to say, "It
3   was fairly expensive in comparison to already
4   having what we had for these two pieces of
5   function."
6       Do you see that?
7       A.  Yes.
8       Q.  He goes on to say, "If you want to bring
9   them in to see them again, you can.  I don't think
10  Bob or I need to see them unless there's something
11  specific you want us to see post your review.  Let
12  me know if you have any questions.  Adam."
13      Is that it for that email?
14      A.  Yes.
15      Q.  So in March of 2016, Giant Eagle and HBC
16  did not have a system that would physically stop
17  orders if they violate the threshold, and when
18  offered to purchase or adopt a program that did,
19  at least Adam Zakin's position was to not do that;
20  correct?
21      MR. BARNES:  Object to form.
22      THE WITNESS:  In the research that I've
23  done, there was a lot of different things the
24  company was looking at, different external
25  solutions, internal solutions, coding internally

Page 215

1   versus buying off the shelf.  I believe I saw
2   something about this was a cloud service that
3   needed a tremendous amount of IT integration.  So
4   I think there's more to this.
5   BY MR. GADDY:
6       Q.  As we sit here today, does HBC or Giant
7   Eagle have a system that will physically stop
8   orders from being shipped if they violate the
9   threshold?
10      A.  For which time period?  I'm sorry.
11      Q.  Now.
12      MR. BARNES:  Same objection.  Take it
13  through June 1 of '18.
14      THE WITNESS:  Yes.
15  BY MR. GADDY:
16      Q.  June 1 of '18 HBC and Giant Eagle did
17  have a system that would stop an order if it
18  violated a threshold?
19      A.  Yes.
20      Q.  When did that happen?
21      A.  January of '17.
22      Q.  I'm going to show you HBC 1027 that I'm
23  going to mark --
24      A.  Let me be clear.  Early 2017.  It might
25  not be exactly January, but early 2017.

Page 216

1       Q.  I'm going to show you what I've marked
2   HBC 1027 or which is HBC 1027, which I'm going to
3   mark as Exhibit 21.
4       (HBC-Tsipakis Exhibit 21 was marked.)
5   BY MR. GADDY:
6       Q.  Do you see this document is an email,
7   and it's going to have some attachments.  The
8   email is from an individual named James Cornwell
9   written in August of 2016.  The subject of that
10  email is Order Item Blocking, December 5, 2013.
11      Do you see that?
12      A.  Yes.
13      Q.  Do you know who Mr. Cornwell is?
14      A.  Yes.
15      Q.  Who is he and what does he do?
16      A.  He's on the IT team.  He works on the IT
17  side.
18      Q.  He writes this email.  He says,
19  "Dominic, Phil, I didn't find much on this.  I do
20  see the SQL was written by Kayla."
21      Do you know what SQL means?
22      A.  SQL, yes.
23      Q.  What does that mean?
24      A.  SQL code.
25      Q.  So she designed the program that's

Page 217

1   generating the report?  Explain that for me,
2   please.
3       A.  I know what SQL means.  I don't know who
4   Kayla is.
5       Q.  It goes on to say, "The requirements
6   were utilizing a monthly average looking back at
7   the last 12 months that had each item ordered
8   based on GPI."
9       Do you see that?
10      A.  Yes.
11      Q.  Is that describing the threshold system
12  that was put in place in 2013?
13      A.  Yes.
14      Q.  It says, "This value was a monthly
15  accumulation that reset the first of each month
16  had which mirrored McKesson's system but left big
17  holes in our logic."
18      Do you see that?
19      A.  Yes.
20      Q.  Do you know what big holes Mr. Cornwell
21  was referring to there?
22      A.  I do not.
23      Q.  Would you agree that it would not be
24  good to have a suspicious order monitoring program
25  with big holes in it.

Page 218

1 MR. BARNES: Object to form.
2 THE WITNESS: If it was the only thing
3 you were relying on. In our system we had --
4 threshold it was one of multiple layers of how we
5 complied with the controlled substance security
6 requirement.
7 BY MR. GADDY:
8 Q. But you agree it would not be a good
9 thing to have big holes in your suspicious order
10 monitoring program?
11 A. I think generally big holes are a bad
12 thing.
13 Q. It says, "If the items showed on the
14 report, George evaluated it, and if it was
15 determined it should be blocked, the blocking form
16 was filled out."
17 Do you see that?
18 A. I'm sorry. Where were you?
19 Q. I just kept reading. It says that items
20 showed on the report George evaluated -- I'm
21 sorry -- "If the item showed on the report, George
22 valuated it, and if it was determined it should be
23 blocked, a blocking form was filled out."
24 Do you see that?
25 A. Yes.

Page 219

1 Q. It goes on to say, "The form expired at
2 the end of each month, again a problem."
3 Do you see that?
4 A. Yes.
5 Q. Do you agree with Mr. Cornwell's
6 suggestion that having a report that stopped at
7 the end of each month and started over was a
8 problem?
9 MR. BARNES: Object to form.
10 THE WITNESS: I don't know what he was
11 looking at, what he was referring to. I'm just
12 reading the words for the first time as you
13 presented it. So it's hard for me to speculate
14 what he was talking about here.
15 BY MR. GADDY:
16 Q. Then he says, "I have attached a SQL on
17 the documentation on the blocking form. This form
18 was my main focus on this project."
19 Do you see that?
20 A. Yes.
21 Q. I'm going to show you HBC 1033, which
22 I'm going to mark as Exhibit No. 22.
23 (HBC-Tsipakis Exhibit 22 was marked.)
24 BY MR. GADDY:
25 Q. If you look at this, do you see this is

Page 220

1 a one-page email. Then it has an attachment that
2 we'll look at in just a second.
3 A. Yes.
4 Q. The subject of the email is Suspicious
5 Order Monitoring. Do you see that?
6 A. Yes.
7 Q. And it says, "Scope document attached we
8 will review during tomorrow's call."
9 Do you see that?
10 A. Yes.
11 Q. Turn to page 3 for me, .3 in the top
12 right.
13 A. .3?
14 Q. Yes. And there at 1.0 it says
15 Stakeholders.
16 A. Yes.
17 Q. Can you tell me what's meant by that?
18 A. I would read it as I'm reading it here,
19 folks that are involved in a particular meeting or
20 constituents as part of a project, I guess.
21 Q. Have you seen this document before that
22 you're aware of?
23 A. It's vaguely familiar, but I'm not sure.
24 Q. As far as the stakeholders that are
25 listed here, the project sponsor is Mark Doerr,

Page 221

1 senior vice-president of pharmacy.
2 A. Yes.
3 Q. Is he still with the company?
4 A. He is not.
5 Q. Are you serving in that position now?
6 A. I am, yes.
7 Q. So if this meeting was happening
8 currently, that would be your name there as
9 opposed to his?
10 A. Again, I don't know what this meeting is
11 about, but if you're saying do I have the same
12 title as Mark Doerr did here, yes.
13 Q. The other folks listed, we've already
14 talked about Adam Zakin a little bit. We talked
15 about Bob McClune, George Chunderlik. Are these
16 folks still with the company?
17 A. Yes.
18 Q. Turn to page .4. It says, "Prior to
19 January 2016, Giant Eagle's drug control program
20 was limited to the monitoring of store-based
21 dispensing of Schedule II narcotics."
22 Do you see that?
23 A. Yes.
24 Q. It says, "Giant Eagle's primary and
25 secondary suppliers of CII products were

Highly Confidential - Subject to Further Confidentiality Review

Page 222

1 responsible for the monitoring of orders from
2 distribution centers to Giant Eagle retail
3 pharmacies."
4    Do you see that?
5    A.  Yes.
6    Q.  Let me ask you a couple of questions
7 about that.  From 2009 through 2014 -- I think we
8 covered it this morning -- Giant Eagle did
9 dispense Schedule II drugs.  They just did not get
10 them from HBC; correct?
11    A.  Correct.
12    Q.  Because these Schedule II drugs from '09
13 to '14 were going to Giant Eagle, HBC would have
14 visibility of those drugs; correct?
15    A.  Ask that again, please.
16    Q.  Sure.  From '09 to '14, HBC is only
17 distributing Schedule III, IV and V drugs;
18 correct?
19    A.  Correct.
20    Q.  But because these Schedule II drugs,
21 which are coming from, I think you said, McKesson
22 and Anda are going to Giant Eagle pharmacies,
23 information or data about how many Schedule II
24 drugs or the frequency of Schedule II drugs or the
25 quantity of Schedule II drugs going to those

Page 223

1 pharmacies, that is information that would have
2 been available to HBC?
3    MR. BARNES:  Object to form.
4    THE WITNESS:  HBC didn't distribute
5 those.  Giant Eagle is aware of those purchases.
6 Is that your question?
7 BY MR. GADDY:
8    Q.  Sure.  Well, HBC also didn't dispense
9 the drugs, but you told us this morning that HBC
10 would have been able to be aware of the percentage
11 of cash versus third-party payers or percentage of
12 controlled versus noncontrolled; correct?
13    A.  As part of a -- but they're not --
14 they're not distributing the class II drugs.
15    Q.  I understand that.  We're on the same
16 page there.  My question to you is a little bit
17 different.
18    If they wanted to, could they have determined
19 the quantity of CII drugs going into the Giant
20 Eagle pharmacies?  That's information that could
21 have been available to HBC just like the
22 percentage of controlled versus noncontrolled that
23 were being dispensed by the pharmacy; correct?
24    MR. BARNES:  Object to the form.
25    THE WITNESS:  Sure.

Page 224

1 BY MR. GADDY:
2    Q.  Was the quantity of Schedule II
3 controlled substances going into Giant Eagle
4 pharmacies from 2009 to 2014, was that something
5 that was considered by HBC as a part of HBC's
6 suspicious order monitoring program that they had
7 during that time period?
8    MR. BARNES:  Talking about '09 to '14?
9    MR. GADDY:  Sorry.
10 BY MR. GADDY:
11    Q.  The suspicious order monitoring program
12 that you said HBC had during that time period,
13 would evaluating Schedule II drugs going into
14 Giant Eagle pharmacies be a part of that?
15    MR. BARNES:  What time period?
16    MR. GADDY:  '09 to '14.
17    MR. BARNES:  If it's not distributing.
18    THE WITNESS:  I'll ask the question to
19 clarify.  If I can read it back to you, so if I
20 could speak it back to you.
21    So you're asking me from '09 to '14 if HBC
22 would evaluate someone else's orders and someone
23 else's SOM process?  I don't understand the
24 question.
25

Page 225

1 BY MR. GADDY:
2    Q.  I'm not asking about the SOM process
3 from McKesson or Anda.  I'm asking whether or not
4 when determining whether orders of hydrocodone
5 combination products were suspicious or not, was
6 it a factor at all to HBC how many Schedule II
7 drugs were also going to the same pharmacy?
8    MR. BARNES:  Object to form.
9    THE WITNESS:  HBC wouldn't be
10 investigating that or have a line of sight to
11 that.  Could they get data?  Sure.  Corporately we
12 would know, and the same procurement team we
13 talked about as part of the controls that we have,
14 they know what prescriptions are coming into our
15 pharmacies.
16 BY MR. GADDY:
17    Q.  So HBC would definitely have the ability
18 to know the quantity and pattern of Schedule IIs
19 going into the Giant Eagle pharmacies?
20    A.  They could, but for what purpose.  I
21 guess I don't understand your question.  Could
22 they find out?  Sure.
23    Q.  So they could I think was the answer to
24 my first question.  Maybe you've answered my
25 second question, which is:  Was that a factor that

Page 226

1 HBC even considered in evaluating HBC's own
2 distribution of hydrocodone combination products
3 to those stores?
4    A.  You're talking about Schedule II drugs;
5 right?
6    Q.  Correct.
7    A.  So Schedule II drugs, HBC has never
8 dispensed them.  I'm sorry.  I'm trying to answer
9 your question.  I'm just not following your line
10 of questioning.
11    HBC has never distributed CII drugs.  Those
12 CII drugs have always been -- from the timeframe
13 you're talking about, they've been procured from
14 McKesson.
15    Q.  I understand that.  I'll try again
16 because obviously I'm not doing a very good job of
17 explaining my question.
18    You talked this morning about -- you claim
19 that HBC had a suspicious order monitoring program
20 from '09 to '14.  I think you said it was an
21 integrated program with these different players
22 involved.  I'm asking if one of the factors that
23 was looked at by HBC was the quantity and pattern
24 of CIIs going into the stores.
25    MR. BARNES:  And it was not

Page 227

1 (indecipherable)?
2    MR. GADDY:  Correct.
3    THE WITNESS:  HBC wouldn't have been
4 looking at the CIIs.  They wouldn't have been
5 looking at products that it doesn't distribute.
6 Does that answer your question?  I'm sorry.  I'm
7 trying really hard to make sure I answer your
8 question.
9    Q.  It does.  Thank you.
10    Let's go back to the document here.  The
11 first paragraph, what they say here is, "Giant
12 Eagle's primary and secondary suppliers of CII
13 products were responsible for monitoring orders
14 from distribution centers to Giant Eagle retail
15 pharmacies."  Correct.
16    A.  Yes.
17    Q.  So that's consistent with something you
18 told me just recently, that if McKesson is
19 shipping CIIs to Giant Eagle pharmacies, McKesson
20 is responsible for making sure those orders aren't
21 suspicious.
22    MS. KVESELIS:  Object to form.
23    THE WITNESS:  Sorry.  I didn't expect
24 that.  Can you repeat that?
25

Page 228

1 BY MR. GADDY:
2    Q.  My understanding of what's being said in
3 this sentence is that if McKesson ships Schedule
4 II controlled substances to Giant Eagle, that
5 Giant Eagle's interpretation is that McKesson is
6 responsible for doing any monitoring of those
7 orders for whether or not they're suspicious.
8    MS. KVESELIS:  Same objection.
9    THE WITNESS:  McKesson is a separate
10 registrant as a wholesaler as we are.  They have
11 their same obligations that we've established
12 during the testimony, and they would have the same
13 obligations as we would have.
14 BY MR. GADDY:
15    Q.  We go back to the first page of this
16 document, this was a meeting that was being set in
17 November of 2016; is that correct?
18    A.  I'm sorry.  Where are you at?
19    Q.  First page.
20    A.  Yes.
21    Q.  Sorry I'm bouncing right back, right to
22 .4 and going to the second paragraph.  It says,
23 "The DEA regulation CFR 1301.74(b) specifically
24 requires that a registrant design and operate a
25 system to disclose to the registrant suspicious

Page 229

1 orders of controlled substances."
2    Do you see that?
3    A.  Yes.
4    Q.  And that's what we've been talking about
5 a lot today; correct?
6    A.  Yes.
7    Q.  It goes on to say, "Purposely vague, the
8 DEA leads the registrant," which is Giant Eagle
9 here, "to interpret the elements and metrics of
10 monitoring a system"; correct?
11    A.  Yes.
12    Q.  It then goes on to say, "It is the
13 belief of the business that Giant Eagle's
14 suspicious order monitoring program is 75 to 85
15 percent of where it needs to be."
16    Do you see that?
17    A.  Yes.
18    Q.  Is it still Giant Eagle and HBC's belief
19 that their suspicious order monitoring program is
20 only three-quarters of the way to where it needs
21 to be?
22    MR. BARNES:  I'm going to object to
23 form.
24    Go ahead.
25    THE WITNESS:  Without understanding,

Page 230

1 again looking at this here for the first time
2 here, I don't know -- I can only -- can you ask
3 your question again for me?
4 BY MR. GADDY:
5     Q.   Well, let me ask it this way:  This is
6 November 2016 document; correct?
7     A.   Yes.
8     Q.   And what's being said here is that Giant
9 Eagle believes that their suspicious order
10 monitoring program is only 75 to 85 percent of
11 where it needs to be; correct?
12     A.   That's what it says, yes.
13     Q.   And we know that in the two years prior
14 to this, there was actually some progress made;
15 correct?  In August of 2014, for the first time
16 HBC had a written policy to monitor for suspicious
17 orders; correct?
18     A.   Yes.
19     Q.   In 2015 they issued a second version of
20 that policy; correct?
21     A.   Yes.
22     Q.   In 2015 they also for the first time had
23 a written policy that provided for some detailed
24 investigation to be performed on potential
25 suspicious orders including factors like the

Page 231

1 geographical location of the prescriber, the
2 geographical location of the patient, the
3 geographical location of the pharmacy in relation
4 to all those, the percentages of cash versus
5 third-party payer.  Do you recall that?
6     A.   Yes.
7     Q.   And all that came out in 2015; correct?
8     A.   The written form, yes.
9     Q.   So you agree there were some steps taken
10 between August 2014 and the date of this document,
11 November of 2016, that were some fairly
12 significant steps for HBC and Giant Eagle as far
13 as their controlled substance monitoring plan;
14 correct?
15         MR. BARNES:  Object to form.
16         THE WITNESS:  Yes.  And then this
17 document here was the company's efforts to further
18 the electronic portions of that system.
19 BY MR. GADDY:
20     Q.   But here in November of 2016, after all
21 those steps and the written policies that we
22 talked about earlier today and that I summarized
23 just now, even after those steps since August of
24 2014, it was still HBC and Giant Eagle's belief in
25 November of 2016 that their program was only 75 to

Page 232

1 85 percent of where it needs to be; correct?
2         MR. BARNES:  Object to form.
3         THE WITNESS:  I don't agree.
4 BY MR. GADDY:
5     Q.   Is that what it says here in the
6 document?
7     A.   That's what it says here in this
8 document, but I don't understand -- I don't have a
9 clear understanding of what the 75 to 85 percent
10 is referring to because it's written by -- it's
11 written by the IT department.
12     So there was many things as I looked through
13 a lot of systems that were being built, a lot of
14 automated things that required a lot of system
15 integrations, warehouse integrations.  So I don't
16 know what this is being referred to as 75 to 85
17 percent.
18     Q.   But you're not disputing that the
19 document says it's the belief of the business that
20 Giant Eagle's suspicious order monitoring in
21 November of 2016 is 75 to 85 percent of where it
22 needs to be.  You're not disputing that, are you?
23     A.   I'm not disputing what it says, no.
24     Q.   Mr. Tsipakis, I don't have any more
25 questions at this time.  I'm going to turn you

Page 233

1 over to my colleague, and he's going to have some
2 questions.
3     A.   Thank you.
4         EXAMINATION
5 BY MR. ROTTINGHAUS:
6     Q.   Mr. Tsipakis, my name is Tom
7 Rottinghaus.  We met earlier this morning.  I'm
8 going to spend a little bit of time talking to you
9 about some items that were in a second amended
10 notice to take your deposition.  Okay?  But I'm
11 going to jump around a little bit, so forgive me.
12 I'm going to try to do that for the sake of time.
13         MR. BARNES:  Before we start, I've been
14 informed that you intend to ask him questions
15 about items which the parties had previously
16 agreed were to be submitted in writing.  And if
17 that's true, then he's not been prepared for those
18 questions, and I will instruct him not to answer.
19         MR. ROTTINGHAUS:  It won't be my
20 intention to purposefully try to elicit something
21 where there's been an agreement not to do so.  If
22 I engage in a topic you think I'm incorrectly
23 doing so, just let me know.  Okay?
24         MR. GADDY:  And, Bob, one of the issues
25 we had or the topics we had issue with were three,

Page 234

1 four and five in the second notice. I'm happy to
2 be corrected if I'm wrong, but I don't believe
3 there was ever an agreement between the parties
4 that we would accept written responses to those
5 three topics.
6     In your letter to us, you indicated that that
7 was a topic that Special Master Cohen had ruled
8 was subject to written responses. His ruling was
9 to the contrary. He had said that -- again, these
10 are related to the rulings on the Wal-Mart
11 notice -- he had said that live testimony must be
12 provided on those topics.
13     We're happy to discuss it further, but those
14 are the only topics I think we have an issue with.
15     MR. KOBRIN: I don't think there are any
16 problems. For the record, Josh Kobrin for HBC.
17 This letter was sent two months ago. We never
18 heard a response back from you regarding three,
19 four and five in written form.
20     I don't know if there were orders before or
21 since on those issues, but we emailed you as
22 recently a two days ago when you said you might
23 want to discuss the topic and what was testified
24 to and I said let me know if you want to discuss
25 anything we represented to you previously, and you

Page 235

1 guys did not accept an offer to meet and confer
2 before today.
3     So I assumed, I think rightfully, the thing
4 we represented previously was going to be how we
5 were going to proceed today.
6     MR. ROTTINGHAUS: Why don't I suggest I
7 start and you guys stop me if there's any concern.
8 Okay? Is that okay, Mr. Barnes?
9     MR. BARNES: We are presenting this
10 witness on other topics. So any questions related
11 to compensation, any compensation incentive
12 program or compensation provided to any employee
13 are off limits pursuant to the prior agreement.
14     MR. ROTTINGHAUS: You're talking about
15 paragraphs three and four?
16     MR. BARNES: Nos. 3, 4 and 5.
17     MR. ROTTINGHAUS: Let me get started and
18 stop me if you need to.
19 BY MR. ROTTINGHAUS:
20     Q.  To back up, what's your position and
21 with which company are you currently employed? Is
22 it Giant Eagle?
23     A.  Yes.
24     Q.  What's your position there?
25     A.  Current position?

Page 236

1     Q.  Yes.
2     A.  SVP of pharmacy.
3     Q.  When did you start with Giant Eagle?
4     A.  Late October 2017.
5     Q.  Prior to 2017, did you work for HBC?
6     A.  I did not.
7     Q.  Did you work for any other companies
8 either owned by or affiliated with Giant Eagle?
9     A.  No.
10     Q.  Have you personally ever worked in the
11 HBC plant that distributed Schedule III, IV and V
12 controlled substances?
13     A.  No.
14     Q.  Have you been to that plant before?
15     A.  No.
16     Q.  Is it a warehouse? It's a warehouse I
17 assume.
18     A.  It's a warehouse, yes.
19     Q.  You've never personally been to that
20 warehouse?
21     A.  Correct.
22     Q.  You mentioned the foreman that to your
23 knowledge worked at the warehouse between 2009 and
24 2014.
25     A.  Yes. I'm not sure of all the years, but

Page 237

1 yes.
2     Q.  Have you ever personally met him?
3     A.  No.
4     Q.  Have you ever personally met anyone who
5 was employed by HBC between 2009 and 2014?
6     A.  Specifically HBC?
7     Q.  Yes.
8     A.  No.
9     Q.  Mr. Millward, was he an employee of HBC,
10 or was he an employee of Giant Eagle between 2009
11 and 2014?
12     A.  Can I ask a clarifying question?
13     Q.  Yes.
14     A.  Giant Eagle owns all of them, so you're
15 asking whether they worked at a specific facility;
16 is that fair?
17     Q.  Yes. Did he work at the Giant Eagle
18 facility or did he work at HBC's warehouse?
19     A.  Joe Millward you had asked?
20     Q.  Yes.
21     A.  He worked at Giant Eagle corporate.
22     Q.  And that's different; it's a different
23 physical location than where the HBC warehouse
24 was?
25     A.  Correct.

Page 238

1    Q.   Similarly, Mr. McClune, did he work at
2  Giant Eagle and not at HBC?
3    A.   Giant Eagle corporate and not HBC;
4  correct.
5    Q.   Similar question with regard to
6  Mr. Zakin.
7    A.   Corporate.
8    Q.   Prior to 2017, where did you work?
9    A.   The Albertsons Company.
10   Q.   And prior to 2017, did you ever work for
11 or for any entity affiliated with Giant Eagle?
12   A.   No.
13   Q.   And I believe you said it was about four
14 or five weeks ago, give or take, that you were
15 informed that you would be the corporate
16 representative designated to testify on certain
17 topics in this case.
18   A.   That's 30(b)(6)?
19   Q.   Yes.
20   A.   Yes.
21        MR. ROTTINGHAUS:  Counsel, correct me if
22 I'm wrong, but it's my understanding that with
23 respect to the second notice, paragraphs number
24 one and two will be responded to in writing?
25        MR. BARNES:  The second notice?

Page 239

1        MR. ROTTINGHAUS:  Yes.  While you're
2  looking, just to clarify, paragraph number one
3  falls under the topic of internal record keeping
4  and data storage.
5        MR. BARNES:  Yes, one and two.
6        MR. ROTTINGHAUS:  And it's the position
7  of counsel that with respect to the topics under
8  compensation, paragraphs three, four and five, the
9  witness will not be allowed to testify on those
10 topics today.
11        MR. BARNES:  Well, I'm thinking you have
12 to go either/or.  We're not going to agree to do
13 it in writing and then allow deposition
14 questioning.  However, if you want -- if you
15 choose deposition questioning, then we won't do
16 writing.  That's the agreement.
17        MR. ROTTINGHAUS:  Well, it would
18 probably depend in part on whether he has any
19 knowledge.  I'm not going to say I'm going to
20 choose one, ask him if he has any knowledge, have
21 him say no, and have you say, well, now we're not
22 responding.  Is that what you're saying?
23        MR. BARNES:  I think he may have some
24 knowledge related to compensation.  This is all
25 about opioids, right, policies and procedures

Page 240

1  related to compensation provided to any employee
2  with oversight or control over marketing, sales or
3  distribution of prescription opioids.
4        MR. GADDY:  Let's have a conversation
5  off the record.
6        THE VIDEOGRAPHER:  Stand by.
7        MR. GADDY:  I didn't mean we have to do
8  it right now.  I'm saying at the next break.
9        MR. ROTTINGHAUS:  Why don't we go past
10 that for right now.
11        MR. BARNES:  Let's go off the record for
12 a second.
13        THE VIDEOGRAPHER:  3:45.  We are off the
14 video record.
15        (Recess from 3:45 p.m. to 3:47 p.m.)
16        THE VIDEOGRAPHER:  3:47.  We are on the
17 video record.
18 BY MR. ROTTINGHAUS:
19   Q.   Sir, I believe you said earlier today
20 that you have seen some emails that you
21 interpreted at least as looking into prior orders
22 for controlled substances that could turn out to
23 be suspicious; is that correct?
24   A.   Yes.
25        (HBC-Tsipakis Exhibit 23 was marked.)

Page 241

1  BY MR. ROTTINGHAUS:
2    Q.   I'm showing you Exhibit 23, which I
3  understand to be an email dated January 10, 2014
4  from Mr. Roahrig to Mr. Millward.  Does it appear
5  that way to you as well at the top?
6        MR. ROTTINGHAUS:  1001.
7        THE WITNESS:  Reading from the bottom,
8  from Joe Millward to Todd Roahrig, yes.
9  BY MR. ROTTINGHAUS:
10   Q.   Why don't we start at the very bottom of
11 this.  There's an email from a person named Kayla
12 Volkner to a number of people; is that correct?
13   A.   Yes.
14   Q.   And that email is dated January 10,
15 2014, and it states that there had been a pharmacy
16 that exceeded the purchasing thresholds for
17 certain controlled products so far that month; is
18 that right?
19   A.   Yes.
20   Q.   Then it appears that this email was
21 forwarded from Mr. Millward to Mr. Roahrig.
22   A.   Yes.
23   Q.   And he states that Store 8 is flagged.
24 Store 8, is that a -- do you know what location
25 Store 8 is?

Page 242

1    A.  I believe it's for our New Kensington,
2  PA location.
3    Q.  Store 8 is flagged as having hit their
4  threshold for total hydrocodone products.  And he
5  then asked if Mr. Roahrig had checked to see if
6  this is an anomaly or that the order should be
7  considered suspicious; is that correct?
8    A.  Yes.
9    Q.  And then ultimately he gets a response
10  from Mr. Roahrig?
11    A.  Yes.  He gets a response, yes.
12    Q.  It appears that Mr. Roahrig had been
13  told by a pharmacist that this prescription,
14  although it did contain hydrocodone, it was for
15  what's called Hydrocan liquid, and he gives the
16  explanation that he got from the pharmacist; is
17  that right?
18    A.  Yes.
19    Q.  Now, we talked before about the daily
20  reports that have thresholds mentioned in them; is
21  that right?
22    A.  Yes.
23    (HBC-Tsipakis Exhibit 24 was marked.)
24  BY MR. ROTTINGHAUS:
25    Q.  I'm going to give you what we've marked

Page 243

1  as Exhibit 24 and represent to you that I
2  understand --
3    MR. ROTTINGHAUS:  And that's 1055, top
4  right-hand corner, 1055.
5  BY MR. ROTTINGHAUS:
6    Q.  We looked at this type of spreadsheet
7  earlier today; is that right?
8    A.  Yes.
9    Q.  And it's my understanding from looking
10  at this, if you look actually back to the first
11  page, the date of this report is January 31 of
12  2014?
13    A.  January 31, 2014?
14    Q.  Yes.
15    A.  Okay.
16    Q.  To the second page, if we look at the
17  spreadsheet, and also referencing --
18    MR. BARNES:  I'm not finding that date.
19  I'm seeing December 31 of '13 on the first page.
20    MR. ROTTINGHAUS:  I apologize.  I may be
21  looking at the wrong.
22  BY MR. ROTTINGHAUS:
23    Q.  You do have the January in front of you.
24  This is all one of one exhibit.  What number is
25  that?

Page 244

1    A.  24.
2    MR. ROTTINGHAUS:  Let's go off the
3  record for one second.
4    THE VIDEOGRAPHER:  3:52.  We are off the
5  video record.
6    (Recess from 3:52 p.m. to 3:56 p.m.)
7    THE VIDEOGRAPHER:  3:56.  We are on the
8  video record.
9  BY MR. ROTTINGHAUS:
10    Q.  We just clarified what we're looking at
11  here.  So that the record is clear, I'm going to
12  be referring you to what I understand to be
13  end-of-the-month reports for several months,
14  including January of 2014, December of 2013,
15  November of 2013, October of 2013, and then
16  although it will look out of order, one from May
17  of 2014.  Okay?
18    A.  Yes.
19    Q.  Going back to the January 2014, page
20  1055 at the top right, second page of that appears
21  to be a spreadsheet like we talked about before?
22    A.  Yes.
23    Q.  Does that look familiar to you?
24    A.  Yes.
25    Q.  Again, I think you said before, that

Page 245

1  this looked a little different than you've ever
2  seen it before, the information; is that right?
3    A.  I was used to seeing it in this format,
4  and the multiple pages threw me this morning.
5    Q.  Does it look somewhat more familiar to
6  you now?
7    A.  Yes.
8    Q.  I was going to ask you, to your
9  knowledge, is there someone at HBC who would have
10  the most knowledge about how this spreadsheet was
11  designed and how it was operated between 2009 and
12  2014?
13    A.  I don't know.
14    Q.  Would it be a system at Giant Eagle or
15  would it have been a system designed by someone at
16  HBC?
17    A.  Probably within the IT department at
18  corporate.
19    Q.  At Giant Eagle?
20    A.  Yes.
21    Q.  Going back to the email we were just
22  discussing, I think Exhibit 23, from Mr. Roahrig
23  to Mr. Millward, Mr. Roahrig is referring to the
24  Hydrocan liquid and trying to address the concern
25  that was raised about store number 8; is that

Page 246

1  right?
2      A.  Yes.
3      Q.  And this is in January of 2014?
4      A.  Yes.
5      Q.  If we go back to Exhibit 24 and if we
6  look four lines down, we'll see store number 8 or
7  pharmacy number 8.
8      A.  Yes.
9      Q.  Looking at this, would it be your
10 understanding that Mr. Roahrig and Mr. Millward
11 were having a discussion about this specific store
12 that we see, store number 8?
13     A.  It references store 8 and I'm reading
14 store 8 on this.  I'm not sure which report
15 they're looking at or which line item or what
16 order they're looking at.
17     Q.  Well, to back up, the email was
18 referenced on January 10th of 2014, and it was
19 started that morning it looks like, maybe even on
20 January 9.  But it's referencing store number 8.
21     A.  Yes.
22     Q.  And if we are correct that this
23 spreadsheet is referencing all of the products
24 that exceeded thresholds for January of 2014, we
25 would see store number 8 did indeed exceed its

Page 247

1  threshold showing the total quantity shipped of
2  8514 with the threshold quantity being 6868.
3      A.  Yes.
4      Q.  You said before that you thought -- and
5  this again appears to have a chain-wide average
6  for the threshold quantity.
7      A.  Yes.
8      Q.  You said before that you thought using a
9  chain-wide average could lead to false positives?
10     A.  For sure, yes.
11     Q.  And by the same token, could using a
12 chain-wide average also lead to false negatives?
13     A.  I'm not a mathematician, but I believe
14 looking here at store 8 that you're asking on,
15 that's one of our busiest stores in the chain, and
16 I'm not surprised that it would have been over
17 threshold from looking at this number.
18     Q.  My question is a little different,
19 however.  Not looking just at store number 8 and
20 not looking at just at the information on this
21 spreadsheet, would you agree that while using a
22 chain-wide threshold can lead to false positives
23 for some stores, could it also lead to false
24 negatives or a sense of reassurance for some
25 stores that may actually be using or ordering a

Page 248

1  lot more of a hydrocodone product than it normally
2  would?
3      A.  It's possible.
4      Q.  If we go to the next document in this
5  set, 1054, this is the end-of-the-month report for
6  December 2013.  If you'll go to the page with the
7  spreadsheet information on it, we see store number
8  8 again; is that right?
9      A.  Yes.
10     Q.  I think it's about four stores down.
11 Are you with me?
12     A.  Yes.
13     Q.  And for store number 8 this month, we
14 see a total shipped quantity of 14,663?
15     A.  Yes.
16     Q.  And a threshold quantity of 7175?
17     A.  Yes.
18     Q.  And if you do the math, correct me if
19 you think I'm wrong, but that appears to be a
20 little over six times the monthly average?
21     A.  Based on this threshold, yes.
22     Q.  Would you expect a daily or a report
23 like this to raise questions about store number 8
24 similar to the questions that were raised in
25 January of 2014?

Page 249

1      A.  Yes.
2      Q.  In getting ready for this deposition and
3  looking through the documents you looked through
4  and in speaking to the individuals you told us you
5  have spoken to, did you become aware of anyone
6  raising any concerns about store number 8 and the
7  amount of shipments to store number 8 in December
8  of 2013?
9      A.  Not specifically, no.
10     Q.  Do you have all of the exhibits in front
11 of you still?
12     A.  Yes.
13     Q.  Could you go back to Exhibit No. 12,
14 which is the suspicious order monitor policy.
15         MR. BARNES:  Are we done with this?
16         MR. ROTTINGHAUS:  We may go back to it,
17 so keep it handy.
18 BY MR. ROTTINGHAUS:
19     Q.  Specifically page referenced under 12.1.
20         MR. BARNES:  Exhibit 12?  It says 12,
21 then 12.2.  You said 12.1?
22         MR. ROTTINGHAUS:  Forgive me.  It's 12,
23 just 12.  I apologize.
24 BY MR. ROTTINGHAUS:
25     Q.  So we're again looking back now at the

Page 250

1  inventory control suspicious order policy that was
2  enacted back in August of 2014?
3      A.  Yes.
4      Q.  I see a name there, the policy owner
5  being Matt Rogos?
6      A.  Yes.
7      Q.  Do you know that person?
8      A.  I do not.
9      Q.  Do you know whether Mr. Rogos indeed
10 worked for HBC back in 2014?
11     A.  I do not, no.
12     Q.  Do you know whether he currently works
13 for Giant Eagle?
14     A.  I do not.
15     Q.  Did you have an opportunity to try to
16 speak with Mr. Rogos to find out about his
17 knowledge concerning this policy?
18     A.  Are you asking me if I tried to reach
19 out to Mr. Rogos?
20     Q.  Yes.
21     A.  No.
22     Q.  Stay on that page with me, but go down
23 towards the bottom under Procedures.  You'll see
24 some bullet points.
25     A.  Yes.

Page 251

1      Q.  Go down to the second bullet point, and
2  I'm going to read it, and tell me if I'm reading
3  it incorrectly.  Okay?
4      A.  Yes.
5      Q.  It appears to me the second bullet point
6  states that "Suspicious order criteria include,
7  but are not limited to, purchases over a defined
8  period that exceed a predetermined threshold."
9      Did I read that correctly?
10     A.  You did.
11     Q.  At least if we read that portion of this
12 policy, Exhibit 12, and we apply it to the
13 spreadsheet that we were just looking at for
14 December of 2013, does it appear to you that any
15 amount shipped in excess of the threshold quantity
16 should at least raise a question in someone's mind
17 as to whether there indeed is a suspicious order?
18     A.  Yes.
19     Q.  Are you able to sitting here today tell
20 us whether anybody raised any questions or raised
21 any red flags about the December 2013 order by
22 store number 8 or the shipment to store number 8
23 that month and whether it indeed was a suspicious
24 order?
25     A.  I can't tie back specifically to that,

Page 252

1  but certainly we just discussed a conversation
2  with the field ops. and corporate regarding store
3  8.
4      Q.  We did, and that was actually the month
5  after December 2013, January 2014.
6      A.  Yes.
7      Q.  And at least in January of 2014, someone
8  wanted to look into the ordering pattern of store
9  number 8 to find out whether this indeed was a
10 suspicious order for January of 2014?
11     A.  Yes.
12     Q.  But going back to 2013, at least sitting
13 here today, you're not aware of anyone questioning
14 the order by store number 8 in December 2013?
15     A.  I don't have anything in front of me
16 that there was or wasn't; correct.
17     Q.  Have you seen any documents or any
18 emails by anyone concerning any questions about
19 the orders by store number 8 in December of 2013?
20     A.  I did not.
21     Q.  If you go to page 1053, I'll represent
22 to you that this appears to be an end-of-the-month
23 report for November 2013 dated specifically 30
24 November 2013.  Are you with me?
25     A.  For November 2013?

Page 253

1      Q.  Yes.
2      A.  Yes.
3      Q.  If you'll go to the spreadsheet, please.
4  And if you go down to store number 8, which I
5  believe is the fourth store from the bottom, and
6  if you look at the amount shipped in November of
7  2013 to store 8, it appears to be 12,298?
8      A.  Yes.
9      Q.  With a threshold quantity being 7257?
10     A.  Yes.
11     Q.  And correct me if you think I'm wrong,
12 but by my math, that's five times the monthly
13 average?
14     A.  Yes.
15     Q.  And knowing what you've told us about
16 your understanding of the store looking into any
17 orders that it thinks should be of concern, would
18 you have expected HBC or someone at HBC to have
19 investigated the amount shipped for the
20 hydrocodone product to store number 8 in that
21 month?
22     A.  I would have expected someone to look at
23 at each line item on the report or daily
24 throughout the month on this report and do their
25 due diligence on each of these line items, yes.

Page 254

1 Q. Would that be an investigation you would
2 expect to be done by the procurement department?
3 A. It's a combination. I think as we saw
4 in other documents, procurement would have been
5 involved. Compliance is involved in some cases.
6 Loss prevention is involved. So it's a whole
7 litany of folks depending what they need to look
8 at.
9 Q. If you go now with me to internal
10 reference 1052, which is the end-of-the-month
11 report of October 2013, again, to the best of your
12 knowledge at least in 2013, the threshold quantity
13 was being applied across the store chain, an
14 average across the store chain; correct?
15 A. Correct.
16 Q. If you go to the second page, the
17 spreadsheet, with me, if you go to the very
18 bottom, you'll find store 8 again.
19 A. Yes.
20 Q. And here in -- at least at the end of
21 October of 2013, does it appear to you that the
22 total amount shipped of the hydrocodone products
23 to store number 8 exceeded the threshold quantity?
24 A. Yes.
25 Q. And again, you're not aware at least for

Page 255

1 this month of any emails by anyone asking anyone
2 to look into whether store 8 had any abnormal
3 ordering patterns for the hydrocodone products?
4 A. I don't have any specific knowledge of
5 them or not.
6 Q. I have one more spreadsheet I want to
7 ask you about, and it actually jumps forward. It
8 fast forwards now to May of 2014. Let me know
9 when you're with me.
10 A. What number is that?
11 Q. I think May of 2014. Is that what you
12 have?
13 A. Is it 1059 in the corner?
14 Q. Yes, 1059.
15 A. I'm tracking with you.
16 Q. And if you'll go to the second page of
17 the spreadsheet again with me, again, you'll see
18 store number 8 about in the middle of that
19 spreadsheet.
20 And would you agree with me that the amount
21 shipped in this month of 10,879 exceeded the
22 threshold quantity, which was 5598?
23 A. Yes.
24 Q. And is it your understanding that even
25 as of 2016, the threshold quantity was still being

Page 256

1 applied as an average across the store chains?
2 A. Yes.
3 Q. I think I'm done with that exhibit.
4 When talking about the threshold system that
5 was put in place in 2013, I think I heard you
6 earlier say that it was done to improve the system
7 of monitoring for suspicious orders.
8 A. To add further layers, yes.
9 Q. Looking back, do you think back in 2013
10 putting the threshold system in place the way it
11 was put in place, that it was indeed an
12 improvement over what HBC had at that point in
13 time?
14 A. It was an improvement that there was
15 automated reports, certainly some IT help to it in
16 some regards.
17 Q. Because prior to 2013, there were no
18 automated reports; is that right?
19 A. It was more a manual process, yes.
20 Q. Not just more a manual process. There
21 was no automated reporting coming out on a daily
22 basis; is that right?
23 A. As far as I could find, no.
24 Q. You may recall a little earlier today
25 that you were shown a couple of letters by the

Page 257

1 Drug Enforcement Agency dating back to 2012 and
2 then prior to 2012.
3 A. Yes.
4 Q. Correct me if I'm wrong. It's my
5 understanding that you cannot recall if you had
6 actually seen those letters before?
7 A. Correct.
8 Q. To your knowledge, did anyone at HBC
9 ever at any point in time from 2012 to 2014
10 initiate any communication to DEA in writing
11 stating that they had read the 2012 letter, but
12 that they either had any questions about it or
13 that they would not be able to comply with it for
14 one reason or another?
15 A. I don't have any knowledge of that.
16 Q. Did you speak to anyone at HBC who told
17 you that they had personally tried to contact DEA
18 with any questions about the contents of the 2012
19 letter?
20 A. I do recall in the conversations from
21 our supervisor, Walt Durr, that there was
22 conversations about they were always in contact
23 with DEA on inspections.
24 I believe he mentioned that they had audits
25 that they had come in, some scheduled, some not

Page 258

1 scheduled. Certainly our loss prevention
2 department has a history of being close with the
3 different municipalities, both the boards as well
4 as the DEA and others.
5 Q. We're going to get a chance to speak
6 with Mr. Durr I think in a couple of weeks in a
7 deposition.
8 But to your knowledge, did he specifically
9 tell you he had had any discussions with DEA about
10 the directives given in the DEA's 2012 letter?
11 A. No.
12 Q. Similarly, you had no discussions with
13 anyone else at HBC that recalls having any
14 discussions with DEA about the specific contents
15 of the 2012 letter?
16 A. Not that I had, no.
17 Q. As I listened to you explain the system
18 that was in place between 2009 and 2014 at HBC,
19 it's my understanding that there was communication
20 between HBC and the Giant Eagle pharmacies on a
21 regular basis.
22 A. There's communication between the
23 warehouse, pharmacy operations, corporate. So it
24 was not uncommon to have dialogue and
25 communication amongst those three teams and loss

Page 259

1 prevention, the constituents internally, all the
2 stakeholders.
3 Q. Similarly, there was sharing of
4 information so that if a question is asked by HBC
5 about a shipment, there was an email chain that
6 somebody could email to a colleague at Giant Eagle
7 to get information; is that right?
8 A. There was an ability to, sure.
9 Q. And we've seen some of those emails
10 today; right?
11 A. Yes.
12 Q. As I understand it from the spreadsheets
13 we were just looking at, did HBC have access to
14 Giant Eagle pharmaceutical data?
15 A. Sure, yes.
16 Q. If a pharmacist at Giant Eagle had a
17 question or had a concern they wanted to express
18 to HBC, they could do that by email?
19 A. If a pharmacist?
20 Q. Yes.
21 A. Sure, they could.
22 MR. ROTTINGHAUS: I'll show counsel what
23 has been marked as Exhibit 25.
24 P-GEN-0085.
25 (HBC-Tsipakis Exhibit 25 was marked.)

Page 260

1 BY MR. ROTTINGHAUS:
2 Q. Sir, was HBC a member of the National
3 Association of Chain Drugstores?
4 A. Was HBC? Giant Eagle was.
5 Q. Was HBC?
6 A. We would contract with that entity at
7 the parent level, so it would have been Giant
8 Eagle.
9 Q. And would HBC have access -- as Giant
10 Eagle -- as part of Giant Eagle's membership,
11 would HBC have access to any information shared
12 among members of the National Association of Chain
13 Drugstores?
14 A. Sure.
15 Q. And have you confirmed that Giant Eagle
16 indeed was a member of the National Association of
17 Chain Drugstores between 2009 and 2014?
18 A. Have I confirmed that?
19 Q. Yes.
20 A. No.
21 Q. Is it your understanding that they were?
22 A. Speculation, but I would assume they
23 were, yes.
24 Q. Well, are you aware of any participation
25 by Giant Eagle in efforts to communicate with the

Page 261

1 Drug Enforcement Administration about the proposed
2 change of hydrocodone-containing products from
3 Schedule III to Schedule II?
4 MR. BARNES: I'm going to object to the
5 form. He's already said HBC wasn't a member.
6 You're asking him about a document for something
7 it wasn't a member.
8 BY MR. ROTTINGHAUS:
9 Q. Are you, sir?
10 A. I'm sorry. Can you repeat the question,
11 please?
12 Q. Let me ask you this: Are you aware of
13 or do you know whether HBC had any involvement in
14 any efforts to communicate with the Drug
15 Enforcement Administration about any concerns HBC
16 had with the administration's proposed change for
17 hydrocodone-containing products from Schedule III
18 to Schedule II?
19 A. I don't know.
20 Q. And you'll see that Exhibit 25 is an
21 April 28, 2014 letter to the Drug Enforcement
22 Administration.
23 A. Yes.
24 Q. And if you look at the top right above
25 the date of the letter, you'll see that among

Page 262

1  signatories to this letter was the National
2  Association of Chain Drugstores?
3      A.  Yes.
4      Q.  And sitting here today, do you have any
5  knowledge whether Giant Eagle or HBC provided any
6  input into this April 28, 2014 letter?
7      A.  I do not.
8      Q.  Have you ever seen this letter before?
9      A.  I have not.
10     Q.  Take as much time as you need, but look
11 at the first paragraph of the letter.
12     A.  The one that ends with spectrum of
13 practice settings?
14     Q.  Yes.  Does it appear to you there's
15 being concern expressed about the change from
16 Schedule III to Schedule II for hydrocodone
17 combination products?
18     A.  Yes.
19         MR. BARNES:  Object to form.
20 BY MR. ROTTINGHAUS:
21     Q.  Again, you don't know whether HBC had
22 any participation in communicating the contents of
23 this letter to the Drug Enforcement
24 Administration?
25     A.  I do not.

Page 263

1      Q.  Do you know whether internally there was
2  any concern expressed by HBC or anyone at Giant
3  Eagle about what effect changing the hydrocodone
4  combination products from Schedule III to Schedule
5  II might have on Giant Eagle?
6      A.  I do not.
7      Q.  You were aware that HBC's facility was
8  not equipped and was not licensed to distribute
9  Schedule II controlled substances though?
10     A.  Correct.
11     Q.  And it never was?
12     A.  The HBC warehouse was never licensed or
13 equipped to handle CIIs, no.
14     Q.  Do you know whether Giant Eagle
15 contributed -- strike that.
16         MR. ROTTINGHAUS:  It's my understanding
17 a response will be given in writing to paragraphs
18 13, 14 and 15.
19         MR. KOBRIN:  Correct.
20         MR. BARNES:  Do you mind if we take a
21 minute?
22         THE VIDEOGRAPHER:  4:23.  We're off the
23 video record.
24         (Recess from 4:23 p.m. to 4:31 p.m.)
25         THE VIDEOGRAPHER:  4:31.  We're on the

Page 264

1  video record.
2  BY MR. ROTTINGHAUS:
3      Q.  Sir, we just took a short break.  I
4  think you had a chance to speak with your
5  attorneys.  We also had a chance to speak with
6  your attorneys about a couple of topics that we
7  had asked to raise in your deposition.  And
8  specifically, they deal with compensation
9  incentives and policies on compensation
10 incentives.
11     It's my understanding you may not be prepared
12 to go forward with those issues.  I just have a
13 couple of questions to make sure.  Okay?
14     And specifically what I'm referring to is in
15 the second exhibit or the second deposition notice
16 for 30(b)(6), paragraphs 4 and 5; 3, 4 and 5.
17 Okay?
18     In preparation for your deposition today,
19 have you in any way attempted to prepare yourself
20 to discuss the policies and procedures related to
21 compensation for anyone who worked at HBC or any
22 incentives for people who worked at HBC with
23 respect to the distribution of controlled
24 substances?
25     A.  No.

Page 265

1      Q.  Probably the same answer, but just to
2  clarify, have you done anything to prepare
3  yourself to talk about in any respect whether any
4  pharmacists at Giant Eagle had policies in place
5  for compensation incentives based upon the number
6  of controlled substances sold?
7      A.  No.
8      Q.  And so if I were to ask you questions
9  about the compensation incentives today, would
10 your answer be you don't know?
11     A.  Correct.
12         MR. BARNES:  The reason is because we
13 had an agreement October 15, 2018 letter where we
14 advised plaintiffs that we would be submitting
15 written responses to those topics.  Therefore, the
16 witness was not prepared on those topics.
17 BY MR. ROTTINGHAUS:
18     Q.  And just to make sure, you're not aware
19 of what policies exist with respect to
20 compensation incentives for individuals at HBC?
21     A.  Correct.
22     Q.  We saw earlier today a chart that showed
23 what was called ARCOS data, and it showed the
24 number of hydrocodone-containing products that
25 were distributed to Summit County and Cuyahoga

Page 266

1  County in Ohio.  Do you remember seeing those?
2      A.  Yes.
3      Q.  And the number is in the millions;
4  correct?
5      A.  I don't recall.
6      Q.  You don't recall if it was in the
7  millions?
8      A.  I'd like to see it again.  Actually, I
9  have it here.  Is this the one you're referencing?
10      Q.  Yeah.  It's Exhibit 15.  Let me
11  reference the internal number on it so we can put
12  it on the screen.  HBC 0015.
13          MR. BARNES:  And was your question
14  related to Ohio generally?
15          MR. ROTTINGHAUS:  No, to Cuyahoga and
16  Summit County.
17  BY MR. ROTTINGHAUS:
18      Q.  Referencing just Cuyahoga County to
19  start, does it appear to you the data referenced
20  in this spreadsheet suggests that 10 million total
21  dosage units were distributed between 2009 and
22  2014 by HBC to Cuyahoga County?
23          MR. BARNES:  Object to form.
24          THE WITNESS:  I'm looking at this
25  exhibit that you put in front of me.  I don't have

Page 267

1  any way to corroborate if these are actual numbers
2  from our HBC warehouse or not.  I can tell you
3  what it says, but I have no way to verify what I'm
4  looking at.
5  BY MR. ROTTINGHAUS:
6      Q.  What it says -- if it's correct, what it
7  says is that the total dosage units was 10,103,000
8  to Cuyahoga County?
9      A.  That's what it says, yes, sir.
10      Q.  And then if we look at the total for
11  Summit County, the total was 8,892,000?
12      A.  That's what it says, yes.
13      Q.  That was between 2009 and 2014?
14      A.  Yes.
15      Q.  If we wanted to try to corroborate this
16  data with someone at HBC who would have data
17  available to them, who would the person be?
18      A.  I believe our procurement department
19  would be able to help provide that or the IT
20  department.
21      Q.  Who would you go to in the procurement
22  department?
23      A.  Robert Micklin.
24      Q.  I believe you also testified to your
25  knowledge, there has never been a suspicious order

Page 268

1  for any hydrocodone-containing product that was
2  shipped to Cuyahoga County or Summit County.
3      A.  I testified that there was not a
4  suspicious order that we -- there was orders of
5  interest certainly that we've investigated, but as
6  far as suspicious orders, there was not any
7  suspicious orders that we identified and hence not
8  reported to DEA.
9      Q.  Looking back at these total numbers of
10  10 million to Cuyahoga County, and nearly 9
11  million to Summit County, does it surprise you
12  that there was never a suspicious order found by
13  HBC during the timeframe of 2009 to 2014 for any
14  hydrocodone-containing product?
15          MR. BARNES:  Object to form.
16          THE WITNESS:  No, it does not.  The
17  reason is because all of our orders were pursuant
18  to our pharmacies that were pursuant to valid
19  legitimate prescriptions that we filled.
20  BY MR. ROTTINGHAUS:
21      Q.  And in fairness to you, I understand
22  that that's your position.  But also in fairness,
23  you have not undertaken any personal investigation
24  to make sure all of those were valid orders from
25  your pharmacies, have you?

Page 269

1      A.  Can you ask that again?
2      Q.  You in getting ready for this deposition
3  haven't undertaken any personal investigation to
4  make sure all of these orders that totaled 10
5  million units to Cuyahoga County and 8 million to
6  Summit County were all valid orders, have you?
7          MR. BARNES:  I object to form.  Nor was
8  he required to do so.
9          THE WITNESS:  I did not.
10          MR. ROTTINGHAUS:  I think that's all I
11  have.
12          MR. BARNES:  I have some.
13              EXAMINATION
14  BY MR. BARNES:
15      Q.  Mr. Tsipakis, you were asked some
16  questions about the so-called suspicious order
17  regulation of 1301.74(b).  Do you remember that?
18      A.  Yes.
19      Q.  Were you shown during your deposition at
20  any time the security regulation in 1301.71 of the
21  Code of Federal Regulations?
22      A.  I was not.
23      Q.  What do you understand the security
24  regulation to be?
25      A.  The security regulation in its entirety

Page 270

1 is meant to -- for a registrant to have proper
2 controls to prevent diversion and theft.
3     Q.  And do you understand that to be the
4 main requirement that distributors are supposed to
5 meet?
6         MR. GADDY:  Object to the form.
7         THE WITNESS:  Yes.
8 BY MR. BARNES:
9     Q.  Did HBC meet that requirement at all
10 times?
11     A.  Yes.
12         MR. GADDY:  Objection to form.
13 BY MR. BARNES:
14     Q.  Did Giant Eagle meet that requirement if
15 it was required to do so at all times?
16         MR. GADDY:  Objection to form.
17         THE WITNESS:  Yes.
18 BY MR. BARNES:
19     Q.  Now, do you understand that the one part
20 of the regulation that was shown to you, the
21 1301.74, the one that says design and operate a
22 system to disclose to the registrant suspicious
23 orders of controlled substances, do you understand
24 that to be the only factor taken into
25 consideration for the security requirement?

Page 271

1         MR. GADDY:  Objection to form.
2         THE WITNESS:  It's not the only factor,
3 no.
4 BY MR. BARNES:
5     Q.  What are some of the other factors?
6     A.  Physical security, record keeping,
7 basically multiple controls at all levels in the
8 distribution chain.
9     Q.  So it's not a simple question of meeting
10 the security requirement.  Just go 1301.74(b) and
11 say, well, did you meet this requirement.  It's
12 more a comprehensive requirement; is that
13 accurate?
14         MR. GADDY:  Objection to form.
15         THE WITNESS:  It's a much more
16 comprehensive process that's needed.  That's one
17 piece of a total system.
18 BY MR. BARNES:
19     Q.  And is it your understanding under the
20 security requirement regulation that you're
21 supposed to look at the registrant's overall
22 security system, or do you just look at the piece
23 called suspicious order monitoring system?
24     A.  The overall system, the overall system,
25 a lot of different factors is listed on the type

Page 272

1 of controls that are distributed, the type of
2 chemicals, et cetera.  So there's a whole host of
3 things that go into that.
4     Q.  You told us under questioning by
5 plaintiffs' counsel that HBC was never a
6 controlled substance II facility; is that correct?
7     A.  That's correct.
8     Q.  Are those the most dangerous drugs -- in
9 terms of the DEA hierarchy, you have controlled Is
10 which are what?
11     A.  Controlled Is, marijuana, peyota,
12 et cetera.  Those are list I chemicals that
13 typically are not in the purview of retail
14 pharmacists.
15     Q.  Would it be fair to say those are
16 illegal drugs.  Nobody is supposed to use them at
17 any time for any purpose?
18         MR. GADDY:  Objection.  Form.
19         THE WITNESS:  Yes.
20 BY MR. BARNES:
21     Q.  And then below that you get into
22 controlled substance Schedule II; is that correct?
23     A.  Correct.
24     Q.  Is that where most opioids exist and
25 have always existed in that category?

Page 273

1 Prescription opioids I'm talking about.
2         MR. GADDY:  Objection to form.
3         THE WITNESS:  Yes.
4 BY MR. BARNES:
5     Q.  The one exception for purposes of our
6 case is the HCP products; is that right?
7     A.  That were later reclassified, yes.
8     Q.  When HBC distributed that, it only
9 distributed it when it was classified as Schedule
10 III; is that correct?
11     A.  Correct.
12     Q.  So when determining compliance with the
13 security requirement, did HBC take into account
14 that it was never a controlled substance II
15 distributor?
16         MR. GADDY:  Objection.  Form.
17         THE WITNESS:  Yes.
18 BY MR. BARNES:
19     Q.  Did HBC also consider the quantity of
20 the controlled substances it was handling when it
21 designed its overall security system?
22     A.  Yes.
23     Q.  Did it consider its internal controls
24 over the receipt, manufacture, distribution and
25 disposition of the controlled substances it was

Page 274

1  handling?
2     A.  Yes.
3     Q.  Did it consider the physical security
4  facilities that it had?
5     A.  Of course, yes.
6     Q.  While HBC was distributing controlled
7  substance IIIs, IVs and Vs, did it get visited
8  frequently by the DEA to perform audits and other
9  inspections?
10    MR. GADDY:  Objection to form.
11    THE WITNESS:  Yes.  It was visited by
12 the DEA, yes.
13 BY MR. BARNES:
14    Q.  Did the DEA ever say to HBC you're not
15 meeting the security requirement under the
16 regulations?
17    MR. GADDY:  Objection.  Form.
18    THE WITNESS:  Not to my knowledge, no.
19 BY MR. BARNES:
20    Q.  Are you aware of any DEA regulation that
21 says you're supposed to use a threshold-based
22 system to monitor for suspicious orders?
23    A.  No.
24    Q.  Are you aware of any DEA regulation that
25 requires you to set a threshold at any level?

Page 275

1     A.  No.
2     Q.  Now, we're talking about or we covered
3  in your direct testimony the fact that Giant Eagle
4  had two separate warehouses, is that correct, the
5  HBC warehouse and then the GE RX warehouse?
6     A.  Yes.
7     Q.  And are they both separately licensed by
8  the DEA?
9     A.  Yes.
10    Q.  Are they both separate physical
11 facilities?
12    A.  Yes.
13    Q.  And unlike HBC, which only had a license
14 for IIIs, IVs and V, did the GE RX facility also
15 do some Schedule IIs?
16    A.  Yes.
17    Q.  And do both warehouses only and have
18 they only ever supplied Giant Eagle pharmacies?
19    A.  That's correct.
20    Q.  Did either warehouse ever supply an
21 internet pharmacy?
22    A.  No.
23    Q.  Are you aware of the DEA's efforts for
24 many years in the late '08, '09, '10 period with
25 respect to internet pharmacies?

Page 276

1     A.  Yes.
2     Q.  Can you just briefly summarize those for
3  us?
4     MR. GADDY:  Objection to form.
5     THE WITNESS:  Certainly there was a lot
6  of pop-up pharmacies on the internet that the DEA
7  was cracking down on and certainly there wasn't a
8  valid patient/prescriber relationship, and the DEA
9  had ramped up regulatory efforts against those to
10 curb them or shut them down.
11 BY MR. BARNES:
12    Q.  Did HBC or Giant Eagle at any time ever
13 supply an internet pharmacy at any time?
14    MR. GADDY:  Objection to form.
15    THE WITNESS:  No.
16 BY MR. BARNES:
17    Q.  Now, with respect to the physical
18 structure of the HBC warehouse, did you have a
19 locked cage?
20    A.  Yes.
21    Q.  Was there controlled access to that
22 locked cage?
23    A.  Yes.
24    Q.  Was that locked cage inspected and
25 approved by the DEA?

Page 277

1     A.  Yes.
2     Q.  Was admittance to the locked cage
3  limited to only certain personnel?
4     A.  Yes.
5     Q.  Was there limited entry for the number
6  of personnel?
7     A.  Yes.
8     Q.  What was that number, do you recall?
9     A.  Three or four individuals only.
10    Q.  Were they using any type of digital
11 inventory system with scanners and wrist bands and
12 things of that nature while they were inside the
13 controlled substance locked area?
14    A.  Yes.
15    Q.  Do you know the name of that system?
16    A.  I believe Volcom.  I think it's Volcom.
17    Q.  Can you spell that, please?
18    A.  V-O-L-C-O-M.
19    Q.  And is that system a form of a perpetual
20 inventory system?
21    A.  Yes.
22    Q.  Is that a type of internal control at
23 the warehouse?
24    MR. GADDY:  Objection to form.
25    THE WITNESS:  Sure, yes.

Page 278

BY MR. BARNES:

Q. The controlled substance orders that were picked at the warehouse, the HBC warehouse, were they doublechecked before shipping?

A. Yes.

Q. Were there physical safeguards to prevent theft and diversion at that warehouse?

A. Yes.

Q. Even while picking the orders?

A. Yes.

Q. Can you just describe a few of them?

A. So there would be daily audits, backcounts. The system would make sure that all of the inventory would tie up.

Q. So if there was any product missing, would it be found fairly promptly?

A. Oh, yes.

Q. Was there a daily warehouse inventory for controlled substances?

A. Yes.

Q. Were there security guards and cameras throughout the facility?

A. Yes, multiple.

Q. Besides the daily inventories, were their yearly inventories and biannual DEA

Page 279

inventories?

A. Yes.

Q. Was the warehouse overseen by the Giant Eagle audit and accounting department?

A. Sure, yes.

Q. You were asked a lot of questions about due diligence performed in the 2009 to 2013 time period. In fact, Exhibit 12 you were shown a few minutes ago and you were asked whether you could identify specific investigations for line items on these reports.

Do you recall those questions?

A. Yes.

Q. How many transactions like that are we talking about in any given -- any given month and year?

A. Thousands, millions, many items.

Q. And you can't remember every one of them?

A. No.

Q. And you didn't attempt to memorize every one of them in preparation for your deposition?

A. No.

Q. Have you ever heard of the term CSOS ordering system?

Page 280

A. Yes.

Q. Is that something that was used for the warehouse facilities?

A. Yes.

Q. When did that program start being used?

A. I believe 2015.

Q. Does that program have the ability to stop an order if it exceeds a threshold?

A. Yes.

Q. Are you familiar with the Supply Logic software program?

A. Yes.

Q. Is that another program that Giant Eagle used at these warehouses?

A. Yes.

Q. And what did that allow Giant Eagle or the warehouses to do?

A. It would allow for us to see the ins and outs of inventory and flag anything that had any risk or things to look at out of the ordinary.

Q. Is that a form of an internal control?

MR. GADDY: Objection to form.

THE WITNESS: Yes.

BY MR. BARNES:

Q. Was that part of the overall security

Page 281

system that HBC considered when it was trying to comply and complying with the security requirement?

MR. GADDY: Objection to form.

THE WITNESS: Yes. More further, they would look at patterns. They would look at pretty holistically the patterns and any deviations.

BY MR. BARNES:

Q. You're a pharmacist; is that correct?

A. Yes.

Q. What kind of degrees in pharmacy do you have?

A. Bachelor of science in pharmacy.

Q. And were you a practicing pharmacist in a store for a period of time?

A. Yes.

Q. Was that for a different chain, Albertsons?

A. Yes.

Q. Are you familiar with dispensing practices and things of that nature?

A. Yes.

Q. In your direct testimony upon questioning by Mr. Gaddy, you referenced this integrated control system, and you referenced

Page 282

1 three parts to it, at the warehouse, at corporate
2 and at the stores. Do you recall that testimony?
3    A. Yes.
4    Q. At the stores are there internal
5 controls over controlled substances?
6    A. Sure, yes.
7    Q. Are there physical controls over
8 controlled substances?
9    A. Yes.
10    Q. Does that include vaults -- I'm sorry --
11 not vaults, but safes and things of that nature?
12    A. Locked cabinets and safes, yes.
13    Q. And who's allowed access to those locked
14 cabinets and safes?
15    A. Only the pharmacist.
16    Q. Does Giant Eagle have a mechanism to
17 train pharmacists to keep tight control over
18 controlled substances?
19    A. Yes.
20    Q. And is that monitored by loss prevention
21 and internal audit?
22    A. Yes.
23    Q. And are pharmacists and pharmacy techs
24 trained and supervised?
25    MR. GADDY: Objection to form.

Page 283

1    THE WITNESS: Yes.
2 BY MR. BARNES:
3    Q. Does Giant Eagle at the store level
4 impose policies and procedures on the pharmacists
5 and the pharmacy techs with respect to dispensing
6 prescriptions?
7    A. Yes.
8    Q. Are you familiar with the DEA pharmacist
9 manual?
10    A. Of course, yes.
11    Q. Is that something that's kept at every
12 Giant Eagle pharmacy?
13    A. Yes.
14    Q. And are the pharmacists required to
15 review it and sign off on it?
16    A. Yes.
17    Q. Does Giant Eagle have controlled
18 substance dispensing guidelines?
19    A. Yes.
20    Q. Do those guidelines include red flags,
21 things to watch for in terms of whether a
22 prescription is legitimate or not?
23    A. Yes.
24    Q. And are they required to review those
25 and sign off that they've been trained on it and

Page 284

1 understand them?
2    A. Yes.
3    Q. And are all of Giant Eagle's pharmacists
4 licensed pharmacists with experience?
5    MR. GADDY: Objection to form.
6    THE WITNESS: Yes.
7 BY MR. BARNES:
8    Q. Are there other manuals containing
9 policies at the store level related to controlled
10 substance other than the DEA pharmacist manual and
11 the controlled substance dispensing guidelines?
12    A. Yes.
13    Q. And do those policies include controls
14 over all controlled substances?
15    A. Yes.
16    Q. Do the stores interface with any
17 statewide systems to make sure that incoming
18 prescriptions are legitimate?
19    A. Yes.
20    Q. In the state of Ohio, is there a name
21 for that system?
22    A. Sure. It's the prescription drug
23 monitoring program, the OARRS program.
24    Q. And is that something that the
25 pharmacists are trained to consult?

Page 285

1    A. Yes.
2    Q. Will that provide some information about
3 things like doctor shopping and people coming in
4 from out of state, things of that nature?
5    MR. GADDY: Objection to form.
6    THE WITNESS: Yes.
7 BY MR. BARNES:
8    Q. And do Giant Eagle pharmacists use that
9 system?
10    A. Regularly, yes.
11    Q. Is the activity at the store level
12 reported to the DEA in terms of prescriptions
13 filled?
14    A. Yes, yes.
15    Q. Is the DEA -- does the DEA from time to
16 time visit the stores?
17    A. Sure, yes.
18    Q. Do they perform surprise audits and
19 things of that nature?
20    MR. GADDY: Objection to form.
21    THE WITNESS: Audits or if they're
22 coming in for investigations or other things that
23 they're working on, sure, yes.
24 BY MR. BARNES:
25    Q. Do of the boards of pharmacy of the

Page 286

1 states also interface with the stores?
2    A.  Yes.
3    Q.  Does the Ohio Board of Pharmacy
4 interface with the Giant Eagle stores in these two
5 counties at issue?
6      MR. GADDY:  Objection to form.
7      THE WITNESS:  Yes.
8 BY MR. BARNES:
9    Q.  Do they perform surprise audits and
10 inspections?
11      MR. GADDY:  Objection to form.
12      THE WITNESS:  Absolutely, yes.
13 BY MR. BARNES:
14    Q.  To your knowledge, has there ever been a
15 problem raised by the DEA or the Ohio Board of
16 Pharmacy related to any of the Giant Eagle
17 pharmacies in these two jurisdictions?
18      MR. GADDY:  Objection to form.
19      THE WITNESS:  Not to my knowledge, no.
20 BY MR. BARNES:
21    Q.  Are there controls over incoming orders
22 into the stores, including orders from the other
23 distributors?  McKesson, I guess, was the main
24 distributor of controlled substance IIs for this
25 time period; is that correct?

Page 287

1    A.  Correct.
2    Q.  And when those came into the stores,
3 were there special procedures over those incoming
4 orders?
5    A.  Yes.
6    Q.  Were they treated differently than other
7 incoming orders?
8    A.  Absolutely, yes.
9    Q.  Give us some samples of that.
10    A.  So those orders would need to be checked
11 in by a pharmacist, signed off on the pharmacist.
12 Right away when the couriers would drop off, it's
13 the expectation that the pharmacist would -- it
14 would be segregated.  They come in different totes
15 and they're handled differently.  And any
16 discrepancies are immediately noted or called in.
17    Q.  Is the pharmacist required to
18 immediately input -- update the store's controlled
19 substance inventory for incoming orders?
20    A.  Their onions?
21    Q.  Yes.
22    A.  Yes.
23    Q.  And when controlled substance
24 prescriptions are filled, is the inventory, the
25 store inventory immediately credited for the

Page 288

1 outgoing prescription?
2    A.  Yes.
3    Q.  At the end of the day, is there a check
4 of the remaining balance of controlled substances
5 at the store?
6    A.  Yes, and especially even more so on
7 CIIs.  They're backcounted on every fill.
8    Q.  What does it mean to backcount every
9 fill?
10    A.  The system will prompt for how many
11 pills are left in the bottle.  So if you had a
12 hundred pills to start and you filled 50, you
13 would expect to have 50 left in that bottle.  So
14 the backcount would be to ensure that you had 50
15 left in that bottle and inputting that that you do
16 have, in fact, 50.
17    Q.  Are you familiar with the term monthly
18 narc audit?
19    A.  Yes.
20    Q.  What is that?
21    A.  The requirement that all of our
22 pharmacies do a full inventory of CII narcotics in
23 our stores and some other products as well, not
24 just can CIIs, but some CIIIs.
25    Q.  So you have the daily perpetual

Page 289

1 inventory and the monthly narc audits?
2    A.  Yes.
3    Q.  You also have the annual audits or
4 inventories of controlled substances at every
5 store?
6    A.  The DEA requires an biannual inventory.
7 We do an annual inventory on top, yes.  We do a
8 yearly inventory instead of biannual.
9    Q.  Can you tell us what a PDL is?
10    A.  PDL is a pharmacy district leader.
11    Q.  And what do they do?
12    A.  They supervise the stores.  They're
13 basically a district manager that oversees the
14 stores for all aspects of ensuring Pharmacy
15 Practice Act, DEA, company policy.  They're the
16 oversight for the stores, direct oversight for the
17 stores.
18    Q.  Do they regularly visit the stores?
19    A.  Yes.
20    Q.  Do they conduct audits or inquiries
21 concerning their procedures and things of that
22 nature?
23    A.  They do audits.  We also have an
24 internal audit that quarterly visits the stores
25 for a myriad of things, but yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    Q. Is there any supervision of training of
2 pharmacists?
3    A. Yes.
4    Q. Is that something a PDL does?
5    A. A PDL would definitely make sure any
6 training that needs to be done or computer-based
7 training is completed, and if there's any
8 remediation that's needed, that's their job to
9 make sure.
10    Q. Do the stores work with local law
11 enforcement, police, board of pharmacy inspectors,
12 DEA agents?
13    A. Oh, yes, all the time.
14       MR. GADDY: Objection to form.
15 BY MR. BARNES:
16    Q. Is that cooperative working
17 relationship?
18       MR. GADDY: Objection to form.
19       THE WITNESS: Very much so, yes.
20 BY MR. BARNES:
21    Q. In working with local law enforcement
22 and DEA, have you been able to uncover people
23 attempting to pass bad scripts, things of that
24 nature?
25    A. Yes.

Page 291

1    Q. Is there a pharmacy investigator?
2    A. Yes.
3    Q. Who is that?
4    A. Rick Shaheen.
5    Q. If how much experience does he have?
6    A. He has a lot of experience. He has a
7 background in law enforcement, attorneys general's
8 office, a very -- has a lot of contacts with DEA,
9 boards of pharmacy. So he's been -- he's been in
10 the business a long time.
11    Q. Does he spend a lot of time in the
12 stores?
13       MR. GADDY: Objection to form.
14       THE WITNESS: Yes.
15 BY MR. BARNES:
16    Q. Does he also work individually with
17 local law enforcement and DEA?
18    A. Yes.
19    Q. Are you familiar with the term or the
20 acronym BOLO, B-O-L-O?
21    A. Yes.
22    Q. What is it?
23    A. Be on the lookout for. So he will send
24 out bulletins to the pharmacists when either law
25 enforcement will tell him that there's bad scripts

Page 292

1 on the street or a prescription pad, for example,
2 if it's stolen or something, either if we have
3 information -- so Rick is involved with -- Rick
4 and Andrew, who work for Rick, are involved with
5 all of those activities and alert our stores as
6 soon as they know something and we disseminate
7 very quickly to all our stores.
8    Q. And is that the type of information
9 that's also in the OARRS database, or is that
10 different?
11       MR. GADDY: Objection to form.
12       THE WITNESS: Different.
13 BY MR. BARNES:
14    Q. Are there daily counts of certain drugs?
15    A. Yes.
16    Q. Does that include HCP, hydrocodone, or
17 HCP products?
18    A. Yes.
19    Q. Is there an electronic prescription
20 system with perpetual logs at the stores?
21    A. Yes.
22    Q. Is that a form of internal control?
23    A. Yes.
24    Q. Is there diversion training for pharmacy
25 employees on a yearly basis?

Page 293

1       MR. GADDY: Objection to form.
2       THE WITNESS: Yes.
3 BY MR. BARNES:
4    Q. Now, you were asked a lot of questions
5 about so-called suspicious orders. And I didn't
6 hear a lot of questioning about diversion.
7    Do you understand the term diversion?
8       MR. GADDY: Objection to the question,
9 form of the question.
10       THE WITNESS: Yes.
11 BY MR. BARNES:
12    Q. What does the term diversion mean to
13 you?
14    A. Diversion, theft, loss, things being
15 routed to folks that shouldn't have access to the
16 drugs or prescriptions.
17    Q. If an order is suspicious, does that
18 mean it was diverted?
19       MR. GADDY: Objection to form.
20       THE WITNESS: No, not necessarily, no.
21 BY MR. BARNES:
22    Q. In fact, what has HBC's and Giant
23 Eagle's experience been with respect to so-called
24 suspicious orders or flagged orders? Have they
25 resulted in uncovering diversion?

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    MR. GADDY: Objection to form.
2    THE WITNESS: No.
3 BY MR. BARNES:
4    Q. What happens to -- you were asked
5 questions on Exhibit 15 of these 10 million dosage
6 units in Cuyahoga County. What happened to those
7 10 million units? Where did they go?
8    MR. GADDY: Objection to form.
9    THE WITNESS: Assuming those were the 10
10 million units that we dispensed out of HBC, they
11 were dispensed to patients that were pursuant --
12 on a valid prescription.
13 BY MR. BARNES:
14    Q. And how about the dosage units that went
15 out to Summit County presuming that these numbers
16 are correct?
17    MR. GADDY: Same objection.
18    THE WITNESS: The same. Every single
19 one of them would have been dispensed pursuant to
20 a prescription by a licensed practitioner for
21 those patients.
22 BY MR. BARNES:
23    Q. In your direct questioning today, were
24 you shown at any time any evidence, any document,
25 any piece of paper by plaintiffs' counsel

Page 295

1 suggesting that any single one of these
2 prescriptions was anything other than a legitimate
3 prescription issued by a doctor who had a
4 legitimate license to issue it?
5    MR. GADDY: Objection to form.
6    THE WITNESS: No.
7 BY MR. BARNES:
8    Q. Were you shown any evidence at any time
9 that any of these prescriptions caused anybody any
10 harm at any time in any jurisdiction?
11    MR. GADDY: Objection to form.
12    THE WITNESS: No.
13 BY MR. BARNES:
14    Q. Did the DEA at any time inform HBC or
15 Giant Eagle that it was required to keep records
16 of every call, every conversation that was made
17 with respect to following up on orders of
18 interest?
19    MR. GADDY: Objection to form.
20    THE WITNESS: No.
21 BY MR. BARNES:
22    Q. Did HBC and Giant Eagle keep those
23 records and emails in other types of files?
24    A. Yes.
25    Q. Is Giant Eagle's integrated system

Page 296

1 designed to maintain the integrity of the closed
2 system of distribution from incoming at the
3 warehouse to outgoing at the stores?
4    A. Yes.
5    MR. GADDY: Objection to form.
6 BY MR. BARNES:
7    Q. The system that was designed by Giant
8 Eagle, did you expect it to ever produce a
9 suspicious order?
10    MR. GADDY: Objection to form.
11    THE WITNESS: No.
12 BY MR. BARNES:
13    Q. Before you had the threshold-based
14 system, you've already testified, I think, there
15 was one suspicious order?
16    A. Yes.
17    Q. And after you had the threshold-based
18 system, you had one suspicious order?
19    A. One more, yes.
20    Q. What does that tell you?
21    MR. GADDY: Objection to form.
22    THE WITNESS: That we had adequate
23 controls from the beginning. Adding more layers
24 of controls didn't materially change the outcome
25 of the system we had in place.

Page 297

1 BY MR. BARNES:
2    Q. Do you understand that the plaintiffs in
3 this case are the City of Cleveland, City of Akron
4 and the counties of Summit and Cuyahoga?
5    A. Yes.
6    Q. To your knowledge, did any of those
7 plaintiffs ever approach Giant Eagle or HBC and
8 say, we think we have a problem, we'd like your
9 assistance, or this doctor is bad or there's a
10 pill mill down the street, don't fill these
11 prescriptions? Did they ever do anything like
12 that?
13    MR. GADDY: Objection to form.
14    THE WITNESS: No; not to my knowledge,
15 no.
16 BY MR. BARNES:
17    Q. The employees that work in the Giant
18 Eagle pharmacies in these jurisdictions, do they
19 live in those communities?
20    A. Yes.
21    MR. GADDY: Objection to form.
22    THE WITNESS: Absolutely, yes.
23    MR. BARNES: I've got no further
24 questions.
25    RE-EXAMINATION

Page 298

BY MR. GADDY:

1  BY MR. GADDY:
2      Q.   Mr. Tsipakis, you were asked a lot of
3  questions about some of the security requirements.
4  I want to kind of zero in with a little more
5  specificity to some of those.
6      You were asked by Mr. Barnes whether or not
7  there was any requirement that HBC adopt a
8  threshold program.  Do you recall that?
9      A.   Yes.
10      Q.   And you said there's not; correct?
11      A.   A specific threshold system; correct.
12      Q.   But you agree that there absolutely is a
13  requirement that HBC design and operate a system
14  meant to detect suspicious orders of controlled
15  substances; correct?
16      A.   Yes.
17      Q.   The DEA is not charged with designing
18  and operating a system to do that, are they?
19      A.   They are not.
20      Q.   DEA is not obligated to tell you how to
21  run your own business and design and operate your
22  own system, are they?
23      A.   The DEA has actually given no guidance.
24  It just says that you need to have of a system to
25  disclose suspicious orders, keep control of your

Page 299

1  controlled substances, make sure you know where
2  they're going, all those general requirements that
3  are inside the controlled substance security
4  requirements, yes.
5      Q.   It's the law that says that it's HBC's
6  responsibility, correct, not the DEA's?  It's the
7  law that says that; right?
8      A.   I'm sorry.  I'm not following.  It's DEA
9  reg. that says that?
10      Q.   Sure.  Well, it's a federal regulation
11  that says HBC has the responsibility to design and
12  operate a system; correct?
13      A.   Yes.
14      Q.   So the federal regulation requires HBC
15  to do that, not anybody else; correct?
16      A.   It requires the registrant, which is
17  HBC, ultimately Giant Eagle, yes.
18      Q.   And that includes individuals or
19  entities such as HBC which were distributing
20  Schedule III controlled substances like
21  hydrocodone combination products; correct?
22      A.   Yes.
23      Q.   We looked at several of the documents
24  earlier.  Do you recall them talking about how
25  hydrocodone combination products were the most

Page 300

1  commonly prescribed and most widely abused
2  opioids?  Do you recall those documents?
3      A.   Yes.
4      Q.   Were you attempting to downplay that in
5  your answers to Mr. Barnes when he was talking
6  about the differences between IIIs and IIs and Is?
7      A.   No, absolutely not.
8      Q.   You would agree that there's been more
9  individuals who have died from abusing Schedule
10  III hydrocodone combination products than there
11  are that have died from abusing Schedule I
12  marijuana; do you agree with that?
13           MR. BARNES:  Object to form.
14           THE WITNESS:  I don't have the
15  statistics to tell you which one was more or less.
16  The prescription products in question are life
17  sustaining.  If they're abused and used
18  inappropriately, they can have ill effects.
19  BY MR. GADDY:
20      Q.   You're not quarreling with the documents
21  that you saw today that indicated hydrocodone
22  combination products are the most frequently
23  prescribed and most widely abused of the opioids,
24  are you?
25           MR. BARNES:  Object to form.

Page 301

1           THE WITNESS:  From what you said, those
2  were the quotes they're listing there, and I read
3  them with you, yes.
4  BY MR. GADDY:
5      Q.   You don't take any issue with that; you
6  don't disagree with that?
7      A.   I don't disagree that there's a lot of
8  hydrocodone products that have been abused, sure.
9      Q.   And you don't disagree that those drugs
10  that HBC distributed are subject to abuse and
11  addiction?
12      A.   Sure.
13      Q.   In the answers that you were giving to
14  Mr. Barnes as it related to the security
15  requirements, were you intending to imply that it
16  was not important that HBC design and operate a
17  system to detect suspicious orders?
18      A.   Absolutely not.  The whole point of it
19  was that when HBC designed their system, all of
20  the different pieces of the security provision
21  needed to be taken into consideration, including
22  the class and type of medications or prescriptions
23  that we would be distributing.
24      Q.   And you agree that all aspects of the
25  security requirement are important; correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 302

1  A.  Sure, yes.
2  Q.  If you don't lock the door, that could
3  be just as bad as not having a program that
4  detects suspicious orders?
5  A.  A holistic system, keeping the security
6  and the sanctity and the security of controlled
7  substances in a closed system is of utmost
8  importance.
9  Q.  And that includes the aspect of that
10  security requirement that requires HBC to design
11  and operate a system to detect suspicious orders;
12  correct?
13  A.  Yes.
14  Q.  And you agree that that aspect of the
15  security requirement is critical to making sure
16  the closed system of distribution works the way
17  it's supposed to?
18  MR. BARNES:  Object to form.
19  THE WITNESS:  As I mentioned numerous
20  times today, that's one component of the total
21  picture of a holistic system approach outcome.
22  There's many requirements that need to be
23  considered and holistically implemented and
24  enforced.
25

Page 303

1  BY MR. GADDY:
2  Q.  Mr. Barnes asked you about a lot of
3  different computer programs or reports that are
4  run, but he didn't ask you about the dates of any
5  of those.  So I want to try to clean a little bit
6  of that up.  He asked you about CSOS, the C-S-O-S.
7  Do you recall that?
8  A.  Yes.
9  Q.  HBC as a distributor of Schedule III
10  controlled substances, did they ever utilize CSOS?
11  A.  Yes.
12  Q.  Beginning when?
13  A.  I believe it was 2015.
14  Q.  Well, HBC didn't distribute Schedule III
15  narcotics in 2015, did they?
16  A.  HBC in 2015, they did dispense Class
17  IIIs.  Class IIs they did not.
18  Q.  The hydrocodone combination products
19  were reclassified in 2014; correct?
20  A.  But you asked me if they dispensed Class
21  IIIs, which they did.
22  Q.  Sorry.  Bad question.  Did HBC ever
23  distribute hydrocodone combination product while
24  using CSOS?
25  A.  No.

Page 304

1  Q.  There was a second program that you
2  named.  I missed the name of the program that
3  Mr. Barnes asked you about.
4  Do you recall what that was?  You said --
5  A.  Was it Supply Logics?  Is that the one?
6  Q.  That may be it.  What is that system,
7  when did that come about, and who was it that
8  utilized by?
9  A.  So it's a system that has different
10  modules within it.  It tracks basically the ins
11  and outs of controlled substances within the
12  pharmacies and looks for patterns of anything that
13  is out of the norm by store, individually by
14  store.
15  Q.  So that's a product that is utilized by
16  the pharmacies; correct?
17  A.  It's a product that's utilized by Giant
18  Eagle corporate in that integrated system that we
19  talked about.
20  Q.  And when did that product come online?
21  A.  I believe it was 2015.
22  Q.  Did HBC distribute any hydrocodone
23  combination products after that program came
24  online?
25  A.  No.

Page 305

1  Q.  You mentioned the pharmacy investigator,
2  Rick Shaheen; correct?
3  A.  Yes.
4  Q.  Does Mr. Shaheen have any training or
5  education in detecting or identifying suspicious
6  orders of controlled substances that would come
7  from pharmacies?
8  A.  Having met Mr. Shaheen and spending time
9  with Mr. Shaheen and looking at his very diverse
10  background, I feel he's absolutely qualified to do
11  investigations to support our operation, yes.
12  Q.  I'm not questioning his qualifications
13  as a law enforcement officer or as a pharmacy
14  investigator.  What I'm asking is a little bit
15  different.
16  I'm asking whether or not you're aware of him
17  having any training or experience or education as
18  it relates to HBC's duty under the Controlled
19  Substance Act to design and operate a system to
20  detect suspicious orders.
21  A.  That I do not know, no.
22  Q.  We agree that HBC was under no
23  obligation to utilize a threshold system in 2013;
24  correct?
25  A.  Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 306

1    Q.   But HBC chose to do so; correct?
2    A.   As one level of control, yes.
3    Q.   And this was touched on a little bit
4  earlier, and I think with me you indicated that
5  the original methodology was flawed and was a
6  system that could produce false positives;
7  correct?
8    A.   Certainly.  When you do an average, yes,
9  it's possible, yes.
10   Q.   Then you also were asked after lunch
11 whether or not that same system could produce
12 false negatives, and you agreed that was also a
13 possibility; right?
14   A.   Possible, yes.
15   Q.   I might get these numbers wrong, but I
16 believe the example you gave to me when I was
17 asking questions this morning was that you had
18 some pharmacies that wrote 6000 scripts per month,
19 and you had some pharmacies that wrote 300 scripts
20 per month.
21   A.   If you mean dispense, yes, but that's
22 not just controlled substances.  That's total
23 prescriptions.  But yes.
24   Q.   Sure.  So just like I think the example
25 you pointed out or maybe one of your higher volume

Page 307

1  stores would consistently pop up on that threshold
2  report, it's just as likely that you could have a
3  lower volume store doing two, three, four times
4  what maybe it should be doing for its traffic, but
5  that would not pop up on the threshold report;
6  correct?
7    A.   It's possible.
8    Q.   And that's a symptom of the flawed
9  methodology behind using a threshold program built
10 on a chain-wide average; correct?
11       MR. BARNES:  Object to form.
12       THE WITNESS:  Well, we didn't just rely
13 on one system.  So we didn't base our whole
14 control and our compliance with the security
15 regulation on just thresholds.  There was a reason
16 why -- I think Giant Eagle has demonstrated a
17 diligence and an absolute resilience to continue
18 to improve.
19    I think you mentioned Thrifty White before.
20 I think it's been documented that we did
21 everything possible to try to continue to better
22 ourselves, including talking to other companies on
23 what they were doing in addition to what the
24 industry was doing.
25    So the industry in 2013, whenever we did that

Page 308

1  threshold, was moving to a threshold system.  The
2  company felt that that might be something we want
3  to incorporate into our controls, and that's what
4  the company did.
5  BY MR. GADDY:
6    Q.   The Thrifty White visit that you
7  referenced was in 2015; correct?
8    A.   I don't recall the date.
9    Q.   If it was in 2015, that would be after
10 HBC stopped distributing hydrocodone combination
11 products?
12   A.   Sure.
13   Q.   And the threshold system came out four
14 years after you started distributing hydrocodone
15 combination products; correct?
16   A.   Sure.
17   Q.   And the other aspects of that system
18 that you state you had is what you referred to as
19 the integrated approach that used the pickers, the
20 superintendent and the individuals with the
21 procurement division; correct?
22       MR. BARNES:  Object to form.  Misstates
23 the testimony.
24       THE WITNESS:  As I testified today, if
25 you have the right diligence on the front end,

Page 309

1  making sure that you're filling appropriate
2  prescriptions from appropriate practitioners and
3  you're fulfilling orders pursuant to those
4  legitimate prescriptions, that's a big piece of
5  the system, yes.
6  BY MR. GADDY:
7    Q.   That's the pharmacy piece.  That's not
8  the HBC piece; correct?
9    A.   As I mentioned multiple times today, it
10 was an integrated system amongst -- Giant Eagle
11 owns all pieces of that.  So for us, our approach
12 was looking at it holistically as one total
13 obligation.
14   Q.   And looking at it holistically as one
15 total obligation, over -- from '09 to '14, over 18
16 million hydrocodone pills just in the two counties
17 in the state of Ohio and you reported two
18 suspicious orders and neither of those were for
19 hydrocodone combination product; correct?
20   A.   Correct.
21       MR. GADDY:  That's all I have.
22       MR. BARNES:  I have a follow-up.
23           RE-EXAMINATION
24 BY MR. BARNES:
25   Q.   Did HBC and Giant Eagle believe it had

Page 310

1  any duty to not ship to its own stores before its
2  investigation was complete of anything -- of any
3  order of interest?
4      A.  No.
5          MR. BARNES:  I have nothing further.
6  Thank you.
7          THE VIDEOGRAPHER:  5:20 p.m.  We're off
8  the video record.  This concludes the video
9  deposition.
10         (Whereupon, at 5:20 p.m., taking of the
11 instant deposition ceased.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 311

1  COMMONWEALTH OF PENNSYLVANIA )
2  COUNTY OF ALLEGHENY         )  SS:
3          C E R T I F I C A T E
4      I, Ann Medis, Registered Professional
5  Reporter, Certified Livenote Reporter and Notary
6  Public within and for the Commonwealth of
7  Pennsylvania, do hereby certify:
8      That JAMES TSIPAKIS, the witness whose
9  deposition is hereinbefore set forth, was duly
10 sworn by me and that such deposition is a true
11 record of the testimony given by such witness.
12     I further certify the inspection,
13 reading and signing of said deposition were not
14 waived by counsel for the respective parties and
15 by the witness.
16     I further certify that I am not related
17 to any of the parties to this action by blood or
18 marriage and that I am in no way interested in the
19 outcome of this matter.
20     IN WITNESS WHEREOF, I have hereunto set
21 my hand this 18th day of December, 2018.
22
        _____
23             Notary Public
24
25

Page 312

1          - - - - - -
2          E R R A T A
3          - - - - - -
4  PAGE LINE  CHANGE
5  ____ ____  _____
6    REASON:  _____
7  ____ ____  _____
8    REASON:  _____
9  ____ ____  _____
10   REASON:  _____
11 ____ ____  _____
12   REASON:  _____
13 ____ ____  _____
14   REASON:  _____
15 ____ ____  _____
16   REASON:  _____
17 ____ ____  _____
18   REASON:  _____
19 ____ ____  _____
20   REASON:  _____
21 ____ ____  _____
22   REASON:  _____
23 ____ ____  _____
24   REASON:  _____
25

Page 313

1      ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do hereby
4  certify that I have read the foregoing pages, and that
5  the same is a correct transcription of the answers
6  given by me to the questions therein propounded, except
7  for the corrections or changes in form or substance, if
8  any, noted in the attached Errata Sheet.
9
10
11 _____
12 [WITNESS NAME]              DATE
13
14
15 Subscribed and sworn to
16 before me on this _____day
17 of_____,20___, by _____
18 _____,
19 proved to me on the basis of satisfactory
   evidence to be the person(s) who appeared before me.
20
21      Signature _____
22
23
24
25