```
  1                 UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF OHIO

  2                      EASTERN DIVISION

  3

       *************************

  4

       IN RE:  NATIONAL           MDL No. 2804

  5    PRESCRIPTION OPIATE

       LITIGATION                 Case No.

  6                               1:17-MD-2804

       *************************

  7

       THIS DOCUMENT RELATES TO    Hon. Dan A. Polster

  8    ALL CASES

  9    *************************

 10

 11        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

 12              CONFIDENTIALITY REVIEW

 13        VIDEOTAPED DEPOSITION OF DEAN A. VANELLI

 14

 15             Wednesday, January 16th, 2019

 16                     8:03 a.m.

 17

 18        Held At:

 19             Omni Hotel

 20             One West Exchange Street

 21             Providence, Rhode Island

 22

 23    REPORTED BY:

 24    Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 2

1  APPEARANCES:
2
   FOR THE PLAINTIFFS:
3
       MICHAEL E. ELSNER, ESQ.
4      KAITLYN EEKHOFF
           MOTLEY RICE LLC
5          28 Bridgeside Boulevard
           Mt. Pleasant, South Carolina 29464
6          843-216-9250
           melsner@motleyrice.com
7
           -and-
8
       JAMES A. DeROCHE, ESQ., of Counsel
9      PATTI CARDINAL
           WEISMAN, KENNEDY & BERRIS CO., LPA
10         101 W. Prospect Avenue
           Cleveland, Ohio 44115
11         800-747-9330
           lderoche@garson.com
12
13
   FOR CARDINAL HEALTH, INC.:
14
       CHRISTOPHER N. DAWSON, ESQ.
15         WHELAN, CORRENTE, FLANDERS, KINDER
           & SIKET LLP
16         100 Westminster Street, Suite 710
           Providence, Rhode Island 02903
17         401-270-4500
           cdawson@whelancorrente.com
18
19
   FOR AMERISOURCEBERGEN DRUG CORPORATION:
20
       CHRISTIAN SAUCEDO, ESQ. (Remotely)
21         REED SMITH LLP
           Three Logan Square
22         1717 Arch Street, Suite 3100
           Philadelphia, Pennsylvania 19103
23         215-851-8100
           csaucedo@reedsmith.com
24

Page 3

1  APPEARANCES (Continued):
2
   FOR WALMART:
3
       PAMELA YAACOUB, ESQ. (Remotely)
4      JONES DAY
           77 West Wacker
5          Chicago, Illinois 60601
           312-782-3939
6          pyaacoub@jonesday.com
7
8  FOR CVS INDIANA, LLC and CVS RX SERVICES, INC.
   and THE DEPONENT:
9
       GRAEME W. BUSH, ESQ.
10         ZUCKERMAN SPAEDER LLP
           1800 M Street NW, Suite 1000
11         Washington, DC 20036-5807
           202-778-1800
12         gbush@zuckerman.com
13
14 FOR ENDO PHARMACEUTICALS INC., ENDO HEALTH
   SOLUTIONS INC., PAR PHARMACEUTICAL COMPANIES,
15 INC. (f/k/a PAR PHARMACEUTICAL HOLDINGS, INC.)
16     DAVID KOUBA, ESQ. (Remotely)
           ARNOLD & PORTER KAYE SCHOLER, LLP
17         601 Massachusetts Avenue, NW
           Washington, DC 20001-3743
18         202-942-5000
           david.kouba@arnoldporter.com
19
20
   FOR JANSSEN and JOHNSON & JOHNSON:
21
       ANDREA PRZYBYSZ, ESQ. (Remotely)
22         TUCKER ELLIS LLP
           233 South Wacker Drive
23         Chicago, Illinois 60606
           312-624-6317
24         andrea.przybysz@tuckerellis.com

Page 4

1  APPEARANCES (Continued):
2
   FOR WEST VIRGINIA BOARD OF PHARMACY:
3
       HARRISON CYRUS, ESQ. (Remotely)
4      BAILEY & WYANT PLLC
           500 Virginia Street East
5          Charleston, West Virginia 25301
           304-345-4222
6          hcyrus@baileywyant.com
7
8  VIDEOGRAPHER:  Robert Sweig
9  TRIAL TECHNICIAN:  Gina Veldman
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1          INDEX
2  EXAMINATION                      PAGE
3  DEAN A. VANELLI
4  BY MR. DEROCHE                     9
5
6
7      E X H I B I T S
8  NO.    DESCRIPTION            PAGE
9  CVS-Vanelli-3   8/13/10 memo, Bates
           CVS-MDLT1-000034183.......... 202
10
   CVS-Vanelli-5   Document Bates
11         CVS-MDLT1-000082312 and
           2313........................ 126
12
   CVS-Vanelli-9   CVS Logistics, DC
13         Suspicious Order
           Monitoring, June 6, 2014,
14         Bates CVS-MDLT1-000039935
           and 9936.................... 183
15
   CVS-Vanelli-14  E-mail chain, Bates
16         CVS-MDLT1-000083064 through
           3066, and 3855 and 3856...... 69
17
   CVS-Vanelli-16   Logistics Planning Update,
18         Bates CVS-MDLT1-000002299
           through 2301................. 174
19
   CVS-Vanelli-17  E-mail chain with
20         attachment, Bates
           CVS-MDLT1-000003026 through
           3032........................ 190
22 CVS-Vanelli-20  IRR report, Bates
           CVS-MDLT1-000011359 and
23         11393 through 1399.......... 245
24 CVS-Vanelli-25   3/8/13 e-mail, Bates

Page 6

CVS-Vanelli-26   Draft SOM Algorithm Size Tests, April 1, 2013, Bates CVS-MDLT1-000030208 through 219........................ 104

CVS-Vanelli-28   Document titled SOM End State Enhancement Solution, Bates CVS-MDLT1-000058035 through 8037................. 131

CVS-Vanelli-29   Document titled CVS Logistics, DC Suspicious Order Monitoring, March 26, 2012, Bates CVS-MDLT1-000058176 and 8177........................ 87

CVS-Vanelli-31   4/3/08 e-mail, Bates CVS-MDLT1-000081210.......... 54

CVS-Vanelli-32   E-mail chain, Bates CVS-MDLT1-000081281.......... 48

CVS-Vanelli-33   Document titled Opportunities - Current SOM Process, Bates CVS-MDLT1-000083065 and 3066........................ 59

CVS-Vanelli-35   Document titled Why is the Distribution Center initiating the research of the suspicious orders? Bates CVS-MDLT1-000083969 through 3971................. 119

CVS-Vanelli-36   Item Review Report - Control Drugs, CR, 7/7/19 Bates CVS-MDLT1-000088412 through 8433............ 241

CVS-Vanelli-39   8/21/13 letter, Bates CVS-MDLT1-000104918 through 4921........................ 235

Page 8

CVS-Vanelli-55   1/18/13 e-mail, Bates CVS-MDLT1-000103329.......... 136

CVS-Vanelli-56   4/29/11 e-mail with attachment, Bates CVS-MDLT1-000029864 through 9866........................ 109

CVS-Vanelli-58   10/29/10 e-mail with attached Logistics Core Team Update, Bates CVS-MDLT1-000103859 and 000103867................... 162

CVS-Vanelli-59   E-mail chain, Bates CVS-MDLT1-000108797 through 8800........................ 111

CVS-Vanelli-64   E-mail chain with attachment, Bates CVS-MDLT1-000104850 through 4852....................... 164

CVS-Vanelli-69   E-mail chain, Bates CVS-MDLT1-000018729 and 8730........................ 199

CVS-Vanelli-77   10/15/12 e-mail, Bates CVS-MDLT1-000109962.......... 220

CVS-Vanelli-78   Work Instruction, Irregular Order Review Process, Bates CVS-MDLT1-000109963 through 9965........................ 221

Page 7

CVS-Vanelli-40   Graph titled Hydrocodone Shipments; CVS Pharmacy #03522, 2007 Brookpark Road, Cleveland, OH (Cuyahoga County) January 2006 to December 2008........ 212

CVS-Vanelli-41   Graph titled Hydrocodone Shipments; CVS Pharmacy, 590 East Market St., Summit County, OH, April 2006 to December 2008............. 216

CVS-Vanelli-43   E-mail chain with attachment, Bates CVS-MDLT1-000113943 through 3949........................ 207

CVS-Vanelli-44   Requirements Document, Suspicious Order Monitoring, Bates CVS-MDLT1-000115821 through 5848........................ 92

CVS-Vanelli-45   E-mail chain, Bates CVS-MDLT1-000028615 through 8617........................ 230

CVS-Vanelli-46   E-mail chain, Bates CVS-MDLT1-000017250.......... 238

CVS-Vanelli-47   E-mail chain, Bates CVS-MDLT1-000017246.......... 172

CVS-Vanelli-50   E-mail chain with attachments, Bates CVS-MDLT1-000003749 through 3777........................ 39

CVS-Vanelli-51   1/14/14 e-mail with attached DEA letter, Bates CVD-MDLT1-000013534 through 536........................ 28

CVS-Vanelli-54   E-mail chain, Bates CVS-MDLT1-000059258 through

Page 9

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  My name is Robert Sweig, and I'm a videographer for Golkow Litigation Services.

Today's date is January 16, 2019, and the time is 8:03 a.m.

This video deposition is being held in Providence, Rhode Island in the matter of In Re National Prescription Opiate Litigation pending before the United States District Court for the Northern District of Ohio, Eastern Division.

Our deponent is Dean Vanelli.

Counsel appearances will be as noted on the stenographic record.

Our court reporter is Maureen Pollard, who will now swear in the witness.

DEAN A. VANELLI, having been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. DEROCHE:

Q.  Good morning.  Will you please state

Highly Confidential - Subject to Further Confidentiality Review

1 your name for the record?
2    A.   Dean Anthony Vanelli.
3    Q.   Mr. Vanelli, my name is Jim DeRoche,
4 and I have some questions for you today.  I'm
5 hopefully going to ask some direct questions.  I
6 expect you to give me direct answers.  Do you
7 agree to do that?
8    A.   Yes.
9    Q.   Do you understand the oath you just
10 took?
11    A.   Yes.
12    Q.   You understand you're testifying as if
13 you were at trial, as if the jury is in the room
14 with us today, so we need you to be forthright,
15 give them the information they need to make a
16 decision in this case.  Do you agree to do that?
17    A.   Yes.
18    Q.   You have to give oral answers to all
19 questions so the court reporter can take down
20 your testimony.  Nods of the head won't work
21 even though we're on video, so I need you to
22 hopefully speak up so she can hear you, take
23 down your oral testimony.  Okay?
24    A.   Yes.

1    Q.   Did you prepare for your deposition
2 here today?
3    A.   Yes.
4    Q.   What did you do?
5    A.   Spent some time with counsel.
6    Q.   Okay.  When was that?
7    A.   Probably sometime back in October, and
8 early this week.
9    Q.   Okay.  So did you spend yesterday with
10 counsel?
11    A.   I spent time with the counsel
12 yesterday, yes.
13    Q.   That was here in Providence?
14    A.   It was in Cumberland, Rhode Island.
15    Q.   Okay.  Is that where your office is?
16    A.   Yes.
17    Q.   Did you look at documents?
18    A.   Yes.
19    Q.   Okay.  Can you tell me generally what
20 those documents were?
21       MR. BUSH:  Objection.
22       That's privileged.
23 BY MR. DEROCHE:
24    Q.   Okay.  Let's start with where you work

1 now.  Who is your employer?
2    A.   CVS Health.
3    Q.   Okay.  And how long has CVS Health
4 been your employer?
5    A.   Don't know that I understand their
6 corporate structure.  I've worked for the
7 company referred to today as CVS Health for
8 23 years.
9    Q.   23 years, okay.  So let's just --
10 we'll dispense with the problems with the names
11 and --
12    A.   Yes.
13    Q.   -- changing over time and everything
14 else.  Let's just call them CVS.
15    A.   CVS.
16    Q.   That makes them -- makes things easy
17 for all of us.
18       So you've worked for CVS for 23 years.
19 I'd like to go through where you started, what
20 your job -- what your responsibilities were up
21 through when you started through today.  Can you
22 do that for me?
23    A.   Certainly.
24    Q.   Okay.  So let's start with your first

1 position.
2    A.   I'll correct myself as well.  It will
3 be 23 years in March of this year.
4    Q.   Okay.  Sure.
5    A.   I was first hired as an internal
6 auditor into the internal audit department, in
7 that role for two years approximately.
8    Q.   Where was your office?
9    A.   It was in Woonsocket, Rhode Island on
10 CVS Drive.
11    Q.   Okay.  And what was your general job
12 duty as an internal --
13    A.   Operational and financial auditing.
14    Q.   Okay.  What department were you
15 assigned to?
16    A.   The internal audit department.
17    Q.   Okay.  And that was a department that
18 was part of the financial reporting department?
19    A.   It actually, in my time there,
20 reported into loss prevention at one point, and
21 then reported into the finance organization,
22 yes.
23    Q.   Okay.  And how long did you hold that
24 position?

Page 14

1    A.  Probably short of two and a half
2  years.
3    Q.  Okay.  I'm sorry, I didn't -- did you
4  say when you started work?  What year was that?
5    A.  I believe it was March of '96.
6    Q.  Okay.  Then what did you do?
7    A.  From that position I moved into a
8  position within the logistics department, within
9  the logistics planning organization as a
10  manager.
11    Q.  So your first position was as a
12  manager in logistics?
13    A.  Logistics planning, yes.
14    Q.  Logistics planning.  Is that different
15  than logistics department?
16    A.  Well, it was within -- a group within
17  the logistics organization.
18    Q.  Okay.  Tell me what you did in that
19  position.
20    A.  A host of different activities.  I
21  interacted mainly with finance.  I was hired to
22  do the annual budget, monthly financial closes,
23  financial explanations.  I also did work with
24  capital, capital planning, capital budget,

Page 15

1  coordinating, you know, purchase of equipment,
2  computers, such.
3    Q.  Okay.  What does the logistics
4  department in general do?
5    A.  Logistics oversees the distribution
6  centers.
7    Q.  Okay.  So you were working with the
8  distribution centers starting roughly within two
9  and a half years of your employment with CVS?
10    A.  Correct.
11    Q.  Okay.  And at that time how many were
12  there?
13    A.  When I moved into the logistics
14  department I believe there were three.
15    Q.  Okay.  Were they all licensed to
16  distribute controlled substances --
17    A.  No, they were not.
18    Q.  You have to let me finish my
19  questions --
20    A.  Sorry.
21    Q.  -- so we don't talk over each other.
22  Maureen will go crazy if we do that all day.
23  Sometimes I pause so you have --
24    A.  That's why I thought you were.

Page 16

1    Q.  I apologize.
2        So you had three distribution centers
3  at that time.  How many were licensed, if any?
4    A.  At that time I would not be able to
5  answer.  I did not know if they were licensed at
6  that time.  I know their license status today.
7    Q.  Okay.
8    A.  So today those facilities, two of them
9  were licensed --
10    Q.  Okay.
11    A.  -- currently are licensed.
12    Q.  At that time where were these three?
13    A.  Woonsocket, Rhode Island, which would
14  include the North Smithfield distribution which
15  is the licensed distribution center.  It's a two
16  building operation, but the license -- I refer
17  to it as a single distribution center, multiple
18  operating buildings.  One building that's
19  located in North Smithfield, Rhode Island --
20    Q.  I see.
21    A.  -- has the registrant.  The prior
22  building did have a registration, but that
23  registration was transferred as we moved
24  pharmacy to that other building.

Page 17

1        Then also the facility in Lumberton,
2  New Jersey was a licensed facility.
3        The third facility was in
4  Fredericksburg, Virginia, which was not a
5  licensed facility, did not carry
6  pharmaceuticals.
7    Q.  Okay.  How long did you hold your
8  first position, which was manager?
9    A.  Don't recall.  Multiple years.
10    Q.  Okay.  What was your next position
11  then?
12    A.  Senior manager, logistics planning.
13    Q.  Okay.  And after that?
14    A.  Director of logistics planning.
15    Q.  What year did you become director of
16  logistics planning?
17    A.  It was probably in and around 2011,
18  2012, somewhere in that time frame.
19    Q.  Okay.  And is that the top position in
20  logistics planning?
21    A.  At the time, yes, it was.
22    Q.  Okay.  How many direct reports did you
23  have to you?
24    A.  Do not recall.  I'd estimate three.

Page 18

1    Q.   How big a department is logistics
2 planning?
3    A.   Does that question pertain to today or
4 at that time?
5    Q.   Let's talk about at that time, say
6 2011.
7    A.   Probably about 10 to 12.
8    Q.   Okay.  And how did that change over
9 time?
10    A.   The responsibilities of the department
11 grew, and the head count grew accordingly.
12    Q.   So say in 2013, what had it grown to?
13    A.   Probably about 18.  Again, do not
14 recall exact numbers.
15    Q.   Okay.  Did you have budget
16 responsibility for logistics planning when you
17 became the director in 2011?
18    A.   Logistics planning in and of itself
19 did not have a budget other than payroll and
20 travel.  There was no real budget.  We didn't
21 open -- we didn't run facilities.
22    Q.   Sure.
23       In terms of the logistics planning,
24 was that part of another group?

Page 19

1    A.   It was part of logistics, logistics
2 organization.  It was a group or team within
3 that logistics organization.
4    Q.   And why is it called logistics
5 planning?  Explain what that role is.
6    A.   As I mentioned previously, you know,
7 budgeting, handling the budgeting,
8 communication, where the group is basically a
9 liaison between the departments in -- we refer
10 to it as the customer support center, but more
11 commonly referred to as corporate and the
12 distribution centers.
13    Q.   I see.
14       So you interface between the
15 distribution centers and the corporate office in
16 terms of arranging what the distribution centers
17 need with corporate?
18    A.   Yes.
19    Q.   Essentially?
20    A.   Yeah.
21    Q.   Okay.
22    A.   Yes, so product flow, like scheduling,
23 you know, providing information about new items
24 coming into the distribution centers, when those

Page 20

1 needed to be received, be available to be
2 shipped to stores, handling the flow of
3 promotional goods for the weekly ad, things
4 along those lines.
5    Q.   Okay.  And that included the flow of
6 controlled substances as well?
7    A.   At that time, no, it did not.
8    Q.   Okay.
9    A.   To state -- me and my team didn't have
10 much influence in the control -- or the flow of
11 controlled substances.  If there were situations
12 where the pharmacy merchandising group, like any
13 other group, needed or had something that was
14 occurring that could impact the distribution
15 centers, they would usually communicate that so
16 we could share that information with the
17 distribution centers to help make sure there's
18 an efficient process, goals and timelines were
19 met.
20    Q.   Even in 2011 there were --
21 distribution centers were shipping controlled
22 substances to the pharmacies, correct?
23    A.   Yes.
24    Q.   And so that was part of what the

Page 21

1 distribution centers that you interfaced were
2 doing, right?
3    A.   I can't -- I do not recall if we were
4 engaged in the communication or information flow
5 or flow of controlled substances at that point.
6    Q.   Well, as early as 2008, you would
7 agree you were involved at some level in the
8 operations of the distribution centers including
9 standard operating procedures, correct?
10    A.   No.  I was responsible for sharing
11 information to allow the DCs to perform their
12 jobs.  I was not providing the DCs instruction
13 per se more than I was communicating
14 information.
15    Q.   So you communicated to the
16 distribution centers concerning controlled
17 substances and the standard operating procedures
18 associated with controlled substances starting
19 in 2008 at least, correct?
20    A.   No.  I do not recall if my
21 responsibilities as early as 2008 involved any
22 information regarding controlled substances.  I
23 will tell you my responsibility, or the areas in
24 my work evolved to that perspective, but I can't

Page 22

1 tell you the exact timeline and I can't commit
2 to you and say that 2008 was the beginning of me
3 having involvement. I do not recall.
4    Q. Okay. Fair enough. Hopefully we'll
5 have the documents that will help you refresh
6 your recollection in a few minutes here.
7        You do agree, though, at some point
8 you took ownership of the suspicious order
9 monitoring process, correct?
10   A. Yes. I oversee the operation of the
11 suspicious order monitoring program beginning --
12 I'm sorry?
13   Q. Go ahead. I don't want to cut you
14 off.
15   A. Thank you.
16        -- beginning in 2014.
17   Q. 2014 is when you said you became
18 involved in suspicious order monitoring process?
19   A. No, I did not.
20        MR. BUSH: That's not -- misstates the
21 record.
22        MR. DEROCHE: Again, I'm asking. It's
23 his testimony, Graeme. You want to object,
24 object to the form.

Page 23

1        MR. BUSH: I did.
2        MR. DEROCHE: Go ahead.
3        MR. BUSH: That's what I did, and I
4 will continue to do that if necessary.
5        MR. DEROCHE: Great.
6 BY MR. DEROCHE:
7    Q. Now, when did you first become
8 involved in the suspicious order monitoring
9 program at CVS?
10   A. My first recollection of involvement
11 in suspicious order monitoring was in the fourth
12 quarter of 2012.
13   Q. And what was that involvement?
14   A. That involvement was a discussion with
15 my immediate supervisor and his supervisor that
16 they wanted me to get involved in a project to
17 create or to develop and design a suspicious
18 order monitoring program to replace the program
19 that we were using at that time.
20   Q. And in the meantime weren't you
21 involved in, at some level, in what that
22 existing program entailed?
23   A. Beginning at that point in 2012, in
24 Q4, I became -- I got in -- I actually spent

Page 24

1 some time to understand high-level operation of
2 that system in order to understand what was
3 happening today as a baseline of how we would
4 develop the new system.
5    Q. Okay. Makes sense.
6        Did you also get involved in ensuring
7 that that existing system remained operational
8 until your new system was up and running?
9    A. I was not responsible for the
10 operation of that system. But in my role, as I
11 described earlier, assisting the distribution
12 network, I did partner with the individual
13 responsible for the operation of that system.
14   Q. And that entailed dealing with issues
15 such as staffing, correct?
16   A. Correct.
17   Q. There were issues you recall at that
18 time in terms of the staff for seeing their jobs
19 going away and perhaps there being a problem
20 with staffing that you had to address?
21   A. There was transition in that team that
22 I assisted the director in trying to determine
23 ways to build staffing, build bench strength for
24 that team. And then subsequently as we got

Page 25

1 closer to the role of the new system, I did
2 assist, because obviously the individuals who
3 were performing the system, I had discussions
4 with them, weren't -- I'll use the term willing,
5 but weren't -- were not interested in moving to
6 Rhode Island to perform the task in the new
7 system there, so we had worked on contingency
8 plans in case if there were staffing shortfalls
9 of how we'd maintain that system, again,
10 assisting the director in how we could maintain
11 that system until the new system was running.
12   Q. When you said the director, who are
13 you referring to?
14   A. I'm referring to Mark Nicastro.
15   Q. And he was the director of the
16 Indianapolis DC?
17   A. Correct.
18   Q. When I say DC, I assume you know what
19 I mean?
20   A. Yes, I do.
21   Q. That's a common term for distribution
22 center.
23        And he was the one who was overseeing
24 the operation at that point of the SOM system

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 for the entire chain?
2    A. In 2012, yes.
3    Q. Okay.
4    A. 2012 through the sunset of that
5 system, yes.
6    Q. Okay. Did you go to Indianapolis to
7 check out the system, watch it in operation?
8    A. Yes, I took a trip to Indianapolis.
9    Q. Okay. So you wanted to get a firm
10 understanding of the existing system, I take it,
11 so that you could better perform the duty of
12 coming up with the new system?
13    A. Yeah, I wanted to get a general
14 understanding of the process that the team
15 followed to see where there are opportunities
16 for improvement.
17    Q. Okay. And I take it that you also had
18 to have some understanding of why there was an
19 SOM system and what the regulations and laws
20 were that you were attempting to comply with in
21 designing your new system, correct?
22    A. I was aware that there were
23 regulations that required a suspicious order
24 monitoring system to be in place.

Page 27

1    Q. And you -- did you understand why?
2 What were you trying to accomplish with it?
3    A. Trying to accomplish that we were in
4 compliance with the regulations.
5    Q. Okay. What do the regulations
6 require?
7    A. In essence to ensure that we -- to
8 review all controlled substance orders, to --
9    Q. Go ahead.
10    A. No? You threw me off there a little
11 bit with your body language, I apologize.
12      To review orders of unusual size,
13 frequency, or ordering pattern.
14    Q. Okay. Did you review the regulations
15 in connection with your duties in terms of
16 coming up with a new SOM system?
17    A. I've read a couple portions. The
18 interpretation of the requirements or the
19 responsibility of legal, legal transition that
20 are -- translated those legal requirements for me to
21 put into business action.
22    Q. I'm going to hand you what we've
23 marked as Exhibit 51.
24

Page 28

1      (Whereupon, CVS-Vanelli-51 was marked
2      for identification.)
3 BY MR. DEROCHE:
4    Q. Take a moment.
5      MR. DEROCHE: It's not the same?
6      MR. BUSH: I'm sorry, I'm just looking
7 because the number I have is Vernazza 4. I'm
8 trying to figure out --
9      MR. DEROCHE: I see what you're
10 saying. That's from a prior deposition.
11      MR. BUSH: Yeah, that's fine. Okay.
12      MR. DEROCHE: You should sticker over
13 those.
14      MS. CARDINAL: I did.
15      MR. BUSH: It's on the original.
16 Yeah, mine didn't have it. I think I was just
17 trying to figure out --
18      MR. DEROCHE: That's the confusion.
19 This is 51 for Vanelli deposition.
20 BY MR. DEROCHE:
21    Q. Do you recognize that document, sir?
22    A. Yes.
23    Q. Okay. It's an e-mail from Mr. Schiavo
24 with a copy to you, correct?

Page 29

1    A. Correct.
2    Q. Are you familiar with the folks that
3 it was sent to?
4    A. Yes, I am.
5    Q. Okay. Who is Noah Zimmerman?
6    A. Noah Zimmerman was a former SOM
7 analyst.
8    Q. Okay. Annette Lamoureux?
9    A. Annette was also at that time an SOM
10 analyst.
11    Q. I'm going to blow this next name.
12    A. Shan Xue.
13    Q. Shan Xue?
14    A. Yes.
15    Q. Another analyst?
16    A. Yes, she was.
17    Q. And --
18    A. Khalilul Mia, also a former analyst.
19    Q. A former analyst.
20      And Beatty, Caitlin Beatty?
21    A. Caitlin Beatty.
22    Q. Beatty.
23    A. Also a former. That was the actual
24 original five individuals that were hired to be

Page 30

1 SOM analysts to do all the -- perform the due
2 diligence work on the new or current existing
3 SOM system that we were designing.
4     Q. This is your first team of analysts
5 that actually operated the SOM system that you
6 were involved in designing?
7     A. Correct.
8     Q. Okay. And you hired all these folks?
9     A. Yes, I did.
10     Q. What kind of background were you
11 looking for for the analysts?
12     A. I was looking for a background of
13 statistics, law, pharmacy, loss prevention or
14 diversion background. And, of course, SOM
15 experience if they had that. The experienced
16 SOM analysts, as I had previously mentioned,
17 weren't interested in relocating to Rhode
18 Island.
19     Q. Sure.
20     And when you refer to those prior
21 analysts, who are you referring to?
22     A. At the time Shauna Helfrich. At one
23 point Aaron Burtner. I apologize, there's one
24 other name that's escaping me right now.

Page 31

1     Q. Kelly Baker?
2     A. Kelly Baker.
3     Q. Was Aaron Burtner replaced when he
4 left the company?
5     A. Was Aaron Burtner? Not with a
6 permanent associate. His responsibilities were
7 replaced by multiple individuals, including
8 third party.
9     Q. Are you talking about a consultant
10 that came in?
11     A. Yes.
12     Q. At one point you had to hire an
13 outside consulting firm to add additional staff
14 to the SOM program?
15     A. At one point we chose to bring in
16 outside assistance to review and perform the
17 process.
18     Q. Okay.
19     A. Yes.
20     Q. Was it one particular individual who
21 came in?
22     A. No. There were multiple.
23     Q. Does Shauna Helfrich have a background
24 in statistics that you're aware of?

Page 32

1     A. I'm not aware of Shauna Helfrich's
2 background.
3     Q. So you don't know if she had any
4 background in pharmacy?
5     A. I do not.
6     Q. Okay.
7     A. I did not hire her.
8     Q. What about Kelly Baker, did he have
9 any background in statistics or law or loss
10 prevention or --
11     A. I believe Kelly, as well as Aaron,
12 were from the loss prevention department.
13     Q. They previously were in loss
14 prevention?
15     A. To my understanding, yes.
16     Q. Let's go back to 51. If you look at
17 the attachment to the e-mail, do you recognize
18 that letter, sir?
19     A. Don't recall. I mean, if I -- I see
20 the e-mail. I do not recall anything about
21 this -- the letter from -- with the DEA heading?
22     Q. Correct. This is a letter from the
23 Drug Enforcement Agency -- Administration that
24 was sent to all distributors of --

Page 33

1     A. Yeah, I assume it was the --
2     MR. BUSH: Hold on. Let him finish
3 his question.
4 BY MR. DEROCHE:
5     Q. -- distributors of controlled
6 substances.
7     Now, this was e-mailed to you to
8 review it. Did you review it?
9     A. I do not recall. It was an e-mail
10 from four years ago.
11     Q. Okay.
12     A. Five years ago.
13     Q. This is a letter that reiterates the
14 responsibilities that were going to apply to CVS
15 and the system that you were designing and going
16 to be running, correct?
17     MR. BUSH: Objection.
18 BY MR. DEROCHE:
19     Q. Do you want to look through the letter
20 so we can talk about it?
21     A. Do you have a somewhat cleaner
22 version? Because if you look at the letter, I
23 mean, going right down about an inch and a half
24 in from the left column, it's --

Page 34

1    Q.  Are you having a hard time?
2    A.  Does your version look cleaner than
3  that?
4        MR. BUSH:  Yeah, do you want to use
5  that?  That is a little cleaner.
6        THE WITNESS:  A little bit.
7        MR. BUSH:  I gave him my copy which is
8  a little cleaner.
9        MR. DEROCHE:  It's a little cleaner.
10  I apologize.
11       MR. ELSNER:  You can also use the
12  screen.
13  BY MR. DEROCHE:
14    Q.  Yeah, the screen helps.
15    A.  I can see it on the screen, it makes
16  it a little --
17       MR. BUSH:  Yeah, but make sure that
18  you look at the entire letter so you have the
19  context.  The screen only gives you certain
20  parts of it.
21       (Witness reviewing document.)
22  BY MR. DEROCHE:
23    Q.  Sir, are you ready to answer questions
24  about the letter?  I'll point you to particular

Page 35

1  sections I want to talk about.
2    A.  Okay.
3    Q.  Now, the DEA is reiterating a
4  responsibility here for CVS and other
5  distributors of controlled substances to review
6  orders to determine if they're suspicious,
7  correct?
8        MR. BUSH:  Objection.
9        You can answer the question.
10  BY MR. DEROCHE:
11    Q.  Correct?
12       MR. BUSH:  I'm just objecting.  Unless
13  I instruct you not to answer, you answer.
14    A.  I was waiting to see if there's
15  another further instruction.
16       I'm not per se a lawyer.  I'm saying I
17  don't recall ever seeing this document prior to
18  today.  I can read the words, but I don't know.
19  BY MR. DEROCHE:
20    Q.  Do you know whether or not CVS, prior
21  to the system that you implemented when you came
22  up with a new SOM system, did any benchmarking
23  against similar stores in connection with the
24  SOM system?

Page 36

1    A.  I do not recall if it did or did not.
2  I do not know.
3    Q.  And the letter, the last sentence, if
4  you could read that.
5    A.  Last sentence, second page?
6    Q.  On the first page of the letter, last
7  sentence, could you read that for the record so
8  we can --
9    A.  "The determination of whether an order
10  is suspicious depends not only on the ordering
11  patterns of the particular customer, but also on
12  the patterns of the registrant's customer base
13  and the patterns throughout the relevant segment
14  of the regulated industry."
15    Q.  Okay.  When you reviewed the SOM
16  system that was in place prior to the new system
17  that you implemented, do you recall what the
18  primary factor was that was considered by that
19  system in assessing whether or not an order was
20  suspicious?
21       MR. BUSH:  Objection.
22    A.  I do not recall.
23  BY MR. DEROCHE:
24    Q.  Do you know what factors that the

Page 37

1  algorithm that was being used at the time
2  considered?
3    A.  I do not know.  My focus was not
4  actually on the system, it was more on the
5  process.
6    Q.  The process in terms of what the
7  analysts were looking at?
8    A.  The process of the -- the due
9  diligence process that the analysts looked at on
10  the orders that were generated to review.
11    Q.  Did you get an understanding of how
12  many of the orders that were flagged by the
13  algorithm were actually looked at on a daily
14  basis?
15    A.  No.
16    Q.  Did you look at the standard operating
17  procedures that were in place at the time --
18    A.  I did not.
19    Q.  -- to determine what they said they
20  should -- that they should have looked at?
21    A.  I do not recall looking at standard
22  operating procedures.
23    Q.  Did you determine what documentation
24  existed with respect to orders that may or may

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 not have been reviewed?
2    A.  No.
3    Q.  Sorry?  I didn't hear that.
4    A.  Repeat your question, please.
5    Q.  Yeah.  Did you determine what
6 documentation existed on a -- with respect to
7 the process that was being used prior to the
8 time you implemented your new process?
9    A.  I sat with the analysts over the
10 portion of a day and just observed
11 the process that they had gone through to review
12 orders.  I mean, in the course of that time I
13 reviewed a few orders with them to go through
14 the process to understand some of the -- what --
15 the data that they were looking at.
16    Q.  Okay.  Do you know how many of the
17 flagged orders were looked at on a daily basis
18 that were on the IRR, the review report?
19    A.  I do not recall.
20    Q.  Were you aware in 2011 that there was
21 an opioid crisis in the United States?
22    A.  No, I was not.
23    Q.  When did you become aware of the
24 opioid crisis?

Page 39

1       MR. BUSH:  Objection.
2    A.  I don't see myself as qualified to
3 know if there was or was not an opioid crisis.
4 I mean, I understand people in this country
5 have, you know, addictions to drugs and that
6 addiction could lead to death or other negative
7 consequences, but not qualified to say if there
8 is a crisis or not.
9 BY MR. DEROCHE:
10    Q.  I'm going to show you what we've
11 marked as Exhibit 51 -- excuse me, 50.
12       (Whereupon, CVS-Vanelli-50 was marked
13        for identification.)
14 BY MR. DEROCHE:
15    Q.  The e-mail at the top is an e-mail
16 from you, correct?
17    A.  Yes, it appears to be.
18    Q.  You're attaching reference material,
19 sending it to your team, correct?
20    A.  Yes.
21    Q.  Includes information concerning levels
22 of drug abuse in the United States, correct?
23       MR. BUSH:  Take your time and look
24 through it, make sure you know what you're

Page 40

1 talking about.
2       (Witness reviewing document.)
3 BY MR. DEROCHE:
4    Q.  Sir?
5    A.  Yes.
6    Q.  If you look at the page, you'll see
7 there's some numbers in the corner, lower right
8 corner.
9    A.  Two sets of numbers I see in the lower
10 right corner.
11    Q.  Correct.  They may be cut off, but
12 let's go to Page 3763 -- 3753.
13    A.  Using the lowest set of numbers?
14    Q.  Correct, let's use the lower set of
15 numbers.
16    A.  3763?
17    Q.  It's 3752.  You'll see it's --
18    A.  Does it say Checks and Balances under
19 the CSA?
20    Q.  It's from McKesson, and it says
21 "Current Landscape:  Epidemic."
22       MR. BUSH:  I think the lower number is
23 always 3752.  I think you maybe can't see --
24       MR. DEROCHE:  Maybe we can use the

Page 41

1 upper number.
2    A.  3752?
3 BY MR. DEROCHE:
4    Q.  Let's use -- let's go to the
5 PowerPoint presentation.  You'll see there's
6 slides.  You know what those look like, right?
7    A.  The information that has McKesson --
8    Q.  Correct.
9    A.  -- in the top right corner?
10    Q.  Yes, "Prescription Drug Abuse" is the
11 first slide, "The National Perspective."
12       Do you see that, sir?
13    A.  This slide appears to be on the --
14 which page, sir?
15    Q.  The next page after that having to do
16 with "Prescription Drug Abuse."
17       Do you see that, sir?
18    A.  I do.
19    Q.  You're there.  All right.  Let's go to
20 Page 2.  "Current Landscape:  Epidemic."  And
21 then you sent this information to your team,
22 correct?
23    A.  Yes.
24    Q.  Did you have any reason to not -- to

Page 42

1 disagree with this slide that there's an
2 epidemic?
3     A.  I had no reason to agree or disagree
4 with that slide.
5     Q.  Okay.  You understood that, at least
6 from this slide, that there was an epidemic of
7 prescription drug abuse in the US which was part
8 of the reason why the SOM system that you were
9 designing was so important.  Is this what you
10 were trying to communicate to your team?
11     A.  No.  I was trying to communicate to my
12 team information that was relevant about the
13 work they were doing.  I was not agreeing with
14 there was an epidemic or -- again, I didn't put
15 this slide together.  I wasn't responsible for
16 the slide.  I shared it with my team as I
17 thought there would be some relevant information
18 for the job that they were going to perform to
19 review suspicious order monitor -- suspicious
20 orders.
21     Q.  Go to the third slide, sir.  "Current
22 Landscape:  Epidemic.  Every component of the
23 distribution chain has been breached."
24         Now, you understood your distribution

Page 43

1 centers were part of the distribution chain for
2 controlled substances, correct?
3     A.  I understand our CVS distribution
4 centers distribute controlled substances.
5     Q.  Okay.  Go to the fourth slide, sir.
6 "Prescription Drug Abuse is an Epidemic in the
7 US.  Prescription drug" abuse -- "Prescription
8 drugs cause more deaths than heroin and cocaine
9 combined."
10         Do you see that, sir?
11     A.  Yes, I do.
12     Q.  Did you read these slides before you
13 sent them to your team?
14     A.  I do not recall.
15     Q.  Do you generally send information to
16 your team members that you don't review first?
17     A.  No hard-fast rule.
18     Q.  So you may --
19     A.  I do --
20         MR. BUSH:  Wait a second, please.
21 BY MR. DEROCHE:
22     Q.  You may just forward things on without
23 reviewing it?
24     A.  I may be provided information from

Page 44

1 someone who says this is useful data, and I may
2 decide to forward it on.  I may or may not
3 review.
4     Q.  Who is Nicole Harrington?
5     A.  Nicole Harrington works in the
6 professional services team within pharmacy
7 operations of CVS.
8     Q.  Okay.  Nicole Harrington apparently
9 forwarded this information on to you with a
10 "Here you go" e-mail.  Do you see on the first
11 page?
12     A.  I see that.
13     Q.  Appears that you had made a request
14 for this information.  Did you request it from
15 Ms. Harrington and just forward it on without
16 reviewing it, sir?
17     A.  I cannot state.  It might have been
18 information that Nicole Harrington thought was
19 worth sharing with me.  That does not mean I
20 requested the data.
21     Q.  Okay.  So the "here you go" e-mail to
22 you doesn't indicate to you that you may have
23 made a request for some information?
24     A.  It may or may not.

Page 45

1     Q.  Okay.  The first two attachments are
2 good reference material you say in your e-mail
3 when you forwarded this on.  "The Excel file may
4 require explanation so let me know if you have
5 any questions."
6         So your team was going to have
7 questions possibly for you concerning this
8 material, but you think you may not have
9 reviewed it before you sent it to them?
10         MR. BUSH:  Objection.
11     A.  Again, as I stated, I do not recall if
12 I read the information, reviewed the
13 information.
14 BY MR. DEROCHE:
15     Q.  Sure.
16     A.  I at this point may not have shared
17 the Excel file that it's referencing.
18     Q.  Then you didn't find in your job
19 duties with CVS that it was important for you to
20 understand the landscape in terms of the use of
21 the drugs that you were distributing in terms of
22 how they might be diverted?  That wasn't
23 something you were concerned about?
24     A.  I would believe that's the explanation

Page 46

1 of why this information was shared with the
2 team.
3     Q.  Okay.  But you didn't study it
4 yourself so you understood what was going on in
5 the United States with respect to controlled
6 substances and how many people it was -- they
7 were killing?  You didn't care about that?
8         MR. BUSH:  Objection.
9     A.  Those were --
10 BY MR. DEROCHE:
11     Q.  You can answer the question, sir.
12     A.  Those were not my words.  I was
13 sharing information with the team that was felt
14 to be relevant.  I do not recall if it was my
15 determination if it was relevant or from Nicole
16 Harrington or another source.
17     Q.  Well, did you think the death rate
18 from opioids that your company were
19 distributing -- was distributing/selling, was it
20 at all a relevant consideration for you, sir, in
21 your job?
22         MR. BUSH:  Objection.
23         Go ahead.
24     A.  I'm not aware of any link that the

Page 47

1 drugs that my company was distributing were
2 causing that.  I was building a system to ensure
3 that all orders of controlled substances placed
4 by CVS pharmacies to CVS distribution centers
5 were reviewed for unusual size, frequency, and
6 pattern of ordering.
7 BY MR. DEROCHE:
8     Q.  But you didn't care the reason behind
9 why that was important that that be done, you
10 just didn't care about that?
11     A.  I understand there's a reason why, as
12 I previously stated.  I understand people have
13 drug addictions, and those drug addictions can
14 lead to death or other harm.  I understand that.
15 Again, I think that's part of the reason this
16 information was shared with the team, with the
17 people who were going to do the day-to-day work
18 in the new system.
19     Q.  Were you trying to reiterate to them
20 the importance of their job --
21         (Phone interruption.)
22         MR. DEROCHE:  Everybody on the
23 speakerphone, please mute your phones.  Thank
24 you.

Page 48

1         (Phone interruption.)
2 BY MR. DEROCHE:
3     Q.  I show you what will be marked as
4 Exhibit 32.
5         (Whereupon, CVS-Vanelli-32 was marked
6         for identification.)
7 BY MR. DEROCHE:
8     Q.  Exhibit 32 is an e-mail string.  The
9 top e-mail is from you, correct?
10     A.  Yes.
11     Q.  And you are apparently forwarding a
12 DEA standard operating procedure as of
13 12/11/2009, correct?
14     A.  If I could have a moment to review the
15 document.  I don't -- I haven't seen them -- I
16 haven't seen this document since 2009.
17         (Witness reviewing document.)
18     Q.  Are you ready?
19     A.  Hold on a minute, please.
20         (Witness reviewing document.)
21     A.  Okay.
22     Q.  The top e-mail is from you, correct?
23     A.  Yes, it is.
24     Q.  Who is Chris Preli?

Page 49

1     A.  Chris Preli at the time was my
2 manager.
3     Q.  And your job at this time was what?
4     A.  2009, my best guess I was senior
5 manager of logistics planning.
6     Q.  You state "LP" -- and that's loss
7 prevention, correct?
8     A.  Correct.
9     Q.  -- "is pulling out of the DEA
10 operations and will play more of a compliance
11 auditing role.  Frank and I talked earlier in
12 the week."  Frank Devlin?
13     A.  I believe, yes, that would be
14 referring to.
15     Q.  Did you work with Mr. Devlin?
16     A.  I worked with Frank, yes.  Frank was
17 loss prevention for the distribution center so
18 our paths have obviously crossed.  We both
19 supported the DCs.
20     Q.  Chris C, who is that?
21     A.  I believe that refers to Chris
22 Cassidy, or Christopher Cassidy.  He was on my
23 team at one point.
24     Q.  Did he --

Page 50

1    A.  I'm sorry.
2    Q.  I'm sorry.  Go ahead.
3    A.  And look at the timing.  It most
4 likely would be Amy Propatier's direct manager
5 at this time.
6    Q.  Amy Propatier was what?
7    A.  Amy Propatier was a coordinator.
8    Q.  Were you aware that she was the
9 director of DEA compliance?
10   A.  Not in any time that Amy reported to
11 me was she the director of DEA compliance.  I do
12 not believe Amy has ever been a director in her
13 time at CVS.
14   Q.  Or manager of DEA compliance, or the
15 head of DEA compliance, or any term like that?
16   A.  Amy had a role where -- again, going
17 back to our previous discussion of the role of
18 my department as being the liaison between
19 customer support center and the distribution
20 centers, Amy would facilitate or coordinate
21 activities between those two groups.  At no time
22 did Amy have ownership of any DEA compliance, to
23 my knowledge, with the exception of she was
24 responsible for filing ARCOS reporting.

Page 51

1    Q.  Other than filing ARCOS reporting, she
2 had no role in terms of DEA compliance that you
3 were aware of?
4    A.  No.  As I previously said, Amy would
5 coordinate activities between the distribution
6 centers and customer support.  She may have been
7 involved in or had information on DEA compliance
8 activities, but she was not the owner of any of
9 those activities other than ARCOS reporting, to
10 my recollection.
11   Q.  You said "Chris C's Team (mainly Amy)
12 will be inserted more on day-to-day issue
13 oversight."
14       Was that issue oversight with respect
15 to DEA compliance?
16   A.  I do not recall what the term issue
17 oversight meant in here, but it would be a role
18 in -- Amy had a -- area of concentration in
19 Amy's position at the time was to, again,
20 coordinate activities, and she did have a focus
21 on the pharmacy portion of the operations of the
22 distribution center versus, you know, the front
23 store type product.  I mean, we'd look at the
24 distribution centers, the pharmacy operations

Page 52

1 are within that building, but they're looked at
2 as a stand -- somewhat of a stand-alone
3 operation.  And there are separate requirements
4 and guidelines there versus the larger part of
5 the facility, if you think about it from a
6 square footage perspective.  In the activities
7 of those facilities, she focused more on the
8 pharmacy part of the operations.
9    Q.  The controls had more security
10 requirements, I take it, compared to toothpaste?
11   A.  Correct, correct.
12   Q.  I would like -- "I would also like Amy
13 to get involved more to ensure DC compliance."
14       What compliance were you referring to,
15 sir?
16   A.  Again, I -- looking at this, I do not
17 recall what I was referring to at that time,
18 other than compliance.  I can't say if it's
19 operational procedure compliance, if it's DEA
20 compliance, if it's FDA compliance, OSHA
21 compliance.
22   Q.  Well, you were forwarded DEA SOP,
23 standard operating procedure, correct?  Does
24 that give you a clue that perhaps you were

Page 53

1 discussing --
2    A.  I'm sorry, was there an SOP that was
3 attached to this e-mail?
4    Q.  It notes the attachment in the e-mail
5 itself, doesn't it?  Do you see that, sir?
6    A.  If there's a specific point -- I mean,
7 I'll read through the document again unless you
8 can point to me where it says that.  In my
9 e-mail?
10   Q.  Your e-mail, do you see the word
11 "attachments" on there?
12   A.  Yes.
13   Q.  Okay.  What's the attachment?
14   A.  The title -- the document says "DEA
15 SOP 12-11-09(2)(2).doc."
16   Q.  Do you have any reason to believe this
17 e-mail was -- did not attach the DEA SOP?
18   A.  I have no reason to believe it would
19 or would not.
20   Q.  You want Amy to perform a gap
21 analysis.  What is a gap analysis?  What are you
22 referring to?
23   A.  I believe to perform a review between
24 the audit that the loss prevention department

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1 was performing and the contents of the SOP.
2     Q. For what purpose?
3     A. To understand if there were any gaps
4 or any risks.
5     Q. Was that report ever prepared, to your
6 knowledge?
7     A. I do not recall.
8     Q. Were you concerned at the time that
9 there was a gap between what DEA required and
10 what CVS was performing at the DCs?
11     A. I do not recall.
12     Q. Amy Propatier worked in logistics
13 planning department, is that correct?
14     A. Yes, she did.
15     Q. Let me show you what we've marked as
16 Exhibit 31.
17       (Whereupon, CVS-Vanelli-31 was marked
18       for identification.)
19 BY MR. DEROCHE:
20     Q. I've handed you an e-mail dated
21 4/3/2008 from Amy Lynn Brown. You know that to
22 be Amy Propatier, I believe?
23     A. Correct.
24     Q. Her name changed?

Page 55

1     A. She was married.
2     Q. E-mail to you, correct?
3     A. I see that, yes.
4     Q. Subject is "DEA SOP," correct?
5     A. Yes, it is.
6     Q. "Final DEA SOP 2008.doc" is noted as
7 the attachment?
8     A. It is.
9     Q. And this is in 2008 that you were
10 receiving this document?
11     A. That is the date of the e-mail.
12     Q. And you at that time had had some
13 involvement at least in the DEA issues at CVS in
14 compliance, correct?
15       MR. BUSH: Objection.
16     A. I do not recall what my exact
17 responsibilities were in 2008, and no time have
18 I had responsibility for DEA activities in the
19 CVS distribution centers.
20 BY MR. DEROCHE:
21     Q. Do you know why Amy Lynn Brown would
22 have been forwarding the DEA SOP to you at that
23 time?
24     A. I do not. I don't -- do not recall

Page 56

1 why.
2     Q. Was it her general mode of operating
3 to send you things that weren't -- didn't
4 involve your job duties on a CVS e-mail?
5     A. There could be a multitude of reasons
6 of why she had sent this doc. I was not
7 responsible for the SOP. I was not responsible
8 for the DEA procedures in the distribution
9 centers at that time.
10     Q. Okay. When you started your work in
11 developing the new SOM system at CVS, did you go
12 back and review documentation concerning the old
13 system so you knew what you were replacing and
14 what the problems might have been?
15     A. When I began the design I spent some
16 time in the Indianapolis facility to get a
17 general understanding of the process that they
18 were following as a baseline, as a jumping off
19 point for the process that we were building in
20 the system that we were building to replace that
21 system.
22     Q. Okay. Did you at any time try to
23 research any issues that may be involved with
24 the existing system in terms of problems in its

Page 57

1 operation?
2     A. I do not recall doing that, no.
3     Q. Did you ever try to determine whether
4 or not the existing system you were replacing
5 made any effort to compare controlled drugs
6 versus non-controlled in terms of the pharmacies
7 ordering controlled drugs from the distribution
8 centers?
9     A. I recall that the team had access to
10 data, dispensing data, data regarding patients,
11 prescribers, the dispensers. I understand they
12 had data available which is data we wanted to
13 ensure we had available. I believe I tried -- I
14 got some indication of how they got about
15 getting to that data and the efforts -- in the
16 new system we wanted to be able to make that
17 data more readily providable that doesn't
18 require somebody to look for the information,
19 that I would be presented that information for
20 each case right -- or each flagged order as --
21 order of interest that our system would actually
22 generate and to look at that and have them
23 provide that information. But I do believe they
24 had access to that data.

Page 58

1    Q.  I understand that access to dispensing
2  data, if someone wanted to go look for it.  What
3  I'm talking about is with respect to the
4  algorithm itself in terms of flagging orders,
5  was there any effort made at that time to
6  compare controlled versus non-controlled volume
7  at the pharmacy?
8        MR. BUSH:  In the algorithm?
9        MR. DEROCHE:  In the algorithm.
10    A.  Yeah, I have no and gained no
11  understanding of how the algorithm actually
12  worked.
13  BY MR. DEROCHE:
14    Q.  You made no effort to determine what
15  the algorithm looked at or didn't look at?
16    A.  The operation of that algorithm was
17  irrelevant in the development of the program we
18  were designing.  I did not spend my time looking
19  at that.
20    Q.  Did you look at the IRRs?
21    A.  Over the couple of days that I was in
22  Indianapolis, when I said I had spent periods of
23  time with that team, I, you know, recall looking
24  at reports, and I believe the IRR was one of

Page 59

1  those reports that we looked at.
2    Q.  Do you know if the existing SOM system
3  you were replacing had any methodology by which
4  new stores were assessed within the SOM
5  algorithm?
6    A.  Again, I didn't look at the -- how
7  that -- the algorithm worked in my time
8  reviewing that system or that process.
9    Q.  Do you know if there was any effort
10  made in the existing SOM system that you were
11  replacing to assess outside vendor orders in
12  connection with the analysis of orders placed to
13  the distribution centers?
14    A.  I did not look at the operations of
15  the algorithm so I can't say if they -- it did
16  or did not look at that.  I do not know.
17    Q.  Showing you what we've marked as
18  Exhibit 33.
19        (Whereupon, CVS-Vanelli-33 was marked
20          for identification.)
21  BY MR. DEROCHE:
22    Q.  This is a document produced by CVS in
23  this litigation, and it's titled
24  "Opportunities - Current SOM Process."

Page 60

1        This was part of the process you went
2  through when you developed your new system so
3  that you could understand the existing system
4  that was in place in connection with your duties
5  in designing a new system, correct?
6        MR. BUSH:  Objection.
7    A.  I don't know the origin of this
8  document.  I can't even state if I was the
9  individual that created this document or someone
10  else.
11  BY MR. DEROCHE:
12    Q.  Sir, looking at the heading, it says
13  "Current SOM process," and there are a number of
14  points below discussing the current process and
15  opportunities to improve it.  Was this part of
16  the process that you went through when
17  determining how you were going to design the new
18  SOM system?
19        MR. BUSH:  Objection.
20    A.  Again, I don't recall if I had seen
21  this document.  I do not recall if I had created
22  this or who created it and what the intent of
23  the document was.
24  BY MR. DEROCHE:

Page 61

1    Q.  The first line of this document
2  marked -- and it's Page 83065 Bate number,
3  indicates "Lack of understanding as to what
4  characteristics make up the current algorithm."
5        Do you know if the staff that was
6  assessing the IRR flags in the system you were
7  replacing had a lack of understanding of what
8  the characteristics were that make up the
9  algorithm they were working with?
10    A.  I do not know.  I didn't -- as I
11  stated, I spent most of my time -- or the focus
12  was more on the process.  We knew that existing
13  system was going to be replaced.  I didn't feel
14  it necessary to spend time understanding the
15  actual algorithms.  I don't recall if the team
16  knew or did not know the characteristics that
17  make up the current algorithm.
18    Q.  Number 2, "Can we do all checks up
19  front?  Stores won't get orders in time if all
20  checks are completed up front."
21        Do you know if it was a situation with
22  the existing SOM system where the checks weren't
23  done up front?
24    A.  I'm not certain as to what that refers

Page 62

1 to. I understand in this system that the
2 orders -- they would get their data, their
3 reports that they would review, and they would
4 contact the distribution centers to tell them to
5 hold orders until they completed their review,
6 and not to release those orders until their
7 review was completed and they authorized that
8 the product be shipped. I do not know if that's
9 what that's referring to.
10 Q. Number 3, "Aaron reviews orders pushed
11 through after it is reviewed. Aaron gets all
12 the following info: CAP, Algorithm Output,
13 MIN/MAX."
14     Do you see that, sir?
15 A. I do see that.
16 Q. Do you know what CAP means?
17 A. I do not know.
18 Q. Do you know what the algorithm output
19 at that point was? Was that the IRR?
20 A. I'm not certain, but there was a
21 report. It may have been the IRR. I do not
22 recall.
23 Q. Do you know what MIN/MAX stands for?
24 A. In the context -- I can only assume

Page 63

1 it's short for minimum/maximum, but I don't know
2 minimum/maximum what.
3 Q. "By doing the 'CAPS' we are modifying
4 the order and not looking at actual order from
5 the store."
6     Do you understand that there was a
7 system in place that would cap orders and,
8 therefore, the actual order from the store that
9 should have been reviewed in the SOM system
10 wasn't being reviewed?
11 A. Again, I don't recall. I did not get
12 into the operations of the actual algorithm.
13 Q. Number 5, "If order is cleared on 1st
14 of month and cleared, and store then orders
15 again that month it won't be looked at. If
16 system flags it, we are required to look at it
17 and document why it was released, currently we
18 are simply releasing order based on past due
19 diligence on a different order."
20     Is that part of the process that you
21 reviewed when you went to the DC to analyze the
22 existing SOM system, sir?
23 A. I do not recall if that was part of
24 the discussion. Again, I was reviewing the

Page 64

1 process of the data review, the due diligence
2 work because I think there may be value
3 understanding the due diligence work they were
4 performing as it could relate to the work we
5 were doing going forward.
6 Q. But you don't know --
7 A. But with the system, or the operations
8 of the algorithm of the system that we knew we
9 were going to sunset.
10 Q. Well, this is saying that under that
11 current system if an order -- if a store is
12 looked at and then orders again that month,
13 there is no due diligence at all for the second
14 order.
15     MR. BUSH: Objection.
16 BY MR. DEROCHE:
17 Q. Does that make sense to you from a
18 perspective of an effective SOM system, sir?
19     MR. BUSH: Objection.
20 A. I did not write that document, I don't
21 know the accuracy of that statement.
22 BY MR. DEROCHE:
23 Q. Do you know how many orders would have
24 been affected by that same store, same month

Page 65

1 ordering issue --
2     MR. BUSH: Objection.
3 BY MR. DEROCHE:
4 Q. -- that is flagged here on the
5 opportunity document?
6     MR. BUSH: Objection.
7 A. I do not know that that did or did not
8 happen. I do not know.
9 BY MR. DEROCHE:
10 Q. "No automatic hard stop of orders.
11 Happens via e-mail/phone call - DC and LP
12 Manager." That refers to the process by which
13 an order is actually stopped from shipping from
14 the DC. And at that point in time the SOM
15 system basically was a manual process, correct?
16 Someone had to actually reach out to the DC to
17 stop an order?
18     MR. BUSH: Objection.
19 A. I don't know what that statement there
20 is referring to.
21 BY MR. DEROCHE:
22 Q. "Only order in question is stopped,
23 not all controlled substances."
24     Is that a problem when you have a

Page 66

1 store ordering one controlled substance and
2 perhaps it's flagged for suspicion, and you
3 don't stop the other ones from going there as
4 well?
5     MR. BUSH: Objection.
6     A. Again, in this document I don't know
7 the contents -- context of that statement.
8 BY MR. DEROCHE:
9     Q. "100-plus orders flagged by system,
10 looked (past history, Algorithm, MIN/MAX). 2 to
11 3 were stopped by Aaron for review. Deeper dive
12 review. Dispensing versus ordering. Reach out
13 to store."
14         Does that indicate to you that under
15 the existing SOM system you were replacing, if
16 100 orders were flagged, only 2 or 3 percent
17 were actually looked at from a due diligence
18 perspective?
19     A. I'm not familiar with the document. I
20 didn't write this document. I don't understand
21 the context of the --
22     Q. The context is pretty clear, isn't it?
23 It says 100 flags, 2 or 3 were looked at. Does
24 that sound like an effective SOM system to you,

Page 67

1 sir?
2         MR. BUSH: Objection.
3 BY MR. DEROCHE:
4     Q. Assuming that's true and someone wrote
5 this and they weren't erroneous when they wrote
6 this, came out of CVS's files in this case, sir,
7 do you think that's an effective system to only
8 do due diligence on 2 or 3 percent of the orders
9 that are flagged by the algorithm?
10     MR. BUSH: Objection.
11     A. I, again, do not know the context. I
12 do not -- can't render an opinion on a system
13 I'm not familiar with.
14 BY MR. DEROCHE:
15     Q. Seems like a SOM system that would
16 lead to a lot of orders slipping through the
17 cracks, wouldn't you agree with that, sir?
18     A. No, I would not.
19     Q. "Hold or cancel orders when flagged?
20 Holding order until due diligence is completed
21 may be the best option."
22         This is forward-looking. This is a
23 document that was prepared in connection with
24 what you were developing, you were going to put

Page 68

1 in place, and you were in charge of it. You're
2 saying you never looked at this document, sir?
3 You don't recall it?
4     MR. BUSH: Objection.
5 BY MR. DEROCHE:
6     Q. Is that what you're saying?
7     MR. BUSH: Objection.
8     A. I would say I do not recall looking at
9 this document.
10 BY MR. DEROCHE:
11     Q. Number 15 on the second page, "OV
12 orders and DC orders don't get
13 reviewed/monitored together. Both pieces of
14 information need to be run through the same
15 system."
16         Were you aware that outside vendor
17 orders weren't considered in any respect in the
18 SOM system that you were replacing?
19     MR. BUSH: Objection.
20     A. I'm not aware in the context of this
21 document, and I did not review the content of
22 the algorithm to know if they did or did not
23 both get run through the system.
24 BY MR. DEROCHE:

Page 69

1     Q. So you had no idea whether or not
2 outside vendor orders were even considered at
3 all in the old system?
4     A. I do not recall.
5     Q. Okay. Sir, I'm going to show you
6 what's --
7     MR. DEROCHE: This is 14, Graeme.
8     (Whereupon, CVS-Vanelli-14 was marked
9     for identification.)
10     MR. DEROCHE: Don't be confused by the
11 sticker on there.
12     MR. BUSH: I thought you said it's 14.
13     MR. DEROCHE: It's 14.
14 BY MR. DEROCHE:
15     Q. Showing you what we marked as
16 Exhibit 14. The top e-mail is an e-mail from
17 Craig Schiavo to a number of folks including
18 yourself, correct?
19     A. Correct.
20     Q. Okay. It's forwarding some
21 attachments concerning the new SOM system,
22 correct?
23     A. I see the attachment is stated
24 "Opportunities.doc."

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1   Q.  Correct.  The page -- the Bate number
2   on this e-mail is 83064, correct?
3   A.  If you're referring to the number on
4   the bottom, yes, that is correct.
5   Q.  It's dated November 29, 2012, correct?
6   A.  Correct.
7   Q.  All right.  You're with me so far.
8       Why don't you turn the page to the
9   second page of the exhibit, sir.  Do you
10  recognize that document, sir?
11  A.  It appears to be the document we had
12  just reviewed.
13  Q.  Two-page document titled
14  "Opportunities - Current SOM System," correct?
15  A.  Yes.
16  Q.  Yes?
17      Did you ignore this attachment when
18  you received it by e-mail from Mr. Schiavo?
19  A.  I do not recall what I did with this
20  e-mail when I received it from Mr. Schiavo on
21  11/19/2012.
22  Q.  At that point in time you were the
23  person who was responsible for the running of
24  the SOM -- existing SOM system, weren't you?

Page 71

1   A.  I was not the individual responsible
2   for -- excuse me.  Can you -- by "existing,"
3   please define the term for me.
4   Q.  Sure.  The system that was being used
5   to review orders on November 29, 2012, sir, that
6   system that was in place at that time, you had a
7   responsibility to make sure that that existing
8   system continued to run efficiently before your
9   system, new system was in place, right?
10  A.  No, I did not.
11  Q.  Okay.  Whose responsibility was that?
12  A.  Mark Nicastro.
13  Q.  Are you in silos at CVS, meaning if
14  you see a problem with something in one
15  department that may not be your direct
16  responsibility you just put blinders on and you
17  just go on with your day, go to lunch, have
18  coffee, and not do anything about it?  Is that
19  kind of the culture that you had at CVS, sir?
20  A.  No.
21  Q.  So you have a document that's
22  forwarded to you on November 29, 2012 that
23  flags, you call them opportunities, someone may
24  call them gaps in your SOM system that existed

Page 72

1   on that date.  Did you just ignore that and move
2   on with your day, sir?
3       MR. BUSH:  Objection.
4   A.  That is not my document, I did not
5   create that, I did not call those opportunities.
6   BY MR. DEROCHE:
7   Q.  Okay.  Would you call them problems?
8       MR. BUSH:  Objection.
9   A.  I do not -- that is not my document.
10  BY MR. DEROCHE:
11  Q.  Okay.  You understood part of the SOM
12  responsibility was a know your customer
13  responsibility.  You've heard that term, haven't
14  you?
15  A.  Yes, I have.
16  Q.  Okay.  And that was part of the
17  responsibility that CVS had, and the customers
18  in this particular instance were the pharmacies
19  that were placing orders, right?
20  A.  From -- yes.
21  Q.  And that responsibility wasn't
22  something that fell out of the sky in 2012, it
23  existed since 1972.  You're aware of that,
24  right?

Page 73

1   A.  If that is the date of the CSR, 1972 I
2   was not responsible for suspicious order
3   monitoring or employed by CVS Health.
4   Q.  I understand completely that you
5   weren't responsible, sir.  But you were the
6   responsible person in 2012, correct?
7   A.  No, I was not.
8   Q.  Okay.  You weren't responsible.
9       Again, is that kind of the culture at
10  CVS, if it's not squarely within your
11  responsibility and you see a problem, you just
12  go on with your day?  Even if people are dying
13  from the opioid epidemic, just move on and let
14  someone else deal with it?
15      MR. BUSH:  Objection.
16  BY MR. DEROCHE:
17  Q.  Is that the culture that you had at
18  CVS, sir?
19      MR. BUSH:  Objection.
20  BY MR. DEROCHE:
21  Q.  Do you think it makes -- do you think
22  that under the system that was operating until
23  your system came online where you didn't even
24  look at outside vendor orders, you knew nothing

Page 74

1  about what these pharmacies were ordering from
2  outside vendors, that that allowed you to know
3  your customer when you're assessing their SOM,
4  doing an SOM review?
5      MR. BUSH:  Objection.
6      A.  In 2012 I was not responsible for the
7  operation of suspicious order monitoring system.
8  It was not part of my duties.
9  BY MR. DEROCHE:
10     Q.  Do you think not knowing what's being
11 ordered from outside vendors allowed CVS to
12 comply with the know your customer requirement
13 that was in existence in 1972, sir?  Do you
14 think that was a good system?
15     MR. BUSH:  Objection.
16     A.  I do not know that it did or did not
17 look at -- or that the analyst team did or did
18 not look at --
19 BY MR. DEROCHE:
20     Q.  You understood --
21     A.  -- outside vendors.
22     Q.  You understood pharmacies were
23 ordering product from outside vendors, including
24 opioids, right?  You knew that?

Page 75

1      A.  I understand that pharmacies have two
2  sources of drugs, CVS distribution center or an
3  outside vendor.
4      Q.  And that included the purchasing of
5  Schedule III hydrocodone combination products?
6  Those could be ordered from outside vendors,
7  right?
8      A.  Yes.  To my knowledge, yes.
9      Q.  And you're getting orders to your
10 distribution centers for hydrocodone combination
11 products, right?
12     A.  Until the period it became a Schedule
13 II drug, CVS pharmacies were able to order
14 hydrocodone products from the servicing CVS
15 distribution center.
16     Q.  And at the same time they were able to
17 order those same products from outside vendors?
18     A.  I believe so, yes.
19     Q.  And your IRR that is running up until
20 the point where your new system went in place
21 looked at month-to-date volume as a key factor,
22 right, in assessing whether or not an order was
23 suspicious?  That was the key factor?
24     A.  Again, as I stated, I did not get into

Page 76

1  the operations of that existing algorithm or
2  that system as we were sunsetting it and
3  building a new one.
4      Q.  You testified, sir, you went to the
5  distribution center and you actually reviewed
6  some orders, right?  You reviewed some orders?
7  You said that.
8      A.  Those were not my words.  My words
9  were I went to the distribution center and
10 observed the team that performed review to get a
11 general understanding of their due diligence
12 process.
13     Q.  And you said -- well, the record will
14 be clear and I guess we'll see, but I believe
15 you said, "yeah, and I looked at some orders."
16     A.  I observed the team looking at orders.
17 I was not trained to perform SOM review.  I
18 didn't know the system.  I didn't know their
19 tools.
20     Q.  So you just sat there and watched them
21 silently review orders, or were you trying to --
22 were you interested in finding out what were
23 they actually looking at, sir?
24     A.  I would assume I asked some questions

Page 77

1  along the way.
2      Q.  Did you ask them to -- how are you
3  looking at this IRR?  What's the important
4  factor on the IRR, right?  Did you do anything
5  along those lines in terms of determining what
6  they were actually looking at?
7      A.  I do not recall any specific questions
8  about the operation of the IRR report.
9      Q.  Do you know if month-to-date
10 cumulative volume of a particular drug was
11 anything at all that they may have considered
12 when they're doing their reviews?  Did that come
13 into your mind at all?
14     A.  I don't recall.
15     Q.  Do you know if it's any good to look
16 at cumulative volume of a drug when you don't
17 even know if that same drug is being ordered
18 from outside vendors at the same time?  Seems to
19 be that would be kind of a pointless process,
20 wouldn't it?
21     MR. BUSH:  Objection.
22 BY MR. DEROCHE:
23     Q.  You don't know what the volume is at
24 that point, do you?

Page 78

1    A.  Again, I don't know the -- I'm sorry.
2  Go ahead.
3       MR. BUSH:  Go ahead.  You can testify.
4    A.  I did not look at the operation of the
5  algorithms and the data that the algorithms
6  used.
7  BY MR. DEROCHE:
8    Q.  Well, I just want to use some common
9  sense for two seconds here so the jury can
10 understand exactly what's going on here.
11      You have distribution center receiving
12 orders for a drug.  Are you with me so far?
13   A.  Yes.
14   Q.  Part of your SOM system is -- let's
15 assume for a moment you're looking at cumulative
16 month-to-date orders in assessing whether or not
17 that's out of line.
18      With me so far?  Do you understand
19 what I'm saying?
20   A.  Repeat the second portion, please.
21   Q.  Sure.
22      You're looking at the month-to-date
23 volume of what they've ordered for this
24 particular drug in connection with your SOM

Page 79

1  system as part of whether -- to determine
2  whether or not it's a suspicious order, all
3  right?  Yes?
4    A.  Yes.
5    Q.  Okay.  And you don't know what that
6  same drug has been ordered from an outside
7  vendor, so you really don't know what the
8  month-to-date volume is for that store.
9       Are you with me so far?
10   A.  Yes.
11   Q.  Looking at the month-to-date only for
12 your distribution centers and not considering
13 outside vendors is a pointless process,
14 pointless, wouldn't you agree?
15      MR. BUSH:  Objection.
16   A.  I would not.  I was not -- did have no
17 understanding of the operation of that
18 algorithm.  I can't speak if that's an incorrect
19 or a correct statement.  I do not know.
20 BY MR. DEROCHE:
21   Q.  Again, I've laid the foundation for
22 you.  You don't have to go back --
23      MR. BUSH:  You need to let him finish
24 his answer before you start.

Page 80

1  BY MR. DEROCHE:
2    Q.  I apologize.  I didn't mean to speak
3  over you.
4       I just laid out the scenario, sir.  I
5  don't care if you went back and looked at the
6  time.  I'm asking you, under that scenario you
7  just agreed to when I laid it out for you, do
8  you think it's pointless when you don't know
9  what the actual volume is for that store for
10 that month?  Isn't it a pointless process?
11      MR. BUSH:  Objection.
12   A.  I did not -- I did not agree to that
13 scenario.  I agree that I heard what you said,
14 and I understood what you said.  I did not agree
15 to that scenario.
16 BY MR. DEROCHE:
17   Q.  Let's assume that that's what was
18 going on as of 2012, November.  That's what's
19 going on at CVS in your SOM system.  You would
20 agree that's pointless?  It's not an SOM system
21 that is effective, right?
22      MR. BUSH:  Objection.
23   A.  I do not know that is an accurate
24 statement.  I did not understand the operation

Page 81

1  and do not understand the operation of the
2  algorithm.  I do not know.
3  BY MR. DEROCHE:
4    Q.  But into November of 2012, did you
5  care if the system that was in place at the time
6  was actually assessing whether or not orders
7  were suspicious?  Did you care?
8    A.  My focus in 2012 was to design a
9  system, an SOP -- excuse me, an SOM system and
10 process.  That was my focus.
11   Q.  So I take it the answer to my question
12 is no?
13   A.  Repeat your question.
14      MR. BUSH:  Objection.
15 BY MR. DEROCHE:
16   Q.  Did you care if the existing system
17 was efficient and working in actually assessing
18 orders for suspicion?
19   A.  I was operating under the belief that
20 the system was operating as intended and being
21 operated by folks that took their job seriously,
22 understood what they were doing.  I was not
23 focusing on that system.  I was focusing on the
24 development of a new system.

Page 82

1    Q.  Okay.  So you didn't assess at that
2  time whether or not the key attribute, the key
3  attribute they were looking at when they were
4  trying to assess suspicion, was actually an
5  effective attribute they should be looking at,
6  total monthly volume?
7    A.  I did not look at how the algorithm
8  was operating as I knew that system was being
9  sunset, and my focus was on developing a system
10  and a process to detect suspicious orders.
11    MR. BUSH:  Is now a good time for a
12  break?  About an hour and a half.
13    MR. DEROCHE:  Yes, that's a good idea.
14    THE VIDEOGRAPHER:  We're going off the
15  record at 9:29 a.m.
16    (Whereupon, a recess was taken.)
17    THE VIDEOGRAPHER:  We're back on the
18  record at 9:47 a.m.
19  BY MR. DEROCHE:
20    Q.  In 2013, Mr. Vanelli, was Christopher
21  Tulley your boss?
22    A.  No, he was not.
23    Q.  What was he?
24    A.  He was a project manager.

Page 83

1    Q.  Okay.  And what role did he have in
2  the work that you were doing on the SOM system?
3    A.  Chris was a project manager for the --
4  on the project for developing the new suspicious
5  order monitoring system.
6    Q.  I'm going to show you what we marked
7  as Exhibit 25.
8    (Whereupon, CVS-Vanelli-25 was marked
9    for identification.)
10  BY MR. DEROCHE:
11    Q.  Before you get there, you said that
12  with respect to the old SOM system that was
13  running that you were going to be sunsetting and
14  replacing, that you didn't do any deep dive into
15  how it operated.
16    A.  That existing system that we were
17  going to sunset?
18    Q.  Right.
19    A.  No, I did not.
20    Q.  You didn't do anything with respect to
21  that system other than sit in the DC in
22  Indianapolis for a couple days and watch what
23  the analysts were doing?
24    MR. BUSH:  Objection.

Page 84

1    A.  I sat in the DC with the analysts
2  multiple times over the course of a couple days
3  to review their process.  And we also discussed
4  that I did assist ensuring staffing, and
5  assisted Mark Nicastro in where he may have
6  needed assistance to maintain that system while
7  it was running until the time that we sunset it
8  by replacing it with the new system that was my
9  focus in developing with a team of folks.
10  BY MR. DEROCHE:
11    Q.  Again I want to make sure I've got a
12  bracket around your full interaction with the
13  SOM system that was in place.  Is that the end
14  of it?  That's all you did with respect to that
15  system?
16    A.  Like I said, I spent time to
17  understand the due diligence process, and I
18  assisted Mark when there were challenges that he
19  had, such as staffing.
20    Q.  Any other challenges?
21    A.  Not that I recall.  Not that I recall.
22    Q.  25.  I show you what we marked as
23  Exhibit 25, sir, electronic message from you to
24  Christopher Tulley, 3/8/2013, correct?

Page 85

1    A.  Correct.
2    Q.  "SOM GPS Goal" is the subject,
3  correct?
4    A.  Correct.
5    Q.  GPS is what?
6    A.  It stood for at the time goals for
7  performance and success, I believe.
8    Q.  Okay.  "Suspicious Order Monitoring"
9  is the subject of the e-mail, correct?
10    A.  I'm sorry?  My apologies, I wasn't
11  listening to you.  I was reading.
12    Q.  Fair enough.
13    "Suspicious Order Monitoring" is the
14  subject of this e-mail, correct?
15    A.  "SOM GPS Goal," yes.
16    Q.  Well, you put "Suspicious Order
17  Monitoring" as the first line of the e-mail
18  itself in bold, right?
19    A.  Yes.
20    Q.  "Assume ongoing oversight of current
21  and enhanced suspicious order monitoring program
22  for controlled substances and PSE."  You wrote
23  that, sir, correct?
24    A.  I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.  "Stabilize current process to ensure
2  all flagged orders are reviewed.
3        "Ensure future process continues to
4  meet known DEA requirements."
5    Did you write that, sir?
6    A.  I did.
7    Q.  Are you suggesting that that's
8  something that you had done or planned to do?
9    A.  This was a goal that would have been
10 for -- what's the date of this?  2013.  With the
11 title "GPS," that would have been a goal out of
12 '13, '14, 2013 or 2014.
13   Q.  So as of the time you wrote this
14 e-mail in 2013, you hadn't yet stabilized the
15 current process to ensure all flagged orders
16 were reviewed?
17   A.  I can't state to that.  If it was a
18 goal for '13, it could have been.  That does not
19 assume that -- I'm not reading that that assumes
20 that the system was not in current state.
21   Q.  Does that mean that they weren't
22 reviewing all flagged orders?
23   A.  That is not what that means.
24   Q.  Do you know if all flagged orders were

Page 87

1  being reviewed?
2    A.  No, I do not.
3    Q.  We saw the opportunity document that
4  you were e-mailed where it said 2 or 3 percent
5  of the flagged orders were reviewed.  Do you
6  know if that's the state of affairs as of 3/8/13
7  as well?
8    A.  As I stated then, I did not write the
9  document, I do not know the accuracy of that
10 statement.  That was --
11   Q.  I take it as a no?
12   A.  Whether it was true or not true, I
13 don't know.
14   Q.  Who was going to be cast with
15 stabilizing the current system?
16   A.  The ownership of that current system
17 fell under the responsibilities of Mark Nicastro
18 and the team that he assigned that ran that
19 process.
20   Q.  Let me show you what we marked as
21 Exhibit 29.
22       (Whereupon, CVS-Vanelli-29 was marked
23       for identification.)
24 BY MR. DEROCHE:

Page 88

1    Q.  I show you what was marked as
2  Exhibit 29.  29, again, is a document produced
3  by CVS in this litigation bearing Bates number
4  58176, CVS Logistics document, "DC Suspicious
5  Order Monitoring, March 26, 2012."
6        This is a document you would have been
7  involved in working with, correct?
8    A.  I would assume, yes.
9    Q.  And as of 2012 you were already well
10 into the project, correct?
11   A.  March, 2012?
12   Q.  Correct.
13   A.  Looking at March of 2012, I have no
14 recollection of working in SOM.  As I stated
15 previously, my involvement in suspicious order
16 monitoring began in the fourth quarter of 2012
17 when I was approached by my vice president and
18 president to design a new system and process.
19   Q.  States that as of that date, "The
20 Analysis Group currently developing mathematical
21 algorithms to identify orders of suspicious
22 size, frequency, and/or pattern."
23       That was the Analysis Group that you
24 were involved in retaining to design the new

Page 89

1  algorithm, correct?
2    A.  I was not involved in the retaining of
3  the Analysis Group.  The Analysis Group was
4  introduced to me as a third party that was going
5  to assist.  I was not involved in contracting
6  with them, soliciting them.  That happened prior
7  to my involvement in SOM.
8    Q.  Do you know why they were chosen over
9  some other consultant?
10   A.  I do not know.  I was not involved in
11 the decision.
12   Q.  Did you ever work with the Buzzeo
13 Group or any company associated with Buzzeo?
14   A.  I am aware of the Buzzeo Group, but I
15 do not recall having any interaction with the
16 Buzzeo Group.  Although I am aware that the
17 Buzzeo Group was the company that the -- you had
18 referred to prior as the existing, so the system
19 that was in place in 2012, that that system was
20 acquired from the Buzzeo Group, they developed
21 it.  I do know that.
22   Q.  Do you know why they weren't retained
23 for the new system?
24   A.  I do not know.  I was not involved in

Page 90

1 that decision.
2    Q.  Do you know if they were fired by CVS
3 for any reason?
4    A.  They were not an employee of CVS, so
5 being fired, I'm not sure how you fire somebody
6 that is not an employee of you.
7    Q.  Do you know why the relationship as a
8 consultant with Buzzeo was discontinued by CVS?
9    A.  No, I do not.
10       MR. BUSH:  Objection.
11    A.  I had no involvement in the
12 relationship with Buzzeo.
13 BY MR. DEROCHE:
14    Q.  You have consultants that you fired
15 before, haven't you?
16    A.  About as many as you've hired, yes.
17    Q.  It references in the fourth bullet
18 down "Reviewing algorithmic requirements for new
19 stores and new items due to lack of
20 order/shipment history; considering benchmark
21 stores and like item approach."
22       Do you see that, sir?
23    A.  I see the sentence, yes.
24    Q.  "All new store and all new items

Page 91

1 orders will flow through algorithm from day
2 one."
3       Do you see that, sir?
4    A.  I see that, yes.
5    Q.  Do you know if that was what was
6 happening with the system that was in place as
7 of March 26, 2012, or was that an improvement
8 that was being made in the new system?
9    A.  I do not know if -- new stores and new
10 items that flowed through that algorithm.  I can
11 state that they do and there were specific
12 algorithms in the current system.
13    Q.  So the old system may not have had any
14 methodology to assess new stores or new items?
15    A.  I do not know if it did or didn't.
16    Q.  Did you ever try to find out in the
17 process of trying to stabilize the existing
18 system that was going to be running until the
19 new system was up and running?
20    A.  I never stated I was stabilizing
21 a system.  I believe I was stabilizing or
22 reviewing and provided Mark assistance on the
23 process.  As I stated, I did not get involved in
24 the actual workings of the algorithms or system

Page 92

1 itself.
2       (Whereupon, CVS-Vanelli-44 was marked
3       for identification.)
4 BY MR. DEROCHE:
5    Q.  Let me show you what we marked as
6 Exhibit 44.  It's a Requirements Document for
7 Suspicious Order Monitoring dated 7/1/13, and
8 the author appears to be Tim Burtch, correct?
9    A.  That is what the cover sheet says,
10 yes.
11    Q.  Do you know who Tim Burtch is?
12    A.  Yes, I do.
13    Q.  What was his role in 2013?
14    A.  Tim Burtch is a member of the IT
15 department.  He was part of the project team
16 that was working on the design and
17 implementation of the new SOM system.
18    Q.  Let's go to Section 5.  Let me know
19 when you're there.
20       MR. BUSH:  Do you have the page
21 number?
22       MR. DEROCHE:  Section 5 is a section
23 of the document.  Page number is 115826.
24    A.  I'm there.

Page 93

1 BY MR. DEROCHE:
2    Q.  Okay.  States that it's "High-Level
3 Business Requirements."  Do you know what that
4 means?
5    A.  I understand high-level business
6 requirements from a process perspective.  In
7 this document, not -- I'm not 100 percent
8 certain, but high-level business requirements
9 are the requirements of the business.
10    Q.  And these are the requirements that
11 were set for the new SOM system that you were in
12 charge of implementing, correct?
13    A.  I was part of a team implementing,
14 yes.
15    Q.  Number 4 under Section 5, "The SOM
16 algorithm and history should be at store level
17 detail not store/DC level; history cannot be
18 lost if a store aligns to a new DC or is
19 temporarily overridden to a different DC and
20 should include returns and credits."
21       Do you see that, sir?
22    A.  I see that.
23    Q.  That has to do with the fact that you
24 don't want your SOM system losing history when a

---

Page 94

1 store moves to a different DC, correct, because
2 you want to have that history to assess?
3     A.  Correct.
4     Q.  Right?
5         Do you know if the SOM system that
6 existed that you were replacing had a -- the
7 level, store level detail at store/DC level so
8 that the history was lost?
9     A.  I do not know if it stored that data,
10 and I do not know if history was or was not
11 lost.
12    Q.  Did you ever hear of any instance when
13 history was lost, for instance when the name of
14 an item changed, so that there was no real data
15 to look at?
16    A.  For example, we don't track
17 information by item name.  It would be tracked
18 by item number or NDC number.
19    Q.  Okay.
20    A.  And I did -- and I apologize, or
21 clarify, I'm speaking about that in the current
22 system.
23    Q.  Correct.
24    A.  In the existing system at that time,

---

Page 95

1 again, I do not know.
2     Q.  Did you hear of any instance in the
3 old system where history may have been lost with
4 an item name changed?
5     A.  I do not recall any.
6     Q.  Okay.  You weren't involved in that?
7     A.  I was not involved.
8     Q.  Number 5, "The SOM Algorithm requires
9 details for new stores and methodology to begin
10 to analyze the new store orders."
11        Do you see that?
12    A.  I see that requirement.
13    Q.  Under the old system, do you know if
14 that was what happened, or if there was any
15 system at all to assess new stores?
16    A.  I do not know if new stores was looked
17 at or not looked at.
18    Q.  You were aware, when you looked at the
19 2000 letter from the DEA that you were sent a
20 copy of, the DEA indicated in that letter that
21 new stores should be assessed immediately and
22 not wait for a history to develop.  Do you know
23 as of 2007 if CVS was complying with that
24 requirement?

---

Page 96

1         MR. BUSH:  Objection.
2     A.  I have no knowledge if CVS was or was
3 not complying with that requirement.
4 BY MR. DEROCHE:
5     Q.  Did you make any effort in 2012 when
6 you were brought into the project to assess
7 whether or not the current system that was being
8 used by CVS actually complied with the
9 requirements of the DEA?
10        MR. BUSH:  Objection.
11 BY MR. DEROCHE:
12    Q.  Including the new store requirement?
13        MR. BUSH:  Objection.
14    A.  I did not.  My focus was on the due
15 diligence process performed by the team.  I did
16 not look into the operation of a system and
17 algorithms that we were going to sunset.
18 BY MR. DEROCHE:
19    Q.  Again, the DEA requires all orders to
20 be assessed, including new drug orders.  And do
21 you know if the system in place as of 2012 had
22 any methodology for assessing new drugs from day
23 one?
24    A.  I do not know.  I do not recall.

---

Page 97

1     Q.  Was there anybody at CVS, pick any
2 year, let's pick 2012, that was responsible for
3 actually knowing if the SOM system that was
4 being operated by CVS complied with the guidance
5 provided by the DEA?  Was there a human being
6 that was in charge of that at CVS?
7         MR. BUSH:  Objection.
8     A.  200,000 individuals at CVS Pharmacy, I
9 don't know the responsibilities of each
10 individual.  That was not my responsibility.  I
11 was not responsible for that system.
12 BY MR. DEROCHE:
13    Q.  We're getting into the blinder
14 situation so I want to put that aside for a
15 minute, and I'm just going to ask you, from
16 someone who in 2012, quarter 4, started working
17 on the SOM system, do you know in 2012, let's
18 pick quarter 4, was there any individual at CVS
19 who was responsible for ensuring that the SOM
20 system in place complied with DEA requirements
21 including new store, new item?
22        MR. BUSH:  Objection.
23 BY MR. DEROCHE:
24    Q.  Was there an individual that was in

---

Page 98

1 charge of that?
2    MR. BUSH: Sorry. Objection.
3    A. There was an individual responsible
4 for the operation of that. I do not know folks'
5 detail of their responsibility to say if there
6 was an individual, group of individuals, or
7 multiple individuals that had that
8 responsibility. I do not know.
9 BY MR. DEROCHE:
10    Q. So the question is -- the answer is
11 you don't know if there was any individual who
12 ultimately had to sit in a chair and say, we
13 comply with DEA requirements for our SOM system?
14 You don't know if there was someone who was
15 assigned with that responsibility?
16    MR. BUSH: Objection.
17    A. I do not know. That's all I can say.
18 BY MR. DEROCHE:
19    Q. Number 7 talks about control versus
20 non-control, dispensed being a factor to
21 consider in connection with the SOM system.
22 Again, something that was mentioned by the DEA
23 in the letter in 2007 to CVS. Do you know if
24 there was any effort under the existing SOM

Page 99

1 system that you replaced to actually comply with
2 that requirement?
3    MR. BUSH: Objection.
4    A. I do not know. Again, I was focused
5 on designing the new system, the replacement
6 system, and ensuring that system met the
7 requirements as guidance was provided by CVS
8 legal that was attached to that project.
9 BY MR. DEROCHE:
10    Q. CVS had data for its pharmacies that
11 would have allowed CVS to assess the dispensing
12 of controlled versus non-controlled drugs,
13 correct?
14    A. I do not know.
15    Q. Excuse me?
16    A. I do not know.
17    Q. You don't know if CVS had available
18 data on the dispensing of controlled versus
19 non-controlled that it could look at to assess?
20 You don't know if that --
21    A. I could assume. Well, I apologize.
22 Yes, I know, because dispensing data was used by
23 the review team. They discuss using dispensing
24 data to review orders that flagged in their

Page 100

1 system.
2    Q. So that data existed?
3    A. Dispensing data?
4    Q. Yes.
5    A. Yes.
6    Q. It was in CVS's possession in 2007,
7 for example, right?
8    A. I do not know.
9    Q. 2008, you don't know if you had
10 dispensing data at CVS Pharmacy?
11    A. You're asking about the existence.
12    Q. The jury is watching this, sir.
13    A. I understand.
14    MR. BUSH: Objection. Let's stop the
15 grandstanding and ask the questions.
16 BY MR. DEROCHE:
17    Q. All right. I want you to look them in
18 the eye, look at the camera and tell them.
19    MR. BUSH: Let's stop the
20 grandstanding and ask questions, all right?
21 BY MR. DEROCHE:
22    Q. Do you know if CVS Pharmacy, one of
23 the largest pharmacies in the country, had
24 dispensing data in 2008 that it could have

Page 101

1 looked at to compare dispensed controlled
2 substances versus non-controlled?
3    A. CVS dispensed controlled substances in
4 2008. The existence of data was for dispensing,
5 which has nothing to do with my position at that
6 time in 2008. I can't speak to what I don't
7 know.
8    Q. In 2012, sir, when you were looking to
9 put this system together, you recognized that
10 CVS had at its disposal dispensing data, right?
11    A. I stated that the review team had
12 access to dispensing data that they looked at in
13 the performance of their due diligence.
14    Q. You don't know how many they actually
15 looked at in terms of the flagged orders, right?
16    A. By spending a couple of days with that
17 team, no, I do not know.
18    Q. And with respect to the use of
19 dispensing data, you don't know if the algorithm
20 at the time even considered dispensed controls
21 versus dispensed non-controls in determining
22 whether an order should be flagged? You have no
23 idea?
24    A. I have no knowledge of the inner

Page 102

1 workings of the algorithms for the system that
2 was in place in 2012.
3    Q.  Let's go to Section 7.1 that's on
4 Page 115829.  Let me know when you're there.
5    A.  Section 7.
6    Q.  7.1 discusses the function of the SOM
7 algorithm moving forward.  "C.  SOM algorithm
8 and history should be to store level detail not
9 store/DC level; history cannot be lost if a
10 store aligns to a new DC or is temporarily
11 overridden to a different DC."
12       Do you see that, sir?
13    A.  Yes, I do.
14    Q.  That was a requirement so that the SOM
15 system operated effectively and appropriately
16 and continued to assess the history of a store
17 even if it changed to a different DC, correct?
18    A.  I didn't write this document, but
19 that's what I believe it to mean.
20    Q.  You were involved in this project,
21 right?
22    A.  I was involved in the project.  I am
23 not an IT expert.  This is an IT document.
24    Q.  Again, D addresses store -- new stores

Page 103

1 being analyzed from day one.  Again, you don't
2 know whether or not the existing system in 2012
3 had that functionality, right?
4    A.  I do not know that it did or did not
5 have that functionality.  This isn't a
6 comparison document.  This is the requirements
7 in the new system.
8    Q.  SOM system identify new drugs, and
9 assess those new drug orders from day one.  You
10 don't know if the system that existed in 2012
11 that you were replacing had that functionality?
12    A.  I do not know if it did or did not
13 have that functionality.  I do not know.  I do
14 not recall.
15    Q.  As part of this project, that was one
16 of the things that the new system was going to
17 have because it was required by the DEA, right?
18    A.  It was included because it was felt to
19 be a requirement, yes.
20    Q.  So if the old system didn't have that
21 requirement, it didn't meet the DEA
22 requirements, plain and simple, right?  Didn't
23 have that functionality?
24    A.  I do not know if it included or did

Page 104

1 not include.  I don't know.
2    Q.  I said if it didn't have it, it didn't
3 comply with the requirement, right?
4    A.  I'm not a lawyer, I don't interpret, I
5 do not know.
6    Q.  Again section F, "Non-control order
7 and dispensed info to SOM, compare control
8 substance order amount to non-controlled
9 substance order amount."
10       Again, something that the DEA said was
11 a factor that needed to be assessed in looking
12 at a SOM system, right?
13       MR. BUSH:  Objection.
14    A.  Yes.
15 BY MR. DEROCHE:
16    Q.  Yes.
17       And again, if the old system didn't do
18 that it wouldn't have complied with that
19 requirement of the DEA, correct?
20       MR. BUSH:  Objection.
21    A.  Do not know.
22       (Whereupon, CVS-Vanelli-26 was marked
23       for identification.)
24 BY MR. DEROCHE:

Page 105

1    Q.  I'm going to show you what we've
2 marked as Exhibit 26.
3    A.  Thank you.
4    Q.  This is a document prepared by the
5 Analysis Group that was tasked with designing a
6 new algorithm for the new system.
7       Do you recognize the Analysis Group as
8 the outside consultant that was used for that
9 purpose?
10    A.  Yes.
11    Q.  And this talks about SOM algorithm
12 size tests that were to be implemented in the
13 work they were doing to come up with those size
14 tests, right?
15    A.  I believe so, yes.
16    Q.  And you recognize the new system had
17 size tests, pattern tests, and what was the
18 other test they had?
19    A.  Frequency tests.
20    Q.  Frequency tests.
21    A.  New store test, new item test.
22    Q.  Okay.  And it looks like, if we go to
23 Page 30212, that you moved from monthly volume
24 tests to rolling 28-day periods, is that

Page 106

1 correct?
2    A.  I can attest to the fact that we moved
3 to rolling 28-day periods, yes.
4    Q.  One of the reasons --
5    A.  I don't recall if there were --
6    Q.  Go ahead.  You recall what?
7    A.  I said I do not recall the details of
8 that original algorithm that you said were going
9 from, so I'm making an assumption that's what
10 you were referring to.
11    Q.  But do you know if the old algorithm
12 had a calendar month cumulative amount that was
13 looked at --
14    A.  No.
15    Q.  -- as opposed --
16    A.  I do not recall.
17    Q.  This talks about alleviating the
18 problem with using calendar months and having a
19 disproportionate review burden at the end of the
20 month, which makes sense if you're using a
21 cumulative amount as your key factor you're
22 assessing, correct?
23    A.  I'm not a statistician.  I didn't put
24 this algorithm together.

Page 107

1    Q.  You can use common sense.  If you're
2 using cumulative amount at the end of the month,
3 it's going to be higher than at the beginning of
4 the month.  Does that make sense?
5    A.  As you're describing it, yeah.  We're
6 talking about very high level, so --
7    Q.  Right.
8    A.  -- giving me maybe an explanation
9 might help me answer you better.
10    Q.  You order drugs four times during the
11 month and you're collecting your -- calculating
12 the cumulative amount ordered for the month.  At
13 the end of the month, your cumulative amount is
14 going to be higher, right?
15    A.  Your amount, yes.
16    Q.  Okay.  And the cumulative amount at
17 the end of the month, again, is something that's
18 assessed in the SOM system looking at whether or
19 not the order -- current order is suspicious,
20 that's going to increase the burden, at the end
21 of the month, correct?
22    A.  Repeat the question, please.
23    Q.  Yes.
24       If you're looking at the cumulative

Page 108

1 amount as a factor in assessing suspicion, more
2 orders are going to be flagged at the end of the
3 month than at the beginning of the month,
4 correct?
5    A.  I believe, yes.
6    Q.  Do you know if the SOM analysts were
7 overwhelmed at the end of the month such that
8 they could only give cursory review to the
9 number of the orders that were flagged?
10    A.  I know there was -- in discussions
11 about staffing that there was more assistance
12 needed to staff and complete the work at the end
13 of the month.
14    Q.  Okay.  Do you believe that using
15 monthly amount, cumulative amount was sort of an
16 arbitrary process compared to using rolling
17 28-day periods which was more accurate?
18    A.  Again, I'm not a statistician and
19 create algorithms.  I do not know.
20    Q.  But you were the one who was
21 ultimately deciding what algorithm to use in the
22 new system, weren't you?  I mean, you had to
23 sign off on it?
24    A.  No, I was not.  I was one of many

Page 109

1 people who were involved in that process.  I was
2 one of many.  I was the lead person from my
3 group.  I was not the end-all-be-all decider.
4       MR. DEROCHE:  Let's take a five-minute
5 break, if you don't mind.  I'm sorry, I've got
6 to find an exhibit.
7       THE VIDEOGRAPHER:  We're going off the
8 record at 10:24 a.m.
9       (Whereupon, a recess was taken.)
10       THE VIDEOGRAPHER:  We're back on the
11 record at 10:29 a.m.
12 BY MR. DEROCHE:
13    Q.  Sir, I talked to you earlier about
14 whether or not you recall a situation where
15 because the name of a drug was changed that the
16 history was lost.  Do you recall that testimony
17 earlier?
18    A.  I recall that discussion, yes, I do.
19    Q.  You said you didn't know anything
20 about that.  I'm going to show you what I've
21 marked now as Exhibit 56.
22       (Whereupon, CVS-Vanelli-56 was marked
23       for identification.)
24 BY MR. DEROCHE:

Page 110

1   Q.  It's an e-mail from Gary Misiaszek --
2   A.  Misiaszek.
3   Q.  -- Misiaszek from the IT department,
4 correct?
5   A.  He is from the logistics department.
6   Q.  And you're copied on this e-mail, sir?
7   A.  I see my name copied, yes.
8   Q.  If you turn to the last page of the
9 exhibit, in the description of the project
10 that's being assessed here for IT purposes,
11 states "DEA expects CVS to prevent suspicious
12 orders from being filled out of our DCs.  The
13 current IRR does not provide proper information
14 to meet the DEA's needs.  We need control drugs
15 to be monitored by 'active ingredient.'
16 Currently the control drugs are monitored by
17 item.  The IRR loses all order history when the
18 info on the item changes causing CVS to be
19 non-compliant with DEA expectations."
20       Did I read that correctly, sir?
21   A.  I believe you did.
22   Q.  When you got this e-mail on 4/29/2011,
23 did you review the attachments?
24   A.  Are all attachments -- are there

Page 111

1 other -- was there other information included in
2 this e-mail other than this one section that you
3 just read?
4   Q.  The one section I just read was the
5 only one that was produced by CVS in this
6 litigation, so I'm assuming none of them had to
7 do anything with this case if there were.  Do
8 you know if you reviewed the attachment I just
9 read, sir?
10   A.  No, I do not recall reading that.
11   Q.  That's all I have for that one.  I'm
12 going to show you what we've marked as
13 Exhibit 59.
14       (Whereupon, CVS-Vanelli-59 was marked
15       for identification.)
16 BY MR. DEROCHE:
17   Q.  Here's 59, sir (handing).  This is an
18 e-mail string from -- culminating on
19 November 10, 2010.
20       Do you see that, sir?
21   A.  Yes, I do.
22   Q.  Have you seen this document before?
23   A.  I do not recall this document.  I can
24 see that I was -- this document was sent to me.

Page 112

1   Q.  It has to do with something called max
2 bill.  What is max bill?
3   A.  Max bill is a field within the CVS
4 mainframe system where generally a merchant or
5 inventory management, the team that manage the
6 amount of inventory in the DCs and stores, it is
7 a field that for -- where every item on the item
8 file could be set to allow a store to --
9 basically -- I don't know how best to explain
10 this, I apologize.
11       Max order is the maximum allowable
12 quantity that will run through the billing
13 system.  So if a store is to place an order for
14 24, you know, things of Mennen Speed Stick Musk,
15 if the category manager didn't want a store to
16 receive 24 pieces of -- because they thought
17 that was too much, they would enter in a
18 quantity or have a quantity entered to say cap
19 that at six pieces, so if a store tried to order
20 24 pieces, it would adjust that order to six.
21 There was a relevant field detecting when the
22 stores actually place their orders versus the
23 system-generated orders that we have today.
24   Q.  Okay.  In 2010 there was a max bill

Page 113

1 process in place?
2   A.  Again, every item that is carried in a
3 CVS distribution center is set up in the system,
4 and this is a field that is there to -- a field
5 that's available for every item.
6   Q.  Okay.  The first e-mail in this string
7 that ultimately culminated with you is from
8 Laura Miranda, and it states "Chris, Can we have
9 this 'Max Store Order' changed from 144 to
10 something smaller?  We had a few recent
11 situations where large orders have crossed over
12 to be selected."
13       Do you know what that means?
14   A.  It seems like she's questioning the
15 size of an order that came to her distribution
16 center.
17   Q.  And it appears -- it says "RX Control"
18 dealing with control drugs.  Was there max bill
19 for control drugs?
20   A.  As I stated, every item that is
21 distributed out of a CVS distribution center has
22 this as a field.
23   Q.  Okay.  This was forwarded to you for
24 help.

Page 114

1    A.   Opportunity -- we have a -- let me
2 look to help with this.  I see John Mortelliti
3 asking for help.
4    Q.   Why was he asking you for help on the
5 max bill issue?
6    A.   As I previously stated, my role is a
7 liaison between the distribution centers and the
8 corporate support center.  I know people, I know
9 resources.  I can only assume, just by reading
10 this now, it was to help get a max order
11 quantity adjusted.
12    Q.   You sent an e-mail.  It's on page --
13 the bottom of Page 108798, "Any help you can
14 provide to adjust this max bill would be
15 appreciated; 144 appears too high for a control
16 drug."
17        Did I read that correctly?
18    A.   That is what it states.
19    Q.   "This is also the second request in
20 the last couple of weeks to review max bill for
21 controlled items.  Should all controls be
22 reviewed to ensure reasonable max bills?"
23        Now, you appear to have made a
24 determination that for the control drug 144 was

Page 115

1 too high.  Do you know how you made that
2 determination?
3    A.   I would assume I'm only reiterating
4 the information from -- stated from Laura
5 Miranda.  I do not know.
6    Q.   You said "144 appears too high for a
7 control drug," an e-mail you sent.  Are you
8 saying that you didn't come to that conclusion
9 yourself?
10    A.   I said appears.  I did not say is.  It
11 appears.  That was in my opinion.  I'm not --
12 that's why I forwarded it to an individual who,
13 as I mentioned earlier, that field would
14 generally be managed by the purchasing team.
15 And as the e-mail shows, I sent it to Mike Shea
16 in pharmacy purchasing.  I do not have the
17 access to change or set that number.
18    Q.   This appears to have -- if you look at
19 the -- that same page up at the top, it appears
20 to deal with a hydrocodone product.  Do you know
21 why the max bill would have been set high for a
22 hydrocodone product carried by CVS?
23    A.   I do not know.  I'm not responsible
24 for setting max bill quantities on any drugs, or

Page 116

1 any items for that matter, within the CVS item
2 file.
3    Q.   On the first page of the document,
4 second e-mail down, "Dean, Does it impact your
5 team if we set max bill quantity too low?  Can
6 your team ship more than max bill quantity on
7 store's request?"  That was sent to you,
8 correct?
9    A.   I see that e-mail from Sumit asking me
10 that question.  I see that, yes.
11    Q.   "What is our policy on over the max
12 quantity requests for controlled drugs?"  Does
13 anybody -- sent a response to that question to
14 you, correct?
15    A.   I did forward an e-mail.
16    Q.   And the response you got was "We will
17 grant over the max requests on the store's poll
18 day for a pharmacy item."
19        What is a store's poll day?
20    A.   It's the day that the system generates
21 that store's order for that week.  I use that
22 term "week" as some stores may order more
23 frequently than that, and that is then brought
24 back to the mainframe in Woonsocket to run

Page 117

1 through the store to process to create orders to
2 send to the distribution centers.
3    Q.   "We will grant over max requests on
4 the store's poll day for a pharmacy item."
5        Would a pharmacy be ordering control
6 drugs on any day other than a poll day?
7    A.   The stores can only order -- their
8 setup, every store set up the specific order
9 cycle, the day they order and the day they
10 deliver, and they could call in and request
11 something off-cycle.  They have a patient that
12 has a need, they could call in and request an
13 order, and an order can be created and shipped
14 to them, but generally orders are on there.
15 Each store has an order frequency, and they have
16 an order day.
17    Q.   So they could get an extension or a --
18 grant or over max request granted on the day of
19 their normal order according to this e-mail?
20    A.   That states for pharmacy items.  We
21 generally do not refer to control drugs as
22 pharmacy items generally.  They're referred to
23 as controlled drugs and controlled substances.
24        In her response I will -- I do not

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  know policy back in 2010, but I do know that
2  over the max we receive -- we accept no over the
3  max requests for controlled substances.
4      Q.  As of today you're talking about?
5      A.  Yeah, as of today.  I can't go back to
6  2010.  I don't recall how, you know, long that
7  policy has been in place.
8      Q.  Do you know how many stores were
9  seeking over max requests for controlled drugs
10 in 2010?
11     A.  I do not.
12     Q.  That would be a concern, would it not,
13 if stores were requesting delivery of excessive
14 amounts of controlled drugs?
15     A.  I -- no, I do not know the
16 circumstances of the order.  I don't know the
17 setting of that max bill on that specific
18 request.  I don't know what the volume is in the
19 pharmacy, and what their needs are, and that
20 perspective.
21     Q.  How are max bills set?
22     A.  Was there a question?
23     Q.  Yeah.  How are max bills set?  Are
24 they set --

Page 119

1      A.  They're set --
2      Q.  Go ahead, finish your answer.
3      A.  Finish the question.
4      Q.  How are they set?
5      A.  They are not -- they are set by the
6  merchandising team.  I do not know their
7  decision process and how they go about
8  determining what maximum allowable quantity
9  would be on an item.
10         I do know that they're generally set
11 up to reduce -- or to maintain proper levels in
12 stores and to minimize overstock.
13         (Whereupon, CVS-Vanelli-35 was marked
14         for identification.)
15 BY MR. DEROCHE:
16     Q.  I show you what we marked as
17 Exhibit 35.  This is a document that deals with
18 the review of suspicious orders at the
19 distribution centers produced in this litigation
20 by CVS.
21         If you look at Page 8390, do you see
22 that, sir?  Page 8390 -- 83970.  Excuse me.
23     A.  70?
24     Q.  Yes.

Page 120

1      A.  I see the page.
2      Q.  Do you see that, sir?
3      A.  I see the page, yes.
4      Q.  Okay.  And now you're on -- there's a
5  heading "Suspicious Order Process."  I want to
6  go through this and confirm that this is the
7  process that you observed when you went to the
8  Indianapolis DC to see what was going on in the
9  existing SOM process.
10         First of all, you have an IRR analyst,
11 and you had a number of them there in
12 Indianapolis DC, correct?
13     A.  The day I was there, I believe I
14 worked with two folks.  I do not recall beyond
15 those two folks.
16     Q.  The "Analyst will review IRR for order
17 quantity that has flagged as potentially
18 suspicious."
19         You looked at the IRR, and you see --
20 you saw that that's how the process worked?
21 They were looking at the IRR for flags?
22     A.  They looked at multiple reports for
23 different information, but I -- you know, they
24 looked at the IRR, and that was a report that

Page 121

1  they reviewed and initiated some of their due
2  diligence.
3      Q.  Do you know, again when you were
4  there, how many orders on the IRR that had been
5  flagged were selected to have additional
6  information reviewed?
7      A.  I do not recall.
8      Q.  States "The month-to-date field is
9  then observed and compared to Lags 1 through 6."
10         Lags 1 through 6, I assume they are
11 the months, the amount ordered in the prior six
12 months?
13     A.  I do not know.
14     Q.  Well, right above, "Lag 1.  The amount
15 ordered the month before.
16         Lag 2.  The amount ordered two months
17 before."
18         Do you see that, sir?
19     A.  I'm sorry, which bullet are you
20 referring to?
21     Q.  It's up above, above suspicious
22 orders.  Do you see that?  Describes what they
23 are?
24     A.  I do see that.

Page 122

1  Q. Okay. "If a month-to-date quantity is
2  out of line compared to the store Lag as well as
3  the ordering patterns of the network, the order
4  will be labeled suspicious."
5     Do you know if they looked at anything
6  other than the month-to-date quantity in making
7  that determination?
8     MR. BUSH: Objection.
9  A. I do not recall.
10 BY MR. DEROCHE:
11 Q. You can answer.
12 A. I do not recall. I was trying to
13 understand the due diligence work that they
14 performed in the review, not what they did or
15 did not review, because the tools that they were
16 using were being sunset.
17 Q. I understand that, sir.
18    What I'm asking you is, do you know in
19 the process that was being followed if anything
20 other than the month-to-date quantity as a first
21 pass was considered?
22 A. I do not know, do not recall.
23 Q. Do you recall in the 2007 letter from
24 the DEA CVS was warned that looking at

Page 123

1  month-to-date quantity or a quantity ordered
2  alone was insufficient? Do you know if that's
3  what was actually being done --
4     MR. BUSH: Objection. I'm sorry.
5  BY MR. DEROCHE:
6  Q. -- in the SOM process that you
7  replaced?
8     MR. BUSH: Objection.
9  BY MR. DEROCHE:
10 Q. Go ahead.
11 A. I do not know, and I did not read that
12 letter as a warning. Again, I do not know. I
13 didn't look at and focus on the tools that they
14 were using to identify items. I was looking at
15 the due diligence process they went through once
16 they were looking at an item.
17 Q. "The DC IRR Analyst" -- those are the
18 folks you were observing -- "communicates any
19 suspicious orders with the Viper Analyst."
20    Do you know who the Viper analysts
21 are?
22 A. I do not know. I do know Viper is a
23 tool in the loss prevention department.
24 Q. When you were observing what was going

Page 124

1  on at the Indianapolis DC, did you ever see
2  anybody contact a Viper analyst?
3  A. I do not recall.
4  Q. States, the next bullet point down,
5  "The DC IRR Analyst will...work with field LP"
6  -- loss prevention, right? -- "until the
7  investigation is resolved."
8     Did you ever see any of the analysts
9  you were observing actually work with a field
10 LP, field loss prevention person, in connection
11 with any investigation?
12 A. In the two days that I spent portions
13 of my day with that team, I do not recall if
14 they worked with an LP field representative.
15 Q. Did you see any orders actually
16 stopped and labeled as suspicious in the two
17 days that you were there?
18 A. I do not recall seeing any orders that
19 were stopped and deemed suspicious in the two
20 portions of the two days I was in the
21 Indianapolis DC.
22 Q. Does this document in its description
23 of what was going on in the SOM system comport
24 with what you observed?

Page 125

1  A. I'm not familiar enough with that
2  document over what I observed over a couple of
3  days, I don't feel qualified to make a statement
4  if they were following that process or following
5  a different process or if they did or did not.
6  I do not know.
7  Q. Did you work with Pam Hinkle at all in
8  determining what the existing SOM process
9  entailed?
10 A. I do not recall.
11 Q. Do you know who Pam Hinkle was?
12 A. Yes, I know who Pam Hinkle is.
13 Q. Okay. Is she still with the company?
14 A. Yes, she is.
15 Q. She works in the Knoxville DC, is that
16 correct?
17 A. She's resident in the Knoxville DC,
18 yes.
19 Q. What is her position?
20 A. She's a senior manager of supply chain
21 compliance and quality.
22 Q. Was she in charge of the SOM system at
23 one point in time?
24 A. Prior to my time I believe that she

Page 126

1  may have been. I do not know certainly. I know
2  the SOM system was managed out of Knoxville at
3  one point, and Pam was in that facility. I
4  don't know if that was her -- I do not recall if
5  that was her -- she was ultimately responsible
6  for it.
7      (Whereupon, CVS-Vanelli-5 was marked
8      for identification.)
9  BY MR. DEROCHE:
10     Q.  I'm going to show you what I marked as
11  Exhibit 5. This is a document that was produced
12  in this litigation bearing Bate number from CVS
13  82312. And the metadata that was produced in
14  connection with this document shows that it was
15  from the files of Shauna Helfrich.
16     Do you know who Shauna Helfrich is?
17     A.  Yes.
18     Q.  She was one of the analysts that you
19  observed in the DC when you were there, correct?
20     A.  Correct.
21     Q.  And this file was named "IRR SOM
22  Review Process" dated 12/26/2013, according to
23  the metadata. I want to go through this.
24     Could you -- I want to make sure that

Page 127

1  this is consistent with what you observed when
2  you were there at the Indianapolis DC getting
3  ready to design a new system. So in particular,
4  the review process. If you go down to the
5  bullet point that begins "Review MTD."
6      Do you see that, sir?
7     A.  Yes.
8     Q.  It states "Review MTD, does it exceed
9  more than 2-3 month lag of individual lags."
10     Do you know what that means?
11     A.  I do not.
12     Q.  Do you know if the analysts that you
13  were observing in the Indianapolis DC were
14  looking at the month-to-date amount and
15  determining whether or not it was two or three
16  times greater than the prior lags in terms of
17  making a first cut in what they were going to
18  look at further?
19     A.  I do not recall.
20     Q.  It states that there's a review then
21  of InfoPACK other items on the store order for
22  the family group. What does family group refer
23  to?
24     A.  A family group of drugs. So my

Page 128

1  interpretation of this, again not my document,
2  first time I recall seeing this, I can only
3  answer what I believe family group to mean
4  today, or in the new system, the system that
5  I've developed. But I would say hydrocodone
6  products is a family group. It's a list of
7  similar items with the same ingredient. I would
8  say like carisoprodol is a family group.
9     Q.  This is talking about review in
10  InfoPACK. InfoPACK, I assume, is a system that
11  allows you to look at the orders that were
12  placed by a store?
13     A.  InfoPACK is a core tool within the CVS
14  mainframe where you would go to receive -- or go
15  to view reports of data that's within that
16  system. It's either you get hard copies that
17  are generated and printed for you, or you can
18  actually go on into the InfoPACK system and look
19  at the systems online.
20     Q.  Okay. So she's talking about looking
21  at the family group for items that were
22  month-to-date exceeding two or three times the
23  lag to see what else was -- what other items in
24  the same family group, in other words

Page 129

1  hydrocodone, were ordered along with that order.
2  Is that something you observed when you were
3  there?
4     A.  I do not recall.
5     Q.  "Identify item for review in
6  MicroStrategy by store dispensing for previous
7  90 days."
8      Did the analysts review store orders
9  and write -- or rather dispensing information in
10  MicroStrategy as part of what you observed?
11     A.  I recall them looking at various
12  reports. I do not recall the specific reports
13  that they looked at.
14     Q.  Okay. Going down to the next bullet
15  point, states "If order is approved document in
16  recap sheet."
17      So the analysts, when you observed
18  them in the DC, would keep track and keep a
19  record of what they reviewed in their recap
20  sheet, correct?
21     A.  Again, I do not recall their
22  documentation of their work.
23     Q.  There was documentation of some type
24  that was kept when they went the extra step to

Page 130

1  review this additional information that was
2  recorded somewhere?
3      A.  Again, I review them for a couple of
4  days.  I didn't ask them what they did with the
5  paperwork when they were done with it.  But I
6  don't -- I can't speak to what they did with it.
7      Q.  Did you observe them keeping a record
8  of it in a recap sheet?
9      A.  I did not observe that.  I do not
10  recall observing that.
11      Q.  "If order is not approved, store
12  flagged and DC contacted to place order on hold.
13  Store contacted for further questions for
14  legitimate ordering approval."
15          So orders that were flagged and not
16  approved initially from review of the IRR, there
17  would be some communication to the DC, correct?
18      A.  I recall that the team would reach out
19  to the DC if the team needed to review -- to
20  hold an order to allow the team to complete
21  further review.
22      Q.  Okay.  Talks about something called a
23  max cutoff review.  Do you know what those are?
24      A.  I do not.

Page 131

1      Q.  As part of the system that you put in
2  place, was there a record that was kept of
3  reviews that were done?
4      A.  Are you referring to the SOM that I
5  developed?
6      Q.  Correct.
7      A.  There is a record of every case
8  reviewed by the entire team.
9      Q.  And when there's a flag, there's a
10  case?
11      A.  If an order flags on any algorithm, a
12  case is generated in the company's compliance
13  tool.  The team will review that case, and all
14  of the review is documented.
15      Q.  Do you know if that happened with the
16  prior system in terms of every flag being
17  reviewed?
18      A.  I do not know if that did or did not
19  happen.  I do not know.
20          (Whereupon, CVS-Vanelli-28 was marked
21          for identification.)
22  BY MR. DEROCHE:
23      Q.  Showing you what we marked as
24  Exhibit 28.  This is a CVS document that was

Page 132

1  produced in this case titled "SOM End State
2  Enhancement Solution."  "Actions to Be Taken to
3  Enhance CVS Process."
4          You've seen this document before,
5  correct?
6      A.  I do not recall seeing this document.
7      Q.  Again, this is a document that was
8  created in connection with the project that you
9  were working on to put in place a new SOM
10  system, correct?
11          MR. BUSH:  Objection.
12      A.  Again, I do not recall seeing this
13  document.  I do not know who created the
14  document or if I had any view of this prior to
15  us sitting here today.
16  BY MR. DEROCHE:
17      Q.  The SOM system that you were looking
18  at originally, the original SOM system that you
19  replaced, do you know if in connection with the
20  SOM process orders were adjusted downward to be
21  below a threshold and shipped to stores?
22      A.  I recall stores -- stores being
23  adjusted.  A specific or arbitrary -- excuse me,
24  not your, but a threshold, I do not recall that.

Page 133

1  But I do know there were instances where orders
2  were adjusted.
3      Q.  They were adjusted.
4          If you go to the second page of
5  Exhibit 28, Page 53036.  Are you there, sir?
6      A.  Yes, I am.
7      Q.  There are a series of checkmarks, and
8  the last one states "If an order is flagged, it
9  should not be cut to a smaller quantity in order
10  to be below a threshold and shipped.  Orders
11  should be all is shipped if cleared or nothing
12  is shipped."
13          Do you see that, sir?
14      A.  I do.
15      Q.  Do you know if that was a process that
16  wasn't followed under the old SOM system, sir?
17      A.  Again, I was aware that orders were
18  adjusted, but I was not aware of a -- or do not
19  recall a threshold.
20      Q.  Adjusting an order instead of marking
21  it as suspicious and investigating it would in a
22  lot of ways defeat the purpose of having an SOM
23  system, wouldn't it?
24          MR. BUSH:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1   A. I wasn't -- didn't create the
2 document. I wasn't reviewing that. There's a
3 lot of reasons why an order could be adjusted.
4 BY MR. DEROCHE:
5   Q. The store orders an excessive amount
6 of product and the order is adjusted downward
7 and shipped instead of investigated. That's
8 like not having an SOM system at all, isn't it?
9     MR. BUSH: Objection.
10 BY MR. DEROCHE:
11   Q. You can answer.
12   A. I'm giving counsel time to object.
13     Can you repeat your question, please?
14   Q. Yes.
15     Adjusting an order downward when it's
16 flagged as suspicious instead of investigating
17 it defeats the purpose of having an SOM
18 system --
19     MR. BUSH: Objection.
20 BY MR. DEROCHE:
21   Q. -- wouldn't you agree?
22     MR. BUSH: Objection.
23   A. Again, I didn't write the document,
24 and that's not what the document states.

Page 135

1 BY MR. DEROCHE:
2   Q. Well, I'm not asking if you wrote the
3 document.
4     You were involved in developing a new
5 SOM system for your company?
6   A. Yes, I was involved. I was part of
7 the team that created the new SOM system for my
8 company.
9   Q. So adjusting orders that are flagged
10 as suspicious instead of investigating them,
11 just adjusting them and shipping the product,
12 you would agree, defeats the purpose of having a
13 SOM system, doesn't it?
14     MR. BUSH: Objection.
15   A. All orders of controlled substances
16 are reviewed if they flag, and if there is a
17 reason to adjust the order, an order would be
18 adjusted. I'm speaking in the current state
19 today. No order within the new SOM system has
20 ever been adjusted to avoid notifying DEA of a
21 suspicious order.
22 BY MR. DEROCHE:
23   Q. Well, that's because this is a
24 document that was prepared in connection with

Page 136

1 the end state for your new system.
2     What I'm asking you is, prior to you
3 putting that new system in place, that was, in
4 fact, what was happening at CVS, isn't it?
5     MR. BUSH: Objection.
6   A. I do not know. I do not recall.
7 BY MR. DEROCHE:
8   Q. Go ahead.
9   A. I do not recall any instances of that,
10 being involved in any instances that happened.
11     (Phone interruption.)
12     MR. DEROCHE: Will you mute your
13 phone, please?
14     PERSON ON PHONE: Hello?
15     MR. DEROCHE: You need to mute your
16 phone.
17     Let's go off the record for a second.
18     THE VIDEOGRAPHER: We're going off the
19 record at 11:07 a.m.
20     (Pause.)
21     THE VIDEOGRAPHER: We're back on the
22 record at 11:20 a.m.
23     (Whereupon, CVS-Vanelli-55 was marked
24     for identification.)

Page 137

1 BY MR. DEROCHE:
2   Q. I'm going to show you what we've
3 marked as Exhibit 55. This is an e-mail from
4 1/18/2013, Craig Schiavo to Tom Bourque.
5     Do you know who Tom Bourque is?
6   A. Yes.
7   Q. Or is? He was? Is he a was or an is?
8   A. He's still with the organization.
9 He's in a different role than he was at this
10 time.
11   Q. At this time what was he?
12   A. Tom, I believe, was a senior director
13 in the compliance organization. He was -- Craig
14 reported to Tom structurally, and Tom was, along
15 with Craig, key players in the design of the
16 SOM.
17   Q. Okay.
18   A. The project.
19   Q. And I'm sorry, what was Craig
20 Schiavo's position as of 1/18/2013?
21   A. He was either a manager or assistant
22 manager, I believe, in compliance.
23   Q. In compliance there was a separate
24 compliance department?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.   There was a compliance organization
2  within CVS Health that both of them at the time
3  were a part of that organization.
4    Q.   Do you know who Tom P. referenced here
5  is?
6    A.   Where is the reference?
7    Q.   I'm sorry, in the subject line of the
8  e-mail.
9    A.   "Monday Meeting with Tom P."  My
10 assumption would be -- again, it's an
11 assumption, I believe Tom Bourque at the time
12 reported to a gentleman named Tom Pawlik.
13   Q.   Okay.  And that was also in the
14 compliance department?
15   A.   Yes, I believe.
16   Q.   Was Schiavo and Bourque, were they
17 both sort of involved in the new SOM process
18 that you were -- when you were working with
19 them, but they were on the compliance side, you
20 were on the logistics side?
21   A.   Correct.
22   Q.   And Mr. Schiavo is making a point that
23 -- the reasons why outside vendors' orders need
24 to be part of the new SOM system?

Page 139

1    A.   I see that.
2    Q.   Okay.  It says "Why it is Needed:  DEA
3  'Know Your Customer' Requirements."
4        That was a requirement that was in
5  place since 1972 or thereabouts?
6        MR. BUSH:  Objection.
7  BY MR. DEROCHE:
8    Q.   And it appears that Mr. Schiavo
9  believes that not including outside vendors
10 didn't allow CVS to know its customers to the
11 degree it needed to?
12       MR. BUSH:  Objection.
13   A.   I do not know the context of what
14 Craig is trying to communicate in this e-mail
15 and for what purpose.
16 BY MR. DEROCHE:
17   Q.   States "In order for dispensing data
18 contained in the algorithm to be useful, we must
19 account for all controlled substances ordered."
20       Do you see that, sir?
21   A.   I see that sentence, yes.
22   Q.   You'd agree with that, sir?
23   A.   Do I agree with that -- do I agree
24 with that statement --

Page 140

1    Q.   Correct.
2    A.   -- that Craig makes?
3    Q.   Yes.
4    A.   I don't know the context that he's
5  making in that statement.  And I will say in the
6  SOM system that I designed, all of the orders of
7  controlled substances are contained within the
8  algorithms.
9    Q.   Do you agree that if the algorithm
10 doesn't include outside vendor orders the
11 algorithm will not be useful in terms of an
12 appropriate SOM system?
13   A.   Not knowing that system, I'm not
14 qualified to speak on the accuracy of that
15 system.
16   Q.   You would agree that if you don't
17 include outside vendor orders in your SOM system
18 that you're not accounting for all controlled
19 substances ordered by the pharmacy that you're
20 assessing?  You would agree with that, sir,
21 right?
22   A.   I would agree to complete the work
23 that we do, we review both OV and DC orders.
24   Q.   I understand the system that you put

Page 141

1  in place that ultimately, I assume, is still
2  running today, correct --
3    A.   It is.
4    Q.   -- did that.  What I am saying is if
5  you don't do that, you're not accounting for all
6  controlled substances ordered by the pharmacies
7  you're looking at, if you don't include outside
8  vendor orders.  You would agree with that,
9  right?
10       MR. BUSH:  Objection.
11   A.   I can't make that general statement.
12 The orders would be used by the review process.
13 I don't know the history behind -- I don't know.
14 BY MR. DEROCHE:
15   Q.   Again, sir, it's a simple question.
16   A.   I provided a simple answer.
17   Q.   The simple question is this, sir, and
18 I don't believe you answered the question I
19 asked, so let's ask it again.
20       If your SOM system is not taking into
21 account outside vendor orders, then your SOM
22 system is not accounting for all controlled
23 substances ordered by the pharmacy.  That is a
24 correct statement, isn't it?

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1      MR. BUSH:  Objection.

2  BY MR. DEROCHE:

3     Q.  Simple yes or no answer.

4     A.  We may have to disagree on that.  I

5  don't see that as a simple yes or no answer.

6  Don't have all the facts.  The data could be

7  looked at and not processed regardless of the

8  inclusion in that algorithm, if that's where

9  you're going there.

10     Q.  If outside vendor orders are not

11  looked at at all in an SOM system, then that SOM

12  system is not accounting for all controlled

13  substances ordered by the pharmacy, isn't that

14  correct?

15      MR. BUSH:  Objection.

16  BY MR. DEROCHE:

17     Q.  Isn't looked at?

18     A.  Again, you're referring to these -- a

19  system.  I'm saying that process you're looking

20  at that, the data -- that that data is looked at

21  in the review process, the system could be.  I

22  don't know the history behind orders.

23     Q.  Listen carefully to my question.

24      Outside vendors are not looked at in

Page 143

1  the review process, and they're not looked at in

2  the algorithm process, they're not looked at at

3  all in the SOM process.  If you don't look at

4  outside vendor orders, your SOM process is not

5  accounting for all controlled substances

6  ordered, is it?

7      MR. BUSH:  Objection.

8     A.  Again, I will tell you in the system

9  that I'm responsible for and the system I

10  designed, that occurs today.

11  BY MR. DEROCHE:

12     Q.  Were outside vendor orders looked at

13  at any level in the system you replaced?

14     A.  I do not know.  I do not recall.

15     Q.  If they weren't, then you would agree

16  that SOM system wasn't accounting for all

17  controlled substances ordered by the pharmacies,

18  correct?

19      MR. BUSH:  Objection.

20     A.  I cannot make that statement based on

21  one single fact, which is all you provided to

22  me.

23  BY MR. DEROCHE:

24     Q.  Potential issues that were flagged by

Page 144

1  Mr. Schiavo, if you don't account for outside

2  vendor orders in realtime, "Store may order a

3  little from both the OV and DC and stay under

4  the radar."

5      Do you see that, sir?

6     A.  I see that.

7     Q.  Do you know if that was occurring

8  under the old SOM system that you replaced with

9  your new SOM system?

10     A.  I do not recall.  I do not know if it

11  was or was not occurring.

12     Q.  "We report and OV reports an order to

13  the DEA if an order flags in both systems."

14      Do you see that, sir?

15     A.  I see that sentence, yes.

16     Q.  Do you know if outside vendors were

17  doing a review of orders that were being placed

18  by the CVS pharmacies?

19     A.  I'm not aware of our outside vendors'

20  SOM processes.

21     Q.  In your SOM processes you put in

22  place, even under the old system you indicated

23  that dispensing data is considered at times.

24     A.  I stated that dispensing data is

Page 145

1  available in the existing system and that tools

2  were available, and I -- in discussion with that

3  team, they discussed using dispensing data.

4     Q.  Okay.  Do you know if outside vendors

5  had dispensing data pertaining to CVS

6  pharmacies?

7     A.  I do not know data that outside

8  vendors would have regarding CVS pharmacies

9  short of items we're ordering from them, which I

10  would assume they would have access to that.

11     Q.  They would have access to the orders

12  but not the dispensing data, so they would not

13  have the tools necessary to do an appropriate

14  SOM review of CVS orders, would they, without

15  dispensing data?

16      MR. BUSH:  Objection.

17     A.  I do not know if they do or do not

18  have access to that data.

19  BY MR. DEROCHE:

20     Q.  So you don't -- you're not aware that

21  there was a request made by outside vendors to

22  CVS for dispensing data and that CVS refused

23  that?  You're not aware of that?

24      MR. BUSH:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    A.  I am not aware of that.
2  BY MR. DEROCHE:
3    Q.  "If we bring in OV data later in the
4  process, we may ship a potentially reportable
5  suspicious order from our DC."
6        Do you see that, sir?
7    A.  Yes, I do.
8    Q.  Under the old SOM system, outside
9  vendor order wasn't brought into the process
10  ever.  Do you know how many times CVS under the
11  old system shipped a potentially reportable
12  suspicious order from a DC --
13        MR. BUSH:  Object.
14  BY MR. DEROCHE:
15    Q.  -- to one of its pharmacies?
16        MR. BUSH:  Objection.
17    A.  Repeat the question.
18  BY MR. DEROCHE:
19    Q.  Sure.
20        Outside vendor orders were not
21  assessed under the old system.  Do you know how
22  many times as a result of that CVS shipped a
23  potentially suspicious order to a pharmacy from
24  its DC?

Page 147

1    A.  I do not know.
2        MR. BUSH:  Objection.
3    A.  I do not know.
4  BY MR. DEROCHE:
5    Q.  "Stores can place phone orders which
6  we have no visibility to until a later time."
7        You were aware that CVS pharmacies
8  could place phone orders to outside vendors?
9        MR. BUSH:  Objection.
10    A.  I do not know how -- if stores have
11  ability to place phone orders or how store
12  orders are placed from the OV, if that's what
13  that's referring to.
14  BY MR. DEROCHE:
15    Q.  "Currently have a store which had a
16  68,000 hydrocodone pill loss and was placing
17  phone orders to OV."
18        Do you see that, sir?
19    A.  I do see that.
20    Q.  Were you aware of that circumstance
21  where a store, a CVS store, had a 68,000
22  hydrocodone pill loss?
23    A.  No, I was not aware of that.
24    Q.  Do you know what diversion means, sir?

Page 148

1    A.  The Webster definition of diversion?
2    Q.  How about the definition of diversion
3  in connection with the suspicious order
4  monitoring process and what you're attempting to
5  prevent, do you know what that means?
6        MR. BUSH:  Objection.
7    A.  Do I know what that means.  I'm trying
8  to again review all those controlled substances
9  for unusual size, frequency and pattern.
10  BY MR. DEROCHE:
11    Q.  The DEA has a department of diversion,
12  you're aware of that, right?
13    A.  Yes.
14    Q.  Okay.  They're your regulator, aren't
15  they?  You're trying to comply with their
16  requirements, aren't you?
17    A.  I'm trying to comply with the federal
18  code of regulation.
19    Q.  They send diversion investigators to
20  the DCs, don't they, from time to time?
21    A.  They send agents to the DCs.  I can't
22  particularly say if they're diversion
23  investigators or they play a different role.
24    Q.  So in the context of controlled

Page 149

1  substances, do you know what diversion means?
2    A.  I believe it to mean to take drugs and
3  use them for non-medical purposes.
4    Q.  Do you know if a 68,000 pill --
5  hydrocodone pill loss is an instance of
6  diversion?
7    A.  I don't know any facts around this.
8  This is the first time I'm seeing it.
9    Q.  "Other Positives with Accounting for
10  OV Orders.
11        "Prevent reporting by OV to DEA."
12        Do you know what Mr. Schiavo might
13  have been referring to there?
14    A.  I do not.
15    Q.  Do you know if CVS pharmacies were
16  reported to the DEA by outside vendors in the
17  past prior to this e-mail?
18    A.  I do not know if they were or were
19  not.
20    Q.  "All ordering information reviewed
21  during the due diligence process when making a
22  decision on whether or not to release an order."
23        You would agree it's important to have
24  all ordering information at your disposal when

Page 150

1  performing due diligence?
2      A.  I'm sure we have available data.  We
3  use the available data that is available.
4      Q.  That includes outside vendor orders
5  now, correct?
6      A.  We do review outside vendor orders.
7  They are included in the data that is used in
8  the current process.
9      Q.  In the absence of outside vendor
10 orders being included, not all ordering
11 information is reviewed during the due diligence
12 process, correct?
13     MR. BUSH:  Objection.
14     A.  Repeat the question.
15 BY MR. DEROCHE:
16     Q.  Yes.
17     If you're not looking at outside
18 vendor orders, then you're not looking at all
19 ordering information, and you're not reviewing
20 all order information in connection with due
21 diligence if you're not looking at outside
22 vendor orders.
23     MR. BUSH:  Objection.
24 BY MR. DEROCHE:

Page 151

1      Q.  Correct?
2      MR. BUSH:  Objection.
3      A.  No, I don't know the facts of each
4  individual case to know if data is relevant.
5  BY MR. DEROCHE:
6      Q.  "SOM algorithm will have" to be
7  better -- "will be better equipped to identify a
8  potential suspicious order, minimizing the risk
9  of shipping a potential suspicious order."
10     Did I read that correctly?
11     A.  I believe.
12     Q.  If your SOM algorithm isn't looking at
13 outside vendor orders, then it's not minimizing
14 the risk of shipping a potential suspicious
15 order, correct?
16     A.  I did not write the document.  I don't
17 know the context of what Craig Schiavo was
18 trying to communicate to Tom Bourque at the
19 time.
20     Q.  Well, you worked with Mr. Schiavo,
21 correct?
22     A.  I worked with and I currently work
23 with Mr. Schiavo.
24     Q.  Find him to be a competent individual?

Page 152

1      A.  I'm not responsible for his review,
2  but I find him to be, yes.
3      Q.  Not the type of person who would write
4  an e-mail like this without a basis, correct?
5      A.  I don't know his state of mind.  I
6  don't know what he was trying to communicate.
7      Q.  It's right here on the page.  He's
8  explaining why the absence of outside vendor
9  orders in the SOM process is a problem for CVS,
10 may cause it not to comply with DEA regulations.
11     MR. BUSH:  Objection.
12 BY MR. DEROCHE:
13     Q.  That's all -- he's in compliance.
14 That's what he's talking about, right?
15     MR. BUSH:  Objection.
16     A.  I can't state to what he is talking
17 about.  I'm not him.
18 BY MR. DEROCHE:
19     Q.  If you're using incomplete information
20 in your SOM analysis, you're not doing your job,
21 you're not complying with your obligations to
22 the DEA on which your license is based as a DC,
23 isn't that correct?
24     MR. BUSH:  Objection.

Page 153

1      A.  Repeat the question.
2  BY MR. DEROCHE:
3      Q.  Yes.
4      If you're not looking at outside
5  vendor orders in your SOM process at CVS, you
6  are not complying with the requirements of the
7  DEA on which your license is based.  You would
8  agree with that, wouldn't you?
9      MR. BUSH:  Objection.
10     A.  I don't -- I am not a lawyer.  I don't
11 interpret requirements.
12 BY MR. DEROCHE:
13     Q.  If you're not looking at all of the
14 controlled substance orders placed by a
15 pharmacy, you are not placing the order in
16 context in connection with your SOM review,
17 isn't that correct?
18     A.  Again, as I stated, in the process I'm
19 responsible for and I'm knowledgeable of, we
20 review all the orders, we take into account all
21 information we have available about that
22 pharmacy and about that order in our process.
23     Q.  And the reason why you did that is
24 because that's required in order to meet your

Page 154

1  obligations under the DEA regulations, isn't it?
2      MR. BUSH: Objection.
3      A.  The reason we complete that is it was
4  guidance from legal counsel as part of the team
5  that these are requirements that we must meet.
6  BY MR. DEROCHE:
7      Q.  Prior to putting your system in place,
8  CVS didn't look at outside vendor orders.
9  You're aware of that, aren't you?
10     MR. BUSH: Objection. Asked and
11 answered.
12     A.  No, I am unaware.
13 BY MR. DEROCHE:
14     Q.  Let me show you what we marked as
15 Exhibit 54.
16     (Whereupon, CVS-Vanelli-54 was marked
17      for identification.)
18     MR. DEROCHE: Graeme, this is 64 --
19 54, excuse me.
20 BY MR. DEROCHE:
21     Q.  I've handed you 54. It's an e-mail
22 string that involves you, correct?
23     A.  I see that I received the last e-mail
24 in the chain.

Page 155

1      Q.  And you sent the second-to-last e-mail
2  in the chain, correct?
3      A.  I have not read that, but I see my
4  name there right below.
5      Q.  I'm going to focus on the first page,
6  which is two e-mails. The e-mail was from you
7  on January 31, 2014 to Jonathan --
8      A.  Thiboutot.
9      Q.  -- Thiboutot, okay, talking about the
10 SOM system go live.
11     Do you see that, sir?
12     A.  Yes.
13     Q.  And you wrote that e-mail, right?
14     A.  It appears as though I did.
15     Q.  You're talking about it going live on
16 February 17, 2014, correct?
17     A.  That's what it says.
18     Q.  And you rolled this out to DCs not all
19 at the same time, right? It was rolled out bit
20 by bit, so to speak?
21     A.  Yes, we rolled out distribution center
22 by distribution center.
23     Q.  One of the first distribution centers
24 where you rolled it out to was Indianapolis?

Page 156

1      A.  Yes.
2      Q.  And that was because Indianapolis had
3  known problems with diversion of controlled
4  drugs, correct?
5      A.  I do not know that as the reason that
6  they were selected first.
7      Q.  All right. The third sentence of your
8  e-mail on July 31st, "I know the current SOM
9  team in Indy calls stores today, but with the
10 inclusion of OV orders within the SOM scope and
11 the increased staffing to support the DC SOM
12 program pharmacy contacts will increase."
13     Did I read that correctly?
14     A.  You did.
15     Q.  How did you know that that was going
16 to be the case?
17     A.  How did I know that there would be
18 increased calls, is that the question?
19     Q.  Correct.
20     A.  Because the orders that were reviewed
21 in the existing system at the time did not
22 have -- OV orders did not run through the
23 algorithms at that time. That is not to say the
24 information wasn't available. The order itself

Page 157

1  was not run through the algorithm, to my
2  understanding, at that time.
3      Q.  Okay.
4      A.  And at this time the intent was to run
5  those orders through the algorithms in the
6  existing system.
7      Q.  Right.
8      A.  And an increase in orders could
9  logically include -- lead to an increase in
10 calls.
11     Q.  I know you're going to run the outside
12 vendor orders through the new SOM system. Were
13 you running them through in order to assess them
14 for SOM purposes to determine if they were
15 suspicious or not?
16     A.  The original intent was to run them
17 through the algorithms to see if they would flag
18 on algorithms.
19     Q.  And they were going to be assessed to
20 determine if they were suspicious orders?
21     A.  There was a thought process for a time
22 that they would be reviewed.
23     Q.  Is that what actually happened, or
24 were they just reviewed for purposes of know

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  your customer?
2      MR. BUSH:  Objection.
3      A.  Currently today all -- we have history
4  of all OV orders in our current system.  We can
5  see all their order history.  OV orders do not
6  run through the existing algorithms.  The data
7  is available, the data is considered in the
8  calculations of the algorithms, but I do not run
9  OV orders which I have no oversight of, I have
10 no ability to stop.
11 BY MR. DEROCHE:
12     Q.  I understand that.  I'm talking about
13 back in January 31, 2014.
14     What are you referring to, you're not
15 -- you're saying that calls may be increased
16 because we have OV orders considered in our SOM
17 system.  But you're not saying you're calling
18 them about the OV orders, are you?
19     A.  I do not know what I was saying at
20 that time.  Looking at the words, all I know is
21 I'm communicating to Jonathan that there could
22 be an increase in calls from the SOM team.
23     Q.  Was there an increase in calls because
24 when you consider outside vendor orders your SOM

Page 159

1  process is more robust than previously?  Yes?
2      A.  I do not know the knowledge of that
3  system.  I cannot make statements about a system
4  I do not know.
5      Q.  When you implemented the new SOM
6  system that considered outside vendor orders,
7  did the calls to the pharmacies increase?
8      A.  I do not know.  That data did not
9  track -- did not relate to calls prior to the
10 system.
11     Q.  Prior system didn't track that kind of
12 information?
13     A.  I'm not aware of what data that that
14 team tracked or did not track.
15     Q.  The new SOM system looks at active
16 ingredient as opposed to individual drug items,
17 is that correct?
18     A.  Looks at active ingredients versus
19 drug item?
20     Q.  That's correct?
21     A.  In the new system drugs are grouped
22 into a family group, as we discussed earlier,
23 based on active ingredient.
24     Q.  And it assesses that in terms of when

Page 160

1  it does an SOM review of the order?
2      A.  When it does an SOM review of the
3  order, the system looks at the store's order and
4  it groups stores into family groups based on
5  those active ingredients, and that cumulative
6  order that the store is placing for
7  Carisoprodol, we have Carisoprodol 5 milligrams,
8  10 milligrams, it adds that together.  It
9  doesn't look at the order of 5 separately than
10 the order of 10.  It combines the two for any
11 order for that day that the store is placing
12 order.  That is then run through the algorithm.
13     Q.  Okay.  And also it looks at the
14 algorithm, considers what the cumulative amount
15 has been ordered for that family group during
16 the period in question.
17     A.  The algorithm looks at those orders
18 over multiple time periods.
19     Q.  Got it.  So it's not looking at a
20 particular drug manufacturer's particular item
21 or NDC number, it looks at the family group in
22 total?
23     A.  It optimally is agnostic to who the
24 supplier of the drug is.

Page 161

1      Q.  Sure.
2      A.  It literally looks at the ingredient
3  and classifies -- or summarizes that based on
4  active ingredient, which we refer to as family
5  group.
6      Q.  Okay.  Now, in the prior versions of
7  the SOM system, were you aware that for a period
8  of time the algorithm actually looked at the
9  separate drug as opposed to the family group?
10     MR. BUSH:  Objection.
11     A.  I'm not aware.  I was not aware --
12 BY MR. DEROCHE:
13     Q.  You would agree that that --
14     A.  -- of that happening or not happening.
15     Q.  You would agree that if that's the
16 case you could have a situation where multiple
17 different drugs with the same active ingredient
18 could be ordered, in other words spreading
19 orders amongst different drug items, and
20 therefore, an excessive amount of an active
21 ingredient could be ordered by the store?
22     MR. BUSH:  Objection.
23 BY MR. DEROCHE:
24     Q.  A situation that could arise?

Page 162

1    MR. BUSH:  Objection.
2    A.  Again, not knowing the workings of
3 that algorithm, I don't know the impact.
4 BY MR. DEROCHE:
5    Q.  I'm going to show you what we've
6 marked as Exhibit 58.
7       (Whereupon, CVS-Vanelli-58 was marked
8       for identification.)
9 BY MR. DEROCHE:
10    Q.  First page of Exhibit 58 bearing Bate
11 Number 103859 is an e-mail from Christopher
12 Tulley to a number of recipients.
13       Do you see that, sir?
14    A.  I do.
15    Q.  And one of the recipients is you,
16 correct?
17    A.  Yes, my name is there.
18    Q.  Okay.  And the attachment to this
19 e-mail, one of the attachments, Logistics Core
20 Team Update.  And you will see under "Pharmacy
21 Compliance," third bullet point, "Control drug
22 suspicious order monitoring is being reworked to
23 identify active ingredients versus product
24 name."

Page 163

1       That's the issue that we just
2 discussed, correct?
3       MR. BUSH:  Objection.
4    A.  I see that that document states that.
5 BY MR. DEROCHE:
6    Q.  "This will prevent stores from
7 spreading orders over multiple products and also
8 address name change issue."
9       Do you see that, sir?
10    A.  I see the words, yes.
11    Q.  When you got this e-mail, did you make
12 inquiries as to what this was referring to?
13    A.  No, I did not.  I did not create this
14 document.
15    Q.  Do you know if anybody was tasked with
16 the job of determining whether or not stores
17 were, in fact, spreading orders amongst various
18 hydrocodone products, therefore -- thereby
19 increasing the volume that they received?
20    A.  At the time of this document, I had no
21 involvement in SOM.  This was -- you showed me
22 one page of what could have been a 30-page
23 document with updates from every individual
24 that's listed on this e-mail of just talking

Page 164

1 about things that were going on within their
2 department.  I -- you know, you could ask every
3 representative on here, and I doubt everyone
4 went through every -- with a fine tooth comb to
5 see what the detail was in there.
6    Q.  Again, sir, the question was, do you
7 know if anybody followed up on this issue at CVS
8 to determine if that's, in fact, what was
9 occurring?
10    A.  I would say at that time it would have
11 been the responsibility of Frank Devlin who
12 oversaw loss prevention, I believe had oversight
13 on the SOM system at some period of time.
14    Q.  You don't know if he ever did
15 anything?
16    A.  I --
17    Q.  You have no idea?
18    A.  I have no idea.
19       (Whereupon, CVS-Vanelli-64 was marked
20       for identification.)
21 BY MR. DEROCHE:
22    Q.  I show you what I marked as
23 Exhibit 64.  Sir, Exhibit 64 is an e-mail
24 string, some of it is redacted, contents of an

Page 165

1 e-mail to you on December 31, 2015 from Betsy
2 Ferguson, I believe is redacted, the content of
3 that e-mail, but it is attaching a letter from
4 the Department of Justice Drug Enforcement
5 Administration.
6       Do you see that, sir?
7    A.  I do.
8    Q.  This is a letter of admonition that
9 was issued based on a review that was done in
10 July of 2013 by the DEA.  You're aware of that,
11 sir?
12       MR. BUSH:  Objection.
13    A.  Am I aware of the letter stating that?
14 BY MR. DEROCHE:
15    Q.  Aware of the letter stating that,
16 you're also aware of the review occurring,
17 correct?
18    A.  I am aware that the DEA did visit the
19 Indianapolis distribution center.
20    Q.  And that was the same distribution
21 center that you went to in, I believe you said,
22 fourth quarter of 2012 to look at the -- or
23 observe the SOM system?
24    A.  Observe the due diligence process.

Page 166

1 Yes, that is the facility I visited.
2    Q. It's the same facility that in July of
3 2013 the DEA went to for an inspection, correct?
4    A. Yes.
5    Q. Part of the inspection, they did a
6 review of the SOM system that was in place at
7 the time, correct?
8      MR. BUSH: Objection.
9    A. I do not recall that the visit
10 entailed any review of the system or process for
11 suspicious order monitoring.
12 BY MR. DEROCHE:
13    Q. You're aware that the DEA issued a
14 letter of admonition, though? I mean, you see
15 the copy of it, correct?
16    A. I see the copy of it, correct.
17    Q. And the first point made by the DEA in
18 their letter of admonition to CVS concerned a
19 violation of the Controlled Substances Act with
20 respect to the SOM system that CVS had in place,
21 correct?
22      MR. BUSH: Objection.
23    A. I see there's an allegation of that.
24 BY MR. DEROCHE:

Page 167

1    Q. Okay.
2    A. I see they state that.
3    Q. They determined and told CVS that CVS
4 had failed to design and maintain a system to
5 detect suspicious orders and report suspicious
6 orders for Schedule III through V controlled
7 substances, correct?
8    A. I see the document states that.
9    Q. And in particular they point out that
10 CVS failed to detect orders that should have
11 identified -- been identified as suspicious for
12 retail locations in Vincennes and Kokomo,
13 Indiana.
14      Do you see that, sir?
15    A. I do see that.
16    Q. Do you know of any effort that was
17 made by anyone at CVS to assess whether or not
18 the SOM system was operating properly at that
19 time and should have flagged the orders placed
20 by Vincennes and Kokomo, Indiana CVS stores?
21    A. I do not know who or if -- what was
22 done. Again, it was not an area of -- I was not
23 responsible for the SOM system that they are --
24 would have been reviewing in July of 2013.

Page 168

1    Q. Do you know if the orders placed by
2 Vincennes, the Vincennes CVS were not flagged
3 and not identified as suspicious because outside
4 vendor orders were not being considered?
5      MR. BUSH: Objection.
6    A. I do not know anything regarding the
7 ordering of drugs in those pharmacies, or from
8 the DC -- Indianapolis DC or outside vendor.
9 BY MR. DEROCHE:
10    Q. Do you know if the Vincennes and
11 Kokomo, Indiana CVS stores would have been
12 flagged and the orders identified as suspicious
13 if CVS had been using a benchmark system to
14 compare those stores to other like stores in the
15 system?
16      MR. BUSH: Objection.
17    A. Again, I do not know the details of
18 that system and the workings of those
19 algorithms.
20 BY MR. DEROCHE:
21    Q. Do you know if the orders were not
22 identified as suspicious because there were
23 staffing problems in the existing CVS SOM system
24 at the time?

Page 169

1      MR. BUSH: Objection.
2    A. I recall no information regarding
3 reviews of orders from those stores.
4 BY MR. DEROCHE:
5    Q. Do you know if those CVS stores were
6 able to avoid the CVS SOM system by spreading
7 orders amongst different drugs in order to avoid
8 detection?
9      MR. BUSH: Objection.
10    A. I know no information regarding the
11 orders of drugs from those stores. I was not
12 responsible for SOM and had no involvement in
13 SOM at the time, which it doesn't even state
14 when these orders were placed.
15 BY MR. DEROCHE:
16    Q. When you got this letter of admonition
17 by e-mail on December 31, 2015, did you take
18 steps to give extra attention to the Vincennes
19 and Kokomo, Indiana CVS stores in the SOM
20 process that you were in charge of?
21    A. I was not in charge of a SOM process
22 in July of 2013.
23    Q. I'm talking about when you got the
24 letter in December of 2015.

Page 170

1    A.  When I received the letter in 2015?
2       MR. BUSH:  Objection.
3    A.  Could you repeat your question?
4  BY MR. DEROCHE:
5    Q.  Yes.
6       Did you do any -- make any effort to
7  assess or to give extra attention to the
8  Vincennes and Kokomo, Indiana CVS stores in the
9  SOM review process?
10   A.  I do not recall making any specific
11 changes in the SOM process as it relates to
12 those two stores.
13   Q.  Was the deployment of the new SOM
14 system delayed because of data feed issues?
15   A.  The SOM system, the initial?  Can you
16 clarify your question, please?
17   Q.  Right.  Was there a delay in the
18 deployment of the SOM system that you put in
19 place because there were data feed issues with
20 the operation of your SOM system?
21   A.  There were delays in the deployment
22 based on the delivery of a product from the
23 Analysis Group where the Analysis Group had made
24 the assumption based on the data we provided

Page 171

1  them that allowed them to build that system.
2  They built the system anticipating a single feed
3  of data coming into the system that would feed
4  and run the operation when, in fact, the data
5  that was being used was coming from multiple
6  different sources.  The project, the rollout got
7  delayed because it increased the -- because the
8  increased number of sources that had to be
9  reworked in the code to be able to pull the
10 data.  Again, you have a system that was created
11 for a single pipe.
12   Q.  I understand.
13   A.  Because that's what -- they made the
14 assumption.  And then what ended up, they didn't
15 realize that, and when we had brought the code
16 over from -- when we moved the code over from
17 the Analysis Group into CVS environment, they
18 built a single pipe from a single source, so our
19 IT team needed additional time to work with AG
20 to adjust the feed and work on all the feeds to
21 bring the data into the system.
22      It was not an issue of not having the
23 right data, inaccurate data, inconsistent data.
24 It was an issue of having to build additional

Page 172

1  feeds that weren't seen -- weren't foreseen.
2    Q.  And was that done prior to the rollout
3  to Indianapolis?
4    A.  That was completed prior to the
5  rollout for any distribution center.
6    Q.  I'm going to show you what we've
7  marked as 47.
8       (Whereupon, CVS-Vanelli-47 was marked
9       for identification.)
10 BY MR. DEROCHE:
11   Q.  I'm showing you what's marked as
12 Exhibit 47.  Looking at 47, it's Bate Number
13 17246, CVS document.  That's an e-mail from you,
14 third e-mail down, March 14, 2014.
15   A.  I see that.
16   Q.  "Nightly Front Store Order Files."  Is
17 that what that refers to?
18   A.  That's what the subject suggests, yes.
19   Q.  This has to do with the front of store
20 drugs -- not drugs, excuse me, front of store
21 items that needed to be reviewed under the new
22 SOM system, correct?
23   A.  Yes, referring to flow of data to --
24 flow of data to the DCs, timing of the flow of

Page 173

1  order data to the DCs.
2    Q.  And this talks about the deployment
3  last Friday to the Indy DC only, is that
4  correct?
5    A.  It says that.  Yes, that is correct.
6    Q.  And the Indy DC was selected to be the
7  first DC to have the rollout because it had the
8  issues with servicing stores like Vincennes and
9  Kokomo that were having problems with large
10 volume of drugs shipped to those stores --
11      MR. BUSH:  Objection.
12 BY MR. DEROCHE:
13   Q.  -- is that correct?
14      MR. BUSH:  Objection.
15   A.  No.
16 BY MR. DEROCHE:
17   Q.  Okay.
18   A.  I do not recall.
19   Q.  DC -- or the Indy DC served markets
20 including Vincennes and Kokomo and other markets
21 that were served by that DC that had known
22 prescription drug problems, controlled substance
23 problems, right?
24   A.  I'm not aware of specific areas that

Page 174

1  have issues for controlled substance.
2      (Whereupon, CVS-Vanelli-16 was marked
3      for identification.)
4  BY MR. DEROCHE:
5      Q.  I'm going to hand you what we marked
6  as Exhibit 16, a document called "Logistics
7  Planning Update" produced by CVS in this
8  litigation bearing Bate Number 2299, correct?
9      A.  I see 2299.
10     Q.  Correct.
11     A.  Correct.
12     Q.  It's a document prepared by you,
13 February 17, 2014, correct?
14     A.  I see the date, yes.  17th.
15     Q.  And one of the subject matters that is
16 addressed by this in this planning update is
17 "Suspicious Order Monitoring," correct?
18     A.  Yes.
19     Q.  And the first bullet point you wrote
20 was "Delaying deployment of SOM due to data and
21 system stability concerns."
22     Did I read that correctly?
23     A.  You read that correctly, yes.
24     Q.  "Current deployment date being pushed

Page 175

1  from February 17th to March 3rd."
2      Is that the date that you actually
3  hit?
4      A.  I do believe that to be the date that
5  we hit.  I -- let me -- I believe it was either
6  the 3rd or the 10th, I don't specifically
7  recall, but it was March that we went live with
8  the first DC.
9      Q.  Okay.  Third bullet point down, "Will
10 deploy SOM on a DC by DC basis starting with DCs
11 service markets with known prescription drug
12 concerns (Indiana, Florida, Texas, California)."
13     Did I read that correctly?
14     A.  You did.
15     Q.  So you did have an understanding that
16 the Indiana DC service markets with known
17 prescription drugs concerns as of February 17,
18 2014, correct?
19     A.  Based on what I'm reading now,
20 correct.  I have no recollection of that prior
21 to you showing me this document.
22     Q.  You picked Indiana as the very first
23 DC to receive deployment of the new SOM system
24 because of known prescription drug concerns in

Page 176

1  the markets that were serviced by that DC,
2  correct?
3      A.  I'd say that's incorrect.  I did not
4  determine the rollout.  It was a collective
5  group that determined -- that made all decisions
6  as it related to the rollout of the deployment
7  of that system including compliance, legal, loss
8  prevention, and the key players on the project
9  team.
10     Q.  You were aware that the Indiana DC
11 serviced Cuyahoga County, Ohio?
12     A.  I didn't know nothing about that
13 county.  I wasn't aware of the specific counties
14 that a DC serviced.
15     Q.  Do you know if Cuyahoga County was one
16 of the markets with known prescription drug
17 concerns that was serviced by the Indiana DC?
18     A.  I do not.
19     Q.  Do you know if Summit County, Ohio was
20 one of the markets serviced by the Indiana DC
21 that had known prescription drug concerns?
22     MR. BUSH:  Objection.
23 BY MR. DEROCHE:
24     Q.  Do you know one way or the other?

Page 177

1      A.  I certainly know that today based on
2  the proceedings and me being pulled into this
3  process.  But again, at this time Indiana, I
4  don't know counties in Indiana.  I know very
5  little about Indiana.  I'm from Massachusetts.
6  I'm not an expert in geography.
7      But again, there was information that
8  was provided to the team, and the team made the
9  decision on rolling out based on these words to
10 those markets with known prescription drug
11 concerns.
12     Q.  Which team members voiced to you the
13 fact that Indiana was servicing markets with
14 known prescription drug concerns?
15     A.  I do not recall.
16     Q.  Do you know what efforts were
17 undertaken by CVS while you were waiting for
18 deployment of this new SOM system to make sure
19 CVS was addressing the markets with known
20 prescription drug concerns serviced by the
21 Indiana DC?
22     A.  I do not know what actions were or
23 were not taken to address.
24     Q.  Was the fact that Indiana DC was

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1 servicing markets with known prescription drug
2 concerns at all concerning to you at the time
3 that you wrote this in February of 2014?
4     A.   Was it concerning to me?
5     Q.   Yes.
6     A.   Yes.  Again, I understand people, you
7 know, have issues with controlled drug --
8     Q.   You understand people were dying,
9 right?
10     MR. BUSH:  Objection.
11 BY MR. DEROCHE:
12     Q.   You knew people were dying?  You saw
13 earlier a PowerPoint from McKesson that showed
14 deaths were occurring at that point in time.
15 Was it concerning to you that you had a DC that
16 was servicing markets with prescription drug
17 problems, that maybe you were adding to that
18 issue, killing people?
19     MR. BUSH:  Objection.
20     A.   I have no information that would lead
21 me to believe that --
22 BY MR. DEROCHE:
23     Q.   When you were sitting around with a
24 group of people that --

Page 179

1     MR. BUSH:  Would you please let him
2 finish the answer?
3 BY MR. DEROCHE:
4     Q.   Sorry.
5     When you were sitting around with that
6 group of folks --
7     MR. BUSH:  Excuse me.  Let him finish
8 his answer.
9 BY MR. DEROCHE:
10     Q.   Do you have something else to say?
11     MR. BUSH:  It's not a yes or no
12 question.  He was explaining his answer.
13     MR. DEROCHE:  I appreciate that,
14 Graeme.
15 BY MR. DEROCHE:
16     Q.   When you were sitting around with this
17 group of folks that you were talking about in
18 this process, right, I assume the people you
19 sent this memo to, did you at all discuss the
20 fact that you're servicing markets with
21 prescription drug -- with known prescription
22 drug concerns in the Indiana DC and that
23 something had to be done about it?  Was that at
24 all the subject of discussion amongst that big

Page 180

1 group of folks you just referenced?
2     A.   What big group of folks I just --
3     Q.   The group of folks you said that
4 were -- made a group decision on all this stuff.
5     A.   We didn't --
6     Q.   What group were you referring to?
7     A.   I was trying to clarify the group
8 you're referring to, the group that this was an
9 audience of, or the group of this project team
10 that was developing and implementing the
11 suspicious order monitoring system.
12     Q.   Are they two different groups?
13     A.   Yes.
14     Q.   Who was this going to, this
15 Exhibit 16?
16     A.   A few minutes back you provided a
17 document that looked very similar from Frank
18 Devlin that we discussed, that was reviewed,
19 which I classified as being an update document
20 that was shared with the logistics team of
21 activities that were happening within each
22 group, and that could be 30 different updates
23 that would cover in a meeting.  That was the
24 purpose of this document.

Page 181

1     Q.   That's what this document --
2     A.   This document was not an action
3 document towards anybody to do anything.  It's
4 an update document.
5     Q.   I see.
6     So this would have gone to that large
7 group of folks at CVS similar to what Mr. Devlin
8 did, or similar to how his update document was
9 circulated?
10     A.   It would go to -- it went to a group
11 of individuals that worked within the logistics
12 department.
13     Q.   And it was a fairly large group of
14 folks in the logistics department that got those
15 updates, if I remember correctly?
16     A.   Large is a fairly subjective term.  I
17 don't know what you consider large.  There was a
18 group of folks, probably 10 or 15.
19     Q.   So 10 or 15 folks would have gotten
20 this logistics planning update, and one of the
21 things they would have learned, those 10 or 15
22 folks, was that the Indiana DC serviced markets
23 with known prescription drug concerns.  Did any
24 of them approach you and raise a flag and say,

Page 182

1 hey, we've got to do something about this,
2 people are dying from the use of prescription --
3 or from the misuse of prescription drugs, we
4 have to do something to make sure our DC isn't
5 adding to the problem?
6     A.  I do not recall.
7         MR. DEROCHE:  We can break for lunch
8 now.
9         MR. BUSH:  Okay.
10        THE VIDEOGRAPHER:  We're going off the
11 record at 12:19 p.m.
12        (Whereupon, a luncheon recess was
13        taken.)
14
15
16
17
18
19
20
21
22
23
24

Page 183

1         AFTERNOON SESSION
2
3         THE VIDEOGRAPHER:  We're back on the
4 record at 1:13 p.m.
5 BY MR. DEROCHE:
6     Q.  Mr. Vanelli, we just had a lunch
7 break, but you understand you're still under
8 oath, correct?
9     A.  Yes, I do.
10    Q.  Okay.  I'm going to show you what we
11 have marked as Plaintiffs' Exhibit 9.
12        (Whereupon, CVS-Vanelli-9 was marked
13        for identification.)
14        MR. BUSH:  This is 9?
15        MR. DEROCHE:  Yes.
16 BY MR. DEROCHE:
17    Q.  This is a CVS Logistics DC suspicious
18 order monitoring update document June 6, 2014,
19 correct?
20    A.  Yes.
21    Q.  And this gives an update on the
22 deployment of the new SOM system that you were
23 working on, correct?
24    A.  Appears to be a project timeline.

Page 184

1     Q.  Okay.  You state in there under
2 "Deployment.  Currently mid-deployment of 9 of
3 19 DCs deployed and live on the new SOM."
4         MR. BUSH:  You're directing his
5 attention to the second page, is that right?
6         MR. DEROCHE:  I'm sorry.
7         MR. BUSH:  He's still on the first
8 page of the --
9         MR. DEROCHE:  I'm on the first page
10 under "Deployment."
11        THE WITNESS:  Under "Deployment," the
12 first page?
13        MR. BUSH:  Sorry, sorry, sorry, my
14 fault.
15        MR. DEROCHE:  That's okay.
16        MR. BUSH:  My bad.
17 BY MR. DEROCHE:
18    Q.  "Currently mid-deployment of 9 of 19
19 DCs deployed," and I assume we can tell by the
20 date which of the nine that were deployed.
21    A.  I see that.
22    Q.  It looks like stopping at Hawaii, is
23 that right?
24    A.  Appears to be correct.

Page 185

1     Q.  Okay.  You state on here, or whoever
2 wrote this -- I assume it was you.  Was it you?
3     A.  I do not recall.
4     Q.  In any event, this was under your
5 direction, or you were involved in this, right?
6     A.  I was -- stayed involved in this
7 project, yes.
8     Q.  "Deployment delayed due to system
9 processing and data feed issues that have"
10 increased "SOM historical data inaccuracy."
11 "Created" -- excuse me -- "SOM historical data
12 inaccuracy."
13        Did I read that correctly?
14    A.  Yes, I believe you did.
15    Q.  Okay.  While it was delayed, the DCs
16 that were not on the new system, were they still
17 under the old system?
18    A.  Any DC that was not on the new system
19 would have been on the old system.
20    Q.  Okay.  So that was still being handled
21 in Indianapolis by Mr. Nicastro's group?
22    A.  And that team, yes.
23    Q.  So they were still under the old
24 algorithm and the old process that we have

Page 186

1  discussed earlier, is that correct?
2      A.  To my knowledge, yes, that is correct.
3      Q.  It states "Creating additional orders
4  to flag in the algorithms and incremental false
5  positives that are stretching the SOM review
6  team bandwidth."
7          Do you recall that being a problem at
8  the time that this was written in June -- on
9  June 6, 2014?
10     A.  I see the words.  I don't specifically
11 recall details, but...
12     Q.  The "IT processing issues have been
13 identified and rectified."
14         What were the IT processing issues?
15     A.  I do not recall.
16     Q.  How long were they -- did those issues
17 exist before they were identified and rectified,
18 do you know?
19         MR. BUSH:  Well, objection.
20     A.  I do not recall, but I would --
21 BY MR. DEROCHE:
22     Q.  Okay.
23         MR. BUSH:  One second.  Were --
24 BY MR. DEROCHE:

Page 187

1      Q.  I'm sorry.  I thought you were done.
2      A.  Yes, I'm trying to think of if there
3  was anything.  I don't recall.
4      Q.  Not bringing back any -- jogging any
5  memories on you?
6      A.  Not detail, no.
7      Q.  The DCs, the nine that were under the
8  new SOM system, were not under the old system at
9  this time, correct?
10     A.  Correct.
11     Q.  And so if there were problems with the
12 new system, there could have been problems with
13 the SOM review for the nine that were on the new
14 system, correct?
15     A.  Based on the information here it was
16 creating false positives, which means there was
17 additional work.  And it would not mean that
18 something was missed or wasn't flagged.  It was
19 causing additional flags.
20     Q.  Well, under the first bullet point
21 it's talking about creating false positives, but
22 that's not the subject of the -- or there's
23 nothing about that on the second bullet point
24 below the list where it says "IT processing

Page 188

1  issues have been" rectified -- "identified and
2  rectified."  So those issues are something
3  additional to the data feed issues, correct?
4      A.  No, that is not correct.  I cannot
5  agree to that statement based on the information
6  in front of me.
7      Q.  It says "Current plan is to update SOM
8  history."
9          What is that referring to?
10     A.  It's to update the history that the
11 current system uses within its calculations and
12 within the data that it provides for the review
13 team.
14     Q.  Were the additional false positives
15 that are stretching the bandwidth, that means
16 that the review team would have less time to
17 review each of the flagged items, is that
18 correct?
19     A.  No.  That refers to the review team
20 extra work -- extra time to get their work
21 completed.
22     Q.  On the next page it talks about "The
23 algorithms will...run for one week to monitor
24 output and history updates, and to review output

Page 189

1  for opportunities to adjust algorithm thresholds
2  to fine-tune output and reduce false positives."
3          Was this at the same time that the
4  system was being run live for the nine that were
5  already deployed?
6      A.  I do not recall.
7      Q.  "SOM Operations."  It says since
8  March 1st it had reviewed over 8,000 orders that
9  had been flagged, is that correct?
10     A.  That's what the document states.
11     Q.  Do you know how that compared to the
12 flagging of the old system?
13     A.  I do not.
14     Q.  "Since deployment, the review team has
15 flagged five orders as suspicious orders,
16 stopped shipping the drug class to the stores
17 and notified DEA."
18         That's since March 1, is that correct?
19     A.  That is what the document states.
20     Q.  Do you know how that compares to the
21 entire history of CVS and how many had reported
22 to the DEA in terms of orders prior to March 1st
23 of 2014?
24     A.  I do not know how that compares to

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1 orders flagged prior to March 1st.
2    Q. What about orders reported to the DEA,
3 do you know how many had been reported in the
4 history of CVS to the DEA?
5    A. I do not know that. I do not know.
6    (Whereupon, CVS-Vanelli-17 was marked
7    for identification.)
8 BY MR. DEROCHE:
9    Q. I show you what we've marked as
10 Exhibit 17. The bottom of the first page of
11 Exhibit 17, page marked 3026, is an e-mail from
12 Betsy Ferguson to you, among others, correct?
13    A. Yes.
14    Q. And attached is something called a "DC
15 employee huddle."
16    Do you see that?
17    A. I see the reference to that in her
18 e-mail.
19    Q. And it states "Attached please find
20 the huddle to use with the DC employees who deal
21 with controlled substances. Dean and I
22 discussed, and we do not think that this goes to
23 people that load the filled and closed totes
24 into the trucks."

Page 191

1    Were you involved in developing this
2 DC huddle?
3    A. I believe that huddle was developed by
4 Betsy Ferguson who had forwarded it to me. I do
5 not recall the exact author of that document.
6    Q. When you refer to a huddle guide, what
7 does that mean?
8    A. In the DCs, generally at the start of
9 a shift of employees coming in to start for that
10 day or whatever time their shift starts,
11 generally the supervisor or lead over that group
12 will provide information to the team about their
13 work. They'll refresh them on certain things or
14 things to know, you know, if there was a
15 challenge with quality in a particular area
16 from, you know, a pick quality, that they'll be
17 talking about focusing on that. It's an
18 opportunity to share information with the DC
19 staff.
20    Q. Okay. So this is something that the
21 DC management would go over with the employees
22 that are at the DC?
23    A. That's what happens in the huddles,
24 and it's what Betsy is suggesting we share with

Page 192

1 the DCs.
2    Q. Then following your receipt of the
3 e-mail from Ms. Ferguson, you appear to, on
4 Tuesday, August 6, 2013, to have shared this
5 document with others. I assume these are folks
6 at the DCs, correct?
7    A. Based on that review, to the best of
8 my recollection, at the time they were the
9 directors of the distribution centers.
10    Q. Okay. And that includes, for
11 instance, Mr. Nicastro?
12    A. Correct.
13    Q. Who was the DC director at Indiana,
14 correct?
15    A. Correct.
16    Q. Prior to this DC huddle guide that
17 deals with SOM issues, had you ever seen any
18 other training document that was used to train
19 DC employees on SOM issues?
20    A. I do not recall seeing any document.
21    Q. So as of August 6, 2013, as far as you
22 can recall, this is the first training document
23 you've seen for DC employees to be involved in
24 SOM?

Page 193

1    A. I'm not aware of any documents that
2 were shared prior to this. I'm not responsible
3 for training associates that don't report to me.
4    Q. And this was a huddle document that
5 was bringing to the attention of the DC
6 employees their role in identifying suspicious
7 orders, is that correct?
8    A. Without reading the document, I can't
9 state that.
10    Q. If you go to Page 3029, it appears to
11 be the huddle document that was giving direction
12 to management on what they're to talk to the
13 employees about, correct?
14    A. I have not read that -- this document
15 to state that that's what the purpose was.
16    Q. Do you know, other than this document,
17 of any other documents where management of DCs
18 were directed to train DC employees who
19 interacted with controlled substances on how to
20 perform SOM functions?
21    MR. BUSH: Objection.
22 BY MR. DEROCHE:
23    Q. You can answer if you know.
24    MR. BUSH: He can answer.

Page 194

1   A.  I am not aware that documents existed
2   or did not exist prior to this document.
3   BY MR. DEROCHE:
4   Q.  Number 1 on Page 3029 appears to
5   direct the management to introduce the employees
6   at the distribution centers to the notion of
7   suspicious order monitoring.  "We call this" --
8   in the words it states, I quote, "We call this
9   suspicious order monitoring process" -- "the
10  suspicious order monitoring process."
11      Does it appear to you that this is
12  actually the first time employees are hearing
13  this kind of discussion?
14      MR. BUSH:  Objection.
15  BY MR. DEROCHE:
16  Q.  You can answer.
17  A.  Again, I do not know if this is the
18  first or other -- there are other
19  communications, if there were other huddles that
20  this topic was discussed.
21  Q.  As of August 6, 2013, had you ever
22  seen a situation where a DC employee had flagged
23  an order as suspicious because it deviated from
24  a normal pattern of ordering?

Page 195

1   A.  DC associates is a general term.
2       Maybe step back.  The SOM process was
3   completed in one facility.  It wasn't completed
4   in all facilities at that time.
5   Q.  I understand.  I'm talking about --
6   for instance, let's pick a DC, any DC.  How
7   about Lumberton, for example, there are
8   associates that work in that DC that deal with
9   controlled substance orders, correct?
10  A.  There are individuals in that facility
11  that will pick and fulfill controlled substance
12  orders.
13  Q.  Those are the folks I'm talking about
14  as opposed to the ones who may have been located
15  there that were the SOM employees.
16  A.  There were no -- SOM employees at the
17  time we're discussing were located in
18  Indianapolis.
19  Q.  Right.  So I'm not talking about the
20  Indianapolis SOM employees.  I'm talking about
21  the SOMs -- the folks that are in DCs that are
22  filling orders by picking the orders and
23  sticking them in the tote for shipping.
24      Are you with me so far?

Page 196

1   A.  Yes.
2   Q.  Have you ever seen any of those folks
3   ever flag an order as suspicious because it
4   deviated from a normal pattern of ordering?
5   A.  I wasn't -- did not oversee the SOM
6   process at that time.  Am I aware of
7   individuals -- I'm stuck on the use of the word
8   "flag."
9       So for a little background, the SOM at
10  Indianapolis performed that for all facilities,
11  so that review.  To my knowledge, the only --
12  the requirement, the primary opportunity for the
13  associates that worked in the other facilities
14  in picking those orders, again, you have an
15  individual sitting there just giving a piece of
16  paper that says pick this quantity of this
17  amount.
18  Q.  Sure.
19  A.  That instruction, if you have a
20  concern with that quantity or that amount, to
21  bring that to your supervisor for review.  I
22  doubt -- that is policy that is in place, that's
23  a practice that's in place.  I do not know when
24  that was rolled out.  I have no recollection

Page 197

1   when that was rolled out --
2   Q.  But do you know --
3   A.  -- if that was in 2007 or it is --
4   Q.  I guess what I'm asking you, from your
5   involvement in SOM, have you ever seen an
6   associate working at the DC flag an order, in
7   other words bring an order to someone's
8   attention because it deviated from a normal
9   pattern?
10  A.  Ask that -- no.  Am I -- you're
11  asking --
12  Q.  I understand.  I just want to know if
13  you've ever seen it.
14  A.  So I'd like to clarify.
15      Since my involvement in SOM, since
16  March of 2014 when Indianapolis went live, we
17  have had and we have a process in place for
18  facilities to contact the suspicious order
19  monitoring team if they have a concern with any
20  order that they receive that is sent to that
21  team.  That team reviews those orders.  The
22  order is held until the team might -- the team
23  that reports to me here reviews those orders.
24      So there are multi -- there are a fair

Page 198

1  number of instances where I don't have a
2  specific count, but it will happen where they
3  will forward those concerns, hey, this order
4  looks large, and those will be reviewed.
5      Q.  Okay.  Do you know, what I'm asking
6  you, in any specific instance do you recall
7  where that has happened?
8      A.  I can't remember details of a specific
9  instance.  I know it has happened.
10     Q.  Do you have any written record of that
11 happening?  Would there be a written record
12 somewhere of that?
13     A.  There would be documentation in our --
14 in the suspicious order monitoring system in our
15 documentation tool.
16     Q.  That would be in Archer?
17     A.  That would be in Archer.  And there
18 would be e-mail records of that as well.
19     Q.  So if we looked at the Archer records
20 produced in this case, we should see that in
21 there, if it happened?
22     A.  It happened -- if it happened since
23 the go live and there were specific orders from
24 the DCs that were live on the system, yes.

Page 199

1      Q.  Let's do 69.
2          (Whereupon, CVS-Vanelli-69 was marked
3          for identification.)
4  BY MR. DEROCHE:
5      Q.  Let me show you what we marked as
6  Exhibit 69.  It appears to be a string of
7  e-mails that consists of two e-mails, one from
8  Mark Nicastro, August 18, 2013, forwarded to you
9  by Ron Link on 8/19/2013.
10         Do you see that, sir?
11     A.  I see that, yes.
12     Q.  And you received this e-mail on that
13 date, as far as you can tell?
14     A.  As far as I can tell, I received it on
15 8/19/2013.
16     Q.  Mr. Nicastro is talking about an
17 interview with a future SOM manager.  At that
18 point in time, was CVS without a SOM manager?
19     A.  No, Mark was -- from my recollection
20 we were looking at a manager, a -- let me see a
21 little detail on this candidate.
22         This is a candidate that I had
23 subsequently spoke to to hire to move to Rhode
24 Island and to fill the new role on my new team.

Page 200

1      Q.  Okay.
2      A.  That I recall.
3      Q.  Did you talk to this person about
4  moving?
5      A.  I interviewed that candidate, and the
6  discussion of moving was part of that.
7      Q.  Okay.  And did you ultimately
8  determine that this person should be hired?  Did
9  they agree to move?
10     A.  We extended an offer, and the offer
11 was not accepted.  She accepted another offer.
12     Q.  Okay.  In the first paragraph after
13 the bullet points in Mr. Nicastro's e-mail, the
14 sentence states "Tom Bourke."  Do you know who
15 that is?
16     A.  Yes.
17     Q.  Is that spelled incorrectly?
18     A.  Yes.  Q-U-E is the proper.
19     Q.  "Tom Bourke mentioned a reason for
20 moving the process is because we don't usually
21 get tipped off that the DEA are coming and they
22 never take a day off during the audit."
23         Now, do you know why Mr. Bourque would
24 be concerned that Indianapolis isn't tipped off

Page 201

1  about DEA audits?
2      A.  No, I do not.
3      Q.  Does that seem like a valid reason,
4  when you received this e-mail from moving the
5  SOM process from Indianapolis to some other
6  place?
7      A.  We moved the SOM process from
8  Indianapolis to corporate to provide a better --
9  improved corporate support, because most of the
10 contacts that you need to interact with,
11 compliance, logistics, legal, our resident in
12 Rhode Island, not Indianapolis.
13     Q.  What was Mr. Bourque's position at
14 this time?
15     A.  I believe he was a director or senior
16 director within the compliance department.
17     Q.  Okay.  Do you recognize that in most
18 instances the DEA makes unannounced inspections
19 of distribution centers?
20     A.  My experience is that they make
21 unannounced visits.
22     Q.  Do you know how CVS was apparently
23 tipped off that the DEA was coming, at least
24 with respect to the Rhode Island location?

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1    A.  I don't understand the question.
2    Q.  Well, Mr. Bourque is saying we should
3  move from Indiana because Indiana doesn't get
4  tipped off, and it's being moved, it was being
5  contemplated to move it to Rhode Island.
6    A.  I don't understand what Mr. -- what
7  Mr. Nicastro is proposing that Mr. Bourque said.
8    Q.  Did you talk to Mr. Bourque after you
9  received a copy of this e-mail saying, hey, are
10  we getting tipped off in Rhode Island about the
11  DEA inspections?
12    A.  I do not recall having any
13  conversations with Mr. Bourque about DEA
14  inspections, being tipped off to DEA
15  inspections.
16        MR. DEROCHE:  Let's do Exhibit 3.
17        (Whereupon, CVS-Vanelli-3 was marked
18        for identification.)
19  BY MR. DEROCHE:
20    Q.  I'm sorry if this is repeating, were
21  you familiar with Frank Devlin?
22    A.  That sounds familiar, Frank Devlin.
23    Q.  Was he -- did you report to him or --
24    A.  There was never a reporting

Page 203

1  relationship between myself and Mr. Devlin.
2    Q.  What was your interaction with
3  Mr. Devlin?
4    A.  My interaction with Mr. Devlin, you
5  know, as I mentioned earlier, Frank was in the
6  loss prevention team working with the
7  distribution centers, and our paths would cross
8  on, you know, on work, on processes where he may
9  -- has interacted with the operations with the
10  DCs and he would leverage me, just normal
11  day-to-day interaction.
12    Q.  Okay.  So it was day-to-day
13  interaction you had with him?
14    A.  Periodically.  I mean, you know, I
15  didn't see Frank every day.  We both travel, but
16  we did work together.
17    Q.  What about Mr. Mortelliti, are you
18  familiar with him?
19    A.  Yes.
20    Q.  How are you familiar with
21  Mr. Mortelliti?
22    A.  John is -- reported to Frank at the
23  time.  John worked out of the Lumberton
24  distribution center in an off-peak capacity.  At

Page 204

1  the time I could not say if he was a manager or
2  what particular role.
3    Q.  You said he was in loss prevention?
4    A.  He was in loss prevention as well.
5    Q.  Let me show you what we marked as
6  Exhibit 33.  Exhibit 33 is a memo from
7  Mr. Mortelliti to Mr. Devlin in 2010.  But I
8  just want to focus on the fifth bullet point
9  down, talking about "Low volume stores are
10  flagging on the IRR because they are being
11  measured on the same order percentage as high
12  volume stores."  And then he gives an example
13  what he's talking about.  "A low volume store
14  may not need to order hydrocodone for four
15  months because the minimum shelf quantity
16  satisfies several weeks of small prescriptions
17  being filled.  If someone has surgery or suffers
18  a significant injury, the store would need to
19  order approximately three bottles of the item
20  (300 pills) to service the prescription.  This
21  causes the small volume store to flag."
22        Do you see that?
23    A.  I see that, yes.
24    Q.  It appears that he's indicating that

Page 205

1  that's a problem with the existing SOM process
2  or algorithm flagging this low volume store in
3  connection with that order, and he needs to have
4  that addressed by the consultant that designed
5  the system.  That's a fair summary, I believe,
6  of what this implies?
7    A.  I could not say.
8    Q.  It appears he had a conference call
9  with the designer of the system to address this
10  particular situation, to have that not be a flag
11  any longer.
12    A.  This is the first time I recall seeing
13  this document.  I have not reviewed the entire
14  document.  I can't say that that is what it says
15  or does not say.
16    Q.  Well, in terms of your understanding
17  of the SOM system and what it's intended and
18  supposed to do, wouldn't you agree that this is
19  precisely the kind of situation where the SOM
20  system should flag the order and have someone
21  confirm that the order of three bottles emanated
22  from the fact that someone had a significant
23  injury or surgery as opposed to a pharmacist
24  selling them out the back door?  That's exactly

Page 206

1  what you want to do when you have an SOM system,
2  isn't it, confirm that this is legitimate?
3      A.  I cannot say there is -- I have
4  limited information to go on to make any
5  determination of that.
6      Q.  Well, you were involved in designing
7  the new SOM system that's in place to this day.
8      A.  I was not --
9      Q.  Based on your design of a new SOM
10  system, wouldn't you want this order to be
11  flagged so someone could at least confirm that,
12  in fact, the increase to three bottles, 300
13  pills, of hydrocodone was a legitimate order as
14  opposed to a pharmacist selling them out the
15  back door?
16      A.  In the system we have today, we would
17  review this order if it were flagged and
18  complete the proper due diligence.
19      Q.  Apparently Mr. Mortelitti was
20  complaining that this type of this order gets
21  flagged by that existing SOM system as of that
22  date and that he wanted to do something about it
23  not being flagged in the future.  Wouldn't you
24  say that that's a problem with the IRR system

Page 207

1  that you have in place on August 13, 2010, if
2  that doesn't get flagged to go forward?
3      A.  I cannot -- absolutely I cannot make
4  that determination based on the information that
5  you've provided in front of me.
6      Q.  I want to show you what we marked as
7  Plaintiffs' Exhibit 43.
8          (Whereupon, CVS-Vanelli-43 was marked
9          for identification.)
10  BY MR. DEROCHE:
11      Q.  This is an e-mail string.  I know on
12  most of these e-mails you're not there, but on
13  the second page marked 133944, you see an e-mail
14  from you to Frank Devlin, correct?
15      A.  I do see that e-mail.
16      Q.  January 31, 2011?
17      A.  Correct.
18      Q.  Okay.  It appears that you were
19  involved in reviewing the control drug policy
20  and procedure template for CVS at that time,
21  correct?
22          MR. BUSH:  Objection.
23      A.  Based on the title here, it is not a
24  control drug policy and procedure that was

Page 208

1  attached.
2  BY MR. DEROCHE:
3      Q.  Well, if you look at it, the subject
4  of the e-mail says PSE but, in fact, the actual
5  document which is attached starting at 113946
6  appears to deal with control drugs, correct?
7      A.  I'm sorry.  Yes, I was trying to read.
8  You've put something in front of me that I, you
9  know, haven't -- apparently haven't seen since
10  2011.
11      Q.  I was trying to help you, sir.
12      A.  No, I understand, but I was also
13  trying to read at the same time so I didn't hear
14  your question.
15      Q.  If you go to Page 113946.  It appears
16  at the top to refer to control policy and
17  procedure.  And you were making comments on
18  that, I assume, in your e-mail back.
19          (Witness reviewing document.)
20      Q.  So as of January 13, 2011, it appears
21  that you had some involvement in the SOP having
22  to do with the item review report, correct?
23      A.  I'm still reading.
24          (Witness reviewing document.)

Page 209

1      A.  Appears that John Mortelliti did some
2  work in SOP, forwarded it to Frank, and Frank
3  asked me to review, and I provided Frank
4  feedback on that SOP.
5      Q.  He's asking you "Are you okay with
6  this," correct?
7      A.  That is -- those are Frank's words.
8      Q.  According to you, you didn't have any
9  involvement until, I believe you said, quarter 4
10  of 2012.  Does this refresh your recollection
11  that you may have been involved a little earlier
12  than that, sir?
13      A.  It refreshes my recollection that I
14  was asked by a colleague to review an SOP to
15  provide feedback, which is something that's not
16  unique to SOP or to SOM.  I've spent a lot of my
17  time in my role writing SOPs, and I was asked by
18  a colleague to review.  I gave him feedback of
19  ways that he may think of improving that SOP
20  regarding record retention and other topics.
21      Q.  In terms of this SOP, it states under
22  "Thresholds" on Page 113946 that "These
23  thresholds are the primary tool to prevent
24  stores from purchasing excessive or suspicious

Page 210

1 amounts of Controls and other List I chemicals,"
2 is that correct?
3   A.  The document states that it's
4 "established monthly thresholds that restrict
5 the amount of Controls and other List I
6 chemicals that can be ordered by each store."
7 It does state that, yes.
8   Q.  Do you know how these thresholds were
9 developed under this SOP?
10   A.  I do not know.
11   Q.  What is a peak TIL?
12   A.  I do not know.  As I stated before, I
13 wasn't -- I had no oversight on the existing or
14 the prior or SOM that was in place at this time.
15   Q.  Under "Item Review Report" it
16 indicates that the IRR analyst at the
17 distribution center will review -- "has the
18 primary responsibility for reviewing the report
19 and investigating all orders that may be
20 excessive or unusual."
21   A.  I'm sorry, I don't know where you're
22 referring to.
23   Q.  Well, let's go to the bottom of
24 Page 113946 under the heading "Item Review

Page 211

1 Report."  Last sentence on that page,
2 "Distribution Center IRR Analyst has the primary
3 responsibility for reviewing the report and
4 investigating all orders that may be excessive
5 or unusual."
6       Do you know how at this point in time
7 the IRR analyst decides what might be excessive
8 or unusual?
9   A.  I had no responsibility over SOM at
10 that time.  I was -- based on my feedback, I was
11 strictly reviewing this SOP for information to
12 help provide.  I was not -- did not understand
13 or have any involvement in peak TIL or
14 thresholds.  I simply provided feedback on items
15 such as record retention to ensure that the SOP
16 included that according to the company's policy
17 on record retention.
18   Q.  When a review is accomplished for an
19 item that's on the IRR report because it's
20 escalated for further review, is there a record
21 kept at the DC?
22       MR. BUSH:  Talking about at this point
23 in time?
24 BY MR. DEROCHE:

Page 212

1   Q.  As of the date that this was prepared,
2 this SOP.
3   A.  I had no involvement in SOM at the
4 time this document was created.
5       Excuse me, if I said SOP, I meant to
6 say SOM.
7       (Whereupon, CVS-Vanelli-40 was marked
8       for identification.)
9 BY MR. DEROCHE:
10   Q.  Sir, I want to show you what was
11 marked as Exhibit 40.  It's a chart that was
12 created from data extracted from the ARCOS
13 database that was produced in this case
14 concerning a pharmacy located on Brookpark Road
15 in Cuyahoga County, Ohio.
16       First of all, are you familiar at all
17 with the Brookpark Road CVS Pharmacy?
18   A.  No.
19   Q.  Have you ever been to Ohio?
20   A.  Columbus.
21   Q.  Other than Columbus, nowhere else?
22   A.  Jacobs Field in Cleveland.
23   Q.  You came to Cleveland one time?
24   A.  I have been to Cleveland one time.

Page 213

1 I've been to Columbus, Dublin particularly, one
2 time.
3   Q.  Did you ever come to Cuyahoga County
4 to visit a CVS store?
5   A.  I do not recall ever visiting a CVS
6 store in Cuyahoga County.
7   Q.  So you never visited, for instance,
8 the store located at 2070 Brookpark Road?
9   A.  No, sir.
10   Q.  This is a recap of orders on a monthly
11 basis in January, 2006 to December, 2008, and it
12 compares those orders for hydrocodone shipped to
13 the store to the average of all CVS stores in
14 Cuyahoga County.  And it appears that this store
15 substantially exceeds the average in the county
16 every month that's covered by this chart.
17       Under your system that you put in
18 place, do you believe that this store would be
19 flagged, given the volume exceeding the average
20 in the county that it's located in?
21       MR. BUSH:  Objection.
22   A.  I've never seen this chart before.  I
23 don't know the source of the chart.  I don't
24 know the source of the average.  I could not

Page 214

1  make that determination just strictly on this
2  chart.  The algorithms are a little more
3  in-depth than just data on the chart.
4  BY MR. DEROCHE:
5      Q.  I understand.  I understand they don't
6  look at just volume, but volume is one of the
7  issues or one of the factors that's considered
8  by the current algorithm, correct?
9      A.  Could you repeat that?
10     Q.  Volume is one of the factors that's
11 considered by the current algorithm, correct?
12     A.  Ordering size, frequency, and pattern
13 are all part of the tests that occur today in
14 the system we operate.
15     Q.  Do you know if there was any system in
16 place in the time period covered by this chart
17 at CVS that systematically assessed the order
18 volume for stores such as the Brookpark Road
19 store in Cuyahoga County?
20     A.  I do not know.  I do not know what
21 systems were in place at that time.  I had no
22 involvement in SOM in 2006 to 2008 time period.
23     Q.  If you looked at a store like this
24 Brookpark Road store and you saw that, for

Page 215

1  instance, in September of 2008 a store was
2  ordering close to 40,000 doses of hydrocodone
3  compared to an average somewhere in the 8 range
4  of all stores in that county, would that raise a
5  concern for you?
6      A.  Again, I have no basis of any
7  information for this particular store.  I don't
8  know if it's located in the center point of 16
9  hospitals.  I have no background on this to be
10 able to say on one piece of data -- on one data
11 point that I can make a determination such as
12 that.
13     Q.  You can look at that, I mean, and say,
14 well, it would raise a concern, and if it was
15 located as the center point of 16 hospitals,
16 maybe someone should find that out and confirm,
17 yes, that's the case, as opposed to it being
18 located in a seedy neighborhood with a
19 substantial overdose problem?
20     A.  I have no knowledge if that was or was
21 not --
22     Q.  But wouldn't you want to --
23     A.  -- performed.
24     Q.  Wouldn't you want to find out?

Page 216

1      A.  I am telling you I can speak to what I
2  know in the current process.  They review that,
3  what you are looking at, the stores.  I cannot
4  speak to this time period.
5          (Whereupon, CVS-Vanelli-41 was marked
6          for identification.)
7  BY MR. DEROCHE:
8      Q.  Did CVS ever attempt to look at
9  publicly available information about overdose
10 rates and to overlay that to a map of their
11 store locations?
12     A.  I do not know.
13     Q.  Do you know if the rate of overdose
14 deaths would correlate to location of high
15 volume CVS stores if that process was done?
16     A.  I do not -- I do not know.
17     Q.  As part of your annual review of
18 your -- I mean, I assume you do reviews of your
19 SOM system, right, and you do an annual check-up
20 to make sure it's operating properly, something
21 along those lines, correct?
22     A.  We have done reviews of our existing
23 system, yes, we have.
24     Q.  You do quality control of some sort,

Page 217

1  correct?
2      A.  Quality control reviews are in place
3  within the current SOM system.
4      Q.  Wouldn't you want to know what stores
5  are located in high overdose areas to make sure
6  your SOM system was appropriately focusing on
7  those stores?
8      A.  We focus on all stores and all orders.
9  If it flags, it is reviewed and proper due
10 diligence is performed.
11     Q.  I understand you're saying that you do
12 that now with the system you put in place, but
13 you have no idea before you put your new system
14 in place if that was the case, isn't that
15 correct?
16     A.  I had no responsibility to -- it was
17 not my responsibility to know.  CVS is a very
18 large organization.  I have a set of
19 responsibilities.  Those are the
20 responsibilities that I focus on.
21     Q.  So back then before you put your new
22 system in place, did anybody try to correlate
23 and see if overdose deaths clustered around CVS
24 high volume stores?

Page 218

1    A.  I don't know if that did or did not
2  happen.  I have no recollection of any
3  involvement in those types of discussions.  I do
4  not recall.
5    Q.  Would you find that problematic if you
6  discovered that that was, in fact, the case?
7      MR. BUSH:  I'm sorry, if what was the
8  case?
9  BY MR. DEROCHE:
10    Q.  Overdose deaths --
11      MR. BUSH:  I'm not sure --
12  BY MR. DEROCHE:
13    Q.  -- overdose deaths clustered around
14  high volume CVS stores.
15    A.  Based on that one point, no, would
16  have to -- you would have to look at a lot of
17  other data to understand if there is some
18  correlation.
19    Q.  Take a look at Exhibit 41 real quick.
20  Again, this is a chart that's created in
21  extracting ARCOS data that was produced in this
22  case.  It has to do with the hydrocodone
23  shipments to CVS Pharmacy located at 590 East
24  Market Street in Summit County, Ohio.

Page 219

1      I take it you haven't been to Summit
2  County?
3    A.  I don't know where Summit County is.
4  Is it Cleveland?  I've been to Cleveland.  We've
5  established that.  I don't know counties well.
6    Q.  Cleveland is Cuyahoga County.
7    A.  Is it?
8    Q.  Yes.
9    A.  If it wasn't Dublin or Columbus, those
10  are the only places I recall I've been to in
11  Ohio.
12    Q.  Again, this is a store that from
13  April, 2006 to December, 2008, the period
14  covered by this chart, appears to have a volume
15  of hydrocodone shipments that is substantially
16  in excess of the average for CVS stores in the
17  Summit County area.  I'm wondering if this type
18  of data is something -- this aggregate data is
19  something that was ever looked at by CVS so you
20  could focus your attention on these types of
21  stores when you're doing your SOM analysis.
22      MR. BUSH:  Objection.
23    A.  Performing my SOM analysis, this data
24  is, you know, 11 plus years old.

Page 220

1  BY MR. DEROCHE:
2    Q.  I'm saying, did CVS ever do these
3  types of charts to at least get a picture of,
4  hey, this is a high volume store compared to all
5  the other stores in this county, maybe we want
6  to focus on it, give it more attention in the
7  SOM process?  That type of analysis ever done?
8      MR. BUSH:  Objection.
9    A.  The question is?
10  BY MR. DEROCHE:
11    Q.  Was that ever done that you know of?
12    A.  As a single individual working in a
13  logistics department, I certainly cannot be
14  aware of what everybody in a major organization
15  is doing, and particularly in an area that I had
16  no involvement and no job responsibility at the
17  time that this graph is depicting, so I do not
18  know if anyone did or did not.
19    Q.  Let me show you what we marked as
20  Plaintiffs' Exhibit 77.
21      (Whereupon, CVS-Vanelli-77 was marked
22      for identification.)
23  BY MR. DEROCHE:
24    Q.  It's an e-mail from Mr. Burtner to,

Page 221

1  among others, you, October 15, 2012.
2    A.  I see that.
3    Q.  And it attaches a number of documents
4  including a document called -- let's mark these
5  two -- one document called work instructions --
6  sorry, "Work Instruction" for the loss
7  prevention analyst position.
8      Are you familiar with those work
9  instructions, sir?
10    A.  Without seeing them I would say no.  I
11  do not recall what the -- that document
12  contains.
13    Q.  Okay.  Let's look at 78.
14      (Whereupon, CVS-Vanelli-78 was marked
15      for identification.)
16  BY MR. DEROCHE:
17    Q.  I show you what we marked as
18  Exhibit 78.  This appears to be the work
19  instructions for the IRR review process as of
20  5/3/2012.  It's the revision number 6.  And that
21  would have been a later version than the ones
22  that were attached, I believe.  This appears to
23  be the latest version we have.  I want to go
24  through this briefly and just have you tell me

Page 222

1 if it's consistent with what you experienced
2 when you went to the Indianapolis DC to watch
3 what they were doing in that DC.
4        Now, it talks about the IRR report,
5 and they retrieve it, and then "Review IRR to
6 identify irregular orders based on, but not
7 limited to," and it says current week,
8 month-to-date, previous 12 month lag, potential
9 for abuse, and verification of single item or
10 multiple items.
11        And it says "Determine potential
12 irregular orders for each DC."
13        Now, do you know if this is a process
14 by which the IRR analyst was looking at the IRR,
15 may list 100 orders on the IRR, but they're
16 choosing which ones that they want to go and do
17 due diligence on by pulling additional
18 information?  Is that what you experienced when
19 you saw the IRR process?
20        MR. BUSH:  Objection.
21     A.  I do not recall the process.
22 Understand this, the team started early.  I
23 wasn't there for their entire day.  I didn't see
24 the entire process that they completed.  And I

Page 223

1 focused on their due diligence, what they looked
2 at after they had an order to review.
3 BY MR. DEROCHE:
4     Q.  I see.
5        So you focused on once they went
6 through this selection process of, all right,
7 these are the orders that we think need to have
8 due diligence done, then you looked at, all
9 right, this is what they're going to do in
10 connection with that due diligence effort?
11     A.  I wanted to see the due diligence
12 effort because, again, that was the part that I
13 viewed as -- to be transferable to the new
14 process because, again, everything that happened
15 up front of identifying was all going to change.
16     Q.  Gotcha.
17     A.  I was just focused on the fact, now
18 you have an order you need to look at, what do
19 you do, what do you do to get comfortable that
20 this order is not suspicious or what do you do
21 to determine that it is, so what's that --
22 again, that due diligence process.
23     Q.  And it appears that once, like you
24 said, they said all right, this is -- found an

Page 224

1 order, hey, do you want to look at this order,
2 that that's the point where that the first thing
3 they do is contact the DC that is associated
4 with that order to have that DC not ship the
5 order until someone gets back to them and says,
6 hey, this is cleared or not cleared?
7     A.  We discussed the fact that when they
8 had a review, they would contact the DC and
9 instruct the DC to hold the order until they
10 approved the DC releasing the order.
11     Q.  Sure.
12        So that -- and on each day a DC may
13 have an order that's looked at or it may not
14 have an order -- any orders that are looked at,
15 but there's a communication that goes out that
16 identifies for those DCs which have an order
17 that's being looked at and which don't?
18     A.  I believe in general a phone call was
19 placed to the DC, the pharmacy DC to instruct
20 them to hold any order or orders that the team
21 felt need to be held and not picked until
22 reviewed.
23     Q.  Under E it indicates "Forward
24 Irregular Orders - Logistics Communication form

Page 225

1 to each DC, identifying which DCs have stores
2 with potential irregular orders."  Is that what
3 you, in addition to that, you're saying in
4 addition to sending the identification form
5 there is also a phone call made?
6     A.  I'm saying I recall the phone call.
7     Q.  Okay.  A form may or may not have been
8 sent, but you don't recall that?
9     A.  I do not recall.
10     Q.  The steps following this are -- all
11 relate to those orders that were selected as
12 potentially irregular, and it lists a number of
13 due diligence steps that may be taken with
14 respect to that order, is that correct?
15     A.  Looking at this, not clear if these
16 steps were specifically just for the ones that
17 were held or any order.  Looking at the
18 document, I can't draw a relationship between is
19 it -- again, is it the ones that they called on
20 or was it something that -- other orders.
21     Q.  In any event, if you go down to the
22 second page, you go down to -- it's 109964, go
23 down to step O in this work instruction, the IRR
24 analysts are directed to "Document all reviews

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 on IRR recap spreadsheet."
2    Do you see that, sir?
3    A.  I do see that.
4    Q.  Then it indicates that the "IRR recap
5 spreadsheet is to be submitted to the Director
6 of Logistics Loss Prevention and the Senior Loss
7 Prevention Manager on the first day of each
8 Month."
9    So it appears that that recap
10 spreadsheet was a document by which CVS recorded
11 what reviews were done for what orders.  Is that
12 your understanding, sir?
13    A.  Again, I don't have any recollection
14 of the IRR recap.  And it's stating there it's
15 something that was sent to two individuals.
16    Q.  Correct.
17    A.  It does not state that it was the
18 record of the work that was completed.
19    Q.  It does say "document all reviews on
20 IRR recap sheet," correct?
21    A.  Again, I don't know the purpose of
22 documenting on the recap sheet and sending it to
23 those individuals, so I can't assume that this
24 is the only record, or just a record of what the

Page 227

1 purpose of that recap sheet was.
2    Q.  Gotcha.
3    But let me ask you, when a work
4 instruction document such as this is created,
5 you would expect the people who are doing the
6 work to follow the work instructions, correct?
7    A.  My understanding of work instructions
8 is that they are completed to provide guidelines
9 of performing a task.
10    Q.  So if a review is completed during the
11 time period that the work instruction is
12 effective, that review should be documented on
13 an IRR recap spreadsheet, correct?
14    A.  The document states that all reviews
15 are put on an IRR recap spreadsheet.  That, I
16 can see.
17    Q.  By looking at an IRR recap spreadsheet
18 or a group of them that cover a certain time
19 period, one could determine what reviews were
20 done by the IRR analysts, correct?
21    A.  I can't speak to the folks who perform
22 this work and their -- and was that done or not
23 done.  Again, it was not something that I
24 reviewed as part of my time in the Indianapolis

Page 228

1 distribution center.
2    Q.  As a normal practice at CVS, folks
3 follow work instructions, would you agree?
4    A.  Again, large organization, I cannot
5 speak for areas that I am not responsible for
6 and I don't have intimate knowledge of.
7    Q.  Have you ever looked at an IRR recap
8 spreadsheet?
9    A.  I believe I stated that I wasn't aware
10 that one exists, and I don't recall looking at
11 an IRR recap spreadsheet.
12    Q.  If you look at the last page of
13 Exhibit --
14    A.  Exhibit 78?
15    Q.  -- Exhibit 78, on Page 109965, it
16 talks about "Revision documentation," and it
17 gives a number of entries, including the date
18 this was created, 2/29/2012, and then it lists a
19 number of revision dates.
20    Do you see that, sir?
21    A.  Yes, I do.
22    Q.  Have you ever reviewed the prior
23 versions of this document to determine how the
24 process changed over time between the first and

Page 229

1 the current one?
2    A.  I do not recall ever reviewing any
3 versions of this document.  This was not an area
4 that I was responsible for and the focus of my
5 responsibilities in May of 2012, or dating back
6 to February of 2012.
7    Q.  Quarter 4 of 2012 is when you became
8 involved in the SOM process and developed a new
9 one, right?
10    A.  In fourth quarter of 2012 is when I
11 was approached to be part of a project to create
12 a new system and process, yes.
13    Q.  Did you go back and look at things
14 like work instructions for the current system to
15 see what you could discern and what you could
16 learn from those?
17    A.  I did not, no.  I do not recall doing
18 so.
19    MR. DEROCHE:  Why don't we take a
20 break for ten minutes.
21    THE VIDEOGRAPHER:  We're going off the
22 record at 2:20 p.m.
23    (Whereupon, a recess was taken.)
24    THE VIDEOGRAPHER:  We're back on the

Page 230

1  record at 2:37 p.m.
2  BY MR. DEROCHE:
3      Q.  Mr. Vanelli, I've handed you what
4  we've marked as Plaintiffs' Exhibit 45.
5          (Whereupon, CVS-Vanelli-45 was marked
6          for identification.)
7  BY MR. DEROCHE:
8      Q.  It appears to be a string of e-mails,
9  some of which include you, and also Kelly Baker,
10  Craig Schiavo, and Mark Nicastro.
11          I want to direct your attention first
12  to the e-mail at the top of Page 28616.
13  Actually the date on it starts in the bottom of
14  the previous page. It's an e-mail from Kelly
15  Baker to Craig Schiavo, July 16, 2013.
16          Do you see that, sir?
17      A.  Yes, I do.
18      Q.  And it's talking about "Archer SOM
19  User Acceptance Testing."
20          Do you know what that relates to?
21      A.  I believe that relates to testing
22  being performed in the new system, and the use
23  of Archer within that new system.
24      Q.  And Mr. Baker writes "Thanks Craig.

Page 231

1  Right now the volume is up enough that I really
2  don't have time to get into it right now (it'll
3  be like this for the rest of the month). Also,
4  I'm having problems with MicroStrategy's
5  response time this week and it's affecting my
6  ability to complete all reviews for each day."
7          Do you see that, sir?
8      A.  I do.
9      Q.  Do you know what the problems he was
10  having with MicroStrategy were?
11      A.  I do not know the specific problems he
12  is having with MicroStrategy. I do know some of
13  that tool, that the more people are on there, as
14  he refers to response time, if you put a request
15  in for -- I'll just use an example. He's
16  looking forward to dispensing data for a
17  particular store. It takes longer to get the
18  data out of the system and get the report back
19  with the information you're looking at because
20  as opposed to just me doing it, everybody in the
21  room is trying to run something. So, yes,
22  understand that it just slows down getting the
23  report back.
24      Q.  He then states "That's a good segway

Page 232

1  for one of my other concerns. Connectivity is
2  already a big restraint when a system acts up.
3  Is the new system going to be web based?"
4          So again he's talking about being able
5  to access data, correct?
6      A.  I don't know exactly what that -- what
7  he is referring to in that statement. I do
8  again -- I understand what he's talking about,
9  the response time and MicroStrategy, because
10  I've -- I have experienced that. I'm aware of
11  that happening and slowing down getting the
12  reports back, but I don't know what he's
13  referring to in the connectivity already being a
14  big constraint other than that statement.
15      Q.  Okay. He states "With the volume of
16  flagged orders we may see, this situation won't
17  work (doesn't work that well now)."
18          Do you recall there being major
19  problems with the SOM team that was in
20  Indianapolis having constraints on their ability
21  to get the work done because of connectivity
22  issues?
23      A.  Over and above what I read -- what I'm
24  reading here, I recall -- I don't recall

Page 233

1  discussions on that. It's -- reading this, it
2  looks like it was slowing them down. Does not
3  state that it was preventing them from doing
4  their job, just making it take a little bit more
5  time.
6      Q.  On the first page there's a -- then an
7  e-mail from Mr. Schiavo to you, July 16, 2013.
8      A.  On the first page, I see that.
9      Q.  And in the last sentence of the first
10  paragraph, "It looks like Kelly has his hands
11  full with orders, and I know he has voiced
12  concern about the lack of a backup, this is
13  something we are going to need to find a way to
14  work through."
15          Do you recall concerns being voiced
16  with respect to the lack of backup for the SOM
17  team in Indianapolis?
18      A.  Yes, I recall, as we discussed
19  earlier, that I got -- did get involved to make
20  -- to assist in staffing for that team of
21  running that existing system at that time while
22  my team and I were focused on building the new
23  system.
24      Q.  And again, you then sent an e-mail, I

Page 234

1 believe, to Mr. Nicastro again addressing the
2 staffing issue, correct?
3     A.  I see that e-mail that I sent to
4 Mr. Nicastro on the 16th of July, '13.
5     Q.  You ask "Has Aaron's job been posted?"
6     Do you know, had Aaron left by that
7 point?
8     A.  I don't -- I cannot state if Aaron had
9 left or given notice that he had planned to
10 leave.
11     Q.  You state "I did speak to Andy about
12 staffing and suggested to replace Aaron, add two
13 analysts (like Kelly) and six clerical staff."
14     Who is Andy?
15     A.  I believe I was referring to Andy
16 Koropoulis who was the operations manager of the
17 Indianapolis distribution center who reported in
18 to Mark.
19     Q.  Do you know if two analysts and six
20 clerical staff were added to the SOM team in
21 Indianapolis at any point in time after this
22 e-mail?
23     A.  I do not recall that two analysts or
24 six clerical staff were added.  I recall that we

Page 235

1 had -- as we discussed earlier, we had
2 interviewed for some positions, we back-trained
3 and pulled in a former employee, former
4 pharmacist employee to come in and work on the
5 process, as well as hired third-party DEA
6 consultants to assist.
7     Q.  Who was that person that was brought
8 in, the former pharmacist?
9     A.  Gary Millikan.  He was a pharmacist,
10 and he ran the pharmacy operation in
11 Indianapolis for a period of time.  I don't know
12 how long.
13     (Whereupon, CVS-Vanelli-39 was marked
14     for identification.)
15 BY MR. DEROCHE:
16     Q.  I show you what we marked as
17 Exhibit 39.  This is a letter from yourself to
18 Matthew Murphy at Pharma Compliance Group, is
19 that correct?
20     A.  Appears so by looking at the heading,
21 yes.
22     Q.  Appears to be a letter agreement that
23 you sent to engage Pharma Compliance Group to
24 perform some services for CVS, correct?

Page 236

1     A.  That is what I see.
2     Q.  Is this the group that you referred to
3 in terms of coming in and providing some SOM
4 staffing as needed?
5     A.  Yes.
6     Q.  How many folks do you know were
7 assigned by Pharma to CVS to provide the
8 staffing you needed?
9     A.  How many folks?  I could recall
10 probably maybe three.  I don't know the exact
11 number.
12     Q.  Do you know what training they were
13 provided with respect to the SOM system that was
14 currently in place in Indianapolis?
15     A.  Other than being former DEA agents,
16 I'm not aware of training that they were
17 provided prior to coming in to assist in the
18 facility.
19     Q.  Did you ever see them do their work?
20     A.  I did not.  It occurred in
21 Indianapolis, and I was in Rhode Island.
22     Q.  Do you know as former DEA agents if
23 they had performed SOM analysis in the past?
24     A.  I do not know.  Do not recall.

Page 237

1     Q.  Do you know if -- I'm sorry, go ahead.
2     A.  I just said I do not know.  I don't
3 recall.
4     Q.  Do you know if they were provided the
5 work instructions that we reviewed a moment ago
6 with respect to how to perform the IRR analysis
7 at CVS?
8     A.  I do not know.  Again, I was in Rhode
9 Island, I wasn't responsible with the process.
10 I was assisting between the distribution center
11 and our legal department, which is where I got
12 the contacts for Mr. Murphy, through Betsy
13 Ferguson, to facilitate the assistance they
14 required.
15     Q.  Do you know how often Pharma
16 Compliance Group provided personnel following
17 this August 21, 2013 letter agreement?
18     A.  Multiple months.  I don't recall the
19 exact time they started.  I believe it was
20 sometime around the date of this letter, and I
21 believe it continued into early -- into January,
22 the following -- sometime into the following
23 year.  I don't know exact dates, but my memory
24 says sometime in that time period.

Page 238

1 Q. Do you know if the Pharma Compliance
2 personnel that came in to assist with the IRR
3 process used the IRR recap spreadsheet to
4 document reviews?
5 A. I do not know the actual tasks that
6 they performed, not being there.
7 (Whereupon, CVS-Vanelli-46 was marked
8 for identification.)
9 BY MR. DEROCHE:
10 Q. Showing you what we marked as
11 Plaintiffs' Exhibit '46. This appears to be two
12 e-mails, the first of which is from you dated
13 September 27, 2013.
14 Do you recall this e-mail, sir?
15 MR. BUSH: I think --
16 MR. DEROCHE: I'm sorry, to you,
17 excuse me.
18 A. From Mark to me, September 27, '13.
19 BY MR. DEROCHE:
20 Q. Correct. It's Bate Number 17250,
21 correct?
22 A. That question to me is --
23 Q. Do you recall receiving this e-mail?
24 A. Yeah, I do not recall. I mean, I see

Page 239

1 my name on it. I haven't seen this e-mail since
2 2013.
3 Q. Mr. Nicastro is expressing concern
4 about the staffing level if Shauna were to
5 leave. That's Shauna Helfrich, correct?
6 A. I believe that's who Mark was
7 referring to.
8 Q. And it appears that he's concerned
9 that they're going to be understaffed in the SOM
10 review process and be in trouble fast.
11 Do you know if this trouble that he's
12 referred to ever came to pass?
13 A. I know Shauna did not accept that
14 position. I know that Kelly did leave the
15 company, and I believe this is the timing when
16 Gary Millikan was brought in as far as the
17 Pharma Compliance Group to replace Kelly's
18 departure. I don't know exactly when Kelly
19 left, but I know Kelly did end up leaving prior
20 to the sunset of the existing SOM system.
21 Q. It refers to a person named Nikki. Do
22 you know who that is?
23 A. I believe we discussed earlier it was
24 the candidate that we looked to hire as the SOM

Page 240

1 manager in Indianapolis -- from Indianapolis
2 that we were eventually going to bring to Rhode
3 Island.
4 Q. Okay.
5 A. I believe that her name was Nikki.
6 Q. So Mr. Nicastro was urging you to get
7 her on board, but that didn't occur, correct?
8 A. That did not occur. Like I said, we
9 made a job offer to her. She accepted a job
10 offer from a law firm in Indianapolis.
11 Q. Have you ever seen an IRR as that
12 existed as of 2012, what the IRR actually looked
13 like?
14 A. As I said, I looked at a fair -- a
15 number of reports in my time in Indianapolis. I
16 can't specifically say that IRR was one or was
17 not one, but I would assume, I mean, based on
18 just looking at data, I'm sure -- my assumption
19 is I've seen one before, but I don't recall.
20 And I -- you know, if I looked at one today, I'm
21 not sure I could pick it out other than if it
22 said IRR somewhere on the top that would lead me
23 to that potential conclusion.
24 Q. Did you ever review the IRR to

Page 241

1 determine what data was on there, what
2 information was on there that could be used to
3 clear or not clear a potentially suspicious
4 order?
5 A. I don't recall.
6 Q. No?
7 A. I don't recall.
8 Q. Let's go to 36. This may be my last
9 exhibit.
10 (Whereupon, CVS-Vanelli-36 was marked
11 for identification.)
12 BY MR. DEROCHE:
13 Q. I'm going to hand you what we marked
14 as Plaintiffs' Exhibit 36. It was produced by
15 CVS in this litigation. It is Bate Number 88412
16 ending on 88434. "Item Review Report - Control
17 Drugs, 7/7/2010."
18 And this report appears to have on the
19 first page a number of coefficients listed that
20 are used in connection with the production of
21 the IRR. On to the second page culminating with
22 a score, and it indicates that the cutoff for
23 the score is .65.
24 MR. BUSH: Did you say on to the

Page 242

1 second page is this -- it's the cover page or --
2 actually it would be in landscape and it would
3 go -- maybe it's not in landscape, but it would
4 go continuously to Page 8414, so that those
5 columns go across? I'm just trying to be clear
6 on how it works.
7      MR. DEROCHE: I'm just going to talk
8 about the document that we have in front of us.
9 So let's use the Bate numbers and we'll know
10 where we are. The second page is 88413.
11      MR. BUSH: Right.
12      MR. DEROCHE: So let's just look at it
13 as it's formatted right in front of us. That's
14 how it was produced.
15 BY MR. DEROCHE:
16      Q. Do you know what these attributes
17 as are identified on this document are looking
18 at?
19      A. I do not know.
20      Q. Do you know if any of them looked at
21 the ratio of controlled versus non-controlled
22 drugs dispensed by the pharmacy?
23      A. I do not know. I did not look at the
24 details of the algorithm in that existing system

Page 243

1 at that time.
2      Q. Were you involved at all in
3 determining what the score cutoff would be in
4 connection with the IRR report?
5      A. I recall having no conversations
6 regarding the content or threshold, or I'm
7 sorry, settings I think was the word, the cutoff
8 setting on the IRR report.
9      Q. Looking at this IRR report, and look
10 at a particular item. If you can go to the last
11 page, that's the easiest one to get to, which is
12 88433.
13      A. I see that page.
14      Q. Okay. Are you there?
15      A. Yeah.
16      Q. And there's an item for store 1179,
17 hydrocodone, and then it gives a number of
18 numbers associated with the various
19 coefficients, and then lists a number of lags,
20 which we established earlier refer to the month
21 total for the previous six months. Looking at
22 this, could you make any determination of
23 whether or not this is a suspicious order that
24 needs to be reported to the DEA?

Page 244

1      MR. BUSH: Objection.
2      A. Again, having not worked with this
3 report, having no more than a potential cursory
4 review of this report back in 2012, I cannot
5 tell you what that report says. I was not
6 trained in the use of this report.
7 BY MR. DEROCHE:
8      Q. Do you know if the folks who were the
9 IRR analysts that looked at this report at the
10 time it was generated could discern anything of
11 use from the information that is on the report
12 itself?
13      A. I believe -- I cannot. Again, I
14 wasn't involved in this report. I did not train
15 them, other than on spending a few hours with
16 them over a couple of days. That was my only
17 exposure to --
18      Q. Do you know how this report compared
19 to the reports that you reviewed or looked at in
20 2012?
21      A. I don't recall the -- any details of
22 reports I looked at in 2012.
23      Q. In 2012 when you looked at the IRR
24 reports while you were in Indianapolis, were you

Page 245

1 able to discern whether or not any of those
2 orders that were on the report may or may not
3 have been suspicious?
4      A. Again, my focus was not on their work,
5 with their reviews and what flagged, what didn't
6 flag. My focus was you have an order that is an
7 order of interest that you're going to perform
8 due diligence on. I focused on that, what the
9 due diligence process was, again the activities
10 that I felt could be transferable to the new
11 system, to the new process.
12      Q. Let's get 20.
13      (Whereupon, CVS-Vanelli-20 was marked
14      for identification.)
15 BY MR. DEROCHE:
16      Q. Aaron Burtner, I believe you said, was
17 present in the Indianapolis DC. Is he still --
18      A. In -- sorry.
19      Q. -- at the time you went to review?
20      A. Yes, he was one of the individuals. I
21 talked with Aaron Burtner, Aaron Burtner and
22 Shauna Helfrich.
23      Q. Exhibit 20. I'm going to show you
24 what we now have marked as Exhibit 20, another

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  document produced in this litigation by CVS,
2  beginning Bate Number 11359.  It appears to be
3  an IRR report that was addressed to Mr. Burtner
4  in Indianapolis.
5      Do you see that, sir?
6      A.  I see the cover page.  There's nothing
7  on here that -- okay.  I was only looking at the
8  cover page.  It gave me no indication what the
9  report was, whether this report was generated
10 and provided to Aaron back on 12/30/2012.
11     Q.  I understand.
12         If you look at -- back in 2012, just
13 so we're clear, the folks, Mr. Burtner and
14 Ms. Helfrich, in Indianapolis were performing
15 the review for the entire chain in terms of the
16 SOM review, correct?
17     A.  It is my understanding that the team
18 in Indianapolis at that time was reviewing
19 SOM --
20     Q.  Okay.
21     A.  -- orders, yes.
22     Q.  They were reviewing the IRR report in
23 connection with their duties in reviewing SOM,
24 correct?

Page 247

1      A.  At that point, again, I can't speak to
2  what they did or did not look at, but I do know
3  they were responsible for completing the SOM
4  reviews at that time.
5      Q.  On a daily basis, correct?
6      A.  That is my understanding.
7      Q.  And that was for, I believe there
8  were --
9      A.  Daily basis as orders were processed
10 and the report was generated.
11     Q.  I understand.
12     A.  I can't say that this is -- anything
13 was generated every day or holidays, what have
14 you, but again, my -- I spent time with them on
15 two days.
16     Q.  Okay.  And on those two days,
17 reviewing the IRR report was part of what they
18 did?
19     A.  Yeah, and discussion.  Again, with
20 them starting earlier in the day than I did,
21 they had already finished a portion of their
22 job.  We reviewed the due diligence process.
23     Q.  Okay.
24     A.  That would have happened after they

Page 248

1  did some review of the report.
2      Q.  The IRR.  And that was for -- I
3  believe there were at that point nine Rx DCs in
4  operation?
5      A.  We're talking 2012?
6      Q.  Correct.
7      A.  I'm just going through the math.
8  2012, I can't remember the count.  My dates as
9  far as acquisitions and the acquisition of
10 pharmaceutical facilities, I really can't say
11 how many facilities we had.  I don't recall how
12 many facilities we had at that time.
13     Q.  Do you recall there was approximately
14 eight or nine Rx DCs at that point?
15     A.  I believe in 2012, the Eckerd and
16 Revco acquisitions were both complete.  Sitting
17 here, I do not recall the number.
18     Q.  Okay.  This report, again, this is a
19 redacted document that was produced by CVS in
20 this litigation, and the portion of the IRR
21 report that was produced relates solely to the
22 Indianapolis DC.
23         If you look on page -- the second page
24 that I handed you, you'll see the "IN"

Page 249

1  designation after "Item Review Report."
2         Do you see that up there?
3      A.  You know, not -- again, not very
4  familiar with this report.  I do not know if --
5  what that reference of IN stands for, if these
6  are Indy stores, or does that have something to
7  do with the fact that this was printed out and
8  it's in the IN -- and IN is the two digit code
9  we use for the Indianapolis distribution center.
10 That, again, I -- not familiar enough with the
11 report to say if this contains Indianapolis
12 stores or other stores.
13     Q.  Well, if you look at the second page
14 bearing Bate Number 11393, you'll see that this
15 is actually Page 33 of the IRR for that
16 particular day.  Do you see in the upper
17 right-hand corner?
18     A.  I see that it has Page 33 of the
19 packet of reports that were distributed.  I do
20 not know that that is the 33rd page of the IRR
21 report.
22     Q.  And it ends on Page 39 again with the
23 designation "IN" after "Item Review Report."
24     A.  I see Page 39.  I see the reference to

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  IN. But as I previously stated, I do not know
2  if that IN is referring to stores that are from
3  the Indianapolis distribution center or if this
4  is referring to the -- and we referred to
5  earlier InfoPACK. This is a packet of reports
6  that came out of InfoPACK. So not knowing this
7  report, I don't know what that reference IN is
8  referring to.
9      Q. Okay. Did you -- if you look at the
10 third page of the exhibit, 11394, you'll see an
11 order that was flagged for hydrocodone at the
12 bottom of the page.
13     Do you see that, sir?
14     A. For store 370, 00370, is that what
15 you're referring to?
16     Q. Correct.
17     A. I see that. Okay. I see that.
18     Q. Do you know what any of the attributes
19 that are listed here indicate in terms of why
20 this store was flagged?
21     A. I do not. I'm not familiar. I have
22 not worked with this report, was not responsible
23 for the SOM process within that system.
24     Q. Were you aware that the score that

Page 251

1  could be attained or attributed to a particular
2  order was from 0 to 1? Did you know that?
3      A. I -- again, no information about the
4  report, the data on the report, and the
5  interpretation of that data.
6      Q. Looking at this particular order and
7  the information that is on this report, can you
8  discern anything in terms of why this order was
9  considered suspicious by the SOM algorithm?
10     MR. BUSH: Objection.
11     A. There is no indication that this
12 report suggests that this order is suspicious.
13 And again, looking -- not a report that I work
14 with, that I worked with or have worked with, I
15 don't know the contents of the data. I don't
16 know the interpretation of the data.
17 BY MR. DEROCHE:
18     Q. The IRR report, the very purpose of it
19 was to provide a score of suspiciousness,
20 related to suspiciousness, and that's a Buzzeo
21 word, and flag orders that are potentially
22 suspicious. That's the whole point of the IRR
23 report, isn't it?
24     A. Again, I do not know the whole intent

Page 252

1  of the report that I'm not responsible for, I
2  did not use, nor did anyone on my team use the
3  report.
4      Q. Did you go back and look at the IRR
5  report that was being used at the time you were
6  tasked with putting together the new system to
7  see how it was structured, how it was used, what
8  the data on it indicated, or anything of that
9  nature?
10     A. In my time of review of the existing
11 system at the time in 2012, my focus was on the
12 due diligence process. It was not to review a
13 system that I was not responsible for running
14 that was being sunset. My focus was on
15 understanding the due diligence process that was
16 performed by that existing team to see if there
17 are learnings and use it as a baseline jumping
18 off point for creating a due diligence process
19 within the system and process that I was working
20 collectively with the project team to build.
21     Q. But you did nothing to determine how
22 the people who were actually running that system
23 at the time determine which, if any, orders that
24 were flagged on the IRR report were subjected to

Page 253

1  that due diligence you just mentioned, did
2  nothing to determine how that determination was
3  made?
4      A. That was not my area of focus. That
5  was not my area of responsibility. I was
6  looking to understand the due diligence process
7  because the due diligence process could be
8  transferable and add value to the existing team.
9  I was not looking at a system that I was not
10 responsible for and I knew was going to be
11 sunset. My focus was on the new system and the
12 due diligence process that they performed at the
13 distribution center.
14     Q. Again, the answer to my question then
15 is no, you did nothing to determine under the
16 current system how the IRR analysts decided
17 which, if any, of the orders that were flagged
18 by the algorithm were even subjected to one
19 little bit of due diligence other than what was
20 shown on this report?
21     MR. BUSH: Objection.
22 BY MR. DEROCHE:
23     Q. You did nothing to determine that?
24     MR. BUSH: Objection.

Page 254

1    A.  That was not my area of focus.  I did
2  not review that.  I was reviewing the due
3  diligence process performed.
4  BY MR. DEROCHE:
5    Q.  Okay.  In looking at this report, do
6  you know if any of the orders for hydrocodone
7  that are listed here and were flagged, for
8  instance with a score of 1, if they were
9  subjected to any further due diligence other
10  than what's on this report?
11    A.  Again, at the date of this report, I
12  was not involved.  I was not responsible for the
13  suspicious order monitoring process in the
14  Indianapolis distribution center.  I'm 800 miles
15  away in Rhode Island taking care of my
16  responsibilities, designing a new system.  How
17  would I know what this team was or was not
18  doing?  I do not know.
19    Q.  You don't know.  Okay.  Fair enough.
20    MR. DEROCHE:  I have nothing further.
21  You're free to go.
22    MR. DAWSON:  No questions.  Thank you.
23    MR. BUSH:  Really, you guys are
24  champs.  I love this.  Thank you.

Page 255

1    THE VIDEOGRAPHER:  This concludes the
2  video deposition of Dean Vanelli.  The time is
3  3:10 p.m., and we are now off the record.
4    (Whereupon, the deposition was
5    concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 256

1  STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
2
3    I, MAUREEN O'CONNOR POLLARD, RMR, CLR,
4  and Commissioner in the State of Rhode Island
5  and Providence Plantations, do certify that on
6  the 16th day of January, 2019, at 8:03 o'clock,
7  the person above-named was duly sworn to testify
8  to the truth of their knowledge, and examined,
9  and such examination reduced to typewriting
10  under my direction, and is a true record of the
11  testimony given by the witness.
12    I further certify that I am neither
13  attorney, related or employed by any of the
14  parties to this action, and that I am not a
15  relative or employee of any attorney employed by
16  the parties hereto, or financially interested in
17  the action.
18    In witness whereof, I have hereunto
19  set my hand this 20th day of January, 2019.
20
21    _____
22    COMMISSIONER
23    My Commission Expires April 30, 2020
24

Page 257

1    INSTRUCTIONS TO WITNESS
2
3    Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8    After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11    It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24

Page 258

```
1        - - - - - -
           E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5    REASON: _____
6  ____  ____  _____
7    REASON: _____
8  ____  ____  _____
9    REASON: _____
10 ____  ____  _____
11   REASON: _____
12 ____  ____  _____
13   REASON: _____
14 ____  ____  _____
15   REASON: _____
16 ____  ____  _____
17   REASON: _____
18 ____  ____  _____
19   REASON: _____
20 ____  ____  _____
21   REASON: _____
22 ____  ____  _____
23   REASON: _____
24 ____  ____  _____
```

Page 260

```
1      LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24 ____  ____  _____
```

Page 259

```
1    ACKNOWLEDGMENT OF DEPONENT
2
3      I, _____, do
   Hereby certify that I have read the foregoing
4  pages, and that the same is a correct
   transcription of the answers given by me to the
5  questions therein propounded, except for the
   corrections or changes in form or substance, if
6  any, noted in the attached Errata Sheet.
7
8  _____
   WITNESS NAME          DATE
9
10
11
12
13
14
15 Subscribed and sworn
   To before me this
16 _____ day of _____, 20____.
17 My commission expires: _____
18
   _____
19 Notary Public
20
21
22
23
24
```