```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                    -  -  -
 5   IN RE:  NATIONAL    :  MDL NO. 2804
     PRESCRIPTION OPIATE :
 6   LITIGATION          :
     ----------------------------------------
 7                       :  CASE NO.
     THIS DOCUMENT       :  1:17-MD-2804
 8   RELATES TO ALL CASES:
                         :  Hon. Dan A.
 9                       :  Polster
10                    -  -  -
            Tuesday November 20, 2018
11                    -  -  -
12   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13
                      -  -  -
14
              Videotaped deposition of
15   MARK VERNAZZA, taken pursuant to notice,
     was held at Zuckerman Spaeder, LLP,
16   1800 M Street NW, Suite 1000, Washington,
     DC 2003, beginning at 9:13 a.m., on the
17   above date, before Amanda Dee
     Maslynsky-Miller, a Certified Realtime
18   Reporter.
19
                      -  -  -
20
21
            GOLKOW LITIGATION SERVICES
22      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

APPEARANCES:

WEISMAN, KENNEDY & BERRIS CO., L.P.A
BY: ERIC KENNEDY, ESQUIRE
      DANIEL P. GOETZ, ESQUIRE
101 W. Prospect Avenue
Midland Building, Suite 1600
Cleveland, Ohio 44115
(216) 781-1111
Ekennedy@weismanlaw.com
Dgoetz@weismanlaw.com
Representing the Plaintiffs

LEVIN PAPANTONIO THOMAS MITCHELL
RAFFERTY PROCTOR PA
BY: WILLIAM BAKER, ESQUIRE
      STEPHANIE HACKMAN, PARALEGAl
316 South Baylen Street
Pensacola, Florida 32502
(850) 485-4160
Wcb850@gmail.com
Representing the Plaintiffs

MOTLEY RICE LLC
BY: MICHAEL E. ELSNER, ESQUIRE
      MICHAEL HALL, ESQUIRE
      AMANDA UNTERREINER, PARALEGAL
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000
Melsner@motleyrice.com
Representing the Plaintiffs

Page 3

APPEARANCES: (Continued)

GARSON AND JOHNSON LLC
BY: JAMES A. DEROCHE, ESQUIRE
101 W. Prospect Avenue
Midland Building, Suite 1610
Cleveland, Ohio 44115
(216) 696-9330
Jderoche@garson.com
Representing the Plaintiffs

PELINI, CAMPBELL & WILLIAMS, LLC
BY: GIANNA M. CALZOLA-HELMICK, ESQUIRE
Bretton Commons
Suite 400
8040 Cleveland Avenue NW
North Canton, Ohio 44720
(330) 305-6400
Giannac@pelini-law.com
Representing the Defendant,
Prescription Supply, Inc.

COVINGTON & BURLING LLP
BY: EMILY KVESELIS, ESQUIRE
850 Tenth Street, NW
Suite 856N
Washington, DC 20001
(202) 662-5000
ekveselis@cov.com
Representing the Defendant,
McKesson Corporation

Page 4

APPEARANCES: (Continued)

WILLIAMS & CONNOLLY, LLP
BY: STEVEN M. PYSER, ESQUIRE
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
spyser@wc.com
Representing the Defendant,
Cardinal Health

REED SMITH, LLP
BY: LINDSAY A. DEFRANCESCO, ESQUIRE
1301 K Street, N.W.,
Suite 1000 - East Tower
Washington, D.C., 20005
(202) 414-9200
Ldefrancesco@reedsmith.com
Representing the Defendant,
Amerisource Bergen Drug
Corporation

ZUCKERMAN SPAEDER LLP
BY: ERIC R. DELINSKY, ESQUIRE
BY: ALEXANDRA W. MILLER, ESQUIRE
1800 M Street NW
Suite 1000
Washington, DC 20036
(202) 778-1800
Edelinsky@zuckerman.com
Smiller@zuckerman.com
Representing the Defendants,
CVS Indiana, CVS RX Services
and The Witness, Mark Vernazza

Page 5

APPEARANCES: (Continued)
VIA TELEPHONE/LIVESTREAM:

JONES DAY
BY: EDWARD M. CARTER, ESQUIRE
325 John H. McConnell Boulevard
Suite 600
Columbus, Ohio 43215
(614) 469-3939
emcarter@jonesday.com
Representing the Defendant,
Walmart

MORGAN LEWIS & BOCKIUS, LLP
BY: JOHN M. MALOY, ESQUIRE
101 Park Avenue
New York, New York 10178
(212) 309-6000
John.maloy@morganlewis.com
Representing the Defendant,
Rite Aid of Maryland

MARCUS & SHAPIRA LLP
BY: STEPHANIE M. WEINSTEIN, ESQUIRE
One Oxford Centre
35th Floor
Pittsburgh, Pennsylvania 15219
(412) 471-3490
Weinstein@marcus-shapira.com
Representing the Defendant,
HBC Company

Page 6

1  APPEARANCES: (Continued)
2  VIA TELEPHONE/LIVESTREAM:
3
      ZUCKERMAN SPAEDER LLP
4     BY:  GRAEME W. BUSH, ESQUIRE
      1800 M Street NW
5     Suite 1000
      Washington, DC 20036
6     (202) 778-1800
      Gbush@zuckerman.com
7     Representing the Defendants,
      CVS Indiana, CVS RX Services
8     and The Witness, Mark Vernazza
9
10
      CAVITCH FAMILO & DURKIN, CO., L.P.A.
11    BY:  CHIP ERB, ESQUIRE
      Twentieth Floor
12    1300 East Ninth Street
      Cleveland, Ohio 44114
13    LWErb@cavitch.com
      Representing the Defendant,
14    Discount Drug Mart
15
16
      BARTLIT BECK LLP
17    BY:  ALEX J. HARRIS, ESQUIRE
      1801 Wewatta Street
18    Suite 1200
      Denver, Colorado 80202
19    (303) 592-3100
      Alex.harris@bartlit-beck.com
20    Representing the Defendant,
      Walgreens
21
22
      ALSO PRESENT:
23    Daniel Holmstock, Videographer
24

---

Page 7

1      - - -
2    I N D E X
3      - - -
4
   Testimony of: MARK VERNAZZA
5
6    By Mr. Kennedy          12
7
8      - - -
9    E X H I B I T S
10     - - -
11
   NO.        DESCRIPTION        PAGE
12
   CVS-Vernazza
13 Exhibit-1   United States Code -
        Section 823        76
14
   CVS-Vernazza
15 Exhibit-3   CVS-MDLT1-000010552-555   100
16 CVS-Vernazza
   Exhibit-4   CVS-MDLT1-000013534-536   135
17
   CVS-Vernazza
18 Exhibit-6   CVS-MDLT1-000025204-259   205
19 CVS-Vernazza
   Exhibit-7   CVS-MDLT1-000034234-300   229
20
   CVS-Vernazza
21 Exhibit-8   CVS-MDLT1-000024877-941   274
22 CVS-Vernazza
   Exhibit-9   CVS-MDLT1-000088956-9025  304
23 CVS-Vernazza
   Exhibit-14  CVS-MDLT1-000034374
24        With attachment    222

---

Page 8

1      - - -
2    E X H I B I T S
3      - - -
4
   NO.        DESCRIPTION        PAGE
5
   CVS-Vernazza
6  Exhibit-16  CVS-MDLT1-000034175-177   397
7  CVS-Vernazza
   Exhibit-17  CVS-MDLT1-000024523-524   429
8
9  CVS-Vernazza
   Exhibit-18  CVS-MDLT1-000029864
        With attachment    445
10
   CVS-Vernazza
11 Exhibit-18A CVS-MDLT1-000029864-866   432
12 CVS-Vernazza
   Exhibit-23  CVS-MDLT1-000034168-171   420
13
   CVS-Vernazza
14 Exhibit-24  CVS-MDLT1-000075542     414
15 CVS-Vernazza
   Exhibit-25  CVS-MDLT1-000029877-880   446
16
   CVS-Vernazza
17 Exhibit-30  CVS-MDLT1-000057751-754   308
18 CVS-Vernazza
   Exhibit-31  CVS-MDLT1-000075299-312   317
19
   CVS-Vernazza CVS-MDLT1-000076284-285
20 Exhibit-32           295
21 CVS-Vernazza
   Exhibit-34  CVS-MDLT1-000061097     266
22
   CVS-Vernazza
23 Exhibit-40  CVS-MDLT1-000089188     300
24

---

Page 9

1
2    E X H I B I T S
3      - - -
4  NO.        DESCRIPTION        PAGE
   CVS-Vernazza
5  Exhibit-43  CVS-MDLT1-000081281     267
6
   CVS-Vernazza
7  Exhibit-44  CVS-MDLT1-000089315-379   280
8  CVS-Vernazza
   Exhibit-45  CVS-MDLT1-000090853-854   238
9
   CVS-Vernazza
10 Exhibit-46  CVS-MDLT1-000091508-518   119
11 CVS-Vernazza
   Exhibit-48  CVS Controlled Drug Manual:
12      Suspicious Order Monitoring
          Procedure        285
13
   CVS-Vernazza
14 Exhibit-49  CVS-MDLT1-000087889-890   254
15 CVS-Vernazza
   Exhibit-65  CVS-MDLT1-000019722-786   150
16
   CVS-Vernazza
17 Exhibit-93  CVS-MDLT1-000068377-381   182
18 CVS-Vernazza
   Exhibit-103  Amended First Notice of
19      Deposition Pursuant to Rule
         30(b)(6) and Document Request
20      Pursuant to Rule 30(b)(2)
         and Rule 34 to Defendant
21      CVS Health Corporation    25
22
23
24

Page 10

## E X H I B I T S

- - -

NO.    DESCRIPTION    PAGE

CVS-Vernazza
Exhibit-104  Amended Second Notice of
            Deposition Pursuant to Rule
            30(b)(6) and Document Request
            Pursuant to Rule 30(b)(2)
            and Rule 34 to Defendant
            CVS Health Corporation    26

CVS-Vernazza
Exhibit-105  9/21/18 Letter from
            Daniel Goetz to Eric
            Delinsky    27

CVS-Vernazza
Exhibit-108  10/22/18 Letter from
            Daniel Goetz to Eric
            Delinsky    27

CVS-Vernazza
Exhibit-111  CVS-MDLT1-000103859-867    426

CVS-Vernazza
Exhibit-119  CVS-MDLT1-000012286    460

CVS-Vernazza
Exhibit-125  CVS-MDLT1-000034172;
            Native    453

Page 11

- - -

## DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer
Page Line   Page Line   Page Line
None

Request for Production of Documents
Page Line   Page Line   Page Line
None

Stipulations
Page Line   Page Line   Page Line
12    1

Question Marked
Page Line   Page Line   Page Line
None

Page 12

- - -

(It is hereby stipulated and agreed by and among counsel that sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

VIDEO TECHNICIAN:  We are now on the record.  My name is Daniel Holmstock.  I'm the videographer for Golkow Litigation Services.  Today's date is November 20th, 2018.  The time on the video screen is 9:13 a.m.

This video deposition is being held at Zuckerman Spaeder LLP, 1800 M Street, Northwest, Suite 1000, in Washington, D.C., in the matter of In Re National Prescription Opiate Litigation pending before the United States District Court for the Northern

Page 13

District of Ohio, Eastern Division.  The deponent is CVS, and representing CVS is Mr. Mark Vernazza.

The court reporter is Amanda Miller.  Counsel will be noted on the stenographic record.  And will, now, the court reporter administer the oath?

- - -

MARK VERNAZZA, after having been duly sworn, was examined and testified as follows:

- - -

MR. KENNEDY:  This is Eric Kennedy, I represent the plaintiffs in this litigation.

If we can go around the room and everybody just introduce themselves and let us know who you represent, please.

MR. GOETZ:  Dan Goetz, plaintiffs.

MR. BAKER:  William Baker,

Page 14

1 plaintiffs.
2    MR. DEROCHE: James DeRoche,
3 plaintiffs.
4    MR. ELSNER: Michael Elsner,
5 plaintiffs. And with me today are
6 Michael Hall and Amanda
7 Unterreiner.
8    MS. CALZOLA: Gianna Calzola
9 from Pelini Campbell & Williams on
10 behalf of Prescription Supply,
11 Inc.
12    MS. DEFRANCESCO: Lindsay
13 DeFrancesco, Reed Smith, on behalf
14 of Amerisource Bergen.
15    MS. KVESELIS: Emily
16 Kveselis, Covington & Burling, for
17 McKesson.
18    MR. PYSER: Steven Pyser,
19 Williams and Connolly, Cardinal
20 Health.
21    MS. MILLER: Sasha Miller,
22 Zuckerman Spaeder, on behalf of
23 CVS, Indiana, LLC and CVS RX
24 Services, Inc., and on behalf of

Page 15

1 the corporate designee, Mr. Mark
2 Vernazza.
3    MR. DELINSKY: Eric
4 Delinsky, of Zuckerman Spaeder on
5 behalf of CVS Indiana, LLC and CVS
6 RX Services Inc., and on behalf of
7 their corporate designee, Mark
8 Vernazza and Mr. Vernazza himself.
9    And just at the outset, I
10 would like to make clear that the
11 deposition is of CVS Indiana, LLC
12 and CVS RX, Inc., the two CVS
13 defendants named in the case.
14    MR. KENNEDY: Eric Kennedy
15 on behalf of plaintiffs.
16    The gentleman who manages
17 our exhibits is not here,
18 unexpectedly. We hope everything
19 is okay.
20    But because of that, we're
21 going to use paper exhibits. And
22 we're not going to be putting them
23 up on the screen. And we have an
24 agreement that those paper

Page 16

1 exhibits that we utilize,
2 thereafter, if this deposition is
3 played, the video will be played,
4 we will be allowed to use those
5 exhibits, split the screen and
6 highlight what is actually read
7 into the record and referenced by
8 the witness.
9    Agreeable?
10    MR. DELINSKY: Agreeable.
11    MR. KENNEDY: Great.
12    - - -
13    EXAMINATION
14    - - -
15 BY MR. KENNEDY:
16    Q. Sir, my name is Eric
17 Kennedy. We briefly met.
18    Could you please state your
19 full name for the record?
20    A. My full name is Mark Robert
21 Vernazza.
22    Q. And what is your
23 professional address, sir?
24    A. 1 CVS Drive in Woonsocket,

Page 17

1 Rhode Island.
2    Q. And who is your current
3 employer?
4    A. CVS Pharmacy, Inc.
5    Q. And what is your present
6 position with CVS Pharmacy, Inc.
7    A. Senior legal counsel.
8    Q. Tell me about your current
9 duties and responsibilities.
10    A. I assist the company
11 primarily with respect to litigation and
12 government investigations.
13    Q. And when you said "senior
14 legal counsel," that means you are a
15 lawyer?
16    A. I am a lawyer.
17    Q. You do not work, am I
18 correct, for either of the CVS defendants
19 in this case?
20    A. I may, from time to time,
21 perform services on behalf of those
22 entities. I'm not employed by those
23 entities.
24    Q. And when you provide

Page 18

1  services for those entities, CVS Indiana,
2  LLC and CVS RX Services, who pays you?
3      A.   CVS Pharmacy, Inc.
4      Q.   Tell me about your career,
5  if you can, briefly, with CVS.
6      A.   I joined the company in
7  approximately January of 2014 as senior
8  legal counsel.  I have remained in that
9  position until the present day.
10     Q.   Have your responsibilities
11 as a lawyer at CVS, have they involved,
12 in any way, a suspicious order monitoring
13 of controlled substances?
14         MR. DELINSKY:  I would
15     instruct the witness not to
16     answer, to the extent it calls for
17     attorney-client information.
18 BY MR. KENNEDY:
19     Q.   And at all times, please, do
20 not answer any questions that you believe
21 or feel invade that privilege, all right?
22     A.   Absolutely.
23         I have been part of a team
24 of lawyers in-house that advises the

Page 19

1  company with respect to litigation,
2  including this litigation, as well as
3  controlled substances matters more
4  generally.
5      Q.   And that did not begin until
6  2014, would that be true?
7      A.   That would be true.
8      Q.   And your responsibilities
9  with respect to the monitoring of
10 suspicious orders, would I be correct
11 that those responsibilities did not begin
12 until after CVS stopped distributing
13 hydrocodone drugs to CVS pharmacies?
14         MR. DELINSKY:  Object to
15     form.
16         THE WITNESS:  I'm not a part
17     of the team that regularly reviews
18     suspicious orders.  My
19     responsibility is providing legal
20     services with the company,
21     beginning upon my employment with
22     the company in January of 2014.
23 BY MR. KENNEDY:
24     Q.   All right.  So there was

Page 20

1  some overlap?
2      A.   CVS ceased the distribution
3  of hydrocodone combination products upon
4  those products being upscheduled to
5  Schedule II in October of 2014.  That is
6  before I joined the company.
7      Q.   All right.
8      A.   Excuse me.  I joined the
9  company before that time.
10     Q.   Correct.  Let's just cut to
11 the chase.
12         You've had no
13 responsibility, at any point in time, in
14 the creation, implementation or direct
15 management of any controlled substance
16 monitoring program at CVS; true?
17         MR. DELINSKY:  Object to
18     form.
19         THE WITNESS:  I'm not sure
20     that I can answer that question
21     without revealing privileged
22     communications.
23 BY MR. KENNEDY:
24     Q.   Let me ask you, identify for

Page 21

1  me what controlled substance operating
2  policies and procedures that you wrote?
3         MR. DELINSKY:  Object to
4     form.  And I instruct the witness
5     not to --
6  BY MR. KENNEDY:
7      Q.   Prior to October of 2014,
8  tell me which ones you wrote.
9      A.   Prior to October?
10     Q.   Of 2014, yes.
11         MR. DELINSKY:  Object to the
12     form of the question.  And I
13     instruct -- I instruct the witness
14     not to answer, to the extent
15     answering requires the disclosure
16     of attorney-client privileged
17     information.
18         THE WITNESS:  I don't recall
19     offering any controlled substance
20     policy with respect to suspicious
21     order monitoring, prior to October
22     of 2014.
23 BY MR. KENNEDY:
24     Q.   You didn't operate -- you

Page 22

1  didn't create or write any; would that be
2  true?
3      A.   With respect to suspicious
4  order monitoring, that's correct.
5      Q.   Your involvement with
6  suspicious order monitoring has always
7  been as a lawyer, correct?
8      A.   That's correct.
9      Q.   In 2006, where were you
10 working?
11     A.   At a law firm in Boston.
12     Q.   Any involvement with CVS in
13 2006?
14     A.   Not to my recollection.
15     Q.   When did CVS begin the
16 distribution of hydrocodone drugs to CVS
17 stores?
18         MR. DELINSKY:  Object to the
19     form of the question.
20         Further object that -- to
21     the extent the question exceeds
22     the agreed-upon date limits of
23     this deposition, which are from
24     2006 through October 2014.

Page 23

1         MR. KENNEDY:  You've
2      provided us transaction data
3      predating '06.  So that's why I
4      believe that is within the scope
5      of what we're doing here today.
6  BY MR. KENNEDY:
7      Q.   Do you know when CVS began
8  to distribute hydrocodone drugs to CVS
9  stores?
10     A.   No, I don't.
11     Q.   Were they doing it in '06?
12     A.   Yes.
13     Q.   Were they doing it prior to
14 '06?
15     A.   My understanding is yes.
16     Q.   Now, you've been asked to
17 provide testimony in response to 30(b)(6)
18 notices in this case.
19         Would that be correct?
20     A.   Yes.
21     Q.   And I'm going to mark those
22 exhibits, if we can.
23         MR. KENNEDY:  Can we take a
24     break for a second?

Page 24

1         - - -
2         (Whereupon, a discussion off
3  the record occurred.)
4         - - -
5         VIDEO TECHNICIAN:  The time
6  is 9:22 a.m.  We're going off the
7  record.
8         - - -
9         (Whereupon, a brief recess
10 was taken.)
11        - - -
12        VIDEO TECHNICIAN:  The time
13 is 9:31 a.m.  We are back on the
14 record.
15 BY MR. KENNEDY:
16     Q.   All right.  Before we went
17 off the record, I asked you whether or
18 not you were here in response to 30(b)(6)
19 notices that had been served on CVS.
20         And your answer was that you
21 are, correct?
22     A.   On behalf of CVS Indiana,
23 LLC and CVS RX Services, Inc., the
24 defendants in this case.

Page 25

1      Q.   All right.  I'm going to
2  refer to them as the CVS defendants; so
3  you'll know what I'm talking about when I
4  say CVS defendants, it will be those two
5  distributor entities that you just
6  described, all right?
7      A.   That's fair.
8      Q.   I'm going to give you CVS
9  Exhibit-103, I think we already have 103,
10 104, 105 and 108.
11         Is 103 the first amended
12 notice of deposition pursuant to Rule
13 30(b)(6)?
14         - - -
15         (Whereupon, CVS-Vernazza
16     Exhibit-103, Amended First Notice
17     of Deposition Pursuant to Rule
18     30(b)(6) and Document Request
19     Pursuant to Rule 30(b)(2) and Rule
20     34 to Defendant CVS Health
21     Corporation, was marked for
22     identification.)
23         - - -
24         THE WITNESS:  I see that

Page 26

1     document, yes.
2 BY MR. KENNEDY:
3     Q.   And 104 is the amended
4 second notice of deposition pursuant to
5 Rule 30(b)(6), correct?
6        - - -
7     (Whereupon, CVS-Vernazza
8     Exhibit-104, Amended First Notice
9     of Deposition Pursuant to Rule
10     30(b)(6) and Document Request
11     Pursuant to Rule 30(b)(2) and Rule
12     34 to Defendant CVS Health
13     Corporation, was marked for
14     identification.)
15        - - -
16     THE WITNESS: I see that
17     document as well.
18 BY MR. KENNEDY:
19     Q.   And then we have 105 and
20 108, which are two letters from our law
21 firm which are amending and describing
22 further these notices, correct?
23        - - -
24     (Whereupon, CVS-Vernazza

Page 27

1     Exhibit-105, 9/21/18 Letter from
2     Daniel Goetz to Eric Delinsky, was
3     marked for identification.)
4        - - -
5     (Whereupon, CVS-Vernazza
6     Exhibit-108, 10/22/18 Letter from
7     Daniel Goetz to Eric Delinsky, was
8     marked for identification.)
9        - - -
10     THE WITNESS: I see two
11     letters that I presume to be from
12     your law firm, yes.
13 BY MR. KENNEDY:
14     Q.   And I think you've indicated
15 that you are here in response to those
16 notices, and you are speaking on behalf
17 of CVS Indiana, LLC, correct?
18     A.   Yes. And CVS RX Services,
19 Inc.
20     Q.   That we're going to refer to
21 as the CVS defendants as we move forward.
22     A.   Yes.
23     I just want to clarify this
24 notice does say CVS Health. I'm not here

Page 28

1 on behalf of CVS Health.
2     Q.   Let me ask you this: Did
3 only employees of CVS Indiana, LLC and
4 CVS RX Services, Inc. create, develop and
5 manage the suspicious order monitoring
6 policies between 2006 and 2014?
7     MR. DELINSKY: Object to the
8     form.
9     THE WITNESS: To the best of
10     my corporate knowledge, no. And
11     to the extent that the services
12     were performed by entities other
13     than those two entities, on behalf
14     of those two entities, to the
15     topics that have been designated
16     here, I'm prepared to provide
17     testimony on that as well.
18 BY MR. KENNEDY:
19     Q.   The other entities that
20 would have provided services to the CVS
21 defendants, with respect to the creation
22 and management of suspicious order
23 monitoring policies, would have been,
24 number one, CVS Pharmacy, Inc., true?

Page 29

1     MR. DELINSKY: Object to the
2     form.
3     THE WITNESS: CVS Pharmacy,
4     Inc. would have provided some of
5     those services, yes.
6 BY MR. KENNEDY:
7     Q.   And CVS Pharmacy, Inc.,
8 would that be the parent or the owner of
9 the CVS defendants?
10     A.   Yes.
11     Q.   What other CVS entities
12 provided services in the creation or the
13 management of the suspicious order
14 monitoring policies of the CVS
15 defendants?
16     MR. DELINSKY: Object to
17     form.
18     THE WITNESS: I don't have
19     corporate knowledge that there
20     were other such entities involved.
21     There may have been, I don't have
22     that knowledge at this point in
23     time.
24 BY MR. KENNEDY:

Page 30

1  Q.   The first notice that we
2  marked as Exhibit-103, that asks that you
3  would come prepared to provide
4  testimony -- if you look at Page 6, that
5  you would come and be prepared to provide
6  testimony with respect to, A, your
7  past -- and "your" would be the CVS
8  defendants -- past, present suspicious
9  order monitoring system, SOMS program
10 policies and procedures, correct?
11    A.   I see that language.
12    Q.   And are you prepared to do
13 that today, to provide testimony with
14 regard to that topic that we've outlined
15 as A?
16    MR. DELINSKY:  Before you
17    answer, Mr. Vernazza.
18    I would just like to put on
19    the record the fact that written
20    objections were served on
21    plaintiffs by the CVS defendants
22    as to both the first and second
23    notice, and additional
24    correspondence was sent by the --

Page 31

1  by counsel for the CVS defendants
2  regarding the scope and objections
3  to the topics in the two notices
4  that have been marked as
5  Exhibits-103 and 104.
6    And, of course, there were
7  considerable verbal conversations
8  among counsel for the CVS
9  defendants and plaintiffs
10 regarding the scope of the
11 exhibits.  Those are not part of
12 the record as of yet, and I simply
13 would note that the topics in the
14 two notices are subject to the
15 objections and subsequent
16 discussions among counsel.
17 BY MR. KENNEDY:
18    Q.   If you'd look at H, if you
19 would, of this notice that was provided
20 to the CVS defendants.
21    And let me ask you, on
22 behalf of the CVS defendants, are you
23 prepared to provide testimony,
24 information and facts with respect to the

Page 32

1  present policies and procedures related
2  to due diligence following the detection
3  of a suspicious order, past or present?
4    MR. DELINSKY:  Object to
5    form.  And I simply incorporate,
6    by reference, the remarks I just
7    made regarding the scope of this
8    notice.
9    THE WITNESS:  I am prepared
10   to testify as to the due diligence
11   and the process that CVS undertook
12   to identify and report suspicious
13   orders.
14 BY MR. KENNEDY:
15    Q.   And if we look at H -- or,
16 excuse me, if we look at I, have you come
17 prepared to provide testimony and facts
18 with respect to the past, present policy,
19 procedure, standards and metrics used to
20 identify orders of unusual size, orders
21 deviating substantially from a normal
22 pattern, and orders of unusual frequency?
23    A.   I have, again, prepared to
24 testify, on behalf of the CVS defendants,

Page 33

1  with respect to the policies --
2    Q.   So my answer would be yes --
3  your answer would be yes?
4    MR. DELINSKY:  Excuse me,
5    Mr. Vernazza, you can finish your
6    answer.
7    THE WITNESS:  With respect
8    to the policies, practices and
9    procedures that CVS used to
10   identify and report suspicious
11   orders.
12 BY MR. KENNEDY:
13    Q.   And that would include the
14 policies and procedures and metrics and
15 standards relating to the identification
16 of orders of unusual size, orders
17 deviating substantially from a normal
18 pattern and orders of unusual frequency;
19 is that true?
20    MR. DELINSKY:  And I would
21   note again that these topics have
22   been narrowed and have been made
23   subject to objections and
24   discussion among counsel.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1  THE WITNESS:  Again, the
2  suspicious order monitoring
3  processes and systems and due
4  diligence conducted in connection
5  with those is a topic that I have
6  undertaken to prepare to provide
7  testimony on today.
8  BY MR. KENNEDY:
9  Q.   Would the answer to my
10  question then be yes?
11  A.   I'm sorry, could you repeat
12  the question?
13  Q.   I want you to listen very
14  carefully to my question, and there's no
15  need for you to repeat my question in
16  your answer, if it doesn't call for it,
17  all right?
18  My question is very simply,
19  Number I, part of the 30(b)(6) notice,
20  have you come prepared to provide
21  testimony with respect to the CVS
22  defendants' past, present, policy,
23  procedures, standards and metrics used to
24  identify orders of unusual size, orders

Page 35

1  deviating substantially from a normal
2  pattern and orders of unusual frequency?
3  MR. DELINSKY:  I just
4  incorporate my comments again
5  regarding the scope of the notice.
6  THE WITNESS:  I understand
7  that there's been some narrowing
8  among counsel as to the topics and
9  some objections as to the topics.
10  I am prepared to testify, on
11  behalf of the CVS defendants, with
12  respect to the company's
13  suspicious order monitoring
14  policies, procedures and
15  practices.
16  BY MR. KENNEDY:
17  Q.   All right.
18  MR. KENNEDY:  Could you read
19  my question back again?
20  I want you to listen to this
21  question very carefully.  It's not
22  the one you're answering, but I
23  want you to answer my question.
24  - - -

Page 36

1  (Whereupon, the court
2  reporter read following part of
3  the record:
4  "Question: My question is
5  very simply, Number I, part of the
6  30(b)(6) notice, have you come
7  prepared to provide testimony with
8  respect to the CVS defendants'
9  past, present, policy, procedures,
10  standards and metrics used to
11  identify orders of unusual size,
12  orders deviating substantially
13  from a normal pattern and orders
14  of unusual frequency?")
15  - - -
16  MR. DELINSKY:  I'd like to
17  object to form.  I incorporate my
18  comments to the scope of the
19  notice.
20  And, Mr. Kennedy, I would
21  simply note that some, if not
22  many, of the topics set forth in
23  the notice that don't square with
24  what the CVS defendants did or

Page 37

1  didn't do, making it difficult to
2  answer in any way other than the
3  way that Mr. Vernazza already has
4  answered.
5  BY MR. KENNEDY:
6  Q.   Do you want to incorporate
7  the objection into your answer?
8  A.   I'm not sure what you mean
9  by that.
10  But to the extent that
11  objections have been made and agreements
12  have been made among counsel to narrow
13  the scope of the topics, I am prepared to
14  testify to that topic.
15  Q.   All right.  And how have
16  they been narrowed with respect to what
17  we just read?  Have they been narrowed
18  with respect to I?
19  MR. DELINSKY:  I'm
20  instructing the witness --
21  BY MR. KENNEDY:
22  Q.   And I'm talking about -- and
23  I just want to know, from '06 to '14,
24  okay, '06 to '14, Number I, how have they

Page 38

1 been narrowed that it's going to limit
2 your preparation, your ability to provide
3 us with that testimony and that evidence?
4        MR. DELINSKY:  And I would
5     instruct the witness not to answer
6     to the extent it discloses your
7     communications with counsel.
8        THE WITNESS:  I've conducted
9     an extensive effort to prepare on
10    the topic of the suspicious order
11    monitoring policies, procedures,
12    practices on behalf of the CVS
13    defendants in preparation for this
14    deposition.
15 BY MR. KENNEDY:
16    Q.   And did your preparation
17 include learning and understanding the
18 procedures in relation to unusual size,
19 frequency, and pattern with respect to
20 suspicious orders?
21        MR. DELINSKY:  Object to the
22    form.
23        THE WITNESS:  That's
24     included in the scope of my

Page 39

1     preparation.
2 BY MR. KENNEDY:
3    Q.   That was easy, wasn't it?
4 We didn't have to take 20 minutes.
5    A.   I'm just attempting to
6 answer your question.
7    Q.   Work harder.
8        MR. DELINSKY:  Objection.
9     Counsel.
10 BY MR. KENNEDY:
11    Q.   Can you tell me what efforts
12 you or the CVS defendants have made to
13 provide you with information known or
14 reasonably available to the CVS
15 defendants with respect to the topics
16 that you're going to testify on?
17    A.   Yes.  I have conducted
18 interviews with current and former CVS
19 personnel.  Those interviews number in
20 excess of 40 different individuals that I
21 have interviewed, many individuals on
22 multiple occasions.
23        I have undertaken a review
24 of a number of different documents in

Page 40

1 preparation for the deposition.
2        I have sat with our current
3 suspicious order monitoring team and
4 watched them perform their work for a
5 good portion of a morning.
6        I have traveled to the
7 Indianapolis distribution center for the
8 purposes of observing their operations
9 and conducting interviews with personnel
10 at that facility.
11        There may be more, but
12 that's what comes to mind.
13    Q.   And can you tell me how much
14 time you've put into educating yourself,
15 or being educated, with respect to the
16 suspicious order monitoring systems,
17 programs and procedures at the CVS
18 defendants?
19    A.   I can't put a precise time
20 on it.  The best of my estimation, the
21 amount of time I've spent preparing for
22 this deposition exceeds four weeks of
23 business days.
24    Q.   Did you interview and spend

Page 41

1 time with Mr. Martoletti?
2    A.   I did.
3    Q.   And on how many occasions
4 did you speak with him?
5    A.   More than one.
6    Q.   And what about Ms.
7 Propatier, did you interview her?
8    A.   I did.
9    Q.   On how many occasions?
10    A.   In preparation for this
11 deposition, I believe I interviewed Ms.
12 Propatier one time.
13    Q.   And what about Mr. Devlin?
14    A.   Yes.  I interviewed Mr.
15 Devlin in preparation for this
16 deposition.  I spoke with him more than
17 once in preparation.
18    Q.   And where did you interview
19 or speak to Mr. Martoletti?
20    A.   By telephone.
21    Q.   And Mr. Devlin?
22    A.   In person and by telephone.
23    Q.   And Ms. Propatier, in person
24 or telephone?

Highly Confidential - Subject to Further Confidentiality Review

Page 42

1      A.   In person.

2      Q.   And you understand, as a

3  lawyer, that your testimony here does not

4  necessarily represent your knowledge but

5  represents the knowledge of the CVS

6  defendants?  You understand that?

7      A.   I understand that as the

8  30(b)(6) deponent here today.

9      Q.   And you understand that your

10  testimony here today represents the

11  positions of the CVS defendants on the

12  topics that we're going to talk about?

13  You understand that?

14      MR. DELINSKY:  Object to

15      form.

16      THE WITNESS:  I understand

17      that I'm being asked to provide

18      corporate testimony.

19  BY MR. KENNEDY:

20      Q.   And corporate testimony

21  means you're providing testimony on

22  behalf of the CVS defendant corporations?

23      A.   That's my understanding.

24      Q.   And let me ask you, if

Page 43

1  CVS -- if a CVS pharmacy, individual

2  pharmacy, wants to purchase OxyContin

3  from McKesson or a Cardinal distributor,

4  does that pharmacy place the order

5  directly with Cardinal or McKesson?

6      MR. DELINSKY:  Object to

7      form.  Outside the scope of the

8      deposition notice.

9      If you have corporate

10      knowledge, you may answer.

11      THE WITNESS:  My

12      understanding is that, yes, they

13      would place that order directly

14      with Cardinal or McKesson.

15  BY MR. KENNEDY:

16      Q.   And then the order of, let's

17  say, an OxyContin or Schedule II

18  controlled substance, that order would be

19  delivered directly from the distributor,

20  the outside distributor, McKesson or

21  Cardinal, directly to the pharmacy; is

22  that your understanding?

23      MR. DELINSKY:  Objection to

24      the extent the question calls for

Page 44

1  information outside the scope of

2  the notice.

3      You may answer if you have

4  corporate knowledge.

5      THE WITNESS:  That is my

6  understanding.

7  BY MR. KENNEDY:

8      Q.   Now, with respect to

9  hydrocodone drugs, HCPs, I'm going to

10  call them hydrocodone drugs, when I call

11  them hydrocodone drugs, I mean HCPs, it's

12  a Schedule III, for the most part, what

13  we're going to talk about today, that's a

14  Schedule III narcotic; is that true?

15      A.   Hydrocodone combination

16  products, yes, were Schedule III drugs up

17  through October of 2014.

18      Q.   Now, the same process that

19  we just talked about, would that also be

20  the process where a CVS pharmacy wants to

21  purchase a hydrocodone drug from an

22  outside vendor or distributor such as

23  McKesson or Cardinal?

24      A.   I don't think I understand

Page 45

1  your question, sir.

2      Q.   If a CVS pharmacy, prior to

3  2014, wanted to purchase a hydrocodone

4  drug from an outside vendor, such as

5  McKesson or Cardinal, would that CVS

6  drugstore place the order directly with

7  the outside vendor, Cardinal or McKesson?

8      MR. DELINSKY:  Object to

9      form.  Object to the extent the

10      question calls for information

11      outside the scope of the notice.

12      You may answer to the extent

13      you have corporate knowledge.

14      THE WITNESS:  So let me just

15      make sure I understand the

16      terminology in your question

17      first.

18      You're talking about

19      hydrocodone combination products?

20      There are, I believe, certain

21      hydrocodone-only products that

22      have always been Schedule II

23      products.  So you're referring to

24      Schedule III --

Page 46

BY MR. KENNEDY:

Q. When I say hydrocodone drugs, again, I'm talking about hydrocodone drugs, hydrocodone HCPs, I'm talking about the Schedule III that you folks were distributing to your own pharmacies.

That's what we're here about, all right?

A. Okay.

Q. So my question is, when a CVS pharmacy, prior to 2014, wanted to order a hydrocodone drug from an outside vendor, an outside distributor, such as Cardinal, would that order be placed directly from the CVS pharmacy to that outside distributor?

MR. DELINSKY: Same objection.

THE WITNESS: If a CVS pharmacy, prior to October of 2014, were to place an order for a hydrocodone combination product with Cardinal or McKesson, they

Page 47

would place that order directly with Cardinal or McKesson.

BY MR. KENNEDY:

Q. And then the order for that hydrocodone drug from Cardinal, the outside vendor, would be delivered directly to the pharmacy, true?

A. In an instance where a pharmacy ordered a hydrocodone combination product, prior to 2014 -- October of 2014, from Cardinal or McKesson, my understanding is that Cardinal or McKesson would deliver that product directly to the pharmacy, yes.

Q. Did either of the CVS defendants ever distribute controlled substances to any customer, any entity other than a CVS pharmacy, between '06 and '14?

MR. DELINSKY: Object to form. Object to the extent the question exceeds the scope of the deposition notices.

You may answer to the extent

Page 48

you have corporate knowledge.

THE WITNESS: No.

BY MR. KENNEDY:

Q. Between 2006 and '14, when a CVS pharmacy wanted to order hydrocodone drugs from a CVS distributor, tell me what the process was.

A. The general process for a CVS pharmacy ordering a drug, such as a hydrocodone combination product, from a CVS distribution center would begin with an automated program known as the AMES system, which would calculate a suggested order for that pharmacy with respect to a particular drug for a particular ordering period.

That suggested order would take into account certain historical dispensing information, as well as what the system understood to be the balance on hand, or inventory, of the product and would generate a suggested order to restore that pharmacy's inventory level to what would be called a target

Page 49

inventory level.

The pharmacy would have the ability to modify that suggested order consistent with the needs of the pharmacy. At that point, the order would get passed through the mainframe computer system within the company, and then, subject to different suspicious order monitoring processes in place, to the warehouse for distribution.

Q. The automated system that places the order through which the order would go to the distribution center, that AMES system, is that a system that was created and managed by CVS Pharmacy, Inc.?

A. It was a CVS computer system managed by CVS. I don't have corporate knowledge as to whether CVS created the system or acquired the system from somebody else.

MR. DELINSKY: And by "CVS," do you mean CVS Pharmacy, Inc.?

THE WITNESS: I do.

Page 50

BY MR. KENNEDY:

1  Q.   So CVS Pharmacy would have
2  created, acquired and managed that
3  ordering system from the pharmacy to the
4  distribution center, true?
5  A.   That's correct.
6  Q.   And then the distribution
7  center, with respect to the hydrocodone
8  drug, would ship directly to the CVS
9  pharmacy?
10  A.   Yes.  There are certain
11  instances in which orders would be
12  cross-docked, consistent with the DEA
13  regulations, at another distribution
14  center, but then sent along to that
15  pharmacy.
16  Q.   Did any contracts exist
17  between the distribution centers and the
18  pharmacies with respect to the sale, the
19  provision of the controlled substances?
20       MR. DELINSKY:  Object to
21  form.  Object to the question, to
22  the extent it calls for
23  information outside the notice as

Page 51

1  agreed upon by counsel.
2       You may answer if you have
3  corporate knowledge.
4       THE WITNESS:  I don't have
5  any corporate knowledge with
6  respect to any such contracts.
7  BY MR. KENNEDY:
8  Q.   Who determined the -- let me
9  ask you this: Would the CVS pharmacies
10  actually pay the distribution center that
11  they were purchasing the hydrocodone
12  drugs from?
13       MR. DELINSKY:  Excuse me.
14  Object to the question, insofar as
15  it calls for information outside
16  the scope of the notices.
17       You may answer if you have
18  corporate knowledge.
19       THE WITNESS:  To the best of
20  my corporate knowledge, there
21  would not be an exchange of funds
22  between the pharmacy and the
23  distribution center with respect
24  to a shipment of hydrocodone

Page 52

1  combination products to that
2  pharmacy.
3  BY MR. KENNEDY:
4  Q.   Who would the CVS pharmacy
5  pay for the drugs that they were buying?
6       MR. DELINSKY:  Same
7  objection, based on scope.
8       THE WITNESS:  I'm not sure I
9  understand the question.
10  BY MR. KENNEDY:
11  Q.   If the CVS pharmacy
12  purchases hydrocodone drugs, who do they
13  pay for those drugs that they're
14  purchasing?
15       MR. DELINSKY:  Object to
16  form.  Same objection as to scope.
17       THE WITNESS:  I do not have
18  corporate knowledge that the CVS
19  pharmacy itself would pay funds in
20  connection with the receipt of
21  those drugs.
22  BY MR. KENNEDY:
23  Q.   Is that something that would
24  be managed by CVS Pharmacy, Inc.?

Page 53

1  A.   To the best of my corporate
2  knowledge, yes.
3  Q.   CVS Pharmacy, Inc., would I
4  be correct that they own, either directly
5  or indirectly, all of the CVS pharmacies
6  in the United States?
7       MR. DELINSKY:  Object to the
8  form of the question.  Object on
9  scope grounds.  This is outside
10  the -- the question calls for
11  information that's outside the
12  scope of the agreed-upon topics
13  for this deposition.
14       This information, to the
15  extent it's called for through the
16  notice, it's called for by, I
17  believe, Topic 2 of the second
18  notice, which is, in the first
19  instance, a topic to be answered
20  in writing.
21       You may answer to the extent
22  you have corporate knowledge.
23       THE WITNESS:  To the best of
24  my corporate knowledge at this

Page 54

1  point in time, CVS Pharmacy, Inc.
2  owns, either directly or
3  indirectly, all of the CVS retail
4  pharmacies.
5  BY MR. KENNEDY:
6  Q.  So CVS Pharmacy, Inc. would
7  own both the distribution centers we're
8  talking about and the pharmacies that
9  we're talking about; is that right?
10  MR. DELINSKY:  Same
11  objection.
12  THE WITNESS:  Not
13  necessarily.  There are various
14  entities that may own pharmacies
15  in different locations.  And there
16  are various entities that may own
17  distribution centers in different
18  locations.
19  Those entities ultimately
20  roll up to CVS Pharmacy, Inc.,
21  either directly or indirectly.
22  BY MR. KENNEDY:
23  Q.  Okay.  So let me make my
24  question clear, then.

Page 55

1  CVS Pharmacy, Inc. owns,
2  directly or indirectly, the
3  distribution -- let me go back.
4  CVS Pharmacy, Inc. owns,
5  directly or indirectly, the
6  distribution centers we're talking about
7  and the CVS pharmacies across the
8  country, correct?
9  MR. DELINSKY:  Same scope
10  objection.
11  THE WITNESS:  While this is
12  not a topic that I undertook
13  preparation on for the purposes of
14  this deposition, to the best of my
15  knowledge, that is true.
16  BY MR. KENNEDY:
17  Q.  Now, the two CVS defendants
18  both distribute controlled substances,
19  correct?
20  MR. DELINSKY:  Object to
21  form.
22  THE WITNESS:  Both of
23  these --
24  BY MR. KENNEDY:

Page 56

1  Q.  To CVS pharmacies, correct?
2  A.  Both of the CVS entities
3  named as defendants in this case are
4  distributors of controlled substances.
5  They are now, and have always been, only
6  distributors of Schedule III through V
7  controlled substances, and have never
8  been distributors of Schedule II
9  controlled substances.
10  Additionally, those entities
11  have only distributed controlled
12  substances to CVS pharmacies, to the best
13  of my corporate knowledge.
14  Q.  So the answer to my question
15  would be yes, correct?
16  MR. DELINSKY:  Object to
17  form.
18  THE WITNESS:  I think the
19  answer to your question is the
20  answer I provided to your
21  question.
22  BY MR. KENNEDY:
23  Q.  Well, the shortened version
24  would be yes, correct?

Page 57

1  MR. DELINSKY:  Object to the
2  form.
3  BY MR. KENNEDY:
4  Q.  The two distribution centers
5  that we're talking about, the two CVS
6  defendants, distribute controlled
7  substances to CVS pharmacies; is the
8  answer to that yes?
9  MR. DELINSKY:  Object to
10  form.  The answer has already been
11  provided.
12  THE WITNESS:  The answer is
13  that yes, insofar as we're talking
14  about Schedule III through V
15  controlled substances and only to
16  CVS pharmacies.
17  BY MR. KENNEDY:
18  Q.  Unless I'm talking about --
19  unless I specifically let you know, we're
20  talking about Schedule III hydrocodone
21  drugs, all right, that CVS distributed to
22  the CVS pharmacies, all right?
23  A.  With respect to --
24  MR. DELINSKY:  Object to

Page 58

1  form.  And I don't think there's a
2  question pending, or is there?
3  BY MR. KENNEDY:
4     Q.   Do you understand that
5  that's what we're here talking about?
6  We're talking about hydrocodone drugs
7  being distributed by CVS defendants to
8  the CVS pharmacies.
9        You understand that's kind
10 of the topic of the litigation here?
11       MR. DELINSKY:  I would just
12    like to -- I object to form.  It's
13    hydrocodone combination products.
14 BY MR. KENNEDY:
15    Q.   When I say "hydrocodone
16 drugs," you know I'm talking about HCPs
17 or hydrocodone products, all right?  You
18 understand that?
19       I think we kind of been
20 through that.
21       MR. DELINSKY:  Object to --
22 BY MR. KENNEDY:
23    Q.   You understand that?
24       MR. DELINSKY:  Object to the

Page 59

1  shorthand that's being used in the
2  question.  There's a question as
3  to whether they are drugs or
4  medicine.
5  BY MR. KENNEDY:
6     Q.   Well, CVS refers to them as
7  drugs, don't they, in every one of their
8  standard operating procedures?
9        You've reviewed those.
10 Don't they refer to them as drugs?
11    A.   Medications or drugs,
12 certainly.
13    Q.   In fact --
14    A.   Everything CVS dispenses is
15 an FDA-approved medication.
16       But shorthand, in the
17 industry, may be drugs.
18    Q.   Well, shorthand, every --
19 what's the name of your -- the standard
20 operating procedures?  Isn't it
21 controlled drugs?
22    A.   Sure.
23    Q.   Right.  So that's a term
24 you're familiar with, right, drugs?

Page 60

1     A.   We're talking about
2  controlled substances that are regulated
3  by the DEA and approved by the FDA.
4  We're not, of course, talking about
5  street drugs.
6     Q.   I'm talking about the term
7  "drugs" that you and CVS used in every
8  one of its standard operating procedures.
9        Do you know what I'm talking
10 about?
11    A.   I'm --
12    Q.   Do you know what I'm talking
13 about when I use the term "controlled
14 drugs"?  Do you understand that?
15       MR. DELINSKY:  Object to
16    form.  If there's a document
17    you're referring to, please show
18    the witness.
19 BY MR. KENNEDY:
20    Q.   Do you understand that?
21    A.   If you're talking about
22 controlled drugs, I would understand you
23 to be talking about those medications
24 that are scheduled by the DEA as

Page 61

1  controlled substances.
2        When you say "controlled
3  substances," that may refer to a broader
4  class of controlled substances than
5  simply hydrocodone combination products.
6     Q.   Did CVS, from '06 to '14,
7  understand that hydrocodone drugs were
8  highly addictive?  Did they understand
9  that?
10       MR. DELINSKY:  Object to the
11    form of the question.  That is
12    outside the scope of the two
13    deposition notices.
14       To the extent the witness
15    has corporate knowledge, you may
16    answer.
17       THE WITNESS:  Could you
18    repeat the question?
19 BY MR. KENNEDY:
20    Q.   Did CVS, from 2006 to 2014,
21 did they understand that hydrocodone
22 drugs, HCPs, were a highly addictive
23 drug?
24       MR. DELINSKY:  Same

Page 62

1   objection.
2       THE WITNESS: CVS understood
3   that they were controlled
4   substances in Schedule III,
5   between 2006 and 2014.
6       MR. KENNEDY: Could you read
7   my question back, please?
8       I want you to answer my
9   question.
10          - - -
11      (Whereupon, the court
12  reporter read the following part
13  of the record:
14  "Question: Did CVS, from
15  2006 to 2014, did they understand
16  that hydrocodone drugs, HCPs, were
17  a highly addictive drug?")
18          - - -
19      MR. DELINSKY: Object to
20  form. Object on the grounds that
21  the question is outside the scope
22  of the deposition.
23      Further object on the
24  grounds that the question has been

Page 63

1   asked and answered directly.
2       THE WITNESS: CVS was
3   familiar with those drugs as being
4   controlled substances in Schedule
5   III. CVS was also aware that
6   controlled substances could be
7   abused or misused.
8       Beyond that, I'm not sure I
9   have corporate knowledge to answer
10  your question.
11  BY MR. KENNEDY:
12      Q.   Did CVS understand, between
13  2006 and 2014, that there was an opioid
14  epidemic in the United States of America?
15      MR. DELINSKY: Object to
16  form. Object to the -- on the
17  grounds that that question is
18  outside the scope of the
19  deposition notices.
20      Mr. Kennedy, could you
21  please identify the topic to which
22  this question pertains?
23      MR. KENNEDY: Let me ask the
24  first question.

Page 64

1   BY MR. KENNEDY:
2       Q.   Let me ask you this: If CVS
3   is writing, establishing and putting in
4   place suspicious order monitoring
5   policies, if they're doing that,
6   shouldn't they understand the existence
7   of an epidemic in relation to those
8   substances in the United States of
9   America?
10      MR. DELINSKY: Object to
11  form.
12  BY MR. KENNEDY:
13      Q.   Can you answer that?
14      A.   I'm not sure that I have
15  corporate knowledge with respect to that
16  question.
17      Q.   So CVS has no position on
18  whether or not they should understand the
19  existence of an epidemic in relation to
20  the drugs that it is distributing --
21      MR. DELINSKY: Object to
22  the --
23  BY MR. KENNEDY:
24      Q.   -- is that your position?

Page 65

1   Is that the position of CVS defendants in
2   this case?
3       MR. DELINSKY: Object to
4   form.
5       THE WITNESS: That is not
6   the position of CVS, as you've
7   characterized it.
8       I don't have corporate
9   knowledge to answer your question
10  throughout the time period that
11  you have set forth, in the manner
12  that you've set it forth.
13      It's not a topic that I
14  understood to be part of the
15  topics that I prepared for in the
16  course of preparing for this
17  deposition. And for that reason,
18  at this point in time, I don't
19  have corporate knowledge that can
20  respond to that question.
21  BY MR. KENNEDY:
22      Q.   So let me ask you, you
23  didn't think you needed to understand and
24  know whether CVS was aware of an opioid

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1 epidemic during the period of time that
2 they are establishing, creating and
3 managing policies and procedures to limit
4 diversion in the shipping of suspicious
5 orders of the drugs? You didn't find a
6 need to prepare on that topic?
7        MR. DELINSKY: Object to
8    form. You're referring to a
9    topic, Mr. Kennedy.
10       I'm going to make my second
11   request for you to identify the
12   topic that questions regarding a
13   potential opioid epidemic pertain
14   to before we proceed any further.
15       MR. KENNEDY: And I'll go
16   back to my question.
17 BY MR. KENNEDY:
18   Q.   Does CVS believe, does CVS
19 take the position that it was necessary
20 for them to understand the opioid
21 epidemic in this country when they were
22 writing policies and procedures to
23 monitor the drugs that they were selling
24 that were involved in this epidemic?

Page 67

1        MR. DELINSKY: Object to
2    form. Object on -- to the extent
3    it's outside -- insofar as it's
4    outside the scope of the
5    deposition notice.
6        THE WITNESS: The company
7    took steps to comply with the
8    Controlled Substances Act, with
9    the regulations promulgated under
10   the Controlled Substances Act, and
11   state law, and for its pharmacists
12   to dispense legitimate
13   prescriptions to patients for
14   the -- legitimate medical
15   purposes.
16 BY MR. KENNEDY:
17   Q.   Did I ask you -- did I just
18 ask you whether or not they made efforts
19 to conform to the law? Did I ask you
20 that?
21       MR. DELINSKY: Object to the
22   form of the question.
23 BY MR. KENNEDY:
24   Q.   Did I ask you that question?

Page 68

1        MR. DELINSKY: I object to
2    the form of the question.
3        MR. KENNEDY: That's fine.
4        MR. DELINSKY: You
5    effectively did.
6        MR. KENNEDY: If we could
7    just take a moment.
8        You know, the protocols with
9    respect to depositions say you are
10   allowed to object, but you are not
11   allowed to give a speech prior to
12   every single answer. You're not
13   allowed to do that.
14       You're allowed to object,
15   and that is all you're allowed to
16   do, in the protocols that we
17   absolutely, positively negotiated
18   for a long time.
19       This deposition is taking
20   twice as long as it needs to do,
21   because you are repeating my
22   question, and your objection is as
23   long as my question, for every
24   question. And I just don't think

Page 69

1 you're allowed to do that. I
2    would ask that you stop doing
3    that.
4        MR. DELINSKY: Mr. Kennedy,
5    I think the record will speak to
6    itself on that subject, number
7    one.
8        Number two, we have asked
9    you now three times to identify
10   the topic to which this line of
11   questioning pertains, and you have
12   not identified one.
13       MR. KENNEDY: Very, very
14   simply. If you're writing
15   policies to monitor the drugs that
16   you're selling, you should know
17   about the death and the addiction
18   that those drugs are causing, when
19   you are writing those policies.
20   And the topic here is their
21   efforts to write those policies.
22       Now, if this witness
23   believes that CVS had no need to
24   know about the people that these

Page 70

1 drugs were killing and addicting,
2 when writing those policies, then
3 he should say so, and I will move
4 on.
5 But if he agrees with me
6 that they should know about the
7 people that these drugs are
8 killing and addicting, when they
9 write their policies with respect
10 to the sale of these drugs to our
11 communities, then he should answer
12 the questions about what they knew
13 with respect to the epidemic.
14 That's very simple.
15 So I'll ask my question
16 again, and I want you to listen
17 carefully.
18 MR. DELINSKY: I --
19 MR. KENNEDY: Go ahead.
20 MR. DELINSKY: Before you
21 do --
22 MR. KENNEDY: Yes.
23 MR. DELINSKY: I object to
24 your commentary. It's laden --

Page 71

1 MR. KENNEDY: I object to
2 your --
3 MR. DELINSKY: It's laden
4 with factual assumptions. It's
5 not appropriate for the deposition
6 to be giving speeches or opening
7 statements.
8 And I have now asked you for
9 a fifth time to direct us to the
10 particular topic to which you
11 believe this line of question
12 pertains so that we may evaluate
13 it.
14 MR. KENNEDY: And it's the
15 topics we read into the record.
16 Their policies and procedures with
17 respect to suspicious order
18 monitoring.
19 BY MR. KENNEDY:
20 Q. Let me ask you -- let me ask
21 you a very simple question.
22 Do you believe that CVS
23 should have been aware of the existence
24 of the opioid epidemic, between '06 and

Page 72

1 2014, while they were creating,
2 preparing, managing their suspicious
3 order monitoring policy?
4 MR. DELINSKY: Object to
5 form. Object as outside the scope
6 of the notice.
7 THE WITNESS: That is not a
8 topic on which I have undertaken
9 preparation for this deposition,
10 and for that reason is a topic on
11 which I do not have corporate
12 knowledge to provide at this time.
13 BY MR. KENNEDY:
14 Q. Do you know whether or not
15 CVS was aware of the extent of the opioid
16 epidemic between 2006 and 2014, as a
17 distributor of opioids to CVS pharmacies?
18 MR. DELINSKY: Object to
19 form. Object as outside the scope
20 of the deposition notice --
21 notices, plural.
22 THE WITNESS: To the best of
23 my corporate knowledge, CVS was
24 aware that hydrocodone combination

Page 73

1 products were Schedule III
2 products during that time period,
3 and that CVS took steps to comply
4 with the law with respect to
5 Schedule III controlled
6 substances.
7 MR. KENNEDY: Would you read
8 the question back, please?
9 MR. DELINSKY: Excuse me,
10 were you done with your answer?
11 THE WITNESS: Yes.
12 - - -
13 (Whereupon, the court
14 reporter read the following part
15 of the record:
16 "Question: Do you know
17 whether or not CVS was aware of
18 the extent of the opioid epidemic
19 between 2006 and 2014, as a
20 distributor of opioids to CVS
21 pharmacies?")
22 - - -
23 THE WITNESS: Again, Mr.
24 Kennedy, that is not a topic that

Page 74

1 I understood to be part of the
2 noticed topics that I prepared for
3 in preparation for this
4 deposition.
5 So I don't have corporate
6 knowledge that I can provide on
7 the topic at this time.
8 MR. DELINSKY: And I would
9 just like to ensure that my -- I
10 objected on two grounds to that
11 same question and that those are
12 incorporated into the read back
13 question.
14 BY MR. KENNEDY:
15 Q. Did CVS know, by 2010, that
16 prescription drugs were killing more
17 people in America than heroin and cocaine
18 combined?
19 MR. DELINSKY: Object to
20 form. Object as outside the scope
21 of the notice.
22 I'd ask Mr. Kennedy, as to
23 this question, if he could
24 identify a particular topic in

Page 75

1 your notices to which this
2 question pertains.
3 THE WITNESS: Again, that is
4 not a topic that I undertook to
5 prepare on in advance of this
6 deposition. CVS was aware of
7 hydrocodone combination products
8 being Schedule III controlled
9 substances. CVS was aware, and
10 has been aware at various times,
11 that those products can be abused
12 and misused.
13 MR. KENNEDY: We need to
14 call the Special Master, just to
15 try to get the parameters down.
16 Can we take a break?
17 MR. DELINSKY: I think
18 they're in court.
19 - - -
20 (Whereupon, a discussion off
21 the record occurred.)
22 - - -
23 MR. DELINSKY: Mr. Kennedy,
24 again, I've asked you for -- to

Page 76

1 identify a topic to which your
2 questions about CVS's knowledge
3 about the opioid epidemic pertain.
4 And if you identify it, we, of
5 course, will consider it. But you
6 haven't identified one.
7 BY MR. KENNEDY:
8 Q. We're going to take a look
9 at Exhibit-1.
10 - - -
11 (Whereupon, CVS-Vernazza
12 Exhibit-1, United States Code -
13 Section 823, was marked for
14 identification.)
15 - - -
16 BY MR. KENNEDY:
17 Q. Have you seen this before,
18 Exhibit-1?
19 A. I haven't seen this
20 particular printout before. But I
21 presume this to be a printout from the
22 Controlled Substances Act, resources on
23 the DEA website.
24 Q. Does it say Title 21, United

Page 77

1 States Code, Controlled Substances Act?
2 A. That's what it says.
3 Q. Are you familiar with that
4 act?
5 A. I am generally familiar with
6 the Controlled Substances Act, yes.
7 Q. Did you review that in
8 preparation for your understanding of the
9 testimony you would be providing today?
10 A. I have reviewed certain
11 components of the Controlled Substances
12 Act.
13 Q. When did CVS, the CVS
14 defendants, first become aware of the
15 Controlled Substances Act of 1971?
16 MR. DELINSKY: Object to
17 form. It's outside the scope of
18 the notice.
19 THE WITNESS: I have no
20 corporate knowledge that CVS has
21 ever been unaware of the
22 Controlled Substances Act.
23 BY MR. KENNEDY:
24 Q. Should they have been aware

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1  of it in 2006?
2      A.   I understand that in 2006
3  CVS was aware of the Controlled
4  Substances Act.
5      Q.   Did you hear my question?
6          MR. DELINSKY:  Object to
7  form.
8          THE WITNESS:  I thought I
9  answered it.
10 BY MR. KENNEDY:
11     Q.   My question was, should CVS
12 have been aware of the Controlled
13 Substances Act in 2006?
14         MR. DELINSKY:  Object to
15 form.  Asked and answered.
16 BY MR. KENNEDY:
17     Q.   I didn't ask you whether
18 they were, I asked you should.
19         Should they have been aware
20 of it in 2006, the Controlled Substances
21 Act?  Should they have been?
22     A.   As a --
23         MR. DELINSKY:  Excuse me.
24 Object to form.  Object as

Page 79

1  outside the scope of the notice.
2  Object as outside the scope of
3  Special Master Cohen's rulings on
4  the deposition notices.  And
5  object on the grounds that the
6  question has been asked and
7  answered.
8          THE WITNESS:  In 2006, CVS
9  was a DEA registrant in a number
10 of different capacities, and so
11 surely CVS would have been aware
12 of the Controlled Substances Act,
13 which provides for such licensure.
14 BY MR. KENNEDY:
15     Q.   Should have been aware and
16 were aware; is that your answer?
17     A.   Yes.
18     Q.   Do you know how CVS became
19 aware of this, the Controlled Substances
20 Act?
21         MR. DELINSKY:  Object to
22 form.  Object to scope, on scope
23 grounds as well.
24         THE WITNESS:  That's not

Page 80

1  something on which I have
2  corporate knowledge.
3  BY MR. KENNEDY:
4      Q.   Look at Number E, if we can
5  scroll down.
6          Look at E, if you would,
7  E(1).
8      A.   I just need to take a minute
9  to review the rest of the document, if
10 you would.
11     Q.   All of E, please.  All of E
12 plus (1).
13         Now, E, E is titled,
14 Distributors of Controlled Substances in
15 Schedule III, IV or V.
16         Do you see that?
17     A.   Yes.  If you could wait just
18 a second.  I'm still reviewing the
19 document.
20         Yes, sir.  I'm ready for
21 your question.
22     Q.   E is titled, Distributors of
23 Controlled Substances in Schedules III,
24 IV and V, correct?

Page 81

1      A.   That's what I see here.
2      Q.   That would include the CVS
3  distributors?
4      A.   CVS distributors were
5  distributors of controlled substances in
6  Schedules III, IV and V, that is correct.
7      Q.   Would the answer to my
8  question be yes?
9          MR. DELINSKY:  Object to
10 form.
11         THE WITNESS:  I think your
12 question was, and the CVS
13 distributors.  I was providing an
14 answer to your question.
15 BY MR. KENNEDY:
16     Q.   This is a yes-or-no
17 question, all right?  I'm just going to
18 give you a kind of heads up, it's a
19 yes-or-no question, all right?  So listen
20 very carefully.
21         Would E, what we just read,
22 apply to CVS as a distributor of Schedule
23 III opioids?
24         MR. DELINSKY:  Object to

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 form.
2    THE WITNESS:  And my
3 response was that CVS distributors
4 were distributors of Schedule III
5 opioids.
6 BY MR. KENNEDY:
7    Q.   So the answer -- let me ask
8 you:  Were you told to repeat my question
9 in every answer so that this would take
10 longer?
11    MR. DELINSKY:  Object to
12    form.  I instruct you not to
13    answer that question.
14 BY MR. KENNEDY:
15    Q.   I just asked a simple
16 yes-or-no, question and you have to
17 repeat my entire question in your answer.
18 The time we are wasting isn't fair to
19 anybody here.
20    So if it's a yes-or-no
21 question, then please answer yes or no.
22 If you need to explain, then please go
23 ahead and explain.  All right?
24    A.   I didn't understand that to

Page 83

1 be a yes-or-no question.
2    Q.   Under E, it then states, The
3 attorney general shall register an
4 applicant to distribute controlled
5 substances in Schedules III, IV or V,
6 unless he determines that the issuance of
7 such registration is inconsistent with
8 the public interest.  In determining the
9 public interest, the following factors
10 shall be considered.  1, maintenance of
11 effective controls against diversion of
12 particular controlled substances into
13 other than legitimate medical, scientific
14 and industrial channels.
15    Did I read that correctly?
16    A.   I believe you did.
17    Q.   Did you understand and did
18 CVS understand that to be what this act
19 of Congress stated in 1971?
20    MR. DELINSKY:  Object to
21    form.  Object on scope grounds.
22    THE WITNESS:  I am not sure
23    I understood the question.
24    Could you repeat it?

Page 84

1 BY MR. KENNEDY:
2    Q.   Was CVS aware of that
3 statement by Congress in this act as of
4 2006?
5    MR. DELINSKY:  Object to
6    form.
7    THE WITNESS:  I don't have
8 corporate knowledge as to the
9 extent of CVS's knowledge of that
10 particular provision at that
11 particular point in time.
12    I can say that CVS was a
13 registrant and would have applied
14 and met the standard set forth
15 here in order to receive a
16 registration.
17 BY MR. KENNEDY:
18    Q.   Fine.  So can we agree that
19 CVS certainly should have been aware of
20 E(1) in 2006 as a registrant and as a
21 distributor of controlled substances?
22    MR. DELINSKY:  Object to
23    form.
24 BY MR. KENNEDY:

Page 85

1    Q.   True?
2    A.   CVS is aware of the
3 Controlled Substances Act.  This is a
4 provision that refers to what the
5 attorney general should do upon
6 application for a registration by a
7 potential registrant.
8    And as I have said, CVS was
9 a registrant in 2006.
10    Q.   Can we agree that CVS should
11 have been aware of E(1) that we just read
12 in relation to the maintenance of
13 effective controls against diversion?
14 CVS should have been aware of E(1) in
15 this statute by the United States
16 Congress in 2006?  Should have been aware
17 of it, correct?
18    MR. DELINSKY:  Object to
19    form.
20    THE WITNESS:  Again, I don't
21 have corporate knowledge as to the
22 particular nature in which CVS was
23 aware of this particular
24 provision, which applies to the

Page 86

1  attorney general in acting upon
2  applications for registrations.
3      I do know that CVS would
4  have applied for a registration
5  and received one, presumably
6  consistent with the provision of
7  the Controlled Substances Act.
8      I'm aware of no information
9  suggesting that CVS was not aware
10  of the Controlled Substances Act
11  in general.
12  BY MR. KENNEDY:
13    Q.   And I asked you whether they
14  should have been aware of it, not whether
15  they were or whether they were not.  I
16  haven't asked you whether they agreed or
17  disagreed.  I haven't asked you for any
18  legal interpretation.
19    I'm asking you, should CVS
20  have been aware of this statement by
21  Congress contained in E(1) that we have
22  read?  Should they have been aware of
23  this in 2006?  That's my question.
24      MR. DELINSKY:  Object to

Page 87

1  form.  Object on the grounds that
2  it's outside the scope of the
3  notices.
4      THE WITNESS:  I really don't
5  know --
6      MR. DELINSKY:  Object as
7  asked and answered.
8      THE WITNESS:  I don't know
9  what you mean by "should."  I'm
10  trying to answer the best way I
11  can, based on the factual
12  corporate knowledge that I have.
13  BY MR. KENNEDY:
14    Q.   As someone or a registrant
15  that is attempting to maintain effective
16  controls against diversion, should they
17  have known of the existence of E(1), the
18  statement by the United States Congress
19  in 1971?  Should they have known that?
20      MR. DELINSKY:  Same
21  objections.
22      THE WITNESS:  Sir, I think
23  that's the same question you've
24  now asked me several times.  I can

Page 88

1  give you the same answer, which is
2  that this is a provision of the
3  Controlled Substances Act.  I have
4  no reason to believe that CVS
5  wasn't aware of the Controlled
6  Substances Act.
7      This particular provision
8  appears to apply to the attorney
9  general.
10      MR. KENNEDY:  I'm just going
11  to note in the record your refusal
12  to answer my question.
13      THE WITNESS:  Sir, I don't
14  believe I'm refusing to answer
15  your question.  I'm trying to
16  answer your question to the best
17  of my ability.
18  BY MR. KENNEDY:
19    Q.   Do you know what the word
20  "should" means?  I mean, you understand
21  my question.  I mean, you're a lawyer.
22      You have taken depositions
23  in the past, have you not?
24    A.   I have taken depositions.

Page 89

1    Q.   How many?
2    A.   A handful.
3    Q.   And when I ask you, should
4  they have been aware of this provision
5  and this statute, do you not know what I
6  mean?  Whether or not they should have
7  been aware of it as opposed to were they
8  aware of it.  I'm asking you should they
9  have been.
10      MR. DELINSKY:  Object to
11  form.
12      THE WITNESS:  I really don't
13  understand your question as to
14  "should have been" with respect to
15  this particular provision.
16      Again, I have no reason to
17  believe that CVS, as a DEA
18  registrant, was not aware of the
19  Controlled Substances Act,
20  including this provision, as of
21  2006.
22      MR. DELINSKY:  Let's take a
23  break.  We've been on the record
24  for about 50 minutes.

Page 90

1     VIDEO TECHNICIAN: The time
2 is 10:26 a.m. We're going off the
3 record.
4         - - -
5     (Whereupon, a brief recess
6 was taken.)
7         - - -
8     VIDEO TECHNICIAN: The time
9 is 10:44 a.m. And we're back on
10 the record.
11 BY MR. KENNEDY:
12    Q. Sir, you understand when I
13 say "CVS," I mean the CVS defendants in
14 this case? You understand that?
15    A. Okay. I think you had
16 defined the CVS defendants earlier to me,
17 the two defendants in the case.
18     You're now saying you want
19 to further define the CVS defendants as
20 just CVS?
21    Q. Yes. When I ask you a
22 question, when I say "CVS," "CVS
23 defendants," I'm meaning the same thing.
24     Do you understand that?

Page 91

1    A. I'm not sure I have
2 understood that to this point.
3     When I might use the term
4 "CVS," I might speak to CVS more broadly
5 than just the CVS defendants.
6    Q. When I say "CVS," I mean the
7 defendants, unless I say otherwise, all
8 right?
9    A. I will try to keep that in
10 mind.
11    Q. CVS Pharmacy, Inc., have
12 they ever been a DEA registrant to
13 distribute controlled substances?
14     MR. DELINSKY: Object on
15 scope grounds. It's outside the
16 scope of the notice.
17     You may answer.
18     THE WITNESS: I don't
19 specifically recall whether any of
20 our distribution centers are owned
21 directly by CVS Pharmacy, Inc.
22     The two CVS defendants in
23 this case are not owned directly
24 by CVS Pharmacy, Inc. I do know

Page 92

1 that there are some stores in some
2 locations that are owned directly
3 by CVS Pharmacy, Inc., although
4 not in the jurisdictions where I
5 have prepared for this deposition.
6     MR. KENNEDY: All right. If
7 you read my question back, please.
8     - - -
9     (Whereupon, the court
10 reporter read the following part
11 of the record:
12     "Question: CVS Pharmacy,
13 Inc., have they ever been a DEA
14 registrant to distribute
15 controlled substances?")
16     - - -
17     MR. DELINSKY: Object to
18 form. Asked and answered. Object
19 as outside the scope.
20 BY MR. KENNEDY:
21    Q. Could you answer my
22 question, please?
23    A. I did answer your question
24 to the best of my ability.

Page 93

1     And based on the preparation
2 I've undertaken for this deposition, the
3 two CVS defendants in this case are not
4 owned directly by CVS Pharmacy, Inc.
5     The registrants on the DEA
6 licensure, to the best of my knowledge,
7 for the two distribution centers who are
8 the defendants in these cases, the two
9 entities that own the distribution
10 centers in these entities, are the
11 entities that own the distribution
12 centers.
13     I do not recall, because
14 it's beyond the scope of what I prepared
15 for -- testimony for today, whether any
16 other CVS distribution center is owned
17 directly by CVS Pharmacy, Inc. such that
18 CVS Pharmacy, Inc. would be the
19 registrant.
20    Q. Is the answer to my question
21 you do not know whether or not CVS
22 Pharmacy, Inc. has ever been a DEA
23 registrant to distribute controlled
24 substances? Is that the answer?

Page 94

1      MR. DELINSKY:  Object to
2  form.  Object as outside the
3  scope.  Object as asked and
4  answered.
5      THE WITNESS:  I did not
6  undertake preparation on that
7  point, consistent with the notice
8  and as I understand the topics.
9      So I do not have corporate
10 knowledge on that as we sit here
11 today.
12 BY MR. KENNEDY:
13     Q.  In '06 and '07, did the CVS
14 distributors, or any CVS entity,
15 including CVS Pharmacy, Inc., have any
16 meetings with the DEA to talk about
17 controlled substance monitoring?
18     MR. DELINSKY:  Object to
19 form.  Object as outside the
20 scope, to the extent it's outside
21 the scope of the deposition
22 notice.
23 BY MR. KENNEDY:
24     Q.  Do you know?

Page 95

1      A.  Could you set forth the time
2  period again?
3      Q.  In '06 or '07 or '08, did
4  the CVS defendants, or any CVS entity,
5  including CVS Pharmacy, Inc., have any
6  meetings with the DEA to talk about
7  suspicious order monitoring of controlled
8  substances?
9      MR. DELINSKY:  Same
10 objections.
11     THE WITNESS:  I do not have
12 corporate knowledge as to whether
13 or not the CVS defendants, as
14 you've used the term, or CVS
15 Pharmacy, Inc. had a meeting with,
16 for instance, DEA headquarters
17 concerning suspicious order
18 monitoring.
19     DEA does regularly inspect
20 and conduct audits of our
21 distribution facilities, and so
22 there may have been conversations
23 about suspicious order monitoring
24 in one of our facilities during

Page 96

1  one of those types of interactions
2  during that time period.
3      I just don't know for
4  certain as I sit here.
5  BY MR. KENNEDY:
6      Q.  When, if ever -- well, when.
7  When did the CVS defendants, when did
8  they become aware of the Know Your
9  Customer requirement or program of the
10 DEA?
11     MR. DELINSKY:  Object to
12 form.
13     THE WITNESS:  I don't have
14 corporate knowledge as to when
15 exactly CVS would have acquired
16 knowledge of the DEA's Know Your
17 Customer language.
18     I do know that CVS received
19 at least some correspondence from
20 the DEA that, to the best of my
21 recollection, references that type
22 of language.
23 BY MR. KENNEDY:
24     Q.  And when the DEA talks about

Page 97

1  Know Your Customer, did CVS understand
2  that to mean the customer being the CVS
3  pharmacies that you were distributing
4  hydrocodone drugs to?
5      MR. DELINSKY:  Object to
6  form.
7      THE WITNESS:  Yes.  The only
8  customers that distribution
9  centers would have would be the
10 CVS stores.
11 BY MR. KENNEDY:
12     Q.  And if there is evidence
13 throughout this case that in '07, '08 the
14 DEA communicated to distributors across
15 the country the Know Your Customer
16 program and requirement, do you have any
17 knowledge that would indicate that CVS
18 was unaware of the Know Your Customer
19 program by the DEA?
20     MR. DELINSKY:  Object to
21 form.
22     THE WITNESS:  I do not have
23 any specific corporate knowledge
24 that the company was unaware of

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1     that concept being communicated by
2     the DEA.
3  BY MR. KENNEDY:
4     Q.   Are the CVS defendants or
5  CVS Pharmacy, Inc. members of the HDMA?
6     A.   CVS is what's, I believe,
7  called an affiliate member of HDA.
8          Originally, Caremark, prior
9  to the merger of CVS and Caremark, had a
10 membership in HDA.  It's my understanding
11 that prior to that time, CVS did not have
12 a membership in that organization and
13 that CVS has remained a member of that
14 organization only in an affiliate
15 capacity, which means that CVS does not
16 hold seats on boards or committee and is
17 not generally consulted for policy and
18 other types of communications.
19    Q.   Was any CVS entity
20 affiliated in any ways with the HDMA in
21 2008?
22    A.   2008, to the best of my
23 recollection, is the date when the
24 CVS/Caremark merger took effect.

Page 99

1     Q.   In 2008, was any CVS entity
2  affiliated with the HDMA; yes or no?
3          MR. DELINSKY:  Object to
4     form.
5          THE WITNESS:  So as I --
6  BY MR. KENNEDY:
7     Q.   I just want a yes-or-no
8  question.
9     A.   Well, I don't --
10         MR. DELINSKY:  Object to
11    form.
12         THE WITNESS:  I'm not sure
13    of the specific point in 2008.
14    As I testified, I believe
15    that 2008 is the year of the
16    CVS/Caremark merger.  Prior to the
17    CVS/Caremark merger, my
18    understanding is that CVS was not
19    a member, in any way, of HDA, but
20    that Caremark was an affiliate
21    member.
22         Following the merger of
23    those two entities, the new
24    company maintained its affiliate

Page 100

1  membership in HDA.
2  BY MR. KENNEDY:
3     Q.   Did any of the CVS
4  defendants ever receive a copy of the
5  2008 HDA model controlled substance
6  monitoring program?
7     A.   To the best of my corporate
8  knowledge, no.
9     Q.   No.
10         Did CVS pharmacy ever
11 receive the 2008 model Controlled
12 Substance Monitoring Act of the HDA?
13    A.   Again, to the best of my
14 corporate knowledge at this point in
15 time, no.
16         MR. KENNEDY:  Exhibit-3,
17    please.  We're going to look at
18    Exhibit-3, the first of the DEA
19    letters I think you referenced to.
20            - - -
21    (Whereupon, CVS-Vernazza
22    Exhibit-3,
23    CVS-MDLT1-000010552-555, was
24    marked for identification.)

Page 101

1            - - -
2  BY MR. KENNEDY:
3     Q.   Do you know who Mr.
4  Rannazzisi is?
5     A.   I do.
6     Q.   And who is he?
7     A.   Mr. Rannazzisi is a former
8  official with the DEA with
9  responsibilities for oversight over the
10 DEA's diversion control organization.
11    Q.   If you'll take a look at
12 Exhibit-3, that is a letter, is it not,
13 from the United States Department of
14 Justice, Drug Enforcement Administration,
15 which is the DEA, correct?
16    A.   The Drug Enforcement
17 Administration is what I would consider
18 to be the DEA, yes.
19    Q.   September 27, 2006 is the
20 date of this letter, true?
21    A.   The letter appears to be
22 dated September 27, 2006.
23    Q.   CVS Indiana, LLC, one of the
24 defendants in this case, it appears as if

Page 102

1 they received this letter, true?
2     A.   To the best of our corporate
3 knowledge, that is true.
4     Q.   And who was this letter
5 shared with? Was this shared with CVS
6 Pharmacy, Inc. at this point in time, in
7 2006, around September?
8     A.   I do not have corporate
9 knowledge as to who this particular
10 letter may have been shared with at CVS
11 Pharmacy, Inc., or if this letter was
12 shared with anyone at CVS Pharmacy, Inc.
13     Q.   And you don't know whether
14 it was shared with the other defendant,
15 the other distributor defendant in this
16 case, CVS RX Services?
17     A.   I, likewise, don't have
18 corporate knowledge of that.
19         MR. DELINSKY:  Just so the
20     record is clear, and Mr. Kennedy,
21     I don't mean to take your time, so
22     we can excise this 30 seconds, but
23     the CVS RX Services, Inc. did not
24     open its distribution center, I

Page 103

1     may not have the date right, until
2     2011 or 2012.
3         MR. KENNEDY:  Fine.  Thank
4     you.
5 BY MR. KENNEDY:
6     Q.   The letter, Exhibit-3, from
7 the DEA to one of the CVS defendants,
8 let's look at the first sentence, if we
9 could.
10         It states, This letter is
11 being sent to every commercial entity in
12 the United States registered with the
13 Drug Enforcement Administration (DEA) to
14 distribute controlled substances.
15         CVS Indiana, at that point
16 in time, was a registrant, correct?
17     A.   To my understanding, that's
18 correct.
19     Q.   And we don't know whether
20 CVS Pharmacy, Inc. was a registrant to
21 distribute at this time; would that be
22 true?
23     A.   I don't have corporate
24 knowledge of that.

Page 104

1     Q.   Look at the first sentence
2 under background, if you would.
3         And does it state, and this
4 is the DEA to CVS Indiana, As each of you
5 is undoubtedly aware, the abuse
6 (nonmedical use) of controlled
7 prescription drugs is a serious and
8 growing health problem in this country.
9         Do you see that statement?
10     A.   I do.
11     Q.   Was, I'm assuming, then, CVS
12 Indiana, at this point in time, was aware
13 of that statement in 2006, that statement
14 by the DEA?
15     A.   To the best of my corporate
16 knowledge, CVS received this letter --
17 CVS Indiana received this letter and
18 would have reviewed its contents,
19 including that sentence.
20     Q.   Do you know whether CVS
21 Indiana, or any other CVS entity,
22 disagreed with that statement in 2006?
23         MR. DELINSKY:  Object to
24     form.  Object on scope grounds, to

Page 105

1     the extent the question
2     encompasses any other CVS entity.
3         THE WITNESS:  I have no
4     knowledge that CVS disagreed with
5     that.
6 BY MR. KENNEDY:
7     Q.   Look to the third paragraph
8 over to the right, four lines down, that
9 starts with, Distributors are.
10         You can look at that whole
11 sentence.
12         The sentence states,
13 Distributors are, of course, one of the
14 key components of the distribution chain.
15         Does CVS disagree with that
16 statement, do you know, in 2006?  And the
17 CVS Indiana, I'm talking about.
18     A.   I have no corporate
19 knowledge, at this point in time, that
20 CVS disagreed with that statement.
21     Q.   The next sentence states, If
22 the closed system is to function properly
23 as Congress envisioned, distributors must
24 be vigilant in deciding whether a

Page 106

1 prospective customer can be trusted to
2 deliver controlled substances only for
3 lawful purposes.
4         CVS, any knowledge that they
5 disagreed with that statement in 2006?
6         MR. DELINSKY:  Object to
7         form.  Object on the grounds it's
8         outside the scope of the Special
9         Master Cohen's rulings on the
10        30(b)(6) topics.
11 BY MR. KENNEDY:
12        Q.   Any evidence that they
13 disagreed with that, at that point in
14 time, in '06?
15        A.   I have no corporate
16 knowledge as to whether or not CVS
17 disagreed with that statement in 2006.
18        Q.   It next states, This
19 responsibility is critical.
20        Any information that CVS
21 Indiana disagreed with that statement in
22 2006?
23        MR. DELINSKY:  Same
24        objections.  Form and scope.

Page 107

1         THE WITNESS:  I have no
2         corporate knowledge, at this point
3         in time, as to whether or not CVS
4         agreed or disagreed with the
5         statement there.
6 BY MR. KENNEDY:
7        Q.   If you go to the next page,
8 10553.  The second paragraph, second
9 sentence that starts with, Moreover.
10        It states --
11        A.   I'm sorry, sir, which?
12        Q.   Second page -- I'm sorry,
13 second page, second paragraph starting
14 with, Moreover.
15        It states, Moreover, all
16 registrants - manufacturers,
17 distributors, pharmacies and
18 practitioners - share responsibility for
19 maintaining appropriate safeguards
20 against diversion.
21        At this point in time, in
22 '06, did CVS understand that to be the
23 position of the DEA?
24        A.   Having received this letter,

Page 108

1 as CVS Indiana, LLC, and having reviewed
2 the letter, CVS would have understood
3 that statement to be a statement made by
4 the DEA.
5        Q.   The next sentence starts
6 with, Nonetheless.
7        Nonetheless, given the
8 extent of prescription drug abuse in the
9 United States, along with the dangerous
10 and potentially lethal consequences of
11 such abuse, even just one distributor
12 that uses its DEA registration to
13 facilitate diversion can cause enormous
14 harm.
15        CVS Indiana would have been
16 aware of that statement by the DEA,
17 correct, because they received this
18 letter, and we assume they read it, true?
19        A.   As I said, CVS Indiana did
20 receive this letter and, presumably,
21 would have reviewed it and been aware of
22 that statement by the DEA.
23        Q.   Any knowledge that you have
24 in your preparation, any knowledge to

Page 109

1 indicate that any CVS entity disagreed
2 with that statement in 2006?
3        A.   I do not have any corporate
4 knowledge that CVS disagreed with that
5 statement.
6        Q.   If you go down to the
7 paragraph two down that starts with, The
8 DEA regulations require.
9        This 2006 letter goes on to
10 state, The DEA regulations require all
11 distributors to report suspicious orders
12 of controlled substances.
13        Again, CVS Indiana would
14 have been aware of that statement and
15 position of a requirement by the DEA,
16 true?
17        A.   CVS -- I have no corporate
18 knowledge that CVS would not have been
19 aware of this statement in this letter
20 that CVS Indiana received.
21        Q.   All right.  And this one is
22 important, this -- the DEA now quotes, in
23 this letter in '06, they quote from
24 federal regulations, do they not, in the

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 very next indented paragraph? Is that a
2 quote from a federal regulation?
3     A. I understand it to be so.
4     Q. And it states, The
5 registrant shall -- now you're a lawyer.
6 What does that word "shall" mean?
7     MR. DELINSKY: Object to
8     form, to the extent that's
9     calling -- and object to scope, to
10     the extent that's calling for a
11     legal interpretation, it's outside
12     the scope of Special Master
13     Cohen's ruling.
14 BY MR. KENNEDY:
15     Q. Shall is a mandate; that's a
16 serious word, is it not, in the English
17 language and under the law? Shall means
18 you've got to do it, right?
19     MR. DELINSKY: Same
20     objections.
21     THE WITNESS: I'm not here
22     to interpret what the words of the
23     regulation mean.
24 BY MR. KENNEDY:

Page 111

1     Q. You're here on behalf of the
2 CVS defendants in this case to talk about
3 what they did to monitor controlled
4 substances, correct?
5     A. I'm happy to talk about
6 that, sir.
7     Q. And wouldn't we agree that
8 they certainly would have had to read
9 this regulation and understand it, right?
10 Correct?
11     They would have to do that;
12 to put together a controlled substance
13 monitoring program, can we agree they
14 would have to have read, have to have
15 read, this regulation and understood what
16 it means, true?
17     A. I have no corporate
18 knowledge that CVS didn't read this
19 regulation.
20     Q. And when they read it and
21 saw the word "shall," they certainly
22 should have understood what that word
23 meant, right?
24     MR. DELINSKY: Object to

Page 112

1 form. Object on the ground that
2 this line of questioning violates
3 Special Master Cohen's ruling on
4 September 3rd regarding the scope
5 of these topics.
6 BY MR. KENNEDY:
7     Q. Am I right?
8     THE WITNESS: Could you read
9     the question?
10 BY MR. KENNEDY:
11     Q. When CVS put together its
12 monitoring policies and they received
13 this letter from the DEA quoting the
14 regulation with respect to monitoring
15 policies and they saw that the
16 government, the federal government in its
17 regulations, had used the word "shall"
18 with respect to their responsibility to
19 establish a system, they should have
20 understood the meaning of the word
21 "shall," correct?
22     MR. DELINSKY: Object to
23     form. Object on scope grounds.
24     Object to the extent --

Page 113

1 BY MR. KENNEDY:
2     Q. Isn't that true, sir?
3     MR. DELINSKY: Object to the
4     extent that this line of
5     questioning violates Special
6     Master Cohen's prior ruling on
7     these topics.
8 BY MR. KENNEDY:
9     Q. Isn't that true, they needed
10 to understand the word "shall" when
11 putting together their policies to
12 monitor the distribution of controlled
13 substances?
14     MR. DELINSKY: Same
15     objections.
16     THE WITNESS: My corporate
17     knowledge is that CVS, in putting
18     together its policies, was aware
19     of this regulation and all of the
20     words in the regulation.
21 BY MR. KENNEDY:
22     Q. Right. And they should have
23 understood that "shall" doesn't mean
24 maybe, maybe we need to do this, or we

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1 don't have to do this necessarily; they
2 should have understood that "shall" means
3 you have to do it, correct?  Shouldn't
4 they have understood that?
5      MR. DELINSKY:  Object to
6 form.
7 BY MR. KENNEDY:
8      Q.   And if you don't know,
9 that's fine.  But --
10      MR. DELINSKY:  Mr. Kennedy,
11 please indulge me.  Object to the
12 form of the question.  I --
13 Special Master Cohen specifically
14 ruled on these topics.  And he
15 struck from them questions
16 regarding the interpretation of
17 any laws and limited to -- them to
18 questions about compliance with
19 the laws.
20      This line of questions is in
21 violation of Special Master's
22 rulings.  And, again, if you want
23 to take a break and review the
24 ruling, I have copies here.

Page 115

1      MR. KENNEDY:  Let me ask
2 you, so we can -- your speaking
3 does not -- does not count on my
4 tape time; is that correct?
5      MR. DELINSKY:  No, it
6 counts.
7      MR. KENNEDY:  Then we've got
8 to do something.  Because you're
9 taking up three-quarters of my
10 tape time.
11      MR. DELINSKY:  You're asking
12 questions that violate Special
13 Master's ruling.
14      MR. KENNEDY:  And you have
15 right to object or instruct
16 not to answer, but not to talk for
17 three minutes every question.  And
18 you should just do one of the two.
19      And I will give you a
20 continuing objection on form and
21 scope of the notice for every
22 question going forward so we don't
23 have to take the time to do that.
24 I'm willing to do that.

Page 116

1      MR. DELINSKY:  I think the
2 record will speak for itself on
3 the length and propriety of my
4 objections.
5 BY MR. KENNEDY:
6      Q.   Let me ask you this: Let's
7 go on and read further and see what the
8 DEA was telling the CVS defendant from
9 Indiana here.
10      It next states, The
11 registrant shall -- shall inform the
12 field division of the Administration in
13 his area of suspicious orders when
14 discovered by the registrant -- and that
15 would be CVS Indiana, correct?
16      A.   Yes.
17      Q.   Suspicious orders -- this is
18 coming from the regulation, Suspicious
19 orders include orders of unusual size,
20 orders deviating substantially from a
21 normal pattern and orders of unusual
22 frequency.
23      CVS Indiana would have been
24 aware of that statement had they received

Page 117

1 and read this letter, correct?
2      A.   I believe that's correct.
3      Q.   Is there any indication from
4 your study, from your four weeks of study
5 of this case, that CVS, or any of the CVS
6 entities, that being the other defendant
7 or CVS Pharmacy, Inc., disagreed with
8 that statement?
9      MR. DELINSKY:  Object to
10 form.
11      THE WITNESS:  I have no
12 corporate knowledge that CVS
13 disagreed with that statement.
14 BY MR. KENNEDY:
15      Q.   The next statement by the
16 DEA in this letter starts with, It bears
17 emphasis.
18      The DEA next states, in
19 2006, It bears emphasis that the
20 foregoing reporting requirement is in
21 addition to, and not in lieu of, the
22 general requirement under 21 U.S.C. 823
23 (e) that a distributor maintain effective
24 controls against diversion.

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1    CVS Indiana would have been
2  aware of that statement by the DEA,
3  correct?
4    A.  I have no corporate
5  knowledge that CVS was not aware of that
6  statement.
7    Q.  And you have no corporate
8  knowledge that they disagreed with that
9  statement, true?
10    A.  I also have no corporate
11  knowledge that CVS has agreed with that
12  statement.
13    Q.  The DEA next states, in
14  2006, Thus -- Thus, in addition to
15  reporting all suspicious orders, a
16  distributor has a statutory
17  responsibility to exercise due diligence
18  to avoid filling suspicious orders that
19  might be diverted into other than
20  legitimate medical, scientific and
21  industrial channels.  Failure to exercise
22  such due diligence could, as
23  circumstances warrant, provide a
24  statutory basis for revocation or

Page 119

1  suspension of a distributor's
2  registration.
3    Do you have any corporate
4  knowledge that would indicate that CVS,
5  any of the CVS entities, CVS Pharmacy,
6  Inc. or the two defendants, would
7  disagree with that statement by the DEA
8  in 2006?
9    MR. DELINSKY:  Object to
10  form.
11    THE WITNESS:  I do not have
12  any corporate knowledge that any
13  CVS entity would have disagreed
14  with that statement in 2006.
15    - - -
16    (Whereupon, CVS-Vernazza
17  Exhibit-46,
18  CVS-MDLT1-000091508-518, was
19  marked for identification.)
20    - - -
21  BY MR. KENNEDY:
22    Q.  I'm showing you Exhibit-46,
23  which is the second DEA letter that the
24  DEA sent to all distributors.

Page 120

1    Have you seen 46 before,
2  this e-mail attached to DEA letters?
3    A.  I don't believe I have.
4    Q.  This is an e-mail from Ron
5  Buzzeo.
6    Do you know who that is?
7    A.  I do.
8    Q.  And Mr. Buzzeo is involved
9  in an independent organization,
10  independent of CVS, an outside
11  third-party organization, correct?
12    A.  Yes.  Mr. Buzzeo was a
13  third-party consultant that was engaged
14  by CVS.
15    Q.  Engaged by CVS to assist
16  them with respect to suspicious order
17  monitoring and anti-diversion programs,
18  true?
19    A.  That is true.
20    Q.  And he sends this e-mail to
21  Amy Lynn Brown.
22    And who is Amy Lynn Brown?
23    A.  I'm uncertain as to who Amy
24  Lynn Brown is.  I presume Amy Lynn Brown

Page 121

1  is Amy Propatier, before a name change.
2  But I cannot say that I know that for
3  certain.
4    Q.  All right.  An employee,
5  nonetheless, of CVS Pharmacy, Inc., if it
6  indeed is Amy Propatier?
7    A.  If it is Amy Propatier, Amy
8  Propatier has been an employee of CVS
9  Pharmacy, Inc.  If Amy Lynn Brown is
10  somebody different, I don't know.
11    Q.  All right.  Amy Lynn Brown,
12  if it indeed is Amy Propatier, has never
13  been an employee of the CVS defendants in
14  this case, the distribution centers,
15  true?
16    A.  To the best of my corporate
17  knowledge, that is true.
18    Q.  The date of this e-mail is
19  important.
20    The date of this e-mail is
21  2/21/08, correct?
22    A.  The e-mail reflects a date
23  of 2/21/08, I agree with that.
24    Q.  And there's an attachment of

Page 122

1 DEA letter, September 27, '06, and the
2 attachment of an additional DEA letter
3 from '07, true?
4     A.   As I mentioned, I haven't
5 had a chance to review this document now.
6 I'll take a look at it.
7     Q.   I'm just reading the
8 attachments.  Under subject, I'm reading
9 the purported attachments, right?
10     A.   Well, it looks like there
11 maybe are three attachments.  I think you
12 referenced two.
13     Q.   Let's go -- go to Page
14 91513.
15         We have already looked at
16 the 2006 letter from the DEA that was
17 received by Indiana -- CVS Indiana,
18 correct?  We talked about --
19     A.   We have.  I haven't had a
20 chance to review this document to
21 determine whether or not that letter is
22 also attached to this.
23     Q.   I'm not asking you any
24 question about that.

Page 123

1         You and I have already
2 reviewed the 2006 DEA letter to CVS
3 Indiana, correct?
4     A.   We have reviewed a September
5 27th, 2006 letter addressed to --
6     Q.   So my answer is yes?
7     A.   -- CVS Indiana, LLC.
8     Q.   So my answer is yes,
9 correct?
10         MR. DELINSKY:  Object to
11     form.
12 BY MR. KENNEDY:
13     Q.   My answer is yes, right?
14     A.   I answered -- yes --
15     Q.   Yes.
16     A.   -- we reviewed a letter
17 dated September 27th, 2006 to Indiana,
18 LLC.
19     Q.   That was my question, right?
20     A.   I don't think that was
21 exactly your question.
22     Q.   Well, I want you to answer
23 my exact questions.
24         You and I have already

Page 124

1 reviewed the 2006 correspondence from the
2 DEA to Indiana, LLC, correct?
3     A.   We've reviewed one letter.
4     Q.   Correct.
5     A.   You said 2006
6 correspondence.  I just want to be a
7 little bit more precise, to make sure
8 we're talking about the same thing.
9     Q.   DEA sent out a second
10 letter, in 2007, to all distributors, did
11 they not?
12         Sir?  Sir, I'm not asking
13 you anything about the exhibit.
14         Did the DEA send out a
15 second letter to all distributors in 2007
16 again talking about suspicious order
17 monitoring?
18         MR. DELINSKY:  Mr. Vernazza,
19     you may read the document if you
20     feel you need to, to answer the
21     question.
22         THE WITNESS:  The letter
23     here in the exhibit that you've
24     put in front of me does not have

Page 125

1 an addressee.
2 BY MR. KENNEDY:
3     Q.   I'm not asking you about the
4 exhibit yet.  I'm just asking you a
5 question.
6         Did -- do you have
7 knowledge, on behalf of the CVS
8 defendants, that the DEA indeed sent out
9 a second letter in 2007 to all
10 distributors again outlining their duties
11 and responsibilities under the
12 regulations and the Controlled Substances
13 Act?  Are you aware of that?
14     A.   And, sir, I was attempting
15 to answer the question before you cut
16 me --
17     Q.   Are you aware --
18     A.   -- off.  If you could let me
19 answer the question, I'll let you know.
20     Q.   Are you aware of that, that
21 the DEA sent out a letter to all
22 distributors in '07, similar to the
23 letter they sent out in '06?  Are you
24 aware of that?

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    A.   I have seen statements to
2  that effect.
3    Q.   Okay.
4    A.   We have not been able to
5  locate a copy of the 2007 letter.
6    Q.   Sir, just answer my
7  questions.  I'm going to get to that.
8       You are aware that they did
9  that, correct?
10      MR. DELINSKY:  Object to
11      form.
12      THE WITNESS:  No, I'm not
13      aware that they did that, because
14      I have been unable to find a copy
15      of that letter in our -- in our
16      files to validate that CVS
17      Indiana, LLC, received a copy of
18      the 2007 letter.
19  BY MR. KENNEDY:
20   Q.   And I'm not asking you that,
21  all right?
22   A.   Well, CVS Indiana, LLC --
23   Q.   Right.
24   A.   -- was a DEA registrant --

Page 127

1    Q.   Right.
2    A.   -- in 2007.
3    Q.   Correct.
4    A.   I have not located a copy of
5  that letter in our files as sent to CVS
6  Indiana, LLC, based on my investigation
7  to date.  Therefore, I am unable to say,
8  to the best of my corporate knowledge,
9  with certainty, that CVS Indiana, LLC,
10  received the 2007 letter.
11      You asked me whether or not
12  DEA sent that letter to all registrants.
13  I do not have corporate knowledge as to
14  whether or not Indiana, LLC, received
15  that letter at this point in time.
16   Q.   All right.  If the DEA did
17  what they said they did, sent it out to
18  all registrants, then CVS Indiana, LLC
19  should have received a copy of the
20  February of '07 letter, correct?
21      MR. DELINSKY:  Object to
22      form.
23  BY MR. KENNEDY:
24   Q.   If the DEA did what they

Page 128

1  said they did, true?
2      MR. DELINSKY:  Object to
3      form.
4      THE WITNESS:  Are you
5      referring to a particular
6      statement by the DEA when you say
7      they said --
8  BY MR. KENNEDY:
9    Q.   You can assume that the DEA
10  has stated that they sent a letter, dated
11  February 7th, 2007, to all registrants,
12  all distributors.  Assume that to be
13  true.
14      If they did indeed do what
15  they say they did, then CVS Indiana
16  should have received a copy of the
17  February 7th letter, true?
18      MR. DELINSKY:  Object to
19      form.
20      THE WITNESS:  CVS Indiana
21      was a DEA registrant in 2007.  If
22      every DEA registrant received a
23      copy of the letter, CVS Indiana,
24      as a registrant, would presumably

Page 129

1      have received a copy of that
2      letter.
3      We have been unable to
4      locate the 2007 letter in our
5      files.
6  BY MR. KENNEDY:
7    Q.   And that certainly does not
8  mean you didn't receive it, correct, just
9  because you couldn't find it, true?
10   A.   It does not necessarily mean
11  we didn't receive it.  I agree with that.
12   Q.   Look at Page 91513, if you
13  would.  Exhibit-46.
14      This is the February 7th,
15  2007 letter from the DEA, true?  True?
16   A.   This is a letter dated
17  February 7th, 2007.  It appears to be
18  redacted in some form, and I have not
19  reviewed this particular copy, which also
20  bears, maybe, some annotations.
21   Q.   Sir, I asked you, is this
22  the February 7, 2007 letter from the DEA?
23  Is that what it appears to be?  Simple
24  question.

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1    A.   It appears to be a letter on
2  DEA letterhead, dated February 7, 2007.
3  Signed by Mr. Rannazzisi.
4    Q.   And was this letter sent to
5  CVS on 2/21/08 by Mr. Buzzeo?
6    A.   Again, assuming that Amy
7  Lynn Brown is an employee of CVS, the
8  answer to that would appear to be yes.
9    Q.   Look at the Bates stamp down
10  at the bottom.
11       Does that say CVS?
12    A.   It does.
13    Q.   Do you understand this was
14  provided to us from the CVS files?
15    A.   I presume that to be the
16  case.
17    Q.   All right.  So CVS received
18  this; we can agree with that, right?
19    A.   To the best of my corporate
20  knowledge at this point in time, yes.
21    Q.   This letter, again, 91513,
22  it starts off with, This letter is being
23  sent to every commercial entity in the
24  United States registered with the Drug

Page 131

1  Enforcement Administration (DEA) to
2  distribute controlled substances.
3       That's a statement by the
4  DEA that this was sent to all of the
5  registrants, which should have included
6  CVS Indiana, true?  True?
7    A.   CVS was -- Indiana was a
8  commercial entity in the United States
9  registered with the DEA to distribute
10  controlled substances.
11    Q.   Is my answer yes?  Is the
12  answer to my question is yes?
13       MR. DELINSKY:  Object to
14  form.
15  BY MR. KENNEDY:
16    Q.   You don't have to repeat --
17  again, we have limited time.  You don't
18  have to repeat my question in your
19  answer.
20       Is the answer to that
21  question yes?
22    A.   I didn't repeat your
23  question in my answer.  I gave an answer.
24       The answer is that CVS

Page 132

1  Indiana was registered with the DEA to
2  distribute controlled substances at the
3  time that this letter is dated.  There is
4  a statement in this letter that it's
5  being sent to every such registrant.
6    Q.   Go to the next page, if you
7  would, please.  If you go one, two,
8  three, four paragraphs down, it starts
9  with, DEA regulations require.  All
10  right?
11       It states, DEA regulations
12  require all distributors to report
13  suspicious orders of controlled
14  substances.
15       By '08, at the latest, from
16  this e-mail, CVS has this letter and that
17  statement by the DEA; true?
18    A.   Yes.  It appears that Mr.
19  Buzzeo would have provided a copy of this
20  letter in 2008.
21    Q.   It goes down, and it
22  indicates, like the previous letter in
23  '06, it indicates in the quote, again the
24  quote from the federal regulation, The

Page 133

1  registrant shall inform the field
2  division office of the Administration in
3  this area of suspicious orders when
4  discovered by the registrant.  Suspicious
5  orders include orders of unusual size,
6  orders deviating substantially from a
7  normal pattern and orders of unusual
8  frequency.
9       At least at '08 at the
10  latest, you've received this second
11  statement from the DEA with respect to
12  what the DEA considers to be your
13  responsibility at CVS, true?
14    A.   We would have received this
15  letter from Mr. Buzzeo.
16    Q.   This letter goes on, and I'm
17  not going to go through each of the
18  statements, but at least by '08, CVS
19  Pharmacy, Inc. has received the second
20  DEA letter, true?
21    A.   I think, again, presuming
22  that Amy Lynn Brown is an employee of CVS
23  Pharmacy, Inc., this e-mail suggests that
24  Mr. Buzzeo provided to Ms. Brown, in

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1 2008, the copy of the letter that's
2 attached to this e-mail.
3      Q.   At the very least, we've got
4 a CVS Bates number on this so this came
5 from CVS files, true?  Despite who Amy
6 Lynn is, this came from CVS files, true?
7      A.   CVS files, yes.  But not
8 necessarily only CVS Pharmacy, Inc.
9 files.
10          My understanding from --
11     Q.   If you want to take a look
12 at Exhibit-4, please.
13     A.   -- taking a look at
14 documents that have been --
15     Q.   Take a look at Exhibit-4,
16 please.
17     A.   -- produced in this case
18 that have been taken from the files of
19 both CVS Indiana, CVS RX Services, Inc.
20 and CVS Pharmacy, Inc.
21          - - -
22          (Whereupon, CVS-Vernazza
23      Exhibit-4,
24      CVS-MDLT1-000013534-536, was

Page 135

1      marked for identification.)
2          - - -
3 BY MR. KENNEDY:
4      Q.   I'll show you Exhibit-4, if
5 I could.
6          Do you have Exhibit-4?
7      A.   Yes, sir.
8      Q.   Exhibit-4 is an e-mail, is
9 it not, from Craig Schiavo; is that
10 correct?
11     A.   I just need a minute to
12 review the document.
13     Q.   I'm just asking you whether
14 it's an e-mail from Craig Schiavo.
15          Do you see up at the top
16 where it says, From?
17     A.   I need to review the
18 document in order to answer that
19 question, sir.
20          Yes, sir, this does appear
21 to be an e-mail from Mr. Schiavo.
22     Q.   And attached -- and Mr.
23 Schiavo, where does he work?
24     A.   He works for, I believe, CVS

Page 136

1 Pharmacy, Inc. in Rhode Island.
2      Q.   And he's attaching a
3 December 27, 2007 letter from the DEA.
4 And I think this is the third letter that
5 the DEA sent to all distributors.
6          Am I right?  Do you see the
7 attachment, which would be 13535?
8      A.   I do see that attachment,
9 yes.
10     Q.   Look at the first sentence
11 where it says, Dear Registrant.
12          It states, Dear Registrant,
13 This letter is being sent to every entity
14 in the United States registered with the
15 Drug Enforcement Administration (DEA) to
16 manufacture or distribute controlled
17 substances.
18          At that point in time, CVS
19 Indiana, LLC was registered to distribute
20 controlled substances, true?
21     A.   I believe that is true.
22     Q.   Have you reviewed this
23 letter before?
24     A.   Perhaps some components of

Page 137

1 it.
2      Q.   I'm not going to go through
3 all of this, but this was also attached
4 to 46, Exhibit-46, was the 2008 e-mail to
5 you -- or not to you, but to CVS,
6 correct?
7          So you would have received
8 this -- if the DEA is accurate in their
9 statement, CVS Indiana would have
10 received this in December of '07 and it
11 was also attached to the 2008 e-mail that
12 was sent to Amy Lynn in 2008?
13     A.   I'm sorry, could you repeat
14 the question?
15     Q.   If the first sentence is
16 true, that this was sent to all
17 registrants to distribute controlled
18 substances, then this letter would have
19 been received by CVS Indiana in 2007,
20 true?
21     A.   Given that CVS Indiana was a
22 registrant, if the statement in the first
23 sentence is accurate, then, presumably,
24 CVS Indiana would have received the

Page 138

1  letter.
2      Q.   And, again, have you
3  reviewed this letter?
4      A.   My testimony was that I have
5  reviewed, perhaps, certain components of
6  this letter.
7      Q.   Let's look at the second
8  paragraph.  It starts with, In addition.
9          It states, In addition to,
10 and not in lieu of, the general
11 requirement under 21 U.S.C. 823, that
12 manufacturers and distributors maintain
13 effective controls against diversion, DEA
14 regulations require all manufacturers and
15 distributors to report suspicious orders
16 of controlled substances.
17         From your knowledge of this
18 case, at this point in time, did any CVS
19 entity disagree with that position of the
20 DEA?
21         MR. DELINSKY:  Object to
22     form.  Object to scope.  Object to
23     the extent it calls for a legal
24     interpretation in violation of

Page 139

1      Special Master Cohen's ruling.
2          THE WITNESS:  At this point
3      in time, I do not have corporate
4      knowledge that any CVS entity
5      disagreed with that statement.
6  BY MR. KENNEDY:
7      Q.   It next states, Title 21 CFR
8  1301.74(b) specifically requires that a
9  registrant design and operate a system to
10 disclose to the registrant suspicious
11 orders of controlled substances.
12         CVS would have been aware of
13 that statement had they received this
14 letter in '07, true?
15     A.   To the best of my corporate
16 knowledge at this point in time, had CVS
17 Indiana received this letter at that
18 point in time, presumably, it would have
19 been reviewed and CVS Indiana would have
20 been aware of the statement.
21     Q.   And next it states, The
22 regulation clearly indicates that it is
23 the sole -- sole responsibility of the
24 registrant to design and operate such a

Page 140

1  system.
2          Do you see that?
3      A.   I do see that.
4      Q.   Let me ask you this:  The
5  registrant is the CVS Indiana, correct?
6      A.   The -- yes, the registrant
7  would be CVS Indiana with respect to the
8  distribution activities at the CVS
9  Indiana distribution center.
10     Q.   All right.  Now, as we go
11 forward today and talk about the design
12 and operation of a system to disclose,
13 can we agree that the design and the
14 operation of the system to disclose
15 suspicious orders was designed and
16 operated by CVS Pharmacy, Inc. and not
17 the registrant, as required?
18         MR. DELINSKY:  Object to
19     form.
20         THE WITNESS:  Not at all
21     times, no.
22 BY MR. KENNEDY:
23     Q.   Well, I'm going to ask you
24 about that.

Page 141

1          As we move through today,
2  I'm going to ask you who did what, where
3  and when, as to whether or not it is the
4  distribution center, the registrant being
5  identified in this DEA letter, or whether
6  or not it is CVS Pharmacy, Inc., all
7  right?
8          We're going to be very clear
9  about that as we proceed, is that
10 agreeable, that we can be clear about
11 that?
12         MR. DELINSKY:  Object to
13     form.
14 BY MR. KENNEDY:
15     Q.   Agreeable?
16     A.   I'll respond to your
17 questions the best I can, based on the
18 question that's asked.
19     Q.   Let's move on.
20         Generally, pharmacies have
21 certain responsibilities with respect to
22 filling prescriptions, certain
23 requirements with respect to attempting
24 to prevent diversion?  Pharmacies have

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1 those certain responsibilities; agreed?
2     A.   There are certain
3 responsibilities, under the Controlled
4 Substances Act, that are incumbent upon
5 pharmacies and pharmacists with respect
6 to the filling of controlled substances.
7 Certainly, one of those is the pharmacy's
8 duty to perform corresponding
9 responsibility, or obligation under the
10 law to perform corresponding
11 responsibility, due diligence, before
12 dispensing a prescription.  That's
13 certainly consistent with the prevention
14 of diversion.
15     Q.   And can we agree that just
16 because pharmacies have certain
17 responsibilities under the law, that does
18 not in any way abdicate or negate the
19 responsibilities of a distributor with
20 respect to suspicious order monitoring?
21 Can we agree with that?
22         MR. DELINSKY:  Object to
23     form.  Object on scope grounds,
24     including in light of Special

Page 143

1     Master Cohen's ruling on the
2     interpretation of Controlled
3     Substances Act and its
4     regulations.
5         THE WITNESS:  Could you
6     repeat the question?
7 BY MR. KENNEDY:
8     Q.   Can we agree that just
9 because the pharmacies have certain
10 responsibilities that you just described,
11 can we agree that just because those
12 responsibilities exist on the part of a
13 pharmacy, those do not in any way
14 diminish or negate the responsibilities
15 of the distributor with respect to
16 monitoring suspicious orders?
17         MR. DELINSKY:  Same
18     objections.
19         THE WITNESS:  The
20     regulations in the Controlled
21     Substances Act provide for
22     different obligations on behalf of
23     pharmacies and distributors.
24         CVS undertakes to comply

Page 144

1     with both sets of obligations.
2 BY MR. KENNEDY:
3     Q.   And one does not affect the
4 other, correct?
5         MR. DELINSKY:  Object to
6     form.  Object on scope grounds.
7     Object on the grounds of Special
8     Master Cohen's ruling.
9         THE WITNESS:  No, I don't
10     know that I would agree with that.
11     A pharmacy places orders for
12     controlled substances that are
13     shipped.  There can be any number
14     of processes, procedures,
15     safeguards in place at the
16     pharmacy that would result in the
17     pharmacy not placing orders that
18     would be identified by a
19     distributor as suspicious.
20 BY MR. KENNEDY:
21     Q.   Let me ask you this -- I'm
22 going to ask you again.
23         Is it the position of the
24 CVS defendants that because they had

Page 145

1 pharmacy policies in place that their
2 responsibility to monitor suspicious
3 orders was less?
4     A.   No, that's not the question
5 you asked me.
6         MR. DELINSKY:  Excuse me.
7 BY MR. KENNEDY:
8     Q.   That's the question I'm just
9 asking.  And if you'll answer the
10 question I just asked, please.
11         MR. DELINSKY:  Object to
12     form.
13 BY MR. KENNEDY:
14     Q.   Do you want her to read the
15 question back?
16     A.   Sure.  I think they are two
17 different questions.
18     Q.   I want you just to answer
19 the one I just asked.
20     A.   Okay.  Well, it's a new
21 question, so I'll respond to it.
22     Q.   We'll just do one at a time.
23 If you would please just answer the most
24 recent question, that would make things

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 easier.
2     A.   That would be great, if she
3 can read it back.
4         MR. KENNEDY:  Would you read
5 it back, please?
6            - - -
7         (Whereupon, the court
8 reporter read the following part
9 of the record:
10     "Question:  Let me ask you
11 this -- I'm going to ask you
12 again.
13     "Is it the position of the
14 CVS defendants that because they
15 had pharmacy policies in place
16 that their responsibility to
17 monitor suspicious orders was
18 less?")
19            - - -
20     THE WITNESS:  There was no
21 less an obligation to monitor
22 suspicious orders.
23     The question that you had
24 asked before was whether or not

Page 147

1     there could be -- whether it was
2     relevant.
3 BY MR. KENNEDY:
4     Q.   I just want that question.
5 So your answer is fine.
6     The responsibility is not
7 less, correct?
8     A.   It is relevant to the
9 concept of knowing your customer.  And in
10 the case of CVS pharmacies, CVS
11 pharmacies had in place policies and
12 procedures requiring pharmacists to
13 follow the law, including corresponding
14 responsibility.
15     There was also a system of
16 field supervision of those pharmacies, a
17 system of loss prevention, a supervision
18 of those pharmacies, and other
19 considerations that would be relevant to
20 understanding who you were shipping your
21 shipments to.
22     So is it relevant to the
23 obligation of suspicious order
24 monitoring?  We would say it is.  It does

Page 148

1 not mean that the regulation doesn't say
2 what the regulation says or that the
3 regulation doesn't apply to CVS
4 distributors as a registrant.
5     Q.   The Know Your Customer
6 obligation that you just talked about,
7 that had been expressed by the DEA going
8 back to 2007 and 2008, correct?
9         MR. DELINSKY:  Object to
10     form.
11         THE WITNESS:  I would have
12     to review a document to confirm
13     that.  But it sounds consistent
14     with my understanding.
15 BY MR. KENNEDY:
16     Q.   And would you agree that the
17 responsibility that a distributor has
18 under the Controlled Substances Act and
19 the regulatory requirements cannot be
20 abdicated or transferred to anyone else?
21 Do you agree with that?
22     A.   There were certain services
23 that could be performed on behalf of the
24 registrant and that were performed on

Page 149

1 behalf of the registrant, for the
2 registrant; so, for instance, to the
3 extent that corporate logistics personnel
4 are involved in operating a suspicious
5 order monitoring system for the
6 registrant.
7     Q.   Do you agree with that
8 statement, the responsibilities that a
9 distributor, a CVS distributor, has under
10 the regulatory requirements cannot be
11 abdicated or transferred to anyone else?
12 Do you agree with that, sir; yes or no?
13         MR. DELINSKY:  Object to the
14     form of the question.  Object on
15     the grounds that this question,
16     again, is outside the scope of the
17     deposition notice as ruled upon by
18     Special Master.
19 BY MR. KENNEDY:
20     Q.   Do you agree with that, sir?
21     A.   I think the regulation
22 speaks for itself.
23         MR. KENNEDY:  Exhibit-65.
24            - - -

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1     (Whereupon, CVS-Vernazza
2  Exhibit-65,
3  CVS-MDLT1-000019722-786, was
4  marked for identification.)
5           - - -
6  BY MR. KENNEDY:
7     Q.   Sir, you took four weeks to
8  prepare for this today, did you not?
9     A.   I did.
10     Q.   You talked to 40 different
11  people actually involved with this
12  program?
13     A.   I think it's more than 40.
14     Q.   Four weeks of time, several
15  hundred hours?
16     A.   That's fair.
17     Q.   Reviewed documents?
18     A.   I have.
19     MR. DELINSKY:  Let's take a
20  break, before we get to the
21  exhibit.  I don't want you to show
22  us the exhibit.  Let's take a
23  break.
24     MR. KENNEDY:  What's that?

Page 151

1     MR. DELINSKY:  Let's take a
2  break.  It's been about 55
3  minutes.
4     MR. KENNEDY:  I'm in the
5  middle of showing him an exhibit.
6     MR. DELINSKY:  I don't want
7  to see -- right.  That's why --
8  the exhibit has yet to be shown to
9  him, and that's why I propose we
10  take the break now.
11     VIDEO TECHNICIAN:  The time
12  is 11:41 a.m.  We are going off
13  the record.
14           - - -
15     (Whereupon, a brief recess
16  was taken.)
17           - - -
18     VIDEO TECHNICIAN:  The time
19  is 11:59 a.m.  And we're back on
20  the record.
21  BY MR. KENNEDY:
22     Q.   Sir, we're showing you
23  Exhibit-65.
24     Have you seen this before?

Page 152

1     A.   Allow me to just take a
2  minute to review.
3     Q.   Sir, if you look at the top
4  of the first page --
5     A.   I apologize.  I'm still
6  looking through the document.
7     Q.   You don't know whether
8  you've seen this before?
9     A.   I reviewed a great number of
10  documents in preparation for this
11  deposition.  I'm attempting to review the
12  document in order to answer that
13  question.
14     Q.   Maybe if you just -- if you
15  look at the title on the first page, that
16  would help you out.
17     A.   Yes, I did.
18     Q.   We can look at the title,
19  then, all the way at the top, this is the
20  CVS distribution center -- distribution
21  center controlled drug-DEA standard
22  operating procedures manual, true?
23     A.   I'm sorry, I just want to
24  clarify my prior answer.

Page 153

1     To the extent that your
2  question was whether or not I reviewed
3  this, I did look at the front page when
4  you asked me to look at the front page.
5     I have not yet been able to
6  determine whether or not I reviewed this
7  document in preparation for the
8  deposition.
9     Q.   The title of this document
10  is, CVS Distribution Center Controlled
11  Drug-DEA Standard Operating Procedures
12  Manual, correct?
13     A.   I'm sorry, I was still
14  leafing through the back of the document.
15  I'm not done reviewing it.
16     But I can answer your
17  questions about the title.
18     Q.   Right.  That's the title of
19  this document, correct?
20     A.   That is the title of the
21  document.
22     Q.   And you're aware of DEA
23  standard operating procedures manuals at
24  CVS?  There's a lot of them that I'm sure

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1  you have reviewed in this case.
2      A.  I have reviewed documents
3  consistent with that description.
4      Q.  And if you go down -- this
5  was written either by or on behalf of the
6  CVS distributors, correct?
7          MR. DELINSKY:  Object to
8      form.
9  BY MR. KENNEDY:
10     Q.  Is that correct?
11     A.  To the best of my corporate
12  knowledge, that's correct.
13     Q.  Front page, if you look down
14  at paragraph, one, two, three, four,
15  five, it starts with, CVS is responsible.
16         Do you see that?
17     A.  I do.
18     Q.  And these are the words of
19  CVS; this is their standard operating
20  procedures, true?  True?
21         MR. DELINSKY:  Object to
22     form.
23  BY MR. KENNEDY:
24     Q.  Sir, these are the words of

Page 155

1  CVS?  This is their document?
2      A.  I'm just trying to go back
3  to your prior instruction on how you were
4  terming CVS before --
5      Q.  Right.
6      A.  -- and whether or not you're
7  terming CVS to be only the CVS
8  distribution centers.
9          How are you using the term
10  here?
11     Q.  Well, let me ask you this:
12  This is a document -- do you know who
13  made this document?  That would be CVS
14  Pharmacy created it or paid to get this
15  document created; CVS Pharmacy, they
16  would have done this, right?
17         MR. DELINSKY:  Object to
18     form.
19  BY MR. KENNEDY:
20     Q.  Is that true?
21     A.  To the best of my corporate
22  knowledge, this document would have been
23  put together by individuals working for
24  CVS Pharmacy in connection with the

Page 156

1  distribution center entities.
2      Q.  All right.  And if we go to
3  that fifth paragraph, does it state --
4  you had a little bit of a problem with
5  this concept before, but does it state --
6  CVS policies -- does it state, CVS is
7  responsible for ensuring compliance with
8  DEA regulatory requirements and that
9  responsibility cannot be abdicated or
10  transferred to anyone else?
11         Are those the words of CVS
12  Pharmacy, Inc.?
13     A.  Those are the words that are
14  here in this document.
15     Q.  On behalf of the CVS
16  defendants in this case, do you disagree
17  with those words?  Do you disagree with
18  those words?
19     A.  The words say what the words
20  say.
21     Q.  All right.  Let me ask you
22  this, just so we can get a good
23  understanding of what's going on, CVS
24  Pharmacy, Inc. is writing these standard

Page 157

1  operating procedures in relation to the
2  monitoring of the pharmacies that it
3  owns, right?
4          MR. DELINSKY:  Object to
5      form.
6  BY MR. KENNEDY:
7      Q.  That's really how things
8  happened at CVS?  The company, the CVS
9  company that owned the pharmacies,
10  actually put together the policies and
11  procedures to monitor the pharmacies,
12  true?
13     A.  I'm not sure I understood
14  the question.  Could you repeat it?
15     Q.  CVS Pharmacy, Inc., as you
16  just told us, is the one responsible for
17  putting these policies and procedures
18  together, true?
19     A.  I said that CVS Pharmacy,
20  Inc. would have played a role in putting
21  these policies together, in connection
22  with the distribution centers as well.
23     Q.  Right.  And CVS Pharmacy,
24  Inc. is the one that owns the pharmacies

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  that are being monitored pursuant to
2  these procedures, true?
3      A.   Well, CVS Pharmacy, Inc. may
4  own subsidiaries that own pharmacies.
5  CVS Pharmacy, Inc. may also own
6  subsidiaries that operate distribution
7  centers.
8          In addition, I do know that
9  CVS Pharmacy, Inc. directly operates a
10 subset of pharmacies.
11     Q.   So I'm going to go back.
12 Just listen to my question.
13         The way things are all set
14 up at CVS is CVS Pharmacy, Inc. is
15 putting together the policies and the
16 procedures, playing a role in the
17 policies and procedures, to monitor the
18 pharmacies when, in fact, they own,
19 directly or indirectly, the pharmacies,
20 correct?  That's what happened?
21     A.   Again, CVS Pharmacy
22 personnel would have put together, to the
23 best of my corporate knowledge, these
24 policies and procedures in connection

Page 159

1  with the distribution centers.
2          The folks that were tasked,
3  to the best of my corporate knowledge,
4  with putting together these policies were
5  folks who worked within the logistics
6  group or the part of CVS Pharmacy that
7  relates to its distribution operations.
8          CVS Pharmacy, as I have
9  testified, owns, directly or indirectly,
10 pharmacies.
11     Q.   So the answer to my question
12 is yes?
13     A.   The answer to your question
14 is the answer I gave.
15     Q.   Okay.  And so I'm going to
16 ask it again.
17         CVS Pharmacy, Inc. that put
18 together the policies and procedures to
19 monitor the pharmacy, owns, directly or
20 indirectly, the pharmacies that are being
21 monitored; true?
22         MR. DELINSKY:  Objection.
23     Asked and answered.  Object to
24     form.

Page 160

1  BY MR. KENNEDY:
2      Q.   Very simple.  Is that -- and
3  if it's false because I misstated
4  something, you can just say that's not
5  true.
6      A.   I'd like to answer your
7  question with a little bit more precision
8  than you've asked it.
9          Which is that CVS Pharmacy,
10 Inc. has personnel that are responsible
11 for its logistics operations that are
12 employed by CVS Pharmacy, Inc.  And they,
13 to the best of my corporate knowledge,
14 put together policies and procedures in
15 connection with folks that would be
16 working for the logistics operation.  Or
17 the --
18     Q.   Who are all part of CVS
19 Pharmacy?
20     A.   Excuse me.
21         With the distribution
22 centers, the individual entities and
23 people who worked in the distribution
24 centers.

Page 161

1          CVS Pharmacy, Inc. owns,
2  directly or indirectly, pharmacies.
3      Q.   That they are monitoring,
4  right?
5      A.   CVS monitors its pharmacies
6  in a number of different capacities.
7      Q.   Let's look at -- let's look
8  at what CVS -- the CVS defendants did and
9  CVS Pharmacy, Inc. did to fulfill their
10 duties with respect to the distribution
11 of hydrocodone drugs, all right?
12         January of '06.  By January
13 of '06, the Controlled Substances Act has
14 been in place for over 30 years, true?
15     A.   To the best of my
16 recollection, that's correct.
17     Q.   And that -- again, we went
18 through their definition of how they
19 define the responsibilities of a
20 distributor, true?
21     A.   We looked at the DEA
22 regulation regarding suspicious order
23 monitoring.
24     Q.   And that regulation has been

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 in place for over 30 years by the time we
2 get to 2006, true?
3        A.   I believe that's correct.
4        Q.   With respect to CVS Indiana
5 in 2006, can you tell me what controls
6 against diversion of hydrocodone drugs
7 did they have in place?  January of '06.
8        A.   So I think we're -- controls
9 against diversion?  Or are you asking
10 about specifically the suspicious order
11 monitoring --
12       Q.   Suspicious order monitoring
13 would be a part of the control to prevent
14 diversion, would it not?
15       A.   Well, the suspicious order
16 monitoring regulation is separate from
17 the regulation or statute that talks
18 about effective controls against
19 diversion.
20            But speaking with respect to
21 the regulation addressing suspicious
22 order monitoring, there are individuals
23 within the CVS Indiana warehouses who
24 are --

Page 163

1        Q.   We're talking about January
2 of '06, correct?
3        A.   Yes.
4        Q.   January of '06, tell me what
5 policies and procedures CVS Indiana had
6 in place to monitor suspicious orders of
7 hydrocodone drugs.  Go ahead.
8            MR. DELINSKY:  I just want
9        the record to reflect you've
10       changed the question --
11           MR. KENNEDY:  I have changed
12       the question.
13           MR. DELINSKY:  -- from the
14       one that Mr. Vernazza was
15       answering before you interrupted
16       him.
17           MR. KENNEDY:  Correct.
18           MR. DELINSKY:  You're free
19       to continue answering the question
20       that had been put to you before
21       you were interrupted, if you wish,
22       or you can move to the new
23       question.
24 BY MR. KENNEDY:

Page 164

1        Q.   I'm going to ask -- listen
2 to my question.
3            I want to know what policies
4 and procedures did CVS Indiana have in
5 place and functioning to monitor
6 suspicious orders of controlled
7 substances that it was distributing in
8 January of '06.
9            MR. DELINSKY:  Object to
10       form.
11           THE WITNESS:  The -- just a
12       little bit of context here may be
13       helpful to your understanding.
14           The CVS Indiana warehouse
15       facility is a large facility that
16       ships to CVS stores.  It ships not
17       just drugs, but also front store
18       items, what we would call,
19       anything ranging from paper towels
20       to other things that you would see
21       in the front of the store.
22           Within the warehouse, there
23       is a section dedicated to what we
24       would call pharmacy items.  Within

Page 165

1 that section containing pharmacy
2 items, there is a subsection that
3 contains controlled substances.
4            Those controlled substances
5 are put in what's called a cage,
6 with restricted access to only
7 certain individuals.
8            When CVS Indiana would have
9 received an order for a controlled
10 substance, that controlled
11 substance order would have gone to
12 individuals who work within the
13 controlled substances cage.  We
14 sometimes refer to them as the
15 pickers and the packers, because
16 they are the folks who actually
17 pick the drugs, place them in
18 secured totes and see to it that
19 those, then, are transferred for
20 loading on trucks.
21            It has always been the
22 practice of the pickers and
23 packers, and it has always been
24 the understanding of the pickers

Page 166

1    and packers, within that
2    controlled drug cage, to be aware
3    of unusual orders, and when they
4    were to identify an unusual order,
5    to escalate that for further
6    review.
7        The pickers and the packers
8    have experience picking those
9    controlled substances and have
10   experience picking controlled
11   substances for those stores.
12   BY MR. KENNEDY:
13       Q.   Have you finished your
14   answer?
15       A.   I believe so.
16       Q.   That's what was in place in
17   January of '06?
18       A.   There were also a number of
19   systems that would have complemented that
20   practice that were based in the field,
21   not the least of which is a set of field
22   supervisors over CVS Pharmacy stores.
23       Q.   I'm not talking about --
24       A.   Not least of which is loss

Page 167

1    prevention personnel with specific duties
2    to investigate diversion.  There were
3    hundreds of pharmacy supervisors,
4    approximately 150 loss prevention
5    personnel.
6        The loss prevention
7    organization also would run data analysis
8    that would look for certain indicators of
9    diversion with respect to store ordering
10   practices.  For instance, the report
11   would look at what we would deem pharmacy
12   growth, which is a store that may be
13   ordering more controlled substances than
14   it was dispensing.  And the report varied
15   over time in form and substance, but
16   would have included other potential
17   indicia of diversion that might prompt a
18   field loss prevention investigator to
19   conduct an investigation at the store
20   level.
21       Q.   What was this report called?
22       A.   It was called a PDMR report.
23   It may have changed names to some degrees
24   over the course of time.  But that report

Page 168

1    was in place, to the best of my corporate
2    knowledge, in 2006.
3        Q.   And tell me the data
4    information on the PDMR report.
5        A.   It would include orders; to
6    the best of my recollection, it would
7    include both orders from warehouses and
8    outside vendors.  It would include
9    information about a store's dispensing.
10   It may include information about
11   instances in which a store would have
12   manually adjusted the suggested order
13   through the AMES system.
14       And it may have included,
15   and I believe did include, information
16   where a store may have adjusted its
17   inventory level in the computer system to
18   reflect a different inventory level than
19   the computer system had on record.
20       Q.   Was the PDMR report reviewed
21   prior to every single order being placed
22   for a hydrocodone drug in 2006?
23       A.   It was not.
24       Q.   Did the PDMR report provide

Page 169

1    an evaluation of whether or not a
2    specific order for a CVS Pharmacy for a
3    hydrocodone product, whether or not that
4    was of unusual size for a specific order?
5        A.   It could potentially.  It
6    looked at orders in the aggregate to
7    determine whether or not that store,
8    among other things, was receiving more
9    than it was dispensing.
10       Q.   Did it evaluate specific
11   orders for hydrocodone products in 2006
12   with respect to whether or not it was
13   unusual in size in relation to other
14   orders placed by that pharmacy?
15       MR. DELINSKY:  Object to
16   form.  Asked and answered.
17       THE WITNESS:  I think, as I
18   said, it contained information
19   about orders that could be
20   evaluated by loss prevention
21   personnel to determine whether or
22   not there should be an
23   investigation undertaken with
24   respect to the orders that were

Page 170

1    reflected on that report.
2    BY MR. KENNEDY:
3        Q.   Did that report provide all
4    the information necessary for anyone to
5    look at that specific order and determine
6    whether or not it was unusual in its
7    size?
8            MR. DELINSKY:  Object to
9        form.  Asked and answered.
10           THE WITNESS:  To the extent
11       that the report reflected orders
12       that were larger than dispensing,
13       in connection with other
14       attributes, that would be the
15       basis and the judgment of the loss
16       prevention personnel to
17       potentially conduct a further
18       investigation.
19   BY MR. KENNEDY:
20       Q.   Are you talking about VIPER
21   reports?  Is that what you're -- is that
22   was this PDMR is?
23       A.   It would come out of the
24   VIPER system, that's correct.

Page 171

1        Q.   And you're representing to
2    us, under oath now, that that report
3    contains sufficient data for someone to
4    look at that report and determine whether
5    or not a specific order is unusual with
6    respect to size?  Is that your testimony
7    under oath?
8            MR. DELINSKY:  Object to
9        form.  Object on the ground that
10       that misstates the testimony.
11           THE WITNESS:  I don't think
12       that's what I've said.
13   BY MR. KENNEDY:
14       Q.   All right.  Fine.
15           Does that specific report,
16   in and of itself -- look, if anybody
17   investigates, they can figure out whether
18   something is unusual.
19           I want to know whether that
20   report does any kind of assessment or
21   analysis as to whether or not a specific
22   order for hydrocodone drugs, in January
23   of '06, gave a specific analysis as to
24   whether or not that specific order was

Page 172

1    unusual in size.  Did it?
2        A.   I don't believe I have
3    corporate knowledge that would answer
4    that specific question.
5            What I can say is there
6    could be instances, conceivably, on that
7    report where an order, one order, was
8    placed in a month and that pharmacy
9    dispensed less than the amount of the
10   order, so what was coming in was less
11   than what was going out and would prompt
12   an investigation by one of the -- by one
13   of the pharmacy loss prevention
14   personnel.
15           I can't say, I don't have
16   corporate knowledge that that couldn't
17   have happened.
18       Q.   It's very clear.
19           Did that report contain an
20   analysis as to whether or not a specific
21   order was unusual in its size?
22           MR. DELINSKY:  Object to
23       form.  Asked and answered.
24   BY MR. KENNEDY:

Page 173

1        Q.   Did it?
2        A.   There is information on that
3    report that loss prevention personnel
4    could use to determine whether the orders
5    for that store were such that the loss
6    prevention department would undertake an
7    investigation with respect to that store.
8        Q.   Right.  But the report
9    itself did not analyze any specific order
10   to determine whether or not that order
11   was unusual in size, correct?
12           MR. DELINSKY:  Object to
13       form.  Object, asked and answered.
14   BY MR. KENNEDY:
15       Q.   Correct?  We've all looked
16   at the form.
17       A.   The company did not consider
18   the results that populated on that report
19   to be, per se, unusual in size.  It was a
20   tool that was available to loss
21   prevention personnel in determining
22   whether or not further investigation by
23   loss prevention personnel would be
24   appropriate.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1  Q. That report doesn't even
2 identify a specific single order,
3 correct? It doesn't even identify a
4 specific order?
5  A. I don't recall whether
6 specific orders are listed in the report
7 or whether it's an aggregate number at
8 this point in time.
9  Q. Well, if you're citing that
10 report as part of a suspicious order
11 monitoring program, isn't that something
12 you should know?
13  MR. DELINSKY: Object to
14 form. Object it misstates the
15 testimony.
16 BY MR. KENNEDY:
17  Q. Right?
18  A. I don't think I said that
19 that was our suspicious order monitoring
20 system. I said that it is a complement
21 to what was occurring in our distribution
22 centers.
23  And, indeed, the metrics
24 that -- some of the metrics that were

Page 175

1 looked at in that report are consistent
2 with some of the metrics that we look at
3 in our algorithms that we run today.
4  Q. Let's be real clear, then.
5 Maybe I misunderstood.
6  I thought this was a part of
7 the suspicious order monitoring, because
8 that was my question.
9  This PDMR report, number
10 one, it does not evaluate any specific
11 order, correct?
12  MR. DELINSKY: Object to
13 form.
14 BY MR. KENNEDY:
15  Q. Is that correct?
16  MR. DELINSKY: Excuse me.
17 Object to form. Misstates the
18 testimony. Object on that ground
19 as well.
20 BY MR. KENNEDY:
21  Q. No specific order is
22 identified?
23  A. To the best of my corporate
24 knowledge, it investigates orders in the

Page 176

1 aggregate.
2  Q. Fine. And it does not
3 evaluate any specific order with respect
4 to unusual size; is that correct?
5  MR. DELINSKY: Object to
6 form. Asked and answered.
7  THE WITNESS: As I testified
8 a few moments ago, the -- CVS does
9 not take the position -- did not
10 take the position that an order
11 that populated on that report or
12 was reflected within that report
13 was, per se, suspicious.
14 BY MR. KENNEDY:
15  Q. I don't even know -- I don't
16 even -- did you hear my question?
17  I'm asking you, did that
18 report analyze any specific order with
19 respect to unusual size?
20  MR. DELINSKY: Object to
21 form.
22 BY MR. KENNEDY:
23  Q. Did it?
24  MR. DELINSKY: Asked and

Page 177

1 answered.
2  THE WITNESS: To the best of
3 my corporate recollection, it
4 looked at orders in the aggregate
5 and compared them to dispensing in
6 the aggregate to see if there was
7 a growth in inventory that wasn't
8 explained and should be -- and
9 should be investigated.
10  The company did not use the
11 terminology "suspicious order
12 monitoring" with respect to that
13 report.
14 BY MR. KENNEDY:
15  Q. I'm going to ask you again,
16 and I have to have answers to these
17 questions, period.
18  Did that report evaluate any
19 specific order as to whether or not it
20 was unusual in its size; yes or no?
21  MR. DELINSKY: Object to
22 form.
23 BY MR. KENNEDY:
24  Q. Did that report do that?

Page 178

1       MR. DELINSKY: Object to
2   form. Object on the grounds that
3   this question has been asked and
4   answered.
5       MR. KENNEDY: He hasn't
6   answered. He's not even close to
7   answering the question.
8   BY MR. KENNEDY:
9       Q.  Did that report do that
10  analysis of any specific order for
11  hydrocodone drugs?
12      A.  I'm not sure I understand
13  your question. So I'm trying to answer
14  it to the best of my ability.
15      Q.  The answer is no, isn't it?
16  The answer is simply no, that report
17  didn't do that?
18      MR. DELINSKY: Object to
19  form. Object, asked and answered.
20      THE WITNESS: The report
21  reflected orders in the aggregate
22  and compared those orders to
23  dispensing and looked to see if
24  there were increases in ordering

Page 179

1   over dispensing, coupled with
2   other indicia that may prompt loss
3   prevention personnel to undertake
4   an investigation.
5       That's what the report was
6   intended to do and how it was
7   used. It was an anti-diversion
8   tool used by the loss prevention
9   personnel.
10  BY MR. KENNEDY:
11      Q.  And that's all that report
12  did, correct?
13      MR. DELINSKY: Object to
14  form.
15  BY MR. KENNEDY:
16      Q.  That's all that report
17  did --
18      MR. DELINSKY: Object to the
19  form.
20  BY MR. KENNEDY:
21      Q.  -- was compare distribution
22  and dispensing, correct? That's all it
23  did?
24      MR. DELINSKY: Object to

Page 180

1   form. Object on the grounds it
2   misstates the testimony.
3       THE WITNESS: No, I think it
4   did other things, because it gave
5   other information about some of
6   the ordering activity of the
7   pharmacy, such as adjustments in
8   the order that had been suggested
9   by the AMES system to make that
10  order a larger order, or instances
11  where the pharmacy had adjusted
12  the inventory level in the
13  computer system or the balance on
14  hand to a lower level.
15      These, in the experience of
16  the company, could be potential
17  indicators of diversion occurring
18  in the pharmacy and --
19      MR. KENNEDY: I'm going to
20  move to strike.
21      Listen to my question.
22  BY MR. KENNEDY:
23      Q.  Did that form, the PDMR
24  report, provide an evaluation of a single

Page 181

1   order, any single order, of a hydrocodone
2   product with respect to whether or not it
3   was of unusual size? Did it? Did it
4   provide that evaluation?
5       MR. DELINSKY: Mr. Kennedy,
6   you are within your rights to move
7   to strike, but you're not within
8   your rights to interrupt the
9   witness.
10      So I'd ask that you let the
11  witness complete his answers
12  before you move to strike.
13      THE WITNESS: I was --
14      MR. KENNEDY: Go ahead.
15      MR. DELINSKY: I do object
16  to the form of the question. And
17  I object on the grounds the
18  question has been asked and
19  answered.
20      THE WITNESS: So I was
21  attempting to -- when you
22  interrupted me, I was attempting
23  to answer the question you asked
24  last, which was, is that -- is

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1  only the ordering and dispensing
2  reflected on a PDMR report.
3       And to my understanding,
4  there was more than that that was
5  reflected on the PDMR report. And
6  I was attempting to explain to you
7  what those were.
8  BY MR. KENNEDY:
9     Q.   Let's look at Exhibit-93,
10 please.
11            - - -
12      (Whereupon, CVS-Vernazza
13  Exhibit-93,
14  CVS-MDLT1-000068377-381, was
15  marked for identification.)
16            - - -
17 BY MR. KENNEDY:
18    Q.   Is this a PDMR report,
19 Exhibit-93?
20    A.   I did not review this
21 document in preparation for this
22 deposition. But I do believe it to be a
23 PDMR report.
24    Q.   Could you show the jury

Page 183

1  where on this report a specific order, a
2  specific order is evaluated as to whether
3  or not it is of unusual size? Show the
4  jury to that, please. Point that out,
5  point out the numbers for us.
6            MR. DELINSKY: I'm going to
7  object to form again. And I'm
8  going to further object on the
9  ground that this question has been
10  asked and answered on multiple
11  occasions.
12           And, Mr. Kennedy, I don't
13  know if there's two ships passing
14  in the night here, but Mr.
15  Vernazza has testified, on
16  multiple occasions already, that
17  this report addresses orders in
18  the aggregate. So he's already
19  answered that question.
20 BY MR. KENNEDY:
21    Q.   Could you please show the
22 jury -- show the jury where on this
23 report that we've been talking about,
24 where on this report an individual order

Page 184

1  for any controlled substance is evaluated
2  as to whether or not it is of unusual
3  size. Show that to the jury, sir,
4  please.
5           MR. DELINSKY: Object to
6  form. Object, asked and answered.
7           THE WITNESS: So I see on
8  this report, and certainly this is
9  an example and not every PDMR
10  report, but I do see orders that
11  reflect what I would understand to
12  be aggregated orders over a period
13  of time.
14           I do not know whether there
15  was ever an instance where, on the
16  PDMR report, there was only one
17  shipment made during that period
18  of time.
19           The process that was in
20  place, as I understand it, would
21  have been for loss prevention
22  managers to review this report and
23  determine whether or not
24  additional follow-up was

Page 185

1  necessary. Among the tools that
2  would have been available to loss
3  prevention personnel in such a
4  circumstance would have been data
5  that reflected individual orders.
6  BY MR. KENNEDY:
7     Q.   And, please, would you show
8  the jury where on here this report
9  reflects the individual evaluation of an
10 order as to whether or not it's of
11 unusual size? Could you show the jury
12 that, please, sir?
13           MR. DELINSKY: Object to
14  form. Object, asked and answered.
15 BY MR. KENNEDY:
16    Q.   Are you able to do that? Is
17 that information on this form that we've
18 been talking about?
19           MR. DELINSKY: Object to
20  form. Object as asked and
21  answered.
22 BY MR. KENNEDY:
23    Q.   Is it on this form anywhere,
24 sir?

Page 186

1 MR. DELINSKY: Same
2 objection.
3 THE WITNESS: There's a
4 column reflecting warehouse
5 shipments, and that could be
6 evaluated by loss prevention
7 personnel.
8 I don't have any knowledge
9 as to whether or not, in this
10 particular report, each entry is
11 reflective of multiple orders.
12 If multiple orders were
13 made, my understanding is that
14 those orders would be aggregated
15 in that number. But -- and so I
16 cannot say that a loss prevention
17 manager could not use this report
18 to look at the size of the orders.
19 But as I testified earlier,
20 the company did not term this
21 report to be one that was
22 primarily looking for suspicious
23 orders for the purposes of
24 reporting those orders to the DEA.

Page 187

1 BY MR. KENNEDY:
2 Q. Is my answer you cannot find
3 anywhere on here where a specific single
4 order is evaluated for size? Is that
5 true, you cannot find that on this
6 report?
7 MR. DELINSKY: Object to
8 form.
9 BY MR. KENNEDY:
10 Q. That data is not here, true?
11 MR. DELINSKY: Object to
12 form. Object, asked and answered.
13 BY MR. KENNEDY:
14 Q. True?
15 A. I think that's the same
16 question you just asked me. I can give
17 you the same answer.
18 Q. Just point to me --
19 A. Again --
20 Q. -- a number or a column --
21 A. -- which is that --
22 Q. -- where there is an
23 evaluation of a single order for any
24 controlled substance for size. Just show

Page 188

1 me.
2 A. I'm unable to say on this
3 document alone whether --
4 Q. I'm just talking about this
5 document. I'm not talking about somebody
6 else's investigation later.
7 I'm talking about on this
8 document, which you cited, show me where
9 there is an evaluation of a specific
10 order for size.
11 A. The --
12 Q. Point me to the number.
13 A. -- size of the warehouse
14 shipments is reflected there.
15 Q. Right.
16 A. I understand that to be an
17 aggregate number.
18 Q. Right.
19 A. I do not know, for each and
20 every instance, whether or not that
21 reflected one order or more than one
22 order.
23 My understanding is if more
24 than one order was made during the time

Page 189

1 period of this report, that those orders
2 would be aggregated in that fashion.
3 Q. Show me the evaluation of
4 that number, that order, the amount; show
5 me the evaluation for size.
6 A. The evaluation of the size
7 of the orders would be made with respect
8 to the dispensing --
9 Q. Right.
10 A. -- and adjustments and the
11 variance in the order -- the orders in
12 and the dispensing out. That's the
13 manner in which the report countenances
14 the size of the orders.
15 It would have then been used
16 by loss prevention personnel to conduct a
17 further investigation, if that was deemed
18 warranted at the time.
19 Q. Are you anywhere --
20 A. This is within a field
21 process.
22 Q. Are you anywhere on
23 Exhibit-93, PDMR report, able to show me
24 the evaluation of a single specific order

Page 190

1 for size? Are you able to do that?
2 You're not?
3     A.   Based on the information I
4 have in front of me, I'm not.
5     Q.   Thank you.
6         This report, the PDMR
7 report, can you show the jury anywhere on
8 this report where the frequency of orders
9 for controlled substances is being
10 evaluated?  Anywhere on this report, can
11 you show us that?
12         MR. DELINSKY:  Object to
13     form.
14         THE WITNESS:  Based on my
15     corporate knowledge at this point
16     in time, I cannot.
17 BY MR. KENNEDY:
18     Q.   Can you show us anywhere on
19 this report, the PDMR, Exhibit-93, where
20 an evaluation is done of a specific order
21 as it relates to the pattern of ordering
22 of a controlled substance?
23         MR. DELINSKY:  Object to
24     form.

Page 191

1 BY MR. KENNEDY:
2     Q.   Anywhere on this report.
3     A.   Among the things that we
4 consider in our analysis of pattern is
5 whether or not the particular store is
6 ordering in more than it's dispensing,
7 that remains part of the algorithms that
8 we run today.
9         That is reflected in this
10 report.  It's, in fact, the point of this
11 report.  So, to some degree, this report
12 could be used to look at pattern.
13         But, again, as I testified,
14 this report was not what we deemed a
15 suspicious order monitoring report.  It's
16 relevant to orders and order size and,
17 some degree, order pattern.
18         But the point of this was
19 not to produce results for the purposes
20 of determining whether suspicious orders
21 were made and reporting those to the DEA.
22     Q.   And this PDMR report is
23 printed every three months, true?  This
24 is a three-month report?  Do you know

Page 192

1 that?
2     A.   I believe it's -- perhaps
3 comes out on different cadences over the
4 course of time.  To the best of my
5 corporate knowledge, I understood it to
6 be a monthly report.
7     Q.   So this isn't -- certainly
8 isn't looked at before any particular
9 order for a controlled substance is being
10 shipped out to one of your pharmacies,
11 true?
12     A.   It is not.
13     Q.   You talked about the pickers
14 and the packers.
15         Is it your testimony that
16 the pickers and the packers were
17 responsible for evaluating orders to
18 determine whether or not they are
19 suspicious?
20     A.   The pickers and the packers
21 would be aware of, as part of their job
22 responsibilities, to raise any orders
23 that they considered to be irregular
24 based on their knowledge and experience,

Page 193

1 and to escalate those within the chain of
2 command within the warehouse and could
3 involve consultation with field
4 personnel.  Most commonly, to my
5 corporate knowledge, that would be a
6 phone call to the pharmacy.
7         There were fairly -- there
8 were a number of instances where I
9 understand the pickers and the packers
10 would identify orders and initiate
11 contact, through supervisors, to the
12 store in order to determine whether that
13 order was one that the store made by
14 mistake, for instance.
15     Q.   Tell me this:  What
16 database, what information and knowledge
17 did a picker and a packer have in January
18 of '06 to determine whether or not a
19 specific order for a specific pharmacy
20 was of unusual size?
21         MR. DELINSKY:  Object to
22     form.
23         THE WITNESS:  Their
24     knowledge and experience of

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1 picking controlled orders, and
2 exclusively controlled orders, for
3 many years for, generally
4 speaking, the same subset of
5 stores.
6     They would then escalate
7 those orders for further review,
8 which would most often include a
9 phone call to the store. And I
10 can't tell you, you know, what
11 each of those conversations may
12 have included or what information
13 may have been provided by the
14 store.
15 BY MR. KENNEDY:
16     Q.   The pickers and the packers,
17 how many orders would they fill a day in
18 January of '06?
19     A.   I don't have corporate
20 knowledge of that number.
21     Q.   Hundreds, right? Maybe
22 thousands a day?
23     A.   I don't have corporate
24 knowledge of that number.

Page 195

1     Q.   Let me ask, you expect a
2 picker or packer -- did CVS expect a
3 picker and a packer to remember the
4 ordering quantities of a specific
5 pharmacy that they were shipping to? Did
6 they expect them to remember that from
7 their basic experience?
8     Did you expect them to
9 remember the ordering quantities of a
10 specific pharmacy before filling that
11 order?
12     MR. DELINSKY: Object to
13 form.
14     THE WITNESS: Based on my
15 corporate knowledge, pickers and
16 the packers had experience and
17 knowledge as to what would be a
18 typical order for controlled
19 substances, and were able to
20 identify orders that they found to
21 be out of the ordinary.
22     I actually had conversations
23 with pickers and packers who had
24 been in the warehouse during the

Page 196

1 2006 time period, and they told me
2 that that was the case.
3 BY MR. KENNEDY:
4     Q.   And did they tell you that
5 before they filled an order for CVS Main
6 Street in Akron, Ohio, they would have a
7 memory of the ordering pattern and
8 frequency and amount of that particular
9 pharmacy for the preceding 30 days or 60
10 or 90?
11     A.   They did not tell me
12 specifically that.
13     Q.   And let me ask you this:
14 The pickers and the packers and their
15 just -- their general experience, is that
16 what CVS had in place as its system to
17 disclose suspicious orders, based upon
18 size, frequency and pattern, in '06?
19     MR. DELINSKY: Object to
20 form.
21     THE WITNESS: To the best of
22 my corporate knowledge at this
23 point in time, yes.
24 BY MR. KENNEDY:

Page 197

1     Q.   And would I be correct to
2 say there were no written policies,
3 procedures and protocols for those
4 pickers and the packers in '06, with
5 respect to their obligations? Nothing in
6 writing?
7     A.   In 2006, not in writing. We
8 later have reduced that process to
9 writing, as a part of a policy.
10     And, in fact, on the door to
11 the controlled substances cage today, and
12 I understand it's been there for some
13 period of time, is a poster that actually
14 reminds the pickers and the packers of
15 their obligations with respect to this.
16     Q.   In 2006, did CVS rely upon
17 pickers and packers to have a memory of
18 the frequency of a particular pharmacy's
19 ordering of a controlled substance over
20 the preceding 30, 60, 90 days?
21     A.   The pickers and the packers
22 who I spoke to told me that they were
23 able to identify orders that seemed out
24 of the ordinary, based on their

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1 experience picking controlled substances
2 in the controlled substances cage.
3      Q.   Can you describe to me the
4 training program that the pickers and the
5 packers went through to identify unusual
6 orders of size, frequency or pattern?
7          MR. DELINSKY:  Object to
8      form.
9          THE WITNESS:  Are you
10     speaking -- in which time period?
11 BY MR. KENNEDY:
12     Q.   In '06.  In '06.
13     A.   To the best of my corporate
14 knowledge, there was no formal training
15 program.  However, the pickers and the
16 packers who I spoke with who worked in
17 that environment in 2006 told me that
18 they were aware of that component of
19 their job responsibilities and had
20 acquired that knowledge in the course of
21 their employment.
22     Q.   And what were the job
23 requirements to be a picker and a packer
24 at a CVS distribution center in 2006?

Page 199

1      A.   I'm unaware of the formal
2 job requirements.  I have been told that
3 the pickers and the packers in the
4 controlled substances cage were often
5 among the best and most valued employees
6 who performed those types of functions.
7      Q.   From '06 to 2012, did a
8 picker and a packer ever identify an
9 order that was stopped and determined to
10 be suspicious and report it to the DEA,
11 ever?
12     A.   To the best of my --
13         MR. DELINSKY:  Object to
14     form.  Object to scope.  It's
15     outside the scope of the
16     deposition notice and the Special
17     Master's rulings.
18 BY MR. KENNEDY:
19     Q.   Ever?
20     A.   To the best of my corporate
21 knowledge at this point in time, we do
22 not have record of any suspicious order
23 being identified or reported to the DEA
24 in 2006 from the Indianapolis

Page 200

1 distribution center.
2      Q.   Can you give me the names of
3 the pickers and the packers that you
4 spoke with that were either working --
5 that were working in January '06, let's
6 start with that, because that's what
7 we've been talking about.
8          Tell me the names of the
9 packers and the pickers that you spoke
10 with who were employed by CVS in 2006,
11 January.
12     A.   One's name was Allan Wilson.
13 Another's name was Sherri Hinkle.
14     Q.   And they were employed in
15 January of '06?
16     A.   Yes.  That's my
17 understanding.  In fact, my understanding
18 is they had been employed in the
19 warehouse for 20 years or more.
20     Q.   Now, a CVS standard
21 operating procedure regarding controlled
22 drugs came into place on 12/1/07,
23 correct?
24     A.   I'd have to see the document

Page 201

1 to validate that particular date.  I am
2 aware that in 2007 there was a controlled
3 substances policy that was put into place
4 with respect to certain components of
5 distribution center operations.
6      Q.   From January of '06 -- I
7 want to talk about from January of '06,
8 because we've talked about January, from
9 January of '06 until 12/1/07, when the
10 first operating policy manual comes into
11 play, can you describe for me what
12 suspicious order monitoring policies and
13 procedures were in place?
14         MR. DELINSKY:  Object to
15     form.  Object, asked and answered.
16         THE WITNESS:  The practice
17     and procedure that I described to
18     you with respect to the controlled
19     substances cage, pickers and
20     packers, was in effect and
21     remained in effect.
22         There were a number of other
23     safeguards against diversion at
24     various places within the company.

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 But with respect to the
2 identification of suspicious
3 orders for reporting to the DEA,
4 to the best of my corporate
5 knowledge at this point in time,
6 that was the primary practice that
7 was in place.
8 BY MR. KENNEDY:
9 Q. Let me ask you this: From
10 January of '06 up to 12/1, December 1, of
11 '07, were any audits ever done of the
12 pickers and the packers to see how
13 effective they were in identifying orders
14 of unusual size, frequency or pattern?
15 Were any audits done --
16 MR. DELINSKY: Object to
17 form.
18 BY MR. KENNEDY:
19 Q. -- to see how effective they
20 were?
21 MR. DELINSKY: Object to
22 form.
23 THE WITNESS: I'm aware of
24 various DEA inspections that

Page 203

1 occurred at our facilities.
2 BY MR. KENNEDY:
3 Q. No. I'm asking you about
4 CVS audits, where they audited the
5 pickers and the packers to see how
6 effective they were in identifying orders
7 for controlled substances that were
8 unusual because of size, frequency or
9 pattern.
10 A. At this point in time, I
11 don't have corporate knowledge with
12 respect to an audit that had been done on
13 that specific point by CVS.
14 MR. KENNEDY: Do you want to
15 do lunch for 15 or just keep
16 going?
17 MR. DELINSKY: We can break
18 and do lunch.
19 MR. KENNEDY: I mean, I
20 don't -- doesn't matter to me, but
21 if we are going to break for
22 lunch, now is kind of a good time,
23 I suppose.
24 MR. DELINSKY: Let's do it.

Page 204

1 Let's do a little more than 15.
2 Let's do -- let's take 30 minutes.
3 MR. KENNEDY: Thirty, fine.
4 VIDEO TECHNICIAN: The time
5 is 12:51. Going off the record.
6 - - -
7 (Whereupon, a luncheon
8 recess was taken.)
9 - - -
10 VIDEO TECHNICIAN: The time
11 is 1:26 p.m. We're back on the
12 record.
13 BY MR. KENNEDY:
14 Q. All right, sir. I think
15 when we --
16 VIDEO TECHNICIAN: Your
17 microphone, counsel.
18 MR. KENNEDY: Sorry about
19 that. That's common for me.
20 BY MR. KENNEDY:
21 Q. Sir, I think when we left
22 off, we had moved in time from January of
23 '06 up to December of '07.
24 In that regard, I've given

Page 205

1 you Exhibit-6, which --
2 VIDEO TECHNICIAN: Hold on,
3 counsel, we have to go off the
4 record.
5 The time is 1:27 p.m. Going
6 off the record.
7 - - -
8 (Whereupon, a brief recess
9 was taken.)
10 - - -
11 VIDEO TECHNICIAN: The time
12 is 1:28 p.m. We're back on the
13 record.
14 BY MR. KENNEDY:
15 Q. All right, sir, I'm showing
16 you Exhibit-6.
17 - - -
18 (Whereupon, CVS-Vernazza
19 Exhibit-6,
20 CVS-MDLT1-000025204-259, was
21 marked for identification.)
22 - - -
23 BY MR. KENNEDY:
24 Q. Have you seen this before?

Page 206

1  A.  I reviewed a large number of
2  documents in preparation for this
3  deposition.  I'm not certain this is
4  among them.
5  Q.  All right.  Let's look at
6  the first page of this.
7  This is an e-mail from Amy
8  Lynn Brown, true?
9  A.  The e-mail at the bottom
10  appears to be an e-mail from Amy Lynn
11  Brown.
12  Q.  Sent on November 27, 2007,
13  correct?
14  A.  Again, this document seems
15  to reflect at least three e-mails.  The
16  document -- the e-mail at the bottom
17  would be November 27th, 2007 from Amy
18  Lynn Brown.
19  Q.  So my answer is yes, right,
20  that the date of the e-mail that we're
21  looking at is November 27, from Amy Lynn
22  Brown, true?
23  Nice and easy.
24  A.  True, the e-mail at the

Page 207

1  bottom.  There's multiple e-mails on this
2  document, and I don't believe you
3  specified it in your question.
4  Q.  Well, it's -- never mind.
5  It's the only one from Amy
6  Lynn Brown?  Is the subject --
7  A.  I think there's two from Amy
8  Lynn Brown.
9  Q.  Is the subject, New RX DEA
10  SOP?
11  A.  The subject of the e-mail at
12  the bottom of the page is, New RX DEA
13  SOP.
14  Q.  And all of these people that
15  this is being sent to, generally, do you
16  recognize who those people are?
17  A.  I recognize some of them.
18  Q.  And who are those folks
19  employed by?
20  A.  With respect to some of the
21  names that I recognize, I believe those
22  names would be employed by CVS Pharmacy,
23  Inc.
24  With respect to some of the

Page 208

1  other names, I'm not certain.  To the
2  best of my corporate knowledge, they
3  could have been employed by the entities
4  that owned individual distribution
5  centers.
6  Q.  Now, on this date, November
7  27th, 2007, Amy Lynn Brown states, Good
8  afternoon.  In late August, we met to
9  review a new SOP.
10  "SOP" we understand to mean
11  standard operating procedure, true?
12  A.  I'm familiar with that
13  terminology being used that way, yes.
14  Q.  And she says it's new, which
15  would imply it didn't exist before this
16  date, true?
17  MR. DELINSKY:  Object to
18  form.
19  THE WITNESS:  That this form
20  of the SOP didn't exist before
21  this date, is how I would
22  interpret that.  But I don't know
23  exactly what Ms. Brown meant when
24  she authored this e-mail.

Page 209

1  BY MR. KENNEDY:
2  Q.  Okay.  In late August, we
3  met to review a new SOP in development
4  for the DEA and controlled drug process.
5  Did the DEA request that CVS
6  develop a standard operating procedure?
7  A.  I don't have corporate
8  knowledge that they did.
9  Q.  Next sentence, it states,
10  Not all the RX DCs -- and that would be
11  distribution center, true?
12  A.  Again, that would be the way
13  I read this e-mail.  But I don't know
14  specifically what Ms. Brown was
15  referencing there.
16  But, certainly DC is a
17  common way of expressing distribution
18  center within CVS.
19  Q.  You don't have any
20  knowledge, or taking a position, that she
21  was suggesting anything other than
22  distribution center, do you?
23  A.  No, no.
24  Q.  All right.  Not all RX DCs

Highly Confidential – Subject to Further Confidentiality Review

Page 210

1  had a representative at the meeting, so I
2  am forwarding a copy for your review.  We
3  are looking to implement this new SOP in
4  early December.  The company that
5  authored the SOP is also going to provide
6  the training on the SOP.
7         Let me ask you this: Who was
8  the company authoring the SOP at this
9  point?
10      A.   To the best of my corporate
11  knowledge, the Buzzeo Group was engaged
12  in a consulting capacity and assisted in
13  authoring this document that's attached
14  to the e-mail.
15      Q.   And she says here that
16  they're going to provide training on this
17  suspicious order -- excuse me, this
18  standard operating procedure.
19         Do you see that?  They're
20  going to provide training, right?
21      A.   I see that referenced in the
22  e-mail.
23      Q.   Does that imply to you that
24  the people that are receiving this, then,

Page 211

1  were unfamiliar with this standard
2  operating procedure, because they need to
3  be trained --
4         MR. DELINSKY:  Object to
5     form.
6  BY MR. KENNEDY:
7     Q.   -- correct?
8         MR. DELINSKY:  Object to
9     form.
10  BY MR. KENNEDY:
11      Q.   Do you agree with that?
12      A.   I don't have corporate
13  knowledge that that's what that means.
14      Q.   That's -- as you sit here
15  today, you don't interpret it that way,
16  that these folks need to be trained
17  because it's new?
18         MR. DELINSKY:  Object to
19     form.
20  BY MR. KENNEDY:
21      Q.   Do you agree with that?
22      A.   I don't have corporate
23  knowledge that that's what she meant, or
24  whether or not individual personnel would

Page 212

1  have seen this before, or whether or not
2  they would have had an understanding as
3  to its content.
4         I'm unable to tell that just
5  from the e-mail alone.
6     Q.   Let me -- forget your
7  corporate knowledge for just one second.
8         Just common sense would tell
9  you that if they refer to it as new and
10  they're talking about training, that
11  these folks probably are unfamiliar with
12  these standard operating procedures at
13  this point in time, true?  Just common
14  sense.
15         MR. DELINSKY:  Object to
16     form.  A corporate knowledge
17     deposition, the witness is only
18     here to answer knowledge --
19     regarding his corporate knowledge.
20         MR. KENNEDY:  And the law
21     says I can ask him questions
22     outside of those 30(b)(6)s.  I'm
23     not limited to the 30(b)(6)
24     topics, under the law.

Page 213

1  BY MR. KENNEDY:
2     Q.   Let's continue.  We can --
3         MR. KENNEDY:  We researched
4     it.
5  BY MR. KENNEDY:
6     Q.   But go on.
7         The last statement there, it
8  says, Below is a list of dates for
9  training at your facilities.
10         Right?  It says, again,
11  training to these employees, true?
12      A.   I see the word "training."
13      Q.   All right.  Now, there's a
14  list of dates and facilities for
15  training.
16         And then it states, We are
17  still in the process of writing the
18  suspicious order monitoring section of
19  the standard operating procedures.  We
20  will forward once it is complete.
21         On behalf of CVS, you agree
22  that, at this point in time, 12/27/07,
23  the suspicious order monitoring section
24  of CVS's standard operating procedures

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 had not yet been written, correct?
2     A.   If you'll allow me just to
3 review the document for a minute.
4     Q.   Well, I can direct your
5 attention. If you want to go to Page
6 25243.
7       MR. DELINSKY: The witness
8     is already there. He understands
9     the document.
10 BY MR. KENNEDY:
11     Q.   Do you see Page 25243?
12     A.   Yes, I do.
13       So there is a section here
14 that addresses suspicious order
15 monitoring.
16     Q.   Correct.
17     A.   My understanding is that
18 that was essentially a draft or a
19 placeholder for that section and was not
20 the policy that was necessarily in place
21 at that time.
22     Q.   Well, then, we'll go through
23 this a little bit more carefully.
24       Do you agree with her

Page 215

1 statement here, We are still in the
2 process of writing the suspicious order
3 monitoring section of this standard
4 operating procedure?
5       As of this date, do you
6 agree that it was still being written, in
7 November of 2007? Do you agree with that
8 statement?
9     A.   To the best of my corporate
10 knowledge, that is true.
11     Q.   Now, she attaches to this
12 e-mail the standard operating procedures,
13 correct, that she talks about in her
14 e-mail that she is sending out to all
15 these people, true? She attaches it?
16     A.   That's not evident to me
17 from the face of this document.
18     Q.   Pardon me?
19     A.   That's not evident to me
20 from the face of this document.
21     Q.   Well, her e-mail is Bates
22 number 25204, correct?
23     A.   Sir, you're looking at three
24 e-mails, as we discussed before.

Page 216

1     Q.   Right.
2     A.   Right. There's no
3 indication of an attachment to the bottom
4 e-mail. There's an indication of an
5 attachment to the top e-mail.
6     Q.   Correct.
7     A.   The top e-mail was sent, it
8 appears, in January of 2008.
9     Q.   All right.
10     A.   So I'm unable to tell from
11 this document whether the attachment was
12 attached to the bottom e-mail. I don't
13 have any knowledge that it wasn't; I just
14 can't tell from this document that it
15 was.
16     Q.   I mean, in this e-mail, does
17 she say, I am forwarding a copy for your
18 review? Correct?
19     A.   She does say that. And that
20 would certainly be consistent with her
21 sending the document as an attachment.
22       Again, I don't see an
23 attachment listed. But, certainly, the
24 content of her e-mail is consistent with

Page 217

1 the notion that she would have been
2 forwarding that. Whether it was this
3 version, I'm unable to say.
4     Q.   Well, let's look at the
5 version that appears in consecutive
6 numbering, 25206; am I right?
7     A.   Yes.
8     Q.   Her e-mail references
9 standard operating procedures, and two
10 e-mails -- or two pages later, we have
11 standard operating procedures, correct?
12     A.   Yes. But the e-mail that
13 was sent most recently in this string is
14 the e-mail that appears to be sent from
15 Todd Janson to John Mortelliti in January
16 of 2008. That very clearly seems to
17 attach CVS seventh draft, November 2007.
18       And so that certainly
19 appears to be the attachment to Mr.
20 Janson's e-mail.
21       Whether that was also the
22 same attachment to Ms. Brown's e-mail, to
23 the extent there was an attachment, I
24 can't answer conclusively from the

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1  document you put in front of me.
2      Q.   25206, titled, Distribution
3  Centers Controlled Drug-DEA Standard
4  Operating Procedures (SOPs) Manual,
5  correct?
6      A.   CVS Distribution Centers
7  Controlled Drug-DEA Standard Operating
8  Procedures (SOPs) Manual, that's correct.
9      Q.   And what we have in this
10  exhibit, are these the standard operating
11  procedures that were put into effect on
12  12/1/07 at CVS?
13      A.   It is a set of standard
14  operating procedures that appear to have
15  been in effect in November 2007.
16          However, there are certain
17  components of the standard operating
18  procedures here that I know were still in
19  draft form or, essentially, a
20  placeholder.
21      Q.   Let me ask you, go to Page
22  25242 of the standard operating
23  procedures.
24          Do you see the 25242?  Do

Page 219

1  you see that on the bottom, Suspicious
2  order monitoring?  Do you see that?
3      A.   I do.
4      Q.   And is this section, this
5  Section D, suspicious order monitoring,
6  is this what was put into place on
7  December 1, 2007 at CVS?
8          MR. DELINSKY:  Object to
9      form.
10          THE WITNESS:  As I
11      mentioned, and as Ms. Brown's
12      e-mail indicates, that section was
13      still being written and is in
14      draft form used as a placeholder
15      in this policy.
16          And no, to the best of my
17      corporate knowledge, what's
18      reflected in that section was not
19      implemented at that time.
20  BY MR. KENNEDY:
21      Q.   All right.  So what we are
22  looking at, under the suspicious order
23  monitoring program in Exhibit-6, right,
24  if we look to the next page, 25243,

Page 220

1  right?
2      A.   Yes.
3      Q.   And the big bold letters, do
4  you see that?
5      A.   I do.
6      Q.   This is in the suspicious
7  order monitoring section.  It says, SOP,
8  blank, order quantity parameters for
9  controlled drugs being developed and
10  written.
11          So the SOP, with respect to
12  the parameters section of the suspicious
13  order monitoring policy, have not yet
14  been written or developed; is that what
15  that says?
16          MR. DELINSKY:  Object to
17      form.
18          THE WITNESS:  No.  I believe
19      it says what you read.  I know,
20      from my preparation for this
21      deposition, that this Section D,
22      starting on page that ends 5242
23      and spanning to 25 -- excuse me,
24      5243, was in draft form, a

Page 221

1      placeholder, and not the policy
2      that was put into place at this
3      time.
4  BY MR. KENNEDY:
5      Q.   All right.  So what we're
6  seeing in Exhibit-6 is not the suspicious
7  order monitoring policy that was put into
8  effect on 12/1/07; is that what you're
9  saying?
10      A.   What I'm saying is I don't
11  believe that there was a suspicious order
12  monitoring policy put into place as of
13  that date.
14      Q.   Okay.
15      A.   Other than what's reflected
16  here, which is consistent with some of
17  the principles that we discussed --
18      Q.   But it's not in place --
19      A.   -- earlier.
20      Q.   -- and in effect and up and
21  running?
22      A.   What's described here is
23  what was written, to the best of my
24  corporate knowledge, by the Buzzeo Group,

Page 222

1 but not yet describing a system that had
2 been implemented in a centralized,
3 computer-based fashion at CVS. And that
4 was understood.
5    Q.   All right. Exhibit-14,
6 please.
7            - - -
8       (Whereupon, CVS-Vernazza
9       Exhibit-14, CVS-MDLT1-000034374,
10      with attachment, was marked for
11      identification.)
12           - - -
13 BY MR. KENNEDY:
14    Q.   We were just talking about
15 December of '07. So I want to move
16 forward now to September of '08, so ten
17 months or so later.
18       This is an e-mail, that
19 being Exhibit-14, from Richard Sanitate,
20 correct?
21    A.   September 18th of 2008 from
22 Richard Sanitate, yes.
23    Q.   And who is he employed by?
24    A.   I don't know Mr. Sanitate,

Page 223

1 and he's not somebody who I spoke with in
2 preparation for this deposition.
3       So, unfortunately, I
4 don't --
5    Q.   He is writing --
6    A.   -- have corporate knowledge
7 on that.
8    Q.   -- an e-mail, though, to
9 various folks that are involved with the
10 suspicious order monitoring procedures
11 protocols, correct?
12    A.   Could you repeat the
13 question?
14    Q.   The e-mail is being sent to
15 Byers, Bachofen, Wagner -- and these
16 would be people that are involved with
17 the monitoring of orders, correct, the
18 policies, the development of policies?
19    A.   I don't know that each of
20 the individuals listed in the "to" line
21 there would have been involved in
22 suspicious order monitoring.
23    Q.   And the attachment says,
24 DEA-CVS operating procedures.

Page 224

1       We've been talking about
2 operating procedures, true? Is that what
3 the attachment says? Is that what it
4 says?
5    A.   CVS standard operating
6 procedures.
7    Q.   Is that the attachment? If
8 you look at the first page, does the
9 attachment say, DEA-CVS operating
10 procedures.ppt, probably PowerPoint?
11    A.   Yes.
12       MR. DELINSKY: Excuse me,
13 could you please put it up on the
14 screen? It's hard to read.
15 There's parts of this I can't read
16 on the document, just due to the
17 size.
18       Can you please put up 34375
19 on the screen? That's all.
20       Right now it's only the
21 cover e-mail.
22       THE WITNESS: That's what I
23 understood your question to be
24 asking me about the cover e-mail.

Page 225

1 BY MR. KENNEDY:
2    Q.   No, no. I'm asking about
3 the e-mail now. Why are we at the
4 PowerPoint?
5       MR. DELINSKY: I'm sorry.
6 My bad.
7 BY MR. KENNEDY:
8    Q.   The attachment, does the
9 attachment to this 9/18/08 e-mail say,
10 DEA-CVS operating procedures.ppt --
11 probably standing for PowerPoint. Is
12 that the attachment on the e-mail?
13    A.   That is not what the
14 attachment says is the title, no.
15       MR. DELINSKY: Okay. I
16 think we're talking to two
17 different things. Mr. Vernazza is
18 looking at what appears to be the
19 actual attachment. You're looking
20 to the attachment line.
21       That's the source of the
22 confusion.
23 BY MR. KENNEDY:
24    Q.   Please listen to my

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 question. I'm just on Page 1.
2     A.   I think you said is the
3 attachment titled that.
4         MR. DELINSKY: Go back. I
5 think this is an innocent
6 confusion.
7         MR. KENNEDY: It clearly is.
8 I'll go back and clear it up.
9 BY MR. KENNEDY:
10    Q.   Just look at the e-mail on
11 the first page? That's all. The e-mail
12 on the first page.
13    A.   The attachment to the e-mail
14 on the first -- at the top level is
15 indicated as DEA-CVS operating
16 procedures.ppt.
17    Q.   Correct.
18    A.   Totally agree.
19    Q.   Now, let's look at the
20 attachment, okay?
21        And, again, we are in
22 September of '08, correct? And the
23 attachment is the PowerPoint.
24        And it says, CVS standard

Page 227

1 operating procedures, correct?
2     A.   I do see that, yes.
3     Q.   If we go further -- at this
4 point in time, is the suspicious order
5 monitoring section of the standard
6 operating procedures complete and up and
7 running and in place? This is now
8 September of '08.
9     A.   This is not a document that
10 I reviewed in preparation for this
11 deposition. The standard operating
12 procedures document that we were looking
13 at earlier that was the placeholder --
14    Q.   Right.
15    A.   -- remained in effect for
16 some period of time. I believe through
17 this period of time.
18    Q.   All right.
19    A.   And remained in draft
20 placeholder form --
21    Q.   So the standard --
22    A.   -- through this time.
23    Q.   -- operating procedures for
24 the suspicious order monitoring are still

Page 228

1 being drafted, and we are in September of
2 '08, correct?
3     A.   To the best of my corporate
4 knowledge, that's true.
5     Q.   So let's look at the
6 PowerPoint. If you'd go to Page 380.
7         MR. DELINSKY: If you feel
8 as though you need to read the
9 document, take your time.
10        THE WITNESS: Unfortunately,
11 I do think it is a document I'm
12 going to have to take a few
13 minutes to review, Mr. Kennedy.
14 BY MR. KENNEDY:
15    Q.   Are you on Page 380?
16    A.   No, not yet. I need to
17 review a little bit more of the document.
18    Q.   380, that's -- we don't --
19 no need to talk about their security and
20 driving trucks.
21        I wanted to go to the
22 standard operating procedure portion on
23 380.
24    A.   I just see other pages that

Page 229

1 seem to define terms that are being used,
2 so in order to --
3     Q.   If we come across something
4 you don't understand, you want to go
5 back, I've got no problem. But these are
6 pretty straightforward questions.
7         MR. DELINSKY: Let's just
8 give the witness a minute.
9 BY MR. KENNEDY:
10    Q.   Let's move on. We're going
11 to move to another exhibit.
12        MR. KENNEDY: If you'd give
13 me Exhibit-7, if we could.
14        - - -
15        (Whereupon, CVS-Vernazza
16 Exhibit-7,
17 CVS-MDLT1-000034234-300, was
18 marked for identification.)
19        - - -
20 BY MR. KENNEDY:
21    Q.   We were just looking, we
22 were in September of '08, and the
23 drafting of the suspicious order
24 monitoring is still proceeding, correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 230

1    MR. DELINSKY: Exhibit-7.
2    THE WITNESS: Yes, it was
3  still in draft form, to the best
4  of my corporate knowledge, at that
5  time.
6  BY MR. KENNEDY:
7    Q.   Let's move forward now.
8  That was September of '08.
9    Let's move forward now to
10  April 3 of '09. And that would be
11  Exhibit-7. All right.
12    I'm looking at the bottom
13  e-mail from Amy Propatier.
14    She's employed at CVS
15  Pharmacy, Inc., correct?
16    A.   To the best of my knowledge,
17  that's true, yes.
18    Q.   And she would have been
19  involved with establishing the suspicious
20  order monitoring policy and that section
21  of the standard operating procedures,
22  true?
23    MR. DELINSKY: Object to
24  form.

Page 231

1    THE WITNESS: To the best of
2  my knowledge, Mrs. Propatier was
3  involved in the standard operating
4  procedures.
5  BY MR. KENNEDY:
6    Q.   She sends this e-mail to a
7  large group of people.
8    Do you recognize all those
9  people?
10    A.   Not all of them, no. Some
11  of them.
12    Q.   That's a large group of
13  people, and so most of those people that
14  you recognize would be employed at CVS
15  Pharmacy, Inc., correct?
16    A.   No, that's -- that's not
17  correct. I don't know all the
18  individuals who she's sending this to.
19  I understand at least one of
20  them to be employed by CVS Indiana, LLC.
21    Q.   So this is people involved,
22  though, with respect to standard
23  operating procedures, people that would
24  be involved with suspicious order

Page 232

1  monitoring procedures, true?
2    MR. DELINSKY: Object to
3  form.
4    THE WITNESS: I don't know
5  that to be true, no.
6  BY MR. KENNEDY:
7    Q.   But this would be people
8  both at the distribution centers and at
9  CVS Pharmacy, Incorporated, true? It
10  looks that way.
11    A.   I see at least one
12  individual who I understand to have been
13  employed by CVS Pharmacy, Inc. I see at
14  least one individual who would have been
15  employed by CVS Indiana, LLC.
16    Q.   All right.
17    A.   I do not know all of these
18  people to have been involved in
19  suspicious order monitoring.
20    Q.   A large group of people on
21  the e-mail, true?
22    A.   It depends on how you would
23  judge "large." We could count them, if
24  you would like.

Page 233

1    Q.   The subject of this is,
2  Updated DEA SOP, correct? Is that the
3  subject?
4    A.   That is the subject of Ms.
5  Propatier's e-mail at the bottom of this
6  exchange.
7    Q.   So is the answer yes?
8    MR. DELINSKY: Object to
9  form.
10  BY MR. KENNEDY:
11    Q.   Just a real simple -- let's
12  try this.
13    Is the subject, Updated DEA
14  SOP?
15    MR. DELINSKY: Object to
16  form.
17  BY MR. KENNEDY:
18    Q.   Can you answer that yes or
19  no?
20    A.   I can't. Because if you
21  look at this e-mail, there's three
22  different e-mails.
23    Q.   Are we talking about any
24  e-mail other than the April 3 e-mail

Highly Confidential – Subject to Further Confidentiality Review

Page 234

1 where we just went through, in great
2 detail, everybody that was sent to and
3 who it was from?  Anybody else, other
4 than that e-mail?
5      THE WITNESS:  I wasn't
6      focused --
7      MR. DELINSKY:  Object to
8      form.  It's less than clear
9      whether we're talking about just
10     that one e-mail or everything on
11     the same page.
12 BY MR. KENNEDY:
13     Q.   Let me try this:  Is the
14 subject line of the April 3, 2009 e-mail,
15 Updated DEA SOP; yes or no?
16     A.   Yes.
17     Q.   Great.  Can we try to do
18 that moving forward?
19     A.   I would love that.
20     MR. DELINSKY:  Object to
21     form.
22 BY MR. KENNEDY:
23     Q.   Now, it says, Good morning.
24 Attached is the DEA SOP -- standard

Page 235

1 operating procedures -- which was
2 implemented in December of 2007.  We have
3 made some recent updates to the SOP.
4 Please note we have updated the record
5 retention period from five years to two
6 years.  Also, the SOM -- suspicious order
7 monitoring -- section is still not
8 included in the SOP.  In the event of an
9 audit and the question comes up, please
10 direct them to corporate (Frank or
11 myself) for explanation of the program.
12 Please review with your teams and forward
13 to anyone I have missed.
14      We agree, at this point in
15 time now, it's April of '09, and the
16 standard -- or, excuse me, the suspicious
17 order monitoring section is still not
18 included in the standard operating
19 procedures, correct?
20     A.   A final version is not
21 included in the standard operating
22 procedures being referenced by Mrs.
23 Propatier in this e-mail.
24     Q.   And with respect to all of

Page 236

1 these people on the e-mail, this large
2 group, without counting, with respect to
3 this group of folks, the indication is
4 that if the DEA wants to know about our
5 policy, direct it to somebody else,
6 correct?
7     A.   What Ms. Propatier appears
8 to express in this e-mail is if --
9     Q.   Isn't that what it says?
10     A.   -- in the event of an audit
11 and the question comes up about the SOM
12 section, direct them to corporate, Frank,
13 who I understand her to be representing
14 Frank Devlin, or myself, Mrs. Propatier,
15 for an explanation of the program.
16     Q.   What's being said here is
17 that none of these people here, none of
18 these people here know enough about what
19 CVS is doing to monitor suspicious orders
20 to answer questions by the DEA, correct?
21 Isn't that the clear implication?
22     MR. DELINSKY:  Objection.
23     THE WITNESS:  I don't have
24     corporate knowledge that that's

Page 237

1      the case.
2 BY MR. KENNEDY:
3     Q.   You don't?
4      MR. DELINSKY:  And I object
5      to the form of the question.
6      Just give me a second to
7      interpose my objections.
8 BY MR. KENNEDY:
9     Q.   Clearly, Amy Propatier
10 doesn't want any of the people on this
11 e-mail answering questions to the DEA
12 about the suspicious order monitoring
13 policy, correct?  Isn't that clear?
14     MR. DELINSKY:  Object to
15     form.
16     THE WITNESS:  I don't have
17     corporate knowledge of that.
18     Certainly, the e-mail
19     instructs that if, in the event of
20     an audit, a question comes up,
21     please direct them to corporate,
22     Frank or myself, for an
23     explanation of the program.
24      - - -

Page 238

1      (Whereupon, CVS-Vernazza
2      Exhibit-45,
3      CVS-MDLT1-000090853-854, was
4      marked for identification.)
5          - - -
6      MR. GOETZ:  Exhibit-45.
7  BY MR. KENNEDY:
8      Q.   I showed you Exhibit-45.
9          We're going to -- we're
10  moving forward three months from the
11  April '09 e-mail.  I'm going to move
12  forward now to June of '09.
13          And I want to look at the
14  Amy Propatier e-mail, the middle one.
15  And it's dated June 12th, 2009, all
16  right?  Subject, DEA standard operating
17  procedure.
18          If you look down at Number
19  3, Amy Propatier states, Suspicious order
20  monitoring-Section VIII D1B.  This is
21  incomplete.  It states, These parameters
22  are documented in SOP blank.
23          And then she asks, When will
24  this be completed?  This is not completed

Page 239

1  yet.
2          Indicating Frank has
3  consultants working on the program.
4          And Frank would be Frank
5  Devlin, would that be true?
6      A.   To the best of my corporate
7  knowledge, that is who I understood to be
8  working primarily with outside
9  consultants to develop the suspicious
10  order monitoring process that was put in
11  place and centralized in algorithmic
12  fashion either in late 2008 or, to my
13  understanding, the first half of 2009.
14          So Ms. Propatier could be
15  referencing just the policy section that
16  she's talking about there.
17      Q.   And Mr. Devlin worked for
18  CVS Pharmacy, Inc.; is that true?
19      A.   That is my understanding.
20      Q.   And this e-mail is
21  indicating that this suspicious order
22  monitoring section is still incomplete;
23  is that the statement, sir?
24      MR. DELINSKY:  I would just

Page 240

1  like to object to the form of the
2  question.  You attributed certain
3  statements in the e-mail to Ms.
4  Propatier, where I believe Ms.
5  Propatier is forwarding an e-mail
6  from another person who makes the
7  statement, and Ms. Propatier is
8  providing answers.
9  BY MR. KENNEDY:
10      Q.   Is that correct, sir?
11      A.   There is language in Ms.
12  Propatier's e-mail, dated June 12th, 2009
13  at 2:26 p.m., that says that a certain
14  section of the SOP with respect to
15  suspicious order monitoring is not yet
16  complete.
17          I do have --
18      Q.   And on behalf of CVS, do you
19  disagree with that statement, that it was
20  incomplete at this point in time?
21      MR. DELINSKY:  Object to
22      form.
23  BY MR. KENNEDY:
24      Q.   And this is June of '09.

Page 241

1      MR. DELINSKY:  Object to
2      form.
3  BY MR. KENNEDY:
4      Q.   Do you disagree with that?
5      MR. DELINSKY:  Object to
6      form.
7      THE WITNESS:  I don't object
8      that the section in the SOP was
9      not complete at that time.
10          There was at this point, to
11      the best of my corporate
12      knowledge, a system that had been
13      delivered and implemented by the
14      Buzzeo Group and implemented
15      within the CVS IT infrastructure,
16      which was an algorithmic-based
17      analysis of orders in connection
18      with the company's suspicious
19      order monitoring process.
20  BY MR. KENNEDY:
21      Q.   The SOP is incomplete on
22  this date.
23          Do you disagree with that?
24      MR. DELINSKY:  Object to

Highly Confidential - Subject to Further Confidentiality Review

Page 242

1    form.
2    BY MR. KENNEDY:
3        Q.   Do you disagree with that
4    statement, that the suspicious order
5    monitoring section of your standard
6    operating procedures is still incomplete
7    as of June of '09?
8        A.   I do not have corporate
9    knowledge that would indicate that a
10   statement that the written SOP --
11       Q.   Correct.
12       A.   -- with respect to the
13   suspicious order monitoring system was
14   incomplete as of the date of that e-mail.
15       Q.   You don't have corporate
16   knowledge that it was incomplete?
17           You agree with her, don't
18   you, that it was incomplete?
19       A.   I don't -- I don't have
20   knowledge on which I would disagree.
21       Q.   Well, let me ask you this:
22   This is 2009, where were you in 2009?
23   Where were you in 2009?
24       A.   Personally?

Page 243

1        Q.   Yes.
2        A.   I was working for a law firm
3    in Boston.
4        Q.   And Amy Propatier was
5    working at CVS, correct?
6        A.   That's correct.
7        Q.   And she was involved in the
8    process of creating the suspicious order
9    monitoring policies and incorporating
10   that into your procedures, was she not?
11           MR. DELINSKY:  Object to
12       form.
13           THE WITNESS:  To the best of
14       my knowledge, she was.
15   BY MR. KENNEDY:
16       Q.   And so in '09, you're at a
17   law firm, not at CVS.  You're not
18   disagreeing with her, are you?
19           MR. DELINSKY:  Object to
20       form.
21   BY MR. KENNEDY:
22       Q.   You don't have any
23   information to disagree with her position
24   that this SOM was complete on this

Page 244

1    date -- incomplete?
2            MR. DELINSKY:  Object to
3        form.
4    BY MR. KENNEDY:
5        Q.   Correct?
6            MR. DELINSKY:  Do you mean
7        an SOP or SOM?
8    BY MR. KENNEDY:
9        Q.   This SOM was incomplete,
10   according to Amy Propatier, on that date,
11   true?
12           MR. DELINSKY:  Eric, I think
13       you mean SOP.
14   BY MR. KENNEDY:
15       Q.   No.  The SOM was incomplete
16   on that date, true?
17       A.   So now you're asking me a
18   different question than you asked me
19   before.
20       Q.   Let's start back.
21           Do you disagree with Amy
22   Propatier, when she states on June 12th,
23   2009, that the suspicious order
24   monitoring section of the SOP was

Page 245

1    incomplete?
2        A.   The suspicious order
3    monitoring section of the SOP, to my
4    knowledge, I don't have any information
5    that would suggest that is incorrect.
6            However --
7        Q.   Fine.
8        A.   -- based on my preparation
9    for this deposition, numerous interviews
10   that I have undertaken, to the best of
11   our corporate knowledge, the suspicious
12   order monitoring system that we engaged
13   the Buzzeo Group to provide had been
14   delivered and implemented within the CVS
15   IT infrastructure by this date.
16           But that --
17           MR. KENNEDY:  I'm going to
18       move to strike.  But go ahead and
19       finish.
20           THE WITNESS:  It may not --
21   BY MR. KENNEDY:
22       Q.   I asked you a very simple
23   question.
24           Do you disagree -- I didn't

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1 ask you what's been implemented somewhere
2 else. I know that's what you want to
3 tell us. I know that's what you've been
4 coached to tell us. A very simple
5 question.
6          MR. KENNEDY: I'm moving to
7     strike your other answer.
8 BY MR. KENNEDY:
9     Q. On this date, June 12th,
10 2009, do you disagree with Amy
11 Propatier's statement that the suspicious
12 order monitoring Section VIII D1B was
13 incomplete? Do you disagree with that
14 statement, on behalf of CVS, as we sit
15 here today?
16          MR. DELINSKY: Object to
17     form.
18 BY MR. KENNEDY:
19     Q. Do you disagree; yes or no?
20          MR. DELINSKY: Object to
21     form. This question already has
22     been answered.
23          MR. KENNEDY: Not even close
24     to being answered.

Page 247

1 BY MR. KENNEDY:
2     Q. Do you agree or disagree?
3     A. Based on the corporate
4 knowledge I have at this time, I do not
5 disagree with the statement that's made
6 here with respect to the SOP.
7     Q. Go back to Exhibit-7 for a
8 second. And look to Page 34274.
9     A. I'm sorry, which page?
10          MR. DELINSKY: 34274.
11 BY MR. KENNEDY:
12     Q. The section of the
13 suspicious order monitoring program and
14 policies that was incomplete, being
15 developed and written, was the order
16 quantity parameters for controlled drugs,
17 correct?
18          MR. DELINSKY: Objection.
19 BY MR. KENNEDY:
20     Q. That's what this indicates?
21 That's what hadn't been written yet; is
22 that what that states?
23          MR. DELINSKY: Objection.
24     Asked and answered.

Page 248

1          THE WITNESS: No. Based on
2     the investigation I've undertaken
3     in preparation for this
4     deposition, this entire section of
5     Section D was in draft placeholder
6     form, not simply Section D1B.
7 BY MR. KENNEDY:
8     Q. Let me ask you this: Being
9 developed and written, does it state that
10 anywhere else in the suspicious order
11 monitoring section other than in 1B?
12 Anywhere else?
13     A. That's not stated any place
14 else in the text of the document. But I
15 understand it to be true, from the --
16     Q. So you understand --
17     A. -- the preparation for this
18 deposition that I've undertaken.
19     Q. So you understand something
20 to be true that's different than what is
21 written in the standard operating
22 procedure manual; is that right?
23          MR. DELINSKY: Object to
24     form. Misstates the testimony.

Page 249

1          THE WITNESS: I don't
2     believe that there's any portion
3     of this that necessarily indicates
4     that only 1B is in draft form.
5          Because I understand, from
6     my preparation for this deposition
7     and the interviews that I've
8     conducted, that this entire
9     section was in draft form.
10 BY MR. KENNEDY:
11     Q. Right. But as far as the
12 standard operating procedures, the
13 only -- where it says being developed and
14 written is with respect to the
15 parameters, correct?
16     A. I think the document speaks
17 for itself. It says what it says.
18     Q. And the document also speaks
19 for itself on Page 34237, the first page
20 of the document, if you could take a look
21 at that.
22     A. Could you say the number
23 again? I'm sorry.
24     Q. 34237.

Page 250

1    A.   Yes.

2    Q.   And do you see the second
3 paragraph on that page?  This is right in
4 the beginning of the standard operating
5 procedures.

6        It states, Therefore, the
7 following standard operating procedures
8 were prepared in response to a need for a
9 single source of current information for
10 CVS regarding DEA and policies and the
11 requirements of a Comprehensive Drug
12 Abuse Prevention Act.

13       Do you see where that
14 statement is?

15   A.   I do.

16   Q.   It says this document is the
17 single document, correct?  Isn't that
18 what it states?

19   A.   Not exactly.

20   Q.   Let's read again.

21       Therefore, the following
22 standard operating procedures were
23 prepared in response to a need for a
24 single source of current information for

Page 251

1 CVS regarding DEA policies and the
2 requirements of the Comprehensive Drug
3 Abuse Prevention Act.

4        Did I read that correctly?

5    A.   That you read correctly.

6        As Ms. Propatier's e-mail
7 indicates, the component with respect to
8 suspicious order monitoring at this time
9 was in draft form.

10   Q.   And by this time -- when she
11 says that your suspicious order
12 monitoring policies are still being
13 drafted, at this point in time, it is
14 June of 2009; and at this point in time,
15 CVS has received three letters from the
16 DEA outlining their responsibilities,
17 correct?  Three letters by this time,
18 '09?

19       MR. DELINSKY:  Object to
20   form.  That misstates the
21   testimony.

22       THE WITNESS:  We discussed
23   that earlier this morning.  We can
24   go back through each of the

Page 252

1 letters and whether or not we've
2 been able to locate those in our
3 files.

4        But I'm aware that -- of the
5 three letters, I think, that
6 you're referencing.

7 BY MR. KENNEDY:

8    Q.   Mr. Buzzeo sent those in
9 2008, remember?  He sent all three
10 letters in 2008.  You've got the three
11 letters from the DEA, you've got them by
12 June of '09; he sent them to you in '08,
13 right?

14   A.   Can you direct me back
15 towards the exhibit where we --

16   Q.   The record will stand.

17   A.   I believe you're correct.

18   Q.   I am correct.  Let's just
19 move on.

20   A.   But I'd have to go back and
21 check.

22   Q.   We're still wondering about
23 the drafting of the suspicious order
24 monitoring policy.  So let's look at 49.

Page 253

1    A.   And I just want to be clear
2 that at this point in time, it is my
3 understanding --

4    Q.   There's no question in front
5 of you, sir.  There is no question in
6 front of you.

7        MR. DELINSKY:  You may
8   complete what you were saying.

9        THE WITNESS:  It was my
10   understanding that at this point
11   in time the company had engaged
12   the Buzzeo Group to develop and
13   deliver a set of algorithms that
14   the company then implemented in
15   its IT infrastructure and was
16   reviewing the outputs of that,
17   even before the SOP was no longer
18   in draft form.

19       MR. KENNEDY:  And I'll move
20   to strike.  There's no question in
21   front of you.

22            - - -

23       (Whereupon, CVS-Vernazza
24   Exhibit-49,

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1    CVS-MDLT1-000087889-890, was
2    marked for identification.)
3           - - -
4  BY MR. KENNEDY:
5    Q.   Let's continue now.
6           MR. GOETZ:  49.
7  BY MR. KENNEDY:
8    Q.   We're five months later,
9  Exhibit-49, five months later.
10        Let's look at CVS's --
11  whether or not they have any procedures
12  in place.
13        We have an e-mail dated
14  11/5/09.  Do you see that, the top
15  e-mail?  Do you see that?  Does it state,
16  November 5, 2009, e-mail from Mr.
17  Mortelliti, correct?
18   A.   That appears to be the date
19  of the e-mail.  The subject of the e-mail
20  is, November 10th, 2009.
21   Q.   Who is Mr. Mortelliti?
22   A.   Mr. Mortelliti was an
23  individual within the CVS loss prevention
24  organization.

Page 255

1    Q.   CVS Pharmacy, Incorporated,
2  correct?
3    A.   To the best of my corporate
4  knowledge, that is correct.
5    Q.   And did he have significant
6  responsibility for the creation, the
7  implementation of the suspicious order
8  monitoring policies?
9    A.   I believe Mr. Mortelliti had
10  involvement in the implementation of both
11  the system that had been developed by the
12  Buzzeo Group, as well as input, perhaps,
13  to the best of my corporate knowledge, on
14  policies.
15   Q.   So he was playing a big role
16  in this whole process, was he not?
17        MR. DELINSKY:  Object to
18  form.
19        THE WITNESS:  Mr. Mortelliti
20  played a role.  He also played a
21  role as a primary personnel
22  assigned to the review of outputs
23  of the system of algorithms that
24  had been delivered to the company

Page 256

1  by the Buzzeo Group in late 2008
2  and put into place, to the best of
3  the company's knowledge, during
4  the first half of 2009.
5        MR. KENNEDY:  I'm going to
6  move to strike as nonresponsive.
7        MR. DELINSKY:  Just for the
8  record --
9  BY MR. KENNEDY:
10   Q.   Let's go to --
11        MR. KENNEDY:  Look, I got my
12  time.
13        MR. DELINSKY:  Eric, just
14  for the record, I oppose the
15  motions to strike.  That's for
16  another day.
17        MR. KENNEDY: That's fine.
18  BY MR. KENNEDY:
19   Q.   Mr. Mortelliti -- now we're
20  in November '09.  He writes, Sounds good.
21  I am trying to get a rough draft of the
22  suspicious order monitoring standard
23  operating procedure to you prior to the
24  meeting.  This is a big issue with CVS

Page 257

1  and the DEA.
2        Do you agree that drafting
3  and having written suspicious order
4  monitoring policy, written and drafted,
5  now November of '09, was a big issue not
6  only for CVS but also for the DEA at that
7  point in time?  Would you agree with that
8  statement on behalf of CVS?
9    A.   I don't know what Mr.
10  Mortelliti is specifically addressing
11  here.  The context of the e-mail is not
12  clear to me.
13   Q.   Let me go back and read it
14  again.
15   A.   But CVS's compliance with
16  DEA regulations is something that CVS
17  takes seriously.
18   Q.   All right.  Let's read it
19  again.
20        Mr. Mortelliti.  I am trying
21  to get a rough draft suspicious order
22  monitoring standard operating procedure
23  to you prior to the meeting.  This is a
24  big issue with CVS and the DEA.

Highly Confidential - Subject to Further Confidentiality Review

Page 258

1      He is speaking about the
2  suspicious order monitoring policies, is
3  he not?
4      MR. DELINSKY:  Object to
5      form.
6      THE WITNESS:  I don't know
7      exactly what Mr. Mortelliti was
8      addressing there.
9  BY MR. KENNEDY:
10     Q.   You do not?
11         On behalf of CVS, who you
12  are here representing, would you disagree
13  that at this point in time, the drafting
14  of suspicious order monitoring policies
15  were a big issue for CVS and the DEA at
16  this point in time?  It's now November of
17  2009.
18     A.   In November of 2009, it's my
19  understanding that CVS had the Buzzeo
20  algorithmic-based system in place.
21         This references drafting a
22  suspicious order monitoring SOP prior to
23  a meeting, the context of which is
24  unclear from the face of the e-mail.

Page 259

1      I have not reviewed this
2  e-mail in preparation for this
3  deposition, nor have I had an opportunity
4  to speak with Mr. Mortelliti about what
5  he was communicating here.
6      So, unfortunately, I don't
7  have corporate knowledge as to exactly
8  what that means.
9      Q.   I'm going to talk to you --
10  independent of the statement by Mr.
11  Mortelliti, who is the responsible guy at
12  CVS, despite his statement that this is a
13  big issue for CVS and DEA, putting that
14  aside, I'm asking you, as the corporate
15  representative of CVS, whether or not at
16  this point in time, November of 2009,
17  whether or not getting a draft of a
18  suspicious order monitoring policy was a
19  big issue for CVS and the DEA at this
20  point in time?
21      What is your answer, as the
22  corporate representative of CVS,
23  independent of Mr. Mortelliti?
24      MR. DELINSKY:  Object to

Page 260

1  form.
2      THE WITNESS:  My response is
3  that compliance with DEA
4  regulations is important to CVS.
5      Beyond that, it's not
6  abundantly clear what Mr.
7  Mortelliti is referencing here and
8  the extent to which the draft of
9  the SOP was something that he was
10  particularly concerned about or
11  others at CVS were particularly
12  concerned about at the time.
13  That's just something on which I
14  don't have corporate knowledge
15  that I acquired in the course of
16  preparation for this deposition.
17      But CVS does take compliance
18  with DEA regulations seriously.
19  BY MR. KENNEDY:
20     Q.   I know what Mr. Mortelliti
21  believes.
22      I want to know whether you
23  have a position, as the corporate
24  representative for CVS, as of November of

Page 261

1  2009, on behalf of CVS, do you have a
2  position as to whether or not drafting
3  suspicious order monitoring policies was
4  a big issue to CVS and the DEA?
5      MR. DELINSKY:  Object to
6      form.  Object, asked and answered.
7      THE WITNESS:  I don't know
8      whether Mr. Mortelliti --
9  BY MR. KENNEDY:
10     Q.   I don't care about Mr.
11  Mortelliti.
12      I'm asking you, as the
13  designated corporate representative of
14  CVS here today, I want to know your
15  position.
16      Was it a big issue of CVS
17  and the DEA, at this point in time, for
18  CVS to draft suspicious order monitoring
19  policies?  I'm asking you, as the
20  corporate representative.
21      MR. DELINSKY:  Object to
22      form.  Object, asked and answered.
23      And I object to the interruption
24      of the witness.

Page 262

1    Mr. Kennedy, I would ask
2  that you let the witness complete
3  his answers.
4    THE WITNESS:  It has always
5  been important to CVS to follow
6  DEA regulations.
7  BY MR. KENNEDY:
8    Q.   All right.  And one of the
9  regulations by 2009, after the DEA has
10  already written you three letters, would
11  be to have a written suspicious order
12  monitoring policy, correct?
13    MR. DELINSKY:  Object to
14  form.
15    THE WITNESS:  CVS, at this
16  point, had undertaken and
17  committed resources to engaging
18  the Buzzeo Group to deliver a
19  suspicious order monitoring set of
20  algorithms and dedicated resources
21  to operationalizing those
22  algorithms within its IT
23  infrastructure and committing
24  personnel to reviewing those

Page 263

1  reports in order to determine
2  whether or not orders were
3  suspicious.
4    MR. KENNEDY:  I'm going to
5  move to strike.
6    Would you read my question
7  back, please?  I'm entitled to an
8  answer.
9        - - -
10    (Whereupon, the court
11  reporter read the following part
12  of the record:
13    "Question:  And one of the
14  regulations by 2009, after the DEA
15  has already written you three
16  letters, would be to have a
17  written suspicious order
18  monitoring policy, correct?")
19        - - -
20    MR. DELINSKY:  Same
21  objections.
22    THE WITNESS:  I'm not aware
23  of any DEA regulation requiring us
24  to have a written policy with

Page 264

1  respect to the suspicious order
2  monitoring system that we had in
3  place at this time.
4  BY MR. KENNEDY:
5    Q.   All right.  And is that the
6  position and the answer of CVS, that you
7  just stated?  Very simple.
8    A.   I'm unaware of any DEA
9  regulation that would require us, at this
10  time, to have a written policy with
11  respect to the system that we were using
12  to flag, evaluate and potentially report
13  suspicious orders.
14    Q.   Very simple, that's the
15  position of CVS, correct?  You're
16  speaking for CVS at this point in time,
17  true?
18    MR. DELINSKY:  Object to
19  form.
20  BY MR. KENNEDY:
21    Q.   Very simple question.
22    Are you speaking on behalf
23  of CVS at this point with that answer?
24    MR. DELINSKY:  Object to

Page 265

1  form.  Asked and answered.  The
2  witness stated he is unaware --
3  BY MR. KENNEDY:
4    Q.   It's a yes-or-no question.
5    Are you speaking on behalf
6  of the CVS defendants in this case?
7    A.   The --
8    Q.   Are you speaking on behalf
9  of the CVS defendants in this case?  Very
10  simple, yes-or-no question, sir.
11    A.   To the best of my corporate
12  knowledge at this point in time, I'm
13  unaware of any specific DEA regulation
14  that requires a written policy as opposed
15  to the system that we had in place.
16    Q.   And you're speaking on
17  behalf of CVS when you just gave that
18  answer; is that true?
19    A.   That is to the best of my
20  corporate knowledge.
21    Q.   All right.  Thank you.
22        - - -
23    (Whereupon, CVS-Vernazza
24  Exhibit-34, CVS-MDLT1-000061097,

Page 266

1 was marked for identification.)
2 - - -
3 MR. GOETZ: 34.
4 BY MR. KENNEDY:
5 Q. I think this is later in the
6 same month, Exhibit-34.
7 This is a Logistics LP
8 update. Logistics LP would be a part of
9 CVS Pharmacy, Inc.; would that be true?
10 A. The logistics department
11 could include individuals -- could be
12 used -- that terminology could be used to
13 refer to individuals in warehouses who
14 would be employed by the individual
15 entities that own those distribution
16 centers.
17 Q. Right.
18 A. And it could be used also to
19 refer to corporate personnel with
20 responsibilities with respect to the
21 logistics operation as well.
22 Q. The date of this update
23 would be November 10th, 2009, true?
24 A. That's the date reflected at

Page 267

1 the top.
2 Q. And does this state under
3 regulatory, one, two, three, four, five
4 down, starting with John Mortelliti, and
5 does it state, John Mortelliti working
6 with field LP regarding suspicious order
7 monitoring SOPs?
8 Is that what it states?
9 A. It does.
10 MR. KENNEDY: Exhibit-43,
11 please.
12 - - -
13 (Whereupon, CVS-Vernazza
14 Exhibit-43, CVS-MDLT1-000081281,
15 was marked for identification.)
16 - - -
17 MR. DELINSKY: Let's take a
18 break after this exhibit.
19 MR. KENNEDY: Sure.
20 BY MR. KENNEDY:
21 Q. 43, if you look at the
22 bottom e-mail from Amy Propatier -- Amy
23 Propatier is logistics service manager
24 with corporate CVS/DEA compliance

Page 268

1 coordinator, true?
2 A. That appears to be her title
3 at the time.
4 Q. And this would be a December
5 11, 2009 e-mail to a large group of
6 people at CVS, true?
7 A. The e-mail on the bottom is
8 that. Again, I don't know exactly how
9 you would characterize large, but there's
10 a number of individuals here.
11 Q. And the subject would be, RX
12 DEA standard operating procedures again,
13 correct?
14 A. I think it says SOP.
15 Q. What does SOP stand for,
16 sir?
17 A. In this context, I would
18 presume it to mean standard operating
19 procedures. But that's not what the text
20 of the document says.
21 Q. It says, Good afternoon --
22 from Amy Propatier -- Attached is the DEA
23 RX standard operating procedures.
24 Revisions have been made to the document.

Page 269

1 Please review the standard operating
2 procedures in its entirety for a
3 follow-up conference call on Thursday,
4 12/17. This is an operational-driven
5 standard operating procedure.
6 Do you see that?
7 A. Again, you've articulated,
8 in long form, standard operating
9 procedure for SOP, but I do see the
10 portion that you're referencing.
11 Q. Sir, she says, Attached are
12 the standard operating procedures.
13 You understand that it's now
14 December of '09, and there is still no
15 completed section for suspicious order
16 monitoring?
17 Do you understand that, sir,
18 that what she attached still does not
19 have any provisions, any policies that
20 have been completed for suspicious order
21 monitoring? Do you understand that at
22 this time, sir?
23 MR. DELINSKY: I interpose
24 an objection to the use of this

Page 270

1 exhibit, absent the attachment.
2 BY MR. KENNEDY:
3    Q.  Sir, do you understand that?
4      MR. DELINSKY:  It is unfair
5 to the witness to ask him
6 questions about a document, when
7 the attachment you're inquiring
8 about is not --
9      MR. KENNEDY:  Just object.
10 Come on, man, I have limited time.
11 Just object.
12 BY MR. KENNEDY:
13    Q.  Answer my question, sir,
14 please?
15    A.  Without reviewing the
16 attachment to this particular e-mail, it
17 would be hard for me to answer the
18 question.
19    Q.  Just let me ask you this,
20 and maybe we can move on.
21      You took four weeks to look
22 at this. You don't understand that in
23 December of '09 CVS has still not drafted
24 any suspicious order monitoring policies?

Page 271

1 Don't you understand that from your
2 review? They still hadn't?
3      MR. DELINSKY:  Object to
4 form.
5 BY MR. KENNEDY:
6    Q.  Correct? Isn't that true?
7      MR. DELINSKY:  Object to
8 form.
9      THE WITNESS:  To the best of
10 my corporate knowledge, the
11 suspicious order monitoring
12 section of the centralized DEA
13 policy and procedure remained in
14 draft or placeholder form, I
15 believe, into some point in 2010.
16      Meanwhile, there was a
17 system of review that was -- that
18 was ongoing.
19 BY MR. KENNEDY:
20    Q.  And, sir, at this point, the
21 standard operating procedures have been
22 in place for almost three years and CVS
23 still does not have a suspicious order
24 monitoring section that's complete, after

Page 272

1 almost three years, correct?
2      MR. DELINSKY:  Object to
3 form.
4      THE WITNESS:  I'd have to
5 look back at the exhibit with the
6 date of the --
7 BY MR. KENNEDY:
8    Q.  The first one was put into
9 place on 12/1/07; your standard operating
10 procedures are put into place on 12/1/07
11 without a section on suspicious order
12 monitoring. And now it is December of
13 '09.
14    A.  I think that's two years,
15 isn't it?
16    Q.  Two years. I'm sorry.
17      So we're at two years, and
18 they still haven't drafted the section on
19 suspicious order monitoring; isn't that
20 what's going on?
21    A.  To the best of my corporate
22 knowledge, the section of that SOP, with
23 respect to suspicious order monitoring,
24 remained in draft form at that time.

Page 273

1    Q.  And it's going to be in
2 draft form for almost another nine
3 months, right?
4      MR. DELINSKY:  Object to
5 form.
6      THE WITNESS:  Without seeing
7 the document, I can't recall the
8 exact date when the draft was
9 updated.
10 BY MR. KENNEDY:
11    Q.  All right.
12      VIDEO TECHNICIAN:  The time
13 is 2:31 p.m. We're going off the
14 record.
15      - - -
16      (Whereupon, a brief recess
17 was taken.)
18      - - -
19      (Whereupon, CVS-Vernazza
20 Exhibit-8,
21 CVS-MDLT1-000024877-941, was
22 marked for identification.)
23      - - -
24      VIDEO TECHNICIAN:  The time

Page 274

1 is 2:47 p.m. We are back on the
2 record.
3 MR. DELINSKY: Mr. Kennedy,
4 before you begin, the witness has
5 a clarification to make.
6 MR. KENNEDY: Please.
7 THE WITNESS: Yes.
8 Previously when we were discussing
9 one of the DEA letters, and
10 specifically, one component of the
11 letter that spoke about emphasis
12 that the foregoing requirement is
13 in addition to and not in lieu of
14 the general requirements, the
15 distributor maintain effective
16 controls against diversion, there
17 was some other language in
18 addition to reporting --
19 MR. KENNEDY: I can't hear
20 you at all.
21 MR. DELINSKY: Let's start
22 with the exhibit number and the
23 paragraph.
24 THE WITNESS: Yes, that's a

Page 275

1 good idea.
2 MR. KENNEDY: And this is
3 not part of my time. Whatever
4 you -- you can clarify for a half
5 hour, if you want, but this is not
6 being counted on our time.
7 Agreeable?
8 MR. DELINSKY: No.
9 MR. KENNEDY: Mark the time,
10 please.
11 There's no question in front
12 of the witness. But go ahead.
13 THE WITNESS: With respect
14 to Exhibit-46 that was shown to me
15 earlier, in particular the portion
16 that discusses, In addition to
17 reporting all suspicious orders, a
18 distributor has a statutory
19 responsibility to exercise due
20 diligence to avoid filling
21 suspicious orders that might be
22 diverted into other than
23 legitimate medical, scientific or
24 industrial channels, you asked me

Page 276

1 whether or not I knew of anyone at
2 CVS, in 2006, who disagreed with
3 that statement.
4 And I just want to be clear,
5 I believe my response was that I
6 didn't have corporate knowledge
7 that CVS disagreed with that
8 statement.
9 What I was attempting to
10 express, and hopefully the record
11 is clear, is that in the course of
12 my preparation for this
13 deposition, I did not speak with
14 anybody at CVS who told me that
15 CVS disagreed or agreed with that
16 statement from this letter in
17 2006.
18 Based on my corporate
19 knowledge, in preparation for the
20 deposition, I hadn't spoken to
21 anybody who told me that they
22 agree with that or disagree with
23 that.
24 I do recognize that that

Page 277

1 language does not appear in the
2 suspicious order monitoring
3 regulation.
4 I just wanted to make that
5 clear, to the extent that it was
6 unclear before. What I said is
7 now in clarification. I don't
8 believe it's inconsistent with my
9 testimony earlier. I just wanted
10 to make sure the record was clear
11 on that point.
12 BY MR. KENNEDY:
13 Q. And was that clarification
14 pointed out to you by counsel at the
15 break? Or is that something you came up
16 with all on your own?
17 A. The clarification is
18 something all of my own. Counsel pointed
19 out to me the testimony on a break, and
20 simply asked me whether I would like to
21 make a clarification as to that
22 testimony.
23 Upon reviewing it, I
24 concluded that I would like to make that

Highly Confidential – Subject to Further Confidentiality Review

Page 278

1 clarification.
2     Q.   All right.  Let's move on.
3         Are you ready?  Anything
4 else you want to clarify at this point?
5     A.   No, sir.
6     Q.   When we broke, we were
7 talking about the standard operating
8 procedures that were implemented on
9 12/11/09.
10         Take a look at Exhibit-8, if
11 you would, please.  Look at the cover
12 page, if you would, please.
13         Is the title, CVS
14 Distribution Center Controlled Drug-DEA
15 Standard Operating Procedures Manual?
16     A.   It is.
17     Q.   And the first one was put
18 into effect on 12/1/07.
19         We've looked at that one,
20 true?
21     A.   It indicates that the
22 effective date of the policy is 12/1/07.
23     Q.   So the answer to my question
24 would be yes?

Page 279

1         MR. DELINSKY:  Object to
2     form.
3         THE WITNESS:  We looked at
4     the exhibit earlier.  I could go
5     back through and find it.  It is
6     consistent with my recollection of
7     what we looked at.
8 BY MR. KENNEDY:
9     Q.   Revision date now is
10 12/11/09.
11         And that's what we are
12 looking at is the 12/11/09 version of the
13 standard operating procedures, correct?
14     A.   That appears to be the case.
15     Q.   If you look at the section
16 on suspicious order monitoring, which is
17 24916, do you see that?  Do you see that
18 section, suspicious order monitoring,
19 correct?  That's the section?
20     A.   I do.
21     Q.   Look to the next page, if
22 you would, and does B state the same
23 thing that it's stated two years before,
24 These parameters are documented in SOP

Page 280

1 blank, order quantity parameters for
2 controlled drugs -- capital letters --
3 being developed and written.
4         The same statement we had
5 two years earlier, true?
6     A.   Yes.  I believe that the
7 entire section remains essentially the
8 same in the draft form.
9     Q.   All right.  Let's look at
10 two months later.  CVS creates and posts
11 another revision, another revision of its
12 standard operating procedures.
13         - - -
14     (Whereupon, CVS-Vernazza
15     Exhibit-44,
16     CVS-MDLT1-000089315-379, was
17     marked for identification.)
18         - - -
19 BY MR. KENNEDY:
20     Q.   Do you recall that, that now
21 this is the third set, the original back
22 in '07, now it's January of '10, and we
23 have our second revision of the standard
24 operating procedure?

Page 281

1         Do you remember that?
2     A.   I'm sorry, could you repeat
3 the question?
4     Q.   Is this the second revision
5 now, Exhibit-44?
6         MR. DELINSKY:  Object to
7     form.
8         THE WITNESS:  This is a
9     revision dated January 28th, 2010.
10 BY MR. KENNEDY:
11     Q.   Correct.
12     A.   I believe it is the second
13 revision of this particular form that
14 we've looked at today.  I don't have
15 corporate knowledge as to whether or not
16 it is the -- only the second revision of
17 the document in general.
18     Q.   This was originally created
19 on 12/1/07, correct?
20     A.   That's what it says is the
21 effective date, yes.
22     Q.   And we just looked at the
23 12/09, correct?
24     A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    Q.    And now we're looking at the
2  1/28/10, correct?
3    A.    Also correct.
4    Q.    All right.  And the second
5  paragraph, again, it states, Therefore,
6  the following standard operating
7  procedures were prepared in response to a
8  need for a single source of current
9  information for CVS regarding DEA
10  policies and the requirements of the
11  Comprehensive Drug Abuse Prevention Act.
12       Did I read that correctly?
13    A.    I believe you did.
14    Q.    And let's look to the
15  suspicious order monitoring section
16  again.  And that is 8937 -- excuse me --
17  that is 89354.
18       89354, the suspicious order
19  monitoring section, true?
20    A.    I see a section entitled,
21  Suspicious Order Monitoring.
22    Q.    And it's January of 2010
23  now.  And if we look to the next page, it
24  once again states, These parameters are

Page 283

1  documented in SOP blank, order quantity
2  parameters for controlled drugs --
3  capital letters -- being developed and
4  written, once again, correct?
5    A.    Yes.  That's consistent with
6  my understanding that this section
7  remained in draft form at this time.
8    Q.    All right.  Let's move
9  forward now.  Now to three months later.
10       We know, from looking at
11  later versions, on April 30th, 2010, CVS
12  put into effect another revised set of
13  standard operating procedures.
14       Do you understand that from
15  your study of this case?
16    A.    I don't recall that specific
17  fact.
18    Q.    Let me ask you this: Have
19  you -- in the search you have done, the
20  study you have done, have you located
21  anywhere and seen the standard operating
22  procedures for controlled drugs put into
23  effect on 4/30/2010?
24       MR. DELINSKY:  Object to

Page 284

1  form.  Perhaps if you could show
2  him the document, the question
3  will be more fair.
4       MR. KENNEDY:  Do you have
5  them?  We don't have them.
6       MR. DELINSKY:  If we had it,
7  we produced it.
8       MR. KENNEDY:  Fine.
9  BY MR. KENNEDY:
10    Q.    Have you seen them -- have
11  you seen the April 30, 2010 standard
12  operating procedures?
13    A.    Not to my knowledge.  But I
14  looked at a lot of documents and don't
15  remember the date of them all.
16       I don't have a specific
17  recollection of seeing that document.
18    Q.    From other documents that
19  we'll talk about, the suspicious order
20  monitoring section once again has the
21  language, Being developed and written, in
22  April of 2010.
23       Do you have any corporate
24  knowledge to disagree with that, that it

Page 285

1  still remains incomplete as of April 30,
2  2010?
3       MR. DELINSKY:  Object to
4  form.
5       THE WITNESS:  I haven't seen
6  that document, so can't testify as
7  to that particular document.
8       Although, as a more general
9  matter, based on my corporate
10  knowledge at this point in time,
11  that's consistent with my
12  understanding.
13       MR. KENNEDY:  Give me
14  Exhibit-48.  I think you have it.
15       - - -
16       (Whereupon, CVS-Vernazza
17  Exhibit-48, CVS Controlled Drug
18  Manual: Suspicious Order
19  Monitoring Procedure, was marked
20  for identification.)
21       - - -
22  BY MR. KENNEDY:
23    Q.    To summarize here, to catch
24  up to where we're at, first creation of

Page 286

1  standard operating procedures by CVS was
2  12/1/07.
3       And with respect to the
4  section on suspicious order monitoring
5  and the parameters it stated, did it not,
6  Being developed and written, in the first
7  one, true?
8       MR. DELINSKY:  Object to
9  form.  Object to this exhibit
10  absent further information about
11  who created it.  And object to the
12  information printed on the
13  exhibit --
14      MR. KENNEDY:  This is an
15  exhibit --
16      MR. DELINSKY:  -- as
17  misstating the testimony.
18      MR. KENNEDY:  This is an
19  exhibit that we created.
20  BY MR. KENNEDY:
21   Q.   The first one we looked at,
22  the first operating procedures, with
23  respect to suspicious order monitoring,
24  had a paragraph that we read saying,

Page 287

1  Being developed and written, did it not?
2   A.   I remember that language
3  from the written policy that was in draft
4  form at that time.
5   Q.   Two years later, the written
6  policy, intended to be the single
7  document to describe these policies, two
8  years later, same thing, being developed
9  and written, correct?
10      MR. DELINSKY:  Object to
11  form.
12  BY MR. KENNEDY:
13   Q.   We looked at that, did we
14  not?
15      MR. DELINSKY:  Object to
16  form.
17      THE WITNESS:  Again, with
18  respect to the written document
19  that we looked at, I remember this
20  language being included.
21      I think as I explained,
22  there was a system --
23  BY MR. KENNEDY:
24   Q.   I didn't ask you that.

Page 288

1       Was that written in the
2  document two years later on 12/11/09?
3  Was that written in the document, your
4  standard operating procedures?
5   A.   That's consistent with my
6  recollection.  I could look back at the
7  document and confirm it if you'd like.
8   Q.   January of '10, we just
9  looked at that document, it said the same
10  thing, Being developed and written,
11  correct?
12      MR. DELINSKY:  Object to
13  form.
14      THE WITNESS:  Again, I
15  remember that language being
16  included in that written document
17  that we looked at earlier.  I
18  could again look at the document
19  and confirm.
20  BY MR. KENNEDY:
21   Q.   Now it's April of 2010.  At
22  this point in time, it's been nearly four
23  years since the DEA wrote CVS its first
24  letter, correct?  Nearly four years by

Page 289

1  April of 2010, would that be true, sir?
2   A.   I just need to refresh on
3  the original date of the 2006 letter.
4   Q.   Sir, you can assume that
5  just a few hours ago we looked at the '06
6  letter from the DEA, did we not?
7   A.   Yeah.  I believe it was
8  September of 2006.  But, again, I have a
9  large stack of exhibits in front of me.
10  And I can just try to confirm the date.
11      Yeah, September 27 of 2006.
12   Q.   So it's been nearly four
13  years since the DEA wrote your -- the
14  first letter.
15      And by this point in time,
16  the DEA has written three letters total,
17  have they not?
18      MR. DELINSKY:  Object to
19  form.
20  BY MR. KENNEDY:
21   Q.   By April of 2010, the DEA
22  has written three letters, true?
23      MR. DELINSKY:  Object to
24  form.

Page 290

1    THE WITNESS: We have
2 discussed three letters today that
3 were apparently written by the DEA
4 that predated 4/30/2010.
5 BY MR. KENNEDY:
6    Q.   And by April of 2010, it's
7 been 40 years since the federal
8 regulations said that you shall have a
9 system to disclose suspicious orders,
10 correct? It's been 40 years by April of
11 2010, would that be true, sir?
12    MR. DELINSKY: Object to
13 form.
14    THE WITNESS: I'm not
15 certain the exact number of years.
16 BY MR. KENNEDY:
17    Q.   Decades?
18    A.   Something close to 40 years
19 since the enactment of the Controlled
20 Substances Act.
21    As I've mentioned, at this
22 point in time, we had operationalized a
23 set of algorithms that had been delivered
24 by the Buzzeo Group.

Page 291

1    Q.   Sir, this is April of 2010.
2    Four months later, things
3 changed quickly at CVS, correct? In
4 August of 2010, things changed quickly at
5 CVS with respect to suspicious order
6 monitoring policy, did they not?
7    MR. DELINSKY: Object to
8 form.
9 BY MR. KENNEDY:
10    Q.   You reviewed all these
11 documents, and you have interviewed 40
12 people.
13    In August of 2010, things
14 changed quickly for CVS with respect to
15 its responsibility and creation and
16 implementation of a system to monitor
17 suspicious orders?
18    MR. DELINSKY: Objection.
19 Object to form.
20    THE WITNESS: Based on my
21 corporate knowledge that I have
22 developed in preparation for this
23 deposition, I can't say that
24 that's correct.

Page 292

1 BY MR. KENNEDY:
2    Q.   Sir, you know, and you
3 understand very well, that in August of
4 2010, the DEA came knocking on CVS's door
5 to do an inspection and audit and to
6 investigate, correct?
7    A.   I believe that our
8 distribution facilities had undergone a
9 number of audits throughout the course of
10 many years.
11    I'm aware of an audit that
12 occurred in the Indianapolis distribution
13 center in approximately 2010, when
14 suspicious order monitoring was discussed
15 with company personnel --
16    Q.   Sir, I didn't ask what was
17 discussed and what went on. And I will
18 ask you that. I'm just asking the simple
19 question.
20    The DEA came knocking to
21 your distribution centers in 2010 to
22 inspect and to audit and to investigate,
23 correct? We're going to go through what
24 they did, but that's when they came?

Page 293

1    A.   My understanding is it was
2 an audit. To the best of my knowledge,
3 the Indianapolis distribution center had
4 gone through what are essentially routine
5 audits on a cyclical basis, essentially
6 every three years, since CVS owned the
7 facility.
8    Q.   But this one was different.
9    This presented a problem for
10 CVS in August 2010, correct, because they
11 asked, they asked for your suspicious
12 order monitoring policies, right?
13    MR. DELINSKY: Object to
14 form.
15 BY MR. KENNEDY:
16    Q.   They asked for them and you
17 didn't have them in place, correct?
18    MR. DELINSKY: Object to
19 form. Objection, misstates the
20 testimony.
21    THE WITNESS: I'm not sure I
22 have clear corporate knowledge on
23 the policies that may or may not
24 have been provided to the DEA at

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1  that time.
2      I am aware that suspicious
3  order monitoring was discussed
4  with the DEA and that the DEA made
5  no adverse findings with respect
6  to the company's suspicious order
7  monitoring system.
8  BY MR. KENNEDY:
9      Q.   So the answer to my question
10  is, yes, they asked for your policies in
11  August of 2010?  They asked for them, do
12  you remember that?
13      A.   I remember that has been
14  a -- there was a discussion about
15  suspicious order monitoring at that time.
16      Q.   Maybe this will help you,
17  sir.
18      A.   It's consistent with my
19  recollection that policies were asked for
20  and/or provided.
21      I don't believe I have more
22  specific recollection than that.
23          - - -
24      (Whereupon, CVS-Vernazza

Page 295

1  Exhibit-32,
2  CVS-MDLT1-000076284-285, was
3  marked for identification.)
4          - - -
5  BY MR. KENNEDY:
6      Q.   32.  I'll show you
7  Exhibit-32, please.
8      32 looks like a memo with
9  respect to the DEA inspection in August
10  of 2010.  The memo is to Frank Devlin.
11      And Frank Devlin, tell us
12  his position.
13      A.   Mr. Devlin was loss
14  prevention.  He was among the loss
15  prevention personnel responsible for CVS
16  distribution centers.
17      Q.   And he worked for CVS
18  Pharmacy, Inc, would that be true?
19      A.   To the best of my
20  understanding, that's true.
21      Q.   And who is Terrence Dugger?
22      A.   To the best of my corporate
23  knowledge, Mr. Dugger was in loss
24  prevention at the Indianapolis

Page 296

1  distribution center.
2      Q.   So he's in Indianapolis.
3      And the subject is, DEA
4  visits, 8/24, 8/26 and 8/31, 9/1/2010,
5  true?  Is that true?
6      Is that what the subject
7  says, sir?
8      A.   DEA visits 8/24 to 8/26
9  and --
10      Q.   Is that what --
11      A.   -- 8/31 to 9/1/2010 --
12      Q.   You don't have to repeat my
13  question, we're short on time.
14      If the answer is yes, please
15  just give me a yes.
16      A.   I'm just trying to make sure
17  I accurately answer your question.
18      Q.   It says, Results of the
19  inspection.  The DEA inspectors, Madeline
20  Kuzma and Elizabeth Stewart, was on site
21  at the Indianapolis facility on Tuesday,
22  August 24, 2010 through Thursday, August
23  26th, 2010, and again on Tuesday, August
24  31, 2010 and Wednesday, September 1,

Page 297

1  2010.
2      Did I read that correctly?
3      A.   I believe you did.
4      Q.   Their purpose was to conduct
5  a full inspection.
6      Requested information.  You
7  go down, under requested information, the
8  fourth bullet down is, SOM SOP.
9      The DEA requested the
10  suspicious order monitoring standard
11  operating procedure of CVS in August of
12  2010, true?
13      A.   Under requested information,
14  SOM SOP appears in this document.
15      Q.   And that presented a problem
16  because you didn't have one that had been
17  approved and in place in your standard
18  operating procedures, correct?
19      MR. DELINSKY:  Object to
20  form.
21      THE WITNESS:  I don't have
22  corporate knowledge as to whether
23  or not that presented a problem.
24      I do know that the DEA made

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1   some findings as a result of this
2   inspection.
3   BY MR. KENNEDY:
4       Q.   I'm not asking about the
5   findings.
6           MR. DELINSKY:  Please don't
7   interrupt him.
8           MR. KENNEDY:  I'm going to
9   move to strike.  He's just got to
10  answer my question.
11  BY MR. KENNEDY:
12      Q.   That presented a problem
13  because you didn't have it yet?
14          MR. DELINSKY:  You can
15  complete your answer, Mr.
16  Vernazza.
17          THE WITNESS:  I don't have
18  corporate knowledge that it
19  presented a problem.  I do know
20  that there were some findings made
21  in connection with this audit and
22  that not having an SOM SOP was not
23  among the findings that the DEA
24  made.

Page 299

1   BY MR. KENNEDY:
2       Q.   Oh, it wasn't among the
3   findings?  Because we're going to look at
4   what you folks did.
5           Let's go back a second.  Do
6   you remember telling us here today, under
7   oath, on behalf of CVS, that you were
8   unaware of whether or not the DEA
9   required standard operating procedures
10  for suspicious order monitoring to be in
11  writing?  You said you weren't aware of
12  that, do you remember telling us that?
13          MR. DELINSKY:  Object to
14  form.  There was no testimony to
15  that effect.
16  BY MR. KENNEDY:
17      Q.   Do you remember telling us
18  that?
19      A.   No, I don't.
20      Q.   You don't?
21      A.   What I remember telling you
22  was that I am unaware of any specific DEA
23  regulation that requires CVS to have a
24  written policy with respect to its

Page 300

1   suspicious order monitoring process.
2       Q.   Let's see what CVS did when
3   the DEA asked for their policies.
4           MR. KENNEDY:  Exhibit-40,
5   please.
6               -  -  -
7           (Whereupon, CVS-Vernazza
8   Exhibit-40, CVS-MDLT1-000089188,
9   was marked for identification.)
10              -  -  -
11  BY MR. KENNEDY:
12      Q.   Start at the bottom, because
13  that's the first e-mail.
14          The bottom e-mail, Mr.
15  Devlin, CVS Pharmacy, Inc. on August 23,
16  2010, he's writing Mr. Mortelliti and Amy
17  Propatier, subject, DEA SOP.
18          And he says, Good morning,
19  John -- and this is while the audit is
20  going on -- can you work with Amy to get
21  the PSE IRR and the controlled drug IRR
22  inserted into our DEA standard operating
23  procedure under suspicious order
24  monitoring?  We promised this to the DEA

Page 301

1   by Wednesday.
2           Did I read that correctly?
3       A.   You did.  Although you
4   mentioned that this was while the audit
5   was going on.
6           This e-mail was sent on
7   August 23rd.  The notes of the inspection
8   say that the inspection began on August
9   24th.
10          So I don't know that this
11  was while the audit was underway at the
12  Indianapolis distribution center.
13      Q.   At some point, at least
14  maybe this day or the day before, or
15  whatever, the DEA requested and they
16  promised to provide it by Wednesday; is
17  that what it says?
18      A.   My understanding of the way
19  that a DEA audit would work is that they
20  wouldn't request information in advance,
21  they would show up, essentially
22  unannounced, and they would request
23  documents on site.
24          So if this inspection began

Page 302

1  on 8/24, the 8/23 e-mail would have
2  preceded the DEA being on site, and
3  presumably, the DEA requesting that
4  information.
5       I have no knowledge -- I
6  have no corporate knowledge --
7       Q.   This says --
8       A.   -- that Mr. Devlin's e-mail
9  was sent in response to a request from
10  the DEA in connection with its inspection
11  of the Indianapolis distribution center.
12       Q.   Is it your testimony that
13  just by pure coincidence they promised to
14  give the DEA the suspicious order
15  monitoring section in the SOPs by
16  Wednesday?  That has nothing to do with
17  the audit; is that your testimony?
18       You think this was a
19  coincidence on that date?
20       MR. DELINSKY:  Object to
21       form.
22       THE WITNESS:  I don't have
23       corporate knowledge that it was
24       associated with the audit.

Page 303

1  BY MR. KENNEDY:
2       Q.   All right.  Let's look up
3  Mr. Mortelliti.  He gets back to Mr.
4  Devlin, copies Amy Propatier on the same
5  date.
6       And he says, Good morning,
7  Amy.  I attached the PSE -- and PSE,
8  that's separate from controlled substance
9  that we're talking about, correct?
10       A.   Yes.
11       Q.   Okay.  I've attached the PSE
12  SOP in this e-mail.  The controlled drug
13  SOP is being reviewed by counsel.  I hope
14  to receive it back.  I will forward as
15  soon as I get the information that the
16  draft is acceptable.
17       So at this point in time,
18  they're dealing with a draft of the
19  policy and it hasn't yet been approved by
20  counsel, correct?
21       MR. DELINSKY:  Object to
22       form.
23  BY MR. KENNEDY:
24       Q.   Is that true, sir?  Is that

Page 304

1  what it states?
2       MR. DELINSKY:  Object to
3       form.
4       THE WITNESS:  That appears
5       to be what Mr. Mortelliti is
6       suggesting in this e-mail.  I
7       don't have further corporate
8       knowledge as to that.
9  BY MR. KENNEDY:
10       Q.   Okay.  And if you'll give me
11  Exhibit-9.
12            - - -
13       (Whereupon, CVS-Vernazza
14       Exhibit-9,
15       CVS-MDLT1-000088956-9025, was
16       marked for identification.)
17            - - -
18  BY MR. KENNEDY:
19       Q.   So things must have moved
20  pretty fast, right?  Because a few days
21  later Amy Propatier is sending an e-mail
22  to Annette Lamoureux dated 8/26/2010.
23       She is attaching the DEA
24  suspicious -- excuse me, standard

Page 305

1  operating procedure, dated 8/25/10; is
2  that true?
3       MR. DELINSKY:  Object to
4       form.
5  BY MR. KENNEDY:
6       Q.   Do you see those dates?  Are
7  those dates correct?
8       A.   The date of the e-mail --
9       Q.   Yes.
10       A.   -- is 8/26/10.
11       Q.   And she states, Can you
12  please post?  We added the suspicious
13  order monitoring.
14       Do you see that, sir?
15       A.   I see that in the e-mail.
16       Q.   And this is the first time
17  that the suspicious order monitoring
18  procedures have been added to the
19  standard operating procedures at CVS,
20  August of 2010, true?
21       A.   Sorry, I'm just going to
22  take a moment to review this.
23       Q.   We're going to go through
24  it, sir, in detail.

Page 306

1     A.   To the best of my corporate
2  knowledge at this point in time, it is
3  consistent that this document reflects
4  the first revision to the prior draft
5  that we were looking at before.
6          I do not know whether or not
7  it was done in connection with the DEA
8  inspection.
9     Q.   You think it's a
10 coincidence?  You think this is a
11 coincidence that the DEA comes to inspect
12 and within a day of the four-day
13 inspection in Indianapolis and
14 inspections at others, they are providing
15 this?  You think that -- very simple, you
16 think it's a coincidence?
17    A.   In the scope of my
18 preparation for this deposition, I did
19 not acquire corporate knowledge on this.
20        However, I do look at the
21 e-mail from Mr. Devlin on the 23rd and
22 see that it's prior to the date of the
23 inspection occurring.  And, indeed, Mr.
24 Mortelliti's e-mail to Mr. Devlin and Ms.

Page 307

1  Propatier, again, is on the 23rd, which
2  is before the inspection.
3          So speaking in my personal
4  capacity, it would seem somewhat
5  illogical that the inspection that
6  occurred after this date could have
7  prompted this e-mail.  But, again, I
8  don't have corporate knowledge on that.
9          I will say, we do have,
10 certainly, more than one distribution
11 center.  And all of our distribution
12 centers are subject to inspections by the
13 DEA.
14    Q.   And there was more than one
15 being inspected at this time; is that
16 right?
17    A.   I did not undertake to
18 determine that.  I focused on the
19 Indianapolis distribution center in my
20 preparation for this deposition.
21    Q.   Look at Exhibit--
22    A.   I can't say whether -- it
23 could or could not have.
24    Q.   Look at Exhibit-30.

Page 308

1          - - -
2          (Whereupon, CVS-Vernazza
3   Exhibit-30,
4   CVS-MDLT1-000057751-754, was
5   marked for identification.)
6          - - -
7  BY MR. KENNEDY:
8     Q.   This idea that you don't
9  understand this is related to the DEA,
10 who was there for four days within a day
11 of this, let's look at -- look at
12 Exhibit-30.
13        This is Mr. Mortelliti
14 again.  He's writing to Greg Brantley.
15        Do you know who he is?
16    A.   I don't.
17    Q.   Copying Mr. Devlin, who is
18 involved with these procedures, correct?
19    A.   He would have been.
20    Q.   And sent 8/25/2010, subject,
21 Drug control -- or excuse me, controlled
22 drug IRR SOP, correct?  And that's
23 suspicious order monitoring, true?  Is
24 that true?

Page 309

1     A.   The IRR was a report that
2  was generated in connection with our
3  suspicious order monitoring process
4  during that time.
5     Q.   And the attachment -- this
6  says, Importance, high, right?  It says
7  it's high importance?
8     A.   Yes.
9     Q.   The audit is going on with
10 the DEA at this point, right, 8/25/2010,
11 true?
12    A.   That is correct, according
13 to the notes from Mr. Dugger that you
14 showed me in Exhibit-32.
15    Q.   This says, Attachments,
16 controlled drug IRR draft 3.doc.
17        Do you see that?
18    A.   I do.
19    Q.   And he says, Greg, this
20 needs to be implemented ASAP.
21        What's the big hurry on this
22 date if it isn't the DEA, sir?
23        MR. DELINSKY:  Object to
24 form.  Mischaracterizes.

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1 BY MR. KENNEDY:
2      Q.  What's the big hurry?
3          This is -- you've been
4 drafting this since 2007.  It's now 2010.
5 The DEA is there.  They incorporate this
6 into the SOPs for the first time, and
7 he's sending it out saying, you need to
8 implement this ASAP.
9          Explain to me, what's the
10 hurry?
11          MR. DELINSKY:  Object to
12     form.
13          THE WITNESS:  I don't have
14     corporate knowledge that would
15     answer that question.
16 BY MR. KENNEDY:
17     Q.   Let's read on.
18          He says, Read it over and
19 give me a call if you have any questions.
20 I have found it to be much easier than
21 the PSE because you actually have items
22 and NDC numbers to track.  It is also
23 based on six months.
24          Do you get the idea from

Page 311

1 this that Gregory Brantley has no idea
2 what's in these suspicious order
3 monitoring procedures?  He's saying, look
4 it over.
5     A.  I do know, based on my
6 preparation for this deposition, that
7 there was a period of time during the
8 fall of 2010 when Mr. Mortelliti, who
9 had -- prior to this time, had primary
10 responsibility for review of the IRR,
11 involved personnel at individual
12 distribution centers to some degree in
13 that process.
14          I don't have, and I don't
15 believe the company, at this point, has
16 clear corporate knowledge as to exactly
17 how that set of responsibilities was
18 apportioned during that time.
19          But I do believe that this
20 is around a period of time when Mr.
21 Mortelliti may have been involving more
22 of the individual personnel at the -- at
23 each specific distribution center.
24     Q.  Sir, I'm not quite sure what

Page 312

1 you're talking about.  I'm going to be --
2 I just want to talk about this document.
3          At this point in time, Mr.
4 Mortelliti is writing this gentleman
5 telling him to implement these policies
6 on suspicious order monitoring ASAP.  And
7 he's saying, if you have any questions,
8 call me.
9          Because this gentleman has
10 no idea what these policies are; isn't
11 that the logical interpretation of this
12 e-mail?
13          MR. DELINSKY:  Object to
14     form.
15 BY MR. KENNEDY:
16     Q.   Right?
17          MR. DELINSKY:  Object.
18     Asked and answered.
19          THE WITNESS:  No, I don't
20     know that that's the case.
21          As I was saying, Mr.
22     Mortelliti was located in the
23     Lumberton, New Jersey distribution
24     center.  And for a period after

Page 313

1 implementation of the Buzzeo
2 algorithms that generated the IRR
3 report, Mr. Mortelliti was the
4 primary individual responsible for
5 review of those reports in the
6 first instance, as assisted by
7 other resources.
8          To the best of our corporate
9 knowledge, there was a period of
10 time, during the fall of 2010,
11 when additional resources were
12 consulted in individual
13 distribution centers.
14          MR. KENNEDY:  I'm going to
15     move to strike.
16 BY MR. KENNEDY:
17     Q.  Let me ask you, sir --
18          MR. DELINSKY:  No.  You can
19     complete your answer.
20          The motion to strike is
21     pending.
22          THE WITNESS:  Exactly what
23     that looked like at that time is
24     not something on which we have

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1  clear corporate knowledge, at this
2  point in time, other than to know
3  that there were -- I have seen
4  documents signed by individuals in
5  distribution -- in the
6  Indianapolis distribution center,
7  for instance, that indicate that
8  the IRR may have been reviewed at
9  the distribution center level at
10  that point in time.
11  BY MR. KENNEDY:
12  Q.  I'm talking about this
13  document, 8/25/2010.
14  Would you agree with me, he
15  tells Mr. Devlin -- do you agree with me,
16  he tells Mr. Devlin that he needs to
17  implement these policies ASAP because the
18  DEA is still there investigating?  Isn't
19  that why he said "ASAP"?  Isn't that
20  true, sir?
21  MR. DELINSKY:  Object to
22  form.
23  BY MR. KENNEDY:
24  Q.  Is that true?

Page 315

1  MR. DELINSKY:  Objection,
2  asked and answered.  Objection, it
3  misstates the document.
4  I would also note, counsel,
5  that you put -- immediately prior
6  to showing the witness this
7  exhibit, you put before him
8  Exhibit-9, which bears, I believe,
9  the date immediately after this
10  e-mail, which explains the very
11  process that the witness has been
12  explaining.  But you did not ask
13  him questions about it.
14  MR. KENNEDY:  This is so
15  inappropriate of you to be giving
16  this speech at this point in time.
17  The protocol says you're allowed
18  to object, period.
19  This is ridiculous.  It's
20  ridiculous.  Stop.  We have a
21  limited amount of time, and you
22  know it.  And he has been coached
23  to give speeches.  He has been
24  coached to repeat my question in

Page 316

1  every answer to waste time.  And
2  you're wasting time.  This is
3  ridiculous.
4  Let's move on.
5  MR. DELINSKY:  Counsel,
6  you're the one wasting time.  He
7  has answered your question --
8  MR. KENNEDY:  He hasn't
9  answered a question all day.
10  MR. DELINSKY:  And it
11  doesn't mean -- and just because
12  you don't like his answers doesn't
13  mean he hasn't answered.  He's
14  answered.
15  MR. KENNEDY:  He is looping
16  back to the speeches you want to
17  give him.  And this is the problem
18  with the 30(b)(6) in this
19  litigation, and you are
20  perpetuating the problem.
21  Let's move on.
22  MR. DELINSKY:  You're wrong.
23  And I object to what you're
24  saying.

Page 317

1  MR. KENNEDY:  Let's move on.
2  Exhibit-31, please.
3  - - -
4  (Whereupon, CVS-Vernazza
5  Exhibit-31,
6  CVS-MDLT1-000075299-312, was
7  marked for identification.)
8  - - -
9  MR. DELINSKY:  I would also
10  take this opportunity to move to
11  strike the many questions you have
12  put to the witness today that were
13  in plain violation of Special
14  Master Cohen's rulings limiting
15  the scope of this deposition.
16  BY MR. KENNEDY:
17  Q.  Before you, I believe, is
18  Exhibit-41.  Let's start at the bottom so
19  we can go in chronological order of these
20  e-mails.
21  This is dated -- the first
22  e-mail is from Mr. Mortelliti, correct?
23  The one on the bottom dated September 1,
24  2010, 10:46 a.m., true?

Highly Confidential - Subject to Further Confidentiality Review

Page 318

1    A.   I believe that's correct,
2  yes.
3    Q.   And he's sending it out to
4  Dugger and Humphries, true?
5    A.   That's correct.
6    Q.   And the subject is, DEA
7  speaking points.
8        Do you see that?
9    A.   I do.
10   Q.   The DEA is still
11 inspecting -- according to the e-mail
12 memo we saw, they were still inspecting
13 on 9/1/2010, true?
14   A.   According to the memo in
15 Exhibit-32, the DEA was on site in the
16 Indianapolis distribution center on
17 September 1st, yes.
18   Q.   This says, Terrence, this is
19 for the DEA.  The corrections listed
20 below have been updated.  It is okay to
21 review this with the agents.
22       And he's talking about DEA
23 agents, is he not?
24   A.   I don't know exactly what

Page 319

1  Mr. Mortelliti meant when he wrote this
2  e-mail.  Although, that's a sensible
3  reading of the e-mail.
4    Q.   He is -- Mr. Mortelliti is
5  telling these two gentlemen about a
6  PowerPoint, about speaking points to the
7  DEA with respect to the suspicious order
8  monitoring procedures, is he not?
9    A.   This appears to address
10 speaking points that were put together.
11 And Mr. Mortelliti indicates they would
12 be speaking points in the second e-mail
13 for DEA agents if they come to your
14 facilities.
15   Q.   Sir, let's go to the second
16 e-mail up above.
17       Mr. Mortelliti, John.  This
18 is seven minutes later, September 1,
19 2010.  Now it's to a larger group at CVS.
20       Subject, DEA speaking
21 points.  Importance, high.  Team, these
22 are the final approved speaking points
23 for the DEA agents if they come to one of
24 your facilities and question suspicious

Page 320

1  monitoring.
2        He states next, It is okay
3  to share this document.
4        Look at what he says next to
5  these CVS folks that are going to
6  interacting with the DEA.  He says next,
7  Please be sure your team understands it.
8  It is -- understands it before
9  presenting.
10       He's telling them that
11 because they don't know anything about
12 your suspicious order monitoring policies
13 at this point, correct?  He's saying,
14 read it and understand it before you
15 present it; isn't that what he says?
16       MR. DELINSKY:  Object to
17    form.
18 BY MR. KENNEDY:
19   Q.   Sir, is that what he says?
20   A.   Could you repeat your
21 question?
22   Q.   Does he say, Please be sure
23 your team understands it before
24 presenting?

Page 321

1        And he's talking about the
2  PowerPoint on suspicious monitoring,
3  true?
4        MR. DELINSKY:  Object to
5    form.
6  BY MR. KENNEDY:
7    Q.   Is that true?
8    A.   I don't know exactly what
9  Mr. Mortelliti is referring to.  He seems
10 to be referring to, in this e-mail, the
11 PowerPoint that he was attaching.
12   Q.   All right.  He goes on.
13       So he says, Please be sure
14 your team understands it before
15 presenting so it doesn't look like a prop
16 instead of a tool.
17       Is that what he says?
18   A.   He does.
19   Q.   He wants to make sure the
20 suspicious order monitoring policies look
21 like a tool instead of a prop in the eyes
22 of the DEA, right?
23       MR. DELINSKY:  Object to
24    form.

Page 322

1 BY MR. KENNEDY:
2 　Q.　Is that what he says?
3 　　MR. DELINSKY:　Object to
4 form.
5 　　THE WITNESS:　I do not have
6 corporate knowledge that that's
7 what Mr. Mortelliti was saying.
8 　　He says in this e-mail,
9 Everyone should understand so it
10 doesn't look like a prop instead
11 of a tool.
12 BY MR. KENNEDY:
13 　Q.　And a tool is something you
14 use, right?
15 　A.　Right.
16 　Q.　And a prop is something
17 make-believe on the set of a play, right?
18 　　MR. DELINSKY:　Object to
19 form.
20 BY MR. KENNEDY:
21 　Q.　Is that right, sir?
22 　A.　I don't know that that's the
23 way that Mr. Mortelliti was using the
24 word there.

Page 323

1 　Q.　What do you think?　Tool is
2 something you use, right?
3 　A.　A tool can be something you
4 use.
5 　Q.　And a prop is something
6 that's kind of make-believe that's on the
7 stage of a play, right?　Isn't that a
8 common understanding?
9 　　MR. DELINSKY:　Object to
10 form.
11 　　THE WITNESS:　I'm familiar
12 　with that usage of the word.
13 BY MR. KENNEDY:
14 　Q.　And if Mr. Mortelliti wants
15 the people at the distribution centers to
16 create the impression that these policies
17 are actually a tool instead of a prop,
18 he's asking these folks to mislead the
19 DEA, correct?
20 　　MR. DELINSKY:　Object to
21 form.
22 　　THE WITNESS:　I don't have
23 　knowledge that that's the case.
24 BY MR. KENNEDY:

Page 324

1 　Q.　They've never seen or used
2 these policies before; they're not a
3 tool, they've never been used, right?
4 They've never been used?
5 　　MR. DELINSKY:　Object to
6 form.　Misstates the testimony.
7 BY MR. KENNEDY:
8 　Q.　At this point in time,
9 sir --
10 　A.　That's actually --
11 　Q.　-- these policies have never
12 been used, true?
13 　A.　That's inconsistent with my
14 understanding of the process that was in
15 place.
16 　　Mr. Mortelliti had been
17 reviewing and conducting due diligence on
18 potentially suspicious orders at this
19 point in time for, as I understand it,
20 more than a year.
21 　　If you look at what was
22 marked as Exhibit-9 --
23 　Q.　I don't want to go back to
24 Exhibit-9.　These policies --

Page 325

1 　　MR. DELINSKY:　No.　No.　Mr.
2 Kennedy.
3 　　MR. KENNEDY:　He's not
4 giving a speech.
5 　　MR. DELINSKY:　He's entitled
6 to answer the question.
7 　　You can complete your
8 answer.
9 　　MR. KENNEDY:　I'm going to
10 move to strike.　This is not my
11 question.　He's looping back to
12 the same speech he's been giving
13 all day.
14 　　THE WITNESS:　Sir, I need to
15 refer to this document in order to
16 answer your question, because this
17 document speaks to the process of
18 reviewing the IRR report, moving,
19 in September of 2010, from being
20 centrally reviewed in the
21 Lumberton distribution center --
22 　　MR. KENNEDY:　This is so
23 inappropriate.
24 　　THE WITNESS:　-- to being

Page 326

1  reviewed --
2      MR. KENNEDY:  What document
3  are you referring to?  It's not
4  the subject of my question.
5  You're going back to another
6  document to give a speech?  It's
7  not appropriate.
8      MR. DELINSKY:  Excuse me,
9  Mr. Kennedy, please let the
10 witness complete his answer.
11     This is a question that you
12 put before him.
13     MR. KENNEDY:  I asked him
14 whether or not the policies that
15 were created and presented on that
16 day had ever been used.  Not some
17 other document.
18     MR. DELINSKY:  You can
19 complete your answer, Mr.
20 Vernazza.
21     MR. KENNEDY:  Not some other
22 document, sir.
23     THE WITNESS:  As I
24 understand it, in the document we

Page 327

1      looked at in Exhibit-9 --
2  BY MR. KENNEDY:
3      Q.   And we're going to go back
4  to Exhibit-9.  I'm not asking you any
5  questions.  We are on a different
6  exhibit, sir.
7      We are on --
8      A.   It references --
9      Q.   -- Exhibit-31.
10     A.   -- review of the IRR report
11 being moved from primarily performed out
12 of the central location in New Jersey.
13     And then it says, During the
14 month of September 2010, the report will
15 be transitioned to each pharmacy DC and
16 the following procedures will apply.
17     The procedures that I
18 understand Mr. Mortelliti to have sent
19 out at the end of August were procedures
20 to be followed by the individual
21 personnel who were performing those
22 reviews in or around that time in the
23 individual DCs.
24     Prior to that time, Mr.

Page 328

1  Mortelliti had been conducting that
2  review himself at the Lumberton
3  distribution center.
4      MR. KENNEDY:  We'll move to
5  strike.
6  BY MR. KENNEDY:
7      Q.   Let's look -- now, let's
8  look at the PowerPoint that was given to
9  the folks at the distribution center for
10 their representations to the DEA.  It's
11 Exhibit-31.
12     It's titled, Suspicious
13 Order Monitoring for PSE/Controlled
14 Drugs.  And it's dated August 27, 2010,
15 correct?
16     A.   Yes.  I understand from
17 talking to Mr. Mortelliti that this is a
18 document that he put together for the
19 purposes of training personnel in the
20 individual distribution centers to, in
21 some capacity, take over some of the
22 responsibilities that he had been
23 performing at the Lumberton distribution
24 center.

Page 329

1      MR. KENNEDY:  And I will
2  move to strike as nonresponsive.
3      THE WITNESS:  I believe that
4  answers your question.
5  BY MR. KENNEDY:
6      Q.   And this was what was given
7  to the CVS employees to make a
8  presentation to the DEA in August of
9  2010, correct?
10     MR. DELINSKY:  Object to
11 form.
12 BY MR. KENNEDY:
13     Q.   Is that correct?
14     A.   I'm not aware that CVS
15 employees made a presentation to the DEA
16 in or around that time.
17     Q.   Does the e-mail state, Here
18 is the PowerPoint you can use to make
19 presentations to the DEA.  Make sure it
20 doesn't look like a prop but a tool?
21     Is that what the e-mail
22 states, that this is attached to, sir?
23     A.   The e-mail does not speak to
24 a presentation made to the DEA.

Page 330

1    Q.  Please be sure your team
2  understands it before presenting so it
3  doesn't look like a prop instead of a
4  tool.  I included Marvin because the DEA
5  will be there today as well.  This is for
6  the DEA, the corrections listed below
7  have been updated.
8    A.  I'm sorry --
9    Q.  It's okay to show it to the
10  agents.
11    A.  I'm sorry.  I do see the
12  word "presenting" there now.
13    I understand, from my
14  discussions with Mr. Mortelliti in
15  preparation for this deposition, that to
16  the best of his recollection, this was
17  put together for the purposes of training
18  distribution center personnel.
19    I do not know the extent to
20  which it was or has been provided to the
21  DEA or whether that was in a presentation
22  style format.
23    Q.  Let me ask you, it would be
24  important to be honest with the DEA in

Page 331

1  this presentation, wouldn't it?
2    MR. DELINSKY:  Object to
3    form.
4    THE WITNESS:  Certainly, it
5    would always be CVS's policy and
6    practice to be honest with the
7    DEA.
8  BY MR. KENNEDY:
9    Q.  And that would be important,
10  right?
11    MR. DELINSKY:  Object to
12    form.
13  BY MR. KENNEDY:
14    Q.  Right?
15    A.  That would be important.
16    Q.  And you don't want to
17  mislead the DEA and make something look
18  like a tool when it's just a prop, right?
19  You don't want to mislead them that way,
20  do you, sir?
21    MR. DELINSKY:  Object to
22    form.
23    THE WITNESS:  From what I
24  understand Mr. Mortelliti to be

Page 332

1  saying, and I don't have
2  independent corporate knowledge on
3  this, I can only look at --
4  BY MR. KENNEDY:
5    Q.  I'm not asking --
6    A.  -- this document, what he
7  seems to be saying is he doesn't want the
8  DEA to think it's a prop instead of a
9  tool.
10    Mr. Mortelliti has told me
11  that this was a tool for training the
12  distribution center personnel.
13    Q.  And you want to be complete
14  and thorough if you're making a
15  representation to the DEA, don't you?
16    MR. DELINSKY:  Object to
17    form.
18  BY MR. KENNEDY:
19    Q.  Would that be true, sir?
20    A.  My understanding that it's
21  always been CVS's policy and practice to
22  be open and honest with the DEA.
23    Q.  Let's look at the second
24  page of this presentation to the DEA,

Page 333

1  301.
2    Look at the third bullet.
3  It says, DC RX.  That's somebody at the
4  distribution center, right?
5    A.  That's correct.
6    Q.  And loss prevention.
7    Who is that?  Is that one
8  person?
9    A.  No.  It would be a
10  reference, to the best of my
11  understanding, to the loss prevention
12  organization within the company.
13    There were loss prevention
14  officers located within the logistics
15  component of the loss prevention
16  organization at the corporate office and
17  at individual distribution centers.  I'm
18  unable to tell you which loss prevention
19  that refers to.
20    There were additional loss
21  prevention resources associated with the
22  suspicious order monitoring process,
23  including analysts and field-based loss
24  prevention personnel, that would be

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1 consulted from time to time.
2     Q.   Let's go to Page 75306,
3 please.
4          This is still part of the
5 representations that are being made to
6 the DEA in this PowerPoint.
7          MR. DELINSKY:  Object to
8     form.
9 BY MR. KENNEDY:
10    Q.   Do you see where it says,
11 Responsibilities?
12    A.   I'm sorry, which page?
13    Q.   5306.
14         Do you see this?
15    A.   Yes.  I don't know that
16 this -- that this document was provided
17 to the DEA.
18    Q.   Well, it was provided to the
19 folks at the distribution centers to do
20 just that, wasn't it?
21    A.   From Mr. Mortelliti's
22 e-mail, there is a discussion of
23 providing to the DEA.  I don't know
24 whether this document was provided to the

Page 335

1 DEA or not.
2     Q.   Responsibilities.  This is
3 for the DEA.  Responsibilities, DC
4 RX-review the report, IRR, daily and
5 determine whether variances are within
6 acceptable ranges.
7          That wasn't happening yet,
8 was it, sir?  That had not been
9 implemented yet, true?
10         MR. DELINSKY:  Object to
11    form.  Misstates the testimony.
12 BY MR. KENNEDY:
13    Q.   Is that true?
14    A.   I don't know that to be true
15 as of September 1st.  I have seen the
16 policy revision that contemplates that
17 review being done by individual
18 distribution center personnel.
19         I've talked to Mr.
20 Mortelliti in preparation for this
21 deposition, and he recalls that occurring
22 to some degree.  I've also reviewed
23 documents from the Indianapolis
24 distribution center, bearing the

Page 336

1 signature -- IRR documents from the
2 Indianapolis distribution center that
3 bear the signature of distribution center
4 personnel.
5     Q.   Is it your testimony here
6 today that as of 12/27/10, the policies
7 and procedures in place, in place, had
8 the DC RX manager reviewing the IRR daily
9 and determining variances within
10 acceptable ranges?  Is that your
11 testimony under oath here today, sir,
12 that that was the policy in place as of
13 12/27/10?
14         MR. DELINSKY:  Object to
15    form.
16         THE WITNESS:  12/27/10?
17 BY MR. KENNEDY:
18    Q.   That's the date of this
19 PowerPoint that was given to your folks
20 to present to the DEA.
21    A.   I don't believe it is.
22    Q.   Thank you.
23    A.   I don't believe that's the
24 date of the PowerPoint.

Page 337

1     Q.   August 27, 2010.
2     A.   You said 12/27.
3     Q.   I'm sorry.  August 27, 2010.
4          Is it your testimony that as
5 of August 27, 2010, the DC RX managers
6 were reviewing the IRR daily and
7 determining whether variances are within
8 acceptable ranges?  Is that your
9 testimony, sir, that that was the policy
10 in place as of that date?
11    A.   I understand this document
12 to be a training document and not a
13 policy document.  We looked at the policy
14 document that speaks to the process
15 moving to the individual DCs as of
16 September 1st.
17    Q.   Sir, this is the -- this
18 isn't a policy or training document.
19 This is the PowerPoint that you're making
20 representations to the DEA.
21         And they're making
22 representations to the DEA about policies
23 and procedures that aren't even in place
24 yet, right?

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1        MR. DELINSKY:  Object to
2     form.  Objection, misstates the
3     testimony.
4  BY MR. KENNEDY:
5     Q.   Did they tell the DEA, this
6  is what we're going to do in the future,
7  or are they telling the DEA, this is what
8  we're doing now?
9     A.   I don't know what was told
10  to the DEA or if this document was
11  provided to the DEA.
12        My understanding of this
13  document was that it was a document that
14  was to be used in training individual
15  distribution center personnel for the
16  period of time when it was contemplated
17  that the daily review of the IRR report
18  would transition from a central location
19  reviewed by Mr. Mortelliti in the
20  Lumberton distribution center to being
21  reviewed by personnel in each individual.
22     Q.   Are you denying that this is
23  the document and the PowerPoint that was
24  provided to show to the DEA?  Are you

Page 339

1  denying that?
2        MR. DELINSKY:  Objection.
3  BY MR. KENNEDY:
4     Q.   Are you denying that?
5        MR. DELINSKY:  Object to
6     form.  Objection, asked and
7     answered on numerous occasions.
8     Objection, misstates -- well,
9     strike that last objection.
10  BY MR. KENNEDY:
11     Q.   Are you denying that, sir?
12     A.   I don't have corporate
13  knowledge that this document was provided
14  to the DEA.
15     Q.   But it was given to the
16  people at the distribution centers so
17  that they could show the DEA; is that
18  true?
19     A.   That's what Mr. Mortelliti
20  writes in this e-mail.
21     Q.   Correct.
22     A.   I don't know that it was
23  provided to the DEA.
24     Q.   Okay.  If they did, they

Page 340

1  certainly should have been told that
2  under responsibilities these are things
3  that are going to happen in the future,
4  not that are happening now, true?  Very
5  simple.
6        MR. DELINSKY:  Object to
7     form.
8  BY MR. KENNEDY:
9     Q.   This is all what's going to
10  happen in the future; this isn't what's
11  going on currently?
12     A.   I don't know what was said
13  to the DEA.  I don't have corporate
14  knowledge on that.
15        I note that the document
16  that you're showing me is dated September
17  1st.  The policy that we looked at in
18  Exhibit-9 contemplates moving the review
19  of the IRR to individual distribution
20  center personnel starting in September.
21     Q.   Correct.  And this is dated
22  August 27th, 2010, and can we very simply
23  agree, all of these statements with
24  respect to responsibilities in the DEA

Page 341

1  slide show had not yet occurred --
2        MR. DELINSKY:  Object to
3     form.
4  BY MR. KENNEDY:
5     Q.   -- true?
6        MR. DELINSKY:  Object to
7     form.
8        THE WITNESS:  I don't know
9     that they had not yet occurred on
10     that date.  That's not something
11     that we have clear corporate
12     knowledge of.
13        I've conducted a number of
14     interviews in order to learn about
15     that period of time.
16        I do note that the e-mail
17     that says it can be shared with
18     the DEA, from Mr. Mortelliti, is
19     dated the 1st of September.  The
20     policy that we looked at that says
21     things are going to move -- the
22     review of the IRR was going to
23     move to individual distribution
24     centers --

Page 342

BY MR. KENNEDY:

1 BY MR. KENNEDY:
2     Q.   Right.
3     A.   -- speaks to the -- speaks
4 to the beginning of September.
5     Q.   But that doesn't happen at
6 the beginning of September, it happens in
7 late September and October, sir.  You
8 know that.  You've reviewed this.
9         This DEA PowerPoint is
10 absolutely, positively misleading,
11 because none of this has happened yet.
12         It's not going to happen for
13 another month, right?
14         MR. DELINSKY:  Object to the
15 form of the question.
16 BY MR. KENNEDY:
17     Q.   Another month.
18         MR. DELINSKY:  Object to
19 form.  Misstates the testimony.
20 BY MR. KENNEDY:
21     Q.   Sir, it doesn't happen for
22 another month.
23     A.   I don't know that to be the
24 case.

Page 343

1     Q.   Let's look at Exhibit-28 --
2     A.   My understanding of this
3 document is that it was a training
4 document.
5     Q.   It's being -- it's being
6 designated as the DEA presentation, is it
7 not?
8         MR. DELINSKY:  Object to
9 form.
10 BY MR. KENNEDY:
11     Q.   Correct?
12         How many times --
13     A.   Mr. Mortelliti has an e-mail
14 here.  I don't know exactly what Mr.
15 Mortelliti was intending when he wrote
16 this or how the document was used.  Other
17 than in the course of my preparation, I
18 understood this to be a training
19 document.
20     Q.   Mr. Mortelliti, does he
21 state, These are the final approved
22 speaking points for the DEA agents if
23 they come to your facilities and question
24 the suspicious monitoring?  Isn't that

Page 344

1 what he states?
2     A.   He does.
3         But I do not have knowledge
4 as to whether or not these were provided
5 to the DEA in connection with this
6 investigation of the Indianapolis
7 distribution center or any other
8 distribution center.
9         I simply don't have
10 knowledge as to whether they were or they
11 were not.
12     Q.   You looked at the DEA
13 PowerPoint.  Every representation in this
14 DEA PowerPoint talks about a process
15 that's not going to occur for another
16 month, correct?  It's not in place.
17     A.   I --
18     Q.   Isn't that true, sir?  It's
19 not going to occur for another month?
20         MR. DELINSKY:  This needs to
21 stop.  I object to the form of the
22 question.  I object to the
23 mischaracterization of the
24 document.  I object to the number

Page 345

1 of times the same question has
2 been answered.
3         The witness has testified
4 about what he has to testify --
5         MR. KENNEDY:  Object.
6 That's all you're allowed to do.
7 Just object.
8         MR. DELINSKY:  This is
9 becoming abusive.  It's time to
10 stop.  We're taking a break.
11         VIDEO TECHNICIAN:  The time
12 is 3:51 p.m.  We're going off the
13 record.
14             - - -
15         (Whereupon, a brief recess
16 was taken.)
17             - - -
18         VIDEO TECHNICIAN:  The time
19 is 4:10 p.m.  And we're back on
20 the record.
21 BY MR. KENNEDY:
22     Q.   All right, sir.  Let's look
23 to Exhibit-9, if we could, please.
24         Go to the second page of

Page 346

1  Exhibit-9, please. Tell us what this is.
2      A.   It is a document entitled,
3  CVS Distribution Center, Controlled
4  Drug-DEA Standard Operating Procedures
5  Manual. It appears to bear a last
6  revision date of 8/25/10.
7      Q.   And so this is what was
8  posted and came into effect on 8/25/10;
9  would that be true?
10     A.   I don't know the date on
11 which it was posted. The revision date
12 was dated 8/25.
13         I also see a cover e-mail
14 from Ms. Propatier to Ms. Lamoureux
15 asking for it to be posted. But the date
16 of that is 8/26.
17     Q.   These came into effect on
18 8/25/10; would that be true?
19     A.   That's the revision date.
20     Q.   And would this be the first
21 time that the procedures with respect to
22 suspicious order monitoring were
23 incorporated into the standard operating
24 procedures?

Page 347

1          MR. DELINSKY: Object to
2      form.
3          THE WITNESS: As I've
4      mentioned, the process was in
5      place for some period of time
6      prior to this. It is my
7      understanding, to the best of my
8      corporate knowledge, that the
9      document here reflects the first
10     time in which the draft was
11     replaced.
12         MR. KENNEDY: And I'll move
13     to strike.
14 BY MR. KENNEDY:
15     Q.   Let me ask you again.
16         August 25, 2010, would this
17 be the first time that the effective,
18 actually-in-place standard operating
19 procedures would have had an operable, in
20 effect, section on suspicious order
21 monitoring?
22         MR. DELINSKY: Object to
23     form.
24         THE WITNESS: As I said, the

Page 348

1  process for reviewing suspicious
2  order monitoring -- or, excuse me,
3  the suspicious order monitoring
4  process was in place prior to this
5  document.
6          Based on my corporate
7  understanding -- corporate
8  knowledge, it is my understanding
9  that this document reflects the
10 first time in which the draft
11 component of the written document
12 that speaks to suspicious order
13 monitoring was taken out of draft
14 form.
15 BY MR. KENNEDY:
16     Q.   All right. Let me ask you
17 again. I want you to listen to my
18 question very carefully, if you would,
19 please. I'm not asking you what's in
20 place, what isn't in place.
21         I'm very simply asking, the
22 standard operating procedures dated
23 8/25/10, would this be the first time
24 that the standard operating procedures

Page 349

1  have in place the suspicious order
2  monitoring procedures that are actually
3  being utilized?
4          MR. DELINSKY: Object to
5      form.
6          THE WITNESS: It was the
7      company's procedure to review the
8      IRR reports prior to this time.
9      This is the first time that the
10     written policy and procedure, to
11     my knowledge, was updated to
12     reflect that process.
13 BY MR. KENNEDY:
14     Q.   And let me ask you again. I
15 didn't ask you about the IRR reviews. I
16 didn't ask you what they're actually
17 doing.
18         I very simply asked you, is
19 this the first time that the standard
20 operating procedures incorporated the
21 actual process for suspicious order
22 monitoring?
23         MR. DELINSKY: Object to
24     form. Object, asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

Page 350

1    THE WITNESS:  Again, there
2 was a process and a procedure --
3 BY MR. KENNEDY:
4    Q.   That's not what I asked you.
5    A.   -- in place --
6       MR. KENNEDY:  Let's just
7    stop.  Can you have him please
8    answer this question?
9       MR. DELINSKY:  Counsel, I
10    believe he's answered the
11    question.
12       MR. KENNEDY:  He hasn't.
13    He's telling me about what's in
14    place.  I'm asking about what's in
15    the suspicious order monitoring
16    with respect to the SOP.  That's
17    all.  I don't want the speech
18    about what's already in place.
19 BY MR. KENNEDY:
20    Q.   I'm going to ask you about
21 that, trust me.  You'll have an
22 opportunity to talk all about that.
23       I just want to know, is this
24 the first time that the standard

Page 351

1 operating procedures actually incorporate
2 the suspicious order monitoring
3 procedures?  Is this the first time?
4    A.   To the best of my corporate
5 knowledge, it is the first time that the
6 company's written policies and procedures
7 are taken out of draft form with respect
8 to suspicious order monitoring.
9       However --
10    Q.   Not "however."  That's all I
11 asked.
12    A.   However --
13    Q.   That is all I asked.
14    A.   I'm going to finish my
15 answer.
16       However, there was a process
17 and a procedure in place prior to this
18 document.
19       MR. KENNEDY:  We'll move to
20    strike and see if the court will
21    have you answer the question.
22 BY MR. KENNEDY:
23    Q.   Prior to this date, were
24 they actually doing anything?  Can you

Page 352

1 tell me, what were they doing prior --
2 prior to actually having a written policy
3 that was in place, the IRR report was
4 being reviewed at some location in
5 central New Jersey, right?
6    A.   In Lumberton, New Jersey --
7    Q.   Let's look at the policy
8 themselves.
9    A.   -- at the distribution
10 center by --
11    Q.   Let's look at the policies
12 themselves.  We're on Exhibit-9.  Let's
13 go to Page --
14       MR. DELINSKY:  Mr. Kennedy,
15    I just ask that you not interrupt
16    the witness when he's providing an
17    answer.
18       If there was anything
19    further to say, you may complete.
20    If there's not, you can wait for
21    another question.
22       THE WITNESS:  I can wait
23    until the next question.
24 BY MR. KENNEDY:

Page 353

1    Q.   Let's go to Page 88996.
2       Do you see prevention and
3 monitoring of controlled drugs,
4 suspicious orders?
5       This first paragraph, is
6 this the first time this has ever
7 appeared in the standard operating
8 procedures?
9    A.   To the best of my corporate
10 knowledge, this is the first time that
11 this written language has appeared in the
12 written policies and procedures.
13    Q.   Go to the next page, please,
14 97, Paragraph 2 at the top.
15       Is this paragraph at the
16 top, is this paragraph the first time
17 that this has ever appeared in the
18 standard operating procedures?
19    A.   To the best of my corporate
20 knowledge, this reflects the first time
21 that this paragraph has been included in
22 written policies and procedures.
23    Q.   And Paragraph 2, then, let's
24 go through this.

Page 354

1    It says, Items reviewed.
2  CVS has established controlled drug order
3  thresholds which will flag, on the IRR
4  (item review report), as well as the
5  field loss prevention Novistor (loss
6  prevention software) reports.
7    Do you see that?
8    A.  I do.
9    Q.   And the IRR report, that is
10 the report that would provide a scoring
11 with respect to an order for a controlled
12 substance, correct?
13    MR. DELINSKY:  Object to
14    form.
15    THE WITNESS:  The IRR report
16    was generated based on a number of
17    algorithms and would eventually
18    combine some of those factors and
19    attributes to produce a score.
20    That item would then be
21    subject to a manual review,
22    consulting additional resources as
23    appropriate.
24 BY MR. KENNEDY:

Page 355

1    Q.   So the IRR report -- that's
2  all I want to talk about at this point,
3  we'll go step by step.
4    The IRR report, then,
5  reflects the evaluation and the scoring
6  of a specific order for a controlled
7  substance, right?
8    MR. DELINSKY:  Object to
9    form.
10    THE WITNESS:  The IRR report
11    would include specific orders of
12    controlled substances that met the
13    criteria for inclusion on the
14    report.
15 BY MR. KENNEDY:
16    Q.   The IRR report, then --
17 again, what makes the IRR report is
18 something that's being flagged; for some
19 reason, it's passed through the
20 algorithms, it appears that this is an
21 order that might potentially be
22 suspicious.
23    So now it appears in the IRR
24 report, correct?

Page 356

1    A.   Based on my understanding,
2  that sounds consistent with my
3  understanding.
4    Q.   And the IRR algorithms -- if
5  you look at the next sentence, it says,
6  These thresholds are the primary tool to
7  prevent stores from purchasing excessive
8  or potentially suspicious controlled drug
9  orders.
10    Do you see that sentence?
11    A.   I see that sentence.
12    Q.   Is that accurate?
13    A.   The IRR report was the first
14 step in the process of the distribution
15 center side of the CVS business
16 identifying particular orders for further
17 evaluation.
18    Q.   Listen very carefully.
19    This states, These
20 thresholds -- and that's referring to the
21 IRR report, correct?
22    A.   I believe it is.
23    Q.   It states, These thresholds
24 are the primary tool to prevent stores

Page 357

1  from purchasing excessive or potentially
2  suspicious controlled drug orders.
3    Is that an accurate
4  statement in CVS's suspicious order
5  monitoring policies as printed here?  Is
6  that accurate?
7    A.   You read it accurately.
8    Q.   And do you agree with that
9  statement, on behalf of CVS?
10    A.   Based on my preparation for
11 this deposition and the interviews that I
12 have conducted and my corporate
13 knowledge, the IRR report was the report
14 that would flag orders for additional
15 review.  And within the logistics
16 function within CVS would be the primary
17 way in which those orders would be
18 elevated for review.
19    The system that we talked
20 about, about the pickers and the packers
21 being aware of potentially unusual
22 orders, also stayed in place.
23    And there were additional
24 resources available to the reviewers of

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1  the IRR report in order to make
2  assessments about those orders.
3  　　　　MR. KENNEDY:  I move to
4  　strike.
5  BY MR. KENNEDY:
6  　Q.  Let me ask you again.
7  　　　On behalf of CVS, do you
8  agree with the statement, These
9  thresholds are the primary tool to
10  prevent stores from purchasing excessive
11  or potentially suspicious controlled drug
12  orders?
13  　　　　Do you agree with that
14  statement on behalf of CVS?
15  　　　　MR. DELINSKY:  Objection.
16  　Asked and answered.
17  BY MR. KENNEDY:
18  　Q.  Yes or no, do you agree with
19  it?  And if you can't answer yes or no,
20  just let me know.
21  　　　　Do you agree with that
22  statement that, as printed in CVS's
23  standard operating procedures, do you
24  agree with that statement; yes or no?

Page 359

1  　　　　MR. DELINSKY:  Objection,
2  　asked and answered.
3  BY MR. KENNEDY:
4  　Q.  And if you can't answer it
5  yes or no, let me know, and I'll move on.
6  　A.  I don't know exactly what
7  the drafter of the statement was
8  attempting to express there.
9  　　　　What I'm saying to you is
10  the IRR report was used by distribution
11  center personnel, or those acting on
12  behalf of distribution center personnel,
13  to flag orders that would be further
14  reviewed in order to determine whether or
15  not those orders were suspicious.
16  　　　　It's not the only --
17  　Q.  If it doesn't get flagged --
18  　A.  It's not the only
19  anti-diversion tool within CVS.
20  　　　　MR. KENNEDY:  I'll move to
21  　strike, please.
22  BY MR. KENNEDY:
23  　Q.  Can you answer my -- just
24  let me know whether you can answer this

Page 360

1  question yes or no, answer yes or no, or
2  tell me you can't, please.  All right?
3  　　　　The standard operating
4  procedures at CVS state, These thresholds
5  are the primary tool to prevent stores
6  from purchasing excessive or potentially
7  suspicious controlled drug orders.
8  　　　　Can you answer that question
9  yes or no, sir?
10  　　　　MR. DELINSKY:  Object to
11  　form.
12  BY MR. KENNEDY:
13  　Q.  I just -- can you answer
14  that question yes or no?
15  　　　　MR. DELINSKY:  Objection to
16  　form.  Objection, asked and
17  　answered.
18  　　　　THE WITNESS:  There are a
19  　number --
20  BY MR. KENNEDY:
21  　Q.  No.  I just want to know,
22  can you answer my question yes or no?
23  　　　　MR. DELINSKY:  Objection to
24  　form.

Page 361

1  　　　　THE WITNESS:  In the way
2  　that you've posed it and without
3  　allowing me to explain the answer,
4  　I don't believe I can simply
5  　answer that question yes or no.
6  BY MR. KENNEDY:
7  　Q.  Fine.  Then I will move on.
8  　　　　If we go to the item review
9  report, Paragraph 4.  It states,
10  Currently, the item review report (IRR)
11  for controlled drugs is being reviewed at
12  a central location in New Jersey.
13  　　　　Is that what it states?
14  　A.  It does.
15  　Q.  Where in New Jersey?
16  　A.  My understanding is the
17  Lumberton, New Jersey distribution center
18  where Mr. Mortelliti was based.
19  　Q.  And why doesn't it say
20  Lumberton distribution center, just
21  central location in New Jersey?  Was that
22  a secret?  Or why don't they say it's at
23  the distribution center?
24  　A.  I don't know why that

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1  language was not used.  I have no reason
2  to believe it was a secret.
3      Q.   What does it mean -- what
4  does the statement mean that the IRRs
5  were being reviewed at a location in
6  Central New Jersey?  What does that mean?
7      A.   Mr. Mortelliti, at that
8  time, had primary responsibility for
9  reviewing the items on the IRR and
10  conducting further due diligence on those
11  items to determine whether or not they
12  should be regarded as suspicious.
13      Q.   Okay.  Now, Mr. Mortelliti,
14  was he reviewing all of the IRRs for the
15  entire country up until probably what's
16  going to be October of 2010?  Was he
17  reviewing all of them in the country, all
18  IRR flagged orders?
19          MR. DELINSKY:  Object to
20      form.
21          THE WITNESS:  There was a
22      period of time when Mr. Mortelliti
23      would review the IRR report, that,
24      to my understanding, included

Page 363

1      orders that met the criteria for
2      inclusion on the IRR, orders
3      placed from any store, any CVS
4      store in the country, yes.
5  BY MR. KENNEDY:
6      Q.   What period of time was Mr.
7  Mortelliti reviewing all of the IRR
8  flagged orders for the entire country?
9  For what period of time?
10      A.   The period of time when Mr.
11  Mortelliti had primary responsibility for
12  reviewing the IRR report, to my
13  understanding, began at some point in the
14  first half of 2009 and continued through
15  approximately the fall of 2010, when Mr.
16  Mortelliti began to potentially involve
17  others at each individual distribution
18  center.
19      Q.   From mid '09 to the fall of
20  2010, was he reviewing them all by
21  himself for the country, all flagged
22  orders?
23          MR. DELINSKY:  Object to
24      form.

Page 364

1          THE WITNESS:  My
2      understanding is that Mr.
3      Mortelliti would have primary
4      responsibility for the first-line
5      review.
6          However, there were a number
7      of resources that were available
8      to assist Mr. Mortelliti,
9      including other loss prevention
10      personnel in the field, including,
11      to the best of my corporate
12      knowledge, analysts within the
13      loss prevention organization, as
14      well as personnel within CVS
15      stores, should Mr. Mortelliti
16      reach out to consult with them.
17  BY MR. KENNEDY:
18      Q.   Let's start with the first
19  line of review.  You said primary
20  responsibility.  My question is
21  different.
22          The first review of the IRR
23  report, for the entire country, for all
24  orders flagged for the entire country,

Page 365

1  was anyone helping Mr. Mortelliti, during
2  this period of time, with the review of
3  the IRR, or was he doing it all himself?
4          MR. DELINSKY:  Object to
5      form.
6          THE WITNESS:  At this point
7      in time, to the best of my
8      corporate knowledge, Mr.
9      Mortelliti was taking the first
10      pass through the IRR himself.  And
11      he would reach out for additional
12      resources to help him conduct his
13      due diligence as appropriate.
14  BY MR. KENNEDY:
15      Q.   All right.  And so tell me
16  the names of the people that were
17  assisting Mr. Mortelliti from this period
18  of mid '09 to the fall of 2010.
19      A.   Well, Mr. Mortelliti would
20  have had available to him data systems --
21      Q.   No.  I asked you the names.
22          Give me the names of the
23  people and their titles that were
24  assisting him in the due diligence after

Page 366

1 he took the first review of the IRR.
2     A.   I know that Mr. Mortelliti
3 would frequently reach out and talk to
4 stores with respect to particular orders.
5     Q.   No.  No.  I'm not asking
6 that.
7         I'm asking, give me the
8 names of the people and their title of
9 the people that were assisting him in the
10 due diligence review after he took the
11 first review of the IRR.  Give me the
12 names and the titles of the people.
13         MR. DELINSKY:  Object to
14     form.
15         THE WITNESS:  To the best of
16     my corporate knowledge, at this
17     point in time, I believe he was
18     assisted by field VIPER analysts.
19 BY MR. KENNEDY:
20     Q.   Give me the name and the
21 title of the people that were assisting
22 him with the due diligence, please.
23         MR. DELINSKY:  Object to
24     form.

Page 367

1         THE WITNESS:  I spoke to one
2     field VIPER analyst, it's a
3     position that no longer exists at
4     CVS, who had recollection of being
5     responsible for assisting with the
6     IRR review process.
7         I do not recall, at this
8     point in time, the specific dates
9     when she would have been involved
10     in that process.  So I cannot
11     state with certainty that she
12     would have been involved in
13     helping Mr. Mortelliti during that
14     period of time.
15 BY MR. KENNEDY:
16     Q.   And what is that person's
17 name?
18     A.   It's -- she goes by Cricket
19 Osmond.
20     Q.   And she was a field VIPER
21 analyst?
22     A.   That's correct.
23     Q.   And you aren't certain
24 whether she helped him, but possibly

Page 368

1 helped him during this period of '09 to
2 '10, correct?
3     A.   Into 2010, yes.
4     Q.   Can you give us the name and
5 the title of any person that you know,
6 that you actually know assisted Mr.
7 Mortelliti during this period of '09 into
8 '10?
9     A.   In the first-pass review,
10 I'm unable to provide additional names of
11 folks who helped Mr. Mortelliti during
12 the period of time when he had primary
13 responsibility for the review of that
14 report.
15     Q.   The review, the due
16 diligence, the investigation after the
17 first pass, can you give us the name and
18 title of any people that you know were
19 assisting him in '09 and '10?
20     A.   I don't believe, based on my
21 preparation for this deposition, I can
22 provide you with specific names.
23     Q.   And what did you do to find
24 the specific names and identify people

Page 369

1 that were assisting him with the due
2 diligence during this period of time?
3     A.   I had a few conversations
4 with Mr. Mortelliti.  I did not
5 specifically ask him to name other
6 individuals who he might have consulted
7 with in the field, to the best of my
8 recollection.
9     Q.   Can you --
10     A.   Other than by -- other than
11 by role.
12     Q.   This -- these people that
13 you can't identify that were assisting
14 Mr. Mortelliti, can you tell me
15 specifically what they were doing with
16 respect to the due diligence follow-up of
17 the IRR flagged orders?  Specifically,
18 what did they do for him during this
19 period of '09 into '10?
20         MR. DELINSKY:  Object to
21     form.
22         THE WITNESS:  I can't tell
23     you what each individual would
24     have done to assist.  My

Page 370

1  understanding is -- of the process
2  is that Mr. Mortelliti would
3  review the report and conduct
4  additional due diligence on items
5  that flagged on the report as he
6  deemed appropriate. Whether that
7  was consulting with loss
8  prevention personnel, whether that
9  was consulting with store
10 personnel or whether that was
11 consulting additional data
12 resources, I understand that those
13 are the types of actions that Mr.
14 Mortelliti would take in
15 connection with that review.
16 BY MR. KENNEDY:
17     Q.   Can you tell me, were there
18 any policies, procedures that were in
19 existence that in any way controlled what
20 Mr. Mortelliti was doing and what anybody
21 that might have been helping him was
22 doing with respect to due diligence?
23 What policies and procedures existed at
24 that time?

Page 371

1      MR. DELINSKY:  Object to
2  form.
3      THE WITNESS:  I'm not aware
4  of any written policies and
5  procedures before the ones we just
6  looked at.
7  BY MR. KENNEDY:
8      Q.   Can you tell me unwritten
9  policies and procedures, what were in
10 place with respect to the required due
11 diligence review of a flagged order on
12 the IRR from '09 to early '10?
13     MR. DELINSKY:  Object to
14 form.
15     THE WITNESS:  I understand
16 that Mr. Mortelliti's practice
17 would have been to review the
18 report on a daily basis and
19 determine whether items on the
20 report warranted further review
21 and due diligence and conduct that
22 review and due diligence as he
23 deemed appropriate.
24 BY MR. KENNEDY:

Page 372

1      Q.   And what was the required
2  due diligence, from '09 to early '10,
3  with respect to a flagged order?  What
4  was the required due diligence during
5  that period of time?
6      MR. DELINSKY:  Object to
7  form.
8      THE WITNESS:  Mr.
9  Mortelliti's practice, as I
10 understand it, would have been to
11 consult additional data sources.
12 That may include the VIPER system.
13 That may include systems that
14 would reflect store dispensing.
15 It may involve communications with
16 pharmacists in stores in order to
17 gain a level of comfort that the
18 order was not suspicious.
19 BY MR. KENNEDY:
20     Q.   Is it your testimony here
21 today under oath that Mr. Mortelliti was
22 reviewing dispensing data from pharmacies
23 in '09 into early '10?
24     A.   To the best of my corporate

Page 373

1  knowledge at this point in time, I
2  believe he was.
3      Q.   You believe he was.
4      Was Mr. Mortelliti stopping
5  orders that were flagged in the IRR prior
6  to the due diligence in '09 into '10?
7      A.   From what I understand,
8  based on my discussions with Mr.
9  Mortelliti, if he had an order that he
10 was conducting further due diligence on
11 and had not yet reached a conclusion that
12 it wasn't suspicious, he would call or
13 e-mail, typically call, the distribution
14 center in order to have that order held
15 while the further due diligence was being
16 conducted, and after making the
17 determination that the order was not
18 suspicious, tell the distribution center
19 that they could release the order.
20     Q.   In '09 and '10, did Mr.
21 Mortelliti, or any -- anyone at CVS,
22 identify, stop and report to the DEA a
23 suspicious order at any time?
24     MR. DELINSKY:  Objection on

Page 374

1 the grounds that the question
2 exceeds the scope of the
3 deposition notice and Special
4 Master Cohen's discovery rulings.
5 You can answer with regard
6 to the Track 1 jurisdictions.
7 THE WITNESS: I'm not aware,
8 during that time period, that Mr.
9 Mortelliti identified any orders
10 that were deemed suspicious and
11 reported to the DEA.
12 BY MR. KENNEDY:
13 Q. During this period from mid
14 '09 to probably October of 2010, over a
15 year, can you explain why it is that CVS
16 had no suspicious order monitoring
17 policies or standard operating policies
18 and procedures with respect to what Mr.
19 Mortelliti was doing for over a year?
20 Why is that?
21 A. That's not a point on which
22 I have corporate knowledge.
23 Q. Let me ask you, from this
24 period of '09 into '10, as part of the

Page 375

1 investigation of potentially suspicious
2 orders, let me ask you, was Mr.
3 Mortelliti -- do you have knowledge and
4 evidence that Mr. Mortelliti was
5 determining whether or not the pharmacy
6 was ordering excessive quantities of
7 certain controlled substances in relation
8 to other drugs? Was he doing that? Do
9 you have evidence that he was actually
10 doing that from '09 to '10?
11 MR. DELINSKY: Object to
12 form.
13 THE WITNESS: I'm not sure I
14 understand your question.
15 BY MR. KENNEDY:
16 Q. In the due diligence
17 process, from '09 to '10, was Mr.
18 Mortelliti, or anyone at his request,
19 were they determining whether or not the
20 pharmacy that had been flagged was
21 ordering excessive quantities of
22 controlled substances in relation to
23 other drugs they were ordering?
24 MR. DELINSKY: Object to

Page 376

1 form.
2 THE WITNESS: I'm not aware
3 of Mr. Mortelliti having knowledge
4 that a pharmacy was ordering
5 excessive drugs with respect to --
6 excessive controlled drugs with
7 respect to non-controlled drugs.
8 He may have looked at that
9 type of information in the data
10 that was available to him or
11 within the communications that he
12 had.
13 The extent to which he did
14 that, I can't say with certainty,
15 based on the corporate knowledge I
16 have at this point in time.
17 BY MR. KENNEDY:
18 Q. You talked to him how many
19 times?
20 A. More than once.
21 Q. Twice? Three times?
22 A. Yeah, I can't remember if
23 it's twice, three times, or even more.
24 But a couple of times, at least.

Page 377

1 Q. From '09 into the fall of
2 2010, was Mr. Mortelliti, or anyone at
3 his request, determining whether a CVS
4 Pharmacy was ordering a disproportionate
5 amount of controlled substances in
6 relation to non-controlled substance
7 drugs?
8 MR. DELINSKY: Object to
9 form.
10 THE WITNESS: As I
11 mentioned, Mr. Mortelliti would
12 have access, as I understand it,
13 during that period of time, to
14 data from which he would be able
15 to research that type of question.
16 I do not have corporate
17 knowledge as to the nature and
18 extent to which he undertook that
19 particular exercise in any
20 particular circumstance.
21 BY MR. KENNEDY:
22 Q. Wouldn't that be something
23 that would be important for you to
24 understand here, if you were trying to

Highly Confidential - Subject to Further Confidentiality Review

Page 378

1 explain the -- what was actually being
2 done by CVS for over a year? Isn't that
3 something that you should have known and
4 researched so that you could come answer
5 those questions?
6      A.   I know that Mr. --
7           MR. DELINSKY:  Object to
8      form.  Object to the extent that
9      it calls for an attorney-client
10     privileged information or work
11     product.  And object as outside
12     the scope of the deposition
13     notice.
14          THE WITNESS:  I know that
15     Mr. Mortelliti was undertaking
16     investigations with respect --
17 BY MR. KENNEDY:
18     Q.   That's not my question.
19          My question is, shouldn't
20 you --
21          MR. DELINSKY:  No.  No.  If
22     you haven't finished, you can
23     finish your answer.
24          THE WITNESS:  I know that

Page 379

1      Mr. Mortelliti was undertaking
2      reviews of particular orders to
3      determine whether or not they
4      should be deemed suspicious.  And
5      I know that he had data resources
6      and personnel resources available
7      to him.
8           In the course of my
9      conversations with Mr. Mortelliti,
10     I don't recall if I asked him that
11     particular question.
12 BY MR. KENNEDY:
13     Q.   From this period of '09 into
14 '10, the fall of '10, was Mr. Mortelliti,
15 or anybody at his direction  -- the
16 amount of lifestyle drugs that were being
17 ordered by a CVS Pharmacy during the
18 course of his due diligence?
19     A.   When you refer to "lifestyle
20 drugs," what are you referring to?
21     Q.   Hydrocodone, oxycodone,
22 Fentanyl, morphine.
23     A.   Are you seeing this in a
24 document that I should be looking at?

Page 380

1      Q.   Please just answer my
2 question.
3           MR. DELINSKY:  Well, I would
4      object.  Mr. Kennedy, you're
5      reading from a document and that
6      being the case, we'd ask that you
7      show the witness the document.
8           MR. KENNEDY:  Answer my
9      question.  I have no obligation to
10     show him what I'm reading from.
11          Answer the question.
12          MR. DELINSKY:  So you're
13     refusing to show the witness, just
14     so the record is clear --
15          MR. KENNEDY:  Absolutely.
16     Positively.
17          MR. DELINSKY:  -- the
18     document on which you're
19     interrogating him.
20          MR. KENNEDY:  Absolutely.
21     Absolutely.  You are not entitled
22     to my handwritten notes now or at
23     any time during the course of this
24     deposition.

Page 381

1           MR. DELINSKY:  We don't want
2      your notes.  But to the extent
3      your notes are referring to a
4      document that you're intentionally
5      withholding from the witness while
6      asking him questions --
7           MR. KENNEDY:  Every question
8      that I've asked today --
9           MR. DELINSKY:  -- that's
10     inappropriate.
11          MR. KENNEDY:  -- is in
12     reference to a document that CVS
13     has produced and this witness
14     should have reviewed.
15 BY MR. KENNEDY:
16     Q.   Now, answer my question,
17 please, doctor -- not doctor, but sir.
18          MR. DELINSKY:  I'll renew my
19     request that you produce the
20     document from which these
21     questions were based.
22          THE WITNESS:  I was just
23     asking because we had been looking
24     at the document that you had in

Page 382

1    front of me, and you were asking
2    questions based on that.
3  BY MR. KENNEDY:
4    Q.   Would you please answer my
5  question?  I don't have a lot of time
6  here.  I don't want to know the
7  explanation for why you're asking me
8  questions.  I just need you to answer my
9  question.
10    Let me ask it again.
11    MR. DELINSKY:  You can
12  continue, Mr. Vernazza.  You have
13  a right not to be interrupted, and
14  you can continue your answer.
15    THE WITNESS:  Speaking in my
16  personal capacity, my
17  understanding of the term
18  "lifestyle drugs" typically refers
19  to drugs like Viagra that aren't
20  controlled substances.
21  BY MR. KENNEDY:
22    Q.   I defined them for you.
23  Very clearly.
24    Let me ask you this:  From

Page 383

1  December into the fall of 2010, did Mr.
2  Mortelliti, at anybody's direction,
3  during the course of his due diligence,
4  did they investigate the amount of
5  OxyContin, Fentanyl, hydrocodone or
6  morphine that was being ordered by a CVS
7  pharmacy?  Did they?
8    A.   CVS distribution centers did
9  not distribute several of those drugs.
10    Q.   Would the answer be no?
11    A.   And specifically you
12  mentioned oxycodone and morphine.  Those
13  have always been Schedule II drugs and
14  have never been distributed by CVS.
15    You did mention, I believe,
16  hydrocodone, if you mean hydrocodone
17  combination products, those are among the
18  drugs that Mr. Mortelliti would have been
19  reviewing while reviewing the IRR report.
20    Q.   So he would -- during the
21  course of his due diligence, would I be
22  correct in saying, then, you have no
23  evidence that he looked into OxyContin or
24  Fentanyl or morphine; is that your

Page 384

1  answer?
2    A.   I don't have corporate
3  knowledge that he did or he did not.
4    Q.   From December into the fall
5  of 2010, did Mr. Mortelliti, or anybody
6  at his direction, while doing their due
7  diligence on a flagged order, did they,
8  at any time, review the percentage of the
9  pharmacy's total business related to the
10  dispensing of controlled substances?
11    MR. DELINSKY:  Object to
12    form.
13    THE WITNESS:  He might have.
14    I don't have corporate knowledge,
15    at this point in time, as to
16    specifically the nature of each
17    inquiry that Mr. Mortelliti
18    undertook while reviewing the IRR
19    reports.
20  BY MR. KENNEDY:
21    Q.   And from December of '09 to
22  2010, did Mr. Mortelliti, or anybody at
23  his direction, when conducting due
24  diligence on a flagged order, did they,

Page 385

1  at any time, look to whether or not there
2  were any medical practitioners at the
3  pharmacy who were writing a
4  disproportionate share of the controlled
5  substances being filled?
6    MR. DELINSKY:  Object to
7    form.
8    THE WITNESS:  Based on my
9    discussions with Mr. Mortelliti, I
10    believe that prescribing and, in
11    particular, prescribers were among
12    the factors that he considered in
13    conducting his due diligence, yes.
14  BY MR. KENNEDY:
15    Q.   And he would have gotten
16  that off of the dispensing data, is that
17  what you're telling us?
18    A.   I believe that's correct.
19    Q.   And it's your testimony here
20  today that Mr. Mortelliti and CVS was
21  considering dispensing data in '09 and
22  into '10 when it was doing its due
23  diligence?  That's your testimony under
24  oath on behalf of the company today,

Page 386

1 correct?

2     A.   My understanding is that Mr.

3 Mortelliti had access to a system known

4 as Micro Strategy that would have

5 contained dispensing data that Mr.

6 Mortelliti could review, as he deemed

7 appropriate, in conducting the reviews.

8     Q.   And I know that they had --

9 that he had access to dispensing data.

10 That's not my question.

11        On behalf of CVS today,

12 under oath, is it your position that CVS,

13 when conducting due diligence for flagged

14 orders, as early as mid '09, was looking

15 and considering dispensing data?  Is that

16 your testimony here today on behalf of

17 CVS?

18        MR. DELINSKY:  Object to

19     form.  Objection, asked and

20     answered.

21        THE WITNESS:  To the best of

22     my corporate knowledge, at this

23     point in time, based on the

24     preparation I've undertaken for

Page 387

1     this deposition, I understand that

2     Mr. Mortelliti had access to and

3     consulted dispensing data

4     concerning pharmacies.

5 BY MR. KENNEDY:

6     Q.   In his due diligence of

7 flagged orders?

8     A.   In his due diligence based

9 on flagged orders.

10     Q.   Okay.

11     A.   Whether that was every order

12 or the orders where Mr. Mortelliti deemed

13 that to be helpful in making his

14 determination, my understanding is that

15 it's more the latter.

16     Q.   All right.  You would agree

17 with me that it wasn't -- it wasn't until

18 2012 that CVS, as part of their due

19 diligence, on a regular basis required an

20 evaluation of dispensing data?  You

21 understand that that didn't occur until

22 2012?

23     A.   I'm not sure what you mean

24 by that.

Page 388

1     Q.   There was no requirement at

2 CVS, until 2012, that when doing due

3 diligence on a flagged order that

4 dispensing data be reviewed, correct?

5     A.   I don't have corporate

6 knowledge that that's true.

7     Q.   When did the store metrics

8 report come into existence?

9     A.   I am aware of a report known

10 as the store metrics report that I

11 believe was used in 2012.

12     Q.   And let me ask you this: Do

13 you know how often -- if it's your

14 testimony that Mr. Mortelliti reviewed

15 and evaluated dispensing data in the due

16 diligence of a flagged order, can you

17 tell me how often he did that in '09

18 leading into '10?

19     A.   I cannot.

20     Q.   But you believe he did do

21 it?

22     A.   Based on my discussions with

23 Mr. Mortelliti, I believe that he did

24 consult dispensing data as part of the

Page 389

1 due diligence process with respect to

2 certain orders.

3     Q.   In doing due diligence from

4 '09 to '10, did Mr. Mortelliti, or anyone

5 at his direction, make a determination,

6 during due diligence of a flagged order,

7 as to the amount of cash purchases of

8 controlled substances at the pharmacy?

9        MR. DELINSKY:  Object to

10     form.

11        THE WITNESS:  I don't recall

12     whether or not Mr. Mortelliti told

13     me that he would look at that

14     specific point, although he may

15     have.

16 BY MR. KENNEDY:

17     Q.   Do you have any documents

18 that you have been provided that would

19 support your testimony that Mr.

20 Mortelliti reviewed dispensing data,

21 during the due diligence, on a flagged

22 order in '09 and into '10, any documents

23 that you can point us to that would

24 support that?

Highly Confidential - Subject to Further Confidentiality Review

Page 390

1      MR. DELINSKY:  Object to
2  form.
3      THE WITNESS:  I don't recall
4  any such documents.  But I
5  certainly didn't have the ability
6  to review all the documents that
7  we produced in this litigation.
8  BY MR. KENNEDY:
9    Q.   Did anybody point you to
10 such a document?
11   A.   I don't recall --
12     MR. DELINSKY:  Excuse me.
13 Object to the form.  To the extent
14 that information calls for
15 attorney-client communications, I
16 instruct you not to answer.
17     THE WITNESS:  I don't recall
18 seeing such a document.  Again, I
19 didn't undertake to review each
20 and every document that has been
21 produced in this litigation.
22 BY MR. KENNEDY:
23   Q.   Let's go to October of 2010.
24     The new suspicious order

Page 391

1  monitoring policies are implemented in
2  2010, correct?  October of 2010, early
3  October?
4    A.   The written policies --
5    Q.   Are implemented?
6    A.   -- we looked at earlier, as
7  I understand.
8    Q.   And that's different than
9  what Mr. Mortelliti has been doing up
10 until that point in time, correct?
11   A.   In some regards, but not in
12 others.  There was a process in place
13 where Mr. Morteliti was reviewing the
14 IRR reports.
15   Q.   Right.
16   A.   That process, as reflected
17 as of October of 2010, as I understand
18 it, contemplated some different personnel
19 being involved in that type of review.
20   Q.   The starting point -- I
21 think you've told us the starting point
22 of the suspicious order monitoring
23 procedures is the IRR drug report,
24 correct?

Page 392

1      MR. DELINSKY:  Object to
2  form.
3      THE WITNESS:  The IRR
4  contains the drugs that would have
5  flagged on the algorithms that
6  were established to identify
7  potentially suspicious order for
8  review.
9  BY MR. KENNEDY:
10   Q.   It was the starting point,
11 correct?
12   A.   It was the starting point.
13   Q.   It was the starting point.
14     If you don't get flagged in
15 the IRR, there's not going to be due
16 diligence of that order, true?
17   A.   Unless it was an order that
18 was identified through the warehouse
19 associates.
20   Q.   Some rare occasion,
21 something might get flagged for some
22 other reason.
23     But if you don't get flagged
24 in the IRR report, there's not going to

Page 393

1  be due diligence, true?
2      MR. DELINSKY:  Object to
3  form.
4      THE WITNESS:  I can't say
5  that that's universally true.  But
6  for the most part, that would be
7  true.
8  BY MR. KENNEDY:
9    Q.   The IRR report, how many
10 algorithms -- in 2010, do you know how
11 many different algorithms were evaluating
12 and scoring an order for a hydrocodone
13 drug?
14   A.   At what period of time are
15 you saying?
16   Q.   2010, when this -- when the
17 written policies go into place.
18   A.   I'm not certain as to the
19 number of different algorithms that the
20 Buzzeo system employed.
21     As we talked about, there
22 were several different algorithms.  My
23 understanding, it was based on a
24 progression model, and that it would

Page 394

1 ultimately produce a score.  If the score
2 was above a certain threshold, then the
3 item would populate on the IRR.
4     Q.    Accuracy and effectiveness
5 of the IRR report would be critical,
6 then, to the identification of suspicious
7 orders, correct?  It's the primary way
8 you're doing it?
9          MR. DELINSKY:  Object to
10     form.
11          THE WITNESS:  The IRR was
12     the system that the company had in
13     place to identify suspicious
14     orders based on an algorithm
15     analysis.
16 BY MR. KENNEDY:
17     Q.    Reported, then, in the IRR
18 report?
19     A.    Which would then be on the
20 IRR report.
21     Q.    And the IRR report is what's
22 being reviewed every day to look for
23 flagged orders so you can start to
24 investigate, correct?

Page 395

1          MR. DELINSKY:  Object to
2     form.
3          THE WITNESS:  That's my
4     understanding.
5 BY MR. KENNEDY:
6     Q.    Just as CVS was implementing
7 these new policies in October of 2010, it
8 discovered a significant problem, did it
9 not, with the IRR report?
10          MR. DELINSKY:  Object to
11     form.
12 BY MR. KENNEDY:
13     Q.    Right in the beginning.
14     A.    October of 2010 was not the
15 beginning, as I understand it.
16     Q.    That's the beginning of the
17 written SOPs, correct?
18     A.    The written SOPs were
19 updated around that point in time.  We
20 looked at those documents earlier.
21          But as I testified, the
22 process, as I understand it, was in place
23 for a significant period of time before
24 that.

Page 396

1     Q.    In October of 2010, CVS
2 discovered a significant problem with
3 this all-important IRR report, did it
4 not?
5          MR. DELINSKY:  Object to
6     form.
7          THE WITNESS:  I don't recall
8     corporate knowledge on that
9     specific point.
10 BY MR. KENNEDY:
11     Q.    Is Mr. Mortelliti still in
12 charge of these procedures in October of
13 2010?
14     A.    Mr. Mortelliti still had
15 some involvement in the process of
16 reviewing suspicious orders.  The extent
17 to which he was involved is something on
18 which we don't have clear corporate
19 knowledge.
20              - - -
21     (Whereupon, CVS-Vernazza,
22     Exhibit-16,
23     CVS-MDLT1-000034175-177, was
24     marked for identification.)

Page 397

1              - - -
2 BY MR. KENNEDY:
3     Q.    I'm showing you Exhibit-16.
4 From the metadata, this is October 8,
5 2010.
6          Does the top say, Business
7 idea description?
8          MR. DELINSKY:  I object to
9     the use of this document on the
10     ground that it disaggregates the
11     document from its parent e-mail.
12 BY MR. KENNEDY:
13     Q.    Does the top say, Business
14 idea description?
15          MR. DELINSKY:  Same
16     objection.
17 BY MR. KENNEDY:
18     Q.    Sir, did it state that?
19     A.    The top of the document
20 states, Business idea description, yes.
21     Q.    Have you seen this before?
22     A.    I believe I have.
23     Q.    All right.  This says,
24 Requested for or on behalf of John

Page 398

1  Mortelliti, correct?
2      A.   It does.
3      Q.   And then under summary
4  description and objectives, it states,
5  DEA expects CVS to prevent suspicious
6  orders from being filled out of our DCs.
7          That's distribution centers,
8  correct?
9      A.   I see that.
10     Q.   Do you agree with that
11 statement on behalf of CVS?  That first
12 statement, DEA expects CVS to prevent
13 suspicious orders from being filled out
14 of our DCs, do you agree with that
15 statement on behalf of CVS?
16     A.   I'm aware of the DEA
17 regulation that requires reporting of
18 suspicious orders.  I'm also aware of the
19 DEA guidance that suspicious orders not
20 be shipped.
21     Q.   Well, let me ask you this:
22 CVS wouldn't write that there unless they
23 believed it, would they?
24     A.   I presume Mr. Mortelliti

Page 399

1  wrote this document.  He didn't
2  necessarily write it to reflect CVS's
3  corporate position.
4      Q.   Well, when you spent, what,
5  two, three times, maybe, talking with
6  him, did he give you any indication that
7  he didn't believe that the DEA expects
8  CVS to prevent suspicious orders from
9  being filled out of our DCs?  Did he give
10 you the impression that he didn't believe
11 that to be true?
12     A.   No.  In fact, as I
13 understand it from Mr. Mortelliti, an
14 order deemed suspicious was not ever
15 shipped from one of our DCs.
16     Q.   A responsible man, Mr.
17 Mortelliti, responsible, trusted guy at
18 CVS?
19         MR. DELINSKY:  Object to
20 form.
21 BY MR. KENNEDY:
22     Q.   Is that the impression you
23 got, that CVS had a lot of respect for
24 him?

Page 400

1          MR. DELINSKY:  Object to
2  form.
3          THE WITNESS:  Mr. Mortelliti
4  is personnel within our loss
5  prevention department and has had
6  oversight over other loss
7  prevention personnel.
8  BY MR. KENNEDY:
9      Q.   Well, look, you talked to 40
10 people at CVS, did you get the impression
11 that Mr. Mortelliti was well respected
12 for the job that he did at CVS?
13         MR. DELINSKY:  Object to
14 form.
15         THE WITNESS:  I don't have
16 corporate knowledge as to what
17 other individuals thought of Mr.
18 Mortelliti.  It's not -- it's not
19 something I undertook to
20 understand in preparation for the
21 deposition.
22 BY MR. KENNEDY:
23     Q.   But you did not get an
24 impression, in talking to 40 people,

Page 401

1  about their feelings about Mr.
2  Mortelliti?
3          MR. DELINSKY:  Object to
4  form.
5          THE WITNESS:  Speaking in my
6  personal capacity, I can't say
7  that I really did.
8  BY MR. KENNEDY:
9      Q.   All right.  Next stated --
10 next thing stated -- so first states, DEA
11 expects CVS to prevent suspicious orders
12 from being filled out of our DCs.
13         Then it states, The current
14 IRR does not provide the proper
15 information to meet the DEA's needs.
16         Do you see that statement?
17     A.   I do.
18     Q.   Next it states, We need
19 controlled drugs to be monitored by
20 active ingredient.  Currently, the
21 controlled drugs are monitored by item.
22 The IRR loses all order history when the
23 info on the item changes causing CVS to
24 be noncompliant with DEA expectations.

Page 402

1       Did I read that right?

2      A.   You read that correctly.

3      Q.   Does CVS agree with this

4 statement of Mr. Mortelliti in October of

5 2010? Does CVS agree with that

6 statement?

7       MR. DELINSKY: Object to

8     form.

9       THE WITNESS: CVS does not

10     agree that it was not compliant

11     with DEA expectations.

12 BY MR. KENNEDY:

13      Q.   At this point in time, Mr.

14 Mortelliti was working with the

15 suspicious order monitoring system and

16 the IRRs on a daily basis, was he not?

17 We just went through everything he does

18 with the IRR.

19      A.   Yeah, I'm just trying to get

20 a sense -- is there a date on the

21 document?

22      Q.   This is 10/8/10. And up

23 until this point in time, we've been

24 talking for the last 45 minutes, Mr.

Page 403

1 Mortelliti is the one who is reviewing

2 the IRRs every day, correct?

3      A.   I'm sorry, I'm looking for

4 the date on the document.

5      Q.   There's no date. I'm

6 telling you to assume that this is

7 October 8 of 2010.

8       And as of this date, since

9 mid '09, Mr. Mortelliti is the one who

10 has been reviewing the IRRs on behalf of

11 CVS every day; is that true?

12       MR. DELINSKY: I object to

13     the form of the question. I

14     further renew my objection to the

15     fact that this document has been

16     disaggregated from its parent

17     e-mail, which would have supplied

18     context and information on date.

19 BY MR. KENNEDY:

20      Q.   Am I right, sir? Can you

21 answer my question? Can you answer my

22 question?

23      A.   My understanding is from

24 some point in 2009 through some point in

Page 404

1 2010, Mr. Mortelliti was responsible for

2 reviewing the IRR report on a daily

3 basis.

4      Q.   And in -- at this point in

5 time, in 2010, you were at a law firm,

6 you weren't working for CVS, correct?

7      A.   Correct.

8      Q.   And so we have Mr.

9 Mortelliti, who has been looking at the

10 IRRs, being responsible for the IRRs for

11 over a year now, and he thinks that CVS

12 is noncompliant with DEA expectations.

13       And you, who are working at

14 a law firm at this time, disagree; is

15 that -- is that true?

16       MR. DELINSKY: Object to

17     form.

18 BY MR. KENNEDY:

19      Q.   Is that true, sir? You are

20 disagreeing -- on behalf of CVS, you're

21 disagreeing with the man who has been

22 reviewing this report every day when, in

23 fact, you were working at a law firm at

24 this point in time? You disagree?

Page 405

1       MR. DELINSKY: Object to

2     form. Object to the use of this

3     document in its incomplete form as

4     it's currently being used.

5       THE WITNESS: I have set

6     forth the corporate position of

7     CVS with respect to this document,

8     which is that CVS does not agree

9     that it was not compliant with DEA

10     regulations.

11 BY MR. KENNEDY:

12      Q.   And can you tell me what is

13 the -- you weren't there, so what is the

14 basis for CVS's position that Mr.

15 Mortelliti is wrong when he says that CVS

16 is noncompliant with DEA expectations in

17 October of 2010? What is the basis for

18 CVS's disagreement with its employee?

19       MR. DELINSKY: Object to

20     form. Object to the use of an

21     incomplete document.

22       THE WITNESS: Based on the

23     investigation that I have

24     undertaken in preparation for this

Page 406

1 deposition, and based on the
2 systems and the positions of the
3 company, as I understand them, it
4 is CVS's position that CVS was not
5 noncompliant with DEA regulations.
6        I further don't know whether
7 or not Mr. Mortelliti is referring
8 to something that occurred for a
9 very brief period of time or more
10 extended period of time, or what
11 exactly he's referring to or what
12 the basis for his statement is.
13 BY MR. KENNEDY:
14     Q.   Well, you don't know whether
15 this is a brief period of time.
16        You know, from your review
17 of the documents, that this problem and
18 this noncompliance continues for at least
19 a year, right?  This is -- this is
20 occurring for a year past the date that
21 Mr. Mortelliti declares that CVS is
22 noncompliant, right?  This happens --
23 this goes on for another year, does it
24 not, from your understanding?

Page 407

1     A.   To my understanding --
2        MR. DELINSKY:  Object to
3     form.  Object to the use of this
4     document.  It's unfair, Mr.
5     Kennedy.
6 BY MR. KENNEDY:
7     Q.   This goes on for another
8 year --
9        MR. KENNEDY:  You cannot give
10     speeches.  You can object and you
11     can instruct him not to answer,
12     but you cannot give speeches.
13     Please, let it stop.  We are
14     limited in time.  Let us move
15     forward.
16 BY MR. KENNEDY:
17     Q.   What is the specific basis
18 for CVS's disagreement with its employee
19 that CVS is noncompliant with DEA
20 expectations as of October of '10?  What
21 is your basis?
22        MR. DELINSKY:  Object to
23     form.  Object to the use of the
24     document.

Page 408

1        THE WITNESS:  CVS had a
2     system in place to detect
3     suspicious orders.  CVS's position
4     is that that system was compliant
5     with DEA regulations.
6 BY MR. KENNEDY:
7     Q.   And let me ask you this:  Do
8 you think you know better, in a four-week
9 review, than Mr. Mortelliti back in 2010,
10 who had been reviewing the IRR for a
11 year?
12        MR. DELINSKY:  Object to
13     form.  Object to the use of the
14     incomplete document.
15        THE WITNESS:  Mr. Mortelliti
16     is making statements here that I
17     don't fully understand the basis
18     for and what they're referring to.
19        Mr. Mortelliti is not a
20     lawyer.  And it is CVS's position
21     that it had in place a system to
22     detect suspicious orders, and that
23     that system was compliant with DEA
24     regulations.

Page 409

1 BY MR. KENNEDY:
2     Q.   When you met with Mr.
3 Mortelliti, or when you talked to him
4 these several, two, three times, let's
5 say, did he tell you, I was wrong, I was
6 wrong when I filled out that business
7 idea description, I was wrong when I
8 filled it out and said that CVS was
9 noncompliant with DEA expectations?  Did
10 he tell you he was wrong?
11        MR. DELINSKY:  Object to
12     form.
13        THE WITNESS:  Mr. Mortelliti
14     and I did not discuss this
15     particular document when I spoke
16     with him.  I had not reviewed this
17     document at the time that I had
18     spoken to Mr. Mortelliti.
19        He didn't express to me, in
20     any capacity, that he believed
21     that the CVS system was not
22     compliant for any period of time.
23 BY MR. KENNEDY:
24     Q.   After you received this

Page 410

1  document, didn't you call up Mr.
2  Mortelliti again and say, Mr. Mortelliti,
3  John -- you were probably on a first name
4  basis -- John, what did you mean by this?
5  You're stating, in October of 2010, that
6  CVS is noncompliant with DEA
7  expectations.  Didn't you call him up and
8  ask him about this?
9        MR. DELINSKY:  Object to
10       form.
11 BY MR. KENNEDY:
12       Q.   Did you call him and ask
13 him?
14       MR. DELINSKY:  Object.
15       Object to form.  Object to the
16       incomplete use of the document.
17       Object to the question to the
18       extent it calls for
19       attorney-client information.
20       To the extent you're able to
21       answer without disclosing
22       attorney-client communication, you
23       may answer.  If you can't, you're
24       instructed not to answer.

Page 411

1        THE WITNESS:  I reviewed
2  this document --
3        MR. KENNEDY:  I'm going to
4  object to the speeches.
5        But go ahead, please.
6        THE WITNESS:  I reviewed
7  this document only very recently
8  and did not have an opportunity to
9  discuss it with Mr. Mortelliti.
10 BY MR. KENNEDY:
11       Q.   When did you review it?
12 What day?
13       A.   To the best of my
14 recollection, it was yesterday.  It may
15 have been among some documents I saw on
16 Friday night.
17       Q.   Let's go to the next box
18 down.  Next box down under business
19 drivers, all right?
20       It states, We can be fined
21 or penalized by the DEA due to the
22 current environment.
23       Do you agree -- does CVS
24 agree with that statement by Mr.

Page 412

1  Mortelliti?
2        A.   I don't know what Mr.
3  Mortelliti is referring to there.
4        Q.   You don't have any idea --
5  you don't think he means that we can be
6  fined for being noncompliant with DEA
7  expectations because our IRR is losing
8  all order history?  You don't think he's
9  referencing the box above?
10       MR. DELINSKY:  Object to
11       form.
12       THE WITNESS:  Based on this
13       document, I'm unable to provide
14       corporate knowledge as to what Mr.
15       Mortelliti meant when he said
16       that.
17       MR. DELINSKY:  Let's take a
18       break.
19       MR. KENNEDY:  Sure.
20       VIDEO TECHNICIAN:  The time
21       is 5:10 p.m.  We're going off the
22       record.
23            - - -
24       (Whereupon, a brief recess

Page 413

1  was taken.)
2            - - -
3        VIDEO TECHNICIAN:  The time
4  is 5:25 p.m.  We're back on the
5  record.
6  BY MR. KENNEDY:
7        Q.   Sir, when we took a break,
8  we were talking about Exhibit-16.  And
9  that's the business idea description.
10       Mr. Mortelliti, when he
11 indicated that CVS was noncompliant with
12 DEA expectations, it was his position
13 that the problem was that controlled
14 drugs were not being monitored by active
15 ingredient, true?
16       See where he states, We need
17 our controlled drugs to be monitored by
18 active ingredient.  Currently, the
19 controlled drugs are monitored by item?
20       So he felt that the
21 controlled drugs needed to be monitored
22 in the IRR by active ingredient, correct?
23       A.   I see the language that
24 you've cited in the document.

Highly Confidential - Subject to Further Confidentiality Review

Page 414

1  Q.  Go to Exhibit-24, then.
2       - - -
3       (Whereupon, CVS-Vernazza
4  Exhibit-24, CVS-MDLT1-000075542,
5  was marked for identification.)
6       - - -
7  BY MR. KENNEDY:
8  Q.  Exhibit-24 is within days of
9  what we've been looking at.
10      Do you have that in front of
11 you?
12 A.  Yes.  But I don't know that
13 to be the case.  I don't understand what
14 the date of the document that's
15 Exhibit-16 is.
16 Q.  You're talking about the
17 document that says, The DEA is
18 noncompliant?
19      MR. DELINSKY:  Object to
20 form.
21 BY MR. KENNEDY:
22 Q.  Is that the one?
23      MR. DELINSKY:  Object to
24 form.

Page 415

1       THE WITNESS:  The document,
2  as you represented, that was Mr.
3  Mortelliti's statement, but not
4  the company's position.
5       I understand that there was
6  an e-mail attached to this that
7  wasn't there that may have
8  provided the date.  I don't know
9  the date of the e-mail.
10 BY MR. KENNEDY:
11 Q.  Let's go to Exhibit-24.
12      Up at the top, Mr.
13 Mortelliti is sending an e-mail to Todd
14 Jason, correct?
15 A.  It says Jason.
16 Q.  Janson, I'm sorry.
17      Is that correct?
18 A.  From John Mortelliti to Todd
19 Janson, that's what I see.  I don't
20 believe this is a document I reviewed.
21 Q.  Sent on 10/12/2010, true?
22 A.  That appears to be the date
23 of the top e-mail.
24 Q.  Mr. Mortelliti states, Todd,

Page 416

1  I sent you an e-mail about two weeks ago
2  explaining why I am handling the
3  controlled drug IRR for the time being.
4  You may want to forward it to Dean.
5       He states -- and this is,
6  apparently, the e-mail he had sent two
7  weeks earlier -- Dean, there is a rewrite
8  we are trying to get approved for the
9  controlled drug IRR -- that's the report.
10 The current report shows controlled drugs
11 by item instead of active ingredient,
12 (such as PSE).  We thought this would be
13 a great idea at the time, but what we
14 found was that the system cannot match
15 historical data to an item if the
16 manufacturer changes the name of the item
17 (Todd can forward you the example).
18      Now, he gives an example,
19 hydro 5MG can be changed to hydro MG5;
20 same item, just put the 5 in front of the
21 MG.  The system can't match this item
22 because of the change and, therefore,
23 loses historical data.  This is why you
24 are seeing zero for historical ordering

Page 417

1  (usually LAGs 3-6).
2       Long story short, we are
3  having controlled drugs listed by active
4  ingredient (like PSE).  Until then, I
5  will be doing the controlled drug IRR for
6  the network so there won't be as much
7  confusion trying to decipher the report
8  in its current form.
9       Now, when he says that --
10 Mr. Mortelliti says he's going to do it
11 for the network, that means for the
12 entire country, would that be true?
13 A.  I don't have knowledge as to
14 what specifically Mr. Mortelliti meant
15 when he said that.  His statement is
16 consistent with the notion that he would
17 be doing it chain-wide.
18      I know for a period of time
19 that Mr. Mortelliti was reviewing the
20 report chain-wide.
21 Q.  And he gives an example of
22 how small of a change there might be that
23 would cause all of the historical data to
24 disappear.

Page 418

1       Do you see that?  He says,
2   Hydro -- if you go back -- Hydro 5MG can
3   be changed to hydro MG5.  I mean, he's
4   indicating that a change that simple by
5   the manufacturer and then the system
6   cannot match the item and loses
7   historical data.
8       Do you see that?
9       A.   I see language to that
10  effect in Mr. Mortelliti's e-mail.  I
11  don't know exactly what he's talking
12  about.
13      Q.   Well, did CVS, at that point
14  in time, understand that a change that
15  small, that small of a change, would
16  cause the report to lose all historical
17  data?  Did it understand that at that
18  point in time?
19      A.   I don't have corporate
20  knowledge on that particular detail, nor
21  whether or not that's exactly what Mr.
22  Mortelliti was referring to in this
23  e-mail.
24      Q.   The last paragraph he

Page 419

1   states, You are right.  These are not new
2   drugs.  However, there is a change in the
3   drug info supplied by the
4   manufacturer/vendor.  The change can be
5   so small that you wouldn't be able to
6   catch it unless you were looking real
7   hard.  I found this out through
8   experience.
9       So he's indicating that the
10  change can be small and you lose
11  historical data, correct?
12      MR. DELINSKY:  Object to
13  form.
14  BY MR. KENNEDY:
15      Q.   Would you agree with that?
16      A.   I see the statement where
17  Mr. Mortelliti says the change could be
18  so small that you wouldn't be able to
19  catch it unless you're looking real hard.
20      I don't have further
21  information as to what Mr. Mortelliti
22  meant by that.
23            - - -
24      (Whereupon, CVS-Vernazza

Page 420

1   Exhibit-23,
2   CVS-MDLT1-000034168-171, was
3   marked for identification.)
4            - - -
5   BY MR. KENNEDY:
6       Q.   Let me show you 23,
7   Exhibit-23, still talking about the IRR.
8       Go all the way to the last
9   page, if you would.  That's where the
10  first e-mail starts.
11      The first e-mail is, again,
12  from Mr. Mortelliti, it's dated October
13  5, 2010, correct?
14      A.   That's correct.
15      Q.   And it's to a relatively
16  large group of people at CVS, true?
17      A.   There's several individuals
18  here.
19      Q.   And the subject is,
20  Controlled drug IRR important info.
21  Importance, high.
22      Is that correct?
23      A.   You stated the subject
24  correctly, and the importance is rated as

Page 421

1   high.
2       Q.   And he states, The issue
3   with hydro items -- that would be HCPs,
4   true?  Hydrocodone drugs?
5       A.   Presumably.  If he's using
6   the term "hydro" in connection with
7   distribution of that product by CVS, we
8   would be talking about hydrocodone
9   combination products.
10      Q.   And at this point in time,
11  did CVS understand that hydro items,
12  HCPs, hydrocodone drugs, at this point in
13  time, were at the center of the opioid
14  crisis in the United States?  Did CVS
15  understand that by 2010?
16      MR. DELINSKY:  Object to
17  form.  Object as outside the scope
18  of the deposition notices.
19      You may answer to the extent
20  you have knowledge.
21      THE WITNESS:  I don't have
22  corporate knowledge as to whether
23  or not CVS would have understood
24  hydro to be at the center of the

Highly Confidential - Subject to Further Confidentiality Review

Page 422

1   opioid crisis at this time.
2   BY MR. KENNEDY:
3       Q.   This states, The issue with
4   hydro items last month -- so now they're
5   talking about an issue with hydro in
6   September.
7           The issue with hydro items
8   last month appears to be happening again
9   this month with several items.  This
10  includes all drugs that end with PAM,
11  many and items.  The deletions are done
12  by CVS.
13          Do you understand that, the
14  blackouts?
15      A.   My understanding is that
16  they would have been redacted pursuant to
17  court order or agreement.
18      Q.   And he next states, I
19  verified the entire network -- that would
20  be the entire country -- I verified the
21  entire network this morning and there
22  were no controlled drug suspicious
23  orders.
24      A.   I see that.

Page 423

1       Q.   Look up to the next e-mail.
2   Same day.  It looks like it's, who knows,
3   a half hour later, or so.
4           Mr. Mortelliti writes again,
5   now to Gary Misiaszek, subject,
6   Controlled drug IRR important.
7   Importance, high.
8           He states, Gary, it looks as
9   though the same issue we had with hydro
10  items is now happening in several items.
11  The report is about a half-inch thick and
12  only about five total items have
13  historical data.  The report definitely
14  will need to be changed to active
15  ingredient.
16          Let me ask you, at this
17  point in time, if you have a report that
18  is a half-inch thick of single sheets of
19  paper that is identifying potentially
20  suspicious orders and only five of them
21  had historical data so that they could be
22  reviewed, would you agree that that is a
23  very significant problem for CVS at this
24  point in time, with respect to its

Page 424

1   monitoring program?
2           MR. DELINSKY:  Object to
3       form.
4   BY MR. KENNEDY:
5       Q.   Five items with a -- five
6   items with an inch-thick stack of papers;
7   would you agree this is a big problem at
8   this point?
9       A.   I don't have corporate
10  knowledge as to the particular problem
11  that's being discussed here.
12          It appears, from this
13  document, that items are being populated
14  on the report.  And it looks like Mr.
15  Mortelliti is saying that these -- some
16  of the items don't have historical data.
17          What exactly he means by
18  "historical data" and how that would have
19  impacted his review of the report, I
20  can't say.
21      Q.   You do not -- sir, without
22  historical data, you can't evaluate an
23  order of a controlled substance, correct?
24  That's the problem.

Page 425

1       A.   The IRR report took into
2   account historical data.
3       Q.   Correct.
4       A.   So if an order made it onto
5   the IRR report, it would have been
6   historical data considered.
7           Additionally, Mr. Mortelliti
8   would have available to him additional
9   resources that would be able to reflect
10  historical data.
11          So I just don't know exactly
12  what this means.
13      Q.   What it means to Mr.
14  Mortelliti, from what we have already
15  looked at in Exhibit-16, what this means
16  to him, that there's only five items with
17  historical data on a stack of papers an
18  inch thick, what it means to Mr.
19  Mortelliti, as we've already seen, is
20  that CVS is noncompliant with DEA
21  expectations, right?  That's what it
22  means to him?
23          MR. DELINSKY:  Object to
24      form.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 426

1    THE WITNESS: I don't know
2  that to be the case.
3         - - -
4    (Whereupon, CVS-Vernazza
5  Exhibit-111,
6  CVS-MDLT1-000103859-867, was
7  marked for identification.)
8         - - -
9  BY MR. KENNEDY:
10   Q.   Still talking about the
11 active ingredients and the IRR report,
12 Exhibit-111 is an e-mail from Christopher
13 Tulley.
14   Who is that?
15   A.   I have not spoken to Mr.
16 Tulley in preparation for this
17 deposition. I have heard his name.
18   To the best of my corporate
19 knowledge, he works within the corporate
20 logistics team, but I am not certain.
21   Q.   The date on this is
22 10/29/2010, true?
23   A.   The sent date of the e-mail
24 reflects 10/29/2010, yes.

---

Page 427

1    Q.   And the e-mail attaches --
2  let's look at the attachment. It's
3  titled, Logistics Core Team Update,
4  November 1, 2010, true?
5    A.   Logistics core team update,
6  dated November 1, 2010. That is correct.
7    Q.   Frank Devlin's name is on
8  this, true?
9    A.   Frank Devlin's name is on
10 this.
11   Q.   Bullet Point 3, it states,
12 Controlled drug suspicious order
13 monitoring is being reworked to identify
14 active ingredients versus product name.
15   That's exactly what Mr.
16 Mortelliti said needed to be done so that
17 you could solve this problem with the IRR
18 report, correct?
19   A.   The shift from active
20 ingredient with product name would be
21 consistent with some of the discussions
22 that we've seen in the documents that Mr.
23 Mortelliti authored.
24   Q.   That was --

---

Page 428

1    A.   I can't say exactly what Mr.
2  Mortelliti meant in those documents, as
3  I've testified.
4    But the language would be
5  consistent with the language I see here.
6    Q.   It's consistent with the
7  language in Exhibit-16, right, where he
8  says, We need controlled drugs to be
9  monitored by active ingredient.
10 Currently, the controlled drugs are
11 monitored by item. The IRR loses all
12 order history when the info on the item
13 changes, causing CVS to be noncompliant
14 with DEA expectations.
15   He's talking about active
16 ingredient all the way back in '16,
17 correct?
18   A.   Again, I'm not certain what
19 Mr. Mortelliti was referring to in
20 Exhibit-16. And, certainly, it is not
21 CVS's corporate position that it was not
22 compliant with DEA regulations.
23   There is discussion in that
24 document of a shift from the IRR using

---

Page 429

1  item name and moving to using the active
2  ingredient. That's also reflected in
3  this document. And it's also
4  independently something that, in the
5  course of preparation for this
6  deposition, I understand that the company
7  did do.
8         - - -
9    (Whereupon, CVS-Vernazza
10 Exhibit-17,
11 CVS-MDLT1-000024523-524, was
12 marked for identification.)
13        - - -
14   MR. GOETZ: 17.
15 BY MR. KENNEDY:
16   Q.   17 is a -- now we're into
17 2011 now. And it's March 21, 2011.
18   We have an e-mail here from
19 Francis Devlin, correct?
20   A.   I'm sorry, are you looking
21 at the bottom e-mail or the top e-mail?
22   Q.   The top e-mail -- excuse me,
23 let's look at the bottom e-mail, because
24 that's the chronological order.

---

Page 430

1     It's an e-mail from Andrade
2  John, right, dated March 21, 2011, true?
3     A.   No.  I see the bottom e-mail
4  being a message from Mr. Misiaszek to
5  Frank Devlin and Tom McHugh.
6     Q.   I'm talking about the March
7  21, 2011, 9:52.
8     A.   March 21, 2011, 9:52.  So
9  that would be the second one down from
10 the top?
11    Q.   Second one down.
12         And Andrade is sending an
13 e-mail, Subject, suspicious order
14 monitoring modifications.
15         Do you see that?
16    A.   I do.
17    Q.   And it says, Frank, there
18 are three requests in the queue related
19 to the DEA.
20         And number two is suspicious
21 order monitoring retunement.
22         Is that relating to this
23 issue and problem with the active
24 ingredients in the IRR review report?

Page 431

1     A.   I don't know.  I've seen
2  some document from the Buzzeo Group that
3  spoke to a retunement to the system that
4  would have been done in connection with
5  and in consultation with the Buzzeo
6  Group.  That's where I know that term
7  retunement from, or I recognize that term
8  retunement from.  So I don't have
9  knowledge as to whether or not that
10 bullet point refers to any of the other
11 documents we've been looking at.
12    Q.   With respect to these three
13 requests up above, does Devlin state, in
14 the e-mail right up above, John, all
15 three are critical and could cause a
16 problem if we don't complete?
17         Is that what's stated by Mr.
18 Devlin up above?
19    A.   Yes.  In the top e-mail I
20 see, John, all three are critical and
21 could cause a problem if we don't
22 complete, in an e-mail sent from Frank
23 Devlin.
24         I don't know what he's

Page 432

1  referring to in this e-mail, though.
2     Q.   Take a look, if we can, at
3  Exhibit-18A.
4          - - -
5          (Whereupon, CVS-Vernazza
6     Exhibit-18A,
7     CVS-MDLT1-000029864-866, was
8     marked for identification.)
9          - - -
10 BY MR. KENNEDY:
11    Q.   This is a -- this is an
12 e-mail from Misiaszek, do you see that?
13    A.   Gary Misiaszek, yes.
14    Q.   Employed at CVS Pharmacy,
15 Inc.?
16    A.   Good question.  I don't have
17 specific corporate knowledge about that.
18 I believe Mr. Misiaszek is within the
19 corporate IT group and would have been
20 employed by CVS Pharmacy, Inc.
21    Q.   And sent out to a large
22 group of people at CVS for one or more
23 CVS different entities; would that be
24 correct?

Page 433

1     A.   I'm sorry, could you repeat
2  the question?
3     Q.   Sent out to a large group of
4  people at CVS, this e-mail?
5     A.   Sent out to a group of
6  people.
7     Q.   And the date is 4/29/2011,
8  right?  We are now into April of 2011,
9  correct?
10    A.   The e-mail was sent in April
11 of 2011.
12    Q.   And this issue with the IRR
13 report, where, at least according to Mr.
14 Mortelliti, is causing CVS to be
15 noncompliant with DEA expectations, that
16 discovery was made back in October of
17 2010, correct?  So this would be some six
18 and-a-half months later, true?
19         MR. DELINSKY:  Object to
20    form.
21         THE WITNESS:  I'm not sure I
22    agree with the characterizations
23    of your question.
24 BY MR. KENNEDY:

Page 434

1  Q.  Well, Mr. Mortelliti stated
2  that in Exhibit-16, did he not --
3      A.  Again, I don't --
4      Q.  -- noncompliant with DEA
5  expectations?
6      A.  -- know what Mr. Mortelliti
7  was referring to here.  And, certainly,
8  it's not the company's position.
9      Q.  Well, let's look at the --
10  this attachment.  Attachments, 2011/4/28
11  logistics business support requests.
12          Do you know what that means?
13  This is a request to get something done;
14  is that your understanding?
15      A.  I haven't had a chance to
16  review the document.  If you could give
17  me just a minute, I can.
18      Q.  Well, just -- we'll go to
19  the attachment in a minute.
20          But logistics business
21  support requests, do you know what that
22  means, just looking at that?
23          MR. DELINSKY:  If you need
24      to read the document, review the

Page 435

1      document.
2          THE WITNESS:  Just by the
3      title of the attachment, I don't
4      know what it means.
5  BY MR. KENNEDY:
6      Q.  Let's look at the
7  attachment, then.
8      A.  It would be helpful for me
9  to read the document to answer your
10  questions.
11      Q.  Oh, you want to look at the
12  whole e-mail?
13      A.  It's three paragraphs.  But,
14  yes, the attachment --
15      Q.  I thought you wanted to look
16  at the attachment.
17      A.  I'd like to look at both.
18      Q.  Okay.
19      A.  I've read the document,
20  thank you.
21      Q.  All right.  The
22  attachment -- do you know what this
23  attachment is?
24      A.  I do not.

Page 436

1      Q.  It's -- they're calling it
2  logistics business support requests,
3  correct?  That's what it's being called?
4      A.  That is the subject of the
5  e-mail.  I also see it referenced in the
6  title of the attachment and in the e-mail
7  itself.
8      Q.  We've marked, this is 18A.
9  And what 18A is, a pull-out of a long,
10  thick, fat, spreadsheet report, okay?
11  That's what 18A is.
12          18 is the entire spreadsheet
13  that's very lengthy, all right?  So 18A
14  is a pull-out of that.
15      A.  I have no way of knowing if
16  that's true or not, but I'll accept your
17  representation.
18      Q.  And 18A, if you see, as of
19  date, do you see that column?  As of
20  date, and it says 4/25/11, all right?
21      A.  I do.
22      Q.  And the task is revisions to
23  IRR SOM system.
24          Do you see that?  Do you see

Page 437

1  that?
2      A.  Yes, I do.
3      Q.  And then under business
4  lead, it has Devlin, Frank.
5          Do you see that?
6      A.  I do.
7      Q.  So, now, this is somebody
8  different than Mr. Mortelliti, correct?
9  This is somebody different?
10      A.  Yes.  Mr. Mortelliti was --
11  he reported to Mr. Devlin.
12      Q.  And Mr. Mortelliti, he is
13  the one who talked about the existence of
14  this problem with the IRR and CVS being
15  noncompliant with the DEA.  He started
16  talking about that in October of 2010.
17          And now we're into April of
18  2011, and it looks like Frank Devlin, his
19  boss, has taken over this task, right?
20          MR. DELINSKY:  Object to
21      form.
22          THE WITNESS:  No, I don't
23      know that to be true.
24  BY MR. KENNEDY:

Page 438

1    Q.   Well, does it say, Business
2  lead, Frank Devlin?
3    A.   It does say that.
4    Q.   All right.  And under
5  description, objectives, does it state,
6  DEA expects CVS to prevent suspicious
7  orders from being filled out of our DCs.
8  The current IRR does not provide the
9  proper information to meet the DEA's
10  needs.  We need controlled drugs to be
11  monitored by active ingredient.
12  Currently, the controlled drugs are
13  monitored by item.  The IRR loses all
14  order history when the info on the item
15  changes, causing CVS to be noncompliant
16  with DEA expectations.
17         Did I read that correct?
18    A.   You read that correctly.  I
19  believe it's the same language that was
20  included in the submission of the
21  business idea description --
22    Q.   Right.
23    A.   -- in Exhibit-16.
24    Q.   But now, instead of Mr.

Page 439

1  Mortelliti, it's his boss that's leading
2  this -- the charge on this problem,
3  right?  Now it's --
4    A.   No, I don't --
5    Q.   -- now it's Frank Devlin?
6         MR. DELINSKY:  Object to
7      form.
8         THE WITNESS:  I don't know
9      that to be true.  Mr. Devlin,
10      again, is the supervisor of Mr.
11      Mortelliti.  And I don't know
12      whether or not it was just
13      categorized that way in the system
14      because they assigned somebody,
15      within the chain of command at a
16      certain -- certain level, the
17      business lead for that particular
18      task.
19         I have no corporate
20      knowledge that Mr. Devlin became
21      involved in this or agreed with
22      the statements here.
23  BY MR. KENNEDY:
24    Q.   Are you -- Mr. Devlin not

Page 440

1  being involved with this at this point,
2  are you just making that up?
3         MR. DELINSKY:  Object to
4      form.
5  BY MR. KENNEDY:
6    Q.   Are you just making that up?
7    A.   No.  I said I have no -- I
8  have no corporate knowledge that he was.
9    Q.   Right.  You have no idea,
10  right?
11    A.   I have no idea if he was
12  involved in the process at this point.
13    Q.   The only idea you would have
14  would be based upon the document that
15  says that he's the business lead on this
16  project at this point, right?
17    A.   Right.  And sometimes, in my
18  experience at the company, the person
19  deemed responsible for something may be
20  somebody at a higher level because that's
21  the level of sort of authorization that
22  needs to be associated with the
23  particular project.
24         I have no idea if that's the

Page 441

1  case --
2    Q.   You weren't even at the
3  company at 2010.
4    A.   Exactly.  I have no idea
5  whether that's the case.
6    Q.   But from looking at this
7  document, we have Frank Devlin as the
8  business lead.  And it is still saying,
9  and it's now been saying for six months,
10  that the IRR loses all order history when
11  the info and the item changes, causing
12  CVS to be noncompliant with DEA
13  expectations.
14         It's still saying this six
15  months later, right?
16         MR. DELINSKY:  Object to
17      form.
18         THE WITNESS:  I don't have
19      corporate knowledge as to the
20      length of time that this document
21      was in this format, or whether or
22      not Mr. Devlin was involved in the
23      creation of this document.
24  BY MR. KENNEDY:

Page 442

1    Q.   Did you review any
2  documents, talk to any witness at CVS,
3  that indicated that Mr. Mortelliti or Mr.
4  Devlin were wrong, were wrong when they
5  stated that CVS was noncompliant with DEA
6  expectations?
7        As of now, it's April of
8  2011.  Any documents or any of the 40
9  witnesses tell you that when they had
10  their names attached to these statements,
11  they were wrong?
12       MR. DELINSKY:  Object to
13    form.
14  BY MR. KENNEDY:
15    Q.   Anybody?
16       MR. DELINSKY:  Object to
17    form.
18       THE WITNESS:  I have no
19    knowledge that Mr. Devlin was
20    involved in making a statement
21    like that.
22  BY MR. KENNEDY:
23    Q.   Look at down here.  See
24  where it says, Start?  This is kind of --

Page 443

1  see where it says, Start?
2    A.   I do.
3    Q.   February 11, 2011.  This was
4  discovered in October.
5        Can you explain to me, if
6  CVS is noncompliant with DEA expectations
7  and Mr. Mortelliti believes that in
8  October of 2010, can you tell me why
9  there is a four-month delay in starting
10  the project to correct the problem?  Why
11  is there a four-month delay in starting?
12       MR. DELINSKY:  Object to
13    form.
14       THE WITNESS:  I don't have
15    corporate knowledge as to whether
16    there was a delay or why there was
17    a delay or whether this document
18    accurately reflects when the
19    project was -- began.
20       I don't have corporate
21    knowledge about this document, and
22    I just don't know what it means.
23  BY MR. KENNEDY:
24    Q.   You see there it says,

Page 444

1  Finish?  That's probably when -- when are
2  they going to finish this project, this
3  fix so that CVS is compliant?  And they
4  say December 31, 2011.  That's when
5  they're expecting to finish.
6        That's another eight months
7  of noncompliance --
8        MR. DELINSKY:  Object to
9    form.
10  BY MR. KENNEDY:
11    Q.   -- right?
12       MR. DELINSKY:  Object to
13    form.
14  BY MR. KENNEDY:
15    Q.   I mean, according to this
16  document, CVS is noncompliant, they don't
17  start working on getting compliant until
18  February of 2011, and they don't think
19  they're going to get compliant for eight
20  more months.
21       Is that an appropriate, fair
22  read of this document, sir?
23       MR. DELINSKY:  Object to
24    form.

Page 445

1        THE WITNESS:  No, it's not.
2  Because I've stated, it's not
3  CVS's position that it was
4  noncompliant with DEA regulations.
5  It had in place a system for
6  identifying suspicious orders, as
7  I've discussed.
8        I don't know the particular
9  issue that this is referring to,
10  or the manner in which that was
11  resolved, to the extent that it
12  needed to be resolved.
13       MR. GOETZ:  This is 18 --
14       MR. KENNEDY: If you want the
15    full.
16       That's 18.  We marked 18A.
17       MR. GOETZ:  That's 18.
18        - - -
19       (Whereupon, CVS-Vernazza
20    Exhibit-18, CVS-MDLT1-000029864,
21    with attachment, was marked for
22    identification.)
23        - - -
24       (Whereupon, CVS-Vernazza

Page 446

1    Exhibit-25,
2    CVS-MDLT1-000029877-880, was
3    marked for identification.)
4          - - -
5  BY MR. KENNEDY:
6    Q.   Take a look at Exhibit-25,
7  if you would, please.
8         This is an e-mail.  This
9  e-mail is a month later from what we were
10 just looking at.  So now this e-mail is
11 from Dean Vanelli.
12        And you know who he is,
13 correct?  You've spoken with him?
14    A.   I have.
15    Q.   And he works for CVS
16 Pharmacy, Inc., true?
17    A.   I believe that is true.
18    Q.   And this e-mail is dated
19 5/25/2011.  And it is attaching the
20 logistics business support requests
21 again, all right?
22        And I'll tell you, it's
23 attaching the same spreadsheet, but now
24 it's a month later, all right?  Now it's

Page 447

1  a month later.
2    A.   He appears to be forwarding
3  the e-mail that was sent earlier, with
4  the same attachment.
5    Q.   With the same attachment.
6         But it's a month later,
7  correct?
8    A.   Yes.
9    Q.   And if we take a look at
10 this, the attachment on an e-mail now a
11 month later, it still has the business
12 lead as Frank Devlin, does it not?
13    A.   It does.
14    Q.   And it still states that the
15 IRR loses all order history when the info
16 on the item changes, causing CVS to be
17 noncompliant with DEA expectations,
18 correct?
19        It still states it?
20    A.   That language is in the
21 document.  Excuse me, actually, that
22 language is not in the document.
23        Did you say -- I believe you
24 said regulations.  It says expectations.

Page 448

1    Q.   Noncompliant with DEA
2  expectations, correct?
3    A.   The language, not compliant
4  with DEA expectations, is in this
5  document.  It is not CVS's position that
6  it was noncompliant with DEA regulations.
7    Q.   I understand.
8         MR. DELINSKY:  Counsel, is
9  this like Exhibit-18 and 18A, in
10 that the attachment represents an
11 extract of a much longer document?
12        MR. KENNEDY:  Yes, 18.
13 Correct.
14        MR. DELINSKY:  So what is
15 appended to the e-mail on 25 is an
16 extract from Exhibit-18?
17        MR. KENNEDY:  Correct.
18        MR. DELINSKY:  Thank you.
19 BY MR. KENNEDY:
20    Q.   And, again, this is attached
21 to an e-mail a month later from what we
22 looked at.
23        It has the finish date of
24 12/31/2011, true?

Page 449

1         MR. DELINSKY:  Object to
2  form.
3         THE WITNESS:  To the best of
4  my ability to tell, based on the
5  documents that you've put in front
6  of me, it appears to be the same
7  exact document, and it appears to
8  just be forwarded in May of 2011.
9  BY MR. KENNEDY:
10    Q.   And I know you've told us
11 that it's CVS's position that this
12 statement is incorrect, that CVS was
13 noncompliant with DEA expectations, but
14 can you tell me which person, of the 40
15 people you talked to, or which document
16 can you cite us to from CVS that
17 indicates that Mr. Devlin or Mr.
18 Mortelliti was wrong when this statement
19 was made beginning back in October of
20 2010 and continuing up to what we're
21 looking at in April of 2011?
22        MR. DELINSKY:  Object to
23 form.
24 BY MR. KENNEDY:

Highly Confidential - Subject to Further Confidentiality Review

Page 450

1    Q.   Which person said that this
2  statement is wrong?
3        MR. DELINSKY:  Object to
4  form.
5        THE WITNESS:  I spoke to a
6  number of individuals who were
7  able to describe the system that
8  CVS had in place at the time to
9  detect suspicious orders, and
10  learned quite a bit about the way
11  that that system worked at that
12  period of time.
13        And none of those
14  individuals told me that they
15  thought that the system did not
16  comply with law.
17  BY MR. KENNEDY:
18    Q.   So you're -- again, you're
19  sitting here today, as a lawyer who
20  wasn't working for CVS in 2010, and
21  you're disagreeing with Mr. Mortelliti,
22  who was reviewing this IRR every single
23  day, when he concludes that based upon
24  the IRR CVS is noncompliant?

Page 451

1        MR. DELINSKY:  Object to
2  form.
3        THE WITNESS:  No, I'm not
4  sitting here as a lawyer for CVS.
5  I'm sitting here in my capacity as
6  a corporate 30(b)(6)
7  representative.
8        I have undertaken an
9  investigation and preparation in
10  connection with this deposition.
11  And I can tell you that the
12  company's position is that the
13  company's system in place was one
14  that detected potentially
15  suspicious orders of controlled
16  substances and subjected them to
17  further review.
18        I discussed that system with
19  a number of people in preparation
20  for this deposition, and none of
21  them told me that the system did
22  not identify potentially
23  suspicious orders for further
24  review.

Page 452

1        MR. KENNEDY:  I move to
2  strike as nonresponsive.
3        MR. GOETZ:  And just so the
4  record is clear --
5        MR. KENNEDY:  If we can take
6  a break.
7        MR. GOETZ:  One second.
8  Just so the record is clear, that
9  Exhibit-25 is a pull-out from the
10  Bates number 29880.  Just like the
11  prior one was a pull-out.
12        MR. KENNEDY:  If we can take
13  a ten-minute break, please.
14        VIDEO TECHNICIAN:  The time
15  is 6:06 p.m.  We are going off the
16  record.
17        - - -
18        (Whereupon, a brief recess
19  was taken.)
20        - - -
21        VIDEO TECHNICIAN:  The time
22  is 6:19 p.m.  We're back on the
23  record.
24  BY MR. KENNEDY:

Page 453

1    Q.   All right.  So we've been
2  talking about the IRR drug report and the
3  issue with it not tracking by active
4  ingredient.
5        But I want to -- let's back
6  up to the beginning of the discovery of
7  the problem in October of 2010, all
8  right?
9        We've given you Exhibit --
10        MR. GOETZ:  Exhibit-125.
11        - - -
12        (Whereupon, CVS-Vernazza
13  Exhibit-125, CVS-MDLT1-000034172;
14  Native, was marked for
15  identification.)
16        - - -
17        MR. GOETZ:  And just so the
18  record is clear, for some reason,
19  when it printed it, has a Bates
20  number of 3417, and the actual
21  Bates number is 34172.  The 2 got
22  cut off.
23  BY MR. KENNEDY:
24    Q.   So this is an e-mail

Page 454

1 that Mr. Mortelliti -- dated October 6,
2 2010 at 9:30 a.m.
3        Do you see that e-mail?
4    A.  You're talking about the
5 second e-mail down in the chain?
6    Q.  Yes, sir.
7        He's copying his boss, Frank
8 Devlin, is he not?
9    A.  I believe Mr. Mortelliti
10 reported to Mr. Devlin at this time.
11   Q.  And the subject is,
12 Controlled drug IRR, important info,
13 importance, high.
14       Do you read that?
15   A.  The subject is, Controlled
16 drug IRR important info.  The importance
17 level is rated as high.
18   Q.  And you understand that the
19 IRR report is what we've been talking
20 about that Mr. Mortelliti believed and
21 certainly stated, in October of 2010, the
22 problem with the report made CVS
23 noncompliant with DEA expectations;
24 that's what we're talking about, right?

Page 455

1        MR. DELINSKY:  Object to
2    form.
3        THE WITNESS:  No, I don't
4    believe that's consistent with my
5    testimony.
6 BY MR. KENNEDY:
7    Q.  I didn't ask you that.
8        I asked you, do you
9 understand that this e-mail is in
10 relation to the IRR report that Mr.
11 Mortelliti has indicated has a problem
12 which is causing CVS to be noncompliant
13 with DEA expectations?  Do you understand
14 this is the same IRR report we're talking
15 about?
16   A.  I'm familiar with the term
17 "IRR."  I have no reason to believe that
18 the term "IRR" means something different
19 in this e-mail than it meant in prior
20 exhibits that we've looked at.
21   Q.  All right.
22   A.  I also don't have a basis to
23 understand the statements of Mr.
24 Mortelliti in the prior exhibit that you

Page 456

1 just referenced.
2        And as I mentioned, that's
3 not the company's position with respect
4 to its compliance with DEA regulations.
5        MR. KENNEDY:  And I move to
6    strike.
7 BY MR. KENNEDY:
8    Q.  Mr. Mortelliti states in
9 this e-mail, in October of 2010, he
10 states, Gary, all but one item in the
11 network -- and network is the entire
12 country, correct?
13   A.  Again, I don't know what Mr.
14 Mortelliti is referring to here.  It
15 certainly could be that when he's saying
16 "the network" that he's referring to
17 chain-wide.  I just don't know.
18   Q.  He states, All but one item
19 in the network was missing three to four
20 items of LAG info on today's report.
21 Something else changed or just about
22 every company we deal with has changed
23 the description on their drugs.  Whatever
24 you can do to help expedite this process

Page 457

1 would be greatly appreciated.  I am now
2 reviewing the network controlled drug IRR
3 on common sense as opposed to IRR
4 historical data.  I know, that is
5 scary...be nice.
6        Did I read that correctly?
7    A.  I believe you read that
8 correctly.
9    Q.  And when he is indicating --
10 first of all, when he's saying, help, can
11 you expedite this process, this is
12 October of 2010, and we don't have a fix
13 of this process for more than a year; is
14 that correct, sir?
15   A.  I don't know that to be
16 true.
17   Q.  And when he states that --
18 Mr. Mortelliti states he is now reviewing
19 the IRR for the entire network based upon
20 common sense as opposed to historical
21 data, and he states that that is scary,
22 do you know whether he meant scary for
23 CVS, or did he mean that that was scary
24 for the general public, the people of the

Page 458

1 United States who might be receiving and
2 consuming opioids because a suspicious
3 order was sent?
4      MR. DELINSKY: Object to
5 form.
6      THE WITNESS: I do not know
7 what Mr. Mortelliti meant when he
8 wrote that. I have no knowledge
9 on that whatsoever.
10 BY MR. KENNEDY:
11      Q. You don't know whether he
12 meant scary for CVS or scary for the
13 American public?
14      A. I don't know if it's either
15 of those or something else or none of
16 those. I don't know.
17      Q. Or both?
18      A. I have no knowledge, sir.
19      Q. Sir, this IRR report that
20 he's talking about, as we talked about,
21 it's the first step in your suspicious
22 order monitoring policy, correct? It is
23 the first step?
24      MR. DELINSKY: Object to

Page 459

1 form.
2 BY MR. KENNEDY:
3      Q. True?
4      A. The IRR is the step in which
5 orders get flagged for inclusion on a
6 report, pursuant to algorithms, and then
7 reviewed in order to determine whether or
8 not they are suspicious.
9      Q. This IRR report, this report
10 was not only the first step in your
11 monitoring process, it was also something
12 that was mandated by the DEA, correct?
13 It was mandated by the DEA?
14      MR. DELINSKY: Object to
15 form. Object on the grounds that
16 the question exceeds the scope of
17 the deposition topics as defined
18 by Special Master Cohen.
19      THE WITNESS: I'm not aware
20 of any DEA regulation that
21 mandates registrants to perform an
22 algorithmic analysis of orders in
23 the fashion that the IRR did.
24      - - -

Page 460

1      (Whereupon, CVS-Vernazza
2 Exhibit-119, CVS-MDLT1-000012286,
3 was marked for identification.)
4      - - -
5 BY MR. KENNEDY:
6      Q. Let me show you Exhibit-119.
7 Who is Paul Lawson?
8      A. Paul Lawson worked within
9 the loss prevention organization at the
10 Knoxville distribution center.
11      Q. And he is writing an e-mail
12 on 12/26/2011, is he not?
13      A. He appears to be.
14      Q. And the --
15      MR. KENNEDY: Should we go
16 off the Elmo?
17      VIDEO TECHNICIAN: I don't
18 have it on. Don't worry. Proceed
19 as you are. We are prepared.
20      MR. KENNEDY: I got you.
21 BY MR. KENNEDY:
22      Q. He's writing an e-mail on
23 12/26/2011, correct? Is that what we see
24 here?

Page 461

1      A. That's the sent date of the
2 e-mail.
3      Q. And it says, Subject, IRR
4 bullet points. Attachments, revised DEA
5 speaking points IRR.ppt.
6      Did I read that right?
7      A. IRR bullet points is the
8 subject. Revised DEA speaking points
9 IRR.ppt is what's indicated as the
10 attachment.
11      Q. Look at the last paragraph.
12      Do you see the last
13 paragraph? Could you read the first
14 sentence to us?
15      A. What Mr. Lawson wrote in
16 this e-mail --
17      Q. The first sentence of the
18 last paragraph, could you read that to
19 the jury?
20      MR. DELINSKY: Object to
21 form. Object to the form of the
22 question. Object to the
23 interruption of the witness.
24      THE WITNESS: What Mr.

Highly Confidential - Subject to Further Confidentiality Review

1     Lawson wrote in this e-mail, which
2 is not consistent with what I
3 understand to be the regulations,
4 as I've testified, is that the IRR
5 is mandated by the DEA, therefore,
6 we have to adhere to this
7 monitoring policy.
8 BY MR. KENNEDY:
9     Q.   And you disagree with -- you
10 disagree with Mr. Lawson?  Do you
11 disagree with Mr. Lawson?
12        MR. DELINSKY:  Object to
13     form.
14        THE WITNESS:  The DEA
15     suspicious order monitoring
16     regulation does not specifically
17     require an IRR.
18 BY MR. KENNEDY:
19     Q.   I'm asking, do you disagree
20 with Mr. Lawson, who was an LP logistics
21 analyst at CVS, who worked in this field
22 every day, do you disagree with him when
23 he states the IRR is mandated by the DEA?
24        MR. DELINSKY:  Object to

1     form.
2        THE WITNESS:  The company's
3     position is that there is no DEA
4     regulation that specifically
5     requires an IRR.
6 BY MR. KENNEDY:
7     Q.   And your IRR report at CVS,
8 from October of 2010 to the end of '11,
9 over a year, was operating in a fashion
10 whereby Mr. Mortelliti believed that it
11 made CVS noncompliant with DEA
12 expectations, correct?
13     A.   I don't know that to be
14 true.
15     Q.   And this man says the IRR is
16 mandated by the DEA, does he not?  That's
17 his statement; is that true?
18     A.   I've read the statement in
19 the e-mail.  The company's understanding
20 and position is that there is no DEA
21 regulation that specifically requires an
22 IRR.
23        The regulation requires a
24 system to detect suspicious orders.  And

1 it's the company's position that the
2 company had such a system.
3     Q.   And your system was broken
4 from October of 2010, for over a year,
5 until the end of 2011; it was broken, was
6 it not?  The IRR wasn't working, correct?
7        MR. DELINSKY:  Object to
8     form.
9        THE WITNESS:  I don't have
10     any understanding of that, no.
11 BY MR. KENNEDY:
12     Q.   Didn't Mr. Mortelliti say
13 that he was looking at it, he was looking
14 at the entire country by himself, and
15 just applying common sense and it was
16 scary?  That's a broken system, is it
17 not?
18        MR. DELINSKY:  Object to
19     form.
20        THE WITNESS:  I read the
21     e-mail that you're referencing.
22 BY MR. KENNEDY:
23     Q.   Yes.
24     A.   I also had communications

1 with Mr. Mortelliti.  I don't know what
2 the e-mail that you're referencing was
3 intended to convey.
4     I do know that I've had
5 discussions with Mr. Mortelliti and
6 that's not something he's conveyed to me.
7     Q.   Did Mr. Mortelliti tell you
8 that he did not undertake the
9 responsibility to look at the entire
10 country of IRRs, all by himself, and
11 simply apply common sense?  Did he tell
12 you he wasn't doing that?
13        MR. DELINSKY:  Object to
14     form.
15        THE WITNESS:  Based on my
16     discussions with Mr. Mortelliti,
17     he was responsible for reviewing
18     the IRR report on a daily basis.
19     He would take follow-up actions,
20     as he deemed appropriate, to
21     conduct further review and due
22     diligence of the items that were
23     on the report.
24     At no time did Mr.

Page 466

1  Mortelliti express that he was
2  unable to complete that process
3  due to the nature of the report.
4  BY MR. KENNEDY:
5  Q.  Did he specifically tell you
6  that he was not reviewing the IRR based
7  on common sense and it was scary?  Did he
8  tell you -- did he deny that, when you
9  spoke with him?
10  MR. DELINSKY:  Object to
11  form.
12  BY MR. KENNEDY:
13  Q.  Did he deny that when you
14  spoke?
15  MR. DELINSKY:  Object to
16  form.
17  THE WITNESS:  I did not ask
18  Mr. Mortelliti about that
19  particular e-mail.  I don't
20  believe that I had seen that
21  e-mail when I had my discussions
22  with Mr. Mortelliti.
23  My conversations with Mr.
24  Mortelliti, and with others within

Page 467

1  CVS, are inconsistent with your
2  characterizations.
3  BY MR. KENNEDY:
4  Q.  Did anybody at CVS deny the
5  fact -- deny the fact that Mr. Mortelliti
6  had to review this, based upon common
7  sense, for the entire country?
8  MR. DELINSKY:  Objection.
9  BY MR. KENNEDY:
10  Q.  Did anybody tell you that he
11  wasn't doing that because the IRR had no
12  historical data in it?  Did anyone tell
13  you he was not doing that?
14  MR. DELINSKY:  Object to
15  form.
16  THE WITNESS:  I didn't have
17  any discussions or communications
18  on that particular point or those
19  particular words in this
20  particular document.
21  I undertook quite an
22  extensive set of interviews and
23  reviewed -- to prepare for this
24  deposition, and that was not

Page 468

1  something that was told to me.
2  BY MR. KENNEDY:
3  Q.  Let me ask you this: We're
4  not talking about a one-week period or a
5  one-day period where there was a problem,
6  sir.  You spent a month on this,
7  interviewed 40 people, reviewed hundreds
8  of documents.
9  We are talking about a
10  problem with their first step report, the
11  first step report, a problem that lasts
12  for over a year.  And you never ask
13  anybody about it?  Never ever told you
14  about it?  You never heard about it?
15  Is that your testimony?  You
16  never heard about this problem with the
17  IRR before I started asking you
18  questions?
19  MR. DELINSKY:  Object to
20  form.  Objection, misstates the
21  record.
22  THE WITNESS:  I understand
23  that there was a process to move
24  from looking at the IRR being

Page 469

1  premised on items to active
2  ingredient, and that was viewed as
3  an enhancement to the IRR.
4  No, in the course of my
5  preparation for this deposition,
6  no one expressed that there was a
7  problem of a particular severity
8  around that or of the duration
9  that you have characterized.
10  I do not have corporate
11  knowledge about the particular
12  statements in that e-mail.
13  BY MR. KENNEDY:
14  Q.  So your corporate knowledge
15  is missing an entire year with regard to
16  the effectiveness of their suspicious
17  order monitoring policy, right?  You're
18  missing an entire year --
19  MR. DELINSKY:  Object to
20  form.
21  BY MR. KENNEDY:
22  Q.  -- correct?  You're missing
23  a year?
24  MR. DELINSKY:  Object to

Highly Confidential - Subject to Further Confidentiality Review

---

Page 470

1  form.  Object to the question, to
2  the extent -- or due to, in fact,
3  the fact that it misstates the
4  record and the testimony.
5       If you wish to provide the
6  information you have over this --
7  regarding the suspicious order
8  monitoring processes of CVS over
9  the course of this supposed year,
10 you may do so.
11      MR. KENNEDY:  I'm going to
12 move to strike.  You can't ask the
13 witness to provide an answer and
14 then have him provide the answer
15 you asked him to provide.  That's
16 not appropriate.  You can't do
17 that.  You can't do that.  You
18 can't.  That's not fair.  That's
19 not right.  And you know that.
20      MR. DELINSKY:  Mr. Kennedy,
21 you're -- you are -- have
22 identified a single issue at a
23 single point in time and are
24 characterizing it as a gap in

---

Page 471

1  knowledge, without ever having
2  elicited the full scope of
3  knowledge that the witness does
4  have regarding that period of
5  time.
6       And I just don't think that
7  that's a fair characterization.
8       MR. KENNEDY:  I will tell
9  you, I've got a thousand more
10 questions, and in the next seven
11 hours, I will get to it.
12      What is our time?
13      VIDEO TECHNICIAN:  One.
14      MR. KENNEDY:  One minute.
15 I'm not going to move to another
16 topic.
17      THE WITNESS:  Mr. Kennedy,
18 to answer your question, I do not
19 believe that I have a one-year gap
20 in my knowledge with respect to
21 the system.  I've undertaken quite
22 an extensive effort to prepare for
23 this deposition that included all
24 of the time that is at issue in

---

Page 472

1  the notice and subject to my
2  preparation.
3       MR. KENNEDY:  Thank you.
4       VIDEO TECHNICIAN:  The time
5  is 6:36 p.m. on November 20th,
6  2018.  Going off the record.
7  Ending today's videotape session.
8       - - -
9       (Whereupon, the deposition
10 concluded at 6:36 p.m.)
11      - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 473

1            CERTIFICATE
2
3
4       I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10
       Amanda Maslynsky-Miller
11     Certified Realtime Reporter
       Dated:  November 23, 2018
12
13
14
15
16
17      (The foregoing certification
18 of this transcript does not apply to any
19 reproduction of the same by any means,
20 unless under the direct control and/or
21 supervision of the certifying reporter.)
22
23
24

---

Highly Confidential - Subject to Further Confidentiality Review

Page 474

## INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 476

## ACKNOWLEDGMENT OF DEPONENT

I,_____, do hereby certify that I have read the foregoing pages, 1 - 472, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
MARK VERNAZZA          DATE

Subscribed and sworn
to before me this
_____ day of _____, 20____.

My commission expires:_____

_____
Notary Public

Page 475

- - - - - -
### E R R A T A
- - - - - -

PAGE  LINE  CHANGE/REASON

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

Page 477

## LAWYER'S NOTES

PAGE  LINE

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____