Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3    IN RE NATIONAL PRESCRIPTION  | MDL No. 2804
                                   |
 4    OPIATE LITIGATION            | Case No. 17-MD-2804
                                   |
 5    This Document Relates to:    | Hon. Dan A. Polster
                                   |
 6    The County of Summit, Ohio,  |
      et al., v.                   |
 7    Purdue Pharma L.P., et al.   |
      Case No. 17-op-45004         |
 8                                 |
      The County of Cuyahoga v.    |
 9    Purdue Pharma L.P., et al.   |
      Case No. 18-op-45090         |
10                                 |
      City of Cleveland, Ohio v.   |
11    Purdue Pharma L.P., et al.   |
      Case No. 18-op-45132         |
12                                 |
13                       - - -
14              Friday, December 7, 2018
15                       - - -
16         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
17                 CONFIDENTIALITY REVIEW
18                       - - -
19         Videotaped deposition of WILLIAM VERSOSKY,
      held at Foley & Lardner LLP, One Biscayne Tower,
20    2 Biscayne Boulevard, Suite 1900, Miami, Florida,
      commencing at 9:25 a.m., on the above date,
21    before Susan D. Wasilewski, Registered
      Professional Reporter, Certified Realtime
22    Reporter and Certified Realtime Captioner.
23                       - - -
24              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
25                   deps@golkow.com
```

```
 1    APPEARANCES:
 2       WEITZ & LUXENBERG, P.C.
         BY:   PAUL PENNOCK, ESQUIRE
 3             BURTON KING, ESQUIRE
         700 Broadway
 4       New York, New York 10003
         (212) 558-5526
 5       ppennock@weitzlux.com
         bking@weitzlux.com
 6       Representing Plaintiffs
 7
 8       FOLEY & LARDNER LLP
         BY:   KATY E. KOSKI, ESQUIRE
 9       111 Huntington Avenue
         Boston, Massachusetts 02199
10       (617) 342-4000
         kkoski@foley.com
11       Representing Anda, Inc., and the witness
12
13       REED SMITH LLP
         BY:   SUJEY S. HERRERA, ESQUIRE
14       1001 Brickell Bay Drive, Suite 900
         Miami, Florida 33131
15       (786) 747-0207
         sherrera@reedsmith.com
16       Representing AmerisourceBergen Corporation and
         AmerisourceBergen Drug Corporation
17
18
      APPEARANCES VIA TELEPHONE AND STREAM:
19
         WILLIAMS & CONNOLLY LLP
20       BY:   KATELYN ADAMS, ESQUIRE
         725 Twelfth Street, N.W.
21       Washington, D.C. 20005
         (202) 434-5239
22       kadams@wc.com
         Representing Cardinal Health, Inc.
23
24
25
```

```
 1    APPEARANCES VIA TELEPHONE AND STREAM:
 2    JONES DAY
      BY:  CASTEEL E. BORSAY, ESQUIRE
 3    325 John H. McConnell Boulevard, Suite 600
      Columbus, Ohio 43215
 4    (614) 281-3618
      cborsay@jonesday.com
 5    Representing Walmart
 6
 7    ARNOLD & PORTER KAYE SCHOLER, LLP
      BY:  CAITLIN MARTINI MIKA, ESQUIRE
 8    70 West Madison Street, Suite 4200
      Chicago, Illinois 60602-4231
 9    (312) 583-2300
      Representing Endo Health Solutions Inc.,
10    Endo Pharmaceuticals Inc., Par Pharmaceutical,  Inc.,
      Par Pharmaceutical Companies, Inc., f/k/a Par
11    Pharmaceutical Holdings, Inc.
12
13    COVINGTON & BURLING LLP
      BY:  WEISS NUSRATY, ESQUIRE
14    One CityCenter, 850 Tenth Street, NW
      Washington, DC 20001-4956
15    (202) 662-5518
      wnusraty@cov.com
16    Representing McKesson Corporation
17
18    MARCUS & SHAPIRA LLP
      BY:  PAUL MANNIX, ESQUIRE
19    One Oxford Centre, 35th Floor
      Pittsburgh, Pennsylvania 15219
20    (412) 471-3490
      pmannix@marcus-shapira.com
21    Representing HBC Service Company
22
   ALSO PRESENT:
23
      JEFF FLEMING, Videographer
24    CONNOR KENNEDY, Weitz & Luxenbreg
      BEN TRUAX, Weitz & Luxenbreg
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     - - -
 2                   I N D E X
 3                     - - -
 4  Testimony of:  WILLIAM VERSOSKY              PAGE
 5       DIRECT EXAMINATION BY MR. PENNOCK............  9
 6
 7                 E X H I B I T S
 8              (Attached to transcript)
 9  ANDA VERSOSKY      DEPOSITION EXHIBITS         PAGE
10  Exhibit 1    September 27, 2006 - DEA Letter     32
                 Anda_Opioids_MDL_0000540738 through
11               540741
12  Exhibit 2    February 7, 2007 DEA letter         32
                 Anda_Opioids_MDL_0000571720 through
13               571723
14  Exhibit 3    E-mail - Subject: Customer          43
                 Limitations by Controlled Substance
15               Chemical Family
                 Anda_Opioids_MDL_0000152299 through
16               152301
17  Exhibit 4    E-mail - Subject: OXYCODONE FAMILY  48
                 LIMITS REVIEW
18               Anda_Opioids_MDL_0000274353 through
                 274354
19
    Exhibit 5    Leadership Meeting Minutes -        52
20               March 17, 2009
                 Anda_Opioids_MDL_0000614431 through
21               614435
22  Exhibit 6    E-mail - Subject: CII Order: BARTELL  62
                 DRUG 46, Ship To: 490342, Over the
23               Limit, Status Closed
                 Anda_Opioids_MDL_0000077689
24
25
```

```
 1                   E X H I B I T S
 2            (Attached to transcript)
 3   ANDA VERSOSKY      DEPOSITION EXHIBITS          PAGE
 4   Exhibit 7    E-mail - Subject: Bi Mart - CSOS     71
                  roll out - Max Limit Request
 5                Anda_Opioids_MDL_0000077935 through
                  77939
 6
     Exhibit 8    Slide Presentation - Anda Overview   94
 7                Anda_Opioids_MDL_0000721153 through
                  721174
 8
     Exhibit 9    E-mail - Subject: New deck ready?    94
 9                Anda_Opioids_MDL_0000721151 and
                  721152
10
     Exhibit 10   E-mail - Subject: Tadek Inc.        108
11                Anda_Opioids_MDL_0000272169 through
                  272171
12
     Exhibit 11   E-mail - Subject: Sales            101
13                Anda_Opioids_MDL_0000618116
14   Exhibit 12   E-mail - Subject: Assured Pharmacy's 123
                  new Chief Compliance Officer
15                Anda_Opioids_MDL_0000078156 through
                  78158
16
     Exhibit 13   E-mail - Subject: Oxycodone CR 10 &  132
17                20mg from Ranbaxy
                  Anda_Opioids_MDL_0000110089
18
     Exhibit 14   Fax Promotion - Oxycodone CR 10 &    143
19                20 MG
                  Anda_Opioids_MDL_000011042
20
     Exhibit 15   E-mail - Subject: New Acct Request   152
21                for Wholesale Client
                  Anda_Opioids_MDL_0000610318
22
     Exhibit 16   Article - Judge Approves Consent     157
23                Decree Against Shamrock Medical
                  Solutions Group
24
25
```

```
 1                    E X H I B I T S
 2               (Attached to transcript)
 3   ANDA VERSOSKY     DEPOSITION EXHIBITS          PAGE
 4   Exhibit 17   E-mail - Subject: Remedy CSOS      159
                  Profile Related Question Pertaining
 5                to Anita's Account List: Sales for
                  accounts cut off from control
 6                Anda_Opioid_MDL_0000078673 and 78674
 7   Exhibit 18   E-mail - Subject: Controlled       169
                  Substance Training Materials
 8                Anda_Opioids_MDL_0000077289
 9   Exhibit 19   Slide Presentation - Controlled    169
                  Substances: Know Your Customer
10                Ando_Opioids_MDL_0000077290
11   Exhibit 20   E-mail - Subject: Chains           178
                  Anda_Opioids_MDL_0000105969 and
12                105970
13   Exhibit 21   E-mail - Subject: Controlled       195
                  Substance Query Questions
14                Anda_Opioids_MDL_000072880 through
                  725883
15
     Exhibit 22   Spreadsheet                        199
16                Anda_Opioids_MDL_0000647317
17   Exhibit 23   Spreadsheet                        202
                  Anda_Opioids_MDL_0000725057
18
     Exhibit 24A  Spreadsheet                        206
19                Anda_Opioids_MDL_0000725057
20   Exhibit 24B  Spreadsheet                        206
                  Anda_Opioids_MDL_0000725057
21
     Exhibit 25   E-mail - Subject: Controlled       209
22                Substance Sales
                  Anda_Opioids_MDL_0000728018 through
23                728020
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S

 2              (Attached to transcript)

 3   ANDA VERSOSKY      DEPOSITION EXHIBITS           PAGE

 4   Exhibit 26   E-mail - Subject: Rite Aid           215

                  Anda_Opioids_MDL_0000090003

 5

     Exhibit 27   Spreadsheet                          216

 6                Anda_Opioids_MDL_0000090004

 7   Exhibit 28   Slide Presentation - CAP -           221

                  Compliance Assistance Program

 8                Anda_Opioids_MDL_0000085420

 9   Exhibit 29   E-mail - Subject: Rite Aid           221

                  Presentation

10                Anda_Opioids_MDL_0000085419

11   Exhibit 30   Press Release                        230

                  Pfizer confirms merger discussions

12                with AstraZeneca

                  April 28, 2014

13

     Exhibit 31   Interim Report of the Broward County 234

14                Grand Jury

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                       - - -

 2              THE VIDEOGRAPHER:  We are now on the record.

 3      My name is Jeff Fleming.  I am a videographer for

 4      Golkow Litigation Services.  Today's date is

 5      December 7th, 2018.  The time is 9:25 a.m.

 6              This video deposition is being held in

 7      Miami, Florida, in the matter of National

 8      Prescription Opiate Litigation, MDL Number 2804,

 9      for the United States District Court, Northern

10      District of Ohio, Eastern Division.  The deponent

11      is William Versosky.

12              Counsel, please introduce yourselves for the

13      record.

14              MR. PENNOCK:  Paul Pennock, Weitz &

15      Luxenberg, for the plaintiffs.

16              MR. KING:  Burton King, Weitz & Luxenberg,

17      for the plaintiffs.

18              MS. KOSKI:  Katy Koski, Foley & Lardner for

19      Anda, Inc., and the witness, Mr. Versosky.

20              MS. HERRERA:  Sujey Herrera for -- from Reed

21      Smith for AmerisourceBergen Drug Corporation.

22              MS. KOSKI:  Folks on the phone, can you

23      identify yourselves?

24              MS. ADAMS:  I'm Katelyn Adams with Williams

25      & Connolly on behalf of Cardinal Health.
```

```
 1              MS. MARTINI MIKA:  Caitlin Martini Mika from

 2       Arnold & Porter on behalf of Endo Health

 3       Solutions, Inc., Endo Pharmaceuticals, Inc., Par

 4       Pharmaceutical, Inc., Par Pharmaceutical

 5       Companies, Inc., f/k/a Par Pharmaceutical

 6       Holdings, Inc.

 7              MR. MANNIX:  Paul Mannix with Marcus &

 8       Shapira on behalf of HBC Services.

 9              MS. BORSAY:  Casteel Borsay with Jones Day

10       on behalf of Walmart.

11              THE VIDEOGRAPHER:  Thank you.

12              The court reporter is Susan Wasilewski and

13       will now swear in the witness.

14              THE COURT REPORTER:  Sir, would you raise

15       your right hand?

16              Do you solemnly swear or affirm the

17       testimony you're about to give will be the truth,

18       the whole truth, and nothing but the truth?

19              THE WITNESS:  Yes.

20              THE COURT REPORTER:  Thank you.

21              WILLIAM VERSOSKY, called as a witness by the

22       Plaintiffs, having been duly sworn, testified as

23       follows:

24                     DIRECT EXAMINATION

25       BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Good morning, Mr. Versosky.  My name is Paul

 2  Pennock.  I'm going to have a lot of questions for

 3  you today.

 4       A.   Sure.

 5       Q.   If at any time you don't understand my

 6  questions, will you let me know?

 7       A.   Uh-huh.

 8       Q.   If you don't, I'm going to assume that you

 9  understood them.  Is -- can we have that agreement?

10       A.   Sure.

11       Q.   Where are you currently working?

12       A.   I'm consulting right now.  So -- I'm doing

13  consulting.

14       Q.   Are you with any particular employer, or are

15  you self-employed?

16       A.   I -- I have a -- I have an agree -- I'm

17  self-employed as a consulter.  I have an agreement

18  with ABC from a consulting standpoint.

19       Q.   Okay.  Are you working for or consulting for

20  any particular clients right now?  You mentioned --

21       A.   I -- AmerisourceBergen is a client.

22       Q.   Oh, ABC is AmerisourceBergen?

23       A.   Yes.  I'm sorry.

24       Q.   Okay.  Anyone else?

25       A.   Not at this point.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   And is that what you've been doing since you

2    left the employ of Anda?

3      A.   No, not really.  That's been probably the

4    last -- it's basically this year.  Prior to that, I

5    wasn't really doing anything.

6      Q.   You left Anda around April 2016; is that

7    right?

8      A.   That's correct.

9      Q.   And did you leave of your own accord or were

10   you asked to leave?

11     A.   I left of my own accord, but I did get a

12   package.

13     Q.   Okay.  So tell me how that worked.

14          MS. KOSKI:  Object to form.

15          THE WITNESS:  What's that?

16          MS. KOSKI:  You can go ahead.

17     A.   I'm sorry.

18          So there was kind of a leadership change at

19   Anda.  So Chip Phillips came in, replaced Al

20   Paonessa.  You know, with any leadership change, I

21   think he was looking to shake things up a little

22   bit.  For me, you know, I was kind of ready to move

23   on.  The fact that there was a new leader of Anda

24   sort of meant that there was no advancement possible

25   for me in that -- in that role, and so I kind of was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    done.

 2          So between Chip and I and him kind of

 3    figuring out how was he going to build his team

 4    going forward, I wasn't really willing or able to

 5    commit long-term.  So we worked out, you know, a

 6    deal where I would exit the company.  I kind of

 7    stayed a little longer than I would have liked, you

 8    know, to be able to transition things away, and he

 9    gave me a package on the way out.

10    Q.   Okay.  What was the package that they gave

11    you?

12    A.   There was a -- at that time, it was --

13    Pfizer was about to buy Allergan, and so there was a

14    standard package available.  And for me

15    specifically, I believe it was -- I think I got paid

16    for a year-and-a-half with, I think, a two-year

17    noncompete.

18    Q.   Anything else in the package?

19    A.   Within that year-and-a-half, any theoretical

20    stock that was remaining was -- was, you know,

21    vested as if I was an employee.

22    Q.   Sir, you worked for a -- well, let me back

23    up.

24          You are William Versosky, correct?

25    A.   I am, yes.  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And you got out of college in 1999; is that

 2   right?

 3        A.   I believe so, yeah.

 4        Q.   And you went to work after college for a

 5   couple of different places.  But in 2003, you ended

 6   up working for a company known as Anda; is that

 7   right?

 8        A.   Yes.  Yes.

 9        Q.   And that's A-n-d-a, right?

10        A.   Yes.

11        Q.   And when you -- you went to work for Anda,

12   tell us what that company did for their business in

13   2003?

14        A.   Sure.  So Anda is a or was a distributor of

15   predominantly generic pharmaceuticals to, again,

16   back then, predominantly independent pharmacies.  So

17   they were a wholesaler or a middle man buying

18   product from generic manufacturers and then

19   reselling it to mom-and-pop pharmacies.

20        Q.   Now, you were at Anda for about almost 13

21   years, right?

22        A.   Yes.  Yes.

23        Q.   And in -- well, about two-and-a-half years

24   after you were there, you were first promoted; is

25   that right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Correct.  Yeah.

 2      Q.   So tell us what you did first and then what

 3   you did once you were promoted.

 4      A.   What -- so what I was brought in to do and

 5   what I did first was I was one of the negotiators

 6   with generic manufacturers for buy-side contracts.

 7   So we would, you know, reach out to the

 8   manufacturers and kind of negotiate our price on any

 9   generic drug.

10           The promotion -- I -- I believe it was an

11   in-line promotion, honestly.  Am I able to -- are

12   you able to share a copy of my résumé there, or no?

13      Q.   I can give you a copy; but you started out,

14   as I understand it, as a director of purchasing?

15      A.   Correct.

16      Q.   Right?

17      A.   Yes.

18      Q.   And then you went and became senior director

19   of purchasing --

20      A.   Yeah.

21      Q.   -- and trade relations, right?

22      A.   Yes.

23      Q.   And that was in -- so you started out in

24   November '03, you were promoted in May of 2006?

25      A.   Yes.
```

```
 1        Q.    Right?

 2        A.    Yes.

 3        Q.    And then in June of 2007, you were again

 4   promoted to senior director program development?

 5        A.    Yes.

 6        Q.    And then in February 2008, you were promoted

 7   again, but now you became vice -- a vice president?

 8        A.    Yes.

 9        Q.    And so you became vice president for

10   national accounts at Anda, right?

11        A.    Correct.  Yes.

12        Q.    And national accounts dealt primarily with

13   the major chain pharmacies, right?

14        MS. KOSKI:  Object to form.

15        A.    Yeah.  That -- that was the goal, right?

16   Back then, when that promotion occurred, they really

17   didn't have a lot of business with kind of larger

18   customers.  Over time it evolved into that.

19             At that time when I -- when I was promoted,

20   they were really selling to -- we'll call it very

21   small chains, retail independent buying groups, and,

22   you know, maybe some long-term care accounts.

23        Q.    So when you were promoted to vice president

24   for national accounts, one of the things you wanted

25   to do was to expand Anda's business, right?
```

Highly Confidential - Subject to Further Confidentiality Review

1     A.   Yes.  Yes.

2     Q.   And you wanted to expand their business

3    specifically into major retail chains of

4    pharmacies --

5     A.   We wanted to find larger customers for sure.

6     Q.   Okay.  And the last promotion that you got

7    was in May of 2010, right?

8     A.   Yes.

9     Q.   And at that time, you became vice president

10   for all of sales and marketing, right?

11    A.   Yes.  In -- it's interesting in title,

12   right?  So what happened there was there was a

13   gentleman who was running the marketing department

14   who moved into purchasing.  So Marc Falkin was

15   running marketing.  He moved into purchasing.  I

16   absorbed the marketing department, and that title

17   change was reflective of me now running national

18   accounts and marketing.

19        There was a separate gentleman who ran sales

20   for what we called inside sales or telesales.

21    Q.   Okay.

22    A.   So I -- the sales to the mom-and-pop

23   pharmacies was still managed separately.

24    Q.   Okay.  But nevertheless, in May of 2010, you

25   received a promotion?

Highly Confidential - Subject to Further Confidentiality Review

1     A.   Yes.  Yes.  Yes.

2     Q.   Okay.  And it was a promotion to handle and

3   be responsible not just for national accounts, but

4   for all sales and marketing?

5     A.   No.  No.  That's what I was just trying to

6   clarify for you.

7     Q.   There was someone else that did telesales?

8     A.   There was someone else that did telesales.

9     Q.   Okay.  So other than telesales, you were in

10  charge of sales?

11    A.   Correct.  But from -- as a point of

12  clarification, owning the marketing department, I

13  did have interaction with the telesales.  I wasn't

14  responsible for their number or for their management

15  of their people or anything like that.

16    Q.   You had indicated on your résumé that you

17  were part of the leadership team at Anda?

18    A.   Yes.

19    Q.   Right?

20    A.   Yes.

21    Q.   And that meant that you were interacting

22  with the -- with whom?  The other VPs?

23    A.   Yeah.  Yeah, it was the other VPs, the other

24  kind of functional heads of departments.

25    Q.   Okay.  So would you agree that as of 2010,

Highly Confidential - Subject to Further Confidentiality Review

1    you had risen to the level of -- at Anda where you

2    were one of the people helping to run the company?

3        A.   Sure.  I think that's a fair assessment.

4        Q.   Now, when you got to Anda in 2003, did you

5    at any time in your initial role with Anda have

6    involvement with the purchasing of opiates?

7        A.   Yes.

8        Q.   Okay.  And what do you recall about

9    purchasing of opiates in 2003 that you were

10   responsible for?

11       MS. KOSKI:  Object to form.

12       A.   Yeah, I don't know that I recall anything

13   specific to the opiates with the exception of, you

14   know, obviously they were controlled substances, you

15   know.  But from a -- the role that I managed in --

16   on the purchasing team was the negotiations role,

17   trying to figure out what was the cost we were going

18   to pay from the manufacturer.  So we were, you know,

19   bidding those products, those manufacturers against

20   each other, trying to get lower costs.

21       Q.   So when you went there in 2003 and you were

22   bidding those manufacturers to get lower costs for

23   opiates, you mentioned that opiates were a

24   controlled substance.

25       A.   Uh-huh.

1    Q.   So you knew that?

2    A.   Yes.

3    Q.   And did you know what that meant?

4    A.   Yes.

5    Q.   And you understood that it -- that most of

6    the opiates at that time at least were -- we'll call

7    it -- can we call them CIIs?

8    A.   Yes.

9    Q.   And CIIs means that the only more controlled

10   opiate would -- or the only more controlled

11   substance would be substances nobody can sell

12   legally, right, CIs?

13        MS. KOSKI:  Object to form.

14   A.   Yes.

15   Q.   Right.  And so the CIIs were the most

16   controlled substances that could be sold legally?

17   A.   Yes.

18        MS. KOSKI:  Object to form.

19   Q.   Now, at the time that you first went --

20   became involved in any way with purchasing opiates,

21   did you -- were you provided any training with

22   respect to opiates and their use?

23   A.   I don't recall receiving any training, no.

24   Q.   Did you do any reading or educate yourself

25   with respect to opiates?

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   I would say yes.  I don't know that anything

 2   specific, but I had been in the -- in the

 3   pharmaceutical industry for some time at the point

 4   when I went to Anda, so I was generally aware.

 5      Q.   You'd been in the industry.  You've worked

 6   as a financial consultant for a company --

 7      A.   So --

 8      Q.   -- a pharmacy for about a year and then you

 9   went to work for another --

10      A.   Well, the -- so the -- the interesting part

11   is, as you read my résumé literally there, the -- I

12   worked for PCS Health Systems kind of through --

13   from high school through when I went to Anda.  That

14   company was bought and sold several times, similar

15   to Anda, where I think the company you're

16   referencing there was one of the owners; and my role

17   as a financial analyst on that team was, you know,

18   part of their buying team.  So it was as kind of my

19   first entry into the purchasing side of the

20   pharmaceutical business.

21      Q.   Okay.  So opioids were not a mystery to you

22   when you went to Anda?

23      A.   No.

24      Q.   And when you went to Anda, you understood

25   that opioids could be addictive?

```
1              MS. KOSKI:  Object to form.

2       A.   Yes.  I would say, though, from a

3    clarification standpoint, I think, you know, CIIs as

4    opposed to opioids, I don't know if those are the

5    opioids specifically.  I think there are other --

6       Q.   Oh, okay.

7       A.   -- controlled substances --

8       Q.   That's fine.  You -- did you understand when

9    you went to Anda in 2003 that CII opioids could be

10   addictive?

11      A.   Sure.  Yes.

12              MS. KOSKI:  Object to form.  Excuse me for a

13           second.  You guys -- just a little pause if I

14           need to object.

15              THE WITNESS:  Okay.

16              MS. KOSKI:  Thank you.

17      Q.   Okay.  So we -- from the time that you got

18   there, you were initially involved -- withdrawn.

19              I'll tell you that I'm obviously going to

20   focus my questioning today on opioids, and you may

21   have been doing other --

22      A.   Yeah.

23      Q.   -- purchasing for other pharmaceuticals.

24   You understand that, right?

25      A.   Yes.
```

1    Q.   Okay.  But I'm going to be talking about

2    opioids.

3         So one of the things you were doing when you

4    got there in '03 was you were involved in the

5    purchasing of opioids.  You already mentioned that,

6    right?

7    A.   Uh-huh.

8    Q.   Correct?

9    A.   Yeah.

10   Q.   And you, from that point in time, until when

11   you left in April of 2016, throughout that entire

12   course, in one -- whatever role you were in, you had

13   some activity with regard to opioids, correct?

14        MS. KOSKI:  Object to form.

15   A.   Yes.

16   Q.   Okay.  In other words, if you were maybe in

17   some early on, you were involved in purchasing

18   opioids, right?

19   A.   Uh-huh.

20   Q.   Correct?

21   A.   Yes.

22   Q.   And then -- and then subsequently, you

23   became involved in the sales of opioids, right?

24   A.   Yes.

25   Q.   And you became involved in the marketing of

```
 1    opioids, right?

 2         MS. KOSKI:  Object to form.

 3    A.   I don't know that we -- we did -- no, we

 4    didn't market opioids.  I guess I think of

 5    marketing, when you say "marketing," as, you know,

 6    advertising or something like that.

 7    Q.   So when you were there, at no time did you

 8    do any advertising for opioids?

 9    A.   The -- I would say -- I can really only

10    speak to my time when I took over marketing and

11    going forward --

12    Q.   Uh-huh.

13    A.   -- and I believe the answer to that is we

14    did not.  What we would promote was -- we were

15    promoting programs related to trying to get

16    customers to purchase their controlled substances

17    using Anda as a secondary or option to buy their

18    controlled substances through us.

19    Q.   Okay.  So -- so with respect to opioids,

20    from the time you took over being VP of sales, you

21    were involved, of course, in the sale of opioids,

22    right?

23    A.   Yes.

24    Q.   And you did not -- according to you, you did

25    not market opioids?
```

```
 1            MS. KOSKI:  Object to form.

 2       Q.   Right?

 3       A.   Correct.

 4       Q.   But you were involved in promoting to

 5  customers opioids for purchase based on essentially

 6  pricing or other benefits you might confer on then,

 7  right?

 8            MS. KOSKI:  Object to form.

 9       A.   Not necessarily pricing; but again, as part

10  of a larger CII program, yes.

11       Q.   What do you mean by "as part of a larger CII

12  program"?

13       A.   Again, my team wasn't necessarily trying to

14  sell an individual product.  It wasn't really a

15  transactional sell.  It was a program-based sell.

16  So we were going to large customers saying, you

17  know, not -- you know, "Will you buy product X from

18  us."  It was more, "Will you buy" -- "will you take

19  your control volume and put a portion of that

20  through Anda as opposed to through someone else."

21       Q.   So will you take -- so when you were --

22  withdrawn.

23            MR. PENNOCK:  One second.  I want to ask the

24       videographer.  Are you having any problem with

25       the buttons, his buttons on his jacket scratching
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      on the table?
 2              THE VIDEOGRAPHER:  No.
 3              MR. PENNOCK:  You're not picking that up?
 4              THE VIDEOGRAPHER:  I heard a -- I heard one
 5      scratch.
 6              MR. PENNOCK:  Okay.  Let me know if it
 7      becomes -- I don't want that playing through the
 8      whole tape.
 9              THE VIDEOGRAPHER:  Okay.
10              MR. PENNOCK:  Okay.
11              THE WITNESS:  I'll try to be cognizant of
12      that.  Sorry.
13              MR. PENNOCK:  That's okay.  It's not your --
14      not your issue.
15      BY MR. PENNOCK:
16      Q.   But -- okay.  So you would certainly be
17      involved in promoting CIIs to customers, right?
18      A.   Yes.
19              MS. KOSKI:  Object to form.
20      A.   Yes.
21      Q.   But you're saying that at no time were you
22      involved in promoting a particular opioid to a
23      customer.  Is that what you're saying?
24      A.   Look, I -- it's hard to say "at no time,"
25      like it never happened, but that wasn't what our
```

Highly Confidential - Subject to Further Confidentiality Review

1    team did.  Our team wasn't a transactional sell an

2    individual product team.  It's not -- that wasn't

3    what our goal was out there.

4        Q.   What about --

5        A.   Our goal was --

6        Q.   Okay.

7        A.   -- selling larger programs.  And, yes,

8    opioids would have been part of a CII program, and

9    we were actively promoting CII programs to

10   customers.

11       Q.   What about promoting not a particular

12   opioid, but opioids as a group?

13       A.   I don't recall that that ever happened.

14       Q.   Okay.  So from 2003 to 2012 -- I'm sorry.

15   Withdrawn.

16            From 2003 till April 2016, I think we've

17   established you did have some activity with -- in

18   your company with respect to opioids throughout that

19   entire time period; is that correct?

20       A.   Yes.

21       Q.   Okay.  Now, during -- from 2003 to 2016,

22   when you left, there was an e-mail system that

23   existed at Anda, correct?

24       A.   Yes.

25       Q.   Did you have a particular practice of not

Highly Confidential - Subject to Further Confidentiality Review

```
 1     using that e-mail system, you yourself?

 2        A.   No.

 3        Q.   Okay.  Did you have a particular practice of

 4     regularly deleting your e-mails?

 5        A.   No.

 6        Q.   And you --

 7        A.   I was like most people in that I used my

 8     e-mail sort of as my filing system.  I think there

 9     were -- over the course of, you know, 13 years, I

10     believe there were different times where the e-mail

11     system changed or, you know, I think they -- towards

12     the end of my time there, I think they started, you

13     know, allowing you almost -- only so much space and

14     things like that that would potentially purge some

15     e-mails, but --

16        Q.   Okay.  And did you use your e-mail like many

17     people, to speak with people about issues?

18        A.   Yes.

19        Q.   So would it surprise you to learn that

20     for -- from 2003 to 2016, when you left, from when

21     you started until when you left, there are only

22     approximately 167 e-mails with your name on it as a

23     "from," a "to," or a "CC" --

24             MS. KOSKI:  Object to form.

25        Q.   -- that relate in some way to opioids, 167?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  I'm going to object.

 2         Hold on for a second.

 3              THE WITNESS:  Yeah.

 4              MS. KOSKI:  I think that --

 5              MR. PENNOCK:  Excuse me?

 6              MS. KOSKI:  This is an issue that if you had

 7         an issue with those documents and you had a

 8         question about them, you could have asked counsel

 9         in advance.  I don't -- Mr. Versosky doesn't work

10         at the company anymore.

11              We, you know, obviously as part of the

12         discovery process --

13              MR. PENNOCK:  Look, I'm going -- look.  The

14         protocol is clear as to speaking objections.  If

15         you have an objection, okay?

16              MS. KOSKI:  It's also an improper question.

17              MR. PENNOCK:  Well, I don't think it's

18         improper at all.

19              MS. KOSKI:  You're asking about something he

20         doesn't know about.

21              MR. PENNOCK:  That's fine.  The judge can

22         decide that and strike it.

23    BY MR. PENNOCK:

24         Q.  Let me rephrase the question.

25         A.  Sure.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   Okay.  So --

2       A.   I -- I don't think --

3       Q.   You get what I'm driving at?

4       A.   Yeah.  I don't think you need to rephrase

5   the question.

6       Q.   Okay.

7       A.   I -- you know, does it surprise me there is

8   only 167 with me on them?  I think as I -- as I

9   described to you, we were more looking at programs,

10  not necessarily opioids.  It is a long time, 167, I

11  mean, that's --

12      Q.   Well, it was -- it was even -- let's just

13  say --

14           MR. PENNOCK:  We're getting the buttons on

15      the video.

16           THE WITNESS:  Want me to try to keep my arms

17      below the table?

18           MR. PENNOCK:  Well, I don't -- I want you to

19      be comfortable, but maybe there is something -- I

20      don't know how to solve it.

21  BY MR. PENNOCK:

22      Q.   Okay.  Let's say if from -- if I told you

23  from May 2003 to when you left in April 2016 --

24      A.   Sure.

25      Q.   -- there were only 167 e-mails that you sent
```

1    that related to opioids, that would surprise you,

2    wouldn't it?

3         MS. KOSKI:  Object to form.

4    A.    Yeah, I don't -- I don't know.  Again, I --

5    thinking about, like, the purchasing role, I don't

6    know that we were speaking about opioids

7    specifically, you know, anywhere.  We would have

8    been speaking about a product contract, a

9    manufacturer -- a new contract happening with a

10   manufacturer that may or may not have been selling

11   opioids.

12        On the sales side, we wouldn't have been

13   speaking specifically about opioids.  We would have

14   been speaking related to a controlled substance

15   program or a customer as opposed to the products.

16   Q.    So what you're telling us is that if you

17   sent only 167 e-mails that related to opioids

18   between the time you started in 2003 to the time you

19   left in April 2016, that's not something that seems

20   unusual to you?

21        MS. KOSKI:  Object to form.

22   A.    I think it's possible.  I think it's

23   possible.  167 over, you know, 13 years, what is

24   that, 10 a year.

25   Q.    You do know that we're relying upon the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    truth of your answers here today, don't you?

 2    A.   I do.

 3         MS. KOSKI:  Object to the form.

 4    A.   I do.  I'm trying -- I'm trying to be --

 5    Q.   Okay.

 6    A.   -- truthful.

 7         MS. KOSKI:  And, again, Paul, if you want to

 8    off the record ask us about the number of

 9    documents that he doesn't know anything about,

10    you can ask us about it.

11    A.   My assumption is you have all the data, so

12    I --

13    BY MR. PENNOCK:

14    Q.   So at some point -- well, withdrawn.

15         So it -- I want to understand and be clear.

16    At no time before you left the company did you make

17    any effort to delete e-mails from you that related

18    to opioids?

19    A.   No.

20    Q.   Are you familiar with or you've heard of

21    the -- you know, the DEA letters that came from a

22    DEA agent in 2006 and 2007 regarding opioids?

23    A.   Came to --

24    Q.   To the company.

25    A.   Not specifically, no.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  Let's mark this as Exhibit 1,

 2      and we'll mark this one as Exhibit 2.

 3              I'll give you copies in just a second.

 4              (Anda-Versosky Exhibit 1 was marked for

 5      identification.)

 6              (Anda-Versosky Exhibit 2 was marked for

 7      identification.)

 8              MS. KOSKI:  Thank you.

 9              Which one did you hand me?  Is that 1 or 2?

10      BY MR. PENNOCK:

11          Q.  Sir, we've marked as Exhibit 1 to your

12      deposition a document that appears to be from U.S.

13      Department of Justice Drug Enforcement

14      Administration.

15          A.  Uh-huh.

16          Q.  It's dated September 27th, 2006, right?  Do

17      you see that?

18          A.  I do.

19          Q.  Okay.  And then we've marked as Exhibit 2 to

20      your deposition a document that also appears to be

21      from the U.S. Department of Justice Drug Enforcement

22      Administration dated February 7th, 2007, right?  Got

23      that?

24          A.  I do.

25          Q.  And if you look at the last page of both of
```

1    these exhibits, a Drug Enforcement Administration

2    deputy assistant administrator Joseph T. Rannazzisi

3    is the signatory.  Do you see that?

4        A.   I do.

5        Q.   All right.  Have you ever seen these

6    documents before?

7        A.   Not that I can recall.

8        Q.   Have you ever seen them reported on in the

9    media?

10       A.   Not that I can recall.

11       Q.   When you -- back in -- let's take the first

12   one in 2006, September 2006.  When -- did anyone

13   ever discuss this communication with you at that

14   time?

15       A.    Not that I remember.  In 2006, I believe I

16   was still in my role in purchasing, so I wasn't on

17   the leadership team.  At the point when I got to the

18   leadership team, I would have probably, you know,

19   had more visibility to something like this; but at

20   that point, I don't believe I did.

21       Q.   So when you got to the leadership team, you

22   still don't recall these being brought to your

23   attention?

24       A.   No.

25       Q.   And do you recall any discussion about the

1    DEA's communication to the company regarding what

2    the company should be doing and not doing?

3        A.    Sure.

4              MS. KOSKI:   Object to form.

5        Q.    You do recall that?

6        A.    Yes.

7        Q.    Okay.  Let's look at the 2007 letter.

8        A.    It's Number 2?

9        Q.    Yes.  If you might, feel free to read any

10   aspect of the letter that you want, but I wanted to

11   direct your attention to the next-to-last page.

12   It's Page 3.  The pages are noted in the upper

13   left-hand corner.

14             MS. KOSKI:   And you should take your time to

15        read whatever portion you think you need to.

16       A.    Uh-huh.

17       Q.    Okay.  And I've highlighted here -- and

18   that's my highlight -- a line I'd like to read to

19   you.  Tell me if I'm reading this correctly:  "A

20   distributor seeking to determine whether a

21   suspicious order is indicative of diversion of

22   controlled substances to other than legitimate

23   medical channels may wish to inquire with the

24   ordering pharmacy about the following."

25             Do you see that statement?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    I do.

2      Q.    Okay.  And then it goes on to list 10

3  different potential inquiries from a pharmacy.  Do

4  you see that?

5      A.    I do.

6      Q.    Okay.  Take a minute to read those 10,

7  please.

8      A.    All right.

9      Q.    Thank you.

10          When you became vice president for national

11  accounts in 2008, February 2008, did you have any

12  understanding as to the suggestions made by the DEA

13  in this -- in these 10 numbered points here?

14          MS. KOSKI:  Object to form.

15      A.    Yeah, I don't know that I knew that they

16  were specifically from this; but these are very

17  consistent with the things that our compliance team

18  was looking at or requiring of, you know,

19  salespeople to talk to their customers about.

20      Q.    And in order for the compliance team to

21  effectively be in line with what the DEA wanted, the

22  salespeople would have to know, right?

23          MS. KOSKI:  Object to form.

24      A.    Yes.

25      Q.    So in other words, the salespeople are sort

Highly Confidential - Subject to Further Confidentiality Review

```
 1    of where the rubber meets the road on much of the

 2    compliance with what the DEA may have directed,

 3    correct?

 4         MS. KOSKI:  Object to form.

 5    A.   Yes and no.  All right.  So it's

 6    interesting.  I would say the salespeople had a --

 7    kind of a general understanding; but the -- their

 8    role was to collect data and pass it to compliance

 9    who had, you know, full authority to make a decision

10    of yes or no if we were going to sell a customer.

11    Q.   Did you find when you got to this position

12    of director of -- sorry, vice president of national

13    accounts, that the salespeople were acting with

14    concern regarding opioids?

15         MS. KOSKI:  Object to form.

16    A.   My -- I would say my short answer is not

17    necessarily, but, again, that's only because they

18    weren't actively, you know, promoting opioids.  You

19    know, the -- they were out promoting programs to

20    customers.

21         And one other point of clarification.  When

22    you -- when you speak to the sales team, the team

23    that I'm responding on behalf of would be the

24    national account team, which was a, you know, I

25    think 8- to 10-person team at any given time, not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    the larger 150-person telesales floor.

 2        Q.   Tell me what you mean when you say they were

 3    not actively promoting opioids.

 4            MS. KOSKI:  Object to form.

 5        A.   Yeah.  So "actively promoting opioids"

 6    meaning it's not like there was a program out there

 7    where we were trying to say, "Buy all your opioids

 8    from us."  You know, to my recollection, our only

 9    promises were related to, "Buy your controlled

10    substances from us," unless there was, you know,

11    some arrangement between a manufacturer and a

12    customer.

13        Q.   What percentage of your controlled

14    substances in 2008 were opioids versus other

15    controlled substances?

16        A.   I don't know the answer to that.

17        Q.   Did you know it back then?

18        A.   No.  Probably not at the beginning, but over

19    time I probably would have, you know, maybe a few --

20        Q.   Are you able to estimate for me what that

21    percentage was?

22        A.   If I were to take a guess, may -- you said

23    opioids, which I would guess --

24            MS. KOSKI:  Object to form.  Don't guess.

25        Q.   I'm trying to assess if you're only out
```

```
 1    promoting CIIs.

 2       A.    Sure.

 3       Q.    But if opioids were 99 percent of your CIIs,

 4    then you're out promoting opioids, right?

 5             MS. KOSKI:   Object to form.

 6       A.    If -- if that's a case and you know that

 7    answer, then yes, I'm wrong on that.   I -- my

 8    assumption is there are other CIIs outside of

 9    opioids, but --

10       Q.    There are.

11       A.    Yeah.

12       Q.    And I'm just giving you an example and

13    that's why --

14       A.    Sure.

15       Q.    So you say you were not out actively

16    promoting opioids, right?

17       A.    Yes.

18       Q.    That's your testimony?

19       A.    Yes.

20       Q.    All right.  But you also say you don't know

21    what the percentage of opioids was of the CII

22    programs you were promoting, correct?

23       A.    Correct.

24             And when you asked would I have known that

25    number then, I don't know that I would have known
```

```
 1    that number.  I would have known the number of

 2    controlled substances overall versus, you know, like

 3    the total sales of the -- you know, total sales

 4    versus controlled sales; and that was probably, you

 5    know, that was low, 10 percent maybe.  I don't know.

 6        Q.   So when you became vice president for

 7    national accounts, you did not undertake any steps

 8    to understand what the percentage of CIIs,

 9    controlled substances, were opioids?

10        A.   No.

11        Q.   And that's -- the same is true when you

12    became vice president for sales and marketing, you

13    did not undertake to ascertain what percentage of

14    overall controlled substances sales were opioid

15    sales?

16        A.   I never looked at it that way, no.

17        Q.   At some point, the Anda company had

18    threshold limits that they set for purchasers of

19    opioids, right?

20        A.   Correct.

21             MS. KOSKI:  Object -- object to form.

22        Q.   And do you know what that limit was?

23        A.   No.

24        Q.   So I'd like to understand this.  So you --

25    do you recall that the company set a benchmark
```

1    threshold back in 2007 to permit customers to

2    purchase up to 5,000 dosage units of opioids per

3    month?

4         MS. KOSKI:  Object to form.

5    A.   Yeah.  So it sounds familiar.  I would say

6    again, 2007 was kind of -- you know, I was sort of

7    in purchasing.  I don't -- I didn't have as much

8    broad experience to what else was happening; but it

9    sounds familiar, yes.

10   Q.   Sir, you -- you are aware that there is

11   something out there called "the opioid crisis" in

12   this country?

13        MS. KOSKI:  Object to form.

14   Q.   Aren't you?

15   A.   Yes.

16   Q.   And you are aware that it is -- there's data

17   that as many as 200,000 people have died from opioid

18   overdoses, right?

19   A.   Yes.

20        MS. KOSKI:  Object to form.

21   Q.   And you are aware that there are

22   allegations, to say the least, that much of the

23   opioids crisis is generated through the use of

24   prescription opioids, right?

25        MS. KOSKI:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1       A.   Yes.
 2       Q.   So the reason I ask this question is that
 3   you -- it seems that you've not -- well, let me
 4   withdraw that.
 5            You -- at what point did you become familiar
 6   with those assertions that are out there in the
 7   world regarding the number of people that have died,
 8   the fact that there is an opioid crisis, the fact
 9   that it seems to have substantially got going
10   because of prescription opioids?  When did you first
11   become aware of all that?
12            MS. KOSKI:  Object to form.
13       A.   Yeah, I think, you know, sort of as with
14   everything else, the visibility to a situation like
15   that grew over time, right?  So if you want to judge
16   2000 based on, you know, today's understanding of
17   the -- of the issue, it's -- that's challenging.
18   You know, all I can tell you is related to 2007, I
19   was not, you know, really that big of a deal in the
20   Anda organization as far as seeing other things.
21            Would I have been aware of that?  Very
22   possibly I would have been aware of that.  I don't
23   recall that limit specifically.  Over time the
24   limits, you know -- your initial question related to
25   do you remember what the limit was.
```

 1          The limits were, I believe, placed by a

 2    customer, so I don't know that there is any specific

 3    answer to that with the exception of potentially if

 4    that was the first limit that was placed before my

 5    knowledge, then maybe there was.

 6        Q.   Yeah.  Well, you get what I'm driving at.  I

 7    mean, have you -- have you at any time since you --

 8    let's just say since you left the company sat back

 9    and thought through in your head how things

10    progressed with respect to your involvement with the

11    promotion of controlled substances at Anda and how

12    it may have contributed to this crisis?

13          MS. KOSKI:  Object to form; mischaracterizes

14      testimony.

15        Q.   Have you thought about that?

16        A.   Of course.  Yeah.  My -- you know, the

17    interesting thing -- and I'm sure you'll be talking

18    to other people from Anda -- I think we felt we had

19    a responsibility, and we were always trying to be

20    cautious.

21        Q.   Okay.

22        A.   And I'll say from a sales standpoint, you

23    know, the feedback we would receive from customers

24    is that we were always, you know, more restrictive

25    than, you know, anybody else they were buying from.

Highly Confidential - Subject to Further Confidentiality Review

1    And that's -- you know, our compliance team was

2    tough.  I feel like we had good, stringent policies.

3        Q.   Sir, back at the time that you were with

4    Anda, is it your view that you -- you and Anda

5    recognized that you had a responsibility with

6    respect to opioids?

7            MS. KOSKI:  Object to form.

8        Q.   And is it your view that back at the time,

9    that you and those under you and the company was

10   trying to be cautious with respect to opioids?

11       A.   Yes, with all controls.

12       Q.   With all controls as well?  Okay.

13           (Anda-Versosky Exhibit 3 was marked for

14   identification.)

15           MR. PENNOCK:  Could you please mark this as

16       Exhibit 3 to Mr. Versosky's deposition.

17           MS. KOSKI:  Counsel, just as a matter of

18       practice, can I get the document from the witness

19       so just in case -- I don't expect you're going to

20       give him something of -- objectionable; but just

21       before he sees it, if I can see it, it would be

22       helpful, just as a matter of procedure?

23           MR. PENNOCK:  Oh, that's -- that's fine.

24       Yeah.  Of course.  Just remind me.

25   BY MR. PENNOCK:

1      Q.   Sir, I've marked as Exhibit 3 to your

2   deposition an e-mail thread.  The top e-mail is

3   dated Thursday, July 24, 2008.  Do you have that?

4      A.   I do.

5      Q.   Okay.  And I will tell you that I don't

6   believe you were on this e-mail thread from what I

7   can tell.  Okay?

8      A.   Yes, I see that.

9      Q.   So in case you were wondering?

10     A.   Yeah.

11     Q.   I don't think you were.  All right.

12          But you know who Michael Cochrane was?

13     A.   Yeah.  Michael ran compliance.

14     Q.   He ran compliance, meaning that Michael

15   Cochrane ran that part of the Anda business that was

16   in charge of making sure that the -- whatever you

17   were doing with controlled substances was compliant

18   with the regulation and directives from the

19   government?

20          MS. KOSKI:  Object to the form.

21     A.   Choosing which --

22     Q.   Fair statement?

23     A.   -- which customers we were willing to sell

24   controls to or not, yes.

25     Q.   Okay.  So --

Highly Confidential - Subject to Further Confidentiality Review

1      A.   And Brian Witte ran the -- that he was the

2   other lead of sales that ran the larger telesales

3   group.

4      Q.   Okay.  And incidentally, what was the

5   telesale -- what did the telesales people do?

6      A.   So that -- that's the -- that's the basic of

7   what Anda's business is, is that they call

8   mom-and-pop pharmacies and try to sell them

9   products.

10      Q.   Okay.  All right.  Well, could you turn to

11   the third page of this Exhibit 3, please?

12      A.   Sure.

13      Q.   And for the record, I'm going to read the

14   starting Bates number.  This is

15   Anda_Opioids_MDL_0000152299.

16          MR. PENNOCK:  Do I have to do that every

17      time?

18          MS. KOSKI:  That's the cover page?

19          MR. PENNOCK:  That's the front first page.

20          MS. KOSKI:  I will -- if you want a

21      stipulation, that as long as that's the prefix of

22      the document, you can use some shorthand of the

23      numbers at the end.  That's fine with me.

24          MR. PENNOCK:  That would be great.  I'd

25      rather not to have to read them at all.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            MS. KOSKI:  Yeah.  Obviously, if it doesn't

 2       have that prefix, we should say something.

 3            MR. PENNOCK:  Okay.  Thank you for that.  So

 4       I'll just read the digits the next time.

 5            MS. KOSKI:  That's fine.

 6    BY MR. PENNOCK:

 7       Q.   Okay.  And this document ends at 301.

 8            Okay.  Could you -- do you see that third

 9    page?

10       A.   I do.

11       Q.   Have you had an opportunity to read that?

12       A.   I haven't, no.

13       Q.   Okay.  Please do that.

14       A.   Okay.

15       Q.   Thank you, sir.

16            Reading that, does that refresh your

17    recollection as to the 5,000 dosage unit limit per

18    month that I asked you about earlier?

19            MS. KOSKI:  Object to form.

20       A.   Again, I'm -- I feel like I'm aware of that.

21    Specifics, not really.

22       Q.   You're not really aware of it as we sit here

23    today, but you're not sure what your awareness was

24    going back when you were at the company?

25       A.   I would say I feel like I remember that this
```

 1   was happening; but again, I, you know, like, changes

 2   in this and kind of that time frame, I mean, I

 3   just -- I was more focused on the national account

 4   side and kind of launching that than what was really

 5   happening on the telesales floor.  But, yes, I guess

 6   I have some cursory knowledge of this.

 7       Q.   Okay.  Well, so you -- with respect to

 8   selling to national chains --

 9       A.   Yeah.

10       Q.   -- or large chains, you certainly still

11   needed to be aware of any dosage unit limit that

12   individual stores for those chains might have,

13   right?

14       A.   Yes.

15       Q.   And you needed to be aware of that because

16   once -- well, let's -- let me rephrase.

17           You would -- you were responsible at one

18   point for getting these large chains to become Anda

19   customers, right?

20       A.   Yes.

21       Q.   And part of being an Anda customer is you

22   wanted to promote to them a CII program --

23       A.   Yes.

24       Q.   -- controlled substances program, right?

25       A.   Yes.

1     Q.   But part of that is each of the individual

2   stores for the chain had to comply with the --

3   whatever limits were set for the stores, right?

4     A.   Yes.

5          MS. KOSKI:  Object to the form.

6     A.   But again, you know, to my clarification

7   earlier, you know, like 2008, we didn't really have

8   big business there, you know.  It evolved over time,

9   you know.  So the thought that a large chain was

10   working with us in 2008, they weren't, right.

11          But I would say generally, you know,

12   you're -- generally you're correct, I would have

13   been aware in some form or fashion.

14          MR. PENNOCK:  Mark this as Exhibit 4,

15      please.

16          (Anda-Versosky Exhibit 4 was marked for

17   identification.)

18          MR. PENNOCK:  Just hold that till counsel

19      sees it.

20          MS. KOSKI:  Okay.  Thank you.

21   BY MR. PENNOCK:

22     Q.   Sir, we've marked as Exhibit 4 to your

23   deposition an e-mail from Marc Falkin --

24     A.   Uh-huh.

25     Q.   -- dated November 1st, 2007.  You mentioned

1   him earlier.  Who is Marc Falkin?

2       A.   Marc Falkin was a -- he was an executive

3   with Anda for many years.  He held the roles of VP

4   of purchasing, I believe VP of marketing.  He ran

5   the telesales floor at one point.  He held many

6   different roles, kind of -- while I was there.

7            In this specific case, I don't know if it

8   was -- he was sending this from a position of

9   running sales or running marketing, but it probably

10  would have been one of those two in 2007.

11      Q.   He certainly sent it to everybody, didn't

12  he?

13           MS. KOSKI:  Object to form.

14      Q.   I mean that literally.  He seems to have

15  sent it to everyone involved in sales or marketing

16  at the company.

17           MS. KOSKI:  Object to form.

18      Q.   Do you agree with that?

19      A.   Yes.

20      Q.   Okay.  And you were one of the people named

21  about nine-tenths down this list, correct?

22      A.   I don't see my name on there, but I'm sure

23  it is.

24      Q.   It's --

25      A.   Yeah, that's me.

```
 1        Q.   Okay.  Now, the title of the document is

 2   "Oxycodone Family Limits Review," right?

 3        A.   Uh-huh.

 4        Q.   And --

 5             MS. KOSKI:  You have to verbally say "yes"

 6   or "no," not uh-huh.

 7        A.   Yes.

 8   BY MR. PENNOCK:

 9        Q.   It says:  "This will confirm that we have

10   formally broken out the oxycodone family into two

11   product families for the purposes of setting pill

12   counts" -- sorry, "pill count limits."

13             Do you see that?

14        A.   Yes.

15        Q.   And it says:  "Each family will have the

16   limit capacity."

17             Do you see that?

18        A.   Yes.

19        Q.   So he goes on to say that "Oxycodone &

20   Oxycodone Combo," do you know what those are?

21        A.   Yes.

22        Q.   Okay.  And it looks like instead of those

23   two having one 5,000 count applicable to both of

24   them as a family, he's going to break them out so

25   they each got a 5,000-count limit.
```

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Okay.

2      Q.    Do you see that?

3      A.    Yes.

4      Q.    Now, you received this e-mail back at that

5   time, right?

6      A.    Correct.

7      Q.    Did this concern you, that at that time that

███  ████████████████████████████████████

███  ██████████████████████████████████████

███  ████████████████████████████████████

███  ████████████████████

12          MS. KOSKI:  Object to form.

13     A.    I can't say specifically if it concerned me.

14   I think that -- I know I'm not supposed to assume,

15   but my assumption would be that there was some sort

16   of customer response to whatever those initial

17   limits were that caused compliance to look at were

18   we doing it kind of correctly or not.  That would be

19   my assumption.

20     Q.    Well, breaking them up and giving each of

21   them a 5,000-count limit certainly would allow Anda

22   to sell more product to each customer of these two

23   types, right?

24     A.    Yeah, I understand that.  Yes.

25     Q.    So you don't know why they were combined

Highly Confidential - Subject to Further Confidentiality Review

1     together in the first place?

2          A.   No.   I think that would probably be a

3     discussion with Mike Cochrane.   And even an e-mail

4     like this, this is -- this type of thing Marc would

5     have sort of, you know -- this isn't something that

6     Marc would have decided, in my opinion.   It's

7     something Mike would have decided and Marc would

8     have packaged for communication out, if that makes

9     sense.   My -- I would -- I believe this was probably

10    when he was running marketing, and that would be

11    kind of his role of communications.

12              MR. PENNOCK:   We'll mark this, please.

13              (Anda-Versosky Exhibit 5 was marked for

14    identification.)

15              MS. KOSKI:   Okay.   Thank you.

16              MR. PENNOCK:   Katy, I have a couple of legal

17       assistants I'm going to have come into the depo

18       at this point.

19              Can you go get them?

20              MS. KOSKI:   Do you want to take a break so

21       they can --

22              MR. PENNOCK:   It's just going to take a

23       second.

24              MS. KOSKI:   They can come in that door

25       maybe.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PENNOCK:

 2       Q.   Sir, have you had an opportunity to look at

 3    that?  I specifically want to direct your attention

 4    to the paragraph that begins "Teva Matrix Patches"

 5    on Page 2.

 6            MS. KOSKI:  If you need to read the whole

 7       thing, take your time.

 8            THE WITNESS:  Yeah, I'm going to read it

 9       real quick.  Sorry.

10       A.   Okay.  I've read it.

11    BY MR. PENNOCK:

12       Q.   Thank you.

13            Mr. Versosky, we've marked as Exhibit 5 to

14    your deposition a document entitled "Leadership

15    Meeting, March 17, 2009 Minutes."

16       A.   Yes.

17       Q.   Do you see that?

18            And these are minutes, meaning somebody took

19    notes and then -- from the meeting and then typed

20    them up, right?

21       A.   Yes.

22       Q.   And these meeting minutes were prepared at

23    or about the time of the meeting, right?

24       A.   Sure.  Yeah.

25       Q.   And they were prepared and maintained in the
```

1    regular course of business of Anda, right?

2        A.   Yes.

3        Q.   Okay.  And your -- your name appears on here

4    as an attendee at the meeting?

5        A.   Yes.

6        Q.   You -- so as of this time, you were -- you

7    were vice president for national accounts, right?

8        A.   Correct.

9        Q.   But when you became vice president for

10   national accounts, you moved into the leadership

11   role --

12       A.   Yes.

13       Q.   -- for the whole company, right?

14            MS. KOSKI:  Object to form.

15       Q.   You moved into a leadership role for Anda?

16       A.   Yes.

17       Q.   All right.  And AI Paonessa --

18       A.   Al.

19       Q.   -- Al, sorry -- Al Paonessa, who is that?

20       A.   Al was president of Anda.

21       Q.   All right.  Now, so the -- y'all had a

22   meeting in March of 2009, right?  And the purpose --

23   right, correct?

24       A.   Correct.

25       Q.   And the purpose of that meeting was to

1    discuss any issues that people on the leadership

2    team thought might be raised with the rest of the

3    leadership, right?

4        A.    Correct.

5        Q.    And you'd have a -- you had a discussion

6    about these issues, and then maybe some conclusions

7    were drawn on each of the issues and some action

8    items, right?

9        A.    Yes.

10       Q.    Now, Teva is a pharmaceutical manufacturer,

11   right?

12       A.    Yes.

13       Q.    Generic manufacturer?

14       A.    Yes.

15       Q.    And do you know what "matrix patches" are?

16       A.    Yeah.  There was -- when fentanyl patches

17   came out, there were two different -- call it types

18   of patch technology, and one was preferred in the

19   market and the other one wasn't, I believe.  I don't

20   remember what the other one was.

21       Q.    So it appears from this discussion that was

22   had at the leadership meeting that Anda had some

23   volume of matrix patches that were unsold?

24       A.    Correct.

25       Q.    Right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yeah.

 2      Q.   Fentanyl is an opioid, right?

 3      A.   Yes.

 4      Q.   And they -- there was -- it seems to me, and

 5   correct me if I'm wrong, there is a discussion of,

 6   "Okay, how can we get these sold?"

 7      A.   Yes.

 8      Q.   Is that fair?

 9      A.   Yes.

10      Q.   And there was apparently, you had -- of

11   these units, you had $1.4 million in these units --

12      A.   Yes.

13      Q.   -- that were unsold?

14           And there was a belief stated at the meeting

15   that you only had two months to move the product?

16      A.   Yeah.  My assumption would be that was

17   related to the dating on the product.

18      Q.   So what you mean by that is the product --

19      A.   Expiration date.

20      Q.   -- probably had an expiration date?

21      A.   Correct.

22      Q.   So you had $1.4 million in fentanyl product

23   that had an expiration date, right?

24      A.   Yes.

25      Q.   So you --
```

```
 1        A.    Actually, I say that.  It's possible this

 2   may have been related to a new entrant into the

 3   market or a -- you know, a patent, like a patent

 4   expiration date.

 5        Q.    Well, for some reason, you only had two

 6   months to sell this product?

 7        A.    Yeah.  Yeah, absolutely.

 8        Q.    And the president of the company concluded

 9   this discussion by saying, "Just move the product."

10          Do you see that statement?

11        A.    Yes.

12        Q.    Earlier you told us that you think everyone

13   acted -- recognized the responsibility that you had

14   for opioids, right?  Do you remember saying that?

15        A.    Absolutely.  Uh-huh.

16          MS. KOSKI:  Object to form.

17        Q.    You said that you believed that everyone

18   acted cautiously with respect to opioids.  Do you

19   remember saying that?

20        A.    Absolutely.

21        Q.    Okay.  When the president of the company

22   said, "Just move the product," at the meeting, did

23   you or anyone else stand up and say, "Whoa, wait a

24   second.  Okay?  We're not selling widgets here.  We

25   can't just move the product."
```

Highly Confidential - Subject to Further Confidentiality Review

1          Did anybody object to that, do you recall?

2     A.   I think that's a -- taken out of context

3     interpretation of "just move the product."  We were

4     only allowed to sell to customers that we had vetted

5     deeply.

6     Q.   Well, I mean, these minutes are intended to

7     be an important record of the leadership of this

8     company getting together and meeting in person,

9     right?

10         MS. KOSKI:  Object to form.

11    A.   I would say that's a misrepresentation of

12    what the meeting minutes were.

13    Q.   Oh, really?

14    A.   I -- yeah.  I --

15    Q.   Well, what do you think meeting minutes were

16    for?

17         MS. KOSKI:  Object to form.

18    A.   I -- I would say for this leadership meeting

19    at that period of time, I'm -- I don't know that we

20    had meeting minutes, you know, for a majority of the

21    meetings.  You know, so, yes, were they a record of

22    what happened in the meeting?  Sure, they were, for

23    distribution to us, frankly, to try to keep people

24    moving forward on the things that we committed to in

25    the meeting.

1      Q.   So it's your statement that you don't

2   believe that the president of the company said,

3   "Just move the product," as is recorded here at or

4   about the time of that meeting?

5           MS. KOSKI:   Object to form; mischaracterizes

6      testimony.

7      A.   Yeah.  It's possible he may have said that,

8   but I think you're misinterpreting or taking out of

9   context that statement.  We would have been trying

10  to sell that product to only customers who were

11  allowed to buy controls from us based on a thorough

12  vetting of the customer.

13     Q.   Did this product get moved in that two-month

14  period?

15     A.   I don't know.  Yeah, I -- and my assumption

16  is I think -- yeah, I don't --

17          MS. KOSKI:   Wait for a question.

18          THE WITNESS:   Yeah.

19          MR. PENNOCK:   I'm sorry?

20          MS. KOSKI:   I was just telling him to wait

21     for a question.

22  BY MR. PENNOCK:

23     Q.   If the president of the company said, "Just

24  move the product," didn't you interpret that to

25  mean, "Find a home for this product somehow"?

1      A.   To a degree, yes; but we had product that we

2   wrote off all the time.  I don't know if this was

3   expiration-related from an expiration dating of

4   product, we would have been able to return it.  If

5   it was, you know, patent expiration date-related, we

6   would have still been able to sell it but for a

7   lower cost.  So it's hard to assume what he was

8   saying there.

9      Q.   But it's your testimony that -- that people

10   at the company would not have acted without caution

11   with respect to opioid products?  Is that your

12   testimony?

13      A.   Yes.

14      Q.   Do you know who Rachelle Vance was?

15      A.   Yes.

16      Q.   Who was she?

17      A.   Rachelle was a national account manager on

18   my team.

19      Q.   She was on your team?

20      A.   She was.

21      Q.   Okay.  With respect to any sale that might

22   be possible to a customer, you-all had a term for

23   those.  You called them "opportunities," right?

24      A.   Sure.

25      Q.   Didn't you use that term a lot?

```
 1      A.   As a --

 2      Q.   As a term for a potential sale?

 3      A.   I guess, yeah, sure.

 4      Q.   You don't remember that?

 5      A.   I know the definition of the word

 6  "opportunity" and I use the word "opportunity," but

 7  as a formal -- you know, from a reporting standpoint

 8  or anything, I don't know that.  I believe

 9  "opportunity" was used in Remedy, our process

10  management system, that -- that may be what you're

11  referring to from a --

12      Q.   So didn't -- didn't you --

13      A.   An "opportunity" would have been something

14  we would have been working on, sure.

15      Q.   When you and the salespeople used the term

16  "opportunity," quote/unquote --

17      A.   Sure.

18      Q.   -- to mean a potential sale of a product?

19           MS. KOSKI:  Object to form.

20      A.   Yes.

21      Q.   Right?

22      A.   Yes.

23      Q.   So even for opioids, you would say -- you

24  would call the potential sale of opioids an

25  "opportunity"?
```

```
1        A.    Yes.

2        Q.    Okay.   Even though it was a controlled

3    substance?

4        A.    Yes.

5        Q.    A CII?

6        A.    Yes.

7              MR. PENNOCK:   Would you mark that, please.

8              (Anda-Versosky Exhibit 6 was marked for

9    identification.)

10   BY MR. PENNOCK:

11       Q.    Sir, we've marked as Exhibit 6 to your

12   deposition an e-mail dated February 1st, 2010.

13       A.    Sure.

14       Q.    And take a second and read that, please.

15       A.    Okay.

16       Q.    So this e-mail was sent by one of your

17   people, Rachelle Vance, to Michael Cochrane --

18       A.    Uh-huh.

19       Q.    -- who was in charge of compliance, but also

20   to you, right, Marc Falkin and Kim Bloom, right?

21       A.    Yes.

22       Q.    Falkin and Bloom were involved in sales,

23   right?

24       A.    Yes.

25       Q.    And Vance describes an opportunity to sell
```

1    CII controlled substances, specifically oxy, to some

2    stores, right?

3       A.   Sure.

4       Q.   And she calls that an "opportunity"?

5       A.   She does.

6       Q.   Okay.  And she says:  "Here are the complete

7    details of the opportunity."

8            Do you see that?

9       A.   I do.

10      Q.   She says:  "We cannot ship the entire order

11   because of a limit on Number 700139."

12           Do you see that?

13      A.   Yes.

14      Q.   That refers to a store, right?

15      A.   No.  That would be a product.  That's a

16   product identifier.

17      Q.   Okay.  So there is a limit on 700139.  Do

18   you know what product that was?

19      A.   I don't.

20      Q.   Okay.  "Customer ordered 12, Shipped 7, 0,"

21   you didn't ship any for the oxy products.

22      A.   Uh-huh.  Yes.

23      Q.   Okay.  And she's -- so she's telling you

24   there is an order, right?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    She's telling you that they are overlimited,

2    at least in part, for the oxy products, right?

3        A.    Yes.

4        Q.    And she's telling you that the opportunity

5    is we can sell this oxy if we increase the control

6    limits for that account?

7        A.    Yeah.

8        Q.    Right?

9        A.    Uh-huh.

10       Q.    And is that the sort of procedure by which

11   this happened back in 2010?

12             MS. KOSKI:  Object to form.

13       A.    Yeah.  So it's funny, because, you know, now

14   I see why you were asking about the word

15   "opportunity" and trying to define it.  It's clearly

16   an awkward word to be using in this scenario.

17             This was an e-mail from a national account

18   person, a salesperson, who was trying to, you know,

19   act as an advocate for her customer, but sent that

20   to Mike, who ultimately, you know, likely was saying

21   no, which is why they're not getting product.

22             I'd be curious to see if you have any

23   follow-up e-mails to this as to whether or not Mike

24   allowed them to, you know, buy on this,

25   quote/unquote, "opportunity," but it's unlikely.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.   You don't have any idea whether he did or

2   didn't?

3      A.   No.

4      Q.   Right?

5      A.   No.

6      Q.   So I will tell you that we don't know what

7   happened with this yet.

8      A.   Yeah.

9      Q.   But you would agree with me that based on

10  what you just testified to, that you think it should

11  have been denied?

12     A.   No, that's not what I said.

13     Q.   No?

14     A.   What I said is the word "opportunity" is

15  awkward in this e-mail.  But knowing Mike, Mike

16  denied everything, so --

17     Q.   And in your view, when you received this

18  e-mail back in February 2010, did you think this

19  should be denied?

20         MS. KOSKI:  Object to form.

21     A.   Yeah, I -- I can't make that assumption

22  based on, you know, this e-mail.  I don't know the

23  context.

24     Q.   Well, would it have been your custom and

25  practice to e-mail the person under you, namely

1    Ms. Vance, and say, "What are you talking about,

2    'opportunity'?  That's awkward in such a serious

3    context"?

4       A.   No.  No, not related to the -- to the term

5    that she used.  Of course not.

6       Q.   Why not?

7       A.   Salespeople think everything is an

8    opportunity.  They are going -- they use positive

9    words to -- even in the worst circumstances.  I

10   wasn't in the role of trying to correct text on

11   e-mails.

12      Q.   Well, you said earlier that you believed

13   everyone looked at -- recognized their -- the

14   responsibility that they had with opioids?

15      A.   Uh-huh.

16      Q.   Right?

17      A.   Yes.

18      Q.   So do you think that referring to potential

19   sales of a controlled substance such as opioids

20   being -- referring to it in this manner reflects

21   that level of responsibility that you said existed?

22          MS. KOSKI:  Object to form.

23      A.   No.

24      Q.   Does not?

25      A.   No.

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And --

2        A.   But, again, that's looking at an e-mail

3    from, you know, eight years ago through today's

4    lens, you know.

5        Q.   So at that -- at that time, there was -- are

6    you saying people inside Anda -- withdrawn.

7             At that time are you saying that you did not

8    have an understanding as to the seriousness of

9    opioid distribution in terms of the risks associated

10   with their use?

11       A.   No, that's not what I'm saying.

12            MS. KOSKI:  Object to form.

13       Q.   Well, you just said that we're looking at an

14   e-mail eight years later through today's lens.  What

15   did you mean by that?

16            MS. KOSKI:  Object to form.

17       A.   I feel like there is a -- a bigger spotlight

18   on it today than there was then generally.  So for

19   you to read this e-mail and say "opportunity" is a

20   horrible word, I don't know that "opportunity" would

21   have been a horrible word back then; but that

22   doesn't mean that we didn't know that it was an

23   issue.

24            And, you know, painting a broad stroke that

25   everybody understood their responsibility doesn't --
```

 1   doesn't necessarily mean at the specific level, you

 2   know.  Different people act different ways.

 3   Rachelle was very -- acted in a very -- as an

 4   advocate for her customer, right?

 5        So a customer complaining about something,

 6   even if it was a control limit, Rachelle would have

 7   brought that to, you know, Mike to say, "Is there

 8   something we can do here," would have copied us to

 9   say, "Is there something you can do here."

10        But those were almost, you know, scientific

11   decisions within the control compliance department,

12   right.  It's not like we had any sway or influence

13   to be able to get them to approve anything.

14        But Rachelle specifically, if her customer

15   complained, she would have brought something like

16   this up for sure.

17   Q.   Well, didn't you teach your salespeople not

18   to bring it up in this way because you were dealing

19   with products that were controlled substances and

20   particular opioids that had very significant issues

21   related to them?

22        MS. KOSKI:  Object to form.

23   Q.   I'll rephrase.

24        Didn't you tell your salespeople that you

25   shouldn't be approaching opioids in this manner --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. KOSKI:  Object to form.

 2       Q.   -- back in 2010?

 3              MS. KOSKI:  Same objection.

 4       A.   Are you asking related --

 5       Q.   Yeah.

 6       A.   -- to the word "opportunity" again?

 7       Q.   No.  In term -- I'm not asking -- I'm asking

   in general.  You said that -- you said that Rachelle

   would be an advocate for her customer?

10       A.   Yes.

11       Q.   And -- right?

12       A.   Yes, I did.

13       Q.   And would be pushing you and compliance to

   get limits increased, right?

15       A.   The --

16              MS. KOSKI:  Object to form; mischaracterizes

   his testimony.

18              Go ahead.

19       A.   Her ask would have been for them to relook

   at a store, right?  So stores had their own

   individual limits, I believe, by this point.  So,

   you know, that would have been her ask.

23              Your question about wouldn't I have trained

   them to not do this, stores had their own individual

   limits.  So if they were potentially set arbitrarily
```

1    too low, we would have wanted them to potentially

2    ask and say, "Can you relook at this?"  There may

3    have been some additional data that was needed.

4         As a secondary in the market, it was a

5    little more difficult for us to get at dispense data

6    than, you know, call it a primary wholesaler,

7    because the primary wholesaler, they are buying 90

8    some-odd percent of their drugs through that person,

9    so they can run some kind of internal -- internal

10   data to calculate potentially their limits.  For us,

11   it was a little more difficult.

12   Q.   Sir, the reason that one of your people was

13   asking that the limits be increased for this

14   pharmacy was simply because there was an opportunity

15   to sell more opioid to that pharmacy.  That's why

16   she was asking, right?

17   A.   Correct.

18   Q.   Okay.  And if it -- it had nothing to do

19   with her believing that there was some reason that

20   there was -- that the limit was too arbitrary and

21   too low for them?

22        MS. KOSKI:  Objection to form.

23   A.   Yeah.  I -- I don't know that.

24        MR. PENNOCK:  Mark this, please.

25        MS. KOSKI:  Are we at 7?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  Yeah.

 2              MS. KOSKI:  Thank you.

 3              (Anda-Versosky Exhibit 7 was marked for

 4     identification.)

 5     BY MR. PENNOCK:

 6         Q.   I have marked as Exhibit 7 to Mr. Versosky's

 7     deposition Bates number 0000077935 through 938.

 8              Sir, could you please take a moment and look

 9     at that?

10         A.   Yes.

11              MS. KOSKI:  Is this set up so it's the

12         earliest in time is at the back then it moves

13         forward?

14              MR. PENNOCK:  I'm sorry.  What's your

15         question?

16              MS. KOSKI:  The first e-mail in time is at

17         the back and then it moves forward and --

18              MR. PENNOCK:  That's correct.

19              MS. KOSKI:  Okay.

20     BY MR. PENNOCK:

21         Q.   Are you ready, sir?

22         A.   Just give me one more second, I'm sorry.

23     I'm on the last section here.

24              Okay.  I think I'm ready.

25         Q.   This is an e-mail thread that starts with an
```

Highly Confidential - Subject to Further Confidentiality Review

1    e-mail, again, sent by Ms. Vance.

2        A.   Uh-huh.  Yes.

3        Q.   And the e-mail is sent to a number of

4    people.  Ms. Vance, again, she worked for you in

5    national accounts, right?

6        A.   Yes.

7        Q.   And she sent the e-mail to Kim Bloom.  She

8    was also in national accounts?

9        A.   No.  Kim -- Kim never worked for me.  I took

10   over national accounts from Kim.

11       Q.   Okay.

12       A.   So at this point, I'm not sure what her

13   exact role was.

14       Q.   Well, you were cc'd in any event?

15       A.   Yes.

16       Q.   Do you see that?

17       A.   Yes.

18       Q.   She said:  "We are rolling out CSOS

19   Enterprise for this chain."

20            That's an electronic ordering system that

21   you created; isn't that right?

22       A.   That is correct.  Yes.

23       Q.   And you had a hand in the establishment of

24   that, didn't you?

25            MS. KOSKI:  Object to form.

```
 1        A.   As far as programming it, no.

 2        Q.   No, not as far as programming it.  As far

 3   as --

 4        A.   Trying to sell it to customers, yes.

 5        Q.   Uh-huh.  It says:  "And we would like to

 6   request a review of all accounts limits and would

 7   like to request max allowable limits for all Bi-Mart

 8   pharmacies.  Attached is a complete list of Bi-Mart

 9   account numbers."

10             Do you see that?

11        A.   Yes.

12        Q.   And Bi-Mart is a reasonably significant

13   chain of pharmacies in one area of the country?

14        A.   It's a -- it was considered a small chain,

15   but yes.

16        Q.   Small chain?

17        A.   Yes.

18        Q.   But it was still under national accounts?

19        A.   Yeah, I think they -- 60 stores or something

20   like that.

21        Q.   So it gets passed up the ladder, and it

22   says:  "Mike, let me know if there is anything you

23   need from me in order to make this happen."

24        A.   Uh-huh.

25        Q.   That's from Kim Bloom, right?
```

```
 1       A.   Yes.

 2       Q.   And, again, you're -- at this point, you've

 3   been -- you've been still cc'd, right?

 4       A.   Yes.

 5       Q.   Okay.  And we see that there's some

 6   discussion here that the president of the company,

 7   Al Paonessa, it's A --

 8       A.   Yeah.

 9       Q.   -- Al3, because he was the third, Al

10   Paonessa, III, right?

11       A.   Yes.

12       Q.   "A3 previously approved all the stores up to

13   15,000 dosage units per month."

14            Right?

15       A.   Yes.

16       Q.   15,000 pills of opioid, of oxy a month,

17   right?

18            MS. KOSKI:  Object to form.

19       Q.   I'll rephrase:  15,000 dosage use -- units a

20   month?

21       A.   Yes.

22       Q.   He says -- she says -- or Mike says:  "There

23   were five that were missed.  I have corrected them.

24   All the stores are now at a minimum of 15,000.  Some

25   are more.  We will deal with any increases on a
```

1    case-by-case basis as we have in the past."

2         Right?

3    A.   Yes.

4    Q.   What's a "case-by-case basis"?  What kinds

5    of things would you do?

6    A.   So let me put some context around this.

7    That CSOS Enterprise, the CSOS Enterprise is a

8    software application, was a CSOS system for chains

9    to buy centrally.  Right?  So no one in the market,

10   from a competitive standpoint, had another central

11   buying kind of application, electronic ordering

12   platform for controlled substances.  So we were out

13   promoting that to customers.

14        The need for increased limits on items was

15   related to Bi-Mart taking advantage of that CSOS

16   Enterprise system.  They would have moved to their

17   volume from a competitor to us.  So we went from

18   being a secondary to, on some of these products,

19   their primary.  Right?  So their volume naturally

20   would have gone up through us.

21        As far as the five that were missed, I'm

22   sure that's a file-related issue, like they gave

23   them a store list of 55 stores and not 60 or

24   something like that.

25        Or -- I'm sorry.  As I read that, he missed

 1    five on moving them to 15,000 dosage units.

 2         The -- where he says, "Some are more,"

 3    that's based on looking at their individual store

 4    level usage and creating limits based on their

 5    historical demand and all that good stuff.

 6         And then, "We will deal with any increases

 7    on a case-by-case basis," that's where, sort of to

 8    that previous e-mail that you showed me, if there

 9    was somebody that was hitting their threshold that

10    would drive a further review of that store by Mike

11    and his team to say, you know, "Did we mis-shoot the

12    mark on what we gave the -- gave them as a limit?"

13    Q.   Okay.  So there would be some evaluation of

14    these stores that you were bringing on board to

15    determine if the 15,000-unit limit was too much or

16    too little?

17    A.   Yes, I believe so.

18    Q.   Then one of the following e-mails, we have

19    an e-mail from Rachel Vance -- I'm sorry, Rachelle

20    Vance.  It says that:  "These are the high volume

21    CII stores.  Can they be reviewed prior to reaching

22    max volumes?"

23         Do you see that?

24    A.   Yes.

25    Q.   So she wanted them to be reviewed before

Highly Confidential - Subject to Further Confidentiality Review

1    reaching max volumes because she didn't want any of

2    the sales that were being made under national

3    accounts to this store to be cut off?

4         MS. KOSKI:  Object to form.

5    Q.   Right.

6    A.   You're correct.  What she was asking for,

7    you know, so if someone -- if a store, say their

8    limit was 15,000.  If a store got to 13,000, as

9    opposed to us going to ask for review, once they

10   stop, you know, receiving product from us, can they

11   start that review when they are at, say, 13,000, so

12   that potentially we don't have a customer service

13   issue.

14   Q.   And the review would be to look at the store

15   and --

16   A.   Yes.

17   Q.   -- to ascertain if the dosage units is

18   correct or not correct?

19   A.   Yes, or if we're comfortable with.

20   Q.   That you were comfortable with it?

21   A.   Yes.

22   Q.   Okay.  So she lists here a number of stores.

23   Well, let me track this.  I'm sorry.

24        Michael Cochrane writes back to her, because

25   now he's -- Mike Cochrane has now looked into these

Highly Confidential - Subject to Further Confidentiality Review

```
 1    stores that your team --

 2       A.   Yes.

 3       Q.   -- is selling to to see where they are at in

 4    terms of their limits, right?

 5       A.   Uh-huh.

 6       Q.   And he writes back, and he says -- he

 7    says -- let's see:  "Let's wait to see if they hit

 8    it."

 9       A.   Uh-huh.

10       Q.   Right?

11       A.   Yes.

12       Q.   So as you said, they were trying to -- your

13    salespeople were trying to get ahead of it and bump

14    the max limit before they hit it, right?

15       A.   Yes.  Yes.

16       Q.   Okay.  "I've listed what the accounts are

17    currently at," right?

18       A.   Yes.

19       Q.   And then he lists this one.  I'll just focus

20    on the top one.  That is Bi-Mart Store Number 610,

22            Right?

23       A.   Yes.

24       Q.   Now, do you know where that store is?

25       A.   I don't.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   You can look it up on the Internet.  Does

 2    that -- doesn't surprise you, right?  You could look

 3    that store up, Bi-Mart Store Number 610?

 4       A.   I'll take your word for it, sure.

 5       Q.   So have you ever heard of Grand Pass,

 6    Oregon?

 7       A.   I have not.

 8       Q.   The court can take judicial notice of this,

 9    but Grand Pass, Oregon has a population of

10    approximately 37,000 people.

11            MS. KOSKI:  Object to form.

12       Q.   Did you know that?

13       A.   I did not.

14       Q.   Is there any -- I thought you said that

15    there was sort of an assessment of look at the

16    stores by people to decide whether you're selling

17    too much product to a small -- you know, to an area

18    based on where the stores were.  No?  You didn't do

19    that?

20            MS. KOSKI:  Object to form; mischaracterizes

21       testimony.

22       A.   I didn't personally.  Mike did.  I think if

23    you asked Mike, he might know where that store is.

24       Q.   Well, you were in charge of national

25    accounts?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah.

2    Q.    Right?

3    A.    Yes.

4    Q.    And you were in charge of these people

5    that -- this woman, Rachelle Vance, that sent this

6    e-mail, right?

7    A.    Correct.

8    Q.    So you didn't take any particular

9    responsibility to look into a store that was already

10   at 30,000 dosage units to see where it was?

11         MS. KOSKI:  Object to form.

12   A.    No.  Michael -- Michael's team would have

13   done that.

14   Q.    So you -- you certainly by this point in

15   time were at -- we're -- we're in 2009.  Even you as

16   vice president for national accounts understood that

17   30,000 dosage units for a particular store in this

18   chain was a lot of units, didn't you?

19         MS. KOSKI:  Object to form.

20   A.    I don't know that I would have thought that

21   that was an unreasonable amount.

22   Q.    Well --

23   A.    Again, we were taking on primary volume for

24   that store.  I don't know what their historical

25   dispense data would have looked like.  I don't --

```
1        Q.   Well, does that really matter?  If they were

2    already getting too much product, does that matter

3    what the historical dispense data --

4        A.   I guess --

5             MS. KOSKI:  Sorry.  Object to form.

6        Q.   Do you need me to rephrase that?

7             MS. KOSKI:  Please.

8        A.   Yes, please.

9    BY MR. PENNOCK:

10       Q.   Yeah.  You keep -- you've referenced a

11   couple times "historical dispense data," right?

12       A.   Right.

13       Q.   And what you mean by that is, "Well, we look

14   and see, well, how much product has the store sold

15   over time and is what they are asking for from us

16   now consistent with what they've been selling,"

17   right?

18            MS. KOSKI:  Object to form.

19       Q.   That's what you're saying what "historical

20   dispense data" is, right?

21       A.   So -- so let me -- let me clarify for

22   myself -- for myself.  Yes, that's what I'm saying,

23   but that wasn't my role in the organization.  So to

24   me, that's a generalized way of saying how Mike and

25   his team would have reviewed stores.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   So, I mean, you were vice president of

2   national accounts.  We've already said that a bunch

3   of times, right?

4        A.   Yeah.

5        Q.   And you were vice president of national

6   accounts at the time of this e-mail, right?

7        A.   Yes.

8        Q.   And you were on the leadership team at the

9   time of this e-mail, right?

10       A.   Yes.

11       Q.   You had already had a leadership meeting a

12  few months earlier back in March.  We talked about

13  that, with the fentanyl patches, right?

14       A.   Yes.

15       Q.   To move the product we had a discussion

16  about, right?

17       A.   Yes.

18       Q.   Okay.  And you're now on an e-mail chain

19  where they are talking about a store that is in a

20  location that has 37,000 people in it, and you're

█   ████████████████████████████████████████████████

22  substances every month.  That's not something that

23  you paid any attention to?  Was --

24            MS. KOSKI:  Object to form.  Sorry.  I

25       thought you were done.
```

```
 1        A.   No, I don't -- I -- I wouldn't have paid

 2    specific attention to that unless Mike, you know,

 3    brought that up as an issue as -- you know, where

 4    that might have come up as an issue is if Rachelle

 5    was making requests of Mike, Mike saying, "This

 6    doesn't make any sense."  He might come to me and

 7    say, "tell Rachelle to stop, you know, bothering me

 8    about this."

 9         That's where -- that analysis would have

10    happened within Mike and his team, the one that

11    you're asking for.

12         Me specifically, I was looking at, at a high

13    level, you know, we were selling thousands of

14    accounts product.  So I'm -- I'm sorry.  That

15    answer's --

16        Q.   What -- well, you may have been selling --

17    okay.

18         You were selling thousands of accounts you

19    just said, right?

20        A.   Yes.

21        Q.   And -- and just --

22        A.   I don't know where every store is for every

23    one of those accounts.  I wouldn't have looked them

24    up.  So the idea that I can -- that I would have --

25        Q.   Who -- who was going to do that then?
```

```
 1        A.    Mike and his team absolutely would have been

 2   doing that.

 3        Q.    That's it?

 4        A.    Yes.

 5        Q.    So the -- how many people were on Mike's

 6   team?

 7        A.    I don't know the answer to that.  I know --

 8   because it varied from time to time.  I think when I

 9   left, there were probably six maybe.

10        Q.    Six people.

11              How many salespeople did you have in --

12   withdrawn.

13              How many people were in your national

14   accounts team, like Rachelle Vance?

15        A.    I think, you know, we peaked out.  The most

16   we ever had was maybe 12.  At this time we probably

17   were in the 8 to 10 range, I would guess.

18        Q.    And not -- they had no responsibility, the

19   national account people, the 12 people that you had,

20   they had no responsibility for making their own

21   independent sort of assessment to provide

22   information to compliance as to the nature of the

23   store they were asking to max out at?

24              MS. KOSKI:  Object to form; mischaracterizes

25        testimony.
```

1      Q.   They didn't have none?  I'm just asking.

2      They had no responsibility, is that what you're

3      telling me?

4      A.   I would say they didn't have direct

5      responsibility; but we would have asked them to, you

6      know, not be, you know, foolishly asking for things

7      that didn't make sense.

8      Q.   Right.  Like --

9      A.   But we -- we always --

10      Q.   Like asking for -- like asking to max out a

11      store in a location, Grand Pass, Oregon, with 37,000

12      people, that would be foolish?

13           MS. KOSKI:  Object to form.

14      Q.   Are you agree --

15      A.   I could agree with you if that would be

16      foolish if Rachelle knew that was in Grand Pass with

17      that --

18      Q.   Right.

19      A.   I don't -- I don't know that she knew that.

20      She may have seen it as Store Number 610.

21      Q.   I understand that.

22      A.   Yeah.

23      Q.   And I'm saying is:  Don't you think that she

24      should have had, as part of her guidance and

25      instruction, that, "Don't just see it as Store

1    Number 610; but you're the salesperson.  You're the

2    one interacting with the chain.  You're the one

3    interacting with the store.  Where is the store?

4    Tell us what you can tell us about the store from

5    the beginning."

6            Shouldn't she have been doing that back

7    then?

8            MS. KOSKI:  Object to form.

9        A.  Again, I -- possibly, but we sort of had,

10   you know, Mike's team as our -- was handling that

11   for us.  I don't know.  You know, I -- I'm sorry

12   that that's not the answer that you like, but that's

13   sort of the way we were operating as we were out

14   trying to sell, and Mike was a very hard backstop

15   and he was handling that piece.

16           Our sales team, from a national account

17   standpoint, was requesting additional information

18   where Mike needed it, was, you know --

19       Q.  But your sales team for national accounts

20   that you were in charge of didn't undertake any

21   activity to see what they were asking for to begin

22   with?  Give it to Mike, Mike is the backstop, if he

23   passes it, wonderful, we sell it and we move on.

24   That's what was happening at this --

25       A.  I would say at this period of time, that

```
 1    that's fair.  I think as we moved forward, we were

 2    doing a lot more of, you know, getting

 3    questionnaires and getting data, getting

 4    questionnaires, all that stuff.

 5         MS. KOSKI:  I could use a bathroom break.

 6    We've been going about an hour and a half.  It

 7    doesn't have to be right this second.  If --

 8    when --

 9         (Discussion off the record.)

10         MR. PENNOCK:  No, we can take a break.

11         MS. KOSKI:  Okay.

12         THE VIDEOGRAPHER:  Off the record,

13    11:06 a.m.

14      (Recess from 11:06 a.m. until 11:18 a.m.)

15         THE VIDEOGRAPHER:  On the record, 11:18 a.m.

16         MR. PENNOCK:  Are you ready, Counsel?

17         MS. KOSKI:  Yes.  All set.  Thank you.

18    BY MR. PENNOCK:

19      Q.   Well, we were looking at Exhibit 7, the

20    Bi-Mart -- the Bi-Mart e-mail, and the e-mail -- in

21    response, Mike Cochrane, he says their mix is too

22    high.

23         Do you see that?

24      A.   Yes.

25      Q.   So he's saying, look, I'm not going to
```

 1    approve any increase.

 2       A.   Yes.

 3       Q.   Who is Kim Bloom?  We talked about her

 4    earlier.  You took over national accounts from her,

 5    right?

 6       A.   Yes.

 7       Q.   And she's now executive director of sales

 8    operations, right?

 9       A.   Yes.

10       Q.   It looks like she was on this e-mail

11    chain -- I'm trying to find -- she didn't get on

12    this e-mail chain until a few e-mails in.

13            MS. KOSKI:  Object to form.

14            MR. PENNOCK:  Yeah, I'll withdraw that.

15    BY MR. PENNOCK:

16       Q.   You see, if you look on the second page of

17    this e-mail thread, it looks like Kim Bloom got

18    thrown on a cc in the middle of this thread.

19            MS. KOSKI:  Object to the form.

20       A.   I see that.

21       Q.   Right?

22       A.   Yeah, I see that.

23            THE VIDEOGRAPHER:  Excuse me, Counsel.  I

24       just need to adjust the witness's position again.

25       I didn't realize you were blocking that camera.

1    So just a little bit more.

2         That's good.  Thank you.

3    BY MR. PENNOCK:

4    Q.  I'm sorry, she jumped on -- she -- it was

5    before that she -- she was on -- she was an

6    addressee of the original e-mail.  Okay.

7    A.  Yes.

8    Q.  But Michael Cochrane, he's in compliance.

9    Kim Bloom is in sales.  She's the executive director

10   of sales operations.

11        Cochrane is the compliance guy you've been

12   talking about, right?

13   A.  Yes.

14   Q.  Michael Cochrane?

15   A.  Yes.

16   Q.  He says the mix is too high.

17        Do you see that?

18   A.  Yes.

19   Q.  And she comes back and says -- and you're

20   cc'd.

21        Do you see that?

22   A.  Yes.

23   Q.  And she comes back and says:  Please discuss

24   this with Al, the president of the company.

25        Right?

1    A.   Yes.

2    Q.   She says:  This is a chain initiative to

3    increase CII distribution.

4    A.   Yes.

5    Q.   So that means that your customer is trying

6    to increase controlled substances distribution for

7    you?

8    A.   No.  What that means is -- in general, we're

9    trying to get more customers to sell -- to buy CIIs

10   from us.

11   Q.   Oh.  So that means -- when he says this is a

12   chain initiative, you mean -- it means this is --

13   those of us working on chains, we are taking the

14   initiative to increase controlled substances

15   distribution?

16   A.   Yes.

17   Q.   That's something that she was working on,

18   along with you were working on?

19   A.   I don't remember specifically what Kim's

20   role was in here, but -- but yeah.

21   Q.   Okay.

22   A.   We were trying to get more customers to buy

23   CIIs from us.

24   Q.   And thereby increase your distribution?

25   A.   Increase our distribution.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And thereby -- you were trying to expand the

2    market?

3    A.   No.  We were trying to expand our share of

4    the market.

5    Q.   Okay.  And if they hit their threshold and

6    are cut off from buying more, it's going to hurt our

7    relationship with the accounts.

8         Do you see that statement?

9    A.   I do.

10   Q.   Does that sound like the responsibility that

11   you told us earlier in terms of CIIs and opioids?

12   A.   I mean, it sounds like something a

13   salesperson would say, which is why we had the kind

14   of church and state between regulatory and

15   compliance.

16   Q.   When you had church and state, what do you

17   mean by that?

18   A.   Compliance was separate from -- from sales.

19   Right?  So sales worked as advocates.  Compliance

20   worked as determining who we were willing to sell

21   product to.

22   Q.   So sales worked as advocates for making

23   sales?

24   A.   Correct.

25        You know, the -- the --

```
 1      Q.   Okay.

 2      A.   I think I know why Kim was on this.  The --

 3   so Bi-Mart specifically as a customer had telesales

 4   reps talking to their stores.  So in some scenarios

 5   we would have had sort of a shared ownership of

 6   accounts.

 7      Q.   So in any event, the -- the backstop,

 8   Michael Cochrane that you referred to earlier --

 9      A.   Yes.

10      Q.   Well, this executive director of sales

11   operations is trying to go by the backstop and go

12   right to the president because she doesn't want to

13   hurt the relationship with the accounts, right?

14          MS. KOSKI:  Object to the form.

15      A.   I think she's -- she's suggesting that he

16   talk to Al, yes.  Al was his -- Al was Mike's boss,

17   right?  So I would assume from an escalation

18   perspective, talk to Al.

19      Q.   So you mentioned that in terms of making

20   decisions to sell to particular -- make particular

21   sales, you said that they were, quote, scientific

22   decisions.

23          Do you remember saying that earlier?

24      A.   I do.

25      Q.   Okay.  Kim is not -- Ms. Bloom is not
```

```
 1    engaging in this scientific decision process, is

 2    she?

 3       A.   No.

 4       Q.   But that -- that was sort of -- her conduct

 5    here and how she was approaching this and how

 6    Ms. Vance was approaching this, it was sort of

 7    endemic in the sales operation for Anda when it came

 8    to CIIses, wasn't it?

 9            MS. KOSKI:  Object to form.

10    BY MR. PENNOCK:

11       Q.   Do you know what I mean by endemic?

12       A.   No.

13       Q.   So with respect to Ms. Bloom and Ms. Vance,

14    this type of approach to sales was -- of CIIs and

15    particular opioids was sort of business as usual for

16    them?

17            MS. KOSKI:  Object to form.

18       Mischaracterizes the document.

19       A.   I think that would be a generalization.  I

20    think, you know -- I think Rochelle was probably

21    more aggressive than others in trying to be that

22    advocate for a customer.  I don't know that I can

23    speak to Kim really there.

24       Q.   But sales in general, even the people under

25    you, were you -- they didn't really have that --
```

```
 1      A.   That's what I was saying --

 2      Q.   -- scientific decisionmaking process

 3  applying to their attempts to make sales?

 4      A.   Correct.  Correct.

 5      Q.   Okay.  So, you know, we talked about the

 6  Grand Pass, Oregon, Bi-Mart e-mail, this one right

 7  here.

 8           I want to show you something, a PowerPoint.

 9           MR. PENNOCK:  Would you mark this, please.

10           (Anda-Versosky Exhibit 8 was marked for

11  identification.)

12           (Anda-Versosky Exhibit 9 was marked for

13  identification.)

14           MS. KOSKI:  She was waiting for me, and I

15      didn't give the high sign.

16  BY MR. PENNOCK:

17      Q.   Let me know when you're ready, sir.

18      A.   Sure.

19           MS. KOSKI:  This doesn't have any notes on

20      it.  Is that what you're asking?

21           Is there any notes on the one you have?

22           THE WITNESS:  No.

23           MS. KOSKI:  Oh, that's the one.  It's

24      dog-eared.

25  BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

1     Q.   It's the same document, Mr. Versosky.

2     A.   Okay.

3     Q.   Sir, have you had an occasion to look at

4    Exhibit 9 -- or Exhibit 8?

5     A.   Yes.

6     Q.   That's a PowerPoint presentation that you

7    had some input on, isn't it?

8     A.   Yeah.  So the interesting thing is the

9    general kind of Anda overview presentation was a

10   large deck that we used and kind of clipped for a

11   bunch of different presentations.  So many of the

12   slides in here, I created.  Many of them, I've never

13   seen before.

14    Q.   Okay.  Well, can you look at Exhibit 9,

15   please.

16    A.   Sure.

17    Q.   Let me identify Exhibit 8 first.  I didn't

18   do that yet.

19         So Exhibit 8 is a PowerPoint presentation

20   entitled "Anda, Incorporated, Anda Overview," and it

21   is Bates number 0000721153 and it runs through 1174.

22         Exhibit 9 is an e-mail thread, Bates number

23   0000721151 and 152.  So it's the Bates number that

24   immediately precedes the PowerPoint Bates number.

25         Okay?

```
1       A.   Okay.

2       Q.   Now, Exhibit 9, this e-mail thread reflects

3   that the -- this PowerPoint presentation was sent to

4   you by Michael Cochrane, right?

5       A.   Yes.

6       Q.   And he asked you to take a -- take a look at

7   it and perhaps give a couple bullet points on

8   Slide 4.

9            Do you see that?

10      A.   Yes.

11      Q.   He says:  I have been refreshing this

12  presentation from before that we used with DC awhile

13  back.

14           Do you know what he means by that?

15      A.   Where was that?

16      Q.   It's right here.  He says:  I have been

17  refreshing this presentation from before that we

18  used with DC awhile back.

19           At the time, did you have any understanding

20  what he meant by that?

21           MS. KOSKI:  Object to form.

22      A.   At the time, I'm sure.  I mean, as DC -- I

23  don't want to speculate.

24      Q.   Okay.  Anyway --

25      A.   At the time, I probably knew what it was --
```

1      Q.   He says:  Meeting with DEA next week.

2      A.   Yeah.

3      Q.   Keep that to yourself if you don't already

4    know.

5           Right?

6      A.   Yes.

7      Q.   Okay.  And this is August 28, 2014, right?

8      A.   Yes.

9      Q.   So he's  -- this is a -- this is a

10   PowerPoint that he intends to present to the DEA; is

11   that correct?

12     A.   Yes.

13     Q.   Now, were you at any meetings with the DEA?

14     A.   No, never.

15     Q.   Never?

16     A.   Never, not that I'm aware of.

17     Q.   Okay.  Take a look at Page 1167.  I'm going

18   by the Bates number on the lower right.

19     A.   Okay.

20     Q.   So Mr. Cochrane -- he's -- again, he's the

21   compliance backstop at Anda, right?

22     A.   Uh-huh.

23     Q.   And he  -- he has a slide in here, it says

24   "Control Limit Increase Process."

25          Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   I do.

2       Q.   Manufacturers and distributors are required

3   to know your customers and maintain suspicious order

4   monitoring systems.

5            Do you see that?

6       A.   Uh-huh.

7       Q.   Customer review process for control

8   substances -- controlled substance increase.

9            Right?

■                ■■■■■■        ■■■■■■■■■■

■        ■■■■■■■■■■

12           That's the very first bullet point, right?

13      A.   Yes.

14      Q.   It's the very first bullet point in this

15  slide for the DEA, right?

16      A.   Uh-huh.

17      Q.   No one was doing that with respect to

18  Bi-Mart Store 610 in Grand Pass, Oregon.

19      A.   In 2009, probably not.

20      Q.   In 2009.

21           Okay.  Thank you.

22      A.   Yeah, not on the sales side.

23      Q.   Got it.  Okay.

24           As of 2014, were you -- were you then paying

25  attention to the city and state of request?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   I'll tell you, I don't know that.  Yeah.  I

 2   don't know that it was a -- no.

 3        Q.   On the sales side.

 4        A.   Yeah.

 5             No, I don't believe so.

 6        Q.   Who is George Fields?

 7        A.   So George -- George was with Anda for a very

 8   long time.  I believe he ran -- he also ran sales at

 9   some point, the telesales function; moved into

10   purchasing; and before we had sort of a formal

11   marketing department, he kind of ran some of the

12   promotions and things like that out of -- I believe

13   out of purchasing.  He kind of had a bunch of

14   different roles at Anda at the time.

15        Q.   And who is Brian Witte?

16        A.   Brian was my counterpart that led the inside

17   sales -- telesales team.  So he was owner of the

18   budget and whatnot for telesales.

19        Q.   Do you remember someone by the name of Norm?

20        A.   Yes.

21        Q.   Who might that be?

22        A.   Norm Dodes was a -- was a national account

23   manager also on my team.

24             MR. PENNOCK:  Do you have copies of this?

25             We'll mark my copy.  Could you -- I only --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      I don't seem to have another copy of this.  I
 2      don't know, but could you take that?
 3          MS. KOSKI:  If you want to walk out to the
 4      front desk, they can make copies for you if you
 5      need to.
 6          MR. PENNOCK:  If you want me to.
 7          MS. KOSKI:  I guess I can read it first.  I
 8      don't know.
 9          MR. PENNOCK:  Yeah.
10          MS. KOSKI:  Just go --
11          MR. PENNOCK:  Hold on.  Why don't you go and
12      see if you have a copy next door.
13          While we're doing that, Ben, why don't you
14      take this out and make a copy before she puts the
15      tab on there.  Yeah.
16   BY MR. PENNOCK:
17      Q.  All right.  Let's see if I can go on to
18   something else.
19          Not really.
20          MR. PENNOCK:  Got it.  That was easier than
21      I thought.
22          MS. KOSKI:  We've all been there.
23          MR. PENNOCK:  Of course there is only one
24      copy.  No, this is not it.  This is not -- this
25      is not -- 143.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Okay.  We'll wait for copies.

 2              (Discussion off the record.)

 3     BY MR. PENNOCK:

 4        Q.   Okay.  All right.

 5              (Anda-Versosky Exhibit 11 was marked for

 6     identification.)

 7     BY MR. PENNOCK:

 8        Q.   Sir, take a look, please, at Exhibit 11 to

 9     your deposition.  This is an e-mail, one page,

10     0000618116.

11        A.   Yes, please.

12        Q.   So this is an e-mail.  The top e-mail is

13     from you, right?

14        A.   Uh-huh.

15        Q.   This is September 26, 2008.  Were you yet in

16     charge of national accounts?

17        A.   I believe so by then.

18        Q.   So we have here an e-mail from Brian Witte,

19     W-i-t-t-e?

20        A.   Yes.

21        Q.   And he writes:  Daily sales are slipping a

22     bit to forecast.

23        A.   Uh-huh.

24        Q.   Meaning you -- you had all projected some

25     volume of sales, and in looking at the daily sales,
```

```
1     you weren't going to meet that?

2         A.    Yes.

3         Q.    For the month, I assume?

4         A.    Yeah, I assume, yeah.

5         Q.    Is there any large sales we can get out?

6         A.    Yes.

7         Q.    Anything on 20 milligram Protonix?  What

8     about the K-Mart sale?  Did that go through?

9         A.    Yes.

10        Q.    Did the large BJK Risperdal order hit?

11              And then he says:  Anyone in need of oxy?

12        A.    Yes.

13        Q.    Any other thoughts?

14              Do you see that?

15        A.    Uh-huh.

16              MS. KOSKI:  Can I just -- so the record is

17        clear, you're agreeing that he read it correctly?

18              THE WITNESS:  Yes.

19              MS. KOSKI:  You're not answering the

20        question.

21              It wasn't clear to me on the record.

22              MR. PENNOCK:  You're right.

23    BY MR. PENNOCK:

24        Q.    So right here he's asking everyone on this

25    e-mail:  Does anyone have any customers that we can
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sell some oxy to, isn't he?

 2        A.    Correct.

 3        Q.    And George Fields says something about the

 4    Risperdal order today and oxy being received today

 5    from BJK.

 6              What does that mean?

 7        A.    BJK was a customer.  Oxy being received

 8    today would have been -- my reading of this e-mail

 9    is that's two separate notes there.

10              Oxy, the reason I believe in this e-mail

11    they were asked about it is there was a market

12    shortage on the item, and so oxy being received

13    today means we're receiving this item that's short

14    in the market.  That's why they were asking can you

15    go and see if there is anybody that is in need of it

16    today.

17        Q.    And you wrote back -- among other things,

18    you say:  Norm is going to contact Aetna on oxy?

19        A.    Yes.

20        Q.    So Norm, who worked for you, you were going

21    to have him contact Aetna, I guess their customer,

22    right?

23        A.    Correct.

24        Q.    He was going to contact to see if he could

25    sell any oxy to them?
```

```
 1      A.   Yes.

 2      Q.   And rally the troops in the office to ensure

 3  any in-process opportunities are expedited and

 4  capitalized on.

 5           Do you see that?

 6      A.   Yes.

 7      Q.   And "opportunities," that's the awkward word

 8  you were talking about early -- we talked about

 9  earlier, right?

10      A.   Sure.

11      Q.   So with respect to oxy, you were going to

12  make some effort to make some sales to meet the

13  monthly forecast that you were slipping on?

14      A.   Sure.

15      Q.   Isn't that correct?

16      A.   But in respect to oxy, Risperdal, any of the

17  other opportunities, you know, short in the market

18  items -- like that sentence right there is two

19  different specific things, right?  Norm is going to

20  contact them on oxy, and then we were going to look

21  at anything else that was in process.  In process

22  may have included other, you know, oxy sales; it may

23  not.

24           But just wanted to clarify that.

25      Q.   Okay.  But you were going to make some calls
```

```
 1    about the oxy?

 2        A.   Sure.

 3        Q.   To see if anyone was in need of oxy?

 4        A.   Yes.

 5        Q.   It seems to me from your response that

 6    that's not unusual that you would go out and try and

 7    sell some oxy?

 8        A.   Correct.

 9        Q.   And basically making calls to see if anybody

10    wanted it?

11        A.   Again, in this case with my specific

12    customers, we have been calling large customers --

13    some of them, we currently sold to; some of them, we

14    didn't -- to see if this product that was in short

15    supply was something they needed today.  They still

16    would have had to been vetted from compliance to say

17    are we willing to sell that customer or not.

18             But so --

19        Q.   Well, I know that the scientific decision

20    would have been made, as you've testified to.

21        A.   Okay.

22        Q.   I understand that's your position.

23             But if these were your customers and they

24    had a need for this oxy product, wouldn't they have

25    already told you that?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.   No, not necessarily.  Again, being in the
2    secondary space, it's sort of -- a big portion of
3    Anda's sales were, you know, time-sensitive
4    opportunities where if we had inventory and the
5    market didn't, we would have to go reach out to the
6    market and say we may have it when someone else may
7    not.
8              They didn't always know to ask us, right?
9    They would be looking at their primary potentially,
10   or the other competitive secondaries to say can I
11   buy this from you if they were out.
12        Q.   If they were out and they would need it,
13   you're saying it was not your experience that
14   they -- that they would contact anybody to see if
15   they had something to sell them?
16        A.   They would contact people, but it's not
17   necessarily that they would contact us.
18        Q.   But it's not necessary -- not necessarily
19   did anyone you were going to contact need the
20   product.  That's also not necessarily true, right?
21        A.   Yeah.  Potentially true, yes.  Yes.
22        Q.   You may have contacted somebody and said,
23   look, we have some oxy, we can sell it to you, maybe
24   you haven't hit your limit, maybe you want to buy it
25   so you've got it on hand, right?
```

```
 1              MS. KOSKI:  Form.

 2       A.   Yeah, that's a potential scenario.

 3       Q.   I mean, so this was in '08.  I mean, we

 4  talked about this meeting minutes from March of '09

 5  where the president of the company said just move

 6  the product.

 7              Do you remember that?

 8       A.   Yes.

 9       Q.   And so that's what you had going on here,

10  right, with this e-mail with this oxy?  You were

11  just trying to move the product?

12              MS. KOSKI:  Object to form.

13       A.   No.

14       Q.   You were just trying to move the product to

15  meet the sales forecast that you-all had set for

16  yourselves; isn't that right?

17       A.   Again, I think that's a mischaracterization,

18  right?  The -- if you see what the e-mail says, it

19  says here is a bunch of different products to think

20  about because we need some incremental sales.

21              Was oxy one of them that he recommended?

22  For sure.  Did -- was there a follow-up where, you

23  know, I asked Norm to look at Aetna?  It looks like,

24  yes, there was.

25       Q.   How many -- when you got this e-mail where
```

```
 1    it says anyone need -- anyone in need of oxy and you

 2    said Norm is going to contact Aetna on oxy, how many

 3    products was Anda selling at that time in September

 4    2008?

 5        A.   Probably 6,000.

 6        Q.   6,000?

 7        A.   Yeah.

 8        Q.   Do you know -- are you familiar with a place

 9    called The Hometown Pharmacy?

10        A.   I've heard the name.

11        Q.   They were -- they were a growing chain back

12    in 2008, weren't they?

13        A.   Like I said, I've heard the name.  I don't

14    know specifically.  I believe, were they a customer?

15        Q.   Do you know who Heath Ullman is?

16        A.   Yes.  He was a telesales rep.

17        Q.   Yeah.  So -- let's take a look at this.

18             (Discussion off the record.)

19             (Anda-Versosky Exhibit 10 was marked for

20    identification.)

21    BY MR. PENNOCK:

22        Q.   Sir, take a look at this e-mail.  It begins

23    with an e-mail from Mr. Ullman.

24             MS. KOSKI:  Is there another one?

25             MR. PENNOCK:  That's the same one.  I gave
```

```
 1      you two.

 2          THE VIDEOGRAPHER:  Could you slide a little

 3      more to your left?  I'm sorry.

 4          Thank you.

 5  BY MR. PENNOCK:

 6      Q.  Are you ready, sir?

 7      A.  No, I'm sorry.  I'm reading the last page.

 8          Okay.

 9      Q.  Exhibit 10 is an e-mail thread that bears

10  Bates number 0000272169, and it runs to 171.

11          In this e-mail, Mr. Ullman is writing about

12      a customer who has -- that's called The Hometown

13      Pharmacy, right?

14      A.  Yes.

15      Q.  Right?

16      A.  Yeah.

17      Q.  They are a company out of Youngstown, Ohio,

18      originally; is that right?

19      A.  I --

20      Q.  You don't know?

21      A.  I don't know.

22      Q.  So Mr. Ullman is concerned because The

23  Hometown Pharmacy has hit its limits regarding the

24      sale of certain CIIs, right?

25      A.  Yes, I see that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.    And The Hometown Pharmacy principal --

 2   somebody at The Hometown Pharmacy -- actually, I

 3   think the owner of the company, right?

 4        A.    It looks that way, yeah.

 5        Q.    He says:  Heath, I am writing this last

 6   e-mail because I have been nothing but a great

 7   customer and we have grown immensely in the last

 8   nine-plus years.

 9              Do you see that?

10        A.    Uh-huh.

11        Q.    And this e-mail is dated December 31st,

12   2008, right?

13        A.    Yes.

14        Q.    So apparently it's a long-standing customer,

15   right?

16        A.    Yes.

17        Q.    We have six retail locations; 1,000 nursing

18   home beds, more coming; one mail order; and many

19   more retail sites in the near future.

20              Right?

21        A.    Yes.

22        Q.    He says:  Do I want Anda to be a part of all

23   these?  Absolutely.

24              Have I read that correctly?

25        A.    Yes.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1        Q.   We are a company that will do over

 2   $24 million in sales this year and never had any

 3   issues with any states nor DEA issues, or for that

 4   matter, third party.

 5             True?

 6        A.   I see that, yes.

 7        Q.   The Newcastle store -- that's Newcastle,

 8   Pennsylvania?  You don't know?

 9        A.   I don't know.

10        Q.   Not something -- okay.

11             The Newcastle store fills 2,000-plus

12   prescriptions a week, and I cannot order any

13   controls from Anda.  That is an absolute disgrace.

14             Right?

15        A.   Yes.

16        Q.   It says:  Your company is penalizing high

17   volume stores.  I bust my butt to where I have

18   gotten, and you guys tie my hands.

19             This is an upset customer, right?

20        A.   Yeah.  And I think this is indicative of,

21   you know, some of the customer feedback we received

22   over time.

23        Q.   All right.

24             But that's okay, isn't it, because these are

25   controlled substances that we're talking about?
```

```
 1        A.    Sure.

 2        Q.    So this gets elevated, and Heath Ullman

 3    forwards it to Amy Centrella.

 4        A.    Yep.

 5        Q.    Who is she?

 6        A.    She was a national account manager.

 7        Q.    She worked for you?

 8        A.    She did.

 9        Q.    And --

10        A.    So this would be one of those accounts where

11    it was a shared account, so it was under Brian's

12    purview with Heath under my purview with Amy, if

13    that makes sense.

14        Q.    Heath says:  See the e-mail below regarding

15    39142 for The Hometown Pharmacy.  Please see what

16    you can do to resolve.  This is out of my control,

17    no pun intended.

18              Right?

19        A.    Yeah, I see that.

20        Q.    This gets forwarded to you?

21        A.    Uh-huh.

22        Q.    And apparently you actually had had a

23    conversation about this issue prior to this e-mail

24    being forwarded to you, right?

25        A.    Yes, I see.
```

```
 1      Q.   It says:  Bill, As per our conversation --

 2      A.   I see that.

 3      Q.   -- earlier, below is the e-mail from Bob

 4   Ekiert, the owner of Tadek, Inc.

 5           Okay?  Got it?

 6      A.   Yes.

 7      Q.   So somebody came -- I guess Amy came --

 8   Ms. Centrella came and talked to you about this

 9   issue.

10           And then he sent you the e-mail, right?

11      A.   Yep.

12      Q.   Okay.  And you send this to the backstop,

13   Michael Cochrane?

14      A.   Uh-huh.

15      Q.   On New Year's Eve?

16      A.   Yes.

17      Q.   2008?

18      A.   Yes.

19      Q.   Do you know how many overdose deaths there

20   were in Cuyahoga County, Ohio, in 2008?

21      A.   I don't.

22      Q.   What about 2009?

23      A.   I don't.

24      Q.   Hi, Mike.  Can you please read the e-mail

25   below and give me a call when you have a chance.
```

```
 1              Have I read that correctly?
 2      A.   Yes.
 3      Q.   I'm wondering if we can get on a conference
 4   call with this guy --
 5              You're referring to the owner of the
 6   company, right?
 7      A.   Yes.
 8      Q.   -- to try and save his business.
 9      A.   Yes.
10      Q.   So a decision had already been made by the
11   backstop to cut these guys off, right?
12      A.   Yes.
13      Q.   And you knew that from this e-mail chain
14   because that's how it all started, right?
15      A.   Yes.
16      Q.   But on New Year's Eve, 5 o'clock, you told
17   the backstop, Cochrane -- Mike Cochrane:  Hey, let's
18   try and save this guy's business.
19              MS. KOSKI:  Object to form.
20   BY MR. PENNOCK:
21      Q.   Right?  That's what you did?
22      A.   Yes, but your assumption is saving the
23   business means turning controls on.  That's not
24   necessarily -- that wasn't necessarily the case
25   every time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Well, was it the case?

 2        A.    In this scenario, I don't know, but where I

 3   say get on a conference call with the guy --

 4        Q.   Yeah.

 5        A.    -- a lot of times what was driving, you

 6   know, frustration with customers was communication

 7   out of our compliance team to customers was poor,

 8   right?

 9             And so there were customers who were -- they

10   were just angry at us because they were not able to

11   buy controls, didn't know why, weren't getting good

12   feedback on, you know, what did they need to

13   provide, if -- like in this scenario, you know, the
```

█ ████████████████████████████████████████████████████

█ ████████████████████████████████████████████████████

```
16   information Michael may not have had which may have

17   informed his decision more, or, frankly, the

18   customer talking to Mike and Mike saying "this is

19   why I'm not comfortable with you" would have

20   alleviated the customer's concern and we may have

21   been able to maintain his business.

22             It got -- yeah.

23        Q.   You're speculating that any of that took

24   place with this guy?

25        A.    To this specific situation, yeah.  Yeah, I'm
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    speculating, but that was --

 2       Q.   This guy's concern had to do with his

 3    controls -- his controlled substances that somebody

 4    had cut off.

 5       A.   Sure.

 6       Q.   You had no idea why they had been cut off?

 7       A.   Correct.

 8       Q.   That's what he wanted back.  He wanted his

 9    controls back.

10       A.   Correct.

11       Q.   That's clear from this, isn't it?

12       A.   Yes.

13       Q.   You get an e-mail at 4:30, and 26 minutes

14    later, you say can we get on a conference call with

15    the guy to save his business.

16            That's what you did, right?

17            MS. KOSKI:  Objection, form.

18       Mischaracterizes the document.  Look at the

19       dates.

20    BY MR. PENNOCK:

21       Q.   Let me rephrase that.

22            You got an e-mail -- I apologize.

23            You got an e-mail at 11:54 a.m. on

24    December 31st, 2008, and later that day, you -- you

25    e-mailed Cochrane, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.    Yeah.

2       Q.    Okay.  And there's not a lot of cautious

3   conduct involved in this, is there, with respect to

4   opioids, by you?

5             MS. KOSKI:  Object to form.

6       A.    I -- I don't agree with that.

7       Q.    You don't agree with that?  You said earlier

8   that you --

9       A.    This was --

10      Q.    -- you-all were very cautious about this.

11      A.    This was from a -- from a practice

12  standpoint, this would have been me collecting the

13  information from Amy, passing it on to Mike.  I just

14  explained, frankly, how these -- how we tried to

15  handle these situations was, you know, one is either

16  Mike needed additional information; or, two, the

17  customer needed better feedback on to why they

18  weren't allowed to buy from us.

19            Those were really the two solutions.

20      Q.    Really?  Those were really the two

21  solutions?  But in this e-mail to Mike, you don't

22  give him any new information, say, by the way, Mike,

23  maybe you need to reconsider this for A, B, C, and

24  D, do you?  You don't say that?

25      A.    The information --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   You don't -- sir, you don't say to Mike

 2    Cochrane, here's some additional information?

 3             MS. KOSKI:  Object --

 4        Q.   That's not said to him here, right?

 5             MS. KOSKI:  Object to form.  You can allow

 6        him to answer.  Allow him to get his question out

 7        and then complete your answer.

 8    BY MR. PENNOCK:

 9        Q.   Yeah.  You don't say to Cochrane, the

10    backstop, I have new information for you, right?

11    You don't say that?

12        A.   I don't say that specifically, no.

13        Q.   Right.  And, in fact, you told us earlier

14    that sales didn't collect any of this information

15    that might be of assistance to Mr. Cochrane.

16             MS. KOSKI:  Objection; mischaracterizes his

17        prior testimony.

18        A.   Yeah, I don't believe I said that.

19        Q.   Oh, you don't believe you said that?

20        A.   No.

21        Q.   You said that --

22        A.   Can I stop you for one second and continue?

23        Q.   No.  You said you don't believe you said

24    that.

25        A.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   You have testified here today on several

 2   occasions that sales was -- was focused on the

 3   opportunities and attempting to make the sale and

 4   not involved with what the backstop was doing unless

 5   asked.

 6             Haven't you said that?

 7             MS. KOSKI:   Object to form.

 8        A.   Sales was collecting information for them,

 9   for sure, and I believe I said that.

10        Q.   And where -- and where is the information

11   that when you contacted Mr. Cochrane to try and save

12   this business, you didn't give him any new

13   information, you just sent him the e-mail chain?

14        A.   I think that's an assumption.  The -- the

15   information to me that would have been relevant

16   would have been on the original e-mail from the

█████    ████████████████████████████████████████████████████

█████    ██████████████████████████████████████████

19             I don't know if Michael had that or not from

20   a new information standpoint.

21        Q.   Well, you were e-mailing Mike Cochrane to

22   have a conference call with him and this gentleman

23   from Hometown Pharmacy to save the business, but you

24   provide no additional information to change this

25   decision.
```

```
 1            MS. KOSKI:  Object to form.  Asked and
 2       answered.
 3       A.   Yeah, I feel like I already answered that.
 4  There is information right here, and, you know,
 5  potentially that discussion with the customer may
 6  have provided additional information if there was
 7  additional information Mike wanted or not.
 8            I think we're doing a lot of generalizing
 9  about this specific scenario, but that's the best
10  answer I can give you.
11       Q.   So it's your testimony, then, I guess --
12  withdrawn.
13            So are you saying that you were going to
14  help Mr. Cochrane engage in one of these scientific
15  decisions --
16       A.   No.
17       Q.   -- with respect to -- with respect to giving
18  this guy his controlled substances back?
19       A.   No.  What I'm saying is that I was trying to
20  build a bridge between Mike and the customer so that
21  if there were additional questions Mike had, he
22  could ask them; or if Mike was already past that
23  point, there was additional information he could
24  give to the customer that hopefully we would be able
25  to save the customer's business because he's getting
```

Highly Confidential - Subject to Further Confidentiality Review

1    more information than potentially he was before.

2    Q.   Well, you certainly weren't hoping to save

3    the customer by giving him his controls back, were

4    you?

5    A.   There -- I think you're assuming that the

6    only way to save the customer is to give them

7    controls.  That's not accurate.  You know, through

8    this time, there were -- you know, these same --

9    these same issues were in the competitive market.

10        So like the customer that couldn't buy

11   controls from us may not have been able to buy

12   controls somewhere else.

13   Q.   All right.  You think you were going to save

14   this customer -- when you -- withdrawn.

15        When you went to e-mail Mike Cochrane and

16   have a call with Mike Cochrane and then a conference

17   call with this guy, you think you were going to save

18   his business without giving him his controls back?

19   A.   Potentially.

20   Q.   So you're -- so you were not contacting Mike

21   Cochrane to talk to Mike Cochrane about giving this

22   guy his controls back?

23   A.   I think that was part of it, for sure.

24   Q.   That was part of it?

25   A.   That's not the only solution.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Here's what he said, the person whose

 2    business you were going to try and save.

 3        A.   Sure.

 4        Q.   I want you to go to bat for Newcastle store

 5    and lift the ridiculous restrictions that were put

 6    on my store for a year now.

 7             That's what he was concerned about.

 8        A.   Customers complained all the time like this.

 9    Like I said, this -- this e-mail, I don't think, is

10    abnormal.

11        Q.   What about you jumping in to the backstop,

12    Mr. Cochrane, to have him try and save the business?

13    Was that abnormal?

14             MS. KOSKI:  Object to form.

15        A.   No.  I think if one of my NAMs sent

16    something to me, I would have immediately sent it to

17    Mike.

18        Q.   Do you know who Norman -- Norman Dodes, is

19    that the Norm that was going to call Aetna?

20        A.   Yes.

21        Q.   So we looked at an e-mail earlier.  Norm was

22    going to call Aetna about seeing if they wanted to

23    buy the oxy?

24        A.   Yes.

25             MS. KOSKI:  Make sure he finishes his
```

Highly Confidential - Subject to Further Confidentiality Review

 1      question first.

 2              MR. PENNOCK:  Mark that, please.

 3              (Anda-Versosky Exhibit 12 was marked for

 4      identification.)

 5      BY MR. PENNOCK:

 6      Q.   Sir, while you're reading that, I'm going to

 7      identify for the record we've marked as Exhibit 12

 8      to your deposition an e-mail thread that is

 9      0000078156 through 158.

10              Are you ready?

11      A.   Yes.

12      Q.   This e-mail is -- the top e-mail is from

13      March 16th, 2009, 4:26 p.m.

14              Right?

15      A.   Yes.

16      Q.   Just coincidentally, this was the day before

17      the leadership meeting with those minutes that we

18      looked at, isn't it?  That meeting was on March 17,

19      2009.

20      A.   Okay.

21      Q.   And Mr. Dodes sent an e-mail to Mr. Cochrane

22      and you, right?

23      A.   Yes.

24      Q.   It started out with an e-mail from Mike

25      Schneidereit from Assured Pharmacy.

```
 1              Do you see that?

 2      A.    Yes.

 3      Q.    And this has been forwarded on to you?

 4      A.    Yes.  I see that.

 5      Q.    Mr. Schneidereit wrote -- he was from this

 6   Assured Pharmacy:  I am pleased to announce that

 7   Assured Pharmacy has hired Michael Mapes as our new

 8   chief compliance officer.  Michael joins our team

 9   with over 30 years of experience with the DEA and

10   specifically the last eight years as section chief

11   in the office of diversion control in Washington,

12   D.C.

13              Do you see that?

14      A.    I do.

15      Q.    With Michael's experience, knowledge, and

16   foresight, we will continue to pioneer pain

17   management as a specialty pharmacy and firmly

18   establish ourselves as the safest, most effective

19   pharmacy in treating chronic pain patients.

20              Right?

21      A.    I see that.

22      Q.    Okay.  So then who is Robert DelVecchio?  Do

23   you know who he was?

24      A.    It looks like he's --

25      Q.    CEO of Assured Pharmacy?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yeah.

 2      Q.    And he wrote to Norm, Mr. Dodes.  He said:

 3   Dear Norman, I'm looking forward to seeing you next

 4   week.  I just wanted to forward to you our new team

 5   member Mike Mapes.  Mike is joining us as our

 6   compliance officer.

 7            Right?

 8      A.    Yes.

 9      Q.    And he sent that on March 7th, and on

10   March 16th, Dodes sends it to Cochrane and you.

11   Right?

12      A.    I see that, yes.

13      Q.    You're not in compliance.

14      A.    Correct.

15      Q.    You were in charge of national accounts,

16   sales, vice president.

17            He sends it to the compliance officer,

18   Michael Cochrane, and to you, and he says:  Mike --

19   he doesn't address you -- this is from Assured

20   Pharmacy.  They just hired a new chief compliance

21   officer.  His name is Mike Mapes.

22            Have I read that correctly?

23      A.    Yes.

24      Q.    Did you ever hear of him?

25            Do you see that?
```

```
 1      A.   Yeah.

 2      Q.   He says:  Please take a look below.  I would

 3   like for you to get in touch with Mike, that's the

 4   C -- I don't know what -- what Mike he's talking

 5   about.

 6           He's talking about Mike Schneidereit

 7   probably, right?

 8      A.   Yeah, I would assume he was talking about

 9   Mike Mapes, but I --

10      Q.   Mike Mapes?

11      A.   Yeah.

12      Q.   The --

13      A.   Maybe not.  Yeah, no, you're right, because

14   he's asking --

15      Q.   He's talking about Mike as if he knows him.

16   He probably would have known Mike Schneidereit.

17           MS. KOSKI:  Object to form.

18   BY MR. PENNOCK:

19      Q.   Okay.  I would like for you to get in touch

20   with Mike.  We need to raise their control limits as

21   soon as possible.

22           MS. KOSKI:  Object to form.

23   BY MR. PENNOCK:

24      Q.   Do you see that statement?

25      A.   I do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Have I read that correctly?

 2       A.   Yes.

 3       Q.   Is this -- is this one of those scientific

 4   decisions that you were telling us about earlier?

 5            MS. KOSKI:   Object to form.

 6       A.   This -- I believe Mike Mapes was known to

 7   Mike Cochrane, so this -- this was a

 8   informational -- a piece of new information that a

 9   salesperson was giving to Mike.

10       Q.   Okay.

11       A.   And he's --

12       Q.   Let's look at the words on the page.  He

13   doesn't say anything about anything other than

14   they've hired a new chief compliance officer.

15       A.   Yes.

16       Q.   That's what he tells them, right?  He tells

17   them it's from Assured Pharmacy, right?

18       A.   Right.

19       Q.   He says:  Did you ever hear of Mike Mapes,

20   right?

21       A.   Yeah.

22       Q.   He says:  Please take a look below, which

23   would tell you that Mike Mapes was -- had been at

24   the DEA for 30 years.

25       A.   Yes.
```

1    Q.   And he says -- he concludes:  We need to

2    raise their control limits as quick as possible.

3         That's what he told you and Mr. Cochrane.

4    A.   It's great, but he's not able to tell us

5    that.

6    Q.   Well, he may not be able to make it

7    happen --

8    A.   Yeah, correct.

9    Q.   You mean he may not be able to make it

10   happen.

11   A.   Correct.

12   Q.   But he's telling you -- somebody that worked

13   for you thought that he could send an e-mail like

14   this telling you to raise their limits as quickly as

15   possible because a sheriff just came to town in one

16   of our customers.

17        Isn't that what's happening here?

18   A.   I would say that's a semi-fair

19   characterization of the way Norm speaks, but that

20   doesn't change how Mike operates his business from a

21   compliance standpoint.

22   Q.   Well, what about changing how you operated

23   Anda's business in terms of your salespeople?  Let's

24   talk about that.

25   A.   Sure.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Your salespeople thought it was okay to

2    suggest raising control limits on controlled

3    substances for a customer just because some new

4    compliance officer was being hired by that customer;

5    is that --

6    A.    I think that's what Norm thought, yeah, that

7    based on this customer bringing in someone with, you

8    know, a boatload of experience, that they would be a

9    theoretically safe customer.

10   Q.    They would be a stickler?

11   A.    What do you mean stickler?

12   Q.    You don't know what a stickler means?

13   A.    A stickler to what?

14   Q.    The DEA guy --

15   A.    Yeah.

16   Q.    -- who was coming in might be a problem with

17   respect to your sales?

18   A.    No.

19   Q.    You don't think that's what he was saying?

20   A.    No, I think it was the opposite.

21   Q.    Oh, really.  You think he -- that Norm was

22   recommending to his boss and the backstop, raise

23   their control limits as soon -- as quick as possible

24   so that you had a benchmark that was higher?

25   A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    No?

2      A.    No.   This -- again, I believe Mike Mapes was

3    known to Mike Cochrane.  I don't want to speculate,

4    but I believe they -- he may have even consulted for

5    Anda at some point, I don't know before or after

6    this, which would be taken as he's a credible

7    compliance manager for this company and we could

8    probably be confident in their policies and

9    procedures.

10          That was a piece of new information --

11     Q.    So why would you have to raise those limits

12   as quick as possible?

13     A.    That's the way Norm talks, you know.

14     Q.    So the reason -- one interpretation of this

15   is that Norm is saying raise the limits as quick as

16   possible --

17     A.    Yeah.

18     Q.    -- because there is a new compliance officer

19   getting onboard with our customer, and we want to

20   start out with higher limits in case he starts

21   slicing and dicing what's happening there.

22          MS. KOSKI:   Object to form.

23   BY MR. PENNOCK:

24     Q.    Don't you agree that's one reasonable

25   interpretation?

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.   I would say it's a reasonable interpretation

2   without any context or history.  That's --

3        Q.   Well, do you remember this?

4        A.   I don't remember it specifically, but

5   knowing, you know, the name Mike Mapes and all of

6   that, it doesn't -- that's not a rational

7   understanding for me.

8        Q.   So you're saying we can raise the -- you're

9   saying your interpretation of this is we can

10  raise -- we can now raise the limits because now we

11  can trust them?

12       A.   No.  No.

13       Q.   We can now raise -- your interpretation --

14       A.   No, no.

15       Q.   -- is we can now raise --

16            MS. KOSKI:  Let him finish.

17  BY MR. PENNOCK:

18       Q.   Norm is suggesting to you we can now raise

19  the limits because now they're going to have a

20  credible compliance officer who we can trust.

21       A.   I think that's a fair assessment that Norm

22  is saying that.

23            We -- my interpretation is this is new

24  information.  This is something Mike would have

25  looked at.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So if what you're now telling us is the

 2   correct interpretation of this, why did he want it

 3   to happen, as he put it, as quick as possible?

 4        A.   Because Norm -- Norma -- it's a

 5   Norm-specific -- he's a very aggressive talker, a

 6   very aggressive salesperson in trying to make sure

 7   things happen quickly.

 8             He's a New York guy.  He's -- he's very

 9   aggressive.

10             MS. KOSKI:  Not that all New York guys are

11        aggressive, necessarily.

12             I think they're all from New York.

13             THE WITNESS:  I'm from New York.

14             (Anda-Versosky Exhibit 13 was marked for

15   identification.)

16             MS. KOSKI:  Thank you.

17   BY MR. PENNOCK:

18        Q.   Okay.  Sir, we've marked as Exhibit 13 to

19   your deposition an e-mail bearing Bates number

20   0000110089.

21             Have you had a chance to look at that?

22        A.   Yes.

23        Q.   And this is an e-mail from Marc Falkin.

24             He was in sales, right?

25        A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   And it's to a very large distribution list.

 2           Would you agree with me?

 3      A.   Yes.

 4      Q.   He's got the Anda Pharmacy Group, Anda

 5   Pricing, Anda Gurney Reps, Anda West Coast Group,

 6   Anda Marketing, Anda Purchasing.

 7      A.   Yeah, just a point of clarification.  At

 8   this point, Marc may have been in marketing, but I

 9   don't know that it matters.

10      Q.   Okay.  Anda National Accounts.

11           That would include you, right?

12      A.   Yes.

13      Q.   Anda New York Sales, Anda Injectables, Anda

14   PR Sales, Anda Sales Floor Managers.

15           All of these have lots of people in these

16   distribution lists, right?

17      A.   Yes.

18      Q.   And then he listed a number of people

19   individually, including you?

20      A.   Yes.

21      Q.   And Mike Cochrane, the backstop, right?

22      A.   Yes.

23      Q.   And this Patrick Cochrane, he's -- he was

24   in --

25      A.   Logistics.
```

Highly Confidential – Subject to Further Confidentiality Review

1     Q.    Logistics?

2     A.    Yeah.   The warehouses.

3     Q.    So this is on April 29th, 2010, at

4     5:20 p.m., and he says -- he's telling everybody

5     we've got $5.5 million of Ranbaxy's -- that's a

6     manufacturer?

7     A.    Yes.

8     Q.    We've got $5.5 million of Ranbaxy's

9     oxycodone CR 10 and 20 milligram available and

10    looking for a home out of our Ohio distribution

11    center.

12          Have I read that correctly?

13    A.    Yes.

14    Q.    And they want -- he puts down here:   WANTED:

15    Paper 222 forms for those customers not ordering by

16    CSOS.

17          What he's communicating there is, look,

18    there might be some customers that want this oxy,

19    right?

20    A.    Correct.

21    Q.    And some of them might not be on our -- on

22    our electronic system, right?

23    A.    Yes.

24    Q.    So we'd have to get the Paper 222.   Those

25    are like the ordering forms --

```
 1        A.   Yes.

 2        Q.   -- official forms for controlled substance,

 3   right?

 4        A.   Yes.

 5        Q.   Including oxy, right?

 6             And he's telling everyone that this is a big

 7   opportunity to sell some product, right?

 8        A.   Yes.

 9        Q.   And have you seen this document before?

10        A.   I'm sure I saw it.  I was copied on it.

11        Q.   So this was a lot of product that you

12   suddenly had available to sell because of some

13   patent infringement situation?

14        A.   Yeah.  I believe, as I read this, the --

15   that first bullet point, Number 1, where it says,

16   "We understand at this point no additional generic

17   suppliers."

18             So that makes this one of those kind of, you

19   know, interesting, you know, product offerings,

20   where we have inventory, potentially others don't,

21   or at some point won't.  It's a short supply item.

22        Q.   Doesn't this smack of the "just move the

23   product" that we talked about earlier today?

24             MS. KOSKI:  Object --

25   BY MR. PENNOCK:
```

1    Q.   Do you know what I mean by that?  Doesn't

2    this smack of that?  Do you know what -- do you know

3    what that phrase means?

4    A.   I don't agree with where you're going,

5    whether I --

6    Q.   Do you know what that phrase means?

7    A.   Enlighten me.

8    Q.   Hmm?

9    A.   No, please --

10    Q.   How about this.

11         Doesn't it sound like the president of the

12    company, when he said -- what was it -- "just move

13    the product" in that leadership meeting?

14    A.   No.

15    Q.   You don't think it sounds like that?

16    A.   Not even close.

17    Q.   Not even close?

18    A.   No, because --

19    Q.   Doesn't it sound like -- doesn't it sound

20    like these other things we've been looking at, like,

21    you know, "save his business" that we looked at that

22    you wrote, save -- "save his business"?

23    A.   No.

24         MS. KOSKI:  Object to form.

25    BY MR. PENNOCK:

1    Q.   Doesn't it look like the situation where

2  Norm was going to call Aetna to try and sell the oxy

3  to Aetna?  Isn't it the same kind of situation?

4       MS. KOSKI:  Object to form.

5    A.   It would be curious.  That situation from a

6  timing standpoint to this one may have been in the

7  same time frame, but there may be a parallel there.

8  This was a market-driven scenario.  As a secondary,

9  if you have product and others do not, that's a good

10 thing for you.

11   Q.   We had the -- you know, remember we had the

12 Rochelle Vance sales opportunity for the oxy

13 products.

14        Remember that from earlier?

15   A.   I do.

16   Q.   And we had the Bi-Mart situation from

17 earlier.

18        Do you remember that?

19   A.   I do.

20   Q.   Store 610, a store in a place with 37,000

21 people, right?  Remember that?

22   A.   I do remember that.

23   Q.   We just looked at Norm:  Need to raise their

24 control limits as quick as possible.

25        We looked at that, right?

Highly Confidential - Subject to Further Confidentiality Review

```
1         A.    Yes.

2         Q.    And now we have this -- we've got $5.5

3    million worth of oxycodones looking for a home.

4               That's what that says, right?

5         A.    I agree that's what that says.

6         Q.    As far as you're concerned, no -- there is

7    not even anything objectionable in that statement?

8         A.    I think that's a cute turn of phrase by a

9    marketing guy of why don't you guys go try to sell

10   this.  When you read the detail, you know, he's

11   speaking to a market supply issue that creates a,

12   you know, sales opportunity for us because we have

13   inventory when others may not.

14        Q.    Well, that -- in -- that's the problem with

15   all of this that we've been looking at, isn't it?

16   The attitude?

17              MS. KOSKI:  Object to form.

18   BY MR. PENNOCK:

19        Q.    I'll rephrase.

20              You understand that the issue that we're --

21   that we've been looking at is that attitude that

22   prevailed inside Anda with respect to selling

23   opioids?  Do you understand that's the point that

24   we've been looking at?

25              MS. KOSKI:  Objection --
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    BY MR. PENNOCK:

2        Q.   Or no, maybe you don't understand that?

3            MS. KOSKI:  Object to form.

4        Mischaracterizes testimony.

5            You can answer.

6    BY MR. PENNOCK:

7        Q.   I'm sorry.  My questioning -- I'll rephrase.

8    She's right this time.

9            We're -- these e-mails that we've been

10   looking at, sir, all reflect an attitude inside

11   sales at Anda that had to do with moving product

12   and -- when you were talking about controlled

13   substances were the product.

14           MS. KOSKI:  Object to form.

15   BY MR. PENNOCK:

16       Q.   Do you understand that?

17       A.   I do understand that.

18       Q.   Don't you agree that the attitude, back

19   then, at least, was not a responsible attitude

20   toward this product?

21           MS. KOSKI:  Object to form.

22       A.   I don't agree.

23       Q.   Don't you agree that it was not a cautious

24   attitude toward this product distribution?

25           MS. KOSKI:  Object to form.
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.   I do not agree.

 2      Q.   Don't you agree that it was an attitude to

 3   inside sales of "just move this product" like it was

 4   any other type of product, widgets?

 5           MS. KOSKI:  Object to form.

 6      A.   I think there was -- there was definitely

 7   more caution related to these types of products than

 8   others; however, from a sales standpoint, we were

 9   very much trying to sell with having the compliance

10   as a separate group, as you mentioned, as our

11   backstop.

12           We -- but, you know, pulling e-mails across

13   years and looking at someone's language, I mean, I

14   would ask Marc about his language on looking for a

15   home for that.  I don't -- you know, that's --

16   that's pulling a lot of strings together.

17      Q.   Looking for a home to destroy maybe, huh?

18           MS. KOSKI:  Object to form.

19           You don't have to answer that.

20   BY MR. PENNOCK:

21      Q.   You made some allusion to one e-mail or a

22   handful of e-mails, but we talked earlier, we're

23   only looking at e-mails that you were on, right?

24           MS. KOSKI:  Object to form.

25   BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Aren't we?

 2      A.   I don't know.  Was I on all of these?

 3      Q.   At some point in the thread you were on the

 4   e-mails.

 5      A.   Okay.

 6      Q.   And we talked earlier, there are only a few

 7   hundred over 12 years with your name on it?

 8           MS. KOSKI:  Object to form.

 9      A.   Is that a question?

10      Q.   Yes.  The question was:  And we talked

11   earlier, there are only a few hundred over 12 years

12   with your name on it?

13           MS. KOSKI:  Object to form.

14      A.   Okay.

15      Q.   Right?

16      A.   That's not a question.

17      Q.   That exists today?

18      A.   You're asking me if that's the case.  I

19   don't know.  I can't look that up.

20           MS. KOSKI:  Objection.  That

21      mischaracterizes -- "that exists today" is not

22      what you talked about earlier, right?

23   BY MR. PENNOCK:

24      Q.   We're talking about e-mails with your name

25   on it related to opioids.  There are only some few
```

Highly Confidential - Subject to Further Confidentiality Review

1    hundred e-mails for an entire 12-year period.

2         MS. KOSKI:  Object to form.

3         Mischaracterizes the discovery record.

4         A.   Again, I'm sorry, I'm not -- I don't know

5    what your question is because I can't --

6         Q.   My question is you understand that there are

7    only --

8         A.   I understand that you're telling me that.

9         Q.   That I'm telling you that?

10        A.   Yes.

11        Q.   And you said that didn't surprise you or

12   words to that effect?

13        A.   Correct.

14        MS. KOSKI:  Object to form.

15   BY MR. PENNOCK:

16        Q.   Right?

17        A.   Yeah.

18        Q.   You said, yeah, there might have only been a

19   few hundred e-mails related to opioids with my name

20   on it, right?

21        A.   Yes.

22        Q.   Okay.  But then you made some allusion to

23   this, like I'm picking out, you know, a limited

24   number of e-mails, but you understand the pool from

25   which we had to look was pretty limited.

```
 1      A.   Okay.

 2           MS. KOSKI:  Object to form.  Argumentative.

 3   BY MR. PENNOCK:

 4      Q.   Okay.  I'll withdraw that.

 5           (Discussion off the record.)

 6           (Anda-Versosky Exhibit 14 was marked for

 7   identification.)

 8   BY MR. PENNOCK:

 9      Q.   We've marked as Exhibit 14 to your

10   deposition a document that appears to be some type

11   of promotion that was faxed out to customers, right?

12      A.   Yes.

13      Q.   And it would have been faxed out to

14   customers who still ordered by paper.

15           Do you agree with that?

16      A.   Well, it says order using CSOS or 222 forms.

17   So it's -- people that were using paper would have

18   gotten it, that's right.

19      Q.   People that were using paper would have

20   gotten it?

21      A.   Yes.

22      Q.   But do you think all of your customers got

23   this?

24      A.   It's possible.

25      Q.   How many customers would that have been?
```

```
 1              MS. KOSKI:  Object to form.

 2        A.    Yeah, the number of customers that we had a

 3    fax number for, I think, was north of 10,000.

 4        Q.    North of 10,000?

 5        A.    Yes.

 6        Q.    And this Exhibit 14 is the -- relates to the

 7    $5.5 -- I'm sorry, $5.5 million worth of oxycodone

 8    that you had on hand?

 9              MS. KOSKI:  Object to form.

10              MR. PENNOCK:  Withdrawn.

11    BY MR. PENNOCK:

12        Q.    This relates to the $5.5 million of oxy --

13    of Ranbaxy's oxycodone, right?  That's what this

14    relates to?

15        A.    Yeah, I would assume so, yes.

16        Q.    You assume so?  I mean, could it be any more

17    clear?

18        A.    Well, I don't see a date on here, so I'm

19    sorry, I'm not trying to --

20        Q.    Okay.  Well, it says -- it says -- it has --

21    from the e-mail, we see here's the item number,

22    brand --

23        A.    I know it --

24        Q.    -- so then we've got the NDC number, right?

25        A.    Sure.
```

1    Q.   Okay.  And it's essentially replicated here.

2    A.   Okay.

3    Q.   Okay?

4         So this document, Exhibit 14, which is Bates

5    number 0000110042, this document, Exhibit 14,

6    relates to the $5.5 million of Ranbaxy's oxycodone

7    that Marc Falkin e-mailed to everybody, correct?

8         MS. KOSKI:  Object to form.

9    BY MR. PENNOCK:

10   Q.   Correct?

11   A.   Once again, I assume so.

12   Q.   Is there some reason you have any doubt

13   about that?

14   A.   I believe oxycodone had, you know, more than

15   one market supply issue related to it, so it's

16   possible this may have happened more than once.

17   Q.   WANTED:  Paper 222 forms for those customers

18   not ordering by CSOS.

19        Do you see that statement?

20   A.   I do.

21   Q.   You will recall that Ranbaxy only had

22   approval of the settlement with Purdue for

23   10 milligram and 20 milligram.

24        Do you see that statement?

25   A.   I do.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And you do see this information up here,

2    don't you?

3    A.   I do.

4    Q.   And you're telling me there is some doubt

5    that -- as to whether this relates to the

6    $5.5 million in oxy that Falkin was e-mailing

7    everyone about?

8    A.   I'm just saying I don't know exactly that

9    that's the case.  If -- for the purposes of moving

10   forward, sure, looks like that would be a marketing

11   piece that would have been put together in relation

12   to the scenario in the e-mail.

13   Q.   In fact, it even tells them on here, kind of

14   gives a little -- this is a fax.  It just gets blast

15   out to north of 10,000 customers at one time, right?

16   A.   A point of clarification on that.  And this

17   is something that like a Marc may have better

18   information related to.  That 10,000, they may have

19   pared that down to only customers that were allowed

20   to buy controls or -- you know, there was that

21   ability to kind of target market, not just blast it

22   out to the world.

23   Q.   There was that ability.  Okay.

24   A.   No, there was that ability.

25   Q.   There was that ability?

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   Okay.  This would have gone to some -- some

 3   number of thousands of customers?

 4      A.   Potentially, yeah.

 5      Q.   Okay.  And it tells them -- kind of gives

 6   them a little instructions how to fill out the form

 7   222, right?

 8      A.   Yes.

 9      Q.   And it even -- you were even going to

10   provide FedEx envelopes -- prepaid FedEx envelopes

11   so they could send this form back?

12      A.   Yeah.  Can I clarify on that, on why that

13   happened?  All right.  So --

14      Q.   So, well, first of all -- you can, yes.

15   I'll ask you in a second.

16           But you were providing a prepaid return

17   envelope for FedEx to send this form back --

18      A.   Yes.

19      Q.   -- to you, right?

20      A.   Yes.

21      Q.   To effectuate the order if somebody wanted

22   to do so, right?

23      A.   To effectuate it more quickly, yes.

24      Q.   So effectuate it more quickly.  Okay.

25           And you provided these prepaid FedEx
```

Highly Confidential – Subject to Further Confidentiality Review

1    envelopes why?

2    A.   So the normal -- a normal product order

3    would be like ordered electronically online,

4    whatever, shipped next day to the customers.  They

5    order from us today; tomorrow, they have a product.

6        In the form of a 222, they would have to

7    mail the form, it would be processed, and then the

8    product would be shipped out.  There was an extra

9    lag in days.

10       And so by providing the FedEx envelope, it

11   sort of collapsed that time as opposed to them

12   having to request a FedEx pickup and give it back.

13   Q.   Made it go faster?

14   A.   Made it go faster.  For a product that was

15   in short supply in the market, that was important.

16   Q.   Did y'all ever wonder why this product was

17   always in short supply on the market?

18       MS. KOSKI:  Object to form.

19   BY MR. PENNOCK:

20   Q.   That's a simple question.

21       Did you ever sit there and go, gee, how

22   come -- how come oxycodone always seems to be in

23   short supply on the market?

24       MS. KOSKI:  Object to form.

25   BY MR. PENNOCK:

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Did you ever think about that?

2             MS. KOSKI:  Object to form.  Sorry.

3    BY MR. PENNOCK:

4        Q.   Yes or no?

5        A.   Yes, we knew why.

6        Q.   Oh, you knew why.  Why did you know?

7        A.   It wasn't in short supply overall.  The

8    generic was in short supply.

9        Q.   I see.

10       A.   Not the brand.  So people were looking to

11   get the generic so that they would --

12       Q.   Get it cheaper?

13       A.   -- could dispense that instead of the brand.

14       Q.   I think we've all heard that phrase before,

15   haven't we?  We've heard that phrase before, "order

16   while supplies last"?

17       A.   Yes.

18            MS. KOSKI:  Object to form.

19   BY MR. PENNOCK:

20       Q.   Everybody has heard that phrase before

21   probably, right?

22       A.   Yes.

23       Q.   Doesn't it sound to you like "just move the

24   product"?  Doesn't it sound like that --

25            MS. KOSKI:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. PENNOCK:

 2        Q.   -- to you?

 3        A.   It doesn't.

 4        Q.   Doesn't.  Does not?

 5        A.   No.  I still go back to this was a -- this

 6    was a product that people needed that we had supply

 7    of.  So this is -- is it a, you know, an

 8    incentivizing statement to a customer that you need

 9    to do this quickly?  Yes.  It's because we were

10    going to run out of product.

11        Q.   So an incentivizing statement to a customer

12    about selling what, in essence, were heroin pills,

13    right?

14             MS. KOSKI:  Object to form.

15             You don't have to answer that.

16        A.   Yes.

17        Q.   And you certainly all needed to incentivize

18    the customer because you had $5.5 million of this

19    stuff on hand that you wanted to find a home for,

20    correct?

21        A.   I think that's unfortunately a

22    misrepresentation.  I mean, a market supply issue

23    like that, $5.5 million, we were going to sell it

24    because there was more need than that out there.

25        Q.   Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  I guess this would be a good

 2       time to break for lunch if you want to.

 3              MS. KOSKI:  Okay.

 4              MR. PENNOCK:  Okay.  Let's do that.

 5              THE VIDEOGRAPHER:  Off the record,

 6       12:44 p.m.

 7         (Recess from 12:44 p.m. until 1:36 p.m.)

 8              THE VIDEOGRAPHER:  On the record, 1:36 p.m.

 9    BY MR. PENNOCK:

10       Q.   Mr. Versosky, are you ready?

11       A.   Yes.

12       Q.   I want to --

13              MR. PENNOCK:  I need a copy of this.  Sorry,

14       I'll do it later.  Here, take that.

15    BY MR. PENNOCK:

16       Q.   Okay.

17                  (Discussion off the record.)

18              MR. PENNOCK:  Katy, let's go off the record,

19       please.

20              THE VIDEOGRAPHER:  Off the record, 1:37.

21         (Recess from 1:37 p.m. until  1:40 p.m.)

22              THE VIDEOGRAPHER:  On the record, 1:40 p.m.

23    BY MR. PENNOCK:

24       Q.   Sir, I'm going to mark the next exhibit to

25       your deposition.
```

 1            (Anda-Versosky Exhibit 15 was marked for

 2     identification.)

 3     BY MR. PENNOCK:

 4        Q.   Let me know when I may proceed,

 5     Mr. Versosky.

 6        A.   Sure, I think you can proceed.

 7        Q.   I've marked as Exhibit 15 to your deposition

 8     an e-mail bearing the number 0000610318.

 9            This is an e-mail -- started out with an

10     e-mail from Kristin Watson to a few people,

11     including you, and then it ended up with a response

12     from you.

13            Right?

14        A.   Yes.

15        Q.   And continuing where we were, this talk --

16     the topic that I was talking to you about, so this

17     is -- this is November 10th, 2009, right?

18        A.   Yeah.

19        Q.   That's your e-mail -- your response, anyway,

20     was November 10th.  Yeah, the original e-mail was

21     also November 10th.

22            And it's -- this Kristin Watson, department

23     coordinator, what was that?  What would she do?

24        A.   I believe -- so on the telesales floor,

25     there were, you know, I think 100 some-odd -- 150

Highly Confidential - Subject to Further Confidentiality Review

```
 1    telesales people.  The department coordinator was

 2    kind of a -- you know, what you would call like an

 3    admin for -- within that group to handle some

 4    process stuff related to that many telesales people.

 5       Q.   Well, she wrote:  I have received a new

 6    account request for Shamrock Medical Solutions

 7    Group.  This client is licensed as a wholesale and

 8    wholesale repackager.

 9            Have I read that correctly?

10       A.   Yes.

11       Q.   Please advise as to whether or not I can

12    proceed with processing this request.

13            Right?

14       A.   Yes.

15       Q.   So this Shamrock Medical Solutions Group

16    apparently wanted to open up an account with you;

17    true?

18       A.   That's how I read this, yes.

19       Q.   So -- but she sends that up to you and

20    George Fields and Brian Witte.  And your response

21    is:  Okay by me.  Who is the rep?

22            Do you see that?

23       A.   Yes.

24       Q.   So what was the reason that she needed

25    clearance from you?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   She didn't need clearance from me.

 2   George -- so because it was a wholesaler

 3   distributor, those typically flowed through George

 4   with a copy to me and Brian.

 5      Q.   But as a wholesale -- as a wholesale

 6   distributor at this time, in 2009, that could --

 7   this distributor could be somebody that requested to

 8   purchase opioids, right?

 9        MS. KOSKI:  Object to form; calls for

10     speculation.

11        MR. PENNOCK:  Well, I don't think it does.

12   BY MR. PENNOCK:

13      Q.   If you were selling to a whole -- if you

14   were opening up a new account for a wholesale

15   distributor in 2009, that company, after you opened

16   the account, might ask to buy opioids?

17        MS. KOSKI:  Same objection.  You can answer.

18      A.   Yeah, I would -- I would say it's possible,

19   but in -- I don't recall specific dates on this, but

20   I don't believe we sold wholesalers and distributors

21   controlled substances past a certain point.

22      Q.   Yeah.  We'll get to that.

23      A.   Okay.

24      Q.   And wholesale -- or wholesale repackagers

25   past a certain point?
```

```
 1     A.   Right.

 2     Q.   But at this point in time you did.

 3          MS. KOSKI:  Object to form.

 4     A.   I don't -- I don't know that factually.

 5     Q.   Okay.  The cutoff was June 17th, 2010.

 6          Does that ring a bell?

 7          MS. KOSKI:  Object to form.

 8     A.   It doesn't ring a bell, but if you're

 9   telling me -- I know there was a date after which we

10   did not do that anymore.

11     Q.   Right.  There was a date after which you

12   didn't sell to wholesalers, wholesale repackagers,

13   repackagers --

14     A.   Yeah.  Anybody that was not in use, yeah.

15     Q.   -- doctors, clinics.

16          Remember that cutoff, when that happened?

17     A.   I don't remember that cutoff, no.

18     Q.   Okay.  We'll talk about that in a minute.

19          So that was -- subject to connection, you

20   will see that was on June 17th, 2010.

21     A.   Okay.

22     Q.   Can you accept that for a second?

23     A.   Yes.

24          MS. KOSKI:  Object to form.

25   BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   Okay.  So this was before that, 2009, and

2    you're -- so your response was:  Okay by me.  Who's

3    the rep?

4         Do you see that?

5    A.   Yeah.

6    Q.   So is it fair to say that you did no

7    analysis with respect to who this new wholesale and

8    wholesale repackager was before you approved that?

9         MS. KOSKI:  Object to form.

10   A.   I think it's fair that I didn't do any

11   additional.  I think I was probably on there as a

12   check in case -- at that point we were concerned

13   about wholesalers and distributors that we

14   considered to be competitors in the market, and we

15   didn't necessarily want to sell to them.

16        So Shamrock Medical, I assume -- I hadn't

17   heard of them.  So for me it was an easy, yes, okay

18   by me.

19   Q.   So your only role in terms of approving the

20   opening of this account was just to make sure they

21   weren't a competitor of yours?

22   A.   I believe so, yeah.

23   Q.   This company, a few years later, was shut

24   down by the FDA, wasn't it?  Do you remember that?

25   A.   I don't.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. PENNOCK:  I have to remember not to
 2         break for lunch next time.
 3              MS. KOSKI:  I was going to give you a hot
 4         turkey dinner in the hopes that you'd just fall
 5         asleep.
 6              (Anda-Versosky Exhibit 16 was marked for
 7    identification.)
 8    BY MR. PENNOCK:
 9         Q.  Sir, I've shown you what's been marked as
10    Exhibit 16 to your deposition.  This is a printout
11    off the internet I'll represent to you that I
12    printed out.  It's from an article from
13    September 18th, 2013, about four years after the
14    exchange we were just looking at, three-and-a-half
15    years, whatever.
16              Okay.  Do you see Exhibit 16?
17         A.  Yes.
18         Q.  Does that at all refresh your recollection
19    as to learning that Shamrock was ultimately shut
20    down by the FDA?
21         A.  No.
22         Q.  If a company was shut down by a governmental
23    agency, one that you had been selling to, is there
24    any procedure for alerting you to that?
25         A.  No.  The -- so the individual rep would have
```

1    been notified, but, you know, me, at multiple levels

2    above that, I would not have seen that.

3        Q.   Wouldn't that have been important for you to

4    know, to see if companies were being shut down that

5    you had been selling to and then trying to find out

6    why?

7        A.   Potentially, if it was a large customer or

8    there was some, you know, specific issue that I was

9    involved with that customer.  And in this case, I

10   think we -- we sold to several hundred small

11   wholesalers and distributors.  I don't know that I

12   would have seen this.

13       Q.   Well, this -- this company, according to

14   this article, was shut down because it was

15   packaging -- it was packaging opioids without proper

16   labeling.

17            MS. KOSKI:  Object to form.

18   BY MR. PENNOCK:

19       Q.   Right?

20       A.   Yeah, I think that's what the article says,

21   yes.

22       Q.   And just coming back to did you ever ask

23   anyone to put a procedure in place to let leadership

24   in sales, namely you, know when a -- when a customer

25   had been shut down by the DEA or FDA for some -- --

Highly Confidential – Subject to Further Confidentiality Review

```
 1      A.   No.

 2      Q.   -- for some irregularity?

 3      A.   No.

 4      Q.   In -- we -- I mentioned earlier this

 5   shutdown of June 17th, 2010, and I'm going to show

 6   you some documents that will perhaps refresh your

 7   recollection on that.

 8           (Anda-Versosky Exhibit 17 was marked for

 9   identification.)

10   BY MR. PENNOCK:

11      Q.   May I proceed, Mr. Versosky?

12      A.   Yes, please.

13      Q.   So Exhibit 17, this is an e-mail thread and

14   it -- the first e-mail is on June 18th, 2010.

15      A.   Uh-huh.

16      Q.   And it's from Anita Isabella -- or is that

17   Isabella Anita?

18      A.   Anita Isabella.

19      Q.   And it's to the president of the company,

20   Albert Paonessa, right?

21      A.   Yes.

22      Q.   Brian Witte.  We heard about him earlier?

23      A.   Yes.

24      Q.   Marc Falkin?

25      A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       Q.   And yourself?

2       A.   Yes.

3       Q.   And Kim Bloom?

4       A.   Yes.

5       Q.   And a host of others, including Michael

6    Cochrane, right?

7       A.   Yes.

8       Q.   Importance:  High.

9            And Ms. Isabella writes:  Attached are the

10   2009 to 2010 year-to-date sales for accounts that

11   were cut off from buying controls yesterday.

12           Have I read that correctly?

13      A.   Yes.

14      Q.   The list, control customer sheet in the

15   file, represents only accounts currently active that

16   have had control sales this year.  There are 2,706

17   accounts.

18           Do you see that?

19      A.   Yes.

20      Q.   Do you remember this now?

21      A.   I remember that it happened, yeah, yes, I

22   guess.

23      Q.   An active account that has not ordered this

24   year or has only ordered noncontrols will not be on

25   this list but was cut off also.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Right?

 2      A.   Yes.

 3      Q.   So there were actually a lot more accounts

 4   than the 2,706 controls accounts?

 5      A.   I don't know that it was a lot more, but

 6   there were potentially more, sure.

 7      Q.   Okay.  We'll look at that in a minute.

 8      A.   Yeah.

 9      Q.   But if I told you it was 8,992 accounts,

10   would that surprise you?

11           MS. KOSKI:  Object to form.

12   BY MR. PENNOCK:

13      Q.   If I told you it was 8,992 accounts, you

14   would agree that was a lot more than 2,706?

15      A.   That is a lot more, but from a process

16   standpoint, my assumption is the customers -- that

17   would have basically been a full customer file that

18   hasn't gone through any kind of due diligence.

19           It's not like they could buy controls, I

20   don't believe.  It was just that they hadn't started

21   any process, and they flipped them all to they

22   couldn't.  So it, you know, was an extra layer of

23   protection.

24      Q.   So -- so they were shut down -- they may not

25   have been able to buy controls or they may not have
```

1    bought controls, but they were shut down regardless?

2        A.    Correct.

3        Q.    According to her -- okay.

4              So in any event, there are 2,706 accounts

5    that were currently buying controlled substances

6    from Anda that were shut down?

7        A.    Yes.

8        Q.    Right?

9        A.    Yes.

10       Q.    And the total amount of sales that had

11   happened year-to-date, that means January 1 to

12   January 17 -- I'm sorry.

13             The total number of sales that had happened

14   year-to-date, that means January 1 to June 17th,

15   right?

16       A.    Yes.

17       Q.    For controlled substances was $12,700,000?

18       A.    Yes.

19       Q.    Big number, right?

20       A.    Yeah.

21       Q.    And she notes the controlled substances

22   sales, quote, for these customers were $18 million

23   last year.  So we were tracking up 52 percent for

24   this year, end quote.

25             That's what she's pointing out, right?

1    A.   I see that, yes.

2    Q.   So in the year -- what that's saying is the

3    year before, for the whole year, we had $18 million

4    in controlled substances sales to the customers

5    being cut off as of yesterday.

6         Right?

7    A.   Yes.

8    Q.   And but this year, based on where we're

9    going, we're up over 50 percent --

10   A.   Yes.

11   Q.   -- in sales?

12        Now, you were vice president for national

13   accounts at this time -- or had you been moved up?

14   No, it's -- no, you'd been moved up.

15        You had been elevated to vice president of

16   sales and marketing?

17   A.   It was right in this time, yeah.

18   Q.   Right.

19        That happened like in May, I think, right?

20   A.   Somewhere around there.

21   Q.   So you were VP for sales as of this point.

22        This -- do you know how it was that you were

23   able to bump sales of controlled substances

24   52 percent across the board -- across the board just

25   for certain customers?

```
 1        A.   Yeah.  Can I make a point of clarification?

 2             So, again, I was -- VP of sales was my

 3   title, all right, and I ran national accounts.

 4        Q.   Yeah.

 5        A.   Physicians, clinics, vet -- and the two

 6   vets, along with the majority of the mailers,

 7   repackagers, and wholesaler distributors were

 8   managed in the Brian Witte realm of telesales.

 9             So not that I didn't have any, you know,

10   involvement in this.  Like in the previous e-mail, I

11   looked at that wholesaler along with, I believe,

12   Brian, but I wasn't as close to this as you're -- I

13   guess you're questioning.

14        Q.   Well, you -- you were a member of the

15   leadership team for the entire company?

16        A.   I am saying I am aware -- I was aware, yes.

17        Q.   Your title was vice president for sales --

18        A.   That's why I continue to clarify that it was

19   a title, right, but I had a vertical in sales.

20   There was another vertical in sales.

21             Frankly, there were three verticals because

22   physicians were in a completely different group

23   but --

24        Q.   So -- okay.

25             Nevertheless --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   -- when -- when you saw this number, that

 3   was a big hit?

 4      A.   Not really, because -- and we'd have to look

 5   at the overall sales of the company, but we were

 6   doing, I think, a billion dollars at that point in

 7   total sales.  So, you know, $12 million is not, you

 8   know, incredibly significant in the grand scheme of

 9   things.

10      Q.   You sent out -- your company sent out a fax

11   to thousands of customers to sell 5.5 million

12   dollars of oxy just, like, a year before this.

13      A.   Correct.  Because there was a market, you

14   know, supply interruption and that created, you

15   know, a reason for us to reach out to customers.

16      Q.   Right.  So you're -- okay.  So you're saying

17   that $12.7 million in sales for six months was not a

18   big deal?

19           MS. KOSKI:  Object to form.

20      A.   $12.7 million is $12.7 million, but I'm just

21   saying, in the grand scheme of things it wasn't

22   dramatic.

23      Q.   Was it -- was it dramatic that you had been

24   told by the Drug Enforcement Administration, the

25   DEA, that you could no longer sell to any of these
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   entities?

 2          MS. KOSKI:  Objection to form;

 3      mischaracterizes.

 4      A.   Were we told that?

 5      Q.   You just said this wasn't dramatic, the

 6   $12.7 million?

 7      A.   But your question was, we were told by the

 8   DEA.

 9      Q.   Well, you didn't --

10      A.   I don't know that we were told that.

11      Q.   Okay.

12      A.   I believe, you know, that we saw --

13   obviously, we didn't want that kind of growth in

14   these types of products and we shut them down.

15      Q.   Okay.  So you're telling us that it's your

16   testimony that overnight, literally, one day to the

17   next, from -- on December 17th -- sorry, withdrawn.

18          On June 17th, 2010, you could sell to

19   physicians, clinics, mail order, repackagers

20   wholesale distributors, vet distribution,

21   veterinarian distribution, veterinarian something

22   else, what's that?

23      A.   That's a veterinarian.

24      Q.   And four independent retail accounts, you

25   could sell to all these on June 17th, 2010, but as
```

1    of June 18th, 2010, no one was allowed to sell to

2    any of them from your company, right?

3        A.   Correct.

4        Q.   Right?  And this was a decision made by the

5    company --

6        A.   I --

7        Q.   -- not because of something the DEA told

8    them to do?

9        A.   I don't believe that I was part of making

10   that decision, so I'm not sure that I'm the most

11   informed to answer that.

12       Q.   Okay.  Well, I mean --

13       A.   It's possible we were told by the DEA.  I

14   don't know that.  I don't --

15       Q.   Well, if you had been in charge --

16   withdrawn.

17            If you had been part of making this

18   decision, that's something you would remember, isn't

19   it?

20       A.   Yes.

21       Q.   Okay.  So -- so you don't know as we sit

22   here today, whether this was an independent decision

23   by the company or whether it was a decision that was

24   as a result of dealings with the DEA?

25            MS. KOSKI:  Object to form.

Highly Confidential – Subject to Further Confidentiality Review

```
 1        Q.   You don't know that?

 2             MS. KOSKI:  Sorry.  Object to form.

 3        A.   I don't know specifically.  I would

 4   assume -- I believe it was related to dealings with

 5   the DEA.  You said before that the DEA specifically

 6   told us not to do that.  I don't -- I don't know the

 7   details related to that.

 8        Q.   Okay.  Well, subsequent to this, there was

 9   the development of something you made mention of

10   earlier, a questionnaire.

11        A.   Uh-huh.

12        Q.   Right?

13        A.   Yes.

14        Q.   Yeah.  You mentioned it in passing earlier,

15   one of your answers.

16             MS. KOSKI:  Object to form.

17        Q.   And the -- what you were alluding to, the

18   questionnaire is a document that Anda started to

19   require each of their controlled substance customers

20   to fill out, right?

21        A.   Yes.

22        Q.   And that was also something that resulted

23   from dealings with the DEA, right?

24             MS. KOSKI:  Object to form.

25        A.   Yes, I believe so.
```

```
 1              MR. PENNOCK:  I think I only have -- did you

 2        have other copies of this?  I only have one extra

 3        copy of this.  Know your controlled substances.

 4        Oh, no, they are all clipped together.  Okay.

 5              (Discussion off the record.)

 6              (Anda-Versosky Exhibit 18 was marked for

 7     identification.)

 8              (Anda-Versosky Exhibit 19 was marked for

 9     identification.)

10     BY MR. PENNOCK:

11        Q.   So, Mr. Versosky, Exhibit Number 18 to your

12     deposition is a document bearing Bates number

13     000077289.  Have you had a chance to look at that?

14        A.   Yes.

15        Q.   And it's an e-mail from someone by the name

16     of Megan Talber.

17        A.   Yes.

18        Q.   It went to the president of the company,

19     right?

20        A.   Yes.

21        Q.   A number of others and it was cc'd to you

22     and some, Christine Leon-Laurent, right?

23        A.   Yes.

24        Q.   Controlled Substances Training Materials,

25     right?
```

Highly Confidential - Subject to Further Confidentiality Review

 1      A.   Yes.

 2      Q.   That's what this subject is?

 3      A.   Uh-huh.

 4      Q.   Okay.  This is October 19, so this is --

 5   this is four months after the shutdown occurred of

 6   all those customers we just looked at, right?

 7      A.   Yes.

 8      Q.   Okay.  So about four months later we have

 9   being transmitted here:  Attached are the revised

10   materials for the controlled substance training

11   program.  We will be meeting with the sales managers

12   at 2:00 p.m. to review the materials.

13      A.   Uh-huh.

14      Q.   Now, she says attached are the revised

15   materials.  Had you seen these before this set was

16   transmitted to you?

17      A.   I don't believe so, and when she speaks to

18   sales managers, Megan Talber was our training person

19   for the telesales representatives, so this would

20   have been a training document put together for that

21   larger 150-person group.  Christine Leon-Laurent was

22   a director of kind of sales operations on my

23   national account team, so she may have managed the

24   training for my team.

25      Q.   Did you have any involvement in the training

Highly Confidential - Subject to Further Confidentiality Review

```
 1    for your team?

 2         A.    I don't believe so, but -- I don't remember

 3    training my team on this.

 4         Q.    Did you get trained?

 5         A.    I would have read the document, I'm sure,

 6    but --

 7         Q.    You would have read the document but you

 8    don't have any recollection of actually receiving

 9    training about the document?

10         A.    It don't -- I don't remember that, no.

11         Q.    So the document is Exhibit 19.

12         MS. KOSKI:   Yes, go ahead.

13         Q.    And the document is Bates number 0000077290.

14    It is produced in native format and therefore has a

15    cover sheet.  Controlled substances:  Know your

16    customer.

17         A.    I believe I may have -- I believe I sat

18    through this training.

19         Q.    Okay.  Well, the training was something that

20    was the result of interactions with the DEA earlier

21    that year, right?

22         A.    I don't know that.

23         Q.    You don't know that?  Do you think that --

24    is it your recollection the company just

25    spontaneously commenced this training controlled
```

 1    substances:  Know your customer?

 2         MS. KOSKI:  Object to form.

 3    A.   Do you want to restate that question?

 4    Q.   Sure.  Do you know whether or not this

 5    training was the result of interactions that the

 6    company had had with the DEA regarding the company's

 7    sale of controlled substances?

 8    A.   I don't know that this training specifically

 9    was, but the overall, you know, trying to do more

10    would have been the result of that.

11    Q.   Okay.  And the know your customer sort of

12    mantra was something that the DEA was urging your

13    company to -- and other companies -- to start doing,

14    right?

15         MS. KOSKI:  Object to form.

16    A.   Yes, that was -- yes.

17    Q.   Okay.  So we talked earlier, and you had

18    pointed out that in your view, compliance was

19    dealing with the customer issues and identifying

20    them as it may concern controlled substances and

21    sales did not do that.  Do you remember that

22    discussion on and off?

23    A.   Yeah, correct.  It's again, sales was

24    collecting information and --

25    Q.   Right?

```
 1       A.    Sales was where there were questionnaires,

 2   they were getting the questionnaires and passing

 3   those to compliance.

 4       Q.    But now we're taking it to another level for

 5   sales, right?

 6       A.    Yes.

 7       Q.    And the questionnaire was something that --

 8   it was a questionnaire that the question had to fill

 9   out for each of its stores, if it had more than one

10   store, right?

11       A.    Yes.

12       Q.    And the point of filling out the

13   questionnaire -- withdrawn.

14             The questionnaire or the -- was a form that

15   was being used in order to try and get in one place,

16   in a uniform way, information about the store and

17   its dispensing history, is that reasonably fair?

18       A.    Yeah.  I think it was a -- there was already

19   a quantitative look.  This was more of getting some

20   qualitative information.

21       Q.    And by that you mean just -- more getting

22   some information that related to a particular store,

23   not just its numbers, but --

24       A.    Yes.

25       Q.    -- answers to specific questions about how
```

```
 1    they were operating?

 2       A.   Yes.

 3       Q.   And where they were operating, right?

 4       A.   Yes.

 5       Q.   And it comes back, these things come back to

 6    having a better understanding of who the customer is

 7    so that you can have a better understanding as to

 8    whether or not they should be selling as much

 9    controlled substances as they are asking for?

10       A.   Yes.

11       Q.   And in the presentation, if you turn -- I'm

12    sorry these aren't paginated, but you can look on

13    the screen.  There is a -- the know your customer

14    initiative --

15            MS. KOSKI:  On the bottom right there is

16        slide numbers, they are hard to see but you can

17        see them on the bottom right hand.

18       A.   They are in the dark.

19            MS. KOSKI:  It's hard to see because it's

20        not in color.

21       Q.   Yeah, page 6 of the PowerPoint presentation,

22    know your customer initiative, right?

23       A.   Uh-huh.

24       Q.   And it says in an attempt to get to know our

25    customers, and determine -- let me put this up so
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'm not -- there we go.
 2         A.   That's all right.  I have it here.
 3         Q.   I know, just for the -- for the video.
 4         A.   Oh.
 5         Q.   It says:  In an attempt to get to know our
 6    customers and determine their controlled substances
 7    purchasing needs, two forms have been developed to
 8    assist Anda/VIP, with determining the customer's
 9    controlled substances purchasing eligibility.
10              Right?  I've read that correctly?
11         A.   Yes.
12         Q.   Who is VIP?
13         A.   It was a sister company.
14         Q.   So the two forms, one of them is the know
15    your customer form, right?
16         A.   Yes.
17         Q.   That's something that would be filled out by
18    the sales rep in combination with their manager?
19         A.   I believe so, yes.
20         Q.   And then the customer questionnaire was
21    filled out by the customer?
22         A.   Yes.
23         Q.   And when the customer filled that out, then
24    you'd have some information straight from each
25    store, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And the customer questionnaire form, now at

 3   page 8, in this training it said:  This form will be

 4   used to determine the customer's potential for

 5   controlled substance purchasing from Anda.

 6           Right?

 7      A.   Yes.

 8      Q.   Okay.  So these -- this was -- this was

 9   something that they, again, they provided -- you --

10   your company provided -- you sent it by FedEx,

11   right?

12      A.   Uh-huh.  Yes.

13      Q.   Do you see that?

14      A.   Yes.

15      Q.   And you had a postage prepaid return

16   envelope?

17      A.   Yes.

18      Q.   And you were even going to tell the rep when

19   it -- through your computer system, when the survey

20   had been sent to the customers so they would know?

21      A.   Yes.

22      Q.   Okay.  And for -- well, new accounts and for

23   reactivating any accounts that may have been closed,

24   that's what that means, react, right?

25      A.   Not that it had been closed.  That meant
```

1    that someone hadn't bought from us in a certain

2    period of time, so six months, a year, whatever.

3        Q.   Oh, okay.

4        A.   Not that they --

5        Q.   So this was new accounts or someone that

6    hadn't bought from you in six months or some period

7    of time?

8        A.   Yeah.  Yes.

9        Q.   Okay.  Well, in any event, the training

10   noted that this questionnaire gives the compliance

11   department the tools they need to assess the

12   customer's potential controlled substance purchasing

13   capabilities.

14       A.   Yes.

15       Q.   This was something the company was putting

16   in place in 2010 to try and improve dealing with the

17   controlled substances distribution issues.  Right?

18       A.   Yes.

19            MS. KOSKI:  Object to form.

20       Q.   Okay.  Now, do you know why it took four

21   months from when you shut down those 2600 customers

22   to put together training materials for the sales

23   reps and this questionnaire process?

24       A.   I don't.  I know when -- when we put

25   together our questionnaire, you know, to a degree I

Highly Confidential - Subject to Further Confidentiality Review

```
 1    think our -- you know, we were looking at best

 2    practices in the industry also, and I think their --

 3    you know, it's almost at the same time everybody

 4    started producing a questionnaire.  I don't know if

 5    we were a leader or a follower on that, to be honest

 6    with you.

 7       Q.   Let's just -- for -- if we just measure from

 8    when you shut down 2600 customers, to when this

 9    comes out, four months is a -- kind of a long time

10    in the business of sales, isn't it?

11       A.   It is.

12       Q.   So -- I'll just find something here.

13            (Anda-Versosky Exhibit 20 was marked for

14    identification.)

15    BY MR. PENNOCK:

16       Q.   Sir, we've marked as Exhibit 20 to your

17    deposition, an e-mail thread bearing Bates number

18    0000105969 through 970.  Could you take a look at

19    that, please.

20            So, sir --

21       A.   I'm sorry.

22       Q.   Oh, you're not done yet?  I apologize?

23       A.   Yeah, just one second.  I'm sorry.

24            Okay.

25       Q.   You -- I'm looking at this e-mail that you
```

Highly Confidential - Subject to Further Confidentiality Review

1    wrote, a couple of e-mails, where March 5th, 2011

2    you wrote an e-mail, so we're talking now, November,

3    December, January, February, March -- I've still got

4    to count on my fingers -- it's five months, just

5    under five months from when this training took

6    place, right?

7        A.   Yes.

8        Q.   And first you said you didn't think you'd

9    gone to the training, which kind of made sense to me

10   when I looked at these e-mails, but then you said

11   you did go to the training, right?

12           MS. KOSKI:  Object to form.

13       Q.   Okay.  And you wrote to Patrick Cochrane:

14   Al -- that's the president, right?

15       A.   Yes.  Where is Al on here?  Sorry.

16       Q.   First e-mail --

17       A.   Ah, you're right.

18       Q.   -- is on Saturday, March 5th, Al spoke of

19   some change that you wanted to look at proactively

20   regarding control limits.  You also mentioned an

21   NACDS specification data sheet laying out basic info

22   regarding a selected chain.  Can you forward an

23   example or copies of this document for the ones you

24   want to look at.

25           Right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.    Yes.

 2      Q.    And that's from -- that's from Cochrane to

 3   you?  Sorry.  Right?

 4      A.    Yes.

 5      Q.    You wrote back the same day and you said:

 6   I'm not sure there is one specifically from NACDS.

 7            Who is NACDS?

 8      A.    They are an industry association, so it's

 9   the chain drug stores, National Association of Chain

10   Drug Stores.

11      Q.    Did you work with them?

12      A.    We attended their shows, we were a member of

13   their --

14      Q.    You were a member of them?

15      A.    Yeah.

16      Q.    So you kind of worked with them in terms

17   of -- well, you're getting, potentially getting

18   forms from them or stuff like that?

19      A.    No.  No.

20      Q.    What are you getting from them?

21      A.    As far as getting anything from them, I

22   think -- I don't know that we got anything from

23   them.  We -- it's -- again, it's the chain store

24   group, people like Anda are a part of that because

25   their trade show is where you go to meet with large
```

1    numbers of chain customers.

2         The -- I think for what data Al was looking

3    for would have been if they had some kind of roster

4    sheet with any sales on it.  I don't know that that

5    exists, but Chain Store Guide was a different thing

6    that we were -- we had a subscription to that could

7    go, pull down some metric data related to different

8    chains and contact names and things like that.

9    Q.   Well, you go on to say that:  My ultimate

10   question is can we get info aside from a store level

11   questionnaire for corporate-owned chains that

12   satisfies the know your customer requirement.

13        Do you see that statement?

14   A.   Yes.

15   Q.   Corporate-owned chain, that might be like a

16   chain like Bi-Mart that we looked at earlier, right,

17   that had like, 60 stores, right?

18   A.   Yes.

19   Q.   And that's the one we looked at -- one of

20   the stores was in Grand Pass, Oregon, remember that?

21   A.   Yes.

22   Q.   But it could also be, like, a Walgreens that

23   has thousands of stores, right?

24   A.   Yes.

25   Q.   Or Rite Aid that has, I don't know,

Highly Confidential - Subject to Further Confidentiality Review

1    certainly hundreds, maybe thousands, of stores,

2    right, CVS, right?

3        A.   Yes.

4        Q.   Thousands of stores?

5        A.   (Nodding head.)

6        Q.   So we just went over the know your customer

7    training and the questionnaire that you were --

8    everybody was going to get from the customer,

9    remember -- just a minute ago, right?

10       A.   Yes.

11       Q.   All right.  And the whole points of getting

12   the questionnaire was to understand or get some

13   understanding -- what was the word you used?  I lost

14   it now.

15            You wanted to get some understanding of each

16   store, right?

17       A.   Yes.

18            MS. KOSKI:  Object to form.

19       Q.   Okay.  But here you are, you know, frankly,

20   sir, less than five months later, trying to

21   eliminate the questionnaire for many thousands of

22   stores, weren't you?

23            MS. KOSKI:  Object to form.

24       Q.   That's what you're asking to do?

25       A.   So --

```
 1       Q.   I'll rephrase the question, there has been
 2   an objection.
 3       A.   If I can clarify --
 4       Q.   You were making a request here within five
 5   months of the know your customer questionnaire
 6   training and everything that went into this, you are
 7   asking, can we ditch the store level questionnaire
 8   for corporate-owned chains?
 9            MS. KOSKI:  Object to form.
10       Q.   In effect, that's what you're asking, right?
11            MS. KOSKI:  Same objection.
12       A.   I --
13       Q.   Do you disagree with me?
14       A.   I go back to there were two separate sales
15   teams, right?  So the know your customer and the
16   process that was put in place worked very well as an
17   individual store level.  The business that I was
18   managing with those customers that may have hundreds
19   or thousands of stores, that process didn't work.
20   My question and request was is there a different
21   process for wholly owned chains because their SOPs
22   are essentially managed, their compliance is
23   centrally managed, it's not an individual store
24   operates differently than the next store.  That was
25   the request.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Well, that was -- you don't know whether or

 2   not the individual store in 8,000 Walgreens operated

 3   differently, that would -- that may have been the

 4   whole problem, right?

 5             MS. KOSKI:   Object to form.

 6        Q.   You knew that then, didn't you?

 7        A.   No.  From a --

 8        Q.   No?

 9        A.   From a policy compliance standpoint, they

10   would have had one -- they would have had an SOP

11   across all their stores.

12        Q.   There were individual stores, for example,

13   Walgreens that were shut down and others were not,

14   shut down in terms of selling CIIs, weren't there?

15        A.   I don't know that I knew that in 2011.

16        Q.   You certainly knew that among dozens and

17   dozens of stores, even with the Bi-Mart chain, you

███ ████████████████████████████████████████████████

███ ████████████████████████████████████████████████

20   people at -- that's one store in a chain, maybe you

21   would want to see the questionnaire from them,

22   wouldn't you?

23        A.   Well, again, I -- we talked about the 3700,

24   that whole thing.  I didn't look at the business

25   that way.
```

1    Q.   Well, I know.  That's the problem.

2         MS. KOSKI:  Object -- object to form, if

3    that was a question.

4    Q.   So I think you will agree with me that

5    having a store-level questionnaire from any store,

6    whether it's in a chain or not in a chain, was what

7    was intended by the training program that was put in

8    place and the procedure that was put in place back

9    in October of 2010, that was what they wanted,

10   right?

11        MS. KOSKI:  Object to form.

12   A.   That was what they wanted to service the

13   larger portion of customers, which was the

14   independent pharmacies that were managed on the

15   telesales floor.

16   Q.   There is nothing in this -- do you remember

17   something from the training that --

18   A.   No, I was just telling you how our business

19   operated.  It was really two separate businesses.

20   Q.   There was nothing in here that distinguished

21   chain stores from single standalone independent

22   stores, were there?

23        MS. KOSKI:  Look in the documents in your

24   pile if you need to.

25   A.   To your question, the answer is no, and the

1    process didn't work, which is why I made a request

2    to change the process.

3        Q.   Well, the process -- the point of the

4    process work -- withdrawn.

5             The way the process was supposed to work was

6    to give you information on each individual store

7    that you might be selling controlled substances to,

8    including opioids, so that you could make a fuller

9    and better assessment, by you I mean the company.

10       A.   Sure.

11       Q.   To continue to sell to them or somehow limit

12   them, that's -- that's how the process was supposed

13   to work, right?

14       A.   Sure, and I think it's reasonable for me to

15   ask a question here, to say, is there another way we

16   can do this because the current process doesn't work

17   for large customers.

18       Q.   It didn't work for the customer because they

19   were frustrated, extremely frustrated, it didn't

20   work for the customer because they were extremely

21   frustrated?

22       A.   Sure.

23       Q.   There is nothing in here that's saying the

24   process isn't giving us information that's useful

25   from each store?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    I agree that doesn't say that, yeah.

 2        Q.    Okay.  And in fact, even though you said a

 3   little while ago that these corporate chains had the

 4   same standard operating procedure across all the

 5   stores, one of their frustrations is that the

 6   questionnaire was so store specific that they

 7   couldn't fill it out for all the stores at once,

 8   they had to fill it out for each individual store,

 9   that's one of their main frustrations, that's what

10   it says, right?

11        A.    True, and that was an operational

12   frustration, so we would have been talking to the

13   corporate office.  Someone in the corporate was then

14   having frustration of having to disseminate that

15   packet out to an individual store level.  If it's

16   somebody that has 500 stores, they are now having to

17   track, you know, 500 questionnaires.

18        Q.    Well, that's terrible that they would have

19   this frustration.  I mean, was there -- was anyone

20   considering, when dealing with this frustration that

21   they had, the devastation that was happening

22   throughout the country from opioids?

23        MS. KOSKI:  Object to form.

24        Q.    That's a real question.  Do you -- I'll

25   rephrase it to correct the form objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              I'm sorry to hear about the frustration from

 2      these businesses for filling out these

 3      questionnaires.  Did anyone say to you, but let's

 4      consider the devastation that's happening and

 5      balance that against our frustration to decide

 6      whether we want to jettison the questionnaire from

 7      each store, was that ever discussed?

 8      A.   I don't recall that ever being asked of me.

 9      Q.   The -- okay.

10              Anyway, Patrick Cochrane, whoever he is,

11      he's with you.  He's sure he can come up with

12      something.  Right?

13              MS. KOSKI:  Object to form.

14      Q.   It's like Cochrane gets in, he is like,

15      anything we can do to make it easier to sell this

16      product.

17              That's basically what he's saying?

18              MS. KOSKI:  Object to form.

19      Q.   He's going to try to come up with a plan for

20      you to get around the individual questionnaire for

21      the chain stores?

22              MS. KOSKI:  Object to form.  Excuse me.

23      A.   Yeah.  I don't know that it was trying to

24      get around.  If you see my request, it's to try to

25      get that -- satisfy the know your customer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    requirement.  Right?  Is there a different way we
 2    can do it rather than sending an individual packet
 3    to an individual store.  Operationally, it just
 4    wasn't feasible at that time.
 5        Q.   Well, it was feasible operationally to send
 6    individual packets of opioids every month, if not
 7    more frequently, to every single individual store,
 8    wasn't it?  Wasn't it?  You were able -- you just
 9    said, operationally it wasn't feasible to send a
10    questionnaire to every store?
11        A.   You were comparing that to something else.
12        Q.   I'm asking you.  You said operationally it
13    wasn't feasible to send this questionnaire to every
14    single store, that's what you said?
15        A.   Yeah, for the corporate chain buyers we were
16    working with.
17        Q.   But it was operationally feasible for you to
18    send product to them, opioid product to the
19    individual stores?
20        A.   Yes.
21        Q.   By the way, the FDA, we looked at Exhibit 9
22    earlier, the FDA was very clear on this issue.  I'm
23    sorry, withdrawn.
24            The DEA was very clear on this issue, wasn't
25    it?  I'm trying to find that --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          MS. KOSKI:  What exhibit are you looking at?

 2          MR. PENNOCK:  I think it was Exhibit 9.  I

 3     got it.

 4     Q.   Sir, we looked at Exhibit 9 earlier, which

 5     was this presentation --

 6          MS. KOSKI:  I think 8 was the presentation.

 7     Q.   Oh, the presentation is number 8?  We looked

 8     at Exhibit 8 earlier, sir, that was a presentation

 9     that Mike Cochrane had asked you to look at a few

10     slides on and he was going to give it to the DEA,

11     Exhibit 9 was the e-mail, a meeting with the DEA

12     next week, keep that to yourself if you don't

13     already know, right?

14     A.   Yes.

15     Q.   And he says I have a couple bullet points on

16     Slide 4 and we looked at this presentation.  This

17     was from August of 2014.  Now, if you look at -- I

18     don't see page numbers on here.  Slide 20.  Right,

19     Slide 20.

20          I underlined this earlier:  Controlled

21     substances compliance.  Tell me if I'm reading this

22     correctly:  Each pharmacy must, underlined, this is

23     from Mike Cochrane, your guy, must be treated as an

24     individual regardless of group or chain affiliation.

25          Do you see that statement?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        A.    I do.

2        Q.    That's what he was telling the DEA, right,

3    in this PowerPoint?

4        A.    In 2014, correct.

5        Q.    In 2014.  So you're suggesting that three

6    years earlier, in 2011, you didn't -- you didn't

7    have that viewpoint?

8        A.    Yeah, I think --

9              MS. KOSKI:  Object to form.

10       A.    Between 2011 and 2014, by 2014, I believe,

11   we were getting individual packets from every store.

12       Q.    You told the FDA you were -- I'm sorry.

13             You told the DEA that you did, that you

14   were?

15             MS. KOSKI:  Object to form.

16       Q.    He told the DEA that you were treating each

17   pharmacy as an individual regardless of group or

18   chain affiliation, right?

19       A.    Yes, and I believe that to be true in 2014.

20       Q.    But the reason didn't suddenly emerge, the

21   grounds didn't suddenly emerge for doing that

22   between 2011 and 2014, did it?

23       A.    There -- to me, I believe there was, you

24   know, and I don't know if you wanted to call it an

25   evolution, but consistently trying to move the bar
```

1    up and get more information throughout this whole

2    process.  Frankly, all the time that we've been

3    talking about.

4        Q.    Well, the need to look at each individual

5    pharmacy, whether it's part of a chain or not, as an

6    individual.  Existed previously, it's just people at

7    Anda, at least some of them, weren't paying

8    attention to that need, right?

9            MS. KOSKI:  Object to form.

10       A.    I don't know that that's factually correct.

11       Q.    Well, you weren't.

12       A.    Well, the --

13       Q.    You personally did not pay attention to that

14   need because you're the one that said we should get

15   rid of the questionnaire for the chain pharmacies.

16       A.    That's not specifically what I said.  I said

17   is there another way to fulfill the need of know

18   your customer --

19       Q.    Right, by --

20       A.    -- aside from a packet.

21       Q.    Right.  By a single representation regarding

22   everyone from the corporate -- from corporate?

23           MS. KOSKI:  Object to form, mischaracterizes

24       the document.

25       A.    And today I think that's a fair question to

Highly Confidential - Subject to Further Confidentiality Review

```
1    have asked.

2            MS. KOSKI:  When you're at -- I'm sorry.  I

3        didn't mean to interrupt you.

4        Q.   There is just as much danger from one store

5    and a group of thousands in a chain than there is

6    from one independent pharmacy, isn't there?

7        A.   Yeah, I agree with you.  I don't know that I

8    would have -- I don't know that I would have been as

9    aware of that in 2011.

10           MR. PENNOCK:  I'm sorry, counsel?

11           MS. KOSKI:  I was just going to suggest when

12       have you a good stopping point to take a break.

13           MR. PENNOCK:  This is a good stopping point.

14           THE VIDEOGRAPHER:  Off the record, 2:43 p.m.

15           (Recess from 2:43 until 3:00 p.m.)

16           THE VIDEOGRAPHER:  On the record, 3:00 p.m.

17   BY MR. PENNOCK:

18       Q.   Mr. Versosky, do you remember developing a

19   process to flag stores in chains for potentially

20   exceeding what would be expected of them for

21   controlled substances sales, including opioids?

22           MS. KOSKI:  Object to form.

23       A.   Yes.

24       Q.   You do remember that?

25       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      Q.   That's something that you -- you actually
 2   had a hand in developing, right?
 3      A.   Yes.
 4      Q.   And you developed this system, I think
 5   around the time you had -- you had Walgreens come to
 6   you to seek getting opioids from you, right?
 7      A.   Yeah, they were seeking to get controls from
 8   us, yes.
 9      Q.   And they were seeking to get controls from
10   you because they had had an entire distribution
11   center in Jupiter, Florida, shut down, right?
12      A.   I believe it --
13           MS. KOSKI:  Object to form.
14      A.   Yeah.  I believe it was their -- I thought
15   it was their wholesaler had a distribution center
16   shut down.
17      Q.   There was a distribution -- there was one or
18   two distribution centers shut down and they could no
19   longer get opioids from those places, right?
20      A.   Correct.
21      Q.   And so they could however -- the problem
22   apparently, was with the sent -- the distribution of
23   the drugs, but they were still allowed -- their
24   stores were still allowed to buy the drugs, they
25   just needed to find somewhere else to buy them,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2       A.   Correct.

3       Q.   So at that time, you had a hand in

4    developing this system and I'd like to go over that

5    quickly.  I think this is it here.

6            MR. PENNOCK:  Ben, yeah, this is it.

7            (Anda-Versosky Exhibit 21 was marked for

8    identification.)

9    BY MR. PENNOCK:

10      Q.   Mr. Versosky, you -- we've marked as

11   Exhibit 21 to your deposition an e-mail thread.  It

12   begins with Bates number 0000725880 and the last

13   document is 883.

14           Okay?  You've had a chance to look at that?

15      A.   Yes.

16      Q.   And this is an e-mail from you to the

17   president of the company, Albert Paonessa, right?

18      A.   Yes.

19      Q.   This is from November 2012, right?

20      A.   Yes.

21      Q.   And it's titled -- you were forwarding it,

22   it's, Controlled Substances Query Questions, right?

23      A.   Yes.

24      Q.   You say:  Hi, Al, here is the reporting that

25   Chuck filled out in Cognos and the criteria

1    questions below.  We can now utilize this program

2    any time we get a file for a store or group of

3    stores.  Also, when looking at this in Cognos,

4    Mike's team can drill down into the store data if

5    they want to look at the individual from the summary

6    sheet.

7            Have I read that correctly?

8       A.   Yes.

9       Q.   So you've -- earlier e-mail down here, you

10   wrote to Jeffrey Daum:  Hi, Jeff, here's an initial

11   list of triggers based on our discussion with

12   Robert.

13           Robert who?

14      A.   Robert Brown.

15      Q.   Compliance?

16      A.   Yes.

17      Q.   He may have more upon discussing with Mike

18   and the team.

19           Mike Cochrane, right?

20      A.   Yes.

21      Q.   But this should give you something to get

22   started on.

23           And these are -- so what you were all doing,

24   including you, is you were saying let's put together

25   a program to look at the dispensing data from the

Highly Confidential - Subject to Further Confidentiality Review

1    individual stores of Walgreens or ultimately any

2    chain, right?

3        A.    Sure.

4        Q.    And then if these -- if these data points

5    popped out of the dispensing data from a store, they

6    would be what you were going to call flags.  Right?

7        A.    Yes.  We were effectively taking the kind of

8    manual process from more -- the things that Mike and

9    Robert were looking for on that team and trying to

10   do it in a big data solution.

11       Q.    Right.  The things that they've been looking

12   for the last many years?

13       A.    Yes.

14       Q.    So now you -- whose idea was it to put

15   together this flag system?

16       A.    I think it was mine, yeah.

17       Q.    Okay.  But now --

18       A.    I mean --

19       Q.    November 2012 --

20       A.    Let me rephrase that.  I think it was mine

21   in trying to turn that into, kind of, a big data

22   solution, taking big chunks of data and run it

23   through that.  The flags weren't mine.  These were

24   things they were already looking at.

25       Q.    Got it.  So they were looking at the flags

Highly Confidential - Subject to Further Confidentiality Review

```
 1    but they were doing it, sort of --

 2        A.   One off --

 3        Q.   -- the 19th century way?

 4        A.   -- one at a time.  Yes.

 5        Q.   Okay.  And now you had suggested, well,

 6    let's try to apply a creative program to do this?

 7        A.   And -- yes, and so that Jeff Daum was like

 8    a --

 9        Q.   Programmer?

10        A.   He was a programmer, a data programmer.
```

Highly Confidential - Subject to Further Confidentiality Review

10      A.   Yes.

11      Q.   Okay.  All right.  So this ultimately was

12   created, maybe with some more flags than your

13   initial triggers, right?

14      A.   Yes.

15      Q.   And you applied that to Walgreens at that

16   time, the Walgreens data that you were provided, I

17   assume by Walgreens, right?

18      A.   Yes.

19      Q.   And -- okay.  I'll mark this?

20           (Anda-Versosky Exhibit 22 was marked for

21   identification.)

22   BY MR. PENNOCK:

23      Q.   So Walgreens had, like, what, 8,000 stores,

24   something like that?

25      A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1        Q.   So you apply this to the data, your flags,
 2    your initial triggers, and it scored a lot of hits,
 3    didn't it?
 4        A.   Yes.
 5        Q.   So, if you look at -- I've just marked as
 6    Exhibit 22 to your deposition a document produced in
 7    native, a cover sheet 0000647317, and we see a
 8    report of these flags and if you turn to the second
 9    page, the overall total number of stores where you
10    looked at the data was 7,984.  Right?
11        A.   Yes.
12        Q.   And 3,768 of them popped at least one flag,
13    right?
14        A.   Yes.
15        Q.   And I'm sorry for zooming this in and out on
16    people.  Just --
```

23        A.   Yes.
24        Q.   And if we go back a page, and this is all
25    laid out by states, true?

Highly Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yes.

 2      Q.   And if we look at Ohio, in Ohio there were

 3   255 stores, right?

 4      A.   Yes.

 5      Q.   And 192 of them hit a flag, at least one

 6   flag, right?

 7      A.   Yes.

 8      Q.   Which is 75 percent.  Right?

 9      A.   Yes.
```

███    ███    ████████████████████████████████████

███    ████████████████████████████████████████████

███    ███████████████████████████████████

```
13      A.   Yes.

14      Q.   Okay.  Now, so when you -- after you ran

15   this, did you provide this information to Walgreens?

16      A.   I believe we did, yes.

17      Q.   And when you provided it to them, did

18   they -- at any point thereafter, did Walgreens tell

19   you, well, I think we're going to be shutting down

20   some controlled substances sales at some of our

21   stores in Ohio?

22           MS. KOSKI:  Object to form.

23      A.   I don't recall that ever happening.

24      Q.   And let's just look at some of the Ohio

25   stores.
```

```
 1              MR. PENNOCK:  Could you mark this, please.

 2              (Anda-Versosky Exhibit 23 was marked for

 3         identification.)

 4    BY MR. PENNOCK:

 5         Q.   So I've marked as Exhibit 23 to your

 6    deposition, sir, a document produced in native

 7    bearing Bates -- the cover sheet is Bates number

 8    0000725057?

 9              MS. KOSKI:  Counsel, is this a complete or

10         did you do an excerpt from a bigger spreadsheet,

11         do you know?  It looks like the top line looks

12         like 5683.

13              MR. PENNOCK:  Yes, this is excerpted from

14         that native production.

15              MR. KING:  This is only Ohio's --

16              MR. PENNOCK:  Say that again.

17              MR. KING:  This is only Ohio.

18              MR. PENNOCK:  You're right, Katy, this is

19         excerpted from the entire state, individual store

20         data, or the entire list of individual store

21         data.

22              MS. KOSKI:  We can talk offline  I just want

23         to know how you sorted it.  I'll just have a few

24         more questions.

25    BY MR. PENNOCK:
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   Mr. Versosky, you may have picked up on what

2   we're saying.  This is -- Exhibit 23 is a -- is an

3   excerpt from all of the individual store data and

4   it's Ohio.  Okay?

5             MS. KOSKI:  He only has one.  Okay.

6             MR. PENNOCK:  It's two pieces because it's

7        an Excel spreadsheet.

8        Q.   Okay?  Are you following me?

9             MS. KOSKI:  I just don't think that the

10       witness has both pieces.

11            MR. PENNOCK:  Oh, okay.

12            MS. KOSKI:  I have -- he has the one with

13       the color but not the --

14            MR. PENNOCK:  Okay.  That was my fault.

15       Q.   Okay.  So it goes across -- so as you can

16  see, the spreadsheet goes -- I'll put this on the

17  screen, and that's going to be kind of hard to do

18  but everyone gets the idea.  The spreadsheet goes

19  across.

20            But over here, this column, the one that has

21  the color, right, do you see that?

22       A.   Yes.

23       Q.   And we can see these are all Ohio stores,

24  right?

25       A.   Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.   And this is from the same analysis that we
2    just looked at, and Anda's -- let me --
3             MS. KOSKI:  Yeah, sorry.
4        Q.   The Anda document that I have printed out
5    here, it had the color highlighting in here.  Okay?
6        A.   Okay.
7        Q.   Got it?  And as you might surmise, the red
8    represents a more -- a more significant number of
9    flags, orange, less so, yellow less so, and the ones
10   without any color had no flags.  Okay?
11       A.   Okay.
12            MS. KOSKI:  Object to form; lack of
13       foundation.
14            MR. PENNOCK:  Okay.  Well, that's fair.
15       We'll hopefully get a stip on that later.  I can
16       do it if you want me to.
17            MS. KOSKI:  You can just ask him if he
18       understands that rather than --
19       Q.   Yeah.  Do you recognize why some of these
20   columns were colored the way they are by Anda?
21       A.   I don't recall specifically but your
22   explanation isn't unreasonable.  It seems like that
23   would make sense.
24       Q.   Okay.  So in any event, we can see as we go
25   through this Exhibit Number 23 --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE COURT REPORTER:  It's 23.  It's 23.

 2       Q.   Okay.  These are all of the Walgreens stores

 3   in Ohio popping flags under the system that Anda

 4   developed to evaluate and help Walgreens evaluate

 5   their stores, right?

 6       A.   Yes.

 7       Q.   And this data that you had from Walgreens,

 8   do you know what time period this was from?

 9       A.   No, I don't, but it would have needed to be

10   recent, you know, to this analysis.

11       Q.   Right.  It says here, the year says 2013.

12       A.   Yeah.

13       Q.   So that would mean that it was some slice of

14   data from the year 2013, right?

15       A.   Yes.

16       Q.   And it says month number 1, so does that

17   suggest to you it was January 2013?

18       A.   Yeah, I would assume so, or it means that we

19   had one month of data, either -- either one of those

20   is --

21       Q.   One or the other?

22       A.   Yeah.

23       Q.   Okay.  So after getting this data with

24   respect to Walgreens, do you know if Anda decided

25   not to sell controlled substances, including
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    opioids, to any of these stores, based on this data?

 2    A.   I don't know if based on this data

 3    specifically.  Right?  So the -- you know, the flag

 4    system is, you know, again, it was both a

 5    quantitative and a qualitative system.  Tripping a

 6    flag didn't necessarily mean that it was a, you

 7    know, quote unquote, bad store.  It meant that there

 8    was additional information required.  I would

 9    assume, yes, there were some stores we didn't sell,

10    ultimately.

11    Q.   Let me mark this, this is another slice of

12    the same data.

13         MS. KOSKI:  Separate number.

14         MR. PENNOCK:  The only problem is they're

15      not -- your second piece is right there -- okay.

16      So that is part of the same exhibit.

17              (Discussion off the record.)

18         (Anda-Versosky Exhibit 24A was marked for

19    identification.)

20         MS. KOSKI:  I don't know if it makes your

21      life easier, I'm marking this 24A and B so that I

22      know what we are talking about.

23         MR. PENNOCK:  That is probably a good idea.

24              (Anda-Versosky Exhibit 24B was marked for

25    identification.)
```

```
1    BY MR. PENNOCK:

2       Q.   Okay.  Sir, 24A and B is the Ohio data we

3    were just looking at from Anda on the Walgreens

4    stores, and here on this document I have highlighted

5    the Summit County stores in green and the Cuyahoga

6    County stores in blue.

7            MR. PENNOCK:  This doesn't help too much but

8       I'll read it.

9       Q.   So, for example, if we come down to this

10   Walgreens store at 6900 Rockside Road in

11   Independence, Ohio, I want to make sure I understand

12   it.  That popped a -- that popped a flag that caused

13   it to be colored red by Anda, which meant three or

14   more flags, right?  It had three or more flags?

15      A.   I -- I don't know that.  If you're telling

16   me that's what translated from the file to the

17   colors, sure.

18      Q.   Let's look at column U?

19      A.   Yeah.

20      Q.   How many flags does that have?

21      A.   It has three.

22      Q.   And then if we go down to -- I want to find

23   one for -- so if we look at the first green, which

24   is Summit County, that's at 1925 West Market Street,

25   Akron, Ohio, store number 3276, and that also popped
```

1    three or more flags, right?

2        A.    Yes.

3        Q.    How many did that pop?

4        A.    It says three.

5        Q.    Okay.  And if we look at this exhibit, we

6    can -- we can pick a store and go across and see how

7    many flags it popped, right?

8        A.    Yes.

9        Q.    So after getting this big data, as you

10   referred to it, did Anda then send out

11   questionnaires to all of these stores?

12       A.    I don't know that we did questionnaires to

13   all the stores, but I believe there were additional

14   questions sent to individual stores.

15       Q.    Based on what?

16       A.    Based upon a particular flag that may have

17   tripped.

■    ■    ███████████████████

■    █████████████████████

■    ██████████████████████

21   them?

22       A.    I believe there were additional questions

23   that would have been asked based on that.  I don't

24   know if it was in the form of a, you know, full

25   questionnaire or not, but yes, there was additional

```
 1    information requested.

 2        Q.   Okay.  Subsequently, however, you --

 3    Walgreens -- well, I'll withdraw that.

 4            Let's turn to a different -- different

 5    analysis.  Are you familiar with Rite Aid?

 6        A.   Yes.

 7            (Anda-Versosky Exhibit 25 was marked for

 8    identification.)

 9            MR. PENNOCK:  Can he look at that document?

10            MS. KOSKI:  Oh, yeah, sorry.  Go ahead.

11    BY MR. PENNOCK:

12        Q.   While you're looking at that sir, marked as

13    Exhibit 25 to your deposition a document bearing

14    0000728018.

15            If you look at -- if you look at page 1 of

16    this document, the Rite Aid was the largest

17    purchaser of controlled substances from Anda in

18    2011, right?

19        A.   Yes.

20        Q.   And the total -- because the -- the subject

21    of this -- of this printout is controlled substance

22    sales.  Right?

23        A.   Yes.

24        Q.   And this e-mail is from you and it's from

25    January 13th, 2012, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1       A.   Yes.

2       Q.   And you say:  Here's the annual CII sales

3    for all customer types, right?

4       A.   Right.
```



Highly Confidential - Subject to Further Confidentiality Review

11        A.    I think in one of your previous documents

12    there is a sales chart, but it was -- it was a large

13    piece of business for sure.

14        Q.    And it was only for controlled substances?

15        A.    Correct.

16        Q.    And all of these numbers on Exhibit 25 are

17    your -- your controlled substances sales?

18        A.    Correct.

19        Q.    To every -- to every customer that you had

20    or every customer that was a national chain?

21        A.    So the -- when they say customer type,

22    customer type was a field type.  If you -- if you

23    see a name next to somebody that you semi recognize,

24    that's probably a chain.  The independent pharmacies

25    were like where you see DVD and IPA and DVD, those

Highly Confidential - Subject to Further Confidentiality Review

```
 1    were kind of independent pharmacy or general

 2    telesales stuff.

 3        Q.   So these were like maybe groups of

 4    independent pharmacies?

 5        A.   Or internal programs, so, like, DVD was a

 6    pricing program, or something like that.

 7        Q.   What does that mean?

 8        A.   What do you mean?

 9        Q.   What is an internal pricing program, what

10    does that mean?

11        A.   Well, we had them on a regular, you know,

12    whatever the standard deal we were offering out to

13    customers.  So there was --

14        Q.   So these could be -- some of these could

15    represent lots of stores?

16        A.   Yes.  Yes.  So like you see, there is DVD1

17    and 2 and 3 up above.  I don't know specifically

18    what those were for.  That was the independent

19    pharmacy side of the business.
```

2    A.    No, the stores would have been unique.

3    Q.    So it would have been unique?

4    A.    Yeah.

5    Q.    So, in any event, from this document we get

6    a snapshot in an e-mail from you in January of 2012

7    of total controlled substances sales, right?

8    A.    Yes.

9    Q.    And what percentage of, let's say, the Rite

10   Aid numbers -- well, we'll just go with the total.

11   What percentage of the total do you think were

12   opioids?

13   A.    I don't know the answer to it.

14   Q.    Are you able to give an estimate?

15   A.    Again, I -- no.  I don't recall specifically

16   which products were on their formulary, but it was a

17   limited -- it was a limited formulary, they were

18   buying a few different items through us.

19   Q.    Oh.  Do you remember what the limited number

20   of items they were buying from you?

21   A.    I don't.  I don't.  But it's probably

22   something --

23   Q.    Some of them were opioids?

24   A.    -- you could pull up really easily.

25   Q.    Okay.  So then you -- you then decided to

1    run the flag system on the -- on the controlled

2    substances sales to Rite Aid just as you had done

3    for Walgreens.  Do you remember that?

4        A.   Yeah, I believe we did that.

5        Q.   Let's take a look at that for now.

6             (Anda-Versosky Exhibit 26 was marked for

7    identification.)

8    BY MR. PENNOCK:

9        Q.   We've marked as Exhibit 26 to Mr. Versosky's

10   deposition, an e-mail, one page, bearing 000090003.

11            Okay.  So here you were -- you're getting an

12   e-mail from Jeffery Daum.  He was sort of the IT

13   guy, is that right?

14       A.   Yes.

15       Q.   He says:  Bill -- referring to you, right?

16       A.   Yes.

17       Q.   Attached is the report for Rite Aid based on

18   the data we received last year.

19            Right?

20       A.   Yes.

21       Q.   I applied the same logic we did for

22   Walgreens.  Meaning the same flag system you had

23   developed for Walgreens, right?

24       A.   Yes.

25       Q.   And you past this on to Mike Cochrane?

```
 1     A.   Yes.

 2     Q.   Okay.  With respect to the Walgreens data --

 3   I'm sorry, withdrawn.

 4          With respect to the Rite Aid data, let's

 5   look at that.

 6          MR. PENNOCK:  Another exhibit, please.

 7          (Anda-Versosky Exhibit 27 was marked for

 8   identification.)

 9   BY MR. PENNOCK:

10     Q.   Exhibit 27 is a document produced in native

11   format bearing Bates number 0000090004.  That's the

12   cover sheet.  This will be Exhibit 27.

13          The Walgreens data -- I apologize.  The Rite

14   Aid data, sir, again we have the flags, and
```

██      ████████████████████████████████████

██      ███████████████████████████

██      ███    ████

██      ███    ████████████████████████

██      ███    ████

██      ███    ██████    ███████████████████████

██      █████████████████████████████████

██   ████████

```
23     A.   I believe so.

24     Q.   And if we look at -- I've highlighted on

25   here Ohio, for Rite Aid there were 220 stores in
```

1    Ohio, 172 of them were flagged, right?

2        A.   Yes.

3        Q.   And 91 of those that were flagged, they had

4    oxy in the top three.  Do you see that?

5        A.   Yes.

6        Q.   So when you got this data with 172 of 220

7    Ohio stores flagged, did you know if anyone at Anda

8    decided, well, we should not proceed to sell to Rite

9    Aid to some of these stores until we figure this

10   out?

11           MS. KOSKI:  Object to form.

12           MR. PENNOCK:  Okay.  Let me rephrase.

13       Q.   I want to make sure I understand this.  You

14   ran this program on Rite Aid, correct?

15       A.   Yes.

16       Q.   And you had been -- this data was being run

17   in 2013, right?

18       A.   Yeah.

19       Q.   And it's being run on data from last year?

20       A.   Yes.

21       Q.   From the prior year.  So you'd already been

22   selling to Rite Aid, of course, right?

23       A.   It's true but I don't know if we were still

24   selling to Rite Aid when we ran this, in total

25   transparency, this data is from 2011, we're running

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this in 2013.  Again, I'm sorry, my memory is a
 2    little foggy but I think we were prospectively
 3    trying to do something different with Rite Aid here
 4    on a larger level.  That's why we ran the data at a
 5    larger level, that I don't know if that moved
 6    forward, if that makes sense.
 7        Q.   Okay.  Let's see if we can sort that out.
 8        A.   Yeah.
 9        Q.   So Exhibit 25 tells us this is from January
10    2012, Exhibit 25 and that's where we looked at these
11    numbers for the sales that did happen in 2011 from
12    Anda to Rite Aid and that's where we went through
13    the different quarters, right?
14        A.   Yeah, in 2011 --
15        Q.   In 2011, you sold, we said approximately
```

█    ███████████████████████████████████

```
17    Rite Aid?
18        A.   Yeah, but those were for specific items.  If
19    they decided to buy that specific item somewhere
20    else, that can go away overnight.
21        Q.   Understood.  But just so we remember, you
22    were selling to them throughout -- withdrawn.
23             Just so we all remember, in 2011 this was
24    the level of sales to Rite Aid by Anda?
25        A.   Absolutely.
```

```
1       Q.   Of controlled substances?

2       A.   Yes.

3       Q.   Including opioids?

4       A.   Potentially.  Again, we talked about this

5   before, I don't know what the specific products

6   were, but you can look that up.

7       Q.   I could look it up but I just want to see if

8   maybe you can remember back in -- it wasn't that

█   ████████   ███████████████ percent of your overall

10  sales for the whole company were to one customer and

11  it reflected just what you sold in controlled

12  substances to that one customer, right?

13      A.   Yeah, let me think about this.  I believe --

14  I believe Adderall was in there.  I -- I don't know.

15  I'm sorry.  I don't know.

16      Q.   So you don't know if any opioids were

17  reflected in that number?

18      A.   Yeah, and I'm not trying to be dodgy, it's

19  very possible that there were, but there were a very

20  limited number of items based on their ability to

21  negotiate a contract that was advantageous to them

22  as opposed to taking it through a wholesaler.

23      Q.   Okay.  In any event, we know you made sales

24  to Rite Aid in 2011 at least?

25      A.   Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.   And now we're looking at, again, trying to

2    help everyone stay where we are, I apologize for

3    getting lost, we're in February of 2013, you're

▪    ████████████████████████████████████████

▪    ██████████████████████████████████████████

▪    ███████████████████████████████████████

▪    ███████████████████████████████████████████

▪    ████████████████████████████████████████

▪    ██████   █████████████████████████

10   A.   Yes.

11   Q.   Okay.  So did you act upon this information,

12   did Anda act upon this information in terms of

13   stopping the sale of any opioids or any controlled

14   substances to any Rite Aid stores?

15       MS. KOSKI:  Object to form.

16   Q.   Go ahead?

17       MS. KOSKI:  There is just more than one

18   question.

19   Q.   Did Anda act upon this information in terms

20   of stopping the sale of any controlled substances to

21   any Rite Aid stores?

22   A.   I don't believe any Rite Aid stores were

23   necessarily cut off as a result of this, but I also

24   don't remember that we were selling controls to Rite

25   Aid at this time.  So to begin selling controls to

Highly Confidential - Subject to Further Confidentiality Review

 1    Rite Aid, we would have had to go through a process.

 2    That's -- that's my recollection.

 3         MS. KOSKI:  Is this another A and B, or are

 4     these separate?  Are we doing this as an A and B

 5     or are these two separate?

 6         MR. PENNOCK:  There's just one.  There

 7     should only be one.

 8         MS. KOSKI:  Oh, I just got two copies of the

 9     same thing.  Sorry.  Yeah.  Okay.

10         (Anda-Versosky Exhibit 28 was marked for

11    identification.)

12    BY MR. PENNOCK:

13     Q.   We've marked as Exhibit 28 a document

14    bearing Bates numbers 0000085420.  That's the cover

15    sheet.  It was produced in native format.

16         MR. PENNOCK:  This is the e-mail, right?

17     Let me mark this, too, because this is the

18     corresponding e-mail.

19         (Anda-Versosky Exhibit 29 was marked for

20    identification.)

21         MS. KOSKI:  Go ahead, yeah.

22         THE WITNESS:  Sorry.

23     A.   I'm ready.

24     Q.   Okay.  So we first marked Exhibit 28, this

25    is a PowerPoint that you had prepared, right?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.   Yes.

 2        Q.   And the Exhibit 29 is the e-mail

 3   disseminating that PowerPoint internally and this is

 4   in April of 2013, and you sent it to Robert Brown,

 5   who was in compliance, right?

 6        A.   Yes.

 7        Q.   And you said:  Hi, Robert, could you please

 8   review the attached presentation which is intended

 9   for Rite Aid and let me know if you have any

10   concerns about the statements or information

11   provided.

12             Right?

13        A.   Yes.

14        Q.   Subsequently, and you were not on this

15   e-mail, there was some concerns raised to the

16   president of the company about whether you should be

17   doing this PowerPoint, apparently.  Do you see that?

18        A.   It wasn't -- yeah, yeah.  It's funny, this

19   -- this PowerPoint, this never -- I don't know that

20   this ever got sent to anyone externally.  This was

21   something that I authored, I thought it was a good

22   idea, you know.

23        Q.   Yeah.

24        A.   I think the organization didn't.  So this

25   was theoretically taking that big data solution and
```

1    could we do this as a service to help our customers

2    to look at their data in the way that we're looking

3    at their data.

4        Q.   Right?

5        A.   Because at the chain level at that point,

6    the chains and their regulatory folks were able to

7    see kind of, you know, their information, whereas

8    Mike and our team were able to see sort of the --

9    more of the market's information.  Potentially

10   better informed, another set of eyes, I thought it

11   could be a good service.  It didn't really become a

12   service.

13       Q.   Okay.  So Mike Cochrane's suggestion to the

14   president of the company apparently, the president

15   went with that and you never gave this presentation

16   to --

17       A.   Yeah, I don't believe it ever went anywhere.

18   We may have discussed the concept with people, but I

19   don't think the formal presentation or anything ever

20   went anywhere and we definitely never got any kind

21   of customers on board with it.

22       Q.   With the flag system that you had developed?

23       A.   With, like a formal, you know, named

24   program.  The -- so the flag system, as you

25   mentioned --

```
 1        Q.   Was part of the named program?

 2        A.   Walgreens saw that.  This was after that.

 3   This was taking that, you know, kind of data

 4   solution that we created and trying to turn it into

 5   something that we could offer out to others,

 6   potentially.

 7        Q.   So you did it for Walgreens, you showed it

 8   to Walgreens, so that they could use it, whether

 9   they did or didn't, we don't know?

10        A.   We shared it as part of our discussion with

11   them related to were we going to sell product to

12   them.

13        Q.   And you called -- then you said well, let's

14   develop that into a program --

15        A.   Yeah.

16        Q.   -- to assist the chains?

17        A.   Yes.

18        Q.   And you were going to call that the

19   Compliance Assisted Program, right?

20        A.   Yes.

21        Q.   CAP.  Maybe they didn't like the word CAP,

22   huh?

23        A.   Maybe.

24        Q.   Maybe.  So in any event, put -- this CAP

25   program does not materialize as something being
```

1    offered to other customers, as I understand it,

2    correct?

3        A.    Correct.  Yeah.

4        Q.    Now, does this PowerPoint refresh your

5    recollection as to whether you were selling to

6    Walgreens at that time?

7        A.    To Rite Aid.

8        Q.    I'm sorry.  To Rite Aid at that time?

9        A.    It does not, and I see at the end there is a

10   chart related to Rite Aid, so this would have been a

11   draft kind of for presentation to Rite Aid.  I don't

12   know that they ever got this or saw this chart.

22       A.    Yeah, and I'm not sure that we ever sent

23   them that data or sent them this presentation.

24       Q.    Do you know why your superiors decided not

25   to use this flag analysis?

```
 1              MS. KOSKI:  Object to form.

 2       Q.   I'll withdraw that.

 3            You told me that they didn't go along with

 4       this CAP program that you had thought up might be

 5       helpful, right?

 6       A.   Yes.

 7       Q.   And you thought it might be helpful because

 8       your customers might look at it as the two of you

 9       working better together regarding controlled

10       substances, right?

11       A.   Yes.

12       Q.   And you were trying to improve the working

13       together relationship on controlled substances that

14       had existed to date, right?

15       A.   Yes.

16       Q.   But your -- the president of the company

17       apparently turned it down, we established that,

18       right?

19       A.   I don't know that it was him specifically

20       that turned it down, but, yes, it never went

21       anywhere.

22       Q.   And do you know why it never went anywhere?

23       A.   I don't recall specifically.  Right?  The --

24       I think there was some development involved.  We

25       were trying to, I think, put it in as part of the
```

```
 1    CSOS enterprise application, but I don't recall

 2    specifically.

 3        Q.   Okay.  Do you -- do you remember having

 4    symposiums from year to year?

 5        A.   Yes.

 6        Q.   And these were events where you invited both

 7    manufacturers and customers to, right?

 8        A.   Yes.

 9        Q.   What were -- what was the purpose of

10    those -- of these symposiums?

11        A.   So -- I mean the purpose of everything we

12    did was to grow sales.  So these were

13    specifically -- as a distributor, right, we had

14    customers that were both manufacturers and

15    retailers.  We treated the customer -- the --

16    treated the manufacturers as customers as well, but

17    a good chunk of our customer base, our retailer

18    customer base didn't really have strong

19    relationships with generic manufacturers, so we

20    created this thing to kind of bring them together,

21    help our smaller customers build relationships with

22    manufacturers hoping that it would lead to

23    opportunities for us, for them to connect together

24    through us.

25        Q.   So they would meet -- they would come to
```

1    this symposium?

2        A.   It was like a trade show.

3        Q.   There would be golf, like a convention, at a

4    lot of places?

5        A.   Yes.

6        Q.   You had maybe some golf involved, right?

7        A.   Yes.

8        Q.   You had a motivational speaker, I think one

9    of them you had Joe Montana?

10       A.   Right.

11       Q.   And you had Dr. J at one?

12       A.   Yes.

13       Q.   Jack Nicklaus showed up to one.

14       A.   Yes.

15       Q.   You had one around Scottsdale, Arizona?

16       A.   Yes.

17       Q.   What would -- by the retail customer meeting

18   with the manufacturer, how would that benefit Anda?

19       A.   Yeah.  So the -- I mentioned -- an indirect

20   contract.  The customers, depending on how they were

21   organized from a buying structure, if they had their

22   own warehouse, if they didn't -- depending on that,

23   they could utilize us in different ways.  Right?  So

24   if they didn't have their own warehouse, their

25   ability to buy outside of their primary wholesaler

 1    was limited.  We would try to get them to load an

 2    indirect contract through us, we would ship them,

 3    they would buy the rest of their products from the

 4    primary wholesaler.

 5           If they had a warehouse, they may not be

 6    warehousing CIIs, they may not be warehousing -- I

 7    don't know, special items or some other type of, you

 8    know, niche item.  So it was basically we would

 9    provide a distribution service that connected that

10    manufacturer to that store.

11       Q.   I see.  So they would meet the manufacturer

12    at the symposium, presumably, the convention,

13    whatever, trade show, and by meeting the

14    manufacturer, they might decide, well, you know

15    what, I want to buy from that manufacturer now.

16       A.   Correct.  That was our hope.

17       Q.   So -- and it would be a generic, so they

18    could be buying that product from any number of

19    manufacturers but because they made a personal

20    connection, they are like, you know what, I'm going

21    to give that guy the business.  Is that sort of it?

22       A.   It is a very relationship heavy business,

23    yes.

24       Q.   Okay.  I see.  And were there -- the seventh

25    annual chains -- let me just mark this and show you

1    this.

2        A.    Sure.

3            (Anda-Versosky Exhibit 30 was marked for

4    identification.)

5    BY MR. PENNOCK:

6        Q.    I printed out the entire thing off the web,

7    but your quote, I think, is on page 3.  It starts at

8    page 2.  It says -- and this is Exhibit Number 30.

9            So Anda facilitates relationship building,

10   this is exactly what you were just telling me?

11       A.    Right.

12       Q.    April 28, 2014, this is an example, you had

13   Joe Montana in there, right?

14       A.    Yeah.

15       Q.    Okay.  So I don't know who wrote this, but

16   it's from the web, this is -- here's the -- from

17   Drugstore News, right?  Okay.  More than 350

18   executives who participated in Anda's seventh annual

19   supply chain symposium Thursday and Friday here,

20   including a record 25 retail representatives, were

21   treated to a keynote address from sports legend

22   Dr. J and four-time Super Bowl Champion Joe Montana,

23   right?

24       A.    Yes.

25       Q.    And then you had a quote in here:  Yeah, the

Highly Confidential – Subject to Further Confidentiality Review

```
 1    key to this event, what really does make it unique,

 2    is the casual atmosphere, said Bill Versosky, VP

 3    sales and marketing for Anda.

 4          Do you see that?

 5    A.    Yes.

 6    Q.    Quote:  We look at both the manufacturers

 7    and the retailers as our customers.

 8          Do you see that?

 9    A.    Yes.

10    Q.    That's exactly what you were saying?

11    A.    Yes.

12    Q.    Okay.  So this event is where we bring all

13    of our customers together and enable conversations

14    between them to help grow their businesses.  End

15    quote.

16          So I think your prior comments already

17    established what I was asking about, is that's what

18    it was all about?

19    A.    Yes.  Yes.

20    Q.    And their -- were they successful?

21          MS. KOSKI:  Object to form.

22    A.    You know, it's funny.  So this event we

23    always held, and I believe Anda still to this day

24    holds it sort of piggyback to one of the NACDS

25    shows.  You asked about NACDS before, so this is
```

1    like the day before, two days before.

2        Q.    Got it?

3        A.    Traditionally coming out of those shows we

4    would leave with new opportunities either with a

5    manufacturer or with a customer, so we thought they

6    were generally successful.

7        Q.    That's why you keep having them?

8        A.    Yes, why they keep having them.

9        Q.    They are not inexpensive propositions, they

10   are not inexpensive propositions?

11       A.    They were inexpensive for us because the

12   manufacturers supported them.

13       Q.    Oh, they helped pay for them?

14       A.    Yes.

15       Q.    I see.  That makes sense.  Because the

16   manufacturer is trying to get new retailers --

17       A.    Yes.

18       Q.    -- to connect with as well?

19       A.    Yeah, most customers have some type of trade

20   show of their own that manufacturers pay to attend.

21   We created this and kind of piggybacked on that but

22   brought in other customers.

23       Q.    Did they -- how would you invite people?

24   How did you decide to invite people?  Like, I mean,

25   would you -- or did they just know about it?

1      A.   No.  No.  We would -- I would go through a

2    list, I would speak with my national account

3    managers, who did they want us to invite.  We would

4    look at who are our current customers, are there any

5    prospective customers that might want to come.

6      Q.   Then you just mail out an invitation?

7      A.   I think I e-mailed them, I think I e-mailed

8    them personally, but we invited a lot of people.

9    Only -- 25 people came.  I might have invited 100,

10   you know.

11     Q.   Got it.  Do you -- do you know where I can

12   find one of those invitations?

13     A.   I would think in my sent e-mail.

14     Q.   Okay.

15          MR. PENNOCK:  Okay.  Let's take a short

16     break.  All right?

17          MS. KOSKI:  Uh-huh.

18          THE VIDEOGRAPHER:  Off the record, 4:03 p.m.

19        (Recess from 4:03 p.m. until  4:17 p.m.)

20          THE VIDEOGRAPHER:  On the record, 4:17 p.m.

21   BY MR. PENNOCK:

22     Q.   Mr. Versosky, you -- Anda -- is Anda located

23   in Broward County?

24     A.   Yes.

25     Q.   And you also have lived in Broward County,

1    right?

2        A.    Yes.

3        Q.    And you did back in the time you were

4    working for Anda?

5        A.    Yes.

6        Q.    Did you ever hear of a Broward County grand

7    jury report that was issued in November 2009, it

8    would have been public -- potentially public --

9    well, it was public information.  Did you ever hear

10   about it back then, on opioids?

11       A.    I don't remember specifically hearing of

12   anything like that, no.

13            MR. PENNOCK:  Do you have another copy of

14       this?

15            (Anda-Versosky Exhibit 31 was marked for

16       identification.)

17   BY MR. PENNOCK:

18       Q.    Sir, I've marked as Exhibit 31 a copy of an

19   interim report from the Broward County grand jury

20   titled:  The Proliferation of Pain Clinics in South

21   Florida.  It's dated November 19th, 2009.

22            Do you see that?

23       A.    I do.

24       Q.    Have you ever been provided this document

25   before by anyone?

1      A.   I don't recall ever seeing it, no.

2      Q.   Do you recall anyone at Anda talking about

3   the issuance of this report by the Broward County

4   grand jury?  And I ask just because, I mean, it's

5   the County in which the company was located, so --

6      A.   Yeah, and -- I -- I don't recall that.

7   Right?  I do -- I do know there was discussion

8   related to, you know, legislative actions against

9   pharmacies over time and things like that, but I

10  don't recall this one specifically.

11     Q.   So do you -- did you ever hear it being

12  reported back in late 2009 that there was a finding

13  that in 2007 there were four pain clinics operating

14  in Broward County but in -- by the end of 2009 there

15  were 115 pain clinics operating in Broward County.

16          MS. KOSKI:  Object to form.

17     Q.   Do you remember hearing that report?

18     A.   I don't know that I remember hearing that

19  reporting.  I do remember there was a general

20  culture of concern around, you know, pain

21  management, like that, anybody speaking related to

22  pain management was sort of a concern for a

23  customer.

24     Q.   What do you mean by that?

25     A.   Mike could have been very interested in

1    hearing if anybody was, you know, quote, unquote, a

2    pain clinic or anything like that.

3        Q.    Because they might be -- they might not be

4    appropriately prescribing opioids?

5        A.    Correct.

6        Q.    Living and working in Broward County during

7    those years, did you observe any or make any

8    observations regarding the proliferation of pain

9    clinics in Broward County?

10       A.    Not really.

11            MR. PENNOCK:  Sorry.

12            MS. KOSKI:  Object to form.

13       Q.    Back at that time, by that I mean late 2009,

14   do you remember -- do you ever remember any

15   discussion within Anda that there had been a finding

16   that the top 25 dispensing doctors of oxycodone in

17   the nation were located in the state of Florida,

18   with 22 of the top 25 dispensing doctors of

19   oxycodone in South Florida, did you ever hear

20   anything like that?

21            MS. KOSKI:  Object to form.

22       A.    I don't remember specific points of data,

23   but again, being, as you mentioned, being in

24   Florida, we sort of always knew we were ground zero

25   for every, you know -- it seems like every epidemic

1    started in Florida, so we were always looking at

2    Florida.

3        Q.   What do you mean by every epidemic?

4        A.   Anything that -- I mean that's a joke on

5    Saturday Night Live.  Everything that can go bad

6    across the country related to everything starts in

7    Florida.  From the example that you gave, it's not

8    unreasonable we would have -- we would have talked

9    about that specific to Florida.  It wouldn't have

10   been a surprise to us that Florida was, you know,

11   top in prescribing docs or anything like that.

12   Florida is an interesting market.

13       Q.   At any point before you left Anda, did you

14   personally develop a heightened concern that Anda,

15   together with its customers, both manufacturers and

16   retailers, had at least in part contributed to the

17   opioid crisis in a way that they may have avoided?

18       A.   You know, I would say it's a difficult

19   question.  You know, over -- over time, I feel like

20   at Anda everybody was very much trying to do the

21   right thing, right?  And your question related to

22   looking back.  You know, looking backwards, there

23   was a learning process that happened at Anda, I

24   think that happened at customers, at, you know,

25   competitors.  At all times, I think, in relation to

 1    that learning process, we were trying to, you know,

 2    push to be more stringent on any requirement that

 3    was out there.  That was my belief.  I felt that we

 4    were -- we were trying to be good stewards of the

 5    business.

 6           MR. PENNOCK:  Can I see --

 7    Q.    May I see that stack of exhibits, sir?

 8    A.    Yes.

 9           MR. PENNOCK:  There seems to be one missing.

10    I'm looking for the CAP.

11    A.    It would have been high up in that stack.

12    Q.    Oh, I see.  It's going the other way.

13    A.    That's probably it.

14           MS. KOSKI:  28?

15    Q.    There's 28.  Well, when you prepared the CAP

16    PowerPoint, may I see that please?

17    A.    Yes.

18    Q.    Exhibit 28, this concept that you developed

19    back in 2013, right?

20    A.    I believe so, yes.

21    Q.    And it was -- and you presented it and we

22    looked at those e-mails a few minutes ago to use

23    your red flag big data process, right?

24    A.    Yes.

25    Q.    When you developed that, that was developed

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in part to try and be a good steward with respect to

 2    the distribution of these opioid medications, true?

 3       A.   Yes.

 4       Q.   And you sent that upstream, up the ladder,

 5    and never adopted and you don't even know why,

 6    right?

 7       A.   Look, I don't remember why.  I -- yes.

 8            MR. PENNOCK:  Thank you.  I have no further

 9       questions.

10            MS. KOSKI:  I have none.

11            Does anyone on the phone have any questions

12       for the witness?

13                      (No response.)

14            MS. KOSKI:  Silence is noted.

15            THE VIDEOGRAPHER:  Off the record, 4:27 p.m.

16            (Whereupon, the deposition concluded at

17    4:27 p.m.)

18

19

20

21

22

23

24

25
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1            C E R T I F I C A T E

 2         I, SUSAN D. WASILEWSKI, Registered

 3    Professional Reporter, Certified Realtime Reporter

 4    and Certified Realtime Captioner, do hereby certify

 5    that, pursuant to notice, the deposition of WILLIAM

 6    VERSOSKY was duly taken on Friday, December 7, 2018,

 7    at 9:25 a.m. before me.

 8         The said WILLIAM VERSOSKY was duly sworn by

 9    me according to law to tell the truth, the whole

10    truth and nothing but the truth and thereupon did

11    testify as set forth in the above transcript of

12    testimony.  The testimony was taken down

13    stenographically by me.  I do further certify that

14    the above deposition is full, complete, and a true

15    record of all the testimony given by the said

16    witness, and that a review of the transcript was

17    requested.

18

19    _____

20    Susan D. Wasilewski, RPR, CRR, CCP

21    (The foregoing certification of this transcript does

22    not apply to any reproduction of the same by any

23    means, unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    INSTRUCTIONS TO WITNESS

 2

 3

 4          Please read your deposition over carefully

 5    and make any necessary corrections.  You should

 6    state the reason in the appropriate space on the

 7    errata sheet for any corrections that are made.

 8

 9          After doing so, please sign the errata sheet

10    and date it.  It will be attached to your

11    deposition.

12

13          It is imperative that you return the

14    original errata sheet to the deposing attorney

15    within thirty (30) days of receipt of the deposition

16    transcript by you.  If you fail to do so, the

17    deposition transcript may be deemed to be accurate

18    and may be used in court.

19

20

21

22

23

24

25
```

```
 1                          - - - - - -

 2                        E R R A T A

 3                          - - - - - -

 4     PAGE    LINE    CHANGE

 5     _____   _____   _____

 6        REASON: _____

 7     _____   _____   _____

 8        REASON: _____

 9     _____   _____   _____

10        REASON: _____

11     _____   _____   _____

12        REASON: _____

13     _____   _____   _____

14        REASON: _____

15     _____   _____   _____

16        REASON: _____

17     _____   _____   _____

18        REASON: _____

19     _____   _____   _____

20        REASON: _____

21     _____   _____   _____

22        REASON: _____

23     _____   _____   _____

24        REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3          I, _____, do hereby

 4     acknowledge that I have read the foregoing pages, 1

 5     through 243, and that the same is a correct

 6     transcription of the answers given by me to the

 7     questions therein propounded, except for the

 8     corrections or changes in form or substance, if any,

 9     noted in the attached Errata Sheet.

10

11

12     _____     _____

13     WILLIAM VERSOSKY                              DATE

14

15

16

17

18     Subscribed and sworn to before me this

19     _____ day of _____, 20____.

20     My Commission expires: _____

21

22     _____

       Notary Public

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1                            LAWYER'S NOTES

2       PAGE     LINE

3       _____    _____    _____

4       _____    _____    _____

5       _____    _____    _____

6       _____    _____    _____

7       _____    _____    _____

8       _____    _____    _____

9       _____    _____    _____

10      _____    _____    _____

11      _____    _____    _____

12      _____    _____    _____

13      _____    _____    _____

14      _____    _____    _____

15      _____    _____    _____

16      _____    _____    _____

17      _____    _____    _____

18      _____    _____    _____

19      _____    _____    _____

20      _____    _____    _____

21      _____    _____    _____

22      _____    _____    _____

23      _____    _____    _____

24      _____    _____    _____

25