Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION

 3
      IN RE NATIONAL PRESCRIPTION
 4    OPIATE LITIGATION              Hon. Dan A. Polster
                                     MDL No. 2804
 5    THIS DOCUMENT APPLIES TO ALL   No. 17-MD-2804
      CASES
 6    _____/

 7

 8             HIGHLY CONFIDENTIAL -
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                    --  -- --
10
              THURSDAY, JANUARY 10, 2019
11
                    --  -- --
12
        Videotaped Deposition of DONALD WALKER, held
13    at the Law Offices of COVINGTON & BURLING, One Front
      Street, 35th Floor, San Francisco, California,
14    beginning at 8:57 a.m., before Sandra Bunch
      VanderPol, FAPR, RMR, CRR, CALIFORNIA CSR #3032
15
                    --  -- --
16

17

18

19

20

21
      _____
22
               GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  Deps@golkow.com
24

25
```

Page 2

```
 1        APPEARANCES
 2
 3     ERIC KENNEDY, ESQ.
       WEISMAN, KENNEDY & BERRIS CO., L.P.A.
       101 W. Prospect Avenue
 4     Midland Building, Suite 1600
       Cleveland, OH 44115
 5     (216) 781-1111
       Counsel for the Plaintiffs
 6
 7     EMILY JOHNSON HENN, ESQ.
       EMILY KVESELIS, ESQ.
 8     COVINGTON & BURLING LLP
       3000 El Camino Real
 9     5 Palo Alto Square
       Palo Alto, California 94306-2112
10     (650) 632-4715
       ehenn@cov.com
11     ekveselis@cov.com
       Counsel for Defendant McKesson and the
12     Witness
13
       ABIGAIL G. URQUHART, ESQ.
14     JONES DAY
       555 South Flower Street, 50th Floor
15     Los Angeles, CA 90071
       (213) 243-2884
16     urquhart@jonesday.com
       Counsel for Defendant Walmart
17
18     JOSEPH BUSHAR, ESQ. (Telephone/streaming)
       WILLIAMS & CONNOLLY, LLP
19     725 Twelfth Street, N.W.
       Washington, DC 20005
20     (650) 632-4715
       jbushar@wc.com
21     Counsel for Defendant Cardinal Health
22
       (Appearances continued on next page)
23
24
25
```

Page 3

```
 1     APPEARANCES (Continued)
 2        SAMANTHA L. ROCCHINO, ESQ.
          REED SMITH LLP (Telephone/Streaming)
 3        Three Logan Square
          1717 Arch Street, Suite 3100
 4        Philadelphia, Pennsylvania 19103
          (215) 851 8100
 5        srocchino@reedsmith.com
          Counsel for Defendant AmerisourceBergen
 6
 7        SCOTT LIVINGSTON, ESQ.
          MARCUS & SHAPIRA LLP
 8        One Oxford Centre, 35th Floor
          Pittsburgh, Pennsylvania 15219
 9        (412) 338-4690
          livingston@marcus-shapira.com
10        Counsel for Defendant HBC Company
11
          ERIC SHAPLAND, ESQ. (Telephone)
12        ARNOLD & PORTER KAYE SCHOLER, LLP
          44th Floor, 777 South Figueroa Street
13        Los Angeles, California 90017-5844
          (213) 243-4120
14        eric.Shapland@arnoldporter.com
          Counsel for Defendants Endo Pharmaceuticals,
15        Inc. and Endo Health Solutions, Inc.
16
          CIERA LOGAN, ESQ. (Telephone)
17        FOX ROTHSCHILD LLP
          1301 Atlantic Avenue
18        Midtown Building, Suite 400
          Atlantic City, New Jersey 08401-7212
19        (609) 572-2236
          clogan@foxrothschild.com
20        Counsel for Defendant Validus
          Pharmaceuticals
21
22
          (Appearances continued on next page)
23
24
25
```

Page 4

```
 1        APPEARANCES (Continued)
 2
          LINDA K. RURANGIRWA, ESQ. (Telephone/stream)
 3        COLLINSON, DAEHNKE, INLOW & GRECO
          2110 E. Flamingo Road, Suite 305
 4        Las Vegas, Nevada 89119
          (702) 979-2132
 5        Linda.rurangirwa@cdiglaw.com
          Counsel for Defendant C&R Pharmacy
 6
 7        JUSTIN C. TAYLOR, ESQ. (Video/realtime
          stream)
 8        BAILEY & WYANT, PLLC
          500 Virginia Street East | Suite 600
 9        Charleston, West Virginia 25301
          (304) 720-0714
10        Jtaylor@baileywyant.com
11
          JUSTIN MANN, ESQ. (Video/realtime stream)
12        ROPES & GRAY, LLP
          1211 Avenue of the Americas
13        New York, New York  10036-8704
          (212) 596-9175
14        Justin.mann@ropesgray.com
          Counsel for Defendant Mallinckrodt
15
16
17        LUCY ONYEFORO, ESQ. (Video/realtime stream)
          ALLEGAERT BERGER & VOGEL LLP
18        111 Broadway, 20th Floor
          New York, New York 10006
19        (212) 616-7060
          onyeforo@abv.com
20        Counsel for Defendant Rochester Drug
          Cooperative
21
22
          (Appearances continued on next page)
23
24
25
```

Page 5

```
 1     APPEARANCES:
 2        CONOR B. O'CROININ, ESQ.
          ZUCKERMAN SPAEDER, LLP
 3        100 East Pratt Street, Suite 2440
          Baltimore, Maryland 21202-1031
 4        (212) 616-7060
          cocroinin@zuckerman.com
 5        Counsel for Defendant CVS Indiana, L.L.C.,
          CVS Rx
 6
 7     Also Present:
 8        BRIAN ASQUITH, Law Clerk
 9        EVAN WOLFE, Technical Support
10        RYAN WONG, Videographer
11
12     Appearing Via Video/Realtime Stream:
13        AMY KENNEDY
14
                    --o0o--
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

INDEX

Examination by:                          Page

   MR. KENNEDY                         15
   MS. HENN                         357
   MR. KENNEDY                         410

--o0o--

E X H I B I T S

MCK-WALKER      Description          Page

Exhibit 672  McKesson Operations Manual,     136
Controlled Substance Monitoring
Program, Bates MCKMDL0002509 -
539

Exhibit 674  Email chain dated 4/15/11 re     231
"CSMP contribution, DCM call,
Tightening up our increase
process," Bates MCKMDL00507218 -
220

Exhibit 676  Email dated 1/5/12 from McDonald  146
re "Ongoing Due Diligence, New
Questionnaires and Dispensing
Data," Bates MCKMDL00542108 - 110

Exhibit 677  Email chain dated 11/2/12 re     187
"Hydrocodone limits," Bates
MCKMDL00521372 - 375

Exhibit 678  Email chain dated 8/5/14 re     218
"Topco Member CSMP Meetings - due
by September," Bates
MCKMDL00445881 - 884

Exhibit 680  Email chain dated 1/16/12 re "The  163
new questionnaires," Bates
MCKMDL00492821 - 823

Exhibit 681  Email chain dated 11/30/12 from Lumpkin  171
re "CSMP Update - ISMC Threshold
Increase Reports," Bates
MCKMDL00490953 - 954

Page 7

E X H I B I T S

MCK-WALKER      Description          Page

Exhibit 682  Graph prepared by Plaintiffs -     214
"McKesson, Oxycodone to Rite-Aid
#3157," P1.5076

Exhibit 684  Email dated 1/2/13 from Thomet re  204
"CSMP Level 1 Reviews required
for all RNAs - effective
immediately," Bates
MCKMDL00513746

Exhibit 685  McKesson PowerPoint, "DC     211
Controlled Substance Monitoring
Program (CSMP) Overview, Bates
MCKMDL00498295 - 307

Exhibit 686  Settlement Agreement dated     112
4/30/08 by and between US DOJ and
McKesson (no Bates)

Exhibit 687  PowerPoint - "Directors of     122
Regulatory Meeting, Dallas, March
5-6, 2008," Bates MCKMDL00574724
- 744

Exhibit 688  Memorandum dated 10/20/05 to     40
Rannazzisi from Mapes re
"Internet Presentation with
McKesson Corp. On September 1,
2005," Bate MCKMDL00496859 - 875

Exhibit 689  Memorandum dated 1/23/06 to     55
Rannazzisi re "Meeting Between
Office of Diversion Control (OD)
and McKesson Corp. On January 3,
2006," Bates MCKMDL00496876 - 878

Exhibit 690  McKesson PowerPoint,     23
"Presentation to the U.S.
Attorney's Office, Northern
District of West Virginia and
DEA," dated March 12, 2014, Bates
MCKMDL00409116 - 173

///

Page 8

E X H I B I T S

MCK-WALKER      Description          Page

Exhibit 693  Pie Chart & Table, "McKesson     99
hydrocodone sales for October 1,
2005 through January 31, 2006,
ran June 1, 2006," Bates
MCKMDL00497154 - 155

Exhibit 695  US DOJ letter dated 7/28/04 to     91
Beato from Tandy, P1.5020 - 0.88

Exhibit 698  Email chain dated 4/24/08 re     241
"Today's CVS Conf Call," Bates
MCKMDL00627161 - 162

Exhibit 699  Email chain dated 7/30/08 re "CVS  252
to start CSMP on 7/1/08," Bates
MCKMDL00627168 - 172

Exhibit 700  Email chain dated 8/27/08 re     263
"Updated:  Review process for CVS
on CSMP," Bates MCKMDL00555948 -
950

Exhibit 701  Email chain dated 11/12/08 re     270
"CSMP:  Today's internal CVS
analysis call recap," Bates
MCKMDL00627159

Exhibit 702  Email chain dated 12/2/08 re     274
"CSMP Update and next meeting
dates," Bates MCKMDL00627150 -
158

Exhibit 703  Email chain dated 12/22/08 re     280
"Hydrocodone increase," Bates
MCKMDL00525765 - 757

Exhibit 704  Email chain dated 2/19/10 re "TRC  282
CSMP CVS 2-19-10," Bates
MCKMDL00512900

Exhibit 706  Email chain dated 8/6/10 re "CSMP  288
and CVS - Action Plans," Bates
MCKMDL00627048 - 049

///

Page 9

E X H I B I T S

MCK-WALKER      Description          Page

Exhibit 707  PowerPoint by Walker and McDonald  305
re "CVS - Regulatory Review,"
Bates MCKMDL00497980 - 989

Exhibit 708  Spreadsheet produced in native     291
format, Bates MCKMDL00574318,
et al.

Exhibit 709  Email dated 1/3/12 to McKenna     294
from McDonald re "CVS Controlled
Substance Analysis," Bates
MCKMDL00517082, et al.

Exhibit 710  Email dated 2/8/10 to McKenna     292
from McDonald re "CVS Threshold
Discussion," Bates
MCKMDL00571535, et al.

Exhibit 713  Email chain dated 8/2/10 re     286
"Narcotic Restriction," Bates
MCKMDL00627066

Exhibit 714  Email dated 10/25/10 re     344
"Fentanyl Checks," Bates
MCKMDL00468734

Exhibit 718  Email chain dated 11/11/13 re     353
"Campaign 3578-AMI-Mallinckrdt
Hydrocodone has been Released!,"
Bates MCKMDL00546932 - 934

Exhibit 719  Email chain dated 8/3/12 re     347
"Campaign 2845-AMI-Lower Priced
Oxycodone has been Released!,"
Bates MCKMDL00539021 - 023

Exhibit 720  Email chain dated 1/18/08 re     342
"PMIB 08-005 Purdue Frederick
Company/OxyContin C/R Tablets
100's," Bates MCKMDL00543462 -
463

///
///

Highly Confidential - Subject to Further Confidentiality Review

Page 10

E X H I B I T S

MCK-WALKER     Description     Page

Exhibit 721   Email chain dated 11/8/13 re   350
"Campaign 3578-AMI-Mallinckrdt
Hydrocodone has been Released!,"
Bates MCKMDL00546914 - 022

Exhibit 722   Email chain dated 11/12/06 re   322
"Hydrocodone reports," Bates
MCKMDL00542914 - 916

Exhibit 730   McKesson Audit Report, dated   420
3/14/11, Bates MCKMDL00498058 -
089

Exhibit 732   Email dated 9/17/13 to Jackson   339
from Walker attaching Slides,
"Controlled Substance Regulatory
Org Structure," Bates
MCKMDL00549498 - 502

Exhibit 752   Email dated 5/2/13 to Gustin from   195
Walker re "Know Your Customer,"
with attachment, MCKMDL00498169 -
183

Exhibit 755   Settlement and Release Agreement   139
and Administrative Memorandum of
Agreement, Bates MCKMDL00409289 -
299

Exhibit 801   Handwritten document made by Mr.   40
Kennedy at deposition

Exhibit 802   Handwritten document made by Mr.   112
Kennedy at deposition

Exhibit 803   Handwritten document   263
made by Mr.
Kennedy at deposition

Exhibit 804   McKesson letter dated 1/18/06 to   368
Rannazzisi from Julian, Bates
MCKMDL00571361 - 365

///

Page 11

E X H I B I T S

MCK-WALKER     Description     Page

Exhibit 805   Settlement and Release Agreement   377
and Administrative Memorandum of
Agreement, Bates MCKMDL00516360 -
383

Exhibit 806   Email dated 1/22/09 re "DU45,"   384
Bates MCK_WVA_000167

Exhibit 807   Email chain dated 8/14/18 re   385
"Notification of Suspicious
Customer," Bates MCK_WVA_000088 -
089

Exhibit 808   Email chain dated 11/4/08 re   388
"Questions on Daly & Suspicious
Orders Electronic Reporting,"
Bates MCK_WVA_00139 - 145

Exhibit 809   Email chain dated 2/11/09 re   392
"Suspicious Order," Bates
MCK_WVA_00163 - 164

Exhibit 810   Email dated 3/11/09 to O'Keefe   393
from Walker re "Modern Drug
RM0336950," with attachment,
Bates MCK_WVA_00187 - 189

Exhibit 811   Email dated 9/1/11 to Walker from   394
McIntyre re "Drug Depo Susp Omits
Has Been Transmitted," Bates
MCKMDL00524479 - 481

Exhibit 812   PowerPoint by McKesson -   395
"McKesson Pharmaceutical
Controlled Substance Monitoring
Program (CSMP), Bates
MCKMDL00542494 - 512

Exhibit 813   Email dated 2/23/12 to Boockholdt   407
from Walker re "January 26
meeting Follow-Up," with
attachment, Bates MCK_WVA_000230
- 232

Page 12

E X H I B I T S

MCK-WALKER     Description     Page

Exhibit 814   Administrative Memorandum of   434
Agreement," Bates MCKMDL00355350
- 363

--o0o--

Page 13

1    BE IT REMEMBERED that on Thursday, the 10th

2   day of January, 2019, commencing at the hour of

3   8:57 a.m. in the law offices of Covington & Burling,

4   One Front Street, 35th Floor, San Francisco,

5   California, before me, Sandra Bunch VanderPol, a

6   Certified Shorthand Reporter in and for the State of

7   California, personally appeared.

8           DONALD WALKER,

9   called as a witness (McKesson), who, having been duly

10   sworn, was thereupon examined and interrogated as

11   hereinafter set forth.

12               --o0o--

13       THE VIDEOGRAPHER:  We are now on the record.

14       My name is Ryan Wong.  I'm a videographer

15   for Golkow Litigation Services.  Today's date is

16   January 10th, 2019, and the time is 8:57 a.m.

17       This video deposition is being held in

18   San Francisco, California, in the matter of National

19   Prescription Opiate Litigation, for the United States

20   District Court, Northern District of Ohio.

21       The deponent is Donald Walker.

22       Would counsel please identify themselves for

23   the record.

24       MR. KENNEDY:  Eric Kennedy, on behalf of

25   plaintiffs.

Page 14

1    MR. ASQUITH:  Brian Asquith, plaintiffs.

2    MR. WOLFE:  Evan Wolfe, tech support.

3    MS. URQUHART:  Abigail Urquhart, on behalf

4 of Walmart.

5    MR. LIVINGSTON:  Scott Livingston, on behalf

6 of HBC.

7    MR. O'CROININ:  Conor O'Croinin, on behalf

8 of CVS.

9    MS. KVESELIS:  Emily Kveselis, for McKesson

10 and the witness.

11    MS. HENN:  Emily Henn, from Covington &

12 Burling, on behalf of McKesson and Mr. Walker.

13    THE VIDEOGRAPHER:  On the phone?

14    MR. SHAPLAND:  Eric Shapland, on behalf of

15 Endo and Par, at Arnold & Porter.

16    MR. BUSHAR:  Joseph Bushar, of Williams &

17 Connolly, on behalf of Cardinal Health.

18    MS. RURANGIRWA:  Linda Rurangirwa.

19 Collinson, Daehnke, on behalf of C&R Pharmacy.

20    MS. ROCCHINO:  Samantha Rocchino, of Reed

21 Smith, LLP, on behalf of AmerisourceBergen Drug

22 Corporation.

23    THE VIDEOGRAPHER:  The court reporter is

24 Sandy VanderPol, and she will now swear in the

25 witness.

Page 15

1    THE REPORTER:  Raise your right hand,

2 please.

3    Do you solemnly swear or affirm that the

4 testimony you are about to give in this proceeding

5 will be the truth, the whole truth, and nothing but

6 the truth, so help you God?

7    THE WITNESS:  I do.

8         EXAMINATION

9 BY MR. KENNEDY:

10    Q.    Sir, my name is Eric Kennedy.  You

11 understand that I represent the plaintiffs in this

12 case?

13    A.    I do.

14    Q.    And could you please state your full

15 name for the record.

16    A.    Donald Walker.

17    Q.    And are you currently employed?

18    A.    I am not.

19    Q.    And your prior employer was McKesson;

20 would that be true?

21    A.    That's correct.

22    Q.    And so the jury understands where we

23 are today, we are in San Francisco; are we not?

24    A.    Yes, we're in San Francisco.

25    Q.    And San Francisco would be the

Page 16

1 worldwide corporate headquarters of McKesson

2 Corporation; would that be true?

3    MS. HENN:  Objection to form.

4    THE WITNESS:  McKesson's corporate

5 headquarters is currently in San Francisco,

6 California.

7 BY MR. KENNEDY:

8    Q.    And we are at the offices of your

9 attorney at this present time; yes?

10    A.    Yes, we are.

11    Q.    When did you begin your career with

12 McKesson?

13    A.    I joined McKesson in 1987.

14    Q.    And when you joined them, what was

15 your position?

16    A.    My first position with McKesson was

17 as a Transportation Manager with one of the

18 subsidiary companies that McKesson had.

19    Q.    Were your responsibilities in any way

20 involved with the regulatory affairs at that time?

21    A.    No.

22    Q.    And what was the next position that

23 you held with McKesson?

24    A.    I held the position with the -- what

25 was then the McKesson Drug Company and

Page 17

1 Transportation, and had responsibility for

2 transportation planning.

3    Q.    And when did you take that position?

4    A.    About 1991.

5    Q.    Did that position have anything to do

6 with regulatory affairs of the distribution of

7 opioids?

8    A.    No, it did not.

9    Q.    What did that position basically

10 involve?

11    A.    The transportation position that I

12 held was really a position of optimizing delivery

13 efficiencies for our distribution centers.

14    Q.    What was your next position at

15 McKesson?

16    A.    I was the Distribution Center Manager

17 of our Sacramento Distribution Center.

18    Q.    When did you take that position?

19    A.    My best recollection is about 1992.

20    Q.    And what were your duties and

21 responsibilities then, as the manager of a

22 distribution center?

23    A.    I had responsibility for oversight of

24 our daily distribution of pharmaceuticals to

25 pharmacies served by that distribution center.

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    Q.    And that position would have involved
2  the distribution of opioids; would it not?
3    A.    As part of our distribution, we did
4  distribute controlled substances to pharmacies.
5    Q.    Did you have any responsibility at
6  that point in time with respect to the creation,
7  management or implementation of anti-diversion
8  regulations and policies at McKesson?
9    MS. HENN:  Object to form.
10   THE WITNESS:  No.  At that time I was
11 executing against existing policies the company had
12 in place.
13 BY MR. KENNEDY:
14   Q.    What were in place from 1992 to the
15 late '90s?  What was the policy in place?
16   A.    There were -- the policies we had
17 were contained in our Operations Manuals that
18 specified our responsibilities to comply to
19 regulations for handling and distribution of
20 controlled substances.
21   Q.    We know about the existence of
22 Standard Operating Procedure 55.  Are you familiar
23 with that?
24   A.    Yes.
25   Q.    Was that the policy and procedure

Page 19

1  that was in place in the 1990s?
2    A.    The Section 55 of our Operations
3  Manual covered the responsibilities with the handling
4  and distribution of controlled substances.
5    Q.    Sir, that wasn't my question.  I was
6  asking, was Standard Operating Procedure Section 55,
7  was that the policy in place in the 1990s?
8    A.    My recollection is that Section 55
9  was the applicable policy in place during a period in
10 the 1990s.
11   Q.    How long did you hold the position as
12 a Distribution Center Manager?
13   A.    I recall it was approximately 18
14 months.
15   Q.    So sometime in 1993/'94, you took on
16 a new position?
17   A.    Yes.  In 19 -- in that time frame, I
18 don't recall exactly when, I was promoted to a new
19 position of Vice President of Distribution Operations
20 for their Western Region.
21   Q.    Western Region would be the western
22 part of the United States?
23   A.    Yes.
24   Q.    And what were your responsibilities
25 as VP of Distribution of the Western Region?

Page 20

1    A.    I had responsibility for the
2  operations staff in the distribution centers that
3  comprised the Western Region.  So the distribution
4  center managers that operated those facilities
5  reported to me.
6    Q.    And at that point in time -- how
7  long -- how long did you hold that position?
8    A.    I held that position until about
9  1996.
10   Q.    And in that position, did you have
11 responsibility -- other than the following of SOP 55,
12 did you have any duties, responsibilities, with the
13 creation and the management of anti-diversion
14 policies and procedures at McKesson?
15   MS. HENN:  Objection to form.
16   THE WITNESS:  In that role I had
17 responsibility for the distribution centers and their
18 execution of their responsibilities under Section 55
19 to the handling and distribution of controlled
20 substances.
21 BY MR. KENNEDY:
22   Q.    You held that position till what
23 year, the VP of the Western Region?
24   A.    Approximately 1996.
25   Q.    And what position did you take in

Page 21

1  1996?
2    A.    In 1996 I was promoted to the Senior
3  Vice President of Distribution for McKesson
4  Pharmaceutical.
5    Q.    Was that a new position also?
6    MS. HENN:  Objection to form.
7    THE WITNESS:  No.  That position, I
8  succeeded an individual who retired from the company.
9  BY MR. KENNEDY:
10   Q.    Is that the position you held until
11 the time of your retirement?
12   A.    Yes, with the exception of a period
13 of time from approximately 2000 to 2005 where I was
14 responsible for our Six Sigma organization.
15   Q.    And what is that?
16   A.    Six Sigma is a process improvement
17 methodology that we introduced to the company at that
18 time, and I was the senior leader of our Six Sigma.
19   Q.    Did the Six Sigma project in any way
20 relate to the distribution of opioids?
21   A.    Not that I recall.
22   Q.    From '96 to 2000, in this four-year
23 period, what are your responsibilities as a Senior VP
24 of Distribution as it related to the distribution of
25 opioids?

Page 22

1     A.   As the Senior Vice President of
2 Distribution, included in my responsibility was our
3 Regulatory Affairs Group. It was our overall
4 responsibility to ensure that we were complying with
5 regulations associated with the handling and
6 distribution of controlled substances.
7     Q.   And would that be on a national
8 basis?
9     A.   Yes.
10     Q.   Then from 2000 to 2005, when you no
11 longer had your responsibilities as Senior VP of
12 Distribution, who took over your responsibilities
13 during this five-year period?
14     A.   I recall there were two different
15 individuals that had responsibility during that time
16 frame, a Ron Bone and a Brian Magerkurth.
17     Q.   And so they had taken over your
18 responsibilities as it related to McKesson's
19 responsibilities as a distributor relating to the
20 distribution of opioids?
21     A.   During -- during that time they would
22 have had the responsibility for our Regulatory
23 Affairs, yes.
24     Q.   And would their responsibility and
25 your responsibility, when you were acting as the

Page 23

1 Senior VP, would that have related to the policies
2 and procedures of McKesson in relation to suspicious
3 order monitoring?
4     MS. HENN: Objection to form.
5     THE WITNESS: As part of our overall
6 policies, it did include reporting of suspicious
7 orders.
8     (Exhibit No. 690 was marked.)
9 BY MR. KENNEDY:
10     Q.   I am going to show you what we have
11 marked as Plaintiffs' Exhibit 690, if you would,
12 please.
13     MS. HENN: Do you have a second copy for the
14 counsel over here? `
15     UNIDENTIFIED SPEAKER ON TELEPHONE: And if
16 it does have a Bates number, if that could be read
17 into the record, it would be appreciated.
18     MR. KENNEDY: The Bates number,
19 McKessonMDL00409116 -- that's the starting Bates --
20 to -73. To -173.
21 BY MR. KENNEDY:
22     Q.   Mr. Walker, what is the date on this
23 document, if you look at the cover page?
24     A.   The date is March 12th, 2014.
25     Q.   Large capitals, "McKesson

Page 24

1 Corporation"?
2     A.   Yes.
3     Q.   And the title would be the,
4 "Presentation to the U.S. Attorney's Office, Northern
5 District of West Virginia, and DEA." Do you see
6 that?
7     A.   Yes.
8     Q.   If you will -- if you will go to page
9 -122, the last three -- the last three numbers in the
10 bottom right-hand corner.
11     Is the title of this McKesson's Regulatory
12 Affairs team, Pre-Settlement"?
13     MS. HENN: Objection to form.
14     THE WITNESS: Yes.
15 BY MR. KENNEDY:
16     Q.   Presettlement would be prior to 2008;
17 would that be true? There was a settlement between
18 McKesson and the DEA in 2008; do you recall that?
19     A.   I recall the settlement in 2008, yes.
20     Q.   And this is referencing a
21 pre-settlement; do you see that?
22     A.   I see that.
23     Q.   My question being, from 2000 to -- up
24 to 2008, the time of the settlement, would this have
25 been the regulatory team at McKesson?

Page 25

1     MS. HENN: Objection to form.
2     THE WITNESS: Can you repeat.
3 BY MR. KENNEDY:
4     Q.   In this time frame, prior to the
5 settlement, prior to 2008, would this presentation to
6 the government -- would this presentation to the
7 government accurately reflect the regulatory team at
8 McKesson?
9     A.   The regulatory -- counsel, if your
10 question is if this was the regulatory team prior to
11 2008, yes.
12     Q.   And --
13     A.   I'm not familiar with this document.
14 So that's why I'm answering the question that way.
15     Q.   I just thought I might help you with
16 recollecting back to this period of time.
17     And so my question is, Bruce Russell is one
18 of three of the regulatory team. Do you remember
19 when he was brought on at McKesson, prior to 2008 to
20 make up the regulatory team?
21     A.   I don't recall specifically when he
22 was brought on. When I joined the company, Bruce was
23 already an employee of McKesson.
24     Q.   All right. And do you know when he
25 took this position as part of the regulatory team?

Page 26

1    A.   I don't recall specifically.  He held
2  several -- several different positions.  I know that
3  it did include regulatory, but I don't know the
4  dates.
5    Q.   And do you know when Mr. Hilliard was
6  brought on and made part of the regulatory team at
7  McKesson?
8    A.   Again, I don't recall the specific
9  date.  But Mr. Hilliard joined our regulatory team as
10  a result of our acquisition of Foxmeyer Corporation.
11    Q.   And when we talk about a regulatory
12  team, can we be in agreement we're talking about the
13  team that managed -- managed and implemented the
14  policies in relation to the distribution of opioids;
15  would that be correct?
16    MS. HENN:  Objection to form.
17    THE WITNESS:  The regulatory team had
18  responsibility for ensuring the policies were current
19  and in compliance with the regulation, and provided
20  oversight and guidance to our distribution center
21  teams to ensure that all of our distribution centers
22  were in compliance.
23  BY MR. KENNEDY:
24    Q.   And when we're talking about
25  compliance, we're talking about -- that would include

Page 27

1  compliance as it relates to the distribution of
2  opioids; true?
3    A.   It would include the distribution of
4  controlled substances, yes.
5    Q.   Opioids; correct?  They were a
6  controlled substance?
7    A.   The -- we had responsibility for all
8  controlled substances.
9    Q.   Okay.  I want you -- it's just a
10  simple "yes" or "no" question.
11    Opioids are a controlled substance; are they
12  not?  "Yes" or "no."
13    A.   I understand narcotics are a
14  controlled substance, as defined by the DEA, but I
15  don't have the expertise to understand.  We
16  understood them to be controlled substances.
17    Q.   Well, let me ask you this.  You were
18  in charge of regulatory; you worked at the
19  distribution center; you had a long career working
20  directly with the DEA; correct?  Correct?
21    MS. HENN:  Objection to form.
22    THE WITNESS:  I had a long career with
23  McKesson that included interaction with DEA.
24  BY MR. KENNEDY:
25    Q.   And are you saying that you have

Page 28

1  never understood that opioids were a controlled
2  substance?
3    A.   In the regulations, I understand
4  narcotics to be a controlled substance.  And what I
5  can't answer for you is whether opioids specifically
6  are called out in the regulation.
7    We were responsible for the oversight and
8  control of controlled substances, including
9  narcotics.
10    Q.   Okay.  My question is very simple.
11  In your long career at McKesson -- and at the end of
12  the day you were the boss with respect to
13  regulation -- and are you saying that, as you sit
14  here today, you never understood that opioids were a
15  controlled substance that the federal government was
16  addressing when they put the Controlled Substance Act
17  into law in 1970?  You never understood that; is that
18  your testimony, sir?
19    MS. HENN:  Objection to form.
20  BY MR. KENNEDY:
21    Q.   I'm asking you about opioids.
22    A.   Again, I very specifically understood
23  narcotics, and I --
24    Q.   And you didn't know about opioids?
25    A.   And I don't recall opioids being in

Page 29

1  the regulation.
2    Q.   Let me ask you, did you recall, in
3  your long, long career, did you know whether or not
4  oxycodones were within the topic of controlled
5  substances that the DEA and Congress of the
6  United States were intending to be within the purview
7  of what they wanted regulated?  Did you understand
8  oxycodones were a part of that?
9    MS. HENN:  Objection to form.
10    THE WITNESS:  I understood oxycodone to be a
11  Class 2 narcotic, yes.
12  BY MR. KENNEDY:
13    Q.   A controlled substance that you had
14  the responsibility at McKesson to regulate; correct?
15  You understood that?
16    A.   Yes.
17    Q.   Did you understand that hydrocodones
18  were within the purview of controlled substances that
19  the government and the DEA and Congress intended to
20  be subject to their regulation and distribution?
21    A.   Yes.
22    Q.   The three folks that we see here
23  making up the regulatory team -- and, again, when I
24  say "regulatory team" or "Regulatory Affairs," we
25  could understand that what we are talking about are

Page 30

1 the responsibilities of McKesson as it related to the
2 prevention of diversion of controlled substances; you
3 understand that?
4     MS. HENN:  Objection to form.
5     THE WITNESS:  I would describe our
6 regulatory team as having responsibility to ensure
7 that our distribution centers were complying with all
8 regulations, to which McKesson was obligated.
9 BY MR. KENNEDY:
10     Q.    Well, tell me what regulations
11 McKesson was obligated to with respect to the
12 distribution of controlled substances, then, so maybe
13 we can communicate better.  Tell me.
14     In this period prior to 2008, tell me the
15 regulations that you just referred to that McKesson
16 was responsible to follow.
17     A.    At a high level, the responsibility
18 of our distribution centers was to ensure the safe
19 handling, security, recordkeeping associated with the
20 distribution and handling of controlled substances
21 and to -- specifically under the regulation, to guard
22 against diversion and report suspicious orders.
23     Q.    And that was under this -- this
24 umbrella of Regulatory Affairs; correct?
25     A.    Yes, under our Regulatory Affairs

Page 31

1 Group, including our distribution centers, that was
2 our compliance responsibility.
3     Q.    And prior to 2008, as you've
4 represented to the DEA in this slide presentation,
5 prior to 2008, these three folks, Mr. Walker,
6 Mr. Russell, Mr. Hilliard, they made up the
7 regulatory team; true?
8     MS. HENN:  Objection to the form.
9     THE WITNESS:  Prior to 2008, this was the
10 regulatory team.
11 BY MR. KENNEDY:
12     Q.    So during this period prior to 2008,
13 I want to focus on 2005 to start with; all right?
14     A.    Okay.
15     Q.    2005 there was an opioid crisis in
16 the United States; was there not?
17     MS. HENN:  Objection to form.
18     THE WITNESS:  I -- I don't have the specific
19 knowledge or recollection that there was an opioid
20 crisis in the United States at the time.
21 BY MR. KENNEDY:
22     Q.    In 2005?
23     A.    Correct.
24     Q.    Let me ask you this.  Is it just that
25 you don't remember back to 2005, or is it that you

Page 32

1 believe that back in 2005 you weren't conscious of an
2 opioid crisis in this country?
3     A.    I don't recall when the term --
4 basically, the public information associated with
5 what eventually was termed "the opioid crisis" first
6 was identified.
7     Q.    Well, let me ask.  In 2005 you
8 understood McKesson was selling more opioid narcotics
9 than any company in the United States?  You knew
10 that, didn't you?
11     MS. HENN:  Objection to form.
12     THE WITNESS:  No, I don't have any specific
13 information or recollection that our quantities were
14 the largest in the United States.
15 BY MR. KENNEDY:
16     Q.    As you sit here today, do you know
17 and do you understand that over the years McKesson
18 has been the largest distributor of opioids in this
19 country?
20     MS. HENN:  Objection to form.
21     THE WITNESS:  No, I don't have that
22 knowledge.
23 BY MR. KENNEDY:
24     Q.    In 2005 McKesson was selling
25 oxycodones, were they not?

Page 33

1     A.    In 2005 I believe that McKesson
2 was -- oxycodone was one of the controlled substances
3 we sold.
4     Q.    McKesson was selling hydrocodones;
5 were they not?
6     A.    In 2005?
7     Q.    Yes.
8     A.    Yes.
9     Q.    And if I were to tell you that with
10 respect to narcotics and controlled substances, by
11 2005 McKesson was probably selling over a billion
12 dollars worth of those narcotics, would that be
13 contrary to your memory and your belief of the level
14 of sales of McKesson in 2005?
15     MS. HENN:  Objection to form.
16     THE WITNESS:  I don't have any specific
17 knowledge in what our sales quantities of those
18 substances were at that time.
19 BY MR. KENNEDY:
20     Q.    Let me ask you -- see if we can
21 agree.  Would you agree with me that if McKesson --
22 and just assume that they are selling over a billion
23 dollars of narcotics to the American public -- could
24 we agree that they would have a responsibility back
25 in 2005 to understand whether or not there was a

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1 crisis in relation to the products that they were
2 selling? Should they understand that?
3      MS. HENN: Objection to form.
4 BY MR. KENNEDY:
5      Q.   Could we agree?
6      A.   I would agree our responsibility was
7 to comply with the regulations associated with the
8 reporting of suspicious orders and the guarding
9 against diversion.
10     Q.   That's not what I'm asking you. And
11 you -- you're the right guy, and you understand --
12 you heard my question; did you not?
13     MS. HENN: Counsel, could you just ask a
14 question, please.
15 BY MR. KENNEDY:
16     Q.   Did you hear my question, sir?
17     A.   I heard your question.
18     Q.   Did you understand my question?
19     A.   I understood your question.
20     Q.   I'm going to ask it again, maybe in a
21 little different way.
22     If in 2005 McKesson is selling over a
23 billion dollars worth of narcotics, can we agree that
24 they would have the responsibility to know and
25 understand if their product is causing a crisis in

Page 35

1 this country with respect to addiction and death?
2      MS. HENN: Objection. Lacks foundation.
3 BY MR. KENNEDY:
4      Q.   Can you answer that question, please.
5      A.   I understand our responsibility was
6 to ensure that we were selling to a licensed and
7 registered pharmacist, who was filling prescriptions
8 from a licensed and registered physician. And we
9 complied with that.
10     Q.   And I'm going to move to strike. And
11 I'm going to ask you again.
12     I want to know about your responsibility to
13 know. I don't want you to parrot something that you
14 want to say or have been prepared to say. I want you
15 to answer my question; all right?
16     And my question is: In 2005, if McKesson is
17 selling over a billion dollars worth of narcotics,
18 would you agree with me that they would have the
19 responsibility to know and understand the existence
20 of a crisis in relation to the product they are
21 selling, and that being a crisis causing addiction
22 and death? Would they be responsible to know about
23 that --
24     MS. HENN: Objection.
25 ///

Page 36

1 BY MR. KENNEDY:
2      Q.   -- given that's what they are
3 selling?
4      MS. HENN: Objection. Asked and answered.
5 Lacks foundation.
6 BY MR. KENNEDY:
7      Q.   Can you answer that question, please.
8      A.   Our responsibility was to ensure that
9 we were providing pharmaceuticals and medications to
10 licensed pharmacists, based on a licensed physician's
11 prescription.
12     Q.   So are you going to refuse to answer
13 that question? I want to know, and I will move on.
14 If you are not going to answer that question, I will
15 move on.
16     Are you refusing to answer my question?
17     MS. HENN: Counsel, please just pose
18 questions. He will answer them.
19 BY MR. KENNEDY:
20     Q.   Are you refusing to answer my
21 question, sir?
22     MS. HENN: Objection to form.
23     THE WITNESS: Counsel, our responsibility
24 was very specific. We ensured that we were providing
25 medications to licensed pharmacies who were filling

Page 37

1 prescriptions for licensed physicians.
2 BY MR. KENNEDY:
3      Q.   And I'm asking you about your duty to
4 know about the crisis being caused by your products.
5 Do you understand that's what I'm asking about?
6      I'm asking you whether you have the
7 responsibility to understand the crisis being caused
8 by your products? Do you understand that's my
9 question?
10     MS. HENN: Objection. Asked and answered.
11 BY MR. KENNEDY:
12     Q.   That's a "yes" or a "no." Do you
13 understood that is my question?
14     MS. HENN: Objection to form.
15     THE WITNESS: Counsel, I'm trying to answer
16 your question. I understand your question. Our
17 responsibility was very specific. And the regulation
18 was very specific. We complied with the regulations.
19 BY MR. KENNEDY:
20     Q.   You complied. And so let me ask
21 you -- I'm going to write this down. I think you've
22 told me four or five times that you were
23 responsible -- and that's McKesson; right? -- to
24 comply with the regulations. And that would be the
25 regulations of the United States Government?

Page 38

1  Correct? Is that correct?
2      A.    The regulations I'm referring to are
3  contained in the CFR.
4      MR. KENNEDY: Could I have the Elmo, please.
5      Q.    I want to make sure I get this right,
6  because I think you've told me a number of times --
7  and this is what you've told me. Is this accurate,
8  then? McKesson's -- McKesson is responsible to
9  comply with the regulations; is that your testimony?
10     MS. HENN: Objection to form.
11     THE WITNESS: McKesson's responsibility was
12 to comply with the Code of Federal Regulations in
13 which govern the handling and distribution of
14 controlled substances.
15 BY MR. KENNEDY:
16     Q.    So what I wrote down here is
17 accurate? Would that be right?
18     MS. HENN: Objection to form.
19     THE WITNESS: Specifically, we were
20 responsible to comply with the Code of Federal
21 Regulations governing controlled substances.
22 BY MR. KENNEDY:
23     Q.    Okay. Then I'm going to put in here,
24 "Comply with the Code of Federal Regulations." And
25 you said that was responsible for --

Page 39

1      A.    The handling and distribution of
2  controlled substances.
3      Q.    "The handling and distribution of
4  CS," for controlled substance. All right?
5      So is that an accurate statement of
6  McKesson's responsibility, according to you?
7      A.    As I --
8      Q.    Take a --
9      A.    As I understand our responsibility,
10 that is what we were responsible to do.
11     Q.    Fine. And I can put "Mr. Walker" on
12 that; right? That's your testimony?
13     MS. HENN: Objection to form.
14 BY MR. KENNEDY:
15     Q.    True? Have I written that right?
16     A.    We were responsible to comply with
17 Federal Regulations.
18     Q.    And I've written that accurately;
19 correct? Simple question. If I haven't, I will
20 rewrite it; I will write more.
21     Have I written that correctly with respect
22 to Mr. Walker's view as head of regulatory, your view
23 of McKesson's responsibility?
24     MS. HENN: Objection to form.
25 ///

Page 40

1  BY MR. KENNEDY:
2      Q.    Have I written that accurately, sir?
3      A.    That appears to be what I said.
4      Q.    Very good. All right.
5      So let's take a look at whether or not
6  McKesson fulfilled its responsibility --
7  all right? -- according to Mr. Walker's view of their
8  responsibility. All right?
9      A.    Okay.
10     (Exhibit No. 801 was marked.)
11     MR. KENNEDY: If you can give me
12 Exhibit 688, please.
13     (Exhibit No. 688 was marked.)
14 BY MR. KENNEDY:
15     Q.    So let's look at McKesson's
16 fulfilling of its responsibility, then, as you have
17 described it. This is Exhibit 688, Bates -00496859
18 to -875.
19     This is a memorandum. Do you see that up at
20 the top, it says, "Memorandum"?
21     A.    Yes. Give me just a minute.
22     Yes.
23 BY MR. KENNEDY:
24     Q.    And this is a Memorandum. This is a
25 DEA document; is it not? Do you see the DEA logo,

Page 41

1  U.S. Department of Justice, Drug Enforcement
2  Administration? This is a memo from the DEA, from
3  their documents; true?
4      A.    That's what's on the document, yes.
5      Q.    Well, Mr. Walker, you have seen this
6  document before; have you not? This came from your
7  files.
8      A.    Yes, I have seen this document.
9      MS. HENN: Objection to form.
10 BY MR. KENNEDY:
11     Q.    When was the last time you saw this
12 document?
13     A.    I believe the most recent was in
14 preparation for this deposition.
15     Q.    All right. So this is a memorandum.
16 This is a DEA memorandum. The subject is, "Internet
17 Presentation with McKesson Corporation on
18 September 1, 2005"; is that right?
19     A.    That's in the subject title, yes.
20     Q.    And so what they are talking about is
21 a September 1, 2005, meeting that McKesson had with
22 the DEA; true? Is that true?
23     A.    Yes, I think it represents the
24 meeting we had.
25     Q.    And this is an internal memoranda

Page 42

1 that Mr. Mapes, from the DEA, created for Joseph
2 Rannazzisi of the DEA; true?  Is that true?
3        A.    That would appear to be correct.
4        Q.    And you know who Mr. Rannazzisi of
5 the DEA is, do you not?
6        A.    Yes, I do.
7        Q.    He held an important position with
8 the DEA; did he not?
9        A.    Mr. Rannazzisi was the head of
10 diversion control.
11        Q.    And that's an important position; is
12 it not?
13        A.    I believe so.
14        Q.    All right.  Let's read the first
15 paragraph.  Again, they are talking about a
16 September 1 meeting.  This is a DEA memo.  It says:
17        (Reading) On September 1, 2005, a
18        meeting was held at the Office of
19        Diversion Control conference room.  In
20        attendance were Mr. John Gilbert (end
21        of reading).
22 He's from McKesson; right?
23        MS. HENN:  Objection to form.
24 BY MR. KENNEDY:
25        Q.    He's legal counsel at McKesson?

Page 43

1        A.    Mr. Gilbert is outside counsel for
2 McKesson.
3        Q.    All right.  A lawyer; right?
4        A.    Yes, he's a lawyer.
5        Q.    Ronald Bone, Senior Vice President,
6 Distribution Support.  He's from McKesson; correct?
7        A.    Yes.
8        Q.    Gary Hilliard, Director of Regulatory
9 Affairs was present; right?
10        A.    Yes.
11        Q.    And as far as that -- the hierarchy,
12 the chain of command in Regulatory, he was right
13 underneath you or he was two down from you; correct?
14 We just looked at that.
15        A.    At -- that's not accurate.  At this
16 time I was not in the role of Senior Vice President
17 of Distribution.  But ultimately he was.
18        Q.    Okay.  And Michael Mapes, from the
19 DEA, was at the meeting; true?  Is that what it
20 indicates?
21        A.    That's what the document indicates.
22        Q.    Charles E. Trant, Office of Chief
23 Counsel, Diversion and Regulatory Litigation
24 Division, that was a lawyer from the DEA present at
25 the meeting; true?

Page 44

1        MS. HENN:  Objection to form.
2        THE WITNESS:  Again, that's what the
3 document represents.
4 BY MR. KENNEDY:
5        Q.    Jim Crawford, from the DEA, he was
6 also there; correct?
7        A.    According to the document.
8        Q.    Kyle Wright, from the DEA, was also
9 at the meeting, according to the document?
10        A.    Yes, that's what's written.
11        Q.    That last sentence in the first
12 paragraph states:
13        (Reading) The purpose of the meeting
14        was to address the illegal domestic
15        Internet pharmacy problem and their
16        source of supply (end of reading).
17 Did I read that right?
18        A.    Yes.
19        Q.    And it says, "Illegal"; does it not?
20        A.    That is what is written.
21        Q.    And you understand that they said
22 they wanted to talk to you about source of supply.
23 That's McKesson, because McKesson is a source of
24 supply to pharmacies; true?
25        MS. HENN:  Objection to form.

Page 45

1 BY MR. KENNEDY:
2        Q.    That's what they are talking about?
3        A.    McKesson's role in the pharmaceutical
4 supply chain is to supply distributors.
5        Q.    They are a source of supply?  That's
6 what they are talking about in this memo; true?
7        MS. HENN:  Objection to form.
8        THE WITNESS:  I'm not sure what their intent
9 in writing the "source of supply."  But McKesson does
10 supply pharmacies.
11 BY MR. KENNEDY:
12        Q.    Are you telling me, you don't know
13 what they mean by "source of supply"?  You don't know
14 what that means?
15        MS. HENN:  Objection to form.  Asked and
16 answered.
17 BY MR. KENNEDY:
18        Q.    Is that your testimony?
19        MS. HENN:  Same objection.
20        THE WITNESS:  Again, I'm not sure
21 specifically what Mr. Mapes is intending or meaning
22 there.  What I can assure you is that McKesson
23 supplies pharmacies.
24 BY MR. KENNEDY:
25        Q.    All right.  From your background,

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1 your experience in dealing with the DEA, this is an
2 important meeting? If the DEA is bringing all these
3 folks from McKesson and the DEA is bringing all these
4 people to a meeting, and there's lawyers involved,
5 can we agree this was an important meeting?
6     A.    I would acknowledge that DEA had, you
7 know, regular meetings with -- with McKesson and
8 other distributors. Their intent in this meeting,
9 you know, is it important, you know, again, I'm not
10 going to speak for DEA. It would appear to be.
11     Q.    Let me ask you, meetings like this
12 didn't happen every week with the DEA where lawyers
13 are involved, the DEA is bringing all these folks,
14 and McKesson is bringing all these folks? These type
15 meetings with the DEA did not happen every week;
16 would that be true?
17     A.    Meetings at DEA headquarters were
18 not, you know, frequent.
19     Q.    This didn't even happen every month,
20 where this many people from McKesson were brought in
21 to meet this many people at DEA headquarters? It
22 didn't even happen once a month; did it?
23     A.    Not that I recall.
24     Q.    This is an unusual, important
25 meeting; is it not?

Page 47

1     A.    It would appear to be.
2     Q.    Let's go to the next paragraph down.
3 Again, this is a -- the DEA memo about September 1,
4 2005. The next paragraph starts with, "Mr. Mapes."
5         (Reading) Mr. Mapes opened the meeting
6         by presenting to the representatives
7         of McKesson Corporation a PowerPoint
8         briefing which explained the common
9         characteristics of Internet pharmacies
10        and why their activities are illegal
11        (end of reading).
12     So the DEA, at least according to this memo,
13 felt that these Internet pharmacies that McKesson was
14 supplying, that their activities were illegal; is
15 that what that says?
16     MS. HENN: Objection to form.
17 BY MR. KENNEDY:
18     Q.    Sir, is that what that says?
19     A.    I'm reading it. It says, "the common
20 characteristics of Internet pharmacies and why their
21 activities are illegal."
22     Q.    "Illegal," that's the DEA word;
23 right?
24     A.    That's what is written.
25     Q.    And they told that -- at least

Page 48

1 according to this memo, they told McKesson on
2 September 1, 2005, that the activities of the
3 Internet pharmacies, in their opinion, were illegal;
4 right? Is that what it says?
5     A.    Yes.
6     Q.    Then the next sentence in the
7 memoranda states:
8         (Reading) Reviewed with the
9         representatives of McKesson Corp.,
10        were (end of reading).
11     And then there's some bullet points of what
12 were reviewed; true?
13     MS. HENN: Objection to form.
14 BY MR. KENNEDY:
15     Q.    Do you see the bullet points?
16     A.    Yes, I do.
17     Q.    They talked about Supreme Court
18 cases, suspension orders with respect to Internet
19 pharmacies; right?
20     MS. HENN: Objection to form.
21     THE WITNESS: That's what is written in the
22 memo.
23 BY MR. KENNEDY:
24     Q.    They talked about the DEA Internet
25 policy with McKesson; did they not?

Page 49

1     MS. HENN: Objection to form.
2     THE WITNESS: Again, that is what is
3 written.
4 BY MR. KENNEDY:
5     Q.    They talked about some policies
6 published by the American Medical Association; true?
7     MS. HENN: Objection to form.
8     THE WITNESS: Again, documented in the --
9 BY MR. KENNEDY:
10     Q.    In the memo; right?
11     A.    Yes.
12     Q.    They talked about suspicious order
13 requirements of Title 21. They talked about that
14 with McKesson on this day; true?
15     MS. HENN: Objection to form.
16     THE WITNESS: That is what is written in the
17 document.
18 BY MR. KENNEDY:
19     Q.    And they talked to McKesson about
20 some of the practices and ordering patterns of these
21 Internet pharmacies that they thought were engaged in
22 illegal activities; true?
23     MS. HENN: Objection to form.
24     THE WITNESS: Again, what is documented here
25 is that.

Highly Confidential - Subject to Further Confidentiality Review

Page 50

BY MR. KENNEDY:

Q. All right. Now, let's look to the next paragraph. This is -- and I'm going to you ask you if you can agree how important this next paragraph is, though.

The next paragraph states:

(Reading) After the presentation, Mr. Mapes presented to representatives of McKesson Corporation specific customers of McKesson Corporation who have ordered substantial quantities of hydrocodone products. These specific customers of McKesson Corporation were (end of reading).

And then they list United Prescription Services and Ninth Avenue Pharmacy; do you see that?

A. I see that on the document.

Q. McKesson, when they provided us with this document, put a black box. Do you know why that black box is there?

MS. HENN: Objection to form.

THE WITNESS: No, I do not.

BY MR. KENNEDY:

Q. So you agree with me, this paragraph is important because this is documenting the fact

Page 51

that on September 1, 2005, the DEA actually pointed out to McKesson two of its customers, at least two of its customers, that McKesson was selling substantial amounts of hydrocodone products to; correct? That's important? They are actually telling McKesson, here's some Internet pharmacies that you're selling a lot of hydrocodones to. That's important; true?

MS. HENN: Objection to form.

THE WITNESS: In that I wasn't at the meeting, all I can infer is that the document states that Mr. Mapes presented to representatives of McKesson specific customers of who have ordered substantial quantities of hydrocodone products.

BY MR. KENNEDY:

Q. Let's look to the next paragraph, the final paragraph in this first page. It states:

(Reading) Mr. Mapes -- he's from the DEA -- finalized the presentation by advising the representatives of McKesson Corporation that they needed to thoroughly review the materials provided which had been presented to them and review in depth the purchasing patterns and quantities of their customers (end of reading).

Page 52

So the DEA is telling McKesson here that they have to thoroughly review the materials, and they have to review in depth the purchasing patterns and quantities of their customers; is that what it says?

A. That's what the document says.

Q. And it indicates that the representatives of McKesson acknowledge understanding of the material presented. Is that the final statement?

A. Yes, that's what's in the document.

Q. Now, you have reviewed this document within the last few weeks; true?

A. Yes, I believe so.

Q. And you clearly would have seen this document back in 2005, 2006? We got it out of your files; correct? You saw it back then; right?

MS. HENN: Objection to form.

THE WITNESS: I don't recall seeing this document, this internal DEA document, prior to the review with counsel.

BY MR. KENNEDY:

Q. Can we agree, sir, that the DEA -- at least according to this memo, could we agree that the DEA was clearly concerned about Internet pharmacies

Page 53

and their illegal activities? Could we agree with that, from reading this together?

MS. HENN: Objection to form.

THE WITNESS: I would agree that the DEA in the meeting was highlighting the -- their concerns with -- as documented, their concerns with Internet pharmacies.

BY MR. KENNEDY:

Q. And could we agree that given the fact at this meeting, and that they brought everybody into headquarters, can we agree that the DEA wanted to make sure that McKesson was aware that Internet pharmacies were conducting themselves in an illegal fashion? They wanted you folks to know. Would you agree with that?

MS. HENN: Objection to form.

THE WITNESS: I would agree that based on what is in this document, they are concerned over Internet pharmacies. Again, I wasn't at the meeting, so I don't understand the tone.

BY MR. KENNEDY:

Q. Just plain common sense. If the DEA brought all you folks in from McKesson back to the DEA headquarters, could we agree they wanted McKesson to know about their concern with respect to Internet

Case: 1:17-md-02804-DAP Doc #: 3027-36 Filed: 12/19/19 15 of 112. PageID #: 473746.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1  pharmacies and illegal activity?
2      MS. HENN:  Objection to form.
3  BY MR. KENNEDY:
4      Q.    That's why they brought McKesson in;
5  right?
6      MS. HENN:  Objection to form.
7      THE WITNESS:  I don't know specifically,
8  Counsel, their intent.  Clearly that was the topic
9  that was discussed in the meeting.
10 BY MR. KENNEDY:
11     Q.    During the meeting, during this
12 meeting, the DEA specifically pointed out that
13 McKesson was selling a significant amount of
14 hydrocodones to Internet pharmacies; true?  I mean,
15 we just read that.  They pointed that out to McKesson
16 at this meeting; right?
17     MS. HENN:  Objection to form.
18     THE WITNESS:  That's what's represented in
19 the document.
20 BY MR. KENNEDY:
21     Q.    And this is a meeting that took place
22 on September 1, 2005; right?
23     A.    That was the date of the meeting, as
24 I understand it.
25     MR. KENNEDY:  All right.  Let's go four

Page 55

1  months later.  All right.  Four months later.  If we
2  could look at Exhibit 689, please.
3          (Exhibit No. 689 was marked.)
4      MR. KENNEDY:  That's a Bates -00496876 to
5  -878.
6      Q.    You have got a September 1 meeting,
7  2005.  I want to talk about four months later.  You
8  have seen this document; have you not?
9      A.    Yes, I have.
10     Q.    This is from your files.
11     A.    Yes, I have seen this document.
12     MS. HENN:  Objection to form.
13 BY MR. KENNEDY:
14     Q.    This is another -- this is another
15 DEA memo; is it not?
16     A.    It would appear to be a DEA memo,
17 yes.
18     Q.    And the subject of this memo is a
19 January 3, 2006, meeting with the DEA; true?  True?
20     A.    Yes.
21     Q.    So McKesson is brought into the DEA
22 on September 1, '05.  And now this is four months
23 later, January 3, 2006; true?
24     A.    The meeting was held in January of
25 2006, yes.

Page 56

1      Q.    Now, this is a DEA memo, again,
2  written to Mr. Rannazzisi; correct?
3      A.    That's correct.
4      Q.    Let's look to the first paragraph.
5  They are referencing this meeting, the second meeting
6  four months after the first.  And they state:
7          (Reading) On January 3, 2006, a
8          meeting was held at the Office of
9          Diversion Control conference room
10         between representatives of McKesson
11         Corporation and the Drug Enforcement
12         Administration (end of reading).
13 The second paragraph states:
14         (Reading) Representing McKesson
15         Corporation were Donald G.  Walker" --
16 That's you; right?
17     A.    Yes, it is.
18     Q.    You're at the second meeting; right?
19     A.    Yes, I was at this meeting.
20     Q.    And that point you were Senior Vice
21 President of Distribution Operations; correct?
22     A.    That is correct.
23     Q.    So you're sitting on top of
24 Regulatory Affairs at that point; true?
25     A.    Yes.

Page 57

1      Q.    Bill Mahoney, Distribution Center
2  Manager, Lakeland Distribution Center, Florida, was
3  there; right?  McKesson employee; true?
4      A.    Yes.
5      Q.    Gary Hilliard, Director of Regulatory
6  Affairs, was there; right?
7      A.    Yes.
8      Q.    McKesson.  He's from McKesson; right?
9      A.    Yes, he was.
10     Q.    And John Gilbert, one of McKesson's
11 lawyers was present; true?
12     A.    That is correct.
13     Q.    And it says -- next paragraph down it
14 outlines now who is there from the DEA.  It says:
15         (Reading) Representing Drug
16         Enforcement Administration (DEA)
17         Office of Diversion Control (OD) were
18         Joseph Rannazzisi, Deputy Assistant
19         Administrator, Michael R. Mapes,
20         Chief, E-Commerce Section (end of
21         reading).
22 Another DEA person; true?
23     A.    Yes.
24     Q.    Kyle Wright, Chief E-Commerce
25 Operations from the DEA was present; right?

Page 58

1    A.    Yes.
2    Q.    And then Charles E. Trant, a DEA
3 Chief Counsel, a lawyer, was also present; right?
4    A.    That's what's represented on the
5 document, yes.
6    Q.    The next paragraph down.  Could you
7 read that to us.  Read the next paragraph down.
8    A.    (Reading) The purpose of this
9          meeting -- or the meeting was to
10         discuss the delivery of over two
11         million dosage units of hydrocodone to
12         pharmacies located in Tampa, Florida,
13         area alleged to be Internet pharmacies
14         (end of reading).
15   Q.    Hadn't McKesson just met with the DEA
16 four months earlier about Internet pharmacies and
17 their illegal activity?  Isn't that what we just
18 looked at before this document?  Four months earlier
19 you had a meeting; correct?
20   A.    McKesson participated in a meeting in
21 September --
22   Q.    About Internet pharmacy --
23   A.    -- 2005.
24   Q.    About Internet pharmacies and illegal
25 activity; right?

Page 59

1    A.    As was represented in the document,
2 yes.
3    Q.    And what you have just read to us, it
4 looks like the DEA is bringing you back four months
5 later, because McKesson sold two million dosages of
6 hydrocodone to Internet pharmacies after that
7 meeting; right?  That's the purpose of this next
8 meeting?
9    MS. HENN:  Objection to form.
10 BY MR. KENNEDY:
11   Q.    True?
12   A.    I don't know that to be accurate.
13 What is stated here is the delivery of two million
14 dosages of units of hydrocodone to pharmacies in that
15 area, which is --
16   Q.    It says Internet pharmacies --
17   MS. HENN:  Counsel, try not to speak at the
18 same time.
19   MR. KENNEDY:  I'm sorry.  I'm sorry.
20   THE WITNESS:  Internet pharmacies, but it
21 didn't specify the time frame that they are referring
22 to.
23 BY MR. KENNEDY:
24   Q.    Oh, we are going to get to the time
25 frame.  Because two million doses of hydrocodone,

Page 60

1 sir, you know from your 20, 30 years of experience,
2 that's a lot of hydrocodone drug; is it not?  That's
3 a lot?
4    A.    Depending on the time frame, Counsel.
5 And I can't answer whether that's an appropriate
6 number or an excessive number.
7    Q.    We will get on to whether or not it's
8 appropriate or excessive as we move through this
9 letter; all right?
10   The bullet point -- or the next paragraph:
11        (Reading) Mr. Mapes opened the meeting
12        by making introductions and covering
13        the background of previous meetings
14        and telephone -- telephonic
15        conversations between OD, which is the
16        DEA, and McKesson Corporation.
17        Specifically addressed were the
18        following (end of reading).
19   Did I read that right?
20   A.    Yes.
21   Q.    Okay.  Bullet point No. 1, they are
22 referencing the first meeting that took place four
23 months earlier.  And this first bullet point states:
24        (Reading) A meeting between McKesson
25        Corp and E-Commerce Section -- that

Page 61

1        would be the DEA -- was held
2        September 1, 2005, at which time
3        McKesson Corp. was given a full
4        detailed briefing of the OD
5        Distributor's initiative to address
6        the Internet pharmacy problem.
7        McKesson Corp. was provided a briefing
8        book covering the briefing and all
9        supporting documentation (end of
10        reading).
11   So they are talking about the meeting that
12 took place four months earlier about the Internet
13 pharmacies; correct?
14   A.    I believe that's correct.
15   Q.    The next bullet:
16        (Reading) Issues to be considered were
17        frequency of orders, size of orders,
18        range of product purchases, and
19        percentage of controlled versus
20        non-controlled (end of reading).
21   Did I read that right?
22   A.    Yes.
23   Q.    And, again, they are talking about
24 that meeting on September 1.  The next bullet point:
25        (Reading) Current controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    substances being abused via the
2    Internet were identified as
3    hydrocodone, alprazalam and
4    Phentermine (end of reading).
5    Do you see that?
6        A.    Yes.
7        Q.    Look at that last bullet, though.
8    Let's focus on that last bullet, because they are
9    talking -- they are reflecting back on the meeting
10   that took place four months earlier.  And the DEA in
11   that last bullet point states:
12       (Reading) Specifically addressed
13       concerns with United Prescription
14       Services, a current customer of
15       McKesson's (end of reading).
16   Do you see that, sir?
17       A.    Yes, I see what's written.
18       Q.    So they are saying here in this
19   memorandum that on September 1, the DEA has a meeting
20   with McKesson and addresses concerns about United
21   Prescription Services, one of your customers; right?
22       A.    I don't recall specifically United
23   Prescription as a customer.  But this document states
24   this.
25       Q.    That's what it says?

Page 63

1        A.    That's what it says.
2        Q.    The next bullet point on the next
3    page, it next states, "On October 6, 2005" -- that
4    would be one month after the September 1 meeting;
5    true?
6        A.    Yes.
7        Q.    It states:
8        (Reading) On October 6, 2005,
9        Mr. Mapes" -- and he's from the DEA --
10       called Mr. Gilbert (end of reading).
11   And he's from McKesson; right?
12       A.    Mr. Gilbert was our outside counsel.
13       Q.    So you've got on September 6, one
14   month after the DEA meeting.
15       (Reading) Mr. Mapes, of the DEA, calls
16       McKesson's lawyer to discuss comments
17       the E-Commerce Section -- and that's
18       the DEA -- to discuss comments the
19       E-Commerce Section had received that
20       McKesson Corp. was not taking the
21       Internet pharmacy problem seriously.
22       Mr. Mapes, DEA, was assured by
23       Mr. Gilbert that McKesson Corp. was
24       taking the matters seriously and
25       working to change their procedures

Page 64

1    (end of reading).
2    Did I read that right?
3        A.    Yes.
4        Q.    On October -- next bullet point.
5    This is four days later.  So you've had a meeting on
6    September 1; they called you a month later saying
7    you're not taking it serious; and four days later
8    does this bullet point state:
9        (Reading) On October 10, 2005, a DEA
10       investigator from the Tampa District
11       Office contacted Bill Mahoney at the
12       McKesson Distribution Center in
13       Lakeland, Florida, and expressed
14       concerns of hydrocodone sales to
15       United Prescription Services (end of
16       reading)?
17       Did I read that right?
18       A.    Yes.
19       Q.    So this is a little bit after a month
20   that the DEA warned McKesson about United
21   Prescription Services; right?  A little bit -- it's a
22   month later?
23       MS. HENN:  Objection to form.
24   BY MR. KENNEDY:
25       Q.    A month and nine days after being

Page 65

1    warned about United Prescription Services, McKesson
2    is getting a call and warning them again; true?  Is
3    that what that bullet point says?
4        MS. HENN:  Objection to form.
5        THE WITNESS:  That's what's in the document.
6    BY MR. KENNEDY:
7        Q.    The next bullet point down, "The
8    E-Commerce Section" -- that's the DEA -- "retrieved
9    ARCOS data" -- and that's a database where the DEA
10   can look at what McKesson is actually distributing
11   and selling; true?  That's what the ARCOS data is?
12       A.    The ARCOS data is data that we
13   provided -- that is required by the regulation.  So
14   it is data of sales of controlled substances that are
15   required to be reported.
16       Q.    So it states:
17       (Reading) The E-Commerce Section of
18       the DEA retrieved the ARCOS data which
19       revealed that between October 10 and
20       October 21, 2005, the following
21       alleged Internet pharmacies received
22       the identified quantities of
23       hydrocodone (end of reading).
24       Remember, you said you can't tell us whether
25   or not two million dosages was a lot, it depends on

Page 66

1  the time frame; right? Remember you just -- you just
2  told us that, and how many people you're selling to
3  in the time frame; right?
4      A.    Yes.
5      Q.    We're talking about an 11-day period
6  here; are we not? The E-Commerce Section received
7  ARCOS data which revealed that between October 10 and
8  October 20, 2005, the following alleged Internet
9  pharmacies received the identified quantities of
10  hydrocodone. We're talking about 11 days; right? Is
11  that what we're talking about, 11 days?
12      MS. HENN:  Objection to form.
13      THE WITNESS:  That's what's documented.
14  BY MR. KENNEDY:
15      Q.    It says here, United Prescription
16  Services -- after being warned about them, it says
17  here, does it not, that McKesson in this 11 days
18  distributed them 252,100 units of hydrocodone; is
19  that what it says?
20      A.    That's what it says and is alleged
21  here, yes.
22      Q.    You know that at this point in time,
23  the DEA, their statistics in ARCOS, were showing that
24  the average monthly, average monthly distribution by
25  a distributorship of McKesson was 5,000 units of

Page 67

1  hydrocodone? Do you remember that? Remember that
2  communication, all during this period?
3      MS. HENN:  Objection to form.
4      THE WITNESS:  I recall DEA indicating that
5  5,000 doses of controlled substances was average.
6  BY MR. KENNEDY:
7      Q.    That's an average monthly dose;
8  right?
9      A.    That's what I recall.
10      Q.    And, sir, so McKesson sends to United
11  Prescription Services in an 11-day period, 50 times,
12  50 times the monthly dosage; is that what it says?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  That's what the document says.
15  BY MR. KENNEDY:
16      Q.    So I think you told us a couple
17  minutes ago, to tell us whether or not the amount
18  that you folks are distributing into a pharmacy, you
19  need to know the time frame and the number of
20  pharmacies.
21      Can we agree that if McKesson send 50 times,
22  50 times the monthly dosage in 11 days, that's
23  inappropriate? That's too much?
24      MS. HENN:  Objection to form.
25  ///

Page 68

1  BY MR. KENNEDY:
2      Q.    Would you agree with that?
3      A.    No, I don't agree specifically,
4  because -- not understanding their pharmacies across
5  the country, that have a wide variety of business
6  models that require substantial quantities of
7  controlled substances. And it also is based on DEA's
8  average.
9      Our view was that DEA -- how they calculated
10  their average, we didn't understand. So their
11  alleged average, whether it's accurate or not, we
12  didn't know.
13      Q.    Let me ask you this. Forget the
14  averages and forget everything else. You were
15  involved in this, sir, for how many years?
16      A.    Probably 15 years in the role.
17      Q.    Given your background, experience, as
18  we sit here today, sir, can you agree with me that if
19  McKesson sent 250,000 units of hydrocodone to a
20  single pharmacy in 11 days, sir, that is absolutely,
21  positively, an extraordinary amount that should never
22  have been shipped? Could we agree with that?
23      A.    What I would agree with is that we
24  were -- all of these pharmacies were licensed and
25  registered pharmacies, registered by the DEA, and we

Page 69

1  were filling prescriptions that were submitted to us,
2  you know, based on a licensed pharmacy coming from a
3  licensed prescription.
4      Q.    Sir, McKesson lost its license in six
5  different distribution centers and was fined
6  $13 million for this, and you're sitting here telling
7  us that sending 250,000 units of hydrocodone in 11
8  days is appropriate? Is that what you're telling us?
9      MS. HENN:  Objection to form.
10      THE WITNESS:  What I can assure you is that
11  we were fulfilling orders for pharmacies that were
12  licensed and registered by the DEA and were
13  submitting to us orders.
14  BY MR. KENNEDY:
15      Q.    The next bullet down, it says during
16  an 11-day period you sent Universal Rx 254,700 units
17  of hydrocodone. Is that what it says next?
18      A.    That's what the document says.
19      Q.    That would be 50 times the national
20  average, would it not, for a full month; true?
21      MS. HENN:  Objection to form.
22  BY MR. KENNEDY:
23      Q.    Is that right?
24      A.    The --
25      Q.    Did I did do the division right? If

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1  I put 50 into 250,000, it's about 50 times the
2  national average. Is that -- is my math right? I
3  suppose that's what I'm asking.
4      MS. HENN: Objection to form.
5      THE WITNESS: Again, the document indicates
6  that we shipped 250,000 dose units in -- in that time
7  frame. I don't have any independent knowledge of, A,
8  whether the quantities alleged is correct because I
9  don't have the original information or data; nor, as
10  I stated, the average, whether it was correct --
11  BY MR. KENNEDY:
12      Q.  Well, sir --
13      A.  Based on DEA's view.
14      Q.  -- you don't have any knowledge
15  whether these are correct? You were directly
16  involved with this memo from the beginning, and this
17  led to negotiations and a settlement, and McKesson
18  losing its license to distribute opioids and a
19  $13 million fine; did it not? You were directly
20  involved with that; were you not?
21      MS. HENN: Objection to form.
22      THE WITNESS: I was directly involved in the
23  settlement with DEA and the penalties that were
24  associated with that.
25  ///

Page 71

1  BY MR. KENNEDY:
2      Q.  And you said you don't know whether
3  these numbers are accurate. Did McKesson ever, ever,
4  in fighting its suspension and the $13 million fine,
5  did they ever claim that the numbers were inaccurate,
6  ever?
7      MS. HENN: Objection to form.
8  BY MR. KENNEDY:
9      Q.  You were directly involved. Did they
10  ever say, well, we didn't really sell all that, ever?
11      A.  I don't recall that we have ever had
12  the discussion with DEA around those numbers.
13      Q.  It next states, "Avee Pharmacy." You
14  sold those folks, a single pharmacy, 520,000 units of
15  hydrocodone in 11 days. Is that what it says?
16      A.  That's what the document says.
17      Q.  That's a hundred times the 30-day
18  national average. And McKesson did that in 11 days;
19  is that -- is that right? Is my math right?
20      MS. HENN: Objection to form.
21  BY MR. KENNEDY:
22      Q.  Is that right, sir?
23      A.  Again, using those numbers, as I
24  stated earlier, the average, whether that's correct
25  or incorrect. But if that's what's alleged here,

Page 72

1  then your math is correct.
2  BY MR. KENNEDY:
3      Q.  And then Medipharm Rx, 500,900 in 11
4  days. Again, if my math is correct, that's a hundred
5  times the national average in 11 days; right?
6      MS. HENN: Objection to form.
7      THE WITNESS: Again, the way you calculate
8  it, using that average and these documented numbers,
9  your math would be right.
10  BY MR. KENNEDY:
11      Q.  And then to the Accumed Pharmacy,
12  404,400. And that would be 80 times the national
13  average; would it not?
14      MS. HENN: Objection to form.
15  BY MR. KENNEDY:
16      Q.  Is that right?
17      A.  Again, using your calculations, that
18  would be 80 times.
19      MR. KENNEDY: Could I have the Elmo, please.
20      MS. HENN: Counsel, we have been going over
21  an hour. Would this be a decent time for a five-,
22  ten-minute break?
23      MR. KENNEDY: Sure.
24      THE VIDEOGRAPHER: We are going off the
25  record. The time is 10:07 a.m.

Page 73

1      (Recess taken.)
2      THE VIDEOGRAPHER: We are back on the
3  record. The time is 10:22 a.m.
4  BY MR. KENNEDY:
5      Q.  Mr. Walker, we just went through the
6  DEA's outline of McKesson's sale of two million
7  hydrocodones to six different pharmacies. I'm going
8  to go back for a second. I'm going to stop there on
9  this memo and reflect upon what you told us earlier.
10      This was your statement earlier with respect
11  to McKesson's responsibility; correct? Remember
12  going through that?
13      A.  Yes.
14      Q.  And Mr. Walker said, "McKesson's
15  responsibility was they were responsible to comply
16  with the Code of Federal Regulations in the handling
17  and distribution of controlled substances." That was
18  your statement with respect to McKesson's
19  responsibility; true?
20      A.  Yes, it was.
21      Q.  Hydrocodone is a controlled
22  substance; right?
23      A.  Yes, it is.
24      Q.  Can we agree that if McKesson -- as
25  the DEA has outlined here, if McKesson distributed

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1 two million hydrocodones in 11 days to just six
2 pharmacies, that McKesson did not live up to the
3 responsibility that you have told us that they had?
4     MS. HENN: Objection to form.
5 BY MR. KENNEDY:
6     Q.    Would you agree?
7     A.    No, I wouldn't agree with that
8 statement.
9     Q.    So -- just so we're clear here. On
10 the record here today, under your oath, it's your
11 position that the sale of two million hydrocodones in
12 11 days to six pharmacies is consistent with and
13 comports with McKesson's responsibility to comply
14 with Federal Regulations in the handling and
15 distribution of controlled substances; is that --
16     MS. HENN: Objection.
17 BY MR. KENNEDY:
18     Q.    -- is that your testimony here?
19     MS. HENN: Objection. Asked and answered.
20 BY MR. KENNEDY:
21     Q.    Is that your testimony? I want to be
22 very clear.
23     MS. HENN: Objection. Asked and answered.
24     THE WITNESS: I don't agree with your
25 original statement. What I would state is that we

Page 75

1 complied with the regulations regarding the
2 distribution. We reported to DEA. We sold only to
3 licensed pharmacies who had a licensed physician's
4 prescriptions. And we managed the security of our
5 controlled substances in compliance with the
6 regulations.
7 BY MR. KENNEDY:
8     Q.    That wasn't my question. But you
9 just said you reported to the DEA. Am I correct that
10 not one single one, not one single one of these
11 orders that added up to two million hydrocodones in
12 11 days, not one single one of them was reported to
13 the DEA; isn't that the fact?
14     MS. HENN: Objection to form.
15 BY MR. KENNEDY:
16     Q.    That's the fact?
17     MS. HENN: Objection to form.
18     THE WITNESS: I have no knowledge of that
19 either way.
20 BY MR. KENNEDY:
21     Q.    Sir, you sat through the meetings,
22 the negotiations, the pleadings, and all of the legal
23 proceedings with respect to this event; did you not?
24     A.    No, that's not accurate. I did not
25 sit through all the meetings and negotiations that

Page 76

1 took place between counsels.
2     Q.    Did you sign the agreement with the
3 DEA in relation to these violations, these sales of
4 hydrocodones? Did you sign the very settlement
5 agreement; sir?
6     A.    I signed the 2008 memorandum
7 agreement, yes.
8     Q.    Let me back up, because I just -- I
9 just want to be clear about it.
10     Is it your position, sir -- not in general
11 terms but with respect to the specifics, is it your
12 position that the sale of two million hydrocodones in
13 11 days to six pharmacies comported with, was
14 consistent with, McKesson's responsibility to comply
15 with the Code of Federal Regulations in the handling
16 and distribution of controlled substances?
17     MS. HENN: Objection to form.
18 BY MR. KENNEDY:
19     Q.    If you can answer that specific
20 question.
21     A.    We specifically complied with the
22 regulations as associated with the reporting of
23 suspicious orders and guarding against diversion
24 through the security and controls that we put in
25 place to handle controlled substances.

Page 77

1     Q.    The DEA didn't agree with that. The
2 DEA doesn't agree that you fulfilled your legal
3 responsibilities with the sale of two million in 11
4 days? The DEA didn't agree; did they?
5     MS. HENN: Objection to form.
6 BY MR. KENNEDY:
7     Q.    The DEA did not agree, and they made
8 it clear; didn't they?
9     MS. HENN: Objection to form.
10     THE WITNESS: Our memorandum of agreement
11 was an agreed settlement between the DEA and
12 McKesson. And the basis of that, the legal basis, I
13 don't understand all the details, so I'm not sure
14 whether I can answer whether the DEA agreed or
15 disagreed.
16 BY MR. KENNEDY:
17     Q.    Let's go back -- let's go back to the
18 memorandum. We will see what the DEA said about two
19 million pills in 11 days; all right?
20     Page -877, is that what we are on? The six
21 bullet points about the amounts sold to each.
22     We have gone through the two million pills
23 in 11 days. And let's see what the DEA thought of
24 that, sir.
25     You were at this meeting; were you not?

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1    A.    I was at that meeting.
2    Q.    The memo says, with regard to that
3 meeting:
4         (Reading) Mr. Rannazzisi -- he's of
5         the DEA -- then addressed the
6         representatives of McKesson and
7         informed them that it was his
8         concerted opinion that based upon the
9         information presented, the DEA needed
10        to ask for the surrender of McKesson's
11        Lakeland Distribution Senator --
12        Center registration or the DEA would
13        pursue an Order to Show Cause against
14        the DEA registrant of the McKesson
15        facility in Lakeland, Florida (end of
16        reading).
17        Is that what you were told at that meeting,
18 that they wanted McKesson's registration?  Is that
19 what you were told?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  I recall Mr. Rannazzisi in
22 that meeting requesting that we surrender our
23 Lakeland, Florida, registration.
24 BY MR. KENNEDY:
25        Q.    And that means you're not going to be

Page 79

1 able to sell narcotics to pharmacies:  Right?  If you
2 have got to give your registration back, that's what
3 that means?
4    A.    If a registration is suspended or
5 revoked, then you're unable to sell controlled
6 substances.
7    Q.    So when you say selling two million
8 pills in 11 days is okay, that you're fulfilling your
9 responsibility under the regulations, the DEA didn't
10 agree with that; did they?
11        MS. HENN:  Objection to form.
12 BY MR. KENNEDY:
13        Q.    They want your registration?
14        MS. HENN:  Objection to form.
15        THE WITNESS:  The DEA requested we surrender
16 our registration during that meeting.
17 BY MR. KENNEDY:
18        Q.    And you ended up surrendering your
19 registration; didn't you?
20        MS. HENN:  Objection to form.
21        THE WITNESS:  Counsel, that's not correct.
22 We had a limited suspension of certain controlled
23 substances from certain distribution centers, is the
24 result of the agreement with DEA.
25 ///

Page 80

1 BY MR. KENNEDY:
2    Q.    We will look at that specifically.
3 Let's go down to -- after some bullet points, I want
4 to go down to the paragraph that starts with
5 "Through."
6        Do you see this paragraph that starts with
7 "Through"?
8        (Reading) Through the course of the
9        above discussion, McKesson Corp., by
10       their own admission, was unable to
11       provide a plausible explanation for
12       the sales of over two million dosage
13       units of hydrocodone, in a 21-day
14       period, to pharmacies previously
15       identified by DEA to McKesson Corp.
16       (end of reading).
17 Do you see that?
18       A.    I see what's written there, yes.
19       Q.    Do you remember that, that all these
20 folks at McKesson are sitting there with your
21 lawyers, and you can't explain how you did this?  Do
22 you remember that?
23       MS. HENN:  Objection to form.
24       THE WITNESS:  I don't recall any specific
25 discussion with the DEA around that.  So the answer

Page 81

1 is --
2 BY MR. KENNEDY:
3       Q.    Do you remember -- do you remember
4 saying --
5       MS. HENN:  Counsel, can you make sure to let
6 him finish.
7       MR. KENNEDY:  I'm sorry.
8       Q.    Do you remember you folks at McKesson
9 telling the DEA at this meeting, there's nothing
10 wrong with two million pills in 11 days; we fulfilled
11 our responsibility under the regulations?  Do you
12 remember saying that to them at this meeting?
13       A.    No, I don't remember saying anything
14 like that.
15       Q.    You said earlier you weren't sure
16 whether these numbers, this two million, they were
17 accurate.  Any indication on here that you looked at
18 the DEA at that meeting and said that two million,
19 that two million hydrocodones isn't accurate?  Any
20 indication of that, or do you have a memory of that?
21       MS. HENN:  Objection to form.
22       THE WITNESS:  I don't have a recollection of
23 that one way or the other.
24 BY MR. KENNEDY:
25       Q.    Let's look at the last paragraph on

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  that page. It states that:
2      (Reading) After the conclusion of this
3      meeting, it was learned from Gary
4      Hilliard of McKesson that one of the
5      reasons they were not able to realize
6      the full volume of hydrocodone product
7      going out to Florida pharmacies was
8      that their reports only included the
9      name brand hydrocodone products
10     distributed and was -- next page --
11     and was leaving out the generic
12     products. It was only after realizing
13     that the generic were not being
14     reported was McKesson Corp. then able
15     to see the large quantities that DEA
16     was bringing to McKesson's attention
17     (end of reading).
18  Did I read that right?
19     A.   Yes.
20     Q.   It doesn't say here that you went
21  back and looked and the DEA was wrong; does it?
22     A.   What is documented here is that
23  Mr. Mapes reportedly had a conversation with Gary
24  Hilliard. I'm not directly familiar with that
25  conversation.

Page 83

1      Q.   This is 2006, and McKesson discovers
2  at this point that its reports did not include the
3  sales of generic hydrocodones; isn't that what it
4  indicates?
5      A.   That's what's documented here.
6      Q.   And tell the jury what generic
7  hydrocodones are.
8      A.   In all pharmaceuticals or medicines,
9  as a brand drug comes to market, it stays brand for a
10  period of time, at which time a generic drug can be
11  manufactured that has the same pharmacological
12  characteristics as the brand medication. So it's
13  very common in pharmaceutical industry for generics.
14  Amoxicillin is probably the best example that
15  everybody would know.
16      Q.   And, sir, the majority of
17  hydrocodones that McKesson was selling were generic;
18  were they not?
19      A.   I do not know what quantities were
20  brand versus generic at that point in time.
21      Q.   In a general sense, that has always
22  been true at McKesson? You sell more generics than
23  you do brand name controlled substances; hasn't that
24  always be true?
25      MS. HENN: Objection to form.

Page 84

1      THE WITNESS: Again, I don't have any
2  specific knowledge one way or the other.
3  BY MR. KENNEDY:
4      Q.   Let me ask you this. If you weren't
5  tracking generic drugs with your reporting and your
6  tracking, if you weren't tracking hydrocodone, can we
7  agree you weren't tracking oxycodone either; true?
8      MS. HENN: Objection to form.
9  BY MR. KENNEDY:
10     Q.   Is that what you discovered?
11     MS. HENN: Objection to form.
12     THE WITNESS: There -- I had no indication
13  that we weren't tracking oxycodone.
14  BY MR. KENNEDY:
15     Q.   Are you -- are you representing to
16  the jury that you had one system of tracking for
17  hydrocodones and a totally different system of
18  tracking for oxycodones? Is that what you're telling
19  us, sir?
20     MS. HENN: Objection to form.
21     THE WITNESS: No, that's not accurate. Our
22  overall system was one and the same. The inputs into
23  that system could have potentially created a void in
24  the reporting of hydrocodone and had nothing to do
25  with oxycodone.

Page 85

1  BY MR. KENNEDY:
2      Q.   Is that what was happening, sir? You
3  were in the middle of this. Is that what was
4  happening, your system wasn't tracking generic
5  hydrocodones but, indeed, was tracking generic
6  oxycodones? Is that what was happening?
7      MS. HENN: Objection to form.
8      THE WITNESS: I don't recall specifically.
9  I do recall we had an issue with our system at the
10  time. But I don't recall the specifics of that.
11  BY MR. KENNEDY:
12     Q.   Sir, if your system was not tracking
13  hydrocodones, generic hydrocodones in '05, then it
14  wasn't tracking them in '04 or '03 or '02 or '01;
15  true?
16     MS. HENN: Objection to form.
17  BY MR. KENNEDY:
18     Q.   It never had been?
19     MS. HENN: Objection to form.
20     THE WITNESS: I can't speculate on if this
21  was taking place, when it started, and to the extent
22  that it took place.
23  BY MR. KENNEDY:
24     Q.   Sir, you were in charge at that
25  point. Didn't you say to Mr. Hilliard and the folks

Page 86

1 working for you, how long has this been going on,
2 that we haven't been tracking generic hydrocodones?
3 Did you ask?
4     MS. HENN: Objection to form.
5     THE WITNESS: I don't recall having any
6 specific request or discussions around this.
7 BY MR. KENNEDY:
8     Q.    Sir, McKesson had the duty since 1970
9 to identify and report suspicious orders of
10 controlled substances; did they not?
11     A.    I don't know specifically when the
12 CFR was generated. It was in the early '70s. But in
13 the time that I was there, we had the responsibility.
14     Q.    And that included generic
15 hydrocodones, did it not, that duty, that
16 responsibility?
17     MS. HENN: Objection to form. Lacks
18 foundation.
19     THE WITNESS: We were responsible to report
20 the sales of all pharmaceutical or controlled
21 substances that were reportable to the DEA.
22     MR. KENNEDY: Okay. I'm going to ask to
23 strike your answer. Could you read back my question,
24 sir. I want you to listen real careful, and I want
25 you to answer this question. Not what you want to

Page 87

1 answer. I want you to answer what I'm asking this
2 point forward, if you could.
3     MS. HENN: Objection to form.
4     MR. KENNEDY: Could you read it back,
5 please.
6     (Record read as follows: QUESTION:
7     And that included generic
8     hydrocodones, did it not, that duty,
9     that responsibility?)
10     MS. HENN: Same objection. Lacks
11 foundation.
12     THE WITNESS: Hydrocodone -- all hydrocodone
13 was a reportable controlled substance.
14 BY MR. KENNEDY:
15     Q.    Including generic hydrocodone; true?
16     A.    Including generic hydrocodone, yes.
17     Q.    Because generic hydrocodone, sir, is
18 just as addictive as brand-name hydrocodone; is it
19 not?
20     MS. HENN: Objection to form.
21     THE WITNESS: I have no expertise on
22 addiction rates or addiction. So I can't comment
23 whether -- one versus the other.
24 BY MR. KENNEDY:
25     Q.    They weren't any different

Page 88

1 chemically; were they?
2     MS. HENN: Objection to form.
3 BY MR. KENNEDY:
4     Q.    Branded versus generic aren't
5 different chemically?
6     A.    Generally, my understanding is that
7 they were very close, if not identical, in terms of
8 chemical makeup. But, again, I don't have the level
9 of expertise to testify absolutely that they were the
10 same.
11     Q.    Generic hydrocodone, sir, your
12 understanding generic hydrocodone was just as likely
13 to cause an overdose and death as a named brand
14 hydrocodone; true?
15     MS. HENN: Objection to form.
16     THE WITNESS: My understanding is that
17 generic hydrocodone, as it's designed for medical
18 purposes, it was the same as brand hydrocodone.
19 BY MR. KENNEDY:
20     Q.    Sir, at this point in time, with
21 respect to McKesson's coming to understand in 2006
22 that they weren't tracking generic hydrocodones,
23 would that have been true nationwide? You didn't
24 have a different system before; did you? That would
25 have been true nationwide?

Page 89

1     A.    Our system was a national system.
2 So, yes, anything that occurred in Florida would have
3 been consistent across the country.
4     Q.    In Ohio; correct?
5     A.    If we distributed generic hydrocodone
6 in Ohio.
7     Q.    West Virginia?
8     A.    Again, we service all 50 states.
9     Q.    And you don't know how long this had
10 been going on? Is that your testimony today, you
11 don't know how long it was prior to '06, prior to
12 '05, that McKesson was not tracking its sales and
13 distribution of generic hydrocodone; is that true?
14     MS. HENN: Objection to form. Lacks
15 foundation.
16     THE WITNESS: I do not know the time frame,
17 whether it was a point in time or occurred over a
18 period of time. So the answer is, I do not know.
19 BY MR. KENNEDY:
20     Q.    By 2005, though, you understood, did
21 you not, that hydrocodones were one of the major
22 causes of addictions in the United States? You knew
23 that by 2005; didn't you?
24     MS. HENN: Objection to form.
25     THE WITNESS: I don't recall, you know,

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1 specifically having any awareness of hydrocodone
2 being a national issue in 2005.
3 BY MR. KENNEDY:
4     Q.   By 2005, sir, didn't you understand
5 that hydrocodones were one of the most highly
6 diverted drugs in this country?
7     MS. HENN:  Objection to form.  Lacks
8 foundation.
9 BY MR. KENNEDY:
10     Q.   Do you understand that by 2005?
11     MS. HENN:  Same objection.
12     THE WITNESS:  I don't -- I don't have any --
13 any recollection or knowledge of that.
14 BY MR. KENNEDY:
15     Q.   So at this point in time, in 2005 to
16 early 2006, when you have this period where you sell
17 two million hydrocodones, are you saying that you did
18 not understand that hydrocodones were one of the most
19 highly diverted drugs in this country?  You didn't
20 know that?
21     MS. HENN:  Objection.  Asked and answered.
22 Lacks foundation.
23     THE WITNESS:  I had no knowledge or
24 understanding of addiction rates of hydrocodone.
25 ///

Page 91

1 BY MR. KENNEDY:
2     Q.   You had been selling hydrocodones for
3 a decade or more, making millions of dollars, and you
4 didn't understand that; is that your testimony?
5     MS. HENN:  Objection.  Asked and answered.
6 Lacks foundation.
7     THE WITNESS:  In 2005 I had no knowledge and
8 don't recall.
9     MR. KENNEDY:  I am going to give you
10 Exhibit 695.
11     (Exhibit No. 695 was marked.)
12 BY MR. KENNEDY:
13     Q.   Sir, I'm going to show you --
14     MS. HENN:  Counsel, this appears to have
15 been printed without Bates number or confidentiality
16 stamp.  So we would just ask, for the record, that
17 those -- the number and the confidentiality
18 designation be read into the record, if you have it.
19     MR. KENNEDY:  The Bates numbers?
20     MS. HENN:  The Bates number, so the people
21 on the phone know what you're looking at.
22     MR. KENNEDY:  These are not Bates numbered.
23 This comes from the U.S. Department of Justice, Drug
24 Enforcement Administration.
25     MS. HENN:  Has it not been produced in this

Page 92

1 litigation?
2     MR. KENNEDY:  Well, I can't tell you I've
3 got a memory of all 20 million documents produced, so
4 I really don't know.
5     MS. HENN:  Okay.
6 BY MR. KENNEDY:
7     Q.   Do you see the DEA logo on
8 Exhibit 695, sir?
9     A.   Yes, I do.
10     Q.   Does it say, "U.S. Department of
11 Justice, Drug Enforcement Administration"; correct?
12     A.   Yes.
13     Q.   Do you see the Bates stamp there?
14 They are -- they are not Bates stamped, but a date
15 stamp of July 28, 2004; do you see that?
16     A.   Yes.
17     Q.   And you were just telling me you
18 don't think you had knowledge of -- with respect to
19 the diversion, the addiction of hydrocodones in 2005.
20 That's what we were talking about; right?
21     MS. HENN:  Objection.  Asked and answered.
22 BY MR. KENNEDY:
23     Q.   Correct, sir?  Is that what we just
24 were talking about, your knowledge in 2005; right?
25     A.   That's correct.

Page 93

1     Q.   And then in 2005 you were the boss
2 with respect to McKesson's regulation, diversion of
3 controlled substances; correct?
4     MS. HENN:  Objection.  Lacks foundation.
5     THE WITNESS:  In the latter part of 2005, I
6 assumed that responsibility.
7 BY MR. KENNEDY:
8     Q.   All right.  And this is July '04.  So
9 this is -- this is even before that date; right?  So
10 this is available before that date; all right?
11     MS. HENN:  Objection to form.
12 BY MR. KENNEDY:
13     Q.   Go to page 2.  132 at the bottom,
14 page 2 up at the top.  The second sentence,
15 "Despite."  Does it state:
16         (Reading) Despite their obvious
17         utility in medical practice, as stated
18         above, hydrocodone products are among
19         the most popular pharmaceutical drugs
20         associated with drug diversion,
21         trafficking, abuse and addiction (end
22         of reading)?
23     Is it your testimony you did not know that
24 in 2005?
25     A.   Counsel, as I answered, I do not

Page 94

1  recall having any specific knowledge of hydrocodone
2  or this issue. This is the first time I've seen this
3  document and had no other personal knowledge.
4       Q.   Well, you're in charge of Regulatory
5  in 2005; right?
6       MS. HENN:  Objection to form.
7       THE WITNESS:  I assume --
8  BY MR. KENNEDY:
9       Q.   Correct?
10      A.   I assumed responsibility for
11 Regulatory in September of 2005.
12      Q.   And McKesson is selling millions upon
13 millions of hydrocodones in 2005; are they not?
14      A.   I don't know specifically the
15 quantities that we were selling. We sold hydrocodone
16 as one of the controlled substances we provided to
17 our licensed pharmacies.
18      Q.   Look at the first bullet. And this
19 is a -- this is in a government available document.
20 Look at the first bullet, "Hydrocodone has an abuse
21 liability similar to morphine."
22      Did you know that?
23      MS. HENN:  Objection to form.
24 BY MR. KENNEDY:
25      Q.   Did you know that in 2005?

Page 95

1       A.   No, Counsel, I -- as I said, I don't
2  have and did not have any personal knowledge of, you
3  know, hydrocodone or its comparison to morphine.
4       Q.   Look at the next bullet, first
5  sentence. Now you're in charge of making sure that
6  hydrocodones as a controlled substance are not being
7  diverted; correct?
8       A.   We had the responsibility --
9       Q.   I asked you about, were you in charge
10 of that responsibility?
11      MS. HENN:  Objection to form.
12      Let the witness finish his answer, please.
13      THE WITNESS:  I had responsibility for our
14 regulatory and our compliance, which included
15 guarding against and preventing -- guarding against
16 the diversion of controlled substances.
17 BY MR. KENNEDY:
18      Q.   Does the next bullet point in this
19 DEA document say, "Hydrocodone products are
20 associated with significant diversion"? Does it
21 state that?
22      A.   Paragraph 2, that's what the document
23 says. And DEA is alleging, yes.
24      Q.   You say, "DEA is alleging." Is that
25 what you said? Did you say, "DEA is alleging"?

Page 96

1       A.   This is -- this is their document.
2       Q.   When you say "allege," you didn't --
3  there's not much question about that. This is more
4  than an allegation. That's the truth in 2005, from
5  everything you know, sir? Fifteen years in this,
6  that's the truth; is it not?
7       MS. HENN:  Objection to form. Lacks
8  foundation.
9       THE WITNESS:  Counsel, again, I -- as I
10 stated, I do not remember having any specific
11 recollection around discussions either -- or
12 documents around hydrocodone's addictive and its
13 comparison to others.
14 BY MR. KENNEDY:
15      Q.   I just want to go back.
16      A.   I'm just simply looking at the
17 document and trying to answer your question.
18      Q.   I just want to ask you real simple.
19 You used the words, "DEA alleges." Was the problem
20 in 2005 that you and McKesson thought that these were
21 just DEA allegations with respect to hydrocodones and
22 diversion? Did you think these were just
23 allegations?
24      MS. HENN:  Objection to form.
25 Mischaracterizing the testimony and lacks foundation.

Page 97

1  BY MR. KENNEDY:
2       Q.   Is that what you thought in 2005,
3  sir?
4       A.   Counsel, I was answering your
5  question specific to this document. I don't know.
6  And certainly I'm not sure I can answer the question
7  as you asked it.
8       Q.   Next says -- next bullet, first
9  sentence, "Hydrocodone products are associated with
10 significant drug abuse."
11      Did you know that in 2005, as the person who
12 was in charge of Regulatory? Did you know that?
13      MS. HENN:  Objection to form.
14      THE WITNESS:  Again, I don't recall being
15 specifically aware of a hydrocodone drug abuse issue.
16 BY MR. KENNEDY:
17      Q.   The next bullet:
18        (Reading) Poison control data, DAWN
19        medical examiner (ME) data and other
20        ME data indicate that hydrocodone
21        deaths are numerous, widespread and
22        increasing in number (end of reading).
23      And I want to ask you, sir, very
24 specifically, can we agree that if McKesson is
25 selling millions of dosages of hydrocodone, and

Highly Confidential – Subject to Further Confidentiality Review

Page 98

1 making millions upon millions of dollars in doing
2 that, that they had the responsibility to know that
3 the drugs that they were selling were causing deaths,
4 widespread, and increasing in number? Didn't you
5 have the responsibility to know that?
6     MS. HENN: Objection to form. Lacks
7 foundation. Compound.
8     THE WITNESS: Our responsibility was very
9 specific. And that was to ensure that we were
10 providing controlled substance medications to
11 licensed pharmacists who were filling prescriptions
12 to licensed physicians.
13 BY MR. KENNEDY:
14     Q.   Sir, we've -- we have been talking
15 about -- we've been talking about McKesson's sale of
16 two million hydrocodones in an 11-day period in
17 October of 2005. Do you remember all those questions
18 we had been going through?
19     A.   Yes, I remember the questions.
20     Q.   Isn't it a fact -- isn't it a fact
21 that in addition to the two million dosages in
22 October of '05, McKesson did not stop there; they
23 continued to sell massive amounts of hydrocodones
24 even after October of '05? Isn't that true?
25     MS. HENN: Objection to form.

Page 99

1 BY MR. KENNEDY:
2     Q.   Do you remember that --
3     A.   I don't -- I don't know what specific
4 quantities of hydrocodone we sold, you know, after
5 that period of time.
6         (Exhibit No. 693 was marked.)
7 BY MR. KENNEDY:
8     Q.   Showing you what has been marked as
9 Exhibit 693. 693, all right, which is No. -497154.
10     Go to the second page, if you would. And I
11 believe this is a document prepared by the DEA and
12 provided to us by McKesson.
13     Do you see the chart on page -155? Do you
14 see that?
15     A.   Yes.
16     Q.   Now, this is McKesson hydrocodone
17 sales and distributions from October 1, now, to
18 January 31, a four-month period. We've been talking
19 about just 11 days in October.
20     This is a four-month period; do you see
21 that?
22     A.   Yes.
23     Q.   This is in Florida, just Florida;
24 all right?
25     Look at Accumed. This four-month period,

Page 100

1 1,110,000. 1,110,900, in a four-month period. Do
2 you see that?
3     A.   I see that.
4     Q.   Do you understand that's 31 times the
5 Florida average?
6     MS. HENN: Objection. Lacks foundation.
7 BY MR. KENNEDY:
8     Q.   Do you understand that, 31 times the
9 Florida average for McKesson?
10     MS. HENN: Objection. Lacks foundation.
11 BY MR. KENNEDY:
12     Q.   Do you see that? Do you agree with
13 that?
14     MS. HENN: Same objections.
15     THE WITNESS: I wouldn't agree with that or
16 disagree. I don't understand the source of the
17 numbers because it's not our information, that I'm
18 aware of, and I haven't seen this document before.
19 BY MR. KENNEDY:
20     Q.   This is the DEA's -- these are the
21 DEA numbers.
22     MS. HENN: Objection. Lacks foundation.
23 BY MR. KENNEDY:
24     Q.   I will ask you to assume that these
25 are the DEA numbers, and you provided -- McKesson

Page 101

1 provided to us this document that the DEA created.
2 All right? You can assume that to be true.
3     And at least according to the DEA, over the
4 four-month period -- after that October event of
5 two million, in this four-month period you sold
6 Accumed 1,110,900. Do you have anything in your --
7 in your memory or documentation that would dispute
8 that number? Let me ask you that.
9     MS. HENN: Objection to form. Lacks
10 foundation.
11     THE WITNESS: I don't have any recollection
12 of this document or the numbers, and certainly
13 haven't conducted my own review or analysis. So I
14 can't support it or deny it.
15 BY MR. KENNEDY:
16     Q.   During a four-month period, Avee
17 Pharmacy, you sold them 1,754,800. Do you have
18 anything to dispute the DEA's number there?
19     MS. HENN: Objection. Lacks foundation.
20     THE WITNESS: Same response, Counsel. I
21 don't -- I don't have any knowledge one way or the
22 other.
23 BY MR. KENNEDY:
24     Q.   You do know that the DEA gets its
25 numbers from ARCOS; correct? The ARCOS database,

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  that's where the DEA gets its number; true?
2      MS. HENN: Objection to form.
3      THE WITNESS: I know that ARCOS is one of
4  the sources of DEA's data. But I don't know that
5  it's exclusive.
6  BY MR. KENNEDY:
7      Q.    And tell the jury who provides the
8  DEA with the ARCOS data on your sales. Who provides
9  that to them?
10     A.    We submit on a monthly basis, as
11 required by the regulation, the ARCOS data on the
12 sales of controlled substances that are required to
13 be reported.
14     Q.    McKesson gives them the numbers on
15 what you're selling them; right?
16     A.    We provide the ARCOS data to DEA.
17     Q.    Bi-Wise, you sold them 384,100 in a
18 four-month period; right? And that's about 11 times
19 the Florida average. Do you have anything to
20 disagree with those numbers?
21     MS. HENN: Objection to form. Lacks
22 foundation.
23     THE WITNESS: Again, without understanding
24 the source, the background of the numbers, I can't
25 support or deny either way.

Page 103

1  BY MR. KENNEDY:
2      Q.    Medipharm, 1.2 million. Trelles,
3  324,000. United Prescription, 641,000. Universal
4  Prescriptions, 883,000. Any way to disagree with
5  these numbers, sir?
6      MS. HENN: Objection to form. Lacks
7  foundation.
8  BY MR. KENNEDY:
9      Q.    Any way?
10     A.    I can neither support or refute the
11 numbers, Counsel, because I don't understand
12 specifically the source.
13     Q.    Do you recall ever saying to the DEA
14 your numbers, based upon ARCOS, that we provided you,
15 are wrong? Do you remember that, during the course
16 of events after -- after this date, do you remember
17 telling the DEA your numbers are wrong?
18     MS. HENN: Objection to form. Lacks
19 foundation.
20 BY MR. KENNEDY:
21     Q.    Do you remember that, ever?
22     MS. HENN: Same objection.
23     THE WITNESS: No, I don't recall ever having
24 a conversation with DEA around their numbers or any
25 of the data that they shared with us.

Page 104

1  BY MR. KENNEDY:
2      Q.    Sir, based on this table, McKesson --
3  McKesson sold seven million hydrocodone pills to
4  seven pharmacies in four months. Do you consider
5  that to be consistent with the responsibility that
6  you've told us about? Is that consistent with
7  McKesson's responsibility?
8      MS. HENN: Objection to form.
9      THE WITNESS: We sold to licensed
10 pharmacies. I am aware we wouldn't be able to
11 provide any controlled substances to a pharmacy that
12 wasn't registered by the DEA.
13 BY MR. KENNEDY:
14     Q.    Let me ask you this. You keep -- you
15 keep repeating that over and over, "We sold to
16 licensed pharmacies."
17     Sir, could we agree that the responsibility
18 of McKesson went far beyond just making sure that you
19 were selling to a licensed pharmacy?
20     A.    Our responsibility included
21 monitoring, reporting suspicious orders to the DEA,
22 and guarding against diversion.
23     Q.    And that was a responsibility that
24 was far beyond just making sure that you were selling
25 to a pharmacy with a license; is that true?

Page 105

1      MS. HENN: Objection to form.
2      THE WITNESS: I wouldn't say that that's
3  accurate. I think our responsibility was very
4  specifically spelled out in the regulations, and we
5  adhered to those.
6  BY MR. KENNEDY:
7      Q.    And that included, number one,
8  identifying orders of unusual size; correct?
9      MS. HENN: Objection to form.
10     THE WITNESS: In the suspicious order
11 regulation, unusual size is called out.
12 BY MR. KENNEDY:
13     Q.    Right. And what we're looking at is
14 seven million units of hydrocodone in four months.
15 And you had the responsibility to identify orders of
16 unusual size; did you not?
17     MS. HENN: Objection to form. Compound.
18 BY MR. KENNEDY:
19     Q.    Is that true?
20     A.    We -- our suspicious order reporting
21 needed to provide and identify orders of size,
22 quantity, and frequency.
23     Q.    Absolutely. And that's more than
24 just making sure you're selling to a pharmacy that's
25 got a license; right? Correct?

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    A.    And report to the DEA.

2    Q.    Right.  And you know not one single
3  one of these orders of this seven million was ever
4  reported to the DEA, not one.  Do you remember that?

5        MS. HENN:  Objection to form.

6  BY MR. KENNEDY:

7    Q.    Do you remember that?

8        MS. HENN:  Lacks foundation.

9        THE WITNESS:  I don't know that to be
10  accurate either way.  I don't have independent
11  knowledge of what we did or did not report during
12  that time frame regarding these pharmacies.

13  BY MR. KENNEDY:

14    Q.    You don't remember that that is the
15  reason that you got fined $13 million?

16        MS. HENN:  Objection to form.  Lacks
17  foundation.

18  BY MR. KENNEDY:

19    Q.    You don't remember?

20    A.    I don't remember or have any
21  independent knowledge of whether or not any of these
22  pharmacies ever reported to DEA during that time
23  frame.

24    Q.    All right.  Sir, I wrote down some of
25  the dates of what we have been talking about so we

Page 107

1  can put it all together here, everything we have been
2  talking about.

3        And the memo we had been looking at on
4  September 1, 2005, you had a meeting with the DEA;
5  correct?

6        MS. HENN:  Objection to form.

7  BY MR. KENNEDY:

8    Q.    That's what we talked about, correct?

9        MS. HENN:  Objection to form.  Lacks
10  foundation.  Mischaracterizes testimony.

11  BY MR. KENNEDY:

12    Q.    September 1, 2005, DEA meeting at
13  headquarters?

14    A.    McKesson participated in a meeting of
15  September of '05, yes.

16    Q.    And at that meeting they warned you
17  about Internet pharmacies; did they not?

18        MS. HENN:  Same objection.

19        THE WITNESS:  I wasn't at the meeting.
20  Counsel, based on the notes that you provided, DEA
21  advises of a concern over Internet pharmacies.

22  BY MR. KENNEDY:

23    Q.    And then one month later, right, one
24  month later, your lawyer got a call and said that we
25  have heard that McKesson is not serious about this

Page 108

1  warning; correct?

2        Do you remember going through that?

3        MS. HENN:  Objection to form.

4  Mischaracterizes the document and lacks foundation.

5        THE WITNESS:  I saw the note from DEA.

6  BY MR. KENNEDY:

7    Q.    Four days later the DEA contacted
8  McKesson again about their sales to certain Internet
9  pharmacies; did they not?  We went through that.

10        MS. HENN:  Same objections.

11  BY MR. KENNEDY:

12    Q.    Correct?

13    A.    Again, in the -- in the document that
14  you shared, that was so documented.

15    Q.    And four months later, four months
16  later, after a warning, after saying we're serious,
17  after saying we're concerned, in the next four months
18  McKesson sold seven million hydrocodones to Internet
19  pharmacies, seven of them; right?

20        MS. HENN:  Objection to form.  Lacks
21  foundation --

22  BY MR. KENNEDY:

23    Q.    Is that what we have just been
24  through?

25        MS. HENN:  Objection to form.  Lacks

Page 109

1  foundation.

2        THE WITNESS:  In the document you provided,
3  again, I can't support or refute the numbers.  That
4  is what's indicated.

5  BY MR. KENNEDY:

6    Q.    And you've told us that you believe,
7  as the boss of all of regulatory, that this was
8  consistent with your responsibility to carry out the
9  law, to regulate, and guard against diversion; is
10  that your position?

11        MS. HENN:  Objection to form.

12        THE WITNESS:  As responsible for Regulatory,
13  I feel very confident that we were executing our
14  regulatory responsibilities as required under the
15  CFR.

16  BY MR. KENNEDY:

17    Q.    And, sir, the very fact, the very
18  fact that you sit here today and you tell the jury
19  that seven million hydrocodones under these
20  circumstances, in four months, and McKesson carrying
21  out its responsibility, isn't that very fact the
22  problem with McKesson?  Isn't it the problem?

23        MS. HENN:  Objection to form.
24  Mischaracterizes the document.  Lacks foundation.

25  ///

Highly Confidential - Subject to Further Confidentiality Review

Page 110

BY MR. KENNEDY:
Q. Sir, isn't that the problem, the very fact that you, the boss of Regulatory, think that this conduct is okay? Isn't that the problem with McKesson back in '05 and thereafter?
MS. HENN: Same objections.
THE WITNESS: Counsel, we were very focused on our regulatory responsibilities, and we carried out those responsibilities in the very best way that we understood them in compliance with the regulations.
BY MR. KENNEDY:
Q. Sir, my question is very specific. I'm talking about what we have been talking about for the last hour. Isn't the fact that you, the head of Regulatory, believes that it was okay for McKesson to sell seven million pills to seven pharmacies in a four-month period -- isn't the fact that you, the head of pharmacy, thinks that that is okay, isn't that the problem, the underlying problem that McKesson had?
MS. HENN: Objection. Mischaracterizing the document. And lacks foundation.
THE WITNESS: Counsel, my testimony is that I, as the leader of our Regulatory and senior member

Page 111

of our company, believe that we were completing our regulatory obligations in the very best way that we understood them, and adherence to the regulation as we understood it and had been operating for many years.
BY MR. KENNEDY:
Q. And my question to you is very specific. Isn't that the problem that you, a senior executive, thought that this was okay?
MS. HENN: Objection to form. Asked and answered.
THE WITNESS: I can't answer that question, Counsel. I believe very strongly in my prior testimony.
BY MR. KENNEDY:
Q. And, again, even more, isn't that the problem, that you, the executive, the head of Regulatory, feel very strongly that seven million pills in four months is okay? Isn't that McKesson's problem?
MS. HENN: Objection to form. Mischaracterizing the document. Lacks foundation. Asked and answered.
THE WITNESS: Counsel, I -- again, I will stand by my testimony.

Page 112

BY MR. KENNEDY:
Q. Sir, what we're looking at here, this massive -- this seven million pills in a four-month period in Florida, it wasn't just happening in Florida, was it? It was happening across the country; was it not?
MS. HENN: Objection to form.
THE WITNESS: I don't recall any -- any specific issues and don't have knowledge of what was occurring in the balance of the country.
(Exhibit No. 802 was marked.)
MR. KENNEDY: Well, sir, let's -- let me show you Exhibit 686.
(Exhibit No. 686 was marked.)
BY MR. KENNEDY:
Q. 686 does not have Bates numbers. Sir, you indicate you don't have any knowledge of McKesson -- McKesson sending massive amounts around the country of hydrocodone -- excuse me, hydrocodones. This is a Settlement Agreement. Look at that first sentence.
(Reading) This is a Settlement
Agreement entered into on April 30th,
2008, between the United States
Department of Justice, through the

Page 113

United States Attorney's Office, for
the Districts of Maryland, Middle
Florida, Southern Texas, Colorado,
Utah, and Eastern California (end of
reading).
Do you see that?
A. I see that.
Q. And the Settlement Agreement is with McKesson Corporation; true?
A. Yes.
Q. You signed this document; did you not?
A. Yes, I did.
Q. And that's why I'm asking, why is it that you didn't have any knowledge that this was going on across the country? You signed this document; didn't you?
MS. HENN: Objection to form.
THE WITNESS: I signed this document, Counsel.
BY MR. KENNEDY:
Q. Let's go to the next page, down to No. 8 on the next page. See where it says, on No. 8, paragraph 8, "The Covered Conduct shall mean the following alleged conduct"? Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1    A.    Yes.
2    Q.    "A:  Within the District of
3 Maryland" --  and that's not Florida; right?  Can we
4 agree that's not Florida?
5    A.    Maryland is not Florida.
6    Q.    (Reading) -- from January 2005?
7       through October 2006,
8       McKesson-Landover sold approximately
9       three million dosage units of
10      hydrocodone to New Care Pharmacy in
11      Baltimore and failed to report these
12      sales as suspicious orders to DEA when
13      discovered, as required by and in
14      violation of 21 C.F.R 1301.74(b), and
15      21 U.S.C. 842 (a)(5) (end of reading).
16   Do you see that?
17   A.    Yes.
18   Q.    That's 150,000 hydrocodones a month,
19 if I did the math right.  Do you see that?  That
20 would be 30 times the national average?
21   MS. HENN:  Objection to form.
22 BY MR. KENNEDY:
23   Q.    The DEA national average; right?  If
24 I did my math right.
25   MS. HENN:  Objection to form.

Page 115

1 BY MR. KENNEDY:
2    Q.    Do you see that?
3    A.    Again, if using DEA's average, which
4 I can neither support or refute, and the dosage units
5 here, that your math is correct.
6    Q.    That's Maryland; right?  So let's
7 go -- No. B, that's the Middle District of Florida,
8 and that's probably what we've been talking about;
9 correct?
10   A.    Yes.
11   Q.    And then go to C.  Now we're in the
12 Southern District of Texas; right?  And does it
13 state:
14      (Reading) from February to December of
15      2007, McKesson-Conroe sold
16      approximately 2.6 million dosage units
17      of hydrocodone to Mercury Drive
18      Pharmacy and Maswoswe's Alternative
19      Pharmacy and failed to report those
20      sales as suspicious orders to DEA when
21      discovered (end of reading).
22   Did I read that right?
23   A.    Yes, you read that correctly.
24   Q.    And that's over eight months.  And
25 that would be about 150,000 a month, if I did my math

Page 116

1 right; correct?
2    A.    If you divide what that says, that
3 would be correct for the two pharmacies.
4    Q.    And, again, if the DEA was correct,
5 and that the national average is about 5,000 a month,
6 what's this?  About 30 times?  30 times the national
7 average; right?
8    MS. HENN:  Objection to form.
9 BY MR. KENNEDY:
10   Q.    Correct?
11   A.    Are you referring to the Texas
12 pharmacies?
13   Q.    We're on Texas, yes, sir.
14   A.    If the math -- but, again, it would
15 be -- there's two pharmacies involved.  But your math
16 would be correct.
17   Q.    And not one order was reported to the
18 DEA; was it?
19   MS. HENN:  Objection to form.  Lacks
20 foundation.
21 BY MR. KENNEDY:
22   Q.    Is that right?
23   A.    I don't have any specific knowledge
24 of what was or wasn't reported to DEA.
25   Q.    What does it state here.  "Failed to

Page 117

1 report these sales as suspicious orders to the DEA";
2 does it say that?
3    A.    That's what it says.  That was the
4 allegation.
5    Q.    Did you sign this?
6    A.    I did.
7    Q.    Let's go to D on the next page.  This
8 is Colorado now.  It states:
9       (Reading) With respect to Colorado,
10      from September 2005 through November
11      of 2007, McKesson-Aurora sold large
12      quantities of hydrocodone to three
13      Colorado pharmacies (end of reading).
14   Is that what it states with respect to
15 Colorado?
16   A.    That is correct.
17   Q.    E, now we're in Utah:
18      (Reading) From January 2005 through
19      October 2007, McKesson-Salt Lake City
20      sold approximately 825,000 dosage
21      units of hydrocodone, oxycodone,
22      Fentanyl and Methadone to the
23      Blackfeet Clinic in Browning, Montana
24      (end of reading).
25   Does it state that?

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  A.  Yes, that's what it states.

2  Q.  And, again, failed to report any of
3  these to the DEA as suspicious orders; true?

4  MS. HENN:  Objection to form.  Lacks
5  foundation.

6  BY MR. KENNEDY:

7  Q.  Correct?

8  MS. HENN:  Same objections.

9  THE WITNESS:  What is written is that
10  allegation.

11  BY MR. KENNEDY:

12  Q.  You signed the document; right?

13  A.  I signed the agreement.

14  Q.  And, again, just to backtrack a
15  second.  The responsibility of McKesson, with respect
16  to suspicious orders, included identifying orders of
17  unusual size; true?  Is that true?

18  A.  As part of the regulation, size is a
19  factor.

20  Q.  Part of your responsibility, is to
21  identify unusual orders of size; correct?

22  MS. HENN:  Objection to form.

23  THE WITNESS:  We were responsible for
24  reporting suspicious orders, which included unusual
25  size.

Page 119

1  BY MR. KENNEDY:

2  Q.  Sir, I asked you a "yes" or "no"
3  question.  And we have a limited amount of time here.
4  And I know you've been instructed to repeat my
5  question in your answer to take up time.  But if I
6  asked you a "yes" or "no" question, I want you to
7  answer it "yes" or "no" so we can move forward with
8  this and not waste time having you repeat my question
9  in every answer, as you've been instructed to.
10  All right?

11  MS. HENN:  Counsel, I don't appreciate the
12  kind of --

13  MR. KENNEDY:  But it's the truth.

14  MS. HENN:  -- allegation you're making.

15  MR. KENNEDY:  It's the truth, and you know
16  that.

17  MS. HENN:  You don't know that.  And you're
18  just arguing with the witness and wasting time.

19  MR. KENNEDY:  Are you going to deny that
20  that's the truth?

21  MS. HENN:  I am --

22  MR. KENNEDY:  Are you going to deny that
23  that is the truth of how he has been prepared?

24  MS. HENN:  Counsel, you know you have no
25  right to know anything about how he has been

Page 120

1  prepared.  He is here to answer your questions and
2  has been doing that in good faith, and I suggest you
3  move on and ask the question.

4  MR. KENNEDY:  Absolutely.  Because you know
5  I have no right to know how you have prepared the
6  witness, you know --

7  MS. HENN:  Counsel --

8  MR. KENNEDY:  -- you can get away with
9  instructing him to repeat my question and every
10  answer to waste our seven hours.

11  MS. HENN:  Counsel, you have no basis and no
12  right to make these allegations and waste time in the
13  deposition.

14  Mr. Walker has come from retirement to spend
15  time answering your questions, and he's doing a
16  good-faith job of that.  And I suggest we move on
17  from this tantrum and --

18  MR. KENNEDY:  It's not a tantrum.

19  MS. HENN:  -- pay attention to the job at
20  hand.

21  If you would like to call the Special Master
22  and have him review this transcript, I think he will
23  agree that the witness is doing a fine job of
24  responding to your argumentative questions, and will
25  continue to do that throughout the day.

Page 121

1  MR. KENNEDY:  Nobody answers questions in
2  that fashion unless they are told to do so.  I
3  don't -- I don't blame him one bit.  He's a gentleman
4  coming here from his retirement and having to answer
5  these questions because of the company that he worked
6  for and what they did to this country.

7  What I am objecting to is the way you have
8  instructed this witness to waste our time.

9  MS. HENN:  Counsel --

10  MR. KENNEDY:  That's what I am objecting to.
11  So let's be clear.

12  MS. HENN:  Are you done with your speech now
13  so we can move on?

14  MR. KENNEDY:  I all am done, so let's move
15  on.

16  MS. HENN:  Thank you.

17  MR. KENNEDY:  I hope, I just hope that he
18  ceases and stops what he is doing.

19  MS. HENN:  He's not doing anything of the
20  sort.  And I suggest we focus on the task at hand.

21  BY MR. KENNEDY:

22  Q.  Sir, let's now go to California, if
23  we could.  Does this Settlement Agreement, in
24  California state, that:

25  (Reading) From October of '07 through

Highly Confidential - Subject to Further Confidentiality Review

Page 122

1 June of '07, McKesson-West Sacramento
2 suffered the theft of significant loss
3 of controlled substances on 28
4 separate occasions and failed to
5 timely submit required theft and loss
6 reports to the DEA (end of reading)?
7 Is that what it states here? Now, this is
8 California.
9 A. That's what it states.
10 MR. KENNEDY: I want you to look at
11 Exhibit 688.
12 I'm sorry, 687.
13 (Exhibit No. 687 was marked.)
14 MR. KENNEDY: 687 Exhibit starts with Bates
15 -00574724 and ends with -4744.
16 Q. Mr. Walker, have you seen this
17 document before?
18 A. Yes, I have.
19 Q. And this would relate to a meeting of
20 "Directors of Regulatory"? Is that what it says?
21 A. Yes.
22 Q. This would have been in Dallas, March
23 5-6, 2008; true?
24 A. Yes.
25 Q. Do you remember who was present at

Page 123

1 this meeting?
2 A. I don't remember specifically all the
3 participants. I know that our newly-hired Director
4 of Regulatory Affairs and my Regulatory staff was
5 there. But I don't know who else might have been
6 there.
7 Q. And the purpose of the meeting was
8 what?
9 A. As I recall, the purpose of the
10 meeting was to review with the Regulatory staff and
11 then expanded the overview of the Memorandum of
12 Agreement that we were moving forward with. We
13 hadn't signed it yet, but we were very close. So we
14 had the components.
15 Q. That was the Memorandum of Agreement
16 that we just talked about with the DEA, with the
17 Department of Justice?
18 A. Yes, the same memorandum.
19 Q. And it was signed by you, and it was
20 also signed by Mr. Hammergren, that agreement with
21 the DEA; was it not?
22 A. I'd -- I'd have to look.
23 Q. Let me ask you this. Where -- in
24 relation to the company in 2008, where were you with
25 respect to -- Mr. Hammergren was the CEO?

Page 124

1 A. Yes, he's the CEO.
2 Q. Where did you sit in relation to the
3 CEO in your responsibility as with the VP of
4 Distribution and Operations? Where did you sit in
5 relation to Mr. Hammergren?
6 A. Probably best described as not very
7 close. But it was several levels, you know, down in
8 the organization.
9 Q. Would you interact with him? You
10 were both in San Francisco; right?
11 A. There were occasions that I
12 interacted with Mr. Hammergren.
13 Q. What committees did you sit on? I
14 know that -- we know your title. But were you a part
15 of any management committees at McKesson? And I'm
16 talking about the '08 period.
17 A. Yes. So in that time frame in my
18 role, I was part of the -- I will use your term --
19 management committee that oversaw -- oversaw the
20 pharmaceutical business.
21 Q. Okay. So the management committee
22 that oversaw the pharmaceutical business. And a
23 significant part of McKesson's business was the
24 pharmaceutical business, I assume?
25 A. Yes.

Page 125

1 Q. And when -- who all was on the
2 management committee of pharmaceuticals?
3 MS. HENN: Objection to form.
4 BY MR. KENNEDY:
5 Q. And, again, we're on the 2008 period.
6 A. At a -- at a high level, the
7 president of U.S. Pharma and then individuals that
8 had leadership positions in sales, inventory,
9 vendor-manufacturer relationships, HR, and marketing,
10 I.T. I mean, sort of --
11 Q. Ten members? Twenty members?
12 A. My best recollection is about ten.
13 Q. And their responsibility was -- was
14 what this management committee of U.S. -- this is
15 U.S. pharmaceuticals?
16 A. Yes. U.S. pharmaceuticals.
17 Q. And what was the responsibility of
18 this management committee that you sat on?
19 A. Again, at a high level, it was really
20 to collaborate to provide overall guidance and
21 direction. And there was, you know, the normal
22 planning/budgeting processes that we went through.
23 Q. All right. Let's -- let's go back to
24 this meeting, then, that was -- that was held in 2008
25 with the Directors of Regulatory.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    If you can go to page -- the Bates in the
2  bottom of -4733.  Did you run this meeting?
3       A.   Yes, I did.
4       Q.   Did you prepare these slide
5  presentations?
6       A.   Looking at it, I don't specifically
7  put in the slide presentation.  But it was consistent
8  with one that I would do.
9       Q.   All right.  Well, let's look, then,
10 at this page of the 2008 slide presentation.  And
11 this is talking about the 2008 Settlement Agreement
12 that is reached with the Department of Justice and
13 the DEA; correct?
14      A.   Correct.
15      Q.   And this is in relation to what we
16 have been talking about for the last hour; true?
17      A.   Yes.
18      Q.   And does this slide presentation
19 state that -- the first -- the first bullet, "Six
20 different McKesson facilities involved"; right?
21      A.   Yes.
22      Q.   And we went over those six different
23 facilities, I think.  Florida, Maryland, Texas, Utah;
24 correct?  Those are the ones we went through?
25      A.   That's correct.

Page 127

1       Q.   The next bullet says:
2            (Reading) An estimated more than 4,600
3            violations, potential fine to exceed
4            $46 million (end of reading).
5       Is that accurate, 4,600 violations?  This is
6  in your PowerPoint or at least one presented at your
7  meeting.  Was that accurate?
8       MS. HENN:  Objection to form.
9       THE WITNESS:  I don't recall specifically
10 whether it is accurate or -- I couldn't testify
11 whether it was accurate.
12      What I can say is that we -- I was pulling
13 information from the agreement draft, which were the
14 DEA's allegations, you know, that led up to the
15 agreement.
16 BY MR. KENNEDY:
17      Q.   Would you put this in a PowerPoint to
18 the Regulatory Department, the new members of the
19 Regulatory Department, if it wasn't accurate?
20      MS. HENN:  Objection to form.
21 BY MR. KENNEDY:
22      Q.   Would you do that?
23      A.   Again, Counsel, my recollection, my
24 best recollection, is that this was based on
25 information that was contained in the -- in the draft

Page 128

1  and potentially discussions with DEA or counsel
2  through DEA.
3       Q.   My question isn't whether it was part
4  of a draft, where it came from.  My question is real
5  simple:  Would you put here in this presentation
6  "4,600 estimated violations by McKesson" if it was
7  not true?
8       MS. HENN:  Objection to form.
9  Mischaracterizes the document.
10      THE WITNESS:  Counsel, as I stated, what I
11 would have put in is an accurate representation of
12 DEA's allegations.
13 BY MR. KENNEDY:
14      Q.   Bullet point 4, does it say:
15           (Reading) Seven Tampa area pharmacies
16           purchased almost 2.5 million
17           hydrocodone tablets from Lakeland in
18           October of '05 (end of reading)?
19      Does it state that?
20      A.   Yes, it does.
21      Q.   The next bullet, does it state:
22           (Reading) Between October of '05 and
23           January of '06, the Tampa area
24           pharmacies purchased 6.6 million
25           tablets of hydrocodone (end of

Page 129

1            reading)?
2       Does it state that?
3       A.   Yes, it does.
4       Q.   Would you put that in there if it
5  wasn't true and accurate?
6       MS. HENN:  Objection to form.
7  Mischaracterizes the document.
8       THE WITNESS:  Counsel, I'm trying to answer
9  that.  Very specifically I recall utilizing the draft
10 of the memorandum and DEA's allegations and repeating
11 them in this document.
12 BY MR. KENNEDY:
13      Q.   Well, but, sir, these are more than
14 allegations; right?  You had been at this with the
15 DEA since 2006.  If their allegations as to how much
16 you were sold were wrong, it certainly would be known
17 by 2008; would it not?
18      MS. HENN:  Objection to form.
19      THE WITNESS:  I don't recall that we had any
20 discussions with DEA or validation of the numbers.
21 BY MR. KENNEDY:
22      Q.   It next states:
23           (Reading) Landover DC sold millions of
24           dosage forms to one pharmacy that was
25           later indicted on criminal charges

Page 130

1    (end of reading).
2    Do you remember doing that, that McKesson
3 actually did that? Do you recall that?
4    A.    I don't have any -- no, I really
5 don't have any specific recollection of that.
6    Q.    And does it state, Conroe DC -- that
7 would be Texas, Conroe?
8    A.    Yes.
9    Q.    (Reading) Conroe DC sold millions
10    Of tablets to two pharmacies in the
11    first nine months of 2007 (end of
12    reading).
13    One pharmacy. Would you tell that and put
14 that in the presentation if that was not true?
15    MS. HENN: Objection. Mischaracterizes the
16 document.
17    THE WITNESS: Just to correct. Counsel, as
18 in the allegation, it was two pharmacies in Texas.
19    But, again, I simply was repeating and
20 putting in here to share with the team the
21 allegations that were leading to the Memorandum of
22 Agreement.
23 BY MR. KENNEDY:
24    Q.    Sir, at this point in time, these
25 allegations, which are 2004, 2005, 2006, at that

Page 131

1 point in time were the suspicious order monitoring
2 policies of McKesson national?
3    A.    Yes. It was a single system. So the
4 answer is, yes.
5    Q.    So the policies and the procedures
6 that led at least to what you considered to be the
7 allegations of these extraordinary sales, those
8 policies and procedures were the same in Maryland,
9 Ohio, West Virginia, Utah, Florida; would that be
10 true?
11    A.    Yes.
12    Q.    And as the person in charge, sitting
13 on the top of this, did you make every effort to make
14 sure that the implementation of the policies and
15 procedures relating to suspicious order monitoring,
16 that they were being implemented uniformly across the
17 country?
18    MS. HENN: Objection to form.
19    THE WITNESS: Yes, we had a system in place
20 that was reporting regularly to DEA suspicious
21 orders.
22 BY MR. KENNEDY:
23    Q.    So the answer would be, yes, you, as
24 the boss, made an effort to make sure that your
25 policies with respect to suspicious orders were being

Page 132

1 implemented uniformly across the country; true?
2    A.    Yes.
3    Q.    You didn't want somebody doing
4 something different in California than they were
5 doing in Maryland; did you?
6    A.    The system was one system. So the
7 uniform reporting and report generation was the same
8 across the country.
9    Q.    And would I be correct that you had
10 meetings amongst the Directors of Regulatory Affairs
11 from different regions, you had meetings and calls to
12 make sure that the policies with respect to
13 suspicious order monitoring were being implemented
14 and used by them uniformly; true?
15    MS. HENN: Objection to form. Lacks
16 foundation.
17    THE WITNESS: Can you clarify the time frame
18 you're referring to.
19 BY MR. KENNEDY:
20    Q.    Again, let's -- the entire time that
21 you were the head of -- excuse me. You were the head
22 of Regulatory. You would have meetings and
23 conference calls in an attempt to make sure that your
24 policies with respect to suspicious order monitoring
25 were being implemented uniformly across the country;

Page 133

1 right?
2    A.    Generally I would answer that
3 question, yes, Counsel. The reason I asked you the
4 question about the time frame is at this point this
5 was the initial meeting that I had with newly-hired
6 directors. So prior to that meeting, they would not
7 have been involved in any of the suspicious orders.
8 So I want to be accurate in my response to you.
9    Q.    Okay. But from '08 forward, while
10 you were in charge, again, you would have meetings,
11 you would have memos, you would have calls in an
12 attempt to make sure that your policies were being
13 implemented uniformly across the country; true?
14    MS. HENN: Objection to form. Compound.
15 Lacks foundation.
16    THE WITNESS: So subsequent to the 2008
17 agreement with the regulatory team, we had regular
18 conference calls, regular discussions to ensure that
19 we were executing our regulatory responsibilities
20 uniformly across the country; so yes.
21 BY MR. KENNEDY:
22    Q.    You don't want Mr. Oriente in the
23 East doing something different from Mr. McDonald in
24 the West, doing something different than Mr. Gustin
25 in the Midwest; true?

Highly Confidential – Subject to Further Confidentiality Review

Page 134

1      A.     Generally that would be accurate.
2      MS. HENN:  Counsel, we have been going about
3 an hour and ten minutes.  Take another break.
4      MR. KENNEDY:  I about to switch to a new
5 topic.  That's good.
6      THE VIDEOGRAPHER:  We are going off the
7 record.  The time is 11:31 a.m.
8      (Recess taken.)
9      THE VIDEOGRAPHER:  We are back on the
10 record.  The time is 11:49 a.m.
11 BY MR. KENNEDY:
12      Q.     All right.  Mr. Walker, it's still
13 Eric Kennedy after our break.  I know you might be
14 disappointed, but it's still me.
15      I'm going to switch gears.  I want to talk
16 about the 2008 CSMP, the Controlled Substances
17 Monitoring Program.  You remember that program?
18      A.     Yes.
19      Q.     That was a program that McKesson
20 developed and put into place in 2008; is that true?
21      A.     Yes, that is correct.
22      Q.     And that program was put into place
23 pursuant to the agreement that you entered into with
24 the DEA and the DOJ in 2008; is that accurate?
25      A.     As part of the -- our overall

Page 135

1 discussions with DEA, we developed -- ultimately
2 developed the Controlled Substances Monitoring
3 Program, yes.
4      Q.     The basis for that monitoring
5 program, the 2008 monitoring -- the basis was -- or
6 the basis was the creation of a threshold system;
7 true?
8      MS. HENN:  Objection to form.
9      THE WITNESS:  We -- I wouldn't describe it
10 as the -- as the basis.  There were a number of
11 different pieces to the monitoring.  Our Controlled
12 Substances Monitoring Program thresholds were a
13 component of that, that we had created in -- prior to
14 the CSMP.
15 BY MR. KENNEDY:
16      Q.     Well, you're talking about the
17 Lifestyle Program that was in existence for about ten
18 months in '07; correct?
19      A.     I don't remember exactly how many
20 months we were in existence.  But it was in '07 and
21 prior to CSMP.
22      Q.     Let me -- let me show you
23 Exhibit 672.  And if you keep this exhibit in front
24 of you even after this series of questions, because
25 we're going to refer back to this quite a bit,

Page 136

1 all right?
2      A.     That would be fine.
3      (Exhibit No. 672 was marked.)
4 BY MR. KENNEDY:
5      Q.     This is the McKesson's 2008
6 Controlled Substance Monitoring Program; is it not?
7      A.     What this document is, is a -- the
8 Operations Manual entry and documentation of how to
9 execute against the Controlled Substance Monitoring
10 Program.  That's probably the best way to describe
11 it.
12      Q.     Was there any document that McKesson
13 has that is more comprehensive and detailed with
14 respect to your suspicious order monitoring system
15 than this document from the period of 2008 to, let's
16 say, 2014?  Any document other than this that is more
17 comprehensive?
18      A.     Probably this would be the most
19 comprehensive document.
20      MS. HENN:  Counsel, just to clarify the
21 record.  You had referred to this as the 2008
22 program, but I see it as a 2013 version.  I just want
23 to make sure the record is clear on that.
24 BY MR. KENNEDY:
25      Q.     Okay.  This is the revised version

Page 137

1 that comes into play in 2008; correct?  The original
2 version is 2008?
3      A.     Just a moment, Counsel.
4      MR. KENNEDY:  I was -- this is when it's
5 printed, 2013.  When it's printed.
6      MS. HENN:  If you look on one of the last
7 pages, it will show you the revisions history.
8      MR. KENNEDY:  All right.
9      MS. HENN:  And the last revision I see is
10 from 11-29-2013.
11      MR. KENNEDY:  All right.
12      MS. HENN:  Sorry.  March 20th, 2013.
13 BY MR. KENNEDY:
14      Q.     And this program came into place, as
15 I said before, in 2008; did it not?
16      A.     That is correct.
17      Q.     And it was revised various times, as
18 we have seen, up through '13; correct?
19      A.     Yes.
20      Q.     And if I make reference to something
21 here in my questioning that wasn't in existence in
22 2008, you will let me know; all right?
23      MS. HENN:  Objection to form.
24      THE WITNESS:  I will let you know.
25 ///

Page 138

BY MR. KENNEDY:

Q. All right. So this is the program that comes into place, the Controlled Substances Monitoring Program, in 2008; would that be correct?

A. Yes. This is the Controlled Substance Monitoring Program overview that we would put in our Operations Manual.

Q. And we were talking about this threshold system. And do you see where it says, "Purpose"?

A. Yes.

Q. And the second bullet point down says, "Set and maintain customer's thresholds for all controlled substances"; is that right?

A. That is correct.

Q. And then it says, "Make informed decisions based upon established threshold information"; correct?

A. Yes.

Q. So the thresholds were an important part of this monitoring program; true?

A. Yes.

Q. In fact, when -- when McKesson signed its agreement with the DEA in 2008, McKesson agreed, as part of their settlement, that they would create a

Page 139

monitoring program with thresholds? Didn't they agree to that with the DEA?

A. I'd have to refer to the specific language in the agreement.

MR. KENNEDY: We will take a look.

(Exhibit No. 755 was marked.)

BY MR. KENNEDY:

Q. Showing you Exhibit 755, Bates -409289 to -299. Is this the Settlement and Release Agreement and Administrative Memorandum and Agreement between McKesson and the Department of Justice and the DEA?

A. I understand this to be that, yes.

Q. And if you will go to Attachment 6, or Bates No. -298 down at the bottom. Do you see -- under the -291, is what we're looking for.

And, again, you were a signatory on this agreement? Thank you. Is that correct?

A. Yes, I was.

Q. And -291, on Bates -291, if you will go to that. And do you see the section, "Obligations of McKesson"?

You might want to look at the first four lines. "Obligations of McKesson." And these are the obligations under the agreement that McKesson agreed

Page 140

to with the Department of Justice and DEA; right?

Does it state:

(Reading) McKesson agrees to maintain a compliance program designed to detect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations. This program shall include procedures to review orders for controlled substances. Orders that exceed established thresholds and criteria will be reviewed by a McKesson employee (end of reading).

Do you see that?

A. Yes.

Q. So the agreement with the DEA mentions thresholds; correct?

A. Yes.

Q. And, in fact, the program that you established in 2008, your monitoring program in 2008, under "Purpose," that we just read, said that you will set and maintain thresholds; correct? We just read that.

A. Yes.

Q. And it states that you're going to

Page 141

make informed decisions at McKesson based upon these established thresholds; true? That's what your program states?

MS. HENN: You're referring to Exhibit 672?

MR. KENNEDY: Yeah, I'm talking about the program. We're not talking about the --

MS. HENN: It's a different exhibit.

THE WITNESS: Okay. Okay. Can you repeat --

BY MR. KENNEDY:

Q. Yes, my question is --

A. I'm sorry. I was still --

Q. -- your agreement with the DEA talked about thresholds; true?

A. Correct.

Q. And the program you actually established in '08 was consistent with that agreement? Because what we just went through, when we look at your program under "Purpose," it says you're going to set and maintain thresholds; right?

A. Yes.

Q. And that you're going to make informed decisions based upon the established threshold information; true? That's what your program put together?

Highly Confidential - Subject To Further Confidentiality Review

Page 142

1   A.   Yes.
2   Q.   Now, so each customer of McKesson --
3 pursuant to your 2008 monitoring policy, each
4 customer for each family of a controlled substance
5 would have an established threshold; true?
6   A.   That's correct.
7   Q.   And that was a monthly threshold;
8 right?
9   A.   Calculated monthly.
10   Q.   So a particular pharmacy would have a
11 monthly threshold, for example, for hydrocodones;
12 right?
13   A.   Yes.
14   Q.   They would have a monthly threshold
15 for oxycodones; correct?
16   A.   Yes.
17   Q.   And if they were to exceed that
18 threshold in any month, that would trigger an
19 investigation under your monitoring policies;
20 correct?
21   A.   It would do two things.  One, the
22 order would be blocked, and then the -- which would
23 trigger additional due diligence to determine why the
24 threshold was exceeded.
25   Q.   And each customer, though, each

Page 143

1 customer could request an increase in their threshold
2 for a particular opioid or controlled substance;
3 could they not?
4   A.   The program was designed so that
5 customers could request additional controlled
6 substances of any -- of the controlled substances
7 above their threshold.
8   Q.   All right.  And McKesson -- if we
9 look at this program and how it's divided up, there
10 were basically two different groups of customers.
11 One, the big chain pharmacies, the RNAs, the regional
12 national accounts; correct?
13   A.   That's one large customer group.
14   Q.   And the other major customer group
15 that's defined in your monitoring program were the
16 ISMCs, or the independent small, medium chains;
17 correct?
18   A.   That was also included.  But that
19 wasn't the totality of every registrant that we
20 provided controlled substance to.  So the two groups
21 that you mentioned in addition to that, would be what
22 we called our hospital or MHS group.  So these were
23 hospitals, institutions, surgery centers.  And then
24 probably the fourth big category was the federal
25 government.

Page 144

1   Q.   All right.  I'm going to talk about
2 the two.  I want to talk about the big chain
3 pharmacies, the RNAs; all right?  And I want to talk
4 about the smaller chains, the independents and the
5 smalls; all right?
6   A.   Yes.
7   Q.   First, in talking about ISMCs.  The
8 independent small, medium chains, let's talk about
9 them.  They -- again, they would request -- like
10 other customers, they could request an increase in
11 their thresholds under your policies; right?
12   A.   Yes, they could.
13   Q.   The request, with respect to the
14 intermediate -- or excuse me, the independent and
15 smaller pharmacy groups, that request for an increase
16 in the threshold would come directly from the
17 pharmacy; would that be true?
18   MS. HENN:  Objection to form.
19   THE WITNESS:  Generally, I would say that
20 that was true.
21 BY MR. KENNEDY:
22   Q.   So if there was a pharmacy on Main
23 Street in Cleveland, Ohio, that specific pharmacy
24 would contact McKesson and say, "We want to increase
25 our threshold"?  That's how it basically worked with

Page 145

1 the independents and the small -- small chains?
2   MS. HENN:  Objection to form.
3   THE WITNESS:  Basically, that would be the
4 process.
5 BY MR. KENNEDY:
6   Q.   And then that specific pharmacy, say
7 the Main Street pharmacy, they would provide
8 information and documentation to McKesson to document
9 or provide a basis for the increase in the threshold;
10 is that how it worked?
11   A.   Yes, the request --
12   Q.   And then the Director of Regulatory
13 Affairs would evaluate the information and make a
14 determination as to whether or not an increase in a
15 particular drug threshold was appropriate?  That's
16 how it worked?
17   A.   All threshold increases were reviewed
18 by the Director of Regulatory Affairs, or DRAs, and
19 they were the sole responsible party to make any
20 increases.
21   Q.   Now, these independent small, medium
22 pharmacies were required to submit three months of
23 their dispensing data in order to get approval for a
24 threshold increase?  That was the policy?
25   MS. HENN:  Objection to form.

Page 146

1    THE WITNESS:  I don't believe that that is
2  accurate.
3        (Exhibit No. 676 was marked.)
4  BY MR. KENNEDY:
5    Q.   Let me show you Exhibit -- you
6  were -- you don't think that's accurate, but you
7  were -- you were the boss at this point in time in
8  '08; correct?
9    A.   Yes.
10    Q.   I'm going to show you Exhibit 676.
11  And that's Bates -542108 to -110.
12    This is an email from Tom McDonald.  Do you
13  see that?  The first page.
14    A.   Yes.
15    Q.   And who was Tom McDonald in this time
16  period of 12 -- or excuse me, 2012?  Who was he?
17    A.   Tom McDonald was the Director of
18  Regulatory Affairs for the Western part of the
19  United States.
20    Q.   And so he was, what, one of four
21  directors; true?  Or one of five at that point?
22    A.   I don't recall specifically whether
23  we had four or six at the time.  But one of four or
24  six.
25    Q.   And he's sending an email to an

Page 147

1  extraordinarily large group of people.  Can you --
2  are you able to kind of look through that and say
3  this is -- who this group is?
4    A.   Based on the names here, this is a
5  combination of our sales and operations teams in the
6  West Region.
7    Q.   And you're copied on this; right?
8  Donald Walker, CC.
9    A.   Yes, I am.
10    Q.   So you would have gotten this; right?
11    A.   Yes.
12    Q.   Subject, "Ongoing due diligence, new
13  questionnaires and dispensing data."  Do you see
14  that?
15    A.   Yes.
16    Q.   It says high -- importance is high;
17  right?
18    A.   Yes.
19    Q.   Look to the next page, if you would,
20  -109, all the way toward the bottom, the paragraph
21  that starts with, "Additionally."
22    A.   Can I have a moment just to review
23  the rest of the document?
24    Q.   Sure.
25    A.   I'm not --

Page 148

1        (Witness reviewing document.)
2    A.   Okay.
3    Q.   Look at the paragraph.  This is
4  Mr. McDonald.  You're copied on this.  The paragraph
5  that starts, "Additionally."
6    He states:
7    (Reading) Additionally, dispensing
8    data is an integral part of
9    understanding a customer's business
10    for those accounts requiring higher
11    thresholds (end of reading).
12    Would you agree with that?  Dispensing data
13  is an integral part of understanding a customer's
14  business; do you agree to that?
15    MS. HENN:  Objection to form.
16    THE WITNESS:  I think it would be more
17  accurate to say that at the time, as we evolved the
18  program and gained knowledge around the tools that
19  were available to us, dispensing data was one of the
20  items, and just one of them, that we would use to
21  help us make a determination of customer thresholds
22  and increase requests or establishment.
23  BY MR. KENNEDY:
24    Q.   So you disagree with Mr. McDonald's
25  statement, that dispensing data is an integral part

Page 149

1  of understanding a customer's business?  You disagree
2  with that?
3    MS. HENN:  Objection to form.  Asked and
4  answered.
5    THE WITNESS:  I didn't say I disagreed with
6  it.  What I said was it was a piece, and one of the
7  pieces of understanding.
8  BY MR. KENNEDY:
9    Q.   And tell the jury, dispensing data
10  from a pharmacy, what is that?
11    A.   The data that a pharmacy may or may
12  not provide was data around the quantities of a given
13  pharmaceutical or medicine that they would dispense.
14  So it was a summary document.
15    Q.   So dispensing data is going to tell
16  McKesson how much the CVS store on Main Street, how
17  much Oxycontin they are selling; right?  That's what
18  it would tell McKesson; correct?
19    A.   I can't answer that accurately,
20  Counsel, because your example of a CVS store would
21  not be an example of that.
22    Q.   All right.  Okay.  Take CVS out.
23    A.   I'm trying to answer you accurately.
24    Q.   Let's talk about an independent
25  pharmacy on Main Street.  They provide you with

Page 150

1 dispensing data. It's going to tell McKesson how
2 much Oxycontin that they are selling, actually
3 dispensing, filling prescriptions and dispensing;
4 that's what dispensing data is?
5 　　　MS. HENN: Objection to form.
6 　　　THE WITNESS: Dispensing data should
7 represent that, yes.
8 BY MR. KENNEDY:
9 　　　Q. So Mr. McDonald, head of the Western
10 Region, in this email he says:
11 　　　　　(Reading) Additionally, dispensing
12 　　　　　data is an integral part of
13 　　　　　understanding a customer's business
14 　　　　　for those accounts requiring higher
15 　　　　　thresholds. Bullet 1: Dispensing
16 　　　　　data is not required for all new
17 　　　　　accounts. Bullet 2: It is required
18 　　　　　if the new account is requesting more
19 　　　　　than the minimum stated in the
20 　　　　　questionnaire (end of reading).
21 　　　Do you agree with that, it's required for
22 that?
23 　　　MS. HENN: Objection to form.
24 BY MR. KENNEDY:
25 　　　Q. So if you have got a threshold higher

Page 151

1 than the minimum amount, dispensing data is required;
2 do you agree with that statement by Mr. McDonald?
3 　　　MS. HENN: Objection to form.
4 　　　THE WITNESS: First, I don't recall
5 specifically, you know, reviewing or remembering any
6 details of this -- of this memo.
7 　　　What I would best answer that question, is
8 that this is what Mr. McDonald was requesting from
9 his field sales team to support his decision base for
10 making increases in the Western Region.
11 BY MR. KENNEDY:
12 　　　Q. I understand. We know that to be
13 true, because we're reading the document. I'm asking
14 about your opinion. You were the boss. You were
15 above Mr. McDonald. You were the one that was in
16 charge of the implementation of the policies and
17 procedures at McKesson.
18 　　　Do you agree, Mr. Walker, as being the boss?
19 Do you agree with his statement?
20 　　　MS. HENN: Objection to form.
21 BY MR. KENNEDY:
22 　　　Q. And he states:
23 　　　　　(Reading) It is required -- dispensing
24 　　　　　data, it is required if the new
25 　　　　　account is requesting more than the

Page 152

1 　　　　　minimum stated in the questionnaire
2 　　　　　(end of reading).
3 　　　Did you agree with that statement when you
4 read it?
5 　　　MS. HENN: Objection to form.
6 　　　THE WITNESS: Again, I don't recall
7 specifically. What I would say is that I didn't
8 disagree with his request.
9 BY MR. KENNEDY:
10 　　　Q. You know, we have looked at -- we
11 have been provided your emails, and we see nowhere in
12 your emails where you emailed back to all these
13 people and Mr. McDonald and saying, you know what, it
14 isn't required. We don't find any statement by you
15 in that fashion.
16 　　　Do you have a memory of emailing him back
17 and saying, Mr. McDonald, you're wrong. Dispensing
18 data is not required? Do you remember doing that?
19 　　　MS. HENN: Objection to form.
20 　　　THE WITNESS: No, specifically I do not
21 remember that.
22 BY MR. KENNEDY:
23 　　　Q. All right. He next says -- the
24 bullet next -- and this is the important one for what
25 we're going to talk about -- he states:

Page 153

1 　　　　　(Reading) It is also required when
2 　　　　　customer's request increases on
3 　　　　　elevated thresholds (end of reading).
4 　　　Did you disagree with that statement at the
5 time and email him back and say, no, you're wrong?
6 　　　MS. HENN: Objection to form.
7 　　　THE WITNESS: Again, not -- not that I
8 recall.
9 BY MR. KENNEDY:
10 　　　Q. The next bullet says:
11 　　　　　(Reading) The request for dispensing
12 　　　　　data is standard and should not
13 　　　　　deviate (end of reading).
14 　　　And he goes down and says, a couple more
15 bullets down says, "The most recent three months of
16 data" -- that's the dispensing data that they are
17 talking about; right?
18 　　　MS. HENN: Objection to form.
19 BY MR. KENNEDY:
20 　　　Q. Do you see that?
21 　　　A. I do. It would appear that that's
22 what he's requesting.
23 　　　Q. And then he says:
24 　　　　　(Reading) The data must be by line
25 　　　　　dispensed (end of reading).

Highly Confidential - Subject to Further Confidentiality Review

Page 154

1    Do you see that?
2    A.    Yes.
3    Q.    He's very specific about what's
4  required with respect to specific dispensing data, is
5  he not?
6    A.    He's being very specific.
7    Q.    Then he says:
8         (Reading) The data must, it must
9         include product description, date
10        dispensed, quantity in dosage units,
11        method of payment, prescribing doctor,
12        and the doctor's DEA number (end of
13        reading).
14   Do you see that?
15   A.    Yes.
16   Q.    Do you remember disagreeing with him
17 at that time and sending him back an email, calling
18 him on the phone, having a meeting, saying, you're
19 wrong, that is not what is required?  Do you remember
20 doing that?
21   A.    I do not remember any follow-up
22 response to him and disagreeing with him or
23 counseling him to do otherwise.
24   Q.    What he's talking about is a good
25 idea; is it?  Is it not a good idea to fulfill your

Page 155

1  obligations to get the dispensing data if an
2  independent or small pharmacy wants an increase in
3  their threshold?
4        MS. HENN:  Objection to form.  Lacks
5  foundation.
6        THE WITNESS:  The view that I would have is
7  at the time that we were working under the CSMP and
8  gaining additional expertise and insight into how we
9  would manage our controlled substance program and our
10 understanding of pharmacies, dispensing data became a
11 tool that we had potentially available to us.
12 BY MR. KENNEDY:
13   Q.    This is January of 2012, and
14 Mr. McDonald, who's responsible for the entire West
15 Region, is saying dispensing data is required if a
16 pharmacy wants to increase their threshold; isn't
17 that what he is saying?
18        MS. HENN:  Objection.  Mischaracterizes the
19 document.
20 BY MR. KENNEDY:
21   Q.    Isn't that what he is saying?
22        MS. HENN:  Same objection.
23        THE WITNESS:  What he is saying, for his
24 review, and what he is requesting from his field and
25 sales and ops teams, are these components so that he

Page 156

1  can make an informed decision on thresholds.
2  BY MR. KENNEDY:
3    Q.    And, sir, he uses the word "required"
4  and "must" -- or "must" four times; doesn't he?  Four
5  times?
6    A.    Yes, he does.
7    Q.    And he's in charge -- Mr. McDonald is
8  in charge of the Western Region.  How many states did
9  that include?  What states?
10   A.    If there were just four of the DRAs
11 at the time, he would have had the western states,
12 and from Colorado, north to Wyoming, south to
13 Arizona -- I can't remember -- New Mexico west.
14   Q.    California?
15   A.    California.
16   Q.    Arizona?
17   A.    California, Arizona, Oregon,
18 Washington, Colorado, New Mexico.
19   Q.    He's in charge of thousands of
20 pharmacies, thousands of customers; is he not?
21   A.    There -- there were a lot of
22 pharmacies in the west.
23   Q.    This -- this dispensing data that he
24 is saying is required and is a must, dispensing data
25 allows McKesson to know whether or not an opiate is

Page 157

1  being purchased with cash; does it not?
2        MS. HENN:  Objection to form.  Lacks
3  foundation.
4        THE WITNESS:  I don't believe that's
5  accurate.
6  BY MR. KENNEDY:
7    Q.    All right.  We will look at documents
8  in a minute.  But I'm going to write that down.
9  All right.
10        So I wrote dispensing -- I wrote your name,
11 Mr. Walker, "Dispensing data does not include cash
12 payment information."  Is that your -- is that your
13 testimony?
14        MS. HENN:  Objection to form.
15        THE WITNESS:  That was not my testimony.
16 What I said is your question statement was not
17 accurate.
18 BY MR. KENNEDY:
19   Q.    If you get dispensing data from a
20 pharmacy, you're going to be able to see cash
21 payments; are you not, sir?
22   A.    Not necessarily.
23   Q.    In many instances will you be able to
24 see that, sir?
25   A.    If -- if the pharmacist chooses to

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1 enter a cash payment in their pharmacy terminal
2 system where this data originates, then, yes, it will
3 show up.
4     Q.    All right.
5     A.    If he chooses not to do that, it
6 won't show up.
7     Q.    All right.  And so you're getting
8 dispensing data.  And if the pharmacist is putting
9 cash payments in, all right, you're going to be able
10 to see cash payments -- correct? -- from what you
11 just said, if the pharmacist is entering it; true?
12     MS. HENN:  Objection to form.
13 BY MR. KENNEDY:
14     Q.    True?
15     A.    If the pharmacist enters it into the
16 pharmacy terminal system, we would see that.
17     Q.    And a certain percentage of cash
18 payments for opioids for narcotics is evidence of
19 diversion; is it not?
20     MS. HENN:  Objection to form.
21     THE WITNESS:  The DEA identified cash
22 payment percentage as a potential indicator.
23 BY MR. KENNEDY:
24     Q.    All right.  And if you get dispensing
25 data, as indicated in this memo, it's going to tell

Page 159

1 you who the prescribing doctors are; is it not?
2     MS. HENN:  Objection to form.
3     THE WITNESS:  If the data is complete, we
4 would see the doctors -- generally see the doctors in
5 the dispensing data.
6 BY MR. KENNEDY:
7     Q.    And that would allow McKesson to
8 determine whether a small group of doctors is
9 prescribing a large amount of opioids; correct?  You
10 would be able to do that if you had the dispensing
11 data; true?
12     MS. HENN:  Objection to form.
13     THE WITNESS:  I'm not sure I can answer that
14 accurately.  Generally, if the physicians are in
15 there and the data was complete, not -- our challenge
16 was, is the data wasn't always complete.  So I'm
17 reluctant to say that that is accurate.
18 BY MR. KENNEDY:
19     Q.    If you have accurate prescribing
20 data, McKesson would be able to determine whether a
21 small group of doctors is ordering a large percentage
22 of the opioids from that pharmacy; correct?  You're
23 able to do that?
24     A.    If the data was accurate, yes.
25     Q.    And the DEA told you back in '06 that

Page 160

1 that's one of the things that you should look for;
2 true?  Back in '06 they told you?
3     MS. HENN:  Objection to form.  Lacks
4 foundation.
5     THE WITNESS:  Repeat your question, Counsel.
6 BY MR. KENNEDY:
7     Q.    And the DEA told you back in 2006
8 that's one of the things you should look for, a small
9 number of doctors ordering a large percent of the
10 opioids from a pharmacy?  That's one of the things
11 you should look for?
12     A.    My recollection of the document, the
13 documents state that is one of the areas that they
14 outlined.
15     Q.    And if you had the doctor's name from
16 the prescribing -- or the prescribing data, you
17 could -- McKesson could research as to whether or not
18 this physician was having problems with any medical
19 board; couldn't you?
20     MS. HENN:  Objection to form.
21 BY MR. KENNEDY:
22     Q.    If you had that data?
23     A.    I believe, Counsel -- I didn't
24 specifically make any type of inquiries myself, but
25 my understanding was, is that we -- you had the

Page 161

1 ability to identify any doctors if, in fact, there
2 was documentation on state medical board sites.
3     Q.    And if you got the dispensing data,
4 as Mr. McDonald is saying here in 2012 is required,
5 you can now actually see if a pharmacy is purchasing
6 opioids from other distributors, other than just
7 McKesson; correct?
8     MS. HENN:  Objection to form.  Lacks
9 foundation.
10     THE WITNESS:  I don't recall that we had the
11 ability or felt we had the ability to determine
12 multiple distribution -- distributors supplying a
13 pharmacy through dispensing data.
14 BY MR. KENNEDY:
15     Q.    Let me ask you this.  If the
16 dispensing data says that a particular pharmacy is
17 dispensing, selling 1,000 Oxycontins in a month, and
18 your records say you're selling them only 500, then
19 you can reasonably conclude that they are getting
20 Oxycontins from somebody other than just McKesson;
21 right?
22     MS. HENN:  Objection.  Calls for
23 speculation.
24     THE WITNESS:  Counsel, there are so many
25 variables in pharmacy behavior, in terms of inventory

Page 162

1 management, again, it's very difficult for me to
2 answer accurately whether that could take place.
3 BY MR. KENNEDY:
4    Q.    If you have the dispensing data,
5 McKesson would be able to determine the percentage of
6 controlled substances against total prescriptions?
7 They would be able to calculate that, wouldn't they?
8    MS. HENN:  Objection.  Lack of foundation.
9 Speculation.
10    THE WITNESS:  Counsel, I'm having a
11 difficult time answering the question.  I think it's
12 an oversimplification of analysis of the value of
13 this dispensing data.
14    As I stated, it was a very valuable tool to
15 us, but it was a single tool.  We had other data
16 points that we needed to understand.
17 BY MR. KENNEDY:
18    Q.    Isn't that exactly one of the things
19 that the DEA told McKesson in 2006 you ought to be
20 looking to, the percentage of controlled substances
21 that a pharmacy was selling against its total
22 prescription sales?  Isn't that one of the specific
23 items that DEA informed you in 2006 you should be
24 looking at?
25    MS. HENN:  Objection.  Lack of foundation.

Page 163

1 BY MR. KENNEDY:
2    Q.    Correct?
3    A.    My recollection, was that the
4 percentage of controlled substance sales were a point
5 of indication.
6    MR. KENNEDY:  All right.  So we've got
7 Mr. McDonald in January of '12 saying dispensing
8 data is a must, dispensing data is required.  Let's
9 look to another region, all right?  Let's look to
10 Exhibit 680.
11    (Exhibit No. 680 was marked.)
12    MS. HENN:  Thank you.
13 BY MR. KENNEDY:
14    Q.    Exhibit 680 is -492821 to -492823.
15 This is an email from Dave Gustin; correct?
16    A.    Yes.
17    Q.    Tell the jury who Dave Gustin was?
18    A.    Dave Gustin was the Director of
19 Regulatory Affairs, DRA, for the Central Region.
20    Q.    And the Central Region, how many
21 states are in the Central Region?
22    A.    I don't know specifically the number
23 of states going from memory here, but it's basically
24 the Midwest, stretching down into Kentucky.  So Iowa,
25 Nebraska, Minnesota, Illinois, Indiana.

Page 164

1    Q.    Well, between Mr. McDonald now and
2 Mr. Gustin, they probably account for more than half
3 of the country; would that be right?
4    A.    Certainly half the geography.
5    Q.    Thousands of pharmacies; right?
6    A.    There would be a large number of
7 pharmacies in that area.
8    Q.    And Mr. Gustin -- now, this is
9 1-16-12.  This is about the same time of McDonald's
10 email talking about dispensing data.  And can you
11 tell us who's this large group of people that he
12 seems to be sending this email to?
13    A.    This appears to be the North Central
14 Region Sales and Operations teams.
15    Q.    Look at the next page, if you would.
16 See on the next page, a January 5, 2012, email from
17 Dave Gustin?
18    A.    Yes.
19    Q.    Another large group of people?
20    A.    Yes.
21    Q.    In the first paragraph does he state:
22    (Reading) As an ongoing effort -- as
23    an ongoing effort to educate and
24    inform the region, it is important
25    that we all understand what the

Page 165

1    requirements are related to threshold
2    increases, new customer loads,
3    questionnaires, and our ongoing due
4    diligence as defined in our Controlled
5    Substance Monitoring Program (end of
6    reading).
7    Do you see that?
8    A.    Yes.
9    Q.    So he's talking about requirements,
10 and he's talking about the Controlled Substances
11 Monitoring Program of 2008; true?
12    A.    Yes.
13    Q.    And that program applied nationally;
14 did it not?
15    A.    Yes, it did.
16    Q.    Look at the next page, if you would,
17 page -23.  In big capital letters, "Dispensing data."
18 Do you see that?
19    A.    Yes.
20    Q.    Now, this is Mr. Gustin, and he is
21 the Director of Regulatory Affairs for the entire
22 North Central Region of the United States; true?
23    A.    Yes.
24    Q.    And he states, and he seems -- maybe
25 he's parroting Mr. McDonald.  But now he is writing

Page 166

1  to his region:
2       (Reading) Dispensing data is an
3       integral part for understanding a
4       customer's business for those accounts
5       requiring higher thresholds (end of
6       reading).
7    Do you see that?
8    A.   Yes.
9    Q.   And at this point in time, 2012,
10  McKesson had the absolute duty and obligation to
11  understand and know its customer, the pharmacy; did
12  it not?
13       MS. HENN:  Objection to form.
14       THE WITNESS:  As part of our regulatory
15  program, CSMP, knowing our customer was an integral
16  part of the program.
17  BY MR. KENNEDY:
18   Q.   And that's what the DEA expected;
19  true?
20       MS. HENN:  Objection to form.
21  BY MR. KENNEDY:
22   Q.   The DEA expected you to know your
23  customer, the pharmacy; true?
24       MS. HENN:  Objection to form.
25       THE WITNESS:  The DEA's guidance was, "Know

Page 167

1  your customer."
2  BY MR. KENNEDY:
3    Q.   That's what they expected; yes, sir?
4       MS. HENN:  Objection to form.
5       THE WITNESS:  I would classify it more of
6  their guidance rather than an expectation.
7  BY MR. KENNEDY:
8    Q.   All right.  Well, look at -- look at
9  your Controlled Substances Monitoring Program, if you
10  would, the program you put in place in 2008, which is
11  Exhibit 672?  Back to 672, if you could.
12       MS. HENN:  The 2013 version?
13       MR. KENNEDY:  Yes.
14       THE WITNESS:  I see it.
15  BY MR. KENNEDY:
16   Q.   Do you see that?  Under, "Purpose,"
17  the second paragraph down, does it state the DEA
18  expects McKesson to know their customer?  Do you see
19  that?
20   A.   Yes, it says that.
21   Q.   Was that in place in 2008, or is that
22  some amendment that was added?
23       MS. HENN:  Objection to form.
24       THE WITNESS:  I don't know.  It's clearly in
25  the -- it's in the document.

Page 168

1  BY MR. KENNEDY:
2    Q.   Let's go back, then, if we could, to
3  Exhibit 680.  This is Mr. Gustin, from the North
4  Central Region; correct?
5    A.   Yes.
6    Q.   And he's writing his region.  And if
7  we look to bullet point 2, he states:
8       (Reading) It is required -- he's
9       talking about dispensing data.  It is
10      required if a new account is
11      requesting more than the minimum
12      stated in the questionnaire (end of
13      reading).
14   Is that what he states to the Midwest region
15  now?
16   A.   Yes.
17   Q.   (Reading) It is also required
18      when customers request increases above
19      the standard threshold when the
20      request is in excess of 10 percent
21      increase and/or dosages are beyond
22      12,000, and should be gathered by
23      whoever is receiving the request,
24      either the DC or the RSM in the field
25      (end of reading).

Page 169

1    Does he state that?
2    A.   Yes.
3    Q.   And the second bullet point down, it
4  seems to be the same as Mr. McDonald, he's saying
5  What you want to get is the product description;
6  right?  That's going to tell you whether it's a
7  hydrocodone, an oxycodone, or fentanyl or morphine;
8  correct?
9    A.   Yes.
10   Q.   And you want the date dispensed;
11  right?
12   A.   Yes.
13   Q.   Is that what he says?
14   A.   Yes.
15   Q.   And he says you want the quantity.
16  You want the method of payment; right?  That's going
17  to tell you whether it's cash.  Is that what he's
18  saying?
19   A.   Let me catch up with you here.
20   Yes.
21   Q.   And he puts that in bold even; right?
22   A.   Yes, it's in bold.
23   Q.   And he says, you want the prescribing
24  doctor and the doctor's DEA number; true?  That's
25  what he's saying you are required to get for the

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1 Midwest, the North Midwest part of the United States,
2 his region --
3     A.   Yes.
4     Q.  -- true?
5     But you didn't think this was required?  Was
6 that your testimony as the -- as the boss over these
7 two, you didn't think that was required?
8     MS. HENN:  Objection to form.
9     THE WITNESS:  I think it's better stated
10 that I -- I certainly didn't object to them requiring
11 this to conduct their own due diligence.  I put a
12 great deal of responsibility on their
13 decision-making.  If they required their team to
14 provide this information so they could make their
15 decision, I supported that.
16 BY MR. KENNEDY:
17     Q.   And you didn't look at this and say,
18 this is important; I want to make sure everybody is
19 doing it in the country?  You didn't do that?
20     MS. HENN:  Objection to form.
21     THE WITNESS:  I don't recall any specific
22 action that I took relative to these -- these emails
23 and directions.
24     MR. KENNEDY:  Let's look at 681,
25 Exhibit 681.

Page 171

1       (Exhibit No. 681 was marked.)
2 BY MR. KENNEDY:
3     Q.   Showing you what has been marked as
4 Exhibit 681, which is -490953 to -54.  Now, this is
5 about 11 months after the Western Region, the Central
6 Region have said dispensing data is required, and now
7 we have an email by Joe Lumpkin.
8     Who was Joe Lumpkin?
9     A.   Joe Lumpkin was one of two of our
10 DRAs that we assigned to the Northeast Region.
11     Q.   And, now, on November 30, 2012, he
12 sends an email to a large group of people; does he
13 not?
14     A.   Yes.
15     Q.   And he says, "Northeast Team," right,
16 at the beginning?
17     A.   Yes.
18     Q.   And he says, "As of December 1,
19 please be aware it is required for any ISMC" -- and
20 that would be the independent small, medium chains;
21 right?
22     A.   Yes.
23     Q.   He says:
24       (Reading) Please be aware it's
25       required for any ISMC which is

Page 172

1       requesting an increase on either
2       hydrocodone or oxy-base codes, we will
3       need dispensing data (three months
4       minimum is required).  This does
5       include temporary as well as permanent
6       increases (end of reading).
7     Do you see that?
8     A.   Yes.
9     Q.   Down in the next paragraph, last
10 sentence, under the heading of, "What type of data do
11 we need?"  Last sentence:
12       (Reading) In case the data -- in each
13       case the data must include the names
14       of the prescribers and other
15       information shown below (end of
16       reading).
17     Then it states:
18       (Reading) What we will do with the
19       data?"  We require for anomalies
20       sequential script numbers, inordinate
21       quantities.  The top five to ten
22       prescribers will have their names
23       checked on the state Medical Board
24       site to see if they have any
25       disciplinary actions against them.  We

Page 173

1       will also look at the cash percentage
2       for controlled drugs versus other
3       methods of payment and if they fill
4       for pain clinics (end of reading).
5     He's talking about doing with the dispensing
6 data exactly what you and I have been talking about;
7 correct?  Cash payments; right?  Looking at doctors
8 right on a website, as to see whether or not they
9 have issues with the Medical Board; right?  He's
10 talking about what we have been talking about; true?
11     MS. HENN:  Objection.  Compound.
12     THE WITNESS:  He's referring to a number of
13 things that he's going to do with the data.  I think,
14 as I view this, he is being clear with his team what
15 he plans to do with the data they are collecting.
16 BY MR. KENNEDY:
17     Q.   And these are exactly the things that
18 you told us the DEA said to look out for in 2006;
19 right?
20     MS. HENN:  Objection.  Lacks foundation.
21 BY MR. KENNEDY:
22     Q.   It's now 2012.  The DEA said to
23 McKesson in 2006, these are some of the things to
24 look out for?
25     MS. HENN:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 174

BY MR. KENNEDY:
1    Q.    Correct?
2    A.    I'm not -- I'm not sure I understand
3 your question, Counsel. The DEA outlined the items
4 such as this in 2006, that is correct.
5    Q.    And my point is, sir, it's six years
6 later -- it's 2012 -- and the entire Eastern Region
7 is saying, as of December 1, 2012, six years after
8 these have been outlined by the DEA, we're going to
9 start doing this; correct?
10    MS. HENN: Objection. Mischaracterizes the
11 document. Lack of foundation.
12    THE WITNESS: I wouldn't agree with that
13 statement. We had a number of tools we used
14 throughout the time that we executed CSMP.
15 BY MR. KENNEDY:
16    Q.    Sir, other than the dispensing data,
17 where are you going to get the names of the doctors
18 prescribing medications? Where are you getting the
19 names?
20    MS. HENN: Objection to form.
21 BY MR. KENNEDY:
22    Q.    Tell us.
23    A.    I'm not aware of all the potential
24 sources, but -- that we could get for, you know,

Page 175

1 doctors prescribing.
2    Q.    Other than the dispensing data, where
3 are you going to find out what's getting paid for in
4 cash, sir? Like the DEA said six years earlier you
5 ought to look for, where are you going to find that
6 information without the dispensing data?
7    MS. HENN: Objection to form. Calls for
8 speculation.
9    THE WITNESS: I really don't know. I
10 mean --
11 BY MR. KENNEDY:
12    Q.    Tell me, how are you going to run
13 percentages of controlled substances at a particular
14 pharmacy versus total prescriptions without
15 dispensing data, sir? Tell me that. Where are you
16 going to get it?
17    MS. HENN: Objection to form.
18    THE WITNESS: Again, I would -- I would
19 speculate. But I would like to clarify that DEA's
20 guidance in 2006 was percentage of sales of
21 controlled substances to total pharmacy sales.
22 BY MR. KENNEDY:
23    Q.    And where are you going to get that
24 information other than dispensing data?
25    A.    We would have that information from a

Page 176

1 sales standpoint.
2    Q.    Your sales standpoint, not the total
3 sales; correct? Your sales --
4    MS. HENN: Objection. Calls for
5 speculation.
6 BY MR. KENNEDY:
7    Q.    -- but not the total sales of a
8 pharmacy; true?
9    MS. HENN: Calls for speculation.
10    THE WITNESS: Again, we -- we could look at
11 the sales record as a percentage of sales to a given
12 pharmacy.
13 BY MR. KENNEDY:
14    Q.    McKesson's data, not the pharmacy's;
15 true?
16    MS. HENN: Objection to form.
17 BY MR. KENNEDY:
18    Q.    True?
19    A.    This was McKesson's data.
20    Q.    Right. You can't do it for the
21 pharmacy because you don't know how many different
22 folks they are buying from; right?
23    MS. HENN: Objection to form. Calls for
24 speculation.
25 ///

Page 177

1 BY MR. KENNEDY:
2    Q.    Correct?
3    A.    Again, I don't know that I can answer
4 because there's a number of different tools that we
5 could use to understand if a pharmacy was just our
6 customer.
7    Q.    Tell me where in 2012, without the
8 dispensing data, you can find out the total amount of
9 oxycodone being sold by a particular pharmacy? Tell
10 me.
11    MS. HENN: Objection to form. Calls for
12 speculation.
13    THE WITNESS: I don't know.
14 BY MR. KENNEDY:
15    Q.    And this is the exact reason why
16 Mr. McDonald, Mr. Gustin, and now Mr. Lumpkin are
17 saying dispensing data is required; correct?
18    MS. HENN: Objection. Calls for
19 speculation.
20 BY MR. KENNEDY:
21    Q.    Right?
22    A.    Again, these three DRAs were
23 directing their regions to submit information that
24 they needed to make decisions on thresholds,
25 establishment and changes.

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1    Q.   Sir, let's look at what Mr. Lumpkin
2  says here.  He says -- under this heading, "What are
3  we going to do with it?"  "What are we going to do
4  with it?"  And he's talking about dispensing data;
5  correct?
6    A.   Correct.
7    Q.   He says:
8       (Reading) We will review for
9       anomalies, sequential script numbers,
10      inordinate quantities, the top five or
11      ten prescribers.  We can check their
12      names with the Medical Board to see if
13      there are disciplinary actions (end of
14      reading).
15     Cash percentages.  Controlled drugs.  See if
16 they are filling for pain clinics.  That's what he
17 says they are going to do with the dispensing data;
18 correct?
19     A.   That is correct.
20     Q.   He doesn't say, we don't need to get
21 this dispensing data because we could do all of this,
22 we can calculate all of these numbers, we can get all
23 of this information from other means; does he?  Does
24 he say that?
25     A.   He's being very specific that he

Page 179

1  wants the dispensing data to help with identifying
2  these things and make decisions around thresholds.
3    Q.   And Mr. Gustin in the Midwest was
4  saying it, and Mr. Lumpkin in the East was saying it,
5  and Mr. McDonald in the West was saying it, and the
6  DEA had been saying it since 2006, sir; isn't that
7  all correct?
8    MS. HENN:  Objection.  Lacks foundation.
9    THE WITNESS:  The DEA in the 2006 time frame
10 talked about physicians.
11 BY MR. KENNEDY:
12     Q.   My question is real simple.  You were
13 the boss.  You were the head of all of Regulatory.
14 You're responsible to manage the obligation of
15 McKesson with respect to controlled substances.  And
16 my question is this:  What took McKesson six years,
17 six years to start requiring dispensing data for
18 threshold increases?  What took them six years?
19     MS. HENN:  Objection to form.  Lacks
20 foundation.
21 BY MR. KENNEDY:
22     Q.   Look back in your memory.  What took
23 them six years to begin to require this information?
24     MS. HENN:  Same objections.
25     THE WITNESS:  First, I don't know that it's

Page 180

1  necessarily accurate that we waited until this time
2  to use any of the data that's here.  The fact that
3  we're communicating and requiring it is simply a
4  communication to the field.  But I know that our
5  teams used a lot of different data to make
6  determinations on thresholds between 2008, when we
7  established thresholds, and 2012, as you've outlined
8  here.
9  BY MR. KENNEDY:
10     Q.   In 2012, when these folks that are
11 responsible for more than half of the country say
12 dispensing data is required in 2012, you knew at that
13 point in time that there was an extraordinary
14 epidemic going on in this country with the drugs that
15 you were selling?  Didn't you know it by then?
16     MS. HENN:  Objection.  Lacks foundation.
17     THE WITNESS:  In the 2011, 2000 [sic] time
18 frame, the public information around the abuse of
19 prescription drugs was ramping up significantly.
20     MS. HENN:  I think we are going to have to
21 go off the record.
22     THE VIDEOGRAPHER:  We are going off the
23 record.  The time is 12:44 p.m.
24     (Lunch recess taken at 12:44 p.m.)
25          --o0o--

Page 181

1  AFTERNOON SESSION          1:19 P.M.
2          --o0o--
3    THE VIDEOGRAPHER:  We are back on the
4  record.  The time is 1:19 p.m.
5  BY MR. KENNEDY:
6    Q.   All right.  Mr. Walker, we've talked
7  a bit about the independents, the small, medium, the
8  smaller chains.  I want to switch gears now and talk
9  to you about what McKesson called the RNAs, or the
10 regional national accounts; all right?
11     A.   Yes.
12     Q.   You're familiar with RNA, regional
13 national account terminology?
14     A.   The -- yes, I am.  The correct
15 terminology is retail national account.
16     Q.   I'm sorry.  Those would be the big
17 chains?
18     A.   Big chains.
19     Q.   The CVS, the Walgreens, the Walmarts,
20 the Rite Aids; correct?
21     A.   That size chain, yes.
22     Q.   Those are big customers; we agree?
23 The big chains were big customers to McKesson?
24     A.   Yes.
25     Q.   Probably over a billion dollars worth

Page 182

1 of business with big -- big national pharmacies?

2     MS. HENN: Objection. Lacks foundation.

3     THE WITNESS: I don't recall the specific

4 sales volume, but they are large -- they were large

5 customers.

6 BY MR. KENNEDY:

7     Q. I mean, would you disagree if I were

8 to say that probably the majority of McKesson's

9 controlled substance sales were being made to the big

10 retail national accounts?

11     MS. HENN: Objection to form. Lacks

12 foundation.

13     THE WITNESS: I actually cannot say because

14 it would be speculative, just due to the business

15 models of particularly some of the hospital accounts.

16 BY MR. KENNEDY:

17     Q. All right. Anyway, the big national

18 accounts made up 16,000-plus individual pharmacies;

19 does that sound right?

20     MS. HENN: Objection to form.

21     THE WITNESS: I don't recall specifically

22 the number of pharmacies that were involved in that

23 segment.

24 BY MR. KENNEDY:

25     Q. Can we agree that McKesson's legal

Page 183

1 duties, responsibilities to monitor and prevent

2 diversion applies to the large national chains in the

3 same fashion it applies to the independent smaller

4 chains?

5     MS. HENN: Objection to form.

6     THE WITNESS: Yes, our -- our overall

7 controlled substance and regulatory responsibility

8 applied the all the registrants that we provided

9 controlled substances to.

10 BY MR. KENNEDY:

11     Q. And that's always been true? Going

12 back to 1970, 1971, when the Controlled Substance Act

13 came into existence and the regulations came into

14 existence, that's always been true; your

15 responsibility to the large chains was no different

16 than your responsibilities related to an independent

17 pharmacy?

18     MS. HENN: Objection to form.

19     THE WITNESS: Outside of the direct

20 experience that I had and exposure I had with the

21 retail national accounts, I can't say what happened

22 in the early years. But certainly during my tenure

23 it was the same.

24 BY MR. KENNEDY:

25     Q. The "Know Your Customer"

Page 184

1 responsibility applied to the large national chains;

2 true?

3     A. As part of our program, yes, it did.

4     Q. The responsibility of McKesson to

5 identify suspicious orders, based upon size and

6 frequency, unusual pattern, applied to the big

7 regional national accounts -- retail national

8 accounts -- I'm sorry -- would that be true?

9     MS. HENN: Objection to form.

10     THE WITNESS: All the elements of our

11 Controlled Substance Monitoring Program would have

12 applied to national accounts.

13 BY MR. KENNEDY:

14     Q. Now, with respect to threshold

15 increases. We talked about threshold increases in

16 the smaller chains. Let's talk about threshold

17 increases with respect to the big chains.

18     From time to time McKesson would increase

19 thresholds for pharmacies that were part of a large

20 retail account; correct?

21     MS. HENN: Objection to form.

22     THE WITNESS: Yes, we -- we would increase

23 thresholds.

24 BY MR. KENNEDY:

25     Q. But with respect to the big pharmacy

Page 185

1 chains, when you were going to increase a threshold,

2 McKesson would not communicate directly with the

3 specific pharmacy that was requesting the increase,

4 McKesson, rather, would communicate with the

5 corporate headquarters of the big chain; is that

6 accurate?

7     A. As part of our Controlled Substance

8 Monitoring Program, we utilized the retail national

9 account chain regulatory teams in the communication

10 often. It varied by -- by account or by customer.

11 But we did leverage the regulatory teams at the

12 national accounts.

13     Q. In fact, if an individual pharmacy,

14 for example, of CVS, an individual pharmacy of CVS

15 would call McKesson for a threshold increase, that

16 individual pharmacy would be directed back to CVS

17 headquarters and say, have your headquarters contact

18 us about a threshold increase; true?

19     MS. HENN: Objection. Calls for

20 speculation.

21     THE WITNESS: I'm not aware of any occasions

22 where a pharmacy called us directly. We really

23 depended upon the customer -- the headquarters of

24 each of those pharmacies to manage their pharmacies

25 and direct them as to how changes would take place.

Page 186

BY MR. KENNEDY:

1  Q.   All right.  So if you're talking
about CVS, for example, you would be dealing with
headquarters in Providence, Rhode Island; that was
the norm?  Correct?

6  A.   Yes.

7  Q.   Walgreens, if there was an issue, a
threshold increase with respect to a Walgreens
pharmacy in Utah, you would probably deal with
headquarters in Deerfield, Illinois; right?

11  A.   Actually, Walgreens wasn't one of our
customers.  It would have been nice, but they
weren't.

14  Q.   That's the concept?  You're dealing
with headquarters; correct?

16  A.   Yes.

17  Q.   Who is Elaine Thomet, if I'm saying
that right?

19  A.   I'm sorry.  Can you spell the last
name.

21  Q.   T-h-o-m-e-t.

22  A.   Thomet.

23  Q.   Thomet.  I am very sorry.  I wasn't
even close.

25       Who is she or who was she in this period of

Page 187

1  '08 to, let's say, '14, 2014?

2  A.   My recollection is Elaine and her
responsibilities during that time frame, she worked
in our retail national account support team.  She was
a -- as I understood it -- I don't remember her
title -- was primarily a liaison, you know, from the
retail national account support team into operations
and others.

9  Q.   Okay.  She would liaison into
regulatory?

11  A.   On occasion, I believe that's
correct.

13       MR. KENNEDY:  Let's look at Exhibit 677.

14       (Exhibit No. 677 was marked.)

15       MR. KENNEDY:  And that is Bates -52132 to
-375.

17  Q.   I want to look at an email, the top
email on the first page, -72.

19  A.   I haven't seen this document before.
Could I just --

21  Q.   Sure.

22  A.   -- have a moment to familiarize
myself?

24  Q.   Please.

25  A.   Thank you.

Page 188

1       (Witness reviewing document.)

2  A.   Okay.

3  Q.   If you want to look -- look to page
-74.  That would be the third page in.

5       And you remember, we've had a discussion
about dispensing data and whether or not that was
required for an increase in a drug threshold for the
smaller independent accounts.  Do you recall that
discussion we had?  Correct?

10  A.   I'm sorry.  Repeat your question.

11  Q.   We've -- we've had a discussion --
I've asked you about the requirement for dispensing
data in -- when increasing the threshold of an
independent or smaller chain.  You recall that
discussion?

16  A.   Yes.

17       MS. HENN:  Objection to form.

18  BY MR. KENNEDY:

19  Q.   So I want to have that discussion now
with respect to the regional national accounts.

21       If you look to page -74, down at the bottom,
you will see a November 1, 2012, email, it looks like
from Perry Anderson, where it says:

24       (Reading) Hi, Dan, quick question.

25       See Frank's email below regarding CSMP

Page 189

1       threshold adjustments (end of

2       reading).

3       That's Controlled Substance Monitoring
Program; right?

5  A.   Yes.

6  Q.   And they are asking about threshold
adjustments.  And he says, "Is it common -- common
practice in RNA" -- that would be the big chains;
right?  Right?  RNA?

10  A.   Yes.

11  Q.   (Reading) Is it common practice
12       in RNA to change thresholds without
13       asking for this similar backup, or is
14       it more or less done by RNA support
15       team behind the scenes for RNA
16       accounts (end of reading)?

17       Now, go back to -74.  And here seems to be
the response.  Dan Jeffries responds:

19       (Reading) We do -- we adjust at the
20       request of the customer, but we don't
21       ask for dispense data (end of
22       reading).

23       Do you see that?

24  A.   Yes.

25  Q.   He's talking about the regional

Page 190

1  national accounts. Was that the policy -- and it's
2  2012 -- that with respect to increases in the
3  thresholds for pharmacies that were a part of the big
4  chains, you did not ask for dispensing data?
5      MS. HENN: Objection to form.
6      THE WITNESS: Generally we did not ask for
7  any dispensing data from our retail national account
8  pharmacies.
9  BY MR. KENNEDY:
10     Q.   Go to page -72, the first page. Now,
11 this is an email from Elaine Thomet on 11-2-12. And
12 she says:
13         (Reading) If it helps, I will add some
14         clarification. What Frank may not
15         understand is that with RNA, the big
16         accounts, we are able to establish their
17         regulatory relationship with their
18         headquarters and not at store level
19         (end of reading).
20     Now, that's what we were talking about. You
21 were addressing the headquarters as opposed to the
22 individual stores when it came to the big national
23 accounts; true?
24     A.   We used the headquarters.
25     Q.   She then says:

Page 191

1         (Reading) After their thresholds have
2         been initially set up, based on their
3         required usage data or historical
4         data, if they were a customer back
5         when we implemented the CSMP, then any
6         time they exceed their threshold, we
7         review it and working with their
8         headquarters and our regulatory team,
9         determine if the store should be
10        allowed an increase. If the HQs
11        agreed, then the presumption is made
12        that they have done their due
13        diligence. It also means that we are
14        not talking to the direct purchaser --
15        that's the individual pharmacy -- but,
16        rather, a representative from
17        headquarters, preferably in Regulatory
18        Loss Prevention, Asset Control,
19        et cetera (end of reading).
20     Do you see that?
21     A.   Yes.
22     Q.   And was that basically then the
23 practice? If headquarters said a threshold increase
24 is okay, there was at least -- in the words of
25 Ms. Thomet, there was a presumption that the

Page 192

1  headquarters of the national chain had done their due
2  diligence -- had done their due diligence; is that
3  correct?
4      A.   It is -- it is correct that we
5  utilized the retail national chains' headquarters
6  regulatory and oversight groups to assist us in
7  ensuring that any threshold increases were
8  appropriate.
9      Q.   And you would assume that they did
10 their due diligence when saying a threshold increase
11 is okay, according to -- at least to Elaine Thomet?
12     A.   Based -- based on our discussions
13 with headquarters and understanding what their
14 internal procedures were and how they conducted
15 oversight of their pharmacies, yes.
16     Q.   No prescribing data was required to
17 grant a threshold increase for the pharmacy at a
18 large chain; correct? We just went through that.
19 True?
20     A.   No.
21     MS. HENN: Objection to form.
22 BY MR. KENNEDY:
23     Q.   And so McKesson, when increasing the
24 threshold of a pharmacy at a large chain, had no
25 direct knowledge of the physicians who were writing

Page 193

1  the prescriptions at the pharmacies for the large
2  national accounts; true?
3      A.   That is -- that is correct.
4      Q.   You weren't able to check to see if
5  any of these physicians had an issue with a medical
6  board in the large national chains, correct, because
7  you didn't have their identity? Couldn't do that;
8  true?
9      MS. HENN: Objection to form. Calls for
10 speculation.
11 BY MR. KENNEDY:
12     Q.   Correct?
13     A.   It is probably more accurate to state
14 that we did not have the detail of their -- of their
15 prescriptions and the items that would be included in
16 that prescription data.
17     Q.   All right. And that would include
18 the identity of the doctor; correct?
19     A.   Presumably, yes.
20     Q.   It would include the data that would
21 allow you to accurately run percentages on controlled
22 purchases versus non-controlled purchases; correct?
23     MS. HENN: Objection to form.
24     THE WITNESS: We wouldn't have that ability.
25 ///

Highly Confidential - Subject to Further Confidentiality Review

Page 194

BY MR. KENNEDY:

1 BY MR. KENNEDY:
2     Q.    And you wouldn't have the ability,
3 with respect to the large chains, to make a
4 determination as to whether or not they were -- they
5 were doing business with pain clinics; right?  You
6 wouldn't be able to -- you wouldn't know that because
7 you don't know who they are selling to; true?
8         MS. HENN:  Objection to form.
9         THE WITNESS:  We wouldn't -- without the --
10 we wouldn't have their prescription data.
11 BY MR. KENNEDY:
12     Q.    So you wouldn't -- you wouldn't know
13 whether they were selling to pain clinics, would you,
14 these large -- these large national accounts?
15         MS. HENN:  Objection to form.
16         THE WITNESS:  We -- we wouldn't know from
17 the data whether they are were selling to pain
18 clinics.  I wouldn't state that we wouldn't
19 necessarily -- we may find out some other -- an other
20 way, but generally the data within the potential
21 indicator.
22 BY MR. KENNEDY:
23     Q.    Well, you wouldn't have any
24 systematic, regular way to check up on all of the
25 different pharmacies at the big retail accounts to

Page 195

1 determine who their customers were and as to whether
2 or not they were pain clinics?  That's accurate?
3         MS. HENN:  Objection to form.
4 BY MR. KENNEDY:
5     Q.    Right?
6     A.    Generally we -- we would not.
7     Q.    And the DEA had informed McKesson,
8 had they not, that a list of pain clinics were a big
9 problem in our country?  They had told you that; had
10 they not?
11         MS. HENN:  Objection to form.  Lacks
12 foundation.
13         THE WITNESS:  In a prior meeting and some
14 communications, the DEA identified pain clinics.
15         MR. KENNEDY:  Let me show you Exhibit 752.
16         (Exhibit No. 752 was marked.)
17         MR. KENNEDY:  752 is Bates -498169 to -183.
18     Q.    This is an email from you; is it not?
19     A.    Yes.
20     Q.    Dated May 2nd, 2012; is that right?
21     A.    Yes.
22     Q.    And it looks like you're sending it
23 out to a variety of the Directors of Regulatory
24 Affairs and folks in somewhat management positions as
25 it relates to Regulatory Affairs; right?

Page 196

1         MS. HENN:  Counsel, let me just ask the
2 videographer, could you please close the door.  Thank
3 you.
4         Could you go ahead and repeat that.  I'm
5 sorry.
6         MR. KENNEDY:  Yes.
7     Q.    This email is being sent out by you
8 in 2012, it looks like, to the DRAs, the Directors of
9 Regulatory Affairs, and -- maybe just Directors of
10 Regulatory Affairs; right?
11     A.    It appears to be restricted to the
12 regulatory team.
13     Q.    And if you want to look at -174.
14 And, again, this is something -- is this a slide,
15 sir, that you would have prepared?
16     A.    Yes.
17     Q.    And at -174, in your slide show, "How
18 the DEA sees it."  Does it state:
19         (Reading) The illicit pain clinics,
20         the pharmacies that fill their
21         scripts, and the wholesaler
22         distributors who supply pharmacies
23         without appropriate due diligence have
24         caused and continue to cause millions
25         of dosage units of oxycodone and other

Page 197

1         controlled substances to be diverted
2         and pose an imminent threat to the
3         public health and safety (end of
4         reading).
5         Is that in your slide show?
6     A.    Yes, it is.
7     Q.    And with respect to the big chain
8 pharmacies, McKesson was not on any regular basis
9 getting the dispensing data that would have told them
10 whether or not these big chain pharmacies were
11 selling to pain clinics; is that right?
12     A.    We did not get the dispensing data.
13 We relied on the chain's regulatory and loss
14 prevention groups to understand their patient base.
15     Q.    Without the prescribing data from a
16 chain pharmacy, the big chains, the CVSes, the
17 Walmarts, you wouldn't have enough detail to identify
18 whether or not physicians have been prescribing
19 what's been called the trinity of opioids, would you,
20 a combination of drugs that indicate diversion?  You
21 wouldn't be able to know and understand that; would
22 you?
23         MS. HENN:  Objection to form.  Lacks
24 foundation.
25         THE WITNESS:  The --

Page 198

BY MR. KENNEDY:

1    Q.   You wouldn't have that info; would
2 you?
3    MS. HENN: Same objections.
4    THE WITNESS: We would not have the detail
5 of prescription by doctor.
6 BY MR. KENNEDY:
7    Q.   Mr. Walker, not only did McKesson
8 have the duty to know its customer, the pharmacy, but
9 McKesson had the duty to know its customers'
10 customer; right?
11    MS. HENN: Objection to form. Lacks
12 foundation.
13 BY MR. KENNEDY:
14    Q.   Not just the duty to know the
15 pharmacy, but you had to know the pharmacy's
16 customers? That was part of your obligation with the
17 DEA; was it not?
18    MS. HENN: Objection to form. Lacks
19 foundation.
20    THE WITNESS: No, our -- our responsibility
21 was to continue to adhere to the regulations
22 associated with distribution and handling of
23 controlled substances.
24
25 ///

---

Page 199

BY MR. KENNEDY:

1    Q.   Sir, look at the very next page of
2 your slide -- your slide presentation, -175, the very
3 next page. It says, "DEA Registrants" at the top;
4 right?
5    A.   Yes.
6    Q.   This is your presentation. Then the
7 first box on the left, does it state, "Know your
8 customer and your customer's customer"? Is that what
9 your presentation states?
10    A.   Yes, it does.
11    Q.   And that was your obligation at
12 McKesson; was it not?
13    MS. HENN: Objection to form. Lacks
14 foundation.
15    THE WITNESS: I would more accurately define
16 this as our effort to ensure that we were doing
17 everything that we could to manage the distribution
18 of controlled substances. There -- there was not a
19 regulatory requirement to know our customer, our
20 customer's customer, but clearly there is an
21 opportunity for us to do everything we can to support
22 the DEA in their enforcement actions.
23 BY MR. KENNEDY:
24    Q.   Doesn't it say, "DEA Registrants,"

---

Page 200

1 and then underneath the big arrow it says,
2 "Regulatory Burden"? And your statement to all of
3 the Directors in Regulatory Affairs, "Know your
4 customer and your customer's customer"; is that your
5 slide?
6    MS. HENN: Objection. Asked and answered.
7 BY MR. KENNEDY:
8    Q.   Is that your slide?
9    A.   This is -- this is a slide that I
10 created.
11    Q.   And without prescribing data from the
12 16,000 individual pharmacies that were part of the
13 big chain pharmacy accounts, there is no way for
14 McKesson to know its customer's customer; is there?
15    MS. HENN: Objection to form. Lacks
16 foundation.
17    THE WITNESS: Without prescribing data from
18 the national accounts, we would not have the elements
19 of prescription data that we have outlined before.
20 BY MR. KENNEDY:
21    Q.   You had no -- with respect to the big
22 chain pharmacies, no direct communication with their
23 individual pharmacies? You didn't call [sic] up the
24 phone and call the pharmacy and charge at an
25 individual McKesson pharmacy; correct? You dealt

---

Page 201

1 with headquarters?
2    MS. HENN: Objection to form.
3    THE WITNESS: I can't testify that we never
4 contacted an individual pharmacy. But generally our
5 policy was to work with the chain headquarters.
6 BY MR. KENNEDY:
7    Q.   And the Directors of Regulatory
8 Affairs, and the folks that worked for them, they
9 didn't get in their cars on a regular basis and
10 physically visit the pharmacies of the big chain
11 pharmacies; correct?
12    A.   Again, I can't say that it never
13 occurred. But generally we did not conduct site
14 visits at the chain pharmacies.
15    Q.   So the big chain pharmacies represent
16 16,000 individual pharmacies. And I can't remember
17 if we agreed to that number. Does that sound about
18 right, 16,000 individual pharmacies for the big
19 national chains?
20    MS. HENN: Objection to form. Lacks
21 foundation.
22    THE WITNESS: I didn't -- I didn't agree or
23 disagree. I just don't know.
24 BY MR. KENNEDY:
25    Q.   All right. But essentially McKesson

Highly Confidential - Subject to Further Confidentiality Review

Page 202

1 was allowing the big chain pharmacies to monitor
2 themselves with respect to threshold increases?
3     MS. HENN: Objection to form. Lacks
4 foundation.
5     THE WITNESS: We relied on the resources
6 that were in the chain pharmacies, with the stated
7 responsibility for their regulatory compliance, to
8 help us in ensuring that their pharmacies were
9 executing appropriately.
10 BY MR. KENNEDY:
11     Q.   Well, let me ask, did McKesson ever
12 think that -- let's say, for example, did they ever
13 think that CVS would report themselves to the DEA?
14     A.   I'm not sure I understand that
15 question.
16     Q.   Did McKesson ever believe that CVS,
17 for example, CVS headquarters, would report one of
18 their own pharmacies to the DEA?
19     A.   I can't answer the question. I
20 don't -- I don't know.
21     Q.   I mean, did CVS ever sit there and
22 say, well, we think that CVS headquarters will
23 contact the DEA and tell them we have a pharmacy in
24 West Virginia that is violating the law, and we think
25 you should close them down? Do you think that they

Page 203

1 would ever do that?
2     MS. HENN: Objection to form. Calls for
3 speculation.
4     THE WITNESS: Again, I can't answer what CVS
5 would or would not do with information that they
6 received.
7 BY MR. KENNEDY:
8     Q.   Let's talk about Level 1
9 investigations. That's the investigation that would
10 take place after -- after an individual pharmacy
11 would place an order that exceeded their threshold;
12 correct?
13     A.   Yes.
14     Q.   And, again, I want to focus on the
15 national chains. So if a -- if a small
16 independent -- if a small independent chain ordered
17 over their threshold, McKesson would contact that
18 individual pharmacy directly; true? That was the
19 policy?
20     A.   Yes, that's correct.
21     Q.   But if the -- but if an individual
22 pharmacy from a big national chain ordered over their
23 opioid threshold, then McKesson would contact the
24 national headquarters of the chain; true?
25     A.   If we were to make the contact, it

Page 204

1 would be with the chain -- the chain headquarters.
2     Q.   And then as we read in the email,
3 McKesson would presume that the headquarters did
4 their due diligence with respect to that pharmacy
5 that ordered over their threshold? There would be
6 that presumption on the part of McKesson?
7     MS. HENN: Objection to form. Lacks
8 foundation.
9     THE WITNESS: We -- we would rely on the
10 chain headquarter's regulatory oversight to assist
11 us, yes.
12     MR. KENNEDY: Give me 684.
13         (Exhibit No. 684 was marked.)
14     MR. KENNEDY: I am going to show you
15 Exhibit 684, which is McKesson -513746.
16 BY MR. KENNEDY:
17     Q.   This is an email from Elaine Thomet.
18 And I believe her title was Director of RNA Support
19 Solutions. Does that sound right?
20     A.   Hang on just a moment. Let me take a
21 real quick look.
22     To answer your first question, her title is
23 Director of Business Process.
24     Q.   Oh, right. So she would understand
25 the process of what you folks were doing? That's

Page 205

1 kind of what her job was, the process?
2     A.   I believe that she understood our
3 processes.
4     Q.   She sends an email on January 2,
5 2013. All right. And the subject is, "CSMP Level 1
6 Reviews required for all RNAs - effective
7 immediately."
8     And the RNA are the regional national
9 accounts; right?
10     A.   Yes.
11     Q.   And she says:
12     (Reading) In order to be in compliance
13         with the standard operating procedures
14         without adding a daily task to
15         anyone's plate, we have developed a
16         process where just once per month a
17         report will be run that lists all of
18         the omits for the previous month (end
19         of reading).
20     Now, an omit is -- is when somebody orders
21 over their threshold; correct?
22     A.   Yes.
23     Q.   And she says, when -- and this is
24 about regional national accounts, the big chains;
25 correct?

Page 206

1    A.    Yes.
2    Q.    And she says:
3        (Reading) Whether your customers
4        requested increases, TCRs, Threshold
5        Change Requests, or not, we need to
6        ensure that they are aware of all
7        their stores' omits (end of reading).
8    So she's saying, you've got to make sure,
9 for example, that CVS -- if they have a number of
10 stores that went over their threshold, you have to
11 make sure that their corporate headquarters knew that
12 they had stores that went over -- over their
13 threshold; correct?  Is that what she's saying?
14    MS. HENN:  Objection to form.  Lacks
15 foundation.  And mischaracterizes the document.
16 BY MR. KENNEDY:
17    Q.    Does it state, we need to ensure they
18 are aware of all their stores' omits?  Is that what
19 it says?
20    A.    That's what the document says.
21    Q.    In the next paragraph she says:
22        (Reading) What to do?  You should see
23        the automated monthly omit report
24        Thursday, January 3, listing
25        December's omits (end of reading).

Page 207

1    So that's a report that's going to list
2 every pharmacy that went over their threshold; right?
3 That's what that was?
4    MS. HENN:  Objection to form.
5 Mischaracterizes the document.
6    THE WITNESS:  Hang on just a moment.  Let me
7 reread that.
8    As I read the document, there's -- there's
9 an automated report that is being sent to each of our
10 national accounts --
11 BY MR. KENNEDY:
12    Q.    And that --
13    A.    -- summarizing the omits.
14    Q.    All right.  The orders over the
15 threshold; right?
16    And she says, then:
17        (Reading) Please extract just your
18        individual customer's info from this
19        report, send to them and have them
20        acknowledge in an email, with report
21        attached, that they have been made
22        aware of these omits and nothing
23        further is required at that time.
24        Then save the email in the CSMP
25        database just like a TCR, but check

Page 208

1        the "Level 1 Review" box and name it
2        your Monthly Level 1 customer review
3        (end of reading).
4    Do you see that?
5    A.    Yes.
6    Q.    So, basically, she is -- she is
7 saying that when a pharmacy orders over their
8 threshold, that all you need to do is once a month
9 let headquarters know that they have pharmacies that
10 have ordered over their threshold, and you don't need
11 to do anything else; correct?
12    MS. HENN:  Objection to form.
13 BY MR. KENNEDY:
14    Q.    Is that what she's saying here?
15    MS. HENN:  Mischaracterizes the document.
16 BY MR. KENNEDY:
17    Q.    Read it again, if you need to.
18    A.    What I see that is written is that we
19 would submit this report to the headquarters each
20 month, and the pharmacy -- or the headquarters would
21 have a view of all the omits by pharmacy in it.  If
22 an action needed to be taken, then -- then we could
23 work with them to do that.
24    Q.    All right.  The headquarters would
25 decide; correct?  The headquarters is going to decide

Page 209

1 whether or not an action needs to be taken; right?
2 Just to send them a monthly report, here's your
3 pharmacies that have ordered over their threshold,
4 that's what this is saying?
5    MS. HENN:  Objection to form.
6 Mischaracterizes the document.
7    THE WITNESS:  The -- what I see is that the
8 report that we were sending would summarize all of
9 the omits for all of the controlled substance codes
10 that -- where the threshold was exceeded and blocked.
11 BY MR. KENNEDY:
12    Q.    And it says, "Nothing further is
13 required at this time"?  Is that what it says?
14    A.    That's what the document says.
15    Q.    So McKesson is not doing any review,
16 true, of these orders over the threshold; they are
17 just sending a monthly report to the headquarters of
18 the chain?
19    MS. HENN:  Objection to form.  Lacks
20 foundation.
21 BY MR. KENNEDY:
22    Q.    Is that correct?
23    MS. HENN:  Same objections.
24    THE WITNESS:  I don't know if there was
25 other review conducted as a result of the reports.  I

Page 210

1  can't respond or answer to that.
2      What I do see is what is written.
3  BY MR. KENNEDY:
4      Q.    And what is written is "Nothing
5  further is required at this time"?  That is what is
6  written?
7      A.    That is what is written.
8      Q.    The next paragraph:
9          (Reading) If you recall, Dave
10         discussed this requirement at our
11         October meeting and mentioned that the
12         field has to complete these reviews
13         for every single omit all month long.
14         Luckily, we were able to work with the
15         regulatory team to only ask RNA to
16         complete this required review once a
17         month, per customer (end of reading).
18     Do you see that?
19     A.    Yes.
20     Q.    So the requirement to review each and
21  every time a pharmacy ordered over their threshold is
22  now turned into a monthly report that is being sent
23  to headquarters of the big chain; right?
24     MS. HENN:  Objection to form.  Lacks
25  foundation.

Page 211

1      THE WITNESS:  Again, I don't recall the
2  document and hadn't seen this email before.  But we
3  were sending a monthly report summarizing omits based
4  on this document to chain headquarters.
5  BY MR. KENNEDY:
6      Q.    And relying upon them to look into
7  these omits, these orders over the threshold, to see
8  if they represented anything suspicious, relying upon
9  the headquarters of the chain; true?
10     MS. HENN:  Objection to form.  Lacks
11  foundation.
12     THE WITNESS:  We -- we were relying on their
13  regulatory teams and oversight to review and respond,
14  if required.
15  BY MR. KENNEDY:
16     Q.    And what would they -- would they
17  send you back an explanation for every order over the
18  threshold?
19     MS. HENN:  Objection to form.  Calls for
20  speculation.
21     THE WITNESS:  I don't recall any -- any
22  specific response coming back.
23     MR. KENNEDY:  Let me show you Exhibit 685.
24         (Exhibit No. 685 was marked.)
25     MR. KENNEDY:  685 is Bates -498295 to -307.

Page 212

1      Q.    Do you remember this document?
2      A.    Yes, I do.
3      Q.    And this is a PowerPoint that was put
4  together for presentation to the DEA; true?
5      A.    The date of this document is -- and
6  my understanding of this document, based on the date
7  here, is that it was a document that we put together
8  for a review with various DEA field offices and DEA.
9      Q.    Did you prepare this?
10     A.    I prepared the original, yes.
11     Q.    Go to page -302, if you would.  See
12  where it says, "Level 1 Review"?
13     A.    Yes.
14     Q.    That's what we've been talking about
15  with respect to the large chain pharmacies; right?
16     A.    Yes.
17     Q.    And in this presentation to the DEA,
18  does it state, "Review and Escalation.  Level 1
19  Review, Actions:  Direct contact customer"?
20     Well, that's not true with respect to the
21  big regional accounts, the big national accounts.
22  You contacted headquarters, you didn't contact the
23  pharmacy that ordered over the threshold; true?
24  True?
25     A.    That's not accurate.

Page 213

1      Our relationship at a retail national
2  account level was specifically and strictly with the
3  headquarters, in all matters.
4      Q.    Exactly.  So the individual pharmacy,
5  the individual pharmacy that went over the threshold
6  and was subject to a Level 1 Review, they weren't
7  contacted; you contacted headquarters, correct?
8      A.    That is correct.
9      Q.    And it says, "You will ascertain the
10  reason for exceeding the threshold."  But as you just
11  told us, corporate headquarters wouldn't even
12  necessarily get back to you as to why their
13  individual pharmacy exceeded the threshold; right?
14     A.    That could occur, yes.
15     Q.    It says, "Conduct analysis as
16  required."  And then at the bottom, "Documentation."
17     My question is, when you made this
18  presentation to the DEA in 2008, did you tell them
19  that with respect to these Level 1 Reviews, this
20  isn't going to apply to the big national chains,
21  we're going to let them do all of this themselves?
22  Did you tell them that the big national chains
23  weren't going to be a part of these Level 1 Reviews
24  by McKesson?
25     MS. HENN:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1     THE WITNESS: I don't recall specifically if
2 we had the conversation with DEA either at a local
3 level or at headquarters level of how we were going
4 to handle the retail national accounts.
5 BY MR. KENNEDY:
6     Q.   Do you recall telling them, you know,
7 we're going to let 16,000 pharmacies really kind of
8 monitor themselves? Did you tell them that?
9     MS. HENN: Objection to form. Lacks
10 foundation.
11     THE WITNESS: No, we didn't have that
12 conversation.
13     MR. KENNEDY: Give me 682.
14         (Exhibit No. 682 was marked.)
15     MR. KENNEDY: Let me show you Exhibit 682.
16     Q.   This is a graph of data that we put
17 together, all right? And it is based upon -- I will
18 tell you, it is based upon McKesson's transaction
19 data and sales that they provided to us. All right?
20     And so let me ask you, Rite Aid, was that a
21 big national account, one of the big retail RNA
22 accounts at McKesson?
23     A.   Rite Aid was and is a large customer
24 of McKesson.
25     Q.   And if you look at that red line,

Page 215

1 that red line represents McKesson's average sales of
2 oxycodone, average monthly sales of oxycodone in
3 Cuyahoga County per store; all right?
4     Now, this Rite Aid store, if we take March
5 of '09 -- from the information provided to us by
6 McKesson, it indicates that in March of '09 they
7 ordered over their threshold 11 times. And if we
8 look in the files of McKesson, the due diligence
9 records, there is no documentation or explanation as
10 to why they ordered over their thresholds. I want
11 you to assume that.
12     Would that be consistent with the way things
13 were handled --
14     MS. HENN: Objection.
15 BY MR. KENNEDY:
16     Q.   -- if we just turn it over to the
17 corporate headquarters and they make the
18 determination?
19     MS. HENN: Objection to form. Lacks
20 foundation. And calls for speculation.
21     THE WITNESS: Again, Counsel, we would have
22 worked directly with their retail national account
23 headquarters and their -- and their regulatory team.
24 I'm not familiar with the data. I'm not familiar
25 with the store. But we certainly on a regular basis

Page 216

1 would be in contact with Rite Aid headquarters.
2 BY MR. KENNEDY:
3     Q.   Right. And but, again, if we have
4 got 11 times in one month that Rite Aid ordered over
5 their threshold for oxycodone, it wouldn't surprise
6 you that there is no record of McKesson doing due
7 diligence because, again, you were relying upon the
8 headquarters of Rite Aid to do it; correct?
9     MS. HENN: Objection to form.
10     THE WITNESS: I have no knowledge of what
11 documentation is out there, and so I don't think I
12 can answer the question.
13 BY MR. KENNEDY:
14     Q.   And we see the same thing, you know,
15 seven in October, 23, 17, 3, 9, 8. And, again, no
16 documentation that McKesson did any kind of Level 1
17 Review because would it be, again, your position that
18 you were relying upon the headquarters of Rite Aid to
19 do that; true?
20     A.   I think my testimony is --
21     MS. HENN: Objection to form.
22     THE WITNESS: -- I don't know whether there
23 would be any documentation. I'm not familiar with
24 the store nor the documentation.
25     Again, generally what we would do is we

Page 217

1 would work directly with Rite Aid's corporate
2 regulatory out of headquarters.
3     MS. HENN: And, Counsel, I will just note
4 for the record that this data is all produced highly
5 confidential, and this should be marked when you
6 create exhibits with that information.
7     So we will ask that the court reporter mark
8 this 682 as highly confidential.
9 BY MR. KENNEDY:
10     Q.   Let me ask you this. Maybe we can
11 shortcut things. Did the big national chains, such
12 as CVS and Walmart and Rite Aid, did they represent,
13 then, to McKesson that they would review their own
14 pharmacies when their own pharmacy exceeded a
15 threshold and you notified them?
16     MS. HENN: Oxycodone.
17 BY MR. KENNEDY:
18     Q.   Was that the understanding, the
19 representation?
20     MS. HENN: Same objection.
21     THE WITNESS: I think it's better said that
22 we understood that they would -- had their own
23 internal reports and mechanisms to monitor and
24 evaluate their own pharmacies' distribution of
25 controlled substances, and we relied on their

Page 218

1  resources and their expertise and their data that
2  they had and kept internally to manage that.
3  BY MR. KENNEDY:
4      Q.    But, again, you were relying upon
5  their representation of their monitoring programs,
6  but -- because you didn't hire people to sneak into
7  their offices and look at their monitoring programs?
8  They provided you with the statements that they were
9  monitoring; correct?
10      MS. HENN:  Objection to form.  Lacks
11  foundation.
12      THE WITNESS:  Our -- our discussions with
13  our national account customers, in each of those they
14  would describe to us, and we would have discussions
15  around the processes that they used, and we -- again,
16  we utilized them heavily to -- as resources that were
17  available to help us in managing our overall
18  Controlled Substance Monitoring Program.
19      MR. KENNEDY:  Give me 678.
20          (Exhibit No. 678 was marked.)
21  BY MR. KENNEDY:
22      Q.    I am going to show you Exhibit 678,
23  which we don't have Bates numbers on.  Let me give
24  you this.  It's 445881-4.
25      If you go down to the bottom, this is an

Page 219

1  email by Elaine Thomet again, July 17, 2014.  I want
2  to see if you agree with this.  Do you see the second
3  page?
4      A.    Hang on just a moment.  Let me just
5  take a quick look.
6      Okay.  Counsel, you directed me to the
7  second page?
8      Q.    Yes.  Look at the second page, the
9  big letters.  I mean, you just looked at it.  She
10  is -- she's talking about setting up informational
11  phone calls; is she not?
12      A.    Yes.
13      Q.    And look at "The Call/Web-Ex."  Does
14  she state that, "Due to the nature of centralized
15  management within chains" -- and she's talking about
16  the big accounts, the big national chains; right?
17      A.    Yes.
18      Q.    (Reading) Due to the nature of
19      centralized management within chains,
20      RNA -- that's McKesson -- has the
21      ability to partner with our chain
22      customers to act somewhat as our proxy
23      in regards to regulatory oversight of
24      their stores.  Unlike the ISMC --
25      that's the smaller ones -- this allows

Page 220

1      us to avoid the need to interview and
2      visit all 16K RNA stores individually
3      every one to three years, as we are
4      able to interview the main customer
5      authorities with regulatory oversight
6      of their stores (end of reading).
7      Is that basically what you have been saying
8  as to -- as to how you addressed chains, the big
9  national chains?
10      MS. HENN:  Objection to form.
11      THE WITNESS:  We relied on the national
12  chains' headquarters, because all the national chains
13  had standard operating procedures and centralized
14  oversight in their business model.  And our -- our
15  view was that if you go to one CVS store, you see all
16  the CVS stores or all the Rite Aid stores because
17  they had very, very tight controls over how they
18  managed their business.
19  BY MR. KENNEDY:
20      Q.    Well, let me just -- well, first,
21  tight controls.  You understand CVS was fined
22  $130 million with respect to violations of the
23  Controlled Substances Act, $130 million fines, as you
24  tell us they had these very, very tight controls?
25  You knew that in your position, didn't you?

Page 221

1      MS. HENN:  Objection to form.  Lacks
2  foundation.
3  BY MR. KENNEDY:
4      Q.    You knew that; did you not?
5      A.    I was aware CVS had paid some
6  penalties.  I don't recall the amount nor do I recall
7  the events or the issues.
8      Q.    And Ms. Thomet, what she says is
9  McKesson is giving its proxy to the big national
10  chains with respect to regulatory oversight?  Does
11  she use the word "proxy"?
12      A.    That is what is written.
13      Q.    And proxy means you are giving
14  someone else authority to act for you; is that what
15  it means?
16      MS. HENN:  Objection to form.  Calls for
17  speculation.
18      THE WITNESS:  Generally, I would understand
19  that.
20  BY MR. KENNEDY:
21      Q.    And look where she says now, "The
22  Data."  Do you see that, "The Data"?
23      And does she state:
24      (Reading) We need to ask them to
25      provide three months' dispense data

Page 222

1    using the form specifically developed
2    for RNA customers, attached.  That
3    form can be sent to the customer.  The
4    data portion we're looking for them to
5    provide is simple:  DEA number, store
6    name, total prescription doses
7    dispensed by the DEA registrant for a
8    three-month period (excluding liquids,
9    patches, powders and inhalers and
10   non-Rx).  This data, which only they
11   can provide, simply gives us a better
12   understanding of their pharmacy size
13   and is an important part of your
14   equations when determining percentage
15   controls to total Rx, for example.  If
16   we were their sole provider, we could
17   potentially rely on our data alone,
18   but often that is not the case with
19   RNA customers, which is why we need
20   them to provide their total dispense
21   database (end of reading).
22       Do you see that?
23       A.    I see that written.
24       Q.    It's 2014, all right, when she is
25   saying that.  2014 is the date of this, is it not,

Page 223

1    for this educational webinar?
2        MS. HENN:  Objection to form.
3    BY MR. KENNEDY:
4        Q.    Is that right?
5        MS. HENN:  Mischaracterizes the document.
6    BY MR. KENNEDY:
7        Q.    2014?
8        A.    The document is dated in 2014.
9        Q.    And that's two years after the
10   documents we just looked at saying dispensing data is
11   a must, it's required for the independent and small
12   chains; right?  This is two years later?
13       MS. HENN:  Objection to form.
14   Mischaracterizing the document.
15   BY MR. KENNEDY:
16       Q.    Is that right?
17       A.    This -- this document is two years
18   after the documents we reviewed earlier.
19       Q.    And it's eight years after the DEA
20   told McKesson this is what diversion looks like;
21   right?  Eight years?
22       MS. HENN:  Objection to form.  Lacks
23   foundation.
24   BY MR. KENNEDY:
25       Q.    Eight years, sir?

Page 224

1        MS. HENN:  Mischaracterizes the document.
2        THE WITNESS:  I think better -- a better
3    characterization there is that it was eight years
4    after DEA identified issues with Internet pharmacies.
5    They didn't reveal all of this -- these issues.
6        And, frankly, as we evolved our program and
7    gained additional information and additional
8    knowledge and ability to utilize data, we expanded
9    our enforcement and -- well, not enforcement, but our
10   oversight effort in every way that we could.
11   BY MR. KENNEDY:
12       Q.    Sir, the DEA said it in 2006, it was
13   required for the smaller chains by '12, and there's
14   no requirement, at least according to the documents
15   we're looking at, until 2014 with respect to the big
16   national accounts; right?
17       MS. HENN:  Objection to form.  Lacks
18   foundation.  Mischaracterizing numerous documents.
19       THE WITNESS:  Again, as -- as the program
20   evolved and we identified additional information and
21   areas that we needed to focus, we modified our
22   program and our request for data.
23   BY MR. KENNEDY:
24       Q.    And it took you eight years?
25       MS. HENN:  Same objection.

Page 225

1    BY MR. KENNEDY:
2        Q.    Eight years to modify your program
3    after being told by the DEA this is important
4    information to have in identifying suspicious orders
5    and diversion; correct?
6        MS. HENN:  Objection.  Lacks foundation.
7    Mischaracterizes the documents.
8    BY MR. KENNEDY:
9        Q.    Is that right, sir, eight years to
10   develop it?
11       A.    It is eight years between 2006 and
12   2014.  But it is not correct that DEA identified all
13   the issues and all the information that we have
14   discussed in terms of prescription data.  And during
15   that time frame, prescription data resources and
16   capabilities increased significantly with technology.
17       Q.    You've said over and over that this
18   reliance upon the headquarters of the big national
19   chains was based upon the fact that they had their
20   own monitoring program, their own Controlled
21   Substance Monitoring Program; is that what I have
22   heard you say?
23       A.    More accurately, they had better data
24   and regulatory oversight.  We were never made privy
25   to the specifics of their programs.  The chains

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1 considered their data to be very proprietary and, as
2 a result, we reviewed it at a high level.
3     Q.    They never told you -- you relied
4 upon the fact that they had their own Controlled
5 Substances Monitoring Program, but they didn't give
6 you the detail of those programs ever; did they?
7     MS. HENN:  Objection to form.  Lacks
8 foundation.  And mischaracterizes testimony.
9     THE WITNESS:  To my knowledge, we never had
10 any detailed specifics from a chain on their -- on
11 their programs, due to their proprietary view of
12 their data.
13 BY MR. KENNEDY:
14     Q.    Sir, let me ask you this.  You're
15 familiar with the Controlled Substance Act of 1970;
16 is that right?
17     A.    Yes.
18     Q.    And then the regulations we've talked
19 about after that relating to suspicious order
20 monitoring that came into effect, I think, in 1971?
21 We spoke about that regulation; true?
22     A.    Yes, I'm familiar with that.
23     Q.    Did the United States Congress ever
24 say that McKesson could give the pharmacies and the
25 big national accounts their proxy and allow them to

Page 227

1 monitor themselves?  Did Congress ever state that?
2     MS. HENN:  Objection to form.  Calls for
3 speculation.
4     THE WITNESS:  Ask the question again,
5 Counsel.  I'm not sure I understand what you're
6 asking.
7 BY MR. KENNEDY:
8     Q.    Did Congress ever tell McKesson -- we
9 know what it enacted in 1970, the Controlled
10 Substances Act.  But did they ever enact anything
11 thereafter that told McKesson, you can give
12 pharmacies in the big national accounts your proxy to
13 do your due diligence as it relates to Regulatory
14 Affairs over controlled substances?  Did Congress
15 ever tell McKesson that?
16     MS. HENN:  Objection to form.
17     THE WITNESS:  The regulation required that
18 we operate a system to identify suspicious orders and
19 have systems to prevent the diversion of controlled
20 substances.  We utilized the -- and the pharmacies
21 and the chains as a registrant had the same
22 responsibility.  So we relied upon their
23 responsibility and their tools to assist us in
24 ensuring that we were complying.
25 ///

Page 228

1 BY MR. KENNEDY:
2     Q.    Sir, a pharmacy is not a distributor;
3 correct?
4     MS. HENN:  Objection to form.
5 BY MR. KENNEDY:
6     Q.    With respect to what we're talking
7 about, some of the pharmacies would distribute to
8 themselves.  But outside of that, what we're talking
9 about is, let's say, pharmacies that are not
10 self-warehousing, they have a duty and a
11 responsibility under the law as a pharmacy; correct?
12     MS. HENN:  Objection to form.
13 BY MR. KENNEDY:
14     Q.    Is that right?
15     MS. HENN:  Lacks foundation.
16     THE WITNESS:  I'm not familiar with pharmacy
17 legal requirements.  I understand distributor.
18 BY MR. KENNEDY:
19     Q.    All right.  But didn't you just tell
20 us you, as a distributor, were relying upon the
21 pharmacy and what they were required to do under the
22 law?
23     MS. HENN:  Same objections.
24 BY MR. KENNEDY:
25     Q.    And now you don't know what their

Page 229

1 requirements are?
2     A.    What I was answering was the chains
3 that we're discussing were self-warehousing chains
4 and had a distributor registration as well as a
5 pharmacy registration.
6     Q.    But they would monitor the drugs they
7 were distributing, but they weren't monitoring the
8 drugs they were buying from you?
9     MS. HENN:  Objection to form.  Lacks
10 foundation.
11     THE WITNESS:  Again, we utilized -- because
12 they had processes and systems and data in place, we
13 utilized strongly their resources to help us in
14 overseeing and managing the distribution of
15 controlled substances to their pharmacies.
16 BY MR. KENNEDY:
17     Q.    You understand that the
18 responsibilities under the law for a pharmacy to
19 prevent a diversion is different than the
20 responsibilities under the law of a distributor?
21 They are different; correct?
22     A.    I don't understand specifically the
23 regulations associated with pharmacy.  I've never
24 reviewed them.  But generally I understand that they
25 are different.

Page 230

1  Q.   Right.  And the way Congress set this
2  up, because they did not want a crisis, is they gave
3  responsibilities to the distributors, and they gave a
4  separate responsibility to the pharmacies, a belt and
5  a suspenders?  It wasn't one or the other.  Congress
6  wanted both to have responsibilities to prevent the
7  diversion of dangerous drugs into the communities;
8  right?  A separate set of responsibilities for each;
9  correct?
10     MS. HENN:  Objection to form.
11     THE WITNESS:  Again, I -- I don't know what
12  Congress's intent necessarily was.  I understand the
13  regulation.
14  BY MR. KENNEDY:
15     Q.   And you understand the regulation
16  gave a responsibility and a set of responsibilities
17  to the two different entities?  Distributors, you've
18  got your jobs, and pharmacies, you have your job;
19  correct?
20     A.   I understand the distributor
21  responsibilities.
22     Q.   Nowhere did it ever say that if the
23  pharmacy has responsibility, us as distributors, we
24  don't have any responsibility to prevent diversion?
25  That has never been stated anywhere; correct?

Page 231

1     MS. HENN:  Objection to form.
2     THE WITNESS:  Again, I -- the regulations
3  are very clear what our responsibilities are.
4     MS. HENN:  Counsel, is this another good
5  time for a break?  It's been an hour.
6     MR. KENNEDY:  Give me five minutes.
7     MS. HENN:  Are you comfortable going five
8  minutes?
9     THE WITNESS:  That's fine.
10     MR. KENNEDY:  Let me show you Exhibit 674,
11  if I could.
12     MS. HENN:  Thank you.
13     (Exhibit No. 674 was marked.)
14  BY MR. KENNEDY:
15     Q.   This is Bates -507218 to -507220.
16  This is an email from Michael Oriente, if you look at
17  the top.  Who is Michael Oriente?
18     A.   Michael Oriente was -- was and is the
19  Director of Regulatory Affairs for the East Region --
20  Northeast Region.
21     Q.   So a big responsibility.  He's one of
22  four/six people; correct?
23     A.   Yes, at that point in time.
24     Q.   And at this point in time, he is also
25  responsible for managing and monitoring some of the

Page 232

1  large national chains; true?
2     A.   Yes.
3     Q.   And this is April of 2011.  And does
4  he state, "Dave" -- and he's sending an email to Dave
5  Gustin, who is another Regulatory Affairs person;
6  right?  He's in the Midwest; right?
7     A.   Yes.
8     Q.   He also has some responsibility for
9  these big national chains; right?
10     A.   Yes.
11     Q.   And does he state, "Dave, can you ask
12  RNA" -- and that's the regional national account
13  portion of McKesson; right?
14     A.   Yes.
15     Q.   "Can you ask RNA to provide a contact
16  person for each chain?"
17     Does it look like he doesn't even know who
18  to contact?  He's a Director of Regulatory Affairs,
19  he's managing certain big national accounts, and he's
20  asking for the contact person at the chain; is he
21  not?  Is that what that says?
22     "Can you ask RNA" -- a part of McKesson --
23  "to provide a contact person for each chain?"  Is
24  that how he starts the email?
25     A.   Yes, it's what's written here.

Page 233

1     Q.   And then does he say:
2     (Reading) They could add it to our
3     DRA, Director of Regulatory Affairs,
4     RNA sheet that lists which of us has
5     what chain and if any chain has a
6     documented Controlled Substance
7     Monitoring Program process that they
8     could share with us so we could better
9     understand what they are doing on
10     their side for compliance (end of
11     reading).
12  Is that what he says?
13     A.   That's what's written.
14     Q.   So here's a Director of Regulatory
15  Affairs that is monitoring large national chains, and
16  number one, he doesn't even know who to contact at
17  the national chains; and, number two, he's asking
18  whether or not they even have a documented Controlled
19  Substance Monitoring Program.  Isn't that what he's
20  asking?
21     MS. HENN:  Objection to form.
22  BY MR. KENNEDY:
23     Q.   Right?
24     MS. HENN:  Lacks foundation.
25  ///

Page 234

BY MR. KENNEDY:
2    Q.    Is that correct, sir?
3    A.    That's what is written here, is that
4 request.
5    Q.    And do you know he was responsible
6 for CVS for a certain portion of time; did you know
7 that?
8    A.    I don't recall.
9    Q.    He was in charge of Rite Aid for a
10 certain portion of time; do you know that?
11    A.    I do recall he had responsibility for
12 Rite Aid.
13    Q.    Kroger's?
14    A.    Again, I don't remember all the ones
15 that he had.
16    Q.    Costco; do you remember that?
17    MS. HENN:  Objection to form.  Lacks
18 foundation.
19    THE WITNESS:  Again, I don't -- I don't
20 recall specifically.
21 BY MR. KENNEDY:
22    Q.    So McKesson is relying upon these
23 large national chains to do their own monitoring, and
24 then the person at McKesson who is in charge of
25 various national chains doesn't even know who to

Page 235

1 contact, doesn't even know if they have a documented
2 monitoring program; right?
3    MS. HENN:  Objection to form.
4 BY MR. KENNEDY:
5    Q.    Isn't that what this is saying to us?
6    MS. HENN:  Lacks foundation.
7    THE WITNESS:  No, I don't think that's
8 accurate, as I read this.
9    What I understand it to mean is more of an
10 update of who the contact people are in the chains.
11 I mean, people move around in the chain headquarters
12 constantly.  And he's simply, as I'm reading this,
13 was trying to determine whether there was other
14 information that we could use in our ongoing effort
15 to manage our controlled substance program.
16 BY MR. KENNEDY:
17    Q.    Well, at this point in time -- maybe
18 there's been change, maybe people are moving around,
19 but this man, in charge of CVS and Rite Aid and
20 Costco and Krogers, he doesn't even know who to call;
21 right?
22    MS. HENN:  Objection.
23 BY MR. KENNEDY:
24    Q.    At this point he doesn't even know
25 who to call?

Page 236

1    MS. HENN:  Objection to form.  Lacks
2 foundation.
3 BY MR. KENNEDY:
4    Q.    Isn't that what this is saying at
5 this moment in time?
6    A.    No, that's not accurate.  I don't
7 believe that this is that at all.  I think he is
8 ensuring that he has right information.
9 BY MR. KENNEDY:
10    Q.    Would you agree with me that he's
11 asking, hey, do any of these chains actually have a
12 documented CSMP, Controlled Substance Monitoring
13 Program?  Isn't he asking that?  Could somebody tell
14 me?
15    MS. HENN:  Objection to form.
16 Mischaracterizing the document.
17 BY MR. KENNEDY:
18    Q.    Right?
19    A.    Again, what is written is a request
20 if they have a documented CSMP process that they
21 could share.
22    Q.    The process that you tell me that
23 McKesson is relying upon when it gives its proxy of
24 due diligence to these big national accounts; right?
25    MS. HENN:  Objection to form.

Page 237

1 BY MR. KENNEDY:
2    Q.    Isn't that right?
3    A.    No, that's not accurate.  We -- we
4 utilize the retail national account headquarters, as
5 I said.  We didn't necessarily review or have
6 available to us the documentation they had.  We had
7 interactions with them and confidence in their
8 ability to oversee their pharmacies.
9    Q.    Well, not so much interaction that
10 Mr. Oriente even knows who to call; right?
11    MS. HENN:  Objection to form.
12    THE WITNESS:  Again, I think it's simply, as
13 I read this and understand the question, is more of
14 an update and clarification of who the contact people
15 are.
16    MS. HENN:  Go off the record.
17    THE VIDEOGRAPHER:  We are going off the
18 record.  The time is 2:29 p.m.
19    (Recess taken.)
20    THE VIDEOGRAPHER:  We are back on the
21 record.  The time is 2:46 p.m.
22 BY MR. KENNEDY:
23    Q.    Mr. Walker, we have been talking
24 about the large national --
25    THE VIDEOGRAPHER:  Sorry, Counsel, your

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 microphone.
2 　　　　MR. KENNEDY: Oh, yeah.
3 　　　　Q.　　All right. Let me start all over.
4 Mr. Walker, we have been talking about the large
5 national accounts, and I want to talk specifically
6 about CVS; all right?
7 　　　　A.　　Okay.
8 　　　　Q.　　CVS was a large national account;
9 were they not?
10 　　　　A.　　CVS is a large national retail chain.
11 　　　　Q.　　More than that, CVS, certainly while
12 you were at McKesson, was -- they were McKesson's
13 largest customer; were they not?
14 　　　　MS. HENN: Objection to form. Lacks
15 foundation.
16 　　　　THE WITNESS: I don't recall specifically
17 where they were. They were a large customer, but we
18 were not the sole supplier. So I don't know exactly
19 what their position was in our business.
20 BY MR. KENNEDY:
21 　　　　Q.　　Well, you know that in the 2010,
22 2012, 2014 era, they were a customer purchasing in
23 excess of $10 billion --
24 　　　　MS. HENN: Objection to form. Lacks
25 foundation.

Page 239

1 BY MR. KENNEDY:
2 　　　　Q.　　-- from McKesson? Did you know that?
3 $10 billion?
4 　　　　A.　　I don't have any specific knowledge
5 of what their sales volume was then.
6 　　　　Q.　　In 2008, when the Controlled
7 Substance Monitoring Program was first implemented,
8 as we have talked about, it was based certainly in
9 large part on a system of thresholds; true?
10 　　　　A.　　Yes.
11 　　　　Q.　　And do you remember yourself and
12 others at McKesson -- McKesson having to have a lot
13 of discussions with CVS about the implementation of
14 this threshold system with CVS? Do you remember
15 that?
16 　　　　A.　　I -- I recall that there was a lot of
17 interaction with CVS as we were implementing the
18 thresholds for the national accounts.
19 　　　　Q.　　Well, you remember CVS in particular
20 was concerned about this monthly opioid threshold and
21 it interfering with their business? Do you recall
22 that with CVS?
23 　　　　MS. HENN: Objection to form.
24 　　　　THE WITNESS: What I recall is that CVS was
25 concerned about thresholds in general. And at the

Page 240

1 time we were working with CVS to ensure that we had
2 correct data to establish the thresholds for each of
3 the pharmacies that we served.
4 BY MR. KENNEDY:
5 　　　　Q.　　Well, correct data. CVS refused to
6 give you dispensing data; didn't they? Despite
7 repeated asks, CVS refused to give McKesson their
8 dispensing data; true?
9 　　　　MS. HENN: Objection to form. Lacks
10 foundation.
11 　　　　THE WITNESS: I don't think that is
12 accurate. What I believe CVS's discussion was, was
13 more around their sales data. And we -- to my
14 knowledge, we never requested any prescription data
15 from them.
16 BY MR. KENNEDY:
17 　　　　Q.　　Sales data, that would tell you
18 exactly how much oxycodone they were selling at each
19 particular store; correct?
20 　　　　MS. HENN: Objection to form.
21 　　　　THE WITNESS: Not -- not necessarily.
22 What -- the discussions that we had with CVS were
23 really centered around -- because they were -- in
24 addition to being a self-warehousing national account
25 and having other suppliers, it was really centered

Page 241

1 around our -- the information we needed to provide
2 them with the controlled substances that they
3 purchased from us and establishing the thresholds
4 under the CSMP.
5 BY MR. KENNEDY:
6 　　　　Q.　　And they refused to give you the data
7 you asked for; didn't they?
8 　　　　MS. HENN: Objection to form. Lack of
9 foundation.
10 BY MR. KENNEDY:
11 　　　　Q.　　They refused to give you the data you
12 asked for starting in 2008? They refused?
13 　　　　A.　　I don't recall that they refused. We
14 had a lot of discussions. I don't recall that
15 they --
16 　　　　Q.　　We will go over them.
17 　　　　A.　　-- that they never provided. That's
18 what I don't remember.
19 　　　　MR. KENNEDY: We will go through the
20 refusals. We will do that at one at a time.
21 　　　　Let's start with 698. Let's start in 2008
22 and your discussions with CVS and trying to get them
23 involved with your monitoring program.
24 　　　　　　(Exhibit No. 698 was marked.)
25 　　　　MR. KENNEDY: -627161 to -162.

Page 242

1    THE WITNESS: Can I have a minute to review.
2 I just --
3    MR. KENNEDY: Please. Please.
4    THE WITNESS: -- haven't seen the document
5 before.
6    (Witness reviewing document.)
7    THE WITNESS: Okay.
8 BY MR. KENNEDY:
9    Q.    All right. Let's start at the
10 bottom. That's the first email in time. This is
11 from Michael Oriente, an email; correct?
12    A.    Yes.
13    Q.    And he was one of the Directors of
14 Regulatory Affairs, who at that time was monitoring
15 the CVS stores; would that be accurate?
16    A.    I believe that's correct.
17    Q.    And it's April 24, 2008. This is
18 about the time that you're beginning the
19 implementation of the monitoring program at McKesson;
20 true?
21    A.    Yes, we were implementing.
22    Q.    And this is an email to you; right?
23    A.    It's addressed to me.
24    Q.    And he is recapping a call with CVS
25 on that day; right?

Page 243

1    A.    Yes.
2    Q.    And he starts off, "Don" -- and
3 that's you. And he states:
4        (Reading) On this afternoon, CC with
5        Brian Whalen from CVS, Ned, Dan and
6        Elaine these issues were discussed.
7        No. 1, timing of implementation of
8        McKesson's Controlled Substance
9        Monitoring Program, dash, tentative
10       date 6-1 go live (end of reading).
11    Do you see that?
12    A.    Yes.
13    Q.    So talking about our threshold
14 system, we're going to start to apply that to CVS
15 tentatively on 6-1-08; right?
16    A.    Yes.
17    Q.    Right below the "4," let's look at
18 that next paragraph, where it starts with, "It was
19 discussed." Do you see that? And does it state:
20       (Reading) It was discussed that CVS
21       has an internal monitoring program
22       that drills down to the NDC number of
23       their stores (end of reading).
24    So they are talking about CVS has its own
25 internal order monitoring program that drills down to

Page 244

1 NDC. And NDC is a specific drug code; right?
2    A.    Yes.
3    MS. HENN: Objection to form.
4 BY MR. KENNEDY:
5    Q.    Okay. (Reading) It was discussed
6       that CVS has an internal monitoring
7       program that drills down to NDC number
8       for their stores. It is called Viper
9       (end of reading).
10    Do you see that?
11    A.    I see that in the document.
12    Q.    So was it your understanding from
13 this that CVS had its own Suspicious Order Monitoring
14 Program called Viper?
15    MS. HENN: Objection to form. Lacks
16 foundation.
17    THE WITNESS: I don't recall in the
18 discussions with CVS, and I don't remember this --
19 this memo. And I'm not -- I just don't recall any
20 discussion around Viper.
21 BY MR. KENNEDY:
22    Q.    Well, let me ask you -- let's just
23 read it.
24       (Reading) It was discussed that CVS
25       has an internal monitoring program

Page 245

1       that drills down to NDC number for
2       their stores. It is called Viper (end
3       of reading).
4    Would you read that to mean that CVS had its
5 own Suspicious Order Monitoring Program called Viper?
6    MS. HENN: Objection to form. Asks for
7 speculation.
8    THE WITNESS: I am not certain what Michael
9 is referring to. They talk about an internal
10 monitoring system, a program, that -- for the stores,
11 but I don't read this to mean a suspicious order
12 reporting program. I just don't understand, because
13 I don't recall the discussion or -- around Viper and
14 don't have any recollection of Viper.
15 BY MR. KENNEDY:
16    Q.    Well, Viper would have come -- that
17 name and -- that name of the program would have come
18 from CVS; right?
19    MS. HENN: Objection to form.
20    THE WITNESS: It appears it came from CVS,
21 yes.
22 BY MR. KENNEDY:
23    Q.    The next states:
24       (Reading) Ned asked Brian if they
25       could share some of the information on

Highly Confidential - Subject to Further Confidentiality Review

Page 246

1  the program so we can better
2  understand how theirs works and
3  determine if that monitoring would
4  allow for CVS threshold setting to be
5  able to take that into account (end of
6  reading).
7      So they're asking that CVS provide more
8  detail on their monitoring of opioid orders; correct?
9      MS. HENN: Objection to form. Lacks
10 foundation.
11     THE WITNESS: What I read is, again, it is
12 does CVS have a tool that would help us in
13 establishing the thresholds for their stores.
14 BY MR. KENNEDY:
15     Q.   They are talking about monitoring;
16 aren't they? Where does it say anything about
17 thresholds? It says "monitoring." "Monitoring."
18 Doesn't it?
19     A.   The top line says "monitoring."
20     What I was answering, Counsel, was in the
21 last line, where it -- their monitoring would help
22 allow for threshold setting, to take it into account,
23 was really, as I read this from Michael, an attempt
24 to get additional information to expedite and help us
25 with the establishment of thresholds for the CVS

Page 247

1  accounts.
2  BY MR. KENNEDY:
3      Q.   Well, sir, in all of what we have
4  been talking about with respect to your reliance on
5  corporate headquarters at the big national chains,
6  hasn't your testimony always been that you relied
7  upon the big national chains to have a Suspicious
8  Order Monitoring Program?
9      MS. HENN: Objection to form. Lacks
10 foundation.
11 BY MR. KENNEDY:
12     Q.   Isn't that what you've been saying?
13     MS. HENN: Same objections.
14     THE WITNESS: I think, more specifically, my
15 response was that we relied on their -- their
16 regulatory oversight of both their pharmacies and
17 their distribution to help us understand their
18 processes and help us manage our Controlled Substance
19 Monitoring Program.
20 BY MR. KENNEDY:
21     Q.   Right. And that would include your
22 understanding that the pharmacy, such as CVS, had a
23 Suspicious Order Monitoring Program; correct?
24     MS. HENN: Objection to form. Lacks
25 foundation.

Page 248

1      THE WITNESS: I would -- I would
2  speculate -- I'd be speculating on what -- other than
3  what's written here, on what Viper really was.
4      I don't read that to be a Suspicious Order
5  Monitoring Program. I don't know if this is an
6  internal monitoring program of the pharmacies
7  specifically and some of their methodologies other
8  than suspicious orders, or if it is, in fact, a
9  suspicious order monitoring system.
10 BY MR. KENNEDY:
11     Q.   And I'm just -- forget Viper. Put it
12 aside.
13     Wouldn't McKesson want to know whether or
14 not CVS had a Suspicious Order Monitoring Program?
15 Isn't that something that McKesson would want to
16 know? Do you have a Suspicious Order Monitoring
17 Program before we rely upon your regulatory
18 department at corporate headquarters?
19     MS. HENN: Objection to form. Lacks
20 foundation.
21     THE WITNESS: As part of our discussions and
22 diligence with their headquarters, we may or may not
23 have asked whether they specifically had a Suspicious
24 Order Monitoring Program at their -- at their
25 distribution centers for their pharmacies.

Page 249

1  BY MR. KENNEDY:
2      Q.   All right. So when we looked back at
3  that email from Ms. Thomet, where she said that
4  McKesson was giving its proxy of due diligence to the
5  big national chains, you gave your proxy to big
6  national chains -- I just want to be clear, you gave
7  your proxies to big national chains without knowing
8  whether or not they had a Suspicious Order Monitoring
9  Program?
10     MS. HENN: Objection to form.
11 BY MR. KENNEDY:
12     Q.   Is that your testimony, sir?
13     MS. HENN: Lacks foundation.
14     THE WITNESS: What I can't answer is whether
15 or not we determined at the time that we interacted
16 with these national chains, at that point in time
17 whether they had a Suspicious Order Monitoring
18 Program in place or not.
19 BY MR. KENNEDY:
20     Q.   You did not determine that?
21     A.   At that point in time I don't believe
22 so. Or "I don't know," is my response. In 2008, we
23 were just rolling out CSMP, but I don't know whether
24 we asked every chain that question or not.
25     Q.   In 2009 did you ask the chains --

Highly Confidential - Subject to Further Confidentiality Review

Page 250

1  before you gave them your proxy on due diligence, did
2  you ask chains in 2009, such as CVS, whether or not
3  they had a Suspicious Order Monitoring Program?
4      MS. HENN: Objection to form.
5  BY MR. KENNEDY:
6      Q.   In relation to outside orders, not
7  what they were distributing themselves, but what they
8  were getting from McKesson?
9      MS. HENN: Objection to form. Lacks
10  foundation. Mischaracterizing the document.
11  BY MR. KENNEDY:
12      Q.   Did you ask that in 2009?
13      A.   I don't know.
14      Q.   In 2010 did you ask the big chain
15  pharmacies, including CVS, whether or not they had a
16  Suspicious Order Monitoring Program that covers
17  orders that they placed with McKesson? Did you ask
18  them that in 2010?
19      A.   I don't know.
20      Q.   In 2011 did you ask the big national
21  chains, including CVS, whether or not they had
22  Suspicious Order Monitoring Programs in relation to
23  opioids that they were purchasing from McKesson?
24      A.   I do not know.
25      Q.   And, sir, you were -- you were in

Page 251

1  charge of all the regulatory during this period, were
2  you not, 2010, 2011, and 2012? You were in charge --
3      A.   Yes.
4      Q.   -- correct?
5      And these big national chains made up the
6  majority of your sales of opioids, and you don't
7  know; is that right?
8      MS. HENN: Objection to form. Lacks
9  foundation.
10  BY MR. KENNEDY:
11      Q.   You do not know whether you even
12  asked them whether or not they had a Suspicious Order
13  Monitoring Program? You don't know?
14      A.   I do not know whether we asked that
15  question.
16      Q.   What about 2013? In 2013 did you
17  ever ask any of the big chains, anybody at McKesson
18  ever ask any of the big national chains, including
19  CVS, whether or not they had a Suspicious Order
20  Monitoring Program?
21      MS. HENN: Objection to form. Asks for
22  speculation.
23      THE WITNESS: I do not know.
24      MR. KENNEDY: We were talking about CVS, I
25  believe, in April of '08. Let's go four months

Page 252

1  later, in July of '08.
2      THE REPORTER: What number is that?
3      MR. ASQUITH: 699.
4      (Exhibit No. 699 was marked.)
5  BY MR. KENNEDY:
6      Q.   I'm going to ask you about page -70?
7      MS. URQUHART: Could we get a Bates number?
8      MR. KENNEDY: -627168 to -172.
9      Q.   On page -170 --
10      A.   Can you just -- I haven't seen this
11  document. I am not familiar with it at all.
12      Q.   Okay. All right.
13  (Witness reviewing document.)
14      A.   Okay.
15      Q.   Go to page -170, please. Do you see
16  there, there is an email from Mr. Oriente, dated
17  July 22, 2008. And this email is to you; correct?
18      A.   Yes.
19      Q.   And you're responsible for Regulatory
20  at that point in time; are you not?
21      A.   Yes, I'm still responsible for
22  Regulatory.
23      Q.   And it says:
24      (Reading) CVS to start CSMP on 7-1-08
25      (end of reading).

Page 253

1      So now it's a month later that you're
2  getting them on the monitoring program than what was
3  originally intended; right?
4      A.   Yes.
5      Q.   And does it state:
6      (Reading) Don -- and this is -- this
7      is to you -- Elaine is asking that
8      we -- excuse me. Elaine is asking
9      that with this being CVS's first month
10      on the program, that certain stores
11      during this first month get reviewed
12      and thresholds tweaked before the
13      customer is consulted. Do we want to
14      have CVS provide us a blanket
15      Threshold Change Request for the first
16      month? They have their own monitoring
17      system, Viper, in place. Should I
18      request a Threshold Change Request for
19      each CVS store or can one suffice for
20      the chain? And are you okay with the
21      adjusting of CVS's thresholds similar
22      to Rite Aid's (end of reading)?
23      Now, first, they are talking about a
24  monitoring system called Viper. What did you
25  understand that to mean? That controlled substance

Highly Confidential - Subject to Further Confidentiality Review

Page 254

1 orders are being monitored by a system called Viper?

2     A.   As I stated in previous testimony, I

3 don't recall Viper, other than what is acknowledged

4 here, that it's a monitoring system. But, again, I

5 don't know -- have any detail or recollection of how

6 Viper operated.

7     Q.   Well, let me ask you this. What do

8 you think Viper was monitoring? Was it monitoring

9 controlled substances?

10     MS. HENN: Objection. Calls for

11 speculation.

12 BY MR. KENNEDY:

13     Q.   Or you just don't have any idea?

14     A.   I can't speculate, because I just

15 don't know.

16     Q.   Well, this whole email is about the

17 Controlled Substances Monitoring Program; isn't it?

18     A.   Yes, it is.

19     Q.   And it says that CVS has got a

20 monitoring program. Do you think they are monitoring

21 something other than controlled substances?

22     A.   Again, I don't have any -- any

23 specific knowledge or -- other than to speculate that

24 that's about controlled substances.

25     Q.   So you think that they're talking

Page 255

1 about monitoring toothbrushes?

2     MS. HENN: Objection to form. Asked and

3 answered. Calls for speculation.

4     THE WITNESS: Counsel, I'm trying to be

5 clear that I did not and do not understand what Viper

6 monitored, and, therefore, I can't answer your

7 question specifically whether it did or did not

8 include anything other than controlled substances or

9 whether -- you know, what it oversaw.

10 BY MR. KENNEDY:

11     Q.   Well, let me -- this is an email to

12 you. You're in charge of Regulatory, which relates

13 to controlled substances; right?

14     A.   Yes.

15     Q.   The topic -- or the subject of the

16 email is your Controlled Substances Monitoring

17 Program; correct? Correct?

18     A.   Yes.

19     Q.   They are talking about thresholds and

20 Threshold Change Requests relating to controlled

21 substances; are they not?

22     A.   Yes.

23     Q.   Right? They are talking about

24 thresholds in relationship to controlled substances;

25 are they not?

Page 256

1     A.   The discussion is around thresholds

2 and controlled substances.

3     Q.   And so where it says they have a

4 monitoring program at CVS, isn't it real easy to

5 conclude that they are talking about monitoring of

6 controlled substances when you read this?

7     MS. HENN: Objection to form. Asked and

8 answered. Calls for speculation. Guess.

9     THE WITNESS: Counsel, I am trying to

10 testify to that which I know. I do not know exactly

11 what Viper monitored.

12 BY MR. KENNEDY:

13     Q.   All right. And you can't put all of

14 the content of this email together and conclude that

15 Viper is monitoring controlled substances? You can't

16 do that; is that what you're telling us? Under your

17 oath, on the record, you can't put all that together

18 from this email that you received?

19     MS. HENN: Objection to form. Asked and

20 answered. Calling for speculation.

21     THE WITNESS: Very clearly, I can only

22 testify to that which I absolutely know.

23 BY MR. KENNEDY:

24     Q.   When you got this email, let me -- I

25 don't see a follow-up email, where you sent an email

Page 257

1 back to Michael Oriente and said, Michael, this email

2 that you sent to me is all about monitoring

3 controlled substances and our Controlled Substances

4 Monitoring Program, and you're talking about

5 thresholds for controlled substances, and you're

6 talking about increases for controlled substances,

7 but when you say "monitoring program," I don't know

8 what you're talking about?

9     Do you send that kind of email back to him

10 saying, I don't know what you're talking about when

11 you say "monitoring program"?

12     I don't see that follow-up. Did you send

13 that email back?

14     MS. HENN: Objection to form.

15     THE WITNESS: Not that I recall.

16 BY MR. KENNEDY:

17     Q.   Do you remember looking at this email

18 and saying, boy, monitoring program, what is he

19 talking about? What is he talking about? Monitoring

20 what? Do you recall thinking that?

21     A.   I don't remember this -- this email

22 or this transaction at all.

23     Q.   Do you see a follow-up email so you

24 could understand what they are monitoring?

25     A.   In this --

Page 258

1       MS. HENN: Objection to form.
2       THE WITNESS: In this document, no.
3    BY MR. KENNEDY:
4       Q.    So, just for the record, is it your
5    position that reading this email, you don't know what
6    CVS says they are monitoring? Is that your final
7    position, so we can move on?
8       MS. HENN: Objection. Asked and answered.
9    Calling for speculation.
10      THE WITNESS: What my testimony is, is they
11   have a monitoring system, which is, as I read here,
12   called Viper. Again, it doesn't describe what it
13   monitors, whether it's all controlled substances,
14   partial controlled substances, cough syrups,
15   anything.
16   BY MR. KENNEDY:
17      Q.    So now you think it might involve
18   controlled substances in that answer. That's a
19   little different than what we've heard.
20      MS. HENN: Objection to form.
21   Mischaracterizes the testimony.
22   BY MR. KENNEDY:
23      Q.    Do you think it might just relate to
24   controlled substances?
25      A.    I think my testimony was specific. I

Page 259

1    didn't know exactly what it was monitoring or
2    referring to.
3       Q.    Oh, okay. Let me ask you, would you
4    agree with me that McKesson had an obligation under
5    the law to know whether or not their monitoring
6    system at CVS related to controlled substances? You
7    were required to know that?
8       A.    Our obligation --
9       MS. HENN: Objection to form.
10      THE WITNESS: Our requirement and obligation
11   was to ensure that we were managing our program to
12   comply with the Federal Regulations that had to do
13   with distributors.
14      MR. KENNEDY: All right. Would you read my
15   question back. I want you to listen carefully and
16   answer my question, please. I don't want just the
17   general speech. I just want you to answer my
18   question, if you would.
19      (Record read as follows: QUESTION:
20      Let me ask you, would you agree with
21      me that McKesson had an obligation
22      under the law to know whether or not
23      their monitoring system at CVS related
24      to controlled substances? You were
25      required to know that?)

Page 260

1       MS. HENN: Objection to form.
2       THE WITNESS: Then my answer to the question
3    is that it's not a requirement under the Federal
4    Regulation.
5    BY MR. KENNEDY:
6       Q.    And that's what you believe now, and
7    that's what you believed in 2008; right? Is that
8    right?
9       A.    My belief now, as it was then, is
10   that we had a responsibility to comply to the
11   regulations associated with distribution of
12   controlled substances.
13      Q.    And what you -- and I concede that
14   what you just told me -- we're going to write this
15   down so we get it right -- your position is that you
16   were not legally required to know whether or not CVS
17   had a monitoring program in 2008; is that your
18   testimony?
19      MS. HENN: Objection to form.
20      THE WITNESS: Our responsibility was to
21   operate systems that complied with the regulations
22   regarding the distribution and handling of controlled
23   substances.
24      MR. KENNEDY: Would you read my question
25   back, please.

Page 261

1       (Record read as follows: QUESTION:
2       What you just told me -- we're going
3       to write this down so we get it
4       right -- your position is that you
5       were not legally required to know
6       whether or not CVS had a monitoring
7       program in 2008; is that your
8       testimony?)
9       MS. HENN: Objection to form.
10      THE WITNESS: Our regulatory responsibility
11   was very specific in terms of distribution and the
12   handling and distribution of controlled substances.
13      MR. KENNEDY: Could I have the Elmo, please.
14      Q.    Let me ask you -- is it your -- is it
15   your testimony that McKesson was not required to know
16   whether CVS had a Controlled Substance Monitoring
17   Program?
18      MS. HENN: Objection to form. Asked and
19   answered.
20      THE WITNESS: Under the regulation, we were
21   required to operate a system for the handling and
22   distribution of controlled substances. And how we
23   did that was at our discretion.
24   BY MR. KENNEDY:
25      Q.    Is it your position that McKesson, in

Page 262

1 the exercise of its discretion, was not required to
2 know whether CVS had a Controlled Substance
3 Monitoring Program?
4      MS. HENN: Same objection.
5      THE WITNESS: Again, counsel, I'm trying to
6 answer your question. Because what we are required
7 to do, as I understand, is to manage a program under
8 the CFR on the handling and distribution of
9 controlled substances.
10 BY MR. KENNEDY:
11      Q.   And I'm asking you very specifically,
12 did that requirement include the requirement to know
13 whether CVS had a Controlled Substance Monitoring
14 Program?
15      MS. HENN: Objection to form.
16      THE WITNESS: Again, I understand the
17 regulation. I understand what our requirements were.
18 I did not -- I do not understand that there's any
19 requirement on how we execute that specifically.
20 BY MR. KENNEDY:
21      Q.   So then your answer would be -- am I
22 correct your answer would be, you did not believe
23 that McKesson was required to know whether or not CVS
24 had a Controlled Substance Monitoring Program? Is
25 that your testimony?

Page 263

1      MS. HENN: Objection to form.
2      THE WITNESS: I would -- the answer is, we
3 weren't required. It would be helpful but not
4 required.
5      MR. KENNEDY: Mark this, please.
6      THE REPORTER: 803.
7           (Exhibit No. 803 was marked.)
8      MR. KENNEDY: I show you Exhibit 700.
9           (Exhibit No. 700 was marked.)
10 BY MR. KENNEDY:
11      Q.   I show you Exhibit 700, which is
12 -555948 to -950.
13      (Witness reviewing document.)
14      Q.   You get an email from Elaine Thomet,
15 August 26, '08. We're still talking about CVS, and
16 it is -- you are copied on this email; are you not?
17      A.   Yes, I am.
18      Q.   And it says:
19      (Reading) Team, here's the recap from
20      our meeting with Don this morning (end
21      of reading).
22 And Don is you; right?
23      A.   Yes.
24      Q.   And it says:
25      (Reading) No. 1, Don will continue to

Page 264

1      allow McKesson to increase CVS
2      thresholds as needed to avoid omits
3      through the end of August without
4      receiving advance validation from CVS
5      (end of reading).
6 Tell the jury what that means.
7      A.   We agreed to increase thresholds as
8 needed. We -- I do recall this specifically.
9      We had experienced a data issue in terms of
10 the data that CVS provided to establish the
11 thresholds. And to ensure that we were getting
12 medications to pharmacies to fill scripts across the
13 network, we wanted to ensure that we -- to provide
14 them with orders.
15      Q.   They weren't providing you with
16 dispensing data; were they?
17      MS. HENN: Objection to form.
18 BY MR. KENNEDY:
19      Q.   CVS wasn't providing you with
20 dispensing data that you were asking for to set the
21 thresholds; correct?
22      MS. HENN: Objection to form. Lacks
23 foundation.
24      THE WITNESS: More accurately, CVS was not
25 providing all of the sales data we needed. We never

Page 265

1 asked for the prescription data.
2 BY MR. KENNEDY:
3      Q.   You were asking them for sales data
4 so you could accurately set sales threshold, and CVS
5 refused to give you the sales database; true?
6      MS. HENN: Objection to form. Lacks
7 foundation.
8 BY MR. KENNEDY:
9      Q.   Is that right?
10      A.   Just a minute. I don't recall that
11 they -- that this is true. At this point in time, my
12 recollection is that with the data that they were
13 providing us, we were establishing their thresholds.
14 But my recollection was, is that the data was not
15 accurate or incomplete. It was more of a data issue
16 than it was a refusal for them to provide
17 information.
18      Q.   And they continue to refuse in '08
19 and '10 and '12 and '14; didn't they?
20      MS. HENN: Objection to form. Lacks
21 foundation.
22 BY MR. KENNEDY:
23      Q.   Didn't they, Mr. Walker?
24      A.   I don't recall that they refused to
25 provide data going forward.

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1  Q.  And then it says that you're going to
2  increase their thresholds without CVS validating the
3  increases; isn't that what it says?
4  A.  That's what it says.  And, again,
5  this was a rollout period to CVS, where the issues
6  were more data issues than they were any other
7  issues, to ensure that we had the appropriate
8  threshold sets for the pharmacies based on the size
9  and volume of that particular pharmacy.
10  Q.  Did you ever represent or tell the
11  DEA that you would be increasing thresholds without
12  any validation from the customer?  Did you ever tell
13  the DEA that you would be doing that?
14  MS. HENN:  Objection to form.  Lacks
15  foundation.
16  THE WITNESS:  I don't believe we had any
17  conversation with the DEA around the on-boarding of
18  CVS and CSMP.
19  BY MR. KENNEDY:
20  Q.  Then you state:
21  (Reading) No. 2, Don indicated that
22  the process cannot continue beyond
23  August.  Going forward, in order to
24  meet McKesson's obligation to the DEA,
25  all Threshold Change Requests will

Page 267

1  require documented advance validation
2  from CVS in order for McKesson to
3  increase their thresholds to avoid
4  omit (end of reading).
5  Is that what you stated?
6  MS. HENN:  Objection to form.
7  Mischaracterizes the document.
8  THE WITNESS:  I don't recall the --
9  specifically what I said.  That's what is in the
10  document here by Elaine.
11  BY MR. KENNEDY:
12  Q.  No validation to the end of August,
13  and then you were going to require it to meet your
14  obligations to the DEA; correct?
15  You weren't meeting your obligations up
16  until the end of August, but you were going to start
17  meeting your obligations to the DEA by the end of
18  August; is that what it says?
19  MS. HENN:  Objection to form.  Lacks
20  foundation.
21  BY MR. KENNEDY:
22  Q.  Is that what that means?
23  A.  No, that's not accurate.  What --
24  what we were in the middle of is the execution of
25  CSMP, a very complex rollout.  We were trying to

Page 268

1  ensure that we had legitimate medications that were
2  required for patients to reach the pharmacies without
3  a systemic block that was not justified.
4  Q.  Well, when you state here, going
5  forward, with respect to CVS, Threshold Change
6  Requests will require documentation, advance
7  validation from CVS in order for McKesson to increase
8  their thresholds -- do you see that statement?
9  A.  I see that is written here, yes.
10  Q.  And you indicated that that's what
11  was going to happen with CVS going forward after
12  August of '08; correct?
13  A.  Again, I don't have a specific
14  recollection of this meeting or these events.  It is
15  what Elaine Thomet is representing in this document.
16  Q.  Did you email it back and say you're
17  wrong, Elaine, that's not what -- that's not what I
18  said?
19  A.  I don't recall.
20  MS. HENN:  Objection to form.
21  BY MR. KENNEDY:
22  Q.  Well, let's -- I want to -- this is
23  important.  It states:
24  (Reading) Going forward, in order to
25  meet McKesson's obligation to the DEA,

Page 269

1  all Threshold Change Requests -- all
2  capitals -- all Threshold Change
3  Requests will require documented
4  advance validation from CVS in order
5  for McKesson to increase their
6  thresholds (end of reading).
7  Do you see that?  Is that what is stated at
8  least here?
9  A.  That's -- yes, that's what's stated
10  in here.
11  Q.  And that never happened; did it?
12  MS. HENN:  Objection to form.  Lacks
13  foundation.
14  BY MR. KENNEDY:
15  Q.  That never happened with CVS; did it?
16  This requirement that you stated that going forward,
17  going forward, for all Threshold Change Requests, we
18  will require documented advance validation from CVS,
19  that never happened with respect to CVS; did it?
20  A.  I don't believe that that's accurate.
21  What I can't tell you is specifically.  But I don't
22  believe that to be accurate.
23  Q.  So you believe for all Threshold
24  Change Requests, with respect to CVS, McKesson
25  required advanced documented validations; is that

Page 270

1  what your statement is? That's what you required?
2      A.    What I recall is we required advanced
3  validation from CVS. What I can't testify to is
4  whether all took place. But your earlier statement
5  was, we didn't do it at all. That's not correct.
6      Q.    All right. Well, let's take a look.
7  And you said -- this is what we have to do to meet
8  our DEA obligations; right? Advance documented
9  validation to meet our DEA obligations; that was the
10  statement in this email, was it not?
11      A.    That's what's written in the email.
12      MR. KENNEDY: All right. Let's go forward,
13  then, a couple months into this, in November of '08,
14  and look at 701.
15          (Exhibit No. 701 was marked.)
16  BY MR. KENNEDY:
17      Q.    I'm looking at the Elaine Thomet's
18  email, November 12 of 2008, to you and others. But
19  it's sent to you.
20      The second bullet point down, does it
21  state -- and this is two months after you're saying
22  we're going to need advance documented validation
23  from CVS for any increase:
24          (Reading) Going forward, any CVS
25          pharmacy that encroaches upon these

Page 271

1          new thresholds will be increased by
2          the Regulatory Affairs team without
3          CVS explanations so long as they don't
4          fall into a category we've identified
5          as "unusual" thus requiring further
6          explanation from CVS (end of reading).
7      So explanation from CVS on increasing its
8  threshold was now going to be the exception, not the
9  rule; correct?
10      A.    Hang on just a minute. I'm just
11  catching up with you.
12      Q.    Did I read that right?
13      A.    That's -- I believe so. I wasn't
14  keeping up with you when you were reading it. But I
15  believe that's correct.
16      Q.    It goes on. Do you see, "Don feels
17  comfortable"?
18          (Reading) Don feels comfortable with
19          this approach of not requiring any
20          explanation. Don feels comfortable
21          with this approach since we're talking
22          about lower-end thresholds that are
23          very easily explainable by natural
24          growth we're seeing in their purchase
25          patterns and because we know CVS is

Page 272

1          also co-managing on their side with
2          Viper (end of reading).
3      So you're comfortable -- you're comfortable
4  with increasing thresholds with no explanation from
5  CVS because they have -- they are managing with
6  Viper; do you see that?
7      MS. HENN: Objection to form.
8  Mischaracterizes the document.
9      THE WITNESS: I see what is written here.
10  BY MR. KENNEDY:
11      Q.    And you don't know what Viper is;
12  right?
13      A.    I don't remember what Viper is.
14      Q.    Did anybody ever know what Viper was?
15      A.    I don't know.
16      Q.    You don't know.
17      Would you be surprised to know that Viper is
18  not a Controlled Substance Monitoring Program for any
19  controlled substances that CVS purchased from
20  McKesson?
21      MS. HENN: Objection to form. Lack --
22  BY MR. KENNEDY:
23      Q.    Would that be surprising to you?
24      MS. HENN: Objection to form. Lacks
25  foundation.

Page 273

1      THE WITNESS: Again, I don't have any
2  knowledge of Viper, how CVS used Viper, what it did.
3  I just can't answer your question.
4  BY MR. KENNEDY:
5      Q.    Did anybody at McKesson, when they
6  said, we're comfortable -- this said you're
7  comfortable. You're comfortable with this
8  arrangement because they are co-managing with Viper.
9  It says you're comfortable.
10      So if you're comfortable that they are
11  co-managing with Viper, can we agree that you knew
12  what Viper was?
13      MS. HENN: Objection to form.
14      THE WITNESS: No, I don't think that's
15  accurate. I mean, this document is a summary from
16  Elaine Thomet. Those -- those are interpretations
17  that she presented. I don't -- Counsel, I do not
18  remember. I do not have a recollection of Viper.
19  Until I saw it today, I didn't even understand that
20  CVS had a Viper. I'm trying to be clear that I just
21  don't know.
22  BY MR. KENNEDY:
23      Q.    But, again, from this email, if it
24  says you're comfortable with increasing without CVS
25  explanation, and one of the reasons you're

Page 274

1 comfortable is because CVS is managing with the
2 Viper, could you agree that you probably had an
3 understanding of what a Viper was if it was making
4 you comfortable?
5     MS. HENN:  Objection to form.  Asked and
6 answered.
7     THE WITNESS:  Again, I can't testify that I
8 understood Viper enough to be comfortable.  These are
9 Elaine Thomet's words.  They are not mine.  I simply
10 can't answer the question around Viper.
11     MR. KENNEDY:  Let's go to Exhibit 702.
12         (Exhibit No. 702 was marked.)
13     MS. HENN:  Thank you.
14     MR. KENNEDY:  This is an email from Ned.
15     MS. URQUHART:  Could we get the Bates
16 number, please.
17     MR. KENNEDY:  -627150 to -158.
18     Q.    This is from Ned McKenna of McKesson;
19 correct?
20     A.    Yes.
21     Q.    And it's being sent to CVS; correct?
22     A.    Yes.
23     Q.    And it indicates, it says:
24       (Reading) Brian, as we discussed
25         yesterday, I have attached a

Page 275

1         PowerPoint presentation with our
2         findings, based upon our last meeting
3         with the CVS team (end of reading).
4     True?
5     A.    That's what the document says.
6     Q.    Did you see this document, probably
7 back in December of '08?
8     A.    I was copied on it.  I don't -- I
9 don't recall.
10     Q.    Go to page -157.  Do you see the "Go
11 Forward Proposal" on page -157?
12         Bullet point 3.  And this is where McKesson
13 is writing to CVS.  Instead of focusing on every
14 location -- location would be a pharmacy; is that
15 right?  Is that true, sir?
16     A.    Just a second.
17         Okay.  And bullet point 3?
18     Q.    Yeah.  Does it state, "Instead of
19 focusing on every location" -- that would be a
20 pharmacy; true?
21     A.    I would -- that's what's written,
22 would be my understanding.
23     Q.    (Reading) instead of focusing on
24       every location approaching their new
25         threshold, McKesson will seek CVS

Page 276

1         support when such threshold increases
2     are considered extraordinary.
3         Otherwise, McKesson will adjust the
4     thresholds reasonably without further
5     CVS explanation (end of reading).
6     Was that the policy that was adopted?
7     MS. HENN:  Objection to form.
8     THE WITNESS:  The answer to that is, no.
9 What we were engaged in is trying to true up.  Again,
10 as I said, the data issues that we had in terms of
11 establishing CVS's thresholds were extensive.  And
12 those data issues that were then triggered issues of
13 not getting appropriate medications all -- across all
14 of the controlled substances to the CVS pharmacies
15 that needed to fulfill prescriptions for their
16 patients.  So --
17     MS. HENN:  Are you done with your answer,
18 Mr. Walker?
19     THE WITNESS:  Yes.
20 BY MR. KENNEDY:
21     Q.    Is the title of this slide, "Go
22 Forward Proposal"?
23     A.    The title of this slide is Ned
24 McKenna's words, "Proposal."
25     Q.    Pardon me?

Page 277

1     A.    Ned McKenna's words.  It was his
2 document, not nine.
3     Q.    Oh, you don't agree with that?  You
4 don't agree that this was the going forward proposal?
5     A.    Again, I don't have specific
6 recollection of this document.  But I do know at the
7 time that we were working, trying to appropriately
8 true up their threshold numbers across all their
9 pharmacies.
10     Q.    This is now December of 2008.  And
11 this is what's being sent to CVS.  And do you think
12 that this is wrong, when it says, this is the go
13 forward proposal we're making?
14     MS. HENN:  Objection to form.  Asked and
15 answered.
16     THE WITNESS:  Again, as I -- as I read the
17 document, Counsel, it is clearly how -- responding to
18 them to help them understand how we were going to try
19 to, you know, correct what we -- I viewed as a
20 business issue around making sure that the thresholds
21 were appropriate around the business that CVS had.
22 BY MR. KENNEDY:
23     Q.    This is six months into the
24 Controlled Substances Monitoring Program, and you are
25 proposing to CVS that you are going to increase their

Highly Confidential - Subject to Further Confidentiality Review

Page 278

1  thresholds with no explanation from CVS; correct?
2  Isn't that's what's being proposed to them six months
3  into the monitoring program, sir?
4      MS. HENN: Objection to form.
5  Mischaracterizing the document or testimony.
6  BY MR. KENNEDY:
7      Q. True?
8      A. I don't -- I don't think that's -- I
9  don't believe that to be accurate. I think what we
10  are saying is we're going to use the -- based on the
11  bullet point above, use the data that they had
12  provided that was more current and reflected the
13  pharmacy's actual volumes to ensure that the
14  thresholds we were establishing were correct.
15      Q. This is not talking about the
16  establishment of thresholds. Bullet point 3 is
17  talking about threshold increases; is it not?
18      A. Threshold increases. But, again,
19  Counsel, what I'm trying to explain, during this time
20  we had established preliminary thresholds based on
21  what I would determine to be incorrect data, not
22  complete data in terms of the pharmacy volumes. We
23  had pharmacies who were not able to fill
24  prescriptions to their customers, a legitimate, you
25  know, pharmacy, and we were trying to appropriately

Page 279

1  re-establish and, for the lack of a better term, true
2  up their thresholds to ensure that we could
3  accurately create a monitoring program for CVS.
4      Q. Real simple: Does this state that
5  thresholds will be increased without further CVS
6  explanation? Is that what is listed as a
7  going-forward proposal? Is that what it states?
8      MS. HENN: Objection to form.
9  Mischaracterizes the document.
10  BY MR. KENNEDY:
11      Q. Is that what it states?
12      MS. HENN: Asked and answered.
13      THE WITNESS: That is what is written here.
14  BY MR. KENNEDY:
15      Q. And this is what was sent to CVS in
16  this PowerPoint; correct?
17      MS. HENN: Objection to form.
18      THE WITNESS: Based --
19  BY MR. KENNEDY:
20      Q. Is this what was sent to CVS in this
21  PowerPoint?
22      A. Based on the email from Ned, this is
23  the document. And, yes, CVS received this.
24      Q. And is this six months into the
25  implementation of the monitoring program?

Page 280

1      A. This -- the answer is, yes, it was
2  six months into the program, three months after we
3  implemented CVS.
4      MR. KENNEDY: Let's look how that worked,
5  all right? Give me 703, please.
6          (Exhibit No. 703 was marked.)
7      MR. KENNEDY: This is Exhibit 703, -535756
8  to -901.
9      Q. I'm going to start with the bottom
10  email. That's from Dave Gustin. All right?
11      A. Okay.
12      Q. And the subject is, "Hydrocodone
13  Increase." We know what hydrocodone is, right, a
14  controlled substance? Right?
15      A. Yes.
16      Q. And it says:
17          (Reading) We, the DRAs, Directors of
18          Regulatory Affairs, have gotten
19          permission from Don Walker to go in
20          and do a "cross-the-board" 30 percent
21          increase in all stores hydrocodone
22          THD -- (end of reading).
23  What does that stand for?
24      A. I don't know.
25      Q. That's related to the hydrocodone;

Page 281

1  right? So you're going to increase the hydrocodone
2  THD for WM. Is that Walmart?
3      A. I believe so.
4      Q. And CVS.
5          (Reading) It will be -- it will then
6          be the last and only increase that
7          will be done in this month on that
8          base-code. We do not want to
9          piece-meal this and be doing lots of
10          individual increases after today (end
11          of reading).
12  Did I read that right?
13      A. That is what the document says.
14      Q. So you gave permission for a
15  30 percent increase in hydrocodone across all CVS
16  stores?
17      A. Again, I don't recall this event
18  specifically. But the document says cross-the-board
19  30 percent increase.
20      Q. And so this is going to be the last
21  and only increase that will be done on this month;
22  true?
23      MS. HENN: Objection to form.
24  BY MR. KENNEDY:
25      Q. Is that what it says?

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1    A.    That's -- yes, that's what the
2 document says.
3    Q.    Go up above.  Now we're seven days
4 later, an email from Elaine Thomet to all the
5 different folks that are Directors of Regulatory
6 Affairs.  You're copied.  And does it say:
7        (Reading) Hi, Team, I just had a
8        discussion with Don.  And after some
9        review, he approved another 5,000
10       temporary increase on each of the CVS
11       locations, showing up to over
12       90 percent on today's threshold report
13       for hydrocodone (end of reading).
14 Did I read that right?
15    A.    Yes.
16    MR. KENNEDY:  Let's go to 2010.  Now, this
17 is two days -- two years later.  Two years after you
18 said you're going to increase without explanation.
19 You said that wasn't permanent, it was temporary.
20 Now we're two years later with CVS; all right?
21 Exhibit 704.
22        (Exhibit No. 704 was marked.)
23    MR. KENNEDY:  -512900 to -01 and then -02.
24    Q.    If you will go to page -- the first
25 page, -900, Exhibit 704, the bottom email.  That's

Page 283

1 from Rhonda Fargo, that bottom email?
2    A.    The bottom of -900?
3    Q.    Yes.
4    A.    Yes.
5    Q.    And now it's February of 2010, two
6 years after the CSMP has been put into place.  And
7 she's sending an email to different directors in
8 Regulatory Affairs; correct?
9    A.    Yes.
10    Q.    She says:
11        (Reading) Please see attached a
12        Threshold Change Request form for CVS
13        (end of reading).
14 Is that what it states?
15    A.    Yes, it does.
16    Q.    Go two pages later.  This Threshold
17 Change Request is asking for threshold increases on
18 30 different CVS stores all at the same time;
19 correct?
20    MS. HENN:  Objection to form.  Lacks
21 foundation.
22    THE WITNESS:  The -- referring to the
23 Threshold Change Request?
24 BY MR. KENNEDY:
25    Q.    I'm looking at the list -- the next

Page 284

1 page, a list of 30 different CVS stores that are
2 having a threshold increase.
3    MS. HENN:  Same objection.
4 BY MR. KENNEDY:
5    Q.    Do you see that?
6    A.    Again, I don't have a specific
7 recollection of this.  But the document lists a
8 number of CVS pharmacies.
9 BY MR. KENNEDY:
10    Q.    Was that common, 30 CVS stores get an
11 increase all at one time?
12    MS. HENN:  Objection to form.  Lacks
13 foundation.
14    THE WITNESS:  Again, Counsel, I don't know
15 the details behind this request.  There may have been
16 a number of very appropriate business issues related
17 to needing to cover all these pharmacies at a single
18 time.
19 BY MR. KENNEDY:
20    Q.    Well, let's look at the Threshold
21 Change Request, the very next page, -902, and see all
22 of these very important considerations.
23        (Reading) Reason for requested change.
24        This is for 30 CVS stores.  Per the
25        process agreed to with McKesson and

Page 285

1        CVS Loss Prevention Team 2/6/09,
2        Michael Oriente will provide CVS a
3        list of any location requiring CVS
4        validation prior to further TCRs.  For
5        now these threshold increases are
6        considered reasonable (end of
7        reading).
8 Is that what it states?
9    A.    Yes.
10    Q.    And these all got approved; didn't
11 they?
12    MS. HENN:  Objection to form.  Lacks
13 foundation.
14 BY MR. KENNEDY:
15    Q.    Thirty stores?
16    A.    I don't --
17    MS. HENN:  Objection to form.  Lacks
18 foundation.
19 BY MR. KENNEDY:
20    Q.    Thirty stores got approved?
21    MS. HENN:  Same objection.
22    THE WITNESS:  I don't -- I don't whether
23 these were approved or not.  This report was
24 submitted.  I don't know whether the approval went
25 through or not.  I can't tell.

Page 286

BY MR. KENNEDY:

1  BY MR. KENNEDY:
2      Q.   Well, look on page -900.  We were
3  just on that page.  Look at page -900.
4      A.   So, yes, I see that now.
5      Q.   All of them approved?
6      MS. HENN:  Objection to form.  Lacks
7  foundation.
8      Counsel, we're over an hour.  Take a five-,
9  ten-minute break.
10     THE VIDEOGRAPHER:  We are going off the
11 record.  The time is 3:51 p.m.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  We are back on the
14 record.  The time is 4:07 p.m.
15     MR. KENNEDY:  I show you Exhibit 713, which
16 is Bates -627066.
17     (Exhibit No. 713 was marked.)
18 BY MR. KENNEDY:
19     Q.   Do you see that email?  I just wanted
20 to look at the last sentence in that email.
21     A.   I see the email there.
22     Q.   You're right.  Do you see that
23 last --
24     A.   The last sentence at the bottom?
25     Q.   Yes.  Ned is from -- Ned is from

Page 287

1  McKesson?
2      A.   Ned is from McKesson.
3      Q.   They are indicating -- if you look at
4  the second sentence, this would be minimized if CVS
5  would provide store-level uses data.  Do you see
6  that?  And it's 2010; correct?
7      A.   I can't find that.  Just a moment.
8      Q.   The second sentence.  The last
9  sentence starts with "Ned," on the last paragraph --
10 or the sentence that starts with "Ned."
11     (Reading) Ned, we should be over the
12     main hurdle, but realistically there
13     still may be some isolated issues in
14     August (end of reading).
15     Do you see that?  It's -066.  Do you see
16 that?
17     A.   Okay.  Yes, I do.
18     Q.   It says:
19     (Reading) This would be minimized if
20     CVS would provide store-level usage
21     data (end of reading).
22     Do you see that?
23     A.   Yes.
24     Q.   CVS still isn't providing McKesson
25 with store-level usage data at this point; true?

Page 288

1      A.   I don't recall specifically what CVS
2  was providing at the time.  The document indicates
3  that we were not getting store-level usage data.
4      Q.   From CVS; right?
5      A.   From CVS.
6      Q.   In 2008 you requested sales data from
7  CVS, didn't you, to try to set the initial
8  thresholds; true?  We've talked about that.
9      A.   Yes, we -- we -- in 2008, during the
10 time that we were bringing them on board to the CSMP,
11 we requested data to help establish the initial
12 thresholds.
13     Q.   And now it's 2010, and they are
14 saying that we could minimize an issue if we had
15 store-level usage data from CVS.  That's 2010, that
16 statement; correct?
17     A.   Yes.
18     MR. KENNEDY:  All right.  And give me
19 Exhibit 706, please.
20     (Exhibit No. 706 was marked.)
21     MR. KENNEDY:  706, Bates -620748 to -49.
22     Q.   I want to look at the second email
23 down from Ned McKenna to Brian Whalen.  And you are
24 copied.  And this is August 6, 2010.  All right?
25     A.   Yes.

Page 289

1      Q.   And does that email -- and it's CVS
2  Action Plans.  That's the subject; true?  Do you see
3  that?
4      A.   Yes.
5      Q.   And it states:
6      (Reading) FYI, prior to the transition
7      and in an effort to be proactive, as
8      we set the CSMP thresholds for 163
9      stores, we asked CVS for three months
10     of sales data.  We were told we could
11     not have the data.  More recently, we
12     again asked for the most recent three
13     months of sales data from CVS.  Once
14     again, we were told that we could not
15     have the data.  Our thinking with both
16     requests was that if we had CVS actual
17     data, we could collaborate with CVS
18     and set very accurate, functional,
19     controlled substance monitoring
20     thresholds.  Unfortunately, we do not
21     have any CVS sales data except for the
22     McKesson actual sales from July after
23     the transition was up and running.
24     Would it be possible for you to
25     authorize someone at CVS to release

Highly Confidential – Subject to Further Confidentiality Review

Page 290

1 three months of actual sales data to
2 McKesson?  I believe it would be an
3 excellent next step in our achieving
4 our common goal of keeping all of
5 these 164 CVS stores supplied with
6 items (end of reading).
7 Do you see that?
8 A.   Yes.
9 Q.   Did I read that correctly?
10 A.   Yes, you did.
11 Q.   So asked for in '08; 2010 asked for.
12 Let's go up to the response to the question, and this
13 is a response from Brian Whalen, of CVS, to McKesson;
14 true?
15 A.   Yes, that's what it appears to be.
16 Q.   And he says:
17 (Reading) As I am sure you remember,
18 this was the same request McKesson
19 made when McKesson launched the
20 Controlled Substance Monitoring
21 Program a couple of years ago.  CVS
22 was not comfortable releasing this
23 information then, and we aren't
24 comfortable now (end of reading).
25 Did I read that correctly?

Page 291

1 A.   Yes.
2 Q.   They were refusing to give you this
3 data, and this is your second request; true?
4 A.   Probably more accurately stated, I
5 recall this 164 stores.  This was a group of stores
6 that we took on in the 2010 time frame.  So with
7 these 164 stores, this is their initial
8 implementation in the CSMP, not an update on the
9 original CVS group.
10 Q.   This is 2010, two years after the
11 original CSMP; is it not, sir?
12 A.   Two years after we implemented.
13 Q.   Right.  Two years after.  And this is
14 the second time you have requested sales data.  And
15 this is the second time they have said, no; true?
16 MS. HENN:  Objection to form.
17 THE WITNESS:  In the note from CVS, they
18 declined to provide sales data.  CVS viewed that data
19 as proprietary and chose not to share it.
20 MR. KENNEDY:  Let's look at the CVS program
21 and where it led to; all right?  Give me Exhibit 708,
22 please.
23 (Exhibit No. 708 was marked.)
24 BY MR. KENNEDY:
25 Q.   The metadata indicates that this is

Page 292

1 from February 8 of 2010.
2 THE VIDEOGRAPHER:  Sorry, sir.  I think
3 you're hitting the --
4 THE WITNESS:  Oh, did it again.
5 BY MR. KENNEDY:
6 Q.   So this is a list of 1,988 CVS stores
7 with thresholds over 10,000 units a month.  Do you
8 remember this, the creation of this report, of 1,988
9 CVS stores with thresholds over 10,000?
10 MS. HENN:  Objection to form.  Lacks
11 foundation.
12 BY MR. KENNEDY:
13 Q.   And I will represent to you that we
14 counted.
15 MS. HENN:  Same objection.
16 THE WITNESS:  Sir, I don't recognize this --
17 this report at all.  So I'm not familiar with it.
18 MR. KENNEDY:  710, Exhibit 710.
19 (Exhibit No. 710 was marked.)
20 MS. HENN:  Are we done with 708?
21 MR. KENNEDY:  Yes.
22 MS. HENN:  Okay.
23 BY MR. KENNEDY:
24 Q.   Do you see the email -- the email is
25 from Tom McDonald, 2-8-2010; do you see that?

Page 293

1 A.   And it's a CVS threshold discussion.
2 And does it say:
3 (Reading) Continue discussion
4 regarding CVS thresholds, data
5 attached.  I have scrubbed all
6 customers with thresholds below 15,000
7 and all CVS warehouse customers.  So
8 we have pharmacies and mail order
9 pharmacies on this list.  Roughly 470
10 lines on the report.  Should be
11 relatively straightforward to review
12 and analyze (end of reading)?
13 So this is a list in 2010 of 470 CVS
14 pharmacies with thresholds above 15,000 a month;
15 correct?
16 MS. HENN:  Objection to form.  Lacks
17 foundation.
18 BY MR. KENNEDY:
19 Q.   Is that what the email says?
20 A.   What I read is that he's created a
21 report with pharmacies, and trying to understand the
22 report with pharmacies in CVS that have a threshold
23 on a given -- or in controlled substance greater than
24 15,000.
25 Q.   Right.  Remember, I was talking about

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1 the DEA national average of five -- 5,000 a month?
2 Here's a list of 470 CVS stores more than three times
3 the national average, 470. Do you remember getting
4 this report?
5        MS. HENN: Objection to form. Lacks
6 foundation.
7 BY MR. KENNEDY:
8    Q.    Do you remember getting this report?
9    A.    I do not recall seeing this report
10 before. And I wasn't copied on the email.
11       MR. KENNEDY: That's 2010. Let's go two
12 years forward and look at CVS and see how the
13 threshold system was working.
14       Let's go to 2012, Exhibit 709.
15           (Exhibit No. 709 was marked.)
16 BY MR. KENNEDY:
17   Q.    This is from Tom McDonald. Tom
18 McDonald, at this point in time, he was the Director
19 of Regulatory Affairs and was responsible for CVS;
20 was he not?
21       MS. HENN: Objection to form. Lacks
22 foundation.
23 BY MR. KENNEDY:
24   Q.    2012.
25   A.    I believe in 2012 Tom McDonald was --

Page 295

1 oversaw CVS.
2    Q.    And he emails to Ned McKenna, Dustin
3 McCoy, and the subject us, "CVS Controlled Substance
4 Analysis." And this is 2012; all right? And he
5 states:
6        (Reading) Ned, per our discussion,
7        attached is the analysis of CVS
8        accounts that are of concern --
9        all right -- the columns are headed
10       with clear titles of the content.
11       Generally speaking, a customer with
12       ratios of controlled substances to Rx
13       should be between ten and fifteen
14       percent. Additionally, hydrocodone
15       30 milligrams could represent between
16       one quarter or one third of the
17       overall oxy purchases. Do not share
18       this file with the customer. Do not
19       share it with anyone within the
20       company with the exception of Dustin
21       McCoy and John -- Dan Jeffries. Once
22       you have had a chance to review it, we
23       can discuss details and set up a call
24       with CVS (end of reading).
25       So did they not share this with you? You

Page 296

1 were still the boss of Regulatory at this point in
2 time; did they not share this report with you about
3 CVS?
4        MS. HENN: Objection to form. Lacks
5 foundation.
6        THE WITNESS: No, I don't think that's
7 correct. I don't recall this report, but I believe I
8 would have been included under that PGR -- RDRC under
9 the CCs.
10 BY MR. KENNEDY:
11   Q.    And this is a list of 93, 93 CVS
12 pharmacies that are of concern to McKesson? Isn't
13 that what this is, 93 stores?
14       MS. HENN: Objection to form.
15       THE WITNESS: This --
16 BY MR. KENNEDY:
17   Q.    Is that what it says?
18       MS. HENN: Lacks foundation.
19       THE WITNESS: This email from Tom McDonald
20 to Ned, as I read it -- again, I don't recall
21 specifically, but as I read it and look at the data,
22 he is preparing to have discussions as -- with CVS
23 headquarters and highlight the areas of concern that
24 he may have or questions that he may have
25 specifically.

Page 297

1        What I don't know is what the outcome of
2 this was or any actions that were taken by Tom.
3 BY MR. KENNEDY:
4    Q.    Let's go back. My question is real
5 simple: Is this a list of 93 CVS accounts that are
6 of concern to Mr. McDonald at McKesson? Is that what
7 this is?
8        MS. HENN: Objection.
9 BY MR. KENNEDY:
10   Q.    Very simply.
11       MS. HENN: Objection to form. Lacks
12 foundation.
13       THE WITNESS: The document states that,
14 "Attached is an analysis of CVS accounts that are of
15 concern."
16 BY MR. KENNEDY:
17   Q.    And do you understand, from looking
18 at this, every single one of these CVS stores that
19 was of concern at this point in time involved
20 oxycodones?
21   A.    I see the analysis is specific to
22 oxycodone.
23   Q.    And oxycodone, sir, was at the center
24 of the opioid crisis in this country by 2012; was it
25 not?

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    A.    In 2012 oxycodone had been identified
2  as a controlled substance that was being abused.
3    Q.    Not "a." "The."
4    You know well that by 2012 oxycodone was in
5  the middle of the opioid crisis; was it not?
6    A.    It was one of the controlled
7  substances that was of concern being abused.
8    Q.    Let me ask you:  Not one of; was
9  oxycodone the number one addictor and killer in the
10 United States with respect to this opioid crisis by
11 2012?  Number one; was it not, sir?
12   MS. HENN:  Objection to form.  Asked and
13 answered.  And lacks foundation.
14   THE WITNESS:  I can't answer its position.
15 What I can absolutely assure you is that there were
16 other controlled substances that were of concern
17 across the country for abuse.
18 BY MR. KENNEDY:
19   Q.    And so McKesson identifies 93 CVS
20 stores that are of concern involving oxycodones.  The
21 plan is to set up a call with CVS in the future; is
22 that what it says?  "Let's set up a call in the
23 future with CVS."
24   A.    That's what the document says.
25   Q.    They are still shipping them

Page 299

1  oxycodones; aren't they?
2    Did it say here, we have 93 CVS stores that
3  are of concern, we need to stop shipping?  Does it
4  say that?
5    A.    No, it does not.
6    Q.    And when you got this, did you say,
7  oh, if you've got 93 CVS stores that are of concern
8  with respect to oxycodones, stop shipping?  Did you
9  order that at this point when you got this?
10   A.    To my knowledge, no.
11   Q.    Did you tell them, this plan to set
12 up a call with CVS in the future, that's not
13 adequate, we have a crisis going on in this country?
14 Did you tell them that?
15   A.    I don't recall stating that or
16 telling them that.
17   Q.    And nobody's doing any individual
18 investigation of any single one of these 93 stores?
19 You're going to call corporate CVS sometime in the
20 future; that's the plan, correct?
21   A.    As part of our monitoring of our
22 retail national accounts, we were and continue to use
23 the resources at the chain headquarters, particularly
24 in their regulatory group.  In and of itself, the
25 numbers -- he sorted out that the numbers, it could

Page 300

1  be very appropriate for a pharmacy.  But until he
2  conducted the due diligence, which my view of this
3  document he was preparing to do, he couldn't make a
4  determination whether or not there was a concern over
5  the particular pharmacy's purchases.
6    Q.    He already said there were concerns;
7  right?  Look at the first sentence.  "Per our
8  discussions, attached is the analysis of the CVS
9  accounts that are of concern."
10   He's already determined they are of concern;
11 hasn't he?
12   MS. HENN:  Objection to form.
13 BY MR. KENNEDY:
14   Q.    Right?
15   A.    He has -- that is what is written.
16 What the concern is would be his analysis
17 identifying, you know, based on numbers.
18   Q.    And, sir, the law says you stop
19 shipping until you do your due diligence; isn't that
20 what the law says?
21   MS. HENN:  Objection to form.  Lack of
22 foundation.
23 BY MR. KENNEDY:
24   Q.    Right?
25   A.    No, that --

Page 301

1    Q.    This is 2012.
2    A.    Can I finish, Counsel.
3    MS. HENN:  Yes, you can.
4  BY MR. KENNEDY:
5    Q.    My question is --
6    MS. HENN:  Counsel, he would like to finish
7  his answer.
8    MR. KENNEDY:  I didn't finish my question.
9    Q.    Isn't that the law in 2012, you don't
10 ship if you have a concern?
11   MS. HENN:  Mr. Walker, do you need the prior
12 question back so you can answer?
13   MR. KENNEDY:  It's the same question.
14   THE WITNESS:  I think I can answer the
15 question.
16   MS. HENN:  Okay.
17   THE WITNESS:  Counsel, there is no
18 regulation to stop shipping controlled substances.
19 The regulation requires that we report suspicious
20 orders.
21   MR. KENNEDY:  We're going to write this one
22 down.
23   Q.    How long has that been your view?  In
24 2007 -- let's start with 2007 -- was McKesson
25 required to not ship until it did its due diligence

Highly Confidential – Subject to Further Confidentiality Review

Page 302

1 on potentially suspicious orders? Was that required
2 in 2007?
3      MS. HENN: Objection to form.
4 BY MR. KENNEDY:
5      Q.   Don't ship until we do our due
6 diligence?
7      MS. HENN: Objection to form. Lack of
8 foundation.
9 BY MR. KENNEDY:
10      Q.   Was that required of McKesson in
11 2007, do not ship until we do our due diligence?
12      MS. HENN: Same objection.
13      THE WITNESS: There is no regulatory
14 requirement to not ship. There is a regulatory
15 requirement to report.
16 BY MR. KENNEDY:
17      Q.   All right. And did the DEA tell you
18 in 2006 that you are required not to ship until you
19 do your due diligence on a potentially suspicious
20 order? Did they tell you that in '06 in a letter to
21 McKesson?
22      MS. HENN: Objection to form. Lacks
23 foundation.
24 BY MR. KENNEDY:
25      Q.   Did they tell you that in '06 in a

Page 303

1 letter to McKesson?
2      A.   In 2006 their guidance and direction
3 was, do not ship. And the requirement is at the
4 point that we determine an order to be suspicious.
5      Q.   Does your CSMP that you put in place
6 in 2008 say, do not ship --
7      MS. HENN: Objection to form.
8 BY MS. HENN:
9      Q.   -- until we have done our due
10 diligence? Does your own CSMP say that in 2008?
11      MS. HENN: Objection to form.
12      THE WITNESS: Our CSMP blocks the order. We
13 conduct the due diligence. But at the point we
14 determine that order to be suspicious, is at the
15 point where we need to report to the DEA.
16 BY MR. KENNEDY:
17      Q.   And you block until you do your due
18 diligence; do you not, sir? That was your policy
19 since '08?
20      MS. HENN: Objection to form. Lack of
21 foundation.
22 BY MR. KENNEDY:
23      Q.   Correct? That was your policy since
24 2008?
25      A.   Orders were blocked if they exceeded

Page 304

1 the thresholds, and we conducted due diligence after
2 the orders were blocked.
3      Q.   And now you've got 93 CVS stores in
4 2012 that you are shipping to even though you are
5 concerned about their purchases of oxycodones? That
6 is exactly what is happening in 2012; is it not?
7      A.   What is -- what is read in here is,
8 as I stated, a note that we needed to conduct
9 additional due diligence on these CVS stores to
10 ensure that we understood that -- their level of
11 purchases and their store activity, utilizing their
12 store headquarters, to ensure that our thresholds
13 were correct.
14      Q.   Right. And while you're doing your
15 due diligence, you're shipping; correct? To these
16 stores that you're concerned about, you're shipping?
17      MS. HENN: Objection to form. Lack of
18 foundation.
19      THE WITNESS: Certainly, if they did not
20 exceed their threshold, we would continue to ship.
21 BY MR. KENNEDY:
22      Q.   Even though you have concern; right?
23      A.   If they did not exceed their
24 threshold, we would continue to ship.
25      MR. KENNEDY: I show you 707.

Page 305

1      (Exhibit No. 707 was marked.)
2 BY MR. KENNEDY:
3      Q.   A PowerPoint prepared by you?
4      MS. URQUHART: Could we get the Bates
5 number, please?
6      MR. KENNEDY: Pardon me?
7      MS. URQUHART: Could we get the Bates
8 number, please?
9      MR. KENNEDY: Just don't interrupt my
10 question, and I will be right back with you,
11 all right?
12      Q.   707, Exhibit 707, is a PowerPoint,
13 "CVS - Regulatory PowerPoint"; is it not?
14      THE WITNESS: This is a -- appears to be a
15 PowerPoint presentation from McKesson to CVS.
16 BY MR. KENNEDY:
17      Q.   So my answer is, "Yes"? Is the
18 answer to my question, "Yes"?
19      MS. HENN: Objection to form.
20      THE WITNESS: It's a McKesson PowerPoint.
21 You asked if it was a CVS PowerPoint. It's a
22 McKesson PowerPoint.
23 BY MR. KENNEDY:
24      Q.   Does it say, "CVS - Regulatory
25 Review"?

Page 306

1   A.   It's a CVS regulatory review.
2   Q.   Prepared by you?
3   A.   Yes.
4   Q.   Bates No. -497980 to -89.  This is
5   March of 2012?  Is that correct?
6   A.   Yes, that's the date on the document.
7   Q.   Go to page -989, if you would.  On
8   this presentation is the title of this slide,
9   "McKesson Regulatory Needs from CVS"?  Is that what
10  the title of this slide is, that you prepared; right?
11  A.   Yes.
12  Q.   Number one -- this is what you need
13  from CVS, and it's 2012.  You need from them a
14  mechanism for the review of prescribing doctors; do
15  you see that?
16  A.   Yes.
17  Q.   CVS provided you no information up to
18  2012 where you could review the prescribing doctors
19  at CVS pharmacies, that's why you're asking for it
20  here in 2012; right?
21       MS. HENN:  Objection to form.  Lacks
22  foundation.
23  BY MR. KENNEDY:
24  Q.   Is that right?  Number one, the first
25  thing you are asking for, "Mechanisms for the review

Page 307

1   of prescribing doctors"?  Is that the first thing
2   that you're asking for?
3   A.   We were asking this in the course of
4   this meeting we had with CVS in terms of trying to
5   improve our abilities to monitor all of our retail
6   national account pharmacies and work with CVS.
7   Q.   At this point in time you had no
8   information from CVS with respect to the prescribing
9   doctors -- the doctors whose prescriptions they were
10  filling, you had no information from them at this
11  point in time, 2012; true?
12       MS. HENN:  Objection to form.  Lacks
13  foundation.
14  BY MR. KENNEDY:
15  Q.   Is that true?
16  A.   We did not have doctor -- prescribing
17  doctor data.
18  Q.   And the DEA had been talking to you
19  about this being important since 2006; right?
20       MS. HENN:  Objection to form.  Lack of
21  foundation.
22       THE WITNESS:  The DEA had identified
23  prescribing doctors as an area of focus.
24  BY MR. KENNEDY:
25  Q.   The second, you're asking CVS,

Page 308

1   "Provide the ratio of prescriptions per doctor."
2   You're asking them for that; true?
3   A.   That's what's written.
4   Q.   And up to 2012, they had provided you
5   with no information that would allow you to calculate
6   that at McKesson; true?
7       MS. HENN:  Objection to form.  Lacks
8   foundation.
9       THE WITNESS:  We had not received any
10  prescription ratio data.
11  BY MR. KENNEDY:
12  Q.   Three, you're saying, here's what we
13  need from CVS, we need a contact person at CVS for
14  inquiries.  You needed that in 2012 from them; did
15  you not?
16  A.   Again, I think what we -- what
17  specifically I was asking for was to have a targeted
18  individual that we could work with in CVS for
19  inquiries such as these, if they were available.
20  Q.   And that's what Mr. Oriente, who
21  managed CVS early on, that's what he was asking for
22  in that email two years before; right?  Who do I
23  contact; right?  And now you're asking for it again,
24  and it's 2012; true?  Who do we contact at CVS for
25  inquiries?

Page 309

1   A.   I don't -- I don't think that's
2   accurate.  We had contact points between 2010 and
3   2012.
4       What I recall from this meeting was
5   specifically we were trying to enhance our efficiency
6   in working with them and have a person that we know
7   that we could go to specifically for the data side.
8   Q.   And you're asking them again to say,
9   we need for you to provide us, CVS, with a rate of
10  growth of each store year over year?  You didn't have
11  that information from CVS at this point in 2012; did
12  you?
13  A.   No.  Again, chains view this as
14  proprietary information.
15  Q.   They wouldn't provide it to you;
16  would they?
17  A.   They did not provide it.
18  Q.   Did you see -- you think that's
19  proprietary.  But did you say to them, do you know
20  what's going on in America in 2012?  Did you say --
21  did they have an understanding of the crisis, the
22  opioid crisis in 2012?
23       MS. HENN:  Objection to form.  Asks for
24  speculation.
25       THE WITNESS:  My recollection of the meeting

Highly Confidential - Subject to Further Confidentiality Review

Page 310

1  with a fairly large group of people at CVS is they
2  were very aware of the issues concerning controlled
3  substances and prescriptions and had a very intense
4  internal effort to try to work on those.
5  BY MR. KENNEDY:
6      Q.    You have a memory of that meeting.
7  What did they tell you about their Suspicious Order
8  Monitoring Program for what they were purchasing from
9  you?  What did they tell you about it at that time,
10  then?
11      MS. HENN:  Objection to form.
12  BY MR. KENNEDY:
13      Q.    You said they had a very aggressive
14  program.  What did they tell you about their
15  Suspicious Order Monitoring Program for you to
16  conclude in 2012 that they had a very aggressive
17  program?  What was it they told --
18      MS. HENN:  Objection to form.  Lacks
19  foundation.
20  BY MR. KENNEDY:
21      Q.    So you remember the meeting.  What
22  did they tell you about the Suspicious Order
23  Monitoring Program in 2012?
24      MS. HENN:  Objection to form.  Lack of
25  foundation.

Page 311

1      THE WITNESS:  I will try to answer what I
2  think are two questions.
3      One is, we didn't have a discussion around
4  suspicious order monitoring of their purchases from
5  us.  That suspicious order monitoring, as I
6  understand it, it really is focused around the
7  distributor.
8      But what I said was not a program.  But I
9  think they had an intense focus internally around
10  ensuring that they were doing what they needed to do
11  to manage their pharmacies to ensure that there
12  wasn't a diversion of prescription medications.
13  BY MR. KENNEDY:
14      Q.    You next asked them for cash sales
15  ratio per store.  You didn't have that information
16  from them yet, and this is 2012; correct?
17      A.    Again, CVS chose not to share that
18  data with us.
19      Q.    And -- and the DEA had been telling
20  you since 2006, this is important information to have
21  to identify diversion; correct?
22      MS. HENN:  Objection to form.  Lacks
23  foundation.
24  BY MR. KENNEDY:
25      Q.    It's six years later.

Page 312

1      A.    DEA had identified cash sales as a
2  potential indicator.
3      Q.    Did you ever say to CVS, why won't
4  you give us this information?  Why won't you tell us
5  about the cash sales and the yearly growth rate
6  prescription ratios, prescribing doctors?  Did you
7  ever ask them why they would not provide you with
8  that information?
9      A.    From -- from this meeting and other
10  discussions that I had had with the -- with CVS, they
11  viewed that their sales data, as a competitive in the
12  business world, was proprietary, and they chose not
13  to share it with us.
14      Q.    They were putting their business over
15  the safety of the American people; is that what they
16  told you?  Our proprietary business interest is more
17  important than the ability to monitor the sales of
18  opioids into this community?
19      MR. O'CROININ:  Objection.
20      MS. HENN:  Objection to form.  Lacks
21  foundation.
22  BY MR. KENNEDY:
23      Q.    That's what they told you, their
24  proprietary business interest --
25      MS. HENN:  Same objection.

Page 313

1      THE WITNESS:  That is not at all accurate.
2  What they said was that their business data and
3  information around sales, because we were a
4  wholesaler servicing other retail national accounts,
5  was proprietary, and they chose not to share it with
6  us.
7  BY MR. KENNEDY:
8      Q.    It's a business interest; right?
9      A.    I would characterize it as a business
10  decision.
11      Q.    A business decision.  And they are
12  making -- and CVS is making a business decision at
13  the same time you, Don Walker, are telling people in
14  all your presentations that at this point opioids are
15  killing more people in this country than cocaine and
16  heroin combined; correct?
17      MS. HENN:  Objection to form.  Lack of
18  foundation.
19      THE WITNESS:  My recollection is that there
20  were a number of presentations that I made that
21  included information that I had pulled off the
22  Internet or from DEA.  That if that was something the
23  DEA reported, then I may have repeated it.
24  BY MR. KENNEDY:
25      Q.    And it's the same time that CVS is

Highly Confidential - Subject to Further Confidentiality Review

Page 314

1 choosing to make a business decision on this issue;
2 right? Same time, 2012?
3     A.   I don't remember. The timing for me
4 is very difficult to piece together. I don't
5 remember.
6     Q.   Sir, from everything we have looked
7 at here, you asked for this sales data from CVS in
8 '08, you asked in 2010, and now it's 2012, and you're
9 asking for it again; right? Correct?
10     A.   We are requesting data from them,
11 yes.
12     Q.   And they're telling you, we're making
13 a business decision, we're not giving it to you; is
14 that what happened?
15     MS. HENN: Objection to form.
16     THE WITNESS: Their decision was that they
17 were not going to provide the data for us and
18 explained it was proprietary.
19 BY MR. KENNEDY:
20     Q.   Let's switch topics. We will talk
21 about sales, McKesson, sales and promotion as it
22 related to the Controlled Substances Monitoring
23 Program.
24     Can we agree that sales should have nothing
25 to do with the Controlled Substances Monitoring

Page 315

1 Program, should not have anything to do with it? Do
2 you agree with that?
3     A.   Can I clarify, Counsel. Are you
4 referring to our sales force?
5     Q.   Your sales force, your sales
6 strategy, your sales goal should have nothing to do
7 with your job as the head of Regulatory to monitor
8 controlled substances?
9     MS. HENN: Objection to form. Compound.
10     THE WITNESS: I would not agree that our
11 sales force should not be involved in the Controlled
12 Substance Monitoring Program. I would agree that
13 sales never influenced our decisions around our
14 regulatory responsibilities.
15 BY MR. KENNEDY:
16     Q.   Okay. Well, let's look at that.
17 Let's look at that.
18     First of all, how many sales reps -- did you
19 know how many national sales reps McKesson had,
20 regional sales manager? Hundreds?
21     A.   I'm going to -- it would be a guess
22 that we had -- it would probably be less -- you know,
23 150 or less. I really don't remember exactly.
24     Q.   And the First Service -- the sales
25 assistants, the First Service folks that were located

Page 316

1 down in Texas, I think I've read there were a hundred
2 sales assistants down in Texas; do you recall that?
3 First Service.
4     MS. HENN: Objection. Objection to form.
5     THE WITNESS: Counsel, our -- it's called
6 Service First.
7     MR. KENNEDY: I'm sorry.
8     THE WITNESS: Our Service First organization
9 was not just a sales support organization. It was
10 really a customer -- customer service call center.
11 BY MR. KENNEDY:
12     Q.   You had the Regional Sales Managers.
13 How many District sales folks above the -- above the
14 Regional Sales Managers were there? If there's 100
15 to 150 Sales Managers, how many District sales folks
16 were above them?
17     MS. HENN: Objection to form. Lacks
18 foundation.
19     THE WITNESS: I don't remember specifically
20 how many there were.
21 BY MR. KENNEDY:
22     Q.   How many marketing folks were there,
23 people that had put together the marketing sales
24 programs above the -- let's say the District Sales
25 Manager? How many were those in that department,

Page 317

1 let's say, nationally?
2     MS. HENN: Objection to form.
3     THE WITNESS: Our marketing group was not
4 based in the field. We had a marketing group that
5 was headquartered. I don't remember what the
6 specific number of marketing people we had. I
7 would -- I would estimate, and it would be a pure
8 estimation, it was probably 35.
9 BY MR. KENNEDY:
10     Q.   So you maybe have 150 Sales Managers
11 across the country, and you've got District Sales
12 Managers above them. McKesson has got 35 people
13 working in marketing. Is that in San Francisco?
14 Would that be here?
15     A.   Yes. All the marketing at the time
16 was at our headquarters in San Francisco.
17     Q.   And you've got a hundred customer
18 service reps sitting at a call center. They were
19 down in Texas; right?
20     MS. HENN: Objection to form. Lacks
21 foundation.
22     THE WITNESS: Our Service First organization
23 was based in Texas, and we also had a satellite --
24 and at that time I think we had a satellite in
25 Phoenix that, again, I can't remember specifically

Page 318

1  how many people were there.
2  BY MR. KENNEDY:
3      Q.    And I'm -- I'm -- for what we've
4  said, I'm counting up close to -- close to 300 people
5  in marketing and sales at McKesson; would that be
6  about right?
7      MS. HENN:  Objection to form.  Lacks
8  foundation.
9      THE WITNESS:  Again, I'm concerned about
10  guessing on the numbers.
11      MR. KENNEDY:  All right.
12      THE WITNESS:  But it's --
13  BY MR. KENNEDY:
14      Q.    Well, one thing you're not guessing
15  on back in 2006 or '7, in Regulatory, watching
16  opioids, there was three; right?  Three people?
17      MS. HENN:  Objection to form.  Lacks
18  foundation.
19  BY MR. KENNEDY:
20      Q.    Three?
21      A.    That -- that's not accurate because
22  our Field Operations Team, our Distribution Center
23  Managers, and their second in command were also very
24  heavily involved in regulatory compliance.
25      Q.    Five hours ago didn't we look at a

Page 319

1  slide you presented to the DEA and said, prior to
2  2008 our regulatory team had three people?
3      MS. HENN:  Objection to form.
4  BY MR. KENNEDY:
5      Q.    You, Mr. Hilliard, and another
6  gentleman.  Isn't that the representation to the DEA
7  on the slide that we looked at six hours ago?
8      MS. HENN:  Objection to form.
9  Mischaracterizing the document.
10      THE WITNESS:  What I was representing in
11  that document was what our Regulatory Affairs staff
12  group was.  Again, we very strongly utilized our
13  Field Operations Teams in terms of our regulatory
14  compliance, and ensured that at a local level we had
15  oversight.
16  BY MR. KENNEDY:
17      Q.    Sir, McKesson paid a $13 million fine
18  in 2008; correct?
19      A.    We paid -- as a result of the
20  agreement, we paid a penalty of $13 million.
21      Q.    So the answer would be "Yes"; right?
22      MS. HENN:  Objection to form.  Asked and
23  answered.
24  BY MR. KENNEDY:
25      Q.    Would the answer be "Yes"?

Page 320

1      A.    We paid the $13 million penalty.
2      Q.    The answer would be "Yes"; correct?
3      MS. HENN:  Objection to form.  Asked and
4  answered.
5  BY MR. KENNEDY:
6      Q.    It's a "yes" or "no."  The answer
7  would be, yes, you paid a $13 million fine; true?
8      A.    We paid a $13 million penalty.
9      Q.    Okay.  Maybe I -- would I be
10  correct -- it's kind of a "yes" or "no."  Simple.
11  Would I be correct you paid a $13 million penalty in
12  2008?
13      A.    That's correct.
14      Q.    Leading up to that, prior to 2008,
15  you folks began to meet and discuss the creation of a
16  new monitoring program; did you not?
17      A.    Internally?
18      Q.    Yes.
19      A.    Yes.
20      Q.    And creating this program, in the
21  discussions in the creation of this program -- this
22  was during the period '06 you were creating the
23  program -- you were having discussions with the DEA
24  about the creation of a new monitoring program
25  leading up to your Settlement Agreement.  You were

Page 321

1  involved in those; right?
2      A.    Most of the involvement that I had
3  was -- was internal and working with counsel.  I
4  don't recall any specific meetings with DEA during
5  that time period of the development of the program.
6      Q.    All right.  Internally, though, when
7  McKesson was beginning to formulate a monitoring
8  program to monitor controlled substances, they
9  were -- they were trying to put together a program to
10  monitor controlled substance that wasn't going to
11  interfere with sales, though?  Wasn't that part of
12  the discussion?
13      MS. HENN:  Objection to form.  Lacks
14  foundation.
15      THE WITNESS:  No, that's -- I wouldn't
16  characterize that as being accurate.
17      I think we were very focused on ensuring
18  that we created a system that monitored controlled
19  substances but at the same time ensured that we could
20  provide medications to pharmacies.  All of those
21  medications are required.  They are sold regularly.
22  They have a lot of need, and appropriate need in the
23  marketplace.  And we wanted to ensure that we
24  maintained our responsibility as a distributor to
25  balance and ensure that we could provide medications

Page 322

1 as needed for patients.
2 BY MR. KENNEDY:
3     Q.   Sir, internally you wanted to put
4 together a monitoring program to make the DEA happy,
5 but you wanted to make sure the monitoring program
6 was not going to interfere with sales at McKesson;
7 right?
8     MS. HENN: Objection to form. Asked and
9 answered.
10 BY MR. KENNEDY:
11     Q.   That was a concern?
12     A.   That is absolutely not correct.
13     MR. KENNEDY: Give me 722, please.
14     (Exhibit No. 722 was marked.)
15 BY MR. KENNEDY:
16     Q.   You have seen this document before;
17 haven't you, sir?
18     A.   Give me a minute. I don't think
19 I've -- certainly, if it's an email that I generated.
20 But I don't remember having seen it.
21     Q.   Bates No. -543914 to -16.
22     A.   Okay.
23     Q.   Go to the last page, -916, because
24 this is where this exchange begins.
25     Okay. You see the email from Gary Hilliard?

Page 323

1 And this is October 23, 2006. This is during the
2 period when you're trying to put together your
3 monitoring program; correct?
4     A.   Yes, this would be during the time
5 frame we were creating the IT development for --
6     Q.   And Gary Hilliard --
7     MS. HENN: Did you finish your answer, sir?
8     THE WITNESS: The IT development program for
9 the CSMP.
10     MS. HENN: Thank you.
11 BY MR. KENNEDY:
12     Q.   Gary Hilliard, at that point he is
13 the Director of Regulatory Affairs; right?
14     A.   I believe Gary's title at the time
15 was Regulatory. He's on the Regulatory staff, and I
16 believe that title is correct.
17     Q.   He states in this email -- do you
18 know Sharon Mackarness? Who that is?
19     A.   I'm familiar with the name. Sharon
20 Mackarness was one of our -- the McKesson I.T.
21 associates who was responsible for pieces of
22 development and interface with CSMP.
23     Q.   This is a year-and-a-half before your
24 monitoring program goes into place; true?
25     MS. HENN: Objection to form.

Page 324

1 Mischaracterizes the evidence.
2     THE WITNESS: October 2006. We implemented
3 in the spring of 2008. So roughly that time frame.
4 BY MR. KENNEDY:
5     Q.   It states:
6     (Reading) McKesson will establish a
7     monthly threshold of 10,000 dosage
8     forms of hydrocodone for all customers
9     at each of the facilities. Customers
10     requesting to purchase more than this
11     amount will be required to provide
12     additional information on its
13     dispensing practices to justify
14     amounts above this threshold. Such
15     information will be reviewed by
16     McKesson Regulatory Affairs before a
17     customer will be authorized to
18     purchase more than 10,000 dosage forms
19     per month. McKesson will also
20     establish thresholds for other
21     controlled substance purchases (end of
22     reading).
23 Did I read that right?
24     A.   Yes.
25     Q.   So Mr. Hilliard, he's talking about

Page 325

1 this threshold system that became your program in
2 2008; correct?
3     A.   I believe that he's -- I believe
4 that's true.
5     Q.   And up above Sharon Mackarness from
6 I.T., she emails back, and she goes through some
7 details about this meeting. Apparently they had a
8 meeting, and she's asking some questions with respect to this
9 dosage and about other items with respect to this
10 implementation from an I.T. standpoint as it relates
11 to this threshold program; correct?
12     MS. HENN: Objection to form.
13 BY MR. KENNEDY:
14     Q.   That's basically what she's saying?
15 She's responding, and she's asking some I.T.
16 questions about the establishment of the program?
17     A.   It appears that she is asking
18 questions to get the information she needs for system
19 design.
20     Q.   And she is -- again, she's
21 referencing a meeting that occurred that morning,
22 October 26, 2006; right?
23     A.   Yes.
24     Q.   And go to the earlier page, -15. The
25 same day Sharon McGinnis -- Mackarness, excuse me,

Page 326

1 from I.T. at McKesson, she writes an email to Gary
2 Hilliard; correct?
3    A.    At the bottom of the page, yes.
4    Q.    And she copies two other folks.
5 VanderWerf; correct?
6    A.    Yes.
7    Q.    And she says, "Gary," right?  Gary?
8    A.    Yes.
9    Q.    In the second paragraph she says,
10 "JD," and that's probably referencing Jean-Dou up
11 ahead?  Up above, JD?
12    A.    Yes.
13    Q.    Do you know JD, who he was?
14    A.    Another I.T. individual.
15    Q.    She says, "JD brought up a valid
16 point in the meeting."  And these folks are meeting
17 about putting together your monitoring program;
18 right?
19    A.    Yes.
20    Q.    It says:
21         (Reading) JD brought up a valid point
22         in the meeting.  We are in the
23         business to sell product.  If we could
24         produce a report (and you may already
25         have one) that warned a customer's

Page 327

1         approach to the threshold, say at
2         85 percent of their 10,000 doses, work
3         could begin on justifying an increase
4         in threshold prior to any lost sales
5         (end of reading).
6    Is that what she wrote?
7    A.    That is what is written.
8    Q.    And this is an email amongst the
9 folks that are trying to formulate a Controlled
10 Substances Monitoring Program to address a crisis in
11 this country; right?  That's who this email is being
12 exchanged among?
13    A.    They're I.T. technical people trying
14 to solve and create a systemic solution, which was
15 very complex, for our I.T. answer to managing the
16 thresholds and the overall system.
17    Q.    Well, they may be I.T. people, but
18 the response of Gary Hilliard, the Vice President of
19 Regulatory Affairs is -- emails right back, "I think
20 JD's idea is good."  Do you see that?
21    A.    I see that.
22    Q.    JD's idea to give warnings to our
23 customers when they approach thresholds so that we
24 don't lose any sales, the head of Regulatory said
25 that's a good idea?  Do you see that?  He's not an

Page 328

1 I.T. guy.  He is the head of Regulatory, and he
2 thinks it's a good idea to give customers warnings so
3 we don't lose sales; is that what he says?
4         MS. HENN:  Objection to form.
5         THE WITNESS:  What his response is, is --
6 and I won't speculate on what his thought process is,
7 but is what JD brought up, he thought, "I think JD's
8 idea is good."
9 BY MR. KENNEDY:
10    Q.    He thinks it's a good idea to design
11 a monitoring program of opioids that won't cause lost
12 sales; is that right?
13         MS. HENN:  Objection to form.  Lacks
14 foundation.
15 BY MR. KENNEDY:
16    Q.    Is that what he's saying?
17         MS. HENN:  Calls for speculation.
18         THE WITNESS:  No, I don't think that's
19 accurate.  I think what Gary and even the I.T. people
20 are saying is we need to design a system that ensures
21 that our pharmacy customers get the product they
22 need, while at the same time that we can monitor and
23 create thresholds and manage our controlled substance
24 distribution.
25 ///

Page 329

1 BY MR. KENNEDY:
2    Q.    Let me ask you this.  What he says,
3 it's a good idea -- it's a good idea to warn
4 customers they are approaching thresholds so that we
5 won't have lost sales.  When he says that is a good
6 idea, are we absolutely certain -- could we
7 absolutely agree that that is exactly what happened
8 with your monitoring program, it provided warnings to
9 customers when they approached thresholds?
10         MS. HENN:  Objection to form.
11 BY MR. KENNEDY:
12    Q.    Is that right, sir?
13    A.    Our system provided a notification
14 when a customer was approaching a threshold.
15    Q.    Exactly what was suggested here and
16 exactly what the Director of Regulatory Affairs says
17 we should do so we won't lose sales?
18         MS. HENN:  Objection to form.  You're
19 mischaracterizing the document.
20 BY MR. KENNEDY:
21    Q.    This exact suggestion became a
22 reality?
23         MS. HENN:  Same objections.
24         THE WITNESS:  That's not -- that's not
25 correct.  All of McKesson was working hard to

Highly Confidential - Subject to Further Confidentiality Review

Page 330

1  understand and make sure that our customers received
2  all the medications that they needed.  We were very
3  focused on providing inventory to our pharmacy
4  customers.  That is what is being -- in my view,
5  what's being stated here.
6  BY MR. KENNEDY:
7      Q.    You had a warning program built right
8  into the CSMP that warned customers when they
9  approached their thresholds; did you not, sir?
10     Did you have a warning program that actually
11 got put into place in 2008?
12     MS. HENN:  Objection to form.
13     THE WITNESS:  We provided a warning to
14 customers, indicating to them that they were
15 approaching a threshold on a given controlled
16 substance.
17 BY MR. KENNEDY:
18     Q.    In addition to this threshold warning
19 system that became part of the 2008 Controlled
20 Substances Monitoring Program, you folks also created
21 a system that put your salespeople in the middle of
22 your monitoring program; true?
23     MS. HENN:  Objection to form.  Lacks
24 foundation.
25 ///

Page 331

1  BY MR. KENNEDY:
2      Q.    Isn't that true, sir?
3      A.    I'm not sure I understand the
4  question as asked.
5      Q.    Well, we will go through some detail,
6  then.
7      First of all, you knew and understood that
8  the salespeople at McKesson were paid on commission;
9  did you not?
10     A.    Our sales force was -- has a
11 portion -- my understanding is a portion of their
12 compensation, there was variable compensation
13 associated with various programs.
14     Q.    The more they sold, the more money
15 they made, very simple; isn't that true?
16     MS. HENN:  Objection to form.  Lacks
17 foundation.
18     THE WITNESS:  To my knowledge, that's not
19 accurate.  It wasn't -- it's not that simple of a
20 calculation or process.
21 BY MR. KENNEDY:
22     Q.    In fact, didn't you know and
23 understand that a salesperson could double, could
24 double their annual income based upon sales?
25     A.    I don't have any specific knowledge

Page 332

1  on what the percentages or the proportions were.
2      Q.    Well, before you allowed them to be
3  in the middle of a Controlled Substance Monitoring
4  Program, wouldn't you want to know whether or not
5  they had an incentive to sell more products, to sell
6  more controlled substances?  Wouldn't you want to
7  know that?
8      MS. HENN:  Objection to form.
9      THE WITNESS:  Our sales force was
10 compensated on a total pharmacy performance, is what
11 I do understand.  And controlled substances in a
12 pharmacy are not a large percentage of any volume.
13     So clearly what our view was is our sales
14 force had more interaction and contact with the
15 pharmacies, and we wanted to leverage them to help us
16 understand and know our customers.
17 BY MR. KENNEDY:
18     Q.    All right.  Salespeople also got paid
19 if they brought in a new pharmacy, a new customer
20 into McKesson; didn't they?  They also got paid if
21 they did that; true?
22     MS. HENN:  Objection to form.  Lacks
23 foundation.
24     THE WITNESS:  Again, I don't have any
25 specific knowledge of what they were paid.  But I

Page 333

1  believe there was compensation associated with new
2  business.
3  BY MR. KENNEDY:
4      Q.    And, sir, before McKesson -- under
5  their 2008 program, before McKesson would sell
6  opioids to a pharmacy, they went through an
7  on-boarding process; did they not?
8      A.    Yes.
9      Q.    Information was gathered, a
10 questionnaire was filled out that McKesson would
11 review and approve the sale of controlled substances
12 to the pharmacy?  That was the process; right?
13     A.    As part of CSMP and LDMP, a
14 questionnaire was part of our process.
15     Q.    And all the information that was
16 gathered, all the information gathered with respect
17 to prescribing controlled substances, and policies,
18 all of that was gathered by the sales rep; right?
19     A.    Generally that is correct.
20     Q.    So the person that's going to get a
21 cash bonus if we bring in this new pharmacy, they are
22 the ones doing the investigation of the pharmacy to
23 see whether or not it's safe to sell them controlled
24 substances; true?
25     MS. HENN:  Objection to form.  Lacks

Highly Confidential - Subject to Further Confidentiality Review

Page 334

1  foundation.
2      THE WITNESS:  Better -- better stated, the
3  sales force that we utilized to gather the
4  information to conduct the diligence prior to taking
5  on a new customer.
6  BY MR. KENNEDY:
7      Q.    In fact, the salespeople even got the
8  information that McKesson used to set these
9  thresholds; right?  The salespeople were doing that?
10     MS. HENN:  Objection to form.  Lacks
11 foundation.
12 BY MR. KENNEDY:
13     Q.    Right?
14     MS. HENN:  Vague.
15     THE WITNESS:  As part of the on-boarding
16 process and the questionnaire, we asked the sales
17 force to collect the data.  And, again, our intent
18 was very clear.  Our sales force understood the
19 customers, and they had the ability, and we wanted to
20 leverage the resource to collect the data.
21 BY MR. KENNEDY:
22     Q.    And, in fact, there had to be a visit
23 to the pharmacy before you would sell them narcotics,
24 and the salespeople were the ones who went out and
25 actually visited and inspected the pharmacy; right?

Page 335

1      MS. HENN:  Objection to form.  Lacks
2  foundation.
3  BY MR. KENNEDY:
4      Q.    Correct, sir?
5      A.    The sales force was generally the
6  first person from McKesson in the pharmacy.
7      Q.    And McKesson knew and you knew and
8  the salespeople knew that if we bring in a new
9  customer, number one, I'm going to get a bonus as a
10 salesperson for bringing in a new customer, and,
11 number two, my sales are going to increase if I get a
12 new customer, and I'm going to make more money; you
13 all knew that, right?
14     MS. HENN:  Objection to form.
15 BY MR. KENNEDY:
16     Q.    You knew that?
17     A.    Again, I think that's oversimplfying
18 the sales force compensation.
19     Q.    Now, also built right into your
20 program for the salespeople, you told us -- we've
21 established this -- that if a pharmacy would order
22 over their threshold, then there would be a Level 1
23 Review or investigation; correct?
24     A.    Yes, as part of the review process,
25 there would be a Level 1 Review.

Page 336

1      Q.    And your program had salespeople
2  doing the Level 1 Review of the pharmacies; correct?
3      A.    Again, we would -- we would utilize
4  the sales force to help us understand and gain
5  information as to why the increase or the threshold
6  was -- was exceeded.  And but at no time was the
7  sales force authorized to approve a threshold
8  increase.  The information was reviewed by the DRAs.
9  They were the sole responsible parties to increase
10 thresholds.
11     Q.    I'm not talking about threshold
12 increases.  I'm talking about Level 1 investigations
13 into a potential suspicious order because a customer
14 has ordered over their threshold.  You had
15 salespeople doing those reviews and investigations;
16 did you not, sir?
17     MS. HENN:  Objection to form.  Lacks
18 foundation.
19     THE WITNESS:  The sales force was used not
20 exclusively.  But the sales force was used to help in
21 the Level 1 Review.
22 BY MR. KENNEDY:
23     Q.    That was a national practice; was it
24 not?  National practice?
25     A.    I don't have the specifics.  But

Page 337

1  generally I believe it took place across all of our
2  regions.
3      Q.    And the salespeople didn't want to
4  investigate their own customers, because if they
5  investigated their customer, the pharmacy may turn
6  them in to DEA, then McKesson wasn't going to sell to
7  them anymore; right?
8      MS. HENN:  Objection to form.  Lacks
9  foundation.
10 BY MR. KENNEDY:
11     Q.    And the salespeople knew that; right?
12     MS. HENN:  Lacks foundation.
13 BY MR. KENNEDY:
14     Q.    Right?
15     MS. HENN:  And calls for speculation.
16     THE WITNESS:  I wouldn't agree with that
17 statement.  The salespeople were very diligent in
18 their process and, quite frankly, reported a lot of
19 pharmacies to us that they chose not to sign up for
20 controlled substances.
21 BY MR. KENNEDY:
22     Q.    You say "they" reported a lot of
23 pharmacies to you.  The salespeople did?
24     A.    Yes.
25     Q.    Sir, I want to -- I'm going to ask

Page 338

1 you to assume some facts. And maybe you know this.
2     Do you know that in the two jurisdictions
3 going to trial, in Summit County and Cuyahoga County,
4 that over 1,000 Level 1 investigations should have
5 been done, and not one single one ever got past a
6 Level 1 investigation, not one? Do you understand
7 that? Not one investigation ever got past a Level 1
8 that the sales reps were doing?
9     MS. HENN: Objection to form. Lacks --
10 vague.
11 BY MR. KENNEDY:
12     Q.  I will ask you to assume those facts
13 in this case. Do you understand?
14     MS. HENN: Objection to form. Lacks
15 foundation.
16     Go ahead.
17 BY MR. KENNEDY:
18     Q.  Do you understand that?
19     MS. HENN: Same objections.
20     THE WITNESS: I don't have any knowledge of
21 that which you are referring to, those documents and
22 those pharmacies.
23 BY MR. KENNEDY:
24     Q.  And you said they brought you a lot
25 of information, these salespeople, about pharmacies.

Page 339

1 Do you understand that from 2008 to August of 2013,
2 in Cuyahoga County, Summit County in Ohio, not one
3 single pharmacy was ever reported to the DEA for a
4 suspicious order? Do you understand that?
5     MS. HENN: Objection to form.
6 BY MR. KENNEDY:
7     Q.  Not one.
8     MS. HENN: Lacks foundation.
9     THE WITNESS: Again, I don't have any
10 specific knowledge on that.
11 BY MR. KENNEDY:
12     Q.  Well, when you say these salespeople
13 were bringing you all this information about the
14 pharmacies and doing suspicious things, what parts of
15 the country are you talking about?
16     A.  The sales folks from across the
17 country that identified pharmacies that they -- to
18 the Regulatory group.
19     MR. KENNEDY: Let's look at Exhibit 730.
20 I'm going to withdraw that exhibit. Give me
21 732, please.
22         (Exhibit No. 732 was marked.)
23 BY MR. KENNEDY:
24     Q.  Do you see this email? This is from
25 you dated 9-17-13; do you see that?

Page 340

1     A.  Yes.
2     Q.  And the next page says, "Controlled
3 Substances Regulatory Org Structure." Do you see
4 that?
5     A.  Yes.
6     Q.  This is created by you?
7     A.  Yes.
8     Q.  And this is 2013. And if you go to
9 page -500. Do you see that? Look at the second
10 bullet point. Do you see that second bullet point?
11     A.  Yes.
12     Q.  In 2013 you write:
13     (Reading) Prior Controlled Substances
14     Monitoring Program process heavily
15     dependent on sales and op (end of
16     reading).
17     Do you see that?
18     A.  Yes.
19     Q.  And underneath it do you write,
20 "Inconsistent, competency, and conflict of
21 objectives"? Is that what you wrote in 2013, five
22 years into the program?
23     A.  I don't recall specifically creating
24 this document, but that's what the document states.
25     Q.  And in 2013 you, as the boss of all

Page 341

1 of Regulatory, after five years you took sales out of
2 the middle of the monitoring program; didn't you,
3 sir?
4     MS. HENN: Objection to form.
5     THE WITNESS: Again, I don't recall
6 specifically. But I know that we modified our
7 go-forward processes.
8 BY MR. KENNEDY:
9     Q.  And, sir, over and above these
10 salespeople that we're talking about, you had -- you
11 had marketing people at McKesson; did you not? We
12 have talked about them.
13     MS. HENN: Objection to forms. Lacks
14 foundation.
15 BY MR. KENNEDY:
16     Q.  There were marketing people at
17 McKesson; were there not?
18     A.  Yes, there was a marketing
19 department.
20     Q.  And while you were trying to control
21 the flow of opioids into the communities and the
22 pharmacy, the marketing people were trying to sell
23 more opioids; were they not?
24     MS. HENN: Objection to form. Lacks
25 foundation.

Page 342

1     THE WITNESS:  No, that's not accurate.
2     MR. KENNEDY:  720.
3           (Exhibit No. 720 was marked.)
4  BY MR. KENNEDY:
5     Q.    The first email in time is number one
6  at the bottom.  That's where it starts in time.
7  -543462 to -63.
8           This is an email from Scott Mooney, and this
9  is to you, January 16 of 2008, importance high.  It
10 states:
11          (Reading) Don, have you seen this one?
12          Special dating and a buy-in on
13          oxycodone?  It will probably hit the
14          limits across the network in the
15          Volakas report (end of reading).
16     Is that what he states?
17     A.    Yes.
18     Q.    And do you respond:
19          (Reading) Given our challenges with
20          DEA, I would -- I would like to review
21          with you how we manage these types of
22          promos going forward (end of reading)?
23     So McKesson is running a promotion on
24  oxycodone; correct?
25     MS. HENN:  Objection to form.  Lacks

Page 343

1  foundation.
2  BY MR. KENNEDY:
3     Q.    Correct?  You call it a promo?
4     MS. HENN:  Same objection.
5     THE WITNESS:  Just a second, Counsel.  Let
6  me answer that.
7     We were not -- what we were offering -- and
8  make sure you understand how the industry works.  We
9  were offering to our customers the -- what was being
10 offered to us through the manufacturers was dating on
11 oxycodone.  We did not promote or push oxycodone, nor
12 do we make any adjustments on thresholds to any
13 customers on the purchases of oxycodone in any of
14 these promotions.
15 BY MR. KENNEDY:
16    Q.    Do you call this a promo?  I'm just
17 asking, did you use the word "promo"?
18    A.    I used the word "promo."
19    Q.    And up top do you send an email to
20 Greg Yonko and say:
21          (Reading) Easy, big fella.  I know
22          it's been standard and your group does
23          need to be involved.  That is why I am
24          suggesting we talk about it.  DEA
25          views the industry as doing anything

Page 344

1          for money and does not understand why
2          we would "promote" controlled
3          substances.  No immediate changes are
4          planned, but we do need to think
5          through how we handle promos on
6          controls especially lifestyle drugs
7          like oxycodone.  Talk with you soon
8          (end of reading)?
9     Was that your response, sir, in 2008?
10    A.    That is what is written.
11    Q.    Now I want to go to two months later.
12 Tell the jury what fentanyl is?
13    A.    Fentanyl is a Schedule 2 narcotic.
14    Q.    And is it the most powerful,
15 dangerous of all the narcotics you sell?
16    MS. HENN:  Objection to form.  Lacks
17 foundation.
18 BY MR. KENNEDY:
19    Q.    Is that true, sir?
20    A.    I do not know.  I know it's a very
21 powerful pain control narcotic.
22    MR. KENNEDY:  714.
23          (Exhibit No. 714 was marked.)
24 BY MR. KENNEDY:
25    Q.    There's an email down at the bottom.

Page 345

1  Kenneth Ball.  And this is two years after you're
2  saying we've got to discuss promos.  And he states:
3          (Reading) Subject:  Fentanyl checks.
4          The promotion ran from 6-22 to 7-31
5          and was a free item promotion per the
6          terms below (end of reading).
7     He's talking in 2010 about a buy one, get
8  one free on fentanyl; correct?
9     MS. HENN:  Objection to form.
10 BY MR. KENNEDY:
11    Q.    Is that what he's talking about?
12    MS. HENN:  Objection to form.
13 Mischaracterizing the document.
14    THE WITNESS:  I don't -- I'm not sure.  I
15 don't understand the promotion that's being referred
16 to here.  I can only see what he's written.
17 BY MR. KENNEDY:
18    Q.    Up above it says "free item"; right?
19 Free item promotion on fentanyl; correct?  Free item
20 promotion; correct, sir?  Is that what it says?
21    A.    Hang on.  Hang on just a minute,
22 Counsel.  I'm trying to catch up with you.
23          Okay.  Yes, I see that.
24    Q.    And up above, in addition to the buy
25 one, get one free, you also sent checks out to

Page 346

1 pharmacies if they bought fentanyl pursuant to this
2 promotion?
3     MS. HENN: Objection to form. Lacks
4 foundation.
5 BY MR. KENNEDY:
6     Q. Well, look right above. He's talking
7 about checks.
8     MS. HENN: Same objection.
9     THE WITNESS: I think to clarify what he
10 said is -- is rebates, which would be more like off
11 invoice, but --
12 BY MR. KENNEDY:
13     Q. Well, rebate is money; isn't it? And
14 he says "checks"; does he not?
15     MS. HENN: Objection to form.
16     THE WITNESS: I may be missing it, but I
17 don't see "checks." But --
18 BY MR. KENNEDY:
19     Q. "Subject: Fentanyl Checks." Do you
20 see that?
21     A. Okay. Under the subject, yes. I
22 didn't see that in the body.
23     Q. This is two years after you're
24 telling the marketing people, we have got to talk
25 about promotions; right? This is now 2010; true? Is

Page 347

1 that the date of the email?
2     A. That's correct.
3     Q. Let's look to 2012, two years later,
4 two years after that 7-19.
5     A. Again, Counsel, we would not have
6 changed any thresholds on any of our customers in
7 support of any promotions.
8     Q. Mr. Walker, you got fined
9 $150 million in 2018 for changing thresholds; didn't
10 you?
11     MS. HENN: Objection to form. Lacks
12 foundation.
13 BY MR. KENNEDY:
14     Q. Is that true? Did you get fined
15 $150 million in 2018, McKesson?
16     A. I wasn't with McKesson at the time.
17 I understand that McKesson paid $150 million.
18     (Exhibit No. 719 was marked.)
19 BY MR. KENNEDY:
20     Q. Let's go to 719. We're still on
21 promotions. This is two years after the fentanyl
22 promotion. This is now 2012. And look -- I want to
23 start on page -22. This is -539021 to -23. 719.
24     And do you see on -22, the subject, "Lower
25 Priced Oxycodone has been Released"? Do you see

Page 348

1 that?
2     A. Yes.
3     Q. And does it say, "McKesson OneStop
4 Generics Campaign has been launched"? And then it
5 states:
6     (Reading) Contact customers showing
7     purchase history of Mallinckrodt
8     Oxycodone to highlight the
9     availability of lower-priced oxycodone
10     items (end of reading).
11 Did I read that correctly?
12     A. Yes.
13     Q. And going to the next page, -21. And
14 this is now Mark Odom, with response to this
15 lower-price oxycodone. Does he email and say:
16     (Reading) Are you kidding me!! We are
17     auto shipping oxy, exclamation,
18     exclamation, exclamation (end of
19     reading)?
20 Do you see that?
21     A. I see that.
22     Q. And then email up above says:
23     (Reading) What's going on? Surely we
24     are not promoting Oxy on special (end
25     of reading).

Page 349

1 Do you see that email?
2     A. Yes, I do.
3     Q. And then you state:
4     (Reading) We agreed to offer the lower
5     price but are not changing any
6     thresholds (end of reading).
7 Is that what you responded?
8     A. Exactly my response.
9     Q. Now, this is 2012. This is four
10 years after you said to marketing, we have got to
11 discuss the promotions; right?
12     MS. HENN: Objection to form.
13 Mischaracterizes the document.
14     THE WITNESS: Yes.
15 BY MR. KENNEDY:
16     Q. Let's go to 2013, a year later.
17     MS. HENN: Could we just get information
18 about how much time is on the record at this point?
19     MR. KENNEDY: I'm going to finish these, and
20 then we are done.
21     MS. HENN: Yeah, I just want to check.
22     MR. KENNEDY: Five minutes left.
23     MS. HENN: Good. But let's get --
24     MR. KENNEDY: As soon as I wrap this up.
25     MS. HENN: How much time?

Page 350

1  THE VIDEOGRAPHER: I think it is ten minutes
2 left.
3  MS. HENN: Okay.
4  (Exhibit No. 721 was marked.)
5 BY MR. KENNEDY:
6  Q.  Let's go to the next. It's 2013.
7 This is now a year after the Oxycontin promotion?
8  THE REPORTER: What's the exhibit number,
9 please?
10  MR. KENNEDY: 721.
11  Q.  Down below, November 7, 2013, "SMS
12 Analytics Group, Dale Harris." And the subject is,
13 "Campaign Mallinckrodt Hydrocodone has been
14 Released!"
15  Dale Harris, it states:
16  (Reading) McKesson OneStop Generics
17  Campaign, hydrocodone has been
18  launched. The campaign will be
19  effective from 11-8-13 to 11-15-13.
20  Inform ISMC customers with purchase of
21  Watson hydrocodone of the savings on
22  Mallinckrodt hydrocodone (end of
23  reading).
24  Do you see that? And then up above that,
25 does Dale Harris send an email from McKesson,

Page 351

1 stating:
2  (Reading) Thought you might want to
3  see that we're pushing hydrocodone
4  with ISMC calls again (end of
5  reading)?
6  And that is the independent small, medium
7 chains; right? Did I read that right?
8  A.  The ISM.
9  Q.  And then up above does Tom Smith --
10 who is Tom Smith?
11  A.  Tom was the head of sales or general
12 manager. General Manager with our Birmingham
13 facility.
14  Q.  And does he say, "This is silly"?
15  A.  That's what's written.
16  Q.  Sir, this is 2013 when he says, "This
17 is silly"; correct?
18  A.  That's what's written.
19  Q.  It's more than silly in 2013, isn't
20 it? Running a promotion pushing hydrocodone on
21 pharmacies, it's more than silly; isn't it? Could we
22 agree that that --
23  A.  No, I don't agree because it's a
24 mischaracterization of what -- of the promo -- or as
25 you call it, a promo.

Page 352

1  These were opportunities for pharmacies to
2 obtain product at a reduced price. It didn't change
3 the threshold. It was simply to provide them an
4 opportunity to provide legitimate medications to
5 customers at a lower price.
6  Q.  At this point in time, when he says
7 "This is silly," what -- strike that for a second.
8  You described this as a legitimate way to
9 get more hydrocodone to pharmacies. Tom Smith --
10  A.  No.
11  Q.  -- doesn't agree this is a legitimate
12 way to get more hydrocodone. He says it's silly;
13 right?
14  MS. HENN: Objection to form.
15  THE WITNESS: Counsel, you asked me two
16 questions.
17  The first question, no, this was not an
18 opportunity to get more hydrocodone to pharmacies.
19 This was an opportunity for pharmacies to purchase
20 the hydrocodone that they required, and we monitored,
21 at a price that was reduced to give them an
22 opportunity from a business standpoint.
23 BY MR. KENNEDY:
24  Q.  Well, you've got one McKesson
25 employee who says, you're pushing hydrocodone. You

Page 353

1 have another one saying, silly. Do you disagree with
2 them?
3  A.  I see what his -- what is written. I
4 don't agree with "pushing" hydrocodone.
5  Q.  Do you know how many people
6 hydrocodone was killing a year at the time of this --
7 of this promotion in 2013? Do you know that?
8  A.  No, I don't have any specific
9 information on that.
10  MR. KENNEDY: Let's look at 718. We are
11 still in 2013.
12  (Exhibit No. 718 was marked.)
13 BY MR. KENNEDY:
14  Q.  This is Exhibit 718, -546932 to -34.
15 And since 2013, five years ago, you said you want to
16 talk to the marketing people about promotions; right?
17 You said that five years ago, I want to talk to them
18 about promotions; remember?
19  MS. HENN: Objection to form. Lacks
20 foundation.
21  THE WITNESS: In my prior email we reviewed,
22 I indicated to Mr. Yanko that we would have a
23 conversation around promotional incentives with
24 certain controlled substances. I did.
25  We clarified very clearly at that time that

Highly Confidential - Subject to Further Confidentiality Review

Page 354

1 we were not going to make any regulatory adjustments
2 regarding thresholds. And our customers could take
3 advantage of the pricing but could not change their
4 threshold as a result of promotion.
5 BY MR. KENNEDY:
6     Q.   And if that's the agreement here with
7 marketing, you still have folks at McKesson saying
8 this is silly, we're pushing hydrocodone. And let's
9 see what they say again.
10     The first email on this page, 2013, this is
11 from Lisa Vicicondi at McKesson, and she says:
12       (Reading) Here is an example of what
13       Spence and I were talking about.
14       Seems counterintuitive (end of
15       reading).
16     And the subject is the Mallinckrodt
17 hydrocodone has been released.
18     Now, move up above, and David Kelly in
19 response -- and he's a VP in Sales -- he sends an
20 email to Dave Gustin in Regulatory, and he says that:
21       (Reading) The inside sales team is
22       running a hydrocodone promotion this
23       week (end of reading).
24     That's not my word, that's his; correct?
25 That's his word, "promotion"?

Page 355

1     A.   That's what's written.
2     Q.   (Reading) You might want to reach
3       out and let them know that this might
4       not be a good idea (end of reading).
5     Then up above, now Gustin is writing you on
6 11-11-13, and says:
7       (Reading) Don, I believe you have
8       addressed this with them before,
9       question mark, question mark (end of
10       reading).
11     So you're telling us that you addressed
12 these promotions with them before, and you agreed
13 that these would be allowed? Is that what you agreed
14 to with marketing with respect to opioid promotions?
15     MS. HENN: Objection to form. Lacks
16 foundation.
17     THE WITNESS: Counsel, these pharmaceuticals
18 continue to be on the market. They have and continue
19 to have a very legitimate purpose. Our Controlled
20 Substance Monitoring Program was very specific that
21 we would not change thresholds without the
22 appropriate justification.
23     And a promotion, we did not change
24 thresholds to accommodate any promotional
25 opportunity. What we provided was a business

Page 356

1 opportunity for pharmacies to ensure they could get
2 medications they required, and potentially at a
3 reduced price.
4 BY MR. KENNEDY:
5     Q.   And, sir, when you say you are not
6 going to change thresholds without justification, let
7 me ask you very clearly, isn't it true that McKesson
8 got fined $150 million in a 2018 agreement based upon
9 conduct, increasing thresholds without
10 documentations, during this very time period, 2012,
11 2013, 2014?
12     MS. HENN: Objection to form. Lacks
13 foundation.
14 BY MR. KENNEDY:
15     Q.   Do you recall that?
16     A.   Counsel, as I -- as I answered, the
17 agreement or document of 2014 or '15, whatever it
18 was, I was not with the company. I have no specific
19 knowledge of the settlement.
20     I do know that McKesson paid 150. I do not
21 understand or have reviewed the details of that
22 settlement.
23     MS. HENN: Counsel, I think we're about at
24 time, if you want to ask your last question.
25     MR. KENNEDY: All done.

Page 357

1     MS. HENN: Great. So I guess we will go off
2 the record.
3     THE VIDEOGRAPHER: We are going off the
4 record. The time is 5:34 p.m.
5     (Recess taken.)
6     THE VIDEOGRAPHER: We are back on the
7 record. The time is 5:54 p.m.
8         EXAMINATION
9 BY MS. HENN:
10     Q.   Good evening, Mr. Walker.
11     A.   Good evening.
12     Q.   Mr. Walker, you testified earlier
13 today that you joined McKesson in 1987; is that
14 correct?
15     A.   That is correct.
16     Q.   Before joining McKesson, where did
17 you work?
18     A.   Prior to -- immediately prior to
19 working for McKesson, I worked for a grocery
20 wholesale distributor, a trucking company. And then
21 prior to that, I spent ten years in law enforcement.
22     Q.   What roles did you play in law
23 enforcement?
24     A.   I was a city police officer in a city
25 in the East Bay of San Francisco.

Highly Confidential - Subject to Further Confidentiality Review

Page 358

1 　Q.　Back to your time at McKesson. Could
2 you describe for the jury the various positions you
3 held at McKesson beginning in 1987.
4 　A.　1987 I joined the company with a
5 subsidiary company in the transportation group,
6 transportation and warehousing. And that company
7 transitioned to the McKesson Drug Company in roughly
8 1991. Was in a staff role for a short period of
9 time, a staff role in transportation.
10 　Then I became the Distribution Center
11 Manager in Sacramento, promoted to the Vice President
12 of Distribution Operations for the Western Region.
13 It was a newly-created position.
14 　And subsequently, in roughly 1996, I was
15 promoted to the Senior Vice President of Distribution
16 for McKesson Pharmaceutical.
17 　Q.　And when did you become Senior Vice
18 President of Distribution for McKesson
19 Pharmaceutical?
20 　A.　It was 1996. I don't remember
21 exactly when in '96.
22 　Q.　And that was also the position you
23 held when you retired from McKesson; is that correct?
24 　A.　Yes, it was.
25 　Q.　When did you retire?

Page 359

1 　A.　June of 2015.
2 　Q.　You've mentioned today that your
3 former employer, McKesson, is a wholesale distributor
4 of pharmaceuticals. Can you describe how that
5 business operates at a high level?
6 　A.　At a high level, McKesson, as the
7 other major distributors operate, we purchase
8 pharmaceuticals and medicines from the manufacturers.
9 We virtually warehoused all of the various
10 medications of manufacturers in our warehouses.
11 　And on a daily basis, we supplied those
12 pharmaceuticals to pharmacies, the major groups
13 of pharmacies that we had were -- are independent
14 pharmacies, single owner; or generally our retail
15 national account customers, which were the large
16 chains, like Rite Aid, and CVS and Walmart; our
17 hospital group; and then the federal government.
18 　Q.　And briefly, what were your job
19 responsibilities as Senior Vice President of
20 distribution operations at McKesson?
21 　A.　I was the senior staff operations
22 person for McKesson. I had the overall
23 responsibility for the distribution network.
24 　On my staff I had a support team made up of
25 a Transportation Group, an I.T. Support Group, our

Page 360

1 Regulatory Affairs Group was in there, and I had a
2 group that was responsible for construction and
3 building of our distribution centers.
4 　Q.　You mentioned Regulatory Affairs.
5 What kind of regulatory affairs matters were you
6 responsible for as Senior Vice President of
7 operations -- distribution operations, I should say?
8 　A.　McKesson, and the wholesalers as an
9 industry, are highly regulated. We have
10 responsibilities for a number of regulatory
11 requirements. The FAA, the Department of
12 Transportation, DOT, OSHA. We had hazardous material
13 requirements. Certainly we had responsibility for
14 compliance with DEA regulations. And various state
15 and local regulations as well.
16 　Q.　What was involved in the handling of
17 controlled substances in particular?
18 　A.　Our -- our distribution network in
19 handling controlled substances was complex. The
20 requirements under the federal code ensure -- wanted
21 to ensure that we had systems in place to prevent
22 diversion, primarily around security, as the code
23 spelled out.
24 　And so the inside of our buildings, the
25 controlled substances divided into two major areas.

Page 361

1 One, in what we called the narcotics Class 2
2 controlled substances were stored in a vault, much
3 like a bank vault, and the balance of the controlled
4 substances were stored in a locked and secured cage.
5 There was requirements for alarm. The physical --
6 the physical construction of both the vault and the
7 cage were specified under regulation.
8 　And, in addition, we had reporting
9 requirements to the DEA, the ARCOS reporting, which
10 was the month-end reporting of all of our sales. We
11 needed to reconcile all of our receipts and all of
12 our sales and our inventory, along with the physical
13 inventory, to ensure that we could account for each
14 and every one of the controlled substances that was
15 in our possession that was reportable.
16 　We had reporting requirements on suspicious
17 orders. Our suspicious order reporting we called at
18 the time -- prior to 2008 we gave it a moniker that
19 said -- basically a report number called DU45, and we
20 provided that suspicious order reporting to the local
21 DEA field offices, as required.
22 　Q.　And you described the DU45 report.
23 What was the DU45 report exactly?
24 　A.　The DU45 was a report that reviewed
25 sales of customers' purchases of controlled

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1 substances. And based on an algorithm that had been
2 developed many years ago, I'm not sure when,
3 identified any sales that might have been of unusual
4 size, frequency, or a pattern, to ensure that we were
5 complying with that portion of the Federal
6 Regulation.
7    Q.    And over what period did McKesson
8 generate the DU45 report for the purpose of reporting
9 to DEA?
10    A.    I'm not certain when we started to
11 provide that report. But during my tenure there,
12 we -- at McKesson we provided that report up until
13 the 2008 time frame, at which time, as a result of
14 our Settlement Agreement with DEA, we ceased
15 providing that report to the DEA.
16    Q.    When you first became Senior Vice
17 President of Distribution Operations back in 1996,
18 what was McKesson's relationship with the DEA like?
19    A.    I think I would best describe that
20 relationship as collaborative. On a regular basis
21 our distribution centers could engage local field
22 offices on inquiries and questions.
23       Conversely, DEA would contact us at a
24 headquarters level, our senior management, my
25 predecessor. And my regulatory team could pick up

Page 363

1 the phone and have conversations back and forth with
2 the DEA regarding various matters.
3    Q.    And how, if at all, did McKesson's
4 relationship with the DEA change over time?
5    A.    Well, in the -- it clearly in the
6 2005 -- late 2005/2006 time frame, after the new
7 administrator was in place, I would say McKesson's
8 relationship with DEA became more confrontational.
9    Q.    And you described earlier to
10 Mr. Kennedy that you had a five-year period, I think
11 it was, when you ran McKesson's Six Sigma program; is
12 that correct?
13    A.    That's correct. Roughly, in 2000 to
14 2005 I was not the Senior Vice President of
15 Operations, Distribution Operations, and did not have
16 responsibility for Regulatory during that time frame,
17 but was responsible for our Six Sigma process
18 improvement.
19    Q.    So starting with your return to the
20 Senior Vice President of Distribution Operations'
21 position in 2005, what interactions did you
22 personally have with DEA?
23    A.    The first personal interaction I had
24 with DEA was the -- was the January 6, 2000 -- or
25 excuse me, January 2006 meeting that we had in

Page 364

1 Washington, D.C., in which we reviewed the Florida
2 and the Internet pharmacies and -- with
3 Mr. Rannazzisi and other members of his staff.
4    Q.    Who -- other than the people you just
5 mentioned, who attended that January 2006 meeting?
6 Maybe starting from McKesson.
7    A.    My recollection is I attended; Bill
8 Mahoney, who was our Distribution Center Manager in
9 Florida; John Gilbert, who is our outside counsel;
10 and I believe that Gary Hilliard, who was on our
11 Regulatory team, also participated in that meeting
12 from McKesson.
13       From DEA, Mr. Rannazzisi, their outside
14 counsel, and one or two other members of his
15 Diversion Control staff.
16    Q.    What message did you take out of the
17 January 2006 meeting at DEA headquarters?
18    A.    I -- the messages that I took out
19 were several. First and foremost, was DEA's concern,
20 it was very clear to us, over the Internet pharmacies
21 that they identified in Florida. You know,
22 Mr. Rannazzisi unexpectedly asked to have us
23 surrender our DEA registration for our Florida
24 Distribution Center.
25       And in the course of discussions, there were

Page 365

1 a couple of key themes that came out. One is that we
2 had a responsibility to -- which it, quite frankly,
3 was the first that we had ever heard from DEA that
4 we -- you know, his statement was, why would you ever
5 ship an order that you identified as suspicious? And
6 he viewed our DU45 report as inadequate and not
7 meeting the -- their needs.
8       He -- and, again, this is the first that we
9 had had any indication, after many, many years of
10 providing it, that there was any concern over our
11 DU45, our suspicious order reporting.
12    Q.    You mentioned that Mr. Rannazzisi, or
13 DEA, expressed that the DU45 report was inadequate.
14 What -- what was the issue that DEA raised with the
15 DU45 report?
16    A.    I think it was -- as I -- as I
17 interpreted the discussion, it was really a matter of
18 just the volume -- he used the term "excessive order
19 report," and that the volume of data was -- was not
20 usable, you know, to DEA. And it was just -- didn't
21 view it as a valuable report to -- you know that they
22 could use to follow up on.
23    Q.    And so in the area of suspicious
24 order reporting, what was the message you received
25 from DEA at the January 2006 meeting?

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1     A.   I came away from there that -- with a
2 very clear view that report only orders that are
3 truly suspicious. That the requirement for --- the
4 bar for reporting suspicious orders, because of his
5 statement that, you know, we -- a suspicious order, a
6 suspicious customer should not receive any controlled
7 substances, we went away from there with a very
8 serious view around correlating the suspicious orders
9 with ceasing selling controlled substances to a
10 customer.
11     Q.   So you've described a message that
12 once deemed suspicious, an order should not be
13 shipped. And you've described a message that, I
14 think you said, a customer should not receive any
15 order of controlled substances if an order placed is
16 deemed suspicious?
17     A.   No. If we -- if we deem that
18 customer to have a suspicious pattern of orders or a
19 business model that was suspicious, then we should
20 cease selling controlled substances to them
21 altogether.
22     Q.   And you mentioned that some of these
23 messages, it was the first time you had heard these
24 things. And could you describe your reaction to
25 these messages that you've explained today.

Page 367

1     A.   Well, the first reaction I had was it
2 was significantly different than the interaction that
3 we had had with DEA in the past. It was clear that
4 there was a different view of the distributors. And
5 from that we really made the determination that we
6 needed to go back and follow up and review our
7 processes and our -- in order to try to, you know --
8 the message was, from the DEA, is that there's an
9 issue. We're trying to solve it.
10     Our view was, is we've always collaborated
11 with DEA. So I took what was being said and tried
12 to, without specific guidance from them, to establish
13 a go-forward modification to our overall monitoring
14 program.
15     Q.   So did you take -- why don't you
16 describe any actions that you took following up on
17 that January 2006 meeting and the messages that you
18 received.
19     A.   Specifically after the meeting in
20 2007, we went back, and we immediately conducted
21 additional review and site visits to the pharmacies
22 that they had identified to us during the meeting.
23     We subsequently ceased selling controlled
24 substances to those pharmacies and reported such to
25 the DEA. Even though the -- you know, we learned

Page 368

1 that the DEA didn't make any changes in their DEA
2 registration, but we made the choice to cease selling
3 controlled substances to them.
4     We initiated -- we went back and initiated
5 the development of a new program, which evolved into
6 what we called the LDMP, which was the Lifestyle Drug
7 Monitoring Program. And primarily named because
8 during the meeting the DEA had used the term
9 "lifestyle drugs" to identify four drugs of concern
10 that they identified as part of the Internet
11 pharmacy, being the oxycodone, the hydrocodone,
12 pyrazoline and Phentermine.
13     MS. HENN: I'd like to show you an exhibit.
14 Let's get this marked as 84.
15     THE REPORTER: 804.
16     MS. HENN: 804. Thank you.
17     (Exhibit No. 804 was marked.)
18 BY MS. HENN:
19     Q.   Mr. Walker, the court reporter handed
20 you an Exhibit No. -- that's been marked 804. The
21 Bates number is -571361 through -65.
22     MR. KENNEDY: Counsel, 804, is this a
23 defense exhibit?
24     MS. HENN: It is.
25     MR. KENNEDY: Okay. Defense Exhibit 804.

Page 369

1     THE REPORTER: I just continued, if that's
2 okay, on the sequence.
3     MR. KENNEDY: Oh, okay.
4 BY MS. HENN:
5     Q.   Mr. Walker, do you recognize
6 Exhibit 804?
7     A.   Yes, I do.
8     Q.   What is Exhibit 804?
9     A.   This is a letter from Paul Julian,
10 our President, one of the senior members of McKesson,
11 to Mr. Rannazzisi in response to the meeting that we
12 had with DEA, in which he -- at a high level when he
13 has done is summarize the actions that we have taken,
14 how seriously we viewed the meeting, and how
15 seriously we reviewed -- or viewed our regulatory
16 obligations, and provided him examples of actions
17 that we had taken subsequent to the meeting.
18     Q.   And at the time this letter was sent
19 to Mr. Rannazzisi, did you receive a copy of this
20 letter?
21     A.   Yes, I did. I was -- I believe I was
22 copied on the letter.
23     Q.   On the --
24     A.   Yes. Yes, I was.
25     Q.   Okay. Turning to the second page of

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1 the letter, page 2. Could you read what McKesson's
2 Mr. Julian writes to Mr. Rannazzisi in the first
3 paragraph.
4     MR. KENNEDY: Objection.
5     THE WITNESS: (Reading) In this regard I
6     must rebut any impression that
7     McKesson has not seriously considered
8     and responded to the information
9     provided by DEA about the
10    management -- about the problem of
11    "Internet pharmacies." After the
12    September meeting with DEA, senior
13    management responsible for all
14    McKesson distribution centers were
15    provided with the -- with a summary of
16    the issues raised by the DEA about
17    Internet pharmacies and DEA's view of
18    what constitutes an illegal Internet
19    pharmacy. Additionally, discussions
20    on the appropriate next steps were
21    reviewed and included running regional
22    sales reports based on the criteria
23    provided by DEA. At the September
24    meeting, DEA identified Colorado
25    pharmacies by name. Upon notification

Page 371

1     that DEA had suspended the
2     registration of these pharmacies,
3     McKesson immediately terminated the
4     authority for these Colorado
5     pharmacies to order controlled
6     substances from McKesson (end of
7     reading).
8 BY MS. HENN:
9     Q. And, Mr. Walker, I think you had
10 told -- you had testified, in response to
11 Mr. Kennedy's questions, that you were not present at
12 the September 2005 meeting between McKesson and the
13 DEA; is that correct?
14    A. That is correct.
15    Q. Were you involved in any of the steps
16 described in Mr. Julian's letter to the DEA,
17 following that September 2005 DEA meeting?
18    A. I don't recall specifically being
19 involved in the -- in the steps related to the
20 Colorado pharmacies.
21    Q. Moving down to the paragraph -- the
22 third paragraph on this page, starting with, "On
23 November 21st, 2005." Could you read that paragraph
24 that Mr. Julian wrote to Mr. Rannazzisi at the DEA.
25    MR. KENNEDY: Objection.

Page 372

1     THE WITNESS: (Reading) On November 21st,
2     2005, DEA notified McKesson through
3     outside counsel that DEA was extremely
4     concerned about excessive distribution
5     of hydrocodone products to six
6     specific pharmacies in the Tampa,
7     Florida area. There's a footnote.
8     McKesson immediately imposed a
9     limitation on all of these pharmacies
10    and cut the sales of hydrocodone to
11    these pharmacies to only 10 percent of
12    their prior orders. McKesson also
13    began an investigation of all these
14    pharmacies which included requesting
15    additional information from the
16    pharmacies about their customers and
17    steps taken to verify that their --
18    that the prescriptions filled are
19    legitimate. McKesson sales managers
20    have been visiting the accounts
21    inquiring into the nature of their
22    business activity (end of reading).
23 BY MS. HENN:
24    Q. And you mentioned there's a footnote
25 in that paragraph. If you could read that footnote

Page 373

1 to yourself. My question for you is whether you're
2 familiar with what's described in Footnote 1?
3     A. Yes. During -- during this same time
4 frame, there was a number of different events that
5 were affecting the country. Hurricane Katrina had
6 just gone through, and specifically in Tampa, Florida
7 and Northern Florida was -- hurricane Wilma was
8 coming through. It was our normal practice with
9 customers where we anticipate, particularly with
10 hurricanes, where we anticipate that there was going
11 to be a business interruption due to the storm, for
12 them to ensure that they ordered in advance and
13 stocked their pharmacies so that after the hurricane
14 passed, that they could come up back into business as
15 quickly as possible, particularly because their --
16 the need becomes very great post hurricanes for
17 certain medications.
18     And there was a concern expressed around the
19 quantities to one of the pharmacies, United
20 Prescription, where we sold a significant quantity in
21 a short amount of time. But at the same time, right
22 after the hurricane passed, and subsequent to that,
23 the volume that the pharmacy purchased dropped
24 dramatically.
25     MR. KENNEDY: I'm going to move to strike.

Page 374

BY MS. HENN:

Q. Mr. Walker, setting aside this letter. In your testimony a few minutes ago, you referred to the Lifestyle Drug Monitoring Program. Could you describe the general contours of the Lifestyle Drug Monitoring Program.

A. We -- this was really the beginning of our overall control of the monitoring program. We focused on the four lifestyle drugs that had been identified in the January meeting. We established a mechanism of thresholds DEA had shared with us in the -- in the meetings that we had had, that they viewed that the average pharmacy purchases per month for a given -- for across the nation for these certain drugs is about 5,000 dose units.

Our own internal data we reviewed, it was -- the average was closer to 8,000 dose units for our customer base. And we then used the information, the data, to establish these thresholds.

We then ran -- we monitored the sales in terms of dose units purchased, which required a significant change in -- from a systems standpoint because we had to combine all of the individual items, unique items, that constitute a given base code. So basically all the brand, generic, all the

Page 375

items that were, for example, hydrocodone, had to be collated together and multiplied out in terms of the base -- the dose units. A complex process.

But we -- we then ran reports on a monthly basis to ensure that it identified any customers that exceeded their threshold. From that we conducted additional follow-up, and to review. And we also instituted our -- the beginning of our questionnaire process for new customers and the regulatory review process that evolved into CSMP.

Q. Why did you take these actions following the January 2006 meeting with DEA?

A. It was our -- our intent to be very responsive to -- we had long taken guidance from DEA and taken it seriously. So from that meeting, we determined that we needed to take actions that would address the issues that were raised by DEA during that meeting. And that was, you know, a very focused part of our effort.

Q. Mr. Kennedy had a lot of questions for you earlier today about a 2008 Settlement Agreement between McKesson and the DEA. Do you recall those questions?

A. Yes.

Q. You've explained that as a result of

Page 376

the January 2006 meeting, you learned that DEA was not satisfied with McKesson's DU45 report. Do you remember explaining that?

A. Yes, I do.

Q. Did the 2008 Settlement Agreement have provisions in it about what was to replace the DU45 reporting?

A. Specifically in the Settlement Agreement, it was agreed that there would be a significant change in suspicious order reporting. That at an agreed-upon time, we would cease providing them a -- the DU45 suspicious order reporting, and we would replace it with a format that was mutually agreed upon between the two parties.

And probably the most significant change was that we would no longer report suspicious orders to field offices, as stated in the regulation because, in fact, that we would be reporting directly to DEA headquarters. And from that, we recognized that there would be a mutual effort from the two I.T. groups, being DEA and McKesson, to develop the system's interface to execute the suspicious order reporting.

MS. HENN: I'd like to mark as Exhibit 805, Defense Exhibit 805, a copy of the Settlement and

Page 377

Release Agreement from 2008.

(Exhibit No. 805 was marked.)

BY MS. HENN:

Q. Mr. Walker, do you recognize Exhibit 805? The Bates number is -516360.

A. Yes, I do.

Q. Were you involved -- or let me just ask you, what was your involvement in the process that led to this 2008 Settlement Agreement with the DEA?

MR. KENNEDY: Okay. Just to interrupt. This has already been marked, do you understand? So you have -- this exhibit will be marked twice?

MS. HENN: I'm not sure it's the same Bates numbered version, but --

MR. KENNEDY: All right.

MS. HENN: -- that's fine.

Q. Did you want me to repeat the question?

A. No. I think I remember your question.

Q. Okay.

A. My -- my role in the overall Settlement Agreement was to provide feedback to counsel, who was interacting with DEA counsel, and to

Page 378

1 primarily focus on operationalizing the commitments
2 that we were negotiating, making in the -- in the
3 agreement.
4      Q.     And in the agreement you mentioned
5 there were provisions dealing with suspicious order
6 reporting. Could you point us to those provisions
7 that you were referring to?
8      A.     Well, the first is -- is under "Terms
9 and Conditions" on page 3, 1(a), Obligations of
10 McKesson to -- Obligations of McKesson. And (a) --
11 do you want me to read this, Counsel, or --
12      Q.     Yes, please.
13      A.     (Reading) McKesson agrees to
14        maintain a compliance program designed
15        to detect and prevent diversion of
16        controlled substances as required
17        under the CSA and applicable DEA
18        regulations. This program shall
19        include procedures for -- to review
20        orders for controlled substances.
21        Orders that exceed established
22        thresholds and criteria will be
23        reviewed by a McKesson employee
24        trained to detect suspicious orders
25        for the purposes of determining

Page 379

1        whether such orders should not be
2        filled and reported to the DEA or,
3        based on a detailed review, the order
4        is for a legitimate purpose and the
5        controlled substances are not likely
6        to be diverted into other than
7        legitimate medical, scientific, and
8        industrial channels. Orders
9        identified as suspicious will be
10        reported to the DEA as discussed in
11        subsection II (end of reading).
12      Do you want me to continue?
13      This compliance program shall apply --
14      Q.     Actually, Mr. Walker, I would like to
15 stick on the subject of suspicious orders. So let's
16 continue to that cross-reference.
17      A.     Okay. II.1(c). II.1(c):
18        (Reading) McKesson shall inform DEA of
19        suspicious orders as required by 21
20        C.F.R in a format mutually and
21        responsibly agreed upon by the
22        parties, except that contrary to DEA
23        regulations, McKesson shall inform DEA
24        headquarters rather than the local
25        field office of suspicious orders,

Page 380

1        unless and until advised otherwise in
2        writing by DEA headquarters. DEA
3        agrees to notify all of the DEA Field
4        Offices within 30 days of the
5        effective date of this agreement that
6        McKesson will no longer be required to
7        provide suspicious order reports or
8        any other types of reports regarding
9        excessive purchases or controlled
10        substances to the DEA Field Offices,
11        and that this agreement shall
12        supersede any DEA regulatory
13        requirements to report suspicious
14        orders to DEA (end of reading).
15      Q.     Mr. Walker, where had the DU45
16 report, that you described earlier, where had that
17 been reported or to whom had that been reported when
18 it was being used at McKesson?
19      A.     In compliance with the regulation
20 that specified we would send them to the local field
21 office, those -- those reports went directly to the
22 effective -- or the respective local field offices
23 for that DC.
24      Q.     And we will get to in a minute the
25 new program that was put in place for reporting

Page 381

1 suspicious orders.
2      You have described the Lifestyle Drug
3 Monitoring Program. Earlier today Mr. Kennedy asked
4 you a lot of questions about the next program that
5 McKesson developed. That was called what?
6      A.     The Controlled Substance Monitoring
7 Program, or CSMP.
8      Q.     What was the difference between the
9 new CSMP program that was put into place and the
10 LDMP, or Lifestyle Drug Monitoring Program?
11      A.     There were a number of things that --
12 that were done at that time. First, the difference
13 specifically in the programs is we continued to use
14 the concept of thresholds to monitor specific orders.
15 The significant difference was that we created a
16 systemic solution to total the dose units purchased
17 by a given pharmacy on a given controlled
18 substances -- substance. And if the order that was
19 generated at any given time caused the pharmacy to go
20 above the threshold, that entire order was blocked.
21 The blocking of orders was a piece.
22      We had -- we continued to have the
23 three-part review. The difference being is that the
24 blocked order triggered a review process, but we
25 still maintained a three-tiered escalation process

Page 382

1 and how we would report to the DEA.

2       We enhanced the questionnaire and document.

3 And it -- outside of specifically the CSMP, but our

4 overall regulatory effort, we invested, well,

5 significantly in the I.T. effort to solve the CSMP

6 I.T. side, but we also expanded our regulatory force,

7 adding the four new directors of Regulatory Affairs,

8 one assigned to each region.

9       Q.    And we looked at the provisions of

10 the 2008 agreement.  That's still in front of you.

11 What actions did McKesson take to implement those

12 provisions, specifically dealing with suspicious

13 order reporting?

14      A.    To -- to create this mutually agreed

15 upon format, we designated an I.T. team, led by an

16 individual on my staff, who was going to interact

17 with the DEA I.T., lead from DEA that they

18 identified, to just fundamentally work through all

19 the technology interfaces.  Getting two systems to

20 speak to one another is not an easy task.  It is

21 complex, making sure that the data that was being

22 sent to DEA was understood by DEA, that they could

23 recognize it, were some of the pieces that needed to

24 take place.

25      So we had a fairly significant I.T. team and

Page 383

1 I.T. investment to execute the establishment of the

2 suspicious or recording mechanism to report to DEA.

3      Q.    As this development effort was

4 underway to develop a new system of suspicious order

5 reporting between McKesson's I.T. and the DEA's I.T.

6 people, how did McKesson report suspicious orders in

7 that interim period?

8      A.    We -- we continued to submit the DU45

9 to local field offices.  And, in addition, as we

10 identified customers that we had done the due

11 diligence, who had gone through our three-tiered

12 review, and we had made a determination that we were

13 no longer going to sell controlled substances to

14 these customers, we reported those to DEA.

15      And the way -- in fact, I did that work.  I

16 would contact DEA directly to ensure that they were

17 aware of the actions we were taking and ensure that

18 they knew that we were reporting those suspicious --

19 those orders and customers to them.

20      Q.    And you mentioned that the DU45s were

21 continued -- McKesson continued to send those while

22 the new system was in development.  When did McKesson

23 cease providing DU45 reports to the DEA?

24      A.    I think in January of '09, we finally

25 reached mutual agreement that we had a system that

Page 384

1 could talk back and forth.  And I think in January of

2 2009 is when we ceased providing DU45.

3      MS. HENN:  Let's mark another exhibit,

4 No. -- Defense Exhibit 806.

5      (Exhibit No. 806 was marked.)

6 BY MS. HENN:

7      Q.    Mr. Walker, you've been handed

8 Defense Exhibit 806, which is Bates

9 No. McKesson-WVA-167.

10      Do you recognize this document?

11      A.    Yes, I do.

12      Q.    What is this?

13      A.    This is a memo from -- or an email

14 memo from me to our field distribution teams and

15 distribution centers advising them that -- this is

16 dated January 22nd of '09 -- that we would no longer

17 be providing the DEA with the end-of-month DU45 or

18 the Suspicious Order Report, and that our new

19 reporting mechanism was in place and established as

20 part of our agreement with DEA, and directed the DCs

21 not to submit those reports to the local field

22 offices.

23      Q.    Thank you.

24      And, again, why did McKesson cease providing

25 the DU45 at this point in time, January 2009?

Page 385

1      A.    It was part of our settlement

2 agreement that we agreed to.

3      MS. HENN:  Let's take a look at another

4 exhibit, which I will mark -- ask the court reporter

5 to mark as 807, Defense Exhibit 807.

6      (Exhibit No. 807 was marked.)

7 BY MS. HENN:

8      Q.    Mr. Walker, you've been handed

9 Defense Exhibit 807, which is a Bates No. MCK-WVA-88.

10      Do you recognize this document?

11      A.    Yes, I do.

12      Q.    What is it?

13      A.    This is an email sequence originating

14 from me to Kyle Wright -- Kyle Wright is a staff

15 member of DEA Diversion Control -- advising him that

16 we had ceased selling controlled substances to a

17 pharmacy in San Antonio, Texas.  In the body of

18 the -- of the email I provided him the information as

19 to why we made the decision and the actions that we

20 had taken, primarily to give DEA some additional

21 background that they wouldn't get in just a simple

22 electronic transmission.

23      And he subsequently acknowledged the receipt

24 and also asked me to advise their local field office

25 in San Antonio of the action.

Page 386

1    Q.    And the date of this email exchange
2  is August 14th, 2008; correct?
3    A.    That's correct.
4    Q.    So -- so this email exchange took
5  place before McKesson ceased providing DEA with the
6  DU45s, as we saw on Exhibit 806; correct?
7    A.    That is correct.
8    Q.    Before we move off of this
9  Exhibit 807, in your email to Kyle Wright, on the
10  second page of the document, you write, quote:
11        (Reading) Since we are still
12        finalizing the electronic protocol, no
13        systemic report will be made (end of
14        reading).
15    Do you see that?
16    A.    I do.
17    Q.    What -- what does that mean?  What
18  were you conveying to Mr. Wright, of the DEA?
19    A.    Just reminding him that we did not
20  have the systemic system in place.  I wanted to
21  ensure that he knew that this was the only mechanism
22  that we had to specifically call out this customer
23  that we had ceased selling controlled substances to.
24    Q.    And do you recall whether you
25  provided any data to the DEA about this pharmacy's

Page 387

1  orders, aside from what's in this email?
2    A.    I don't recall.  I did offer it up in
3  the email that any data that they needed for their
4  follow-up or additional inquiry, we would provide.
5  But I don't recall that there was any request for
6  additional information.
7    Q.    Mr. Walker, who at McKesson was
8  responsible for setting up the electronic reporting
9  system that was put into place after the 2008
10  Settlement Agreement with DEA?
11    A.    Working on my -- on my team, on my
12  I.T. group, was a lady named Jenny Melton.  She was
13  the project lead and coordinator, and she was the
14  direct contact with the DEA contact from the I.T.
15  side.
16    Q.    And at the time Ms. Melton was
17  working on this project, were you from time to time
18  aware of communications back and forth between
19  Ms. Melton and her counterpart at DEA?
20    A.    At a high level, yes, I was aware.  I
21  was aware that there was actually fairly frequent
22  conversations back and forth between Jenny and the
23  I.T. team at DEA.
24    MS. HENN:  I'd like to mark another exhibit,
25  ask the court reporter to mark this as Defense

Page 388

1  Exhibit 808, please.
2        (Exhibit No. 808 was marked.)
3  BY MS. HENN:
4    Q.    So, Mr. Walker, you've been handed a
5  document marked Defense Exhibit 808.  The Bates
6  number is MCK-WVA-139.  And this is a somewhat
7  lengthy chain of emails, but I'll ask you if you
8  recognize it?
9    A.    Yes, I've seen this document before.
10    Q.    What is the date on which you
11  received this email chain?
12    A.    I received the email chain on
13  November 4th of 2008.
14    Q.    And what is it exactly?
15    A.    This is a document, and attached is
16  an email from DEA to Jenny, some of which was
17  specific in terms of the data details of the I.T.
18  systems that they were -- really in direct response
19  to some questions that Jenny had, I think, to the
20  individual was Noel Goretsas, who, if I recall, was
21  the I.T. lead for DEA.
22    Q.    So you're looking at page 2 of the
23  email, from Noel Goretsas, at the DEA, to Jenny
24  Melton, at McKesson, your I.T. lead?
25    A.    Yes.

Page 389

1    Q.    What information did DEA, through
2  Noel Goretsas, communicate to Jenny Melton in the
3  course of this work to set up the electronic system
4  about suspicious order reporting?
5    A.    There were -- there were a couple of
6  questions that were answered.  In looking at the page
7  -142, it provided the technical view on the
8  characters or basically the I.T. format, but also
9  stated that a suspicious order should be reported to
10  DEA only after your company has completed its due
11  diligence and determine that you will not complete
12  the sale because it is suspicious.  Stating that
13  suspicious orders are not sales or potential sales.
14    And there was some other discussion around
15  suspicious orders.  And then he noted that, report a
16  suspicious order as soon as your company had decided
17  that they will not make the sale because it is
18  suspicious.
19    Q.    So was this -- were these -- was this
20  guidance that Mr. Goretsas was providing to McKesson
21  consistent with what you had heard, even dating back
22  to the January 2006 meeting you described with
23  Mr. Rannazzisi and the others from the DEA?
24    A.    Yes, it was -- it was consistent with
25  the messaging that I heard in the 2006 meeting.

Highly Confidential – Subject to Further Confidentiality Review

Page 390

1    Q.   And what did this guidance from DEA
2  mean, in terms of the suspicious order reporting that
3  McKesson would be making to the DEA, if you compare
4  the old DU45 system and this new system put in place
5  pursuant to this guidance?
6    A.   First, is that the numbers of
7  suspicious orders that we would report would be
8  significantly less because the methodology in which
9  we were determining whether something was suspicious
10 was far more involved.
11      We would also, in the course of this, be
12 answering their question around ensuring that we were
13 providing them with usable information.
14      And those were our primary intents, was to
15 ensure that our suspicious order reporting was
16 complying with what -- what limited information they
17 provided us in that January 6 meeting.
18   Q.   And under the new system McKesson put
19 in place pursuant to this guidance from DEA, what was
20 the frequency of the reports of suspicious orders?
21   A.   I don't know that I can answer it in
22 terms of a specific frequency, other than there were
23 a lot fewer Suspicious Order Reports going -- going
24 to DEA.
25   Q.   Did this make sense to you?

Page 391

1    A.   Yes, it did.
2    Q.   Why?
3    A.   My view was that we were -- in our
4  suspicious order and our Controlled Substance
5  Monitoring Program, we were really focused on
6  identifying pharmacies that after the due diligence
7  we had a high degree of confidence were not
8  necessarily complying with their regulatory
9  obligations and potentially diverting controlled
10 substances.  And we created as a -- as a very high
11 standard to report the term suspicious order.  And
12 suspicious -- and with that, it just reduced the
13 number of customers or pharmacies that we were
14 reporting to the DEA.  And very specifically trying
15 to provide them with as much information and expedite
16 the process in their respective enforcement
17 activities.
18   Q.   And you've described that under the
19 new system put in place pursuant to the DEA guidance,
20 there would be -- the frequency of suspicious order
21 reporting and the number of Suspicious Order Reports
22 would be fewer or less.
23      Was there any change to the other types of
24 reporting that you, McKesson, provided to DEA, that
25 you've described today?

Page 392

1    A.   No.  I mean, the ARCOS reporting
2  requirement remained the same.  We continued to
3  report and supply DEA with all of the ARCOS data
4  throughout this process.  The ARCOS reporting was
5  uninterrupted and not changed.
6      MS. HENN:  Let's take a look at another
7  exhibit.  This is internal No. 6.  And I'm going to
8  have the court reporter mark this one as Defense
9  Exhibit 80?
10     THE REPORTER:  809.
11         (Exhibit No. 809 was marked.)
12 BY MS. HENN:
13   Q.   Mr. Walker, you've been handed a
14 document marked Defense Exhibit 809, Bates
15 No. MCK-WVA-163.
16      Do you recognize Exhibit 809?
17   A.   Yes, I do.
18   Q.   What is it?
19   A.   This is an email, again, originating
20 with me, to Kyle Wright at DEA, advising him of a
21 suspicious order pattern that we had identified in
22 which we ceased selling controlled substances to a
23 pharmacy.
24      And at this point we had also completed the
25 interface between the two, but it was my view I

Page 393

1  wanted to ensure that -- as with all I.T., I wanted
2  to make sure that the information got to those that
3  needed it, and backed it up with an email that I sent
4  to Kyle Wright.
5      He responded and acknowledged the two
6  suspicious order designations or notifications and
7  directed me to a different DEA associate in contact
8  going forward, Maureen O'Keefe.
9    Q.   Who is Maureen O'Keefe?
10   A.   I don't -- she's staff coordinator,
11 according to the memo from Kyle.  She was on the
12 diversion staff.
13     MS. HENN:  Okay.  And let's mark another
14 exhibit.  This will be -- I will ask that this be
15 marked Defense Exhibit 810, please.
16         (Exhibit No. 810 was marked.)
17 BY MS. HENN:
18   Q.   You've been handed Defense
19 Exhibit 810 Bates No. MCK-WVA-187.
20      Do you recognize this document, Mr. Walker?
21   A.   Yes, I do.
22   Q.   What is it?
23   A.   This is a -- an email from me to
24 Maureen O'Keefe, DEA, in which we identify the -- a
25 pharmacy that we ceased selling controls, and

Page 394

1  provided some background information. But also
2  wanted to ensure that they could look at and
3  determine and verify that the suspicious order
4  reporting that we sent matched the data set that I
5  attached to the document.
6      Q.   And I will show you -- well,
7  actually, what is attached to the document?
8      A.   This is a summary of orders for a
9  given pharmacy which we did not fill and that were --
10 and subsequently reported to DEA as suspicious.
11     MS. HENN: I will show you one more example.
12 We will mark this exhibit as Defense Exhibit 811,
13 please.
14         (Exhibit No. 811 was marked.)
15 BY MS. HENN:
16     Q.   Mr. Walker, you've been handed
17 Defense Exhibit 811. And I don't think we have a
18 Bates number, but I will try to find out what that
19 is. Oh, actually, I know what it is, but it's not
20 appearing on the document. The Bates number is
21 -534479.
22     Mr. Walker, do you recognize Exhibit 811?
23     A.   Yes, I do.
24     Q.   What is it?
25     A.   This is an email message from Keith

Page 395

1  McIntyre, who was also on my I.T. team -- he was
2  responsible for the electronic submission of
3  Suspicious Order Reports to DEA once we were up and
4  running -- indicating that an order had been sent and
5  acknowledged receipt at DEA on September 1st, 2011.
6      Q.   Mr. Walker, setting that exhibit
7  aside.
8      After McKesson's Controlled Substance
9  Monitoring Program was in place, did you have further
10 interaction with the DEA about the program?
11     A.   Yes, I did. In July of 2008, shortly
12 after the settlement, we requested a meeting with DEA
13 at DEA headquarters so that we could review our
14 Controlled Substance Monitoring Program with them in
15 some -- in some detail.
16     Q.   I think Mr. Kennedy asked you about
17 that meeting as well earlier today; is that -- is
18 that correct?
19     A.   Yes, he did.
20     MS. HENN: Okay. I'd like to mark this
21 exhibit as 812, Defense Exhibit 812, please. But
22 Counsel, a similar document was marked, but this is
23 different, a different version.
24         (Exhibit No. 812 was marked.)
25 ///

Page 396

1  BY MS. HENN:
2      Q.   Mr. Walker, you've been handed
3  Defense Exhibit 812. And the Bates number, again, is
4  not appearing on the document you have, but it's
5  -542494. Or maybe it is on yours, not on mine.
6      A.   I got it.
7      Q.   What is Exhibit 812, if you recognize
8  it?
9      A.   I recognize this. This is a
10 PowerPoint presentation that I created for the
11 meeting that we had with DEA in July of 2008.
12     Q.   Did -- who created this document?
13     A.   I created the document.
14     Q.   And what did you use this document
15 for?
16     A.   We made -- and I say "we." There
17 were people from McKesson that met with members of
18 the DEA Diversion Team in Washington, D.C. at their
19 headquarters, and the intent of this document was to
20 review with them in some level of specifics the way
21 that we had designed the program, how it was being
22 executed, and what we were -- we were going to do
23 with our Controlled Substance Monitoring Program.
24     Q.   Who was present at the July 31st,
25 2008, meeting, starting from the DEA this time, if

Page 397

1  you remember?
2      A.   My recollection was -- well, Kyle
3  Wright was there from DEA. And I believe Maureen
4  O'Keefe. And if I'm not mistaken, I believe I recall
5  that Barbara Boockholdt, all of which were members of
6  the diversion team. And there were some other
7  members that may have been present, one or two other
8  people.
9      Q.   And from McKesson?
10     A.   It was myself and counsel. I don't
11 remember if there were any other McKesson members
12 there.
13     Q.   Could you turn to page 4 of the slide
14 presentation. What were the components of the CSMP
15 that you discussed with DEA at the meeting?
16     A.   Components at a high level was --
17 really, the meat of the program was knowing your
18 customer, which would include the questionnaire and
19 the information that we would gather about the
20 customer and their business.
21     Establishing thresholds, you know, how we
22 would establish thresholds based on customers.
23 Again, knowing the customer, the size of the
24 pharmacy, the business that they -- they had, whether
25 they were supporting an orthopedic clinic or had a

Page 398

1 nursing home oncology, all of the things that can
2 drive a variation in prescriptions.
3     We were going to monitor our orders against
4 the thresholds that we established, you know, for the
5 customers, and that we would block any orders that
6 exceeded the threshold. So, again, if the order came
7 through, and that quantity ordered exceeded the
8 threshold, the order was blocked.
9     A review and escalation process. Once the
10 blocked order was in place, how we would report
11 suspicious orders and any other reports, and offered
12 up any other analysis or reports the DEA could
13 identify that could help them in their enforcement
14 activities.
15     Q.    And turning to page 6, slide 6 of
16 your presentation to the DEA.
17     What did you tell the DEA about steps that
18 McKesson was going to take with respect to existing
19 customers?
20     A.    We -- there were -- there were
21 several points that we covered with DEA, that from an
22 existing customer standpoint, we would establish the
23 thresholds. We would review their 12-month purchase
24 history. We would establish default volumes or
25 quantities in each one of the controlled substances.

Page 399

1 We emphasized that unlike the LDMP, that the CSMP
2 covered all of the controlled substances that we
3 distributed.
4     There's a lot of focus around the controls
5 that have been abused, but there is a total of -- if
6 I recall, somewhere in the area of the mid 80s,
7 different control base-codes that we also managed
8 under this program.
9     So we had to establish, and we explained to
10 them we had to establish thresholds for every base
11 code for every customer that we had.
12     We indicated that we were going to conduct
13 site visits to customers, and based on priority.
14 They had in the meetings communicated to us that
15 their primary concern in pharmacies that had to
16 date -- to that date, had displayed the greater
17 propensity for illegal -- what they called illegal
18 activity, were independent pharmacies. So we viewed
19 that we needed to prioritize the independents first,
20 focusing on the lifestyle drugs, and ensuring that we
21 understood, you know, where pharmacies had dose
22 quantities that were greater than 25,000.
23     We were also clear with them at the time
24 that we -- how we were going to interact with our
25 retail national accounts. That we would utilize the

Page 400

1 retail national accounts' internal regulatory and
2 loss prevention security organizations to assist us
3 as a insight into their pharmacy practices and their
4 overall control.
5     Q.    And one quick question about the
6 analysis of 12-month purchase history that you
7 discussed. It talks -- the slide says, "Set
8 threshold if above family code default." And then it
9 says, "Default if below."
10     What does "default if below" mean?
11     A.    If, depending on the -- on the
12 generic base code -- the family code was basically
13 the size of the pharmacy. If their 12-month purchase
14 history, let's just say, it was a fairly large
15 pharmacy but their behavior in terms of purchases or
16 controlled substances was significantly less than
17 what is the average, if you will, for that particular
18 size pharmacy was, we would default to a lower
19 number.
20     So we would always trying to establish
21 thresholds at a -- at a low number to ensure that all
22 the pharmacies were being evaluated appropriately.
23     Q.    And turning to page -- slide 9. What
24 did you communicate with DEA during the July 2008
25 meeting about the blocking of orders under the CSMP

Page 401

1 program at McKesson?
2     A.    In the meeting and in discussions
3 with them, that we explained very clearly that we
4 would block the orders that exceeded threshold. That
5 it was specific to the base code and specific to the
6 registrant.
7     And that was a critical piece because many
8 customers have in our system multiple customer
9 numbers. And the DEA's -- in prior meetings it had
10 expressed some concern of making sure that we
11 understood all the sales that went to a customer.
12     So we made sure that they understood it was
13 specific to their registrant, which is a unique
14 number for the DEA, even though there might be
15 multiple McKesson customer numbers.
16     There was no override. There was not going
17 to be any override capability. Any changes in the
18 threshold would be -- would be required. And then a
19 threshold change process was going to be implemented
20 to adjust any thresholds with the documentation.
21     And the customer notification, we were very
22 clear that we would notify -- that DEA -- the DEA
23 that we would alert the customer if they were
24 approaching their threshold along with the -- an
25 invoice notification so that the customers were aware

Page 402

1  and -- and, again, explained to them the issues that
2  we had with ensuring the customers had the ability to
3  fulfill their orders for their patients when the
4  orders were absolutely critical and necessary for
5  fulfilling scripts.
6      Q.   Turn to slide 13.  What information
7  did you provide to DEA during this July 2008 meeting
8  about the suspicious order reporting component of the
9  CSMP?
10     A.   We communicated that -- we understood
11 that there was still the ongoing work that we were
12 prepared to stop, the DU45 reporting to DEA Field
13 Offices at the time that they agreed and we agreed --
14 and primarily they agreed that the format was
15 acceptable to them in terms of the reporting.
16     There was -- there certainly was a lot of
17 contact with DEA around the format and the -- and the
18 process that we were going to go through.  And,
19 again, what we were trying to be is -- in this
20 meeting, was clear with them that if there was a
21 concern or there's other information that we needed
22 to have, that they could provide it.
23     And, quite frankly, one of the other things
24 we asked is to get feedback and create a feedback
25 process on orders that were reported.  We -- we

Page 403

1  wanted to understand the effectiveness of our
2  reporting and our CSMP to understand whether we were
3  providing them the information that they needed to
4  manage their enforcement responsibilities for
5  pharmacies.
6      Q.   Did DEA provide that feedback that
7  McKesson requested?
8      A.   No, they did not.
9      Q.   What was the DEA's reaction to all of
10 this information that you provided during the July
11 2008 meeting about the new CSMP program you put into
12 place?
13     A.   My -- my recollection of the meeting
14 was that the DEA was -- well, first, they -- it is
15 not their habit nor did I expect them to provide a
16 stamp of approval on it.  But their -- overall the
17 types of discussion and the questions were positive.
18 There was, you know, a fair amount of body language.
19     So my takeaway was, is that they were
20 satisfied with the -- with what we had presented to
21 them.  And additionally, there wasn't any "you missed
22 it."  There was no direction from them that we had
23 failed in meeting any of the components of the
24 Memorandum of Agreement, nor did they provide any
25 specific guidance at all on the -- on the program or

Page 404

1  what we could do differently, better, et cetera.
2      Q.   Did you have any follow-up meetings
3  about the CSMP with the DEA after this July 2008
4  meeting, that you recall?
5      A.   Well, during -- during the meeting
6  that we had with DEA, we -- we asked -- and, again,
7  the reason we asked is that they were clear around
8  wanting to have more centralized control over
9  suspicious order reporting.
10     But what we wanted to do was we wanted to go
11 to local field offices and share with the local field
12 offices what we were doing with our Controlled
13 Substances Monitoring Program.  We did that.  We took
14 an offshoot of this document and provided that to the
15 DRAs so that they could, in fact, have meetings with
16 the local field offices if the field office wanted to
17 do that.  We reached out to them.
18     We made a number of presentations to local
19 field offices by way of the DRAs.  I'm not sure
20 exactly how many.  But we did do that.  And,
21 actually, the document that I reviewed with
22 Mr. Kennedy earlier, I think is actually a copy of
23 the document we shared with the local field offices.
24     Q.   And did you get any feedback from
25 those local field offices that reached you about the

Page 405

1  2008 -- or about the CSMP that McKesson put in place
2  in 2008?
3      A.   I didn't get any specific feedback
4  from the field office personally.  The DRAs reported
5  a generally positive response, again, not unlike like
6  what we experienced in Washington, D.C.
7      Q.   You've described your meeting at the
8  headquarters and then the DRAs' meetings that
9  occurred at local field offices.  What, if any, other
10 interactions did McKesson have on an ongoing basis
11 with DEA and its distribution centers?
12     A.   Well, throughout this process, there
13 is what I would call a lot of business as usual
14 interactions that McKesson distribution centers had
15 with the local field offices.  Inquires around DEA
16 registrations of pharmacies, you know, around
17 expiration dates.  Those are always a problem with
18 the DEA.
19     If there was a report -- there needed to be
20 a report of a theft or a loss, you know, questions
21 around -- and procedural things, in particular around
22 the paperwork, the ARCOS reporting.  And the
23 paperwork required with that sometimes can be
24 confusing.  So there's an ongoing relationship, just
25 an interactive relationship.

Page 406

1    Additionally, the DEA continued to conduct
2 their cyclical audit. A cyclical audit is where the
3 DEA comes in unannounced and inspects the
4 distribution center in a number of different areas,
5 primarily around the recordkeeping, the security of
6 the controlled substances, the handling, reviewing
7 the associates that are authorized to handle
8 controlled substances. All of that is part of the
9 normal cyclical audit.
10    Q.    And what would happen if DEA found an
11 issue during one of those cyclical audits?
12    A.    Excuse me. There was an Audit Report
13 that was generated out of each one of the audits. If
14 there were actions that needed to be taken by
15 McKesson to correct anything that they identified in
16 the audit, virtually all the time that I can recall,
17 those were fairly minor issues. They were more what
18 I would call procedural.
19    We made the procedural adjustments and
20 reported back to DEA the changes that we made.
21    Q.    Mr. Walker, from 2008, when the CSMP
22 was put into place, to 2012, do you know how many
23 Suspicious Order Reports about customers were
24 reported to the DEA by McKesson?
25    A.    My recollection is that we were

Page 407

1 somewhere in the area of 35 to 40 different
2 pharmacies that we reported and generated suspicious
3 order reporting to DEA.
4    Q.    Did you do any analysis to total that
5 number?
6    A.    We did -- we did tally up the -- and
7 provide a report.
8    And the report only reflected, you know,
9 what we report at the DEA. What is not and was not
10 reported, because it was not a requirement to report
11 or tallied, was the number of pharmacies that we
12 elected not to do business with during our initial
13 due diligence of a potential new customer. And that
14 number of pharmacies was significantly higher than
15 the 40 that we reported to the DEA.
16    MS. HENN: Let's just mark quickly another
17 exhibit, defense Exhibit 812.
18    THE REPORTER: 813.
19    MS. HENN: 813, thank you.
20    (Exhibit No. 813 was marked.)
21 BY MS. HENN:
22    Q.    Mr. Walker, I hand you Defense
23 Exhibit 813, Bates No. MCK-WVA-230.
24    Do you recognize that document?
25    A.    Yes, I do.

Page 408

1    Q.    What is it?
2    A.    This is a -- an email to Barbara
3 Boockholdt at DOA -- or excuse me, DEA, that
4 summarizes some actions that we -- and responses that
5 we made -- needed to make to them during our meeting
6 with DEA in January of 2012. We had a separate
7 meeting with DEA.
8    We -- they had indicated that we had only
9 submitted two Suspicious Order Reports. Again, this
10 was very much a surprise to us. We had no indication
11 whatsoever from DEA that the suspicious order
12 reporting was not reaching them.
13    We went back to summarize and identify all
14 the customers that we could identify in our system
15 that we had identified as having suspicious activity
16 and suspicious orders in which we had ceased selling
17 controlled substances to, summarized those to her and
18 reported back, you know, the -- so that she had some
19 record, specific record of actions that we had taken.
20    Q.    And is that list attached to your
21 email in Exhibit 813?
22    A.    Yes. It's on the last page of that
23 exhibit.
24    Q.    Mr. Walker, you were asked by
25 Mr. Kennedy about -- I think you referred to them as

Page 409

1 RNA chains, retail national accounts, like Rite Aid
2 and CVS. Could you describe how McKesson performed
3 due diligence on orders by chain pharmacies.
4    A.    McKesson, as we had clearly indicated
5 in our program, was going to utilize the regulatory
6 and loss control -- loss control security -- they all
7 had different names for them -- teams at the various
8 chains.
9    In our interaction -- in our business
10 interactions with the retail national accounts, they
11 all had very strong centralized control of their
12 pharmacies and their inventories, and we wanted to
13 leverage the resources to -- they had to help us with
14 understanding, know your customer.
15    And, again, our view was if you understood
16 how one retail national account pharmacy operated in
17 a given chain, they all fundamentally operated the
18 same way because of the heavy centralized control
19 that they had.
20    Q.    Mr. Walker, how would you
21 characterize McKesson's efforts to comply with its
22 regulatory responsibilities?
23    A.    I would -- I would -- I would say
24 that it is a core competency and something that
25 individuals, particularly in our operations group,

Page 410

1   get at the very beginning of their career.  You know,
2   both our hourly associates, but especially our
3   management teams.  So because we're so regulated,
4   compliance is a key component of what we do.  And
5   performance is based on that.  There's -- if there's
6   issues that are there, it can affect the individual's
7   performance reviews.
8        So from a cultural standpoint, we strive
9   to -- you know, strive to be -- or strive to be, and
10  I believe continue to strive to be, a very compliant
11  organization and accept that responsibility readily.
12       MS. HENN:  Thank you very much, Mr. Walker.
13  I have no further questions.
14       Do you mind if we take a break?  It's been a
15  long time.  Let's go off the record, please.
16       THE VIDEOGRAPHER:  We are going off the
17  record.  The time is 7:14 p.m.
18       (Recess taken.)
19       THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 7:38 p.m.
21            FURTHER EXAMINATION
22  BY MR. KENNEDY:
23       Q.   Mr. Walker, this is Eric Kennedy.
24  I'm allowed to ask you some questions in response to
25  the questions that your lawyer asked you a few

Page 411

1   moments ago; all right?
2        A.   I understand that.
3        Q.   And I'm going to try to keep it brief
4   because I know it's late in the day.
5        One of the things that you were shown by
6   McKesson's lawyer was Defense Exhibit 804.  And that
7   was a January 18, 2006, letter written by a gentleman
8   at McKesson to the DEA.  It was written by Paul
9   Julian.  Do you remember that?  Do you remember
10  talking about that?
11       A.   Yes.
12       Q.   And in that -- and this is in regard
13  to the fact that the DEA was -- was unhappy with
14  McKesson with respect to distributing large amounts
15  of hydrocodones to Internet pharmacies; do you recall
16  that?  That's what this letter was basically about?
17       MS. HENN:  Objection to form.
18       THE WITNESS:  I'm trying to find it.  But
19  my -- my -- there it is.
20       My understanding of the letter was a
21  response specifically to Mr. Rannazzisi concerning
22  issues that were raised in the meeting, and
23  Mr. Julian representing McKesson's response to that.
24  BY MR. KENNEDY:
25       Q.   All right.  And you -- actually, I

Page 412

1   think you read a footnote on page -1362 of the letter
2   written to the DEA.  Do you remember reading that
3   footnote?
4        MS. HENN:  Objection to form.
5   BY MR. KENNEDY:
6        Q.   Sir, do you remember reading that
7   footnote?
8        A.   Counselor, I remember describing the
9   content of the footnote.  I don't remember that -- I
10  don't recall that I read it specifically.  I just
11  want to be clear.
12       Q.   All right.  This -- this footnote
13  basically outlines an explanation from McKesson as to
14  why it filled an order of 99,000 doses to United
15  Prescription Services on October 21, 2005; is that
16  what that footnote talks about?
17       A.   Yes, that's what's written there.
18       Q.   And McKesson's excuse and explanation
19  to the DEA was that there was a hurricane, Hurricane
20  Wilma, and that's why we sent 99,000 doses to United
21  Prescription; right?  Is that what that says?
22       A.   That's what is noted, yes.
23       Q.   And my question is, if this is
24  McKesson's explanation to the DEA with respect to
25  99,000 dosages, what was McKesson's explanation for

Page 413

1   the other seven million dosages that the DEA was
2   unhappy about?  The other seven million, what was
3   their explanation on those?
4        A.   I don't recall that there was any --
5   any specific response that McKesson provided
6   regarding any other dosages or shipments that the DEA
7   covered.
8        MR. KENNEDY:  Could you give me 686,
9   Exhibit 686.
10       Q.   And this is the Settlement Agreement
11  with respect to the Internet pharmacy dosages; right?
12       I'm going to pull it up so we can look at
13  it.
14       MS. HENN:  Well, he may want it.
15  BY MR. KENNEDY:
16       Q.   If you will go to the second page of
17  that Settlement Agreement.
18       A.   I got it.
19       MS. HENN:  Great.
20  BY MR. KENNEDY:
21       Q.   And so the DEA, the conduct that they
22  were talking about was three million dosages to
23  Maryland; right?  In Maryland, three million doses.
24  2.1 million into Florida.  2.6 million into Texas.
25  824,000 into Utah.  Right?

Page 414

1    I mean, that's what this DEA settlement was
2  all about for conduct in '04, '05, and '06; right?
3  Correct?
4    A.    This settlement covered the
5  allegations that DEA made.  So yes.
6    Q.    My question is, you sent the DEA a
7  letter explaining that it was a hurricane that caused
8  you to send $99,000.  What was McKesson's explanation
9  to the DEA about the other seven million?
10   MS. HENN:  Objection to form.
11   THE WITNESS:  Counsel, I don't believe that
12 we made any specific response on any other quantity
13 allegations.  I do note that the letter from
14 Mr. Julian to Mr. Rannazzisi was in October of --
15 where's the letter just real quick?
16   MS. HENN:  This one.
17   THE WITNESS:  Was in January of '06.  So
18 what I'm not -- don't recall is what information we
19 had at hand in terms of the number of doses that the
20 DEA was alleging at that time.
21 BY MR. KENNEDY:
22   Q.    Well, my question is, why did you --
23 why did you show us an explanation for 99,000 when,
24 in fact, the alleged conduct involved over seven
25 million dosages?

Page 415

1    A.    Again --
2    MS. HENN:  Objection to form.
3    Go ahead.
4    THE WITNESS:  It's really two different --
5  in my view, it's two different pieces of information.
6    The letter is in direct response to items
7  that were outlined as -- as we understood them in the
8  January '06 meeting.  The settlement and the
9  allegations in the settlement, to my recollection,
10 not all of those were shared with us during the
11 course of the meeting that we had with
12 Mr. Rannazzisi.
13   So the best way I can answer the question is
14 this is a direct response to Mr. Rannazzisi around
15 the issues that he personally raised in that January
16 '06 meeting.
17 BY MR. KENNEDY:
18   Q.    All right.  We're sitting here today,
19 now it's way, way later.  Tell me the explanation
20 that was provided for the other seven million
21 dosages, other than 99,000?  What was provided?
22   MS. HENN:  Objection to form.
23   THE WITNESS:  Counsel, I do not believe --
24 as I stated, I don't believe that we had any other
25 specific response to DEA.

Page 416

1  BY MR. KENNEDY:
2    Q.    Between 2000 and 2005, you said you
3  were out of Regulatory for that period of time, and
4  what was your job?
5    A.    I was -- I can't remember my specific
6  title, but I was the Senior Vice President overseeing
7  Six Sigma.
8    Q.    And what did that involve?  Did that
9  involve regulation of controlled substances?
10   A.    Not at all.
11   Q.    Not at all.
12   How many meetings with the DEA did you go to
13 between 2000 and 2005?
14   A.    None.
15   Q.    How many DEA seminars did you go to
16 between 2000 and 2005?
17   A.    None that I remember.
18   Q.    How many regulatory meetings did you
19 go to at McKesson between 2000 and 2005 with respect
20 to controlled substances?
21   A.    I don't recall going to any.
22   Q.    So when you said that in January of
23 '06 this was the first time that Mr. Rannazzisi of
24 the DEA made certain representations to you with
25 respect to the responsibilities, you had not been

Page 417

1  involved with Regulatory for five years; is that
2  correct?
3    A.    I had not been directly involved with
4  Regulatory during that time frame.
5    Q.    Now, there was a lot of time spent in
6  your questioning about a meeting that you had with
7  the DEA in July of 2008.  Do you remember all those
8  questions about a meeting with the DEA and the
9  presentations that you made to the DEA and McKesson
10 made to the DEA with respect to its 2008 Controlled
11 Substances Monitoring Program?  Do you recall all
12 those questions?
13   A.    Yes.
14   Q.    And I think you went through great
15 details.  We told the DEA we're going to do this.  We
16 told them the monitoring program would include this.
17 And this was all about the program that you were
18 going to implement in 2008; correct?
19   A.    Yes, it was about the program that we
20 were implementing.
21   Q.    And I wrote it down.  I think you
22 said that by their body language, you thought that
23 the DEA was satisfied with the monitoring program
24 that you were going to implement in 2008; correct?
25 Do you remember saying that?

Highly Confidential - Subject to Further Confidentiality Review

Page 418

1    A.    I believe that was my testimony.
2    Q.    Well, let me -- let me ask you:  Your
3  monitoring program, the McKesson monitoring program
4  that you outlined for the DEA at that meeting in
5  2008, could we agree that that monitoring program
6  isn't going to be of any use unless you follow it;
7  right?
8    A.    I would agree that it was certainly
9  our intent and our commitment that we would execute
10  our Controlled Substance Monitoring Program and
11  explained that to DEA.
12    Q.    Right.  And can we agree, just
13  because you write a monitoring program on paper, put
14  it into a heading of, this is our Controlled
15  Substances Monitoring Program and show it to the DEA,
16  just because it's on the paper doesn't mean it's
17  going to be effective or work unless you follow it;
18  right?  You've got to follow it?
19    A.    The monitoring program that we
20  presented, we applied and we followed.
21    Q.    Sir, would you answer my question,
22  please.  The monitoring program you put on paper is
23  of no effect, it's no good to anybody unless you
24  follow it; is that true?
25    A.    I wouldn't agree with that statement.

Page 419

1  Clearly, the monitoring program that we put in place,
2  we executed against and continued to provide the
3  regulatory recite of controlled substances.
4    MS. HENN:  Counsel, I'm going -- we're going
5  to need to go off the record so the court reporter
6  can get her car out of the garage.
7    THE VIDEOGRAPHER:  We are going off the
8  record.  The time is 7:50 p.m.
9    (Off the record.)
10    THE VIDEOGRAPHER:  We are back on the
11  record.  The time is 7:58 p.m.
12  BY MR. KENNEDY:
13    Q.    Mr. Walker, we were talking about the
14  representations that you made to the DEA with respect
15  to the monitoring program that you were going to put
16  into place in 2008.  And I asked you, if you -- could
17  you agree that putting a monitoring program on paper
18  and representing to the DEA at your meeting with the
19  DEA back in 2008 -- representing to them everything
20  that you were going to do in this written monitoring
21  program, can we agree that that does no one any good,
22  it doesn't work unless you actually follow your
23  program?  Agreed?
24    A.    What I think my response -- what I
25  can agree to is that we put the program in place, and

Page 420

1  we executed that program, as described, and with the
2  intent and certainly the execution to ensure that we
3  were meeting our regulatory requirements.
4    Q.    But if you don't execute, the paper
5  doesn't do anybody any good; correct?
6    MS. HENN:  Objection.  Asked and answered.
7    THE WITNESS:  I wouldn't characterize it --
8  again, I -- the program was in place.  We were
9  diligent in executing against the program.
10  BY MR. KENNEDY:
11    Q.    Let's look at how diligent you were
12  in executing, then.  Let's look at Exhibit 730, if we
13  could.
14    MR. ASQUITH:  It's a new one.
15    MS. HENN:  Do you have a copy?  That's the
16  only copy.
17    Oh, this is an exhibit you withdrew.  There
18  you go.
19    (Exhibit No. 730 was marked.)
20  BY MR. KENNEDY:
21    Q.    Pursuant to your agreement and your
22  communication to the DEA and your monitoring program,
23  there should be Level 1 Reviews when a pharmacy
24  orders over their threshold; correct?  Is that
25  correct, sir?

Page 421

1    A.    There -- in orders that went over the
2  threshold, a Level 1 Review was -- was called out.
3    Q.    That's what should be done under the
4  program; right?
5    A.    That's correct.
6    Q.    And you represented that to the DEA
7  at your meeting in 2008?  If somebody omits, meaning
8  they order over the threshold, there will be a
9  Level 1 Review; correct?
10    MS. HENN:  Objection to form.
11    THE WITNESS:  What I represented to the DEA
12  and reviewed with them is that as a -- if somebody
13  exceeded a threshold, we would conduct a Level 1
14  Review.
15  BY MR. KENNEDY:
16    Q.    Exhibit 730 is an audit done by
17  McKesson in March of 2011.  Is that what it says on
18  the cover page, March of 2011 Audit Report?
19    A.    Yes.
20    Q.    If you go to page -498069.  Do you
21  see that?  "Level 1 Forms," do you see that title?
22  Level 1 Forms.
23    A.    Yes.
24    Q.    Delran, what is that?  Is that one of
25  your distribution centers?

Page 422

1      A.    Delran, New Jersey was one of our
2  distribution centers.
3      Q.    Under that it says:
4      (Reading) Omit Reports were not being
5      signed by DC management as required by
6      policy.  In addition, the required
7      Level 1 forms were not completed for
8      20 of 56 omits in July 2010, and all
9      54 omits for the month of November
10     2010 (end of reading).
11     Did I read that right?
12     A.    Yes.
13     Q.    This policy is no good unless you
14 follow it.  Can you agree with that?  No good unless
15 you follow it?
16     MS. HENN:  Objection to form.
17 BY MR. KENNEDY:
18     Q.    Is that agreeable?
19     A.    I don't agree with that statement.
20     What I would agree with is that we had, as
21 part of our control substance, any threshold that
22 generated a Level 1 Review needed to take place.  My
23 interpretation of and review of this document is that
24 we failed to complete the paperwork associated with
25 that.

Page 423

1      Q.    Now, New Castle.  This is another
2  distribution center; right?
3      A.    Yes.
4      Q.    Under that one it says:
5      (Reading) The Omit Reports were not
6      being signed by DC management as
7      required by policy.  In addition, the
8      required Level 1 forms were not
9      completed for 21 of 31 -- 30 omits in
10     July 2010, and 20 of 27 omits in
11     November 2010 (end of reading).
12     Did I read that right?
13     A.    Yes, you read it correctly.
14     Q.    Washington Court House, is that
15 another distribution center?
16     A.    Yes, it is.
17     Q.    Does that say:
18     (Reading) the required Level 1 forms
19     were not completed for all 19 omits in
20     July 2010, and all 11 omits in
21     November (end of reading).
22     Is that what that says about that
23 distribution center?
24     A.    Yes.
25     Q.    Conroe, on the next page.  That's

Page 424

1  another distribution center; is it not?
2      A.    Yes, it is.
3      Q.    Does that state:
4      (Reading) The Omit Reports were not
5      signed and dated by management as
6      required by policy.  In addition,
7      Level 1 forms were not completed for
8      July and November 2010 omits.  CSMP
9      Excursion contract forms were used in
10     place of Level 1 forms, although 22 of
11     35 omits in July and 17 out of 35
12     omits in November didn't have any
13     completed documentation (end of
14     reading).
15     Did I read that right?
16     A.    Yes, you read that correctly.
17     Q.    And let me ask you, when you had your
18 meeting with the DEA in 2008 to outline your
19 Controlled Substance Monitoring Program for them, did
20 you tell them that you would have sales reps doing
21 the Level 1 investigations?  Did you tell them that?
22     MS. HENN:  Objection to form.
23     THE WITNESS:  I don't recall that we
24 specified who would conduct the Level 1 Reviews.
25 ///

Page 425

1  BY MR. KENNEDY:
2      Q.    You told them, did you not -- you
3  described to them that you would have a system
4  whereby pharmacies could request an increase in their
5  threshold.  Did you tell that to the DEA, that that
6  would be part of your program, pharmacies could
7  request increases in their threshold?
8      MS. HENN:  Objection to form.  Lacks
9  foundation.
10     THE WITNESS:  Yes, that was --
11 BY MR. KENNEDY:
12     Q.    And in your PowerPoint you
13 specifically represented, did you not, that if you
14 were going to increase the threshold, it would
15 require documentation?
16     A.    Let me make sure I understand what
17 page you're referring to.
18     Q.    Mine aren't numbered.
19     A.    Okay.
20     MS. HENN:  They are.  Bottom right.  Tiny,
21 tiny number.
22     MR. KENNEDY:  Oh, I'm sorry.  Seven.
23     THE WITNESS:  Seven.
24 BY MR. KENNEDY:
25     Q.    Slide No. 7 you created.

Page 426

1 Did you tell the DEA if you were going to
2 adjust the threshold, it would require documentation?
3     A. That's what I covered with the DEA in
4 that meeting.
5     Q. Did you tell them that you would be
6 giving threshold -- giving threshold increases for
7 reasons such as Thanksgiving? Did you tell them
8 that?
9     A. We didn't have any discussion in that
10 meeting around reasons for increases.
11     Q. Did you tell them in that meeting
12 that you would be increasing thresholds 30 stores at
13 a time for chain pharmacies? Did you tell them that?
14     A. Again, we had no discussion on the
15 reasons that we would be increasing thresholds.
16     Q. Did you tell them that you would be
17 increasing thresholds for CVS without explanation for
18 CVS? Did you tell them that?
19     A. In that meeting we had no discussion
20 around increases or how we would increase thresholds.
21     Q. Did you tell them, that in the system
22 that you would be implementing, that customers would
23 be told that they could expect a decision on a
24 threshold increase within one day? Did you tell them
25 that?

Page 427

1     MS. HENN: Objection to form. Lacks
2 foundation.
3     THE WITNESS: Again, I don't recall any
4 discussion around the specifics of how we would grant
5 increases in thresholds.
6 BY MR. KENNEDY:
7     Q. Did you tell them that this system
8 would be such that McKesson would tell pharmacies
9 that if they requested an increase, that they could
10 presume that that threshold increase was granted and
11 approved unless they heard otherwise?
12     MS. HENN: Objection to form.
13 BY MR. KENNEDY:
14     Q. Did you tell the DEA that that's the
15 kind of system that you would implement?
16     MS. HENN: Lacks foundation.
17     THE WITNESS: Counsel, we had no discussion
18 around our methodology of threshold increases.
19 BY MR. KENNEDY:
20     Q. Did you tell them that you would be
21 increasing thresholds on a permanent basis because of
22 a holiday season? Did you tell them that?
23     MS. HENN: Objection to form. Lacks
24 foundation.
25     THE WITNESS: Again, Counsel, we -- at that

Page 428

1 meeting we just -- we did not have any discussions
2 around the details of threshold increases, nor were
3 there any questions asked.
4 BY MR. KENNEDY:
5     Q. And, sir, you went all through this
6 discussion with the DEA about how you were going to
7 report suspicious orders to them; did you not?
8     MS. HENN: Objection to form.
9     THE WITNESS: We -- we covered with them the
10 process and how we would -- and when we would report
11 suspicious orders based on our three-tiered review
12 process.
13 BY MR. KENNEDY:
14     Q. But, again, if you don't follow your
15 own policies that you put in writing, they don't do
16 anybody any good, do they, unless you follow them;
17 right?
18     A. We followed our policies as we
19 outlined.
20     Q. Sir, do you understand that in
21 Cuyahoga County, Ohio between 2008 and August of
22 2013, there were 481 times that one of your customers
23 ordered over their threshold? Do you understand
24 that?
25     MS. HENN: Objection to form. Lacks

Page 429

1 foundation.
2     THE WITNESS: I have no knowledge of all of
3 the pharmacies in that county.
4 BY MR. KENNEDY:
5     Q. Well, do you understand that of the
6 400 times they ordered over their threshold, not one
7 single report was ever made to the DEA? Do you know
8 that?
9     MS. HENN: Objection to form. Lacks
10 foundation.
11 BY MR. KENNEDY:
12     Q. Do you know that?
13     A. I don't know that.
14     Q. Do you know that in Summit County,
15 Ohio, between 2008 and August of 2013, there were 517
16 occasions where a McKesson customer ordered over
17 their threshold and not one single report was made to
18 the DEA? Do you understand that?
19     MS. HENN: Objection to form. Lacks
20 foundation.
21     THE WITNESS: Again, I have no specific
22 knowledge of pharmacies in either one of those
23 counties.
24 BY MR. KENNEDY:
25     Q. Is Landover one of your distribution

Page 430

1 centers, sir?
2     A.   Landover was one of our distribution
3 centers. It closed in 2012, I believe.
4     Q.   And this comes from the DEA, so you
5 should be aware of this.
6     Are you aware of the DEA finding that
7 between May of 2008 and July of 2011, over a
8 three-year period, McKesson from the Landover
9 Distribution Center did not report one single
10 suspicious order to the DEA? Are you aware of that
11 finding by the DEA?
12     MS. HENN: Objection to form. Lacks
13 foundation.
14     THE WITNESS: I have no -- no knowledge of
15 that.
16 BY MR. KENNEDY:
17     Q.   You didn't receive the report from
18 the DEA making that statement, sir?
19     MS. HENN: Objection to form. Lacks
20 foundation.
21     THE WITNESS: I don't recall receiving any
22 report or information specific to that.
23 BY MR. KENNEDY:
24     Q.   Livonia, is that a distribution
25 center of McKesson?

Page 431

1     A.   Yes, it is.
2     Q.   In Michigan?
3     A.   Michigan.
4     Q.   Do you understand that the DEA found
5 that for a five-year period, not one suspicious order
6 was reported to the DEA by that distribution center?
7     MS. HENN: Objection to form.
8 BY MR. KENNEDY:
9     Q.   Are you aware of that?
10     MS. HENN: Lacks foundation.
11     THE WITNESS: Again, Counsel, I have no
12 knowledge or specific recollection of that.
13 BY MR. KENNEDY:
14     Q.   You didn't review the documentation
15 sent to the DEA with that finding, sir?
16     MS. HENN: Objection to form. Lacks
17 foundation.
18     THE WITNESS: I -- I don't remember.
19 BY MR. KENNEDY:
20     Q.   Lakeland, Florida, that's a
21 distribution center; correct?
22     A.   Yes.
23     Q.   Are you aware of the DEA finding that
24 for a five-year period, not a single suspicious order
25 was reported to the DEA from that distribution

Page 432

1 center?
2     MS. HENN: Objection to form. Lacks
3 foundation.
4     THE WITNESS: Again, absent the
5 documentation, I don't remember any specific report
6 on that.
7 BY MR. KENNEDY:
8     Q.   Metheun, Massachusetts, is that
9 another distribution center?
10     A.   Yes, it is.
11     Q.   Did you review the DEA documentation
12 sent to McKesson that between '08, 2008 and 2013, not
13 one single suspicious order was reported to the DEA
14 out of that distribution center?
15     MS. HENN: Objection to form. Lacks
16 foundation.
17     THE WITNESS: I don't have any recollection
18 of reviewing any documents summarizing that.
19 BY MR. KENNEDY:
20     Q.   And, sir, you've told us that
21 McKesson diligently, aggressively applied the 2008
22 Controlled Substances Monitoring Program; is that
23 what you've told us?
24     A.   Yes, that was my testimony.
25     Q.   Sir, didn't McKesson get fined

Page 433

1 $150 million by the DEA because of their failures
2 with respect to the 2008 program, leading all the way
3 up from 2008 and '09, '10, '11, '12, '13, '14, '15,
4 '16, and '17? $150 million.
5     MS. HENN: Objection to form.
6 BY MR. KENNEDY:
7     Q.   Do you recall that, sir?
8     MS. HENN: Objection to form. Lacks
9 foundation. Mischaracterizes.
10     THE WITNESS: All that I'm aware of is
11 that -- and because it was public information, is
12 that McKesson paid $150 million. I don't understand
13 any of the details of the settlement, of the
14 documentation, because all of it occurred after I
15 left the company.
16 BY MR. KENNEDY:
17     Q.   When did you leave the company?
18     A.   In June of 2015.
19     Q.   And the DEA fine of $150 million
20 involved conduct from '08 to '15, while you were the
21 head of Regulatory; do you understand that?
22     MS. HENN: Objection to form. Lacks
23 foundation.
24     THE WITNESS: Again, Counsel, I was not here
25 when they -- all of that was finalized and completed.

Page 434

1 So I don't understand what was in the allegations
2 presented by the DEA.
3     MR. KENNEDY: Give me P.88, please. This is
4 Exhibit 814.
5         (Exhibit No. 814 was marked.)
6 BY MR. KENNEDY:
7     Q. If you will look at that very last
8 page. Do you see that this is dated 1-5-17, at least
9 the signatures, one of the signatures? 1-5-17, it's
10 on the back cover.
11     A. Yes.
12     Q. If you look at the front cover, the
13 front page, is this titled, "Administrative
14 Memorandum Agreement?
15     A. Yes, it is.
16     Q. And does the first paragraph say:
17     (Reading) The Administrative
18     Memorandum Agreement is entered into
19     by and between the United States
20     Department of Justice, Drug
21     Enforcement Administration, and
22     McKesson Corporation (end of reading)?
23 Is that what it says?
24     A. Yes.
25     Q. And if you'll go to page 88.3 up at

Page 435

1 the -- up at the top. And look at No. 2. Does No. 2
2 say, "Acceptance of Responsibility"?
3     A. Yes.
4     Q. That's acceptance of responsibility
5 by McKesson; isn't it, sir?
6     MS. HENN: Objection to form.
7 BY MR. KENNEDY:
8     Q. Is that what that means?
9     MS. HENN: Objection to form.
10     THE WITNESS: That's what it says, Counsel.
11 Quite honestly, I don't know under the legal terms of
12 a settlement agreement what that means. I don't have
13 the legal expertise.
14 BY MR. KENNEDY:
15     Q. Well, so what I'm -- can you explain
16 to me how you can come in here and tell us that
17 McKesson was diligent and aggressive in following and
18 implementing its 2008 agreement, and you haven't read
19 the settlement covering that same period of time with
20 respect to the implementation of that program? How
21 can you -- how can you not have read this?
22     MS. HENN: Objection to form.
23     THE WITNESS: Counsel, I wasn't with the
24 company when -- to my knowledge, when this document
25 was -- was generated.

Page 436

1 BY MR. KENNEDY:
2     Q. How many hours have you spent with
3 McKesson's lawyer prior to today reviewing documents
4 and other materials in preparation for today's
5 testimony? How many hours, sir?
6     A. A number of them.
7     Q. How many, sir?
8     A. Five or six.
9     Q. And how many different days, sir?
10     A. How many different days?
11     Q. Yes.
12     A. Five or six.
13     Q. Five or six days?
14     A. Yes.
15     Q. And they never showed you this
16 document before you came in here to testify that
17 McKesson was aggressive and diligent in implementing
18 its policies? You were never shown this?
19     A. In reviewing this document, I think
20 it was shown. This document, I believe, we did not
21 cover in detail.
22     Q. Well, under "Acceptance and
23 Responsibility," go down about four or five lines
24 down in the middle where the sentence starts with,
25 "McKesson."

Page 437

1     Does it state:
2     (Reading) McKesson acknowledges that,
3     at various times during the period
4     from January 1, 2009, up through and
5     including the effective date of this
6     agreement (the covered period of
7     time), it did not identify or report
8     to DEA certain orders placed by
9     certain pharmacies which should have
10     been detected by McKesson as
11     suspicious based upon the guidance
12     contained in the DEA letters about the
13     requirements set forth in 21 C.F.R
14     1301.74(b) and 21 U.S.C 842(a)(5)
15     (end of reading)?
16     Do you see where it states that McKesson
17 acknowledged those failures; sir? Is that what it
18 states?
19     MS. HENN: Objection to form.
20     THE WITNESS: That's what the document
21 states.
22 BY MR. KENNEDY:
23     Q. Look down to the next paragraph, if
24 you would. About five lines down it starts with
25 "McKesson." Do you see that?

| Page 438 |
| --- |

1    A.   Yes.

2    Q.   Does it state, again:

3    (Reading) McKesson acknowledges that,

4    at various times during the covered

5    time period, it did not identify or

6    report to DEA certain orders placed by

7    certain pharmacies which should have

8    been detected by McKesson as

9    suspicious in a manner fully

10    consistent with requirements set forth

11    in the 2008 Memorandum of

12    Understanding (end of reading)?

13   Is that what it states?

14    A.   That's -- yes, that's what it states.

15    Q.   Covered conduct, No. 3, A.  Does it

16   state:

17    (Reading) McKesson failed to maintain

18    effective controls against diversion

19    of particular controlled substances

20    into other than legitimate medical,

21    scientific, and industrial channels by

22    sales to certain of its customers in

23    violation of the Controlled Substance

24    Act and the Controlled Substance Act's

25    implementing regulations (end of

| Page 439 |
| --- |

1    reading)?

2   Does it say that?

3    A.   Yes.

4    Q.   And then does it outline the

5   different distribution centers where these failures

6   occurred, sir?

7    MS. HENN:  Objection to form.

8   Mischaracterizing the document.

9   BY MR. KENNEDY:

10    Q.   Does it outline the distribution

11   centers where this conduct occurred?

12    MS. HENN:  Same objection.

13   BY MR. KENNEDY:

14    Q.   Does it, sir?

15    A.   Just a minute.

16   What I -- what I read is that the

17   distribution centers listed there -- it said at

18   McKesson -- at the distribution centers, including

19   the following, with the list of distribution centers

20   that are down below.

21    Q.   Right.  Distribution center --

22   McKesson Distribution Center in Colorado, Illinois,

23   New Jersey, Wisconsin, Florida, Maryland, Nebraska,

24   Michigan, Massachusetts, and California; correct?

25    A.   That's what's written in the

| Page 440 |
| --- |

1   document.

2    Q.   And, sir, is it still your testimony

3   that McKesson was aggressive in its implementation of

4   its own Controlled Substances Monitoring Program?  Is

5   that still your testimony, sir?

6    A.   Yes, it is.

7    Q.   Let's look to the next page.  If we

8   look at C, this was specific to what you've been

9   telling us.  Does it state on C:

10    (Reading) McKesson failed to follow

11    the procedures and policies set forth

12    in the McKesson CSMP to detect and

13    disclose suspicious orders of

14    controlled substances (end of

15    reading)?

16   Is that what it states, sir?

17    A.   Yes, that's what the document states.

18    Q.   Does it next state:

19    (Reading) Among other things, McKesson

20    failed to conduct adequate due

21    diligence of its customers, failed to

22    keep complete and accurate records of

23    the CSMP files maintained for many of

24    its customers, and bypassed suspicious

25    order reporting procedures set forth

| Page 441 |
| --- |

1    in McKesson's CSMP (end of reading)?

2   Did I read that right?

3    A.   You read that correctly.

4    Q.   And, sir, could we agree -- and I'm

5   only going to ask you one more time.  Could we agree

6   that writing a policy, putting it on paper, meeting

7   with the FDA [sic] and saying these are our policies,

8   that doesn't do anybody any good unless you follow

9   your own policies?

10    MS. HENN:  Objection to form.

11   BY MR. KENNEDY:

12    Q.   Could we agree to that, sir?

13    A.   I don't agree with that statement.  I

14   strongly believe that we were executing and doing

15   everything in our capability that we could to manage

16   our Controlled Substance Monitoring Program.

17    Q.   And the FDA [sic] disagreed when they

18   fined you $150 million; correct?

19    MS. HENN:  Objection to form.

20    THE WITNESS:  Again, I'm not going to

21   speculate, because I wasn't involved in the process

22   of how that was negotiated and reached.

23    MR. KENNEDY:  I have nothing further.  Thank

24   you, sir.

25    MS. HENN:  We have no further questions

Highly Confidential - Subject to Further Confidentiality Review

| Page 442 |
|---|

1 either.

2    We have just two things to note.  We would

3 request that the transcript be designated highly

4 confidential pending review and further designations.

5    And we request that the witness have the

6 opportunity to read and sign.

7    Thank you very much.

8    THE VIDEOGRAPHER:  This concludes the video

9 deposition of Donald Walker, consisting of eight

10 media.

11    The time is 8:23 p.m.  We are off the

12 record.

13    (The deposition was concluded at 8:23 p.m.)

14       --o0o--

15

16

17

18

19

20

21

22

23

24

25

| Page 443 |
|---|

1    Please be advised I have read the foregoing

2 deposition, and I state there are:

3 (Check one)  _____NO CORRECTIONS

4       _____CORRECTIONS PER ATTACHED

5

6

7    _____

8    DONALD WALKER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| Page 444 |
|---|

1    DEPONENT'S CHANGES OR CORRECTIONS

2 Note:  If you are adding to your testimony, print the

3 exact words you want to add.  If you are deleting from

4 your testimony, print the exact words you want to

5 delete.  Specify with "Add" or "Delete" and sign this

6 form.

7 DEPOSITION OF:  DONALD WALKER

8 CASE:  IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION

9 DATE OF DEPOSITION:  JANUARY 10, 2019

10 PAGE    LINE    CHANGE/ADD/DELETE/REASON

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16 _____  _____  _____

17 _____  _____  _____

18 _____  _____  _____

19 _____  _____  _____

20 _____  _____  _____

21 _____  _____  _____

22 _____  _____  _____

23 _____  _____  _____

24 DEPONENT'S SIGNATURE _____

25 DATE_____

| Page 445 |
|---|

1    CERTIFICATE OF REPORTER

2    I, SANDRA BUNCH VANDER POL, a Certified

3 Shorthand Reporter, hereby certify that the witness in

4 the foregoing deposition was by me duly sworn to tell

5 the truth, the whole truth and nothing but the truth

6 in the within-entitled cause;

7    That said deposition was taken down in shorthand

8 by me, a disinterested person, at the time and place

9 therein stated, and that the testimony of the said

10 witness was thereafter reduced to typewriting, by

11 computer, under my direction and supervision;

12    That before completion of the deposition, review

13 of the transcript was requested.  If requested, any

14 changes made by the deponent (and provided to the

15 reporter) during the period allowed are appended

16 hereto.

17    I further certify that I am not of counsel or

18 attorney for either or any of the parties to the said

19 deposition, nor in any way interested in the event of

20 this cause, and that I am not related to any of the

21 parties thereto.

22 DATED:  JANUARY 14, 2019

23

      _____

      SANDRA BUNCH VANDER POL, CSR 3032

24

25